**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG    )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,    )
                                  )    Pensacola, Florida
                                  )    April 17, 2019
                                  )    9:17 a.m.
                                  )
                                  )
_____ )

**FIRST CASE MANAGEMENT CONFERENCE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
(Pages 1-60)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

**A P P E A R A N C E S**


FOR THE PLAINTIFFS:          **BRYAN F. AYLSTOCK, ESQUIRE**
                             **CAITLYN P. MILLER, ESQUIRE**
                             Aylstock, Witkin, Kreis & Overholtz
                             17 E Main Street, Suite 200
                             Pensacola, Florida  32502


FOR THE DEFENDANT:           **KIMBERLY BRANSCOME, ESQUIRE**
                             **F. CHADWICK MORRISS, ESQUIRE**
                             Kirkland & Ellis, LLP
                             333 South Hope Street
                             Los Angeles, California  90071

1          P R O C E E D I N G S

2          **THE COURT:**  Wow, I think we have set a record

3     for this courtroom.

4          Good morning, everyone.  I'm Judge Casey

5     Rodgers.  It's my pleasure to have you all here with

6     us this morning.  Of course, we're here for the first

7     case management conference in the 3M Combat Earplugs

8     Product Liability Litigation, that's Case No.

9     3:19md2885.

10          Has everyone been accommodated with a seat?

11     Do we have anyone out in the lobby or reception area?

12     No?

13          I do apologize about the space constraints.

14     As you've probably heard, we are undergoing a major

15     multi-year renovation of our courthouse across the

16     street, our main courthouse.  That is expected to be

17     substantially completed December of this year.

18          GSA -- or the contractor, Yates Construction,

19     has 60 days following that substantial completion date

20     to move us back into the courthouse.  We've been out

21     almost four years.  But we do expect to be in the main

22     courthouse in which we have much more space capability

23     there.  A nice, big ceremonial courtroom, which is the

24     courtroom that I utilize, will be available to us

25     hopefully by the end of February 2020.

1          But we are fortunate to have this beautifully

2     restored historic courthouse, and I do hope you all

3     are comfortable here.  There are a couple of seats

4     still in the jury box, if anyone wishes to come

5     forward.  Not many people take me up on that

6     invitation.  It looks a little bit like jury selection

7     out here this morning.

8          If at any time -- I just want to offer it --

9     if at any time during the MDL if you feel that we need

10    more space -- and I probably should have anticipated

11    it this morning, although I obviously didn't -- we do

12    have the ability to utilize our courthouse in

13    Tallahassee, which has plenty of space, if need be.

14    Otherwise, we'll be here until February and then we'll

15    be back across the street.  But I'm happy to meet you

16    in Tallahassee if that suits you all.

17         I'm going to take just a moment to introduce

18    you to some of the court personnel with whom you'll be

19    working with.  I don't know if you're already

20    acquainted with them.  Before I do that, though, let

21    me, for the record -- I'm not going to ask all of you

22    to introduce yourselves.  I have several dozen

23    attorneys here in the courtroom.  There are probably

24    many more appearing by telephone.  I think we would be

25    here most of the morning if I did that.  I will

1   identify or ask those at counsel table if you would

2   identify yourselves, please, for the record.

3          Mr. Aylstock, we'll start with you.

4      **MR. AYLSTOCK:**  Good morning, Your Honor.

5   Bryan Aylstock for the plaintiffs.  I'm joined by

6   Caitlyn Miller from our firm.

7          **THE COURT:**  Good morning.

8          And Ms. Branscome?  I know it's tight.

9      **MS. BRANSCOME:**  That's all right.

10          Good morning, Your Honor.  Kimberly Branscome

11   on behalf of 3M Company and Aearo Technologies, LLC.

12   And I'm joined by my colleague, Chad Morriss.

13          **MR. MORRISS:**  Good morning, Your Honor.

14          **THE COURT:**  Good morning.

15          First I'd like to introduce you to Magistrate

16   Judge Gary Jones.  Judge Jones is appearing by

17   videoconference.  He is appearing today with us.  He

18   is the assigned magistrate judge to this litigation,

19   and we're all very fortunate that he has agreed to

20   take on this litigation.  He played an indispensable

21   role in the *Abilify* MDL.  He is extremely efficient.

22   He was effective in helping to manage that litigation.

23   He is also very experienced and knowledgeable with

24   electronic discovery, ESI.  And we will be relying on

25   him for that and many other things in this litigation.

1           So good morning, Judge Jones, to you.  Happy
2    to have you here.
3           **JUDGE JONES:**  Good morning, everyone.  Glad
4    to be here.
5           **THE COURT:**  Seated to my immediate left is
6    Ms. Tevenia Jacobs.  She is the law clerk assigned to
7    this MDL, and we're all fortunate in that regard as
8    well because she is excellent.
9           Seated in front of me to my left is Ms. Susan
10   Simms.  Ms. Simms is a deputy clerk of the District
11   Court.  She serves as my courtroom deputy.  She's
12   available to you for any logistical issues that might
13   arrive.  She's also very involved with scheduling in
14   the MDL.  And so please meet her, introduce yourselves
15   to her, if you have not already.
16          To my right is Ms. Donna Boland.  Ms. Boland
17   is my court reporter, our official court reporter for
18   these proceedings.  If there are any special requests
19   that you have for real-time transcripts, that sort of
20   thing, or official transcripts, that is Ms. Boland's
21   responsibility, so please do introduce yourselves to
22   her because I'm sure you'll have those needs
23   throughout the litigation.
24          Mr. Leonard Thomas is our court security
25   officer.  He is obviously responsible for maintaining

1    security here in our courtroom, and he is responsible

2    for -- there he is -- for enforcing all of the Court's

3    orders here in the courtroom, although I don't think

4    that's going to be an issue in this litigation.

5         Finally, over here to my far left -- and

6    she'll be upset with me for introducing her -- is

7    Ms. Donna Bajzik.  Ms. Bajzik is the MDL coordinator

8    for our clerk's office.  In that role, she manages the

9    electronic docket for the MDL, and she has

10   responsibility for all of the day-to-day activity on

11   both the master and the individual case docket.  So if

12   you need any of that type of docket assistance, she

13   would be the one to contact.

14        And then, finally, she is not here in the

15   courtroom here this morning but she's indispensable to

16   me, and that is my judicial assistant, Ms. Kathy Rock.

17   You are free to contact her with any needs that may

18   arise that you have.  If you need to get word to me

19   about something, either Ms. Jacobs or Ms. Rock would

20   be who you would communicate with.  And Ms. Rock is

21   the one who typically would answer the chambers phone.

22        Once an MDL website for this MDL is up and

23   running -- and that's being worked on as I'm speaking

24   -- we'll be posting a list of the contact information

25   for the people that I've just introduced you to.

1           All right.  I'm going to switch gears now and
2    first I want to thank both sides for your
3    preconference submissions.  They were very helpful to
4    me in preparing for today's conference.

5           One thing that certainly I've learned from my
6    experience just as a judicial officer but also
7    specifically in the complex litigation realm with the
8    *Abilify* MDL is that there is no magic formula or
9    recipe for handling any MDL.  Every one is unique, has
10   its own unique challenges.  Approaches that may work
11   in one context do not necessarily fit or work in
12   another.

13          So I want you all to know that, while I will
14   draw on my experience from the *Abilify* litigation, I
15   recognize that this litigation is special and unique
16   in its own right, it has its own challenges, and I
17   will treat it as such, as unique litigation.

18          I also plan to listen to you all, and
19   hopefully we will collaboratively develop a case
20   management plan for this litigation.  All of you here
21   I know bring a wealth of experience and perspectives
22   to the table.  I'll be relying on you as we move
23   through this process.

24          I do see my role largely as a facilitative
25   role.  That is, I view it as my responsibility to get

you the information that you need to ultimately resolve these cases on the merits either here in the MDL or back in the transferor courts or to settle the matter.  And those are decisions that you all will make, but my role is to help facilitate that process.

I view every step that is taken in these consolidated proceedings designed to generate data points or information for you about the strengths and weaknesses of your respective positions and that will help you learn your case and ultimately decide how you wish to resolve that case.

So, in that spirit, I'm going to turn to the agenda items.  And I have my own checklist so I'm going to go down my own checklist.  It may not track the tentative agenda just perfectly, but I think it'll cover everything that we need to discuss.

And you'll hear me say this several times, but in the spirit of transparency I will share with you that this morning I did meet with Mr. Aylstock and Ms. Branscome prior to coming in this morning.

Let me start with the state of the MDL.  As you all know, the panel transfer order was entered on April 3rd, 2019.  And as I understand it, the state of the MDL right now is that we have 108 cases that are now pending.  Ten of those cases were originally filed

1    in this district prior to the transfer order.  Another

2    24 cases have been filed here in this district since

3    the transfer order.

4         I understand that there are a large number of

5    cases that are pending transfer at this time from the

6    panel.  The opposition period, though, has not yet

7    expired.

8         At this time, I don't have a firm grip on the

9    number of cases that we may ultimately be dealing with

10   in this litigation.  You all probably have a much

11   better idea of it than I do.  But no doubt, it will be

12   large.

13        I think I will ask, though, before I continue

14   along those lines, Mr. Aylstock, if you have any sense

15   of the size of the litigation at this time, have some

16   basis --

17        **MR. AYLSTOCK:**  As far as any individual

18   plaintiffs, I do know that many thousands, in fact

19   probably more than ten or 20,000, are already

20   represented, servicemen and women.  So I anticipate

21   this to be a very large MDL at the end of the day,

22   tens of thousands.

23        **THE COURT:**  And many are active duty; is that

24   correct?

25        **MR. AYLSTOCK:**  Some are active and some are

1   out of the service.

2           **THE COURT:**  But some are active?

3           **MR. AYLSTOCK:**  Yes.  There are a very select

4   few that are civilians who used the civilian version

5   as well.

6           **THE COURT:**  I saw that in your position

7   papers there is a firefighter, I believe, and then

8   also a tree trimmer, I believe I saw referenced to

9   outside of the majority of the cases being active duty

10  and former military veterans.

11          **MR. AYLSTOCK:**  That's correct, we do believe

12  that most will be military servicemen and women

13  plaintiffs in this case.

14          **THE COURT:**  All right.  Thank you.

15          And now I'd like to confirm with both you,

16  Mr. Aylstock, and Ms. Branscome the issue of

17  federal-state coordination and whether that's

18  something that I need to focus on at this point in the

19  MDL or do we expect the cases to all be in the MDL as

20  opposed to parallel state court proceedings.

21          Ms. Branscome?

22          **MS. BRANSCOME:**  Certainly, Your Honor.  We

23  have seen the majority of the state cases filed, as

24  you might expect, in Minnesota and Indiana.  We have

25  seen a few cases filed in Delaware, Pennsylvania,

1    perhaps one or two other states.  We have either

2    already removed or are in the process of removing

3    those cases to federal court.  We have a number of

4    bases for removal that will apply across future cases

5    that would be filed in state court.  So our

6    expectation is that the cases will all end up in

7    federal court and, absent some unforeseen reason, they

8    should be transferred into the MDL.

9         We do think state coordination, if it does

10   ever arise, would be essential, but we don't expect

11   any state litigation certainly to get out in front of

12   the MDL, nor do we think that, given the removals,

13   that that is necessarily an immediate priority,

14   although it is an important one if it were to arise.

15        **THE COURT:**  Thank you.  Am I correct, the

16   state cases, they were removed quickly, I think, so

17   there's no discovery that's been conducted in any of

18   those state cases?

19        **MS. BRANSCOME:**  That is correct.  The primary

20   basis of removal is the federal questions that are

21   involved which don't involve necessarily discovery.

22   There are some additional grounds that may, you know,

23   would potentially be susceptible to jurisdictional

24   discovery, but that has not become an issue.

25        There have been a few motions to remand, but

1   either they have been stayed or they were rendered

2   moot by the transfer.

3            THE COURT:   I'm aware of Minnesota and

4   Delaware, that there were those motions to remand that

5   were pending at the time of the transfer and they were

6   rendered moot by virtue of I believe my pretrial

7   order.  I believe that's correct.

8            MS. JACOBS:   Yes.

9            THE COURT:   Yes, I believe so.  And my

10  question would be to those plaintiffs if they'll be

11  refiling those motions here in the MDL.

12           MR. AYLSTOCK:   My understanding, Your Honor,

13  is that, yes, some motions to remand will be refiled

14  here.  And after leadership is established, perhaps

15  the Court would want to have a briefing schedule on

16  that, as it's the position of those individuals that

17  their cases should be in state court.

18            I do know that in Minnesota they have a

19  coordinated proceeding procedure.  They had one in the

20  mesh cases as well.  So I think at this point,

21  obviously Your Honor would need to take that under

22  advisement if in fact they are refiled pursuant to

23  your second pretrial order, which we anticipate.  But

24  I think we can probably set a briefing schedule after

25  leadership is established.

1         **THE COURT:**  All right, that will be fine.

2    Thank you.

3         And I did note the putative class actions

4    that are potentially tag-alongs.  There are six that

5    were filed in the Southern District of Florida, one in

6    the District of Columbia.  And my understanding is

7    that either they've been transferred or they will be

8    transferred into the MDL.

9         And my question is, and it's probably

10   premature, but whether you have had any discussions

11   before this conference about how those actions will

12   proceed in the MDL.  Again, this may be premature, but

13   it's something that we will need to discuss obviously.

14         **MR. AYLSTOCK:**  We haven't discussed that yet,

15   Your Honor.  I do agree with you it's premature for

16   really us to worry about those quite yet.  And I'm

17   sure whatever structure is established by Your Honor

18   we'll be able to deal with those in due course.

19         **THE COURT:**  All right.  I want to address an

20   issue of some pending motions.  There are several

21   motions now that are pending, *pro hac vice* motions.

22   In those motions the plaintiff attorneys who are

23   requesting PHV status have not identified a case in

24   which they are attorney of record, and not even

25   identified one that is anticipated to be transferred

into the MDL.  So without that information, those *pro hac* admissions won't be granted.  Only attorneys of record for individual cases that appear on our docket are eligible for that type of admission for purposes of the MDL.

Now, I don't want any attorney to be prevented from participating in the MDL while awaiting the transfer process, so I'm inclined to grant a temporary PHV status or admission to those attorneys, but that would be conditioned on them getting their case transferred to this district shortly thereafter, and there would be a time frame.  But I would need those motions refiled.

And I can enter an order that restates this. But those motions will be denied without prejudice to be refiled, in which case the attorneys need to identify the case in which they believe they are going to be attorney of record in before the MDL, if that makes sense.  I hope so.  So that will be more clear in a written order I'll enter likely later today or tomorrow.

As I said, we're in the process of developing a website for the 3M MDL, and that will be on our court's public website.  I plan is to include an overview of the case, certainly all relevant orders

 1    and filings, the contact information of pertinent

 2    court personnel, as I mentioned just a moment ago, as

 3    well as leadership counsel.  There are frequently

 4    asked questions and answers.  We had these posted on

 5    the *Abilify* website as well.  There's links to

 6    additional resources such as our local rules, copies

 7    of other relevant information, master and short form

 8    complaints.  And once there's a profile form, those

 9    types of things would be included on the website.

10         But I am open to any other suggestions.  You

11    all are well versed in MDL litigation and mass tort

12    litigation.  And if there's something else that you

13    think from prior experiences you've had in other

14    courts that would be helpful to add for our website,

15    then I would ask that you please share that with me.

16    I welcome that input from you.  I would like to make

17    it as user friendly as possible and as informative as

18    possible.

19         My pretrial order No. 2 required the parties

20    to familiarize or refamiliarize themselves with the

21    Manual for Complex Litigation, the 4th Edition.  That

22    needs to be adjusted now to ask you to refamiliarize

23    yourself with the Annotated Manual for Complex

24    Litigation.  That is the most recently updated manual

25    from 2017.  So that was an error on my part.  I should

1   have included that and wanted to make that clear that

2   that is what we'll be referencing.

3            Now, I want to talk broadly about leadership

4   and leadership structure, and then we'll get more into

5   the weeds.  Obviously we're not going to be

6   establishing the leadership structure today, but it is

7   obviously a top priority at this stage of the

8   litigation.  I have some thoughts about leadership for

9   this MDL, a rough vision.  But this is your

10  litigation, and I'm certainly open to hearing from you

11  all about your thoughts on leadership as well.

12           So I will draw on my experience from the only

13  other MDL that I've had, which was the *Abilify* MDL.

14  But I want you to know that this is not simply going

15  to be Abilify II or a repeat of *Abilify*.

16           What I did in that litigation was I solicited

17  applications for leadership positions and then

18  designed a leadership structure that I think worked

19  well for us in that litigation.  People were appointed

20  to leadership positions and then committees and

21  subcommittees.  I tried to involve as many people as I

22  felt were necessary for an effective management of

23  that litigation.  So I intend to do the same here.

24           The application process -- or application

25  itself, let me say, may be a little different.  I may

1    modify it in some respects.  But in that litigation I
2    simply went through -- and it was a much smaller
3    scale, but I simply went through the applications that
4    I received and made a decision and made those
5    appointments.

6         In this litigation, what I'm considering
7    doing is soliciting applications, and then, depending
8    on the number of applications that I receive, there
9    will be a culling process.  I have no idea how many
10   applications that I'm going to receive, but by the
11   looks of the courtroom it may be more than I can
12   manage myself.  So I may solicit some support in terms
13   of reviewing those applications and then narrowing it
14   to a number that I feel like is more manageable.

15        And then I plan to hold -- and it's probably
16   going to take the Court the better part of a couple of
17   days -- oral presentations from those who have applied
18   who have made that cut, if you will, here in the
19   courtroom.  And I'm going to solicit support from some
20   others in that process who will assist me in making
21   the decision, so those individuals will be present
22   here in the courtroom for your presentations.  He
23   doesn't know it yet, but one of those panel members
24   will be Judge Jones.

25        And my purpose in doing this this way or

designing the process in this way is to make it as
transparent and as fair as I can.

Mr. Aylstock was appointed, as you all know,
as interim lead and liaison counsel.  He was appointed
for two reasons.  They should be obvious to most
people.  One is he's local, and the other is that he
was involved in a leadership position in my very
recent MDL that is still actually ongoing, *Abilify*,
and he did an outstanding job in that litigation in
that role and even, in my view, played an even broader
role.  And so he seemed a natural choice for me in
that interim role.  That role is necessary as an
interim position, and I don't know that I know anyone
else -- well, I see a few faces that I didn't know
were involved in this litigation until this morning.

So Mr. Aylstock was appointed for those two
reasons.  But it's an interim appointment, and I
explained this to him this morning.  And I think he
probably even knew that before without me having to
explain it to him that it's an interim appointment.
There's no decision here that has been made as far as
any permanent leadership position, nothing preordained
or predetermined in any way.  And I do want this to be
a very fair and transparent process.  I think that is
important.

1          I will be looking to establish, as I did in

2    *Abilify*, a diverse team.  I'll be looking for a

3    leadership team certainly with individuals who have

4    demonstrated the capacity, the knowledge, and skill

5    set, reputation, resources, and energy to effectively

6    and efficiently lead the MDL.  And I'll also be

7    looking to establish a team that reflects the

8    diversity, to the extent possible, of the individual

9    plaintiffs in this MDL.

10         In the interest of transparency and

11   disclosure, I do want to say that the Aylstock law

12   firm has had that experience with the Court.  But

13   beyond that, I have no relationship with that law

14   firm, I have no relationship with Mr. Aylstock.  He's

15   never been to my home, I've never been to his home.

16   We don't socialize together.  We did practice on the

17   other side of the courtroom from one another I think

18   25 years ago.  But other than that, we don't have any

19   type of relationship outside of a professional

20   relationship with *Abilify*.

21         I do want you to know that my daughter has

22   accepted a position with that law firm, my youngest

23   daughter.  She will start -- and I disclosed this to

24   Ms. Branscome earlier, as I disclosed it to the

25   attorneys in *Abilify*.  She will begin that associate

position in August or September of 2020.  She is soon
to graduate from law school in a couple of weeks, and
she will be doing a clerkship with Judge David Proctor
in Birmingham for a year before she returns home --
yay -- back to Pensacola to start her practice.

The canons of judicial conduct do not require
disqualification in this type of a situation as long
as she is not a partner in the law firm, which she is
not or will not be, at least not any time soon, and as
long as she does not appear before me, obviously, and
does not perform any work at all in this litigation.

And this was the case with *Abilify*.  My
daughter worked at that firm periodically at summer
recesses and holidays.  *Abilify* was ongoing during
those times when she was there.  And I believe -- it's
my understanding that it was the firm's strict policy
that there was a Chinese wall, and she did not touch
any of that litigation.  She and I don't discuss the
litigation nor will we discuss this litigation even
before she starts at the firm.  But again, I wanted to
disclose that to you all, again, in the spirit of
transparency.

There's one more matter to disclose, and that
is that Ms. Miller is a former law clerk of mine.  I
did not know that Ms. Miller was involved in this

litigation.  But she has been away from this job for almost two years.  August will be two years.  And my policy and the policy of most judges is one year that a law clerk may not appear before that judge.  And that's my policy not just with Ms. Miller but with all my law clerks.

I also have had law clerks leave and go to work at defense firms.  Actually one that was involved in *Abilify* now works at Winston & Strawn, one of the defense firms in that litigation.

So with all of that out, I would like to hear if there's anyone -- and I'll open it up, it doesn't have to just come from Mr. Aylstock -- but if there's anyone who would like to address the Court in regards to -- not a leadership application, not yet -- *[Laughter]* -- but in regards to leadership structure or the design of it.

You've heard what I've just sort of roughly laid out.  Nothing set in stone yet at this point. Those are preliminary thoughts that I have.  But if there's anyone -- Mr. Aylstock?

**MR. AYLSTOCK:**  Thank you, Your Honor.  As you can see, there's a lot of interest in this case, and there's a lot of folks that the people in this room represent, and there's also a tremendous amount of

1    legal talent on the plaintiffs' side in this room.

2    This is a very different case than *Abilify*, different

3    dynamic, and I'm happy to hear that you will treat it

4    uniquely, as it should be.

5              In light of that and the work that needs to

6    be done, in my view, the committee structures could be

7    expanded.  And I would hope that anybody who would

8    want to participate, whether they have a title or not,

9    would be able to participate meaningfully in the

10   common benefit for the folks that they represent in

11   this MDL.

12             **THE COURT:**  Thank you.

13             Anyone else?

14             *[No response.]*

15             Anyone on the telephone?

16             *[No response.]*

17             No?  All right.

18             Ms. Branscome, I've confirmed --

19             Is there someone on the phone who wishes to

20   speak?

21             *[No response.]*

22             Okay.  Ms. Branscome, I confirmed with you

23   earlier that, due to the limited number of defendants

24   in the case and counsel, we will not need to be

25   considering any former leadership structure for the

1    Defense.

2              **MS. BRANSCOME:**  That is correct, Your Honor.

3              **THE COURT:**  Thank you.

4          I would like you all to be thinking about

5    what you feel might be appropriate for this litigation

6    in terms of a structure.  There's typically lead and

7    co-lead counsel, there's liaison counsel for the

8    plaintiffs' side, sometimes an executive committee as

9    well as a steering committee, and then there are

10   committees and sometimes subcommittees.

11         This case has some unique aspects to it, not

12   the least of which is the government or military

13   aspect to it.  So I would anticipate there being some

14   number of individuals, probably a very small number,

15   that I would task with coordinating that aspect of the

16   litigation, and that would be a joint committee or

17   subcommittee.  I'm not sure where it's going to fall

18   in the structure, but that would be a joint committee

19   from my standpoint, so I would ask for lawyers from

20   the Defense to participate as well.

21         And again, this is something I am borrowing

22   from *Abilify*.  I had, I believe, two or three joint

23   committees in *Abilify*, and I think it worked very

24   well.  So that's one unique aspect.

25         The other that I'm considering in terms of a

1  committee or subcommittee is an early vetting

2  committee, which probably won't be a joint committee.

3          *[Laughter]*

4          But I do think that's a process that needs to

5  be put into place certainly sooner rather than later.

6          Is there anyone today who has thought of any

7  other unique aspect?  I mean, ESI certainly, you know,

8  discovery, those are fairly common in terms of

9  committee structure.  But is there anything else that

10  you can think of that's unique to this particular

11  litigation that I'm not thinking of that might be

12  appropriate to be placed into the leadership

13  structure?

14          **MR. AYLSTOCK:**  Your Honor, we had discussed

15  internally amongst the plaintiffs the potential for a

16  law briefing committee.  And regardless of whether the

17  Court would appoint one, I would imagine there's some

18  legal briefers that will rise to the floor, but that

19  was the only thing in addition to what Your Honor

20  mentioned.

21          **THE COURT:**  Okay, excellent.  Thank you.

22          **MR. MOSKOWITZ:**  Judge, I have something, if

23  you don't mind.  Adam Moskowitz from the Moscowitz law

24  firm.  I'm the six cases you had mentioned from the

25  Southern District of Florida which are a class action.

We asked for medical monitoring.  We thought this was a very unique case, very similar to Chris Seeger, who is here as my co-lead counsel in an MDL in New Jersey, where we can help people immediately.  And we didn't know if that should be a separate track.  The MDL in a footnote, footnote 4, said it would be up to the transferee judge.  We can put that in our papers if you'd like, however you'd like to handle that.  But we think that may be something unique in this case because the government is spending so much on hearing now, over a billion dollars, and there's a medical monitoring program we think that could work.  That certainly is for a later date, but that would be something maybe to think about in the leadership structure about having a track for medical monitoring in addition to the personal injury track.

**THE COURT:**  Are those cases here now?

**MR. MOSKOWITZ:**  They are, Your Honor, they were transferred here.  And we have the NCAA and the NFL cases, which are huge successes, which both involved national medical monitoring programs.  And Mr. Seeger did a wonderful job in the NFL, and the Hagens Berman firm did a wonderful job in the NCAA case, and those both have been found approval, and they've really helped the people immediately.  When we

1   traveled the country the last four or five months to

2   try to find out how can we help our veterans, and

3   we've talked to the ATA and different programs, and

4   there are programs set up which can help -- to try to

5   help those types of research programs.

6          The VA is an overmanned -- or they're

7   overworked and understaffed, so we thought maybe that

8   would be a separate track.  And we argued that to the

9   MDL, and they said that would be left up to Your

10  Honor, so we'd just throw that up.

11         The Aylstock firm has been wonderful the last

12  few days hosting us, and we'd just throw that out as a

13  possible suggestion.  It's in the Defendant's

14  statement, so we would throw that out to Your Honor.

15         **THE COURT:**  I will give that further thought.

16         **MR. MOSKOWITZ:**  Thank you very much.

17         **THE COURT:**  Let me turn now to some of the

18  pleading issues, and first the issue of direct filing.

19         We did have a direct filing order in *Abilify*,

20  and many courts in MDLs do have such orders.  I

21  imagine the Plaintiffs are most likely fine with this

22  practice.  My question would probably be directed more

23  to the Defense about whether you are in agreement with

24  the direct filing process.  I do believe it promotes

25  economy and eliminates some of the delays that we can

1   encounter when cases are transferred from other

2   districts.

3        In the *Abilify* MDL -- and the defense agreed

4   to it -- we entered the order, and there was a

5   stipulation that direct filing would not constitute a

6   *Lexecon* waiver by either side, it would not constitute

7   a determination certainly by the Court that

8   jurisdiction or venue was proper in this district, it

9   would not impact any choice of law questions including

10  the applicable statute of limitations that would

11  otherwise apply to an individual case.

12       But what I recall from that MDL on this issue

13  is we had short form complaints that were allowed --

14  in addition to a master complaint, there were short

15  form complaints, and in those short form complaints

16  the plaintiffs were required tos identify the proper

17  venue for that case otherwise.

18       But I would ask, Ms. Branscome, for you to

19  give this some thought, discuss it with your clients.

20  What time frame would you require in order to let me

21  know if you have any objection to a direct file order?

22  And you can speak from counsel table, that's fine, I

23  appreciate it.

24       **MS. BRANSCOME:**  Thank you, Your Honor.  I

25  think I could get an answer back to you really in the

1    very near term.  What I would like to do is, if Your
2    Honor is contemplating the direct filing order
3    following in general terms what was used in the
4    *Abilify* case, I just would like some time to review
5    the specifics of it.
6        So, if Your Honor has a preference -- I mean,
7    I think this would be a matter of days, so if there's
8    a specific date by which you would like an answer, I
9    will get you an answer.  I just want to look at the
10   specifics behind that.
11       **THE COURT:**  That gets me what I need.  I will
12   enter an order -- as I always do after these case
13   management conferences, I will reduce what we've
14   discussed to writing, and it will be filed in an
15   order, and I'll give you a deadline there in that
16   order.
17       So we do have the issue of a master and short
18   form complaints.  I can't imagine anyone is going to
19   have a problem with that process.  It certainly
20   streamlines the process.
21       Mr. Aylstock, do you envision any type of
22   issue with master and short form pleadings?
23       **MR. AYLSTOCK:**  None whatsoever, Your Honor.
24   There is some sort of preliminary corporate structure
25   type discovery, maybe initial disclosures that would

1    help us with that, and so we'd need a little time to

2    make sure that we get off the ground right with that

3    master complaint, but I would think a master complaint

4    with a master answer as well, and then the short form

5    complaints can just adopt that.

6         THE COURT:  That issue -- I'm going to talk

7    about the discovery in a moment, but the issue of --

8    are you talking about the membership?

9         MR. AYLSTOCK:  Yes.  There's several

10   different corporate entities surrounding Aearo Tech

11   and the merger or buyout or whatever it was by 3M, and

12   we still don't really understand the relationship of

13   that nor the members, which are very important for

14   jurisdiction.

15        THE COURT:  I know Ms. Branscome mentioned in

16   chambers that there may be some of that information in

17   their removal papers, so you might look at that and

18   see if you can glean any from there.  But beyond that

19   -- and I'll talk more about this in a moment -- I have

20   asked the Defense to present sort of a corporate

21   structure to be prepared for that in the near future.

22        MS. BRANSCOME:  If I may, Your Honor, may I

23   address the master complaint and short form complaint?

24        THE COURT:  Yes.

25        MS. BRANSCOME:  So I've seen MDLs structured

1    and a number of personal injury MDLs structured in a

2    number of different ways with respect specifically to

3    an answer.

4           So I have been in another MDL in which the

5    defendants did not formally answer a complaint until

6    either a case was selected for the bellwether process

7    or we actually got closer to what was actually

8    selected for the bellwether trial.

9           So I don't know what Your Honor is

10   contemplating here.  I think we would be open to the

11   concept of a master complaint with short form

12   complaints.  There are certain pieces of information

13   that we would want to be in the short form complaint.

14          I think the reference to what would be the

15   proper jurisdiction if it was remanded is an important

16   piece of information.  There are other pieces of

17   information that we would want to see in that.

18          So I don't know what Your Honor is

19   contemplating, though, in terms of the time frame for

20   a master answer or the level of detail for a master

21   answer.  So that was the one thing that I would flag,

22   as we would need a sufficient amount of time to answer

23   the complaint and, depending on the level of detail of

24   the master, it may be appropriate to hold off on the

25   answer.

1      **THE COURT:**  I would anticipate, once

2   leadership is established, that you all would work

3   together and then propose something to me both in

4   terms of the master and the short form.  And again, we

5   did this in *Abilify*.

6          As far as the timing of the answer, I had not

7   given thought to delaying that.  My first thought that

8   comes to mind is your two defenses that, as we

9   discussed in chambers and I'm going to discuss with

10  everyone else in just a few moments -- I don't mean to

11  sound so cryptic -- but that if those are going to be

12  addressed on the front end, they would need to be

13  formally raised in terms of either a motion to dismiss

14  or at least as a defense.  Anyway, just preliminary

15  thoughts on that.

16      **MR. AYLSTOCK:**  We would be -- whoever the

17  Court appoints, obviously we would be happy to work on

18  the timing of it, but I think it would be the

19  Plaintiffs' pretty firm position that we not defer

20  indefinitely or way down the road that master answer

21  because I think that really shapes the litigation.

22      **THE COURT:**  Thank you.

23          Just another point to confirm, the Minnesota

24  cases, Judge Tunheim had *sua sponte* severed the cases

25  that had multi-party/multi-plaintiff cases.

1          Does anyone know if those have been -- were

2     those transferred as individual actions?  Were they

3     refiled?  Just something I was curious about.  I saw

4     that they had been severed and those plaintiffs had

5     been directed to refile.  I wasn't sure if they

6     actually had.

7          **MR. AYLSTOCK:**  I don't know, Your Honor.

8          **THE COURT:**  That's all right.

9          **MR. AYLSTOCK:**  I'm being told that the

10    Plaintiffs were not directed to refile those cases, so

11    they were just severed.  But I don't have personal

12    knowledge.

13         **THE COURT:**  Well, maybe not directed -- that

14    might have been too strong.  But they were not

15    automatically refiled, were they?  So they were

16    severed and then just given an individual case number,

17    is that how --

18         **MR. TRACEY:**  [Indicating affirmatively.]

19         **THE COURT:**  Okay.  Then I misread something.

20         **MR. AYLSTOCK:**  I think that's right, Your

21    Honor.  We can certainly confirm that.

22         **THE COURT:**  And that would make sense.  I

23    think I may have misread a description of how that

24    took place and misinterpreted it, so thank you for

25    that clarification.

1          And Ms. Branscome, Ms. Jacobs was telling me

2   the direct filing order in *Abilify* is Document No.

3   106, if you need that.

4          **MS. BRANSCOME:**  Thank you.

5          **THE COURT:**  And it's also available on the

6   public website.

7          We have a case, it's the *Bennett* case, that

8   names eight plaintiffs, Bennett being one of those

9   plaintiffs, that originated in Delaware state court,

10  and then it was removed to the District Court of

11  Delaware and then transferred here by the JPML, and

12  that was on April 15th.

13         Interestingly, the cases were filed as

14  separate actions in state court.  But when they were

15  removed, they were docketed in the District Court as a

16  single multi-plaintiff action.  So that happened after

17  the removal.  And so they transferred here as a

18  multi-plaintiff case.  And we're talking -- it's eight

19  plaintiffs, but nonetheless they're joined.

20         I don't know if we have counsel here who

21  represents those --

22         **MR. AYLSTOCK:**  Mr. Tracey is here, Sean

23  Tracey, Your Honor.

24         **THE COURT:**  Mr. Tracey, I'm inclined to agree

25  with Judge Tunheim.  I'm inclined to agree that the

1    plaintiffs' claims in these cases arise from different

2    factual circumstances or factual predicates.  And

3    that's what he found in those Minnesota cases.

4         Would you like an opportunity to brief that?

5    Do you want those cases to remain?  I could do what

6    apparently he did, Judge Tunheim, and just sever them

7    and assign them their own case numbers so you wouldn't

8    have to refile them.  But if you feel strongly about

9    this, then I would give you an opportunity to brief

10   that if you think they should remain joined.

11        **MR. TRACEY:**  Your Honor, as you can imagine,

12   this is a subject that we have been talking about

13   intensively over the past couple of days with my

14   co-counsel.  The issue of, when you're going to have

15   tens of thousands of cases, how to manage these on our

16   end is important to us for a whole host of reasons.

17        We didn't reach any consensus yesterday about

18   the issue, although it was talked about, so maybe if

19   we could get some time to maybe put together a

20   coherent response to that.

21        **THE COURT:**  All right.  Does Defense have a

22   position in regards to the joinder?

23        **MS. BRANSCOME:**  We do, Your Honor.  We think

24   that they should be individually -- either originally

25   filed as individual plaintiffs or we would be fine

1   with Your Honor *sua sponte* severing any of the

2   multi-plaintiff cases that get transferred in.  There

3   are a few others that I don't believe have been

4   transferred into the MDL that were not in Minnesota.

5   Judge Tunheim obviously split those apart and from

6   then on my understanding is everything filed in

7   Minnesota has been an individual plaintiff.  But it is

8   our position that they should be individually filed.

9          In terms of a burden on the plaintiffs being

10  sort of an explanation for why you should have

11  multi-plaintiff cases, we think that could be handled

12  with dealing with short-form complaints, things of

13  that nature that deal with how to address a large

14  volume.  That should not be the deciding factor over

15  whether or not multi-plaintiff cases are appropriate

16  in a personal injury litigation.

17          **THE COURT:**  Thank you.

18          Mr. Aylstock, go ahead.

19          **MR. AYLSTOCK:**  Obviously the issue of

20  consolidation for trial came up in *Abilify* and it

21  wasn't ultimately ruled upon --

22          **THE COURT:**  Way too early for the C word.

23          *[Laughter]*

24          **MR. AYLSTOCK:**  It may be an issue later on.

25  I think a separate issue and a little bit different is

1  filing multi-plaintiff complaints.  Obviously some

2  states in state court allow that, encourage it,

3  whatever.

4        **THE COURT:**  That's why it was odd that in

5  Delaware they were filed individually and then joined

6  at removal.

7        **MR. AYLSTOCK:**  Right.

8        **THE COURT:**  It sounds to me like this is

9  probably not something I'm going to do *sua sponte*.  I

10 think I'm going to require briefing.

11       I don't know that -- I guess we could start

12 with these eight in terms of briefing.

13       **MR. AYLSTOCK:**  Some of it, Your Honor, in the

14 *Actos* MDL, my partner, Neil, was heavily involved in

15 dealing with the clerk there, the clerk of court, and

16 Judge Doherty allowed some mult-plaintiff filings, at

17 least initially, without any determination whatsoever

18 as to whether or not they would be permissible for

19 trial, but if perhaps they could be grouped by

20 judicial district or something like that.  And I'm

21 happy to meet and confer, or whoever is appointed --

22       **THE COURT:**  It's a pleading issue, though.

23 You have to satisfy the rule.

24       **MR. AYLSTOCK:**  Well, certainly.  And that's

25 why, you know, we would like an opportunity to brief

1    that.  But it certainly has been done in other MDLs of

2    large volume, and I think it's something that's maybe

3    a little premature quite yet, but we would like the

4    opportunity to discuss it further and brief it if

5    necessary.

6         **THE COURT:**  All right.  Certainly I'll give

7    you an opportunity, and I won't *sua sponte* take any

8    action on those cases at this time.

9         **MR. AYLSTOCK:**  Thank you, Your Honor.

10        **THE COURT:**  But I most likely won't delay in

11   having this scheduled for briefing because it's likely

12   to continue to come up, it sounds like.

13        **MS. BRANSCOME:**  Your Honor, if I may ask one

14   point of clarification on that?

15        **THE COURT:**  Yes.

16        **MS. BRANSCOME:**  Just from the Defendant's

17   perspective, we would ordinarily be the moving party

18   to move to sever a multi-plaintiff complaint.  But if

19   I'm at least understanding what I'm hearing from

20   Plaintiffs counsel, perhaps you all have not landed on

21   a firm position of whether they are advocating for

22   multi-plaintiff complaints.

23        So as a procedural matter I just wanted to

24   seek Your Honor's clarification.  Should we be the

25   instigating party, or is there -- could we perhaps

1   wait and get a firm response from Plaintiffs if they

2   intend to pursue multi-plaintiff complaints?

3          **THE COURT:**  I guess I understood from -- and

4   maybe I was reading too much into it -- I was thinking

5   you were going to pursue multi-party complaints.  I

6   mean, we already have one with eight.

7          **MR. AYLSTOCK:**  Yeah, and I think we are, Your

8   Honor, given the volume of litigation.  Obviously a

9   lot of it has to do with making sure it's convenient

10  to the clerk and the Court and understandable.  And at

11  least in the *Actos* MDL I think the determination was

12  made that this is part of the MDL courts' inherent

13  power to, again without saying they should be

14  consolidated for trial, manage the litigation in a way

15  that's most efficient consistent with Rule 1.

16         So we would like the opportunity to at least

17  brief it and maybe discuss the efficiencies of it with

18  Ms. Bajzik.

19         **THE COURT:**  All right.  Even if it's

20  efficient -- I'm not ruling -- but even if it's more

21  efficient, that doesn't necessarily satisfy the rule.

22         So I think I'm going to ask you all, Ms.

23  Branscome, to file a motion, unless you are in

24  agreement with -- and it sounds like you're not --

25  then in my order following the CMC I will give you a

1    time frame for filing that motion, and then you all

2    will be able to respond.

3            **MR. AYLSTOCK:**   Thank you.

4            **THE COURT:**   I discussed with Mr. Aylstock and

5    Ms. Branscome this morning the issue of, again, the

6    military and its participation -- I put that in quotes

7    -- in this lawsuit.  I feel certain that the military

8    is aware of this litigation.

9            There is a statute that speaks to litigation

10   where the government has an interest and notification.

11   I don't believe that statute requires a formal notice

12   and an opportunity to intervene in this litigation.

13   The statute, for those who are interested, is 28

14   U.S.C. 517.

15           I'm not aware of anything else that would

16   pertain to notice to the military, but I do believe

17   there are sort of multiple layers involving

18   potentially the military, obviously not the least of

19   which is discovery.  And I just think everyone should

20   continue to be -- and I will continue to be -- very

21   focused on the military's interest in this litigation.

22   And if at any time anyone believes that the military

23   is indispensable or they are potentially a third

24   party, I would want to be notified of that immediately

25   if that's on anyone's horizon.

1          I will do what I can to assist in the efforts

2    to gain the military's cooperation in discovery.  I've

3    had this issue in some other cases involving military

4    aircraft accidents with Navy pilots.  It's a

5    complicated process, to say the least, to gain access

6    to documents as well as depositions of individuals who

7    you want to speak to and gain information from about

8    the performance of their official duties.

9          There is a Supreme Court case, *Touhy v. Ragen*

10   from the '60s, that basically gave the government

11   agencies protection in this area, and numerous

12   governmental regulations followed that case.  And you

13   simply cannot issue a subpoena, I guess is the point.

14   There are steps and hoops that you have to go through.

15   Not understanding that process can result in

16   significant delay in litigation.

17          We have in our district an Assistant United

18   States Attorney who is very knowledgeable -- she works

19   on the civil side of the U.S. Attorney's Office --

20   very knowledgeable regarding *Touhy*, the case and the

21   regulations, and what it takes to gain access to

22   government documents and individuals for deposition.

23          I have asked her if she would be willing to

24   make a presentation to us on that issue, and she has

25   agreed to do so, so long as our U.S. Attorney is in

1    agreement, and I have no doubt that he will be when I

2    speak with him.  I just haven't had a chance to do so

3    yet.  I spoke to Mr. Aylstock and Ms. Branscome about

4    that this morning, and they both felt that would be

5    helpful.

6         Now, some of you sitting here in the

7    courtroom or on the telephone, you may be

8    knowledgeable and experienced enough to present that

9    information yourself to us.  I don't know.

10        Are there any takers, anybody who want to

11   join Ms. Butler in making that presentation?

12        *[No response.]*

13        It won't be mandatory to attend.  Leadership

14   will be required to attend, but otherwise it would be

15   just if you are interested in attending that

16   presentation.  I obviously don't have a date for it at

17   this time but it is on my to-do list.

18        I got a little ahead of myself in talking

19   about the discovery.  Let me go back to pleadings for

20   another item.  Service of process, we discussed this,

21   Ms. Branscome and Mr. Aylstock and I discussed this, a

22   way of potentially simplifying service of process.

23        Ms. Branscome, I don't want to misstate what

24   you have shared with me about your client's preference

25   in this regard, so could I ask you to share that with

1    everyone.

2         **MS. BRANSCOME:**  Certainly, Your Honor.

3    Although -- well, the past practice -- so many in this

4    room are aware of it because they've dealt with us

5    directly on it -- is that we have not waived service

6    and we have not accepted service by emails coming to

7    counsel, but we have directed plaintiffs to submit the

8    formal waiver of service form under the federal rules

9    to our process server.

10        In the very beginning we did accept those

11   waiver forms by email, but the volume quickly became

12   high, and we have asked that those be directed to our

13   process server CSC.  We have signed all of those.

14   There may be a few that are still outstanding, but we

15   have made that a routine practice.

16        We think that it would make sense and we

17   could work with leadership counsel to come up with

18   some type of process that would not require formal

19   service on the company through the traditional means,

20   but we do have some concerns about accepting service

21   by email through counsel even if we set up an

22   independent email account, which my understanding was

23   done in the *Abilify* litigation.

24        My client has had past experience in other

25   MDLs where on the front end that seemed like a good

1   idea and efficient for everyone, but the consequence

2   was it was very difficult for my client to track the

3   cases individually in terms of even quite simply

4   logistics like assigning numbers to them, file numbers

5   that then allow us to continue to track the cases as

6   they move forward.

7        And so that was a concern that I had

8   expressed to Your Honor in chambers and would echo

9   here about having an order that would satisfy service

10  just by simply sending it to an email address.  But I

11  do think we could come up with a procedure that

12  perhaps would satisfy my client's concerns but also

13  expedite the process in some way.

14       **THE COURT:**  All right, very good.  I'm hoping

15  you'll be able to confer about that and come to an

16  agreement or stipulation about the service in some

17  abbreviated form that the Defendant is comfortable

18  with.

19       In the interest of judicial economy and

20  avoiding needless waste of resources in any

21  litigation, not just in MDL, but I always start out by

22  looking to see if there's something that is

23  potentially dispositive, an issue that needs to be

24  addressed early on in the litigation as opposed to the

25  very end of the litigation after a great deal of time

1    and money has been spent only to see a case disposed

2    of on a legal issue.

3            So it seems to me that we don't have any

4    issue here of general causation.  I don't think

5    there's any question that, if you have defective

6    earplugs -- and that's an "if" -- that that can result

7    in hearing loss if they don't perform as designed or

8    anticipated, expected.  We don't have that type of an

9    issue here.

10           I'm aware of the two defenses that they have

11   raised and are raising in this litigation, and my

12   thought was let's address those early on in the

13   litigation.  And they are factual, no doubt, but

14   they're not factual in the sense that we have to wait

15   to get into specific individual cases to address them.

16           I raised the very general possibility of even

17   a trial on those defenses, obviously after a period of

18   discovery.  The military discovery will be very

19   important in this regard to these two defenses.

20           The defenses, as you all know, are the

21   combatant activity defense and the government

22   contractor defense.  But I'm just putting this out

23   there for you all to be thinking about and just making

24   you aware that it's something I'm thinking about and

25   it's something that we'll be talking about more as we

move forward and, again, once leadership is put into

place.  The same will be true for potentially class

issues, they may proceed on a separate or different

track.  Again, yet to be determined.

Does anyone wish to speak to that issue of

front loading something in the litigation that in the

Court's view should be addressed earlier rather than

later?  Anyone?  Mr. Aylstock?

**MR. AYLSTOCK:**  Your Honor, with regard to

these defenses you noted that they are issues of fact,

obviously an issue of fact there will be a summary

judgment motion if it's appropriate.  And so while we

are interested in advancing this litigation and

dealing with some preliminary issues as soon as

possible, the Plaintiffs do feel that we need

discovery, we need an opportunity to brief that, and

in the context of a summary judgment can certainly be

dealt with and ultimately it will be decided by the

trier of fact.

So we're not necessarily opposed to that, but

we'd like the opportunity to think about it and brief

it, if it's even an available defense after discovery.

I think there's some question as to whether discovery

will even reveal -- but there is that -- we may be

moving for summary judgment on those defenses.

1          **THE COURT:**  Right.

2          **MR. AYLSTOCK:**  So it may not be an issue at

3     all.  So I think until we get down the road a little

4     bit --

5          **THE COURT:**  I don't want to deal -- I follow

6     you.  I don't want to deal with it in each individual

7     case.  I mean, there's defenses in every one of these

8     potentially thousands of cases.  I think it's

9     something that -- if there's discovery and then

10    there's summary judgment practice following that

11    discovery and summary judgment, if it's a motion filed

12    by the Defense and it's denied, then that issue can

13    just move on with that individual case, I suppose.

14         Because these defenses -- and Ms. Branscome,

15    correct me if I'm wrong, but I don't see these

16    defenses as plaintiff-specific really in any way.

17         **MS. BRANSCOME:**  From our perspective, Your

18    Honor, we do think there may be some merit to

19    separating out the two affirmative defenses that, as

20    you recognize, if they were granted would be

21    dispositive.  We don't view them as case-specific.

22    They don't turn on an individual plaintiff's

23    experience or causation of injury.

24         We do -- and I raised this earlier with Your

25    Honor -- we do have some concern about them proceeding

1    too quickly only insofar as discovery from the
2    government will be an essential portion of the Court's
3    analysis for both sides.  We need to understand the
4    full picture for these defenses.
5         That being said, I think Your Honor would be
6    well within your authority to structure that being
7    potentially -- you know, we may proceed with
8    case-specific discovery in some form, but we could
9    prioritize discovery that would be related to the
10   defenses, conduct that discovery, and then Your Honor
11   could render decisions on those affirmative defenses,
12   which we do think that there is some efficiency to
13   that.
14        One minor point I wanted to address, Your
15   Honor, when you stated that there may be not a general
16   causation defense.  It's my understanding of the
17   Plaintiffs' claims that they're also claiming that the
18   earplugs "as designed" cause -- or allow for hearing
19   damage.
20        So, while I do actually think, Your Honor, it
21   may not make sense to separate out general causation
22   from specific causation, I did want to at least
23   clarify the record on that that we do think there will
24   be a general causation defense.
25        But I think in terms of we're looking at sort

1    of broad scale procedural adjustments, I think the
2    place to target that would be the combatant activity
3    defense and the government contractor defense.  I
4    think there is a way for that to make this more
5    efficient.
6              THE COURT:  All right.  Thank you.
7              Anything else, Mr. Aylstock?
8              MR. AYLSTOCK:  Just to remind the Court that
9    those two defenses, to the extent they apply at all,
10   only apply to the military servicemen and women.
11             THE COURT:  Sure.
12             MR. AYLSTOCK:  And we have plaintiffs that
13   those wouldn't even apply to.
14             THE COURT:  Good point.
15             MR. AYLSTOCK:  So I do think that the
16   discovery really is coextensive as it relates to the
17   liability to some of these defenses, so I don't think
18   general discovery needs to be bifurcated and so forth.
19             THE COURT:  Well, it's going to be managed,
20   though.
21             MR. AYLSTOCK:  Absolutely, and sequenced.
22             THE COURT:  You can't be going in ten
23   different directions at one time.
24             MR. AYLSTOCK:  Correct.
25             THE COURT:  All right.  Along the lines of

1    what Ms. Branscome --

2            Yes, sir?

3            **MR. YANCHUNIS:**  Excuse me, Your Honor.  Good

4    morning.  My name is John Yanchunis.  Mr. Moskowitz

5    opened the door back with the discussion of the class

6    issues.  I am one of several lawyers who filed a class

7    case in the District of Columbia that has been

8    transferred here.

9            My only reason to rise is not to hear myself

10   speak, but is to mention that local Rule 23.1 requires

11   the filing of a motion for class certification within

12   90 days of filing a pleading.  That would obviously be

13   something that would concern those of us who have got

14   those class cases, and to discuss the suspension of

15   that until we can come up with a case management order

16   that would address how the class cases will proceed.

17           **THE COURT:**  Could you spell your last name,

18   please.

19           **MR. YANCHUNIS:**  Yes, ma'am.

20   Y-a-n-c-h-u-n-i-s.  I'm a partner with the law firm of

21   Morgan & Morgan based in Tampa.

22           **THE COURT:**  That makes good sense.  And I

23   overlooked that rule in speaking about the class

24   issues, and so I will agree to that.  I'll issue

25   something that will stay that or toll the time for

1    filing your class certification motion until such time

2    as it makes sense in the context of this litigation.

3              **MR. YANCHUNIS:**  Thank you, ma'am.

4              **THE COURT:**  Thank you.

5              Ms. Branscome, you mentioned the claim that

6    "as designed" the earplugs caused the injuries that

7    are complained of in this case.  And in that regard, I

8    am considering a science day.  And I spoke to Mr.

9    Aylstock and Ms. Branscome about this.  They seemed to

10   -- particularly Ms. Branscome seemed to think that

11   that would be helpful.

12             And I am all about, you know, hit me with

13   some knowledge, educate me.  So I'm seriously

14   considering that and just letting you all know that

15   I'll be most likely pursuing that at some point, as

16   well as -- and this will sort of segue into the next

17   topic -- as well as a technology day/data day.

18             And this may be something that you all -- I'm

19   sure there is a wealth of knowledge and experience

20   here in this courtroom of individuals in the

21   electronically stored information area and technology

22   assisted review.  I know enough to know the acronyms

23   now.  I know what those letters stand for.

24             So it may be that you're able to put together

25   a team of attorney experts both from the defense and

1     the plaintiff side that can make that presentation.

2              Judge Jones does not need the presentation.

3     He could probably make the presentation.  He is

4     extremely well versed in this area.  But for myself, I

5     think that it would be very helpful for me to have you

6     all put something together, and so I'll be asking for

7     that in the future as well.

8              Speaking of ESI protocol, it is my intent,

9     just as soon as we get leadership in place, to

10    schedule a multi-day Rule 26(f) conference for the

11    parties in this case.

12             My vision for this is for all -- obviously

13    leadership would attend, defense counsel would attend.

14    I would like your e-discovery vendors to attend as

15    well, and from the defense standpoint for sure, some

16    in-house IT personnel that understand your client's

17    computer or data infrastructure and architecture.

18             Following that conference, then I'm going to

19    hold a Rule 16 conference, at which time you'll

20    present your Rule 26(f) report to the Court orally.

21    There may also be a filing as well, but I'm going to

22    ask you to appear and present how your conference was

23    held and what information was gathered as part of that

24    conference, and then that will help me going forward

25    in establishing a plan for you all in terms of

1  discovery and case management.

2       But in addition to the computer systems and

3  how you are going to collect and store the data in

4  this massive litigation, I also have asked Ms.

5  Branscome to come to that conference prepared with

6  sort of her corporate infrastructure as far as

7  personnel and the different corporations and sort of

8  how they fit together or don't fit together, but a

9  corporate organizational chart, if you will.  I've

10  also asked that included in that that she begin to

11  identify relevant pertinent custodian positions that

12  we can begin thinking about.

13       As part of the 26(f) conference -- and I'll

14  reduce this to a written order, but I also want y'all

15  to begin thinking about a phased privilege review.  I

16  do not want --

17       And Judge Jones, would you like to add

18  anything about the necessity or importance of that

19  type of a process being put into place early on?

20       **JUDGE JONES:**  No.  I'll just echo that I

21  think we ought to address privilege issues, if there

22  are a number of them, as early as possible, rather

23  than delaying them.  And I'll probably be involved in

24  that issue, so I think that would make the most sense.

25       **THE COURT:**  Right.  And this will require the

producing party to adhere to a steady and disciplined

review process, and the opposing party will receive

the privilege log and responsive material as soon as

available.  And then if there's court review

necessary, that will proceed as well.

What happened in *Abilify* -- and again,

lessons learned -- but what happened in *Abilify* is

really this unfortunately sort of came later in the

process, and poor Judge Jones was just inundated with

-- I don't remember how many -- how massive the

privilege log was, but it was all at one time.  There

was not really a rolling, steady process of this

privilege review.  And so we want to avoid that in

this litigation.  That would not be manageable.

And so Judge Jones is correct, he will be

involved in the privilege review process, and so I'll

ask -- he'll be present for the Rule 16 conference

following your Rule 26 conference, and we'll talk more

about that after you all have had an opportunity to

discuss it.

I'll also be asking you, as part of that

conference, to discuss a deposition protocol, to the

extent you feel that would enhance or benefit the

litigation.

And also it occurred to me that it would

1    probably be helpful to have the presentation by

2    Ms. Butler, the Assistant U.S. Attorney that I spoke

3    of, sooner rather than later, even before your Rule

4    26(f) conference, so that you are armed with that

5    information when you are discussing discovery and

6    servicemember depositions and military personnel

7    depositions.  And then I'll also ask, as part of that

8    conference, that you discuss profile forms, fact

9    sheets, and early vetting and a process for that.

10        Also, as you've seen in the position papers

11   that were submitted, there is an issue of Plaintiffs'

12   request or need for discovery of information in other

13   litigation, and that specifically being the *Moldex I*,

14   the *Moldex II*, and then the *qui tam* case in which

15   Moldex was the relator in that case.  And that's

16   something else that you will be discussing at that

17   conference.  But this needs to be moved on quickly

18   because it may take some time to get this information,

19   particularly the *qui tam*.

20        But I think I might even -- I'm thinking as

21   I'm talking -- I'm going to ask, Ms. Branscome, you

22   all to -- and Mr. Morriss -- to speak with Mr.

23   Aylstock and Ms. Miller soon, I mean, in the next week

24   or so, and I'll give you a deadline or window in the

25   order that I'm going to write, but talk about this and

1   see if there is anything that can be produced sooner

2   rather than later without any contest about it.  If

3   there is an issue, then I need to know what that issue

4   is and hear from you all on it.  But it seems to me

5   that some of this information is going to be

6   discoverable, and I don't know how much of it at this

7   point.  And to the extent there's an agreement, then I

8   don't need to get involved.  But it needs to be

9   produced -- we don't need to take duplicative

10  discovery in this litigation.

11          Once discovery gets underway, one practice in

12  *Abilify* that I will adopt and incorporate into this

13  litigation is regular discovery conferences, and we

14  typically do those by telephone.  Unless there is a

15  need or you just would like to come visit Pensacola,

16  we do those by telephone.  And we have those dates set

17  in advance, and it's on a recurring regular schedule.

18  I try to do those myself.  Judge Jones is always

19  welcome.  If I can't do those, then he would handle

20  them himself.

21          So calendaring -- and I'm about at the end of

22  my agenda, but calendaring in deadlines, dates that I

23  have identified -- and I haven't set dates, but

24  matters that need deadlines would be our next couple

25  of case management conferences.  Your Rule 26(f)

1  conference, the Rule 16 conference following that.

2  And that might be one of those case management

3  conferences.

4        And even before that -- I'm sorry, I should

5  have started with the leadership hearing or oral --

6  not oral argument, it's not really an argument -- the

7  oral presentations on leadership.  Science and

8  technology day.  And then we will establish deadlines

9  for the master and short form complaints and profile

10  forms and fact sheets but probably after your Rule 26

11  conference, something you'll discuss there.

12        All right.  Well, I'll conclude by first

13  asking if anyone has anything they would like to add

14  or ask me?

15        *[No response.]*

16        Anyone on the telephone have anything?

17        *[Participant hangs up.]*

18        I guess not.  You can take a lot of liberties

19  on the phone.

20        Judge Jones, anything from you?

21        **JUDGE JONES:**  Well, the only thing that I

22  would like to add based on what I've heard here today,

23  one of the challenges I see in this case is going to

24  be the discovery from the military, from the

25  government.  And I would encourage the parties as soon

1   as possible to put their heads together, think about

2   those issues and come up with a plan.  And that

3   certainly will be one of the things we discuss at the

4   Rule 16 conference, but I see that as a real roadblock

5   down the road.  And there are ways to navigate around

6   it through cooperation among the parties and, as you

7   suggested, cooperation with the government, but I

8   think that's something that really needs to be

9   addressed.

10          **THE COURT:**  I agree.  As we've said -- and

11   one thing I did not mention in regards to the military

12   and my statement or offer to do everything I can to

13   assist in gaining their cooperation, I think it would

14   be helpful if I asked the military or the Department

15   of Justice -- I'm not sure who I'm going to ask yet --

16   but to establish a liaison for this litigation,

17   someone within whichever agency it is that we can

18   communicate with and coordinate with.  And again, I'm

19   not sure who I'm even going to ask that of yet, but

20   I'm going to figure it out.

21          **MS. BRANSCOME:**  If it is helpful to Your

22   Honor, unless there are a number of claims that I

23   don't know about, based on what we understand of the

24   product sales, the two primary portions of the

25   military that are implicated are the Army and the

1    Marines.  There is some potentially in the Air Force,

2    so I don't mean to exclude that, but I thought that

3    might be helpful to Your Honor, if you're evaluating

4    that, we would anticipate the significant amount of

5    discovery would come from the Army, just to put that

6    on your radar.

7         **THE COURT:**  Thank you.  And it may be someone

8    within the Department of Defense or in the specific

9    branch of the military.  I'm going to, again, give

10   that more thought and ask some questions.

11        **MR. AYLSTOCK:**  Our understanding, Your Honor,

12   is that the special agent in charge of the

13   government's investigation of the issues that form --

14        **THE COURT:**  In the *qui tam*?

15        **MR. AYLSTOCK:**  -- in the *qui tam* is a matter

16   of public record, and that may be a good place to

17   start.

18        **THE COURT:**  Certainly.

19        **MS. BRANSCOME:**  Our perspective on that is

20   that there may be discovery that's important in this

21   case.  The *qui tam*, although there are some issues

22   that do overlap, it came from a slightly different

23   direction, so I don't know -- and it may be that that

24   individual could be the proper liaison, but I would

25   simply flag that.  I think the issues are not a

1    perfect overlap such that it's just a clean reference

2    to whoever was involved in the *qui tam* knowing what we

3    would be after.  In fact, there were some specific

4    issues in the *qui tam* that were carved out related to

5    design elements that would be critical potentially in

6    this case.

7         **MR. AYLSTOCK:**  He or she may just be a good

8    place to start, because obviously that individual

9    would have more information than most.

10        **THE COURT:**  Okay, thank you.

11        Anyone else?

12        *[No response.]*

13        Well, I will close by saying how honored I am

14   by this assignment and how much I look forward to

15   working with all of you in this very interesting and

16   obviously complex and challenging litigation.  Thank

17   you all for coming.  I hope you've enjoyed our city.

18        **MR. AYLSTOCK:**  Thank you, Judge.

19        **(Proceedings concluded at 10:43 a.m.)**

20        --------------------

21   *I certify that the foregoing is a correct transcript*
     *from the record of proceedings in the above-entitled*
22   *matter.  Any redaction of personal data identifiers*
     *pursuant to the Judicial Conference Policy on Privacy*
23   *are noted within the transcript.*

24   *s/Donna L. Boland*                    *4-23-2019*
     *Donna L. Boland, RPR, FCRR*              *Date*
25   *Official Court Reporter*