**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

```
IN RE: 3M COMBAT ARMS EARPLUG    )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,   )
                                 )    Pensacola, Florida
                                 )    June 17, 2019
                                 )    11:05 a.m.
                                 )
                                 )
_____  )
```

**ESI PRESENTATIONS**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-69)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

```
                    P R O C E E D I N G S
```

**JUDGE RODGERS:**  It looks like a lot of folks are interested in the ESI presentation.

Before we start, something I forgot to bring up during the conference.  The orders that you proposed, can we get those electronically, please?

**MR. BUCHANAN:**  Certainly, Your Honor.

**JUDGE RODGERS:**  Very good.  Thank you.

All right.  Do we have Ms. Six by telephone?

**MS. SIX:**  Yes, Your Honor.  Thank you for having me.  Thanks for the accommodation.

**JUDGE RODGERS:**  Oh, absolutely.  Thank you for your help on this.  We're looking forward to it.

All right, Mr. Buchanan, I'm going to turn it over to you.

**MR. BUCHANAN:**  Thank you, Your Honor.

**JUDGE RODGERS:**  And you know where you're starting as far as with me, a very low point.

**MR. BUCHANAN:**  And that's fine, actually. And there will be times during the presentation that you may ask a question that I'll have to phone a friend.  And we have our tech consultants here, and we have the Defendant's tech consultants here.  So I'm confident that, if Michelle or I can't get there, hopefully somebody in the courtroom can.

11:06   1        I have door prizes for the Court.  There's a
11:06   2   copy we could identify, if you'd like, or just for a
11:06   3   reference.  There's a copy for your clerks, and a copy
11:06   4   in the binder for each of you.
11:06   5        **JUDGE RODGERS:**  Thank you.
11:06   6        **MR. BUCHANAN:**  So Michelle and I are going to
11:06   7   do a bit of a duet, but we haven't rehearsed it that
11:06   8   much, so I'm sure we'll be stepping on each other's
11:06   9   lines at various points during the presentation, so
11:06   10   we'll be interjecting with one another throughout the
11:06   11   process, although we did jointly prepare the dec.
11:06   12        So just to orient the Court, what we're
11:06   13   talking about with e-discovery or the e-discovery
11:07   14   workflow is the focus is obviously on ESI or
11:07   15   electronically store information.  But it also picks
11:07   16   up traditional hard copy documents, documents that are
11:07   17   in file cabinets, notes, things like that.  So this
11:07   18   workflow is very much driven by that last box on the
11:07   19   right, the green box, which says "Presentation," so
11:07   20   the use in the litigation, essentially.
11:07   21        So this is a workflow to get things, frankly,
11:07   22   out of people's hands, out of a company's hands, and
11:07   23   into the hands of either the receiving party or the
11:07   24   litigants in the case.
11:07   25        So this is a graph that we're going to use

11:07  1    throughout.  So that tells you about how many

11:07  2    different stops we have on our road today, starting

11:07  3    with identification.

11:07  4         So identification, the first step is no

11:07  5    different than it ever was in the days of hard copy.

11:07  6    It's really identifying people and identifying

11:07  7    entities that you're going to focus on to capture the

11:07  8    discovery.  So the first step is very much an

11:07  9    intellectual exercise.  It's trying to identify who

11:08  10   are the people we think are relevant, who are the

11:08  11   departments we think are relevant, who are the

11:08  12   entities we think are relevant, and then going to

11:08  13   those people.

11:08  14        When we get to those people and we get to

11:08  15   those companies, then we think about the sources of

11:08  16   information or where they're likely to keep

11:08  17   information.  In the case of people, they have paper,

11:08  18   they may have cabinets and filing drawers still.  They

11:08  19   have their laptops and they have their phones, they

11:08  20   may have tablets, and may have other devices.  There

11:08  21   could be thumb drives, any number of things that could

11:08  22   hold potentially relevant information.

11:08  23        Then we go to the company, this is

11:08  24   simplified.  And it's certainly not that simple, as

11:08  25   I'm sure Michelle will attest to, but they have paper

| 11:08 | 1 | and filing rooms and final cabinets and off-site |
| 11:08 | 2 | storage.  They also have file servers, sometimes in |
| 11:08 | 3 | the company, but sometimes now and more prevalently |
| 11:08 | 4 | now in the presence of third parties are being held by |
| 11:08 | 5 | third parties like Amazon web services and Microsoft |
| 11:09 | 6 | has a web service company.  So basically that server |
| 11:09 | 7 | rack on the right -- and that's just a stack of |
| 11:09 | 8 | computers -- where that used to be within the |
| 11:09 | 9 | company's walls in an IT cabinet, now it's often |
| 11:09 | 10 | somewhere else generically referred to as "the cloud." |

11:09  11    And so, when we think about company
11:09  12  documents, they have their paper and they have their
11:09  13  servers.  The servers now, as I said, are sometimes
11:09  14  in-house and sometimes outside, but those servers have
11:09  15  traditional documents that you probably think of and
11:09  16  use every day.  That might be where your Microsoft
11:09  17  Word documents or Excel documents are stored by the
11:09  18  company, so to speak.

11:09  19    But there will also be, as this next item
11:09  20  shows, corporate databases.  So PACER, for example, is
11:09  21  a corporate database of the Government.  It's got
11:09  22  tabular data as opposed to Microsoft Word and other
11:09  23  things, although it does reference files that are more
11:09  24  traditional information.

11:09  25    So what we do at the beginning of the case is

11:09    1   we try and identify who are the people, who are the

11:09    2   companies that we have to go and focus on, and then we

11:10    3   start systematically capturing information from those

11:10    4   sources and ingesting that into the workflow so that

11:10    5   it can ultimately be reviewed and produced.

11:10    6       When we talk about people and companies, we

11:10    7   have traditional email that everyone is familiar with.

11:10    8   We have office documents; this is PowerPoint, this is

11:10    9   Excel, this is Word.  There is other types of files

11:10   10   that probably we don't think of in the first instance

11:10   11   but it includes PDFs, it includes image files like

11:10   12   JPEGs, for example, that you might shoot with your

11:10   13   camera.  But also now, you know, people's voicemail

11:10   14   systems often generate wav files, and they'll get an

11:10   15   email with the audio file that was left in their

11:10   16   voicemail system.  So we think about that in an

11:10   17   e-discovery workflow.

11:10   18       If you're in a design or an engineering case,

11:10   19   you might have engineering documents, in this case CAD

11:10   20   files, which would be the actual diagrams created by

11:11   21   the designers in the system.

11:11   22       And then we get the structured data.  And

11:11   23   this is a whole different bucket, frankly, in our ESI

11:11   24   protocol largely for structured data.  We have

11:11   25   provisions in our ESI protocol which were submitted to

1    the Court for email, for office documents, for other

2    files, and images.  But structure data generally

3    requires a different conversation because you want to

4    make sure you get it in a usable format for the case.

5    Sometimes that usable format will be effectively

6    putting it into an Excel-like table and delivering it

7    to the receiving party.  Other times it might be

8    reports, sometimes it might be both.

9         Sometimes you might want to know what

10   standard reports the company ran and what kind of

11   queries the company ran.  So this one generally

12   requires a discussion among the parties, what

13   corporate databases did you have relevant to this

14   case, did you have a complaint database, did you have

15   an adverse event database maybe in a drug litigation,

16   did your sales reps log their visits with doctors or

17   with the military, or whatever the case may be.

18        So that's an area where there's still further

19   exchange of information in the context of this case

20   but a bucket that we always think about when we think

21   about ESI.

22        We have the paper and hard copy, which I

23   referenced before.  And there's a separate workflow

24   that has to be followed for ESI versus paper and hard

25   copy.

11:12   1          Preservation.  I think, Michelle, I'm going
11:12   2   to pass the mic to you, so to speak.
11:12   3          **MS. SIX:**  Hi.  And good afternoon to
11:12   4   everybody.  I hope you can hear me all right.  But if
11:12   5   I come in and out, let me know.
11:12   6          The next step of the electronic discovery
11:12   7   reference model is preservation.
11:12   8          And Dave, if we could go to the next slide.
11:12   9          **MR. BUCHANAN:**  I'm frozen up.
11:13   10          **MS. SIX:**  So both parties have worked
11:13   11   collaboratively, Your Honor, to draft a preservation
11:13   12   order that was submitted to the Court to carefully and
11:13   13   thoughtfully address both sides' obligations with
11:13   14   respect to the preservation of potentially relevant
11:13   15   data and potentially relevant hard copy documents.
11:13   16          Under the Federal Rules, preservation efforts
11:13   17   are required to be reasonable.  What that means is
11:13   18   that they don't require perfection.  Neither party is
11:13   19   obligated to preserve every single document in their
11:13   20   possession, custody, and control.  Instead, reasonable
11:13   21   efforts tend to extend to the preservation of
11:13   22   potentially relevant and unique or otherwise
11:13   23   nonduplicative data.
11:13   24          Both Defendants and, I believe, Plaintiffs
11:14   25   have either already issued or are in the process of

11:14    1    issuing litigation hold notices to explain to
11:14    2    individual custodians and explain to individual
11:14    3    plaintiffs the scope of what this preservation
11:14    4    obligation looks like.  Preservation is typically far
11:14    5    more broad, more robust than the scope of what is
11:14    6    ultimately collected.  So we extend -- we cast an
11:14    7    intentionally broad but reasonable net to both
11:14    8    currently existing and future created ESI and hard
11:14    9    copy materials that could be potentially relevant, but
11:14   10    it's not necessarily the case that we then go ahead
11:14   11    and collect everything that has been preserved.
11:14   12         David, if we could go to the next slide.
11:14   13         The next phase at the EDRM is collection.  We
11:15   14    don't have a separate slide for collection because
11:15   15    parties traditionally handle this differently.  The
11:15   16    best kind of collection tends to be a sort of bespoke
11:15   17    collection based on the types of data that are kept in
11:15   18    the ordinary course for each side.
11:15   19         This is a -- collection is a practice that
11:15   20    has evolved so much over the past decade and changed
11:15   21    even over the past couple of years.  And the reason
11:15   22    for that is that we all communicate in our day-to-day
11:15   23    lives and in our business practices so differently now
11:15   24    than we did ten years ago or even five years ago.
11:15   25    There is so much electronic data that is being

11:15    1    produced and living in the world that we need to be a

11:15    2    little more creative about how we go and get it and

11:16    3    where we go to find it.

11:16    4         It used to be we would walk into a client's

11:16    5    office and walk out with a bunch of boxes of hard copy

11:16    6    documents that we would go get photocopies.  Now,

11:16    7    while we still do have hard copy materials, most of

11:16    8    our data is largely electronically stored.

11:16    9         And so what that means is that it is

11:16   10    critical, wherever it's reasonable possible, to

11:16   11    collect that data in what we call a forensically sound

11:16   12    manner.  So what does that mean?  It means that we

11:16   13    want to collect material in a way to ensure, as best

11:16   14    we can, that the metadata properties, the electronic

11:16   15    properties of the document that say when it was

11:16   16    created, when it was last edited, who created it, what

11:16   17    time or what day or what year they created it, that

11:16   18    those properties aren't impacted or altered at the

11:17   19    point of the actual collection.

11:17   20         So it's almost as if someone can come in and

11:17   21    make a forensic copy that leaves the document intact

11:17   22    where it lives in its electronic space, whether that's

11:17   23    the cloud that Dave mentioned, whether it's on a

11:17   24    server, whether it's on somebody's laptop, but that

11:17   25    process is we try to keep that document pristine.

11:17   1        It's also important now to have a sound

11:17   2   collection process that can be authenticated and

11:17   3   verified later, which is why we typically discourage

11:17   4   -- and I think most of us can agree, we discourage

11:17   5   self-collection or collection where individual

11:17   6   plaintiffs or individual custodians on the defense

11:17   7   side would decide what to collect themselves and

11:17   8   identify and collect specific documents themselves.

11:17   9        We don't want that because it can alter that

11:18   10  metadata.  If somebody looks at their laptop and says,

11:18   11  *Oh, I have this great document, I'll email it to*

11:18   12  *myself and then I'll send it to my lawyers,* that can

11:18   13  actually change those metadata properties.

11:18   14        So, in the case of email, for example, the

11:18   15  best practice for the collection of email is to have

11:18   16  an independent third-party professional e-discovery

11:18   17  vendor collect forensically a custodian's entire email

11:18   18  box, which now can even be done remotely given how

11:18   19  much of that data tends to be backed up to cloud

11:18   20  sources.  And then once we have that entire email box

11:18   21  collected, we would then do any sort of searching or

11:18   22  culling on the back end.

11:18   23        If we could go on to processing now.

11:18   24        So once we collect this giant corpus of

11:19   25  gigabytes or terabytes of electronic data, there are

11:19    1    some steps that e-discovery vendors will take to

11:19    2    reduce that corpus from what is ultimately reviewed or

11:19    3    subject to searching or analytics like TAR.  And the

11:19    4    reason we do that is that if we have, let's say, 10

11:19    5    terabytes or 20 million documents, there's a big

11:19    6    likelihood of duplicate documents in that pool and

11:19    7    there's also the likelihood of documents that are not

11:19    8    likely to be substantial in nature or have any

11:19    9    evidentiary value.

11:19   10    So the first thing we tend to do is a process

11:19   11    called deduplication.  Every single electronic

11:20   12    document comes with its own unique electronic

11:20   13    thumbprint.  That's typically called a hash value.

11:20   14    You might see it MD5 hash value.  But there is a

11:20   15    manner in which e-discovery professionals can identify

11:20   16    this hash value and then deduplicate documents based

11:20   17    on that thumbprint so the parties aren't needlessly

11:20   18    hosting data or reviewing and producing the same

11:20   19    document multiple times.

11:20   20    The word deNISTing -- N-I-S-T, is an acronym

11:20   21    that stands for the National Institute of Standards

11:20   22    and Technology.  The National Institute of Standards

11:20   23    and Technology has come up with a list of file types

11:20   24    and file extensions that are not likely to have ever

11:21   25    been touched by the end user.  So, in other words, if

11:21    1    somebody comes and takes a forensic image of my

11:21    2    laptop, there are thousands and thousands of what are

11:21    3    called system files on my device that make my device

11:21    4    work, that make my device operate, either they make

11:21    5    Windows operate or they make Microsoft Office operate,

11:21    6    but I've never actually touched them.  I'm not

11:21    7    drafting them, I'm not editing them.  I'm not even

11:21    8    necessarily aware that they're there.

11:21    9         So, by deNISTing we take all of these

11:21   10    documents that are essentially system files or

11:21   11    nonsubstantive files that have been unaltered from

11:21   12    what we think of as sort of their factory original

11:21   13    form, in other words, the files that sort of came with

11:21   14    the computer or with the set of software, and we pull

11:21   15    those out because we don't need to review those.  We

11:21   16    pretty much can all agree that those types of files

11:22   17    are not going to contain potentially relevant

11:22   18    information.

11:22   19         So once we've done that culling, that

11:22   20    deduplication and deNISTing, we then undertake what's

11:22   21    called processing.  And processing is the conversion

11:22   22    of the remaining files -- the deduplicated files and

11:22   23    the substantive files and potentially relevant

11:22   24    files -- to converting that data into a useable format

11:22   25    for document review by attorneys or research and

11:22   1   analysis at the analytics level.

11:22   2        It will take, for example, a Word document

11:22   3   and pull out extracted, searchable text and put that

11:22   4   searchable text into a workspace like a document

11:22   5   review platform like Relativity, which you're going to

11:22   6   see demoed a little bit later.  It will also show the

11:23   7   native file of that Word document so I can actually

11:23   8   open up the Word document itself in Microsoft Word.

11:23   9   It will also show me a version of the document that I

11:23   10  can make my own edits on without changing the actual

11:23   11  value of the document, so highlighting or flagging

11:23   12  information as I review the document internally.

11:23   13       So processing documents allows them to be

11:23   14  searched and reviewed in a much more efficient way.

11:23   15       **MR. BUCHANAN:**  And so, after the files have

11:23   16  been processed, they're staged for review in a

11:23   17  platform like Relativity and there are other platforms

11:23   18  like that.  So what we've talked about to this point

11:23   19  is really collecting the information, sifting out some

11:23   20  of the information that's not likely even to need an

11:23   21  attorney's eyes on it, and then processing it out so

11:23   22  that an attorney's eyes eventually could get on those

11:23   23  documents and start the review process.  But before

11:23   24  that, other tools are used to filter or sift the

11:23   25  candidate documents to determine if they need to be

11:24   1   reviewed.

11:24   2        And this workflow, if I can just back up for

11:24   3   a second, this is really all driven by the recognition

11:24   4   that ESI can be just multiplicative in a sense.  I

11:24   5   mean, an email gets sent to ten people, ten people

11:24   6   have the same email in their files.  Wouldn't it be

11:24   7   great if we didn't have to review it ten times in

11:24   8   everybody's file and we can only review it once?  I

11:24   9   mean, that's the concept of, you know, just looking at

11:24   10  one email thread, track the information where it

11:24   11  landed, you know, what custodians had it in their

11:24   12  files and where it landed, but on the review side only

11:24   13  look at it once.

11:24   14       So this whole workflow is really driven to

11:24   15  recognizing the unique nature and, I'd say, the

11:24   16  multiplicity of electronically stored information to

11:24   17  try and manage the review and ultimately the output.

11:24   18  Because on our side, frankly, it's not that helpful

11:24   19  for us to get 200 million pages.  So if we can get

11:24   20  five million of the unique and the valuable

11:24   21  information, that's about designing -- that's what

11:25   22  these workflows are about, trying to get to the nub of

11:25   23  the documents in the broader collection.

11:25   24       So, filtering.  We're all familiar with

11:25   25  filtering or organization of files that may be

11:25   1    relevant to something.  In the old days, we did it in
11:25   2    filing cabinets and drawers, and we had file folders
11:25   3    that delineated what went where.
11:25   4         There's also manual filtering that people
11:25   5    employ in their own inboxes or maybe with their stored
11:25   6    files for a particular project or case.  And so manual
11:25   7    filtering is one way that a custodian or company might
11:25   8    segregate information where you specifically say this
11:25   9    is where you put your information particular to this
11:25   10   file.
11:25   11        Then there's other filtering.  There's
11:25   12   computer-based filtering.  And I should note that our
11:25   13   ESI protocol that we negotiated says, yes, we're going
11:25   14   to rely on and we're going to use these new techniques
11:25   15   like TAR, and parties are agreeing to that.  But if
11:25   16   somebody, you know, says, *This is where I keep my*
11:25   17   *stuff, I keep my email in this stored email folder*
11:26   18   *related to this particular project,* well, that whole
11:26   19   folder has to be reviewed.  You're not excused from
11:26   20   reviewing that folder because it didn't hit on a
11:26   21   search term because a person, you know, probably the
11:26   22   most reliable source, a person put it there to store
11:26   23   their stuff.
11:26   24        So filtering is, you know, can be human, you
11:26   25   know, on the front end.  The custodian of the company

11:26

11:26

11:26

11:26

11:26

11:26

11:26

11:26

11:26

11:26

11:26

11:26

11:26

11:27

11:27

11:27

11:27

11:27

11:27

11:27

11:27

11:27

11:27

11:27

11:27

1    may say, *This is where we put our stuff related to*

2    *this project.*

3         And then we use other tools.  So what about

4    the person who doesn't have stored email folders, they

5    just, you know, pile up emails in their inbox.  I pass

6    no judgment on that; I'm guilty of that.  For that

7    person, search terms, perhaps.  For that person, maybe

8    clustering of concepts.  For that person, maybe

9    Technology Assisted Review.  And when I say "that

10   person," I mean for people like that or for

11   information like that.  Information that has not been

12   manually segregated, we need some other way, if you

13   will, to cut through the email box, to cut through

14   everything that was on the share folder, you know,

15   where anybody could have stored anything.  So these

16   are common tools that are used.

17        And of course, you know, anyone that's used

18   Google and gone to the advanced page knows that

19   there's ways to do more advanced searches, much like

20   Westlaw.  And for the first 10 or 15 years of

21   e-discovery, search terms were really the way.  That

22   was the way until we were told that maybe it shouldn't

23   be the way.

24        Because search terms -- as we've since

25   learned in some A/B testing between search term use

11:27 1  and TAR use, search terms are believed to capture --

11:27 2  you know, if somebody has the best intention and

11:27 3  there's no -- nobody is trying to steer these away

11:27 4  from finding relevant information, are believed to

11:27 5  capture only 20 to 25 percent of the relevant

11:27 6  information in the corpus.

11:27 7       There's actually been some studies done on

11:27 8  information datasets using a search technique where

11:27 9  somebody looked at, say, the document request, the

11:27 10  complaint, and they developed, if you will, the search

11:27 11  terms that would be used to go in and try and get all

11:28 12  the relevant information, and somebody else has

11:28 13  linearly reviewed the entire production set, gone

11:28 14  through every page without search terms.  And what

11:28 15  they see is that the search terms will capture about

11:28 16  25 percent of what the team that went linearly through

11:28 17  the same dataset would capture.

11:28 18       TAR, when used in a robust way, can capture

11:28 19  80 percent.  So it's still not 100 percent, and that's

11:28 20  kind of what we're always trying to do, we're trying

11:28 21  to get further down that road.  And we're doing a lot

11:28 22  better than we were with search terms, but search

11:28 23  terms still have a place.  And there are documents

11:28 24  that are not going to be susceptible to TAR, for a

11:28 25  number of reasons.

11:28  1   And sometimes there's just inside baseball,
11:28  2  so to speak, emails and correspondence where it's
11:28  3  worse than what I thought it would be.  It's ugly
11:28  4  cute.  That's not going to come up in a TAR search.
11:28  5  It might come up -- if you decided, *Hey, this is a*
11:28  6  *really important custodian, we've got to look in this*
11:28  7  *window of time where they knew they were looking for*
11:28  8  *something,* maybe we have to look at that window of
11:28  9  time.
11:29  10   So I'd say these are complementary approaches
11:29  11  to try and get to the relevant information.  What
11:29  12  everybody is trying to do in litigation is get to the
11:29  13  relevant information as officially as possible without
11:29  14  needlessly troubling people to look at everything.
11:29  15   And so, search terms remain a tool, but I'd
11:29  16  say probably not the primary tool.  And I think,
11:29  17  frankly, Your Honors, the order that's been worked out
11:29  18  between the parties -- and it's really a testament I
11:29  19  think to the commitment on both sides -- is truly one
11:29  20  of the more comprehensive and progressive than I've
11:29  21  seen.  It really, I'd say, addresses all the
11:29  22  shortcomings over the last twenty years in
11:29  23  e-discovery, in my view.
11:29  24   Michelle, I think you were going to address
11:29  25  in your -- clustering is something that --

11:29    1    **MS. SIX:** Yes, I'm happy to. So, in addition
11:29    2    to the search terms but as a sort of precursor to TAR,
11:29    3    the Technology Assisted Review, some of our review
11:29    4    platforms for documents have additional analytic tools
11:30    5    and technologies that we use to identify or cluster
11:30    6    similar documents. Maybe they're not exact duplicates
11:30    7    like that sort of electronic thumbprint I mentioned
11:30    8    before, but there are text categorization tools that
11:30    9    will cluster like documents together based on the
11:30    10    similarity of textual content.

11:30    11    So this is something we really rely on on the
11:30    12    review side of e-discovery, and the reason for that is
11:30    13    twofold. If we can look at an email that we think is
11:30    14    relevant and then, through the technology of near
11:30    15    duplicate analysis, be able to review that same day a
11:30    16    bunch of other similar emails, both similar in dates
11:30    17    and also similar in subject matter, that obviously
11:31    18    makes our review much more consistent and efficient.

11:31    19    And similarly, with concept clustering, once
11:31    20    the materials to be clustered are sort of specified by
11:31    21    relevance, the clustering tool evaluates data, finds
11:31    22    those similarities, and creates clusters. So that's
11:31    23    efficient for us, as attorneys. Because if we want to
11:31    24    sort of quickly categorize 200 or 300,000 documents
11:31    25    and put them into 10 buckets or 20 buckets of topics

| | |
|---|---|
| 11:31 | 1 |

and analysis, that makes everything that must faster
to sort of get it out the door to the other side and
let's us sort of understand the primary sort of source
and subject matter of the material we've collected.

      **MR. BUCHANAN:**   And Michelle, correct me if
I'm wrong but, I mean, this is really a matter of, you
know, if you had let's just say 30 custodians'
unstructured data, their email boxes, their Word
documents, those files, this tool could be applied
against all of that electronic information and
effectively sift the similar information into, you
know, little silos, a silo on, I don't know, product
development, notice, whatever the issue might be, so
that the review teams that are looking at documents
can be more focused and trained up, if you will, on
each of those silos and more efficiently review the
documents.

      Is that fair?

      **MS. SIX:**   That's exactly right.   That's
totally fair.   And it also helps us in responding to
specific RFPs for interrogatories.   It just helps us
identify documents that might all relate to a similar
topic that much more quickly.

      **MR. BUCHANAN:**   Now we're moving to analysis.
And TAR, you know, may be analysis, TAR may be review.

11:33    1    It's often used on the review side once the documents

11:33    2    have been processed and there are text files that have

11:33    3    been extracted from them and to, if you will,

11:33    4    prioritize from this mass of electronic information

11:33    5    what do we need to lay human eyes on.

11:33    6         And that's really the goal of TAR.  There

11:33    7    will be a set of documents, often very pretty

11:33    8    substantial, that human eyes won't look at, and that's

11:33    9    because of the prioritization that TAR applies.  And

11:33   10    we have confidence that this will be better than

11:33   11    search terms.

11:33   12         So on the plaintiff's side generally we're

11:33   13    always looking for everything, everything that can be

11:33   14    relevant to our claims or to the defendant's defenses.

11:33   15    But we know that we get more with TAR than we get with

11:33   16    search terms, so we're moving in a more comprehensive

11:33   17    direction by going there.

11:33   18         So TAR, Technology Assisted Review, what it

11:33   19    does -- there are three components to it, and I'll

11:33   20    talk about them in a moment.  But essentially it

11:33   21    leverages human judgment.  So people will look at

11:34   22    documents and they'll make calls, responsive or

11:34   23    nonresponsive, on documents.  And then the computer

11:34   24    algorithm, the engine, the TAR model -- a lot of these

11:34   25    terms are kind of used interchangeably and probably

11:34  1   will in this presentation -- but that model will then

11:34  2   extend those judgments across the population.

11:34  3          So humans might review 10,000 documents --

11:34  4   and we're proposing an interactive TAR protocol here

11:34  5   where the Plaintiffs and the Defendants would jointly

11:34  6   make calls on documents to get agreement and alignment

11:34  7   on the training of the system.  And there's different

11:34  8   models.  I'll defer greater detail on what we're

11:34  9   thinking about in terms of the TAR proposal here.

11:34  10         But then the computer will leverage that

11:34  11  judgment, the attorney judgment, across the broader

11:34  12  population of collection and then percolate up, if you

11:34  13  will, or score the other documents, you know, *Are they*

11:34  14  *like this, are they not like this*.

11:34  15         We know a similar thing as Spotify or iTunes

11:35  16  or really anything if you listen to music, maybe

11:35  17  Pandora and, *Oh, I like that song, thumbs-up.  No, I*

11:35  18  *don't like that one, I don't want to hear that one*

11:35  19  *again,* and you provide judgments to the computer

11:35  20  algorithm, and the computer now knows that, and it

11:35  21  says, okay, *Dave would like more Metallica, Dave would*

11:35  22  *like less classical.*

11:35  23         **JUDGE JONES:**  You don't seem like a Metallica

11:35  24  guy.

11:35  25         **MR. BUCHANAN:**  When I'm working out.

11:35   1    And so the system will sift the music so you
11:35   2  get more of what you like and less of what you don't
11:35   3  like.  And so you don't have to listen to the entire
11:35   4  Spotify collection and flag every song in there to get
11:35   5  more of what you like and less of what you don't like.
11:35   6  Your judgments are recorded in the system, and then
11:35   7  the system starts to feed you more of what you like.

11:35   8    And that's really what's being explored here
11:35   9  with text classification with TAR, feeding documents
11:35  10  into the system so the engine is built, and then
11:36  11  humans are going through saying, *That's a document*
11:36  12  *that's responsive, thumbs-up; that's one that's not*
11:36  13  *responsive.*

11:36  14    And the system learns from both decisions.
11:36  15  It learns from what you want to see and it learns from
11:36  16  what you don't want to see, and it captures that
11:36  17  information.  And by virtue of that, it feeds up to
11:36  18  the top more of what is of interest for the particular
11:36  19  case and less of what is not of interest.

11:36  20    And really in TAR, so everyone is on the same
11:36  21  page, we're aware that there's a lot of stuff in the
11:36  22  "not of interest" that's not going to be presumptively
11:36  23  looked at by human eyes.

11:36  24    **JUDGE RODGERS:**  How much of that has to be
11:36  25  done?

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 11:36 | 1  | **MR. BUCHANAN:**  So there's different models.             |
| 11:36 | 2  | And the one that's going to be explored here and I          |
| 11:36 | 3  | think is going to be discussed by Michelle a little         |
| 11:36 | 4  | later is called Continuous Active Learning.  And so         |
| 11:36 | 5  | you can look -- in this newer model you can look at a       |
| 11:36 | 6  | smaller set of documents to make some early calls.          |
| 11:36 | 7  | And what's been proposed is that we'll identify some        |
| 11:36 | 8  | seed documents because -- they're called seed               |
| 11:36 | 9  | documents and that's going to discussed in a moment --      |
| 11:37 | 10 | documents which we would like to show the analytic          |
| 11:37 | 11 | engine to train it up.                                      |
| 11:37 | 12 | But you could just have the computer randomly               |
| 11:37 | 13 | sample documents from this big collection across all        |
| 11:37 | 14 | these custodians -- let's say there's 10 million            |
| 11:37 | 15 | documents in there -- it could sample across and then       |
| 11:37 | 16 | feed them out to reviewers and, based how reviewers         |
| 11:37 | 17 | are going thumbs-up or thumbs-down, start to know.          |
| 11:37 | 18 | And I think the tech people will say it will start          |
| 11:37 | 19 | training immediately, I mean, like with ten documents       |
| 11:37 | 20 | start training, but it gets better, it gets better the      |
| 11:37 | 21 | more you look at it.                                        |
| 11:37 | 22 | So the process that's being proposed is I                   |
| 11:37 | 23 | think Continuous Active Learning.  Documents are            |
| 11:37 | 24 | shown, they're scored thumbs-up/thumbs-down, and then,      |
| 11:37 | 25 | you know, over time they'll continue to get stronger        |

11:37    1    and more robust.

11:37    2         **JUDGE JONES:**  Correct me if I'm wrong.  The

11:37    3    whole purpose will be to cut down on human review,

11:37    4    that's where the real cost in e-discovery is, and

11:37    5    hopefully you get a higher recall and precision,

11:38    6    right?

11:38    7         **MR. BUCHANAN:**  One hundred percent, Your

11:38    8    Honor.  I mean, this is about, you know, from our

11:38    9    side, recognizing the volume of electronically stored

11:38   10    information that's created, it propagates, it gets

11:38   11    copied, you know, can we get rid of duplicates, that's

11:38   12    the first step, great, can we get rid of files that

11:38   13    aren't really likely to be informative, sure, that's

11:38   14    great, get rid of that.  And now we're at a place at

11:38   15    this part where there is text-based information that

11:38   16    probably some people are going to have to consider.

11:38   17    And so we're wrestling with how do we sift or how do

11:38   18    we kind of filter that in a manageable way to put

11:38   19    human eyes on it.

11:38   20         You know, there was a day when human eyes

11:38   21    would go across the entire set, and then there was

11:38   22    concern.  Then there was a day that we would just use

11:38   23    search terms across an entire set, and there was

11:38   24    concern because we were getting 20 percent of what we

11:38   25    think might have been the estimated volume.  Now we're

| | |
|---|---|
| 11:38 | 1 |
| 11:38 | 2 |
| 11:38 | 3 |
| 11:38 | 4 |
| 11:38 | 5 |
| 11:39 | 6 |
| 11:39 | 7 |
| 11:39 | 8 |
| 11:39 | 9 |
| 11:39 | 10 |
| 11:39 | 11 |
| 11:39 | 12 |
| 11:39 | 13 |
| 11:39 | 14 |
| 11:39 | 15 |
| 11:39 | 16 |
| 11:39 | 17 |
| 11:39 | 18 |
| 11:39 | 19 |
| 11:39 | 20 |
| 11:39 | 21 |
| 11:39 | 22 |
| 11:39 | 23 |
| 11:39 | 24 |
| 11:39 | 25 |

using TAR to get 80 percent, and it's really pretty clever.

**JUDGE RODGERS:**  Does the computer self-validate that 80 percent or is there some other validation?

**MR. BUCHANAN:**  And that's the rub, Your Honor.  You're nailing one of the critical issues that's discussed in every TAR process is really how do both sides get comfortable with calling done, when has the system been trained enough, when have enough of the responsive documents gotten out to where the defendants say I think we're there.  And that's really for our further discussion.

There are ways to validate the process like this, and I'll talk about that in a moment -- I am getting a little ahead -- but it's statistical sampling.  You can sample this population and see what is the estimated volume of relevant information, relevant documents in that population, what's the estimated volume that we see and what's been produced so far based on review.

We could look at what's the estimated component of relevant information in what's been not reviewed.  So we could sample the stuff that was never looked at -- not stuff -- documents or there could any

11:39  1    number of things, electronic information, we sample it

11:39  2    to see what's the quantity of relevant information in

11:40  3    there.  And that could raise a concern.

11:40  4         If you see relevant documents that have

11:40  5    alluded, if you will, attorney review because the TAR

11:40  6    model has not captured that, that may be a cue to

11:40  7    further train, you know, maybe we've got to go back

11:40  8    Spotify and do more thumbs-up/thumbs-down and change

11:40  9    how we're prioritizing the training of the system.

11:40  10        **JUDGE JONES:**  Let me just ask one other

11:40  11   question just to make sure we're on the same page.  So

11:40  12   the TAR or CAL, Continuous Active Learning, that's

11:40  13   going to help and be efficient when we're dealing with

11:40  14   text files?  When we have structured data and

11:40  15   databases, which I suspect we've got some in this --

11:40  16   engineering -- TAR is not going to be helpful; is that

11:40  17   right?

11:40  18        **MR. BUCHANAN:**  Yes, there are whole

11:40  19   categories of documents that TAR doesn't work for.

11:40  20   You know, spreadsheets can be a challenge because it's

11:40  21   looking for associations of language as a general

11:41  22   matter.  It's depending on the model and how it's

11:41  23   created.

11:41  24        One I'm more familiar with is Latent Semantic

11:41  25   Indexing, which basically you use the correlation

11:41    1    between words to develop concepts, and those concepts

11:41    2    that are naturally associated with concepts across

11:41    3    different documents, and you get, if you will, a

11:41    4    multi-dimensional framework for the document

11:41    5    collection where you can drill across in all different

11:41    6    directions.

11:41    7         That particular model is highly dependent on,

11:41    8    obviously, what it's fed.  The one that's being used

11:41    9    here is more of a thumbs-up/thumbs-down design and, to

11:41   10    my understanding, much more robust and efficient for

11:41   11    doing the type of TAR that's proposed here.  And we'll

11:41   12    hear from the vendors on that a little later.

11:41   13         Your Honors, here's the three components.

11:41   14    There's subject matter experts.  We need people still

11:41   15    because we've got to extend their judgments across the

11:41   16    population.  We need an analytic engine or a TAR tool,

11:42   17    and that's going to classify text.  And then we have

11:42   18    statistical validation, and that's the process where

11:42   19    everyone says, okay, we're comfortable with the

11:42   20    process we created here.

11:42   21         If I could -- Michelle, maybe you could talk

11:42   22    about seed sets?

11:42   23       **MS. SIX:**  Sure.  Did we want to go back to

11:42   24    slide 21 real quick?

11:42   25       **MR. BUCHANAN:**  Oh, sorry.

11:42  1    **MS. SIX:**  That's okay.

11:42  2         So, as Dave mentioned, different e-discovery

11:42  3    vendors will use different TAR engines, different

11:42  4    modeling systems, different algorithms.  And the

11:42  5    engine that the Defendant's vendor is suggesting we

11:42  6    use here is a form of active learning.  It's called

11:42  7    Relativity's Active Learning, and it uses what are

11:42  8    called support vector machines or SVM.

11:43  9         Before I butcher what SVM is, I will give you

11:43  10   my best understanding of it, which is that it is a

11:43  11   binary classification tool, which is sort of a very

11:43  12   fancy way of saying, from my perspective, we're going

11:43  13   to put things into one or two buckets.  We're going to

11:43  14   put them into that Metallica bucket or the classical

11:43  15   music bucket for Dave, but we are going to cull

11:43  16   documents and have the program engine then sort of

11:43  17   immediately start to classify the remaining documents

11:43  18   based on both textual and concept similarities or

11:43  19   differences to the documents that have been coded and

11:43  20   reviewed and the feedback that the system is receiving

11:43  21   from the subject matter experts who are reviewing it.

11:43  22        And when we say subject matter experts,

11:43  23   typically we're thinking of -- certainly at a law firm

11:44  24   level we're thinking of a senior associate or a junior

11:44  25   partner who is super, super familiar with the issues

| | |
|---|---|
| 11:44 | 1 |
| 11:44 | 2 |
| 11:44 | 3 |
| 11:44 | 4 |
| 11:44 | 5 |
| 11:44 | 6 |
| 11:44 | 7 |
| 11:44 | 8 |
| 11:44 | 9 |
| 11:44 | 10 |
| 11:44 | 11 |
| 11:44 | 12 |
| 11:44 | 13 |
| 11:44 | 14 |
| 11:45 | 15 |
| 11:45 | 16 |
| 11:45 | 17 |
| 11:45 | 18 |
| 11:45 | 19 |
| 11:45 | 20 |
| 11:45 | 21 |
| 11:45 | 22 |
| 11:45 | 23 |
| 11:45 | 24 |
| 11:45 | 25 |

in the case.  Because one of the things about TAR that's so important to understand -- and I'm sure that the analysts in the room from our e-discovery vendors might disagree with me, but I still think these systems are only as good as the information that is being input by the attorneys looking at the documents.

So when we talk about artificial intelligence, generally we're still feeding the system, we are still responsible for telling the system, giving it an up or down call regarding relevance and sometimes regarding privilege, and that training has to come from somebody who is intimately familiar with the case and what would actually be relevant to the claims and defenses therein.

When we start this review process, we always talk about a seed set.  And a seed set can be different for different cases.  So there is no one way necessarily to pick the documents that are initially used to train the system.  I think a pure artificial intelligence proponent would tell you that a seed set has to be randomly picked from the entire corpus of documents collected, that that's the only sort of pure way to be able to train the algorithm.  I think perhaps lawyers would argue that a seed set can be seeded from documents that have already been subject

| | |
|---|---|
| 11:45 | 1 |
| 11:45 | 2 |
| 11:46 | 3 |
| 11:46 | 4 |
| 11:46 | 5 |
| 11:46 | 6 |
| 11:46 | 7 |

to certain parameters or limitations.  In other words,
we can do a seed set that has been subject to at least
a few broad search terms or we can do a seed set from
a select number of custodians where we reasonably
expect a large number of relevant documents or we can
either limit the document set based on an
electronically applied date range.

So the process of training works best -- and
Dave touched on this before -- where there is
transparency and cooperation between the parties and
there is an agreement from the very beginning
regarding sort of every step of the TAR process.  And
in my mind, part of that transparency and cooperation
extends to the origin of the seed set and how that's
compiled and chosen.

Another thing that I note Your Honor has
asked about and Dave touched on is that there are some
files that are inherently not going to be as
susceptible to this form of analytics as other files,
although, again, I think we probably have certain
e-discovery vendors who would argue that they've come
up with a tool that's going to fix this dilemma.  But
certain types of files that we have in electronic
format -- we have audio files, video files,
photographs, other sorts of data that can be found in

11:47  1   the cloud.  There are certain types of files that

11:47  2   typically will not have extractible text.  And without

11:47  3   that extractible text, it doesn't mean it's impossible

11:47  4   for a document to be susceptible to TAR, but it does

11:47  5   make it less -- it makes it more complicated and less

11:47  6   of a sure thing.

11:47  7        Excel files are sort of files I would

11:48  8   typically put on the fence because obviously we'll

11:48  9   have some Excel spreadsheets with lots of text and

11:48  10  lots of available ways to categorize or classify that

11:48  11  text.  Other times we'll have Excel files that are

11:48  12  largely numbers with lots of ones and zeros themselves

11:48  13  which makes them less TAR friendly.

11:48  14       To me, this is the most important thing when

11:48  15  we're talking about the susceptibility of files is

11:48  16  that we talk about including parent and attachment

11:48  17  documents or entire families of documents in what we

11:48  18  ultimately review for relevance.

11:48  19       So if we have perhaps an Excel attachment

11:48  20  that was not super classifiable but an email that was

11:48  21  classifiable, we need to make sure when we go into our

11:48  22  review phase that we're including that attachment

11:48  23  Excel in our review process.

11:48  24       **MR. BUCHANAN:**  So, Your Honors hit on earlier

11:48  25  in terms of how do we know we're doing this well.  So

11:49    1    there's processes that have evolved over the last ten

11:49    2    years or so as this has become more prevalent.  So we

11:49    3    have a classifying engine.  Let's assume that we're

11:49    4    using the method that the Defendant's vendor has

11:49    5    chosen and recommended.

11:49    6         The dashed line is surrounding those

11:49    7    documents in this collection that the classifying

11:49    8    engine says are responsive.  So the Defense

11:49    9    classifying engine is predicting that everything

11:49   10    inside this dashed line is responsive.  We can see,

11:49   11    though, when human eyes ultimately touch those files,

11:49   12    that a good number are indeed responsive, so it's

11:49   13    doing pretty good, and there's three that are not.

11:49   14         And so really what we'd like to see -- I

11:49   15    should say the ones that are green are true positives,

11:49   16    it's make the correct call.  It pushed the song

11:49   17    forward that I wanted in Spotify.  The false

11:50   18    positives, when I got some Bach and I didn't want that

11:50   19    and that's not right and we want to kind of push that

11:50   20    out.  The true negative is, yes, okay, classical music

11:50   21    is outside of the scope of this dashed line.  And the

11:50   22    false negative is one of my Metallica songs is down

11:50   23    here and for some reason Spotify is not pulling it up

11:50   24    into the play list.

11:50   25         So this is how -- there are statistics that

11:50   1   are built around this type of analysis.  We can sample
11:50   2   a production, we can look to see how many true
11:50   3   positives, how many true negatives, and what's the
11:50   4   extent, if you will, of false negatives outside the
11:50   5   model.  And that's what a lot of the statistics are in
11:50   6   development.

11:50   7        So we could see, if we had a system trained
11:50   8   that had perfect recall, recall being a measurement of
11:50   9   did we capture everything that was responsive, and you
11:50   10   say, yeah, I mean, this is great, from the plaintiff's
11:50   11   perspective we got everything that was responsive.
11:50   12   From the defense's perspective, because they were
11:51   13   going to lay human eyes on them after this filtering
11:51   14   was done, they say this isn't so great because we have
11:51   15   perfect recall but we've got really low precision,
11:51   16   there's a lot of false positives that are predicted by
11:51   17   the model, so this isn't great, this isn't great, and
11:51   18   it doesn't really serve TAR's purpose of prioritizing
11:51   19   and really to the exclusion of false positives.

11:51   20        Here we have the other situation.  We have
11:51   21   perfect precision.  The model, the dashed line
11:51   22   again -- and the dashed line, as a reminder, is what
11:51   23   the computer is predicting we want.  However the
11:51   24   system has been trained, however it's been trained for
11:51   25   responses, the dashed line is saying this is what you

11:51  1   want.  Okay.  Well, this isn't good.  It's, yes,

11:51  2   incredibly precise.  It had no false positives in

11:51  3   there.  But we see there are lots of positives

11:51  4   outside.  So that model is not doing so great either.

11:51  5        And then on the right we have the other side.

11:52  6   We have, okay, we've got more of the greens, we've got

11:52  7   fewer of the reds, and that's reflecting some kind of

11:52  8   balance in the process.  We've got pretty good recall

11:52  9   and we've got pretty good precision, so striking a

11:52  10  balance.  And that's a lot of what the parties are

11:52  11  trying to do with our TAR protocol, get to a place

11:52  12  where we maximize recall and maximize precision.

11:52  13       How do we check this?  We check with

11:52  14  validation.  Validation -- and there's a lot of ways

11:52  15  that you can validate.  You can validate the extent of

11:52  16  recall, you can validate the extent of elusion and

11:52  17  that would be those green documents that are outside

11:52  18  the dashed box of the model.

11:52  19       And then, should we be stratifying, should we

11:52  20  be looking to ensure that concepts or people of

11:52  21  particular concern, we have higher recall or higher

11:52  22  precision there?

11:52  23       So we take a statistical sample, something

11:53  24  that would be reflective of the population that's been

11:53  25  captured, and then we measure.  This is a measure of

11:53   1   recall.  We've got, I think -- actually, I didn't do a

11:53   2   calculation on this, but 13 documents, 10 of 13,

11:53   3   that's about 83 percent.  So we've captured 83 percent

11:53   4   -- I'm sorry, 10 of 12 responsive documents in the

11:53   5   collection, 83 percent recall.

11:53   6          So we took a sample, we measured how many red

11:53   7   versus how many green did we get.  We saw with one

11:53   8   pull we got 83 percent of what we wanted.  To contrast

11:53   9   that with the traditional method, if we can expect

11:53   10  kind of the information science around search terms,

11:53   11  you know, you'd expect around the first couple of

11:53   12  search terms to be in the 20 to 25 percent

11:53   13  respectively, it varies.  So we're doing better here.

11:53   14         Elusion.  This is measuring the extent of the

11:53   15  things we want and the documents that will never see a

11:54   16  human eye.  Again, if it's eluded the model, that

11:54   17  means human eyes will not see it unless we get to it

11:54   18  through some other way.  So one of the other ways we

11:54   19  do it is we'd do statistical modeling, we sample, we

11:54   20  measure the extent of the elusion.

11:54   21         Now, if I could, I'm going to pass the mic

11:54   22  back to Michelle.

11:54   23         Michelle, you're going to run through the TAR

11:54   24  workflows?

11:54   25         **MS. SIX:**  Sure.  So when we talk about TAR,

11:54  1    you may have heard people say sort of TAR 1.0 or TAR

11:54  2    2.0 and wonder what on earth that possibly means.

11:54  3         So TAR 1.0 is what we think of as traditional

11:54  4    predictive coding.  This is a model that has actually

11:54  5    been approved for use by some of our U.S. regulators.

11:54  6    Especially the DOJ and the FTC are fans of this

11:54  7    workflow when they've got a second request to review

11:55  8    or some other antitrust matter with terabytes and

11:55  9    terabytes of data and documents that need to be

11:55  10   produced to the government in short order.  But this

11:55  11   is a traditional model.

11:55  12        And what happens here, as you can see from

11:55  13   the little chart, is that we get a random sample of

11:55  14   documents in the control set pulled from that bigger

11:55  15   document corpus of collected documents by subject

11:55  16   matter expert.  That's where the senior associate

11:55  17   level person reviews documents, and their coding then

11:55  18   trains the system and helps this algorithm become

11:55  19   established and stable such that it then gets applied

11:55  20   to the large document corpus, and all of those

11:55  21   documents are given a ranking of 1 to 100.

11:55  22        And that ranking sort of says -- if the

11:55  23   document is ranked 100, it's almost certainly likely

11:56  24   to be relevant or potentially relevant.  If it's

11:56  25   ranked 80 out of 100, maybe less likely but still

11:56  1  popping up to the top, and then so on and so forth
11:56  2  from there until you get to the bottom where the
11:56  3  system is not seeing any indication of relevance.

11:56  4  So once that ranking is done, the parties
11:56  5  then determine a review strategy, which is to say they
11:56  6  decide, hopefully with that transparency and
11:56  7  cooperation I mentioned before, what ranking member
11:56  8  they're going to agree to a cutoff.  So if I'm working
11:56  9  with the DOJ and the DOJ says to me, "Everything with
11:56  10  85 or higher we want you to review," and we have that
11:56  11  agreement, the parties are satisfied, and then my 10
11:57  12  million documents I had to review goes down to a
11:57  13  small, more manageable, less expensive, and more
11:57  14  efficient portion of those documents.

11:57  15  So what are the drawbacks here?  There's a
11:57  16  couple.  So the first issue is that we have seen in
11:57  17  the traditional model sometimes, although not always,
11:57  18  that the number of randomly selected sample documents
11:57  19  are seeds that can grow to be quite large.  Because
11:57  20  sometimes, in order to train the system, the control
11:57  21  set will be 2,000 or 3,000 documents, something not
11:57  22  too bad.  But if you have to do that a few times,
11:57  23  multiple times, and you're getting random sample sets
11:57  24  which will sometimes include documents with a low
11:57  25  value, in other words, vague text or text that's not

| 11:57 | 1 | related to other documents, that might mean that we |
| 11:57 | 2 | need to perform multiple iterations of these sampled |
| 11:58 | 3 | reviews to achieve the accuracy that we're looking |
| 11:58 | 4 | for, the facility in that algorithmic model.  So |
| 11:58 | 5 | sometimes we might have to review 10,000 or 12,000 |
| 11:58 | 6 | documents or more for that model to be efficient and |
| 11:58 | 7 | stabilized, and at that point we sometimes start to |
| 11:58 | 8 | see diminishing returns. |
| 11:58 | 9 | We also have some ambiguity in that cutoff |
| 11:58 | 10 | number.  Even though the parties will agree to the |
| 11:58 | 11 | cutoff, there is sort of an arbitrariness to it where, |
| 11:58 | 12 | you know, we don't know, who is to necessarily say |
| 11:58 | 13 | that a document coming in with a 75 rating or an 80 |
| 11:58 | 14 | rating isn't something that's really interesting and |
| 11:58 | 15 | important as maybe one that has a 90 rating. |
| 11:58 | 16 | So it is not a perfect system, which is why |
| 11:58 | 17 | we see the sort of change or the transition to TAR |
| 11:59 | 18 | 2.0, which is the next slide.  And that's known, as |
| 11:59 | 19 | Dave said, as Continuous Active Learning.  Some |
| 11:59 | 20 | formats call it Continuous Multimodal Learning, but |
| 11:59 | 21 | it's the same general idea.  Like you look at this |
| 11:59 | 22 | chart and you see the same sort of work flow.  The |
| 11:59 | 23 | difference is is that the CAL protocol enables the |
| 11:59 | 24 | system to continuously analyze the machine learning |
| 11:59 | 25 | results as humans are reviewing documents but without |

11:59   1   the need to begin necessarily by analyzing a bunch of

11:59   2   static randomized samples.

11:59   3        So the result and the reason we see a little

11:59   4   more of a lean towards this newer version is that a

11:59   5   user can sometimes begin a TAR 2.0 session by

11:59   6   reviewing, you know, as few as a couple hundred

12:00   7   documents and then the system immediately is able to

12:00   8   rely on those documents to train the system before

12:00   9   running it on unreviewed documents.

12:00   10        In other words, the idea of CAL is that the

12:00   11   system is continuously improving as the review

12:00   12   progresses by reranking the entire datasets with each

12:00   13   new batch of data.  It also repeatedly refines its

12:00   14   understanding of which documents are most likely to be

12:00   15   relevant based on the user's feedback regarding the

12:00   16   documents that have already been presented, so in that

12:00   17   way it's actually most like the Spotify example that

12:00   18   Dave mentioned earlier.

12:00   19        So, if we move on to the next slide, which is

12:00   20   what the Defendant's TAR proposal is, you'll see this

12:01   21   is that same sort of Continuous Active Learning model.

12:01   22   And one of the reasons that we suspect this might make

12:01   23   the most sense for the Defendant's data is that we

12:01   24   don't anticipate having a super massive corpus of

12:01   25   documents to search.  And by using this CAL program,

12:01  1   we think that we're electing a system or an engine

12:01  2   that most resembles an internet search engine because

12:01  3   of the way it's presenting documents to the user and

12:01  4   ranking them sort of immediately upon the initial

12:01  5   feedback and continually refining that decision-making

12:01  6   process by classifying the documents based on the

12:01  7   similarity or the differences to that population.

12:01  8        And so I think what might make the most sense

12:01  9   right now is to have one of the data experts from XACT

12:02  10  just explain a little bit more in detail what this

12:02  11  proposed engine does.

12:02  12        **MR. LAVON:**  Thank you, Michelle.

12:02  13        Thank you, Your Honor.  My name is Paul

12:02  14  Lavon, and I'm the senior director for Relativity

12:02  15  Analytics for XACT Data Discovery.

12:02  16        **JUDGE RODGERS:**  Last name is Lavon?

12:02  17        **MR. LAVON:**  Lavon, yes, ma'am.

12:02  18        **JUDGE RODGERS:**  Okay.  Thank you for coming.

12:02  19        **MR. LAVON:**  Thank you for having me.

12:02  20        So this is a screenshot from the active

12:02  21  learning project home.  This is what it looks like on

12:02  22  my end as a technician who is going to be running this

12:02  23  in conjunction with any client who has one of these

12:02  24  things in your data system.  I know you're going to

12:02  25  see a demonstration of Relativity later on today, but

12:02   1   this is actually built into the Relativity software on

12:02   2   our end.  So the proposed technology of it is going to

12:02   3   be available to both parties so they'll be able to see

12:02   4   similar types of things.

12:02   5       What this represents is a chart of all of the

12:03   6   data associated with our product that would have been

12:03   7   selected with a team of people that work for me at

12:03   8   XACT, for instance, where we would have selected the

12:03   9   data in conjunction with whatever priorities had been

12:03   10  given to us by the attorneys.  So whatever the ESI

12:03   11  protocol was, I would have had that in my hands to

12:03   12  review, understood exactly which custodians were going

12:03   13  in, which data types have been agreed to be, say,

12:03   14  culled before it had gone into the process, and then I

12:03   15  would be building a search that would sort of

12:03   16  encompass that entire population, injecting that into

12:03   17  an analytic index, which is a little bit different

12:03   18  than a search term index, it does a lot of more

12:03   19  analysis between the documents to see which documents

12:03   20  have features that are similar or different.  And that

12:03   21  classification index will be the core of this process.

12:03   22      And so, when I put that into the system, I'm

12:03   23  going to get charts just like this that's going to

12:03   24  show me how many documents are in the system.  We have

12:03   25  some dummy data up there, as you can see, it's a

12:03   1   little squinty up there, but it's just under 20,000

12:03   2   documents and the projects in this particular case.

12:04   3   Of course, there would be significantly more in the

12:04   4   current matter.  And then the system is providing me a

12:04   5   chart.

12:04   6        They're absolutely right, as they touched on

12:04   7   before, it used to be that, in order to get a system

12:04   8   seeded, you might have to review maybe potentially

12:04   9   several thousand documents just to get a start on the

12:04   10   random sample.

12:04   11        The TAR protocol has advanced enough that we

12:04   12   know that we can actually begin learning once we've

12:04   13   gotten about five good examples of both relevant and

12:04   14   nonrelevant.  So the more examples we have in the

12:04   15   beginning -- I like to have them.  I may be a TAR

12:04   16   purest but I'm not crazy.  I don't want people to be

12:04   17   reviewing thousands and thousands of nonrelevant

12:04   18   documents.

12:04   19        So we would start this process.  We would

12:04   20   have some examples of relevant and nonrelevant data.

12:04   21   I understand we're talking about having a protocol

12:04   22   wherein an initial sample would be reviewed by both

12:04   23   parties so that there would be an agreement to only

12:04   24   review protocol.  I think that's absolutely the best

12:04   25   way to go because it will easily streamline the

12:04  1  beginning of the process.

12:04  2          And then, as reviewers code, we start to get

12:04  3  information about what they're doing and the system is

12:05  4  continuously updating, just as Michelle had said.  If

12:05  5  you see, there's a blue line on the bottom of that

12:05  6  screen.  And I apologize that that is so small because

12:05  7  I know I'm the one who took the screenshot.  But that

12:05  8  blue line right there is a representation to me on the

12:05  9  back end of about how the reviewers are doing.

12:05  10          And you may notice that there's a divider

12:05  11  every 200 documents there.  What that's actually

12:05  12  showing is every 200 documents I'm kind of getting a

12:05  13  score of what percentage of documents the reviewers

12:05  14  are looking at that are actually relevant compared to

12:05  15  what the computer predicted was relevant.

12:05  16          And where this works really well for us on

12:05  17  our end is that there are no batches.  The system is

12:05  18  just continuously updating itself as it learns from

12:05  19  the reviewers, feeding those reviewers -- I'm getting

12:05  20  immediate feedback on my end showing that what they're

12:05  21  reviewing continues to remain relevant.

12:05  22          And as we see that blue line drop off for any

12:05  23  particular reason, we can take a look and see, you

12:05  24  know, is it because the process is coming to an end,

12:05  25  have we reviewed everything that's likely to be

12:05  1    relevant, or is it just this particular batch, for

12:06  2    instance, et cetera.

12:06  3          It lets us know that -- you had alluded

12:06  4    earlier in one of your questions about when do you

12:06  5    know to stop.  The answer is, the system is not going

12:06  6    tell me to stop.  It's going to keep feeding documents

12:06  7    as best it can at the top of the priority list and

12:06  8    just work its way down.  And we're going to at some

12:06  9    point decide that we want to look at judgment on how

12:06  10   to test it to see if we've gotten enough that all

12:06  11   clients will be satisfied.

12:06  12         And you'll see in the bar chart in the middle

12:06  13   some documents that are purple that are not reviewed,

12:06  14   those would be all the documents that kind of got

12:06  15   pushed off to that not relevant portion of the screen

12:06  16   based on coding that had been done so far.

12:06  17         The items you'll see on kind of the

12:06  18   right-hand side of the screen happened to be blue and

12:06  19   in this case are the documents that were not just

12:06  20   reviewed but actually coded relevant by reviewers.

12:06  21         And we see the yellow documents representing

12:06  22   those documents that were reviewed by reviewers but

12:06  23   turned out not to be relevant.

12:06  24         If the reviewers go idle for 20 minutes, the

12:06  25   system will update everything.  When the reviewers

12:06   1   have coded a couple of hundred documents, the system

12:07   2   will update everything.  So it really is a continuous

12:07   3   basis that it goes through all day long.

12:07   4        After the initial seed, all the documents

12:07   5   that can be scored are.  We don't expect at the very

12:07   6   beginning that five documents are relevant and five

12:07   7   documents not relevant is going to score everything.

12:07   8   So we'll end up with a lot of documents kind of at

12:07   9   this 50 line, which just tells me they haven't been

12:07   10  pushed one way or another into the relevant or

12:07   11  nonrelevant classification.

12:07   12       Documents above the threshold score will be

12:07   13  added to the prioritized review.  Everything above the

12:07   14  threshold will automatically go to the reviewers so

12:07   15  there's not a decision being made to hold back

12:07   16  anything that would be above that particular

12:07   17  threshold.

12:07   18       The default is 75.  That is not an actual

12:07   19  scientific representation of anything.  We just had to

12:07   20  pick one to have the software -- so that just happens

12:07   21  to be where it is.

12:07   22       Typically one of two things will happen

12:07   23  initially.  Usually, we'll either negotiate something

12:08   24  ahead of time that we expect that there would be some

12:08   25  kind of score that they would be happy with.  Then,

12:08   1   you know, that could be negotiated.  We would pick

12:08   2   that score -- otherwise, you know, potentially there's

12:08   3   an option to have that continue and have whoever is

12:08   4   running the project make the best call usually by

12:08   5   looking at what's the lowest threshold that we're

12:08   6   seeing actual relevant documents from.  Maybe it's 75,

12:08   7   maybe it's 84, and sort of we go off the lowest after

12:08   8   we've been going on the project for a couple of weeks,

12:08   9   maybe it's 64, I mean, we just kind of go on from that

12:08   10  and we would pick that score and that would be our

12:08   11  cutoff.

12:08   12          It really doesn't matter in the long run

12:08   13  which of the ways that we go through that process

12:08   14  because of how we did the validation in the end.  And

12:08   15  the reason why that is is because the system will

12:08   16  always be feeding these relevant documents to the

12:08   17  reviewers, the reviewers are constantly engaged in the

12:08   18  most likely relevant documents that there are.  And as

12:08   19  soon as we decide to validate, then we're going to be

12:08   20  testing to see, you know, what's that recall number,

12:08   21  what's that elusion rate, and that validation process

12:09   22  is really kind of what drives whether or not we're

12:09   23  actually going to stop the process or not.

12:09   24          The system is much better in this current

12:09   25  format than anything that we've worked with before,

12:09   1   and the reason is because older systems -- the TAR 1.0

12:09   2   system -- are all focused on similarities between

12:09   3   documents.

12:09   4          The truth is that one of the best ways to be

12:09   5   most efficient in this process is to focus on the

12:09   6   differences between what makes a document relevant or

12:09   7   not.  You can have two identically-worded contracts

12:09   8   for a purchase, one has a company at interest in the

12:09   9   case, one does not.  If the system knows that that one

12:09  10   company at interest is in the case and it sees that on

12:09  11   a contract and you mark another version of that

12:09  12   contract as not relevant, it will still go back and

12:09  13   check to see, *Hey, I've got this really important*

12:09  14   *feature, is that important in this case.*

12:09  15          If it turns out yes, it learned two things.

12:09  16   One, the presence of that company makes the document

12:09  17   relevant even if it would otherwise be a nonrelevant

12:09  18   type of contract, you know, but it has also learned

12:09  19   that this other company may not be relevant to the

12:10  20   case.  So now it can start biasing other documents

12:10  21   away.  So it's much, much smarter in dividing the

12:10  22   line.

12:10  23          The underlying software SVM, support vector

12:10  24   machines, it's a mathematical term function machine

12:10  25   which basically means the system is trying to

12:10  1    calculate constantly what are the documents that if I
12:10  2    change the coding from relevant to nonrelevant or from
12:10  3    not relevant to relevant would actually change the
12:10  4    ranking of the other documents in the system.
12:10  5         Those documents that educate between what
12:10  6    we're looking at and what we're proposing to hold for
12:10  7    review are really truly the only documents that matter
12:10  8    to the system.  It's trying to draw a path between
12:10  9    that relevant pile and that nonrelevant pile as most
12:10  10   efficiently as it can, and it's constantly updating
12:10  11   the algorithm that it's using to make the path between
12:10  12   those two based on the reviewers' coding.
12:10  13        The active learning tool does test its
12:10  14   results.  So not only is it looking at to become
12:10  15   educated over time, but it does actually absorb some
12:11  16   human error.  We all do expect some level of human
12:11  17   error in review.  It just -- it happens.  So if the
12:11  18   reviewer were to code something as relevant but it
12:11  19   turned out to be not actually relevant, when the next
12:11  20   document that was given to a reviewer as it seen
12:11  21   somewhere was marked not relevant, the system is going
12:11  22   to test and maybe it starts to figure out, okay, this
12:11  23   is an aberration.  So it will absorb some amount of
12:11  24   error.
12:11  25        And it will test against reviewers who have

12:11   1   made potentially conflicting calls.  One of the

12:11   2   benefits of this particular system is that you're not

12:11   3   using one attorney to make the call, you're going to

12:11   4   actually engage a review team to do this.  But of

12:11   5   course, that means with maybe ten sets of eyes on the

12:11   6   documents that are doing it sometimes there are going

12:11   7   to be conflicting calls.  So the system is going to

12:11   8   test the reviewers and give them similar documents to

12:11   9   see if there various consensus views on what's going

12:11   10  on.

12:11   11           And again, at the end, when we do our

12:11   12  validation process, we'll be able to determine if

12:11   13  there's anything novel that's relevant that should

12:11   14  have been introduced to the system, and that we would.

12:12   15           **JUDGE RODGERS:**  Thank you very much.

12:12   16           **MR. BUCHANAN:**  This is an excerpt of the

12:12   17  joint parties' -- this is an excerpt from the ESI

12:12   18  protocol with provisions for the negotiation of a TAR

12:12   19  process.  The parties have agreed to cooperate and I

12:12   20  think submit a protocol to you within two weeks.  So

12:12   21  we have a draft from the Defense.  We're going to get

12:12   22  our tech consultants together today and see if we

12:12   23  can't move that forward expeditiously.

12:12   24           It's been a while since we've seen this, but

12:12   25  we're about at the end of this workflow, probably

12:12    1    thankfully for many.  This is the production part.  So

12:12    2    reviewers now have -- there's been ingestion of

12:12    3    information, there's been filtering of information,

12:12    4    there's now been prioritization for review using TAR

12:12    5    or search terms, and now documents have been flagged

12:12    6    and produced.

12:12    7         One of the components of the ESI protocol is

12:12    8    what's the deliverable to the other side, the

12:13    9    receiving party.  And it's more involved, frankly,

12:13   10    with the Defendants because they have IT expertise and

12:13   11    ability to deliver a deliverable that's common and

12:13   12    acceptable by the lit support vendors.

12:13   13         So here what we're getting essentially.  If

12:13   14    it was an email, we're getting TIFF image files, we're

12:13   15    getting full text, and we get all the metadata, you

12:13   16    know, when it was sent, who got it, whether it was

12:13   17    opened, whether it wasn't opened, whether there were

12:13   18    attachments, et cetera, and we also get the

12:13   19    attachments, but the attachments will come in this

12:13   20    production format.  So if it was Word file, if it was

12:13   21    Excel, if it was a PDF, if it was a PowerPoint,

12:13   22    they're being produced in native format, so we're

12:13   23    getting a full native.

12:13   24         And that's significant.  And since Your

12:13   25    Honors haven't considered this -- perhaps Judge Jones

12:13   1   has -- if you have PowerPoints, color can be very

12:13   2   important.  A black and white image of a PowerPoint

12:13   3   can be very difficult to discern the chart to see the

12:14   4   words, you lose the animation, often is challenging on

12:14   5   speaker notes.

12:14   6       With Word files, if you get images of Word

12:14   7   files, we've all seen them now, you know, when we have

12:14   8   red lines, you don't know what the red lines mean,

12:14   9   sometimes depending on how they're reviewed you don't

12:14  10   know who made them and you don't get the full comment.

12:14  11       So, too, with Excels, you need properties of

12:14  12   those files, the ability to use the data in them, to

12:14  13   run the calculations, to see, if you will, hidden

12:14  14   comments that are in the Excel files that can be

12:14  15   concealed.

12:14  16       So the parties have agreed, and this was

12:14  17   important to us to have, frankly, for ease of review,

12:14  18   a native format production.  That's essentially what's

12:14  19   being done here, with the extracted full text and with

12:14  20   the extracted data fields, something that's necessary

12:14  21   for the lit support tools that we'll be working with

12:14  22   in the joint platform that we hope to host these

12:14  23   materials in.

12:14  24       There are other production formats.  They're

12:14  25   just going to be given to us in the native format.  So

12:15   1   these are the audio files if there was a voicemail

12:15   2   that got captured, maybe some other files.  I'm not

12:15   3   sure.  We'll see when we get the production.

12:15   4        And then this is structured data.  We

12:15   5   understand, in conferring with the Defense, that Lotus

12:15   6   Notes databases may exist and may be relevant here.

12:15   7   That remains to be determined.  Maybe there's

12:15   8   complaint databases to be searched and produced in

12:15   9   some form.  That remains to be determined and to be

12:15   10  discussed what production form that will come in.

12:15   11       At this point we were going to provide a

12:15   12  Relativity demonstration.  But if Your Honors want a

12:15   13  break, we can do it in whatever order, whatever you'd

12:15   14  like.

12:15   15       **JUDGE RODGERS:**  We're ready to proceed.

12:15   16       **MR. BUCHANAN:**  Elizabeth Koenig from ILS, our

12:15   17  web support vendor, is going to demo the Relativity

12:15   18  platform.

12:15   19       **JUDGE RODGERS:**  Very good.  Thank you.

12:15   20       **MS. KOENIG:**  Thank you, Your Honor.  If I can

12:15   21  just have a minute to log in here.

12:16   22       **JUDGE RODGERS:**  Certainly.

12:16   23       **JUDGE JONES:**  I have one question for

12:16   24  Mr. Buchanan unrelated to the Relativity.

12:16   25       As part of your production with these

12:16    1    structured files, so when that's produced, in the

12:16    2    production will be a sort of a placeholder?

12:16    3    **MR. BUCHANAN:** That's a great question, Your

12:16    4    Honor. That's going to be more for native files. So

12:16    5    at the top of the box there was -- it was referenced

12:16    6    as load file. And a load file is just an instruction

12:16    7    to the lit support vendor of how to map the other

12:16    8    three files together. So, you know, this is where you

12:16    9    go to find the metadata, this is where you go to find

12:17   10    the image file associated with it, and this is where

12:17   11    you'll find the native file.

12:17   12    Now, for native files, they're also going to

12:17   13    produce, as you indicated, a placeholder image which

12:17   14    will show up in the database. When you click on it,

12:17   15    you'll see there's a placeholder image and it will say

12:17   16    document produced in native, and it will have a Bates

12:17   17    number on it. And so we can correlate, if you will,

12:17   18    the physical image in the database with the native

12:17   19    file.

12:17   20    That becomes useful at depositions when you

12:17   21    go to try and use this evidence and to track things in

12:17   22    some type of custodial tracking way. We have the TIFF

12:17   23    placeholder image which will place on top of the

12:17   24    printout of the native file or on the back, depending

12:17   25    on the deposition protocol, if we're using native

12:17   1    files at depositions.  That's the one issue with

12:17   2    native files, you know, people print them out on their

12:17   3    own systems, how do we correlate the native file to

12:17   4    the actual produced Bates number, and that's the way

12:17   5    we do it, with a TIFF image placeholder.

12:18   6              **JUDGE JONES:**  Okay, thanks.

12:18   7              **MS. KOENIG:**  Thank you for your time today,

12:18   8    Your Honors.

12:18   9              So I'm going to be taking a little bit of

12:18   10   time.  I do recognize that I'm between us and lunch,

12:18   11   so I think this shouldn't take too long.  What I'm

12:18   12   going to be demoing today is the idea of a joint

12:18   13   platform, both parties, Defendants and Plaintiffs,

12:18   14   logged into one database viewing the same documents in

12:18   15   the Relativity platform.

12:18   16             What I have on the screen right now, if you

12:18   17   see in the upper right-hand corner, it says, "3M

12:18   18   Plaintiff."  This is the Plaintiff's login.  And on my

12:18   19   screen I'm logged in as "3M Defendant."

12:18   20             The idea here is that both parties are

12:18   21   looking at the exact same documents.  They're not

12:18   22   hosted twice so there's not two copies of them, but

12:18   23   they're looking at one data source.

12:18   24             Relativity is one of the leading platforms in

12:18   25   the country if not the world.  It's been incorporated

12:19  1  into many Fortune 500 companies and firms, state

12:19  2  governments, federal governments, the U.S. Department

12:19  3  of Justice uses it.  It's very widely known and very

12:19  4  widely known on both sides of the aisle.

12:19  5      It's incredibly customizable.  And I was

12:19  6  talking to the XACT team today that -- we're using

12:19  7  RelativityOne right now.  This is the cloud powered

12:19  8  version of it.  It is secured through Microsoft Azure.

12:19  9      There's also Relativity On-Prem which is a

12:19  10  secured server environment.  A little bit different,

12:19  11  so it may look slightly different than what some

12:19  12  people are used to, although, again, it's incredibly

12:19  13  customizable.  And that would be something that the

12:19  14  parties would be working with the neutral joint

12:19  15  platform to customize it to their liking.

12:19  16      Because it's so large and widely known and

12:19  17  widely used, it does also have a large variety of

12:19  18  third-party vendors that have certain applications

12:20  19  that they use with Relativity, so that's another

12:20  20  feature of it, and those are coming out, new ones,

12:20  21  every day.

12:20  22      This is powered through the web, as I

12:20  23  mentioned, so it is dependent on a solid internet

12:20  24  connection.  So I'm going to do a brief overview.

12:20  25  There's obviously a lot of things I could take a lot

12:20    1    of time to show you how to do.  I'm assuming the Court

12:20    2    just wants to see what it looks like, what the

12:20    3    documents look like.  If you have any questions or if

12:20    4    you want me to show something in more depth, I can

12:20    5    certainly do that.

12:20    6         For purposes of today, I'm going to be

12:20    7    talking back and forth between the plaintiff and the

12:20    8    defendant logins that were created.

12:20    9         So here we can see in the upper corner here

12:20   10    there's 606 documents.  I'm also looking at the same

12:20   11    exact 606 documents as a defendant.  This is demo

12:20   12    data, it's public.  And what you'll see along the side

12:20   13    here is I have various production volumes.  The idea

12:20   14    of this joint platform is that this would be the

12:21   15    documents that are processed.

12:21   16         So this is post-TAR.  Once the parties have

12:21   17    gone through the TAR process, the documents have been

12:21   18    produced, what documents are then pushed into the

12:21   19    joint mutual platform.

12:21   20         Scrolling along here I'm looking at my

12:21   21    metadata.  If I use this tool bar on the bottom, you

12:21   22    can see here I've got the metadata, which is the data

12:21   23    about the files that underlies the documents.

12:21   24         We mentioned earlier doing a deduplication.

12:21   25    You can see here I have a custodian field and I also

12:21    1    have all custodians, so these are the other people
12:21    2    that had the exact same copy of the document and
12:21    3    they're shown here.   These fields are all searchable,
12:21    4    sortable, and often used by parties to further
12:21    5    investigate the data.
12:21    6          Relativity has a fantastic filtering feature
12:22    7    here that kind of performs a search functionality.
12:22    8    And I'm going to take a look and show you what a
12:22    9    couple of documents look like so you can see the
12:22   10    different formats.
12:22   11          MR. BUCHANAN:   Elizabeth, before you go on,
12:22   12    just for the Court's benefit, the fields, the columns
12:22   13    at the top, are these the metadata fields that are the
12:22   14    last page of our ESI protocol, or several of them?
12:22   15          MS. KOENIG:   Yes, these are many of the
12:22   16    fields.   This is not complying with the precise fields
12:22   17    in the protocol, but it would be.   At the time of
12:22   18    production eventually these would be the fields that
12:22   19    are produced according to the protocol.   There's
12:22   20    probably a few extras in here.   You can see file type,
12:22   21    file extension, filename, all of the metadata that
12:22   22    underlies the documents.
12:22   23          Does that satisfy?
12:22   24          MR. BUCHANAN:   Yes.   Thank you.
12:22   25          MS. KOENIG:   So I'm going to look at a sample

12:22   1   of documents here so you can see what that -- how it

12:22   2   displays in Relativity.  So here is an email file.

12:23   3   It's showing me also that I have a PDF attachment.

12:23   4   And here on the side here I have my coding panel.

12:23   5         So this is where the review team is going to

12:23   6   be doing their work.  You can see here that they can

12:23   7   -- plaintiffs can indicate the kind of treatment that

12:23   8   they want to give a document, they could write notes,

12:23   9   they can code issues.

12:23   10         And down here below is going to be the

12:23   11   document metadata about this particular document.  The

12:23   12   image here that we're looking at in the viewer, these

12:23   13   function very much like a PDF.  They can be

12:23   14   manipulated so that they show larger.  They can also

12:23   15   be highlighted, as you can see.

12:23   16         And we have -- in creating this joint

12:23   17   platform, we have done quite a bit of testing where we

12:23   18   are able to look at the same database but have, for

12:23   19   example, plaintiffs only be able to highlight here and

12:23   20   not have that shown to defendant, and vice versa.  So

12:24   21   that kind of security permissions will be critical for

12:24   22   a joint platform like this.

12:24   23         And if I go to the next document, I can see

12:24   24   an attachment to the email, and I can also see here

12:24   25   the -- that Relativity is showing me the family

12:24   1   relationship of the documents.  So there's a parent

12:24   2   email with a child attachment, and I can see that all

12:24   3   here, and that's able to be seen by the review team.

12:24   4   I can also share the documents with colleagues.  I can

12:24   5   print it.

12:24   6          And here is another email similar.  This

12:24   7   would be a Word document.  When there is a native

12:24   8   production, you can click on this and then download

12:24   9   the native files directly to your desktop if you

12:25   10  needed to.  Excel as well.  Any native files are

12:25   11  searchable.  The extracted text, if I toggle here, is

12:25   12  also fully searchable.

12:25   13         And this is also where in this panel here I

12:25   14  would be looking at whether there are duplicative

12:25   15  documents or closely duplicative documents, like

12:25   16  Michelle was explaining, whether there are documents

12:25   17  that have very similar texts, and then I can also use

12:25   18  a feature in Relativity to compare those to see how

12:25   19  they might differ.  I'll show you how to do that.

12:25   20         So this is now showing me -- this is

12:26   21  comparing two similar documents that have similar

12:26   22  text, but I can see in the red line what is different

12:26   23  about the two documents.

12:26   24         This is also the panel where I would see if

12:26   25  there are threads, email threads between the documents

12:26  1  where you have a conversation that might be shorter or
12:26  2  that might be inclusive of a shorter thread in the
12:26  3  email that is also shown in this pane.
12:26  4      And then, if I toggle over to the defendant
12:26  5  view, you can see how the defendants are looking at
12:26  6  these exact same documents but they would have a
12:26  7  different coding panel that is only visible to them.
12:26  8  So they'll be working here, they'll be able to do
12:27  9  their coding, their response coding, including for
12:27  10 trial or depo prep, and none of that will be visible
12:27  11 to plaintiff.
12:27  12      So I think the critical thing certainly that
12:27  13 we've taken home in creating this is that the
12:27  14 permissions and security would have to be very tightly
12:27  15 controlled and monitored and need to be tested before
12:27  16 any kind of joint platform would be used.
12:27  17      And then the front here is where you do your
12:27  18 searching.  Relativity has broad searching
12:27  19 capabilities, searching with keywords.  It also can
12:27  20 search on linking up metadata.  I can search for -- if
12:27  21 I want to see documents from custodian through this
12:27  22 date range, including this term, I want to see only
12:27  23 the documents that are coded hot, and all of that
12:27  24 would be locked down so that it would be just visible
12:27  25 to defendant or plaintiff individually and save

12:27  1    searches of the same exact thing.  The plaintiff would

12:27  2    be able to save their searches but those same searches

12:28  3    couldn't be visible to defendant.

12:28  4          I could go into lots more detail, and I

12:28  5    welcome your questions, but that is an overview of the

12:28  6    platform itself.

12:28  7          **JUDGE JONES:**  Just one question, and I think

12:28  8    you answered it.  So everything the defendant could do

12:28  9    the plaintiffs could do in terms of all the robust

12:28  10   search features.

12:28  11         **MS. KOENIG:**  Yes.

12:28  12         **JUDGE RODGERS:**  And it would just be

12:28  13   segregated, the access -- the restrictions one would

12:28  14   have to the other's search and the way they coded

12:28  15   documents and that type thing?

12:28  16         **MS. KOENIG:**  Exactly.  So the defendants

12:28  17   couldn't run a search that would say "let me see all

12:28  18   the documents that plaintiff coded hot," and vice

12:28  19   versa.

12:28  20         **JUDGE JONES:**  Is there a limit to how much

12:28  21   data can go on the system?

12:28  22         **MS. KOENIG:**  Not -- no.  I believe that -- I

12:28  23   don't know the exact answer on that, but certainly on

12:28  24   our system we have upwards of 50 terabytes of data, so

12:28  25   not that I'm aware of.

12:28    1         **JUDGE RODGERS:**  You said the security

12:29    2    features would have to be tested.  Do you mean up

12:29    3    front or is this a continuous review making sure

12:29    4    there's no breach?

12:29    5         **MS. KOENIG:**  That's really just my

12:29    6    recommendation from having set this up and working

12:29    7    with my engineers and working with Relativity support,

12:29    8    that I think both parties would be very comfortable --

12:29    9    they would both want to know that their work product

12:29   10    would not be visible to opposing counsel.

12:29   11         **JUDGE RODGERS:**  So that's something that you

12:29   12    do, you all would --

12:29   13         **MS. KOENIG:**  That's something that we could

12:29   14    do in conjunction with whoever is hosting the joint

12:29   15    platform, and XACT could play that same role.

12:29   16         **JUDGE RODGERS:**  I see.  Thank you very much.

12:29   17         **MR. BUCHANAN:**  To be clear, Your Honor, the

12:29   18    vision -- and I think Elizabeth mentioned it -- is

12:29   19    that, after the Defendants had produced with regard to

12:29   20    whatever they've reviewed and whatever they've

12:29   21    processed in TAR, that will essentially be

12:29   22    electronically handed off in some way into the

12:30   23    dual-use platform.

12:30   24         That platform could certainly host the

12:30   25    Defendant's documents, once produced; it could host

12:30   1   third-party documents to which both sides are going to

12:30   2   have access.  A vendor perhaps can jointly process

12:30   3   information from third-parties so that each side will

12:30   4   be working with the same set of information for all

12:30   5   purposes of the litigation.

12:30   6          Once it's in there, it will be in Relativity,

12:30   7   and the Plaintiffs will have the ability to use their

12:30   8   own TAR tools, their own clustering tools, the other

12:30   9   things that are in Relativity in a distinct way from

12:30   10  the defense.

12:30   11         But subject to Elizabeth's security concerns,

12:30   12  I think it could be very granular permissioning.  And

12:30   13  I know it's been done before in other litigations and

12:30   14  other settings, but it's certainly something that both

12:30   15  sides are going to have an interest in ensuring that

12:30   16  it's properly tuned.

12:30   17         **JUDGE RODGERS:**  That is post the joint TAR

12:30   18  where you have both worked on seed sets and developed

12:30   19  a universe --

12:30   20         **MR. BUCHANAN:**  I believe the vendors are

12:30   21  going to speak tomorrow on the ESI component that the

12:31   22  ESI component is focused on the dual use ESI platform,

12:31   23  the platform like you're looking at right here.  This

12:31   24  was a demo platform.

12:31   25         **JUDGE RODGERS:**  The TAR protocol that you're

12:31  1   working on right now, that is going to precede this?

12:31  2          **MR. BUCHANAN:**  It will, correct.

12:31  3          **JUDGE RODGERS:**  So that will determine the

12:31  4   universe of documents that will go into Relativity

12:31  5   or --

12:31  6          **MR. BUCHANAN:**  Yes.  The Defense is working

12:31  7   with its vendor for purposes of preprocessing review,

12:31  8   et cetera, the documents, and then they'll be handed

12:31  9   off into a platform that will be the dual use platform

12:31  10  for the case.

12:31  11         **JUDGE RODGERS:**  Okay.  Kim?

12:31  12         **MS. BRANSCOME:**  The idea would be the

12:31  13  workspace that was just demo'd would basically contain

12:31  14  all produced documents in the case.  For documents

12:31  15  coming from 3M, we will have already done the

12:31  16  processing, everything that was described earlier in

12:31  17  the presentation.  So the material that's coming from

12:32  18  us loaded into Relativity is going to be very

12:32  19  seamless.

12:32  20         Why we think there's some added benefit to

12:32  21  having the joint document repository, if we can get

12:32  22  comfortable with the security, is not only does it

12:32  23  mean we're not duplicating hosting costs which can be

12:32  24  substantial but also because we anticipate documents

12:32  25  coming from a third-party that will require

12:32  1    processing.

12:32  2         So if Your Honor remembers back in the sort

12:32  3    of flowchart of things that have to happen to data, we

12:32  4    don't know yet what form the government will be

12:32  5    producing its documents in, but it may need some level

12:32  6    of processing in order for us to really work with it

12:32  7    in a meaningful way in the litigation.

12:32  8         So one option would be that those documents

12:32  9    come into this system and sort of the making them text

12:32  10   searchable and things like that, to the extent

12:32  11   possible, that's something that can be handled jointly

12:32  12   so that then both sides have access to documents that

12:32  13   are much more usable than just getting a 5,000 page

12:33  14   PDF that then we independently have to process.

12:33  15         **JUDGE RODGERS:**  That's great.

12:33  16         **MR. BUCHANAN:**  Thank you, Your Honor.  If you

12:33  17   have any other questions, we do have our tech people

12:33  18   here.

12:33  19         **JUDGE RODGERS:**  Thank you, everyone who was

12:33  20   involved in putting the presentation together and

12:33  21   certainly to those here who presented in the

12:33  22   courtroom, thank you very much.

12:33  23         I know it's a challenge to put together a

12:33  24   presentation to two individuals who have such widely

12:33  25   disparate knowledge and experience with ESI, but from

12:33   1   my standpoint it was excellent.  I feel well educated,

12:33   2   if not dangerous with support vector machines and --

12:33   3   new terminology for me.

12:33   4           *(Conference between Judge Rodgers and Judge*

12:34   5   *Jones.)*

12:34   6           What Judge Jones is asking is whether we have

12:34   7   any vendors here this afternoon that we could go ahead

12:34   8   and get started with as opposed to tomorrow.  Of

12:34   9   course, I doubt we can get through everyone, but if

12:34   10  there are any ESI folks that would make our tomorrow

12:34   11  stop time a little bit earlier, Judge Jones, of

12:34   12  course, is in Gainesville, which is 350 miles drive.

12:34   13  Maybe someone could --

12:34   14          **MR. BUCHANAN:**  Professor Dodge I know is

12:34   15  handling the coordination around them.  I don't know

12:34   16  if she's in the courtroom today.

12:34   17          Oh, great, okay.

12:34   18          **JUDGE RODGERS:**  Oh, I see her.

12:34   19          **PROFESSOR DODGE:**  I believe most people are

12:34   20  flying in this afternoon, but I'll send them an email

12:34   21  and double check and see if anybody has landed in time

12:34   22  and let you all know very soon.

12:34   23          **JUDGE RODGERS:**  That sounds good.  Thank you

12:34   24  for doing that.

12:34   25          If there's nothing else, we will be in

12:34

1    recess.

2              *(Proceedings concluded at 12:34 p.m.)*

3                   --------------------

4    *I certify that the foregoing is a correct transcript*
     *from the record of proceedings in the above-entitled*
5    *matter.  Any redaction of personal data identifiers*
     *pursuant to the Judicial Conference Policy on Privacy*
6    *are noted within the transcript.*

7

8    *s/Donna L. Boland*                          *7-9-2019*
     *Donna L. Boland, RPR, FCRR*                    *Date*
9    *Official Court Reporter*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25