# EXHIBIT 1

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF RAMSEY | SECOND JUDICIAL DISTRICT |
| | CASE TYPE: PRODUCT LIABILITY |

| | |
|---|---|
| Jacob Cowen; Jason Kenneth Cox; Matt Cox; Regan H. Craig; Jared Gregory Craiglow; Michael Cranford; Joshua S. Crawley; Lamont Credle; Lionel Creppel; Kenneth Crew; Steven Cristerna; Robert Crooks; Robert Crossley; Robert Crutchfield; Cody Cser; Anthony Shawn Culbertson; Dietrich Culley; Antoine Demetrice Curry; Thomas Curtin; William Curtis ll; Michael Cutler; William Cutlip; Diego Damian; George Damour; Chad Daniel; Darrell Wayne Daniels; Maxcillian Joseph Danos III; Bryon Dantzler; Earl Dantzler Jr.; Kurt Everett Darby; Jonathan Darling; David Levoy Daughtry; David George Davis Jr.; Calvin Davis; Donald Davis; Geraldine Davis; Jimmy Davis; Johnathan Davis; Joshua Saul Davison; Darone Jerome Dawsey; Douglas Dawson; James Daye; Timothy Decock; Nathan Defond; Ryan Delacruz; Keith Delatorre; Rich Delmonico; Brian H. Delnevo; Linjaman Jefferson Denham; Brandon Denman; Jeremy Denton; Justin Denton; Robert Lee Denton; Charlie Deramus; Curtis Deshiell; Sean Dial; Vince Diloreto; Joshua Dinehart; Matt R. Dinkledine; Bryan Dipalermo; Scottie Dishner; James Dixon; Travis Dixon; Joshua A. Doane; Vada Dobbins Jr.;  Franco Domek; Richard Donovan; William Donovan; Brandon Luis Doom; Shaviance Dor; Trellis Fernando Dorman II; John Dorsey; Warren Doud; Kelvin Douglas; Kyle Douglas; Steven Douglas; Gregory Downceroux; Todd Drake; Howard William Draper; Michael Dries; Christopher Dylan Drohan; Eric Drouncheck; Dusty Drummond; Noah Dueker; Brian Dumas; Michael Dumont; Jack Duncan; Christopher Dunning; Brian Joseph Duplessis; Dimitri | **Court File No.** _____<br><br>**COMPLAINT** |

Dupoux; Shawn Earle; Thomas Eaves; Fred Echols; Thomas Le'Rouse Echols; Duwayne Charles Edge; Christopher Michael Edgmond,

                    Plaintiffs,

vs.

3M Company; 3M Occupational Safety LLC; Aearo Holdings, LLC; Aearo Intermediate, LLC; Aearo, LLC; Aearo Technologies, LLC; and Does 1-50,

                      Defendants.

The above-named Plaintiffs bring this action against Defendants 3M Company; 3M Occupational Safety LLC; Aearo Holdings, LLC; Aearo Intermediate, LLC; Aearo, LLC; Aearo Technologies, LLC; (collectively, "Defendants") and Does 1-50, and in support thereof allege:

## BACKGROUND

1.     This is a product liability action related to a defective earplug manufactured and sold by Defendants. Plaintiffs used Defendants' dual-ended Combat Arms™ Earplugs, Version 2 ("Combat Arms™ Earplugs"), while in training and/or while deployed on active military duty. As a result of the earplugs' defective condition, Plaintiffs now suffer from hearing loss, impairment, and/or tinnitus. Defendants knew the earplugs were defective prior to selling them, because they falsified test results and misrepresented their performance specifications to qualify for a multi-million dollar per-year contract with the United States.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over Plaintiffs' claims under Minn. Stat. § 484.01, subd. 1.

3.     This action is <u>not</u> removable to federal court, because Plaintiffs assert no claim arising under the Constitution, law, or treaties of the United States to satisfy 28 U.S.C. §1331.

2

Because at least one Defendant is domiciled in the state of Minnesota, , diversity jurisdiction does not apply and 28 U.S.C. §1441(b)(2) precludes removal.

4. Venue is proper in Ramsey County, Minnesota, under Minn. Stat. §§542.01 and 542.09, because Defendant 3M resides in Ramsey County in that it has its resident agent, an office, and place of business in Ramsey County.

## PARTIES

5. Plaintiffs are servicemembers of the United States armed forces and/or National Guard and Reserve who served between the years 2002-2015 and had no signs or symptoms of hearing loss or tinnitus prior to commencing service. Plaintiffs were issued and wore the dual-ended Combat Arms™ Earplugs designed and supplied by Defendants. Despite using the Combat Arms™ Earplugs as instructed, Plaintiffs thereafter suffered tinnitus and/or hearing loss due to the defective nature of the Combat Arms™ Earplugs.

6. Defendant 3M Company is a Delaware corporation with its principal place of business in Minnesota. Defendant 3M Occupational Safety LLC is a Delaware limited liability company and is a citizen of Delaware and Minnesota. Defendant 3M Occupational Safety LLC is a subsidiary of Defendant 3M. Collectively, these Defendants are referred to in this complaint as "3M."

7. Defendant Aearo Technologies, LLC, is a limited liability company formed in Delaware with its principal place of business in Minnesota. At all relevant times and as relevant here, Defendant Aearo Technologies LLC utilized two assumed names: Aearo Company and Aearo Technologies. Defendant Aearo Holdings LLC is a Delaware limited liability company with a principal place of business in Minnesota. Defendant Aearo Holdings LLC was formerly known as Aearo Holdings Corporation. Defendant Aearo Intermediate LLC is a Delaware limited liability company with a principal place of business in Indiana and is a citizen of Minnesota. Defendant Aearo Intermediate LLC was formerly known as Aearo Technologies,

3

Inc. Collectively, these Defendants are referred to herein as "Aearo." Defendant Aearo LLC is a Delaware limited liability company with a principal place of business in Indiana and is a citizen of Delaware and Minnesota. Defendant Aearo LLC was formerly known as Aearo Corporation. Defendant Aearo LLC is a subsidiary of Defendant 3M Company.

8. In 2008, 3M purchased Aearo. Defendant Aearo is now a wholly owned subsidiary of Defendant 3M.

9. The true names of Does 1-50, whether individual, corporate, associate, agency, or otherwise, are unknown to Plaintiffs who, under Minnesota Rules of Civil Procedure Rule 9.08, sue these Defendants under fictitious names for contributing to their tinnitus and/or hearing loss related to the defective nature of the Combat Arms™ Earplugs.

## FACTUAL ALLEGATIONS

10. In 2000, Aearo was a global market leader in hearing and eye protection equipment and was based in Indianapolis, Indiana. Aearo developed, marketed, and sold the Combat Arms™ Earplugs until being acquired by 3M in 2008 for $1.2 billion.

11. After purchasing Aearo, 3M hired Aearo's employees and maintained Aearo as a separate operating unit. Post-acquisition, the Combat Arms™ Earplugs were marketed and sold under the 3M brand at all times relevant to this complaint. Because 3M acquired both the assets and liabilities of Aearo, Aearo and 3M are used interchangeably and all allegations against Aearo are directed as a matter of law against 3M.

12. Aearo designed the Combat Arms™ Earplugs to be dual-ended, non-linear (selective attenuation) earplugs based upon existing commercially available technology. The Combat Arms™ Earplugs were created for the specific purpose of providing users with a single set of earplugs that provide two options for hearing attenuation depending on how they are worn.

13. One side of the dual-sided earplugs is yellow; the other is green. The earplugs can be worn in an open, or "unblocked," position (yellow end in) to block, or at least

4

significantly reduce, loud impulse sounds commonly associated with military service, while still allowing the user to hear quieter noises.  These quieter noises include voice commands or other communications spoken by fellow U.S. military servicemembers, approaching enemy combatants, etc.  Alternatively, the earplugs can be worn in a closed, or "blocked," position (green end in) to block, or at least significantly reduce, all sounds.  When used in the "blocked" position, the Combat Arms™ Earplugs operate as ordinary earplugs.

14. Based on the supposed technological design and qualities of the Combat Arms™ Earplugs, Defendants won a series of Indefinite-Quantity Contracts ("IQCs") to be the exclusive supplier of selective attenuation earplugs to the U.S. military between 2003 and 2012.  However, the Combat Arms™ Earplugs were not exclusively designed for military use, and were, in fact, widely commercially available and used by civilians.

15. To win these IQCs, Defendants represented that the Combat Arms™ Earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs.

16. At all times, Defendants' performance representations were false, and Defendants knew them to be false.  In fact, Defendants knew these earplugs were defective and did not work as they were supposed to as early as the year 2000; years before Defendants became the exclusive supplier of selective attenuation earplugs to the U.S. military.

17. At all relevant times, the Combat Arms™ Earplugs had a dangerous design defect that caused them to imperceptibly loosen in the wearer's ear, thus allowing damaging sounds to enter the ear canal around the outside of the earplug.  Specifically, the basal edge of the third flange of the non-inserted end of the earplug is prone to press against some users' ear canals and fold back to its original shape, thereby loosening the seal in their ear canals. Because the earplug is symmetrical, the defect exists regardless of which end is inserted into the ear.

18. Aearo learned of this design defect when it completed its testing of the Combat Arms™ Earplugs. In fact, in February 2000, after the Combat Arms™ Earplugs first failed the

5

specification testing, Aearo employees rolled back the non-inserted yellow flanges to mitigate the loosening effect of the defect.

19. The value and effectiveness of earplugs has been standardized under federal law through a Noise Reduction Rating ("NRR"). The testing and labeling of earplugs such as the Combat Arms™ Earplugs to achieve an NRR is governed by federal regulations promulgated by the Environmental Protection Agency ("EPA") pursuant to the Noise Control Act, 42 U.S.C. §4901 et seq. Specifically, 40 C.P.R. §211.206-1 provides:

> The value of sound attenuation to be used in the calculation of the Noise Reduction Rating must be determined according to the "Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs." This standard is approved as the American National Standards Institute Standard (ANSI-STD) S3.19-1974.

20. Further, 40 C.P.R. §211.204-4(e) requires that specific supporting information accompany hearing protection devices sold in the United States:

> The following minimum supporting information must accompany the device in a manner that insures its availability to the prospective user. In the case of bulk packaging and dispensing, such supporting information must be affixed to the bulk container or dispenser in the same manner as the label, and in a readily visible location.... Instructions as to the proper insertion or placement of the device.

**A.  Aearo Deliberately Falsified Test Results for the Combat Arms™ Earplugs**

21. The NRR is supposed to represent the amount of sound attenuation experienced by a test group under conditions specified by the federal Noise Control Act's testing methodology. In addition, the U.S. military may only purchase earplugs that meet the general testing standards established by the U.S. Army Public Health Command, Army Hearing Program, or equivalent standards that may be established by other branches of the military. Any such standards are tied to the NRR achieved under the EPA regulations.

22. In or around January 2000, Aearo began NRR testing on each end of the Combat Arms™ Earplug. Rather than use an independent test lab, Aearo performed its testing in-house at its E-A-RCAL laboratory (also now owned by 3M). Aearo selected 10 test subjects, including some of its own employees. Aearo's test protocol involved testing: (1) the subject's hearing

6

without an earplug; (2) the subject's hearing with the open/unblocked (yellow) end of the Combat Arms™ Earplug inserted; and (3) the subject's hearing with the closed/blocked (green) end of the Combat Arms™ Earplug inserted. Aearo's own employees (without oversight from the U.S. military or any independent third parties) monitored the test results as the tests were performed, which allowed them to stop the testing at any point if they were not achieving the desired NRR and/or to manipulate or conceal unfavorable test results.

23. This violated the ANSI S3.19-1974 testing protocol. In fact, Aearo stopped the test of the green end of the Combat Arms™ Earplug inserted after only 8 of the 10 subjects had been tested. At that point, the Combat Arms™ Earplugs were failing expectations miserably. Aearo was expecting to achieve an NRR of 22 with the green end inserted, but in fact was on target to receive a 10.9 rating based on the experiences of the first eight subjects. These disappointing results were caused by the design defect described above.

24. Despite stopping the test on the green end of the Combat Arms™ Earplugs, Aearo had the remaining two test subjects complete the test with respect to the yellow end of the Combat Arms™ Earplugs, because Aearo liked the low NRR rating the test was indicating to that point. After completion, however, testing of the yellow end resulted in an NRR of -2, which falsely suggested that the earplugs actually amplified sound. Aearo thus knew that the test was inaccurate and needed to be repeated. Instead, Aearo changed the -2 NRR to a 0 NRR, and used that rating on its labels.

25. After prematurely stopping the NRR test of the green end of the Combat Arms™ Earplugs, Aearo investigated the disappointing test results and discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit as required by ANSI S3.19-1974, Section 3.2.3.1.[1]

26. Aearo also discovered that when the green end of the Combat Arms™ Earplugs was inserted into the ear using the standard fitting instructions, the basal edge of the third flange

---

[1] *See* Acoustical Society of America Standard Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs (ASA STD 1-1975).

7

of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer. Because the Combat Arms™ Earplugs were symmetrical, this same problem occurred when the earplug was reversed. Aearo then improperly manipulated the test protocol by instructing the test subjects to fold the flanges on the non-inserted end of the earplug back before inserting it into the ear.

27. Using the manipulated fitting instructions, Aearo re-tested the green end of the Combat Arms™ Earplugs starting in February 2000. During this re-test of the green end, test subjects folded back the yellow flanges of the earplug (essentially elongating the too-short defective stem) to allow them to insert the earplugs deeper into their ears to obtain a proper fit. Because the yellow flanges were folded back, the basal edge of the third flange no longer pressed against the subject's ear canal, and thus did not cause the earplug to loosen during the testing. Using this manipulated test protocol, Aearo achieved a 22 NRR on the green end of the Combat Arms™ Earplugs.

28. Due to the symmetrical nature of the Combat Arms™ Earplugs, the design defect that affected the fit of the green end similarly affected the fit of the yellow end. The fact that Aearo's testing of the yellow end resulted in a -2 NRR meant that the earplugs did not provide a proper fit (as required by ANSI S3.19-1974, Section 3.2.3) between the ear canal of at least some of the subjects and the earplugs. As a result, some subjects had large standard deviations across trials on the yellow end test, which suppressed the NRR rating.

29. Nevertheless, Aearo did _not_ re-test the yellow end using the manipulated fitting instructions like it did on the green end, *i.e.*, folding back the flanges on the green end of the earplug before inserting the yellow end into the ear.

30. Aearo did _not_ re-test the yellow end because it knew that it would not be able to obtain a 0 NRR (much less the facially invalid -2 NRR), and further knew the 0 NRR was a major selling point to the U.S. military. An accurate NRR for the yellow end, which would have

8

been higher than 0, would have rendered the Combat Arms™ Earplugs less attractive to the U.S. military because the military would have known that the earplugs would impair communication.

31.  Moreover, the defect in the Combat Arms™ Earplugs is more likely to manifest itself during military activities than in a lab where the NRR tests are performed over the span of just a few minutes and the head of the test subject remains virtually motionless during the test. Servicemembers, on the other hand, may wear the earplug for an extended period of time and are significantly more active than test subjects in a lab.

32.  Because the defect was imperceptible to the wearer, Defendants' design defect went undetected for more than a decade by the U.S. military and those who wore them. It is thus not surprising that hearing damage is now the largest ongoing medical cost the military incurs each year.[2]  The VA now spends more than $1 billion per year to treat hearing damage suffered by more than 800,000 servicemembers.[3]

### B.  Defendants' False Certifications to the U.S. Military

33.  In 2003, Aearo submitted a bid in response to the U.S. military's Request for Proposal ("RFP") to supply large quantities of Combat Arms™ Earplugs.  The RFP required bidders to certify that the earplugs complied with the Salient Characteristics of Medical Procurement Item Description ("MPID") of Solicitation No. SP0200-06-R-4202.

34.  In its bid, Aearo certified that the Combat Arms™ Earplugs complied with the Salient Characteristics of MPID, even though, at the time it made this certification, Aearo knew that the certification was false.

35.  The pertinent Salient Characteristics of MPID in each RFP, in relevant part, were:

---

[2] *See* David E. Gillespie, *Researchers Evaluate True Effects of Hearing Loss for Soldiers* (Dec. 16, 2015), available at http://www.army.mil/article/160050.

[3] *See* Kay Miller, *Hearing loss widespread among post-911 veterans,* The Center for Public Integrity (Aug. 29, 2013), available at http://www.publicintegrity.org/20 13/08/29/132S3/hearing-loss-widespread-among-post911-vetcrans ("The most-widespread injury for [post-911] veterans has been hearing loss and other auditory complications .... Hearing maladies cost more than $1.4 billion in veterans' disability payments annually, according to first year 2010 data from the Hearing Center of Excellence, a part of the Department of Defense.").

> 2.1.1. Ear plugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield.
>
> 2.2.2 The sound attenuation of both ends of the ear plugs shall be tested in accordance with ANSI S3.19 ....
>
> 2.4. Workmanship. The ear plugs shall be free from all defects that detract from their appearance or impair their serviceability.
>
> 2.5. Instructions. Illustrated instructions explaining the proper use and handling of the ear plugs shall be supplied with each unit....

*See* Solicitation No. SP0200-06-R-4202, at 41-42.

36. Although Aearo knew that its test protocol did <u>not</u> comply with ANSI S3.19, it nevertheless certified that its testing was fully compliant with the U.S. military's specifications.

37. Aearo also falsely certified that it provided accurate "instructions explaining the proper use and handling of the ear plugs." Aearo knew when it did so that its own testing had revealed a design defect that needed modified fitting instructions to ensure a proper fit that would deliver the promised NRR. However, at no time did Defendants disclose the modified fitting instructions to the U.S. military. Even after winning the bid, Defendants still failed to disclose the modified fitting instruction to the U.S. military. Pursuant to Section 2.4 of the MPID, Aearo was required to certify that the "ear plugs shall be free from all defects that detract from their appearance or impair their serviceability." *See* Solicitation No. SP0200-06-R-4202 at 41-42. Despite Aearo knowing since 2000 that its Combat Arms™ Earplugs suffered from a design defect, Aearo certified to the U.S. military that its earplugs had no defects.

38. Based on its facially invalid test results, Aearo falsely reported to the U.S. military that the yellow end of its Combat Arms™ Earplugs had a 0 NRR, which would allow servicemembers to freely communicate with their fellow servicemembers and avoid any hearing impairment that might prevent them from hearing enemy combatants.

39. Aearo also certified that the green end of its Combat Arms™ Earplugs had a 22 NRR, even though Aearo did not disclose the modified fitting instructions necessary to achieve the hearing protection afforded by a 22 NRR. *See* Combat Arms™ Earplugs Instructions.

10

Nothing in these fitting instructions disclosed that it was necessary to fold back the flanges of the opposite end to ensure a proper fit in order to achieve the promised NRR. By failing to provide this disclosure, Aearo falsely overstated the amount of hearing protection afforded by the green end of the earplug and overstated the benefits of the yellow end of the earplug.

40. Based on Aearo's false representations and certifications, its bid prevailed. Aearo entered into the first of a series of IQCs later that year, making it the exclusive provider of selective attenuation earplugs to the U.S. military.

41. The U.S. military did not provide design or testing requirements or set forth reasonably precise specifications, but rather deferred to bidders such as Aearo to determine how to provide a design that complied with the NRR ratings requirements. Further, the U.S. military never approved the design of the Combat Arms™ Earplugs and did not engage in negotiations or dialogue regarding the design. Instead, it relied on Aearo's false certifications.

42. In response to additional RFPs, in subsequent years Defendants re-certified that the Combat Arms™ Earplugs met the MPID criteria, even though Defendants knew that to be false.

43. In total, the U.S. military purchased enough Combat Arms™ earplugs to provide one pair to every servicemember deployed each year in major foreign engagements from 2003 through 2015.[4]

44. Defendants continued to sell the Combat Arms™ Earplugs to the U.S. military and to civilians until late 2015, at which time Defendants discontinued the earplug.[5] Defendants did not recall the earplugs despite discontinuing them due to the design defect.

45. Defendants' misrepresentations about the benefits and protections provided by the Combat Arms™ Earplugs caused Plaintiffs to suffer hearing loss and/or tinnitus.

---

[4] See Scott D. Mcilwain, *Heritage of Army Audiology and the Road Ahead: The Army Hearing Program,* AMERICAN JOURNAL OF PUBLIC HEALTH, Vol. 98 No. 12 (Dec. 2008).

[5] Discontinuation: 3M Combat Arms Earplugs Version 2 (Nov. 17, 2015).

11

46. At all times after 3M's acquisition of Aearo, 3M knew of, conspired with, and was complicit in Aearo's fraudulent and wrongful acts in marketing and selling the Combat Arms™ Earplugs without disclosing the defect or the modified fitting instructions.

## TOLLING OF STATUTES OF LIMITATIONS

47. Under the Servicemembers Civil Relief Act, the period of a plaintiff's military service may <u>not</u> be included in computing any statute of limitations applicable herein. *See* 50 U.S.C. § 3936.

48. Plaintiffs could not, by the exercise of reasonable diligence, have discovered Defendants' wrongful acts as the cause of their injuries at an earlier time, because, at the time of these injuries, the cause was unknown to Plaintiffs. Plaintiffs did not suspect, nor did Plaintiffs have reason to suspect, the cause of these injuries, or the tortious nature of the conduct causing these injuries, until approximately one year prior to the filing of this action.

49. Further, the running of the statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiffs (and the U.S. military) the risks associated with the defects in the Combat Arms™ Earplugs.

50. As a result of Defendants' actions, Plaintiffs were unaware, and could not reasonably have known, or have learned through reasonable diligence, that they had been exposed to the defects and risks alleged herein, and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

51. Through Defendants' affirmative misrepresentations and omissions pertaining to the safety and efficacy of the Combat Arms™ earplugs, Plaintiffs were prevented from discovering this information sooner, because Defendants misrepresented, and continued to misrepresent, the defective nature of the Combat Arms™ Earplugs.

## COUNT 1: STRICT PRODUCTS LIABILITY – DESIGN DEFECT

52. Plaintiffs incorporate by reference the paragraphs above as if fully set forth herein.

53. Defendants are the manufacturers and sellers of the defective Combat Arms™ Earplugs.

54. The defective Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defectively designed in that the design of the earplug caused it to loosen in the wearer's ear, which allowed damaging sounds to enter the ear canal.

55. The defective Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective and unreasonably dangerous for their ordinary and expected use, because they did not stop the damaging loud noises of military use that can cause hearing loss or tinnitus.

56. The defective Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective and not reasonably safe for its intended use.

57. At all times relevant to this complaint, Defendants knew of the defect in the Combat Arms™ Earplugs.

58. No reasonably prudent manufacturer would design, distribute, and sell an earplug with the knowledge that Defendants had, namely that the stem of the earplug was too short to fit correctly in many wearers' ears and that, if not fitted correctly, the earplugs would not guard against loud impulse noises and could cause hearing loss and/or tinnitus.

59. The defective Combat Arms™ Earplugs that the Defendants manufactured, distributed, and sold were delivered to Plaintiffs without any change in their defective condition and were used by Plaintiffs in the manner expected and intended.

60. Defendants owed a duty of care to Plaintiffs to design, manufacture, and sell earplugs that met the specified performance criteria and were otherwise fit for use by servicemembers to protect them from damaging noises typically incurred in military service. Defendants breached this duty.

61. Defendants owed a duty of care to Plaintiffs to design and sell earplugs that were fit for use in military service and that performed according to the specifications that Defendants certified the Combat Arms™ Earplugs would meet. Defendants breached this duty.

62. Defendants owed a duty of care to Plaintiffs to design and sell earplugs that were safe when used for their intended purpose; i.e., when in the presence of loud impulse sounds. Defendants breached this duty.

63. Plaintiffs suffered injury and damage as a direct and proximate result of the defective and unreasonably, unsafe, dangerous condition of the Combat Arms™ Earplugs that the Defendants manufactured, distributed, and sold.

### COUNT II: STRICT PRODUCT LIABILITY – USE DEFECTIVENESS AND/OR FAILURE TO WARN

64. Plaintiffs incorporate by reference the paragraphs above as if fully set forth herein.

65. Defendants are the manufacturers and sellers of the defective Combat Arms™ Earplugs.

66. The defective Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective because the earplugs did not come with adequate warnings, instructions, or labels.

67. The defective Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective because Defendants failed to warn, failed to provide instructions, and failed to provide an adequate label that included the modified fitting instructions necessary for the earplug to fit correctly in the wearer's ear and create the seal necessary to block out damaging sounds.

68. Defendants had a duty to manufacture, design, and sell the Combat Arms™ Earplugs with reasonable and due care for the safety and well-being of wearers, including Plaintiffs. Defendants breached that duty.

69. Defendants had a duty to provide adequate warnings and/or instructions to prevent the risks associated with the Combat Arms™ Earplugs when worn in the ordinary course. Defendants breached that duty.

70. It was foreseeable to Defendants that the Combat Arms™ Earplugs would be unreasonably dangerous if distributed without the warning regarding the risks of damage to the ear with an improper fit and/or without modified fitting instructions.

71. Not only was it reasonably foreseeable that the Combat Arms™ Earplugs would be unreasonably dangerous if distributed without the warning regarding the risks of damage to the ear with an improper fit and/or without modified fitting instructions, it was actually known to Defendants. During testing, Defendants discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit.

72. Defendants also discovered that when the green end of the Combat Arms™ Earplugs was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer. Because the Combat Arms™ Earplugs were symmetrical, this same problem occurred when the earplug was reversed.

73. Defendants had a post-sale duty to warn of the above alleged product-related defects and risks, because Defendants knew or reasonably should have known that the Combat Arms™ Earplug posed a substantial risk of harm to servicemembers, including Plaintiffs. The servicemembers who used the Combat Arms™ Earplug can reasonably be assumed to be unaware of the risk of harm caused by the above-alleged defects, because said defects were imperceptible. A warning or instruction showing how to correctly and safely use the Combat Arms™ Earplug could have been effectively communicated to and acted upon by servicemembers. The risk of harm, including but not limited to hearing loss and tinnitus in servicemembers, is sufficiently great to justify the slight burden of providing a warning or

instruction. Defendants breached this duty by failing to provide a post-sale warning or instruction.

74. The Combat Arms™ Earplugs contained no warnings, or in the alternative, inadequate warnings and/or instructions, as to the risk that the Combat Arms™ Earplugs would allow damaging sounds to bypass the earplug, thereby posing a serious risk to Plaintiffs' hearing, unbeknownst to Plaintiffs.

75. The warnings and instructions that accompanied the Combat Arms™ Earplugs failed to provide the level of information that an ordinary wearer would expect when using the Combat Arms™ Earplugs, in a manner reasonably foreseeable to Defendants.

76. Had Plaintiffs received a proper or adequate warning as to the risks associated with the use of the Combat Arms™ Earplugs in the manner contemplated by Defendants, they would not have used them and/or would have taken other measures to protect themselves.

77. Additionally, and/or alternatively, had Plaintiffs received the modified fitting instructions that were used by Defendants during the testing, which were not disclosed to Plaintiffs, Plaintiffs would have followed the modified fitting instructions to ensure a proper seal to prevent damaging sounds from entering the ear canal.

78. Plaintiffs suffered injury and damage as a direct and proximate result of the use-defectiveness and Defendants' failures to warn and/or provide adequate instructions regarding the dangerous condition of the Combat Arms™ Earplugs that the Defendants manufactured, distributed, and sold.

## COUNT III: NEGLIGENCE

79. Plaintiffs incorporate by reference the paragraphs above as if fully set forth herein.

80. Defendants had a duty to each use their professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by a person or entity in Defendants' business of designing, developing, testing, manufacturing, marketing, and distributing hearing protection devices.

16

81. Defendants further had a duty to comply with the certifications made to the U.S. government about the qualities and performance characteristics of the Combat Arms™ Earplugs. Plaintiffs are among the class of persons meant to be protected by these regulations and certification standards. They were foreseeable plaintiffs to Defendants.

82. Defendants breached these duties by failing to exercise the required degree of care in designing, developing, testing, manufacturing, marketing, and distributing hearing protection devices in a manner to provide the specified level of hearing protection.

83. The damages suffered by Plaintiffs was or should have been reasonably foreseeable to Defendants.

84. Plaintiffs were damaged by Defendants' conduct, including but not limited to damage to their hearing, hearing loss/impairment, and/or tinnitus.

85. Defendants' breaches are a direct and proximate cause of the injuries and damages suffered by Plaintiffs in an amount not yet fully determined, but in excess of $50,000, exclusive of costs and interest. Plaintiffs are entitled to recover damages and other relief as available, at law or equity, as a direct and proximate result of Defendants' conduct.

## COUNT IV: VIOLATION OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT

86. Plaintiffs incorporate by reference all of the above-stated paragraphs as though fully set forth therein.

87. The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43 et. seq., provides in pertinent part:

> Subdivision 1. Acts constituting. A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
>
> . . .
>
> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;
>
> . . .

   (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

   . . . .

88. Defendants used in commerce false or misleading descriptions of fact, and/or false or misleading representations of fact, which caused or likely caused confusion or mistake. These misleading descriptions and/or representations related to the quality, performance, and characteristics of the Defendants' dual-ended Combat Arms™ Earplugs.

89. Defendants' false or misleading descriptions of fact, and/or false or misleading representations of fact, caused or likely caused confusion regarding the quality, performance and characteristics of the dual-ended Combat Arms™ Earplugs.

90. Plaintiffs have been, and continue to be, damaged by Defendants' conduct. Plaintiffs' damages were proximately caused by Defendants' conduct. As a direct and proximate result of the foregoing, Plaintiffs have been injured and have suffered losses in excess of $50,000, for which damages and other relief as may be available at law or equity is warranted. Because Defendants' actions were committed willfully, maliciously, and intentionally, Plaintiffs are entitled to recover costs and reasonable attorneys' fees pursuant to Minn. Stat. § 325D.45.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request from Defendants, jointly and severally, compensatory damages, together with appropriate equitable relief, costs, and attorneys' fees as follows:

  A. Award of monetary damages, including compensatory relief, to which Plaintiffs are entitled at the time of trial in amount exceeding $50,000, exclusive of costs and interest.

  B. Award of pre- and post-judgment interest.

  C. Award of costs.

  D. Any and all damages and relief available as a result of Defendants' conduct in engaging in a deceptive trade practice under the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §325D.44.

E.  Award of reasonable attorney's fees under Minn. Stat. §325D.45, subd. 2.

F.  Award of all other and further relief as may be available at law or equity.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

## ACKNOWLEDGEMENT

Plaintiffs hereby acknowledge that sanctions may be imposed under the circumstances set forth in Minn. Stat. §549.211.

Dated:  July 25, 2019

Tim M. Phillips (#390907)
2836 Lyndale Avenue S, Suite 160
Minneapolis, Minnesota 55408
Telephone: (612) 486-5540
Facsimile: (612) 605-1944
Email:  tphillips@jrwilliamslaw.com

s/Gerald Singleton
SINGLETON LAW FIRM, APC
Gerald Singleton (PRO HAC VICE PENDING)
Amanda M. LoCurto (PRO HAC VICE PENDING)
450 A Street, Fifth Floor
San Diego, CA 92101
Telephone: (619) 771-3473
Facsimile: (619) 255-1515
Email:  gerald@slffirm.com
           amanda@slffirm.com

**ATTORNEYS FOR PLAINTIFFS**

19