**EXHIBIT 2**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Jacob Cowen; Jason Kenneth Cox; Matt Cox; Regan H. Craig; Jared Gregory Craiglow; Michael S. Cranford; Joshua S. Crawley; Lamont Credle; Lionel Creppel; Kenneth Crew; Steven Cristerna; Robert Crooks; Robert Crossley; Robert Crutchfield; Cody Cser; Anthony Shawn Culbertson; Dietrich Culley; Antoine Demetrice Curry; Thomas Curtin; William Curtis II; Michael Cutler; William Cutlip; Diego Damian; George Damour; Chad Daniel; Darrell Wayne Daniels; Maxcillian Joseph Danos III; Bryon Dantzler; Earl Dantzler Jr.; Kurt Everett Darby; Jonathan Darling; David Levoy Daughtry; David George Davis Jr.; Calvin Davis; Donald Davis; Geraldine Davis; Jimmy Davis; Johnathan Davis; Joshua Saul Davison; Darone Jerome Dawsey; Douglas Dawson; James Daye; Timothy Decock; Nathan Defond; Ryan Delacruz; Keith Delatorre; Rich Delmonico; Brian H. Delnevo; Linjaman Jefferson Denham; Brandon Denman; Jeremy Denton; Justin Denton; Robert Lee Denton; Charlie Deramus; Curtis Deshiell; Sean Dial; Vince Diloreto; Joshua Dinehart; Matt R. Dinkledine; Bryan Dipalermo; Scottie Dishner; James Dixon; Travis Dixon; Joshua A. Doane; Vada Dobbins Jr.; Franco Domek; Richard Donovan; William Donovan; Brandon Luis Doom; Shaviance Dor; Trellis Fernando Dorman II; John Dorsey; Warren Doud; Kelvin Douglas; Kyle Douglas; Steven Douglas; Gregory Downceroux; Todd Drake; Howard William Draper; Michael Dries; Christopher Dylan Drohan; Eric Drouncheck; Dusty Drummond; Noah Dueker; Brian Dumas; Michael Dumont; Jack Duncan; Christopher Dunning; Brian

Case No. 19-cv-2185

**NOTICE OF REMOVAL**

Joseph Duplessis; Dimitri Dupoux; Shawn
Earle; Thomas Eaves; Fred Echols;
Thomas Le'Rouse Echols; Duwayne
Charles Edge; Christopher Michael
Edgmond,

        Plaintiffs,

v.

3M Company; 3M Occupational Safety
LLC; Aearo Holdings, LLC; Aearo
Intermediate, LLC; Aearo, LLC; Aearo
Technologies, LLC; and Does 1-50,

        Defendants.

_____

Defendant 3M Company ("3M") hereby gives notice of removal of this action,

pursuant to 28 U.S.C. §§ 1441, 1442(a)(1), and 1446, to the United States District Court

for the District of Minnesota. As grounds for removal, 3M states as follows:

Plaintiffs are servicemembers who seek to hold Defendants 3M Company, 3M

Occupational Safety LLC, Aearo Holding, LLC (misnamed in the Complaint as "Aearo

Holdings, LLC"), Aearo Intermediate, LLC, Aearo, LLC, Aearo Technologies, LLC,[1] and

unnamed "John Doe" defendants liable for hearing loss they allegedly suffered while

serving in various branches of the U.S. military, and including during combat. They

_____

[1] 3M acquired Aearo Technologies, Inc. ("Aearo") in 2008 and continued to sell CAEv2.
After acquiring Aearo, 3M reorganized it and its subsidiaries into a structure including all
of the named co-defendants. The named co-defendants are all separate entities. (Aearo
Technologies LLC, named in the Complaint, is a different entity from Aearo.) Nonetheless,
they consent to this removal.

contend that Combat Arms™ Earplugs, Version 2 ("CAEv2") manufactured and sold by Aearo were defectively designed and failed to provide adequate hearing protection. 3M denies these allegations. CAEv2, designed by Aearo in close collaboration with the U.S. military, represented a revolutionary breakthrough in hearing protection for service members. CAEv2 helped servicemembers better maintain situational awareness (e.g., to hear nearby voice commands) while also maintaining some protection from gunfire and other higher decibel sounds. CAEv2 met the U.S. military's specifications and helped the military provide hearing protection to servicemembers.

In this action, 3M intends to assert the federal government contractor defense and the combatant activities defense. Aearo sold the CAEv2 to the U.S. military under government contracts and in accordance with the military's rigorous specifications. Plaintiffs further allege they suffered damage to their hearing, at least in part, while engaged in combat. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is entitled to remove this action to have its federal defenses adjudicated in a federal forum. Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008) (*citing Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 127 (2007)). 3M also contends that this case and others like it present a nonjusticiable political question, as the design of the CAEv2 reflects the balance struck by the military between hearing protection and military operational needs. *See, e.g.*, *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277, 1281 (M.D. Ga. 2006).

3

Separately, this action is also removable because Plaintiffs seek to hold 3M liable for alleged injuries that occurred in part at U.S. military facilities in connection with Plaintiffs' military service. While Plaintiffs do not identify these facilities specifically in their complaint, they are almost certainly "federal enclaves" for jurisdictional purposes. "Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'" *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006). Because Plaintiffs' claims arose, at least in part, at federal enclaves, the claims involve a federal question, and 3M may remove this action under 28 U.S.C. § 1441(a).

Removal is timely because this action was served on 3M on July 29, 2019. Venue is proper pursuant to 28 U.S.C. §§ 112(a) and 1441(a) because the Second Judicial District is located within this District. Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiffs and a copy is being filed with the Clerk of the Second Judicial District.

## **BACKGROUND**

The CAEv2 is an earplug with two insertable ends developed specifically for the needs of the U.S. military for use as hearing protection in noisy environments. CAEv2 has a yellow end and green end. Each end has a different purpose. When the yellow end of the earplug is inserted, users can still hear nearby low-level sounds, like verbal communication, but receive protection from high-level impulse noise, like gunfire. In contrast, when the green end of the earplug is inserted, CAEv2 acts like a traditional earplug, providing steady and continuous protection from both ambient and impulse noise.

In the area of national defense, the U.S. military relies on close collaboration with private contractors to design and develop products, such as the CAEv2, and manufacture and supply those products in accordance with highly particular specifications balancing the multitude of operational and budgetary needs of equipping the nation's fighting forces. This litigation involves a classic example of that military-contractor collaboration.

CAEv2 was designed at the request of and in consultation with military audiologists, including Dr. Doug Ohlin. Ohlin at the time served in the capacity of Program Manager, Hearing Conservation, U.S. Army Center for Health Promotion and Preventive Medicine (USACHPPM). Ohlin and his program gave direction to Aearo to ensure that the CAEv2 would appropriately balance performance with military operational needs for servicemembers. For example, Ohlin proposed the inclusion of the filter that was a key updated feature of the CAEv2. Ohlin specifically directed Aearo to ensure that the CAEv2 would fit into a military-issued carrying case. Ohlin also was involved in Aearo's testing of the CAEv2.[2]

Following the development of the product, Ohlin was involved in the ultimate approval of CAEv2 for military use and proposed purchasing CAEv2 to the Joint Readiness Clinical Advisory Board. The military's specifications for the CAEv2 reflect the design direction that Ohlin and his program gave to Aearo. In particular, these specifications are memorialized in a Medical Procurement Item Description (MPID) that was used by the

---

[2] Ohlin's involvement continued following the military's decision to purchase and deploy the CAEv2. He provided Aearo with feedback from military personnel as to using the CAEv2 and developed training and instructions for military personnel.

Defense Logistics Agency (the U.S. military's purchasing authority), in soliciting bids from Aearo for the CAEv2. The MPID specified "military unique, double-ended ear plugs suitable for use as hearing protectors for military personnel in chronically noisy environments," that should "be designed to provide protection from the unique noises created by military firearms, while allowing the wearer to clearly hear normal speech . . . such as voice commands, on the battlefield" and should be "camouflage green or another suitable dark color."

In sum, the CAEv2 was launched at the request of, and in close coordination with, the U.S. military. The CAEv2's design reflects the direction and feedback of individuals acting on behalf of the U.S. military. The U.S. military purchased the CAEv2 and issued it to servicemembers like Plaintiffs precisely because the CAEv2 fulfill the military's specifications and accomplishes the military's goal of balancing hearing protection with operational needs.

## BASES FOR FEDERAL JURISDICTION AND REMOVAL

### I.   REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE.

Removal is proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. Removal rights under this section are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).

This is because Section 1442 protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prod.*, No. 11 Civ. 5990 (BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011). This important federal policy "should not be frustrated by a narrow, grudging interpretation of s 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

The removing defendant must establish that: (1) the defendant is a "person" under the statute; (2) the defendant was "acting under" the direction of a federal officer when it engaged in the allegedly tortious conduct; (3) the defendant was acting "under color of" federal office at the time of the allegedly tortious conduct; and (4) the defendant raises a "colorable" federal defense. *See Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989); *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012). All requirements for removal under § 1442(a)(1) are satisfied here. *Cf., e.g., Ayo v. 3M Co.*, No. 18-CV-0373 (JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in case where product liability was sought for defendants' product's conformance with military specifications).

**A. The "Person" Requirement Is Satisfied.**

The first requirement for removal under Section 1442 is satisfied because 3M is a "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes "'companies, associations, firms, [and] partnerships.'" *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (quoting 1 U.S.C. § 1); *Isaacson*, 517 F.3d at 135-36 (holding non-natural person to be a "person" under § 1442).

7

### B. The "Acting Under" Requirement Is Satisfied.

To satisfy the second requirement ("acting under" a federal officer) "a private person's actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Jacks*, 701 F.3d at 1230 (holding that health insurer contracted by U.S. Office of Personnel Management was "acting under" a federal officer) (*quoting Watson*, 551 U.S. at 152). "The words 'acting under' are to be interpreted broadly." *Isaacson*, 517 F.3d at 136. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813; *see also Jacks*, 701 F.3d at 1230 (although "not limitless, '[t]he words "acting under" are broad,' and the Supreme Court 'has made clear that the statute must be "liberally construed."'") (*quoting Watson*, 551 U.S. at 147).

The "acting under" requirement is met here because Plaintiffs directly challenge Defendants' alleged conduct in providing vital products "that, in the absence of Defendants, the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. As discussed above, Aearo designed and manufactured the CAEv2 at the direction of the U.S. military to meet the military's specific needs to provide hearing protection.

Plaintiffs' Complaint effectively concedes that Aearo was "acting under" federal officers of the Department of Defense and its agencies when manufacturing and selling the CAEv2 they were provided. Plaintiffs allege that Aearo specifically developed the CAEv2 for the military's use and to meet the military's specifications:

- "Aearo designed the Combat Arms™ Earplugs to be dual-ended non-linear (selective attenuation) earplugs based upon commercially available technology. The Combat Arms™ Earplugs were created for the specific purpose of providing servicemen a single set of earplugs that provide two options for hearing attenuation depending on how they are worn." (Compl. ¶ 12.)

- "Based on the supposed technological design and qualities of the Combat Arms™ Earplugs, Defendants won a series of Indefinite-Quantity Contracts ('IQCs') to be the exclusive supplier of selective attenuation earplugs to the U.S. military between 2003 and 2012." (*Id.* ¶ 14.)

- "To win these IQCs, Defendants represented that the Combat Arms™ Earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs." (*Id.* ¶ 15.)

- "In addition, the U.S. military may only purchase earplugs that meet the general testing standards established by the U.S. Army Public Health Command, Army Hearing Program, or equivalent standards that may be established by other branches of the military." (*Id.* ¶ 21.)

Not only did Aearo meet "specific performance criteria established by the U.S. Government," it developed the CAEv2 under the direction of, and with significant involvement of, representatives of the U.S. military. *See e.g. Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (holding that defendant was "acting under" a federal officer because it "worked hand-in-hand with the government, assisting the federal government in building warships. 'Acting under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."); *Isaacson*, 517 F.3d at 137 ("Defendants contracted with the Government to provide a product that the Government was using during war—a product that, in the absence of Defendants, the Government would have had to produce

9

itself."); *In re National Prescription Opiate Litig.*, 327 F. Supp. 3d 1064, 1075-76 (N.D. Ohio 2018) (removal under § 1442 was appropriate were defendant was subject to "precise specifications" of government contract, administration of contract was overseen by federal official, and absent defendant's role, government would have had to warehouse and distribute product itself).

As described above, the military's involvement went beyond merely establishing standards. Its involvement also included such operational features as ensuring the CAEv2 would fit in military-issued containers. Such involvement is quintessential activity "acting under" a federal officer. *See e.g. Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998) (authorizing removal of a tort suit against private defense contractors that manufactured Agent Orange); *Gordon v. Air & Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 320 (E.D.N.Y. 2014) (contractor was "acting under" a federal officer for purposes of removal statute when it provided products used in construction of ships to Navy's precise specifications).

Plaintiffs' allegation that the CAEv2 were "widely commercially available and used by civilians" (Compl. ¶ 14) does not change that Aearo was "acting under" a federal officer when it designed the earplugs at issue. For example, in *Stallings v. Georgia-Pac. Corp.*, the defendant removed under the federal officer removal statute a case involving steam turbine engines originally designed for and with the U.S. Navy. 2013 WL 1563231, at *1 (W.D. Ky. Apr. 12, 2013). Plaintiffs argued that defendants were not "acting under" a federal officer because defendant "manufactured the turbines for military and public consumption," which, according to the plaintiffs, "destroy[ed] Defendants' argument that

the military had exclusive control" over the design. *Id.* at *3. The court rejected that argument (and denied plaintiffs' motion to remand) because the turbines were designed to the military's specifications, and thus "[e]ven if Plaintiffs prove that [Defendants] sold these exact turbines to non-governmental entities, this does not undermine Defendants' demonstration, for the purpose of removal, that the Navy possessed extensive control over the design and manufacture of these turbines such that [Defendants'] production thereof was effectively acting under a federal agency." *Id.* So too in this case. Because the U.S. military "possessed extensive control over the design and manufacture" of the CAEv2, Aearo was "effectively acting under a federal agency" even if Plaintiffs prove that the CAEv2 were also available to non-governmental entities. *Id.*

### C. The "Causation" Requirement Is Satisfied.

The third prong, that a defendant's actions were taken "under color of federal office . . . has come to be known as the causation requirement." *Isaacson*, 517 F.3d at 137 (internal quotation marks, alterations, and citation omitted). Like the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Id.* Courts "credit Defendants' theory of the case when determining whether [this] causal connection exists." *Isaacson*, 517 F.3d at 137 (*citing Acker*, 527 U.S. at 431-32 (1999) ("demanding an airtight case on the merits in order to show the required causal connection" would "defeat the purpose of the removal statute")).[3] In 2011, Congress further expanded Section 1442 by amending

---

[3] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

section 2(b) to permit removal "for *or relating to* any acts under color" of federal office,

so as "to broaden the universe of acts that enable Federal officers to remove to Federal

court." H.R. REP. 112-17, 6, 2011 U.S.C.C.A.N. 420, 425 (emphasis showing addition).

"To show causation, Defendants must only establish that the act that is the subject

of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties."

*Isaacson*, 517 F.3d at 137-38 (emphasis in original). Here, Plaintiffs' claims arise from

Defendants' production and sale of CAEv2 to military specifications. Plaintiffs allege that

the design of the CAEv2 is defective. Aearo developed and designed the Combat Arms™

earplugs, including establishing its length, at the direction of federal officers.

Further, even if Plaintiffs were to prove that any alleged defect was the result of an

act not specifically contemplated by the government contract, "it is enough that the

contracts gave rise" to the harm alleged. *See Isaacson*, 517 F.3d at 138. "[W]hether the

challenged act was outside the scope of Defendants' official duties, or whether it was

specifically directed by the federal Government, is one for the federal—not state—courts

to answer." *Id.* (*citing Willingham*, 395 U.S. at 409).

**D. The "Colorable Federal Defense" Requirement Is Satisfied.**

The fourth requirement (establishing a "colorable federal defense") is satisfied by

3M's assertion of the government contractor defense and the combatant activities defense.

Courts around the country have held that the government contractor defense and the

combatant activities defense support removal under § 1442(a)(1). *See, e.g.*, *Jacks*, 701 F.3d

at 1234-35 (government contractor defense supports removal under § 1442); *Isaacson*, 517

F.3d at 139 (same); *Zeringue v. Crane Co.*, 846 F.3d 785 (5th Circuit 2017) (same);

12

*McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1200 (M.D. Fla. 2006) (both government contractor defense and combatant activities defenses supported removal under § 1442).

A defendant need not prove its defense at the removal stage; a defendant need only show that a federal defense is "colorable." *Jacks*, 701 F.3d at 1235. Courts will not "require that these defenses be clearly sustainable in order to support removal under § 1442(a)(1)." *Id.* (*citing Willingham*, 395 U.S. at 406–07 ("[The federal officer removal statute] is broad enough to cover all cases where federal officers can raise a colorable defense. . . . The officer need not win his case before he can have it removed.")).

At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116 (citing *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n. 12 (2006)).[4] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783-84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (quoting *Willingham*, 395 U.S. at 409).

_____

[4] *See also Kraus v. Alcatel-Lucent*, Civil Action No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determines whether there are sufficient facts alleged to raise a colorable defense.").

### 1.  3M Has a Colorable Government Contractor Defense.

Under the government contractor defense, the defendant is not liable for alleged

defects or negligence with respect to military equipment or supplies "when (1) the United

States approved reasonably precise specifications; (2) the equipment conformed to those

specifications; and (3) the supplier warned the United States about the dangers in the use

of the equipment that were known to the supplier but not to the United States." *Boyle*, 487

U.S. at 512.

3M has satisfied all of these elements for purposes of removal. As discussed above,

the Defense Logistics Agency (the military's procurement agency) established reasonably

precise specifications governing double-ended non-linear earplugs' performance, testing,

inspection, packaging, and labeling, with which the CAEv2 complied. Plaintiffs likewise

allege that the CAEv2 were subject to stringent military specifications. (Compl. ¶ 21 ("the

U.S. military may only purchase earplugs that meet the general testing standards

established by the U.S. Army Public Health Command, Army Hearing Program, or

equivalent standards that may be established by other branches of the military.").) When

properly used, the CAEv2 fully conforms to those specifications.

Finally, the government was adequately informed regarding alleged product-related

"dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and

procuring the CAEv2 earplugs. The U.S. military was actively involved in discussions with

Aearo in the development of the CAEv2 regarding its length and instructions for use.

Aearo's engineers discussed the challenges, and trade-offs, in conforming the design of the

CAEv2 to fit within the military's desired carrying cases and with its other equipment.

At minimum, this constitutes colorable evidence that the U.S. military generally "made a discretionary determination" regarding the requirements and design of the CAEv2's benefits against the alleged risks. *See In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145, at *14 (E.D.N.Y. Sept. 30, 2018) (holding removal proper under § 1442 because defendants presented "colorable evidence" that government was aware of alleged problems with product at issue); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *Agent Orange*, 517 F.3d at 89-90; *see also Ayo*, 2018 WL 4781145, at *13.

### 2.   3M Has a Colorable Combatant Activities Defense.

The "combatant activities defense" is a complete defense for claims arising out of combat activities. Although Congress waived sovereign immunity for tort claims against the United States and those acting on its behalf in the Federal Tort Claims Act, it excluded "claims arising out of combatant activities of the military or armed forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). The combatant activities exception has been applied to contractors to create a federal defense shielding manufacturers from tort claims arising from war. *See, e.g.*, *Saleh v. Titan Corp.*, 580 F.3d 1, 6 (D.C. Cir. 2009) (applying § 2680(j) exception to tort claims arising from treatment of inmates in military prison in Iraq brought against private contractor); *Bentzlin v. Hughes Aircraft Co.*, 833 F.

Supp. 1486, 1492 (C.D. Cal. 1993) ("The combatant activities exception generates a federal common law defense which immunizes manufacturers such as Hughes from state tort suits arising from war.") The combatant activities defense is broader than the government contractor defense under *Boyle* because it acts like "field preemption because it casts a[n] immunity net over any claim that *arises* out of combat activities." *Saleh*, 580 F.3d at 6 (emphasis in original; internal citation omitted).

Application of the defense has two elements: (1) the presence of combatant activities; and (2) that such activities occur during a time of war. The combatant activities element has been liberally construed and is not limited to the exertion of physical force. *See Johnson v. U.S.*, 170 F.2d 767, 770 (9th Cir. 1948). Rather, "activities both necessary to and in direct connection with actual hostilities" are included. *Id.* Ammunition supply, troop movement and logistical support, and holding prisoners of war have all qualified as combatant activities under the test. *See Aiello v. Kellogg, Brown & Root Servs.*, 751 F. Supp. 2d 698, 706 (S.D.N.Y. 2011).

Each factor is satisfied here. The Complaint alleges that each Plaintiff suffered hearing loss and/or tinnitus due, at least in part, to their involvement in combat, and that the CAEv2 issued to them by the military failed to provide adequate protection. (Compl. ¶ 1 ("Plaintiffs used Defendants' [CAEv2] while in training and/or while deployed on active military duty. As a result of the earplugs' defective condition, Plaintiffs now suffer from hearing loss, impairment, and/or tinnitus.").) While Plaintiffs have not pled the details of their military service, it is likely that one or more of them participated in activities both necessary to and in direct connection with actual hostilities. Claims in

16

such circumstances fall within the scope of the combatant activities defense. *See e.g.*, *Bentzlin*, 833 F. Supp. at 1492-95 (holding that claims brought against missile manufacturer for causing death of U.S. soldiers as a result of alleged product defect were barred by combatant activities defense).

Accordingly, 3M is immune from tort claims arising from Plaintiffs' harm suffered while they were engaged in combatant activities. This defense separately supports federal question jurisdiction under § 1442 and removal to this Court.

### 3. 3M Has a Colorable Basis for Asserting that This Case Presents a Nonjusticiable Political Question.

3M also intends to argue that Plaintiffs' suit presents a nonjusticiable political question. "[M]ilitary activities often give rise to political questions." *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1358 (11th Cir. 2007). Courts have recognized that "the interjection of tort law into the realms of foreign policy and military affairs would effectively permit judicial reappraisal of judgments the Constitution has committed to the other branches." *Id.* (citation and internal quotation omitted). Thus, decisions about "[t]he strategy and tactics employed on the battlefield" are beyond a federal court's ability to review. *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991).

As a general matter, cases brought by "soldiers injured at the hands of the military raise political questions." *Whitaker*, 444 F. Supp. 2d at 1281; *see also Bentzlin*, 833 F. Supp. at 1497-98, *Carmichael v. Kellogg Brown & Root Servs., Inc.*, 572 F.3d 1271 (11th Cir. 2009). Moreover, "a soldier injured at the hands of a contractor which is performing military functions subject to the military's orders and regulations also raises the same

political questions." *Whitaker*, 444 F. Supp. 2d at 1281. This is such a case. Plaintiffs are

servicemembers. They allege that they suffered hearing loss and/or tinnitus due to exposure

"while in training and/or while deployed on active military duty" because the CAEv2 "did

not stop the damaging loud noises of military use that can cause hearing loss or tinnitus."

(Compl. ¶¶ 1, 55.) There is no doubt that the U.S. military made the decision to issue the

CAEv2 to Plaintiffs, that the U.S. military directed Plaintiffs during training exercises, and

that the U.S. military directed their activities in combat.[5] *See Whitaker*, 444 F. Supp. 2d at

1279 (concluding that suit against Army contractor for negligent operation of a convoy

vehicle presented a political question where the Army regulated "all aspects of control,

organization, and planning of Army convoy operations").

As discussed above, the design of the CAEv2 reflects the balance struck by the

military between hearing protection and military operational needs. The decision to issue

the CAEv2 to servicemembers, and the instructions to Plaintiffs and others about when and

where to use them, was made by the U.S. military. Accordingly, resolution of Plaintiffs'

claims for design defect and inadequate warnings requires inquiry into the military's

decisions and conduct. *See Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) ("The complex

subtle, and professional decisions as to the composition, training, equipping and control of

a military force are essentially professional military judgments, subject always to civilian

_____

[5] This case is, therefore, unlike *Brokaw v. Boeing Co.*, 137 F. Supp. 3d 1082, 1104 (N.D. Ill. 2015), where the court rejected the application of the political question doctrine and remanded to state court because the plaintiffs were family members of civilian contractors, not service members, and the military had "only tangential involvement" in those civilians' deaths in a plane crash.

control of the Legislative and Executive Branches."). Plaintiffs' claims therefore are

nonjusticiable and are barred by the political question doctrine.

## II.   REMOVAL IS ALSO PROPER BECAUSE PLAINTIFFS' CLAIMS AROSE IN PART ON FEDERAL ENCLAVES.

In addition, removal of this action is proper because Plaintiffs' claims almost

certainly arose, at least in part, at a federal enclave—namely, U.S. military facilities

throughout the United States. To that extent, the claims are governed by federal law and

are subject to this Court's federal question jurisdiction under 28 U.S.C. § 1331. Thus, this

action is removable under 28 U.S.C. § 1441(a).

"A federal enclave is a portion of land over which the United States government

exercises federal legislative jurisdiction." *Brookhaven Sci. Assocs., LLC v. Donaldson*, No.

04 Civ. 4013(LAP), 2007 WL 2319141, at *5 (S.D.N.Y. Aug. 9, 2007) (internal quotation

and citation omitted). The Constitution confers on Congress the power "[t]o exercise

exclusive legislation" over the District of Columbia "and to exercise like authority over all

places purchased by the consent of the legislature of the state in which the same shall be,

for the erection of forts, magazines, arsenals, dockyards, and other needful buildings." U.S.

Const. art. I, § 8, cl. 17. "It has long been settled that where lands for such a purpose are

purchased by the United States with the consent of the State legislature, the jurisdiction

theretofore residing in the state passes, in virtue of the constitutional provision, to the

United States, thereby making the jurisdiction of the latter the sole jurisdiction." *Surplus

Trading Co. v. Cook*, 281 U.S. 647, 652 (1930).

Because the United States exercises sole lawmaking authority over a federal enclave, the law applicable to that enclave is, by definition, federal law, although such federal law may incorporate state-law rules of decision. *See, e.g.*, *Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952) ("[A]ny law existing in territory over which the United States has 'exclusive' sovereignty must derive its authority and force from the United States and is for that reason federal law"); *accord Macomber v. Bose*, 401 F.2d 545, 546 (9th Cir. 1968) ("State law theretofore applicable within the [ceded] area was assimilated as federal law, to remain in effect until changed by Congress. Rights arising under such assimilated law, arise under federal law and are properly the subject of federal jurisdiction."); *Brookhaven Sci. Assocs.*, 2007 WL 2319141, at *5 ("[W]hen an area becomes a federal enclave, the state law in effect at the time of cession becomes federal law and is the applicable law unless Congress provides otherwise.").

Federal courts have federal-question jurisdiction under 28 U.S.C. § 1331 for actions involving tort claims that arise on federal enclaves. *See, e.g.*, *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998) (movant properly removed case to federal court when case was removed based on movant's status as a "person acting under" a federal officer, and status of the Air Force base as a federal enclave). It follows that such actions, if originally filed in state court, may be removed to federal court under 28 U.S.C. § 1441(a). *See, e.g.*, *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1236 (10th Cir. 2012) (affirming grant of summary judgment on state employment law claims as barred by federal enclave doctrine after removal from state court).

While Plaintiffs' Complaint does not specifically identify the U.S. military facilities where they were issued and used CAEv2 and allegedly suffered hearing damage, one or more of these facilities undoubtedly qualifies as a federal enclave. *See Jamil v. Workforce Res., LLC*, Case No. 18-CV-27-JLS (NLS), 2018 WL 2298119, at *2 (S.D. Cal. May 21, 2018) (inferring from Complaint that some of the alleged events must have occurred at Marine Corps base, a federal enclave, and denying motion to remand). Because Plaintiffs' claims almost certainly arose, at least in part, at a federal enclave, this Court has subject matter jurisdiction over the action, and removal of the action is proper under 28 U.S.C. § 1441(a).

## CONCLUSION

For all the foregoing reasons, 3M hereby removes this action from the Second Judicial District Court of Minnesota, Hennepin County, to this Court. As noted above, co-defendants 3M Occupational Safety, Aearo Holding, LLC, Aearo Intermediate, LLC, Aearo, LLC, and Aearo Technologies LLC consent to this removal. It is not necessary to obtain the consent of any of the "John Doe" defendants, as such defendants have been neither identified nor properly served. *See* 28 U.S.C. § 1446(b)(2)(A); *In re Baycol Prods. Litig.*, MDL No. 1431 (MJD), Case No. 02-875, 2003 WL 24229818, at *4 (D. Minn. Dec. 12, 2003) (parties not properly served need not consent to removal); *see also Johnson v. Wellborn*, 418 Fed. Appx. 809, 815 (11th Cir. 2011) ("The requirement that there be unanimity of consent in removal cases with multiple defendants does not require consent of defendants who have not been properly served."); *Plumlee v. Humana Ins. Co.*, No.

4:09-cv-00780 GTE, 2009 WL 10676845, at *2 (E.D. Ark. Nov. 10, 2009) (no obligation

to obtain consent from fictitious or unnamed defendants).


Dated: August 9, 2019                    Respectfully submitted,

                                         s/ Benjamin W. Hulse
                                         Jerry W. Blackwell (MN #186867)
                                         Benjamin W. Hulse (MN #0390952)
                                         S. Jamal Faleel (MN #0320626)
                                         BLACKWELL BURKE P.A.
                                         431 South Seventh Street, Suite 2500
                                         Minneapolis, MN 55415
                                         Phone: (612) 343-3200
                                         Fax: (612) 343-3205
                                         Email: blackwell@blackwellburke.com
                                                bhulse@blackwellburke.com
                                                jfaleel@blackwellburke.com

                                         **Counsel for Defendants 3M Company and
                                         3M Occupational Safety LLC**

STATE OF MINNESOTA

COUNTY OF RAMSEY

DISTRICT COURT

SECOND JUDICIAL DISTRICT

CASE TYPE: PRODUCT LIABILITY

| | |
|---|---|
| Jacob Cowen; Jason Kenneth Cox; Matt Cox; Regan H. Craig; Jared Gregory Craiglow; Michael Cranford; Joshua S. Crawley; Lamont Credle; Lionel Creppel; Kenneth Crew; Steven Cristerna; Robert Crooks; Robert Crossley; Robert Crutchfield; Cody Cser; Anthony Shawn Culbertson; Dietrich Culley; Antoine Demetrice Curry; Thomas Curtin; William Curtis II; Michael Cutler; William Cutlip; Diego Damian; George Damour; Chad Daniel; Darrell Wayne Daniels; Maxcillian Joseph Danos III; Bryon Dantzler; Earl Dantzler Jr.; Kurt Everett Darby; Jonathan Darling; David Levoy Daughtry; David George Davis Jr.; Calvin Davis; Donald Davis; Geraldine Davis; Jimmy Davis; Johnathan Davis; Joshua Saul Davison; Darone Jerome Dawsey; Douglas Dawson; James Daye; Timothy Decock; Nathan Defond; Ryan Delacruz; Keith Delatorre; Rich Delmonico; Brian H. Delnevo; Linjaman Jefferson Denham; Brandon Denman; Jeremy Denton; Justin Denton; Robert Lee Denton; Charlie Deramus; Curtis Deshiell; Sean Dial; Vince Diloreto; Joshua Dinehart; Matt R. Dinkledine; Bryan Dipalermo; Scottie Dishner; James Dixon; Travis Dixon; Joshua A. Doane; Vada Dobbins Jr.; Franco Domek; Richard Donovan; William Donovan; Brandon Luis Doom; Shaviance Dor; Trellis Fernando Dorman II; John Dorsey; Warren Doud; Kelvin Douglas; Kyle Douglas; Steven Douglas; Gregory Downceroux; Todd Drake; Howard William Draper; Michael Dries; Christopher Dylan Drohan; Eric Drouncheck; Dusty Drummond; Noah Dueker; Brian Dumas; Michael Dumont; Jack Duncan; Christopher Dunning; Brian Joseph Duplessis; Dimitri | **Court File No.** _____<br><br>**SUMMONS** |

Dupoux; Shawn Earle; Thomas Eaves; Fred
Echols; Thomas Le'Rouse Echols; Duwayne
Charles Edge; Christopher Michael
Edgmond,

                              Plaintiffs,

        vs.

3M Company; 3M Occupational Safety LLC;
Aearo Holdings, LLC; Aearo Intermediate,
LLC; Aearo, LLC; Aearo Technologies,
LLC; and Does 1-50,

                              Defendants.

---

THIS SUMMONS IS DIRECTED TO 3M COMPANY; 3M OCCUPATIONAL SAFETY LLC;
AEARO HOLDINGS, LLC; AEARO INTERMEDIATE, LLC; AEARO, LLC; AND AEARO
TECHNOLOGIES, LLC:

    **1. YOU ARE BEING SUED**. The Plaintiff has started a lawsuit against you. The
Plaintiff's Complaint against you is attached to this summons. Do not throw these papers away.
They are official papers that affect your rights. You must respond to this lawsuit even though it
may not yet be filed with the Court and there may be no court file number on this summons.

    **2. YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.** You
must give or mail to the person who signed this summons **a written response** called an Answer
within 20 days of the date on which you received this Summons. You must send a copy of your
Answer to the person who signed this summons at:

    Law Office of Joshua R. Williams

    2836 Lyndale Avenue South, Suite 160

    Minneapolis, MN 55408

    **3. YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response
to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with
each paragraph of the Complaint. If you believe the Plaintiff should not be given everything
asked for in the Complaint, you must say so in your Answer.

    **4. YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN
RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS
SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to
tell your side of the story, and the Court may decide against you and award the Plaintiff
everything asked for in the complaint. If you do not want to contest the claims stated in the
complaint, you do not need to respond. A default judgment can then be entered against you for
the relief requested in the complaint.

2

**5. LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer.  If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance.  **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

**6. ALTERNATIVE DISPUTE RESOLUTION.**  The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: July 25, 2019

Tim M. Phillips (#390907)
2836 Lyndale Avenue S, Suite 160
Minneapolis, Minnesota 55408
Telephone:  (612) 486-5540
Facsimile:  (612) 605-1944
Email:  tphillips@jrwilliamslaw.com

3

STATE OF MINNESOTA                                          DISTRICT COURT

COUNTY OF RAMSEY                                    SECOND JUDICIAL DISTRICT

                                                   CASE TYPE:  PRODUCT LIABILITY

| | |
|---|---|
| Jacob Cowen; Jason Kenneth Cox; Matt Cox; Regan H. Craig; Jared Gregory Craiglow; Michael Cranford; Joshua S. Crawley; Lamont Credle; Lionel Creppel; Kenneth Crew; Steven Cristerna; Robert Crooks; Robert Crossley; Robert Crutchfield; Cody Cser; Anthony Shawn Culbertson; Dietrich Culley; Antoine Demetrice Curry; Thomas Curtin; William Curtis ll; Michael Cutler; William Cutlip; Diego Damian; George Damour; Chad Daniel; Darrell Wayne Daniels; Maxcillian Joseph Danos III; Bryon Dantzler; Earl Dantzler Jr.; Kurt Everett Darby; Jonathan Darling; David Levoy Daughtry; David George Davis Jr.; Calvin Davis; Donald Davis; Geraldine Davis; Jimmy Davis; Johnathan Davis; Joshua Saul Davison; Darone Jerome Dawsey; Douglas Dawson; James Daye; Timothy Decock; Nathan Defond; Ryan Delacruz; Keith Delatorre; Rich Delmonico; Brian H. Delnevo; Linjaman Jefferson Denham; Brandon Denman; Jeremy Denton; Justin Denton; Robert Lee Denton; Charlie Deramus; Curtis Deshiell; Sean Dial; Vince Diloreto; Joshua Dinehart; Matt R. Dinkledine; Bryan Dipalermo; Scottie Dishner; James Dixon; Travis Dixon; Joshua A. Doane; Vada Dobbins Jr.;  Franco Domek; Richard Donovan; William Donovan; Brandon Luis Doom; Shaviance Dor; Trellis Fernando Dorman II; John Dorsey; Warren Doud; Kelvin Douglas; Kyle Douglas; Steven Douglas; Gregory Downceroux; Todd Drake; Howard William Draper; Michael Dries; Christopher Dylan Drohan; Eric Drouncheck; Dusty Drummond; Noah Dueker; Brian Dumas; Michael Dumont; Jack Duncan; Christopher Dunning; Brian Joseph Duplessis; Dimitri | Court File No. _____<br><br>**COMPLAINT** |

Dupoux; Shawn Earle; Thomas Eaves; Fred
Echols; Thomas Le'Rouse Echols; Duwayne
Charles Edge; Christopher Michael
Edgmond,

                                Plaintiffs,

        vs.

3M Company; 3M Occupational Safety LLC;
Aearo Holdings, LLC; Aearo Intermediate,
LLC; Aearo, LLC; Aearo Technologies,
LLC; and Does 1-50,

                                Defendants.

The above-named Plaintiffs bring this action against Defendants 3M Company; 3M

Occupational Safety LLC; Aearo Holdings, LLC; Aearo Intermediate, LLC; Aearo, LLC; Aearo

Technologies, LLC; (collectively, "Defendants") and Does 1-50, and in support thereof allege:

## BACKGROUND

1.      This is a product liability action related to a defective earplug manufactured and

sold by Defendants.  Plaintiffs used Defendants' dual-ended Combat Arms™ Earplugs, Version

2 ("Combat Arms™ Earplugs"), while in training and/or while deployed on active military duty.

As a result of the earplugs' defective condition, Plaintiffs now suffer from hearing loss,

impairment, and/or tinnitus.  Defendants knew the earplugs were defective prior to selling them,

because they falsified test results and misrepresented their performance specifications to qualify

for a multi-million dollar per-year contract with the United States.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over Plaintiffs' claims under Minn. Stat.

§ 484.01, subd. 1.

3.      This action is <u>not</u> removable to federal court, because Plaintiffs assert no claim

arising under the Constitution, law, or treaties of the United States to satisfy 28 U.S.C. §1331.

2

Because at least one Defendant is domiciled in the state of Minnesota, , diversity jurisdiction does not apply and 28 U.S.C. §1441(b)(2) precludes removal.

    4.    Venue is proper in Ramsey County, Minnesota, under Minn. Stat. §§542.01 and 542.09, because Defendant 3M resides in Ramsey County in that it has its resident agent, an office, and place of business in Ramsey County.

**PARTIES**

    5.    Plaintiffs are servicemembers of the United States armed forces and/or National Guard and Reserve who served between the years 2002-2015 and had no signs or symptoms of hearing loss or tinnitus prior to commencing service. Plaintiffs were issued and wore the dual-ended Combat Arms™ Earplugs designed and supplied by Defendants. Despite using the Combat Arms™ Earplugs as instructed, Plaintiffs thereafter suffered tinnitus and/or hearing loss due to the defective nature of the Combat Arms™ Earplugs.

    6.    Defendant 3M Company is a Delaware corporation with its principal place of business in Minnesota. Defendant 3M Occupational Safety LLC is a Delaware limited liability company and is a citizen of Delaware and Minnesota. Defendant 3M Occupational Safety LLC is a subsidiary of Defendant 3M. Collectively, these Defendants are referred to in this complaint as "3M."

    7.    Defendant Aearo Technologies, LLC, is a limited liability company formed in Delaware with its principal place of business in Minnesota. At all relevant times and as relevant here, Defendant Aearo Technologies LLC utilized two assumed names: Aearo Company and Aearo Technologies. Defendant Aearo Holdings LLC is a Delaware limited liability company with a principal place of business in Minnesota. Defendant Aearo Holdings LLC was formerly known as Aearo Holdings Corporation. Defendant Aearo Intermediate LLC is a Delaware limited liability company with a principal place of business in Indiana and is a citizen of Minnesota. Defendant Aearo Intermediate LLC was formerly known as Aearo Technologies,

3

Inc. Collectively, these Defendants are referred to herein as "Aearo." Defendant Aearo LLC is a

Delaware limited liability company with a principal place of business in Indiana and is a citizen

of Delaware and Minnesota. Defendant Aearo LLC was formerly known as Aearo Corporation.

Defendant Aearo LLC is a subsidiary of Defendant 3M Company.

8.      In 2008, 3M purchased Aearo.  Defendant Aearo is now a wholly owned

subsidiary of Defendant 3M.

9.      The true names of Does 1-50, whether individual, corporate, associate, agency, or

otherwise, are unknown to Plaintiffs who, under Minnesota Rules of Civil Procedure Rule 9.08,

sue these Defendants under fictitious names for contributing to their tinnitus and/or hearing loss

related to the defective nature of the Combat Arms™ Earplugs.

## FACTUAL ALLEGATIONS

10.     In 2000, Aearo was a global market leader in hearing and eye protection

equipment and was based in Indianapolis, Indiana. Aearo developed, marketed, and sold the

Combat Arms™ Earplugs until being acquired by 3M in 2008 for $1.2 billion.

11.     After purchasing Aearo, 3M hired Aearo's employees and maintained Aearo as a

separate operating unit. Post-acquisition, the Combat Arms™ Earplugs were marketed and sold

under the 3M brand at all times relevant to this complaint. Because 3M acquired both the assets

and liabilities of Aearo, Aearo and 3M are used interchangeably and all allegations against Aearo

are directed as a matter of law against 3M.

12.     Aearo designed the Combat Arms™ Earplugs to be dual-ended, non-linear

(selective attenuation) earplugs based upon existing commercially available technology.  The

Combat Arms™ Earplugs were created for the specific purpose of providing users with a single

set of earplugs that provide two options for hearing attenuation depending on how they are worn.

13.     One side of the dual-sided earplugs is yellow; the other is green.  The earplugs

can be worn in an open, or "unblocked," position (yellow end in) to block, or at least

4

significantly reduce, loud impulse sounds commonly associated with military service, while still allowing the user to hear quieter noises. These quieter noises include voice commands or other communications spoken by fellow U.S. military servicemembers, approaching enemy combatants, etc. Alternatively, the earplugs can be worn in a closed, or "blocked," position (green end in) to block, or at least significantly reduce, all sounds. When used in the "blocked" position, the Combat Arms™ Earplugs operate as ordinary earplugs.

14.     Based on the supposed technological design and qualities of the Combat Arms™ Earplugs, Defendants won a series of Indefinite-Quantity Contracts ("IQCs") to be the exclusive supplier of selective attenuation earplugs to the U.S. military between 2003 and 2012. However, the Combat Arms™ Earplugs were not exclusively designed for military use, and were, in fact, widely commercially available and used by civilians.

15.     To win these IQCs, Defendants represented that the Combat Arms™ Earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs.

16.     At all times, Defendants' performance representations were false, and Defendants knew them to be false. In fact, Defendants knew these earplugs were defective and did not work as they were supposed to as early as the year 2000; years before Defendants became the exclusive supplier of selective attenuation earplugs to the U.S. military.

17.     At all relevant times, the Combat Arms™ Earplugs had a dangerous design defect that caused them to imperceptibly loosen in the wearer's ear, thus allowing damaging sounds to enter the ear canal around the outside of the earplug. Specifically, the basal edge of the third flange of the non-inserted end of the earplug is prone to press against some users' ear canals and fold back to its original shape, thereby loosening the seal in their ear canals. Because the earplug is symmetrical, the defect exists regardless of which end is inserted into the ear.

18.     Aearo learned of this design defect when it completed its testing of the Combat Arms™ Earplugs. In fact, in February 2000, after the Combat Arms™ Earplugs first failed the

specification testing, Aearo employees rolled back the non-inserted yellow flanges to mitigate the loosening effect of the defect.

19.     The value and effectiveness of earplugs has been standardized under federal law through a Noise Reduction Rating ("NRR"). The testing and labeling of earplugs such as the Combat Arms™ Earplugs to achieve an NRR is governed by federal regulations promulgated by the Environmental Protection Agency ("EPA") pursuant to the Noise Control Act, 42 U.S.C. §4901 et seq. Specifically, 40 C.P.R. §211.206-1 provides:

> The value of sound attenuation to be used in the calculation of the Noise Reduction Rating must be determined according to the "Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs." This standard is approved as the American National Standards Institute Standard (ANSI-STD) S3.19-1974.

20.     Further, 40 C.P.R. §211.204-4(e) requires that specific supporting information accompany hearing protection devices sold in the United States:

> The following minimum supporting information must accompany the device in a manner that insures its availability to the prospective user. In the case of bulk packaging and dispensing, such supporting information must be affixed to the bulk container or dispenser in the same manner as the label, and in a readily visible location.... Instructions as to the proper insertion or placement of the device.

A.     **Aearo Deliberately Falsified Test Results for the Combat Arms™ Earplugs**

21.     The NRR is supposed to represent the amount of sound attenuation experienced by a test group under conditions specified by the federal Noise Control Act's testing methodology. In addition, the U.S. military may only purchase earplugs that meet the general testing standards established by the U.S. Army Public Health Command, Army Hearing Program, or equivalent standards that may be established by other branches of the military. Any such standards are tied to the NRR achieved under the EPA regulations.

22.     In or around January 2000, Aearo began NRR testing on each end of the Combat Arms™ Earplug. Rather than use an independent test lab, Aearo performed its testing in-house at its E-A-RCAL laboratory (also now owned by 3M). Aearo selected 10 test subjects, including some of its own employees. Aearo's test protocol involved testing: (1) the subject's hearing

without an earplug; (2) the subject's hearing with the open/unblocked (yellow) end of the Combat Arms™ Earplug inserted; and (3) the subject's hearing with the closed/blocked (green) end of the Combat Arms™ Earplug inserted. Aearo's own employees (without oversight from the U.S. military or any independent third parties) monitored the test results as the tests were performed, which allowed them to stop the testing at any point if they were not achieving the desired NRR and/or to manipulate or conceal unfavorable test results.

23.     This violated the ANSI S3.19-1974 testing protocol. In fact, Aearo stopped the test of the green end of the Combat Arms™ Earplug inserted after only 8 of the 10 subjects had been tested. At that point, the Combat Arms™ Earplugs were failing expectations miserably. Aearo was expecting to achieve an NRR of 22 with the green end inserted, but in fact was on target to receive a 10.9 rating based on the experiences of the first eight subjects. These disappointing results were caused by the design defect described above.

24.     Despite stopping the test on the green end of the Combat Arms™ Earplugs, Aearo had the remaining two test subjects complete the test with respect to the yellow end of the Combat Arms™ Earplugs, because Aearo liked the low NRR rating the test was indicating to that point. After completion, however, testing of the yellow end resulted in an NRR of -2, which falsely suggested that the earplugs actually amplified sound. Aearo thus knew that the test was inaccurate and needed to be repeated. Instead, Aearo changed the -2 NRR to a 0 NRR, and used that rating on its labels.

25.     After prematurely stopping the NRR test of the green end of the Combat Arms™ Earplugs, Aearo investigated the disappointing test results and discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit as required by ANSI S3.19-1974, Section 3.2.3.1.[1]

26.     Aearo also discovered that when the green end of the Combat Arms™ Earplugs was inserted into the ear using the standard fitting instructions, the basal edge of the third flange

---

[1] *See* Acoustical Society of America Standard Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs (ASA STD 1-1975).

of the yellow end pressed against the wearer's ear and folded backward. When the inward

pressure of the earplug was released, the yellow flanges tended to return to their original shape,

thereby loosening the earplug, often imperceptibly to the wearer. Because the Combat Arms™

Earplugs were symmetrical, this same problem occurred when the earplug was reversed. Aearo

then improperly manipulated the test protocol by instructing the test subjects to fold the flanges

on the non-inserted end of the earplug back before inserting it into the ear.

27.     Using the manipulated fitting instructions, Aearo re-tested the green end of the

Combat Arms™ Earplugs starting in February 2000. During this re-test of the green end, test

subjects folded back the yellow flanges of the earplug (essentially elongating the too-short

defective stem) to allow them to insert the earplugs deeper into their ears to obtain a proper fit.

Because the yellow flanges were folded back, the basal edge of the third flange no longer pressed

against the subject's ear canal, and thus did not cause the earplug to loosen during the testing.

Using this manipulated test protocol, Aearo achieved a 22 NRR on the green end of the Combat

Arms™ Earplugs.

28.     Due to the symmetrical nature of the Combat Arms™ Earplugs, the design defect

that affected the fit of the green end similarly affected the fit of the yellow end. The fact that

Aearo's testing of the yellow end resulted in a -2 NRR meant that the earplugs did not provide a

proper fit (as required by ANSI S3.19-1974, Section 3.2.3) between the ear canal of at least some

of the subjects and the earplugs. As a result, some subjects had large standard deviations across

trials on the yellow end test, which suppressed the NRR rating.

29.     Nevertheless, Aearo did not re-test the yellow end using the manipulated fitting

instructions like it did on the green end, i.e., folding back the flanges on the green end of the

earplug before inserting the yellow end into the ear.

30.     Aearo did not re-test the yellow end because it knew that it would not be able to

obtain a 0 NRR (much less the facially invalid -2 NRR), and further knew the 0 NRR was a

major selling point to the U.S. military. An accurate NRR for the yellow end, which would have

been higher than 0, would have rendered the Combat Arms™ Earplugs less attractive to the U.S. military because the military would have known that the earplugs would impair communication.

31.     Moreover, the defect in the Combat Arms™ Earplugs is more likely to manifest itself during military activities than in a lab where the NRR tests are performed over the span of just a few minutes and the head of the test subject remains virtually motionless during the test. Servicemembers, on the other hand, may wear the earplug for an extended period of time and are significantly more active than test subjects in a lab.

32.     Because the defect was imperceptible to the wearer, Defendants' design defect went undetected for more than a decade by the U.S. military and those who wore them. It is thus not surprising that hearing damage is now the largest ongoing medical cost the military incurs each year.[2] The VA now spends more than $1 billion per year to treat hearing damage suffered by more than 800,000 servicemembers.[3]

**B.     Defendants' False Certifications to the U.S. Military**

33.     In 2003, Aearo submitted a bid in response to the U.S. military's Request for Proposal ("RFP") to supply large quantities of Combat Arms™ Earplugs.  The RFP required bidders to certify that the earplugs complied with the Salient Characteristics of Medical Procurement Item Description ("MPID") of Solicitation No. SP0200-06-R-4202.

34.     In its bid, Aearo certified that the Combat Arms™ Earplugs complied with the Salient Characteristics of MPID, even though, at the time it made this certification, Aearo knew that the certification was false.

35.     The pertinent Salient Characteristics of MPID in each RFP, in relevant part, were:

---

[2] *See* David E. Gillespie, *Researchers Evaluate True Effects of Hearing Loss for Soldiers* (Dec. 16, 2015), available at http://www.army.mil/article/160050.

[3] *See* Kay Miller, *Hearing loss widespread among post-911 veterans,* The Center for Public Integrity (Aug. 29, 2013), available at http://www.publicintegrity.org/20 13/08/29/132S3/hearing-loss-widespread-among-post911-veterans ("The most-widespread injury for [post-911] veterans has been hearing loss and other auditory complications .... Hearing maladies cost more than $1.4 billion in veterans' disability payments annually, according to first year 2010 data from the Hearing Center of Excellence, a part of the Department of Defense.").

2.1.1. Ear plugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield.

2.2.2 The sound attenuation of both ends of the ear plugs shall be tested in accordance with ANSI S3.19 ....

2.4. Workmanship. The ear plugs shall be free from all defects that detract from their appearance or impair their serviceability.

2.5. Instructions. Illustrated instructions explaining the proper use and handling of the ear plugs shall be supplied with each unit....

*See* Solicitation No. SP0200-06-R-4202, at 41-42.

36.      Although Aearo knew that its test protocol did <u>not</u> comply with ANSI S3.19, it nevertheless certified that its testing was fully compliant with the U.S. military's specifications.

37.      Aearo also falsely certified that it provided accurate "instructions explaining the proper use and handling of the ear plugs." Aearo knew when it did so that its own testing had revealed a design defect that needed modified fitting instructions to ensure a proper fit that would deliver the promised NRR. However, at no time did Defendants disclose the modified fitting instructions to the U.S. military. Even after winning the bid, Defendants still failed to disclose the modified fitting instruction to the U.S. military. Pursuant to Section 2.4 of the MPID, Aearo was required to certify that the "ear plugs shall be free from all defects that detract from their appearance or impair their serviceability." *See* Solicitation No. SP0200-06-R-4202 at 41-42. Despite Aearo knowing since 2000 that its Combat Arms™ Earplugs suffered from a design defect, Aearo certified to the U.S. military that its earplugs had no defects.

38.      Based on its facially invalid test results, Aearo falsely reported to the U.S. military that the yellow end of its Combat Arms™ Earplugs had a 0 NRR, which would allow servicemembers to freely communicate with their fellow servicemembers and avoid any hearing impairment that might prevent them from hearing enemy combatants.

39.      Aearo also certified that the green end of its Combat Arms™ Earplugs had a 22 NRR, even though Aearo did not disclose the modified fitting instructions necessary to achieve the hearing protection afforded by a 22 NRR. *See* Combat Arms™ Earplugs Instructions.

Nothing in these fitting instructions disclosed that it was necessary to fold back the flanges of the opposite end to ensure a proper fit in order to achieve the promised NRR. By failing to provide this disclosure, Aearo falsely overstated the amount of hearing protection afforded by the green end of the earplug and overstated the benefits of the yellow end of the earplug.

40.     Based on Aearo's false representations and certifications, its bid prevailed. Aearo entered into the first of a series of IQCs later that year, making it the exclusive provider of selective attenuation earplugs to the U.S. military.

41.     The U.S. military did not provide design or testing requirements or set forth reasonably precise specifications, but rather deferred to bidders such as Aearo to determine how to provide a design that complied with the NRR ratings requirements. Further, the U.S. military never approved the design of the Combat Arms™ Earplugs and did not engage in negotiations or dialogue regarding the design.  Instead, it relied on Aearo's false certifications.

42.     In response to additional RFPs, in subsequent years Defendants re-certified that the Combat Arms™ Earplugs met the MPID criteria, even though Defendants knew that to be false.

43.     In total, the U.S. military purchased enough Combat Arms™ earplugs to provide one pair to every servicemember deployed each year in major foreign engagements from 2003 through 2015.[4]

44.     Defendants continued to sell the Combat Arms™ Earplugs to the U.S. military and to civilians until late 2015, at which time Defendants discontinued the earplug.[5]  Defendants did not recall the earplugs despite discontinuing them due to the design defect.

45.     Defendants' misrepresentations about the benefits and protections provided by the Combat Arms™ Earplugs caused Plaintiffs to suffer hearing loss and/or tinnitus.

---

[4] *See* Scott D. Mcilwain, *Heritage of Army Audiology and the Road Ahead: The Army Hearing Program,* AMERICAN JOURNAL OF PUBLIC HEALTH, Vol. 98 No. 12 (Dec. 2008).

[5] Discontinuation: 3M Combat Arms Earplugs Version 2 (Nov. 17, 2015).

46.     At all times after 3M's acquisition of Aearo, 3M knew of, conspired with, and
was complicit in Aearo's fraudulent and wrongful acts in marketing and selling the Combat
Arms™ Earplugs without disclosing the defect or the modified fitting instructions.

## TOLLING OF STATUTES OF LIMITATIONS

47.     Under the Servicemembers Civil Relief Act, the period of a plaintiff's military
service may not be included in computing any statute of limitations applicable herein. *See* 50
U.S.C. § 3936.

48.     Plaintiffs could not, by the exercise of reasonable diligence, have discovered
Defendants' wrongful acts as the cause of their injuries at an earlier time, because, at the time of
these injuries, the cause was unknown to Plaintiffs. Plaintiffs did not suspect, nor did Plaintiffs
have reason to suspect, the cause of these injuries, or the tortious nature of the conduct causing
these injuries, until approximately one year prior to the filing of this action.

49.     Further, the running of the statute of limitations has been tolled by reason of
Defendants' fraudulent concealment.  Through their affirmative misrepresentations and
omissions, Defendants actively concealed from Plaintiffs (and the U.S. military) the risks
associated with the defects in the Combat Arms™ Earplugs.

50.     As a result of Defendants' actions, Plaintiffs were unaware, and could not
reasonably have known, or have learned through reasonable diligence, that they had been
exposed to the defects and risks alleged herein, and that those defects and risks were the direct
and proximate result of Defendants' acts and omissions.

51.     Through Defendants' affirmative misrepresentations and omissions pertaining to
the safety and efficacy of the Combat Arms™ earplugs, Plaintiffs were prevented from
discovering this information sooner, because Defendants misrepresented, and continued to
misrepresent, the defective nature of the Combat Arms™ Earplugs.

## COUNT 1: STRICT PRODUCTS LIABILITY – DESIGN DEFECT

52.     Plaintiffs incorporate by reference the paragraphs above as if fully set forth
herein.

53.     Defendants are the manufacturers and sellers of the defective Combat Arms™ Earplugs.

54.     The defective Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defectively designed in that the design of the earplug caused it to loosen in the wearer's ear, which allowed damaging sounds to enter the ear canal.

55.     The defective Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective and unreasonably dangerous for their ordinary and expected use, because they did not stop the damaging loud noises of military use that can cause hearing loss or tinnitus.

56.     The defective Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective and not reasonably safe for its intended use.

57.     At all times relevant to this complaint, Defendants knew of the defect in the Combat Arms™ Earplugs.

58.     No reasonably prudent manufacturer would design, distribute, and sell an earplug with the knowledge that Defendants had, namely that the stem of the earplug was too short to fit correctly in many wearers' ears and that, if not fitted correctly, the earplugs would not guard against loud impulse noises and could cause hearing loss and/or tinnitus.

59.     The defective Combat Arms™ Earplugs that the Defendants manufactured, distributed, and sold were delivered to Plaintiffs without any change in their defective condition and were used by Plaintiffs in the manner expected and intended.

60.     Defendants owed a duty of care to Plaintiffs to design, manufacture, and sell earplugs that met the specified performance criteria and were otherwise fit for use by servicemembers to protect them from damaging noises typically incurred in military service. Defendants breached this duty.

13

61.     Defendants owed a duty of care to Plaintiffs to design and sell earplugs that were fit for use in military service and that performed according to the specifications that Defendants certified the Combat Arms™ Earplugs would meet. Defendants breached this duty.

62.     Defendants owed a duty of care to Plaintiffs to design and sell earplugs that were safe when used for their intended purpose; i.e., when in the presence of loud impulse sounds. Defendants breached this duty.

63.     Plaintiffs suffered injury and damage as a direct and proximate result of the defective and unreasonably, unsafe, dangerous condition of the Combat Arms™ Earplugs that the Defendants manufactured, distributed, and sold.

## COUNT II:  STRICT PRODUCT LIABILITY – USE DEFECTIVENESS AND/OR FAILURE TO WARN

64.     Plaintiffs incorporate by reference the paragraphs above as if fully set forth herein.

65.     Defendants are the manufacturers and sellers of the defective Combat Arms™ Earplugs.

66.     The defective Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective because the earplugs did not come with adequate warnings, instructions, or labels.

67.     The defective Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective because Defendants failed to warn, failed to provide instructions, and failed to provide an adequate label that included the modified fitting instructions necessary for the earplug to fit correctly in the wearer's ear and create the seal necessary to block out damaging sounds.

68.     Defendants had a duty to manufacture, design, and sell the Combat Arms™ Earplugs with reasonable and due care for the safety and well-being of wearers, including Plaintiffs. Defendants breached that duty.

69.     Defendants had a duty to provide adequate warnings and/or instructions to prevent the risks associated with the Combat Arms™ Earplugs when worn in the ordinary course. Defendants breached that duty.

70.     It was foreseeable to Defendants that the Combat Arms™ Earplugs would be unreasonably dangerous if distributed without the warning regarding the risks of damage to the ear with an improper fit and/or without modified fitting instructions.

71.     Not only was it reasonably foreseeable that the Combat Arms™ Earplugs would be unreasonably dangerous if distributed without the warning regarding the risks of damage to the ear with an improper fit and/or without modified fitting instructions, it was actually known to Defendants. During testing, Defendants discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit.

72.     Defendants also discovered that when the green end of the Combat Arms™ Earplugs was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer.  Because the Combat Arms™ Earplugs were symmetrical, this same problem occurred when the earplug was reversed.

73.     Defendants had a post-sale duty to warn of the above alleged product-related defects and risks, because Defendants knew or reasonably should have known that the Combat Arms™ Earplug posed a substantial risk of harm to servicemembers, including Plaintiffs. The servicemembers who used the Combat Arms™ Earplug can reasonably be assumed to be unaware of the risk of harm caused by the above-alleged defects, because said defects were imperceptible. A warning or instruction showing how to correctly and safely use the Combat Arms™ Earplug could have been effectively communicated to and acted upon by servicemembers.  The risk of harm, including but not limited to hearing loss and tinnitus in servicemembers, is sufficiently great to justify the slight burden of providing a warning or

instruction. Defendants breached this duty by failing to provide a post-sale warning or instruction.

74.     The Combat Arms™ Earplugs contained no warnings, or in the alternative, inadequate warnings and/or instructions, as to the risk that the Combat Arms™ Earplugs would allow damaging sounds to bypass the earplug, thereby posing a serious risk to Plaintiffs' hearing, unbeknownst to Plaintiffs.

75.     The warnings and instructions that accompanied the Combat Arms™ Earplugs failed to provide the level of information that an ordinary wearer would expect when using the Combat Arms™ Earplugs, in a manner reasonably foreseeable to Defendants.

76.     Had Plaintiffs received a proper or adequate warning as to the risks associated with the use of the Combat Arms™ Earplugs in the manner contemplated by Defendants, they would not have used them and/or would have taken other measures to protect themselves.

77.     Additionally, and/or alternatively, had Plaintiffs received the modified fitting instructions that were used by Defendants during the testing, which were not disclosed to Plaintiffs, Plaintiffs would have followed the modified fitting instructions to ensure a proper seal to prevent damaging sounds from entering the ear canal.

78.     Plaintiffs suffered injury and damage as a direct and proximate result of the use-defectiveness and Defendants' failures to warn and/or provide adequate instructions regarding the dangerous condition of the Combat Arms™ Earplugs that the Defendants manufactured, distributed, and sold.

### COUNT III: NEGLIGENCE

79.     Plaintiffs incorporate by reference the paragraphs above as if fully set forth herein.

80.     Defendants had a duty to each use their professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by a person or entity in Defendants' business of designing, developing, testing, manufacturing, marketing, and distributing hearing protection devices.

16

81.     Defendants further had a duty to comply with the certifications made to the U.S. government about the qualities and performance characteristics of the Combat Arms™ Earplugs. Plaintiffs are among the class of persons meant to be protected by these regulations and certification standards.  They were foreseeable plaintiffs to Defendants.

82.     Defendants breached these duties by failing to exercise the required degree of care in designing, developing, testing, manufacturing, marketing, and distributing hearing protection devices in a manner to provide the specified level of hearing protection.

83.     The damages suffered by Plaintiffs was or should have been reasonably foreseeable to Defendants.

84.     Plaintiffs were damaged by Defendants' conduct, including but not limited to damage to their hearing, hearing loss/impairment, and/or tinnitus.

85.     Defendants' breaches are a direct and proximate cause of the injuries and damages suffered by Plaintiffs in an amount not yet fully determined, but in excess of $50,000, exclusive of costs and interest. Plaintiffs are entitled to recover damages and other relief as available, at law or equity, as a direct and proximate result of Defendants' conduct.

### COUNT IV: VIOLATION OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT

86.     Plaintiffs incorporate by reference all of the above-stated paragraphs as though fully set forth therein.

87.     The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43 et. seq., provides in pertinent part:

Subdivision 1. Acts constituting. A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

. . .

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

. . .

(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

. . . .

88.    Defendants used in commerce false or misleading descriptions of fact, and/or false or misleading representations of fact, which caused or likely caused confusion or mistake. These misleading descriptions and/or representations related to the quality, performance, and characteristics of the Defendants' dual-ended Combat Arms™ Earplugs.

89.    Defendants' false or misleading descriptions of fact, and/or false or misleading representations of fact, caused or likely caused confusion regarding the quality, performance and characteristics of the dual-ended Combat Arms™ Earplugs.

90.    Plaintiffs have been, and continue to be, damaged by Defendants' conduct. Plaintiffs' damages were proximately caused by Defendants' conduct. As a direct and proximate result of the foregoing, Plaintiffs have been injured and have suffered losses in excess of $50,000, for which damages and other relief as may be available at law or equity is warranted. Because Defendants' actions were committed willfully, maliciously, and intentionally, Plaintiffs are entitled to recover costs and reasonable attorneys' fees pursuant to Minn. Stat. § 325D.45.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request from Defendants, jointly and severally, compensatory damages, together with appropriate equitable relief, costs, and attorneys' fees as follows:

A.    Award of monetary damages, including compensatory relief, to which Plaintiffs are entitled at the time of trial in amount exceeding $50,000, exclusive of costs and interest.

B.    Award of pre- and post-judgment interest.

C.    Award of costs.

D.    Any and all damages and relief available as a result of Defendants' conduct in engaging in a deceptive trade practice under the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §325D.44.

18

E.   Award of reasonable attorney's fees under Minn. Stat. §325D.45, subd. 2.

F.   Award of all other and further relief as may be available at law or equity.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

## ACKNOWLEDGEMENT

Plaintiffs hereby acknowledge that sanctions may be imposed under the circumstances set

forth in Minn. Stat. §549.211.

Dated:  July 25, 2019

_____
Tim M. Phillips (#390907)
2836 Lyndale Avenue S, Suite 160
Minneapolis, Minnesota 55408
Telephone: (612) 486-5540
Facsimile: (612) 605-1944
Email:  tphillips@jrwilliamslaw.com

s/Gerald Singleton_____
SINGLETON LAW FIRM, APC
Gerald Singleton (PRO HAC VICE PENDING)
Amanda M. LoCurto (PRO HAC VICE PENDING)
450 A Street, Fifth Floor
San Diego, CA 92101
Telephone: (619) 771-3473
Facsimile: (619) 255-1515
Email:  gerald@slffirm.com
        amanda@slffirm.com

## ATTORNEYS FOR PLAINTIFFS

19

**STATE OF MINNESOTA**                         **DISTRICT COURT**
**COUNTY OF RAMSEY**                  **SECOND JUDICIAL DISTRICT**
                                            Case type: Product Liability

---

JACOB COWEN, et al.,

                                Court File No.: 62-CV-19-5260

        Plaintiffs,

v.                                **NOTICE OF FILING OF**
                                    **NOTICE OF REMOVAL**

3M COMPANY, 3M OCCUPATIONAL
SAFETY LLC, AEARO HOLDINGS,
LLC, AEARO INTERMEDIATE, LLC,
AEARO, LLC, AEARO
TECHNOLOGIES, LLC and
DOES 1-50,

        Defendants.

---

TO:    PLAINTIFFS AND THEIR ATTORNEY, TIM M. PHILLIPS, LAW OFFICE OF
        JOSHUA R. WILLIAMS, PLLC, 2836 LYNDALE AVENUE SOUTH, SUITE
        160, MINNEAPOLIS, MN 55408.

      PLEASE TAKE NOTICE that Defendant 3M Company has filed a Notice of

Removal in the United States District Court for the District of Minnesota removing the

civil action entitled *David Bryant, et al., v. 3M Company, et al*, from the District Court,

Second Judicial District, County of Ramsey, State of Minnesota to the United States

District Court for the District of Minnesota.

      FURTHER TAKE NOTICE that attached hereto is a copy of said Notice of

Removal.

Dated: August 9, 2019                  Respectfully submitted,

                                       s/ *Benjamin W. Hulse*
                                       Jerry W. Blackwell (MN #186867)
                                       Benjamin W. Hulse (MN #0390952)
                                       S. Jamal Faleel (MN #0320626)
                                       BLACKWELL BURKE P.A.
                                       431 South Seventh Street, Suite 2500
                                       Minneapolis, MN 55415
                                       Phone: (612) 343-3200
                                       Fax: (612) 343-3205
                                       Email: blackwell@blackwellburke.com
                                              bhulse@blackwellburke.com
                                              jfaleel@blackwellburke.com

                                       **Counsel for Defendant 3M Company**

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Jacob Cowen, et al.

### DEFENDANTS
3M Company, 3M Occupational Safety LLC, Aearo Holdings, LLC, Aearo Intermediate, LLC, Aearo, LLC, Aearo Technologies, LLC, and Does 1-50

**(b)** County of Residence of First Listed Plaintiff   Out of State
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Ramsey County, MN
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
TIM M. PHILLIPS, 2836 LYNDALE AVENUE SOUTH, SUITE 160, MINNEAPOLIS, MN 55408

Attorneys *(If Known)*
JERRY BLACKWELL (COUNSEL FOR 3M COMPANY), BLACKWELL BURKE, P.A., 431 SOUTH SEVENTH STREET, SUITE 2500, MINNEAPOLIS MN 55415

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☒ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | ☐ 368 Asbestos Personal Injury Product | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Liability | Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 195 Contract Product Liability | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☐ 1  Original Proceeding
- ☒ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*

Brief description of cause:
Product liability

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $   50,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE   See Attachment.   DOCKET NUMBER   MDL 2885

DATE   08/09/2019

SIGNATURE OF ATTORNEY OF RECORD
s/ Benjamin W. Hulse (Counsel for Defendant 3M Company)

FOR OFFICE USE ONLY

RECEIPT #   AMOUNT   APPLYING IFP   JUDGE   MAG. JUDGE

**ATTACHMENT**

The JPML determined on April 3, 2019 that centralization is appropriate for these actions and consolidated all federal actions before Judge M. Casey Rodgers in the United States District Court, Northern District of Florida. *In re: 3M Combat Arms Earplug Prods. Liab. Litig.*, MDL No. 2885 (Dkt. No. 343). The parties expect that this matter will be transferred to the MDL shortly.

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

JACOB COWEN, et al.,

        Plaintiffs,

v.

3M COMPANY, 3M OCCUPATIONAL
SAFETY LLC, AEARO HOLDINGS,
LLC, AEARO INTERMEDIATE, LLC,
AEARO, LLC, AEARO
TECHNOLOGIES, LLC and
DOES 1-50,

        Defendants.

Case No. 19-cv-2185

**RULE 7.1 CORPORATE
DISCLOSURE STATEMENT OF
DEFENDANT 3M COMPANY**

---

        Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, Defendant 3M Company states that it has no parent corporation and there is no publicly held corporation that holds 10% or more of its stock.

Dated: August 9, 2019

/s/ *Benjamin Hulse*
Jerry W. Blackwell, Minn. Bar #186867
Benjamin W. Hulse, Minn. Bar #0390952
S. Jamal Faleel, Minn. Bar #0320626
BLACKWELL BURKE P.A.
431 South Seventh Street, Suite 2500
Minneapolis, MN 55415
Tel: (612) 343-3200
Fax: (612) 343-3205

*Attorneys for Defendant 3M Company*



# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

JACOB COWEN, et al.,

                Plaintiffs,

v.

3M COMPANY, 3M OCCUPATIONAL
SAFETY LLC, AEARO HOLDINGS,
LLC, AEARO INTERMEDIATE, LLC,
AEARO, LLC, AEARO
TECHNOLOGIES, LLC and
DOES 1-50,

                Defendants.

Case No. 19-cv-2185

**CERTIFICATE OF SERVICE**

---

I hereby certify that on August 9, 2019, I caused Defendant 3M Company's

Notice of Removal (Dkt. No. 1) and Corporate Disclosure (Dkt. No. 2) to be served via

first class mail, postage prepaid, upon the following recipients:

      Tim M. Phillips
      LAW OFFICE OF JOSHUA R.
      WILLIAMS, PLLC
      2836 Lyndale Avenue S., Ste 160
      Minneapolis, MN 55408

      Gerald Singleton
      Amanda M. LoCurto
      SINGLETON LAW FIRM, APC
      450 A Street, Fifth Floor
      San Diego, CA 92101

Dated:  August 9, 2019

s/ Benjamin W. Hulse
Jerry W. Blackwell, Minn. Bar # 186867
Benjamin W. Hulse, Minn. Bar # 0390952
BLACKWELL BURKE P.A
431 South Seventh Street, Suite 2500
Minneapolis, MN 55415
Tel: (612) 343-3200
Fax: (612) 343-3205

*Attorneys for Defendant 3M Company*