# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to All Actions: | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |
| PLAINTIFFS, | MASTER LONG FORM COMPLAINT AND |
| v. | JURY TRIAL DEMAND |
| 3M COMPANY, 3M OCCUPATIONAL SAFETY LLC, AEARO HOLDING LLC, AEARO INTERMEDIATE LLC, AEARO LLC, and AEARO TECHNOLOGIES LLC. | |

## MASTER LONG FORM COMPLAINT AND JURY TRIAL DEMAND

MDL Plaintiffs, by and through the undersigned counsel, submit this Master Long Form Complaint and Jury Trial Demand ("Master Complaint") seeking judgment against Defendants 3M Company, 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC (collectively, "Defendants") for personal injuries and sequelae thereto sustained from Defendants' unreasonably dangerous product, the dual-ended Combat Arms™ earplug (Version 2 CAEv.2) ("Dual-Ended Combat Arms Earplug"). At all relevant times, Defendants created, designed, assembled, manufactured,

constructed, produced, tested, packaged, labeled, marketed, advertised, promoted, made, distributed, supplied, and/or sold the Dual-Ended Combat Arms Earplug.

Plaintiffs intend this Master Complaint to achieve efficiency and economy by presenting certain common allegations and common questions of fact and law that generally pertain to Plaintiffs in this MDL. Plaintiffs plead all Counts of this Master Complaint in the broadest sense and pursuant to all applicable laws and choice of law principles, including the law of each Plaintiff's home state.

This Master Complaint does not necessarily include all claims asserted in all of the transferred actions to this Court. Each Plaintiff will adopt this Master Complaint and the causes of action alleged herein by and through a separate Short Form Complaint. Any individual facts, jurisdictional allegations, additional legal claims, and/or requests for relief of an individual Plaintiff may be set forth as necessary in the Short Form Complaint filed by the respective Plaintiff. This Master Complaint does not constitute a waiver or dismissal of any allegations or claims asserted in those individual actions, and no Plaintiff relinquishes the right to amend his or her individual claims to include additional claims as discovery continues.

## INTRODUCTION

1.      Plaintiffs submit this Master Complaint to recover damages arising from hearing-related injuries and sequelae thereto caused by the Dual-Ended Combat Arms Earplug.

2.      Plaintiffs used Defendants' dangerously defective Dual-Ended Combat Arms Earplug in myriad contexts.

3.      Some Plaintiffs used the Dual-Ended Combat Arms Earplug while performing civilian recreational activities, including but not limited to hunting or firing weapons at shooting ranges, and/or while working in civilian industrial professions.

4.      Other Plaintiffs used the Dual-Ended Combat Arms Earplug during their military service, which included, among other things, firearms training, vehicle use and maintenance, non-combat related work in noise-hazardous conditions, and/or active military duty domestically and/or abroad.

5.      Defendants were aware of the defects and risks of the Dual-Ended Combat Arms Earplug but nonetheless supplied this dangerously defective product to Plaintiffs and the United States military for more than a decade without Plaintiffs or the United States military having any knowledge of those defects and risks.

6.      The defective design of the Dual-Ended Combat Arms Earplug prevented Plaintiffs from obtaining a proper fit and seal when inserting the device into their ear canals.

7.      The defective design of the Dual-Ended Combat Arms Earplug also caused the device to loosen imperceptibly in Plaintiffs' ear canals.

8.      As a result of the dangerously defective design of the Dual-Ended Combat Arms Earplug, the device did not remain sealed to Plaintiffs' ear canals and thus allowed damaging sounds to enter Plaintiffs' ear canals, unbeknownst to Plaintiffs and the United States military.

9.      Defendants failed to warn or instruct Plaintiffs or the United States military of the defects and risks related to the Dual-Ended Combat Arms Earplug.

10.     Use of Defendants' Dual-Ended Combat Arms Earplug has caused Plaintiffs to suffer hearing loss, tinnitus, and/or additional hearing-related injuries.

11.     Defendants provided the Dual-Ended Combat Arms Earplug to Plaintiffs and/or the United States military between approximately 2003 and 2015.

12.     Defendants' Dual-Ended Combat Arms Earplug has caused thousands upon thousands, if not millions, of innocent civilians and military personnel to suffer hearing loss, tinnitus, and/or additional hearing-related injuries, including but not limited to pain, suffering, and loss of fundamental life pleasures.

4

## PARTIES

13.     This Master Complaint is filed on behalf of all Plaintiffs whose claims are subsumed within MDL No. 2885.

14.     Plaintiffs in these individual actions are citizens and/or residents of the United States who have suffered hearing-related injuries and sequelae thereto as a result of using Defendants' dangerously defective Dual-Ended Combat Arms Earplug.

15.     Where applicable and/or necessary, this Master Complaint is also filed on behalf of Plaintiffs' spouses, children, parents, decedents, wards, heirs, and/or legally designated representatives.

16.     Defendant 3M Company ("3M") is a Delaware corporation with its principal place of business in Minnesota. Defendant 3M is a citizen of Delaware and Minnesota for diversity of citizenship purposes. Defendant 3M has a dominant market share in virtually every safety product market, including hearing protection devices. Defendant 3M is one of the largest companies in the United States.

17.     Defendant 3M Occupational Safety LLC is a Delaware limited liability company with its principal place of business in Minnesota. Defendant 3M Occupational Safety LLC is a wholly owned subsidiary of Defendant 3M. Defendant 3M Occupational Safety LLC is a citizen of Delaware and Minnesota for diversity of citizenship purposes.

5

18.     On or about November 15, 2007, 3M and/or 3M Occupational Safety LLC (collectively, "3M Defendants") acquired Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC (collectively, "Aearo Defendants") for approximately $1.2 billion.

19.     Defendant Aearo Technologies LLC's sole member is Defendant Aearo LLC, whose sole member is Defendant Aearo Intermediate LLC, whose sole member is Defendant Aearo Holding LLC, whose sole member is Defendant 3M Occupational Safety LLC, whose sole member is Defendant 3M.

20.     Following the merger and acquisition, Aearo Defendants were incorporated in Delaware with a principal place of business in Minnesota or Indiana. Aearo Defendants are citizens of Delaware and Minnesota for diversity of citizenship purposes.

    a.     Defendant Aearo Holding LLC is a Delaware limited liability company with a principal place of business in Minnesota. Defendant Aearo Holding LLC is a subsidiary of Defendant 3M. Defendant Aearo Holding LLC was formerly known as Aearo Holding Corporation. Defendant Aearo Holding LLC is a citizen of Delaware and Minnesota for diversity of citizenship purposes.

    b.     Defendant Aearo Intermediate LLC is a Delaware limited liability company with a principal place of business in Indiana.

6

Defendant Aearo Intermediate LLC is a subsidiary of Defendant 3M. Defendant Aearo Intermediate LLC was formerly known as Aearo Technologies Inc. Defendant Aearo Intermediate LLC is a citizen of Delaware and Minnesota for diversity of citizenship purposes.

c.   Defendant Aearo LLC is a Delaware limited liability company with a principal place of business in Indiana. Defendant Aearo LLC is a subsidiary of Defendant 3M. Defendant Aearo LLC was formerly known as Aearo Corporation. Defendant Aearo LLC is a citizen of Delaware and Minnesota for diversity of citizenship purposes.

d.   Defendant Aearo Technologies LLC is a Delaware limited liability company with a principal place of business in Indiana. Defendant Aearo Technologies LLC is a subsidiary of Defendant 3M. At all relevant times, Defendant Aearo Technologies LLC utilized two assumed names: Aearo Company and Aearo Technologies. Defendants Aearo Technologies LLC is a citizen of Delaware and Minnesota for diversity of citizenship purposes.

21.   Defendant 3M is liable for Aearo Defendants' conduct.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

23.     Plaintiffs allege the existence of subject matter jurisdiction, and absent any objection, there is complete diversity among Plaintiffs and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

24.     To the extent any individual case that has been transferred to this Court lacks complete diversity of citizenship among the parties, Defendants removed those cases to federal court pursuant to 28 U.S.C. § 1442.

25.     A substantial part of the events, actions, or omissions giving rise to Plaintiffs' causes of action occurred in the federal judicial district identified in each Plaintiff's Short Form Complaint.

26.     Venue is proper in each of those districts under 28 U.S.C. § 1391(a).

27.     Pursuant to the Transfer Orders of the Judicial Panel on Multidistrict Litigation, venue in actions sharing common questions with the initially transferred actions is proper in this Court for coordinated pre-trial proceedings pursuant to 28 U.S.C. § 1407.

28.     Defendants have significant contacts with the federal judicial district identified in each Plaintiff's Short Form Complaint such that they are subject to the personal jurisdiction of the courts in each of those districts.

29.    Specifically, Defendants engaged in the following contacts in each of those districts:

a.    conducted business in the state of that district;

b.    regularly solicited business in the state of that district;

c.    specifically transacted and conducted business in the state of that district with respect to the Dual-Ended Combat Arms Earplug;

d.    targeted military bases in the state of that district for the sale and use of the Dual-Ended Combat Arms Earplug to be given to and/or used by military personnel within the state of that district;

e.    engaged in substantial and continuing contact with the state of that district;

f.    derived substantial revenue from goods used and consumed within the state of that district;

g.    purposefully directed their business activities, particularly with respect to the Dual-Ended Combat Arms Earplug, to the state of that district;

h.    purposely placed the Dual-Ended Combat Arms Earplug into the stream of commerce in the state of that district;

i.    expected or reasonably should have expected that the Dual-Ended Combat Arms Earplug would reach the state of that

9

district and be purchased and used by individuals in the state of that district;

j.  anticipated or reasonably should have anticipated that the Dual-Ended Combat Arms Earplug would reach the state of that district and be purchased and used by individuals in the state of that district;

k.  engaged in a persistent course of conduct in the state of that district with respect to the Dual-Ended Combat Arms Earplug;

l.  committed a tort in whole or in part in the state of that district;

m.  reasonably expected or should have expected their acts to have consequences within the state of that district; and/or

n.  intended to serve the market of that district and therefore purposely availed themselves of jurisdiction there.

## FACTUAL ALLEGATIONS

### *Defendants' Creation of the Dual-Ended Combat Arms Earplug*

30.  The Dual-Ended Combat Arms Earplug is a one-sized, dual-ended, triple-flanged earplug that Defendants created, manufactured, constructed, assembled, designed, tested, promoted, advertised, marketed, distributed, and/or sold to civilians and the United States military from approximately 2003 to 2015.

10

31.     Each end of the Dual-Ended Combat Arms Earplug incorporates a single-ended, triple-flanged earplug called the Ultrafit, which Defendants also designed.



32.     Defendants patented this "multi flanged earplug" design on September 19, 1989, as set forth in further detail in U.S. Patent No. 4,867,149.

33.     Although both ends of the Dual-Ended Combat Arms Earplug use the same Ultrafit earplug, Defendants designed each end to serve a different purpose.

34.     Defendants designed the olive-colored end of the Dual-Ended Combat Arms Earplug to block as much sound as possible, just like the single-ended Ultrafit earplug initially designed by Defendants.

35.     Defendants referred to the olive-colored end of the Dual-Ended Combat Arms Earplug as the "closed," "blocked," or "linear" end.

36.     Unlike the olive-colored end, the yellow-colored end of the Dual-Ended Combat Arms Earplug is attached to a non-linear filter, which provides level-dependent hearing protection so that users can hear low-level sounds (*e.g.*, close-

range conversation), while also blocking loud impulse sounds (*e.g.*, noises from industrial machines).

37.     Defendants referred to the yellow-colored end of the Dual-Ended Combat Arms Earplug as the "open," "unblocked," or "non-linear" end.

38.     Drs. Pascal Hamery and Armand Dancer from the French-German Institute of Saint Louis ("ISL") designed and patented the non-linear filter in 2000.

39.     According to U.S. Patent No. 6,068,079, ISL's non-linear filter uses a "simple design permitting improved filtering performance."

40.     The filter is "placeable in the external auditory canal of a user by means of an earplug" and may be used "in a military or industrial environment," providing protection from "noise from firearms of all calibers or from industrial machines, such as metallurgical presses."

41.     Dr. Hamery of ISL also designed and patented the "double-ended" design of the Dual-Ended Combat Arms Earplug in 2000.

42.     According to U.S. Patent No. 6,070,693, ISL's "double-ended" earplug "can function either in a selective attenuation mode or a maximum attenuation mode," allowing users to "choose between two operating modes of attenuation."

43.     ISL's patent of the "double-ended" design makes clear that "[t]he hearing protector is intended to be sealingly inserted into the auditory canal of the user."

44.     Thus, in addition to designing, developing, and patenting the non-linear filter used in the Dual-Ended Combat Arms Earplug, Dr. Hamery also designed and patented the "double-ended" design of the Dual-Ended Combat Arms Earplug.

45.     Defendants subsequently ███████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████.

46.     Defendants created the Dual-Ended Combat Arms Earplug by inserting ISL's non-linear filter into a channel connecting two triple-flanged Ultrafit earplugs, resulting in a single "double-ended" earplug intended for linear and non-linear attenuation as covered by U.S. Patent Nos. 4,867,149; 6,068,079; and 6,070,693.

47.     On October 7, 2015, Jeff Hamer of 3M testified that Defendants' Dual-Ended Combat Arms Earplug uses the "████████████████████████████ ███████████████████████████████████████████████████."

48.     Likewise, on April 24, 2013, Doug Ohlin of 3M testified that "███ ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████."

49.     The Ultrafit earplug already contained a small hole in its channel for a "██████████."

50.     Mr. Ohlin testified that the United States military purchased the Dual-Ended Combat Arms Earplug ██████████████████████████████████

13

██████████████████████████████████████████████████████

████████████████████████████████████████████.

51.     Thus, in the words of Defendants' own internal documents, "███████

███████" of the Dual-Ended Combat Arms Earplug.

*Civilian and Military Use*

52.     Given the preexisting design of the Dual-Ended Combat Arms Earplug,

██████████████████████████████████████████████████████

██████, the United States military assigned the Dual-Ended Combat Arms Earplug a

national stock number and began purchasing the device in approximately 2003, after

the product had already entered the commercial market.

53.     Defendants directly and/or indirectly supplied the Dual-Ended Combat

Arms Earplug to military personnel and civilians, including Plaintiffs, from at least

2003 to 2015, regardless of wartime, combat, and/or military-related exigencies.

54.     Bryan McGinley, who testified as 3M's corporate representative on

April 3, 2013, asserted that "████████████████████████████████████████

███████████████████████████████████████████."

55.     Likewise, Elliott Berger, the Division Scientist of 3M's Personal Safety

Division, testified on October 8, 2015, that the Dual-Ended Combat Arms Earplug

is "█████████████████████████████████████."

14

56.     Defendants supplied their commercial distributors with "███████

████████████████████████████████████████."

57.     The part number and/or SKU of the device was 370-1011.

58.     Mr. Berger of 3M touted the Dual-Ended Combat Arms Earplug to

civilians as "██████████████████████████████████

████████████████████████████████████████."

59.     Civilians and military personnel, including Plaintiffs, relied on

Defendants' representations that the Dual-Ended Combat Arms Earplug is safe,

effective, and provides two different options for adequate hearing attenuation and/or

protection depending upon which end of the device is inserted into the user's ear.

60.     In addition to selling the Dual-Ended Combat Arms Earplug to civilians

and the United States military, Defendants marketed, distributed, and sold the Dual-

Ended Combat Arms Earplug commercially under different product names.

61.     For instance, among other products, Defendants' ARC earplug is

structurally and technologically identical to the Dual-Ended Combat Arms Earplug.



62.     On October 21, 2015, Doug Moses of 3M acknowledged that there is

███████████████████████████████████████████████████████████████

███████."

63.     In other words, as another 3M executive put it, "███████████████

██████████████████████████████████████████."

64.     Defendants initially marketed and sold the ARC earplug to civilians, such as electrical linemen, who frequently encountered potential noise hazards from electric arcs.

65.     ████████████████████████████████████████████████

██████████████████████████████████████

66.     Given this identical commercial product, Defendants did not design or develop the Dual-Ended Combat Arms Earplug for exclusive military use.

67.     Defendants designed and developed the Dual-Ended Combat Arms Earplug for a wide variety of users.

### Defendants' Testing of the Dual-Ended Combat Arms Earplug

68.     Federal and industry regulations required Defendants to test the safety and efficacy of the Dual-Ended Combat Arms Earplug before distributing, supplying, and/or selling the device to consumers.

16

69.     Environmental Protection Agency ("EPA") regulations codified in 30 CFR 211.201 et seq., and the Noise Control Act, 42 U.S.C. § 4901 et seq., specifically regulate labeling and testing of hearing protection devices.

70.     Hearing protection devices are classified by their potential to reduce noise in decibels ("dB"), a term used to categorize the power or density of sound.

71.     Hearing protection devices must be tested pursuant to guidelines and procedures promulgated by the American National Standards Institute ("ANSI").

72.     These guidelines require manufacturers of hearing protection devices to test for and label their devices with a Noise Reduction Rating ("NRR").

73.     An NRR is a unit of measurement used to determine the effectiveness of hearing protection devices in decreasing sound exposure in certain environments.

74.     The noise measurement procedure published by ANSI, also known as ANSI S3.19-1974, governs the NRR labeling and testing of hearing protection devices.

75.     The higher the NRR number associated with a hearing protection device, the greater the potential for noise reduction in certain environments.

76.     The EPA requires manufacturers of hearing protection devices to provide accurate NRRs on the labels of their devices.

*Systemic Testing Bias*

77.     Instead of hiring an independent laboratory to test the NRRs of their hearing protection devices, Defendants have regularly used their own EARCAL laboratory for that purpose since at least December 1999.

78.     The EARCAL laboratory is located in Indianapolis, Indiana.

79.     Unlike independent laboratories, the EARCAL laboratory used and uses inappropriate testing procedures that substantially skew the results of the NRR labeling tests that Defendants perform on their own hearing protection devices.

80.     Mr. Berger has managed the EARCAL laboratory since at least 1999.

81.     Mr. Berger testified at his October 8, 2015 deposition that ████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████.

82.     EARCAL lab technician Ronald Kieper likewise testified at his October 9, 2015 deposition that ██████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████.

83.     Defendants have also used ████████████████████████████████ ███████████████████████████████████████████████████████████████.

18

84.     Mr. Hamer of 3M admitted at his October 7, 2015 deposition that

█████████████████████████████████████████████████████████████████."

85.     In addition, Defendants' use of their own EARCAL laboratory allows

████████████████████████████████████, unlike in an independent

laboratory.

86.     As a result of Defendants' biases and improper testing procedures,

Mr. Berger acknowledged at his October 8, 2015 deposition that Defendants

████████████████████████████████████████████████████████

████████████████████████████████████████████.

87.     Specifically, on April 6, 1993, ███████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████.

*January 2000 Testing*

88.     ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

89.     The EARCAL laboratory began testing the Dual-Ended Combat

Arms Earplug in approximately December 1999 or January 2000.

90.     The first test of the Dual-Ended Combat Arms Earplug, which Defendants identified as "███████," involved the closed, blocked, or linear end of the device.

91.     The next test of the Dual-Ended Combat Arms Earplug, which Defendants designated as "███████," involved the open, unblocked, or non-linear end of the device.

92.     ████████████████████████████████████████

93.     ████████████████████████████████████████

████████████████████████████████████████████

94.     Similarly, on October 9, 2015, Mr. Kieper testified at his deposition that "████████████████████████████████████."

95.     ████████████████████████████████████████

████████ Defendants should not have terminated the tests prior to completion.

96.     Nor could Defendants sell a hearing protection device such as the Dual-Ended Combat Arms Earplug based on incomplete ██████ testing.

97.     For example, Mr. Hamer testified at his October 7, 2015 deposition that ████████████████████████████████████████."

98.     ████████████████ Defendants selected ten subjects to test the Dual-Ended Combat Arms Earplug, ████████████████████████████ ████████████████████████████.

99.     To determine the NRR of each end of the Dual-Ended Combat Arms Earplug, Defendants designed the ███████ tests to capture: (1) each subject's hearing without an earplug; (2) each subject's hearing with the closed end of the Dual-Ended Combat Arms Earplug inserted according to standard procedures for proper use; and (3) each subject's hearing with the open end of the Dual-Ended Combat Arms Earplug inserted according to standard procedures for proper use.

100.    Defendants monitored the results of each subject during the testing.

101.    After testing only eight of the ten subjects in ███████████, Defendants terminated the test of the closed end of the Dual-Ended Combat Arms Earplug.

102.    ██████████████████████████ terminate the test of the closed end of the device because the average NRR of the eight subjects was only 10.9.

103.    Mr. Hamer of 3M also testified at his October 7, 2015 deposition that ████████████████████████████████████████████████████████████.

104.    ████████████████, explained Mr. Hamer, ██████████████████████████████████████████████████████████████.

105.    Defendants' internal documents likewise acknowledge that ██████████ ███████████████████████████████████████████.

106.    After the aborted test, Defendants investigated the cause of the low NRR rating for the closed end of the Dual-Ended Combat Arms Earplug.

107.   Defendants determined that when users inserted the closed end of the Dual-Ended Combat Arms Earplug into their ears, the edge of the third flange of the open end of the earplug pressed against the users' ears and folded backwards. When the inward pressure on the earplug released, the folded flange on the open end pushed back into its original shape and caused the earplug to loosen imperceptibly.

108.   In fact, Mr. Kieper testified that ."

109.   Mr. Kieper also emphasized that upon fitting the test subjects with the Dual-Ended Combat Arms Earplug, "                                        ."

110.   Defendants therefore concluded that if used as designed and intended, the Dual-Ended Combat Arms Earplug would loosen imperceptibly                        .

111.   Such imperceptible loosening would in turn allow harmful sounds to move around the totality of the earplug instead of through it, thus entering the user's ear canal and damaging the user's hearing.

112.    Given the symmetrical nature of the product with regard to its flanges, Defendants knew in 2000 that the design of the Dual-Ended Combat Arms Earplug prevented a proper fit and seal when inserting either end of the device into the user's ear canal according to standard fitting procedures.

113.    Tellingly, when testing the open end of the Dual-Ended Combat Arms Earplug in ████████, Defendants obtained an NRR of -2.

114.    An NRR of -2 indicated that the open end of the Dual-Ended Combat Arms Earplug actually amplified sound rather than attenuated sound, as intended.

115.    Defendants knew ████████████████████████ given the negative NRR and ████████████████████.

116.    Defendants also knew that NRR "████████████████████."

117.    Unsurprisingly, then, Mr. Hamer testified that "████████████████ ████████████████," and Mr. Kieper further testified that "██ ████████████████████."

118.    Without informing Plaintiffs or the United States military, Defendants brazenly and perniciously inflated the -2 NRR to a 0 NRR.

119.    Defendants have displayed the 0 NRR on the packaging of the Dual-Ended Combat Arms Earplug ever since they began supplying the device to civilians and military personnel.

120.    Defendants have also continued to display the fabricated 0 NRR despite ███████████████████████████████████ ███████████████████████████████.

121.    Worse, Defendants touted the obviously invalid 0 NRR as a benefit of the open end of the device, routinely representing that soldiers and civilians would be able to hear quiet, close-range conversation despite being protected from louder, harmful noises.

122.    In reality, however, Defendants knew all the way back in 2000 about the Dual-Ended Combat Arms Earplug's dangerously defective design, which not only prevents users from obtaining a proper fit and seal, but also causes the device to loosen imperceptibly regardless of which end of the device is inserted into the user's ear.

123.    Ultimately, both ends of the Dual-Ended Combat Arms Earplug allow high-level and harmful sounds to move around the unsealed earplug and to enter the user's ear, causing hearing loss, tinnitus, and/or other hearing-related injuries.

*February 2000 Testing*

124.    Defendants retested the closed end of the device beginning in February 2000.

125.    Defendants identified this test as ███████████████████████ ███████████████████████████████.

24

126.    Defendants also used different insertion instructions than in ████
████, contrary to the standard instructions that would be provided to civilians and military personnel.

127.    Defendants conducted this retesting despite the fact that ████████
███████████████████████████████████████████████████████████
████████████████████████████.

128.    In ████████████, Defendants folded back the yellow flanges of the open end of the earplug prior to inserting the closed end into each subject's ear.

129.    This reconfigured fitting procedure ostensibly created a tighter fit and seal than the standard fitting procedure that Defendants had used in ████████████.

130.    As a result of ████████████, Defendants learned in 2000 that when the flanges of the open end of the Dual-Ended Combat Arms Earplug were folded back prior to inserting the closed end of the earplug into the user's ear, the flanges of the open end neither touched the user's outer ear nor disturbed the seal of the earplug.

131.    Using this reconfigured insertion procedure, Defendants obtained an ███████████████████████████████████████████████████████.

132.    Still unsatisfied, ████████████████████████████████████████
███████████████████████████████████████████████████████████.

133.    █████████████████████████████████████████████████
████████████████████████, Defendants increased the NRR to 22 on the closed

end of the Dual-Ended Combat Arms Earplug, more than doubling the NRR compared to ███████████, which used Defendants' standard fitting procedures.

134.    Defendants have displayed this manipulated 22 NRR on the packaging of the Dual-Ended Combat Arms Earplug ever since this device was first made available to civilian consumers and military personnel.

135.    Defendants have done so even though ███████████ generated a 10.9 NRR and subsequent testing of the closed end of the device ███████████ ███████████.

136.    For example, ███████████████████████████████ ███████████████████████████████.

137.    In addition, ███████████████████████████████ ███████████████████████████████.

138.    Defendants, however, never warned civilians, military personnel, or the United States military that they obtained the 22 NRR by testing the Dual-Ended Combat Arms Earplug on an ███████████ of subjects, that they manipulated the test data of those ███████████ subjects, or that they reconfigured the device by folding back the flanges of the open end before inserting the closed end of the device into the ear canals of the test subjects.

139.    Mr. Hamer testified at his October 7, 2015 deposition that Defendants' testing of the Dual-Ended Combat Arms Earplug "███████████ ████████████████████."

140.    He also unequivocally admitted that "███████████████████ ████████████████████████████████████████████."

141.    In stark contrast to folding back the opposing flanges of the Dual-Ended Combat Arms Earplug when retesting the closed end of the device, Defendants did not retest the open end based on that reconfigured fitting procedure.

142.    On multiple occasions, however, Defendants did retest the open end of the Dual-Ended Combat Arms Earplug using standard fitting procedures.

143.    For instance, ████████████████████████████ █████████████████████████████████████████████ ██████████████████.

144.    But Defendants once again ████████████████ ████████ labeled the open end of the Dual-Ended Combat Arms Earplug with a 0 NRR.

145.    To make matters worse, Defendants' continued to label the open end of the Dual-Ended Combat Arms Earplug with a 0 NRR despite ███████████ ████████████████████.

27

146. For example, ████████████████████████████████
████████████████████████████████████████.

147. ████████████████████████████████████████
████████████████████████████.

148. ████████████████████████████████████████
██████████████████████████████.

149. ████████████████████████████████████████
████████████████████████.

150. ██████████████████████████ Defendants' internal documents admit that "████████████████████████████████████████
████████████████████████████████."

151. Though Defendants' internal testing demonstrated that the Dual-Ended Combat Arms Earplug created "████████████████████████████
████████████████████████████████," Defendants continued to label the device with a 0 NRR because ████████████████████████████
████████████████████.

152. Indeed, Defendants told civilians and the United States military that the open end of the Dual-Ended Combat Arms Earplug enhanced "situational awareness" by allowing the user to hear low-level sounds between impulse noises.

28

153.   Ultimately, given Defendants' intentional manipulation and misrepresentation of the NRRs for both ends of the Dual-Ended Combat Arms Earplug, new employees who evaluated the internal testing of the device called the 22 NRR for the closed end and the 0 NRR for the open end an utter "██████."

### *Defendants' False Claims About the Dual-Ended Combat Arms Earplug*

154.   Following Defendants' deceptive and unlawful testing of the Dual-Ended Combat Arms Earplug, Defendants and/or their distributors sold the device commercially and then to the United States military beginning in or around 2003.

155.   Defendants and/or their distributors continued to sell the Dual-Ended Combat Arms Earplug to civilians and the United States military until at least November 2015, when Defendants discontinued the Dual-Ended Combat Arms Earplug.

156.   Defendants therefore sold the Dual-Ended Combat Arms Earplug commercially and to the military for over a decade, reaping millions of dollars in ill-gotten profits from selling this defective product each year it was on the market.

### *Inaccurate Noise Reduction Ratings*

157.   From at least 2003 to 2015, Defendants inaccurately represented the NRRs of both the open end and closed end of the Dual-Ended Combat Arms Earplug.

158.   Specifically, Defendants falsely marketed, advertised, and promoted the closed end of the Dual-Ended Combat Arms Earplug to civilians and the United States military as a linear earplug with a 22 NRR.

159.   However, Defendants' internal testing revealed that the NRR of the closed end of the Dual-Ended Combat Arms Earplug is only 10.9 when used according to the standard instructions for "proper use" that came with the device.

160.   Defendants also falsely marketed, advertised, and promoted the open end of the Dual-Ended Combat Arms Earplug to civilians and the United States military as providing adequate level-dependent hearing protection with a 0 NRR.

161.   However, Defendants' initial test revealed that the NRR of the open end of the Dual-Ended Combat Arms Earplug was -2, ███████████████████ ████████████████████████████████████████ █████████████████████.

162.   Defendants thus falsely represented that the Dual-Ended Combat Arms Earplug provided civilians and military personnel with two different hearing protection options for providing adequate hearing protection regardless of which end of the plug is used.

163.   This was one alleged benefit that Plaintiffs and the United States military relied on in purchasing and/or using the Dual-Ended Combat Arms Earplug.

*Inadequate Instructions and Warnings*

164.    Defendants also directly and/or indirectly supplied, sold, and/or distributed the Dual-Ended Combat Arms Earplug to civilians and military personnel without disclosing or warning about the defective design of the product.

165.    Defendants were aware no later than 2000 of the dangerously defective design of the Dual-Ended Combat Arms Earplug and that the device inadequately protected the hearing of civilian and military users such as Plaintiffs.

166.    Specifically, Defendants knew the Dual-Ended Combat Arms Earplug could loosen in the user's ear—imperceptible to not only the user but also audiologists visually observing the user—thereby permitting damaging sounds to enter the user's ear through leaks in the seal between the user's ear and the earplug.

167.    Yet, Defendants did not adequately warn of the dangerous design defects of the Dual-Ended Combat Arms Earplug, despite their knowledge of the same.

168.    Defendants also did not adequately warn or instruct users, including Plaintiffs, how to wear and insert the Dual-Ended Combat Arms Earplug in order to achieve the NRR ratings that Defendants advertised and promoted over the years.

169.    Although Defendants issued standard instructions for "proper use" of the Dual-Ended Combat Arms Earplug, the instructions did not instruct all users to

fold back the opposing flanges of the earplug before inserting the device into their ears.

170. Defendants' standard instructions also did not warn users that the ▮▮▮▮▮▮▮▮▮▮ panel of ten subjects who tested the Dual-Ended Combat Arms Earplug in ▮▮▮▮▮▮ did not follow standard instructions for "proper use," but rather folded back the flanges of the opposite end of the earplug before inserting it into their ears.

171. Nor did Defendants' standard instructions for "proper use" inform users that the Dual-Ended Combat Arms Earplug would not provide a 22 NRR if they did not fold back the opposing flanges on the open end of the device before inserting the closed end of the device into their ears.

172. Instead, Defendants' standard instructions simply directed users, such as Plaintiffs, to insert the Dual-Ended Combat Arms Earplug into their ears.

173. The instructions specifically stated: "INSERT the end you have selected into earcanal WHILE PULLING ear outward & upward with opposite hand. ADJUST until earplug feels securely seated in the earcanal."

174. Thus, neither Plaintiffs nor the United States military knew that users had to fold back the opposing flanges of the earplug in order to obtain a proper seal.

175.    In fact, when asked whether he had █████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████, Mr. Berger of 3M testified "███."

176.    Julie Bushman, who previously served as 3M's Senior Vice President of Business Transformation and Information Technology, similarly stated at her October 20, 2015 deposition that "███████████████████████████████

████████████████████████."

177.    Unlike Defendants' "single-sided" earplug, which is "██████████████

██████████████," Defendants' internal documents confirm that the "██████

██████████████████████████████████████████."

178.    Defendants knew that by failing to instruct Plaintiffs to fold back the flanges of the open end of the Dual-Ended Combat Arms Earplug before inserting the closed end, the earplug would not seal to Plaintiffs' ears, thereby allowing harmful noise to enter Plaintiffs' ears unimpeded by the closed end of the earplug.

179.    Defendants also knew that by failing to instruct Plaintiffs to fold back the flanges of the closed end of the Dual-Ended Combat Arms Earplug before inserting the open end, the earplug would not seal to Plaintiffs' ears, thus allowing harmful noise to enter Plaintiffs' ears unimpeded by the open end of the earplug.

180.    And by failing to instruct Plaintiffs to fold back the opposing flanges before inserting the closed end of the Dual-Ended Combat Arms Earplug into their

ear, Defendants falsely overstated the amount of hearing protection supposedly provided by the closed end of the Dual-Ended Combat Arms Earplug.

181.    Mr. Berger confirmed at his deposition that 

182.    When Defendants did not instruct users to fold back the flanges of the open end, ▌▌▌▌▌▌ revealed a 10.9 NRR for the closed end—less than half of the 22 NRR advertised on the label of the Dual-Ended Combat Arms Earplug.

183.    Mr. Berger also testified that Defendants "

."

184.    In addition, by fabricating a 0 NRR for the open end of the Dual-Ended Combat Arms Earplug in the face of contradictory NRR data, Defendants intentionally misstated the amount of protection provided by that end of the device.

185.    Although the open end of the Dual-Ended Combat Arms Earplug provides little to no protection when used according to standard fitting procedures, Defendants represented to Plaintiffs and the United States military that the open mode "allow[s] situational awareness yet protect[s] against dangerous peak levels with a filter element that reacts instantaneously to provide increased protection."

186.    Defendants' labeling, packaging, and marketing of the Dual-Ended Combat Arms Earplug are thus misleading and have caused thousands upon thousands—if not millions—of innocent users to suffer hearing loss and tinnitus.

187.    Further, Defendants' testing, labeling, and marketing of the Dual-Ended Combat Arms Earplug violated EPA regulations, 40 CFR § 211.204-04 et seq., the Noise Control Act, 42 U.S.C. § 4901 et seq., and ANSI S3.19-1974.

188.    Given Defendants' improper and duplicitous testing, labeling, and marketing of the Dual-Ended Combat Arms Earplug, all known by Defendants prior to 2003, Mr. Berger of 3M declared at his October 8, 2015 deposition that "█████████████████████████████."

189.    Defendants discontinued the Dual-Ended Combat Arms Earplug on or about November 17, 2015, just a few weeks after Mr. Berger ███████████ █████████████.

*Scientific Misrepresentations*

190.    In addition to sheltering the defects of the Dual-Ended Combat Arms Earplug, misrepresenting the NRR for both ends of the earplug, and failing to warn or provide proper instructions for using the earplug in civilian and military contexts, Defendants distorted scientific sources when marketing, advertising, and promoting the Dual-Ended Combat Arms Earplug to Plaintiffs and the United States military.

191.    Citing the 1998 Blast Overpressure Study by Daniel Johnson, for example, Defendants' marketing brochures declared that "[t]he level-dependent technology used in the [Dual-Ended Combat Arms Earplug] has been tested on human subjects and found to be protective at 190 dBP for at least 100 exposures (sufficient to cover the loudest weapons in the military inventory, including shoulder-fired rockets)."

192.    Given Defendants' gloss on the Johnson study, customers believed that the Dual-Ended Combat Arms Earplug was "protective at 190 dBP for at least 100 exposures" of the "loudest weapons in the military inventory."

193.    Although Defendants repeatedly cited the Johnson study from 2003 to 2015 when marketing, advertising, and promoting the Dual-Ended Combat Arms Earplug, the Johnson study does not actually show that the Dual-Ended Combat Arms Earplug is "protective at 190 dBP for at least 100 exposures."

194.    To the contrary, according to a Technical Service Specialist at 3M,



."

195.    In a July 9, 2014 email, Ted Madison of 3M informed Mr. Berger and other 3M employees that

."

196.    Mr. Berger echoed Mr. Madison's ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████."

197.    Mr. Berger also said the Dual-Ended Combat Arms Earplug is ████

████████████████████████████████████████████████████

██████ Defendants have advertised the Dual-Ended Combat Arms Earplug for use

in indoor and outdoor gun ranges ever since they started selling the product.

198.    On February 9, 2010, moreover, Mr. Berger declared that "████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████."

199.    Mr. Berger concluded: "████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████.'"

200.    At best, Berger said, "████████████████████████████."

201.    Even though Defendants knew the 1998 Johnson study did not

support their claim that the Dual-Ended Combat Arms Earplug was "protective at

190 dBP for at least 100 exposures," Defendants continued to knowingly market, advertise, and promote the product to the public based on that false statement.

202.    Defendants did so despite acknowledging in their public press releases that "[t]innitus, often referred to as 'ringing in the ears,' and noise-induced hearing loss can be caused by a one-time exposure to hazardous impulse noise, or by repeated exposure to excessive noise over an extended period of time."

*Fraudulent Concealment*

203.    At all times material hereto, Defendants committed a continuing fraud in obfuscating and failing to disclose facts that were known to them relating to their fraudulent testing of the Dual-Ended Combat Arms Earplug and defective design of the product—facts that were not discovered and could not have been discovered by any person or Plaintiff undertaking reasonable due diligence.

204.    Plaintiffs did not and could not have discovered with reasonable diligence the veritable facts regarding Defendants' misrepresentations, omissions, faulty testing, and the defective design of the Dual-Ended Combat Arms Earplug.

205.    Nor could Plaintiffs have discovered that Defendants' Dual-Ended Combat Arms Earplug caused their hearing-related injuries and/or sequelae thereto because the earplug caused imperceptible loosening, as Defendants knew all along.

206.    Defendants are jointly and severally liable to Plaintiffs for their individual and collective tortious acts.

***Defendants' Discontinuation of the Dual-Ended Combat Arms Earplug***

207.    Defendants discontinued the Dual-Ended Combat Arms Earplug on November 17, 2015.

208.    Although Defendants supplied the Dual-Ended Combat Arms Earplug to innocent civilians and military personnel for more than a decade, their discontinuation of this defective device had been a long time in the making.

209.    Defendants' internal testing in January 2000 revealed that the Dual-Ended Combat Arms Earplug was defectively designed and that the defective design caused the earplug to loosen imperceptibly in users' ears.

210.    Subsequent reports also made clear that "███████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████."

211.    ████████████████████ Defendants changed the dual-ended design to a single-ended concept and created different sizing options in 2005.

212.    In 2013, however, Defendants acknowledged that ███████████ ████████████████████████████████████████████████████ ███████████."

213.    In fact, more than 15 years after Defendants learned of the design defect of the Dual-Ended Combat Arms Earplug, Defendants finally discontinued this unreasonably dangerous product and "████████████████████

39

██████████████████████████████████████████████████

█████████████."

214.    The Generation 4 Combat Arms Earplug, unlike the discontinued, dangerous, and defective Dual-Ended Combat Arms Earplug, provides linear and non-linear protection through a single-ended earplug rather than a dual-ended one.

215.    The single-ended Generation 4 Combat Arms Earplug thus does not suffer from the same dangerous defects as the Dual-Ended Combat Arms Earplug.

216.    The single-ended design of the Generation 4 Combat Arms Earplug is also easier for users to insert into their ear canal and obtain a proper fit and seal.

217.    Approximately one month before Defendants discontinued the Dual-Ended Combat Arms Earplug, Mr. Berger testified that the Generation 4 Combat Arms Earplug "█████████████████████████████████████

██████████████████████████████████."

218.    He also said that the Dual-Ended Combat Arms Earplug was "█████

████████████████████████████████████."

219.    Because users do not have to "████████████████████████

███████████████████," Mr. Berger explained that the Generation 4 Combat Arms Earplug as well as other single-ended earplugs manufactured by Defendants, including the traditional Ultrafit earplug, ████████████████████."

40

220.    Indeed, none of Defendants' other pre-molded earplugs have rearward-facing flanges like the defective Dual-Ended Combat Arms Earplug.

221.    ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

222.    What's more, ████████████████████████████████
████████████████████████████████████████████, the Generation 4 Combat Arms Earplug comes in three different sizes—small, medium, and large.

223.    These different sizes allow users to obtain an effective seal, in contrast to the one-size-fits-all approach of the Dual-Ended Combat Arms Earplug.

224.    Defendants recognized in 2011—at least four years before they discontinued the Dual-Ended Combat Arms Earplug—that using a multiple-sized earplug "████████████████████████████████████████."

225.    Other documents reveal Defendants' decades-old knowledge that "████████████████████████████████████████████████
████████████████████████████████████."

226.    Because the Generation 4 Combat Arms Earplug avoids these and other issues, ██████████████████████████████████████████ ███████████████████████.

227.    Indeed, when testing the Generation 4 Combat Arms Earplug in its closed position per standard fitting procedures, Defendants measured a 23 NRR.

228.    The 23 NRR of the Generation 4 Combat Arms Earplug is more than double the 10.9 NRR of the closed end of the Dual-Ended Combat Arms Earplug when inserted according to Defendants' standard procedures for "proper use."

229.    The 23 NRR of the Generation 4 Combat Arms Earplug is also higher than the 22 NRR of the closed end of the Dual-Ended Combat Arms Earplug when inserted according to Defendants' reconfigured fitting procedures.

230.    Defendants thus concluded that the Generation 4 Combat Arms Earplug attenuates impulse and continuous noise better than the Dual-Ended Combat Arms Earplug.

231.    Even Defendants' "standard Ultrafit" earplug outperforms the closed end of the Dual-Ended Combat Arms Earplug when inserted according to Defendants' standard instructions or their reconfigured fitting procedure.

232.    In a confidential document dated December 12, 2010, Mr. Berger emphasized the "██████████████████████████████████████████ ██████████████████████████████████████████."

42

233.    Thus, the development of the Generation 4 Combat Arms Earplug brought Defendants ███████████████████████████ ██████████████████████████████ after perpetrating a protracted fraud on thousands and perhaps millions of innocent civilians and military personnel.

234.    To make matters worse, this dangerously defective product has not been recalled and thus continues to injure innocent civilians and military personnel.

### *Defendants' Attempt to Block a Competitor from Entering the Market*

235.    Besides fleecing civilians and the United States military into purchasing the dangerously defective Dual-Ended Combat Arms Earplug, Defendants also attempted to block competitors from entering the earplugs market.

236.    For example, one of Defendants' competitors is Moldex-Metric, Inc. ("Moldex")—a family-owned company located in Culver City, California.

237.    Among other safety devices, Moldex manufactures a single-sided, non-linear, dual-mode earplug called BattlePlugs, which Moldex introduced to the market in approximately 2011.

238.    At the time, Defendants held a virtual monopoly in the market for non-linear earplugs.

239.    In order to prevent Moldex from selling BattlePlugs and competing in the earplugs market, 3M Defendants sued Moldex in the United States District Court

for the District of Minnesota. *See 3M Co. v. Moldex-Metric, Inc.*, Case No. 12-611 (D. Minn.) ("*Moldex I*").

240.    The lawsuit accused Moldex of infringing U.S. Patent No. 6,070,693 ("'693 patent"), which Defendants had purchased and/or licensed from ISL and ultimately used to design and develop the Dual-Ended Combat Arms Earplug.

241.    Upon notice of the lawsuit, Moldex immediately informed 3M Defendants that BattlePlugs did not infringe the '693 patent under any legal theory.

242.    Undeterred, 3M Defendants stridently pursued their '693 patent claim against Moldex seeking injunctive relief in order to force Moldex out of the market.

243.    After Moldex moved for summary judgment on the '693 patent claim, however, 3M Defendants sent Moldex a covenant not to sue on both the '693 patent and BattlePlugs in order to preclude the district court from adjudicating the motion.

244.    3M Defendants argued that the district court no longer had jurisdiction to hear their '693 patent claim or Moldex's dispositive motion of noninfringement.

245.    3M Defendants then moved to dismiss their infringement claims regarding the '693 patent with prejudice and to dismiss Moldex's counterclaims of noninfringement and invalidity of the '693 patent without prejudice.

246.    On June 19, 2013, the district court dismissed with prejudice 3M Defendants' claims against Moldex relating to the '693 patent.

247.    The district court also dismissed without prejudice Moldex's claim for a declaration that BattlePlugs did not infringe the '693 patent.

248.    Although 3M Defendants ultimately abandoned their lawsuit, Moldex was forced to incur significant legal and other expenses in defending against 3M Defendants' baseless and malicious patent infringement claim.

249.    In June 2014, Moldex filed an antitrust sham litigation and malicious prosecution action against 3M Defendants, alleging that 3M Defendants' prosecution of the '693 patent claim in *Moldex I* was objectively baseless as no reasonable litigant could have expected to succeed on the merits. *See Moldex Metric, Inc. v. 3M Co.*, Case No. 14-1821 (D. Minn.) ("*Moldex II*").

250.    Moldex also alleged that 3M Defendants filed the '693 patent claim in order to drive Moldex out of the earplugs market.

251.    The district court denied 3M Defendants' motion to dismiss Moldex's malicious prosecution claim on the ground that Moldex had shown "clear and convincing evidence" in support of its malicious prosecution claim.

252.    The district court then granted Moldex's motion for summary judgment on the objective baselessness of 3M Defendants' '693 patent claim, holding that "[n]o reasonable litigant could realistically expect success on the merits of 3M's claim that Moldex Metric infringed the '693 Patent."

253.   In addition to filing and prosecuting a baseless patent infringement lawsuit against Moldex, 3M Defendants used other predatory and nefarious conduct in attempting to force this family-owned company out of the earplugs market.

254.   For instance, 3M Defendants falsely maligned Moldex's BattlePlugs in order to persuade the United States military to purchase the Dual-Ended Combat Arms Earplug through the JWOD (Javits-Wagner-O'Day) federal program.

255.   And shortly after 3M filed its frivolous '693 patent infringement claim against Moldex, 3M lodged a spurious protest against a solicitation that the United States military had awarded to Moldex.

### Defendants' Settlement with the United States Government

256.   On May 12, 2016, Moldex filed a sealed *qui tam* complaint against Defendant 3M under the False Claims Act, 31 U.S.C. § 3729 et seq. *See United States ex rel. Moldex-Metric, Inc. v. 3M Co.*, Case No. 3:16-cv-01533 (D.S.C.).

257.   Moldex alleged, on behalf of the United States, that Defendant 3M sold the Dual-Ended Combat Arms Earplug to the "U.S. military for more than a decade without its knowledge of the defect."

258.   The United States intervened on July 25, 2018, in order to hold Defendant 3M liable for its fraudulent conduct.

259.   One day later, Defendant 3M agreed to pay $9.1 million to resolve the allegations that it knowingly sold the Dual-Ended Combat Arms Earplug to the

United States military without ever disclosing the design defects that hampered the effectiveness of this unreasonably dangerous hearing protection device.

260.    As one government official put it: "███████████████████
███████████████████" with the Dual-Ended Combat Arms Earplug.

## CAUSES OF ACTION

### COUNT I
### DESIGN DEFECT - NEGLIGENCE

261.    Plaintiffs restate the allegations above as if fully rewritten herein.

262.    At all times relevant to this action, Defendants had a duty to design, manufacture, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, promote, distribute, and sell the Dual-Ended Combat Arms Earplug with reasonable and due care for the safety and well-being of users, including Plaintiffs and other civilians and military personnel who used the device.

263.    Plaintiffs were foreseeable users of the Dual-Ended Combat Arms Earplug.

264.    Defendants knew civilians and military personnel such as Plaintiffs would use the Dual-Ended Combat Arms Earplug.

265.    The Dual-Ended Combat Arms Earplug is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

47

266.   When the Dual-Ended Combat Arms Earplug is inserted into the ear according to standard fitting instructions, a proper seal is not formed with the ear.

267.   The defect has the same effect for both ends of the device because the earplug is symmetrical. In either scenario, the earplug may not maintain a tight fit and seal in some users like Plaintiffs, allowing dangerous sounds to bypass the earplug altogether and thus damage the user's hearing, unbeknownst to the user.

268.   Defendants failed to exercise reasonable and due care under the circumstances and therefore breached their duty of care in the following ways:

> a.   Defendants failed to design the Dual-Ended Combat Arms Earplug in a manner that protected Plaintiffs from injury;
>
> b.   Defendants failed to design the Dual-Ended Combat Arms Earplug in a manner that provided linear and non-linear protection;
>
> c.   Defendants failed to design the Dual-Ended Combat Arms Earplug in a manner that provided the amount of linear and non-linear protection as represented;
>
> d.   Defendants misrepresented the NRRs of the Dual-Ended Combat Arms Earplug when used according to standard instructions;

e.      Defendants failed to test the Dual-Ended Combat Arms Earplug properly and thoroughly;

f.      Defendants failed to analyze the testing data of the Dual-Ended Combat Arms Earplug properly and thoroughly;

g.      Defendants claimed the Dual-Ended Combat Arms Earplug had benefits that it does not in fact have;

h.      Defendants designed, manufactured, distributed, and sold the Dual-Ended Combat Arms Earplug without adequately warning of the significant and dangerous risks of using the device;

i.      Defendants designed, manufactured, distributed, and sold the Dual-Ended Combat Arms Earplug without providing adequate or proper instructions to avoid foreseeable harm;

j.      Defendants designed, manufactured, distributed, and sold the Dual-Ended Combat Arms Earplug even though its risks and dangers outweighed any purported benefit of using the device;

k.      Defendants failed to fulfill the standard of care required of a reasonable and prudent manufacturer of hearing protection devices;

l.      Defendants continued to manufacture and distribute the Dual-Ended Combat Arms Earplug to civilians and the United States

49

military after they knew or should have known of the device's adverse effects or the availability of safer designs;

m.   Defendants assumed the duty to warn of the defects and risks of the Dual-Ended Combat Arms Earplug by providing instructions and information related to its benefits and effectiveness, but Defendants failed to provide adequate warnings and instructions; and

n.   Defendants provided inaccurate scientific and/or technical information when advertising, marketing, promoting, and supplying the Dual-Ended Combat Arms Earplug.

269.   Defendants knew or should have known that the defective condition of the Dual-Ended Combat Arms Earplug made the device unreasonably dangerous.

270.   The Dual-Ended Combat Arms Earplug was unreasonably dangerous when used by Plaintiffs, who followed the instructions provided by Defendants and used the earplug with common knowledge of its characteristics and according to its common usage.

271.   At the time the Dual-Ended Combat Arms Earplug left Defendants' possession, the device was in a condition that made it unreasonably dangerous to Plaintiffs.

272.    At the time Plaintiffs used the Dual-Ended Combat Arms Earplug, the device was in a condition that made it unreasonably dangerous to Plaintiffs.

273.    The Dual-Ended Combat Arms Earplug used by Plaintiffs was expected to and did reach Plaintiffs without substantial change in the condition in which the device was manufactured, sold, distributed, and marketed by Defendants.

274.    At all relevant times, Plaintiffs used the Dual-Ended Combat Arms Earplug in the manner in which the device was intended to be used.

275.    As designers, developers, manufacturers, inspectors, advertisers, distributors, and suppliers of the Dual-Ended Combat Arms Earplug, Defendants had superior knowledge of the product and owed a duty of care to Plaintiffs.

276.    It was foreseeable that Defendants' misrepresentations, actions, and omissions would cause severe, permanent, and debilitating injuries to Plaintiffs.

277.    Defendants' conduct was a substantial factor in bringing about the injuries and/or sequelae thereto sustained by Plaintiffs because Defendants designed, manufactured, tested, sold, and distributed the Dual-Ended Combat Arms Earplug used by Plaintiffs.

278.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered serious and dangerous injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

279.    As a direct and proximate result of Defendants' negligence, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

280.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT II
## DESIGN DEFECT – STRICT LIABILITY

281.    Plaintiffs restate the allegations above as if fully rewritten herein.

282.    Defendants designed, manufactured, and sold the Dual-Ended Combat Arms Earplug.

283.    Plaintiffs were foreseeable users of the Dual-Ended Combat Arms Earplug.

284.    The Dual-Ended Combat Arms Earplug is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

285.    The Dual-Ended Combat Arms Earplug is also defective because it fails to contain adequate warnings of the significant risks of using the earplug, it fails to contain adequate or proper instructions for use, and the risks and dangers of using the device outweigh any purported benefit.

286.    Defendants knew that the defective condition of the Dual-Ended Combat Arms Earplug made the device unreasonably dangerous to Plaintiffs.

287.    The Dual-Ended Combat Arms Earplug is dangerous when used by ordinary users such as Plaintiffs, who used the device as it was intended to be used.

288.    The Dual-Ended Combat Arms Earplug is dangerous to an extent beyond what would be contemplated by the ordinary user who purchased and/or used the device because it allows dangerous sounds to enter the user's ear canal.

289.    At all relevant times, an economically and technologically feasible and safer alternative design existed for the Dual-Ended Combat Arms Earplug.

290.    At the time the Dual-Ended Combat Arms Earplug left Defendants' possession, the Dual-Ended Combat Arms Earplug was defective and in a condition that made the device unreasonably dangerous to Plaintiffs.

291.    At the time Plaintiffs used the Dual-Ended Combat Arms Earplug, the device was defective and in a condition that made it unreasonably dangerous to Plaintiffs.

292.   The Dual-Ended Combat Arms Earplug used by Plaintiffs was expected to and did reach Plaintiffs without substantial change in the condition in which the device was manufactured, sold, distributed, and marketed by Defendants.

293.   At all relevant times, Plaintiffs used the Dual-Ended Combat Arms Earplug in the manner in which the earplug was intended to be used.

294.   The Dual-Ended Combat Arms Earplug was the proximate cause of Plaintiffs' hearing loss and/or tinnitus because the design of the earplug allows dangerous sounds to bypass the earplug altogether, thereby posing a serious risk.

295.   Defendants' conduct was a substantial factor in bringing about Plaintiffs' injuries and/or sequelae thereto because Defendants designed, tested, manufactured, sold, and distributed the Dual-Ended Combat Arms Earplug that caused those injuries and/or sequelae thereto.

296.   As a direct and proximate result of Defendants' defective design of the Dual-Ended Combat Arms Earplug, Plaintiffs' suffered serious and dangerous injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

297.   As a direct and proximate result of Defendants' defective design of the Dual-Ended Combat Arms Earplug, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

298.    Plaintiffs may also be required to obtain additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT III
## FAILURE TO WARN – NEGLIGENCE

299.    Plaintiffs restate the above allegations as if rewritten fully herein.

300.    At all times relevant to this action, Defendants had a duty to manufacture, design, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, promote, distribute, and sell the Dual-Ended Combat Arms Earplug with reasonable and due care for the safety and well-being of Plaintiffs, who were subject to and used the product.

301.    Plaintiffs were foreseeable users of the product.

302.    The Dual-Ended Combat Arms Earplug is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes the earplug is working as intended.

303.    Defendants breached their duty to Plaintiffs by failing to warn of the risks and dangers of using the Dual-Ended Combat Arms Earplug as intended.

304.    The Dual-Ended Combat Arms Earplug did not warn or instruct that it allows harmful sounds to bypass the earplug, thereby posing a serious risk.

305.    Defendants also breached their duty to Plaintiffs because they failed to warn or instruct that their testing subjects did not follow standard instructions, but rather used a reconfigured method of folding back the opposing flanges before inserting the device into their ears.

306.    Defendants also breached their duty to Plaintiffs because they failed to warn or instruct that following Defendants' standard instructions for insertion would not achieve a 22 NRR and would thereby pose a serious risk to Plaintiffs.

307.    Defendants further breached their duty to Plaintiffs because they failed to warn or instruct that they had not adequately or properly tested the Dual-Ended Combat Arms Earplug.

308.    The warnings and instructions of the Dual-Ended Combat Arms Earplug did not provide the amount of information that an ordinary consumer would expect when using the device in a reasonably foreseeable manner.

309.    Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using the Dual-Ended Combat Arms Earplug, including but not limited to instructions directing them to fold back the opposing flanges of the device, Plaintiffs would have heeded such a warning or instruction.

310.    Defendants' failure to warn of the design defect or risks and dangers of the Dual-Ended Combat Arms Earplug proximately caused Plaintiffs' injuries and/or sequelae thereto.

311.    As a direct and proximate result of Defendants' failure to warn, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

312.    As a direct and proximate result of Defendants' failure to warn, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

313.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT IV
## FAILURE TO WARN – STRICT LIABILITY

314.    Plaintiffs restate the allegations above as if fully rewritten herein.

315.    Defendants designed, manufactured, and sold the Dual-Ended Combat Arms Earplug.

316.    Plaintiffs were foreseeable users of the Dual-Ended Combat Arms Earplug.

57

317.    The Dual-Ended Combat Arms Earplug is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

318.    The Dual-Ended Combat Arms Earplug is defective and unreasonably dangerous even if Defendants exercised all proper care in the preparation and sale of the product.

319.    Defendants knew that the defective condition of the Dual-Ended Combat Arms Earplug made the device unreasonably dangerous to users such as Plaintiffs.

320.    The Dual-Ended Combat Arms Earplug is dangerous when used by an ordinary user who used the device as intended.

321.    The Dual-Ended Combat Arms Earplug is dangerous to an extent beyond that contemplated by the ordinary user who purchased and/or used the device because it allows dangerous sounds to enter the user's ear.

322.    Defendants knew or should have known of the defective design of the Dual-Ended Combat Arms Earplug at the time they provided the device to Plaintiffs.

323.    At the time the Dual-Ended Combat Arms Earplug left Defendants' possession, the earplug was defective and in a condition that made it unreasonably dangerous to Plaintiffs.

324.    At the time Plaintiffs used the Dual-Ended Combat Arms Earplug, the device was defective and in a condition that made it unreasonably dangerous to Plaintiffs.

325.    The Dual-Ended Combat Arms Earplug used by Plaintiffs was expected to and did reach Plaintiffs without substantial change in the condition in which the device was manufactured, sold, distributed, and marketed by Defendants.

326.    At all relevant times, Plaintiffs used the Dual-Ended Combat Arms Earplug in the manner in which the device was intended to be used.

327.    The Dual-Ended Combat Arms Earplug is defective because Defendants failed to warn or instruct that the device allows dangerous sounds to bypass the earplug altogether, posing a serious risk to users.

328.    The Dual-Ended Combat Arms Earplug is also defective because Defendants failed to warn or instruct that their testing subjects did not follow standard instructions, but rather used a reconfigured method of folding back the opposing flanges before inserting the device into their ears.

329.    The Dual-Ended Combat Arms Earplug is also defective because Defendants failed to warn or instruct that following their standard instructions for insertion would not achieve a 22 NRR and would thus pose a serious risk to users.

330.    The Dual-Ended Combat Arms Earplug is also defective because Defendants failed to warn or instruct—or inadequately warned and instructed—that the device had not been adequately or properly tested.

331.    The warnings and instructions that accompanied the Dual-Ended Combat Arms Earplug failed to provide the level of information that an ordinary consumer, including Plaintiffs, would expect when using the product in a manner reasonably foreseeable to Defendants.

332.    Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using the Dual-Ended Combat Arms Earplug, including but not limited to instructions to fold back the opposing flanges, Plaintiffs would have heeded the warning and/or instruction.

333.    The Dual-Ended Combat Arms Earplug proximately caused Plaintiffs' hearing loss and/or tinnitus because the device allows dangerous sounds to bypass the earplug altogether, thereby posing a serious risk to Plaintiffs.

334.    Defendants' conduct was a substantial factor in causing Plaintiffs' injuries and/or sequelae thereto because Defendants designed, tested,

manufactured, sold, and distributed the Dual-Ended Combat Arms Earplug that caused the hearing loss and/or tinnitus.

335.   As a direct and proximate result of Defendants' failure to warn, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

336.   As a direct and proximate result of Defendants' failure to warn, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

337.   Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT V
## BREACH OF EXPRESS WARRANTY

338.   Plaintiffs restate the allegations above as if fully rewritten herein.

339.   Through Defendants' public statements, descriptions, and promises relating to the Dual-Ended Combat Arms Earplug, Defendants expressly warranted that the product was safe and effective for its intended use and was designed to prevent harmful sounds from entering and thus damaging the user's hearing.

340.    These warranties came in one or more of the following forms:

a.    publicly made written and verbal assurances of safety;

b.    press releases, media dissemination, or uniform promotional information intended to create demand for the Dual-Ended Combat Arms Earplug, but which contained misrepresentations and failed to warn of the risks of using the product;

c.    verbal assurances made by Defendants' consumer relations personnel about the safety of the Dual-Ended Combat Arms Earplug, which also downplayed the risks associated with the product; and

d.    false, misleading, and inadequate written information and packaging supplied by Defendants.

341.    When Defendants made these express warranties, they knew the intended purposes of the Dual-Ended Combat Arms Earplug and warranted the product to be in all respects safe and proper for such purposes.

342.    Defendants drafted the documents and/or made statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties.

343.    The Dual-Ended Combat Arms Earplug does not conform to Defendants' promises, descriptions, or affirmations, and is not adequately packaged,

labeled, promoted, and/or fit for the ordinary purposes for which it was intended.

344.    All of the aforementioned written materials are known to Defendants and in their possession, and it is Plaintiffs' belief that these materials shall be produced by Defendants and made part of the record once discovery is completed.

345.    As a direct and proximate result of Defendants' breach of these warranties, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

346.    As a direct and proximate result of Defendants' breach of the express warranties, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

347.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VI
## BREACH OF IMPLIED WARRANTIES

348.    Plaintiffs restate the allegations above as if fully rewritten herein.

349.    At all times material to this action, Defendants were merchants of the Dual-Ended Combat Arms Earplug.

350.    Plaintiffs were foreseeable users of the Dual-Ended Combat Arms Earplug.

351.    At the time Defendants marketed, sold, and distributed the Dual-Ended Combat Arms Earplug, Defendants knew of the intended use of the Dual-Ended Combat Arms Earplug, impliedly warranted the Dual-Ended Combat Arms Earplug to be fit for a particular purpose, and warranted that the Dual-Ended Combat Arms Earplug was of merchantable quality and effective for such use.

352.    Defendants knew or had reason to know that Plaintiffs would rely on Defendants' judgment and skill in providing the Dual-Ended Combat Arms Earplug for its intended use.

353.    Plaintiffs reasonably relied upon the skill and judgment of Defendants as to whether the Dual-Ended Combat Arms Earplug was of merchantable quality, safe, and effective for its intended use.

354.    Contrary to Defendants' implied warranties, the Dual-Ended Combat Arms Earplug is neither of merchantable quality, nor safe or effective for its intended use, because the device is unreasonably dangerous, defective, unfit, and ineffective for the ordinary purposes for which it is used.

355.    The Dual-Ended Combat Arms Earplug was sold without adequate instructions or warnings regarding the foreseeable risk of harm posed by the device.

64

356.    Defendants breached their implied warranties to Plaintiffs because the Dual-Ended Combat Arms Earplug was not adequately tested and was not of merchantable quality, safe, or fit for its foreseeable and reasonably intended use.

357.    Defendants' breach of their implied warranties violated numerous statutes, including but not limited to:

a.    Ala. Code §§ 7-2-314 et seq.;

b.    Alaska Stat. §§ 45.02.314 et seq.;

c.    Ariz. Rev. Stat. Ann. §§ 47-2314 et seq.;

d.    Ark. Code Ann. §§ 4-2-314 et seq.;

e.    Cal. Com. Code §§ 2314 et seq.;

f.    Colo. Rev. Stat. §§ 4-2-314 et seq.;

g.    Conn. Gen. Stat. Ann. §§ 42a-2-314 et seq.;

h.    Del. Code Ann. tit. 6, §§ 2-314 et seq.;

i.    D.C. Code Ann. §§ 28:2-314 et seq.;

j.    Fla. Stat. Ann. §§ 672.314 et seq.;

k.    O.C.G.A. §§ 11-2-314 et seq.;

l.    Haw. Rev. Stat. §§ 490:2-314 et seq.;

m.    Id. Code §§ 28-2-314 et seq.;

n.    Ill. Comp. Stat. Ann. Ch. 810, 5/2-314 et seq.;

o.    Indiana Code Ann. §§ 26-1-2-314 et seq.;

p.      Iowa Code Ann. §§ 554.2314 et seq.;

q.      Kan. Stat. Ann. §§ 84-2-314 et seq.;

r.      Ky. Rev. Stat. Ann. §§ 355.2-314 et seq.;

s.      La. Civ. Code Ann. art. 2520 et seq.;

t.      Me. Rev. Stat. Ann. tit. 11, §§ 2-314 et seq.;

u.      Md. Code Ann., Com. Law §§ 2-314 et seq.;

v.      Mass. Gen. Laws Ann. Ch. 106, §§ 2-314 et seq.;

w.      Mich. Comp. Laws Ann. §§ 440.2314 et seq.;

x.      Minn. Stat. Ann. §§ 336.2-314 et seq.;

y.      Miss. Code Ann. §§ 75-2-314 et seq.;

z.      Mo. Rev. Stat. §§ 400.2-314 et seq.;

aa.     Mont. Code Ann. §§ 30-2-314 et seq.;

bb.     Neb. Rev. Stat. §§ 2-314 et seq.;

cc.     Nev. Rev. Stat. §§ 104.2314 et seq.;

dd.     N.H. Rev. Stat. Ann. §§ 382-A:2-314 et seq.;

ee.     N.J. Stat. Ann. §§ 12A:2-314 et seq.;

ff.     N.M. Stat. Ann. § 55-2-314 et seq.;

gg.     N.Y. U.C.C. Law §§ 2-314 et seq.;

hh.     N.C. Gen. Stat. Ann. §§ 25-2-314 et seq.;

ii.     N.D. Cent. Code §§ 41-02-31 et seq.;

jj. Ohio Rev. Code Ann. §§ 1302.27 et seq.;

kk. Okl. Stat. tit. 12A, §§ 2-314 et seq.;

ll. Or. Rev. Stat. §§ 72.3140 et seq.;

mm. 13 Pa. Stat. Ann. §§ 2314 et seq.;

nn. R.I. Gen. Laws §§ 6A-2-314 et seq.;

oo. S.C. Code Ann. §§ 36-2-314 et seq.;

pp. S.D. Codified Laws §§ 57A-2-314 et seq.;

qq. Tenn. Code Ann. §§ 47-2-314 et seq.;

rr. Tex. Bus. & Com. Code §§ 2.314 et seq.;

ss. Utah Code Ann. §§ 70A-2-314 et seq.;

tt. Va. Code Ann. §§ 8.2-314 et seq.;

uu. Vt. Stat. Ann. tit. 9A, §§ 2-314 et seq.;

vv. Wash. Rev. Code §§ 62A.2-314 et seq.;

ww. W. Va. Code §§ 46-2-314 et seq.;

xx. Wis. Stat. Ann. §§ 402.314 et seq.; and

yy. Wyo. Stat. Ann. §§ 34.1-2-314 et seq.

358. Plaintiffs could not have discovered that Defendants breached their warranties or the danger in using the Dual-Ended Combat Arms Earplug.

359.     As a direct and proximate result of Defendants' breach of implied warranties, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

360.     As a direct and proximate result of Defendants' breach of the implied warranties, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

361.     Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VII
## NEGLIGENT MISREPRESENTATION

362.     Plaintiffs restate the allegations above as if fully rewritten herein.

363.     Defendants had a duty to tell Plaintiffs and the public the truth of the efficacy, risks, and harms associated with the Dual-Ended Combat Arms Earplug.

364.     Defendants breached their duty by falsely representing to Plaintiffs and the public that the Dual-Ended Combat Arms Earplug had been properly tested and found to be effective when Defendants knew or should have known that the device is defective, had not been properly or adequately tested, and that Defendants had manipulated the test results.

68

365.    Defendants also breached their duty by falsely representing to Plaintiffs and the public that the instructions for use of the Dual-Ended Combat Arms Earplug were proper and adequate and would result in the advertised NRR when Defendants knew or should have known these statements were false.

366.    Defendants were in fact aware that they unlawfully manipulated the testing of the Dual-Ended Combat Arms Earplug and that their instructions were inadequate and improper.

367.    Defendants failed to exercise ordinary care in the representation of the Dual-Ended Combat Arms Earplug during its manufacturing, sale, testing, quality assurance, quality control, and/or distribution into interstate commerce, in that Defendants negligently misrepresented the safety and efficacy of the device.

368.    As a result of these misrepresentations and omissions, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

369.    As a direct and proximate result of these misrepresentations, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

370.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VIII
## FRAUDULENT MISREPRESENTATION

371. Plaintiffs restate the allegations above as if fully rewritten herein.

372. Defendants falsely and fraudulently represented to Plaintiffs and the public that the Dual-Ended Combat Arms Earplug had been properly tested, was free from all defects, and contained adequate warnings and instructions.

373. Defendants also falsely and fraudulently represented to Plaintiffs and the public that the Dual-Ended Combat Arms Earplug functioned properly and promoted the closed end as having a 22 NRR and the open end having a 0 NRR.

374. Defendants also manipulated testing of the Dual-Ended Combat Arms Earplug, resulting in false and misleading NRRs and improper fitting instructions.

375. Defendants therefore knew that the Dual-Ended Combat Arms Earplug could and would injure Plaintiffs.

376. When Defendants made these representations, they knew their claims were false, and they willfully, wantonly, and recklessly disregarded the truth.

377. Defendants made these false representations with the intent of defrauding Plaintiffs and the public, and with the intent of inducing Plaintiffs and the public to recommend, purchase, and/or use the Dual-Ended Combat Arms

Earplug, all of which demonstrate a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiffs.

378.   At the time Defendants made the foregoing representations, and at the time Plaintiffs used the Dual-Ended Combat Arms Earplug, Plaintiffs did not know of the falsity of the representations and reasonably believed them to be true.

379.   In reliance upon these representations, Plaintiffs were in fact induced to and did use the Dual-Ended Combat Arms Earplug, thereby sustaining injuries and/or sequelae thereto.

380.   As a result of the foregoing acts and omissions, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

381.   As a direct and proximate result of the foregoing acts and omissions, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

382.   Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT IX
## FRAUDULENT CONCEALMENT

383.    Plaintiffs restate the allegations above as if fully rewritten herein.

384.    At all times relevant, Defendants misrepresented the safety and efficacy of the Dual-Ended Combat Arms Earplug for its intended use.

385.    Defendants knew or were reckless in not knowing that their representations were false.

386.    In their representations to Plaintiffs, Defendants fraudulently concealed and intentionally omitted the following material information:

> a.    the flawed and deliberately manipulated testing of the Dual-Ended Combat Arms Earplug;
>
> b.    the inadequate amount of hearing protection provided by the Dual-Ended Combat Arms Earplug;
>
> c.    the inadequacy of the standard instructions for proper use of the Dual-Ended Combat Arms Earplug;
>
> d.    the defective, improper, negligent, fraudulent, and dangerous design of the Dual-Ended Combat Arms Earplug; and
>
> e.    the dangerous effects of the Dual-Ended Combat Arms Earplug.

387.    Defendants had a duty to disclose the foregoing issues to Plaintiffs.

388.    Defendants had sole access to the material facts concerning the defective nature of the product and its propensity to cause dangerous injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

389.    Defendants' concealment of information regarding the safety and efficacy of the Dual-Ended Combat Arms Earplug was willful, wanton, and/or reckless and was intended to mislead Plaintiffs into using the product.

390.    Defendants knew that Plaintiffs could not determine the truth of this information.

391.    Plaintiffs reasonably relied on facts revealed, which negligently, fraudulently, and/or purposefully did not include facts that Defendants concealed.

392.    As a direct and proximate result of the foregoing concealments and omissions, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

393.    As a direct and proximate result of the foregoing concealments and omissions, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

394.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT X
## FRAUD AND DECEIT

395. Plaintiffs restate the allegations above as if fully rewritten herein.

396. Defendants conducted unlawful and improper testing on the Dual-Ended Combat Arms Earplug.

397. As a result of this unlawful and improper testing, Defendants blatantly and intentionally omitted certain test results and distributed false information that misrepresented the amount of hearing protection provided by the Dual-Ended Combat Arms Earplug.

398. Defendants had a duty when disseminating information to disclose truthful information and a parallel duty not to deceive the public and Plaintiffs.

399. The information that Defendants distributed to Plaintiffs contained false and misleading material representations and/or omissions concerning the safety and efficacy of the Dual-Ended Combat Arms Earplug.

400. Upon information and belief, Defendants intentionally suppressed and/or manipulated test results to misrepresent the amount of hearing protection provided by the Dual-Ended Combat Arms Earplug.

401.    In making these misrepresentations, Defendants intended to deceive and defraud the public and Plaintiffs, to gain the confidence of the public and Plaintiffs, and to induce the public and Plaintiffs to purchase, request, dispense, recommend, and/or continue using the Dual-Ended Combat Arms Earplug.

402.    Defendants also made the foregoing false claims and false representations with the intent of convincing the public and Plaintiffs that the Dual-Ended Combat Arms Earplug is effective and safe for use.

403.    These representations and the others alleged herein were false when made, and/or made with a pretense of actual knowledge when knowledge did not actually exist, and/or were made recklessly and without regard for the truth.

404.    Defendants intended these false representations to deceive and defraud Plaintiffs, to induce Plaintiffs to rely upon them, and to cause Plaintiffs to purchase, use, and/or rely on the Dual-Ended Combat Arms Earplug.

405.    Defendants recklessly and intentionally misrepresented the efficacy and safety of the Dual-Ended Combat Arms Earplug to the public and Plaintiffs for the specific purpose of influencing the marketing of a product that only Defendants knew was dangerous and defective or not as safe as other alternatives.

406.    Defendants willfully and intentionally failed to disclose material facts regarding the dangers and safety concerns of the Dual-Ended Combat Arms Earplug by concealing and suppressing material facts regarding such information.

407.    Defendants willfully and intentionally failed to disclose material facts and made false representations in order to deceive and lull Plaintiffs into purchasing, using, and/or relying on the Dual-Ended Combat Arms Earplug.

408.    Plaintiffs did in fact rely on and believe Defendants' representations to be true at the time Defendants made the representations.

409.    Plaintiffs were thus induced to purchase, use, and/or rely on the Dual-Ended Combat Arms Earplug based on Defendants' false representations.

410.    At the time Defendants made these representations, Plaintiffs did not know about any safety concerns regarding the Dual-Ended Combat Arms Earplug.

411.    Plaintiffs did not discover the true facts regarding Defendants' false representations; nor could Plaintiffs have done so with reasonable diligence.

412.    Had Plaintiffs known the true facts, they would not have purchased, used, and/or relied on the Dual-Ended Combat Arms Earplug.

413.    Defendants' conduct constitutes fraud and deceit and was committed and/or perpetrated willfully, wantonly, and/or purposefully on Plaintiffs.

414.    As a result of the foregoing acts and omissions, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

415.    As a direct and proximate result of the foregoing acts and omissions, Plaintiffs require and/or will require more healthcare and services and did incur

medical, health, incidental, and related expenses.

416.   Plaintiff may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XI
## GROSS NEGLIGENCE

417.   Plaintiffs restate the allegations above as if fully rewritten herein.

418.   Defendants' conduct in designing, testing, advertising, and supplying the dangerously defective Dual-Ended Combat Arms Earplug was grossly negligent.

419.   Punitive damages are appropriate given Defendants' gross negligence, fraudulent conduct, and deliberate indifference to the rights, safety, and/or welfare of Plaintiffs.

420.   Plaintiffs relied on Defendants' grossly negligent representations and/or omissions and suffered serious injuries as a proximate result of such reliance.

421.   Plaintiffs therefore seek to assert claims for punitive damages in an amount within the jurisdictional limits of the Court, as set forth below.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XII
## NEGLIGENCE PER SE

422.     Plaintiffs restate the allegations above as if fully rewritten herein.

423.     At all times, Defendants had an obligation to comply with applicable statutes and regulations, including the Noise Control Act and implementing regulations, in the labeling and testing of the Dual-Ended Combat Arms Earplug.

424.     Defendants' actions as described herein violated applicable statutes and regulations, including but not limited to 42 U.S.C. § 4901 et seq., and 40 C.F.R. § 211.201 et seq., which regulate hearing protection devices such as the Dual-Ended Combat Arms Earplug, as well as NRR labeling and testing of such devices.

425.     Specifically, Defendants violated 42 U.S.C. § 4907 and 40 C.F.R. §§ 211.104, 211.210, and 211.211 by mislabeling the Dual-Ended Combat Arms Earplug, misrepresenting the NRR on the label of the device, and/or by failing to include proper fitting instructions to achieve the NRR stated on the label of the device.

426.     Defendants did not follow the "[m]ethods for measurement of sound attenuation" stated in 40 C.F.R. § 211.206 and as required by ANSI S3.19-1974.

427.     Defendants violated 40 C.F.R. § 211.207 by failing to properly calculate the NRR of the Dual-Ended Combat Arms Earplug.

428.     Plaintiffs are within the class of persons that these statutes and regulations are intended to protect.

429.   Plaintiffs' injuries and/or symptoms are the type of harm that these statutes and regulations are intended to prevent.

430.   Defendants' violations of the foregoing statutes and regulations, among others, constitutes negligence per se.

431.   As a direct and proximate result of Defendants' statutory and regulatory violations, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

432.   As a direct and proximate result of Defendants' statutory and regulatory violations, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

433.   Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XIII
## CONSUMER FRAUD AND/OR UNFAIR AND
## DECEPTIVE TRADE PRACTICES UNDER STATE LAW

434.   Plaintiffs restate the allegations above as if fully rewritten herein.

435.   Certain Plaintiffs herein will bring a cause of action for consumer fraud and/or unfair and deceptive trade practices under applicable state law.

436.   Defendants are on notice that such claims may be asserted by those Plaintiffs.

437.   Plaintiffs purchased and/or used the Dual-Ended Combat Arms Earplug and suffered ascertainable losses as a result of Defendants' actions in violation of these consumer protection laws.

438.   Had Defendants not engaged in the deceptive conduct described herein, neither Plaintiffs nor the United States military would have purchased and/or paid for the Dual-Ended Combat Arms Earplug.

439.   Nor would Plaintiffs have incurred related medical costs and injuries from using the device.

440.   Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include the following:

> a.   representing that goods or services have approval, characteristics, uses, or benefits that they do not have;
>
> b.   advertising goods or service with the intent not to sell them as advertised; and
>
> c.   engaging in fraudulent or deceptive conduct that creates a likelihood of confusion.

441.   Plaintiffs were injured by Defendants' unlawful conduct, which was intended to artificially create sales of the Dual-Ended Combat Arms Earplug.

442.    Defendants have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of devices such as the Dual-Ended Combat Arms Earplug.

443.    Defendants' deceptive, unconscionable, unfair, and/or fraudulent representations and material omissions to Plaintiffs and the United States military constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including but not limited to:

      a.     Ala. Ala. Code §§ 8-19-1 et seq.;

      b.     Alaska Stat. §§ 45.50.471 et seq.;

      c.     Ariz. Rev. Stat. Ann. §§ 44-1522 et seq.;

      d.     Ark. Code Ann. §§ 4-88-101 et seq.;

      e.     Cal. Civ. Code §§ 1770 et seq.

      f.     Cal. Bus. & Prof. Code §§ 17200 et seq.;

      g.     Colo. Rev. Stat. §§ 6-1-105 et seq.;

      h.     Conn. Gen. Stat. §§ 42-110a et seq.;

      i.     Del. Code Ann. tit. 6, §§ 2511 et seq., §§ 2531 et seq.;

      j.     D.C. Code Ann. §§ 28-3901 et seq.;

      k.     Fla. Stat. Ann. §§ 501.201 et seq.;

      l.     O.C.G.A. §§ 10-1-372 et seq.;

      m.     Haw. Rev. Stat. §§ 481A-1 et seq.;

n.    Id. Code Ann. §§ 48-601 et seq.;

o.    Ill. Comp. Stat. Ann. ch. 815, 505-1 et seq.;

p.    Ind. Code Ann. §§ 24-5-0.5-1 et seq.;

q.    Iowa Code Ann. §§ 714.16 et seq.;

r.    Kan. Stat. Ann. §§ 50-623, et seq.;

s.    Ky. Rev. Stat. Ann. §§ 367.110 et seq.;

t.    La. Rev. Stat. Ann. §§ 51:1401 et seq.;

u.    Me. Rev. Stat. Ann. tit. 5, §§ 205A et seq.;

v.    Md. Code Ann., Com. Law §§ 13-101 et seq.;

w.    Mass. Gen. Laws Ann. Ch. 93A et seq.;

x.    Mich. Comp. Laws §§ 445.901 et seq.;

y.    Minn. Stat. §§ 325D.43, et seq. §§ 325F.67 et seq., §§ 325F.69;

z.    Miss. Code Ann. §§ 75-24-3 et seq.;

aa.   Mo. Ann. Stat. §§ 407.010 et seq.;

bb.   Mont. Code Ann. §§ 30-14-101 et seq.;

cc.   Neb. Rev. Stat. §§ 59-1601 et seq.;

dd.   Nev. Rev. Stat. §§ 598.0903 et seq.;

ee.   N.H. Rev. Stat. Ann. §§ 358-A:1 et seq.;

ff.   N.J. Stat. Ann. §§ 56:8-2 et seq.;

gg.   N.M. Stat. Ann. §§ 57-12-1 et seq.;

82

hh.   N.Y. Gen. Bus. Law §§ 349 et seq., §§ 350-e et seq.;

ii.   N.C. Gen. Stat. §§ 75-1.1 et seq.;

jj.   N.D. Cent. Code §§ 51-12-01 et seq., §§ 51-15-01 et seq.;

kk.   Ohio Rev. Code Ann. §§ 1345.01 et seq.;

ll.   Okla. Stat. tit. 15 §§ 751 et seq.;

mm.   Or. Rev. Stat. §§ 646.605 et seq.;

nn.   73 Pa. Stat. §§ 201-1 et seq.;

oo.   R.I. Gen. Laws. §§ 6-13.1-1 et seq.;

pp.   S.C. Code Ann. §§ 39-5-10 et seq.;

qq.   S.D. Codified Laws §§ 37-24-1 et seq.;

rr.   Tenn. Code Ann. §§ 47-18-101 et seq.;

ss.   Tex. Bus. & Com. Code Ann. §§17.41 et seq.;

tt.   Utah Code Ann. §§ 13-11-1 et seq.;

uu.   Vt. Stat. Ann. tit. 9, §§ 2451 et seq.;

vv.   Va. Code Ann. §§ 59.1-196 et seq.;

ww.   Wash. Rev. Code. §§ 19.86.010 et seq.;

xx.   W. Va. Code §§ 46A-6-101 et seq.;

yy.   Wis. Stat. Ann. §§ 100.20 et seq.; and

zz.   Wyo. Stat. Ann. §§ 40-12-101 et seq.

444.    Under these and other consumer protection statutes, Defendants are the suppliers, manufacturers, advertisers, and sellers of the Dual-Ended Combat Arms Earplug, who are subject to liability under such legislation from fraudulent, unfair, deceptive, and unconscionable consumer sales practices.

445.    The actions and omissions of Defendants are uncured or incurable.

446.    Defendants were put on notice of these issues by the investigation of the United States, numerous complaints filed against them, and individual letters and communications from certain Plaintiffs and others within a reasonable amount of time after Defendants' conduct was publicly disclosed.

447.    Defendants had actual knowledge of the defective and dangerous condition of the Dual-Ended Combat Arms Earplug and failed to take any action to cure those conditions.

448.    Plaintiffs relied upon Defendants' misrepresentations and omissions in deciding to use the Dual-Ended Combat Arms Earplug instead of another hearing protection device.

449.    By reason of the fraudulent and unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiffs have sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and other further relief as the Court deems equitable and just.

## COUNT XIV
## LOSS OF CONSORTIUM

450.    Plaintiffs restate the allegations above as if fully rewritten herein.

451.    At all relevant times, certain Plaintiffs were married to spouses.

452.    As a result of the injuries and damages sustained by certain Plaintiffs, their spouses have suffered the loss of care, comfort, society, and affection from Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and other further relief as the Court deems equitable and just.

## COUNT XV
## UNJUST ENRICHMENT

453.    Plaintiffs restate the allegations above as if fully rewritten herein.

454.    Defendants have enjoyed numerous revenues from sales of the Dual-Ended Combat Arms Earplug.

455.    It is unjust to allow Defendants to earn revenues and retain the benefits and profits from the Dual-Ended Combat Arms Earplug while Plaintiffs

suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and other further relief as the Court deems equitable and just.

## COUNT XVI
## PUNITIVE DAMAGES

456.    Plaintiffs restate the allegations above as if fully rewritten herein.

457.    Defendants have acted willfully, wantonly, with an evil motive, and recklessly in one or more of the following ways:

    a.    By failing to disclose material facts regarding the dangers and serious safety concerns of the Dual-Ended Combat Arms Earplug;

    b.    By concealing and suppressing material facts regarding the dangers and serious health and/or safety concerns of the Dual-Ended Combat Arms Earplug;

    c.    By failing to disclose the truth and making false representations with the purpose of deceiving and lulling Plaintiffs into using and relying upon the Dual-Ended Combat Arms Earplug;

    d.    By falsely representing the qualities and characteristics of the Dual-Ended Combat Arms Earplug to the public and Plaintiffs; and

    e.    By filing a baseless patent infringement lawsuit, misusing the JWOD program, and lodging frivolous protests to solicitation awards in order to block Moldex from selling BattlePlugs—a reasonable alternative design to the Dual-Ended Combat Arms Earplug.

WHEREFORE, Plaintiffs demand judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and other further relief as the Court deems equitable and just.

## TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

458.    Through the exercise of reasonable diligence, Plaintiffs did not and could not have discovered that the Dual-Ended Combat Arms Earplug caused their injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiffs.

459.    Plaintiffs did not suspect and had no reason to suspect that the Dual-Ended Combat Arms Earplug caused their injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

460.    In addition, Defendants' fraudulent concealment has tolled the running of any statute of limitations.

461.    Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiffs the risks associated with the defects of the Dual-Ended Combat Arms Earplug and that the device caused their injuries and/or sequelae thereto.

462.    Through their ongoing affirmative misrepresentations and omissions, Defendants committed continual tortious and fraudulent acts.

463.    As a result of Defendants' fraudulent concealment, Plaintiffs were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all claims in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request:

i.     That process issue according to law;

ii.    That Defendants be duly served and cited to appear and answer herein, and that after due proceedings are had, that there be judgment in favor

of Plaintiffs and against Defendants for the damages set forth below, along with court costs and pre-judgment and post-judgment interest at the legal rate;

iii.    Pain and suffering (past and future);

iv.    Wage loss (past and future);

v.    Loss of earnings and loss of earning capacity;

vi.    Medical expenses (past and future);

vii.    Loss of enjoyment of life (past and future);

viii.    Mental anguish and distress (past and future);

ix.    Disfigurement (past and future);

x.    Physical impairment (past and future);

xi.    Costs and expenses incurred in this litigation, including but not limited to expert fees and reasonable attorneys' fees;

xii.    Any and all applicable statutory and civil penalties, as allowed by law;

xiii.    Punitive or exemplary damages in such amounts as may be proven at trial;

xiv.    Pre- and post-judgment interest on any amounts awarded, as allowed by law; and

xv.    Any such other and further relief as the Court deems just and proper.

**DATED:** September 20, 2019

*s/ Bryan F. Aylstock* _____
Bryan F. Aylstock, Lead Counsel
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel.: (850) 202-1010
baylstock@awkolaw.com

Shelley V. Hutson, Co-Lead Counsel
Clark, Love & Hutson, GP
440 Louisiana Street, Suite 1600
Houston, TX 77002
Tel.: (713) 757-1400
shutson@triallawfirm.com

Christopher A. Seeger, Co-Lead Counsel
Seeger Weiss LLP
77 Water Street, 8th Floor
New York, NY 10005
Tel.: (212) 587-0700
cseeger@seegerweiss.com

Brian H. Barr, Co-Liaison Counsel
Levin, Papantonio, Thomas, Mitchell,
Rafferty, & Proctor, P.A.
316 South Baylen Street
Pensacola, FL 32502
Tel.: (850) 435-7044
bbarr@levinlaw.com

Michael A. Burns, Co-Liaison Counsel
Mostyn Law Firm
3810 W. Alabama Street
Houston, TX 77027
Tel.: (713) 714-0000
epefile@mostynlaw.com

**Counsel for Plaintiffs**