# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG PRODUCTS LIABILITY
LITIGATION,                                        Case No. 3:19-md-2885

                                                   Judge M. Casey Rodgers
                                                   Magistrate Judge Gary R. Jones

This Document Relates to All Cases
_____/

## O R D E R

This matter is before the Court on the following submissions:[1] (1)

Defendants' Memorandum of Law Regarding Plaintiffs' Requests for

Production Seeking Certain Moldex Depositions, ECF No. 686; (2)

Plaintiffs' Motion To Compel Discovery and Memorandum of Law, ECF No.

688; and (3) Defendants' Memorandum of Law Regarding Plaintiffs'

Requests for Production That Seek Information Regarding Predecessor

and Successor Designs of the 3M Earplugs. ECF No. 689.

The dispute outlined in the parties' submissions concerns two issues

the parties were unable to resolve. The first dispute relates to four of the 28

transcripts of depositions taken in two prior lawsuits related to the Combat

Arms Earplug Version 2 ("CAEv2") between 3M Company ("3M") and

_____

[1] The Court directed the parties to file their submissions at the same time.

Moldex, one of 3M's competitors.[2] The four deposition transcripts are the

depositions of: (1) Karl Hanson, an IP attorney at 3M; (2) Eric Levinson, an

IP attorney at 3M; (3) Julie Bushman, then 3M's Vice President of Business

Information and Information Technology; and (4) Frank Little, then 3M's

Vice President of the Safety and Graphics group.

The second dispute relates to Plaintiffs' request for Defendants to

produce several categories of documents concerning the predecessor and

successor designs of the CAEv2. These designs include the CAEv1,

CAEv3, CAEv4, CAEv4.1, UltraFit and TCAPS earplugs. As to these non-

CAEv2 earplugs Defendants seek production of documents relating to the

predecessor and successor designs, product complaints, packaging and

instructions, marketing studies and analyses and sales and government

procurement documents.

## DISCUSSION

### *A.* Production of Certain *Moldex* Depositions

So far, Defendants have produced in their entirety 24 of the 28

depositions from the *Moldex* cases. Four of the transcripts remain in

---

[2] One of the lawsuits was a patent infringement suit in which 3M asserted that certain of Moldex's products infringed 3M's patents. *3MCo., et al. v. Moldex-Metric, Inc., et al.,* No. 0:12-cv-0611 (d. Minn. 2012). The other case was an antitrust lawsuit Moldex filed alleging that 3M improperly sued Moldex to increase 3M's market share to Moldex's detriment. *Moldex-Metric, Inc. v. 3M Co., et al.,* No. 0:14-cv-01821 (D. Minn. 2015).

dispute. Defendants say they should not be required to produce these transcripts because the testimony in each of these depositions primarily relates to 3M's review and investigation of the Moldex BattlePlug earplug and the M series earmuggs, and particularly 3M's decision to bring a patent enforcement action regarding those products. According to 3M, the issues in the *Moldex* litigation have little to do with the issues in this MDL. This MDL case is a products liability action, concerned with whether Defendants were negligent in their design, testing and labeling of the CAEv2. Defendants argue that the testimony in the four withheld depositions[3] concerns 3M's internal processes for investigating and prosecuting potential patent infringements, and 3M's motivation for suing *Moldex* for patent infringement in 2012—issues 3M says have nothing to do with the issues in this MDL.

Plaintiffs look at the withheld deposition transcripts differently. Plaintiffs contend that the information in the four withheld transcripts is highly relevant for at least three reasons. First, Plaintiffs argue that any efforts by 3M to block the sale of *Moldex's* competing design—a design

---

[3] Portions of two of the withheld depositions have been produced. Potions of the Bushman and Levinson transcripts, which contain testimony concerning the design, marketing and distribution of CAEv2 have been produced. Only the remaining portions of Bushman and Levinson remain in dispute.

that 3M contended was substantially similar or equivalent to the CAEv2—
would demonstrate (in the eyes of 3M) such design was a reasonable
alternative. Second, Plaintiffs say that any information in the withheld
transcripts suggesting that Defendants ascribed the design and technology
of the CAEv2 to their own ingenuity and efforts (and not to the
Government) would tend to disprove 3M's defense that the Government
was responsible for the CAEv2 design. Lastly, Plaintiffs argue that 3M's
efforts to block a safer alternative design could be used to refute any
argument by 3M that it always put service member safety and protection
before financial transactions. While Plaintiffs' arguments have superficial
appeal, the testimony in three of the four withheld transcripts offers no
information, which could be used to advance these theories.[4]

In resolving Plaintiffs' request to produce the four withheld deposition
transcripts the Court has conducted an *in camera* review of the testimony in
the withheld depositions. While Plaintiffs have raised colorable arguments
in support of their request to obtain the four withheld transcripts, the
testimony in three of the four withheld deposition transcripts has little to do

---

[4] While Plaintiffs might be able to use the results in the failed *Moldex* cases to support
their arguments, the testimony in the transcripts provides no information that could be
used as evidence to support these theories. Indeed, much of the questioning in the
Hanson and Levinson depositions concerning patent assessment was not answered by
the deponents based upon the assertion of attorney-client and work product privileges.

with issues relevant in this MDL. Instead, the lion's share of the questioning and responses in the depositions concerns 3M's patent review and investigation.

For example, the testimony of Karl Hanson, a Senior Intellectual Property counsel for 3M, evidences Mr. Hanson's limited role in the *Moldex* litigation and that his involvement concerned primarily providing infringement assessments of the various *Moldex* products before suit was filed. Other than providing patent assessments Hanson did not have any significant involvement in the *Moldex* litigation and had no involvement in the safety, development or design of the CAEv2.   Indeed, most of the questioning in the Hanson deposition involved questions about Hanson's views and interpretation of the claims in the accused Moldex patents— questions which Mr. Hanson declined to answer based upon work product and attorney-client privilege instructions from counsel.  The testimony in the transcripts for Levinson, Bushman[5] and Hanson fail to provide any information, which arguably would provide insight to the issues in this case.

---

[5] Several portions of the transcripts of the Bushman and Levinson depositions were produced by 3M because the deponents provided some testimony regarding the design, marketing and distribution of CAEv2. This order applies only to the portions of those depositions that 3M has withheld.

The bottom line is that the withheld testimony in the Hanson, Levinson and Bushman depositions concerns 3M's patent review and assessment of infringement and prosecution issues concerning the *Moldex* patents.  While the questioning in these depositions is relevant to the patent infringement claims between *Moldex* and 3M the testimony does not provide any information, which arguably could assist Plaintiffs or the trier of fact in this case in resolving the issues in this MDL. In short, the testimony in the Hanson, Levinson and Bushman transcripts offers nothing which Plaintiffs could use to support any of their three asserted theories.

The Little deposition is somewhat different. Little was the Vice President of the Safety and Graphics group. Although some of the questioning was focused upon the reasons for 3M bringing the patent infringement suit against *Moldex*, that was not the only testimony provided. The Little transcript contains testimony concerning the discontinuance of sales of the "Combat Arms" earplug and other hearing devices, the launch of a new earplug that could be sold to the military and generally information concerning sales of hearing protection devices to the military. While the sum and substance of the testimony in the Little transcript is not remarkable, some of the testimony does touch upon in a general sense the ear protection devices involved in this case and 3M's sales to the military.

The Court, therefore, concludes that the Little transcript in a general sense contains information relevant to the MDL. Consequently, 3M must produce to Plaintiffs the transcript of the Little deposition.  But 3M is not required to produce the withheld portions of the transcripts of the Hanson, Levinson and Bushman depositions.

### B. Information Regarding Predecessor and Successor Designs of the 3M Earplugs

Plaintiffs request production of Defendants' documents relating to design, development, testing, marketing, sales, packaging, instructions and product complaints for six other non-CAEv2 products. Defendants resist production of this information arguing that the information is not relevant and would be unduly burdensome and expensive for Defendants to produce, thus running the risk that production of all of this information would delay the progress of this case.

Plaintiffs advance the argument that information about predecessor and successor products goes to the issue of whether there were safer, feasible designs that could meet the needs of the military during the time period that the CAEv2 was on the market. Further, Plaintiffs say these documents are relevant to the issue of Defendants' notice and awareness of risks and design flaws in the CAEv2 drawn from user complaints

regarding the fit and performance of a predecessor or successor product. Lastly, as further support for their argument that this information is relevant, Plaintiffs point to Defendants *Touhy* requests, which seek the same categories of documents from the Government.

As to whether production of this information is burdensome, Plaintiffs argue that the proportionality factors in Rule 26, outweigh any burden Defendants might suffer in producing these documents.

The guideposts for the Court's analysis are of course the current Rule 26(b)(1) of the Federal Rules of Civil Procedure. Discovery under the revised rule is now limited to nonprivileged matters relevant to a party's claim or defense *and* proportional to the needs of the case, considering the proportionality facts enumerated in Rule 26(b)(1).

Turning first to Plaintiffs' request for Defendants to produce documents relating to the design, development and testing of the predecessor and successor products, there is no serious dispute that these categories of documents satisfy the relevance standard. All versions of the Combat Arms Earplug represent variations on a common, level-dependent product design. Among the similarities in design are the ISL filter, and the flanged tips used on the ends of each of the Combat Arms Earplugs. Thus, as Plaintiffs point out, the "CAEv2 is a member of a family of nonlinear,

level-dependent earplugs sharing closely related features and technologies." Because of the similarity between the predecessor and successor products, design development and testing documents for the predecessor and successor products are relevant because the alleged similarities among the products relates directly to Plaintiffs' theory of defect. Consequently, production of design, development and testing information concerning the predecessor and successor products does not—as Defendants argue—require production of information about products not in issue in this case. Rather, the Court concludes that there is sufficient similarity between the features on the CAEv2 and the predecessor and successor products to require Defendants to produce documents relating to the design, development and testing of the predecessor and successor products.

Plaintiffs also seek production of product complaints relating to the predecessor and successor products arguing that complaints about product design, performance or use are relevant to Defendants' notice or awareness about design defects, risks, hazards and the necessity of greater warnings and/or instructions on the CAEv2. The Court agrees.

For example, as Plaintiffs highlight, user complaints about the CAEv1 or UltraFit plug slipping out of the ear canal during use would be relevant to

whether Defendants were aware of the fit issue when the CAEv2 was developed, marketed and sold. Changes in the design in predecessor products would also be relevant to the reasons designs on the Combat Arms Earplugs may have been changed or modified.

Defendants resist Plaintiffs' request for documents relating to product complaints for predecessor and successor products by arguing that Plaintiffs' requests to produce documents regarding product complaints already cover this type of information and that because Defendants have agreed to produce "documents regarding risks, elevated hazards, failures or deficiencies in fit or dangers to hearing" from CAVe2 and information "regarding proposed or executed edits, additions, deletions or other modifications to any [] training or instructions for the use of CAEv2" the request is duplicative and should be denied. That is not necessarily the case. Product complaints about the similar predecessor and successor products is separate from Defendants' interpretation of Plaintiffs' requests to produce. Therefore, the Court concludes that documents relating to user and purchaser complaints regarding the predecessor and successor products satisfy the relevance prong of the scope of discovery under Rule 26(b)(1).

Plaintiffs also seek production of documents relating to the instructions and packaging that accompanied predecessor and successor products arguing that this information is relevant to Defendants' awareness of fitting defects and risks with the CAEv2, an issue that is highly relevant to Plaintiffs' theory of defect in this case. According to Plaintiffs, changes to the fitting instructions issued with successor designs, and internal discussions regarding the reasons for those changes, goes directly to the issue of whether the CAEv2 achieved a proper fit in the ears of the users. Plaintiffs also contend that changes to the fitting instructions on the Combat Arms Earplugs may be relevant to whether the fitting instructions were changed to achieve more favorable Noise Reduction Ratings.

In opposing this request Defendants raise the same argument advanced in opposing Plaintiffs' request for product complaints about predecessor and successor designs. Defendants say that "there is no reason to believe that the information Plaintiffs request cannot be derived from Plaintiffs' Requests regarding instructions" related to the CAEv2. Again, while Plaintiffs' requests for information concerning changes in instructions and labeling for the CAEv2 might capture some overlap of documents from predecessor and successor products, Plaintiffs' request for information relating to predecessor and successor designs is specific and

(while broader) focuses on information that in the Court's view falls well within any definition of relevance because the information would tend to inform and support Plaintiffs' claims and theories advanced in this case. Therefore, the Court concludes that Defendants' documents relating to the labeling and packaging, instructions for use, warnings, end-user packaging, shipment packaging and any training materials accompanying predecessor and successor products are relevant as contemplated by Rule 26(b)(1).

The Court's view of Plaintiffs' requests for production of documents relating to marketing and sales materials, however, is different. Plaintiffs say that the sales and marketing materials concerning predecessor and successor products is probative of features and characteristics 3M believed were important to military purchasers. While this may be so in a very general sense, requiring Defendants to produce voluminous documentation concerning the sales and marketing strategies, market evaluations, focus groups, product and franchise road maps for products sold and marketed both before and after the CAEv2 would offer little to the Plaintiffs' claims in this case or theories of liability. And as explained below, even assuming this information has marginal relevance to the claims and theories in this case, production of this information is not proportional to the needs of this case. To be sure, however, Defendants have agreed to produce, and

Plaintiffs will be provided with, marketing materials related to CAEv2 even if the marketing documents relate both to the CAEv2 and predecessor and successor products.

Plaintiffs also argue that their request for marketing materials includes communications between Defendants and the U.S. Government regarding the procurement and purchase of predecessor and successor products. Plaintiffs say these materials are relevant to Defendants' position in this case that Defendants worked in close consultation with the U.S. Government and audiologists to develop the CAEv2. The Court disagrees. While marketing materials may have relevance in a general sense to the longitudinal relationship between 3M and the U.S. Government concerning the sale of hearing protection devices, where and how much non-CAEv2 products Defendants sold to the military has little bearing on the claims or theories of liability in this case. And any marginal relevance of sales and marketing documents between 3M and the military of non-CAEv2 products certainly unreasonably would increase the cost of production in this case and would not be proportional to the needs of the case.

In addition to considering whether the requests concern information relevant to the claims and defenses in this case, the Court has considered

the issue of proportionality as to each of the categories of documents Plaintiffs have requested.

Under the amended and current version of Rule 26(b)(1) of the Federal Rules of Civil Procedure, the scope of discovery is now cabined both by information that is relevant and by information that is proportional. To assess whether requested discovery is proportional the Court must consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

As support for its argument that Plaintiffs' requests are not proportional, Defendants have filed the declaration of Michelle Six, the partner at Kirkland & Ellis supervising Defendants' collection, review and production of ESI in this case.[6] In summary, Ms. Six describes the steps which must be undertaken to comply with Plaintiffs' requests for discovery concerning the predecessor and successor products and concludes that Defendants cannot complete the steps necessary to produce the additional

---

[6] ECF No. 689-1.

information by September 30, 2019, the date for substantial completion of production. The Court has no doubt that additional time (and expense) will be necessary to produce the additional documents relating to predecessor and successor products. But when taking into account the amount in controversy in this case—which by all accounts is very substantial— Defendants' resources and the likely benefit of the additional limited categories of discovery that Defendants will be required to produce, the Court concludes that the benefit far outweighs the burden and expense of producing the additional discovery. This conclusion and analysis applies to Plaintiffs' requests for predecessor and successor documents relating to the design, development and testing of non-CAEv2 products and product complaints, instructions and packaging of predecessor and successor products.

The analysis of whether the additional discovery is proportional as applied to sales and marketing information for predecessor and successor products—including sales and marketing information concerning non-CAEv2 sales or hearing protection devices sold to the U.S. Government— is different. As to these materials, the likely marginal benefit of these documents is far outweighed by the significant expense and time Defendants would incur in identifying, collecting, reviewing and producing

sales and marketing information related to other non-CAEv2 products. Therefore, the Court concludes that production of this additional information is not proportional to the needs of the case as provided in Rule 26(b)(1).

Accordingly, for the reasons discussed above, it is **ORDERED**:

1.      Plaintiffs' request for Defendants to produce full, unredacted transcripts from the depositions of Julie Bushman, Karl Hanson, and Eric Levinson is **DENIED.** Plaintiffs' request is **GRANTED** with respect to the deposition transcript of Frank Little. Defendants must produce the full unredacted transcript of Frank Little's deposition.

2.      Plaintiffs' request for Defendants to produce additional documents relating to predecessor and successor products to the CAEv2 is **GRANTED in part** and **DENIED in part.** Defendants must produce documents related to predecessor and successor versions of the CAEv2 concerning: the design, development and testing of non-CAEv2 products; user and purchaser complaints about the predecessor and successor products; and instructions, packaging, warnings and training materials accompanying predecessor and successor products. Defendants are not required to produce additional documents related to marketing materials,

sales materials and government procurement documents for any

predecessor and successor products.

**DONE AND ORDERED** this 9th day of October 2019.

*s/Gary R. Jones*
GARY R. JONES
United States Magistrate Judge