# Exhibit 3

```
                    SUPERIOR COURT OF NEW JERSEY
                    ATLANTIC COUNTY/CIVIL DIVISION




------------------------------x
KATHLEEN HERMANS              DOCKET NO.ATL-L-5520-05MT
MESSERSCHMIDT, As
Administrator of the          CIVIL ACTION
Estate of BRIAN HERMANS
          PLAINTIFF,          CASE CODE 619
       VS.
MERCK & CO.,INC.,
          DEFENDANT.
------------------------------x
FREDERICK HUMESTON, et. al., DOCKET NO. ATL-L-2272-03MT
          PLAINTIFFS,
       VS.                    CIVIL ACTION

MERCK & CO., INC.,            CASE CODE 619
          DEFENDANT.
------------------------------x



         PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                 1201 BACHARACH BOULEVARD
                 ATLANTIC CITY, NJ 08401


         DATE:   JANUARY 31, 2007

B E F O R E:

   THE HONORABLE CAROL E. HIGBEE, P.J.Cv.

TRANSCRIPT ORDERED BY:

   MARK LANIER, ESQUIRE
   DIANE SULLIVAN, ESQUIRE




         *      *      *      *      *      *
                 REGINA A. TELL, CCR-RMR-CRR
                 OFFICIAL COURT REPORTER
                 1201 BACHARACH BOULEVARD
                 ATLANTIC CITY, NJ  08401
```

Page 1642

1  go and get her. It will be 30 seconds.
2       THE COURT: Okay.
3       (Whereupon, Alise Reicin, M.D., witness for
4  the Plaintiffs, sworn.)
5       MR. SEEGER: Good morning, Dr. Reicin.
6       Your Honor, may I proceed?
7       THE COURT: You may.
8  DIRECT EXAMINATION BY MR. SEEGER:
9    Q. Good morning, everybody.
10      Dr. Reicin, you're a medical doctor?
11   A. I am.
12   Q. And I want to talk a little bit about what
13  your area of medicine is.
14      What kind of medicine did you practice before
15  you came to Merck?
16   A. Before I came to Merck, I practiced infectious
17  diseases and did basic science research, as well.
18   Q. Okay. You are not a cardiologist, correct?
19   A. I am not.
20   Q. You're not a gastroenterologist, a GI doctor?
21      MR. STRAIN: Excuse me. Dr. Reicin, could you
22  pull the microphone a little closer to you to make sure
23  the jurors can hear real, real well.
24      THE WITNESS: Is that better?
25      Yes.

Page 1643

1  BY MR. SEEGER:
2    Q. You're not a stomach doctor or a GI doctor?
3    A. No, I am not.
4    Q. And today -- you're not an epidemiologist.
5    A. Or, I was not. I, obviously, spent a lot of time
6  dealing with these issues in the last 10 years.
7    Q. Okay. I'm just focusing on the time before
8  you came to Merck. You are not an epidemiologist,
9  right?
10   A. No, I am not.
11   Q. And before you came to Merck, you really had
12  never designed any large clinical trials studying
13  pharmaceutical products; is that right?
14   A. I had never designed a large trial. That is
15  correct.
16   Q. That's what I'm asking. Thank you for hearing
17  my question. I appreciate that.
18   A. That's one of one of the reasons I came to Merck
19  was to actually get that experience.
20   Q. And, Doctor, just I know, you have testified
21  before, correct?
22   A. Yes, I have.
23   Q. In fact, you have testified many times in this
24  case, correct?
25   A. Not in this case, no.

Page 1644

1    Q. Well, in the litigation.
2    A. Yes, I have.
3    Q. I just want to be clear on the rules.
4       I'm going to ask you some questions, and just
5  because we have a clock here, if you could try to
6  answer mine yes or no to the extent you can, and if you
7  can't, I'll try to rephrase it. And Mr. Strain, I
8  believe, is going to have an opportunity to ask you
9  whatever questions, so you'll have a lot of time.
10      Okay. So you had never designed a large
11  clinical trial before coming to Merck, correct?
12   A. That is correct.
13   Q. Okay. And you had never really headed up a
14  large clinical trial before you came to Merck.
15   A. That is correct.
16   Q. Okay. And you came to Merck in 1996, around
17  that time?
18   A. 1996.
19   Q. All right. And when you came to Merck...
20      In fact, in 199...
21      Let me back up a little bit.
22      Do you -- you said you testified many times in
23  the litigation. Do you consider yourself a
24  professional witness?
25   A. No, I absolutely do not.

Page 1645

1    Q. You would resent that implication if anyone
2  tried to draw that you were a professional witness; is
3  that right?
4    A. That is not what I do with my career.
5    Q. Okay. You don't think it would be called fair
6  to call any scientist who spends their time doing
7  science or practicing medicine who has testified a few
8  times a professional witness. Would you disagree with
9  a characterization like that?
10   A. I mean, I can only speak for myself. I can't speak
11  for others and what they do.
12   Q. Thank you, Dr. Reicin.
13      Now, I want to talk a little bit about what
14  you have done at Merck.
15      You've got -- you don't practice medicine
16  today; is that fair to say? You don't see patients, I
17  should say.
18   A. I do not see patients, although I still practice
19  some family members occasionally.
20   Q. That's always nice to have a doctor in the
21  family.
22      You don't see patients. Do you maintain your
23  medical license?
24   A. Yes, I do.
25   Q. Are you licensed in New Jersey?

Page 1646

1  A. I am licensed in New York.
2  Q. You're licensed in New York?
3  A. And I was still seeing patients up until just a
4  few -- couple years ago, even after I joined Merck.
5  Q. Family members you're talking about?
6  A. No, I donated my time at Columbia University and
7  saw patients on infectious disease rounds, taught
8  medical students and fellows.
9  Q. Now, since coming to Merck...
10     I want to switch over to that time frame a
11  little bit.
12     You have received media training while you
13  were at Merck, correct?
14  A. I have not received it in a while, but certainly in
15  the past, before I would meet the press, I had received
16  media training, correct.
17  Q. So, the answer to my question is, you have
18  received media training. That would be a yes?
19  A. Many years ago, yes.
20  Q. Around 2000, 2001, I believe you have
21  testified in the past.
22  A. I think that's correct.
23  Q. And you understand the focus of media training
24  is really for you to try to stay on message?
25  A. I don't remember it being that focused. I think it

Page 1647

1  was more to be prepared for the type of questions I was
2  going to ask and know that you had to speak in laymen's
3  terms, and I wouldn't get into medical jargon.
4  Q. And you are a good speaker, in fact? You
5  consider yourself a good speaker?
6  A. I think I am a good public speaker, yes.
7  Q. That's probably one of the reasons why Merck
8  has called you at many of these trials, correct?
9  A. I think they have called me because I know the
10  facts, and I'm capable of talking about the facts.
11  Q. Okay. And we're going to do that.
12     At Merck, you have also spent a lot of time
13  working with marketing people, isn't that fair to say?
14  A. Some of my time is spent working with marketing
15  people. I would say I spend more of my time working
16  with scientists than marketing people, but certainly I
17  have worked with marketing people, as well.
18  Q. Just so I understand your answer, more of your
19  time is spent with marking people?
20  A. No, no, no. I'm with scientists. More of my time
21  is spend with scientists than marketing people. I'm
22  part of a scientific organization at Merck.
23  Q. You know, let me ask you about that, just so
24  we're clear on that.
25     Mike, could you pull up Plaintiff's 41,

Page 1648

1  please? And I need a copy.
2     Dr. Reicin, where would you like me to put
3  these? Over here? Is that okay?
4  A. Yes, that's fine.
5     MR. SEEGER: Any objections, counsel, or do
6  you need a few minutes?
7     MR. STRAIN: Actually, I won't take a few
8  minutes. I need just a few seconds. It is long.
9     I don't think I'll have an objection. If I
10  do, I'll interrupt when you get to a page, but I don't
11  think I'll have one.
12  BY MR. SEEGER:
13  Q. I want to clarify a few things, Dr. Reicin,
14  and I'm going to refer you to pages, and if you need to
15  refer to any other part of it, I know it is a long
16  document, please let me know and go ahead and do it.
17  It is not a problem.
18  A. Okay.
19  Q. Mike, could you pull up the page that's Bates
20  stamped -- the last two numbers are 22?
21     Okay. Mike, blow up the paragraph that
22  starts, "During the review and analysis"...
23     Right here.
24     Now, before I talk about this, you recognize
25  what this file is that I have just handed you, correct?

Page 1649

1  A. I actually do not. I looked at a couple things.
2  Is this a promotion package? I'm not sure.
3  Q. I'm sorry. Actually, Dr. Reicin, before we do
4  that...
5     MR. SEEGER: Your Honor, I don't believe there
6  was an objection. Let me just move into evidence and
7  get that out of the way Plaintiff's 41.
8     MR. STRAIN: Your Honor, that's fine, but
9  subject to my review, Your Honor. I didn't want to
10  slow down and look through every page, if I may.
11     THE COURT: P-41 will be marked into evidence
12  subject to defense counsel being able to ask for
13  redactions.
14     (Whereupon, Exhibit P-41 marked into
15  evidence.)
16     MR. STRAIN: Thanks very much.
17  BY MR. SEEGER:
18  Q. Now, this is your personnel file, correct?
19  A. Um, I don't know. I have never actually seen my
20  personnel file.
21  Q. That's funny, because when I was reading
22  through it, I noticed that you, actually -- in addition
23  to your bosses signing at the end of each year, you
24  also sign these, correct?
25  A. Yes, I didn't say I didn't see everything. There

Page 1650

1  are letters of recommendation that I wouldn't have
2  seen.
3      Q.  I wasn't suggesting anything wrong.  I'm just
4  saying, you typically would sign off on your review,
5  correct?
6  A.  On my review, that's correct.
7      Q.  And the last sentence of this paragraph, where
8  it says, "She has worked effectively with regulatory
9  affairs," now, that's the people who deal with the FDA,
10 correct?
11 A.  Those are scientists who deal with the FDA, yes.
12     Q.  "And labeling," that's the label?
13 A.  They are also part of the regulatory affairs group.
14     Q.  It says, "marketing and public affairs."
15 A.  That's correct.
16     Q.  Marketing and public affairs, marketing is
17 selling the drug; isn't that right?
18 A.  Um, I don't deal with salespeople, actually.  There
19 are people who I dealt with internally.
20     Q.  I understand, and let me just ask the question
21 and see if I can get you to say yes or no, and then
22 I'll let you explain.
23        The marketing arm of Merck, they are involved
24 with selling the drug, correct?
25 A.  Some of those people are involved in selling their

Page 1651

1  drug.  There are many other things.  There are people
2  in marketing who do clinical research, as well.
3      Q.  But you wouldn't resist the characterization
4  that the marketing part of Merck is in charge of
5  actually getting -- marketing the drug, promoting it,
6  and seeing to it that doctors prescribe it and patients
7  buy it, correct?  That's their job.
8  A.  Prescribe it according to label, and things like
9  that, yes.
10     Q.  Public affairs, they get messages out to the
11 public, correct?
12 A.  They deal with the press and put out press
13 releases, and I couldn't tell you everything public
14 affairs does.
15     Q.  All right.  Thank you.
16        And, Mike, if you could go to 30, please...
17        Okay.  Dr. Reicin, this is another page from
18 your review.  If you could blow up this last box right
19 here...
20        Thanks, Mike.
21        "Join WBST as a formal member."  What is that,
22 Dr. Reicin?
23 A.  Okay.  Worldwide Business Strategy Team, I think it
24 stands for.  We have a lot of acronyms at Merck, and
25 they change often, and so you forget what they actually

Page 1652

1  stand for.
2      Q.  You wouldn't resist if I said business was --
3  a fair definition of business, without pulling out a
4  dictionary, would be to sell a product, commercialize,
5  make money.  That's what you do in business, correct?
6  A.  But that's not exactly -- that is not a fair
7  representation of what that team did.
8      Q.  Let me ask you this:
9         You said the name was Worldwide Business
10 Strategy Team?
11 A.  Correct.
12     Q.  So, would it be fair to say that they were
13 focused on worldwide business strategy?  Fair enough?
14 A.  Well, they looked at everything, what our clinical
15 strategy is.  I mean, it was just an
16 all-encompassing -- it was all-encompassing group.
17     Q.  And, Mike, could you drop that?
18 A.  There were members of regulatory on that group,
19 there were members of marketing, there were clinical
20 people.
21     Q.  Right.  Thank you, Dr. Reicin.
22        Could you drop that down, please.
23        And go to the box right above it.  This box
24 right here.
25        Tell me if I'm reading this correctly.  It

Page 1653

1  says, "Supported global marketing efforts through
2  participation and symposium, advisory board meetings,
3  and with key thought leaders," correct?
4  A.  That's correct, scientific interactions with all
5  these people.
6      Q.  And global marketing efforts, what's your
7  understanding of that?  That's also to promote and sell
8  the drug, correct?
9  A.  That's -- except that's not what those efforts
10 were.  Many of those advisory board meetings are
11 meetings with thought leaders, getting their input on
12 the science.  I never really saw that as part of a
13 marketing effort, but...
14     Q.  Well, Dr. Reicin, the people who wrote this
15 up, I mean, they knew what they were doing, didn't
16 they, your bosses who wrote this up?
17 A.  Um.
18     Q.  Who was your boss at the time?
19 A.  I don't know.  We would have to -- you have pulled
20 one thing out of --
21     Q.  I'll go through many.
22        This is from December 31st of 2001.  Who was
23 your boss at that time?
24 A.  Either Barry Gertz or Alan Nies.
25     Q.  Your boss was Barry Gertz?

Page 1654

1    A.  I believe so at that time.
2        Q.  And Barry Gertz is somebody who understands --
3    I mean, who speaks English, right?
4    A.  Yes.
5        Q.  So, he understood what he was writing, isn't
6    it fair to say, when he put the items down and signed
7    off on it?
8    A.  Yes.
9        Q.  Let's see.  How about D, "Collaborated on
10   marketing strategy and promotional materials."
11       Do you see that?
12   A.  Yes.
13       Q.  And that included promotional materials or
14   brochures, things like that, that go to doctors,
15   correct?
16   A.  Again, my role would be to make sure the science
17   there is correct.
18       Q.  Dr. Reicin, I know you're going to have a lot
19   of time to explain.  I just need to get some yes or no
20   answers.
21       Promotional materials are the things that go
22   to doctors about the drug.
23   A.  That's correct.
24       Q.  Okay.  And marketing strategies are strategies
25   that are designed to actually sell the drug, correct?

Page 1655

1    A.  I guess you could put it that way.
2        Q.  And let me go to...
3        Mike, if you could go to page 32...
4        And, again, you feel free to look through
5    this, and if there's anything you want to point out...
6    A.  So, do you want me to point out other things?
7        Q.  You can, if you want.  If I'm reading
8    something, and you feel you need to read something else
9    in a paragraph, I don't want anyone to think I'm not
10   reading everything.
11   A.  Well, you're pulling out very small pieces.
12       THE COURT:  All right.  Stop.  Stop.  Stop.
13       MR. SEEGER:  I was trying to be helpful,
14   Judge.
15       THE COURT:  I don't want her to add what she
16   wants to add.  I want you to ask her a question and her
17   answer the question, and that's it.
18       MR. STRAIN:  Thank you, Your Honor.
19       MR. SEEGER:  I appreciated that.  And I'm
20   going to follow the judge's order.
21       Mike, please pull up this paragraph right
22   here.
23   BY MR. SEEGER:
24       Q.  Again, this is from one of your reviews,
25   correct?

Page 1656

1    A.  That's correct.
2        Q.  And your boss signs off on this, correct?
3    A.  That's correct.
4        Q.  And you sign off on it, correct?
5    A.  That's correct.
6        Q.  And --
7    A.  I believe my boss would have written this.
8        Q.  Your boss would have written this.  Okay.
9        And it says...
10       Please blow this up a little more, Mike, if we
11   can, so the jury can see it.  It is kind of hard.
12       How about just the first half of it?
13       All right.  It says, "Dr. Reicin's major
14   efforts this past year were focused on defending the
15   VIOXX franchise."
16       Did I read that correctly?
17   A.  You did.
18       Q.  And let's just cut to the chase on this.
19   There's many references, other references about you
20   being a tenacious defender of the VIOXX franchise,
21   correct?
22   A.  He has used that term, that's correct.
23       Q.  Okay.  And, Dr. Reicin...
24       Mike, if you could please pull up page 54...
25       One of the things I believe you said to the

Page 1657

1    jury earlier was that you were a scientist and you
2    focus your time mostly on science; is that correct?
3    A.  That's correct.
4        Q.  And you see here, this is kind of -- I don't
5    know, is it fair to kind of call it a report card?
6        MR. STRAIN:  I'm sorry.  What page?
7        MR. SEEGER:  54.
8        MR. STRAIN:  I have it.  Thanks.
9    BY MR. SEEGER:
10       Q.  Can you see it on your screen, or do you have
11   the page, Dr. Reicin?
12   A.  I do.  I think this isn't the full thing, but I see
13   the page you have.  It looks like there's something
14   missing here.
15       Q.  Hold on.  Let me do it this way.
16   A.  You can see it starts with Objective 3, it looks
17   like.
18       Q.  Pull up page 77, please.
19       Mr. Strain, I'm on page 77.  Can you see this
20   page better?
21       MR. STRAIN:  I wonder, counsel, could you give
22   Dr. Reicin -- there's 30 pages, it looks to me,
23   involved in this, just 30 seconds to get a sense of
24   what the document is?
25       MR. SEEGER:  Actually, I'm just on this one