# Exhibit 5

                                                                                           1

```
 1            IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3                          )   Docket No. 14 C 1748
   IN RE:                   )
 4 TESTOSTERONE REPLACEMENT )
   THERAPY PRODUCTS LIABILITY)
 5 LITIGATION                )
                             )   Chicago, Illinois
 6 MITCHELL v. ABBVIE, CASE NO. 14 C 9178)  March 7, 2018
                             )   9:45 o'clock a.m.
 7                           )
 8             TRIAL TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
 9                       VOLUME 1-A

10

11 APPEARANCES:

12
   For the Plaintiff:   ROBINS CLOUD LLP
13                      BY:  MR. BILL ROBINS, III
                        808 Wilshire Boulevard, Suite 450
14                      Santa Monica, CA  90401

15
                        LEVIN PAPANTONIO THOMAS MITCHELL
16                      RAFFERTY & PROCTOR, P.A.
                        BY:  MR. TROY RAFFERTY
17                           MR. BRANDON L. BOGLE
                        316 S. Baylen Street
18                      Pensacola, FL  32502

19
                        SEEGER WEISS LLP
20                      BY:  MR. DAVID R. BUCHANAN
                        77 Water Street, 26th
21                      New York, NY  10005

22
   Court Reporter:      MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
23                      Official Court Reporter
                        219 S. Dearborn Street, Suite 2102
24                      Chicago, Illinois  60604
                        (312) 435-5639
25
```

---

                                    Wojtanowski - direct by Buchanan
                                                                     230

 1   then we are going to start again.
 2         (Short break.)
 3         (Proceedings heard in open court.  Jury in.)
 4         THE COURT:  All right.  Everybody can have a seat.
 5         You can call the first witness.
 6         MR. ROBINS:  Your Honor, at this time, plaintiffs
 7   call Mr. Steven Wojtanowski.  Mr. Buchanan will be doing the
 8   examination, your Honor.
 9         (Witness sworn.)
10         THE WITNESS:  I do.
11         THE COURT:  Okay.  Mr. Buchanan, you can go ahead.
12      STEVEN WOJTANOWSKI, PLAINTIFF'S WITNESS, SWORN
13                    DIRECT EXAMINATION
14   BY MR. BUCHANAN:
15   Q.  Hello, sir.  Could you state your name, please?
16   A.  Steven Wojtanowski.
17   Q.  And for the record --
18         THE COURT:  Spell both Steven and Wojtanowski, if you
19   would, please.
20         THE WITNESS:  S-t-e-v-e-n, W-o-j-t-a-n-o-w-s-k-i.
21         THE COURT:  Thank you.
22   BY MR. BUCHANAN:
23   Q.  Okay, sir.  As you may know, sir, you are identified as a
24   potential witness by the defense.  Are you aware of that?
25   A.  Yes.

---

                                    Wojtanowski - direct by Buchanan
                                                                     231

 1   Q.  Okay.  We asked that you be made available so we could ask
 2   you some questions in our case.  You are a current employee in
 3   the regulatory affairs group within AbbVie?
 4   A.  That is correct.
 5   Q.  Okay.  And for the jury's benefit, regulatory affairs
 6   would be the group that interacts with the regulatory agencies
 7   throughout the world?
 8   A.  Yes.
 9   Q.  In the case of the United States, that would be the FDA?
10   A.  Yes.
11   Q.  Okay.  To put you in context in this case, sir, you
12   started at the predecessor company, what was it, 1998?
13   A.  Yes.
14   Q.  Okay.  Solvay?
15   A.  Solvay Pharmaceuticals.
16   Q.  Okay.  Solvay ultimately acquired AndroGel, the drug we're
17   here about, and you continued to work with Solvay through that
18   period of time until they were acquired by Abbott, correct?
19   A.  That's correct.
20   Q.  Okay.  So the sequence here is Solvay -- I'm sorry --
21   Unimed initially developed the drug, correct, sir?
22   A.  Yes.
23   Q.  Unimed brought it forward through its development phase
24   and to the FDA, right?
25   A.  Yes.

---

                                    Wojtanowski - direct by Buchanan
                                                                     232

 1   Q.  Okay.  So we go Unimed to Solvay, and you're at Solvay at
 2   the time when AndroGel is bought, right?
 3   A.  Yes.
 4   Q.  Okay.  Solvay has been bought by Abbott, correct?
 5   A.  Correct.
 6   Q.  And subsequently evolved into AbbVie, correct?
 7   A.  Correct.
 8   Q.  That's where you are today?
 9   A.  Yes.
10   Q.  And you started here in 1998.  Do I have that right?
11   A.  At Solvay.
12   Q.  At Solvay.  Thank you.  It's not really a great timeline.
13   It's kind of going around the corner.
14         You had active involvement with the drug AndroGel
15   between 2004, very active until about 2007, late 2007, and
16   then a little bit after that until about 2010, right?
17   A.  Yes.  Generally speaking, that's correct.
18   Q.  Okay.  And during that period from 2004 to 2007, you were
19   the regulatory liaison with the FDA?
20   A.  Yes.
21   Q.  Okay.  And we'll talk a little bit about your activity in
22   that window of time as we go forward.  I do -- starting this
23   after the defense opening, and there are a lot of things were
24   said about Mr. Mitchell and, obviously, his health and
25   cardiovascular disease and things of that nature.  You have

Wojtanowski - direct

393

1  only redo these studies if no option were left and we have no
2  new low volume formulation."
3       Did I read that correctly?
4  A. You did.
5  Q. You then state here in the next bullet, "We have no
6  intention on performing these studies with 1 percent," what
7  did you write next?
8  A. "Unless cornered."
9  Q. Unless the FDA cornered you, you were not going to run the
10 studies that the people in clinical said in 2007 should have
11 been run, right?
12 A. For the 1 percent product, that's correct. That's what
13 this states.
14 Q. Unless cornered by the FDA.
15      You note here, "We don't want to give the FDA a win,"
16 right?
17 A. Yes. That's what the document states.
18 Q. Don't want to give the FDA a win.
19      Well, you understood, sir, that this wasn't just
20 about you and the FDA, right?
21 A. I'm sorry. I don't understand your question.
22 Q. Ultimately, this is the label that doctors are getting,
23 right?
24 A. Yes.
25 Q. This isn't just some kind of chess match between the

Wojtanowski - direct

394

1  company and the FDA. There are doctors around the country who
2  are going to be given your prescribing information so that
3  they can have the information they need hopefully to properly
4  inform their patients. That's the concept of the labeling,
5  right?
6  A. That's correct.
7  Q. And you're not going to give the FDA a win, huh?
8  A. That's what this document states.
9  Q. You got a win, right?
10 A. I'm not sure what you're referring to.
11 Q. Well, I mean, you were praised up one side and down the
12 other for the way you negotiated this process, right?
13 A. I'm not sure what you're referring to.
14 Q. You got a promotion, right?
15 A. Yes. At the time, I was promoted.
16 Q. Got praised for avoiding class labeling language, right,
17 sir?
18 A. Again, I'm not sure exactly what you're referring to.
19 Q. You don't remember being praised for that, sir?
20 A. Praised? No, I'm sorry, I don't. I'm not sure what
21 you're referring to.
22      MR. BUCHANAN: Can I have 821c and 821d.
23 BY MR. BUCHANAN:
24 Q. Passing you, sir, 821c and d. Are these, in fact,
25 performance appraisals year-end 2007 in connection with your

Wojtanowski - direct

395

1  role and responsibility at Solvay during that period of time,
2  sir?
3  A. Yes.
4       MR. BUCHANAN: Okay. Plaintiffs offer 821d and c in
5  evidence, your Honor.
6       MR. BERNICK: No objection.
7       THE COURT: They're admitted.
8    (Above-mentioned exhibits were received in evidence.)
9  BY MR. BUCHANAN:
10 Q. Okay. Let's go to 821c.
11      On the first page, we have -- do you recognize this
12 former performance appraisal, sir?
13 A. I do.
14 Q. Okay. Let's go to 821c.5. You're credited with getting
15 the class labeling guidance off the FDA docket, right?
16      "His work with FDA to address concerns for class
17 labeling of TRT resulted in a delay of the guidance such that
18 it was" what?
19 A. "Removed from the docket."
20 Q. Okay. These are listed under the behavior examples for
21 your superior performance in 2007, right, sir?
22 A. Yes.
23      MR. BUCHANAN: Can you scroll down, please, Corey,
24 where you see the SU under innovation?
25 BY MR. BUCHANAN:

Wojtanowski - direct

396

1  Q. These behavior examples that are cited in particular to
2  get the FDA not to issue the class label guidance is listed as
3  superior, correct?
4  A. Yes.
5  Q. You are praised for your negotiating skills with the FDA,
6  right?
7  A. In general terms, yes.
8  Q. And you were praised for leading the AndroGel franchise to
9  $400 million this year, right?
10 A. I don't know what you're specifically referring to there.
11 Q. 821c.10. I mean, you're the one dealing with the FDA,
12 sir, but you got a pretty big business hat on, don't you?
13 A. I'm sorry. I wasn't paying attention.
14      Could you repeat that?
15 Q. You've some pretty significant business function, I'm
16 talking dollars?
17 A. Not specifically. I was not specifically accountable for
18 sales.
19 Q. Okay. As evidenced by his success in driving the AndroGel
20 franchise to the $400 million this year, and this is crediting
21 you with driving it to $400 million, your success in doing so,
22 right?
23 A. That's what this states.
24 Q. Okay. Let's go to 821c.4. Under behavior examples for
25 competitive drive, superior.

Wojtanowski - direct
397

1  "Steven understands the business needs of the
2  marketing team."  Do you see that there at the bottom under
3  behavior examples, first line?  "Steven understands the
4  business needs of the marketing team."
5      That's true, right?
6  A.  Yes, I did understand their needs.
7  Q.  Okay.  821d.3.  Can you switch documents, sir.  This is
8  another performance appraisal from another.  You're credited
9  with avoiding class labeling language, right?
10 A.  Where are you specifically referring?
11 Q.  821d.3.  "Quarterly or year-end results:  Led interactions
12 between Solvay and FDA."
13      MR. BUCHANAN:  It's up top here, Corey.
14 BY MR. BUCHANAN:
15 Q.  "Avoidance of class labeling language."  It's true you
16 avoided class labeling language, right, sir?
17 A.  Yes.
18 Q.  It wasn't until 2015 that age-related hypogonadism got in
19 some eight, nine years after you started fussing with the FDA
20 on it, right?
21 A.  I disagree with your characterization.
22 Q.  Okay.  Let's just do the math.
23      It is, what, 2005?  I guess it was ten years.  Is
24 that what you mean by disagreeing with me?
25 A.  I don't recall fussing.

Wojtanowski - direct
398

1  Q.  Okay.  It was 2005 when the FDA said they wanted to impose
2  class labeling language, correct?
3  A.  That's correct.
4  Q.  In 2015 the FDA finally got it, right?
5  A.  Yes.
6  Q.  Am I correct, sir, in 2008, you got a promotion to the
7  global regulatory affairs group after this labeling
8  back-and-forth happened in 2007?
9  A.  I was promoted in 2008, that's correct.
10 Q.  Okay.
11      All right.  Sir, we mentioned -- we discussed this a
12 little bit yesterday.  When you were pulling together white
13 papers to go to the FDA, you reached out to different
14 disciplines within the company, correct?
15 A.  Yes.
16 Q.  There's the marketing folks, there's the regulatory folks,
17 there's the clinical development group, the folks who were
18 saying we should have run the studies or we should have run
19 the studies, there's pharmacovigilance people, all that,
20 right?
21 A.  Yes.
22 Q.  When we talk about pharmacovigilance, that's talking about
23 safety surveillance or looking after adverse event reports and
24 other safety information coming in to the company, correct?
25 A.  Yes.

Wojtanowski - direct
399

1  Q.  After 2000, the drug was in use, the company got reports
2  of heart attacks and strokes and other cardiovascular events,
3  true?
4  A.  Yes.
5  Q.  They come to the company often in the form of reports from
6  doctors, they can come from patients, kind of -- they can come
7  from literature reports, you know, something in the medical
8  literature, correct?
9  A.  Yes.
10 Q.  Okay.  The company is supposed to investigate those and
11 study those and then assess those, right?
12 A.  Yes.
13 Q.  Okay.  I'm passing you, sir, a collection of adverse
14 events the company received.
15      The company can take action after it gets adverse
16 events.  It can investigate them and determine whether it's
17 reported in the adverse events section of the label, correct?
18 A.  That's outside of my scope of specialty.  That's what the
19 safety group is charged with.
20 Q.  I'm talking about labeling, sir.  Okay.  The company, if
21 it gets adverse events, it can report adverse events in the
22 adverse events section of the labeling, correct?
23 A.  Generally speaking, that is a correct statement.
24 Q.  Okay.  The company can put them into precautions if it
25 identifies a medical need to do so, correct?

Wojtanowski - direct
400

1  A.  Yes, we could make those proposals, yes.
2  Q.  You can put it into warnings.  There's different sections
3  of the label.  We've seen several of them through the course
4  of the trial so far, correct?
5  A.  Yes, that's correct.
6  Q.  Well, let's look at some of the adverse events the company
7  received during your tenure there, sir.  Direct your attention
8  to the first tab.
9       MR. BUCHANAN:  Plaintiffs offer, just to move things
10 along here, 420, 807d, 807f, 807i, 807n, 807h, 807p, and 807q
11 in evidence.
12      MR. BERNICK:  We have no objection.  I'm assuming
13 they're not proffered for purposes of causation, just the fact
14 that they have been at the company.
15      MR. BUCHANAN:  I'm not eliciting causation opinions
16 from this witness, your Honor.
17      MR. BERNICK:  Okay.  No objection.
18      THE COURT:  They're admitted.
19   (Above-mentioned exhibit was received in evidence.)
20      MR. BUCHANAN:  Let's go, please, to the first tab,
21 sir, Exhibit 420.
22      Can you pull it up on the screen, Corey.
23 BY MR. BUCHANAN:
24 Q.  Let's go to 420. -- 420.4, just orient ourselves.
25      The company collects information in various forms,