# Exhibit 6

```
 1                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3                                      )  Docket No. 14 C 1748
                                        )
 4    IN RE:                            )
      TESTOSTERONE REPLACEMENT          )
 5    THERAPY PRODUCTS LIABILITY        )
      LITIGATION                        )
 6                                      )  Chicago, Illinois
      KONRAD v. ABBVIE, CASE NO. 15 C 966 ) September 20, 2017
 7                                      )  9:30 o'clock a.m.

 8                    TRIAL TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
 9                             VOLUME 3-A

10

11   APPEARANCES:

12
     For the Plaintiff:     SEEGER WEISS LLP
13                          BY:  MR. DAVID R. BUCHANAN
                            77 Water Street
14                          New York, NY  10005

15
                            ROBINS CLOUD LLP
16                          BY:  MR. BILL ROBINS, III
                            808 Wilshire Boulevard, Suite 450
17                          Santa Monica, CA  90401

18
                            LEVIN PAPANTONIO THOMAS MITCHELL
19                          RAFFERTY & PROCTOR, P.A.
                            BY:  MR. TROY RAFFERTY
20                          316 S. Baylen Street
                            Pensacola, FL  32502

21

22

23   Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                            Official Court Reporter
24                          219 S. Dearborn Street, Suite 2102
                            Chicago, Illinois  60604
25                          (312) 435-5639
```

```
                Wojtanowski - redirect by Buchanan
                                                              663
 1           Did I read that correctly, sir?
 2    A.  Yes.  Yes.
 3    Q.  It further continues.  "In particular," on the next page,
 4    "the limited resources could impede the agency's ability to
 5    detect risks of new drugs in a timely fashion, analyze
 6    emerging drug safety data, and effectively communicate that
 7    information to the public in the ways envisioned in the
 8    committee's report."
 9           Did I read those correctly?
10    A.  Yes.
11    Q.  Okay.  That CDER group, that's also the group -- C-D-E-R
12    that's referenced on the first page, could we go back one --
13    is that also the group that you were interacting with
14    concerning labeling in 2007, sir?
15    A.  Yes.
16    Q.  Okay.  You talked about FDA's review or at least the
17    company's submission to the FDA for review of advertising.  Do
18    you recall that testimony?
19    A.  Yes.
20           MR. BUCHANAN:  Okay.  Could I have 1427 for counsel
21    and a copy for the witness?
22           Passing you, sir, Exhibit 1427.
23           Plaintiffs offer 1427 into evidence, your Honor.
24           MS. PARKER:  No objection.
25           THE COURT:  It's admitted.
```

```
                Wojtanowski - redirect by Buchanan
                                                              664
 1           (Above-mentioned exhibit was received in evidence.)
 2           MR. BUCHANAN:  Evan, could you pull up 1427.  Thank
 3    you.
 4    BY MR. BUCHANAN:
 5    Q.  This is a report from the GAO.  Do you know who the GAO
 6    is, sir?
 7    A.  Government Accounting Office, I believe.  I am not
 8    familiar with this.
 9    Q.  It's the United States Government Accountability Office.
10    It's a report to Congress November 2006, prescription drugs.
11    This is that window of time when you had responsibility for
12    overseeing marketing materials, correct?
13    A.  Yes.
14    Q.  Heading:  "Prescription drugs.  Improvement needed in
15    FDA's oversight of direct-to-consumer advertising."
16           Did I read that correctly, sir?
17    A.  Yes.
18    Q.  There is a division of the FDA, sir, that reviews or has
19    the charge to review advertising materials that are submitted
20    to the FDA, correct?
21    A.  That's correct.
22    Q.  That's not the division that reviews the drug for
23    approval, correct?
24    A.  That's correct.
25    Q.  That's not the division that reviews drug safety issues,
```

```
                Wojtanowski - redirect by Buchanan
                                                              665
 1    correct?
 2    A.  That's correct.
 3    Q.  That's a separate division, correct?
 4    A.  Yes.
 5    Q.  All right.  And I guess in this early 2000 period, sir,
 6    they had at one point in time just one person reviewing
 7    advertisements.  Did you know that, sir?
 8    A.  I am not familiar with that information.
 9    Q.  Okay.  Well, let's go to 142 -- I'm sorry, 1427.22.
10    That's a bar graph, sir.  It identifies the number of
11    commercials and advertising submitted to the FDA for review.
12           Do you see that, numbers in thousands?  I think as of
13    2005, it's 16,000 Internet and DTC, other consumer directed.
14    Do you see that?
15    A.  Yes.
16           MR. BUCHANAN:  Okay.  Going to the next page, please,
17    Evan, 1427.23.
18    BY MR. BUCHANAN:
19    Q.  We have a statement from the FDA.  "FDA officials told
20    us," do you understand "us" to be the Government
21    Accountability Office, sir?
22    A.  I believe so.
23    Q.  Okay.  "FDA officials told us that the agency receives
24    substantially more final and draft materials than the DTC
25    review group can review."
```

```
                Wojtanowski - redirect by Buchanan
                                                              666
 1           Did I read that correctly, sir?
 2    A.  Yes.
 3    Q.  "The total number of final materials has almost doubled
 4    since FDA formed its DTC review group in March of 2002.  FDA
 5    officials told us that the group was not fully staffed until
 6    September 2003 and that turnover has been a problem,
 7    temporarily reducing the number of reviewers in that group
 8    from four to one in late summer 2005."
 9           Did I read that correctly?
10    A.  Yes.
11    Q.  And then it follows, that the FDA has since filled all the
12    positions, and now there's five reviewers as of September
13    2006, right?
14    A.  Yes.
15    Q.  Did you know that, sir, that the FDA had five reviewers to
16    review direct-to-consumer marketing that you were submitting,
17    together with all other pharmaceutical companies were
18    submitting for all the advertising done in this country on
19    pharmaceutical products?
20    A.  No.
21    Q.  Sir, you spent some time talking about the labeling back
22    and forth with the FDA in 2007.  Do you recollect that?
23    A.  Yes.
24    Q.  Okay.  I'd like to take you, sir --
25           MR. BUCHANAN:  Can I have 821d?
```

1  BY MR. BUCHANAN:
2  Q.  Sir, you were quite proud and touted your accomplishments
3  in the avoidance of class labeling language; isn't that true?
4  A.  I am not sure what you're referring to specifically.
5  Q.  Your performance self-appraisal for 2007?
6  A.  I don't recall that specifically.
7  Q.  I am passing you Exhibit 821d.
8          MR. BUCHANAN:  Plaintiffs offer 821d into evidence.
9          MS. PARKER:  No objection.
10         THE COURT:  It's admitted.
11     (Above-mentioned exhibit was received in evidence.)
12         MR. BUCHANAN:  Okay.  Now let's please go to page 3
13  of 5, Evan.
14  BY MR. BUCHANAN:
15  Q.  It says, "Critical success factor measure time."
16         MR. BUCHANAN:  You're fine.  Right there is good.
17  BY MR. BUCHANAN:
18  Q.  "Quarterly or year-end results."  Let's look at those
19  bullets.  "Lead interactions between Solvay and FDA."  Do you
20  see that, sir?
21  A.  Yes.
22  Q.  "Finalized negotiations on" it first lists "the pediatric
23  written request and associated amendment and exclusivity for
24  AndroGel."
25         Down at the bottom it says, "Lead internal team," and

1  it continues through a list of things that you did.  Do you
2  see that?
3  A.  Yes.
4  Q.  "Safety update of adult PI and highlights format and
5  avoidance of class labeling language."
6          Do you see that, sir?
7  A.  Yes.
8          MR. BUCHANAN:  Okay.  Let's go, please, to page 4 of
9  5.
10 BY MR. BUCHANAN:
11 Q.  Do you agree, sir, you were in active negotiations during
12 this period of time against the FDA on that labeling issue?
13 A.  It is customary to negotiate with FDA on labeling
14 language, yes.
15 Q.  Okay.  And so the FDA had proposed the language that we
16 saw yesterday, and the company pushed back, and you were told
17 to push back by Jean-Louis Anspach to fight for symptoms,
18 correct?
19 A.  We proposed a scientific rationale for a discussion on a
20 difference in material, yes.
21 Q.  Were you told, sir, to fight for symptoms by Jean-Louis
22 Anspach?
23 A.  Yes, that was his opinion.
24 Q.  Had you also in this same time frame said that you will
25 defend against doing clinical studies if requested by the FDA?

1  A.  Not in that context, but, yes, that's correct.
2  Q.  And you received praise for your work in 2007 in actively
3  negotiating against the FDA, isn't that true, sir?
4  A.  Again, what are you referring to?
5  Q.  You got a promotion.
6  A.  I was promoted in 2008, that's correct.
7  Q.  Okay.  Now, sir, I'd like to finish up with you were read
8  some testimony -- you recall in my examination, sir, I asked
9  you whether the company had ever promoted this drug for
10 age-related hypogonadism.
11         Do you recall that?
12 A.  Yes.
13 Q.  I showed you some prior testimony.  Do you recall that?
14 A.  Vaguely, yes.
15 Q.  From a few months back?
16 A.  Yes.
17 Q.  Okay.  Counsel showed you some additional portions of that
18 testimony, isn't that right?
19 A.  Yes.
20 Q.  Okay.  And you'd previously agreed, sir, and previously
21 testified that the company had, in fact, off-label promoted
22 this drug for age-related hypogonadism in that testimony that
23 I showed to you; isn't that true, sir?
24         MS. PARKER:  Objection.  It mischaracterizes the
25 testimony.

1          THE COURT:  It's a question.  The objection is
2  overruled.
3          THE WITNESS:  I understand what you showed me.  I may
4  have misspoke in the previous testimony because I don't
5  believe Solvay promoted for age-related hypogonadism.
6  BY MR. BUCHANAN:
7  Q.  All right.  You previously testified, sir:
8          "You were in marketing, you were promoting the drug
9  for age-associated hypogonadism, correct?"
10         And you answered:  "That's correct."
11         MS. PARKER:  Objection.  This has been asked and
12 answered.
13 BY MR. BUCHANAN:
14 Q.  Isn't that correct?
15         THE COURT:  No, he didn't answer it.  He asked him
16 whether he gave the testimony, and he tried to give an
17 explanation, which is nonresponsive.  So your objection is
18 overruled.
19         Did he correctly read the testimony?
20         THE WITNESS:  You correctly read the testimony.
21 BY MR. BUCHANAN:
22 Q.  Okay.  Since the time you gave that testimony, sir, you
23 spent some time getting ready to testify in this proceeding?
24 A.  Yes.
25 Q.  You spent considerable time, I suppose?