**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG    )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,  )
                             )    Pensacola, Florida
                             )    October 21, 2019
                             )    3:02 p.m.
                             )
                             )
_____)


**TELEPHONE CONFERENCE**

TRANSCRIPT OF TELEPHONIC PROCEEDINGS
BEFORE THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-68)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

# A P P E A R A N C E S

FOR THE PLAINTIFFS:      **BRYAN F. AYLSTOCK, ESQUIRE**
                         **JENNIFER HOEKSTRA, ESQUIRE**
                         Aylstock, Witkin, Kreis & Overholtz
                         17 E Main Street, Suite 200
                         Pensacola, Florida  32502

                         **SHELLEY HUTSON, ESQUIRE**
                         Clark Love & Hutson, GP
                         440 Louisiana Street, Suite 1600
                         Houston, Texas  77002

                         **DAVID BUCHANAN, ESQUIRE**
                         **PARVIN AMINOLROAYA, ESQUIRE**
                         Seeger Weiss, LLP
                         55 Challenger Road, 6th Floor
                         Ridgefield Park, New Jersey  07660

                         **MICHAEL A. BURNS, ESQUIRE**
                         Mostyn Law
                         3810 W Alabama Street
                         Houston, Texas  77027

FOR THE DEFENDANT:       **KARL B. GUNDERSON, ESQUIRE**
                         Kirkland & Ellis, LLP
                         300 N Lasalle
                         Chicago, Illinois, 60654

                         **MARK J. NOMELLINI, ESQUIRE**
                         Kirkland & Ellis, LLP
                         300 N Lasalle
                         Chicago, Illinois  60654

                         **LARRY HILL, ESQUIRE**
                         MOORE, HILL & WESTMORELAND, P.A.
                         350 W Cedar Street, Suite 100
                         Pensacola, Florida  32502

```
1                      P R O C E E D I N G S
2           THE COURT:  -- [Audio missing] -- Earplug
3    Products Liability Litigation.
4           I know we have a number of people on the
5    phone.  I know for the Plaintiff, Mr. Aylstock is on
6    the phone and Mr. Burns and Ms. Hutson and some
7    others.
8           And before I identify who is appearing on
9    behalf of the Defendants, Mr. Aylstock, did you say
10   someone from Mr. Seeger's office, I don't know, Dave
11   Buchanan or someone else was also going to attend?
12          MR. AYLSTOCK:  Yes, Your Honor, I believe so.
13   My partner, Jennifer Hoekstra, is on as well, and
14   she'll be participating by phone.
15          Jennifer, was it your understanding they were
16   going to be on, too?
17          MS. HOEKSTRA:  That was my understanding.
18   I'm just reaching out to them right now to see if
19   they're jumping on.
20          THE COURT:  Okay.  Let's give them a moment
21   to join in.
22          And then on behalf of the Defendant, Mr.
23   Nomellini is on the phone and Mr. Hill.  Anyone else
24   on behalf of the Defendants?
25          MR. GUNDERSON:  Karl Gunderson from Kirkland
```

1   & Ellis also.

2        **THE COURT:**  Okay.  Well, let's wait a moment

3   and see if Mr. Buchanan -- I guess he's been involved

4   in these issues -- whether he's going to join.

5        **MR. AYLSTOCK:**  So, Your Honor, on the

6   protective order at issue -- and I'm -- (inaudible) --

7   a docket -- I think Ms. Hoekstra will take the lead

8   for us.  And then on the other issues that involve

9   custodial files and so forth, Mr. Seeger's office --

10  (inaudible) --

11       **THE COURT:**  Okay.

12       **MR. AYLSTOCK:**  So we could maybe go ahead and

13  tackle the first part, if the Court was ready.

14       **THE COURT:**  Okay.  Why don't we do that.

15       And so, just to highlight what are the

16  general issues the Court was going to address today, I

17  had two issues identified.  One was the issue relating

18  to Plaintiffs' request for additional custodians.  The

19  parties wrote letters to the Court on that.

20       And then the other issue is the issue of I

21  guess a protective order, or the way I really

22  understood it was some protocol or method for sealing

23  documents on a going-forward basis so, you know, every

24  time you file a motion and want to seal something,

25  there aren't *ad hoc* motions filed and that we would

1   get some standards and the parties would be able to

2   refer to the standards or the protocol when they

3   wanted to seal something.

4          So it's sort of a wide open issue.  So

5   Mr. Aylstock, since you mentioned it, let me turn to

6   you, on behalf of the Plaintiffs.  And what are your

7   thoughts on a protective order or protocol for sealing

8   documents on a going-forward basis?

9          **MR. AYLSTOCK:**  Your Honor, with your

10  permission, Ms. Hoekstra has had some recent

11  conversations with Mr. Nomellini, and she may be --

12  with your permission, I'd like her to address that.

13          **THE COURT:**  Okay.  No problem.

14          Ms. Hoekstra, let me hear from you.

15          **MS. HOEKSTRA:**  Okay.  We've been discussing a

16  mechanism by which the parties would have a meet and

17  confer and determine whether documents that are sealed

18  pursuant to protective order each remain sealed due to

19  confidentiality issues or there can be a submission to

20  unseal them.

21          For example, we had some back and forth going

22  into the master complaint, and portions of those were

23  sealed, and then the issue raised itself again in the

24  Motion to Compel, and there are certain documents that

25  we had not --

1              **THE COURT:**  Ms. Hoekstra, let me just

2    interrupt you for one second because you're sort of

3    breaking up.  Are you on a speaker phone?

4              **MS. HOEKSTRA:**  I'm sorry, sir.  I'm actually

5    on a cell phone.  Can you hear me?

6              **THE COURT:**  Better now.

7              **MS. HOEKSTRA:**  Okay.  Sorry about that.

8              **THE COURT:**  There we go.

9              **MS. HOEKSTRA:**  I just was discussing with

10   Mr. Nomellini earlier today options for addressing

11   this issue which appears to be more ongoing than we

12   thought in terms of how we can not keep documents

13   permanently sealed following filing and how sometimes

14   with discovery issues that are ongoing at the moment

15   of filing, don't know if the other party will have an

16   objection to the materials that we're attaching to the

17   Court and are filing them under seal.

18              And our preference would be to not keep all

19   of those materials sealed permanently, just come up

20   with some sort of meet and confer process and a

21   process at which we moved to -- (inaudible) -- the

22   confidentiality within a week or so of the filing.

23              **THE COURT:**  Okay.  So maybe this is going

24   over my head.  So what you and Mr. Nomellini were

25   talking about was some method where, if both sides had

agreed something was confidential, you could file it,
and then there would be a mechanism later for the
Court to address whether the seal stayed on or not?

      **MS. HOEKSTRA:**  That is correct.

      **MR. NOMELLINI:**  Yes, Your Honor.  And to take
the burden off the Court, the initial filing would
occur -- let's say Plaintiffs filed a, you know,
Motion to Compel and there are various documents that
have been designated confidential.  They would
probably not want to disclose them to us, you know,
before they filed their motion and they might be
working on their motion until they've filed it.

      But after filing, what we would propose is
that the parties have a week to meet and confer about
what really needs to remain under seal and what
doesn't, and then within 10 days of the filing we
could provide a report to the Court about what, if
anything, needs to remain under seal or if there are
any disagreements between the parties.

      This kind of mechanism has been used in MDLs
and I think it's been effective.  And just please let
me know if I've misstated anything, but I think that's
the parties' understanding of what we would propose to
the Court.

      **MS. HOEKSTRA:**  Correct.  But the protective

1   order does address this generally in terms of the fact

2   that issues that might be -- (inaudible) -- should be

3   filed under seal and that there should be a process

4   within 7 days that there's been additional follow-up

5   with the Court.

6         We just want to finalize the mechanism in a

7   method that works best for the Court logistically and

8   make it clear whether it would be a statement of

9   unsealing rather than a motion or how the Court would

10   prefer we proceed with that aspect.

11   **THE COURT:**  Okay.  Just a couple of thoughts.

12   That seems workable.  It sort of jumps over the issue

13   of sealing.  And this has, you know, become just sort

14   of a hot topic in federal courts recently.

15         As y'all know, there's a standard simply

16   because the parties agree something is confidential.

17   You can agree that, you know, menu at a restaurant is

18   confidential, if you want.  It's a whole other story

19   if it's going to be filed on the docket and the Court

20   is supposed to, before we seal something, or at least

21   I guess seal something on a permanent basis, make a

22   determination.

23         So I guess what I'm hearing you saying is, a

24   motion is filed, obviously it would be a document that

25   you had designated confidential, you would file the

motion.   Preliminarily the document would unilaterally
be filed under seal pursuant to the order the Court
will enter covering all filings, and then it would set
out a time period for both sides to meet and confer to
see if you legitimately have a dispute.

If you don't and it turns out both sides say
there's no reason to keep this under seal, it would be
unsealed.  If, however, after your meet and confer --
there's two other possibilities -- one side says it
ought to remain sealed, the other side says not, or
both sides agree it should remain under seal, if
that's the result, then what happens and what gets
filed and how does the Court handle that?

**MR. AYLSTOCK:**  Good afternoon, Judge.  This
is Bryan again.  I've seen this happen, and I think --
I think what the attorneys are saying is there will be
a meet and confer process that a document was filed
under seal will remain under seal for a certain period
of time, maybe 7 days, 10 days, whatever the Court is
comfortable with.

The parties meet and confer after filing.  If
the parties agree, then by operation -- maybe by
operation of just court order under this and just put
unsealing is automatic.

If the parties both agree that it should be

1    under seal, then an unopposed motion or a joint motion

2    could be filed.  Or if the parties disagree, then the

3    party bearing the burden of keeping it under seal

4    would need to file a motion within a certain period of

5    time, so that only those cases where there's some

6    dispute or some agreement that it should remain sealed

7    would then have a motion.

8          I think I got that right, Mark.  If not, let

9    me know.

10         **MR. NOMELLINI:**  Yeah, I think that's correct,

11   Bryan.  And I don't know if there would be a motion or

12   a letter, but basically it would have the -- it would

13   have the same -- the same effect.

14         And I think you're correct, Judge, those are

15   the three possibilities, either the parties agree to

16   unseal it and inform the Court, the parties agree that

17   it should remain under seal and inform the Court of

18   their position, or the parties disagree and set forth

19   their respective positions.

20         And our proposal for the time frame of that,

21   just tentatively, was that the parties meet and confer

22   within 7 days of the filing and then, you know,

23   follow-up with the Court as to one of the three

24   options within 10 days.

25         **THE COURT:**  Okay.  And that may eliminate

1    some of the burden on the Court.

2         Now, as you know, in this case it hasn't

3    happened too much, but in other cases, you have

4    motions filed, there's documents that you want to

5    seal, you're filing a motion to seal, you're holding

6    back, you're waiting for the Court to grant the

7    motion, and it does become, from a filing perspective,

8    a fairly cumbersome process.

9         So, to me, this makes sense.  And although we

10   may end up having documents for some short, finite

11   period of time under seal that may not be subject to

12   sealing either because neither side ultimately wants

13   it sealed or because, in the unusual case, the Court

14   makes a determination down the road when you file your

15   request to seal it that it doesn't need to be sealed.

16        You know, just for your information, this is

17   an issue that courts are taking a look at and there

18   has been -- probably not going to change during the

19   course of this litigation, but there was actually

20   testimony presented I think to a congressional

21   committee by the judiciary essentially asking that the

22   judiciary have more latitude in sealing documents

23   because -- not to downplay the significance of this,

24   you know -- 95 percent of the cases, you know, we all

25   know the kind of thing that should be sealed.

1        You know, if you're going to file the formula

2   for Coca-Cola, you know, that's going to be sealed.

3   You know, some discussion in an email that you just

4   don't want a whole bunch of people to find out about

5   but it's not a big deal, that's not going to be

6   sealed.

7        So this makes sense.  So what I would ask the

8   parties to do is, if you would go ahead and actually

9   prepare a proposed order on this, I think we should

10  have a separate order on the docket.  And you can go

11  ahead and you can send it to me, that's not a problem,

12  and then I'll take a look at it and we can get that

13  entered on the docket.  And that will then be the

14  guide for how we're going to deal with the sealed

15  documents going forward.  And I think this sounds like

16  a reasonable solution.

17        Okay.  That takes care of that.

18        **MR. CERULLO:**  Judge, this is Attorney Thomas

19  Cerullo with Jerry Sullivan here in New Orleans.

20        **THE COURT:**  Yes.

21        **MR. CERULLO:**  -- (inaudible )-- Pensacola.

22  -- (inaudible) -- the criteria as to whether it should

23  be sealed or unsealed along with the proposal such as

24  is it related to admissibility or is it a --

25  (inaudible) -- and then we go on to discuss what's a

1  criteria -- (inaudible) --

2       **THE COURT:**  You're suggesting we should

3  include in the protective order some type of criteria;

4  is that what you're saying?

5       **MR. CERULLO:**  Yes, if the Aylstock group and

6  you all think about it, and perhaps that would

7  eliminate some problem down the line.  I don't

8  anticipate any problems -- (inaudible) --

9       **THE COURT:**  Well, let me throw that idea out

10  for discussion.

11       Ms. Hoekstra and Mr. Nomellini, do you think

12  there would be some efficiencies and benefits if, in

13  the protective order or the document that would govern

14  how this process works, that there's some criteria set

15  in there?

16       I mean, I guess you could put generic topics

17  that might or might not be subject to sealing.  But I

18  think it's sort of hard to pin down.  I mean, you

19  could say, if it involves a trade secret it would be

20  subject to sealing.  But even -- as you all know, you

21  can have a pretty healthy debate over what is or is

22  not a trade secret.

23       Ms. Hoekstra, let me ask you what are your

24  thoughts.

25       **MS. HOEKSTRA:**  Yes, Your Honor.  So what I

1    was going to start with was basically I think that the

2    mechanism that we have where everything is sealed and

3    then the meet and confer happens resolves a lot of

4    concern about whether or not it should.

5            A lot of these decisions in terms of

6    confidentiality, in all honesty, are situational

7    and/or dependent on, you know, the fact pattern that

8    goes along with the purpose.  There are certain

9    documents that would automatically be, you know,

10   considered confidential, and the meet and confer

11   should be fairly short in that situation.

12           -- (inaudible) -- there are a large volume of

13   documents that, while they may be confidential in

14   terms of production in this litigation, are not

15   necessarily confidential -- (inaudible) -- and that's

16   the discussion that happened between the parties --

17   (inaudible) -- ground rules -- (inaudible) -- why

18   we're leaning towards the meet and confer process as

19   opposed to just a motion practice about sealing or

20   unsealing the document.

21           **THE COURT:**  Yeah.

22           **MR. AYLSTOCK:**  And Your Honor --

23           **THE COURT:**  Yes, Mr. Aylstock, go ahead.

24           **MR. AYLSTOCK:**  I'm sorry, I didn't mean to

25   interrupt.  I was just going to suggest that it is

1    sort of a know it when you see it thing.  I think the

2    law is pretty clear and restrictive and, in my view at

3    least, as to it really needs to be a trade secret, not

4    just an embarrassing document or so forth.

5         **THE COURT:**  Right.

6         **MR. AYLSTOCK:**  Or a document that the

7    Defendants may not want out in the public.  It needs

8    to be a trade secret.

9         I think the meet and confer process would

10   help.  And then, if there's a dispute, the Court can

11   give guidance based upon some specific review of the

12   documents, and then I'm sure there will be some

13   disputes early on.  And once everybody knows the

14   ground rules from the Court's interpretation of what

15   the law is, then it's a lot easier for us all to

16   follow at the meet and confer.

17        **THE COURT:**  Yeah.

18        Mr. Nomellini, what's your view on that?  Do

19   you agree with Mr. Aylstock on that in terms of it

20   should really not be -- we shouldn't go through the

21   effort of trying to categorize what documents may or

22   may not fall into the sealing versus unsealing

23   category and allow the meet and confer process to sort

24   it out and, you know, when -- if and when you have

25   reached the point you have a disagreement, it's

1    presented to the Court, the Court makes a pretty fast,

2    pretty quick determination on whether it's subject to

3    being sealed, and then the Court's determination on

4    that really guides what's going to happen down the

5    road?  Do you agree with that?

6          **MR. NOMELLINI:**  Yes, Your Honor, I agree.

7    And, you know, for example, I think if you took any

8    given brief and I was to hop on the phone with

9    Jennifer Hoekstra right now and sort of march through

10   it, I think we'd make quick work of it, and I think

11   that the meet and confer process will be helpful in

12   that regard.

13         **THE COURT:**  Okay.  Well, I agree, so let's do

14   that.

15         And then when -- do you think later this

16   week, by the end of the week, you can get a proposed

17   draft of an order that would put some flesh on the

18   bones on the timing and the procedures on this?

19         **MR. NOMELLINI:**  Yes, Judge, I can do that.

20         **THE COURT:**  Okay.  Why don't -- since we have

21   a case management conference on Friday, why don't we

22   see if we can get it filed before Friday.

23         **MR. NOMELLINI:**  Will do, Your Honor.

24         **MR. AYLSTOCK:**  That's definitely doable,

25   Judge.

1      **THE COURT:**  Okay.  Now, that turns us to the

2   more substantive issue of the custodians.

3          Has Mr. Buchanan or anyone else from the

4   Seeger Weiss firm joined us?

5      **MR. BUCHANAN:**  We're on, Your Honor.  I

6   apologize.  I think we thought it was just the sealing

7   issue, but we're here.

8      **THE COURT:**  That's no problem.  Okay.

9          So I do have the letters from the parties

10  with regard to custodians.  And since the Plaintiffs

11  are the ones that want to additional custodians, what

12  I probably would like to do is turn to the Plaintiffs

13  and really go through these -- there's only a handful

14  of them -- custodian by custodian, because I think

15  their situation among the custodians is really very

16  different.

17         You are seeking to add them for different

18  reasons, so there may be different arguments.  And the

19  way I look at it, I guess there are -- am I correct --

20  about six additional custodians you wanted to add?

21     **MS. AMINOLROAYA:**  Yes, Your Honor.  This is

22  Parvin Aminolroaya from Seeger Weiss.

23         Yeah, there are six additional custodians,

24  two of which we identified early on in September, and

25  four that we've identified I guess over the last

1  several weeks as we've been digesting -- (inaudible)

2  -- charts that were just produced to us in Defendant's

3  document production.

4       **THE COURT:**  Okay.  Well, why don't we start

5  with -- in no real order, how about Gary Warren.

6       So he is an individual that you would like to

7  add and, as I understand it, Mr. Warren was the former

8  president of Aearo North America, left a long time

9  ago.

10       So tell me why you think he would be someone

11  who would have responsive documents and then I'll hear

12  from the Defendant on Mr. Warren.

13       **MS. AMINOLROAYA:**  Sure.  So -- and that's --

14  as a threshold matter, my understanding is that

15  Defendants don't have -- I guess "strong" is not the

16  right word.  But they are at -- so they have produced

17  some files related to Mr. Warren.

18       I don't think they strongly dispute

19  Mr. Warren's relevance.  I mean, they may have some

20  objection to him.  I haven't really heard it from

21  them.  But I think generally we agree that Mr. Warren

22  was a significant player, especially during the early

23  years of Aearo, and you see him in the documents, and

24  we've submitted a couple of these for the Court's

25  reference, interacting with individuals of the

military and, in particular, you see this in notes
that Mr. Moses brought to his deposition with him.
Again, we recall last week the deposition of -- a
30(b)(6) deposition took place, Mr. Moses was the
designee, and he brought those to the deposition with
him indicating that Mr. Warren was someone who was
responsible for communications with the government
regarding the Combat Arms Earplugs.

And so, we've come across a number of
communications where Mr. Warren is involved in
significant discussions with the government, and we
believe that will be particularly important for us to
have those communications as a general matter, but
also because he's from this very early time period
where we don't have a lot of communications from that
time period.  So he would be critical to filling in
gaps in time periods that we have in the case.

**THE COURT:**  Okay.  Let me stop you there and
go to you, Mr. Nomellini.

I think that's probably a correct
characterization.  I don't get the feeling that you
have a strong objection to adding Mr. Warren.  You
know, this is not some apex individual that was at
30,000 feet.  He was probably involved to some degree.
As to what, I don't know, and the other side doesn't

1     know at this point.  But he may have had some

2     involvement early on in the pre-2008 period with the

3     government.

4            And I guess you've agreed, am I correct, to

5     produce some of his documents which you had preserved

6     from the *Moldex* litigation?

7            **MR. NOMELLINI:**  Your Honor, with your

8     permission, Karl Gunderson will address this on our

9     side.

10           **THE COURT:**  Okay.

11           **MR. NOMELLINI:**  -- (inaudible) --

12           **THE COURT:**  Okay.  Mr. Gunderson, let me hear

13    from you.

14           **MR. GUNDERSON:**  Yes, so, you're correct, Your

15    Honor, in that we have about 50,000 documents that

16    were preserved in 2008 actually in connection with

17    other litigation, not the *Moldex* action --

18    (inaudible) --

19           And I think we would just agree with the

20    characterization of his role as a general matter.

21    But, you know, as is indicated, we have all agreed I

22    think to add the 50,000 documents that we do have to

23    the TAR protocol.  And I don't know -- (inaudible) --

24           **THE COURT:**  Yeah.  So let me ask this:  So

25    you have those documents, it sounds like you're --

1    reluctantly, but you're going to include in the TAR

2    corpus, and that's because -- the reason you have the

3    documents is because you had a hold in other

4    litigation.

5          But I guess the delicate question I'm going

6    to ask is, what was the hold because you could have a

7    hold -- I don't know, maybe someone had a contract

8    dispute about something and you put a hold pre-2008;

9    or would the documents in general that were on hold,

10   would they be the type of documents that would be

11   relevant to this case, the MDL?

12         **MR. GUNDERSON:**  As you can imagine, Your

13   Honor, the recordkeeping from 12 years ago is not what

14   we might want it to be.  They weren't keeping records

15   for -- (inaudible) --

16         So, to be honest, at this point, I don't

17   know.  I haven't been able to pin down exactly what

18   that prior litigation was.

19         **THE COURT:**  Oh.

20         **MR. GUNDERSON:**  That said, my understanding

21   is that his email -- all the emails that existed for

22   him at that time was collected.  It wasn't a sort of

23   (inaudible) -- of only certain relevance, but it was

24   sort of the emails that existed for him at that point

25   in time.

1      **THE COURT:**  Okay.  So you believe there was

2  whatever was the email system at the time when a hold

3  was placed on it based on the prior litigation, there

4  was a fairly broad preservation and collection done.

5  So whatever email at least he had back in that time

6  frame probably is collected and is probably within

7  that 50,000 documents?

8      **MR. GUNDERSON:**  That is our understanding,

9  yes.

10     **THE COURT:**  Okay.  So that, in my view,

11  really takes care of that issue.  So, to the extent

12  you needed a court's ruling on that, then I would

13  grant, to the extent it has not already been produced,

14  that the Defendant include in the corpus that you're

15  using the TAR tool on the previously collected

16  documents of Mr. Warren.

17     Now, before we move on to another custodian,

18  let me ask the Plaintiffs.  Is there some concern here

19  that there may be other ESI relating to Mr. Warren

20  that wasn't captured in that prior collection that, in

21  some way, now could be collected?

22     **MS. AMINOLROAYA:**  Yes, Your Honor.  You

23  actually anticipated what I was about to say.  So I

24  think one area that causes us concern is that -- we

25  appreciate that the emails were under a litigation

1   hold and that we just learned that they would be -- or

2   late last week we learned that they would be added to

3   the TAR corpus.

4        But one area that we really don't have

5   visibility into and that we haven't yet seen

6   information from on 3M is the extent to which any

7   common folders within 3M or Aearo represent all

8   SharePoints or shared folders or shared systems might

9   have information relevant to Mr. Warren and very

10  relevant to this case, not just relevant to

11  Mr. Warren.

12       We don't know whether anything like that

13  exists and whether it can be searched.  So that's a

14  critical piece of this, gaining that understanding.

15       **THE COURT:**  Okay.  Let me go back to you, Mr.

16  Gunderson.  I know this was mentioned in one of the

17  letters about the possibility of looking at

18  SharePoint.

19       I guess there's two questions:  One, did

20  Aearo even have SharePoint back before 2008?  But, if

21  so, if there is SharePoint folders, are you aware of

22  any way within reason that you can search SharePoint?

23       **MR. GUNDERSON:**  So let's take those two

24  questions.  Our understanding is that Aearo did not

25  use SharePoint at that time.  So, you know, again, I

1    wouldn't want to rely on that representation too much
2    because it's -- (inaudible) --

3         But we have looked at the ability of our, you
4    know, technical team to run sort of custodial searches
5    for individuals or, you know, really over all the
6    SharePoint sites who are -- (inaudible) -- that
7    existed or individual custodians.  And we were not
8    aware of the ability to do that.

9         That said, the core custodians are -- you
10   know, three or four other custodians are -- have
11   agreed to and are collected from, to the extent
12   possible -- when they do identify sets of relevant
13   materials from shared resources.  We are endeavoring
14   to collect those, you know, targeted sets of materials
15   and adding them to the TAR or, you know, doing a
16   linear review of those documents.

17        **THE COURT:**  So maybe that went over my head.
18   Are you saying that you believe with SharePoint and
19   shared systems there is a way to make a reasonable
20   examination to collect that information, or are you
21   saying that you've not yet figured out that that can
22   be done?

23        **MR. GUNDERSON:**  Apologies for the confusion.
24   No.  We've asked our team, and they are not aware of a
25   way to reasonably do that, in a general sense.  But to

1    contrast that, for your other custodians, if somebody

2    identified a particular folder that is likely to

3    contain responsive materials, at that point our team

4    can go in and can collect those materials.  But we

5    can't run a search of all of the universe of shared

6    resources for a particular custodian.

7         **THE COURT:**  Okay.  So you can go in -- if

8    there was custodian Joe Smith, you then might be able

9    to go into the system and see if there's responsive

10   ESI, but in general you cannot go into SharePoint or

11   similar collaborative systems and do a general search

12   and collection; is that what you're telling me?

13        **MR. GUNDERSON:**  Correct.  So if Joe Smith

14   says, you know, *Here is folder X, I think it contains*

15   *relevant information,* we would collect folder X.  But

16   there's no sort of Google across the systems where you

17   can plug in "Joe Smith" and get all of the documents.

18        **THE COURT:**  Right, right.

19        Let me ask the Plaintiffs, do you have any

20   different view on that?  And this is, you know, sort

21   of an area that is very problematic in e-discovery is

22   looking through SharePoint and things like Slack and

23   that kind of thing, it is a bit of a challenge.

24        Do you have a different view on that?

25        **MR. BUCHANAN:**  Your Honor, this is Dave

1   Buchanan.  I just think with regard to SharePoint, it

2   depends what type of information you're seeking to

3   extract from the SharePoint.

4          And SharePoint, as a name, I think has a

5   number of different kind of offerings within it.  At

6   its most basic level, SharePoint can be used by a firm

7   to organize -- it used to be just a shared network

8   folder, so it may just be a document repository.

9          In that sense, it's my understanding that, if

10  the shared folder was identified as attributable to

11  Mr. Warren, for example, the Defendants, as part of

12  their custodial sweep, would capture Mr. Warren's

13  shared folder from its network share.

14          **THE COURT:**  Okay.

15          **MR. BUCHANAN:**  As it relates to other

16  information in a SharePoint, you know, you could have

17  chats going, you could have texts going.  SharePoint,

18  I think, can also be searched, my understanding, as a

19  structured data source.  But it depends on what

20  portion you're looking for within SharePoint.

21          So I think the Plaintiffs were principally

22  doing SharePoints, based on the 26F conference we had

23  with the Defendants, as a shared folder analog.  And

24  so we were hoping, to the extent there was a shared

25  folder attributable to Mr. Warren or, you know, to the

1    extent we have hard copy documents, you know, and

2    maybe they've put them into, you know, Iron Mountain

3    or something, that would be considered, you know,

4    within his custodial file for purposes of the

5    Defendant's review and their responsiveness.

6         **THE COURT:**  Okay.  Mr. Gunderson, let me go

7    back to you.  I do understand what Mr. Buchanan just

8    said, and I think that's what you were attempting to

9    tell me.

10        So if -- and we're just focusing right now on

11   Mr. Warren.  So, to the extent Mr. Warren had a folder

12   and that folder happened to be in SharePoint, you

13   could see if there's a folder.  But in terms of doing

14   a general search throughout the entirety of SharePoint

15   for all "Warren" documents that would not specifically

16   be identified in a Warren folder, that's something

17   that either you can't do or you are saying is so

18   difficult to do it's not reasonable.

19        Is that a fair recitation of your position?

20        **MR. GUNDERSON:**  In general, yes.  I think

21   there's, you know -- (inaudible) -- Mr. Buchanan --

22   (inaudible) --

23        There are shared network resources that, in

24   my mind at least, I don't consider SharePoints.  And a

25   number of our custodians that do have, you know,

1    individual shared network folders that we do collect
2    as a matter of course for custodians.
3           For example, for Mr. Warren, who left so long
4    ago, that I honestly don't know if there's --
5    (inaudible) -- shared folders existed at that time.
6    But at this point in time, we don't have data from a
7    shared folder like that for him.
8           When I think of SharePoint, I think more of
9    their -- and this is beyond my technical knowledge,
10   Your Honor, but my understanding is, you know, there
11   are multiple ways to organize SharePoints, and
12   different teams can have their own SharePoints or, you
13   know, different departments can have their own
14   SharePoint.
15          And so when I say, you know, there isn't the
16   ability to search SharePoint for a particular
17   custodian, what I really mean is, you know, within the
18   3M universe there may be hundreds or thousands or tens
19   of thousands of different SharePoints that exist, and
20   there's no way to sort of search all of those to see
21   where there might be data for a particular custodian.
22          **THE COURT:**  But, nonetheless, back to the
23   folders, you can, am I correct, look in these
24   SharePoint or other collaborative systems that might
25   have been used, although we're back before 2008, so

there probably wasn't much available.  But in any
event, you are able to make an effort to identify
whether there are designated folders within which you
can look and you can also make inquiry, as
Mr. Buchanan suggested, as to whether there are any
identifiable folders that might be in hard copy?  You
know, maybe there's a Warren folder and it was stored
somewhere.  I mean, is there a way to identify that?

**MR. GUNDERSON:**  Yes, that's entirely correct
with the hard copy documents, we have a way to search
in that repository of all of the custodians who sent
boxes to Iron Mountain for long-term storage, and we
have been, as part of our process, searching those
materials for all the custodians and have searched
those materials for these disputed custodians as well.

To sort of go back for a moment, while it is
possible where we know of a particular, you know,
shared folder environment sort of shared drive
environment to look for individual custodial files
there, then my understanding is there are multiple
shared folder environments within 3M as a company at
large.

And I just want to be clear that at this
point we are not attempting to and don't believe it's
reasonable to search every possible shared sort of

1  folder scenario or, you know, a potential subfolder

2  related to an individual.

3        When we become aware of a particular

4  relevant, you know, sort of shared folder environment,

5  then we do analyze that for -- (inaudible) --

6  materials.

7        **THE COURT:**  Okay.  You know, I don't know how

8  -- you say it's something you can't do.  I don't know

9  that one way or the other.

10        Have you all shared information with Mr.

11  Buchanan as to the extent of their shared environments

12  that you would have to look within for folders and

13  what you've done and what you've been able to find?

14  Has that information been shared with Mr. Buchanan?

15        **MR. GUNDERSON:**  We have been sharing with Mr.

16  Buchanan the general sort of shared repositories of

17  information that we've become aware of along the way.

18  And Ms. Six, who was in my role before me, had a

19  number of communications with the Plaintiffs on that

20  front, and we are continuing to update Plaintiffs sort

21  of as we go and as we learn additional information.

22        **THE COURT:**  Okay.

23        **MR. BUCHANAN:**  Your Honor --

24        **THE COURT:**  Yes, Mr. Buchanan, go ahead.

25        **MR. BUCHANAN:**  There's a point or two that's

1    percolating on that, and we have some follow-up with

2    the Defense on it.

3           Within the first 30(b)(6) notice for some

4    IT/data source topics that has, from Plaintiffs'

5    perspective, become increasingly important that we

6    get, if you will, company testimony on.

7           And, you know, it's not uncommon, obviously,

8    as Defense counsel digs in deeper or even Defendants

9    dig in deeper, they find certain things and become

10   aware of certain things.  There is just -- there are a

11   few areas -- and it would be premature for me to get

12   into detail with Your Honor on it, but we do require

13   additional information on shared data sources,

14   snapshots that were done probably in the 2007 window.

15          We have learned of some lost data due to

16   various reasons over time.  And if for no reason other

17   than just to see what we can do to do our best to get

18   the best we can with what's available, there's -- you

19   know, we've had discussion or at least some written

20   exchanges going back and forth with the Defense to try

21   and fix a date in the very near term -- I think my

22   email on Friday said within two weeks -- to get a

23   witness on those topics.

24          So, to the extent we can't agree between now

25   and Friday, it may be something we need to bring up to

1   Your Honor just so --

2        **THE COURT:**  Yeah.  Well, in my view, there

3   are two -- and there's probably more than two -- but

4   two ways to handle it.  You know, one would be, as you

5   say, to find a 30(b)(6) witness who could talk about

6   it.  I just don't know how complicated it is.

7        The other way is, to the extent this is not

8   that complicated but, in fairness, the Plaintiffs need

9   to have more information, the Defendant could provide

10  a declaration, essentially, an affidavit from what

11  essentially would be a company representative

12  describing the system, the shared environments, and

13  putting a little more flesh on the bones, which would

14  do one of two things:  Either the Plaintiffs would see

15  that and realize the challenge and have more

16  information, be able to make a choice as to whether,

17  at least from the Plaintiffs' perspective, you think

18  pursuit of ESI, if there are some avenues to find some

19  further information, whether that, in your view, is

20  reasonable and is proportional.

21        But at least you'd have information to, on

22  your own, make that determination.  And then, if you

23  were to determine there was a dispute between each

24  side on that and it had to be presented to the Court,

25  then I would have information that I could use to make

1   an assessment of really how accessible, if at all, you

2   know, this information is.

3            So you're talking about -- you're going to

4   talk further with the Defendant, you're talking about

5   a 30(b)(6) witness.  What about simply getting a

6   declaration?

7            **MR. BUCHANAN:**  We had some preliminary

8   discussions about that, Your Honor, in September.  And

9   it's -- you're correct, Your Honor, that indeed we

10  would definitely want, you know, something from the

11  Defendants on this rather than from counsel, just to

12  ensure that --

13           **THE COURT:**  Right.

14           **MR. BUCHANAN:**  -- you know, we have obviously

15  the full commitment of the Defendant to whatever is

16  written there.

17           But the concern that arose is that I felt as

18  though Plaintiffs couldn't do that without waiving the

19  potential need for a further examination of somebody

20  from the company if there were holes or gaps or need

21  for further information.

22           So that was the reservation that the

23  Plaintiffs had proposed.  Yeah, we'd be happy to take

24  that route in the first instance so long as, if there

25  were questions, recognize we may need to still talk to

1   the declarant or to an appropriate witness on that so

2   we have the full information.

3         So that was really where we left it.  And due

4   to some events that I think would be premature to

5   really discuss with Your Honor on the call, in the

6   last few weeks became increasingly concerned about not

7   having sworn testimony as to the existence or not of

8   information from earlier points in time.

9         So I'm happy, certainly, to proceed with a

10  written statement so long as it was not, you know,

11  eliminating our potential to seek an examination, to

12  the extent there were unresolved points.

13       **THE COURT:**  Well, let me ask the Defendant,

14  Mr. Gunderson, would -- you know more about the

15  system, obviously, than Mr. Buchanan, certainly a lot

16  more than I do.

17       In your view, is this the kind of thing where

18  information that you believe you could adequately

19  explain in a declaration that would be provided to the

20  Plaintiffs?

21       **MR. GUNDERSON:**  I think that -- I think that

22  route is better for a variety of reasons, most likely,

23  to the extent that I think one of the issues that's

24  come up in a lot of our meet and confers is the sort

25  of talking past each other in terms of what is it that

1    we're really interested in.  Whether it's, you know,

2    differing definitions of SharePoint, differing

3    definitions of "snapshot" or whatever the case may be,

4    it's just difficult to make sure that we're on the

5    same page and even talking about the same thing during

6    some of those conversations.

7           And so, you know, I think that a declaration

8    could be helpful.  I think a declaration tied to sort

9    of the topic that Plaintiffs are most concerned about

10   as opposed to just, you know, a general statement

11   about, you know, the systems that the company uses is

12   likely to be productive and advance the ball further.

13           **THE COURT:**  Okay.  You know, the --

14           **MR. GUNDERSON:**  -- (inaudible) --

15           **THE COURT:**  Yeah.  You know, the one problem

16   with a declaration -- that's why I'm asking if you

17   think you can explain it in a declaration.  If the

18   declaration raises more questions than answers, then,

19   you know, Mr. Buchanan would have a pretty good

20   argument to say, you know, just give us a

21   representative and let this person describe the

22   system.

23           You know, and I recognize the problem with IT

24   is -- I don't know if there's any IT people on the

25   phone.  I don't mean this in a bad way.  But, you

1    know, IT people tend to be very myopic, and they know

2    about their little piece of the puzzle, and they don't

3    know about all of the pieces of the puzzle.

4         And an electronic -- ESI system from -- I

5    don't know about 3M or Aearo, but I suspect that it

6    changes, it improves, but there are segregated pieces

7    to it, and there normally isn't just one human being

8    whose job is '*I'm in charge of everything*.'

9         So when you present a 30(b)(6) witness, it

10   truly is someone who is going around, who is

11   investigating all the pieces, and he or she becomes

12   the spokesperson that ties it all together, you know.

13   If you can accomplish that in a declaration or maybe

14   more than one declaration then, you know, maybe that

15   would work.

16        So let's do it this way:  Why don't you go

17   ahead and, with regard -- and this will morph over

18   into the other custodians because one of the issues on

19   the other custodians we're going to talk about is you

20   don't have any information for them -- or that's

21   certainly the position of the Defendant.

22        I would like there to be a declaration given

23   by the Defendant explaining the electronic filing

24   system, if that's the correct word, for the relevant

25   periods of time.  And as to Mr. Warren, that would be

1    the period of time where Aearo was in existence, and

2    this would be pre-September of 2008.

3         And what, Mr. Buchanan, would be a relevant

4    starting point?  Where is the time frame that you

5    would focus on that you would want if there were

6    relevant documents and to know about how documents

7    were maintained?

8         **MR. BUCHANAN:**  For Mr. Warren, who has been

9    implicated in documents for early 2000, given his

10   level of seniority, it would not surprise me that he

11   would have been involved in discussions concerning

12   licensing the ISL technology or the filter technology

13   in the late '90s but, you know, I just don't know

14   that.

15        So it would probably, to the extent -- I

16   would think, though, that that information would have

17   carried forward in time, whatever information he had

18   on his email, his email servers, or whatever

19   information he had in shared folders.  To the extent

20   we can get a good picture of that as of 2008, I think

21   that would really help us know what should be

22   available or where we should be searching.

23        **THE COURT:**  Okay.

24        **MR. BUCHANAN:**  It would surprise me if his

25   information didn't migrate.

1         **THE COURT:**  Okay.  That probably makes sense.

2         So, Mr. Gunderson, the focus of the

3 declaration explaining Aearo/3M's systems will be up

4 to the time that Mr. Warren left, which I guess is

5 September of 2008.

6         So what Mr. Buchanan needs to know is how the

7 systems were maintained, what shared systems there

8 were for Aearo that could have potentially had

9 Mr. Warren's documents on it, and explain that in a

10 declaration of one or more individuals -- hopefully

11 it's one person can explain it.

12         And then Mr. Buchanan will have a better idea

13 -- I'm not saying that you haven't explained some of

14 these things to him, but then he'll have something he

15 can rely on.  You all then can discuss it.  I'm sure

16 Mr. Buchanan will have questions.  You can respond to

17 that.

18         But in short order, if that does not prove

19 adequate, then, Mr. Buchanan, you could then request

20 the next step of a 30(b)(6) witness on these issues.

21 And if it's something that the Court has to intervene

22 on and resolve, I can do that.  But let's see if the

23 declaration answers the majority of the questions.

24         **MR. BUCHANAN:**  Thank you, Your Honor.  And

25 just one nuance, if I could put out there, that

1    because we're in an acquisition setting, it's been my

2    experience, Your Honor, and probably the same as you

3    have, that when a company is acquired, you know, often

4    there's an information transfer and assimilation to

5    the new firm.

6         And obviously, to the extent data is

7    migrated, you know, the system that it was migrated

8    into would be a very relevant consideration because

9    that might be where we would go to look to find this

10   information.

11        Belatedly, most companies at the point of

12   time of a merger or before migrating systems will

13   snapshot the old systems before they bring them into

14   the new system.  And so I would ask that, whatever

15   person is addressing this for the Defendant, address

16   the existence or not of any relevant data snapshots at

17   the time of transition.

18        **THE COURT:**  Okay.  I think that would be

19   helpful so we're focusing really on three things:  The

20   declaration would address the Aearo systems, what is

21   there; secondly, whether at the time of the merger

22   whether whatever was there, there was a snapshot; and

23   then, if so, into what 3M system that ESI would have

24   been migrated.

25        Mr. Gunderson, is that something that sounds

1    doable or is that going to be a challenge?

2         **MR. GUNDERSON:**  Your Honor, that does sound

3    doable, I mean, with the one caveat.  You know, we

4    will do our best to get our answers to these

5    questions.  Considering how long ago this was, the

6    number of iterations for software that's likely to

7    take place over time, you know, we will do our best to

8    get answers to these questions.

9         But some of the questions may be difficult to

10   get precise answers, especially before, you know, the

11   2008 period.  My understanding is that Aearo --

12   (inaudible) -- 3M -- (inaudible) -- different email

13   systems, for example.  And we'll try to keep those

14   together, to the extent we can, for Mr. Warren.

15        So my understanding for him in particular is

16   that he left the company before transitioning as a 3M

17   employee, and so that sort of transition period is not

18   as applicable to his data precisely -- (inaudible) --

19        **THE COURT:**  Okay.  You sort of trailed off.

20   I didn't hear you at the end.  But if what you're

21   telling me is there's no guarantee when you look at

22   email systems pre-2008 that you're going to be able to

23   identify everything, I do recognize that.

24        And remember the standard here is under the

25   circumstances to make a reasonable inquiry.  And so

1  long as you make a reasonable inquiry into the systems
2  that were in place, whether they were captured at the
3  time of the transfer and then, of course, you should
4  be able to provide information as to into what system
5  of 3M the Aearo data was migrated to.  You should know
6  that, I would think, even though that may go back a
7  while, but there should, I assume, be some information
8  on that.

9       **MR. GUNDERSON:**  Correct.  Especially as it
10  relates to email, we have that time period --
11  (inaudible) --

12       **THE COURT:**  Okay.  Okay.  So that's on
13  Mr. Warren.  So on Mr. Warren, just so we have a clear
14  view of what the Court is saying, first the Plaintiffs
15  are entitled to designate Mr. Warren as a custodian,
16  and the Defendant will be required to make a custodial
17  collection, to the extent it can, of Mr. Warren's
18  email and other ESI, and agrees to add that to the
19  corpus.

20       And in addition, the Defendant will provide a
21  declaration to the Plaintiffs describing the email
22  systems that were in place at the time of Mr. Warren's
23  departure from the company, whether snapshots of the
24  data was taken before the transfer, and then into
25  which 3M system the data was migrated to.

1          Now, let's briefly talk about the other

2   custodians.  And I guess there's two issues on them.

3   The Defendant is taking the position that they

4   shouldn't be required to make a further custodial

5   search, and then there's also the issue of I believe

6   the Defendants have said that for some of these other

7   custodians, the same situation, they don't have any

8   documents because they weren't maintained because they

9   were not preserved.

10          So first let's talk about the other

11   custodians of whether they should be included as

12   additional custodians, and then, if I determine they

13   should, let's talk about whether there is any data

14   that can be collected.

15          So let me go back to the Plaintiffs.  And who

16   were the other custodians that Plaintiffs took the

17   position should be included in the custodial

18   production?

19          **MR. BUCHANAN:**  There are two of the remaining

20   three, Your Honor, that I'd say a similar relevancy

21   argument.  In the mid-2000s -- it's Mike Harrison and

22   Tom Thompson.

23          **THE COURT:**  Okay.

24          **MR. BUCHANAN:**  And they were regional -- they

25   were two of three regional sales representatives at

1    Aearo Corporation continuing into 3M.

2          In the mid-2000s, Aearo formed a military

3    strategic business unit.  The military strategic

4    business unit was -- (Inaudible) -- at least reported

5    to Mr. Warren.  It had a leader in Mr. Cimino

6    *[phonetic]*, and it had a sales function, a marketing

7    function, and it had a business development function,

8    each with heads.  So we now have agreement they're

9    going to produce this for us.

10          But there were three regional sales

11   representatives that canvassed the relevant territory

12   and had the communications with whatever accounts they

13   were calling on.  And again, this was a military

14   strategic business unit.

15          We think Mr. Harrison and Mr. Thompson are

16   squarely relevant custodians.  I think the Defendants

17   even identified one of them in their -- (inaudible) --

18   responses, their most recent -- (inaudible) --

19   responses as an individual who has such knowledge.

20          And so it comes down to, I don't know, as we

21   hear it, you know, a suggestion of maybe they've

22   already produced something from sales and we're going

23   to get coincident documents from them.  But we think,

24   because of the -- (inaudible) -- that we agreed to

25   here with -- (inaudible) -- the duplication of

1  information, to the extent there's duplicate

2  information, really all we're going to get is unique

3  information from these individuals.

4        And we think, frankly, it's quite important,

5  given the defense the Defendants are articulating, to

6  make sure we're capturing the custodial files of the

7  regional representatives which were calling on whether

8  it be audiologists or clinics or other military

9  facilities throughout the country.

10        **THE COURT:**  Okay.  Let me stop you there.

11        Mr. Gunderson or Mr. Nomellini, let me hear

12  from you.

13        **MR. GUNDERSON:**  Our position, with respect to

14  Mr. Harrison and Mr. Thompson, is not that they, you

15  know, don't -- you know, might not contain any

16  relevant data.

17        I think our position is that, you know, from

18  our perspective, especially through the meet and

19  confers where Plaintiffs, you know, didn't identify

20  for us any particularly, you know, unique documents

21  related to them, it is not clear to us why, you know,

22  the addition of these two individuals would yield any

23  unique, you know, information that isn't already

24  covered by the third sales representative for which we

25  are already producing.

1        **THE COURT:**  So, I mean, that's the issue,

2   whether we're really looking at duplicative

3   information or whether the data in some way is or

4   might be independent of the data already produced

5   relating to the other sales representative.

6        And I'll be candid with you, it seems to me

7   that this would tend to -- I agree there will be some

8   duplicative data, but I think this is an area where

9   there really may be some independent ESI data

10  generated by these two individuals because they did,

11  from what I can tell, have an independent role with

12  the judiciary and were involved in marketing.

13       And I'm not sure this is the kind of

14  situation where you can just say, if you've captured

15  one, you probably have the same information the second

16  and third sales representative would have.

17       So I am inclined -- and I know this will

18  involve two other custodial collections.  I'm inclined

19  to require the Defendant to collect the data for

20  Harrison and Thompson and to -- I guess that would be

21  added to the corpus for the TAR tool.  But let me go

22  on to the second issue.

23       Is there an issue here with regard to the

24  Defendant, Mr. Gunderson, taking the position that,

25  even if you are required to collect and produce

1    Harrison and Thompson ESI data, it was not preserved?
2    In other words, do you have data going back to when
3    they worked with the company?

4           **MR. GUNDERSON:**  My apologies, Your Honor.
5    That is correct, we have conducted a reasonable
6    investigation of, you know, our email systems, our
7    hard copy long term storage systems and, you know, the
8    other sources that the company sort of maintains on a
9    custodial basis, and we have not identified custodial
10   documents for either of them.

11          Though, I believe as we did note in our
12   letter brief, there is data, you know, in our TAR
13   protocol already with respect to these individuals
14   that was collected, you know, from other individuals
15   from their custodial files, to the extent, you know,
16   that data is all being added to the TAR protocol and
17   is being reviewed and produced sort of via that
18   process.

19          **THE COURT:**  Okay.  Mr. Buchanan, so does this
20   now -- because I'm ruling that you are entitled to the
21   data from Harrison and Thompson.

22          Does this bring us back to the situation of
23   you need to get some explanation as to the systems, or
24   is this simply an issue where their systems would have
25   custodial files but they don't have it simply because

1    it wasn't preserved?

2         **MR. BUCHANAN:**   Yes.   And this goes to really

3    the other issue, the issue that I alluded to earlier,

4    Your Honor.   When we had our 26(f) conference, it was

5    our understanding from the conference that there was a

6    snapshot of the group-wide server, which was the email

7    server that was used, among other systems from the

8    time of the transition.

9         We, I'll say, learned -- and there may be a

10   dispute with the Defendants in whether we should have

11   been learning it last week or whether we should have

12   understood differently at an earlier point in time.

13   But we learned, from my perspective, that there is not

14   a snapshot of the group-wise server that is a general

15   one or maybe not a snapshot of other things.

16        I think maybe, if the Defendants did some

17   broader looking, there may be things because most

18   companies tend to keep them for various reasons.   But

19   at this point that's what we were told.

20        And that's what was accelerating my desire,

21   frankly, to get sworn testimony on this kind of Aearo

22   issue for this transition issue because we're

23   identifying gaps in documents and -- (inaudible) --

24   and that's one of the reasons we wanted all three is

25   to try and fill out this picture in a more

1    comprehensive way.

2          **THE COURT:**  So I'm curious, why --

3    Mr. Gunderson, why did you have data on one of the

4    sales representatives but not the other two?  Is there

5    a reason for that?

6          **MR. GUNDERSON:**  I would need to check into

7    that.  I don't know if it is the case that the third

8    representative was just at the company longer.  I

9    think, as we -- (inaudible) -- you know, Mr. Harrison

10   left in 2011 and Mr. Thompson left in 2010.  Both of

11   those individuals, you know, left prior to the first

12   *Moldex* litigation and certainly prior to the second

13   *Moldex* litigation on other issues that arose later on.

14          So, at this point, I'm speculating, to be

15   honest.  I don't know why we had data for the third

16   sales representative, but I do know that we have

17   conducted a similar search for Mr. Harrison and

18   Mr. Thompson and had not located any such data.

19          **THE COURT:**  When did the merger take place,

20   what year, do you know?

21          **MR. GUNDERSON:**  I believe it took place in

22   2008.

23          **THE COURT:**  2008, okay, that's what I

24   thought.  So Harrison and Thompson would cover the

25   time period pre-Aearo, pre-2008 as well as post-merger

1  up until 2010 for one, 2011 for the other one; is that

2  correct?

3           **MR. GUNDERSON:**  Correct.

4           **THE COURT:**  And both of which would have been

5  pre-*Moldex* litigation, and that may explain it.

6           Well, Mr. Buchanan, let me ask you, what is

7  your request here to try to get to the bottom of it?

8           Because if it turns out that Harrison and

9  Thompson simply can't be collected and added to the

10  TAR corpus because it was not preserved, if it's not

11  there, and there really is not a way to access it,

12  whether there was a snapshot or not, I mean, when you

13  know the answer to that question, that may help you.

14  But if it simply wasn't part of the snapshot for some

15  reason and wasn't preserved, I'm not aware, at least

16  at this point, of any argument of, you know, why they

17  would have had a duty to preserve back in 2010 or

18  2011, because it was even pre-*Moldex* litigation.

19           What is your suggestion?  What is it that you

20  would want to document that or what further can be

21  done?

22           **MR. BUCHANAN:**  Yes, Your Honor.  Thank you.

23  That's a great question.

24           The reason we asked -- or that, you know, I

25  engaged in wanting sworn testimony from the company on

1    this is that it's really been my experience that

2    through that process of getting sworn testimony, the

3    company actually has to say something that binds it or

4    that could have very real consequences.

5           Often a lot of information is learned just

6    through the diligence process that counsel and the

7    company go through to prepare a witness to provide

8    that testimony.

9           I think your solution, Your Honor, of coming

10   forward with the declaration first is a similar path

11   that will hopefully do that.

12          This is not really, from my perspective,

13   about, you know, Rule 37 relief or other relief.

14          **THE COURT:**  Right.

15          **MR. BUCHANAN:**  Fundamentally it's being

16   solution minded to test do we really have a good

17   handle on this.

18          And because, if you will, the information

19   frame on this changed from Plaintiffs' perspective

20   from where we were at the 26(f) conference, I'm very

21   concerned about what we don't know or that the future

22   things could change as well.

23          And maybe there is information that, with

24   further diligence, could be recovered, for example,

25   are there snapshots actually in Iron Mountain.  You

1    know, they probably had turnover in IT, there may be

2    information there.

3            And I will say that these particular

4    witnesses are not the only holes in the story that we

5    see as we start looking for information.  There are

6    information gaps.  We've learned about a server -- the

7    great server disaster of 2015 we now see referenced in

8    documents.  We see references to server loss in the

9    mid-2000s, which is -- I mean, I don't want to argue

10   too much, but I have concerns.

11           And as the person who is trying to lead and

12   make sure that we get the discovery we're supposed to,

13   I do want to really hold the Defendants to the best

14   investigation that's reasonable in these

15   circumstances.  And I think getting a company person

16   on the record achieves a lot of that.

17           So we may find that there is information

18   that's -- (inaudible) -- and that's really my primary

19   hope, to follow this to make sure we have the

20   documents both sides needs to make a record in this

21   case.

22           **THE COURT:**  Okay.  So here is what we're

23   going to do on Harrison and Thompson:  To the extent

24   there's a dispute between the parties as to whether

25   Harrison and Thompson should be included as additional

1    custodians, I'll grant that request.  But I recognize
2    the Defendants have taken the position that,
3    nonetheless, they've been unable to identify any
4    custodial files.
5         So, as part of the declaration that the
6    Defendants will provide, I want the Defendants to
7    include information in the declaration as to
8    essentially why Harrison and Thompson's custodial
9    files do not exist, why there is not custodial files
10    for them.
11         I mean, the answer might be really simple, it
12    could be as simple as their custodial files were on
13    such and such system, or should have been, and the
14    data from that system was purged, you know, mine years
15    ago and not preserved, maybe that's the answer, and it
16    was not duplicated anywhere.  Or, you know, the
17    information may have been captured on the snapshot,
18    which at least would cover the pre-2008 time frame.
19         But that needs to be -- Mr. Gunderson, that
20    needs to be addressed in a declaration.
21         And just for your own edification, the more
22    informative your declaration is and the more questions
23    it answers, the more likely it would be that the
24    declaration would be sufficient for our purposes and
25    there would not be a need for, you know, discovery on

```
1    discovery, a 30(b)(6) deposition on these issues.  To
2    the extent it raises more questions than provides
3    answers, then, if the Plaintiffs request a 30(b)(6)
4    depo on these issues, then there's a good chance
5    they're going to be entitled to that.  So keep that in
6    the back of your mind.
7         MR. GUNDERSON:  We appreciate that, Your
8    Honor.
9         THE COURT:  Okay.  And then --
10        MR. GUNDERSON:  And just to respond to Mr.
11   Buchanan's sort of suggestions, you know, we do want
12   to make it clear that we have been diligent in working
13   with the company to locate data, to the extent we can.
14   Especially, as Mr. Buchanan or others raise particular
15   questions, we have always been happy to try to run
16   down answers to those, to the extent possible, and we
17   will, you know, continue do that as we work through
18   this declaration process.
19        THE COURT:  I appreciate it.  Now, I don't
20   doubt that for a moment.  But I do know how piecemeal
21   and segregated IT information can be from a company
22   because the IT guys live in their own world and don't
23   necessarily have, you know, an overall view of all of
24   the company's systems and how they were integrated and
25   operated or interfaced with each other, you know,
```

1    unless there was, you know, some grand head of IT who

2    had all of this under his or her umbrella, but

3    probably not, because companies were probably not

4    doing that back in 2010.

5            Okay.  And then there was one other, I

6    believe, custodian, Mr. Buchanan, that was in dispute.

7    This was Scott Cheek.

8            **MR. BUCHANAN:**  I think my partner,

9    Ms. Aminolroaya, is going to address it.

10           **THE COURT:**  Okay.

11           **MS. AMINOLROAYA:**  Yes, Your Honor.  So

12   Mr. Cheek was very relevant in the sense that he was a

13   marketing manager at 3M.  He was on the consumer side,

14   which also sold Combat Arms Earplugs.  And as far as

15   we can tell on the documents that we've been able to

16   review, he has a very relevant responsibility of

17   verifying whether there are any claims and bargaining

18   statements that were made about the Combat Arms

19   Earplug were accurate.

20           His duty was referred to as "claims

21   substantiation."  And so, he would have been verifying

22   whether the things that they were saying about the

23   Combat Arms Earplugs were correct but for the consumer

24   side of 3M.

25           So we think that's very relevant, obviously,

1  to whether 3M -- the bases that 3M had for issuing the

2  claims that they did about the Combat Arms Earplugs.

3      **THE COURT:**  Okay.  Mr. Gunderson, let me hear

4  from you.  And also fill me in if this is also one of

5  those issues where you don't even have the data if you

6  were required to produce it.

7      **MR. GUNDERSON:**  Yes, to lead off with the

8  punchline, that is entirely correct, Your Honor, we do

9  not have custodial data for Mr. Cheek available.

10      You know, to the extent Plaintiffs have

11  identified a particular role for Mr. Cheek, you know,

12  as we've seen in the documents, and especially the

13  documents I just cite, you know, we understand that

14  Cheek was one of multiple people who were doing claims

15  substantiation at the time.  At least one of those

16  other people is already a custodian.

17      And so, our position in general is that,

18  again, we don't have reason to believe that he would

19  have unique information available that wouldn't be

20  covered by the existing custodians.

21      **THE COURT:**  Is he, though, maybe unique, to

22  use your word, because he would have data relating to

23  the consumer side?  Because, you know, there's two

24  parts to the case.  There are some consumer plaintiffs

25  in this case.  It's not all military, predominantly

1   military.  But would that make him a little bit

2   different because he was the senior marketing guy

3   primarily on the consumer side?

4        **MR. GUNDERSON:**  As we understand it -- and,

5   you know, one of the documents Plaintiffs cite is for,

6   you know, substantiation of claims to consumers.  That

7   was Mr. Cheek and other individuals also as

8   responsible for that claims substantiation.

9        So it's not a sort of military versus

10  consumer divide in terms of those roles, but a -- you

11  know, multiple people were responsible for claims

12  substantiation.

13       **THE COURT:**  And when you talk about claims

14  substantiation, that means not claims that someone

15  says, *Oh, your product doesn't work, I lost my*

16  *hearing*; "claims" meaning the claims the company said

17  the product can do X, Y, and Z, substantiating that

18  the product is able to do X, Y, and Z?  Is it the

19  latter or the former?

20       **MR. GUNDERSON:**  It's -- the idea is for

21  packaging materials, for example, the sort of claims

22  that appear on the packaging, whatever they are.

23       Part of the process of the company was to

24  have individuals closer to the product sort of run

25  down and verify the accuracy of those statements.  And

1    so I think in our Exhibit 3 heading example -- this is

2    the one document Plaintiffs had cited to us prior to

3    the briefing, and you could see there's a hundred

4    pages of different claims that were being

5    substantiated.

6          And, as the document shows, Mr. Cheek was,

7    you know, not the only individual responsible for

8    substantiating claims related to hearing products.

9          **THE COURT:**  Okay.  Well, here is -- he was

10   the senior marketing manager, so I could see how it

11   makes sense -- or it's not unreasonable, let's use

12   that word, to include him as an additional custodian.

13   But we find ourselves in the same situation -- *So*

14   *what?  You don't have custodial files for him.*

15         So I am going to allow Mr. Cheek to be

16   included as an additional custodian.  But what you

17   will need to do in the declaration is address why 3M

18   does not have his custodial files.  He was separated,

19   I guess, in the fall of 2013, so I don't know what

20   period of time -- how long he worked for the company.

21         Did he cross over -- was he an Aearo guy that

22   came over to 3M or only a 3M guy?

23         **MR. GUNDERSON:**  I honestly don't know the

24   answer to that question.

25         **THE COURT:**  Well --

1      **MR. BUCHANAN:**   I thought that he was both,

2   Your Honor, just because he is contacted following the

3   acquisition to substantiate the claims from both the

4   consumer and military side for the products.

5          **THE COURT:**   Okay.

6          **MR. BUCHANAN:**   I'm sorry -- for the

7   consumer's side of the products after the acquisition.

8   So it seems that he would have been somebody who came

9   over from Aearo, but that was just my reading of the

10  documents.

11         **THE COURT:**   So, Mr. Gunderson, to the extent

12  he was an Aearo employee, your declaration and

13  information you're going to provide that would be

14  applicable to Mr. Warren would apply equally to

15  Mr. Cheek, to the extent he was an Aearo employee who

16  came over with 3M.

17         But you do need to address, because clearly

18  he was with 3M through October of 2013, why 3M does

19  not have his custodial files.  And when I say "why,"

20  you would explain in the declaration the systems of

21  how custodial files of Mr. Cheek would be maintained,

22  so his custodial files would be kept in the following

23  systems in the following manner, and we've made

24  reasonable inquiry and do not have custodial files

25  relating to Mr. Cheek, and then you need to fill in,

1    after the word "because", because they weren't

2    maintained or whatever is the reason.

3            As I said, it just may be as simple as it was

4    not preserved.  And, of course, there will always be

5    the unanswered question, if you didn't preserve it,

6    was it kept in any alternative systems or any type of

7    backup or any other form, and if so, you need to

8    identify that.

9            And if you're going to take the position that

10   arguably something could be out there in some backup

11   system somewhere, you need to describe that, if indeed

12   you're taking the position that that data is

13   inaccessible.

14           And then -- because I know Mr. Buchanan will

15   want to know that.  And then the Plaintiffs will make

16   a determination whether they think this is something,

17   you know, worth fighting about.

18           We all know that, when the Court looks at

19   what is going to be proportional, you know, focusing

20   on the custodian, as we discussed, whether this person

21   is likely to have some data or this is just going to

22   be duplication, duplication, and doesn't look like

23   it's going to be complete duplication, and then

24   there's the issue, of course, is how accessible is the

25   data and, you know, how reasonable that would be to

1    require a collection from data that we all agree, for

2    all intents and purposes, is inaccessible.  And

3    certainly, if it doesn't exist, then we don't even

4    have to worry about it.  If it doesn't exist, it

5    doesn't exist, and it can't be collected.

6           So, Mr. Gunderson, let me get a feel from you

7    in terms of a declaration to go along with this.  What

8    type of time frame -- I know that you just don't call

9    one person.  What type of time frame reasonably do you

10   need that you could provide a declaration as I

11   described?

12          **MR. GUNDERSON:**  I mean, based on the

13   reasonable, you know, investigation we've done to

14   date, I think we have a good handle on a fair amount

15   of this information already.  Pinning it to a

16   particular declarant who can sign off on that I think

17   is, as you noted, is going to take, you know,

18   potentially more time for us to sort that piece of it

19   out.

20          I think we will end up, most likely, with

21   multiple declarants for either just different systems

22   or different aspects of this.  That said, I think, you

23   know, it would be reasonable for us to, you know, get

24   such a declaration to, you know, Mr. Buchanan by the

25   end of next week.  That would be November 1st.

1     **THE COURT:**  Okay.  I know Mr. Buchanan would

2  probably like to have it sooner, but that to me does

3  not seem to be unreasonable.

4     **MR. BUCHANAN:**  Your Honor, I apologize.

5  There was some echo and I didn't hear the date that

6  Mr. Gunderson --

7     **THE COURT:**  Friday, November 1st.

8     **MR. BUCHANAN:**  That's reasonable, certainly,

9  for Plaintiffs, Your Honor.

10     **THE COURT:**  Yeah.

11     **MR. BUCHANAN:**  I do have one request, though,

12  and that's because what was not in dispute in the

13  letter were two custodians in our second paragraph,

14  and that's Mr. Knauer and Frank Gavin.

15     The Defendants have agreed that both of those

16  custodians are relevant.  Mr. Knauer, as I understand

17  his role and function, was the lead of the lab where

18  these products were tested, and Mr. Gavin was the lead

19  salesperson for the military strategic business unit.

20     I don't think we attached necessarily core

21  documents to them because we didn't understand there

22  to be a dispute about their relevance.  But I would

23  ask that they be encompassed within the declaration

24  Defendants are preparing because we're certainly

25  interested in doing whatever we can do to unearth

1  their documents.  Indeed, Mr. Knauer is a requested
2  deponent of the Plaintiffs.
3        THE COURT:  Okay.  And it looks like Knauer
4  was there for a pretty lengthy period of time.
5        MR. BUCHANAN:  Indeed.
6        THE COURT:  And so he definitely was a
7  before-and-after witness in Aearo and 3M employee.
8  Gavin --
9        MR. GUNDERSON:  So --
10        THE COURT:  -- looks like he crossed over,
11  too.
12        Yes, go ahead.
13        MR. GUNDERSON:  I apologize for interrupting
14  you.  On Mr. Knauer -- I think it's n-OW-er -- it
15  could be K-n-OW-er, I guess -- you know, while he was
16  associated with 3M for a long period of time, because
17  his employment history is a lot more complicated than
18  that, in that our understanding is he formally retired
19  in 2006, was then a consultant on a part-time basis
20  for about three years through the end of 2009, and
21  then from that point forward worked through a temp
22  agency doing *ad hoc* work occasionally while otherwise
23  enjoying his retirement.
24        We're happy to, you know, sort through as
25  much of, you know, Mr. Knauer's material as we can for

1    a potential declaration.  I think, you know,

2    especially as it relates to 2006 in particular and

3    what happened when he formally retired, I think that

4    may be a time period where -- I know Plaintiffs are

5    interested in that, you know, pre-2006 time period,

6    but it also may be, because it was so long ago, more

7    difficult to get exact information regarding that.

8          But as Your Honor has pointed out, we will

9    do, you know, the best we can to do a reasonable

10   investigation of that and report as much information

11   as we can in a declaration.

12         **THE COURT:**  Okay.  That would be helpful so

13   there's no dispute on Gavin and Knauer that it's

14   appropriate or reasonable to include them as

15   custodians.  The issue, again, is that the Defendant

16   takes the position that, despite reasonable attempt,

17   no data was -- you couldn't collect any data

18   apparently because no litigation hold had been placed.

19         Mr. Buchanan, this may be a situation -- if

20   guy was a consultant, I don't know how -- you know,

21   there's all kinds of consultants.  There's a

22   consultant that sits in an office of a company and

23   he's considered an independent contractor and he uses

24   all the company's equipment, and then there's a true

25   outside consultant.

1          So, to the extent you think Mr. Knauer

2     independently might have some responsive documents,

3     the burden may be on the Plaintiffs to subpoena

4     Mr. Knauer.  I have no idea what type of data he would

5     have, if he had a laptop or what he did.  But I'm

6     throwing that out there because, if he is truly a

7     third-party during the time he was a third-party, in

8     my view, it is not 3M's legal responsibility to go out

9     and independently get from him data that he might

10    have.

11         I assume you are not doing that, Mr.

12    Gunderson?

13         **MR. GUNDERSON:**  We have not, no.  It is our

14    position, as Plaintiffs sort of point out, that

15    whatever he has on his personal systems is not within

16    3M's possession, custody, or control.

17         **THE COURT:**  Right.

18         **MR. BUCHANAN:**  And Your Honor, it's funny,

19    you kind of zoomed in on an issue we've been working

20    on, frankly.  With regard to Mr. Knauer, it's our

21    understanding that even after the 3M acquisition he

22    had a 3M email address.  So he may have been acting as

23    one of those consultants in your first example,

24    somebody who was practically employee-like or at least

25    was given employee-like, you know, IT tools.

1    So he probably is within, from the

2   Plaintiffs' perspective, the Defendant's obligation

3   given that he had a 3M email address for that period

4   of time.  But your suggestion is well taken.

5    In fact, several of the witnesses in this

6   case, even during the times when they were Aearo or 3M

7   employees, were communicating from personal email

8   accounts, you know, CompuServe and Comcast and things

9   like that.  And it is Plaintiffs' intent to separately

10  subpoena them to ensure that we do our best to get a

11  complete picture of the documents in this case.

12          **THE COURT:**  Okay.  Very well.

13    Is there anything else -- I'll turn to you,

14  Mr. Buchanan:  Any other custodians that are in play

15  here at this point or any other issues from your

16  perspective on additional custodial productions?

17          **MR. BUCHANAN:**  There are, Your Honor.  Well,

18  I can say, the issue that we spoke about last week,

19  we've had some further productive conversations, "we"

20  being me and Plaintiffs' technical consultants with

21  Mr. Gunderson and Defendant's technical consultant

22  trying to work through the TAR challenges, particular

23  document types that presented some issues.

24    We have identified some additional custodians

25  and anticipate tendering that to Defendants by

1   Wednesday.  Some custodians who we identified in
2   documents either produced at the deposition last week
3   or that, I'd say, we appreciated heightened relevance
4   for in connection with the depositions last week.  So
5   we'll probably send that, you know, by Wednesday so
6   that we can have, if you will, an informal
7   conversation with the Court, if we needed to, on those
8   custodians.
9           **THE COURT:**  Okay.  This, of course, always
10  happens.  It's a learning experience when you start to
11  depose a party and you get documents, names come up.
12  But it seems that you are all attempting to, before
13  you're requiring court intervention, to make a good
14  faith effort to meet and confer to reach resolution of
15  issues, if possible.
16          **MR. GUNDERSON:**  One point on that, Your
17  Honor.  I think the Defendants were a bit surprised to
18  read Plaintiffs' brief on Friday and see a number of
19  documents that had never been flagged for us in the
20  multiple meet and confers we had had prior.
21          You know, so to the extent Plaintiffs are,
22  you know, intending to request information or, you
23  know, adding additional custodians on Wednesday, we
24  would just ask that, you know, Plaintiffs identify,
25  you know, whatever information they have about the

1  custodians, including any documents or relevant

2  deposition testimony that they think highlights the

3  relevance.

4      **THE COURT:**  Okay.  I don't think that's

5  unreasonable.  It's not a game of surprise.  So in the

6  meet and confer obviously you all need to know some of

7  the flesh and bones of why someone else might be a

8  relevant additional custodian other than simply

9  someone saw his or her name somewhere.

10      Okay.  And then, I guess we have a case

11  management conference scheduled for Friday; is that

12  correct?

13      **MR. GUNDERSON:**  That's correct, Judge.

14      **THE COURT:**  Okay.  I will probably not

15  personally be there, although I'm going to be in

16  Pensacola this week, but I'll probably be attending

17  that by video.

18      But it seems to me -- and I'm not asking

19  either side to characterize it, but it seems like the

20  issues that we're going to be discussing at the case

21  management conference -- I don't want to say there's

22  nothing really earth shattering, but I'm not -- that's

23  the reason I'm not going to go to Pensacola for it, it

24  doesn't seem like it's going to be a lengthy case

25  management conference.

1        Mr. Aylstock, is that sort of your view, more

2   of a reporting as to what's going on as opposed to

3   making material changes or decisions in the MDL?

4        **MS. HUTSON:**  Judge, I'm not sure Bryan is

5   still on the phone.

6        **THE COURT:**  Oh, okay, Ms. Hutson.

7        **MS. HUTSON:**  He and I have discussed this

8   issue, and I believe you're right, that you attending

9   by videoconference is perfect.

10        **THE COURT:**  Okay, good.  Well, thank you all

11   very much and have a good day.

12        *(Proceedings concluded at 4:42 p.m.)*

13        --------------------

14   *I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled*

15   *matter.  Any redaction of personal data identifiers
     pursuant to the Judicial Conference Policy on Privacy*

16   *are noted within the transcript.*

17        *Donna L. Boland*
                                              *11-5-2019*
18   *Donna L. Boland, RPR, FCRR*              *Date*
     *Official Court Reporter*

19

20

21

22

23

24

25