UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG )<br>PRODUCTS LIABILITY LITIGATION, )<br> )<br> )<br> )<br> )<br> )<br> )<br>_____ ) | Case No. 3:19md2885<br><br>Pensacola, Florida<br>November 22, 2019<br>9:55 a.m. |


SEVENTH CASE MANAGEMENT CONFERENCE

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-52)

# A P P E A R A N C E S

FOR THE PLAINTIFFS:          **BRYAN F. AYLSTOCK, ESQUIRE**
                             Aylstock, Witkin, Kreis & Overholtz
                             17 E Main Street, Suite 200
                             Pensacola, Florida  32502

                             **SHELLEY HUTSON, ESQUIRE**
                             Clark Love & Hutson, GP
                             440 Louisiana Street, Suite 1600
                             Houston, Texas  77002

                             **CHRISTOPHER A. SEEGER, ESQUIRE**
                             Seeger Weiss, LLP
                             55 Challenger Road, 6th Floor
                             Ridgefield Park, New Jersey  07660

FOR THE DEFENDANT:           **MIKE BROCK, ESQUIRE**
                             Kirkland & Ellis, LLP
                             1301 Pennsylvania Avenue, N.W.
                             Washington, D.C.  20004

                             **MARK J. NOMELLINI, ESQUIRE**
                             **NICHOLAS F. WASDIN, ESQUIRE**
                             **BARRY E. FIELDS, ESQUIRE**
                             Kirkland & Ellis, LLP
                             300 N Lasalle
                             Chicago, Illinois  60654

                             **LARRY HILL, ESQUIRE**
                             MOORE, HILL & WESTMORELAND, P.A.
                             350 W Cedar Street, Suite 100
                             Pensacola, Florida  32502

```
 1                        P R O C E E D I N G S
 2           THE COURT:  Good morning.  And I apologize for the
 3   delay.  There was a great deal to discuss this morning in the
 4   preconference meeting with Leadership.
 5           Let me start out by repeating what I said to counsel
 6   this morning in that meeting about how much we all enjoyed the
 7   event last night and thank everyone who was involved in hosting
 8   that and putting that on.  I enjoyed the time I had to spend
 9   with people, talking to folks, and look forward to another one,
10   if that happens in the future.
11           Judge Herndon, I know I speak for him in saying, he
12   enjoyed it as well, and Judge Jones as well, and all of my
13   staff, so thank you for including them.
14           This is our Seventh Case Management Conference in the
15   3M Combat Arms Earplug Products Liability Litigation, MDL 2885.
16           For the Plaintiffs I have Mr. Aylstock, Ms. Hutson,
17   and Mr. Seeger here.  For the Defense, I have Mr. Brock, Mr.
18   Nomellini, Mr. Fields -- welcome him -- Mr. Wasdin, and Mr.
19   Hill.
20           And I'm not even sure where to begin, there was so
21   much discussed this morning, largely related to what I'll call
22   the census and our efforts to get our arms around the census.
23           There are right now -- according to a report from
24   BrownGreer, there are 141,732 claimants processed through MDL
25   Centrality as of November 20th.
```

1          We have pending here in terms of cases -- there are

2     more plaintiffs because, as you know, the Minnesota cases still

3     have multiple joinder plaintiffs in those Minnesota cases, but

4     there are 2700 cases currently pending in the MDL.  Those

5     cases, though, represent several thousand plaintiffs, but not

6     141,000.

7          So you have some deadlines coming up both for filed

8     and unfiled cases; some have already passed in terms of

9     document production.  I commend the efforts of all of those who

10    have been working so diligently and really around the clock to

11    try to make sure that those deadlines are complied with.  We

12    have both sides working together through the early vetting

13    subcommittee with assistance from the Defense as well.  And I

14    believe Mr. Fields and Ms. Elizabeth and Mr. Wasdin have been

15    working with the subcommittee on early vetting to see to it

16    that those deadlines are met.

17         The complexity of trying to get our arms around the

18    census can't be overstated and largely due to the difficulty in

19    obtaining records from the military.  And that's not to

20    criticize the DoD or the military.  They are working hard as

21    well.  But with this number of servicemembers involved and

22    multiple branches of the military involved as well as multiple

23    government agencies, including the DoD, DOJ, and the VA, it's

24    complex, and it's a lot of work for those people.  And there's

25    still a lot of work to be done to get the records that you all

1     need to move this litigation forward, and I'm working hard to

2     do that.

3              But with all of that said, the December deadlines that

4     are approaching -- December 2nd and December 23rd -- I'm going

5     to redefine those deadlines.  And what I'm going to ask the

6     parties to do -- and I assume this will be led, Ms. Lanier, by

7     your subcommittee along with the Defendants and with MDL

8     Centrality's help -- is to identify the claimants who have

9     complete production -- and I say that hoping that there are

10    some -- who have complete record production as well as the

11    census questionnaires completed.

12             And I realize that's going to be initially a

13    determination that the Plaintiffs make that the production is

14    complete, but then the Defendants are certainly going to be

15    given an opportunity to work with you all and identify

16    deficiencies, to the extent they believe deficiencies exist.

17    And then, if necessary, the Court will get involved in

18    determining whether there is a material deficiency.

19             I want to take this approach as opposed to applying

20    that deadline to every single unfiled and filed case because I

21    understand that there have been difficulties encountered with

22    some of the claimants -- servicemembers -- who, just by virtue

23    of their military training and that culture and environment

24    that they're accustomed to, that they are reluctant to verify

25    or swear under penalty of perjury that the information is

1   complete and accurate without being 100 percent confident.  And

2   the questionnaire, as you all know, asks for dates, specific

3   dates of testing, for instance.  And there's some reluctance,

4   so I defined those questionnaires.

5          I may rethink the verification requirement, but I'll

6   talk about that later.  For now, what I would like is for you

7   all to identify for me those cases that could proceed into a

8   stage one for a bellwether process.

9          Ms. Lanier, do you have a sense of whether there are

10  complete productions for some of the claimants?  Come on

11  forward.

12          **MS. LANIER:**  May it please the Court?

13          **THE COURT:**  Yes, ma'am.

14          **MS. LANIER:**  We do have a good sense that -- the firms

15  are working incredibly diligently, and we have a good

16  understanding that we'll have a large chunk of forms that are

17  completed, census questions that are completed.  We have

18  fortunately been able to review a lot to try and spot-check for

19  deficiencies, and Roma and the BrownGreer system has been

20  really helpful with that as well.  So we'll continue working to

21  do that.

22          But, yes, Your Honor, we do think that there will be a

23  substantial number of completed forms, and we'll keep working

24  as diligently as we can to help folks submit everything they

25  can.

1    **THE COURT:**  Okay.  My understanding is I believe maybe

2    39 forms have been uploaded and produced to the Defense, and

3    there's some question in the Defense's mind as to whether those

4    are complete or whether there's deficiencies.  I know Jake

5    Woody is working with the Defense and Roma has been working

6    with you all.

7        I've asked the parties to make that a more

8    collaborative process.  And so I'm asking everyone and those

9    that are involved in this vetting process to work together to

10   identify those cases that are ready to be moved into a stage

11   one holding area for bellwether purposes.

12       Also, Ms. Lanier, Mr. Wasdin identified an issue that

13   seems like a valid issue of concern regarding the drop-down

14   menu that exists in MDL Centrality for when a firm uploads

15   records, for instance.  There's an ability to categorize or

16   identify the records as they're uploaded, and in many cases

17   that's not being done, and so it's making it very difficult to

18   assess the completeness of the production.

19       I'm sure, in your education of law firms, that you

20   have been stressing the need to properly categorize the

21   documents through this drop-down menu.

22       I'm considering entering an order advising firms that,

23   if that is not done -- it seems to me not too much to ask --

24   but if that's not done, then the production is just going to be

25   deemed incomplete.

1      So what do you think about that?  Because it is

2 happening that that's not being done.

3      **MS. LANIER:**  I understand the concern on behalf of the

4 Defendants wanting to make sure that they're able to know where

5 certain records fit in and the categories.  And it seems like

6 it should be a straightforward process.

7      So, I would request that, if you can give us the

8 ability to continue our education efforts and we will put that

9 at the very top of the educational efforts that we're doing

10 consistently and repeatedly with firms.

11      What we will also do -- and I'll represent to the

12 Court that what we'll do is make sure and go through the

13 BrownGreer system so that we are identifying firms with issues

14 with that, and we will directly continue our reach-out to them

15 to try and cure that and fix that.

16      And it may just be a function of firms trying to get

17 everything in and then categorize it when they're able to.

18 We'll get down to the bottom of it and make sure that we

19 continue our collaborative efforts with the Defendants to cure

20 what they've notified as deficiencies or what they've notified

21 as something that is not categorized the way that it should be.

22      **MS. BURKE:**  Your Honor, if I may?  Beth Burke.  I

23 actually spoke with a firm yesterday with a large inventory of

24 cases, and they've discussed that issue with me, and they said,

25 *We only put our documents in "other" because we don't have any*

1    *information back from Touhy.*

2         So they were hesitating to categorize because they

3    don't have a complete production yet.  So I think the lack of

4    categorization goes back to the issue everyone is struggling

5    with that we don't have our *Touhy* documents in, we don't know

6    whether our census forms are complete and accurate yet, and our

7    document production is blatantly incomplete because we don't

8    have a response to *Touhy.*

9         **THE COURT:**  I'm not sure I follow why you can't

10   categorize the documents that you have.

11        **MS. BURKE:**  They can categorize what they have.  But

12   for the time being, they've put them in the "other" just for a

13   holding position.  We can go back and tell people to categorize

14   what they have in the "other" bucket for now.

15        **THE COURT:**  Well, what I'm asking you to do in terms

16   of identifying cases that are complete and ready, they'll need

17   to be categorized.  So if you have claimants whose documents

18   are just dumped into "other," then that's not going to be

19   considered complete.

20        **MS. LANIER:**  We understand, Your Honor.  We'll address

21   this.  We'll put it at the top of our communications and

22   education efforts, and we will reach out directly to those

23   firms and make sure that that's done.

24        **THE COURT:**  One more educational item.  Apparently

25   some firms -- thank you, Ms. Burke -- some firms are submitting

 1    multiple questionnaires.  Why is that happening?

 2         **MS. LANIER:**  So what is essentially -- our

 3    understanding is there are two different reasons why this may

 4    have taken place.  Number one is, I think -- or, before our

 5    educational efforts, it's clear to us now that there was a

 6    little bit of a misunderstanding of the BrownGreer system when

 7    it came to uploading a form versus actually submitting it to

 8    the Defendants.

 9         Our understanding is some firms may have thought

10    hitting "submit" just meant uploading it and that they didn't

11    realize that they may have been submitting a form that they

12    were working on, *et cetera*.  So that's one bucket.

13         The second bucket we've identified under that is,

14    because we have tried so hard, per the Court's education to us

15    and instruction, to try and cure deficiencies on the front end,

16    firms are going back in and amending forms that we've flagged

17    and amending -- so amending where there may be a blank or may

18    be just not a very completed form.

19         There's also a third probably much smaller category

20    that explains that, but it would be that -- the Court may

21    recall that there was a slight change to the census form at one

22    point, so some firms had already had their clients fill out the

23    census form in its original form and then it changed.  So

24    that's probably the reason.  And it was just a slight change

25    but to include, as you may recall, some nonmilitary use or

1    civilian use.

2          So those are kind of the three buckets for why that's

3    probably taking place that we've been able to identify.

4          **THE COURT:**  All right.  How long do you think you will

5    need to identify the cases that are -- I call them cases --

6    that are complete?

7          **MS. LANIER:**  Our -- if I could ask a question for

8    clarification?

9          **THE COURT:**  Yes.

10         **MS. LANIER:**  Would you like to know how long prior to

11   December 2nd that the early vetting committee will be able to

12   review and to submit for December 2nd or --

13         **THE COURT:**  Well, I'm not opposed to lifting those

14   dates -- I said I was going to redefine the deadline -- but to

15   lifting it completely if I have an understanding from you as to

16   how much time you think it will take your committee, working

17   with the Defendants, to identify a pool of cases, plaintiffs,

18   claimants that are complete in terms of their production and

19   the questionnaire.

20         **MS. LANIER:**  In terms of if we're talking about the

21   filed cases and that grouping of claimants -- I don't want to

22   speak for the Defendants --

23         **THE COURT:**  No, you can't.

24         **MS. LANIER:**  -- yeah, the Defense lawyers, my

25   colleagues here.  So I would want to chat with them and make

1   sure they're comfortable with any kind of deadlines I throw

2   out.  Because a lot of it depends on what we may be able to

3   represent are, *Here are a few thousand forms that we believe*

4   *are nondeficient.*  I don't want to speak for them if they

5   believe that there are deficiencies.

6          So I think that we could work collaboratively together

7   to very quickly agree upon a time frame, and we could propose

8   some dates to you for your review, if you'd like us to do so.

9          **THE COURT:**  Yes, I would.  It doesn't make sense to

10  continue down this path with the deadlines that are set.  It's

11  not realistic, I don't think, because so many claimants don't

12  have the records that they need, and then you're also

13  encountering some resistance -- and I don't mean that in a

14  negative sense but -- to actually signing the questionnaires,

15  which certainly would not be a complete questionnaire if it's

16  not verified under the rules that exist now.

17         **MS. LANIER:**  We can absolutely continue -- Mr. Wasdin

18  and I and some of our other colleagues, we've been working

19  together very collaboratively on this, and I think we could

20  absolutely put our heads together and get you some dates on

21  that and, as part of that, continue our discussion on the

22  deficiency process and the review process.  So we can

23  absolutely do that, Your Honor.

24         **THE COURT:**  All right.  I don't want to dissuade or

25  discourage you.  I want you to continue your efforts in terms

1    of vetting and working with the law firms to assist them in

2    their vetting.  But I do want to sort of redefine the focus

3    here, and I want to start focusing on what we have that is

4    complete.

5              And then once -- this is a sort of footnote to the

6    discussion, but I've made contact with higher level officials

7    at the VA, and hopefully I'll talk to that individual next week

8    -- well, that's Thanksgiving, it may be the week after -- and

9    get a better understanding of the VA's position relative to

10   *Touhy* and the health records, audiograms, and disability

11   records.

12             And then I think I will be in a position to reset your

13   deadlines.  But right now, moving in this fashion just doesn't

14   seem realistic, because we don't want cases that aren't ready

15   being put into any kind of a bellwether pool.

16             Thank you very much.

17        **MS. LANIER:**  Thank you, Your Honor.

18        **THE COURT:**  Mr. Brock or Mr. Nomellini, anyone wish

19   to --

20        **MR. NOMELLINI:**  Yes, Your Honor, just a couple of

21   issues or maybe points of clarification.  With respect to the

22   dates Your Honor mentioned, my understanding is that, for the

23   unfiled cases -- and we were having a discussion about filed

24   versus unfiled -- that those dates are in the parties' tolling

25   agreement as opposed to in Your Honor's order.

1          **THE COURT:**  That's true.

2          **MR. NOMELLINI:**  So I think that's probably something

3     we'll have to have some discussion with the Plaintiffs about in

4     terms of following up on that.  So that's the first thing.

5          The second thing is, with respect to cases that are

6     complete moving into the bellwether process, as Mr. Brock

7     mentioned, we have some concern with respect to the bellwether

8     pool being tilted toward the complete cases because the fact of

9     something being complete may in fact say something about the

10    cases.  I know that that's something that the parties can work

11    through as well, but we would have a concern if the bellwether

12    pool got tilted toward the cases that are deemed complete.

13         **THE COURT:**  Well, you entered into the tolling

14    agreement.  I am not going to put this litigation on hold, Mr.

15    Nomellini.  I'm not.

16         So, as we spoke about earlier, it's a good thing to

17    have all of these claimants in one place in MDL Centrality.

18    It's a good thing, and it allows for an organized process of

19    vetting to take place.  But I'm not going to sit on the

20    2700 cases that we have here in this litigation.  We're going

21    to move them forward.

22         **MR. NOMELLINI:**  We're not advocating for that, Your

23    Honor.  We just want to try to figure out a way to work with

24    Plaintiffs to make the bellwether process as representative as

25    possible.

1    **THE COURT:**  We talked a little bit about this in the

2    preconference meeting.  Hopefully BrownGreer can come up with

3    some ideas for that.

4         For everyone's benefit, this morning I let the

5    attorneys know in the preconference meeting that I will not

6    preside over or adjudicate, decide any issues relative to a

7    case that is not filed in this MDL.

8         Your tolling agreement provides for me to resolve a

9    dispute, for instance, if there's a dispute about a material

10   deficiency, that I will resolve that.  And I will not do that

11   for any unfiled cases.

12        And I'm also not going to engage in a bellwether

13   process with any unfiled case.  And I'm also not -- it's a

14   little bit of a concern the lopsided nature of what we have

15   here.  We have less than 2 percent of the cases in the MDL on

16   the whole from what's at MDL Centrality, and it feels a little

17   bit like the tail wagging the dog in some respects.

18        I don't want to see everyone's efforts turning towards

19   unfiled cases as opposed to filed cases, because these cases

20   are filed and they're sitting on this Court's docket, and so

21   I'm going to move them.  And I'm not going to move an

22   incomplete case, so you're going to be dealing with completed

23   cases.

24        I only have jurisdiction and authority over those that

25   are filed, so those are the only ones that I have the authority

1   to move.

2   **MR. NOMELLINI:**  We share the same concern about the
3   lopsided nature, Your Honor.

4   **THE COURT:**  Mr. Brock?

5   **MR. BROCK:**  I think that covers it.  I think the point
6   we were trying to make to Your Honor in the back was that we
7   were looking for representative cases.

8   There is self-selection that would occur in terms of
9   what cases would be in an original bellwether pool if we start
10  only with the cases that we look at the first time around or
11  the second time around and they appear to be complete files.

12  **THE COURT:**  Well, if you can work out a process where,
13  with BrownGreer's assistance, you identify a representative
14  sample that includes unfiled cases that then get filed and that
15  are ready to go, then I'm not opposed to that at all.

16  **MR. BROCK:**  Right.  And I do think the other issue
17  that we'd like to talk about is -- and we've had discussions
18  about this yesterday -- if we started with a pool that was
19  randomly selected or it was selected by different factors, we
20  could then focus efficiently and quickly on completing
21  discovery that would be needed in order to start looking at
22  what the right cases would be to bring to trial.

23  As opposed to just saying, *We'll take what's complete*
24  *and work with that*, with a little more work, to focus on a
25  little broader set than just the ones that are deemed to be

1    complete.  That really is the point that we're making here.

2         **THE COURT:**  Well, what we're dealing with is the

3    effects -- and I am not being negative or critical because I

4    think the process that's in place right now is a very good

5    process for vetting cases.  Getting them all in one place in

6    MDL Centrality, having the sharing that's taking place of data

7    and information, that is a good thing.  Because the idea is to

8    avoid having completely frivolous and meritless cases filed in

9    the MDL.

10        But the reality is the tolling agreement.  I can't

11   force anybody to file a case, and your tolling agreement allows

12   up to December of 2021 for a plaintiff to file a case.

13        And so, while I understand and appreciate where you're

14   coming from -- and I spoke about this earlier, to start a

15   bellwether process, I want a representative sample as well --

16   but again, I can't force anyone to file a case.  All I can say

17   is I'm not going to adjudicate or rule on any issue in any case

18   that's not filed.

19        **MR. BROCK:**  Okay.

20        **THE COURT:**  But I'm going to encourage you all to work

21   together.  You've said you will.

22        What do you think, Mr. Brock, as far as a time frame

23   for you -- and then I'll hear from the Plaintiffs as well -- to

24   work together to present a proposal to me?  As I said, I don't

25   want to wait until the next CMC because that's not until

1    January.  That's just too much time lost.

2            **MR. BROCK:**  I know, you know, we've got a short week

3    next week.

4            **THE COURT:**  Yes.

5            **MR. BROCK:**  I would think probably, at the earliest,

6    maybe the end of the week following Thanksgiving.

7            **THE COURT:**  Let me check something.  Just a moment.

8            December 13th we have a biweekly leadership call.  So,

9    can I ask you all to have something to present to me in advance

10   of that call -- the day before -- and then we can discuss it?

11           **MR. BROCK:**  Yes.

12           **THE COURT:**  I'm hoping it will be joint.  But if not,

13   then each side can submit its own proposal to me, and Judge

14   Jones and I will talk to you about that on that call.

15           Is that sufficient time?

16           **MR. BROCK:**  That sounds good.  I think we have a call

17   next week with Your Honor.

18           **THE COURT:**  November 26th.  But I thought that might

19   be -- hey, if you can get it ready for me by then --

20           **MR. BROCK:**  No, I won't have it ready by then.  But I

21   might have a few more questions and we may have had a

22   conversation.  Maybe if we could take five or ten minutes next

23   week, we can get Your Honor a little more information, talk to

24   you about our process.  And, yes, I think definitely by

25   December 13th we'll know if we can agree or we can agree on a

1   lot of it or we have some disputes.  And we'd be fine with

2   briefing disputes by the 13th, if that's what the Court would

3   like to do.

4           **THE COURT:**  Well, let's talk about whether briefing is

5   necessary on the 26th.

6           I'd also ask, between now and then, if you all, both

7   sides, would confer with Roma and Jake from BrownGreer about

8   how they might be able to assist as well.

9           **MR. BROCK:**  Sure.

10          **THE COURT:**  Thank you.

11          Judge Jones?

12          **JUDGE JONES:**  I don't have anything.

13          **THE COURT:**  Judge Herndon, anything?

14          **JUDGE HERNDON:**  *[Indicating negatively.]*

15          **MR. WASDIN:**  Your Honor --

16          **THE COURT:**  Mr. Wasdin?

17          **MR. WASDIN:**  For clarity on the census, to the extent

18  we are delaying the identification of complete cases of

19  plaintiffs, does the Court expect us to move forward with the

20  deadlines in -- I think it's PTO 18 -- for sending over

21  deficiency notices for those questionnaires we've received to

22  date, or should we delay that process pending getting a list of

23  complete files?

24          **THE COURT:**  That's a good question.  I would suspend

25  those deadlines until we can get a list of -- I would like to

1    have a list of cases that at least the Plaintiffs think are

2    complete.  And then, if you all can agree, that would be great.

3    If not, then we may reinstitute that process or I may work more

4    informally with you, or Judge Jones, in identifying cases that

5    are ready.

6              But in answer to your question, I'll suspend that

7    deficiency process and those deadlines in connection with it.

8              **MR. WASDIN:**  For the questionnaire and the documents?

9              **THE COURT:**  Right.  But I want to make sure I

10   understand exactly what you're asking.  I'm not delaying the

11   process -- I mean, actually I'm instituting the process for

12   identifying cases that are complete, which would mean

13   questionnaire and hopefully document production as well.  But

14   let's start with the questionnaires and then see where we are

15   with the documentation on those that have completed

16   questionnaires.

17             I don't want to delay that process, but at the same

18   time I guess I haven't given you a deadline for doing that.  Is

19   that the confusion?

20             **MR. WASDIN:**  Yeah.  Absent any further deadline, you

21   know, whatever your deadline was in the order, for example, for

22   the document deadline, we would then trigger our deficiency

23   process off of that and we'd send out 2700 letters or something

24   like that if folks hadn't checked the boxes for X number of

25   documents.

         1          **THE COURT:**  Let's don't do that right now.  Things are
         2   complicated enough.
         3          Could I ask you to get with Ms. Lanier and her
         4   committee and on the 26th someone be on the call?  And
         5   hopefully at that point you can give me a timeline you are
         6   comfortable with and you feel would give you the time to
         7   identify that first group of cases.
         8          And, again, I'm assuming we have some.
         9          **MR. SEEGER:**  Yes.
        10          **THE COURT:**  Okay.
        11          Is that all right for the 26th?
        12          **MR. WASDIN:**  Yes, Your Honor.
        13          **THE COURT:**  You can work with Ms. Lanier and her
        14   committee and Roma and Jake.  I want Roma and Jake talking.
        15          **MR. WASDIN:**  Yes, Your Honor.  We didn't know that
        16   they were silent on this issue, so we will lift that silo.
        17          **THE COURT:**  Very good, very good.  Thank you.
        18          As you all probably saw in an order I entered, I
        19   believe on the 13th of November, I am going to move forward on
        20   the remand motions in the Minnesota cases based upon
        21   Mr. Watts's objections that he's filed in his 47-cases, and the
        22   objection was his cases having to participate in the census
        23   process due to his contention that the Court lacks subject
        24   matter jurisdiction over those cases.
        25          So I am going to be moving forward as opposed to what

1   I told you at the last case management conference, which was

2   that I was going to put off and defer a ruling on the motions

3   to remand until such time as I dealt with the affirmative

4   defenses.

5            We heard this morning from Mr. Sacchet on a briefing

6   proposal for a 12(b)(1) motion by the Defense regarding

7   political question doctrine and then Rule 56 motions on both

8   sides, cross motions on the affirmative defenses.

9            I've asked him to, again, to work with the Defendants,

10  and they are going to come up with what hopefully will be a

11  joint proposal.  If not, then I'll entertain separate proposals

12  and we'll go from there.

13           I don't believe we set a time frame for that, did we?

14           **MR. AYLSTOCK:**  I don't think so, Your Honor.  We could

15  potentially do that on the 12th as well.

16           **THE COURT:**  I think that should give you enough time.

17           Agreed, Mr. Sacchet?  You as well?

18           **MR. SACCHET:**  Sounds great.

19           **THE COURT:**  Very good.

20           Just, again, for everyone's benefit, the parties have

21  submitted -- this is back to *Touhy* and DoD.  The parties have

22  submitted requests for both interviews of some DoD personnel,

23  and also the Plaintiffs have submitted a *Touhy* request for

24  depositions of 12 individuals who were either present or former

25  DoD personnel.

1          Judge Herndon and I spoke this week with Major Evans,

2   Major Kim, Jackie Snead, Michael Fucci, all of our friends at

3   the Department of Defense, and they are going to issue a formal

4   response to these requests for interviews and depositions.

5          The Plaintiffs actually submitted a request for

6   interviews back in August that just wasn't responded to.  The

7   Defense submitted a more recent request at the end of October

8   for interviews.  Apparently the Defendants are actually

9   narrowing that request and reformulating it.

10          In any event, I've asked the DoD to give the parties

11   here a formal response so we know where we are with regard to

12   interviews and depositions.

13          I've also asked the parties, in regards to *Touhy*, to

14   get together to look at 3M's *Touhy* request, which is the

15   request that pertains mostly to the affirmative defenses and,

16   from within that *Touhy* request, to identify the requests that

17   are essential to the affirmative defenses.  Because there are

18   some parts of the request that, in my view, are not essential

19   to the affirmative defenses.

20          And I've asked the parties to address a letter to

21   Major Kim and Major Evans in regards to that subset from the

22   *Touhy* request, and then the DoD will give us their official

23   position, which we desperately need, on those items from 3M's

24   *Touhy* request.

25          Judge Herndon is going to assist the parties in

1    identifying the critical aspects of that request relative to
2    the affirmative defenses.
3              I don't know if I set a time deadline for that either.
4    I'm not accustomed to giving judges deadlines.
5              **JUDGE HERNDON:**  Never hurts.
6              **THE COURT:**  Okay.  The 13th of December.
7              Really, this should not be too cumbersome for y'all to
8    do this.  You're not coming up with new requests, okay?  These
9    are just identifying those that are pertinent to the
10   affirmative defenses.
11             We didn't discuss this in the preconference meeting,
12   but may I ask you all to do the same with regards to your DoD
13   personnel that you want to speak to, whether it's by deposition
14   or interview?
15             And again, Judge Herndon can assist with this.
16             And I know you haven't exchanged -- so you're going to
17   need to do this separately -- right? -- because you haven't
18   exchanged the names of those that you are wanting to talk to.
19             But, to the extent any of these individuals are not
20   critical to the affirmative defenses, I would ask that you
21   remove them from your list for now.  You're not giving up your
22   right or your need to talk to these people.  But I'm trying
23   desperately to focus us on these affirmative defenses right
24   now, that and then also getting the Plaintiffs' records that
25   they need.

1          **MR. AYLSTOCK:**  We'll do that, Judge.

2          **MR. BROCK:**  That sounds good.  We're almost there on

3    that on our side.

4          **THE COURT:**  Thank you.

5          And then we could resubmit that to the DoD as well,

6    unless we get a formal response from them before we have an

7    opportunity to do that, but we could submit those names as well

8    when we submit the document items.

9          Does either side wish to be heard anymore on the

10   bellwether process or the next phase of where we're headed?

11         I think it's clear that I'm -- as much as I want to

12   resolve the affirmative defenses, it's just taking longer than

13   I had anticipated, perhaps naively so, given the complexity of

14   the records and getting them from the military and the VA -- or

15   actually, the military with the affirmative defenses.  But I

16   think we need to move forward with another phase

17   simultaneously.  I'm not stopping the work on the affirmative

18   defenses, by any means, but we need to start the other process.

19         Mr. Brock, is there anything else you would like to

20   add?

21         **MR. BROCK:**  No, Your Honor.  As we indicated in

22   chambers, we are willing and agree with the idea of moving

23   forward on the bellwether process.  We've got a lot to talk

24   about with the Plaintiffs and perhaps with the Court in terms

25   of how that's managed.  We've expressed some of that today, but

1    we'll continue to work on that.

2            **THE COURT:**  Okay.  Thank you.

3            Mr. Aylstock, Mr. Seeger, Ms. Hutson?

4            **MR. AYLSTOCK:**  We're prepared to work on that, Judge,

5    and certainly appreciate the Court's comments.

6            **THE COURT:**  You all agree the need and the benefit of

7    having a representative sample to work with?

8            **MR. AYLSTOCK:**  Absolutely, Judge.

9            **MR. SEEGER:**  Judge, may I just make a brief comment on

10   that?

11           **THE COURT:**  Yes.

12           **MR. SEEGER:**  And maybe just to help with the issue

13   that's been made by Mr. Brock.

14           Representativeness can be measured in many different

15   ways.  We can serve an unfiled.  But if you pick an unfiled

16   case to be worked up and the lawyer decides never to file that

17   complaint, we have a problem and you'll have no trials.

18           **THE COURT:**  I won't do that.

19           **MR. SEEGER:**  Yes, you made that clear.

20           **THE COURT:**  So this may be an iterative process.  We

21   may have to go through several layers of this, identify cases,

22   and if the cases are ready, then see if lawyers are willing to

23   bring those cases into the fold of the MDL.

24           **MR. SEEGER:**  And my understanding is we are going to

25   have completed, filed cases, a large enough number to select a

1    bellwether pool from.  On the issue of representativeness,

2    that's going to be a relatively big discussion about what both

3    sides think would be the criteria that would go into that, but

4    we're going to start that today, based on what you've said.

5            **THE COURT:**  All right.

6            **MR. BROCK:**  There's not a -- there's not the same

7    information about those cases on the Defense's side as there is

8    on the Plaintiffs' side.  They know their cases.  I feel

9    confident that they have cases that they are very interested in

10   advancing where they've been more aggressive on collecting

11   records and that type of thing.

12           And that's what I'm referring to when I say, if we

13   start with a selection of ready cases, there is a

14   self-selection in that that worries me from the perspective of

15   fairness for my clients.

16           That really is the issue that we're talking about.

17   And we will talk with Plaintiffs about that and hopefully work

18   through that.  But there is --

19           **THE COURT:**  Well, I had the same thought when I

20   realized that we had only less than 2 percent of the whole in

21   the MDL and that -- and I'm not suggesting any -- just

22   hypothetically, if that was a model, so to speak, going forward

23   in MDLs that you just get enough cases together, you get in

24   front of the panel, you get an MDL form, you take the

25   inventory, and you park it in a platform, and then you've filed

1    your best cases, and that's what the Defendant has to deal

2    with.

3            But, again, I'm back to -- it's the reality of the

4    agreement you all have reached, which I'm not saying is a bad

5    thing, but it is a consequence of that.

6            You're going to figure out how to deal with it --

7            MR. BROCK:   We're going to figure out how to deal with

8    it.

9            THE COURT:   -- and you'll let me know.

10           MR. BROCK:   There is a tool that we can use to bring

11   in unfiled cases to the discussion.  Because we do have an

12   ability to revoke tolling on cases if someone is -- if it's a

13   complete case or it's an incomplete case and picked randomly,

14   however that is, there is a way to manage that without Your

15   Honor having to rule on anything.

16           THE COURT:   I didn't see that in the tolling

17   agreement.

18           MR. BROCK:   It would have to be your bellwether order,

19   of course but -- I think I've probably said enough for today.

20   I think maybe let us work on this a little bit and see if we

21   make progress.

22           THE COURT:   Happy to.

23           MR. SEEGER:   I'll save my comments for when we debate

24   this.

25           THE COURT:   All right.

```
 1              Something we did not talk about in the preconference
 2   meeting, but it was on your agenda and I had it also to discuss
 3   with you, is the status of discovery right now with the
 4   30(b)(6)s and fact witness depositions.
 5              The custodians -- I appreciate very much the custodian
 6   chart that was produced, Mr. Buchanan.  That was very helpful.
 7              Plaintiffs have identified 59 custodians, apparently
 8   14 are in dispute, and then there's one of those 14 that the
 9   Plaintiffs have agreed to wait on.  I can't remember the
10   individual's name.
11              Mr. Buchanan?
12              MR. BUCHANAN:  Yeah, there's more, Your Honor.  As
13   reflected in the chart, I think we've deferred on five.
14              THE COURT:  Oh, five, okay.  Five of the 14?
15              MR. BUCHANAN:  Five of the 14 we're prepared to defer
16   on.  We think they're probably appropriate generally in
17   discovery in this case.  But with Your Honor's guidance last
18   Friday to focus principally on ones we think bear on the
19   affirmative defenses and the discovery we're currently focused
20   on, we've reduced it to nine pending.
21              THE COURT:  So there are nine, then, is that right,
22   that are in dispute, that the Defendants dispute?
23              MR. NOMELLINI:  Correct, Your Honor.
24              THE COURT:  On grounds of relevance or --
25              MR. NOMELLINI:  That's correct, Your Honor.  And I
```

1  think the original concern we would raise was the need to have

2  some kind of reasonable stopping point.

3           **THE COURT:**  Right.

4           **MR. NOMELLINI:**  But I think that's what we're working

5  toward.

6           **THE COURT:**  And then I didn't get a chance to

7  determine, although I have this information -- thank you,

8  you've provided it to me -- to determine how many of the 59 are

9  currently either have been deposed or scheduled for deposition

10  and then what your plans are for the remainder.

11           **MR. BUCHANAN:**  There's currently, I believe, 11

12  depositions on the calendar.

13           **THE COURT:**  I have the calendar.

14           **MR. BUCHANAN:**  I think we have 11 depositions on the

15  calendar in December, Your Honor.  One witness that we had

16  sought in December is going to go forward, for personal reasons

17  or personal challenges, I suppose, with scheduling in December,

18  and is now going to be in January.

19           **THE COURT:**  I saw that.

20           **MR. BUCHANAN:**  We have six witnesses that we requested

21  in a letter, I think it was late October.  I understand the

22  Defendants are coordinating with those witnesses to try and

23  provide dates.  And with Your Honor's guidance, we've blocked

24  off the last two weeks of January for those witnesses, so we're

25  just awaiting dates on that.

1          Coming back to those custodians.  To some extent,

2     whether we need depositions from them will depend, obviously,

3     on their files.  Some of them are important, disputed

4     custodians in particular.

5          **THE COURT:**  Am I correct in interpreting the chart,

6     where it indicates the status in the final column and that

7     Defendants agree, does that mean you have these records?

8          **MR. BUCHANAN:**  That means that they have agreed to

9     produce for them and that they are in the process of producing

10     them.  I don't believe, until we have certifications of

11     completion from the Defense for all of these witnesses, that

12     they have been produced.

13          Several of them are in the process, and we've gotten

14     40,000 documents since we spoke on Friday.  So there's, I

15     think, 200,000 documents have been produced, 40,000 of which

16     came in in the last week.

17          **THE COURT:**  Mr. Gunderson has been busy.

18          **MR. NOMELLINI:**  He has been, Your Honor.

19          **THE COURT:**  Well, I know he's not here, but maybe

20     someone can speak on his behalf, Mr. Nomellini, as to when you

21     anticipate those certifications submitted.

22          **MR. NOMELLINI:**  Yes, Your Honor.  So I think

23     Mr. Gunderson has had some pretty detailed discussions with

24     Mr. Buchanan about this and has basically laid out a schedule

25     for certifications of each of the witnesses that are coming up.

1          The general rule is the 10-day rule, but actually, for

2    some of the more immediate depositions, I think it's even more

3    aggressive than that, and I think for each of those, Dave and

4    Karl have talked through specific dates.

5          **THE COURT:** Okay.

6          **MR. BUCHANAN:** Yeah, I have information on the

7    witnesses for the first two weeks. And I understand that, for

8    the witnesses who are being deposed, we're going to have

9    certifications of completion by Wednesday, if not today, for

10   some of the witnesses.

11         So the third-week witnesses, we're awaiting

12   certifications of completeness. But more generally, with

13   regard to the nondeposition witnesses, we don't really have a

14   timetable on their productions.

15         **MR. NOMELLINI:** And that I need to check with

16   Mr. Gunderson on, Your Honor.

17         **THE COURT:** Will you let me know, then, or he could

18   even be on the call on the 26th, an update on -- because I'm

19   trying to -- do I need to give you a deadline for production on

20   all the custodians and their information?

21         **MR. NOMELLINI:** Yes. For example, custodians that

22   were just requested, you know, a week or two ago would probably

23   have a different timeline from the ones earlier.

24         **THE COURT:** Right.

25         **MR. NOMELLINI:** So I think -- Karl is very good at

1    this stuff.  I have a chart here for the deponents and the

2    timing for those.  We could expand that to others and come up

3    with something for Your Honor.

4         **THE COURT:**  That would be helpful.  Do you think you

5    can do that by the 26th?

6         **MR. NOMELLINI:**  I can ask Karl.  I don't know if --

7         **THE COURT:**  If not, then it could wait -- as long as

8    the production is continuing for the witnesses who are

9    scheduled for depositions, including those in January -- those

10   aren't complete yet, right?

11        **MR. NOMELLINI:**  Correct, Your Honor.

12        **THE COURT:**  So as long as that's continuing, this

13   could wait until our call on the 13th.  But I would love to

14   have -- the chart is helpful, it's definitely helpful.

15        **MR. BUCHANAN:**  Yeah, I'd ask, if you do have a chart,

16   I'd certainly like to see it as well.

17        **THE COURT:**  Did you submit this to them?  Did they see

18   this chart?

19        **MR. BUCHANAN:**  Yes, the Defendants have the chart that

20   we submitted to the Court.

21        **THE COURT:**  Okay.

22        **MR. BUCHANAN:**  But more broadly in terms of a

23   production calendar, I've been trying to work to develop that

24   with Mr. Gunderson just to see really what's on the other side

25   of the net and what's going to be coming back.

1    **THE COURT:**  I'm going to help you.  I'm going to ask

2    that you and Mr. Gunderson have a production chart to me -- I'm

3    not saying the production, but the chart to me in advance, so

4    December 12th, the day before the call.

5         **MR. NOMELLINI:**  Okay.

6         **MR. BUCHANAN:**  And, Your Honor, with regard to the

7    custodian dispute -- I indicated nine, but my math was rough,

8    it's eight -- how would you like to bring that issue to a head?

9         At this point, we obviously served the requests, we

10   made a proffer to the Defense, they raised some arguments as to

11   why they believe it shouldn't happen.  We submitted the charts

12   so Your Honor had some broader context.

13        I didn't know whether the process is a Motion for

14   Protective Order by the Defense or how you'd like to resolve

15   it.  We could certainly articulate in words what's in the

16   chart, but essentially many of the arguments have already been

17   presented, so --

18        **THE COURT:**  Judge Jones?

19        **JUDGE JONES:**  I think the quickest way to do that is I

20   could schedule a phone call.  I don't think you need to brief

21   whether a custodian is or is not relevant out of the chart that

22   Judge Rodgers was referring to.  We could have a phone call

23   right after the holidays, possibly next week, or maybe it makes

24   more sense right after the holidays.

25        **MR. BUCHANAN:**  That's fine.

1          **THE COURT:**  And you mean the Thanksgiving holidays?

2          **JUDGE JONES:**  The Thanksgiving holidays, yes.

3          **MR. NOMELLINI:**  And frankly, Your Honor, our bigger

4   concern beyond just these custodians I got in, you know, a week

5   or two ago is really having some kind of reasonable limits, you

6   know, in terms of -- for example, for affirmative defenses,

7   right, for the affirmative defense custodians the Plaintiffs'

8   date to give Defendant more is X, you know.

9          Because our focus is less on these individual people,

10  which they're important, but more on -- if we keep adding to

11  the pile, it makes both the existing work and the new work --

12  it makes it more difficult.  So, if there's some kind of

13  structure around that, I think that would be helpful to both

14  the parties.

15         **MR. BUCHANAN:**  The concept seems logical and wise.  If

16  I could just pass something to Your Honor, and share with the

17  Defense as well, one for Judge Jones as well.

18         As you can see from the chart, Your Honor -- for those

19  who don't have a copy, it's reflecting documents produced as of

20  the substantial completion date --

21         **THE COURT:**  I'm sorry, Mr. Buchanan.  What you just

22  handed me, do you have a copy of it?

23         **MR. BUCHANAN:**  Yes.

24         **THE COURT:**  Will you put it on the document screen?

25         **MR. BUCHANAN:**  Oh, okay, yes.

1        This lays out the document production from the Defense

2    that we've received over the last three to four months.

3    Obviously September 30th is a substantial completion date.   I

4    don't intend to argue or fuss about that at the moment, but

5    it's relevant to the point just raised by Defense counsel.

6        98,000 documents produced as of that date, 15,000 of

7    which I think were from the *Moldex* litigation.   There's been

8    118,000 produced in the last six weeks.   And, you know, I have

9    reason to believe that that's going to continue to escalate as

10   we get closer to custodial certifications for the witness.

11       So what's happening in our process on our workflow is

12   that we identify witnesses from the documents that get produced

13   to us to ask for their custodial file, largely, if it's a new

14   witness, then, you know, bringing something new to bear, or

15   filling in a gap that we see in the productions that we've

16   already seen, like there's windows of time where we just don't

17   have good visibility or a department where we don't have good

18   visibility or a gap in labeling, which was made evident in the

19   30(b)(6).

20       So that's the workflow and the process.   So we

21   continue to iterate on that.   And, you know, obviously we know

22   the Court is on a timeline to resolve the affirmative defenses.

23   We know a lot of that is, in some respect, dependent on what

24   comes from the military.   And we're working to do everything we

25   can do on our end to get the most information we can get

1    relevant to those issues.

2              And as I indicated, we have withdrawn and pulled back

3    a number of custodians who we thought, in light of Your Honor's

4    guidance, we could defer more toward general discovery period.

5              I do want to address one point.  It was suggested at

6    the last call that all we're really seeing with these new

7    productions is, you know, kind of reproduction or very similar

8    material to points previously produced in the initial cut.

9              And I got some stats last night that -- our system is

10   not that elegant on the Plaintiffs' side, Your Honor.

11             "Super hot" documents we think are trial exhibits.  We

12   think of them as potential trial exhibits.

13             "Hot" documents we think of as deposition candidates.

14             And that blue pile, based on what we've been able to

15   review so far -- and I can tell you it's probably only half to

16   two-thirds reviewed, given when it was produced -- there's some

17   700 hots and there's some 75 super hots.

18             That's based on what our reviewers are percolating out

19   to us today.  That is deduplicated off of the orange piles so

20   the unique documents that we think are deposition or trial

21   exhibit candidates.

22             The effort is significant on our part and I know it's

23   significant for the Defendants, but it's worthwhile, and we're

24   trying to moderate our effort as best we can to focus on the

25   support.

1      **THE COURT:**  All right.  Thank you.

2      Mr. Nomellini?

3      **MR. NOMELLINI:**  Your Honor, just briefly.  In terms of

4  separating the super hots from the hots and the blazing hots, I

5  think that the -- I trust nobody better to identify the super

6  hots than these lawyers here.  And the proof in the Berger

7  deposition was that about 20 original documents marked, of

8  which I think three were October/November produced.  So that's

9  just another perspective for the Court.

10      I think Judge Jones raised a good point on the last

11  call, and I think Judge Rodgers raised it as well, that as you

12  add more custodians, they're kind of concentric circles kind of

13  farther and farther out from the core.  And while they may give

14  rise to some documents being produced, they're probably not

15  going to be the super hots.

16      And so, while you may get more volume, what we've

17  found from what's been marked is that the earlier documents

18  were marked.

19      **MR. BUCHANAN:**  There was one deposition that followed

20  our discussion on that, it was Dr. Berger or Mr. Berger's

21  deposition.  And as you know, we had a discussion about whether

22  to continue the second day of Mr. Berger's deposition at that

23  point or go the next day.

24      I do provide this for context, Your Honor.  The orange

25  and blue correlate in the same way they did in the prior chart.

1     The blue bar for Mr. Berger shows he's got about

2  60,000 documents, 40,000 of which were produced in the 10 days

3  before his deposition.  So I can assure you there are

4  additional hots and super hots that have been identified by our

5  team and that Mr. Berger will have a chance to see when he's

6  redeposed.

7     Thank you, Your Honor.

8     **THE COURT:**  Thank you.

9     **MR. BUCHANAN:**  In terms of the other discovery issues,

10  we have the custodian dispute, which I take it, Judge Jones,

11  you'll set a date for a call?

12     **JUDGE JONES:**  I will, I'll do that.

13     **MR. BUCHANAN:**  Thank you.

14     We have an issue with ISL.  ISL, as you may remember

15  from Science Day, is the inventor of the double-ended design.

16     **THE COURT:**  Right, it's the French --

17     **MR. BUCHANAN:**  It's a French-German cooperative, also

18  the inventor of the nonlinear filter, they have the patents on

19  it.

20     We had a subpoena out to them.  There's a service

21  issue that we feel we're correct on that they're disputing.

22  There's also some general objections --

23     **THE COURT:**  Who is "they"?

24     **MR. BUCHANAN:**  Counsel for ISL.

25     So we think that issue will probably be ripe in the

1    coming days, and we'd like to file that Motion to Compel to get

2    that moving.

3              **THE COURT:**  Definitely.

4              **MR. BUCHANAN:**  There's one other -- there's an item

5    that's open, Judge Jones, from our call.  You resolved a

6    dispute concerning various e-discovery issues, and there was a

7    discussion about taking a deposition of an electronic discovery

8    custodian who could describe what was done to preserve, to

9    search, to gather, to preserve the various sources of

10   information.  You resolved it in terms of a declaration the

11   first instance.

12              Just by way of update, we have received those

13   declarations.  We got them three weeks ago.  We sent a list of

14   follow-ups two-and-a-half weeks ago.  We do await the response

15   on that.

16              I think Your Honor's guidance to us was, if the

17   declarations were unsatisfactory, we could reapply for that

18   deposition.

19              Just because we're not here in December, I'm going to

20   further ripen this with Mr. Gunderson.  We've had that

21   discussion already.  I know he's busy, but this is also very

22   important.  And if we can't get resolution on that, we may be

23   seeking application for that deposition soon.

24              The final issue, Your Honor, is I guess our request

25   for exemplar products.  We had a request for them, and we've

1    since offered to buy them from the Defense so that we can get a

2    few hundred pairs of these for examination, testing, use at

3    depositions, *et cetera*.  And that request is out.  But given

4    the timelines the Court is likely to operate under, if there's

5    something that an expert might need to see, we obviously want

6    to get those things to the hands of the consultants and others

7    as soon as possible.

8            **THE COURT:**  When did you make the request?

9            **MR. BUCHANAN:**  The request was made back in September.

10   We served a request for -- our third request for production, or

11   it may have been in our request to inspect, we've asked for

12   exemplars.  We've since sharpened it and said, *Hey, please send*

13   *us four boxes of 50 and we'll write a check*.

14           I understand there may be some debate about whether

15   they exist.  We have reason to believe that they've been

16   provided to a research institution.  And we don't think, if

17   there's scarcity in a product, that it should be preferentially

18   provided to a Defense consultant over a Plaintiffs consultant.

19   So we certainly want to bring that issue to a head very quickly

20   and hopefully before our January conference.

21           **THE COURT:**  I'll hear, if anybody wants to respond on

22   the 3M side.

23           But otherwise, Mr. Buchanan, I would suggest you need

24   to file a Motion to Compel.  September was two months ago.

25           **MR. BUCHANAN:**  We'll do so, Your Honor.

 1          **THE COURT:**  Mr. Brock, if you know something about

 2     this and --

 3          **MR. BROCK:**  Well, we've had a meet and confer about

 4     this and we talked about it yesterday.

 5          I'm going to let Mr. Wasdin or Mr. Nomellini say the

 6     actual number of these devices that we have.  It's not four

 7     boxes of 50, it's not "a" box of 50.  It's a couple, three

 8     handfuls, and I don't even know if it's that many.  I think

 9     they have more of these than we do.  We just don't have the

10     quantity of these devices that's being referenced here.

11          We're happy to compare notes on what they have and

12     what we have, but it's not going to be a large number of the

13     devices.

14          The issue was raised yesterday about some independent

15     institution doing some testing.  I don't know what that is.  We

16     invited them to give us the name and we will check it out, but

17     it's not something that's being done to my knowledge.

18          **MR. BUCHANAN:**  We're happy to share that information.

19     We can't imagine an independent institution having an interest

20     in testing a product that's four years off the market, if it's

21     not being done in connection with the litigation.  So certainly

22     we'd want to expedite resolution of that issue with the

23     Defense, and we'll get them that name.

24          **THE COURT:**  Right.  I'm going to ask that, if you're

25     not able to resolve this, then you need to file a Motion to

 1    Compel.  I'd ask that you do that by the 2nd.

 2            **MR. BUCHANAN:**  That's fine, Your Honor.

 3            **THE COURT:**  And then you all file your response by the

 4    12th.

 5            Actually, let me look at my calendar.  This is

 6    something we can resolve at the December 13th --

 7            **MR. BROCK:**  If there's a need for us to put on the

 8    record the number of these devices that we have as opposed to

 9    telling them what that number is in a meet and confer, we're

10    happy to do that.

11            I'm saying that we have conducted this investigation,

12    we've checked around the company.  There are a few of these

13    here and there and maybe -- let me -- they had a conversation

14    about this yesterday since I've gotten the information and it's

15    not --

16            **THE COURT:**  Are you willing to produce what you have

17    or are you saying that they have more than you have and you

18    want some from them or --

19            **MR. BROCK:**  I'm saying, for the few that we have, I'm

20    not willing to turn all of those over.  And we've not talked

21    about what we would do with regard to the limited universe of

22    those things that we have.  We've not had that discussion.  But

23    it's not a number that is going to be sufficient for people to

24    do extensive testing with.  So I think that's where we are on

25    that particular issue.

1      **THE COURT:**  Well, I think it's best to have this

2   addressed in a formal fashion --

3      **MR. BUCHANAN:**  That's fine.

4      **THE COURT:**  -- so that both sides are on the record in

5   terms of what investigation has been done and what amount of

6   the product exists and where and then how much, if any, you're

7   willing to produce of the product based on what you have.  And

8   I don't know, it sounds --

9      Mr. Wasdin, did you want to respond, or Mr. Nomellini?

10      **MR. NOMELLINI:**  Yes, Your Honor.  So, based on our

11   investigation to date, we've located 15 pair of the Version 2

12   earplugs.  And I don't know what Plaintiffs have, but it sounds

13   like it might be comparable or more than that.

14      **THE COURT:**  Okay.  So just when you submit your

15   briefing, make sure to include what investigations you have

16   done to try to locate more of the earplugs and then tell me

17   what you have.

18      **MR. NOMELLINI:**  Yes.  And just for some context, Your

19   Honor, since the early 2010s, the earplugs were coming out of

20   New Dynamics, which is another company.  So there's kind of an

21   eight-year window here which gives rise to the relative absence

22   of inventory.

23      **THE COURT:**  Yes.  And I'm certainly not suggesting you

24   have to produce something that you don't have.

25      And I didn't realize you all had any, so I need to

1   know if you really need what they have.

2          **MR. BUCHANAN:**  We get them from clients, Your Honor.

3   You know, it's one of those things that, you know, we would not

4   use anything like that for testing.  From a chain of custody

5   perspective, we want the actual product, you know, in commerce.

6   And we imagine from --

7          **THE COURT:**  So that's your source is all from your

8   clients?

9          **MR. BUCHANAN:**  Clients.  I think there was -- people

10  were able to buy some things off of eBay, but they're not going

11  to have the chain of custody tied to the Defendants.  Now,

12  obviously, if that's best available, that's best available.

13         **THE COURT:**  Does the military still have some or any

14  third-party distributors?

15         **MR. NOMELLINI:**  I think that's an excellent question

16  worth both parties following up on, Your Honor, with both the

17  military and potentially New Dynamics.

18         **MR. BUCHANAN:**  That's fine, we're happy to.

19         **THE COURT:**  All right.  And I don't mind -- I can ask

20  Major Evans if they have any.  They might have them at

21  Aberdeen.

22         **MR. BUCHANAN:**  Thank you, Your Honor.

23         **MR. NOMELLINI:**  If they find any testing materials

24  while they're looking for them --

25         **THE COURT:**  Speaking of the testing, did you all

```
 1    resolve the issue of the site visit to the testing lab in
 2    Indianapolis?
 3              MR. BUCHANAN:  I think we're trying to do it when
 4    we're in Indianapolis.  I'm not sure what the final position is
 5    from the Defense on that.  We don't anticipate doing testing.
 6    We anticipate it being an inspection and photographs.
 7              THE COURT:  That's what I thought.
 8              Mr. Wasdin, any response to that?
 9              MR. WASDIN:  Yeah, we saw the most recent email come
10    through on that.  We asked the Plaintiffs' position on whether
11    or not the lab visit related to the affirmative defenses and
12    whether we should be taking time away from the work that we're
13    doing with the government and the depositions to do that while
14    we're in Indy.
15              THE COURT:  We'll, you're going to be there, though.
16    I might agree with you if you're making a special trip.  But
17    since you're going to be there anyway, it makes sense to me to
18    just knock it out.
19              MR. WASDIN:  We'll look at what they sent us and try
20    to schedule a date, but we'll have to kind of come to terms on
21    what they're going to be allowed to do while they're inside of
22    the lab.  That is not something that we've hammered out a
23    proposal on.
24              THE COURT:  This issue has been around for a while.
25              Are these the three weeks in December depos that --
```

1    **MR. BUCHANAN:**  We're there four or five times, I

2    think, in December.

3    **MR. WASDIN:**  Your Honor, for clarity, when we first

4    got the request, Mr. Buchanan told us that they wanted to send

5    an expert to do testing, and so we've spent a number of weeks

6    now waiting around on a proposal as to what that testing would

7    be.

8    And it was just a few days ago or a week ago, I'm not

9    sure, that we got an email where they said, *We're no longer*

10   *interested in doing testing, we just basically want to come and*

11   *take photographs.*

12   And so I think, from our perspective, we just need to

13   hammer down who that's going to be and what they're going to be

14   photographing.

15   **MR. BUCHANAN:**  We were advised by the Defense that all

16   the equipment had been changed, so the essential test suite and

17   test machines have been changed out over the last 10 to 12 to

18   20 years, depending what tests you're looking at.  So we're

19   just taking pictures, Your Honor.

20   **THE COURT:**  So the scope of the visit has been

21   reduced.

22   I'm going to ask you to continue to confer.  I would

23   like to have this resolved by the 26th call.

24   If you just want to take photographs, tell them where

25   you want to take those photographs, what you want photographs

1    of, and set up the visit for when you're there in December.

2             **MR. BUCHANAN:**  Thank you, Your Honor.  Will do.

3             **THE COURT:**  Let me go back to ISL.

4             Are they located in France or do they have an office

5    here in the United States?

6             **MR. BUCHANAN:**  The license agreement with 3M I think

7    or with Aearo I think had resolutions resolved in New York, but

8    I think their agents are all in either France or Germany.

9             **THE COURT:**  And that's where the subpoena was --

10            **MR. BUCHANAN:**  The subpoena was served that way.

11   There was a debate about the service and the means through

12   which we did it and whether it was proper.  We think, under the

13   relevant case law, that it was.  So we're going to -- we'd like

14   to enforce the subpoena.

15            As a timing matter, obviously, alternative process, as

16   Your Honor knows, is quite delayed and doesn't suit the

17   timetable for what we have before us.  So we'd like to see if

18   we can enforce it through the means we've chosen.

19            **THE COURT:**  All right.  Any other third-party issues

20   for either side?

21            **MR. BUCHANAN:**  We have a handful of subpoenas that are

22   out, Your Honor, many I think are to Defendant's former

23   employees.  I think due dates for those objections and

24   responses is rolling.  I'm not aware of a particular issue yet,

25   but it may be that on the former employee subpoenas there is a

1    point where we have to expedite the Court's attention to it, if
2    we can.
3              **THE COURT:**  As much as I like it when you meet and
4    confer and you resolve issues, I don't want the meet and confer
5    process to delay getting an issue resolved.  And that can
6    happen.  And it's in good faith you're trying to resolve an
7    issue, but then it can impact the schedule in a meaningful way,
8    and we need to avoid that.
9              **MR. BUCHANAN:**  We've tried to be crisp and efficient
10   on that, Your Honor.  We recognize the Court's timeline.
11             **THE COURT:**  I don't think you have a timeline.
12             **MR. BUCHANAN:**  What's that?
13             **THE COURT:**  I don't think you have a timeline.  I
14   think our only timeline is now obsolete.
15             **MR. BUCHANAN:**  I think we've kind of processed
16   sentiment into a mental timeline, Your Honor.  I'm sorry.
17   We're trying to get everything done --
18             **THE COURT:**  Fast.
19             **MR. BUCHANAN:**  -- ASAP.  Thank you.
20             **THE COURT:**  Hopefully we'll be able to set a timeline
21   once we see the production schedule that Mr. Gunderson and
22   Mr. Buchanan work on and we'll be able to set a deadline for
23   that and for depositions.
24             And then, when we get the first pool, however that's
25   going to materialize, then we'll get a discovery process in

1    place for those cases.

2              I'm looking at your agenda.  There was an item I

3    believe on both -- on lien resolution administration.

4              Mr. Aylstock?

5              **MR. AYLSTOCK:**  Yes, Your Honor.  I have discussed this

6    with Mr. Brock.  We're going to meet and confer on presenting

7    an order to the Court for appointment of a lien resolution

8    administrator.

9              **THE COURT:**  Good.

10             **MR. AYLSTOCK:**  In particular, Mr. Will Shapiro is

11   here, and we've nominated him.  There are particular issues

12   with regard to TRICARE and their timetable sometimes responding

13   to liens --

14             **THE COURT:**  Right.

15             **MR. AYLSTOCK:**  -- could be very extended.  So we felt

16   it prudent to go ahead and get something before Your Honor so

17   that Mr. Shapiro can proceed and begin that process sooner

18   rather than later.

19             **THE COURT:**  That's excellent.  I was hoping that we

20   would -- I talked to Ms. Hutson about this a while back, and I

21   think this is a good idea.

22             **MR. AYLSTOCK:**  Thank you, Judge.

23             **THE COURT:**  Mr. Shapiro, thank you for being here, and

24   I look forward to continuing to work with you.

25             **MR. SHAPIRO:**  Thank you.

1    **THE COURT:**  I believe that covers what I had to go

2 over with you all.

3    Judge Jones?

4    **JUDGE JONES:**  I think that covers everything on the

5 agenda.

6    **THE COURT:**  Judge Herndon?

7    **JUDGE HERNDON:**  I'm good, thank you.

8    **THE COURT:**  Mr. Nomellini?  I was going to turn to the

9 parties to see if you had anything else.

10    **MR. NOMELLINI:**  Your Honor, just one thing.  With

11 respect to the depositions, I believe we have 11 depositions

12 now scheduled for December.  We are working on the January

13 dates, and we provided a couple of dates to Plaintiffs on that

14 this morning.

15    There is an issue with respect to -- another illness

16 issue with respect to one of the witnesses that we'd probably

17 like to discuss with Your Honor on Tuesday with respect to one

18 of the January depositions.

19    **THE COURT:**  All right.  Thank you.

20    Anything else?

21    **MR. AYLSTOCK:**  The only other thing I'd just like to

22 inform the Court, Mr. Brock and I had discussed -- and

23 Mr. Overholtz -- the continuation of Mr. Berger's 30(b)(6)

24 deposition.  It appears we have an agreement worked out on that

25 that will allow for completion of that for a couple, few hours

1    without needing some additional time beyond the two days.  So I

2    think we have that resolved and just wanted to bring that to

3    your attention.

4              **THE COURT:**  Yay.  Happy to hear that.

5              Well, again, it was very nice to see everyone, and we

6    thank you very much for a delightful evening last night and

7    also for all of your input today.  And we will continue to

8    press on.

9              I'll talk to you all, Leadership, on the 26th, and

10   then we'll also have the call on the 13th.  And our next CMC in

11   January is the 14th of January.

12             Safe travels home for those traveling.  Thank you.

13             **MS. HUTSON:**  Thank you, Your Honor.

14             **MR. AYLSTOCK:**  Thank you, Judge.

15             *(Proceedings concluded at 11:09 a.m.)*

16             --------------------

17   *I certify that the foregoing is a correct transcript from the*
     *record of proceedings in the above-entitled matter.  Any*
18   *redaction of personal data identifiers pursuant to the Judicial*
     *Conference Policy on Privacy are noted within the transcript.*

19

        *Donna L. Boland*

20                                              *11-25-2019*
     *Donna L. Boland, RPR, FCRR*               *Date*
21   *Official Court Reporter*

22

23

24

25