**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG       )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,      )
                                    )    Pensacola, Florida
                                    )    January 14, 2020
                                    )    9:46 a.m.
                                    )
                                    )
_____  )

**EIGHTH CASE MANAGEMENT CONFERENCE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-45)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

**A P P E A R A N C E S**

FOR THE PLAINTIFFS:        **BRYAN F. AYLSTOCK, ESQUIRE**
                          Aylstock, Witkin, Kreis & Overholtz
                          17 E Main Street, Suite 200
                          Pensacola, Florida  32502

                          **SHELLEY HUTSON, ESQUIRE**
                          Clark Love & Hutson, GP
                          440 Louisiana Street, Suite 1600
                          Houston, Texas  77002

                          **CHRISTOPHER A. SEEGER, ESQUIRE**
                          Seeger Weiss, LLP
                          55 Challenger Road, 6th Floor
                          Ridgefield Park, New Jersey  07660

FOR THE DEFENDANT:         **KIMBERLY BRANSCOME, ESQUIRE**
                          Kirkland & Ellis, LLP
                          333 South Hope Street, 29th Floor
                          Los Angeles, California  90071

                          **MARK J. NOMELLINI, ESQUIRE**
                          **NICHOLAS F. WASDIN, ESQUIRE**
                          Kirkland & Ellis, LLP
                          300 N Lasalle
                          Chicago, Illinois  60654

                          **LARRY HILL, ESQUIRE**
                          Moore, Hill & Westmoreland, P.A.
                          350 W Cedar Street, Suite 100
                          Pensacola, Florida  32502

P R O C E E D I N G S

**JUDGE RODGERS:**  Good morning, everyone.  We are here for the Eighth Case Management Conference in the 3M Combat Arms Earplug multidistrict liability litigation.

You all know I'm Judge Casey Rodgers.  I have Judge Dave Herndon also present here in the courtroom and Judge Gary Jones present by videoconference.

For the Plaintiffs, in Leadership I have Mr. Aylstock, Ms. Hutson, and Mr. Seeger.  For 3M Defendants, I have Ms. Branscome, Mr. Nomellini, Mr. Wasdin, and Mr. Hill.

I met with Leadership this morning in a preconference meeting.  We discussed a number of items.  I will address those items here in the courtroom so you're all aware of what we've been talking about for the last hour or so.  And then I'm going to invite the parties -- because we ran out of time, I'm going to invite the parties to raise any issues from the agenda that I've overlooked or any other issue that they believe we need to discuss, and we'll do so here in open court.

I'll try to track the agenda.  I'll start with the bellwether process.  Thanks to BrownGreer, we do now have a representative pool from which the parties are going to be selecting cases for an actual discovery process.  For those of you who don't know the process that we undertook for getting to where we are now, I'm going to just touch on it.  And then I'm going to ask Roma from BrownGreer to present her findings or

1  her analysis to you all, which will confirm that we have a

2  representative pool.

3           So we started with one percent of the entire universe

4  of both unfiled and filed cases.  And at the time I think we

5  were roughly 40,000 cases.  We took one percent -- and this

6  will tell you I guess what the whole was, but we took one

7  percent.  I asked BrownGreer -- Jake -- to randomly pull one

8  percent from the total, and that left us with 1397 cases.

9           I then -- and all of this was done in discussion with

10  Leadership from both sides.  I then discussed with Leadership,

11  we decided on three categories that we wanted to look at in

12  terms of representativeness:  Age, branch of service, and

13  injury.  And BrownGreer looked at those categories for

14  prevalence within the entire universe of cases, not just the

15  1397.

16           So we pulled one percent from the entire universe,

17  then we went back to the entire universe and applied those

18  categories of age, branch of service, and injury.  And what we

19  arrived at was a representative claimant being between the ages

20  of 30 and 39, having served in the Army or currently serving in

21  the Army, with a claim of both tinnitus and hearing loss, and

22  that claimant being the most representative.  That actually

23  represented 10 percent of the overall population.

24           I asked Roma to conduct a more thorough and detailed

25  prevalence analysis to determine if the combination of those

1    three categories or factors did in fact capture the most

2    representative claimant.  She did that -- that's what she's

3    going to present to you here in just a moment -- and confirmed

4    that what we thought was correct, and the 30 to 39, Army

5    service, tinnitus and hearing loss was the most representative.

6           The next most representative group would have been to

7    expand -- we would have needed to expand and we did expand the

8    age category to 49, so from 30 to 49.  And that took us to 17.6

9    percent.  I determined that that would give us more diversity

10   in the pool, so our age category expanded, again, from 30 to

11   49.  That took us from 10 percent to 17.6 percent.

12          I think I have those numbers right, but Roma will

13   correct me if I don't.

14          And we then applied that criteria to -- it would have

15   been 1397, which was the one percent.  However, we had to make

16   sure that that pool of claimants all had census forms completed

17   and also had short form complaints.  The number was just over a

18   thousand that had met those criteria.

19          And so, over the weekend and through yesterday,

20   BrownGreer continued with their work and arrived at a pool of

21   177 -- I'll call them cases, 177.

22          Four of those cases did not have short form

23   complaints.  But my understanding is -- I've identified those

24   cases to Leadership and that is going to be quickly rectified.

25          What I told the parties early on was the way we would

1    arrive at the discovery pool is, once we got to this 177 cases

2    fully representative, then each side would be able to select a

3    certain number and the Court would select a certain number at

4    random to arrive at 20 so each side has seven selections and

5    the Court has selected six at random.  Those six cases have

6    been selected.

7           Additionally, we are going to set aside five cases as

8    backup cases, and the parties will be able to select two apiece

9    and the Court will take one at random for backup cases.

10          All right.  So I'm going to ask Roma -- because I

11   think it's important for you all to be aware of the work that

12   went into this and to feel confident that we do in fact have a

13   representative pool of the 177 cases -- come on up, Roma -- to

14   make the individual selections from.

15          Roma, thank you.

16       **MS. PETKAUKAS:**  Good morning, Your Honor.

17       **JUDGE RODGERS:**  Good morning.

18       **MS. PETKAUKAS:**  I have copies of the presentation that

19   I can give to you.

20       **JUDGE RODGERS:**  This will be shown on the overhead

21   screen as well.

22       **MS. PETKAUKAS:**  So, thank you for the opportunity.  I

23   will just focus to illustrate the points that you already went

24   over.

25       **JUDGE RODGERS:**  And the thanks is all ours.

1      **MS. PETKAUKAS:**  So, as the first step, as you

2  mentioned, we have done the analysis of the overall population

3  of claimants who have submitted census form information to us

4  just to determine who would be a representative claimant type.

5  And we focused on three criteria that were asserted on the

6  census forms, and that is being the age, branch of service, and

7  injuries asserted.

8          So, as to the age of the overall population --

9      **JUDGE RODGERS:**  You can move the microphone over

10  closer to you, Roma.

11      **MS. PETKAUKAS:**  Okay.  So if we focus just on the age,

12  as you mentioned, there are 45 percent of people in the overall

13  pool in their thirties.  And then, if you look at the people in

14  their forties, that's the most prevalent group, 26 additional

15  percent of people are in their forties.

16          As a next step, we looked at people what was asserted

17  branches of service.  So here in the overall population, we see

18  that over 47 percent have served in the Army, and that's the

19  number here.

20          As a third criteria, we looked at the injuries.  So

21  from all the assertions of whether hearing loss, tinnitus, a

22  combination of both were asserted, it is apparent that the

23  majority -- over 50 percent, 54 percent -- have asserted both

24  hearing loss and tinnitus as their injury.

25          As the next step, then what has emerged is that people

1    in their thirties and forties were the most prevalent people

2    who served in the Army and then people who have both hearing

3    loss and tinnitus.

4            So we have done the combination of factors analysis,

5    so we applied all three factors to the overall population.  And

6    you see the -- as we applied the factors, the population had

7    shrunk, but it -- the combination of a few factors represents

8    18 percent of the population in the overall claimant population

9    that have these characteristics.

10           As you also mentioned, we took an additional step.  We

11   have looked at all the other combinations possible of the three

12   factors to see and confirm that these criteria are most

13   prevalent.  So that resulted in an overall 114 or so

14   combinations as we looked at different ages, so ages 18 to 24

15   and 50 to 55 and all the different places where people served

16   and all the injuries asserted.

17           And that analysis of all of the data still confirmed

18   to us that the most prevalent group in this overall population

19   of claimants are people who are in the 30-to-49 age group,

20   served in the Army, and had both hearing loss and tinnitus

21   asserted.

22           As the next step, we then focused on the one percent

23   population that you mentioned that we selected randomly from

24   the overall population.  And so for the people who had census

25   forms in the one percent population, we did the same analysis,

1    factor-by-factor analysis, and I want to illustrate the results

2    here.

3         What I'm doing is I'm putting side by side the

4    analysis I just showed you of overall population.  And on the

5    right side you see the one percent result.  So, as we saw -- so

6    here in the overall population we saw 45 percent of people were

7    in their thirties, an additional 25 were in their forties.  The

8    same trends have emerged and were confirmed the one percent.

9    So we have 45 percent of people in the one percent in their

10   thirties, additional 26 in their forties.  So the statistics

11   are very similar.

12        Similarly, we also -- we did the analysis of the

13   branches of service.  And in the overall population, we had 47

14   percent in the Army -- in the one percent, we have 47 percent

15   of people who served in the Army.  So again, the similar trends

16   have been confirmed.

17        And lastly, as to the injuries, we saw the same

18   similarities being confirmed.  Hearing loss and tinnitus have

19   been the most prevalent in the overall population and the same

20   prevalence in the one percent.

21        So the importance here is that the one percent that

22   were selected randomly, we have also confirmed that it's a

23   representative sample and shares the same trends as the overall

24   population.

25        And as a result then of all this analysis, we have

1    applied the three filters, all the three criteria to the

2    claimants in the one percent to arrive at that pool of

3    claimants who will be in the representative bellwether

4    selection pool.

5              And from the 177 census forms that we have for the one

6    percent, there are 783 in the age 30 to 49 group.  When you

7    look at those that served in the Army, it narrowed down to 331,

8    and that leaves us with 177 that also have hearing loss and

9    tinnitus.  And that is the result of the bellwether selection

10   pool.

11             **JUDGE RODGERS:**  All right.  Thank you very much, Roma.

12             Does anyone have any questions about the analysis

13   process that was undertaken?

14             **MR. AYLSTOCK:**  I don't, Your Honor.  I'd just comment

15   on how remarkable it is that the one percent really matches

16   almost exactly to --

17             **JUDGE RODGERS:**  The Army was the exact same percentage

18   of 47 percent between the overall and the one percent.

19             **MS. PETKAUKAS:**  Yes, and the others closely matched as

20   well.

21             **JUDGE RODGERS:**  That was outstanding.  I'm really

22   pleased.  Thank you.  I'm 100 percent confident in our pool and

23   the representativeness of the pool.

24             And now, as I said, the parties will have the

25   opportunity to make their individual selections from the 172 --

1    or 177, is that where we ended up?

2              **MR. AYLSTOCK:**  Yes, Your Honor.

3              **JUDGE RODGERS:**  So 171.  And everyone knows, if you've

4    been before me in court or certainly if you've been in these

5    preconference meetings, that I'm terrible at math.  But it is

6    171 because we've taken out those six that were selected at

7    random by the Court.

8              So what's going to happen now is the -- what has been

9    referred to as a fact sheet, the first thing that's going to

10   happen is the name of that document is going to change to a

11   selection sheet.

12             And in hindsight, I should have made this more clear

13   to the parties what my intent was for this now selection sheet,

14   and it's just that, that this would be a tool for selecting

15   those 14 cases that the parties would be selecting for the

16   discovery pool.  And I wasn't clear enough on that point.

17             I think there was a good bit of back and forth between

18   the parties about what should be on that fact sheet, and I

19   think there was some misunderstanding that this was a discovery

20   tool or would be a part of a discovery tool.  And I can

21   understand why the parties had that thought.  And they weren't

22   exactly sure whether this would be the only fact sheet used in

23   the litigation, whether interrogatories would be permitted at a

24   later time, and so that's all been clarified.  The selection

25   sheet is just that.

1          It's been pared down significantly all in the interest

2      of time and my desire to get to the 20 as quickly as possible

3      -- or the 14 as quickly as possible.

4          The questions have been narrowed in number.  And also

5      I made the decision today to eliminate the document production

6      portion of the form, so there will be no documents produced in

7      connection with the selections.

8          And also, I've eliminated the declaration part of the

9      form, so the plaintiffs will not have to declare under penalty

10     of perjury that the information is true and correct to the best

11     of their knowledge.

12         In exchange for doing that -- because that certainly

13     makes it easier for the Plaintiffs to get those forms filled

14     out, but some concern on the Defense part about that.  And so,

15     what I've told the Defense is, once the 20 are identified and

16     those cases are identified, those plaintiffs are identified,

17     then there will be a much more fulsome process of written

18     discovery that will take place with those 20 plaintiffs.

19         So certainly they will be required to produce

20     documents and respond to interrogatories, the number and scope

21     of which has not been determined and will be determined at a

22     later time.

23         I'm going to sort of progress into a little bit of a

24     discussion about *Touhy* and the military and VA's participation

25     in the discovery process.

1     Initially I thought we might include a certain number

2     of the pool in an initial request to the VA. We're not sure

3     how quickly the VA is going to turn around records. That has

4     yet to be determined. So I wanted to limit that number to

5     something that was manageable for the VA to get their sort of

6     feet wet, their systems in place.

7     And what I'm still intending to do is to submit the

8     joint requests -- the parties do have a joint *Touhy* request --

9     to the VA with those six names that I've selected -- or I

10    didn't select them but I called them my selections, but they're

11    random selections, and we'll start with those. However, that

12    is not going to interfere with the process of filling out the

13    selection sheets.

14    I have been advised -- and I'm not going to name any

15    names, but I've been advised by those in Leadership that they

16    believe the forms can be filled out and submitted within 21

17    days given the fact that there is no -- and I pushed them on

18    that, that was my decision on the 21 days.

19    But given the absence of a declaration that your

20    clients have to sign and the absence of any documents, it is I

21    think the belief that, given the number of records that have

22    already been produced in connection with the census forms, the

23    work that Cerner has done, the work that Leadership has done,

24    the early vetting committee has done, that you'll be able to

25    fill out the forms.

 1              Let me ask if anyone has questions thus far and also
 2    to Leadership counsel if I've overlooked something or missed a
 3    step in where we are?
 4              February 4th, by the way, is 21 days.
 5              There is not contemplated any type of deficiency
 6    process for these selections that are going to be made.  If it
 7    turns out that a form is lacking material information that's --
 8    you know, the majority of the questions are not responded to,
 9    the parties are going to confer about that and decide whether
10    we need to substitute a case from the backup group of cases.
11              I don't think that's going to be an issue.  But if it
12    is, we have a mechanism in place to deal with it.
13              And again, it has yet to be determined once we have
14    the selections what the exact scheduling of discovery and scope
15    of discovery is going to be for those cases, but that's to
16    come.
17              Ms. Branscome?
18              **MS. BRANSCOME:**  Your Honor, we had discussed in
19    chambers the sort of -- Your Honor's thoughts on the importance
20    of making sure that both sides have as equal access to the
21    information as possible.
22              **JUDGE RODGERS:**  Yes.
23              **MS. BRANSCOME:**  And Your Honor had indicated that you
24    would enter an order sort of addressing that issue and limiting
25    Plaintiffs to, as much as possible, the same amount of

1    information that the Defendants were getting.  So I will leave

2    that to you but I wanted to raise that issue.

3          **JUDGE RODGERS:**  Yes, thank you.  We did have this

4    discussion.  It has been my intent from the very beginning when

5    we embarked on this bellwether process to come up with as fair

6    an approach as I could.

7          Of course, the Defendants sought complete

8    randomization of selections.  The Plaintiffs obviously opposed

9    that and wanted more of an individual selection process to be

10    put in place.  And I tried my best to achieve a hybrid of the

11    two, a middle ground.  I think we've done that.  Nothing is

12    perfect, but I think we've done that.

13          Just as a way of background, there was some resistance

14    in the beginning to fact sheets, which I'm now calling a

15    selection sheet, from the Plaintiffs for the individual

16    selections.  There was a thought that the Defendants had what

17    they needed with the census forms.  And I disagreed and felt,

18    to do my best to level the playing field, that the Defendants

19    should be entitled to more information.

20          There is still a concern that it is not completely

21    level.  I mean, these are your clients that you're going to be

22    selecting your seven cases from.  The Defendants, while they

23    have records, they don't have access to those individuals.

24          And so, what I have done, in an effort, again, to

25    level the playing field, is I've told Leadership -- and I'm

1    speaking also to Ms. Lanier -- I know I saw Rachel here.  I'm

2    hoping that the early vetting subcommittee can assist with

3    gathering these selection sheets and making sure that they are

4    complete.

5             But what I have told Leadership and I'll stress to you

6    all and ask that you convey to your committee is that there is

7    to be no effort on anyone's part to interview or discover facts

8    specific to an individual plaintiff or claimant's case.

9             Understood?  Any questions about that?

10            **MS. LANIER:**  No, Your Honor.  I do have one brief

11   question just to make sure that I understand the subcommittee's

12   obligations --

13            **JUDGE RODGERS:**  And I'm sorry, I should have

14   clarified, I mean outside of the selection sheet and the

15   information -- you're obviously going to be privy to that

16   information.  But outside of that, then no effort to learn more

17   about a case.

18            **MS. LANIER:**  Absolutely understood, Your Honor.  That

19   should be no problem.  May I ask you one question?

20            **JUDGE RODGERS:**  Yes.

21            **MS. LANIER:**  In terms of the 21-day deadline, will

22   that begin to run when the form is able to be filled out in MDL

23   Centrality or is that beginning to run today?

24            **JUDGE RODGERS:**  Well, I'm hoping that's going to

25   happen today -- where is Jake? -- today or tomorrow.

1          Jake, when can we have that in the system?

2          **MR. WOODY:**  As soon as I get it, it usually takes us a

3     few hours or a day to set it up.

4          **JUDGE RODGERS:**  It will run from the day it's

5     available, whenever that is.

6          **MR. WOODY:**  We'll do it quickly, Your Honor.

7          **JUDGE RODGERS:**  Thank you.

8          **MR. AYLSTOCK:**  Your Honor, one other thing that I

9     think we spoke about before that may help with the 21 days is

10    that you had termed this as not a discovery tool but a

11    selection tool.  And we had discussed the fact that these are

12    to be used for cross-examination and so forth of the plaintiff

13    and obviously to be filled out in good faith.  But we're trying

14    to get this done quickly so --

15         **JUDGE RODGERS:**  Well, they need to be filled out in

16    good faith.  I can't predetermine what is going to happen in a

17    trial.  I don't know.  I think everyone is operating, you know,

18    under at least the spirit certainly that there's no

19    declaration, but it is a statement of a plaintiff.  I don't

20    know.

21         I haven't looked at the evidence rules and boned up on

22    613 and -- I think it's 613, but 611, 12, 13, I haven't done

23    that.  So I can't say for certain that this will never come up.

24    I did say in the jury room this morning when we were meeting

25    that I didn't expect to see this in cross-examination in a

trial.  I think that's the spirit of this.  But I'm also
expecting that these are going to be filled out by your clients
in good faith and there's not going to be any intent to mislead
or to -- but I can't today -- I don't have a crystal ball, I
can't today opine on whether there will ever be an issue of
inconsistency.  I just can't.

> **MR. AYLSTOCK:**  Understood, Your Honor.

> **JUDGE RODGERS:**  But we had this discussion and --
there is no verification form, there is no penalty of perjury,
though, on the form.  That was removed or will be removed.

> So I'm not sure I answered your question, but I tried
to address it.

> **MR. AYLSTOCK:**  Thank you, Judge.

> **JUDGE RODGERS:**  Ms. Branscome, do you wish to be heard
on that issue, anything more need to be said?

> **MS. BRANSCOME:**  No.  We understood that Your Honor has
removed the declaration.  And from our standpoint, what falls
under the Rules of Evidence is something that we'll address
when we get there.  We certainly do think this is something
that's subject to discovery, but we will cross that bridge when
we get there.

> **JUDGE RODGERS:**  All right.  Anything else we need to
discuss on the bellwether process from anyone?

> Mr. Garrard, are you good?

> **MR. GARRARD:**  Yes, Your Honor.  The other thing that

1  you did not mention is that you were removing the requirement

2  to produce releases.

3          **JUDGE RODGERS:**  I'm sorry.  That's true.  Yes, I guess

4  I intended that under the document umbrella.  But, yes, I'm

5  removing anything in connection with documents from this form.

6          **MR. GARRARD:**  Does the Court want Mr. Wasdin and

7  myself to resubmit this or is the Court going to modify it?

8          **JUDGE RODGERS:**  I'm trying to think what else we -- I

9  know we had some discussion about dates, but I think we left it

10  as is with the dates.

11          **MR. GARRARD:**  Yes.

12          **JUDGE RODGERS:**  So the only thing that would come --

13  you all have the electronic version of this, right?

14          **MR. WASDIN:**  Yes, Your Honor.  We just need to change

15  the title, strip the document request, strip the authorization,

16  strip the declaration, and then we'll have a --

17          **MR. GARRARD:**  That might speed it up for the Court.

18          **JUDGE RODGERS:**  Yes, that would be great if you all

19  would do that.  And I'd certainly like to have a copy of it,

20  but most importantly Mr. Woody needs a copy of it.

21          **MR. WASDIN:**  We can do that today.

22          **JUDGE RODGERS:**  Very good, thank you.

23          Let me turn back to *Touhy* for just a moment.  We have

24  a meeting scheduled between myself and the parties and the VA

25  and the DoD, a separate meeting in D.C. on the 28th, and

1    hopefully in part of those discussions we'll be able to help

2    streamline the process, particularly for the VA.  We've already

3    met with the DoD, but this will be a follow-up meeting with

4    them.  We're now moving into witness discovery, depositions

5    with DoD, and we'll just be touching base with them in that

6    regard.

7            There have been a number of witnesses who have been

8    identified by both sides, several of whom are still employed in

9    federal service.  Those individuals I think will be scheduled

10   first for depositions.  These are depositions largely related

11   to the affirmative defense.  But some are not in federal

12   service any longer, so those may take a little bit more effort

13   to coordinate.

14           That's, I think, really all I need to say about that,

15   unless you all think there's anything more that -- no?  Okay.

16           I raised with the parties a question about the

17   resolution of the affirmative defense, the government

18   contractor defense.

19           Mr. Sacchet, there was a reference in your letter to

20   the Court regarding the proposed briefing schedule once we get

21   there and a reference to the possibility of a need for experts

22   on some of the factors for the test under government contractor

23   defense.

24           I've asked the parties to talk more about that and to

25   let me know -- if you all deem it necessary to present expert

1    testimony, then I'd like to know that by the time we either

2    meet in D.C. or we have a conference call shortly thereafter.

3    Because, if you do believe that expert testimony is going to be

4    necessary, then I want you all to start on that process and

5    down that road.

6         **MR. SACCHET:**  I think that makes good sense, Your

7    Honor.  Plaintiffs' position at the current time is that, based

8    on the documents in the depositions that have been received and

9    conducted to date, from Plaintiffs' perspective, expert

10   discovery is not necessary.  We believe that, as to each of the

11   three *Boyle* factors, that we can prevail on a Motion for

12   Summary Judgment with respect to the government contractor

13   defense.

14         On the other hand, we cannot forecast or determine

15   exactly how 3M would respond to such a motion.  So, for

16   example, if Plaintiff put forth fact evidence from a deposition

17   about lack of conformance, would 3M in turn argue that that

18   evidence isn't sufficient, that particular witness didn't have

19   foundation, you have to have expert evidence to make that

20   assertion.

21         **JUDGE RODGERS:**  Well, that's why I want you all to

22   have a discussion now.

23         **MR. SACCHET:**  Precisely.

24         **JUDGE RODGERS:**  Because I don't want to entertain

25   requests for experts after all fact discovery has closed, you

1   all have briefed, I'm ready to hold a hearing, and then you

2   tell me, no, Judge, we need expert -- that's --

3          **MR. SACCHET:**  Yeah, and that makes a lot of sense.

4          And, Your Honor, if I may, there was another subject

5   touching on the affirmative defenses I was hoping to briefly

6   raise with the Court.

7          **JUDGE RODGERS:**  Yeah, sure.

8          **MR. SACCHET:**  It's a simple but very straightforward

9   request that I think is significant.

10         As the Court knows, 3M has abandoned its political

11  question defense.

12         **JUDGE RODGERS:**  Right.

13         **MR. SACCHET:**  On December 12th, 2019, it submitted a

14  letter to the Court advising the Court of the same.  It

15  explained its rationale for abandoning that defense, which

16  coheres with Plaintiffs' analysis of that defense.

17         We have yet to see a motion for leave to amend the

18  master answer to reflect that amendment to the master answer.

19  In my opinion, to formally get that done, 3M should move under

20  Rule 15(a)(2).  It has been 21 days after they served that

21  affirmative --

22         **JUDGE RODGERS:**  Well, Mr. Sacchet, you may be far

23  better versed in this than I am as far as the law, but I don't

24  see that as an affirmative defense.  It's an issue of subject

25  matter jurisdiction.  I'm not sure I agree that the answer

1    needs to be amended.

2         **MR. SACCHET:**  And if that's the Court's view, that's

3    fine.  I was more or less thinking about it from the vantage

4    point of the Court that, if there was an allegation that there

5    was a lack of jurisdiction that remained in a pleading in the

6    MDL, that that posed an issue.

7         **JUDGE RODGERS:**  Frankly, it can be raised at any time.

8    They can amend their answer, remove it as an affirmative

9    defense, and turn around and raise it a week later.

10        **MR. SACCKET:**  That's very true.  On the other hand,

11   their papers that they submitted to the Court do say that they

12   would not raise this jurisdictional defense with respect to any

13   of these cases.

14        **JUDGE RODGERS:**  I would have a discussion with them if

15   they did that.  I don't think they're going to do that.

16        **MR. SACCHET:**  Well, that's fine with Plaintiffs if

17   that's the Court's position.

18        **JUDGE RODGERS:**  As you know, I *sua sponte* would have

19   to address any issue that I believe impairs my jurisdiction.

20        **MR. SACCHET:**  Great.  And that clarifies it for

21   Plaintiffs.  Thank you.

22        **JUDGE RODGERS:**  Okay, very good.

23        Ms. Branscome?

24        **MS. BRANSCOME:**  And we're also happy to meet and

25   confer with the Plaintiffs about amending the answer.  There

```
 1    may be some other things that we want to clean up in the
 2    answer, so we can meet and confer.
 3              JUDGE RODGERS:  Very good.
 4              Thank you, Mr. Sacchet.
 5              There are depositions scheduled this month and then
 6    there are I believe seven -- there were seven outstanding
 7    witnesses that I was aware of.  One has been deferred.  One is
 8    scheduled in February, February 11th, that's Mr. Falco.  And
 9    then there are five scheduled this month and then I believe --
10    Mr. Buchanan, correct me if I'm wrong -- you indicated there
11    were another five that were not critical to the affirmative
12    defenses.
13              MR. BUCHANAN:  We sent a letter yesterday, Your
14    Honor --
15              JUDGE RODGERS:  To me?
16              MR. BUCHANAN:  No, I'm sorry, to defense counsel
17    seeking depositions of an additional five witnesses who, based
18    on the record and based on our understanding of their relevance
19    to the issues, do not appear to bear on the affirmative
20    defenses.  So we're seeking dates, you know, late February,
21    March, just to develop that testimony.
22              I don't know if you have other questions on the
23    depositions, Your Honor.  We took 11 in December, 11 fact
24    witness depositions.  We took two 30(b)(6)s between October and
25    December, you know, over some 15 to 19 days of testimony in
```

 1    that period of time, generally focused on -- obviously the

 2    affirmative defenses are the issues there, but obviously also

 3    crossing into core liability issues, to the extent those

 4    witnesses went there.

 5         **JUDGE RODGERS:**  All right.  Well, just make sure,

 6    please, I know as you have, if there are issues that arise that

 7    are potentially disruptive to the schedule, that you alert

 8    myself or Judge Jones as early as possible.  I would certainly

 9    like it and prefer it if you could work it out amongst

10    yourselves but not to the extent it impairs the schedule.

11         **MR. BUCHANAN:**  I appreciate that, Your Honor.  And

12    we're very focused on that and we've tried to be diligent in

13    that regard.

14         The one issue that I alluded to in chambers, as Your

15    Honor is aware, there's been significant document production

16    both before 9/30/2019 and after the substantial completion date

17    which is 9/30/19.  Two-thirds of the documents that we have in

18    our hands today were produced after that date.  Two-thirds of

19    those documents relate to the initial disclosure of witnesses,

20    people who were identified in June and July.

21         So we've had some concern.  I don't have to rehash it.

22    It's been the subject of a number of conference calls with Your

23    Honor and Judge Jones.  We had significant productions for the

24    witnesses when we took their testimony in November, December,

25    but there have been documents produced for those witnesses

1    after that point in time.  Candidly, we're assessing this, and
2    there are significant ones.
3           **JUDGE RODGERS:**  Well, what I'm going to be asking you
4    to do, and if I need to I'll impose a deadline, but I need you
5    all to assess whether you feel there's a need for this to be
6    brought to the Court's attention.  I don't want to wait until
7    March and you all decide, oh, wait a minute, we need to
8    redepose Elliot Berger, for instance.
9           So I need you all to do your best to conduct that
10   assessment and then let us know if there's a contest -- if
11   there's an issue about needing to redepose because you didn't
12   have the documents that you needed and you weren't able to ask
13   the questions that you feel you should have asked, then Judge
14   Jones or I need to know that and make that decision about
15   whether you're entitled to redepose somebody.
16          **MR. BUCHANAN:**  And that's the thought process we're
17   undertaking currently, Your Honor.  And frankly, we're trying
18   to focus on are these facts that need to be developed at this
19   point to address the affirmative defenses or are they facts
20   that are necessary for liability.
21          Because the Defendant's document production continues
22   to this day.  And if there's going to have to be an application
23   for supplemental testimony, I think the preference probably for
24   both sides would be to ensure that it encompasses the full
25   record as completely produced by the Defense.

1         But that was the process we were undertaking trying to

2    be mindful of the affirmative defense near term obligations and

3    prioritize testimony and discovery efforts in that regard.

4         **JUDGE RODGERS:**  One thought I'm having is, if these

5    are 30(b)(6) witnesses -- I know some of the 30(b)(6) were

6    hybrid, they were 30(b)(6) plus an individual fact witness with

7    personal knowledge of the facts.

8         But while I could see perhaps a continuation of a

9    deposition for that person if the documents were not produced,

10   if it's 30(b)(6), we need to deal with that now.

11        **MR. BUCHANAN:**  Fair enough, Your Honor, we'll focus on

12   that.  Those are broad buckets of testimony and we'll try and

13   prioritize that.

14        **JUDGE RODGERS:**  Okay.  I don't want the 30(b)(6) -- I

15   don't want that lingering.

16        **MR. BUCHANAN:**  Okay, thank you.

17        **JUDGE RODGERS:**  All right, thank you.

18        **MR. BUCHANAN:**  More generally, Your Honor, while I'm

19   here, did you want to address the third-party issue?  There was

20   a question from Judge Jones on ISL.

21        **JUDGE RODGERS:**  Yes, I had that on my list.  Go ahead.

22        **MR. BUCHANAN:**  As the Court is aware, there's a Motion

23   to Compel pending against ISL.  ISL, for the Court's benefit

24   and also as a reminder, was the inventor of the nonlinear

25   filter and the inventor of the dual-ended design that's

1  embodied in the Combat Arms Version 2.  The company, 3M or

2  Aearo, licensed that technology from ISL.

3          The Plaintiffs subpoenaed ISL in, I'd say, September

4  through a series of meet and confers.  It became apparent they

5  were raising challenges to our authority to compel that

6  discovery.  There's a Motion to Compel currently on file.

7          Judge Jones, I think you had a request -- or you

8  wanted to know whether we were anticipating a response this

9  week or what the timing would be for that or whether they would

10 be responding at all.

11         We've reached out during the break between chambers

12 and now to find out what their intent was.  And I understand

13 there are some challenges with ISL's counsel in coordinating

14 with the entities.  They have requested additional time for

15 their response.  I, of course, said it's -- while it's our

16 subpoena, it's not my briefing schedule.

17         I'm not sure whether we would benefit from a call with

18 Your Honor or -- the request I think was for an additional two

19 weeks for their response.  That timing is not problematic for

20 the Plaintiffs.  But it's not our schedule, so I just wanted to

21 alert Your Honor to that request.

22         **JUDGE JONES:**  Well, Mr. Buchanan, I did have a

23 question on the deadline.  I asked you to serve the motion on

24 ISL's counsel.  What was the date the motion was served on

25 them?

1    **MR. BUCHANAN:**  So I believe -- and my colleague is in

2    the courtroom -- but I think service was facilitated via like

3    courier and confirmation was received last Monday.  I don't

4    have that calendar date, but it's -- so I think it's been

5    served now for nine days.  January 6th.  Thank you.

6           **JUDGE JONES:**  January 6th, okay.  So that would make

7    their response due the early part of next week.

8           Do you expect they're going to file a motion or an

9    unopposed motion for a little more time to brief it?

10          **MR. BUCHANAN:**  I don't anticipate that they were going

11   to do that.  I think they asked us -- they asked Plaintiffs'

12   counsel for additional time.  I said we're actually in court

13   today and I would alert the Court to that request.

14          I'm happy to get on a call with Your Honor and ISL

15   counsel tomorrow to confirm really the state of play.  It's not

16   clear to me whether they're going to be opposing, whether --

17   what was clear to me was that they had not yet really gotten to

18   the point of deciding on their position on this.  So there may

19   be an opposition, there may be a production.  I'm unclear.

20          **JUDGE JONES:**  Okay.  Well, the deadline is early next

21   week, so I'm sure I'll hear from them one way or the other.  If

22   for some reason they withdraw their objection to all or part of

23   the subpoena, let me know.  If not, I'm sure they'll ask for a

24   little more time, which probably wouldn't be a real problem.

25   But if not, I guess they'll respond and tell me why they don't

1    have to produce the documents.

2         **MR. BUCHANAN:**  Thank you, Your Honor.  I'll

3    communicate that message, and I'm sure we'll hear from them by

4    next Tuesday now, I think, Martin Luther King day.  Thank you.

5         **JUDGE JONES:**  Thank you.

6         **JUDGE RODGERS:**  Thank you, Mr. Buchanan.

7         **MR. NOMELLINI:**  Your Honor, may I be heard briefly on

8    the issue of custodians?

9         **JUDGE RODGERS:**  Yes.

10        **MR. NOMELLINI:**  There have been 25 new custodian

11   requests since September 30th, and that continues to give rise

12   to additional document production.

13        And I raise that because there was new custodial

14   productions -- or custodial requests last week, and that's

15   something we'll be meeting and conferring with the Plaintiffs

16   on.  If there are any issues with respect to the new custodial

17   requests, we'll bring them to Judge Jones's attention.

18        I know Judge Jones has already ruled on a number of

19   the new custodial requests and granted some, not granted

20   others.  But just wanted to flag that, and we'll bring that to

21   Your Honor's attention as soon as possible.

22        **MR. BUCHANAN:**  Yes, there were four requests, Your

23   Honor, just to clarify, versus the 25, four new requests for

24   custodians that were made.

25        We've tried to incorporate Your Honor's thinking, and

1    Judge Jones's, in terms of our prioritization of custodial

2    requests, mindful of the Court's focus at this point on the

3    affirmative defense discovery.  So we are trying to defer some

4    more core liability custodians at this point.  Thank you.

5         **JUDGE RODGERS:**  Well, I think there needs to be a

6    discussion -- not today, and it ought to take place among the

7    parties first maybe with Judge Herndon's assistance.  I would

8    like to know more specifically what it is you're referring to.

9         I guess from these discussions -- we've had these

10   discussions on telephone conferences as well, and I'm always

11   left with the feeling of doom that down the road I'm going to

12   be -- and Judge Jones, we're going to be looking at issues

13   related to the discovery, the document production, the impact

14   that it has on witnesses.  And what we're going to hear, I'm

15   afraid, is, well, judge, you know, that was affirmative

16   defense, this is all merits.

17        And so I guess I need to get a better handle on the

18   delineation, and I need to be on the same page with you all

19   regarding this category of discovery related to affirmative

20   defenses versus the category of discovery that you're referring

21   to as merits.

22        So, anyway, I'm just thinking out loud, sharing those

23   thoughts with you.

24        **MR. BUCHANAN:**  Certainly.  And Your Honor, I'm happy

25   to certainly be a part of that conversation, and we can do it

1    with Leadership and with Defense counsel.

2         What I was referring to, just in the exchanges with

3    Defense counsel with regard to custodians and certainly in

4    connection with Judge Jones's consideration, as I understand

5    the Court's rulings on these issues, the focus on custodial

6    requests has been on witnesses that certainly provide some

7    information on affirmative defenses.

8         The scope of their document production has not been

9    limited to affirmative defenses, so we would have the benefit,

10   if you will, Your Honor, just to alleviate some concern, of

11   their full custodial file on relevant issues.  Our document

12   requests, while incorporating affirmative defense discovery,

13   were broad enough to incorporate general liability discovery

14   because we didn't want to do, you know, broad do-overs on

15   issues and coming back to certain custodians.

16        So I hope that provides the Court some sense of how we

17   focused things.  But with regard to custodians, there have been

18   some that have been precluded as well that, as I understood it,

19   or maybe we haven't requested them, because they seem to bear

20   most principally on general liability topics than not.

21        **JUDGE RODGERS:**  Is this your understanding, Mr.

22   Nomellini?

23        **MR. NOMELLINI:**  Your Honor, our understanding is that

24   the custodians who have been requested so far, I mean, some of

25   them have no general contractor involvement and some of them

1    had very little.

2            I'm happy to meet and confer with Mr. Buchanan about

3    that, but certainly we would not agree to all the custodians to

4    date have had affirmative defense involvement.

5            **JUDGE RODGERS:**  I guess in my mind you all aren't --

6    you're not operating under -- I mean, I have no scheduling

7    order in place, which makes me a little uneasy, but there's no

8    scheduling order in place, and I understand why -- and I'm

9    responsible for it -- that there's been this sort of

10   bifurcation.

11           But I'm not sure that I've ever been quite comfortable

12   with you all's -- and I'll say both sides -- understanding of

13   what discovery is affirmative defense discovery versus what's

14   remaining out there still to be done as far as your discovery

15   of the Defendant.

16           So I guess I'm going to ask Judge Herndon to meet with

17   you all to try to get a handle on that.

18           **MR. BUCHANAN:**  That's fine, Your Honor, certainly.

19           **JUDGE RODGERS:**  Let's plan to talk about this when

20   we're in D.C. on the 28th, if there's time.  If not, we'll talk

21   about it on the call -- if we're not able to meet and talk

22   about it in person, we'll have a call, as we discussed, on the

23   30th or 31st, and I would like this to be included as part of

24   those discussions.

25           **MR. BUCHANAN:**  Certainly, Your Honor.  Thank you.

1        **JUDGE RODGERS:**  Okay.  Thank you.  So the need for

2   experts and then this issue on that agenda.

3        I understand Mr. Barr, our liaison counsel, has been

4   handling some privilege issues along the way.

5        Mr. Barr, I'm still focused on this bifurcation of

6   affirmative defenses and merits and wondering what it is so far

7   -- we haven't discussed -- we haven't been talking privilege at

8   all -- and how much of that relates to what I'm going to call

9   affirmative defenses.  Because I don't want to get caught at

10  the end of this and have a boat load of privilege objections

11  that haven't been resolved and that stalls the schedule for

12  resolution of that defense.

13       **MR. BARR:**  Thank you, Your Honor.  As far as the

14  bifurcation of the merits versus affirmative defense, I think

15  at this point --

16       **JUDGE RODGERS:**  I'm sorry, if you could, the

17  microphone --

18       **MR. BARR:**  It would be very difficult to say what

19  would apply to affirmative defenses and what wouldn't be.

20  Because what we have is a spreadsheet that gives us the author

21  of the document, a little bit about the subject, and the

22  privilege challenge, and the date.  But, you know, obviously we

23  don't have the document, so it's hard to really look at it and

24  see the substance of what the document describes.

25       But as far as where we are, just to bring you up to

1   speed, you know, when we started the meet and confer process,

2   there were about 5500 documents on the privilege log.  What we

3   proposed to the Defendants was we would provide to them a

4   sample set of 110 documents.  We provided that to them on

5   December 13th.

6          We anticipated that they were going to get us back

7   their responses on whether those documents were privileged or

8   not within a week or so.  That didn't happen for various

9   reasons.  Maybe it was a misunderstanding of the parties, but

10  that didn't happen.

11         We had a couple of meet and confers, and then last

12  night around midnight we got their response to our first set of

13  110.  Out of that first set of 110, there were 18 that they

14  took off the list that they withdrew their privilege challenge,

15  so close to 20 percent.  There were 45 where they changed the

16  privilege description.

17         Given the time of getting the list, I haven't had a

18  chance to really analyze it at this point to try and figure out

19  what goes with what.  But now we're at the point where the

20  privilege log is up to around 9500 documents, so it's expanded

21  substantially.  If that 20 percent number holds true, there

22  could be 1500 or so documents that the Defendants withdraw

23  their challenge without us even challenging it and just saying

24  look at this one.

25         Given those numbers, I think we need to set up kind of

1    a dual-track process to get ahead of this issue before it

2    becomes a major problem.

3            What we would suggest -- and certainly we'll do a meet

4    and confer with the Defendants, get their thoughts on this, and

5    they certainly suggested they're open to that.  But what we

6    would suggest is they go back through the 9500 in a deadline

7    and look at them in the same method in which they looked at

8    this list of 110 to withdraw 18.

9            We think there needs to be a deadline on that because

10   obviously I don't think we can wait 30 days, you know, to do

11   100 -- I mean, we can't wait that type of time process or we'll

12   never work our way through this.

13           I think on the 110 it may be a good suggestion, if

14   Judge Jones is open to this, is the Plaintiffs would pull 15,

15   20 that they are maintaining as privileged, provide those to

16   Judge Jones to do an in camera review to see if these are truly

17   privileged documents.  You know, they can assert whatever

18   privilege -- whatever letter they want to, you know, because I

19   believe it is their burden to show the document is privileged,

20   and I think Judge Jones could make that decision, which would

21   provide us guidance as to how to deal with the rest.

22           And I think at that point we would have enough,

23   between what they are withdrawing the challenge on and then the

24   instruction from Judge Jones, to be able to take a more

25   educated and efficient look at the privilege log list and work

1    our way through it.

2           **JUDGE RODGERS:**  Okay.  Thank you, Mr. Barr.

3           Mr. Nomellini?

4           **MR. NOMELLINI:**  Your Honor, just briefly.  I think

5    Mr. Barr and Mr. Gunderson have been working very cooperatively

6    moving through these documents.  And what I would suggest is

7    that we get together and propose quickly a process to move

8    through this quickly.

9           I don't have the level of granularity in terms of

10   knowledge of the details of that process, but I think that

11   makes sense as a next step.

12          And to address Your Honor's concern, my understanding

13   is that it hasn't been divided so that, you know, we're dealing

14   with general contractor now and we'll later need to come back

15   to it for other issues.  My understanding is it is all being

16   addressed in connection with this process.  And I'll confirm

17   with Mr. Gunderson on that.

18          **JUDGE RODGERS:**  Yeah, I guess that was my

19   understanding certainly with the document production that had

20   been taking place, but I guess that's based on the custodians

21   identified.  I certainly prioritized things for the DoD.  But

22   we can talk more about this.  But it sounds like there may be a

23   difference of opinion.

24          **MR. NOMELLINI:**  Yeah.  My understanding is consistent

25   with yours, Your Honor, in terms of just looking at document

1    requests themselves and, you know, the productions, the

2    privilege issues haven't been divided.  Certainly the

3    depositions, all manner of topics have been covered as well.

4          **JUDGE RODGERS:**  Well, that was going to be something I

5    would look at to see how you all had been treating these

6    depositions.  That -- well, I won't say any more about that

7    now.  Thank you.

8          **MR. NOMELLINI:**  Thank you, Your Honor.

9          **JUDGE RODGERS:**  I'm sorry.  Mr. Nomellini and

10   Mr. Barr, do either of you feel it necessary for Judge Jones to

11   get involved in coming up with a process or do you want to do

12   that yourselves and present that to him for consideration?

13         But we do need to start addressing some of these

14   privilege issues.  I know Judge Jones feels the same way, I'm

15   confident he feels the same way.

16         **MR. BARR:**  I certainly welcome Judge Jones's input in

17   the process, as he's going to be the person who has to make

18   these decisions.  I don't think we need to spend a lot of time

19   together coming up with a process that Judge Jones doesn't want

20   to do, so I think we need to certainly work him in when we come

21   up with that process.

22         **MR. NOMELLINI:**  Yeah.  So I think the next step is

23   Karl and I will get on the phone with Bryan and come up with

24   something quickly and then we'll move in Judge Jones.

25         **MR. BARR:**  That makes sense.

1          **JUDGE RODGERS:**  Judge Jones?

2          **JUDGE JONES:**  Yeah, if we could set a schedule -- I

3    know that was mentioned -- that makes sense.  So a deadline

4    within which the parties -- really the Defendant will take a

5    fresh look at really what documents it's raising legitimate

6    challenges to.

7          And then what the parties would do, as Mr. Barr

8    suggested, is present a sample of documents -- you know, it's

9    the Defendant's burden.  So if the Defendants need to provide

10   declarations to the Court in support of any of their privilege

11   claims, all of that would be provided, there would be a

12   deadline for the Plaintiffs to respond, I would take a look at

13   them.

14         If it's 110 documents, there's probably a 90 percent

15   chance I would look at them in camera.  If it's 9500, I

16   probably won't.  And then, I could pretty quickly issue an

17   order on that, and I think that would give the parties guidance

18   as to how to address privilege with regard to the remainder of

19   the documents.

20         I don't know what's a workable schedule, how much time

21   you all need to chat before you would get to the point where

22   the Plaintiffs would actually submit documents with a brief,

23   potentially declarations to the Court.  I don't know if we're

24   talking about two weeks from now, ten days from now.

25         What do the parties think?

1    **MR. NOMELLINI:**  Your Honor, would it make sense to

2    schedule later this week a short call just to nail down the

3    process?  And also that way I can loop in Mr. Gunderson who has

4    been much more involved in this than I have.

5    **JUDGE JONES:**  Okay.  Why don't we do this while we're

6    here.  Can we schedule something for Thursday, possibly

7    Thursday afternoon or Thursday morning even?

8    **MR. BARR:**  I'll make myself available whenever, Your

9    Honor.

10   **MR. NOMELLINI:**  Yes, Your Honor.

11   **JUDGE JONES:**  Are you all available on Thursday?

12   **MR. BARR:**  Yes, Your Honor.

13   **MR. NOMELLINI:**  Yes, Judge.

14   **JUDGE JONES:**  How about we schedule a telephone call

15   at 11:00 Eastern Time Thursday morning the 16th.  And we can

16   discuss deadlines and we'll put a little more meat on the bones

17   on the process.  Does that work?

18   **MR. BARR:**  Yes, sir.

19   **MR. NOMELLINI:**  Sounds good, Your Honor.

20   **JUDGE JONES:**  Okay.

21   **JUDGE RODGERS:**  Thank you.

22   There was an item on the agenda for lien resolution

23   administration.  Ms. Hutson?

24   **MS. HUTSON:**  We're in the process of working on and

25   have almost finalized an order for that.  I was going to submit

1    it to Ms. Branscome and have them look at it and then submit it

2    to the Court.

3              **JUDGE RODGERS:**  Okay.  Excellent.

4              So back to our bellwether process and our 177

5    representative pool and the cases in that pool.  No. 7 on that

6    list, the BrownGreer ID is 60806.  That case has been selected

7    randomly for the backup of five.  So that case is also removed,

8    No. 7.

9              Let me ask a question about this list.  Obviously I

10   have the list, Leadership has the list.  But nobody else has

11   the list, including the attorneys that represent these people.

12             So, any suggestion -- I'll ask you, Mr. Aylstock.

13   Now, certainly I can post this and identify for all concerned

14   the 177, not -- obviously the 177 are not going to be in the

15   actual discovery pool.  We've narrowed that down.  But these

16   are all cases or claimants for which the selection sheets are

17   going to have to be filled out.

18             **MR. AYLSTOCK:**  Yes, Your Honor, I think it does make

19   sense to post it.  And obviously, an order will be forthcoming

20   mandating to do the selection sheets pursuant to your comments

21   earlier.

22             We'd also work with Rachel in the early vetting

23   committee immediately, even before an order is on the docket,

24   to make sure those firms understand their obligations that are

25   upcoming and the process.

1      **JUDGE RODGERS:**  Okay, very good.  I'll attach this as
2  an exhibit to that order, the list.  And I will identify --
3  well, let me stop a moment.
4      There are still those four cases that do not yet have
5  short form complaints.  We talked about those in the
6  preconference meeting.  Mr. Burns, I think, is taking care of
7  one of those.
8      How are the other -- no.  And then, Mr. Seeger, was
9  one of those yours as well?
10      **MR. AYLSTOCK:**  I don't think Mr. Seeger --
11      **MR. SEEGER:**  No, no, no.
12      **JUDGE RODGERS:**  No, no, no.  Yours was one of the
13  random -- you have a random case.
14      **MR. SEEGER:**  Yes.
15      **JUDGE RODGERS:**  So I'll identify -- Mr. Burns, I see
16  you standing there.  Yours is No. 123.  But that was an issue
17  of representation.
18      **MR. BURNS:**  Yes, Your Honor.  And I'll work with Ms.
19  Hutson and we'll get those taken care of, all of the ones that
20  are on there.
21      **JUDGE RODGERS:**  The four?
22      **MR. BURNS:**  Yes, ma'am.
23      **JUDGE RODGERS:**  Okay, excellent.  Can you get started
24  on that, Mr. Burns, today?
25      **MR. BURNS:**  Yes, ma'am.  The one that we had, the 123,

1  that will be filed before lunchtime today, so we'll get the

2  others taken care of as well.

3        **JUDGE RODGERS:**  And then the other three -- I just

4  need to be told -- if, for whatever reason, one of those is not

5  going to participate, then I need to remove them from the pool.

6        **MR. BURNS:**  Yes, ma'am.

7        **JUDGE RODGERS:**  Okay.  Thank you.

8        **MR. AYLSTOCK:**  Thank you, Judge.

9        **JUDGE RODGERS:**  The next question I have -- we've set

10  a date, February 4th, for the selection sheets to be completed.

11        What, both sides, are you thinking turnaround time to

12  identify your seven plus two, so your nine cases, two of which

13  are backup cases?

14        **MR. AYLSTOCK:**  I'll take a stab at it first, Judge.

15  Two weeks?

16        **JUDGE RODGERS:**  Okay.

17        Ms. Branscome?

18        **MS. BRANSCOME:**  I think, Your Honor, it may depend in

19  part on how quickly -- you know, if the sheets are coming in on

20  a rolling basis, we could probably do it in a more expedited

21  time frame.  But if everything comes in on February 4th, I

22  think we'd probably need three weeks.

23        **JUDGE RODGERS:**  I suspect they'll be coming in on a

24  rolling basis.

25        Ms. Lanier, do you agree?

1          **MS. LANIER:**  Yes, Your Honor.

2          **JUDGE RODGERS:**  Very good.  Then I'm going to set the

3    date for which I would like to have your selections for the

4    18th.  If that's not doable, Ms. Branscome because you didn't

5    get the forms on a rolling basis, then please let me know that.

6          **MS. BRANSCOME:**  Will do.  Thank you, Your Honor.

7          **JUDGE RODGERS:**  And we can talk about this when we

8    meet on the 28th and see what kind of progress has been made by

9    that time.

10         Judge Herndon, is there anything you would like to add

11   or have answered?

12         **JUDGE HERNDON:**  No, ma'am.  Thank you.

13         **JUDGE RODGERS:**  Judge Jones?

14         **JUDGE JONES:**  Nothing else from this end.

15         **JUDGE RODGERS:**  All right.  From the parties or --

16   I'll start with Leadership and then I'll ask in the courtroom

17   if there's anyone that has anything or anyone on the phone.

18         **MR. AYLSTOCK:**  Nothing from the Plaintiffs'

19   Leadership, Judge.

20         **JUDGE RODGERS:**  Ms. Branscome, from you all?

21         **MS. BRANSCOME:**  Nothing from us, Your Honor.

22         **JUDGE RODGERS:**  On the phone, anyone have any

23   questions?

24         *[No response.]*

25         All right, then.  Our next CMC is in February, it's

1    the 21st.  And then, just to recap, March is March 27th, April

2    is April 24th, and then May is May 12th.  Those are, for the

3    next several months, our CMCs.

4           All right.  Well, thank you all very much.  I just

5    want to conclude by saying that I'm very pleased with where we

6    are.  Of course, you all know I would like to have the

7    affirmative defense resolved sooner rather than later.  Some of

8    that is out of our control.  We're trying to do our best to

9    obtain that discovery, and we will.  And there will be a

10   briefing schedule put into place, and that defense will be

11   resolved for purposes of the summary judgments.

12          But other than that, I'm very pleased with where we

13   are.  I'm very pleased with the bellwether selection process,

14   and I want to thank BrownGreer and Jake and Roma for all of

15   their hard work in that regard.

16          If nothing else, then the Court is in recess.

17

18              *(Proceedings concluded at 10:55 a.m.)*

19              --------------------

20   *I certify that the foregoing is a correct transcript from the*
     *record of proceedings in the above-entitled matter.  Any*
21   *redaction of personal data identifiers pursuant to the Judicial*
     *Conference Policy on Privacy are noted within the transcript.*

22

         *Donna L. Boland*
23                                          *1-16-2020*
         *Donna L. Boland, RPR, FCRR*       *Date*
24       *Official Court Reporter*

25