**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG   )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,  )
                                      )    Pensacola, Florida
                                      )    March 4, 2020
                                      )    11:00 a.m.
                                      )
                                      )
_____)


**TELEPHONE CONFERENCE**

TRANSCRIPT OF TELEPHONIC PROCEEDINGS
BEFORE THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-86)

**A P P E A R A N C E S**

FOR THE PLAINTIFFS:     **BRYAN F. AYLSTOCK, ESQUIRE**
                        Aylstock, Witkin, Kreis & Overholtz
                        17 E Main Street, Suite 200
                        Pensacola, Florida  32502

                        **SHELLEY HUTSON, ESQUIRE**
                        Clark Love & Hutson, GP
                        440 Louisiana Street, Suite 1600
                        Houston, Texas  77002

                        **DAVID BUCHANAN, ESQUIRE**
                        **PARVIN AMINOLROAYA, ESQUIRE**
                        **CHRISTOPHER A. SEEGER, ESQUIRE**
                        Seeger Weiss, LLP
                        55 Challenger Road, 6th Floor
                        Ridgefield Park, New Jersey  07660

                        **MICHAEL A. BURNS, ESQUIRE**
                        **CAROLINE L. MAIDA, ESQUIRE**
                        Mostyn Law
                        3810 W Alabama Street
                        Houston, Texas  77027

                        **BRIAN H. BARR, ESQUIRE**
                        Levin Papantonio
                        316 S Baylen Street, Suite 600
                        Pensacola, Florida  32502

                        **KRISTIAN RASMUSSEN, ESQUIRE**
                        Cory Watson
                        2131 Magnolia Avenue S., Ste. 200
                        Birmingham, Alabama  35205

FOR THE DEFENDANT:      **KARL B. GUNDERSON, ESQUIRE**
                        **MARK J. NOMELLINI, ESQUIRE**
                        **NICHOLAS F. WASDIN, ESQUIRE**
                        Kirkland & Ellis, LLP
                        300 N Lasalle
                        Chicago, Illinois, 60654

                        **TABITHA J. DE PAULO, ESQUIRE**
                        Kirkland & Ellis, LLP
                        609 Main Street
                        Houston, Texas 77002

                        **LARRY HILL, ESQUIRE**
                        MOORE, HILL & WESTMORELAND, P.A.
                        350 W Cedar Street, Suite 100
                        Pensacola, Florida  32502

```
1                      P R O C E E D I N G S

2            THE COURT:  Good morning, everyone.  Judge Jones.

3    Let's see who we have on the line.  I'm told Mr. Aylstock, Ms.

4    Hutson, Mr. Seeger, Mr. Barr, Mr. Buchanan, Mr. Burns, Kristian

5    Rasmussen, Caroline Maida.  We have a court reporter, Donna

6    Boland, on the line as well.

7            And then for the Defendants, we have Larry Hill, Karl

8    Gunderson, Tabitha De Paulo, and I think Mark Nomellini is on

9    the line as well.

10           MR. WASDIN:  Your Honor, Nick Wasdin is on for the

11   Defendants as well.

12           THE COURT:  Oh, and Nick Wasdin, okay.

13           Anyone else on the line that I have not acknowledged?

14           MS. AMINOLROAYA:  Yes, Your Honor.  This is Parvin

15   Aminolroaya for the Plaintiffs from Seeger Weiss.

16           THE COURT:  Oh, okay.

17           Anyone else?

18           [No response.]

19           Okay.  The parties provided me with an agenda which I

20   have in front of me, and there was a zip file also sent as

21   well.  I have some of the exhibits.  I don't know how much I'll

22   need to refer to those but, if necessary, I can pull them up on

23   my computer.

24           So I guess the best way to start is with the agenda,

25   and let's start with the first item.  And this relates to
```

1    Plaintiffs' request to produce.  There are some issues that the

2    Plaintiffs raise.

3         I don't know who is going to speak on behalf of the

4    Plaintiffs, but whoever it is, go ahead.

5         **MR. BUCHANAN:**  Thank you, Your Honor.  This is Dave

6    Buchanan.  I'll be handling the issues on the Plaintiffs' RFPs

7    and the rogs.

8         The first issue -- I guess it probably makes sense to

9    proceed in sequence, some of these may be more involved than

10   others.  This relates to information from the prior *Moldex*

11   litigation -- *(inaudible)* --

12        I'm just getting some background noise.  Maybe it's my

13   line, I'll pick up.

14        We're looking for information where the Defendants

15   have addressed issues concerning the Combat Arms.  Obviously

16   that proceeding was a patent proceeding in the first instance

17   and then the subsequent litigation revolved around the

18   propriety or not of the initial litigation.

19        But in that case, *Moldex* contended it was a designer

20   and developer of novel technology that was embodied in,

21   obviously, the Combat Arms which it had the rights or held

22   patents for that technology through license or otherwise and

23   that *Moldex* was infringing.

24        Now the contention of the Defense is that this was

25   government specified, there are precise or reasonably precise

1    specifications for it, and they manufactured it to the

2    government's specifications.

3         We think statements by the company in the form of

4    declarations and rogs and pleadings and RFAs or other responses

5    to discovery are important admissions as against 3M in the

6    context of the government contractor dispute that the Court may

7    be hearing very soon or will be hearing very soon.

8         The Defendants guided us to the docket and said, *Hey,*

9    *can you review the docket and see what you think might be of*

10   *interest.*  Because this Court is aware the docket in that case

11   is sealed, for the most part, given that it was an IP

12   proceeding.  There are some things that, obviously, would be on

13   the docket.  There are many things that would not be on the

14   docket.  You know, RFAs, rogs, discovery responses, et cetera,

15   would likely not appear.

16        We reviewed the docket.  We can't discern from the

17   docket what we would not be interested in, which is a

18   fundamental problem here.  And so we just simply asked *Moldex*

19   -- we've asked 3M to produce documents that fall into those

20   categories, and at this point we haven't gotten them.

21        So we are concerned about the timeline.  This is a

22   request that's been out there since our first RFP last July,

23   and we'd like to get some closure on this very soon.

24        **THE COURT:**  Let's go through a couple of items you

25   highlight.  The first item you reference sworn statements in

1    prior proceedings.  Is this in *Moldex II* or *Moldex I* or both?

2              **MR. BUCHANAN:**  It would be both, Your Honor.

3              **THE COURT:**  Okay.  So your argument is there is

4    something 3M said or you think they said in that case in which

5    they said the design is original and they're the ones that

6    invented it, for lack of a better word.

7              **MR. BUCHANAN:** -- *(inaudible)* --

8              **THE COURT:**  Do you indeed know that there are sworn

9    statements in that regard in that case.

10             **MR. BUCHANAN:**  We can't see them, Your Honor, so the

11   answer is no.  From experience in -- *(inaudible)* -- litigation

12   -- *(inaudible)* -- reasonable likely, but we have not been able

13   to review any of them.

14             **THE COURT:**  Okay.  Now, in your -- and I'll hear from

15   3M in a moment.  In your meet and confers, have you asked if

16   there are any sworn statements?  Because I guess what I'm

17   getting at is sworn statements -- of course there's sworn

18   statements probably on a variety of issues, a number of which

19   would have -- I wouldn't say no relevance to this case, but

20   wouldn't really be of interest in this case.  There might be

21   sworn statements in that case as you argue that could be

22   relevant to who developed the design.

23             So, have you had those discussions with 3M and said,

24   *We don't want every sworn statements, we only want sworn*

25   *statements that relate to the design in this case*?

1          **MR. BUCHANAN:**  Yeah, our request, as framed, related

2     to the 3M earplugs, and so that was the constraint.  But we

3     have not had any discussion about whether they exist with the

4     Defense.  We can see the docket -- no, I'm sorry.  We have had

5     discussions with them.  They pointed us to the docket to try

6     and identify documents that would be candidates for them.

7          But, frankly, as Your Honor would suspect, things like

8     rogs or RFAs or other responses to discovery where they would

9     say they would have documents or don't have documents or have

10    specifications or don't have specifications or they're the

11    inventor or not, many of those would not hit the docket; and

12    those that do it's not evident that they would contain such

13    information, we can't see them.

14         **THE COURT:**  Okay.  The second item in agenda item one

15    is you're asking for board materials relating to the 3M

16    earplugs.  What are you getting at there?

17         **MR. BUCHANAN:**  We had a specific request, Your Honor,

18    and they are materials that were provided or made available or

19    background material for the board of directors that concerned

20    either the 3M earplugs or the *Moldex* litigation.

21         We have not received any materials from the Defense in

22    that regard in their production.  We have a follow-up call in

23    connection with preparing the agenda for today, and the

24    Defendants advised us that that further sweep is in process,

25    they're looking for that.  And as I understand it, the

1    Defendants don't have any responsive information that's not

2    otherwise privileged.

3              That state of play, though, is, I mean, inconsistent

4    with our understanding of the facts.  There was a document

5    produced by an individual named Gary Warren in his personal

6    capacity from his own files.  I think he retired in 2007 or

7    2008 after 3M acquired the company.  But he produced from his

8    own files an Aearo Technologies board of directors meeting

9    presentation from December of 2007, and it plainly concerns

10   these plugs and references their objectives with regard to the

11   Combat Arms version 2.

12             So I'm quite concerned that the report that we're

13   getting back from the Defense that they have nothing is

14   certainly inconsistent with the fact that somebody who was in

15   senior management has one in their own files but yet the

16   company has nothing.

17             **THE COURT:**  Okay.  So the official position is they

18   don't have responsive documents, and you're questioning that

19   because --

20             **MR. BUCHANAN:**  Before the call yesterday with the

21   Defense, we just wanted the materials, and we wanted a date

22   certain to receive them, Your Honor.  The update we received

23   yesterday was they've done a sweep, they don't believe they're

24   going to have responsive, nonprivileged materials.

25             So I'm responding on two fronts.  One, we wanted a

1    deadline to close this out because I think it was on our

2    initial request from last summer.  And then secondly, I'm now

3    questioning, if you will, the thoroughness of any sweep because

4    we have one from a witness's personal file.

5            **THE COURT:**  Okay.  Two other quick items and then I'll

6    hear from 3M.

7            Lab notebooks.  I know that issue has come up before.

8    What's the issue before?

9            **MR. BUCHANAN:**  Yes, Your Honor, this is another

10   request from our first -- from our summer of 2019 requests.

11           We've met and conferred with the Defense, had a series

12   of letters in mid-December.  They made a production of lab

13   notebooks.  We had a concern about the completeness of that

14   which we've escalated with the Defendants.

15           I understand that there's at least one lab notebook

16   that's referenced in a history of the Combat Arms that has not

17   been produced.  I understand from Defense counsel that they're

18   sweeping for that.

19           It does, if you will, beg the question as to what else

20   we don't have given that it's referenced in the history of the

21   Combat Arms document and it was not produced, and it's still

22   being closed out.  So we'd just like a certification that we've

23   got a complete production of all the lab materials.

24           **THE COURT:**  And then the other item is promotional and

25   training media.  What, in particular, are you focused on there?

1    **MR. BUCHANAN:**  We have a general request on it, Your

2    Honor, for training materials that would be used with the Aearo

3    folks, you know, on the training side internally with them,

4    training materials that would then be shared out to purchasers

5    or military customers, and any materials that would be used in

6    connection with base-level training or promotional activities.

7         We've learned in recent depositions that the company

8    actually had a direct-to-soldier marketing initiative where

9    they would target the soldiers directly seemingly with

10   base-level activities.

11        And one, we want to ensure that we have all that

12   material as we're transitioning into a bellwether phase, but we

13   separately think it's relevant in terms of who the company was

14   targeting at the customer level even with promotions.

15        So we just want to make sure that we're closing out

16   this phase of discovery with full visibility to the promotional

17   and training materials.

18        I do note there are references to a training DVD and

19   documents in the production that we have yet to find in any of

20   the materials that have been produced to date.

21        **THE COURT:**  Okay.  Let me -- on each of those items,

22   let me hear from the Defendant.  Who is going to speak on

23   behalf of the Defendant?

24        Did we lose everybody?

25        **MR. GUNDERSON:**  Apologies, Your Honor.  I had my phone

1    on mute.  But this is Karl Gunderson, and I'll be talking to

2    the production issues.

3            **THE COURT:**  Okay.  Let's just then go through them one

4    at a time.  And I guess the first one relates to what the

5    Plaintiff identified as sworn statements in the *Moldex*

6    litigation.  What is the issue there, if anything?

7            **MR. GUNDERSON:**  Yeah, so I think there's a big picture

8    issue connected to a lot of these items.  In our discussions

9    about this request, Defendants agreed to take a look at all of

10   the written discovery responses by 3M in the *Moldex* litigation,

11   review those for relevance to the earplugs, and produce them as

12   appropriate to the extent that they do describe or discuss the

13   earplugs.  That was what we had agreed to do, and the

14   Defendants are in the process of completing that review and

15   production, as Mr. Buchanan noted.

16           There are a lot of intellectual property issues and

17   confidentiality concerns with some of these documents, which is

18   one of the reasons why our review has taken longer than it

19   might otherwise.  But we were -- are in the process of

20   preparing that production which we expect to get out in the

21   next week or two once we run down those confidentiality issues.

22           In terms of the broader set of documents that Mr.

23   Buchanan sort of now is seeking, from our perspective that is

24   more or less walking back from the agreement we had reached in

25   January regarding this topic in terms of, you know, we made it

1   clear to Mr. Buchanan and the Plaintiffs that we were not going

2   to produce pleadings that are publicly available on the docket

3   or materials that the Plaintiffs have access to via the docket

4   itself.

5          And as I think both Mr. Buchanan and the Court has

6   recognized, a lot of the issues in the intellectual property

7   case regarding Moldex's products are entirely irrelevant here,

8   and that's consistent with the Court's order regarding some of

9   the *Moldex* transcripts as well.

10          So, in terms of proceeding on this item, sort of

11   consistent with our prior discussions with Plaintiffs, we are

12   preparing a production of relevant RFP, interrogatory, and RFA

13   responses to complete our production for this request.

14          **MR. AYLSTOCK:**   Your Honor, this is Bryan.  I apologize

15   for interrupting.  It is our understanding that Moldex, in

16   fact, raised the government contractor as an affirmative

17   defense in its defense of the patent litigation, and 3M opposed

18   that.

19          And so there's definitely a large degree of overlap

20   with regard to the issues in the case, and it is our goal to

21   have this in very short order.  We have an April 1st deadline,

22   and these materials, all the pleadings potentially could become

23   relevant to our government contractor issue.

24          So, if there is some process and all of this will be

25   produced, that's great.  But it really needs to happen

1    yesterday, and it should have happened long ago.  And we do see

2    it as highly relevant.

3         I also understand that -- we do believe that there

4    were sworn statements as well as RFP.  And the pleadings that

5    are on the docket are sealed, and so that's an issue for us.

6         I'm sorry to interrupt, Dave, but I wanted to chime

7    in.

8         **MR. NOMELLINI:**  Two responses, Your Honor.

9         **THE COURT:**  Yes, go ahead.

10        **MR. NOMELLINI:**  I don't know if anybody with Quinn

11   Emanuel is on the call, but Quinn Emanuel represents plaintiffs

12   in this litigation as well as *Moldex*.  And Judge Rodgers had

13   previously asked them to sort through any confidentiality

14   issues relating to *Moldex* requests.

15        So, if it's just a matter of looking through the

16   docket and the issue is some entries are sealed, that would

17   seem to be something that Plaintiffs' counsel, i.e., Quinn

18   Emanuel, could quickly sort through, as Judge Rodgers had asked

19   them to sort through other *Moldex* related issues in the past.

20        **MR. GUNDERSON:**  And just one additional thing to add

21   on that, it's been Defendant's position all along that, to the

22   extent that Plaintiffs become aware of an issue, like

23   apparently this government contractor defense briefing that

24   Plaintiffs are interested in, we have committed to looking into

25   those issues once Plaintiffs have identified them for us and,

1    to the extent we have the ability, to get those materials and

2    produce them to Plaintiffs, you know, and work through those

3    issues.

4         Our concern is with the sort of broad fishing

5    expedition relating to every document that might have come up

6    in the case where we just don't think the vast majority of that

7    is responsive.  But, again, as we've done on other issues,

8    Defendants are happy to, when Plaintiffs identify something

9    specific, dig into that issue and see if we can help Plaintiffs

10   get access to those materials.

11        **THE COURT:**  I have a question.  So the docket is

12   sealed.

13        3M, do you have access to the docket because you were

14   a party?

15        **MR. GUNDERSON:**  My understanding is the entire docket

16   is not sealed, but I honestly haven't checked that recently.

17        But I guess, Dave, were you saying that the entire --

18   that nothing on the docket is accessible, or that only a lot of

19   the documents on the docket are individually sealed?

20        **MR. AYLSTOCK:**  I don't know that the whole docket is

21   sealed, Judge, but these requests have been outstanding, we

22   need them, and we'd like to have a deadline to get them well in

23   advance of April 1st and we're already at March 4th.

24        **THE COURT:**  Well, I'm just trying to get my hands

25   around whether this is unilaterally sealed and you all can't

1    access the entire docket or there are selected sealed documents

2    and the -- and I'm not sure I understand whether 3M has

3    unfettered access to the docket or, because things are sealed,

4    they also are unable to access those things on the docket.

5         **MR. BUCHANAN:**  Your Honor, this is Dave Buchanan.  I

6    understood the docket itself, the docket can be viewed.  The

7    contents of the docket, certainly in the areas that would be of

8    interest, are sealed.

9         So anything that seems to be substantive seems to have

10   been submitted under seal, at least based on the last time I

11   looked at it as of a month ago.  So Plaintiffs don't have the

12   ability to review any of the entries that are sealed.  It was

13   my understanding that 3M, as a party in that case, do.

14        **MR. NOMELLINI:**  Your Honor, it would seem to me that

15   there's a simple solution here which would be to ask Quinn

16   Emanuel to look into the matter since they are both counsel for

17   the Plaintiffs and have access.  And if there are any specific

18   items that need to be de-confidentialized to address that, that

19   would seem to be the most direct solution and I know one that

20   the pursuit is best.

21        **THE COURT:**  But I'm not sure I have an answer to my

22   question.  Are you, Mr. Nomellini, and your team able to go on

23   the *Moldex* docket and look at sealed entries or are you also

24   prohibited or prevented from doing that?

25        **MR. NOMELLINI:**  I do not believe -- I would have to

1    check, Your Honor.  I do not believe Kirkland & Ellis can since

2    we were not counsel on that matter.  But I could check with the

3    law firm that was counsel on that matter to figure out the

4    answer.

5         **THE COURT:**  Okay.  So you have answered my next

6    question.  So Kirkland was not counsel for 3M in that case, it

7    was another law firm?

8         **MR. NOMELLINI:**  That's correct, Your Honor.

9         **THE COURT:**  And who was the other law firm?

10        **MR. NOMELLINI:**  Karl Gunderson, correct me if I'm

11   wrong.  I think it was -- was it Faegre?

12        **MR. GUNDERSON:**  I believe that's right, but I would

13   have to confirm given the different matters that have come up.

14        **THE COURT:**  Okay.  So back to you, Mr. Gunderson.

15   How, then, are you figuring out whether there is something that

16   is on that docket that's responsive?  Because this is not a

17   situation where 3M is saying none of that has anything to do

18   with this case.

19        So you have represented you're looking for statements,

20   briefing, potentially, on the government contractor defense,

21   possibly a response to a request to admit or maybe an

22   interrogatory.

23        How are you accessing that information to see if

24   indeed there is responsive documents or not?

25        **MR. GUNDERSON:**  Yeah, to be clear, in the prior

1   discussions with Plaintiffs, we committed to looking at the

2   written discovery responses, and we were not getting into the

3   briefing issues unless Plaintiffs identified particular briefs

4   that they thought were at issue and relevant to the case.

5         I have to be honest, Mr. Aylstock's raising briefing

6   regarding the government contractor defense in *Moldex* is the

7   first time I am hearing that, despite the number of calls that

8   we have had on this issue.  So we have not looked into that

9   specific issue yet.  Now that we are aware of it, we can dig

10  into that and see if there is briefing that is not available to

11  Plaintiffs that we would have access to.

12        In terms of 3M's written discovery responses, we have

13  reached out to the counsel that was involved in the *Moldex* case

14  and have obtained copies of those discovery responses and that

15  is what we are reviewing for production purposes.

16        **THE COURT:**  Oh, okay.  Well, that's good to know.  I

17  didn't fully understand that.

18        So how much time -- I can't think it would be that

19  time consuming.  How much time do you need to look at

20  3M/Aearo's discovery responses in the *Moldex* cases to identify

21  any responsive information?  You mentioned you were looking

22  into that now.  How much more time do you think you need to do

23  that?

24        **MR. GUNDERSON:**  In terms of identifying what might be

25  responsive, we should be able to complete that in, you know,

1   less than a week, I would expect.

2          Where I think we can probably work with Plaintiffs --

3   or at least in our discussions with Plaintiffs yesterday there

4   seemed to be room for agreement on parts of this at least, you

5   know, to the extent there are confidentiality issues within

6   documents that also contain nonconfidential issues related to

7   the Combat Earplugs, our proposal to Plaintiffs was to sort of

8   redact that out as we did with the *Moldex* transcripts that the

9   Court ruled on in October.

10          It sounded like Dave yesterday -- I'm just recounted

11  yesterday when we talked about this -- Plaintiffs were amenable

12  to that.  To the extent that is true, we would expect to be

13  able to hopefully complete the production by end of day

14  Wednesday next week of those written discovery responses.

15          **THE COURT:**  Okay.  Well, let's do this, before we get

16  bogged down in confidentiality issues.  First you have to

17  complete going through the discovery responses to see if there

18  are responses to requests for admissions, interrogatories,

19  sworn statements that would have relevance to this case.

20          And you say you can hopefully complete that process by

21  the 11th of next week; is that right?  By Wednesday?

22          **MR. GUNDERSON:**  Correct.

23          **THE COURT:**  Okay.  Now, what about -- this is the

24  first I'm hearing of this that a government contractor defense

25  was raised or referenced in the *Moldex* litigation.

 1          Mr. Buchanan, are you able to -- because you can go on

 2     the docket and you probably have an idea -- if you know the

 3     government contractor defense was raised, you probably have an

 4     idea where that argument was made, whether it was on a summary

 5     judgment or a motion to dismiss or something like that.

 6          Are you able to pinpoint particular docket entries and

 7     tell Mr. Gunderson that you want 3M to access those, look at

 8     those, determine if there are issues raised, i.e., the

 9     government contractor defense, and then, if so, produce those

10     documents?  Are you able to do that?

11          **MR. BUCHANAN:**   Your Honor, we looked at the docket a

12     period of time, you know, probably in the last three or four

13     weeks.  I don't have it fresh in my mind.  I'd be happy to

14     further review it and press forward on that.

15          I think, obviously, if that issue is contained in

16     those documents, obviously, that would be one area of

17     relevance.  The other area of relevance that I articulated at

18     the outset I think would also be true, any discussion of

19     originality and development by 3M, you know, obviously, would

20     also arise in connection with litigating that affirmative

21     defense.

22          I don't have personal knowledge of all of the

23     parameters of that, but we're happy to take another look at the

24     docket and get back to Mr. Gunderson in that regard.  I think

25     it's going to be identifying a number of sealed documents and

1    sealed exhibits, but it would be a paring back, so we could

2    certainly try and do that promptly.

3            **MR. AYLSTOCK:**   So, Your Honor, I don't know exactly

4    what was raised because it's under seal in the response, but

5    there is a docket number 48, March 1st, 2013, there was a

6    Memorandum in Opposition to Motion for Summary Judgment of the

7    infringement and defendants/government had made the immunity

8    defense and then the response, and all of those materials are

9    under seal.

10           Obviously, we're anxious to get this soon and a

11   certification that everything has been done.  This request has

12   been out -- No. 33 -- since June of last year.  And I guess I'm

13   a little surprised to hear maybe they haven't been looking at

14   the materials on the docket, but we'd like a fulsome response

15   to this request and we'd like it by next Wednesday at the

16   latest.

17           **MR. GUNDERSON:**   Just to clarify for the Court,

18   Plaintiffs continually reference the fact that the request was

19   made in June.  On the face of the request, it's dramatically

20   overbroad and requests any document, you know, any of these

21   litigation related documents from any related proceedings

22   without any scope limitation in terms of the relevance to the

23   3M earplugs.

24           So 3M's response to the request was, *Hey, this is*

25   *overbroad, we need to meet and confer about it.*  Plaintiffs

1   didn't meet and confer about it or initiate the meet and confer

2   process with us until late in the fall, I forget whether it was

3   late November or December, and then, as discussed, we met and

4   conferred on it for the first time really in early January.  So

5   I just want to make sure the Court is aware of that context.

6          **THE COURT:**  Yeah, I'm aware of that.  So let's do

7   this:

8          So, Mr. Buchanan, et al., you'll take a look at the

9   docket and identify any specific docket entries on the *Moldex*

10   litigation that you think might go to government

11   contractor/government immunity defense.  Mr. Aylstock

12   identified Doc 48.

13         And then Mr. Gunderson mechanically -- say, for

14   example, docket 48.  Mr. Aylstock says what is sealed there,

15   the response may have an argument that could have some

16   relevance here.  I think we all understand if you said

17   something there that is different from what you're saying in

18   this case, that would be of great interest to the Plaintiffs.

19         But mechanically, how do you go and look at docket

20   entry 48 if it's sealed?  Mechanically, do you call the other

21   law firm, they get a copy of it and send it to you?  Or you get

22   a copy that your client has kept in its file?  Or how does that

23   work?

24         **MR. GUNDERSON:**  So, mechanically, we would go to our

25   client first to determine whether they have a copy of it in

1   their sort of internal files.  As you can imagine, clients

2   don't keep a copy of every brief that was filed in every case.

3   So to the extent they don't have the unredacted, unsealed

4   versions of the documents, we would reach out to the individual

5   counsel who was involved in the prior litigation and ask if

6   they have a copy of it in their records that can be obtained.

7   Again, when there are these sort of targeted requests, it is a

8   lot easier for us to locate those documents.

9        **THE COURT:**  Then what happens?  Because this is back

10  in 2013 and this is 2020.  I would be surprised -- your client

11  probably has some things floating around, but that's a long

12  time ago, they might not have copies of every brief filed in

13  that case.  You call the law firm who represented your client

14  and they say, *We don't have it* or *If we do have it it's in Iron*

15  *Mountain somewhere* or if they don't have it, then how do you

16  get, if at all, access to the docket to actually get the

17  document off the docket?

18       **MR. GUNDERSON:**  That is a good question.  I think we

19  would probably need to reach out to the District of Minnesota

20  clerk and determine whether they have a copy of this somewhere

21  in their files.  But, yeah, as you can imagine, that process

22  would take substantially more time than if either the law firm

23  or the client has a copy.

24            And just for the record, while we've been talking

25  about this, my colleague, Ms. De Paulo, went on the docket and

1 found document 48 that Mr. Aylstock just referenced.

2     While there are some redactions in here, the vast

3 majority of the 24-page brief is publicly available.  So,

4 again, we can look for an unredacted version of that document,

5 but the vast, vast majority of the substance in the document is

6 publicly available to anyone looking at the docket.

7    **THE COURT:**  Okay.  Well, what's redacted may or may

8 not be important.

9     Mr. Buchanan, what is your suggestion, if any?

10     Mr. Gunderson is saying that mechanically what he

11 needs to do, he goes to the client, sees if the client has the

12 brief that's on the docket, the unredacted.  If they don't have

13 a copy, he goes to the law firm and attempts to get it from

14 them.  If they don't have it, what do you suggest Mr. Gunderson

15 should do?

16    **MR. BUCHANAN:**  I would have thought -- I guess I would

17 have thought that counsel in the prior proceeding would have

18 the ability to download what had previously been uploaded.  I

19 guess if it's -- you know, I don't know if there are two forms

20 to what was filed, a public version that is the redacted

21 version and a private version that is the unredacted version.

22 I just don't have that facility with the docket or that court.

23     But I would hope that the prior law firm would be able

24 to generate a copy of the pdf that is at issue either from the

25 docket or from its own files.  Most firms retain a copy of

1   anything they ever file.

2        **THE COURT:**  Well, they may or may not.  But assuming

3   they were counsel of record on CM/ECF, they still should have

4   access to it.

5        So let's do this:  Mr. Gunderson, by Wednesday of next

6   week, complete your review of the discovery in *Moldex* that you

7   now have and produce what would be responsive.  You will hear

8   shortly from the Plaintiffs as to specific docket entries in

9   which they are interested.  And you should then go to your

10  client and then go to the law firm if your client doesn't have

11  it.  And if, indeed, there is information that is relevant to

12  this case, then make that available for production.

13       There is the issue of confidentiality.  I'm not sure

14  how we resolve that.  But what we did with the transcripts I

15  think is what Mr. Nomellini suggested, I believe the Quinn

16  Emanuel law firm -- I guess Mr. Wolfson, he's on one of the

17  leadership committees.  I guess his law firm represented *Moldex*

18  and would have the ability to get permission or a waiver from

19  *Moldex*; is that right?

20       **MR. AYLSTOCK:**  Yes, Your Honor.  And they already

21  have.  They just didn't want the financial information of

22  *Moldex* produced, but that's not what we're seeking here.  We're

23  looking for discovery responses.

24       And just to be clear, it's more than just what's filed

25  on the docket that was requested; it's the discovery responses

1    as well.

2         **THE COURT:**  Well, Mr. Gunderson has those, he's

3    collected those, and he's in the process of reviewing those.

4    So that does not seem that it would be a problem.

5         What do you need, Mr. Gunderson, before you produce

6    any further responsive documents in terms of something from

7    *Moldex* waiving confidentiality?  Is there anything you need?

8         **MR. GUNDERSON:**  I need to sit down with the documents

9    and sort through the confidentiality issues that have come up

10   in the specific responsive documents.  I think, going forward,

11   it probably makes the most sense for me to reach out to

12   Plaintiffs, to the extent we do encounter those issues, to -- I

13   honestly don't know.

14        I know in some instances there are individual written

15   discovery documents that relate only to *Moldex*, you know,

16   intellectual property issues and, you know, per Plaintiffs'

17   request for documents related to the 3M earplugs, those just

18   wouldn't be responsive.

19        So it's really the sort of mixed use kind of documents

20   that relate to both *Moldex* confidentiality issues and the

21   relevant earplugs here that would be at issue here.  And I

22   honestly don't know if that actually comes up in any of the

23   individual documents we have.  But to extent it is, we can flag

24   those for Plaintiffs this week so that they can -- whether it's

25   Quinn Emanuel or anyone on their end can sort of sort through

1    those issues.

2         Again, Quinn Emanuel should have copies of the same

3    discovery responses on their end to review it for

4    confidentiality and/or getting approval for us to just produce

5    them as is.  Otherwise, I think on our end we'd be happy to

6    redact out that information to which is just not relevant to

7    the earplugs here.

8         **MR. NOMELLINI:**  Your Honor, I can add to that.  I'm

9    looking for a letter -- *(inaudible)* -- from Quinn Emanuel

10   August 1st, 2019.  We asked for a broad confidentiality waiver

11   and they gave us -- *(inaudible)* -- one relating to precise

12   depositions, et cetera.  They have not given a broad

13   confidentiality waiver for all pleadings, you know, these

14   specific pleadings.  So I agree it should not be hard to get

15   that, and the sooner we can get that the better.

16        **THE COURT:**  Okay.  So March 11th will be the deadline.

17   If you run into some confidentiality issues you need to work

18   through, it sounds like they're not insurmountable, shouldn't

19   be a problem.  But I'd encourage both sides to work together.

20   And I guess the resource then is Mr. Wolfson from Quinn Emanuel

21   if you need a broader waiver from *Moldex*.

22        But step one is let's find out what documents there

23   are, because let's not waste our time on getting *Moldex* to

24   waive confidentiality where we really don't know what we're

25   talking about.  Now, we might ultimately be talking about a

1    briefing response to a motion or in support of a Motion for

2    Summary Judgment, and maybe the material that would be sort of

3    hybrid that could be subject to confidentiality is not a big

4    issue in this case.  There might be a couple of sworn

5    statements or declarations filed in opposition to or in support

6    of.  And the discovery that Mr. Gunderson actually has in hand

7    that his team is looking at, there might be a handful of

8    documents there.

9         So let's identify what it is, if any, that is going to

10   be produced, and then you can resolve the confidentiality issue

11   with *Moldex*.  And obviously it's going to depend on what it is

12   that would be produced that would be additional.

13        Let me just shift gears here for one second.  And Mr.

14   Gunderson, what about the board materials relating to the 3M

15   earplugs?  Mr. Buchanan says Mr. Warren had it in his private

16   files.  That doesn't necessarily mean you all have it.  He may

17   have been a pack rat and held on to this kind of stuff.

18        But what kind of search have you made for board

19   materials?  Have you exhausted efforts?  Are there further

20   things that you need to do?  Or have you reached a point where

21   you are ready to certify that, despite reasonable inquiry, you

22   have not identified any Aearo board materials relating to the

23   3M earplugs?

24        **MR. GUNDERSON:**  So there are sort of two issues in

25   connection with the board materials issue.  In terms of the 3M

1    board materials, we have collected and reviewed and completed

2    our review of those materials consistent with the scope defined

3    in our January 11th letter.  For those, you know, the 3M board

4    materials, we have found no responsive documents apart from

5    certain board materials related to the litigation.  And for

6    those documents, we have claimed privilege and then listed

7    those on our privilege log.

8         So from the 3M perspective, we are happy to close out

9    and to certify our production of those materials given that

10   scope and the parties' prior agreement on that.

11        In terms of the Aearo board materials, we have in fact

12   produced a number of Aearo board related materials both as part

13   of the collection of due diligence materials that the parties

14   -- or that the Defendants produced I believe it was in October

15   and from other documents that exist in our system.

16        We have not identified a discrete collection of all

17   Aearo board materials that exist, and so we have not been able

18   to do a comprehensive review for the Aearo board materials like

19   we have done for the 3M board materials.

20        The specific document that Mr. Buchanan raised, again,

21   this is, you know, from our perspective, Plaintiffs playing the

22   gotcha game where up until this point, you know, today was the

23   first time Plaintiffs told us about this document and their

24   concerns regarding this document in connection to the board

25   issue.

1          So, given that recent disclosure just now, I do want

2     to go back to our documents to see if there are any other

3     documents like this specific one that we are able to identify

4     in any of our other collections.

5          So, in terms of the Aearo board materials, there is

6     some more work I would like to do before we engage in any sort

7     of certification procedure.  But, again, I wouldn't expect that

8     process to take a particularly long time.  Again, by next week

9     we should be in a position to identify any additional materials

10    that might need to be produced or certify our efforts have been

11    exhausted.

12          **THE COURT:**  Okay.  Well, then, why don't you, by March

13    11th, let Mr. Buchanan know and represent that you've done

14    further review of your collection materials and produce any

15    Aearo board minutes that are responsive.  And if there are

16    none, meaning not that they didn't exist but you have not found

17    any despite reasonable inquiry, then let Mr. Buchanan know

18    that.

19          I'm not surprised that some employee -- some employees

20    are like pack rats and they just keep all kinds of materials

21    and, you know, they have folders with dribs and drabs of

22    things.  That doesn't necessarily mean that you would have all

23    the board materials.  But I would think somewhere -- I mean,

24    this was a viable corporation -- that there would be a

25    repository of old board minutes somewhere.

1          You said you've identified some materials -- Aearo

2    board materials but did not identify in your collection one

3    place where all the board materials were maintained; is that

4    right?

5          **MR. GUNDERSON:**  That's correct, beyond the large

6    collection of, you know, 4,000 documents that were exchanged

7    during the due diligence process around the 3M acquisition.

8    There were a number of board materials and, as I noted, those

9    all got produced previously to Plaintiffs.

10         But we haven't, beyond that set of due diligence

11   materials, found, you know, "the folder" where all of the other

12   -- any other board materials might be.  And we have

13   investigated a number of potential sources to try to identify

14   those locations and so far have come up empty.

15         **THE COURT:**  Well, by the 11th let Mr. Buchanan know

16   whether -- obviously, if you find more materials, you would

17   produce them.  But if, despite additional reasonable inquiry,

18   you are unable to locate them, you need to go on the record and

19   let Mr. Buchanan know that, despite reasonable inquiry, you

20   have not identified additional responsive documents concerning

21   Aearo board materials relating to the 3M earplugs.

22         Now, I don't know, Mr. Buchanan, did you comment on

23   the quality assurance testing in Aearo Mexico?  What was the

24   issue there?

25         **MR. BUCHANAN:**  The issue there, Your Honor, is an

1    affiliate of the Defendants here, its Mexican affiliate, was

2    involved in the manufacture, assembly, and quality assurance on

3    these plugs.  There was a particular process that was supposed

4    to be used in connection with the quality assurance on this

5    plug, in particular the yellow end of the plug, a method that

6    had been designed by the company to ensure the filter as seated

7    would provide the protection that was being represented on the

8    packaging and in the marketing materials.

9         We became aware that there was an issue with that and

10    they suspended quality assurance.  And when they actually went

11    back to test -- *(inaudible)* -- about 80 percent of the plugs

12    tested failed.

13         Apparently Aearo Mexico had not been included in any

14    prior sweep for materials by the Defendant.  We followed up in

15    December on it together with the request for the deposition of

16    a Mr. Zielinski.  You may recall the discussion about him

17    perhaps in chambers.

18         That deposition, I think we're now on the second

19    amended notice, so it's been moved a few times.  And this

20    deposition obviously we would like to complete timely and in

21    connection with the briefing scheduled for April.

22         To do so, we have requested Mr. Zielinski's custodial

23    file.  I believe that has been produced.  We are, however,

24    waiting on all of the materials from Aearo Mexico that would

25    otherwise be responsive to our request which apparently had

1   eluded the first sweep.

2              So I'm told from the Defense they're working on it.  I

3   don't know the extent to which they have particular caches of

4   documents that addresses the quality assurance or not.  The

5   indication is yesterday I think they're still looking for that.

6              They have identified some responsive materials that

7   they intend to get out the door.  But we really need a date

8   certain to complete this production so that we can ensure

9   Mr. Zielinski's deposition occurs as noted.

10             **THE COURT:**  To your knowledge, are these documents all

11  in English or is there Spanish in there, too?

12             **MR. BUCHANAN:**  I am told there's a mixture.

13             **THE COURT:**  Mr. Gunderson, what's the status of the

14  Mexican documents?

15             **MR. GUNDERSON:**  Yeah, so, again, there's some context

16  here that is helpful.  Plaintiffs cite to RFP 49 which relates

17  to the degree of attenuation and the relationship between that

18  and anticipated use.  You know, that just clearly isn't calling

19  for documents related to manufacturing testing.

20             Nonetheless, when Plaintiffs raised this issue,

21  Defendants agreed to look into it and determine whether any

22  documents connected to the issues Plaintiffs have identified

23  are available and responsive to Plaintiffs' request.

24             There's some complications here, in that, in the early

25  2000s when the issues Mr. Buchanan was describing occurred or

1    arose in the early manufacture of the Combat Arms in Mexico,

2    the assembly of the Combat Arms in Mexico.

3         In that early 2000 time period, the Mexican company

4    that did the assembly was actually an independent third-party.

5    Later in time, in or around 2007, Aearo and that independent

6    company formed a joint venture.  And then when 3M acquired

7    Aearo, it also acquired this manufacturing facility and

8    assembly facility in Mexico and made it a wholly owned

9    subsidiary.

10        So, in part, due to the complications related to that

11   complex history dealing with documents in another country with,

12   you know, language issues in terms of communicating with the

13   staff there and other issues, we have been working diligently

14   since Plaintiffs first raised this issue to get this process

15   going.

16        Our current -- you know, we do have, as we told

17   Plaintiffs yesterday, approximately 800 documents from ATM that

18   have been collected and are in the process of being reviewed.

19   We expect to get a production of those materials out early next

20   week for Plaintiffs to have access to those.

21        As we've told Plaintiffs, at this point we have not

22   identified documents from that earlier time period related to

23   the issues that Plaintiffs have discussed.  We are still

24   producing and reviewing the documents -- we are still reviewing

25   and will produce the documents from ATM related to the later

1    time periods.  But at this point, we are still investigating

2    whether or not any other -- you know, there are any other

3    caches of documents at the Mexican facility that may continue

4    to hold materials and we are continuing that investigation.

5         So in terms of Mr. Buchanan's request for a

6    certification, there's a tension there between us continuing to

7    look as hard as we can to try to locate these additional

8    materials at the facility in Mexico versus imposing an

9    artificial deadline for us to sort of certify that we've done

10   everything we can do within the time period allowed.

11        So, from our perspective, we are happy to keep pushing

12   on the investigation and continuing to look for, you know,

13   especially these older materials that might be relevant.  But

14   to the extent that there is some shorter deadline that's

15   imposed, we're only going to be able to do what we can do

16   within that time period allowed to do that investigation.

17        **THE COURT:**  I'm curious.  What is it -- because this

18   came up at the preconference to the case management conference.

19   What is it that you actually do on investigating the existence

20   or nonexistence of these documents?  Is there actually a

21   factory still in Mexico that is owned or affiliated with 3M?

22        **MR. GUNDERSON:**  There is, and it's a wholly-owned

23   subsidiary at this point.  And so we have been in regular

24   contact with them over the past six or seven or eight weeks,

25   whatever it is since Plaintiffs first raised this issue, you

1    know, multiple points of contact each week trying to push on

2    this to figure out where the relevant documents are.

3            In terms of the Combat Arms version 2, it was

4    discontinued in 2015, and so the facility hasn't been producing

5    or assembling or quality testing those documents since then,

6    and so the materials related to the Combat Arms are all in sort

7    of backup, you know, long term storage repositories of

8    information, not sort of active, you know, *Here is the folder*

9    *of all the Combat Arms related testing.*

10           And in addition, the way the Combat Arms was

11   manufactured and produced or sort of assembled at this

12   facility, it wasn't a continuous production line of every day,

13   you know, a thousand plugs are turned out.  Instead, it was an

14   on-demand production where there would be a request for an

15   order to be assembled by the facility in Mexico when certain

16   orders came in or when the inventory was low, and so there are

17   a lot of ad hoc dates on which the actual assembly took place

18   and then the sort of related quality assurance testing took

19   place as well.

20           And so, the team is going through to identify the

21   location of those documents related to those particular orders

22   and trying to run down what they can, to the extent that

23   information does still exist.  At this point we don't

24   necessarily expect to locate documents from prior to 2008, but

25   as I said, we are still investigating.

1              And you know, one of the delays in getting the agenda

2    out yesterday was, you know, I was involved in a call with the

3    ATM personnel looking at their files and working with them to

4    see if there's anything else that needs to be collected.

5              **THE COURT:**  The other question is, to your knowledge

6    -- because you have identified 800 documents -- are the

7    documents a combination of ESI but also potentially hard copy

8    documents?

9              Because we're talking about quality assurance testing.

10   And don't take this as a statement that things in Mexico are

11   not as advanced as the United States, but we are looking at a

12   period of time of 10, 12 years ago or more.

13             Are there, to your knowledge, potentially hard copy

14   documents that have been sent out to storage like in Iron

15   Mountain or something like that that someone is going to and

16   reviewing?

17             **MR. GUNDERSON:**  To the best of our knowledge, there

18   aren't.  You are correct that, during the process of actually

19   assembling these on the line -- right on the factory line, they

20   did create and use hard copy documents as part of that process.

21   But our understanding is that, at least since 2008 and likely

22   before that, too, that the procedure was, at the end of each

23   shift, for the sort of shift manager to take those physical

24   pieces of paper and to scan them into an electronic format for

25   storage exactly for the reason you identified, so they don't

1    have to go back to boxes and boxes of paper materials.

2              **THE COURT:**  Okay.  Well, that's encouraging at least.

3              Well, here is what I want you to do.  Press forward on

4    that.  But when we get to the end of next week, not the 11th

5    but the 13th, I want you to advise Mr. Buchanan and his team in

6    writing as to the status of the quality assurance documents

7    from Aearo Mexico.  Obviously, if you produce documents, you

8    will have produced them.  But let him know candidly and

9    honestly where you're at on that.

10             And if you believe in good faith that there is some

11   additional inquiry that you can make, you can tell him in

12   writing that you've exhausted most of the avenues, what you are

13   producing is what you have found, but in good faith you are --

14   if you believe there's a need to, you are continuing to have

15   investigation done of the Aearo Mexico materials.  And that

16   way, in case in the eleventh hour you do find something, you'll

17   be able to produce it and you won't be giving an absolute

18   certification that you had finished your reasonable inquiry.

19             If, on the other hand, on the 13th, by the time you

20   get to that, there is nothing in good faith further that you

21   believe can be done or that you can do, then provide a

22   certification to Mr. Buchanan and his team that reasonable

23   inquiry has been made and what has been produced is the result

24   of your efforts and that will be that.  And we'll see if that

25   produces the materials that Mr. Buchanan is looking for.

1          So you'll either certify on the 13th, Mr. Gunderson,

2     or, if in good faith you think you need -- not need but can

3     make some further inquiry, tell Mr. Buchanan what you've done

4     and how much time you need to do whatever you think you need to

5     do to make sure you've looked under every stone and rock to see

6     if those materials are available.

7          **MR. GUNDERSON:**  Will do, Your Honor.

8          **THE COURT:**  Okay.  What about the lab notebooks, what

9     is the status of that, Mr. Gunderson?

10         **MR. GUNDERSON:**  So, again, from our perspective, this

11    is more of a game of gotcha than anything else.  As Plaintiffs'

12    exhibits show, we've produced a significant number of lab

13    notebooks, including one lab notebook for Mr. Falco previously.

14    And then during the deposition of Mr. Falco the Plaintiffs

15    clearly had evidence they thought that a notebook had not yet

16    been produced and so sprung it on the witness during the

17    deposition.

18         Once I became aware of the issue, I was able to run

19    down that notebook.  We are in the process of collecting that,

20    reviewing it, and producing it, and will get it out in our next

21    production.  My understanding is it's a very large notebook

22    that deals with -- I haven't seen it yet, but my understanding

23    is it's a very large notebook that deals with a number of

24    different products.

25         I honestly don't know if it actually is anything

1    relevant to the Combat Arms, but we will look at it and

2    investigate this more.  Again, until we sort of saw Plaintiffs'

3    agenda this week, it wasn't really an issue on our radar at

4    all.  But again, once we sort of were made aware of it, we were

5    able to run down the notebook and will be producing it to

6    Plaintiffs.

7            **THE COURT:**  Okay.  So complete that process by the

8    11th of next week, produce any responsive information in those

9    additional lab notebooks so that they will have them.  In the

10   event there's absolutely nothing in there that relates to the

11   Combat Arms earplugs, then let Mr. Buchanan know that you've

12   looked through this additional notebook and there's nothing in

13   there.  But let's see if we can draw that to a conclusion by

14   the 11th.

15           **MR. GUNDERSON:**  Will do, Your Honor.

16           **MR. BUCHANAN:**  Your Honor, just a brief follow-up on

17   that point.  The concern I tried to flag in my initial remarks

18   was that I did want an assurance, obviously, that the search

19   for lab notebooks had been comprehensive.

20           Obviously that one had been either not seen or

21   withheld or not completely produced until after our specific

22   follow-up on it.  It just raises a concern about whether there

23   are more.  This is not a request for just Mr. Falco's.  Mr.

24   Falco's identified the issue and the concern.  We're just in a

25   place where we need to close this issue out.  It's been

1    percolating for a while.  So wherever this lab notebook was,

2    I'd just ask that we get an assurance that other responsive lab

3    notebooks are also produced.

4         **MR. GUNDERSON:**  Your Honor, on that point, just to

5    provide some context here, we have two methods of trying to

6    locate responsive lab notebooks.  One is we ask the individual

7    witnesses as part of their collection interviews whether they

8    have such materials, and then we also look into certain

9    repositories for lab notebooks that we are aware of.

10        In terms of this new notebook for Mr. Falco our

11   understanding at this point -- again, I've only had this really

12   on my radar for the last 24 hours or so, maybe a little more

13   than that.  Our understanding was that it was located in a

14   place along with other lab notebooks where we have collected

15   others in that set.  We have investigated that collection of

16   lab notebooks generally for responsive materials and have

17   produced, as the exhibit Plaintiffs' provided, a large number

18   of lab notebooks from that source.

19        I want to take a look at this individual notebook to

20   determine why it was missed during that process.  But, from our

21   perspective, there is no systemic issue here.  It is part of

22   our process to look for these, and we have produced a

23   significant number of them to Plaintiffs.

24        **THE COURT:**  Well, by the 11th then let Mr. Buchanan

25   and his team know that reasonable search and inquiries have

1    been made in addition to this one missed notebook, to the best

2    of your knowledge, all of the relevant lab notebooks have been

3    identified and produced.  And, you know, it's good to know

4    that, as you say, it's not systemic, everyone's pencils have

5    erasers on them and someone missed that lab notebook for some

6    reason.  But make sure there are no other lab notebooks in that

7    collection that were overlooked for any reason.

8           And then lastly, which is a broad category, this

9    promotional and training media, what is your response to what

10   Mr. Buchanan had to say about that?

11          **MR. GUNDERSON:**  So I think this is a difficult issue

12   in part because at this point Plaintiffs [sic] have produced

13   thousands, if not tens of thousands or more, documents that

14   arguably fall into the category of promotional or training

15   materials.

16          We've identified custodians and we've added custodians

17   that are connected to and whose primary role is related to

18   marketing and promotions, and so we have produced vast

19   quantities of documents related to this issue in general.

20          Again, as this sort of identified with respect to some

21   of these other issues where Plaintiffs have specific things

22   they are missing, we are sort of happy to dig into those

23   discrete issues and follow up with Plaintiffs on them to see if

24   there's more information that we might have in connection with

25   those particular items.

1          Again, sort of yesterday for the first time when we

2   were talking with Plaintiffs, Mr. Buchanan identified

3   potentially some materials that were discussed in the

4   deposition of Marty Salon and maybe some documents related to

5   Project Cobra.  But as you can imagine, with a topic this broad

6   that relates to multiple custodians, multiple issues, you know,

7   a company that sells these products, we have, as we have told

8   Plaintiffs all along, been relying on the TAR process in

9   general to identify these responsive materials and get them

10  produced to Plaintiffs.

11          So, with respect to the issues raised in the

12  deposition of Mr. Salon and the Project Cobra, we are happy to

13  look into those discrete issues and see if there are additional

14  responsive materials that they think they are missing to see if

15  there is something else that could be produced on that front.

16          But I guess, from our perspective, it isn't, again, a

17  systemic issue of producing our materials.  But to the extent

18  Plaintiffs have specific questions, we are happy to continue

19  looking into those.

20          **THE COURT:**  Mr. Buchanan, did you say there was a

21  video or something of that nature?

22          **MR. BUCHANAN:**  Yeah, there's a training video, Your

23  Honor, which -- and I'll state, this applies, obviously, at a

24  general level, and it's also anticipating the parties'

25  bellwether process.

1          We are, obviously, very interested in communications

2     by the company with the servicemembers, with the bases, posters

3     and marketing and other things, and when they were used and

4     where.

5          So we have a rog out there that's going to further

6     elucidate that information, but it's obvious to us that we are

7     missing some information, or at least we believe we're missing

8     some information, and we've tried to follow-up with Mr.

9     Gunderson on those points.

10         I mentioned the training video.  There was a

11    direct-to-soldier initiative that the company initiated in 2005

12    that's been testified to, and yes, we want completeness on

13    this.

14         I do want to raise one point, though, and it just

15    concerned me when I heard Mr. Gunderson say, you know, as is

16    known, this is a product of the parties' TAR process.

17         There is a TAR process that's contemplated for

18    nonsegregated materials, custodial files, things like that, and

19    there's a separate process -- a linear review -- that's

20    contemplated for segregated materials.

21         In my experience, most companies have marketing

22    directories, whether they're SharePoints or document management

23    systems or other sources, where approved marketing materials

24    are retained and stored, they go through an approval process,

25    and they remain there so the salespeople know what the official

1    stuff is that they're permitted to use in connection with their

2    activities.

3            So I just want to highlight that, that TAR is

4    obviously one pathway as it relates to custodial information.

5    But as it relates to segregated files or marketing directories

6    or other repositories of information, that information is

7    supposed to be linearly reviewed.

8            **MR. GUNDERSON:**  And again, this is another great

9    example Plaintiffs are raising issues for the first time with

10   the Court.  Mr. Buchanan's concern here about approved

11   marketing materials, that is a category of documents we have

12   been producing.  We have a resource for that, and those

13   documents are included in the production.

14           To the extent Mr. Buchanan would like to discuss that

15   further, we're happy to talk about that.  But we're not -- at

16   this point, we are not -- Defendants have undertaken the exact

17   effort Mr. Buchanan just identified.  And had he raised it

18   yesterday during the meet and confer or previously, this issue,

19   to the extent that is Mr. Buchanan's concern, could have been

20   addressed without using the Court's time.

21           **THE COURT:**  Okay.  Well, it looks like you're both on

22   the same page on that, to the extent these marketing materials

23   have not been produced.

24           What is the Cobra program?

25           **MR. AYLSTOCK:**  So, Your Honor, I was at Mr. Salon's

1    deposition and it came up.  There was a program -- there were
2    sales reps that were individually going to various bases
3    apparently and handing out earplugs and telling people how to
4    use them and so forth and marketing their materials.  And we
5    have reference to it in a document.  Mr. Salon testified about
6    it.  But we don't seem to have the underlying documents about
7    that program.

8          There was another training program that came up in
9    some of the earlier depositions when the company, in their own
10   words, realized that the training was woefully inadequate and
11   hired people to let's see what we can do to fix this.  And
12   we're not sure if we have those documents either.

13         And so, I am concerned that there has been some sort
14   of systemic failure to do the review that's necessary.
15   Obviously we have a lot going on and we want to get this
16   information.  And to the extent it exists, we believe it should
17   have been produced in conjunction with our first request for
18   production which -- *(inaudible)* --

19         **THE COURT:**  Are you aware of that program, Mr.
20   Gunderson, this Cobra program?

21         **MR. GUNDERSON:**  I am not.

22         **THE COURT:**  Okay.  Well, now that it's been
23   highlighted as an issue, is that something you are looking into
24   in following through on these marketing materials?

25         **MR. GUNDERSON:**  Correct.  As I said to one --

1    explained to Plaintiffs yesterday, to the extent they

2    identified these sort of concrete things that they think they

3    are missing, we are happy to dig into them, and that would

4    include the Project Cobra materials that Mr. Aylstock was just

5    describing.

6          **THE COURT:**  And how much time do you need to either

7    locate and produce those materials or finish your reasonable

8    inquiry where you can represent that you have not identified

9    these materials, you don't have them?  I don't know what time

10   frame this comes from.  But how much time do you need to

11   complete that process?

12         **MR. GUNDERSON:**  To be honest, I think for this one in

13   particular, I don't have a good -- I don't want to misrepresent

14   to the Court the time it will take to run this down.  Certainly

15   we can do the simple investigation of -- you know, we have

16   close to 12 million documents now that are subjected to the TAR

17   protocol.

18         We can search those documents to see -- you know, look

19   for additional references to Project Cobra beyond what

20   Plaintiffs already have.  And it may be that there are

21   documents in Plaintiffs' production or in our production

22   already that relate to this.

23         I would think by the end of next week we should be

24   able to give Plaintiffs an update on where we are and whether

25   we think we actually have captured everything already or if we

1    think additional investigation may be necessary to run down the

2    issue completely.

3         **THE COURT:**  Let's do this:  We've got a leadership

4    conference call on Monday the 16th in the afternoon.  Let's see

5    if we can either wrap up this issue by then so you'll be able

6    to report by the 16th you've done what was necessary and you've

7    located additional materials and produced them or if it turns

8    out that, despite your best efforts, you've not been able to

9    complete that process, you'll be able to report to the Court on

10   the 16th what's going on there.

11        And, you know, if you need a little more time you can

12   tell us why, but hopefully you'll be able to get to the bottom

13   of that by then.  Because today is the 4th, so that gives you

14   close to a week-and-a-half, a week and three or four days to

15   see if you can track down those materials.

16        It doesn't sound like it would be too complicated.

17   But I know you're going into trying to locate historical

18   documents, and sometimes it's difficult to find documents when

19   employees have left and -- but at least see if you can complete

20   that process by the 16th.  And if you can't, you can explain to

21   the Court on the 16th what additional efforts, if any, need to

22   be done in that regard.

23        **MR. GUNDERSON:**  Will do, Your Honor.

24        **THE COURT:**  Okay.  Let's quickly move on to the second

25   agenda item.  And this relates to an additional custodian,

1    April Noblet.  So tell me, Mr. Buchanan, who she is and why she

2    should be added at this late date.

3            **MR. BUCHANAN:**  Thank you, Your Honor.  Ms. Aminolroaya

4    from my office is going to address Ms. Noblet.

5            **MS. AMINOLROAYA:**  Hello, Your Honor.  So Ms. Noblet

6    held a position of product line director for the Browning Duo

7    Ear Plugs, and she was also responsible for the marketing of

8    the Range earplugs.  So these are both consumer versions of the

9    Combat Arms earplugs, and her time here was particularly

10   noteworthy.

11           From the documents, as far as we can tell, she was

12   with Aearo from 1998 through 2004, so just at the beginning of

13   the sale of the earplugs as well as at the beginning point when

14   the wording for this labeling for these consumer products were

15   being drafted.  And that's actually how Ms. Noblet came to our

16   attention.

17           We noticed in the documents -- in a few documents that

18   we have with her name on them that she is listed as having --

19   more being involved with and having the responsibility for

20   creating the wording for the U.S. consumer packaging for the

21   Combat Arms earplugs.  She is also listed on a document

22   indicating that she would have reviewed and signed off on

23   labeling and the packaging for the Browning Duo Ear Plugs.

24           In addition to her involvement with the labeling for

25   these consumer plugs, she is also identified in a press release

1    as the marketing contact for the Range earplugs.  And there is

2    one particular press release where she offers some claims about

3    the type of protection provided by the Range earplugs and is

4    listed as the marketing contact and the responsible individual

5    for marketing about the Range earplugs.

6              **THE COURT:**  Did she continue on after 2004 with Aearo,

7    or she left and never became an employee of 3M?

8              **MS. AMINOLROAYA:**  As far as I can tell -- as far as we

9    can tell, we don't think she continued on with 3M.  3M would

10   have better visibility into that.  But as far as I can see, she

11   did not continue with 3M.

12             **MR. GUNDERSON:**  Just on that point, Your Honor, our

13   understanding is Ms. Noblet left Aearo in May of 2004, some

14   three-and-a-half or four years before the 3M acquisition.  And

15   to the best of our knowledge, she hasn't returned to either

16   Aearo or 3M since May of 2004.

17             **THE COURT:**  Well, she was obviously on the consumer

18   side, but there's certainly relevance there.

19             Why should she not be added as a custodian other than

20   you don't want to add any more custodians?

21             **MR. GUNDERSON:**  Your Honor has hit the nail on the

22   head on our primary argument.  At this point, we do think we

23   have a lot of custodians in our system.  As I noted, we have

24   close to 12 million documents that have been added to the TAR

25   protocol.

1          And significantly, even though Ms. Noblet left in May

2     of 2004, some 16 years ago practically at this point, within

3     the TAR process we have some 5400 emails and attachments that

4     show Ms. Noblet having sent or received those documents.

5     Approximately 3500 of those are documents that Ms. Noblet sent

6     herself where she is listed in the email from metadata field.

7          And our understanding, based on the documents that

8     we've seen and really the documents that Plaintiffs have

9     identified, is that the work Ms. Noblet was doing in connection

10     with marketing and labeling really overlapped with a number of

11     the other custodians we have already added and with individuals

12     who were in fact deponents in the case already including

13     Mr. Burger, Ms. Cladden, Mr. Murphy, and then a nondeponent

14     named Christine Dunn.

15          So, yeah, from our perspective, we have a lot of

16     documents that have already been added to TAR.  Very few of

17     them have been identified by TAR as relevant and, you know,

18     from our understanding of Plaintiffs' argument in terms of the

19     work she was doing, our understanding is that other people were

20     doing the same kind of work and that those other individuals

21     were and have already been added as custodians.

22          **THE COURT:**  Were these other individuals her co-equals

23     or superiors or underling?  I can't figure out where in the

24     pecking order Ms. Noblet fell.  What was her title?

25          **MR. GUNDERSON:**  She was a marketing manager, is I

1    believe the title that we've seen associated with her.   In

2    terms of the exact pecking order, I know she and Mr. Murphy

3    worked closely together on the consumer side of things.   And in

4    terms of the other documents that Plaintiffs have identified,

5    people like Mr. Burger or Ms. Dunn or Ms. Cladden, they really

6    had other responsibilities that related to, for example,

7    reviewing the packaging or reviewing the claims to determine

8    whether they were -- for example, Mr. Burger and Ms. Cladden

9    would review those materials or reviewed materials in general

10   from the sort of lab perspective, and Ms. Dunn was sort of the

11   expert in packaging and labeling.

12          So I don't know if they -- there's not really a

13   hierarchical relationship with then.   It's more the sort of

14   overlapping expertise with those custodians.   But my

15   understanding is that Mr. Murphy and Ms. Noblet worked more

16   closely in the same sort of division department.   I don't know

17   off the top of my head whether Mr. Murphy reported to

18   Ms. Noblet or vice versa or if they were sort of co-equals in

19   the reporting structure.

20          **THE COURT:**   Do you know -- because this goes way back

21   to '98 to 2004, so is there even a custodial file for

22   Ms. Noblet?

23          **MR. GUNDERSON:**   Our understanding is that the only

24   data that might exist for Ms. Noblet would be some backup tape

25   data that our vendor has identified that may be associated with

1    Ms. Noblet.

2             **THE COURT:**  Okay.

3             **MS. AMINOLROAYA:**  And Your Honor, if I could just

4    respond just briefly?

5             **THE COURT:**  Yes.

6             **MS. AMINOLROAYA:**  Mr. Gunderson made the point that

7    there were others involved with the plugs and they had varying

8    responsibilities with respect to labeling, but Ms. Noblet was

9    the product line director.  So as far as we can see, she has

10   the primary responsibility for these areas.

11             And while she worked with Mr. Murphy, it's notable

12   that, in his deposition when he was asked about the marketing

13   piece that we referenced earlier, he points to her as the

14   person that would have been responsible for that and that would

15   have been the one to ask about the claims made in that

16   marketing piece.

17             So, while there may have been others involved and

18   Mr. Burger or Ms. Cladden may have been involved, Ms. Dunn, as

19   far as I understand was involved with graphic design and that

20   area of labeling, it appears, as far as we can see, that

21   Ms. Noblet had primary responsibility for these areas.

22             **THE COURT:**  Okay.  I don't know.  To me it sounds like

23   her custodial file is not really that critical.  I know

24   Plaintiffs always think that there's going to be some treasure

25   trove of information in there that they don't already have.

1          But it seems like a number of documents have been

2     produced on the consumer side; is that correct?  This is not

3     your first attempt to get documents on the consumer side?

4     There have been other documents produced on the consumer side

5     relating to that time frame, the early days with Aearo; am I

6     right on that?

7          **MS. AMINOLROAYA:**  My understanding is that we have

8     some, but it is very limited what we have.  So I know that

9     there was a production of some files from Mr. Murphy, but my

10     understanding is that that was very limited and that a few of

11     those documents were used during his deposition, but it's not a

12     large production by any means, and we certainly -- our

13     understanding, as far as we can see, no documents that speak to

14     what happened on the consumer side in terms of the creation of

15     the wording for the labeling and what went into the claims that

16     Ms. Noblet made about the plugs.

17          In one press release that we have of her she talks

18     about the Range earplugs providing optimum protection for

19     indoors and outside.  We don't have the underlying documents

20     that are related to that claim.

21          **MR. AYLSTOCK:**  Your Honor, I just want to make --

22          **MR. BUCHANAN:**  Your Honor, if I could identify a

23     point -- and maybe that's what Bryan was going to say -- the

24     consumer labeling, it becomes, if you will, the labeling that

25     the company attaches to later labeling for the Combat Arms as

 1    used by the military, which is why we've been focused on it and

 2    any interactions concerning statements in it, the support for

 3    them, what they were intended to represent versus what they do

 4    represent, and how consistent they are or inconsistent with

 5    whatever the testing showed.

 6         So the first -- that is the level of interest.  It's

 7    not just a simple curiosity as to what consumer labeling may

 8    have said.  It evolved into the labeling for the military

 9    packaging.

10         **MR. NOMELLINI:**  Your Honor, we would certainly dispute

11    that statement that the consumer labeling was used for the

12    military packaging -- *(inaudible)* -- so there is actual dispute

13    on that.  I don't believe that's been established.

14         **THE COURT:**  Well, I think we can all agree -- whether

15    that's true or not, we can all agree that certainly the

16    development of the product on the consumer side certainly is

17    going to have relevance to this case.

18         I understand -- and correct me if I'm wrong just to

19    make sure I'm on the same page -- it's the same product, right?

20    If I'm a hunter in 2004 and I buy an earplug, it's the same

21    earplug that was sold to the military, for all intents and

22    purposes?

23         **MR. AYLSTOCK:**  That's right, Judge.

24         **MR. NOMELLINI:**  Different packaging and labeling, same

25    earplug.

1              **THE COURT:**  Okay.  Well, you know, I'm very reluctant

2    to add custodians, but I don't know, I think you've convinced

3    me that there may be something since she was a marketing

4    manager and signed off on some of the marketing materials,

5    albeit on the consumer side.

6              Of course, I'm always looking at a custodian as it's

7    just one custodian, this isn't going to be such a big deal.  I

8    know Mr. Gunderson wouldn't agree with that when you add a

9    custodian.  And I don't know how extensive her custodial file

10   would be, but it is an effort to collect.

11             And then I guess when you collect it, you'll put it

12   back into TAR, is that right, Mr. Gunderson?

13             **MR. GUNDERSON:**  That is correct.

14             **THE COURT:**  But --

15             **MR. BUCHANAN:**  Your Honor, just to fill the Court in

16   on something the parties have been discussing and I think it

17   may generally be helpful to understand where the parties are

18   from a TAR perspective.

19             The Defendants are in elusion testing, and we've

20   agreed with respect to future custodians to use the TAR

21   training model as it related to the prior corpus.  So we think

22   we have stability -- it appears that we have stability.

23   Obviously we're testing -- that's what the Defendants tell us

24   is there's stability in the model.  We're currently evaluating

25   their elusion test.

1          So this is not a revisitation of the full TAR model

2     because we're adding a custodian.  So I hope that's helpful for

3     the Court's knowledge.

4          **THE COURT:**  Okay, yeah, that is.

5          Here is what I'm going to do, somewhat reluctantly.

6     But, Mr. Gunderson, I am going to require you to collect

7     Ms. Noblet's custodial file.  I think there's been enough

8     presented of interest here that something very relevant might

9     be discovered.

10         If what Mr. Nomellini said, the marketing materials on

11    the consumer and the military side are not really that related,

12    then we'll see when this information has been produced.  But if

13    it turns out to be the same or very similar -- same bottle of

14    wine with a little bit of a different label on it, then it

15    could be relevant.  So I do want you to go ahead and collect

16    her custodial file and then review and produce it.

17         Mr. Gunderson, what type of timeline -- this is now an

18    additional custodian here, this is not a suggestion that, oh,

19    there might have been something that you missed, but this is a

20    whole new custodian.  How much time do you need to collect,

21    review, and produce her materials?

22         **MR. GUNDERSON:**  It will likely take us -- my hope is

23    that we would be able to complete the production within three

24    to four weeks.  Hopefully it can be done faster than that.  I

25    think there's a big question here in terms of what the actual

1     volume is that we're able to obtain from the backup tapes.  If

2     it's a large volume, even with the TAR model given all the

3     exceptions to TAR for Excel documents and images and the like,

4     the review could be -- you know, take some time.

5          And in addition, unlike sort of more standard

6     collections, extracting the data from the backup tapes is a

7     more involved process that takes some time in and of itself.

8     So I would think by four weeks from now we should be in a

9     position to complete the production.

10         And clearly we have no interest in sitting on a

11    production if we're able to get it done before then, and so

12    we'll make our best effort to get it out as soon as we can.

13         **THE COURT:**  And I know you don't know how extensive

14    this is going to be -- until you do the collection, how

15    extensive her custodial file would be.  But because Murphy's

16    Law does apply, let's give a target date of Friday, March 27th.

17    And that gives you the better part of this week, one, two,

18    three good weeks plus.

19         And, you know, if for some reason that turns out to be

20    unrealistic, you can report that to the Court.  I'm always open

21    to if there's -- you know, if you tell me her custodial files

22    is one of the largest custodial files and there are some

23    complicating issues because you're having to go into backup

24    tapes and things like that that necessitates more time, I have

25    an open mind and I'm sure Mr. Buchanan does.  But let's set a

1   target date on that for production of Ms. Noblet's custodial

2   file for the 27th of March, which is a Friday.

3            **MR. GUNDERSON:**  Will do, Your Honor.  And by the 16th

4   -- in the leadership call on the 16th we should have a much

5   better idea of the timeline, and so if there are any issues,

6   we'll make every effort to raise them during that call.

7            **THE COURT:**  Okay, very good.

8            Now, let's quickly shift gears.  There's an issue, Mr.

9   Buchanan, you raised in your agenda about supplementing

10  responses to interrogatories.  What is the issue there and what

11  is the status of that?

12           **MR. BUCHANAN:**  If I could, Your Honor, maybe

13  prioritize a few of these.  And I don't want to abuse the time

14  the Court has indulged us with today.

15           There is a general issue, yes, with supplementing.

16  More generally, it relates to completeness, identification of

17  individuals.  In particular, third parties as well, you know,

18  interrogatory No. 2.

19           Yes, obviously, we have documents that have been

20  produced in this case, but our interrogatories request more

21  than simply names on documents.  They request really the

22  responsibilities or involvement of certain folks, which is more

23  challenging with regard to third parties who are engaged or

24  disengaged at various points in time.

25           So this is a roadmap to third-party discovery in these

1     requests, and we'd just like to make sure we get full and

2     complete answers on interrogatories 1 and 2.

3          **MR. WASDIN:**  Your Honor, this is Nick Wasdin.  If I

4     could just respond to that briefly?

5          **THE COURT:**  Go ahead.

6          **MR. WASDIN:**  So we initially responded to Plaintiffs'

7     interrogatories in October of last year, timely, and we did a

8     reasonable search for information responsive to both

9     interrogatories 1 and 2 and the numerous other interrogatories

10    they served.  And our answers are reflected in our responses,

11    and they reflect the results of the investigation as of that

12    date.

13         Rule 26(e), which Plaintiffs cited to as the basis for

14    supplementation, doesn't make us go back to the interrogatories

15    every time someone says a name at a deposition.  In fact, it's

16    just opposite, that you don't have a supplementation obligation

17    for information that is otherwise made known in discovery.

18         So, in our view, our answers were complete when we

19    gave them.  And to the extent Plaintiffs have asked a witness

20    about a particular employee or found a document with someone's

21    name on it, there's no issue with us having to turn around and

22    go back and expand the list.

23         **THE COURT:**  Mr. Buchanan?

24         **MR. BUCHANAN:**  Yes, Your Honor.  As Defense counsel

25    notes, obviously documents have been produced.  But the

1    interrogatories are testimonial, they are the company's

2    statements, and they are binding with regard to relevant

3    individuals that may be germane to the proceeding from that

4    perspective.

5          Telling us to go and fish through the production to

6    identify those and then sort through and, frankly, imagine what

7    their roles and responsibilities may have been from the

8    Defense's perspective I'd say is not contemplated by the rule.

9          Their answers specifically state that they're going to

10   reserve the right to supplement these because discovery is

11   early and ongoing, yet they haven't done so.

12         We haven't requested serial updates every time there's

13   a document production -- *Hey, tell us how your rogs have*

14   *changed*.  But we're at a place now at the end, if you will, of

15   this first phase of discovery principally focused on the

16   general contractor defense or the government contractor defense

17   where it's an appropriate time to supplement.  There is still

18   ample time for further general discovery, to the extent it's

19   necessary.

20         If there are third parties that have particular roles

21   that we don't appreciate from the document production, that

22   would be certainly important to know.  But we don't think it's

23   supposed to be -- and the rogs are a tactical tool to be used

24   to try and allow us to focus our discovery.

25         I know, on the Plaintiffs' side, if I tried to 33(d) a

1    Defendant with a stack of medical records and said, *You go*
2    *figure out who did what and when with respect to my client, you*
3    *know, here is some medical record authorizations, I'm not*
4    *answering your questions*, that would not be acceptable to the
5    Court.
6            And so I think we're in a different place in this MDL
7    where we'd like those guideposts from the Defendant, and we'd
8    like to make sure that we've checked all the boxes that we need
9    to in discovery.
10           **MR. WASDIN:**  Your Honor, if I could just briefly
11   respond?
12           **THE COURT:**  Go ahead.
13           **MR. WASDIN:**  We did not 33(d) Defendant's
14   interrogatories No. 1 and 2.  We identified 37 people by name
15   who we knew about as of October 2019 who had relevant
16   information.  We included the information we had about their
17   role and dates of employment.
18           Those witnesses include all the relevant 3M people we
19   had identified up until that point in time, technical people
20   like Mr. Burger, marketing people like Mr. Moses or Mr. Myers,
21   even included someone who -- I'm looking here -- was
22   potentially relevant because they did some graphic design.
23   Numerous third-party witnesses are identified by name.
24           So we did not just dump documents.  We answered the
25   interrogatories.  And the issue, as I understand it, is do we

1      have an obligation today to go back to all of the documents

2      that have been produced or to read all of the depo transcripts

3      and see where we're at now.  We obviously know more now than we

4      did then.  We've taken military depositions, among other

5      things.

6              But the answer to that is no, we don't have that

7      obligation under Rule 26(e).  Rule 26(e) says you supplement

8      for things that have not otherwise been made known in

9      discovery.

10             **THE COURT:**  Okay.  Well, here is what I'm going to do:

11     Although I guess you're correct, Mr. Buchanan, that

12     interrogatories are testimonial, they're sworn and it's the

13     position of the company and, theoretically, you know, an answer

14     to an interrogatory can be read at a trial, in my experience,

15     because interrogatory answers are prepared by lawyers, it is

16     very rare where someone successfully can use an interrogatory

17     answer as evidence before a jury.

18             They are a very useful tool for identifying relevant

19     discovery, obtaining information that can assist one as a

20     roadmap in where to go with discovery.

21             But, as Mr. Wasdin points out, under 26(e), the rule

22     does say information you have an obligation to correct if it

23     has not otherwise been made known during the discovery process

24     or in writing.

25             So, for example, if, in answer to interrogatory, the

1    question was, *On the day this was developed was it raining or*

2    *was the sun shining*, and the interrogatory answer was, *It was a*

3    *sunny day*, and then the defendant discovers that that was

4    incorrect, they would have an obligation to supplement the

5    answer.

6         But where you take depositions and, for example, one

7    of your interrogatory requests is *Identify relevant*

8    *individuals,* well, they have an obligation to, when they

9    certify and sign off on the interrogatory, to give you the

10   names of all the people that they believe would be responsive

11   to that.

12        If it turns out down the road some witness brings up

13   the name of someone who really wasn't made known to counsel

14   when the interrogatories were prepared, they don't really have

15   an obligation to go back and add that additional information.

16   You now know about Mr. X, he may have been involved in it, and

17   then you can reasonably pursue discovery.  But I don't believe

18   that triggers an obligation to correct or supplement.

19        If, however, it turns out there is an area of the

20   interrogatories that truly required supplementation because the

21   information was not made known or the position of the Defendant

22   is different in subsequent discovery compared to what is in the

23   interrogatory, then indeed there is some obligation to correct

24   and supplement.  But correct and supplement doesn't mean to

25   refine or put more topspin or make the answer even better.  It

1     just means to correct or supplement.

2          So, to the extent you are requesting

3     supplementation -- and I don't have all of the interrogatories

4     sitting in front of me right now, but generally I'm going to

5     deny the request.

6          If you think there is a particular area of high

7     relevance where the interrogatory answer needs to be

8     supplemented, then you can, in a motion, bring that to the

9     attention of the Court.  But just generally I'm not going to

10    order 3M to make their answers a little bit better and more

11    thorough if, indeed, what you're complaining about is

12    information that has been disclosed through subsequent

13    discovery.

14         **MR. BUCHANAN:**  Thank you, Your Honor.  We understand

15    your ruling on -- *(inaudible)* -- if Your Honor is able to --

16    *(inaudible)* --

17         **THE COURT:**  Defendant had three quick issues, and why

18    don't we go through those real quickly.  The first one related

19    to some personnel files and medical records that relates to the

20    25 bellwethers.  Let me hear from the Defendant on that.

21         **MR. NOMELLINI:**  Yes, Your Honor, it's Mark Nomellini.

22    So PTO 10, which is the order governing the production of

23    documents, was entered in June 2019.  And one of the provisions

24    that it had is that documents obtained in discovery from third

25    parties have to be produced to the other side within 14 days.

1    That's irrespective of documents or -- *(inaudible)* --

2    interrogatories and in fact so the parties don't constantly

3    have to be checking up on, *What have you obtained from third*

4    *parties pursuant to a subpoena,* et cetera.

5            We have now learned, in connection with the bellwether

6    selection process, that personnel files and medical records

7    were obtained by Plaintiffs' counsel from the military and the

8    government long ago and have not been produced.

9            For example, we provided to Your Honor among the

10    materials a standard Form 180 response from the military to a

11    Thomas J. Henry, who is a plaintiff's lawyer, October 2nd,

12    2019, containing various -- *(inaudible).* That was made

13    available to -- that's just an example of many -- made

14    available to Plaintiffs' counsel in October, also uploaded into

15    Centrality months ago.  We also understand Plaintiffs have been

16    using other avenues other than Form 180.

17            The Defendants were not notified about these

18    documents, even though they were in Centrality, until, in some

19    cases, about one hour before bellwether selections were made,

20    in some cases not until after bellwether selections were made.

21            Plaintiffs were literally holding on to these highly

22    relevant documents for months.  And it's just -- it was just an

23    issue in this case of pushing a button in Centrality to make

24    the documents available to Defendants so we can see them.  So

25    it's not about the Plaintiffs getting new documents, it is

1    about the Plaintiffs hiding the documents that they have and in

2    some cases that they've had for months.

3            We understand there's some issue about reviewing

4    documents for HIV or for, you know, sickle cell, but that

5    certainly should not take a month to do.  So we're concerned

6    about this.

7            We've had some discussion with Mr. Aylstock about

8    this.  We understand that, starting with the 25 plaintiffs who

9    are in the bellwether pool, Plaintiffs are going to produce by

10   next week -- and I mean "produce" in the sense of make

11   available to us in Centrality all medical and personnel files

12   in the care, custody, and control of Plaintiffs' counsel or

13   Plaintiffs' Leadership counsel, and we'd like a certification

14   by Plaintiffs to that effect.

15           **THE COURT:**  Let me hear from the Plaintiffs.

16           **MR. AYLSTOCK:**  Hi, Your Honor, this is Bryan.  I'll be

17   addressing that.  First of all, if we go to PTO 10, there is a

18   requirement for both sides, if they were to receive records

19   through subpoenas, FOIA requests, and *Touhy* requests -- and I'm

20   looking at page 15 of that order, section 6 -- that they do be

21   produced within 14 days to the Defendants.

22           These cases, the vast majority of which are on the

23   administrative docket, are being investigated still by the

24   Plaintiffs.  But PTO 10 is very specific on what its

25   requirements are.  And it's no secret and it's never been a

1    secret to the Defendants or the Court or anybody that

2    Plaintiffs can try to obtain their records from the VA

3    directly, they can do medical requests in the context of

4    vetting the claims, do medical HIPAAs, they can ask their

5    client if they have any records, and so on and so forth.  And

6    so those types of materials do exist, but PTO 10 is very

7    specific on what it requires.

8              There was a negotiated scheduling order, as the Court

9    is aware, with regard to the bellwether plaintiffs, and it in

10   fact allows for written discovery.  And to date, we haven't had

11   any written discovery from the Defendants to produce these

12   documents that were not obtained through the specific methods

13   set forth by PTO 10.

14             Despite that, in conjunction with my discussions with

15   Mr. Nomellini and to try to move the bellwether process along,

16   we have agreed to contact all of the firms and make sure that

17   anything that we have available is also produced to the

18   Defendants on an expedited basis without even requiring the

19   written discovery that the parties had contemplated in the

20   bellwether scheduling order and, frankly, agreed to in the

21   bellwether scheduling order.  We're not going to stand on that.

22   We're going to go ahead and produce that.

23             But the materials that were uploaded into Centrality

24   earlier on by some of the firms, they were not reviewed.  In

25   fact, the instructions given to BrownGreer were, "Do not

1    produce to the Selection Committee any of the materials until

2    the Defendants have access to them."

3        And my understanding is that the Defendants did have

4    access to them.  When they were notified or when they asked

5    BrownGreer about them, I don't know.  But there is a two-step

6    process in Centrality.  They can be uploaded and then there's

7    an additional step that has to be taken by the firm in order to

8    make them available to the Defendants.

9        Not all firms were aware of that.  The Early Vetting

10   Committee made firms aware of that and reminded them.  But the

11   salient point is that, until the Defendants had access to those

12   materials, the committee didn't have access to them.

13       So I think we have gotten this issue resolved.  But

14   our agreement and despite the need -- or we're not going to

15   stand on the need for the written discovery.

16       **THE COURT:**  So, if I can understand this, I think what

17   you're telling me -- what Mr. Nomellini is concerned about is

18   -- and you're right about PTO 10, that had to do with the

19   issues of subpoenas or *Touhy* requests.  It certainly would not

20   cover the situation where a client had his own records and gave

21   them to the -- well, obviously they would have to be produced

22   in response to a request to produce, but that was not part of

23   the sort of unilateral production.

24       But having said all of that, I guess what you're

25   telling me is this was not something that gave an advantage to

1     the Plaintiffs over the Defendants in the selection of

2     bellwethers because, when you all from the Plaintiffs' side

3     selected and Defendant selected, you essentially had the same

4     information and would not have included information that the

5     individual law firm may have collected from the individual

6     plaintiff.  Is that what you're telling me?

7               **MR. AYLSTOCK:**  That's exactly right, Your Honor.  In

8     fact, BrownGreer was instructed only to give us information

9     that was equally available to the Defendants.

10              **THE COURT:**  Okay.

11              **MR. NOMELLINI:**  Well, Your Honor --

12              **THE COURT:**  Yes, go ahead, Mr. Nomellini.

13              **MR. NOMELLINI:**  So I guess we'll see if the documents

14    -- *(inaudible)* -- it's my understanding we'll get a

15    certification of completion next week?

16              **MR. AYLSTOCK:**  Well, I have agreed to produce the

17    documents.  Obviously we have agreed, in conjunction with the

18    bellwether scheduling, that you're -- I presume you're going to

19    do a request for documents, and at that point in time there

20    will be a certification.  But I have to reach out to all of

21    those firms, and I have done that with many of them, and my

22    understanding is that they've already done that.

23              **MR. NOMELLINI:**  Your Honor, so, you know, Plaintiffs

24    have asked for certifications over and over and over.  And,

25    including on this call, we've asked for one.  So we would

1   request a certification of completeness of what Mr. Aylstock

2   said he was going to do by next week, that is produce all the

3   medical records and personnel files that Plaintiffs have for

4   the 25, we would like that as well.

5            **THE COURT:**  Well, let's do this:  Mr. Aylstock is

6   agreeing to produce all medical and personnel information of

7   the individual plaintiff law firms in the 25 bellwether cases

8   that you have and will produce that within 14 days to you.

9            As to the certification, Mr. Nomellini, you know, the

10  ultimate certification here will be, you will send an

11  interrogatory and/or request to produce to each of the

12  plaintiffs in the bellwether.  And they will be required, in

13  response to an interrogatory, under penalty of perjury, to

14  represent to you and obviously the Court that everything that

15  they have -- medical records, personnel file -- indeed have

16  been turned over.

17           And that is -- you know, an answer to an interrogatory

18  is under penalty of perjury so, in my view, that will be the

19  ultimate certification, and then there will be no issue.  And

20  that will be better than Mr. Aylstock asking law firm X -- *Have*

21  *you turned over everything?* -- and they tell Mr. Aylstock, *Yes*,

22  and then Mr. Aylstock sends you a letter and says, *This*

23  *certifies that Plaintiff P has turned over everything*, and it

24  turns out that it hasn't been.

25           If it is in the form of a response to a discovery

1    request, in particular an interrogatory, then it is under

2    penalty of perjury and it is -- raises a whole other slew of

3    issues.

4            So let's do that.  But I will direct that the

5    Plaintiffs produce to you within 14 days all medical records

6    and personnel records that they have in their possession that

7    have not already been produced or uploaded to MDL Centrality.

8            **MR. NOMELLINI:**  So, Your Honor, with respect to the

9    bellwether -- thank you, Your Honor.

10           With respect to the bellwether selection process,

11   there were some documents that were not -- we were not notified

12   of until even after the process was complete.

13           You know, there is an instance of an individual who

14   had an audiogram done, according to the records, the day -- on

15   February 24th of Lloyd Baker, and he was a Plaintiffs' pick.

16   We were not notified of that audiogram until an hour before he

17   was picked.

18           So I guess what I would also like is a certification

19   by Plaintiffs' counsel that, A) they did not have any of the

20   information that was not produced to us until the date of

21   bellwether selections or after in making their bellwether

22   picks; and B) that they did not meet and confer at all with

23   counsel who had the documents in making their bellwether picks.

24           **THE COURT:**  Mr. Aylstock?

25           **MR. AYLSTOCK:**  Your Honor, I'm an officer of the

1    Court.  I'm not asking -- you know, with regard to this,

2    BrownGreer has been very clear on what their directions are,

3    and BrownGreer did not give us access until they had access.

4           Now, there might be a question of notification.  I

5    think Mr. Nomellini is choosing his words very carefully.

6    Because my understanding and what we asked BrownGreer to do is

7    *Please let us know when in fact something is uploaded so the*

8    *committee can have access to it*.  My understanding is the

9    Defendants didn't do that.  They just wanted an FTP downloaded

10   once a week or whenever.

11          So I think Mr. Nomellini is going too far here, and I

12   don't think that a certification is necessary.  I don't think

13   that -- we can certainly confirm with BrownGreer what they've

14   told us and what our directions to them were.  But that was a

15   very clear direction, and I believe that they complied with the

16   direction, and I'm sure BrownGreer can assure the Court of

17   that.

18          **MR. NOMELLINI:**  So, Your Honor, just -- Mr. Aylstock

19   keeps talking about documents and I'm talking about

20   information.

21          So, for example, the individual who was Plaintiffs'

22   bellwether pick had an audiogram done the day before the

23   bellwether picks were due, which that timing is interesting.

24   And we did not receive any notification from BrownGreer

25   regarding that audiogram until the date of bellwether

1    selection, I think it was 3:52 Central.

2             So what we would like is a certification that

3    Plaintiffs did not have that information -- Plaintiffs' counsel

4    did not have that information until we were notified, either

5    the day of or in some cases afterwards.

6             **MR. AYLSTOCK:**  We did not have that information until

7    it was available to you.  And my understanding, if I can look

8    at this, I believe you had that information accessible before

9    we even had it.

10            So it's not an issue with regard to when you were

11   notified of it.  It's when you had it accessible.  And you had

12   it accessible before we knew about it.

13            **MR. NOMELLINI:**  That's simply not the case.  The

14   audiogram was done the day before bellwether selection was

15   made.  We were not aware of that audiogram being done.  I would

16   be surprised if Plaintiffs' counsel weren't aware of it, either

17   individual counsel or some other counsel.  And if it isn't an

18   issue, there should be no problem certificating that --

19            **THE COURT:**  Well, individual plaintiff's counsel very

20   well may have known about it, but I don't think that's the

21   issue here.  I guess what we're talking about is whether in

22   some way this skewed the bellwether selection process.

23            And if you all didn't have it and the lawyers on the

24   Plaintiffs' side who made the bellwether selections who decided

25   what cases were of interest didn't have that information

1    because BrownGreer had not released the information to

2    Plaintiffs' leadership, then it would not have affected the

3    bellwether selection process.

4           And I'm not sure what we need to certify.  I guess

5    maybe we can ask BrownGreer to certify when this information

6    was made available, was it made available at the same time to

7    Defendant's counsel and all of Plaintiffs' Leadership.

8           **MR. AYLSTOCK:**  And we were very careful, Your Honor,

9    to silo ourselves off from Early Vetting and made very clear

10   instructions to BrownGreer, so I'm sure they'd be happy to let

11   the Court know exactly what happened.

12          **MR. NOMELLINI:**  So, Your Honor, the other issue that

13   we asked for certification on is whether individual counsel

14   talked to plaintiffs on the Selection Committee.  Because, if

15   individual counsel are doing something that are communicating

16   with the Selection Committee, that's a separate issue.

17          **THE COURT:**  Right.  And Judge Rodgers had said that

18   Plaintiffs' Leadership would not do that, is that correct, Mr.

19   Aylstock?

20          **MR. AYLSTOCK:**  That's correct, Your Honor.

21          **THE COURT:**  So I'm not sure what exactly you want the

22   Court to order.  If you're looking for Mr. Aylstock to

23   represent in writing that they did not contact the individual

24   plaintiffs' lawyers to obtain information not available to

25   Defendants and not available in MDL Centrality --

 1          I mean, do you have any problem representing that in a

 2    letter, Mr. Aylstock?

 3          **MR. AYLSTOCK:**   No, Your Honor.

 4          **THE COURT:**   Okay.  So why don't you send Mr. Nomellini

 5    a letter confirming that indeed there was compliance with Judge

 6    Rodgers's directive.  And then I'll go ahead and I'll talk to

 7    BrownGreer and confirm with them that access to those materials

 8    was equal, in other words, both Defendants and Plaintiffs

 9    Leadership would have access to information on MDL Centrality

10    at the same time.

11          **MR. AYLSTOCK:**   Thank you, Your Honor.

12          **MR. NOMELLINI:**   Thank you, Your Honor.  And when you

13    do that -- so let's say Plaintiffs' counsel had a plaintiff

14    take an audiogram, as happened in this case, and it was

15    uploaded on Monday and then it was uploaded to Centrality.

16          So what we do -- we have done is we ask BrownGreer to

17    provide certifications to us when new documents are provided.

18    In this case, the notification -- and you can check this with

19    BrownGreer -- would have came to us at 3:52 Central Time on

20    Tuesday, which is about an hour before the bellwether

21    selections were due.  But because Plaintiffs were the ones, you

22    know, doing the audiogram, it would have been known to them

23    before that.

24          So the question really is that -- one question for

25    BrownGreer is not just when the documents were in Centrality --

1    because there are like a hundred thousand plaintiffs in

2    Centrality and, you know, we can't check every second which

3    plaintiff has new documents -- but when BrownGreer notifies us

4    pursuant to our request.

5          **MR. AYLSTOCK:**  Well, and when you asked them to

6    notify.  Because it's clear that it's in there and so it will

7    -- I don't know when you asked them or when you said, *Can you*

8    *give me an FTP download of each document.*  If you asked for it

9    once a week on every Tuesday and it was Tuesday afternoon,

10    that's one thing.  But the fact is you had access to it at the

11    same time or actually before we did.

12          **MR. NOMELLINI:**  We did ask them to notify us as soon

13    as they were available.

14          **THE COURT:**  Okay.  Then access would be equal to

15    notification, so you get the notification that is when they

16    were first accessible; is that what you're saying?

17          **MR. NOMELLINI:**  That should be, Your Honor, and that

18    was at 3:52 Central on last Tuesday.

19          **THE COURT:**  Okay.

20          **MR. AYLSTOCK:**  Well, this was a Plaintiffs' pick.  So

21    I don't even understand what the issue is because it's already

22    been picked.  It wouldn't have been a Defense pick anyway.

23          **THE COURT:**  Well, I'll be candid with both of you.

24    You know, if it turns out that, you know, one side had access

25    to the document an hour before the other side, which I don't

1    think should be the case because I think BrownGreer will

2    confirm that when they pushed the button allowing access it

3    covers both Defendants and Plaintiffs, it's not -- they don't

4    push a button and here is Defendants and then push another

5    button and that is Plaintiffs, so when documents are opened up

6    generally for people to view, it happens literally

7    simultaneously.  But I will find out about that.

8         But if I'm wrong and, in some way, there's a delay and

9    the Plaintiffs get to look at it an hour before the Defendants,

10   that's something we'll look into.  But I'm not sure where this

11   is going to impact, you know, the bellwether.

12        I mean, I'm reading between the lines, Mr. Nomellini,

13   that you think that in some way some advantage has been given

14   to the Plaintiffs --

15        **MR. NOMELLINI:**  I don't know that, Your Honor.  I

16   don't know that at all.  I as just asking for the information

17   and it sounds like we're going to get it --

18        **THE COURT:**  Mr. Aylstock, you'll confirm that the

19   Plaintiffs' Leadership did not discuss information with the

20   particular plaintiff or plaintiff's counsel, in other words,

21   get information that was not accessible to you and then we'll

22   talk -- I'll talk to BrownGreer and confirm that access is

23   granted virtually simultaneously.

24        **MR. AYLSTOCK:**  Yes, Your Honor.  Thank you.

25        **THE COURT:**  One last issue, Mr. Nomellini.  You were

1     requesting the deposition of an April Hansberry.  Who is she

2     and what's that all about?

3          **MR. NOMELLINI:**  Your Honor, she is a plaintiff, one of

4     the plaintiffs who was not selected for the bellwether

5     discovery pool.

6              In the information that she provided there's some

7     information relating to training provided for the Combat Arms

8     earplugs -- *(inaudible)* -- develop the government contractor

9     defense that we're going to be filing on April 1st.

10             Plaintiffs have agreed to provide her on the limited

11    topic of the training that she received in connection with the

12    Combat Arms earplug.

13             The issue at this point -- and this came up after we

14    submitted the agenda -- is just deciding on the date.  And I

15    understand she's going to have surgery, and so we're trying to

16    schedule a date.

17             I understand Shelley Huston was looking into the end

18    of March, which is tricky because our brief is due April 1st.

19    So, you know, if we can have it earlier than then, that is much

20    more preferable.  But we do understand that there's an issue of

21    this plaintiff having surgery from Shelley, though, and that's

22    something I understand Shelley is working through.

23         **THE COURT:**  Let me hear from the Plaintiffs on that.

24    Who is Ms. Hansberry's lawyer?

25         **MS. HUTSON:**  Ms. Hansberry's lawyer is Henry Garrard.

1          **THE COURT:**  Okay.

2          **MS. HUTSON:**  And I'm working with the firm on the case

3     now.  I wanted to clarify one quick thing, Your Honor -- this

4     is Shelley Hutson, by the way.

5          **THE COURT:**  Yes.

6          **MS. HUTSON:**  -- that April Hansberry is currently in

7     the service and, as such, and as Mr. Nomellini just said,

8     they're wanting her deposition for purposes of government

9     contractor defense.  All of the other witnesses currently in

10    service and produced for purposes of *Touhy* or government

11    contractor defense had gone through the *Touhy* process, and so

12    she is technically a *Touhy* witness, and they have not submitted

13    a *Touhy* request for her.

14         I, out of professional courtesy, told them that,

15    because she is represented and a plaintiff in the litigation, I

16    would do my best, and have, but I cannot guarantee that

17    deposition is going to happen by April 1st.

18         She has a number of concerns, of course, the surgery

19    being the top of the list, and having to take off work when

20    she's going to have to take off work after the surgery for

21    recovery.  She's going to her pre-op today and is going to ask

22    the surgeon what he feels like the recovery may be.

23         But again, there's no *Touhy* request on it.  I have a

24    call out to Major Evans to ask, you know -- I don't know if --

25    I assume he's going to want to be there at it because, again,

1    she's still a servicemember and, again, this is, as I

2    mentioned, a witness that they want for government contractor

3    defense.  She's still employed by the military so that's a

4    *Touhy* deposition.

5            But I'm going to give my best efforts.  I explained to

6    Mr. Nomellini yesterday I can't guarantee it.  And hopefully

7    I'll have some information sooner than later.

8            And, you know, looking back historically at the *Touhy*

9    witnesses -- and she'd be one of them -- you know, the first

10   deposition, that was three months' turnaround from the date of

11   the Defense request for the deposition to the date the

12   deposition actually happened.

13           I'm doing my best.  I don't mind working with them.  I

14   just cannot guarantee that she will confirm a date prior to

15   April 1.

16           **THE COURT:**  Mr. Nomellini, correct me if I'm wrong,

17   but weren't we told that for witnesses like this the military

18   had taken the position that these would be *Touhy* witnesses and

19   they therefore would have their lawyer sitting there?  Weren't

20   we told that?

21           **MR. NOMELLINI:**  Your Honor, I don't know that they

22   told us that with respect to parties to the case.  So, for

23   example, this is a plaintiff in the case.  There are other

24   current servicemembers in the case.  I -- I don't think anybody

25   has told me that those are subject to *Touhy*.  You know, for

1    example, 3M employs people who were former military, and those
2    haven't been subject to *Touhy*.
3          So I do think we need some clarification from Major
4    Evans whether for current parties to the case *Touhy* is going to
5    be part of it.  I think the first I heard of that from Shelley
6    was a day or two ago.
7          **MS. HUTSON:**  One of --
8          **THE COURT:**  Go ahead.
9          **MS. HUTSON:**  I apologize, Your Honor.  But it's also
10   important what they're asking her for.  She was a member of
11   DoD, and they're asking her for information that's specifically
12   and directly related to her role with the DoD and her
13   experience with training and instructions.  And that has been
14   covered by, you know, the -- *(inaudible)* -- deposition.  And
15   those are depositions that Major Evans or someone from his team
16   are present.
17         I did reach out to Major Evans and I have not heard
18   back yet.  But I definitely can't authorize the deposition to
19   go forward and fly in the face of what the government has told
20   us that we're supposed to do, and won't do that, and I know you
21   wouldn't want me to.
22         I'll do the best that I can trying to work with Major
23   Evans, get his precise confirmation as to how this overlap, if
24   any, will exist between current servicemembers or not.
25         But I do think the topic that they're asking for is

1     exactly the type of thing that falls directly under *Touhy*, and

2     there's not been a *Touhy* request for her.

3           **MR. NOMELLINI:** And Your Honor, I'm glad we're

4     addressing this. Because if this is a bridge we're going to

5     have to cross for other plaintiffs in this case who are current

6     servicemembers, then we might as well address it with Major

7     Evans sooner rather than later.

8           So we'll coordinate with Shelley and figure out that

9     aspect of it and also work with Shelley to get the depositions

10    scheduled as quickly as we can.

11          **THE COURT:** Yes, do that. And, as I recall, not to me

12    but I think to Judge Rodgers, there was some representation

13    made by Major Evans that, as a general proposition, witnesses

14    who were still serving in the military in all likelihood would

15    be considered *Touhy* witnesses and there would be someone from

16    the military there.

17          Maybe there's an exception of, you know, if you take a

18    plaintiff's deposition and the plaintiff is still in the

19    military, and you're simply asking the plaintiff, *How did you*

20    *use the product, what happened, how is your hearing, what*

21    *testing did you have*, you know, those kinds of things, the

22    military may take the position, I would assume, that they are

23    not *Touhy* depositions.

24          But where you are intending to ask questions about

25    what the individual did in his or her role in the military with

1 regard to, you know, training and those kinds of things, I'm 99

2 percent sure Major Evans will say that's covered by *Touhy* and

3 they'll want to be there.

4   So go ahead, make contact with him, find out what is

5 his position -- Ms. Hutson sounds like she'll be able to work

6 this through -- and see how quickly you can get the deposition

7 set.  But it's sounding more and more like it's not going to

8 happen before April 1.  But I just don't know how many people

9 Major Evans has on his team.  If it's a limited number, it may

10 take a little more scheduling.

11   **MR. NOMELLINI:**  Thank you, Your Honor.  We'll do that.

12 We only received the information from Plaintiffs maybe two or

13 three weeks ago and we made the request maybe two or three

14 weeks ago and that's the first we heard of these scheduling

15 issues was a few days ago.  But we will follow up and see if we

16 can get it scheduled as expeditiously as we can with Shelley

17 and Major Evans on that.

18   **THE COURT:**  Okay, sounds good.  Okay.  That covers the

19 items on the agenda.

20   Anything else from the Plaintiffs?

21   **MR. BUCHANAN:**  Your Honor, this is Dave Buchanan.  I

22 did want to circle back on item 3 which were the rogs.  I know

23 we've been going for some time now, and I just wanted to make

24 sure I had the Court's -- I understood the Court's guidance

25 correctly.

1      We drilled down a little bit on (i), identification of

2  individuals, which I think would fairly be characterized as a

3  *Please bring your prior answer current*.  The remaining four are

4  more accurately, I'd say, *Please answer the rog as written*.

5      So those maybe more -- if Your Honor would prefer, we

6  could present a Motion to Compel on those four.  We have

7  ripened these issues, I think, with the Defense.  There are a

8  series of meet-and-confer letters that have gone back and

9  forth, and I don't see resolution on the topics.

10     I'm happy, as we proceed down the road of a motion, to

11  continue to hear from the Defense if there's room for

12  resolution on them.  But I think we're at a place where we'll

13  probably require the Court's engagement to reach a resolution

14  on items (ii) through (v).

15     **THE COURT:**  That might be the best way to present it.

16  Because, you know, I recognize -- as I said, I recognize that

17  in this case, as in every case, when a detailed answer is given

18  to an interrogatory and you have discovery after that, maybe

19  there is a way that you could make your answer better.  But

20  that doesn't mean, because you have additional information,

21  that you necessarily need to supplement.

22     If, however, information comes to light that makes the

23  interrogatories necessary to correct it, then that very well

24  may trigger the obligation to supplement your interrogatory

25  answer.

1       So, you know, I'll have to take a look.  I'm not

2   inviting motion practice, I'm not encouraging it, but that may

3   be the shortest distance between point A and point B, to file a

4   motion, direct me to what it is that you believe necessitates

5   supplementation, and then the Defendants can respond and tell

6   me why under the rule they would not be required to supplement,

7   and it would be pretty easy for me to address it.

8       **MR. BUCHANAN:**  I think that's right, Your Honor.  And

9   I think the use of the term "supplementation" by Plaintiffs in

10  their letter suggests that we are in 26(e) territory for each

11  of the open points.  In reality, for four of them, from my

12  perspective, it's supplementing their prior, I would say,

13  deficient responses, deficient at the time they were rendered.

14      And so, I think that's probably -- given the positions

15  of the parties at this point, that's probably best presented to

16  the Court formally, and we're happy to do so.

17      **THE COURT:**  Okay.  Anything else from the Plaintiffs?

18      **MS. HUTSON:**  I don't have anything.

19      **THE COURT:**  Okay.  And anything else from the

20  Defendants?

21      **MR. NOMELLINI:**  Nothing from here, Your Honor.  Thank

22  you.

23      **THE COURT:**  Thank you very much and have a good day,

24  and I'll talk to you all on the 16th.  And just so you know, on

25  the privileged documents, I'm taking a look at them and right

1    now I don't see a need to have a hearing on that.  I may change

2    my mind in the next few days, so don't be holding your breath

3    waiting for me to schedule a hearing on that at this point.

4              **MR. NOMELLINI:**  Thank you, Your Honor.

5              **THE COURT:**  Thank you.  Have a good day.

6

7                        --------------------

8    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any
9    redaction of personal data identifiers pursuant to the Judicial
     Conference Policy on Privacy are noted within the transcript.

10

11

         **s/Donna L. Boland**                          **3-7-2020**
12       **Donna L. Boland, RPR, FCRR**                  **Date**
         **Official Court Reporter**

13

14

15

16

17

18

19

20

21

22

23

24

25