# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | CASE NO. 3:19-MD-2885 |

**PLAINTIFFS' FIRST SET OF INTERROGATORIES
TO DEFENDANTS**

Pursuant to Federal Rule of Civil Procedure 33, Plaintiffs in the above-referenced cases hereby propound the following First Set of Interrogatories to Defendants.

Each interrogatory, as provided by law, shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for the objection shall be stated. The answers are to be signed by the person making them, and the objections signed by the attorney making them, pursuant to Fed. R. Civ. P. 33(b)(5). Answers to these interrogatories, or objections in lieu thereof, shall be served within 30 days from the service of this document.

Under Fed. R. Civ. P. 26(e), these Interrogatories are continuing in nature. Defendants, therefore, are required to supplement their responses as new or different information becomes known.

**DEFINITIONS**

1. As used herein, the terms "you," "your," or "yourself," refer to 3M Company, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC, Aearo, LLC, 3M Occupational LLC, and any of their related or affiliated entities or individuals named as defendants in this proceeding (the "Defendants" and each a "Defendant"), their present and former officers, directors, executives, agents, representatives, employees, and/or attorneys.

2. As used herein, the term "representative" means any and all agents, employees, servants, officers, directors, attorneys or other persons acting or purporting to act on behalf of any Defendant.

3. As used herein, the term "person" shall mean any natural person or any business, legal or governmental entity, or association.

4. As used herein, the term "document" is synonymous in meaning and equal in scope to the usage of this term in Fed. R. Civ. P. 34. A draft or non-identical copy is a separate document within the meaning of this term. The definition of "document" shall include "communication" as defined below.

5. As used herein, the term "communication" means the transmittal of information in the form of facts, ideas, inquiries, or otherwise and, with respect to oral communications, includes any document evidencing such oral communications. It includes the transmittal of information by any means, including email, SMS, MMS, or other "text" messages, messages on "social networking" sites (including, but not limited to, Facebook, Google+, and Twitter), shared applications from cell phones, or by any other means. "Communication" shall also include, without limitation, all originals and copies that are provided by you or to you by others.

6. As used herein, the word "or" should not be read to eliminate any part of an Interrogatory but, whenever applicable, it should have the same meaning as the word "and." For example, an Interrogatory stating "support or refer" should be read as "support and refer" if any answer that does both can be made.

7. Where used with respect to a communication or document, the word "identify" means to provide the date and Bates number for that communication or document.

8. Where used with respect to a person, the word "identify" means to provide, to the

extent known, that person's full name, present or last known address, and with regard to natural persons their present or last known place of employment.

  9. As used herein, the word "including" means "including but not limited to."

  10. As used herein, the term "HPD" refers to any passive or active hearing protection device, including earmuffs and earplugs.

  11. As used herein, the term "3M Earplugs" refers to the dual-ended Combat Arms earplugs (Version 2 CAEv.2) that were designed, manufactured, and/or sold by Defendants to the U.S. Government from the early 2000s through approximately 2015, together with any like-design earplugs marketed or sold by you for civilian use or non-military use.

  12. As used herein, the term "competing product" means a product targeting the same market segment, customers, users, non-user purchasers, or uses or types of uses, as the 3M Earplugs.

  13. As used herein, the terms "study" or "studies" include, without limitation, reports, presentations, articles, data compilations, data collections, analyses, evaluations, tests, testing, experiments, scientific literature, and slide presentations, complete or incomplete, published or unpublished, finalized or unfinalized, peer reviewed or non-peer reviewed.

  14. As used herein, the term "U.S. Government" means the United States Federal Government, together with any entity, agency, person, bureau, division, branch, or other subpart controlled or owned thereby, and any employees or agents acting on or purporting to act on its behalf, including the United State Department of Defense, all branches of the military, and the Defense Logistics Agency.

## INTERROGATORIES

1. Please identify any person with relevant information concerning the claims or defenses herein, including any persons responsible for design, development, testing, distribution, procurement, government relations, public affairs, marketing, sales, customer/user feedback or complaints, lobbying, and business strategy relating to the 3M Earplugs and any other HPD provided by you to the military, including their title, role, and dates of responsibility and/or involvement.

2. Please identify any of your current or former employees who previously worked for any U.S. Government branch, department, agency, entity, or other subpart that purchased, distributed, received, tested, recommended or approved 3M Earplugs, and the dates of their employment with Defendants.

3. Please identify each version of the 3M Earplugs (and any predecessor or successor design), together with its (i) brand name(s); (ii) internal name(s), product code(s), or product identifier(s); (iii) external product identifier(s), including product or part number(s), SKU(s), National Stock Number(s), or P/N(s); (iv) date(s) of first and last sale; (v) number of units sold to domestic purchasers; (vi) number of units sold to the U.S. Government, broken down by number of units sold to each entity, agency, bureau, division, branch, or other subpart thereof; (vii) number of units sold to foreign purchasers, by country of purchase.

4. Please identify all persons who evaluated, considered, or discussed the potential recall, withdrawal from market, or cessation of sales of the 3M Earplugs, together with the dates of such discussions, evaluations, and communications.

5. Please identify any warnings, guidance, recommendations, instructions for use, or testing data that you provided to the U.S. Government regarding the 3M Earplugs, including risks or defects associated therewith.

6. Please describe and identify all complaints you received regarding the 3M Earplugs.

7. Please identify any person or entity not a party to this litigation that received a percentage of sales, profits, income, or other royalty on the sale of 3M Earplugs, together with the amounts and dates of any such payments, and any contract or agreement setting forth the rights and obligations of you or any other entity relating to such payments.

8. For all of your sales of 3M Earplugs to the U.S. Government, please identify the purchasing entity of the U.S. Government, to whom the order was placed, the date of the order, who fulfilled the order, the quantity sold, the price, the sales representative for 3M associated with the sale, and the location where the U.S. Government took delivery.

9. Please describe any involvement of the U.S. Government in the development or testing of the 3M Earplugs prior to the U.S. Government's first purchase of 3M Earplugs.

10. Please identify the regulatory pathway by which the dual-ended Combat Arms earplugs (Version 2 CAEv.2) were approved onto any U.S. Government Approved Product List, specifying whether such approval was granted under "Other Transaction Authority," "Commercial-off-the-Shelf" or any other regulatory pathway through Defense Federal Acquisition Regulation or otherwise.

11. Please identify any U.S. Government specifications, product descriptions, requirements, requests, directives, or communications for the design, testing, use, size, length, stem length, color, fit, or performance of any level-dependent or non-linear earplugs, including the 3M Earplugs.

12.    For any professional or industry organizations related to HPDs of which you are a member, please state the nature of such membership, the dates of such membership, and any funding you have provided to such organizations.

13.    Please identify any scientists, audiologists, physicians, medical professionals, professional associations, or other organizations or persons that you paid or compensated in any way for speaking about, researching, publishing about, or otherwise promoting any HPD, together with the amount of such compensation, the person's role, and the identity of any specific programs, speaking engagements, or presentations for which you provided direct or indirect compensation.

14.    Please identify any external experts, consultants, scientists, physicians, medical professionals, thought leaders, academics, or key opinion leaders, who you have compensated for work promoting or otherwise distributing information regarding the risk of auditory injury, and/or the importance of hearing conservation programs and hearing protection devices, whether to the government, the public, or otherwise, together with the amount of such compensation, the person's role, and the identity of any specific programs, speaking engagements, or presentations for which you provided direct or indirect compensation.

15.    Please identify all studies, including NRR, REAT, physical measurement, acoustic test fixture, walk-up, and impulse noise studies, regarding 3M Earplugs and any predecessor, successor, and/or alternative designs that use any aspect of the technologies used in the 3M Earplugs, including flanges, level dependence, or non-linearity technologies, mechanisms or filters, or that involved a comparison between an HPD's design and the design of the 3M Earplugs. For each study identified, please provide, if applicable, (i) the study's name and study number; (ii) the study's date; (iii) the identity of all investigators, authors or experimenters involved in the study; (iv) the number of study subjects; (v) the entity sponsoring the study; (vi) the role of

Defendants in the study, including any direct or indirect financial support or compensation of any kind for the study; (vii) Bates numbers for documents constituting the study's protocol and results, including final and draft reports, amendments to protocols, and any study data not included in the final study report; and (viii) the date of transmittal of any items identified in part (vii) to the U.S. Government and the Bates number of those documents constituting such transmittal.

16. Please identify all passive level-dependent or non-linear HPDs you are aware of, whether developed by you or any other entity, including (i) the person that developed or marketed such HPD; (ii) the date you became aware of such HPD; (iii) any study or testing performed by you or any other person on such HPD; and (iv) any communications between you and the U.S. Government concerning such HPDs.

17. Please identify all persons involved in your decision to partner with Access: Supports for Living (formerly known as New Dynamics) in or around 2009, including persons involved in negotiating or approving any agreement between you and New Dynamics, together with their role therein.

18. Please identify any persons involved in any activities or efforts on your behalf regarding the manufacture or assembly of the 3M Earplugs by Source America and New Dynamics.

19. Please identify all persons involved in any effort by you to have the 3M Earplugs added to the Ability One program, including any related assessments of potential competing HPDs.

20. Please describe all potential commercial and/or civilian uses of the 3M Earplugs.

21. Please describe the similarities and differences with regard to design, performance, and use between the dual-ended Combat Arms earplugs (Version 2 CAEv.2) that were designed,

manufactured, and/or sold by Defendants to the U.S. Government and any like-design earplugs marketed or sold by you for civilian use or non-military use, including the ARC Earplugs.

22. Please describe any oversight, control, or authority the U.S. Government had over you during the design, development, study, and testing of the 3M Earplugs.

23. Please (i) identify all versions of the July 10, 2000 memorandum entitled "How Folding the Flanges Back Affects REAT Results of the Ultrafit Earplug End of the Combat Arms Plug" (Bates 3M_MDL000005285) (the "Flange Report"), (ii) identify all authors and reviewers of the Flange Report, (iii) describe the circumstances underlying the creation of the Report, and (iv) the identity of any third party, including the U.S. Government, with whom you shared any version of the Flange Report, including the date and identity of any such communication or transmittal.

24. Please identify where and when the 3M Earplugs were designed, developed, tested, and studied.

25. Please describe any known defects of the 3M Earplugs.

26. For the 3M Earplugs, please identify and describe all (i) failure mode and effect analyses; (ii) hazard analyses, assessments, or evaluations; (iii) risk analyses, assessments, or evaluations; and (iv) quality assurance analyses, assessments, or evaluations, whether formal or informal, conducted under such name or another, and conducted by you or any other person, together with all persons involved in such analyses, assessments, and evaluations.