**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG      )      Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,     )
                                   )      Pensacola, Florida
                                   )      March 24, 2020
                                   )      2:01 p.m.
                                   )
                                   )
_____)


**TELECONFERENCE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-63)

**A P P E A R A N C E S**


FOR THE PLAINTIFFS:          **BRYAN F. AYLSTOCK, ESQUIRE**
                             Aylstock, Witkin, Kreis & Overholtz
                             17 E Main Street, Suite 200
                             Pensacola, Florida  32502

                             **SHELLEY HUTSON, ESQUIRE**
                             Clark Love & Hutson, GP
                             440 Louisiana Street, Suite 1600
                             Houston, Texas  77002

                             **CHRISTOPHER A. SEEGER, ESQUIRE**
                             Seeger Weiss, LLP
                             55 Challenger Road, 6th Floor
                             Ridgefield Park, New Jersey  07660

FOR THE DEFENDANT:           **MARK J. NOMELLINI, ESQUIRE**
                             **NICHOLAS F. WASDIN, ESQUIRE**
                             KARL GUNDERSON, ESQUIRE
                             Kirkland & Ellis, LLP
                             300 N Lasalle
                             Chicago, Illinois  60654

```
 1                      P R O C E E D I N G S

 2          THE COURT:  Good afternoon, everyone.  This is Judge

 3   Jones.  I think we've got the Defendants on, Mr. Wasdin, Mr.

 4   Gunderson, Mr. Nomellini.  I don't think we have anyone at this

 5   point on behalf of the Plaintiffs.  We'll wait.

 6          (Off-the-record discussions.)

 7          THE COURT:  So this is Defendant's Motion to Compel

 8   the authorizations.  And I do have the letter briefs from both

 9   sides, which is helpful, thank you.

10          What I think the best thing to do is go through each

11   one of the authorizations -- we don't need to go through the

12   precise language -- but the issues that each side raises on

13   each authorization.

14          And I'll hear from Defendants as to all of the

15   authorizations as to why they believe they should be entitled

16   to have the Plaintiffs executed the authorizations, and then

17   I'll hear from the Plaintiffs, and then, if necessary, I'll

18   give the Defendants an opportunity to reply.

19          So maybe one of the best places to start -- you know,

20   and I understand one of the overriding issues here has to do

21   with the breadth of the authorizations and the time limit, and

22   we'll talk about that.  But I'm interested right now more in

23   the specific authorizations.

24          So the first issue relates to the health care

25   authorizations, which are essentially HIPAA authorizations.
```

1   The Defendants are requesting the disclosure of mental health

2   records, and the Plaintiffs dispute that.

3         So first let me hear from the Defendants why the

4   authorizations must cover mental health records.

5         **MR. WASDIN:**   Your Honor, I think we lay out in our

6   letter brief that some of the damages that are alleged in the

7   master complaint relate to mental health, so a loss of

8   enjoyment of life, other unspecified mental health conditions.

9   So if we're going to be litigating cases on the cause of

10  someone's mental health, we need records to document that.

11        **THE COURT:**   Generally that may be a true statement.

12  But my understanding of the law in this area is as follows, and

13  I've had this issue come up many times in, for example,

14  employment discrimination cases.

15        And generally, if a plaintiff alleges damages or

16  mental anguish, loss of enjoyment of life, those kinds of

17  things, in my view, that is not putting the plaintiff's mental

18  health in controversy.  Because that's really the trigger, if

19  mental health is in controversy, it goes without saying that a

20  defending party is going to be entitled to mental health

21  records.

22        So, generally, in my view, in a tort case, a plaintiff

23  can get on the stand and, putting aside the nature of the tort

24  as to damages and injuries, the plaintiff can say this injury

25  caused me mental anguish, my life is not the same, I cry all

1     the time, I don't feel right, I've never been so upset in my

2     life, and that is not placing the individual's mental health at

3     issue.

4                However, if a plaintiff is going to get on the witness

5     stand and say this has ruined my life, I suffer from mental

6     anguish, I cry all the time, and I suffer from depression, and

7     there is either going to be evidence of some DSM classification

8     or the plaintiff is seeing a therapist and it's going to offer

9     the opinion of the therapist, then clearly mental health is in

10    controversy, and the defendant would be entitled to all of the

11    mental health records.

12               And the reason for that is, you know, there is both a

13    federal where you're dealing with a federal question, federal

14    psychotherapist/patient privilege.  In a case like this, which

15    is driven -- the rule of decision is state law, most states --

16    I know Florida does, but most states have a

17    psychotherapist/patient privilege.

18               So I'm going to ask the Plaintiffs at this point --

19    and we're talking now about the bellwethers -- are any of the

20    bellwether plaintiffs expecting to put into issue an

21    identifiable or specific mental health condition they suffered

22    and/or offer support from a therapist, psychologist, or

23    psychiatrist in support of any of their mental health

24    complaints?

25               **MR. AYLSTOCK:**  Good afternoon, Your Honor.  This is

1    Bryan Aylstock.  Again, sorry for the delay this afternoon.

2              I believe the answer to that is no.  I don't represent

3    all of the -- *(inaudible)* -- is this better?  I'm hearing an

4    echo, maybe it's my speakerphone.

5              **THE COURT:**  Yes.

6         **MR. AYLSTOCK:**  At this point, I can't say with 100

7    percent certainty because I do not represent all of the

8    individuals, and some of them, of course, were court picks and

9    defense picks.

10             I can say for my cases at this point the answer would

11   be no.  Obviously, if that were to change, we're not opposed to

12   providing those records or an authorization to get them that's

13   reasonable in time and scope.  But, generally speaking, that's

14   not where the Leadership anyway is focused as far as the

15   damages that will be asserted in these cases.

16        **MR. WASDIN:**  Your Honor, could I briefly respond to

17   that?

18        **THE COURT:**  Yes.

19        **MR. WASDIN:**  So I don't have the exact tally in front

20   of me, but I think Bryan's firm represents two or three of the

21   25, so you have 20 or a little bit more that he doesn't.  And

22   if I'm hearing him right, he's basically saying that for his

23   firm he doesn't think the three are going to assert those

24   damages, maybe the other 20 are, he'd need to confirm.

25        **MR. AYLSTOCK:**  That's actually the exact opposite of

1    what I'm saying.  I think none of them likely will.  I just

2    want to be candid with the Court and everybody that -- you

3    know, I don't represent them all, but generally speaking,

4    that's not the focus that we're going for.

5            **MR. WASDIN:**  Okay.  So the point I was trying to make

6    was, given any uncertainty over the issue for these 25

7    bellwether plaintiffs, let alone the next set of bellwether

8    plaintiffs, and let alone, of course, the broader pool of

9    plaintiffs, I think it's our position that we err on the side

10   of caution in discovery, even if some or all of this material

11   would not be admitted in any particular trial.

12           Of course, if it turns out that someone is not going

13   to say that on the witness stand, perhaps it wouldn't come in

14   any trial.  But to sort of delay the issue down the road until

15   a particular plaintiff puts it specifically in their --

16   *(inaudible)* -- or some other form of triggering event to us

17   that they are raising that issue and then have us play catchup

18   on the back end by starting the authorization process all over,

19   collecting records, and seeking a deposition or something, is

20   not an efficient way to go about MDL discovery of this scale.

21           **THE COURT:**  Well, I get the idea of you're focused on

22   efficiencies.  But mental health records are generally

23   privileged under the law of most states, as I mentioned.  There

24   is the federal psychotherapist/patient privilege.  And the

25   reason for that is there can be a host of reasons why someone

1    is seeking consultations with a therapist.  It could be

2    domestic relations issues.  It could be issues completely

3    unrelated to, you know, issues of mental anguish someone might

4    assert as a result of a hearing loss.

5          So, to be clear, if none of the plaintiffs produce

6    mental health records, when they testify they will not be able

7    to get on the witness stand and sort of back-door mental health

8    conditions.  They won't be able to say, as a result of this I

9    suffer from -- fill in the blank.  If any of them are going to

10   say that, then their mental health records are going to come

11   into play.

12         So here is what I'm going to do:  Your request that

13   there be an execution of the authorizations for mental health

14   records or medical records that would include mental health

15   records, I'm going to deny that request.

16         You, of course, are free to ask any individual

17   bellwether plaintiff whether they suffer from any diagnosed

18   mental health issue that they're going to assert, and you may

19   of course ask the Plaintiffs whether they are going to offer

20   any expert testimony in support of any mental health testimony.

21         And if either of those answers are in the affirmative,

22   then those particular plaintiffs would be required to execute a

23   mental health authorization.  But in the absence of that,

24   simply intoning the sort of general mental anguish, et cetera,

25   et cetera, is normally, in almost all cases, insufficient to

1   place controversy on someone's mental health records.

2           Now, I have a question.  I probably should answer it

3   myself because I have the authorizations here.  Is the medical

4   authorization that is being requested that you provided, Mr.

5   Wasdin -- this is the HIPAA authorization -- is that the same

6   authorization where there would be authorizations for the

7   mental health record, so it would simply be a matter of taking

8   out the mental health records and keeping the same wording in

9   the authorization?

10          **MR. WASDIN:**  Your Honor, I would need to look at it

11  and figure out whether there was a reference to mental health.

12  Maybe someone else -- *(inaudible)* --

13          **THE COURT:**  Yeah, does -- in other words, is there a

14  separate authorization for mental health records or is that

15  subsumed within the HIPAA medical records authorization?

16          **MR. AYLSTOCK:**  It's subsumed, Your Honor.  And we did

17  provide a revised version that excluded mental health in our

18  submission to the Court, our Exhibit A.

19          **THE COURT:**  Okay.  So I'm going to table for the

20  moment the discussion of the time limit.  We can do that

21  because that same argument applies to most of the

22  authorizations.  But, in theory, the HIPAA medical

23  authorization, including mental health records, that request

24  for that authorization is denied.

25          But the Plaintiffs will, subject to resolution of the

1   time limit, will execute the HIPAA authorization that

2   specifically exclude mental health records.

3           **MR. AYLSTOCK:**  Thank you, Your Honor.

4           **THE COURT:**  And in the order that I'm going to do, I'm

5   going to make it clear that, if any plaintiff raises either of

6   those issues, puts into controversy a specific mental health

7   condition or is going to support his or her claim of mental

8   anguish/mental health with expert testimony, that the

9   Defendants will be entitled to obtain those records and the

10  Plaintiffs would be required then to execute an authorization.

11          **MR. WASDIN:**  Your Honor, may I briefly respond to that

12  last point?

13          **THE COURT:**  Yes.

14          **MR. WASDIN:**  My concern about, you know, efficiencies

15  that I raised earlier is just that it almost sounded like where

16  we would learn about this at the first time was later in

17  discovery, perhaps in the plaintiff's deposition, perhaps later

18  with expert disclosures.

19          Is it possible to just set up a process to where the

20  Plaintiffs tell us that they are not bringing those claims in

21  the first instance, and then we don't have to worry about it as

22  we proceed through document and deposition discovery?

23          **THE COURT:**  Well, that's one way.  What I thought you

24  all would do is would include in an interrogatory to each of

25  the bellwether plaintiffs an interrogatory that would say, *Do*

1    *you suffer from an identifiable mental health condition which*

2    *you contend in this case is a causally related damage?*  Or,

3    second interrogatory, *Do you intend to offer any expert*

4    *testimony in support of any mental health psychological, mental*

5    *health conditions* -- I'm sure you could draft something -- *that*

6    *you intend to assert in this case?*

7             And they would answer that.  And if there was a yes to

8    either of those, then you would be entitled to the

9    authorization to be able to obtain the record.  Obviously, if

10   it's all nos to that, then it's a dead issue.

11            **MR. WASDIN:**  Certainly sending the interrogatories is

12   not burdensome.  My experience has been that, if you ask

13   somebody what type of expert discovery they're planning on

14   putting on, they may object to that and tell us we can't find

15   out about it for another five months.

16            **THE COURT:**  Well, that probably won't happen here.

17            But let me ask you, Bryan, what is your view if you

18   were to receive interrogatories along what I described?

19            **MR. AYLSTOCK:**  Judge, I think that's the way it should

20   happen.  That's the way it would happen in most cases, and that

21   should answer the question.

22            **THE COURT:**  Okay.  So that will take care of the

23   health records.

24            Now, let's move on to the tax authorizations.  And I

25   don't know if this is going to be you, Mr. Wasdin, or Mr.

1    Nomellini.  But explain to me why the Plaintiffs ought to

2    provide tax authorizations so you can get tax returns.

3            **MR. WASDIN:**  So, as an initial matter, I believe the

4    proposal we gave during the meet and confer and also in our

5    letter brief was essentially that, if they are willing to tell

6    us today that they're not bringing a lost wage claim, you know,

7    we may not need that authorization.

8            But if somebody is putting their ability to earn

9    income at issue, we need to basically be able to see how much

10   income they used to earn and how much income they're earning

11   today.

12           **THE COURT:**  Well, there's no claim in this case by

13   anyone for loss of income.  It's a loss of wages and a loss of

14   earning capacity.

15           So, for example, let's say you had a job and you made

16   $100,000 a year and, as a result of the tort in the case, you

17   no longer were able to have that job, and you claimed lost

18   wages.  But your income tax return, it turns out that, you

19   know, you have from family investments $10 million of interest

20   income and other forms of incomes.  That would be irrelevant to

21   whether you're entitled to lost wages.  Lost wages are

22   typically proven up by submission of W-2s or someone

23   self-employed possibly 1099s.

24           Now, loss of earning capacity, again, doesn't relate

25   to the income, it relates to the ability of the person to earn

1    wages in their chosen profession.  So lost wages is the money

2    you didn't get because you couldn't work, and the loss of

3    earning capacity is the wages you will not get in the future as

4    a result of the injury, of course, discounted to present value.

5          So, if they are the possible damages in this case, how

6    are income tax returns going to inform the analysis of their

7    claim for lost wages or lost earning capacity?

8          **MR. WASDIN:**  Well, I think it's twofold.  I think Your

9    Honor is correct that there may be sources of income on

10   someone's tax returns that end up being unrelated to their

11   claim.  There may be sources of income on there that are

12   related to their claim, and that's the basis of the request.

13         But you're also going to have people who are going to

14   have a claim along the lines of, I lost my job, I can no longer

15   do my same profession because I lost my hearing, and that's

16   causing me the type of general distress Your Honor referred to

17   earlier, and in particular it's because I don't have any money

18   anymore and I'm having a difficult time supporting my family or

19   something.

20         And in that setting, you know, the fact that they have

21   $10 million of interest income very well may be relevant to,

22   you know, that other type of claim that they're bringing.

23         **THE COURT:**  Okay.  Mr. Aylstock?

24         **MR. AYLSTOCK:**  I think you hit the nail on the head,

25   Judge.  The W-2s, the income information is a much less

1    burdensome way to get at this and in a way that really doesn't

2    get into a fishing expedition into, you know, somebody's trusts

3    and maybe alimony or child support or things like that.

4          Obviously what's being requested here are just

5    blanket, unlimited authorizations for IRS tax returns.  If

6    there's a particularized need and something comes up, then

7    obviously that will be an issue that the Court can address in a

8    particular case.

9          But these tax returns are, at best, only tangentially

10   relevant.  They're certainly not relevant at all if there's not

11   a loss of income claim in the case or so forth.  The loss of

12   earning capacity is also very tangential to this.  And I think

13   it needs to be addressed on a case-by-case basis, as it is in

14   most of these type cases, as opposed to everybody just signing

15   authorizations that's unlimited in time and scope whether you

16   really have an income claim or not or a loss of earning

17   capacity.

18         So I think it should be addressed in a particular case

19   with a particular need.  And if there's a showing, you know,

20   there may be an agreement on that.  But at this point, I think

21   it's way overbroad, and it shouldn't be required of every one

22   of the bellwether cases.

23         **THE COURT:**  Mr. Wasdin?

24         **MR. WASDIN:**  Yeah, just briefly.  We're now on the

25   second authorization and going through what we're trying to set

1   up for a very large MDL, the beginning of the bellwether

2   process of 25 cases that will probably set the precedent for

3   another series of rounds of similar bellwether cases in the

4   future.  And, you know, here we are on the second authorization

5   and the request is the same, which is let's take this on a

6   case-by-case basis, maybe this person has a claim, maybe this

7   person does not, you'll find out later.

8           But the problem with that approach in a litigation of

9   this size is that finding out later creates a tremendous

10   problem for discovery on the back end as we lead into these

11   trials.

12           You know, the type of claim that we just talked about

13   is probably going to end up being a claim in this case by one,

14   more, or maybe many of the bellwether plaintiffs.  In

15   scheduling or designing this process on the front end to

16   basically be piecemeal and ad hoc, you know, I guess just in

17   our view is only going to create problems.

18           **THE COURT:**  I think generally, again, I think you're

19   correct that this isn't just party A to party B, this is an MDL

20   and we're looking for efficiencies in looking at discovery.

21   You know, the Court is going to take into account issues of

22   proportionality and efficiencies.

23           But with tax return records, there's a really pretty

24   healthy body of law out there.  I think I issued some opinions

25   on this and there's some other courts.  And because of the

1    nature of the tax returns, courts -- I don't want to say take a

2    heightened scrutiny approach or anything like that, but there

3    certainly is a public policy concern with regard to tax

4    returns.

5            And where most of the information that -- actually all

6    of the information that you would need to defend a lost wage or

7    lost earning capacity claim can be obtained without the

8    necessity of tax returns, in my view, it doesn't get you over

9    the hump of, as a general matter, should you be entitled to tax

10   returns and should all the plaintiffs be required to execute

11   authorizations for tax returns.

12           I can tell you where the tax return issue could

13   potentially come up.  And, you know, if there was a plaintiff

14   that said, I lost my job, I can't work, and therefore I've lost

15   my wages, and I've lost the ability to earn that profession,

16   and it turns out that the person got another job and has been

17   working at another job and has been filing tax returns showing

18   other earned -- not unearned, but other earned income, then a

19   tax return certainly would be in order.

20           And if that issue did come up -- and this is going to

21   be the exception, but anything can happen.  If that was to come

22   up, and you were to identify that information, you could

23   immediately ask the plaintiffs to execute an authorization and,

24   if they wouldn't, come to the Court, and in short order I would

25   direct that the plaintiffs execute a tax authorization, and

1    you'd be able to obtain the tax returns.

2           But in the absence of that exceptional situation,

3    because of the heightened concern over tax returns, I am going

4    to deny the Defendant's request that all of the plaintiffs

5    execute tax authorizations.

6           Now, let's move on to the employment authorizations.

7    And that raises some of the same but certainly many other

8    issues.  So let me hear from you on the employment

9    authorizations.

10           **MR. WASDIN:**  Sure.  When you talk about employment, it

11    touches on a wide number of issues in the case.  So, can

12    somebody work is a question that not only speaks to their

13    income, their earning capacity, but it also speaks to their

14    physical condition.  Is this somebody who is capable of going

15    to a job that requires them to hear, do they perform well on

16    that job, do they have any problems with that job, or any

17    limitations on that job that would give some insight into the

18    quality of their hearing that may be consistent or

19    inconsistent, as the case may be, with their allegations of

20    injury in this case.

21           Employment records are also going to be a major source

22    of alternative causation.  Occupational noise exposure, whether

23    they were involved in a hearing conservation program is going

24    to be a big issue for plaintiffs in this case.

25           We expect that many folks who -- *(inaudible)* -- in the

1  military will join the type of job that hearing protection

2  would be required, that the employer is doing annual audiograms

3  in some cases.  Those same records can talk about, you know,

4  does this person understand how to -- *(inaudible)* -- hearing

5  protection, are they good at wearing it, do they follow the

6  rules, or do they enter into noise without it.

7          So, when you're talking about employment records,

8  you're talking about information relevant to not only the

9  actual injury itself but other causes of the injury and,

10  frankly, whether or not the plaintiff has the ability to follow

11  rules with respect to hearing protection.

12          So we see this as sort of a big issue that's relevant

13  across the board from both before and after their military

14  service.

15          **THE COURT:**  Mr. Aylstock, let me hear from you.

16          **MR. AYLSTOCK:**  I think this is another situation where

17  Defendants are trying to employ a sledgehammer when a scalpel

18  would work.

19          We don't contest that there may be situations that

20  employment records, certain of them, might be relevant.  But

21  how -- whether there was a disciplinary issue back when they

22  were in high school or even much later but before they got out

23  of the service and so forth really has no bearing on their

24  claims in this case.

25          It's, at best, a fishing expedition, I would say.  And

1    I would remind the Court we did have a hearing on personnel

2    records with some very key people on this litigation in 3M.

3    And what Your Honor ruled was that, if it had something to do

4    directly with the 3M Combat Arms Earplugs, we would get it, but

5    generally we didn't get the full personnel records of the 3M

6    employees who were most directly relevant to this case.

7            So I think that there may be situations where it

8    becomes relevant, but it's certainly not something that every

9    -- and we are setting a precedent, frankly, and that's one of

10   the reasons why this is so important when we're talking about

11   100,000, 150,000 potential claimants in this.  They shouldn't

12   have to disclose information without any barrier, I guess,

13   where, if it's relevant, that's one thing.  But this is an

14   authorization for the records that go directly to the Defendant

15   without any review of the Plaintiffs.  The Plaintiffs may not

16   even know some of the things that are in there.  And they

17   certainly will contain virtually all, if not all, irrelevant

18   information.

19           To the extent there's a hearing conservation program,

20   that can be requested, and we don't object to that, *per se*.

21   But we would like the opportunity for us to be able to do that

22   and produce it to the Defendants just like they did with their

23   own personnel files.

24           **THE COURT:**  What about -- I know this is sort of --

25   *(inaudible)* -- the issue of time frame.  And one of your

1    objections as to all of those but, in particular, employment

2    records, you say they should be limited for no more than work

3    background for only the past ten years and up until the time

4    the plaintiff left the military.

5            And I guess my question is twofold.  Why would records

6    after the person left the military not be relevant?  And then,

7    conversely or additionally, why would records before the person

8    joined the military be off limits in your mind?

9            **MR. AYLSTOCK:**  Well, if we're talking about hearing

10   conservation records, then that's a different issue.  If we're

11   talking about just general service before the military, that's

12   something that's really completely irrelevant to the claims

13   here.

14           In order for anybody to join the military, they have

15   to meet certain standards -- medical, physical standards in

16   order to go in, and that includes preexisting ear conditions

17   and hearing conditions.  So that's already sort of going to be

18   in the military records.  They are getting all of the military

19   records, the VA records.

20           So these are sort of add-on records that now we're way

21   out in the Gulf of Mexico fishing as opposed to inshore.  And I

22   just don't think that we need to go that far on the general

23   basis for these plaintiffs or many, many other plaintiffs when

24   they're really going to be irrelevant in 99 percent of the

25   cases.

 1            I acknowledge, Your Honor, there may be the 1 percent
 2   where they are, but let's deal with it like we deal with it in
 3   any MDL.  And usually we find agreement with our counterparts
 4   on the other side; but where we don't, that's what Your Honor
 5   is for.
 6            **THE COURT:**  Why would the, in your view -- I'll hear
 7   from you in a second, Mr. Wasdin.  One more question of
 8   Mr. Aylstock.
 9            Why would the records after the plaintiff left the
10   military not be relevant?  I mean, a person goes the military,
11   leaves the military, and then, you know, they get a job as the
12   road manager for The Rolling Stones or something, and their job
13   is standing next to the speaker that causes deafness to their
14   eardrums.  Certainly the Defendants would want to see those
15   employment records and see what the person did or did not do.
16            And then secondly, employment records are really going
17   to be -- I don't want to call it the gold standard, but very
18   important information with regard to a loss of wage claim and
19   loss of earning capacity.
20            If, you know, someone went in the military, left the
21   military, got a job, lost that job as a result of hearing loss
22   or the inability to properly hear, in looking at lost wages and
23   loss of earning capacity, you would look at not just the
24   person's W-2, but you would take into account the benefits they
25   lost.  A lot of people are paid on bonuses, commissions.  And

```
 1    all of those things are in the employment records and are
 2    really necessary in order, from your end, to prove up the claim
 3    but, from the Defendant's end, to defend the claim.
 4            So I think those records would be relevant.  But
 5    that's rhetorical, you don't have to respond to that.
 6            Mr. Wasdin, let me hear from you on the time frame.
 7    Tell me why you think the records before they went into the
 8    military, as to employment records, could be relevant?  And
 9    then you can tell me why records after they left the military
10    would be relevant.
11        MR. WASDIN:  Sure.  I don't want to exaggerate this,
12    but it's sort of a long list.  It would be hard to spend 20
13    minutes thinking about all the ways that the records in one
14    bucket or another may impact the claim.
15            But to just dispel something that Mr. Aylstock said,
16    which I also saw in Plaintiffs' letter brief, it is not the
17    case that the plaintiffs in this litigation are all -- when
18    they're evaluated by the military at the beginning of their
19    service, some decision is made that they have no problems prior
20    to service that could impact their hearing.
21            We have plaintiffs in the bellwether pool who have
22    documented hearing loss prior to service and yet they still
23    entered the military and performed their jobs.
24            And so his point about sort of starting with a fresh
25    slate at the military, we don't need to look at anything behind
```

1    that because there's an evaluation that's made that tells us

2    all we need to know about their hearing is just not correct.

3         Now, when you think about what may be in those

4    employment records from prior to the military, you could have

5    plaintiffs who were not capable of performing a particular job

6    because their hearing was insufficient.  That's one thing it

7    could be relevant to, scope of injury.  It could tell us if

8    they had hearing loss prior to service.

9         You could have people who had problems performing

10   certain jobs prior to service unrelated to hearing but they

11   would be relevant to some sort of future lost wages claim

12   because they can't perform that same type of job when they get

13   out of the service.

14        You could have people who had serious noise exposure

15   that is documented in their employment records prior to service

16   that could explain whatever hearing loss we see later.  And you

17   could have people who, frankly, make admissions about their own

18   medical records or sometimes you see medical records contained

19   within employment records that would be relevant to their

20   injuries.

21        So there's a lot of things that one tends to find in

22   people's employment records that are going to be relevant

23   regardless of whether it's before, during, or after they

24   entered the military service.

25        **THE COURT:**  One more question of Mr. Wasdin.  The

1    plaintiffs would execute authorizations, you would serve

2    subpoenas, and you would get their records.

3         In your view, would the records that you received --

4    because they don't first go to the Plaintiffs to review before

5    they're turned over.  But the records that you receive, in your

6    view, are they subject to the Court's protective order,

7    confidentiality order?

8         **MR. WASDIN:**  Yes, of course.

9         **THE COURT:**  Okay.  So, in the off chance there was

10   something, you know, uber confidential in someone's employment

11   record, it would be confidential, and if some plaintiff in this

12   case really felt that those records should never be disclosed

13   -- and we can think of some exceptional circumstances -- a

14   plaintiff would be entitled to do that in this case; is that

15   right?

16        **MR. WASDIN:**  Yes, a plaintiff would be entitled, just

17   like with their medical records or any other record in this

18   case, to assert all of the protections available under the

19   Court's protective order on these or any other of the records

20   that we're collecting pursuant to the authorizations.

21        **MR. AYLSTOCK:**  Could I respond briefly, Your Honor?

22        **THE COURT:**  Yes.

23        **MR. AYLSTOCK:**  I think there might be some confusion.

24   When a person enlists or otherwise joins up, there is an

25   audiogram that is done on entrance.  And maybe there is some

1    hearing loss, maybe they get a waiver on that, and that will be

2    in the VA or more likely the DoD records.

3         But most of these people who sign up are in their

4    teens or early twenties.  They may have had jobs at a -- you

5    know, God knows where, at a pizza joint or what have you, and

6    not all of them -- you know, one of the reasons you go into the

7    military is you're trying to get your head screwed on straight.

8         So having all of that information before they have a

9    showing that there's even any audiometric data -- and they all

10   should have it, there is an audiogram that's given and maybe

11   there was some preexisting hearing loss, I think again is way

12   overbroad and really out there fishing.

13        Moreover, when it comes to the audiograms themselves,

14   if there is something there that shows that there's some

15   hearing deficit or what have you, they do have that.  That's

16   the best evidence that they would have to say, look, they went

17   in, maybe they had something when they went in.  And at that

18   point, maybe there's some more digging that needs to happen.

19        But, again, these are relatively young folks.  Some of

20   them have been in the military a very long time, some of them

21   shorter times.  But what is in their personnel file or

22   disciplinary actions or what have you I think is way, way

23   overbroad and really needs to be limited, Your Honor.

24        **THE COURT:**  Well --

25        **MR. WASDIN:**  Your Honor --

 1          **THE COURT:**  Yes, go ahead.

 2          **MR. WASDIN:**  I just wanted to just briefly respond to

 3   that.  The first point is, I appreciate that somebody may have

 4   a reference audiogram.  But the statistics, at least in the

 5   federal investigations at this point, is that most people do

 6   not.  So it's just not accurate to say that for each plaintiff

 7   we can start with some military record that tells us exactly

 8   what their hearing was at the date of entrance.  I think the

 9   vast majority of people will not have that record.

10          But even putting that aside, I hope I've made the

11   point that we are seeking these records for reasons beyond just

12   audiometry.  It may be that someone got hearing tests for work

13   but they're relevant for a variety of other reasons.

14          **THE COURT:**  Right.  Okay.  I think I've got it.  In my

15   view, employment records do cover a variety of issues that

16   certainly a defendant would be interested in looking at and

17   exploring.  First and foremost, it can go to the claim of loss

18   of wages, loss of earning capacity.

19          I think, for the most part, many of the plaintiffs in

20   this case, because they joined the military when they were

21   young, probably didn't have significant employment history

22   before the military, but they may have something that happened

23   there that could be something with the nature of the job that

24   could have affected their hearing.

25          But more importantly, there could have been something

1    in the employment prior to military service that bears on the

2    issue of why, after they got a job when they left the military,

3    they lost their job, which could be unrelated or there could be

4    an argument that it's unrelated to hearing loss.

5            So I am going to grant the Defendant's request and

6    require the bellwether plaintiffs to execute the employment

7    authorizations.  And I will require that the employment

8    authorizations -- or authorize the employment authorizations to

9    cover the time period both before the plaintiff went in the

10   military as well as after the time the plaintiff went in the

11   military.

12           Obviously, when they were in the military, their

13   employment records are -- you're going to get those through

14   your *Touhy* requests.  That's their personnel records while they

15   were in the military.  And I think the Defendants have a right

16   to find out what they did, what they earned, what kind of

17   employment they had before, and then after they left the

18   military, the answer to those questions.  And there can be

19   comparison in between after the military time and the before.

20   So I think there's enough in there that it makes sense, so I

21   will grant that request.

22           Now, let's move on to another authorization.  This is

23   the insurance authorization.  And I'm not quite sure what it is

24   the Defendants are getting at, but let me hear from you, Mr.

25   Wasdin.

1           **MR. WASDIN:**  I think we just need a separate

2    authorization that will allow us to get records of any variety

3    that we've been talking about directly from insurance

4    companies.

5           So when you talk about a potential source of what

6    claims is someone submitting for medical issues that's relevant

7    for the same reason someone's medical issues are.  If someone

8    has insurance, it may cover lost wages.  You know, we want to

9    see what their claims say about that and what the cause is, et

10   cetera.  So I think it's more of a derivative authorization

11   than -- *(inaudible)* --

12          **THE COURT:**  So what insurance authorizations would

13   show would be, you know, the insurance records and showing the

14   person had a claim for X, Y, and Z, and they paid a portion of

15   it.

16          How is that going to be relevant?  You say that's

17   going to be relevant to some kind of setoff or something?

18          **MR. WASDIN:**  No, no, typically not a setoff.  Every

19   state's law is probably different on whether you could show

20   something about a setoff.

21          But my experience with insurance records is, when

22   folks have the ability to submit a claim for one thing or

23   another to their insurance company, they tend to call up and

24   whether it ends up being some sort of document that the

25   insurance agency creates about whatever the conversation was on

1    the claim, a lot of times you get audio recordings of people's

2    calls and they say, hey, you know, I'm submitting a claim about

3    X, Y, and Z, let me tell you what happened.

4            And the description you get when people are talking to

5    their insurance company is often different with respect to the

6    same set of events that you later get at a deposition in a

7    lawsuit.

8            And so, we've had a lot of claims where people have

9    called their insurance company and said, just as an example,

10   this is how my car accident happened, I was driving down the

11   road, and I fell asleep, and I ran into the back of the guy in

12   front of me, and then, you know, later on they sue the car

13   manufacturer for something.

14           It may be that in this case someone calls and submits

15   a claim related to X, Y, or Z hearing loss issue, unemployment

16   issue, whatever it is they have insurance for, and the reason

17   they say that that claim is valid is different than I used

18   Combat Arms Version 2 and now I don't have any hearing.

19           **THE COURT:**  Mr. Aylstock?

20           **MR. AYLSTOCK:**  Yeah, we're way far afield here.  The

21   medical records are what they're going to get.  The medical

22   records are important information.  Insurance records, it's

23   billing codes and things like that.

24           This isn't a car wreck case.  This isn't GM ignition

25   switch where people might be calling in.  This is just

1    insurance records.  And this will have -- you know, first of

2    all, it will be a huge burden.  Secondly, it also raises all

3    sorts of issues for these servicemembers, it's unintended

4    consequences.  All of a sudden these insurance companies are

5    sending letters.  It's really going to create a nightmare.

6           And I've never been involved in an MDL involving some

7    kind of an injury where I've had to do this.  It is absolutely

8    way far afield.

9           If there is a setoff issue, as Your Honor identified,

10   or we need to prove up some loss or medical record bills and so

11   forth, then that's one thing.  But just to have a blanket

12   authorization for insurance records when the important

13   information and the accurate information is going to be in the

14   medical records is really the way to go.  This is just way far

15   afield.

16         **MR. WASDIN:**  Your Honor, here we are on the fourth one

17   and I'm feeling a sense of pattern here.  But my concern is,

18   this is discovery, this is not what's coming in at trial, and

19   we're all sitting around speculating what may be in a

20   particular record.

21         But it is possible that somebody has called their

22   insurance company and submitted a claim and given them relevant

23   information, and it's within the scope of Rule 26 for us to

24   kind of dig into that.

25         And the possibility, on the other hand, that they did

1    not and that their insurance company just entered a bunch of

2    codes into a document is not really the thing that takes it

3    outside of the scope of discovery.

4         So, if someone has insurance records, within Rule 26,

5    it seems like we should be entitled to look at them.  If they

6    turn out to not be relevant or if there's some other reason to

7    keep them out of trial, we'll cross that bridge later.  But in

8    terms of can we get them in the first place, this is, you know,

9    it's discovery.

10        **THE COURT:**  Okay.  Well, this one may be not really

11   too close.  I can't really see how insurance records -- I get

12   your example if someone -- you know, an adjuster called someone

13   in a car accident, and they say, Billy was driving too fast,

14   and then they say something else in a deposition.

15        But insurance records here are, you go to a doctor or

16   a hospital for treatment, and they enter your insurance card,

17   and the hospital bills your insurance, and you have all the

18   billing from the hospital, you have all the medical records,

19   and what you get from the insurance company is going to be

20   really no different.

21        I know that last week I requested my medical records

22   and got my insurance records on an accident I was involved in,

23   and there was certainly nothing in the insurance records that

24   is additional to or different from what you have in the medical

25   records other than explaining, you know, deductibles and

1   whether it's an allowed claim or not an allowed claim or that

2   type of thing.

3         So on the insurance authorization, I am going to deny

4   the Defendant's request that the plaintiffs execute an

5   insurance authorization.  And I really can't even think of an

6   exception where this might come up in a particular plaintiff's

7   case.

8         But rest assured, if you took someone's deposition and

9   asked them have they ever contacted an insurance company and

10  someone said, oh, yeah, I was in a dispute with the insurance

11  company and I gave sworn statements to them, or something like

12  that, then for that exceptional plaintiff you might be entitled

13  to pursue that.

14        But, in my view, these are doubtful within the

15  definition of relevance in a case like this, and certainly

16  would not be proportional.  I mean, they really don't have a

17  whole bunch to do with the case.  So that request will be

18  denied.

19        Now, let's see, what other authorizations, and then we

20  can talk generally about time frame and scope.  Were there

21  other authorizations that you requested?  There were health

22  care authorizations, IRS, employment -- oh, disability

23  authorization, I was a little confused about that.

24        None of these plaintiffs are going to be covered by

25  Medicare, right?

1          **MR. AYLSTOCK:**  Unlikely, Your Honor.  It is possible

2      that they might.  And certainly the Plaintiffs are very much

3      attuned to this.  We've done this many times in the

4      pharmaceutical context.  And we actually, with the consent of

5      the Defendants, appointed a lien resolution -- or the Court

6      appointed and we submitted a lien resolution administrator.

7          The Defendants have an interest in making sure that

8      Medicare, to the extent there is a claim, that claim is set

9      aside when it comes to settlement.  We have the same interest,

10      and we've addressed that like we did in Abilify and like it's

11      been done in all of these cases with a lien resolution

12      administrator.

13          And so, all of that is going to be taken care of, to

14      the extent it does exist.  But it's not a -- I wouldn't call it

15      a major issue in the case because, you're right, most of these

16      people are not Medicare patients.

17          **THE COURT:**  What about -- Mr. Wasdin, is your request

18      -- it covers disability authorization?  So if someone was

19      disabled under the Social Security Act, that's what you're

20      getting at here?  Or something else?

21          **MR. WASDIN:**  Well, I think Your Honor hit the nail on

22      the head in the first piece.  I do think there are scenarios in

23      which someone may be receiving Medicare benefits in this case

24      even though they're below the age of 65.  So it's that.  But

25      yes, I mean, also, if people are submitting Social Security

1    type claims or getting any other type of government assistance.

2    I'm not sure that I can give you a full list of things

3    that may be available to someone with hearing loss.  But

4    whatever it may be, if they're making those claims or not, as

5    the case may be, we see that as relevant.

6    **THE COURT:**  Well, again, Medicare -- if you get

7    Medicare health part A or part B, you have to be 65 I think is

8    the youngest and now probably 66 or older.

9    Mr. Aylstock, is there any plaintiff in this case

10   that's possibly that old?

11   **MR. AYLSTOCK:**  I don't -- I guess -- certainly not in

12   the bellwether because the Court restricted the age of the

13   bellwether.  Out of 150,000, there probably may be somebody who

14   was in the military a very long time who may be that old.  But

15   again, the way these are handled is through a lien resolution

16   administrator.

17   And they are getting all the VA records.  If they're

18   that old, they're certainly going to the VA and have

19   disability.  And if there's one out of 150,000, let's address

20   that one.  This is, again, something you're asking everybody to

21   sign when it's going to be relevant to really nobody or, you

22   know, the one in a million.

23   **MR. WASDIN:**  The one in a million -- *(inaudible)* --

24   **THE COURT:**  Is there anyone, Mr. Aylstock, who had

25   claimed or is receiving Social Security disability benefits?

1    **MR. AYLSTOCK:**  Not to my knowledge.  But again, in a

2    pool this large, I would be hesitant to make any absolutes on

3    that.  But really these people would be getting VA disability

4    if it was service-connected hearing loss.

5        **THE COURT:**  They could also theoretically be getting

6    Social Security disability, I guess?

7        **MR. AYLSTOCK:**  I'm not sure, Judge, how those two

8    interplay, but I suppose that --

9        **THE COURT:**  That could happen.

10       **MR. AYLSTOCK:**  Yeah.

11       **THE COURT:**  Well, let me ask you, Mr. Wasdin, is that

12   ultimately what you're interested in here is, if someone has

13   made a claim and/or has made a claim and is receiving Social

14   Security disability benefits, you would want those records?

15       **MR. WASDIN:**  Yes, Your Honor.  And again, I think

16   that's probably the core of it.  But, you know, when we did

17   this, I'm not sure that someone has given me a list that says

18   this is the universe of federal programs that someone could

19   apply to.  But certainly Social Security is on there and it

20   would be at the top of the list.

21       So if someone -- to Mr. Aylstock's point, if someone

22   has VA disability and it's service related, that's one thing.

23   If, you know, they're getting Social Security disability for a

24   hearing-related injury, perhaps, because it's not

25   service-related, that's obviously a different thing.

1          **THE COURT:**  Yeah, it's -- well, and also the

2     definition of what's a disability under the VA and the Social

3     Security system are two different things.  If you are partially

4     or totally disabled under the VA, that does not necessarily

5     mean you are disabled under the Social Security Act.  They are

6     different standards.

7          Well, here is -- I can see where Social Security

8     disability records would be relevant if someone had applied for

9     and/or applied for and successfully received Social Security

10    benefits, because there would be submission of medical records,

11    there would be testimony by the plaintiff, and that could be

12    relevant.

13         So let me ask you, Mr. Aylstock, would you be able to

14    have -- in the absence of an interrogatory, simply identify any

15    bellwether plaintiffs who have applied for or applied for and

16    received Social Security disability benefits?

17         **MR. AYLSTOCK:**  Yes, we can certainly do that, Judge.

18         **THE COURT:**  Okay.  So I'm going to direct that you do

19    that.  And for any plaintiff that has applied for and/or has

20    applied for and received Social Security disability benefits,

21    then those particular plaintiffs will be required to execute

22    the authorization so the Defendants can obtain those records.

23         There may be none or maybe in the long run only a

24    handful.  But those records obviously could be of some benefit.

25    There's no reason to have every plaintiff in the case execute

1    one of these things.

2           So why don't you do this:  Let's put a time frame on

3    that.  How many weeks would you need to tell Mr. Wasdin whether

4    any of these bellwether plaintiffs applied for and/or applied

5    for and received Social Security disability benefits?

6           **MR. AYLSTOCK:**  If we could have three weeks, that

7    would be great, Judge.  There's a couple of -- well, there's

8    one in particular we're trying to get ahold of and another one

9    who is -- we're still waiting on the VA -- or his VA release.

10   So some of these, given COVID, may take a little longer.

11          **THE COURT:**  So today is the 24th.  How about by April

12   17th?

13          **MR. AYLSTOCK:**  That's fine, Judge.  Thank you.

14          **THE COURT:**  So, Mr. Wasdin, by April 17th, Mr.

15   Aylstock's team will tell you whether any of the bellwether

16   plaintiffs have applied for and/or applied for and received

17   Social Security disability benefits.  And if so, you will be

18   entitled to have them execute an authorization.

19          **MR. WASDIN:**  Thank you, Your Honor.

20          **THE COURT:**  We talked about education insurance.  Now,

21   lastly, time frame.  That seems to be a big issue.  We have

22   addressed that in the context of educational records.

23          What about, in general, medical records under the

24   HIPAA authorization?

25          And, Mr. Wasdin, why should it be essentially you're

1   covering their whole life and the plaintiffs want to limit it

2   to -- I believe ten years?

3          **MR. WASDIN:**  I think that's right.

4          **MR. AYLSTOCK:**  Yes, Judge.

5          **MR. WASDIN:**  I mean, Your Honor, the central issue in

6   the cases are, do plaintiffs have hearing loss, and if so, what

7   caused it.

8          And it's basically beyond dispute that you can have

9   conditions or exposures that caused hearing loss in your

10  childhood.  People can have a history of earaches that cause

11  middle ear problems.

12         We have a bellwether plaintiff whose father has a bone

13  condition in the middle ear, and he's got it, too, and he

14  picked that up, and it's identified in the records from when

15  he's 17 years old is when he first started noticing that.

16         People can take medications, particularly certain

17  types of antibiotics and other ototoxins, that impact your

18  hearing.

19         There's no reason why any of this couldn't happen in

20  someone's childhood or be reflected in their medical records

21  from that time period.

22         I mean, the bottom line is, if you want to know

23  whether someone has hearing loss and what caused it, you have

24  to look at their medical history from basically cradle to

25  present.

1                    Some sort of ten-year limitation on that is -- you

2      know, frankly, it's just sort of an arbitrary time period to do

3      this in, and it's going to leave us without the information we

4      need to work this case up for trial.

5                    And I want to kind of go back and talk about how to

6      briefly again -- Rule 26 here is broad, it's intentionally

7      broad.  And if the question to be answered is, is it reasonably

8      likely to lead to some sort of relevant evidence or admissible

9      evidence later, the answer to that is, without a doubt, yes.

10               **MR. AYLSTOCK:**  So --

11               **THE COURT:**  Go ahead, Mr. Aylstock.

12               **MR. AYLSTOCK:**  First of all, I'll address his -- Mr.

13      Gunderson's *(sic)* last point first.

14                    Rule 26 is broad, and we agree with this.  But this is

15      a procedure that they're asking for outside of Rule 26.

16      They're asking for blanket authorizations from our plaintiffs.

17                    And might there be a case out there where childhood

18      things are relevant?  Yes, there might.  And we can deal with

19      that, and the way to deal with that is with a scalpel, not a

20      sledgehammer.

21                    This issue about unlimited authorizations has come up

22      before.  In fact, one of the cases you cited in one of your

23      previous motions to compel was the *American Federal of State,*

24      *County, and Municipal Employees vs. Scott.*  It's a reported

25      decision out of the Southern District of Florida.

1        And one of the things it says is that, "Document

2    requests with no time limitation are exceedingly broad and

3    burdensome on their face.  The universe of information covered

4    by these requests appears boundless and untethered to the

5    claims or defenses."

6        So, if there is a situation where this issue comes up,

7    we deal with it.  But to ask for everybody, from child to

8    grave, for 150,000 servicemembers, ultimately, because this may

9    set a precedent down a road, is exceedingly burdensome, and

10   it's really just a way to harass the plaintiffs in this case.

11       There very much may be cases where this issue comes up

12   about a childhood disease and so forth.  They have specifically

13   asked for issues related to that in the interrogatories.

14       So where the answers to the interrogatories or

15   depositions indicate that there was a childhood issue, perhaps

16   where on the entrance audiogram there's some hearing loss and

17   it may be genetically related, actually that can be a case, and

18   we don't dispute that.  But the audiograms tell the tale on

19   that.

20       It's not just simply everybody who had a middle ear

21   infection when they were a kid has hearing loss, because we all

22   do.  There's not a kid out there that I know of -- and I've got

23   more than a few myself -- that hasn't had that.

24       So we're again way far afield from what a blanket

25   authorization is intended to do.  This is not the traditional

1    means of discovery under Rule 26.  This is sort of an extra

2    procedure not really contemplated or addressed in the rules to

3    let me get everything and let me get it first and then let me

4    dig around and see what I can find while I'm fishing out there.

5         So they have interrogatories that ask these type of

6    questions.  They certainly will have a deposition.  They will

7    have, soon enough, entrance audiograms that will show whether

8    there was hearing loss at the beginning.  And if they don't --

9    I suspect Mr. Gunderson *(sic)* is incorrect and the vast, vast

10   majority will when we finally get the DoD records.

11        But if that's not the case and there's something out

12   there that demonstrates a need to see the information, then, by

13   all means, they should get it, and we're not going to be

14   fighting that, if there's a demonstration of something out

15   there in the pond.

16        But to just go and say everybody out there has to give

17   all the records from cradle to grave of God knows what's in

18   there that may or may not be relevant is way beyond I think

19   what any -- what even the rules contemplate and certainly a

20   blanket authorization.

21        I'd also say that the Defendants haven't been required

22   to give us irrelevant information or what they deem irrelevant.

23   They review for relevance and then they give us what they

24   believe in good faith is relevant.  I'd love to have an

25   authorization on them to give us everything, give us all the

1    documents, and then, if it's not relevant, the judge will just

2    decide it's not relevant at trial.

3          But that's not the way our system works anyway, and

4    it's certainly not the way the system is supposed to work when

5    we're given authorizations from the Defendant to collect these

6    records.

7          **THE COURT:**  What is your problem with the records

8    after the plaintiff left the military?

9          **MR. AYLSTOCK:**  I don't have a problem with that,

10   judge.

11         **THE COURT:**  Okay, Mr. Wasdin, let me hear from you.

12         **MR. WASDIN:**  Sure.  I just want to reiterate that it's

13   beyond dispute that, you know, things that happen in someone's

14   childhood can impact their hearing.  That's beyond dispute.

15   And all of our experts are going to ask us for precisely these

16   medical records, early childhood medical records, teenage

17   medical records, when they try to determine someone's hearing

18   loss.

19         So, is this information relevant to the case?  Yes,

20   there's no question about that.

21         And then, you know, to the point that Mr. Aylstock

22   made regarding, well, you can just ask the plaintiffs, and if

23   they say yes, then that would open the door here.  You know,

24   these folks aren't going to know, when you ask them, hey, did

25   something happen to you in your childhood, did you have a lot

1    of middle ear infections, did you take X, Y, Z medication, or

2    whatever the universe may be, that's relevant to your hearing

3    loss, and the answer is going to be no or I don't know.

4            That's why we need the records so that we can go

5    figure that out and defend these cases against us.

6            **THE COURT:**  Well, it seems to me that -- certainly, in

7    my experience, the first question -- I think, Mr. Wasdin, you

8    just said this -- that a medical expert is going to ask you --

9    you hire a medical expert to provide an opinion on specific

10   causation, and I believe the doctor is going to say, let me see

11   all of the plaintiff's medical records literally from childhood

12   on.

13           It's obviously very important what happened during the

14   military, but both before and after, because that may be part

15   of the story.  That may be part of the defense argument with

16   someone -- there's going to be some cases where some

17   individuals probably have complete hearing loss, and there may

18   be alternative medical explanations.  And I don't think a

19   qualified expert is going to be able to render an opinion if he

20   or she doesn't have the breadth of someone's medical history.

21           If you even sent someone -- I don't think that will

22   happen in this case -- for an IME, independent medical

23   examination, the IME will, in all likelihood, say, before I

24   examine the person, I'd like to see all of their medical

25   records.

```
 1              That's why our family doctors have electronic records.
 2    That's why there are now portals that collect all of an
 3    individual's records.  Because in the medical field -- and this
 4    applies certainly with hearing loss -- it is what happened in
 5    the big picture.  It involves events in someone's life of
 6    possible injuries, it involves nutrition, it involves
 7    medication, it involves a host of things, all of which play
 8    into why a person may or may not have a specific medical
 9    condition.
10              So I am convinced that the medical authorization ought
11    to be broad, so I am going to grant the Defendant's request
12    that the HIPAA release, which we already said will not include
13    mental health records, be executed by the plaintiffs.  And it
14    will cover the entirety of the individual plaintiff's medical
15    records from the time before they were in the military, the
16    time while they're in the military, to the extent there are not
17    government records -- I guess there's a chance someone went to
18    a private doctor when they were in the military -- and
19    certainly after they left the military.
20              I think that's the only way the Defendants truly can
21    have a full picture of the medical situation of an individual
22    plaintiff.
23              MR. AYLSTOCK:  Thank you, Your Honor.
24              THE COURT:  So, Mr. Wasdin, let me ask you -- this was
25    your motion.  Are there any other areas that Defendants were
```

1    requesting or any particular details of authorizations as to

2    disputed wording or anything like that that we need to resolve?

3    Or does the Court's ruling resolve most of the issues on the

4    authorizations, it's simply a matter of making some changes

5    consistent with my ruling, finalizing the authorizations, and

6    then getting them over to the Plaintiffs to be executed?

7          **MR. WASDIN:**  Your Honor, there's two things.  The

8    first one I'll start with, because I think it will be shorter,

9    is, if I understand the Court's ruling on the HIPAA piece, it's

10   essentially striking the mental health language out of the

11   authorization that was proposed by Defendant, is what the Court

12   is authorizing?

13         **THE COURT:**  Yes.  And let's just take a look at, just

14   so we're all on the same page and we don't have a dispute down

15   the road, what -- I think it's Exhibit A to the Plaintiffs'

16   letter.

17         **MR. AYLSTOCK:**  Yeah, we had one that just specifically

18   said "Important:  This authorization does not authorize

19   disclosure of mental health records," so I would want that to

20   be clear on there.

21         **MR. WASDIN:**  Yeah, I'm looking at Exhibit A to the

22   Defense letter, so this is our letter.  We have the HIPAA

23   authorization as Exhibit A.  And there's some language in

24   paragraph 2 that says -- you know, it covers mental health

25   services, et cetera, so we would strike that basically.

```
 1              THE COURT:  The information about health records --

 2    "it may also include information about behavioral or mental

 3    health treatment for alcohol and drug use," that should not be

 4    in there.  So what are you proposing?

 5              MR. WASDIN:  We're happy -- I mean, given Your Honor's

 6    ruling, we can strike out the mental health services piece of

 7    that and then even add in the sort of reverse disclaimer that

 8    Mr. Aylstock just mentioned that it specifically does not cover

 9    mental health.

10              MR. AYLSTOCK:  I think that's what ours does, our

11    version, which is Exhibit A to the health care authorization

12    that we submitted.

13              THE COURT:  Yeah, they just have different type.  I

14    can't tell if they are identical.  They do appear to be

15    identical.

16              MR. AYLSTOCK:  We would need to strike paragraph 5

17    because it has the ten years.

18              THE COURT:  Yes, paragraph 5 would come out.  So the

19    difference is in paragraph 2.

20              So simply -- Mr. Wasdin, maybe this is the simple

21    thing.  Just simply insert paragraph 2 in the Plaintiffs'

22    authorization in place of your paragraph 2, which is

23    essentially identical, other than they've added on "Important:

24    This authorization does not authorize disclosure of mental

25    health records."
```

1              **MR. WASDIN:**  Okay.

2              **MR. AYLSTOCK:**   In paragraph 7, Your Honor, we also

3    direct the health care provider to provide them to Centrality

4    pursuant to the same language that Jackie Snead wanted for the

5    VA, and I would suggest that that should also happen here.

6              **MR. WASDIN:**  Well, I'm not sure --

7              **THE COURT:**  Mr. Wasdin, your company that's going to

8    get these records is Medical Research Consultants?

9              **MR. WASDIN:**  Yeah, MRC.  We've used them in the past

10   and really like them, so that's the company we want to go with.

11             **THE COURT:**  That's not a problem.  But don't these

12   records need to be uploaded -- whatever records you get that

13   you're going to provide them to the Plaintiffs, isn't the

14   method that they're going to be uploaded on MDL Centrality?

15             **MR. WASDIN:**  I don't -- I've never -- I don't know how

16   that process would work.  But yes, they would be made available

17   to the Plaintiffs in one way or another after they're collected

18   by MRC.

19             **MR. AYLSTOCK:**  Judge, we've dealt with MRC, and we

20   don't object to them.  We've always had a sort of first look

21   because sometimes there might be mental health in there that

22   are accidentally done despite what is said in these

23   authorizations.

24             So I'm happy to discuss that with Mr. Wasdin, but

25   usually there's a ten-day first look provision so the

```
 1   Plaintiffs -- and they actually have a portal where they notify
 2   the Plaintiffs these are uploaded, the Plaintiffs have ten
 3   days, and if they don't do something, they're going to be given
 4   to the Defendants.  So we would certainly want that.
 5            THE COURT:  So you're saying that through MRC you're
 6   able to get the records without Mr. Wasdin having to copy them
 7   and transmit them to you?  Simply by putting them on an MRC
 8   portal, that would give you and your clients access to the
 9   records?
10            MR. AYLSTOCK:  Yeah, and I know MRC has done that.
11   That's sort of the typical way to do it.  I think we'd prefer
12   Centrality because everything is going in there.  But, you
13   know, I guess I just wanted to highlight the first look part of
14   our --
15            THE COURT:  Well, I mean, I thought all this would --
16   it would benefit both sides if it was uploaded to MDL
17   Centrality.  But, you know, if y'all don't want to do that --
18            MR. AYLSTOCK:  We'd prefer it, Judge, but, you know --
19            MR. WASDIN:  We rely on MRC to help us with the
20   process, and it's important for their ability to do so.  For
21   example, they have consulting nurses that can help us identify
22   additional providers, et cetera.  But, you know, in order for
23   them to perform that function for us and make the service
24   valuable, they need to be able to get the records.
25            THE COURT:  Yeah.  So this is your subpoena, and these
```

1      are your records, so you can -- your subpoena could say, you

2      know, mail them all to your home address, Mr. Wasdin, if that

3      was what was going to happen.

4              But my only concern is, after MRC has collected the

5      records, is there going to be some reason why the parties would

6      then want to upload the records to BrownGreer?

7              **MR. WASDIN:**  I don't think from our perspective that's

8      a necessary step.  I think both sides just have access to them

9      on MRC.  But, you know, frankly, the logistics of that I think

10     is something that we'd be willing to work out, whatever way

11     works.

12             **THE COURT:**  That's up to you then.  So simply -- the

13     only reason I was asking is, if MRC was going to do the

14     collection, it would be on their portal, but ultimately the

15     records are going to end up on BrownGreer, then in the HIPAA

16     authorization the Plaintiffs sign, you would want to disclose

17     that because I think the Plaintiffs would have an objection if

18     all of a sudden the records were on BrownGreer and they said,

19     well, the authorization never told me that.

20             But if that's not what you're intending to do, then

21     you wouldn't need to add paragraph 7.  So everything else, as

22     far as I can tell, is the same in the authorization other than

23     paragraph 5 on the Plaintiffs would be eliminated and paragraph

24     2 would be changed as we discussed.

25             Okay, what was the other issue, Mr. Wasdin?

1       **MR. WASDIN:** Your Honor, the other issue was, I don't

2   believe we talked about educational records, which was one of

3   the issues in the letter.

4       **THE COURT:** Okay, we didn't, and my law clerk is

5   shaking his head that's correct.

6       Okay, let's talk about educational records. Tell me

7   why you believe you'd need those records to defend the case.

8       **MR. WASDIN:** You know, the bottom line is it's pretty

9   similar to employment. Looking at someone's educational

10  history can tell you something about how well they hear

11  relevant to injury, did they have any problem learning, did

12  they need to sit at the front of the class or something, were

13  accommodations made.

14      And on the flip side, when you talk about a lost wages

15  type claim, you know, you need to know how well someone did in

16  school before and after the military for, you know, your expert

17  to have a handle on how much money they should be making.

18      **MS. HUTSON:** Your Honor, this is Shelley Hutson. May

19  I respond?

20      **THE COURT:** Yeah, let me hear from you.

21      **MS. HUTSON:** Great. The educational authorizations

22  are vastly different, in my mind, than the medical

23  authorizations that we just went over for a variety of reasons.

24      Their authorization has no limitations to time or

25  scope. And there is very little believable evidence that any

1    of these educational records are reasonably likely to lead to

2    admissible evidence.

3              In their letter brief, the Defendants say that perhaps

4    the academic aptitude of a particular, let's say, fifth grader,

5    seventh grader, whatever age group it would be during the

6    educational process, somehow will reflect and educate us, as we

7    look at this case, as to whether or not they would have

8    succeeded or whether or not they would have been able to be

9    employed.

10             And my opinion is -- and actually, this is based on

11   not just cases but just real life -- that one does not have any

12   connection the other.  And there's no time limitations on these

13   educational records.  If they seek to get educational

14   authorizations, we strongly feel that a ten-year time frame is

15   plenty.

16             And, you know, there's just not reasonable evidence

17   that because someone had to sit in a class one spot versus

18   another that that has anything to do with hearing loss.  That

19   connecting of the dots just isn't reasonable.

20             And of course, these are questions -- unlike with the

21   medical care exactly, these are questions that the plaintiffs

22   can easily answer -- Did you have to sit in the front of the

23   room when you were in school -- that they will know the answer

24   to the question.

25             And if there is some need, based on some of those

```
1    answers and responses, to go and get educational authorizations
2    of records prior to ten years from now, then we can do it at
3    that time.  But I think it's going to be few and far between,
4    to say the least.
5            I don't see the connection on how educational records
6    go to the actual hearing loss, the medical side of that.  And I
7    certainly don't see how you could connect dots to aptitude in
8    school -- elementary, junior high, or high school -- to whether
9    a person can succeed in life.  I'm glad that we can't do that
10   because I think a lot of people would not be able to really say
11   that there's a connection between those two.
12           THE COURT:  Would educational records after the
13   individual -- after or even -- well, during they would be
14   military records.  So let's say after they left the military,
15   would that have any relevance?
16           MS. HUTSON:  You know, Your Honor, we wouldn't have an
17   opposition to that necessarily.  If they didn't -- you know, if
18   there are educational records post-military that's within the
19   last ten years, then we really wouldn't have an objection to
20   that.
21           THE COURT:  So you're not seriously challenging any
22   educational records during the time they were in the military,
23   although I guess all those would be covered by *Touhy* requests,
24   or after they left the military?
25           So if someone got out of the military and went to
```

1    college or technical school or something like that, the after

2    part you don't have a real problem with?

3              **MS. HUTSON:**  Not really.  I just think a ten-year time

4    frame is reasonable in this setting.  And if that education

5    happened within ten years from the date of the request, then

6    they're entitled to it, if it exists.

7              **THE COURT:**  Okay.  Mr. Wasdin, so your real focus here

8    is on the educational records before they were in the military

9    then; is that right?

10             **MR. WASDIN:**  Well, if I understand -- I mean, we want

11   both.  So if the post-military service records are not in

12   dispute, we can put that off to one side.  But, you know, yes,

13   I guess we do have a disagreement that pre-military educational

14   records are relevant.

15             And I guess in my head you can kind of bump it out

16   into two buckets.  You may have someone's sort of grade school

17   records which raise some of the issues I talked about earlier

18   like is this a plaintiff who had some sort of an identifying

19   combination -- *(inaudible)* -- hearing or some other hearing

20   related issue there.

21             I agree that, you know, whether you make a B in

22   eleventh grade science doesn't tell us whether or not you're

23   going to end up having some sort of a career in field X, but

24   certainly information about your hearing that may be in those

25   records would.

1           Now, on the flip side, I think we also need to at

2     least contemplate that there's going to be a lot of people who

3     don't just go from high school to the military.  So when you

4     have someone who graduates, tries a year out in college, flunks

5     out, or whatever the case may be, goes into the military for a

6     period and then has a similar issue on the back end when they

7     try to go back to college, you know, those sort of pre-military

8     records may speak to their academic prowess, their ability to

9     do it, their willingness to do it or whatever at issue.

10          **THE COURT:**  Okay.  That's an interesting issue.  I'm

11    not convinced that the educational records prior to the

12    military are really going to be relevant or proportional.

13          As a practical matter, when you request educational

14    records, you're going to get attendance records, report cards.

15    And the one area where there could be potentially something of

16    interest would be, a kid is in elementary school and he goes

17    through speech therapy because he or she has a hearing issue.

18          I'm not even sure that would be included in the

19    educational records.  But even if that happened, in order to

20    have those things occur, there would have to be medical records

21    supporting it.

22          So you have a broad HIPAA request.  And in order to go

23    through that kind of thing, there would have to be an

24    examination by a doctor in the medical records, so you would

25    get that.

1            So for all intents and purposes, your educational

2    records are going to be attendance and report cards and if it's

3    a school that writes up a narrative on the individual instead

4    of giving a letter grade whether he or she was a good student

5    or bad student, and that really has very little to do with the

6    case and certainly, in my view, is overly broad.

7            Any educational records while someone was in the

8    military, I cannot think of a situation in which -- and both

9    sides correct me if I'm wrong -- where you would pursue

10    education and have educational records that would be separate

11    from military records that you would get in a *Touhy* request.

12            Could there possibly be such a thing?

13            **MS. HUTSON:**   I don't believe so, no.

14            **MR. WASDIN:**   If I'm understanding the question, Your

15    Honor, is it is there a military occupational specialty where

16    you would separately go to like a private community college or

17    something?

18            **THE COURT:**   Yeah.

19            **MR. WASDIN:**   I don't know the answer to that.

20            **THE COURT:**   Well, let me do this:  So I will allow you

21    to obtain educational records going back for a period of ten

22    years.

23            And that will take us back to what time frame?  When

24    were these cases filed?

25            **MR. AYLSTOCK:**   Most were filed within the last year.

1    The earplugs came out in force in 2003, originally '99.

2            **THE COURT:**  So ten years would take us back to, what

3    is that, 2009?

4            **MS. HUTSON:**  '09, yes.

5            **MR. WASDIN:**  Your Honor, just before we finish this

6    up, you know, I'm thinking here, our bellwether pool includes

7    people that are 30 to 49 years old.  So, if we're talking about

8    folks that are on the back end of that range, I just don't know

9    that ten years, you know, taking them back down to when they

10   were 39 is going to cover the period when they would have been

11   going to sort of post-military educational institutes.  I think

12   we're going to have people whose post-military records are 20

13   and 30 years old, just depending on how old they are.

14           **THE COURT:**  Well, that's a good point.  So the

15   authorizations will run from when the person left the military

16   until suit was filed, and so that will be up to 2019.  So for

17   some individuals that will be a shorter period of time.  But

18   for the oldest individuals in the bellwether, that could

19   theoretically end up covering more than a ten-year period.

20           So I guess you could have someone in the military that

21   went in in 2003, got the earplugs, left in 2005, and it would

22   cover all the way back from when they left the military 2005 up

23   to the filing of the lawsuit.

24           But pre-military, in my view, isn't relevant, it's not

25   proportional.  It is not going to give you any information that

1    is going to assist a defendant -- if someone had a poor

2    attendance record or a bad report card or even, you know, it

3    might say someone is expelled from school for doing some bad

4    thing, that's not going to be relevant to hearing loss and it's

5    not going to be relevant to damages.  Because you'd have a

6    tough time arguing, oh, the person doesn't have a loss of

7    earning capacity because they've been a loser since they've

8    been in eleventh grade.  That's not going to work.

9             So is everything else in the educational authorization

10   -- other than the time frame, is there any other objection to

11   that?

12            **MS. HUTSON:**  No, Your Honor.

13            **THE COURT:**  Okay.  That, then, takes care of that.

14   Thanks for pointing that out.  I thought we had skipped

15   something, Mr. Wasdin.  I just couldn't figure out what it was.

16   Okay, I think that probably takes care of it.

17            So, Mr. Wasdin, anything else from your end we need to

18   address?

19            **MR. WASDIN:**  I think not.  We do have this federal

20   disclosure requirement issue that we needed people to sign, but

21   I believe -- I'm not sure if that's encompassed by the ruling

22   on Social Security disability benefits.

23            **MR. AYLSTOCK:**  I thought it was.

24            **THE COURT:**  Yeah, so, I mean, I think -- I thought

25   there was agreement on Medicare eligibility that there would

1    simply be a statement by the plaintiff whether they are or are

2    not covered by Medicare.  Is that right?

3              **MR. AYLSTOCK:**  Yes, Judge, we'll get that done.

4              The only other thing, Judge, I was kicked under the

5    proverbial table on the telephone about MRC in particular,

6    because apparently there was an issue in another litigation not

7    involving Kirkland & Ellis where some things were thrown over

8    the transom.  I think they were mental health.  I'm not exactly

9    sure.

10             So I said I was okay with MRC, but we would certainly

11   want to make sure that there were safeguards in place and do

12   our own vetting on that.  But I'm sure we can work it out and,

13   if not, you know, we'll find a workaround.

14             **THE COURT:**  Mr. Wasdin, what is your view on that?

15             **MR. WASDIN:**  I'm not sure what the issue was in the

16   prior case but, you know, we haven't had an issue with MRC.

17   And as long as, you know, we can find a process with Bryan, I'm

18   sure that they will work fine in this case.

19             **THE COURT:**  Okay.  I think all Mr. Aylstock is saying

20   is the records are produced, these are authorizations, these

21   aren't all sent to the Plaintiffs and then they spend weeks and

22   weeks reviewing them and then turn them over to you.  These are

23   authorizations and subpoenas, will go into the MRC portal, and

24   Mr. Aylstock is saying they've made some mistakes in the past,

25   there could be some concern of a mental health record or

1    something slipping through the cracks.

2             And I think you all need to work out what would

3    happen.  Obviously, if any of those records were discovered by

4    the Defendants, they would give notice to Plaintiffs and return

5    them or eliminate them.  And then the Plaintiffs, by having

6    access to the portal, would be able to identify if indeed any

7    records were inadvertently included.  And you would be able to,

8    I think, Mr. Aylstock, simply clawback those records without

9    objection.

10            Is that what you're talking about?

11   **MR. AYLSTOCK:**  Yes, Your Honor, exactly.  And again,

12   I'm a little remote, so I don't know the exact details.  But

13   I'm sure we'll be able to work it out with Mr. Wasdin.

14   **THE COURT:**  You know, what we're talking about is

15   really the exception rather than the rule.

16            Okay.  One other issue I did want to raise.  I saw

17   that the Defendants filed yesterday another Motion to Compel,

18   and I wanted to -- I mean, the Plaintiffs did, and I wanted to

19   talk to the Defendants about when you would file your brief in

20   opposition.

21            **MR. NOMELLINI:**  Your Honor --

22            **MR. WASDIN:**  Your Honor -- oh, sorry, Mark, you go

23   ahead.

24            **MR. NOMELLINI:**  Your Honor, I think we could file our

25   response to that within a week of today.

1          **THE COURT:**  Okay.  Today is the 24th.  How about --

2    would you be able to get a response by Friday the 3rd?

3          **MR. NOMELLINI:**  Yes, Your Honor.

4          **THE COURT:**  What is the deadline for your briefing on

5    the affirmative defenses?  Is that still the 1st?

6          **MR. AYLSTOCK:**  Yes, Your Honor.

7          **MR. NOMELLINI:**  That's the 1st, Judge.

8          **THE COURT:**  Okay, so that's after.  So let's make your

9    response deadline Friday the 3rd.  And what I'll do is I'll

10   review the papers and rule on them.  And if for some reason I

11   think we ought to have a telephonic hearing, I would schedule

12   one in short order, but I probably would not need to do that if

13   the issues are fairly briefed in the response and the motion.

14         One thing I did talk to -- before the Plaintiffs got

15   on the line, I had asked Mr. Nomellini and Mr. Wasdin what

16   their view was on Zoom Meeting as a method of holding these

17   types of conferences.  And Mr. Wasdin pointed out that

18   sometimes if you do it on a laptop there can be some audio

19   problems.

20         Mr. Aylstock, Ms. Hutson, or any of the others on the

21   line, what has been your experience with -- have you conducted

22   any Zoom Meeting formats with any federal courts, and if so,

23   what success have you had or lack of success?

24         **MR. AYLSTOCK:**  I haven't, Judge.  Neil is on the line.

25   Neil is our most technically savvy person in our firm, so he

1    might be able to speak to that.

2         **MR. OVERHOLTZ:**  Good afternoon, Judge.  Neil

3    Overholtz.

4         Yes, Your Honor, we've used Zoom with certain federal

5    courts sometimes.  We've also used the court system that a lot

6    of firms spent a lot of money investing in so we can use the

7    same system that you guys use for conference calls.  But we've

8    had a good amount of luck with Zoom recently.

9         And Mr. Wasdin I think is right that there can be

10   audio issues.  But the way we've handled that is to establish

11   alternative audio, which is part of the Zoom program.  There's

12   an alternative audio call-in so we can call in by phone but you

13   get the benefit of the video.

14        And in fact, the other thing that Zoom allows, if

15   necessary, is sharing of a screen, sharing of a document so

16   that everybody can see it as well as seeing each other's faces.

17        So we've been using it over the last couple of weeks

18   with the COVID-19 issue pretty successfully, and we really

19   haven't had a bandwidth problem over that time period.

20        **THE COURT:**  Okay.  I have used it many times, not for

21   hearings, but conferences and seminars and those things I've

22   been involved in.  The University of Florida, right now all of

23   their classes are online, and they are handling classes of up

24   to 150 through Zoom Meeting, and a lot of my neighbors teach at

25   the university and say it works very well.

1          So I was just thinking about that.  And I'm going to

2    suggest to Judge Rodgers that's something maybe to think about

3    in the short term since we probably will not be having case

4    management conferences in person for a little while.  I don't

5    know how long that will be.  The next one right now is

6    scheduled telephonically.

7          But after that, maybe the next either Leadership

8    conference call or maybe more appropriately a case management

9    conference we could try to use Zoom Meeting software to do it,

10   and it might be a little more up close and personal than on the

11   telephone.

12         This telephone conference has worked pretty well, but

13   sometimes there are real problems in audio.  And I don't know

14   if it's because someone is using their speakerphone or their

15   cell phone or whatnot.  But it just seemed to me that Zoom

16   Meeting was a more reliable medium to communicate.

17         And we just don't know how long this thing is going to

18   go on, so anyway I was just interested in what your thoughts

19   were.  I'm going to chat with our IT people and chat with Judge

20   Rodgers.  It will be her call if she wants to use it.  But

21   she's pretty progressive, so maybe down the road that will be

22   an option we can utilize for communicating in this case.

23         Anything else from the Defendant?

24         **MR. WASDIN:**  No, Your Honor.

25         **THE COURT:**  And anything else from the Plaintiffs?

```
 1          MR. AYLSTOCK:  Nothing here, Judge.

 2          THE COURT:  Thank you all very much and have a good

 3   day.

 4               (Proceedings concluded at 3:55 p.m.)

 5                   --------------------

 6   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any
 7   redaction of personal data identifiers pursuant to the Judicial
     Conference Policy on Privacy are noted within the transcript.
 8
     s/Donna L. Boland                        3-25-2020
 9   Donna L. Boland, RPR, FCRR               Date
     Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```