**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG     )     Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,    )
                                  )     Pensacola, Florida
                                  )     March 27, 2020
                                  )     9:31 a.m.
                                  )
                                  )
_____)

**TENTH CASE MANAGEMENT CONFERENCE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE

and

THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE

(Pages 1-66)

**A P P E A R A N C E S**

FOR THE PLAINTIFFS:      **BRYAN F. AYLSTOCK, ESQUIRE**
                         **JENNIFER HOEKSTRA, ESQUIRE**
                         **CAITLYN MILLER, ESQUIRE**
                         Aylstock, Witkin, Kreis & Overholtz
                         17 E Main Street, Suite 200
                         Pensacola, Florida  32502

                         **SHELLEY HUTSON, ESQUIRE**
                         Clark Love & Hutson, GP
                         440 Louisiana Street, Suite 1600
                         Houston, Texas  77002

                         **CHRISTOPHER A. SEEGER, ESQUIRE**
                         **DAVID R. BUCHANAN, ESQUIRE**
                         Seeger Weiss, LLP
                         55 Challenger Road, 6th Floor
                         Ridgefield Park, New Jersey  07660

FOR THE DEFENDANT:       **KIMBERLY O. BRANSCOME, ESQUIRE**
                         Kirkland & Ellis, LLP
                         2040 Century Park East
                         Los Angeles, California  90067

                         **MARK J. NOMELLINI, ESQUIRE**
                         **NICHOLAS F. WASDIN, ESQUIRE**
                         **KARL GUNDERSON, ESQUIRE**
                         Kirkland & Ellis, LLP
                         300 N Lasalle
                         Chicago, Illinois  60654

                         **ROBERT C. BROCK, ESQUIRE**
                         Kirkland & Ellis, LLP
                         655 15th Street NW
                         Washington, D.C.  20005

```
 1                     P R O C E E D I N G S
 2           THE COURT:  I've got 9:31 Central Time.  I just need
 3   to know who all is on the phone and if we're still waiting on
 4   anyone.  And let me just start by confirming a few names, and
 5   then I'll hear from the lawyers.
 6           Judge Jones, are you on?
 7           JUDGE JONES:  I am.
 8           THE COURT:  Very good.
 9           Judge Herndon, are you on?
10           JUDGE HERNDON:  I am.
11           THE COURT:  Very good.
12           Orran Brown, are you on?
13           MS. BROWN:  Yes.  Good morning, Your Honor.  I'm on.
14           THE COURT:  Good morning, Orran.
15           And then Roma Petkauskas, are you on?
16           MS. PETKAUSKAS:  Yes, I'm here.  Good morning, Judge.
17           THE COURT:  Good morning, Roma.
18           Okay, I wanted to confirm those folks were on.
19           Tevenia, are you on as well?
20           MS. JACOBS:  Yes.
21           THE COURT:  Okay, very good.
22           Then, from the parties' standpoint, for the
23   Plaintiffs, who do we have?
24           MR. AYLSTOCK:  Good morning, Your Honor.  This is
25   Bryan Aylstock.  I've got Jen Hoekstra and Caitlyn Miller on as
```

1    well from my office.

2          **THE COURT:**  Okay.  Good morning.

3          **MR. AYLSTOCK:**  Neil may be -- *(inaudible)* --

4          **MR. SEEGER:**  Good morning, Your Honor.  It's Chris

5    Seeger.  I believe Dave Buchanan is on as well.

6          **MR. BUCHANAN:**  I am, Your Honor.

7          **THE COURT:**  Okay.

8          **MS. HUTSON:**  Good morning.  This is Shelley Hutson and

9    I'm on.

10         **THE COURT:**  Okay, good morning, Shelley.

11         **MR. BURNS:**  Good morning, Judge.  Mike Burns.

12         **THE COURT:**  Good morning.

13         Anyone else for the Plaintiffs?

14         **MR. SACCHET:**  Good morning, Judge.  Michael Sacchet

15   for Plaintiffs.

16         **THE COURT:**  Good morning.

17         **MS. ANELLO:**  Good morning, Your Honor.  Virginia

18   Anello with Douglas & London for the Plaintiffs.

19         **THE COURT:**  Good morning.

20         **MS. LANIER:**  Good morning.  Rachel Lanier for the

21   Plaintiffs.

22         **THE COURT:**  Good morning.  It sounds like that's all

23   the lawyers on the Plaintiffs' side.

24         And then, for the Defendants, I recognized a couple of

25   voices, but let me go ahead and ask you all to identify

1   yourself by name, please.

2   **MS. BRANSCOME:**  Sure.  Good morning, Your Honor.  It's

3   Kim Branscome.

4   **THE COURT:**  Good morning.

5   **MR. BROCK:**  Good morning, everyone.  Mike Brock is

6   here also.

7   **THE COURT:**  Good morning.

8   **MR. HILL:**  Good morning, Judge.  It's Larry Hill.

9   **THE COURT:**  Good morning, Larry.

10   **MR. HILL:**  I'm sorry, Barry, I cut over you.

11   **MR. FIELDS:**  That's all right.

12   **THE COURT:**  Barry Fields, you're on the phone as well?

13   **MR. FIELDS:**  Yes, Your Honor.  Good morning.

14   **THE COURT:**  Good morning.

15   **MR. NOMELLINI:**  Good morning, Your Honor.  Mark

16   Nomellini is on.

17   **THE COURT:**  Good morning, Mark.

18   **MR. WASDIN:**  Good morning, Your Honor.  Nick Wasdin is

19   on.

20   **THE COURT:**  And Nick.  Are you all anticipating anyone

21   else?

22   **MR. GUNDERSON:**  Good morning, Your Honor.  This is

23   Karl Gunderson.

24   **THE COURT:**  Good morning, Karl.

25   I think I overlooked our most important participant

1    and this is Ms. Donna Boland, my court reporter.

2              Donna, are you on?

3              **COURT REPORTER:**  Yes, I'm here.

4              **THE COURT:**  Okay, very good.  I should have started

5    with you.

6              Well, let me say first I hope everyone and everyone's

7    family members are healthy.  I understand these are trying

8    times and very strange times.  I appreciate you all continuing

9    your efforts to move the litigation forward as best you can as

10   a practical matter.

11             Hopefully we can make this work by telephone.  As you

12   know, I, of course, prefer to be in person.  But, for obvious

13   reasons, that's just not possible right now.  So we'll do the

14   best we can on the telephone.  And as just indicated,

15   Ms. Boland is here taking down the conference.  And I would ask

16   you to, if you speak, please identify yourself.  I'm familiar

17   now with all your voices, but I don't think she is.  So make

18   sure you identify yourself, please.

19             I'd like to start with something that's not on your

20   agenda.  And I do appreciate the agenda; I have that.

21             But I'd like to start, because I have Orran and Roma

22   here on the phone from BrownGreer -- we had an issue that was

23   raised -- Dave Buchanan, I believe, raised this on our

24   Leadership call on the 16th, I think it was, our last

25   Leadership call.  And I just wanted the issue to be addressed

1    or defined for Orran and Roma and then have them respond.  I

2    just want to be sure that we have all the security measures in

3    place that we've all expected were in place and that they'll

4    continue in place.  And if there are any concerns, then I want

5    to air those now and hear from BrownGreer about that.

6         So, Dave, what I recall from our discussion -- and

7    that conference was not recorded.  But my memory of that call

8    was there was an issue of the Defendants being able to see when

9    certain records were uploaded into MDL Centrality, and there

10   was, I guess, a concern about Defendants being able to see that

11   upload date and whether that exposed more information to them

12   than just the date.

13        Is that it, in a nutshell, or is there more to it?

14        **MR. BUCHANAN:**  I think that's a portion of the issue,

15   Your Honor.  You know, MDL Centrality being a database that

16   captures a lot of information about interactions with the

17   system.  And there's a -- if you will, there's a hard wall, as

18   we understand it, between the service of information from the

19   Plaintiffs to the Defendants.

20        And when information is served, it goes over the

21   transom, so to speak, from one side of the system to the other.

22   And whatever kind of -- whatever dates and other metadata are

23   ascribed to that transmittal are recorded in the system and

24   they're there for all to see.

25        As a practical matter, people have the ability to work

1    the MDL Centrality on the Plaintiffs' side -- and I don't know

2    how the Defendants use it, but on the Plaintiffs' side in what

3    they perceive to be a secure way, and it can be a workspace

4    where they can manage their client's files up until the time of

5    service.

6            And there was an issue that arose in connection with

7    certain records where certain fields were accessible to the

8    Defense about when information was first uploaded into MDL

9    Centrality versus when it was transmitted, and there was a

10   concern that was expressed about that.

11           And I think we've sorted that out with BrownGreer at

12   this point.  I've spoken to Mr. Brown, and I know others had

13   spoken to Roma and maybe Jake as well.  But I understand that

14   the sharing of that information was, frankly, not the way

15   things are intended to work, and that will be remedied and will

16   not occur in the future.

17           So it was a metadata issue, Your Honor, as opposed to

18   a file itself being accessed.  But nonetheless, to protect

19   Plaintiffs' expectations in using that workspace in a secure

20   manner in the same way they might be using it for processing

21   records on their own systems, we want to make sure that

22   security is paramount and the Defendants don't have the ability

23   to access metadata around those documents in the same way we

24   wouldn't have the ability to access metadata on their servers

25   or they be able to access them on our local servers.

1          So Mr. Brown has assured us that whatever had happened

2    won't happen in the future.

3          **THE COURT:**  Well, I want to be -- you say it's

4    metadata and then you said there are fields.  So -- and you

5    know my limitations when talking about computer systems.  So is

6    this truly -- it's fields of metadata?  I understood it was

7    just a date and time.  So what's --

8          **MR. BUCHANAN:**  Yeah, I'm capturing those -- I'm sorry,

9    Your Honor.

10         **THE COURT:**  It's more than that is what you're saying?

11         **MR. BUCHANAN:**  Yeah.  The metadata I'm referring to,

12   Your Honor, is basically data about the documents, you know,

13   upload dates into MDL Centrality versus service dates.  And

14   there's certain information about files that could be relevant

15   or not, but certainly not appropriately shared to the Defendant

16   other than service date.

17         So that metadata that I'm referring to, Your Honor,

18   the information I'm aware of that was shared related to upload

19   dates versus service dates.  And we just want to assure that

20   that information in that private workspace remains private, and

21   I understand that it can be.

22         **THE COURT:**  All right.  Well, it would be best if that

23   can be eliminated to everyone's satisfaction.  But it doesn't

24   sound to me that, if it's simply metadata in regards to an

25   upload date as opposed to a service date, that that information

1   is going to cause any prejudice to any plaintiff, to the extent

2   that has happened in the past.  I mean, you're suggesting

3   otherwise.  And if that's the case, then I would like to know

4   why that would be a prejudice to a plaintiff.

5          **MS. BROWN:**  Your Honor, this is Orran Brown.  If I

6   could fill in a little bit of the background on it, and then I

7   think we can all answer your last question, too.

8          And Mr. Buchanan described it accurately.  This

9   system, because of its electronic nature and it's a database,

10  it captures the footprints that people make when they work in

11  it electronically, and it records dates that people do things

12  and it's just -- and that's what we're calling metadata because

13  it's just the interaction that people have with the system.  It

14  records it just like Google records it when you make a search.

15         The question then is, what each, as Mr. Buchanan put

16  it, hard wall between one side and the other and where that

17  wall is erected amidst that database.  The issue that came up

18  in this one was one date because it records the date that

19  someone uploads a document into the system.  And then later on

20  when it's decided to be served, it records the date of service.

21         What each side should see is the date of service and

22  nothing that precedes it.  None of the other footprints, none

23  of the other metadata, none of the other private workspace

24  activity that either the Plaintiffs' side or the Defense side

25  is doing in their own materials.  Once they decide to serve it

1   on the other side and designate it for service, there is a

2   service date.  And that's the only date, unless the Court were

3   to order otherwise, that should be visible to the receiving

4   party.

5           In this instance, there was a preceding date of when

6   the serving party had uploaded it to the system that the

7   receiving party could also see.  That should not have happened.

8   Because, while in the normal sort of database world that's an

9   innocent footprint, in the litigation world it gives a

10  visibility to the receiving party that they wouldn't have if

11  this had been done the old-fashioned way of just sending it in

12  the mail or hand delivering the materials in hard copy.  You

13  wouldn't know in that system when the producing party actually

14  got the material and was working on it.

15          So we should have aired that with everybody from the

16  outset and been very clear on what one side could see or not

17  see.  It's where the hard wall sets up.  This was not a system

18  breach or a breach of security or some problem in people

19  digging around where they shouldn't.  This was just the way it

20  was set up.  It showed visibility into the upload date and the

21  service date when it should have just shown the service date.

22          And once we realized that was going to be an issue, we

23  changed it.  Because we can definitely securely control what

24  one side sees from the other person's workspace.  It's just a

25  matter of code.  So we just changed it so that cannot happen,

1    you cannot see the other side's upload date, you only see the

2    service date.  And that's the issue that created the problem

3    that came up between the parties that I had talked to Mr.

4    Buchanan about.

5            And Roma and Jake Woody have been working on it to

6    make sure that we're clear on what people can and cannot see

7    and to guarantee that the system allows visibility only to what

8    the parties agree each other can see or the Court orders each

9    other can see.  And so that has been corrected to say you only

10   see the service date.

11           Just as you would if you were getting it hand

12   delivered, you would know the date you got it, this system, it

13   replicates that now.  You do not see in the private workspace

14   when the producing party got the documents, what they did with

15   the documents when they uploaded them into the system to look

16   at them.  And so we've got the hard wall shifted over now to

17   shield that upload date from visibility by the other side.

18           In the instance where this happened and there was some

19   discovery -- maybe "dispute" is too harsh a word, but some

20   debate about whether the documents had been timely produced or

21   served, then that upload date which showed the producing

22   party's possession of the documents became an issue in terms of

23   whether it took too long to get them produced.

24           And I don't -- I don't know where the parties stand on

25   that or whether it's still an issue in dispute.  But I think

1    that answers your last -- your question, Your Honor, about does

2    it matter now, is anyone prejudiced or not.  Because this

3    system is not supposed to create litigation issues, it's not

4    supposed to slow people up on debating about things that you

5    wouldn't normally debate.  It's supposed to make everything

6    easier.

7              The visibility of that upload date created a problem.

8    We have corrected it and guarantee it will not occur again.

9    Nobody can see that unless somebody agrees to see it or a court

10   orders it being revealed.  And I think the problem has been

11   isolated.  And I don't know exactly whether it's still a

12   contentious issue on that set of documents, but it has been

13   changed and will not occur going forward.

14             **THE COURT:**  All right.  Well, Orran, thank you very

15   much for that explanation.  I also appreciate you jumping on

16   this and giving it your full attention as soon as you found out

17   about it.

18             So, all right, let me turn back to the Plaintiffs and

19   then the Defendants.  I need to know if there's an issue in

20   dispute, but I also want to know if everyone is satisfied with

21   the explanation that Mr. Brown has provided.  I am.  And I

22   remain comfortable with MDL Centrality 100 percent.

23             **MR. BUCHANAN:**  We are, Your Honor.  And yes, we were

24   pleased with BrownGreer's attention to the issue.  And we

25   certainly don't want collateral litigation or challenges

1    arising through, if you will, footprints that may be captured

2    or not captured.  You know, we don't get to see into the

3    Defense kitchen, so to speak, into how the food is being

4    prepared.

5              And certainly we didn't understand MDL Centrality

6    could provide any visibility on anything like that.  But

7    Mr. Brown has satisfied us that, whatever issue arose, it's

8    been resolved to everybody's satisfaction.  So we're good on

9    the Plaintiffs' side.

10             **THE COURT:**  All right, very good.

11             From the Defense side?

12             **MR. NOMELLINI:**  Your Honor, it's Mark Nomellini.  So

13   just in terms of our awareness of all this and I can fill you

14   in on a little context.  This came up in connection with the

15   bellwether selection process.  Right at the time we were making

16   our picks, some additional documents became available in

17   Centrality.  And we looked at what was available and saw that

18   some of the documents that were just being made available had

19   been, in fact, in Centrality for several months.

20             And we didn't realize at that point there was any

21   claim of work product or privilege.  We passed that information

22   along to Judge Jones in connection with a hearing that we had

23   with Judge Jones.  And then after that, Plaintiffs made a claim

24   of work product.  And we understand that the Plaintiffs will be

25   sending us a claw-back letter, et cetera.  And it's our

understanding that the information has now been taken down and
it is no longer visible to us.

**THE COURT:**  Is that the same issue?  Is this all the
same issue?  I understood what you just described to be a
separate issue from the metadata issue that Dave Buchanan just
described.  Are those the same?

**MR. NOMELLINI:**  I think it's the same, Your Honor,
only to this extent:  The information that we were relying on
in our submission to Judge Jones for data on how long the
documents had been in Centrality before they were provided is
the metadata that's being described by Mr. Buchanan and by
Mr. Brown.  So to that extent, it's the same issue, Your Honor.

**THE COURT:**  I see, all right.  I didn't understand.

**JUDGE JONES:**  Judge Rodgers, this is Judge Jones.  If
I can add a little topspin to the issue Mr. Nomellini raised.
The concern at the time is that the information that Defendants
may have wanted to see prior to the fix had been held back in
some way by the Plaintiffs and were literally dumped in in the
eleventh hour.

And after that hearing, I actually had a telephone
conference with Roma and Jake Woody so I could understand the
issue.  And the issue really had to do -- there was no
holdback.  It is simply a notification issue.  The
communication that the Defendants received was not held back
and initiated by the Plaintiffs.  Information was unilaterally

1    made available to the Defendants.  And the thought was -- and,

2    Roma, you can correct me if I'm wrong -- that Jake Woody was

3    simply making all of the information available in the universe

4    of bellwethers so that the Defendants would have a defined

5    database.  It was not a situation where the Defendants *(sic)*

6    held back until the last minute and then instructed, either

7    electronically or telephonically, BrownGreer to transfer the

8    information.

9            Is that correct, Roma?

10           **MS. PETKAUSKAS:**  Yes, that is correct.  The issue was

11   when the information was available to the Defendants and the

12   Plaintiffs' Leadership making the selections.  And we clarified

13   that both Leadership on the Plaintiffs' side and the Defendants

14   got access to the information at the same time when the

15   Plaintiffs' firm produced the documents.

16           **THE COURT:**  I looked into this as well.  I heard some

17   rumblings about it.  And my understanding was that the

18   information was available to both sides at the same time, it's

19   just the Defendants didn't realize it was available, is that

20   correct, until Jake Woody notified you it was available?

21           **MS. PETKAUSKAS:**  That is correct, from the system's

22   standpoint, yes.

23           **MR. NOMELLINI:**  Karl Gunderson, could you address that

24   point from a technical perspective?

25           **MR. GUNDERSON:**  Yes.  So, Your Honor, that is correct

1    that one of the issues was related to the notifications.

2            And I think, from Defendants' perspective, there is

3    also -- based on what we saw, we had concerns and I think we

4    still have lingering concerns that -- it was surprising, I

5    guess, that all of this information was just *sua sponte* being

6    released on the day before the picks were occurring.  And I

7    think some of the documents included an audiogram that was

8    given the day before the bellwether selections occurred.

9            And so our concern was that behind the scenes someone

10   may have been communicating with individual counsel to like,

11   you know, goad them into producing documents that can be seen

12   by both parties or other communications that would reflect

13   investigating the claims more so.

14           And our concern, from our perspective, was we clearly

15   didn't have that opportunity to ask for more documents or ask

16   for an audiogram of a potential pick.  And we found it highly

17   suspicious that all of that was happening, you know, the 24

18   hours or 48 hours before the picks were occurring.

19           **THE COURT:**  Well, I mean, there's no evidence of that.

20   I understand you're saying you're suspicious of it.  But do you

21   have any facts that that actually occurred in the manner that

22   you're suggesting?

23           **MR. GUNDERSON:**  Well --

24           **THE COURT:**  Mr. Gunderson, that's not an insignificant

25   matter.  Because, if that was occurring, then that would be in

1    direct violation of my order.  And so I don't take this

2    lightly.  If there's something -- if there was investigation

3    being done and communications through Leadership to individual

4    law firms in any form, that would have been a violation of my

5    order.

6            That's not what I understood from the explanation

7    given back to me about what the system reflects, but the system

8    is not going to capture maybe what you're suggesting.

9            So is this just suspicion, you know, hypersensitivity

10   on your part or the Defendants' part, or is there something

11   more there, more to it?

12           **MR. GUNDERSON:**  Your Honor, I don't think we have

13   anything more than circumstantial evidence.  And I think -- you

14   know, we did address this with Judge Jones previously, and

15   Judge Jones had Mr. Aylstock provide us the certification that

16   this wasn't happening.

17           I think, from Defendants' perspective, we don't view

18   this as a live issue at this point or something that we think

19   is worth pursuing at the moment, though we do -- you know, to

20   the extent other evidence were to come up down the road to sort

21   of -- you know, if there was something more direct than

22   circumstantial evidence we have at this point, I think it's

23   something that we would potentially raise again in the future.

24           **THE COURT:**  Okay.

25           **MR. SEEGER:**  Your Honor, can I just add a little bit

1    more context to this?  Because this hasn't been mentioned, and

2    I'm a little surprised it hasn't.  I spent personally hours on

3    this.

4            I was contacted by somebody on our side about the

5    concern that Mark had, and I believe it was Karl.  I then

6    personally interviewed people involved in the process to ask

7    them exactly what they did to make sure that what their

8    suspicions were didn't occur.

9            I then contacted the Defendants, spoke to Mark, and

10    represented to him -- and even laid out the steps.  Many

11    lawyers probably wouldn't have done that, but I went through

12    every step that I did to confirm that your order was not

13    violated and that everybody was uploading records pursuant to

14    one process.

15            And the bellwether selection committee had no

16    information at all, not one person -- and I interviewed many,

17    Judge, and I'm more than happy to share that with you privately

18    if you'd like to know.  So there is actually evidence this

19    didn't occur, and I'm a little surprised that this is being

20    raised today out of suspicion.

21            **THE COURT:**  Well, I raised it, though.  Well, Mr.

22    Gunderson referenced it because he was explaining, I guess,

23    whether Defendants still had any lingering issues with the

24    system itself.  And it doesn't sound like this is a system

25    issue.

1          I'm confident, based on what Roma has disclosed to me

2    and to Judge Jones, that the system performed as it's intended

3    to perform and that the data and information was available to

4    both sides at the same time.

5          So I'm going to consider this sort of a dead issue,

6    and I'm not going to bring it up again and won't consider it

7    again unless and until someone raises it more formally with me.

8          **MR. NOMELLINI:**  Your Honor, just back to this -- so I

9    was just explaining the context for this.  Mr. Seeger did call

10   me and told me about the investigation that he had done.  He

11   said he was concerned on his end, so he looked into it and

12   assured me that it was a coincidence in terms of the audiogram

13   and documents.  And I do appreciate the efforts that he went

14   into, and he said he had found that it was a coincidence.

15         **MR. SEEGER:**  And just to be clear -- and I don't mean

16   to dispute this, but it wasn't a concern.  I want to be clear.

17   I know the integrity of the people involved in the process.

18   But because it was a concern raised by, Mark, you and your

19   team, I took it serious and put hours into it and interviewed

20   people to make sure.

21         And I even said to you that, if I found that anybody

22   violated the Court's order, I'd bring it to the Court's

23   attention.  And Bryan feels the same way and so does Shelley

24   and anybody involved in this.

25         So I just want -- Your Honor, I would hate for you to

1    be left with the impression that somebody raised a concern

2    about an order being violated that we wouldn't jump all over

3    that.  We did.

4         **THE COURT:**  Good.  No, I'm pleased at what I'm

5    hearing.

6         **MR. AYLSTOCK:**  And, Your Honor, it did come up before

7    Judge Jones.  I offered -- and he suggested that I write a

8    letter.  I've written a letter.  I'm happy to go into greater

9    detail about the silos that we created to avoid these issues,

10   and I can assure you that, to my satisfaction and to Chris's

11   and to the entire Leadership, no order was violated.

12        So I don't think there's any circumstantial evidence

13   of anything, so I don't agree that there is.  But I can assure

14   the Court that I wrote that letter in good faith, and I gave it

15   to the Defendants, as Judge Jones requested, and I believe it

16   to be a dead issue.

17        **THE COURT:**  Okay.  Well, I do as well.  And again, it

18   only -- it came up in this discussion about the issue that I

19   did raise which had to do with the electronic footprint or the

20   metadata in terms of the upload date for some of the records.

21        I did not appreciate the connection between those two

22   issues.  I was aware of this other one, but I really did not --

23   I wasn't expecting to discuss that today.  I have considered it

24   a dead issue and figured, if it was otherwise, someone would

25   raise it with me.  It sounds like Judge Jones took care of it

```
 1    and you all took care of it, and I'm satisfied that no one
 2    violated the letter or the spirit of my order.
 3              Everybody okay to move on from there?
 4              MR. AYLSTOCK:  Yes.  Thank you.
 5              MR. NOMELLINI:  Yes.
 6              MR. GUNDERSON:  Yes, Judge.
 7              THE COURT:  Also, does anyone have any other questions
 8    or need for discussion with Orran or Roma?  I don't want to
 9    keep them on the call if it's not necessary.
10              [No response.]
11              Well, then, Orran and Roma, thank you for being on the
12    call.  Thank you very much for the detailed explanation about
13    what happened.  I agree, it does not sound like there was any
14    type of security breach.  This is just the way the system was
15    set up and designed.  And once you found out that this was an
16    issue in terms of the other side being able to see the
17    production date, that you just corrected that issue.  And
18    everyone is satisfied with that.  And so, with that, I will say
19    thank you again.  Stay healthy and well.
20              MS. PETKAUSKAS:  Thank you, Your Honor.
21              MS. BROWN:  Thank you, Your Honor.
22              MS. PETKAUSKAS:  See you next time.
23              THE COURT:  Look forward to seeing you all again, too.
24              MS. BROWN:  Thank you for having us, Your Honor, and
25    wish everyone the same thing about protecting themselves and
```

1     their families, and hope we get past all of this very soon.

2             If anyone else has any other questions about any of

3     this, please let us know, because we can make sure that the

4     system does not create issues that cause people to have to

5     pause like this.  Thank you.

6             **THE COURT:**  No issue.  Thanks, Orran.

7             *(Mr. Brown and Ms. Petkauskas disconnect.)*

8             Okay.  Let's then turn to the agenda.  The first item

9     -- and this is a joint agenda, which I appreciate.  And I do

10    appreciate the additional context that you all provided with

11    the agenda this time.

12            The first item pertains to the virus COVID-19 and the

13    impact of all the precautionary measures that are being taken

14    around the country who are scheduled here in this litigation.

15            There's been a tolling of the deposition schedule.  I

16    see here in your agenda the Plaintiffs have explored the

17    potential use of a technology firm for remote depositions.  The

18    Defendants are not in favor of that and would prefer to brief

19    the issue.

20            I'm comfortable with having you all submit briefs on

21    the issue if that's -- I'm certainly not going to decide the

22    issue without hearing from everyone, so written briefs are fine

23    by me.

24            **MR. AYLSTOCK:**  Yes, Your Honor, this is --

25            **MS. BRANSCOME:**  Thank you, Your Honor.  This is Kim --

1          **MR. AYLSTOCK:**  Oh, go ahead, Kim.  Ladies first.

2          **MS. BRANSCOME:**  Thanks, right.

3          On this one, Your Honor, I don't know -- and I think

4   what might make sense is probably a meet and confer with

5   Plaintiffs on this.  I am in another litigation in which

6   depositions are needed -- they need to be taken because there's

7   actually plaintiffs who are passing away, and so they're

8   exigent depositions.

9          And one of the things that they're running into in a

10  number of states is there are now orders in place very much

11  controlling who can go where and when and for what purpose.

12  And so there are challenges over and over again with whether

13  things are essential services.  The legal industry as a whole

14  is not necessarily considered an essential service.  There are

15  very narrow exceptions.

16         The one thing I would say on this, and perhaps we

17  could even reach agreement with Plaintiffs so that we don't

18  need to bring it to you just yet, is that everything is

19  evolving so quickly that one concern I would add is we may even

20  brief this and then the governor rules in the states where the

21  deposition might be taken may change.

22         So I think on this, from our perspective, it would at

23  least make sense to hold off on this a little while until I

24  think the states have all finished entering their orders.

25         We still would not be in favor for remote depositions

1    for a number of reasons, but I can just speak from experience

2    that that is actually -- even where the parties have agreed to

3    do remote deposition, it has been a real struggle because of

4    all the restrictions in place.

5            So that's the only point that I would make is that we

6    may be premature on this because everything is so rapidly

7    evolving.

8            **THE COURT:**  Right.  I would not characterize a

9    deposition in this litigation as an essential meeting or need,

10   obviously.  And that wouldn't be for me to declare anyway.

11   It's for the governor of a particular state to declare.

12           So what I was going to suggest, if you want to brief

13   it, if you -- meet and confer is great.  If you can't reach a

14   consensus for agreement, then let's get it briefed and teed up

15   for the next CMC.  Because I was not envisioning in any way

16   agreeing to remote video depositions between now and then,

17   again, because we just don't know enough about what's going to

18   happen in the foreseeable future.

19           I think our next CMC is April 27.  So I'd like you all

20   to meet and confer about this.  And if you're on separate pages

21   still, say, within a week or so of that conference, then just

22   go ahead and submit briefs on it.

23           I would like your briefs, by the way, just as a

24   footnote to that, in accordance with my order, I'd like them a

25   week before the conference.  If you all can manage that, it

1   would help me.  I believe that's what I required.

2        **MR. AYLSTOCK:**  That's fine, Judge.

3        **THE COURT:**  I don't want to get this confused with

4   Abilify, but I believe that's what I required.  But certainly

5   getting it the afternoon before the conference the next

6   morning, that's just not going to work for me.  I need a little

7   more time.

8        **MS. BRANSCOME:**  Understood, Your Honor.

9        **MR. AYLSTOCK:**  Understood, Your Honor.  I think for

10  these agendas they were supposed to be in a week prior, so

11  apologies for the tardiness on that.  And we'll certainly have

12  the briefing done.  I don't think this is anything that needs

13  to be heard before the next CMC.  There's no depositions on the

14  schedule.

15        I would note a couple of things.  One, there have been

16  administrative orders entered in Florida and other states

17  dealing with this.  And although this probably isn't one of

18  those essential and critical proceedings, I'm looking at the

19  Florida Supreme Court's administrative order on this, and what

20  they -- or at least the Supreme Court in Florida indicated is

21  that the chief judge determines, if other proceedings and

22  events can be effectively conducted remotely without the

23  necessity of in-person appearances, that they can proceed.

24        And certainly this is an evolving issue.  Some people

25  are saying it will be over by Easter.  I don't subscribe to

1    that.  But in any event, there are ways -- and, in fact,

2    another administrative order of the Florida Supreme Court

3    allows for oaths to be administered remotely.

4          And I spent some time with Linda Golkow, who owns

5    Golkow Technology.  She had a webinar yesterday that a special

6    master for one of them for the opioid litigation MDL was on.

7    And the technology is really good these days, I mean, even on a

8    cell phone.  The demonstration was on a cell phone, a laptop,

9    and a personal computer.

10         And she's happy to share that with the Court.  I could

11   even email you and the parties their YouTube thing so that you

12   can see that it can work.  I'm not suggesting that it's the

13   only way to do it, and there may be some depositions that need

14   in-person.  But oaths can be administered remotely now, at

15   least in Florida.

16         If it can be done remotely, and even for a

17   nonessential deposition, the Plaintiffs would be interested in

18   at least exploring that with the Defendants in the coming

19   months, if this is going to drag on.  We just would prefer the

20   case to move than to kind of sit on pause indefinitely.  So I'm

21   happy to discuss that with Ms. Branscome.

22         **THE COURT:**  I'm not suggesting we're going to sit on

23   pause indefinitely, but I don't think that I need to make a

24   decision on this before the next CMC.  It sounds like you agree

25   with that and everyone agrees with that.

1          **MR. AYLSTOCK:**  Totally, yes, Your Honor.

2          **THE COURT:**  And as we approach the next CMC, if it

3     appears that this is going to extend for the next several

4     months, then at that CMC we'll talk more about it.  And maybe

5     in advance, if you do submit briefs, then you can submit

6     something to me and everyone else electronically so we can see

7     how this could work.

8          **MR. AYLSTOCK:**  Yes, Your Honor.

9          **THE COURT:**  But we're not there yet.

10          In terms of the schedule, I know you all have --

11     there's some issues about written discovery, and we're going to

12     talk about that in a minute.  But understanding that the dates

13     are very flexible and fluid right now, I want you all to begin

14     working with Judge Herndon on a plan for the four trial groups.

15          I would presume that with group A you would duplicate

16     it with the other groups whatever that plan is.  You may have

17     to tweak it.  But I think your time would be used well if you

18     start working with him on a plan that could be implemented as

19     soon as we are past all this madness.

20          **MR. AYLSTOCK:**  Sure will, Your Honor.

21          **THE COURT:**  And I've asked him to get with you all in

22     that regard.

23          Kim, who on your team is that point person going to

24     be?

25          **MS. BRANSCOME:**  I mean, really -- perhaps Mark

1   Nomellini would be a good point person on that.  But we're in

2   close communication so --

3            **THE COURT:**  All right.

4            **MR. BROCK:**  Judge, this is Mike Brock.  I'll be

5   involved in that also.

6            And, Judge Herndon, if you could also -- *(inaudible)*

7   -- me, that'd be great.

8            **THE COURT:**  Okay, very good.

9            Kim, I thought I heard you say you were -- you're not

10  in trial but you're involved in another case in which you are

11  doing depositions remotely, so I wasn't sure if your focus was

12  there right now so --

13           **MS. BRANSCOME:**  No, Your Honor.  It's a large, ongoing

14  litigation.  I'm not personally the one taking or defending

15  depositions.  I'm just aware of the coordination issue.  So not

16  at all.

17           **THE COURT:**  All right.  So the next item on your

18  agenda came as a little bit of a surprise.  I wasn't aware that

19  we had cases in Minnesota state court involving these earplugs.

20  But I have read Judge Tunheim's order.  I understand the

21  Defendants have filed a notice of appeal of that order of

22  remand to the Eighth Circuit, and I also understand that that

23  sort of keeps those cases in Minnesota District Court until

24  such time as that order is resolved on appeal.

25           Is that correct?  I think you suggested that in your

1     agenda.

2              **MS. BRANSCOME:**  That is correct.

3              **MR. NOMELLINI:**  Your Honor, that's correct.  I'd like

4     to add that the Plaintiffs are now attempting to get to state

5     court pending the appeal, and so it looks like that issue is

6     also going to be litigated.  It hasn't been resolved yet.

7              **THE COURT:**  Has Judge Tunheim issued a stay of his

8     order?

9              **MR. NOMELLINI:**  No, he hasn't issued a stay, but he's

10    withheld from actually sending the case down to state court

11    and --

12             **THE COURT:**  So he granted the motion but did not order

13    the cases remanded?

14             **MR. NOMELLINI:**  Correct, not yet, Your Honor.  But

15    that issue is being litigated, and we can provide Your Honor

16    with the docket entry on that.  And if there's any update on

17    that that anything gets sent to state court, we will, of

18    course, notify Your Honor.

19             **THE COURT:**  Thank you.  How many cases are involved?

20    Is it just one?

21             **MR. NOMELLINI:**  Your Honor, I believe at this point

22    it's just one.

23             **THE COURT:**  All right.  Does anyone else have anything

24    to add?

25             **MR. SEEGER:**  Your Honor, it's Chris Seeger again.  We

1   also had wanted this on the agenda to discuss maybe ways that

2   we could improve our state/federal coordination here.  I know

3   this issue was raised by Your Honor actually very early in the

4   case.  I can't remember the conference, but I think you had

5   asked did the parties think there was a need for state and

6   federal coordination.  I believe it was the Defense at that

7   time didn't think it was necessary.

8           The issue for us is we didn't even know that this was

9   going on.  We didn't -- I mean, the issue of government

10  contractor is obviously a crosscutting issue in the entire

11  litigation.  And the whole purpose of an MDL is to have

12  crosscutting issues in front of the MDL judge.

13          Now, there's not much any of us can do about people

14  making motions for remand from the District Court.  I

15  understand that's got to go forward.  But had we known, we

16  might have been able to get involved and maybe had some

17  influence here that either would have led to the issue not

18  having to be teed up right now because maybe there wasn't an

19  understanding, for example, without the coordination about how

20  things were moving in your court.

21          So it just caused us to say, look, we should really --

22  we need to know.  We do reach out and we talk to state court

23  lawyers.  But without any formal coordination, we had no clue

24  that this was going forward.  It wasn't brought to our

25  attention by the Defendants.  And I know Your Honor likely

 1   didn't know about this as well.  I just think that --

 2        **THE COURT:**  No, I did not know.  And certainly it

 3   serves everyone's best interest, if there is a proceeding in

 4   state court, that we do what we can to coordinate the

 5   proceedings.  But right now there isn't.  So I'm not -- if

 6   there were, I would appoint a liaison.  But right now I don't

 7   -- I mean, there's no judge for me to contact to begin to

 8   establish a relationship with, and I wouldn't know where to

 9   begin in terms of appointing a federal/state liaison lawyer.

10        **MR. SEEGER:**  I have a suggestion on that, Your Honor,

11   if you're open to it.  You're right, and we were not focused so

12   much, Your Honor, on you having to make phone calls and do it.

13   I think the lawyers maybe could do a better job informing Your

14   Honor about what's going on.

15        And if you're open to it, we can make a proposal for

16   maybe a lawyer or two on the Plaintiffs' side that might just

17   take on the responsibility of talking to state court lawyers

18   and being ahead of these issues so that at least we're all

19   informed on what's going on.  Maybe there's nothing that

20   anybody can do, but the information I think is important.

21        And also, lawyers who are addressing these issues,

22   government -- we're doing 99.9 percent, if not 100 percent, of

23   discovery in the MDL.  You're about to get all of these issues.

24   You're going to get the briefing and all the evidentiary -- and

25   the entire evidentiary record.  If there are others involved in

1   this, that means these issues are likely being briefed in front

2   of other judges who don't have the facts in front of them

3   because they don't have the record.

4        **THE COURT:**  Well, are there -- this is a question to

5   3M.  Are there other cases in state courts or in federal courts

6   that are not a part of the MDL in which a motion to remand is

7   pending?  Quite frankly, I was very surprised I didn't know

8   about them.

9        **MS. BRANSCOME:**  No, Your Honor.  This one -- the

10  Graves case was the one that had gone up in Minnesota in front

11  of Judge Tunheim.  It looked for a little while like it

12  actually may just get -- we thought procedurally it would get

13  transferred actually into the MDL.  It was set for transfer by

14  the JPML.  Judge Tunheim, my understanding, has accelerated the

15  remand hearing which allowed him to rule before it got sort of

16  procedurally pulled into the MDL.

17       It is our position and continues to be our position

18  that these are all cases that appropriately should be in

19  federal court, which is why we're appealing the order.  From

20  our perspective, we have a strong basis for the appeal.

21       It is not our understanding that there will now be a

22  significant state court litigation, unless there's something

23  that we don't know about.  It is a single case, and

24  procedurally it doesn't exist yet in state court.

25       And so, I agree completely with Chris that there

 1    should be good coordination.  Our interests are entirely

 2    aligned on that.  We want good coordination.  We would like the

 3    entire litigation in the MDL.  And so our interests are very

 4    much aligned in that respect.  From our perspective, we just

 5    think it's premature because there isn't anything in state

 6    court.

 7            And just to let you know, Your Honor, I mean, this

 8    just happened, so we sent you the remand order.  I mean, this

 9    is not something that has been sitting out there for a long

10    time.  It's an evolving situation.

11            So my apologies for not letting you know that it was

12    pending, so I do apologize for that, that you were taken

13    unaware.  But, from our perspective, there is not a state court

14    litigation with which to coordinate.

15            **THE COURT:**  Let me ask, was there a conditional

16    transfer order entered in that case by the JPML?

17            **MS. BRANSCOME:**  No, that -- I'll defer to Mark on the

18    details, but it was not.  It was set to be transferred at the

19    next hearing, and then Judge Tunheim accelerated his hearing

20    date for hearing the remand in the Graves case.

21            But, Mark, definitely correct me if I've got those

22    dates wrong.

23            **MR. NOMELLINI:**  That's my understanding as well.

24            **MR. SEEGER:**  Your Honor, just to be clear about what

25    I'm saying -- and maybe I'm not doing a good job of it -- is at

1      some point a motion was made for remand.  That's a good time to

2      let everybody know the issue.  And I think Kim is do a mea

3      culpa, and I'm not really trying to point the finger.  I'm

4      trying to keep the MDL -- we're trying to keep the MDL as the

5      center of gravity.

6              You know, sometime back in January when the remand

7      motion was made, a simple phone call to one of us, the lawyers

8      involved, could have, you know, maybe could have headed this

9      off at the pass.  And that's really all I'm saying.  And

10     perhaps we make the phone call and they tell us to go pound

11     sand.  But that's part of state/federal coordination that the

12     lawyers can do, we could be doing that for the MDL.

13             **MR. AYLSTOCK:**  I had a suggestion as well, Your Honor.

14     I think I'm looking at the docket here.  It looks like the

15     motion to remand and the hearing on it was noticed back in

16     December.  And maybe if there was an appointment of both a

17     Plaintiff and Defendant liaison -- maybe there's not state

18     court litigation, but there's probably going to be more motions

19     to remand heard.  This one may end up in the Eighth Circuit,

20     and the Eighth Circuit may be doing it on an incomplete record.

21     So we have real concerns about that.

22             And if there were somebody whose job it was to inform

23     the Court or other parties if our designee or designees knew of

24     something, we could either head it off or let the Court or the

25     Defendants know, and vice versa.  Even though there's not

1    technically a state court case yet, just the fact that these

2    are happening in other federal courts and now maybe even in

3    appellate courts, we're just trying to facilitate good

4    communication.

5              **THE COURT:**  All right.  Well, I am not sure what I

6    would have done if I had known about this, but I am sure that I

7    would have liked to have known it was out there.  But I don't

8    see any harm in appointing someone from the Plaintiffs and from

9    the Defense to have this responsibility.  It may be premature,

10   but then again it may not be.

11             There may be -- and I'm not aware.  I didn't know this

12   was an issue.  But it may be that there are cases involving

13   these earplugs in other district courts that have pending

14   motions to remand right now.  I have no idea.  I would have

15   thought not.  I would have thought that I would have known

16   that, but obviously that wasn't the case.

17             So I'm happy to do that.  I don't see any harm in it.

18             **MR. BROCK:**  Judge, that's fine with our side.  And I

19   think we -- we have an alignment of interests here, I think,

20   and we'd be happy to suggest a name on our side, however you

21   would like for us to do that.

22             **THE COURT:**  Thank you, Mr. Brock.  Each side, you can

23   confer, if you'd like to confer, but you don't have to confer.

24   But hopefully you're going to identify individuals that will

25   work well together.  So I will ask you to submit your names to

1    me within a week.  Sooner is fine as well.  And then I will

2    appoint those individuals to that role, and I'll try to put

3    some definition to it in my order.

4              **MR. AYLSTOCK:**  Thank you, Judge.

5              **THE COURT:**  All right.  Thank you.

6              **MR. AYLSTOCK:**  The next agenda item, if I could jump

7    in, because there's an inaccuracy on the agenda as to the

8    signatures on the short form complaint.  I just learned of that

9    this morning that I guess the short form complaints that are on

10   the active docket are unsigned because of the way that they

11   were imported into the inactive docket.  So I guess I wanted to

12   jump in so I could apologize because there's an inaccuracy on

13   No. 3, Judge.

14             **THE COURT:**  Okay.  So you've seen these on the

15   administrative docket?

16             **MR. AYLSTOCK:**  Well -- and I learned this from Roma

17   this morning.  The way on the administrative docket that

18   complaints can get there is on spreadsheets with data and those

19   get uploaded.  And so when they are moved to the active docket

20   -- all of the 25 complaints are now on the active docket, so I

21   should have said all 25 short form complaints have been

22   activated or submitted to the active docket.  But the mechanism

23   doesn't have the signatures.  My understanding is that will be

24   corrected going forward and really isn't an issue, but I wanted

25   to highlight that because it wasn't accurate, No. 3 on the

1  agenda.

2         **THE COURT:**  Okay, I see what you're saying.  All

3  right.  So you've talked to Roma and discussed this with her?

4         **MR. AYLSTOCK:**  I have, Your Honor.

5         **THE COURT:**  Okay.  What I'm showing right now just

6  from I guess a census standpoint is we have 7,869 cases on the

7  active MDL docket, the active docket.  There are 40,022 on the

8  administrative docket.

9         And I just had an update from our MDL administrator in

10  the clerk's office who is handling the transition from MDL

11  Centrality to the inactive and then also from the inactive to

12  the active.  She said there are 100,000 in the queue.

13         That's not -- I mean, you all have done your part, so

14  that's on our end.  This has been, as you might imagine, a huge

15  undertaking for our court and also for the judiciary

16  nationally.  Our goal was to transition 10,000 a week, and we

17  haven't gotten there.  We've had some issues with servers.  And

18  this week we had considerable server issues because of the

19  amount of telework that's being done in the judiciary.  But

20  they're working on it.  Everyone is aware of the need to keep

21  the computers running 24/7.

22         Again, the teleworking has created a layer of

23  complication, but that's being worked through.  So I hope for

24  us to see more moving to the administrative docket more

25  quickly.  Just as an update.

1      **MR. AYLSTOCK:**  Yes, Your Honor.  We have received

2    roughly those numbers from Roma.  I think we have 136,469 on

3    the administrative docket presently and -- *(inaudible).*  And

4    then 10,869 filed claimants, but I think that may include some

5    that were initially up for a motion to remand.  But the numbers

6    are consistent generally.

7      **THE COURT:**  Well, I'm going to set this as a priority

8    for me, by the time of our next CMC, to get a better handle

9    myself on the census.  Because when Roma said cases on the

10   administrative docket, I'm not sure if she's thinking -- she's

11   done her part, she has transitioned those short form complaints

12   to Elizabeth Lawrence, our administrator.  But just because

13   Roma has taken that step doesn't mean they're actually on the

14   docket yet just because of the processing on our end or the

15   lack of processing on our end.  But everyone is working very

16   hard to make this happen and get everything on the docket as

17   quickly as possible.

18     **MR. AYLSTOCK:**  Thank you, Judge.

19     **THE COURT:**  So the next item, Judge Jones, just so

20   everyone is aware -- and hopefully everyone has seen Judge

21   Jones entered an order this morning on -- it wasn't on the VA

22   authorizations but it was on the authorizations that you all

23   have had some disputes about and had a hearing with Judge

24   Jones.

25     I know there was some back and forth regarding PTO 25

1    and the mental health records.  I'm not going to hear argument

2    about that, to the extent there's no argument about that.

3    Judge Jones has issued his order, and you all will need to

4    proceed accordingly based on his order.  And if there's a need

5    for me to reconsider or review something, then you'll just file

6    the appropriate motion with the Court.  But right now his order

7    stands.

8               We have the issue of --

9               Ms. Anello, hopefully you're still on the call.

10          **MS. ANELLO:**  Yes, Your Honor.

11          **THE COURT:**  One of our bellwether claimants is your

12   client, Mr. Garcia.  I understand there was a suggestion that

13   he had not been responsive, but then I had a more recent update

14   that maybe your office had made contact with him.

15              Where do we stand with Mr. Garcia?

16          **MS. ANELLO:**  Well, I have some good news to report to

17   the Court, I hope, that we have made contact with Mr. Garcia,

18   and we are hopeful that we will have a completed bellwether

19   selection sheet and signed authorization being delivered to our

20   office as we are on this phone call.

21              I'm kind of just a little concerned -- I don't know if

22   it's concern or at a loss.  I'm just unclear how his case even

23   sort of got selected as a bellwether case by the Defendants.

24              My understanding -- obviously, I was not there -- was

25   that at the last in-person CMC with the Court, Ms. Lanier

1    advised the Court and the Defendants that certain of the

2    hundred or so bellwether cases -- in some cases there were

3    similar ones to mine where they were unresponsive despite all

4    the efforts of counsel.

5           And I understood that we were -- in this situation, we

6    were still to file what we could but identify on the bellwether

7    selection sheet for the Defendants that we're dealing with an

8    unresponsive client, which I did on the first page, and then

9    half of my answers that Defendant said they needed to select

10   bellwether cases were left blank.

11          So I think just from an overall confusion standpoint

12   I'm not entirely understanding, given all the information I

13   gave to the Defendants, how this ended up being a pick.

14          With that being said, we had tried -- before any of

15   this happened, we tried to move heaven and earth, various

16   methods to contact this client, and it was very difficult to

17   get any receptiveness.

18          However, like I mentioned earlier, the good news is

19   that we have been able to make contact with the client.  And if

20   everything that our client has informed us is correct, we will

21   have the bellwether selection sheet in our office as well as

22   the VA authorization.

23          Because the VA authorization has to be original and

24   someone has to go to my office and pick it up and then send it

25   to me and then send it to the right people, it may take a week

1   or so, given our current situation.  But our office is willing

2   to do everything we can to keep the case moving, and hopefully

3   Mr. Garcia will remain responsive and in continuous

4   communication with us.

5          And ideally, once I receive the paperwork, I can serve

6   it as needed but also amend the notice of designated forum and

7   the notice regarding the *Lexecon* waiver.

8          **THE COURT:**  Okay.  Let's just keep our fingers

9   crossed.  I'm not aware of which side selected which cases, so

10  that -- and I certainly can't speak to the reasons why one side

11  picked a particular case over another.

12         So for now I'm going to ask you, Ms. Anello -- again,

13  we'll keep our fingers crossed that the documentation will be

14  provided to you that everyone needs from Mr. Garcia.  But then

15  I'm also going to ask you going forward to keep a very good log

16  or record of your communications with Mr. Garcia and your

17  efforts to communicate with him and any problems that you've

18  had in keeping communication with him and keeping that ongoing.

19  So I'd like you to --

20         **MS. ANELLO:**  Yes, Your Honor.

21         **THE COURT:**  I'd like you to keep a record of it, who

22  made the efforts and what contact has been made on what dates,

23  because it may be necessary for me to have that information in

24  the future.

25         **MS. ANELLO:**  Of course, Your Honor.

1          **THE COURT:**  Thank you.

2          Anything from the Defendants on Mr. Garcia that we

3    need to --

4          **MR. NOMELLINI:**  Nothing, Your Honor, on Mr. Garcia.  I

5    did have something to raise with respect to other

6    authorizations among the 25.

7          **THE COURT:**  Okay.  Well, before I turn to you, Mr.

8    Nomellini, let me ask about Joseph Palanki.  You referenced him

9    in No. 4 on the VA authorizations.

10         Is there a dispute about his military status, or am I

11   misreading your agenda letter?

12         **MS. BRANSCOME:**  The issue there, Your Honor, is

13   whether or not Mr. Palanki has any records in the VA's

14   possession.  So, from the information that we have about

15   Mr. Palanki, it looks like he has not always been on active

16   duty.  There's some conflicting information in his bellwether

17   selection sheet that's not entirely clear, but it looks like,

18   during periods of time he was employed, he had a civilian

19   employer, which would suggest that he was not active duty at

20   certain periods.

21         So he may have been, like many of the plaintiffs, gone

22   in and out of active duty.  If that is the case, it's our

23   understanding that he may have documents with the Veterans

24   Administration.

25         And so, from our perspective, we think we should go

1    ahead and submit his name.  If it comes back that there are no

2    records in the VA's possession, then that answers that

3    question.  But given his service history, we think there's at

4    least a suggestion that he would have records with the Veterans

5    Administration, or he could, and we just don't see a downside

6    to submitting that authorization.

7           **THE COURT:**  So he's on active duty now; is that

8    correct?

9           **MR. AYLSTOCK:**  Yes.

10          **THE COURT:**  Does anybody have his DD 214?  Anybody

11   seen a DD 214 suggesting that he had separated in the past?

12          **MS. BRANSCOME:**  I am pulling that up now, Your Honor.

13   The issue largely stems from his questionnaire where he

14   completes that he was employed by private companies during the

15   period that he would have supposedly been in active duty, and

16   so it's just not quite clear.  I'm trying to pull up his forms

17   right now.  I apologize.

18          **THE COURT:**  Well, then, why don't we just include him

19   but with a notation to Jackie Snead that we're not sure about

20   this guy and whether he has VA records but, you know, to cover

21   all bases and avoid having to come back to the VA later, let's

22   just go ahead and find out now.

23          **MR. AYLSTOCK:**  Your Honor, we did reach out to Jackie

24   on this issue of active duty and folks who may not have any VA

25   treatment, and she's pretty adamant, at least with my office,

1    that, look, if they don't have VA records, don't burden the VA

2    with it.

3            I don't represent Mr. Palanki, but our understanding

4    is he never had any VA treatment, and I'm just trying to be

5    mindful of Jackie's sort of instruction on this.  So I can

6    double, triple verify that, and I'm happy to do so.  But I'm

7    just concerned if we submit it, even though she told us not to

8    if they don't have VA records, then, you know, that might

9    backfire on all of us, which nobody wants.

10           So I like your suggestion of getting the DD 214

11   because that will tell it -- and it may very well be there in

12   the system.  I'm not in a place I can pull it up.  But that was

13   my concern.

14           **MS. BRANSCOME:**  I have it.  I actually pulled it up

15   quickly.  This is actually his -- like, for example, there is

16   an indication that he was released from active duty -- it looks

17   like he separated in 1995.  So I think he's someone who has

18   been in and out of service.  So we at least have an indication

19   on one record of a separation at one point in time.

20           Whether or not he had medical treatment by the VA, I

21   don't know.  But I think there's enough in his file to indicate

22   that we wouldn't be wasting the VA's time on one individual,

23   that we at least have records that he did separate at one point

24   or another.

25           **MR. AYLSTOCK:**  That doesn't necessarily mean he had VA

1    treatment.

2            **THE COURT:**  Right.  But we don't know for any -- at

3    least I wouldn't know for any of the people that you're

4    submitting to the VA that they actually had treatment.

5            **MR. AYLSTOCK:**  Right.

6            **THE COURT:**  You all obviously know a lot more about

7    these cases than I do.  But when you're submitting these names

8    to Ms. Snead and these authorizations, are you confident every

9    one of those people has had treatment at the VA?

10           **MR. AYLSTOCK:**  No.  We're submitting them -- and she's

11   okay with this -- for anybody who is separated just to see.  So

12   certainly --

13           **THE COURT:**  It sounds like he may have separated, so

14   I'm in favor of submitting his name.  And I'll email Jackie

15   Snead and tell her that I'm doing it, you're not doing it, and

16   if anybody is burdening the VA, it's me.  But I think there's

17   enough there, based on what Kim is relaying, that he may have

18   been in and separated and then went back in.  And if that's the

19   case, then there's certainly the potential that he's had VA

20   treatment.

21           **MR. AYLSTOCK:**  Understood, Your Honor.  We'll make it

22   happen as quickly as we can.

23           **THE COURT:**  All right.  I appreciate that.  And I will

24   let Ms. Snead know that I've asked you to do that.  On the

25   chance that nothing shows up, I don't want her to be upset with

1    anybody.

2              Mark, you said -- is there anything else on the VA

3    authorizations that you may have?

4              **MR. NOMELLINI:**  Your Honor, I'm happy to report that

5    it's now been covered.

6              **THE COURT:**  Very good.  I'm happy to hear it.

7              Moving down the list to No. 6, the *Touhy* requests.

8    And this is just an update for me.  Is there anything we need

9    to discuss?

10             **MR. AYLSTOCK:**  I don't think so, Judge.

11             **MR. NOMELLINI:**  No, Your Honor.  We're going to be --

12   go ahead, Bryan.

13             **MR. AYLSTOCK:**  I was just going to say, I don't think

14   there's anything to discuss, but the parties reached an

15   agreement on this and submitted it, and we're just waiting on

16   the records.

17             **THE COURT:**  Okay, very good.

18             **MR. NOMELLINI:**  That's correct.  And we're going to be

19   checking in with Major Evans soon, and if there's anything to

20   report we'll let you know, Judge.

21             **THE COURT:**  Very good.  Thank you.

22             No. 7 deals with the authorizations Judge Jones has

23   addressed in his recent order, so I've already discussed that.

24             No. 8 is interrogatories and document requests.

25   Apparently there's a disagreement about the May 15 deadline.

1          **MS. HUTSON:**  Yes, Your Honor.  We received from the

2     Defendants on March 12th of this year the requested

3     interrogatories and document requests.  And as part of those

4     requests -- and just to give the Court a little bit of context

5     of the served interrogatories, when you include the

6     interrogatories themselves and subparts, they served us with

7     192.  And then when you include the census and its subparts,

8     and we've got 211 requests out there.

9          Part of those requests they identified the specific

10    requests that they're asking for us to produce earlier than the

11    May 15th deadline.  Those interrogatories that they list in

12    this agenda are, in summary, requests for identification of

13    health care professionals that have examined the

14    servicemember's ears or hearing.

15         We had a hearing back in November, you may recall,

16    where we talked about -- and it was in the context of the

17    census -- servicemembers' understandable hesitancy to swear to

18    a list of treatments that they had received, who the treatment

19    providers were, and to swear to that when we don't have records

20    yet.  And that was something that we discussed.

21         You asked us to discuss this with Judge Herndon, which

22    we did.  And there was a negotiated deadline for the production

23    of this information via interrogatories or document production

24    requests, and that deadline was moved to May 15th.  And

25    therefore this request now is asking to back that deadline up.

1          And there's obviously different compartments of

2    records and answers that would come into play with these

3    requests.  So most, if not almost all, are government records

4    which are governed, obviously, by the *Touhy* process, which,

5    once we get those records in, whether it's VA or DoD, we have

6    the 14 days within which to turn those around.

7          Additionally, I think very importantly, too, for those

8    records outside of government records, those being individual

9    providers and such in the bellwether selection sheet, the

10   Defendants requested and we allowed and we put them in the

11   bellwether selection sheet under IV injury information,

12   questions 15 and 17, that the servicemembers have been asked

13   these questions.

14         Specifically 15 asks for, "Has your injury been

15   diagnosed by a medical provider?"  And the bellwether selection

16   sheet No. 17 requests "all facilities, agencies, hospitals,

17   audiologists, physicians, therapists, and other medical

18   professionals who provided treatment."  And the individual

19   claimants are to and have answered those questions to the best

20   of their ability.

21         We are in the process -- and you just mentioned a

22   moment ago the authorizations that were discussed with Judge

23   Jones.  We're in the process now of finalizing those

24   authorizations with the Defendants and should have those

25   shortly.

1          So our response to this is twofold:  A) it's either

2     covered by *Touhy*; and/or, B) it's covered in the negotiations,

3     and the new deadline for those records and answers to

4     interrogatories should be May 15th, as PTO 28 orders us to do.

5          So we're just not real clear why they're trying to

6     back up that date and request that those things are provided in

7     April -- April 13th to be specific -- when we've kind of had

8     this discussion already, and that was the deadline that was

9     discussed and agreed upon and memorialized in your order.

10          **THE COURT:**  All right.  Thank you, Shelley.

11          **MS. BRANSCOME:**  I can speak to this, Your Honor, and

12     Mark may jump in with some more details.

13          So, from our perspective, the date in the discovery

14     order is the date by which the responses have to be complete.

15     Our issue really here is we just want to make sure this

16     litigation is moving forward.

17          We're not trying to do any -- you know, pull a fast

18     one or anything to that end.  And for a number of these

19     bellwether plaintiffs, they left that portion of their

20     bellwether selection sheet blank.

21          And so, what we were simply trying to do was to get

22     responses, to the extent that the plaintiffs can, that would

23     enable us to start the record collection process.  Because at

24     least, if we have some providers, we do not have a problem with

25     the plaintiff supplementing their responses, or if, for

1     example, they think a doctor's first name was Frank and it

2     really was Fred, you know, amending that.

3          But to the extent that they are able to identify

4     providers from which we could start the record collection

5     process, we thought that would help move the litigation

6     forward, particularly in this period of time where, for the

7     most part, what we're all doing is things that we can do from

8     our homes, and at least we could get started with the record

9     collection process.

10          I will say we're a little concerned about the

11     Plaintiffs' comment that most of our discovery requests are

12     objectionable.  We do appreciate their willingness to go ahead

13     and identify their objections now so that we can start getting

14     things resolved.

15          We think many of the questions -- I will respectfully

16     disagree with Ms. Hutson's characterization of the number of

17     interrogatories.  But if there's a dispute about that, we can

18     go through the normal procedural channels.

19          Our issue here really was we just wanted to keep this

20     moving forward.  And the typical response time for a written

21     discovery request is within 30 days of the request, it's just

22     the discovery schedule contemplates that this would be ongoing

23     until May 15th, 2020.

24          We also anticipate, because there was a delay getting

25     in the *Touhy* requests to the government -- there was, you know,

1    the complication of, you know, not the right forms and all of

2    that.  But because that process was delayed and the

3    authorizations were disputed, we're just concerned about this

4    litigation slowing down because it may take longer to get

5    records which could also be the consequence of the pandemic

6    we're all in.

7          So really this was all aimed at trying to keep the

8    litigation moving forward, not trying to get plaintiffs to

9    commit to something they couldn't later supplement or change.

10         **MR. AYLSTOCK:**  May I respond, Your Honor, briefly?

11         **THE COURT:**  Okay.

12         **MR. AYLSTOCK:**  Because I negotiated this agreement

13   that resulted in PTO 28 with, actually, Mr. Nomellini and Judge

14   Herndon on the phone.  I remember it vividly because I was at

15   an airport.

16         And the May 15th deadline was the deadline to respond

17   to these interrogatories.  And we even put in there a caveat

18   assuming that we were able to have those records.  So nobody

19   wants this case moving more than the Plaintiffs do.  We want

20   these records.  And that's why, when the bellwether selection

21   sheet came up, we were in chambers, and you said, well, to the

22   extent they know, they should put it in.  And that was at, I

23   think, Ms. Branscome's request.

24         So we can't help if they don't know or if at the time

25   that they were picked people weren't communicating.  But we're

1   happy to get them the information on the bellwether selection

2   sheet.  But this was an agreement.  It was very clear it was an

3   agreement.  And Judge Herndon was involved in it.  It was a

4   hard fought -- I was, frankly, very pleased that we were able

5   to reach agreement because I didn't think we could or were

6   going to within, you know, if you had asked me a few hours

7   before we did it.

8           So it is absolutely a reneging on the agreement.  But

9   that said, we're willing to go ahead and get some of these

10  objections teed up early and address them.  And as well, to the

11  extent we have some of this, it's been produced on the

12  bellwether selection sheet.  And they're going to get VA

13  records and DoD records that they can cross-reference it.

14  That's where a lot of this is going to be.

15          **THE COURT:**  All right.  Judge Herndon, your name was

16  brought up.  Do you have anything you want to add?

17          **MR. AYLSTOCK:**  Sorry, Judge.

18          **JUDGE HERNDON:**  Well, frankly, I remember it like

19  Bryan does, so I thought that was the deadline they had agreed

20  to.  But I don't know what, if anything, changed or if the

21  language of the pretrial order is different than was

22  contemplated.  I think it's -- I think Bryan is recalling it

23  correctly.

24          **THE COURT:**  Well, that's the deadline that I

25  incorporated into the Pretrial Order No. 28, which is, of

1    course, based on the parties' agreement and joint proposal, and

2    it is the deadline for response to written discovery.  I'm not

3    going to change that.

4            I'm also moving things forward.  But if this was

5    something you all agreed to and that was the agreement that it

6    was the deadline to respond to written discovery, then that's

7    not going to change.  Notwithstanding the civil rules, this is

8    something you agreed to that I put into an order.

9            So with that said, to the extent -- and Plaintiffs, if

10   you have health care providers or treaters for some of these

11   plaintiffs and you're aware of them, then I don't know why you

12   wouldn't go ahead and provide those to the Defendants so they

13   can start the third-party process.  The authorizations issue is

14   resolved or soon to be resolved.  There's objection to the

15   mental health records.  But I think you can move forward with

16   some of this.

17           And also the objection, Judge Jones and I both would

18   appreciate you getting those before us as soon as possible.

19   You don't need to wait if you know you have objections.

20           **MR. AYLSTOCK:**  We agree, Your Honor.

21           **THE COURT:**  I'm not going to move the deadline, and it

22   remains the 15th.  It was also conditioned or subject to the

23   government's production which hasn't occurred yet in terms of

24   the request for production.

25           **MS. BRANSCOME:**  Your Honor, we would just reserve the

1    right to come back to you if we get to May 15th and the

2    Plaintiffs are still not willing to answer anything because the

3    government documents haven't come in.

4              **THE COURT:**  Certainly.

5              **MS. BRANSCOME:**  We had a different view.  We thought

6    that was a close of discovery deadline but the normal deadlines

7    would apply.  But I understand, and I understand Judge

8    Herndon's position and Mr. Aylstock's.  But we would want to

9    reserve on the ability to come back to you if the Plaintiffs'

10   position is they can't answer any discovery until all of the

11   documents come back.  And I really think it's reflecting more

12   of a concern about that position that the Plaintiffs are

13   taking.

14             **MR. AYLSTOCK:**  I don't think we're taking that

15   position but --

16             **THE COURT:**  Okay.  Let's put this on the agenda for

17   the 27th and see where we are then and discuss it again.  But

18   like I said, I'm not going to move that date of the 15th.  That

19   was my understanding as a response date deadline.  But I

20   certainly would not preclude 3M from coming back to the Court

21   if there's an issue with the responses at that point.

22             So both sides should be satisfied, right?

23             **MR. AYLSTOCK:**  Yes, Judge.

24             **MS. BRANSCOME:**  Very well.  Thank you, Your Honor.

25             **MR. NOMELLINI:**  Thank you, Your Honor.  On the

1     identification of health care providers, which I think was a

2     good idea, we'll follow up with Plaintiffs on that and

3     hopefully we can work through that with them.  And if there's

4     any issues, we'll bring them to Your Honor's attention.

5          **THE COURT:**  All right, yes.  Thank you.  I would like

6     the Plaintiffs, to the extent you can go ahead and identify

7     some of the health care providers, please don't wait until the

8     15th, if you have that information.

9          **MR. AYLSTOCK:**  No, Your Honor.  And in fact, in the

10     bellwether selection sheet there is a question, and they've

11     done that to the best of their ability.  To the extent cases

12     were chosen where the people were unresponsive and now they're

13     responsive, we're happy to supplement to provide that.  As I

14     said, we're not trying to hide behind a date to slow things

15     down.  It's the exact opposite.

16          **THE COURT:**  Okay.  Well, I think I also -- at least I

17     hope I did -- made it clear that no plaintiff should fear

18     repercussions from the Court if they identified a health care

19     provider and it turns out that that health care provider

20     doesn't have records for them or if they overlook a health care

21     provider and don't include that health care provider and then

22     it turns out that the VA records come in and there's some

23     reference to another health care provider or the Defendants

24     later learn that there's another health care provider.  I'm

25     going to be flexible in that regard.

1          **MR. AYLSTOCK:**  That's helpful, Judge.  Thank you.

2          **THE COURT:**  Yeah, let's just all, you know -- I know

3     you will -- work together and do your best to meet this May

4     15th deadline.  And to the extent you can give the Defendants

5     information before that time, I'm asking you to, if you haven't

6     already, if you're able to.

7          **MR. AYLSTOCK:**  Yes, Judge.

8          **THE COURT:**  Major Evans is in the process of

9     determining when those Department of Defense witnesses can be

10    available for deposition.  So you all -- I know Mark probably

11    and maybe Bryan, you're continuing to talk with Major Evans

12    about this?

13         **MR. NOMELLINI:**  Yes, Your Honor.

14         **MR. AYLSTOCK:**  Yes, Judge.

15         **THE COURT:**  All right.  Very good.

16         **MR. NOMELLINI:**  He asked a question whether we wanted

17    him to start looking into dates beyond the 60 days, and I held

18    off on that.  So I wanted to raise that with the Court.  My

19    initial reaction is I thought it might be premature to start

20    scheduling something only to have to take it off the calendar

21    again.  So at this point, he's not looking for dates beyond the

22    60 days.  But if Your Honor would like us to start doing that

23    with him, we're happy to do that.

24         **THE COURT:**  What was the 60-day -- what was the end of

25    the 60 days by virtue of the secretary of defense or whoever

1    entered that stay?

2              **MR. NOMELLINI:**  I think it was approximately May 15th,

3    Your Honor, maybe a few days before that.

4              **MR. AYLSTOCK:**  I think that's right, Judge.

5              **THE COURT:**  Yeah, I think you should start looking at

6    dates.  I know there is -- absolutely there's some time and

7    effort that goes into that.  But if you have to take them off,

8    you take them off.  I'm assuming you're not going to have

9    something scheduled on the 16th of May, but I would have him

10   start looking at dates and talking with the deponents about

11   their availability after that date.

12             **MR. AYLSTOCK:**  We're good with that, Judge.

13             **MR. NOMELLINI:**  Will do, Judge.

14             **THE COURT:**  Maybe you go ahead and just start looking

15   at the very end of May or the first part of June and get dates

16   scheduled in there.

17             **MR. NOMELLINI:**  Will do, Your Honor.

18             **THE COURT:**  All right.  Item No. 10, tolling,

19   compliance with the tolling agreement.  I have not been very

20   much involved with tolling agreement.

21             **MR. AYLSTOCK:**  Yes, Your Honor.  There were a number

22   of folks that where tolling was either revoked or expired,

23   depending on how you want to look at it.  Our concern -- and

24   some of those were justified under the terms of the tolling

25   agreement.  Our concern was more with regard to the process.

1           In the one percent bellwether pool, the Defendants

2    certainly let people know, look, this is coming, and that was

3    very helpful, because there were some people who had done

4    certain things to submit the form but maybe it didn't get

5    thrown over the transom, so to speak, in the BrownGreer portal

6    or what have you.

7           That didn't happen, as I understand it, with the other

8    ones.  It was just a letter out of the blue.  And for some of

9    those cases there were some issues, I guess we described them

10    as technical issues.  Not so much issues with the BrownGreer

11    technical aspect at all.  In fact, they're really not

12    BrownGreer issues.

13           But issues with regard to some of these are duplicate

14    plaintiffs, so they had -- or they may have hired two law

15    firms, unbeknownst to the various law firms, so one was off of

16    tolling and the PIDs that BrownGreer has weren't consolidated.

17           Some of them, the lawyer no longer represents the

18    person and had notified BrownGreer.  Some of them might have

19    been submitted before midnight on the deadline Pacific time but

20    not Eastern Time, just little things like that.

21           But as I understand it, the Defendants are willing to

22    work with the parties to resolve those types of issues.  But it

23    just created a lot of confusion, particularly in light of the

24    Court's orders.  And we understand that it was -- those were

25    geared more toward the filed cases, but some folks were waiting

1   on their tranche.

2            Because one of the things you ordered Leadership to do

3   is let's not overwhelm the system with 100,000 administrative

4   complaints on a single day.  They might have been waiting and

5   they may have been in tranche two or three to file their

6   administrative complaints.

7            So I think it's an issue the parties can work through.

8   I'm happy to continue trying to do that.  But I did want to let

9   the Court know that that was happening.  We were getting a lot

10   of questions, as Leadership, about what's going on here, can we

11   fix this or what is the -- what about -- why did you tell me to

12   be in tranche three instead of tranche one.  But I think

13   hopefully it can all be worked through.

14            **MR. WASDIN:**  Your Honor, if I could just sort of

15   briefly respond to that?

16            **THE COURT:**  Okay, sure.

17            **MR. WASDIN:**  So we didn't -- just to be clear for

18   context, we didn't revoke tolling.  The tolling agreement has a

19   provision that says if you just entirely fail to submit your

20   questionnaire, tolling is automatically -- *(inaudible)* --.

21            So the letters were just merely pointing out the

22   operation of that automatic provision.  The letters themselves

23   were not like a triggering event for anything.

24            We sent that out to the 24,000 people, I think, or a

25   little under that, who BrownGreer identified as having entirely

1    failed to submit anything by the deadline.  A couple hundred of

2    those people reached back out and identified technical problems

3    I guess along the lines of what Mr. Aylstock was just

4    describing.

5         And for those few hundred or so, I believe we've all

6    been able to work out whether or not there was a submission by

7    the deadline and there was just some sort of technical issue on

8    Centrality, and BrownGreer has, where applicable, corrected

9    those people's upload date and resolved the problem.

10        So we've been working with folks who had a true

11   technical issue.  But for the vast majority of these people,

12   it's just a failure to submit a questionnaire by the agreed

13   upon deadline and the automatic operation of that provision.

14        **THE COURT:**  Well, my memory of the tolling agreement

15   -- and again, this is not something that I had any involvement

16   in and it's a private agreement between the Defense and

17   Plaintiffs lawyers.  But my understanding is there was one

18   provision in the agreement whereby you could bring a breach, if

19   you will, to the attention of the Court for resolution.

20        And actually, that was one of the issues that I had

21   was having the cases just parked in MDL Centrality because I

22   didn't have any ability to deal with folks who were not on the

23   docket in the case.  But it seems to me the parties agreed at

24   least in those circumstances, and I want to say that

25   circumstance related to whether there was a material

 1    deficiency.

 2         **MR. AYLSTOCK:**  I think that's right, Your Honor.

 3         **THE COURT:**  And I think the parties, by virtue of that

 4    provision, agreed to give the Court authority to interpret the

 5    agreement and possibly enforce it.

 6         I can't do that right here in this vacuum as we're

 7    sitting here talking about this, and I really can't speak to

 8    whether there's been a material deficiency or an automatic

 9    expiration of the agreement.  I can't do that.

10         So what I'm going to ask is, you all continue to

11    confer about this.  And if you can't come to a resolution and

12    if there are plaintiffs for whom the Defendants believe are no

13    longer entitled to the benefit of tolling, then that's

14    something that we need to address at the next CMC, but you need

15    to tee that up for me.  I need to know what the circumstances

16    were on each of those situations for the plaintiff.

17         **MR. AYLSTOCK:**  Yes, Your Honor.

18         **THE COURT:**  I'm not sure of any other way --

19         Judge Jones, can you think of any other way for me to

20    address this?  I think that that's the only way, in my mind.

21         **JUDGE JONES:**  Yeah, I think that seems like the most

22    pragmatic solution.

23         **MR. AYLSTOCK:**  For the vast majority, Your Honor,

24    nobody complained out of the 24,000 or so.  These letters, at

25    least to Leadership, kind of came out of the blue.  It would

 1   have been nice to get a little heads-up on it.

 2           In any event, some of them had actually gotten

 3   extensions from the Defendants but were swept up in sort of

 4   what the pool BrownGreer did for the Defendants on who hadn't

 5   done it.  Of those that complained, most of them seemed to be

 6   one law firm, Danziger & De Llano.  And apparently I guess they

 7   had provided information but maybe not to BrownGreer and not in

 8   the form of the census form where it could be submitted.

 9           But again, I don't think there's anything ripe for

10   Your Honor to decide right now.  I just wanted it on here so

11   that you'd be aware that it's an ongoing issue and weren't

12   blindsided by it at the next conference.  But if it is an issue

13   that remains, we'll have it teed up properly.

14           **THE COURT:**  Okay.  That sounds good.

15           Defendants, does that sound good to you?  You're okay

16   with that plan?

17           **MR. WASDIN:**  Yes, Your Honor, we can -- that sounds

18   good to us.

19           **THE COURT:**  All right.  Item 11 pertains to the Motion

20   to Compel Responses to Interrogatories.  There's a response

21   date for the Defendants of April 3rd, so I don't think we need

22   to go into that, and that's a matter before Judge Jones, unless

23   you all have something you want to discuss with him about it.

24   But I think it would probably be premature because the matter

25   is not truly ripe because he doesn't have the Defendants'

1    response, unless there's something you think he needs to know.

2         **MR. BUCHANAN:**  No.  At this point, Your Honor, this is

3    just keeping the Court involved or aware of the briefing on

4    that.  It is properly submitted before Judge Jones at the

5    moment.

6         **MS. BRANSCOME:**  Agreed, Your Honor.

7         **THE COURT:**  Very good.

8         The next CMC, I may have misspoken, is actually the

9    24th.  I think I said the 27th.

10        **JUDGE JONES:**  I was going to ask about that because I

11   have the 24th.

12        **THE COURT:**  It's the 24th.  So do we need a Leadership

13   call before then?  Would you like to schedule something in a

14   couple of weeks?  I'm fine with that, if you all would like to

15   at least go ahead and get it on the books.  If it turns out

16   there's nothing to discuss, you can let me know that and we can

17   cancel it.

18        **MR. AYLSTOCK:**  That sounds good, Your Honor.

19        **THE COURT:**  It looks like that would be the 10th,

20   which right now -- and again, this is very fluid, but right now

21   that's a busy day for me with sentencings -- or no, no, no,

22   those were continued.  I'm sorry.  We continued those.  So I'm

23   good on the 10th, if you all are.  That's two weeks from now,

24   if you want to try the 10th.

25        **MR. AYLSTOCK:**  That's good for me, Your Honor.

 1          **MS. BRANSCOME:**  We can make that work as well, Your

 2  Honor.

 3          **THE COURT:**  All right, very good.  Am I leaving

 4  anything out, overlooking --

 5          **MR. AYLSTOCK:**  The only thing that you had addressed

 6  on the Leadership call, Your Honor, that hasn't been discussed

 7  is I think in the July -- you had mentioned maybe the July CMC

 8  would be better off on the 29th as opposed to the 31st because

 9  of something happening.  And I forget exactly but --

10          **MS. JACOBS:**  Naturalization ceremony is on the 31st,

11  Judge.

12          **THE COURT:**  Oh, that's it.  Yeah, right now that is

13  still on the book.  We've cancelled others.

14          Can you all do the 29th?

15          **MR. AYLSTOCK:**  That's fine with me, Your Honor, but we

16  could also discuss it at the next conference.

17          **MS. BRANSCOME:**  I believe we can do that as well, Your

18  Honor.

19          **THE COURT:**  Okay.  Let's bring it up at the next

20  conference.  You all help me remember.  Obviously I forgot to

21  get back with you on that.  And we can discuss that.  I

22  remember Kim reminding me on the 16th that I was going to let

23  you know about that.  Unfortunately, with the pandemic and the

24  havoc, I just didn't discuss it with my boss, and so I need to

25  do that, and I will, I'll talk to Ms. Rock about that.

1      Right now we'll tentatively plan for the 29th, but
2  I'll confirm that with you on the 24th.
3      **MR. AYLSTOCK:**  Great.  Thank you, Judge.
4      **THE COURT:**  Everyone good?
5      **MR. AYLSTOCK:**  Yes, Your Honor.
6      **THE COURT:**  Okay.  Everyone please protect yourselves
7  and your families.  I believe we're all going to get through
8  this.  It certainly is a trial and tribulation for so many
9  people.  It's heartbreaking to watch the news.
10     **MS. BRANSCOME:**  You stay well as well, Judge.
11     **THE COURT:**  Thank you.
12     **MR. AYLSTOCK:**  Yes, thank you.
13     **THE COURT:**  Everyone take care.
14     Judge Jones, Judge Herndon, thank you both.  Goodbye.
15       *(Proceedings concluded at 11:16 a.m.)*
16              --------------------
17  *I certify that the foregoing is a correct transcript from the*
   *record of proceedings in the above-entitled matter.  Any*
18  *redaction of personal data identifiers pursuant to the Judicial*
   *Conference Policy on Privacy are noted within the transcript.*
19
20
   *s/Donna L. Boland*                          *3-27-2020*
21  *Donna L. Boland, RPR, FCRR*                 *Date*
   *Official Court Reporter*
22
23
24
25