# EXHIBIT 56

Confidential - Pursuant to Protective Order

1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF FLORIDA
2                     PENSACOLA DIVISION

3

     IN RE: 3M COMBAT ARMS   )   Case No.
4    EARPLUG PRODUCTS         )   3:19md2885
     LIABILITY LITIGATION     )
5    _____   )   Judge M. Casey
                              )    Rodgers
6    THIS DOCUMENT RELATES    )   Magistrate Judge
     TO ALL CASES             )   Gary R. Jones

7

8            THURSDAY, DECEMBER 12, 2019
9    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
10                    - - -
11            Videotaped deposition of Elliott H.
12   Berger, M.S., held at the offices of KIRKLAND
13   & ELLIS LLP, 300 North LaSalle, Chicago,
14   Illinois, commencing at 2:01 p.m., on the
15   above date, before Carrie A. Campbell,
16   Registered Diplomate Reporter, Certified
17   Realtime Reporter, Illinois, California &
18   Texas Certified Shorthand Reporter, Missouri
19   & Kansas Certified Court Reporter.
20                    - - -
21

          GOLKOW LITIGATION SERVICES
22       877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
23

24

25

```
 1              A P P E A R A N C E S :

 2

 3       AYLSTOCK, WITKIN, KREIS & OVERHOLTZ,
         PLLC
 4       BY:  NEIL OVERHOLTZ
              noverholtz@awkolaw.com
 5            JENNIFER HOEKSTRA
              jhoekstra@awkolaw.com
 6       17 East Main Street
         Pensacola, Florida  32502
 7       (850) 202-1010
 8       and
 9       MONSOUR LAW FIRM
         BY:  DOUGLAS C. MONSOUR
10            doug@monsourlawfirm.com
              KATY KROTTINGER
11            katy@monsourlawfirm.com
         404 North Green Street
12       Longview, Texas  75601
         (903) 999-9999
13
         and
14
         QUINN EMANUEL URQUHART, LLP
15       BY:  MATTHEW HOSEN
              matthosen@quinnemanuel.com
16       865 South Figueroa Street, 10th Floor
         Los Angeles, California  90017
17       (213) 443-3000
         Counsel for Plaintiffs
18
19
         KIRKLAND & ELLIS LLP
20       BY:  NICHOLAS WASDIN
              nick.wasdin@kirkland.com
21            THOMAS A. WILSON
              taxi.wilson@kirkland.com
22       300 North LaSalle
         Chicago, Illinois  60654
23       (312) 862-2000
24       and
25
```

Confidential - Pursuant to Protective Order

```
 1       KIRKLAND & ELLIS LLP
         BY:  MIKE BROCK, P.C.
 2            mike.brock@kirkland.com
         1301 Pennsylvania Avenue, NW
 3       Washington, DC  20004
         (202) 389-5996
 4       Counsel for Defendants

 5

 6    ALSO PRESENT:

 7       ERIC RUCKER, in-house counsel, 3M

 8       JAMES BATTLE, Aylstock, Witkin,
         Kreis & Overholtz
 9
         JOSHUA URBAN, trial tech, Kirkland &
10       Ellis

11       EVAN WOLFE, trial tech, Golkow
         Litigation Services
12

13
      V I D E O G R A P H E R :
14       DAN LAWLOR,
         Golkow Litigation Services
15
                        - - -
16

17

18

19

20

21

22

23

24

25
```

Confidential - Pursuant to Protective Order

 1                    VIDEOGRAPHER:  We are now on

 2          the record.

 3                    My name is Dan Lawlor.  I'm a

 4          videographer with Golkow Litigation

 5          Services.

 6                    Today's date is December 12,

 7          2019.  The time on the record is

 8          2:01 p.m.

 9                    This video deposition is being

10          held in Chicago, Illinois, in the

11          matter of 3M Combat Arms Earplug

12          Products Litigation.

13                    The deponent is Elliott Berger.

14                    The court reporter is Carrie

15          Campbell.

16                    Mr. Berger, I remind you you're

17          under oath from a previous deposition.

18                    Counsel, please proceed.

19                    MR. BROCK:  Thank you.

20                      EXAMINATION

21   QUESTIONS BY MR. BROCK:

22        Q.    Will you please introduce

23   yourself to the jury, tell them where you

24   live and what you do.

25        A.    My name is Elliott Berger.  I

Confidential - Pursuant to Protective Order

1   live in Indianapolis, Indiana.

2             In the middle of 2018, I

3   retired from 3M Corporation after about 41

4   and a half years of service.

5             Since that point in time I'm a

6   general consultant in acoustics, and I do

7   provide some part-time consulting services

8   under contract to 3M.

9        Q.    Thank you.

10            What was your personal

11  involvement in the development of the Combat

12  Arms version 2 hearing protector device?

13       A.    I was involved in the

14  development of that product from its

15  inception at, at the time, Aearo Company.  I

16  was a participant at a meeting in 1997 at

17  Aberdeen Proving Ground where the military

18  was discussing research that they had

19  conducted over the past five to seven years

20  and had come to conclusions about the sort of

21  earplug that the US military would like to

22  have to field to their troops.

23            (Berger Exhibit D1 marked for

24       identification.)

25

Confidential - Pursuant to Protective Order

```
 1    QUESTIONS BY MR. BROCK:

 2          Q.      Thank you for that.

 3                  Could I have our Exhibit

 4    Number 1, please?  Defendant's Exhibit

 5    Number 1.

 6                  I'm going to hand over to you,

 7    Dr. Berger, a copy of your résumé.  And can

 8    you confirm for the Court that that was the

 9    résumé that was in your file?

10          A.      Yes.

11          Q.      Okay.

12          A.      And I appreciate the honorary

13    Ph.D., but it's Mr. Berger.

14          Q.      Yeah.  You correct me every

15    time.  I'm sorry.  I know that's not the

16    first time I've done that.

17                  So have you worked with us to

18    create a slide that will allow you to talk

19    about some of the highlights of your

20    educational background, professional awards

21    and experience, that type of thing?

22          A.      Yes.

23          Q.      Okay.  And do the entries that

24    we have on the slide that you helped us put

25    together, are they also items that appear in
```

Confidential - Pursuant to Protective Order

1   your résumé?

2        A.      Yes.

3                And should I be seeing that

4   slide?

5        Q.      I'm going to put it up in just

6   a second.

7                All right.  Now, if you'd put

8   up our first slide, please.

9                Okay.  Is this one of the

10  slides that we just talked about?

11       A.      Yes.

12       Q.      All right.  Now, you show here

13  for your education that you have a BS in

14  physics and an MS in acoustics from North

15  Carolina State University, and you obtained

16  your master's in acoustics in 1976, correct?

17       A.      That's correct.

18       Q.      Okay.  And shortly after that,

19  did you go to work for E-A-R, E-A-R?

20       A.      Upon graduation, I was hired by

21  E-A-R at the time in Westwood, Massachusetts.

22  I began work for them in December of 1976.

23       Q.      And we haven't talked about

24  some of the terminology with you in the time

25  that folks have been asking you questions.

Confidential - Pursuant to Protective Order

1          So here we have Mr. Garinther's

2    comments about watching soldiers fire in a

3    demonstration of a rapid-fire mission?

4          Do you see that?

5    A.     Yes.

6    Q.     And he's noting here, "It's

7    apparent why they could not normally wear

8    earplugs nor cover their ears."

9          Do you see that?

10   A.     Yes.

11   Q.     And is this the issue that you

12   have been talking about with regard to

13   soldiers having the need to hear what's

14   around them, to take instruction from others,

15   to communicate, and that they can't do that

16   as well if their hearing is attenuated with a

17   linear device?

18   A.     This would be one of the

19   environments in which that would occur.

20   Q.     Yeah.

21   A.     And he's illustrating the

22   effect that they're not wearing hearing

23   protection, and they're not able to cover

24   their ears, either, because of the need to

25   use their hands to conduct their job.

1    Q.    And the loader could not cover

2  his ears with his hands because he was

3  loading the round with his hands.  After

4  releasing the round, he jumped to the ground,

5  off a small stool, and the round would go off

6  before his feet hit the ground.

7         That was what's happening with

8  the loader, right?  According to his

9  observation of the rapid-fire mission,

10  correct?

11    A.    Yes.

12    Q.    And then the aimer was

13  adjusting controls, so he couldn't cover his

14  ears.

15         The ammo loader didn't cover

16  his ears because he was constantly moving

17  rounds up to the loader.

18         And the weapons chief was

19  listening for the mortar settings and passing

20  these settings and other commands to the

21  crew, and he wasn't covering his ears or

22  wearing hearing protection either, was he?

23    A.    Correct.

24    Q.    And is this a pretty good

25  example of why a nonlinear device can be very

Confidential - Pursuant to Protective Order

1    helpful to members of our military with

2    regard to protecting their hearing?

3              MR. MONSOUR:  Objection.

4         Leading.

5              THE WITNESS:  I would say

6         that's a good example in the last

7         sentence where George says that it was

8         apparent from this rapid-fire mission

9         that a nonlinear earplug, which would

10        permit the crew to hear comments while

11        effectively protecting their hearing,

12        should dramatically reduce hearing

13        loss among the soldiers.

14   QUESTIONS BY MR. BROCK:

15        Q.    And then Garinther recommends

16   that the nonlinear earplug be considered for

17   use by the US Army since its use by weapon

18   crews would reduce hearing loss among

19   soldiers while permitting them to hear voice

20   commands and combat-related sounds, correct?

21        A.    Correct.

22        Q.    All right.  So let's move to

23   the next section of our discussion.  You

24   mentioned a little bit ago that pretty soon

25   that some of these developments would be

Confidential - Pursuant to Protective Order

1    brought to your attention at a meeting.

2              We've got a section here called

3    "military request dual-ended, single-size

4    earplug from Aearo."  And perhaps just for

5    the benefit of the jury, just give us a brief

6    overview of what we're going to talk about in

7    this section, and then we'll look at a few

8    documents.

9         A.    So to summarize and sort of

10   frame this, the section we just covered is

11   material that, to my recollection, was

12   unbeknownst to 3M at the time.

13             The 1995 study didn't land on

14   my desk until about 2004.  The other two

15   documents we've just discussed were recently

16   revealed and records provided by the

17   military.

18             So my first real awareness of

19   what's happening is when I'm invited to a

20   meeting in December of 1997 where these

21   people we've been discussing - Dick Price,

22   George Garinther, Doug Ohlin, Armand Dancer,

23   Pascal Hamery - are getting together to

24   brainstorm, if you will, how can we solve

25   these problems for our respective militaries.

Confidential - Pursuant to Protective Order

1   And that's a meeting we'll tell you about in

2   December.

3                And then very shortly

4   thereafter, Aearo creates product samples and

5   sends prototypes for evaluation.

6                (Berger Exhibit D4 marked for

7        identification.)

8   QUESTIONS BY MR. BROCK:

9        Q.    Okay.  All right.  Let's look

10  at a couple of documents that are relevant to

11  what you just discussed, and we'll start with

12  Defendant's Exhibit 4.

13               And let me ask you, first of

14  all, is this a document that you created?

15       A.    This is a document I created

16  which was extracted from my files.

17       Q.    Okay.  Is this a document that

18  you would have created at the time or close

19  in time to the meeting that took place at

20  Aberdeen Proving Ground?

21       A.    Knowing the way I work, I

22  probably created this on the airplane on the

23  way home.

24       Q.    And is it an accurate

25  reflection of the events, the important

1   events, that occurred with regard to the

2   meeting at -- that took place on 12/16 of

3   1997?

4        A.    That is what I was endeavoring

5   to do, was to accurately recall the

6   highlights of that meeting.

7        Q.    Yeah.

8              And was this record created as

9   part of your business practice of creating a

10  record of some of the events that would have

11  occurred?

12       A.    This would have been a standard

13  business practice.

14       Q.    Okay.  Now, I want to focus on

15  some of the language of this document, but

16  before I do that, I just want to ask you:  Do

17  you recall what the circumstances were that

18  led to your invitation to this meeting with

19  Dick Price, Doug Ohlin, George Garinther,

20  Theresa Schulz, Armand Dancer and Pascal

21  Hamery?

22       A.    I was very happy to uncover

23  this document because as you can see, this

24  meeting occurred over 20 years ago, so I have

25  a dim recollection of the actual meeting.

1                   I recall being asked to be

2       involved since all of these people were

3       scientists or officers in the military that I

4       had worked with.  I had been involved with

5       Armand Dancer and Pascal Hamery from the

6       early 1990s.  I was aware of their

7       publications and had corresponded with them.

8                   Doug Ohlin was a man I was sent

9       to meet shortly after I started work at E-A-R

10      because he was one of the two principal

11      hearing conservationists in the military, the

12      other being Don Guessaway at Fort Sam Houston

13      in Texas.  And I knew of Dick Price and

14      George Garinther and Theresa Schulz.

15                  So they were all effectively

16      colleagues and knew that I had been working

17      in this area because I had been involved in

18      development of a previous style of

19      level-dependent hearing protector in an

20      earmuff form.  So -- and I think I was

21      invited to this because of those reasons, and

22      especially because the results of their

23      evaluations were that the preferred vehicle

24      for using the nonlinear filter would be that

25      E-A-R UltraFit earplug.

Confidential - Pursuant to Protective Order

1              MR. MONSOUR:  Objection.

2       Responsiveness.

3   QUESTIONS BY MR. BROCK:

4       Q.     Now, if we turn to the second

5   page of that document, I want to -- I want to

6   ask you a couple of questions about this.

7              You see that there is a

8   paragraph there that is titled "Ohlin."

9              Correct?

10      A.     Yes.

11      Q.     That's Doug Ohlin, correct?

12      A.     Yes.

13      Q.     And what was Doug Ohlin's role

14  with regard to what he did in terms of his

15  interaction with the military, including

16  military audiologists?

17      A.     I believe his role would have

18  been -- effectively have been director of

19  audiology for the Army.  He established their

20  DOHRA program, one of the arcane military

21  acronyms, Defense Occupational Hearing

22  Readiness Awareness, something like that.  He

23  interfaced with all of their audiologists.

24  He was involved in directing some of the

25  military co-service hearing conservation

Confidential - Pursuant to Protective Order

1    groups.

2         Q.    Now, we've called out this

3    paragraph, and you have recorded that "Ohlin

4    accepts our plug because they had good

5    experience with Com-Fit.  Would not accept

6    two different plugs, one nonlinear and one

7    conventional."

8              Did I read those two sentences

9    correctly?

10        A.    Yes.

11        Q.    All right.  And do you remember

12   that when we were looking at the notes about

13   the meeting that took place at ISL in France,

14   one of the options was to create two

15   different plugs:  One being a linear plug,

16   and one being a nonlinear plug, right?

17        A.    Yes.

18        Q.    And Doug Ohlin is conveying

19   that he would not accept that option,

20   correct?

21        A.    Correct.

22        Q.    That's what he said at the

23   meeting?

24        A.    That's what he said.

25        Q.    Right.

Confidential - Pursuant to Protective Order

1                    He was interested in two-ended

2      plug, one-size plug, because easier to

3      dispense, and they are losing so many field

4      audiologists that they need a less

5      labor-intensive item to use.

6                    Do you see that?

7           A.      Yes.

8           Q.      So one of the design options

9      that the Army could have asked for would have

10     been to make plugs with different sizes, that

11     is, where the flanges would be different

12     sizes, correct?

13          A.      Correct.

14          Q.      All right.  But Doug Ohlin is

15     saying that he is interested in and wants a

16     two-ended plug, one size, correct?

17          A.      Correct.

18          Q.      And he gives a reason for that?

19          A.      Yes.

20          Q.      Now, after this meeting in

21     December of 1997, did Aearo create a design

22     and some product samples?

23          A.      We did.

24          Q.      In early 1998?

25          A.      Correct.

Confidential - Pursuant to Protective Order

1              And one other point that you

2  perhaps would like to highlight here is that

3  there was a short time frame on this.  It

4  wasn't, let's start looking at this and see

5  when you can come up with products.

6              We're having this meeting in

7  December of '97, and my notes say here they

8  would like delivery of products early in

9  1999.

10      Q.    Okay.  So they're looking for a

11  quick turnaround with regard to design as

12  well as delivery of product?

13      A.    Sounds like about a year and a

14  half.

15              (Berger Exhibit D5 marked for

16      identification.)

17  QUESTIONS BY MR. BROCK:

18      Q.    And let me ask you then to

19  direct your attention to Defendant's

20  Exhibit 5.

21              And I'll ask you -- we've got

22  this up -- if you can you describe for the

23  benefit of the jury, what is this document?

24      A.    This is a design drawing for

25  the initial version of the dual-ended plug as

Confidential - Pursuant to Protective Order

1    was created by 3M, or Aearo at the time.

2              You will see in the expanded

3    box on the right that this is dated March of

4    '98, so it's late March.  It's on the order

5    of three months after the meeting that we

6    just discussed.

7              Although you can't see the

8    details, or maybe you'd like to expand it,

9    the box in the upper left calls out the

10   various component parts.  You'll see there's

11   parts A, B, C and D, which are the various

12   parts that are put together in this assembly.

13   And each of those, if we were to look at

14   those design documents, the various earplugs,

15   the stem and the filter, the design drawings

16   on those date from a couple months prior to

17   this.  So this is the first drawing that

18   shows the assembly of all the bits and

19   pieces.

20        Q.    Okay.  And when we look at the

21   design of the product, is this a dual-ended

22   design as was discussed in the meeting that

23   took place in December?

24        A.    It meets the specifications

25   discussed in that meeting.  It's using the

Confidential - Pursuant to Protective Order

1    UltraFit design earplug at both ends.  It's a

2    single-sized product, and housed in it in

3    the -- what I like to call out in the upper

4    portion there, item D, is the nonlinear

5    filter assembly.

6              There you go.

7         Q.    And I don't think we mentioned

8    the use of the ISL filter, but that was

9    another component of the product that the

10   Army wanted included?

11        A.    That was a key requirement.

12        Q.    At the time the drawings and

13   initial samples were -- at the time of the

14   drawings and the initial samples, had the

15   military instructed as to the size of the

16   product?  Had they given any instructions

17   about it needs to fit in a case or anything

18   like that?

19        A.    My meeting notes don't indicate

20   that, and I don't recall that we were given

21   any instructions of that nature.  So we put

22   together the parts in a way that we thought

23   could work for the military, and this was our

24   initial prototype.

25              (Berger Exhibit D7 marked for

Confidential - Pursuant to Protective Order

 1        identification.)

 2   QUESTIONS BY MR. BROCK:

 3        Q.     Now, I want to turn if we can

 4   to the next exhibit, which is a March 24,

 5   1998 letter from Richard Knauer to Doug

 6   Ohlin.

 7               Exhibit 7 is a March 24, 1998

 8   letter to Doug Ohlin from Richard Knauer.

 9   Let me hand you that, please.

10               And is this a letter that

11   documents that Aearo is sending to Doug Ohlin

12   approximately 25 pair of the nonlinear

13   earplugs you requested from Brian Myers at

14   the NHCA conference?

15        A.     It is.  I may have misheard

16   you, but I think you said it was from Ohlin

17   to Knauer.

18        Q.     I apologize.

19               This is from Knauer to Ohlin.

20        A.     From Knauer to Ohlin.

21        Q.     Thank you.

22        A.     So what he's saying here is

23   that Brian Myers, who was the marketing

24   manager at the time, had apparently ran into

25   Doug Ohlin.  Both of them were frequent

Confidential - Pursuant to Protective Order

1    attenders of the conference of the National

2    Hearing Conservation Association.  As we

3    mentioned earlier, that conference typically

4    takes place in February each year.  And

5    apparently at that conference, Doug Ohlin

6    requested from Brian that he'd like 25 pair

7    for evaluation.

8        Q.    And Aearo is meeting that

9    request and getting those samples to Doug

10   Ohlin in a prompt fashion?

11       A.    As expeditiously as possible.

12       Q.    Now, after Doug Ohlin receives

13   the samples that have been sent to him, does

14   Aearo hear from Doug Ohlin with regard to the

15   length of the device?

16       A.    We do.

17             (Berger Exhibit D8 marked for

18       identification.)

19   QUESTIONS BY MR. BROCK:

20       Q.    All right.  So I'm going to

21   draw your attention now to Exhibit 8.

22             And this is Exhibit 43 in

23   plaintiff's examination, but we're going to

24   mark it as Defendant's Exhibit 8.

25             And let me just ask if we

1   can -- if we can go back to our third section

2   of our timeline.  We have here "the military

3   directs Aearo to shorten the length of the

4   plug," and then we've got references to three

5   documents there.

6                  Do you see that?

7        A.     Yes.

8        Q.     All right.  And I don't want

9   you to get into all the detail, but just so

10  that the jury has an overview, tell us what

11  happened.

12       A.     Doug Ohlin had an opportunity,

13  either personally or presumably sharing the

14  samples with others at CHPPM, to evaluate

15  them, and came back with instructions to us

16  that the sample that we devised was a quarter

17  of an inch too long for their purposes.

18                  The first reason I was aware of

19  that it was going to be too long for the

20  carrying case that the military had been

21  using for their earplugs in general, not one

22  specifically designed for this product, but

23  then it turned out in correspondence that

24  there were also other issues that he felt

25  could better be addressed by a shorter

Confidential - Pursuant to Protective Order

1    earplug.

2           Q.    Okay.  So looking at Exhibit --

3           A.    8.

4           Q.    -- 8, which is also Exhibit 43,

5    let me direct your attention to the bottom.

6    Well, we've got it at the top here.

7                 So you see that there's an

8    e-mail of April the 8th, 1999, at 11:41 from

9    Brian Myers to Doug Ohlin?

10                Do you see that?

11          A.    I do.

12          Q.    All right.  Who is Brian Myers?

13          A.    As I mentioned, he was our

14   marketing manager for the hearing protection

15   product line at the time.

16          Q.    Okay.

17          A.    And he had met Doug Ohlin at a

18   conference, but I believe they also had met

19   and spoken at other times.

20          Q.    All right.  And he records that

21   he spoke with Dick Knauer, and what was Dick

22   Knauer's role at this time?

23          A.    He was my supervisor.  He was

24   the technical director in the hearing

25   protection group.

Confidential - Pursuant to Protective Order

1          Q.     All right.  Who believes that

2     "we can probably shorten the plug by a

3     quarter of an inch required to fit your

4     current container."

5                 Do you see that?

6          A.     Yes.

7          Q.     It says, "The designer will

8     look at this when he gets back from vacation

9     on the 19th."

10                Who was the designer?

11         A.     That would have been Bob Falco.

12         Q.     Okay.  And Brian says, "It may

13    help to expedite the redesign if we could get

14    a storage container from you."

15                Do you see that?

16         A.     Yes.

17         Q.     In other words, if we're going

18    to try to make something that will fit in the

19    container, it would be a good idea for us to

20    have one of those containers so that we can

21    see if we are meeting your design

22    specification?

23         A.     Yes.

24                MR. MONSOUR:  Objection.

25         Leading.

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. BROCK:

2        Q.     And the second e-mail is one

3    from Doug Ohlin to Brian Myers in response to

4    the e-mail we just talked about, and he says,

5    "In addition to the plug being too long for

6    the case and an increased potential for wind

7    noise, my green suit friends tell me it

8    sticks out too far for the Kevlar combat

9    helmet.  The last one is a show stopper."

10               Do you see that?

11       A.     Yes.

12       Q.     Okay.  And I believe you've

13   testified a couple of times that your

14   recollection of that time period was that the

15   predominant issue was the carrying case, but

16   you've seen e-mails and other correspondence

17   where other reasons have been listed for

18   shortening the plug.

19               MR. MONSOUR:  Objection.

20       Leading.

21   QUESTIONS BY MR. BROCK:

22       Q.     Is that right?

23       A.     That's correct.

24               (Berger Exhibit D9 marked for

25       identification.)

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. BROCK:

 2        Q.    Let's look at Defendant's

 3   Exhibit 9.

 4             And I don't think this has been

 5   previously marked.  I do have some questions

 6   about it.

 7             Do you see that this is now an

 8   April 9, 2000 -- I mean, pardon that.  Strike

 9   that.

10             You see that this is an

11   April 9, 1999 design review memo?

12        A.    Yes.

13        Q.    Okay.  And the author of this

14   note is Annette Shaver.

15             Do you see that?

16        A.    Yes.

17        Q.    All right.  If we go down to

18   the product design preliminary, do you see

19   that section?

20        A.    Yes.

21        Q.    All right.  "The technical

22   department provided samples of the products

23   along with Aearo drawings."

24             So not only did you turn over

25   to the military the products, but you also
```

Confidential - Pursuant to Protective Order

1    sent the drawings; is that right?

2         A.    Yes.

3         Q.    This is what this reports --

4    yeah.

5              "The length of the earplug,

6    once assembled, was discussed.  It was

7    requested by the military that the earplug

8    fit into a case which is in current use by

9    the military.  This would require reducing

10   the length by one-quarter of an inch."

11             Do you see that?

12        A.    Yes.

13        Q.    All right.  And --

14             MR. MONSOUR:  Mike, do you have

15        one of those for me?

16             MR. BROCK:  Oh, of course.

17             MR. MONSOUR:  I thought you

18        said this one hadn't been used before.

19             MR. BROCK:  I don't think it's

20        been used in this deposition.  It may

21        be in his big notebook, but I am not

22        sure about that.

23             THE WITNESS:  No, I don't think

24        it was in this notebook.

25             MR. OVERHOLTZ:  Okay.  It's not

Confidential - Pursuant to Protective Order

1       in that one?

2                  MR. MONSOUR:  Thank you.

3                  And what number is this

4       exhibit?

5                  MR. BROCK:  8.

6                  THE WITNESS:  9.

7   QUESTIONS BY MR. BROCK:

8       Q.     Okay.  This was a design review

9   meeting, correct?

10      A.     Yes.

11      Q.     Okay.  And does this appear to

12  be the kind of meeting that would take place

13  at Aearo with regard to addressing issues of

14  design of products?

15      A.     I was not typically a

16  participant in those meetings.  You don't see

17  my name listed there, but I'm familiar with

18  all of the names there.  And this would be

19  the typical group of technical production and

20  quality who would get together to look at

21  implementing a product design or revising a

22  product.

23                 And I do note that this appears

24  to be occurring only one day after we

25  received the e-mail from Dick Knauer -- from

Confidential - Pursuant to Protective Order

1    Doug Ohlin about shortening the plug.

2             (Berger Exhibit D10 marked for

3         identification.)

4    QUESTIONS BY MR. BROCK:

5         Q.     Sure.  Okay.

6                All right.  Let's look at the

7    next exhibit very quickly.  Exhibit 10.

8                Can I see that back just a

9    second, please?

10               Okay.  All right.  So I think

11   you have looked at this document today with

12   plaintiff's counsel.  This is an e-mail from

13   Doug Ohlin to Belva Hoffman and copies Brian

14   Myers, and he is giving on April 12, 1999,

15   some information about why he's instructing

16   that the samples, the production samples, be

17   shortened.

18               Do you see that?

19        A.     Yes.

20        Q.     And he refers to some of these

21   things that we've talked about so that they

22   fit in the standard case, number one, to

23   minimize wind noise, and to be compatible

24   with the Kevlar helmet when the chinstrap is

25   fastened.

Confidential - Pursuant to Protective Order

1          Do you see that?

2     A.    Yes.

3     Q.    And he uses the show stopper

4   language again, correct?

5     A.    Yes.

6          (Berger Exhibit D11 marked for

7          identification.)

8   QUESTIONS BY MR. BROCK:

9     Q.    All right.  If we look at the

10   next exhibit, number 11.  I want to direct

11   your attention to page 136 in this series of

12   e-mails.  Some of these e-mails have been

13   discussed, but not this one.

14          This is an e-mail that's in the

15   chain of e-mails that we've discussed.  Here

16   on April the 13th, 1999, Doug Ohlin is

17   conveying to other members of the military.

18          Do you know any of these folks

19   that are listed here, Loyborg, Chandler or

20   Robinette?

21     A.    I know Dave Chandler and Marty

22   Robinette.

23     Q.    And what are their roles,

24   please?

25     A.    At this point I'm not sure, but

1    Dave Chandler at times was involved at Walter

2    Army Reed Medical Center.  Marty Robinette

3    was a captain working at some bases on the

4    East Coast.

5        Q.    Okay.  And this letter from --

6    or note from Doug Ohlin states that "The

7    production samples Aearo sent me were at

8    least a quarter of an inch too long.  I took

9    the liberty in cutting down the samples I'm

10   sending you under a separate cover.  The

11   production samples didn't fit in the standard

12   earplug carrying case, didn't take advantage

13   of a design to minimize wind noise, and were

14   hit by the Kevlar helmet chinstrap when it

15   fastens."

16            Correct?  That's what he

17   writes?

18       A.    Yes.

19       Q.    Okay.  Now, I just -- just so

20   the jury can appreciate what we're talking

21   about in terms of the length of the device, I

22   have put together, with the assistance of

23   people a lot of smarter than me, a

24   demonstrative aid.  I'm not asking you to

25   sponsor it because I know you didn't develop

Confidential - Pursuant to Protective Order

1    this.  I just want to use it for purposes of

2    discussion.  Okay?

3              And this is the -- this is the

4    document that I wanted to talk about.

5              You see here we're depicting a

6    carrying case and two versions of plugs,

7    correct?

8         A.    Yes.

9         Q.    And the point I just want to

10   make for the jury is that the version of the

11   plug that you first designed and sent to the

12   military is sticking out there of the rim of

13   the case that was already in use by the

14   military, correct?

15        A.    Yes.

16        Q.    And so the military instructed

17   that that be shortened.  In fact, Doug Ohlin

18   even took the samples and figured out a way

19   to shorten them himself so that he could see

20   if they fit in the carrying case, correct?

21        A.    Yes.

22        Q.    And this is just a depiction of

23   how one of the things that the military was

24   saying, how that goal was achieved by

25   shortening the plug, correct?

Confidential - Pursuant to Protective Order

1       A.      And it may be obvious to the

2   jury members, but you might like to highlight

3   the panel that is projecting outwards to the

4   left, sticking out over the edge of the case.

5   That's the top of the case.  And the way the

6   case closes is that would rotate 90 degrees

7   around so that it would cover the portion

8   where you see one earplug sticking up and the

9   other earplug standing just shy of the edge.

10      Q.      Okay.  And does that carrying

11  case also have as part of the case a tool

12  that can be used to assist in placing

13  different kinds of hearing protection

14  devices?

15      A.      It was specifically designed

16  for the comfort earplug.  So the element that

17  I just described that rotates around, you can

18  also pull that free of the case, and there's

19  a hollow cylindrical extension that would be

20  used as a fitting tool for a comfort style

21  earplug.

22              It does not work with a

23  Com-Fit, and it does not work with a Combat

24  Arms Earplug.  But that was the standard

25  military case that they wanted to use.

Confidential - Pursuant to Protective Order

```
 1        Q.      Okay.  Thank you.

 2              (Berger Exhibit D12 marked for

 3        identification.)

 4    QUESTIONS BY MR. BROCK:

 5        Q.      All right.  I want to now turn

 6    to the next exhibit.  I'm going to hand over

 7    to you Defendant's Exhibit 12.

 8              And do you see that this is an

 9    e-mail from Doug Ohlin to Brian Myers with

10    regard to information on the Combat Arms

11    Earplug?

12              Do you see that?

13        A.      Well, that's part of it.

14        Q.      At the top.

15        A.      The top of it is actually an

16    e-mail to me saying that he sent this to

17    Brian Myers.

18        Q.      Yes.  Okay.

19              And if we look at the e-mail

20    chain, and I appreciate you pointing this

21    out, Doug Ohlin sends to you the note that he

22    sent to Brian Myers, correct?

23        A.      Correct.

24        Q.      So this note would have been in

25    your file and received by you on March
```

1    the 23rd, 2005, at approximately 4:28 p.m.?

2         A.    Correct.

3              And Brian is putting together

4    some marketing materials, and he would like

5    to know if it's appropriate in those

6    materials to say "evaluated and specified by

7    the US Armed Forces."

8              And Doug responds at the top

9    and discusses a number of ways in which the

10   military has evaluated the plug and found it

11   appropriate, and included it in the Army

12   pamphlet 40-501, and concludes by saying,

13   "Yes, I think you can say the Combat Arms

14   Earplug has" -- and there's a typo "has

15   be" -- "has been evaluated and specified by

16   the US Armed Forces."

17        Q.    Okay.  So the first question

18   that is asked by Brian of Doug is, "Is it

19   okay to say that the Combat Arms Earplug is

20   evaluated and specified by the US Armed

21   Forces?"

22              That's the question, correct?

23        A.    Correct.

24        Q.    And then you've given some of

25   the explanation for the answer that Doug

Confidential - Pursuant to Protective Order

1    Ohlin gives, including that "the Army has

2    conducted blast overpressure studies at White

3    Sands missile range and at the Army research

4    lab at the Aberdeen Proving Grounds.  It's

5    used extensively by the US Army and Marines.

6    It's been approved by the DOD Hearing

7    Conservation working group.  It appears in

8    the Defense Occupational and Environmental

9    Health Readiness System - hearing

10   conservation applications, lookup table of

11   approved hearing protectors, and in the

12   Department of Army pamphlet."

13            Do you see that?  Did I read

14   that right?

15       A.    Yes.

16       Q.    And then he says, as you noted,

17   "Yes, I think you can say the Combat Arms

18   Earplug has been evaluated and specified by

19   the US Armed Forces."

20            Do you see that?

21       A.    Yes.

22       Q.    All right.  I want to ask you

23   this question:  What was the specification in

24   terms of what the Army expected of this

25   device, as you understood that from your

Confidential - Pursuant to Protective Order

1    correspondence and conversations with Doug

2    Ohlin?

3         A.     At this point in time, the

4    specification had been primarily what was

5    transmitted at the December 1997 meeting:

6    that it was to be a nonlinear plug

7    incorporating the ISL nonlinear filter; that

8    that filter was to be housed in a plug based

9    upon the E-A-R UltraFit earplug; and that

10   especially the plug had to be dual-ended and

11   one-sized.

12            There were no other material or

13   dimension or performance specifications at

14   that time because he knew how the nonlinear

15   filter worked, he was familiar with the

16   Combat Arms Earplug, and we were not

17   initially given a length specification.

18            As we've discussed, after we

19   developed a prototype, we were then

20   effectively given a length specification,

21   which is that it shall be approximately

22   one-quarter inch longer than our original

23   prototype -- one quarter-inch shorter than

24   our original design prototype.

25            MR. BROCK:  Okay.  Thank you.

Confidential - Pursuant to Protective Order

1          Let's take a short break.

2                    VIDEOGRAPHER:  We're going off

3          record.  The time is 3:45.

4           (Off the record at 3:45 p.m.)

5                    VIDEOGRAPHER:  We're going back

6          on record.  Time 4:17.

7   QUESTIONS BY MR. BROCK:

8          Q.     Okay.  Mr. Berger, are you

9   ready to resume?

10         A.     I thought I was.

11         Q.     Okay.  I've put back up on the

12  timeline that we've been talking about the

13  middle section, "the military requests

14  dual-ended, single-sized earplug from Aearo,"

15  and I just want to do a point of

16  clarification here.

17                 In December of 1997, you

18  attended the meeting with Army -- with the

19  United States Army.  You represented Aearo,

20  and ISL was present there also, correct?

21         A.     Yes.

22         Q.     And it was at this meeting that

23  Ohlin requested the dual-ended plus, correct?

24         A.     Yes.

25         Q.     I just want to be clear.  Prior

Confidential - Pursuant to Protective Order

1    to this time, Aearo had interacted with ISL

2    with regard to the development of a

3    single-ended plug that would utilize the ISL

4    filter?

5           A.      Yes.  Once they had done

6    preliminary testing with their filter in

7    versions of the Combat Arms that they had

8    modified on their own, they had then asked us

9    to create various samples.

10                  And so at one point they came

11   to visit our laboratory, we had interacted

12   with them, so we certainly had had

13   involvement on the single-ended earplug.

14                  So when I was speaking about

15   our first awareness -- or my first awareness

16   in '97, that was of the dual-ended design.

17          Q.      Okay.  You were talking about

18   the category that we're referring to here,

19   the dual-ended, single-size earplug which

20   eventually became the Combat Arms version 2?

21          A.      Correct.

22                  (Berger Exhibit D13 marked for

23          identification.)

24   QUESTIONS BY MR. BROCK:

25          Q.      All right.  I want to turn to a

1  different topic now, and I'll hand over to

2  you Exhibit D13.

3            And I'll ask you, if you don't

4  mind, to describe for the benefit of the jury

5  what is Defendant's Exhibit D13 --

6  Defendant's Exhibit 13, sorry?

7      A.    So this is back in 2001 when

8  there were different e-mail systems that we

9  were using at Aearo, and I also used a

10 program called Daytime Organizer, which was a

11 program in which I maintained my address

12 contacts and a call log of unusual, important

13 or different phone calls, customer calls,

14 that I would make so that I could refer to

15 that from time to time.

16           And as we were putting

17 documents together for this case, this

18 software's -- actually put this together a

19 few years ago.  This software no longer runs

20 on Windows 10 machines.

21           So at the time, I did searches

22 for various topics germane to this

23 litigation, and one of the things that popped

24 up was calls and correspondence with Major

25 Mark Little.

Confidential - Pursuant to Protective Order

1           And so what you see here are
2    screenshots of various elements of that call
3    log since there wasn't any easier way to
4    output it.
5           Q.      So is this particular document
6    that we're looking at here something that you
7    have copied from e-mail to this file-keeping
8    system?
9           A.      Yes.
10          Q.      And that will allow you at that
11   point in time to more easily access
12   information that you might have generated by
13   e-mail or other means during the course of
14   your regular business?
15          A.      It enabled me at that time,
16   pre-Outlook and other more sophisticated
17   programs, it was a way to assemble telephone
18   call, e-mail and other interactions with
19   customers and others so that I would have one
20   easy-to-access database with all that
21   information.
22          Q.      Okay.   This is, we see at the
23   top, an e-mail from Mark Little, Major, US
24   Army, to TZL3@CDC -- oh, his e-mail address
25   is TZL3@cdc.com.

Confidential - Pursuant to Protective Order

 1                    And is this an e-mail from

 2    Major Mark Little to you?

 3         A.     Yes.  He says, "I got your

 4    e-mail," and then he goes on to provide some

 5    questions.

 6         Q.     Okay.  And he also references

 7    that you may have received an e-mail from

 8    Dr. Doug Ohlin at the Army Center for Health

 9    Promotion and Preventive Medicine also,

10    correct?

11         A.     Yes.

12         Q.     All right.  And what does he

13    tell you that he is doing at this point in

14    time?

15                    And I've got a callout here

16    that you can look at.

17         A.     So just to point out, Major

18    Little was a major in the US Army.  Had a

19    working relationship, perhaps a dotted-line

20    reporting, I'm not sure, to Doug Ohlin.  At

21    this point he was doing a study program for a

22    limited period of time at NIOSH in

23    Cincinnati.

24                    And he says that he'd like to

25    run some studies on the Army's Combat Arms

Confidential - Pursuant to Protective Order

1    Earplug, which I'm told and have read

2    reference to, is made by -- from the E-A-R

3    UltraFit.

4                And so he's asking me for

5    information.

6        Q.    Okay.  And so what you have put

7    in your file here in this exhibit is his

8    e-mail to you; is that right?

9        A.    Yes.

10       Q.    Okay.  And this is a document

11   that you would have kept in the regular

12   course of your business?

13       A.    In the Daytime Organizer.

14       Q.    All right.  Let's go to the

15   next exhibit.

16                (Berger Exhibit D14 marked for

17           identification.)

18   QUESTIONS BY MR. BROCK:

19       Q.    And will you please describe

20   this for the benefit of the jury.

21                D14.  What is D14,

22   Dr. Berger -- or Mr. Berger?

23       A.    The e-mail we just discussed

24   was dated August 20th, and here we see

25   approximately a month later that I'm writing

Confidential - Pursuant to Protective Order

 1    a letter to Mark Little providing him the

 2    information that he's requesting.

 3              And I specifically detail that

 4    I'm going to include a consumer package of

 5    the product, that I'm going to include a copy

 6    of a letter from Pascal Hamery to me from

 7    January 2000 in which he has provided impulse

 8    and attenuation results measured on the

 9    product, and that I'm going to provide a

10    REAT, which stands for real-ear attenuation

11    at threshold, the standardized reports for

12    the plug measured according to the American

13    National Standard.

14              And then at the bottom of that

15    letter, you see that it says "enclosures,"

16    and it describes those three items.

17              (Berger Exhibit D15 marked for

18         identification.)

19    QUESTIONS BY MR. BROCK:

20         Q.    Okay.  Now I'm going to hand

21    over to you D15 and ask you to describe that

22    document for the benefit of the jury.

23         A.    So what I've written at the top

24    is that this is apparently a -- potentially a

25    telephone call.  I say that he has more

Confidential - Pursuant to Protective Order

1    questions.  It looks like it's an e-mail.

2    And I say there's more questions.  Thanks

3    again, he's received the mailing, and then he

4    asked me some particular questions:  Do we

5    provide instructions in the 50-pair bags that

6    we send.  He wants to know about the sealing

7    rings.  Since it's a one-size product and it

8    has three different sealing rings or flanges,

9    do all of the flanges have to be in the ear.

10             And then of particular

11   interest, see down at the bottom -- or no --

12   he says, finally, "Do the sealing rings, or

13   the flanges, of the outward-facing plug that

14   were rolled back upon themselves during

15   fitting, as per the instructions, stay this

16   way in the ear or should they be unrolled?"

17             So he's pointing out that he's

18   well aware of the fold-back instruction that

19   has been provided to him, and he's asking me

20   further guidance on it.

21        Q.    Okay.  And did you answer?

22        A.    I did.  I said they should stay

23   rolled back.

24        Q.    All right.  And the date of

25   this e-mail exchange is September 25, 2001,

Confidential - Pursuant to Protective Order

```
 1    correct?

 2          A.      Yes.

 3          Q.      And this is a follow-up note

 4    from the letter with enclosures that you sent

 5    a week earlier on September 18, 2001?

 6          A.      Correct.

 7          Q.      All right.  And he's

 8    acknowledging receiving the mailing and

 9    making use of the instructions, correct?

10          A.      Yes.

11          Q.      And you had sent along some

12    information with regard to instructions as

13    part of the enclosures that were included

14    with the letter, correct?

15          A.      Yes.

16          Q.      At the present time in your

17    recordkeeping system, do you have a letter

18    with the actual attachments that were with

19    the letter?

20          A.      No.

21          Q.      Do you know what you sent him?

22          A.      It's described very clearly at

23    the bottom.

24          Q.      Okay.  I want to talk then

25    about what you sent.
```

Confidential - Pursuant to Protective Order

1              (Berger Exhibit D16 marked for

2        identification.)

3    QUESTIONS BY MR. BROCK:

4        Q.     I'm going to have to skip to --

5        A.     At the time in our company,

6    when actual paper e-mail was used, in the

7    course of events we wouldn't normally make

8    copies of all of the attachments.

9              The purpose of detailing them

10   clearly as enclosures on the bottom of the

11   letter was to indicate what would have been

12   sent.

13       Q.     Okay.  I'm going to hand over

14   to you now Defendant's Exhibit 16.

15             So you see that your bullet

16   point 1 in your September 8, 2001 letter

17   refers to "a consumer package is enclosed."

18             Do you see that?

19       A.     Yes.

20       Q.     And is the exhibit there --

21   what number is that again?  I'm sorry.

22       A.     16.

23       Q.     16.

24             Is Exhibit 16 the consumer

25   package that you enclosed to Major Mark

1    Little?

2        A.     Yes, this is for the

3    indoor/outdoor range E-A-R plugs.

4        Q.     And do you tell him that he can

5    use the instructions from the package in

6    testing?

7        A.     Yes.

8        Q.     All right.  And just to help

9    the jury be able to see it because we do have

10   some small font in the copy, is there a

11   Fitting Tips section of the indoor/outdoor

12   range E-A-R earplugs that you are telling the

13   major that he can utilize with regard to

14   testing?

15       A.     I am.

16              And it refers to pulling the

17   pinna, which is illustrated in the picture.

18   The pinna is the flap of your ear on the side

19   of your head that holds your glasses up.  You

20   can -- should pull the pinna upward and

21   outward during insertion.  And then

22   specifically it says, "Fitting is also

23   improved if the sealing rings of the

24   outward-directed plug are rolled back upon

25   themselves."

Confidential - Pursuant to Protective Order

1     Q.     Okay.

2     A.     And you'll note that in my call

3  log it indicates that he asked me

4  specifically about that part of the

5  instruction.

6     Q.     All right.  And Major Mark

7  Little is, or was at this time, a major in

8  the United States Army?

9     A.     Yes.

10    Q.     Was he an audiologist?

11    A.     I believe he was, and that's

12 why he was interacting with Doug Ohlin, but

13 I'm not certain of that.

14    Q.     Okay.  Was he involved in

15 hearing protection programs for the United

16 States Army?

17    A.     At this time, I'm not sure what

18 his involvements were.  I know he was, as you

19 saw earlier, contemplating doing a study on

20 Combat Arms Earplugs.

21    Q.     Okay.  And does his e-mail to

22 you acknowledge that he has received the

23 instructions and will use them?

24    A.     Yes.

25    Q.     Now, this letter of September

Confidential - Pursuant to Protective Order

1    18, 2001, also refers to a copy of a letter

2    from Pascal Hamery from January of 2000 in

3    which he provides insertion loss data and

4    impulsive noise measured on the ISL blockhead

5    for the Combat Arms Earplug.

6         A.    Yes.

7         Q.    That's a lot.

8               What is that?

9         A.    So we've talked about real-ear

10   attenuation at threshold, and that's a human

11   subjects test that tells you how the product

12   protects against noise at levels in its

13   linear region.  So that's for levels with the

14   open end of the product up to about 110,

15   115 dB.

16              If you want to know how it

17   performs in high-level, impulsive noise, then

18   you need to actually present those noises.

19              And it's not safe to present

20   them routinely to human test subjects, so the

21   way this test is conducted is that you take

22   an acoustical test fixture or a dummy head

23   that's a reasonably accurate simulation of a

24   human head, and you expose that to high-level

25   impulses.

Confidential - Pursuant to Protective Order

 1                 At this time there was really

 2    only one facility worldwide that was doing

 3    that sort of work, and it was ISL.  They

 4    would expose these heads to plastic

 5    explosives detonated out of doors, and so we

 6    were sending them their earplugs -- our

 7    earplugs for their test evaluation.

 8                 (Berger Exhibit D17 marked for

 9         identification.)

10    QUESTIONS BY MR. BROCK:

11         Q.    Okay.  In your September 18,

12    2001 letter, you refer to an enclosure, which

13    is the Pascal Hamery January 2000 letter.

14                 I'm going to hand you

15    Defendant's Exhibit 17 and ask you if this is

16    what was sent.

17         A.    This is the letter.  It's dated

18    January 2000.

19         Q.    Okay.

20         A.    Is when we received the test

21    results.

22         Q.    All right.  And then the last

23    item that's mentioned here -- I'm sorry, go

24    ahead.

25         A.    I wasn't sure if you were going

Confidential - Pursuant to Protective Order

1  to cover that.

2       Q.    Go ahead.

3       A.    So what I want to point out is

4  that it includes the results on the final

5  design of the Combat Arms, which was the

6  shortened earplug measured over a range of

7  sound pressure levels from 110 to

8  190 decibels.

9            But also, interestingly and

10  importantly, it says "the results are the

11  same as those we obtained before with a

12  double-faced earplug prototype."

13           So that's -- in his French

14  language, double-faced is dual-ended.  And

15  what he's saying is that he had already

16  tested an original, longer prototype, and

17  both it and the shorter plug performed

18  similarly in this impulsive test.

19      Q.    So by this point in time, the

20  plug had been redesigned, and you had sent

21  samples to ISL to conduct their impulse test

22  in the same way they had tested the longer

23  version of the plug, correct?

24      A.    As well as all of the prior

25  versions they had constructed and we had

Confidential - Pursuant to Protective Order

1   constructed.

2       Q.      Now, the third thing that is --

3   or the third item that's listed in your

4   letter of September 18, 2001, are the REAT

5   test reports for both ends of the CAE

6   measured according to ANSI S3.19, correct?

7       A.      Yes.

8           (Berger Exhibit D18 marked for

9       identification.)

10  QUESTIONS BY MR. BROCK:

11      Q.      And I want to draw your

12  attention to -- I want to draw your attention

13  to Exhibit 18.

14          And this is a document that

15  has been discussed in your deposition, but

16  I'll ask you if the information in this

17  document -- document was transmitted by your

18  letter of September 18, 2001.

19          And if it was all transmitted,

20  tell me that; if some of it was transmitted,

21  tell the jury that, what you sent him.

22      A.      The letter indicated that we

23  sent him a test report, and our reports are

24  labeled in the top right corner page with

25  page numbers.  So the first page says page 1

1   of 5, or it may say page 1 of 4.

2               So routinely when we would send

3   out a report, it would include the cover

4   page, which has a summary of all of the

5   results as you see in this photograph here,

6   the NRR and the frequencies at which the test

7   was conducted over on the left, the mean

8   attenuation values from low to high

9   frequencies in the middle, and the associated

10  standard deviations.

11              And then the second page of the

12  report would include -- and I'm not sure if

13  you're going to show that on the screen --

14  would include a table that shows the data for

15  all of the ten subjects with three

16  measurements per subject.

17              And then in addition, there are

18  either two or three other pages he would have

19  received.  That's the second page I just

20  described, which is a tabular result for ten

21  subjects.  And you see listed on the left,

22  the frequencies are at this time listed

23  horizontally from left to right, 125 hertz up

24  to 8,000 hertz, and then a retest and some

25  other ancillary data.

Confidential - Pursuant to Protective Order

```
 1                 The next page --

 2        Q.    Let me pause you on that for

 3   just one second.

 4               If we could highlight the

 5   information at the top of the page where it

 6   says "Comments."

 7               And the comments at the top of

 8   the page -- you've been asked about this in

 9   the deposition -- it says, "Plugs are the

10   green end of the Combat Arms plug.  The

11   yellow flanges were folded outward to allow a

12   deeper insertion of the green plug."

13               Correct?

14        A.    Correct.

15        Q.    And that information was

16   transmitted to Major Mark Little?

17               MR. OVERHOLTZ:  Object to form.

18        Foundation.

19               THE WITNESS:  That was

20        transmitted as part of this report,

21        and, of course, the instructions we

22        already discussed were transmitted on

23        the indoor/outdoor range card.

24               Would it be worth discussing

25        the difference between the two cover
```

Confidential - Pursuant to Protective Order

1          pages here?

2     QUESTIONS BY MR. BROCK:

3          Q.     I think that would be helpful,

4     yes.

5          A.     So the situation you have is

6     that when we originally conduct the test on a

7     product, that will be testing the initial

8     version of the product.  And later on it may

9     be marketed, the identical product, with

10    other brand names, in other markets or with

11    different colors.

12         Q.     Sure.

13         A.     And so at that time we would go

14    back and reissue the initial report, simply

15    adding on the other products to which it

16    would apply.

17              So in this case, on the second

18    page you see the earlier version of the

19    report, which is just for the UltraFit end of

20    the Combat Arms Earplug, but on the cover

21    page you see what's the current report in our

22    file, which indicates that it also applies to

23    the Arc plug, which was another version of

24    the product that was distributed.

25         Q.     Okay.  Same data, but

Confidential - Pursuant to Protective Order

```
 1    identifying the same data for two different

 2    names of the plug?

 3         A.     Of the same product.

 4         Q.     Of the same product.

 5                Okay.  Thank you.

 6                Did you also transmit the data

 7    from study -- the one we've been referring to

 8    as 016?

 9         A.     Yes.

10                (Berger Exhibit D19 marked for

11                identification.)

12    QUESTIONS BY MR. BROCK:

13         Q.     All right.  So let me hand you

14    Exhibit 19, and I'd like for you to identify

15    out of Exhibit 19 the pages that you sent to

16    Major Mark Little, US Army.

17         A.     So this particular exhibit

18    you've provided me includes many pages of raw

19    data that were provided when documents were

20    requested for the litigation, but they were

21    not part of the distribution to Mark Little.

22                What he would have received

23    would have again been the cover page, the

24    backside of that cover page, which is the

25    individual subject data, the summary tables
```

Confidential - Pursuant to Protective Order

```
1    showing the ranges and mean attenuation

2    values for the subject, and a graph of the

3    results, along with a picture of the product.

4                 (Berger Exhibit D20 marked for

5         identification.)

6    QUESTIONS BY MR. BROCK:

7         Q.    All right.  I'm going to hand

8    over to you now Exhibit 20.

9                 Can you tell us what Exhibit 20

10   is?

11                This is -- he's acknowledging

12   receiving the mailing.  He says he'll make

13   use of the instructions, and then he has a

14   question, right?

15        A.    I think we already covered

16   this --

17        Q.    We did.  I have something else

18   I want --

19        A.    -- as another exhibit.

20        Q.    We did, but I have another

21   question there.

22        A.    Okay.

23        Q.    So he says, "Thanks again.

24   Received your mailing and will make use of

25   the instructions."
```

Confidential - Pursuant to Protective Order

1          And then he asked the question:

2   "Finally, do the sealing rings of the

3   outward-facing plug that were rolled back

4   upon themselves during fitting, as per the

5   instructions, stay this way in the ear or

6   should they be unrolled?"

7          And then did you answer that,

8   "They should stay that way"?

9      A.    I provided him an answer, which

10  was "they should stay that way."

11         (Berger Exhibit D21 marked for

12         identification.)

13  QUESTIONS BY MR. BROCK:

14     Q.    Okay.  You've mentioned in your

15  testimony that you've seen some documents and

16  e-mails that reflect knowledge by the Army

17  that rolling back the flanges are a way to

18  obtain a better fit of the plug.

19         I want to show you this

20  USACHPPM "Just the Facts" document.

21         And, first of all, we haven't

22  talked about this much.  For this document --

23  and this is Exhibit 21?  Is that Exhibit 21?

24     A.    Yes.

25     Q.    Okay.  Let's talk just for a

Confidential - Pursuant to Protective Order

1    minute.

2              What is USACHPPM?  What is that

3    organization?

4         A.    It's the US Army Center for

5    Health Promotion and Preventative Medicine, I

6    believe.

7         Q.    Okay.

8         A.    And it was essentially a

9    research group as well as a group that

10   interacted with the Armed Forces to provide

11   them guidance on matters of safety and health

12   for their operational readiness.

13        Q.    And you remember -- oh, go

14   ahead.

15        A.    And also conducted some of the

16   their own research, wrote technical reports,

17   et cetera.

18        Q.    Okay.  Do you remember when you

19   were being asked some questions earlier about

20   Marines that were having difficulty in

21   Fallujah because they weren't being furnished

22   with hearing protection devices or they

23   weren't using them, that members of USACHPPM

24   were actually very involved in that

25   discussion about what would -- what hearing

Confidential - Pursuant to Protective Order

1    protection devices would be provided for the

2    Marines in Fallujah and other places?

3         A.     Yes.

4         Q.     And did you describe earlier

5    that it was your understanding that

6    audiologists in the Army or in other service

7    branches would have dotted-line reporting to

8    Doug Ohlin?

9         A.     My recollection was in the Army

10   they would have a dotted-line reporting or a

11   close relationship with Doug Ohlin.

12        Q.     Okay.

13             MR. MONSOUR:  Objection.

14        Responsiveness.

15             THE WITNESS:  He was the one

16        who basically wrote the program for

17        the military.  He was very involved in

18        managing -- I forget the term we

19        looked at earlier, but the

20        collaborative services branch between

21        the government military groups to come

22        up with the hearing conservation

23        programs for the military.

24             MR. MONSOUR:  Object to

25        responsiveness again.

Confidential - Pursuant to Protective Order

```
 1                    CERTIFICATE

 2

 3          I, CARRIE A. CAMPBELL, Registered
      Diplomate Reporter, Certified Realtime
 4    Reporter and Certified Shorthand Reporter, do
      hereby certify that prior to the commencement
 5    of the examination, Elliott H. Berger, M.S.,
      was duly sworn by me to testify to the truth,
 6    the whole truth and nothing but the truth.

 7          I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.

10

            I DO FURTHER CERTIFY that I am
11    neither a relative nor employee nor attorney
      nor counsel of any of the parties to this
12    action, and that I am neither a relative nor
      employee of such attorney or counsel, and
13    that I am not financially interested in the
      action.

14

15

16

17    CARRIE A. CAMPBELL,
      NCRA Registered Diplomate Reporter
18    Certified Realtime Reporter
      California Certified Shorthand
19    Reporter #13921
      Missouri Certified Court Reporter #859
20    Illinois Certified Shorthand Reporter
      #084-004229
21    Texas Certified Shorthand Reporter #9328
      Kansas Certified Court Reporter #1715
22    Notary Public
23    Dated:  December 17, 2019

24

25
```