EXHIBIT 59

Confidential - Pursuant to Protective Order

1            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF FLORIDA
2               PENSACOLA DIVISION
3

     IN RE: 3M COMBAT ARMS   )  Case No.
4    EARPLUG PRODUCTS         )  3:19md2885
     LIABILITY LITIGATION     )
5    _____  )  Judge M. Casey
                              )  Rodgers
6    THIS DOCUMENT RELATES    )  Magistrate Judge
     TO ALL CASES             )  Gary R. Jones
7

8            WEDNESDAY, NOVEMBER 13, 2019
9    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
10                   - - -
11           Videotaped 30(b)(6) deposition of
12   Elliott H. Berger, M.S., held at the offices
13   of KIRKLAND & ELLIS LLP, 300 North LaSalle,
14   Chicago, Illinois, commencing at 9:04 a.m.,
15   on the above date, before Carrie A. Campbell,
16   Registered Diplomate Reporter, Certified
17   Realtime Reporter, Illinois, California &
18   Texas Certified Shorthand Reporter, Missouri
19   & Kansas Certified Court Reporter.
20                   - - -
21

             GOLKOW LITIGATION SERVICES
22       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
23

24

25

Confidential - Pursuant to Protective Order

```
 1              A P P E A R A N C E S :
 2
        AYLSTOCK, WITKIN, KREIS & OVERHOLTZ,
 3      PLLC
        BY:  NEIL D. OVERHOLTZ
 4           noverholtz@awkolaw.com
             JENNIFER HOEKSTRA
 5           jhoekstra@awkolaw.com
             BRYAN F. AYLSTOCK
 6           baylstock@awkolaw.com
        17 East Main Street
 7      Pensacola, Florida  32502
        (850) 202-1010
 8
        and
 9
        SEEGER WEISS, LLP
10      BY:  DAVID R. BUCHANAN
             dbuchanan@seegerweiss.com
11           MAX KELLY
             mkelly@seegerweiss.com
12      77 Water Street
        New York, New York  10005
13      (212) 584-0700
14      and
15      CLARK, LOVE & HUTSON, PLLC
        BY:  SHELLEY HUTSON
16           shutson@triallawfirm.com
             EMILY MARLOWE
17           emarlowe@triallawfirm.com
        440 Louisiana Street, Suite 1600
18      Houston, Texas  77002
        (713) 757-1400
19
        and
20
        TRACEY & FOX
21      BY:  SEAN P. TRACEY
             stracey@traceylawfirm.com
22      440 Louisiana Street, Suite 1901,
        Houston, Texas  77002
23      (713) 495-2333
24      and
25
```

Confidential - Pursuant to Protective Order

```
 1        MONSOUR LAW FIRM
          BY:  DOUGLAS C. MONSOUR
 2            doug@monsourlawfirm.com
          404 North Green Street
 3        Longview, Texas  75601
          (903) 999-9999
 4
          and
 5
          COLSON HICKS EIDSON
 6        BY:  ROBERTO MARTÍNEZ
              bob@colson.com
 7        255 Alhambra Circle Penthouse
          Coral Gables, Florida  33134
 8        (305) 476-7400
          Counsel for Plaintiffs
 9
10
          KIRKLAND & ELLIS LLP
11        BY:  SIERRA ELIZABETH
              sierra.elizabeth@kirkland.com
12        333 South Hope Street
          Los Angeles, California  90071
13        (213) 680-8122
14        and
15        KIRKLAND & ELLIS LLP
          BY:  MIKE BROCK, P.C.
16            mike.brock@kirkland.com
          1301 Pennsylvania Avenue, NW
17        Washington, DC  20004
          (202) 389-5996
18
          and
19
          KIRKLAND & ELLIS LLP
20        BY:  NICHOLAS WASDIN
              nick.wasdin@kirkland.com
21            SIMON GOTTLIEB
              simon.gottlieb@kirkland.com
22        300 North LaSalle
          Chicago, Illinois  60654
23        (312) 862-2000
          Counsel for Defendants
24
25
```

Confidential - Pursuant to Protective Order

```
 1   ALSO PRESENT:
 2       ERIC RUCKER, in-house counsel, 3M
 3       JAMES BATTLE, Aylstock, Witkin,
         Kreis & Overholtz
 4
         ZACH HONE, trial technician, Golkow
 5       Litigation Services
 6
     V I D E O G R A P H E R :
 7       DAN LAWLOR,
         Golkow Litigation Services
 8
                     - - -
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1    January of 2000, so I'm thinking in December

 2    it had begun.

 3         Q.    Okay.  And I see you

 4    referencing the notebook that you brought.

 5    Can you tell me what tab and what document

 6    you're looking at?

 7         A.    I'm looking at 23015 and 23016

 8    {sic}.

 9         Q.    Okay.  The test reports?

10         A.    Yes.

11         Q.    Okay.  And then the test that

12    was started on the open end was the 213016;

13    is that right?

14         A.    Yes.

15         Q.    Okay.  And these tests were

16    going to be conducted under EPA regulations;

17    is that right?

18              MS. ELIZABETH:  Objection.

19         Form.

20              THE WITNESS:  I'm not sure what

21         you mean when you say "under EPA

22         regulations."

23    QUESTIONS BY MR. OVERHOLTZ:

24         Q.    In order to be able to

25    establish an NRR that can be labeled on the
```

Confidential - Pursuant to Protective Order

1   product, you have to comply with certain

2   regulations from the EPA, correct?

3              MS. ELIZABETH:  Objection.

4        Form.  Vague.

5              THE WITNESS:  There is an EPA

6        labeling regulation that specifies

7        that testing will be conducted in

8        conformance with an ANSI standard.

9   QUESTIONS BY MR. OVERHOLTZ:

10       Q.    Okay.  So there was an EPA

11  regulation, and it said that we need to do

12  the testing in performance with an ANSI

13  standard; that's right?

14       A.    Yes.

15       Q.    Okay.  And the ANSI standard

16  that the 213015 and 213016 testing that was

17  going to be conducted was with which

18  standard?

19       A.    ANSI S3.19-1974, 3.19-1974,

20  also designated ASA STD1-1975.

21       Q.    Okay.  A lot of times in the

22  documents we see it referred to as either the

23  319 standard or the ANSI 1974 standard; is

24  that right?

25       A.    Yes.

Confidential - Pursuant to Protective Order

1    Q.    Okay.  And when it comes to

2  earplugs, one of the things that this

3  standard calls for is how the plugs are fit

4  in the subjects; is that right?

5    A.    It describes an experimenter

6  fit, which is what is required under the EPA

7  regulation.

8    Q.    Okay.  And Aearo has -- or at

9  the time had policies that covered how they

10  conducted testing under this ANSI 1974

11  standard?

12    A.    Yes.

13    Q.    And can you tell me what the

14  Aearo policy was for how experimenter fit was

15  conducted in the testing conducted in 213016

16  and 213015?

17          MS. ELIZABETH:  Objection.

18      Form.  Vague.

19          THE WITNESS:  You're asking for

20      a complete description of all the

21      features?

22  QUESTIONS BY MR. OVERHOLTZ:

23    Q.    Well, what would -- if you

24  could describe for a layperson what

25  experimenter fit meant according to Aearo's

Confidential - Pursuant to Protective Order

1  policies back then that would have been

2  required to be conducted for the 016 and 015

3  studies.

4         A.    It would require the hearing

5  protector being fitted for the goal of

6  achieving optimum performance, which is

7  what's called for by the experimenter fit

8  section of ANSI S3.19 as dictated by the EPA.

9              There would be an experienced

10 experimenter, such as Ron Kieper who

11 conducted these tests, who would work with

12 subjects who were on our panel, who already

13 had some familiarity with testing hearing

14 protectors and had met the requirements of

15 the standard with respect to their hearing

16 sensitivity and being able to track their

17 sequential thresholds within a certain degree

18 of variability.

19        Q.    Okay.  So the experimenter in

20 the 016 and 015 --

21             MS. ELIZABETH:  Were you

22        finished with your answer?

23             THE WITNESS:  No.

24 QUESTIONS BY MR. OVERHOLTZ:

25        Q.    Okay.  You had more?

1          Okay.

2     A.     So what I described for you is

3     the experimenter and the subjects and the

4     name of the procedure.

5                Ron would enter the chamber and

6     work with those subjects.  He would be

7     fitting the hearing protectors as per the

8     requirements of that standard.  And then

9     through some interaction with them, the goal

10    would be to achieve an optimum fit before the

11    test was conducted.

12    Q.     Okay.  The experimenter in the

13    015 and 016 would have been Ron Kieper?

14    A.     Yes.

15    Q.     Okay.  Is it i-e-p-e-r?

16    A.     Yes.

17                MS. ELIZABETH:  Yes.

18                MR. OVERHOLTZ:  You threw me

19    off for a second there.

20    QUESTIONS BY MR. OVERHOLTZ:

21    Q.     So Ron Kieper would be the

22    experimenter.

23                And would Mr. Kieper be the

24    first to insert the plug into the subject's

25    ear?

Confidential - Pursuant to Protective Order

1                THE WITNESS:  It would have

2          been in violation of the EPA law to

3          put it in commerce with a label based

4          on testing less than ten subjects.

5    QUESTIONS BY MR. OVERHOLTZ:

6          Q.     Okay.  Do you know when the 016

7    study completed?  When it started and when it

8    completed, if you can give me that

9    information?

10         A.     What I can tell you with

11   certainty is that it was completed around

12   January 25th, since that's the date I see on

13   the 016 report.

14         Q.     So around 1/25/2000?

15         A.     Yes.

16         Q.     Okay.  When was the 213015

17   stopped?

18         A.     The date on that test is listed

19   as, again, the same date.  I'm not exactly

20   certain of when it was stopped, but in that

21   time frame.

22         Q.     Okay.  Let's talk a little bit

23   about -- so -- well, let's go back to this.

24                So the 213015 was stopped at

25   eight subjects.  You made the decision to

1    stop it?

2         A.     I would say that decision was

3    made in collaboration between myself and my

4    manager at the time.

5         Q.     Your manager at the time --

6         A.     Would have been Dick Knauer.

7         Q.     Okay.  So...

8         A.     I don't recall exactly.  I

9    certainly had involvement in that decision.

10   I do not believe it was solely my decision.

11        Q.     You think that Mr. Knauer had a

12   part in that?

13        A.     The way the chain of command

14   works, for me to have made that decision at

15   that time, I would in all likelihood have

16   been talking to my supervisor.

17        Q.     Okay.  And what about

18   Mr. Kieper, did he have a say in that

19   decision?

20        A.     I would say his input about

21   what he was observing was considered.  I

22   don't believe he had a say in the decision.

23        Q.     He was told to stop the study?

24        A.     Yes.

25        Q.     Okay.  The 213015, the company

Confidential - Pursuant to Protective Order

1    calculated at the end of the eight subjects

2    the NRR, right?

3        A.    We did have an estimated NRR.

4    It wouldn't be an NRR because an NRR by

5    definition must be computed from ten

6    subjects.  But could be an estimated NRR.

7        Q.    The estimated NRR, call it

8    estimated NRR, was 10.8?  10.9?

9        A.    10.9.

10       Q.    10.9.

11             Almost 11, right?

12       A.    It would round to 11.

13       Q.    When it comes to selling an

14   earplug for steady-state noise, a 10.99 NRR,

15   if it was a final NRR, would be unacceptable,

16   correct?

17             MS. ELIZABETH:  Objection.

18        Form.

19             THE WITNESS:  We've been

20        selling three-flanged earplugs like

21        that since the mid-1980s.  We knew

22        what to anticipate for the performance

23        of that type of product, which would

24        have been on the order of 10 dB or so

25        higher than that number.

Confidential - Pursuant to Protective Order

```
 1                    So it was a number that didn't

 2          make sense to us at the time, and we

 3          decided to look into it in more

 4          detail.

 5   QUESTIONS BY MR. OVERHOLTZ:

 6          Q.    Okay.  And so you expected at

 7   least 10 dB higher?

 8          A.    Something in the range of 20.

 9          Q.    Did Mr. Kieper tell you why he

10   believed the estimated NRR was so low?

11                    MS. ELIZABETH:  Objection.

12          Form.

13                    THE WITNESS:  At the time we

14          stopped the test, I don't recall what

15          he did or didn't say to me.

16   QUESTIONS BY MR. OVERHOLTZ:

17          Q.    Okay.  He was an experienced

18   earplug fitter, wasn't he?

19                    MS. ELIZABETH:  Objection.

20          Form.

21                    THE WITNESS:  He had been in

22          his role for a number of years, so he

23          did have a good degree of experience.

24   QUESTIONS BY MR. OVERHOLTZ:

25          Q.    Okay.  And he had been involved
```

Confidential - Pursuant to Protective Order

1    as being the experimenter in many of the

2    tests involving versions of the three-flange

3    UltraFit plug, right?

4         A.    Versions of it, which were not

5    a dual-ended version.  And as we had

6    discovered over the years with competitors'

7    earplugs or our own earplugs, as you learn to

8    work with earplugs, you can fit them better.

9              This was a new style of earplug

10   that he had not been -- as we discussed

11   earlier, this was the first REAT test on a

12   dual-ended product, so although he was

13   experienced in general, he was not

14   experienced with this design.

15        Q.    So the 016 test, that was on

16   the open end, right?  We talked about that

17   before.

18        A.    Yes.

19        Q.    And it was completed?

20        A.    Yes.

21        Q.    And an NRR was calculated for

22   the 016; is that right?

23        A.    Yes.

24        Q.    And the NRR that the company

25   calculated for the 016 was a negative

Confidential - Pursuant to Protective Order

1    point -- a negative 2.0, right?

2         A.    Yes.

3         Q.    So let me show you what we'll

4    mark...

5              (Berger 30(b)(6) Exhibit 19

6         marked for identification.)

7    QUESTIONS BY MR. OVERHOLTZ:

8         Q.    I'm showing you the testing

9    results from the 213016 study, MDL000188143,

10   signed by yourself and Mr. Kieper.

11             You're familiar with this

12   document and have it in your notebook, right?

13        A.    Is there a question?

14        Q.    Yes.

15             You're familiar with this

16   document, and you have it in your notebook;

17   is that correct?

18        A.    Yes.

19        Q.    Okay.  So this test report,

20   this is produced out of the testing database

21   that's held at Aearo; is that correct?

22        A.    Yes.

23        Q.    Now, this describes that there

24   were ten subjects, as we talked about, and

25   you had to review these results and sign off

1        A.      My answer to your initial

2   question is no.

3        Q.      Okay.  You don't agree that the

4   policies and procedures of Aearo require

5   there to be some type of physical change to

6   the plug to improve the plug in some way

7   before another test is performed?

8               MS. ELIZABETH:  Objection.

9        Form.

10  QUESTIONS BY MR. OVERHOLTZ:

11       Q.      Is that right?

12       A.      No.

13       Q.      Your understanding of the

14  policies and procedures is if there is a

15  change in the instructions, that that can be

16  a change that can relate to the ability to

17  conduct another test?

18       A.      Yes.

19       Q.      Okay.  And so a decision was

20  made to change the instructions by Aearo with

21  respect to the fitting of the Combat Arms

22  Earplug for another test to try to get an NRR

23  for labeling for the Combat Arms plug; is

24  that right?

25               MS. ELIZABETH:  Objection.

Confidential - Pursuant to Protective Order

1          Form.

2                    THE WITNESS:  We decided then

3          to change the instructions and to

4          start a labeling test with that new

5          type of instruction set.

6     QUESTIONS BY MR. OVERHOLTZ:

7          Q.    Okay.  And so with respect to

8     you're going to conduct another test and the

9     change that's required under the policies,

10    you agree some type of change is necessary,

11    right?

12                   MS. ELIZABETH:  Objection.

13         Form.

14                   THE WITNESS:  Our policies,

15         although on that one there is not a

16         written policy, but our policy and

17         practice has been that we don't simply

18         do a retest for the purpose of a

19         retest.  We make a change in the

20         function of the product or in some

21         aspect of how the product is used.

22    QUESTIONS BY MR. OVERHOLTZ:

23         Q.    Okay.  Either in function or

24    how it's used, right?

25         A.    (Witness nods head.)

Confidential - Pursuant to Protective Order

1        Q.     And did, in fact, a change in

2    the instructions for fitting the plug get

3    implemented before the other tests to get an

4    NRR label was begun?

5                  MS. ELIZABETH:  Objection.

6         Form.

7                  THE WITNESS:  There was a

8         change in the guidance at this time --

9         and it's not instructions.  They're

10        not instructions on the package.  It's

11        guidance to the experimenter on how

12        he's going to be working with that

13        product.

14   QUESTIONS BY MR. OVERHOLTZ:

15        Q.     Okay.  And so what you describe

16   as guidance, what was -- the method of

17   fitting the plug was changed for the new

18   test; is that right?

19        A.     There was another procedure

20   implemented besides what Ron had been doing,

21   which is that now, as needed for listeners,

22   he could fold back the opposing flange on the

23   earplug as he was inserting it.

24        Q.     He could fold back the -- you

25   said the opposing flange?

Confidential - Pursuant to Protective Order

```
 1          A.     The flange of the end of the

 2   plug that was sticking out of the ear.

 3          Q.     Okay.  So if I'm looking at

 4   this Combat Arms Earplug and I'm sticking the

 5   green end into the ear --

 6          A.     Yes.

 7          Q.     -- I can fold back this

 8   yellow --

 9          A.     Yes.

10          Q.     -- flange.

11                 And that was the difference in

12   how Ron Kieper, the experimenter, was

13   instructed to fit the plugs in the new NRR

14   test?

15                 MS. ELIZABETH:  Objection.

16          Form.

17                 THE WITNESS:  If that was

18          necessary for those listeners, he

19          would do that.

20   QUESTIONS BY MR. OVERHOLTZ:

21          Q.     So if it was necessary.

22          A.     (Witness nods head.)

23          Q.     And the test that was conducted

24   to get the other label, that was the 213017;

25   is that right?
```

Confidential - Pursuant to Protective Order

```
 1          A.      I believe so, but just so I

 2    don't misspeak...

 3                  Yes.

 4          Q.      Okay.  So he would fold back

 5    the flange and then insert the plug as part

 6    of the fit process; is that right?

 7                  MS. ELIZABETH:  Objection.

 8          Form.

 9                  THE WITNESS:  For some of the

10          subjects he did that.

11    QUESTIONS BY MR. OVERHOLTZ:

12          Q.      And after he got the plug

13    fitted, would the flange remain folded back,

14    or would he put it back?

15          A.      He would --

16                  MS. ELIZABETH:  Objection.

17          Form.

18                  THE WITNESS:  He would leave

19          the flange folded back.

20    QUESTIONS BY MR. OVERHOLTZ:

21          Q.      Okay.  And why would he leave

22    the flange folded back?

23          A.      There would be no reason to

24    unfold it.

25          Q.      Okay.  Well, if you left it
```

Confidential - Pursuant to Protective Order

1   folded back, wouldn't that allow the wind to

2   make wind noise over the top of it if a

3   soldier was out in the field?

4              MS. ELIZABETH:  Objection.

5         Form.

6              THE WITNESS:  We had no

7         information on the dual end of the --

8         dual-ended product about the wind

9         noise issues in practice.

10             All of the information provided

11        to us that was available -- and

12        actually I didn't see all those

13        reports we've looked at.  But as we

14        look back at them, all of those

15        studies' feedback from soldiers was on

16        single-ended earplugs with wind noise.

17  QUESTIONS BY MR. OVERHOLTZ:

18        Q.    And so part of the reason for

19  going for the two-sided design was that these

20  flanges being so close together would protect

21  this hole from wind noise, right?

22             MS. ELIZABETH:  Objection.

23  QUESTIONS BY MR. OVERHOLTZ:

24        Q.    That was one of the advantages?

25             MS. ELIZABETH:  Objection.

Confidential - Pursuant to Protective Order

1              Form.

2                   THE WITNESS:  That was

3        something that Doug Ohlin thought

4        might be the case.  There was no data

5        to support that.  That was his

6        supposition.

7   QUESTIONS BY MR. OVERHOLTZ:

8        Q.     So Ron Kieper could fold back

9   this opposing flange and insert it into the

10  ear and leave it folded back, would be the

11  process --

12       A.     Yes.

13       Q.     -- for the test?

14              What was the reason why --

15  well, the reason why the decision was made to

16  fold this flange back was because there was

17  concern that this flange, this opposing

18  flange on the other end of the plug, was

19  pressing against parts of the ear

20  requiring -- making the plug loosen in some

21  imperceptible way to the user; is that right?

22                  MS. ELIZABETH:  Objection.

23        Form.

24                  THE WITNESS:  Ron had spent a

25        period of time between the cessation

Confidential - Pursuant to Protective Order

1          of the initial 015 testing and the

2          commencement of the 017 testing

3          working with subjects, both enhancing

4          his own skill set in terms of

5          inserting the plug and understanding

6          what issues there might be working

7          with subjects.

8                    And his determination was that

9          it was the potential that when that

10         flange was folded back, it could

11         interfere.

12                   The imperceptible nature of

13         that loss in seal relates to the

14         person in the test chamber.  What you

15         must realize is that in the test

16         chamber, in the absence of fitting

17         noise, which is only on briefly, that

18         there is no sound.  That's the whole

19         purpose of the chamber.  It's a room

20         in which you cannot hear a thing.

21                   So whether a plug changes its

22         fit or seal, you had no auditory

23         feedback to suggest that there's been

24         a change in the noise reduction

25         characteristics once you're sitting

Confidential - Pursuant to Protective Order

```
1          there in this effectively totally

2          silent room.

3              Were you wearing the plug in

4          any sort of realistic environment,

5          either noise hazardous or simply loud

6          enough for sounds to be present, if

7          there was a change in the fit, I would

8          not suspect it would be imperceptible

9          at that point because you would notice

10         a change in the sound levels at your

11         ear.

12             So the imperceptible refers to

13         during that artificial type of test

14         environment.

15  QUESTIONS BY MR. OVERHOLTZ:

16         Q.   Okay.  So the concern is that

17  this flange is pressing against parts of the

18  ear causing the earplug to loosen, correct?

19             MS. ELIZABETH:  Objection.

20         Asked and answered.

21             THE WITNESS:  His statement was

22         that he presumed that that's what he

23         observed with some of the test

24         subjects.  There's not an in-depth

25         measurement on a particular person to
```

Confidential - Pursuant to Protective Order

1          demonstrate that.  That is what he

2          felt he observed and what he wrote

3          about.

4     QUESTIONS BY MR. OVERHOLTZ:

5          Q.     So we're going to talk about

6     that a little bit more, but before we do --

7     okay.  So before we do, the subjects that

8     were part of the 015 -- and only eight got

9     tested, right?

10         A.     Yes.

11         Q.     Had any other subjects been

12    identified to be tested in the 015 before the

13    test was stopped?

14         A.     I don't know.

15         Q.     Okay.  Those subjects, did all

16    eight of those subjects then get -- were they

17    part of the 213017 test?

18         A.     Not all of them.

19         Q.     Okay.  So only some of the

20    subjects in the 015 were tested in the 017?

21         A.     Yes.

22         Q.     Okay.  Some of the people were

23    switched out, right?

24              MS. ELIZABETH:  Objection.

25         Form.

Confidential - Pursuant to Protective Order

```
 1                 THE WITNESS:  You are aware
 2          that the retest is taking place in
 3          May.  The original test was in
 4          January.
 5   QUESTIONS BY MR. OVERHOLTZ:
 6          Q.     Okay.
 7          A.     As I indicated to you, one
 8   of -- or maybe I didn't make it clear, but
 9   one of the most difficult parts of being the
10   experimenter in Ron's role is getting people
11   to show up and take the test.  So people may
12   be sick, they may have other assignments,
13   they may not want to show up.
14                 So just because you had ten
15   people in January doesn't mean you have ten
16   people in May.  You're going to have whomever
17   you can get.
18                 So he would be looking at his
19   master panel and trying to select subjects
20   who were involved before, and likely unable
21   to obtain all of them, and so he would need
22   other subjects on that test.
23          Q.     Did Aearo ever consider hiring
24   like a contractor company that could have a
25   panel of subjects to be tested that would
```

Confidential - Pursuant to Protective Order

```
 1          our searches.  I don't recall how this

 2          was distributed or if it was

 3          distributed.

 4     QUESTIONS BY MR. OVERHOLTZ:

 5          Q.     You didn't find any e-mails

 6     where you e-mailed this to anyone, right?

 7          A.     Correct.

 8          Q.     And you searched your e-mails?

 9          A.     Yes.

10          Q.     Okay.  Let's see what you

11     documented back in July of 2000 in this

12     version 1.2.

13                 Let's look at the Introduction

14     section if we can.  Blow that up.

15                 It says, "The Combat Arms" --

16          A.     Could you just give me one

17     minute?

18          Q.     Sure.

19          A.     I just wanted to pull up one

20     thing in my book.

21          Q.     Okay.

22          A.     Okay.  Go ahead.

23          Q.     It says, "The Combat Arms

24     Earplug was shortened, at the request of the

25     Army, so that it would fit into a carrying
```

Confidential - Pursuant to Protective Order

1    case."

2              Do you see that?

3        A.    Yes.

4        Q.    Okay.  Did you provide that

5    information or did Ron Kieper have that on

6    his own?

7        A.    That information would have

8    been provided by me.

9        Q.    Okay.  And do you have any

10   documented evidence of the Army asking you to

11   shorten the plug to fit into their case?

12       A.    We have documented evidence of

13   Doug Ohlin indicating that he cut the plug

14   down by a quarter of an inch, and we have

15   documented evidence of our responses to that.

16   And we have a series of the 20/41 drawings of

17   the earplug showing the initial versions from

18   1998 being approximately one-quarter inch

19   longer than the subsequent versions in 1999.

20       Q.    Okay.  So we'll look at some of

21   those '99 files.  But sometime in '99, Aearo

22   shortened the plug, Mr. Falco redid drawings

23   shortening the plug, to end up with the final

24   length of the Combat Arms version 2 plug; is

25   that right?

Confidential - Pursuant to Protective Order

1        A.      Yes.

2        Q.      It says, "Because of this, the

3    plug is shorter than any other UltraFit plug

4    design."

5                Right?

6        A.      That's what it says, yes.

7        Q.      All right.  Now, let's read

8    this.

9                "The purpose of this report is

10   to document that the current length of the

11   UltraFit earplug end of the Combat Arms plug

12   is too short for proper insertion."

13               Right?

14       A.      That is a portion of the

15   sentence that you're abbreviating --

16       Q.      Right.

17       A.      -- which goes on to discuss how

18   changing the fitting technique affected the

19   results of REAT tests.

20               And so my reading of that

21   sentence is that the proper insertion refers

22   to the REAT tests and the ability to obtain

23   optimum performance in these tests.

24       Q.      So you say, "The purpose of the

25   report is to document that the current length

1    of the UltraFit earplug end of the Combat

2    Arms plug is too short for proper insertion

3    and how changing the fitting technique

4    affected the results of real-ear tests of

5    this plug."

6              Right?

7        A.    That's what's written there,

8    yes.

9        Q.    Okay.  Now, the UltraFit

10   earplug end of the Combat Arms plug, that's

11   talking about the green end that was tested,

12   right?

13       A.    Yes.

14       Q.    But it actually applies to both

15   ends, right?  They're both the UltraFit plug

16   end on both ends?

17             MS. ELIZABETH:  Objection.

18        Vague.

19             THE WITNESS:  This report is

20        directed at fitting the plug with the

21        sealed end in.  It could apply to both

22        ends.

23   QUESTIONS BY MR. OVERHOLTZ:

24       Q.    Okay.  It says that the current

25   length, the current length, of the UltraFit

Confidential - Pursuant to Protective Order

1    fit earplug end of the Combat Arms plug is

2    too short for proper insertion.

3              After this July 2000 report,

4    was the length of the UltraFit earplug end of

5    the Combat Arms plug changed in any way?

6              MS. ELIZABETH:  Objection.

7         Form.

8              THE WITNESS:  Once the plug was

9         shortened, I did have conversations

10        with Doug about that.

11             You will find in the records we

12        revealed that at one point he

13        requested a larger earplug carrying

14        case, which was one of the initial

15        principle reasons for the shortening

16        of the plug.  The case was never

17        enlarged.

18             And he made it clear that

19        lengthening the plug was not an

20        option.  His requested specification

21        was the length to which we had changed

22        the plug.

23   QUESTIONS BY MR. OVERHOLTZ:

24        Q.    All right.  So in --

25        A.    So we were making a product for

Confidential - Pursuant to Protective Order

```
 1              THE WITNESS:  I have
 2         documentary evidence that the military
 3         knew that the flanges needed to be
 4         folded back to obtain the optimum
 5         performance in our tests, as evidenced
 6         by providing our instruction card to a
 7         military officer, as evidenced by the
 8         military's own wallet card which shows
 9         pictures of a folded-back flange and
10         directs the need of that.
11              MR. OVERHOLTZ:  Objection.
12         Nonresponsive.  And we'll get to that.
13    QUESTIONS BY MR. OVERHOLTZ:
14         Q.    But do you have any evidence
15    that you communicated that Aearo believed
16    that the current length of the CAEv2 plug was
17    too short for proper insertion?
18              MS. ELIZABETH:  Objection.
19         Asked and answered for the third time.
20              THE WITNESS:  I have no
21         documentary evidence that this report
22         was shared or that the concept that it
23         was too short for proper insertion for
24         optimum fit in an S3.19 procedure was
25         communicated.
```

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. OVERHOLTZ:

 2        Q.     But it's your testimony that

 3   you were speaking to Doug Ohlin about this as

 4   this was occurring?

 5        A.     In this time frame, Doug and I

 6   were in communication and talking about

 7   issues about the plug.  I don't recall

 8   specific time/date phone call.  I know that

 9   we were in open communication.

10             There's an e-mail in the

11   documentary record where I communicate with

12   Brian Myers saying, "Should I share the

13   results of this study?"

14             In collecting background

15   information for this 30(b)(6), I spoke to

16   Brian and asked him if he had any

17   recollection of either approving or not

18   approving that sharing of the information.

19   He had no specific recollection.  His memory

20   was, as mine, that there'd be no reason he

21   wouldn't have been able to share it.

22             We were working closely with

23   Doug.  This was his baby.  He would need to

24   know what we were finding.

25        Q.     So it's your testimony that you
```

Confidential - Pursuant to Protective Order

1    specifically told Doug Ohlin that the company

2    believes that it's too short for proper

3    insertion?

4              MS. ELIZABETH:  Objection.

5    QUESTIONS BY MR. OVERHOLTZ:

6         Q.    Is that your testimony that you

7    told Doug Ohlin, that the company believed

8    that the plug was too short for proper

9    insertion?

10              MS. ELIZABETH:  Objection.

11         Form.  Argumentative.  Asked and

12         answered.

13              THE WITNESS:  I do not believe

14         I used those words.  I believe I spoke

15         to him about the fact that the

16         shortened earplug was creating a

17         problem in the initial test and that

18         the work we had done to try and

19         resolve that problem to get optimum

20         performance for labeling purposes

21         would require this fold-back

22         instruction.

23    QUESTIONS BY MR. OVERHOLTZ:

24         Q.    Did you tell him that failing

25    to fold back the flange of the opposing plug

Confidential - Pursuant to Protective Order

1    would compromise the fit of the earplug in

2    soldiers?

3         A.    I do not recall the specific

4    words of the conversation.  This entire

5    development project was discussed with him,

6    and the issues from shortening it to how it

7    affected our testing were reviewed.

8         Q.    Because that's what the company

9    believed, that you if you didn't fold back

10   the flanges, the fit was compromised, right?

11            MS. ELIZABETH:  Objection.

12        Form.

13            THE WITNESS:  I think you're

14        mischaracterizing what I said.

15   QUESTIONS BY MR. OVERHOLTZ:

16        Q.    Okay.  If we can look down at

17   the one, two, three, four, fifth paragraph,

18   and it says, "For test 213017" -- that's the

19   second test on the green end, right?

20        A.    Yes.

21        Q.    "For 213017, the yellow flanges

22   of the level-dependent end of the plug were

23   folded back prior to the green, solid plug

24   being inserted into the subjects' ears."

25            Did I read that right?

Confidential - Pursuant to Protective Order

```
 1        A.     Yes.

 2        Q.     And that says the yellow

 3   flanges, right?

 4        A.     Yes.

 5        Q.     Okay.  Can I get the ELMO real

 6   quick?

 7               So earlier we were talking

 8   about just folding back the opposing flange,

 9   but this is describing folding back all three

10   flanges, right?

11               MS. ELIZABETH:  Objection.

12          Form.

13               THE WITNESS:  I think the

14          wording is indeterminate.

15   QUESTIONS BY MR. OVERHOLTZ:

16        Q.     Can you fold back all three

17   flanges?

18        A.     And nor would I want to fold

19   back all three flanges.  I think flanges

20   refers to flanges across the variety of

21   earplugs as opposed to all the flanges on one

22   earplug.

23        Q.     So it's your belief that only

24   the outside flange?

25        A.     It's my belief that that is the
```

```
 1   deeper and more consistent fit of the solid

 2   plugs for test 213017."

 3                   Right?

 4        A.     Those are the words, yes.

 5        Q.     "When folded back in that way,

 6   the yellow flanges never {sic} touched the

 7   subjects'" -- is that conchae?  Conchae?

 8   Conchae?

 9        A.     You are misreading that.

10        Q.     "When folded back in that way,

11   the yellow flanges never touched the

12   subjects'" --

13        A.     You're still misreading it.

14        Q.     Okay.  Well, I think I read the

15   words right, right?

16        A.     No.

17        Q.     "When folded back in that way,

18   the yellow flanges neither touched the

19   subjects'" --

20                   Did I read it right now?

21        A.     Yes.

22        Q.     Okay.  I missed a word, right?

23                   "When folded back in that way,

24   the yellow flanges neither touched the

25   subjects'" --
```

Confidential - Pursuant to Protective Order

1               Is it conchae?

2       A.      Conchae.

3       Q.      -- "nor compromised the fit of

4   the solid earplugs."

5               Right?

6       A.      Those are the words.

7               And again, in reading that

8   sentence, the yellow flanges could refer to

9   the fact that there's a plug in each ear, so

10  there's flanges in both ears that need

11  folding back.

12              I don't believe the precision

13  of this was trying to address if I'm folding

14  back one, two or three flanges.

15      Q.      Okay.  But what is described

16  here is that when you fold the flanges back,

17  the fit isn't compromised, right?

18              MS. ELIZABETH:  Objection.

19          Form.

20              THE WITNESS:  Those are the

21          words in this document.  It says that

22          the "subjects' conchae neither

23          compromise the fit -- neither touch

24          the subjects' conchae nor compromise

25          the fit of the solid earplugs."

Confidential - Pursuant to Protective Order

```
1    QUESTIONS BY MR. OVERHOLTZ:

2         Q.    Okay.  So did you ever

3    communicate to the United States military

4    that if the yellow flanges touch the

5    subjects' ear, the conchae of the ear, that

6    that would compromise the fit of this Combat

7    Arms plug?

8              MS. ELIZABETH:  Objection.

9         Form.

10             THE WITNESS:  As I said, I

11        don't recall the details of the words

12        of our conversations.

13             What I recall is being in

14        direct communication with Doug about

15        this project and discussing what we

16        were observing and whether that was

17        going to be acceptable then --

18        acceptable to the military to have

19        this additional type of instruction

20        included.

21   QUESTIONS BY MR. OVERHOLTZ:

22        Q.    This is 2000, right?  May

23   of 2000?

24             MS. ELIZABETH:  I think it says

25        July --
```

Confidential - Pursuant to Protective Order

```
1    QUESTIONS BY MR. OVERHOLTZ:

2         Q.     This is when the 015 was

3    redone?

4                The testing was done in May

5    of 2000; is that right?

6         A.     Yes.

7         Q.     Finishes up on May 9th, right?

8         A.     Yes.

9         Q.     A couple days later you write

10   an e-mail asking Brian Myers:  Is it okay for

11   me to tell Doug Ohlin this?

12               Right?

13               MS. ELIZABETH:  Objection.

14        Form.

15               THE WITNESS:  We should look at

16        the exact words of that, but it

17        referred to, is it okay to communicate

18        something?  If you want to ask me, we

19        should pull up that e-mail.

20   QUESTIONS BY MR. OVERHOLTZ:

21        Q.     You recall reviewing an e-mail

22   in which you asked Brian Myers whether you

23   should tell Doug Ohlin about the test

24   results?

25        A.     Share something with him.  I
```

Confidential - Pursuant to Protective Order

 1   don't recall the words in that e-mail.

 2        Q.     Okay.  Why were you talking to

 3   Doug Ohlin in 2000 about this plug, about the

 4   testing that was done?

 5        A.     Because we're in the process of

 6   developing and finalizing this product that

 7   he's interested in.

 8        Q.     You had already started selling

 9   it to the military, right?

10             MS. ELIZABETH:  Objection.

11        Form.  Misstates the testimony.

12             THE WITNESS:  I believe that

13        was addressed by other 30(b)(6)

14        witnesses.  I don't know if you want

15        me to speak to that or not.

16             MS. ELIZABETH:  You can answer

17        the question.

18             THE WITNESS:  I believe that it

19        had been distributed to various

20        military users.  I know, for example,

21        that the original longer version was

22        shared with Doug Ohlin, which is how

23        we ended up coming up with the

24        feedback that said I want the plug

25        shortened.

Confidential - Pursuant to Protective Order

```
 1        A.      Yes.

 2        Q.      -- internal test reports?

 3        A.      Yes.

 4        Q.      Did you talk to Dick Knauer

 5   about whether you should share this with the

 6   US military?

 7        A.      I don't recall if I did.

 8                What I can tell you is that

 9   Dick's office was three doors down from mine.

10   Brian was in another building.

11        Q.      Okay.

12        A.      So I would see Dick multiple

13   times a day.  Brian I might or might not see.

14        Q.      Okay.  Have you talked -- have

15   you spoken to Dick Knauer since -- in

16   preparation for this deposition or in the

17   past regarding whether or not you shared this

18   information with the United States military

19   in some way?

20        A.      I did have a conversation with

21   Dick.

22        Q.      All right.  And what did he

23   say?

24        A.      And --

25                THE WITNESS:  Would you remind
```

Confidential - Pursuant to Protective Order

1        me which 30(b)(6) topic is this?

2                MS. ELIZABETH:  Sure.

3        Number -- what number are you on?

4                THE WITNESS:  Well, I spoke to

5        Dick about 11, 12 --

6                MR. OVERHOLTZ:  It would either

7        be 10 or 11.

8                THE WITNESS:  I did speak to

9        him about Topic 11.

10   QUESTIONS BY MR. OVERHOLTZ:

11        Q.    Okay.  And did he say anything

12   about whether or not the fact that the 015

13   test had been stopped and that the 017 test

14   had been conducted with flanges rolled back

15   to get the NRR of 22, whether that had been

16   communicated to the United States military?

17                MS. ELIZABETH:  Objection.

18        Form.

19                THE WITNESS:  He had no

20        recollections of those details.

21   QUESTIONS BY MR. OVERHOLTZ:

22        Q.    Okay.  And he had no documents

23   to provide to you that would indicate that

24   that information had been shared with the

25   United States military; is that right?

Confidential - Pursuant to Protective Order

1        A.      Correct.

2        Q.      Okay.  You go on and say, "It

3   looks like the existing product has problems

4   unless the user instructions are revised."

5                Right?

6        A.      That's what's written there.

7        Q.      Okay.  And it's your testimony

8   that you told Doug Ohlin that the 017 test

9   had been conducted by rolling back the

10  flanges?

11               MS. ELIZABETH:  Objection.

12       Asked and answered.

13               THE WITNESS:  Yes.

14  QUESTIONS BY MR. OVERHOLTZ:

15       Q.      You told me before that

16  Mr. Kieper could roll back the flanges if it

17  was necessary.

18               Do you recall that?

19               MS. ELIZABETH:  One second.

20               Objection.  Asked and answered.

21       Form.

22  QUESTIONS BY MR. OVERHOLTZ:

23       Q.      During the 017 --

24               MR. OVERHOLTZ:  If we can just

25       keep the objections to form, please.

Confidential - Pursuant to Protective Order

```
 1    QUESTIONS BY MR. OVERHOLTZ:

 2         Q.    During the 017 tests, is it

 3    your testimony that Mr. Kieper could fold

 4    back the flanges if he thought it was

 5    necessary?

 6              MS. ELIZABETH:  Same

 7         objections.

 8              THE WITNESS:  Yes.

 9    QUESTIONS BY MR. OVERHOLTZ:

10         Q.    Okay.  And did he tell you --

11    or did you determine when it would be

12    necessary to roll back the flanges?

13         A.    I did not make a determination

14    subject by subject.

15              Ron was someone who had been

16    doing this testing for a number of years.  In

17    my supervisory capacity I would coach him if

18    he was having problems.  I would observe from

19    time to time his test practices to assure

20    that I thought they were appropriate.

21              If he had questions on a

22    particular subject, my office was just

23    outside the lab.  He'd call me in, and we

24    would take a look and discuss it together.

25              I don't recall what our
```

Confidential - Pursuant to Protective Order

1    interactions were over this particular test.

2         Q.    Okay.  You don't remember

3    discussing with Mr. Kieper about when it

4    would be necessary to roll back the flanges?

5         A.    No.

6         Q.    Speaking of -- you mentioned

7    observing.  When the testing was going on in

8    these tests, where you would have been in the

9    lab?

10             MS. ELIZABETH:  Objection.

11        Vague.

12             THE WITNESS:  I could have been

13        multiple places.  I could have been on

14        a business trip.  I could have been in

15        my office.  I could have been in the

16        laboratory waiting to see the results

17        of a given test.

18             You know, he was able to do the

19        testing independent of my constant

20        involvement, so it was in a

21        supervisory role, a collaborative

22        role.  I would certainly be checking

23        to make sure that in general things

24        were being done as I thought was

25        appropriate.

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. OVERHOLTZ:

2         Q.    Were you ever in the testing

3    lab and observed the rolling back of the

4    flanges during the testing during the 017

5    test?

6         A.    I don't have a recollection

7    specifically for my time.

8         Q.    Okay.  Did you tell Doug Ohlin,

9    "We rolled back the flanges in the 017 test

10   to get that NRR"?

11              MS. ELIZABETH:  Objection.

12         Asked and answered.

13              THE WITNESS:  I discussed with

14         him that we had determined that

15         rolling back the flanges would be

16         important for some people and that it

17         was something that we were doing on

18         the most recent test.

19              (Berger 30(b)(6) Exhibit 24

20         marked for identification.)

21   QUESTIONS BY MR. OVERHOLTZ:

22         Q.    Let me show you what we'll mark

23   as Exhibit Number 24.  It's Exhibit 913A.

24              This is Bates -- ends in

25   3M_MDL000192859, Plaintiff's 913A.

Confidential - Pursuant to Protective Order

```
 1                  I'll let you take a look,

 2      glance at it, and then ask you some questions

 3      about it.

 4                  Okay?

 5          A.     Yes.

 6          Q.     So on November 15, 2004, you

 7      send an e-mail from your CompuServe e-mail

 8      address to Doug Ohlin, and you copy both

 9      Brian Myers and Richard Knauer, right?

10          A.     Yes.

11          Q.     And the subject was "CAE

12      Comfort Issues."

13                  Do you see that?

14          A.     Yes.

15          Q.     Okay.  And you say, "Doug, good

16      to see you at the beach."

17                  Do you see that?

18          A.     Yes.

19          Q.     Which beach did you see Doug

20      Ohlin at?

21          A.     My recollection is that there

22      was a -- perhaps the Acoustical Society of

23      America or a military conference that both of

24      us attended that took place at Virginia

25      Beach.
```

Confidential - Pursuant to Protective Order

```
1          Q.     Okay.

2          A.     And so we were at the beach.

3          Q.     Okay.  Were you actually out on

4    the beach with him?

5          A.     I don't recall.  I hope I was.

6    I don't recall.

7          Q.     But you don't remember it.

8                 Have you ever been to the beach

9    with Doug Ohlin?

10         A.     I don't recall.  I don't think

11   so.

12         Q.     If you had gone to the beach

13   with Doug Ohlin, you'd remember, right?

14                MS. ELIZABETH:  Objection.

15         Form.

16                THE WITNESS:  I don't know.

17   QUESTIONS BY MR. OVERHOLTZ:

18         Q.     Okay.

19         A.     I grew up on the beach.  I've

20   been at the beach many times.  I'm landlocked

21   these days, but I grew up on the beach.

22         Q.     Okay.  You say, "I took back

23   your concerns on the CAE and have some

24   thoughts."

25                Do you see that?
```

Confidential - Pursuant to Protective Order

1   for taking it through distribution.  I don't

2   believe we have grown this business at all -

3   ask Tim.  I think we need to revisit this

4   decision and reverse it as quickly as we

5   can."

6            Do you see that?

7       A.    Yes.

8       Q.    And he's forwarding an e-mail

9   on the back of the second page from Doug

10  Ohlin.

11           Do you see that?

12      A.    Yes.  I was in the process of

13  reading it.

14      Q.    Okay.

15      A.    I'll go ahead and do that.

16           Why don't you ask me your

17  question --

18      Q.    Sure.

19      A.    -- and then I'll see if I have

20  to focus on a particular paragraph.

21      Q.    Sure.

22           So Doug Ohlin, if you've read

23  this, he's e-mailing someone about sending

24  some samples and is providing information

25  about how they can purchase the product; is

Confidential - Pursuant to Protective Order

1    that right?

2              MS. ELIZABETH:  Objection.

3         Form.

4              THE WITNESS:  That appears to

5         be what he's saying here.

6    QUESTIONS BY MR. OVERHOLTZ:

7         Q.    He's providing information

8    about -- that you can even contact Aearo

9    directly to expedite the order.

10             Do you see that?

11        A.    Yes.

12        Q.    "Recommend you contact Aearo

13   directly," and there's a number to expedite

14   your order.

15             Do you see that?

16        A.    Yes.

17        Q.    It says, "Lately, however, they

18   have been referring customers to

19   distributors, which has increased the price."

20             Do you see that?

21        A.    Yes.

22        Q.    "The dual-ended plug will fit a

23   majority of the adult male population."

24             Do you see that?

25        A.    Yes.

Confidential - Pursuant to Protective Order

1    Q.    And then he says, "For those

2  with excessively large ear canals, we

3  recommend that the opposing plug be folded

4  back before attempting insertion."

5          Do you see that?

6    A.    Yes.

7    Q.    So it seems that in whatever

8  conversations that Doug Ohlin had with you,

9  he got the impression that the only flanges

10  that needed to be folded back were in people

11  with excessively large ear canals.

12          MS. ELIZABETH:  Objection.

13      Form.

14  QUESTIONS BY MR. OVERHOLTZ:

15    Q.    Right?

16    A.    No.

17    Q.    That's what he wrote, right?

18          MS. ELIZABETH:  Objection.

19      Form.

20          THE WITNESS:  I do not know why

21      he wrote that.

22          There's a military card that

23      talks about very large ear canals.

24      This talks about excessively large ear

25      canals.  And if you look at the

Confidential - Pursuant to Protective Order

1           instructions that we provided when we

2           introduced the product, it is agnostic

3           about ear canals.  It says for fitting

4           tips it's easier to fold back the

5           flanges.  It doesn't discuss ear

6           canals at all.

7                So I can't tell you why he

8           wrote this.  All I can tell you is

9           that he would be working with

10          soldiers, he would have information

11          that he was determining appropriate,

12          and I don't know why that was written.

13     QUESTIONS BY MR. OVERHOLTZ:

14          Q.     You had been communicating with

15     him, you testified to, during the testing of

16     the 017 tests when the flanges were being

17     folded back, right?

18          A.     Back in 2000, yes.

19          Q.     And Aearo wasn't just folding

20     back the flanges in that test in people with

21     very large or excessively large ear canals,

22     right?

23                MS. ELIZABETH:  Objection.

24          Form.

25                THE WITNESS:  That is not what

Confidential - Pursuant to Protective Order

1           we did on that test.

2    QUESTIONS BY MR. OVERHOLTZ:

3           Q.    Okay.  But here he is, just

4    less than a couple years later, saying that

5    they recommend that only for those with

6    excessively large ear canals do you fold the

7    opposing plug back before attempting

8    insertion.

9               MS. ELIZABETH:  Is there a

10         question?

11   QUESTIONS BY MR. OVERHOLTZ:

12         Q.    Right?

13         A.    He is recommending that in

14   2002.

15         Q.    I just want to be clear about

16   something.  As the person who was designated

17   on these topics by 3M, you don't have any

18   recollection of actually providing the test

19   data of the 015 and the 017 study test to

20   Doug Ohlin; is that right?

21              MS. ELIZABETH:  Objection.

22         Form.

23              THE WITNESS:  I do not have

24         specific recollection of providing

25         that.

Confidential - Pursuant to Protective Order

```
 1              (Berger 30(b)(6) Exhibit 26

 2         marked for identification.)

 3    QUESTIONS BY MR. OVERHOLTZ:

 4         Q.    Okay.  Let me show you what

 5    we'll mark as Exhibit Number 26.

 6              Okay.  So what I've shown you

 7    here is Plaintiff's 0302A.  It's Bates

 8    number 3M_MDL000022452, and it's an e-mail

 9    chain between Doug Ohlin and Doug Moses at

10    the top, and then down below also including

11    Mark Santoro and Brian Myers.

12              Do you see that?

13         A.    Yes.

14              MS. ELIZABETH:  Counsel, what

15         30(b)(6) topic are you representing

16         this refers to?

17              MR. OVERHOLTZ:  This refers to

18         design decisions related to the

19         product as well as the NRR testing

20         that was conducted on the CAE Vs and

21         communications about the NRR testing.

22              MS. ELIZABETH:  What number is

23         it?

24              MR. OVERHOLTZ:  It's number 13

25         and number 12.
```

Confidential - Pursuant to Protective Order

 1                    Do you see that?

 2          A.      Yes.

 3          Q.      Okay.  Now, that was talking

 4   about a different UltraFit plug that the

 5   company got a fine on the EPA about, right?

 6                    MS. ELIZABETH:  Objection.

 7   QUESTIONS BY MR. OVERHOLTZ:

 8          Q.      Not the Combat Arms.

 9                    MS. ELIZABETH:  Objection.

10          Outside the scope.  Form.

11                    You can answer.

12                    THE WITNESS:  It was not the

13          Combat Arms.

14                    I would also point out that

15          it's misstated.

16   QUESTIONS BY MR. OVERHOLTZ:

17          Q.      Okay.  At the bottom of the

18   paragraph, Doug Ohlin says to Doug Moses,

19   "Bottom line, make sure we aren't putting

20   Elliott in a position where he is

21   compromising the integrity of his lab."

22                    Do you see that?

23          A.      Yes.

24          Q.      Okay.  Now, at this point Doug

25   Ohlin has become an employee of Aearo, 3M,

Confidential - Pursuant to Protective Order

1    right?

2         A.    Yes.

3         Q.    Okay.  What's being described

4    in this e-mail is essentially what happened

5    as described in the flange report, right,

6    that in the 213017 test -- yeah.

7              In the 213017 test, which is

8    the second NRR test, 3M changed the fitting

9    protocol so they could get a better NRR,

10   right?

11             MS. ELIZABETH:  Objection.

12        Form.  Misstates the testimony.

13             THE WITNESS:  We changed the

14        fitting protocol so that we could test

15        and achieve the optimum performance

16        fit called for in the ANSI standard.

17   QUESTIONS BY MR. OVERHOLTZ:

18        Q.    You wanted the optimum

19   performance fit?

20        A.    Optimum performance as called

21   for in the ANSI standard.

22        Q.    Okay.  And when you achieve

23   optimum performance under the ANSI standard,

24   you get a higher NRR, right?

25             MS. ELIZABETH:  Objection.

1        Form.

2               THE WITNESS:  You typically

3        would get a higher NRR.

4   QUESTIONS BY MR. OVERHOLTZ:

5        Q.    Okay.  So that's what the

6   company did with respect to the 213017 test,

7   right?

8               MS. ELIZABETH:  Objection.

9        Misstates the testimony.

10              THE WITNESS:  With respect to

11       the 23017 test, we changed our fitting

12       protocol and then conducted our label

13       test.

14   QUESTIONS BY MR. OVERHOLTZ:

15       Q.    And the change that was made

16   was folding back the yellow flange, right,

17   during the testing?

18       A.    As needed, yes.

19       Q.    Okay.  Rolling back the flanges

20   needed.  And the truth here, Mr. Berger, is

21   that the fact that the flanges were rolled

22   back as part of a fitting protocol change to

23   get the higher NRR in the 213017 test was

24   never told to Doug Ohlin, right?

25              MS. ELIZABETH:  Objection.

Confidential - Pursuant to Protective Order

```
 1          Form.  Asked and answered for about

 2          the eighth time.

 3               THE WITNESS:  No.

 4   QUESTIONS BY MR. OVERHOLTZ:

 5          Q.    You disagree with me?

 6          A.    I disagree with you.

 7          Q.    You believe that Doug Ohlin was

 8   told that in the 213017, that the flanges

 9   were rolled back, as necessary, in order to

10   get this optimum performance under the ANSI

11   standards?

12          A.    Absolutely --

13               MS. ELIZABETH:  Objection.

14          Asked and answered.  Form.

15   QUESTIONS BY MR. OVERHOLTZ:

16          Q.    You know that Doug Ohlin was

17   asked about this in his deposition, right?

18          A.    No.

19          Q.    Have you read Doug Ohlin's

20   testimony?

21          A.    No.

22          Q.    You know he was specifically

23   asked whether he had ever heard of 3M doing

24   this, what they did in the 017?

25               MS. ELIZABETH:  Objection.
```

Confidential - Pursuant to Protective Order

 1          Form.

 2                  THE WITNESS:  I don't know.

 3     QUESTIONS BY MR. OVERHOLTZ:

 4          Q.     You haven't read that

 5     testimony?

 6                  MS. ELIZABETH:  Objection.

 7          Form.  Asked and answered.

 8                  THE WITNESS:  No.

 9                  MR. OVERHOLTZ:  Let me -- do we

10          have a copy of this?

11                  So if we can show the front

12          page of this deposition.  The top left

13          up there.

14     QUESTIONS BY MR. OVERHOLTZ:

15          Q.     This was the videotaped

16     deposition of Doug Ohlin on April 24, 2013,

17     and I want to turn your attention over to

18     page 191, about halfway down the page on

19     line 18 --

20                  MS. ELIZABETH:  Do you have an

21          extra copy, Counsel?

22                  MR. OVERHOLTZ:  Yeah, I'm going

23          to give you a copy.

24     QUESTIONS BY MR. OVERHOLTZ:

25          Q.     Okay?  So if we --

Confidential - Pursuant to Protective Order

```
 1          conducted testing, those results

 2          should be documented.  They would

 3          likely be in that database.

 4   QUESTIONS BY MR. OVERHOLTZ:

 5          Q.    Can you tell me who made the

 6   decision to put those tests on hold?

 7                MS. ELIZABETH:  Objection.

 8          Form.

 9                THE WITNESS:  I don't recall.

10   QUESTIONS BY MR. OVERHOLTZ:

11          Q.    The company has conducted

12   Method B testing on lots of plugs, right?

13          A.    What do you mean by "lots"?

14          Q.    On other plugs that the company

15   has commercialized, the company has done REAT

16   Method B testing under the 1997 standard; is

17   that right?

18                MS. ELIZABETH:  Objection.

19          Form.

20                THE WITNESS:  On some plugs,

21          not a lot.  On some of the plugs we

22          sold, we've done Method B.

23                It's an arduous test for us to

24          conduct because of the difficulty of

25          obtaining listeners, the fact that
```

Confidential - Pursuant to Protective Order

1           they can only be used for a limited

2           amounts of tests, the fact that often

3           you establish a listener panel and

4           before your testing's done they end up

5           not showing up, not coming back.

6                They're not the same type of

7           listeners that we have for a standard

8           panel.  We have to throw a very broad

9           net out to end up getting Method B

10          subjects, and so it's always been much

11          more difficult for us to accomplish.

12   QUESTIONS BY MR. OVERHOLTZ:

13          Q.    So your testimony is that you

14   don't believe that the Method B testing was

15   ever conducted on the Combat Arms plug; is

16   that right?

17                MS. ELIZABETH:  Objection.

18          Misstates the testimony.  Form.

19                THE WITNESS:  I don't know.

20          What I see there is it says "tests on

21          hold."

22                Of course, this is written at a

23          point in time, so I would have to go

24          back and look through the data to

25          answer your question.

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. OVERHOLTZ:

2         Q.    Okay.  Let me ask you do you

3    recall us discussing the fact that under the

4    flange report and the REAT test, the second

5    test that was done on the 213017, that

6    Mr. Kieper would determine whether it was

7    necessary to roll back the flanges for some

8    of the people; is that right?

9         A.    Yes.

10        Q.    Okay.  Is it your testimony

11   that he made that determination based on

12   individual by individual?

13             MS. ELIZABETH:  Objection.

14        Form.  Foundation.

15             THE WITNESS:  I'm not certain

16        how he made that.

17             Looking at the notes file that

18        accompanies the test report, it

19        indicates that he did that for one

20        listener.  It doesn't indicate that he

21        did that for others.

22             So my understanding is that it

23        wasn't done for all subjects, and if

24        that's the case, he would have been

25        making the determination about who it

Confidential - Pursuant to Protective Order

 1          would be done for and who it would not

 2          be done for.

 3   QUESTIONS BY MR. OVERHOLTZ:

 4          Q.     Do you have any personal

 5   knowledge as to which subjects it was done

 6   for and which it wasn't?

 7          A.     Other than the written document

 8   I looked at, no.

 9          Q.     And you haven't spoken to

10   Mr. Kieper about it; is that right?

11          A.     Correct.

12          Q.     Okay.  And do you have an

13   understanding of how the soldier would

14   determine whether they should roll back the

15   plugs or not?

16                 MS. ELIZABETH:  Objection.

17          Form.

18                 THE WITNESS:  I don't know what

19          individual soldiers were doing, no.

20   QUESTIONS BY MR. OVERHOLTZ:

21          Q.     Okay.  All right.  So one of

22   the things we want to do is pull up the

23   exhibit that we had -- the demonstrative that

24   we had earlier.

25                 MR. OVERHOLTZ:  Do you have

Confidential - Pursuant to Protective Order

1          that one, Zach?

2                    And we'll get a printout of

3          this, but we're going to mark this as

4          Exhibit Number 33.

5                    (Berger 30(b)(6) Exhibits 33,

6          34, 35 and 36 marked for

7          identification.)

8                    MR. OVERHOLTZ:  Okay.  And then

9          I made some further notes here

10         regarding the testing that are on

11         the -- you can put them on the ELMO

12         here, and I'm going to mark those as

13         demonstrative Exhibit Number 34.

14                   Okay.  And then this next page

15         of notes I'm going to mark as

16         demonstrative Exhibit Number 35.

17                   And then we got a copy of your

18         notes from earlier that was provided

19         to us, and I'm going to mark those as

20         Exhibit Number 36 to the deposition.

21                   MS. ELIZABETH:  His notes that

22         accompany his binder?

23                   MR. OVERHOLTZ:  The notes that

24         accompany the binder.

25                   MS. ELIZABETH:  Okay.

Confidential - Pursuant to Protective Order

```
 1              MR. OVERHOLTZ:  Those.

 2              Okay.  So we'll mark those as

 3         Exhibit Number -- demonstrative

 4         exhibit -- I mean, that's regular

 5         Exhibit 36.

 6              34 and 35 and 33 are all

 7         demonstratives, so I'll give you those

 8         to put into the stack.

 9              MR. BROCK:  Okay.  Are you

10         going to ask him anything else about

11         this notebook right now?

12              MR. OVERHOLTZ:  I'm not going

13         to ask him anything else about that

14         notebook right now.

15              MR. BROCK:  All right.  Let me

16         have that.

17              MR. OVERHOLTZ:  Can we go off

18         the record real quick?

19              VIDEOGRAPHER:  We are going off

20         record at 6:36.

21          (Off the record at 6:36 p.m.)

22              VIDEOGRAPHER:  We're back on

23         record.  The time is 6:40.

24    QUESTIONS BY MR. OVERHOLTZ:

25         Q.   Okay.  Mr. Berger, a follow-up
```

Confidential - Pursuant to Protective Order

```
1                      CERTIFICATE
2
3           I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
4    Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
5    of the examination, Elliott H. Berger, M.S.
     30(b)(6), was duly sworn by me to testify to
6    the truth, the whole truth and nothing but
     the truth.
7
            I DO FURTHER CERTIFY that the
8    foregoing is a verbatim transcript of the
     testimony as taken stenographically by and
9    before me at the time, place and on the date
     hereinbefore set forth, to the best of my
10   ability.
11          I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor attorney
12   nor counsel of any of the parties to this
     action, and that I am neither a relative nor
13   employee of such attorney or counsel, and
     that I am not financially interested in the
14   action.
15
16
17   _____
     CARRIE A. CAMPBELL,
18   NCRA Registered Diplomate Reporter
     Certified Realtime Reporter
19   California Certified Shorthand
     Reporter #13921
20   Missouri Certified Court Reporter #859
     Illinois Certified Shorthand Reporter
21   #084-004229
     Texas Certified Shorthand Reporter #9328
22   Kansas Certified Court Reporter #1715
     Notary Public
23
     Dated:  November 15, 2019
24
25
```

Confidential - Pursuant to Protective Order

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.  You are signing

10    same subject to the changes you have noted on

11    the errata sheet, which will be attached to

12    your deposition.

13              It is imperative that you return

14    the original errata sheet to the deposing

15    attorney within thirty (30) days of receipt

16    of the deposition transcript by you.  If you

17    fail to do so, the deposition transcript may

18    be deemed to be accurate and may be used in

19    court.

20

21

22

23

24

25
```

Confidential - Pursuant to Protective Order

1             ACKNOWLEDGMENT OF DEPONENT

2

3

4        I,_____, do

hereby certify that I have read the foregoing

5  pages and that the same is a correct

transcription of the answers given by me to

6  the questions therein propounded, except for

the corrections or changes in form or

7  substance, if any, noted in the attached

Errata Sheet.

8

9

10

11

12  _____

Elliott H. Berger, M.S.        Date

13

14

15

Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25