# EXHIBIT 60

Confidential - Pursuant to Protective Order

```
 1                  UNITED STATES DISTRICT COURT
 2                  NORTHERN DISTRICT OF FLORIDA
 3                       PENSACOLA DIVISION
 4
 5   IN RE:  3M COMBAT ARMS        )  Case No. 3:19md2885
 6   EARPLUG PRODUCTS LIABILITY    )
 7   LITIGATION                    )  Judge M. Casey
 8   -------------------------     )  Rodgers
 9                                 )  Magistrate Judge
10   THIS DOCUMENT RELATES TO      )  Gary R. Jones
11   ALL CASES                     )
12       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
13          The videotaped deposition of RONALD WILLIAM
14   KIEPER, called by the Plaintiffs for examination,
15   taken pursuant to the Federal Rules of Civil Procedure
16   of the United States District Courts pertaining to the
17   taking of depositions, taken before JULIANA F.
18   ZAJICEK, a Registered Professional Reporter and
19   Certified Shorthand Reporter, at the Indianapolis
20   Marriott Downtown, The Lincoln Room, 350 West Maryland
21   Street, Indianapolis, Indiana, on the 19th day of
22   December, 2019, commencing at 9:06 a.m.
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1    PRESENT:
 2    ON BEHALF OF THE PLAINTIFFS:
 3         AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
           17 East Main Street, Suite 200
 4         Pensacola, Florida 32502
           850-202-1010
 5         BY:  NEIL D. OVERHOLTZ, ESQ.
                noverholtz@awkolaw.com
 6
                     -and-
 7

           SEEGER WEISS, LLP
 8         77 Water Street
           New York, New York 10005
 9         212-584-0700
           BY:  DAVID R. BUCHANAN, ESQ.
10              dbuchanan@seegerweiss.com;
                CALEB SEELEY, ESQ.
11              cseeley@seegerweiss.com
12
      ON BEHALF OF THE DEFENDANTS:
13
           KIRKLAND & ELLIS LLP
14         300 North LaSalle
           Chicago, Illinois 60654
15         312-862-2000
           BY:  SIMON GOTTLIEB, ESQ.
16              simon.gottlieb@kirkland.com
17                   -and-
18         KIRKLAND & ELLIS LLP
           333 South Hope Street
19         Los Angeles, California  90071
           213-680-8122
20         BY:  SIERRA ELIZABETH, ESQ.
                sierra.elizabeth@kirkland.com
21
22
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1   ALSO PRESENT:
 2        CHARLES BACHMANN, Legal Analyst,
 3           Seeger Weiss, LLP
 4        ZACH HONE, Trial Technician,
 5           Golkow Litigation Services
 6
 7
 8
 9
10   THE VIDEOGRAPHER:
11        DEVYN MULHOLLAND,
12           Golkow Litigation Services
13
14
15
16
17
18
19
20   REPORTED BY:   JULIANA F. ZAJICEK, CSR No. 84-2604.
21
22
23
24
25
```

```
 1   time talking about it.  Frankly, I wish I had this
 2   picture up before.  This would have been an easier one
 3   to look at.
 4              Do you see the gentleman there in the
 5   picture?
 6        A.    Yes.
 7        Q.    Who is that?
 8        A.    I can't recognize him.
 9        Q.    Okay.  This is the same room just from a
10   different perspective?
11        A.    That's correct.
12        Q.    This is the so-called REAT testing room?
13        A.    Yes.
14        Q.    Did you call it something else?
15        A.    Test chamber.
16        Q.    Test chamber, okay.
17              And you had an office or a space where you
18   could see into the test chamber?
19        A.    If you look at the wall on the right side,
20   there is a window.
21        Q.    Oh, I see.
22              MR. BUCHANAN:  Can you just kind of put a circle
23   on it or something, Zach, so we can make sure we are
24   referring to the right black box.
25   BY THE WITNESS:
```

Confidential - Pursuant to Protective Order

 1         A.    That's it.
 2    BY MR. BUCHANAN:
 3         Q.    That's it, okay.
 4         A.    That's the window.
 5         Q.    So this gentleman sitting in the test
 6    chamber, if he was actually in the middle of a test
 7    right now, we'd expect to see Mr. Kieper on the other
 8    side of that window, right?
 9         A.    Well, I would be on the other side.  You
10    wouldn't see me from here, but yes.
11         Q.    Understood.
12               But if he turned to his left, he would see
13    you on the other side of that window, right?
14         A.    Yes, he would.
15         Q.    Okay.  How about Mr. Berger, was he kind
16    of in the same vicinity?
17         MS. ELIZABETH:  Objection; foundation, form.
18    BY THE WITNESS:
19         A.    Elliott's office was, oh, 70 feet from the
20    lab, approximately.
21    BY MR. BUCHANAN:
22         Q.    Okay.  So if we are, you know, thinking of
23    the footprint of the building where the "test chamber"
24    is, where you are sitting when you are administering
25    the test, Mr. Berger's office, this test chamber is on

1  the first floor?

2  A. Yes.

3  Q. Okay. You have your location on the other
4  side of the glass where you're monitoring the test,
5  right?

6  A. Conducting the test, yeah.

7  Q. Conducting the test. Thank you.
8  Did you also have an office where you
9  would go to work to prepare reports and assimilate the
10 data, you know, that kind of stuff?

11 A. At times, there were times when I first
12 came up to the lab I had a space in the lab that I --
13 where I had a desk. It wasn't an office per se, but
14 it was my own space.

15 Q. That changed, I guess, huh?

16 A. It changed.

17 Q. You are smiling.

18 A. I did get an office.

19 Q. Okay. So when you are actually inputting
20 the data from the test, where is that happening, right
21 on the other side of the glass?

22 A. The -- yeah, the computers were in the lab
23 on the other -- you know, in the lab as opposed to in
24 the test chamber, yes.

25 Q. Okay. And Mr. Berger would come down from

Confidential - Pursuant to Protective Order

 1   time to time and watch the test being conducted?

 2        A.   Yes, he could, sure.

 3        Q.   Come down from time to time and talk to

 4   you when you were conducting tests?

 5        A.   Yes.

 6        Q.   And he was the lab director?

 7        A.   That -- yeah, I think that may be what he

 8   was called in -- in the NVLAP, but, yes, that's a --

 9   he was the -- he oversaw the construction and -- and

10   was, yeah, the lab director.

11        Q.   And he -- he guided the tests that you

12   conducted, fair?

13        MS. ELIZABETH:  Objection; form.

14   BY THE WITNESS:

15        A.   No.  The -- the tests, if you are talking

16   about a labeling test, a real-ear test, I was guided

17   by the ANSI standard.

18   BY MR. BUCHANAN:

19        Q.   Oh, okay.  Let me -- let me be more clear.

20   I guess that was confusing.

21             In terms of telling you what product you

22   were going to test or what testing was going to be

23   done this week, I mean, he would essentially marshal

24   out the testing for you to do, fair?

25        A.   He -- yes, he guided -- he told me what he

Confidential - Pursuant to Protective Order

```
 1   wanted done, yes.
 2       Q.   Right.
 3            This week we are going to test Combat Arms
 4   Version 2, he'd tell you that, and it's a labeling
 5   test, and you would go about doing so, fair?
 6       A.   Sure.
 7       Q.   Okay.  If you go to the .8, we see
 8   real-ear attenuation at threshold.  That's the gold
 9   standard for hearing protection attenuation
10   measurement, isn't it, sir?
11       MS. ELIZABETH:  Objection; form.
12   BY THE WITNESS:
13       A.   That's what it says on this document.
14   BY MR. BUCHANAN:
15       Q.   Okay.  You don't -- you don't believe
16   otherwise, do you?
17       MS. ELIZABETH:  Objection; form.
18   BY THE WITNESS:
19       A.   I don't know if there is any other test
20   method that's considered better at this point.  I
21   haven't been involved in the field for several years.
22   BY MR. BUCHANAN:
23       Q.   At least at the beginning of our relevant
24   period, sir, we'll call it 1999 and through the time
25   of your departure, real-ear attenuation at threshold
```

Confidential - Pursuant to Protective Order

1  or REAT testing was the gold standard for hearing
2  protection attenuation measurement, right?
3          MS. ELIZABETH:  Objection; form.
4  BY THE WITNESS:
5      A.   That's what it says in this document.
6  BY MR. BUCHANAN:
7      Q.   Okay.  And it lists here that what you are
8  measuring is:  "The threshold difference between the
9  open ear (no protector) and the occluded ear
10 (protector) conditions," is that right, sir?
11     A.   That's what -- that's what it is saying,
12 yes.
13     Q.   And the way you are doing that, as you
14 described it to us, maybe the video caught it, but,
15 you know, by lifting up your thumb and putting your
16 thumb down to measure when you hear the tone or when
17 you don't hear the tone, right?
18     A.   Yes.
19     Q.   Now, this lab, the E-A-RCAL Lab that was
20 NVLAP certified, was it permitted to do labeling
21 testing on 3M or Aearo products?
22          MS. ELIZABETH:  Objection; foundation.
23 BY THE WITNESS:
24     A.   Yes.
25 BY MR. BUCHANAN:

Confidential - Pursuant to Protective Order

1    Q.    I mean, did you -- when you were
2  testing -- as I understand it, sir, with your NVLAP
3  certification, that meant that you had to offer the
4  services of the lab to other people who might want to
5  have their products tested there, is that right?
6        MS. ELIZABETH:  Objection; foundation.
7  BY THE WITNESS:
8    A.    I don't know if that was a requirement.
9  BY MR. BUCHANAN:
10   Q.    But you did?
11   A.    I conducted what we would call contract
12  tests.
13   Q.    And that's when a third party comes to you
14  and says, I need, for example, REAT testing done on
15  this potential product I want to sell or this product
16  that I'm selling?
17   A.    Well, they wouldn't come to me.  They'd
18  come to Elliott.
19   Q.    Okay.  So the lab did contract work?
20   A.    Yes, we did.
21   Q.    And that means you'd test the product for
22  third parties, other businesses, folks like that?
23   A.    Yes, we did.
24   Q.    Okay.  When -- and the company also did,
25  as I understand it, label tests or NRR tests for its

Confidential - Pursuant to Protective Order

```
 1      Q.    So there were three names I think you
 2   didn't identify as a family member or employee.  Is
 3   that EAS, RSS and MV?
 4      A.    Yes.
 5      Q.    Who are they?
 6      A.    That's correct.
 7            They were just other people that came to
 8   the lab and applied to be test subjects.
 9      Q.    Okay.  So looking at this chart, it's
10   talking about US noise reduction rating, attenuation
11   measurements, and this is describing the process.
12            Ten subjects with normal hearing, right?
13      A.    Yes, that's what it says.
14      Q.    Experimenter fits the hearing protector to
15   subject, right?
16      A.    Yes.
17      Q.    And then it talks about the process that
18   you described and you find the hearing threshold at
19   nine frequencies, right?
20      A.    Yes, that's what it says here.
21      Q.    And off to the right, if we were walking
22   across there, we would see 125, 250, 500, 1000, 2000,
23   3150, 4000, what is that, 6300 and 8000?
24      A.    That's correct.
25      Q.    And those would be the frequencies that
```

Confidential - Pursuant to Protective Order

1  someone was tested at using this NRR type test?

2       MS. ELIZABETH:  Objection; form.

3  BY THE WITNESS:

4       A.   These are the test frequencies we used for
5  many of our tests, yes.

6  BY MR. BUCHANAN:

7       Q.   Okay.  And you understand, really, the
8  concept of this NRR is based on a normal population
9  distribution, right?

10      A.   I -- I am not familiar with, you know,
11 that distribution.  I don't know.

12      Q.   Can you go to .19.

13           It describes attenuation and what it calls
14 a theoretical bell curve.

15           Do you see that?

16      A.   I see the theoretical bell curve, yes.

17      Q.   And then in the middle you have the mean
18 attenuation, right?

19      A.   Well, it says attenuation and dB.  I
20 don't -- there is no scale, so I don't know if that's
21 what the mean equals 40 signifies.  I'm not sure.

22      Q.   Well, do you understand the mean to be the
23 average?

24      A.   The mean is an average, yes.

25      Q.   Okay.  Do you understand in a -- in a

Confidential - Pursuant to Protective Order

1   distribution curve the mean is the middle point?

2       A.   That sounds right, yes.

3       Q.   Okay.  And we see at the heading here

4   "Normal Distribution," right?

5       A.   Yes, it says "Normal Distribution."

6       Q.   It is plotting the measured data, right?

7       A.   Measured data, yes.

8       Q.   Okay.  And so let's go to the next page,

9   .20.  It actually talks about how this NRR thing is

10  supposed to work.

11           Do you understand, sir, that in computing

12  the NRR what happens is the mean attenuation is

13  adjusted with the standard deviation to provide an NRR

14  number?

15      MS. ELIZABETH:  Objection; foundation.

16  BY THE WITNESS:

17      A.   Well, the calculation of the NRR uses the

18  means and the standard deviations, and depending on

19  whether you are calculating a zero standard deviation,

20  one standard deviation or two standard deviation NRR,

21  you use multiples of the standard deviation in the

22  calculation, yes.

23  BY MR. BUCHANAN:

24      Q.   So in an EPA labeling test or an ANSI '74

25  labeling test, you would be using the mean attenuation

```
 1   plus two standard deviations, correct?
 2        A.    To get the two standard deviation NRR,
 3   correct.
 4        Q.    That is the NRR that shows up on packaging
 5   for hearing protection devices in the United States,
 6   correct?
 7        A.    The -- yes.
 8        Q.    All right.  Let's actually go to the next
 9   page.  It will probably make it easier for us because
10   we are all probably having some flashbacks to high
11   school math class on that stuff.
12              "Key Points re NRR computation."
13              Do you see that heading?
14        A.    Yes, I do.
15        Q.    It says standard deviation and mean
16   attenuation of these key points, right?
17        A.    Yes.
18        Q.    You calculate the variability at each
19   frequency.
20              Do you see that?
21        A.    Yes.
22        Q.    And that's, in parentheses, described as
23   standard deviation, right?
24        A.    Yes.
25        Q.    And then you apply a two times standard
```

Confidential - Pursuant to Protective Order

```
 1    deviation to the mean, right?
 2         A.   Yes.
 3         Q.   You calculate the mean at each frequency,
 4    right?
 5         A.   Yes.
 6         Q.   And with the applied two times standard
 7    deviation, that's supposed to account for 98 percent
 8    of the population's hearing protection from the
 9    device, right?
10         MS. ELIZABETH:  Objection; form, foundation.
11    BY THE WITNESS:
12         A.   I don't know.  That's what it appears to
13    say, yes.
14    BY MR. BUCHANAN:
15         Q.   Okay.  And you didn't have that
16    understanding, sir, that's what the NRR was supposed
17    to represent?
18         A.   I wasn't aware that it was supposed to
19    account for 98 percent of the population.
20         Q.   Well, when you see -- if you go to the
21    prior page and you see that normal distribution and it
22    shows that red line, 98 percent protection?
23         A.   Yes, I see that.
24         Q.   And the arrow is going off to the right.
25              Do you see that?
```

Confidential - Pursuant to Protective Order

```
 1         A.    Yes.
 2         Q.    Okay.  So 98 percect -- 98 percent
 3   protection to the right of that point that is two
 4   standard deviations below the average, right?
 5         MS. ELIZABETH:  Objection; form.
 6   BY THE WITNESS:
 7         A.    Two standard deviations...  I don't know
 8   if it is two standard deviations below the average.  I
 9   don't -- I don't know if that's the case.
10   BY MR. BUCHANAN:
11         Q.    Okay.
12         A.    I don't understand that.
13         Q.    We can agree that when this is put into
14   text on the next page:  "Apply the two times standard
15   deviation," and in parens it says:  "Accounts for
16   98 percent of the population," right?
17         A.    Yes, that's what it says.
18         Q.    And, sir, we see the EPA label off to the
19   right, don't we, sir?
20         A.    Yes.
21         Q.    And this is not an EPA label for the
22   Combat Arms Version 2 or any version, right?
23         MS. ELIZABETH:  Objection; form.
24   BY THE WITNESS:
25         A.    According to the label, it's for the
```

Confidential - Pursuant to Protective Order

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, JULIANA F. ZAJICEK, a Registered

 4   Professional Reporter and Certified Shorthand

 5   Reporter, do hereby certify:

 6              That previous to the commencement of the

 7   examination of the witness herein, the witness was

 8   duly sworn to testify the whole truth concerning the

 9   matters herein;

10              That the foregoing deposition transcript

11   was reported stenographically by me, was thereafter

12   reduced to typewriting under my personal direction and

13   constitutes a true record of the testimony given and

14   the proceedings had;

15              That the said deposition was taken before

16   me at the time and place specified;

17              That I am not a relative or employee or

18   attorney or counsel, nor a relative or employee of

19   such attorney or counsel for any of the parties

20   hereto, nor interested directly or indirectly in the

21   outcome of this action.

22              IN WITNESS WHEREOF, I do hereunto set my

23   hand on this 22nd day of December, 2019.

24

25              JULIANA F. ZAJICEK, Certified Reporter
```