# EXHIBIT 62

Confidential - Pursuant To Protective Order

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | | |
|---|---|---|
| IN RE: 3M COMBAT ARMS | ) | Case No. |
| EARPLUG PRODUCTS | ) | 3:19md2885 |
| LIABILITY LITIGATION | ) | |
| _____ | ) | Judge M. Casey |
| | ) | Rodgers |
| THIS DOCUMENT RELATES | ) | Magistrate Judge |
| TO ALL CASES | ) | Gary R. Jones |

TUESDAY, DECEMBER 3, 2019
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
- - -

Videotaped deposition of Marc A. Santoro, held at the offices of the Indianapolis Marriott Downtown, 350 West Maryland Street, Indianapolis, Indiana, commencing at 9:06 a.m., on the above date, before Carrie A. Campbell, Registered Diplomate Reporter, Certified Realtime Reporter, Illinois, California & Texas Certified Shorthand Reporter, Missouri & Kansas Certified Court Reporter.
- - -

GOLKOW LITIGATION SERVICES
877.370.DEPS
deps@golkow.com

Confidential - Pursuant To Protective Order

Page 2

```
 1            A P P E A R A N C E S :
 2
 3      QUINN EMANUEL
        BY:   ADAM B. WOLFSON, ESQUIRE
 4            adamwolfson@quinnemanuel.com
              MATTHEW HOSEN, ESQUIRE
 5            matthosen@quinnemanuel.com
        865 South Figueroa Street, 10th Floor
 6      Los Angeles, California  90017
        (213) 443-3000
 7
        and
 8
        LAMINACK, PIRTLE & MARTINES, LLP
 9      BY:   THOMAS W. PIRTLE, ESQUIRE
        5020 Montrose Boulevard, 9th Floor
10      Houston, Texas   77006
        (713) 292-2750
11
        and
12
        TRACEY & FOX
13      BY:   LAWRENCE TRACEY, ESQUIRE
              ltracey@traceylawfirm.com
14            (VIA TELECONFERENCE)
        440 Louisiana Street, Suite 1901,
15      Houston, Texas   77002
        (713) 495-2333
16      Counsel for Plaintiffs
17
18      KIRKLAND & ELLIS LLP
        BY:   GARRET A. LEACH, P.C.
19            garret.leach@kirkland.com
        300 North LaSalle
20      Chicago, Illinois   60654
        (312) 862-2000
21
22      KIRKLAND & ELLIS LLP
        BY:   SAGHAR ESFANDIARIFARD, ESQUIRE
23            saghar.esfandiarifard@kirkland.com
        333 South Hope Street
24      Los Angeles, California   90071
        (213) 680-8122
25      Counsel for Defendants
```

Confidential - Pursuant To Protective Order

Page 3

```
 1   ALSO PRESENT:
 2       CHUCK HUNGER, paralegal, Laminack,
         Pirtle & Martines
 3
         ZACH HONE, trial technician, Golkow
 4       Litigation Services
 5
 6   V I D E O G R A P H E R :
         DAVID LANE,
 7       Golkow Litigation Services
 8                    - - -
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Confidential - Pursuant To Protective Order

Page 181

1   Do you see that?
2   A.   Yes.
3   Q.   All right.  Now, there is a
4   reference in that first line to the
5   indoor/outdoor plug, which you say was on the
6   consumer side.
7   Do you recall whether that is a
8   consumer version of the Combat Arms version 2
9   earplug?
10   A.   Whether the indoor/outdoor
11   range plug was a consumer version of the
12   Combat Arms generation 2?
13   Q.   Yes.
14   A.   I don't recall what version of
15   Combat Arms it is.
16   Q.   Do you understand, though, that
17   it is a retail version of a Combat Arms
18   Earplug?
19   A.   As I recall.
20   Q.   Now...
21   Yeah.  So here, the second
22   sentence of your e-mail you say, "The
23   motivation to create a blister under the name
24   CAE came while I was in US Calvary store down
25   at Fort Campbell."

Confidential - Pursuant To Protective Order

Page 182

1                Now, before I go on reading,
2     "blister" here is referring to a blister
3     pack, right?
4          A.    Yeah, I'd like, if I could --
5     I'm kind of lost on this.  Can I take a
6     second to read the whole thing here?
7          Q.    Sure.
8          A.    Okay.  Sorry.
9                So what was your question on
10    that?
11         Q.    Well, we were reading your
12    e-mail, and you referred in the second
13    sentence to a "blister," quote/unquote.
14               Is that referring to a blister
15    pack?
16         A.    Yes.
17         Q.    What is a blister pack?
18         A.    It was a retail version of the
19    Combat Arms -- or an individual package of
20    Combat Arms on a cardstock with see-through
21    plastic over the top of it.
22         Q.    So it's one of those little --
23    often see them in stores hanging on hooks?
24         A.    Correct.
25         Q.    The little piece of plastic is

Confidential - Pursuant To Protective Order

Page 183

1  blistered out where the product is sitting
2  inside that blister?
3      A.   Yes.
4      Q.   Okay.  So you say here, "The
5  motivation to create a blister under the name
6  CAE came while I was in US Calvary store down
7  at Fort Campbell.  I noticed that they had a
8  big rack on the counter of the AO Safety
9  indoor/outdoor plugs, which bugged me because
10 right across the street at the base that same
11 product has substantial name recognition as
12 CAE."
13          Right?
14     A.   Yes.
15     Q.   Okay.  So what you're
16 describing here is a situation where, at a
17 military base across the street, soldiers are
18 using Combat Arms Earplugs, and right across
19 the street at a retail store where soldiers
20 or civilians can purchase products, there is
21 the same product but it's under a different
22 name; is that fair?
23     A.   Yes.
24     Q.   Okay.  And you say -- you go
25 on, "There's some obvious concern by" --

Confidential - Pursuant To Protective Order

Page 184

1  well, I'm sorry, let me ask a follow-up
2  question.
3           The idea here is that if the
4  service members going across the street into
5  the retail store see Combat Arms Earplugs,
6  they're more likely to purchase those plugs
7  because they already know what they are?
8       A.    Yes.
9       Q.    Now, you go on to say, "There's
10 some obvious concern by Gary that we could
11 cannibalize business, but I think it's in the
12 product line's best long-term interest to
13 offer a retail pack with the name that
14 soldiers recognize."
15           Now, do you still agree with
16 that -- or you understand what you meant
17 there?
18      A.    Yes.
19      Q.    Okay.  And that was you might
20 cannibalize some of the retail business?
21      A.    Correct.  The consumer side
22 business.
23      Q.    Right.
24           But it would -- in the long
25 term it would be better because then service

Golkow Litigation Services - 877.370.DEPS

Confidential - Pursuant To Protective Order

Page 185

1  members coming out of the military might
2  purchase this product because they already
3  know what it is?
4      A.    Yes.
5      Q.    Okay.  So then you go down to
6  the next -- into the next paragraph of your
7  e-mail.  "The other motivating factor was the
8  opportunity to be able to put a quality
9  instruction sheet inside the blister pack.  I
10 continue to hear that the average soldier is
11 not really understanding how to use the
12 plug."
13           Do you see that?
14      A.    Yes.
15      Q.    So here, was it your
16 understanding -- or it was your opinion,
17 correct, that you needed to put a, quote,
18 quality instruction sheet inside the blister
19 pack selling the retail version of the Combat
20 Arms Earplug, right?
21           MR. LEACH:  Objection.  Form.
22           THE WITNESS:  I'm sorry, ask
23      the question again.
24 QUESTIONS BY MR. WOLFSON:
25      Q.    It was your opinion, as you

1  were stating here, that you needed to put a,
2  quote, quality instruction sheet, end quote,
3  inside the blister pack selling the retail
4  version of the Combat Arms Earplug, right?
5           MR. LEACH:  Same objection.
6           THE WITNESS:  I don't know if
7       I'd use the word "need," but it was an
8       opportunity to put it in.
9  QUESTIONS BY MR. WOLFSON:
10      Q.    Okay.  But the reason that you
11 thought it was a good opportunity to do so is
12 that you had continued to hear that the
13 average soldier didn't really understand how
14 to properly use the plug?
15      A.    That we had continued
16 ongoing -- or continuing feedback of -- of,
17 yes, of not knowing which end to put in or
18 pulling the plugs apart.
19      Q.    Okay.  And anything about how
20 to insert them into the ears?
21      A.    I don't recall any specific
22 issues with fitting.
23      Q.    So then was it your
24 understanding that the fitting instructions
25 that were included with Combat Arms that

Confidential - Pursuant To Protective Order

Page 324

```
 1              MR. LEACH:  We'll take your
 2      request under advisement.
 3              And I can assure you this
 4      witness does not have them.
 5              MR. WOLFSON:  Right.  And
 6      that's why we're asking.
 7              You also represent 3M.
 8              MR. LEACH:  I do.  I'm just
 9      making clear we did have him check.
10              MR. WOLFSON:  Right.
11   QUESTIONS BY MR. WOLFSON:
12       Q.    Now, Mr. Santoro, you left 3M
13   in approximately February 2014, you said?
14       A.    To the best of my recollection,
15   yes.
16       Q.    Why did you leave the company?
17       A.    I had an opportunity to work in
18   a different field that was -- that was of
19   interest to me.
20       Q.    Did you get that job offer
21   before you announced that you were leaving
22   3M, or had they indicated that you should
23   look for a job?
24       A.    I made that determination on my
25   own.
```

Golkow Litigation Services - 877.370.DEPS

Confidential - Pursuant To Protective Order

Page 325

```
 1        Q.    And last question:  Are you
 2   being paid for your attendance here today?
 3        A.    No.
 4        Q.    Okay.  Not receiving anything
 5   from 3M for your attendance?
 6        A.    No.
 7              MR. WOLFSON:  Okay.  No further
 8         questions, and I'm just going to
 9         confirm with my co-counsel --
10              MR. PIRTLE:  Pass the witness.
11              MR. LEACH:  I just have a
12         couple of cleanup questions.  This
13         will be fairly brief.
14              CROSS-EXAMINATION
15   QUESTIONS BY MR. LEACH:
16        Q.    Mr. Santoro, earlier today you
17   mentioned that you had had some discussions
18   with Doug Ohlin when he was working for the
19   military.
20              Do you remember that testimony?
21        A.    Yes.
22        Q.    Now, what do you recall about
23   those discussions with Mr. Ohlin when he
24   worked for the military?
25        A.    The discussions were Doug
```

Golkow Litigation Services - 877.370.DEPS

Confidential - Pursuant To Protective Order

Page 326

 1  providing direction on how he wanted to see
 2  the product packaged and sold to them.
 3       Q.    Was there any particular
 4  product that you recall discussing with him?
 5       A.    Yes.
 6       Q.    And what product is that?
 7       A.    Combat Arms generation 2.
 8       Q.    Was there any particular
 9  package or size that you recall discussing
10  with Mr. Ohlin?
11       A.    Yes.  Doug requested the
12  generation 2 to be put in a bulk pack.
13       Q.    And did he indicate how he
14  wanted that packaged?
15       A.    Yes.  He requested that
16  specifically 50 pair in a box -- sorry, 50
17  pair in a plastic bag, with nothing else in
18  there, inside a box.
19       Q.    Did he tell you not to include
20  instructions in that box?
21       A.    He did.
22       Q.    Did he indicate why he didn't
23  want instructions in that box?
24       A.    He felt that personal training
25  was the most effective way to train the

Confidential - Pursuant To Protective Order

Page 327

1  soldiers, and that the military audiologists
2  were going to take on that responsibility of
3  individually training every soldier.
4       Q.    Did you follow Mr. Ohlin's
5  requests?
6       A.    Yes.
7       Q.    And why is that?
8       A.    Doug was the one that pretty
9  much dictated how we were to provide hearing
10 protection to the military.
11            MR. LEACH:  I have no further
12      questions.
13            REDIRECT EXAMINATION
14 QUESTIONS BY MR. WOLFSON:
15      Q.    All right.  I have a few
16 follow-up to that.
17            That's a remarkable
18 recollection of a specific conversation, sir.
19            When about did that
20 conversation with Doug Ohlin occur?
21      A.    I don't recall specifically.
22      Q.    How about generally?
23      A.    First third of my employment
24 with 3M, Aearo.
25      Q.    So within about --

Confidential - Pursuant To Protective Order

Page 328

1    A.    First three or four years.
2    Q.    Okay. And how did you -- did
3 you just remember that conversation without
4 any outside assistance?
5    A.    I specifically remember the
6 conversation.
7    Q.    Okay. Did you look at any
8 documents to help you refresh your
9 recollection on that conversation?
10   A.    No.
11   Q.    Who else was on the call?
12   A.    I don't recall if anyone else
13 was on the call.
14   Q.    So you remember speaking to
15 Mr. Ohlin, but not necessarily if anyone else
16 joined you from Aearo?
17   A.    No.
18   Q.    And Mr. Ohlin talked to you
19 about how the product was packaged and sold
20 but not how it was designed; is that right?
21   A.    I don't recall any discussion
22 about the design of the product with him.
23   Q.    Okay. And you said that he
24 felt personal training was the most effective
25 way to train soldiers?

Confidential - Pursuant To Protective Order

Page 329

```
 1        A.     Yes.
 2        Q.     Okay.  Do you recall
 3   specifically what he said?
 4        A.     Yeah.  Whatever -- if we can
 5   read back my testimony, that was what I
 6   recall he said.
 7        Q.     Well, what was your testimony?
 8   You said you remember the conversation.
 9               What did he say about his views
10   on the best way to train soldiers for using
11   Combat Arms version 2?
12        A.     Again, he said that the -- that
13   he felt the best way to train the soldiers
14   was individually and that he was working with
15   the military audiology group to provide that
16   training so that every soldier would be --
17   would receive training as they went into Army
18   training.
19        Q.     And did Aearo provide any
20   instruction to military audiologists about
21   the proper insertion and usage of the Combat
22   Arms version 2?
23        A.     Yes, we provided instructions
24   to them.
25        Q.     Okay.  Such as that sheet that
```

Confidential - Pursuant To Protective Order

Page 333

```
 1                    CERTIFICATE
 2
 3           I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 4   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 5   of the examination, Marc A. Santoro, was duly
     sworn by me to testify to the truth, the
 6   whole truth and nothing but the truth.
 7           I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10
             I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.
14
15
             _____
17           CARRIE A. CAMPBELL,
             NCRA Registered Diplomate Reporter
18           Certified Realtime Reporter
             California Certified Shorthand
19           Reporter #13921
             Missouri Certified Court Reporter #859
20           Illinois Certified Shorthand Reporter
             #084-004229
21           Texas Certified Shorthand Reporter #9328
             Kansas Certified Court Reporter #1715
22           Notary Public
23           Dated:  December 6, 2019
24
25
```