# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to All Cases | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON GOVERNMENT CONTRACTOR DEFENSE

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

FACTUAL BACKGROUND .......................................................................2

    Aearo and ISL Designed the CAEv2 .................................................2

    Aearo Failed to Test and Warn About the CAEv2...............................4

    Aearo Concealed the CAEv2's Dangers When Contracting with the Military ......6

    3M Discontinued the CAEv2 and Settled Similar Claims with the Government ...7

ARGUMENT ..............................................................................................9

I.     The Government Contractor Defense Is a Limited Preemption Doctrine .........9

II.    The Defense Is Irrelevant to the Vast Majority of Plaintiffs' Claims..............10

III.   The Defense Is Inapplicable to Plaintiffs' Design and Warning Claims .........11

    A.    Defendants did not design the CAEv2 exclusively for the military.........11

         1.   There is no uniquely federal interest..................................................12

         2.   There is no significant conflict .........................................................14

    B.    Defendants did not enter into a federal procurement contract for the design and development of the CAEv2 ....................................................15

         1.   There is no design contract for the CAEv2.......................................15

         2.   The MPID solicited the CAEv2 as a stock product ..........................17

IV.  The Defense Does Not Preempt Plaintiffs' Design-Defect Claims Because Defendants Cannot Satisfy All Three *Boyle* Conditions.................................18

    A.  The military did not approve reasonably precise specifications ..............18

        1.  There are no specifications for the CAEv2.........................................19

        2.  The purported specifications are not reasonably precise..................20

        3.  The military did not approve the design features at issue .................22

    B.  The CAEv2 did not conform to any purported specifications ................25

    C.  Defendants withheld their internal knowledge of the CAEv2's defects, dangers, and potential consequences from the military.............27

        1.  Defendants cannot show they shared the Flange Report or Test 213015 with the military ...................................................................29

        2.  Ohlin's testimony, the Army's Law Enforcement Report, and *Touhy* discovery each prove Defendants withheld information .......32

        3.  Defendants engaged in the very conduct that *Boyle* forbids..............34

V.  The Defense Does Not Preempt Plaintiffs' Failure-to-Warn Claims Because Defendants Cannot Show a Procurement Contract Prohibited a Warning ......36

CONCLUSION ......................................................................................38

CERTIFICATE OF COMPLIANCE ......................................................40

CERTIFICATE OF SERVICE ...............................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amtreco, Inc. v. O.H. Materials, Inc.*,
  802 F. Supp. 443 (M.D. Ga. 1992) ........................................................11

*Boyle v. United Techs. Corp.*,
  487 U.S. 500 (1988) ................................................................. *passim*

*Brinson v. Raytheon Co.*,
  571 F.3d 1348 (11th Cir. 2009) .................................................. 18, 24

*Cabalic v. Owens-Corning Fiberglas Corp.*,
  1994 WL 564724 (N.D. Cal. Oct. 6, 2014) .........................................13

*Caldwell v. Morpho Detection, Inc.*,
  2013 WL 500867 (E.D. Mo. Feb. 11, 2013) ......................................20

*Carley v. Wheeled Coach*,
  991 F.2d 1117 (3d Cir. 1993) .............................................................28

*Carson v. Heli-Tech, Inc.*,
  2003 WL 22469919 (M.D. Fla. Sept. 25, 2003) .................................25

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...........................................................................10

*City of Walker v. Louisiana*,
  877 F.3d 563 (5th Cir. 2017) ..............................................................16

*Coulbourn v. Air & Liquid Sys. Corp.*,
  2015 WL 12656236 (D. Ariz. Feb. 11, 2015) .....................................18

*Crutchfield v. Sewerage & Water Bd. of New Orleans*,
  829 F.3d 370 (5th Cir. 2016) ..............................................................16

*D.F. ex rel. Amador v. Sikorsky Aircraft Corp.*,
  2017 WL 4922814 (S.D. Cal. Oct. 30, 2017).....................................25

*Dietrich v. Key Bank N.A.*,
　72 F.3d 1509 (11th Cir. 1996) ...........................................................................12

*Dorse v. Armstrong World Indus., Inc.*,
　513 So.2d 1265 (Fla. 1987) ........................................................................ 14, 15

*Dorse v. Eagle-Picher Indus., Inc.*,
　898 F.2d 1487 (11th Cir. 1990) .................................................................. *passim*

*Dugas v. 3M Co.*,
　2016 WL 3965953 (M.D. Fla. June 22, 2016) ........................................... *passim*

*Ferguson v. Bombardier Servs. Corp.*,
　2005 WL 8160215 (M.D. Fla. Mar. 25, 2005) ....................................... 18, 25, 26

*Gadsden Indus. Park, LLC v. United States*,
　111 F. Supp. 3d 1218 (N.D. Ala. 2015) ...............................................................28

*Glassco v. Miller Equip. Co., Inc.*,
　966 F.2d 641 (11th Cir. 1992) ............................................................................37

*Graves v. 3M Co.*,
　2020 WL 1333135 (D. Minn. Mar. 23, 2020) .....................................................38

*Gray v. Lockheed Aeronautical Sys. Co.*,
　125 F.3d 1371 (11th Cir. 1997) ................................................................. *passim*

*Griffin v. JTSI, Inc.*,
　654 F. Supp. 2d 1122 (D. Haw. 2008) ................................................................25

*Harduvel v. Gen. Dynamics Corp.*,
　878 F.2d 1311 (11th Cir. 1989) ................................................................. *passim*

*Holdren v. Buffalo Pumps, Inc.*,
　614 F. Supp. 2d 129 (D. Mass. 2009) .................................................................21

*Hudgens v. Bell Helicopter/Textron*,
　328 F.3d 1329 (11th Cir. 2003) .........................................................................15

*In re Chateaugay Corp.*,
　146 B.R. 339 (S.D.N.Y. 1992) ...........................................................................14

*In re Hawaii Fed. Asbestos Cases*,
  960 F.2d 806 (9th Cir. 1992) ...................................................................... *passim*

*In re Joint E. & S. Dist. N.Y. Asbestos Litig.*,
  897 F.2d 626 (2d Cir. 1990) ...............................................................36

*In re Katrina Canal Breaches Litig.*,
  620 F.3d 455 (5th Cir. 2010) ...............................................................21

*In re Fort Totten Metrorail Cases Arising Out of Events of June 22, 2009*,
  895 F. Supp. 2d 48 (D.D.C. 2012)......................................................12

*In re Hanford Nuclear Reservation Litig.*,
  534 F.3d 986 (9th Cir. 2008) ...............................................................16

*Jowers v. Lincoln Elec. Co.*,
  617 F.3d 346 (5th Cir. 2010) ...................................................... *passim*

*Killam v. Air & Liquid Sys., Inc.*,
  2016 WL 7438434 (M.D. Fla. Dec. 27, 2016) .....................................37

*King v. Esmet, Inc.*,
  2006 WL 3635463 (M.D. Fla. Dec. 10, 2006) .....................................17

*Maguire v. Hughes Aircraft Corp.*,
  912 F.2d 67 (3d Cir. 1990) ...................................................................25

*Marcus v. AT&T Corp.*,
  138 F.3d 46 (2d Cir. 1998) ...................................................................12

*Martinez v. Sci. Applications Int'l Corp.*,
  2015 WL 11109381 (S.D. Tex. June 29, 2015) ...........................15, 25

*Mazant v. Visioneering, Inc.*,
  2006 WL 8456002 (E.D. La. Mar. 16, 2006).......................................24

*McKay v. Tracor, Inc.*,
  2005 WL 8158361 (N.D. Ala. Mar. 22, 2005).....................................20

*McKay v. Tracor, Inc.*,
  2005 WL 8158362 (N.D. Ala. Sept. 29, 2005) ....................................11

*McMahon v. Presidential Airways, Inc.*,
  460 F. Supp. 2d 1315 (M.D. Fla. 2006) .................................................................10

*Mitchell v. Lone Star Ammunition, Inc.*,
  913 F.2d 242 (5th Cir. 1990) ..........................................................................9, 10

*Nielsen v. George Diamond Vogel Paint Co.*,
  892 F.2d 1450 (9th Cir. 1990) .......................................................................14, 18

*Schwindt v. Cessna Aircraft Co.*,
  1988 WL 148433 (S.D. Ga. Aug. 31, 1988) .......................................................32

*Scott v. MD Helicopters, Inc.*,
  834 F. Supp. 2d 1334 (M.D. Fla. 2011) ............................................................11

*Shurr v. A.R. Siegler, Inc.*,
  70 F. Supp. 2d 900 (E.D. Wis. 1999) ..........................................................10, 26

*Snell v. Bell Helicopter Textron, Inc.*,
  107 F.3d 744 (9th Cir. 1997) ........................................................................22, 25

*Stecyk v. Bell Helicopter Textron, Inc.*,
  1997 WL 701312 (E.D. Pa. Nov. 4, 1997) ..........................................................24

*Strickland v. Royal Lubricant Co., Inc.*,
  911 F. Supp. 1460 (M.D. Ala. 1995)....................................................10, 22, 37

*Trevino v. Gen. Dynamics Corp.*,
  865 F.2d 1474 (5th Cir. 1989) .................................................................. *passim*

*Turgeon v. Trinity Indus., Inc.*,
  2018 WL 4223165 (D.N.H. Sept. 5, 2018) .........................................................13

*United States v. 3M Co.*,
  No. 3:16-cv-01533-MBS (D.S.C. July 25, 2018)..........................................8, 33

*Weber v. Slingsby Aviation, Ltd.*,
  2001 WL 34135318 (S.D. Fla. Feb. 9, 2001) ......................................................24

**Statutes**

10 U.S.C. § 2305(a)(1)(A)(i)–(iii) ........................................................16

10 U.S.C. § 2305(b)(4)(A) ..................................................................16

28 U.S.C. § 2680(a) ..............................................................................9

**Regulations**

48 C.F.R. § 52.211-6 ...................................................................... 17, 20

48 C.F.R. § 53.212 ..............................................................................17

60 Fed. Reg. 48231-01 (Sept. 18, 1995) ............................................17

**Other Authorities**

Seinfeld, *The Good, the Bad, and the Ugly*,
    114 Mich. L. Rev. First Impressions 111 (2016) ...........................9

## INTRODUCTION

Defendants have known since 2000 that the Combat Arms Earplug Version 2 ("CAEv2") is defective and dangerous. They peddled this product to the public and the United States military anyway, perpetrating an ongoing fraud on our country and its citizens. Fortuitously, the CAEv2's defects and dangers were revealed, under cover of a protective order, when Defendants filed a sham patent lawsuit against their competitor. More than 140,000 Plaintiffs, including servicemembers, veterans, and civilians, now seek judgment against Defendants for hearing loss, tinnitus, and related injuries.

Unable to defend themselves on the merits, Defendants have manufactured an affirmative defense that is just as defective as the CAEv2. Defendants assert the so-called "government contractor defense" against all of Plaintiffs' claims. Dkt. 959 at 96. But this limited preemption defense is facially inapplicable to nearly all claims. Even as to Plaintiffs' design-defect and failure-to-warn claims, Defendants cannot blame the military for their own mistakes and misdeeds. The defense fails out of the gate because Defendants did not design the CAEv2 for exclusive military use, and they did not enter into a procurement contract for the design and development of the CAEv2.

Even if Defendants could bypass those threshold hurdles, they stumble at each successive step of the defense. The military never approved specifications for the

CAEv2, much less reasonably precise ones. Nor does the CAEv2 conform to any purported specifications. Finally, Defendants never warned the military of the CAEv2's defects and dangers. Indeed, Defendants concealed such information from the military and all users for the CAEv2's entire lifetime on the market. For each of these independently dispositive reasons, the defense does not displace Plaintiffs' design-defect claims.

Plaintiffs' failure-to-warn claims also remain unscathed because Defendants cannot show that a federal procurement contract prohibited them from warning about the CAEv2's defects and dangers. Because Defendants cannot shoulder their heavy burden to preempt even one of Plaintiffs' claims, Plaintiffs respectfully request summary judgment on this affirmative defense.

## FACTUAL BACKGROUND

### *Aearo and ISL Designed the CAEv2*

For decades, researchers have studied non-linear hearing protection devices that attenuate loud, sudden noise while allowing low-level noise to pass through.



PX1(3M_MDL000712631).

PX2(3M_MDL000183314); PX3(3M_MDL000779978_25).

███████████████████████████████████████████████

████████████████████████████ PX4(3M_MDL000014158).

███████████████████████████████████████████████

███████████ PX5(3M_MDL000013024). ███████████████

█████████████████████████ *Id.* Another prototype was double-ended; one end

non-linear, the other linear. ISL patented this design. PX6(3M_MDL000019173).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████ PX7(3M_MDL000425673_2);

PX8(3M_MDL000434810). ██████████████████████████

████████████████████ PX7(3M_MDL000425673_2). ███████████

███████████████████████████████████ PX9(Ohlin-233:7-24);

PX10(30(b)(6)-820:17–822:5).

███████████████████████████████████████████████

██████████████████ PX11(Knauer-85:22-25);  PX12(3M_MDL000591210_5).

███████████████████████████████████████████████

█████████████████████████████████ PX13(3M_MDL0000277773);

PX14(3M_MDL000343622_3); PX14A(3M_MDL000826703–04) (███████████

█████████████████████). ████████████████████████

3



PX15(Myers-105:23–109:8).

PX16(30(b)(6)-504:25–505:19).

PX17(3M_MDL00017782–84).

PX9(Ohlin-228:5-16, 233:7-24).

, PX18(McNamara-344:22–350:3), Aearo sold the CAEv2 and "feature identical" products to civilians and the military, PX19(30(b)(6)-38:13–40:14, 51:5-24).

### *Aearo Failed to Test and Warn About the CAEv2*

PX20(3M_MDL000257805).

PX21(3M_MDL000313390); PX22(3M_MDL000057209).

*Id.*;  PX23(Babeu-52:12-17).



PX24(Berger-106:2–107:2).

, PX25(Kieper-254:4–255:8);  PX26(Berger-166:21–168:1),

,

PX27(30(b)(6)-276:3–277:4);  PX28(Kieper-101:20–102:15).

PX25(Kieper-166:10-16);  PX27(30(b)(6)-276:3–277:4).

PX26(Berger-559:5-13);  PX11(Knauer-117:10-17).

, PX29(3M_MDL000005365);  PX25(Kieper-318:24–319:21), even though the flanges were not designed to be folded at all, PX30(Falco-648:18–653:8). , PX31(Hamer-165:20–166:1),

, PX18(McNamara-152:20–153:9).

PX32(3M_MDL000258590);

PX15(Myers-264:12–267:23).



PX33(3M_MDL000728811).

PX33(3M_MDL000728812).

*Id.*

*Id.*; PX27(30(b)(6)-322:18–323:1).

PX26(Berger-206:7–207:3);  PX34(Warren-193:8–201:8).

PX26(Berger-206:7–13,  545:8-22);  PX18(McNamara-439:13–440:15).

PX35(Santoro-304:2–306:22);  PX18(McNamara-158:1-9); PX15(Myers-685:4–686:4).

***Aearo Concealed the CAEv2's Dangers When Contracting with the Military***

, PX36(3M_MDL000803138), but did not enter into a federal procurement contract for these "first orders," PX10(30(b)(6)-793:6–795:5).

PX37(3M_MDL00000013);  PX10(30(b)(6)-804:1–814:12). ███████████

████████████████████████████████████████████ PX9(Ohlin-

241:5-6). ████████████████████████████████████

████████████████████ PX15(Myers-544:25–546:15). Aearo had, of course,

already designed the CAEv2 and sold it commercially. *Id.*

██████████████████████████████████████████████

██████████████████ PX15(Myers-489:6–493:3). ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

PX15(Myers-500:1–501:1, 623:10-25). █████████████████████

██████████████████████████████████████████████

████████████████, PX37(3M_MDL00000013), ████████████████

██████████████████████, PX25(Kieper-512:5–531:23).

### *3M Discontinued the CAEv2 and Settled Similar Claims with the Government*

In 2007, Defendant 3M purchased Aearo and continued to keep all

information about the CAEv2's defects secret. Defendants withheld that information

until they no longer could—that is, when they filed a sham patent lawsuit against a

competitor and had to produce the Flange Report. ███████████████

███████████████████, PX31(Hamer-149:18–157:8), ███████████████

██████████████████████████████████████████████,

PX38(3M_MDL000332111);        PX15(Myers-352:16–353:16,        362:15–363:21);

PX39(Madison-305:8–307:20).

    Following that litigation, the United States intervened in a *qui tam* case against

3M, alleging 3M "did not disclose" the CAEv2's defects and "delivered the CAEv2

to the United States knowing that the product contained defects." *United States v.*

*3M*, No. 3:16-cv-01533-MBS, Dkt. 23-1 (D.S.C. 2018). ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████  PX40(CID0001–02);  PX15(Myers-753:1–754:5).  3M  paid  the

government $9.1 million to settle ████████████████████████████████████

████████████████████████████████████████████████████████████

PX41(3M_MDL000623882). The  military,  however,  ceased  using  the  CAEv2

because "[t]hese earplugs were found to be defective." PX23(Babeu-66:5–67:14);

PX42(3M_TOUHY00002040).

    In this MDL, Defendants have yet again failed to produce any evidence that

they conveyed the Flange Report's or Test 213015's findings to the military. *Touhy*

discovery confirms ████████████████████████████████████████████████

████████████████████████████████████████. PX23(Babeu-171:18–175:14, 389:20–

391:18); PX43(Merkley-327:8–330:17); PX44(Coleman-202:15–203:12).

## ARGUMENT

## I.    The Government Contractor Defense Is a Limited Preemption Doctrine.

The Federal Tort Claims Act immunizes the federal government from lawsuits involving the discretionary functions of a federal agency or employee. 28 U.S.C. § 2680(a). Congress did not extend this protection to government contractors, but the Supreme Court did so, on a limited basis, in *Boyle v. United Technologies*, 487 U.S. 500 (1988).

The government contractor defense preempts design-defect claims only if a procurement contract for the design and development of a product implicates a "uniquely federal interest" that presents a "significant conflict" with state law. *Id.* at 507–09. The contractor must prove: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512. "Stripped to its essentials," the defense shields only those contractors that can prove "the government made me do it," *Gray v. Lockheed*, 125 F.3d 1371, 1377 (11th Cir. 1997), and "must be applied with caution," *Mitchell v. Lone Star*, 913 F.2d 242, 247 n.9 (5th Cir. 1990).[1]

---

[1] After all, Justice Scalia agrees he "got[] [*Boyle*] wrong." Seinfeld, *The Good, the Bad, and the Ugly*, 114 Mich. L. Rev. First Impressions 111, 115 (2016).

Because Defendants cannot carry their burden on any one—let alone all three—of *Boyle*'s conditions, Plaintiffs are entitled to summary judgment. *See Celotex v. Catrett*, 477 U.S. 317, 322 (1986); *Strickland v. Royal Lubricant*, 911 F. Supp. 1460, 1465 (M.D. Ala. 1995) ("Because this is an affirmative defense, the defendant has the burden of proving . . . each element."); *Shurr v. A.R. Siegler*, 70 F. Supp. 2d 900, 915 (E.D. Wis. 1999) ("[M]any contractors will not be eligible for this defense.").

## II.    The Defense Is Irrelevant to the Vast Majority of Plaintiffs' Claims.

Defendants have championed the government contractor defense as a "global" defense. It is not. "*Boyle*, by its terms, applies only to defects in design." *Harduvel v. Gen. Dynamics*, 878 F.2d 1311, 1317 (11th Cir. 1989); *accord* Dkt. 904 at 15.

Although the Eleventh Circuit has stated the defense "could" apply to failure-to-warn claims when a government contract prohibits a warning, *Dorse v. Eagle-Picher*, 898 F.2d 1487, 1489 (11th Cir. 1990), it is irrelevant to all other claims, *e.g.*, *McMahon v. Presidential Airways*, 460 F. Supp. 2d 1315, 1329 (M.D. Fla. 2006). The reason is simple: unlike some design and warning claims, most state-law claims do not implicate "the government made me do it" rationale. *Gray*, 125 F.3d at 1377.

Here, "the protective shield in favor of [Defendants] collapses," *Mitchell*, 913 F.2d at 245–46, because Plaintiffs' misrepresentation, fraud, negligence per se,

and consumer-protection claims have nothing to do with military actions, Dkt. 704 ¶¶ 362–449; *see Amtreco v. O.H. Materials*, 802 F. Supp. 443, 445 (M.D. Ga. 1992); *Scott v. MD Helicopters*, 834 F. Supp. 2d 1334, 1341 (M.D. Fla. 2011).

Plaintiffs' negligence and warranty claims may relate in some ways to the CAEv2's design defects, but not *in toto*. It was Defendants—and Defendants alone—who ██████████ the CAEv2 before they gulled the military. *E.g.*, Dkt. 704 ¶¶ 268(e)–(f), 418; PX20(3M_MDL000257805); *see Gray*, 125 F.3d at 1379–81 (not applying defense to negligence claim). And Defendants, not the military, made promotional claims about CAEv2 and warranted its safety. *E.g.*, Dkt. 704 ¶¶ 338–61; *see McKay v. Tracor*, 2005 WL 8158362, *7 (N.D. Ala. 2005).

Accordingly, Plaintiffs are entitled to summary judgment on the defense as to their negligence, warranty, misrepresentation, fraud, gross negligence, negligence per se, and consumer-protection claims, insofar as these claims do not depend on design or warning defects. *See McKay*, 2005 WL 8158362, *4.

## III. The Defense Is Inapplicable to Plaintiffs' Design and Warning Claims.

### A. Defendants did not design the CAEv2 exclusively for the military.

The defense is also inapplicable to Plaintiffs' design-defect and failure-to-warn claims because Defendants designed the CAEv2 for both military and commercial use. Defendants thus cannot show the "two prerequisites to invoking the *Boyle* defense," namely a "uniquely federal interest" and "significant conflict"

between that interest and state law. *In re Fort Totten*, 895 F. Supp. 2d 48, 85 (D.D.C. 2012).

### 1. *There is no uniquely federal interest.*

The term "uniquely" is significant under *Boyle*, as it is with any preemption doctrine. *Marcus v. AT&T*, 138 F.3d 46, 54 (2d Cir. 1998) (distinguishing "federal interest" and "*uniquely* federal interest"); *Dietrich v. Key Bank*, 72 F.3d 1509, 1514 (11th Cir. 1996) (similar). In *Boyle*, the military's procurement of a CH–53D helicopter was uniquely federal because the contractor designed it for exclusive military use. 487 U.S. at 507, 511. Had the helicopter been a stock product commercially available "by model number," no uniquely federal interest would have existed. *Id.* at 509. Thus, when a contractor designs a product for both government *and* commercial use, the defense fails because there is not a *uniquely* federal interest. *E.g.*, *In re Hawaii*, 960 F.2d 806, 811–12, 814 n.2 (9th Cir. 1992). Indeed, the Eleventh Circuit has considered the "military contractor defense" only where the contractor designs a device for military use. *E.g.*, *Gray*, 125 F.3d at 1371 (S–3 jet).

The CAEv2 was designed for both commercial and military use, rendering any federal interest in the CAEv2's design not uniquely federal. From the start, ISL designed the CAEv2's non-linear filter for both "military [and] industrial" use. PX2(3M_MDL000183316). Defendants followed suit. ███████████████

████████████████████████████████████████████████

█████████████ PX12(3M_MDL000591210_5). Unlike a fighter jet or missile, Defendants designed and developed a simple device for soldiers and civilians alike. PX15(Myers-97:22–100:17); PX45(Murphy-224:17-21). The CAEv2 is just an earplug.

Defendants sold recreational shooters, law-enforcement officers, and industrial customers the CAEv2 and other "feature identical" products—branded as the ARC Plug, AO-Safety Indoor/Outdoor Plug, and Browning Duo. PX19(30(b)(6)-38:13–40:15, 51:5-24, 74:7-21). These commercial counterparts ████████████████████████████████████████████. PX46(Murphy-Ex.21); PX47(3M_MDL000393647); PX45(Murphy-232:4-23); PX15(Myers-398:17–401:11). Thus, even if the military had a federal interest in the CAEv2, it did not have a uniquely federal one.[2] *See Hawaii*, 960 F.2d at 811 ("Where the goods ordered by the military are those readily available, in substantially similar form, to commercial users, the military contractor defense does not apply."); *Turgeon v. Trinity*, 2018 WL 4223165, *13–15 (D.N.H. 2018) (denying defense because government did not have a uniquely federal interest); *Cabalic v. Owens-Corning*, 1994 WL 564724, *3 (N.D. Cal. 2014) (rejecting defense because products were not "different from those designed for civilian use").

---

[2] ██████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████ PX48(3M_MDL000348500).

13

## 2.     *There is no significant conflict.*

The foregoing facts also do not square with *Boyle*'s conflict requirement. When "the military is only one outlet in a larger market," tort policies "continue to require" the contractor to "bear the cost of the injuries it produces." *Dorse v. Armstrong*, 513 So.2d 1265, 1269 (Fla. 1987). In such situations, as here, "conflict there [cannot] be." *Cf. Boyle*, 487 U.S. at 508; *Nielsen v. George*, 892 F.2d 1450, 1455 (9th Cir. 1990).

Moreover, *Boyle*'s paramount justification for establishing the defense was that "contractors [would] predictably raise their prices to cover, or insure against, contingent liability for the Government-ordered designs." *Boyle*, 487 U.S. at 511–12. The "same concerns do not exist with respect to products readily available on the commercial market." *In re Chateaugay*, 146 B.R. 339, 350 (S.D.N.Y. 1992). Government contractors who simultaneously serve commercial markets already include liability costs in the product's price. *Hawaii*, 960 F.2d at 811. Here, in stark contrast, ███████████████████████████████████████████████. PX49(McGinley-60:2–62:20). Permitting them to benefit from this defense would vitiate *Boyle*'s purpose.

"It would be absurd to permit one injured [civilian] to recover damages because he was injured by a [CAEv2] sold in the marketplace while [a veteran] is denied recompense solely because he was injured by the same or a substantially

14

similar product produced for a military purchaser." *Dorse*, 513 So.2d at 1269–70.

As a matter of law, policy, and equity, the defense has no place in this case.

### B. Defendants did not enter into a federal procurement contract for the design and development of the CAEv2.

The government contractor defense is also inapplicable because there was

never any procurement contract for the design and development of the CAEv2.

PX10(30(b)(6)-820:17–822:5); *see Hudgens v. Bell Helicopter/Textron*, 328 F.3d

1329, 1334 (11th Cir. 2003) (requiring defendant to establish "the defense's general

applicability to its contract with the Army" in addition to *Boyle*'s "three elements").

### 1. *There is no design contract for the CAEv2.*

*Boyle* rests on the premise that certain areas of federal concern may warrant

displacing state law. 487 U.S. at 504. The concern there was the military's unique

interest in a "federal procurement contract" for the design of a CH–53D helicopter.

*Id.* at 504–08. Because the contract required the defendant to design the helicopter

"with the sort of escape-hatch mechanism shown by the specifications," the Court

found a "significant conflict" between state law and the design contract. *Id.* at 509.

Absent such a contract, the manufacturer owes no "duty" to the government

and remains free to design the product as it sees fit, obviating any conflict. *Id.* That

is why the *Boyle* factors "presume the existence" of a design contract; without one,

applying *Boyle* "proves impossible." *Martinez v. Sci. Applications*, 2015 WL

11109381, *21 (S.D. Tex. 2015). A *contract* for the design and development of a

product is the *sine qua non* of the government *contractor* defense. *E.g.*, *Crutchfield v. Sewerage*, 829 F.3d 370, 375 (5th Cir. 2016) ("That defense provides immunity to contractors for conduct that complies with the specifications of a federal contract."); *In re Hanford*, 534 F.3d 986, 1000 (9th Cir. 2008) (same).

██████████████████████████████ PX10(30(b)(6)-820:17–822:5); PX43(Merkley-286:4-16); PX23(Babeu-179:1-4). Nor did Defendants follow standard procurement processes, where the DLA "develop[s] specifications," "solicit[s] bids," and "award[s] a contract" for product development. 10 U.S.C. § 2305(a)(1)(A)(i)–(iii), (b)(4)(A); PX9(Ohlin-28:12-22, 132:9-17); PX26(Berger-172:1-10); *see Gray*, 125 F.3d at 1374, 1378 (describing procurement process). Defendants followed that process ██████████████████████, but not the CAEv2. PX34(Warren-267:24–269:10, 275:2-22). Defendants cannot recall any "procurement means through which Aearo entered into a contract with the government to develop the [CAEv2]." PX10(30(b)(6)-820:17–822:5).

Instead of entering into a design contract with the military, *compare* PX50(3M_MDL000689903), ██████████████████████████ ██████, *e.g.*, PX34(Warren-55:23–56:12). ██████████████████████ ████████████████████████████████████████ PX9(Ohlin-167:12-22). The government contractor defense thus unravels with the pull of a single string. *City of Walker v. Louisiana*, 877 F.3d 563, 570 (5th Cir. 2017).

16

## 2.  *The MPID solicited the CAEv2 as a stock product.*

Unable to identify a design contract, PX10(30(b)(6)-820:17–822:5), Defendants might fall back on the MPID—███████████████████████████ ███████, PX10(30(b)(6)-804:1–814:12). But that contract does not save them because it was a "███████████████████████████████" based on Standard Form 1449. PX37(3M_MDL000000014) (emphasis added); 48 C.F.R. § 53.212 ("SF 1449 is prescribed for use in solicitations and contracts for commercial items.").

The commercial item pathway allows the military to acquire preexisting products based on "streamlined" requirements that avoid sensitive design judgments. FAR Acquisition of Commercial Items, 60 Fed. Reg. 48231-01 (1995) (codified at 48 C.F.R. part 12). Pursuant to that pathway, it is "impossible to say" the military had a significant interest in a particular feature of a preexisting product. *Boyle*, 487 U.S. at 509. The defense thus does not protect "stock" products. *King v. Esmet*, 2006 WL 3635463, *3 (M.D. Fla. 2006).

In the same way it would order light bulbs, the DLA ordered the CAEv2 as a stock product. PX10(30(b)(6)-815:12–816:20); PX15(Myers-537:13-18). Tellingly, the MPID ███████████████████████████████████████████. PX37(3M_MDL00000055) ("███████████████████████████████"); PX51(30(b)(6)-336:22–337:20); *see* 48 C.F.R. § 52.211-6. The CAEv2 was

17

therefore nothing more than a "stock" product at the time of Defendants' sole procurement contract. PX26(Berger-262:16–263:6). For that additional threshold reason, the Court should reject this meretricious defense, as in *Ferguson v. Bombardier*, 2015 WL 8160215, *4 (M.D. Fla. 2005). *E.g.*, *Coulbourn v. Air & Liquid*, 2015 WL 12656236, *8 (D. Ariz. 2015).[3]

## IV.   The Defense Does Not Preempt Plaintiffs' Design-Defect Claims Because Defendants Cannot Satisfy All Three *Boyle* Conditions.

### A.   The military did not approve reasonably precise specifications.

*Boyle*'s first condition imposes a double burden on Defendants to show reasonably precise specifications existed *and* government approval of them. *Brinson v. Raytheon*, 571 F.3d 1348, 1351 (11th Cir. 2009). These requirements "assure that the *design feature in question* was considered by a Government officer, and not merely by the contractor itself." *Boyle*, 487 U.S. at 512 (emphasis added).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *E.g.*,  PX52(3M_MDL000254204_1).

Plaintiffs target two here: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. PX25(Kieper-914:24–915:20).

---

[3] Assuming *arguendo* the MPID is a design contract for the CAEv2, civilian Plaintiffs did not purchase the CAEv2 pursuant to it. No matter how Defendants cut it, they cannot show the military made them sell the CAEv2 commercially. *E.g.*, *Nielsen*, 892 F.2d at 1455.

1.      ***There are no specifications for the CAEv2.***

Defendants cannot establish the first *Boyle* condition for these two defects (or

any others) because ███████████████████████. PX9(Ohlin-130:6-23,

133:16–134:10, 168:17–169:4, 240:4–241:11); PX53(3M_MDL000527305).

Ignoring Ohlin's unequivocal testimony, Defendants might argue that Ohlin

created pseudo-specifications for certain characteristics he allegedly desired. ████

███████████████████████████████████████████

████████████████████████  PX16(30(b)(6)-578:18–584:22);

PX55(Berger-147:7–148:11). Defendants' President of Sales and Military Sales

Managers agree ████████████████████. PX34(Warren-290:17-

21); PX18(McNamara-369:4–372:15); PX35(Santoro-229:3–230:8).

Defendants' attempt to spin straw into gold also contradicts *Touhy* testimony.

PX23(Babeu-57:3–58:8); PX43(Merkley-294:12–295:3) (military does not "specify

the development of earplugs [in] oral conversations"). And for good reason. The

DLA, not Ohlin, ███████████████████████████.

PX26(Berger-172:1-10);      PX43(Merkley-404:5-7);      PX44(Coleman-53:5-10);

PX54(3M_MDL000188604). ████████████████████

███████████████████████████████████████████

███████████████████████████ PX9(Ohlin-

148:20–150:9, 233:7-24).

19

Defendants might say the MPID "memorialized" Ohlin's wish list. This argument founders on the shoals of ████████████████████████████ ████████████████████████████████████████████ ██████████████████████████. PX37(3M_MDL00000055); PX26(Berger-262:16–263:6); PX15(Myers-544:25–546:15); *see* 48 C.F.R. § 52.211-6(a). The CAEv2 was, after all, a preexisting product sold commercially years before the MPID. PX15(Myers-545:10-15). It therefore could not have been designed to satisfy *ex-post* requirements. *E.g.*, *Caldwell v. Morpho*, 2013 WL 500867, *5 (E.D. Mo. 2013) (denying defense because specifications were "produced after the [product] had already been designed and sold to customers, including the Government").

## 2. *The purported specifications are not reasonably precise.*

In addition, the purported specifications are too vague to shield Defendants from their own design decisions. Specifications are precise if the government exercises "discretion over significant details and all critical design choices." *Gray*, 125 F.3d at 1377.

According to Berger, Ohlin said he wanted a single-sized, double-ended, triple-flanged, dual-mode earplug that would fit in a carrying case. PX55(Berger-81:22–82:24). This is inadmissible hearsay. *McKay v. Tracor*, 2005 WL 8158361, *1–2 (N.D. Ala. 2005). Even so, this supposed wish list constitutes a precatory "narrative description" that left "important design choices" to Defendants, *Gray*,

20

125 F.3d at 1378, devoid of "███████████████████████████████████

███████████████," PX16(30(b)(6)-582:16–583:6). Ohlin's silence as to ███

███████████████████████████████ is dispositive. *See Trevino v. Gen. Dynamics*, 865 F.2d 1474, 1487 (5th Cir. 1989); *Holdren v. Buffalo Pumps*, 614 F. Supp. 2d 129, 148 (D. Mass. 2009) ("Silence is not the stuff of 'reasonably precise' specifications.").

Ohlin's inquiry about whether Aearo ██████████████████████████████

████████████ does not aid Defendants. Ohlin neither told Defendants ██████████

████████ nor directed them to ████████████████. PX16(30(b)(6)-504:25–505:19). Defendants retained design discretion, dooming the defense. *See Boyle*, 487 U.S. at 509 (contract must specify "precise manner of construction"); *In re Katrina*, 620 F.3d 455, 462 (5th Cir. 2010) ("By providing only general instructions regarding the compaction method, the Corps ensured [the contractor] would have significant discretion . . . [which] is not protected by the [defense]."); *Dugas v. 3M*, 2016 WL 3965953, \*4 (M.D. Fla. 2016) (granting plaintiff summary judgment because specifications did not eliminate defendant's discretion over the design feature).

The MPID also fails to specify ██████████████████████████████

██████████████████████████████████████████████████████████

████. PX15(Myers-548:7–549:8). ███████████████████████████████

PX37(3M_MDL000000055). That nebulous description did not require Defendants to design the CAEv2 defectively. *See Gray*, 125 F.3d at 1377; *Snell v. Bell Helicopter*, 107 F.3d 744, 748 (9th Cir. 1997); *Strickland*, 911 F. Supp. at 1467–68.

At bottom, nothing in the record demonstrates the military required Defendants to shorten the stem or position the opposing flanges as they did. Precise specifications do not exist for either defect.

### 3.   *The military did not approve the design features at issue.*

*Boyle*'s first condition also requires Defendants to show the military approved precise specifications. Approval means more than a "rubber stamp." *Trevino*, 865 F.2d at 1480. There must be "substantive review" through a continuous "back-and-forth" with the military regarding the feature in question. *Id*. at 1479–80. Participation in the overall design will not do. *Boyle*, 487 U.S. at 513.

In *Gray*, the Eleventh Circuit held that *Boyle*'s first condition was not met even though "Navy engineers and [the contractor] worked closely together on many aspects of the [product's] development." 125 F.3d at 1374. Because the Navy did not evaluate the defect, the court affirmed the denial of the defense. *Id.* at 1378; *Trevino*, 865 F.2d at 1480 ("If the [contractor] exercised the actual discretion over the defective feature of the design, then the contractor will not escape liability via the [defense]—the government's rubber stamp on the design notwithstanding.").

In *Harduvel*, however, the court found the F-16's electrical system was the "result of continuous back and forth." 878 F.2d at 1320. The Air Force conducted an "extensive review of the aircraft" by "examining specifications, drawings, and blueprints," and a "group of Air Force engineers" reviewed the electrical system. *Id.*

Here, Defendants cannot show a "continuous back and forth" as to either defect in question; they cannot even show Ohlin "worked closely" with them on the CAEv2's overall design—involvement that was rejected as insufficient in *Gray*. PX56(3M_MDL000456625_1) (Army concluding that Ohlin "████████████ ████████████████████████████████████████████████████ ████████████"); PX34(Warren-255:14–262:22).

Nor did Ohlin evaluate the CAEv2. ████████████████████████ ████████████████████████ PX9(Ohlin-140:10-20, 148:20–150:14, 233:7-24). Beyond those ad hoc criteria, Defendants "don't know how he evaluated" it. PX55(Berger-133:3-9). There was "████████████████████████ ████████" when Ohlin recommended it, PX9(Ohlin-228:5-16), and no "██ ████████" or "████████████" existed, PX9(Ohlin-224:5-17, 243:14–244:7); PX23(Babeu-56:2-5). Defendants had not even ████████ the CAEv2 before selling it to the military.[4] PX25(Kieper-148:12–151:9). Defendants and Ohlin

---

[4] The Army's 1995 testing does not ameliorate that fact because ████████████ ████████████████████████████████████████ PX26(Berger-267:20–268:11).

therefore had "██████" on the CAEv2 when he rubber-stamped it. PX20(3M_MDL000257805); PX57(3M_MDL000039904); *see Trevino*, 865 F.2d at 1486–87 (finding no approval without "formal [government] design review").

To make matters worse, neither Ohlin nor a military engineer evaluated the CAEv2 or its final blueprint after Defendants decided to shorten its stem. *See Trevino*, 865 F.2d at 1480 (noting that *Boyle* involved government review and approval of the "final product"). Even if Ohlin evaluated an initial prototype or blueprint, that "is simply not enough" to show substantive approval of the final product. *Stecyk v. Bell Helicopter*, 1997 WL 701312, *7 n.12 (E.D. Pa. 1997).

Further, Ohlin's inquiry about shortening the *plug* does not show substantive approval of the shortened *stem*. No evidence shows "exhaustive communication" with Ohlin regarding Defendants' decision to shorten the stem. *Brinson*, 571 F.3d at 1355. Tellingly, ████████████████████████████████████████ ████████████████████████, contains nary a word about such a conversation. PX55(Berger-85:3-15);    PX58(3M_MDL000696204_289–1379).    Nor    do Defendants know what "evaluations [Ohlin] would have gone through" after they shortened the stem. PX55(Berger-132:24–133:9); *Mazant v. Visioneering*, 2006 WL 8456002, *3 (E.D. La. 2006). Ohlin accepted this modification "without any substantive review or evaluation." *Trevino*, 865 F.2d at 1480; *Weber v. Slingsby*, 2001 WL 34135318, *1 (S.D. Fla. 2001) (defendant failed to show military "had any

other involvement directing [defendant's] design decisions" after modifying the design); *cf. Maguire v. Hughes*, 912 F.2d 67, 71–72 (3d Cir. 1990) (military examined impact of change).

*   *   *

Unable to satisfy either component of *Boyle*'s first condition, the defense collapses. *See Gray*, 125 F.3d at 1377–78; *Dugas*, 2016 WL 3965953, *4; *see also Snell*, 107 F.3d at 748; *D.F. v. Sikorsky*, 2017 WL 4922814, *20–21 (S.D. Cal. 2017); *Ferguson*, 2005 WL 8160215, *3; *Carson v. Heli-Tech*, 2003 WL 22469919, *6 (M.D. Fla. 2003).

## B.    The CAEv2 did not conform to any purported specifications.

*Boyle*'s second condition requires the product to conform to government-approved specifications. Nonconformance means a "deviation from the required military specifications." *Gray*, 125 F.3d at 1378. Because the military did not approve precise specifications, Defendants necessarily fail this condition. *See Griffin v. JTSI*, 654 F. Supp. 2d 1122, 1136 n.29 (D. Haw. 2008). In fact, it is "impossible" to analyze this condition without contractual design specifications. *Martinez*, 2015 WL 11109381, *21.

Assuming Ohlin's requests and the MPID constitute precise specifications, which they definitely do not, Defendants fare no better. In *Gray*, the Eleventh Circuit alternatively analyzed whether an aircraft's servo conformed to the "basic design"

25

requirement of a servo "without a hazardous lag." 125 F.3d at 1378. It concluded the

servo did not meet that "narrative description" because "it suffered from a hazardous

lag." *Id.* at 1378–79. So too here. The CAEv2 does not conform to the ███████████

███████████ due to the defects in question. PX37(3M_MDL000000055 ¶ 2.1.1);

PX9(Ohlin-130:6-23). ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ PX24(Berger-109:10-13).

The CAEv2 also violated the MPID's ████████████████████████ that

ensure ████████████████. PX37(3M_MDL000000055–56); PX15(Myers-

542:6-25).

- ████████████████████████████████
  ████████████████████████████████
  PX25(Kieper-512:5–531:23), ████████████████████
  ████████████████, PX15(Myers-550:12–565:20). *See Gray*,
  125 F.3d at 1378 ("shutoff valve in the servo operated at a
  higher-than-specified pressure").

- ████████████████████████████████
  ████████████████████████████ PX26(Berger-318:13–
  320:11).

- ████████████████████████████████
  ████████████████████ PX25(Kieper-162:17–163:3,
  351:14–354:1); PX59(3M_MDL000332847); PX15(Myers-331:2–
  332:24). The government sued Defendants for violating this very
  requirement. PX60(Hamer-166:4–167:17); *Ferguson*, 2005 WL
  8160215, *4–5; *Shurr*, 70 F. Supp. 2d at 920–25 (nonconformance
  with testing requirements).

26

- █████████████████████████████████████

  PX61(Moses-262:2–268:11);  PX35(Santoro-304:2–306:22). ████
  █████████████████████████████████████
  PX35(Santoro-311:9–314:14); PX26(Berger-290:3-6).

Accordingly, Plaintiffs are entitled to summary judgment even if these requirements constitute precise specifications. *See, e.g.*, *Gray*, 125 F.3d at 1378–79.

### C.    Defendants withheld their internal knowledge of the CAEv2's defects, dangers, and potential consequences from the military.

*Boyle*'s third condition requires a contractor to show that "it warned the government of all the dangers known to it, but not to the government." *Gray*, 125 F.3d at 1379. The contractor must fully disclose not only the defect but also any resulting "problems" and "possible serious consequences." *Harduvel*, 878 F.2d at 1322. Where the contractor conceals such internal knowledge, the defense fails. *See Boyle*, 487 U.S. at 512 (contractors cannot "withhold[] knowledge of risks").

*Harduvel* illustrates this rigorous requirement. There, the plaintiff sued the manufacturer of an F-16, alleging that its electrical system caused wire chafing, which in turn caused the aircraft to lose power and crash. 878 F.2d at 1313–14. *Boyle*'s third condition was met because the Air Force knew about the defect as well as "the chafing problem" and "the possible serious consequences of [it]." *Id.* at 1322. The contractor produced "uncontested evidence that its engineers withheld no information on chafing," and it was undisputed the Air Force knew the F-16's "chafing could lead to electrical shorting." *Id.* at 1321–22. Given the Air Force's

equal knowledge of the defect (electrical system), its dangers (chafing), *and* its potential serious consequences (power loss), *Boyle*'s third condition was met. *Id.*

Other courts likewise hold that *Boyle*'s third condition is not met when the contractor fails to disclose internal information regarding the dangers and consequences of the defect. *E.g.*, *Carley v. Wheeled Coach*, 991 F.2d 1117, 1127 (3d Cir. 1993) (reversing summary judgment because government did not know "as much as" contractor); *Gadsden v. United States*, 111 F. Supp. 3d 1218, 1231 (N.D. Ala. 2015).

Consider *Jowers*. Though the government had "state-of-the-art knowledge" of welding fume hazards based on several "large-scale studies," the contractors could not show "they shared any of their internal information regarding" those hazards. *Jowers v. Lincoln Elec.*, 617 F.3d 346, 354 (5th Cir. 2010). This internal information "demonstrated a deeper knowledge of potential harms" than the government had from its own testing, which was fatal to the defense. *Id.* at 354–55.

Just like in *Jowers*, Defendants cannot show the military knew about the dangers and consequences of the CAEv2's defects, as revealed in their internal documents. The record is bereft of evidence that the military knew the CAEv2's short stem prevented deep insertion and that such fitting problems could cause inadequate protection. There is also not a scintilla of evidence the military knew the

positioning of the CAEv2's opposing flanges caused imperceptible loosening that could result in inadequate protection.

1.   ***Defendants cannot show they shared the Flange Report or Test 213015 with the military.***

It is undisputed that Defendants hid two of their most incriminating documents from the military: Test 213015 and the Flange Report. Not even Defendants' Military Sales Managers laid eyes on those reports until this litigation. PX18(McNamara-376:2-18); PX62(Gavin-92:14-18). Given the asymmetry of knowledge ████████████████████████████████████████████████ ████████████████████ PX45(Murphy-192:18–193:5). Numerous sales executives conceded they "████████████████████████████████████████." PX61(Moses-250:19–251:22); PX18(McNamara-92:8-19).

Indeed, no one disseminated Test 213015 "outside the walls of Aearo and 3M." PX15(Myers-302:5-24); PX27(30(b)(6)-352:15-25). The record shows Defendants instead concealed this information. When applying for the MPID, Myers told the military that NRR testing on the closed end had been "████████████████" ████████████. PX15(Myers-490:3–493:23). Had he disclosed Test 213015, the military never would have purchased the CAEv2. PX42(3M_TOUHY00002040); PX26(Berger-559:5-25);   PX34(Warren-213:12–214:17);   PX45(Murphy-167:9– 168:5). Not to mention, disclosing Test 213015 would have unveiled Defendants' sham testing methods. Defendants therefore buried it. PX15(Myers-623:10-16).

Defendants also cannot show they disclosed the Flange Report. PX27(30(b)(6)-286:5–287:9). The record is crystal clear they did *not*. According to 3M's Laboratory Manager, ███████████████████████████████████. PX60(Hamer-62:1–68:20);   PX51(30(b)(6)-243:16–244:23).   Myers,   however, testified that ███████████████████████████████████████

██████. PX15(Myers-286:18–289:24, 293:24–297:22, 367:11-25). So too with Berger.  PX26(Berger-206:7-13) ("███████████████████████████

███████."). In the end, not one employee "███████████████████████

███████████████████████████████████." PX10(Myers-897:6–898:25); PX60(Hamer-330:23–331:3); PX34(Warren-220:3-8).

Lacking any proof of disclosure, Defendants might argue Berger orally transmitted the Flange Report to Ohlin. He did not. Berger has no "███████

███████████████████████████████" when talking to Ohlin. PX27(30(b)(6)-372:11–373:10).  Not even his ███████████████████

███████████████████████████████████████

███████████████████████████████████████

PX58(3M_MDL000696204);   PX15(Myers-722:1–723:22);   PX55(Berger-152:2–155:9); PX18(McNamara-382:7–396:9). Stuck with these undisputed facts, Berger conceded he could not recall one conversation informing "████████████

███████████████████████████," PX55(Berger-151:8-21), or

that the CAEv2 "███████████████████████," PX27(30(b)(6)-295:14-25).

And even if it were true that Berger told ████████████████████

██████████████████████████████████████████

██████. PX26(Berger-82:9-22).

███████████████████████████████████████

██████████████████████████ PX63(3M_MDL000023464).

██████████████████████████████████████████

███████████████████████████████ PX18(McNamara-435:24–

437:3). Neither one, however, reflects military knowledge of the CAEv2's defects

and dangers. PX51(30(b)(6)-251:24–252:23, 405:8–406:11); PX26(Berger-218:4-

15, 220:10-18, 545:8-22). █████████████████████

██████████████, PX34(Warren-230:19–234:11); PX23(Babeu-94:8–101:9);

PX64(3M_MDL000345123_30–31, A-9), ████████████████████

██████████████████, PX18(McNamara-399:7-23); PX23(Babeu-49:8-12).

Worse, █████████████████████████████

██████████████████████████████████████████

█████████████████████████████. PX27(30(b)(6)-373:12–374:6);

PX18(McNamara-436:15–440:15). In fact, ██████████████████████

██████████████████████████████████████████

██████. PX26(Berger-205:1-9,  212:2–213:9);  PX15(Myers-745:15–748:13);  *see*

*Schwindt v. Cessna*, 1988 WL 148433, *4 (S.D. Ga. 1988) (denying defendant summary judgment because it did not correct military's limited knowledge of potential remedy).

Accordingly, Defendants cannot show the military knew ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████. PX35(Santoro-306:1-22); PX15(Myers-685:4–686:4); PX60(Hamer-76:20–77:6, 310:11–311:8); PX18(McNamara-404:2–405:18). *Compare Gray*, 125 F.3d at 1379 (defense not met because instructions did not reveal "how *critical the positioning* of the control stick" was to avoid danger or that it "*had to be*" in a certain position to function safely) (emphasis added), *with Harduvel*, 878 F.2d at 1321–22 (defense met because technical orders warned that failure to inspect could cause problems and government had full knowledge).

> ### 2.   *Ohlin's testimony, the Army's Law Enforcement Report, and* **Touhy** *discovery each prove Defendants withheld information.*

While this evidentiary chasm itself entitles Plaintiffs to summary judgment, additional evidence *proves* Defendants cannot satisfy *Boyle*'s third condition.

Ohlin previously testified about ███████████████████████████

█████████████████████████████████████████████████████████████.

PX9(Ohlin-80:21–81:5). Ohlin also testified he knew ███████████

████████████████████████████████████████████████████████████████

32

███████████████████████████████████████████████████

██████████████████████████████ PX9(Ohlin-191:18–192:23) (emphasis added).

Ohlin was therefore █████████████████████████████████████

██████████████████████████████████ *Id.*

The government's criminal investigation in the *qui tam* case ends the inquiry. There, the government alleged Defendants "knowingly sold the CAEv2 to the United States military without first disclosing the design defect, flawed testing, and inaccurate NRR." *United States v. 3M*, No. 3:16-cv-01533-MBS, Dkt. 23-1 (D.S.C. 2018). The Army Criminal Investigation Command conducted an intensive, two-year investigation and published a Final Law Enforcement Report concluding ███

███████████████████████████████████████████████████

███████████████████████████████████████ PX40(CID0002); PX15(Myers-753:1–754:5). To this day, Defendants' Master Answer in this MDL does not deny the military lacked such information. Dkt. 959 ¶ 174.

Finally, like Defendants' employees, none of the *Touhy* witnesses have identified "any communication of [the Flange Report's] findings to the Army." PX43(Merkley-331:21–332:16). ████████████████████████████

███████████████████████████████████████████████████

PX43(Merkley-327:8–329:1, 349:4–350:4); PX23(Babeu-171:18–175:14, 389:20–391:18); PX44(Coleman-202:15–203:12).

### 3. *Defendants engaged in the very conduct that* **Boyle** *forbids.*

In the final analysis, Defendants' conduct runs headlong into *Boyle*'s third condition. 487 U.S. at 512–13 ("The third condition is necessary because, in its absence, . . . manufacturer[s] [would] withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability."). Defendants had countless opportunities to disclose the Flange Report and Test 213015 to the military, but they never did because the CAEv2 "▮▮▮▮▮▮▮▮▮▮" and "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." PX19(30(b)(6)-319:4–321:10, 383:2–384:3); PX65(Cimino-76:4–77:12).

Driven by profits instead of safety, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮. PX25(Kieper-482:5–500:23). Days before the MPID, ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮. PX26(Berger-641:16–642:25); PX15(Myers-500:1–501:1, 623:10-25).
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮. PX66(3M_MDL000531885_5); PX15(Myers-783:16–786:21).

Undeterred, Defendants kept that internal information, Test 213015, and the Flange Report a secret until they no longer could; that is, until they were required by law to disclose it in litigation. Only after the cat was out of the bag did they
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. PX15(Myers-352:16–353:16). Indeed, ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████.

PX38(3M_MDL000332111); PX31(Hamer-149:18–157:8, 165:20–166:1, 175:16–176:7). Yet even then, Defendants did not own up to the military. PX15(Myers-362:15–363:21); PX43(Merkley-387:6-11).

Unfortunately, Defendants remain undeterred. When asked whether it is "███████████████████████████████████████████████████████, " one executive still said, "███." PX67(Salon-51:16–54:10). Defendants' Military Sales Manager doubled-down on that statement, PX18(McNamara-167:1–170:14), and brazenly testified that ███████████████ ███████████████████████████████████████████████████████ ██████████████████████████ PX18(McNamara-153:16–156:22).

\*      \*      \*

In sum, Plaintiffs are entitled to summary judgment because Defendants cannot carry their burden on either defect under *Boyle*'s third condition. It is undisputed that Defendants concealed Test 213015. It is undisputed that Defendants withheld the Flange Report. And it is undisputed that Defendants never told the military that ███████████████████████████████████████████ ███████████████████████████████, both of which result in poor protection.

35

Because the military was not aware of Defendants' "deeper knowledge" of the dangers and consequences of the CAEv2's defects, Defendants cannot satisfy *Boyle*'s third condition. *See, e.g.*, *Jowers*, 617 F.3d at 354–55.

## V.   The Defense Does Not Preempt Plaintiffs' Failure-to-Warn Claims Because Defendants Cannot Show a Procurement Contract Prohibited a Warning.

As with design-defect claims, displacement of warning claims requires sharp conflict between state-law duties and the duties imposed by a federal procurement contract. *In re Joint*, 897 F.2d 626, 629–31 (2d Cir. 1990). Put simply, "conflict there must be." *Boyle*, 487 U.S. at 507. The defense therefore preempts failure-to-warn claims only where, unlike here, a federal contract *prohibited* the contractor from warning. *E.g.*, *Hawaii*, 960 F.2d at 812.

*Dorse* set that rule in stone. Instead of applying *Boyle*'s "three-part test," the Eleventh Circuit concluded that *Boyle*'s two threshold requirements governed warning claims. 898 F.2d at 1489. It found the "significant conflict" requirement lacking because the contractor's state-law duty to warn was "not precisely contrary to the duty imposed by the government contract." *Id.* at 1489. Notably, the Navy "specifications [did] not contain any prohibition against health warnings." *Id.* For that reason alone, the Eleventh Circuit affirmed the grant of summary judgment to plaintiff. *Id.* at 1490.

36

District courts in this Circuit are "bound by the *Dorse* case" and must "abide by every contour of that opinion." *Killam v. Air & Liquid*, 2016 WL 7438434, *5 (M.D. Fla. 2016). Contractors therefore generally "challenge [failure-to-warn claims] on the merits." *Strickland*, 911 F. Supp. at 1468 & n.4. When they do assert the defense, they rarely—if ever—succeed. *See, e.g.*, *Glassco v. Miller*, 966 F.2d 641, 644 (11th Cir. 1992) (reversing summary judgment because it was "inconsistent with *Dorse*"). Indeed, *Dorse*'s strict prohibition test typically requires summary judgment for plaintiffs. *E.g.*, *Dugas*, 2016 WL 3965953, *5 (granting plaintiff summary judgment because "warnings were not outright prohibited by the Navy").

*Dorse* dooms the defense here. In that case, Navy specifications were silent as to "any prohibition against health warnings." 898 F.2d at 1489. In this case, "███████████████████████" whatsoever. PX53(3M_MDL000527305). This does not merely "suggest[] that no conflict exists," *Dorse*, 898 F.2d at 1489, ██████ ███████████████████, PX61(Moses-181:18–183:2).

Defendants concede the military never denied them "the right to give an instruction or a warning to the military and to the soldiers," PX51(30(b)(6)-287:3–288:10), and admit nothing in the MPID "████████████████████████ ███████████," PX51(30(b)(6)-278:10–283:4). 898 F.2d at 1489–90 & n.2. Defendants have also not produced any other contract where the military "████████████████████████." PX51(30(b)(6)-283:23–284:13).

37

What's more, the sole contract Defendants invoke ███████████████ ███████████████. PX37(3M_MDL0000000056); PX43(Merkley-308:6–309:7). *Dorse* thus applies here, *a fortiori*. PX51(30(b)(6)-277:1–278:9).

Defendants also never warned "███████████████████████████" ███████████████, even though the military had no power to prohibit them from warning commercial users. PX45(Murphy-192:18–193:5). To be sure, then, Defendants' failure to warn was of their own making, not the military's. PX61(Moses-268:12-24); *see Gray*, 125 F.3d at 1377 ("[T]he military contractor defense is available only when the defendant [shows] 'the government made me do it.'"). The defense does not therefore preempt Plaintiffs' failure-to-warn claims. *See Graves v. 3M*, 2020 WL 1333135, *5–6 (D. Minn. 2020) (defense was not colorable because "3M has not demonstrated that the government had any control over the [CAEv2's] instructions or warnings").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment on the government contractor defense.

DATED: April 1, 2020

*s/ Bryan F. Aylstock*
Bryan F. Aylstock, Lead Counsel
Florida State Bar No. 078263
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel.: (850) 202-1010
baylstock@awkolaw.com

Shelley V. Hutson, Co-Lead Counsel
(Admitted Pro Hac Vice)
Texas State Bar No. 00788878
Clark, Love & Hutson, GP
440 Louisiana Street, Suite 1600
Houston, TX 77002
Tel.: (713) 757-1400
shutson@triallawfirm.com

Christopher A. Seeger, Co-Lead Counsel
(Admitted Pro Hac Vice)
New Jersey State Bar No. 042631990
Seeger Weiss LLP
77 Water Street, 8th Floor
New York, NY 10005
Tel.: (212) 587-0700
cseeger@seegerweiss.com

Michael A. Sacchet, Chair of Law & Briefing
(Admitted Pro Hac Vice)
Minnesota State Bar No. 0395817
Ciresi Conlin LLP
225 South 6th Street, Suite 4600
Minneapolis, MN 55402
Tel.: (612) 361-8220
mas@ciresiconlin.com

**Counsel for Plaintiffs**

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH LOCAL RULES 7.1(F) AND 56.1(E)</u>

I hereby certify that this motion complies with the word limit of Local Rule

56.1(E) and contains 8,000 words.

<em>s/ Bryan F. Aylstock</em>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 1, 2020, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

<u>*s/ Bryan F. Aylstock*</u>