**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | | |
|---|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) | Case No. 3:19-md-02885-MCR-GRJ Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |
| This Document Relates to All Cases | ) ) ) ) ) | CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER |

## <u>MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE GOVERNMENT CONTRACTOR DEFENSE</u>

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS ......................................................................................1

    A.    The Military Researched And Tested Non-Linear Earplugs. ..............1

    B.    The Military Worked With Aearo To Develop The CAEv2. ...............2

    C.    Aearo Subsequently Sold The CAEv2 To Civilians. ...........................4

    D.    Aearo Conducted REAT Tests On The CAEv2.....................................4

    E.    Plaintiffs Are Wrong That The Flange Memo "Memorialized At Least Two Defects"....................................................................7

    F.    Aearo Informed The Military Of The Flange-Fold Issue And The Results Of Its Internal Testing. .......................................................8

    G.    The CAEv2 Meets The Military Sound Attenuation Specification, With Or Without The Flanges Folded Back. ...............10

ARGUMENT .........................................................................................................11

I.    PLAINTIFFS' THRESHOLD ARGUMENTS ARE WITHOUT MERIT. ........................................................................................................12

    A.    Commercial Use Does Not Render The CAEv2 Ineligible For The Contractor Defense. .......................................................12

    B.    The Government Contractor Defense Does Not Require A Written Design Contract......................................................................16

II.    THE GOVERNMENT CONTRACTOR DEFENSE PREEMPTS PLAINTIFFS' DESIGN DEFECT CLAIMS.................................................18

    A.    The Government Approved Reasonably Precise Specifications. .......19

    B.    The CAEv2 Conformed To The Approved Specifications.................21

C.    The Government Was On Notice Of The Consequences Of Shortening The Product's Length. ........................................................22

III.  THE GOVERNMENT CONTRACTOR DEFENSE PREEMPTS PLAINTIFFS' FAILURE TO WARN CLAIMS. ..........................................32

IV.  THE GOVERNMENT CONTRACTOR DEFENSE PREEMPTS PLAINTIFFS' OTHER CLAIMS. ..................................................................34

CONCLUSION ...................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyle v. United Techs. Corp.*,
  487 U.S. (1988) ............................................................................*passim*

*Brinson v. Raytheon*,
  571 F.3d 1348 (11th Cir. 2009) ...................................................*passim*

*Burgess v. Colo. Serum Co.*,
  772 F.2d 844 (11th Cir. 1985) ...........................................................16

*Cabalic v. Owens–Corning Fiberglass Corp.*,
  1994 WL 564724 (N.D. Cal. 1994) ....................................................16

*Carley v. Wheeled Coach*,
  991 F.2d 1117 (3d Cir. 1993) .............................................................17

*Dorse v. Armstrong World Indus.*,
  513 So.2d 1265 (Fla. 1987) .........................................................16, 33

*Dorse v. Eagle-Picher Indus., Inc.*,
  898 F.2d 1487 (11th Cir. 1990) ...................................................12, 13

*Getz v. Boeing Co.*,
  654 F.3d 852 (9th Cir. 2011) .............................................................17

*Harduvel v. Gen. Dynamics Corp.*,
  878 F.2d 1311 (11th Cir. 1989) ...................................................17, 19

*Hill v. Raytheon Aircraft Co.*,
  470 F. Supp. 2d 1214 (D. Kan. 2006)......................................13, 21, 33

*In re "Agent Orange" Prod. Liab. Litig.*,
  304 F. Supp. 2d 404 (E.D.N.Y. 2004) ................................................25

*In re Agent Orange Prod. Liab. Litig.*,
  517 F.3d 76 (2d Cir. 2008) ..........................................................13, 17

*In re Brooklyn Navy Yard Asbestos Litig.*,
  971 F.2d 831 (2d Cir. 1992) ...............................................................15

*In re Hawaii Fed. Asbestos Cases*,
   960 F.2d 806 (9th Cir. 1992) ...............................................................16

*In re Katrina Canal Breaches Litig.*,
   620 F.3d 455 (5th Cir. 2010) ..........................................................19, 22

*Jackson v. Deft, Inc.*,
   223 Cal.App.3d 1305 (Cal.Ct.App. 1990) .........................................15

*Jowers v. Lincoln Electric Company*,
   617 F.3d 346 (5th Cir. 2010) ..........................................................25, 26

*Kase v. Metalclad Insulation Corp.*,
   6 Cal. App. 5th 623 (Ct. App. 2016) ...................................................15

*McKay v. Tracor, Inc.*,
   2005 WL 8158361 (N.D. Ala. Mar. 22, 2005) .....................................3

*Miller v. Diamond Shamrock Co.*,
   275 F.3d 414 (5th Cir. 2001) ..............................................................14

*Quiles v. Sikorsky Aircraft*,
   84 F. Supp. 2d 154 (D. Mass. 1999).....................................................35

*United States v. Bellomo*,
   176 F.3d 580 (2d Cir. 1999) ...................................................................3

*United States v. Cruz*,
   805 F.2d 1464 (11th Cir. 1986) .............................................................3

*Young v. Rios*,
   390 F. App'x 982 (11th Cir. 2010)........................................................8

**Statutes**

42 U.S.C § 4902(3)(B)(i) ........................................................................4, 5

**Other Authorities**

74 FR 39152 .............................................................................................32

74 FR 39154 .............................................................................................32

**INTRODUCTION**

The Court should deny plaintiffs' motion.  Plaintiffs base their design defect claim on a design element of the Combat Arms Earplugs version 2 ("CAEv2")—the length of the earplug—that was required and approved by the U.S. military.  And the military assumed full responsibility for instructing service members on the proper fitting and use of the CAEv2, preempting any claim based on an alleged failure to warn.

**STATEMENT OF FACTS**

The undisputed record is set forth in defendants' separately filed motion for summary judgment.  (Dkt_1071.)  Far from supporting *plaintiffs'* motion, it demonstrates concretely that the government contractor defense applies and summary judgment for *defendants* is warranted.  To avoid unnecessary duplication, defendants restate here only those portions of the record necessary to respond to plaintiffs' arguments.

**A.     The Military Researched And Tested Non-Linear Earplugs.**

As plaintiffs acknowledge, "researchers have studied non-linear hearing protection devices" for decades.  (Dkt. 1072 ("Br.") at 2.)  Plaintiffs' brief attempts to minimize the military's involvement in that research, but the undisputed facts are to the contrary.  Indeed, the U.S. military was a leader in that effort, including with

respect to the ISL filter. (*E.g.*, Ex_10, 3M_MDL000014041-042, 064, 086, 157-158; Ex_1, P01082.2-11; Ex_9, 3M_MDL000039902-04.)[1]

As plaintiffs assert, ISL contacted Aearo in 1997 regarding production of a single-ended prototype. (Br. 2-3.) Plaintiffs notably omit that by 1997 the Army was *already* working with ISL (Ex_1, P01082.2-7), and that Ohlin participated in ISL's communications with Aearo. (DX_1) Regardless, what matters here is not whether Aearo worked with ISL on an earlier, single-ended prototype, but whether the government approved reasonably precise specifications for the allegedly defective length of the dual-ended CAEv2. The record is clear that it did.

## B.     The Military Worked With Aearo To Develop The CAEv2.

On December 16, 1997, the Army hosted a meeting at Aberdeen Proving Ground to discuss the development of a new non-linear earplug for the Army. (DX_2; Ex_2, 3-4; Ex_56 (12/12/19 Berger Tr.), 8:10-22; 54:22-58:25.) During that meeting, Ohlin requested that Aearo develop the dual-ended earplug that would become the CAEv2. (Ex_2 at 3; Ex_56 (12/12/19 Berger Tr.), 60:2-61:19, 64:7-11, 81:22-82:24.)[2] Plaintiffs suggest that Aearo had ***already*** developed a "double-

---

[1]   Citations to exhibits are to Dkt_1071, and new exhibits are attached hereto with a DX prefix.

[2]   Plaintiffs argue that Berger's testimony regarding the design directives given at this meeting is "hearsay." (Br. 20.) But Ohlin was not asserting anything; he was telling Aearo what to do. Such a directive is "not even capable of being true or false," and is thus not hearsay. *United States v. Cruz*, 805 F.2d 1464, 1478

ended" prototype without the military's input, but they do not cite any evidence for that assertion. (Br. 3.)[3]

Aearo completed an initial design of the CAEv2 on March 23, 1998. (Ex_11; Ex_56 (12/12/19 Berger Tr.), 61:20-64:6; Ex_57 (12/17/19 Knauer Tr.), 81:24-82:11.) In that design, the overall length of the earplug was 40.34 millimeters, and the tips on each end were 7.72 millimeters apart. (Ex_11.) Between April 8-12, 1999, Ohlin directed Aearo to "shorten the earplug by approximately 1/4". (Ex_4, 3M_MDL000569995; Ex_3, DOD00000136; Ex_5, 3M_MDL000569956; Ex_56 (12/12/19 Berger Tr.), 66:12-70:23.) By April 27, 1999, Aearo had shortened the earplug in response to Ohlin's directive. (Ex_14; Ex_17 at 0.)

---

(11th Cir. 1986); *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands … directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."). Plaintiffs' unpublished district court decision to the contrary is simply wrong. (Br. 20 (citing *McKay v. Tracor, Inc.*, 2005 WL 8158361 (N.D. Ala. Mar. 22, 2005).) Out-of-court statements offered "solely for the fact that [they were] made and the effect [they] might have had upon [their] hearer," including directives and words of assent, are not hearsay. *Cruz*, 805 F.2d at 1478; *NLRB v. H. Koch & Sons*, 578 F2d 1287, 1290 (9th Cir. 1978).

[3]  Plaintiffs also assert that "the CAEv2 was 'ready to go' when Ohlin began 'looking for products' and he 'didn't want to put [Aearo] in the position of modifying [its] product.'" (Br. 19) This is a mischaracterization of the testimony cited. In it, Ohlin explains that the *UltraFit tips* were "ready to go," and that he did not want to put *other vendors* in the position of modifying their products to accommodate the filter. (*Id.*) Ohlin does not say the dual-ended CAEv2 was "ready to go" prior to the December 1997 meeting.

On May 12, 1999, Ohlin reviewed the modified design and determined it was "acceptable." (Ex_3 at DOD00000137.) Ohlin used those production samples as the "specification" submitted with the "Request for National Stock Number (NSN) and Bulk Purchase of Combat Arms Earplug." (Ex_9.) By June 30, 1999, the Army had tested the CAEv2 and determined that it provided "acceptable protection" for up to 276 rounds of M16-556 ball ammunition fired under the "worst case condition" in a closed room. (Ex_16 at 4 "Operational Significance"; Ex_58 (2/26/20 Merkley Tr.), 84:10-85:11.)

### C.    Aearo Subsequently Sold The CAEv2 To Civilians.

Aearo's first sale of 1,000 earplugs to the military occurred in August 1999. (DX3 at 2, Row 3.) Plaintiffs insinuate that "civilian" sales happened at the same time. (Br. 4.) But Aearo did not distribute the first consumer samples until October 31, 2000, and did not make the first consumer sale until November 10, 2000. (DX3 at 2, Row 36; 8, Row 100.)

### D.    Aearo Conducted REAT Tests On The CAEv2.

Pursuant to EPA regulations, manufacturers of civilian HPDs are required to perform product testing to a particular ANSI standard, and use the results of that testing to calculate an NRR for inclusion on the product label. (Ex_19.) Plaintiffs suggest that Aearo "scrambled" to complete this testing after it made sales to the military. (Br. 4) But the Noise Control Act carves out "any military … equipment

4

which are designed for combat use" from the "product[s]" subject to the EPA regulations, and thus there was no requirement that Aearo perform EPA testing in connection with military sales.  *See* 42 U.S.C § 4902(3)(B)(i).[4]

Aearo performed a separate REAT test on each end of the CAEv2: test number 213015 involved the green (conventional) end, and test number 213016 involved the yellow (non-linear) end.  (Exs_21-22.)  The initial results for the '015 test were unusually variable, with certain users reporting attenuation values that were lower than the standard UltraFit earplug.  (Ex_21; Ex_61 (10/8/15 Berger Tr.), 109:6-110:15; Ex_24, 3M_MDL00005286.)  The combination of increased variability and lower mean attenuation resulted in an estimated NRR of 10.9 through eight subjects. (Ex_21.)

Upon investigation, Berger and Kieper determined that the shortened length of the CAEv2 may have prevented certain users from achieving a best fit, including because the opposite-end flanges could contact the user's ear and cause the product to "loosen[ ]."  (Ex_24, 3M_MDL000005286.)  Because this was occurring in a silent, soundproof test room, the loosening was imperceptible to the test subjects,

---

[4]   Plaintiffs' assertion that there was "no data" on the CAEv2 when the military made its first purchase is also without merit.  (Br. 4.)  Putting aside that the military had tested the ISL filter for years, including in an Aearo UltraFit (*e.g.*, Ex_1), the military tested **the CAEv2** in June 1999, prior to its first purchase. (Ex_16)

and they proceeded to participate in the test without the "best fit" required under the protocol. (*Id.*; Ex_59 (11/13/19 Berger Tr.), 241:14-243:14.) The solution was straightforward: affected users could fold back the flanges as needed to get a best fit. (Ex_24, 3M_MDL000005286; Ex_59 (11/13/19 Berger Tr.) 237:15-239:10, 358:15-18.)[5]

Aearo ran a second test on the green end using the flange-fold fitting technique for at least one of the ten test subjects: test number 213017. (Ex_23, 3M_MDL000195519, 195524.) That test showed lower variability, moderately higher mean attenuation, and a resulting NRR of 21.7. (*Id.*) Aearo summarized its findings in a memorandum titled "How Folding the Flanges Back Affects REAT Results of the UltraFit Earplug End of the Combat Arms Plug" (the "Flange Memo"), which explains that the product was "too short for proper insertion" on an S3.19 test without "changing the fitting technique" as described above. (Ex_24 at 3M_MDL00005286; Ex_59 (11/13/19 Berger Tr.), 289:7-23.) When Aearo subsequently labeled the product for civilian markets in 2000, it included the following fitting tip on the packaging: "Fitting is … improved if the sealing rings of

---

[5]   Plaintiffs criticize this fitting technique on the grounds that "the flanges were not designed to be folded," but the cited testimony says only that (i) there were no "drawings" showing the flange fold, and (ii) the UltraFit tips were not molded in that position in the first instance. (Br. 5.)

the outward directed plug are rolled back upon themselves." (Ex_25, 3M_MDL000425527; DX4 (10/18/19 Myers Tr.) at 135:4-9; 173:16-22.)

Plaintiffs misleadingly truncate an email Berger sent regarding the results of this testing. According to plaintiffs, Berger said that "the existing product has problems." (Br. 5) What Berger actually said was "[i]t looks like the existing product has problems *unless the user instructions are revised*." (PX32 (emphasis added).) The instructions *were* modified to include the flange-fold instruction. (*E.g.*, Ex_25 at 3M_MDL000425527.)

### E. Plaintiffs Are Wrong That The Flange Memo "Memorialized At Least Two Defects."

According to plaintiffs, the Flange Memo "memorialized at least two defects," (1) "the length of the CAEv2's stem," and (2) "the positioning of the CAEv2's opposing flanges relative to the outer ear." (Br. 5-6, 18.) This argument—which plaintiffs make to try to complicate the *Boyle* analysis—is without merit. The one and only *design element* discussed in the Flange Memo is the length of the CAEv2. (Ex_24.)

While the Flange Memo discusses two *fitting issues* that could be caused by the shortened length—(1) "it was difficult for the experimenter to insert the plug deeply into some subjects' earcanals," and (2) the flanges on the opposite end "sometimes pressed against the subject's ear canal opening" and "loosened the plug" (Ex_24)—each of those issues resulted directly from the product's length. (*Id.*)

Indeed, the length of the CAEv2 entirely determined "flange position relative to the ear," and thus the military's decision to shorten the plug *is* what moved the opposing flanges closer to the ear than they were in the initial design.  Importantly, both of these issues were resolved by the flange-fold fitting technique.  (*Id.*)

### F.     Aearo Informed The Military Of The Flange-Fold Issue And The Results Of Its Internal Testing.

Plaintiffs' assertion that Aearo "never disclosed" these issues to the government is inaccurate.  (Br. 6.)

### 1.     Elliott Berger Informed Doug Ohlin.

Elliott Berger testified that the "[Army] had asked us to shorten the earplug to fit in this carrying case and we discussed the ramifications with them [in 2000], the need for changing the fitting instructions and the problems that that created." (Ex_61 (10/8/15 Berger Tr.), 109:6-110:15.)  Among other things, Berger told Ohlin about "the fact that the shortened earplug was creating a problem in the initial test and that the work we had done to try and resolve that problem to get optimum performance for labeling purposes would require this fold-back instruction."  (Ex_59 (11/13/19 Berger Tr.), 297:13-22; *see also id.* at 298:4-7, 305:10-20, 334:7-13, 337:8-18.) Throughout their brief, plaintiffs repeatedly suggest that Berger is lying in this testimony.  (*E.g.* Br. 6, 24, 34-35.)   But it is well established that "credibility determinations are not proper at the summary judgment stage of the proceedings." *Young v. Rios*, 390 F. App'x 982, 983 (11th Cir. 2010).

### 2.   Ohlin Told Military Audiologists About The "Flange-Fold" Issue.

Plaintiffs assert that the military did not "instruct users to fold the CAEv2's flanges." (Br. 31.)  Yet one of the *plaintiffs* was a technician who fitted earplugs in the Army and "[w]as trained to fold back the opposite end flanges for insertion." (Ex_27 at 3.)  Moreover, the Chief of the Army Hearing Program, LTC John Merkley, testified that, beginning at least as early as 2001 (when Merkley started), Ohlin gave the following instruction to military audiologists on how to fit the CAEv2: "if you needed to, you could fold back the flanges on the earplug to get a good fit."  (Ex_58 (2/26/20 Merkley Tr.), 97:15-99:14.)  After receiving Ohlin's "flange-fold" instruction, the audiologists implemented it into the fitting procedures performed with individual service members.  (*Id.* at 99:15-20, 107:21-113:4.)  Thus "[i]f [a service member's] earplug was the Combat Arms Version 2, their training would have included the option to fold back the flanges as needed to get a good fit." (*Id.* at 123:8-12.)

### 3.   Plaintiffs Ignore Other Evidence That The Government Was On Notice Of The Flange-Fold Issue.

In addition to the above, plaintiffs also ignore other evidence showing the government's knowledge of the flange-fold fitting issue.  For example:

- Military audiologists were aware that "a piece of the earplug could touch the [user's] tragus and push out of the ear," and, as a result, "recommended that personnel flip back the first flange so that it would not occur." (Ex_44 (3/3/20 Coleman Tr.), 424:17-425:6.)

9

- Ohlin included a picture of the CAEv2 with the flanges folded back on the wallet card, along with a version of the flange-fold instruction.  (Exs_39-42; Ex_58 (2/26/20 Merkley Tr.), 126:7-128:10.)[6]

(*See also* Dkt. 1071 at Section G.)[7]

### G.     The CAEv2 Meets The Military Sound Attenuation Specification, With Or Without The Flanges Folded Back.

Plaintiffs argue that the "salient characteristics" contained in the MPID "apply to 'equal items,' ***not the CAEv2***."  (Br. 20 (emphasis added).)  To be clear, defendants do not rely upon the MPID as the "approved specifications" relevant to the contractor defense.  (*See* Section II(A), *infra*.)  Rather, defendants rely upon the fact that the government directed and approved the allegedly defective length of the earplug.  (*Id.*)  However, even assuming plaintiffs are correct about the MPID, it

---

[6]  Plaintiffs argue that the wallet card was "created" by Aearo.  (Br. 31.)  The sole basis for that assertion is the deposition in which (1) the witness says "I don't know the exact genesis" of the wallet card, and Aearo "provided it as a support piece"; and (2) ***plaintiffs' counsel*** says it was "developed by Aearo."  (*Id.*; PX18 (3/11/20 McNamara Tr.) at 435:24-437:30.)  Contrary to plaintiffs' assertion: (1) LTC Merkley testified that "[t]he military drafted the wallet card" (Ex_58 (2/26/20 Merkley Tr.), 125:7-10); (2) Ohlin stated that he was "task[ed]" to "develop a wallet-size, laminated card for the earplug" (DX5); (3) the military produced documents showing Ohlin making the wallet card (Ex_40); (4) the wallet card is visually similar to the instructions Ohlin authored in 1999 (Ex_15); and (5) the wallet card bears a military logo (Ex_41).

[7]  Plaintiffs argue that defendants' Answer "does not deny" that "neither ***Plaintiffs*** nor the United States military knew that users had to fold back the opposing flanges."  (Br. 33)  Plaintiffs misunderstand the civil procedure rules.  *See* F.R.C.P. 8(b)(5) ("lack[ing] knowledge or information … has the effect of a denial").

nevertheless memorializes the military's sound attenuation requirements for an "equal" dual-ended product.   (Ex_53, P0692.2; Ex_55, 3M_MDL000000055.) Plaintiffs' entire case is that Aearo's '015 test showed "inadequate protection" due to two "hidden" fitting issues.  (*E.g*, Br. 28-29.)  But even with those alleged fitting issues, ***the '015 test exceeded the MPID attenuation specification at every single frequency***.

| Frequency | MPID Green-End Spec | 213015 Test Result | 213017 Test Result | | MPID Yellow-End Spec | 213016 Test Result |
|---|---|---|---|---|---|---|
| 125 | >25dB | 30.5 | 32.7 | | 0-10dB | 4.7 |
| 250 | >25dB | 29.3 | 31.8 | | 0-10dB | 4.2 |
| 500 | >25dB | 30.3 | 33.0 | | 0-10dB | 6.0 |
| 1000 | >25dB | 27.5 | 32.0 | | 5-15dB | 9.5 |
| 2000 | >30dB | 30.6 | 34.5 | | 10-20dB | 16.7 |
| 4000 | >35dB | 36.7 | 38.9 | | 10-20dB | 16.3 |
| 8000 | >40dB | 41.2 | 43.3 | | 10-25dB | 17.2 |

(Ex_55 at 3M_MDL000000055; Exs_21-23.)

## ARGUMENT

The federal government contractor defense ensures that, when the government makes an informed decision to use a certain product design, courts do not "second-guess" that decision by entertaining state-law tort suits.  *See Boyle v. United Techs. Corp.*, 487 U.S. at 500, 511 (1988).  The defense plays a particularly important role in protecting *military* procurement decisions, which "often involve[] not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater

safety and greater combat effectiveness." *Id.* Juries should not, and as a matter of federal law cannot, reweigh the many factors the military considered and declare that, in hindsight, the military made a mistake and approved a product that was defective.

## I.     Plaintiffs' Threshold Arguments Are Without Merit.

### A.     Commercial Use Does Not Render The CAEv2 Ineligible For The Contractor Defense.

Plaintiffs argue that "because Defendants designed the CAEv2 for both military and commercial use," they "cannot show … a 'uniquely federal interest' and 'significant conflict' between that interest and state law." (Br. 11-12.) But a central premise of the contractor defense is that "[t]he procurement of equipment by the United States is an area of uniquely federal interest"—period. *Brinson v. Raytheon*, 571 F.3d 1348, 1351 (11th Cir. 2009) (quoting *Boyle*, 487 U.S. at 507). The government has that interest regardless of whether the supplier sells that same equipment to other customers.

Plaintiffs' lead case makes this point clear. (Br. 14-15.) In *Dorse v. Eagle-Picher Indus., Inc.*, the Eleventh Circuit recognized that "the procurement of asbestos in World War II for naval ships is undeniably an area of uniquely federal interest," even though there was no indication that the asbestos the government purchased was any different than the asbestos the defendant separately sold commercially. 898 F.2d 1487, 1489 (11th Cir. 1990). Indeed, the federal

government has a unique interest in the entire "area" of government procurement, regardless of whether it is purchasing a custom-built fighter jet or a product that is also made available to the general public. *Id.*[8]

That is not to say the contractor defense applies to *every* product the government purchases. The contractor must also demonstrate a "significant conflict" between federal policy and state tort law. A "significant conflict" is not, however, "some additional test to be applied prior to the use of the *Boyle* standard." *Hill v. Raytheon Aircraft Co.*, 470 F. Supp. 2d 1214, 1223 (D. Kan. 2006). Rather, the contractor makes that showing by satisfying the first two *Boyle* elements: (1) that the government "approved reasonably precise specifications;" and (2) that "the equipment conformed to those specifications." *Boyle*, 487 U.S. at 512; *see Brinson*, 571 F.3d at 1352 ("The *Boyle* test is designed to identify those situations where there is a 'significant conflict' between federal interests and state law …."). These requirements "assure that the design feature in question was considered by a

---

[8]   *See also In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 96 (2d Cir. 2008) ("'uniquely federal interest' in fully taking advantage of its ability to determine what level of risks and dangers must be tolerated in order to achieve a particular military goal need not be belabored.").

Government officer, and not merely by the contractor itself." *Boyle*, 487 U.S. at 512.

Far from plucking CAEv2 off a shelf, the military was the driving force behind the CAEv2's creation. It researched and tested the ISL filter, directed that Aearo develop a dual-ended product incorporating that filter, instructed that the product be shortened after Aearo provided initial samples, and approved and tested its final length. (*See* Sections A-B, *supra*) The CAEv2 conformed to the length required and approved by the military, and thus a "significant conflict" exists between the military's judgment and plaintiffs' allegation that the product is defective. That conflict is no less "significant" because defendants ***subsequently*** sold the same product to civilians.[9]

Although CAEv2 is not a "stock" product, plaintiffs are wrong that stock products are categorically ineligible for the contractor defense. *E.g.*, *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 419 (5th Cir. 2001) ("[N]o court has held that the supplier of an off-the-shelf item is ineligible for protection under the military

---

[9] For the same reasons, plaintiffs' assertion that the military classified the CAEv2 as a "commercial" or "stock" product in a 2006 contract (years after the military's participation in designing and approving the product) is irrelevant to the analysis. (Br. 17-18.) Equally irrelevant is the testimony plaintiffs cite from the Myers 30(b)(6) deposition regarding "contracts." (Br. 15.) In any event, Myers was only designated as a 30(b)(6) witness to "generally describe the manner in which CAEv2 was purchased," not to identify all contracts related to the CAEv2. (DX4 (12/13/19 Myers Tr. 869:18-870:15).)

contractor defense.").[10]  The key criterion under *Boyle* is whether "the design feature in question was *considered* by a Government officer," not whether the government or contractor developed that feature in the first instance.  *Brinson*, 571 F.3d at 1355 (emphasis added).  Thus, even products that have "long been sold commercially" can qualify for the defense so long as the government eventually makes "a considered evaluation of and affirmative judgment call about the design."  *Kase v. Metalclad Insulation Corp.*, 6 Cal. App. 5th 623, 628 (Ct. App. 2016).  As the *Kase* court put it:

> We remain of the view that the Supreme Court, in *Boyle*, did not limit the defense to necessarily exclude the procurement of products also sold commercially.  Rather, the point the high court was making in positing a purchase of a "stock" helicopter identified by manufacturer's model number was that, where a purchase does not involve "reasonably precise specifications" bearing on the challenged design feature, the government necessarily has not made a considered evaluation of and affirmative judgment call about the design.  *Id.*

---

[10]  *See also In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 839 (2d Cir. 1992) (affirming partial summary judgment on design defect claims where district court found the "asbestos products" were "furnished according to specifications and were essentially off the shelf items"); *Jackson v. Deft, Inc.*, 223 Cal.App.3d 1305, 1307 (Cal.Ct.App. 1990) ("[I]f a product is produced according to military specifications and used by the military because of particular qualities which serve a military purpose, and is incidentally sold commercially as well, that product may nonetheless still qualify as military equipment under the military contractor defense.").

Plaintiffs' cases are not to the contrary. Rather, most involve the government purchasing a preexisting commercial product *without consideration* of the design feature in question.[11] Those cases have no relevance where, as here, the military specifically directed and approved the alleged defect. Plaintiffs also cite cases for the proposition that the "military contractor defense" applies only to *military* products. (Br. 12) But even putting aside that the Eleventh Circuit has rejected that position,[12] the Combat Arms Earplug was designed for use in *combat*—indeed, the allegedly defective length was shortened to, among other things, fit under the chin strap of the Kevlar helmet (Exs_3-5)—and thus plaintiffs' military-only limitation is irrelevant.

### B. The Government Contractor Defense Does Not Require A Written Design Contract.

Plaintiffs argue that "[t]he government contractor defense is also inapplicable because there was never any procurement contract for the design and development of the CAEv2." (Br. 15-16.) This argument is contrary to the Eleventh Circuit's decision in *Brinson*, in which the manufacturer originally designed the product

---

[11] Br. 12-15 (citing *In re Hawaii Fed. Asbestos Cases*, 960 F.2d 806 (9th Cir. 1992) (asbestos); *Cabalic v. Owens–Corning Fiberglass Corp.*, 1994 WL 564724 (N.D. Cal. 1994) (same); *Dorse v. Armstrong World Indus.*, 513 So.2d 1265 (Fla. 1987) (same)).

[12] *Burgess v. Colo. Serum Co.*, 772 F.2d 844, 846 (11th Cir. 1985) ("[I]t would be illogical to limit the availability of the defense solely to 'military' contractors.").

"without any input from the government."  571 F.3d at 1350.  Clearly, then, there was no "procurement contract for [] design and development" with the military when the manufacturer developed the product in the first place.

Indeed, *Boyle* does not require that the government *create* specifications (in a "design contract" or otherwise); it requires that the government exercise its discretion and *approve* them.  487 U.S. at 512.[13]  That discretion *can* be exercised through provision of up-front specifications in a contract, but it can also be exercised by reviewing and approving a design outside of any formal contractual process. *Brinson*, 571 F.3d at 1350.  As the Second Circuit put it:

> **[Boyle] did not hold that a conflicting, express contractual duty was required** for the contractor defense to preempt state law. The issues as framed by the *Boyle* Court were not narrowly about duties imposed by contract; they were more broadly about federal policies and interests and the exercise of federal discretion, in the face of contrary state law, in furthering them.

*In re Agent Orange*, 517 F.3d at, 96-97 (affirming government contractor defense where "the defendants do not rely on a contractual duty to demonstrate the required

---

[13]   *See also Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1320 (11th Cir. 1989) (focusing on the military's "review and approval" of the product's design, rather than the existence of a written "design contract"); *Carley v. Wheeled Coach*, 991 F.2d 1117, 1125 (3d Cir. 1993) ("[I]t is necessary only that the government approve, rather than create, the specifications."); *Getz v. Boeing Co.*, 654 F.3d 852, 863 (9th Cir. 2011) (same).

conflict" but rather "[t]he government's discretionary determination about the design defect alleged.").

Plaintiffs' argue that, absent a "design contract," Aearo "owe[d] no 'duty' to the government and remain[ed] free to design the product as it [saw] fit." (Br. 15.) But Aearo *did* design a longer initial prototype, and the military reviewed and *rejected* that design. (Exs_3-5, 11) It was only after Aearo shortened the product to the military's required length that Ohlin determined it was "acceptable" and submitted the request for NSN and bulk purchase. (Ex_14; Ex_3, DOD00000137; Ex_9.) Every subsequent military purchase was accomplished via sales order for a certain quantity of *that* product. (*See* Dkt_1077, Exs_A-B (listing "sales order" or "SO" numbers for each sale, as well as a quantity and a price).) *Boyle* is satisfied *not* because each of those orders was a contract to purchase the CAEv2—although, of course, they were (DX6 (10/17/19 30(b)(6) Tr.), 81:15-17 (plaintiffs' counsel: "A PO, that's a contract."))—but rather because Ohlin had already exercised policy discretion in reviewing and approving the length of the product to be ordered.

## II.   The Government Contractor Defense Preempts Plaintiffs' Design Defect Claims.

In the context of a design defect claim, the government contractor defense has the following three elements: (1) "the United States approved reasonably precise specifications," (2) "the equipment conformed to those specifications," and (3) "the supplier warned the United States about the dangers in the use of the equipment that

were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. As plaintiffs concede, this analysis looks only at "*the design feature in question*." (Br. 18 (emphasis in original); *see also In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 460 (5th Cir. 2010) (*Boyle* analysis "depends only" on whether the elements "are met with respect to the particular product feature upon which the claim is based").

## A.    The Government Approved Reasonably Precise Specifications.

The requirement that the government approve reasonably precise specifications "is meant to ensure that a government officer considered and approved the design feature in question." *Brinson*, 571 F.3d at 1351.  It can be met where the contractor and military engage in a "continuous back and forth" regarding the allegedly defective feature, during which the contractor "incorporate[s]" the government's input "into a design that the government subsequently review[s] and approve[s]." *Harduvel*, 878 F.2d at 1320.

In December 1997, the military requested that Aearo develop a new dual-ended earplug that incorporated the ISL filter.  (Ex_2 at 2; Ex_56 (12/12/19 Berger Tr.), 60:2-61:19, 64:7-11, 81:22-82:24.)  After Aearo sent initial production samples, Ohlin directed that Aearo shorten the earplug to its allegedly defective length. (Exs_3-5.)  Aearo shortened the earplug in response to that directive, and Ohlin determined the modified design was "acceptable."  (Ex_3 at DOD00000137.)  The

military thereafter tested the earplug under "worst case condition[s]," and decided to move forward with using it.  (Ex_16; Ex_58 (2/26/20 Merkley Tr.), 83:20-84:9.) This record easily satisfies the first element, and plaintiffs' arguments should be rejected.  (Br. 18-25.)

*First*, plaintiffs argue that the government did not "promulgate" or "create[ ]" specifications for the CAEv2. (*Id.* at 3, 19-20.)  This argument fails for the reasons stated in Section I(B), *supra*—the government need not *create* specifications, it must *approve* them.  In any event, plaintiffs' argument is based on out-of-context quotes from Ohlin's *Moldex* patent deposition.  (*Id.* at 19-20)  Eight years prior to that deposition, when asked specifically about the CAEv2, Ohlin made clear it was ***"evaluated and specified by the U.S. Armed Forces*."**  (Ex_54 (emphasis added).) But regardless of the particular terminology Ohlin used to describe his involvement, it simply cannot be disputed that, between April-May 1999, he directed Aearo to "shorten the CAEv2 by approximately 1/4", and thereafter reviewed and approved the re-designed product.  (Exs_3-5.)

*Second*, plaintiffs argue that "the purported specifications are not reasonably precise," including because "Ohlin neither told Defendants *how* to shorten the plug nor directed them to shorten the *stem*."  (Br. 20-22.)  *Boyle*, however, "does not require that the contracting authority issue standards which remove all compliance discretion from the contractor."  *Hill*, 470 F. Supp. 2d at 1224–25.  And even if it

did: (1) Ohlin directed Aearo to shorten the CAEv2 approximately 1/4" (Exs_3-5); (2) Aearo asked Ohlin to send an exemplar carrying case to "expedite the redesign," which provided the *exact* measurement needed to accommodate the military's directive (Ex_3 DOD0000135); and (3) most importantly, Ohlin approved the CAEv2 *after* it had been shortened, and thus knew exactly *how* the product was shortened when he determined it was "acceptable." (*Id.* at DOD00000136-137.)[14]

*Third*, plaintiffs argue that the military did not "approve" or "evaluate" the modified design. (Br. 22-24.) But on May 12, 1999, two weeks *after* Aearo modified the design (Ex_14), Ohlin confirmed that the modified production samples were "acceptable," and used those samples to submit the NSN request. (Ex_3 at DOD00000137; Ex_9.) The Army thereafter tested the modified design and decided to move forward with using it. (Ex_16; Ex_58 (2/26/20 Merkley Tr.), 84:10-85:11.)

## B. The CAEv2 Conformed To The Approved Specifications.

"To demonstrate the second *Boyle* condition, a contractor must show that the equipment at issue conformed to precise, government-approved specifications." *Brinson*, 571 F.3d, at 1357. It is undisputed that the CAEv2 conforms to the length specification Ohlin approved. Plaintiffs do not even *argue* to the contrary.

---

[14] Indeed, Ohlin had "t[aken] the liberty in cutting down" the product himself during the design process, and shortening some portion of the stem is the *only* way to do that. (Ex_3 at DOD00000136.)

Instead, plaintiffs argue that because "no specifications" existed, the CAEv2 necessarily did not conform.  But that argument fails for the reasons stated in Sections I(B) and II(A), *supra*.  Plaintiffs also assert that the CAEv2 violated "additional" specifications in the MPID.  (Br. 26.)  But—putting aside that, according to plaintiffs, the MPID specifications do not apply to the CAEv2 (*id.* at 20)—the relevant issue is not whether the CAEv2 complies with *every* specification, but whether it complies with the approved specification for "the particular product feature upon which the claim is based."  *In re Katrina Canal*, 620 F.3d at 460.

## C.     The Government Was On Notice Of The Consequences Of Shortening The Product's Length.

The third element of the contractor defense requires that "the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."  *Boyle*, 487 U.S. at 512.  Plaintiffs allege that the military was not on notice of two issues identified in the '015 test and Flange Memo: (1) that "the CAEv2's short stem prevented deep insertion"; and (2) that the "positioning of the CAEv2's opposing flanges caused imperceptible loosening." (Br. 28-33.)  The record is to the contrary.

### 1.     Because The Product Provided Sufficient Attenuation Without the Flanges Rolled Back, There Was No "Danger" To Warn Of.

As an initial matter, plaintiffs ignore that the '015 test shows that the CAEv2 provided mean attenuation levels above those required in the MPID, even without

the flanges folded back.  (Ex_55 at 3M_MDL00000055; Exs_21-23.)  Thus, even taking into account any difficulties inserting the earplug, and even after the plug "loosened" for some users, the CAEv2 *still* provided mean attenuation values above the military's requirement for a dual-ended non-linear earplug.  There was thus no "danger" that required a *Boyle* warning.  To conclude otherwise would imply that the mean attenuation levels specified by the military were, in fact, dangerously low, or that the military should have used a different metric for its specification—precisely the sort of "second-guess[ing]" *Boyle* forbids.  487 U.S. at 511.

### 2.    Aearo Warned the Military of Any Known "Dangers."

In any event, the undisputed evidence is clear that Aearo *did* tell the military about the fitting issues discussed in the Flange Memo.  (*See* Section F, *supra*.)  Elliott Berger told Ohlin "that the shortened earplug was creating a problem in the ['015] test" and "that the 017 test had been conducted by rolling back the flanges."  (*E.g.*, Ex_59 (11/13/19 Berger Tr.) at 297:13-22, 334:7-13, 337:8-18.)  Shortly thereafter, Ohlin instructed military audiologists to fold back the flanges as needed to get a good fit.  (Ex_58 (2/26/20 Merkley Tr.), 97:15-99:20; 107:21-113:4; Ex_27 at 3; Ex_66 (Fallon Decl.) ¶ 11.)

Military audiologists also understood *why* they were given the flange-fold instruction.  For example, with respect to plaintiffs' assertion that "the CAEv2's short stem prevented deep insertion," retired LTC Eric Fallon (now at 3M), who took

over as the Army Hearing Conservation Program Manager after Ohlin's retirement, testified that: "I instructed technicians that, if they believed the bottom edge of the opposing flange was preventing them from inserting the earplug far enough into a soldier's ear canal, they should roll back the opposing flanges and try again." (Ex_66 (Fallon Decl.) ¶¶ 9-11.)  And with respect to plaintiffs' assertion that the "positioning of the CAEv2's opposing flanges caused imperceptible loosening," military audiologist Martin Robinette—who worked directly with Ohlin at the time the CAEv2 was shortened (Ex_3 at DOD00000136)—stated that "he was aware that a piece of the earplug could touch the [user's] tragus and push out of the ear," and that, as a result, "his office recommended that personnel flip back the first flange so that it would not occur."  (Ex_44 (3/3/20 Coleman Tr.), 424:17-425:6.)

### 3. The Military Was On Notice Of Any "Dangers" From Its Own Testing And Use.

Even if Aearo had not disclosed the findings from its internal testing, the third *Boyle* element would still be met because a contractor has no duty to warn of "dangers" otherwise "known ... to the United States." *Boyle*, 487 U.S. at 512.  Courts around the country have recognized that, in light of the military's extensive testing and use of combat equipment, its knowledge of a product's characteristics is often equal to (or greater than) that of the manufacturer.  *In re "Agent Orange" Prod. Liab. Litig.*, 304 F. Supp. 2d 404, 435 (E.D.N.Y. 2004) (collecting cases).  These cases are on point here.

Numerous branches of the military used the product for over a decade, during which time it was (i) regularly fit by military audiologists, and (ii) continuously tested under a variety of different conditions.  (Ex_58 (2/26/20 Merkley Tr.), 24:21-26:4; Exs_7, 16, 45-52.)  The military's testing included a field study, in which soldiers fired weapons in full combat uniform after running an obstacle course.  (Ex_46 at 6.)  It also included laboratory REAT tests on humans (Exs_48-49, 51-52), including REAT testing done *without folding back the flanges* like the allegedly concealed '015 test done at Aearo.  (Ex_7 at 19-20; Ex_58 (2/26/20 Merkley Tr.), 448:17-451:16.)[15]

If the product's length made it difficult to insert, or caused it to "loosen" in a user's ear, then the military audiologists who fit individual service members, and the Army researchers who tested the product, would have noticed those issues.  Indeed, LTC Merkley testified that "***all*** preformed earplugs are susceptible to loosening" and that he personally experienced "loosening" while wearing the CAEv2 and other earplugs.  (DX7 (2/26/20 Merkley Tr.), 226:16-228:7, 456:2-20.)  There is no basis for plaintiffs' assertion the military was not aware of these issues.

---

[15] This is thus not a case like *Jowers v. Lincoln Electric Company*, in which the defendant withheld internal studies of a highly technical issue—the harms of inhaling "manganese welding fumes"—that demonstrated a "deeper knowledge" of the relevant danger than the government.  617 F.3d 346, 354-55 (5th Cir. 2010).

To the extent plaintiffs are drawing a distinction between the "loosening" that happens with all preformed earplugs, and the "imperceptible loosening" discussed in the Flange Memo, then they misunderstand the record on that issue. "Imperceptible" loosening is a phenomenon that can ***only*** happen in a silent, sound proof test chamber.   Indeed, Elliott Berger, the co-author of the Flange Memo, testified:

> The imperceptible nature of that loss in seal relates to the person in the test chamber. What you must realize is that in the test chamber, in the absence of fitting noise, which is only on briefly, that there is no sound. That's the whole purpose of the chamber. It's a room in which you cannot hear a thing.
>
> So whether a plug changes its fit or seal, you had no auditory feedback to suggest that there's been a change in the noise reduction characteristics once you're sitting there in this effectively totally silent room.
>
> Were you wearing the plug in any sort of realistic environment, either noise hazardous or simply loud enough for sounds to be present, if there was a change in the fit, I would not suspect it would be imperceptible at that point because you would notice a change in the sound levels at your ear.
>
> So the imperceptible refers to during that artificial type of test environment.
>
> (Ex_59 (11/13/19 Berger Tr.), 242:12-243:14.)

LTC Merkley agreed:

> Q. Now, your experience was with any preformed earplug that did loosen, including if it happened to you with the Combat Arms Version 2, it was perceptible to you, right?
>
> A. Yes.
>
> Q. That in the real world, you had an auditory clue that you had lost the seal of your hearing protector, right?
>
> A. Yes.
>
> ...
>
> Q. And in a silent room that had no auditory external clues, if you lost your seal on a plug, you might not notice it, right?
>
> A.  Correct.
>
> Q. But in the real world, particularly in a combat setting or in military training, if you lose your seal on a plug, you will notice it?
>
> A. Generally, yes.
>
> (Ex_58 (2/26/20 Merkley Tr.), 457:1-11, 458:11-459:1.)

Plaintiffs simply have no evidence that "imperceptible" loosening has ever happened outside of a silent laboratory test chamber, and therefore cannot show it was a *Boyle* "danger" relevant to the military's use in the real world.

In any event, even if "imperceptible" loosening *was* a *Boyle* "danger," the military would have been on notice of that issue from its own internal testing. Plaintiffs argue that the military did not test for "imperceptible loosening" (Br. 31), but the military performed the ***exact same*** test that Aearo performed when it first identified that issue—REAT testing without the flanges folded back.  (Ex_7 at 19-

20; Ex_58 (2/26/20 Merkley Tr.), 448:17-451:16.)  Plaintiffs cannot have it both ways: if they are correct that the product "imperceptibly loosens" under those conditions, then they are wrong that the military did not test that issue.

### 4.    Plaintiffs' Alternative Arguments Are Without Merit

*First*, plaintiffs argue that Aearo should have advised the military that *all* users "*must* fold back the flanges to prevent loosening." (Br. 6, 32)  This assertion has no basis in the record.  The handwritten notes accompanying the '017 test report indicate that the flanges were folded back only "[i]f [the] subj's data [were] variable," and that only *one* test subject required that technique to get a best fit. (Ex_23 at 3M_MDL000195524.)  In any event, even assuming that the flanges were folded back for *everyone* on the '017 test, the undisputed evidence demonstrates that such action is not "necessary" for all users.  For example:

- Test subjects on the '015 test achieved attenuation values above the MPID specification without rolling back the flanges.  (Exs_21, 55 at 3M_MDL00000055.)

- REAT testing performed by the military found that the CAEv2 provides "very good attenuation" that "should provide for a safe exposure level for the average user in many noise environments," even *without folding back the flanges*.  (Ex_7 at 19-20; Ex_58 (2/26/20 Merkley Tr.), 168:6-11; 448:17-451:16 ("Q. So, Mr. Hobbs is testing the earplug in human ears without rolling the flanges back, and they are working? A. Yes, it appears so.")

- LTC Merkley testified that the CAEv2 worked well *without folding back the flanges.*  (Ex_58 (2/26/20 Merkley Tr.), 197:1-199:10; 452:20-453:1.)

Plaintiffs cannot prevail by arguing that Aearo should have given the *erroneous* warning that *all* users must fold back the flanges.

**Second,** plaintiffs have pointed to the absence of evidence that the '015 test data and Flange Memo were shared with the government.  But that is irrelevant, because it is undisputed that *the information* in those documents was communicated, and that the government understood and acted on that information.  *See* Section F, *supra*.  Indeed, in light of the information Ohlin provided to military audiologists, LTC Merkley testified about the Flange Memo as follows:

> Q. But if … the central issue in the [Flange Memo] was that for some people folding back the flanges could benefit them to get a good fit, that was information you already had, right?
>
> A. Yes. … I was made aware of it in 2001 or thereabouts.
>
> (Ex_58 (2/26/20 Merkley Tr.), 459:16-460:5.)

There is no requirement under *Boyle* that a warning take any particular form, and thus plaintiffs cannot prevail by quibbling about the precise manner the government learned of the flange-fold issue here.

**Third**, plaintiffs argue that the following testimony "proves" Ohlin was "unaware of the Flange Report.'"  (Br. 32-33.)

> Q. Have you seen other earplugs where the fit protocol was changed after receiving one NRR to get another NRR?
>
> A. I don't recall that, no.

But the "fit protocol" under discussion was whether a different version of the CAE needed an entirely different flange size, not an instructional change like the flange fold.   Regardless, the fitting instructions for the CAEv2 were *not* "changed after receiving one NRR to get another NRR."   An NRR is calculated with ten test subjects.  (DX8 (12/19/19 Kieper Tr.), 128:8–129:3.)  The '015 test was stopped after eight subjects. (Ex_24)  Aearo *estimated* an NRR from the eight subjects' data, but the one and only *actual* NRR for the CAEv2 is the 22 on the product label.

**Fourth**, plaintiffs argue that the Army's CID investigation "conclud[ed] the military did not in fact know about Defendants' 'test results,' [or] the CAEv2's defects." (Br. 33.)  This is another mischaracterization of the evidence cited.  In the CID report, the lead investigator asked certain witnesses the question: "*if* he had known about a potential misrepresentation of the CAE testing, would it have been important?" (*E.g.*, DX9 (3/3/20 Coleman Tr.), 385:2-386:1 (emphasis added).)  That witnesses answered "yes" is reflected in the report summary.  (PX40)  But the CID report does *not* contain the "conclusions" plaintiffs say it does:

> Q. Does the CID report contain any conclusions of yours regarding whether or not the product works?
>
> A. No.
>
> ...
>
> Q. Did you include any conclusions in the CID report regarding whether 3M had concealed anything from the federal government?

A. I don't believe so.

(DX9 (3/3/20 Coleman Tr.), 395:18-396:22.)  To the contrary, the CID report makes clear that "3M expressly denies the allegations."  (PX40)

***Finally,*** plaintiffs argue that "[d]ays before the [2006] MPID, [d]efendants retested the CAEv2's closed end and obtained a 4.4 NRR, yet they hid that fact from the military."  (Br. 34.)  The evidence cited for this assertion relates to a test of the "ARC Plug" done to the ANSI S12.6 "Method B" standard.  (*Id.*)  To understand why plaintiffs' reliance on this test is without merit, one needs to understand the differences between the applicable testing protocols.

Both the EPA regulations and the military's MPID require testing to ANSI S3.19.  (Exs_19, 37, 55 at 3M_MDL000000056.)  That protocol requires that "laboratory personnel … physically fit the HPD on the human test subject."  74 FR 39152, 55.  As a result, it is widely known to test the "maximum attenuation that a product could achieve," which is then used to calculate the NRR on the product's label.  74 FR 39152, 55.  The federal government recommends "derating" NRRs by up to 70% to estimate real-world protection.  (*Id.*)

On the far other end of the spectrum is ANSI S12.6 "Method B," which is *not* used for NRR labeling and *not* the testing required by the military under the MPID.  Unlike S3.19, Method B uses test subjects without "prior knowledge and experience with HPDs," and requires those "naïve" participants to fit the tested earplug on

themselves.  74 FR 39154.  As a result, Method-B tests achieve lower attenuation and far greater variability than the "maximum attenuation" measured under S3.19. *Id.*  The EPA rejected Method B for NRR labeling, in part because "the concept of 'naïve' test subjects … is not appropriate for the determination of a product's acoustical performance," and also because "the true potential effectiveness (NRR) of the HPD … could be understated because of low attenuation measurements that resulted from improper fit by inexperienced test subjects."  *Id.* at 39154-55. Plaintiffs' reliance on a Method B test to show a purportedly low NRR fails for those reasons.

## III.   The Government Contractor Defense Preempts Plaintiffs' Failure to Warn Claims.

Plaintiffs concede that the contractor defense covers failure-to-warn claims. (Br. 36.)  They argue, however, that the Eleventh Circuit in *Dorse* "concluded that *Boyle's* two threshold requirements governed warning claims," rather than the traditional "three part test."  (*Id.* at 36 (citing *Dorse*, 898 F.2d at 1489).   Contrary to that assertion:

> *Dorse* does not create some additional test to be applied prior to the use of the *Boyle* standard. Displacement of state law occurs under *Boyle* so long as the three-prong test of that case is met; the three-prong test is itself the definition of when a significant conflict exists between state and federal law.

32

*Hill*, 470 F. Supp. 2d at 1223 (addressing both design defect and failure to warn claims).

But regardless of whether the court relies on the *Boyle* elements, or plaintiffs' preferred "threshold" analysis, there is an obvious conflict here: the government instructed Defendants to ship the CAEv2 ***without instructions*** because the military did in-person training with every service member.  Indeed, Marc Santoro testified as follows:

> Q.  Did [Ohlin] tell you not to include instructions in that box?
>
> A.  He did.
>
> Q.  Did he indicate why he didn't want instructions in that box?
>
> A.  He felt that personal training was the most effective way to train the soldiers, and that the military audiologists were going to take on that responsibility of individually training every solider.
>
> (DX10 (12/3/19 Santoro Tr.) at 326:11-327:10.)[16]

Indeed, in-person fit and training was ***required*** by DOD policy.  (*See* Ex_26 at 6.6.7, 6.6.9; Ex_58 (2/26/20 Merkley Tr.), 24:21-26:19.)  And because Berger had discussed the flange-fold instruction with Ohlin, and Ohlin in turn relayed that instruction to military audiologists, the training that was given "included the option

---

[16]  Plaintiffs' evidence to the contrary is the testimony of two witnesses who, unlike Santoro, say they don't recall.  (Br. 50.)

to fold back the flanges as needed to get a good fit." (Ex_58 (2/26/20 Merkley Tr.) at 123:8-12.) Plaintiffs cannot now "second guess" those decisions under *Boyle*. *See Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995).

## IV.    The Government Contractor Defense Preempts Plaintiffs' Other Claims.

Plaintiffs correctly note that the contractor defense applies only to design-defect and failure-to-warn claims. Nevertheless, if defendants are successful on the contractor defense, plaintiffs will be preempted from asserting that the CAEv2 is defective, and from challenging the absence of a warning. In that event, plaintiffs will be unable to satisfy necessary elements of their other claims, all of which "boil down" to one or both of those assertions. *E.g.*, *Quiles v. Sikorsky Aircraft*, 84 F. Supp. 2d 154, 165 n.2 (D. Mass. 1999).

## CONCLUSION

For the foregoing reasons, defendants respectfully request the Court deny plaintiffs' motion for summary judgment.

DATED:  April 14, 2020              KIRKLAND & ELLIS LLP


By: */s/ Kimberly Branscome*
        Kimberly Branscome

Mike Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 389-5991
Email: mike.brock@kirkland.com

Kimberly Branscome
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, California 90067
Telephone:  (213) 680-8370
Email:  kimberly.branscome@kirkland.com

Mark J. Nomellini
Nicholas F. Wasdin
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-3254
Email: mark.nomellini@kirkland.com
Email:  nick.wasdin@kirkland.com

*Counsel for Defendants 3M Company, 3M*
*Occupational Safety LLC, Aearo*
*Technologies LLC, Aearo Holding, LLC,*
*Aearo Intermediate, LLC and Aearo, LLC*

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULES 7.1(F) & 56.1**

I HEREBY CERTIFY that this brief complies with the word limit of Local Rules 7.1(F) and 56.1, and contains 7,999 words, excluding the parts exempted by those Rules.


DATED:  April 14, 2020             */s/ Kimberly Branscome*
                                    Kimberly Branscome

i

## <u>CERTIFICATE OF SERVICE</u>

I, Kimberly Branscome, hereby certify that on April 14, 2020, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

DATED:  April 14, 2020                                         */s/ Kimberly Branscome*
                                                                              Kimberly Branscome