**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to All Cases | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**ON THE GOVERNMENT CONTRACTOR DEFENSE**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND .................................................................................2

    A.   Aearo collaborated with ISL to develop the CAEv2..................................2

    B.   Aearo saw the military as a market opportunity .......................................3

    C.   Neither Aearo nor the military tested the CAEv2 before its sale...............4

    D.   Aearo tested the CAEv2 and discovered it did not work ..........................5

    E.   Aearo hid its knowledge of the CAEv2's defects and dangers.................7

        1.   Aearo never told Ohlin.....................................................................7

        2.   Aearo never told the military ...........................................................8

        3.   Military testing did not reveal the defects and dangers ...................11

        4.   Aearo withheld additional testing from the military.........................12

    F.   The CAEv2 violated Aearo's sole supply contract with the military ......12

    G.   The military rejected the CAEv2 after discovering its defects ...............14

ARGUMENT .......................................................................................................15

I.   Defendants Fail to Show a Uniquely Federal Interest or Conflict of Law ......15

    A.   Defendants designed the CAEv2 for commercial and military use .........15

    B.   There is no federal contract for the design of the CAEv2.......................16

II.   Defendants Fail to Preempt Plaintiffs' Design-Defect Claims .......................16

A.  The military did not approve reasonably precise specifications ..............18

    1.  Defendants did not "incorporate" government specifications into the CAEv2's design because there are no specifications...................18

    2.  The purported specifications are not reasonably precise ..................20

    3.  The military did not approve the design features at issue ................21

B.  The CAEv2 failed to conform to the purported specifications ...............23

C.  The military was not aware of the CAEv2's defects or its related dangers and consequences until the *qui tam* case ....................................25

    1.  Defedants improperly transform *Boyle*'s third condition into a merits inquiry ......................................................................................25

    2.  Defendants do not cite any evidence that they told the military about the CAEv2's defects or related dangers and consequences.....27

        i.  Defendants cannot show that they shared the Flange Report's findings or Test 213015 with the military.....................................28

        ii.  Military knowledge of the flange-fold option does not mean the military had equal knowledge of the CAEv2's defects or resulting dangers and consequences .............................................30

        iii.  The remaining evidence that Defendants cite does not show the military had equal information regarding the CAEv2's defects or related dangers and consequences .............................................32

    3.  The military lacked independent knowledge of the CAEv2's defects and resulting dangers and consequences ...............................34

III.  Defendants Fail to Preempt Plaintiffs' Failure-to-Warn Claims ....................36

CONCLUSION ......................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ................................................................ *passim*

*Brinson v. Raytheon Co.*,
571 F.3d 1348 (11th Cir. 2009) ........................................... 18, 20, 22

*Butler v. Ingalls Shipbuilding, Inc.*,
89 F.3d 582 (9th Cir. 1996) .................................................. 31

*Carley v. Wheeled Coach*,
991 F.2d 1117 (3d Cir. 1993) .............................................. 27, 30, 35

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001) ............................................................... 17

*Crutchfield v. Sewerage & Water Bd. of New Orleans*,
829 F.3d 370 (5th Cir. 2016) ................................................ 16

*Dorse v. Armstrong World Indus., Inc.*,
513 So.2d 1265 (Fla. 1987) .................................................. 16

*Dorse v. Eagle-Picher Indus., Inc.*,
898 F.2d 1487 (11th Cir. 1990) ........................................... 37, 38

*Dugas v. 3M Co.*,
2016 WL 3965953 (M.D. Fla. June 22, 2016) ..................... 21, 38

*Ferguson v. Bombardier Servs. Corp.*,
2005 WL 8160215 (M.D. Fla. Mar. 25, 2005) ..................... 16, 25

*Gadsden Indus. Park, LLC v. United States*,
111 F. Supp. 3d 1218 (N.D. Ala. 2015) ............................... 34

*Graves v. 3M Co.*,
2020 WL 1333135 (D. Minn. Mar. 23, 2020) ...................... 34, 37

*Gray v. Lockheed Aeronautical Sys. Co.*,
   125 F.3d 1371 (11th Cir. 1997) ...................................................................... *passim*

*Haltiwanger v Unisys Corp.*,
   949 F. Supp. 898 (D.D.C. 1996)...........................................................................36

*Harduvel v. Gen. Dynamics Corp.*,
   878 F.2d 1311 (11th Cir. 1989) .............................................................. 21, 22, 27

*Hudgens v. Bell Helicopter/Textron*,
   328 F.3d 1329 (11th Cir. 2003) ................................................................... 16, 26

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
   2018 WL 6258903 (N.D. Fla. Nov. 8, 2018) ........................................................37

*In re Agent Orange Prod. Liab. Litig.*,
   534 F. Supp. 1046 (E.D.N.Y. 1982) .....................................................................32

*In re Hawaii Fed. Asbestos Cases*,
   960 F.2d 806 (9th Cir. 1992) ...............................................................................15

*In re Fort Totten Metrorail Cases Arising Out of Events of June 22, 2009*,
   895 F. Supp. 2d 48 (D.D.C. 2012)........................................................................15

*In re Katrina Canal Breaches Litig.*,
   620 F.3d 455 (5th Cir. 2010) ....................................................................... 17, 21

*Jowers v. Lincoln Elec. Co.*,
   617 F.3d 346 (5th Cir. 2010) ...................................................................... 27, 34, 35

*Killam v. Air & Liquid Sys., Inc.*,
   2016 WL 7438434 (M.D. Fla. Dec. 27, 2016) .....................................................37

*Martinez v. Sci. Applications Int'l Corp.*,
   2015 WL 11109381 (S.D. Tex. June 29, 2015) ...................................................34

*McKay v. Tracor, Inc.*,
   2005 WL 8158361 (N.D. Ala. Mar. 22, 2005)............................................. 20, 38

*McKay v. Tracor, Inc.*,
   2005 WL 8158362 (N.D. Ala. Sept. 29, 2005) ....................................................26

*Miller v. United Techs. Corp.*,
   660 A.2d 810 (Conn. 1995) ................................................................25

*Murphy v. F.D.I.C.*,
   208 F.3d 959 (11th Cir. 2000) ...........................................................36

*Russek v. Unisys Corp.*,
   921 F. Supp. 1277 (D.N.J. 1996) .......................................................32

*Sanchez v. Air & Liquid Sys. Corp.*,
   2018 WL 4502280 (N.D. Cal. Sept. 20, 2018) ...................................33

*Shaw v. Grumman Aerospace Corp.*,
   778 F.2d 736 (11th Cir. 1985) ...........................................................22

*Sroka v. Union Carbide Corp.*,
   2015 WL 794942 (D. Md. Feb. 24, 2015) .........................................35

*Stecyk v. Bell Helicopter Textron, Inc.*,
   1997 WL 701312 (E.D. Pa. Nov. 4, 1997) .........................................23

*Stillwell v. Gen. Ry. Servs., Inc.*,
   605 S.E.2d 500 (N.C. App. 2004) ......................................................34

*Strickland v. Royal Lubricant,Co., Inc.*,
   911 F. Supp. 1460 (M.D. Ala. 1995) .................................................30

*Trevino v. Gen. Dynamics Corp.*,
   865 F.2d 1474 (5th Cir. 1989) ................................................. *passim*

*Willis v. BW IP Int'l, Inc.*,
   811 F. Supp. 2d 1146 (E.D. Pa. 2011) ...............................................36

*Yeroshefsky v. Unisys Corp.*,
   962 F. Supp. 710 (D. Md. 1997) ........................................................26

*Zinck v. ITT Corp.*,
   690 F. Supp. 1331 (S.D.N.Y. 1988) ..................................................35

# INTRODUCTION

More than 140,000 servicemembers, veterans, and civilians seek to hold Defendants accountable for, *inter alia*, defectively designing the CAEv2 and failing to warn about its dangers. Defendants invoke the government contractor defense, but this narrow preemption defense cannot save them from themselves.

Conceding the defense does not apply to civilian Plaintiffs or the vast majority of military Plaintiffs' claims, Defendants move for summary judgment on only military Plaintiffs' design and warning claims. But even as to those claims, Defendants fail to satisfy the defense's rigorous requirements. Defendants rest their defense on inadmissible evidence and inapposite precedent, while omitting material facts and misconstruing others.

Defendants dodge the defense's threshold requirements—a uniquely federal interest and significant conflict—because they cannot satisfy either. They designed the CAEv2 for both military and commercial use, vitiating a uniquely federal interest. There was also never a design contract for the CAEv2, precluding a conflict between federal and state law.

In addition, Defendants do not satisfy even a single *Boyle* condition. Unable to point to a military specification, much less show the military substantively approved the design features at issue, they fail the first condition. Defendants also misdirect under the second condition, claiming the CAEv2 conformed to a supposed

length specification while ignoring the most important alleged specification: dual-mode protection. Finally, they short-circuit the third condition, arguing there was no danger to warn about—a desperate attempt to distract from their contrary admissions and fraud on the military. Even the evidence they cite highlights their failure to disclose the CAEv2's defects and dangers.

Defendants fare no better in attempting to preempt Plaintiffs' warning claims, again predicating their defense on inadmissible evidence. Worse, they cite the right test and then apply the wrong one, knowing binding precedent dooms the defense.

At bottom, Defendants cannot show, as they must, that "the government made [them] do it." The Court should therefore deny their motion for summary judgment.

## FACTUAL BACKGROUND

### A.    Aearo collaborated with ISL to develop the CAEv2.

Until this litigation, Defendants have always taken credit for designing the CAEv2, describing Elliott Berger as its "inventor," PX14(3M_MDL000343622_3), and ████████   ██   ██████   ███   ████████   ██████   ██   ██, PX68(3M_MDL000017349).

Since the 1990s, Aearo and ISL partnered to develop non-linear hearing protectors.  PX1(3M_MDL000712631). ████████████████████

████   ██████   ██   ██████   ██   ██   ███████   ███   █████

PX69(3M_MDL000425674). ISL and Aearo—not the government—patented each

development: the non-linear filter, UltraFit tip, and dual-ended design. PX2(3M_MDL000183314); PX3(3M_MDL000779978); PX6(3M_MDL000019173).

### B.     Aearo saw the military as a market opportunity.

As ISL and Aearo collaborated, the French military and U.S. Army expressed interest from the sidelines. The French preferred Aearo's UltraFit as the "best vehicle" and estimated demand for 300,000 per year. PX7(3M_MDL000425673_1). Doug Ohlin of the Army expressed interest in the "new bidirectional earplug design suggested by the French," PX8(3M_MDL000434810), indicating that Army demand could be even greater, PX7(3M_MDL000425673_1).



, PX70(3M_MDL000020535); PX71(3M_MDL000602273_2).

PX71(3M_MDL000602273_2).

Eager to capitalize, Aearo assumed the Army would initiate a "bid process." PX7(3M_MDL000425673_2). It never did. Nor did the military promulgate a specification. PX9(Ohlin-233:7-24). Aearo sought market insight from the military but never reached an agreement—written or otherwise—concerning the CAEv2's design. PX10(30(b)(6)-820:17–822:5). Instead, Aearo "came up with the [CAEv2's] design," PX11(Knauer-85:22-25), not Ohlin or the military, PX9(Ohlin-167:12-22).

Ohlin confirmed the military's contributions were minimal—recommending the color scheme, for example. DX9. Before his death, Ohlin testified Aearo's plug was "ready to go" when he began "looking for products." PX9(Ohlin-148:20–150:14).

In April 1999, Ohlin asked the Army to increase "the height and width of the current earplug carrying case" by 1/4" to fit the plug. PX72(3M_TOUHY00000318_1). ████████████████████, PX73(30(b)(6)-507:8–508:14), Myers volunteered that Aearo could "probably shorten the plug by the 1/4" required to fit [the] current container," DX4. Ohlin acquiesced, noting additional reasons to do so. DX4. All of Aearo's design decisions, including shortening the CAEv2's stem, were its own. PX17(3M_MDL00017782–84).

## C.    Neither Aearo nor the military tested the CAEv2 before its sale.

Aearo and the military had "no data" on the short-stemmed CAEv2 when distribution began.     PX20(3M_MDL000257805);     PX25(Kieper-148:12-25). Johnson's 1995 study and ISL's 1996 testing involved a single-ended prototype, not the CAEv2. DX10; DX1. The Army's June 1999 study did not test the final CAEv2 either; ██ ████ █ ██ █ █ █████ █ █ ██ ███.[1]  DX16; PX74(3M_MDL000821287_1–2).

---

[1] The study also did not test the plug under "worst-case condition[s]." Def-Br-9. Exposing an "artificial head" to 276 shots was the "worst case condition ARL tested." DX16.

Neither Aearo nor the Army completed REAT tests—the "gold standard" for measuring attenuation on a human ear—before 2000. PX23(Babeu-52:12-17); PX25(Kieper-148:12-25). The military did not "know a lot about this plug" when a national stock number ("NSN") was assigned to the CAEv2 in August 1999. PX23(Babeu-56:2-5);   PX75(3M_MDL000258589);   PX18(McNamara-344:22–350:3).

### D.   Aearo tested the CAEv2 and discovered it did not work.

In January 2000, Aearo conducted REAT tests on the linear (Test 213015) and non-linear (Test 213016) ends of the CAEv2. PX21(3M_MDL000313390); PX22(3M_MDL000057209). These tests enrolled the same ten subjects and used "standard fitting instructions." PX24(Berger-106:2–107:2). Test 213016 was completed because Berger liked the results. But Berger terminated Test 213015 after eight subjects because the NRR was 11, PX27(30(b)(6)-276:3–277:4); PX28(Kieper-101:20–102:15), and he knew the military would not accept a plug with an NRR below 20, PX26(Berger-559:5-13); PX11(Knauer-117:10-17).

Berger instructed Aearo's expert tester, Ronald Kieper, to retest the linear end (Test 213017) by folding back the opposing flanges, PX29(3M_MDL000005365); PX25(Kieper-318:24–319:21), even though they were not designed to be folded, PX30(Falco-648:18–653:8). This "improper" modification doubled the NRR to 22

and supposedly boosted protection tenfold. PX31(Hamer-165:20–166:1); PX18(McNamara-152:20–153:9).[2]

Kieper then drafted a memorandum 

PX76(3M_MDL000627115).

*Id.*

PX32(3M_MDL000258590); PX77(3M_MDL000570611). Berger asked Myers whether he should "share this [memo] with Ohlin," but Myers never authorized the communication. *Id.*; PX15(Myers-289:18-24); PX78(Myers-299:25–300:5).

In July 2000, Berger and Kieper drafted the "Flange Report," reiterating that at least two features—the short stem and flange positioning—caused "variable" and "low" protection. PX33(3M_MDL000728812).

---

[2] After retesting the CAEv2, Aearo's CEO conceded that "[i]t goes without saying" that "multiple testing attempts with the same product are not allowed because this is prohibited by the EPA." PX59(3M_MDL000332847_1).

### E. Aearo hid its knowledge of the CAEv2's defects and dangers.

1. *Aearo never told Ohlin.*

Berger and Myers never disseminated the Flange Report or Test 213015 "outside the walls of Aearo and 3M." PX15(Myers-286:18–289:24, 293:24–297:22, 302:5-24); PX27(30(b)(6)-286:5–287:9, 352:15-25); PX26(Berger-206:7-13). Not one employee "recall[s] seeing any document" indicating that Defendants shared the Flange Report with Ohlin or the military. PX10(30(b)(6)-897:6–898:25); PX60(Hamer-330:23–331:3); PX34(Warren-220:3-8).

Berger conceded he did not tell "Ohlin or anyone else in the military" about "loosening of the [CAEv2]," PX55(Berger-151:8-21), or that it "was too short for proper insertion," PX27(30(b)(6)-295:14-25). Though Berger previously claimed he told Ohlin about the CAEv2's "ramifications," DX61(Berger-109:6–110:15), █████ ███████████████████████████████████████████ PX73(30(b)(6)-511:3–513:9). Berger could not have told Ohlin about the CAEv2's dangers "at the time [Test 213017] was occurring," DX61(Berger-109:6–110:15); DX23(3M_MDL000195524), because he did not ask Myers for permission to share that information until months later, PX32(3M_MDL000258590), and there is *no* evidence Myers granted permission. Nor is there evidence Ohlin knew that the CAEv2 provided one-tenth the promised protection when used according to standard instructions █████████████████████ ██████████████████████████████ PX79(McNamara-69:19–70:4).

2.   *Aearo never told the military.*

Defendants claim that Aearo and Ohlin told military audiologists that they could fold back the flanges "as needed." Def-Br-15. The evidence shows otherwise.

███████████████████████████████████████████

████████. PX80(Berger-224:6–226:12). Defendants claim Ohlin asked them not to include instructions *inside* the box, DX62(Santoro-326:11-21), ████████████

████████████████████████████████PX81(30(b)(6)-212:6-15, 287:3–288:10, 375:13–377:21, 410:10–412:24).

Defendants' communications confirm they concealed information. Def-Br-16–17. Defendants claim "Berger sent Aearo's internal test reports and civilian instructions" to military intern Mark Little, Def-Br-16, ████████████████

████████████████████████████, PX80(Berger-206:7–210:10).[3]

Defendants also cite LTC Merkley's testimony that Ohlin told audiologists that "if you *needed to*, you *could* fold back the flange[s]." DX58(Merkley-97:15–99:14) (emphasis added). ████████████████████████████████

██████████████████████████████████████████████

████  PX82(Merkley-324:6-19, 326:17–327:7, 355:10–356:2).

---

[3] The government rejected Defendants' *Touhy* request to depose Little because he has no relevant knowledge about the CAEv2.

Defendants further cite LTC Robinette's statements but admit they are "inadmissible for numerous reasons." Def-Br-6 n.2. Avoiding the most important aspects of his statements,[4] Defendants fall back on more inadmissible evidence.[5]

In any event, official military manuals contradict that evidence, making no mention of a flange-fold option:

**Proper and Improper Fit of the Double-Ended Combat Arms Earplug** (Figures 53 and 54, respectively).

 

*Figure 53*            *Figure 54*

*Proper (left) and Improper (right) Insertion of the Double-Ended Combat Arms Earplug*

---

[4] According to Robinette, Defendants *never* told the military that the CAEv2 causes "imperceptible loosening" or that "there were differences in the NRR with all of the tests." DX13(CID0236–37). Had the military known, it "would have insisted" on instructions stating the "flanges must always be folded back." DX13(CID0237).

[5] Defendants obtained the Fallon Declaration without submitting a *Touhy* request. DX66; PX83(5-20-19-Tr.-14:1-8) (federal employees "don't have authority to testify about anything"). They also cite one Plaintiff's unsigned bellwether-selection sheet in contravention of this Court's orders. DX27; PX84(1-14-20-Tr.-17:8–18:21).

## For Maximum Protection and Comfort, Insert the Combat Arms Earplug (Double-Ended) as Follows:

1. A one-size-only earplug with a doubletree design.

2. When the solid (olive-colored) tip of the plug is properly inserted into the ear canal, it protects against steady-state noise (e.g., helicopters or armored personnel carriers).

3. When the open (yellow-colored) tip of the plug is properly inserted into the ear canal, it protects against impulse noise (e.g., weapons fire).

4. In this latter configuration, the hearing protector allows speech communication and detection, as well as localization of acoustic sources.





DA Poster 40-501O, Mar 2006

PX64(3M_MDL000345123_30–31, A-9); PX85(P1503.37); *e.g.*, PX86(P1272).

Consistent with those manuals, military audiologist LTC Babeu testified she was neither instructed to fold the flanges, nor aware of the option. PX87(Babeu-174:1–175:14, 177:6-19), PX23(Babeu-94:8–101:9). ███████████████

██████████████████████ PX79(McNamara-136:6-20). ███████████████

████████████████████████████████████████

███████████ PX79(McNamara-122:18–124:5, 158:1-9, 435:11-22).

Finally, Defendants claim the Army used a "wallet card" with a flange-fold instruction in 2004 and that Ohlin subsequently reviewed a "fitting tip" included in the CAEv2's commercial packaging. The wallet card was limited to fitting very large

ear canals—4.2% of soldiers. PX18(McNamara-435:24–437:3); PX88(3M_MDL000701185_2). Defendants knew the CAEv2's defects "especially" affected users with "medium and larger earcanals" and "loosened" in all sizes. PX33(3M_MDL000728812–13) (-12 NRR for small). When Ohlin specifically asked Defendants for their input on the card, they said nothing. PX26(Berger-205:1-9, 212:2–213:9); PX15(Myers-745:15–748:13); PX18(McNamara-436:15–440:15).

████████████████████████████████████████ PX89(BROCK_00000083); PX81(30(b)(6)-314:3–317:5). ██████████████████████████████, PX90(Santoro-280:1–281:10), it never instructed users to fold the flanges or warned that failure to do so radically reduced protection, PX51(30(b)(6)-251:24–252:23, 405:8–406:11); PX26(Berger-220:10-18); PX91(Hamer-323:11-22); PX78(Myers-338:18–339:13).

The upshot of this evidence is inescapable: Defendants *never* told the military about the CAEv2's defects and dangers, as *Touhy* discovery makes clear. PX40(CID0001–02); PX23(Babeu-171:4–175:14); PX82(Merkley-324:6–329:1, 355:10–356:2).

3. *Military testing did not reveal the defects and dangers.*

Defendants claim that studies put the military "on notice of exactly how the product performed," Def-Br-21, but no study explored fitting issues, much less discovered insertion or loosening defects, PX92(Coleman-227:6-23);

PX82(Merkley_339:1-19); PX18(McNamara-399:7-23). Most focused on military matters like localization testing and speech intelligibility. *E.g.*, DX7; DX49. Others involved "manikins," DX47; DX50,  PX93(3M_MDL000427467). Some involved REAT testing, DX7; DX48–49; DX51–52,

*e.g.*, PX87(Babeu-174:1–175:14, 177:6-19); PX82(Merkley-448:9-20).

### 4.   *Aearo withheld additional testing from the military.*

Given the "number of problems" with the CAEv2, Aearo continued to test it. PX52(3M_MDL000254204_1). Between 2005 and 2007, experimenter-fit REAT tests on the closed end returned NRRs of 14, 15, and 16, far below the advertised 22 NRR.  PX25(Kieper-482:5–492:22).  A 2006 subject-fit REAT test—a "more realistic" method preferred by the military—revealed a 4.4 NRR. PX78(Myers-514:3-14); PX94(Kieper-544:13–545:4); PX95(3M_MDL000473611). Not one of these tests was shared. PX78(Myers-516:24–517:23).

### F.   **The CAEv2 violated Aearo's sole supply contract with the military.**

No procurement contract ever governed the CAEv2's design. PX10(30(b)(6)-820:17–822:5). The only sales contract is the 2006 Medical Procurement Item

Description ("MPID").[6] PX37(3M_MDL00000013); PX10(30(b)(6)-793:6–795:5, 804:1–814:12).

Before awarding Aearo the contract, the Defense Logistics Agency ("DLA") requested test results. PX15(Myers-489:6–493:3). Aearo again failed to disclose Test 213015 and the Flange Report, as well as all other relevant tests. PX15(Myers-623:10-25). Unaware of Aearo's ongoing fraud, the DLA awarded Aearo the supply contract. Yet nothing changed—Aearo continued to distribute the CAEv2 as a stock product. PX15(Myers-544:25–546:15).

Defendants claim the CAEv2 complied with the MPID, but the non-linear end failed to provide required mean attenuations, PX25(Kieper-512:5–531:23); *e.g.*, PX96(3M_MDL000011826_2); PX97(3M_MDL000018619), or protection "up to 190 dBP," PX26(Berger-318:13–320:11). As for the linear end, Defendants' clandestine practice of killing studies with inadequate NRRs and retesting the CAEv2 after excluding poor-performing subjects violated the MPID's additional requirement to follow ANSI S3.19. PX25(Kieper-254:4–255:8, 351:14–354:1); PX98(3M_MDL000023310) ("Listeners . . . may not be dismissed for reporting small amounts of protection."); PX59(3M_MDL000332847_1) (prohibiting multiple tests). For example, subjects with below-specified attenuation values in

---

[6] Defendants cite a 2003 MPID but fail to show it was executed. DX35 (incomplete); DX36 (redlined).

13

Test 213015 were excluded from Test 213017 to inflate the CAEv2's protection:

| Test 213015 | | 1/3 Octave-Band Frequency | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Subject | Trial | 125 | 250 | 500 | 1000 | 2000 | 4000 | 8000 |
| MKF | 1 | 30 | 26 | 31 | 25 | 32 | 39 | 49 |
| | 2 | 38 | 35 | 40 | 34 | 34 | 46 | 51 |
| | 3 | 35 | 34 | 37 | 31 | 32 | 44 | 49 |
| TRS | 1 | 7 | 2 | -4 | 0 | 12 | 8 | 6 |
| | 2 | 28 | 21 | 25 | 26 | 23 | 14 | 36 |
| | 3 | 25 | 22 | 24 | 22 | 20 | 29 | 38 |
| JMW | 1 | 31 | 31 | 32 | 31 | 31 | 38 | 42 |
| | 2 | 17 | 18 | 14 | 16 | 24 | 22 | 26 |
| | 3 | 21 | 24 | 25 | 21 | 32 | 34 | 39 |
| Mean | | 25.78 | 23.67 | 24.89 | 22.89 | 26.67 | 30.44 | 37.33 |
| MPID Min. Mean | | 25 | 25 | 25 | 25 | 30 | 35 | 40 |

PX21(3M_MDL000313390); PX29(3M_MDL000005365) (excluding MKF, TRS, JMW).

### G.     The military rejected the CAEv2 after discovering its defects.

After Defendants disclosed the Flange Report in their sham patent lawsuit, they "immediately" discontinued the CAEv2. PX38(3M_MDL000332111); PX15(Myers-352:16–353:16, 362:15–363:21). Had Defendants previously disclosed the Flange Report, they would have had no reason to pull the product.

Thereafter, the United States intervened in a *qui tam* case against 3M, asserting 3M had defrauded it. 3M paid $9.1 million to settle, and the military stopped using the CAEv2 upon learning the plug was "defective." PX42(3M_TOUHY00002040). The Army published a report concluding that the

14

military did not know about Defendants' testing, the CAEv2's defects, or that the CAEv2 "did not perform well in certain individuals." PX40(CID0001–02); PX15(Myers-753:1–754:5).

## ARGUMENT

### I.     Defendants Fail to Show a Uniquely Federal Interest or Conflict of Law.

#### A.     Defendants designed the CAEv2 for commercial and military use.

Defendants try to side-step two "prerequisites" to the defense—a "uniquely federal interest" and "significant conflict" between that interest and state law. *In re Fort Totten*, 895 F. Supp. 2d 48, 85 (D.D.C. 2012). This threshold inquiry illuminates what Defendants keep in the dark: the defense is inapplicable because they designed the CAEv2 for both military *and* commercial use.

A uniquely federal interest exists if a product is designed exclusively for military use, *Boyle v. United Techs.*, 487 U.S. 500, 507–11 (1988), but is lacking if designed for military and commercial use, *In re Hawaii*, 960 F.2d 806, 811–12, 814 n.2 (9th Cir. 1992). Besides their own *ipse dixit*, Defendants cite no evidence that the CAEv2 was developed *exclusively* "for the military." Def-Br-9. Nor could they. The CAEv2 was intended for both commercial and military use from the start. PX12(3M_MDL000591210_5);     PX15(Myers-97:22–100:17);     PX45(Murphy-224:17-21). Ergo, the military's interest in the CAEv2 was not unique. *Hawaii*, 960 F.2d at 811.

Nor is there a sharp conflict. Where, as here, the "military is only one outlet in a larger market," tort policies "continue to require" Defendants to "bear the cost of the injuries [they] produce[]." *Dorse v. Armstrong*, 513 So.2d 1265, 1269 (Fla. 1987). It would be "absurd to permit one injured [civilian] to recover damages" but deny an American warfighter "recompense solely because he was injured by the same or a substantially similar product." *Id.* at 1269–70.

### B. There is no federal contract for the design of the CAEv2.

In addition to *Boyle*'s "three elements," Defendants cannot establish "the defense's general applicability to [a] contract with the [military]." *Hudgens v. Bell Helicopter*, 328 F.3d 1329, 1334 (11th Cir. 2003); *Crutchfield v. Sewerage*, 829 F.3d 370, 375 (5th Cir. 2016). There is thus no conflict. *Boyle*, 487 U.S. at 507.

No design contract ever existed, PX10(30(b)(6)-820:17–822:5); PX43(Merkley-286:4-16); PX23(Babeu-179:1-4), and Defendants do not rely on the MPID as one. Even if they did, the MPID solicited a "commercial item" with a preexisting model number. PX37(3M_MDL000000014, 55). The defense thus does not—and cannot—immunize Defendants. *Boyle*, 487 U.S. at 509; *Ferguson v. Bombardier*, 2005 WL 8160215, *4 (M.D. Fla. 2005).

## II. Defendants Fail to Preempt Plaintiffs' Design-Defect Claims.

Defendants also cannot satisfy *Boyle*'s tripartite test. Plaintiffs allege the CAEv2 is defective in at least two ways. *E.g.*, Dkt. 704 ¶ 122. First, the CAEv2

"prevented Plaintiffs from obtaining a proper fit and seal when inserting the device." *Id.* ¶¶ 6, 266 (insertion defect). Second, the CAEv2 "loosen[ed] imperceptibly" after insertion. *Id.* ¶¶ 7, 265 (loosening defect).

Global discovery has revealed multiple "product feature[s] upon which [these] claim[s] [are] based." Def-Br-23; *see In re Katrina*, 620 F.3d 455, 461 & n.7 (5th Cir. 2010) (feature versus defect). The first draft of the Flange Report states:

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████  ███  ██████  ██████  ████████████  ████  ████  ███████  ██████████

████████ PX76(3M_MDL000627115). The final draft of the Flange Report and Defendants' testimony are in accord. *E.g.*, PX33(3M_MDL000728812); PX99(3M_MDL000534021_2); PX25(Kieper-914:24–915:20).

Defendants imprecisely describe the relevant feature as the length of the *plug*, Def-Br-23, when the record makes clear there are several features at issue, including the length of its *stem* (insertion defect) and positioning of its opposing flanges (loosening defect). *See Corr. Serv. v. Malesko*, 534 U.S. 61, 74 n.6 (2001) (defense only available in "special circumstance" where "government has directed a contractor to do the *very thing* that is the subject of the claim") (emphasis added).

Defendants also incorrectly claim the design-defect allegations "all relate to interaction of the opposite-end flanges due to the length of the CAEv2." Def-Br-23.

17

To be sure, the Master Complaint identifies flange positioning as one defect; but it never conflates that defect with the CAEv2's total length. Nor do Defendants cite any allegation or evidence to support their gloss on the Complaint. Absent expert evidence, their say-so is misplaced. Dkt. 987 at 1 n.1.

Defendants' strategy is obvious: they assume that broadly framing the feature as the plug's length somehow saves them. This is a smokescreen. Obfuscating Plaintiffs' allegations and the undisputed evidence warrants denying summary judgment, not granting it. But even accepting their overbroad terms, the record does not show the military required Defendants to design the CAEv2 the way they did.

## A.      The military did not approve reasonably precise specifications.

*Boyle*'s first condition requires that Defendants prove there were reasonably precise specifications *and* the government approved them. *Brinson v. Raytheon*, 571 F.3d 1348, 1351 (11th Cir. 2009).

### 1.      *Defendants did not "incorporate" government specifications into the CAEv2's design because there are no specifications.*

Defendants assert they "incorporated the government's specifications into a design that the government subsequently reviewed and approved." Def-Br-23–24. But they cite no military specifications for length or flange positioning because there are none. *E.g.*, PX53(3M_MDL000527305) (Ohlin stating "no DoD specification").

Defendants argue that Ohlin summarily agreed with Myers that "the combat arms earplug [was] 'evaluated and specified by the U.S. Armed Forces,'" DX54, but

18

Ohlin was not referring to the CAEv2. Ohlin's comment referred to an "earlier" single-ended prototype, not the "current production product." PX26(Berger-267:20–268:11); DX10 (Johnson's blast study). Neither the CAEv2 nor its NSN appears in the 1998 pamphlet Ohlin cited. DX8. Nor could they. The CAEv2 was not assigned an NSN until August 1999. PX18(McNamara-344:22–350:3). Unsurprisingly, then, Ohlin testified that there are "no specifications" for the CAEv2, notwithstanding the email Defendants cite. PX9(Ohlin-130:6-23, 133:16–134:10, 168:17–169:4).

Lacking a specification, *compare* PX54(3M_MDL000188595), Defendants claim Ohlin "requested" a dual-ended, single-sized plug with the ISL filter and UltraFit, Def-Br-24. But the document Defendants cite shows Ohlin was merely "interested" in that design. DX2. Berger, moreover, readily conceded these so-called "requests" were just "wishes." PX55(Berger-147:7–148:8). The DLA (not Ohlin) was responsible for promulgating specifications. PX26(Berger-172:1-10); PX100(Ohlin-28:2-22); PX43(Merkley-404:5-7).

Defendants' remaining evidence contradicts their litigation-driven origin story. In April 1999, Ohlin asked the Army to increase "the height and width of the current earplug carrying case [by] one-quarter of an inch" so it could fit "the proposed Combat Arms Earplugs." PX72(3M_TOUHY00000318_1). ███████████ ███████████████████ PX73(30(b)(6)-507:8–508:14), Myers offered to "shorten the

plug" to fit the case. DX4. Ohlin never "directed" Defendants to shorten the plug; nor did he limit their discretion over how to do so.[7]

In short, there are no military specifications for the CAEv2, let alone specifications regarding length or flange positioning. Not even the MPID contained such specifications. This is unsurprising because Defendants and ISL "jointly" designed the CAEv2. PX15(Myers-105:23–109:8).

### 2.   *The purported specifications are not reasonably precise.*

If Ohlin's wishlist somehow qualifies as a specification, it is still not precise. Specifications are precise only if the government exercises "discretion over significant details and all critical design choices." *Gray v. Lockheed*, 125 F.3d 1371, 1377 (11th Cir. 1997). When "the contractor retains the discretion over the important design decision[s]," the specifications are not precise. *Brinson*, 571 F.3d at 1351–52.

The list of features that Defendants attribute to the military—ISL filter, UltraFit tips, one-sized, dual-ended—is exactly the sort of "narrative description" that left "critical design choices" to Defendants. *Gray*, 125 F.3d at 1378. Indeed, the

---

[7] Berger's testimony about what Ohlin told him, Def-Br-24 (DX56), is inadmissible hearsay because Defendants cite it to prove the existence of a specification, *McKay v. Tracor*, 2005 WL 8158361, *1–2 (N.D. Ala. 2005). This testimony also fails to show that Ohlin asked Defendants to shorten the plug before Myers' offer.

list is totally "silent" about the design features at issue. *Trevino v. Gen. Dynamics*, 865 F.3d 1474, 1487 (5th Cir. 1989).

Ohlin's inquiry about whether Defendants could shorten the plug fares no better. Ohlin never told Defendants *how* to shorten the plug; nor did he say anything about the *stem*. Defendants cite no evidence—because none exists—that the military specified the "precise manner of construction." *Boyle*, 487 U.S. at 509. At all times, Defendants retained design discretion. *E.g.*, *id.*; *Katrina*, 620 F.3d at 462–63; *Dugas v. 3M*, 2016 WL 3965953, *4 (M.D. Fla. 2016).

### 3. *The military did not approve the design features at issue.*

Defendants also fail to show "meaningful" government approval. *Gray*, 125 F.3d at 1377. This may be met by showing "substantive review" through a "continuous back and forth" between the contractor and government regarding the *feature at issue*. *Trevino*, 865 F.2d at 1480; *Harduvel v. Gen. Dynamics*, 878 F.2d 1311, 1320 (11th Cir. 1989).

In *Gray*, which Defendants inexplicably fail to mention, the Eleventh Circuit held *Boyle*'s first condition was not met when the Navy reviewed only general guidelines and narrative specifications. 125 F.3d at 1378. It was not enough that "Navy engineers and [the contractor] worked closely together on many aspects of the [product]'s development," the "Navy held a series of preliminary design reviews," and the product "passed all of the Navy's acceptance tests." *Id.* at 1374.

Because the Navy approved only "the general requirements" and not the specific product feature at issue, the Eleventh Circuit affirmed the denial of the defense. *Id.* at 1378.

By contrast, in *Harduvel*, the Air Force "conducted an extensive review of the aircraft, including the electrical system, examining specifications, drawings, and blueprints." 878 F.2d at 1320. In *Brinson*, too, the military approved the defective rudder trim system. 571 F.3d at 1350. There was "ample" evidence of a "continuous back and forth," including engineer review of the defective system. *Id.* at 1354–55. In short, the military exercised plenary control over the feature at issue. *Id.* at 1356.

In stark contrast to *Harduvel* and *Brinson*, there was neither "exhaustive communication" nor a "continuous back and forth" between Defendants and the military about the CAEv2's stem length or flange positioning. *Brinson*, 571 F.3d at 1356; PX58(3M_MDL000696204_289–1379) ███████████████. Defendants also cannot show they worked closely with the military on the CAEv2's overall design. PX56(3M_MDL000456625_1). Assuming the military was "the driving force," as Defendants say, such general involvement is *irrelevant* under *Gray* and *Boyle* itself. 487 U.S. at 513 (abrogating Eleventh Circuit's general-participation test set forth in *Shaw v. Grumman*, 778 F.2d 736 (11th Cir. 1985)).

Even under Defendants' flawed framework, Ohlin directed Defendants to shorten the plug and they shortened it. Def-Br-24 (citing DX3–5). That "Ohlin

determined the modified design was 'acceptable,'" DX3, is at most a "rubber stamp" of "production samples," *Trevino*, 865 F.2d at 1480. Defendants cite no evidence that Ohlin ever considered, much less critically approved, the features that actually caused the CAEv2's defects. Indeed, Ohlin liked the CAEv2 simply because it was "unique." PX9(Ohlin-233:7-24). Beyond that, there is no admissible evidence of whether or how he evaluated it. PX55(Berger-133:3-9).

Finally, the testing that Defendants cite fails to show military approval. Def-Br-24. The June 1999 study not only states the plug was a "French-design," DX16, but it did not test the final product. ████████████████████████

████████████████████." PX74(3M_MDL000821287_1–2); *e.g.*, *Stecyk v. Bell*, 1997 WL 701312, *7 n.12 (E.D. Pa. 1997) (prototype testing "is simply not enough"). Nor do Defendants cite any evidence that Ohlin or the DLA considered that inapposite study.

### B.    The CAEv2 failed to conform to the purported specifications.

*Boyle*'s second condition requires that the product conformed to "precise, government-approved specifications." *Gray*, 125 F.3d at 1378. This condition presupposes a design contract that forecloses the contractor's discretion. *Id.* A product does not conform where, as here, its "shortcomings" cause a "deviation from the military specifications." *Id.* at 1378–79.

The CAEv2 could not have conformed to any specification because there are none. Even if Ohlin's supposed requests are legally precise enough to assess conformance, the evidence fails to show the CAEv2 met *all* of the "military specifications." *Gray*, 125 F.3d at 1378.

Defendants' sole argument is that they shortened the CAEv2 at Ohlin's "request." Def-Br-26. Tellingly, Defendants disregard his other purported requests, including the "most important" one—a dual-mode plug that protected users from both impulse and continuous noise. *Gray*, 125 F.3d at 1379; PX9(Ohlin-130:6-23); PX37(3M_MDL000000055). Contrary to that request, the CAEv2 protected users from neither due to the alleged length specification. PX33(3M_MDL000728812); PX94(Kieper-205:4–208:20, 215:17–216:5).

*Boyle* also requires examining additional "shortcomings"—independent of the length specification—that cause nonconformance with the dual-mode specification. *Gray*, 125 F.3d at 1378–79. The Flange Report states that the CAEv2 does not fit "the geometry of the earcanal" and the positioning of its flanges causes loosening.   PX33(3M_MDL000728812);   PX25(Kieper-914:24–915:20).   These "shortcomings" render the CAEv2 nonconforming with the dual-mode specification given its "low" and "variable" protection. PX33(3M_MDL000728812).

The military's decision to "move[] forward" with the CAEv2 after it was shortened, Def-Br-26, "does not prove that the [CAEv2] conformed to precise,

[military]-approved specifications," *Gray*, 125 F.3d at 1379; *Miller v. United Techs.*, 660 A.2d 810, 834 (Conn. 1995) (government use and acceptance "cannot foreclose the possibility [that the product], in fact, was nonconforming"); *Ferguson*, 2005 WL 8160215, \*4 (same); *see also* Pl-Br-25–27.

What's more, Defendants' final argument ignores reality. As soon as the military discovered the CAEv2 was "defective" during the *qui tam* case, it rejected the product and sued Defendants for *defrauding* the government. PX42(3M_TOUHY00002040).

## C.   The military was not aware of the CAEv2's defects or its related dangers and consequences until the *qui tam* case.

Defendants' next argument rests on a three-legged stool. First, Defendants try to escape *Boyle*'s final condition altogether, asserting there was no danger to warn about. Def-Br-27. Second, Defendants claim they warned the military, yet they fail to present any evidence of military knowledge of the CAEv2's defects and dangers. Def-Br-28–29. Third, Defendants assert the military was on notice of the dangers from its own testing and use, but they fail to identify any study that attempted to— or actually did—uncover the Flange Report's findings. Def-Br-29–31.

### 1.   *Defendants improperly transform* **Boyle***'s third condition into a merits inquiry.*

*Boyle*'s third condition requires Defendants to prove they "lacked knowledge of any alleged danger" or the military "already knew of any alleged danger."

25

*Yeroshefsky v. Unisys*, 962 F. Supp. 710, 719 (D. Md. 1997). Shortcutting the inquiry, Defendants try to turn *Boyle*'s preemption test into a factual defense against Plaintiffs' claims. They deny the CAEv2 is in fact defective and dangerous, but they have not and cannot cite a case transforming *Boyle* into a merits inquiry. They thus urge the Court to usurp the jury. *Hudgens*, 328 F.3d at 1335 ("alleged defect"); *McKay v. Tracor*, 2005 WL 8158362, *6 (N.D. Ala. 2005) ("alleged danger").

Even on the merits, their defense fails. A mountain of evidence proves the CAEv2 was defective and dangerous. *E.g.*, PX101(Salon-49:14–50:17). After conducting Test 213015 and obtaining an 11 NRR, Defendants conceded the CAEv2 had "problems." PX32(3M_MDL000258590). The Flange Report specifically stated that the CAEv2's design caused "variable" and "low" protection. PX33(3M_MDL000728812). ███████████████," PX78(Myers-274:2–276:1), Defendants should not have sold the CAEv2 without fixing the problem, PX31(Hamer-175:16–176:7). The military, moreover, ceased using the CAEv2 precisely because it was "found to be defective." PX42(3M_TOUHY00002040).

Although Defendants never contend the MPID set forth specifications, Def-Br-23–25, they claim "there was no 'danger' to warn of" because the CAEv2 "met the [MPID's] attenuation specification," Def-Br-27. In so doing, they attempt to hoodwink the Court, just as they duped the military into believing the CAEv2 was not dangerous because it satisfied the MPID's "mean attenuation" requirements.

Def-Br-27. By hiding behind group averages, Defendants obscure the CAEv2's "variable" protection—one danger revealed in the Flange Report but never disclosed to the military. PX24(Berger-109:8-9). Indeed, the attenuation averages for two Test 213015 subjects—TRS and JMW—fell below *all* of the MPID's thresholds, with the CAEv2 providing a -12.5 and 9.1 NRR, respectively. PX21(3M_MDL000313390).

Other REAT tests further prove the CAEv2 did not meet the MPID's mean levels. PX25(Kieper-512:5–531:23); PX15(Myers-550:12–565:20). ████████ ████████████████████████████████████. PX95(3M_MDL000473611); *e.g.*, PX102(3M_MDL000016456). The first leg of their argument thus quickly buckles.

### 2. *Defendants do not cite any evidence that they told the military about the CAEv2's defects or related dangers and consequences.*

The second leg of Defendants' stool is just as flimsy. Properly understood, *Boyle*'s third condition requires a contractor to show that it *fully* disclosed not only the defects in question, but also any resulting "problems" and "possible serious consequences." *Harduvel*, 878 F.2d at 1322. Where, as here, the contractor fails to communicate that information to the government, summary judgment is improper. *E.g.*, *Carley v. Wheeled Coach*, 991 F.2d 1117, 1127 (3d Cir. 1993). In fact, *Plaintiffs* are entitled to summary judgment because Defendants cannot show "they shared any of their internal information" regarding the CAEv2's defects or its related dangers and consequences. *Jowers v. Lincoln*, 617 F.3d 346, 354 (5th Cir. 2010).

i. *Defendants cannot show that they shared the Flange Report's findings or Test 213015 with the military.*

Defendants do not even attempt to argue that they disclosed the Flange Report or Test 213015. Defendants instead concede—as they must—that they did *not*. Def-Br-32. To fill this void, they alternatively suggest that the Flange Report's findings were generally "communicated to the government." *Id.*

Defendants first cite Berger's testimony from their sham patent litigation, where Berger testified that he "discussed the ramifications" of shortening the CAEv2 with the military. Def-Br-13, 32. But Berger clarified the meaning of that statement in this MDL. ████████████████████████████████

████████████████████████████ PX73(30(b)(6)-511:3–513:9).

Indeed, Berger cannot recall telling "Ohlin or anyone else in the military that there was loosening of the [CAEv2]," PX55(Berger-151:8-21), or that it "was too short for proper insertion," PX27(30(b)(6)-295:14-25). Nor does his 7,005-entry call log, 1,653-entry rolodex, 624-entry notebook, or any other evidence show he told the military "anything about" the CAEv2's defects and dangers, even though Berger prides himself on documenting such communications. PX58(3M_MDL000696204); PX55(Berger-152:2–155:9);     PX15(Myers-722:1–723:22);     PX18(McNamara-382:7–396:9); PX103(Berger-214:2-6) ("I document things."). Berger asked Myers if he should "share [the Flange Report] with Ohlin," PX32(3M_MDL000258590),

but Myers never "authorized the communication," PX15(Myers-289:18-24); PX78(Myers-299:25–300:5).

A decade later, Ohlin testified that he was not aware that the CAEv2's "fit protocol was changed after receiving one NRR to get another." PX9(Ohlin-191:18– 192:23). And in 2018, the Army's investigation report concluded the military did not know the CAEv2 "was too short for proper insertion." PX40(CID0002).

Unable to show they disclosed the Flange Report or its findings, Defendants fall back on LTC Merkley. Contrary to their false intonations, Merkley did not testify that he knew about the Flange Report or the CAEv2's defects and dangers; he unremarkably acknowledged "that for some people folding back the flanges could benefit them." Def-Br-32. Merkley also testified that he was *not* aware of "any communication of [the Flange Report's] findings to the Army" or "any correspondence from [Defendants] to Doug Ohlin or others that there [were] problems with the [CAEv2]." PX43(Merkley-327:8–329:1, 331:21–332:16, 349:4– 350:4).

Even on their own facts, Defendants do not come close to proving they disclosed Test 213015 and the Flange Report's findings, especially when viewing the evidence in the light most favorable to Plaintiffs.

ii.   *Military knowledge of the flange-fold option does not mean the military had equal knowledge of the CAEv2's defects or resulting dangers and consequences.*

As the foregoing testimony illustrates, Defendants' argument rests on a false premise. The military's knowledge that the CAEv2's flanges *could* be folded back does not mean the military shared Defendants' knowledge about the CAEv2's defects and dangers. *E.g.*, *Carley*, 991 F.2d at 1127 (denying summary judgment because contractor failed to prove "the government knew as much as [it] about the risks"); *Strickland v. Royal Lubricant*, 911 F. Supp. 1460, 1468 (M.D. Ala. 1995) (similar). Berger admitted as much, testifying that the Flange Report consists of "two components," not one. PX80(Berger-537:17–538:1). In addition to the flange-fold "fitting component," the Report identifies the CAEv2's defects and related dangers and consequences. *Id.*; PX33(3M_MDL000728812).

This distinction is dispositive. *Gray* held that an aircraft manufacturer failed to satisfy *Boyle* because it did not warn "pilots about how critical the positioning of the control stick [was] to effect an emergency latch up." 125 F.3d at 1379. Lacking that information, pilots "did not realize that the control stick *had* to be within 60 degrees of the centered position for [latch up] to occur." *Id.* (emphasis added).

So too here. The military was unaware the flanges *had* to be folded to ensure the CAEv2 worked. *Compare* PX64(3M_MDL000345123_30–31, A-9); PX23(Babeu-94:8–101:9), *with* PX32(3M_MDL000258590); PX78(Myers-

30

723:24–726:5);      PX94(Kieper-235:1-23);      PX104(Murphy_334:4–335:22). Defendants never shared the Flange Report's discovery that the CAEv2's defects caused *one-tenth* the protection than Test 213017's skewed results implied. PX40(CID0002);      PX82(Merkley-324:6–329:1);      PX23(Babeu-171:4–175:14); PX44(Coleman-202:15–203:12);   PX18(McNamara-152:20–153:9).   Nor did the "wallet card say anything about the plug being too short for proper insertion without folding back the flanges." PX26(Berger-218:4-15). Even if the military knew that some users could fold the flanges "as needed to get a good fit," Def-Br-28, it did not know that most if not all users "had to" do so, *Gray*, 125 F.3d at 1379.[8]

*Boyle*'s third condition "ensure[s] that the contractor has fully conveyed all information necessary to allow the government to make a fully informed decision." *Butler v. Ingalls*, 89 F.3d 582, 584 (9th Cir. 1996). Only when the contractor discloses its internal knowledge may the military "make determinations [as to] the design and use of military equipment based on all readily available information." *Trevino*, 865 F.2d at 1481–82.

---

[8] Defendants argue that they were not required to instruct all users to fold the flanges because "only *one* test subject" did so in Test 213017. Def-Br-31. The Flange Report proves otherwise. PX33(3M_MDL000728812) ("subjects"); PX73(30(b)(6)-437:21–438:12); PX80(Berger-111:1–114:12, 117:1-21); PX94(Kieper-318:8–319:6). Even the evidence cited by Defendants recognizes the "flanges must always be folded back." DX13(CID0237).

Defendants robbed the military and our veterans of the opportunity to "balance the [CAEv2's] risks and benefits." *In re Agent Orange*, 534 F. Supp. 1046, 1055 (E.D.N.Y. 1982). They at best provided one potential remedy but otherwise "cut[] off information highly relevant to the discretionary decision." *Boyle*, 487 U.S. at 512–13. Had the military known about the CAEv2's defects and dangers, it would have "share[d] that information with servicemembers," PX82(Merkley-318:19–320:5, 328:16–330:6), and would not have purchased the CAEv2, PX40(CID0002); PX34(Warren-213:12–214:17); PX45(Murphy-167:9–168:5). Defendants therefore prop up and knock down a straw man with their inadequate flange-fold instruction.

iii. *The remaining evidence that Defendants cite does not show the military had equal information regarding the CAEv2's defects or related dangers and consequences.*

Knowing the flange-fold option leaves them liable, Defendants throw the kitchen sink at Plaintiffs. Def-Br-28. None of this evidence shows they revealed the CAEv2's defects or dangers. *Russek v. Unisys*, 921 F. Supp. 1277, 1294 (D.N.J. 1996) ("Of course, if the contractor has undisclosed knowledge . . . it will fail on the third prong."). Plaintiffs address this evidence *ad seriatim*.

- Even if Berger told Ohlin that the CAEv2 had a "problem," he never disclosed Test 213015 (including its 11 NRR) or the Flange Report, much less revealed "the concept that [the CAEv2] was too short for proper insertion," PX27(30(b)(6)-295:14-25); PX26(Berger-82:9-22), or "that there was [imperceptible] loosening," PX55(Berger-151:8-21, 155:2-9).

- Unable to show that any "decisionmaker" knew about the CAEv2's defects and dangers, Def-Br-5, Defendants note that Robinette assumed the CAEv2 "could touch the [user's] tragus and push out," Def-Br-28. Their reliance on his statement through Coleman's testimony is baffling given their concession that it is "inadmissible for numerous reasons." Def-Br-6 n.2. *Tu quoque* aside, Robinette did not say the CAEv2 was too short for insertion. Echoing other military audiologists, PX43(Merkley-327:8–329:1); PX23(Babeu-171:18–175:14), he was unaware of the Flange Report and dangers reported therein, DX13(CID0236–37); *see also supra* at 9 n.4. And even if he did know about that information, "knowledge by some in the [Army], by itself, does not excuse" Defendants' concealment of information. *Sanchez v. Air & Liquid*, 2018 WL 4502280, *3 (N.D. Cal. 2018).

- As explained above, Ohlin's alleged recommendation to fold the flanges "as needed" does not mean he understood the CAEv2 was too short for proper insertion or that its opposing flanges resulted in imperceptible loosening, ultimately causing low and variable protection. PX33(3M_MDL000728812). Neither the Fallon Declaration nor the Hansberry bellwether-selection sheet shows otherwise; they do, however, violate *Touhy* and this Court's directives.

- ██████████████████████████████████████████ PX105(Kladden-300:1–301:11), ████████ ██████████████████████████ PX80(Berger-206:7–210:10, 221:10-23). Nor does the fitting tip that Little received address the CAEv2's defects and dangers. PX51(30(b)(6)-251:24–252:23, 405:8–406:11); PX26(Berger-220:10-18); PX91(Hamer-323:11-22); PX78(Myers-338:18–339:13).

- Defendants also cite their wallet card, PX18(McNamara-439:13–440:15), but it too only highlights the chasm between what Defendants and the military each knew, PX26(Berger-218:4-15, 545:8-22); PX106(30(b)(6)-346:9-23). The card was not distributed until 2005, it was given to the Army alone, and it applied only to soldiers with "very large" ear canals, Def-Br-19; PX18(McNamara-435:24–437:3), even though the CAEv2's defects "especially" affected users with medium and larger ear canals, PX33(3M_MDL000728812). Because Ohlin asked Aearo for comments on the wallet card and received none, he was obviously unaware of the Flange Report's findings, which apply universally, not just to the 4.2% with "very large" ear canals. PX26(Berger-205:1-9, 212:2–213:9); PX15(Myers-745:15–748:13); PX27(30(b)(6)-373:12–374:6); PX18(McNamara-436:15–440:15); PX88(3M_MDL000701185_2).

- Like the wallet card, nothing in the civilian instructions reveals the CAEv2's defects and dangers. *Graves v. 3M*, 2020 WL 1333135, *5 (D. Minn. 2020).

- Finally, Defendants claim "all of [their] internal testing" met the MPID's mean attenuation levels. Def-Br-28. False. *E.g.*, PX95(3M_MDL000473611); *supra* at 13–14.

All told, Defendants have failed to show they communicated the Flange Report's findings or Test 213015 to the military. Because Defendants did not share their "internal information" that "demonstrated a *deeper knowledge* of potential harms," the second leg of their argument snaps. *Jowers*, 617 F.3d at 355 (emphasis added); *Gadsden v. United States*, 111 F. Supp. 3d 1218, 1231 (N.D. Ala. 2015); *Stillwell v. Gen. Ry.*, 605 S.E.2d 500, 505 (N.C. App. 2004).

### 3. *The military lacked independent knowledge of the CAEv2's defects and resulting dangers and consequences.*

The final leg of Defendants' argument is equally unstable. Attempting to pass the buck to the military, Defendants claim that government testing and continued use of the CAEv2 satisfies *Boyle*'s third condition. Def-Br-29–31. Neither *Boyle* nor its Eleventh Circuit progeny has so collapsed the inquiry. Granting immunity on this basis would reward the very conduct *Boyle* condemns. 487 U.S. at 512–13.

Even "state-of-the-art" government knowledge acquired through testing and use does not "establish the third *Boyle* element beyond cavil" where, as here, "the record permits the reasonable conclusion that the contractor withheld information." *Martinez v. Sci. Applications*, 2015 WL 11109381, *19 (S.D. Tex. 2015); *Jowers*,

617 F.3d at 354–55 (rejecting defense where manufacturer did not share "deeper knowledge," even though Navy had "state-of-the-art knowledge" of the dangers); *Carley*, 991 F.2d at 1126 (rejecting defense despite "numerous" government tests).

*Zinck* is inapposite. There, field tests "alerted" the government to product "limitations." *Zinck v. ITT*, 690 F. Supp. 1331, 1337 (S.D.N.Y. 1988). Here, military testing did not focus on—much less discover—insertion or slippage problems. PX92(Coleman-227:6-23); PX82(Merkley_339:1-19); PX18(McNamara-399:7-23). Early research investigated the CAEv2's predecessors and prototypes, not the CAEv2. DX10 (single-ended UltraFit); DX16 (non-shortened CAEv2). Later studies compared different hearing protectors to the CAEv2. DX7 (QuietPro); DX49 (CAEv3). Still others focused on speech intelligibility and sound localization. DX7; DX49; DX50. Not even the REAT tests investigated the fitting problems Defendants uncovered in Test 213015 and analyzed in the Flange Report.[9] DX48–49; DX51–52.

The fact that those tests did not expose the "problems" known to Defendants of course does not satisfy their duty to disclose the Flange Report's contrary findings. Even if the military had "some knowledge" of the dangers from its limited testing, which it did not, Defendants still fail to show the military "knew as much or more" than they did. *E.g.*, *Sroka v. Union*, 2015 WL 794942, *4 (D. Md. 2015).

---

[9] Berger also edited these studies to make the CAEv2 look better. PX87(Babeu-154:8-18, 375:2-22).

Citing *Haltiwanger*, Defendants argue the military's continuing use of the CAEv2 shields them. *Au contraire*. There, the government used the product for 30 years and the contractor was not "fully aware" of the danger. *Haltiwanger v. Unisys*, 949 F. Supp. 898, 904–05 (D.D.C. 1996). Here, the military used the CAEv2 for years, but only Defendants were fully aware of the defects and dangers. *E.g.*, *Gray*, 125 F.3d at 1379 (third condition not met despite 14 years of government use).

Finally, if continued use matters, discontinued use does, too. The government first learned of the CAEv2's defects and dangers during the *qui tam* case, when the Flange Report and other evidence finally came to light. PX40(CID0002). The military's swift decision to cease using the CAEv2 proves the military would not have continued using it had Defendants disclosed their secret. PX42(3M_TOUHY00002040). Indeed, *hours* after the Flange Report was marked at a deposition in their sham patent litigation, Defendants stopped producing it. PX38(3M_MDL000332111); PX15(Myers-352:16–353:16, 362:15–363:21).

Unable to stand on even one leg of their three-legged stool, Defendants cannot shoulder their heavy burden under *Boyle*'s third condition.

## III.    Defendants Fail to Preempt Plaintiffs' Failure-to-Warn Claims.

"The government contractor defense is an issue of federal law and therefore, the MDL transferee court applies the law of the circuit where it sits." *Willis v. BW*, 811 F. Supp. 2d 1146, 1153 (E.D. Pa. 2011); *Murphy v. F.D.I.C.*, 208 F.3d 959, 964–

66 (11th Cir. 2000). This Court therefore applies Eleventh Circuit law to determine whether the defense preempts Plaintiffs' failure-to-warn claims. *See In re Abilify*, 2018 WL 6258903, *2 (N.D. Fla. 2018) (collecting cases and applying the Eleventh Circuit's standard to another issue of federal common law).

As Plaintiffs noted in their opening brief, and as Defendants blithely ignore in their own, *Dorse* sets forth the applicable test for when the defense preempts failure-to-warn claims. *Dorse v. Eagle-Picher*, 898 F.2d 1487 (11th Cir. 1990). *Boyle*'s three-part test is inapplicable; instead, only its threshold requirements—a uniquely federal interest and significant conflict—govern warning claims. *Id.* at 1489. As applied, that means (1) there must be a federal procurement contract and (2) that contract must affirmatively *prohibit* warnings. *Id.* This Court is "bound" by *Dorse* and must "abide by every contour of that opinion." *Killam v. Air & Liquid*, 2016 WL 7438434, *5 (M.D. Fla. 2016).[10]

Because there is "no DoD specification" or design contract here, PX53(3M_MDL000527305); PX10(30(b)(6)-820:17–822:5), Defendants cannot meet *Dorse*'s first requirement, 898 F.2d at 1489. Even if the Court considers the MPID—the sole contract identified—it *required* rather than *prohibited* warnings. PX37(3M_MDL000000056); PX51(30(b)(6)-277:1–283:4); PX43(Merkley-308:6–

---

[10] Defendants cite *Dorse* but improperly invoke an alternative test from a different circuit. Def-Br-33; *see Graves*, 2020 WL 1333135, *4 (contrasting the Eleventh Circuit's "more demanding" test to the Sixth Circuit's "more relaxed" approach).

309:7). Corporate testimony makes clear the military never prohibited Defendants from "giv[ing] an instruction or a warning to the military and to the soldiers," PX51(30(b)(6)-287:3–288:10), or otherwise restricted them from providing warnings, PX51(30(b)(6)-278:10–284:13, 287:3-8). Defendants thus fail *Dorse*'s second requirement. *E.g.*, *Dugas*, 2016 WL 3965953, *5.

Defendants' attempt to circumvent this inescapable fact is nothing but smoke and mirrors. Relying on inadmissible hearsay and failing to cite a contractual prohibition, they claim the military prohibited instructions of *any* kind. Def-Br-33 (citing DX62–63; *McKay*, 2005 WL 8158361, *1–2. Not so. ███████████

████████████████████████████████████████████████████

███████.[11] DX62(Santoro-326:11-21); PX81(Myers-377:14-21). But Defendants admit they could have included instructions *on the outside of the box* and that they were *required* to do so. PX81(30(b)(6)-375:13–377:21, 410:10–412:24). The MPID proves as much. PX37(3M_MDL000000056) (requiring instructions "inside the unit package" or "on the unit container"). Thus, the military never "ordered Aearo to ship the product in bulk *without instructions*," as Defendants misrepresent. Def-Br-33.

---

[11] To the extent Myers recalled a broader restriction from an amorphous conversation with Ohlin, DX63(Myers-248:17–249:12), that "directive" is also inadmissible hearsay, *McKay*, 2005 WL 8158361, *1–2. Regardless, Myers admitted the military never prohibited a warning. PX81(30(b)(6)-287:3–288:10).

Defendants also fail to show the military prohibited them from including instructions in individual blister packs. In fact, the evidence shows that Ohlin always ███████████   ████████   ██   ████████   ████████████   ████████ PX107(3M_MDL000013976); PX108(3M_MDL000340215).

Packaging aside, Defendants created and distributed promotional materials to military bases, which they intended to act as instructions. PX109(Gavin-155:18–156:16). They also conducted military trainings on how to use the CAEv2. PX79(McNamara-29:11–31:3, 47:1-9, 89:14-19, 107:11–108:1); PX109(Gavin-94:16–95:16); PX78(Myers-754:19–755:12, 764:5-9). In none of these instances do Defendants argue the military prohibited warnings. Defendants thus cloud the inquiry in claiming that Plaintiffs attempt to "second guess" the military.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ PX81(30(b)(6)-277:1–278:9); PX110(Moses-182:4–183:2, 268:12-24); PX111(Cimino-235:23–236:22); PX112(Madison-268:25–269:4).

## CONCLUSION

Accordingly, the Court should deny Defendants' motion for summary judgment on military Plaintiffs' design-defect and failure-to-warn claims.

DATED: April 14, 2020

*s/ Bryan F. Aylstock*_____
Bryan F. Aylstock, Lead Counsel
Florida State Bar No. 078263
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel.: (850) 202-1010
baylstock@awkolaw.com

Shelley V. Hutson, Co-Lead Counsel
(Admitted Pro Hac Vice)
Texas State Bar No. 00788878
Clark, Love & Hutson, GP
440 Louisiana Street, Suite 1600
Houston, TX 77002
Tel.: (713) 757-1400
shutson@triallawfirm.com

Christopher A. Seeger, Co-Lead Counsel
(Admitted Pro Hac Vice)
New Jersey State Bar No. 042631990
Seeger Weiss LLP
77 Water Street, 8th Floor
New York, NY 10005
Tel.: (212) 587-0700
cseeger@seegerweiss.com

Michael A. Sacchet, Chair of Law & Briefing
(Admitted Pro Hac Vice)
Minnesota State Bar No. 0395817
Ciresi Conlin LLP
225 South 6th Street, Suite 4600
Minneapolis, MN 55402
Tel.: (612) 361-8220
mas@ciresiconlin.com

**Counsel for Plaintiffs**

### CERTIFICATE OF COMPLIANCE
### WITH LOCAL RULES 7.1(F) AND 56.1(E)

I hereby certify that this motion complies with the word limit of Local Rule

56.1(E) and contains 8,000 words.

*s/ Bryan F. Aylstock*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 14, 2020, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*s/ Bryan F. Aylstock*