**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG      )      Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,     )
                                   )      Pensacola, Florida
                                   )      April 13, 2020
                                   )      11:01 a.m.
                                   )
                                   )
_____)

**LEADERSHIP TELEPHONE CONFERENCE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE

and

THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE

(Pages 1-58)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

## A P P E A R A N C E S

FOR THE PLAINTIFFS:     **BRYAN F. AYLSTOCK, ESQUIRE**
**NEIL OVERHOLTZ, ESQUIRE**
**JENNIFER HOEKSTRA, ESQUIRE**
**CAITLYN MILLER, ESQUIRE**
Aylstock, Witkin, Kreis & Overholtz
17 E Main Street, Suite 200
Pensacola, Florida  32502

**CHRISTOPHER A. SEEGER, ESQUIRE**
**DAVID R. BUCHANAN, ESQUIRE**
Seeger Weiss, LLP
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey  07660

**MICHAEL A. BURNS, ESQUIRE**
Mostyn Law
3810 W Alabama Street
Houston, Texas  77027

**BRIAN H. BARR, ESQUIRE**
Levin Papantonio
316 S Baylen Street, Suite 600
Pensacola, Florida  32502

FOR THE DEFENDANT:     **KIMBERLY O. BRANSCOME, ESQUIRE**
**SIERRA ELIZABETH, ESQUIRE**
Kirkland & Ellis, LLP
2049 Century Park East
Los Angeles, California  90067

**ROBERT C. BROCK, ESQUIRE**
Kirkland & Ellis, LLP
655 15th Street NW
Washington, D.C.  20005

**MARK J. NOMELLINI, ESQUIRE**
**NICHOLAS F. WASDIN, ESQUIRE**
**KARL GUNDERSON, ESQUIRE**
**BARRY E. FIELDS, ESQUIRE**
Kirkland & Ellis, LLP
300 N Lasalle
Chicago, Illinois  60654

**LARRY HILL, ESQUIRE**
MOORE, HILL & WESTMORELAND, P.A.
350 W Cedar Street, Suite 100
Pensacola, Florida  32502

**BENJAMIN W. HULSE, ESQUIRE**
Blackwell Burke, P.A.
431 South 7th St., Ste 2500
Minneapolis, MN  55415

```
 1                      P R O C E E D I N G S
 2            JUDGE RODGERS:  Let's go ahead and see who we have on
 3    the call.  I have 11:00 Central.
 4            Tevenia, are you on?
 5            MS. JACOBS:  Yes, Judge.
 6            JUDGE RODGERS:  Ms. Boland, Donna, are you on?
 7            COURT REPORTER:  Yes, I'm here.
 8            JUDGE RODGERS:  Very good.  Judge Jones?
 9            JUDGE JONES:  Yes, I'm here.
10            JUDGE RODGERS:  Very good.  And Judge Herndon?
11            JUDGE HERNDON:  I am.
12            JUDGE RODGERS:  Very good.  And I'm sorry, Sue Sims,
13    are you on?
14            [No response.]
15            Tevenia, do you know if Sue was going to be on the
16    call?
17            MS. JACOBS:  I don't think that she was, no.
18            JUDGE RODGERS:  All right.  Then for Plaintiffs, who
19    do we have?
20            MR. AYLSTOCK:  Good morning, Your Honor.  This is
21    Bryan.  I've got Neil Overholtz, Jen Hoekstra, and Caitlyn on
22    as well.
23            JUDGE RODGERS:  All right.
24            MR. SEEGER:  Good morning, Your Honor.  Chris Seeger
25    is here and Dave Buchanan is on as well from Seeger Weiss.
```

1            **JUDGE RODGERS:**  All right.  Good morning.

2            **MR. BURNS:**  Good morning, Your Honor.  Mike Burns as

3  well.

4            **JUDGE RODGERS:**  Okay, Mike, good morning.  Anyone

5  else?

6            **MR. BARR:**  Good morning.  Brian Barr, Your Honor.

7            **JUDGE RODGERS:**  Good morning, Brian.

8            Okay.  For 3M?

9            **MS. BRANSCOME:**  Good morning, Your Honor --

10            **MR. BROCK:**  I think you heard Kim, Your Honor, and

11  Mike Brock is here also.

12            **JUDGE RODGERS:**  Good morning.

13            **MR. FIELDS:**  Barry Fields --

14            **MR. NOMELLINI:**  Good morning, Your Honor --

15            **JUDGE RODGERS:**  Okay, Barry.  And then I hear Mark?

16            **MR. NOMELLINI:**  Yes, good morning, Your Honor.  Mark

17  Nomellini is on.

18            **MS. ELIZABETH:**  Good morning, Your Honor.  Sierra

19  Elizabeth is on.

20            **JUDGE RODGERS:**  Good morning.

21            **MR. WASDIN:**  Your Honor, Nick Wasdin is on as well.

22            **MR. HILL:**  Your Honor, this is Larry Hill as well.

23            **JUDGE RODGERS:**  Good morning.

24            **MR. GUNDERSON:**  And Karl Gunderson, too.

25            **JUDGE RODGERS:**  Good morning.

1          **MR. HULSE:**  Your Honor, this is Ben Hulse.  I'm

2     Minnesota counsel for the Defendants, and the Kirkland folks

3     asked me to join this morning.

4          **JUDGE RODGERS:**  All right.  Thank you.

5          That's probably everyone.  So I apologize for the

6     inconvenience on Friday and appreciate everyone accommodating

7     me in moving the hearing.

8          So let me start -- I have my own agenda.  I'm happy to

9     hear from you all first, if you would like -- the Plaintiffs,

10    if there's something specific you want to address with me, and

11    then I can hear from the Defense, and then, to the extent you

12    haven't already raised matters that I have on my own internal

13    agenda, then I can go over those.

14         **MR. AYLSTOCK:**  It probably makes more sense, Judge, to

15    just go through your agenda.

16         **JUDGE RODGERS:**  Okay.  Well, I have a question about a

17    bellwether plaintiff, Garcia.  We don't yet have -- I don't

18    believe we have his position on *Lexecon*.

19         **MR. AYLSTOCK:**  Yes, I'll make sure that happens,

20    Judge.  I did communicate with Ms. Anello this morning.  She

21    was happy to report that the VA authorization went to

22    Ms. Snead, and the bellwether selection sheet was uploaded to

23    Centrality and provided, and must have overlooked that, but I

24    will follow up and make sure that happens immediately.

25         **JUDGE RODGERS:**  All right, very good.

```
1              As far as federal-state coordination, we talked about
2    that the last time we were on a call.  And I have reached out
3    and touched base with Judge Tom Frazer, who has been assigned
4    the Graves case, and I've actually heard back from him.  And I
5    know he only has the one case as opposed to -- there could be
6    more.  But to the extent there's an opportunity for
7    coordination with that one case, then he and I are both on
8    board to facilitate that.
9              I did identify for him the names of the liaison
10   counsel that I appointed.  And he said he hadn't heard much at
11   all in his case so -- but he's definitely amenable to a
12   coordinated effort, to the extent that there's an opportunity
13   for that.
14             MR. AYLSTOCK:  That's great news, Judge.
15             JUDGE RODGERS:  Anything from anyone on the Graves
16   case?
17             [No response.]
18             Okay.  Well, it's come to my attention that we have --
19   I believe there's 70 cases in the MDL in which motions to
20   remand have been filed by Attorney Jeff Eckland.
21             MS. JACOBS:  Judge, this is Tevenia.  He has 70 cases.
22   At this point he's filed 31.
23             JUDGE RODGERS:  Oh, I see.  I apologize.  Tevenia is
24   correct.  He has 70 cases in the MDL, but as of the 9th he had
25   filed 31 motions to remand.
```

1    So I'm wondering if -- I don't know if 3M plans to

2   file a response.  And I haven't looked at the actual

3   complaints.  I'm assuming -- I don't know, I guess I shouldn't

4   assume.

5    Tevenia, maybe you've looked at them, or I don't know

6   if anyone on the call knows if they are straight failure to

7   warn cases or if they are a combination of design defect and

8   failure to warn.

9    Don't read too much into that question.  I'm just

10  wondering what he may be thinking.

11       **MR. AYLSTOCK:**  Judge, this is Bryan --

12       **MR. NOMELLINI:**  Your Honor --

13       **MR. AYLSTOCK:**  I'm sorry, Mark, go ahead.

14       **MR. NOMELLINI:**  Your Honor, Mark Nomellini.  I'm glad

15  that we had Ben Hulse on the line because he has been dealing

16  with this Eckland & Blando issue and may be able to provide

17  some insight for Your Honor.

18       **JUDGE RODGERS:**  All right.

19       **MR. HULSE:**  Thank you, Mark.

20    Yes, Judge, and nice to meet everybody.

21    So I have been in touched with the Eckland & Blando

22  folks, and they've indicated that they do intend to file remand

23  motions in all 70 of those cases.  It's just -- and they think

24  they'll have it done by the end of next week.

25    We have an unopposed motion -- that is, Defendants

1    have an unopposed motion that we're going to file today that

2    asks for the Court's leave to file a consolidated response I

3    think at the end of the first full week of May.

4              Those cases, they do have product defect claims.  The

5    -- I can't say we're in deep enough to know exactly how these

6    -- *(inaudible)* -- first round of remand motions.  They don't

7    seem to be exact copycats, but they do have defect claims in

8    them.

9              **JUDGE RODGERS:**  All right, Mr. Hulse, maybe I'm a

10   little confused.  So these cases are now -- the 70 cases are in

11   the MDL.

12             **MR. HULSE:**  Right, right.

13             **JUDGE RODGERS:**  So you're talking about your firm

14   plans to request of me the opportunity to file an omnibus

15   response.

16             **MR. HULSE:**  To clarify, when I say "we" I mean

17   Defendants, so just speaking as a member of the 3M and Aearo

18   defense team.  So Defendants will be filing a motion before

19   Your Honor to file the omnibus response.

20             **JUDGE RODGERS:**  All right.  I don't need a motion for

21   that.  It's acceptable to me for you to do that.  I just need

22   to know when you would like to have that filed by.

23             **MR. HULSE:**  We'd file by May 8th, Your Honor.

24             **JUDGE RODGERS:**  Okay.  Yeah, that's fine.  And I'll

25   determine how I want to reflect that in the docket so that

1   Plaintiffs' counsel understands what I'm going to allow you to
2   do.
3          But I certainly don't need 70 -- or 31 -- or you say
4   he's actually going to file 70 -- in all of his cases he's
5   going to file a motion to remand.  I don't need 70 responses,
6   though.
7          **MR. HULSE:**  We didn't think you did, Your Honor.
8   Thank you.
9          **JUDGE RODGERS:**  That will be fine.  And again, I'll
10  enter something to that effect on the docket.
11         **MR. AYLSTOCK:**  Judge, this is Bryan Aylstock.  We saw
12  that those were being filed, and Mr. Burns actually reached out
13  to Mr. Eckland.  I'm not sure when Mr. Hulse last spoke with
14  him.
15         Apparently -- and Mr. Burns can provide more detail
16  because I'm getting it third hand.  But I'm not sure that they
17  knew that the Court had already ruled on, really, these issues.
18  These are military people, from what we understand, not the
19  nonmilitary variety without a defect claim, as was the *Graves*
20  case.  But we can report more back on that.
21         It may well be that Mr. Eckland doesn't -- given his
22  ignorance on the fact that the judge had already ruled on it,
23  he might be fine to just let it sit or withdraw the motion
24  pending a ruling on the government contractor.  But Mr. Burns
25  might be able to provide a little more color.

1      **JUDGE RODGERS:**  Well, I mean, that's fine.  And I
2  don't want to suggest -- you know, I haven't reviewed these
3  complaints.  I did understand that they were not civilian
4  cases, that they had government application.

5      But, to the extent Plaintiffs' counsel believes that
6  there's some distinction, certainly they're free to file their
7  motion.  And also, my ruling only pertains to the motions that
8  were pending at that time.

9      I'm not likely to -- obviously not likely to change my
10  position, unless there's some distinction legally or factually
11  that I'm not aware of.  But I don't want to suggest that they
12  can't file their motion.  But what I don't want -- they're not
13  going to just leave them on the -- I'm not going to just leave
14  them sitting on the docket.

15      And the standard for reviewing the motion to remand
16  with the federal officer removal is not the same standard that
17  applies on the merits of the defense.  So I don't know that I'm
18  going to wait either, in other words, until I rule on the
19  affirmative defenses.

20      Anyway, Mr. Burns, do you have something you'd like to
21  add?

22      **MR. BURNS:**  Your Honor, you were cutting out there and
23  I didn't hear everything.

24      **JUDGE RODGERS:**  I apologize.  I'm sorry.  What I was
25  saying is I don't want to suggest from the Court what

1   Mr. Eckland should or should not do with his motions or how I

2   would rule on his motions.

3            So it's really -- you all certainly are free to

4   continue your discussions with him.  But if those motions are

5   not withdrawn, then the Defendant is going to file an omnibus

6   response by May 8th.  And to the extent I haven't -- and it may

7   be that I will -- but to the extent that I haven't ruled on the

8   summary judgment motions that are pending before me on the

9   merits of the government contractor defense, then I'm going to

10  go ahead and rule on these motions to remand.  I'm not going to

11  let them sit.

12            **MR. BURNS:**  Yes, Your Honor.  And I did send him a

13  copy of the order on the remand last night, and he responded to

14  me, and I told him that I would speak with the -- *(inaudible)*--

15            **JUDGE RODGERS:**  Okay.  Well, obviously, to the extent

16  that Leadership here learns that Mr. Eckland intends to

17  withdraw his motions, it would be good to let the Defense know

18  that so that they're not unnecessarily expending time and

19  effort on responding to the motions that are going to be

20  withdrawn.

21            **MR. BURNS:**  Yes, ma'am.  And I'll make sure I get in

22  touch with Mr. Nomellini and pass that information on.

23            **JUDGE RODGERS:**  All right, very good.

24            Then next on my agenda is the issue of blank

25  authorizations.  I saw the Defendants' letter brief to Judge

1    Jones regarding his order of March 26th, which is Document

2    1065, and then I saw the Plaintiffs' response to the

3    Defendants' letter today.

4         So, Judge Jones, I also understand that you had

5    indicated to the parties to be prepared to, I guess, to at

6    least discuss this today.

7         **JUDGE JONES:**  Yes.  It's a fairly discrete issue.  I

8    thought at the conclusion of the hearing or this call I could

9    have brief discussion on it and rule on that so the parties can

10   move forward.

11        **JUDGE RODGERS:**  Okay, that sounds good then, you're

12   going to stay on the call with them.  I'm happy to discuss it

13   now.  But it's your order that they're interpreting, so --

14        **JUDGE JONES:**  Well, we can discuss it now.  Maybe two

15   heads are better than one.  It's a discrete issue.  The parties

16   have briefed it.  But I'd like to hear very briefly from the

17   Defendants why blank authorizations are necessary and then

18   briefly hear from Plaintiffs why there are or could be problems

19   with that process.

20        **JUDGE RODGERS:**  Before you all start -- I'm sorry.

21   Before you start, I will just chime in at the beginning here

22   and say that the Plaintiffs are correct as far as what I

23   ordered in *Abilify*.  And so, in *Abilify*, the blank

24   authorizations were maintained by plaintiffs' counsel, the

25   hand-signed wet signature, those were maintained by plaintiffs'

1    counsel and filled in with the provider information and then

2    provided to the defendant.  That's how it was done in *Abilify*.

3           **MR. WASDIN:**  Your Honor, this is Nick Wasdin.  To give

4    you the sort of brief overview of Defendants' position on why

5    they're necessary, as we note in the letter, it's sort of our

6    view that you ruled on the call that Plaintiffs are willing to

7    provide an authorization and that that contemplated a single

8    blank.  And, you know, that's consistent with our experience in

9    other litigation.

10          I hear Judge Rodgers's point about *Abilify*, but we've

11   certainly all done litigation, at least on the Defense side,

12   where the parties do use a blank authorization that's given to

13   the defendants to streamline the process.  And that was our

14   expectation on the call.  And Plaintiffs didn't raise, at least

15   at that time, this idea of numerous prepopulated authorizations

16   for every provider.

17          We think that, you know, going back and forth like

18   that is almost certainly going to result in disputes over what

19   entities are, quote/unquote, "proper."  And we just got

20   Plaintiffs' letter this morning and that's what they say in the

21   final paragraph, that they're willing to turn over

22   authorizations, quote, "if proper."

23          But our view is that, when we discussed this on the

24   March 24th call with Your Honor, you know, the takeaway was all

25   medical records from cradle to present are proper, you know,

1      with whatever limitations were put into the authorization.

2             And so, the discretion that Plaintiffs are asking to

3      exercise over the authorization process is inconsistent with

4      the idea that we are entitled in this case to go get a

5      plaintiff's entire medical history -- *(inaudible)* -- that are

6      inherent in the authorization.

7             Now, a concern that Plaintiffs articulate in

8      particular in their letter is that they don't want to give us,

9      quote, "carte blanche" to send authorizations to every hospital

10     in someone's hometown or city.  And we understand that.

11            We don't think that concern should belive here because

12     the authorizations that you approved have language on scope;

13     for example, no mental health records.  And probably moreover,

14     if we send the request to a bunch of irrelevant hospitals that

15     never treated the plaintiff, they're not going to have any

16     responsive records.  So we don't do that.

17            What we do in the normal case is go through a

18     plaintiff's medical records, identify the providers that are

19     specifically culled out as treaters, and then send an

20     authorization to those folks.  We don't blanket cities with

21     authorizations.

22            So, you know, given that there's no sort of risk of us

23     just blanketing irrelevant hospitals -- because if they don't

24     have records and they're not relevant, they're just not going

25     to give us anything -- our proposal is that we move forward as

1    we've done in other cases.  And I hear from Judge Rodgers that

2    it was not in *Abilify*, but we've done it with blank

3    authorizations.

4         But before I sit down here, I would like to sort of

5    float the potential compromise position, to the extent the

6    Court is inclined to not do blank authorizations in that

7    manner.

8         Plaintiffs' letter discusses the authorization process

9    put in place by Judge Fallon in *Vioxx*.  Essentially that

10   process was plaintiffs provide blank authorizations to

11   defendants and then defendants are entitled to send those to

12   identified providers.  And if the defense wanted to send it to

13   an unidentified provider, the sort of carte blanche hypo, then

14   they would give notice to plaintiffs and plaintiffs would have

15   an opportunity to seek a protective order.  So it streamlined

16   the process by putting the burden -- assuming the defendants

17   are acting in good faith, in putting the burden back on

18   plaintiffs to identify those unusual situations where somebody

19   is blanketing hospitals in somebody's city or something.

20        Now, this case is a little different than *Vioxx*

21   because in *Vioxx* there was a full-blown PSS that was certified

22   that had identified all the providers.  Here we just have an

23   uncertified bellwether selection sheet.  And we've heard a lot

24   of times, which has been true on the selection sheet, that

25   plaintiffs can't remember their providers, they don't know who

1   they saw.

2           So the proposal that I have is a compromised position

3   as sort of a modified *Vioxx*.  So it would be Plaintiffs send us

4   blanks, and then we're entitled to use the blanks to send to

5   either those providers that Plaintiffs have identified either

6   in their census form or bellwether selection sheet or whatever

7   that is, or those providers that we're able to separately

8   specifically identify in plaintiff's medical records.  And if

9   we wanted to go beyond those two buckets, then we would give

10  notice to Plaintiffs and they would have an opportunity to

11  object, we'd have that discussion, and they could seek a

12  protective order, if needed.

13          And that proposal takes the delay out of the process

14  that -- even if Plaintiffs say they can flip it in two hours,

15  takes that two-hour or multi-day delay or whatever it ends up

16  being out of the process and removes that discussion component

17  where Plaintiffs are trying to -- you know, essentially going

18  to tell us that we can't serve Dr. Smith even if Dr. Smith is

19  identified in the record for some reason that we think is

20  inconsistent with the scope of records authorized by Your Honor

21  in the first place.

22          **JUDGE JONES:**  Okay.  Thank you.

23          Let me hear briefly from the Plaintiffs.

24          **MR. AYLSTOCK:**  Good morning, Judge Jones and Judge

25  Rodgers.  I'll be addressing this for the Plaintiffs.

1         First of all, with regard to these authorizations, we

2    did not and do not interpret your order as ordering blank

3    authorizations.  I went back and looked at the transcript.

4    That issue didn't come up.  I didn't recall it.  Of course, I

5    remember it pretty well because it wasn't that long ago.  It

6    certainly didn't come up on any meet and confers or in the

7    briefing before or after.  It was only just a few days ago that

8    it was first raised I think probably as an afterthought by the

9    Defendants saying we'd like blank authorizations.

10        It's not the norm in the MDLs at all.  And in fact,

11   even Judge Fallon's *Vioxx* order provided for protections with

12   regard to that.  And his more recent order in *Zyprexa*

13   specifically required specific authorizations.  And there's a

14   reason for that.  The reason is both in common sense law and in

15   the regulations related to HIPAA.

16        In order for a HIPAA release to be valid, it needs to

17   identify the class -- the persons or class of persons to which

18   the authorization is provided or directed.  And simply having

19   blank authorizations in the possession of the Defendants to

20   identify some medical records somewhere that might have some

21   podiatrist or eye doctor or plastic surgeon or something

22   completely irrelevant and then go off on a wild goose chase to

23   get that information or seek that information is only going to

24   clog the wheels of these cases and delay things, not expedite

25   things.

1        So, as the Court did in *Abilify*, as Judge Fallon did

2   in *Zyprexa*, as actually Mr. Brock agreed to in the *Juul*

3   litigation, as Kirkland & Ellis also agreed to in the *Heparin*

4   litigation, and as 3M agreed to in the PFFF -- I guess that's

5   what it is -- litigation, we think that the better course is to

6   have these authorizations filled out specifically.  It

7   certainly provides protection for the plaintiffs when they

8   know, *hey, I'm not just filling something out in blank, I'm*

9   *going to at least give it to my attorneys in blank and let them*

10  *fill it out as needed*.  And that can be turned around in very

11  short order.

12       So we think that the law is that blank authorizations

13  aren't typically done.  I'm not sure what Mr. Wasdin is

14  referring to that in his experience it's always done this way

15  because that's not what we've found over the weekend when we

16  were researching all of the instances where in fact the

17  opposite happened.

18       With regard to this contention that there's no risk,

19  they're not going to go, you know, order irrelevant records and

20  we don't have to worry about that, that simply hasn't been our

21  experience in other MDLs.  I'm not casting any aspersions on

22  counsel on the other side, but they're not the ones that are

23  going to be finding this and ordering this.  Mr. Nomellini,

24  Mr. Brock isn't going to be doing that.  It's going to be some

25  paralegal somewhere finding something.  And if the plaintiff

1   has no notice that, hey, this is even being ordered, it really

2   leads to inefficiency and delay, not the opposite, because all

3   of these records might be collected or in fact these medical

4   providers, which all of whom right now have a very important

5   task at hand, shouldn't be burden by unnecessary requests or

6   repeated requests as often happens where multiple requests go

7   out and it just confuses the system.

8            So the compromise we proposed is exactly what

9   Mr. Brock agreed to in *Juul*.  Let's have the Plaintiffs have

10  blank authorizations -- we proposed this on a very lengthy call

11  on Friday -- and allow a very quick turnaround if there's

12  additional people identified in those authorizations where

13  those can be provided.

14           Mr. Wasdin -- or Ms. Branscome I guess signed the

15  letter -- identified this Adkins as the prime example.  Mr.

16  Adkins submitted an authorization with the two lines filled in

17  and there was one that they found and it was not a VA record.

18           Well, we had a very long call on Friday; that wasn't

19  even addressed.  Had it been addressed, I could have told them

20  then, as I can tell them now and the Court, that those records

21  of the additional provider, that was a referral from the VA.

22  And, yes, we understand all those will be in the VA records and

23  that hospital won't need to be burdened by it.  But if it's

24  not, we're happy to provide that authorization.

25           But that's what the process contemplates, not just

1    providing blank authorizations to allow the Defense to just

2    trust them and their paralegals and everybody in there to not

3    order things especially when there's no mechanism for us to

4    track what's been ordered when they just have blanket

5    authorizations.  And it's not what HIPAA regulations require.

6    And we've cited multiple instances across many, many MDLs over

7    many years where the proposal that we put forward is the

8    correct proposal.

9            **JUDGE JONES:**  Okay.  Thank you.  It seems to me

10   there's several things going on here.  Paramount, we do not

11   want to have a process that is going to cause delay.  It

12   doesn't benefit anyone to bog down this process in a lot of

13   back and forth.  I think that was part of the rationale for the

14   Defendants' request to have blank authorizations.

15           Secondly, we don't want to have protracted disputes

16   over what medical providers can receive these authorizations.

17   My prior order was pretty clear that, because of the nature of

18   the injuries in this case -- the hearing loss -- a full picture

19   of a plaintiff's health record is going to be important because

20   hearing loss has multiple causes, there's confounders, there's

21   all kinds of things.

22           And as I mentioned in the prior hearing, the

23   Defendants' experts, I'm sure, in order to provide an opinion,

24   would need the full breadth of a plaintiff's health record.  So

25   I'm not contemplating there's going to be a lot of

1    authorizations sent to podiatrists and that kind of thing.

2          On the other hand, I recognize, and I know Judge

3    Rodgers is 100 percent correct, in *Abilify* we did not have

4    blank authorizations.  And part of the reason for that is --

5    and it was very apropos in this case -- plaintiffs and these

6    military plaintiffs probably get very sweaty palms having to

7    sign blank authorizations and they go off to god knows where.

8    And I think that's probably an issue for the Plaintiffs in

9    their relationships with their respective clients getting blank

10   authorizations that are being turned over.  So I recognize

11   there is that dynamic.

12         But I have a question for you, Mr. Aylstock.  In terms

13   of blank authorizations, your compromise -- not compromise --

14   alternate position -- and I should say, when we had the hearing

15   and I did that order, I did not even have on my radar screen

16   how the authorization process would work.

17         Quite frankly, I'm aware of how it happened in

18   *Abilify*, and I just sort of assumed what was going to happen is

19   the Plaintiffs just fill out the model authorization, fill in

20   the name of the provider, and send one, two, or more, however

21   many were involved, to Defense counsel, and there wouldn't be a

22   problem.  So that really wasn't something on my radar.

23         But, Mr. Aylstock, is there any problem from your end

24   if, in addition to your clients providing authorizations with

25   specific providers written in, which I think a lot of the

1    providers actually are going to insist on, you know, a wet

2    signature on -- is there any problem in the Plaintiffs' counsel

3    having a collection of blank authorizations in your hands so,

4    when you say it's a matter of a turnaround in a few hours,

5    really all the Defendants have to do is contact you and say, we

6    want to send an authorization to X, Y, and Z, and you, not the

7    client, you fill it in and simply transmit it to Defendants'

8    counsel?  Is there any problem in doing that?

9         **MR. AYLSTOCK:**  No, Your Honor.  In fact, that's

10   exactly what I proposed on Friday and exactly what Kirkland &

11   Ellis are doing in *Juul*.  I think that's -- obviously we want

12   speed as well, Judge.

13        **JUDGE JONES:**  Yeah.  Because now the other issue that

14   Mr. Wasdin raises, which, you know, is some concern -- I'm not

15   saying that's going to be the position of the Plaintiffs.  But

16   what we don't want to get into are a number of mini disputes on

17   whether it is or is not appropriate to send an authorization to

18   a provider.

19        I recognize some issues are going to come up.  There's

20   probably, like most issues, will be a gray area, and then

21   Defendants will have an argument, well, we need it from this

22   provider, and I know it's broad but we think it's necessary,

23   and the Plaintiffs say, no, we think you've crossed the line.

24   And the Court may have to intervene and resolve that.

25        And there's two ways:  Mr. Wasdin's way is, if he's

1    going to do that, he gives you notice, and then if you don't

2    agree, it's brought to the attention of the Court.  Your way

3    is, he contacts you and says, I need an authorization for X, Y,

4    Z provider, and after discussing it, if you disagree, then it's

5    brought to the attention of the Court.

6          So my question is:  How do you contemplate the Court

7    is going to deal with that type of situation where Mr. Wasdin

8    wants an authorization, it's not in the profile form or it's

9    not in that universe of who we can all agree are the main

10   medical providers, it's someone a little bit outside of those

11   bounds, and Plaintiffs take the position they think it's

12   unnecessary?  How is that going to be teed up to the Court?

13         **MR. AYLSTOCK:**  Well, I think, Your Honor, those cases

14   will be few and far between.  We've read your order, we have

15   the transcript, we understand the scope and breadth of that

16   order.  But it is important for two things:  It's important for

17   us to track, and it's important for our clients to know and

18   their lawyers to know before they're done.

19         So what I would suggest the process be is they can

20   email any one of us or we can create a point person -- happy to

21   do so -- and the authorizations can be housed here or at the

22   local law firm of whoever represents one of the 25, and they

23   can be turned around in very short order.

24         If there is a dispute, it may very well be a

25   podiatrist or something, and I'm sure Mr. Nomellini or

1  Mr. Brock or Ms. Branscome or Mr. Hill or anybody would get on

2  the phone and maybe there's an issue that can be resolved.  If

3  it can't, I think we can very quickly get on the phone with

4  Your Honor or write a quick letter and you make a ruling.

5          But I really don't see that as a common occurrence at

6  all.  We just think that they should notify us and our client

7  and let us have an opportunity to look at it before they just

8  go out and have these blank authorizations.  It very much will

9  give our clients sweaty palms to know that they're just being

10  handed over.

11          **JUDGE RODGERS:**  So, Judge Jones, can I jump in just a

12  minute?

13          **JUDGE JONES:**  Yes, go ahead.

14          **JUDGE RODGERS:**  So I brought up *Abilify* at the

15  beginning of this discussion because 3M cited *Abilify* for an

16  MDL where the practice that they're asking us to put into place

17  here was utilized.  And as we've all discussed, that is not the

18  case.

19          In *Abilify*, it was of paramount importance that we

20  comply with HIPAA, right?  And so my concern here is that the

21  request for blank authorizations to the Defendant where the

22  Defendants fill out the "to" line, the provider line, to me

23  that circumvents HIPAA.  I mean, that plaintiff has not

24  authorized the release of those specific records.

25          And if you're talking about -- I mean, for anyone who

1   has had any amount of health care in their lifetime, I mean,

2   there are references to physician visits, after physician

3   visits, after physician visits that may have occurred in

4   childhood that an individual has no memory of, and they say,

5   yes, I authorize you to access Dr. Smith's records, but very

6   deep within Dr. Smith's records is a reference to a visit to a

7   Dr. Jones 20 years ago.  If I'm signing that authorization for

8   Dr. Smith, I am not authorizing you to obtain Dr. Jones's

9   records.  But that's exactly what Mr. Wasdin has just described

10  is likely to happen if they had blank authorizations.  And

11  again, I think that circumvents HIPAA.

12          So I'm of the mindset that we adopt a practice that we

13  had in *Abilify*.  It's cleaner, it's easier to keep track of,

14  and it is fully consistent with HIPAA.  The plaintiffs

15  themselves can give the blank authorizations to their

16  representative who then fill in the information as far as the

17  provider.

18          To the extent the Defendants want additional records

19  from other providers, then they notify Plaintiffs about that.

20  If they can't reach an agreement on it, then they contact

21  Tevenia, she sets up a call with one of us, and we get it

22  resolved, or they work with Judge Herndon to try to get it

23  resolved first.

24          I'm all about avoiding delay, but I don't think this

25  is going to inject delay doing this this way.  I'm more

```
 1    concerned about violating HIPAA and asking these plaintiffs to
 2    do something that to me sounds like it would violate HIPAA.
 3              JUDGE JONES:  I think you're right.
 4              MR. WASDIN:  Your Honor --
 5              JUDGE JONES:  Mr. Wasdin?
 6              MR. WASDIN:  Yes, Your Honor.
 7              JUDGE JONES:  Were you going to say something?
 8              MR. WASDIN:  I was.  Thank you.  We looked into that
 9    issue in particular.  We were sent into that issue, and our
10    research was that the HIPAA analysis is done essentially, you
11    know, once we fill in a provider on the line.  And so the
12    provision of blank authorizations, which, as I've said, we have
13    done in prior cases and I think people -- even though it may
14    not have been mandated in Abilify, it was my understanding from
15    Mr. Hill that some plaintiffs chose to do it that way.
16              But, in any event, our research was that blank
17    authorizations were consistent with HIPAA and that the analysis
18    was done at the time a provider was put on the line.
19              JUDGE RODGERS:  Yeah, but Mr. Wasdin, I don't see how
20    that can be.  If HIPAA requires a patient authorization and
21    that patient doesn't know who the provider is and the Defense
22    counsel is going to insert that information and the plaintiff
23    doesn't know who the provider is -- when you fill in that
24    blank, the Plaintiff has no idea about that.  How can that be
25    HIPAA compliant?
```

**MR. WASDIN:**  I believe the thinking is that the plaintiff is providing, you know, essentially a general authorization to get their medical records from all of their providers when they give a blank, and then when we fill in the name of each individual provider, so long as they are one of the plaintiff's providers, is consistent with that authorization.

But we hear Your Honor's position on that to the contrary.  And I think, you know, what would be helpful for us on this call, if we were going to do the blank in Plaintiffs' possession to circumvent that issue, is just to get some tight clarity around the time frame for getting the authorizations back.  And I know Mr. Aylstock has said a few times that that can be done in a matter of hours.

**JUDGE RODGERS:**  Right.  And to the extent HIPAA allows for a blanket authorization -- I don't know that to be the case, but I'll take your word for it for purposes of our discussion here -- I'm not comfortable requiring a plaintiff in litigation before me -- I'm not comfortable requiring blanket authorizations.

So, Judge Jones, I guess that kind of answers the question.

**JUDGE JONES:**  Yes.

**JUDGE RODGERS:**  I'm just not comfortable with it.

**JUDGE JONES:**  That's my view.  Because the issue is --

1    and even if you could provide blanket authorizations, I'm not

2    sure what the Defendants are going to lose. If they have a

3    blanket authorization and if someone other than the universe of

4    providers that we can all agree would be necessary, it's in

5    that gray area, they have the authorization. The alternative

6    is, to justify Mr. Wasdin, is they can't go forward, they have

7    to give notice to the Plaintiffs, and then it's a disputed

8    issue for the Court to resolve.

9          It's the same result if the Plaintiffs has in their

10    hand -- the plaintiffs' representatives have the blank

11    authorization and the request is made by the Defendant to the

12    Plaintiffs and it is disputed. I'm not sure, in terms of

13    timing, how the Defendants would lose anything, how there would

14    be any further delay.

15          So, anyway, we're going to talk about the issue you

16    just raised, Mr. Wasdin, about the scope so we have dotted our

17    i's and crossed our t's. But based on what Judge Rodgers said

18    and my thinking, what we will do is the Plaintiffs will provide

19    the authorizations with the specific providers written in.

20          If there are providers that are not identified on the

21    fact sheets or profile sheets that the Defendant wants to send

22    an authorization, the plaintiffs' representatives, i.e.,

23    counsel, will have in their possession blank authorizations

24    signed by the clients. And then Defendants will give notice to

25    the Plaintiffs, and then, if there's no dispute, the name will

1    be filled in and it will be provided.  If there's a dispute, a

2    short period of time for the parties to discuss it.  If they

3    can't resolve it, you would bring it to my attention or Judge

4    Rodgers's attention.  You can do a very quick letter on it and

5    the Court can even rule on the letter, or if we even have to

6    have a little telephone hearing, we could do that.

7            But, Mr. Wasdin, you were raising the issue of making

8    sure everyone is on the same page of what would be within the

9    universe of those undisputed providers and ones where there

10   might be discussion or dispute.

11           And how were you going to define that?

12           **MR. WASDIN:**  Well, Your Honor, I think, from our

13   perspective, it's essentially already been defined by the

14   language in the authorization and Your Honor's March 24th, and

15   I believe subsequent issued order was on the 26th, and as

16   discussed earlier on this call, that it's the entire medical

17   record that our experts are going to need to understand a

18   person's medical history from cradle to present.  That's what

19   was decided on the last call.

20           And so, it's hard for me to imagine the gray area.  I

21   know Mr. Aylstock has used the podiatrist example twice.  You

22   know, maybe that's it.  But, frankly, if someone is at the

23   podiatrist and there's some reason why they are getting a

24   treatment -- I don't actually know what podiatrists do.  But if

25   our experts tell us that there's something they could do that

1    would result in an ototoxic medication or something like that,

2    then, you know, maybe that would be within the scope as well.

3         It's really hard for me to imagine any provider under

4    Your Honor's guidance of the "entire medical history," outside

5    of the mental health issue that we carved out of the

6    authorization, that would be a gray area.  And that's why this

7    process of meeting and conferring over providers -- *(inaudible)*

8         **MR. BROCK:**  It's also the case, I will add, that

9    almost every medical provider takes a medical history of a

10   patient when that patient is seen.  And it's frequently the

11   case that there are general questions about eyes, ears, nose,

12   throat, anything that's troubling or bothersome to the patient,

13   anything that's giving a patient a problem.  This is done on

14   routine medical examinations, it's done by surgeons and

15   anesthesiologists in terms of workups for surgery.  It could be

16   a knee surgery but still would have potentially relevant

17   information in the medical record about the patient.

18        So the general rule of we're entitled to the records

19   of the plaintiff to see what is there on the basis of

20   discoverable evidence I think should hold.  It should be -- I

21   can't think of a situation that would be objectionable beyond

22   what's in the order with regard to the scope of discovery.

23        **JUDGE JONES:**  Well, it certainly is very broad.  Maybe

24   a podiatrist falls outside the scope.  I have a tough time

25   thinking how that could be relevant.  But other than that

1    example, I really can't think of many examples because my order

2    did contemplate broad medical records for the exact reason you

3    described, Mr. Brock, is you go in for indigestion and they

4    take a medical history and they ask what problems do you have,

5    and that's certainly relevant, and you say, well, I have

6    ringing in my ears, I have trouble hearing, I have loss of

7    balance, you know, those kinds of things that all could relate

8    to hearing.  That certainly would be something that could be

9    marginally relevant.

10           But, in any event, maybe we don't need to define the

11   scope of it other than to recognize it is fairly broad.  And

12   then, to the extent that there is a request made by the

13   Defendants to the Plaintiffs for a medical provider and the

14   parties are unable to agree on it, then bring it to the

15   attention of the Court.  It's a very discrete issue.  Both

16   sides can tell the Court why they need it or why the other side

17   shouldn't have it, and we can resolve it.  And I don't think

18   there would be too much of a delay there.

19           I think that Plaintiffs recognize that the medical

20   records obtained are going to be fairly broad because of the

21   nature of the condition, i.e., injury in this case.

22           **JUDGE RODGERS:**  So can I -- let me jump in a minute.

23   I don't think there's going to be a lot of dispute here.  Judge

24   Jones's order is clear.  It is intended to be broad as far as

25   the scope of these medical records.

1             To the extent there is a dispute, Plaintiffs should

2    bring it to the Court's attention within 24 hours.  If you feel

3    like the Defendant should not be entitled for a specific reason

4    to a certain provider's records, we need to know about that

5    within 24 hours, and Judge Jones or I will get you a ruling

6    hopefully on the spot, would be the intent.

7             And I don't want 3M to misinterpret anything I've said

8    as, you know, an indication that I think the scope should be

9    more narrow than what Judge Jones has ordered in the case,

10   because I don't.

11            And I understand you all, I believe -- I'm just

12   reading between the lines and hearing some of your comments,

13   particularly Mr. Brock's, that it's your belief that there are

14   some medications that could be prescribed by maybe even a

15   podiatrist that might contribute to an injury that a plaintiff

16   is suggesting he or she has.

17            And so I don't think we're that far apart here at all.

18   My concern, as I said, is that I want to make sure an

19   individual plaintiff knows what he or she is authorizing as far

20   as a release.  So that's my first concern.  And then I also

21   think that it's just cleaner and easier to keep track this way.

22            But 24 hours, Plaintiffs, you need to notify us if you

23   have an objection.

24            **MR. AYLSTOCK:**  Yes, Your Honor.  And if it's a Friday

25   evening, then maybe we could have until Monday?  Is that 24

1    hours not including business days or holidays, just --

2         **JUDGE RODGERS:**  I will give you the weekend off.

3         **MR. AYLSTOCK:**  Thank you, Judge.  I appreciate it.

4         **MR. WASDIN:**  Your Honor, just to clarify what I think

5    is implicit in that direction is that, to keep this process

6    moving forward, I think what you're saying is the Plaintiffs

7    would have 24 hours to either provide us with the requested

8    authorization or raise it?

9         **JUDGE RODGERS:**  Well, what I guess I was referring to

10   was raising the issue.  I assume you're going to have -- if you

11   present a provider name and the Plaintiffs have a problem with

12   that, I assume they're going to contact you and try to resolve

13   it before, so maybe we need to put a time frame on that.

14        **MR. AYLSTOCK:**  Yes, Your Honor.  And 24 -- I mean,

15   certain of these may need to be contacted.  I've seen

16   situations where X-ray techs are being required to do things or

17   things that just clearly don't matter.  And I think we should

18   be given an opportunity to at least, if possible, discuss it

19   with our client.

20              I've also seen many instances where somebody's record

21   is just -- not just incorrect, but it's somebody else's record

22   in there, and somebody is looking at something that was

23   misfiled, and all of a sudden you're giving an authorization to

24   something that isn't even related to a litigant in the MDL.

25              So I do think there -- certainly it has been our

1    practice, it remains our practice, we try to beat deadlines,

2    not just meet them.  Mr. Nomellini is quite persistent in

3    following up over and over again, and we do our best to keep

4    him happy.  But a 24-hour turnaround is just not realistic.

5         I think it can happen in many cases for that, but

6    typically you get 21 days, seven days, something to allow us to

7    deal with it.  But raising the objection is obviously doable in

8    24 hours.

9         **JUDGE RODGERS:**  Well, Judge Jones, I guess, I don't

10   know, five days to resolve it; if it can't be resolved, then 24

11   hours to bring it to the Court's attention?

12        **JUDGE JONES:**  Well, I mean, I'm contemplating a fairly

13   quick process.  I think the 24 hours -- 24, 48 hours.  So you

14   are asked for a certain authorization on a provider.  If the

15   Plaintiff objects, that gives a little bit of opportunity to go

16   back to the client, maybe there's something the lawyers didn't

17   understand by talking to the client.  But within 48 hours,

18   you're going to know whether you have a disagreement or you

19   don't have a disagreement.

20        And the point is -- you know, I'm all for meet and

21   confers, and that's great.  But we don't want this to become a

22   very bogged down process.  So maybe 48 hours, within 48 hours

23   of a request being made for a provider you give the Defendants

24   the authorization or you object, and it's an unresolved

25   objection.  And that gives both sides a day or two to talk

     1    about it, make some calls back and forth.  But at that point, I
     2    say you should just tee it up to the Court, and we can make a
     3    call on it.  These are not complicated issues.
     4         **JUDGE RODGERS:**  My only thinking was, you know, the
     5    discussion with -- they may need to involve individual
     6    plaintiff's counsel as well as the plaintiff him or herself.
     7    But let's leave it with what Judge Jones has decided, 48 hours,
     8    not including weekends, and see how that works.
     9         **JUDGE JONES:**  Yeah.
    10         **MR. AYLSTOCK:**  Thank you, Judge.  If we have an issue,
    11    we'll certainly bring it up.  You're correct, Your Honor, that
    12    we're kind of the funnel through this information.  We have
    13    calls and we have another call coming up with all of these
    14    firms.  But sometimes it's not always the easiest to get ahold
    15    of everybody, and we'll do the best we can, as we continue to
    16    do.
    17         **JUDGE JONES:**  Right.  And just make sure you do have,
    18    Mr. Aylstock, in your hands blank authorizations so it's simply
    19    a matter of, when the issue is resolved, you can fill in the
    20    provider, and it's not a process where the Court says, yes,
    21    that authorization is appropriate, and then you have to go to
    22    the law firm, and then they have to track down the client and
    23    get their client to sign it, and then the client has to send it
    24    to the lawyer, and then the lawyer sends it to Plaintiffs'
    25    leadership.  We don't want that process.

1          **MR. AYLSTOCK:**  Correct, I completely agree.  That was

2     added to the agenda for our call.

3          **JUDGE RODGERS:**  I think in *Abilify* I saw reference to

4     multiple waivers.  How many did you all maintain in *Abilify*?

5          **MR. AYLSTOCK:**  Your Honor, I'd be reluctant to say a

6     number off the top of my head.  I think we would want to

7     maintain multiple ones in case there are multiple new providers

8     identified.  I think this is probably going to be less of an

9     issue than *Abilify* because most of the providers here are VA

10    and we'll be getting them with the VA records, and in *Abilify*

11    people had a tendency to hop around a lot more.  So we'll be

12    getting multiple ones but maybe five.

13         **JUDGE RODGERS:**  I would prefer you err on the side of

14    too many than not enough.  You can always tell the client that,

15    to the extent they're not needed, they'll be disposed of,

16    they'll be shredded, whatever, they'll be disposed of.  And

17    you'll also be able to convey to them to hopefully give them

18    some comfort that no records are going to be obtained that you,

19    the plaintiff's attorney, didn't authorize or the Court didn't

20    authorize.

21         **MR. AYLSTOCK:**  Yes.

22         **MR. BROCK:**  I think you should get 20 because I think

23    there's going to be a fair amount of activity pre-military,

24    during military, post-military with regard to physician and

25    hospital interaction.  I don't think this is going to be a

1      three or four or five kind of exercise.

2                    **MR. AYLSTOCK:**  Now, that concerns me, Mr. Brock.

3                    **JUDGE RODGERS:**  Well, I was going to suggest ten.  I

4      think you should obtain ten.  And if you don't need ten, then

5      you shred what you don't need later.

6                    **MR. AYLSTOCK:**  Will do so, Judge.

7                    **JUDGE RODGERS:**  I have another related question.  I

8      noted in the Defendants' letter the reference to Mr. Adkins.

9      And it sounds like that is something that Bryan has addressed

10     and can address further with the Defendants off line.

11                   But I did also note that there are, I believe it was,

12     20 out of 25 of the bellwether plaintiffs who have not returned

13     any authorizations.  So we need a timetable or a deadline, a

14     time frame here for getting these authorizations to the

15     Defense.

16                   **MR. AYLSTOCK:**  Yes, Your Honor.

17                   **JUDGE RODGERS:**  What are y'all operating under now?

18                   **MR. AYLSTOCK:**  We're operating under as soon as

19     humanly possible already, Judge.  We had a call with all of

20     these firms.  We distributed these authorizations.  We've been

21     in contact through Leadership as well as Early Vetting.

22                   There's been some questions that were raised about

23     various things, for example, I never had an educational -- I

24     never went to college, so do I have to fill this out?  So we're

25     getting back and forth as the information gets filtered back

1      and forth between the Leadership and Early Vetting and those

2      firms and those clients, one of whom is overseas as well, and

3      the COVID is certainly complicating things.

4           So we anticipate more coming back as soon as today.

5      The process is that the firms get them back and then they send

6      them to my office.  My office is -- we do have mail here and so

7      forth, so they're alerting us whenever anything like this comes

8      in.  It does take a little time.

9           We have asked -- and we just received a few minutes

10     ago -- although, I don't know if we got the address, Mr.

11     Nomellini.  We need the address for which to send these forms,

12     the wet signatures for the forms we already have, because we've

13     asked and we need that address so we can at least get that

14     process moving.

15          So at this point nothing has happened because the

16     Defendants don't have the wet signatures.  They're sitting in

17     my office waiting on an address for us to send them to.

18          But I think that within the next ten days to two weeks

19     we should be able to have most if not all of them.  But it's

20     difficult with the overseas people to get a wet signature back,

21     it's difficult with the COVID, and one client has a newborn,

22     and so forth.  So it's just a myriad of issues.

23          **JUDGE RODGERS:**  Well, you've been engaged in this

24     process for, what, a couple of weeks, two or three weeks now?

25          **MR. AYLSTOCK:**  A couple of weeks, Judge.  And we had

```
1    our call the week -- the end of the week before last, I guess.
2    So they're going out regular mail and FedEx, and that's a
3    little more hit or miss than normal given the problems of
4    COVID.
5            JUDGE RODGERS:  Well, I certainly understand with the
6    overseas plaintiffs.  But what I'm going to ask is for Judge
7    Herndon to get involved.  I want sort of an inventory, if you
8    will, provided or an accounting I guess to Judge Herndon with
9    all of these plaintiffs and when the authorizations were
10   requested of individual counsel, when they were received by you
11   all, when they were provided to the Defendants, and the number
12   of authorizations.  I want to be able to keep track of this.
13           MR. AYLSTOCK:  Be happy to do so, Judge.
14           JUDGE RODGERS:  And you say 10 to 14 days you feel
15   like you will have them all provided.  That would be terrific.
16   I hope you're able to provide some along the way, obviously, on
17   a rolling basis.
18           MR. AYLSTOCK:  We have been.
19           JUDGE RODGERS:  Right, okay.  And at the end of that
20   -- I'll just make it a 14-day period -- if they aren't all
21   provided, I'm going to enter a show cause order to the
22   individual plaintiff's counsel as to why these haven't been
23   provided, so you can let them know that.
24           MR. AYLSTOCK:  Will do so, Judge.
25           JUDGE RODGERS:  Okay.  Anything else on
```

1    authorizations?

2            **MR. AYLSTOCK:**   Thank you.   None from the Plaintiffs,

3    Judge.

4            **MR. WASDIN:**   There is one more thing, yes, Your Honor.

5    This is Nick Wasdin.   There's one more thing coming down the

6    pike, I think, just to put it on Judge Jones's radar.   Maybe it

7    won't end up being an issue.

8            On the March 24th conference, one of the issues that

9    was in dispute was whether we would do mental health

10   authorizations.   And the resolution of that by Judge Jones was

11   let's figure out for each plaintiff if that issue is in dispute

12   via interrogatory.   And Judge Jones gave us some language for

13   example interrogatories to send, and if they answered yes to

14   those questions, we would get that authorization.

15           We sent the rogs.   We got back like boilerplate

16   objections.   So we'll see if those do get answered.   But it may

17   be that we -- if we don't do the rogs or can't get the rogs

18   answered, we need a different process for figuring out whether

19   any particular plaintiff is putting mental health at issue.

20           **JUDGE RODGERS:**   Okay.   Well, that --

21           **JUDGE JONES:**   Well, I --

22           **JUDGE RODGERS:**   Go ahead, Judge Jones.

23           **JUDGE JONES:**   I was just going to say, if that's an

24   issue, chat with the Plaintiffs about the objections.   And if

25   you can't resolve them in fairly short order, file a motion,

1    and I can rule on it pretty quickly.

2              **MR. WASDIN:**  Yes, Your Honor, will do.

3              **JUDGE RODGERS:**  Right.  It would be my preference to

4    have that issue, to the extent there is an issue, resolved, if

5    not by the time or before the April 24th CMC, then at the CMC,

6    which is -- another item on my agenda is just to make sure you

7    all are notified that I am going to convert the April CMC to a

8    conference call with Leadership only just like we did in March,

9    so everyone is aware of that.

10             **MR. AYLSTOCK:**  Sounds good, Judge.

11             **MR. BROCK:**  Thank you.

12             **JUDGE RODGERS:**  So let me ask if -- because I am not

13   very clear at this moment on where things stand with the VA,

14   and I don't know if you all are better informed than I am about

15   that.

16             I know Judge Herndon has had some communications with

17   Jackie Snead.  I've been aware of those.  As far as I know,

18   we're waiting to hear back from her on a couple of items.  But

19   I also understood she was going to be getting with the parties

20   in regards to the VA's proposed new forms.

21             Have the parties had any recent discussion with

22   Ms. Snead?

23             **MR. AYLSTOCK:**  Your Honor, this is Bryan.  As far as

24   the -- no, the answer I guess is no, not after our call that we

25   had with Judge Herndon and all of the parties participating.  I

1    did follow up with Roma because I had provided to Ms. Snead the

2    instructions for how to convey the documents, which are

3    electronic.  And I understand that Roma and Jackie have been in

4    fairly constant communication about that and that that process

5    looks like it's going to work.

6              I asked Roma this morning if there had been any

7    progress or any documents uploaded, because what we heard on

8    our call with Jackie -- with Ms. Snead I guess a week ago now

9    is that they were imminent but none have been provided as yet.

10   And we've asked BrownGreer to notify us the second they're in

11   so we can make sure they get reviewed and sent.

12             **JUDGE RODGERS:**  Can I ask --

13             **MR. NOMELLINI:**  Judge --

14             **JUDGE RODGERS:**  One moment and then I'll -- I think

15   that was Mark maybe.  I'd also like to ask via Ms. Snead does

16   the VA have all wet signatures for every plaintiff at this

17   point based on the forms that we thought the VA had approved?

18             **MR. AYLSTOCK:**  So there's -- except for two, Judge.

19   One is Mr. Palanki, who was discussed at our prior CMC.  We did

20   provide and do have -- what we have is a picture of the signed

21   form.  He's the overseas servicemember, Your Honor.  So he sent

22   it back to us, but we do not have it in our possession yet to

23   send to Ms. Snead.

24             The other one I believe is Mr. Taylor.  And we've been

25   following up through his counsel repeatedly.  He is represented

1    by the Hensley firm, I believe.  And both Early Vetting and

2    Leadership firms have been in communication as recently as this

3    morning and have been told that it's in the mail.  He's the one

4    with the newborn child, so he's been out of pocket because of

5    that.

6         **JUDGE RODGERS:**  Well, I understand, you know, a

7    newborn is a hectic time.  But it's just a signature.

8         **MR. AYLSTOCK:**  Understood, Your Honor.

9         **JUDGE RODGERS:**  How long have you been told it's,

10   quote, "in the mail"?

11        **MR. AYLSTOCK:**  Too long.  I think Ms. Hoekstra may be

12   able to -- or Ms. Hunt, I'm not sure if you're on.  I'm getting

13   the information from them, so I think it's been at least a few

14   days, maybe since last week.  I'm not sure exactly, Judge.

15        **MS. HOEKSTRA:**  Yes.

16        **MR. AYLSTOCK:**  But any time in my mind is too long

17   because I'm doing everything I can to push this along.

18        **JUDGE RODGERS:**  Yeah.  So, Ms. Hoekstra, are you on

19   the line?

20        **MS. HOEKSTRA:**  Yes, Your Honor, I am.  We've spoken

21   with the counsel as early as this morning.  They indicated to

22   us last Friday that they had spoken with the client, he

23   explained he had put it in the mail, but he wasn't sure which

24   day.  He seemed a little confused about the specifics.  He had

25   received the additional authorization from their office.  They

1    had sent an additional copy of the VA authorization with that,

2    and he indicated to them that he was signing and returning all

3    of them.

4         I haven't gotten an update or response yet today, but

5    he did have -- they had made additional contact and have made

6    additional arrangements to get the authorizations back as

7    recently as last Thursday or Friday.

8         **MR. AYLSTOCK:**  So they'll be coming back to the

9    Hensley firm, I believe, and then they'll get them to us.  So

10   for Ms. Anello and Garcia, we were able to make arrangements

11   where she sent it directly to Jackie and made sure they had the

12   right information to save one step, so maybe we could do the

13   same here.

14        **MS. HOEKSTRA:**  It depends on their mail situation in

15   terms of COVID and how their office is handling it.  We've been

16   coordinating with firms based on that.

17        **JUDGE RODGERS:**  Well, I'm going to ask Tevenia to

18   check in Wednesday afternoon.  And if you all have not --

19   you're saying you're directing the Hensley firm to send it

20   straight to Ms. Snead?  Is that --

21        **MR. AYLSTOCK:**  At this point, that's what we'd

22   suggest, Judge, just to save a day or two on the --

23        **JUDGE RODGERS:**  Right, I agree.  So, actually, Tevenia

24   will check with Ms. Snead.  If she hasn't received it by

25   Wednesday afternoon, I'm going to enter an order on Thursday.

1    So they need to get this done.

2              **MR. AYLSTOCK:**  We will let them know, Judge.

3              **JUDGE RODGERS:**  All right, very good.  And with

4    Mr. Palanki, you're expecting that -- you said you had a

5    picture of it.  You think it's in transit, the actual signed --

6              **MR. AYLSTOCK:**  Ms. Betsy Williams spoke with them, I

7    believe.

8              Is that right, Bets, is it on the way to our office?

9              **MS. HOEKSTRA:**  It is on the way to us, Bryan.  They

10   took a picture and they sent a picture of it when it was being

11   sent from the client.  Our understanding is they received it

12   and they're forwarding it to our attention, but we'll follow up

13   on the timing.

14             **JUDGE RODGERS:**  Okay.  Please let Tevenia know what

15   you find out as far as when we can all expect that to be

16   received.

17             **MR. AYLSTOCK:**  Yes, Your Honor.

18             **JUDGE RODGERS:**  But, again, let me confirm, Bryan, I

19   believe I heard you just say that to date BrownGreer is saying

20   no documents have been uploaded or otherwise received from the

21   VA?

22             **MR. AYLSTOCK:**  That's correct, as of an email that

23   Roma sent to Mr. Nomellini, Judge Herndon, and I, I suppose,

24   just a few minutes ago, if I can find it.

25             **MR. NOMELLINI:**  Yes, it was 11:46.  And I can forward

1    this to Tevenia, if you'd like, Your Honor.  It's an email from

2    Roma to myself, Bryan, and Judge Herndon.  Roma says, "I just

3    exchanged emails with Jackie and I understand from those that

4    she has not yet received the records."

5             **JUDGE RODGERS:**  Yes, if you would, Mark, thank you, if

6    you'll forward that on to us.

7             **MR. NOMELLINI:**  Will do that.

8             **JUDGE RODGERS:**  Thanks.  And I will do my best to have

9    a conversation with Ms. Snead and Judge Herndon this week to

10   hopefully get us back on track with the VA.

11            And with DoD, has anything been provided there?

12            **MR. AYLSTOCK:**  There have been some productions for

13   these, and I think there was additional productions that were

14   going to be forthcoming.  And specifically I asked Major Evans

15   about the audiograms that are contained indoors that both sides

16   jointly requested, and he confirmed that, yes, those were on

17   the list to be provided, but we haven't received a production

18   since our call with them either.

19            **JUDGE RODGERS:**  How are those to be produced?  What's

20   the mechanism?

21            **MR. AYLSTOCK:**  I believe that they're doing hard copy

22   printouts of them and then sending them.  I had discussed with

23   them -- and it might have even been at our meeting at the

24   Pentagon -- the possibility of maybe getting an extract from

25   the database.

1          Going forward, as we progress down this road beyond

2     the 25, that was going to be my thought to revisit that,

3     because hard copy printouts and individual searches are not

4     very efficient when you could get some database people to just

5     do an extract of many more clients.  But at this point, I

6     believe it's going to be hard copy printouts, but I can't swear

7     to that, Judge.

8          **JUDGE RODGERS:**  Okay.  Well, it sounds like maybe a

9     call with Major Evans and Kim is in order as well, so I'll try

10    to set that up as well and report back to all of you if I learn

11    anything new.

12         Mark, do you have something?

13         **MR. NOMELLINI:**  Yes, Your Honor.  So on the last call

14    with Judge Herndon and Bryan and others, one of the things that

15    Major Kim and Major Evans reported is that they are going to be

16    working on a separate authorization form for DoD medical

17    records that they'll be providing for plaintiffs to execute.

18         I don't know if Your Honor was already made aware of

19    that, but I believe that's something that Major Kim and Major

20    Evans and Jackie are working on.

21         **JUDGE RODGERS:**  Well, I did see -- I'll have to say,

22    much to my dismay, I did see some email traffic about that

23    apparently they are going to require the wet signature as well.

24         Plaintiffs, were you all aware of that?

25         **MR. AYLSTOCK:**  Yes, Your Honor.  We were waiting on

1    that form from them.  And obviously, if we get it sooner and

2    quit bombarding the servicemembers with more and more forms,

3    we'd do it all in one.  But we're going to do what we have to

4    do to meet all the deadlines.

5              **JUDGE RODGERS:**  But, Bryan, is it your -- and Mark,

6    too -- is it your understanding that the DoD has produced some

7    hard copy files for records to individual plaintiffs already,

8    that that's been done?

9              **MR. AYLSTOCK:**  Early on when the Court picked the 175,

10   we did a request for all of the active duty people, I believe,

11   and maybe Ms. Hoekstra can correct me.  But we did get a lot of

12   DD 214s, we got some other records related to that, and maybe

13   some 2216s and 15s.

14             So we did get some and it seemed to be working.  But

15   then we heard from them on our call that they wanted to do it a

16   different way and that would make it more efficient and

17   quicker.  And we were fine with that, but just we're awaiting

18   the exact form with the pre-filled-out language from Ms. Snead,

19   or maybe it was Major Evans, but one of the two, so we didn't

20   have to go back and forth again.

21             **JUDGE RODGERS:**  Okay.

22             **JUDGE HERNDON:**  The last thing I hear from Ms. Snead

23   is that she and Major Kim just haven't been able to work that

24   out yet.  So I'm just not getting any information from them

25   other than, it's going to be today, oh, sorry, it can't be

1   today, it will be tomorrow, and then there's a delay.  So I

2   don't know what's going on.

3           **JUDGE RODGERS:**  Well, maybe I'll give my good friend

4   Michael Fucci a call and see if I can't speed things up.  I'm

5   sure they're obviously very distracted with the COVID-19

6   response and dealing with those issues, but hopefully they can

7   carve out a little bit of time for us.

8           **JUDGE HERNDON:**  I assume that's the issue.

9           **JUDGE RODGERS:**  A couple of just final matters I had,

10  logistical matters on my agenda.  The July CMC, I am planning

11  to move it to July 29th.  And I will enter an order to that

12  effect, unless someone has a problem with that date.

13          **MR. AYLSTOCK:**  That works for the Plaintiffs, Your

14  Honor.

15          **MR. BROCK:**  I hope we'll be able to see you in person

16  by then.

17          **JUDGE RODGERS:**  I do, too.  If you are able to, we

18  will be in my old new courtroom.

19          **MR. AYLSTOCK:**  I can't wait, Judge.

20          **JUDGE RODGERS:**  Actually, we're moving.  That process

21  is ongoing in spite of the virus.  So we should be over there

22  the first week of May.

23          And I already mentioned about the April CMC, I'm going

24  to convert that to a call with Leadership only.

25          And do let us know -- you will, we just discussed this

1    -- about the interrogatories, if there is an issue there that

2    we need to resolve before or at that CMC.

3        Along those lines, I would like an agenda in advance

4    of the CMC, and I'd prefer it a week ahead of time.  If that's

5    not possible, then let me ask for three days.  It's scheduled

6    for Friday, I'm assuming in the morning.  So if I could have

7    the agenda by close of business on Tuesday, that would be

8    helpful.

9        **MR. AYLSTOCK:**  That won't be a problem, Judge.  And by

10   Friday you had indicated the parties should go ahead and brief

11   the issue on remote depositions, so we were intending to

12   provide that to Your Honor on Friday.

13       **MS. BRANSCOME:**  This is Kim.  I did want to raise one

14   issue with respect to the remote depositions.  I know, Your

15   Honor, you had asked us, if we thought that was something that

16   should be teed up at the next CMC, to address that a week in

17   advance, and certainly we will in terms of your timing and

18   giving you enough time to address it.

19       But I wanted to raise the possibility that we actually

20   push that to the next CMC only because one of the things we

21   talked about during the last discussion was, you know,

22   addressing it when we had a better sense of how sort of the

23   country was going to come back online and what are considered

24   essential services under the various orders.  Given the fact

25   that, for most states, those orders have now been extended

1    through the end of April, I'm not sure that we have much more

2    clarity on this issue.

3          And we also, you know, just -- we've been discussing

4    it basically all morning, you know, we've had a slow down in

5    terms of records with respect to authorizations, you know,

6    records coming in from the military.  And so I would expect

7    that the vast majority of depositions will not be occurring

8    until the summer, in any event, despite the fact that we would

9    all love to get started earlier.  We also have received no

10   indication that the government is opening up again in terms of

11   those depositions.

12         So, from our perspective, we were just going to raise

13   the possibility that this may not be ripe yet, or even if it

14   is, we may be briefing a set of circumstances that, by time we

15   run into any depositions, have completely changed.  And so, I

16   wanted to raise that.

17         We have not had -- I think the Plaintiffs were going

18   to give us some information about remote depositions, and we

19   candidly have not met and conferred just yet.  But I know that

20   was in your last order, so I wanted to raise it for the group's

21   consideration to push it back.

22         **JUDGE RODGERS:**  Yeah, Bryan, I guess I tend to agree

23   with Kim.  We don't even have authorizations yet to the

24   Defendants.  I don't see how -- there's no possibility of

25   depositions taking place in May, even remotely.

1          **MR. AYLSTOCK:**  Yeah.  And obviously the facts do

2    change rapidly on the ground.  I don't know when -- none of us

3    know when it will have -- it will kind of be lifted, which is

4    why I think going ahead and getting the issue teed up so Your

5    Honor can look at the legal issue and decide when that might be

6    appropriate.

7          The government did reach out and ask if the parties

8    wanted them to look for dates in May, and I think the answer to

9    that was yes, let them know that we would like dates.  And I

10   don't know if that happened from the Kirkland side, because

11   these were Kirkland-requested depositions.  We still have some

12   depositions outstanding on the liability side that were pushed

13   that we'd like to talk about and not delay, because I know the

14   summer will be very busy with plaintiff depositions and so

15   forth.

16         So I don't know that there's a reason to wait.  What I

17   heard Ms. Branscome say at the last hearing was, we oppose

18   that, period.  But if there's room for a meet and confer, happy

19   to do so.

20         **JUDGE RODGERS:**  So these are what I'll call sort of

21   core discovery, these are not plaintiff-specific discovery

22   depositions that we're talking about?

23         **MR. AYLSTOCK:**  Yes, Your Honor.

24         **JUDGE RODGERS:**  All right.  Well, Kim, then let me

25   turn back to you.  The issue about records doesn't really

1    pertain to these depos.  I forgot about the government witness

2    depos you all still want to take.  And so I think we need to go

3    ahead and get this teed up and let us make a decision on

4    whether remote depositions are going to be utilized in the

5    event the stay-in-place order is -- *(inaudible)* --

6           **MS. BRANSCOME:**  So if what the Plaintiffs are asking

7    for is the remaining government depositions and the -- you

8    know, I think there may be a few individuals from 3M

9    depositions that were postponed, you know, we can certainly

10   meet and confer.

11          One of the meet and confer issues was even just

12   understanding what the Plaintiffs were proposing.  I think

13   there was some discussion during the last one about the

14   Plaintiffs had received a special presentation from the

15   deposition vendor.

16          My concern is that the orders governing the different

17   states in which either the lawyers or the witnesses live have

18   now all been extended, or some of them have not, and just the

19   state of play of even what a remote deposition would look like

20   in order for the Defendants to be able to address our due

21   process concerns is unknown.  I think that's the problem from

22   our perspective.

23          And because Your Honor maintains the deadline for the

24   government contractor briefing, there's no reason why the core

25   discovery depositions, as it were, would need to occur in May

1    and nor do we know that the government would still offer dates

2    in May.  That request was made before the guidelines were

3    extended even by the President.

4            And so I don't know that we even know the government's

5    position right now on whether they would put up their deponents

6    in May or what their position is on a remote deposition, and I

7    just think it's so much of a moving target in terms of what's

8    permissible in terms of us meeting with our witnesses to

9    prepare them.  I suspect that is not considered an essential

10   service under most of these stay-in-place orders, and so, even

11   if we could get it done, you know, court reporters can't be in

12   the location, we can't prep our witnesses.

13           But the point to me raising it now was not so much to

14   get into the substance of whether they're appropriate but

15   simply to even argue about the substance is a moving target,

16   and so that's my concern.

17           **JUDGE RODGERS:**  That target, we don't have any idea

18   when that target is going to stop moving.  So there's no harm

19   in going ahead and addressing your due process concerns now.

20   For purposes of your presentation to the Court, I guess assume

21   a worst case scenario and make your argument from there.

22           **MS. BRANSCOME:**  Okay.

23           **JUDGE RODGERS:**  But we're conducting criminal

24   proceedings remotely.

25           **MS. BRANSCOME:**  Understood.

1          **JUDGE RODGERS:**  The court reporter is in one location,

2     the defendant is in jail, defense attorneys in another

3     location, judge in another location.  I mean, it's happening

4     all over the country.

5          **MS. BRANSCOME:**  Certainly.  Of course, the prejudice

6     analysis is very different for those situations, you know,

7     so -- but I understand, Your Honor.  We will brief this in

8     relation to the government and remaining company depositions,

9     and we will assume that the current stay-in-place orders will

10    remain functional through that time period.  So that's at least

11    the framework under which we are briefing it, if that makes

12    sense.

13         **JUDGE RODGERS:**  Yes, and that's what I've asked you to

14    do.  And you'll, I know, do a good job of educating me on the

15    prejudice and how it differs from the criminal context, but

16    I'll look forward to both sides' briefs.

17         And, Judge Jones, I may get you involved in this as

18    well, since you're very familiar with the discovery related

19    issues and also in handling a number of proceedings remotely

20    yourself.

21         I said three days for the agenda before the 24th CMC,

22    but then I heard that there was a reference to a week before as

23    far as the remote deposition issue because I think I probably

24    said before I would prefer the agenda the week ahead of time.

25         When do you all want to have this presented to us, the

1    remote deposition issue?

2            **MR. AYLSTOCK:**  We'll be ready by Friday, Judge, but

3    whatever Your Honor prefers is fine.

4            **MS. BRANSCOME:**  Same here, Your Honor, it's your

5    preference.

6            **MR. BROCK:**  I think we would like to see what the

7    Plaintiffs are proposing.  We could obviously talk about it a

8    little bit, but I'm not sure that we know right now who we are

9    talking about taking or what their proposal is for doing that.

10   So we could meet and confer and file simultaneous briefs or we

11   could get one to you after they've --

12           **JUDGE RODGERS:**  I thought you would meet and confer

13   and then you would go ahead and just file simultaneous briefs.

14   And you can do that one week ahead so that I have the time I

15   need to consider this.  So the Friday before the 24th.  Does

16   that make sense?

17           **MR. AYLSTOCK:**  Yes, Your Honor, be happy to do that.

18           **JUDGE RODGERS:**  Mike and Kim, that's good with you

19   all?

20           **MR. BROCK:**  Yes, that's fine.  That would be this

21   Friday, so we'll get started talking about that and be ready.

22           **JUDGE RODGERS:**  I'm losing track of dates.  Sorry

23   about that.  You're right.

24           And then also I would like to see -- Bryan, you did

25   mention in our last call a presentation that I guess you had

1    seen by a vendor.  So, if that's what you're proposing to use,

2    if you could -- I don't know, do you have a link to it?

3              **MR. AYLSTOCK:**  Yes, it's a link to basically a YouTube

4    video on a demonstration.  And it's not -- there's no magic to

5    it.  This was from Golkow.  Kirkland has been using Veritext.

6    Veritext also has -- they all have remote deposition

7    capabilities.  Our understanding is depositions are proceeding

8    in other MDLs using this technology, so I'm happy to share

9    that.  And I'm sure Veritext could do it as well for Kirkland.

10   But I'll email that link around.

11             **JUDGE RODGERS:**  Well, email the link around.

12             And then, 3M, if you have a different technology that

13   you think is better, then share that as well.

14             **MS. BRANSCOME:**  Certainly.

15             **JUDGE RODGERS:**  I believe that covers everything on my

16   agenda.  Does anyone have anything else that we need to

17   discuss?

18             **MR. AYLSTOCK:**  Nothing from the Plaintiffs, Your

19   Honor.

20             **JUDGE RODGERS:**  From 3M?

21             **MS. BRANSCOME:**  Nothing from us, Your Honor.

22             **JUDGE RODGERS:**  All right.  Then, thank you all very

23   much, and I look forward to talking with you all again on the

24   24th.

25             **MR. AYLSTOCK:**  Thank you, Judge.

1      **JUDGE RODGERS:**  As always, if something comes up in

2   the meantime, just let us know.

3      **MR. AYLSTOCK:**   Okay.

4      *(Proceedings concluded at 12:35 p.m.)*

5      --------------------

6   *I certify that the foregoing is a correct transcript from the*
    *record of proceedings in the above-entitled matter.   Any*
7   *redaction of personal data identifiers pursuant to the Judicial*
    *Conference Policy on Privacy are noted within the transcript.*

8

9      *s/Donna L. Boland*                    *4-16-2020*
10     *Donna L. Boland, RPR, FCRR*           *Date*
       *Official Court Reporter*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25