# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-02885-MCR-GRJ |
| | Judge M. Casey Rodgers |
| This Document Relates to All Cases | Magistrate Judge Gary R. Jones |
| | CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE GOVERNMENT CONTRACTOR DEFENSE

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

I. THE GOVERNMENT CONTRACTOR DEFENSE PREEMPTS PLAINTIFFS' DESIGN DEFECT CLAIMS.................................................2

    A. The Government Approved Reasonably Precise Specifications. .........2

    B. The CAEv2 Conformed To The Approved Length Specification. ......................................................................................5

    C. The Government Was On Notice Of The Consequences Of Shortening The Length. .........................................................................6

        1. The CAEv2 Provided Attenuation Deemed Adequate By The Military. ..............................................................................6

        2. Aearo Warned The Military Of Any Known "Dangers."...........8

        3. The Military Was On Notice Of Any "Dangers" From Its Own Testing And Use............................................................12

II. THE GOVERNMENT CONTRACTOR DEFENSE PREEMPTS PLAINTIFFS' FAILURE-TO-WARN CLAIMS. ........................................12

CONCLUSION ...................................................................................................15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Boyle v. United Techs. Corp.*,
  487 U.S. 500 (1988) .................................................................................*passim*

*Cf. Robinson v. Tyson Foods, Inc.*,
  595 F.3d 1269 (11th Cir. 2010) ............................................................................6

*Gray v. Lockheed Aeronautical Sys. Co.*,
  125 F.3d 1371 (11th Cir. 1997) ......................................................................3, 4

*Harduvel v. Gen. Dynamics Corp.*,
  878 F.2d 1311 (11th Cir. 1989) ............................................................................9

*In re Agent Orange*,
  304 F. Supp. 2d 404 (E.D.N.Y. 2004) ................................................................12

*In re Agent Orange*,
  517 F.3d 76, 98 (2d Cir. 2008) ......................................................................6, 11

*Koopmann v. U.S. Dept't of Transp.*,
  335 F. Supp. 3d 556 (S.D.N.Y. 2018) ................................................................10

*United States v. Cruz*,
  805 F.2d 1464 (11th Cir. 1986) ..........................................................................13

*United States v. Mena*,
  863 F.2d 1522 (11th Cir. 1989) ..........................................................................13

# INTRODUCTION

Plaintiffs' opposition does not contest *any* of the material facts making clear that the government contractor defense applies, including that:

1. Aearo initially designed a longer CAEv2 prototype.

2. Ohlin rejected that design, and identified three reasons the military needed a shorter plug.

3. Aearo thereafter shortened the CAEv2 to its current length.

4. Ohlin determined the modified samples were "acceptable," and submitted them as the "specification" for the National Stock Number.

5. Military audiologists understood that the length of the CAEv2 might "prevent[] them from inserting the earplug far enough into a soldier's ear canal," or cause the opposing flanges to "touch the [user's] tragus and push out of the ear."

6. Ohlin instructed military audiologists to fold back the flanges as needed to get a good fit.

(Dkt._1071 at 5-8, 14-16.)  These facts alone demonstrate that the government made an informed decision to use the CAEv2, and thus that summary judgment for defendants is warranted.  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 511 (1988). This Court should reject plaintiffs' attempt to reweigh the many factors the military considered and declare that, in hindsight, the military made a mistake and approved a product that was defective.

# ARGUMENT

**I. The Government Contractor Defense Preempts Plaintiffs' Design Defect Claims.** [1]

Plaintiffs concede that the *Boyle* analysis depends only on the "*design feature in question*." (Dkt._1072 at 18.) Plaintiffs argue that the Flange Memo identified "at least two" defects. (Dkt._1089 at 6) But the one and only **design feature** discussed is the military's decision to shorten the earplug. (Ex._24; Dkt._1088 at 7-8.) Both of plaintiffs' alleged defects—the "short stem and flange positioning"—resulted directly from the product's length and were resolved by the flange-fold instruction. (*Id.*)

**A. The Government Approved Reasonably Precise Specifications.**

Plaintiffs do not contest the essential facts laid out in the introduction above. In light of that record, there is no question that the U.S. military, through Ohlin, "approved" the length of the CAEv2 after a substantive back-and-forth with Aearo. Plaintiffs' arguments to the contrary should be rejected.

*First*, plaintiffs argue that there are no "military specifications." (Dkt._1089 at 18-19.) But *Boyle* does not require that the government *create* specifications, it requires that it *approve* them. 487 U.S. at 512. And even putting aside that the

---

[1] Plaintiffs two "threshold" arguments (Dkt._1089 at 15-16) fail for the reasons stated in defendants' opposition to plaintiffs' motion for summary judgment. (Dkt._1088 at 12-18.)

military *approved* the length of the CAEv2, it was the military that directed the 1/4" reduction in the first place. (Dkt._1071 at 7.)

According to plaintiffs, Ohlin merely "acquiesced" in this decision. (Dkt._1089 at 4.) But he **rejected** the longer design and threatened to cancel the project unless the plug was shortened. (Exs._4-5.) Plaintiffs' argument—essentially, that by "it's a showstopper if we can't get the modification" Ohlin really meant "we are indifferent but if Aearo insists we will go along with it"—is impossible to credit. (*Cf.* Ex._67 at 524:24-525:2 (plaintiffs' counsel: "It's a show stopper … means they're not going to be able to … use this plug, in the military.").)

**Second**, plaintiffs argue that Ohlin's length specification was not "reasonably precise." (Dkt._1089 at 20.) This argument fails for the reasons stated in defendants' opposition, including that Ohlin approved the CAEv2 *after* it had been shortened, and thus knew exactly *how* that was accomplished when he determined it was "acceptable." (Dkt._1088 at 20-21.) Plaintiffs' reliance on *Gray* fails for this reason. In *Gray*, a "general narrative description" of a product to be developed in the future was not "reasonably precise." 125 F.3d 1371, 1378 (11th Cir. 1997). Ohlin was not looking at a "general narrative description" when he approved the length of the CAEv2—*he was looking at a finished production sample*.

**Third**, plaintiffs argue that Ohlin did not "meaningfully" approve the final length because his review was "at most a 'rubber stamp.'" (Dkt._1089 at 21-23.)

3

But far from automatically approving the product without consideration, Ohlin held the initial production samples for ***over a year***, during which time he performed sufficient evaluation to identify three different tactical issues caused by the longer stem: (1) it did not fit into the carrying case; (2) it subjected the plug to wind noise; and (3) it interfered with soldiers' ability to fasten the chin strap on the Kevlar helmet. (Dkt._1071 at 5-8.) As a result, he ***rejected*** the initial design, communicated those issues to Aearo, and directed that the plug be shortened. (*Id.*) After Aearo sent modified samples, Ohlin determined they were "acceptable" and used them as the "specifications" submitted with the NSN request. (*Id.*) That record plainly demonstrates "meaningful" consideration of the allegedly defective length.

For these reasons, plaintiffs' reliance on *Gray* is again misplaced. (Dkt._1089 at 21-22.) As plaintiffs note, the missing element in *Gray* was consideration of "the specific product feature at issue." (*Id.*) Here, unlike *Gray*, Ohlin considered *and changed* the length of the CAEv2.

Plaintiffs further argue that the June 30, 1999 testing conducted by the Army Research Laboratory "did not test the final product," and thus does not support the military's review. (Dkt._1089 at 23.) Of course, Ohlin had *already* approved the shortened CAEv2 over a month and a half earlier, and thus plaintiffs' characterization of this test is irrelevant. In any event, it makes absolutely no sense that three months after Ohlin said the longer version was a "showstopper," and one

and a half months after he approved the shortened plug, ARL would perform a "quick response effort" to help develop "safety release documentation" on an obsolete prior version. (Dkt._1071 at Ex. 16.)[2]

### B.  The CAEv2 Conformed To The Approved Length Specification.

Plaintiffs do not contest that the CAEv2 conformed to *the length* Ohlin approved. (Dkt._1089 at 23-24.) Rather, plaintiffs argue that it did not meet *other* specifications, including the "dual mode specification" in the MPID. (*Id.* (citing PX37).) This argument fails for two reasons.

***First***, plaintiffs concede that *Boyle* depends only on the "*design feature in question*." (Dkt._1072 at 18.) Here, plaintiffs assert that the CAEv2 failed to protect users "due to the alleged length specification." (Dkt._1089 at 24.) Thus, the relevant question is not whether the CAEv2 complied with *all* specifications, but whether it conformed to an approved specification for the allegedly defective length. (*Id.*) As noted above, plaintiffs do not contest that it did.

***Second***, even assuming *all* specifications are relevant, the "dual mode" specification plaintiffs rely on is contained in the MPID. (*Id.* at 24 (citing PX37).) According to plaintiffs, *those* specifications "apply to 'equal items,' not the CAEv2."

---

[2]  Plaintiffs rely on an Aearo memo dated July 1999 that notes "the length of the short plug will need to be determined." (Dkt._1089 at 23.) But that as of July 1999 the Army had not yet given *Aearo* final sign off does not mean that the June 30 testing was of the older, longer version.

5

(Dkt._1072 at 20.) Given plaintiffs' position, the Court can assume for purposes of this motion that the specifications in the MPID apply to "equal" items only.[3] Regardless, the CAEv2 *is* a "dual mode" earplug that meets the MPID's attenuation specification at every frequency. (Dkt._1071 at 21.)

### C. The Government Was On Notice Of The Consequences Of Shortening The Length.

#### 1. The CAEv2 Provided Attenuation Deemed Adequate By The Military.

According to plaintiffs, consideration of whether something is a "danger" that requires a *Boyle* warning "shortcut[s] the inquiry" and "usurp[s] the jury." (Dkt._1089 at 25-26.) But courts are free to consider this issue when deciding summary judgment. In *Agent Orange*, the Second Circuit held that *Boyle* does not require a defendant to share "all known hazards with the government, irrespective of whether those hazards allegedly not conveyed would have had an impact on the government's exercise of discretion about the design defect alleged." 517 F.3d 76, 98 (2d Cir. 2008). The court in that case held that the contractor defense applied where the allegedly undisclosed "danger" would not have "influenced the military's

---

[3] *Cf. Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010) ("The purpose of judicial estoppel is 'to protect the integrity of the judicial process by prohibiting parties from changing positions according to the exigencies of the moment.'").

6

conclusion that 'operational use' of [the product] posed 'no health hazard.'" *Id.* at 101.

The same is true here. Plaintiffs' entire case is that Aearo's '015 test showed "inadequate protection" due to two fitting issues. (Dkt._1072 at 28-33; Dkt._1089 at 6, 28) But even taking those fitting issues into account, *the '015 test exceeded the MPID attenuation specification at every frequency.* (Dkt._1071 at 21.) To be clear, defendants do not rely upon the MPID as the "approved specifications" relevant to the contractor defense. Rather, defendants rely upon the fact that the government directed and approved the allegedly defective length of the earplug. (*Id.* at 26.) But even if, as plaintiffs assert, the MPID does not apply to the CAEv2, it nevertheless memorializes the military's judgment regarding adequate protection for an "equal" dual-ended earplug. (Dkt._1071 at 21.) The CAEv2 met those requirements *with or without plaintiffs' alleged defects*. (*Id.*) Thus, those alleged "dangers" would not have impacted the military's decision to shorten the earplug, and consequently did not require a *Boyle* warning.

Plaintiffs' only response is to criticize the military's judgment. (Dkt._1089 at 25-27.) According to plaintiffs, the military's reliance on "mean attenuation" was a mistake because it allowed manufacturers to "hid[e] behind group averages." (*Id.* at 26-27.) Plaintiffs suggest that, had the military instead used the NRR—a widely known alternative metric that reduces "mean attenuation" by two standard

7

deviations—it might have concluded that the CAEv2 provided "variable" and "low" protection. (*Id.*) Plaintiffs are missing the point. The military chose to use "mean attenuation" (with its alleged flaws) when determining adequate protection for service members. The purpose of *Boyle* is to prevent plaintiffs from "second-guessing" that decision here.

Plaintiffs' related assertion that certain test subjects on the '015 test fell *below* the MPID specification fails for the same reason. (Dkt._1089 at 27.) By virtue of using "mean attenuation" the military necessarily accepted that some users would fall below the average. That is the nature of averages. The military decided to use non-linear protectors *not* because they provided "above average" attenuation for every user (an impossibility), but rather because they provided "acceptable hearing protection, especially when one considers that the alternative presently being used is not to wear hearing protection." (Ex.1 at P01082.10.)[4]

### 2. Aearo Warned The Military Of Any Known "Dangers."

Plaintiffs argue that Aearo did not "*fully*" disclose the risks because it did not "disclose[] the Flange Report." (Dkt._1089 at 27-34.) But plaintiffs cite no case law holding that a manufacturer must disclose *a particular document*. Rather, the

---

[4] Plaintiffs' related assertion that "*none* of the Test 213030 mean results met th[e] thresholds" is also meritless. (Dkt._1089 at 27.) As noted in defendants' opposition, that was a "Method B" test that is *not* comparable to the testing protocol called for under the MPID. (*See* Dkt._1088 at 31-32.)

8

third *Boyle* element is satisfied if a manufacturer discloses *information* regarding known risks. *See Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1321 (11th Cir. 1989) (affirming summary judgment notwithstanding non-disclosure of internal video because "[p]laintiff produced no example of *information* about the chafing problem that was … not conveyed to the Government.") (emphasis added).

Here, the record is clear that Aearo disclosed the fitting problems that occurred during the '015 test, and the flange-fold fitting technique that resolved those issues. Berger told Ohlin how shortening the earplug "affected [Aearo's] testing," including "the fact that the shortened earplug was creating a problem in the initial ['015] test," and that, as a result, "the 017 test had been conducted by rolling back the flanges," which "would be important for some people." (Dkt._1071 at 13-14.) Shortly thereafter, Ohlin began giving the flange-fold instruction to military audiologists, who incorporated it into the training given to individual service members. (*Id.* at 14-16.) Plaintiffs argue that the "military was unaware the flanges *had* to be folded" (Dkt._1089 at 30-31), but the undisputed evidence makes clear that the flange fold is *not* necessary for all users. (Dkt._1071 at 31-32.) Plaintiffs' opposition ignores this evidence.

According to plaintiffs, the military was not *also* on notice that the CAEv2 "was too short for proper insertion" and could "loosen" in users' ears. (Dkt._1089 at 28-32.) But the undisputed record is to the contrary. For example:

9

- **"Too short for proper insertion":** LTC Eric Fallon testified that: "I instructed technicians that, if they believed the bottom edge of the opposing flange was preventing them from inserting the earplug far enough into a soldier's ear canal, they should roll back the opposing flanges and try again." (Ex._66 ¶¶ 9-11.)

- **"Loosening":** LTC Merkley testified that "all preformed earplugs are susceptible to loosening" and that he personally experienced "loosening" while wearing the CAEv2. (Ex. 58 at 456:2-20, 226:16-228:7.) And military audiologist Martin Robinette—who worked directly with Ohlin at the time the CAEv2 was shortened (Ex. 3 at DOD00000136)—stated that "he was aware that a piece of the earplug could touch the [user's] tragus and push out of the ear," and that, as a result, "his office recommended that personnel flip back the first flange so that it would not occur." (Ex. 44 at 424:17-425:6.)[5]

Plaintiffs claim that the Fallon declaration is inadmissible because it was obtained without a *Touhy*. (Dkt._1089 at n.5.) Notably, plaintiffs noticed Fallon's deposition outside of the *Touhy* process. And for good reason: *Touhy* does not apply to *former* government employees, like Fallon. *Koopmann v. U.S. Dep't of Transp.*, 335 F. Supp. 3d 556, 558 (S.D.N.Y. 2018) ("*Touhy* regulations are unlawful to the extent that they apply to former employees."). If it did, plaintiffs' counsel would violate *Touhy* every time they talked to one of their clients about information obtained in the course of their service. (*E.g.*, Ex. 27 at 3-5 (individual plaintiff

---

[5] The parties agree that statements in the CID Report are inadmissible. (Dkt._1089 at 9.) Defendants will depose Robinette on his personal knowledge regarding tragus interaction at a future date. (Dkt._927 at 6 n.8 ("[E]xhibits may be considered for purposes of pretrial rulings so long as they can be reduced to admissible form at trial.").)

10

disclosing that she trained service members to fold back the flanges when fitting the CAEv2).)

To the extent plaintiffs are arguing that Aearo should have *also* warned the Army that the CAEv2 could "imperceptibly" loosen (*e.g.*, Dkt._1089, n.4), that argument would fail for two reasons. ***First***, as stated in defendants' opposition, "imperceptible" loosening is a phenomenon that happens in a silent, sound proof test chamber, and is thus not a *Boyle* "danger" relevant to the military's use of the product in the real world. (Dkt._1088 at 25-28.) For example, in *Agent Orange*, the plaintiffs argued that defendants failed to warn the government of certain "dangers" that occurred *during the manufacturing process*. 517 F.3d at 99. The court rejected that argument because those risks were not relevant to the military's "operational use" in the real world. *Id.* at 100-01. The same is true here. ***Second***, in any event, the military *was* on notice that all earplugs can "imperceptibly loosen." For example, military audiologist Lorraine Babeu testified:

> Plaintiffs' counsel: If you were aware that they could imperceptibly loosen, you wouldn't have put them in people on the range?
>
> Babeu: When you say "imperceptibly loosen," ***that's every earplug***.
>
> Plaintiffs' counsel: ***Sure***.

(Ex._68 at 176:7-15 (emphasis added).)[6]

### 3. The Military Was On Notice Of Any "Dangers" From Its Own Testing And Use.

Plaintiffs do not contest that the military used the product for over a decade, during which time it was (i) fit on service members by military audiologists and (ii) repeatedly tested under a variety of different conditions. (Dkt._1071 at 14-15, 20-21.) Plaintiffs argue that the military "did not focus on—much less discover—insertion or slippage problems." (Dkt._1089 at 35.) But you cannot test an earplug without "inserting" it, and the military performed the *exact same* test that Aearo performed when it first identified "loosening"—REAT testing without the flanges folded back. (Ex. 7 at 19-20; Ex. 58 at 448:17-451:16.) If the product's length made it difficult to insert, or caused it to "loosen" in a user's ear, then the military audiologists who fit thousands of individual service members, and the Army researchers who tested the product under the same conditions as Aearo, would have noticed those issues.

## II. The Government Contractor Defense Preempts Plaintiffs' Failure-To-Warn Claims.

Regardless of the test applied, plaintiffs have failed to create a material issue on the military's directive *not* to provide instructions. (Dkt._1088 at 32-34.) Two

---

[6] Plaintiffs' further arguments regarding Ohlin's "fit protocol" testimony, and "conclusions" in the "Army investigation report" fail for the reasons stated in defendants' opposition. (Dkt._1088 at 29-31.)

12

Aearo employees testified that Ohlin instructed them *not* to include instructions because military audiologists would personally fit and train service members. (Dkt._1071 at 18, 33.)[7] And Ohlin further told Aearo that the cost of providing instructions would outweigh the benefits. (*Id.* at 19.)

Plaintiffs respond by pointing to the specification for instructions in the MPID. (Dkt._1089 at 37-38 (citing PX37).) But, according to plaintiffs, those specifications "apply to 'equal items,' *not the CAEv2*." (Dkt._1072 at 20.) Indeed, the military *already* had its own instructions for the CAEv2 when the MPID was drafted. (Dkt._1071 at 8-9, 18-19.)

Plaintiffs argue that defendants "admit[ted]" they were required to include instructions on the *outside* of a 50-count box. (Dkt._1089 at 38.) But the cited testimony says only that defendants were required to include a "***marking label***" on the box. (*Id.*) The marking label required by the government (excerpted below)

---

[7] This testimony regarding Ohlin's instructions is not "hearsay." (*See* Dkt._1088 at 2 n.2.) Ohlin was not asserting anything; he was telling Aearo what to do. Such a directive is "not even capable of being true or false," and is thus not hearsay. *United States v. Cruz*, 805 F.2d 1464, 1478 (11th Cir. 1986); *United States v. Mena*, 863 F.2d 1522, 1526 (11th Cir. 1989) (words granting consent to board a ship were "not hearsay at all; but rather a verbal act, similar to the utterances involved in making a contract, to which the law attaches independent significance."). In any event, plaintiffs do not contend that Ohlin's statements in his emails are hearsay, and those statements are sufficient to demonstrate consideration and approval of the CAEv2's length. (Exs._3-5.)

does *not* include instructions.  (*See* Dkt._1089, PX81 at 375:13-377:21, 410:10-414:13.)

```
Exterior (Shipping Container) Markings:

GO ON UPPER LEFT OF SIDE WITH LARGEST          BAR CODES - TO THE UPPER RIGHT
MARKING SURFACE AREA:
[All Capital Letters]
[Letter Height – minimum: no less than ¼" High]
6515-01-466-2710                               ||||||||||| ||| ||||| ||||    |||||||||||||||
CAGE  1M331   P/N   fill in                    6515014662710                 1M331
PLUG, EAR, COMBAT ARMS,
DOUBLE-ENDED, 50 PAIR
   fill in    PG                               ||||||||||||||||||||
M10  (month & yr item is packaged) e.g. 09/04  SP020005MEA28
WT   fill in      CU    fill in

SP0200-05-M-EA02
AEARO COMPANY
5457 W 79TH STREET
INDIANAPOLIS, IN 46268-1675
```

(Ex._69 (sample markings).)

Plaintiffs also argue Ohlin wanted "comprehensive instructions." (Dkt._1089 at 39.) But the documents plaintiffs cite discuss the Combat Arms *version 3*, not the CAEv2. Finally, plaintiffs argue that the military did not prohibit Aearo from including instructions in the individual blister packs sold in Army retail stores. (*Id.*) The argument is correct but irrelevant, because defendants *did* provide instructions in those blister packs. (Ex. 43 at 3; Ex._70 at 182:17-184:8.) Ohlin reviewed, edited, and approved those instructions. (Dkt._1071 at 19-20.) Thus, defendants are entitled to summary judgment on any warning claims based on the blister pack.

14

## CONCLUSION

For the foregoing reasons, defendants request the Court grant their motion for summary judgment.

DATED: April 21, 2020                KIRKLAND & ELLIS LLP

By: */s/ Nicholas F. Wasdin*
      Nicholas F. Wasdin

Mike Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
Email: mike.brock@kirkland.com

Kimberly Branscome
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, California 90067
Telephone: (213) 680-8370
Email: kimberly.branscome@kirkland.com

Mark J. Nomellini
Nicholas F. Wasdin
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
Email: mark.nomellini@kirkland.com
Email: nick.wasdin@kirkland.com

*Counsel for Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC and Aearo, LLC*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULES 7.1(F) & 56.1

I HEREBY CERTIFY that this brief complies with the word limit of Local Rules 7.1(F) and 56.1, and contains 3,196 words, excluding the parts exempted by those Rules.


DATED:  April 21, 2020                    */s/ Nicholas F. Wasdin*
                                          Nicholas F. Wasdin

## **CERTIFICATE OF SERVICE**

I, Nicholas F. Wasdin, hereby certify that on April 21, 2020, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

DATED:  April 21, 2020                              */s/ Nicholas F. Wasdin*
                                                                    Nicholas F. Wasdin