# PX114

Confidential - Pursuant to Protective Order

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF FLORIDA

PENSACOLA DIVISION

| | | |
|---|---|---|
| IN RE:  3M COMBAT ARMS | ) | Case No. 3:19md2885 |
| EARPLUG PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | Judge M. Casey |
| ------------------------- | ) | Rodgers |
| | ) | Magistrate Judge |
| THIS DOCUMENT RELATES TO | ) | Gary R. Jones |
| ALL CASES | ) | |

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

The videotaped deposition of TIMOTHY MCNAMARA, called by the Plaintiffs for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before JULIANA F. ZAJICEK, a Registered Professional Reporter and Certified Shorthand Reporter, at the Indianapolis Marriott Downtown, Atlanta Room of 350 West Maryland Street, Indianapolis, Indiana, on the 11th day of March, 2020, commencing at 9:03 a.m.

Confidential - Pursuant to Protective Order

Page 2

```
 1   PRESENT:
 2   ON BEHALF OF THE PLAINTIFFS:
 3        AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
          17 East Main Street, Suite 200
 4        Pensacola, Florida 32502
          850-202-1010
 5        BY:  BRYAN AYLSTOCK, ESQ.
               baylstock@awkolaw.com
 6
                    -and-
 7
          TRACEY & FOX
 8        440 Louisiana Street, Suite 1901
          Houston, Texas 77002
 9        713-495-2333
          BY:  LAWRENCE TRACEY, ESQ.
10             ltracey@traceylawfirm.com
               SEAN TRACEY, ESQ.
11             stracey@traceylawfirm.com
12
     ON BEHALF OF THE DEFENDANTS:
13
          KIRKLAND & ELLIS LLP
14        2049 Century Park East
          Los Angeles, California 90067
15        310-552-4200
          BY:  SIERRA ELIZABETH, ESQ.
16             sierra.elizabeth@kirkland.com
17                  -and-
18        KIRKLAND & ELLIS LLP
          300 North LaSalle
19        Chicago, Illinois 60654
          312-862-2000
20        BY:  BLAKE W. GIBNEY, ESQ.
               blake.gibney@kirkland.com
21
22
23
24
```

Confidential - Pursuant to Protective Order

Page 3

1  ALSO PRESENT:
2      DANIEL OLIVO, Paralegal,
3         Tracey & Fox;
4      JAMES BATTLE, Legal Assistant,
5         Aylstock, Witkin, Kreis & Overholtz, PLLC;
6      JON INT-HOUT, Trial Technician,
7         Golkow Litigation Services
8
9  THE VIDEOGRAPHER:
10     DAVID LANE,
11        Golkow Litigation Services
12
13
14
15
16
17
18
19
20 REPORTED BY:  JULIANA F. ZAJICEK, CSR No. 84-2604.
21
22
23
24

Confidential - Pursuant to Protective Order

Page 291

1    Q.    And specifically when it comes to the
2    Combat Arms Earplug, the Version 2 dual-ended earplug,
3    we -- it talks about the yellow end and the olive drab
4    green end, correct?
5    A.    Yes.
6    Q.    And it talks about the fact that you
7    insert the yellow plugs for weapons fire in a
8    dismounted mode, correct?
9    A.    Yes.
10   Q.    And, in fact, one of the things that you
11   testified earlier is that you use these earplugs,
12   correct?
13   A.    Correct.
14   Q.    And you use them on the range firing
15   weapons, right?
16   A.    Yes.
17   Q.    Both indoor and outdoor, I take it, I
18   think you testified?
19   A.    Yes.
20   Q.    And when you use the indoor -- use the
21   plugs in the indoor range, you would also follow these
22   instructions that you provided to the distributor to
23   use the yellow end, correct?
24        MS. ELIZABETH:  Objection; form, foundation.

Golkow Litigation Services - 877.370.DEPS

Confidential - Pursuant to Protective Order

Page 292

```
 1   BY THE WITNESS:
 2        A.   Yes.
 3   BY MR. AYLSTOCK:
 4        Q.   And you were never told anything by
 5   anybody at Aearo that -- about the use of anything
 6   other than the yellow end for weapons fire, correct?
 7        MS. ELIZABETH:  Objection; form.
 8   BY THE WITNESS:
 9        A.   No.
10   BY MR. AYLSTOCK:
11        Q.   That's not correct?
12        A.   No.
13        Q.   Okay.  Well, in this presentation piece,
14   this sell sheet, what is being communicated to ADS,
15   the distributor, is that the yellow end is perfectly
16   fine for weapons fire in the dismounted mode, correct?
17        A.   Correct.
18        MS. ELIZABETH:  Objection to form.
19   BY MR. AYLSTOCK:
20        Q.   And it would be perfectly fine for weapons
21   fire at the range, correct?
22        MS. ELIZABETH:  Objection; form, misstates the
23   document.
24   BY THE WITNESS:
```

Confidential - Pursuant to Protective Order

Page 293

1      A.   I believe so.
2  BY MR. AYLSTOCK:
3      Q.   And that includes the indoor range,
4  correct?
5          MS. ELIZABETH:  Objection; form, misstates the
6  document.
7  BY THE WITNESS:
8      A.   It doesn't state that, but yes.
9  BY MR. AYLSTOCK:
10     Q.   And that's consistent with when you were
11 visiting these bases, that's consistent with what you
12 would communicate to the people you would speak with,
13 the men and women in uniform, about the Combat Arms
14 Earplug, correct?
15         MS. ELIZABETH:  Objection; form, vague.
16 BY THE WITNESS:
17     A.   I believe so.
18 BY MR. AYLSTOCK:
19     Q.   Okay.  So let me -- well, let me ask you
20 this:  You know who Elliott Berger is, right?  I think
21 you've answered that earlier.
22     A.   Yes.
23     Q.   Did you ever hear from Elliott Berger or
24 anybody else at Aearo that the Combat Arms Version 2

Golkow Litigation Services - 877.370.DEPS

Confidential - Pursuant to Protective Order

Page 294

1   yellow end is not supposed to be used and did not
2   provide protection in the indoor range?  Is this the
3   first time anybody has ever told you that?
4       A.   I don't re --
5       MS. ELIZABETH:  Objection; form.
6   BY THE WITNESS:
7       A.   I don't remember.
8   BY MR. AYLSTOCK:
9       Q.   Well, I -- since you were out there
10  selling this product to use the yellow end for indoor
11  ranges, that would have been something you would have
12  liked to know, I take it?
13      MS. ELIZABETH:  Objection; form.
14  BY THE WITNESS:
15      A.   I believe so.
16  BY MR. AYLSTOCK:
17      Q.   Okay.  And Elliott Berger was the head guy
18  at the lab, the Aearo lab, right?
19      A.   Yes.
20      Q.   And you interacted with Elliott Berger
21  personally from time to time, correct?
22      A.   Sometimes, yes.
23      Q.   And, in fact, you went to his lab from
24  time to time, did you not, the Aearo lab?

1    A.    From time to time, yes.

2         MR. AYLSTOCK:  Can we put up a photo of the
3    Aearo -- just the Aearo building.  I think I have a
4    copy of it somewhere.

5    BY MR. AYLSTOCK:

6    Q.    Is that -- is that the Aearo building
7    where the lab is that Elliott Berger was at that you
8    would go to from time to time?

9         MR. AYLSTOCK:  Zoom out so he can see the
10   whole building and the part on the right that says
11   "Aearo."

12   BY MR. AYLSTOCK:

13   Q.    That's here in Indianapolis, right?

14   A.    Yes.

15   Q.    And that's where you would go when you
16   would interact with Elliott Berger or -- yeah --
17   strike that.

18        Is that -- when you had an office when you
19   weren't out on the road at the military bases, was
20   your office in this building?

21   A.    My office was not in that building.

22   Q.    Okay.  But you knew that this was where
23   the lab was that Elliott Berger worked in, right?

24   A.    Yes.

Confidential - Pursuant to Protective Order

Page 296

1    Q.   And you would go there from time to time,
2    correct?
3    A.   Very seldom.
4    Q.   Well, in fact, I think we established you
5    might have even been a participant in a -- in a lab
6    test, correct?
7    A.   I -- yes.
8    Q.   Okay.
9    A.   One time.
10   Q.   Let me show you these photographs.  We'll
11   mark them as Plaintiffs' Exhibit -- demonstrative
12   exhibit -- what exhibit are we up to?
13   MR. BATTLE:  16.
14   MR. AYLSTOCK:  16.
15              (WHEREUPON, a certain document was
16               marked Timothy McNamara Deposition
17               Exhibit No. 16, for identification,
18               as of 03/11/2020.)
19   BY THE WITNESS:
20   A.   Thank you.
21   BY MR. AYLSTOCK:
22   Q.   These are photographs of the lab and the
23   building that I just showed you.  You recognize that
24   as the -- the lab that you would visit from time to

Confidential - Pursuant to Protective Order

Page 297

1  time and see Mr. Berger, correct?
2      A.   It looks familiar, yes.
3      Q.   And if we page --
4      MR. AYLSTOCK:  Go back to the second one, Jon,
5  the one with the window.  Can you -- yeah.
6  BY MR. AYLSTOCK:
7      Q.   Do you recognize that as sort of a view
8  through the window into the -- the acoustical chamber
9  where the test would be done?
10     A.   It looks familiar, yes.
11     Q.   Okay.  And is -- do those pictures
12 approximate how the lab looked when you worked there?
13     A.   Yes.
14     Q.   Okay.  Now, with regard to Mr. Berger, did
15 you ever have any conversation with Mr. Berger that,
16 in fact, the P.0197 that -- oh, I should put this as
17 part of that stack.
18     A.   Okay.
19     Q.   Did you ever have any conversation with
20 Mr. Berger that, in fact, the CAE Version 2 yellow end
21 is not to be recommended -- is not to be used or not
22 recommended for indoor range use?
23     A.   I don't recall.
24     Q.   Let me show you this.

Confidential - Pursuant to Protective Order

Page 298

```
 1              (WHEREUPON, a certain document was
 2              marked Timothy McNamara Deposition
 3              Exhibit No. 17, for identification,
 4              as of 03/11/2020.)
 5   BY THE WITNESS:
 6       A.   Thanks.
 7       MS. ELIZABETH:  Is this marked as an exhibit?
 8       MR. AYLSTOCK:  Yes.  I believe it is Exhibit 17.
 9   Exhibit 17.
10       MS. ELIZABETH:  Does it say 17?
11       MR. AYLSTOCK:  P.0197.
12   BY MR. AYLSTOCK:
13       Q.   We'll have it up in a minute, but --
14       A.   Okay.
15       Q.   It's an e-mail chain.  I realize that this
16   is actually after you left Aearo, isn't it?  It's from
17   2014, correct?
18       MS. ELIZABETH:  Just so that I'm clear, was
19   there an Exhibit 16?
20       MR. AYLSTOCK:  Exhibit 16 was the demonstrative
21   exhibit, the photograph --
22       MS. ELIZABETH:  Can I get a copy of that,
23   please?
24       MR. AYLSTOCK:  Yeah, we can get that to you.
```

Confidential - Pursuant to Protective Order

Page 299

```
 1   Here, take a look at that.
 2   BY MR. AYLSTOCK:
 3        Q.    So let me ask you about this document,
 4   sir.  Do you see --
 5        MR. AYLSTOCK:  Do you have it, Jon?  P.0197.
 6   There we go.  Okay.
 7   BY MR. AYLSTOCK:
 8        Q.    The date of this document is 2/25/14.
 9              Do you see that?
10        A.    Yes.
11        Q.    And this is after you are gone, correct?
12        A.    Yes.
13        Q.    And it is from Elliott Berger, the guy we
14   just talked about who ran the lab that we -- that you
15   were in --
16        A.    Yes.
17        Q.    -- from time to time, correct?
18        A.    Correct.
19        Q.    And what Mr. Berger is doing is he is
20   having an e-mail conversation with a Michael Stewart
21   and Doug Moses.
22              You know who Doug Moses is, right?
23        A.    I do.
24        Q.    You worked with Doug Moses, in fact, when
```

Confidential - Pursuant to Protective Order

Page 300

1  you were at Aearo, correct?
2     A.   Yes.
3     Q.   And one of the things Mr. Berger says is:
4  "Mike, I too had a discussion after we spoke.  As I
5  mentioned, we don't typically like to recommend CAE
6  for indoor ranges because I question its adequacy with
7  high-peak levels and high-reverberant levels too, but
8  I agreed in your case because of the low-level impulse
9  from .22s."
10         Do you see that?
11    A.   Yes.
12    Q.   That's -- a .22, that's a very small gun?
13    A.   Yes.
14    Q.   You would agree with that?
15    A.   Yes.
16    Q.   And you -- since you shoot guns, you know
17 that a .22 has a lot different noise profile than your
18 AK -- or your AR that you shoot, right?
19    A.   Correct.
20    Q.   So as we sit here today in the year 2020,
21 is this the first time you're hearing any -- that
22 there was any recommendation not to use a CAE yellow
23 end for indoor ranges?
24    A.   I don't remember.

Page 301

1    Q.    You have no recollection of ever hearing
2  that because you were telling people out on the bases
3  the opposite, that you could use that for the yellow
4  end, correct?
5        MS. ELIZABETH:  Objection; form.
6  BY THE WITNESS:
7    A.    Yes, for gunfire.
8  BY MR. AYLSTOCK:
9    Q.    Right.  And we are talking about an indoor
10 range is a gunfire, that's what you do in an indoor
11 range, right?
12   A.    You're right.
13           (WHEREUPON, a certain document was
14            marked Timothy McNamara Deposition
15            Exhibit No. 18, for identification,
16            as of 03/11/2020.)
17 BY MR. TRACEY:
18   Q.    Okay.  Let me show you Exhibit 18 now.  It
19 is another document that is after your time, so I want
20 to make that clear, it is a 3M document, and you left
21 when 3M purchased Aearo, right?
22   A.    Yes.
23   Q.    So, again, we are talking about a
24 statement here, if you look in the Comment section --

Confidential - Pursuant to Protective Order

Page 302

1    MR. AYLSTOCK:  Can you blow up the one that's
2 dated -- or at 9:47 at -- 9:47:44 p.m., the first one
3 there, Jon.
4 BY MR. AYLSTOCK:
5    Q.   Do you know who Jason Joy is --
6    MR. BATTLE:  Jones.
7 BY MR. AYLSTOCK:
8    Q.   I'm sorry.  Jason Jones.  Do you know who
9 Jason Jones is?
10   A.   I don't recall.
11   Q.   Okay.  Well, if we look at this comment,
12 which --
13   A.   By the way, would you excuse me.  I'm just
14 going to stand up.  You can keep that camera rolling.
15 I've got a cramp in my leg.
16   Q.   We can go off the record if that would --
17   A.   No, that's fine.
18   Q.   Are you okay?
19   A.   I'm good.
20   Q.   Okay.
21   MR. AYLSTOCK:  We'll let Jon get the comment.
22 Why don't we just use the Elmo, Jon.  Can you switch
23 this over.
24 BY MR. AYLSTOCK:

Confidential - Pursuant to Protective Order

Page 303

1    Q.    Okay.  And the jury will have this as an
2   exhibit, but, again, I'm -- this is after your time,
3   but there is a statement here that says:  "I would not
4   recommend CAE in open mode" -- that's the yellow end,
5   right?
6    A.    Yes.
7    Q.    -- "in training if the training is
8   shooting at the gun range."
9          Do you see that?
10   A.    Yes.
11   Q.    That's news to you, isn't it?
12   MS. ELIZABETH:  Objection; form.
13  BY THE WITNESS:
14   A.    I don't remember this.  I don't remember
15  that information.
16  BY MR. AYLSTOCK:
17   Q.    Right.  Because you were telling folks,
18  the military folks that you met with, the exact
19  opposite, right?
20   MS. ELIZABETH:  Objection; form.
21  BY THE WITNESS:
22   A.    Would you repeat the question?
23  BY MR. AYLSTOCK:
24   Q.    Well, I think we've established that --

Confidential - Pursuant to Protective Order

Page 304

```
 1   and we've seen your presentation to the distributor,
 2   but you were training folks in the US military that it
 3   was fine to use the yellow end at the range, correct?
 4        MS. ELIZABETH:  Objection; form.
 5   BY THE WITNESS:
 6        A.   Correct.
 7   BY MR. AYLSTOCK:
 8        Q.   And that's the exact opposite of what's
 9   being stated here, that is:  "I would not recommend
10   the CAE in open mode in training if the training is
11   shooting at the gun range."
12             Do you see that?
13        A.   Yes.
14        Q.   Okay.  So you were telling people the
15   exact opposite of what 3M is saying in this document,
16   correct?
17        MS. ELIZABETH:  Objection; form, misstates the
18   document.
19   BY THE WITNESS:
20        A.   I believe so.
21   BY MR. AYLSTOCK:
22        Q.   In fact, it goes on, "This makes" -- it
23   looks like a typo there, "This makes it sound like the
24   open mode can be used for any gunfire.  If the gun
```

Confidential - Pursuant to Protective Order

Page 305

1  fire is frequent, you want closed mode."
2          Do you see that?
3      A.   Where is that?
4      Q.   Right -- right below in the comment, right
5  after it says:  "I would not recommend it in the open
6  mode for training on the gun range."
7      A.   Yes.
8      Q.   And then the comment says:  "This makes it
9  sound," although there is a typo, so I'll just read it
10 the way it is.  "This makes si sound like the open
11 mode can be used for any gunfire.  If the gunfire is
12 frequent, you want closed mode."
13         Do you see that?
14     A.   Yes.
15     Q.   And, again, that's the exact opposite of
16 what you were telling people on military bases when
17 you were training them, correct?
18     MS. ELIZABETH:  Objection; form, misstates the
19 document.
20 BY THE WITNESS:
21     A.   I believe so.
22 BY MR. AYLSTOCK:
23     Q.   Okay.  So let's go back to the personnel
24 file, if we could, Exhibit 2.  I think we've -- so