# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | | |
|---|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | ) ) ) | Case No. 3:19-md-2885-MCR-GRJ |
| | ) | |
| | ) | Judge M. Casey Rodgers |
| This Document Relates to: See Addendum A | ) ) | Magistrate Judge Gary R. Jones |
| | ) | |
| | ) | PUBLIC VERSION - REDACTED |

# DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTIONS TO REMAND

On January 13, 2020, the Court concluded that it had jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442, over more than 5,700 plaintiffs whose cases Defendants removed from Minnesota state court. (Dkt. 904.)[1] Now, a further 70 Minnesota plaintiffs, asserting identical claims, have filed their own motions to remand (the "Remand Motions"). These plaintiffs seek to avoid the Court's prior, well-reasoned decision by raising new arguments. But none of these arguments addresses the basic facts establishing this Court's jurisdiction. As the

---

[1] The Court first issued its order on January 13, 2020 under seal. Dkt. 904. The Court then issued a redacted order on January 22, 2020 (the "Remand Order"). Dkt. 927. That order is available on the Westlaw database at *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 3:10md2885, 2020 WL 365617 (N.D. Fla. Jan. 22, 2020). Citations in this brief to "Remand Order" and page number references are to the publicly available Westlaw version.

Court has already found, Defendants' removals of the cases filed in Minnesota were proper and the Court has jurisdiction over all suits filed by Plaintiffs in Minnesota. The Remand Motions provide no reason for the Court to alter its decision.

Defendants' notices of removal set forth a plausible basis for federal jurisdiction, which is all they needed to do under controlling Supreme Court authority. Plaintiffs' remand motions should be denied.[2]

## FACTUAL BACKGROUND

Defendants' recent brief in support of their motion for summary judgment on the contractor defense describes in detail the military's extensive involvement in the design of the CAEv2, the back and forth between Aearo and the military regarding the length of the CAEv2, and the military's approval of the final product. The brief also explains that the CAEv2 met the military's attenuation specifications for "equal" dual-ended earplugs, that the military knew its decision to shorten the CAEv2 meant some users would need to fold back the flanges, and that the military knew exactly how the CAEv2 performed through extensive use and testing. *See* Dkt.

---

[2] Defendants submit this Consolidated Opposition pursuant to the Court's Order (Dkt. 1086) in opposition to all remand motions filed by the plaintiffs listed in Addendum A. These plaintiffs largely filed their claims as part of multi-plaintiff complaints in Minnesota state court. Following removal, these cases were transferred to this MDL and this Court ordered each plaintiff to file an individual short form complaint. Each plaintiff filed an identical remand motion.

1071 at 3-22.  Defendants incorporate by reference the statement of facts from that brief and, for the convenience of the court, include the most relevant facts below.

### A.    The Military Worked With Aearo To Develop The CAEv2.

On December 16, 1997, the U.S. military hosted a meeting at Aberdeen Proving Ground, a U.S. military facility, to discuss the development of a new nonlinear earplug for the Army. (Ex. 1 at 2-3; Ex. 2 (12/12/19 Berger Tr.) at 8:10-22; 54:22-58:25.) Attendees included Dr. Doug Ohlin, other Army representatives, ISL representatives, and Elliott Berger, an acoustical scientist with Aearo. (*Id.*) During the meeting, Ohlin requested that Aearo develop an earplug that: (1) incorporated the ISL filter, (2) used Aearo's "Ultrafit" tips, which the government had previously tested with the ISL filter, (3) was dual-ended, with both nonlinear and conventional ends, so that service members did not need to carry two separate sets of earplugs, and (4) was single-sized, because a one-size-fits-most product was easier for field audiologists to dispense. (Ex. 1 at 2; Ex. 2 (12/12/19 Berger Tr.) at 60:2-61:19, 64:7-10, 81:22-82:24.)

Aearo completed an initial design of the product on March 23, 1998. (Ex. 3; Ex. 2 (12/12/19 Berger Tr.) at 61:20-64:6; Ex. 4 (12/17/19 Knauer Tr.) at 81:24-82:11.) Aearo sent samples of the product to Ohlin on March 24, 1998. (Ex. 5 at DOD00000257; Ex. 2 (12/12/19 Berger Tr.) at 65:3-66:11.)  On April 8-9, 1999, Ohlin directed Brian Myers at Aearo to shorten the earplug by approximately 1/4".

(Ex. 6 at 3M_MDL000569995; Ex. 2 (12/12/19 Berger Tr.) at 68:2-70:23) Ohlin sent the same feedback to military audiologists, stating that he "took the liberty in cutting down the samples" himself. (Ex. 7 at DOD00000136; Ex. 8 at 3M_MDL000569956; Ex. 2 (12/12/19 Berger Tr.) at 66:12-68:1.) According to Ohlin, the original length of the earplug created three issues: (1) the samples did not fit into the Army's standard issue carrying case; (2) the flanges were far enough apart that they did not cover the sound port on the stem of the plug, which, Ohlin believed, exposed the plug to wind noise; and (3) the samples stuck out of the ear too far and interfered with the ability to fasten the strap on the Kevlar helmet. (Ex. 7 at DOD00000136; Ex. 6 at 3M_MDL000569995; Ex. 8 at 3M_MDL000569956.) Ohlin described the last problem as a "show stopper if we can't get the modification." (Ex. 8 at 3M_MDL000569956.)

By April 27, 1999, Aearo had shortened the length of the earplug in response to Ohlin's directive. (Ex. 9; Ex. 10 at 0.) By May 12, 1999, Ohlin had determined that Aearo satisfied the government's requirements, and that the company had manufactured "acceptable production samples." (Ex. 7 at DOD00000137.) Ohlin used those production samples to submit a "Request for National Stock Number and Bulk Purchase of Combat Arms Earplugs." (Ex. 11.)

**B.     The Military Was On Notice Of The Consequences Of Shortening The CAEv2.**

**1.     Aearo Informed The Military Of The Flange-Fold Issue.**

After Aearo's internal testing revealed that some individuals would experience greater attenuation if they folded back the opposing flanges before inserting the CAEv2, Berger informed Ohlin of Aearo's findings.  *See* Dkt. 1071 at 13-14. Beginning at least as early as 2001, Ohlin gave the following instruction to military audiologists on how to fit the CAEv2: "if you needed to, you could fold back the flanges on the earplug to get a good fit." (Ex. 12 (2/26/20 Merkley Tr.) at 97:15-99:14.) Ohlin did not limit this advice to any particular group of soldiers or any particular size ear canal. (*Id.* at 98:13-99:2.) After receiving Ohlin's "flange fold" instruction, the audiologists implemented it into the fitting procedures performed with individual service members. (*Id.* at 99:15-20, 107:21-113:4.) Thus, according to the Chief of the Army Hearing Program, LTC John Merkley: "If [a service member's] earplug was the Combat Arms Version 2, their training would have included the option to fold back the flanges as needed to get a good fit." (*Id.* at 123:8-12.)

Military audiologists also understood *why* they were given the flange-fold instruction. ████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████

### 2. The CAEv2 Met The Military's Attenuation Expectations.

In 2003, the Defense Logistics Agency ("DLA"), which oversees military procurement for the DoD, decided to develop a Medical Procurement Item Description (MPID) for the CAEv2 and other "equal" dual-ended earplugs. DLA worked with Aearo to develop the MPID, and asked Aearo to provide input on the "salient characteristics" of an "equal" product, including minimum mean attenuation. (Ex. 14 at P1355.1, 3.) The attenuation specifications Aearo provided were *below* the results obtained in all of its internal testing, including the tests in which none of the flanges were folded back. (*See* Ex. 15 at P0498.1; Exs. 16-18.) The military determined these attenuation levels were adequate and adopted them in the MPID.

### 3. The Military Tested The CAEv2 And Understood How It Performed.

In addition to the testing it performed during product development, *see* Dkt. 1071 at 9, the government extensively tested the CAEv2 between 2001 and 2015. (Exs. 19-27.)  Among other things, the military performed: (i) laboratory REAT tests on humans, like the testing performed internally at Aearo (Exs. 19, 23-24, 26-27);

6

(ii) real-world field testing on humans, in which soldiers' hearing was measured before and after firing weapons while wearing the CAEv2 (Ex. 21); (iii) impulse noise tests, in which the CAEv2 was inserted into a specialized mannequin and exposed to high-level explosions (Ex. 20, 22-25); and (iv) speech intelligibility and localization precision testing, in which service members wore the yellow end of the earplug while listening to speech or determining the direction of incoming sounds (Ex. 24). One military REAT test determined that the CAEv2 "compared very well with [its] design specifications." (Ex. 23 at 19.) Another, done *without rolling back the flanges*, concluded that the green end of the CAEv2 provides "very good attenuation" and "should provide for a safe exposure level for the average user in many noise environments up to 105 dB." (Ex. 19 at 19-20; Ex. 12 (2/26/20 Merkley Tr.) at 448:17-451:16.) These tests "show that the plug provides reasonable attenuation or good attenuation under a variety of different circumstances." (Ex. 12 (2/26/20 Merkley Tr.) at 452:12-18) More importantly, these tests put the military on notice of exactly how the product performed, including during REAT testing on humans.

## ARGUMENT

The Court was clear in its Remand Order: it has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1442 because all the requirements for federal officer removal were met and Defendants have plausibly alleged the government contractor

defense. The new arguments these Plaintiffs present should not change that conclusion.

A private party, such as Defendants, seeking to remove under 28 U.S.C. § 1442(a)(1) must demonstrate that: (1) it is a "person" within the meaning of the federal officer removal statute; (2) it was "acting under" the United States, its officers, or its agencies; (3) the actions for which it is being sued were performed under color of federal authority (or there is an adequate causal connection between the complained of acts and the federal authority); and (4) it has a colorable federal defense to the plaintiff's claims. *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017).

The Court has already found that each element was met on the same facts and allegations: ***First,*** it is undisputed that Defendants are persons under section 1442. ***Second,*** Defendants were "acting under" a federal officer because "Plaintiffs' allegations are clearly directed at Defendants' actions in connection with its contractual relationship with the military involving the CAEv2." Remand Order at *4.

***Third,*** the Court further concluded that "[b]ecause the actions challenged by Plaintiffs—that is, Defendants' alleged design, production and sale of a defective product, and failure to provide adequate warnings —involve actions that Defendants maintain were performed either at the direction of the government or in connection

with their contractual relationship with the government, the necessary causal link has been shown for purposes of the federal officer removal statute." Remand Order at *4.

**Finally**, the Court concluded that Defendants had raised a "colorable" or "plausible" federal defense: the government contractor defense. The Court found that "Defendants have made a plausible showing that the CAEv2 was designed and manufactured in accordance with the military's specifications, which included a reasonably precise instruction to shorten the earplug to its allegedly defective length." Remand Order at *5. The Court further found that the evidence "provide[d] a plausible factual foundation for Defendants' assertion that the military was warned about the known 'dangers' of using the CAEv2." Remand Order at *5.

In their Remand Motions, Plaintiffs do not argue that their claims or allegations differ from those addressed by the Court's Remand Order (because they do not). Nor do they contend that there are factual, procedural, or legal differences between their removals and those affirmed by the Court in its Remand Order that justify a different outcome.

The new motions simply ignore the Court's Remand Order. Instead, they cite inapposite case law to argue that Defendants' commercial sale of a version of the CAEv2 forecloses removal under Section 1442 and Defendants' ability to assert the government contractor defense. But neither the federal officer removal statute nor

9

the government contractor defense is so limited. The important federal interests that Section 1442 and the government contractor defense serve to protect are not destroyed merely by commercial sale. And no authority provided by Plaintiffs supports their attempt to obtain an outcome different to that of the first 200 removals from Minnesota.

## I.  All Requirements For Removal Under § 1442(a)(1) Are Satisfied Here.

The federal officer removal statute is to be "'liberally construed' in favor of granting federal officers and agencies (and those acting under federal officers and agencies) access to a federal forum in which to litigate the merits of defenses arising from their official duties." Remand Order at *2 (quoting *Watson v. Philip Morris, Co.*, Inc., 551 U.S. 142, 147 (2007)).

### A.  Defendants Are Persons Acting Under An Officer of the United States.

Plaintiffs' argument that Defendants were not "acting under" an officer of the United States because they also sold a version of the CAEv2 to the general public is unavailing. A defendant's commercial sale of a product does not alter the relevant fact of a defendant's acting under the instruction of a federal officer when it sells the same product to the military. Nor do the unproven claims made in the *qui tam* litigation brought by Aearo's competitor or the government's stated position in that litigation.

10

Aearo developed the CAEv2 under the direction of the U.S. military, and Aearo sold the CAEv2 with the precise length that the military had determined was necessary to meet its operational needs.  *See* Dkt. 1071 at 4-9.  As this court has already held, that is more than sufficient to satisfy the "acting under" requirement. *See* Remand Order at *3 ("Defendants have shown that Plaintiffs' allegations are directed at their actions, or their failure to act, in connection with federal contracts to 'produce an item that [the government] needed' … which, 'in the absence of a contract with a private firm, the [g]overnment would have had' to produce itself.").

Plaintiffs' assertion that Defendants' commercial sale of a version of the CAEv2 precludes federal officer removal in effect asks the Court to ignore the question at issue: was Defendants' relationship with the government in creating the CAEv2 one of "subjection, guidance, or control." *Id.* Plaintiffs provide no explanation or authority for why a commercial sale should alter that fact.[3] The

---

[3] Indeed, courts have routinely found jurisdiction under the federal officer statute involving suits brought by commercial purchasers of products designed for the government. *See e.g. Stallings v. Georgia-Pac. Corp.*, 2013 WL 1563231, at *31 (W.D. Ky. Apr. 12, 2013) ("Even if Plaintiffs prove that [Defendants] sold these exact turbines to non-governmental entities, this does not undermine Defendants' demonstration, for the purpose of removal, that the Navy possessed extensive control over the design and manufacture of these turbines such that [Defendants'] production thereof was effectively acting under a federal agency."); *see also Glassco v. Miller Equip. Co.*, 966 F.2d 641 (11th Cir. 1992) (civilian who bought allegedly defective military surplus lineman's belt was precluded from recovery for product defect by the military contractor defense); *Skyline Air Serv., Inc. v. G.L. Capps Co.*, 916 F.2d 977 (5th Cir. 1990) (military contractor was immune from liability for

purpose behind federal officer removal is to provide a federal forum to protect federal interests. The government has an interest in the design of the products it purchases regardless of whether the supplier independently sells that same equipment to civilians. *See Brinson v. Raytheon*, 571 F.3d 1348, 1351 (11th Cir. 2009) ("The procurement of equipment by the United States is an area of uniquely federal interest") (*quoting Boyle v. United Techs.*, 487 U.S. 500, 507 (1988)). In *Dorse v. Eagle-Picher Industries*, for example, the Eleventh Circuit recognized that "the procurement of asbestos in World War II for naval ships is undeniably an area of uniquely federal interest," even though there was no indication that the asbestos the government purchased was any different than the asbestos the defendant separately sold commercially. 898 F.2d 1487, 1489 (11th Cir. 1990).

The government's position in the *qui tam* litigation brought by Defendants' competitor Moldex also does not establish that Aearo was not "acting under" a federal officer when it developed the CAEv2 in conjunction with the military. (Dkt. 019 ("Memo.") at 9.)[4] Defendants did not fail to disclose known "dangers," despite the government's stated position in the *qui tam* suit. Defendants' position in that suit, as it is here, is that the CAEv2 met the attenuation standards regardless of fitting

---

injuries stemming from the crash of a military surplus helicopter being used for commercial logging operations).

[4] For simplicity, Defendants' references are to the docket in *Allen v. 3M Co. et al.*, 3:19-cv-04846, the first Motion to Remand to be filed in this renewed round of briefing.

instructions and that Defendants appropriately informed the government of the implications of making the changes it requested to the design of the CAEv2. *See infra* Section I(C)(3). Further, the government was on notice of any "dangers" through its own testing and use. *Id*. Regardless, to the extent Plaintiffs' arguments have any merit—which they do not—they are factual disputes, "which are properly resolved by federal, not state, courts." Remand Order at *4.

The Court has already concluded that Defendants have sufficiently demonstrated they were "acting under" a federal officer in connection with Plaintiffs' claims because Plaintiffs' allegations are "clearly directed at Defendants' actions in connection with its contractual relationship with the military involving the CAEv2." Remand Order at *4. Plaintiffs' new arguments provide no basis for the Court to deviate from its prior holding.

### B.    The Causation Requirement Is Satisfied.

Whether a defendant's actions were taken "under color of federal office . . . has come to be known as the causation requirement." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008) (internal quotation marks, alterations, and citation omitted); *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018) ("[A] bona fide federal officer could not remove a trespass suit that occurred while he was taking out the garbage—there must be a 'causal connection between the charged conduct and asserted official authority.'"). In 2011, Congress expanded Section 1442 by

13

amending section 2(b) to permit removal "for *or relating to* any acts under color" of federal office, so as "to broaden the universe of acts that enable Federal officers to remove to Federal court." H.R. REP. 112-17, 6, 2011 U.S.C.C.A.N. 420, 425 (emphasis showing addition). The Eleventh Circuit has held that "[t]he hurdle erected by this requirement is quite low." *Caver*, 845 F.3d at 1144 (internal citations and quotations omitted) (emphasis added). "The phrase 'relating to' is broad and requires only 'a connection or association' between the act in question and the federal office." Remand Order at *4 (quoting *Caver*, 845 F.3d at 1144.)

Here, Plaintiffs' claim arises from the design of the CAEv2 with the length directed and approved by the military, and Aearo's sale of the CAEv2 to the military for use by Plaintiffs.  As the Court has already held, this demonstrates "the requisite 'connection or association'" between the military and Aearo's allegedly negligent design of the CAEv2.  Remand Order at *4.

There is no authority for Plaintiffs' proposition that a defendant can only establish a causal connection when it was acting "solely" under federal authority. Plaintiffs' reliance on *Magnin v. Teledyne Continental Motors* for this proposition is misplaced. In *Magnin*, the Eleventh Circuit addressed federal officer removal based on defendants' purportedly negligent inspection and certification of an airplane under federally delegated authority.  91 F.3d 1424, 1428 (1996). As Plaintiffs cite, the court held that a defendant "***can*** establish this nexus through a

14

showing that [its] actions 'derived solely from [its] official duties." Memo. at 10 (citing *Magnin*, 91 F.3d at 1427 (emphasis added).) But *Magnin* does not hold that the nexus can ***only*** be shown this way. The court also stated that "it is ***sufficient*** for the defendant to show that his relationship to the plaintiff 'derived solely from [his] official duties.'" *Id*. at 1427-28 (citing *Willingham v. Morgan*, 395 U.S. 402, 409 (1969)). The Eleventh Circuit concluded that the undisputed fact that the defendant was working at his place of federal employment was sufficient to show a nexus for removal purposes. *Id*. at 1428. The court went on to explain that any dispute about whether "defendant was engaged in 'some kind of a frolic' or defendant acted in contravention of his official duties" was appropriately addressed in federal court. *Id*.

Defendants here have presented evidence that the military directed Aearo to shorten the CAEv2 and approved the product's final length, and that Aearo manufactured the CAEv2 with the length that the military required.  Any disputes as to whether Defendants breached any duty or otherwise acted outside the scope of the government's authority are properly resolved in a federal forum. *See* Remand Order at *4 ("Disputes about whether certain acts were specifically directed by the government, or outside the scope of Defendants' official authority, are properly resolved by federal, not state, courts.")

Further, the scope of federal officer removal has been expanded since *Magnin*, when Congress broadened Section 1442 to include removal for matters "***relating to***

any act under color" of federal office. H.R. REP. 112-17, 6, 2011 U.S.C.C.A.N. 420, 425; *see also Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1250 (9th Cir. 2017) ("Congress passed the Removal Clarification Act to amend § 1442 [to add 'relating to'] because Congress felt that the courts were construing the statute too narrowly.")

Plaintiffs' further contention that Defendants cannot establish that they acted "solely" under federal authority when designing the CAEv2 for "consumption on the general commercial market" is both irrelevant and incorrect. (Memo. at 11.) There is a direct connection between Defendants' actions under the direction of federal officers and Plaintiffs' allegations. Plaintiffs' claims arise from Defendants' development of the CAEv2 in conjunction with the military and Defendants' subsequent sale of the CAEv2 to the military. Remand Order at *4. They allege that the design of the CAEv2 is defective because it is too short, (Dkt. 1-1, Compl. at ¶ 79), but the military directed Aearo to shorten the CAEv2 and approved its final length because a longer earplug did not meet the military's operational needs. *See* Dkt. 1071 at 4-9. That is a sufficient connection between Defendants' acts and federal authority, regardless of whether Aearo independently sold the same product commercially. *See* Remand Order at *4; *Marley v. Elliott Turbomachinery Co.*, 545 F. Supp. 2d 1266, 1274 (S.D. Fla. 2008) ("All a defendant needs to do to show a causal nexus is to establish that the plaintiff's claims arise from the defendants'

16

performance of their duties under contract with the Navy."); *Ayo v. 3M Company*, 2018 WL 4781145, at *13 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding causal connection where the conduct complained of occurred because "[c]oncerns over interference with the government's ability to contract for products it needs remain even if private parties later purchase those products."); *Corley v. Long-Lewis*, 688 F. Supp. 2d 1315, 1334 (N.D. Ala. 2010) (finding a "causal nexus" where defendant designed turbines under the supervision of the Navy, according to its specifications).

Plaintiffs also cannot defeat removal by picking and choosing which of their allegations they contend Defendants must connect to the military's direction and approval of the design of the CAEv2. Memo. at 10-11. It is Defendants' theory of the case upon which its removal must be analyzed, not Plaintiffs'. Remand Order at *4 (noting that courts "credit Defendants' theory of the case when determining whether a causal connection exists").

## C. The "Colorable Federal Defense" Requirement Is Satisfied.

Defendants have raised a colorable government contractor defense. The government contractor defense applies where: "(1) the United States approved reasonably precise specifications [for the design feature at issue]; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States

about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

For removals under Section 1442, Defendants' burden is only to demonstrate that their federal defenses are "colorable," not "clearly sustainable." *Isaacson*, 517 F.3d at 139. "A 'colorable' defense is one that is 'plausible,'" or "not 'immaterial and made solely for the purpose of obtaining jurisdiction or . . . wholly insubstantial and frivolous." Remand Order at *5 (quoting *Caver*, 845 F.3d at 1145; *Zeringue v. Crane Co.*, 846 F.3d 785, 792 (5th Cir. 2017)). The Supreme Court has rejected a "narrow grudging interpretation" of the term "colorable," and has recognized that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Corley*, 688 F. Supp. 2d at 1332 (citing *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999)). A removing defendant, therefore, need only show that the federal defense "is not without foundation and made in good faith." *Marley*, 545 F. Supp. 2d at 1274; *see also Mesa v. California*, 489 U.S. 121, 129 (1989) ("[T]he validity of the defence authorized to be made is a distinct subject . . . [and] has no connection whatever with the question of jurisdiction.").

Defendants have met this burden because, as the Court previously concluded, they have made a "plausible showing that the CAEv2 was designed and manufactured in accordance with the military's specifications, which included a reasonably precise instruction to shorten the earplug to its allegedly defective

18

length." Remand Order at *5. Defendants have provided evidence that "*easily* provides a *plausible* factual foundation for Defendants' assertion that the military was warned about the known 'dangers' of using the CAEv2." Remand Order at *5 (first emphasis added, second in original.)

## 1. The Government Approved Reasonably Precise Specifications.

The United States approved reasonably precise specifications when Ohlin reviewed and approved the final length of the CAEv2 after Aearo complied with his directive to shorten the product. *See* Dkt. 1071 at 23-25; Dkt. 1088 at 19-21; Dkt. 1101 at 2-5. Defendants do not rely on the MPID as an approved specification for the CAEv, so Plaintiffs' argument that it was not reasonably precise is irrelevant.[5] Memo. at 15-16.

As explained at length in Defendants' opposition to Plaintiffs' summary judgment motion, the commercial sale of a version of the CAEv2 does not render the CAEv2 ineligible for the contractor defense. Dkt. 1088 at 12-16. Even products that a manufacturer originally designed (and patented) without government involvement and that have "long been sold commercially" can qualify for the defense so long as the government eventually makes "a considered evaluation of and

---

[5] In determining whether it has jurisdiction, the district court is not limited to the evidence or positions taken by Defendants in their removal papers. *See e.g. Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 773 (11th Cir. 2010); *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 n. 1 (9th Cir. 2002).

affirmative judgment call about the design." *Kase v. Metalclad Insulation Corp.*, 6 Cal. App. 5th 623, 628 (Ct. App. 2016).  Plaintiffs' assertion that Dr. Ohlin had no authority regarding the design of the CAEv2 raises a dispute as to the strength of Defendants' defense, not a legal bar to it.  In any case, the record is clear that Ohlin did have the authority to determine whether the design of the CAEv2 was acceptable to the military.  *See* Ex. 28 at 234-53; Ex. 29 (Fallon Decl.) ¶ 6.). Ohlin reviewed the initial version of the CAEv2 and concluded that its length was a "showstopper" because it interfered with the straps of soldiers' helmets.  Only after Aearo shortened the CAEv2 at his request did Ohlin approve the product and submit a "Request for National Stock Number and Bulk Purchase," which enabled the military to begin purchasing the CAEv2.

Plaintiffs are also incorrect in their claim that the government's 2006 solicitation for the CAEv2 establishes that the government was seeking an existing product, and not a product for which it had approved precise specifications.  *See* Memo. at 3-4. The government did not merely purchase a readily available commercial product.  By 2006, the military had already been purchasing CAEv2 earplugs for seven years, since August 1999.  (Dkt. 1088 at 4; Ex. 30 at 2, Row 3.) The first military purchases occurred more than a year before Aearo's first commercial sale, which happened in November, 2000. (*Id.*; Dkt. 1088-4, Ex. 30 at 8, Row 100.) The military purchased the CAEv2 because the earplug conformed to

20

the specifications it had established and approved. Specifically, it purchased production versions of the prototype approved by Ohlin, which Aearo had developed after being instructed to shorten the stem to meet the military's requirements.

Contrary to Plaintiffs' argument, this is exactly a case of "the government made me do it." Memo. 15 (quoting *Brinson*, 571 F.3d at 1351). The military made Aearo shorten the CAEv2, and when the military subsequently ordered the CAEv2, Aearo was obligated to ship the product with the length the military had directed and approved.

## 2.    The CAEv2 Conformed to The Approved Specifications.

The second prong of the government contractor test is met because the CAEv2 the military purchased from Aearo had the same length that the military had directed and approved. Plaintiffs assert that Defendants cannot satisfy this prong because of a position taken by the government in the *Moldex qui tam* litigation two decades after the development of the CAEv2. The government's position in a different case cannot defeat the contractor defense, and certainly cannot do so at the removal stage. First, the government did not contend that Defendants failed to conform the CAEv2 to the required length—the specification at issue in this litigation. Second, the government's position that the CAEv2 did not conform to some specifications was vigorously contested by Defendants in that litigation. Defendants decision to settle the case did not establish that the CAEv2 did not conform.

21

### 3. Defendants Warned the Government of Known "Dangers" Of The Design.

Defendants have also made a colorable showing that they informed the military of any "dangers" posed by the CAEv2 of which the military was not aware. As an initial matter, because the CAEv2 provided more attenuation than the military required from dual-ended earplugs *even without the flanges folded back*, there was no "danger" to warn of at all. *See* Dkt. 1071 at 21, 27.

In any event, Aearo did inform the military that some users would obtain a better fit if they folded back the opposing flanges before insertion. Berger testified that he told Ohlin "the shortened earplug was creating a problem in the test" and "that the 017 test had been conducted by rolling back the flanges." (Ex. 31 (11/13/19 Berger Tr.) at 297:13-22, 334:7-13, 337:8-18.) Ohlin passed this information on to military audiologists, instructing them that "if you needed to, you could fold back the flanges on the earplug to get a good fit." (Ex. 12 (2/26/20 Merkley Tr.) at 97:15-99:14.)

The military also conducted its own extensive testing of the CAEv2, including a REAT test performed without the flanges folded back—the same test that Aearo allegedly withheld from the military. Dkt. 1071 at 20-21. There is therefore no basis to assert that the military was unaware of any issues with the CAEv2.

At minimum, Defendants have presented colorable evidence that the U.S. military "made a discretionary determination" regarding the requirements and

design of the CAEv2's benefits against alleged risks. *In re Agent Orange*, 517 F.3d 76, 90 (2d Cir. 2008); *Ayo*, 2018 WL 4781145, at \*14 (holding removal proper under § 1442 because defendants presented "colorable evidence" that government was aware of alleged problems with product at issue).

Plaintiffs' reliance on the government's investigatory report is again unavailing because it ignores:  (i) that the CAEv2 met the military's minimum attenuation expectations, (ii) the government's knowledge of the flange-fold issue, and (iii) the government's knowledge of the CAEv2's performance through its own testing.

### 4.    The Government Contractor Defense Also Applies to Plaintiffs' Failure to Warn Claims.

Defendants have also put forward a colorable contractor defense with respect to Plaintiffs' failure to warn claims.  Under Eleventh Circuit law, a defendant need not show that the military "prohibited" any warnings; indeed, Courts in the Eleventh Circuit have rejected that exact argument.  *See Donson v. Air & Liquid Sys., Inc.*, 2017 WL 74790, at \*3 (M.D. Fla. Jan. 9, 2017) ("Donson argues that  . . . the U.S. Navy did not prohibit its suppliers from affixing warning labels to its equipment and products. . . .  '[The defendant] need not prove that the Navy would have forbidden it to issue asbestos warnings had [the defendant] requested the Navy's approval ... the ***government contractor defense isn't limited to 'instances where the government forbids additional warning*** or dictates the precise contents of a

23

warning.'") (quoting and citing *Leite v. Crane Co.*, 749 F.3d 1117, 1123 (9th Cir. 2014), and *Ruppel v. CBS Corp*., 701 F.3d 1176, 1185 n. 2 (7th Cir. 2012)).  *Dorse v. Eagle-Picher Indus., Inc.*, 898 F.2d 1487 (11th Cir. 1990), is not to the contrary. Indeed, the *Donson* court cited *Dorse* before reiterating that "the government contractor defense isn't limited to instances where the government forbids additional warning."  2017 WL 74790, at *3 (M.D. Fla. Jan. 9, 2017) (internal citations omitted).  As with design defect claims, a defendant can defeat a failure to warn claim by showing the government approved the warning (or absence of a warning) at issue and was aware of any "dangers" known to the defendant.  *See* Dkt. 1071 at 33-34.

Under either test, however, Defendants' defense is colorable.  The military repeatedly instructed Aearo representatives not to include instructions with the CAEv2 because it wanted to instruct soldiers in proper fitting itself, as required by Department of Defense policy.  (Ex. 32 (12/3/19 Santoro Tr.) at 326:19-21; Ex. 33 (10/18/19 Myers Tr.) at 248:17-25; Ex. 12 (2/26/20 Merkley Tr.) at 129:4-10; Ex. 29 (Fallon Decl.) ¶ 16.).  Indeed, in instances when Aearo did ship items beyond those the military expressly specified, the military "really went after [Aearo]."  Ex. 33 (10/18/19 Myers Tr.) at 378:13-14; *see id.* at 413:14-25 ("[Plaintiffs' Counsel]: There's nothing in here either that says that your company could not have provided an insert, one of the inserts with instructions for use or warnings related to the fit

and wearing those Combat Arms Earplugs. There's nothing in here that says you cannot do that, correct? A. Again, my belief, both from this e-mail and from the one that we reviewed from Dr. Ohlin, was that we should not put things into the product that aren't requested."); *id.* at 371-79 (discussing that the military dictated what should be included in packages and reacted adversely when additional materials were provided); 410-416 (same). The military also created its own "wallet card" with instructions for inserting the CAEv2 and distributed the card to individual soldiers, making clear it did not require duplicative instructions from Aearo.  Ex. 34.

*          *          *

Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *Agent Orange*, 517 F.3d at 89-90; *see also Ayo*, 2018 WL 4781145, at *13. Defendants have established a colorable government contractor defense, requiring that Plaintiffs' motion to remand be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs' remand motions should be denied.

Dated: May 8, 2020                              Respectfully submitted,

                                                */s/ Robert C. Brock*
                                                Robert C. "Mike" Brock
                                                KIRKLAND & ELLIS LLP
                                                1301 Pennsylvania Avenue, N.W.
                                                Washington, D.C. 20004

Telephone:  (202) 389-5991
Email: mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
Email: mark.nomellini@kirkland.com

*Counsel for Defendants 3M Company and
Aearo Technologies LLC*

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to L.R. 7.1(F), the foregoing memorandum contains 5,933 words exclusive of the case caption, certifications, and signature block.


Dated: May 8, 2020                                Respectfully submitted,

                                                          */s/ Robert C. Brock*
                                                          Robert C. "Mike" Brock

## <u>CERTIFICATE OF SERVICE</u>

I, Mike Brock, hereby certify that on Mary 8, 2020, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

DATED:  May 8, 2020                                  */s/ Robert C. Brock*                                  
                                                                      Robert C. "Mike" Brock

28