# EXHIBIT 12

Page 1

1                 UNITED STATES DISTRICT COURT

2                      NORTHERN DISTRICT OF

3                   FLORIDA, PENSACOLA DIVISION

4     IN RE 3M COMBAT ARMS      : MDL No. 2885

5     EARPLUG PRODUCTS          : Civil Action No.:

6     LIABILITY LITIGATION      :  3:19-md-02885-MCR-GRJ

7                      --------------------

8

9           Deposition of LTC JOHN A. MERKLEY, was

10    taken via videotape on Wednesday, February 26,

11    2020, commencing at 9:09 a.m., at Baltimore

12    Marriott Waterfront Hotel, 700 Aliceanna Street,

13    Baltimore, Maryland, before MICHELE D. LAMBIE,

14    Notary Public.

15                     --------------------

16

17

18

19

20    Reported By:

21              Michele D. Lambie, CSR-RPR

```
 1    APPEARANCES:

 2              ON BEHALF OF THE PLAINTIFFS:

 3         SeegerWeiss LLP.

 4              DAVID R. BUCHANAN, ESQUIRE.

 5              dbuchanan@seegerweiss.com.

 6              MAX KELLY, ESQUIRE.

 7              mkelly@seegerweiss.com.

 8              (via computer)

 9              55 Challenger Road.

10              Ridgefield Park, New Jersey  07660.

11              (212) 584-0713

12

13         Clark, Love & Hutson, PLLC

14              AMANDA HUNT, ESQUIRE.

15              ahunt@triallawfirm.com.

16              440 Louisiana Street.

17              Suite 1600.

18              Houston, Texas  77002.

19              (713) 757-1400

20

21
```

Page  3

1    APPEARANCES CONTINUED:

2             ON BEHALF OF THE PLAINTIFFS:

3        Tracey & Fox.

4             LAWRENCE TRACEY, ESQUIRE.

5             ltracey@traceylawfirm.com.

6             4400 Louisiana Street.

7             Suite 1901.

8             Houston, Texas  77002.

9             (800) 925-7216

10

11            ON BEHALF OF THE DEFENDANTS:

12        Kirkland & Ellis LLP.

13            NICHOLAS WASDIN, ESQUIRE.

14            nick.wasdin@kirkland.com.

15            COLE CARTER, ESQUIRE.

16            cole.carter@kirkland.com.

17            300 North LaSalle Street.

18            Chicago, Illinois  60654.

19            (312) 862-7090

20

21

Page 4

1    APPEARANCES CONTINUED:

2              ON BEHALF OF LTC JOHN A. MERKLEY:

3       U.S. Army Legal Services Agency.

4              MAJOR COLLIN P. EVANS, ESQUIRE.

5              collin.p.evan2.mil@mail.mil.

6              9275 Gunston Road.

7              Suite 3005.

8              Fort Belvoir, Virginia  22060-5546.

9              (703) 693-0352

10

11

12       ALSO PRESENT:  Charles Bachmann

13                      Zach Hove

14                      Derek Fox - Videographer

15

16

17

18

19

20

21

1   injuries among service members?

2       A.   Yes.

3       Q.   What percentage of service members

4   experience hearing loss or tinnitus?

5       A.   I -- I don't have those numbers right

6   now.  I -- I -- I just don't know them off the top

7   of my head.

8       Q.   Can you ballpark?

9            MAJOR EVANS:  Don't --

10            MR. BUCHANAN:  Objection.

11            MAJOR EVANS:  Don't ballpark that.

12            THE WITNESS:  Okay.

13            MAJOR EVANS:  No.  You --

14   BY MR. WASDIN:

15       Q.   Why are hearing loss rates or hearing

16   loss and tinnitus rates high among members of the

17   armed forces?

18            MR. BUCHANAN:  Objection to form.

19            THE WITNESS:  Well, I can speculate, but

20   I don't want to speculate.

21            MAJOR EVANS:  He can't speculate.

Page 22

1        THE WITNESS:  So --

2        MAJOR EVANS:  He's not authorized to give

3   opinions.  He can give factual testimony, but not

4   opinions.

5   BY MR. WASDIN:

6        Q.   The Department of Defense requires the

7   Army to maintain a Hearing Conservation Program,

8   right?

9        A.   Correct.

10            (Whereupon, Merkley Deposition Exhibit 1,

11   Department of Defense Instruction, marked for

12   identification.)

13   BY MR. WASDIN:

14        Q.   I'm going to hand you what I have marked

15   as Exhibit 1.  Take a look at Exhibit 1 and tell me

16   if you recognize it.

17        A.   Yes.

18        Q.   What is that document?

19        A.   Well, this is an -- an outdated

20   Department of Defense instruction for the Hearing

21   Conservation Program.

1      Q.    You say outdated.  This particular

2   version is dated April 22, 1996, correct?

3      A.    Correct.

4      Q.    This instruction is updated from time to

5   time, right?

6      A.    Correct.

7      Q.    Do you know when the next update after

8   April of 1996 was?

9      A.    I -- I believe it was in 2010.

10      Q.    Okay.  So, this was the operative

11   instruction during at least 1996 to 2010?

12      A.    I believe so.

13      Q.    This instruction contains a number of

14   requirements for the Hearing Conservation Program

15   at each of the DoD components, right?

16      A.    Correct.

17      Q.    Including the Army?

18      A.    Yes.

19      Q.    For example, if you turn to page 7 and

20   look at section 6.6, there are requirements for

21   personal hearing protectors, do you see that?

1      A.    Yes.

2      Q.    And one of the --

3      A.    Well 6. -- yes, okay.

4      Q.    And, for example, 6.6.2 requires that DoD

5 components issue personal hearing protectors free

6 to all personnel who work in noise or

7 noise-hazardous areas or with noise-hazardous

8 equipment, right?

9      A.    Right.

10      Q.    6.6.5 provides that DoD personnel shall

11 be allowed to choose personal hearing protectors

12 from among those approved devices available through

13 supply channels unless medically contraindicated or

14 inappropriate for a particular hazardous-noise

15 exposure; is that right?

16      A.    Correct.

17      Q.    Are Army service members able to choose

18 what hearing protection device they wear while in

19 service?

20      A.    Yes.

21      Q.    6.6.7 says that preformed earplugs shall

1    be fitted and issued only under the supervision of

2    personnel who have been specifically trained to fit

3    earplugs, did I read that right?

4         A.    Correct.

5         Q.    What are preformed earplugs?

6         A.    Preformed earplugs are ear -- earplugs

7    that are -- you -- you don't form on yourself.

8    They're not moldable.  They -- they come premolded

9    usually containing flanges.  They can be single

10   flanges up to -- currently there are hearing

11   protectors that have four flanges.

12        Q.    Is -- are you familiar with the Combat

13   Arms Version 2 Earplug?

14        A.    Yes.

15        Q.    Is that a preformed earplug?

16        A.    Yes.

17        Q.    And so, when the Combat Arms Version 2 is

18   issued to service members, the DoD instruction

19   requires that it would be fitted and issued only

20   under the supervision of personnel who have been

21   specifically trained to fit earplugs --

1           MR. BUCHANAN:  Objection to form.

2    BY MR. WASDIN:

3        Q.   -- is that right?

4        A.   That's correct.

5        Q.   6.6.9, going down, states that medically

6    trained personnel must examine the fit and

7    condition of preformed and custom earplugs at least

8    annually, right?

9        A.   Yes.

10       Q.   So, under 6.6.9, anyone who had been

11   issued the Combat Arms Version 2 should have been

12   examined for fit at least annually?

13       A.   Correct.

14       Q.   And then 6.6.8 allows that if basically

15   you couldn't be fit by the medically trained

16   personnel with the preformed earplug, such as the

17   Combat Arms, then they would move to a custom

18   device in special circumstances; is that right?

19       A.   Correct.

20       Q.   Flipping back a page or two, excuse me,

21   page -- the page at the bottom is 3, there is a

1  requirement under the header 6, Procedures, and

2  subheader, 6.1, Written Plan, that the DoD

3  components shall prepare a written plan for the

4  implementation of a comprehensive Hearing

5  Conservation Program, right?

6      A.    Correct.

7      Q.    And that program would track the

8  requirements in the DoD instruction?

9          MR. BUCHANAN:  Excuse me, Counsel.  I'm

10  just trying to find the subsection.  Where are you?

11          MR. WASDIN:  Page 3, 6.1.

12          THE WITNESS:  I -- yes.

13  BY MR. WASDIN:

14      Q.    For example, 6.1 states that the plan to

15  be implemented by the DoD components shall address

16  occupational noise exposure, computation and

17  monitoring, noise abatement, hearing protectors,

18  methods for exa- -- estimating the adequacy of

19  hearing protector attenuation, training,

20  audiometric testing requirements, audiometric test

21  rooms, audiometric measuring instruments, acoustic

1   calibration of audiometers, recordkeeping and

2   program evaluation, did I read that right?

3        A.   Yes.

4        Q.   And so, in 1996 at least, the requirement

5   was for the Army to have a written plan that

6   tracked those items?

7        A.   Correct.

8             (Whereupon, Merkley Deposition Exhibit 2,

9   Department of the Army Pamphlet 40-501, marked for

10  identification.)

11  BY MR. WASDIN:

12       Q.   I'm going to hand you what I have marked

13  as Exhibit 2.

14       A.   I have two.

15            MAJOR EVANS:  I'll take yours, sir.

16            THE WITNESS:  Okay.

17  BY MR. WASDIN:

18       Q.   LTC Merkley, do you recognize the

19  document that I have handed you as Exhibit 2?

20       A.   Yes.

21       Q.   What is it?

```
1    you see that?

2        A.   Yes.

3        Q.   Section 6.2, labeled Protector

4    Requirements, contains guidelines that were then in

5    place for what type of protector to wear in various

6    types of steady-state or impulse noises, correct?

7        A.   Correct.

8        Q.   And then section 3 or, excuse me, 6.3,

9    labeled Characteristics discusses the various types

10   of hearing protection devices that were then

11   available; is that right?

12       A.   Yes.

13       Q.   And like the DoD instruction, it begins

14   by saying that preformed ear flange -- excuse me,

15   preformed earplugs are triple- or single-flange

16   earplugs.  Medically trained personnel must fit and

17   examine these earplugs at least annually to ensure

18   proper fit and condition, right?

19       A.   Correct.

20       Q.   I noticed, if you go back to 6.1c on page

21   5, there's a reference that an earplug carrying
```

1  case must also be provided in addition to earplugs?

2      A.    Um-hum.

3      Q.    And then it has a single national stock

4  number there?

5      A.    Correct.

6      Q.    Do you know what carrying case that's

7  referring to?

8      A.    Yes.

9      Q.    At the time in 1998, was there just one

10  carrying case that would be issued regardless of

11  what type of preformed earplug you get?

12      A.    Yes.

13      Q.    And did the military have -- they had

14  that carrying case as of at least December 1998

15  already?

16      A.    Well, I -- they -- they had it in -- yes.

17  I was issued one in the National Guard, so -- and

18  that was prior to 1998.

19      Q.    How long had the military had that

20  particular earplug carrying case?

21          MR. BUCHANAN:   Objection to form.

1          THE WITNESS:  I don't know.

2    BY MR. WASDIN:

3       Q.   What year were you issued one?

4       A.   I was issued one in 1994.

5       Q.   Focusing on 6.3a, the requirement that

6    medically trained personnel must fit and examine

7    preformed earplugs at least annually to ensure

8    proper fit and condition, can you tell us how, if

9    you know at this time, medically trained personnel

10   would have evaluated the fit of preformed earplugs

11   for service members?

12      A.   For --

13          MR. BUCHANAN:  Objection to form and

14   foundation.

15          THE WITNESS:  Okay.  So, if it was -- if

16   it was done correctly -- and I was fitted with

17   preformed earplugs at basic training back in

18   October of 1991.  They were the triple-flanged,

19   orange, regular hearing protectors, and the

20   medically trained personnel would do a tug test and

21   a visual inspection of the ear to see, you know,

1  were -- were all of the flanges in the ear and then

2  tugged -- well, they actually had us tug to make

3  sure that we felt the suction and that the earplug

4  didn't just come out of the ear.

5  BY MR. WASDIN:

6      Q.   That happened for you at basic?

7      A.   That happened to me -- for me at basic

8  training.

9      Q.   Okay.

10     A.   We trained all of our technicians on the

11 same fitting technique and how to identify a -- a

12 good or a poor fit.

13     Q.   Okay.  And it sounds like that

14 technique -- would the technician actually insert

15 the earplug into the service member's ear?

16     A.   Not usually.

17     Q.   Okay.

18     A.   The -- the service member would insert

19 the earplug, and then the -- the -- the service

20 member would walk by the technician, and the

21 technician would do a check.

```
1       Q.   Visual and tug test?

2       A.   Visual and tug test.

3            MR. BUCHANAN:  Objection to form.

4            THE WITNESS:  For both ears.

5            MAJOR EVANS:  And, I'm sorry, I'm just

6   going to clarify one point.  You weren't an

7   audiologist in that time frame, sir?

8            THE WITNESS:  No.  No, I was not.

9            MAJOR EVANS:  So, you're -- you're just

10  only talking about what the test would be from

11  your -- your education as an audiologist?

12           THE WITNESS:  No.  This is what happened

13  to me --

14           MAJOR EVANS:  Okay.

15           THE WITNESS:  -- at Fort Leonard Wood.

16           MAJOR EVANS:  That's just what I wanted

17  to be clear about.

18           THE WITNESS:  Right.

19           MAJOR EVANS:  So, that's not the --

20           THE WITNESS:  So, that was the -- that

21  was the check that was given to me at Fort Leonard
```

1    Wood.

2    BY MR. WASDIN:

3        Q.   Okay.  And after you became an

4    audiologist?

5        A.   When I became an audiologist in the

6    Army --

7            MAJOR EVANS:  Which was when, sir?

8            THE WITNESS:  In -- well, I was

9    commissioned in the Reserves in June of 1999.  I

10   came on active duty in March of 2000.

11           My first hearing-protection fitting

12   experience was with the ROTC Summer Camp at Fort

13   Lewis, Washington, where we did mass-fitting

14   events, and our technicians were trained to do a

15   visual inspection and a -- a tug test.

16   BY MR. WASDIN:

17       Q.   What is situation awareness?

18       A.   Well, just the -- the awareness of your

19   surroundings.

20       Q.   Is situation awareness important in the

21   military?

1      A.    Yes.

2      Q.    Why?

3      A.    Because in a combat zone, a combat

4    environment, you need to be aware of what's

5    happening around you.

6      Q.    Is situation awareness a dueling priority

7    with hearing protection?

8      A.    Absolutely.

9      Q.    Why?

10     A.    Because any time you plug the ears, it

11    affects your ability to hear and localize sounds.

12          (Whereupon, Merkley Deposition Exhibit 3,

13    Final Report for October 2006 to October 2008,

14    marked for identification.)

15    BY MR. WASDIN:

16     Q.    When service members are going into

17    combat, how do they manage -- what instructions are

18    they given by the hearing protection or the hearing

19    division to sort of manage situation awareness

20    while on the battlefield?

21          MR. BUCHANAN:  Objection to form.  Vague

Page 81

1      Q.   It was prepared by the Army Research

2   Laboratory Hearing Research & Engineering

3   Directorate; is that right?

4      A.   Yes.

5      Q.   What is the ARL-HRED?

6      A.   It's a -- a division within the Army

7   Research Laboratory.

8      Q.   And at the very top, it's a little faded,

9   but it looks like this was a report that was

10  prepared about two months after the Doug Ohlin

11  email we just looked at, but on June 30th, 1999?

12           MR. BUCHANAN:  Are you drawing that from

13  the heading?  I just want to --

14           MR. WASDIN:  It says initial report 30

15  June 1999.

16           MR. BUCHANAN:  Top left?

17           MR. WASDIN:  Top left.

18           MR. BUCHANAN:  Thank you.

19           THE WITNESS:  Yes.

20  BY MR. WASDIN:

21      Q.   The -- looking at the first page, there's

1    a paragraph titled, Overview, do you see that?

2        A.   Yes.

3        Q.   And it says, the ARL Human Research &

4    Engineering Directorate initiated a quick response

5    effort to collect data on several hearing

6    protection devices in support of John King, the

7    AMC-FAST Science Advisor at SETAF, Vicenza, Italy,

8    did I read that right?

9        A.   Yes.

10       Q.   Do you know Mr. King?

11       A.   I don't.

12       Q.   Is this an indication that ARL was

13   collecting data on a variety of hearing protection

14   devices in response to a request from somebody in

15   the military?

16           MR. BUCHANAN:   Objection to form and

17   foundation.

18           THE WITNESS:   Yes.

19   BY MR. WASDIN:

20       Q.   And then the next sentence goes on to

21   say, the primary objective of the effort was to

1   collect data on the French design Combat Arms

2   Earplug being manufactured in the U.S. by the Aearo

3   Company, Indianapolis, Indiana, right?

4       A.   Correct.

5       Q.   Okay.  So, in June of 1999, at least, ARL

6   is running its own testing on the Combat Arms

7   Earplug?

8           MR. BUCHANAN:  Objection to form and

9   foundation, independent of the document.

10          THE WITNESS:  Yes.

11  BY MR. WASDIN:

12      Q.   That's what this document indicates?

13      A.   That's what it says, yes.

14      Q.   If you flip over to page 2, there's a

15  section titled, Data Analysis and Results -- I'm

16  sorry, page 4 is what I was trying to go after.

17  Operational Significance is the section.  Do you

18  see the Operational Significance paragraph?

19      A.   Yes.

20      Q.   It states, the results of this

21  assessment, as depicted in Table 1, suggest that

1    for the protective device of primary interest to

2    the AMC-FAST Advisor, the Combat Arms Earplug, when

3    properly fitted will provide acceptable protection

4    for most situations when firing up to 276 rounds of

5    M16 556 ball ammunition in a hallway-scaled MOUT

6    environment (the worst case condition ARL tested in

7    the Match-type MOUT training facility); is that

8    right?

9         A.   Correct.

10        Q.   Can you tell from that description what

11   type of tests they were running on the Combat Arms

12   at that point in time?

13             MR. BUCHANAN:  Objection to foundation

14   and form.

15             THE WITNESS:  From this description, yes.

16   BY MR. WASDIN:

17        Q.   And what was it?

18        A.   They were --

19             MR. BUCHANAN:  Same objections.  Excuse

20   me, sir.

21             THE WITNESS:  Okay.  Conducting

1   a -- well, I would say a health-hazard assessment

2   of that earplug firing or under worst-case

3   conditions in a closed-room, MOUT-type environment.

4   BY MR. WASDIN:

5      Q.  And can you tell what the results were,

6   at least at a high level here?

7      A.  According to this, it says that they give

8   safe -- you know, what -- that the hearing

9   protector provides acceptable protection for firing

10   up to 276 rounds of ammunition -- of 556

11   ammunition.

12      Q.  When the military is considering the

13   distribution of a new hearing protection device to

14   service members, is it common to run testing on it

15   to determine whether or not it works?

16         MR. BUCHANAN:  Objection to form as to

17   time and foundation generally.

18         MAJOR EVANS:  And, Sir, you can only

19   speak to your experience.

20         THE WITNESS:  I -- I really don't know

21   what testing goes into the hearing protection

1  devices prior to them being issued.

2  BY MR. WASDIN:

3     Q.   Okay.  Well, at least in this case, it

4  looks like the military, ARL was conducting testing

5  of the Combat Arms Earplug in June of 1999?

6     A.   Right.

7          MR. BUCHANAN:  Objection to the form.

8          THE WITNESS:  Correct.

9  BY MR. WASDIN:

10    Q.   And the determination was essentially

11  that it works in the worst-case scenario?

12         MR. BUCHANAN:  Objection to the form.

13         THE WITNESS:  For up to -- up to a

14  certain point.

15  BY MR. WASDIN:

16    Q.   Up to 276 rounds of M16 fire?

17    A.   Correct.

18         (Whereupon, Merkley Deposition Exhibit 8,

19  Memorandum for Staff Director, Joint Readiness

20  Clinical Advisory Board at Fort Detrick, marked for

21  identification.)

1   BY MR. WASDIN:

2        Q.   LTC Merkley, I've handed you a document

3   that we have marked as Exhibit 8, which is titled,

4   Memorandum for Staff Director, Joint Readiness

5   Clinical Advisory Board at Fort Detrick, do you see

6   that?

7        A.   Yes.

8        Q.   In the Subject of that document is a

9   request for national stock number in bulk purchase

10  of the Combat Arms Earplug, right?

11       A.   Yes.

12       Q.   Paragraph 2 on the first page states that

13  the Department of Defense Hearing Conservation

14  Working Group has recommended that a nonlinear

15  earplug configured to the specifications of the

16  enclosed production samples be adopted for military

17  use, did I read that right?

18       A.   Yes.

19       Q.   Have you ever seen a memorandum like this

20  one before, a request for a national stock number

21  and purchase of hearing protection?

1      A.    I have not seen that, no.

2      Q.    Okay.  Do you know what evaluation is

3  typically done by the DoD Hearing Conservation

4  Working Group, or others in the military, prior to

5  requesting a national stock number and purchase?

6      A.    I'm not --

7            MR. BUCHANAN:  Objection as to vague as

8  to time.

9  BY MR. WASDIN:

10     Q.    You do not?

11     A.    No, I don't.

12     Q.    If you turn over, this particular memo

13 was signed by Doug Ohlin on the second page, right?

14     A.    It has his signature block.

15     Q.    Yes.

16     A.    It's not signed.

17     Q.    Sure.  Doug Ohlin is -- is the person

18 listed in the signature block --

19     A.    Correct.

20     Q.    -- of this memo?  I could not find a date

21 on it.  I don't know if there's a -- it may just be

Page 89

1    undated, but I thought I would ask you if you knew

2    what the -- some coding or something meant a date

3    here?

4            (Whereupon, there was a pause for

5    document examination.)

6            THE WITNESS:  I don't -- I don't -- I

7    don't see any coding for a date.  It should be, so,

8    no, it's not dated.

9    BY MR. WASDIN:

10       Q.   Okay.  Attached to the request for

11   purchase is a Justification for a Nonlinear Earplug

12   (Combat Arms Earplug), right?

13       A.   Um-hum.

14       Q.   And you can skim it, but essentially,

15   it's just a write-up of the features and potential

16   usability of the Combat Arms plug?

17           MR. BUCHANAN:  Objection to form.

18           THE WITNESS:  Correct.

19   BY MR. WASDIN:

20       Q.   The final paragraph on the first page of

21   the justification discusses the American military's

1   contribution in the development effort of the

2   Combat Arms Earplug, right?

3       A.   Yes.

4       Q.   It discusses -- well, I'll just read it.

5   It says, the American military's contribution in

6   this development effort has been to recommend an

7   American-made earplug, the UltraFit to

8   hous- -- house the French filter, the color scheme

9   and blast overpressure testing.  The single-sized

10  UltraFit should accommodate most of our Combat Arms

11  users.  Moreover, thanks to French ergonomic

12  designers, a solution has been provided on how to

13  eliminate wind noise while adapting the earplug for

14  steady-state noise use, did I read that right?

15      A.   Yes.

16      Q.   Earlier when we were talking about, I

17  believe it was in connection with the DoD

18  instruction, but I could be misremembering, you

19  said that you had generally been aware that the

20  American military participated in the design and

21  development of the Combat Arms Version 2?

1          MR. BUCHANAN:  Objection to form.

2     Misstates testimony.

3          THE WITNESS:  I had -- I had seen

4     documents about that, yes.

5     BY MR. WASDIN:

6        Q.   Okay.  What is the extent of your

7     knowledge regarding the American military's

8     participation in the design and development of the

9     Combat Arms Version 2?

10         MR. BUCHANAN:  Objection to form.

11         THE WITNESS:  I -- I --

12    BY MR. WASDIN:

13       Q.   Okay.

14       A.   I don't have any.

15       Q.   Okay.  Just what you have seen in

16    documents?

17       A.   Right.

18       Q.   Okay.  Understood.  I think the answer to

19    these may be you don't know, but I'm going to ask

20    them because here you are.

21       A.   Okay.

1      Q.   Who at the military would have been the

2   principal either group or division or person in

3   charge with working with outside consultants to

4   develop hearing protectors in the 1998 to 2000 time

5   period?

6      A.   I don't know.

7           MR. BUCHANAN:  You're anticipating my

8   objection.  Foundation.

9           MR. WASDIN:  Yeah.  I've got to ask.

10          MR. BUCHANAN:  Did -- did you get the

11   answer correctly is, I don't know?

12              THE COURT REPORTER:  Yes.

13          MR. BUCHANAN:  Thank you.

14   BY MR. WASDIN:

15      Q.   And do you know the group of people at

16   the military who would have been involved in the

17   discussion surrounding the development of the

18   Combat Arms Version 2?

19          MR. BUCHANAN:  Same objection.

20          THE WITNESS:  I -- I don't know unless it

21   was the working group that was asking for it.

1   BY MR. WASDIN:

2       Q.   That's the DoD Hearing Conservation?

3       A.   The DoD Hearing Conservation Working

4   Group, but I'm not -- it's not clear if they were

5   the ones that were asking for it or if they just

6   got the results.

7       Q.   Do you know whether or not Doug Ohlin, in

8   his position as the chair of that working group in

9   the late 1990s, would have had the responsibility

10  or authority to work with outside contractors to

11  develop new hearing protectors?

12          MR. BUCHANAN:  Objection to foundation.

13          THE WITNESS:  I don't know.

14  BY MR. WASDIN:

15      Q.   Okay.  We've talked a lot about Doug

16  Ohlin.  I know you told me what his role was, but

17  did you ever have interactions with him?

18      A.   I did.

19      Q.   How did you interact with Mr. Ohlin?

20      A.   Well, I interacted with him.  When I

21  first came on active duty, I came to the CHPPM to

1   teach a couple of hearing conservation technician

2   courses.  I interacted with him at -- at that time

3   just in -- as an instructor for a course that --

4   that they were -- they were holding at Aberdeen.

5          I met him at conferences and, you know,

6   received updates on the Army's Hearing Conservation

7   Program from him.  That's about it.

8      Q.   Was -- was Doug Ohlin a presenter at the

9   conferences that you went to with him?

10     A.   Not usually.  It was his staff that were

11  presenting.  I -- I don't recall him ever being

12  a presenter in a presentation, other than I -- we

13  received instruction from him related to the wallet

14  cards and -- and the educational materials that

15  were being put out.

16     Q.   For the Combat Arms plug?

17     A.   For the Combat Arms Earplug.  I -- I

18  remember that.

19     Q.   So, you have had conversations with

20  Mr. Ohlin related to the wallet card and

21  instructions for use for the Combat Arms Earplug?

Page 95

1      A.    Yes.

2      Q.    When did you talk to him about that?

3      A.    Oh, I don't remember exactly.  Between

4    200- -- probably 2001 and 2004 or '5.

5      Q.    What were the context for those

6    conversations?

7      A.    Oh, just at -- at the conference about,

8    you know, the -- how to get hearing protectors, how

9    to -- not -- not so much on how to fit them,

10   although I -- well, yeah.  You know, we -- we got

11   instructions on how to order them, who to -- who to

12   order them from in terms of for -- for

13   government -- government sales and -- and then

14   issues related to -- early in their development

15   issues related to insufficient stock of that

16   particular hearing protector because of bulk

17   purchases from other services and what to do to get

18   hearing protectors.

19     Q.    What was your role at the time?

20     A.    I was the chief of the Army Hearing

21   Program at or the Army Hearing Conservation Program

1    and Audiology Clinic at Fort Drum.

2              (Whereupon, Merkley Deposition Exhibit 9,

3    Copy of Wallet Card, marked for identification.)

4              MR. BUCHANAN:  Thank you.

5    BY MR. WASDIN:

6         Q.   LTC Merkley, we've handed you a document

7    marked Exhibit 9, and can you tell me if you

8    recognize that?

9         A.   Yes.

10        Q.   What is that?

11        A.   It's a wallet -- it's one of the wallet

12   cards that was developed.

13        Q.   You mentioned that in your conversations

14   with Doug Ohlin regarding instructions that you

15   discussed the wallet card with him on those

16   occasions, did I remember that?

17        A.   Right.

18        Q.   Okay.

19        A.   Now, I -- I want to make it clear,

20   this -- these weren't necessarily one-on-one

21   discussions, but discussions at a -- a meeting with

1   a group.

2        Q.   Okay.  Who were the people that were in

3   the group?

4        A.   It would have been military audiologists.

5        Q.   Like yourself who were the head of some

6   program --

7        A.   Um-hum.

8        Q.   -- at a different installation?

9        A.   Right.

10       Q.   Okay.  If you look at the wallet card,

11  beside the pictures, there is an image on the right

12  of the plug with the flange folded back on the

13  opposite end?

14       A.   Correct.

15       Q.   Did you ever discuss whether or not to

16  fold the flanges back on the opposite end of the

17  plug with Doug Ohlin?

18       A.   I remember Doug Ohlin giving us

19  instruction on how to fit the earplug.

20       Q.   What did he say?

21       A.   And he -- he said if you have -- well, I

1  don't remember his exact words, but I remember, you

2  know, if you needed to, you could fold back the

3  flange on the earplug to get a good fit.

4      Q.   And so, Doug Ohlin was telling the

5  program managers at the various installations in

6  the country that if they needed to fold back the

7  flanges on one side of the plug, they could do so

8  to get a good fit?

9      A.   Yes.

10          MR. BUCHANAN:  Objection to form and

11  foundation.

12  BY MR. WASDIN:

13      Q.   During his oral discussion of that

14  fitting procedure, did he limit that technique to

15  any particular group of service members, or was it

16  agnostic as to who they were and what their ear

17  canal size was or anything like that?

18      A.   I don't --

19          MR. BUCHANAN:  Objection to form and

20  foundation.

21          THE WITNESS:  Yeah, I don't -- I don't

1  remember it being specific to a particular group of

2  people.

3  BY MR. WASDIN:

4      Q.   So, as you recall, the instruction you

5  got from Doug Ohlin, it was if you need to, you can

6  fold back the flange to fit the plug, and he didn't

7  limit that to one particular size ear canal or

8  another?

9      A.   Correct.

10         MR. BUCHANAN:  Objection.  Form.

11 BY MR. WASDIN:

12     Q.   And those conversations, I think you

13 said, were happening in the '01 to '05 time period?

14     A.   Right.

15     Q.   And was the point of that conversation in

16 the group setting that the program managers at the

17 various installations would then take that

18 information and go back to their particular

19 facility and implement it?

20     A.   Yes.

21         MR. BUCHANAN:  Objection.  Foundation.

1    BY MR. WASDIN:

2        Q.   You gave a lecture at the NHCA conference

3    last week, right?

4        A.   I did.

5        Q.   What was your topic?

6        A.   My topic was just in time learning --

7        Q.   You played --

8        A.   -- and micro learning, hearing, yeah.

9        Q.   You played a video of a guy named Elliott

10   Berger during your speech --

11       A.   I did.

12       Q.   -- am I remembering that right?

13       A.   Yes.

14       Q.   Who is Elliott Berger?

15       A.   Elliott Berger is -- I think he is the

16   principal engineer at 3M at their test lab, hearing

17   protection testing lab.

18       Q.   Do you know Elliott?

19       A.   I do.

20       Q.   How long have you known Mr. Berger?

21       A.   I have -- well, I have known him -- I've

```
 1   known of him for, I don't know, 20 years or so.
 2   I've had more personal interactions with him in the
 3   last eight years just as a member of the -- the
 4   Council for Accreditation in Occupational Hearing
 5   Conservation and his work in different chapters and
 6   regulations that go into the hearing conservation
 7   manual, his work on the ANSI working group.
 8       Q.   What are some of Mr. Berger's
 9   contributions to National Hearing Conservation that
10   you're aware of?
11            MAJOR EVANS:  Is --
12            MR. BUCHANAN:  Objection to form and
13   foundation.
14            MAJOR EVANS:  I'm just going to ask a
15   clarifying question.  Does this relate at all to
16   the CAEv2?  Because that's the scope of the QE.
17            MR. WASDIN:  Mr. Berger is the principal
18   Aearo contact with the Army on the development of
19   the CAEv2.
20            MAJOR EVANS:  Okay.  So, this is going to
21   lead to questions about the CAEv2?
```

1          MR. WASDIN:  Yeah.  Just how he worked

2    with him.

3          MAJOR EVANS:  Okay.  Got it.

4    BY MR. WASDIN:

5      Q.   I'll try -- let me ask the question again

6    just so we get a Q and A.  But what are some of

7    Mr. Berger's contributions to the national

8    hearing -- conservation hearing that you're aware

9    of?

10          MR. BUCHANAN:  I have the same objection.

11    Form and foundation.

12          THE WITNESS:  Well, he's a well-known

13    figure in hearing conservation.  He is the editor

14    of the noise manual.  He's contributed to multiple

15    chapters on hearing conservation in the United

16    States and has been recognized at -- at the

17    National Hearing Conservation Association as such.

18    BY MR. WASDIN:

19      Q.   Has he won awards for that?

20      A.   He has.

21      Q.   What type of awards?

1      MR. BUCHANAN:  Same objections.  Form and

2  foundation.  This is bolstering.

3      THE WITNESS:  Yeah, I -- I don't know for

4  sure what those awards -- I think -- well,

5  I'd -- I'd be trying to remember, and I don't -- I

6  don't recall.

7  BY MR. WASDIN:

8      Q.   Do you know whether Mr. Berger has ever

9  worked with members of the military to help the

10  military advance its hearing conservation mission?

11      A.   I have seen documents between he and Doug

12  Ohlin, but that's the extent of what I've -- what I

13  know about with regard to hearing pro- -- his

14  involvement in hearing protection in the military.

15      Q.   Just based on the documents that you've

16  seen, was he working with Doug Ohlin on a

17  particular project?

18      A.   I -- yes.  I believe he was working

19  on -- with Doug Ohlin on this Combat Arms Earplug

20  project.

21      Q.   Okay.  Given what you know about

1   Mr. Berger and the contributions he's made to

2   national hearing conservation, does it surprise you

3   that Doug Ohlin would work with him to develop a

4   product for the military?

5               MR. BUCHANAN:  Objection to form and

6   foundation.

7               THE WITNESS:  No.

8               MR. WASDIN:  Okay.  Is now a good time to

9   just take a short break?

10              MAJOR EVANS:  Up to you.

11              MR. BUCHANAN:  Sure.

12              MAJOR EVANS:  Whatever you want.

13              MR. WASDIN:  You've got three minutes

14   left on the tape, right?

15              THE VIDEOGRAPHER:  Twenty.

16              MR. WASDIN:  Oh, okay.  You've got a long

17   tape, but let's take a break.

18              THE VIDEOGRAPHER:  We are going off the

19   record.  The time is 10:51.

20              (Recess taken -- 10:51 a.m.)

21              (After recess -- 11:06 a.m.)

Page 105

1          THE VIDEOGRAPHER:  We are back on the

2     record.  The time is 11:06.

3     BY MR. WASDIN:

4          Q.   LTC Merkley, I want to go back to the

5     discussion we were having regarding your

6     communications with Doug Ohlin in the '01 to '05

7     time period regarding fitting the Combat Arms

8     Version 2.

9          A.   Um-hum.

10         Q.   I think you said these discussions would

11    take place at the National Hearing Conservation

12    Association?

13         A.   No.  They would take place usually at the

14    military audiology short course, which was a -- a

15    conference or a -- well, they -- they called it a

16    work -- a course of Army -- Army audiologists

17    would -- would come together and get instruction

18    from leadership, present presentations on things

19    that were happening in -- in the military, and

20    usually, we would get an update from the Hearing

21    Conservation Program on, you know, what -- how

1    things were going and, you know, what was -- what

2    was new that we needed to pay attention to.

3        Q.   And at the time, you were the chief

4    audiologist at Fort Carson?

5        A.   Correct.  No, I'm sorry.  Fort Drum.

6        Q.   Fort Drum.  Okay.  Who else -- would you

7    have had peers that were the chief audiologists at

8    other installations --

9        A.   Oh, yeah.

10        Q.   -- that would also attend those meetings?

11        A.   Right.

12        Q.   Can you recall who else that would have

13    been your peers at other installations would have

14    been at the meetings with Doug Ohlin when he

15    discussed the flange fold?

16        A.   I --

17            MR. BUCHANAN:  Objection to the form.

18            THE WITNESS:  Yeah, most of the Army

19    audiologists, senior audiologists down to junior

20    audiologists.  I can't recall exactly who was

21    there, but usually the -- most of the military

1   audiologists.  Not just in the Army, but across the

2   Navy and the Air Force as well --

3   BY MR. WASDIN:

4        Q.   Okay.

5        A.   -- would attend that meeting.

6        Q.   And they all would have been present for

7   his description on how to fit the product?

8             MR. BUCHANAN:  Objection to form and

9   foundation.

10            THE WITNESS:  Yes.  There -- there were

11  break-out sessions where the services would meet

12  alone, so I -- I can't guaran- --  don't know that

13  Air Force and Navy audiologists would have been in

14  that -- in -- on those conversations.  I just -- I

15  don't recall.

16  BY MR. WASDIN:

17       Q.   Okay.  Do you remember whether or not he

18  gave that guidance via PowerPoint or whether it was

19  just orally?

20       A.   I don't -- I don't remember.

21       Q.   Okay.  Once you would have gotten that

1   guidance at the audiology short course, was the

2   expectation that you would then take it back to

3   Fort Drum and implement it with the folks who fit

4   earplugs there?

5       A.   Yes.

6            MR. BUCHANAN:  Objection to form.

7   BY MR. WASDIN:

8       Q.   And was that true for all of the

9   installation managers who were there, they were

10  going to take that guidance back to whatever

11  installation they were responsible for and

12  implement it?

13           MR. BUCHANAN:  Objection.  Foundation and

14  form.

15           THE WITNESS:  Yes.

16  BY MR. WASDIN:

17      Q.   Okay.  When -- when you got back to Fort

18  Drum at some point after that, did you, indeed,

19  train the -- who are the folks at Fort Drum or

20  elsewhere that would actually be fitting individual

21  service members with earplugs?

Page 109

1    A.   Well, we would -- we trained all of our

2   technicians.

3    Q.   Technicians, that's what I was looking

4   for.

5    A.   Yeah.  So, our hearing technicians, but

6   we also trained -- we conducted training for unit

7   hearing program -- at -- at the time, they were

8   called Hearing Conservation Program officers.  I'm

9   sure there's a reference to that in the DA-PAM, but

10   every company is supposed to have a Hearing

11   Conservation Program officer, and a part of that,

12   their training would be how to fit hearing

13   protection.

14    Q.   Okay.  So, I think I understand.  In one

15   bucket are the technicians who would fit individual

16   service members as they were distributing hearing

17   protection?

18    A.   Correct.

19    Q.   And then in the other one, bucket, you

20   mentioned, it was a unit Hearing Conservation

21   Program officer who would be with a -- a group of

Page 110

1    service members going forward and have that

2    experience?

3         A.    Right.

4         Q.    Okay.  You trained both of those groups

5    of people?

6         A.    Yes.

7         Q.    And when you trained the technicians at

8    Fort Drum, did you include the information you

9    received from Doug Ohlin regarding folding back the

10   flanges as needed to achieve a good fit?

11        A.    Yes.

12             MR. BUCHANAN:  Objection to form.

13   BY MR. WASDIN:

14        Q.    Did you limit your instruction to any

15   particular size ear canal?

16             MR. BUCHANAN:  Objection to form.

17             THE WITNESS:  No.  I don't -- I don't

18   recall that.

19   BY MR. WASDIN:

20        Q.    Okay.  Is that also true for the unit

21   Hearing Conservation Program officers, you gave

1   them the instruction that they could fold back the

2   flanges as needed to achieve a good fit?

3          MR. BUCHANAN:  Objection to form.

4          THE WITNESS:  Yes.

5   BY MR. WASDIN:

6      Q.   And did you limit that instruction by

7   size of ear canal?

8          MR. BUCHANAN:  Same objection.

9          THE WITNESS:  No.

10  BY MR. WASDIN:

11     Q.   Do you know how the technicians would

12  have implemented that guidance at the time they

13  were fitting individual service members with

14  hearing protection -- with the Combat Arms Version

15  2?

16         MR. BUCHANAN:  Objection.  Foundation.

17         THE WITNESS:  Well, I -- I would expect

18  them to implement it just the way that they were

19  instructed.

20  BY MR. WASDIN:

21     Q.   Well, what was the instruction I guess is

1    what I'm asking?

2         A.   To, you know -- well, the instruction

3    really was to get a good fit --

4         Q.   Yeah, right.

5         A.   Okay.  Not -- and then to obtain a good

6    fit.  If you needed to fold back -- back the

7    earplug flange, you could do that, but the specific

8    instruction was get a good fit, and this is how you

9    check --

10        Q.   Okay.

11        A.   -- for a good fit.

12        Q.   And if you're not getting a good fit,

13   this is something you might try?

14        A.   You can try, yes.

15        Q.   That's the same instruction for the unit

16   Hearing Conservation Program officers as well?

17        A.   Correct.

18        Q.   Yeah.  Do you know -- I mean, do you have

19   any feedback from them or maybe you did this

20   personally, but who they ended up having to fold

21   back the flanges for, if anyone?

1     A.   I don't.

2     Q.   Okay.  Just a

3   service-member-by-service-member determination?

4     A.   Right.

5     Q.   I have a --

6          MR. WASDIN:  Can I see document 16?

7          (Whereupon, Merkley Deposition Exhibit

8   10, Bellwether Selection Sheet Case Information,

9   marked for identification.)

10         MR. WASDIN:  Do you want to take at look

11  at this one first?  It's not a military document.

12  I just want to ask about a particular training

13  that's referenced in here.  It's an answer to

14  question 13 on page 4, and we have redacted out

15  PIA.

16         MAJOR EVANS:  Okay.  Hold on a second.

17         MR. BUCHANAN:  Exhibit Number?

18         MR. WASDIN:  Ten.

19         MR. BUCHANAN:  I'm going to object to the

20  use of this.  This is not supposed to be used for,

21  I thought, any purpose beyond case selection.

1          MR. WASDIN:  I --

2          MR. BUCHANAN: I think it violates the

3   Court's Order, or at least its expectation.  I

4   didn't reread the Order.  I didn't anticipate this.

5          MR. WASDIN:  Okay.  I'm not aware of that

6   limitation, and I thought we could ask about it,

7   but --

8          MR. BUCHANAN:  I think the Bellwether

9   case selection sheet was supposed to be exclusively

10  for them.

11         MR. WASDIN:  Your objection is noted, and

12  we'll ask about it and cross that bridge later.  I

13  can just ask about it verbally.

14         MAJOR EVANS:  I -- I don't -- the

15  document doesn't bother me.  I'm more concerned

16  with his knowledge of this, but if -- if he has

17  any, so you can explore that, and we'll see where

18  we go.

19         MR. WASDIN:  Okay.  He may not.  I just

20  want to ask.

21         MAJOR EVANS:  What number is this, I'm

```
 1   sorry?

 2           MR. WASDIN:  Ten.

 3           MAJOR EVANS:  Ten, okay.

 4   BY MR. WASDIN:

 5     Q.   LTC Merkley, I've handed you a document

 6   marked Exhibit 10.

 7           MR. BUCHANAN:  I have a standing

 8   objection on this.

 9           MR. WASDIN:  Mr. Buchanan has a standing

10   objection.

11   BY MR. WASDIN:

12     Q.   I know you have never seen this before.

13   This was a document that was just produced in this

14   litigation by a particular Plaintiff, and I wanted

15   to ask you, it's just questions about training on

16   the Combat Arms Earplug in here, and if you go to

17   question 10, it's -- the question is, describe how

18   you inserted each end of the CAEv2 into your ears,

19   and there's a general description of the insertion

20   technique that ends with, was trained to fold back

21   the opposite end flanges for insertion, do you see
```

Page 121

1    in-processing part, and part of that in-processing

2    includes a medical in-processing, and they would

3    receive a hearing test, get fitted with hearing

4    protection and a small class on hearing

5    conservation.

6        Q.   Would the fitting with hearing protection

7    as part of the intake process be done by the

8    technicians we talked about earlier?

9        A.   Either the technicians or the audiologist

10   on site, yes.

11       Q.   Okay.

12            MAJOR EVANS:  And, sir, can you just

13   clarify the ranks, the rank level of soldiers that

14   go through in-processing?

15            THE WITNESS:  Yeah.  The rank -- I mean,

16   they can be private, E1 to Colonel.

17   BY MR. WASDIN:

18       Q.   Okay.  So, some are brand new in the

19   military; some may have been there for a

20   while --

21       A.   Right.

Page 122

1      Q.    -- but whenever you get a transition of

2    your class or duty station -- regardless of how

3    long you have been in the Army, when you show up at

4    Fort Drum, while you were there, one of the first

5    things that happened was the medical exam that

6    included fitting hearing protection?

7      A.    Correct.

8      Q.    And was that done for all service

9    members?

10      A.    Everybody that came through

11    in-processing.

12      Q.    Was there a training component during

13    that intake on how to fit themselves with earplugs

14    going forward?

15      A.    Yes.

16      Q.    And would -- was it your expectation that

17    the audiologist or the technicians would have given

18    the service members the same fitting tips that you

19    had provided them?

20      A.    Right.  Yes.

21      Q.    And that would include that if they

1  needed to, they could fold back the flanges?

2           MR. BUCHANAN:  Objection to form and

3  foundation.

4           THE WITNESS:  If -- if they were fitted

5  with a Combat Arms Earplug.  We did not routinely

6  fit the Combat Arms Earplug for in-processing.

7  BY MR. WASDIN:

8     Q.   Got it.  If their earplug was the Combat

9  Arms Version 2, their training would have included

10  the option to fold back the flanges as needed to

11  get a good fit?

12     A.   Yes.

13          MR. BUCHANAN:  Objection to form and

14  leading.

15  BY MR. WASDIN:

16     Q.   Looking at the wallet card, which was

17  marked as Exhibit 9, the second bullet at the

18  bottom mentions the option to fold back the flanges

19  on the plug, and then there's an image of it,

20  right?

21     A.   Correct.

1          MR. BUCHANAN:  I think you said the

2    second bullet from the bottom.

3          MR. WASDIN:  Sorry, second bullet at the

4    bottom.

5          MR. BUCHANAN:  Oh, sorry.  Okay.

6    BY MR. WASDIN:

7      Q.   On the wallet card, there is a reference

8    to very large ear canals.  So, it says for very

9    large ear canals, fold opposing plug back?

10     A.   Correct.

11     Q.   Where did the -- that language relating

12   to very large ear canals come from?

13     A.    I don't know.

14     Q.   And I guess I'm asking because you said

15   earlier that the guidance you got was agnostic as

16   to ear canal size, right?

17          MR. BUCHANAN:  Objection.  Form.

18          THE WITNESS:  Right.

19   BY MR. WASDIN:

20     Q.   Okay.  But --

21     A.   At that -- at least that I recall.

Page 125

1       Q.    Yeah.

2       A.    Yeah.

3       Q.    Do you know if the military did its own

4   analysis of what size ear canals were likely to

5   benefit from a fold of the flange?

6       A.    I'm not -- not that I recall.

7       Q.    The military drafted the wallet card

8   though, right?

9       A.    Yes.

10            MR. BUCHANAN:  Objection to form.

11  BY MR. WASDIN:

12      Q.    Other than -- did the military distribute

13  this wallet card to individual service members?

14            MAJOR EVANS:  And can we just clarify

15  real quick, this is the Army's wallet card,

16  correct?  Not the --

17            THE WITNESS:  It is the -- it is the

18  Army's wallet card, yeah.

19            MR. WASDIN:  Sorry.

20            MAJOR EVANS:  Yeah, just to clarify.

21  BY MR. WASDIN:

1        Q.    I should do better about that.  The

2   wallet card that we marked as Exhibit --

3        A.    Nine.

4        Q.    -- 9 is -- was created by USACHPPM for

5   use in the Army?

6        A.    Correct.

7        Q.    Was this wallet card distributed to

8   individual service members?

9             MR. BUCHANAN:  Objection to form and

10   foundation.

11             THE WITNESS:  Individual service members

12   that came through the Hearing Conservation Program,

13   if -- if the clinic had them available, then yes.

14   BY MR. WASDIN:

15        Q.    Okay.  This would be in addition to

16   whatever training they received by the technician

17   or audiologist when they were being fit?

18        A.    Right.

19        Q.    Other than the wallet card, did the Army

20   have other training materials for the Combat Arms

21   Version 2 that it would distribute to soldiers?

1          MAJOR EVANS:  From -- I just want to

2     clarify.  From your experience when you were at

3     Fort Drum or -- or at all in the Army, sir, but

4     then, obviously, you didn't work on this program or

5     design the wallet card, so just from your

6     experience.

7          THE WITNESS:  You know, I -- I just don't

8     recall.  I -- I think there was a -- a single sheet

9     of paper, but I don't -- you know, like an

10    8-and-a-half-by-11 fact sheet, but I don't recall

11    using it a lot to just hand out --

12    BY MR. WASDIN:

13        Q.   Okay.

14        A.   -- to individuals.

15             (Whereupon, Merkley Deposition Exhibit

16    11, Just the Facts Documentation, marked for

17    identification.)

18    BY MR. WASDIN:

19        Q.   LTC Merkley, I'll hand you what we just

20    marked as Exhibit 11.  Is this the single fact

21    sheet you were talking about?

1      A.    I believe so, yes.

2      Q.    Okay.  Other than the wallet card and the

3  one-page fact sheet we marked as Exhibit 11, are

4  you aware of any other training materials that

5  would have been physically distributed to

6  individual service members?

7            MR. BUCHANAN:  Objection to the form of

8  the question --

9            THE WITNESS:  Not -- not that I can

10  recall.

11            MR. BUCHANAN:  -- and foundation.

12  BY MR. WASDIN:

13      Q.    Have you ever seen instructions for the

14  Combat Arms Version 2 that were authored by Aearo

15  or 3M?

16      A.    I have not.

17      Q.    When you were responsible for training

18  technicians and hearing conservation officers on

19  how to fit the Combat Arms Version 2, you weren't

20  relying on any Aearo or 3M instructions; is that

21  fair?

1          MR. BUCHANAN:  Objection to form.

2          THE WITNESS:  Yes.

3    BY MR. WASDIN:

4      Q.   Do you know whether the Army ever used

5    any instructions or training materials provided by

6    Aearo or 3M to train soldiers on how to use the

7    Combat Arms Version 2?

8      A.   I -- I don't know.

9      Q.   You've never seen it?

10     A.   I -- I haven't seen it, no.

11     Q.   Okay.  And, certainly, you wouldn't use

12   any when you were training folks?

13     A.   I -- well, I didn't -- I didn't use any.

14     Q.   Yes.  Let's switch gears a little bit

15   here.  In addition to the testing that we looked at

16   briefly from June of 1999 that was done by Georges

17   Garinther, --

18     A.   Um-hum.

19     Q.   -- are you aware if the military has done

20   other testing on the Combat Arms Version 2 over

21   time?

1      A.   I -- I believe they have.  I recall a

2   couple of reports --

3      Q.   Okay.

4      A.   -- on them, but I --

5           MR. WASDIN:  Thirteen and 14.

6           (Whereupon, Merkley Deposition Exhibit

7   12, Email dated October 23, 2001, marked for

8   identification.)

9           (Whereupon, Merkley Deposition Exhibit

10  13, PowerPoint Presentation, marked for

11  identification.)

12          MR. WASDIN:  Twelve for them.  I'm sorry,

13  sorry, sorry.  That's 14.  Let's start with 13.

14  BY MR. WASDIN:

15     Q.   LTC Merkley, I suspect you may have never

16  seen this before, but I just want to ask you about

17  some of the recipients on it.

18          So, Exhibit 12 is an email from

19  WilliamJMurphy@cdc.gov, do you see that?

20     A.   Um-hum.

21     Q.   And it's dated 10-23-2001, and the

Page 131

1    Subject is impulse peak levels, right?

2        A.   Correct.

3        Q.   Do you know who William Murphy was?

4        A.   I do.

5        Q.   Who was William Murphy?

6        A.   I --

7        Q.   Bill Murphy, right?

8        A.   Bill Murphy, yeah.

9        Q.   Yeah.

10       A.   He is a uniformed public health service

11   acoustic engineer with NIOSH, the National

12   Institute for Occupational Safety and Health.

13       Q.   Is he active in the National Hearing

14   Conservation Association?

15       A.   He's an active presenter --

16       Q.   Yes.

17       A.   -- at the -- the conference, yes.

18       Q.   Mr. Murphy sends this particular email to

19   Elliott Berger, Doug Ohlin, JohnFranks@cdc.gov and

20   Mark Little at cdc.gov, amongst some other people,

21   do you see that?

1      A.    I do, yes.

2      Q.    So, we've discussed Elliott and Doug

3   Ohlin.  Do you know who John Franks was?

4      A.    I don't.

5      Q.    Okay.  Do you know who Mark Little was or

6   is?

7      A.    I -- I don't.  I know a Mark Little, Army

8   audiologist, but I don't believe that that's who

9   this is.

10      Q.    Okay.  Who is the Mark Little Army

11   audiologist you know?

12      A.    He's -- he was a uniformed audiologist.

13   He's retired several years ago.  He's now an

14   audiologist at Fort Gordon.

15      Q.    Did he work with Doug Ohlin?

16          MR. BUCHANAN:  Objection to form and

17   foundation.

18          THE WITNESS:  I -- I don't believe that

19   he ever worked with CHPPM.  Now, he did -- you

20   know, he did -- I -- I believe he did some training

21   with industry.  Now, whether or not -- I don't know

1      A.    Right.

2      Q.    Okay.  When the 1974 standard is used to

3  put a label, an NRR label on a product, do you know

4  how many standard deviation reduction?

5      A.    (Shaking head no.)

6      Q.    Okay.  You don't know --

7      A.    I don't know.

8      Q.    -- if it's one or the two?

9      A.    No.

10      Q.    All right.  So, looking at the chart that

11  is in the October 2008 Air Force testing, when you

12  go to two standard deviations, they list the Combat

13  Arms Earplug green tip as a 15 NRR, do you see

14  that?

15      A.    Um-hum.

16      Q.    And then they list the Combat Arms

17  Earplug yellow tip as a 3 NRR, do you see that?

18      A.    Correct.

19      Q.    So, as of at least October 2008, the

20  gov- -- the Air Force, excuse me, has REAT, Real

21  Ear Attenuation Test data on both ends of the

1    Combat Arms; is that correct?

2         MR. BUCHANAN:  Objection to form and

3    foundation.

4         THE WITNESS:  Correct.

5    BY MR. WASDIN:

6         Q.   And they have used that data to calculate

7    their own NRR for the product?

8         A.   Correct.

9         Q.   Do you know how these NRRs compare to the

10   NRR that was included on the civilian package for

11   the Combat Arms Version 2?

12        A.   I -- I don't.

13        Q.   In your time working with and training

14   people on and distributing the Combat Arms Version

15   2, did you ever look at the NRR on the civilian

16   package?

17        A.   I'm sure I did.

18        Q.   You just don't remember?

19        A.   I don't remember what it -- what it was.

20        Q.   All right.  You don't know if these

21   numbers line up to that or not?

1      A.    I don't.

2      Q.    Okay.  If you flip to page 19, there's a

3  section titled 3.3, Discussion, at the top, do you

4  see that?

5      A.    Um-hum.

6      Q.    And it starts out by saying, the

7  continuous noise protection of all devices tested

8  was reasonable and should provide for a safe

9  exposure level for the average user in many noise

10  environments up to 105 dB, do you see that?

11      A.    Yes.

12      Q.    Do you know what the -- this is Air

13  Force, so, you know, maybe this is just something

14  totally different, but does the Army or Air Force

15  use any particular standard for reasonable?

16           MR. BUCHANAN:  Objection to form and

17  foundation.

18  BY MR. WASDIN:

19      Q.    It says it was -- the continuous noise

20  protection of all devices tested was reasonable.

21  Is that just the author's interpretation of the

1   test data or something, or is that a military

2   standard, if you know?

3        A.   I don't -- I don't know.

4        Q.   Okay.  Flipping the page to page

5   20 -- geez -- it goes on to say, the passive in the

6   ear tactical headset, ITE TH work as they should in

7   that continuous noise settings provide more

8   continuous noise attenuation than the impulse noise

9   settings.  Table 1 illustrates that the Combat Arms

10  Earplug green, intended for continuous noise

11  protection, provides very good attenuation and is

12  readily distinguished from the Combat Arms P yellow

13  intended for impulse noise protection setting, did

14  I read that right?

15       A.   Yes.

16       Q.   So, as of October of 2008, this list of

17  authors doing an Air Force study of the Combat Arms

18  determined that it provides very good attenuation

19  in continuous noise?

20            MR. BUCHANAN:  Objection to form and

21  foundation.

1          THE WITNESS:  Yes.

2     BY MR. WASDIN:

3          Q.   If you go to page 21, in addition to

4     conducting testing on continuous noise, it looks

5     like they also did some air blast overpressure

6     measurements for impulse noise, right?

7          A.   (Nodding head yes.)  Yes.

8          Q.   And if you flip the page to page 22 and

9     23, there are images of how they conducted some of

10    that testing, do you see those?

11         A.   Um-hum.  Yes.

12         Q.   Figure 17, in particular, is labeled as

13    195 dB blast, do you see that?

14         A.   Yes.

15         Q.   And it looks like what they've done is

16    put some manequin heads on the ground and exploded

17    some sort of explosive within a couple of feet of

18    the heads, is that fair?

19         A.   Yes.

20         Q.   195 decibels, are there -- what are these

21    weapons, if any, in the military arsenal that would

Page 171

1    create 195 decibel impulse peak?

2              MR. BUCHANAN:  Objection to the form.

3              THE WITNESS:  I'm -- I'm not aware of any

4    that create 195 decibel peak.

5    BY MR. WASDIN:

6        Q.    It looks like to get that high, you have

7    to basically have an explosion happen a few feet

8    away from you.

9              MR. BUCHANAN:  Objection to form.

10             THE WITNESS:  I --

11   BY MR. WASDIN:

12       Q.    Okay.

13       A.    I -- I guess, yeah.

14       Q.    Okay.  Do you know any that

15   create -- weapons in the military arsenal that

16   create 190 dB peak?

17       A.    That approximate --

18       Q.    What are those?

19       A.    -- 190.  Some of the shoulder-fired

20   weapon systems.

21       Q.    Like shoulder fired --

1    have you ever surveyed individual service members

2    on their use of the Combat Arms Version 2?

3        A.   Not -- not that I recall.  I've -- I've

4    surveyed -- I did a user acceptance, but it wasn't

5    for the Version 2.

6        Q.   Did you, while in Iraq, observe service

7    members who had used the Combat Arms Version 2 and

8    been exposed to noise and then those who had not

9    worn hearing protection and been exposed to noise?

10       A.   Yes.

11       Q.   And did the Combat Arms Version 2 protect

12   service members in Iraq?

13            MR. BUCHANAN:  Objection to form and

14   foundation.

15            THE WITNESS:  I -- I won't be specific on

16   the Combat Arms Version 2, but hearing protection

17   use did protect the individuals.

18   BY MR. WASDIN:

19       Q.   But you're including the Combat Arms?

20       A.   Including the Combat Arms Earplug.

21       Q.   So, what you observed in Iraq was service

1    members who did not use hearing protection, had

2    greater rates of threshold shifts than those who

3    used hearing protection, including the Combat Arms

4    Version 2?

5         A.   Yes.

6         Q.   Do you know if other audiologists in the

7    military have surveyed service members on how well

8    the Combat Arms Version 2 works?

9              MR. BUCHANAN:  Objection to form.  It

10   implies that he had actually done that, but --

11             THE WITNESS:  I -- I don't -- I'm -- I'm

12   not -- I don't recall any surveys being done

13   specifically on that.

14   BY MR. WASDIN:

15        Q.   One --

16             (Whereupon, Merkley Deposition Exhibit

17   15, PowerPoint Presentation with Attachment, marked

18   for identification.)

19             MR. WASDIN:  How much time is left on the

20   tape?

21             THE VIDEOGRAPHER:  Fifty-five.

1          MR. WASDIN:  Fifty-five?

2          THE VIDEOGRAPHER:  Yes.

3          MR. WASDIN:  And how long have I been on

4     the record total?

5          THE VIDEOGRAPHER:  Two hours and 49

6     minutes.

7          MR. WASDIN:  Okay.

8     BY MR. WASDIN:

9      Q.    LTC Merkley, I've handed you a -- a

10    document that was produced this way to us by the

11    military in this case, and so I think there's a

12    couple of things here that are all bound together.

13    I'm going to do my best to direct you around.  It's

14    going to be a little unwieldy.

15     A.    Okay.

16     Q.    But if you flip past the PowerPoint

17    presentation, which is probably the first 15 or so

18    pages -- yep, keep going.  Past that redacted page.

19    Right there.

20          This is an email chain dated October 6,

21    2005.  Subject RE:  Success story regarding the

1   Combat Arms Earplug, right?

2        A.   Correct.

3        Q.   It was sent from Leanne Cleveland to

4   Kathy Gates, Kevin Hannah and a variety of other

5   people in the military, including, if you go all of

6   the way down to the bottom, you, do you see that?

7        A.   Yes.

8        Q.   Who is Leanne Cleveland?

9        A.   She's an audiologist in the Army; active

10  duty.

11       Q.   Who is Kathy Gates?

12       A.   Kathy Gates, she -- she is -- was an Army

13  audiologist at this time serving in -- at the

14  Office of the Surgeon General.  I'm not sure she

15  was a consultant to Army audiology or to the

16  Surgeon General for Army audiology, but I -- I

17  don't know if she was a consultant at this time.

18       Q.   I don't want to ask you about every

19  single person here on the cc: line, but are these,

20  generally, folks that were involved in military or

21  Army hearing conservation?

1      A.    Yes, all -- all of them.

2      Q.    And do you recall this discussion amongst

3  this group of Army audiologists in 2005 regarding

4  success stories for the Combat Arms Earplug?

5      A.    I don't -- I don't recall it, but I

6  obviously had seen it.

7      Q.    If you just go to this first -- it's a

8  very long chain, and I'll tell you that I think it

9  duplicates itself a few times on the way through,

10  so I don't want to attempt to track it.  But if you

11  just go to the first one, it looks like this is an

12  email from Leanne Cleveland specifically at least

13  to Kathy Gates and Kevin Hannah, copying the rest

14  of the Army audiology community and sharing two

15  success stories, right?

16      A.    Right.  Two?

17      Q.    It says --

18      A.    Yes.  Yes, two.  Okay.

19      Q.    I'm going to read the first one.

20      A.    Okay.

21      Q.    Several months ago, I saw an O6 Brigade

1  Commander for his post-deployment OIF audiometric

2  evaluation.  What's -- what's the post-deployment

3  OIF audiometric evaluation?

4      A.   Well, the post-deployment hearing test.

5  So, the unit is returning from a deployment, and

6  they get a hearing test to determine if -- has

7  there been any change in their hearing.

8      Q.   And what is an O6 Brigade Commander?

9      A.   An 06 is a Colonel level.  A Brigade

10 Commander is generally a full-bird Colonel.

11     Q.   And can we tell anything from the time

12 period about where he was likely returning from?

13     A.   Well, it says he was returning from

14 Operation Iraqi Freedom, OIF.

15     Q.   Okay.  So, this is Lee -- Leanne

16 Cleveland must have done the post-deployment OIF

17 audiometric evaluation on this?

18     A.   Yes.  She or her -- her staff.

19     Q.   Okay.  So, this is somebody who had been

20 in combat basically --

21     A.   The --

1      Q.   -- the O6 Brigade Commander --

2      A.   Yes.

3      Q.   -- that was being evaluated?  It goes on

4   to say, he told me that he hadn't heard of the CAE

5   plugs until he was in theatre.  He did not know

6   what they looked like, but he was determined to get

7   them for his entire brigade.  He inquired with some

8   local Iraqi supply company and ended up purchasing

9   what he thought were CAE plugs, but in reality,

10   they were only foam plugs.

11          Finally, he made some calls back to Fort

12   Hood and was able to get his staff to order them

13   here and then ship them out to the brigade.  They

14   were finally received by the soldiers in Iraq

15   at -- over four months after they initially

16   deployed.

17          The COL, the Colonel, told me that he was

18   sitting in the back of his HMWVV with his new CAE

19   plugs in his ears for the first time when he

20   experienced his first IED blast in close range.  He

21   said that his soldiers in the HMWVV had just been

1    grumbling to him about his insistence that they all

2    wore their CAE plugs, but that they were all very

3    glad that they had their CAEs after the blast, and

4    they all wore them every day afterwards.  By the

5    way, the Colonel had no hearing loss and no

6    tinnitus upon redeployment, did I read that right?

7         A.   Yes.

8         Q.   Is it -- we talked just a couple of

9    minutes ago about a -- basically how loud an IED

10   blast would be at close range, so it sounds like

11   this is a service member who experienced a

12   close-range IED blast while wearing the Combat Arms

13   Earplug?

14        A.   Correct.

15        Q.   And what Leanne Cleveland is

16   determining -- determining is that after that

17   event, while wearing those plugs, he had no hearing

18   loss and no tinnitus?

19        A.   Correct.

20        Q.   Is that -- I mean, 190 dB, are there many

21   hearing protection devices available to the Army,

1  passive earplugs, that would protect against 190 dB

2  with no hearing loss and no tinnitus?

3          MR. BUCHANAN:  Objection.  Form, vague.

4  At what range?

5  BY MR. WASDIN:

6      Q.   At close range?

7      A.   Are there a lot of earplugs?

8      Q.   Right.

9      A.   I -- I would expect that any of the

10  earplugs that were available at this time, if they

11  were in use, would have -- have been protective.

12      Q.   If they're working?

13      A.   If they're working and fitted correctly.

14      Q.   They would be protective?

15      A.   They would be protective.

16      Q.   And this is telling us that the Combat

17  Arms Earplug was protective for that exposure?

18          MR. BUCHANAN:  Objection to form.

19          THE WITNESS:  For this, yes.

20  BY MR. WASDIN:

21      Q.   The second success story she shares is,

1    at a recent PDHRA Post Deployment Health

2    Reassessment Survey session --

3         A.    Where --

4         Q.    Number 2.

5         A.    Okay.  I'm sorry.

6         Q.    -- I asked several redeploying 1CAV

7    soldiers the following questions re: the CAE plug

8    at the request of Aearo.  What is a Post Deployment

9    Health Reassessment Survey session?

10        A.    The -- well, every -- every soldier that

11   deploys, when they return, that -- they're required

12   to complete a health assessment, a post deployment

13   health assessment --

14        Q.    Basically --

15        A.    -- and -- and now, this was the Post

16   Deployment Health Reassessment, so I believe that's

17   90 days post deployment.  So, they come back.  They

18   -- they do their Post Deployment Health Assessment,

19   and then there's a -- a reassessment.

20        Q.    What is a 1CAV soldier?

21        A.    First calvary division, so CAV is a Cav.

1    Q.   And then later, I'm about to read the

2  sentence, but it references an SPC 50 cal gunner.

3  What is that?

4    A.   Where is that?

5    Q.   The next sentence.

6    A.   Oh, the S -- like this -- I -- I believe

7  what they're referring to is a specialist, the rank

8  of specialist who is a 50 -- who was a 50, a gunner

9  on a 50-caliber machine gun.

10    Q.   What type of impulse peaks does a 50 cal

11  machine gun create?

12    A.   I don't know off the top of my head.  I

13  know it's documented.  I -- I just don't know right

14  off the top of my head.

15    Q.   Leanne Cleveland in this success story

16  goes on to state, I wish all soldiers believed in

17  the merit of the Combat Arms Earplug like this SPC

18  50 cal gunner does.  (I especially liked his

19  comment that he wouldn't change anything about the

20  Combat Am -- Combat Arms Earplug -- plug or the

21  case, because they "worked for 205 convoys.")  Did

1    I read that right?

2        A.   Yes.

3        Q.   What is a -- what does it mean to work

4    for a 205 convoy?

5        A.   I -- I read that to mean that it worked

6    for 205 convoys.  The individual com- -- completed

7    205 convoys during their tour.

8        Q.   I asked you earlier about, you know,

9    performance on shot one versus performance on shot

10   101, and you said you thought they'd be the same

11   unless there was an issue with the fit, right?

12           MR. BUCHANAN:  Objection to the form.

13           THE WITNESS:  Correct.

14   BY MR. WASDIN:

15       Q.   This is a report from a 50 cal gunner,

16   who had been employed into Iraq, that says they

17   worked for 205 separate convoys, right?

18           MR. BUCHANAN:  Objection to form.

19           THE WITNESS:  That's what it appears to

20   say, yes.

21           (Whereupon, Merkley Deposition Exhibit

1    16, ArmyTimes Article, marked for identification.)

2    BY MR. WASDIN:

3        Q.    LTC Merkley, Exhibit 16 is a -- an

4    article that was published in the ArmyTimes titled,

5    Army Says New Earplugs Will Save Your Hearing, in

6    which you are quoted?

7        A.    Correct.  Okay.  Yes, I'm sorry.

8        Q.    Yes.  What is the ArmyTimes?

9        A.    It is a news -- a newspaper that's

10   published for the Army and distributed online, or

11   in the PX you can buy it.

12       Q.    This one was -- at least at the top, it

13   was listed as posted on September 8th, 2009, do you

14   see that?

15       A.    Um-hum.

16       Q.    Is that -- do you remember if that's the

17   date of this article or when you participated in

18   it?

19       A.    I -- I would have participated in it

20   before that day, but --

21       Q.    That's approximately?

1      A.   Right.  Right, yeah.

2      Q.   So, this is after you had been deployed

3  into Iraq and had seen service members in combat --

4      A.   Correct.

5      Q.   -- in theatre.  And you've -- you've

6  returned to the U.S. at this point?

7      A.   I returned to Germany.

8      Q.   To Germany, excuse me.

9      A.   Yes.

10     Q.   If you skim through this, there's a lot

11 of quotations from you and I believe two other Army

12 audiologists, including Kathy Gates.  Sometimes

13 the -- I'm trying to find the quote.  Yes, Kathy

14 Gates is quoted at the bottom there.  There's

15 CPT Jillyen Curry-Mathis in the middle?

16     A.   Correct.

17     Q.   Did all of you give an interview

18 together?

19     A.   No.

20     Q.   Okay.  So, separate interviews that were

21 compiled into this?

1   dismounted out of a vehicle and may have hid.  In

2   the two cases that I quote previously, the two

3   leaders, those were both IED events, but not always

4   IED events.

5          It could be a fire fight or an incoming,

6   indirect fire.  A mortar or a round goes off or a

7   rocket or an RPG hits them, so not -- not always an

8   IED.

9      Q.   Can you describe the situation that's

10  referenced here of a vehicle stopping, removing the

11  communications headsets, getting out, not putting

12  in earplugs, and then encountering some sort of

13  impulse noise as, in your opinion, I guess here a

14  common occurrence?

15         MR. BUCHANAN:  Objection to form.

16         THE WITNESS:  I --

17  BY MR. WASDIN:

18     Q.   That was a terrible question, but if you

19  could just tell me what you're talking about in

20  this paragraph.

21     A.   In -- in which paragraph?

1    Q.   The one that starts out, most of the

2    soldiers he treated.  I'm just trying to understand

3    what you're talking about in that paragraph,

4    A.   Well, if I -- if I was treating an --

5    so -- so, treating somebody that has a significant

6    hearing damage, in the majority of those cases, the

7    individual had either gone outside the wire without

8    their hearing protection in or dismounted a

9    vehicle, taken hearing protection off and continued

10   the mission without hearing protection.

11        Those that wore hearing protection had

12   very little, if any, hearing damage, especially

13   when it came to IED blasts.

14   Q.   That's what -- I'm sorry, I didn't mean

15   to interrupt you.

16   A.   I was just going to say because the

17   injuries from an IED, especially tympanic membrane

18   injuries, can be catastrophic without the use of

19   hearing protection.

20        With the use of hearing protection, you

21   saw very, very little dam- -- physical damage to

1    the tympanic membrane, and if there was, depending

2    on the volume of the blast, you -- you might see

3    just a small tympanic membrane perforation that

4    would easily heal in theatre.  So, that's what I'm

5    referring to.

6         Q.   Yeah.  I think you just said it way

7    better than I attempted to, but the essence of it

8    is when you were in Iraq, most of the cases of

9    hearing-related injuries you saw stemmed from not

10   wearing hearing protection?

11        A.   Correct.

12             MR. BUCHANAN:  Objection to form.

13   BY MR. WASDIN:

14        Q.   And that those service members who you

15   treated who had worn hearing protection, including

16   the Combat Arms Version 2, tended to not have any

17   hearing loss?

18             MR. BUCHANAN:  Objection to form.

19             THE WITNESS:  Correct.

20   BY MR. WASDIN:

21        Q.   If you flip the page in this article,

1  there's a reference to something Kathy Gates says.

2  It's in the second sort of full paragraph.

3          It says, soldiers who wear the CAE

4  properly, Gates said, don't show any hearing loss

5  or injury.  Is that essentially what you're

6  describing your own experience was?

7          MR. BUCHANAN:  Objection to form.

8          THE WITNESS:  Yes.  Now, a -- a point of

9  clarification here, because Combat Arms Earplug at

10  the time could have -- especially this is in

11  2009 --

12  BY MR. WASDIN:

13     Q.   It could be a different version of the

14  plug?

15     A.   It could be a different version of the

16  plug, and it may not be a 3M Combat Arms Earplug.

17     Q.   Got you.  But --

18     A.   It --

19     Q.   -- don't all versions have the ISL filter

20  that is the impulse noise reduction mechanism?

21     A.   I -- I don't know.

1      Q.   Okay.  Have you ever personally used the

2   Combat Arms Version 2?

3      A.   Yes.

4      Q.   Did it work for you?

5      A.   Yes.

6      Q.   Did you need to fold the flanges back to

7   get a good fit?

8      A.   I didn't.

9      Q.   So, you wore it without the flanges

10  folded back, and it worked?

11     A.   Yes.

12     Q.   Would you wear it today?

13          MR. BUCHANAN:  Objection to form.

14          MAJOR EVANS:  Don't -- don't answer that.

15          THE WITNESS:  Okay.

16  BY MR. WASDIN:

17     Q.   How often did you wear it in service?

18     A.   As -- as long as I had it.

19     Q.   What time period did you have it?

20     A.   So, I had that earplug -- well, I -- I

21  got my first set in -- right around 2000 when they

1    were just starting to come out in the military.

2              It was at the -- I believe the MASC, the

3    military audiology short course, so it may have

4    been 2001, because I -- I don't remember if I went

5    in 2000.  In 2001 definitely, and then up until

6    the -- the new version came out --

7         Q.   Do you remember what year --

8         A.    -- the single-sided version.

9         Q.   Do you remember what year you

10   transitioned from the dual-ended to the

11   single-ended version?

12        A.    In 2007.

13        Q.   So, you wore the Version 2, the

14   dual-ended version, during your deployment in Iraq,

15   right?

16              MR. BUCHANAN:  Objection to form.

17              THE WITNESS:  Yes.

18   BY MR. WASDIN:

19        Q.   Okay.  Was that the only hearing

20   protector you used while you were over there?

21        A.    No.

1      Q.   How frequently --

2      A.   No.  I -- I -- I'm sorry, how frequently?

3      Q.   Sorry.  I interrupted you there.  Go

4   ahead.

5      A.   I was going to say, I -- I used the

6   quad-flange earplug probably more often than

7   the -- the Combat Arms Earplug, but if on a range,

8   I would wear the Combat Arms Earplug.

9      Q.   You fired weapons with it in?

10      A.   Yes.

11      Q.   What was the loudest weapon you can

12   remember being around while wearing the Combat Arms

13   Version 2?

14      A.   Oh, an M4 -- an M16.

15      Q.   A rifle basically?

16      A.   Yeah, a rifle.

17           MR. BUCHANAN:  I'm sorry, was that both

18   of those, or just an M16?

19           THE WITNESS:  I -- M16.  I -- I fired the

20   M16.  I haven't fired an M4.

21   BY MR. WASDIN:

1      Q.    The -- you mentioned the quad-flange

2   earplug?

3      A.    Um-hum.

4      Q.    That's one of the ear -- linear passive

5   earplugs that the Army has available to it?

6      A.    Correct.  Yes.

7      Q.    There's also a triple-flange earplug

8   that's a linear passive earplug that the Army has

9   available to it, right?

10     A.    Right.

11     Q.    Who makes the triple-flange earplug that

12  the Army has?  Is it North Com-Fit or something?

13          MR. BUCHANAN:  Objection to form.

14          THE WITNESS:  I don't know.  You're

15  talking about the orange and the blue triple

16  flange?

17  BY MR. WASDIN:

18     Q.    I've got a document that may help us.

19  Let's see.  I don't know what color it is.

20     A.    If it's the standard triple-flange

21  earplug, I -- I don't know who the manufacturer is.

```
 1   It's been around for a -- a long time, and
 2   I --
 3       Q.   Before?
 4       A.   Well, that's what I was fitted with back
 5   in '91 when I came on active duty, and -- and we
 6   still have them today.
 7       Q.   I'm going to regret --
 8            MR. WASDIN:  Let me see 22.
 9   BY MR. WASDIN:
10       Q.   I have got a document with no page
11   numbers that I've been trying to not use because I
12   know it's going to be a nightmare, but --
13            (Whereupon, Merkley Deposition Exhibit
14   17, Interim Hearing Protector Approval Criteria and
15   Approval Process, marked for identification.)
16            MR. BUCHANAN:  It's exhibit what number?
17            MR. CARTER:  Seventeen.
18   BY MR. WASDIN:
19       Q.   I will try to pre-find what I want to ask
20   you about.
21       A.   Okay.
```

1      Q.   And I'm already struggling.  A-ha, yes.

2   So, hold this page, but you can look at the first

3   page and see if -- this is --

4           MR. BUCHANAN:  Can you do it for me, too?

5           MR. WASDIN:  Oh, gosh.  Starting at the

6   bottom --

7   BY MR. WASDIN:

8      Q.   So, before I ask you about the specific

9   page, this was a document that was produced to us

10   by the military, I believe the Army, but I'm not a

11   hundred percent sure.  It looks like some sort of a

12   draft, but there's a title on the first page that

13   says, Interim Hearing Protector Approval Criteria

14   and Approval Process, do you see that?

15      A.   I do.

16      Q.   Have you ever heard of a document with

17   that title before?

18      A.   No.

19      Q.   Okay.  Have you ever seen this document

20   before?

21      A.   Not that I recall, no.

Page 446

1              THE WITNESS:  Yes.

2     BY MR. WASDIN:

3         Q.   Now, your experience with the plug, when

4     you used it, is that you got a seal, correct?

5         A.   Correct.

6         Q.   You didn't have any problem getting a

7     seal with the Combat Arms Version 2, right?

8              MR. BUCHANAN:  Objection to form.

9              THE WITNESS:  No.

10    BY MR. WASDIN:

11        Q.   So, in addition to -- that's -- that's a

12    piece of questioning by Mr. Buchanan that you

13    actually do have a reason to disagree with, right?

14             MR. BUCHANAN:  Objection to form.

15    Misstates the testimony.

16    BY MR. WASDIN:

17        Q.   Your own personal experience is contrary

18    to his representation, right?

19             MR. BUCHANAN:  Objection to form.

20             THE WITNESS:  Correct.

21    BY MR. WASDIN:

Page 447

1      Q.   Okay.  I believe you mentioned in passing

2   to Mr. Buchanan, and he cut you off, that you

3   recalled at some point seeing some testing where

4   the flanges had been folded back on the plug, am I

5   remembering that right?

6           MR. BUCHANAN:  Objection to form.

7           THE WITNESS:  That I had seen -- yes.

8   BY MR. WASDIN:

9      Q.   What was that testing?

10      A.   I -- I don't recall what the testing was.

11      Q.   Do you remember --

12      A.   I -- I don't remember.  I -- I just

13   recall seeing testing or some document, I don't

14   remember if it was in the DOJ documents or where,

15   that they had done testing with flanges folded

16   forward and flanges folded backward.

17      Q.   Do you remember what time period you saw

18   reference to that in?

19      A.   I don't.

20      Q.   Okay.

21      A.   I'm sorry.

1     Q.   That's okay.  Now, Mr. Buchanan asked you

2    some questions about Mr. Hobbs's interview in the

3    CID report, do you remember that?

4     A.   Yes.

5         MR. WASDIN:  1079.240.

6         MR. BUCHANAN:  What's the PIIN site?

7         MR. WASDIN:  1079.240.

8    BY MR. WASDIN:

9     Q.   In particular, Mr. Buchanan focused on

10   the statement on 1079.240 near the bottom of the

11   page that says, Mr. Hobbs stated that he was not

12   made aware of any problems with the Combat Arms

13   Earplug nor would he have told anyone to fold back

14   the opposite end for testing, did I read that

15   right?

16    A.   Yes.

17    Q.   So, Mr. Hobbs wasn't folding the opposite

18   end back in his testing?

19         MR. BUCHANAN:  Objection to form.

20         THE WITNESS:  Correct.

21   BY MR. WASDIN:

Page 449

1      Q.   And that's interesting, because if you go

2    to the Hobbs testing, which is the Air Force

3    testing we've been talking about all day, he

4    actually does -- are you with me on the Air Force

5    document?

6      A.   I am.

7           MR. BUCHANAN:  Where are you?

8           MR. WASDIN:  I have not gone anywhere

9    yet, but I'm about to go to page 4.

10          MR. BUCHANAN:  Okay.

11   BY MR. WASDIN:

12     Q.   He actually does real ear attenuation

13   testing as part of that testing, right?

14          MR. BUCHANAN:  Objection to form.

15          THE WITNESS:  Yes.

16   BY MR. WASDIN:

17     Q.   And real ear there means the earplugs

18   were inserted into a human ear and tested for

19   attenuation, right?

20     A.   Correct.

21     Q.   And if you go to page 19, at the top,

Page 450

1    there's a paragraph called, Discussion.  He

2    determines that the continuous noise protection of

3    all devices tested was reasonable and should

4    provide for a safe exposure level for the average

5    users in many noise environments up to 105 dB,

6    right?

7              MR. BUCHANAN:  Objection to the form.

8              THE WITNESS:  Yes.

9    BY MR. WASDIN:

10       Q.   So, Mr. Hobbs is testing the earplug in

11   human ears without rolling the flanges back, and

12   they are working?

13             MR. BUCHANAN:  Objection to form.

14             THE WITNESS:  Yes, it appears so.

15   BY MR. WASDIN:

16       Q.   The next -- sorry to cut you off.  The

17   next -- I'm hurrying because of my 21-minute time

18   limit.

19       A.   Right.

20       Q.   The next page, on page 20 goes on.  The

21   Hobbs report notes the passive in the ear, TH,

1    including the Combat Arms Earplug, work as they

2    should and that the continuous noise settings

3    provide more continuous noise attenuation than the

4    impulse noise setting.  Table 1 illustrates that

5    the Combat Arms Earplug, green, provides very good

6    attenuation and is readily distinguished from the

7    CAEP yellow, am I right?

8        A.   Yes.

9        Q.   That was what Mr. Hobbs determined in

10   October of 2008 about the Combat Arms Earplug in a

11   human ear without rolling the flanges back?

12            MR. BUCHANAN:  Objection to form,

13   foundation.

14   BY MR. WASDIN:

15       Q.   Correct?

16       A.   Yes.

17       Q.   Mr. Buchanan insinuated in about 200

18   questions that there was a problem with the earplug

19   and asked you, did you have any information to

20   disagree the earplug did not provide adequate

21   attenuation?  Do you remember those types of

Page 452

1   questions?

2          MR. BUCHANAN:  Objection.  Misstates the

3   record.

4          THE WITNESS:  Yes.

5   BY MR. WASDIN:

6      Q.   And I want to talk about the information

7   you told me that does contradict Mr. Buchanan's

8   representations.

9          MR. BUCHANAN:  Objection.  Not a

10  question.

11  BY MR. WASDIN:

12     Q.   First, we have test data from a variety

13  of branches of the military that show that the plug

14  provides reasonable attenuation or good attenuation

15  under a variety of different circumstances, right?

16         MR. BUCHANAN:  Objection to form and

17  foundation.  Vague.

18         THE WITNESS:  Yes.

19  BY MR. WASDIN:

20     Q.   Second, you have personal experience with

21  the plug, and for you, it worked well?

Page 453

1      A.    Yes.

2            MR. BUCHANAN:  Objection to form.

3    BY MR. WASDIN:

4      Q.    Third, we reviewed a number of success

5    stories from other members of the military who

6    served in Iraq who said that the plug worked for

7    them, too, right?

8      A.    Yes.

9      Q.    Third, you treated patients in Iraq, and

10   your experience was those that didn't use a plug

11   had hearing loss, and those that did use a hearing

12   protector, like the CAEv2, did not, right?

13           MR. BUCHANAN:  Objection.  Form.

14           THE WITNESS:  Correct.

15   BY MR. WASDIN:

16     Q.    Mr. Buchanan walked through a number of

17   documents, training materials that were written by

18   the Army on the Combat Arms Version 2, right?

19     A.    Yes.

20     Q.    And he asked you for each, did it mention

21   folding back the flanges.  Do you remember those

Page 454

1    questions?

2        A.   Yes.

3        Q.   Now, there are some Army training

4    materials that do mention folding back the flanges,

5    right?

6            MR. BUCHANAN:  Objection.  Form.

7            THE WITNESS:  Yes.

8    BY MR. WASDIN:

9        Q.   Indeed, the wallet card, which I think

10   was the principal training material, has a picture

11   of the plug with the flanges rolled back on it,

12   right?

13       A.   Yes.

14           MR. BUCHANAN:  Objection to form.

15   BY MR. WASDIN:

16       Q.   But, perhaps, to his point, some training

17   materials authored by the Army do reference the

18   flanges and some do not, correct?

19           MR. BUCHANAN:  Objection to form.

20           THE WITNESS:  Correct.

21   BY MR. WASDIN:

Page 455

1      Q.   But your experience was, regardless of

2   what a particular document did or did not say, that

3   in the 2001 to 2005 time period, Doug Ohlin

4   instructed you and other Army audiologists to fold

5   back the flanges as needed to get a good fit,

6   right?

7           MR. BUCHANAN:  Objection to form.

8           THE WITNESS:  Yes.

9   BY MR. WASDIN:

10     Q.   And he didn't limit that instruction to

11  any particular ear -- ear canal size, right?

12     A.   I don't recall that, no.

13     Q.   Now, Mr. Buchanan asked you

14  questions -- I think he put a document on the

15  screen that had the term imperceptible loosening in

16  quotes, do you remember that?

17     A.   Yes.

18     Q.   And he asked you, wouldn't it be

19  important to know if the Combat Arms Version 2 was

20  susceptible to imperceptible loosening, and I think

21  you said yes?

1     A.   Yes.

2     Q.   Now, you told me earlier that all

3  preformed earplugs are susceptible to loosening,

4  right?

5     A.   Yes.

6     Q.   That's a well-known phenomenon, right?

7     A.   Yes.

8          MR. BUCHANAN:  Objection to form.

9  BY MR. WASDIN:

10     Q.   So, users of the Combat Arms Version 2,

11  at least the audiology community, would know, like

12  other preformed earplugs, it could be susceptible

13  to loosening, right?

14          MR. BUCHANAN:  Objection.  Form.

15  Foundation.  Well beyond the witness.

16          THE WITNESS:  Yes.

17  BY MR. WASDIN:

18     Q.   Yourself included, right?

19          MR. BUCHANAN:  Objection to form.

20          THE WITNESS:  Yes.

21  BY MR. WASDIN:

1      Q.   Now, your experience was with any

2  preformed earplug that did loosen, including if it

3  happened to you with the Combat Arms Version 2, it

4  was perceptible to you, right?

5      A.   Yes.

6           MR. BUCHANAN:  Objection.

7  BY MR. WASDIN:

8      Q.   That in the real world, you had an

9  auditory clue that you had lost the seal of your

10 hearing protector, right?

11     A.   Yes.

12     Q.   Now, here is some more testimony he

13 didn't tell you about.

14          MR. BUCHANAN:  Objection, Counsel.

15 That's just wrong.  You're not going to be able to

16 do that examination in Court.  You can't do it in

17 this room.

18          MR. WASDIN:  Okay.

19          MR. BUCHANAN:  That's what the Federal

20 Rules say.

21          MR. WASDIN:  Okay.

1   BY MR. WASDIN:

2       Q.   I'll represent to you some testimony

3   given in this case.  Mr. Berger said that the

4   concept of imperceptible loosening is a phenomenon

5   that's limited to the REAT chamber because there

6   are no auditory clues in a silent room.  Do you

7   follow that logic?

8           MR. BUCHANAN:  Objection to form.

9           THE WITNESS:  Yes.

10  BY MR. WASDIN:

11      Q.   And in a silent room that had no auditory

12  external clues, if you lost your seal on a plug,

13  you might not notice it, right?

14          MR. BUCHANAN:  Objection to form and

15  foundation.

16          THE WITNESS:  Correct.

17  BY MR. WASDIN:

18      Q.   But in the real world, particularly in a

19  combat setting or in military training, if you lose

20  your seal on a plug, you will notice it?

21          MR. BUCHANAN:  Objection.  Foundation.

1          THE WITNESS:  Generally, yes.

2    BY MR. WASDIN:

3       Q.   Okay.

4          MR. BUCHANAN:  I think you have a minute.

5    BY MR. WASDIN:

6       Q.   I have one or two final questions in my

7    minute.  Mr. Buchanan asked you, did anybody send

8    you the so-called flange memo that discusses how

9    folding back the flanges impacted the results of

10   REAT testing at Aearo Company, do you remember that

11   question?

12      A.   Yes.

13      Q.   And I think you said, no, no one sent me

14   the memo, right?

15      A.   Correct.

16      Q.   But if the issue in the memo, the central

17   issue in the memo was that for some people folding

18   back the flanges could benefit them to get a good

19   fit, that was information you already had, right?

20          MR. BUCHANAN:  Objection to form.

21   Misstates the document.

Page 460

1              THE WITNESS:  Yes.

2              MR. BUCHANAN:  Foundation.

3              THE WITNESS:  Depending on when that

4    information was made available.  I was made aware

5    of it in 2001 or thereabouts.

6    BY MR. WASDIN:

7       Q.   Okay.  But as of 2001, information that

8    for some people they could benefit by folding back

9    the flanges on the opposite side of the plug, you

10   had that information as of 2001?

11             MR. BUCHANAN:  Objection to form.

12             THE WITNESS:  Yes.

13             MR. BUCHANAN:  I think that's it,

14   Counsel, at least from the videographer's nod.  If

15   you have one more question, go ahead, but, I

16   mean --

17             MR. WASDIN:  Nope.  That's all I've got.

18             MR. BUCHANAN:  Thank you.  Would you

19   indulge me so I can go get a document?

20             THE VIDEOGRAPHER:  We are going off the

21   record.  The time is 6:34.

Page 461

1              (Recess taken -- 6:34 p.m.)

2              (After recess -- 6:48 p.m.)

3              THE VIDEOGRAPHER:  We are back on the

4     record.  The time is 6:48.

5                    RECROSS-EXAMINATION

6              BY MR. BUCHANAN:

7         Q.   Sir, I just have a few more questions.  I

8     want to follow up on some of the things that

9     Mr. Wasdin asked you about.

10             First of all, there was some statements

11    and testimony by Mr. Wasdin about you having seen a

12    prior report where the flanges were folded back.  I

13    just want to make sure we get some clarity on that.

14             I think we were -- you and I were talking

15    about the CID report and statements that were given

16    in the CID report after witnesses had been shown

17    this memo from July of 2000 that we referred to as

18    the flange report.  Do you recall our discussion

19    earlier about that?

20        A.   Yes.

21        Q.   Okay.  Do you recall reading that when

1   you looked in the CID, that some people were shown

2   a report that reflected the testing being done two

3   ways?

4        A.   It -- it may have been that memo.  I

5   don't -- I don't recall.  I just recall reading

6   something about the testing being done in both

7   methods.

8        Q.   And that's what I wanted to understand,

9   because outside of the context of the information

10  you were exposed to in connection with the

11  litigation -- I guess I should be clear.  You were

12  exposed to the CID report in connection with the

13  litigation; is that fair?

14       A.   Yes.

15       Q.   Okay.  You didn't have exposure to this

16  and were not interviewed as part of this process on

17  the CID, correct?

18       A.   No.

19       Q.   Separate from your exposure to the CID or

20  that time frame -- let's just say when did you

21  start to look for information in connection with

Page 497

1   State of Maryland

2   County of Baltimore, to wit:

3          I, Michele D. Lambie, a Notary Public of

4   the State of Maryland, County of Baltimore, do

5   hereby certify that the within-named witness

6   personally appeared before me at the time and place

7   herein set out, and after having been duly sworn by

8   me, according to law, was examined by counsel.

9          I further certify that the examination

10  was recorded stenographically by me and this

11  transcript is a true record of the proceedings.

12         I further certify that I am not of

13  counsel to any of the parties, nor related to any

14  of the parties, nor in any way interested in the

15  outcome of this action.

16         As witness my hand and notarial seal this

17  2nd day of March 2020.

18
                                    *Michele D Lambie*
19

20

21