# EXHIBIT 31

Confidential - Pursuant to Protective Order

```
 1          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF FLORIDA
 2               PENSACOLA DIVISION
 3

    IN RE: 3M COMBAT ARMS  )  Case No.
 4  EARPLUG PRODUCTS        )  3:19md2885
    LIABILITY LITIGATION    )
 5  _____   )  Judge M. Casey
                            )  Rodgers
 6  THIS DOCUMENT RELATES   )  Magistrate Judge
    TO ALL CASES            )  Gary R. Jones
 7
 8         WEDNESDAY, NOVEMBER 13, 2019
 9  CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
10                   - - -
11          Videotaped 30(b)(6) deposition of
12  Elliott H. Berger, M.S., held at the offices
13  of KIRKLAND & ELLIS LLP, 300 North LaSalle,
14  Chicago, Illinois, commencing at 9:04 a.m.,
15  on the above date, before Carrie A. Campbell,
16  Registered Diplomate Reporter, Certified
17  Realtime Reporter, Illinois, California &
18  Texas Certified Shorthand Reporter, Missouri
19  & Kansas Certified Court Reporter.
20                   - - -
21
            GOLKOW LITIGATION SERVICES
22     877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1              A P P E A R A N C E S :
 2
          AYLSTOCK, WITKIN, KREIS & OVERHOLTZ,
 3        PLLC
          BY:  NEIL D. OVERHOLTZ
 4             noverholtz@awkolaw.com
               JENNIFER HOEKSTRA
 5             jhoekstra@awkolaw.com
               BRYAN F. AYLSTOCK
 6             baylstock@awkolaw.com
          17 East Main Street
 7        Pensacola, Florida  32502
          (850) 202-1010
 8
          and
 9
          SEEGER WEISS, LLP
10        BY:  DAVID R. BUCHANAN
               dbuchanan@seegerweiss.com
11             MAX KELLY
               mkelly@seegerweiss.com
12        77 Water Street
          New York, New York  10005
13        (212) 584-0700
14        and
15        CLARK, LOVE & HUTSON, PLLC
          BY:  SHELLEY HUTSON
16             shutson@triallawfirm.com
               EMILY MARLOWE
17             emarlowe@triallawfirm.com
          440 Louisiana Street, Suite 1600
18        Houston, Texas  77002
          (713) 757-1400
19
          and
20
          TRACEY & FOX
21        BY:  SEAN P. TRACEY
               stracey@traceylawfirm.com
22        440 Louisiana Street, Suite 1901,
          Houston, Texas  77002
23        (713) 495-2333
24        and
25
```

Confidential - Pursuant to Protective Order

```
 1       MONSOUR LAW FIRM
         BY:  DOUGLAS C. MONSOUR
 2            doug@monsourlawfirm.com
         404 North Green Street
 3       Longview, Texas  75601
         (903) 999-9999
 4
         and
 5
         COLSON HICKS EIDSON
 6       BY:  ROBERTO MARTÍNEZ
              bob@colson.com
 7       255 Alhambra Circle Penthouse
         Coral Gables, Florida  33134
 8       (305) 476-7400
         Counsel for Plaintiffs
 9
10
         KIRKLAND & ELLIS LLP
11       BY:  SIERRA ELIZABETH
              sierra.elizabeth@kirkland.com
12       333 South Hope Street
         Los Angeles, California  90071
13       (213) 680-8122
14       and
15       KIRKLAND & ELLIS LLP
         BY:  MIKE BROCK, P.C.
16            mike.brock@kirkland.com
         1301 Pennsylvania Avenue, NW
17       Washington, DC  20004
         (202) 389-5996
18
         and
19
         KIRKLAND & ELLIS LLP
20       BY:  NICHOLAS WASDIN
              nick.wasdin@kirkland.com
21            SIMON GOTTLIEB
              simon.gottlieb@kirkland.com
22       300 North LaSalle
         Chicago, Illinois  60654
23       (312) 862-2000
         Counsel for Defendants
24
25
```

Confidential - Pursuant to Protective Order

1    ALSO PRESENT:

2        ERIC RUCKER, in-house counsel, 3M

3        JAMES BATTLE, Aylstock, Witkin,
         Kreis & Overholtz

4

         ZACH HONE, trial technician, Golkow
5        Litigation Services

6

     V I D E O G R A P H E R :

7        DAN LAWLOR,
         Golkow Litigation Services

8

                        - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Pursuant to Protective Order

1    January of 2000, so I'm thinking in December

2    it had begun.

3         Q.    Okay.  And I see you

4    referencing the notebook that you brought.

5    Can you tell me what tab and what document

6    you're looking at?

7         A.    I'm looking at 23015 and 23016

8    {sic}.

9         Q.    Okay.  The test reports?

10        A.    Yes.

11        Q.    Okay.  And then the test that

12   was started on the open end was the 213016;

13   is that right?

14        A.    Yes.

15        Q.    Okay.  And these tests were

16   going to be conducted under EPA regulations;

17   is that right?

18               MS. ELIZABETH:  Objection.

19        Form.

20               THE WITNESS:  I'm not sure what

21        you mean when you say "under EPA

22        regulations."

23   QUESTIONS BY MR. OVERHOLTZ:

24        Q.    In order to be able to

25   establish an NRR that can be labeled on the

Confidential - Pursuant to Protective Order

1    product, you have to comply with certain

2    regulations from the EPA, correct?

3              MS. ELIZABETH:  Objection.

4         Form.  Vague.

5              THE WITNESS:  There is an EPA

6         labeling regulation that specifies

7         that testing will be conducted in

8         conformance with an ANSI standard.

9    QUESTIONS BY MR. OVERHOLTZ:

10        Q.    Okay.  So there was an EPA

11   regulation, and it said that we need to do

12   the testing in performance with an ANSI

13   standard; that's right?

14        A.    Yes.

15        Q.    Okay.  And the ANSI standard

16   that the 213015 and 213016 testing that was

17   going to be conducted was with which

18   standard?

19        A.    ANSI S3.19-1974, 3.19-1974,

20   also designated ASA STD1-1975.

21        Q.    Okay.  A lot of times in the

22   documents we see it referred to as either the

23   319 standard or the ANSI 1974 standard; is

24   that right?

25        A.    Yes.

Confidential - Pursuant to Protective Order

```
1        Q.     Okay.  And when it comes to

2   earplugs, one of the things that this

3   standard calls for is how the plugs are fit

4   in the subjects; is that right?

5        A.     It describes an experimenter

6   fit, which is what is required under the EPA

7   regulation.

8        Q.     Okay.  And Aearo has -- or at

9   the time had policies that covered how they

10  conducted testing under this ANSI 1974

11  standard?

12       A.     Yes.

13       Q.     And can you tell me what the

14  Aearo policy was for how experimenter fit was

15  conducted in the testing conducted in 213016

16  and 213015?

17              MS. ELIZABETH:  Objection.

18       Form.  Vague.

19              THE WITNESS:  You're asking for

20       a complete description of all the

21       features?

22  QUESTIONS BY MR. OVERHOLTZ:

23       Q.     Well, what would -- if you

24  could describe for a layperson what

25  experimenter fit meant according to Aearo's
```

1    policies back then that would have been

2    required to be conducted for the 016 and 015

3    studies.

4         A.    It would require the hearing

5    protector being fitted for the goal of

6    achieving optimum performance, which is

7    what's called for by the experimenter fit

8    section of ANSI S3.19 as dictated by the EPA.

9              There would be an experienced

10   experimenter, such as Ron Kieper who

11   conducted these tests, who would work with

12   subjects who were on our panel, who already

13   had some familiarity with testing hearing

14   protectors and had met the requirements of

15   the standard with respect to their hearing

16   sensitivity and being able to track their

17   sequential thresholds within a certain degree

18   of variability.

19        Q.    Okay.  So the experimenter in

20   the 016 and 015 --

21             MS. ELIZABETH:  Were you

22        finished with your answer?

23             THE WITNESS:  No.

24   QUESTIONS BY MR. OVERHOLTZ:

25        Q.    Okay.  You had more?

Confidential - Pursuant to Protective Order

1           Okay.

2      A.    So what I described for you is

3  the experimenter and the subjects and the

4  name of the procedure.

5           Ron would enter the chamber and

6  work with those subjects.  He would be

7  fitting the hearing protectors as per the

8  requirements of that standard.  And then

9  through some interaction with them, the goal

10  would be to achieve an optimum fit before the

11  test was conducted.

12      Q.    Okay.  The experimenter in the

13  015 and 016 would have been Ron Kieper?

14      A.    Yes.

15      Q.    Okay.  Is it i-e-p-e-r?

16      A.    Yes.

17           MS. ELIZABETH:  Yes.

18           MR. OVERHOLTZ:  You threw me

19      off for a second there.

20  QUESTIONS BY MR. OVERHOLTZ:

21      Q.    So Ron Kieper would be the

22  experimenter.

23           And would Mr. Kieper be the

24  first to insert the plug into the subject's

25  ear?

Confidential - Pursuant to Protective Order

1            THE WITNESS:  It would have

2       been in violation of the EPA law to

3       put it in commerce with a label based

4       on testing less than ten subjects.

5  QUESTIONS BY MR. OVERHOLTZ:

6       Q.    Okay.  Do you know when the 016

7  study completed?  When it started and when it

8  completed, if you can give me that

9  information?

10      A.    What I can tell you with

11 certainty is that it was completed around

12 January 25th, since that's the date I see on

13 the 016 report.

14      Q.    So around 1/25/2000?

15      A.    Yes.

16      Q.    Okay.  When was the 213015

17 stopped?

18      A.    The date on that test is listed

19 as, again, the same date.  I'm not exactly

20 certain of when it was stopped, but in that

21 time frame.

22      Q.    Okay.  Let's talk a little bit

23 about -- so -- well, let's go back to this.

24            So the 213015 was stopped at

25 eight subjects.  You made the decision to

Confidential - Pursuant to Protective Order

1   stop it?

2          A.     I would say that decision was

3   made in collaboration between myself and my

4   manager at the time.

5          Q.     Your manager at the time --

6          A.     Would have been Dick Knauer.

7          Q.     Okay.  So...

8          A.     I don't recall exactly.  I

9   certainly had involvement in that decision.

10   I do not believe it was solely my decision.

11          Q.     You think that Mr. Knauer had a

12   part in that?

13          A.     The way the chain of command

14   works, for me to have made that decision at

15   that time, I would in all likelihood have

16   been talking to my supervisor.

17          Q.     Okay.  And what about

18   Mr. Kieper, did he have a say in that

19   decision?

20          A.     I would say his input about

21   what he was observing was considered.  I

22   don't believe he had a say in the decision.

23          Q.     He was told to stop the study?

24          A.     Yes.

25          Q.     Okay.  The 213015, the company

Confidential - Pursuant to Protective Order

```
 1   calculated at the end of the eight subjects

 2   the NRR, right?

 3        A.     We did have an estimated NRR.

 4   It wouldn't be an NRR because an NRR by

 5   definition must be computed from ten

 6   subjects.  But could be an estimated NRR.

 7        Q.     The estimated NRR, call it

 8   estimated NRR, was 10.8?  10.9?

 9        A.     10.9.

10        Q.     10.9.

11               Almost 11, right?

12        A.     It would round to 11.

13        Q.     When it comes to selling an

14   earplug for steady-state noise, a 10.99 NRR,

15   if it was a final NRR, would be unacceptable,

16   correct?

17               MS. ELIZABETH:  Objection.

18        Form.

19               THE WITNESS:  We've been

20        selling three-flanged earplugs like

21        that since the mid-1980s.  We knew

22        what to anticipate for the performance

23        of that type of product, which would

24        have been on the order of 10 dB or so

25        higher than that number.
```

Confidential - Pursuant to Protective Order

```
 1              So it was a number that didn't

 2         make sense to us at the time, and we

 3         decided to look into it in more

 4         detail.

 5    QUESTIONS BY MR. OVERHOLTZ:

 6         Q.     Okay.  And so you expected at

 7    least 10 dB higher?

 8         A.     Something in the range of 20.

 9         Q.     Did Mr. Kieper tell you why he

10    believed the estimated NRR was so low?

11              MS. ELIZABETH:  Objection.

12         Form.

13              THE WITNESS:  At the time we

14         stopped the test, I don't recall what

15         he did or didn't say to me.

16    QUESTIONS BY MR. OVERHOLTZ:

17         Q.     Okay.  He was an experienced

18    earplug fitter, wasn't he?

19              MS. ELIZABETH:  Objection.

20         Form.

21              THE WITNESS:  He had been in

22         his role for a number of years, so he

23         did have a good degree of experience.

24    QUESTIONS BY MR. OVERHOLTZ:

25         Q.     Okay.  And he had been involved
```

Confidential - Pursuant to Protective Order

1    as being the experimenter in many of the

2    tests involving versions of the three-flange

3    UltraFit plug, right?

4         A.    Versions of it, which were not

5    a dual-ended version.  And as we had

6    discovered over the years with competitors'

7    earplugs or our own earplugs, as you learn to

8    work with earplugs, you can fit them better.

9              This was a new style of earplug

10   that he had not been -- as we discussed

11   earlier, this was the first REAT test on a

12   dual-ended product, so although he was

13   experienced in general, he was not

14   experienced with this design.

15        Q.    So the 016 test, that was on

16   the open end, right?  We talked about that

17   before.

18        A.    Yes.

19        Q.    And it was completed?

20        A.    Yes.

21        Q.    And an NRR was calculated for

22   the 016; is that right?

23        A.    Yes.

24        Q.    And the NRR that the company

25   calculated for the 016 was a negative

Confidential - Pursuant to Protective Order

1    point -- a negative 2.0, right?

2         A.    Yes.

3         Q.    So let me show you what we'll

4    mark...

5              (Berger 30(b)(6) Exhibit 19

6         marked for identification.)

7    QUESTIONS BY MR. OVERHOLTZ:

8         Q.    I'm showing you the testing

9    results from the 213016 study, MDL000188143,

10   signed by yourself and Mr. Kieper.

11             You're familiar with this

12   document and have it in your notebook, right?

13        A.    Is there a question?

14        Q.    Yes.

15             You're familiar with this

16   document, and you have it in your notebook;

17   is that correct?

18        A.    Yes.

19        Q.    Okay.  So this test report,

20   this is produced out of the testing database

21   that's held at Aearo; is that correct?

22        A.    Yes.

23        Q.    Now, this describes that there

24   were ten subjects, as we talked about, and

25   you had to review these results and sign off

Confidential - Pursuant to Protective Order

1      A.     My answer to your initial

2  question is no.

3      Q.     Okay.  You don't agree that the

4  policies and procedures of Aearo require

5  there to be some type of physical change to

6  the plug to improve the plug in some way

7  before another test is performed?

8              MS. ELIZABETH:  Objection.

9      Form.

10  QUESTIONS BY MR. OVERHOLTZ:

11      Q.     Is that right?

12      A.     No.

13      Q.     Your understanding of the

14  policies and procedures is if there is a

15  change in the instructions, that that can be

16  a change that can relate to the ability to

17  conduct another test?

18      A.     Yes.

19      Q.     Okay.  And so a decision was

20  made to change the instructions by Aearo with

21  respect to the fitting of the Combat Arms

22  Earplug for another test to try to get an NRR

23  for labeling for the Combat Arms plug; is

24  that right?

25              MS. ELIZABETH:  Objection.

Confidential - Pursuant to Protective Order

     1          Form.

     2                   THE WITNESS:  We decided then

     3          to change the instructions and to

     4          start a labeling test with that new

     5          type of instruction set.

     6     QUESTIONS BY MR. OVERHOLTZ:

     7          Q.    Okay.  And so with respect to

     8     you're going to conduct another test and the

     9     change that's required under the policies,

    10     you agree some type of change is necessary,

    11     right?

    12                   MS. ELIZABETH:  Objection.

    13          Form.

    14                   THE WITNESS:  Our policies,

    15          although on that one there is not a

    16          written policy, but our policy and

    17          practice has been that we don't simply

    18          do a retest for the purpose of a

    19          retest.  We make a change in the

    20          function of the product or in some

    21          aspect of how the product is used.

    22     QUESTIONS BY MR. OVERHOLTZ:

    23          Q.    Okay.  Either in function or

    24     how it's used, right?

    25          A.    (Witness nods head.)

Confidential - Pursuant to Protective Order

1      Q.     And did, in fact, a change in

2  the instructions for fitting the plug get

3  implemented before the other tests to get an

4  NRR label was begun?

5            MS. ELIZABETH:  Objection.

6       Form.

7            THE WITNESS:  There was a

8       change in the guidance at this time --

9       and it's not instructions.  They're

10      not instructions on the package.  It's

11      guidance to the experimenter on how

12      he's going to be working with that

13      product.

14  QUESTIONS BY MR. OVERHOLTZ:

15      Q.     Okay.  And so what you describe

16  as guidance, what was -- the method of

17  fitting the plug was changed for the new

18  test; is that right?

19      A.     There was another procedure

20  implemented besides what Ron had been doing,

21  which is that now, as needed for listeners,

22  he could fold back the opposing flange on the

23  earplug as he was inserting it.

24      Q.     He could fold back the -- you

25  said the opposing flange?

Confidential - Pursuant to Protective Order

1        A.      The flange of the end of the

2    plug that was sticking out of the ear.

3        Q.      Okay.  So if I'm looking at

4    this Combat Arms Earplug and I'm sticking the

5    green end into the ear --

6        A.      Yes.

7        Q.      -- I can fold back this

8    yellow --

9        A.      Yes.

10       Q.      -- flange.

11               And that was the difference in

12   how Ron Kieper, the experimenter, was

13   instructed to fit the plugs in the new NRR

14   test?

15               MS. ELIZABETH:  Objection.

16        Form.

17               THE WITNESS:  If that was

18        necessary for those listeners, he

19        would do that.

20   QUESTIONS BY MR. OVERHOLTZ:

21       Q.      So if it was necessary.

22       A.      (Witness nods head.)

23       Q.      And the test that was conducted

24   to get the other label, that was the 213017;

25   is that right?

Confidential - Pursuant to Protective Order

```
 1        A.    I believe so, but just so I
 2   don't misspeak...
 3             Yes.
 4        Q.    Okay.  So he would fold back
 5   the flange and then insert the plug as part
 6   of the fit process; is that right?
 7             MS. ELIZABETH:  Objection.
 8        Form.
 9             THE WITNESS:  For some of the
10        subjects he did that.
11   QUESTIONS BY MR. OVERHOLTZ:
12        Q.    And after he got the plug
13   fitted, would the flange remain folded back,
14   or would he put it back?
15        A.    He would --
16             MS. ELIZABETH:  Objection.
17        Form.
18             THE WITNESS:  He would leave
19        the flange folded back.
20   QUESTIONS BY MR. OVERHOLTZ:
21        Q.    Okay.  And why would he leave
22   the flange folded back?
23        A.    There would be no reason to
24   unfold it.
25        Q.    Okay.  Well, if you left it
```

Confidential - Pursuant to Protective Order

1    folded back, wouldn't that allow the wind to

2    make wind noise over the top of it if a

3    soldier was out in the field?

4              MS. ELIZABETH:  Objection.

5         Form.

6              THE WITNESS:  We had no

7         information on the dual end of the --

8         dual-ended product about the wind

9         noise issues in practice.

10             All of the information provided

11        to us that was available -- and

12        actually I didn't see all those

13        reports we've looked at.  But as we

14        look back at them, all of those

15        studies' feedback from soldiers was on

16        single-ended earplugs with wind noise.

17   QUESTIONS BY MR. OVERHOLTZ:

18        Q.    And so part of the reason for

19   going for the two-sided design was that these

20   flanges being so close together would protect

21   this hole from wind noise, right?

22             MS. ELIZABETH:  Objection.

23   QUESTIONS BY MR. OVERHOLTZ:

24        Q.    That was one of the advantages?

25             MS. ELIZABETH:  Objection.

1        Form.

2               THE WITNESS:  That was

3        something that Doug Ohlin thought

4        might be the case.  There was no data

5        to support that.  That was his

6        supposition.

7    QUESTIONS BY MR. OVERHOLTZ:

8        Q.     So Ron Kieper could fold back

9    this opposing flange and insert it into the

10   ear and leave it folded back, would be the

11   process --

12       A.     Yes.

13       Q.     -- for the test?

14              What was the reason why --

15   well, the reason why the decision was made to

16   fold this flange back was because there was

17   concern that this flange, this opposing

18   flange on the other end of the plug, was

19   pressing against parts of the ear

20   requiring -- making the plug loosen in some

21   imperceptible way to the user; is that right?

22              MS. ELIZABETH:  Objection.

23       Form.

24              THE WITNESS:  Ron had spent a

25       period of time between the cessation

Confidential - Pursuant to Protective Order

1          of the initial 015 testing and the

2          commencement of the 017 testing

3          working with subjects, both enhancing

4          his own skill set in terms of

5          inserting the plug and understanding

6          what issues there might be working

7          with subjects.

8                    And his determination was that

9          it was the potential that when that

10         flange was folded back, it could

11         interfere.

12                    The imperceptible nature of

13         that loss in seal relates to the

14         person in the test chamber.  What you

15         must realize is that in the test

16         chamber, in the absence of fitting

17         noise, which is only on briefly, that

18         there is no sound.  That's the whole

19         purpose of the chamber.  It's a room

20         in which you cannot hear a thing.

21                    So whether a plug changes its

22         fit or seal, you had no auditory

23         feedback to suggest that there's been

24         a change in the noise reduction

25         characteristics once you're sitting

Confidential - Pursuant to Protective Order

```
 1          there in this effectively totally

 2          silent room.

 3               Were you wearing the plug in

 4          any sort of realistic environment,

 5          either noise hazardous or simply loud

 6          enough for sounds to be present, if

 7          there was a change in the fit, I would

 8          not suspect it would be imperceptible

 9          at that point because you would notice

10          a change in the sound levels at your

11          ear.

12               So the imperceptible refers to

13          during that artificial type of test

14          environment.

15     QUESTIONS BY MR. OVERHOLTZ:

16          Q.    Okay.  So the concern is that

17     this flange is pressing against parts of the

18     ear causing the earplug to loosen, correct?

19               MS. ELIZABETH:  Objection.

20          Asked and answered.

21               THE WITNESS:  His statement was

22          that he presumed that that's what he

23          observed with some of the test

24          subjects.  There's not an in-depth

25          measurement on a particular person to
```

Confidential - Pursuant to Protective Order

1           demonstrate that.  That is what he

2           felt he observed and what he wrote

3           about.

4     QUESTIONS BY MR. OVERHOLTZ:

5           Q.    So we're going to talk about

6     that a little bit more, but before we do --

7     okay.  So before we do, the subjects that

8     were part of the 015 -- and only eight got

9     tested, right?

10          A.    Yes.

11          Q.    Had any other subjects been

12    identified to be tested in the 015 before the

13    test was stopped?

14          A.    I don't know.

15          Q.    Okay.  Those subjects, did all

16    eight of those subjects then get -- were they

17    part of the 213017 test?

18          A.    Not all of them.

19          Q.    Okay.  So only some of the

20    subjects in the 015 were tested in the 017?

21          A.    Yes.

22          Q.    Okay.  Some of the people were

23    switched out, right?

24                MS. ELIZABETH:  Objection.

25          Form.

Confidential - Pursuant to Protective Order

```
 1                 THE WITNESS:  You are aware
 2        that the retest is taking place in
 3        May.  The original test was in
 4        January.
 5   QUESTIONS BY MR. OVERHOLTZ:
 6        Q.     Okay.
 7        A.     As I indicated to you, one
 8   of -- or maybe I didn't make it clear, but
 9   one of the most difficult parts of being the
10   experimenter in Ron's role is getting people
11   to show up and take the test.  So people may
12   be sick, they may have other assignments,
13   they may not want to show up.
14                 So just because you had ten
15   people in January doesn't mean you have ten
16   people in May.  You're going to have whomever
17   you can get.
18                 So he would be looking at his
19   master panel and trying to select subjects
20   who were involved before, and likely unable
21   to obtain all of them, and so he would need
22   other subjects on that test.
23        Q.     Did Aearo ever consider hiring
24   like a contractor company that could have a
25   panel of subjects to be tested that would
```

Confidential - Pursuant to Protective Order

```
 1          our searches.  I don't recall how this
 2          was distributed or if it was
 3          distributed.
 4     QUESTIONS BY MR. OVERHOLTZ:
 5          Q.     You didn't find any e-mails
 6     where you e-mailed this to anyone, right?
 7          A.     Correct.
 8          Q.     And you searched your e-mails?
 9          A.     Yes.
10          Q.     Okay.  Let's see what you
11     documented back in July of 2000 in this
12     version 1.2.
13                 Let's look at the Introduction
14     section if we can.  Blow that up.
15                 It says, "The Combat Arms" --
16          A.     Could you just give me one
17     minute?
18          Q.     Sure.
19          A.     I just wanted to pull up one
20     thing in my book.
21          Q.     Okay.
22          A.     Okay.  Go ahead.
23          Q.     It says, "The Combat Arms
24     Earplug was shortened, at the request of the
25     Army, so that it would fit into a carrying
```

Confidential - Pursuant to Protective Order

1    case."

2              Do you see that?

3         A.    Yes.

4         Q.    Okay.  Did you provide that

5    information or did Ron Kieper have that on

6    his own?

7         A.    That information would have

8    been provided by me.

9         Q.    Okay.  And do you have any

10   documented evidence of the Army asking you to

11   shorten the plug to fit into their case?

12        A.    We have documented evidence of

13   Doug Ohlin indicating that he cut the plug

14   down by a quarter of an inch, and we have

15   documented evidence of our responses to that.

16   And we have a series of the 20/41 drawings of

17   the earplug showing the initial versions from

18   1998 being approximately one-quarter inch

19   longer than the subsequent versions in 1999.

20        Q.    Okay.  So we'll look at some of

21   those '99 files.  But sometime in '99, Aearo

22   shortened the plug, Mr. Falco redid drawings

23   shortening the plug, to end up with the final

24   length of the Combat Arms version 2 plug; is

25   that right?

1        A.      Yes.

2        Q.      It says, "Because of this, the

3    plug is shorter than any other UltraFit plug

4    design."

5                Right?

6        A.      That's what it says, yes.

7        Q.      All right.  Now, let's read

8    this.

9                "The purpose of this report is

10   to document that the current length of the

11   UltraFit earplug end of the Combat Arms plug

12   is too short for proper insertion."

13               Right?

14       A.      That is a portion of the

15   sentence that you're abbreviating --

16       Q.      Right.

17       A.      -- which goes on to discuss how

18   changing the fitting technique affected the

19   results of REAT tests.

20               And so my reading of that

21   sentence is that the proper insertion refers

22   to the REAT tests and the ability to obtain

23   optimum performance in these tests.

24       Q.      So you say, "The purpose of the

25   report is to document that the current length

Confidential - Pursuant to Protective Order

1   of the UltraFit earplug end of the Combat

2   Arms plug is too short for proper insertion

3   and how changing the fitting technique

4   affected the results of real-ear tests of

5   this plug."

6               Right?

7       A.    That's what's written there,

8   yes.

9       Q.    Okay.  Now, the UltraFit

10  earplug end of the Combat Arms plug, that's

11  talking about the green end that was tested,

12  right?

13      A.    Yes.

14      Q.    But it actually applies to both

15  ends, right?  They're both the UltraFit plug

16  end on both ends?

17              MS. ELIZABETH:  Objection.

18      Vague.

19              THE WITNESS:  This report is

20      directed at fitting the plug with the

21      sealed end in.  It could apply to both

22      ends.

23  QUESTIONS BY MR. OVERHOLTZ:

24      Q.    Okay.  It says that the current

25  length, the current length, of the UltraFit

Confidential - Pursuant to Protective Order

1    fit earplug end of the Combat Arms plug is

2    too short for proper insertion.

3                After this July 2000 report,

4    was the length of the UltraFit earplug end of

5    the Combat Arms plug changed in any way?

6                MS. ELIZABETH:  Objection.

7         Form.

8                THE WITNESS:  Once the plug was

9         shortened, I did have conversations

10        with Doug about that.

11               You will find in the records we

12        revealed that at one point he

13        requested a larger earplug carrying

14        case, which was one of the initial

15        principle reasons for the shortening

16        of the plug.  The case was never

17        enlarged.

18               And he made it clear that

19        lengthening the plug was not an

20        option.  His requested specification

21        was the length to which we had changed

22        the plug.

23   QUESTIONS BY MR. OVERHOLTZ:

24        Q.    All right.  So in --

25        A.    So we were making a product for

Confidential - Pursuant to Protective Order

1              THE WITNESS:  I have

2         documentary evidence that the military

3         knew that the flanges needed to be

4         folded back to obtain the optimum

5         performance in our tests, as evidenced

6         by providing our instruction card to a

7         military officer, as evidenced by the

8         military's own wallet card which shows

9         pictures of a folded-back flange and

10        directs the need of that.

11             MR. OVERHOLTZ:  Objection.

12        Nonresponsive.  And we'll get to that.

13   QUESTIONS BY MR. OVERHOLTZ:

14        Q.    But do you have any evidence

15   that you communicated that Aearo believed

16   that the current length of the CAEv2 plug was

17   too short for proper insertion?

18             MS. ELIZABETH:  Objection.

19        Asked and answered for the third time.

20             THE WITNESS:  I have no

21        documentary evidence that this report

22        was shared or that the concept that it

23        was too short for proper insertion for

24        optimum fit in an S3.19 procedure was

25        communicated.

Confidential - Pursuant to Protective Order

1   QUESTIONS BY MR. OVERHOLTZ:

2        Q.      But it's your testimony that

3   you were speaking to Doug Ohlin about this as

4   this was occurring?

5        A.      In this time frame, Doug and I

6   were in communication and talking about

7   issues about the plug.  I don't recall

8   specific time/date phone call.  I know that

9   we were in open communication.

10              There's an e-mail in the

11  documentary record where I communicate with

12  Brian Myers saying, "Should I share the

13  results of this study?"

14              In collecting background

15  information for this 30(b)(6), I spoke to

16  Brian and asked him if he had any

17  recollection of either approving or not

18  approving that sharing of the information.

19  He had no specific recollection.  His memory

20  was, as mine, that there'd be no reason he

21  wouldn't have been able to share it.

22              We were working closely with

23  Doug.  This was his baby.  He would need to

24  know what we were finding.

25       Q.      So it's your testimony that you

Confidential - Pursuant to Protective Order

1    specifically told Doug Ohlin that the company

2    believes that it's too short for proper

3    insertion?

4              MS. ELIZABETH:  Objection.

5    QUESTIONS BY MR. OVERHOLTZ:

6         Q.    Is that your testimony that you

7    told Doug Ohlin, that the company believed

8    that the plug was too short for proper

9    insertion?

10             MS. ELIZABETH:  Objection.

11         Form.  Argumentative.  Asked and

12         answered.

13             THE WITNESS:  I do not believe

14         I used those words.  I believe I spoke

15         to him about the fact that the

16         shortened earplug was creating a

17         problem in the initial test and that

18         the work we had done to try and

19         resolve that problem to get optimum

20         performance for labeling purposes

21         would require this fold-back

22         instruction.

23    QUESTIONS BY MR. OVERHOLTZ:

24         Q.    Did you tell him that failing

25    to fold back the flange of the opposing plug

Confidential - Pursuant to Protective Order

1   would compromise the fit of the earplug in

2   soldiers?

3        A.    I do not recall the specific

4   words of the conversation.  This entire

5   development project was discussed with him,

6   and the issues from shortening it to how it

7   affected our testing were reviewed.

8        Q.    Because that's what the company

9   believed, that you if you didn't fold back

10  the flanges, the fit was compromised, right?

11           MS. ELIZABETH:  Objection.

12       Form.

13           THE WITNESS:  I think you're

14       mischaracterizing what I said.

15  QUESTIONS BY MR. OVERHOLTZ:

16       Q.    Okay.  If we can look down at

17  the one, two, three, four, fifth paragraph,

18  and it says, "For test 213017" -- that's the

19  second test on the green end, right?

20       A.    Yes.

21       Q.    "For 213017, the yellow flanges

22  of the level-dependent end of the plug were

23  folded back prior to the green, solid plug

24  being inserted into the subjects' ears."

25           Did I read that right?

Confidential - Pursuant to Protective Order

```
1        A.     Yes.

2        Q.     And that says the yellow

3   flanges, right?

4        A.     Yes.

5        Q.     Okay.  Can I get the ELMO real

6   quick?

7               So earlier we were talking

8   about just folding back the opposing flange,

9   but this is describing folding back all three

10  flanges, right?

11              MS. ELIZABETH:  Objection.

12        Form.

13              THE WITNESS:  I think the

14        wording is indeterminate.

15  QUESTIONS BY MR. OVERHOLTZ:

16        Q.     Can you fold back all three

17  flanges?

18        A.     And nor would I want to fold

19  back all three flanges.  I think flanges

20  refers to flanges across the variety of

21  earplugs as opposed to all the flanges on one

22  earplug.

23        Q.     So it's your belief that only

24  the outside flange?

25        A.     It's my belief that that is the
```

Confidential - Pursuant to Protective Order

```
 1   deeper and more consistent fit of the solid

 2   plugs for test 213017."

 3                   Right?

 4        A.      Those are the words, yes.

 5        Q.      "When folded back in that way,

 6   the yellow flanges never {sic} touched the

 7   subjects'" -- is that conchae?  Conchae?

 8   Conchae?

 9        A.      You are misreading that.

10        Q.      "When folded back in that way,

11   the yellow flanges never touched the

12   subjects'" --

13        A.      You're still misreading it.

14        Q.      Okay.  Well, I think I read the

15   words right, right?

16        A.      No.

17        Q.      "When folded back in that way,

18   the yellow flanges neither touched the

19   subjects'" --

20                   Did I read it right now?

21        A.      Yes.

22        Q.      Okay.  I missed a word, right?

23                   "When folded back in that way,

24   the yellow flanges neither touched the

25   subjects'" --
```

Confidential - Pursuant to Protective Order

```
 1                    Is it conchae?

 2        A.         Conchae.

 3        Q.         -- "nor compromised the fit of

 4   the solid earplugs."

 5                    Right?

 6        A.         Those are the words.

 7                    And again, in reading that

 8   sentence, the yellow flanges could refer to

 9   the fact that there's a plug in each ear, so

10   there's flanges in both ears that need

11   folding back.

12                    I don't believe the precision

13   of this was trying to address if I'm folding

14   back one, two or three flanges.

15        Q.         Okay.  But what is described

16   here is that when you fold the flanges back,

17   the fit isn't compromised, right?

18                    MS. ELIZABETH:  Objection.

19           Form.

20                    THE WITNESS:  Those are the

21           words in this document.  It says that

22           the "subjects' conchae neither

23           compromise the fit -- neither touch

24           the subjects' conchae nor compromise

25           the fit of the solid earplugs."
```

Confidential - Pursuant to Protective Order

```
 1    QUESTIONS BY MR. OVERHOLTZ:

 2         Q.    Okay.  So did you ever

 3    communicate to the United States military

 4    that if the yellow flanges touch the

 5    subjects' ear, the conchae of the ear, that

 6    that would compromise the fit of this Combat

 7    Arms plug?

 8              MS. ELIZABETH:  Objection.

 9         Form.

10              THE WITNESS:  As I said, I

11         don't recall the details of the words

12         of our conversations.

13              What I recall is being in

14         direct communication with Doug about

15         this project and discussing what we

16         were observing and whether that was

17         going to be acceptable then --

18         acceptable to the military to have

19         this additional type of instruction

20         included.

21    QUESTIONS BY MR. OVERHOLTZ:

22         Q.    This is 2000, right?  May

23    of 2000?

24              MS. ELIZABETH:  I think it says

25         July --
```

Confidential - Pursuant to Protective Order

```
 1    QUESTIONS BY MR. OVERHOLTZ:

 2         Q.     This is when the 015 was

 3    redone?

 4                The testing was done in May

 5    of 2000; is that right?

 6         A.     Yes.

 7         Q.     Finishes up on May 9th, right?

 8         A.     Yes.

 9         Q.     A couple days later you write

10    an e-mail asking Brian Myers:  Is it okay for

11    me to tell Doug Ohlin this?

12                Right?

13                MS. ELIZABETH:  Objection.

14         Form.

15                THE WITNESS:  We should look at

16         the exact words of that, but it

17         referred to, is it okay to communicate

18         something?  If you want to ask me, we

19         should pull up that e-mail.

20    QUESTIONS BY MR. OVERHOLTZ:

21         Q.     You recall reviewing an e-mail

22    in which you asked Brian Myers whether you

23    should tell Doug Ohlin about the test

24    results?

25         A.     Share something with him.  I
```

Confidential - Pursuant to Protective Order

```
 1   don't recall the words in that e-mail.
 2        Q.    Okay.  Why were you talking to
 3   Doug Ohlin in 2000 about this plug, about the
 4   testing that was done?
 5        A.    Because we're in the process of
 6   developing and finalizing this product that
 7   he's interested in.
 8        Q.    You had already started selling
 9   it to the military, right?
10             MS. ELIZABETH:  Objection.
11        Form.  Misstates the testimony.
12             THE WITNESS:  I believe that
13        was addressed by other 30(b)(6)
14        witnesses.  I don't know if you want
15        me to speak to that or not.
16             MS. ELIZABETH:  You can answer
17        the question.
18             THE WITNESS:  I believe that it
19        had been distributed to various
20        military users.  I know, for example,
21        that the original longer version was
22        shared with Doug Ohlin, which is how
23        we ended up coming up with the
24        feedback that said I want the plug
25        shortened.
```

Confidential - Pursuant to Protective Order

1        A.     Yes.

2        Q.     -- internal test reports?

3        A.     Yes.

4        Q.     Did you talk to Dick Knauer

5    about whether you should share this with the

6    US military?

7        A.     I don't recall if I did.

8               What I can tell you is that

9    Dick's office was three doors down from mine.

10   Brian was in another building.

11       Q.     Okay.

12       A.     So I would see Dick multiple

13   times a day.  Brian I might or might not see.

14       Q.     Okay.  Have you talked -- have

15   you spoken to Dick Knauer since -- in

16   preparation for this deposition or in the

17   past regarding whether or not you shared this

18   information with the United States military

19   in some way?

20       A.     I did have a conversation with

21   Dick.

22       Q.     All right.  And what did he

23   say?

24       A.     And --

25              THE WITNESS:  Would you remind

Confidential - Pursuant to Protective Order

```
 1       me which 30(b)(6) topic is this?

 2             MS. ELIZABETH:  Sure.

 3       Number -- what number are you on?

 4             THE WITNESS:  Well, I spoke to

 5       Dick about 11, 12 --

 6             MR. OVERHOLTZ:  It would either

 7       be 10 or 11.

 8             THE WITNESS:  I did speak to

 9       him about Topic 11.

10  QUESTIONS BY MR. OVERHOLTZ:

11       Q.    Okay.  And did he say anything

12  about whether or not the fact that the 015

13  test had been stopped and that the 017 test

14  had been conducted with flanges rolled back

15  to get the NRR of 22, whether that had been

16  communicated to the United States military?

17             MS. ELIZABETH:  Objection.

18       Form.

19             THE WITNESS:  He had no

20       recollections of those details.

21  QUESTIONS BY MR. OVERHOLTZ:

22       Q.    Okay.  And he had no documents

23  to provide to you that would indicate that

24  that information had been shared with the

25  United States military; is that right?
```

Confidential - Pursuant to Protective Order

```
 1        A.     Correct.

 2        Q.     Okay.  You go on and say, "It

 3   looks like the existing product has problems

 4   unless the user instructions are revised."

 5               Right?

 6        A.     That's what's written there.

 7        Q.     Okay.  And it's your testimony

 8   that you told Doug Ohlin that the 017 test

 9   had been conducted by rolling back the

10   flanges?

11               MS. ELIZABETH:  Objection.

12        Asked and answered.

13               THE WITNESS:  Yes.

14   QUESTIONS BY MR. OVERHOLTZ:

15        Q.     You told me before that

16   Mr. Kieper could roll back the flanges if it

17   was necessary.

18               Do you recall that?

19               MS. ELIZABETH:  One second.

20               Objection.  Asked and answered.

21        Form.

22   QUESTIONS BY MR. OVERHOLTZ:

23        Q.     During the 017 --

24               MR. OVERHOLTZ:  If we can just

25        keep the objections to form, please.
```

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. OVERHOLTZ:

 2        Q.    During the 017 tests, is it

 3   your testimony that Mr. Kieper could fold

 4   back the flanges if he thought it was

 5   necessary?

 6             MS. ELIZABETH:  Same

 7        objections.

 8             THE WITNESS:  Yes.

 9   QUESTIONS BY MR. OVERHOLTZ:

10        Q.    Okay.  And did he tell you --

11   or did you determine when it would be

12   necessary to roll back the flanges?

13        A.    I did not make a determination

14   subject by subject.

15             Ron was someone who had been

16   doing this testing for a number of years.  In

17   my supervisory capacity I would coach him if

18   he was having problems.  I would observe from

19   time to time his test practices to assure

20   that I thought they were appropriate.

21             If he had questions on a

22   particular subject, my office was just

23   outside the lab.  He'd call me in, and we

24   would take a look and discuss it together.

25             I don't recall what our
```

Confidential - Pursuant to Protective Order

```
 1    interactions were over this particular test.

 2         Q.    Okay.  You don't remember

 3    discussing with Mr. Kieper about when it

 4    would be necessary to roll back the flanges?

 5         A.    No.

 6         Q.    Speaking of -- you mentioned

 7    observing.  When the testing was going on in

 8    these tests, where you would have been in the

 9    lab?

10              MS. ELIZABETH:  Objection.

11         Vague.

12              THE WITNESS:  I could have been

13         multiple places.  I could have been on

14         a business trip.  I could have been in

15         my office.  I could have been in the

16         laboratory waiting to see the results

17         of a given test.

18              You know, he was able to do the

19         testing independent of my constant

20         involvement, so it was in a

21         supervisory role, a collaborative

22         role.  I would certainly be checking

23         to make sure that in general things

24         were being done as I thought was

25         appropriate.
```

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. OVERHOLTZ:

2         Q.    Were you ever in the testing

3    lab and observed the rolling back of the

4    flanges during the testing during the 017

5    test?

6         A.    I don't have a recollection

7    specifically for my time.

8         Q.    Okay.  Did you tell Doug Ohlin,

9    "We rolled back the flanges in the 017 test

10   to get that NRR"?

11             MS. ELIZABETH:  Objection.

12        Asked and answered.

13             THE WITNESS:  I discussed with

14        him that we had determined that

15        rolling back the flanges would be

16        important for some people and that it

17        was something that we were doing on

18        the most recent test.

19             (Berger 30(b)(6) Exhibit 24

20        marked for identification.)

21   QUESTIONS BY MR. OVERHOLTZ:

22        Q.    Let me show you what we'll mark

23   as Exhibit Number 24.  It's Exhibit 913A.

24             This is Bates -- ends in

25   3M_MDL000192859, Plaintiff's 913A.

Confidential - Pursuant to Protective Order

```
 1                  I'll let you take a look,

 2   glance at it, and then ask you some questions

 3   about it.

 4                  Okay?

 5        A.     Yes.

 6        Q.     So on November 15, 2004, you

 7   send an e-mail from your CompuServe e-mail

 8   address to Doug Ohlin, and you copy both

 9   Brian Myers and Richard Knauer, right?

10        A.     Yes.

11        Q.     And the subject was "CAE

12   Comfort Issues."

13                  Do you see that?

14        A.     Yes.

15        Q.     Okay.  And you say, "Doug, good

16   to see you at the beach."

17                  Do you see that?

18        A.     Yes.

19        Q.     Which beach did you see Doug

20   Ohlin at?

21        A.     My recollection is that there

22   was a -- perhaps the Acoustical Society of

23   America or a military conference that both of

24   us attended that took place at Virginia

25   Beach.
```

Confidential - Pursuant to Protective Order

```
1        Q.     Okay.

2        A.     And so we were at the beach.

3        Q.     Okay.  Were you actually out on

4   the beach with him?

5        A.     I don't recall.  I hope I was.

6   I don't recall.

7        Q.     But you don't remember it.

8               Have you ever been to the beach

9   with Doug Ohlin?

10       A.     I don't recall.  I don't think

11  so.

12       Q.     If you had gone to the beach

13  with Doug Ohlin, you'd remember, right?

14              MS. ELIZABETH:  Objection.

15       Form.

16              THE WITNESS:  I don't know.

17  QUESTIONS BY MR. OVERHOLTZ:

18       Q.     Okay.

19       A.     I grew up on the beach.  I've

20  been at the beach many times.  I'm landlocked

21  these days, but I grew up on the beach.

22       Q.     Okay.  You say, "I took back

23  your concerns on the CAE and have some

24  thoughts."

25              Do you see that?
```

Confidential - Pursuant to Protective Order

```
 1    for taking it through distribution.  I don't

 2    believe we have grown this business at all -

 3    ask Tim.  I think we need to revisit this

 4    decision and reverse it as quickly as we

 5    can."

 6              Do you see that?

 7       A.    Yes.

 8       Q.    And he's forwarding an e-mail

 9    on the back of the second page from Doug

10    Ohlin.

11              Do you see that?

12       A.    Yes.  I was in the process of

13    reading it.

14       Q.    Okay.

15       A.    I'll go ahead and do that.

16              Why don't you ask me your

17    question --

18       Q.    Sure.

19       A.    -- and then I'll see if I have

20    to focus on a particular paragraph.

21       Q.    Sure.

22              So Doug Ohlin, if you've read

23    this, he's e-mailing someone about sending

24    some samples and is providing information

25    about how they can purchase the product; is
```

1    that right?

2                 MS. ELIZABETH:  Objection.

3         Form.

4                 THE WITNESS:  That appears to

5         be what he's saying here.

6    QUESTIONS BY MR. OVERHOLTZ:

7         Q.    He's providing information

8    about -- that you can even contact Aearo

9    directly to expedite the order.

10                Do you see that?

11        A.    Yes.

12        Q.    "Recommend you contact Aearo

13   directly," and there's a number to expedite

14   your order.

15                Do you see that?

16        A.    Yes.

17        Q.    It says, "Lately, however, they

18   have been referring customers to

19   distributors, which has increased the price."

20                Do you see that?

21        A.    Yes.

22        Q.    "The dual-ended plug will fit a

23   majority of the adult male population."

24                Do you see that?

25        A.    Yes.

Confidential - Pursuant to Protective Order

1          Q.     And then he says, "For those

2    with excessively large ear canals, we

3    recommend that the opposing plug be folded

4    back before attempting insertion."

5                Do you see that?

6          A.     Yes.

7          Q.     So it seems that in whatever

8    conversations that Doug Ohlin had with you,

9    he got the impression that the only flanges

10   that needed to be folded back were in people

11   with excessively large ear canals.

12               MS. ELIZABETH:  Objection.

13          Form.

14   QUESTIONS BY MR. OVERHOLTZ:

15          Q.     Right?

16          A.     No.

17          Q.     That's what he wrote, right?

18               MS. ELIZABETH:  Objection.

19          Form.

20               THE WITNESS:  I do not know why

21          he wrote that.

22               There's a military card that

23          talks about very large ear canals.

24          This talks about excessively large ear

25          canals.  And if you look at the

Confidential - Pursuant to Protective Order

 1          instructions that we provided when we

 2          introduced the product, it is agnostic

 3          about ear canals.  It says for fitting

 4          tips it's easier to fold back the

 5          flanges.  It doesn't discuss ear

 6          canals at all.

 7               So I can't tell you why he

 8          wrote this.  All I can tell you is

 9          that he would be working with

10          soldiers, he would have information

11          that he was determining appropriate,

12          and I don't know why that was written.

13     QUESTIONS BY MR. OVERHOLTZ:

14          Q.    You had been communicating with

15     him, you testified to, during the testing of

16     the 017 tests when the flanges were being

17     folded back, right?

18          A.    Back in 2000, yes.

19          Q.    And Aearo wasn't just folding

20     back the flanges in that test in people with

21     very large or excessively large ear canals,

22     right?

23               MS. ELIZABETH:  Objection.

24          Form.

25               THE WITNESS:  That is not what

Confidential - Pursuant to Protective Order

1          we did on that test.

2   QUESTIONS BY MR. OVERHOLTZ:

3          Q.    Okay.  But here he is, just

4   less than a couple years later, saying that

5   they recommend that only for those with

6   excessively large ear canals do you fold the

7   opposing plug back before attempting

8   insertion.

9              MS. ELIZABETH:  Is there a

10       question?

11  QUESTIONS BY MR. OVERHOLTZ:

12         Q.    Right?

13         A.    He is recommending that in

14  2002.

15         Q.    I just want to be clear about

16  something.  As the person who was designated

17  on these topics by 3M, you don't have any

18  recollection of actually providing the test

19  data of the 015 and the 017 study test to

20  Doug Ohlin; is that right?

21             MS. ELIZABETH:  Objection.

22       Form.

23             THE WITNESS:  I do not have

24       specific recollection of providing

25       that.

Confidential - Pursuant to Protective Order

1                    (Berger 30(b)(6) Exhibit 26

2          marked for identification.)

3    QUESTIONS BY MR. OVERHOLTZ:

4          Q.     Okay.  Let me show you what

5    we'll mark as Exhibit Number 26.

6                 Okay.  So what I've shown you

7    here is Plaintiff's 0302A.  It's Bates

8    number 3M_MDL000022452, and it's an e-mail

9    chain between Doug Ohlin and Doug Moses at

10   the top, and then down below also including

11   Mark Santoro and Brian Myers.

12                Do you see that?

13         A.     Yes.

14                MS. ELIZABETH:  Counsel, what

15         30(b)(6) topic are you representing

16         this refers to?

17                MR. OVERHOLTZ:  This refers to

18         design decisions related to the

19         product as well as the NRR testing

20         that was conducted on the CAE Vs and

21         communications about the NRR testing.

22                MS. ELIZABETH:  What number is

23         it?

24                MR. OVERHOLTZ:  It's number 13

25         and number 12.

Confidential - Pursuant to Protective Order

 1               Do you see that?

 2       A.      Yes.

 3       Q.      Okay.  Now, that was talking

 4   about a different UltraFit plug that the

 5   company got a fine on the EPA about, right?

 6               MS. ELIZABETH:  Objection.

 7   QUESTIONS BY MR. OVERHOLTZ:

 8       Q.      Not the Combat Arms.

 9               MS. ELIZABETH:  Objection.

10           Outside the scope.  Form.

11               You can answer.

12               THE WITNESS:  It was not the

13           Combat Arms.

14               I would also point out that

15           it's misstated.

16   QUESTIONS BY MR. OVERHOLTZ:

17       Q.      Okay.  At the bottom of the

18   paragraph, Doug Ohlin says to Doug Moses,

19   "Bottom line, make sure we aren't putting

20   Elliott in a position where he is

21   compromising the integrity of his lab."

22               Do you see that?

23       A.      Yes.

24       Q.      Okay.  Now, at this point Doug

25   Ohlin has become an employee of Aearo, 3M,

Confidential - Pursuant to Protective Order

1    right?

2         A.     Yes.

3         Q.     Okay.  What's being described

4    in this e-mail is essentially what happened

5    as described in the flange report, right,

6    that in the 213017 test -- yeah.

7              In the 213017 test, which is

8    the second NRR test, 3M changed the fitting

9    protocol so they could get a better NRR,

10   right?

11             MS. ELIZABETH:  Objection.

12        Form.  Misstates the testimony.

13             THE WITNESS:  We changed the

14        fitting protocol so that we could test

15        and achieve the optimum performance

16        fit called for in the ANSI standard.

17   QUESTIONS BY MR. OVERHOLTZ:

18        Q.     You wanted the optimum

19   performance fit?

20        A.     Optimum performance as called

21   for in the ANSI standard.

22        Q.     Okay.  And when you achieve

23   optimum performance under the ANSI standard,

24   you get a higher NRR, right?

25             MS. ELIZABETH:  Objection.

Confidential - Pursuant to Protective Order

```
 1        Form.
 2              THE WITNESS:  You typically
 3        would get a higher NRR.
 4   QUESTIONS BY MR. OVERHOLTZ:
 5        Q.    Okay.  So that's what the
 6   company did with respect to the 213017 test,
 7   right?
 8              MS. ELIZABETH:  Objection.
 9        Misstates the testimony.
10              THE WITNESS:  With respect to
11        the 23017 test, we changed our fitting
12        protocol and then conducted our label
13        test.
14   QUESTIONS BY MR. OVERHOLTZ:
15        Q.    And the change that was made
16   was folding back the yellow flange, right,
17   during the testing?
18        A.    As needed, yes.
19        Q.    Okay.  Rolling back the flanges
20   needed.  And the truth here, Mr. Berger, is
21   that the fact that the flanges were rolled
22   back as part of a fitting protocol change to
23   get the higher NRR in the 213017 test was
24   never told to Doug Ohlin, right?
25              MS. ELIZABETH:  Objection.
```

Confidential - Pursuant to Protective Order

```
 1          Form.  Asked and answered for about
 2          the eighth time.
 3                THE WITNESS:  No.
 4   QUESTIONS BY MR. OVERHOLTZ:
 5          Q.    You disagree with me?
 6          A.    I disagree with you.
 7          Q.    You believe that Doug Ohlin was
 8   told that in the 213017, that the flanges
 9   were rolled back, as necessary, in order to
10   get this optimum performance under the ANSI
11   standards?
12          A.    Absolutely --
13                MS. ELIZABETH:  Objection.
14          Asked and answered.  Form.
15   QUESTIONS BY MR. OVERHOLTZ:
16          Q.    You know that Doug Ohlin was
17   asked about this in his deposition, right?
18          A.    No.
19          Q.    Have you read Doug Ohlin's
20   testimony?
21          A.    No.
22          Q.    You know he was specifically
23   asked whether he had ever heard of 3M doing
24   this, what they did in the 017?
25                MS. ELIZABETH:  Objection.
```

Confidential - Pursuant to Protective Order

 1          Form.

 2                  THE WITNESS:  I don't know.

 3     QUESTIONS BY MR. OVERHOLTZ:

 4          Q.     You haven't read that

 5     testimony?

 6                  MS. ELIZABETH:  Objection.

 7          Form.  Asked and answered.

 8                  THE WITNESS:  No.

 9                  MR. OVERHOLTZ:  Let me -- do we

10          have a copy of this?

11                  So if we can show the front

12          page of this deposition.  The top left

13          up there.

14     QUESTIONS BY MR. OVERHOLTZ:

15          Q.     This was the videotaped

16     deposition of Doug Ohlin on April 24, 2013,

17     and I want to turn your attention over to

18     page 191, about halfway down the page on

19     line 18 --

20                  MS. ELIZABETH:  Do you have an

21          extra copy, Counsel?

22                  MR. OVERHOLTZ:  Yeah, I'm going

23          to give you a copy.

24     QUESTIONS BY MR. OVERHOLTZ:

25          Q.     Okay?  So if we --

Confidential - Pursuant to Protective Order

```
 1          conducted testing, those results

 2          should be documented.  They would

 3          likely be in that database.

 4   QUESTIONS BY MR. OVERHOLTZ:

 5          Q.    Can you tell me who made the

 6   decision to put those tests on hold?

 7                MS. ELIZABETH:  Objection.

 8          Form.

 9                THE WITNESS:  I don't recall.

10   QUESTIONS BY MR. OVERHOLTZ:

11          Q.    The company has conducted

12   Method B testing on lots of plugs, right?

13          A.    What do you mean by "lots"?

14          Q.    On other plugs that the company

15   has commercialized, the company has done REAT

16   Method B testing under the 1997 standard; is

17   that right?

18                MS. ELIZABETH:  Objection.

19          Form.

20                THE WITNESS:  On some plugs,

21          not a lot.  On some of the plugs we

22          sold, we've done Method B.

23                It's an arduous test for us to

24          conduct because of the difficulty of

25          obtaining listeners, the fact that
```

Confidential - Pursuant to Protective Order

```
 1          they can only be used for a limited

 2          amounts of tests, the fact that often

 3          you establish a listener panel and

 4          before your testing's done they end up

 5          not showing up, not coming back.

 6              They're not the same type of

 7          listeners that we have for a standard

 8          panel.  We have to throw a very broad

 9          net out to end up getting Method B

10          subjects, and so it's always been much

11          more difficult for us to accomplish.

12   QUESTIONS BY MR. OVERHOLTZ:

13       Q.    So your testimony is that you

14   don't believe that the Method B testing was

15   ever conducted on the Combat Arms plug; is

16   that right?

17              MS. ELIZABETH:  Objection.

18          Misstates the testimony.  Form.

19              THE WITNESS:  I don't know.

20          What I see there is it says "tests on

21          hold."

22              Of course, this is written at a

23          point in time, so I would have to go

24          back and look through the data to

25          answer your question.
```

Confidential - Pursuant to Protective Order

```
 1    QUESTIONS BY MR. OVERHOLTZ:

 2         Q.    Okay.  Let me ask you do you

 3    recall us discussing the fact that under the

 4    flange report and the REAT test, the second

 5    test that was done on the 213017, that

 6    Mr. Kieper would determine whether it was

 7    necessary to roll back the flanges for some

 8    of the people; is that right?

 9         A.    Yes.

10         Q.    Okay.  Is it your testimony

11    that he made that determination based on

12    individual by individual?

13              MS. ELIZABETH:  Objection.

14         Form.  Foundation.

15              THE WITNESS:  I'm not certain

16         how he made that.

17              Looking at the notes file that

18         accompanies the test report, it

19         indicates that he did that for one

20         listener.  It doesn't indicate that he

21         did that for others.

22              So my understanding is that it

23         wasn't done for all subjects, and if

24         that's the case, he would have been

25         making the determination about who it
```

Confidential - Pursuant to Protective Order

1          would be done for and who it would not

2          be done for.

3     QUESTIONS BY MR. OVERHOLTZ:

4          Q.    Do you have any personal

5     knowledge as to which subjects it was done

6     for and which it wasn't?

7          A.    Other than the written document

8     I looked at, no.

9          Q.    And you haven't spoken to

10    Mr. Kieper about it; is that right?

11         A.    Correct.

12         Q.    Okay.  And do you have an

13    understanding of how the soldier would

14    determine whether they should roll back the

15    plugs or not?

16              MS. ELIZABETH:  Objection.

17         Form.

18              THE WITNESS:  I don't know what

19         individual soldiers were doing, no.

20    QUESTIONS BY MR. OVERHOLTZ:

21         Q.    Okay.  All right.  So one of

22    the things we want to do is pull up the

23    exhibit that we had -- the demonstrative that

24    we had earlier.

25              MR. OVERHOLTZ:  Do you have

Confidential - Pursuant to Protective Order

```
 1          that one, Zach?

 2               And we'll get a printout of

 3          this, but we're going to mark this as

 4          Exhibit Number 33.

 5               (Berger 30(b)(6) Exhibits 33,

 6          34, 35 and 36 marked for

 7          identification.)

 8               MR. OVERHOLTZ:  Okay.  And then

 9          I made some further notes here

10          regarding the testing that are on

11          the -- you can put them on the ELMO

12          here, and I'm going to mark those as

13          demonstrative Exhibit Number 34.

14               Okay.  And then this next page

15          of notes I'm going to mark as

16          demonstrative Exhibit Number 35.

17               And then we got a copy of your

18          notes from earlier that was provided

19          to us, and I'm going to mark those as

20          Exhibit Number 36 to the deposition.

21               MS. ELIZABETH:  His notes that

22          accompany his binder?

23               MR. OVERHOLTZ:  The notes that

24          accompany the binder.

25               MS. ELIZABETH:  Okay.
```

Confidential - Pursuant to Protective Order

1          MR. OVERHOLTZ:  Those.

2          Okay.  So we'll mark those as

3     Exhibit Number -- demonstrative

4     exhibit -- I mean, that's regular

5     Exhibit 36.

6          34 and 35 and 33 are all

7     demonstratives, so I'll give you those

8     to put into the stack.

9          MR. BROCK:  Okay.  Are you

10    going to ask him anything else about

11    this notebook right now?

12         MR. OVERHOLTZ:  I'm not going

13    to ask him anything else about that

14    notebook right now.

15         MR. BROCK:  All right.  Let me

16    have that.

17         MR. OVERHOLTZ:  Can we go off

18    the record real quick?

19         VIDEOGRAPHER:  We are going off

20    record at 6:36.

21     (Off the record at 6:36 p.m.)

22         VIDEOGRAPHER:  We're back on

23    record.  The time is 6:40.

24  QUESTIONS BY MR. OVERHOLTZ:

25         Q.   Okay.  Mr. Berger, a follow-up

Confidential - Pursuant to Protective Order

```
 1                    CERTIFICATE

 2

 3          I, CARRIE A. CAMPBELL, Registered
       Diplomate Reporter, Certified Realtime
 4     Reporter and Certified Shorthand Reporter, do
       hereby certify that prior to the commencement
 5     of the examination, Elliott H. Berger, M.S.
       30(b)(6), was duly sworn by me to testify to
 6     the truth, the whole truth and nothing but
       the truth.
 7
            I DO FURTHER CERTIFY that the
 8     foregoing is a verbatim transcript of the
       testimony as taken stenographically by and
 9     before me at the time, place and on the date
       hereinbefore set forth, to the best of my
10     ability.

11          I DO FURTHER CERTIFY that I am
       neither a relative nor employee nor attorney
12     nor counsel of any of the parties to this
       action, and that I am neither a relative nor
13     employee of such attorney or counsel, and
       that I am not financially interested in the
14     action.

15

16

17     _____
       CARRIE A. CAMPBELL,
18     NCRA Registered Diplomate Reporter
       Certified Realtime Reporter
19     California Certified Shorthand
       Reporter #13921
20     Missouri Certified Court Reporter #859
       Illinois Certified Shorthand Reporter
21     #084-004229
       Texas Certified Shorthand Reporter #9328
22     Kansas Certified Court Reporter #1715
       Notary Public
23
       Dated:  November 15, 2019
24

25
```

Confidential - Pursuant to Protective Order

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3            Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the

 6   appropriate space on the errata sheet for any

 7   corrections that are made.

 8            After doing so, please sign the

 9   errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13            It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25
```

Confidential - Pursuant to Protective Order

1              ACKNOWLEDGMENT OF DEPONENT

2

3

4        I,_____, do
    hereby certify that I have read the foregoing
5    pages and that the same is a correct
    transcription of the answers given by me to
6    the questions therein propounded, except for
    the corrections or changes in form or
7    substance, if any, noted in the attached
    Errata Sheet.

8

9

10

11

12   _____
    Elliott H. Berger, M.S.          Date

13

14

15

    Subscribed and sworn to before me this
16   _____ day of _____, 20 _____.
17   My commission expires: _____

18

19   Notary Public

20

21

22

23

24

25