# EXHIBIT 33

Confidential - Pursuant to Protective Order

1          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF FLORIDA
2              PENSACOLA DIVISION
3

    IN RE: 3M COMBAT ARMS  )  Case No.
4   EARPLUG PRODUCTS        )  3:19md2885
    LIABILITY LITIGATION    )
5   _____  )  Judge M. Casey
                            )  Rodgers
6   THIS DOCUMENT RELATES   )  Magistrate Judge
    TO ALL CASES            )  Gary R. Jones
7
8          FRIDAY, OCTOBER 18, 2019
9   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
10               - - -
11          Videotaped deposition of Brian
12   Myers, held at the offices of KIRKLAND &
13   ELLIS LLP, 300 North LaSalle, Chicago,
14   Illinois, commencing at 9:00 a.m., on the
15   above date, before Carrie A. Campbell,
16   Registered Diplomate Reporter, Certified
17   Realtime Reporter, Illinois, California &
18   Texas Certified Shorthand Reporter, Missouri
19   & Kansas Certified Court Reporter.
20               - - -
21
          GOLKOW LITIGATION SERVICES
22     877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
23
24
25

Confidential - Pursuant to Protective Order

```
1                A P P E A R A N C E S :
2
        SEEGER WEISS, LLP
3       BY:  DAVID R. BUCHANAN
                dbuchanan@seegerweiss.com
4               MAX KELLY
                mkelly@seegerweiss.com
5       77 Water Street
        New York, New York  10005
6       (212) 584-0700
7
        WAGSTAFF & CARTMELL, LLP
8       BY:  THOMAS P. CARTMELL
                tcartmell@wcllp.com
9               KATHLEEN E. HUDNALL
                khudnall@wcllp.com
10      4740 Grand Avenue, Suite 300
        Kansas City, Missouri  64112
11      (816) 701-1100
12
        ABRAHAM, WATKINS, NICHOLS, SORRELS,
13      AGOSTO & AZIZ
        BY:  MUHAMMAD S. AZIZ
14              maziz@awtxlaw.com
        800 Commerce Street
15      Houston, Texas  77002-1776
        (713) 222-7211
16
17      CLARK, LOVE & HUTSON, PLLC
        BY:  EMILY MARLOWE
18              emarlowe@triallawfirm.com
        440 Louisiana Street, Suite 1600
19      Houston, Texas  77002
        (713) 757-1400
20
21      AYLSTOCK, WITKIN, KREIS &
        OVERHOLTZ, PLLC
22      BY:  BRYAN F. AYLSTOCK
                baylstock@awkolaw.com
23             (VIA TELECONFERENCE)
        17 East Main Street
24      Pensacola, Florida  32502
        (850) 202-1010
25      Counsel for Plaintiffs
```

Confidential - Pursuant to Protective Order

```
 1        KIRKLAND & ELLIS LLP
          BY:  MARK J. NOMELLINI
 2            mark.nomellini@kirkland.com
          300 North LaSalle
 3        Chicago, Illinois  60654
          (312) 862-2000
 4
 5        KIRKLAND & ELLIS LLP
          BY:  WHITNEY N. KNOWLTON
 6            whitney.knowlton@kirkland.com
          333 South Hope Street
 7        Los Angeles, California  90071
          (213) 680-8122
 8
 9        KIRKLAND & ELLIS LLP
          BY:  NOLAN STANTON
10            nolan.stanton@kirkland.com
          601 Lexington Avenue
11        New York, New York  10022
          (212) 446-4800
12        Counsel for Defendants
13
14     ALSO PRESENT:
          CHARLES BACHMANN AND COREY TAM,
15        Seeger Weiss
16        ZACH HONE, trial technician, Golkow
          Litigation Services
17
18     V I D E O G R A P H E R :
          DAVID LANE,
19        Golkow Litigation Services
20                      - - -
21
22
23
24
25
```

Confidential - Pursuant to Protective Order

1          My question is --

2          MR. NOMELLINI:  You can keep

3      answering the question -- you can keep

4      answering the question.

5          MR. CARTMELL:  Stop coaching

6      the witness.

7          MR. NOMELLINI:  He was not

8      finished.

9  QUESTIONS BY MR. CARTMELL:

10      Q.     Were you finished, sir?

11          I'll withdraw my question.  Let

12  me you ask another.

13          MR. NOMELLINI:  He's not

14      finished answering.

15          MR. CARTMELL:  I think he

16      answered it.

17          MR. NOMELLINI:  Were you

18      finished answering?

19          THE WITNESS:  I wanted to point

20      out that I do have some very specific

21      directions from, I think her name was,

22      Loretta about things to include,

23      things not to include, that seem to be

24      counter even to directions that their

25      own office had given me.

```
 1                    So we tried to be -- we tried

 2          to be precise in following the

 3          directions that we were given by the

 4          place we were shipping the product.

 5                    MR. NOMELLINI:  Are you looking

 6          for a document there?

 7                    MR. CARTMELL:  Mark, this is

 8          out of control.  Stop coaching the

 9          witness, giving the witness documents.

10                    He's here to answer my

11          questions, this is my deposition, and

12          he needs to respond.

13                    If you continue to do it, we'll

14          shut it down and show the examples to

15          the judge.  You've been doing this all

16          day.  It's ridiculous.

17                    Right?  I didn't ask him to

18          look for a document.  I'm going to ask

19          him --

20                    MR. NOMELLINI:  He's entitled

21          to look for a document in response to

22          your question.

23                    MR. CARTMELL:  Not when you are

24          the one that asked him to look for a

25          document.
```

Confidential - Pursuant to Protective Order

```
1              MR. NOMELLINI:  He started to

2         look for it.

3              MR. CARTMELL:  No, he didn't.

4         You handed him the documents and said,

5         "Were you looking for a document?"

6    QUESTIONS BY MR. CARTMELL:

7         Q.    Sir, I'm going to ask you about

8    those e-mails in a little while.  We'll get

9    back to that.  I want to go back to my

10   question, though.

11             If 3M had information that

12   there was difficulty inserting the Combat

13   Arms Earplug version 2, 3M could have put an

14   instruction for use in its inserts or in its

15   label to that effect, correct?

16        A.    Unless we were told not to.

17        Q.    Okay.  And is your testimony --

18   let me ask you this:  From 19 -- I'm going to

19   break it down.

20             From 1999 to 2005 is your

21   testimony that -- and I want to be very

22   precise -- the military told 3M not to

23   include instructions relating to how to fit

24   or use the Combat Arms Earplug?

25        A.    That was my recollection.
```

Confidential - Pursuant to Protective Order

1      Q.     Do you recall a conversation

2  about that?

3      A.     I don't recall how that was

4  conveyed.

5      Q.     Who was the conversation with?

6      A.     Probably -- it would have

7  either been directly from Doug Ohlin or

8  perhaps through Elliott.

9      Q.     Okay.  And when was that

10  conversation?

11      A.     Again, I don't recall exactly

12  when that conversation may have taken place.

13      Q.     After 3M obtained this

14  information that according to the testing of

15  the Combat Arms plug the plug was too short

16  for proper insertion, did 3M ever -- or

17  Aearo, at the time -- ever attempt to offer

18  an instruction telling soldiers that the

19  Combat Arms plug was too short for proper

20  insertion?

21      A.     I don't know.

22             MR. NOMELLINI:  Object to form.

23  QUESTIONS BY MR. CARTMELL:

24      Q.     After the company got the

25  information in May of 2000 from the testing

Confidential - Pursuant to Protective Order

```
1    of the Combat Arms plug that it was difficult

2    to insert the plugs deeply enough into one's

3    ear canals if you had medium or larger ear

4    canals, did 3M ever offer or suggest that

5    type of instruction or warning or caution to

6    the military?

7              MR. NOMELLINI:  Foundation.

8         Form.

9              THE WITNESS:  I don't know.

10   QUESTIONS BY MR. CARTMELL:

11        Q.    Once the -- strike that.

12              When 3M learned in 2000, May of

13   2000, from its testing of the Combat Arms

14   Earplug that when the green end of the plug

15   was placed in certain individuals' ears the

16   yellow end on the outside tended to push

17   against the ear and could cause the plug to

18   actually loosen and that it would be

19   imperceptible to the soldier, did 3M ever

20   offer that instruction or offer that warning

21   or caution to be placed in any materials?

22              MR. NOMELLINI:  Form and

23        foundation.

24              THE WITNESS:  We saw in the

25        2005 insert that happened, but I can't
```

Confidential - Pursuant to Protective Order

1      Q.     China?

2      A.     I don't believe I saw an entry

3  for China, but we could look and see.

4      Q.     Saudi Arabia?

5      A.     I don't recall.

6             MR. NOMELLINI:  Do you want him

7      to look through the data?

8  QUESTIONS BY MR. CARTMELL:

9      Q.     Any other --

10             MR. NOMELLINI:  You're nodding

11      no.

12             Do you not want him to look

13      through the data?

14             MR. CARTMELL:  I don't need him

15      to.  And actually, I'm asking him

16      questions, so I don't need you to ask

17      me questions.

18  QUESTIONS BY MR. CARTMELL:

19      Q.     Any other countries that you

20  can recall?

21      A.     It seems like India was a

22  country there.  At least in this initial set

23  there were 19 countries in all where we

24  actually sold outside the US.  There were 19

25  countries in all where we sold product.

Confidential - Pursuant to Protective Order

1          MR. NOMELLINI:  To make it

2     easier, there's an electronic version

3     of this spreadsheet.  He could sort

4     through if you think that it's

5     helpful.

6          MR. CARTMELL:  Okay.

7          MR. NOMELLINI:  To help answer

8     your question.

9          MR. CARTMELL:  We don't need to

10     do that.  We've got the documents, so

11     we'll go through those.  I appreciate

12     it.

13          I want to take a three- or

14     four-minute break, get organized and

15     see if I have anything else, but I

16     think I'm super close and may be done.

17          MR. NOMELLINI:  Okay.

18          VIDEOGRAPHER:  Going off the

19     record at 5:28 p.m.

20      (Off the record at 5:28 p.m.)

21          VIDEOGRAPHER:  We're back on

22     record at 5:45 p.m.

23          (Myers 30(b)(6) Exhibit 31

24     marked for identification.)

25

```
 1                    CROSS-EXAMINATION

 2   QUESTIONS BY MR. NOMELLINI:

 3        Q.     Mr. Myers, I've handed you

 4   what's been marked as Myers Exhibit 31.

 5               Do you recognize that document,

 6   sir?

 7        A.     Yes.

 8        Q.     What is it?

 9        A.     That's the -- well, the first

10   part of it I think we reviewed, other than

11   the cover page, is the solicitation for

12   providing the Combat Arms Earplug to the DPSC

13   {sic}, I think, in Philadelphia.  DSCP, yeah.

14        Q.     And did you receive a response

15   to the solicitation?

16        A.     We did.  We won that

17   solicitation.

18        Q.     And did the procurement

19   documents with the government contain

20   specifications as to packaging and labeling?

21        A.     They do, yes.

22        Q.     And did you have some follow-up

23   questions for the government about those

24   specifications?

25        A.     I did.
```

Confidential - Pursuant to Protective Order

```
 1              (Myers 30(b)(6) Exhibit 32

 2         marked for identification.)

 3    QUESTIONS BY MR. NOMELLINI:

 4         Q.     I'm handing you what we'll now

 5    mark as Myers Deposition Exhibit 32.

 6              Can you identify that document,

 7    sir?

 8         A.     Yeah.  So this is an e-mail

 9    chain seeking some clarification relative to

10    exactly how they wanted the product labeled.

11         Q.     And what's the date of this

12    e-mail chain, and were you a party to the

13    e-mail chain?

14         A.     I was.  I actually wrote the

15    first e-mail on it to this contracting agent,

16    Allen Thomas from the DPSC {sic}.

17         Q.     And the person you wrote the

18    e-mail to on September 20, 2006, was that a

19    person affiliated with the government?

20         A.     Yes.

21              MR. CARTMELL:  Where are you?

22              MR. NOMELLINI:  I'm on -- don't

23         coach the witness.

24              MR. CARTMELL:  He's not my

25         witness.
```

Confidential - Pursuant to Protective Order

 1              MR. NOMELLINI:  I'm on -- I'm

 2         on -- but apparently if you ask,

 3         "where are you," that's equivalent to

 4         coaching.

 5              3M_MDL000014303.

 6              MR. CARTMELL:  It's this chair.

 7    QUESTIONS BY MR. NOMELLINI:

 8         Q.    So are you on page 14303, sir?

 9         A.    I am.

10         Q.    And did you write an e-mail to

11    a Thomas Allen {sic} of the United States on

12    September 20, 2006, asking some questions

13    about Combat Arms packaging?

14         A.    I did.

15         Q.    Could you read into the record,

16    sir, your e-mail to the government asking

17    questions about Combat Arms packaging?

18         A.    "Mr. Thomas, sorry for the

19    delay in response.  Primarily we have two

20    questions regarding" -- I misspelled it --

21    "what seemed to be conflicting marketing

22    directions for the Combat Arms Earplug

23    relative to solicitation SPO200-06-R-4202.

24    This product is configured to have 50 pairs

25    of earplugs packaged in one large plastic

Confidential - Pursuant to Protective Order

1    bag, which is packaged in one corrugated box.

2    One box of this product is defined as a

3    package, and it is in this units that you

4    order the product.  Formerly, we had included

5    a human readable label on both the bag and

6    the box.  Essentially the label on the box

7    was a copy of the -- on the bag was a copy of

8    the label on the box.  Under the new labeling

9    directions, we will replace the human

10   readable label on the box with an RFID label.

11   Do we still need a human readable label on

12   the internal bag?  Obviously an RFID would

13   make no sense."

14        Q.    You can stop there.

15              Thank you, sir.

16              And did the government respond

17   to your question to -- about Combat Arms

18   packaging that you asked on September 20,

19   2006?

20        A.    She did.

21        Q.    Okay.

22        A.    Actually, Allen Thomas

23   forwarded this to a lady in his organization,

24   I guess, to answer specific questions about

25   the packaging.  Her name was Loretta Connors.

Confidential - Pursuant to Protective Order

1        Q.     Could you please read the
2   response that the United States government
3   issued to you on December 7, 2006, regarding
4   your questions on Combat Arms packaging?
5        A.     "Brian, I apologize for the
6   delay in responding to your questions.  In
7   addition to the information provided in this
8   message, I've attached sample markings to
9   give you an idea of how the markings should
10  be supplied."
11             And then relative to my first
12  question, do you want me to read that?
13       Q.     Yes.  Could you read your
14  question to the government and the
15  government's response to your question about
16  Combat Arms packaging in December 7, 2006?
17       A.     Okay.  The first question, my
18  question, "This product is configured to have
19  50 pairs of earplugs packaged in one large
20  plastic bag, which is packaged in one
21  corrugated box.  One box of this product is
22  defined as a package, and it is in this units
23  that you order the product.  Formerly, we had
24  included a human readable label on both the
25  bag and the box.  Essentially the label on

Confidential - Pursuant to Protective Order

1    the bag was a copy of the label on the box.

2    Under the new labeling directions, we will

3    replace the human readable label on the box

4    with an RFID label.  Do we still need a human

5    readable label on the internal bag?

6    Obviously an RFID would make no sense."

7            And their response, her

8    response, was, "The unit of issue requirement

9    is one package containing 50 pairs.  Markings

10   are not required on the plastic bag since the

11   bag is further packaged in sealed, corrugated

12   boxes.  Units markings are required on the

13   box.  RFID tagging is not required on the

14   unit of issue for this item.  See the

15   attached sample for the required

16   identification markings."

17       Q.    Thank you, sir.

18            And what did you understand the

19   government's response to your inquiry dated

20   September 7, 2006, to mean?

21       A.    Don't put a label on the bag.

22       Q.    And when you're talking about

23   the bag, what are you referring to in that

24   context?

25       A.    So it was the clear bag in

Confidential - Pursuant to Protective Order

1    which we packaged the Combat Arms, and then

2    that bag was placed into a corrugated box.

3         Q.     And how many bags were in the

4    box?

5         A.     One.

6         Q.     Okay.  And what product code,

7    what 3M product code, would this correspond

8    to?

9         A.     This would correspond to the

10   370-1000.

11        Q.     And in a box of 370-1000, what

12   was the number of product included?

13        A.     There were 50 pair.

14        Q.     Okay.  So what did you

15   understand the government's instruction to

16   mean with respect to each of the 50 pair of

17   bags in the box to be shipped?

18               MR. CARTMELL:  Object to the

19        form.

20               THE WITNESS:  That we weren't

21        to put a label in the box.

22   QUESTIONS BY MR. NOMELLINI:

23        Q.     Now, Mr. Cartmell asked you a

24   number of questions about, well, even if you

25   weren't required to do something by the

Confidential - Pursuant to Protective Order

1    government, you might have been, you know,

2    free to provide more stuff to the military

3    that they didn't specify.

4              So let me ask you:  Was it your

5    understanding that you could send materials

6    to the government in response to their order,

7    packages, labels, other materials, anything

8    that the government had not requested?

9         A.    No.

10             So there was a memo in 2006

11   where Doug Ohlin -- apparently at some point

12   in time we had included a carrying case with

13   the product, and he came back and really went

14   after us and said, we've got to take that out

15   of the product.  I'm telling people to throw

16   it away.  It causes a problem.  Don't include

17   this.

18        Q.    Okay.  Did anybody from the

19   government, United States government, ever

20   tell you, even though we did not specify

21   something in the package that we are ordering

22   from you, you're free to include whatever you

23   want, additional materials in the package?

24        A.    No, that was not my impression.

25        Q.    And would that have been

Confidential - Pursuant to Protective Order

1  consistent with your interaction with the

2  government?

3        A.    For us to freely provide

4  things?  No.

5              I had a former, as I recall,

6  issue with getting proper payment for a

7  shipment, not of this product but because

8  there was some confusion about the way in

9  which it was labeled.  So I tried to be very

10  specific to what the government asked for and

11  did not ask for.

12             (Myers 30(b)(6) Exhibit 33

13       marked for identification.)

14  QUESTIONS BY MR. NOMELLINI:

15       Q.    I've handed you what's been

16  marked as Exhibit 33.

17             Could you identify that

18  document, sir?

19       A.    Yeah, I think we looked at this

20  earlier today.  It's an e-mail from me to

21  Elliott Berger and Tim McNamara, and copies

22  Douglas Moses and Jeff Hamer, dated April

23  the 10, 2007, regarding -- the subject is

24  "NRR labeling."

25       Q.    Could you please read your

Confidential - Pursuant to Protective Order

1    e-mail on April 10, 2007, at 1:22 p.m. to

2    Elliott Berger, Tim McNamara, Doug Moses and

3    Jeff Hamer on the subject of NRR labeling?

4         A.    Yeah.  It's very succinct.  It

5    says, "My understanding is that the military

6    can require whatever they wish.  They could

7    require different test protocols,

8    calculations, et cetera.  It is entirely up

9    to them what they want on their packaging."

10        Q.    What was the basis for that

11   understanding?

12        A.    Past conduct, and certainly the

13   e-mail that I got from Doug Ohlin telling me

14   that they weren't going to have that carrying

15   case in the product.

16             (Myers 30(b)(6) Exhibit 34

17        marked for identification.)

18   QUESTIONS BY MR. NOMELLINI:

19        Q.    I've handed you what's been

20   marked as Exhibit 34.  This is a e-mail chain

21   involving yourself, Doug Ohlin and some

22   others.

23             Do you recognize the parts of

24   the e-mail that are between you and Doug

25   Ohlin, sir?

Confidential - Pursuant to Protective Order

1    A.    I do.

2    Q.    And can you describe what this

3    e-mail chain was about, Exhibit 34?

4    A.    We were putting together an

5    instruction sheet.  I think it was a

6    successor to the instruction sheet that we

7    reviewed earlier, the insert that we talked

8    about.

9    Q.    And what was your e-mail

10   message to Doug Ohlin on December 9, 2005, at

11   3:03 p.m.?

12   A.    Let me -- can I read it?

13   Q.    Yes.

14   A.    "Doug, we are in the process of

15   setting up a product which is a single pair

16   of Combat Arms Earplugs on a blister card.

17   I'll send you some when available.  We've

18   prepared the attached insert which will be

19   printed and placed in the package with each

20   pair.  We're interested in any comments or

21   modifications which you think are appropriate

22   for us to make.  Also, if there is any part

23   of this insert which you would like to use,

24   let us know and we can get you a file with

25   the artwork in it.  Thanks, Brian."

Confidential - Pursuant to Protective Order

1    with each pair."

2                Do you see that?

3        A.    I do see those words, yes.

4        Q.    This is after the 2006

5    procurement agreement that stated in there

6    that there needed to be instructions with

7    every single pack of earplugs, correct?

8                MR. NOMELLINI:  Form.

9                THE WITNESS:  This was after

10       the...

11   QUESTIONS BY MR. CARTMELL:

12       Q.    2006 procurement?

13       A.    The 2006 procurement request.

14       Q.    Right.

15                Not only did the military not

16   say you shouldn't include instructions, they

17   were in agreement that you should put more

18   complete instructions, correct?

19                MR. NOMELLINI:  Form.

20                THE WITNESS:  That's what the

21       e-mail says.

22   QUESTIONS BY MR. CARTMELL:

23       Q.    This actually supports what I'm

24   saying, and that is, that you could put more

25   complete instructions, better, more concise,

Confidential - Pursuant to Protective Order

1    complete instructions about how to wear the

2    earplugs in the label.

3                You recommended that, and the

4    military actually agreed with you, correct?

5        A.    So I'm not sure what happened

6    to this request subsequent to this e-mail,

7    but had they wanted -- ultimately wanted

8    these in pillow packs, that's what we would

9    have done.  That was the point that I was

10   trying to make.

11       Q.    Okay.  All I know is at the

12   time, back in 2007, you wrote an e-mail,

13   these are your words, and you specifically

14   stated that you recommended more complete

15   instructions, and the Army -- or excuse me,

16   the military agreed that you could do that,

17   correct?

18       A.    But at some point that -- we

19   came off that path, and I don't know why,

20   because I don't know where this request went.

21       Q.    Right.

22                There's no document that you

23   can point us to that says you came off that

24   path, right?

25       A.    No, but obviously we did,

Confidential - Pursuant to Protective Order

1   because the whole product ended up not being

2   in a pillow pack.

3         Q.     Well, but you don't know it was

4   because of the military telling you that you

5   cannot do that or you could not do that,

6   correct?

7         A.     But I don't know that it

8   wasn't.

9         Q.     Okay.  If you go to Exhibit 35.

10             Actually, I apologize.  I want

11   to go the other document your counsel used

12   from Loretta Connors, the first page.  Okay.

13             I think, sir, you were actually

14   asked by your counsel whether this was a

15   document that supported that the military

16   didn't want you or was preventing you or

17   limiting or restricting your company somehow

18   in providing more complete, concise

19   instructions or warnings or cautionary info

20   in the label, correct?

21             MR. NOMELLINI:  Form.

22             THE WITNESS:  Can you repeat

23      that?

24   QUESTIONS BY MR. CARTMELL:

25         Q.     Sure.

Confidential - Pursuant to Protective Order

1              This exhibit, actually, you

2    said, and you read into the record -- I think

3    you were insinuating or stating by reading

4    this that somehow the military was preventing

5    or restricting or limiting your company from

6    putting instructions or labeling, more

7    complete, concise labeling, or warnings with

8    the Combat Arms; is that correct?

9         A.    What I read into the record

10   simply indicates that there was a label she

11   specifically did not want, she did not want

12   in the...

13        Q.    Well, that's what I was going

14   to ask you about, because I don't see

15   anything that there's any statement here that

16   they did not want something.

17              Here's what I read, if you look

18   at this document.  She states in the bottom

19   of the first paragraph -- or your question

20   states, "Under the new labeling directions,

21   we will replace the human readable label on

22   the box with an RFID label."

23              So what you were saying there

24   is that you were going to include a label on

25   the box, correct?

Confidential - Pursuant to Protective Order

1       A.      Yes.

2       Q.      Okay.  So the product shipping

3    would have a label on it, correct?

4       A.      The box would, yes.

5       Q.      Okay.  Do we still -- you're

6    asking a question:  Do we still need a human

7    readable label on the internal bag?

8               You're asking:  We have one on

9    the box; do we also need one on the bag?

10              Correct?

11      A.      That's my question.

12      Q.      On the bag.  Not in the bag

13   with each of the products.  You're asking if

14   you need one on the box and the bag, correct?

15      A.      In essence, that's my question.

16      Q.      And she says, "The marking

17   label is required on the box," isn't it?

18      A.      That was her response.

19      Q.      She says it's not required on

20   the bag, correct?

21      A.      She said it's not required on

22   the unit of issue for this item, and

23   apparently attached a sample.

24      Q.      Right.

25              So there's a difference, isn't

Confidential - Pursuant to Protective Order

```
1    there, from her saying it's not required?
2    There's a difference between that and the
3    military telling you it -- they want to
4    prevent you from doing it or you cannot do
5    it.
6              Would you agree?
7        A.    Candidly, I don't perceive it
8    that way, though.  When they say they don't
9    require it, my sense is, don't do it or it
10   will cause confusion.
11       Q.    Okay.  But this doesn't say
12   that, fair enough?
13       A.    But that was my belief.
14       Q.    Okay.  There's nothing in here
15   either that says that your company could not
16   have provided an insert, one of the inserts
17   with instructions for use or warnings related
18   to the fit and wearing those Combat Arms
19   Earplugs.  There's nothing in here that says
20   you cannot do that, correct?
21       A.    Again, my belief, both from
22   this e-mail and from the one that we reviewed
23   from Dr. Ohlin, was that we should not put
24   things into the product that aren't
25   requested.
```

Confidential - Pursuant to Protective Order

```
 1        Q.     Fair enough, sir.  We've gone a

 2   long time.

 3               But my point is you're asking

 4   the jury to believe that this says that you

 5   are prevented from putting an insert, for

 6   example, or any updated instructions in the

 7   box related to the fitting of the Combat Arms

 8   Earplugs, and this document does not say

 9   that, correct?

10        A.     What I'm saying is that my

11   understanding is that we should provide the

12   US military exactly what they ask for, no

13   more, no less, so that things would go

14   smoothly.

15        Q.     This document doesn't say that,

16   though, fair?

17        A.     But that was my belief.

18        Q.     Your belief is one thing, but

19   this document doesn't say it, correct?

20        A.     This document says that we --

21   that we are not required, and I read that as

22   we should not include that label.

23        Q.     I understand you have your

24   belief, okay, and you interpreted this a way

25   that you've told us.
```

Confidential - Pursuant to Protective Order

1           My simple question is:  This

2    document does not say that.  It doesn't say

3    that, correct?

4           It says it's not required.  It

5    doesn't say you can't do it.

6      A.    That's how I take that

7    response.  When she says it's not required, I

8    believe I shouldn't do it.

9           MR. CARTMELL:  Object, and I'm

10       going to move to strike it and ask you

11       to answer my question.

12   QUESTIONS BY MR. CARTMELL:

13     Q.    I'm not asking how you would

14   take it.

15           This document does not say you

16   can't do it; it says it's not required,

17   correct?

18     A.    My perception of the reply is

19   that --

20           MR. CARTMELL:  I'm going to

21       object and move to strike because

22       you're not answering my question.

23           I'm not asking about your

24       perception.  I'm asking about the

25       words on the page.

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. CARTMELL:

2         Q.    This document does not say that

3    you can't do it; it says it's not required,

4    correct?

5         A.    This document says -- let me

6    read from it.  In her response is, "RFID

7    tagging is not required on the unit of issue

8    for this item.  See the attached sample for

9    the required identification markings."

10        Q.    Never says you can't do it,

11   correct?

12        A.    That is not how I perceived

13   that response.

14        Q.    Sir, look at Exhibit 35,

15   please.  This is a document your counsel

16   asked you about, and I think you said that

17   this e-mail reflects the first sale that your

18   company had to the military in May of 1999;

19   is that correct?

20        A.    I believe the sale was after

21   that.

22        Q.    Okay.  This is just

23   regarding --

24        A.    No, let me look that up.

25        Q.    No, you don't need to.  It's

Confidential - Pursuant to Protective Order

1    late, and I'll withdraw the question about --

2    or you don't need to look at the exact date.

3              This is in May of 1999.  This

4    is an e-mail between you and an officer in

5    the military requesting the Combat Arms

6    Earplugs, correct?

7        A.    It's an e-mail chain between me

8    and Dr. Ohlin.

9        Q.    Okay.  And it's regarding a

10   request by the military.

11             And who was it that was

12   requesting the earplugs in 1999?

13       A.    According to Dr. Ohlin's

14   e-mail, it was a gentleman named John King,

15   who is the scientific advisor to the Southern

16   European Command.

17       Q.    And so was he asking for these

18   earplugs to be used in combat for soldiers?

19   Strike that.

20             Was he asking that these

21   earplugs be used by soldiers in combat?

22             MR. NOMELLINI:  Foundation.

23             THE WITNESS:  I don't think the

24        e-mail says.

25

Confidential - Pursuant to Protective Order

```
 1    QUESTIONS BY MR. CARTMELL:

 2         Q.    Do you know how those earplugs

 3    were going to be used?

 4         A.    I don't.

 5         Q.    Do you know if they were going

 6    to be used by soldiers, for instance?

 7         A.    I don't.  I just know that John

 8    King was clearly a part of the US military.

 9         Q.    And as we established, at this

10    time when you were sending these earplugs to

11    the military overseas, they had not been

12    tested.  The REAT testing had not occurred by

13    your company, correct?

14              MR. NOMELLINI:  Foundation.

15              THE WITNESS:  So this was in

16         May when they were requested.  We'd

17         have to look at the ship date.

18    QUESTIONS BY MR. CARTMELL:

19         Q.    The ship date was August,

20    remember?

21         A.    Yeah, according to this the

22    invoice -- or the PO date was in July.  The

23    invoice and bill date was in mid-August.

24         Q.    The ship date was in August

25    of 1999.  The REAT testing that you received
```

Confidential - Pursuant to Protective Order

```
 1                    CERTIFICATE
 2
 3          I, CARRIE A. CAMPBELL, Registered
    Diplomate Reporter, Certified Realtime
 4  Reporter and Certified Shorthand Reporter, do
    hereby certify that prior to the commencement
 5  of the examination, Brian Myers, was duly
    sworn by me to testify to the truth, the
 6  whole truth and nothing but the truth.
 7          I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
 8  testimony as taken stenographically by and
    before me at the time, place and on the date
 9  hereinbefore set forth, to the best of my
    ability.
10
            I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
13  that I am not financially interested in the
    action.
14
15
16
            Carrie A. Campbell
17  CARRIE A. CAMPBELL,
    NCRA Registered Diplomate Reporter
18  Certified Realtime Reporter
    California Certified Shorthand
19  Reporter #13921
    Missouri Certified Court Reporter #859
20  Illinois Certified Shorthand Reporter
    #084-004229
21  Texas Certified Shorthand Reporter #9328
    Kansas Certified Court Reporter #1715
22  Notary Public
23  Dated:  November 1, 2019
24
25
```

Golkow Litigation Services                    Page 421