## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | | |
|---|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | ) ) ) | Case No. 3:19-md-2885-MCR-GRJ |
| | ) | Judge M. Casey Rodgers |
| This Document Relates to All Cases | ) ) | Magistrate Judge Gary R. Jones |
| | ) ) | |

## DEFENDANTS' OPPOSITION TO
## <u>APPOINTMENT OF A RULE 706 EXPERT</u>

The scope of this multidistrict litigation, the number of parties involved, and the difficulty in obtaining critical records from the government have presented significant challenges.  It is obviously important that the Court have the resources necessary to address these challenges and successfully manage this litigation.  Defendants respectfully submit that the parties should bear responsibility for providing the necessary resources to help the Court address these challenges, not a court-appointed biostatistician.[1]  True, the Federal Rules of Evidence grant this Court the authority, under certain circumstances, to appoint an independent expert to assist a fact finder.  But the required circumstances do not exist at this time.

---

[1]  The parties met and conferred after the Court's Order and concluded that, in light of Defendants' objection, neither side would nominate an expert at this time.  If the Court overrules Defendants' objection, the parties will again meet and confer regarding a potential nominee.

The Court's Order states that expert assistance may be needed to understand what "litigation-relevant characteristics … must be considered to develop a more complete and accurate picture of the full universe of cases in the MDL," as well as "how much information is necessary to provide a fair and reliable basis for extrapolation." Pretrial Order No. 33 at 3. Defendants believe the Court has followed an appropriate path in overseeing the selection of 25 bellwether case candidates, who in turn will be subject to random selection for bellwether trials. The Court is also overseeing records requests for 1,509 cases. The combination of bellwether discovery and review of data from the 1,509 cases will assist the parties and the Court in better understanding the key characteristics of the plaintiff population.

To be sure, there are many plaintiffs who have not produced relevant information—such as medical and personnel records—to support their claims. That failure of proof is not an issue that can be remedied by invocation of Rule 706. Defendants respectfully submit there are four reasons why the Court's appointment of a biostatistician to conduct some kind of statistical extrapolation is not legally appropriate and will not advance the goals and objectives of this MDL.

*First*, in Defendants' view, it would be inappropriate for a court-appointed expert to identify litigation-relevant characteristics. *Second*, a statistical analysis by a court-appointed expert or party-retained expert is no substitute for individual

documentary proof.   *Third*, even if Rule 706 were the appropriate vehicle for obtaining a more thorough analysis of the plaintiff population, and it is not, a biostatistician would be of little or no help.   *Fourth*, although obtaining records and other discovery from the federal government presents certain challenges, there are viable options the parties should pursue instead of resorting to extrapolation.

### 1.   A Court-Appointed Expert Should Not Identify The Litigation-Relevant Characteristics Of The Plaintiffs At This Time.

"Courts and commentators alike have remarked that Rule 706 should be invoked only in rare and compelling circumstances" where "the ordinary adversary process does not suffice."  *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 558 F.3d 1341, 1348 (Fed. Cir. 2009) (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 830 F. Supp. 686, 693 (E.D.N.Y. 1993)).   Although the appointment of an independent expert is "rare under virtually any circumstances," it is "proper" only "where the issues are complex and the parties' experts have presented conflicting testimony that is difficult to reconcile or have otherwise failed to provide a sufficient basis for deciding the issues."   Charles A. Wright *et al.*, Federal Practice and Procedure §§ 6302, 6304 (2d ed. 2002).  The Manual for Complex Litigation lists the type of features that might justify the appointment of a Rule 706 expert in mass tort litigation, including (1) "a highly disputed subject in which strong evidence appears to support the contentions of both sides of the litigation" and (2) "a technical complexity that taxes the capacity of the adversary system."   MCL 4th, § 22.87.

Judge Jack Weinstein has noted that "court appointment of experts is a rarity" because "it is against the common-law tradition for the court to get involved in the process of actually digging out evidence," but that independent experts can be useful in "provid[ing] a fresh perspective on highly technical matters when each side has shopped for experts most favorable to its position." 4 Weinstein's Federal Evidence § 706.02 (2020).

Appointing a Rule 706 expert at this juncture would be, at best, premature. As a threshold matter, there are no complex disputed issues or dueling expert opinions that cannot be addressed through the ordinary adversary process. Indeed, the parties have not yet disclosed expert opinions under Rule 26. Courts have rarely, if ever, appointed Rule 706 experts before the parties themselves have disclosed their own experts. As one district court has observed, "[t]he first, and most obvious [factor in deciding whether to appoint a Rule 706 expert] is whether testimony from the parties' experts is sufficient to reveal the facts." *Gorton v. Todd*, 793 F. Supp. 2d 1171, 1182 (E.D. Cal. 2011).

Per the Order, the Court is focused on understanding "more variants of litigation-relevant characteristics that must be considered to develop a more complete and accurate picture of the full universe of cases in the MDL." Order at 3. It appears the Court is interested in gleaning what characteristics jurors might deem to be important or highly relevant. The parties and the Court likely will have to wait

for the litigation to mature before that information is available.  For instance, "[i]f bellwether cases are representative of the broader range of cases in the MDL proceeding, they can provide the parties and court with information on the strengths and weaknesses of various claims and defenses and the settlement value of cases." *See* Federal Judicial Center, Bellwether Trials in MDL Proceedings: A Guide for Transferee Judges 3.

The parties are certain to disagree over the significance of various characteristics.  In the upcoming bellwether trials, the parties can make their own arguments, supported as necessary by expert testimony, as to why certain aspects of a plaintiff's medical or service history support or undermine the plaintiff's claim that the CAEv2 caused him or her an otherwise preventable effect on hearing.  To the extent any claims remain after motion practice, the fact finder will decide which arguments are more persuasive.

Should the Court find during the bellwether process that the expert testimony presented by the parties is insufficient to help the jury understand and resolve a particular issue, it can revisit the possibility of appointing a Rule 706 expert.  For example, courts have appointed independent experts to assist in technically complex tasks such as "evaluating contradictory evidence about an elusive disease of unknown cause," *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999), and "estimating a major airline's lost profits resulting

from extensive delays stretching over a period of three years." *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 1000 (5th Cir. 1976); *see also* Wright, *supra*, at § 6304 ("The most important factor in favor of appointing an expert is that the case involves a complex or esoteric subject beyond the trier-of-fact's ability to adequately understand without expert assistance."); Cecil and Willging, Court-Appointed Experts, Federal Judicial Center Reference Manual on Scientific Evidence, p. 538 (1994) (survey of federal judges' use of Rule 706 powers concluding "experts are most often appointed to assist in understanding technical issues necessary to reach a decision"). Defendants do not expect this MDL to present any comparably technically complex issues. But in any event, there is no need to appoint a Rule 706 expert now, before the parties and their experts have even attempted to identify and analyze the relevant characteristics of individual plaintiffs.

Defendants also note that Rule 706, consistent with its use in the cases cited above, contemplates that the appointed expert will serve as a "witness" who makes "findings," and can be deposed or called to testify by either party. *See, e.g.*, *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, 1996 WL 34401813, at *2 (N.D. Ala. May 31, 1996) (authorizing appointment of experts in epidemiology, immunology, rheumatology, and toxicology and permitting the parties to bring their own experts to assist in deposing the independent experts). Rule 706 authorizes the appointment of an expert to provide impartial expert insight on a highly technical

6

issue the parties cannot adequately address.  The individual would serve as an expert *witness*—and not simply as a consultant or adviser to the Court.  *See Gorton*, 793 F. Supp. 2d at 1181 ("The touchstone is that expert witnesses should not be appointed under Rule 706 where not necessary or significantly useful for the trier of fact to comprehend a material issue in a case.").  This appears to be inconsistent with the role of a Court-appointed biostatistician, who would simply assist the Court with creating a statistical description of the characteristics of the plaintiff pool.

In sum, Defendants believe that the identification and analysis of the litigation-relevant characteristics of the plaintiffs is a job best left to the adversarial process.  At the very least, appointment of a Rule 706 expert should await the parties' own presentation of the relevant evidence.

### 2. Statistical Analysis Cannot Substitute For Individual Proof.

To prevail on a claim, each plaintiff must, at minimum, put forward medical and other information supporting his or her claim to have suffered hearing damage while using the CAEv2.  Extrapolation cannot substitute for individual proof.  *See Cimino v. Raymark Indus.*, 151 F.3d 297, 321 (5th Cir. 1998) (reversing judgments for plaintiffs who presented "no evidence" and relied entirely on "extrapolation" from sample cases as contrary to the Seventh Amendment).[2]  In this respect,

---

[2] *See also Seijas v. Republic of Argentina*, 606 F.3d 53, 55-56, 59 (2d Cir. 2010) (reversing "aggregate, class-wide" judgments "based on reasonable estimates of the total amount of damages" in the absence of "procedures to ensure that the

statistical analysis cannot overcome the difficulty the Court and the parties have encountered in obtaining timely discovery from the government. Plaintiffs must have documentary support for their claims to obtain relief. And, as discussed in Section 4 below, viable alternatives exist for obtaining this evidence from the government.

### 3.   A Biostatistician Would Not Aid The Court.

For the reasons given above, Defendants do not believe the Court should use a court-appointed expert to attempt to identify litigation-relevant characteristics and estimate their frequency in the overall plaintiff population. And if the Court does wish to conduct that analysis, it is not necessary to appoint a biostatistician. The Court's Order identifies two tasks for which it might require expert assistance: (1) understanding what "litigation-relevant characteristics," other than those used to select the bellwether plaintiffs, "must be considered to develop a more complete and accurate picture of the full universe of cases in the MDL;" and (2) understanding "how much information is necessary to provide a fair and reliable basis for

---

damages awards roughly reflect the aggregate amount owed to [individual] class members"); *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 603 (E.D. La. 2002) ("[T]his Court does not approve of any attempt by plaintiffs to employ statistics to cure the individualized nature of their breach of contract cause of action or the amount of damages each plaintiff may be entitled to receive by focusing on a 'representational sample' of plaintiffs.").

extrapolation."  A biostatistician could not help with the first task and is not needed for the second.

### (a)    Identification of Litigation-Relevant Characteristics

A biostatistician's expertise comprises "the techniques of collecting and exploring data relevant to health, medical, and biological sciences."[3] This form of statistical expertise alone could not aid the Court in identifying *litigation-relevant* characteristics.  At the very least, it requires *substantive* expertise—primarily in audiology or tort litigation—to predict what characteristics will affect the strength of a plaintiffs' claim, not statistical expertise.  A biostatistician will have no basis for determining what information in plaintiffs' records is likely to be relevant to their claims, or to determine the value (if any) of those claims.

### (b)    Ensuring There Is A Reliable Basis For Extrapolation

Defendants reiterate that plaintiffs cannot rely on extrapolation from a subset of cases to satisfy their burden of proof, and that identification of litigation-relevant characteristics should be left to the adversary process.  If the Court has questions about the docket or the frequency of relevant characteristics, the parties should be

---

[3] University of California, Berkeley, Department of Public Health, Division of Epidemiology and Biostatistics, *available at* https://publichealth.berkeley.edu/academics/epidemiology-and-biostatistics/

able to furnish this information based on their review of data from the bellwether cases and the 1,509 cases targeted for record requests.

If the Court simply wishes to determine the distribution of basic demographic characteristics among the entire population of plaintiffs, the Court would not need any special biostatistical expertise.  Any large, randomly selected sample will provide a basis for understanding the most common demographic characteristics of the total population.  As the Court already well knows, random selection is "the standard method for helping ensure that a sample is representative of the population."  Guide for Transferee Judges, *supra*, at 25.  The one-percent sample the Court created for targeted record requests should provide helpful information for understanding the common characteristics of the plaintiff population.  If the Court wished to gather additional information related to the entire population, it could issue record requests for a large random sample drawn from all plaintiffs beyond the scope of the characteristics targeted to date.

Until records are actually available, however, no examination of relevant characteristics is possible.  As of now, not even all the bellwether plaintiffs have produced their medical and other records, much less the plaintiffs included in the targeted record requests.  The principal problem is getting the records in the first place, not extrapolating from information that plaintiffs have not yet made available.

### 4.    Alternative Means of Overcoming The Difficulty In Obtaining Records From The Government.

Plaintiffs bear the burden of proving their claims.  As discussed above, if Plaintiffs cannot produce medical records, they cannot prove their claims. Extrapolation is no substitute.

Plaintiffs' counsel have more than adequate resources to obtain their clients' medical records and personnel records.  This Court can take judicial notice of the massive advertising campaign various plaintiffs' counsel have mounted for this case. At least partly because of this advertising, there are now nearly 150,000 plaintiffs. But the medical records and personnel files produced by plaintiffs and the government have not nearly kept pace with the growing plaintiff population. Extrapolation cannot fill these gaps in many plaintiffs' records.  Instead, the parties can pursue more direct and more effective methods to overcome the gaps.

First, plaintiffs could use Cerner's "HealtheHistory" service to download their own VA records and provide the records to counsel.  The Department of Justice confirmed via email on December 19, 2019, that the Veterans Administration has no legal objection to Cerner's proposal to have the patients download their own health records and direct that the information be provided to the firm.  Following that email, it is Defendants' understanding that the Court lifted its hold on using Cerner. Although Cerner is not needed for the bellwether cases, plaintiffs should be focusing on obtaining non-bellwether records.  The parties should also continue to explore

the use of other contractors to obtain non-bellwether plaintiffs' medical records and personnel files.

Second, the Early Vetting Subcommittee should begin to weed out those plaintiffs who filed cases without sufficient evidence to support their claims.

Third, to the extent the goal is determining litigation-relevant characteristics, Defendants should be permitted to take additional deposition and document discovery of government audiologists and other government personnel knowledgeable about those characteristics. While Plaintiffs deride all of Defendants' government discovery efforts as a "fishing expedition," government discovery is just as important to Defendants as company discovery is to plaintiffs. Yet, to date, plaintiffs have taken approximately twenty depositions, while Defendants have taken two. Plaintiffs' counsel have asked deposition questions for 163 hours, while Defendants' counsel have used less than one-eighth that time (20 hours).

## CONCLUSION

For the foregoing reasons, Defendants respectfully oppose the appointment of an expert under Federal Rule of Evidence 706.

Dated: May 8, 2020                     Respectfully submitted,

                                       */s/ Robert C. Brock*
                                       Robert C. "Mike" Brock
                                       KIRKLAND & ELLIS LLP

1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 389-5991
Email: mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
Email: mark.nomellini@kirkland.com

*Counsel for Defendants 3M Company,
3M Occupational Safety LLC, Aearo
Technologies LLC, Aearo Holding, LLC,
Aearo Intermediate, LLC and Aearo, LLC*

## **WORD COUNT CERTIFICATION**

Pursuant to L.R. 7.1(F), the foregoing memorandum contains 2,687 words exclusive of the case caption, certifications, and signature block.


Dated: May 8, 2020                    Respectfully submitted,

                                      */s/ Robert C. Brock*
                                      Robert C. "Mike" Brock

## <u>CERTIFICATE OF SERVICE</u>

I, Mike Brock, hereby certify that on Mary 8, 2020, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

DATED:  May 8, 2020                    */s/ Robert C. Brock*        
                                           Robert C. "Mike" Brock