**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | | |
|---|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | ) ) ) | Case No. 3:19-md-2885 |
| | ) | Judge M. Casey Rodgers |
| This Document Relates to All Cases | ) ) | Magistrate Judge Gary R. Jones |

**[PUBLIC VERSION]**

**DEFENDANTS' MOTION TO COMPEL**
**AGAINST THE DEPARTMENT OF DEFENSE**

Defendants move that the Court set aside the decision of the Department of Defense to deny Defendants' *Touhy* request to depose ten of the Department's former and current employees, and compel the Department to present the current employees—Mary Binseel, Dr. Mark Little, LTC Martin Robinette, Dr. Douglas Brungart, and Dr. Leanne Cleveland—for deposition.  Defendants also move that the Court compel the production of noise and ototoxin exposure data for certain military occupational specialties, tasks, and installations.

**BACKGROUND**

The Department of Defense, like most federal agencies, has enacted a set of "*Touhy*" regulations—named after the Supreme Court case that gave rise to them, *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951)—that govern the Department's responses to third-party subpoenas in civil litigation.  The regulations provide that the Department's lawyers will determine whether "DoD

personnel … may be interviewed, contacted, or used as witnesses concerning official DoD information."  Department of Defense Directive 5405.02, § 6.1.1; *see* Ex. A.  The Directive defines "DoD Personnel" to include "[p]resent and former U.S. military personnel."  *Id*. § 3.2.

Nearly eight months ago, on October 25, 2019, Defendants submitted a *Touhy* request to interview 30 former and current employees of the Department whom Defendants believed to have relevant information related to the Combat Arms Earplug Version 2 ("CAEv2").  Ex. B.  Defendants have long maintained that the Department lacks statutory authority to apply its *Touhy* regulations to former employees.  In the spirit of cooperation, however, Defendants submitted *Touhy* requests for former as well as current employees.

At the Department's request, Defendants submitted a revised *Touhy* request on December 2, 2019, prioritizing their request to interview 11 witnesses, and renewing the request to interview an additional 19 witnesses.  Ex. C.  The Department denied all of the Defendants' requests for pre-deposition interviews, but approved the deposition of four witnesses.[1]  The government orally denied

---

[1] The approved witnesses were LTC Jeff Merkley, Dr. Lorraine Babeu, LTC Kathy Gates, and LTC Marc Stevens.  Only the first three depositions have taken place. LTC Marc Stevens has since told the Department he does not wish to appear for a deposition.  Because LTC Stevens is no longer a government employee, the Department informed Defendants that it cannot make him appear.

Defendants' request as to two witnesses, Col. David Chandler and Dr. Mark Little, in an in-person meeting on January 28, 2020.  In this same meeting, the government also questioned the relevance of a third witness, Dr. Douglas Brungart. The next day, Defendants produced documents to the government demonstrating Dr. Little and Dr. Brungart's personal knowledge of relevant information.  The government indicated that it would further consider the requests pertaining to Dr. Little and Dr. Brungart.

Since that time, Defendants have asked for an update on the government's position regarding the pending deposition requests.  Most recently, on May 12, May 13, May 14, and May 19, 2020, Nick Wasdin of Kirkland & Ellis reached out to Jacqui Snead at the Department of Justice, and Major Nicole Kim and Major Collin Evans at the Department of Defense, to request calls relating to the status of the government's responses, including the status of Defendants' deposition requests.  Ms. Snead did not agree to the calls, and responded that the government was working on letters and would prefer that those serve as the government's responses to Defendants' requests.  Although Defendants received a disclosure letter on May 22, 2020 regarding the status of certain document requests, the government has not provided an answer to Defendants on whether or when depositions may take place for 22 individuals.

On June 9, 2020, Defendants sent Ms. Snead a letter asking for a final decision on their requests by Thursday, June 11, 2020.[2]  *See* Ex. D.  Defendants have received no further response approving any of these 22 deposition requests.

After almost eight months of waiting for a decision from the government, Defendants consider their requests to have been constructively denied.  Defendants cannot wait any longer for the Department to make up its mind.  Summary judgment briefing on the government contractor defense (to which many of the government witnesses are relevant) has already concluded, and bellwether discovery is now commencing.  Defendants have no choice but to ask the Court to resolve this dispute now, while Defendants still have the opportunity to use the evidence these witnesses possess.

Although Defendants originally requested the opportunity to interview 30 former and current employees of the Department, Defendants now seek the deposition of just 10 additional government witnesses—five former employees and five current employees.  Defendants will serve individual subpoenas on the five former employees:  LTC Theresa Schulz, LTC Marc Stevens, Dr. G. Richard Price, Col. Nancy Vause, and Col. Chandler.  Defendants ask that the Court set aside the Department's decision to deny Defendants' requests to depose the former

---

[2] The email transmitting Defendants' letter also copied Major Kim and Major Evans.

employees and allow discovery to proceed pursuant to the individual subpoenas.

*See Koopmann v. U.S. Dep't of Transp.*, 335 F. Supp. 3d 556, 565-66 (S.D.N.Y.

2018).  With respect to the current employees—Ms. Binseel, Dr. Little, LTC

Robinette, Dr. Brungart, and Dr. Cleveland—Defendants ask that the Court set

aside the Department's *Touhy* denial and compel the deposition of those witnesses.

## ARGUMENT

### I.     A Motion To Compel Is An Appropriate Vehicle For Challenging The Government's *Touhy* Denials.

A motion to compel is a procedurally appropriate, and by far the most

efficient, means of resolving this discovery dispute.  In the past, the United States

has taken the position that any challenge to a federal agency's decision to deny a

*Touhy* request must take the form of a separate action brought under the

Administrative Procedure Act.  *See, e.g.*, *Wilson v. Jackson Nat'l Life Ins. Co.*,

2017 WL 10402568, at *1 (M.D. Fla. Dec. 27, 2017).  The United States is correct

that, in the Eleventh Circuit, an agency's denial of a *Touhy* request is considered an

"agency action" subject to review under the APA.  5 U.S.C. § 706(2)(A); *see*

*Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1197 (11th Cir. 1991).[3]  But courts

---

[3] The Ninth and D.C. Circuits disagree, however, and correctly hold that federal courts should assess the discovery obligations of federal agencies under the applicable Federal Rules of Civil Procedure.  *Watts v. SEC*, 482 F.3d 501, 508 (D.C. Cir. 2007) (Kavanaugh, J.); *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 778-79 (9th Cir. 1994).

in the Eleventh Circuit have routinely rejected the government's argument that APA review can occur only in a separate action, which would require duplicative and time-consuming litigation. *See U.S. ex rel. Lewis v. Walker*, 2009 WL 2611522, at *2 (M.D. Ga. Aug. 21, 2009) ("[T]he Court sees no reason why it cannot decide [the dispute] as part of the presently pending … action."). Instead, courts have saved time and effort by simply construing a motion to compel (or response to the agency's motion to quash) as an APA action. *Forgione v. HCA Inc.*, 954 F. Supp. 2d 1349, 1352-53 (N.D. Fla. 2013) ("Significant delay and inconvenience will be avoided simply by construing the instant action as arising under the APA."); *Barnett v. Illinois State Bd. of Elecs.*, 2002 WL 1560013, at *1 (N.D. Ill. July 2, 2002) ("[A] motion to compel directed against the Department does the job of bringing an APA action before the court equally as well as, if not better than, a separate APA claim against the Department.") (citation and internal quotation marks omitted). Requiring a separate APA action would be especially unwarranted here, where the government has already caused months of unnecessary delay by failing to respond to Defendants' *Touhy* requests.

## II.   The Department Cannot Apply Its *Touhy* Regulations To Former Employees.

The Department's *Touhy* regulations are unlawful insofar as they apply to former employees. The regulations were enacted pursuant to the federal Housekeeping Statute, 5 U.S.C. § 301, and that statute gives the Department

authority over current employees only.  The Department's denial of Defendants' request to depose former employees was therefore "in excess of its statutory jurisdiction" and must be set aside.  5 U.S.C. § 706(2)(C).

When analyzing an agency's interpretation of a statute under *Chevron*'s "two-step framework," a court first "ask[s] whether, after applying the 'traditional tools of statutory construction,' [it] can determine whether Congress has spoken clearly on the issue." *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1190 (11th Cir. 2019) (internal citations omitted).  "In applying the traditional tools of statutory construction, we begin with the statutory text, and proceed from the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Id*. at 1190 (quotation marks omitted).

The Housekeeping Statute states:

> The head of an Executive department or military department may prescribe regulations for the government of his department, *the conduct of its employees*, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

5 U.S.C. § 301 (emphasis added).

The definition of the term "employee" makes clear that an employee is a person *currently working* for an employer.  *Employee*, Black's Law Dictionary (11th ed. 2019) ("Someone who works in the service of another person (the

employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance.").  Accordingly, courts that have confronted the issue have found that "the statutory term 'employee' unambiguously covers only current employees—not current and former employees." *Sherwood v. BNSF Ry. Co.*, 2019 WL 943548, at *3 (D. Idaho Feb. 25, 2019) (citing *Koopmann*, 335 F. Supp. 3d at 560-65); *see also La. Dep't of Transp. & Dev. v. U.S. Dep't of Transp.*, 2015 WL 7313876, at *7 (W.D. La. Nov. 20, 2015) ("The term 'employees' is not ambiguous, and, thus, USDOT has no authority to extend that definition to the conduct of former employees."); *Gulf Oil Corp. v. Schlesinger*, 465 F. Supp. 913, 917 (E.D. Pa. 1979) (finding that the statute "on its face applies only to employees and not former employees of government agencies and departments").

"The more natural reading of 'employees' to mean current employees alone is reinforced by the Housekeeping Statute as a whole." *Koopmann*, 335 F. Supp. 3d at 561.  First, the statute states that an agency may regulate its employees' "conduct," but "[n]othing in the statute as a whole suggests that Congress intended for its grant of authority to extend to regulation of the conduct of anyone who was ever employed by the agency without any temporal limitation." *Id.*; *see also Sherwood*, 2019 WL 943548, at *3 (noting that "construing the housekeeping statute to cover former employees would likely raise First Amendment issues").  Therefore, to maintain

consistency with the rest of the statute and to avoid "practical—if not constitutional—questions," the Court should limit the application of the Directive to current DoD employees. *Koopmann*, 335 F. Supp. 3d at 565.

Second, "'[t]he antecedents' of today's Housekeeping Statute '[trace] back to the beginning of the Republic, when statutes were enacted to give heads of early Government departments authority to govern internal departmental affairs.'" *Id.* at 558 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 309 (1979)). The Supreme Court has explained that the Housekeeping Statute "seems to be simply a grant of authority to the agency to regulate its own affairs." *Id.* at 562 (quoting *Chrysler Corp.*, 441 U.S. at 309). Moreover, Congress has revised the statute to prevent the Housekeeping Statute from being used "to withhold information" and instead limiting its application "to provide for the day-to-day office housekeeping in the Government departments." *Id.* (quoting *Chrysler Corp.*, 441 U.S. at 310).

The text and structure of the Housekeeping Statute unambiguously limit the Department's authority to current employees. The Department's use of its *Touhy* regulations to deny Defendants' requests to depose former employees is thus unlawful and must be set aside.[4]

---

[4] For the same reasons, Defendants need not obtain the Department's permission to interview and depose former servicemembers as fact witnesses in the bellwether cases. Indeed, using the *Touhy* process for those contacts and depositions would

## III.   The Department's Refusal To Present Its Current Employees For Deposition Is Arbitrary And Capricious.

### A.   The Current Employees Possess Relevant Evidence

Courts in the Eleventh Circuit review an agency's decision to deny a *Touhy* request under the APA's arbitrary-and-capricious standard.[5]   An agency's denial of a request to depose a witness who possesses relevant evidence is arbitrary and capricious—particularly where, as here, the agency has failed to give any rationale whatsoever for the denial.   *See Lewis*, 2009 WL 2611522, at *4 (overturning an agency's denial of a *Touhy* deposition request as arbitrary and capricious).   There can be no dispute that each of the current employees Defendants seek to depose possesses evidence relevant to this litigation.

### (a)   Mary Binseel

Mary Binseel is a researcher at the Army Research Laboratory and the lead author of two studies analyzing the CAEv2.  In one study, Ms. Binseel conducted

---

introduce considerable delay into the bellwether process, making it impossible to hold the first bellwether trial when planned.

[5] As noted above, however, other circuits have correctly held that the Federal Rules of Civil Procedure, rather than the APA, govern the discovery obligations of federal agencies.  It makes little sense to review an agency's *Touhy* denial under the APA's arbitrary-and-capricious standard, given that the regulations themselves do not give the agency a basis for "withholding information from the public or limiting the availability of records to the public."  5 U.S.C. § 301; *see Watts*, 482 F.3d at 508-09.  Accordingly, a federal agency should be required, like any other party, to respond to valid discovery requests unless it can show that the discovery requests are irrelevant or unduly burdensome.  *See Watts*, 482 F.3d at 509.

"real-ear attenuation at threshold" (REAT) tests of the CAEv2 and concluded that the earplug "compared very well with [its] design specifications." Dkt 1071, Ex. 48 at 19. The other study involved speech intelligibility and localization precision testing, in which service members wore the yellow, non-linear end of the CAEv2 while listening to speech or determining the direction of incoming sounds. Dkt. 1071, Ex. 49.

Defendants seek to depose Ms. Binseel regarding: (i) the test protocols employed in the testing, (ii) the results of the studies; (iii) the context surrounding the studies, including why the studies were commissioned, who requested them, what the information was used for, (iv) communications with Aearo or other entities regarding the studies, and (v) the location of documents and other data regarding those topics.

### (b)    Dr. Mark Little

Dr. Mark Little is an Army audiologist who currently serves as the chief of audiology at the Dwight D. Eisenhower Army Medical Center in Georgia. As detailed in Defendants' summary judgment brief, Little had extensive communications with Aearo research scientist Elliott Berger regarding Aearo's internal testing and the proper fitting technique for the CAEv2. *See* Dkt. 1071 at 16-17. Dr. Little contacted Berger to request information on the CAEv2 for testing he was planning to conduct, and Berger responded with a letter enclosing three

attachments: (i) a package for the consumer version of the product, which contained the "flange fold" fitting instruction; (ii) test data from the makers of the CAEv2's non-linear filter; and (iii) Aearo's internal test reports describing, among other things, the flange fold fitting technique used on one of the tests.  *See* Dkt. 1071, Ex. 28; Ex. 56 (12/12/19 Berger Tr.) at 84:25-88:13; Exs. 29-33; Ex. 56 (12/12/19 Berger Tr.) at 88:16-103:3.  On September 25, 2001, Dr. Little sent Berger an email stating that he "received [the] mailing and will make use of the instructions."  Dkt. 1071, Ex. 34; Ex. 56 (12/12/19 Berger Tr.) at 103:4-104:10. Little specifically asked Berger if "the sealing rings of the outward facing plug that were rolled back upon themselves during fitting, as per the instructions, stay this way in the ear or should they be unrolled??"  Dkt. 1071, Ex. 34.  Berger responded: "they should stay that way."  *Id.*

These communications show that Plaintiffs have no basis for their assertion that Defendants deliberately concealed the flange-fold issue from the government. Defendants seek to depose Dr. Little regarding: (i) his communications with Berger and others at Aearo, (ii) any communications with Doug Ohlin or other Army audiology officials, and (iii) the testing he performed on the CAEv2.

### (c) LTC Martin Robinette

LTC Martin Robinette is an Army audiologist who currently serves as the Army Liaison to the Hearing Center of Excellence at Lackland Air Force Base in

Texas. ████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████. The government's production also shows that Robinette was included

on emails in which Ohlin noted that Aearo's initial production samples were "at

least a quarter of an inch too long." Dkt. 1071, Ex. 3 at DOD00000136.

Defendants seek to depose LTC Robinette regarding: (i) his knowledge of

any fitting issues with the CAEv2, (ii) his understanding of the flange-fold

instruction, (iii) Ohlin's evaluation and approval of hearing protection devices, and

(iv) the military's consideration of the length of the CAEv2.

### (d)   Dr. Douglas Brungart

Dr. Douglas Brungart is an Army audiologist who currently serves as the chief scientist in the audiology and speech center at Walter Reed.  Dr. Brungart is one of the authors of a 2008 study that involved REAT testing of the green end of the CAEv2 without the flanges folded back—precisely the type of test that Plaintiffs claim demonstrates the CAEv2 to be defective.  Dkt. 1071, Ex. 7 at 1. The study concluded that the green end of the CAEv2 provided "very good attenuation."  *Id*. at 20.

Defendants seek to depose Dr. Brungart regarding: (i) the test protocols employed in the testing, (ii) the results of the study; (iii) the context surrounding the study, including why the study was commissioned, who requested it, what the information was used for, (iv) communications with Aearo or other entities regarding the study, and (v) the location of documents and other data regarding those topics.

### (e)   Dr. Leanne Cleveland

Dr. Leanne Cleveland is an Army audiologist who currently serves at Fort Carson in Colorado.  Documents produced to date show that Ms. Cleveland attended a Post Deployment Health Reassessment Survey Session in 2005 and asked soldiers questions regarding their experiences using the CAEv2.  *See* Ex. E. Defendants seek to depose Dr. Cleveland regarding: (i) questions and answers at

the post Deployment Health Reassessment Survey; (ii) Dr. Cleveland's personal experience regarding CAEv2 usage and application within the Army; (iii) Dr. Cleveland's personal knowledge and experience regarding service member satisfaction with CAEv2 while worn in training and in combat.

## IV.   The Department's Failure To Locate And Provide Noise and Ototoxin Exposure Data is Arbitrary and Capricious

The regulations governing the Army's Hearing Conservation Program require that the Industrial Hygiene Program Manager at every Army installation, among other things, (i) survey all known and suspected noise-hazardous areas and equipment and ototoxic exposures, (ii) maintain a current inventory of all noise-hazardous areas, (iii) compile the names and social security numbers of noise-exposed and ototoxic-exposed personnel and the magnitude of their noise exposure, and (iv) track noise exposure violations for inclusion on a violation inventory log.  Dkt. 1071, Ex. 8 at 1-4.  Similarly, the regulations require Hearing Conservation Officers to, among other things, (i) notify noise-exposed and ototoxic-exposed personnel under their supervision of their exposures, and (ii) ensure that noise-exposed and ototoxic-exposed personnel wear noise and ototoxic chemical dosimeters when requested.  *Id*.

Defendants requested this data in a supplemental *Touhy* request on March 17, 2020.  Ex. F.  Major Evans has responded that the data, which the regulations require the Army to collect, do not exist.

The regulation and other public documents suggest that the Army does, in fact, collect and retain this data.  The website of the Army Public Health Center notes that, consistent with the regulation, "Army industrial hygienists are responsible for conducting noise surveys in the workplace to identify military and civilian workers potentially exposed to noise hazards."  Ex. G.  A factsheet for the Department's industrial hygiene database explains that two "key features" of the database are that it "[c]aptures comprehensive, operational and work task potential exposures-based medical surveillance recommendations," and "[t]racks DoD lifetime personnel exposure data."  Ex. H.  It also says a "key benefit" of the database is that it "[c]aptures information to monitor compliance with occupational health and safety federal law and directives."  *Id*.  The 2006 book *Noise and Military Service*, published by the National Academies of Sciences, observes that each "Army installation evaluates work environments for potential noise hazards from steady-state noise in industrial-type operations.  Since 1988, the sound pressure level and noise dosimetry measurements have been collected…."  Ex. I at 76.

In light of this evidence that the exposure data does exist, Defendants ask that the Court order the Department to renew its search and either produce the data or explain why a reasonable search cannot locate the data.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court set aside the Department's denial of Defendants' deposition requests, compel the Department to present Ms. Binseel, Dr. Little, LTC Robinette, Dr. Brungart, and Dr. Cleveland for deposition, and compel the Department to renew its search for the noise and ototoxin exposure data.

Dated:  June 12, 2020                         Respectfully submitted,

/s/Robert C. Brock
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
Email: mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
Email: mark.nomellini@kirkland.com

*Counsel for Defendants 3M Company,
3M Occupational Safety LLC, Aearo
Technologies LLC, Aearo Holding, LLC,
Aearo Intermediate, LLC and Aearo, LLC*

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

I HEREBY CERTIFY that this brief complies with the word limit of Local

Rule 7.1(F), and contained 3700 words, excluding the parts exempted by the Rule.

Dated: June 12, 2020

*/s/Robert C. Brock*
Robert C. "Mike" Brock

## **CERTIFICATE OF SERVICE**

I, Robert C. Brock, hereby certify that on June 12, 2020, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

Dated: June 12, 2020

*/s/Robert C. Brock*
Robert C. "Mike" Brock