# Exhibit B

## KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

Mark J. Nomellini
To Call Writer Directly:
+1 312 862 2410
mark.nomellini@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

October 25, 2019

Major Collin Evans
Michael Fucci

Re:     Touhy Request Relating to *In re: 3M Combat Arms Earplug Products
        Liability Litigation*, 3:19-md-02885-MCR-GRJ (N.D. Fla.).

Dear Major Evans and Mr. Fucci:

In connection with *In re: 3M Combat Arms Earplug Products Liability Litigation*, a multidistrict litigation pending before the Northern District of Florida, this letter constitutes Defendants 3M Company ("3M") and Aearo Technologies LLC's ("Aearo") *Touhy*[1] request to the United States Department of Defense ("DoD"), Defense Logistics Agency ("DLA"), Army, Navy, Marine Corps, Air Force, and Coast Guard to interview certain individuals who are former representatives and or employees of the DoD, DLA, Army, Navy, Marine Corps, Air Force, and/or Coast Guard who were involved in the design, conception, development, testing, distribution, and the provision of Combat Arms Earplugs Version 2 ("CAEv2") from Defendants to the U.S. Military and service members and/or certain relevant aspects of the military's hearing conservation programs.  Pursuant to 32 C.F.R. § 516.40-57 and 32 C.F.R. § 97; 33 C.F.R. § 1.20-1 and 6 C.F.R. § 5.45; DoD Directive 5405.2 § 6.2; Navy Instruction 5820.8A; Air Force Instruction 51-301, Defendants set forth the basis for their *Touhy* request as follows:

## I.     Summary of the Litigation

3M was founded in 1902 as a small-scale mining venture in Northern Minnesota, and has grown into a global science company employing over 90,000 people and produces more than 60,000 products world-wide.  Many of 3M's brands have become universally known, including Scotch™ Brand adhesive tapes, Post-it® Brand sticky notes, and Thinsulate™ thermal insulation, to name just a few.  In addition to its consumer-side business, 3M also had a long-standing relationship with federal and state governments for well over fifty years and provides thousands of products designed to protect American troops and support their missions.  In 2008, 3M purchased Aearo, who, at the time, was a global leader in personal protection equipment,

---

[1]     *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

# KIRKLAND & ELLIS LLP

Major Collin Evans
Michael Fucci
October 25, 2019
Page 2

headquartered in Indianapolis, Indiana.  The acquisition helped 3M expand its occupational health and environmental safety platform by adding hearing protection, eyewear protection, and fall protection to its product lines, including Combat Arms Earplugs - the subject of this litigation. Combat Arms Earplugs represented a significant advance in hearing protection in that they were one of the first hearing protection devices to offer protection from high-level impulse noises, like gun-fire, while still allowing the user to hear lower level sounds, like speech, with limited interruption.  Hearing loss is a common injury among military veterans.  The U.S. military has provided hearing protection and preservation services to soldiers for decades.  In support of that mission, the military employs audiologists to administer hearing conservation programs and work with outside contractors, like 3M, to advance their hearing protection goals.

The complaints in this MDL assert claims for alleged hearing loss or tinnitus allegedly caused by noise exposure to plaintiffs while wearing the Combat Arms Earplugs Version 2. CAEv2 was developed and designed by Aearo at the request of and in close consultation with U.S. military audiologists, including Dr. Doug Ohlin, former Program Manager, Hearing Conservation, U.S. Army Center for Health Promotion and Preventative Medicine.  Specifically, the U.S. military and Aearo decided to modify and update Aearo's Ultrafit® triple-flanged earplug by including a specially patented filter created by the French-German Institute in Saint Louis, France ("ISL"). Thereafter, Aearo worked with the U.S. military and ISL to develop an earplug embodying ISL's patented technology, which ultimately became CAEv2.  CAEv2 consists of two Ultra-fit type tips, one green and one yellow, attached to opposite sides of a plastic stem with a small opening at the center.  The green end works like a conventional passive earplug, providing steady and continuous protection from ambient noise.  In contrast, the yellow end allows sound to travel into the opening at the center of the earplug and through a sound channel and the patented filter before entering the ear.  The filter allows lower-level sounds, such as speech, to pass through while reducing higher-level impulse noises, like gun-fire.

Throughout the design process, Aearo worked closely with the U.S. military to ensure that CAEv2 would appropriately balance performance with military operational needs for soldiers and military personnel.  These specifications were memorialized in a Medical Procurement Item Description ("MPID") that was used by the Defense Logistics Agency to solicit bids from Aearo for CAEv2.  To date, thousands of actions have been filed on behalf of current or former military personnel.  These claims allege plaintiffs were provided CAEv2 by various branches of the military, and used CAEv2 during training and/or deployment.  Plaintiffs asserting these claims typically allege hearing loss and/or tinnitus as a result of noise exposure in military and combat settings, and assert claims for design defect, negligence, failure to warn, breach of warranties, and/or fraud.  On April 3, 2019, the Judicial Panel on Multidistrict Litigation entered an order transferring the consolidated cases and any tag-along actions to the Northern District of Florida.

## KIRKLAND & ELLIS LLP

Major Collin Evans
Michael Fucci
October 25, 2019
Page 3

**II.**     **Summary of the Interviews Requested**

Defendants request interviews with the following individuals:

    **A.**     **Lorraine Babeu**

    **B.**     **Mary Binseel**

    **C.**     **Dr. Douglas Brungart**

    **D.**     **Kristi Casto**

    **E.**     **David Chandler**

    **F.**     **Don Ciliax**

    **G.**     **Georges Garinther**

    **H.**     **Kathy Gates**

    **I.**     **Albert Gatica**

    **J.**     **Jamies Hamil**

    **K.**     **Brian Hobbs**

    **L.**     **Belva Hoffman**

    **M.**     **Maj. Dean Hudson**

    **N.**     **Daniel L. Johnson**

    **O.**     **Joel Kalb**

    **P.**     **John King**

    **Q.**     **Tomasz Letowksi**

    **R.**     **Mayne Loyborg**

    **S.**     **Richard McKinley**

    **T.**     **John Andrew ("Andy") Merkley**

# KIRKLAND & ELLIS LLP

Major Collin Evans
Michael Fucci
October 25, 2019
Page 4

      **U.**      **Julie Parisi**

      **V.**      **Richard Price**

      **W.**      **Martin Robinette**

      **X.**      **Angelique A. Scharine**

      **Y.**      **Theresa Schultz**

      **Z.**      **Thomas Sidor**

      **AA.**      **Bettye Simmons**

      **BB.**      **Marc Stevens**

      **CC.**      **Nancy Vause**

      **DD.**      **Rachel A. Weatherless**

As purchasers of the CAEv2 earplugs, individuals within the Army, Navy, Marine Corps, Coast Guard, Air Force, Defense Logistics Agency, and Department of Defense exclusively possess necessary information concerning the military's decision to buy the CAEv2 earplugs from Defendants. Specifically, an interview with Thomas Sidor and Albert Gatica, the government contracting officers on the 2006 contract with the Defense Logistics Agency (No. SP0200-07-D-4013) may reveal facts concerning the military's decision to request and purchase CAEv2, and the pertinent specifications Defendants were required to follow in working with the military to design and evaluate the earplugs, including with respect to design features, noise reduction testing, audiology reports and studies, military procurement and Indefinite-Quantity contracts, operational considerations in the design of the earplugs (including shortening of the earplugs' hard plastic stem), and training, safety, and fitting information provided to service members. Government knowledge is a critical issue brought in the product liability lawsuits thus far, and an interview with government contracting officers is pertinent to government knowledge and considerations in the specifications it proposed.

An interview with Georges Garinther regarding design specifications and requests for proposals is relevant in order for Defendants to establish necessary facts to support the government contractor defense. *See Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). Garinther traveled to ISL in 1996 and met with ISL personnel, including Armand Dancer and Pascal Hamery, to discuss non-linear earplugs on behalf of the Army. Garinther discussed, and even participated in, studies relating to non-linear earplugs and impulse noises and their positive impact, including on non-linear Ultra-fit prototypes. Garinther also participated in meetings with Doug Ohlin and

# KIRKLAND & ELLIS LLP

Major Collin Evans
Michael Fucci
October 25, 2019
Page 5

other military personnel regarding the proposed design and purchase of the CAEv2.  Defendants believe Garinther is pertinent to the government's participation in, and ultimate approval of, the CAEv2 design, including the Army's participation in the development of CAEv2, that ultimately lead to the design specifications.  Garinther may also illustrate the military's understanding and acceptance of certain risks and limitations of non-linear earplugs in general, including CAEv2. Similarly, Theresa Schultz, an Army and Air Force audiologist, and Richard Price, an Army Engineer in the Army Research Laboratory, participated in meetings with Dr. Doug Ohlin and other military personnel regarding the design of CAEv2.  Additionally, Price created the Auditory Hazard Assessment Algorithm for Humans Model ("AHAAH") - which tracks the human ear's response to impulse sound.  In that regard, Price is pertinent to the government's understanding of the risks associated with military noises, and the use of hearing protection devices to attenuate impulse noises.  Bettye Simmons, Brigadier General, USA Commanding, is also relevant because she is referenced in connection with Dr. Ohlin's memorandum recommending the purchase of CAEv2 to the Joint Readiness Clinical Advisory Board, and may have communicated with Dr. Ohlin or other military personnel regarding the design, development, and testing of CAEv2. Garinther, Schultz, Simmons, and Price may also shed light on the Army's, and Dr. Ohlin's, involvement in the design of CAEv2, and the relevant design specifications required by the military.

An interview with John Andrew ("Andy") Merkley is relevant given that Merkley served as the Program Manager of the Army Hearing Conservation Program, previously held by Dr. Doug Ohlin.  Merkley may demonstrate facts pertaining to the Program Manager's role in hearing conservation efforts, including working with outside contractors on the design of hearing protection devices, and the military's testing of hearing protection devices at Aberdeen Proving Grounds.  Merkley also has experience as a military audiologist at various military bases and may speak to service member's use of CAEv2, including the instructions provided to service members in connection therewith.  Merkley may also provide facts concerning the Army Hearing Conservation Program's creation of, and involvement in drafting instructional wallet card that accompanied the CAEv2 when distributed to service members.  Don Ciliax, a former member of the Army Hearing Conservation Program, is relevant in this same regard, and, according to the documents produced in the litigation to date, may have been involved in the drafting of the original wallet cards by the Army Hearing Conservation Program.

Interviews with witnesses regarding CAEv2 testing are relevant in order for Defendants to establish facts necessary to support their defenses in this litigation.  For example, in 2014, Angelique Scharine and Rachel Weatherless conducted testing on CAEv2 on behalf of the Marine Corps.  Understanding the various tests, testing procedures and protocols, and test results is relevant to show that the CAEv2 works as intended, and that the military was on notice of the product's performance. Additionally, Scharine and Weatherless may also provide facts demonstrating that the military's attenuation and impulse testing yielded similar results to those

# KIRKLAND & ELLIS LLP

Major Collin Evans
Michael Fucci
October 25, 2019
Page 6

performed by Defendants.  The same is true for Mary Binseel, Joel Kalb, Tomasz Letowski, who were all involved in testing on CAEv2 in December, 2012 on behalf of the Army.  Like Scharine and Weatherless, these individuals may provide facts that speak to the government's knowledge about CAEv2 and dual-ended earplugs, especially regarding attenuation performance.  An interview with Binseel, Kalb, and Letowski is also relevant due to the fact the Army was the major purchaser of CAEv2 among the military branches. and Army audiologists and testing may have generated instructions for use provided to service members in connection the CAEv2.  Moreover, interviews with Brian Hobbs, Maj. Dean Hudson, Richard McKinley, Dr. Douglas Brungart, Julie Parisis, and James Hamil are similarly relevant as these individuals conducted testing on CAEv2 on behalf of the Air Force in January, 2009.  Moreover, an interview with Daniel L. Johnson is relevant given his blast overpressure study for the Army Aeromedical Research Laboratory in 1995.  Johnson's overpressure study focused on impulse noises and the realistic safety limits for heavy weapons noise while wearing hearing protection, which issues are relevant to this litigation.  Johnson may reveal facts to illustrate the military's knowledge of limitations associated with hearing protection and impulse noises associated with military service.  And Lorraine Babeau conducted impulse noise testing on CAEv2 on behalf of the Army Research Laboratory in 2005.  Babeau's study focused on impulse noises and level dependent systems, and the amount of protection they are able to provide, while adapting to changing environments.  Interviews with the aforementioned individuals will likely be relevant to government knowledge of CAEv2 performance, which is relevant to, among other things, Defendants' government contractor defense.

Interviews with Mayne Loyborg, David Chandler, Belva Hoffman, John King, Georges Garinther, Theresa Shultz, Richard Price, Marc Stevens, and Martin Robinette are relevant as these individuals likely have knowledge related to government participation in the design and decision to purchase the CAEv2.  John King, specifically, was the Scientific Advisor to an Army Southern Europe Command and may have requested an early shipment of CAEv2 in 1999.  Defendants believe King's early purchase and involvement may shed light on the government's analysis of CAEv2 and going forward decision to purchase additional quantities. Similarly, Loyborg, Robinette, Chandler, and Hoffman likely have information related to the military's desire to house the CAEv2 into standard issue military carrying cases.  For example, Loyborg, Chandler, Robinette, and Hoffman were copied on correspondence between Dr. Ohlin and Defendants where Dr. Ohlin informed Defendants the production samples he received were too long and that he shortened those samples to fit into the case.  Finally, Robinette authored a 2015 narrative outlining some of the ways the Army Hearing Conservation Program's missions have prevented/mitigated negative health effects in Army populations, including through use of the CAEv2.  Interviews with the aforementioned individuals are relevant to the government contractor defense, and specifically the precise specifications the Army required as it related to, among other things, the length of CAEv2 stem, which plaintiffs allege is defective.  Moreover, these individuals may detail the

# KIRKLAND & ELLIS LLP

Major Collin Evans
Michael Fucci
October 25, 2019
Page 7

military's oversight and control over Defendants in the design and development of CAEv2, which is relevant to establish the government contractor defense.

Information regarding hearing protection usage in the military is relevant in order for Defendants to establish facts necessary to support several state law defenses. Former Army audiologist, Marc Stevens, may have relevant information concerning service member usage of hearing protectors given Stevens' experience and familiarity with CAEv2 beginning in the early 2000's, including while stationed at Fort Campbell. Similarly, interviews with Kristi Casto, Kathy Gates, and Nancy Vause are relevant because they can speak to the role of military audiologists in general, including military audiologist role and experience as it specifically relates to CAEv2. Gates, in particular, is relevant given her membership in the DoD Hearing Conservation Working Group during the time which CAEv2 was developed and initially purchased by the military; documents produced to date indicate she attended early meetings with Ohlin and other personnel discussing those topics. Gates also received and distributed survey information regarding soldier satisfaction with CAEv2. Finally, interviews with military audiologists, such as Stevens, Casto, Gates, and Vause, are relevant to the government contractor defense as it relates to the military's desire for hearing protection devices meeting certain design specifications.

Policies and procedures are relevant in order for Defendants to establish facts necessary to support several state law defenses. Interviews with military audiologists and other individuals with firsthand experience with service members and hearing protectors at military installations across the world and country may uncover facts that support the combatant activities defense. Stevens, Casto, Gates, Vause, Merkley, and Schultz likely have knowledge pertaining to the required use of hearing protectors in combat situations. Additionally, Stevens, Casto, Gates, Vause, Merkley, and Schultz may have information regarding actual hearing protector usage rates in combat settings. Information regarding actual usage rates may negate the causation element for certain of plaintiffs' claims. Finally, interviews with Merkley, Casto, Stevens, Schultz, Gates, Vause, and Ciliax, may provide information regarding instructions for CAEv2, including the processes regarding whether and how military audiologists fit products on individual service members and provided instructions for use.

Interviews regarding purchasing and distribution data is relevant in order to establish facts necessary to support Defendants' combatant activities and federal enclave defenses. Military audiologists - Stevens, Casto, Gates, Vause, Merkley, and Schultz may show that specific plaintiffs received and used CAEv2 while engaging in training activities on military bases - that are federal enclaves. *See Jamil v. Workforce Resources, LLC*, 2018 WL 2298119 (C.D. Cal. May 21, 2918) ("Camp Pendleton is a federal enclave"); *see also Haining v. Boeing Co.*, 2013 WL 4874975, at *2 (C.D. Cal. Sept. 11, 2013) (concluding Vandenberg AFB is a federal enclave). The distribution data is also relevant because it may show that specific plaintiffs used CAEv2 in combat-related activities, including in actual combat. *See Bentzlin v. Hughes Aircraft Co.*, 833 F.Supp. 1486, 1492 (C.D. Cal. 1993) ("The combatant activities exception generates a federal common law

# KIRKLAND & ELLIS LLP

Major Collin Evans
Michael Fucci
October 25, 2019
Page 8

defense which immunizes manufacturers such as Hughes from state tort suits arising from war."). Interviewing these witnesses related to purchase history and distribution data also may establish facts necessary for Defendants' statute of limitations defense by illustrating dates and locations (in the early or mid-2000's) where service members used CAEv2, which may indicate that certain plaintiffs understood product performance at that time, but failed to bring any cause of action within the applicable statute of limitations period. Finally, these interviews may establish that certain individual plaintiffs were not in locations and/or on bases that used CAEv2.

## III.    Additional Considerations

These requests comply with the policies of the DoD, DLA, Army, Navy, Marine Corps, Air Force, Coast Guard, and the Department of Homeland Security regarding the provision of information by its employees in connection with litigation in federal court:

1.    Disclosure of the requested information is not unduly burdensome or otherwise inappropriate under the federal discovery rules.

2.    Disclosure of the requested information would be appropriate under the Federal Rules of Evidence and appropriate under the rules of the Northern District of Florida.

3.    Disclosure of the requested information would be appropriate under the Federal Rules of Civil Procedure and would not impact any concerns regarding privileged information pursuant to the rules of procedure governing this litigation.

4.    Disclosure of the requested information would not violate any statute, executive order, regulation, or directive.

5.    Disclosure of the requested information would not reveal any classified information, data restricted pursuant to AR 380-5, unclassified technical data withheld from public release pursuant to 32 C.F.R. § 250 or DoD Directive 5230.25, privileged safety information restricted from public release by DoD Directive 6055.7, AFI 31-401, or other matters exempt from unrestricted disclosure.

6.    Disclosure of the requested information would not interfere with ongoing enforcement proceedings, compromise any constitutional rights, reveal the identity of an intelligence source or confidential informant, disclose trade secrets or similarly confidential commercial or financial information, or otherwise be inappropriate under the circumstances.

# KIRKLAND & ELLIS LLP

Major Collin Evans
Michael Fucci
October 25, 2019
Page 9

      7.     Disclosure would not violate any person's expectation of confidentiality or privacy.

      8.     The United States is not, and is not reasonably anticipated to be a party in this litigation.

*See* 32 C.F.R. §§ 97.6(b)(1)-(6); 32 C.F.R. §§ 516.41(d), 516.44; Navy Instruction 5280.8A(1)-(10); Department of Defense Directive 5405.2 § 6.2; 33 C.F.R. § 1.20-1; 6 C.F.R. § 5.45; Air Force Instruction 51-301, 9.5.1-9.5.6.

## IV.   **Administrative Matters**

     Defendants will bear the costs of producing the witnesses for interviews sought by this *Touhy* request. Costs will be paid by check or money order payable to the Treasury of the United States. to the extent the DoD, DLA, Army, Navy, Marine Corps, Air Force, or Coast Guard believe any of the requested information does not implicate the statutory considerations set forth above, Defendants are willing to work with the DoD, DLA, Army, Navy, Marine Corps, Air Force, or Coast Guard to narrow the scope of the requested interviews, and narrow the scope of what each individual witness may speak to. Should you have any questions or require additional information about this *Touhy* request, please do not hesitate to contact me at (312) 862-2410 or mnomellini@kirkland.com.

              Sincerely,

              *Mark J. Nomellini*

              One of the Attorneys
              Representing 3M