**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG       )     Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,      )
                                    )     Pensacola, Florida
                                    )     June 15, 2020
                                    )     1:08 p.m.
                                    )
                                    )
_____)

**MOTIONS FOR SUMMARY JUDGMENT**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE

and

THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE

(Pages 1-166)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

**A P P E A R A N C E S**

FOR THE PLAINTIFFS:      **MICHAEL A. SACCHET, ESQUIRE**
                         Ciresi Conlin LLP
                         225 South 6th Street, Suite 4600
                         Minneapolis, Minnesota  55402


FOR THE DEFENDANT:       **NICHOLAS F. WASDIN, ESQUIRE**
                         Kirkland & Ellis, LLP
                         300 N Lasalle
                         Chicago, Illinois  60654

```
 1                         P R O C E E D I N G S

 2            THE COURT:  Good afternoon.  I apologize for the delay

 3   in getting started.  We had some technical issues to work out,

 4   but I think they've been worked out.

 5            We are here in the 3M Combat Arms Earplug Products

 6   Liability Litigation.  The Court will hear argument this

 7   afternoon on the cross motions for summary judgment on the

 8   government contractor defense that's been raised by 3M in the

 9   litigation.

10            I have, I believe, Judge Jones and Judge Herndon.  I

11   see them both.  Welcome.

12            JUDGE JONES:  Good afternoon.

13            JUDGE HERNDON:   Thank you.

14            THE COURT:   There are, I believe, counsel also

15   appearing on the videoconference bridge, or I believe they're

16   muted but they're there.  And then we have a number of people

17   on the telephone as well.

18            I asked, other than the judges, that only those here

19   in the courtroom who have been assigned to present argument

20   actually address the Court, unless there's a special

21   circumstance.

22            I am going to invite Judge Jones and Judge Herndon to

23   raise questions, if they have questions.  We promise not to

24   double- or triple-team you too much, but I'm going to allow

25   them to do that, if they have questions.  We know from the
```

1    circuit court that three heads are better than one, although I

2    will be the only one making the decision on the motions, but

3    their questions will probably be helpful to me as well.

4         Anything before we get started?

5         We have Mr. Sacchet arguing for the Plaintiffs and,

6    Mr. Wasdin, it's my understanding you'll be arguing for 3M.

7         **MR. WASDIN:**  Yes, Your Honor.

8         **THE COURT:**  Are both sides ready to go?

9         **MR. SACCHET:**  We are, Your Honor.

10        **MR. WASDIN:**  Yes, thank you.

11        **THE COURT:**  And my understanding is we'll start with

12   3M's opening.  Mr. Wasdin, you have 60 minutes, and then we'll

13   hear from the Plaintiffs.

14        I'll probably recess for comfort reasons, five or ten

15   minutes or so.  Mr. Sacchet, we'll probably recess at some

16   point in your argument, we'll find a comfortable place for you

17   to break, and then we'll return for you to finish.  And I know

18   we have additional time reserved for rebuttal for both sides.

19        All right, Mr. Wasdin, you're up.

20        **MR. WASDIN:**  Good afternoon, Your Honor.  Nick Wasdin

21   for 3M to present the government contractor motion.

22        I want to start by thanking the Court for dedicating

23   as much time as you have this afternoon to hear argument on

24   this motion.  Three hours is -- I think represents the

25   significance, the weight of the motion that's before the Court

1   today.  It's, of course, important to the litigation to

2   determine the arc of the litigation, important to my client who

3   is facing massive civil litigation over a product feature that

4   was designed by the government.

5          And as I was preparing for this argument today

6   rereading some of the case law, it was reimpressed upon me that

7   it's also incredibly important public policy to protect our

8   military's ability to work with government contractors and get

9   the equipment that they need to get the job done.

10          The *Boyle* court -- if I can get my --

11          **THE COURT:**  We're working with the sound.  Just a

12   moment, Mr. Wasdin.

13          **MR. WASDIN:**  The *Boyle* court framed the argument

14   essentially like this.  The U.S. military has the

15   responsibility for procuring equipment for use by our

16   servicemembers.  The factors that go into that decision-making

17   process have no analog in other contexts, and they often

18   prioritize combat effectiveness or military priorities over

19   traditional product liability considerations.  And so the Court

20   said those decisions are incompatible with products liability

21   law.

22          Now, the military enjoys immunity for those decisions.

23   The federal government contractor defense is about extending

24   that immunity that the military enjoys to contractors so that

25   the military -- when they need equipment, somebody will be

1   there to help them make it.

2          Now, I sort of want to just put this right on the

3   table up front.  This is a big litigation, and the Court

4   understandably may have some hesitation about looking down a

5   preemption doctrine and applying it to a case of this size.

6   But the critical thing to remember is that the balance has

7   already been done by the Supreme Court, and the output was our

8   servicemembers are better off, our nation is better off if the

9   military has the ability to work unobstructed with contractors

10  to purchase the equipment that it needs.

11         **THE COURT:**  That almost sounds, Mr. Wasdin, like

12  you're saying every time the government procures or purchases a

13  piece of equipment or a product for the military that has a

14  military use or benefit, the contractor is immune just as the

15  government would be immune from suit.

16         **MR. WASDIN:**  It's more narrow than that, and the case

17  law explains why it's more narrow than that for a purchase

18  decision that triggers the government contractor defense.  It's

19  those instances where the military or the government exercises

20  discretion to select or change a piece of the product that it's

21  purchasing.  Servicemembers cannot then turn around and sue the

22  contractor who acted out the military's direction and claim

23  that the military's decision-making created a product defect.

24         If they could do that, one of two things would happen:

25  Contractors would quit working with the military, or they would

1    charge exorbitantly high prices, which is the issue identified

2    by the Court in *Boyle*.

3          And so, extending this immunity, which is not some

4    sort of fringe technicality -- Your Honor probably saw in the

5    parties' briefing, the table of authorities in these papers is

6    a mile long.  This is a doctrine that's routinely applied by

7    cases involving airplanes and cases involving products as

8    simple as a leather strap in the *Glassco* case by the Eleventh

9    Circuit.

10         The policy is the same across the board.  Immunity

11   goes to the contractor for decisions made by the government to

12   protect that relationship and protect the military's ability to

13   purchase the equipment that it needs to get the job done.

14         **THE COURT:**  That decision on the part of the military

15   has to create a conflict, correct?  Justice Scalia told us that

16   in *Boyle*, "conflict there must be."

17         **MR. WASDIN:**  Sure.  The conflict comes from the

18   Plaintiffs' allegation that state law creates an obligation

19   that's different than the military's decision, true.  And in

20   this case, as we'll go through it today, it is beyond dispute

21   that the military directed 3M to shorten this earplug a quarter

22   of an inch.

23         **THE COURT:**  But it's not just different.  The

24   obligation has to be impossible to reconcile.

25         **MR. WASDIN:**  You can't do both.  In other words, they

1    claim we should have made a longer earplug and the military

2    told us to make a shorter one.  You can't do both of those

3    things.

4           And if the military wants the ability to work with

5    government contractors to buy things like earplugs, helmets,

6    Kevlar vests, F-16 fighter planes, whatever, that channel of

7    communication has to be as such that the contractor reacts to

8    the military's direction, does what the military needs it to do

9    based on whatever the unique set of factors are that the

10   military is balancing, and gives the military the equipment

11   that it needs.  And it can only do that if it knows that it

12   can't later be turned around and sued in massive civil

13   litigation over the military's decision-making.

14        **THE COURT:**  But in every design contract or

15   procurement contract, the contractor is giving the military

16   what the military wants or has said it needs.

17        **MR. WASDIN:**  But the conflict only exists if -- so,

18   for example, the military may purchase a set of -- I'm making

19   this up -- pencils for its office space without consideration

20   at all about the length or width of the pencil.  The person

21   shipping the pencils can send whatever they want.

22           But, if the military specifically identifies a precise

23   type of item that it needs and tells the contractor that's what

24   you must give me or I won't buy it, that's what the military

25   needs, servicemembers can't then sue the contractor for acting

1    out in the military's wishes.

2           **THE COURT:**  What if the contractor has options

3    available to it to satisfy that specific need?

4           **MR. WASDIN:**  The case law says that the total absence

5    of discretion is not a requirement.  The requirement is a

6    reasonably precise specification.

7           **THE COURT:**  That creates a conflict?

8           **MR. WASDIN:**  That corrects a conflict, not a precise

9    specification.  And so, for example, when the military directed

10   Aearo to shorten the earplug a quarter of an inch and

11   plaintiffs now sue us and say it should have been longer, that

12   is a conflict.

13          **THE COURT:**  Did the military direct Aearo to shorten

14   the plug a quarter of an inch, or did the military identify a

15   problem that the earplug was too long to fit in the carrying

16   case?

17          **MR. WASDIN:**  It did both.  It identified three

18   problems, which is:  One, too long to fit in the carrying case;

19   two, Doug Ohlin believed that the flanges were too far apart

20   and they weren't prevented the plug from a wind noise

21   susceptibility; and three, that it didn't -- and what he said

22   was most important that it didn't fit under the chinstrap of

23   the Kevlar helmet.  He called that a "show-stopper" and

24   directed us to shorten it a quarter of an inch.  So they both

25   identified problems and gave us direction.

1          **THE COURT:**  Okay, go ahead.

2          **MR. WASDIN:**  Going back to *Boyle* and the decisions we

3     were talking about, these factors that the military weighs when

4     making a procurement decision are the exact factors that gave

5     rise to this earplug.

6          I'm going to put up a couple of callouts from a test

7     report done by the Air Force Research Laboratory, not for the

8     data in the report, but because it has an introduction that

9     overviews how we got here today.

10         The military had longstanding hearing loss problem.

11    The source of it is essentially as follows:  On the one hand,

12    it's one of the loudest occupations on earth; and on the other,

13    there's an incentive not to wear hearing protection because you

14    have to be able to hear your surroundings.  That's been true

15    since World War II and probably long before that.

16         The legacy solution, this document says, is that

17    servicemembers sacrifice their hearing in order to maintain

18    situational awareness on the battlefield.  You had to be able

19    to hear someone sneaking up on you.  You had to be able to hear

20    your commanding officer give you an order.  And as a result of

21    that tension, sometimes referred to in the documents as a

22    dueling priority, hearing loss is the number one injury

23    impacting our servicemembers.

24         The military endeavored to solve that problem in the

25    mid 1990s by, as this document states, working with industry as

1    it often does when it needs a new product to fit its deeds, to

2    develop what is essentially described here as a non-linear

3    hearing protection device.

4         This document goes on to say that the first device

5    done between the military and industry was the Combat Arms

6    Earplug.  So that is the product we're here to talk about

7    today.  We're here to talk about this design process that's

8    alluded to in this document and to assert our entitlement to

9    immunity under the contractor defense to say that plaintiffs

10   cannot sue us for decisions that were made by the military.

11        **THE COURT:**  So who designed the filter for this

12   earplug?

13        **MR. WASDIN:**  The Institute of Saint-Louis.  It's a

14   quasi-governmental organization in France.

15        **THE COURT:**  And who designed the triple flange

16   feature?

17        **MR. WASDIN:**  The UltraFit tips on this earplug were

18   originally designed by Aearo in a slightly different form, but

19   the triple flange feature was designed by Aearo.

20        **THE COURT:**  And this earplug, the CAEv2, had an

21   UltraFit tip on either end?

22        **MR. WASDIN:**  Correct.  Modified tips, but yes.

23        **THE COURT:**  That created the dual-sided nature of this

24   plug, did it not?

25        **MR. WASDIN:**  Putting an UltraFit end on either side of

1    a hard plastic stem made the plug dual-ended, yes, Your Honor.

2         **THE COURT:**  And who designed that feature?

3         **MR. WASDIN:**  I believe ISL has, you know, a patent on

4    the concept of a dual-ended earplug.  In terms of how this

5    dual-ended earplug came into existence, that was a directive

6    from the military to us.

7         **THE COURT:**  Point me to the evidence in the record

8    that this was a directive of the military, the United States

9    military.

10        **MR. WASDIN:**  Can we go to slide 9, please.

11             Before I play this, Your Honor, this is a short clip

12   from the deposition of Elliot Berger.  Mr. Berger was an

13   acoustical scientist at Aearo.  I know Your Honor is familiar

14   with his name, but he was the lead point of contact between

15   Aearo and the military, or one of the lead points of contact

16   during the design of this process.

17             *(Video published:)*

18        **MR. BROCK:**  "I want to ask you this question:  What

19   was the specification in terms of what the Army expected of

20   this device as you understood that from your correspondence and

21   your conversations with Doug Ohlin?"

22        **THE WITNESS:**  "At this point in time, the

23   specification had been primarily what was transmitted at the

24   December 1997 meeting, that it was to be a non-linear plug

25   incorporating the ISL non-linear filter, that that filter was

1    to be housed in a plug based upon the E-A-R UltraFit earplug,

2    and that especially the plug had to be dual-ended and

3    one-sized.  There were no other material or dimension or

4    performance specifications at that time because he knew how the

5    non-linear filter worked, he was familiar with the Combat Arms

6    Earplug, and we were not initially given a length

7    specification.  As we've discussed, after we developed a

8    prototype, we were then effectively given a length

9    specification, which is that it shall be approximately one

10   quarter inch longer than our original design prototype -- one

11   quarter inch shorter than our original design prototype."

12          **THE COURT:**  Can I ask you to stop that for a moment,

13   please.

14          So, from what I put together from the record, the

15   military was interested in the non-linear technology back -- I

16   could see back to 1996 with Mr. Garinther.

17          **MR. WASDIN:**  Your Honor, may I put this timeline up to

18   talk with you about this?

19          **THE COURT:**  Sure.

20          **MR. WASDIN:**  You're referring to Mr. Garinther's trip

21   to France in 1996.

22          **THE COURT:**  Right.

23          **MR. WASDIN:**  The papers discuss an earlier study from

24   '95, but the timeline is approximately correct.

25          **THE COURT:**  He had a couple visits to France, one in

1   '96 and then I believe he went again at the end of '97.  And in

2   those visits -- and correct me if I'm wrong, but it appears

3   what they're looking at is the non-linear technology.

4           **MR. WASDIN:**  They're testing the ISL filter inside of

5   an Aearo UltraFit earplug.

6           **THE COURT:**  And following -- well, the November '97 as

7   well as the December '96 visits to ISL by Mr. Garinther and the

8   testing that was done there, those were all tests on

9   single-sided plugs that had the filter -- the single-sided

10  UltraFit that had the filter inserted?

11          **MR. WASDIN:**  Correct.

12          **THE COURT:**  Following Mr. Garinther's second visit to

13  ISL in November of '97, so the next month, December of '97,

14  that's where we have this meeting at Aberdeen?

15          **MR. WASDIN:**  December 16th, 1997.

16          **THE COURT:**  To be exact.

17          A number of participants in that meeting.  Aearo is

18  represented, ISL is represented.  I presume the French military

19  was perhaps represented.  Obviously, the U.S. military and the

20  Army by Dr. Ohlin was represented.

21          The meeting minutes reference that ISL already has a

22  patent on the new non-linear value and has applied for a patent

23  on the dual-ended plug.

24          The meeting minutes -- and I'm sorry, I don't have

25  that exhibit number at my fingertips, but you all know the

```
 1    exhibit number.  Is it 2?  It's D2.  So Item No. 5 states that
 2    they already have patent on new non-linear valve and have
 3    applied for a patent on double-sided or two-ended plug.
 4              And these are meeting minutes of Aearo?
 5              MR. WASDIN:  Correct.  These were typed by Elliot
 6    Berger, whose testimony you just heard.
 7              THE COURT:  And the second page references Armand, who
 8    I believe is the representative for the French military.
 9              MR. WASDIN:  For ISL.
10              THE COURT:  Or for ISL.
11              MR. WASDIN:  There's a connection, but I don't believe
12    it's -- frankly, I'm not 100 percent sure what the connection
13    is between ISL and the French military.
14              THE COURT:  Armand is attributed with expressing the
15    French army's preference.  And then there's reference to
16    Dr. Ohlin.  And it says, "Accepts our plug," meaning Aearo's
17    plug -- that's the UltraFit plug?
18              MR. WASDIN:  Yes, Your Honor.
19              THE COURT:  And then, "doesn't want two different
20    plugs, is interested in a dual-ended plug, one size plug for
21    the reasons stated."
22              And then there's a reference to a bid process and an
23    RFQ to be issued in the next couple of months.  And then
24    Mr. Berger writes that, "We," meaning Aearo, "have a
25    competitive advantage because our plug is tested."  And then
```

1  there are three proposed solutions or options, one of which is

2  the two-ended plug with the non-linear filter.

3           I guess I don't read that as a requirement that you

4  all -- or that Aearo make this plug.  The military is

5  interested in it, but I'm not sure I see that this is a

6  requirement that you make this plug or that they've hired you

7  to make this plug.

8           **MR. WASDIN:**  What Mr. Berger said at his deposition

9  was, at the meeting Doug Ohlin told him essentially what Your

10  Honor read off of the meeting minutes, and then they designed a

11  dual-ended plug, gave it to the military, and they had a

12  collaborative process over the length.

13           With respect to the contractor defense -- and I think

14  this is critical for this discussion -- what you're focusing on

15  for the three elements is the design feature at issue.  And so,

16  when you talk about did the military ask for a dual-ended plug,

17  did they ask for a single-sized plug, et cetera, essentially

18  the specifications from this memo, those are contexts to how we

19  got into the back-and-forth process that followed that meeting.

20           **THE COURT:**  Well, I just thought, Mr. Wasdin, you said

21  a moment ago that the military required you to make this plug.

22  And I don't read -- in fact, there wasn't an RFQ.  There was

23  not a competitive bid process that was issued in the next month

24  or two.  That never happened.

25           **MR. WASDIN:**  What Mr. Berger said in his deposition

1    was Doug Ohlin requested that they make a dual-ended product

2    that was single-sized, et cetera, per those specifications in

3    the memo that Your Honor is reading.  And then we know that

4    within three months of that time they had produced precisely

5    that product.

6              **THE COURT:**  Well, let me ask you to look at -- I have

7    this as a Plaintiffs' No. 8, which is a memo from Brian Myers

8    to Elliot Berger just a few days after these meeting minutes

9    were typed.

10             Product development is the first section on the memo,

11   and it discusses the meeting that took place a few days before

12   at Aberdeen.  And it says, "Concepts were reviewed as well as a

13   new bidirectional earplug design suggested by the French."

14             **MR. WASDIN:**  Yes, Your Honor.

15             **THE COURT:**  It was the French that suggested the

16   bidirectional design?

17             **MR. WASDIN:**  What the Garinther November 1997 meeting

18   suggests, which is a memorialization of his trip to France with

19   ISL, is that they discussed the three features that are listed

20   -- or three concepts that are listed at the end of the Berger

21   memo, meaning prior to the meeting in '97 when they were

22   testing the product in France, they were discussing should it

23   be single-sided, should we give them two plugs, or should it be

24   dual-ended.

25             But this memo here I think is discussing how it was

1      presented at the meeting, and so he's saying, you know, this

2      was a bidirectional design earplug suggested by the French.

3      And so, the French view was you should use bidirectional

4      design, that will accomplish these goals that you're describing

5      in the -- you know, you have audiologist problems, field

6      dispensing, et cetera.

7               But I want to go back.  The critical thing for the

8      government contractor defense is not who came up with it.  We

9      know from the Eleventh Circuit case in *Brinson* that the piece

10     that was at issue in that case had been independently designed

11     and patented before the military ever saw it.

12              So there's no issue from a government contract

13     perspective whether the French suggested it, whether Elliot

14     Berger suggested it, or whether Doug Ohlin suggested it.  No

15     piece of this analysis turns on whose idea it was.

16              **THE COURT:**  I would agree with you on the one hand

17     that it's not dispositive.  I don't agree with you that it's

18     irrelevant.

19              The next -- well, not the next sentence, but the

20     following sentence says, "The U.S." -- and I'm back to PX 8 --

21     "The U.S. is also interested in the product."  Fair?  That's

22     what --

23              **MR. WASDIN:**  That's what this document says, yes.

24              **THE COURT:**  -- Mr. Elliot Berger wrote?

25              **MR. WASDIN:**  But here we're talking right now at this

1    point in time about the general concept of a non-linear earplug

2    incorporating the ISL filter that will be dual-ended.

3         **THE COURT:**  But I think what you just suggested to me,

4    Mr. Wasdin, was that what happened at the Aberdeen meeting,

5    which was just a few days before this memo, was where the

6    government came up with specs for Aearo to design and make this

7    product.

8         **MR. WASDIN:**  They told Aearo, of the three options

9    that were on the table, which one that they were interested in.

10        **THE COURT:**  That they were interested in, okay.

11        **MR. WASDIN:**  And then that's what Aearo moved forward

12   with designing, they made the longer plug, and Your Honor knows

13   the story from there.

14        **THE COURT:**  So tell me, up to this -- one moment,

15   please.

16        So, this is December '97.  The next thing I have in my

17   timeline is Mr. Garinther, he reports on his earlier -- his

18   November '97 trip, and he documents what you just discussed,

19   these three options, and he recommends that the non-linear plug

20   be considered for use by the Army.

21        **MR. WASDIN:**  That's right, Your Honor.

22        **THE COURT:**  And then, following that report, again,

23   which he is memorializing or documenting the purpose and

24   outcome of his visit, March 24th, so a couple of weeks later,

25   approximately 25 pair of the non-linear earplugs are sent from

1  Aearo with, I guess, a cover letter from Mr. Knauer to

2  Mr. Ohlin.

3        **MR. WASDIN:**  That's correct, Your Honor.  The design

4  of the longer initial plug is dated the 23rd of March, and then

5  the letter from Mr. Knauer is the 24th of March.

6        **THE COURT:**  So, what in the record -- I'm not sure

7  what you're referring to as far as the longer design or the

8  design of the longer plug.  What is that?

9        **MR. WASDIN:**  Give me slide 10.  This is Exhibit 11 to

10  Defendants' motion.  This design drawing -- the initial design

11  drawing for what would be later called the Combat Arms Version

12  2 was completed on March 23rd, 1998, and you can see that in

13  the top right corner.

14        It contains within itself four components, tips on

15  both ends, the filter, and then the hard plastic stem, all of

16  which are listed there at the top and have design dates in

17  between the December meeting and the final completion of this

18  product.  This is the longer initial version.

19        **THE COURT:**  And is this the only design drawing?

20        **MR. WASDIN:**  No, Your Honor.  We --

21        **THE COURT:**  I know there were some drawings attached

22  to the patent, obviously.

23        **MR. WASDIN:**  Excuse me.  We're sort of skipping ahead.

24  But if you go to 14, once you go through the series of Ohlin

25  emails where he says, you know, you've got to shorten it a

1    quarter of an inch for a number of reasons, the output of that

2    is the drawing on the right, that we shorten it a quarter of an

3    inch or a little less than a quarter of an inch.

4         **THE COURT:**  Let me ask you about the March 23rd

5    drawing with the longer length, the 40.34 mm length.  Where in

6    the record can I see or find the military's involvement with

7    that design or approval of the design, the drawing?

8         **MR. WASDIN:**  You're referring specifically to the

9    longer version?

10        **THE COURT:**  Right.

11        **MR. WASDIN:**  The longer version stems out of the

12   December 1997 meeting --

13        **THE COURT:**  I'm not asking what it stems out of it.

14   I'm asking where in the record can I find or see the

15   government's involvement in that design, meaning, *Here,*

16   *Dr. Ohlin, here are the design drawings.  Take a look at it.*

17   *Do you have any changes?  Do you think we need to make any*

18   *changes?  Does it look right to you?*

19        **MR. WASDIN:**  Sure, if we go back to 11.  One year

20   after we sent them that design, we began receiving emails from

21   Doug Ohlin requesting that we shorten it.

22        **THE COURT:**  That's not what I'm asking you.  I'm

23   asking, as far as either -- I can go as far as even before the

24   design.  I'm wanting to know if there is evidence of an

25   exchange between Aearo and the military in that design.

1          **MR. WASDIN:**  The only evidence in the record right now

2     of an exchange on that design is the specifications or

3     recommendations, as Your Honor put it, that Doug Ohlin gave

4     Elliot Berger at the December '97 meeting memorialized in that

5     memo, Mr. Berger's testimony about what the Army requested that

6     he build, and the design drawings that --

7          **THE COURT:**  But those were options -- those were

8     options your folks came up with, that Aearo came up with?

9          **MR. WASDIN:**  The first reference to the three options

10    in terms of the one, two, or the double-ended appear in

11    Mr. Garinther's memo with respect to the 1997 November trip to

12    ISL.

13         **THE COURT:**  Right.  But you all or Aearo wasn't even a

14    part of that.

15         **MR. WASDIN:**  Right.  I'm saying that was a

16    conversation the military appears to have been having before

17    Aearo's involvement in the December --

18         **THE COURT:**  No question about it.  But in terms of

19    what happened at Aberdeen, looking at these meeting minutes, it

20    says, "We have advantage because ours is tested.  Propose three

21    solutions."

22         Now, I read that as Aearo is proposing three

23    solutions.

24         **MR. WASDIN:**  What Mr. Berger said in his deposition

25    was that Doug Ohlin requested a dual-ended plug, a single-sized

 1   plug, et cetera.

 2              But, again, in some respects -- I understand Your

 3   Honor has questions about this, and I'm trying to answer them.

 4   But the design feature at issue on these three elements for the

 5   contractor case is the length of the plug.  And we have,

 6   following the first design, a well documented record that the

 7   military reviewed the original design, found --

 8              **THE COURT:**  Where is the documentary evidence that the

 9   government reviewed the original design?  I know you sent them

10   product samples.

11              **MR. WASDIN:**  Sure.  Right here on slide 11.  So this

12   is one year after he first got the product samples, he begins

13   asking us to shorten it --

14              **THE COURT:**  The product sample, in my mind, is not the

15   same thing as the product design.  So I'm looking for, like I

16   said, is there evidence where Aearo sent Dr. Ohlin those

17   drawings.

18              **MR. WASDIN:**  No evidence that Aearo sent Dr. Ohlin

19   those drawings.  But, Your Honor, the issue on the contractor

20   defense is did the government have information that they could

21   exercise discretion on to make design decisions.

22              There's no functional difference with respect to the

23   length of the plug if you're looking at a product sample or a

24   drawing.  Doug Ohlin can look at either --

25              **THE COURT:**  I understand your point.  But I just

1    needed an answer to that question --

2              **MR. WASDIN:**  Sorry, Your Honor.

3              **THE COURT:**  -- was there an exchange or a production

4    of engineering drawings for that earplug, the longer length

5    earplug, with the military before those production samples were

6    sent to Dr. Ohlin.  And your answer is no?

7              **MR. WASDIN:**  My answer is no.  What we have is an

8    exchange of production samples and not drawings.  But I do

9    think it's an important point.  Because when you ask a question

10   that's relevant for government contractor, you know, what was

11   the military's design involvement in the length, did they have

12   information that they needed to make an informed decision about

13   the length, the production sample is far better than a design

14   drawing, because Doug Ohlin can actually take it, put it in the

15   carrying case, he can take it, put it in his ear and put a

16   helmet on.  He may not even have identified those problems with

17   the length if all we had sent him was a design drawing.

18              I know a lot of the cases that deal with, you know, an

19   F-16 fighter jet do involve design drawings, because when

20   you're developing a sophisticated piece of airplane equipment

21   for the military, you don't build it in the first instance, you

22   work it out on paper before you put it into practice.

23              **THE COURT:**  Well, many times in these cases it's a

24   component part of some system in the aircraft.

25              **MR. WASDIN:**  Sure.  But there are certainly -- you

1    know, the simpler the product gets, the easier it is to

2    manufacture in the first instance and to give --

3            **THE COURT:**  Well, you had drawings.  I mean, there

4    were drawings.  There were drawings attached to the patent.

5    You just showed me a drawing.

6            **MR. WASDIN:**  Sure.

7            **THE COURT:**  And so that's all I was asking --

8            **MR. WASDIN:**  Yes, Your Honor.

9            **THE COURT:**  -- were those drawings provided to the

10   military.

11           **MR. WASDIN:**  I apologize.  The answer to that is no;

12   he got production samples.

13           He held the production samples for over a year, during

14   which time he identified three problems that are memorialized

15   in a chain of emails dating April 8th to April 13th, 1999, the

16   first of which are called up on this slide.

17           So, beginning on April 8th, Brian Myers is responding

18   to Doug Ohlin's letter for the Combat Arms Earplug, and he says

19   that they believe they can shorten the plug by the quarter inch

20   required to fit in the container, and he asked Ohlin to send

21   him a container to help expedite the redesign.

22           The following day Mr. Ohlin responds to Brian Myers at

23   Aearo and identifies an additional two issues.  It's not just

24   the carrying case.  He says that the plug is also creating an

25   increased potential for wind noise.  And this is important

1    because it relates to a different issue I think we're going to

2    talk about later.  But what he's saying there is, it's so long

3    and the distance between the two flanges is far enough, there's

4    a whole in the flange where the sound goes in called the sound

5    port.  He's theorizing that, if you bring the flanges closer

6    together, you would sort of scallop that hole with the flanges

7    and block wind noise.

8         **THE COURT:**  Where do you find that in the record that

9    that was the explanation behind the comment that there were

10   three problems, the second one of which was the wind noise?

11        **MR. WASDIN:**  There are memos -- Your Honor, I don't

12   know the exhibit number or even if it was attached to the

13   briefs as an exhibit.  So I'm not 100 percent sure if that

14   particular piece of information is in the summary judgment

15   record.  But that was the issue that --

16        **THE COURT:**  Well, that's significant, is it not?  I

17   mean, if -- actually, I had the question, where -- I mean, I

18   certainly have seen Dr. Ohlin's reference to the three

19   problems, he identifies three problems with the sample.  The

20   carrying case problem has gotten a lot of attention in the

21   briefing, but the other two don't.

22        So I'm just wondering, did shortening it by a quarter

23   of an inch, did that solve the other two problems as well, the

24   wind noise issue as well as the Kevlar helmet chinstrap.

25        **MR. WASDIN:**  The evidence that it solved the problems

1    to Doug Ohlin's satisfaction is that, after we shortened it

2    according to his directive, we send him a revised production

3    sample which he reviewed and determined was acceptable.

4          **THE COURT:**  But do you have -- let's set aside the

5    carrying case issue for a moment.  Is there anything in the

6    record that you can point me to where -- and I understand your

7    position on the acceptance -- but that you can point me to

8    where Doug Ohlin and Elliot Berger or even Brian Myers, Mr.

9    Knauer, anybody had a discussion -- Mr. Fallon -- had a

10   discussion about the issue raised in regards to the Kevlar

11   helmet or the wind noise?

12         **MR. WASDIN:**  Not other than Doug Ohlin's acceptance.

13         **THE COURT:**  So, am I right that, before this email

14   that you're showing here on the screen, that actually Dr. Ohlin

15   had sent a memo to the Army proposing his solution for the

16   length issue relative to the case?

17         **MR. WASDIN:**  He wanted to expand the size of the case.

18         **THE COURT:**  Right, right.  And that was a memo that

19   was dated April -- I think it's dated April 6th, right?

20         **MR. WASDIN:**  That's correct, yes.

21         **THE COURT:**  And then, three days later we have this

22   memo -- or excuse me -- email -- one moment.

23              Actually, April 9th there is a design review meeting

24   at Aearo in which there are a number of -- this is DX 17.  One

25   of the items from the meeting was a discussion that says, "The

  1   length of the earplug, once assembled, was discussed.  It has

  2   been requested by the military that the earplug fit into a case

  3   which is in current use by the military.  This would require

  4   reducing the length by one quarter of an inch."

  5          Now, around this same time -- those meeting minutes

  6   are dated April 9th.  And then there's these emails that you

  7   are showing on the screen dated April 8th and 9th in which

  8   Mr. Myers emails Ohlin and says, "Dick Knauer believes we can

  9   probably shorten the plug by the one quarter required to fit

 10   your container."  I think "inch" was left out.

 11          And then Myers says to Ohlin, "The designer will look

 12   at this when he gets back from vacation.  It may help to

 13   expedite the redesign if we could get a storage container from

 14   you.  If possible, send one on to Dick Knauer."

 15          So, who is the designer, do you know?

 16          **MR. WASDIN:**  His name -- I believe it was Marc Doty

 17   that's signed -- I believe that actually does the drawings.

 18          **THE COURT:**  And did that happen?  Did the designer

 19   take a look at this when he got back from vacation, as

 20   Mr. Myers says, and did he do a redesign?

 21          **MR. WASDIN:**  Yes, Your Honor.  The second drawing that

 22   we looked at earlier was the redesign that follows these four

 23   or five emails.

 24          **THE COURT:**  Okay.  And then, Dr. Ohlin replies to that

 25   email from Myers on the 9th and says, "In addition to the plug

1   being too long for the case, an increased potential for wind

2   noise exists, and that it sticks out too far for the Kevlar

3   combat helmet.  This last one is a show-stopper."

4           So, when was the redesign?  When was that drawing

5   done?

6           **MR. WASDIN:**  So we have the --

7           **THE COURT:**  Could you bring that back up?

8           **MR. WASDIN:**  Yes, Your Honor.

9           So April 9th -- I won't read these again, but we see

10  more email traffic here from Ohlin on the 12th where he

11  re-identifies the three issues, and says it's a show-stopper if

12  the Army can't get the modification --

13          **THE COURT:**  Well, that's to Belva at the DLA, I think.

14  Was she at DLA?

15          **MR. WASDIN:**  DSCP or DLA, I'm not sure, but I believe

16  she was in Philly.

17          So, this is two days later he's now copying Brian,

18  emailing Belva, saying that there's three reasons why they, the

19  Army, are going to have to get the plug shortened, and he lists

20  them, the last one is a show-stopper, that's the helmet.

21          A day later on the 13th, he emails a group of military

22  audiologists and tells them the same three things and that he

23  actually cut the plug down himself.

24          **THE COURT:**  Did you all ever receive that --

25          **MR. WASDIN:**  There's no evidence he sent that back to

1    us.

2              And then two weeks later, to answer Your Honor's

3    question, is when Aearo is able to complete the redesign

4    drawing, which is on the right side of the screen.

5              **THE COURT:**  What is the exhibit number for the

6    redesign and what is it attached to?

7              **MR. WASDIN:**  It's Exhibit 14 and attached to

8    Defendants' brief.

9              **THE COURT:**  Is it attached to any email?

10             **MR. WASDIN:**  I believe that's a standalone document in

11   the production.

12             **THE COURT:**  Same question I had with the earlier

13   design drawing, was this sent to the military?

14             **MR. WASDIN:**  It was not.  A production sample with

15   these specifications was sent.

16             **THE COURT:**  Right.  So, tell me, Mr. Wasdin, as best

17   you can from the record -- and you're much more knowledgeable

18   about the record than I am -- what did Aearo do to shorten the

19   length of the plug?

20             **MR. WASDIN:**  I wish I could walk up to one of the

21   screens.

22             **THE COURT:**  I wish you could, too.  Sorry.

23             **MR. WASDIN:**  Can I get way up there?  It's not going

24   to work.  You're going to have to bear with me while I try to

25   explain this without pointing.

1          If Your Honor is looking at the plug on the left, the

2     longer plug, you see the four components, A, B, C, and D.

3          **THE COURT:**  Yes, I do.

4          **MR. WASDIN:**  So, A is the yellow end tip, B is the

5     green end tip, C is the hard plastic stem, and D is the ISL

6     non-linear filter.

7          A and B are different in one respect -- well, the

8     yellow end, the hole goes all the way through for sound, but

9     they're different in a length respect.  You can see on the sort

10    of what is in the drawing the top of B, but what would actually

11    be the bottom of the flange, there's actually two pieces of

12    thermoplastic elastomer, the same material that the flanges are

13    made of, that are coming out of the bottom and creating like

14    essentially thermoplastic elastomer, what we would probably

15    call silicon or rubber, you know, like a stem feature coming

16    off of the bottom of the plug that attached on to the hard

17    plastic stem.

18         **THE COURT:**  On the green end?

19         **MR. WASDIN:**  On the green end.  Could Your Honor see

20    that sort of V shape on the top of B?

21         **THE COURT:**  At the top of B?  Not very well.

22         **MR. WASDIN:**  If you would like me to approach, I'd be

23    happy to point it out on the screen.

24         It goes away when I hit this.

25         **THE COURT:**  It does.  Not very helpful.

 1          **MR. WASDIN:**  How about if you compare the longer one

 2     to the shorter one, what you'll see is, if you look at B, it

 3     looks different, and what it's missing is that extension of the

 4     flange onto the hard plastic stem.

 5          **THE COURT:**  I'm going to ask you to walk up here and

 6     show me, please, on my --

 7          **MS. BRANSCOME:**  Here, use that.

 8          *(Ms. Branscome hands Mr. Wasdin an electronic tablet;*

 9     *Mr. Wasdin approaches the bench.)*

10          **MR. WASDIN:**  On the longer version, this is the same

11     material that the flange is made out of.  Whereas the yellow

12     end connects directly to the hard plastic stem like at a hard

13     stock right at the bottom of the flange, the green end

14     initially had a longer like green, you know, thermoplastic

15     elastomer stem that kept the flange farther away from the hard

16     plastic stem.  So it's just this.  And when you look, this one

17     makes the green end look just like the yellow end by getting

18     rid of the little extension piece here.  And so when --

19          **THE COURT:**  Okay, thank you.

20          *(Mr. Wasdin returns to the well.)*

21          **MR. WASDIN:**  It's actually an important point because,

22     when you ask yourself how could Doug Ohlin have cut the plug

23     down himself on April 13th, it doesn't actually seem to make

24     much sense because it's hard plastic and how would you

25     reassemble it.

1        But what you do is you just pop the tip off, that

2   little piece is sticking out, and you clip it with scissors,

3   and you put it back together, and that's essentially --

4        **THE COURT:**  But we don't know that that's actually

5   what Dr. Ohlin did to cut it down.  We just -- he says he cut

6   it but --

7        **MR. WASDIN:**  Sure.  That's the only think I could

8   think of that one could do without, you know, remanufacturing

9   the product.

10       **THE COURT:**  So, that brings up another question that I

11  have is Dr. Ohlin did not see this drawing.  Did he tell you or

12  Aearo how to shorten the plug?

13       **MR. WASDIN:**  He told us how much to shorten the plug.

14       **THE COURT:**  Well, the carrying case told you how much

15  to shorten the plug.  I mean, it was in relation, you knew it

16  was --

17       **MR. WASDIN:**  He requested a quarter of an inch, we

18  asked for the carrying case, we shortened it approximately a

19  quarter of an inch, we sent it back.  So he didn't say "chop

20  this piece down" or "chop that piece down," to Your Honor's

21  question.

22       But the key moment for the government contractor

23  defense is he gets the -- he basically gets the production

24  sample version of this drawing, he can see with his own eyes

25  exactly how it was shortened, and it's on that sample --

1          **THE COURT:**  Did he tell you that in the deposition?

2          **MR. WASDIN:**  No.  He states in a document.

3          **THE COURT:**  Where?  If you'd point me to that.

4          **MR. WASDIN:**  Sure.  So this is approximately two weeks

5    after the redesign.  It says, "Aearo got back to us with

6    acceptable production samples."  So he has the production

7    samples --

8          **THE COURT:**  No, but that doesn't -- what you just

9    described was he can see with his own -- we don't know what

10   exactly he looked at.  I mean, he does say it's an acceptable

11   production sample.

12         **MR. WASDIN:**  Well, Your Honor, I would submit that the

13   only reasonable interpretation of the email is that he's looked

14   at it and determined they were acceptable.

15         **THE COURT:**  Determined that it fit in the carrying

16   case?

17         **MR. WASDIN:**  Determined that it accepted whatever the

18   military's requirements were for that product.  It need not

19   have hit the three if he didn't care about them at the time he

20   determined they were acceptable.  He can make this decision

21   however he wants.  When he gets the final sample, determines

22   it's acceptable, that is the piece of military decision-making

23   that both satisfies the first prong and shouldn't be second

24   guessed under *Boyle*.

25         **THE COURT:**  If Dr. Ohlin doesn't have any involvement

1   in how Aearo decided to redesign -- and I think there's

2   reference to it being called a "redesign" in these emails --

3   the plug to fit the carrying case, how is his acceptance

4   anything other than a rubber stamp approval?

5           **MR. WASDIN:**  Because a rubber stamp approval is

6   accepting something without consideration.

7           Dr. Ohlin got a longer version, held it for over a

8   year, identified three separate problems with it, asked us to

9   shorten it a quarter of an inch.  We did that.  We sent him a

10  revised production sample.  He determined the revised

11  production sample was acceptable.  That is not a rubber stamp.

12  That's a continuous back and forth --

13          **THE COURT:**  No, what -- just hypothetically, just for

14  discussion purposes, the government says -- and this is

15  specific to this case, but the government -- well, I'll use a

16  different example.  The government says, you, manufacturer,

17  contractor, design and develop a helicopter for us for our use.

18  The military gets the helicopter, it doesn't fit in the hangar,

19  or looks at a design, this isn't going to fit in our hangar,

20  and it's a problem with the length from the nose to the tail.

21  You need to do something to shorten the helicopter to fit in

22  our hangar.

23          The contractor looks at options about ways of solving

24  that problem -- do you take the length out of the nose, do you

25  take the length out of the tail, do you take the length out of

1    the middle -- and makes a decision about where to take out that

2    length, and then sends a new helicopter to the military that

3    fits in the hangar.  The military never said anything to the

4    contractor about where to find that length.

5            **MR. WASDIN:**  Your Honor, an earplug is not a

6    helicopter.

7            **THE COURT:**  I understand that.

8            **MR. WASDIN:**  You only have one option for how to

9    shorten this thing.

10           **THE COURT:**  Let me stop you right there.  A very good

11   point and question that I have is, where is it in the record

12   that that is the only option that Aearo had to shorten that

13   earplug?

14           **MR. WASDIN:**  As opposed to -- I'm talking about to

15   shorten some piece of the stem.  That's the only way to shorten

16   it.  There's no document that says there's one and only way to

17   shorten this earplug.  It's you're looking at an earplug that

18   has a tip on both ends and a stem on the middle and, if you're

19   going to it, you have to take out some piece of the stem.  It's

20   the only option.

21           **THE COURT:**  Could you have not -- and this would have

22   been a redesign, which, again, is how -- I don't know if it was

23   Myers or Berger, but -- and I can find it in a little bit on a

24   break, but there's a reference to this as a redesign.  But

25   could you have not increased the size of the flanges a little

1    bit and reduced it to two flanges as opposed to three flanges?

2        **MR. WASDIN:**  Well, Dr. Ohlin had already requested the

3    triple flange UltraFit earplug, so those sizes were set.

4        **THE COURT:**  Isn't that the continuous back and forth

5    exchange that these cases are looking for?

6        **MR. WASDIN:**  The continuous back-and-forth exchanges

7    in cases like *Brinson* and *Harduvel* typically identify one, two,

8    or three swaps of engineering drawings where there's some

9    evidence that somebody approved it -- "considered and approved

10    it," is the language from *Brinson*.

11        **THE COURT:**  It's continuous back and forth, extensive

12    meaningful review and consideration, is what I see in the

13    cases.

14        **MR. WASDIN:**  And in this case we have exactly that

15    level of review of the length of the product.  We sent -- I

16    mean, there is no --

17        **THE COURT:**  Let me ask you to go back and answer my

18    question.  Is there anything in the record that says this is

19    the only way this could be done?  I don't know.  I'm asking.  I

20    don't know the record like you do.

21        **MR. WASDIN:**  I'm describing the product and I'm saying

22    that, if you look at the product, if you have two flanges and a

23    stem in the middle and you want to shorten that, the only way

24    to do it is to shorten the stem.

25        **THE COURT:**  And I understand that that's the solution

1    or the redesign that Aearo chose, and it might have been the

2    simplest path.  But I don't know that it was the only way to do

3    it.  It might have been.  I don't know.  I'm asking if there's

4    something in the record that sheds light on this.

5        **MR. WASDIN:**  There is not a document that I'm aware of

6    in the record that says expressly there is one and only way to

7    shorten this plug.  It's looking at the plug and drawing the

8    one and only reasonable inference that, if you're going to

9    shorten it, you have to shorten the space between the two

10   flanges.  It's the only way to do it.

11       I'm trying to answer Your Honor's question, but I also

12   feel compelled to make the legal point, which is both

13   government contractor does not require a total absence of

14   discretion on the part of the contractor to comply, that's one;

15   and two, what matters here is -- let's just say there were ten

16   ways to shorten the plug, he asked us to shorten it, and we got

17   to choose between the ten, which is not the case here.  If we

18   chose one of those and sent it back to him, if he reviews that

19   final production sample, sees how we shortened it -- because he

20   would see that it had been clipped in the manner that I

21   described to Your Honor earlier and that would be visible --

22   and looks at those and says, these are fine, these are

23   acceptable, that is the moment that matters for government

24   contractor, not the decision of which of the ten to --

25       **THE COURT:**  I don't think all cases support your point

1   in that regard.

2          **MR. WASDIN:**  The cases in Plaintiffs' brief do.  And

3   I'll -- Plaintiffs cite to, for example, the Third Circuit's

4   opinion in *Carley v. Wheeled Coach*.  And I saw this as I was

5   preparing for today's argument.  The issue there was they

6   rejected the ambulance design or gave them specs in the first

7   instance that required a particular center of gravity.  And the

8   court said, "Although these guidelines permitted Wheeled Coach

9   to place the center of gravity anywhere below the maximum

10  height, the government need not deprive the manufacturer of all

11  discretion pertaining to a particular design feature in order

12  for the government contractor defense to apply."

13         **THE COURT:**  So where does the conflict come in?

14         **MR. WASDIN:**  The conflict comes in because, regardless

15  of how the product was shortened, it was the military's

16  decision to shorten it to satisfy three tactical reasons.  He

17  told us that they are not buying this product, it is a

18  show-stopper unless you shorten it by a quarter of an inch.

19  That decision to shorten the plug --

20         **THE COURT:**  I think that overstates the email.  The

21  show-stopper was the Kevlar helmet, and we don't know anything

22  about the Kevlar helmet because it never came up again.

23         **MR. WASDIN:**  Well, no.  The Kevlar helmet was one of

24  three reasons why they needed it shortened a quarter of an

25  inch.

1          **THE COURT:**  Right.  But the emails that you've shown

2     me and I've seen in terms of the continuous back and forth, as

3     you characterize it, relate to the case.

4          **MR. WASDIN:**  They relate -- Your Honor, I would

5     respectfully disagree.  They relate to all three of those

6     issues.  They all list, with exception of the Brian Myers April

7     8th email, all three issues.

8          **THE COURT:**  Well, the Brian Myers April 8th email,

9     isn't that the email that -- hold on just a minute.  That's the

10    one your people or Aearo -- that's the issue that you all are

11    focused on.

12         Where is there anything else about you responding in

13    an email -- Aearo responding in an email to Ohlin's concerns

14    about the Kevlar helmet?

15         **MR. WASDIN:**  Ohlin emailed us his concerns about the

16    Kevlar helmet, and two weeks later we changed the design of the

17    product.  That is the record.

18         **THE COURT:**  Right.  But I asked if there was an email

19    that discussed the Kevlar helmet.

20         **MR. WASDIN:**  There's no email responding from Aearo to

21    Myers -- excuse me, from Aearo to Ohlin that I'm aware of that

22    discusses the Kevlar helmet.  The record is that Ohlin

23    identified that as one of three reasons he needed the plug

24    shortened.  We did it.  Plaintiffs now claim it's too short.

25    If they are correct that there is a state law duty to make it

```
 1   longer, there is a conflict between that duty and Ohlin's
 2   instruction to shorten the plug.  That's the conflict.
 3          THE COURT:  Well, I'll certainly hear from the
 4   Plaintiffs about what duty they believe was violated.  I think
 5   there's a dispute in this case about what the Plaintiffs
 6   actually are identifying as a defect.
 7          MR. WASDIN:  Your Honor, I think sadly -- I didn't
 8   expect to spend an hour talking about these four emails.  I've
 9   got a lot more in my deck, but I do think I'm coming close on
10   my time.
11          THE COURT:  Well, sometimes that's what happens at
12   oral argument, you have plans and the judge has different
13   plans.
14          I'll give you a couple of minutes to wrap up, if you'd
15   like.
16          MR. WASDIN:  Sure.  I want to then spend my last few
17   minutes talking quickly about two and three.
18          THE COURT:  About two and three?
19          MR. WASDIN:  Element two and element three for the
20   contractor defense.
21          THE COURT:  Oh, all right, go ahead.
22          MR. WASDIN:  On element two.  There is no allegation
23   in this case that any of the Combat Arms version 2 Earplugs
24   shipped to the military were of some length other than what
25   Doug Ohlin found to be acceptable in that production sample.
```

1    That's it.  That's element two.

2          So, if Your Honor finds that we had a reasonably

3    precise specification for the length, we are also entitled to

4    summary judgment on element two.

5          On element three.  Plaintiffs' case, as I understand

6    it from the briefing, is that they believe Aearo did not tell

7    the military about dangers from the use of this product on what

8    is the called in the briefs the 015 tests, the initial green

9    end tests that are then memorialized in the flange memo.

10         The only testimony in the case about what Aearo told

11   the military with respect to those issues came from Elliot

12   Berger, and he said over and over and over again that he told

13   them.  That testimony is not disputed in this lawsuit.

14         **THE COURT:**  That's testimony from the *Moldex*

15   litigation?

16         **MR. WASDIN:**  That's the testimony from both *Moldex* and

17   in this lawsuit.  He was asked about the flange memo outside of

18   this lawsuit in *Moldex*, and he said, "I told Ohlin about that."

19   He was asked inside of this lawsuit about ten different times

20   in ten different ways, "What did you tell Ohlin?"  And he

21   testified --

22         **THE COURT:**  Does he say anything more specific than "I

23   told him about the problems and ramifications"?

24         **MR. WASDIN:**  He said, "These conversations were 20

25   years ago.  I don't remember every word of them.  I can't sit

1    here today and tell you I remember every word of them, but I

2    what I told him was the problems that happened in our testing,

3    the fact that we had to do a second test, the fact that we

4    folded the flanges back on the second test, and the fact that

5    folding the flanges back would be important for some people."

6         That's the material information.  And when you look

7    specifically at his testimony, he says -- and this quote tracks

8    the *Brinson* case so well that I put them together -- "The

9    entire development project was discussed with Ohlin, and the

10   issues from shortening it to how it affected our testing were

11   reviewed."

12        That's the type of evidence, that type of what the

13   Eleventh Circuit calls --

14        **THE COURT:**  What are you -- the entire development

15   project?

16        **MR. WASDIN:**  He's discussing from point A, make the

17   longer sample to shorten it, from testing it to how it affected

18   our --

19        **THE COURT:**  I don't agree that the military developed

20   this earplug.  I'm not commenting on the shortening and that

21   design feature.  But as far as the military developing this

22   product, they didn't develop the technology and they didn't

23   develop the product.

24        They wanted the technology and they wanted a product

25   that would do the things that we've talked about as far as

1    selective attenuation, provide for situational awareness in

2    combat settings.  They certainly wanted that, and they wanted

3    it to fit in the carrying case.

4          But as far as designing and developing the product,

5    I'm probably not going to agree with you on that.

6          **MR. WASDIN:**  I don't believe Mr. Berger was

7    attributing one role or another here.  He's saying that working

8    with the military through the shortening process and the

9    testing at the company was discussed, and we had an open

10   relationship, and that type of open relationship was the --

11   almost analogous perfectly to the testimony that the Eleventh

12   Circuit found sufficient in *Brinson*.

13         And I know I'm running out of time but I do want --

14         **THE COURT:**  Can I ask -- and I'll -- obviously, if I'm

15   asking you a question, I would like to know the answer, so

16   you're fine to go over your time limit since I'm the one doing

17   that.

18         Why did Aearo so quickly take this product off the

19   market in the *Moldex* litigation when the flange report came up?

20   Why?  I mean, if there was no problem -- if there's no problem

21   with that noise reduction rating being known, I mean, why?

22   What else was wrong -- was there anything wrong with the

23   product?

24         **MR. WASDIN:**  My understanding is that the product --

25   we were on to generation four --

1          **THE COURT:**  It stopped immediately, immediately, same

2     day of that deposition.

3          **MR. WASDIN:**  Your Honor, I am positive that a majority

4     of the communications regarding this issue that you're asking

5     about have been withheld on privilege grounds, and I do not

6     want to waive any of that in answering your question.

7          But I believe it's not privileged that we had -- --

8     the military had almost exclusively moved on to version 4 by

9     the time of the *Moldex* litigation.  I don't believe the Army

10    was even using version 2.  It may have had some store.  I know

11    Lt. Col. Merkley gave it to us.  But they were past the version

12    2 when the *Moldex* litigation came up.

13         And so, the decision to pull something down if there's

14    any issue around safety when people aren't even using the

15    product is not some sort of admission that there was an issue

16    15 years earlier.

17         **THE COURT:**  I want to ask you another question.  We

18    haven't really discussed in detail the flange report.  I'll

19    reference it as PX 33.  And the description of test 213015,

20    there's a description of the problem with the plug being so

21    short that it's difficult for the experimenter to insert the

22    plug deeply into some subject's ear canals especially those

23    with medium and large ear canals.

24         **MR. WASDIN:**  Yes, Your Honor.

25         **THE COURT:**  And then, the next line says,

1    "Additionally, the geometry of the ear canal opening sometimes

2    prevented the deep plug insertion required for maximum

3    attenuation values."

4          That sounds like a separate problem to me.

5          **MR. WASDIN:**  Your Honor, I believe the way we briefed

6    this in our papers was essentially agreeing with Plaintiffs'

7    reading of this document that there was difficulty inserting

8    the earplug for some people, so that's one; and two, the

9    possibility that the -- if you inserted it, so you could get it

10   in deeply, the possibility that the opposite end flanges could

11   interact with the external ear canal -- the geometry of the

12   external ear canal, fold up, and cause the plug to push out.

13         **THE COURT:**  So that's a problem with the dual-sided

14   nature of the plug?

15         **MR. WASDIN:**  A problem with -- yeah, I mean, it's a

16   problem with the length of the plug and how close the two

17   flanges are together on a dual-ended plug.  It's a problem that

18   stems from the length of the plug.

19         I mean, just to take that in the reverse, if the plug

20   was longer, that would not have been the same issue.

21         **THE COURT:**  All right.  And I wanted to, Mr. Wasdin,

22   before you sit down, let you know what exhibit it was I was

23   referring to where there was a reference to the shortening of

24   being a redesign, and that was the -- it's DX 4 and 5.  The

25   emails between Ohlin and Myers regarding the size of the plug,

1    April 8th and 9th, and Myers is the one that says it may help

2    to expedite the redesign if we could get a storage container

3    from you.

4           Before you sit down, Judge Jones, any questions for

5    Mr. Wasdin?

6           **JUDGE JONES:**  I did, I had one very brief comment.

7    And correct me if I'm wrong, Mr. Wasdin.  The real thrust of

8    your government contractor defense relates to the modification

9    of the design in shortening the plug by a quarter of an inch?

10          **MR. WASDIN:**  That's correct, Your Honor.

11          **JUDGE JONES:**  Yeah.  So, my question is, if we just

12   have the original plug without the request to change the design

13   by shortening it, it seems like your government contractor

14   defense really would not then have much traction.

15          **MR. WASDIN:**  It would depend on --

16          **JUDGE JONES:**  Am I correct?

17          **MR. WASDIN:**  No, Your Honor.  It would depend on what

18   the defect alleged in the case was and then whether or not that

19   related to a design feature that was subjected to military

20   decision-making.

21          So here the defect alleged in the case is related to

22   the length of the product, and so the reason we're focused on

23   length in our government contractor defense is because that's

24   how you do it, you figure out was there a design feature that

25   the military exercised discretion on, and then, you know, did

1  that cause the problems that Plaintiffs are alleging you should

2  have done differently.

3          So we're not focused on length because it's the only

4  issue, it's the relevant issue.

5          **JUDGE JONES:**  Is that how it is, there's not, as Judge

6  Rodgers alluded to, you know, a separate issue with the fit?

7  Let's assume it was just the longer product and there was a

8  problem with the fit.  You really wouldn't then have much of a

9  government contractor defense.

10          **MR. WASDIN:**  I think in that hypothetical -- I think

11  there were two questions there, and I'll try to answer them

12  both.

13          In that hypothetical, it would depend on whether the

14  problem with the fit you're proposing stemmed from some

15  decision made by the government.

16          But here the evidence of any fitting problem stems

17  almost exclusively from the flange memo, and that is a document

18  talking about fitting issues that stemmed from the length.

19          So I'm not sure if Your Honor is suggesting that there

20  would be a problem with the fit in the longer version.  There's

21  no evidence of that.  But in this case, the evidence that there

22  were fitting issues during Aearo's testing is documented in a

23  memo that is relating those to the military's decision to

24  shorten the plug, and so that's the reason we briefed it how we

25  did.

1          **JUDGE JONES:**  Okay.  Thank you.

2          **THE COURT:**  So I'm going to ask Judge Herndon if he

3    has anything, but let me follow-up on that, Mr. Wasdin.  If the

4    meeting at Aberdeen -- if Doug Ohlin had said dual-ended,

5    non-linear earplug that fits our carrying case, and we had no

6    other facts change in terms of -- I guess you wouldn't have the

7    original design drawing, you'd have the second design drawing

8    to fit the carrying case.  So that wouldn't change anything for

9    you, I presume, if the defect was the length of the plug --

10   alleged to be the length of the plug?

11         **MR. WASDIN:**  I believe the answer is yes.  But to sort

12   of state it as I understand it, if he gave us specifications at

13   the meeting and said make me a dual-ended plug that fit into

14   this carrying case and use those tips, and we did that, and

15   then he accepted that, yes, you know, we would have the exact

16   same government contractor defense with respect to allegations

17   that the length of the plug was defective because it would have

18   been directed by the military in an exercise of their

19   discretionary decision-making.

20         **THE COURT:**  Judge Herndon, anything?

21         **JUDGE HERNDON:**  No questions.  Thank you very much.

22         **THE COURT:**  Thank you very much, Mr. Wasdin.

23         Since we've run over, Mr. Sacchet would you like a

24   break before we start or do you want to go ahead and get

25   started?  It matters not so much to me.

1    **MR. SACCHET:**  I could use a five-minute restroom

2    break.

3    **THE COURT:**  We'll take five minutes.

4    **MR. SACCHET:**  Thank you.

5    *(Recess taken 2:21 p.m. to 2:33 p.m.)*

6    **THE COURT:**  Mr. Sacchet, you're up.

7    **MR. SACCHET:**  Good afternoon, Your Honor.

8    **THE COURT:**  Good afternoon.

9    **MR. SACCHET:**  Contrary to Defendants' broad, sweeping

10    statements about the applicability of the government contractor

11    defense, this preemption doctrine is extremely narrow and is

12    rarely applied even when a defendant provides a product to the

13    federal government.

14    *Boyle* created the government contractor defense to

15    immunize only those contractors who enter into a binding

16    federal procurement contract containing written specifications

17    to design a uniquely federal product.

18    **THE COURT:**  But that's -- the case law doesn't require

19    -- *Agent Orange* indicates there's no such requirement for an

20    actual contract with written specs.

21    **MR. SACCHET:**  Your Honor, *Agent Orange* is the only

22    case I'm aware of in the entire expanse of litigation involving

23    the government contractor defense that has insinuated that a

24    written contract containing specifications may not be required.

25    But in *Agent Orange* itself, that case involved a design

1    contract containing written specifications.  And in fact,

2    footnote 12 of that very decision says, "A contractor who

3    cannot provide a contract incorporating written specifications

4    will rarely, if ever, being entitled to this defense."  And

5    that's because in *Boyle*, *Boyle* made clear that a contract with

6    specifications is required.  The Eleventh Circuit said the

7    exact same thing in *Hudgens*, and so has every single other

8    circuit in the country.

9         For example, Third Circuit in *Carley*, a private

10   contractor who is compelled by a contract to perform an

11   obligation for the United States shall in some circumstances

12   share the sovereign immunity of the United States.

13        The Fifth Circuit in *Crutchfield*, "*Boyle* itself,"

14   quote, "provides immunity to contractors for conduct that

15   complies with the specifications of a federal contract."

16        **THE COURT:**  On the one hand, I agree with you.  This

17   was a question I thought I had, and that is the duty has to

18   arise from somewhere, the contractor's duty.  And I'm not sure

19   where it arises from if it doesn't arise from the contract.

20        But then again, *Boyle* speaks more in terms of federal

21   interests, in federal policy in terms of the discretion, and

22   that's where the conflict comes in as opposed to a specific

23   contractual duty.  And I think that's what -- I believe that's

24   what *Agent Orange* says.

25        **MR. SACCHET:**  So, Your Honor, two things.  Before

1    *Agent Orange* was the *In Re: Joint* decision out of the Second

2    Circuit.  It's the law in every circuit that I'm aware of that

3    a subsequent panel cannot reverse a prior panel decision.  And

4    in *In Re: Joint*, which preceded *Agent Orange*, the Court said,

5    as we can see under the line that says, "procurement contracts

6    formalize the military's decision and remove contractor

7    discretion," what *In Re: Joint* said -- this is the reason why

8    the immunity has to arise out of a contract as opposed to some

9    other ultra vires action.

10        Quote:  "The contractor limits the contractor's

11   ability to accommodate safety in a different fashion."  And

12   that's because the contract is what binds the contractor to do

13   exactly what they're supposed to do.

14        As the Eleventh Circuit says, the contractor has to be

15   able to say the government made me do it.  And if there's no

16   contract that says you must do X, Y, or Z, at any point the

17   contractor can make the decision, a) I don't want to do it; b)

18   I'm going to suggest an alternative and see if the government

19   will still take it; or c) I'll do what you said, these are the

20   risks and the problems that could arise, but I need a contract

21   that says I had to do just that.  So, in turn, when that's

22   agreed upon and there is that contractual duty, that gives the

23   right for the contractor to claim immunity because it arises

24   from it.  That's the origin of the immunity.  And that's what

25   every single circuit has said.

1          **THE COURT:**  But here 3M's position is that the Army,

2     through Dr. Ohlin, made them shorten the earplug length.

3          **MR. SACCHET:**  So there's two responses to that.  The

4     first is:  Mr. Ohlin saying something, that's different than a

5     procurement contract entered into by the government itself.

6          **THE COURT:**  But isn't it a discretionary decision made

7     by a government official?

8          **MR. SACCHET:**  It's a government official.  But the

9     reason why the contract is important is because that's the *sine*

10    *qua non* of the federal government itself; it's no longer one

11    person in one branch of one department of the whole military.

12         The contract is from the DLA or the DSCP.  That's the

13    stamp of federal government approval that, yes, these are the

14    very specifications we want, and this is what the contractor

15    must do.

16         And as to the question about Ohlin directing Aearo to

17    do something, he did no such thing.  I can delve into that

18    topic if you would like, Your Honor, or stay with the contract

19    argument.

20         **THE COURT:**  Stay with the contract argument for just a

21    moment.

22         *Boyle* focused on the Federal Tort Claims Act, the

23    discretionary function exception to that, and that deals with

24    the exercise of discretion by a government official, right, I

25    mean, rejected the whole Feres-Stencel Doctrine as a basis for

1    the government contractor defense, correct?

2           **MR. SACCHET:**  That is correct.  At the same time, Your

3    Honor, the Court made very clear that the conflict that is

4    required -- in Justice Scalia's words, "a conflict there must

5    be" --

6           **THE COURT:**  I agree with you.

7           **MR. SACCHET:**  -- originates from a contractual

8    obligation.  That's what the court said.

9           **THE COURT:**  Or does it originate from a federal

10   interest, a federal policy?

11          **MR. SACCHET:**  No.  Because, again, Your Honor, as the

12   *In Re: Joint* court said, only a contract can truly obligate a

13   defendant manufacturer to do what is in the contract.  Any

14   other option -- there can be a walkaway, there can be a

15   modification, or there can be let's do this, we hear what the

16   government says, I need a contract to immunize myself in the

17   event that this goes south that I can point back to and say I

18   was truly required to do this.

19          And, in fact, the very fact that Defendants

20   continually prop up in all their briefing is the statement by

21   Ohlin that says "show-stopper."  What does it also say?

22   "Show-stopper if we can't get the modification."  Why is that

23   important?  It's a conditional statement, "if."  That's key.

24   "If we can't get it."

25          If they had a contract, they would have had to get it.

1    They didn't have a contract, so it left the discretion to the

2    contractor to decide, *Why don't we wait, why don't we see if*

3    *this modification for a case enlargement actually happens,*

4    which it did.  But they preempted that decision and decided

5    let's try to satisfy the government on our own terms and

6    suggest just shortening it anyway.

7            There was no obligation to do that by a contract or

8    otherwise.  And Ohlin's statement about a show-stopper proves

9    Plaintiffs' argument, and it's their best bet.

10           **THE COURT:**  All right.

11           **MR. SACCHET:**  A few housekeeping things, Your Honor, I

12   just want to make sure that are on the table as we proceed

13   through this argument is that the Court's decision on remand is

14   not relevant other than certain legal statements about what the

15   Court should do on summary judgment.

16           Your Honor's order made that clear.  The *Willis*

17   decision out of the Eastern District of Pennsylvania says it's

18   the opposite circumstance.  One of the primary reasons for that

19   is, in order for Defendants to prevail on their motion, not

20   only do they need to satisfy both prerequisites to even

21   triggering the defense as a matter of law, they need to satisfy

22   each and every one of *Boyle* conditions.

23           On the other hand, Plaintiffs' burden is considerably

24   lighter.  All that Plaintiffs need to do to prevail on summary

25   judgment is to show that Defendants can't satisfy one of the

1    two prerequisites or can't satisfy any one of the three

2    conditions.

3         So, if this Court were to find no substance of

4    approval -- and Your Honor alluded to this, they have no

5    evidence of a substantive approval.  They literally just have

6    an email from Ohlin saying, "I accept the plug."  That is the

7    hallmark, the showcase of a government rubber stamp.

8         **THE COURT:**  When you refer to the two prerequisites,

9    are you referring to *Boyle*'s requirement to show a uniquely

10   federal interest as well as a significant conflict?

11        **MR. SACCHET:**  So, a fine distinction there, Your

12   Honor.  I'm referring to a uniquely federal interest, and I'm

13   referring to "a" conflict.  And this is where Defendants'

14   understanding of the law is not on point.

15        The *Boyle* factors address the significance of the

16   conflict.  They address whether the degree of conflict is so

17   large or significant that preemption is warranted.  That does

18   not mean that there's not a threshold consideration of is there

19   even a conflict.

20        And we see in cases, from the District of Columbia, *In*

21   *Re: Totten*, and *Gadsden* from the Northern District of

22   Alabama -- in those cases, the Court said it was error to jump

23   straight into the *Boyle* framework, which is exactly what

24   Defendants do, exactly what they do courts calling out as

25   error.

1          Moreover, in *In Re: Totten* the Court rejected the

2     defense because they couldn't make the threshold showing of a

3     uniquely federal interest or a conflict.

4          And then we have cases like *Hudgens* from the Eleventh

5     Circuit, an Eleventh Circuit saying you've got to do two

6     things; you've got to show the relationship of the contract to

7     the defense and then you trigger the three *Boyle* factors.

8     That's black letter Eleventh Circuit law.  And that's why

9     Justice Scalia said "a conflict there must be," and then went

10    on to illuminate the three *Boyle* factors to determine the scope

11    or significance for actually displacing the whole field of

12    state tort law, which is a radical remedy.

13         In terms of the uniquely federal interest argument

14    that Your Honor has brought up, it's not present here.  In

15    *Boyle* itself -- Your Honor also brought up the Feres Doctrine.

16    The reason why the Court rejected the Feres Doctrine is because

17    it would have immunized standard equipment.  You can't apply

18    the government contractor defense to standard equipment.

19    That's what *Boyle* says, and so do its progeny such as *In Re:*

20    *Hawaii*; and then the progeny from *In Re: Hawaii*, which is

21    *Cabalic* and *Turgeon* and other district court cases.

22         **THE COURT:**  Yeah, but *Boyle* is plain that the

23    procurement of military equipment is a uniquely federal

24    interest.

25         **MR. SACCHET:**  The case was about a CH-53D helicopter.

1    That's 100 percent military equipment.  And since then, courts

2    have said that when it's not a CH-53D helicopter, it's not the

3    Kevlar vest that my friend on the other side alluded to, it's

4    not the fighter jet that was also alluded to.  It's just an

5    earplug?  It's a product that anyone can buy on the market,

6    which is exactly what happened here.  That's standard

7    equipment, and that's why courts in this circumstance say you

8    don't even trigger the first prerequisite of this defense.

9         And here we have evidence from 3M's own documents --

10   and this evidence is undisputed, it is undisputed, they have

11   made no factual argument to say that this is incorrect -- their

12   product summary sheet from 1998 says, in plain language, this

13   plug is supposed to be sold to the military and as a shooters

14   plug.

15        Anyone that's going to use this plug with a firearm

16   can use this.  That was their intention, and that's their

17   design intention in this document.  And we see that illuminated

18   by the underlying patents of this device.  All three made clear

19   in the patents themselves for both commercial, civilian, and

20   military use.  Not a single one of them says this technology,

21   like the filter, the double-end design, or the UltraFit is for

22   the military.  That's not what this product was.  And we see an

23   admission from --

24        **THE COURT:**  I think there's reference to it being

25   designed primarily for the military.

1          **MR. SACCHET:**  I agree, there are documents that say

2    primarily for the military.  Is that a uniquely federal

3    interest?  "Primarily" is not the same as "unique."

4          **THE COURT:**  Isn't it a uniquely federal interest that

5    -- setting the contract argument aside -- that Dr. Ohlin

6    specified the need for the plug to fit into the military's

7    carrying case -- the soldier's carrying case?

8          **MR. SACCHET:**  That was a request that Dr. Ohlin made

9    on behalf of the military.  That's not to say that --

10          **THE COURT:**  It sounds uniquely federal to me, same

11    with the Kevlar helmet.  I've worn a Kevlar helmet.

12          **MR. SACCHET:**  I have not.

13          **THE COURT:**  If you have an earplug that interferes

14    with the chinstrap, you've got a problem.

15          **MR. SACCHET:**  And, Your Honor, there is certain

16    interest that --

17          **THE COURT:**  A military problem.

18          **MR. SACCHET:**  -- the military had such as shortening

19    the plug to fit in the case, which were not specifications, but

20    requests.  But, in any event, there were other considerations

21    that the company considered, and we have that as evidence in

22    this document saying it was intended not just for the military

23    but as a shooters plug.

24          **THE COURT:**  Right.  But it was redesigned with that

25    shortened length.

1           **MR. SACCHET:**  But from its inception, from its origin

2    that's the question, was this product designed from the

3    beginning to be only for the military like in all the cases we

4    see in the Eleventh Circuit -- certain fighter jets, you name

5    it.

6           That's not what this case is about.  It's about a plug

7    that, from the moment it was designed, had commercial

8    intentions.  And that's exactly what happened, it hit the

9    military market and the commercial market.  And in fact, Your

10   Honor, it's undisputed that, during the first three years this

11   product was on the market, there were more commercial

12   transactions than military transactions.

13          **THE COURT:**  But isn't this akin to *Agent Orange* in

14   that dioxin is readily available on the market but not in the

15   composition that the military required?

16          **MR. SACCHET:**  That's what distinguishes this case from

17   that case.  In *Agent Orange*, that composition wasn't readily

18   available.  That's what the Second Circuit said.

19          **THE COURT:**  So your position would be --

20          **MR. SACCHET:**  It proves our claim.

21          **THE COURT:**  -- this earplug was sold commercially with

22   the shortened stem?

23          **MR. SACCHET:**  Absolutely.  It was sold as the Combat

24   Arms Version 2, it was sold as the AO shooters plug for range

25   use, it was sold as the Arc ear plug for electricians.  There

1    was even a private label called Browning Duo.  All those things

2    were the shortened plug that were on the market for people to

3    buy, and indeed they did buy, and that's why there are civilian

4    plaintiffs in this litigation.

5          And that's why certain courts have said, like the

6    Florida Supreme Court, it would be absurd to permit one injured

7    civilian to recover damages because he was injured by a product

8    sold in the marketplace while a veteran is denied recompense

9    solely because he was injured by the same product procured by

10   the military.

11         And at the end of the day, Your Honor, the cost

12   shifting rationale that *Boyle* predicated this whole defense on,

13   it only works for a uniquely federal product.  And what I mean

14   by that is, in *Boyle* Justice Scalia said, listen, if we don't

15   immunize contractors for providing a product, all that's going

16   to happen is they're going to increase the cost of the product,

17   and then they're going to shift that on to the government to

18   cover their contingent liability.

19         And when a product is applied both in commercial and

20   military markets, the Florida Supreme Court, the Ninth Circuit,

21   the Southern District of New York have all said that rationale

22   can't apply, because when the product is in the market strict

23   liability policies require the contractor to account for that

24   contingent liability cost in the price of the product.

25         The only hypothetical I can imagine where that

```
 1   wouldn't be true is if it was still provided in the market but
 2   the contractor actually charged the government less.  Okay.  No
 3   court has said that, but that's the only hypothetical I can
 4   imagine.
 5          Here, undisputed, undisputed, they charged the
 6   military more, almost 20 percent more.  Mr. McGinley, on behalf
 7   of the company, said exactly that.  That is opposite of *Boyle*.
 8   It proves that they didn't think they were immune under this
 9   doctrine.  Why else would they be charging the government more
10   when the policy is totally inverted?  It makes no sense.
11          There's not a single case in the country, none --
12   I've read all of them that are published on government
13   contractor, every single one.  Not a single one has ever found
14   this defense applies when the contractor charged the government
15   more.  It's the opposite of *Boyle*.
16          **THE COURT:**  Are there cases where that's discussed?
17          **MR. SACCHET:**  No.  But it is a factor that would make
18   this case run headlong into the one and the only, the sole
19   justification that Justice Scalia gave for invoking this
20   limited, narrow exceptional preemption doctrine.
21          **THE COURT:**  So let me ask you to talk about the
22   defect, if you would.
23          **MR. SACCHET:**  I'd be happy to, Your Honor.
24          **THE COURT:**  Alleged defect.
25          **MR. SACCHET:**  As to the framing of the defect,
```

1  Plaintiffs' master complaint, in paragraphs 6 and 7 and 122,

2  state that there are two defects.  One, there's an insertion

3  problem.  Two, there's a loosening problem.  That's what the

4  master complaint says.

5       I'm not sure if Defendants ever read the master

6  complaint because they've said it's the length, and that word

7  doesn't appear in the master complaint, unlike some of the

8  individual complaints that they moved in opposition to remand

9  on.

10      **THE COURT:**  But what do you believe caused these two

11 problems?

12      **MR. SACCHET:**  Yes.  So there are two features that

13 independently cause these two defects, and we know that based

14 on the very own documents that are in this case that Defendants

15 have produced.

16      We see in the flange report itself, PX 76, which is

17 the first draft of the report, and PX 33, which is the final

18 draft of the report, as Your Honor mentioned in response to

19 3M's argument.  Because the UltraFit's plug stem is so short,

20 it is difficult to fit the plug deeply into some subjects' ear

21 canals.

22      Additionally -- additionally, key -- not only is there

23 a geometry issue, but it goes on to explain that there can be

24 loosening of the plug due to a different mechanism, the

25 positioning of opposing flanges relative to the outer ear.

1           **THE COURT:**  Mr. Wasdin says that's a length issue.

2           **MR. SACCHET:**  It's not a length issue because there

3  are numerous ways in which this plug could have been designed.

4  A) If it was the same length, the opposing flanges still would

5  have contacted the outer ear of some users.  How does the boil

6  down to the length?

7           In the flange report itself, the insertion problem of

8  the stem is delimited by sizing.  And Your Honor brought that

9  up.  It says some users, especially with those with medium and

10  large.  Is there any such size delimitation of the opposing

11  flange?  No, none.  And that's because, depending on the

12  geometry of the ear, it could affect some, it could affect

13  others.

14          So it can't boil down to the length.  And the reason

15  why we know that is the deposition testimony of Mr. Kieper, the

16  very person who fit these plugs on the subject in test 213015

17  that was cut short because the results were so poor that Berger

18  didn't want it to go forward.

19          Mr. Kieper was asked the question:

20          "It wasn't just the shortness, something else about

21  the design that inhibited with the geometry of the ear canal,

22  right?"

23          **ANSWER:**  "Yes."

24          **QUESTION:**  "And then you further noted that when the

25  plug was fitted" --

1          And that's key, when it was fitted, it's been

2     inserted, it's been fitted.

3          -- "the third flange could press against the subject's

4     ear canal opening and fold up, right."

5          **ANSWER:**  "Yes, that's what I wrote."

6          Their own deposition testimony from the very person

7     that inserted this plug rejects the argument that the Defendant

8     is making that this boils down to just the length.

9          **THE COURT:**  And so, in Plaintiffs' view, is that the

10    relationship of the opposing flanges or -- but does that not

11    incorporate some aspect of length and relationship of those

12    flanges?

13         **MR. SACCHET:**  Not necessarily.  Because, again, Your

14    Honor, if the plug stayed the same size, there would still be

15    this issue.  So it can't just boil down to length.

16         **THE COURT:**  So you mean if it stayed the original

17    size?

18         **MR. SACCHET:**  Yeah, there would still be a preexisting

19    problem with the plug for some users.  It may not be the exact

20    same users.  But there's going to be a problem because the

21    opposing flange is making contact with the outer ear and

22    causing it to pop out.

23         And there's nothing in the flange report, again, that

24    delimits that design feature to a sizing problem.

25         **THE COURT:**  Does anything in the record do that?  You

1    cite Mr. Kieper, and he actually -- it sounds like, from what

2    you just cited, he rejects that.

3            **MR. SACCHET:**  Yes.

4            **THE COURT:**  Just a candid review of the record, is

5    there anything else in the record to support that that feature

6    is a function of length --

7            **MR. SACCHET:**  So --

8            **THE COURT:**  -- that that defective feature is a

9    function of length?

10           **MR. SACCHET:**  In all candor, the very first paragraph

11   of the flange report broadly speaks of the length of the plug.

12   And I'm bringing that up because I assume my friend on the

13   other side will if I don't.

14           But what matters is the analysis below it.  The

15   analysis in the flange report is about the stem as one problem

16   and the opposing flanges as the other.

17           **THE COURT:**  Mr. Sacchet, can you refer me to -- oh,

18   you have it here, Mr. Kieper's depo testimony, PX 25.  Just a

19   moment.

20           What page are we on here?

21           **MR. SACCHET:**  I actually don't have -- I didn't want

22   the clutter the slides but --

23           **THE COURT:**  I'll find it.  That's all right.

24           I found it.  It's at the end.  I'm on page 914, bottom

25   of 914 of the deposition.

1              Is there anywhere else in the record that this is

2    discussed or explained?

3              **MR. SACCHET:**  That was a very precise question from a

4    very skilled attorney, and that was the answer.

5              In addition, Mr. Berger in PX 80 made clear that the

6    flange report is about two components.  There's a fitting

7    component and there's a loosening component.  That also

8    supports Mr. Kieper's testimony that there was more than just a

9    loosening effect going on with insertion.

10             **THE COURT:**  And Ron is Mr. Kieper?

11             **MR. SACCHET:**  Yes.  And, Your Honor, if I could

12   perhaps take a step back and just explain, as a matter of law

13   here, in what universe does the defendant get to define the

14   plaintiff's design defect claim?  I'm not aware of any case

15   that says, you know what, you've actually alleged the wrong

16   thing, we're going to allege it for you because it maps

17   directly onto the pseudo-specification from the government to

18   say we win the government contractor defense.

19             They have inverted the inquiry about how this works.

20   The plaintiff alleges their claims.  They define the feature

21   based on global discovery, which is exactly what Plaintiffs

22   have done here, and then you apply this defense.  And that's

23   why in the Supreme Court in *Malesko*, which came after *Boyle*,

24   the Supreme Court said the inquiry is about the very thing that

25   is the subject of the claim, the subject of the claim.  The

1    plaintiffs make the claims.

2              In my meet and confers with 3M, it was agreed upon

3    that the defense depends on the offense, not the other way

4    around.

5              **THE COURT:**  Well, and there are cases that discuss

6    that the defense may apply to one alleged defect and not

7    another.

8              **MR. SACCHET:**  Of course.  That's black letter.

9    There's also cases like *D.F. vs. Sikorsky*, the last case on

10   this slide, from the Southern District of California, that

11   reject exactly what Defendants do here.  By saying Defendants

12   have tried to lump these two things together, we're not doing

13   that.

14             This is what the Plaintiffs said.  That's what we

15   agreed to do.  We've stipulated to brief this defense right now

16   based on the global discovery that's been conducted, and here

17   we are with the flange report expressly stating that there's

18   more than just the stem length, there's additionally geometry

19   and the positioning of the opposing flanges, and moreover, the

20   very person who fit this plug from the company reinforcing that

21   plain language of the very documents from 3M's files.

22             **THE COURT:**  So explain to me what -- and I have an

23   earplug here -- what your position is on this second defect --

24   or feature defect in that it doesn't change based on the length

25   of the plug.

1          So, it's the third flange, right, that, if you have a

2     certain geometry of your ear canal -- it's the third flange.

3     Which one of the three is the third?

4          **MR. SACCHET:**  The last one, the one in the middle of

5     the plug.

6          **THE COURT:**  And that can press against the ear -- go

7     ahead.

8          **MR. SACCHET:**  It could press against your tragus.  It

9     could press against some area of the concha.  That's why we use

10    the term in the flange report "the outer ear."  It's not just

11    limited to the tragus.  It's depending on the geometry of the

12    ear.  There could be multiple indentures that require this

13    fold.

14         And it's just the fold of the basal edge, just a

15    little fold in the basal edge that folds back and then at some

16    point snaps back that causes an inverted pressure to push the

17    plug out of the seal.

18         And the positioning of the opposing flanges -- this

19    issue came up with Defendants -- again, they admitted in their

20    argument just 30 minutes ago that it didn't have to be the

21    UltraFit itself.  It could be a modified UltraFit.  That's what

22    they just said.  And in fact, the testimony in this case

23    supports that.

24         DX 56, from Berger, the filter was supposed to be

25    housed in a plug based upon the UltraFit, not the UltraFit

1    itself.  So there was this design discretion about how this tip

2    could be modified.  It could have been modified.  Instead of

3    shortening the stem, you could have shaved off the bottom edge

4    of the third flange to make that flange shorter.

5          They did modify the tips of this plug in subsequent

6    earplugs like the Combat Arms Version 3.  Mr. Falco and

7    Mr. Knauer have admitted -- Knauer's own -- DX 57, from

8    Defendants themselves, agreeing that the tips could have been

9    made shorter and smaller.

10         **THE COURT:**  Can you cite me to that testimony?

11         **MR. SACCHET:**  DX 57 at page 82 to 83.

12         **THE COURT:**  Mr. Sacchet, 82 to 83?

13         **MR. SACCHET:**  Yes.  There's an answer from Mr. Knauer:

14         "The best of my memory, what we did was we took the --

15    because we had the UltraFit tips, we took them and cut them

16    down to certain lengths."

17         So the decision about how much should this tip really

18    be.  They cut them down.  So they could have cut them down more

19    if they wanted to, on 82.

20         And then on 83:  "The acknowledgment that these triple

21    flange plugs do come in more than one size, correct?"

22         "They can come in more than one size, yes."

23         And that's exactly what happened with the Combat Arms

24    Version 3, there were different tip sizes.

25         And there was no specification whatsoever that it had

1   to be the UltraFit itself, and Knauer is admitting that right

2   here, saying that they cut it down, and the Defendant just said

3   that it was a modified UltraFit tip.

4           **THE COURT:**  Is this a cut or a shortening that's

5   independent of the carrying case and Kevlar helmet issue?

6           **MR. SACCHET:**  Yes.  This is from the inception.

7           **THE COURT:**  There's some -- you maybe can help me.

8   There is a reference in the record to shortening the stem of

9   the UltraFit.

10          **MR. SACCHET:**  So, yes, there are design documents from

11  like the 1997, 1998, from way back when, when ISL and Aearo

12  were working together to even just deal with the single-ended

13  plug.  And there were discussions about how long that stem

14  should be.  And that was separate from, obviously, this

15  separate issue about should we shorten the plug, according to

16  Doug Ohlin, and that 3M chose to shorten the stem when it

17  didn't have to shorten the stem.

18          We kept hearing that the stem has to be shortened.

19  Why is that true?  There's no evidence for that proposition,

20  none whatsoever in the record.

21          We have a statement right here from Mr. Knauer saying

22  they modified the tips by cutting them down to certain lengths.

23  This wasn't some monolithic object.  There's different

24  component parts.  And there was no specification that it had to

25  be exactly that tip.  They could have also done other things.

1          They could have perhaps -- they could have tightened

2     the flanges so they could closer to the stem.  They could have

3     moved the flanges closer together so that there was more space

4     to actually have a stem even when they shortened.

5          They cannot support this assertion that there was only

6     one way to do it, nor can they show without a design drawing

7     that Ohlin knew exactly what they did.  That's ipse dixit.

8     There's no evidence for that proposition whatsoever in the

9     record.

10         He said they were acceptable.  That is a rubber stamp.

11    And in fact, Defendant's own brief in their opening memorandum

12    says they lack the discovery to show what Ohlin even did to

13    evaluate this product.  How can they possibly show a continuous

14    back and forth, substantive approval of the design features at

15    issue when they don't have evidence?

16         This case is legion.  It's not even close to *Harduvel*,

17    *Brinson* and *Maguire*, not even close.

18         **THE COURT:**  But in *Brinson* -- I'll discuss this with

19    Mr. Wasdin when he's back up.  But in *Brinson*, the acceptance

20    was sufficient, but it was acceptance with knowledge of a

21    defect.

22         **MR. SACCHET:**  So, a couple of things.  In *Brinson*,

23    there was a preexisting patent.  The Eleventh Circuit made

24    clear that a patent on a product doesn't eliminate the design

25    discretion.  You still have to implement that patent.

1          **THE COURT:**  Right.

2          **MR. SACCHET:**  I mean, it's not like you take a patent

3     and you just say let's plug this in.

4          **THE COURT:**  Right.  But they looked at post-design

5     evidence.

6          **MR. SACCHET:**  I reason why I love that line is, if

7     we're going to look at post-production evidence here, there is

8     a *qui tam* action where the government alleged under Rule 11

9     that the Defendant didn't provide the information they needed

10    to have.  So *Brinson* is actually the opposite where there the

11    government found out that there was an issue with the Teflon

12    lined rods because they could expand with humidity and

13    therefore considered that post-production evidence.  Here we

14    have the opposite case, post-production evidence showing that

15    the government not only rejected the product but actually filed

16    a *qui tam* under Rule 11 saying you didn't tell us what you

17    knew; and moreover, then created a report after a two-year

18    investigation expressly finding just that.

19          So, if we want to talk about *Brinson*, it's the

20    opposite cases here.  And as to the substantive approval

21    feature in *Brinson*, there, there were design drawings.

22          **THE COURT:**  Say that again.

23          **MR. SACCHET:**  There were design drawings, exactly what

24    Your Honor asked my friend, and he said they were never

25    provided.  I mean, there's nothing.

1            Defendants say in their brief, quote, "The military

2    has not yet provided discovery regarding the steps Ohlin took

3    to evaluate those samples."

4            And then we see -- I mean, to me this is the death

5    nail.  PX 55, Mr. Berger himself, the purported liaison between

6    Aearo and the military, "I don't know how he evaluated them

7    after we provided them.  I don't know what evaluation he went

8    through on the first version and ended up coming back and

9    telling us to shorten it, and I don't know what evaluation he

10   would have gone through on the next version."

11           There is no evidence, no evidence in the record

12   whatsoever of a substantive approval of either the original

13   design or the subsequent modified design.  And under these

14   cases -- *Weber* is a great example, Southern District of Florida

15   stating -- rejecting the defense, as a matter of law, not

16   denying a motion by the defendant for summary judgment,

17   rejecting as a matter of law because the government did not

18   substantively review the modified design after it requested a

19   change.

20           No evidence in the record.

21           This is in stark contrast, on the other hand, to cases

22   like *Maguire* from the Third Circuit.  There what happened is

23   what should have happened here.

24           There was a design request for a change.  The

25   contractor submitted a memorandum saying this is the proposed

1    change.  We've conducted a hazard analysis based on what will

2    happen if we do this change.  All those documents provided to

3    the military.

4         Then the military met and said let's look at these

5    documents to see what's going to happen if we do this.

6    Critical review of the implications of the change.

7         In that circumstance, the Third Circuit said you've

8    shown substantive review of the modified design.

9         This case is the opposite.

10        **THE COURT:**  And similar with *Brinson*.

11        **MR. SACCHET:**  Similar with *Brinson*.

12        **JUDGE JONES:**  Mr. Sacchet, not to interrupt, but I had

13   one very quick question.

14        So Mr. Wasdin told us that the diagram of the modified

15   shortened version, am I correct, that was never provided to Mr.

16   Ohlin.

17        **MR. SACCHET:**  That's exactly correct, Your Honor, nor

18   am I aware that the original blueprint was provided either.

19        **JUDGE JONES:**  So what was provided was some sample or

20   prototype?

21        **MR. SACCHET:**  That's correct, that's correct.

22        **JUDGE JONES:**  Is there anything in the record where it

23   was brought to Mr. Ohlin's attention that it was shortened by

24   cutting the stem or anything in the record that shows Mr. Ohlin

25   took it apart and could see the stem was shortened?

1          **MR. SACCHET:**  No.  And, in fact, the timeline -- I

2     don't know if you can see this right here.  On May 12th Ohlin

3     -- or Aearo sends a shortened plug to Ohlin.  A whole five days

4     later, there is a stamp of approval.  And that's the extent of

5     the evidence of a continuous back and forth on the design

6     feature at issue even on Defendant's overbroad terms that the

7     defect is the length as opposed to the stem or the positioning

8     of the opposing flanges.

9          **JUDGE JONES:**  Okay.  Thank you.

10         **MR. SACCHET:**  You're welcome.

11         And to suggest, Your Honor, that there can be

12    substantive approval based on a -- based on the product itself,

13    not only is there no case that says that, but if there were the

14    rule, there would be no substantive approval factor.  Because

15    obviously the government gets the product.  So if you could

16    just show substantive approval by receiving the product, every

17    single case would satisfy this condition.  And that's all that

18    3M has to argue because they've got nothing else.

19         In fact, the evidence they do cite for substantive

20    approval, the only thing they could dig up was DX 13, which is

21    an inadmissible witness statement from Lt. Col. Robinette.  It

22    actually proves Plaintiffs' point.  In that statement,

23    Robinette says Ohlin had no standards, Ohlin didn't write

24    anything down, Ohlin approved the product just because he liked

25    it.

1        And then, after Ohlin left CHPPM as the program

2    manager for that group, then the Army created a formal process

3    that depended on data that Ohlin, in PX 9 right here at the

4    bottom of the slide, says, "I wish I would have had that

5    information."  He didn't have any of it.  The Defendant hadn't

6    even tested this product when Ohlin so-called approved it.  No

7    data whatsoever, no engineering review, no formal review, no

8    specs, no blueprints, no drawings, nothing.

9        As to the issue of whether there was a specification,

10   Your Honor discussed this a bit at the beginning of the

11   argument, and I want to piggyback off of some of the points

12   that were brought up.

13       The evidence that 3M relies on to purportedly show

14   that a specification was generated out of this December 1997

15   Aberdeen meeting is one document of Berger's recollection of

16   that meeting after he left the meeting.

17       Berger himself testifies -- I pulled this clip while

18   the argument was ongoing -- that, quote, "I was very happy to

19   uncover this document because, as you can see, this meeting

20   occurred over 20 years ago, so I have a dim recollection of the

21   actual meeting."

22       So it's the document.  And the document DX 2 says,

23   "Ohlin is interested in a two-ended plug."  Contrast that with

24   Defendant's brief, "The military provided specifications."  Not

25   the same thing at all.

1          In addition, 3M makes the argument, on page 24 of

2     their brief, "After Aearo sent production samples, Ohlin

3     directed that Aearo shorten the plug.  Aearo shortened the plug

4     in response to that directive."

5          They have it backwards.  On April 6th, PX 72, Ohlin

6     requested to enlarge the case to fit the current earplug.  Two

7     days later -- no intervening evidence between that time

8     period -- Myers of Aearo responds in bawling tears to shorten

9     the plug.

10          Yes, there are subsequent emails between Myers and

11     Ohlin -- actually, there's just one and he's copied on another

12     where Ohlin expresses other reasons for doing it.  But they

13     have the timeline backwards.

14          And how can they possibly argue the government made me

15     do it?  Even if you don't need a contractual specification --

16     assuming arguendo no contractual specification, that a

17     contractor can actually satisfy that requirement based on mere

18     verbal affirmations, which it can't, but if it could, how do

19     they say the government made me do it when they volunteered to

20     do it?

21          There are three legal reasons why there were no

22     specifications.  And 3M has wobbled on this argument throughout

23     all of its briefing.  It came right out of the box and said, we

24     went on *Boyle* 1 because the military created specifications.

25          You can see, based on the genesis of their argument,

1    that that argument has fallen way, way down.  But that's what

2    they argued.  That's their theory of this case.

3          People like Ohlin don't create specifications.  The

4    DLA does, that federal agency that represents the military.

5    And we see that with *Boyle* discussing a federal procurement

6    officer, and we see even Berger -- Berger himself admitting the

7    Defense Logistics Agency develops procurement specs.

8          Ohlin is asked the question, "Who writes the specs?"

9          "I think they're written at the DLA.  I didn't create

10   specifications.  Those come from the logistics side of the

11   house."

12         This is undisputed testimony.

13         The second reason:  Oral statements and emails, they

14   can't be specs.  A military spec is a term of art.  It's a real

15   thing.  This isn't some like fabricated idea that's loosely

16   used in the case law.  There's a thing called a Mil-Spec.  And

17   we put this in the record as PX 56.

18         Berger tries to wriggle out of this by saying, "When

19   we did the Combat Arms, Mil-Specs didn't exist."

20         Well, guess what.  There's a 1985 Mil-Spec for the

21   foam earplug from the DLA that says exactly what you need to

22   do.  There's a length specification.  They have nothing like

23   that in this case.  Nothing.

24         In fact, Berger admitted in his 30(b)(6) deposition in

25   PX 16 that someone was looking for a written Mil-Spec and there

1    isn't one.

2          We also asked Lt. Col. Merkley, one of the *Touhy*

3    deponents:  "Does the military specify the development of an

4    earplug based on an oral conversation?"

5                **ANSWER:**  "No, no."

6          And we have case law to back it up.

7          In *Griffin*, the District of Hawaii said what would

8    happen if we allowed the very arguments that Defendants are

9    making in this case to actually stand.  According to the Court,

10   allowing an email or a request, like Mr. Hayashi, who was the

11   federal officer in that case, to be characterized as a, quote,

12   "reasonable precise spec" would essentially absolve all

13   government contractors from liability if they simply provided

14   evidence that they were in some way acting at the government's

15   instruction.  That's why you have to have the contract, Your

16   Honor.  That's why you have to have a contractual spec.

17         The doors would fling open and people that called up

18   the government and said:

19               *Hey, we're thinking about designing a light bulb.*

20               *What do you guys like?*

21               *Oh, we like fluorescent, we like this, blah, blah,*

22   *blah.*

23               *Okay, that sounds good.*

24         They're now immune?  No.  You have to have a federal

25   procurement contract with military specifications just like

1   every single circuit said, including *In Re: Agent Orange* in

2   footnote 12.  And in fact, that case involved a contractual

3   specification, but the reason why there was wriggle room is

4   because the contractual specification said that the product

5   needed to be a hundred percent of a certain toxicity.

6           The plaintiff's allegation in that case was, you never

7   specified that it had to have dioxin, which was the chemical

8   that actually resulted in the disfigurement of many soldiers.

9           The Court said, you know what, there isn't a spec

10  about dioxin, but the rub is that the expressed spec about it

11  being 100 percent of a certain toxicity necessarily required

12  dioxin as a byproduct.  So there's an expressed spec that

13  guaranteed essentially an implied spec.  And that's part of the

14  reason why *In Re: Agent Orange* didn't overturn *In Re: Joint*

15  because it can't overturn *In Re: Joint*.  There's the prior

16  panel rule.

17          *In Re: Joint* says contract incorporating written

18  military specifications because, without them, you leave the

19  contractor with discretion.

20          They can't even get off the ground in this case.  They

21  can't even lift off.  There's no conflict.  There's no

22  contract.

23          **THE COURT:**  Could I ask, Mr. Sacchet, that you address

24  the third prong right now and the Defendants' position that

25  there isn't a defect with this product, well, in that it

 1    satisfied all the mean attenuation score requirements of the

 2    MPID.

 3              **MR. SACCHET:**  Okay.  So, as to that specific --

 4              **THE COURT:**  And talk to me a little bit about mean

 5    attenuation versus noise reduction ratings.

 6              **MR. SACCHET:**  Okay.  So, Defendants make an argument

 7    that there was no duty to warn because purportedly this issue

 8    was approved by the government anyway based on the MPID table.

 9              So, first issue, that's not the way you run a *Boyle*

10    analysis, especially at this juncture in the litigation.

11              **THE COURT:**  But do they not also argue that the

12    problem that you all say resulted from the design defect, that

13    there really isn't a problem, because this plug, as modified,

14    performs according to the MPID and satisfies the MPID?

15              **MR. SACCHET:**  So, a couple of things.  One, I think

16    it's *tu quoque* for them to rely on the MPID when they've

17    disclaimed it.

18              **THE COURT:**  Well, but they have moved away from that.

19    But nonetheless, in terms of what the government was looking

20    for in terms of performance later, I mean, post-production

21    evidence --

22              **MR. SACCHET:**  So, I have six points about why the

23    argument fails.  I'll start with two.  The first is that the

24    data from 015 is not tantamount to the flange report.  And this

25    is key.

1      **THE COURT:**  Say that again.

2      **MR. SACCHET:**  It is not the same thing as the flange

3    report.  So the flange report is the analysis about what is

4    really the problem here.  And the flange report says the

5    problem here is variability in an extremely low NRR.

6      Now, the data can be what the data is.  But the

7    problem here that 3M uncovered is this plug doesn't work for

8    certain people, and that's what they hid from the government.

9    And then -- and this is basically the end of the inquiry --

10   when the government actually found this out, they discontinued

11   the product, they stopped using it.  The Air Force memo says

12   exactly that, "This plug is detective.  We're not going to use

13   it."

14     So, if it were true that the government was totally

15   cool with the data in 015 but, nonetheless, when they get the

16   flange report through the *qui tam* case and they then cease

17   using the product, and the CID report itself says they wouldn't

18   have purchased it, how can there be any argument that, because

19   the 015 data met mean attenuation values of an MPID that they

20   disclaim, that it was immaterial?  That belies what actually

21   happened here.

22     **THE COURT:**  So the problem identified in the test 015

23   is the variability in low protection, right?

24     **MR. SACCHET:**  So, 015 is just the raw data.  It's the

25   data for --

1       **THE COURT:**  Oh, that was the test.  I mean, I'm

2   referring to the --

3       **MR. SACCHET:**  The flange report?

4       **THE COURT:**  Yes.  I'm sorry.  So the problem that was

5   identified in the flange report, based on the data from the 015

6   test, you're saying that exists separate and apart from any

7   mean attenuation values that one doesn't reflect the other?

8       **MR. SACCHET:**  It's not the same danger.  So, you can

9   have mean attenuation values that say something for eight

10   people, and then you can have the company determine or report

11   that it has extremely variable protection for certain people,

12   in that --

13       **THE COURT:**  Based on eight people tested?

14       **MR. SACCHET:**  Based on eight people tested, two of

15   whom had single-digit NRRs, one of whom had a negative 12, I

16   mean, like no protection at all.

17       And the bottom line here, Your Honor, is Lt. Col.

18   Merkley and other people that were the *Touhy* witnesses, they

19   said, we needed this information to be able to appropriately

20   instruct the base audiologists and technicians about what's the

21   totality of information here.

22       We need the totality.  That's how you make a

23   discretionary decision under the law, when there's equal

24   information between both the contractor and the government so

25   that the government can say, what do we want to do with this.

1           **THE COURT:**  I'm interpreting your argument that you're

2    saying that's information the Army military needed as opposed

3    to what should have been put in a warning?

4           **MR. SACCHET:**  Yeah.  I mean, they're different points.

5    Like we see here, Mr. Merkley:

6           "And if the company had information on the strengths

7    and limitations, you'd certainly want that shared with you so

8    -- so you could share that with the base-level audiologists and

9    their technicians?"

10          **ANSWER:**  "Yes."

11          The only way that *Boyle* 3 triggers and can be

12   satisfied is when there's equal information, because that's

13   what the Supreme Court said itself.  You can't have that parity

14   when information is cut off.  And here the flange report and

15   its contents were cut off, undisputed.  There was not equal

16   information between the company and the contractor in this

17   case.

18          **THE COURT:**  Dr. Berger says he shared it.

19          **MR. SACCHET:**  And if we look exactly at what that clip

20   was, he shared "a" problem, at best.  That's their best

21   evidence, he shared "a" problem.  Did he share the specific

22   problem?  No.

23          We see here, 30(b)(6) testimony PX 27, this is Berger:

24   "I have no documentary evidence that this report was shared" --

25   and key here -- "or that the concept that it was too short for

1    proper insertion was communicated."

2            That's dispositive.  I mean, he shared "a" problem?

3    He's saying right here he didn't share that problem.  Moreover,

4    as to imperceptible loosening, PX 55, Defendant's own exhibit

5    PX 59, both say no documentation on sharing that specific

6    danger.  And moreover --

7            **THE COURT:**  And I think 3M's at least part of the

8    argument that they would make for that imperceptible loosening

9    is the testing environment.

10           **MR. SACCHET:**  So that undercuts the entire predicate

11   of this product.  The very purpose of this product was that you

12   can hear situational noise while it's being used.  So the very

13   clue that you had lost seal was the clue that it was working.

14           **THE COURT:**  But -- and I don't want to make Mr.

15   Wasdin's argument.  But what I read from their briefing is that

16   you would know that, that you had lost seal in a real world

17   environment as opposed to the clinical testing environment.

18           **MR. SACCHET:**  Mr. Myers, the marketing manager of the

19   Combat Arms Version 2, there's a document where he says, "I

20   can't tell if this plug is working or not because I don't get

21   that distortion effect."

22           The manager of the product -- of the company didn't

23   know when the product was working or not working.  I mean,

24   that's the point of this product.  And in fact, there's a

25   number of documents that support that same assertion.

1        If you actually go to DX 3, this is their email string

2    between Ohlin and Myers about the shortening issue.  I think

3    it's in DX 3, second page, bottom of the page, Ohlin says, the

4    French people don't know when it's working or not, the soldiers

5    don't know if it's working because you're supposed to hear but

6    obviously it's an earplug and you're not supposed to hear, so

7    when does it work and when does it not work.

8        So, the idea about this being limited to a soundproof

9    booth is not only litigation-driven, never been mentioned in

10   any document whatsoever in the history of 3M's internal files,

11   none whatsoever -- first time it appears is in this litigation.

12   Never said in *Moldex*; about the same plug, never came up with

13   it there, just here.

14       And in addition, their own documents -- the flange

15   report says it's low and variable protection.  Does it say this

16   danger is limited to a soundproof booth?  No.

17       Did Berger, when he wrote an email to Myers in May of

18   2000 asking if he could share this information with Ohlin, say

19   there's a problem, but don't worry about it, it's only when we

20   test it in a soundproof booth?  No.

21       **THE COURT:**  Let me ask you a question, now that you

22   brought up that email.  It appeared to me that that email was

23   sent twice.  Was it?

24       **MR. SACCHET:**  Yes.  So we -- no, the email -- okay,

25   let me --

1    **THE COURT:**  I'm showing that it was sent in May of

2    2000, and then again it appears that it was sent in 2003.

3    **MR. SACCHET:**  Yeah.  So, this is an interesting issue.

4    And if memory serves, my recollection of the deposition

5    testimony on this question is -- let me back up.

6    We put in both versions into the record because the

7    2003 version actually shows the attachments whereas the 2000

8    version, the way it was produced, doesn't show an attachment,

9    but obviously there was one because it's referenced in the text

10   of the document.  So I didn't want the Court to have an adverse

11   inference that nothing was attached to the first one, so I'm

12   showing by the later one that indeed there was.

13   I believe this question was asked to Mr. Berger was

14   this sent twice.  And in all candor, I believe that Mr. Berger

15   said, I don't think so.  I think there was some kind of server

16   issue that popped it back out.  Whether it actually went to

17   Ohlin or not, like, I don't know, but I don't want to -- I

18   don't want to make a false argument that like that proves that

19   it wasn't, you know, that there's absolutely no knowledge

20   between '03 -- that would be disingenuous of me to suggest.

21   **THE COURT:**  Okay.  Well, thank you.

22   **MR. SACCHET:**  But in terms of -- you know, we've got

23   testimony right here, and this is key, DX 59:  "I don't recall

24   the words of our conversations," from Berger himself.

25   How can 3M meet its burden -- it's their burden -- to

1    show that it disclosed this information when, not only Berger

2    says he didn't communicate the concept it was too short, but as

3    to other issues like imperceptible loosening, he can't recall

4    the details of the conversation.

5         *Celotex* does not allow this Court to draw reasonable

6    inference to fill an evidentiary gap.  That's error.  This is

7    what it says, and it shuts down the whole thing.  At best, the

8    disclosure of the flange report was limited to a fitting tip,

9    at best.  That's not all the flange report, though.  Berger

10   says the flange report is two components.  There's the defect,

11   dangers, and consequences of why this plug doesn't work, and

12   there's the suggestion of a potential remedy.  It's twofold.

13        Now, you'll see in 3M's brief what they did was kind

14   of tricky.  They deposed Merkley and asked him if -- if -- if

15   the central issue of the flange report is the fold, did you

16   know that?  And he says, yeah, I knew about the flange fold.

17   If, if it was the central issue.  Is it the central issue?

18   Absolutely not.

19        There's two purposes of the flange report, Berger

20   admits it right here.  And in fact, the very document itself,

21   PX 33, the intro says, it's not only the document the defect

22   that it's too short for proper insertion and -- and how

23   changing the fitting tip -- there's two things in the flange

24   report, not just one.

25        This is the intro to the very document.  And that's

 1    why in Berger's testimony at the bottom here in PX 80 he's

 2    acknowledging it's twofold, it's not monolithic.

 3            **THE COURT:**  But changing the -- can you back to the --

 4    changing the fitting technique, I mean, I think 3M would say

 5    that was the solution for the length problem.

 6            **MR. SACCHET:**  So, as a matter of law, Your Honor, the

 7    courts made clear, such as the Eleventh Circuit in *Gray*, that,

 8    in order for a potential instruction to satisfy *Boyle* 3, it

 9    must explain how critical and mandatory it is to do that.

10            So, for example, in *Gray* --

11            **THE COURT:**  I agree with you as far as the -- I

12    actually have this language highlighted in the *Gray* decision.

13            **MR. SACCHET:**  Great.

14            **THE COURT:**  But back to the exhibit we were just

15    looking at -- there it is -- I thought I understood you to just

16    argue that this is referencing two different problems.

17            **MR. SACCHET:**  No.

18            **THE COURT:**  Oh, okay.  I misunderstood.  I apologize.

19            **MR. SACCHET:**  Not two problems.  There are two parts.

20    The flange report is twofold.

21            **THE COURT:**  Oh, okay.  I misunderstood.  I apologize.

22    I follow you now.

23            **MR. SACCHET:**  In order for there to be a symmetry of

24    information of actual disclosure of the contents of this

25    report, which we know anyway Berger said right here he didn't

1    share the concept it was too short and then he doesn't have a

2    recollection of saying it was imperceptible loosening.  But,

3    even if 3M makes this argument that, you know what, they knew

4    about the flange report, it's not good enough because it

5    doesn't say the whole story.  It doesn't do the work we need it

6    to do.  And we see that here in this clip from Mr. Berger.

7              This is key.  We told them that a tip for getting

8    better performance is that the flange of the outward directed

9    plug should be folded back as needed.

10             **QUESTION:**  "Or what?"

11             Witness, Berger himself, "Period.  That's what we told

12   them."

13             I'm taking 3M's evidence as true, as the Court must do

14   when reviewing Plaintiffs' Motion for Summary Judgment.  They

15   can't get at the second part of the flange report.  There's an

16   asymmetry, and that asymmetry demands the Court to grant

17   Plaintiffs' Motion for Summary Judgment.

18             The case law is clear.  *Jowers* rejecting the

19   government contractor defense despite, quote, "some government

20   awareness" of the dangerous and consequences, but not the same

21   depth of the information.

22             In *Sroka*, remanding, not even colorable, because the

23   government had some level of knowledge of the hazards but did

24   not show the government knew as much or more than it did.

25             In *Carley*, the case that my friend brought up here

1   from the Third Circuit, reversing the grant of summary judgment

2   for the defendant because the government didn't know as much as

3   the contractor about the defects and dangers.

4        There's no evidence that the military knew the whole

5   story, and we know that for a fact for a variety of reasons.

6        Is there any evidence in the record that the military

7   knew that, when you use the plug according to standard fitting

8   instructions, that you get an 11 NRR?  Absolutely not, zero.

9   Not a scintilla of evidence.

10       We have an admission from Mr. Myers:  "Are you aware

11  of anybody, anyone within Aearo who told Doug Ohlin, anyone in

12  the military that we got an 11?

13       "No."

14       Ten percent of the claimed protection, not protected

15  from gunfire.  You can't even use the plug at the range, even

16  though that's what Defendants told the military even though

17  they knew you couldn't.

18       There's a call log from Mr. Berger himself -- it's

19  7,000 entries, actually, I think it's 7005 -- that documents

20  things as sundry as Mr. Berger watching someone use a leaf

21  blower and, to be honest, some other pretty salacious stuff

22  that I'm not going to say in open court.

23       Zero, absolutely zero evidence of any conversation

24  with Ohlin or anyone else at the military that they disclosed

25  the defect, the danger, or the consequences, any one of those

1    three things, notwithstanding the fact that in *Moldex* Berger

2    touted himself, paraded himself, championed himself on the

3    notion that, quote, "I document things.  It's important to

4    document what you do."

5           If that's true, how do they meet their burden when

6    their own document has no evidence whatsoever of the

7    disclosure?

8           And Your Honor brought this up:  October 7th, first

9    time the flange report is outside the walls of the company,

10   first time ever, marked at a deposition of Mr. Hamer on October

11   7th, 2015.  One day later an email from Myers, "Please seize

12   shipping immediately and put on hold indefinitely."

13          Two weeks later -- I don't know why the screen just

14   went out, but two weeks later Myers says they can't distribute

15   the product with the current NRR on the package.

16          If they couldn't distribute the product with the

17   current NRR on the package, how could the military have known

18   that, when it was fitted according to standard fitting

19   instructions, it got an 11?  It can't.  It's impossible.

20          This is also key.  For Plaintiffs to prevail on

21   summary judgment, all they need to show is Defendants can't

22   meet their burden.  That's all we have to show.  They can't

23   show equal information.  They can't.

24          This case is almost like any other where we have

25   affirmative proof to actually prove the military didn't know,

1     affirmative proof that the military didn't know.  And we don't

2     have to have that evidence.  I want to be very clear about

3     this.

4              Plaintiffs deserve summary judgment if Defendants

5     can't meet their burden.  That's black letter law.  We actually

6     have evidence that goes way beyond that to say we know for a

7     fact -- not even for a jury, no one -- the military didn't

8     know.  We know that based on a number of things.

9              Every single *Touhy* witness deposed to date:  *Have you*

10    *seen any communication of the findings, not the document, of*

11    *the findings in the flange report to the Army?*  None.  Merkley,

12    Babeu, so on and so forth.

13             DX 13, Defendants' own exhibit, they say it's

14    inadmissible, they nonetheless cite it.  Let's see what it

15    actually says.  Both Mr. X and Mr. Y -- I'm not going to say

16    their names because it's sealed -- agreed that the U.S.

17    Government should know that there were differences in the NRR.

18             The military didn't know about the consequences of

19    this defect, even assuming for the sake of argument that Berger

20    said there was a problem.  No evidence of the consequence.  And

21    that's what Eleventh Circuit law requires.  In *Harduvel*, the

22    Court said there needs to be parity of information between the

23    defect, the dangers, and the consequences.  Not just the first,

24    not just the second, all three.

25             **THE COURT:**  Let me ask, Mr. Sacchet, about subsequent

1     testing of the government following production.

2                  So there was the DOE James Lovejoy testing, and there

3     was also the September 2008, research lab, more testing.  This

4     is a curiosity question.  I guess I'm wondering why the -- and

5     I assume that both ends were tested of the plug.  Do you know

6     if that's not the case?

7                  **MR. SACCHET:**  Some tests tested both ends.  Most

8     tested only the non-linear end.

9                  **THE COURT:**  Okay, so the non-linear end.  Why didn't

10    they get the NRRs that are reflected in 015?

11                 **MR. SACCHET:**  So, there's a few reasons, Your Honor.

12    There were a few tests that conducted analyses --

13                 **THE COURT:**  015 was --

14                 **MR. SACCHET:**  The first one with the NRR of 11.

15                 **THE COURT:**  But that was for the green --

16                 **MR. SACCHET:**  Yes.

17                 **THE COURT:**  That's not an apples-to-apples comparison.

18    But you understand what I'm --

19                 **MR. SACCHET:**  I understand your question.  And I can't

20    speculate about why that occurred.  What I will say is, yes,

21    they make the point retesting occurred.  Did that retesting

22    involve the type of qualitative analysis that 3M did with

23    Mr. Kieper and Mr. Berger in a formal memo actually

24    interpreting raw data?  No.

25                  And this is my favorite fact that I uncovered in

1    preparing for this argument.  Relatively nerdy, but I love it.

2         3M's argument is that military testing put the

3    military on notice of the problems and defects and consequences

4    of this plug.  That's their argument.  They can't show that

5    they disclosed the defects and dangers, so they fall back on

6    pointing the finger at the government to say they knew it

7    anyway based on this testing.

8         DX 49, their own study from Binseel, *et al.*, 2012.

9    This is 2012, 12 years after the product has been on the

10   market, three years before it was discontinued --

11        **THE COURT:**  Wait.  DX -- you said 49?

12        **MR. SACCHET:**  DX 49.

13        **THE COURT:**  Okay, go ahead.

14        **MR. SACCHET:**  Quote -- this is from 2012, this is the

15   scope of the military's knowledge of the problems of the plug:

16   "The primary disadvantage of the two-sided earplug is that it

17   must be removed from the ear canal, reversed, and reinserted

18   for the user to switch attenuation modes."

19        **THE COURT:**  Where are you reading?  Is this in the

20   abstract or --

21        **MR. SACCHET:**  I just need a minute.  49.

22        **THE COURT:**  40?

23        **MR. SACCHET:**  I'm sorry, I misspoke.  DX 49.

24        **THE COURT:**  Is it 49 or 40?

25        **MR. SACCHET:**  49, page 4.

1          **THE COURT:**  This is PX or DX?

2          **MR. SACCHET:**  DX 49.

3          **THE COURT:**  I'm having trouble hearing the D versus

4      the P.

5          **MR. SACCHET:**  I'm sorry.  DX 49, page 4, Bates stamp

6      page 15 of Docket 1071-50.

7          **THE COURT:**  Okay.

8          **MR. SACCHET:**  So we see in the top paragraph of page

9      4, "Both the Gen I CAE triple-flange tips come in one size.

10     Mode switching is accomplished by removing, reversing, and

11     reinserting the earplug."

12         For some reason this study described the Combat Arms

13     Version 2 as the Gen I and called the Combat Arms Version 3 the

14     Gen II.  Nonetheless, notwithstanding that kind of interesting

15     use of terms, it says, "The primary disadvantage of the

16     two-sided earplug is that it must be removed from the ear

17     canal, reversed, and reinserted for the user to switch

18     attenuation modes."

19         That's the primary disadvantage known to the Army

20     Research Laboratory in 2012, three years before the product was

21     discontinued, 12 years after it was on the market.

22         **THE COURT:**  The DX 47, which is the DOE Lovejoy

23     executive summary of that testing report, the ultimate

24     conclusion is, is that "analysis of the data indicates the

25     Combat Arms earplug does provide adequate protection in

1    accordance with" -- the military standard reference -- "when

2    used to protect against impulse noise generated by small arms

3    fire using blank ammunition."

4         **MR. SACCHET:**  So that study was limited to insertion

5    loss testing on the non-linear end of the plug, it wasn't a

6    retest on the linear end of the plug.

7         **THE COURT:**  That was my question -- that's what I was

8    getting at with asking you about these tests, if in your mind

9    they were relevant to the issues we're discussing or not.

10        **MR. SACCHET:**  I think that there is military testing

11   that was performed on this plug that was done in a variety of

12   different modalities.  Virtually all of them were comparative

13   studies of the CAEv2 to another product.  Like the whisper

14   study that we saw in one of the initial slides from 2008, that

15   wasn't an individual study of the earplug to say let's look at

16   this on its on terms, let's get an NRR, and then let's

17   interpret the NRR to see what's happening here.

18        That's what 3M did that the military never did.  And

19   that's key.  I mean, that's -- there's no qualitative analysis

20   by the military of an NRR and interpreting that to be fit or

21   loosening.

22        And we see here, PX 92, from Ms. Coleman, who was the

23   author of the CID report, and PX 82 from Lt. Col. Merkley

24   testifying that the military didn't set out to evaluate

25   insertion or loosening issues with the plug.  That wasn't the

1    intention of these studies, even if they were retests.

2         I mean, I'm not going to hide from the fact that there

3    were retests.  I mean, fine.  Was there qualitative analysis

4    like in the flange report?  Absolutely not.  No evidence of

5    that.  And we have a 2012 study by Binseel from the Army

6    Research Laboratory saying the primary disadvantage is that you

7    have to switch the plug.

8         How can 3M argue that the military was on notice even

9    in 2012, three years until this product was gone, that it knew

10   about these defects, dangers, and consequences when there's no

11   mention of it?

12        **THE COURT:**  Let me ask you to address the point that

13   3M makes in regards to Dr. Ohlin and his insistence -- I'll use

14   that word -- that they not provide instructions?

15        **MR. SACCHET:**  So this goes to the failure to warn

16   argument.  This is my favorite argument.  Because in the

17   Eleventh Circuit the law is black letter under *Dorse*.  To

18   preempt a failure to warn claim, you have to have a contractual

19   prohibition against a warning, a contractual prohibition.

20   That's what the Eleventh Circuit said in *Dorse*.  We've cited it

21   in all three of our briefs.

22        **THE COURT:**  Doesn't this go back to the same issue

23   we've been discussing about whether a contract is required?

24   Why would it be any different in a failure to warn context?

25        **MR. SACCHET:**  And that's Plaintiffs' point.  It's not

1    different.  You need it in both.

2          **THE COURT:**  Well, I know.  But if you're wrong about

3    needing it in the design defect context, are you saying you

4    could still be correct in terms of a failure to warn claim?

5          **MR. SACCHET:**  *Dorse* requires that.  In *Dorse*, the

6    Eleventh Circuit, two years after *Boyle*, said I'm not going to

7    follow *Boyle's* tripartite test.  The Eleventh Circuit created a

8    different framework that only evaluates the threshold

9    conditions and, based on the conflict factor, specifically says

10   you need a federal procurement contract that's spec and the

11   contract has to prohibit a warning.  That's what the Eleventh

12   Circuit said.

13         **THE COURT:**  Is it not -- can you make the argument at

14   least that by saying we don't want any instructions that he was

15   prohibiting a warning?  I mean, it's a warning to -- do you

16   draw a distinction between a warning to Ohlin, i.e., the Army,

17   versus a warning to the soldiers who are going to use the

18   earplugs and also to the audiologists who are going to be

19   fitting the earplugs?

20         **MR. SACCHET:**  I'm not drawing a distinction.  I think,

21   as long as there was no prohibition on the government warning

22   the intermediary, they can't preempt the claim.  And here, the

23   -- in all their briefing, I mean, it's just false.  It's just a

24   misrepresentation.  They say Ohlin prohibited a warning.  He

25   didn't.  At best, even --

1          **THE COURT:**  That's what I want you to address.

2          **MR. SACCHET:**  Okay.  Even if you take Mr. Santoro's

3    testimony as true, even if you accept it, it's inadmissible

4    hearsay under *McKay*.  The Eleventh Circuit --

5          **THE COURT:**  We'll set that aside.  Assume it's

6    admissible.

7          **MR. SACCHET:**  Okay, assume it's admissible, take it as

8    given.  Mr. Santoro said -- we can see right here:

9          Did he tell you not to include instructions in that

10   box?

11         He did.

12         Does he ever say you couldn't put an instruction on

13   the box?

14         No.

15         **THE COURT:**  But he said he didn't want the instruction

16   -- or not included in the box because he wanted the

17   instructions to be given by the audiologists, and I think he

18   referenced training, to come through training, that he wants it

19   to come through training.

20         **MR. SACCHET:**  And the audiologists could be instructed

21   based on a label on the outside of the box about how to

22   properly use the product.  That instruction wouldn't have

23   gotten with all servicemembers with each particular earplug,

24   but it --

25         **THE COURT:**  That's the distinction I was asking if you

1    were drawing.

2            **MR. SACCHET:**  Okay.  So, as long as an instruction was

3    on the outside of the box, that would have instructed the

4    military audiologists at the base camps and the technicians to

5    see that box, see what the instructions were, and then they

6    could instruct the servicemembers themselves.

7            And this is a really fine point that I need to make

8    clear:  Both Plaintiffs and 3M apparently now agree that the

9    design specs in the MPID are not applicable to the Combat Arms

10   Version 2.  That does not mean that the labeling specifications

11   in that indefinite quantity/indefinite delivery contract are

12   not.

13           The IDIQ is like a 90-page contract.  Outside the MPID

14   -- I think it's like page 38 -- there's a sheet that says this

15   product must be supplied according to the labeling

16   specifications cross-referencing the MPID.  Not a design

17   requirement, a labeling requirement.

18           And in the MPID we see this flow.  So here is the

19   graphic.

20           **THE COURT:**  Isn't a labeling requirement on a failure

21   to warn claim the same as the design-defect in a defect claim?

22   That didn't make sense, did it?

23           So, you're saying that the failure to warn, right,

24   that that is -- I don't want to misstate your argument.  Let me

25   just let you continue.  I don't want to make it more confusing

1   than I already have.

2         **MR. SACCHET:**   In *Tate*, which is the Sixth Circuit case

3   that 3M cites because it can't satisfy *Dorse.*  In all of its

4   briefs, it never explains *Dorse*.  It's binding Eleventh Circuit

5   law.  They just don't deal with it and they apply the Sixth

6   Circuit's decision in *Tate*.

7         In *Tate*, the Sixth Circuit said, we analyze design

8   defect in warning claims for purposes of government contractor

9   preemption differently.  So it's not the same inquiry.  Failure

10  to warn has a different box, and in the Eleventh Circuit the

11  box is created by *Dorse*.

12        In here, this case is actually stronger than *Dorse*, so

13  I want to say a few things.  I clipped things from *Dorse* -- and

14  I rarely say this -- it's on all fours, and it's even better --

15  this case is even better than *Dorse*.

16        In *Dorse*, the deponent admitted no document showing a

17  prohibition.  Same exact admission from the 30(b)(6) rep of

18  Defendants, same exact one.

19        In addition, in *Dorse* the opponent admitted nothing in

20  specifications prohibiting a warning.  Same exact admission

21  from 30(b)(6) in this case.

22        This case is better than *Dorse* because the indefinite

23  quantity/indefinite delivery contract contained a labeling

24  specification.  It incorporated, through paragraph 5.1, that

25  packaging had to be required and, through 2.5, that you could

1   label -- you could put an instruction inside the box or outside

2   the box, either one.  You had to do one of the two.

3            So, even assuming for the sake of argument that

4   Santoro's testimony is admissible, which it's not, but even if

5   it is, even if Ohlin purportedly told him not to put it in the

6   box, the very contract for the indefinite delivery/indefinite

7   quantity term required them to label it on the outside of the

8   box.  It's undisputed.

9            And any mention that Ohlin otherwise didn't want an

10  instruction is actually belied by the very documents Defendants

11  cite.  Defendants cite DX 38 to say that Ohlin concluded that

12  the cost of an instruction outweighed its benefit.  That's what

13  they said in their reply brief.  Total misrepresentation.  He

14  didn't say that.

15           He said he was concerned about that, and then he went

16  on to say, quote, "My concern for any earplug issue is that

17  they are going to be handed out without proper instructions."

18  That's Ohlin.

19           **THE COURT:**  Proper instructions from whom?  Is he

20  talking about the audiologists?

21           **MR. SACCHET:**  Fair enough.  I don't know.  It was an

22  email between Myers and Ohlin, so he was responding to Myers.

23  So presumably I think the inference is he's telling Myers I

24  would be concerned if there's no instructions with this plug.

25           **THE COURT:**  What is that exhibit?

1          **MR. SACCHET:**  It's Defendant's 38.

2              In addition, it's undisputed that the blister packs --

3      and the blister pack is different than the bulk package.  But

4      the blister packs, at least in 2006, had an insert which

5      Plaintiffs contend is an inadequate instruction, but it had an

6      instruction.

7              So, how can 3M possibly argue they were prohibited

8      from instructing when they put an instruction in the package?

9              What 3M does, because they can't avoid that fact, is

10     they try to apply *Tate*, a different test, to say, because that

11     instruction was approved, government contractor defense

12     applies.

13             That's not the merits inquiry here.  That's not the

14     right doctrinal framework.  The framework is was there a

15     prohibition.  And we have clear evidence as day that

16     instructions were provided.  We can dispute on the merits of

17     the claim whether the instruction was adequate.  But there's no

18     dispute that the government contractor defense can't apply when

19     there were instructions.  I mean, it's backwards.

20         **THE COURT:**  Let me ask, Judge Jones, do you have any

21     questions for Mr. Sacchet?

22         **JUDGE JONES:**  I do not.  Thank you.

23         **THE COURT:**  Judge Herndon, anything?

24         **JUDGE HERNDON:**  No questions.  Thank you very much.

25         **THE COURT:**  All right, Mr. Sacchet, thank you very

1   much.

2            Let's take five minutes, and we'll reconvene and, Mr.

3   Wasdin, I'll hear from you.

4            *(Recess taken 3:54 p.m. to 4:08.)*

5            **THE COURT:**   To the point I was not very artfully

6   making earlier with Mr. Sacchet in regards to the *Dorse* and

7   failure to warn and I lost my train of thought, what I was

8   trying to say or ask you if you agree that, in a failure to

9   warn context the conflict is no different -- under *Dorse* is no

10  different than the conflict requirement under *Boyle* in a design

11  defect context.  Or do you think it is different?

12           I understand you don't believe *Dorse* requires the

13  three separate elements be shown.  But in terms of the defense,

14  an invocation of the defense immunity, there still has to be a

15  conflict, do you agree?

16           **MR. SACCHET:**   Absolutely, there needs to be a

17  conflict.  And the way I would contextualize *Dorse* is that

18  Eleventh Circuit law requires a showing that the government

19  made me do it.  In the context of a failure to warn claim, that

20  would be the government made me not warn.  How do you show the

21  government made you not warn?  By a contract saying you can't

22  warn.

23           **THE COURT:**   Thank you.

24           All right, Mr. Wasdin.  Let me ask, Mr. Wasdin, if you

25  would, to -- I don't want to mess you up in terms of your

1    presentation, but I would like to hear from you on this issue

2    of the requirement of a contract that creates a duty on the

3    part of the contractor or on the part of the manufacturer.

4         **MR. WASDIN:**  Sure, Your Honor.  In their briefing,

5    Plaintiffs focus on the concept of what they called a design

6    contract or sometimes referred to as a design and procurement

7    contract, by which we read to mean what you need to satisfy the

8    government contractor defense is some very long document that

9    contains within itself either prose or actual blueprints that

10   are attached as an appendix that you would then point to.

11        That is clearly not the law, which we know from

12   *Harduvel* and *Brinson*.

13        **THE COURT:**  But let me stop -- you're not relying on

14   the MPID?

15        **MR. WASDIN:**  That's correct, for the reasonably

16   precise specification that's at issue for the length in this

17   case.

18        **THE COURT:**  Well, let me I guess ask it more

19   basically.  What do you believe was Aearo's duty, what was the

20   source of that duty, and then how did it conflict with the

21   federal interest?

22        **MR. WASDIN:**  Sure.  And that's where I was going to go

23   second, which was, as I understood the argument made today,

24   which was different than it was made in the brief.  I heard Mr.

25   Sacchet say we had no contracts at all, as if the military

1    ordered hundreds of thousands of earplugs over a decade in a

2    series of lawless transactions.  That is not the case.

3            Each and every purchase order made by the military to

4    Aearo was for a specific quantity of Combat Arms Version 2

5    earplugs at a specific price.  It formed a binding contractual

6    agreement for Aearo to deliver those products and for the

7    military to pay Aearo.  They were done by product number,

8    370-1000, or whatever the case may be.  And that product was

9    for the product that Doug Ohlin had previously approved and had

10   a national stock number assigned to.

11           So every single time they ordered the product, we had

12   a contractual obligation to deliver it as specified, as

13   accepted, as assigned an NSN.

14           **THE COURT:**  How is that any different than ordering a

15   stock product off the shelf?

16           **MR. WASDIN:**  Because he had already exercised the

17   discretion of the length of the product that had that number.

18           **THE COURT:**  Right.  So, in terms of the duty and the

19   conflict in the duty under state law to consumers versus your

20   duty to the military to shorten the plug, create a plug short

21   enough to fit in a carrying case that created the design defect

22   in your argument, that doesn't need to be in a contract, in

23   your view?

24           **MR. WASDIN:**  The duty is, in this case, contractual,

25   to be clear.  But the contract was for X number of Combat Arms

1    Version 2 earplugs.  So we now have an obligation, a

2    contractual obligation to give the military that product, and

3    that product was of the length that Plaintiffs say is

4    detective.

5          **THE COURT:**  So it doesn't matter -- and I'm

6    interpreting your argument -- but it doesn't matter that that

7    didn't exist at the time the design was created or --

8          **MR. WASDIN:**  That's the argument we responded to

9    principally in the brief because that's the one they were

10    making then, which was what you really need is not only a

11    contract -- of course, a purchase order is a contract, but you

12    need it to include within itself some lengthy specifications

13    that you would be pointing to.

14          And that is not true because we know that from

15    *Harduvel* and *Brinson* such a contract didn't exist.  What you

16    had there is what you have here, which is a design process

17    where in those cases they swapped drawings, in our case we

18    swapped production samples.

19          **THE COURT:**  But there were design contracts in those

20    cases, were there not?

21          **MR. WASDIN:**  I believe there were RFPs, and you enter

22    into essentially, you know, a series of exchanges of drawings

23    where they add something and you add something and eventually

24    the military approves it.

25          **THE COURT:**  I guess I understood that following the

1      RFP there would be a contract awarded for the design.

2              **MR. WASDIN:**  Correct, Your Honor.  However what we

3      don't know -- if you just read *Harduvel* and *Brinson*, it doesn't

4      say -- and that contract that was awarded for the design

5      included within itself as an appendix or something, you know,

6      the blueprints.  And so we're saying two separate things.

7              **THE COURT:**  But there's a contract that requires the

8      design according to specs in that contract.

9              **MR. WASDIN:**  Correct.  In our case, when they order

10     the Combat Arms Version 2 from us, it forms a contract that

11     requires an earplug according to the military's length

12     specification.

13             **THE COURT:**  That you already -- you designed earlier?

14             **MR. WASDIN:**  Earlier assigned a number to, and now

15     they're ordering the number versus giving us some 60-page

16     document.

17             **THE COURT:**  Okay.  Just because I don't want to

18     forget, I have a couple of other questions for you.

19             So you cite to *Brinson* for the -- let me turn to

20     *Brinson* real quick before I start talking about it.  So you

21     rely on *Brinson* basically for your argument in regards to

22     acceptance by the military of your product in this case, do you

23     not?

24             **MR. WASDIN:**  For the first element?

25             **THE COURT:**  Yes, I'm on the first element.

1      **MR. WASDIN:**  Yes, Your Honor, we do.  *Brinson* and

2  *Harduvel* are our two leading authorities on that point.

3      **THE COURT:**  But in *Brinson* the record reflected that

4  the government had knowledge of the design defect when it

5  accepted the product or accepted the design.

6      **MR. WASDIN:**  The Court does note that.  In that case,

7  the third element, which is essentially --

8      **THE COURT:**  But they don't talk about this just in the

9  third element.  They're talking about this in regards to the

10  first element.

11      **MR. WASDIN:**  That's true, the third element wasn't an

12  issue in that case.  It was conceded.  So they mentioned in the

13  first element that they had knowledge of the design issues --

14      **THE COURT:**  How is it not a rubber stamp if the

15  government doesn't have knowledge of the design-defect issue

16  when it accepts the product if there's no back-and-forth design

17  drawings such as in this case?

18      **MR. WASDIN:**  I believe *Brinson* was a post-production

19  evidence of acceptance of the product so --

20      **THE COURT:**  Right.  But the Court noted that during

21  that process, which was a much more lengthy and involved

22  process than we have here, that during that process it was

23  clear that -- and actually, I think *Brinson* is the case where

24  the government actually rejected proposals that were made to

25  the Army regarding the product or the design of the product.

1        **MR. WASDIN:**  That is precisely what we have here.  We

2   sent them a longer sample, they rejected it.  We sent them a

3   shorter sample, they reviewed it and accepted it.

4        **THE COURT:**  Yeah, but where is the knowledge of Ohlin

5   or anyone else in the Army or the military -- the knowledge of

6   the design problem?

7        **MR. WASDIN:**  There is only an element three duty to

8   warn of dangers that are known to the --

9        **THE COURT:**  No, I think we're not on the same page.

10   So *Brinson* doesn't deal with the third element.

11        **MR. WASDIN:**  Correct.

12        **THE COURT:**  We're not there, we're not talking about

13   duty to warn.  But what *Brinson* is talking about is, if you are

14   going to hold -- if you're going to allow the invocation of the

15   defense for a contractor under circumstances present in *Brinson*

16   where there was an acceptance or an approval, there was

17   evidence that the government knew about the design-defect on

18   the first prong, not the third prong.

19        **MR. WASDIN:**  Your Honor, that was true in *Brinson*, the

20   court does mention that under the first prong in *Brinson*.  I do

21   not believe that's a requirement for the first element, and we

22   know that from *Harduvel* where no such similar finding was made,

23   it's done under a third element.  I think the court is --

24        **THE COURT:**  Well, but *Harduvel* had an intensive

25   back-and-forth, did it not?

1           **MR. WASDIN:**  I believe both of those cases, Your

2    Honor, my reading of them is that it was similar to the

3    back-and-forth in this case.  I don't think either of those

4    cases outlines more than two or three swaps of drawings which

5    somebody wrote the word "approved" on the drawing.

6           And what we're talking about in this case is something

7    better than that.  We were sending them actual production

8    samples as many times as in both of those cases.

9           **THE COURT:**  Isn't it such that in *Brinson* that you

10   could say the government accepted the product -- I think it was

11   the Army in that case -- accepted the product and, in doing so,

12   assumed the risk because it knew of the defect and it made that

13   tradeoff decision, safety versus military readiness.

14          **MR. WASDIN:**  That may be a reading of *Brinson*.  I

15   think that is almost always the sole -- that's sort of the

16   whole point of the government contractor defense is that they

17   have to have the knowledge needed to make an informed

18   decision --

19          **THE COURT:**  But here how did they -- in the record

20   what supports the assumption of the risk that we're going to

21   take this earplug with the shortened length at the expense of

22   safety because we need it badly to fit in our carrying case and

23   to work with our Kevlar helmet?

24          **MR. WASDIN:**  We know from the case law that you do not

25   need knowledge of defects at the time you accept the

1    specification because there are --

2              **THE COURT:**  All right, then let me stop you there, and

3    just for the sake of our discussion, I'll accept that.

4              I'm going to ask you to look at the record with me.

5    In November '99 -- I'm still in '99.  This is after the plug

6    has been shortened and is being used by the military.

7              There's an email from someone named Robert Bosanko to

8    Brian Myers, and he says, "Brian, I need to get all the specs

9    on the Combat Arms Earplug.  I'm going to be doing some testing

10   on the new earplug.  I need to get feedback.  If you could help

11   me with this, I will keep you informed on how it's going.

12   Could you send us some earplugs for approximately 100

13   soldiers."

14             The next day, Myers emails Ohlin and he cc's Bosanko

15   and Tim McNamara, and he forwards Bosanko's email and points

16   out that Bosanko has requested specs and data on the new

17   earplug, and Myers says, "Could you possibly send him some of

18   the test results from your studies?"

19             And then an email back from Ohlin, November 8th, says,

20   "I'm at something of a loss to know what studies I've done or

21   am capable of doing here at CHPPM."

22             So, at this point in time from this evidence, it seems

23   clear to me the Army doesn't have the specs, doesn't have

24   testing.

25             So, at this point in time, where have they developed

1    the knowledge of the problem with this earplug?  Because we

2    know they don't know about the flange report -- or actually,

3    that hasn't been done yet, that's why these REAT tests were

4    done.

5             **MR. WASDIN:**  Right, Your Honor.  So the issue that

6    you're describing, which is did he know about the 015 test and

7    flange memo in November of 1999, the answer is no.

8             **THE COURT:**  He didn't have specs or tests or anything.

9    And actually, I guess it depends on how you interpret the

10   reference to specs, but Myers doesn't have them either.

11            **MR. WASDIN:**  Myers --

12            **THE COURT:**  So was this earplug, was it sold to the

13   military without any testing having been done on it?

14            **MR. WASDIN:**  No.

15            **THE COURT:**  Well, let me ask you, then -- there's an

16   email on November 19th, Berger to Myers, PX 20, "It recently

17   occurred to us that we have no data on the actual version of

18   the non-linear earplug we are now selling to the United States,

19   namely the dual-ended Combat Arms plug."  And of course that's

20   why they do the retesting, right?

21            **MR. WASDIN:**  No, Your Honor.  They did the retesting

22   when they moved to label it for civilian markets.  He's, I

23   think, talking to -- it's a draft email to Armand Dancer for

24   ISL impulse noise testing.  But shortly after --

25            **THE COURT:**  Wait.  I'm confused.  Because PX 20 says,

1    again, "It recently occurred to us that we have no data on the

2    actual version of the non-linear earplug, the dual-ended CA

3    plug that we are now selling in the U.S." -- oh, I said U.S. --

4    you may be right.  But then he says, "Therefore, we will be

5    conducting REAT evals in the near future on both ends of the

6    plug."

7            And this follows just by a week or two that exchange

8    between Bosanko to Brian Myers, Brian Myers to Ohlin, and now

9    this is from Berger to Myers.

10           So did they have REAT testing on this plug?

11       **MR. WASDIN:**  They did not do REAT testing on the final

12   end of the dual-ended plug until December '99 and into January

13   of 2000.

14       **THE COURT:**  But yet they were selling it to the

15   military before that time.

16       **MR. WASDIN:**  Correct.  There was no requirement to do

17   retesting prior to selling it to the military.  That is an EPA

18   regulation made for civilian labeling.  But Your Honor is

19   correct, it post-dates the first sales to the military.

20       **THE COURT:**  So, at the time Aearo shortened the plug

21   and then began selling it to the military, at any time from the

22   time it was shortened until the time you started selling it did

23   you do any testing on that design, the redesign?

24       **MR. WASDIN:**  The final shortened dual-ended version --

25       **THE COURT:**  The one that is the problem in this case

1 | apparently.

2 | **MR. WASDIN:**  The military tested that during the time

3 | frame Your Honor just mentioned, Aearo did not.

4 | **THE COURT:**  Where did the military test it?  Where are

5 | those tests?

6 | **MR. WASDIN:**  I believe it's DX 16.

7 | **THE COURT:**  Can you tell me -- hold on just a moment.

8 | DX 16?

9 | **MR. WASDIN:**  I'm going by memory, so let me confer.

10 | **THE COURT:**  Or is it -- I'll let you tell me.

11 | **MR. WASDIN:**  And I was right, DX 16.

12 | This is DX 16.  DX 16 is testing of the Combat Arms

13 | Earplug done by the Army Research Laboratory on June -- the

14 | report is dated June 30th, 1999.  In the highlighted portions,

15 | which came that way from the military, say that the results of

16 | this study will be provided to CHPPM, which is Doug Ohlin's

17 | office, as input to development of safety release documentation

18 | for the Aearo non-linear Combat Arms Earplug, and it goes on to

19 | talk about how they tested it.

20 | Now, I want to be --

21 | **THE COURT:**  Would this testing tell you the same thing

22 | REAT testing would tell you?

23 | **MR. WASDIN:**  This I believe was on a mannequin, so no.

24 | And I do want to be clear, Your Honor --

25 | **THE COURT:**  You don't have any live subject testing of

1   this earplug at the time you began selling it to the military?

2         **MR. WASDIN:**  Not of the final length dual-ended

3   version.

4         **THE COURT:**  So, at that point in time that you began

5   selling to the military, how would the government know of the

6   issue, have knowledge of what they say is a defect?

7         **MR. WASDIN:**  That issue had not been discovered yet,

8   and so they may not have.  But --

9         **THE COURT:**  Well, even after the retest, so when you

10  all had the knowledge --

11        **MR. WASDIN:**  How did they get the knowledge after we

12  did our retesting?

13        **THE COURT:**  My first point was you didn't do any

14  testing, Aearo did no testing on this product -- this exact

15  product, shortened dual-sided non-linear attenuation on live

16  subjects at any time before the REAT test?

17        **MR. WASDIN:**  Correct.

18        **THE COURT:**  And you do the retest and the results are

19  not given -- I think it's Dr. Berger gave the results to Dr.

20  Ohlin.  And when was that again does he say he did that?  Or

21  not the results, but he says he told him of a problem.

22        **MR. WASDIN:**  In 2000.

23        **THE COURT:**  He doesn't know when?

24        **MR. WASDIN:**  I think he's trying to recall

25  conversations that happened 15 or 20 years earlier but --

1      **THE COURT:**  I haven't seen his call log.  Is it as

2  impressive as --

3      **MR. WASDIN:**  It is not, Your Honor.  Can I walk

4  through this evidence with you and answer that along the way

5  through?

6      **THE COURT:**  Okay.

7      **MR. WASDIN:**  Sure.  So let's start with -- this is

8  slide 20 in my deck.  Elliot Berger testified in two different

9  depositions that he told -- you and I talked about this earlier

10  but I want to start here -- that he told Doug Ohlin of the

11  problems that happened during the initial test.  The work they

12  had done to resolve the problems to get optimum performance for

13  labeling purposes would require a fold-back instruction, that

14  the 01 test had been conducted by rolling back the flanges, and

15  that rolling back the flanges would be important for some

16  people.

17      **THE COURT:**  But does he say in any deposition what the

18  problem was and what the test results were?

19      **MR. WASDIN:**  I'm going to --

20      **THE COURT:**  Oh, okay.

21      **MR. WASDIN:**  -- keep going here.

22      Shortly after he says he had that conversation with

23  Ohlin, this is what Ohlin told military audiologists.

24      *(Video published:)*

25      **QUESTION:**  Did you ever discuss whether or not to fold

1    the flanges back on the opposite end of the plug with Doug

2    Ohlin?

3            **ANSWER:**   I remember Doug Ohlin giving us instruction

4    on how to fit the earplug.

5            **QUESTION:**   What did he say?

6            **ANSWER:**   And he said if you have -- well, I don't

7    remember his exact words, but I remember, you know, if you

8    needed to, you could fold back the flange on the earplug to get

9    a good fit.

10           **QUESTION:**   Can you recall who else that would have

11   been your peers at other installations would have been at the

12   meetings with Doug Ohlin when he discussed the flange fold?

13           **ANSWER:**   Yeah.  Most of the Army audiologists, senior

14   audiologists, down to junior audiologists.  I can't recall

15   exactly who was there, but usually the -- most of the military

16   audiologists, not just in the Army but across the Navy and the

17   Air Force as well --

18           **QUESTION:**   Okay.

19           **ANSWER:**   -- would attend that meeting.

20           *(Video paused.)*

21           **MR. WASDIN:**   Okay.  So pausing there briefly, what we

22   have so far is Elliot Berger giving the testimony we've

23   discussed, Lt. Col. Merkley saying that shortly thereafter

24   Ohlin showed up and told every audiologist in every branch of

25   the military that they could fold back the flanges on the plug.

1           Keep going here, Plaintiffs say that wasn't specific

2    enough, you know, you need to actually get into the insertion

3    and the loosening, we can't just deal with the flange fold.

4           We see that in '04, when Doug Ohlin drafts a wallet

5    card, he includes on the front cover of it a picture of the

6    plug with the flange folded back.  So there can be no question

7    I think what --

8           **THE COURT:**  Let me ask you about that because it says

9    "for very large ear canals."  So the flange report on this

10   issue, the short stem referred to persons with medium to large

11   ear canals.

12          **MR. WASDIN:**  That is a change at that Doug Ohlin

13   included on this card.  That is not --

14          **THE COURT:**  Where do you have evidence that you can

15   point me to, before I forget my train of thought here, that

16   shows that anyone in the military was told about the problem

17   for people with medium and large ear canals?

18          **MR. WASDIN:**  Can you go to slide 36, please.

19          *(Video continued:)*

20          **QUESTION:**  So, as you recall the instruction you got

21   from Doug Ohlin, it was, if you need to, you can fold back the

22   flange to fit the plug, and he didn't limit that to one

23   particular size ear canal or another?

24          **ANSWER:**  Correct.

25          *(Video paused.)*

1          **THE COURT:**  Well, but that's my point, he didn't know

2     to limit it to one size ear canal or another because he didn't

3     know about the flange report saying it's a problem for people

4     with medium to large ear canals.

5          **MR. WASDIN:**  He said everyone should fold it back as

6     needed.  And what the military audiologists do, they have a DoD

7     regulation that requires them to fit -- individual fit training

8     on every single servicemember.  So each servicemember comes

9     through, someone like Lt. Col. Merkley takes a Combat Arms

10    Earplug, puts it in their ear, and does two tests -- a visual

11    testing, meaning they actually look at the plug in their ear,

12    and a tug test, they tug on the plug to see if it comes out or

13    if it breaks the seal.

14         Those audiologists and technicians had an instruction

15    for Doug Ohlin to be on the lookout for whether you needed to

16    fold back the flanges to get a good fit.  One hundred --

17         **THE COURT:**  But really and truly just this just a fit

18    tip?  I mean, is that what this was, it was just --

19         **MR. WASDIN:**  Well, the two issues that Plaintiffs have

20    identified are fitting issues.  And so you can call it a

21    fitting instruction or a fitting tip, but ultimately it's a way

22    to fit the earplug to avoid having any difficulty getting it in

23    the first place or the possibility of inadvertent loosening in

24    the second place.  And I --

25         **THE COURT:**  Did the military at any time understand or

1    were they told of the consequences of -- I mean, do they need

2    to be told of the consequences of an earplug not fitting

3    properly?

4         **MR. WASDIN:**  Your question is do they need to be told

5    that it would provide lower attenuation?  No.  That's common

6    knowledge if an earplug doesn't fit well -- and if you want, we

7    can go to slide 44, second bullet in the Just the Facts

8    document about the Combat Arms, it needs to fit well to work.

9         **THE COURT:**  But what Mr. Sacchet said that there was

10   -- in the 015 test that one of those wearers, at least one I

11   guess had no protection.

12        **MR. WASDIN:**  I'm not sure what he's referring to

13   there.  I think that must be a mischaracterization of the

14   record.  Everybody has some level of attenuation.  But the

15   military wasn't requiring a person-by-person specification.  As

16   Your Honor pointed out in the questioning of Mr. Sacchet, it

17   was a mean attenuation specification.

18        **THE COURT:**  But, look, that came later.  That's the

19   MPID.  That doesn't mean that Dr. Ohlin -- if I accept your

20   argument that he was the one that made you do it or made Aearo

21   do it, that MPID doesn't suggest anything about what he would

22   have liked to have known at the time he accepted your product.

23        **MR. WASDIN:**  That MPID memorializes the military's

24   requirement for sound attenuation for an equal dual-ended

25   earplug.  So I do think it tells us --

1      **THE COURT:**  But it didn't exist at the time the

2   military started buying the product.  So, on this issue of what

3   the government knew, I just don't see how that's relevant on

4   what you should have told them.

5          If you look at the *Gray* case, it requires that the

6   contractor, the manufacturer, designer disclose critical issues

7   and how the product may perform under different circumstances

8   and certain situations.

9      **MR. WASDIN:**  Let's talk more about that, then.

10         If we can go back to 24.

11         In addition to knowing about the problems in the

12   testing that Elliot told him about, and in addition to

13   understanding the flange fold instruction, Eric Fallon, who

14   took over Doug Ohlin's job after he had it, specifically said

15   that he understood the insertion issue.  So that's one of

16   Plaintiffs' two issues.

17         So, if you're looking for more, then Elliot Berger,

18   then Lt. Merkley, then the wallet card, the next step is

19   Fallon.  Fallon says, I actually understand one of the two

20   issues that Mr. Sacchet alleges is detective about the product.

21   Martin Robinette, who took over after Fallon, says that he

22   understands the other one.

23         So here in this case, Your Honor, we have evidence

24   from Elliot Berger who talks about conversations from twenty

25   years ago, and he explains that he told Doug Ohlin what he knew

1    about this product.  We have evidence from Lt. Col. Merkley who

2    says Doug Ohlin showed up and told every military audiologist

3    in the country about the flange fold.  We have the wallet card.

4    He put a picture of it on it.  We have Fallon saying he

5    understood insertion.  We have Robinette saying he understood

6    the flange loosening issue.

7            What is left for the military to know about this

8    product?

9            **THE COURT:**  I guess my mind immediately went to the

10   Criminal Investigative Division's report and how unhappy the

11   military was when it learned about the flange report.

12           **MR. WASDIN:**  Let's talk briefly then about the CID.

13           Can we go to what for me at least is 48.

14           Plaintiffs say this report, this CID report really

15   blows the whole case open for them and contains some

16   conclusions that there's something wrong with the product.  It

17   does not.

18           I asked Jennifer Coleman specifically:

19           **QUESTION:**  Does this CID report contain any

20   conclusions of yours regarding whether or not the product

21   works?

22           **ANSWER:**  No.

23           **QUESTION:**  Did you include any conclusions in the CID

24   report regarding whether 3M had concealed anything from the

25   federal government?

1          **ANSWER:**  I don't believe so.

2          Now, with respect to the *qui tam* case, that wasn't

3     initiated by the government.  That was initiated by a

4     competitor who was upset over some prior patent litigation.

5     DOJ lawyers have various incentives to join that type of

6     litigation.  The fact that a DOJ lawyer decided to intervene in

7     that case on whatever record existed at the time they made that

8     decision is not evidence that Doug Ohlin did not have that

9     conversation with Elliot in '99, that he didn't have the

10    conversation with Merkley in '01, that he didn't draft the

11    wallet card that Erick Fallon didn't know about insertion and

12    that Robinette didn't know about tragus interaction.  The

13    decision to enter into that lawsuit does not show that any of

14    that didn't happen.

15         **THE COURT:**  Okay.

16         **MR. WASDIN:**  I do want to turn next to a point you

17    asked Mr. Sacchet about.  You know, you said, hey, they have

18    the data from the 015 test, you know, the test that supposedly

19    has these two defects involved in it, and it's above the MPID

20    specification.  And he said, yeah, but it doesn't explain

21    exactly what the two issues were in the flange memo.

22         Now, we just went through Fallon and Robinette who do,

23    but let's put that to the side for one moment.  It's not about

24    explaining the flange memo.  It's making the point that, even

25    when those supposed defects were happening, even on our worst

1    day, as Plaintiffs would put it, the product still performs

2    better than the military was requiring for equal dual-ended

3    products.  That's the point of the 015 test data.

4         Turning to imperceptible loosening.  There is not a

5    single piece of evidence in this lawsuit -- you should ask Mr.

6    Sacchet when he gets back up here what it is -- that

7    imperceptible loosening has ever happened outside of a

8    laboratory, period, on either end of the plug.  There's

9    actually not a single --

10        **THE COURT:**  How do they know, though, in this case?

11   Because wasn't it a concern even of Dr. Ohlin's that, because

12   of the selective attenuation that the soldiers were reporting

13   -- it might have been the French soldiers that were reporting

14   that they had difficulty telling whether the protection was

15   there because the noises were so loud?

16        **MR. WASDIN:**  You mean on the yellow end?

17        **THE COURT:**  Okay.

18        **MR. WASDIN:**  Well, for the green end it's a full block

19   so --

20        **THE COURT:**  You're right.

21        **MR. WASDIN:**  So for the yellow end, Plaintiffs tried

22   out that argument on Merkley.

23        Can we take a look at slide 43.

24        And they said, hey, I know you said you'd perceive it

25   with the green end, I know that you said that sound would get

1    louder if the plug actually loosened.  But what about the

2    yellow end?  And he adds, hey, look, can I add, you know,

3    because the questioning was related to, you know, would you

4    perceive a break in the seal, and when you fit the yellow end

5    of that earplug in you still get an occlusion effect, and when

6    the seal is broken that occlusion effect is what tends to go

7    away.  So the sound is still different, it's different with the

8    earplug seated and when the seal is broken.  You can generally

9    tell when that seal is broken.  I won't say all the time but --

10           So he's saying yellow or green end is perceptible in

11   the real world.  The single piece of evidence in this lawsuit

12   that imperceptible loosening happened with the Combat Arms

13   Version 2 is a description of laboratory testing on the green

14   end inside of Aearo.

15           And basically what Mr. Sacchet's argument is, it's an

16   argument of extrapolation, not evidence.  He says, look, if we

17   know loosening happens on the green end and you also know when

18   you turn the plug around it's geometrically similar, it's

19   reasonable to infer it would happen on the yellow end.

20           And we also know that with the yellow end it's a

21   pass-through technology.  So another inference you could draw

22   is that sound wouldn't get louder.

23           Let's just put to the side one second that Merkley

24   rejected that argument.

25           The military had those data inputs.  Robinette just

1    said on one of the slides I put that they understood loosening,

2    okay, and they also understood that the yellow end was a

3    pass-through technology.

4             Can we put up the next slide.

5             The top bullet here written by Ohlin in Just the Facts

6    document is essentially the same thing they showed you from

7    Myers.  "Commanders should know that the non-linear earplug

8    contributes to realism in training.  Even though the non-linear

9    plug is protective, weapons fire sounds louder than with

10   conventional hearing production.  It's a pass-through product,

11   it's going to sound louder on the yellow end."

12            So they know it can loosen; that's Robinette.  They

13   know the yellow end sounds louder.

14            So, if Plaintiffs are right that one plus one equals

15   two there, that it's reasonable to draw that extrapolation, the

16   military had the data inputs to do it and there's no evidence

17   we did.

18            **THE COURT:**  And here we also have the reference to

19   exceptionally large ear canals.  I just don't -- I can't

20   determine where that comes from.

21            **MR. WASDIN:**  Your Honor, there's no evidence in the

22   record -- I can tell you my understanding just based on having

23   worked on this case is that they probably did some analysis of

24   the type of large ear canal where you would put it in far

25   enough where the other flange would hit.  There's no evidence

1    on that point.

2            But what we do have evidence on is Berger's

3    instruction to Ohlin not limited to any particular size ear

4    canal, Ohlin's instruction to audiologists not limited to any

5    particular size ear canal.  Wherever that language came from,

6    it came from the military.

7            **THE COURT:**  Why do you think Lorraine Babeu -- she

8    testified she never folded the flanges back.

9            **MR. WASDIN:**  Neither did Mr. Hobbs in his testing,

10   which is a different test report we put up.  That's a decision

11   that -- it may be that there were some military audiologists

12   who weren't at that meeting with Doug or who didn't pay

13   attention to the instruction.  But we know for a fact Doug

14   Ohlin had that information.

15           I can't tell you why she didn't decide to implement it

16   in her training.  It may have been that she didn't feel like

17   she needed it.  But we don't have that evidence.  But the fact

18   that -- this is actually sort of a broader point I wanted to

19   make.

20           The standard here is not perfect information to every

21   single person in the government.  The standard is material

22   information to the decision-makers who are making the decision.

23           Doug Ohlin had this information.  Berger said he told

24   him, and Ohlin definitely told Merkley and whoever else was at

25   that meeting that Merkley was at, every audiologist in the

1   military.  There's no question about that.

2          Why Lorraine Babeu didn't do it on one test or

3   another, I don't know the answer to that.  But it doesn't give

4   rise to an inference that Ohlin didn't know.

5          So that brings me back to your question which sent me

6   into these slides in the first place, which is, is Berger's

7   call log impressive.

8          The testimony Plaintiffs cite for the call log, Berger

9   talks about what he used it for.  He has a long call log.  But

10  he does say in his testimony, "I used it for things that were

11  unusual, if I got an unusual call, met a new person, et cetera.

12  I didn't memorialize every call in the call log.  If I was

13  speaking to someone regularly, I didn't put all of the entries

14  down."

15         He says in his testimony he was in open, regular

16  communication with Doug Ohlin.  He's not logging every single

17  time he picks up the phone to call the same person.

18         **THE COURT:**  But isn't it true, though, that at the

19  same time -- you say he only logged unusual, noteworthy things.

20  I mean, he felt it was noteworthy enough to email Myers about

21  it and say we have a problem with this plug.

22         You can correct me if I have the parties wrong.  I

23  thought that was Berger saying, we have a problem with this

24  plug, should I tell Ohlin.

25         **MR. WASDIN:**  Correct.  So I think he does identify the

 1     issues.  I don't think he uses the word "noteworthy" but Your

 2     Honor's point is well taken.  I don't think he's using the call

 3     log to log everything that happens in his life that he believes

 4     is noteworthy.  I mean, it's a log of communications he has

 5     with people and other things.

 6              **THE COURT:**  What was the date of -- I can find it

 7     myself -- the date of that email?

 8              **MR. WASDIN:**  With Myers?

 9              **THE COURT:**  Yes.

10              **MR. WASDIN:**  I don't know but I will --

11              **THE COURT:**  I'll find it.  I have the wrong chart

12     here.  Just a moment.  Here we go.  So it was May 12th, 2000.

13     And the -- he gets the Kieper memo in April; is that right?

14              **MR. WASDIN:**  Your Honor, that sounds approximately

15     correct.  I don't have those exhibits in front of me.

16              **THE COURT:**  Well, let's see, I mean, Berger is part of

17     the testing, obviously, right?  I mean, he's aware back in

18     February -- there's a memo from him to Myers about the test,

19     about the 015 and 016, so that was in February.

20              And then in May, like I mentioned a minute ago, PX 32

21     he's -- I guess he attaches the report.  "It looks like the

22     existing product has problems, unless the user instructions are

23     revised.  Should I share with Ohlin."

24              So we can accept at least as of this point he hasn't

25     told Ohlin anything?

1      **MR. WASDIN:**  I think that's a reasonable inference

2  from that.

3          **THE COURT:**  Does he say when he told Ohlin?

4      **MR. WASDIN:**  The only thing we know from -- he says in

5  2000 in his 2015 testimony.  And we know that in 2001 -- so

6  what he's saying in the email is, we need to revise the user

7  instructions, should I tell Ohlin.  And then in 2001, Ohlin

8  gives the revised instruction.

9          **THE COURT:**  He actually says it a little bit

10  differently.  He refers to the two studies.  "The original

11  study was with eight subjects, second study was with folded

12  back flanges.  Should I share with Ohlin."

13      **MR. WASDIN:**  And we know that he did, because Ohlin

14  shows up the next year and begins instructing military

15  audiologists, and those that succeeded him had all of the

16  relevant information --

17          **THE COURT:**  It sounds like he's asking if he should

18  share the studies with Ohlin.

19      **MR. WASDIN:**  Your Honor, I don't read the email that

20  way.  He says, "It looks like the existing product has problems

21  unless we revise the instructions.  Should I share that with

22  Ohlin?"

23          **THE COURT:**  No.  He says, "Should I share with Ohlin"

24  before he says it has problems.  He's referencing the two

25  studies, and he says, "Should I share with Ohlin?"  And then he

1    says, "It looks like the existing product has problems."  I

2    believe that's the email.

3              **MR. WASDIN:**  That sounds correct to me with respect to

4    the email.

5              Your Honor, could I touch on failure to warn before my

6    time is up?

7              **THE COURT:**  Yes, go ahead.

8              **MR. WASDIN:**  Can we go to slide 29.

9              **THE COURT:**  What's the number?

10             **MR. WASDIN:**  29 for me.

11             **THE COURT:**  PX or DX?

12             **MR. WASDIN:**  I'm sorry, this is my slide number.

13             **THE COURT:**  Oh, slide, okay.

14             **MR. WASDIN:**  Your Honor hinted at this in questions to

15   Mr. Sacchet, you know, are you warning the military

16   audiologists who warns the servicemembers or are you warning

17   the servicemembers.

18             And a quick clip from Lt. Col. Merkley explains how

19   it's done in the military.

20             *(Video published:)*

21             **QUESTION:**  And so, when the Combat Arms Version 2 is

22   issued to servicemembers, the DoD instruction requires that it

23   would be fitted and issued only under the supervision of

24   personnel who have been specifically trained to fit earplugs;

25   is that right?

1      **ANSWER:**   That's correct.

2          *(Video paused.)*

3      **MR. WASDIN:**   So they only get it fit by military

4  audiologists and then they're trained.

5          And if you go to the next slide:

6      **QUESTION:**   And so he explains it in no uncertain terms

7  that, if their earplug was the Combat Arms Version 2, their

8  training would have included the option to fold back the

9  flanges as need to get a good fit?

10      **ANSWER:**   Yes.

11          So the information in this case moved from Elliot

12  Berger to Doug Ohlin to every audiologist in the military, and

13  they trained individual servicemembers on the exact thing that

14  Mr. Sacchet says was missing.

15          There was no failure to warn.  We plugged the

16  information into the preexisting warning system that the

17  military already had in place.  No case holds that we have an

18  obligation to barge onto basis in the United States, stand on

19  the firing range next to somebody passing out the plugs, and

20  hand them an instruction manual.  We did it the way they wanted

21  it done, and we know that because, if you go to the next slide,

22  that's what Mark Santoro says Doug Ohlin told him.

23          And I know Your Honor is familiar with his testimony

24  because you asked Mr. Sacchet about it.  Mr. Sacchet's point

25  was, yeah, Ohlin says don't warn because we are warning, but

1     that's on the inside of the box, not the outside of the box,
2     you could have put a sticker on the outside of the box.
3          A sticker on the outside of the box of bulk earplugs
4     sent to bases would do nothing more than land in the lap of the
5     audiologist who receives them.  They would have had the exact
6     same information that Ohlin had already given them, and they
7     would have plugged it into the system and trained individual
8     servicemembers as they were doing.  There was no failure to
9     warn here in this case.
10         **THE COURT:**  Just one moment, Mr. Wasdin.  I need to
11    find something.
12         What input did you all provide to Doug Ohlin when he
13    asked for input on the warning for the wallet card?  I believe.
14    Didn't he ask for input?
15         **MR. WASDIN:**  He sent the wallet cards to folks at
16    Aearo and asked for input.  Standing here, Your Honor, I don't
17    know whether any changes were made.  My best recollection is
18    there weren't, but I'm not 100 percent positive.
19         **THE COURT:**  One moment, please.
20         Okay, go ahead.
21         **MR. WASDIN:**  Your Honor, I know I must be short on
22    time so let me wrap this up.
23         We attended a meeting in December 1997 where the
24    military requested from us help making an earplug, a non-linear
25    earplug for the Army.  The status quo at the time was nobody

```
 1    was wearing hearing protection and everybody had hearing loss.
 2    We took that up.  We sent them a longer earplug.  They looked
 3    at it for over a year, identified three tactical problems with
 4    it, and directed us to shorten it.  We did that.  They looked
 5    at it again and they accepted it.
 6              The claims in this case are that it's defectively
 7    short.  We are entitled to immunity under the federal
 8    government contractor case because of that.  If not this case,
 9    then when?  We had as many back-and-forths with as many
10    production samples as drawings in *Harduvel* and *Brinson*.  This
11    is exactly the type of case that you're supposed to --
12              **THE COURT:**  Say that again.  You had as many
13    back-and-forths with drawings?
14              **MR. WASDIN:**  In *Harduvel* and *Brinson* you see, I
15    believe, two back-and-forths with drawings.  If you read
16    *Harduvel*, it says, how do we know they approved it, they sent
17    them a drawing at time one --
18              **THE COURT:**  Ohlin never got a drawing.
19              **MR. WASDIN:**  I'm suggesting that with our production
20    sample we sent --
21              **THE COURT:**  Yeah, but you just said we had as many
22    back-and-forths with drawings and production samples.  So I'm
23    going to ask you to be specific when you're referencing what's
24    in the record and supported by the record.
25              **MR. WASDIN:**  Your Honor, I apologize if I misspoke.  I
```

1    was attempting to analogize the drawings in *Brinson* and

2    *Harduvel* to the sending of production samples in this case,

3    which frankly are better than drawings.

4          **THE COURT:**  But was -- well, I won't belabor the

5    point.  I don't remember there being a back and forth with the

6    production samples, other than you shorten the one, yes.

7          **MR. WASDIN:**  We sent him two, he rejected the first,

8    we shortened the second, he accepted the second.

9          That is the level of meaningful consideration in

10   approval that is required in the Eleventh Circuit for the first

11   element.  There's no question that the plugs we sent after that

12   were the length that were approved, so we're entitled to

13   summary judgment on the second element as well.

14         And you and I just walked through evidence that every

15   single one of the alleged defects that Plaintiffs have found in

16   this case in the record were on notice the military knew about

17   all of those.

18         **THE COURT:**  Is it the same thing to say to get optimal

19   performance -- with sort of an improved fit you'll get optimal

20   performance, is that synonymous or the same thing as saying

21   there are some people who have to have those flanges folded

22   back or they will not get any protection?

23         **MR. WASDIN:**  First, I don't believe --

24         **THE COURT:**  Or seriously reduced protection?

25         **MR. WASDIN:**  First, I don't believe there's any

1    evidence that without folding back the flanges somebody gets no

2    protection.  And I'm not sure --

3         **THE COURT:**  I'm just referencing what Mr. Sacchet said

4    to me, and I'm going to ask him to be as true to the record as

5    I've just asked you to be.

6         **MR. WASDIN:**  Okay.  The next line on that bullet under

7    optimum performance says, "I told him that folding back the

8    flanges would be important for some people."  So that

9    information was communicated.

10        **THE COURT:**  I don't know that that answers my

11   question, though.  So you're saying that's the same, that the

12   risk was adequately conveyed by saying you can get better

13   performance with a better fit, that's the same thing as warning

14   the military that you may not get performance at all or very

15   good performance if you don't fold the flanges back for certain

16   people?

17        **MR. WASDIN:**  Again, I don't think there's any evidence

18   that somebody doesn't get any performance at all without

19   folding back the flanges.  But by telling them -- he told them

20   exactly what happened.  We did test one, we didn't fold, we had

21   problems.  We test two, we did fold, we got optimum

22   performance, which is a different way of describing the

23   labeling standard, best fit.

24        **THE COURT:**  Did anything you shared with the military

25   advertise an NRR of 22 of the green end?

1          **MR. WASDIN:**  The blister packs that began being

2     shipped in the '05 time period had I believe the instructions

3     that were used on civilian labeling.

4          **THE COURT:**  And that NRR, was it limited to a

5     particular size of ear canal?

6          **MR. WASDIN:**  The civilian labeling doesn't limit the

7     22 NRR to any particular size ear canal but it contains the

8     fitting tip to get the 22 NRR.

9          **THE COURT:**  Did that go to the military, too, in the

10    blister packs, is that what you're saying?

11         **MR. WASDIN:**  Your Honor, I am not sure precisely what

12    the NRR labeling was on the blister packs that went to the

13    military.

14         **THE COURT:**  And you're referring to the fit tip,

15    that's what you just referred to?

16         **MR. WASDIN:**  The fitting tip for folding back the

17    flange to get a better fit, or however it was worded.

18         **THE COURT:**  All right, Mr. Wasdin, I thank you very

19    much for your argument.

20         Mr. Sacchet?

21         Wait.  I'm sorry.  I neglected to ask Judge Jones.

22         Judge Jones, did you have a question for Mr. Wasdin?

23         **JUDGE JONES:**  I did not.

24         **THE COURT:**  Judge Herndon, questions?

25         **JUDGE HERNDON:**  No, no questions, thank you.

1        **MR. SACCHET:**  Hello again, Your Honor.  I am happy to

2   start from the very beginning of 3M's rebuttal, unless Your

3   Honor would like to take it in a different order.

4        **THE COURT:**  No.  Go ahead, that's fine.

5        **MR. SACCHET:**  If we could flip to our deck.

6        **THE COURT:**  And I do want you, though, in your

7   argument to please address the issue of -- I believe it was

8   maybe the negative --

9        **MR. SACCHET:**  I'll actually start there just to ensure

10  that I don't forget it.  I'll start talking and hopefully the

11  slides catch up.

12        So, in slide 28, it's a depiction of test 213015 that

13  displays the individual subject data of the eight persons that

14  were tested in that test by Defendants.

15        **THE COURT:**  015?

16        **MR. SACCHET:**  015.  There were eight people, three of

17  whom had very low NRRs.  Two of those people had single digit

18  NRRs.  One person, TRS is the acronym of his or her name, that

19  had a small sized ear canal in both ears, SS, had a negative

20  12.5 NRR.  Negative.  No protection.

21        There's even evidence in the record from, I believe

22  it's Mr. Berger or Kieper, that a negative NRR could actually

23  increase sound as opposed to attenuate it.

24        And Your Honor can see TRS, I hope --

25        **THE COURT:**  Yes.

1          **MR. SACCHET:** -- on the screen, second to last person.

2     Small size, small size, negative 12.5 NRR.  That's one of the

3     other people independent of the medium and large who are

4     especially affected by the faulty design of this plug that was

5     getting no protection.  And that's why the flange report is

6     different than just looking at mean attenuation levels.  We're

7     seeing here one person who is not getting protection.

8          And when the military discovered that some people were

9     not getting any protection -- low protection in the flange

10    report, 11 NRR, here we've got someone with a negative 12.

11         And to be clear, Your Honor, NRRs aren't -- I might

12    botch this, but it's a logarithmic scale.  So the difference of

13    like one point on an NRR isn't the same as just saying it's one

14    point less.

15         So, when it went from 11 NRR or 22 NRR, that's a 90

16    percent difference in protection, 90 percent, not like a

17    doubling of the NRR or it's 11 points higher.  90 percent less

18    protection when they tested this plug without the flanges

19    folded back.  Then when they folded back the flanges and test

20    017 and got a 22 based on the logarithmic scale that's used to

21    actually determine the level of protection.

22         And Mr. McNamara, the director of military sales, for

23    Defendants agreed with that proposition.  It's not expert

24    issue.  It's not something I'm making up.  It's in the record,

25    and we've put it in the record.

1          I hope that answers the Court's question about whether

2     some individuals were not receiving protection.

3          **THE COURT:**  Yes.  Thank you.

4          **MR. SACCHET:**  Going back to the beginning of the

5     points that were made at the start of the rebuttal argument,

6     I'd like to start at slide 10, which goes to the question of

7     design contracts versus other contracts as to whether there

8     needs to be a specification.

9          It doesn't matter whether the contract is a design and

10    development contract, a manufacturing contract.  Name the

11    contract what you want, it needs to have specifications about

12    what's being delivered.

13         In some circumstances, to be sure, in *Harduvel*,

14    *Brinson*, and Gray there were RFP processes to develop a

15    product.  They all had RFP.

16         There's other cases where it's not an RFP, and the

17    contractor provides a spec, and there's back-and-forth about,

18    okay, let's look at this spec.  But that spec is in the

19    contract because that's what obligates the contractor to do

20    just that.

21         **THE COURT:**  Well, 3M says that the product is the

22    spec.

23         **MR. SACCHET:**  There's no case in the country that

24    adopts that proposition.  And if it were, every single case

25    would satisfy the first element of *Boyle* by simply procuring a

1    product.  There would be no Boyle 1 inquiry.  That can't be the

2    rule.  That's impossible.

3         But I want to point out here that 3M's argument is

4    that, as I heard Defendants just represent, there were

5    purchases for that product.  That's their argument.  It's in

6    their reply brief as well.  I was blown away when I saw it

7    because it steps right into the stock product exception.

8         They fall back on literally a list of sales orders

9    denominated by a sale date, the amount of the product, and its

10   product number.

11        Their very own case, *Agent Orange*, says that's

12   unacceptable in footnote 12.  *Boyle* itself says it's

13   unacceptable in its air conditioning hypothetical.

14        In *Boyle*, the Supreme Court said, if, for example, the

15   United States contracts for the purchase of an air-conditioning

16   unit without specifying the precise manner of construction,

17   quote, "no one would suggest that state law would generally be

18   preempted in this context."

19        That's the Supreme Court in *Boyle* saying exactly what

20   3M falls back here is insufficient to even trigger the defense,

21   much less apply the tripartite test.

22        There's no procurement contract with design

23   specifications for this product.  This defense is dead before

24   it starts.  3M has touted this case as a government contractor

25   case and they don't even have a procurement contract with the

1    requirement specifications.

2         **THE COURT:**   What about the MPID?

3         **MR. SACCHET:**   They disclaimed the MPID.

4         **THE COURT:**   I know, but just for fun.

5         **MR. SACCHET:**   Okay, for fun.  We argued in our brief

6    that the MPID states clear as day it's procuring the Combat

7    Arms pursuant to its stock number.  It actually says in the

8    MPID 370-1000.  That's its stock-keeping unit.  And then it

9    says, here are salient characteristics for an equal earplug.

10        The case law is clear you cannot spec out ex post,

11   after the fact, to create the government contractor defense.

12   The Eastern District of Missouri in *Caldwell* said exactly that.

13        **THE COURT:**   What about *Brinson*?

14        **MR. SACCHET:**   *Brinson* doesn't address post hoc specs.

15   In *Brinson* there was a contract that said --

16        **THE COURT:**   It's post-design --

17        **MR. SACCHET:**   Post-patent.

18        **THE COURT:**   Post-patent, probably even

19   post-production.

20        **MR. SACCHET:**   Post-patent, and then there was

21   collaboration between the two to specify the design.

22        In *Brinson* itself, they say it doesn't contain any

23   contractual requirements.  It says that in the case, it says

24   that there were contractual requirements.  And in fact, *Brinson*

25   outlines the landscape of Eleventh Circuit authority, and it

1    says, in *Gray* the contractor and the government contracted to

2    produce the product.  In *Harduvel*, they say the contractor and

3    the government contracted to produce the product, and that's

4    exactly what happened in *Brinson*.  It's the *sine qua non* of the

5    defense, and they can't even meet it.

6         **THE COURT:**  So do you agree that in some circumstances

7    the defense is applicable to a pure procurement contract

8    without a design component to it?

9         **MR. SACCHET:**  No.  There's no contractual obligation.

10   The immunity arises from the contract.  Only a contract --

11        **THE COURT:**  I suppose you have the contractual

12   obligation to provide the product?

13        **MR. SACCHET:**  Yeah, but it's just the product.

14   There's no specification for it to be a particular way that

15   binds the company to do just that.  And that's why *Boyle* said

16   in the air conditioner hypothetical that, even if there's a

17   contract for sale, if it doesn't have the precise manner of

18   construction, it's insufficient, quote, "no one would suggest

19   that state law would generally be preempted in this context."

20   That's the Supreme Court saying exactly what they're doing here

21   is inadequate.

22        The stock product exception itself in *Boyle* says when

23   you get a product pursuant to a model number, it doesn't count.

24        That's what this case is.  There was never a

25   procurement contract to create the relationship and the

1    contractual duties that bound 3M to do what Ohlin may have

2    requested or was interested in.  To be sure, the military was

3    interested in the product.  We don't deny that.  Does the fact

4    that the military being interested in the product triggers this

5    narrow immunity doctrine?  Absolutely not.  They can't get off

6    the ground.  They haven't met their burden to show this

7    requirement.

8           3M has also made the argument that in *Harduvel* and

9    *Brinson* there was like this minimal back-and-forth and review

10   of design drawings.  That's not true at all.  There was -- as

11   we see in Harduvel, continuous back and forth based on a great

12   deal of communication, extensive review, extensive review of

13   the aircraft through examining specifications, drawings, and

14   blueprints of the feature at issue.  Not even just the product

15   as a whole.

16          The Eleventh Circuit in *Gray* said general

17   participation, general involvement in design is not the

18   question.  Was there extensive analysis of the feature at

19   issue.

20          In *Harduvel*, a group of Air Force engineers reviewed

21   the purportedly defective servo.  In *Brinson*, the contract

22   compliance officers representing the government were on site at

23   the contractor's office every day, each and every day.  USAFF

24   Air Force engineers reviewed detailed drawings of the rudder

25   trim system in particular.

1          I mean, if it were any other way, every single

2    contractor could simply satisfy *Boyle's* approval element by

3    saying, we sent the product, there's a rubber stamp that says

4    it's approved, who cares about *Boyle* 1.

5          That's not what the Supreme Court said.  To trigger

6    this narrow preemption doctrine, it must be approval of the

7    precise feature at issue and there needs to be clear, hard

8    review.  End of story.

9          And they concede, they concede on page 6 they lack the

10   evidence to satisfy this requirement.  Quote, "The military has

11   not yet provided discovery regarding the steps Ohlin took to

12   evaluate those samples."  There's no evidence -- Berger

13   admitted they have no evidence of what he did when they sent

14   the first plug and what they did when he sent the next plug.

15         They can't meet their burden.  It's their burden to

16   show it and they can't meet it.  This would be the first case

17   ever that I'm aware of that found *Boyle* factor 1 satisfied

18   based on one document from Ohlin saying, I've approved the

19   product.

20         **THE COURT:**  Do you agree with the Third Circuit in

21   *Maguire* that the rubber stamp exception, which would -- I

22   believe you'd probably rely on *Trevino* for that -- applies only

23   where the contractor proposed the design feature to the

24   government?

25         **MR. SACCHET:**  This is a very interesting question that

1    I've thought a lot about.  It is my own view that when the

2    government itself -- and I'm not saying this is supported by

3    the law -- when the government itself creates the extremely

4    specific specifications, I think that could moot the approval

5    requirement because it would be wrapped up in the same inquiry.

6         **THE COURT:**  Isn't that what 3M is arguing here is that

7    Doug Ohlin created -- setting aside the contract argument --

8    but that Doug Ohlin created this very specific length reduction

9    feature?

10        **MR. SACCHET:**  So, that was my personal opinion, but

11   it's not what the Eleventh Circuit cases say.  In *Brinson*, it

12   says there are two requirements to *Boyle's* first element.  You

13   have to show reasonably precise specs, those specs have to be

14   substantively approved.  It's a conjunctive requirement.

15   That's what the Eleventh Circuit says.

16        **THE COURT:**  Is there a case in the Eleventh Circuit on

17   rubber stamping?  In the Fifth Circuit it's *Trevino*.

18        **MR. SACCHET:**  A case that's rejected for rubber

19   stamping?

20        **THE COURT:**  That discusses rubber stamping.

21        **MR. SACCHET:**  Yes.  So, in *Harduvel*, I believe, which

22   was the first government contractor case in the Eleventh

23   Circuit to analyze the substantive approval question.  It cited

24   *Trevino* for incorporating the idea of a continuous

25   back-and-forth and for it not to be a rubber stamp.

1        **THE COURT:**  It does not say that the design feature in

2    question had to be proposed by the contractor?

3        **MR. SACCHET:**  And it doesn't.  I mean, *Boyle* says it

4    doesn't have to be proposed by the military, it doesn't have to

5    be proposed by the contractor.  It needs to be proposed by

6    someone, and that proposal needs to be reduced and incorporated

7    into a procurement contract so that it defines the boundaries

8    of what one is responsible for doing based on that contract.

9        **THE COURT:**  So that proposition or principle of law is

10   limited to the Third Circuit, as far as you know?

11       **MR. SACCHET:**  If you could remind me of exactly what

12   *Carley* said?

13       **THE COURT:**  This is *Maguire*, that rubber stamp

14   exception applies only where the contractor proposes the design

15   to the government.

16       **MR. SACCHET:**  The Eleventh Circuit hasn't said that.

17   The Eleventh Circuit, if anything, said the opposite, in saying

18   in *Brinson* that it's a double requirement.  You've got to show

19   reasonably precise specifications and substantive approval of

20   them, "them" obviously being the subject of the specification

21   itself.

22       The next point that Defendants argued is that there

23   was testing by the military of this plug even though they

24   concede the Defendants themselves had not conducted testing on

25   this plug before selling it to the military.

1          The test they rely on in DX 16 is the June 1999 Kalb

2     study.  That study is irrelevant because, according to 3M's

3     reply, quote, "Of course, Ohlin had" -- italicized -- "*already*

4     approved the shortened CAEv2 over a month-and-a-half earlier."

5          If Ohlin had approved the product a month-and-a-half

6     before the study was published or conducted, it has no bearing

7     whatsoever on Ohlin's decision to prove it.  Therefore, both

8     parties agree it's irrelevant, and 3M says just that in saying

9     it is irrelevant.

10          So, even if the military did this test, which it

11     did --

12          **THE COURT:**  What was the date of the testing?

13          **MR. SACCHET:**  June 30th, 1999.  Ohlin approved the

14     plug in mid May of 1999.

15          **THE COURT:**  And do you agree that Aearo did not have

16     any knowledge of the problems until the REAT testing, or is

17     there anything you can point to that they knew of a problem

18     before that?  I mean, they didn't have any data.

19          **MR. SACCHET:**  I mean, they sold the plug to the

20     military without testing it.  And the idea that Defendants have

21     suggested that EPA requirements didn't obligate the military to

22     do that is based on their own interpretation of the exception

23     in the EPA noise control act about whether the product was

24     designed for combat use.

25          We obviously dispute that proposition because it

1    wasn't just designed for combat use.  It was a commercially

2    equivalent product from the very start.

3          So they'll probably make that argument in moving to

4    dismiss at some point, and we have our responses to it.  But

5    that's beside the point.

6          Whether or not 3M knew prior to approval, it knew

7    months later, and there's no evidence in the record whatsoever

8    to suggest that there was a parity of information.  Even if we

9    heard a thousand times that there was a flange fold, there's no

10   evidence that 3M told the military of the specific dangers and

11   the consequences of this product.  And under --

12         **THE COURT:**  You don't dispute, then, based on the

13   testimony that Mr. Wasdin just walked through with me with the

14   audiologists, that at least some of them knew of this fold back

15   instruction?  I mean, they discussed it.

16         **MR. SACCHET:**  There is evidence that some officers

17   were aware of a flange fold instruction.  Was the military

18   itself -- did the military adopt that as an instruction?  No.

19   And we see that on slide 40, PX 64.  This is the 2006 Manual of

20   CHPPM where Mr. Ohlin was the program director, 2006 manual of

21   CHPPM.

22         There is an initial page that discusses the insertion

23   of this plug, and then there is an appendix page at the end

24   that copies a poster of how to insert the plug that was

25   displayed at base camps.  No mention of the flange fold

1   whatsoever, nothing.  Just insert the plug as you would

2   normally insert it, which is why people like Lt. Col. Babeu,

3   they had no idea about this flange fold.

4        So the idea that people like -- you know, I'll go

5   through it.  They say Lt. Col. Robinette, Lt. Col. Fallon, they

6   named both those people.  As a threshold matter, their own

7   cases -- Fifth Circuit decision in *Miller*, which they cite for

8   a different proposition, says that, "In order to satisfy *Boyle*

9   3, there needs to be pervasive institutional knowledge."

10  That's what that case says.  In *Miller* there was knowledge by

11  multiple military departments of the problem.  They cited that

12  case.

13       We cited a case called *Sanchez*, Southern District of

14  California.  The knowledge by a few people is not knowledge by

15  the government.  But, in any event, Robinette said even if he

16  knew that the opposing plug could touch the tragus, he had no

17  idea about imperceptible loosening.  And he said, if they, the

18  U.S. Government, would have known about the slippage issue,

19  they would have insisted on instructions saying the same,

20  flanges must always be folded back."

21       This is the evidence that 3M has put in the record,

22  not Plaintiffs, 3M.  It disproves their argument and proves

23  Plaintiffs' argument.

24       **THE COURT:**  Does this -- just curious what your

25  position on this would be -- and I'll hear from Mr. Wasdin on

1    this, too, I didn't think to ask him at the time when he was

2    up.  This folding back of the flanges, did that become a design

3    feature?

4           There's some evidence in the record by -- I'm trying

5    to remember who gave the testimony -- acknowledging that it's a

6    defect, that if you have to fold the flanges back that that

7    would be a malfunction of the -- I don't remember who said it

8    but I know I read it.

9           MR. SACCHET:  We have testimony on it, and we put in a

10   docket where 3M's manufacturing department says that a folded

11   back flange is a defect because it will eventually wear out the

12   tip itself by being folded back.  That's what the internal

13   document says.

14          Again, 3M never provided that document to the

15   military.  Another example of the asymmetry of information.

16          THE COURT:  Where is that document again?  Do you have

17   the records cite?

18          MR. SACCHET:  That one, unfortunately, is probably one

19   of the few I can't give you at the moment.  It is cited in our

20   -- in Plaintiff's opening memorandum in the *Boyle* 3 argument

21   probably somewhere in the exhibit range of 50s or 60s.

22          THE COURT:  All right.

23          MR. SACCHET:  As to Defendant's invocation of Lt. Col.

24   Fallon, they cite his declaration and they say in paragraph 9

25   that Lt. Col. Fallon knew exactly about the insertion problem.

1           The insertion problem that Fallon describes in

2    paragraph 9 is not the insertion problem that's described in

3    the flange report.  Fallon says in paragraph 9 that, if you

4    don't fold back the flange, the opposite flange is going to hit

5    your tragus when you try to put it in the ear.

6           That's not what the flange report says.  The flange

7    report says the stem is too short to hold it so it just makes

8    it hard to put in in the first place, and that, after it's put

9    in, there can be imperceptible loosening due to that issue.

10          **THE COURT:**  Due to what issue?

11          **MR. SACCHET:**  Due to the positioning of the opposing

12   flanges contacting the outer ear.  It's not even one for one.

13          In any event, even if it were, which it's not,

14   Fallon's declaration says nothing whatsoever about his or the

15   military's knowledge of the specific consequence of that one of

16   two defects.  It doesn't say anything of the fact that he knew

17   that, if you didn't do that, you'd get an 11 NRR.  It doesn't

18   say if you didn't do that that you could get 10 percent of the

19   protection that 3M advertising.  It doesn't say any of those

20   things.

21          None of their evidence shows, like is required in

22   *Harduvel*, binding Eleventh Circuit precedent, there needs to be

23   parity of information about the gravity -- this is key -- the

24   gravity or the seriousness of the consequence.  That's what has

25   to be known, not just that, if you don't do this, the plug can

1    slip and therefore you get bad hearing protection.  You need to

2    know what the degree is, the gravity of the impact.

3          Here the gravity of the impact is a difference between

4    90 percent protection.  No evidence in the record whatsoever

5    that 3M can point to to satisfy their burden to show that.  And

6    in fact, Plaintiffs have evidence to say they can't.  That's

7    exactly what the *qui tam* action was about and exactly what the

8    CID report found.

9          And I can move to the CID report issue now, a little

10   bit out of turn.  But 3M's argument is that, in that report

11   Ms. Coleman didn't make conclusions.  This is just a wordplay.

12   Coleman testified under oath that she made factual findings

13   based on an unbiased investigation on behalf of the United

14   States Army.

15         Rule 803(8)(A) through (B) says it can either be a

16   finding or conclusion.  So, call it what you want, it satisfies

17   the rule to come in and it shows the military didn't know.  And

18   even if it didn't, the military and the United States

19   Government filed a *qui tam* case alleging under Rule 11 in that

20   *Moldex* litigation that it didn't know.

21         What else do the Plaintiffs need?  The government has

22   spoken, they didn't know.  It's unlike any other case.  There's

23   no case that finds *Boyle* 3 met or even a dispute of fact when

24   there's a *qui tam* case where the government said they don't

25   know.  None.

1           As to the wallet card issue, 3M pointed to the picture

2    of the folded flange in this wallet card.  They said, look,

3    they knew the flange should be folded.  That's not how 3M

4    tested the product.  The picture is a fold of the olive end,

5    not the yellow end.  And 3M didn't test the plug when it was

6    folded with the olive end folded.  It only tested it with the

7    yellow end folded.  It doesn't even make sense.

8           In addition, as Your Honor pointed out, it's limited

9    to very large ear canals.  And Ohlin conducted a study saying

10   that there were 4.2 percent of servicemembers who had very

11   large ear canals, 4 percent, even though the flange report says

12   it can affect some and especially medium and large for the

13   insertion defect, no size delimitation as to positioning of the

14   opposing flange defect.  None.  Could affect anyone.  And we

15   saw that in TRS from test 213.015 small ear canal getting

16   negative 12.5 NRR.  Small.

17           **THE COURT:**  Did you just say that the 017 test --

18           **MR. SACCHET:**  016.  The 016 test tested the non-linear

19   end without the flange folded back.  Here is a depiction of the

20   plug as it would be used with the non-linear end but the olive

21   end is folded back.  Not what 3M did.

22           In addition, Berger admitted in Defendant's own

23   exhibit in its 30(b)(6) that they didn't test the plug by only

24   folding back the flanges for very large or excessively large

25   ear canals.  That's not what they did.

1        The wallet card proves the asymmetry of information

2    here.  They try to use it to say Ohlin knew.  There's an

3    obvious asymmetry.  It's not how 3M tested it and it's not what

4    the flange report says, not even close.

5        In addition, they say that this fitting tip satisfies

6    their burden.  Putting aside the fact that the fitting tip is

7    only one component of the flange report, the fitting tip's

8    genesis, as just the facts made clear, is just to a tip, a tip.

9        And they played the deposition testimony of

10   Mr. Merkley -- you could fold back the flanges, you could.

11       It's not what the flange report says.  The flange

12   report says, if you want to maintain a consistent seal, you

13   need to fold that flange back.  It's not some kind of

14   recommendation, you can do this or you can do that if you want

15   to.  It's you need to and, if you don't, you could be like TRS

16   with a small size ear canal and get a negative 12.5.

17       In addition --

18       **THE COURT:**  The flange report doesn't -- in the

19   narrative it doesn't discuss that small ear canal finding.

20       **MR. SACCHET:**  So, to go back to the prior point, as to

21   the short stem, it says that defect can prevent deep insertion

22   in some users especially medium and large.

23       **THE COURT:**  Right.

24       **MR. SACCHET:**  Then, when it goes on to define the

25   feature of the positioning of the opposing flanges relative to

1   the outer ear, it's not delimited by size.  It can be anyone

2   depending on their ear canal geometry.

3           So this idea that there's a distinction about this

4   applying to extra large ear canals, not what the document says.

5   This --

6           **THE COURT:**  Where do you think Ohlin came up with

7   that?

8           **MR. SACCHET:**  For anyone to comment on that is rank

9   speculation.  I'm not going to even go there.  There's no

10  evidence in the record.  And it's not -- it doesn't create a

11  dispute of material fact to deny Plaintiffs' Motion for Summary

12  Judgment.  On this record there's an asymmetry that 3M can't

13  make up.

14          Plaintiffs deserve summary judgment on *Boyle* 3, and

15  that's it.  The defense is dead, even if the Court assumes that

16  there's a procurement contract that was created based on verbal

17  assertions that don't even line up with the chronology that 3M

18  says.

19          **THE COURT:**  All right.

20          **MR. SACCHET:**  The other small point here that I just

21  want to point out, it's a fine distinction, but this document,

22  Just the Facts, it says, "To enhance proper insertion."

23          Even assuming, for the sake of argument, that this

24  fitting tip is tantamount to full knowledge, it's limited to

25  insertion.  And we see in the flange report that the

 1    positioning of the opposing flange issue is post-insertion.

 2    So, at best -- I mean, I'm not going to make this concession,

 3    but, at best, okay, they might have know to fold the flange

 4    back to enhance proper insertion.  A) it's not an instruction,

 5    it's a recommendation; B) it's limited to excessively large in

 6    the wallet card, even though there was -- you know, we're not

 7    going to deny there was testimony that it was told to others.

 8    But, even so, enhance proper insertion, not to maintain the

 9    seal as the flange report says.

10            So, in other words, you could fold the flange back to

11    get it in.  Do you have to keep it folded?  Not according to

12    this.

13            **THE COURT:**  All right.  Thank you.

14            **MR. SACCHET:**  Okay.

15            **THE COURT:**  Thank you very much.

16            So, Mr. Wasdin, I said I would hear from you, if you

17    wanted to be heard, on that issue I raised with Mr. Sacchet on

18    the flange folding back.  I asked if that was a design feature,

19    and then we got into the issue about it being defined as a

20    defect.

21            You don't have to respond.  I just said I would give

22    you the opportunity.

23            **MR. WASDIN:**  Your Honor, I'll only respond to say that

24    the only evidence -- I know Mr. Sacchet couldn't pull up a

25    record cite.  The only evidence that I'm thinking of right now

1   that I'm aware of in this record is testimony about was it

2   molded in that way.

3        **THE COURT:**  No.  There is testimony -- I can find it

4   in my notes, if we want to take a few minutes.  But there was

5   deposition testimony of an Aearo official, a person, employee

6   who said that that created a defect in the product, the need to

7   roll the flanges back, and that it was a malformation or -- and

8   I think the word "defect" was used.

9        And then there was questions about whether -- did

10  Aearo test to determine whether the folding back of the

11  flanges -- did Aearo test to determine whether the folding back

12  of the flanges affected the integrity of the product.

13       **MR. WASDIN:**  I'm not 100 percent sure right now, so

14  I'm not going to guess at what that was.  But thank you for the

15  opportunity.

16       **MR. SACCHET:**  I'm happy to provide the citation.

17       **THE COURT:**  Well, I'm going to find it because I don't

18  want people to think I'm making it up.  But if you can do it

19  quicker than me, then I'll let you do that, Mr. Sacchet.

20       **MR. SACCHET:**  So, the specific manufacturing memo that

21  3M did not provide to the military that said that, quote, "The

22  flanges will stay distorted if folded," is PX663M_MDL000531885,

23  page 5.  And then PX15 is the deposition of Myers, the

24  marketing manager for the Combat Arms Version 2.  Page 783 to

25  786, Myers agrees with the statements in the memo.

1        **THE COURT:**  Yeah, there's something else, though.

2        It's PX --

3        **MR. SACCHET:**  Page 648, line 18, to 653, line 8, PX30

4    page 648.

5        **THE COURT:**  I had 652, so let me look at that.

6    Starting on 651 -- now, let me go back to -- there's also --

7    page 649, line 16, there's a question of whether he's aware of

8    any testing done on the Combat Arms plug as far as what it

9    means to the material and the quality of the material and

10   strength of the material from a manufacturing perspective if

11   the flanges are folded back.  The witness says, "I don't recall

12   anything like that."

13       "Did you ever do any testing of the elastomer and what

14   would happen to the elastomer as far as whether it could tear

15   or crack if the flanges were folded back?"

16       And he says, "Any testing of it?"

17       The lawyer says, "Yes."

18       "No."

19       "In your design of the Combat Arms" -- oh, that's

20   version 3 and 4 -- "did you ever design the UltraFit plug or

21   ever do any drawings with the flanges of the UltraFit folded

22   back?"

23       "Not that I can recall."

24       And I want y'all to correct me if I'm wrong in how I'm

25   interpreting this.

1      **QUESTION:**  "And in fact, so these defects -- when the

2   flanges are folded back, those are defects" --

3          This is Mr. Overholtz.

4          -- "those are defects that aren't even allowed

5   according to 3M's documents, right?"

6          The witness says, "Those three pictures that you have

7   there, those -- what they are is when the cavity of a tool

8   didn't completely -- the plug didn't completely come out of the

9   cavity and another cavity was shot over it, so that's like two

10  plugs rammed together.  So yes, that's a distortion of the plug

11  because it was, you know, double injected."

12         Mr. Overholtz says, "And that was a defect that's not

13  allowed?  It would be considered a defect if that happened?"

14         And the witness said, "It was an obvious, you know,

15  malfunction of the tool to cause that.  That part was not

16  molded like that."

17         And then there's a question:  "There's never been a

18  mold of the Combat Arms plug or an UltraFit plug that would

19  mold it so the flanges would fold back?"

20         "Not that I'm aware of."

21         And then, "It wasn't designed that way?

22         "No, not that I'm aware of."

23         Mr. Sacchet, anything you want to add to that or, Mr.

24  Wasdin, then you?

25         **MR. SACCHET:**  I don't have a lot to add to the

1    testimony itself other than the prior exhibit that I cited are

2    the actual manufacturing memo that say it's an obvious defect.

3              **THE COURT:**  But what was Mr. Overholtz showing to him,

4    do you know?

5              **MR. SACCHET:**  I believe it was that memo.

6              **THE COURT:**  That's what I assumed.

7              Mr. Wasdin?

8              **MR. WASDIN:**  Your Honor, the testimony that was

9    read --

10             **THE COURT:**  Are they not discussing the folding back

11   of the flanges?  Are they discussing something else?

12             **MR. WASDIN:**  They appear to be discussing two things.

13   At first, some sort of double injection, which, you know, he's

14   saying --

15             **THE COURT:**  Isn't that the dual-sided --

16             **MR. WASDIN:**  It sounds like they have accidentally

17   injected a single mold for a flange on more than one occasion

18   and it created essentially a malformed flange out of the mold.

19   That's unrelated to the government contractor case or any of

20   the defects alleged in this case.

21             He goes on to be asked the question, you know, did

22   they ever mold the plug in the first instance so it came out of

23   the mold with the flange folded back, and he said, no, that

24   when it's molded, it's molded, you know, in that way and then

25   you would fold it back later.

1          And I do want to add one thing to it, which is they

2     are not alleging any defect theory in this lawsuit based on,

3     you know, that the flanges are detective if you have to fold

4     them back, and that is not something that's been put at issue

5     in the government contractor briefing.

6               **THE COURT:**  All right.  Thank you.

7          Can you all please cite me to the memo -- or Mr.

8     Sacchet, I'll ask you to do it -- the memo that you were just

9     referring to, where is it in the record?

10              **MR. SACCHET:**  It's Exhibit 66 and on page 7 of PX66 it

11    says "specification, all the flanges should be rolled down."

12              **THE COURT:**  So I don't have -- I don't think I do --

13    if we do have them -- I don't have the full exhibits.  You all

14    file excerpts of the depositions.  So is that an attachment to

15    Mr. Falco's deposition?  It must have been if it was discussed.

16              **MR. SACCHET:**  Yes.

17              **THE COURT:**  But it's also a separate exhibit here?

18              **MR. SACCHET:**  Yes.

19              **THE COURT:**  That's what I needed to know.

20         Judge Jones, any questions of either side?

21              **JUDGE JONES:**  No questions from this end.  Thank you

22    to counsel for your arguments.  Very informing.

23              **THE COURT:**  And Judge Herndon?

24              **JUDGE HERNDON:**  No questions.  Excellent argument.

25    Thank you.

1     **THE COURT:**  Yes, I agree, excellent arguments.  You've

2     given me a great deal to think about.  And I don't want anyone

3     here to interpret anything that I've said or comments I've

4     made, questions I've asked as an indication that I've made up

5     my mind, because I have not.  You all have given me a great

6     deal to think about.

7          Thank you very much.  I appreciate it.  I know you've

8     put a tremendous amount of time and effort into this.  Very

9     good arguments.  Thank you.  Y'all have a good rest of the

10    night.

11              *(Proceedings concluded at 5:39 p.m.)*

12                    --------------------

13    *I certify that the foregoing is a correct transcript from the*
      *record of proceedings in the above-entitled matter.  Any*
14    *redaction of personal data identifiers pursuant to the Judicial*
      *Conference Policy on Privacy are noted within the transcript.*

15

16

      *s/Donna L. Boland*                          *6-22-2020*
17    *Donna L. Boland, RPR, FCRR*                  *Date*
      *Official Court Reporter*

18

19

20

21

22

23

24

25