# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | | |
|---|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | ) ) ) | Case No. 3:19-md-2885 |
| | ) | Judge M. Casey Rodgers |
| This Document Relates to All Cases | ) ) | Magistrate Judge Gary R. Jones |
| | ) ) ) | PUBLIC VERSION -REDACTED |

## DEFENDANTS' MOTION TO COMPEL
## AGAINST THE DEPARTMENT OF DEFENSE

Defendants move that the Court compel the Department of Defense to: (1) present six current employees—Mary Binseel, Dr. Mark Little, LTC Martin Robinette, Dr. Leanne Cleveland, LTC Theresa Schulz, and Dr. John King—for deposition; (2) search for and produce the noise and ototoxin exposure data discussed below; (3) produce the safety release documentation for the CAEv2; and (4) produce the names of the Hearing Conservation Program Managers and Industrial Hygiene Program Managers—as those roles are described in Army Pamphlet 40-501—at the various Army installations the bellwether plaintiffs were stationed at, during the time periods the bellwether plaintiffs were present.

## BACKGROUND

The Department of Defense, like most federal agencies, has enacted a set of "*Touhy*" regulations—named after the Supreme Court case that gave rise to them,

*United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951)—that govern the Department's responses to third-party subpoenas in civil litigation. *See* Department of Defense Directive 5405.02 (attached as Ex. A). Since June 2019, Defendants have served numerous *Touhy* requests on the Department seeking documents, depositions, and other information related to the Combat Arms Earplug version 2 ("CAEv2"), service member noise exposures, and the Department's hearing conservation program. Over the past twelve months, the Department has improperly denied certain of Defendants' requests, and numerous others have been left "open" indefinitely, with no substantive answer and no assurance that the Department will produce the requested materials in time to meet the September 1, 2020 discovery deadline applicable to the Trial Group A bellwether case. This motion seeks relief from the Department's treatment of Defendants' requests, so that Defendants can obtain the discovery they need to prepare the bellwether cases for trial.

### A.    The Department Improperly Denied Defendants' Request To Depose Relevant Witnesses.

Eight months ago, on October 25, 2019, Defendants submitted a *Touhy* request to interview and depose 30 former and current employees of the Department whom Defendants believe have relevant information related to the Combat Arms Earplug Version 2 ("CAEv2"). (Ex. B.) At the Court's and Department's request, Defendants submitted a revised *Touhy* request on December 2, 2019, prioritizing

their request to interview and depose 11 witnesses, and renewing the request to interview and depose an additional 19 witnesses.  (Ex. C.)[1]

At an in-person meeting on January 28, 2020, the Department orally (i) denied all of the Defendants' requests for pre-deposition interviews, and (ii) denied Defendants' deposition request as to Dr. Mark Little.  The next day, Defendants produced documents to the government demonstrating Dr. Little's personal knowledge of relevant information.  The government indicated that it would further consider the request.

Since that time, Defendants have repeatedly asked for an update on the government's position regarding the pending deposition requests.  Most recently, on May 12, May 13, May 14, and May 19, 2020, Nick Wasdin of Kirkland & Ellis reached out to Jacqui Snead at the Department of Justice, and Major Nicole Kim and Major Collin Evans at the Department of Defense, to request calls relating to the status of the government's responses, including the status of Defendants' deposition requests.  Ms. Snead did not agree to the calls, and responded that the government

---

[1] Since that time, the Department has approved the depositions of five of the thirty witnesses requested.  The approved witnesses are LTC Jeff Merkley, Dr. Lorraine Babeu, LTC Kathy Gates, LTC Marc Stevens, and Brian Hobbs.  Only the first three depositions have taken place.  LTC Marc Stevens has since told the Department he does not wish to appear for a deposition.  Because LTC Stevens is no longer a government employee, the Department informed Defendants that it cannot make him appear.  Mr. Hobbs's deposition is scheduled to occur on July 16, 2020.

was working on letters and would prefer that those serve as the government's responses to Defendants' requests.  Although Defendants received a disclosure letter on May 22, 2020 regarding the status of certain document requests, the government did not at that time provide an answer to Defendants on whether or when depositions may take place.

On June 9, 2020, Defendants sent Ms. Snead a letter asking for a final decision on their requests by Thursday, June 11, 2020.[2]  (*See* Ex. D.)  Defendants received no response, and filed a Motion to Compel on June 12, 2020.  (Dkt. 1178.)  On June 23, 2020, the Department sent Defendants a letter denying the request to depose LTC Robinette, but offering to let the parties submit a limited number of interrogatories. (Ex. E.)  On June 24, 2020, after Special Master Herndon advised Defendants to hold the then-pending motion to compel in abeyance in order to refine the contested issues, if any, Defendants withdrew their motion, without prejudice.  Defendants' withdrawal noted that "To the extent the Department of Defense denies certain of Defendants' requests, or delays in responding to Defendants' requests (*i.e.*, more than one week from today), Defendants will refile this motion."  (Dkt. 1197.)

The Department then sent a "comprehensive" update letter on June 26, 2020. (Ex. F.)  But, given the schedule in this litigation and the need for government

---

[2] Defendants' letter also copied Major Kim and Major Evans.

discovery to be conducted promptly, the government's "comprehensive" letter amounted to a constructive denial of Defendants' requests. The letter noted the Department had made final decisions on two requests, which it denied by letter on June 30, 2020. But with respect to every other request, the June 26 letter simply noted that no final determination had yet been made. (*See, e.g.*, Ex. F, at 2 ("We have reached out to [Ms. Binseel] but have been unable to speak with her regarding this matter. No determination has been made as to whether we can approve or deny this witness."))

The Department's letter also noted that, with Defendants' "implicit consent," it had "not expended many resources trying to locate" the witnesses Defendants "deprioritized" in their December 2, 2019 letter to the Department. True, at the Court's request, Defendants did identify 11 "priority" witnesses relevant to government contractor issues in the December 2 letter, but this hardly amounted to "implicit consent" that the Department should make no effort to process the other 19 requests in the subsequent seven months. As the government is aware, this litigation involves more than the government contractor defense.

After months of waiting for a decision from the government, Defendants consider their requests to have been constructively denied. Defendants cannot wait any longer for the Department to make up its mind. Summary judgment briefing on the government contractor defense (to which many of the government witnesses are

relevant) has already concluded, and bellwether discovery has commenced. Defendants have no choice but to file this motion to compel and ask the Court to resolve the dispute now, while Defendants still have the opportunity to use the evidence these witnesses possess.

Although Defendants originally requested the opportunity to interview and depose approximately 19 current employees of the Department, Defendants now seek the deposition of just six current employees: Ms. Binseel, Dr. Little, LTC Robinette, Dr. Cleveland, LTC Schulz, and Dr. King. Defendants ask that the Court set aside the Department's *Touhy* denials and compel the deposition of those witnesses.

### B. The Department Has Improperly Withheld Noise And Ototoxin Exposure Data.

Over twelve months ago, on June 21, 2019, Defendants requested eight categories of noise and ototoxin exposure data, including, for example, "[n]oise dosimetry data or other documents regarding the amount of noise service members are exposed to in particular specialties, in particular situations, or when operating particular weapons." (Ex. G, at 10-11.) At the Department's request, on July 26, 2019, Defendants resubmitted that *Touhy* request to adhere to the Department's preferred formatting. (Ex. H, at 12-13.) In subsequent telephonic discussions, Major Evans stated that he had been unable to locate the information and believed it did not exist. In response, on March 17, 2020, Defendants submitted a supplemental

*Touhy* request that specifically identified potential sources of this information, and noted that the Army's regulations *require* that it be collected.  (Ex. I, at 3.)  All of Defendants' requests for this information remain "open" and unanswered.  Indeed, the Department's "comprehensive" update letter on June 26, 2020 stated that the Department had not even begun "processing" the March 17, 2020 request because it was still working on the earlier request from July 2019.  (Ex. F, at 3.)  Given the discovery schedule in this litigation and the need for any government discovery to be taken promptly, the government's "update" amounts to a constructive denial of Defendants' request.

Notwithstanding the government's suggestion that the requested data may not exist, noise exposure data is required by various Department regulations.  For example, pursuant to Army Pamphlet 40-501, Hearing Conservation Program: the Industrial Hygiene Program Manager at every Army installation must, among other things, (i) survey all known and suspected noise-hazardous areas and equipment and ototoxic exposures, (ii) maintain a current inventory of all noise-hazardous areas, (iii) compile the names and Social Security numbers of noise-exposed and ototoxic-exposed personnel and the magnitude of their noise exposure, and (iv) track noise exposure violations for inclusion on a violation inventory log.  (Dkt. 1071, Ex. 8 at 1-4.)  Similarly, the regulations require Hearing Conservation Officers to, among other things, (i) notify noise-exposed and ototoxin-exposed personnel of their

exposures, and (ii) ensure that noise-exposed and ototoxin-exposed personnel wear noise and ototoxin dosimeters when requested.  (*Id.*)  Defendants understand that, pursuant to these regulations, the Army collects the required data and calculates the average daily noise exposure of individuals working in each military occupational specialty.

Other public documents confirm that the Army has the data the regulation requires it to collet.  The website of the Army Public Health Center notes that, consistent with the regulation, "Army industrial hygienists are responsible for conducting noise surveys in the workplace to identify military and civilian workers potentially exposed to noise hazards."  (Ex. J.)  A factsheet for the Department's industrial hygiene database (DOEHRS-IH) explains that two "key features" of the database are that it "[c]aptures comprehensive, operational and work task potential exposures-based medical surveillance recommendations," and "[t]racks DoD lifetime personnel exposure data."  (Ex. K.)  It also says a "key benefit" of the database is that it "[c]aptures information to monitor compliance with occupational health and safety federal law and directives."  (*Id.*)  The 2006 book *Noise and Military Service*, published by the National Academies of Sciences, observes that each "Army installation evaluates work environments for potential noise hazards from steady-state noise in industrial-type operations.  Since 1988, the sound pressure level and noise dosimetry measurements have been collected…."  (Ex. L, at 76.)

**C.    The Department Has Improperly Withheld Health Hazard Assessments.**

In addition to the average daily noise-exposure data discussed above, Department regulations also require that the military determine the noise exposures caused by individual weapons systems and transport vehicles.  In particular, per Department regulations, the Army performs health hazard assessments ("HHAs") on the following military systems: "weapons platform, munitions, equipment, clothing, training devices, and other materiel systems."  (*See* Ex. M, Army Regulation 40-10, Health Hazard Assessment Program in Support of the Army Acquisition Process, at § 1-5.)   According to the Army regulation, an HHA is "[t]he application of biomedical knowledge and principles to document and quantitatively determine the health hazards of Army systems." (*Id.* at 25.)  "This assessment identifies, evaluates, and recommends controls to reduce risks to the health and effectiveness of personnel who test, use, or service Army systems," and includes within itself: "(a) [t]he evaluation of hazard severity, hazard probability, risk assessment, consequences, and operational constraints, (b) [t]he identification of required precautions and protective devices, [and] (c) [t]raining requirements."   (*Id.*)   Health hazards addressed in the HHA include, among other things: "[a]coustic energy (steady-state noise, impulse noise, and blast overpressure)," including, for example, "continuous noise from engines and helicopter rotors," "impulse noise from shoulder-fired

weapons," and "blast overpressure created from the firing of mortars, towed artillery, and heavy weapons on crew-served vehicles." (*Id.* at C-2.)

Thus, HHAs should exist for, among other things, each weapon system operated by the bellwether plaintiffs, and each military vehicle the bellwether plaintiffs operated or were transported in. In an effort to assist the government's production of relevant HHAs, on May 20, 2020, Nick Wasdin of Kirkland & Ellis provided Maj. Evans with the list of weapons the bellwether plaintiffs had identified using in their bellwether selection sheets. (Ex. N at 3-4.) The Department has not yet produced any of the relevant HHAs.

### D.   The Department Has Improperly Withheld Safety Release Documentation For The CAEv2.

The Department has also failed to produce the safety release documentation for the CAEv2. Defendants' July 26, 2019 *Touhy* contains numerous requests for documents related to, among other things, specifications for the CAEv2 (A(1)), test data on the CAEv2 (G(1)), data and protocols related to CAEv2 testing (G(2)), policies or procedures related to fitting the CAEv2 on individual service members (H(1), H(2), H(3)), training materials on the proper use or fit of the CAEv2 (C(2), C(3)), and recommendations or guidelines for when to wear the CAEv2 (I(2), I(3), I(4)). (*See* Ex. H.) One document responsive to all of those requests is the Army's "safety release" for the CAEv2.

Per Army Regulation 385-10, a "Safety Release" is "[a] formal document issued to any user or technical test organization before any hands-on training, use, or maintenance by troops." (Ex. O, at 148.) "The safety release is a stand-alone document which indicates the system is safe for use and maintenance by typical user troops and describes the specific hazards of the system or item based on test results, inspections, and system safety analyses." (*Id.*) "Operational limits and precautions are included." (*Id.*) "The test agency uses the data to integrate safety into test controls and procedures and to determine if the test objectives can be met within these limits. …" (*Id*.). The Department has not yet produced the safety release documentation for the CAEv2.

The Department has, however, produced documents indicating that the CAEv2 safety release exists. Exhibit 16 to Defendants' motion for summary judgment on the government contractor defense is a report of testing on the CAEv2 conducted by the Army Research Laboratory in June 1999. (Dkt. 1071, Ex. 16 at 1.) That report states, on the first page, that "[t]he results of this effort will be provided to the U.S. Army Center for Health Promotion and Preventative Medicine (CHPPM), APG, MD *as input to development of safety release documentation for the Aearo non-linear Combat Arms Earplug*." (*Id.*) The government's failure to identify and produce this material over a twelve-month time period amounts to a constructive denial of Defendant's request.

On June 16, 2020, Special Master Herndon advised the parties of the burdens on Major Kim's office in responding to the parties' *Touhy* requests, and of Major Kim's request that the parties assist her with prioritization of the requests relative to other pending matters. Thus, on June 18, 2020, Defendants sent Major Kim an email asking that she prioritize production of the CAEv2 safety release. (Ex. P at 2-3.) In response, Ms. Snead of the DOJ asked Mr. Wasdin to identify the specific requests to which the safety release documentation would be responsive, and suggested that Defendants were "speculating" that the safety release would be responsive to Defendants' requests. (*Id*. at 1-2.) Mr. Wasdin identified the relevant requests, and asked Ms. Snead to clarify whether the Department intended to produce the safety release, but Ms. Snead did not respond. Subsequent to that correspondence, Major Kim separately emailed Defendants and stated that "[w]e are looking into whether there is anything that would be responsive to the request." (Ex. Q.)

Defendants can certainly appreciate the burden on Major Kim's office in responding to the request, and appreciate her willingness to further analyze the safety release and Defendants' requests. But, in total, Defendants have served over 50 *Touhy* requests for documents related to the CAEv2, including, among other things, for documents related to specifications, testing, training, and recommended use. The safety release—which, per Army regulations, is "[a] formal document issued to any user or technical test organization before any hands-on training, use, or maintenance

by troops" and "describes the specific hazards of the system or item based on test results, inspections, and system safety analyses" —is plainly responsive to numerous of those requests.   (Ex. O, at 148.)   The Department's failure to produce this document for over twelve months, coupled with the Department's failure to give a definitive answer with respect to its position on production when Defendants attempted to prioritize it in June 2020, amounts to a constructive denial of Defendants' requests.  The Department should either produce the documentation or explain why it cannot be located.

### E.    The Department Has Improperly Withheld The Identity Of Military Witnesses Relevant To The Bellwether Cases.

The military employs audiologists and industrial hygienists to administer hearing conservation programs at every Army installation.  In particular, pursuant to Army Pamphlet 40-501, the commander of every Army installation must, among other things, (i) appoint an audiologist, where available, to act as the Hearing Conservation Program Manager and to be a member of the installation's Safety and Occupational Health Advisory Council, and (ii) appoint an individual to act as the Industrial Hygiene Program Manager. (Dkt. 1071, Ex. 8, at § 1-4.)  The duties of the Hearing Conservation Program Manager and Industrial Hygiene Program Manager are detailed in Army Pamphlet 40-501 (and the related DoD Instruction 6055.12), and include, respectively, among other things: (i) ensuring that medically trained personnel fit individuals with preformed earplugs, like the CAEv2, and examine

those individuals at least annually to ensure proper earplug condition and fit, and (ii) surveying all known and suspected noise-hazardous areas and equipment and ototoxic exposures, maintaining a current inventory of all noise-hazardous areas, compiling the names and Social Security numbers of noise-exposed and ototoxic-exposed personnel and the magnitude of their noise exposure, and tracking noise exposure violations for inclusion on a violation inventory log.  (*Id.* at § 1-4(g)-(h).) Thus, it is the Hearing Conservation Program Manager who would determine whether and how servicemembers at a particular installation were fit with and trained to use the CAEv2, and it is the Industrial Hygiene Program Manager who had the responsibility of tracking noise exposures at each installation.

On May 30, 2020, Defendants sent Ms. Snead a list of the Army installations relevant to the bellwether plaintiffs, as well as the time periods the bellwether plaintiffs were present.  Defendants asked for Ms. Snead's guidance on the best way to obtain the names of the individuals who served as the Hearing Conservation Program Manager and Industrial Hygiene Program Manager at the bellwether-relevant installations.  On June 2, 2020, Ms. Snead advised Defendants to submit another *Touhy* request to Major Kim.  Defendants submitted that request on June 3, 2020.  (Ex. R.)  Defendants' June 3 *Touhy* request identified the installations and time periods relevant to all of the bellwether plaintiffs.  In light of Special Master Herndon's June 16, 2020 guidance to further prioritize *Touhy* requests, on June 17,

14

2020, Defendants sent Major Kim a shorter list of priority installations and time periods relevant to the Trial Group A bellwether plaintiffs.  (Ex. S at 1.)

The Department's June 26, 2020 "comprehensive" update letter states that, although the Department has "started processing" this request, "no final determination has been made as to whether this information is available or whether it would be unduly burdensome for the agency to obtain this information."  Given the discovery schedule in this litigation and the need for any government discovery to be taken promptly, and the Department's failure to produce other relevant material for over a year, the government's "update" amounts to a constructive denial of Defendants' request.  Defendants need this information quickly, so that Defendants can then use it to begin the likely lengthy process of submitting additional *Touhy* requests to take these individuals' depositions in connection with the individual bellwether cases.  Defendants fear that any further delay will jeopardize their ability to complete bellwether discovery on the schedule set by the Court.

## ARGUMENT

### I.    A Motion To Compel Is An Appropriate Vehicle For Challenging The Government's *Touhy* Denials.

A motion to compel is a procedurally appropriate, and by far the most efficient, means of challenging a federal agency's *Touhy* denials.  In the past, the United States has taken the position that any challenge to a federal agency's decision to deny a *Touhy* request must take the form of a separate action brought under the

Administrative Procedure Act.  *See, e.g.*, *Wilson v. Jackson Nat'l Life Ins. Co.*, 2017 WL 10402568, at *1 (M.D. Fla. Dec. 27, 2017).  The United States is correct that, in the Eleventh Circuit, an agency's denial of a *Touhy* request is considered an "agency action" subject to review under the APA.  5 U.S.C. § 706(2)(A); *see Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1197 (11th Cir. 1991).[3]  But courts in the Eleventh Circuit have routinely rejected the government's argument that APA review can occur only in a separate action, which would require duplicative and time-consuming litigation.  *See U.S. ex rel. Lewis v. Walker*, 2009 WL 2611522, at *2 (M.D. Ga. Aug. 21, 2009) ("[T]he Court sees no reason why it cannot decide [the dispute] as part of the presently pending … action.").  Instead, courts have saved time and effort by simply construing a motion to compel (or response to the agency's motion to quash) as an APA action.  *Forgione v. HCA Inc.*, 954 F. Supp. 2d 1349, 1352-53 (N.D. Fla. 2013) ("Significant delay and inconvenience will be avoided simply by construing the instant action as arising under the APA."); *Barnett v. Illinois State Bd. of Elecs.*, 2002 WL 1560013, at *1 (N.D. Ill. July 2, 2002) ("[A] motion to compel directed against the Department does the job of bringing an APA

---

[3] The Ninth and D.C. Circuits disagree, however, and correctly hold that federal courts should assess the discovery obligations of federal agencies under the applicable Federal Rules of Civil Procedure.  *Watts v. SEC*, 482 F.3d 501, 508 (D.C. Cir. 2007) (Kavanaugh, J.); *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 778-79 (9th Cir. 1994).

action before the court equally as well as, if not better than, a separate APA claim against the Department.") (citation and internal quotation marks omitted).  Requiring a separate APA action would be especially unwarranted here, where the government has already caused months of unnecessary delay by failing to respond to Defendants' *Touhy* requests.

## II.    The Department's Refusal To Present Its Current Employees For Deposition Is Arbitrary And Capricious.

Courts in the Eleventh Circuit review an agency's decision to deny a *Touhy* request under the APA's arbitrary-and-capricious standard.[4]  An agency's denial of a request to depose a witness who possesses relevant evidence is arbitrary and capricious—particularly where the agency has failed to give any rationale whatsoever for the denial.  *See Lewis*, 2009 WL 2611522, at *4 (overturning an agency's denial of a *Touhy* deposition request as arbitrary and capricious).  There can be no dispute that each of the current employees Defendants seek to depose possesses evidence relevant to this litigation.

---

[4] As noted above, however, other circuits have correctly held that the Federal Rules of Civil Procedure, rather than the APA, govern the discovery obligations of federal agencies.  It makes little sense to review an agency's *Touhy* denial under the APA's arbitrary-and-capricious standard, given that the regulations themselves do not give the agency a basis for "withholding information from the public or limiting the availability of records to the public."  5 U.S.C. § 301; *see Watts*, 482 F.3d at 508-09.  Accordingly, a federal agency should be required, like any other party, to respond to valid discovery requests unless it can show that the discovery requests are irrelevant or unduly burdensome.  *See Watts*, 482 F.3d at 509.

### (a)   Mary Binseel

Mary Binseel is a researcher at the Army Research Laboratory and the lead author of two studies analyzing the CAEv2.  In one study, Ms. Binseel conducted "real-ear attenuation at threshold" (REAT) tests of the CAEv2 and concluded that the earplug "compared very well with [its] design specifications."  (Dkt 1071, Ex. 48 at 19.)  The other study involved speech intelligibility and localization precision testing, in which service members wore the yellow, non-linear end of the CAEv2 while listening to speech or determining the direction of incoming sounds.  (Dkt. 1071, Ex. 49.)

Defendants seek to depose Ms. Binseel regarding: (i) the test protocols employed in the testing, (ii) the results of the studies; (iii) the context surrounding the studies, including why the studies were commissioned, who requested them, what the information was used for, (iv) communications with Aearo or other entities regarding the studies, and (v) the location of documents and other data regarding those topics.

### (b)   Dr. Mark Little

Dr. Mark Little is an Army audiologist who currently serves as the chief of audiology at the Dwight D. Eisenhower Army Medical Center in Georgia.  As detailed in Defendants' summary judgment brief, Little had extensive communications with Aearo research scientist Elliott Berger regarding Aearo's

internal testing of the CAEv2,  and the proper fitting technique for the CAEv2 during testing.  (*See* Dkt. 1071 at 16-17.)  Dr. Little contacted Berger to request information on the CAEv2 for testing he was planning to conduct, and Berger responded with a letter enclosing three attachments: (i) a package for the consumer version of the product, which contained the "flange fold" fitting instruction; (ii) test data from the makers of the CAEv2's non-linear filter; and (iii) Aearo's internal test reports describing, among other things, the flange fold fitting technique used on one of the tests.  (*See* Dkt. 1071, Ex. 28; Ex. 56 (12/12/19 Berger Tr.) at 84:25-88:13; Exs. 29-33; Ex. 56 (12/12/19 Berger Tr.) at 88:16-103:3.)  On September 25, 2001, Dr. Little sent Berger an email stating that he "received [the] mailing and will make use of the instructions."  (Dkt. 1071, Ex. 34; Ex. 56 (12/12/19 Berger Tr.) at 103:4-104:10.)  Little specifically asked Berger if "the sealing rings of the outward facing plug that were rolled back upon themselves during fitting, as per the instructions, stay this way in the ear or should they be unrolled??"  (Dkt. 1071, Ex. 34.)  Berger responded: "they should stay that way."  (*Id.*)  These communications show that Plaintiffs have no basis for their assertion that Defendants deliberately concealed the flange-fold issue from the government.  Defendants seek to depose Dr. Little regarding: (i) his communications with Berger and others at Aearo, (ii) any communications with Doug Ohlin or other Army audiology officials, and (iii) the testing he performed on the CAEv2.

(c)     **LTC Martin Robinette**

LTC Martin Robinette is an Army audiologist who currently serves as the Army Liaison to the Hearing Center of Excellence at Lackland Air Force Base in Texas. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████ The government's production also shows that Robinette was included on emails from 1999 in which Ohlin noted that Aearo's initial production samples were "at least a quarter of an inch too long," and that

Ohlin had taken the liberty of cutting down the samples himself.  (Dkt. 1071, Ex. 3 at DOD00000136.)

Defendants seek to depose LTC Robinette regarding: (i) his knowledge of any fitting issues with the CAEv2, (ii) his understanding of the flange-fold instruction, (iii) Ohlin's evaluation and approval of hearing protection devices, and (iv) the military's consideration of the length of the CAEv2.

LTC Robinette is the only one of these witnesses on which the Department has rendered a decision.  On June 23, the government denied the parties' requests to depose LTC Robinette because he "had a minimal role, if any, in acquiring or approving the CAEv2."  (Ex. E at 1.)  Even if that were true, LTC █████████ testimony would still be highly relevant to demonstrating the military's knowledge of the flange-fold issue.   The Department also asserted that it would be too burdensome to prepare LTC Robinette because he had served as "a DOJ subject matter expert" in the *qui tam* case concerning the CAEv2.  LTC Robinette's service as a "subject matter expert" in a related investigation further demonstrates his relevance to this litigation, and the Department's bare assertion that preparing him to testify would be too burdensome is not a sufficient basis for denying Defendants' request.  Indeed, if he recently served as a subject matter expert in related litigation, then the events should be fresh in his memory and preparation for a deposition should not be burdensome.

### (d)    Dr. Leanne Cleveland

Dr. Leanne Cleveland is an Army audiologist who currently serves at Fort Carson in Colorado.  Documents produced to date show that Ms. Cleveland attended a Post Deployment Health Reassessment Survey Session in 2005 and asked soldiers questions regarding their experiences using the CAEv2.  (*See* Ex. T.)  Defendants seek to depose Dr. Cleveland regarding: (i) questions and answers at the post Deployment Health Reassessment Survey; (ii) Dr. Cleveland's personal experience regarding CAEv2 usage and application within the Army; (iii) Dr. Cleveland's personal knowledge and experience regarding service member satisfaction with CAEv2 while worn in training and in combat.

### (e)    LTC Theresa Schulz

LTC Theresa Schulz was an Army audiologist who, according to notes taken by Elliott Berger, attended the December 1997 meeting at which Doug Ohlin informed Aearo he wanted an earplug that was dual-ended, among other design features.  (*See* Dkt. 1071, Ex. 2 at 1.)  Defendants seek to depose LTC Schulz regarding: (i) the military's solicitation of the CAEv2; and (ii) the military's evaluation and approval of the design of the CAEv2.

### (f)    Dr. John King

Dr. John King ordered one of the first shipments of the CAEv2 while serving as the scientific adviser to the Army's Southern Europe Command.  (*See* Dkt. 1071, Ex. 3 at DOD00000138-40.)  Dr. King was also involved in the Army's

first study of the CAEv2 in June 1999.  (*See* Dkt. 1071, Ex. 16 at 1.)  When Dr.

King was recalled to active duty in 2003, he determined "based on his field

experience with the Combat Arms" that his unit had a need for the earplugs.  (Ex.

U at 2.)  The initial reaction was that the CAEv2 were "worth their weight in

gold," and Dr. King intended to conduct a more thorough "field evaluation" of the

CAEv2.  (*Id*.)

Defendants seek to depose Dr. King regarding: (i) the military's solicitation

of the CAEv2; (ii) the June 1999 testing of the CAEv2; (iii) his experience with the

CAEv2 as a scientific adviser and while on active duty, including the results of any

"field evaluation" he conducted.

## III.   The Department's Failure To Locate And Provide Noise and Ototoxin Exposure Data is Arbitrary and Capricious

Defendants first requested noise and ototoxin exposure data on July 26, 2019.

(Ex. G, at 10-11.)  The Department responded that it had been unable to locate the

information and believed it did not exist.  Defendants then submitted a supplemental

*Touhy* request on March 17, 2020, which described that the Army is *required* to

collect this data.  (Ex. I.)  And, in addition to the Army's own regulations, it is clear

from publicly available information that the Department tracks noise exposure data

for servicemembers, weapons systems, and military vehicles, and compiles some or

all of that data in the DOEHRS-IH database.  (*See* Exs. J-L.)

By this motion, Defendants seek four categories of noise and ototoxin exposure data that Defendants understand exist based on their review of the Army regulations and other publicly available materials.

- First, average noise and ototoxin exposure per military occupational specialty. This data may be kept as average daily, weekly, monthly or yearly exposures.

- Second, data regarding noise and ototoxin exposures at the bellwether-relevant Army installations. A list of the relevant installations and time periods is contained in Defendants' June 3, 2020 *Touhy* request. (Ex. R.)

- Third, the health hazard assessments for the weapons operated by the bellwether plaintiffs. A list of the bellwether-relevant weapons identified to date is contained in Defendant's May 20, 2020 email to Major Evans. (Ex. N.)

- Fourth, the "comprehensive, operational and work task potential exposures-based medical surveillance recommendations," and "DoD lifetime personnel exposure data," that are referred to in the promotional materials related to the DOEHRS-IH database. (Ex. K.)

Defendants' request for these materials has been "open" and unanswered since July 2019. The Department's refusal to provide this discrete set of documents is arbitrary and capricious, and the Court should compel production of these materials here.

## IV.   The Department's Failure To Provide "Safety Release" Documentation For The CAEv2 Is Arbitrary And Capricious.

In the July 26, 2019 *Touhy* request, Defendants asked for documents that may contain, among other things, specifications for the CAEv2, test data on the CAEv2, data and protocols related to CAEv2 testing, policies or procedures related to fitting

the CAEv2 on individual service members, training materials on the proper use or fit of the CAEv2, and recommendations or guidelines for when to wear the CAEv2. (*See* Ex. H, at 7-11.)   A "safety release" for the CAEv2—which, per Army regulations, is "[a] formal document issued … before any hands-on training, use, or maintenance by troops" and "describes the specific hazards of the system or item based on test results, inspections, and system safety analyses"—would be responsive to those requests.  (Ex. O, at 148.)  And the June 1999 testing report from the Army indicates that a safety release was, in fact, created for the CAEv2.  (Dkt. 1071, Ex. 16 at 1.)

The Department's failure to produce the safety release, as well as its failure to even confirm that it believes the safety release is responsive to Defendants' requests, is arbitrary and capricious.  The Court should order the Department to produce the safety release or explain why it cannot be located.

## V.   The Department's Failure To Identify Military Witnesses Relevant To The Bellwether Cases Is Arbitrary And Capricious.

The Hearing Conservation Program Managers and Industrial Hygiene Program Managers at the installations where the bellwether plaintiffs served will have highly relevant information concerning the noise and ototoxin exposures the bellwether plaintiffs may have experienced and the hearing-protection measures they may have taken.  Defendants need to know the identities of these individuals before the close of discovery for bellwether Trial Group A on September 1, 2020.

Given the discovery schedule, the Department's failure to respond to Defendants' request constitutes an arbitrary and capricious constructive denial.  The Court should compel the Department to provide the identities of the bellwether-relevant military witnesses.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court compel the Department to present Ms. Binseel, Dr. Little, LTC Robinette, Dr. Cleveland, LTC Schulz, and Dr. King for deposition.

Defendants also request the Court compel the production of the following information and documents.  *First*, the noise and ototoxin exposure data discussed above: (i) average exposures for each military occupation, (ii) exposure data for each installation, (iii) the requested HHAs, and (iv) the comprehensive DOEHRS data. *Second*, the bellwether-relevant health hazard assessments.  *Third*, the safety release documentation for the CAEv2.  *Fourth*, the identities of the Hearing Conservation Program Managers and Industrial Hygiene Program Managers at the bellwether-relevant installations.

Dated:  July 1, 2020                    Respectfully submitted,


                                        */s/Robert C. Brock*
                                        Robert C. "Mike" Brock
                                        KIRKLAND & ELLIS LLP

1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
mark.nomellini@kirkland.com

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company,*
*3M Occupational Safety LLC, Aearo*
*Technologies LLC, Aearo Holding, LLC,*
*Aearo Intermediate, LLC and Aearo, LLC*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

I HEREBY CERTIFY that this brief complies with the word limit of Local

Rule 7.1(F), and contained 5990 words, excluding the parts exempted by the Rule.


Dated: July 1, 2020

*/s/Robert C. Brock*
Robert C. "Mike" Brock

## <u>CERTIFICATE OF SERVICE</u>

I, Robert C. Brock, hereby certify that on July 1, 2020, I caused a copy of Defendants' unredacted Motion to Compel Against the Department of Defense to be submitted via email to Tevenia Jacobs, law clerk to Judge Rodgers.  Jacqui Snead of the Department of Justice and Major Nicole Kim of the Department of Defense were copied on that email.

On July 2, 2020, I will cause a paper copy of the foregoing to be sent via FedEx Priority Overnight to Ms. Snead and Major Kim at the following addresses:

>    Major Nicole Kim
>    Judge Advocate, U.S. Army
>    Litigation Attorney
>    U.S. Army Legal Services Agency
>    9275 Gunston Road
>    Fort Belvoir, VA 22060
>
>    Jacqui Coleman Snead
>    Assistant Branch Director
>    Federal Programs Branch
>    U.S. Dep't of Justice, Civil Division
>    1100 L Street, N.W., Room 12402
>    Washington, D.C. 20005

Dated: July 1, 2020

>                         */s/Robert C. Brock*
>                         Robert C. "Mike" Brock