**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG    )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,  )
                               )    Pensacola, Florida
                               )    July 6, 2020
                               )    12:30 p.m.
                               )
                               )
_____)


**TELEPHONE CONFERENCE**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE

(Pages 1-16)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

## A P P E A R A N C E S

FOR THE PLAINTIFFS:        **BRYAN F. AYLSTOCK, ESQUIRE**
                           Aylstock, Witkin, Kreis & Overholtz
                           17 E Main Street, Suite 200
                           Pensacola, Florida  32502

                           **THOMAS W. PIRTLE, ESQUIRE**
                           Laminack, Pirtle & Martines, LLP
                           5020 Montrose Boulevard, 9th Floor
                           Houston, TX  77006

                           **VIRGINIA E. ANELLO, ESQUIRE**
                           Douglas & London, P.C.
                           59 Maiden Lane, 6th Floor
                           New York, New York  10038

FOR THE DEFENDANTS:        **ROBERT C. BROCK, ESQUIRE**
                           Kirkland & Ellis, LLP
                           1301 Pennsylvania Avenue NW
                           Washington, D.C.  20004

                           **KIMBERLY BRANSCOME, ESQUIRE**
                           Dechert, LLP
                           633 W 5th Street, Suite 4900
                           Los Angeles, California  90071

**MARK J. NOMELLINI, ESQUIRE**            **HALEY J. VANFLETEREN, ESQUIRE**
Kirkland & Ellis, LLP                     Moore, Hill & Westmoreland, PA
300 N Lasalle                             350 W Cedar Street, Suite 100
Chicago, Illinois  60654                  Pensacola, Florida  32502

```
 1                      P R O C E E D I N G S
 2          THE COURT:  Hello.  This is Casey Rodgers.
 3          MR. AYLSTOCK:  Good afternoon, Judge.  Bryan is on.
 4          THE COURT:  Hello.
 5          MR. PIRTLE:  Good afternoon, Judge.  This is Tom
 6   Pirtle.
 7          THE COURT:  Hi, Tom.
 8          MS. BRANSCOME:  Good afternoon, Judge.  This is Kim
 9   Branscome.
10          THE COURT:  Hi, Kim.
11          MS. VANFLETEREN:  Haley VanFleteren is present.
12          THE COURT:  Okay, Haley, thank you.
13          MR. NOMELLINI:  Good afternoon.  Mark Nomellini is on.
14          THE COURT:  Okay, Mark.
15          Do I have the attorneys here right now that have
16   already introduced themselves that are going to be addressing
17   the Court on this call?  That's really all I need to know right
18   now.  So, Bryan, who on your team is going to address the
19   Court?
20          MR. AYLSTOCK:  It's going to be myself and Mr. Pirtle,
21   so we're all here from the Plaintiffs.
22          THE COURT:  Okay.  Ms. Branscome?
23          MS. BRANSCOME:  Yes, Your Honor, I believe we can
24   proceed.  I know Mike was going to try to join, so I don't know
25   if he's on, but myself and Mark can handle it for our side.
```

1        **MR. BROCK:**  Judge, this is Mike.  I'm on.  And yes,
2    Kim and Mark will handle for our side.  Thank you.

3        **THE COURT:**  All right.  Very good.  Thank you.

4        **MS. ANELLO:**  Your Honor, if I may, this is Virginia
5    Anello, counsel for Mr. Garcia.  Mr. Aylstock and Mr. Pirtle
6    will be speaking, but I just wanted to let the Court know that
7    I was here.

8        **THE COURT:**  Good.  I'm glad you're on.  Thank you, Ms.
9    Anello.

10       Is Donna Boland, my court reporter, on the call?

11       **COURT REPORTER:**  Yes, Judge, I'm here.

12       **THE COURT:**  Okay, very good.  I'm not sure if Sue
13   Simms is on.

14       **MADAM CLERK SIMMS:**  Yes, I am, Judge, I was able to
15   connect.

16       **THE COURT:**  Okay.  Very good.  Thank you.

17       All right.  Let me hear from the Plaintiffs on the
18   update on Mr. Garcia.  I believe, at last discussion,
19   Mr. Pirtle was going to make an effort to actually visit with
20   Mr. Garcia in person.

21       **MR. AYLSTOCK:**  He did, Judge, and I'll turn it over to
22   him.  First of all, thank you for allowing us to give this oral
23   report, appreciate that.

24       But, Tom, you want to tell the Court what you did and
25   what you found?

1          **MR. PIRTLE:**  Sure, Judge.  Tom Pirtle.  I was assigned

2     the task of going down to the valley and trying to find Mr.

3     Garcia.  After several phone calls and one attempt at going

4     down there -- I went down there last Wednesday -- he wasn't

5     answering his phone, wasn't replying to text messages.  So I

6     decided not to call in advance.

7          Got there, went to his apartment, got entry into the

8     complex, got there.  Had a great lead from some lawyers from --

9     four lawyers here that helped me with where he worked.  Talked

10    to his coworkers, talked my way through so they finally

11    admitted he worked there.

12         And then I talked to his boss, Mr. Rojo, until he got

13    off work, and I got an opportunity to speak with him at length

14    after five o'clock on Wednesday.

15         **THE COURT:**  Okay.

16         **MR. PIRTLE:**  Mr. Rojo told me while we were sitting

17    there -- and he runs a fire sprinkler company -- that Mr.

18    Garcia had been out for a week-and-a-half because he was ill.

19    So we chatted about that a bit, and he said he had a lung

20    problem.  That's the first I knew of that.

21         When Mr. Garcia got there between five and six, we

22    spoke, and he relayed to me that he had been ill for -- well,

23    he pushed it back to the time when he got out of the service,

24    but evidently he's got some type of lung problem.  And he had,

25    the week, week-and-a-half before, went to some doc-in-the-boxes

1    and ended up in the VA hospital in Harlingen for three days

2    trying to figure out what was wrong with his breathing.

3            According to him and Mr. Rojo, Mr. Garcia was having

4    such a difficult time breathing that he was fainting at work

5    and those type of things, you know, and had to be transported,

6    you know, to the hospital.

7            So that explains, in part, why he was hard to get

8    ahold of.  But it also I think, you know, raises some questions

9    as to his overall health and fitness as to whether or not he's

10   the right person to continue.  I don't know the answer to that.

11   I'm just relating what I found out.

12           And I asked him straight up, I said, "Are you going to

13   be able to do this?"  And he said, "I don't know."  And I said,

14   "Well, I don't know is not going to work."  I said, "This thing

15   is fixing to move fast."

16           So he basically said do whatever you want to do,

17   Judge, with it.  He obviously will try his best to comply, but

18   I have no confidence that I can raise him on the phone -- I can

19   sure enough find him again.  But in terms of getting any quick

20   replies out of him, I don't know whether that's going to work

21   or not.

22           **THE COURT:**  Mr. Pirtle, thank you for that.  Let me

23   ask, did you speak to him -- and maybe Ms. Anello needs to

24   address this -- about his interrogatory responses?

25           **MR. PIRTLE:**  I did not speak to him directly about his

1  interrogatory responses.  You know, his general attitude was

2  he's talked to some people and they keep him on the phone for

3  about an hour and he's short of breath and all this, that, and

4  the other.  And so I wanted to make sure that the guy continued

5  to talk to me, so rather than do that, I let Virginia handle

6  that.  And I guess she can answer the question.

7          **THE COURT:**  All right.  Thank you.

8          Ms. Anello?

9          **MS. ANELLO:**  As for the interrogatories, there was a

10  period of time that he was briefly responsive and I was able to

11  obtain certain information.  But the interrogatories would not

12  be complete and then he became unresponsive.  I guess he would

13  always do all of his health concerns and issues that he was

14  having, and I would not be able to provide complete

15  interrogatories based off of where we are standing today.

16          **THE COURT:**  And why is that?

17          **MS. ANELLO:**  Because, honestly, before Mr. Pirtle was

18  able to actually search him out, we had difficulty speaking

19  with him and reaching him at all by any means to get responses

20  to the interrogatories.

21          And my understanding -- and I don't want to speak for

22  Mr. Pirtle -- is, based on his conversation with him, he is not

23  medically, I guess, capable or not -- I don't want to use the

24  word "wanting" but to spend time responding to the

25  interrogatories.

1    **THE COURT:**  Well, it sounds like he's working an

2    eight-hour day, so I'm not understanding that.  I mean, I

3    understand he's had some difficulties.  It sounds like he was

4    in the hospital for a few days, but Mr. Pirtle found him after

5    work.

6    **MR. PIRTLE:**  I did, Your Honor.  And I think you are

7    right, he's working an eight-hour day.  I do assess him as

8    being fairly ill from looking at him, and that was something I

9    wasn't really looking -- I didn't think that was going to be

10   what I found when I went down there.

11   And I told him straight up, I said, "Look, either

12   you're going to have to come along and start complying, or this

13   judge is going to dismiss your lawsuit."  And he's kind of

14   like, "Well, I guess they'll do what they're going to do."

15   He's a different kind of animal.  Certainly, you know,

16   we need those kind of people in the military, and I'm sure he

17   was a good soldier.  But he is different than the other clients

18   that we have in terms of -- well, he lives a mile away from the

19   Mexican border.  He's just different.  And he's difficult to

20   get ahold of, period.

21   **THE COURT:**  Right.

22   **MS. ANELLO:**  Yes, Your Honor, I mean, to that effect

23   -- and I want to be clear, I understand that he is working the

24   eight-hour days, and I understand with his illness and

25   everything else.  But we've tried to even accommodate him at

1  weekends and making ourselves available when he has the

2  availability to respond, and it just hasn't been successful.

3          **THE COURT:**  Okay.  Thank you.

4          Let me hear from the Defendant.

5          **MS. BRANSCOME:**  Thank you, Your Honor.  This is Kim.

6  You know, I think we have some of the same reactions that it

7  sounded like from your questions you may have had, which is

8  simply that, you know, it sounds like Mr. Garcia is able to

9  work, he is, you know, responsive kind of periodically.

10         If Your Honor will recall, this came up in early days.

11 You know, he did fill out some of the initial forms that were

12 required to participate in the bellwether process.  There was

13 an indication that he was nonresponsive, but then, you know, a

14 fair amount of information was provided.  He became

15 nonresponsive when it came time do the *Lexecon* waivers.  We

16 raised a concern at that time about his lack of responsiveness,

17 and then he became responsive and submitted a *Lexecon* waiver

18 and said he wanted to proceed with his case.  And now here we

19 are again attempting to obtain discovery and he's, you know,

20 sort of it sounds like intermittently responsive.

21         From our standpoint, if he's filed a lawsuit and he is

22 proceeding with that lawsuit against our client, he was

23 selected for the bellwether process, he is engaged in the

24 bellwether process, he should be meeting these deadlines.  If

25 he is not capable of meeting these deadlines, then his case

1   should be dismissed with prejudice.

2        You know, I understand that he may have had some

3   health issues but, you know, he's going to work.  As I'm sure

4   Your Honor has experienced, there are lawsuits that proceed all

5   over this country with very sick plaintiffs, some of them

6   terminally ill, and yet they still satisfy court deadlines.  I

7   mean, that's not kind of -- if someone wants to pursue a claim,

8   they have certain obligations to do so.

9        So, from our perspective, he either needs to be

10  meeting the deadlines or the case needs to come out with

11  prejudice.  And because he is a Defense pick, he needs to be

12  replaced with a Defense pick.  And this is something that, from

13  our perspective, should happen as soon as possible because he's

14  in the trial pool A, and we want to make sure that we have time

15  to work up these cases and get them ready for trial.

16       But sort of, you know, either existing in this limbo

17  where he's not moving forward I don't think is workable.  And

18  then, on the other hand, you know, I don't know if the

19  Plaintiffs are going to try to dismiss without prejudice.  You

20  know, that's being addressed also with Mr. Burgus.  But from

21  our perspective, he either moves forward with his case or he

22  chooses to step away from this litigation altogether.  So

23  that's our reaction.

24       In terms of the health issues, you know, it just feels

25  like each time we kind of get a different story with Mr.

1   Garcia, and I don't quite frankly know what to make of it or if

2   it's just someone who really isn't that interested in

3   proceeding with the lawsuit.

4        **MS. ANELLO:**   Your Honor, if I may, there's a variety

5   of things that were stated -- that Ms. Branscome stated, and I

6   think even -- Mr. Pirtle can speak to his meeting with the

7   client and everything else.  But I can remember when I did

8   speak to him that, when questioning him for long periods of

9   time, he did seem to be sick and get tired and fade out, and he

10  didn't sound well.  And I am just personally not believing that

11  he would serve as a viable representative candidate.

12        But I think when we are going back to what Ms. -- and

13  I apologize if I'm pronouncing your last name wrong --

14  Branscome said, she skips over the fact -- and I think, if the

15  Court had it in front of them, the BSS that was submitted by

16  Mr. Garcia -- because not only did it say, "Plaintiff

17  unresponsive, this is being submitted by counsel," which we

18  were advised to do so people would -- so the parties picking

19  the cases would understand this should not be a case that's

20  representative because of that, but it wasn't simply the

21  unresponsiveness.

22        My understanding is that, before the BSS was decided

23  by the Court, the Defendants submitted a laundry list of

24  questions that they represented to the Court that they needed

25  answered in order to properly pick a BSS, a bellwether

1    selection sheet.  And my understanding again is that the Court

2    limited it to these questions saying these are the questions

3    deemed necessary to select a bellwether candidate.  So, not

4    only was he noted to be unresponsive, his answers said

5    "Unknown," "Unknown," "Can't answer that" about the yellow or

6    green end, "Unknown," "Unknown."

7         Despite all of those not being answered, even though

8    Defendants represented they needed these questions to pick a

9    bellwether case, they chose this -- this case was selected as a

10   bellwether case regardless.  And so, I mean, to me there's a

11   lot of questions about how it got selected.

12        But I do believe, given his illness, where we find

13   ourselves right now, dismissal should definitely not be with

14   prejudice.  And I believe Mr. Aylstock may add to me when I'm

15   done, but I also was under the impression that the Court said

16   in its email do not recommend to me ways by which you think I

17   should select a new bellwether case.

18        I'm just -- I'm not going to do that because that's my

19   understanding of what the directions of the Court were, but I'm

20   saying the manner by which Mr. Garcia's case ended up being

21   selected is questionable.

22        **THE COURT:**  Questionable because you believe that he

23   shouldn't have been sort of considered as a representative

24   candidate?

25        **MS. ANELLO:**  I think given the fact that he was

1    identified as unresponsive and that a lot of his questions on

2    the bellwether selection sheet were identified as "Unknown," it

3    raises questions as to how -- like why his case got selected.

4    Like bellwether representatives --

5         **THE COURT:**  Ms. Anello, there was a discussion between

6    myself and counsel back at that time about sort of eligible

7    representative candidates for bellwether, and I made the

8    decision that, if there was someone for whom the bellwether

9    selection sheet wasn't completed in full, they were still

10   eligible.  And so I made that decision, not the Defendants.

11        **MS. ANELLO:**  I understand that.  I thought that it was

12   raised with the Court that some of these people would not be

13   available or reachable given the random selection and things

14   like that and that we were advised to identify that on the

15   bellwether selection sheet to make the parties aware that it

16   would not be a good candidate.

17        **THE COURT:**  I don't know, if you all had those

18   discussions amongst yourselves.  I mean, you may have told me

19   that -- leadership may have made me aware of that, but that did

20   not exclude -- I know my decision was that would not exclude

21   someone from being selected.

22        So I'm not going to get into any more discussion about

23   how I might replace Mr. Garcia.  As I said in my email, I don't

24   want to hear it from the Defendants and I don't want to hear

25   any argument from the Plaintiffs on that.

1            So, it seems to me that Mr. Garcia needs to be removed

2     first and foremost from trial group A.  And then what I'm

3     inclined to do is issue a show cause order as to why his case

4     should not be dismissed with prejudice.

5            And I will allow you all, Ms. Anello, to respond and

6     try to show cause for why it should not be dismissed with

7     prejudice.  I suggest you include medical support for his

8     condition and how long he's had that condition and the impact

9     of that condition on his daily activities.

10           **MS. ANELLO:**  Yes, Your Honor.

11           **THE COURT:**  Anything from anyone else?

12           **MR. BROCK:**  Not from us, Your Honor.

13           **MR. AYLSTOCK:**  Yes, Your Honor.  We did, as you know,

14    oppose -- we filed a motion to dismiss without prejudice for

15    Mr. Burgus with regard to his situation.  I would submit that

16    Mr. Garcia's situation is similar in many respects including

17    the fact that, although his case was filed, it was initially

18    filed on the administrative docket.  And we can go into that in

19    our response, but this wasn't a case that probably would have

20    been filed absent that unique situation in this case.

21           **THE COURT:**  Mr. Aylstock, I don't want to hear about

22    Mr. Burgus.  I wasn't even aware your motion had been filed.

23    That was the direction I gave you.  I haven't seen the motion.

24    I don't want to talk about Mr. Burgus here.  As far as whether

25    they're similar or not, I don't know.

1        I know about Mr. Garcia.  I remember Mr. Garcia.

2   There was difficulty with him.  There was difficulty getting --

3   I think we had a telephone call with Ms. Anello about the

4   *Lexecon* waiver, or else I issued an order in regards to that

5   *Lexecon* waiver maybe following a discussion on the phone.

6        And what I'm being told by Mr. Pirtle -- and I 100

7   percent accept what he's telling me, and I appreciate the

8   efforts he made to go and track down Mr. Garcia -- but that the

9   reason he has not been responsive is due to a medical condition

10  and that medical condition prevents him from continuing to

11  participate in the litigation as a bellwether plaintiff.

12       And so, before I make my decision about how to deal

13  with Mr. Garcia, whether to dismiss his case with prejudice or

14  without, I'm going to require some response from him and some

15  support for what you all are telling me has been the problem

16  with Mr. Garcia.  I've never talked to Mr. Garcia, and it may

17  be that I need to talk to Mr. Garcia.  Maybe he needs to be on

18  a phone call.  I'll determine that once I see the response to

19  the order to show cause.

20       I don't know the same as to Mr. Burgus.  Now I'm

21  bringing him up and I said I don't want to talk about

22  Mr. Burgus.  But I -- *(inaudible)* --

23       **MR. AYLSTOCK:**  My only --

24       **THE COURT:**  -- in discussion with the parties in

25  regards to Mr. Burgus not being responsive, but I'll leave it

1   at that.

2                You said, Mr. Aylstock, your motion has been filed?

3                **MR. AYLSTOCK:**  Yes, Your Honor.  It was filed last

4   week.

5                **THE COURT:**  Wow, okay.

6                **MR. BROCK:**  I think our reply, Judge, is due either

7   today or tomorrow, but soon.

8                **THE COURT:**  All right.  That may be why I haven't seen

9   it is it usually gets to me when it's ripe, but I'll look at

10  that.  Right, I think I did -- I gave you all a fairly short

11  turnaround on the response, so I will be looking for your

12  response.

13               **MR. AYLSTOCK:**  I believe it was five days, Your Honor.

14               **THE COURT:**  All right.  That's called a rocket docket

15  response.

16               **MR. BROCK:**  This is a rocket docket case.

17               **THE COURT:**  You all have a nice rest of the afternoon.

18  I hope everyone is safe and healthy, and we'll be talking soon,

19  I'm sure.

20               *(Proceedings concluded at 12:55 p.m.)*

21                      --------------------

22  *I certify that the foregoing is a correct transcript from the*
    *record of proceedings in the above-entitled matter.  Any*
23  *redaction of personal data identifiers pursuant to the Judicial*
    *Conference Policy on Privacy are noted within the transcript.*
24
        *s/Donna L. Boland                      7-8-2020*
25      *Donna L. Boland, RPR, FCRR            Date*
        *Official Court Reporter*