**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG )<br>PRODUCTS LIABILITY LITIGATION, )<br>)<br>)<br>)<br>)<br>)<br>)<br>_____ ) | Case No. 3:19md2885<br><br>Pensacola, Florida<br>May 28, 2020<br>3:08 p.m. EST |

**TELECONFERENCE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-49)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

# A P P E A R A N C E S

FOR THE PLAINTIFFS:          **BRYAN F. AYLSTOCK, ESQUIRE**
                             Aylstock, Witkin, Kreis & Overholtz
                             17 E Main Street, Suite 200
                             Pensacola, Florida  32502

                             **SHELLEY HUTSON, ESQUIRE**
                             Clark Love & Hutson, GP
                             440 Louisiana Street, Suite 1600
                             Houston, Texas  77002

                             **DAVE BUCHANAN, ESQUIRE**
                             Seeger Weiss, LLP
                             55 Challenger Road, 6th Floor
                             Ridgefield Park, New Jersey  07660

FOR THE DEFENDANT:           **MARK J. NOMELLINI, ESQUIRE**
                             **NICHOLAS F. WASDIN, ESQUIRE**
                             **KARL GUNDERSON, ESQUIRE**
                             Kirkland & Ellis, LLP
                             300 N Lasalle
                             Chicago, Illinois  60654

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | **THE COURT:**  Good afternoon, everyone.  This is Judge |
| 3 | Jones.  Can you hear me? |
| 4 | **MR. AYLSTOCK:**  Yes, Judge.  Good afternoon. |
| 5 | **THE COURT:**  Minor technical difficulties. |
| 6 | Just first, with Mr. Aylstock, who is going to be |
| 7 | speaking on behalf of the Plaintiffs? |
| 8 | **MR. AYLSTOCK:**  It will be primarily Mr. Buchanan and |
| 9 | myself, Your Honor.  This is Bryan. |
| 10 | **MR. BUCHANAN:**  And this is Dave Buchanan, Your Honor. |
| 11 | **THE COURT:**  Good afternoon. |
| 12 | **MR. BUCHANAN:**  Good afternoon. |
| 13 | **THE COURT:**  And who is going to be speaking on behalf |
| 14 | of the Defendants? |
| 15 | **MR. NOMELLINI:**  Your Honor, it will be primarily Karl |
| 16 | Gunderson. |
| 17 | **THE COURT:**  And that's Mr. Nomellini.  He is also on |
| 18 | the line. |
| 19 | Okay.  This relates to the May 26th letter that |
| 20 | Plaintiffs' counsel sent me regarding the documents by Eric |
| 21 | Fallon.  And I did get a brief today from Defense counsel |
| 22 | responding to it.  And as y'all know, this relates to the 12 |
| 23 | documents -- and there was other issues, but primarily the 12 |
| 24 | documents Mr. Fallon had that Gates on Wednesday was working |
| 25 | for the government that he had in his personal possession that |

1     had been produced but were produced only recently.  And these

2     documents, both sides tell me, are going to have some

3     importance at the deposition which I'm assuming is going to

4     take place tomorrow.

5             Is it Ms. Gates or Mr. Gates?

6             **MR. BUCHANAN:**  It's Ms., yes.

7             **THE COURT:**  Ms. Gates, okay.  So let me turn to the

8     Plaintiffs and first let me hear from you, Mr. Buchanan and

9     Mr. Aylstock.

10            **MR. BUCHANAN:**  Thank you, Your Honor.  I think I'll

11    begin.

12            So this issue arose last week following a somewhat

13    different production, frankly, from the Defense of the 12

14    documents in a single PDF mid last week.

15            As Your Honor is aware, we've been going back and

16    forth with the government concerning the setting of witnesses,

17    trying to schedule those.  Lt. Col. Gates's deposition, I

18    believe, had been set that day.

19            Later that day, or that evening, the Defendants

20    produced the documents.  The next day they were loaded up into

21    our document system, and the next morning on the 22nd we

22    reviewed those.

23            We'd learned that that is indeed the day that exhibits

24    are going to be due for Lt. Col. Gates's deposition.  We

25    promptly looked at the documents from Mr. Fallon and see that

1    there are indeed Gates PowerPoints in here.  There are other

2    PowerPoints and other documents that are also relevant to

3    witnesses who have already been deposed including several that

4    have been deposed in the last few months, including Lt. Col.

5    Babeu, Special Investigator Coleman, as well as Lt. Col.

6    Merkley.  These documents are also relevant to the deposition

7    of Mr. McNamara, a 3M employee who was deposed in late March.

8           The documents also concern the government contractor

9    issue that has been briefed and presented to the Court.  As the

10   Court may be aware, Lt. Col. Fallon submitted a declaration in

11   connection with that briefing in which he made certain

12   contentions about the PowerPoints and the training that were

13   provided in the military.  The documents that were produced

14   just last week refute some very specific contentions of

15   Mr. Fallon in his declaration.

16          We pressed in a meet and confer last week for

17   additional information concerning the circumstances of this

18   production, and it was at that point that Defense counsel

19   stated they no longer represent Mr. Fallon -- though they once

20   represented him, they no longer do, they had obtained these

21   documents, and that the letter that was sent to us in January

22   reflected a clear disclosure of the third-party nature of those

23   documents, Plaintiffs should have subpoenaed the witness.

24          The issue currently, Your Honor, is we have

25   depositions that have been taken, we have briefing that's been

1    submitted, and we have documents germane to all of that.  We

2    have a witness who is up tomorrow for which disclosure of

3    exhibits was required on the day that Plaintiffs first got

4    access to them.

5         And it's not just a matter of what's in those

6    documents may be relevant to that witness, but what's in other

7    documents that may relate to the Defendants' intended use of

8    those documents.

9         And we now have a position being taken from the

10   Defense that these are third-party documents as to which no

11   discovery obligation was owed.

12        We think, if the Court looks at the letter that the

13   Defendants sent to Plaintiffs in January, you'll see that the

14   Defendants were certifying the completion of their production

15   with regard to witnesses pursuant to Plaintiffs' discovery

16   requests to Defendants.  They certified that production under

17   Rule 34, under Your Honor's orders, with regard to everybody

18   but not the 12 documents or 14 documents at that point that had

19   been submitted for Mr. Fallon.

20        We have since learned that the Defense had approval --

21   they indicate in that letter that they would notify us when

22   they received approval from the military -- Maj. Evans -- that

23   they could produce them to us.

24        We have attached the Defendants' submission

25   correspondence between Mr. Wasdin and Maj. Evans saying that

1   they have captured these documents as part of their sweep and

2   they would like permission to produce them as part of their

3   production in the litigation.

4           The Defendants treated these documents as discovery

5   that was due and owing to Plaintiffs.  There would not have

6   been a need for a *Touhy* request or a *Touhy* response if it was

7   not due to a discovery request or response.  They now take the

8   position that it was third-party and Plaintiffs were obligated

9   to go and fish these out on their own.

10          I would say, Your Honor, that Lt. Col. Fallon, as

11  identified by the Defendants, was unlikely to have information

12  prior to -- pre-2012.  And when they sent their letter, they

13  identified the information that had been provided that seemed

14  responsive to Plaintiffs' request and they were getting

15  approval.  When that approval never came, Plaintiffs assumed

16  that approval was never received.

17          The fact is, at this point witnesses have been

18  deposed, three from the government, one from the Defense.

19  There's been briefing submitted and a declaration submitted

20  from this witness they contend is a third-party for which his

21  documents contradict the points that he's made.

22          So, at this point, the issue is, under Rule 37(c), at

23  least from the Plaintiffs' perspective, there has been a

24  failure to provide information, it has not been harmless, and

25  there is no good excuse.

1          The Defendants have said they've had access to these

2    for months and months, and they've had permission to disclose

3    them at least as of the end of February.

4          That's what brings us to the Court for our specific

5    request as it relates to Lt. Col. Gates's deposition for an

6    order barring their use in connection with that deposition.  We

7    think it's squarely within 37(c)(1), and we don't think the

8    Defendants can meet their burden to show otherwise.

9          **THE COURT:**  Okay.  Mr. Buchanan, let me just ask you a

10   few questions so I can know the focus.

11         So, in your letter brief, at the end you asked for

12   various relief from the Court, and it looks like some of it you

13   really already had been given when you saw the Defendants'

14   response.

15         For example, you asked for information about the

16   process by which Defendants became aware of Fallon's possession

17   of the documents -- I'm not sure you know that -- but the

18   process by which Defendants selected the Fallon documents for

19   documents, the Defendants' receipt, review, and submission to

20   the government and production to Plaintiffs.

21         I think you sort of know that because you have the

22   email to Maj. Evans and correspondence that the Defendants have

23   attached.  Maybe you need a little more information.  But the

24   three things now that you're focusing on is the importance of

25   these documents first to witnesses already deposed, that, if

1    you had had them, they would have helped in those depositions.

2    Secondly, the briefing on the summary judgment that's pending.

3    And then really what brings us to the hearing this afternoon is

4    the Gates depo tomorrow.  And for the Gates depo tomorrow, you

5    want the Court to bar use of those documents.  So, in that

6    regard, I have a couple of questions.

7           First, was this deposition -- was it cross-noticed?

8    Did the Defendants cross-notice it?

9           **MR. BUCHANAN:**  Both sides requested this deposition.

10          **MR. AYLSTOCK:**  And, Your Honor, it has been

11   cross-noticed for both sides, yes.

12          **THE COURT:**  Okay.  And you don't want the Defendants

13   to use the documents, but it seems to me you would want to use

14   these documents at Gates's depo; is that right?

15          **MR. BUCHANAN:**  It may depend, Your Honor, on the

16   testimony that's elicited.  We do have some concern about our

17   ability, obviously, to designate, as the government has

18   required, in a timely fashion exhibits that would be used, if

19   you will, in response to a potential use of these exhibits.  So

20   that's one of our concerns.

21          But generally, they do concern the witness.  And we

22   think the way this works is their nondisclosure would preclude

23   that party's use.  If they weren't used by us, obviously, then

24   the Defendants would not be permitted to use them.

25          **THE COURT:**  And your concern -- part of the prejudice

1    that you are complaining of is you're now the day before -- or

2    when you filed this letter brief, two days before the

3    deposition, and it's outside the deadline to provide the

4    government with documents under the *Touhy* process.  Is that one

5    of your concerns?

6          **MR. BUCHANAN:**  That is one of the concerns.

7          **THE COURT:**  Well, for that it seems to me -- and maybe

8    I'm being too simplistic about this -- although I recognize

9    you're past the deadline, these are documents that have been

10   provided to Maj. Evans.  There were 14 provided.  He signed off

11   on 12 of them.  Two of them he told the Defendants or

12   Mr. Fallon not to disclose because, in his view, they were

13   privileged.  And I guess there's maybe one other document

14   floating around out there that he has not responded on that is

15   still, I guess, going through the *Touhy* process.

16          So I guess what I'm saying is, if you called Maj.

17   Evans today or tomorrow morning and -- was he actually going to

18   be at the depo, Maj. Evans?

19          **MR. AYLSTOCK:**  It's going to be a video Zoom

20   deposition, Your Honor.

21          **THE COURT:**  But he'll be there?

22          **MR. AYLSTOCK:**  Well, on the video, as I think will

23   Ms. Snead.  And Ms. Snead has indicated that she needed them --

24   the government needed them five days, and that was one of our

25   preconditions.

1          **THE COURT:**  Yeah, I --

2          **MR. AYLSTOCK:**  What we don't know -- I'm sorry, Your

3      Honor.

4          **THE COURT:**  Yeah, I was just going to say that I would

5      think that they would be -- the whole point of the five-day is

6      so they're not surprised regarding the subject matter at a

7      deposition so they can make a proper *Touhy* analysis.  They've

8      already done that.  They know those documents.

9          So I'd be surprised if Maj. Evans could raise much of

10     an objection to the use of these documents.  I haven't decided

11     that issue.  I'm just saying if they were to be used -- if you

12     were to give him notice now and explain the circumstances.

13         And then, quite frankly, as a practical matter, if

14     Maj. Evans didn't like that, he could put his objection on the

15     record and complain and do whatever he wants, but he doesn't

16     have the power to stop a deposition.  He would be on pretty

17     thin ice trying to stop a deposition.  Because, as you know,

18     the only way to stop a deposition is to file a Motion for

19     Protective Order.  And I think they'd be on thin ice trying to

20     get the Court to stop a deposition to have a witness questioned

21     about documents that they were provided with, albeit months

22     ago, that they said can be disclosed, in other words, they

23     didn't have an objection on.  So I'm just sort of throwing that

24     out there.

25         And then on briefing, you know, one of the things

1    there could always be -- if you were given an opportunity to

2    supplement with these documents in short order -- I understand

3    there's some prejudice, but this is -- it's not a new argument

4    that you did not make; it just makes your argument have

5    potentially more evidentiary support; is that right?

6         **MR. BUCHANAN:**  In particular, Your Honor, there's a

7    declaration from Lt. Col. Fallon that was submitted that's

8    contradicted by the documents that were produced last week.

9         **THE COURT:**  Yeah, so --

10        **MR. BUCHANAN:**  It would effectively be a motion to

11   strike the declaration or the witness.  I'm not sure what that

12   relief would be.  Our primary goal was obviously to ensure

13   appropriate treatment and protect everybody with regard to the

14   examination of Lt. Col. Gates in the first instance, but there

15   may be more broad requests.

16        **THE COURT:**  Are any of the parties contemplating -- I

17   know you haven't taken Gates's depo but -- attempting to

18   supplement the record for the summary judgment with Gates's

19   depo?

20        **MR. GUNDERSON:**  Your Honor, this is Karl Gunderson.  I

21   think Defendants' position all along, given the timeline set by

22   the Court for filing summary judgment papers and the amount of

23   -- *(inaudible)* -- was that, as we, you know, go through the

24   process, you know, the *Touhy* process with respect to additional

25   -- *(inaudible)* -- government and additional deposition --

1    *(inaudible)* -- Lt. Col. Gates, at some point we do envision

2    likely filing some supplemental papers to -- *(inaudible)* --

3    issues.

4         **MR. AYLSTOCK:**   Your Honor, this is Bryan Aylstock.

5    Obviously, I suppose it would depend on the testimony.

6         If I could go back to one thing that you mentioned,

7    what the Defendants don't say one way or the other in their

8    brief from this afternoon is whether they have provided all of

9    these or if they have provided some of these to Jacqui Snead.

10        Ms. Snead and the government gets -- since this is a

11   *Touhy* deposition, I think that the government believes anyway

12   that they have the absolute right to dictate terms as to what

13   could be used or not used and what could be answered and not

14   answered and whether a deposition could be stopped and so

15   forth.  So I don't know that that necessarily would happen, but

16   I think that would be their position.

17        And we did have a very specific meet and confer --

18   well, more of a call with her which I tuned in on the line, and

19   she laid down these conditions and was very clear on the

20   conditions.

21        And what's just perplexing to me, particularly in

22   light of the letter from January 31st to me, one, they

23   certified completeness of Eric Fallon's production, and then

24   they identify these 14 documents that they're awaiting *Touhy*

25   approval on, and they say specifically that they'll produce

1 them once they receive permission from Maj. Evans.

2   And they obviously received that in February well

3 before many of these other depositions.  And it's clear to us

4 that the reason that they did this now is, well, there was this

5 dictate by Ms. Snead that these documents had to be produced in

6 advance of the deposition and then we get ours too late to make

7 such an effective production.

8   So I guess I don't know if all of them have already

9 been even given to Ms. Snead as part of that process, but she

10 was the one who wanted it, not Maj. Evans.

11   **THE COURT:**  Okay.  Well, let me hear from Mr.

12 Gunderson or Mr. Nomellini on your response to the Plaintiffs'

13 request in their motion and what they say happened.

14   **MR. GUNDERSON:**  Thank you, Your Honor.  So, as our

15 letter brief sort of lays out the history of these documents

16 and sort of the process that we went through to ensure their

17 production, you know, I should just recap for everyone to make

18 sure we're on the same page.

19   As part of our efforts to close out Mr. Fallon's

20 collection that, you know, he *sua sponte* indicated that he had

21 these materials stored on a personal computer and a DVD --

22 *(inaudible).*  He suggested that they may have potentially

23 relevant material on them and that, you know, he specifically

24 identified for us approximately 14 documents -- or exactly 14

25 documents related to the Combat Arms Version 2.

1        When we became aware of these documents, we -- at this

2   stage -- *(inaudible)* -- Fallon in getting them reviewed by Maj.

3   Evans as part of a -- *(inaudible)* -- process.  We first asked

4   Maj. Evans how he wanted to brief these documents and whether

5   the military was -- *(inaudible)* -- some amount of control of

6   the ability to produce them or not, and he indicated they were

7   and that he wanted to review the documents before --

8   *(inaudible)* -- litigation.

9        As we, you know, sort of describe in our letter, our

10   January 31st letter, in which we then notified Plaintiffs of

11   these documents, we did not attempt to sort of, you know, take

12   possession, custody, or control over these military documents.

13   Instead, we were trying to do the right thing, which was notify

14   Plaintiffs that we were aware of some additional materials that

15   could be relevant to the litigation and that we were going to

16   sort of ensure that they got produced to Plaintiffs.

17        **THE COURT:**  So let me interrupt you for a second

18   because you do lay out pretty well the chronology of what

19   happened here.  Documents were identified -- let's put aside

20   the issue of are these third-party documents or 3M documents.

21        You know, I'll be candid with you, they do seem like

22   -- I'm assuming these came from some personal computer or file

23   that Mr. Fallon had, that these were not documents on his 3M

24   computer at work.

25        Am I right about that, these were things he kept

1  separately?

2       **MR. GUNDERSON:**  That is correct, Your Honor.

3       **THE COURT:**  Yeah, okay.  And then you become aware of

4  them, and it sounds like you did the right thing.  And, you

5  know, these are arguably subject to the *Touhy* process because

6  they relate to his time in the government, so you sent them

7  off.  You eventually got the *Touhy* response.  Maj. Evans raised

8  privilege or denied permission to disclose two of the

9  documents, and then 12 of them you could disclose to the other

10  side.

11       You know, I guess, as I understand it, there was

12  another document of some significance that was also sent on as

13  part of the *Touhy* process that you thought in short order you

14  would get a response to approving or not approving and that you

15  would simply, at some point a long time ago, would have

16  produced those documents to Plaintiffs' counsel, and you didn't

17  do so, and I suspect maybe because of the pandemic.  That may

18  be some of the rationale for why this happened belatedly.

19       But I guess the pointed question is, if you did have

20  approval back in late February or March of the 12 documents,

21  what led you -- not you, Karl Gunderson, but your side to not

22  produce them until later in May about a week ago?  What was the

23  reason for the delay?  And it may be just it fell through the

24  cracks, I don't know.  But I'd like to know what is the reason

25  for the delay.

1    **MR. GUNDERSON:**  It's just that there are really sort

2    of two elements at play.  Sort of one of them was this, you

3    know, sort of by the point in time in March, you know, when the

4    second set of documents or the second, you know, documents was

5    identified the second time to Maj. Evans, you know, at this

6    point the deposition schedule had sort of been suspended.  You

7    know, there wasn't sort of an upcoming sort of action that we

8    thought was -- *(inaudible)* -- get these documents out for.  And

9    during our letter we were really just trying to be efficient

10   and do one production, you know, of all of the documents --

11   *(inaudible)* -- much better reason than that.

12        As I said, you know, we were aware that these were

13   relevant to the deposition of Lt. Col. Gates, and so we did

14   want to make sure they were available to both parties.  I think

15   today was the first time that Plaintiffs had sort of disclosed

16   to us that the delay getting access to the documents was in

17   part due to, you know, the vendor that they used and that's

18   sort of how they handled the documents.

19        But these were all -- *(inaudible)* -- had 48 hours to

20   review these 12 documents, like 391 pages, to decide whether to

21   -- *(inaudible)* -- potential exhibits for the -- *(inaudible)* --

22   or not.

23        Does that answer the Court's question?

24        **THE COURT:**  Yeah, I mean, it does.  But, you know,

25   they were given the documents not in native format, that's

1   another issue.  But the documents were turned over to them

2   literally on the day that there was the deadline by the

3   government for disclosures.  And I suspect someone on your side

4   said, *Oh, haven't these documents -- better get them over*

5   *because the deadline is today or tomorrow, let's get the*

6   *documents to them.*

7        Is that sort of what happened, that it dawned on your

8   side that there was that delay and you needed to bring this up

9   within that five-day window so, if the Plaintiff wanted to use

10  them, they would have availability of those documents?

11       **MR. GUNDERSON:**  You know, I think, to be honest, I

12  don't know if our side will end up using any of these documents

13  in the Gates deposition but, you know, we did want to make sure

14  that Plaintiffs did have access to them in advance.

15       And just to be clear on this -- *(inaudible)* -- to

16  Plaintiffs on Wednesday -- *(inaudible)* -- that the deadline

17  for, you know, identifying documents for the deposition was

18  Friday.  So, again, it wasn't the day of the selection that Mr.

19  Buchanan identified.

20       It sounds like his -- *(inaudible)* -- had some issues

21  translating the 12 documents into a usable format for them.

22  Before from our perspective, we were getting the documents to

23  them two days in advance of -- *(inaudible)* --

24       **MR. BUCHANAN:**  Your Honor, could I address that

25  briefly?

1    **THE COURT:**  Yes.  One second.  I just have a couple of

2    more questions for Mr. Gunderson.  I'll give you a chance.

3         And then, so, Mr. Gunderson, from the Defendants'

4    side, these 12 documents, are you all intending to use these

5    documents at Col. Gates's deposition?

6    **MR. GUNDERSON:**  I think there's one our team has

7    considered using at the deposition.  I honestly don't know the

8    evening before the deposition whether they still plan on using

9    it or not.

10   **THE COURT:**  But I guess the question is, if the

11   Plaintiffs say you can't use the documents, not because they

12   want me to say that, but because they were not disclosed to the

13   military, to Jacqui Snead within the five-day period, that the

14   parties are barred from asking questions about documents that

15   were not sent to them within that window, is it your position

16   that, if the Court does not bar you from using them, you can

17   still go ahead and use them even though they have not been, by

18   your side, disclosed to Jacqui Snead?

19   **MR. GUNDERSON:**  Well, just to clarify, I am not

20   familiar with the set of exhibits that our team -- *(inaudible)*

21   -- for Jacqui Snead.  They may have identified some documents

22   from the set.  I'm sort of disclosing the -- *(inaudible)* -- of

23   where -- *(inaudible)* --

24   **THE COURT:**  Mr. Nomellini, do you know if they were

25   disclosed to Jacqui Snead within that five-day period?

1        **MR. NOMELLINI:**  Yes, I think, Your Honor, that at

2    least some documents within the 12 or 14 were disclosed to

3    Jacqui Snead.  I don't know if it's one or two or, you know,

4    what the precise number is, but I do think that there is at

5    least one.

6        **THE COURT:**  Okay.  So, Mr. Gunderson, back to you.

7    So, in any event, it sounds like, based on what's in your

8    letter brief and what you're telling me is there was no method

9    to the madness of hiding the ball here.  It's simply something

10   that, for lack of a better word, fell through the cracks.

11        And, you know, I'm wondering what led to the process

12   of disclosing these documents to the Plaintiffs.  Was it part

13   of the deposition preparation, Defendants were preparing for

14   Col. Gates's deposition, and as part of that preparation they

15   were referring to or going to ask her questions about some or

16   all of these documents, and a light bulb went off and someone

17   said, *These have not been given to the Defendant [sic], you*

18   *better send them immediately*?  Or were they produced unrelated

19   to that process?

20        **MR. GUNDERSON:**  -- *(inaudible)* -- the production last

21   week May 20th of the documents.

22        **THE COURT:**  So they came to the forefront then

23   because, as part of the deposition preparation, someone on your

24   team realized that they might use these documents and someone

25   said, *Well, they, you know, haven't been turned over to the*

1   *other side yet,* and that's what sort of led to the turnover of

2   the documents?

3   **MR. GUNDERSON:**   That's correct.  I think, as we

4   mentioned in -- I mean, that's related to it, right.  It wasn't

5   just we want to use the documents or we need somebody to

6   produce the documents -- *(inaudible).*  It was sort of an

7   acknowledgment that, you know, these documents, as Mr. Buchanan

8   explained, have Lt. Col. Gates's name on them and --

9   *(inaudible)* -- was an element of in early May our team realized

10   these should get out before the Gates's deposition.  And as the

11   Gates's deposition got set, the process in place is to make

12   sure they got produced.

13   **THE COURT:**   Can we all agree on one point about the

14   Gates deposition -- and I don't know if the Defendants

15   disclosed one or two or five or how many of these documents,

16   sent them to the government within that five-day window.  But

17   can we all agree that, as to whatever documents were timely

18   sent to the government, the government couldn't object

19   seriously to the Plaintiffs using those documents at the

20   deposition?

21   Am I right on that, Mr. Buchanan, that would not fly?

22   **MR. BUCHANAN:**   Your Honor, I guess I would defer to

23   Mr. Aylstock on that.  The impression I had from the discourse

24   with Jacqui Snead was that, as these are *Touhy* examinations,

25   the government effectively set the term of the examinations and

1    the permission structure around that.  And the government had

2    expressed some concerns and was quite clear that everything had

3    to be provided within a window.  And actually, we did have our

4    timing correct earlier with regard to what that window is.  I'm

5    not sure what the Court is focusing on, whether it was 24 or 48

6    hours, but it was 24.

7        **THE COURT:**  Yeah, whatever it is.  And did your side

8    -- so you had the documents not in native format, but you had

9    the documents Wednesday, and Friday was the deadline.  Were

10   they --

11       **MR. BUCHANAN:**  It was Thursday, actually.

12       **MR. AYLSTOCK:**  Judge, could I talk to that just a

13   second?  Because I think there's some confusion on that issue

14   of when -- they were delivered at seven o'clock Wednesday

15   night.  They have to be uploaded into our system and we've made

16   clear -- and it's self-evident to the Defendants, but we've

17   also made clear on calls that it takes time, sometimes days,

18   but at least a day to get them uploaded, much less reviewed.

19       And Ms. Snead has made very clear and made very clear

20   on a call where everybody was on that she must have the

21   documents -- hard copies in her possession five business days

22   in advance.  So the answer is really less than 24 hours.

23       And what it sounds like and what I'm hearing is the

24   Defendants chose the documents they liked, deliberately waited

25   until the very last minute -- because what their letter said is

1    they would do it immediately upon the approval, which was

2    months ago in pre-COVID, to delivery us documents so that we

3    couldn't use the ones we liked but they could use the ones they

4    liked because maybe there's one, maybe there's two, but we know

5    that there's 12.  So we have no visibility into what they've

6    sent.  We know the ones that we might use, depending on the

7    testimony.

8            But going back to the point of the delay, one of the

9    things that is very -- that wasn't mentioned in their letter,

10   Your Honor, is that it was multiple depositions that were still

11   going on at the time they had approval, including Jennifer

12   Coleman, the CID investigator, government deposition; Lorraine

13   Babeu, who is a very critical government witness; and the one I

14   took, Tim McNamara, is the guy who details -- who goes to all

15   of these bases day-in and day-out, talks to people like Kathy

16   Gates, talks to Army audiologists, trains them on how to use

17   the plug.

18           These are documents that they had no excuse for not

19   giving over to me and Mr. Buchanan and my partner, Neil

20   Overholtz.  When they're talking to Mr. Fallon and getting his

21   declaration, they know they have these documents in their

22   possession at that time they're creating that declaration, and

23   it doesn't occur to them, after they have sent a letter saying

24   we'll give them to you, well, gosh, there's some government

25   deposition coming up, there's the primary sales guy to every

1    base in the country coming up -- these are highly relevant

2    documents that now have been cherry-picked, maybe one or two

3    that are sent but not all apparently, according to Mr.

4    Nomellini.  And now we're foreclosed by the, frank,

5    gamesmanship of waiting until the very last minute when a

6    deposition comes up to throw it over the transom at seven

7    o'clock the day before.  They have to be shipped out the next

8    day and they have to be uploaded and they have to be reviewed.

9          It's -- without even so much as a courtesy of a phone

10   call, *Hey, we messed up,* or something like that, *you may want*

11   *to look at those*, but just one of these letters out of the

12   blue.  I've never seen anything like it, Judge.  The prejudice

13   can't be overstated here.

14         **THE COURT:**  Well, that's one of the things that -- why

15   I'm having this discussion.

16         So, as to Lt. Col. Merkley's deposition -- was it

17   Merkley or McNamara that you were --

18         **MR. AYLSTOCK:**  So Merkley was done shortly before they

19   had approval, but Tim McNamara was a deposition, Jennifer

20   Coleman, Lorraine Babeu, all of which --

21         **THE COURT:**  How would these documents have been

22   relevant?  McNamara is a 3M employee?

23         **MR. AYLSTOCK:**  He is, he's a current 3M employee who

24   was in charge of going through training dealing with military

25   folks day-in, day-out to sell these plugs and to train people

1    on their proper use, whether to fold the flanges back.  There's

2    materials in here about training, you know, pictures of how

3    they're used, things like that that were clearly relevant.

4           And they're clearly relevant when they're doing a

5    declaration of Mr. Fallon, who they told us at a Rule 26

6    conference didn't have any relevant information before 2012

7    when he came in to 3M, then does a full declaration with all of

8    this information.

9           And we write a letter saying, *Look, in light of the

10   Court's admonition to focus on government contractor, we don't

11   need Mr. Fallon's deposition,* and so we pull it down, and they

12   don't raise, *Well, you know, we do have this going on*, or *You

13   might want to rethink this*, or *We're going to do a declaration*.

14   They knew.  They knew, Judge.

15           **MR. GUNDERSON:**  Your Honor --

16           **THE COURT:**  One second, Mr. Gunderson.

17           So, Mr. Aylstock, Mr. McNamara's deposition, that was

18   taken after Maj. Evans gave his approval; is that right?

19           **MR. AYLSTOCK:**  Yes.  It was taken March 11th.  So we

20   -- well over a week --

21           **THE COURT:**  So he was a 3M employee.  And I'm not

22   saying retaking a deposition or opening a deposition is

23   necessarily a cure, but that would be an option there that you

24   could be permitted to further examine Mr. McNamara with regard

25   to the Fallon documents, if you thought that would be

1    beneficial, not that it's the best thing in the world, but you

2    could be given an opportunity there.

3                 What about Lorraine Babeu, who does she work for or

4    who is she?

5                 **MR. BUCHANAN:**   I can address those, Your Honor.   She's

6    a retired lieutenant colonel.   She was an audiologist.   She did

7    localization studies, and she was examined about those in her

8    deposition.

9                 There are documents -- PowerPoints that have not been

10   previously produced that concerned the military's view on

11   localization and the effect or the lack of an effect of

12   localization with regard to one plug or the other.

13                There are specific training documents that show how

14   audiologists were trained, I would say training that refutes

15   the Defense's contention on how audiologists were trained.

16                There are documents that address the Defendants'

17   contentions concerning loosening, as evident to everybody, was

18   a line of inquiry with regard to Lt. Col. Babeu.   There are

19   documents in the formal training materials that talk about the

20   absence of a vacuum effect and how some sounds will seem louder

21   with regard to the yellow end so don't expect that with the

22   yellow end.

23                So these address core contentions that the Defendants

24   are eliciting from Lt. Col. Babeu but other witnesses as well

25   including Lt. Col. Merkley, who was deposed two days before.

1              It's important to note the Defendants had seen these

2      documents and knew what their content was and knew the extent

3      to which they bore or didn't bear on the witnesses who were to

4      be taken.

5              And I would submit a number of these documents go

6      directly to lines of inquiry by Defense counsel of Lt. Col.

7      Merkley as well.

8              **THE COURT:**  When was the Fallon declaration filed?

9              **MR. BUCHANAN:**  April 1st.

10             **THE COURT:**  April 1st, okay.  So your argument -- one

11     of your arguments on prejudice is you have a Fallon declaration

12     and the documents which the Defendants had and had Maj. Evans's

13     approval would have taken issue with some of the

14     representations in Mr. Fallon's declaration; is that right?

15             **MR. BUCHANAN:**  They tend to refute his contentions,

16     yes, Your Honor.

17             **MR. AYLSTOCK:**  They certainly do, Your Honor.  And one

18     thing we brought up on the meet and confer that I don't know

19     has been answered is whether he has additional 3M documents on

20     that computer and whether those might relate.

21             We were told on our meet and confer that he has

22     separate counsel and you'll have to deal with them.  And I read

23     the letter, and it's not clear to me whether there's additional

24     information, may be non-governmental but may be relevant

25     information on that computer.  And as an employee of 3M, they

1    did certify, other than these few documents, completeness of

2    production.

3            So it would be nice to have clarity on that because we

4    don't know what those might be if they exist, but they might

5    also be important for the Gates deposition and others.

6            **THE COURT:**  Well, I think we can all agree, if

7    Mr. Fallon has 3M corporate documents on his home computer or

8    his phone or in his attic, even though he has them in a private

9    place, that is certainly within the possession, custody, and

10   control of 3M, and they well know they have an obligation to

11   ask their employees to give them for review and production any

12   documents they have.  If they have documents relating to

13   private matters before their employment, that indeed may be

14   another issue.

15           So, Mr. Gunderson, let me ask you this so we can put

16   this issue to rest.  With the certification that was provided

17   back in January, your certification that you had provided all

18   of the documents, including the Fallon documents, except the 14

19   documents which he privately possessed which he made you aware

20   of, any other documents that he might have had that are 3M

21   documents I assume they've been produced, if any.  Am I right?

22           **MR. GUNDERSON:**  Correct, Your Honor.  We're not aware

23   of anything else for Mr. Fallon to have to produce.

24           **THE COURT:**  Which means you asked him or asked his

25   lawyer, he's looked, and he said, *I don't have anything else*

1   *but here are these 14 documents that aren't 3M documents,*

2   *they're from my prior employment, my prior service in the*

3   *government, here are these documents,* and that's how they were

4   brought to the attention of 3M; is that right?

5          **MR. GUNDERSON:**  That is correct, Your Honor.  And I

6   think this issue came up somewhat back in the October 21st

7   hearing in the fall where we were talking about some of the --

8   *(inaudible)* -- to add.  In that hearing we were pretty

9   straightforward about our process on -- *(inaudible)* -- and I

10  think on that call -- *(inaudible)* -- that the right way to get

11  at documents -- *(inaudible)* -- 3M's possession would be through

12  individual subpoena and further explains that's the process

13  Plaintiffs have used to ensure production of those types of

14  documents.

15         And except for Fallon and one other potential

16  deponent, Plaintiffs have served those individual subpoenas, so

17  it's not clear to us why they elected to not serve a subpoena

18  on Mr. Fallon.

19         **MR. BUCHANAN:**  Your Honor, I don't want to take the

20  Court in a different direction, but to be clear, it is

21  Plaintiffs' understanding, as the Court expressed, that 3M's

22  documents in the possession of their employees are always 3M's

23  documents, and they have the ability to call for those and are

24  obligated to call for those for purposes of production.

25         Generally we issue subpoenas with regard to deposition

1    witnesses with regard to collateral information and sometimes

2    for former employees, neither of which happened for Mr. Fallon.

3              **THE COURT:**  Right, right.

4              **MR. NOMELLINI:**  Your Honor, one part of the chronology

5    that Mr. Gunderson was getting into that I think is important

6    here is that, around the same time of the February 28th

7    approval, Mr. Fallon informed Defendants that he had become

8    aware of an additional potentially relevant document, and that

9    there was a second request made, and that during the hiatus we

10   were expecting Maj. Evans to get back to us to make one

11   production.

12             And it did take, you know, over two months for Maj.

13   Evans to respond to that request.  I'm not blaming him.  I

14   think it might have been due to coronavirus.  And, you know, a

15   lot of people have been dealing with coronavirus, and we've

16   heard Plaintiffs talk about coronavirus in terms of

17   authorizations.

18             And Karl can give more detail on this, but in early

19   May it appeared unlikely that Maj. Evans had completely

20   reviewed the final documents.  So, rather than wait -- you

21   know, it now looked like it might be an additional length of

22   time that we'd hear from Maj. Evans rather than a quick

23   turnaround -- we just made the production.

24             And, Karl, correct me if any of that is inaccurate.

25             **MR. GUNDERSON:**  That's correct, Your Honor.

1          **THE COURT:**  Yeah.

2          **MR. AYLSTOCK:**  I'm just looking at the letter that

3     says you'll send it once you receive permission, so --

4          **THE COURT:**  Yeah, I know, I think Kim Branscome's

5     letter said that.

6          You know, the one thing that's got me scratching my

7     head a little bit, Mr. Nomellini, and maybe there's an

8     explanation for this, you know, everyone's pencils have

9     erasers.  But the impetus for the now turnover of these 12

10    documents is early May but they weren't turned over until late

11    in the evening on -- I guess it was the 20th.

12         And I suspect -- and tell me if I'm wrong -- really

13    what the impetus was for the turnover of these documents -- and

14    I'm not saying this is the world's best excuse but things

15    happen -- that at some point in May your team began to prepare

16    for Gates's deposition, and as part of the preparation for that

17    deposition some of these Fallon documents came on the radar

18    screen which were of interest to your side, and it was at that

19    point that it dawned on someone on your side of the equation

20    that these documents ought to be produced pronto, and you did

21    it.  That's one explanation.

22         Another scenario -- and I don't know which is the

23    correct scenario -- is the beginning of May you realized,

24    because of the virus, Maj. Evans might not in short order be

25    getting back to you on the other document, so you all decided

1    you were going to have to produce it, and then someone said,

2    *Well, let's wait until the absolute last minute.*  That would be

3    a different scenario with a different motivation.

4            So which scenario was it or is it something in between

5    that?

6            **MR. GUNDERSON:**  Your Honor, so, yes, you know, one of

7    the issues that arose is, in connection with getting these

8    documents actually out the door, coordinating with Fallon's

9    individual counsel.  You know, I think, as we've made clear in

10   our papers and the conversation so far is the condition that

11   these were Fallon's -- *(inaudible)* -- as though we were working

12   with Fallon's individual counsel to get them stamped and then

13   out the door to Plaintiffs.

14           In early May when we, you know, realized that --

15   *(inaudible)* -- everyone before -- *(inaudible)* -- deposition, we

16   started working with Fallon's individual counsel to work

17   through some issues in getting this stamped and out the door to

18   the Plaintiffs.

19           **THE COURT:**  What was the time frame between Fallon's

20   counsel getting back to you -- and I understand he had his own

21   lawyer, they're his documents, so you had to get permission

22   from his lawyer.  What was the timeline between his lawyer

23   saying, fine, you have Maj. Evans's approval, you can produce

24   them to the other side, and then you actually sending them to

25   the Plaintiffs on the evening of Wednesday, May 20th?

1            **MR. GUNDERSON:**  So we got the production from

2    Mr. Fallon's individual counsel on the 19th, and it was just

3    trying to get out the door amongst everything else, it didn't

4    go out until the 20th.

5            **THE COURT:**  Okay.  So just to review the bidding here,

6    it's early May.  Your team realizes you may want to use these

7    documents.  They haven't been produced.  You contact Fallon's

8    counsel.  Fallon's counsel gives you approval on the 19th.  And

9    then the next day, albeit it's the eleventh hour, nonetheless,

10   within a day of that approval you ship them off to Plaintiffs

11   counsel.

12           Mr. Aylstock makes the point that it was just sort of

13   some benign production.  It wasn't like, *Hey, we've got these.*

14   There was no alert.  It sort of fell under the Plaintiffs'

15   radar a little bit so that they did not timely notify the

16   government.

17           Mr. Aylstock, let me ask you, because I don't know if

18   I have a clear answer to this -- and I recognize when you got

19   them late on the 20th you had to upload them and there were

20   some issues, you wanted them in native format and whatnot and

21   really didn't have everything that you needed until the 22nd,

22   which is the deadline.

23           Did you, nonetheless, even if it was late, send these

24   documents to the government giving them notice that these were

25   going to be used?

1      **MR. AYLSTOCK:**  No, Your Honor.  By the time they were

2      reviewed, first of all, it was going into a holiday weekend,

3      they had to be out the door, hard copy, FedExed, per

4      Ms. Snead's directive.  So we did not have them reviewed or

5      looked at by the time those had to go out.  And then with the

6      holiday weekend and so forth, they have not been -- we have not

7      sent any of them to Ms. Snead at this point.

8           I think it is worth noting, though, that Kirkland &

9      Ellis has had these documents even well before.  It was

10     Kirkland & Ellis that had sent them originally to -- and they

11     told us back at our initially Rule 26 of, apparently after

12     having spoken to Mr. Fallon, that he didn't have any relevant

13     information.

14          So this is really out of the blue for us, and we

15     didn't get the courtesy of a call or anything alerting us to

16     any of that information.

17     **MR. NOMELLINI:**  Your Honor, with respect to the Rule

18     26 conference, that's not accurate in terms of the description

19     of Eric Fallon.  Sierra Elizabeth, who is on, can address that.

20     She was the person who made the descriptions.  But that's not

21     accurate.  If you want to hear further from her, she can

22     address it.

23     **THE COURT:**  No, I don't think I do.  I think I've got

24     a sense of what went on here in terms of, you know, the *mens*

25     *rea* behind the nondisclosure of the documents.

1          And, you know, there's a couple of things that are not

2   disputed.  The end of February you had Maj. Evans's approval.

3   We did have really a pullback on this litigation for a period

4   of time.  And I'm not saying it wasn't on the forefront with

5   you all but, because of the pandemic, depositions were

6   temporarily stayed and rescheduled, and we went through that

7   process to where we're at now.

8          And we can all agree the documents, although they're

9   maybe not smoking guns, there has been no suggestion they're

10  not relevant.  They are relevant to issues in this case, and

11  they are documents that would be used at a deposition.

12         And it seems to me there are three issues.  One, there

13  are depositions that Plaintiffs took that were taken after

14  February 28th that they did not have the benefit of these

15  documents.  And the remedy there -- and I know there's a bar on

16  taking depositions for a second time of any government

17  witnesses, but some of them are 3M employees, at least

18  Mr. McNamara is.

19         So I'm inclined to say, if the Plaintiffs want to not

20  retake the whole deposition but take the deposition of those

21  deponents for whom these documents are relevant and to whom the

22  Plaintiffs clearly would have made inquiry during their

23  deposition, I would give them the right to do that.

24         The second issue is the deposition tomorrow of Col.

25  Gates, and that's really what leads us here, and a couple of

1    things on that.  One, it is not an option to simply say we'll

2    reschedule the deposition and that will cure the harm.

3            I can tell you, I've chatted with Judge Rodgers and,

4    come hell or high water, she does not want a deposition

5    continued.  So that is not going to be an option.

6            I recognize that the Plaintiffs have two problems.

7    One, they have Fallon documents that the Plaintiffs may use in

8    their examination of Col. Gates tomorrow, and they want me to

9    bar Plaintiffs *[sic]* from using that.  I am not inclined to do

10    that.  You know, we're not in the middle of trial.  We're

11    talking about a deposition.

12            So, as to their request to bar the Plaintiffs -- I

13    mean, Defendants from using the documents, I'm not going to

14    order that at this point.  But Plaintiffs may and can and

15    should raise an objection at the deposition.

16            And to the extent the examination and disclosure of

17    information elicited by Defendants from Mr. Fallon turned out

18    to be of some importance as we get into other dispositive

19    motion practice or trial, the Plaintiffs will be able to

20    request the Court not allow that evidence to be used at the

21    trial, you know, and the Court has more information then.

22            And there's certainly a different standard that might

23    apply for barring the use of information at a trial.  But at a

24    deposition, I'm not sure how that benefits this overall

25    litigation by simply not allowing those documents to be used by

1    the Defendants at the deposition.

2             As for the Plaintiffs using the documents -- and I

3    understand, Mr. Aylstock, what you're saying is there was this

4    hard and fast deadline and the government didn't get them and

5    they're going to object at the deposition and they do have the

6    power to put the brakes on the deposition.  I respectfully

7    disagree that the government has the power or authority to do

8    that.

9             They can put appropriate objections on the record.

10   They can then seek court intervention.  They could ask Judge

11   Rodgers or me to bar and strike any testimony that you elicit

12   regarding the documents because they were not disclosed on

13   time.  But I think they'd have a real tough time convincing us

14   to do that when indeed they had the documents and they knew

15   about them and they went through the *Touhy* process and approved

16   the use of them.  So I think they'd have a tough time.

17            You know, we're not talking about, you know, you have

18   a document that's going to disclose where the bank account of

19   ISIS is or something.  So they'll be entitled to do that, but

20   they do not have the authority to say this deposition is going

21   to end at this point.  They can request it from the Court.  So

22   I'm not inclined to do that.

23            Now, the third issue, which I'm a little more

24   concerned about, is how any of this could be relevant to the

25   Court's determination of the pending Motion for Summary

1    Judgment.  This could give rise potentially to the striking of

2    all or a portion of Mr. Fallon's declaration.

3            Alternatively, or additionally, it could give rise to

4    a motion to supplement the briefing, in other words, the

5    Plaintiffs supplementing the briefing to allow these documents

6    to be included in the summary judgment record so that the Court

7    can look to that evidence in determining how it's going to

8    resolve the Motion for Summary Judgment.

9            But I don't think any of us know -- I'm hearing both

10   sides sort of dancing around this issue of whether either or

11   both sides would want to do that, and you really don't know the

12   answer -- I'm talking about supplementing the record -- you

13   don't really know the answer to that question until you take

14   Col. Gates's deposition.

15           You take her deposition, and then you determine -- you

16   know, you've got the smoking gun answer with the Fallon

17   document of, you know, she killed Colonel Mustard in the

18   conservatory with the candlestick, you know, that kind of thing

19   that you think is essential that it be included in the summary

20   judgment briefing.  And if so, you file a motion.

21           Judge Rodgers is ruling on the summary judgment.  She

22   can determine whether she would allow that, whether that's

23   necessary.  Certainly if you were to go in that direction, you

24   need to do it sooner as opposed to later.

25           If, on the other hand, it simply turns out to be what

1    you believe are fertile grounds for not just discrediting the

2    declaration of Eric Fallon but sufficient grounds to strike all

3    or a portion of his declaration, then the Plaintiffs should

4    file a formal motion and request that the Court -- and the

5    other side, obviously, will get a chance to brief it -- strike

6    the Fallon deposition.  And as part of the summary judgment

7    process, the Court can then determine whether it is necessary

8    to do so.

9           If it turns out the Fallon declaration has some

10   significance to the calculus of the Court's summary judgment

11   determination, then that would be something the Court would

12   have to really take a close look at.  If it turns out that the

13   Fallon declaration neither wins or loses the day, then

14   certainly it's not as important.

15          But, you know, having said all of that, I will say I

16   don't think the Defendants, in my view, did anything calculated

17   or intentional here.  But, you know, in the discovery process,

18   certainly the Defendants dropped the proverbial ball.  It's a

19   little more than just falling through the cracks.

20          And notwithstanding the cancelling of depositions and

21   moving depositions off and what we're all going through in the

22   pandemic, at some point in time after the 28th and certainly

23   before they were produced, those documents, it would have been

24   better if they had been turned over to the Plaintiffs.  And I

25   understand in the beginning of the process why you would wait

1    for the approval on the one other document, but at some point

2    they had to be turned over.

3            But, nonetheless, I do not think it is appropriate,

4    based on these facts and what happened here, to bar the

5    Plaintiffs *[sic]* from using those documents at the Fallon

6    deposition.  But the Plaintiffs -- I'm sorry, barring the

7    Defendants from using them.  But the Plaintiffs certainly may

8    and can raise an objection on the record, if they so choose to

9    do so, if examination is made by the Defendants of Mr. Fallon.

10           You know, it may turn out -- you know, depositions are

11   funny things.  I know the Defendants have an agenda where they

12   will ask direct examination questions of witnesses to elicit

13   testimony.  I know Mr. Brock told us a long time ago at one of

14   our conferences that that is something that you do do from time

15   to time.  But you never know until the deposition.

16           And, you know, it may turn out that we're talking

17   about Defendants using one of the Fallon documents and it may

18   not be of great consequence.  Or they may use, you know, a

19   majority of them and it may be of more consequence.

20           But that is the remedy for the Defendants *[sic]*, to

21   raise the objection at the deposition in real time.  And then

22   at that point you have certainly an option, after the Court has

23   a fully developed record, if you think it's necessary to strike

24   testimony of Col. Gates, or down the road when we get to trial

25   if the Court should make some ruling excluding that

1   information, excluding Defendants from presenting that

2   information at trial.

3         My intuition tells me these documents obviously helped

4   the Plaintiffs.  And if Mr. Fallon was on the witness stand at

5   trial, these would be great documents for the Plaintiffs --

6   they got a declaration from him -- to attempt to impeach him to

7   make his testimony look not very believable and credible.

8         So it may turn out, when we get to that point, the

9   Plaintiffs will say, *my God, we don't want to strike anything,*

10  *we want to use this to -- this is great evidence for us at*

11  *trial.*

12        **MR. NOMELLINI:**  Your Honor --

13        **THE COURT:**  Yes.

14        **MR. NOMELLINI:**  We disagree with the proposition that

15  the documents help the Plaintiffs.  We didn't want to get into

16  the substance of document-by-document but, in our view, they

17  are not particularly helpful to the Plaintiffs.

18        With respect to the McNamara issue, may we have

19  permission to submit something in writing to Your Honor on

20  that?  That was not one of the -- as I'm looking at Plaintiffs'

21  relief paragraph, that was not one of the types of relief that

22  they asked for in their request.  And so we would like an

23  opportunity to look at the documents, look at the deposition,

24  and respond on the substance of that issue.

25        Of course, Plaintiffs could also have an opportunity

```
 1    to address that.  But if the overlap is none or de minimis,
 2    then it does not make sense to proceed with a deposition,
 3    particularly given that, you know, we've been proceeding in
 4    good faith here throughout the process.
 5            THE COURT:  Well, certainly it was not raised, I don't
 6    believe, in their letter brief, McNamara.  I guess it was, as a
 7    prejudice, Babeu -- Lorraine Babeu, John Merkley and -- was
 8    Mr. Coleman raised?
 9            MR. BUCHANAN:  Jennifer Coleman, yes, Your Honor.
10            THE COURT:  Jennifer Coleman, that was mentioned in
11    your letter brief, right?
12            MR. AYLSTOCK:  I don't know that Coleman was.
13            THE COURT:  No, Coleman wasn't either.
14            MR. WASDIN:  And, Your Honor, this is Nick Wasdin.
15    The John Merkley deposition occurred prior to getting approval
16    to produce these documents.
17            THE COURT:  You're correct on that, and I did comment
18    on that.  So that would not be a deposition where the
19    Plaintiffs get to retake it.  But the other two raised, it was
20    Babeu and -- was it just Babeu and Merkley that were mentioned
21    in your letter brief?
22            MR. AYLSTOCK:  I think those were two of the ones that
23    were -- we weren't sure.  Part of the issue, Your Honor, is we
24    had no visibility.  We just had a meet and confer where we were
25    told.  It was pre-COVID.  We weren't sure of the dates and the
```

1    relevancy of everything until we learned of some of the salient

2    facts this afternoon.

3                **THE COURT:**  Okay.  Well, let me just refine my --

4                **MR. NOMELLINI:**  Your Honor --

5                **THE COURT:**  Because Mr. Wasdin did point out and I

6    mentioned that before, Mr. Merkley's deposition was conducted

7    before the approval, so there's no causation there, so that's

8    not a reason to retake his deposition.  But there is Lorraine

9    Babeu, there is Jennifer Coleman, and Mr. McNamara.  Coleman

10   and McNamara weren't raised in your letter brief.

11               So what I'm going to give the Plaintiffs an

12   opportunity to do is, if you want to retake the deposition --

13   and you might not want to -- of Coleman, McNamara, and Babeu,

14   you need to tell the Defendants that's what you want to do.

15               If they do not agree -- if they say, *Well, we don't*

16   *think these documents are relevant to those depositions* --

17   because this was not argued in the letter brief -- what the

18   Plaintiffs need to do is send me a brief letter brief

19   explaining why those depositions -- why the Fallon documents

20   would be of some assistance in those depositions.  And then I

21   will give the Defendants an opportunity to tell me why they do

22   not think that they would be of assistance in those

23   depositions.

24               And then, if the Plaintiffs make some showing -- you

25   know, you don't have to make a showing that it would change the

1     course of history if you have these documents.  But if you can

2     point to testimony of these witnesses and say, *The Fallon*

3     *documents show X, Y, and Z.  If we had had them when we*

4     *questioned Lorraine Babeu, we would have asked her these areas*

5     *of inquiry, and we did not because we did not have the benefit*

6     *of it* -- and I'll let the Defendants tell me why that's not the

7     case.  But if you're able to show that, you're going to be able

8     to, if you want, retake Babeu's deposition.  The same would

9     apply to McNamara and Jennifer Coleman, but not Merkley because

10    he was deposed before Maj. Evans provided his approval.

11            **MR. AYLSTOCK:**  Your Honor, Ms. Babeu and Ms. Coleman

12    are government, so our shot may be done there.  But we'll -- I

13    think what you say makes sense.  And I'm happy to meet and

14    confer on which, if any, of these we may want to come back to

15    you on on those issues.

16            **THE COURT:**  Right.  And you're right, you raise a good

17    point, and I'm aware of that, that the government is saying,

18    you know, one bite at the apple and this is not some rolling

19    set of depositions, and there may be a real challenge to doing

20    that.

21            But I can tell you this:  If it turns out that there

22    is some important area of inquiry that you would have conducted

23    with a witness and you were just unable to do that because of

24    the delay in receiving these documents, you know, the Court is

25    going to be inclined to do everything it can to allow you to

1     take a brief deposition, you know, even if there is some

2     objection by the government.

3          And as I understand it -- you say they're government

4     witnesses.  She's retired, right?  She's not current military?

5          **MR. BUCHANAN:**  I'm not sure about Ms. Coleman's

6     status.  Lt. Col. Babeu is retired.

7          **MR. AYLSTOCK:**  Ms. Coleman is still a government

8     employee.

9          **THE COURT:**  Okay, so there may be a challenge there.

10    And then McNamara, he's a 3M employee, so the government

11    doesn't have much of a say-so, if at all, there.

12         You know, I understand if they're government

13    employees, the government can just say, *We're not producing the*

14    *person.*  If the person is retired, then it may be a different

15    story.

16         But think through those three depositions of, you

17    know, really, in the big scheme of things, do you think it

18    would be important and necessary to have examination on the

19    Fallon documents with these three witnesses.  Meet and confer,

20    and if you can't work it out, then immediately bring it to my

21    attention.  I'll let you, Mr. Nomellini, respond and tell me

22    why it's really not that important.

23         And, you know, I'm not operating on a cold record, one

24    side is saying, oh, it is relevant, and the other side is

25    saying it's not relevant.  You've taken these depositions,

1   you've got a deposition transcript you can point me to

2   testimony and areas of inquiry and say, *See, read these three*

3   *pages, Your Honor, this is what we asked her, and if we had had*

4   *the documents, you can see there would have been extensive*

5   *inquiry in response to those questions with the Fallon*

6   *documents.*

7           That's a pretty compelling argument, and it's easier

8   really for me to decide.  Because you have to be pragmatic

9   about it.  You don't want to restart a deposition to ask

10  someone about a document and, you know, the witness looks at it

11  and says, *I've never seen that, I have no idea what that is*,

12  *didn't know about it, and it doesn't affect my responses*, as

13  opposed to a more substantive response to the question.

14          So that's my ruling, the Gates deposition will go

15  forward tomorrow.

16          Mr. Aylstock, Mr. Buchanan, whoever is going to take

17  the deposition, you have the Court's permission to use the

18  Fallon documents.  The government may object.  If necessary,

19  their objections can be brought to the attention of the Court.

20  I think they'd be on pretty weak grounds complaining about

21  documents that they received and they had approved, but we'll

22  see what they say.

23          And then, to the extent that Plaintiffs *[sic]*, in its

24  examination, wants to use any of those documents, you can make

25  your objection and preserve your objections.  And then, most

1   importantly, as to the summary judgment, you can move to strike

2   the Fallon declaration and/or supplement the record.  And that

3   is an issue that Judge Rodgers will rule on, since she's going

4   to be the one that's digesting and is going to rule on the

5   Motion for Summary Judgment.

6           **MR. AYLSTOCK:**  Thank you, Your Honor.

7           **THE COURT:**  What time is the depo tomorrow of Col.

8   Gates?

9           **MR. NOMELLINI:**  9:30.

10           **THE COURT:**  9:30, okay.  So that will be taking place

11   as we have the case management conference tomorrow?

12           **MR. AYLSTOCK:**  Yes, Your Honor.  It will last, I

13   believe, until 5:30, so hopefully the case management

14   conference won't go that long.

15           **THE COURT:**  I'm just curious, who is taking the

16   deposition for the Plaintiffs?

17           **MR. AYLSTOCK:**  It's Mr. Tracy.

18           **THE COURT:**  And who is going to take and/or defend the

19   deposition for the Defendants?

20           **MR. NOMELLINI:**  Chad Morris.

21           **THE COURT:**  Okay.  So I'm sure you will update

22   everyone about the Court's ruling on the issue as it relates to

23   the Gates deposition.  I'll do some type of written order but

24   probably not tonight and probably not tomorrow morning since

25   I'll be at least remotely attending the case management

1    conference.  But go ahead and update who will be present at the

2    deposition about the Court's ruling on the Gates deposition.

3             **MR. AYLSTOCK:**  We will, Your Honor.

4             **MR. NOMELLINI:**  We will do so, Judge.

5             **THE COURT:**  Okay.  And I will see you all tomorrow.  I

6    know we have a lot on the agenda tomorrow.  I should be asking

7    Judge Rodgers this, but I'll ask you, Mr. Aylstock.  The

8    preconference, what time Central Time is that starting?

9             **MR. AYLSTOCK:**  It's 8:30, Your Honor.  There is a

10   separate call-in for it, I believe.

11            **THE COURT:**  Yeah.  So that's 9:30 my time.  And then

12   our CMC is at 9:30 Central Time, 10:30 my time, right?

13            **MR. AYLSTOCK:**  Yes, Your Honor.

14            **THE COURT:**  Okay.  Well, I will see you all tomorrow

15   then.  Take care.

16            **MR. NOMELLINI:**  Judge, are you still on?

17            **THE COURT:**  I am.

18            **MR. NOMELLINI:**  Just briefly, we will be filing a

19   motion to compel probably tonight relating to certain of

20   Plaintiffs' interrogatory answers, interestingly relates also

21   to -- primarily to government directive.

22            We could either -- I think we could either set a

23   briefing schedule for that now, or if Plaintiffs want a chance

24   to look at it and talk about a briefing schedule tomorrow

25   that's fine too.

1      **THE COURT:**  Yeah, I think it's best we'll talk about

2    it tomorrow.  And this sort of dovetails with some of the

3    issues I think we're going to talk about tomorrow anyway at the

4    case management conference.  But we will do that tomorrow,

5    we'll set a briefing schedule to get that resolved.  But I

6    appreciate you giving notice.  I hope it's not going to be

7    filed at twelve o'clock.

8      **MR. NOMELLINI:**  We will not file it at twelve o'clock,

9    Your Honor.

10     **MS. HUTSON:**  This is Shelley Hutson.  I believe Bryan

11   may have dropped off, but I agree we can address that tomorrow.

12   Thank you.

13     **THE COURT:**  Thank you.  Have a good evening.

14          ***(Proceedings concluded at 5:31 p.m. EST)***

15                 --------------------

16   *I certify that the foregoing is a correct transcript from the*
     *record of proceedings in the above-entitled matter.  Any*
17   *redaction of personal data identifiers pursuant to the Judicial*
     *Conference Policy on Privacy are noted within the transcript.*

18

19

       *s/Donna L. Boland*                          *5-29-2020*
20     *Donna L. Boland, RPR, FCRR*                  *Date*
       *Official Court Reporter*

21

22

23

24

25