**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG      )      Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,     )
                                   )      Pensacola, Florida
                                   )      July 16, 2020
                                   )      10:02 a.m. EST
                                   )
                                   )
_____)

**TELECONFERENCE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-163)

**A P P E A R A N C E S**

FOR THE PLAINTIFFS:          **BRYAN F. AYLSTOCK, ESQUIRE**
                             Aylstock, Witkin, Kreis & Overholtz
                             17 E Main Street, Suite 200
                             Pensacola, Florida  32502

                             **EMILY MARLOWE, ESQUIRE**
                             Clark Love & Hutson, GP
                             440 Louisiana Street, Suite 1600
                             Houston, Texas  77002

                             **MAX KELLY, ESQUIRE**
                             Seeger Weiss, LLP
                             55 Challenger Road, 6th Floor
                             Ridgefield Park, New Jersey  07660

                             **EVAN D. BUXNER, ESQUIRE**
                             The Gori Law Firm
                             156 N. Main Street
                             Edwardsville, Illinois  62025

FOR THE DEFENDANTS:

**ERIC SEFTON, ESQUIRE**              **KIMBERLY BRANSCOME, ESQUIRE**
**ASHLEY NEGLIA, ESQUIRE**            Dechert, LLP
Kirkland & Ellis, LLP               633 W 5th Street, Suite 4900
555 South Flower St., Ste 3700      Los Angeles, California  90071
Los Angeles, California  90071

**MARK J. NOMELLINI, ESQUIRE**
**NICHOLAS F. WASDIN, ESQUIRE**
Kirkland & Ellis, LLP
300 N Lasalle
Chicago, Illinois  60654

1        P R O C E E D I N G S

2        **THE COURT:**  What I'd like do is -- I don't

3    need a rollcall; there's just too many people on the

4    line.  So I'd like to just find out who is on the

5    line, who will be speaking on behalf of each side.  So

6    let's start with the Plaintiffs.

7        Who is appearing and will be speaking on

8    behalf of the Plaintiffs this morning?

9        **MR. AYLSTOCK:**  Good morning, Your Honor.

10    This is Bryan Aylstock.  I'll be taking the lead on

11    many of the issues.  Max is on, as well as Emily, and

12    Evan Buxner may participate as well.  And to the

13    extent there's anything specific to the individuals,

14    their counsel are on as well that can speak to an

15    individual response.  But I'll be doing most of the

16    heavy lifting.

17        **THE COURT:**  Okay, very good.

18        And who is appearing on behalf of the

19    Defendants?

20        **MR. NOMELLINI:**  Good morning, Your Honor.

21    It's Mark Nomellini.  Also appearing will be Nick

22    Wasdin, Ashley Neglia, Kim Branscome, and Eric Sefton.

23    Mr. Sefton's *pro hac* vice application is forthcoming.

24    He's working on getting his California certificate in,

25    which has coronavirus issues.  But we have checked

1   with Plaintiffs, and they have no objection to him

2   participating.

3        **THE COURT:**   Okay.  No problem from the

4   Court's perspective as well.

5        So I certainly have a number of filings.

6   I'll acknowledge that several responses were filed

7   late yesterday afternoon, and I do have those and

8   reviewed those as well as the sealed motions.

9        And I thought the best way to proceed is in

10  chronological order, and we can take motion by motion.

11  Some of them, in my view, may be a little easier.  But

12  I think that might be the most efficient way to go

13  through the pending issues.

14       And before we start, I just want to confirm

15  that --  Donna Boland, are you on the line?  Maybe I

16  can't hear her but I was told that we were having a

17  transcript of the proceedings which is of some

18  importance.  Yes, she's there, okay, very good.

19       So, because we are creating a transcript of

20  the hearing, although I know most of the voices and

21  probably Ms. Boland does as well, if you would

22  simplify yourself before you make a comment, and then

23  we'll be able to have an accurate transcript of who is

24  saying what about which issues.

25       So, the first motion chronologically is

1    Plaintiffs' Motion to Compel Discovery.  This is ECF

2    1226.  And I believe there was a response filed.  Let

3    me pull it up here.  Yes, there was a response filed

4    yesterday, I believe, to that.  We don't -- oh, it's

5    ECF 1252.  Okay.

6          So, this is a pretty discrete motion, and it

7    relates to the Plaintiffs' request that the Defendants

8    provide better responses to a number of

9    interrogatories, the general interrogatories 2 through

10    5, and then 16, 27, 28, 29, and then a sort of

11    separate issue is on interrogatory 7.  And, as you

12    know, we sort of went down this road previously on the

13    interrogatories.

14          So, let me first turn to, I guess, Mr.

15    Aylstock.  This is the Plaintiffs' motion.  And let me

16    hear from you as to why you believe the responses by

17    the Defendants are insufficient at this point.

18    **MR. AYLSTOCK:**  Yes, Your Honor.  Max is going

19    to address most of these particular issues, so I'll

20    turn it over to him.

21    **THE COURT:**  Okay.

22    **MR. KELLY:**  Good morning, Your Honor.  This

23    is Max Kelly from Seeger Weiss on behalf of

24    Plaintiffs.

25          You're correct that this is essentially a

1   very similar issue to the one that the Court already

2   addressed in April.  Essentially, for several of

3   Plaintiffs' interrogatories, Defendants have in

4   response referred Plaintiffs to documents.  They don't

5   say in those responses these documents reflect all of

6   the information available to Defendants.  They don't

7   say in those responses that this information -- you

8   know, to the extent that any information is missing,

9   what information is missing from those documents,

10  what's contained in those documents.

11        Defendants took the position -- in their

12  briefing last night, they said in a few places

13  essentially what Plaintiffs are seeking in the form of

14  testimony.

15        Just for some context, the concern here is

16  that Defendants are going to at trial pull out some

17  form of information that indicates some ad was not in

18  circulation at a specific time or a specific

19  instruction was or was not included in a shipment on

20  the basis of some information not included in these

21  interrogatory responses.

22        Now, in their briefing last night, Defendants

23  took the position that, although no spreadsheet is

24  perfect, it is the best available information.  They

25  say, for example, that the referenced documents

1    provide detail on every sale of the CAEv2 to the

2    extent it is available and that Defendants are not

3    presently aware of any information beyond what was

4    previously compiled and produced.

5         Similarly, they say that Defendants are not

6    presently aware of any information on what marketing

7    was done for any individual duty station beyond what

8    was previously produced.

9         If it's Defendants' position that they don't

10   know anything beyond what's in the documents they cite

11   in those interrogatories responses, that's all the

12   Plaintiffs seek here is testimony reflecting that.

13   But if the Defendants have knowledge beyond what's

14   reflected in the interrogatory responses, Plaintiffs

15   are entitled to that.

16        And relatedly, just one more issue on this.

17   Defendants' response, both their initial responses and

18   objections and their briefing last night, they both

19   describe this project essentially as Plaintiffs

20   requesting Defense counsel to engage in some kind of

21   document review.  They say it's an unduly burdensome

22   request for Defendants to review and catalog the prior

23   document productions and re-review those.

24        While there may be some counsel review of

25   documents involved in determining interrogatory

1    response, Plaintiffs are not asking Defense counsel to

2    provide information in the TAR document production or

3    in any document production.

4         Plaintiffs' interrogatories are directed to

5    Defendants' knowledge.  If it's Defense counsel's

6    position that all of that knowledge is contained in

7    the productions and that information -- some

8    information responsive to Plaintiffs' interrogatories

9    doesn't exist because it wasn't produced, then that's

10   a position that Plaintiffs can accept.  But we just

11   haven't heard that from Defendants yet.

12        **MR. AYLSTOCK:**  Well, Your Honor -- this is

13   Bryan Aylstock again.  What we're trying to avoid --

14   and this has happened in some other trials and we were

15   able to avoid it in other MDLs through the use of

16   these interrogatories.  But what we're trying to avoid

17   is some kind of a gotcha moment where our client says,

18   for example, *Oh, I saw the stars and stripes, I recall*

19   *that ad*, or whatever it is, or the instruction that

20   was used around that time seemed to say this or that

21   or the other because some of this is historical

22   information, and at trial some kind of a surprise,

23   even if it's not in the documents reflected here, oh,

24   there's something we dug out of somewhere or some

25   testimony from a 3M employee to say, no, he's lying or

1    she's lying about that particular thing, it couldn't

2    because it didn't exist.

3              And what we've been able to get, frankly,

4    without motion practice in other MDLs, is here is the

5    in-use dates for the particular marketing piece in

6    question, here is when it came on, here is when it

7    came off, here is what it was, and that put everybody

8    on a level playing field.

9              If the Defendants don't have that or they

10   can't go ask their people, as the rules require, you

11   know, do you know when these particular things were

12   there, do you know exactly what was distributed at all

13   beyond the documents, then they need to say that and

14   say it in the interrogatory response, not say it in a

15   pleading which we got at 10:40 last night, which

16   incidentally was after the close of business.  And

17   they certainly didn't say that in a motion -- in our

18   meet and confers.

19             So we're just trying to do the best for our

20   clients, absolutely, and nail down -- if the

21   Defendants don't know, then they can say -- the

22   knowledge is reflected in the CELUM database.  The

23   metadata in the CELUM database does not contain all

24   the information that we requested, and rightfully so

25   in our rogs.  And if that's the best that there is,

1    then they need to say that.  They don't get to play

2    games and hide behind objections and then at trial

3    come up with some kind of a gotcha moment.

4         **THE COURT:**  Let me ask you a question for the

5    sake of discussion.  Let's look at Interrogatory 16

6    which requests Defendants to identify all passive

7    level-dependent or non-linear HPDs you're aware of,

8    the person that developed it, the date you became

9    aware, any studies, and any communications.

10        What is it more that you would want the

11   Defendants to do in responding to that?  I mean,

12   they're entitled to -- they don't have to verbatim

13   repeat everything.  If, in responding to it, they

14   point to information in the record, they point to a

15   document or the deposition testimony of someone,

16   that's probably permissible.

17        But is your concern you want them to say,

18   look at the deposition of X, look at these documents

19   and, other than that, we don't know anything else; is

20   that what you're asking the Court to do?

21        **MR. KELLY:**  Well -- Your Honor, this is Max

22   Kelly from Seeger Weiss again.  Essentially, with

23   regard to Interrogatory No. 16 specifically, I think

24   that the issue is that the parties disagree on their

25   reading of the Court's order in April.

1          That order asks Defendants to identify

2     individuals who were involved in evaluating competitor

3     products and then to disclose responsive information

4     relating to them.

5          The problem with Defendants' response, as

6     identified in the brief, is that it's limited to

7     Elliot Berger's knowledge.  It's not clear whether

8     Defendants are saying that 3M also possessed all of

9     the knowledge Elliot Berger possessed.  It's unclear

10    whether 3M is -- I mean, it appears that 3M is

11    testifying that Elliot Berger was the only individual

12    who performed those kind of competitive analyses,

13    although we have identified documents in discovery

14    that show that a broader group of people was involved.

15         In any event, essentially the answer is yes,

16    what we're looking for is a statement that these

17    interrogatory responses that aren't in a narrative

18    form, that don't say something about 3M's knowledge,

19    we need a response that says something about 3M's

20    knowledge.  If they're saying here is some testimony,

21    here is a document, we would like a further statement

22    saying, and we agree that that testimony is accurate

23    and we don't know anything more than that.

24         Because, if they have responsive information

25    to the interrogatory that's beyond whatever document

they're citing to, you know, they're not absolved of
the obligation of providing that information.

**MR. AYLSTOCK:**  And we want to make sure,
Judge, that they've done the correct inquiry under the
rules and ask -- you know, if they asked Elliot
Berger, that's one thing.  It really is just kind of
referring to some deposition and documents.  But we
need to make sure that then -- in fact, what we don't
want them to do is just go hunt and peck some
documents and here is some documents over the transom,
we're not going to tell you that that's the extent of
3M's knowledge, nor are we going to tell you that we
don't have anything other than this.  We're just going
to find some documents and throw them over.

We want a statement these are directed at a
defendant that this is our knowledge, not that this is
what Elliot Berger knew at one point in time, and here
is some other documents and testimony, look at this.

**THE COURT:**  Let me just stop you there.  We
haven't touched on Interrogatory 7 and some of the
other issues raised.  But just keep our focus on, by
way of example, Interrogatory 16, let me hear from the
Defendants as to, first, why your response, in your
view, is sufficient under the rules and why -- I guess
Mr. Aylstock is asking for why something along those

1    lines would not be required.

2        **MR. WASDIN:**   Your Honor, this is Nick Wasdin.

3    I'll take these.  So, to start, you know, all of these

4    -- and 16 is included -- are styled under this 33(d)

5    type argument.  And when you sort of read Plaintiffs'

6    papers -- and I think this was just basically the

7    point of what Mr. Kelly and Mr. Aylstock said that,

8    you know, what they're saying is that 33(d) requires

9    two expressed certifications in our interrogatory

10   responses.  And the main one they want is that,

11   whatever we've put, whether it's a reference to

12   documents or some description of, you know, a

13   narrative investigation, is all of our corporate

14   knowledge.

15        So they want sworn testimony that this is

16   everything that exists, and they want it on a

17   corporate knowledge level.  But the rules don't

18   contain those requirements.  They don't demand

19   perfection.  It's a reasonableness standard, a

20   proportionate response.

21        And so, when you're dealing with a 20-plus

22   year time period, what you say is we've done a

23   reasonable search of locations that we think could

24   have responsive data, or we've, you know, discussed

25   this with a particular witness who remembers.  It's a

1   reasonable search.  And so we've satisfied that

2   obligation.

3           Now, they talk about, you know, wanting to

4   avoid getting sandbagged at trial.  And the rules

5   contain a mechanism for that.  It's Rule 37.  They

6   would file some motion and say that whatever document

7   we've shown up with at trial that we didn't previously

8   disclose should be excluded.  That's the remedy in the

9   rules for sandbagging.  There's not a remedy in the

10  rules under Rule 33 that says folks who do

11  interrogatories have to swear to perfection.

12          One notable counterpoint to what Plaintiffs

13  are saying is that -- you know, they've repeatedly

14  relied on Rule 33(d) in their own interrogatory

15  responses in the bellwether cases -- we cite to a

16  bunch of those in the opposition we filed last night

17  -- and they don't make these certifications.  In fact,

18  a lot of their responses don't even bother to give us

19  Bates numbers.

20          So, you know, they say things like, *We refer

21  you to, quote, "the medical records on MDL

22  Centrality,"* end quote.  They're not saying this is

23  every single shred of information we have, presumably

24  because they don't think Rule 33(d) requires it.  So

25  they're trying to impose upon us requirements under

1     Rule 33 that don't exist and that they're not doing

2     themselves.

3            Now, to answer Your Honor's particular

4     question about Interrogatory 16 -- and by the way, I'm

5     happy to go through all of these, because, you know,

6     when you actually look at the objections that are

7     being litigated in the briefs, they don't really

8     neatly track on to this 33(d) issue.  There are burden

9     issues that we've raised, you know, that explain why

10    we responded to one rog in one way or another that are

11    really not 33(d) issues.  And that's true for all the

12    rogs, and rog 16 is a good example of it that Your

13    Honor called out.

14            So that rog is a broad rog asking for all

15    corporate knowledge of other passive non-linear

16    hearing protection devices.  We litigated that issue

17    earlier this year, and Your Honor issued an order on

18    it on April 10th, I think, 2020, and you specifically

19    addressed this issue of whether we had an obligation

20    to provide corporate knowledge type testimony.  And

21    what you said was:  "The Court cannot compel

22    Defendants in some abstract manner to determine and

23    report on their corporate knowledge of all passive

24    level-dependent or non-linear HPDs, as requested in

25    Interrogatory No. 16."  And you went on to explain why

1    that was.

2         And so, as we read the Court's order, what

3    you were asking for was for us to go identify whether

4    there was a person or group of people who did this

5    type of comparative analysis as part of their job.  We

6    did that.  We investigated it.  We determined that it

7    was Elliot Berger, with the help of some folks that we

8    identified in our rog response.

9         We included a four-page narrative description

10   of those instances we were able to identify where he

11   had done that type of comparative analysis.  We cited

12   to documents that were produced during that process.

13        And then we had another meet and confer with

14   Plaintiffs, and they said, look, there's a couple of

15   sub-romanettes in Interrogatory 16 that you didn't

16   give us for Berger.  And we went back and supplemented

17   again and gave a narrative chart of the years that

18   Berger learned of these various products.

19        And so, our reading of the Court's April 10th

20   order is that's what you were asking for, that's what

21   we were ordered to provide.  And when you look at a

22   four-page narrative description that's based not only

23   upon citations to documents but also upon like an

24   extensive investigation that we did with Mr. Berger,

25   you know, we believe we've satisfied the

1   reasonableness standard and the proportionality

2   standard under the rules.

3         And before I end, I don't want to go through

4   all of these, but I will say that, as I mentioned at

5   the beginning, I think a lot of these raise similar

6   issues where we've done a lot of work, you know, we've

7   produced not only documents, we've produced narrative

8   descriptions, and so it's not just a 33(d) issue.  And

9   I'm happy to go through the rest.

10         **THE COURT:**  Okay.  Well, we'll touch on those

11   in a minute.  Let me go back to Mr. Kelly on this

12   Interrogatory 16.

13         So, you know, the Defendants are saying that

14   -- characterizing your view as requiring some type of

15   certification or closing the loop so that you don't

16   get down the road and get to trial and additional

17   theories and information comes forth different from

18   what's in the interrogatory.  And again, maybe I'm

19   missing the issue.

20         You know, the interrogatories certainly have

21   some use in litigation.  They are sworn, and we know

22   that answers to interrogatories are drafted by lawyers

23   because theoretically at trial you could stand up and

24   read the answer to an interrogatory to the jury as

25   substantive evidence.  And lawyers draft responses so,

1    if someone was to do that, in all likelihood, it would
2    not be helpful to them.
3            But ultimately, you know, an interrogatory to
4    a corporate defendant signed on behalf of a corporate
5    defendant is binding on that party.  If that party was
6    to fail to supplement, as the rules are required, and
7    later on to bring up information contrary to different
8    from or materially in addition to what's in the
9    interrogatory, as Mr. Wasdin points out, there are
10   mechanisms under Rule 37 for excluding that type of
11   information.
12           So isn't that really the, for lack of a
13   better word, the guardrail on this, that their
14   response -- the Defendants' response to this
15   interrogatory is binding on the Defendants.  And a
16   suggestion that, at trial or later on in the case,
17   they would pivot and say, well, that's not really our
18   position, we were just saying that's Mr. Berger's
19   position really would not get much traction, that is,
20   the position of the Defendant.
21           And isn't the requirement here, in answering
22   an interrogatory, simply to make, you know, a
23   reasonable inquiry and inspection in responding, and
24   that you are not required to have a close-the-loop
25   certification in response to each interrogatory?

1          At the end, when you sign it, the corporate

2     representative, whoever signs it, swears to the best

3     of his or her information and belief that the

4     responses are true and correct.  And if you dig down

5     into the rules, implied in all of the rules is a

6     requirement of reasonable inspection and inquiry.

7     These principles apply when you deal with e-discovery.

8     No one ever expects in the world of e-discovery that

9     you get every document.  That's never happened in the

10     history of mankind, and it will never happen.

11          But the inquiry is always was there a

12     reasonable review -- good faith reasonable review and

13     inspection, and if so, that satisfies the standard.

14     And doesn't that same standard really apply to your

15     response to interrogatories?

16          **MR. KELLY:**  Thank you, Your Honor.  So

17     there's a few issues at play here.  The first is that

18     it is correct that these responses are binding on the

19     corporation because the corporation signs them.  But

20     the issue is that they're only binding on the

21     corporation as far as their content goes.

22          And at this point, if some information -- if

23     3M were to make some representation down the line that

24     3M was not aware of one of the safer alternatives

25     listed in Interrogatory No. 16, that doesn't

1    contradict the current testimony in rog response No.

2    16.   Right now that response doesn't say anything

3    about what safer alternatives 3M was aware of or when.

4    It only says what Berger was aware of.

5            So, yes, this response is binding on the

6    corporation, and Plaintiffs can use it against the

7    corporation, you know, as evidence of the

8    corporation's position -- binding position on Elliot

9    Berger's knowledge.

10            But the problem is that that doesn't -- it's

11    not responsive to the interrogatory.  You know, an

12    absurd example would be that if we had served this

13    interrogatory and Defendants' response was that the

14    sky is blue, that answer is binding on them, but it

15    doesn't provide any information responsive to the

16    interrogatory.

17            The issue is that these rogs are directed to

18    the corporate entity.  If it's their position, which

19    it seems like it may be, that all of Defendants'

20    corporate knowledge on safer alternatives exists

21    within Elliot Berger and it's coextensive with Elliot

22    Berger's knowledge, and then this is what Elliot

23    Berger is aware of, then we have a response that

24    relates to Defendants' knowledge.

25            And then, as Your Honor points out, they

1   would be bound by that response.  And later, if they

2   denied some knowledge or claimed some additional

3   knowledge, then we could push back on that.  But as

4   their response currently stands, 3M claiming or

5   denying additional knowledge wouldn't contradict the

6   response because the response just doesn't go to 3M's

7   knowledge.

8        So that's the issue specifically with regard

9   to No. 16.

10       I did want to respond, though, with regard to

11  Mr. Wasdin's suggestion that we're asking for

12  perfection here.  It is, of course, the case that a

13  Rule 33(b) response is limited to a proportional

14  reasonable investigation and personal knowledge.  And

15  indeed that's the basis on which bellwether plaintiffs

16  responded to Defendants' interrogatories.  They

17  provided a Rule 33(b), as in boy, response that

18  reflects their personal knowledge.

19       And the issue is that Defendants, in some of

20  these responses -- now, 16 might be a special case, so

21  I don't know if we would like to look at one of 27

22  through 29, for example.  But the issue is that

23  Defendants' responses rely on the Rule 33(d), and that

24  is not the same as 33(b).

25       Under 33(b), it's correct that you're limited

1  by proportionality and personal knowledge.  Under Rule

2  33(d), when you rely on a document in making your

3  response, what you're saying is that all of the

4  responsive information is contained in these documents

5  that I'm referring to, and that information is as

6  accessible to the questioning party as it is to the

7  responding party.

8           That is not a statement of perfection or a

9  certification of perfection or anything like that, but

10  it is some statement about the relationship between

11  the documents referred to and the responding party's

12  knowledge.

13           The issue is essentially that -- I mean, we

14  can take a look, for example, at -- I believe it's

15  their -- it's the response to Interrogatory No. 28.

16           So what we end up with -- or I'm sorry, it's

17  not.  It's their response to Interrogatory No. 29.

18  What we have there is a -- it's discussed on --

19           **THE COURT:**  Page 12, yeah.

20           **MR. KELLY:**  Yes.  What we have there is a

21  list of evidence from this case.  And this, again,

22  goes, I think, to the concern that we had about how

23  Defense counsel is responding to these

24  interrogatories.  Again, what we're seeking is

25  Defendants' knowledge and position, not Defense

1    counsel's review of documents.

2         But moving beyond that, the response to

3    Interrogatory No. 29 refers Plaintiffs to a document

4    that provides testimony from two individuals.  It says

5    that nonparty documents include a document titled, and

6    then they provide the title.

7         The point is that the response never says

8    3M's knowledge is X or 3M adopts the positions taken

9    in these documents, all 3M knows is what's in here.

10   That's what you need for 33(d).  In order to rely on

11   33(d) in citing to a document and citing to a business

12   record instead of providing an actual response, you

13   need to say the information you're seeking is

14   available in this document, and either, here is the

15   information that's not available in that document, or

16   there is no other information known to us outside that

17   document.

18        If, instead, a party wants to rely on a

19   reasonable and proportional search, then they can

20   provide a 33(b) answer that would be bound by those

21   requirements.  And again, 33(d) does not require

22   perfection.  It just requires -- it's just not

23   satisfied by a naked reference to a document.  You

24   need a document reference plus something else.

25        So, the issue with their response to

1   Interrogatory No. 29 is, as I was saying in the

2   context of 16, if 3M came out and said -- you know, in

3   four months 3M comes out and says 3M has knowledge

4   that X, Y, Z document was contained in every shipment,

5   that doesn't contradict their current interrogatory

6   response because their interrogatory response doesn't

7   contain any information about their knowledge or their

8   position or anything.  It just says here is what some

9   other people have said.

10          So, again, we're not seeking perfection.  But

11   when you rely on 33(d), the reliance on 33(d) comes

12   with some requirements, including that the information

13   sought is contained in the document and that, to the

14   extent it's not, there's an explanation of that, that

15   the information is not available or that here is the

16   additional information on the document.

17          **MR. AYLSTOCK:**  What we're looking for, Judge,

18   I think is contained on page 26 of their response

19   filed late last night.  In their response to the

20   Court, what is said is -- and I'm looking at the end

21   of the first paragraph on page 26, and I'm quoting the

22   Defendants' response:  "Like the sales and

23   distribution data discussed above, Defendants are not

24   presently aware of any information on what marketing

25   was done for each individual duty station beyond what

1    was previously complied and produced."  That's what

2    33(d) requires.  If they're going to refer to a bunch

3    of testimony and documents and that's it, then they

4    need to say that's it.  If they have other

5    information, then they need to say that.

6          But, as Mr. Kelly points out, if we were to

7    stand up and read that at trial, there's nothing to

8    contradict if they pull out some other testimony or

9    Elliot Berger is on the stand and says, *Oh, no, no,*

10   *no, no, no, that's not what happened*, we have nothing

11   to contradict them from their sworn statements under

12   oath without the addition of what they'll tell the

13   Court but for some reason they're not willing to put

14   under oath in these rogs.

15          **THE COURT:**  Let me stop you there.  On this

16   particular interrogatory, let me hear from Mr. Wasdin.

17          What's your response to that?

18          **MR. WASDIN:**  Yeah, let me start with two

19   points, which the first one is, you know, we just

20   heard again these two requirements that Plaintiffs

21   keep telling the Court are contained in Rule 33(d)

22   but, you know, they don't do it in their own

23   responses.  So they're not living up to that standard.

24          And the second point on that is that -- I'm

25   sorry, did I interrupt Your Honor?

1      **THE COURT:**  No.

2      **MR. WASDIN:**  Oh.  The second point on that

3   is, you know, this Court has already taken a look at

4   our 33(d) responses in connection with the last time

5   we briefed this issue that led to the April 10th

6   order.  And in that setting, the Court held that our

7   responses to general Interrogatories 3 and 8, you

8   know, which we do in the same way, this 33(d) way of

9   identifying Bates numbers, don't contain these

10  expressed certifications they're requiring, and the

11  Court upheld those and said Plaintiffs are not

12  entitled to anything more.

13      So, before you even talk about 29 or any

14  other rog, you know, you have to sort of realize (a)

15  they're asking for something they're not doing, and

16  (b) they're asking for something that the Court didn't

17  require last time we litigated this issue.

18      But when you look at 29 in particular, just

19  to address it, it's asking for essentially a list of

20  all documents that were contained in the boxes shipped

21  to the government.  And the problem is that, you know,

22  we have the information we have.  Much of the

23  shipments to the military were packaged by

24  distributors.  Plaintiffs have subpoenaed some of

25  those folks.  They can take those depositions if they

1    want.

2         What we did to satisfy our Rule 26 obligation

3    to respond to this interrogatory, the reasonableness,

4    the proportionality standard was we referred

5    Plaintiffs to 30(b)(6) testimony on what documents

6    were in the box, we referred Plaintiffs to a picture

7    of the CAEv2 packaging contained in the production, we

8    referred Plaintiffs to the sales and distribution data

9    which says where every single shipment went from our

10   perspective.  But most importantly, most importantly,

11   we referred Plaintiffs to the bill of materials and

12   testimony about the bill of materials.  It's a

13   document that explains, from our position, what went

14   into each box.

15         Now, Plaintiffs told us during the meet and

16   confer process they were having difficulty linking the

17   bill of materials to individual documents in the

18   production.  So we came back to them and explained

19   that the component numbers listed on the bill of

20   materials correspond to component numbers assigned to

21   certain labels and inserts and things of that nature,

22   and we gave them those Bates numbers.

23         So that's a reasonable response.  They have

24   the bill of materials.  They have testimony about the

25   bill of materials.  We've identified documents for

1   them, how to use the bill of materials.  True, the

2   bill of materials may not be perfect, but it's a list

3   of what went into the box and it's the best we have.

4        Now, I do want to sort of address one point

5   that we keep making on this call just to make sure our

6   position is known.  We may learn something in the

7   future.  We may take the dep of some distributor.  We

8   may depose more military witnesses.  We may find the

9   military person who opened the box; maybe they

10  remember what was in there.  It's possible that, you

11  know, some future testimony or document produced by

12  the military will refresh some other witness's

13  recollection and we'll learn more from that avenue.

14  And if we learn that in the future, we can use that.

15       And whether we have an obligation to

16  supplement some historical rog response based on that

17  information is controlled by 26(e), and the question

18  would be whether or not it was otherwise made known in

19  the course of discovery.

20       So there are mechanisms in the rules that

21  govern all of these concerns that Plaintiffs are

22  raising.  Rule 37 if they think we sandbagged.  Rule

23  26(e) if they think we have an obligation to

24  supplement.

25       But Rule 33(d) does not contain the

1    requirements they're asking for, they're not doing it

2    themselves, and the Court has previously held that rog

3    responses that don't contain them are adequate.

4              **MR. KELLY:**  Your Honor, can I --

5              **THE COURT:**  One second.

6         Mr. Wasdin, so, your read of Rule 33(d) is,

7    when you respond to an interrogatory and you simply

8    refer someone to information in the record, a document

9    or deposition testimony, so, *In response to this*

10   *interrogatory we refer you to Document No. 123 and the*

11   *testimony of Joe Smith taken on April 10th,* that

12   implies, whether you say it or not in answer to an

13   interrogatory, that, at that point in time when you

14   certified the answers to those interrogatories, based

15   upon a reasonable investigation and inquiry, that is

16   the corporate knowledge, that's what your client knows

17   about that issue at that point in time, and that that

18   is sufficient without having to add some type of

19   statement and saying, other than those things we're

20   pointing to you, that's all we know now.

21        I mean, is that essentially your argument,

22   you don't need to say that second part?  That just by

23   making that your answer and referring to the

24   information, that means that is, to the best of your

25   knowledge and belief, the response to that information

1    at this point in time?

2         **MR. WASDIN:**  Yeah, I think the answer at a

3    high level is, yes.  You know, there is a

4    reasonableness obligation baked into the rules, and so

5    what you're saying when you respond to any discovery

6    is we've done the reasonable investigation, whether

7    it's documents or interrogatories, you know, here is

8    the information we've come up with that's responsive

9    to this request, period.

10        And there's no obligation to separately say

11   two things under 33(d):  (a), you know, this is all

12   corporate knowledge on this issue, you know, at least

13   up until this point in time or, as Plaintiffs keep

14   saying on this call, maybe like all the way through

15   trial; and (b), you know, when you're pointing to

16   documenting, I think it's implicit that, you know,

17   what we're saying is the burden is the same for both

18   of us to go look at this spreadsheet.  I don't know

19   why we need a corporate representative to testify

20   about the burden that Plaintiffs may have from looking

21   at a spreadsheet.  It's just a legal argument.

22        **THE COURT:**  Okay.  Mr. Aylstock, you were

23   going to say something and I interrupted you.

24        **MR. AYLSTOCK:**  I think Mr. Kelly was going to

25   say something, probably the same thing I was going to

1    say.

2           Go ahead, Max.

3           **MR. KELLY:**   Okay, we won't attempt to do it

4    in unison.

5           I just wanted to respond to a few things that

6    were just raised.  The first one is one that's come up

7    with a few times, and I think it's something we

8    haven't addressed yet on this call.

9           Defendants repeatedly characterize and in

10   their motions characterize Plaintiffs' interrogatory

11   responses as relying on Rule 33(d).  I believe that

12   some individual counsel may have cited Rule 33(d) in

13   their responses, but I know that in general that's not

14   the case.  And more relevantly, Rule 33(d) does not

15   apply to bellwether plaintiffs' interrogatory

16   responses because bellwether plaintiffs in those

17   responses are not referring to a party's business

18   records.  That's one of the limitations on 33(d).

19          We can return to that point if we're going to

20   address Defendants' motion later, but I just want to

21   -- Mr. Wasdin has said a few times that the Plaintiffs

22   are seeking something that they themselves are not

23   willing to do.  That's not the case, first, because

24   Plaintiffs are not relying on 33(d); and second,

25   because Plaintiffs have already provided the 33(b)

```
 1    responses that go to the full extent of their personal
 2    knowledge.
 3            It's not the case that Plaintiffs are relying
 4    on some document and saying that all they know is
 5    what's in this business record that they maintain as a
 6    party.  They're saying in the responses that
 7    Defendants object to -- I don't want to go down a
 8    rabbit hole about bellwether interrogatory responses,
 9    but I just want to state very clearly that it is not
10    the case that Plaintiffs are demanding the Defendants
11    do something that Plaintiffs themselves are not doing
12    for several reasons, including that 33(d) does not
13    apply to Plaintiffs' responses.  So that's the first
14    thing I wanted to raise.
15            Two other things.  The second is that there's
16    a significant clause at the beginning of Rule 33(d).
17    Defendants' position seems to be that everything
18    before the final comma in Rule 33(d) is irrelevant.
19    Defendants' reading of 33(d) to me seems to be that
20    the responding party may answer by specifying the
21    records that must be reviewed in sufficient detail, et
22    cetera.
23            Defendants are ignoring the "if" clause
24    before that, which has multiple ifs within it.  The
25    first is, if the answer to an interrogatory may be
```

1   determined by review of the records.  Now, that

2   requires, for a 33(d) response to be accurate, it must

3   be the case that the answer may be determined by

4   reviewing those records.  To the extent that those

5   records do not contain, you know, information

6   responsive to the interrogatory, then you can't rely

7   on 33(d).

8            So there's that "if" and then there's another

9   "if."  There's, "If the burden of deriving or

10  ascertaining the answer will be substantially the same

11  for either party."

12           Again, it's a requirement that Defendants may

13  not hide the ball.  It's just not the case that you

14  may skip most of Rule 33(d) and jump right to "the

15  responding party may answer by."  There are two big

16  "ifs" in there.  And the point of our motion is that

17  Defendants have not met either of those "ifs."

18           It's not the case that the answer may be

19  determined by reviewing these records.  So if

20  Defendants are saying that they don't have that

21  information --

22           **THE COURT:**  Let me interrupt you.  Why not?

23  Why can't the answer be determined by looking at, for

24  instance, the bill of materials, there's the summary

25  chart they prepared, and by looking at testimony of a

1    witness?  Why --

2         **MR. AYLSTOCK:**  It can if they say, Judge,

3    that that's the extent of their knowledge.  And that's

4    the point we're trying to make.  They're willing to

5    say it in a legal paper to the Court that I can't

6    present before a jury, but they're not willing to say

7    it in their sworn interrogatory response that I can

8    use at trial.

9         And you just heard Mr. Wasdin say, well, we

10   might find anything later and we'll decide whether we

11   need to supplement or not.  And if it's -- or you'll

12   have to move for sanctions, which we're always loath

13   to do.

14        And those "if" clauses really do require them

15   to say, well, that's the extent of my knowledge, in

16   order to meet that burden of -- or the requirement of

17   33(d).

18        **MR. KELLY:**  The other thing I wanted to just

19   push back on a little, I think that -- I understand

20   what the Court and Mr. Wasdin were going for with the

21   notion of an implied "to the best of my knowledge this

22   is the full response" accompanying an interrogatory

23   response.  I agree that that is implicit in the

24   signature, you know, under the verification of the

25   rogs.

1           The issue is that, if 3M is saying to the

2    best of 3M's knowledge their full response on what was

3    contained in packages is Mark Santoro said something,

4    a nonparty produced some document, the testimony is

5    that 3M has no knowledge, right?  Like that rog

6    response does not say 3M knows X or 3M knows Y, and so

7    it's kind of worthless.

8           I mean, there's nothing to really rely on in

9    a "to the best of my knowledge this is the full

10   response" because, as applied in many of these rog

11   responses -- to rog 16, for example, right, which

12   discusses Elliot Berger's knowledge, if 3M's statement

13   is, to the best of 3M's knowledge, the full response

14   about 3M's knowledge on this topic is Elliot Berger's

15   knowledge, they haven't said that 3M knows anything.

16          So there's really not -- "to the best of my

17   knowledge this is the full response," it doesn't

18   really -- I agree that that can be read into the

19   verification, but the problem is that the responses

20   don't actually address 3M's knowledge.  If they did,

21   then we wouldn't be having this issue.

22          If the responses said anything about what 3M

23   knows on these topics, then yes, that verification

24   would serve as a, you know, "to the best of my

25   knowledge this is the full response."  The problem is

1    the response doesn't contain any statement about 3M's

2    knowledge.

3         **THE COURT:**  Okay, I think I get it.  Before I

4    give the Defendants a moment to chime in, Mr. Kelly,

5    is there -- let's leave out Interrogatory 7 for a

6    moment.

7         Is there anything in particular about

8    Interrogatories 2, 3, 4, 5, 16, 27, 28, or 29 that is

9    specific to those interrogatories other than the

10   issues that both sides have talked about?

11        **MR. KELLY:**  Well, Your Honor, 27 through 29,

12   as Mr. Aylstock was mentioning before, go to really

13   core issues in this case.  There's not some question

14   of them being of marginal relevance.  I don't think

15   that -- I mean, depending on what the burden is, it

16   doesn't seem like a very strong proportionality issue

17   just because it's so central what instructions were

18   provided in a failure to warn case and what

19   advertisements were live when in a fraud case.

20        The notion that Defendants can withhold that

21   information is not appropriate.  If the Defendants

22   didn't track that information and don't have it, then

23   they should tell us that.  If they did track that

24   information and do have it, then they should provide

25   the information.

1          As it stands right now, we don't have any

2    statement suggesting that that -- you know, we don't

3    have any testimony suggesting that 3M knows or does

4    not know when these ads and instructions were in

5    force, so that's the big issue of 27 through 29.  And

6    importantly, 28 doesn't have any substantive response

7    at all.

8          With regard to bellwether Interrogatory Nos.

9    2 through 5, the issue is that Defendants -- the other

10   interrogatory responses to which Defendants refer just

11   flatly don't contain any information responsive to

12   those interrogatories.

13         Interrogatory Nos. 2 through 5 seek

14   distribution information and contact -- information on

15   contact and communications between Defendants and

16   individual plaintiff duty stations.

17         There's no information on those subjects in

18   the documents to which Defendants refer us, with some

19   exceptions.  There is a spreadsheet that lists one

20   order to -- a few orders to a few bases.  But many of

21   the orders does not reveal that, and there's no

22   contacts described with any of the individual duty

23   stations in the other sources to which Defendants

24   refer.

25         And this, again, this is -- it's squarely a

1   33(d) issue.  If Defendants are saying these other

2   interrogatory responses or these other documents

3   represent all 3M's knowledge with regard to our

4   contacts with these duty stations, we're done here,

5   there's not a live issue.  But 3M hasn't said that,

6   and 33(d) requires it.  33(d) can only be used if you

7   need the "if," if the answer to the interrogatory may

8   be determined by examining the business records.

9          **THE COURT:**  But Rule 33 doesn't say that if

10  the answer -- you can look at a document to determine

11  it, it doesn't say and that document is the only place

12  and the only information defendant has.  It just says

13  if you can determine the answer from looking at the

14  document -- you know, it's sort of like a corporate

15  representative, when you have a 30(b)(6), you have an

16  obligation to have the individual prepared to testify

17  on behalf of the corporation, but you are never

18  required to have the person testify who has the most

19  knowledge.  Just knowledge.  That person can talk

20  about it.  And that person might have absolutely no

21  personal involvement.  You could have a corporate

22  representative say I don't know anything about that

23  issue, but I have made a reasonable inspection, and

24  Mark Santoro and Elliot Berger have told me this

25  information, and that is, based on reasonable inquiry,

1    what we know about that issue.

2         And you wouldn't be able to challenge that

3    and say, well, there's someone in the corporation they

4    could have put up for the deposition who knows even

5    more, so long as the person who testified knew enough

6    to respond.

7         And sort of that principle applies with Rule

8    33, Rule 33(d) if the answer -- if the information and

9    the best information available is in a document, even

10   if that document doesn't have every last detail of the

11   information but that is what the corporate

12   representative signing the interrogatory is saying is

13   the information that the corporation had, isn't that

14   normally sufficient?

15        **MR. KELLY:**  Your Honor, absolutely, and that

16   would be sufficient here.  You touched exactly on what

17   we're missing.  What we do not have is that last "if"

18   that you mentioned twice in the context of the

19   30(b)(6), that the witness says, *I conducted a*

20   *reasonable investigation and this is what we know*.

21   And then just now when you were at the end of your

22   statement that the corporate rep signing the rog

23   responses would say, you know, this is what we know

24   based on a reasonable investigation.

25        We just don't have that here.  That's the

1    issue.

2            And similarly, just to -- on the issue of

3    whether a 33(b) response needs to contain all

4    responsive information.  So 33(b)(3) requires all

5    interrogatories to be answered fully, and (d) allows

6    that if the answer --

7            *[Interference.]*

8            I'm sorry, I think someone is off their mute.

9    Sorry.

10           If the answer to an interrogatory may be

11   determined by examining a party's business records

12   hence the burden will be substantially the same, then

13   the party may answer by providing those records.

14           The issue is that the answer to the

15   interrogatory -- the fully comprehensive answer to the

16   interrogatory may not be determined from the records

17   that -- we don't believe it can be determined from the

18   records that the Defendants provided, unless the

19   answer is Defendants don't know of any such contacts,

20   because no contacts of the duty stations are listed in

21   those documents.

22           If the answer is Defendants don't know of any

23   contacts, then that's a very easy statement for them

24   to make.  If Defendants' answer is all we know about

25   the contacts -- or just we've done a reasonable

1   investigation, what 3M knows about the contacts is

2   reflected in this document -- the kind of statement

3   Your Honor just indicated -- makes interrogatory

4   responses sufficient.  That's what we believe would

5   make these interrogatories sufficient and what's been

6   missing from them for months.

7   **MR. AYLSTOCK:**  With regard to these contacts,

8   Judge, Tim McNamara was one of the main guys that

9   Marty Salon, the vice president of sales, said would

10  go out and detail, for lack of a better word, all of

11  these installations.  And I was one of the people who

12  deposed him, and he said that basically every day of

13  the week he would be out there pressing the flesh with

14  samples, selling product all over the country.  And

15  then we get, of course, the Project Cobra.  We know

16  they had direct mail campaigns.  We know they did all

17  of this.

18      So for them to simply -- if they don't have

19  that information about all of these contacts, they

20  need to tell us that, and if 3M doesn't have it, then

21  they don't have it.  But what we have right now is

22  really nothing responsive, no documents that are

23  responsive to that very important question.  Because

24  he's out there telling these people how to use it, the

25  audiologists and so forth, and he had never heard of

1   even folding the flanges back.  He had told them to

2   use it on the rifle range when internally they were

3   saying don't use it on the rifle range.

4          So if they know -- if I know who Tim McNamara

5   was telling that to, I would very much like to talk to

6   that person to confirm that, and maybe that person was

7   the guy who trained Mr. Hacker or Mr. Rowe, and then

8   it gets linked up.  But what we have right now is just

9   useless information that can't be used at trial, and

10  it doesn't meet 33(d) because it doesn't have that

11  answer.

12         And if the answer is we don't -- didn't keep

13  record of it, okay.  I guess that is what it is.  But

14  we don't have that answer.  And I don't want Tim

15  McNamara coming up, because 3M digs in their files,

16  and says, oh, well, I never met that person, here is

17  -- I did some log or something.  So it just needs to

18  be nailed down, Judge.

19         **THE COURT:**  Mr. Wasdin, in response to 2, 3,

20  4, 5, 16, 17, 28, and 29, other than what you argued,

21  were there other things you wanted to bring to the

22  attention of the Court?  I know you talked about

23  burdensome and things of that nature.  I don't know if

24  we need to get into that.  But is there anything else

25  you need to add?

1    **MR. WASDIN:** Yeah, let me add a little bit on

2    each of them.  And before I jump in, just sort of two

3    high level points.  And I say high level.  Really it's

4    33(d) points.  There's sort of a disconnect in this

5    motion between, you know, the 33(d) issues and then

6    some of the interrogatory specific issues.

7        But on 33(d), the "if" language at the

8    beginning of that, it doesn't say if you give

9    corporate witness testimony under oath that these

10   three things are true, then you can answer as follows.

11   It's just, you know, just like the rest of the rules,

12   you know, the expectation is that lawyers do a

13   reasonable investigation and then they answer

14   according to the rules.

15       And so 33(d) says, if these couple of things

16   are true, then here is what you put in your answer.

17   And that list of things that goes into your answer,

18   you know, isn't -- doesn't include the testimony

19   they're talking about.

20       And I think Your Honor sort of highlighted

21   the disconnect here by talking about, you know, what

22   you would normally expect in a 30(b)(6) testimony

23   because it's exactly the same thing.  You have an

24   obligation to prep somebody reasonably, you have an

25   obligation to do a reasonable investigation in

1    response to an interrogatory.

2         And that 30(b)(6) witness may say things

3    like:  I talked to Doug Moses, here is what he told

4    me; I talked to Brian Myers, here is what he told me.

5    And he's speaking on behalf of the company and he's

6    saying I did a reasonable investigation, I did what

7    was required of me, here are the facts that I learned.

8         And that's what we're saying in our

9    interrogatory responses.  We're not saying this is

10   every conceivable thing on planet earth.  That's not

11   the obligation.  There's no obligation that we certify

12   that the scope of this investigation turned over every

13   single thing in the universe.  So that's 33(d).

14        But to go through the individual rogs, let me

15   just sort of try to do this quickly.  27 to 29, if you

16   just read the interrogatories, they all start out by

17   asking us to identify some universe of documents by

18   Bates number.

19        You know, the first 27 is identify all

20   marketing materials or instructional materials.  28 is

21   identify all final packaging.  29 is identify all the

22   documents that were shipped in the boxes to the

23   government.

24        And so we've got kind of a long piece of our

25   brief that tracks exactly how we responded to the rog,

1    including the case law cites with examples of cases

2    where courts have said that's basically an improper

3    burden shift of document review.  You can't send out

4    these very broad document requests -- in our case we

5    used TAR -- and then come back with a rog that says,

6    hey, can you manually re-review the whole thing and

7    tell us like, you know, what the universe of Bates

8    numbers are of X, Y, and Z.  That's an improper burden

9    shift.

10        When you look at 27 in particular, all

11   documents that are marketing or instruction materials,

12   what we did for them in response to that was beyond

13   reasonable.  We identified an entire database of

14   approved marketing, advertising, and promotional

15   material.  That database includes metadata for each

16   document that says, you know, including the

17   information regarding the production of a document,

18   when a document was in use, the anticipated audience

19   for the document.

20        We then went through and reviewed documents

21   from the database and gave them, in response to

22   Interrogatory 27, a list of, by my count, hundreds of

23   Bates numbers that relate to marketing material for

24   the Combat Arms Version 2.  So we reasonably responded

25   to 27.

1          28, all final versions of packaging

2    instructions and labeling.  You know, I think some of

3    the disconnect here is that a lot of the lawyers in

4    this litigation have some experience in a

5    pharmaceutical-type litigation where that's an

6    industry that's heavily regulated, that's an industry

7    where the manufacturer may have sort of a discrete set

8    of approved, final advertising that you could just go

9    point to and say these are the ten things we said

10   about this pill or something.

11         That's not the way earplugs are regulated.

12   It's a totally different set of relations that apply

13   to instructions.  And so, when you talk about what are

14   the packaging or instructions for earplugs, part of

15   what you're doing is looking through the TAR

16   production to try to find these things that are like

17   attached to an email or something.

18         And so, what we did in response to 28 was (a)

19   object on burden grounds to sort of asking us to

20   re-review the production, and (b) explained that we

21   had already done a reasonable investigation on

22   instructions, packaging, and labeling in connection

23   with the 30(b)(6) testimony.

24         We put up a witness who talked about all of

25   that, and he said during his testimony, quote -- you

1    know, he had done -- let's see here, he provided two

2    binders of, quote, the packaging and labeling and

3    instruction information that he pulled together that

4    was during his preparation.  He also testified that he

5    provided to the best of his ability the labels,

6    instructions, and packaging materials that he could

7    find during his preparation.

8           So we did that work, you know, we gave them

9    what we found on the back end of a reasonable search,

10   and we've objected to going back and re-reviewing the

11   whole production to certify that this is every last

12   piece of marketing material.  That's 28.

13          29, all the documents shipped in the boxes to

14   the government.  This is the bill of materials issue I

15   raised earlier, that was the same issue.

16          And then on 2 through 5, this one actually

17   comes back -- all of these come back to the sales and

18   distribution data that the Court has already taken a

19   look at.  So 2 through 5 -- 2 and 3, if the Court will

20   remember, Plaintiffs previously moved on sort of

21   globally all of our sales and distribution data, and

22   that led to the creation of those spreadsheets that

23   were the subject of the last motion to compel.

24          We talked about in our briefing the sort of

25   herculean effort that we went through to put all that

1    together.   The Court looked at that and said it was
2    sufficient and denied Plaintiffs' request for more
3    information on sales and distribution.   And then we
4    get these rogs that ask for exactly that, so it's
5    essentially what were the sales, you know, to each
6    duty station.
7          As an initial matter, the spreadsheets
8    provide that.   You know, the spreadsheets list the
9    location where the product was shipped like Fort
10   Bragg, it lists the date of the sale, and it lists the
11   various representatives associated with the sale.
12         So we pointed them to the spreadsheets.   The
13   spreadsheets also have the sales reps.   They've taken
14   those deps -- I know Mr. Aylstock just mentioned
15   Mr. McNamara -- at length.   He's deposed Mr. McNamara,
16   Mr. Santoro, Mr. Gavin.   I mean, these are folks
17   listed in the spreadsheet that they have taken their
18   deposition.
19         And, as we've said in connection with the
20   last motion, no spreadsheet is perfect, this data is
21   not perfect.   We're not representing it's perfect.
22   That's sort of the point of this whole call.   But it's
23   the best available information.   And we don't have
24   anything beyond the spreadsheet, you know, that lists
25   sales and distribution to one location or another.

1     Some of that is because it was done via distributor,

2     but we've given them what we have.

3          So, when you look at how Plaintiffs should be

4     getting information like rogs 2 through 5 like what

5     marketing material was used at a base, what sales were

6     made at the base, the far less burdensome way to go

7     beyond the spreadsheets is to depose people.  And

8     that's exactly what they've done.  They've taken

9     30(b)(6) testimony on all of that.  They've taken

10    numerous fact witnesses -- Brian Myers, Doug Moses,

11    Tim McNamara, Frank Gavin, Mark Santoro, et cetera --

12    and they've asked these folks what did you do, what

13    base did you go to, what did you sell there.  And

14    Mr. Aylstock just sort of explained some of the

15    testimony he got.

16         So that's a reasonable search and response on

17    our part.

18         And when the Court looks at the sales and

19    distribution spreadsheets, I think it should reach the

20    same conclusion here that it did the last time we

21    addressed it, which is that was a big effort, that was

22    reasonable under Rule 26.

23         **THE COURT:**  Thank you, Mr. Wasdin.

24         Lastly, Mr. Kelly, on Interrogatory 7, which

25    is a completely different issue, I just want to hear

1    from you very briefly on that.  That relates to the

2    request for surveillance information.  And then I'll

3    give Mr. Wasdin a chance to respond.

4         **MR. AYLSTOCK:**  Yes, Your Honor.  This is

5    Bryan Aylstock.  I'm going to take this one.

6         This issue was the subject of a lengthy meet

7    and confer.  And it's our position -- and there's case

8    law to support it both from Florida state court as

9    well as federal courts, including the First Circuit

10   Court of Appeal -- that our clients are absolutely

11   entitled to the information as far as surveillance on

12   them.

13        These are highly trained, current

14   servicemembers or veterans.  They're all evaluated for

15   PTSD.  Many, if not most, served in active combat.

16   They have families.  Some are deployed, being

17   deployed.  And just as a matter of pure decency, if

18   they're going to be followed around by a private

19   investigator, they should be entitled to know that.

20   And the law supports that they're entitled to know

21   that, if them or their family are being followed

22   around.

23        We're asking for the disclosure of the fact

24   of the surveillance.  The *Chiasson* case out of the

25   Fifth Circuit Court of Appeal absolutely supports that

1   proposition.

2          To be clear, and I made this clear, we're not

3   asking for attorney work product looking on -- you

4   know, Googling people, stuff that's equally available.

5   But whether it's Mr. Wasdin at some conference or

6   something or Magnum PI or whoever it is following

7   these people around, they're entitled to know that.

8   And to the extent that there is surveillance, video or

9   some other thing that's not equally available, we're

10  entitled to it.

11         And we've set out the case law that makes

12  that clear.  But simply as a matter of decency and to

13  avoid the gotcha situation at trial, they shouldn't be

14  allowed to pull out some video on this.  These are

15  hearing loss and tinnitus cases, we all understand

16  that.  And I just fear that really we're going far

17  afield by trying to hide active surveillance of our

18  people and their families.

19         **THE COURT:**  Okay.  Mr. Wasdin?

20         **MR. WASDIN:**  Yes, Your Honor.  So this one

21  has been a bit of a moving target from my perspective.

22  Mr. Aylstock is correct that -- well, let me take a

23  step back.

24         There are two rogs on this, rog 6 and rog 7.

25  Rog 6 basically asks for information of surveillance.

1    Rog 7 is details about whether and how we were doing

2    surveillance and who was doing it and when.  So they

3    only moved on 7, and so I interpreted that to mean

4    they were no longer seeking the, quote/unquote,

5    "fruits of surveillance" like photographs and videos.

6          It sounds like, from what I just heard Mr.

7    Aylstock say, they are asking for that -- I think he

8    just asked for a video -- and they're not limiting

9    this motion to, you know, an interrogatory seeking the

10   existence of surveillance.  So that's concerning.

11         But before this motion was filed, we tried to

12   avoid burdening the Court with it by offering to tell

13   Plaintiffs whether or not we presently had any

14   surveillance, quote/unquote, "materials" like what was

15   mentioned during the meet and confer at least, you

16   know, so long as they would agree it wouldn't -- work

17   product, and it wouldn't create an obligation in the

18   future to make a similar disclosure.  They declined

19   that offer and so they filed this motion.

20         I think, had we answered that -- had they

21   taken us up on that offer, it may have mooted their

22   motion.  But now we're essentially having an academic

23   argument over whether the surveillance, the existence

24   of surveillance, which lawyer is doing it, et cetera,

25   when they're doing it, how they're doing it is work

1  product and getting almost an advisory opinion from

2  the Court on that.

3        But I just heard Mr. Aylstock say he wanted

4  to know if I was at a conference.  You know, stuff

5  like that -- and by the way, the rog talks about

6  internet research, and so we put in our papers, you

7  know -- what does this even mean?  Do they want to

8  know every time a lawyer is Googling Stephen Hacker?

9  I think Mr. Aylstock just said no, but that's not

10  clear from the rog and it's not clear from their

11  motion.  And it may not have been clear, had he not

12  just cleared it up, from an order entered by the

13  Court.

14        So, when you talk about what lawyers are

15  doing, whether it's Googling on the internet or

16  whether it's attending a conference, me or one of my

17  colleagues, our paralegals, et cetera, or even

18  investigators working at the direction of counsel, you

19  know, disclosure of that information would plainly

20  reveal strategy and should be protected from

21  discovery.

22        Now, if we had surveillance of video or

23  photographs or whatever that we intend to use at

24  trial, we would clearly disclose that to Plaintiffs in

25  accordance with the federal rules.  There's not going

1    to be a sandbagging issue.  If there is, they've got

2    Rule 37.

3          And if Plaintiffs think that we had the

4    obligation to disclose it now, the only basis for that

5    is because they want to understand how we're

6    developing our case so that they can sort of do

7    counterstrategy.  They basically want to know are the

8    plaintiffs being followed around so that they can then

9    ask the plaintiffs to basically act accordingly.

10         But, you know, when you look at the

11   question -- *Are you conducting surveillance?  Who is*

12   *conducting it?  How are you conducting it?* -- I don't

13   see how that's any different than asking the question

14   to Plaintiffs, *Have you hired a consulting expert to*

15   *test the product?*

16         I mean, if we could serve that type of rog --

17   that's a case preparation rog.  It's not different

18   than asking have you hired a private investigator to

19   take a photo.  And, you know, when you look at the

20   output of it, the only reason you would want that

21   information is so that they could then sort of

22   basically, you know, test the product themselves or,

23   like I said earlier, ask the plaintiffs to make

24   adjustments in their behavior.

25         So we know on the flip side that Plaintiffs

```
1    do internet research.  They've shown up at depositions
2    of various witnesses and they've got a document that
3    they've pulled off the internet that's germane to some
4    deposition and they surprise the witness with it.  And
5    of course, they don't produce that document to us in
6    advance, and they don't tell us that Mr. Kelly was
7    Googling it the day beforehand or something like that.
8    Like that's not the type of stuff that's normally
9    disclosed in litigation on work product grounds.
10        So, in closing, I mean, what we're doing to
11   develop our case is strategy, it's work product.  And
12   if and when there was a product of that investigation
13   that we wanted to use at trial, there are rules
14   governing that process.  But whether or not we're
15   doing surveillance, who is doing it, how it's done, et
16   cetera, is not the subject of discovery at this point.
17        MR. AYLSTOCK:  Judge, let me be real clear,
18   because I think Mr. Wasdin is trying to create some
19   kind of a straw man here.
20        I have told him and I just told the Court
21   we're not looking for internet research by attorneys
22   that's equally available.  But if attorneys or PIs are
23   following around our people or their families, we
24   believe, under the law, we're entitled to know the
25   existence of that.  And to the extent there is video
```

1    or photographs, whatever, we're entitled to know that

2    as well.

3              And the cases that the Defendants cited in

4    their brief late last night aren't to the contrary.

5    The *Engle* case does not say what they say it says.

6    The interrogatory there just asks for persons with

7    knowledge.  It wasn't about surveillance.

8              And so, what we're seeking here is very

9    discrete.  It's not internet research that's equally

10   available.  I've made that clear in the meet and

11   confer.  But what Mr. Wasdin offered to do was, we'll

12   tell you now whether we have any, but that will be

13   your one and done, there's no supplementations, your

14   rog response is over, we'll tell you, and then we can

15   play a big game of gotcha at trial.

16             And that's what trials these days are about.

17   We want to know if they exist and what it is, and

18   we're entitled to know it under the law.  We're not

19   asking for -- if Mr. Wasdin was at a conference,

20   that's great.  But if he was at a conference of

21   Stephen Hacker where Stephen Hacker was going to work

22   or something and Nick is following him around and

23   taking video, then that's what I want, not whether

24   he's at some other conference developing the case or

25   something like that.

1      It's a very discrete issue, and we believe

2  we're entitled to it under the law in the cases that

3  we cited, not the least of which is the *Chiasson* case.

4      **THE COURT:**  Okay, I think I've got it, and

5  here is what I'm going to do.

6      As to Interrogatories 2, 3, 4, 5, 16, 27, 28,

7  and 29, I am denying the Motion to Compel.  I believe

8  the answers are appropriate.  Certainly to drill down

9  into the specifics of some of the interrogatories

10  certainly where an interrogatory asks someone to

11  identify by Bates number every document produced in

12  the case which contains certain type of information is

13  not appropriate, not proportional, and really not an

14  appropriate use of interrogatories.  But nonetheless,

15  the responses by the Defendants appear to be

16  reasonable.

17      I recognize they do not cite the verbatim

18  language in their answer to the interrogatory under

19  Rule 33(d) and set forth what is in the rule.  But it

20  is apparent to me, in looking at the answers, that

21  that is what they've done.

22      They are bound by these answers.  They've

23  made inquiry.  They have identified information, where

24  the burden is probably equal on both sides, to look at

25  it.  And I'll footnote where there apparently have

1 been some difficulties in understanding documents, the

2 Defendants apparently have been cooperative with the

3 Plaintiffs in trying to get them to understand the

4 document and what is in it.  And that is sufficient.

5   And for some of the information called for in

6 answers to those interrogatories, in addition to the

7 summary that was prepared, there's been deposition

8 testimony taken.  And I think it is appropriate to say

9 look at the deposition of Joe Smith because that

10 information or corporate representative deposition

11 discussed that, and there is nothing really served by

12 getting the Defendant to regurgitate exactly what is

13 in either a document or in deposition testimony.

14   You know, and I'll say -- I'm not going to

15 say the answers to these interrogatories are perfect,

16 but they do seem to have responsive information, not

17 all of the detail that Plaintiffs would want.  But,

18 you know, we're not going to have, in my mind, the

19 kind of situation that Mr. Aylstock is a little

20 concerned about of being sandbagged.

21   As I mentioned earlier in the discussion, you

22 know, these are sworn interrogatories, and they are

23 based upon reasonable inspection, inquiry.  And to the

24 best of information and knowledge, this is the

25 position of the Defendants.

1           And if the Defendants attempted later on in

2     the case to do something different or to say, *well,*

3     *that really wasn't our knowledge in our answer, Your*

4     *Honor, to that in the interrogatory, we were just*

5     *saying that was Mr. Berger's knowledge, that wasn't*

6     *our knowledge,* I guarantee you they wouldn't get real

7     far with that argument with either me or Judge

8     Rodgers.  So I'm really not concerned about that

9     happening.

10          Now, to the extent things come up later on in

11    the case -- I know that is one of Mr. Aylstock's

12    concerns -- that creates additional information from

13    what is in the answers to interrogatories, that is

14    controlled by, you know, Rule 26, Rule 37, and the

15    supplementation rule.

16          And there's a duty to supplement.  But, of

17    course, we all know where information comes to light

18    later on and it's reasonably available to everyone,

19    that normally would not require a party to go back and

20    alter or modify their answer to an interrogatory.  But

21    if something does come to light, information that the

22    Defendants become aware of that materially changes a

23    response to an interrogatory, they have an absolute

24    obligation to supplement and immediately bring it to

25    the attention of the Plaintiffs.

1          So as to those interrogatories, I'm going to

2     deny the Motion to Compel.

3          As to Interrogatory No. 7, I'm going to grant

4     that.  As Mr. Aylstock points out, even though the

5     interrogatory asks for internet research and that kind

6     of thing, he is representing that he is not requesting

7     information concerning internet or computer

8     surveillance that is, you know, readily available

9     through public sources.

10          But the law is pretty straightforward on this

11     issue.  This is a personal injury case in its simplest

12     form, and you are entitled to know if there has been

13     surveillance.  And I would say in the personal injury

14     world pretty much every plaintiffs lawyer is going to

15     include an interrogatory asking whether there is

16     surveillance.  And the reason that is included is

17     exactly what was pointed out, so you can alert your

18     client, *Someone is watching you, watch out what you do*

19     *because you may be subject to surveillance*.

20          So the Defendant will have to disclose

21     whether there has been surveillance.  They will have

22     to disclose the form of the surveillance -- film,

23     videotape, or still photographs.  However, the

24     Defendants are not required to turn over the film,

25     videotape, or photographs unless they intend to use

1    those at trial.

2          So the Plaintiffs will know whether they've

3    been surveilled, the form of surveillance.  But the

4    Plaintiffs will not have the benefit of what the

5    surveillance entails.  That will only be disclosed

6    later on if and when it is determined that that

7    information would be used at trial.

8          And, you know, the law does also seem to be

9    pretty straightforward with surveillance video of

10   plaintiffs, you're not entitled to get the information

11   before the plaintiff is deposed.  So the plaintiffs

12   doesn't get a chance to look at the video and then you

13   depose him so he can modify his or her testimony to

14   try to comport more with what's in the video.  But the

15   plaintiff is entitled to know whether he or she has

16   been surveilled, so I will grant that request.

17         Now, let's briefly move on.  We spent a

18   little more time on that than I thought we would.  But

19   let's go on to the next pending motion, and that is

20   the Defendants' Motion to Compel of Unredacted Records

21   or, in the Alternative, *In Camera* Review.

22         The *in camera* review part has essentially

23   been accomplished because documents have been provided

24   to the Court.  And I'm not going to sit here and tell

25   you I've looked at every last document.  It's a little

confusing with the documents that were provided.  But
certainly I have looked at the documents from
Mr. Hacker and Mr. Rowe, who are the two plaintiffs
that are at issue at this point.  And I have looked at
documents that were redacted.  I've looked at the
unredacted documents.  There is a handful of documents
where the document has been withheld, and I looked at
the withheld document.

So I am generally familiar with the type of
information that has been withheld or redacted, so
that will give you a little information as to what I
know.

But let's start the discussion off with --
let me first hear from the Defendants.  And this is
limited to Mr. Rowe and Mr. Hacker, since Mr. Baker
and Mr. Estes have, as I understand it, produced the
documents that previously had been redacted.

So let me hear from the Defendants.

**MR. SEFTON:**  Sure.  This is Eric Sefton on
behalf of the Defendants.  I'll be -- *(inaudible)* --
this issue.  I know -- so we briefed both issues of
privilege and relevance.  I know in Plaintiffs'
opposition they only addressed relevance based on
their position that that's dispositive.

Would the Court appreciate that I do a brief

1    discussion of privilege and then relevance, or do you

2    have a preference?

3         **THE COURT:**  Well, I think it might be

4    appropriate here because -- I don't want to say

5    there's some confusion as to relevance and privilege.

6    And we all know, you know, what I ruled earlier in the

7    case on putting your mental health/psychiatric issues

8    in controversy based on, you know, what's been pled.

9         But I think the little twist here as to

10   Mr. Rowe and Mr. Hacker -- I think this applies to

11   both of them, but certainly I think as to Mr. Hacker,

12   and it applies down the line to, I believe, Ms.

13   Kelley -- is a number of the documents relate to an

14   application and a granting of a disability

15   determination.

16        And, you know, that is a little bit of a

17   separate animal from just in the abstract whether, you

18   know, your mental health issues are or are not an

19   issue.  But you can address that.

20        But also the bottom line, obviously, on the

21   Court's determination is going to be on relevancy.  So

22   it's important that the particular claim of the

23   plaintiff is appropriate.  For example, if you're not

24   claiming loss of earnings or loss of earning capacity,

25   then the only possible key for relevance of some of

1   these records would be on enjoyment of life, which is
2   somewhat of an abstract concept.
3          But you can talk primarily about relevance.
4   But to the extent you feel it's appropriate, you can
5   talk about privilege as well.
6          **MR. SEFTON:**  Okay.  Thank you.  That's
7   helpful.  So just briefly on privilege, I think our
8   position, as you indicated, that the
9   psychotherapist/patient privilege, which is what we
10  understand the privilege to be at this -- for these
11  records.
12         We emphasize that it's a very narrow
13  privilege and, as the Court has recognize in *Martinez*,
14  is meant to facilitate diagnosis and treatment of
15  mental health conditions by mental health
16  professionals.
17         And so Plaintiffs have, we believe, a
18  relatively heavy burden to establish that the
19  privilege attached in the first place.  And as this
20  Court recognized in *Ortiz-Carballo*, that does involve
21  looking at what -- you know, who the communication is
22  with, is it with an actual psychotherapist or just a
23  doctor who might have provided some care associated
24  with mental health, and that those records, those
25  communications are treated differently.

1           So I think that's sort of, to the question of

2    whether the privilege ever attaches to information or

3    to communications, I think that's an important point

4    to make.

5           And then the point Your Honor just said, you

6    know, once you have something like a disability

7    application, we think that that implicates the form of

8    waiver different from --

9           I'm sorry, I am hearing a lot of static.

10          **THE COURT:**  Yeah, I'm hearing a lot of

11   static, too.  I think it might be from your phone.

12          **MR. NOMELLINI:**  Your Honor, I'm hearing

13   static on my phone, too.  I think it might be

14   universal.

15          **THE COURT:**  It might be.  I'm hearing it as

16   well.

17          Mr. Sefton, are you on a speakerphone or a

18   handset?

19          **MR. SEFTON:**  I am on -- I was on speaker.  I

20   can take it off.

21          **THE COURT:**  Yeah, I think that could be a

22   problem.

23          **MR. SEFTON:**  So I'm off speaker but I still

24   am hearing static.

25          **THE COURT:**  I'm hearing the static, but I'm

1    hearing you better.

2         **MR. SEFTON:**   Okay.  Well, I'll stick with

3    this, and just let me know if there is a problem going

4    forward.

5         So returning to the point that Your Honor

6    raised about when we have something like a disability

7    application, we do think that implicates --

8    *(inaudible)* -- different from the ones addressed by

9    the Court previously in its March 26th order about,

10   you know, waiver through pleadings.

11        We think something like a -- you know, a

12   disability application indicates much more waiver by

13   sharing information with third parties.  So, for here,

14   the predominant one at issue is the Veterans Benefits

15   Administration.

16        And so, it is our position, as explained in

17   our papers, that, to the extent information, even if

18   it was privileged, was shared with the Veterans

19   Benefits Administration or for some of the veterans

20   with third-party veterans service organizations, but

21   then any privilege that might have attached has

22   dissipated.

23        So I think those are our two primary points

24   on relevance, one that it's a heavy burden to invoke

25   it in that it only applies to certain types of

1    communications with certain doctors; and then, even

2    when something was once privileged, it can be waived

3    when shared.

4            So, turning to relevance, though, I think

5    from a -- at the outset, I think there's an important

6    point to clarify with respect to the legal standards

7    that applies.

8            So it's our position that, once you move past

9    privilege, as this Court explained in *Ortiz-Carballo*,

10   the task is simply to apply the normal relevance

11   standard.  The Defendants have to show that the

12   discovery sought is probative of the parties' claims

13   and defenses, and that, once we've made a showing that

14   the information we're seeking is generally probative,

15   then it becomes the objecting party, or the plaintiffs

16   here, they have the burden of showing that actually

17   the specific information they're trying to withhold is

18   not relevant.

19           So I think a lot of cases the Plaintiffs cite

20   in their opposition, including the *Cameron* case are --

21   *(inaudible)* --  apply a different standard

22   inconsistent with *Ortiz-Carballo*, saying that the only

23   time that information related to mental health can be

24   relevant is with respect to sort of an emotional

25   damages claim.

1          So, as we discussed in our papers, we think

2     that that's an incorrect legal position, that that is

3     not the legal test to apply with respect to relevance

4     in this case.  Because, as the Court explained in

5     *Ortiz-Carballo*, once you get past privilege, you're

6     just treating the evidence as any other evidence and

7     you're trying to decide whether it's relevant.

8          And I think importantly, and leading into

9     some more specific discussion of why the various

10    categories of documents here are relevant, in *Cameron*

11    in footnote 4 the Court specifically notes that, while

12    medical records -- the medical records in that case

13    there's some extensive discussion of the level of

14    relevance to an emotional damages claim.

15         In footnote 4, the Court specifically notes

16    that of course medical records are -- or here what

17    Plaintiffs have deemed mental health records -- can be

18    relevant for other types of claims and other issues in

19    the case.

20         So, with that in mind, I think it's important

21    on relevance to consider the various types of

22    documents that are actually -- types of documents and

23    types of communications or information that have been

24    redacted from the documents here, that they have

25    relevance to this case separate and apart from the

1    fact that they are, quote/unquote, "mental health

2    records."

3              So, first, as the Court has noted, there's a

4    whole host of disability records.  As we've noted in

5    our papers, and I don't think Plaintiffs contest, you

6    know, there's a statutory link between a VA disability

7    claim and a lost earning capacity claim.

8              So, to the extent that a party has a claim

9    for lost earning capacity, we think the relevance

10   argument is quite clear that, you know, previously --

11   if a veteran has previously submitted an application

12   to the VBA that they have a disability causing them

13   lost earning capacity and that in this case have a

14   claim that their use of CAEv2 has caused lost earning

15   capacity, you know, those records are probative of

16   whether they have lost earning capacity and what the

17   cause of it is.

18             But I think even absent a lost earnings

19   claim, disability records are relevant to this case

20   because of the temporal and substantive overlaps

21   between the disability claim and the claims in this

22   case.

23             So, specifically, to submit a VA disability

24   claim, a veteran is submitting to the VBA that they

25   have suffered an injury or disease during service and

1    that there's a present impact from that disease or

2    injury on their life today most directly through lost

3    earning capacity.

4         But to support those claims, the veteran has

5    to provide information about what happened during

6    service that caused them the disease or injury and

7    then medical support usually for what is the present

8    effect of that.

9         And so, because in this lawsuit plaintiffs

10   are alleging that during military service they were

11   injured by their use of the product, there's both

12   temporal overlap with those disability records and the

13   plaintiffs' claims relate to their military service,

14   and their substantive overlap because it pertains to

15   disease or conditions that apparently purportedly

16   affect them today.

17        One good example that appears in a fair

18   number of the disability records that we reviewed is

19   that, you know, to the extent you have something like

20   an IED explosion that's been discussed as part of a

21   PTSD diagnosis or assessment that we submit can and,

22   in many times, will be probative of something like

23   acoustic trauma, which would be probative of a claim

24   for hearing loss or tinnitus.

25        For example, Mr. Rowe, in response to

1    Interrogatory No. 39, talks about various rocket
2    attacks and mortar attacks that he experienced during
3    his service.  And to the extent those are discussed in
4    disability record, that's probative of his claims in
5    this case.
6         **THE COURT:**  Let me ask you a question.  What
7    if your disability -- you had a disability and part of
8    it was PTSD, and you had PTSD because you suffer from
9    gender dysphoria.  Would that be really relevant to a
10   case where someone is claiming they have hearing loss
11   or tinnitus?
12        **MR. SEFTON:**  I think it depends.  So I think
13   if the plaintiff has a claim for lost earning
14   capacity, then I think it is plainly relevant because
15   our causation experts and damages experts should be
16   allowed to evaluate the full scope of a plaintiff's
17   claim of lost earning capacity or lost ability to earn
18   income.
19        And so, if previously the plaintiff has told
20   the VA that their lost earnings capacity is due to
21   gender dysphoria and then in this case have said that
22   it's actually due to use of CAEv2, that's relevant
23   because it goes to causation and alternative
24   causation, and also our experts to be able to discover
25   it.

 1          I think absent a lost earnings claim, I

 2   understand that relevance link is missing.  I think

 3   you then -- to the extent that the plaintiff claims

 4   during their disability application that the disabling

 5   condition has an ongoing impact on their quality of

 6   life or their ability to enjoy life presently, I think

 7   it would still be relevant.

 8          There could also be relevant information

 9   about military service that may have caused trauma.

10   But I take the point that certain disability claims

11   may be more relevant than others with respect to the

12   claims in this case.

13          **THE COURT:**  What about Mr. Hacker, who does

14   not have a claim for lost wages or impairment of

15   earning capacity?

16          **MR. BHIMANI:**  Your Honor, this is Jay Bhimani

17   from Dechert.  If I may be heard just on the Hacker

18   portion of this?

19          **THE COURT:**  Yes.

20          **MR. BHIMANI:**  So, with respect to Mr. Hacker,

21   it is true that he does not have a lost wages claim.

22   Our position is that these records still have direct

23   relevance to his claim for mental distress, and so the

24   situation we have with Mr. Hacker is a little bit

25   unique.

1         And Your Honor may have some received

2    correspondence on this issue.  We originally started

3    with about 160 entries on Plaintiffs' privilege log

4    for Mr. Hacker.  Between the filing of the motion and

5    today, that has been reduced to 16 entries relating to

6    16 documents.

7         And in the materials that were unredacted, we

8    have seen the types of redactions that were being

9    made, and I think that they further sort of reinforce

10   the relevance of this.

11        For example, there are documents in the

12   unredacted materials that talk about causes of stress

13   and anxiety in Mr. Hacker's life.  And to the extent,

14   at his deposition or at trial, it is likely in

15   connection with his mental distress claims, Mr. Hacker

16   will describe the mental distress that he contends he

17   suffered from the use of the product at issue.  And we

18   would submit the Defendants have every right to

19   discover alternative explanations for that very same

20   -- *(inaudible)* --

21        And one example I can give -- and, you know,

22   it all depends on what the deposition testimony will

23   be.  But just as an example, if Mr. Hacker uses, you

24   know, a stress on his relationships -- *(inaudible)* --

25   with his family members from his hearing loss, that's

1   something that he has claimed is mental distress

2   caused by his use of CAEv2, we have every right to

3   discover other reasons why he may be suffering that

4   very -- *(inaudible).*

5          So that is our relevance argument as it

6   relates to Mr. Hacker.

7          **THE COURT:**  Okay.  Let me stop you both

8   there.  I'll come back to you.  I want to hear from

9   the Plaintiffs on this both as to Mr. Rowe and

10  Mr. Hacker, and then I'll come back to the Defendants.

11         **MR. AYLSTOCK:**  Hi, Your Honor.  This is Bryan

12  Aylstock again.  I'll be addressing sort of these

13  issues maybe with the assistance of Mr. Buxner, if I

14  leave anything out.

15         First and foremost, and I think the Court

16  recognized this, these are personal injury cases at

17  their core, and they're hearing loss and tinnitus

18  cases.  That's what they are.

19         And what makes these cases different from any

20  other car wreck case or even a hearing loss case

21  involving some private individuals is that these

22  individuals have all gone through military service and

23  they've gone through the VA process.  And the VA

24  process indeed is kind of a history of their entire

25  lives.

| | |
|---|---|
| 1 | So, in the normal PI case, defendants don't |
| 2 | even ask for -- if there's not a mental health claim, |
| 3 | the names of their psychotherapist, none of that even |
| 4 | comes into play, and it's not an issue.  But because |
| 5 | the VA system really is kind of a catalog of a history |
| 6 | of almost their entire life, because every |
| 7 | servicemember goes through a PTSD evaluation and so |
| 8 | forth, these cases are different.  And so, all the |
| 9 | records are kind of collected in one place. |
| 10 | Recognizing that, the Court, following Your |
| 11 | Honor's decision, entered PTO 39.  And that is the |
| 12 | controlling document here.  That is what the Court |
| 13 | ordered, and we absolutely complied with that court |
| 14 | order. |
| 15 | The court order allows redaction of substance |
| 16 | abuse and mental health records, and we followed that |
| 17 | order.  And during that 14-day review period, |
| 18 | Plaintiffs' counsel diligently redacted those isolated |
| 19 | incidents, some substance abuse and mental health |
| 20 | issues, and withheld those documents that were related |
| 21 | to that information pursuant to the order. |
| 22 | The issue with regard to both of these |
| 23 | individuals is that neither have made a mental health |
| 24 | claim, neither have a lost wage claim.  And so really |
| 25 | we're beyond a fishing expedition for relevant |

information.  We're trying to find information that's

completely irrelevant to try to embarrass and harass

and annoy these people because of their military

service and because it may be helpful to the

Defendants for some other reason.

But we complied with the order that --

**THE COURT:**  Let me interrupt for a second.

Doesn't Mr. Rowe have a claim for diminished earning

capacity present and future?

**MR. AYLSTOCK:**  Earning capacity, yes, Your

Honor, but not lost wages.

**THE COURT:**  Not lost wages, okay.

**MR. AYLSTOCK:**  Not lost wages.  So, as Your

Honor ruled and as PTO 39 makes clear, we're entitled

to redact and withhold this highly sensitive

information, just like we can redact and withhold

Social Security numbers and other things that are

highly sensitive.

The *Cameron* case is what Your Honor looked to

previously, and it does say when we make a garden

variety claim for damages, mental anguish related to a

physical injury, they don't get to -- no defendant

should get to rummage around a person's personal life

just because there's an emotional distress claim.

The relevance of the information is dependent

1    upon the claims made.  And so the claims in these two

2    are extremely limited, and the information being

3    withheld is consistent with PTO 39 and extremely

4    sensitive and, frankly, completely irrelevant.  And to

5    the extent there's even a relevance claim, I think

6    it's far outweighed by the harassment and so forth

7    that it could present itself.

8         And I know the Court has reviewed many of the

9    documents *in camera* that we've provided.  We provided

10   the documents the Defendants asked us to provide.

11        And with regard to Mr. Hacker, there were

12   some documents that were provided through the census

13   process that did have -- that were also redacted, and

14   we decided just to go ahead and unredact them.

15        But we inquired, *Look, when it comes to*

16   *things like a reference to a suicidal ideation and*

17   *it's a hearing loss and tinnitus case without a mental*

18   *health claim and without a lost earnings claim, are*

19   *you really going to go plow through all of that?*  And

20   they said, *Well, we couldn't commit.  We think it*

21   *would be very low on the relevance list, but we*

22   *couldn't commit.*

23        So I do think that what's going on here is,

24   because the folks do have kind of every detail of

25   their life documented in the VA records, they're

1    trying to find things to trip up the plaintiff or make
2    them uncomfortable in the deposition, and they're
3    simply not at all relevant to the claims that are
4    being made.

5           And we've complied not only with the law
6    under the *Cameron* case, but PTO 39, and we've done it
7    to the letter.  We've provided the privilege -- or the
8    log.  And as the Court made clear, we don't need to
9    even get to privilege.  This is an issue of relevance,
10   and it's an issue directly addressed by PTO 39, which
11   we've complied with.  And really that ends the
12   inquiry.

13          We've complied with PTO 39.  These folks
14   don't have the claims that would put this at issue,
15   and therefore it needs to be withheld.

16          **THE COURT:**  Let me ask you this, Mr.
17   Aylstock.  So, as to the disability rating, so when
18   you apply for disability, like Social Security
19   disability, you have to voluntarily disclose your
20   medical and, in most cases, psychological information.

21          And when you are successful in being declared
22   totally or partially disabled, it is a determination
23   -- certainly on the Social Security side, it means you
24   can't work -- so it is highly relevant to a claim for
25   lost earnings, but also future diminished earning

capacity.

And the same theory and argument certainly
applies to a VA disability.  You can't be a veteran
and collect a certain measure of VA disability and
have a full-time job.  So it does go to that, so that
certainly would meet the relevance prong.

The issue is, if part of that disability
relates to a mental health issue, for example, PTSD,
which probably the majority of servicemembers have,
why shouldn't that be disclosed to the Defendants so
they will be able to determine -- or argue and, when
they depose the plaintiff, talk about their
disability?

Because if the argument is, *I can't get a job
because I can't hear*, but there's a VA disability
rating saying you are deemed unable to work, why would
that not be relevant?

**MR. AYLSTOCK:**  Well, as Your Honor may have
noticed in the Kelley situation, the reason for that
disability, because it related directly to a highly
sensitive matter involving her mental health, was
withheld, but the rating itself was not.

**THE COURT:**  But was the reason for the
rating, that was redacted as well in Kelley?

**MR. AYLSTOCK:**  It was, in light of the nature

1    of what happened to Ms. Kelley.  And the Defendants --
2    and this is what causes us great concern -- the
3    Defendants had these records.  They were clawed back.
4    But, again, they had them, I believe, because of the
5    census project that needed to be done but then they
6    were clawed back.

7         And so they know the reason for the
8    disability, and they apparently want to ask her
9    questions about that at her deposition, which -- talk
10   about the 30 percent disability, use that at trial.
11   But what on God's green earth does that matter have to
12   do with hearing loss or tinnitus or some future loss
13   of earning capacity because she can't hear?  It
14   doesn't.

15        **THE COURT:**  Right, that I think is all
16   redacted.  But is there not a distinction here between
17   the label and the rating for the disability and the
18   underlying reasons -- and I'll give you two examples.

19        So someone submits an application for a
20   disability and is granted disability, and part of the
21   disability is because of PTSD.  And as the Defendants
22   pointed out, if the person had PTSD because in an
23   affair of war he saw 12 of his buddies blown up and
24   dismembered and it related to bombs and noise, maybe
25   there's an argument that, you know, that's relevant to

1    the case.

2          On the other hand, if someone is rated

3    disabled, part of it is for PTSD, and it turns out the

4    person has gender dysphoria, to use my sort of, you

5    know, far afield example here, I think we would all

6    agree in that instance it would be a real stretch to

7    say why the reason behind the PTSD is relevant,

8    although the actual rating for PTSD is relevant to

9    your ability to earn in the future.

10          Would you agree with that, that it's the

11    reason behind that may or may not be relevant, but the

12    fact that someone has been rated disabled for PTSD

13    would meet the relevancy prong?

14    **MR. AYLSTOCK:**   I think the example of the IED

15    explosion is a good one because I don't believe we

16    would have redacted that.  And if we did -- you know,

17    that goes to a relevant issue in the case.  If it had

18    to do with gender dysphoria or some sexual assault or

19    God knows what, what difference does that make?  They

20    have a disability rating and the Defendants get to use

21    that.  But it's the nature of what is behind the

22    disability.  And that is what PTO 39 allowed us to

23    redact for any VA records very specifically, so the

24    fact that their disability records still allows us to

25    redact them based upon the claims in the case, and

1    that's what we did.

2             **THE COURT:**  Let me raise one other issue and

3    then I'm going to hear from Defendants and then we can

4    wrap it up on this motion.

5             So we've been talking about PTSD, psychiatric

6    mental health.  What about substance abuse, which

7    obviously, arguably, is a species of a mental health

8    issue.

9             In your view, why should -- I know PTO 39

10   culls it out.  But why should substance abuse not be

11   relevant here as opposed to other mental health psych

12   records?

13            **MR. AYLSTOCK:**  Well, I think substance abuse

14   is exactly that, it's a mental health claim, and PTO

15   39 specifically addressed that.

16            If -- and this is the purpose behind ototox

17   day -- one of those substances has anything whatsoever

18   that is credible and might bear on some relevant

19   issue, then fine.  That's what the Court wanted to

20   hear from our experts with regard to ototox day, and

21   we'll make that determination following the

22   presentation of that evidence.

23            **THE COURT:**  Okay.  Let me give the Defendants

24   a chance to chime in here.  And I'm going to pose the

25   same question to the Defendants.

1           If the reason someone was diagnosed with PTSD

2    and indeed was rated partially disabled based upon

3    PTSD was not your IED example but related to my sort

4    of bizarre example here of gender dysphoria or sexual

5    assault, why would that be relevant in a case like

6    this to hearing loss?

7           **MR. SEFTON:**  I think the relevance point goes

8    beyond the specific injury, you know, proximate injury

9    that plaintiffs allege -- *(inaudible)* -- which is

10   hearing loss and/or tinnitus.  But from those claims

11   Plaintiffs, you know -- that's not where it stops.

12          I mean, these cases -- I know that Mr.

13   Aylstock characterized them as very limited, but these

14   cases are not so limited, in that the -- though they

15   start with hearing loss and tinnitus, for example,

16   Mr. Rowe alleges in his interrogatories that, because

17   of his hearing loss and tinnitus, he has chronic

18   headaches and chronic loss of sleep, and it's had

19   negative impacts on his relationships.

20          And so, I think that, you know, there are

21   many avenues that Plaintiffs have indicated that

22   they're going to pursue from just a basic, I have

23   hearing loss, I have tinnitus, and then therefore I

24   should be compensated for that.

25          I think that, moreover, our experts need, you

1    know, not just the percentage that someone is 30

2    percent disabled for something, because different

3    types of disabilities are going to interact

4    differently with hearing loss and/or tinnitus to

5    produce different effects on a plaintiff's current

6    earnings or capacity or current ability to enjoy life.

7    And so we can't just have 30 percent and that the

8    expert is supposed to be like it's 30 percent for

9    something, and I'm just going to assume it interacts

10   with alleged hearing loss and tinnitus in a certain

11   manner.  But I think that on that point it's not

12   sufficient just to have the rating.

13        **THE COURT:**  Why not?  Why not PTSD -- there

14   are symptoms for PTSD that you might be able to argue

15   -- a little bit of a stretch -- that relate to some of

16   the issues in the case depending upon how much of a

17   disability rating there is, how the PTSD affects

18   someone.  I mean, you can maybe try to pursue that.

19        But I guess the point I'm getting to is what

20   caused the PTSD, if it is something that is highly

21   personal, what difference would that make?

22        **MR. KELLY:**  So I think -- I guess that's a

23   slightly different question from what I was answering

24   before, so I apologize.  So I think that beyond the

25   rating, the underlying traumatic experience that

1    caused the PTSD I think is going to something like --

2    you know, sexual assault or gender dysphoria is going

3    to be a more difficult relevance argument than

4    something like an IED explosion causing PTSD.

5           But I think Your Honor makes a good point

6    that still issues like the symptoms that have come

7    from the PTSD diagnosis or how the VA has evaluated

8    those symptoms with respect to earning capacity or

9    with respect to the current impact on life, those are

10   still relevant even if the Court determines that the

11   underlying trauma that was suffered might not be

12   relevant to the claim here.

13          So I think the Kelley redactions are an

14   example where it's some of -- I mean, I actually do

15   not personally know what is redacted under the six

16   pages.  I understand that Defendants have access to

17   the document, but I will representative I do not

18   actually personally know the words that are redacted.

19   But my understanding of, for example, on page -- on

20   the page that talks about the VA's explanation of the

21   30 percent disability rating, my understanding based

22   on other review of VA documents is that something like

23   that might describe the symptoms and how the VA has

24   evaluated their relationship to earning capacity.

25          So I think from a higher level -- and I think

we tried to describe this in our briefing, is that the
question of whether an individual redacted documents
is relevant as a fact-specific inquiry about what does
this document say, and can't be solved, as Plaintiffs
have done in their briefing, which is just saying, you
know, anything that mentions mental health is not
relevant.  I think it's a more nuanced analysis than
that.

So that would be, I think, with respect to
something like a PTSD disability that has a very
sensitive traumatic cause, there still might be --
even if the Court determines that traumatic cause is
not relevant, there may be other aspects of the
disability application that ends in a PTSD diagnosis
that are still relevant.

**MR. AYLSTOCK:**  The problem, Your Honor, with
that is it's the exception as well as the rule.  If
they wanted to move to reconsider PTO 39, then they
should have done that.  That's not -- under that
analysis, nothing could ever be withheld.  Because it
doesn't matter what the plaintiff claims, it doesn't
matter if it's gender dysphoria, there's some
something out there that might somehow, regardless of
how sensitive it is and how much pain it will put the
plaintiff through to have to regurgitate information

1    that's completely unrelated to whatever caused the

2    PTSD.

3            And these plaintiffs aren't claiming mental

4    injury.  And the case law that Your Honor pointed to

5    is exactly the opposite of what was just said, and

6    they're kind of recounted in the *Cameron* case.  But

7    I'm quoting here from *Cameron*, "A defendant is not

8    automatically entitled to full disclosure of all

9    medical records and unrestricted as to time or

10   circumstances simply because emotional distress is

11   claimed.  The contention that any physical malady

12   might cause emotional distress scarcely gives the

13   defendant license to rummage through all aspects of

14   the plaintiff's life."

15           And that's what has already been ruled upon

16   repeatedly after many, many hours of argument and

17   countless pages of briefing.  But if the Court agrees

18   with the analysis that was just provided by my

19   counterpart for 3M, then PTO 39 might as well not even

20   exist.

21           **THE COURT:**  Let me ask you a question, and

22   help me out.  There are, as I understand it, 16

23   documents that have been redacted and/or withheld,

24   that's what we're down to.  Is that for Rowe or Hacker

25   or is it for both?

1          **MR. AYLSTOCK:**  I believe that's for Hacker,

2   Your Honor.  Mr. Buxner can speak to the specifics of

3   that.

4          **MR. BUXNER:**  This is Evan Buxner, Your Honor.

5   That is Hacker.  Hacker is down to 16 redactions or

6   withholdings.

7          And to clarify, Your Honor, something that

8   was said by 3M earlier, there were a significant

9   number of records that were produced early on without

10  redaction.  And throughout the process of reviewing

11  these cases and after PTO 39, we did redact certain

12  information.  And in order to streamline that, this

13  week we unredacted down to these 16 documents.

14         And 3M is now saying, well, we need to see

15  the remaining information that's behind the redacting

16  because look at all the other stuff we've seen.

17         And what the meet and confer process has

18  resulted in and the manner in which these documents

19  have been produced has given 3M far more information

20  than they should have ever seen in the first place.

21  And a lot of those records that we've given them fit

22  squarely within PTO 39, but we unredacted them because

23  they were sent over without redactions as part of the

24  tolling process long before any discovery in this

25  case.

1      And we are down to 16 redactions.  I think
2  the Court has probably reviewed them.  3M knows they
3  must be even more sensitive than the incredibly
4  sensitive records we've already provided them in good
5  faith as part of the meet and confer.  They know that
6  they have no right to these records.  They know
7  exactly where they are.  They've tried to conflate
8  that today.
9      Mr. Hacker does not have a claim for mental
10  health.  He does not have a claim for lost wages.  He
11  does not have a claim for any type of diminished
12  earning capacity.  All of these records are found in
13  family advocacy records or behavioral health records.
14  They're not part of the benefits records.
15      Frankly, Your Honor, they ought to withdraw
16  the motion.  It's enough.  They've been told no --
17  *(inaudible)* --
18      **MR. BHIMANI:**  Your Honor, if I may be heard
19  very briefly -- this is Jay Bhimani -- as to the
20  Hacker issue?
21      **THE COURT:**  Yes.
22      **MR. BHIMANI:**  So a point of clarification
23  here.  I heard counsel refer to a statement that, you
24  know, Defendants have sort of said that these are low
25  on the relevance scale.  That is not the discussion

1    that was had during the meet and confer.

2         There was -- just to clarify for the record,

3    I just don't want the record to be unclear about this.

4    I don't think it necessary will drive the motion.  But

5    there was a hypothetical question posed about whether,

6    you know, an STD from many years ago would come up

7    during the deposition.  And what I had said was, you

8    know, I think something like that conceivably could be

9    low on the scale of things that we would want to

10   explore in a deposition, but I couldn't definitively

11   rule out lines of questioning.  So that was more of a

12   clarification for me.

13        As to the point with respect to Mr. Hacker,

14   we do think that the Court should review the 16

15   remaining documents *in camera*.  And the reason we

16   provided the unredacted documents, Your Honor, when

17   there's a 90 percent reduction in the entries on a

18   privilege log, we think that is some cause to look at

19   the remaining entries.

20        And, you know, from what we can tell -- we

21   obviously can't see the redacted text.  But, you know,

22   the fact that something is sensitive is not cause for

23   blanket protection.  The issues seem to relate to the

24   same types of issues that are in the unredacted

25   documents, whether it's about, you know, stress in

1    Mr. Hacker's family life or the causes of his anxiety,
2    and those are relevant.
3         I think the final point I'll make here, we
4    just have to keep in mind, you know, we're in
5    discovery.  This is not an admissibility standard.
6    The standard is discovery.  And if we get into a
7    deposition and, you know, Mr. Hacker testifies that
8    part of his mental distress is stress that he says is
9    from his hearing loss, on his relationships with his
10   family, or with his spouse, we are entitled to the
11   discovery -- and we already have some information in
12   the unredacted records, but we are entitled to
13   discovery about those facts and to question and test
14   the claims that Mr. Hacker may make about what his
15   related use of the product and what might be stress or
16   anxiety from other sources.
17        **MR. BUXNER:**  Your Honor, this is Evan Buxner
18   again, if I might --
19        **THE COURT:**  Yes.
20        **MR. BUXNER:**  -- just respond?  Because I'm
21   glad that Jay brought that up because it really
22   clarifies what's going on here.
23        We provided all 16 records for the Court to
24   see, and we're happy to do it.  We did it -- we
25   basically confessed the alternative relief that they

1    asked for in the Motion to Compel by saying, here are

2    the records.

3            And the reason we did that, Your Honor, is we

4    want the Court to see how irrelevant these records

5    are, how they fit squarely within PTO 39, they fit

6    squarely as irrelevant under Rule 26.

7            And the fact that 3M during the meet and

8    confer -- and I'm glad Jay brought this up -- will not

9    say in advance of his deposition on the 31st -- that

10   they cannot commit to not asking questions about

11   things like STDs, suicidal ideation, suicide attempt,

12   in a case where the plaintiff is not making a mental

13   health claim, PTO 39 said we never had to give them

14   any of this information before, they're making me

15   wonder for the other two bellwether clients that I

16   represent and the 7,000 other clients I have should I

17   meet and confer and try and streamline this or should

18   I stand on every single thing in the entry in these

19   records that fits squarely within PTO 39?

20           Because they have every intention of showing

21   up on July 31st in Las Vegas and asking Mr. Hacker

22   about things that fit squarely within PTO 39, are

23   clearly irrelevant.  To the extent there's any

24   relevancy, they're severely outweighed by the

25   sensitive nature of these documents.

1           So I'm glad Jay brought that up, Your Honor,

2    because that fight is coming in less than two weeks.

3           **THE COURT:**   Okay.   On Mr. Hacker, there are

4    the 16 documents, and the redactions are fairly

5    discrete.   And they really do not redact the approach

6    of the VA medical professional to issues that

7    Mr. Hacker has because you have disclosed in those

8    documents the evaluation of the information as it

9    relates to a diagnosis of PTSD or something else and

10   how that is rated.

11          But what is redacted are references to

12   specific instances that, as Mr. Buxner points out,

13   I've looked at them, and they are very far afield, and

14   they are really not relevant under really any theory

15   to the Defendants' argument that they should be

16   entitled to explore alternative explanations.

17          So when someone says I've lost enjoyment of

18   life, if there is information arguably that might

19   provide an alternative explanation, then, you know,

20   we're into the relevance area.   The Defendants can

21   still try to make those kinds of arguments, but it is

22   not necessary to have the redacted information to make

23   those arguments.

24          So, as to Mr. Hacker, I am going to deny

25   Defendants' motion as to Mr. Hacker to produce the

1    unredacted records, and we're focusing on the 16

2    records because those redactions are, in my view, do

3    not fall within any measure of the definition of

4    relevance, nor do I think the fact that those excerpts

5    in those documents will prevent Defendants from making

6    a reasonable examination as to alternative

7    explanation.

8          So you can ask someone, you know, in '19 or

9    2000, whenever, you suffered from PTSD, you know, how

10   does it affect you.  You don't need to go back into

11   someone's history to look at all the little nooks and

12   crannies someone might have experienced to make that

13   inquiry.  A defendant can ask a plaintiff how that's

14   affected them.  They obviously will ask a plaintiff

15   how the tinnitus has affected their ability to enjoy

16   life.  You know, the answer to a question by a

17   plaintiff, you know, it may be my enjoyment of life

18   has been impacted, I've been a musician my whole life,

19   I'm unable to enjoy music, I can't go to concerts

20   because I can't hear.

21         So in those instances, probably the inquiry

22   into PTSD and those kinds of things really are not

23   going to provide an alternative explanation.

24         If, on the other hand, the plaintiff says, as

25   a result of hearing loss, I am depressed all the time,

1  and the person happens to have PTSD, he can be asked

2  does the PTSD cause you depression, how do they

3  differ, how are they the same.

4       But the redactions here don't deal with

5  really any of that.  They deal with information that

6  was collected that is of a fairly personal nature

7  which really does not go necessarily to the nature of

8  what one would experience for PTSD.

9       So, for that reason, I'm going to deny it as

10  to Hacker.  And additionally, for the record, I'm

11  focusing on, with Mr. Hacker, his enjoyment of life

12  because it doesn't go to lost wages or impairment of

13  earning capacity because he does not have a claim for

14  that.  So it doesn't satisfy relevance in that

15  respect.

16       As to Mr. Rowe --

17       **MR. SEFTON:**  Your Honor, may I quickly just

18  respond to one point on substance abuse with respect

19  to Mr. Rowe?

20       **THE COURT:**  Yes.

21       **MR. SEFTON:**  Just briefly.  I know you and

22  Mr. Aylstock were discussing it previously.  On the

23  point of substance abuse, I would just direct the

24  Court to the Eleventh Circuit's *Haney* decision

25  discussing that the relevance of substance abuse goes

1  to the earnings claims that we've discussed previously

2  with the connection being that a person suffering from

3  substance abuse may have difficulty obtaining and

4  retaining a job.  And also that the Court in *Haney*

5  acknowledged that a person suffering from substance

6  abuse, that's also relevant to questions of enjoyment

7  of life and emotional damages.  I just wanted to raise

8  that point to close the loop on that.

9          **THE COURT:**  Okay.  Let me then ask the

10  Plaintiffs, what's your response to that?  I know PTO

11  39 carves out substance abuse.  You know, there's two

12  separate issues.  Substance abuse.  The second issue

13  may be medication someone is taking.  That's going to

14  be the subject of science day.

15          But is there a connection between substance

16  abuse and the ability to hold a job?  And when I say

17  substance abuse, I'm broadly -- I'm not just talking

18  about drugs, but I'm talking about alcohol.  Is there

19  a disconnect there?  Someone could have an alcohol

20  problem and still be gainfully employed as the

21  president of a company?

22          **MR. AYLSTOCK:**  Well, first of all, substance

23  abuse is absolutely considered a DSM-5 mental health

24  disorder.  So there's no distinction between that and

25  the other mental health disorders.  According to the

1    scientific community, it is a mental health issue.  So

2    that's point one.

3              Point two is, with regard to substance abuse,

4    I think it's something that could relate perhaps to a

5    lost wage claim.  There isn't one for Mr. Rowe.  And

6    with regard to any substance abuse issues that are

7    being withheld for him or anybody else, I think the

8    Court needs to look at what is being claimed and,

9    consistent with the law and PTO 39, apply PTO 39.

10             Because, again, if the argument is that PTO

11   39 was wrong, well, they didn't raise that.  We

12   followed PTO 39, we followed it to the letter, in our

13   view, and we withheld only those materials that fall

14   within PTO 39.

15             **THE COURT:**  Okay.  And then, lastly, Mr.

16   Aylstock, the redactions for Mr. Rowe, do you know

17   offhand how many redactions there are?  I know there

18   were the 16 for Hacker.  What about Rowe?

19             **MR. AYLSTOCK:**  There are certainly more for

20   Mr. Rowe than there were for Mr. Hacker.  Ms. Marlowe

21   may have the exact count, or Marcus, if he's on the

22   phone.  But there are more redactions for him than

23   there were with Mr. Hacker.

24             **THE COURT:**  Was Mr. Rowe the one that he did

25   receive a disability rating and they consisted of

1   close to 18 different conditions?

2          **MR. AYLSTOCK:**  Yes, I think that's right.

3          Is that right, Emily?

4          **MS. MARLOWE:**  Yes, I believe so, Your Honor.

5          **THE COURT:**  I have the documents but I just

6   don't want to root around while we're on the phone for

7   them.

8          Was the actual disability rating other than

9   the percentage redacted for Mr. Rowe?

10          **MR. AYLSTOCK:**  Emily, can you help me there,

11   or Marcus?

12          **MS. MARLOWE:**  Your Honor, I would have to go

13   back and check with the counsel of record on that,

14   Mr. Martinez and Mr. Kamberger on that.  However, the

15   VA records that were produced were quite voluminous in

16   this case, and so there is information that has been

17   redacted and withheld throughout.  Now, to the extent

18   that it wasn't related to a diagnosed mental health

19   issue, it wouldn't have been redacted.

20          **MR. KAMBERGER:**  Your Honor, this is Markus

21   Kamberger here.

22          **THE COURT:**  Yes.

23          **MR. KAMBERGER:**  So we met and conferred with

24   Defendants, and we actually unredacted the portion

25   that described the disability rating and served that

1    back to the Defendants.  We just kept the underlying

2    information redacted.

3            THE COURT:  Okay.  So the condition for which

4    Mr. Rowe was granted disability as well as the

5    percentage is unredacted and that's been produced; is

6    that correct?

7            MR. KAMBERGER:  That's my understanding, Your

8    Honor, yes.

9            MR. AYLSTOCK:  If not, we'd be willing to do

10   that, Judge, but I think that's right.

11           THE COURT:  Okay.  So here is what I'm going

12   to do --

13           MR. NOMELLINI:  Your Honor, I think

14   Mr. Sefton has information on the volume of the

15   redactions.

16           THE COURT:  Okay.

17           MR. SEFTON:  So, for Mr. Rowe, there are over

18   2,000 items on his privilege log, so the redactions

19   are extensive.

20           And I -- after our meet and confer,

21   Plaintiffs did produce, I believe, nine documents that

22   they -- that purportedly were, you know, were

23   unredacted, but many of them still had redactions.

24   And I'm just checking right now, but I believe that

25   some of them still have -- are redacting information

1   about why -- the basis for various disabilities.  For

2   example, at Bates No. 1866 there's still redaction of

3   an entire condition.

4           So, I mean, I wanted to point out the

5   redactions in Mr. Rowe's records are quite extensive,

6   both from disability and non-disability records, and

7   that the unredactions have been quite minimal.

8           **THE COURT:**  Right.  And I was provided with

9   them.  And I'm not going to pretend I spent all night

10  looking at every document, but I certainly looked at a

11  sample of the redactions relating to Mr. Rowe.

12          So what I'm going to do is deny the motion as

13  to Mr. Rowe to the extent that some of the underlying

14  documents were redacted as to substance abuse, because

15  that's covered by PTO 39, and other mental health

16  issues.

17          To the extent -- and for some reason I

18  thought the actual disability information, the rating,

19  the conditions had been redacted, some of them, but

20  just not the percentage.  I could be confused with

21  maybe Ms. Kelley or others.  But that is not subject

22  to redaction.

23          So the Defendants are entitled to have the

24  fully unredacted VA disability decision so they can

25  see what -- what were the conditions he was considered

1    disabled, the definition of them, even if it was PTSD,

2    and the percentage of the disability rating.

3           A number of background documents have been

4    produced, which should be sufficient for the

5    Defendants to make a reasoned inquiry as to how

6    Mr. Rowe was diagnosed.  But the information that was

7    redacted can remain redacted either because of the

8    nature of the information relating to sensitive mental

9    health issues or relating to substance abuse because

10   substance abuse was specifically covered by PTO 39,

11   subject, of course, to the Court's later ruling after

12   science day if there were any medications, whether

13   legal or illegal, that were taken by a plaintiff that

14   the Court determines meet the relevancy standard

15   because there is a reasonable argument that the

16   ingestion of those drugs lead to or contribute to

17   hearing loss.

18          So I just wanted to be clear on that.  So if

19   someone abused a certain drug and it turns out that

20   there is scientific literature that would support the

21   conclusion that someone who took those drugs could

22   have impaired hearing, then certainly in that instance

23   the Defendant is going to be entitled to obtain that

24   information.  But we haven't had science day.

25          But the redactions as for Mr. Rowe, who does

1    not have a claim for lost wages, he does have a claim

2    for diminished earning capacity, I will deny the

3    motion, and those redactions shall remain.

4         **MR. NOMELLINI:**  Your Honor, on the

5    ototoxicity issue, you raised that issue with respect

6    to science day that's coming up.

7         So Mr. Rowe has some redactions, I think

8    there are over 2,000 redactions.  And the Plaintiffs

9    have not given us a list of which substances are

10   redacted, whether abuse substances or otherwise.  And

11   so that interacts with Mr. Rowe's deposition which is

12   coming up, scheduled for next Thursday.

13        My understanding is that, if we go forward

14   next Thursday and various substances are determined to

15   be relevant and they are in what is redacted, that we

16   will then have the chance to come back and resume the

17   deposition of Mr. Rowe at a later date on those

18   issues.  Is that correct?

19        **THE COURT:**  Well, let me ask what's the

20   Plaintiffs' view on that?

21        **MR. AYLSTOCK:**  Well, so, with regard to any

22   particular plaintiff, there still needs to be a

23   relevance connection to anything, any substance or

24   anything.  So I think, in the event that science day

25   reveals something, which we don't believe that it

1    will, I think that could be subject to additional

2    motion.  But I would not suggest or agree at this

3    point that, regardless of what is said or what is done

4    at science day, they get to come back.

5              THE COURT:  Well, Mr. Nomellini, you're

6    partially correct.  You know, of course, the devil is

7    in the details, it depends on the facts.  But yes, if

8    it turns out that there is a medication that is

9    established at science day is a significant cause of

10   hearing loss and part of the Rowe records that were

11   redacted redacted those drugs because they fall within

12   the definition of, you know, substance abuse records

13   and you were unable to make inquiry on that because

14   these have been redacted, you could then request the

15   right to continue the deposition or extend the

16   deposition to inquire into those areas.

17             Of course, the Court would hear from the

18   other side.  But I think you'd have a pretty

19   compelling reason, in fairness, if that's something

20   that you would normally have explored in the

21   deposition and you were unable to do so, you're going

22   to have the right to come back and reopen the

23   deposition.

24             MR. NOMELLINI:  Thank you, Judge.

25             THE COURT:  Okay.

1          **MR. SEFTON:**  Your Honor, this is Eric.

2          **THE COURT:**  Yes.

3          **MR. SEFTON:**  I just wanted to clarify one

4    thing with respect to your ruling on Mr. Rowe.

5          When you say that the Plaintiffs have to

6    produce the fully unredacted disability decisions, are

7    you referring to just the sheet that says what

8    conditions they have and the percentages or also the

9    VA's explanation as to how they arrived at the

10   disability application, like the letter that

11   accompanies that decision?

12         **THE COURT:**  There is -- is there a redaction

13   in that --

14         **MR. SEFTON:**  So, yes.  Similar to

15   Ms. Kelley's records, for many of the letters sent

16   back and forth -- I mean, sent by the VA to Mr. Rowe

17   that are explaining the basis for the VA's disability

18   decision, both the, you know, condition and -- the

19   condition is redacted and then also the VA's

20   explanation as to how they arrived at the assessment

21   is redacted.

22         So, you know, whereas for some -- like for --

23   an example is he has one for a hip condition that will

24   explain the basis saying his extension is limited, he

25   can't move his hips very well.  And then the next

1  section is totally redacted, which we assume is
2  something akin to PTSD.  And so both the condition,
3  the rating, and then also the explanation by the VA as
4  to how they arrived at it is redacted.
5           And so I just wanted to clarify whether your
6  ruling extends to the VA's explanation of their
7  analysis.
8           **THE COURT:**  Well, it did not.  What I was
9  focusing upon was I guess what you called the VA
10  disability rating sheet.  And I just -- I didn't get a
11  clear answer of whether that was or was not redacted.
12  I thought it had been for at least one of these
13  plaintiffs.
14          **MR. SEFTON:**  Yes, it is.
15          **THE COURT:**  Do you know, indeed, was that
16  face sheet redacted for Mr. Rowe?
17          **MR. SEFTON:**  Yes.
18          **MS. MARLOWE:**  Your Honor, this is Emily
19  Marlowe from Clark, Love & Hutson for the Plaintiffs.
20  One of the these documents which was provided to the
21  Court for *in camera* review was the subject of a meet
22  and confer call between Mr. Sefton and myself along
23  with Mr. Kamberger and others.
24          And as a result of that meet and confer call,
25  we then removed part of the redactions, specifically

1   the part that said that it was an evaluation of

2   Post-Traumatic Stress Disorder, but then kept the

3   redaction regarding the substance of how that decision

4   was reached, so the different symptoms that were

5   evaluated that led to the decision of the disability

6   rating based upon Post-Traumatic Stress Disorder.

7            **THE COURT:**  Okay.

8            **MS. MARLOWE:**  So we're not trying to hide the

9   ball as far as what the diagnosis is.  It was just a

10  redaction as to the substance of the VA's decision.

11           **THE COURT:**  Okay.  Then that is helpful to

12  know.  So the answer to Defendants' question of the

13  redactions behind the disability rating, the

14  discussion of that -- and I have looked at some of

15  those -- those redactions shall stand.

16           The redaction which now has been lifted on

17  the face sheet of the disability, I don't need to rule

18  on that.  It's being represented that in the meet and

19  confer they ultimately removed that so you can see

20  PTSD rating 30 percent, or whatever, is the rating,

21  which you're entitled to.  But the redactions that

22  relate to the mental health and/or substance abuse,

23  which is a species of mental health and which is

24  specifically covered by PTO 39, those redactions at

25  this juncture will remain.

1           **MR. NOMELLINI:**  Your Honor, just to be clear,

2     there was a small portion that was unredacted, maybe

3     15 documents, but there are about 2,000 documents, and

4     so there are definitely still redactions remaining

5     next to the percentage where it describes the

6     condition.  And so we would ask that those be

7     unredacted in the production.  I think that's

8     consistent with what Your Honor ruled, but I just

9     wanted to be clear, the unredactions only pertain to a

10    small portion.

11          **THE COURT:**  Okay.  So what you're saying is

12    there are disability rating sheets where there are

13    still redactions?

14          **MR. NOMELLINI:**  Correct.

15          **MS. MARLOWE:**  Yes, Your Honor.  This is Emily

16    Marlowe again.  There were approximately 5 to 10

17    records that were highlighted by Defendants as records

18    with redactions they wanted to challenge.  We then

19    analyzed those documents and redactions and had a meet

20    and confer on the ones that they had specifically

21    delineated and agreed to remove the various redactions

22    in light of the -- *(inaudible)* --

23          There's been over 9,000 pages of medical

24    records produced, and I don't think that we're opposed

25    to kind of continuing that process consistent with

1   Your Honor's orders today and removing any redactions
2   that show more or less the diagnosed condition that
3   causes the rating as well as the rating percentage.
4   So I think that that's something that we can agree to
5   do.
6          **THE COURT:**  Okay.  Then, Mr. Nomellini, your
7   request is granted.  I'm glad you brought that up.  So
8   it isn't just one page where there were redactions.
9   There are other pages where there is the decision or
10  the rating of the disability where there still were
11  redactions.  So those redactions will be removed.
12         But the underlying documents behind the
13  disability decision which contain the redactions
14  relating to these what we're calling mental health but
15  also substance abuse issues, those redactions will
16  remain.
17         **MR. NOMELLINI:**  Yes, Your Honor.  I
18  appreciate that.  And then one issue, Your Honor, I'd
19  like to come back to because I wasn't clear on Mr.
20  Aylstock's distinction in terms of lost wages versus
21  lost earnings.
22         So, you know, Mr. Sefton alluded to this on
23  substance abuse.  The Eleventh Circuit has held that
24  the evidence of a plaintiff's alcohol and drug use was
25  highly relevant because evidence that the plaintiff's

1    ability to face his alcohol and drug problem would

2    play a crucial role in his ability to adjust

3    emotionally to his infirmity and to become more fully

4    rehabilitated, and that the plaintiff's, quote,

5    "vocational outlook would be much brighter if he did

6    not indulge in alcohol and drugs."

7           So I'm not sure exactly what distinction Mr.

8    Aylstock is making if not something that's precisely

9    made in plaintiff's interrogatory answers.  But

10   certainly the information as to substance abuse is

11   something that our vocational expert is going to need

12   as to a lost earnings claim, even if it's couched that

13   way.  And the Eleventh Circuit authority of *Haney,* 744

14   F.2d 1467, very clearly stands for that proposition.

15           **THE COURT:**  Let me ask you a hypothetical

16   question, Mr. Nomellini.  If, hypothetically, you had

17   a record of someone with a drinking and substance

18   abuse problem who participates on a daily basis with

19   counseling and treatment for substance abuse and

20   drinking, and the person has been, you know, to use

21   the AA nomenclature, you know, has been clean and

22   sober for nine years, how would that information be

23   relevant to a loss of earning capacity claim?

24           I think what you're talking about in the

25   *Haney* case, if -- and, you know, this is obvious -- if

1    someone is a drug addict, they're going to have a

2    tough time getting a job and may be relevant.  That's

3    different from someone who in their lifetime may have

4    undergone and is continuing to receive treatment for

5    drug abuse and alcohol.  You know, anyone that's an

6    alcoholic will tell you it's not a condition, it's a

7    disease and, as the saying goes, you take one day at a

8    time.

9          I can see your argument, you know, if we

10   really had a situation where someone was a raving drug

11   addict, maybe that does impact their ability.  But

12   simply because someone has voluntarily received some

13   type of treatment for drugs, that's not going to be

14   relevant to a claim of diminished earning capacity,

15   and that really falls into the realm of just sort of

16   rooting around for dirt.  Because, you know, you're

17   not going to be able to argue at trial that this guy

18   can never get a job because, you know, ten years ago

19   he had a drinking problem.

20         **MR. NOMELLINI:**  Your Honor, all your points

21   are good ones.  So this is not a case, though, where

22   this is a person who is, you know, clean and sober for

23   nine years.  If that were the case, that would be one

24   thing.  But this is discovery, and we should be able

25   to inquire whether there is an issue now or whether

1    there has been an issue recently for this person.  We

2    don't know because there are redactions.  It should be

3    something that we could inquire into to establish a

4    foundation that our vocational expert could use.

5    Right now we can't say one way or the other.

6          So it's not a fishing expedition.  There is a

7    good faith basis, based on some of the redactions that

8    we've seen, to at least inquire into this topic.

9    There is a confidentiality order designed precisely

10   for this situation where anything on this topic would

11   be redacted, highly confidential, and only certain

12   categories of people would be permitted to see it.

13         And, you know, also something that experts

14   very commonly consider is the issue of relapse.  But

15   we don't know that.  We don't know how many times the

16   person relapsed.  It should be something we can

17   consider.

18         If we can't even go into it a little bit and

19   they block us from determining whether it was a nine

20   years ago issue or a 15 years ago issue or a current

21   issue or a current issue where an expert would say

22   there's a valid possibility of relapse, they're

23   cutting us off at the knees, and it's contrary to the

24   purpose of discovery at this stage -- we're not

25   talking about admissibility -- where we have the right

1    to try to lay a foundation for these things.

2         **THE COURT:**  Right.  So, two things.  One,

3    that is the reason why redacted records were provided

4    *in camera*.

5         But secondly, let me ask the Plaintiffs:  On

6    the issue of claimed damages for diminished earning

7    capacity, were the Plaintiffs intending to present a

8    vocational expert or some other testimony on that?

9         **MR. AYLSTOCK:**  Mr. Kamberger could probably

10   speak more specifically.  I don't believe so, Judge.

11   And that's the whole purpose of PTO 39.  Again, they

12   really want to appeal that, but they didn't, and they

13   raise all these issues that will make the exception

14   swallow the rule.

15        But Marcus -- I don't think there's any

16   present intent to have a vocational expert at all,

17   Judge.

18        Am I right on that, Marcus?

19        **MR. KAMBERGER:**  That's correct, Judge.

20        **MR. NOMELLINI:**  Your Honor, even if that's

21   true, if they're seeking damages for it, we have a

22   right to put on expert testimony and call a vocational

23   expert.  And our vocational expert is going to want to

24   know if there's a serious drug problem.  That's

25   critical information.

1          So us not even being able to inquire into

2     that to establish, you know, when was there an issue,

3     is there a current issue, how long did it go on,

4     what's the risk of relapse is fundamentally -- would

5     fundamentally impact our due process rights when they

6     are telling us they're going to ask the jury for a

7     loss of earnings damages at trial.

8          **THE COURT:**  Let me raise an issue here.  Not

9     to get into what's going to be the testimony at trial,

10    and maybe I'm looking at things incorrectly.

11         But the way I've always viewed -- and this is

12    a question for Plaintiffs -- a claim for diminished

13    earning capacity -- this is a hearing loss case.

14    Although I've loosely characterized it as personal

15    injury, it is a hearing loss case.  And I anticipate

16    that the type of claim that is being made for loss of

17    diminished earning capacity is, I can't hear so these

18    types of jobs that I am qualified for or I would like

19    to pursue in the future I can't do it because I can't

20    hear or I have impaired hearing.

21         My understanding is the claim here is not

22    that, in general, in the employment market my earning

23    capacity is diminished.  It has to do -- it's tethered

24    to the hearing loss.  Am I right on that?

25         **MR. AYLSTOCK:**  You've hit the nail on the

```
1    head.  And this is absolutely rummaging around
2    people's personal lives for things that are completely
3    irrelevant.
4         The Haney case was -- the Eleventh Circuit
5    found there wasn't an abuse of discretion.  An abuse
6    of discretion was the standard, and so the district
7    court did not abuse its discretion by allowing the
8    evidence in.
9         In that particular case, the facts are
10   completely different, and it has nothing to do with
11   the case at hand.  And again, we're not claiming
12   anything other than if he wanted to really go find a
13   job where he needed some hearing -- good hearing or
14   damages related to here, he wouldn't be able to do it.
15   So --
16        THE COURT:  And the Haney case is from back
17   in the early eighties, right, '84?
18        MR. AYLSTOCK:  Yes, Your Honor, it's 1984,
19   and it certainly predated all of the other cases that
20   Your Honor has reviewed.
21        MR. NOMELLINI:  Your Honor --
22        THE COURT:  But it does count, it does count,
23   Mr. Nomellini, because it's '84.  I was a lawyer then
24   so it does count, and it's from the Eleventh Circuit
25   so --
```

1          **MR. NOMELLINI:**  It was a great year, it was a

2     vintage year, Your Honor.

3          So, with respect to all the arguments that

4     Mr. Aylstock is making, these are arguments that he

5     could make as to admissibility, Rule 403, all kinds of

6     arguments he could make.  As to confidentiality, we

7     have a confidentiality order in place that is

8     specifically designed for this.

9          And so the question is discoverability, does

10    this have any potential relevance to the case.  And we

11    don't know.  We don't know if it's going to turn out

12    that this is highly relevant to this person's ability

13    to get a job.  We just don't know.

14         And for us to be in a situation where it's

15    possible that this will be highly relevant to a

16    person's ability to get a job and we don't know

17    because of the redactions and yet for us to be cut off

18    at the knees at this point in the process is -- would

19    be extremely prejudicial to us, particularly in light

20    of the Eleventh Circuit's decision.

21         I mean, the Eleventh Circuit -- it was 1984,

22    but, you know, people were still pretty modern in

23    1984.  Issues of alcoholism and the ability to impact

24    on a job haven't changed much from 1984 until now.

25         The point is this:  Mr. Aylstock will still

1    be able to make his arguments later on.  He'll still

2    be able to say this is more prejudicial than probative

3    later on.  He'll still be able to say that this should

4    all be confidential.  He'll still be able to say this

5    shouldn't go before a jury for any number of reasons.

6         But once we are cut off now, then even if it

7    turns out that this is very important to Mr. Rowe's

8    earnings, we can't come back from that point.  And the

9    jury will render its verdict, it will decide whether

10   it agrees with Mr. Rowe that he has lost earnings, and

11   the jury will not be able to consider whether the drug

12   issues play a role in terms of his earnings, which is

13   a key issue according to the Eleventh Circuit.

14        **MR. AYLSTOCK:**  Your Honor, I feel like Bill

15   Murray in *Groundhog Day*.  This has been argued and

16   reargued and reargued and reargued.  This is an issue

17   of relevance, and it's an issue of balancing the

18   interests.  And that's exactly what PTO 39 does.

19        I'm sorry Mr. Nomellini doesn't like it.  I

20   don't like all the orders of the Court either.  But I

21   don't reargue them ten times just because I don't like

22   them.

23        **THE COURT:**  Well, for whatever it's worth, as

24   I mentioned, I have looked at redacted copies -- or

25   unredacted copies of most of the documents, so I have

1    a flavor of what's been redacted.

2         And I hear you, Mr. Nomellini, there's always

3    a possibility of something.  But there's got to be

4    certainly something tethered to the actual facts of

5    this case that is going to, you know, support a

6    possible argument for a defense here, and right now I

7    don't see it.

8         And PTO 39 certainly did certainly as a

9    matter of -- a general matter did exclude substance

10   abuse records for the reason of avoiding -- I'm not

11   saying you're requesting them because it's a fishing

12   expedition, but it is somewhat far afield at this

13   point.

14        And, you know, we've got to strike a balance

15   between, you know -- I mean, maybe someone, you know,

16   when they were 15 years old had a drinking problem,

17   but that's just not going to be relevant.

18        I understand that that kind of evidence would

19   never come into evidence at trial.  But at this point,

20   you know, discovery has to be both relevant and

21   proportional.  And one of the proportionality factors

22   is important to the issues in the case.  And if the

23   information that is excluded is somewhat far afield,

24   then it's also not going to be relevant or

25   proportional.

1          But I hear your argument.  I'm not deaf to

2     the argument that you're making.  It just probably

3     doesn't apply in this case.

4          **MR. NOMELLINI:**  Your Honor, I appreciate

5     that.  I just wanted to make two quick points.  One

6     is, with respect to PTO 39, it always contemplated

7     that we could make as-applied challenges.

8          **THE COURT:**  Correct.

9          **MR. NOMELLINI:**  And I hear Your Honor

10    agreeing with that.  So he is wrong about that.

11         But the other point is that, Your Honor, may

12    we come back to the Court if, you know, depending on

13    discovery or the witness's testimony, the issue -- you

14    know, there are arguments that we can make as to

15    relevance of this information?

16         **THE COURT:**  You know, it really depends.  The

17    answer is yes, and it depends upon what the testimony

18    is from the particular plaintiff.

19         So, for example -- or to use my example, if a

20    plaintiff testified that he believes his earning

21    capacity has been diminished because he wants to work

22    in a music store because he's been playing guitar his

23    whole life, and you want to come back and make the

24    argument about substance abuse, that's probably going

25    to fall on, you know, deaf ears.  But if other

1    information was developed at his deposition, then, you

2    know, there may be an argument.

3            And you are correct that, as you say, an

4    as-applied challenge, this really is a

5    plaintiff-specific inquiry.  Because we can all agree

6    if someone in a personal injury case said, *I can't get*

7    *a job as a result of the car accident,* and that person

8    was a heroin addict and using heroin on a daily basis,

9    that might be an area you could get into and argue

10   that the person nonetheless is not employable.

11           So it is fact-specific, you can make an

12   as-applied challenge.  But at this point, based on

13   what's been presented, the redactions will stand other

14   than as to the disability rating.  You'll get to see

15   the conditions and the rating, and you'll be able to

16   certainly make examination as to those conditions, how

17   they impact the individual's ability to work.

18           Okay.  Moving on here, just a couple of other

19   things we need to take a look at.  There is the

20   Defendants' motion -- let me find it here -- 1241, the

21   Defendants' Motion to Compel Initial Disclosures and

22   Discovery Responses.

23           And we'll need to move through this pretty

24   quickly, so I'll hear from the Defendants first.  And

25   I guess there's really two separate issues here.  One

1    is, you know, the responses to the particular

2    interrogatories, but there's this issue of the Rule 26

3    initial disclosures.  And I'll admit I'm a little bit

4    confused by it.

5            You, the Defendants, make the argument we're

6    entitled under Rule 26 to the witnesses.  Yes, you

7    are.  We're entitled to damages.  And it's probably

8    not enough to just say, oh, we'll tell you about them

9    later when we hire an expert.  But there's a

10   suggestion here that the parties formally or

11   informally agreed not to engage in Rule 26 disclosures

12   and that the information would be disclosed during the

13   course of discovery in response to interrogatories and

14   in other ways.

15           So there's that, and then there's this

16   specific interrogatory.  So if you would address each

17   of those issues, that would be helpful.

18           **MS. BRANSCOME:**  Happy to do so.  This is Kim

19   Branscome for the Defendants.  So I will make this as

20   brief as possible.  I know you have indulged us for

21   very many hours this morning.

22           So the short answer is, after a Rule 26(f)

23   conference that we held in New York at the very

24   beginning of this litigation -- feels like a lifetime

25   ago -- at that time actually the Defendants had

1    proposed a number of different protocols that related

2    to bellwether plaintiffs.

3         And the specific example that I would give,

4    and I'm going to explain why this is relevant, is that

5    we actually wanted to engage at the time in going

6    ahead and working out bellwether deposition protocols,

7    really starting to work through those, because we

8    contemplated that there would be obviously a

9    bellwether process at some point in time.

10        And the Plaintiffs actually did not want to

11   engage in that discussion.  They said that they were

12   agreeing to a staged approach to this litigation in

13   which the company and government discovery went first.

14        And so I think the best example that I can

15   give you that is actually part of the record is that

16   ultimately, for example, the deposition protocol that

17   came out of the Rule 26(f) conference relates only to

18   company and government witnesses.  There is no mention

19   of a protocol for the bellwether plaintiffs.

20        And so, the issue that we have is that, at

21   the Rule 26(f) conference we set aside a discussion

22   that were specific to the bellwether process, and we

23   did so at the Plaintiffs' request, and we focused on

24   the company and the government discovery.  Everything

25   coming out of the Rule 26(f) conference reflects that.

1              And so now we turn to bellwether discovery,

2    and we are entitled to Rule 26 disclosures.  It's very

3    clear what is required as part of those disclosures.

4    And we hear from the Plaintiffs that we had, in fact,

5    waived that.

6              There's a couple of points on that.  One, as

7    the rule itself requires, there's no obligation on the

8    opposing party to request a Rule 26 disclosure.  It is

9    incumbent upon the party to disclose that information.

10   And the rule itself says that the rules -- the initial

11   disclosures are required unless exempted under

12   26(a)(1)(B), which is not applicable here, or as

13   otherwise stipulated or ordered by the Court.

14             There's certainly no order by the Court that

15   alleviates the Plaintiffs from their duties to provide

16   Rule 26 disclosures, and there absolutely is no

17   stipulation either entered on the record or even in

18   writing.  The Plaintiffs can't provide one, our view

19   is because it did not happen.  But at the very least,

20   if there was confusion between the two sides, then

21   there certainly was no stipulation.

22             So, in the absence of a clear stipulation or

23   a court order, the Plaintiffs are obligated to provide

24   Rule 26 initial disclosures.

25             We had a meet and confer with Plaintiffs.  If

1    they provided the information required by Rule

2    26(a)(1)(A) in their interrogatory responses, we might

3    be willing to accept it, because there's no need to,

4    you know, elevate form over substance.  An

5    interrogatory is just as binding as an initial

6    disclosure, and we can use it for all of the ways that

7    we would use a Rule 26 disclosure.

8         The issue that we're having is not

9    necessarily one of form over substance.  It is one of

10   substance, which is that the Plaintiffs are not

11   providing the information that we are entitled to

12   under Rule 26(a)(1)(A)(i) and (iii), which is the

13   identity of individuals likely to have discoverable

14   information that the disclosing party may use to

15   support its claims or defenses.

16        The different plaintiffs have provided

17   different levels of detail on individuals in response

18   to specific questions, but there is no question that

19   they have not provided a comprehensive list that would

20   satisfy Rule 26 of each individual that they may use

21   to support their claim or defenses.

22        The same is true about the computation of

23   categories of damages.  There may be some elements of

24   that that might require expert input, but there are

25   certainly other areas of damages.  For example, they

         1    could calculate damages from medical records that are
         2    already in their possession.  If they're claiming lost
         3    earnings, they can calculate that based off of their
         4    own records in their possession.  Basically everything
         5    that's required of a party in their Rule 26
         6    disclosures and all of the case law that reflects
         7    that.
         8         What we are getting right now is essentially
         9    stonewalling on this and saying it's all subject to
        10    expert testimony.
        11         So that's the argument on the Rule 26.  I'm
        12    happy to answer any questions or go into more detail,
        13    but I am trying to be as brief as possible.
        14         On the interrogatory --
        15         **MR. AYLSTOCK:**  Could I respond on that,
        16    Judge, before we move on?
        17         **THE COURT:**  Yes, Ms. Branscome, give Mr.
        18    Aylstock -- we'll talk about the initial disclosures
        19    and then we can talk about the interrogatories.
        20         **MS. BRANSCOME:**  No problem.
        21         **MR. AYLSTOCK:**  So, Judge, our conference in
        22    New York, now more than a year ago I think it was, was
        23    extensive, it was many, many days.  We absolutely
        24    discussed Rule 26 obligations on the Defendants and
        25    the Plaintiffs, and we absolutely agreed that we

1    wouldn't be doing Rule 26 initial disclosures for the
2    Plaintiffs.
3           In fact, the report itself talks about the
4    Rule 26 disclosures for the Defendants.  Incidentally,
5    they did identify a few people that were related -- I
6    think 12 -- to their affirmative defenses.  They
7    didn't provide addresses or phone numbers or anything
8    like that, as I recall.
9           But in any event, we talked about the fact
10   that in mass tort cases -- in the Manual for Complex
11   Litigation, it makes this clear, these initial
12   disclosures, this is not the practice of MDLs, not any
13   MDLs that I've been involved in.
14          In fact, what we talked about was there would
15   be obligations for the bellwether plaintiffs and
16   others as the case progressed.  Typically, in fact --
17   I can't remember the last one that ended up in these
18   interrogatory responses as opposed to a fact sheet or
19   a plaintiff profile form, but typically that's the way
20   it goes.  We've provided the Court many examples --
21   *Pradaxa*, *Avandia*, *Actos*, you name it, these are fact
22   sheets, and they ask for this type of information, but
23   not initial disclosures.
24          Ms. Branscome says, oh, well, we were
25   obligated to do that and we can't provide some

1   stipulation.

2           Well, if we were obligated to do it and it

3   wasn't so stipulated, why did they wait until after

4   they served their discovery to even bring this up?

5           We had agreed -- although they're limited to

6   25 interrogatories, as the Court knows, because this

7   was the subject of a hearing, we agreed we'd give them

8   100.  In 100 interrogatories you get to ask whatever

9   questions you want.  And we even said, look, these

10  subparts are more than 100, and the Court found

11  otherwise.

12          So they've had many, many opportunities to

13  ask whatever questions they want.  And we did agree

14  for the Plaintiffs that we would not be serving Rule

15  26 reports.

16          Frankly, this is -- the term "stonewalling"

17  was used.  This is an afterthought, yet another

18  afterthought that said, well, let's make it harder for

19  the Plaintiffs because we don't like some of their

20  answers.

21          So, if we want to talk about the

22  interrogatory answers, that's what we should be

23  talking about.  They do overlap, to a large extent,

24  and we've answered them to the best of our ability,

25  the plaintiffs have, and they've signed them.

1          So that's what we should be focusing on, not

2     retreading an agreement that was already made.

3          **THE COURT:**  Let's talk about that for a

4     second.  Because whether it's Rule 26(a)(1)

5     disclosures or responses to interrogatories, there are

6     two main focuses here.

7          Identify the witnesses.  For obvious reasons,

8     the Defendants need to know that.  And I'm sure they

9     want to know that before the plaintiff's deposition so

10    they can ask some questions about who the potential

11    witnesses are, and they obviously need that in their

12    investigation.

13         And the second prong is damages.  And whether

14    it is a Rule 26(a)(1) disclosure or a response to an

15    interrogatory, there is an obligation to provide not

16    just a theory of damages but to put some flesh on the

17    bones, recognizing that your damage theories may be

18    refined if and when you have experts testify.

19         But the way I'm reading the answers to

20    interrogatories, the Plaintiffs are punting on

21    providing information on damages, and have provided

22    some information on witnesses but it might not be as

23    thorough as required.

24         So I guess the question to you is:  Is there

25    not an obligation of your clients, at least in answers

1    to interrogatories, possibly in 26(a)(1) disclosures,

2    to tell the Defendants what the claimed damages are?

3    And even if they are intangible damages, you have an

4    obligation to give them some idea.

5              So, if, for example, you are claiming mental

6    anguish, loss of enjoyment of life, I think the

7    Defendants are entitled to know whether the Defendants

8    believes that is a claim that is worth in excess of

9    $100,000 or that is a claim that is worth in excess of

10   $10 million.  Because that's going to inform the

11   Defendants as to what is your particular client

12   thinking and what kinds of information they're going

13   to advance to support their damage claim.

14             And, you know, when you talk about -- I know

15   a couple of plaintiffs don't have it but -- loss of

16   wages, you know, I mean, it's pretty easy.  You can

17   say, I had a job, I was a landscaper for two years,

18   and I made $15 an hour, and I haven't been able to

19   work at that job because of the problems I've had with

20   hearing loss.

21             It doesn't mean when you hire an expert you

22   can't fine tune it and make it better, but I don't

23   think it's acceptable to just say, well, we don't

24   know, our expert will tell you later, hold your

25   breath.

1          What's your response to that?

2          **MR. AYLSTOCK:**  Yes, Your Honor.  Ms. Marlowe

3    is going to respond on a more granular level.  We

4    believe that we have complied with the rogs.

5          So with regard to -- I guess I'll take them

6    in turn.  With regard to the witnesses themselves, we

7    did provide answers to the best of the Plaintiffs'

8    knowledge.  Some of these questions are enormously

9    broad, you know, whoever saw you we're hearing

10   protection ever in the military.

11         Well, we objected.  In fact, we objected

12   early -- PTO 28 said we had until May 15th.  We

13   objected a month early to try to deal with the

14   objections early, and we did deal with the objections

15   that were raised.  They were the DoD and bellwether

16   selection forms, and those were resolved.

17         So, to the extent that we've been able to

18   ascertain the information, it has been provided with

19   regard to the witnesses, consistent with the rule.

20         With regard to the damages, some of them are

21   -- obviously discovery is still ongoing.  With regard

22   to punitive damages, one of the things that needs to

23   happen is net worth.  So we need to know the net worth

24   before we can put any more specificity -- net worth of

25   3M, get a stipulation as we've done in other cases.

```
 1              And with regard to loss of enjoyment of life
 2    and things like that, look, that's something that is
 3    very difficult, if not impossible, to really quantify,
 4    particularly given that we've just received a lot of
 5    these records from the military and so forth.
 6              So we stand by and are ready to deal with the
 7    interrogatories, but I do take offense to the fact
 8    that these are -- that we had some Rule 26 obligation
 9    that we agreed to, because that didn't happen.
10         MS. BRANSCOME:  May I respond just briefly on
11    that?
12         THE COURT:  Yes.
13         MS. BRANSCOME:  Well, first of all, it's not
14    that the Plaintiffs had to agree to their Rule 26
15    obligations.  They have a Rule 26 obligation.  And
16    absent, you know, a clear stipulation to obviate those
17    obligations, they stay in place.
18              But, like I said in the beginning, there's no
19    reason to elevate form over substance.  If you'll
20    recall, the path that this case took is somewhat
21    unusual even in an MDL.  Because in a normal MDL you
22    actually would have a plaintiff fact sheet that is
23    actually under oath.
24              Here we have an initial census form that is,
25    you know, short.  That one actually was certified by
```

1    the Plaintiffs.  We have a bellwether selection form

2    which was really targeted at how we picked the

3    bellwether cases.  That is not certified, so it's a

4    more complicated tool to use.

5           And so we did land in a place where, instead

6    of having a plaintiff fact sheet that would be

7    certified that typically would also have these

8    questions -- so I don't disagree with Mr. Aylstock

9    that you can address the Rule 26 obligations in the

10   form of a plaintiff fact sheet.  Here we don't even

11   have a plaintiff fact sheet, and so what we have are

12   the interrogatories.  And we have interrogatories that

13   ask for the information that the plaintiffs are

14   obligated to provide under Rule 26, and those are all

15   laid out in our motion.  I don't need to beat them to

16   death.

17          But the bottom line is we, as the Defendants,

18   are entitled to this information, and we are entitled

19   to a more fulsome response than what we have gotten.

20   And that is true for both the witnesses and the

21   damages calculations.

22          And Rule 26 is instructive -- there is

23   actually something in the rule itself that talks about

24   unacceptable excuses.  I party cannot say that they

25   can't make these disclosures because they don't have

1    enough information.

2            Now, you can caveat them.  As Your Honor

3    pointed out, there may be times where an expert comes

4    in later and estimates shift and things like that.

5    But the idea that we can't get damages estimates

6    because the Plaintiffs first need a stipulation on the

7    company's net worth, that's simply just not something

8    that's supported by the rule.

9            So, to the extent what we're doing is taking

10   the obligations in Rule 26 and putting them in the

11   interrogatory context, that fine.  But we still need

12   the information and we are entitled to the

13   information.

14           And then a secondary issue is that we

15   certainly never talked about just not having Rule 26

16   disclosures for loss of consortium parties.  And so we

17   now have thousands who have been added as parties or

18   will be added as parties who also have Rule 26

19   disclosures, and they would not have been contemplated

20   in the initial census form or the bellwether forms.

21   They certainly didn't certify the initial census form.

22           And again, it goes back to Rule 26 is not an

23   obligation on the other party to propound discovery.

24   It is an obligation on the producing party to provide

25   it.  And so , you know, we think the responses that

1    we've gotten so far are insufficient.  We've briefed

2    that.  I'm happy to answer questions on it, but I

3    think Your Honor can see the details there, but we

4    need this information.

5              **THE COURT:**  Mr. Aylstock?

6              **MR. AYLSTOCK:**  The problem, Your Honor, is

7    the Manual for Complex Litigation says that initial

8    disclosures are often inappropriate for mass tort

9    cases.  And they were here, and that was discussed.

10             What was discussed was we do a plaintiff's

11   fact sheet.  That turned into interrogatories.  We've

12   got their interrogatories, we've made objections.  We

13   can respond to them.  But I've been doing mass torts a

14   very long time, I'm sorry to say, and with regard to

15   the quantification of emotional damages, that's just

16   not something that is done in mass tort cases.  I've

17   never heard of how to quantify sort of some of these

18   noneconomic damages.  And a lot of that is going to

19   depend -- I mean, I say this a little tongue in cheek,

20   but we're plaintiffs lawyers, we're going to be asking

21   for as much as we possibly can, depending on what the

22   facts support.  So that's not going to be a surprise

23   to Ms. Branscome or Mr. Nomellini.

24             As it relates to lost wages, yes, those

25   claims that have those, we can provide some indication

1    of that, obviously, subject to further quantification.

2    But the idea in a mass tort case that you provide some

3    number for mental anguish, that's contrary to the

4    practice and contrary to the manual and contrary to

5    what was discussed.

6        **THE COURT:**  Well, here is what I'm going to

7    do on the initial disclosures.  I mean, I'm aware of

8    what's in the manual.  That's really talking about the

9    overall nature of a mass tort case.  It would be like

10   requiring 3M, when this lawsuit was filed, to provide

11   very, very detailed initial disclosures.

12       And there may have been some information

13   provided.  I know there were names of custodians and

14   that kind of thing.  But what we're talking about now

15   is group A plaintiffs.  We have five pretty

16   straightforward personal injury cases.  And this is

17   really like many other personal injury cases.

18       Rule 26 does apply.  And I hear you how you

19   assume that that might not have applied.  But I think

20   Ms. Branscome is correct, unless there's a stipulation

21   that the parties are not required to comply, Rule

22   26(a) disclosures -- just like if there had been one

23   lawsuit and a plaintiff sued 3M because he or she

24   suffered hearing loss, you need to list the names of

25   the witnesses that would support the claims.  This

1    facilitates investigation by defendants identifying
2    who are the players before and after, witnesses, those
3    kinds of things.
4         And then on damages, I think the law is
5    pretty straightforward that you are required to
6    disclose a reasonable estimate of the damages that are
7    sought.
8         So, for example, if there's a claim for lost
9    wages, we're seeking lost wages of approximately
10   $25,000 because the plaintiff has been unemployed as a
11   landscaper for two years, we are seeking a loss of
12   future earning capacity, the plaintiff is unable to
13   hold a certain type of job because of a hearing loss
14   and would reasonably be expected to earn over the next
15   ten years, twenty years, whatever, and you put a
16   ballpark estimate on it, subject to refinement, if and
17   when you have an expert testify about losses.  Because
18   I know, you know, loss of future earning capacity, you
19   discount it to present value and those kinds of
20   things, and you may need to have an expert do it.
21        But the Defendant I think is entitled to know
22   what are the general classes of damages and what are
23   the amounts that the plaintiff proposes to request.
24   And the rule does not simply permit you to say, *We*
25   *don't know, our expert will tell you later*.

```
 1              So whether that is in a sworn answer to
 2      interrogatory or is in a Rule 26 disclosure, the
 3      plaintiffs -- individual plaintiffs are required to do
 4      that.  And I don't really care if you call it a Rule
 5      26(a) initial disclosure or you respond to the
 6      interrogatories that ask that.
 7              Let me ask Ms. Branscome, what are the
 8      interrogatories in particular, if you know offhand,
 9      that go to the issue of witnesses and which are the
10      ones that go to damages?
11          MS. BRANSCOME:  Sure thing, Your Honor.
12      Roughly speaking, the witness interrogatories would be
13      Nos. 2, 3, and 4.  Someone else should definitely
14      speak up if I've missed one.  And then for damages, it
15      would be 52, 55, 56, and 57.
16              And again, you know, as long as what we get
17      is satisfying the Rule 26, whether it comes in
18      response to the interrogatories or as a separate
19      disclosure is really -- that's not something that's
20      hugely consequential on our end.
21          MR. AYLSTOCK:  So No. 1, Your Honor, also
22      asks for witnesses.  We provided a five-page chart of
23      witnesses, and each individual also provided, to the
24      best of their ability, the witnesses related to the
25      other interrogatories just by virtue of a bit of a
```

1    comparison.

2         Their Rule 26 disclosure identified 11

3    people, one of whom was dead, that's Doug Owen, and

4    that was it.  So we believe, regardless of how this is

5    being looked at, we have complied with the list of

6    witnesses to the best of our clients' ability.

7         **THE COURT:**  Give me an example of -- the

8    witness interrogatories would be 2, 3, and 4 -- where

9    -- give me an example of one of the plaintiff's

10   responses.

11        **MS. BRANSCOME:**  Sure.  So the challenge that

12   we have -- and Ashley may be able to speak to a good

13   example.  The challenge that we have, Your Honor, and

14   this is why I think your order will be instructive, is

15   Rule 26 talked about the name and, if known, the

16   address and telephone number of each individual likely

17   to have discoverable information that the disclosing

18   party may use to support its claims or defenses.

19        And so, the challenge that we have is that

20   what we have gotten is -- and each plaintiff is a

21   little bit different, but we have gotten just sort of

22   lists of people who might have some knowledge.  But we

23   don't know if that's comprehensive, we don't know if

24   these are all the people they intend to support their

25   claims or defenses.

```
1              Each of the interrogatories kind of have
2    their own flavor to them because we were being more
3    specific.
4              So, Ashley, I think I heard you maybe pipe
5    up, if you've got a good example.
6         MS. NEGLIA:  This is Ashley Neglia.  Your
7    Honor, so, for example, we asked in Interrogatory No.
8    2 to have the plaintiffs provide us with information
9    concerning the allegations in their short form
10   complaint.
11             In response, Mr. Rowe, for example, provided
12   his own name and no others and then just a list of
13   objections.
14             We feel as though Mr. Rowe likely has
15   information regarding witnesses who he may rely on
16   that have information regarding the allegations in his
17   short form complaint, but we cannot know based on his
18   response whether or not that's true.
19        MR. AYLSTOCK:  Well --
20        THE COURT:  Let me interrupt just one second.
21   Let's take a five-minute break here.  I just had
22   something come up.  Let's be back here at 1:32 my
23   time.  Is that good?
24        MR. AYLSTOCK:  Yes, Your Honor.
25        MS. BRANSCOME:  Of course.
```

1              (Recess taken 1:28 p.m. to 1:33 p.m.)

2         **THE COURT:**  I'm back.  I don't know if

3    everyone else is on line.

4         **MR. AYLSTOCK:**  I'm still here, Judge.

5         **THE COURT:**  When I cut everyone off, counsel

6    was pointing out the --

7         **MR. AYLSTOCK:**  I think, Judge, on Rowe, maybe

8    a place to start is Interrogatory No. 5.  Because I

9    think what's happening here, quite frankly, is -- I'm

10   not sure the Defendants are really reading the rogs

11   and the rog responses.

12        So, if we look at rog 5 in Rowe, "Identify

13   all persons who served with you in the military that

14   were present when you fired weapons in training and

15   combat."

16        Well, that's a pretty broad statement.  We

17   did object to it.  It wasn't part of any meet and

18   confer.  It is pretty broad because that's kind of

19   hard to do for a military person when these were on

20   the market for all the time that they were.

21        But Mr. Rowe says he served in the following

22   units and it is possible that some people in those

23   units may have been present when he fired a weapon.

24   He doesn't recall the names of everybody.  Talks about

25   the duty stations.  And he does list Johnny Hall, SPC,

1   Joshua Aston, Billy Jacks, a platoon sergeant, Dylan

2   Youngblood, Rodolfo Ravada -- has a phone number for

3   him, and so forth.  So there is a fulsome response to

4   that, to the best of his ability.

5       And then some of these other questions, like

6   Interrogatory No. 2, "Identify all people of knowledge

7   of allegations in your short form complaint."

8       Well, we did in the preceding page, but a

9   five-page chart of everybody we thought had knowledge

10  of the master complaint.  Obviously, the short form

11  incorporates the master.  Mr. Rowe identifies himself,

12  because obviously he has some knowledge.  And then he

13  refers the Defendants to the other interrogatory

14  answers in the same manner in which the Defendants had

15  just argued, well, we can refer to documents.

16      So the questions that are asked are answered

17  fulsome.  Sometimes it's referred to, you know, to the

18  extent it's duplicative of another response, maybe --

19  obviously some of these people might be in other

20  answers.  But it does in fact refer them to the other

21  interrogatory answers with great specificity and does

22  what is required under the rules.

23      **MS. BRANSCOME:**  May I just weigh in here?  I

24  think, given maybe the discussion that I'm hearing

25  from Mr. Aylstock where he thinks that, you know,

1    perhaps information is in different places, I would
2    note, for example, the chart in response to rog 1 is
3    pointing to 3M witnesses or third-parties.

4         If it is true that there's information sort
5    of scattered throughout various responses, then
6    perhaps I will amend my earlier position which was
7    whether we get it in response to interrogatories or as
8    a Rule 26 disclosure really didn't matter that much.

9         I think the challenge is, if Mr. Aylstock
10   thinks that each of the plaintiffs have responded but
11   what they've done is responded in different ways to
12   questions that are not entirely clear that these are
13   individuals that may be used to support the claims or
14   defenses, then perhaps, if we are entitled to the
15   information, which is what I'm understanding Your
16   Honor to have preliminarily at least ruled, then
17   perhaps it is easier just to do Rule 26 disclosures,
18   put it all in one place.  And then it's very clear for
19   both sides that the question that's being answered is
20   the individual that the disclosing party may use to
21   support its claims or defenses.

22        Because the challenge from our perspective
23   is, for some of these plaintiffs, we are getting
24   scattershot individuals identified, but they're being
25   identified in response to questions where it's not

1   entirely clear that those are individuals that are

2   being used to support the claims or defenses.

3          And when we ask what we consider to be

4   straightforward questions in Interrogatories 2, 3, 4,

5   which is aimed at who are the people who have

6   information to support your claims, we did not get

7   what we see as fulsome responses.

8          And so what I'm hearing Mr. Aylstock say is

9   that, well, you can look at the responses to all of

10  the other interrogatories and you can incorporate

11  responses from the bellwether form and in the initial

12  census form and you can piece it all together.  But

13  from our perspective, that's not the same as a

14  comprehensive list that is clearly defined as

15  identifying the people that may be used to support the

16  claims or defenses.

17         So, to the extent that we are entitled to

18  that information, I think putting it in one place in a

19  Rule 26 disclosure would be the better way to do it.

20  We also still would need this information from the

21  spouses who have recently become parties and so that

22  way we would have consistency across the board.

23         So, in response to hearing what Mr. Aylstock

24  is saying, perhaps he's not contesting giving us the

25  information, but the way in which we've received it is

1   not clear, from our perspective, that it satisfies

2   Rule 26.

3            **THE COURT:**  Mr. Aylstock, what I hear Ms.

4   Branscome saying is what they want is, covered under

5   Rule 26, is, in support of your claim, the affirmative

6   witnesses that you now know -- there will be some

7   others maybe identified down the road -- who you would

8   use to support your claims and the same with the

9   damages.

10           I don't think Ms. Branscome is -- for

11  example, if there's a question who are all the people

12  who would support the allegations in your complaint, I

13  don't think they're looking for you to put, well,

14  maybe Mr. Berger does or maybe Mr. Myers does.

15  They're looking for who are going to be your client's

16  witnesses.  It's going to be your client, it's going

17  to be his wife, it's going to be his poker buddy, it's

18  going to be these people that he served in the

19  military with.  And I think that's what they want to

20  focus on.

21           Because at some point is in the very, very

22  foreseeable future they're going to want to take

23  depositions of individuals, and they want to have an

24  idea who they might want to depose who would be a

25  witness to some or all of the claims that the

```
 1    plaintiff is making on damages, and they want to just
 2    have a roadmap of what are the damages other than just
 3    the generic listing of damages.
 4         And it may make sense that all of that is
 5    simply put into a Rule 26(a)(1) disclosure, the
 6    information is there.  As you point out, some of it
 7    certainly has been disclosed in answers to
 8    interrogatories where you talk about who was in the
 9    military with a particular plaintiff, so they may or
10    may not be witnesses.  But if you did put it all in
11    one place, that may ultimately solve the problem, at
12    least on witnesses.
13         What is your response to that?
14         MR. AYLSTOCK:  Well, I guess the problem with
15    that, Judge, is that we answered the interrogatories
16    that were written, and we agreed to a limit with 100
17    with the understanding that those encompass Rule 26.
18         And what I'm hearing now is, well, we could
19    have asked all of that, we didn't, and now, because we
20    don't like the form that we put it in, we're now going
21    to go back and have you do initial disclosures.  When
22    they only identified 11 people, and now we have to
23    identify every witness we plan to call at trial.
24         We did identify, to the extent known -- and
25    they are about to get seven hours of deposition with
```

1   all these folks -- people that were around.  We

2   answered the questions that were done.  And so I don't

3   believe that we've done anything other than follow the

4   rules and the agreements of the parties.

5          And actually in the revised Rule 28(a),

6   there's a provision, look, to the extent somebody is

7   identified later on as what we would call a

8   before-and-after witness or a moaner and groaner, or

9   however you want to say it in the general PI context,

10  yeah, they get a deposition of that person.

11         So I think this is just an afterthought.  I

12  think Ms. Branscome made that point that, look, we

13  don't like the way we worded the question now, so now

14  we're going to go back and make you do something

15  completely different than what was agreed to.

16         **THE COURT:**  Okay.  Then, there is still a

17  challenge to many of these interrogatories.  And we

18  can handle it in one of two ways.

19         We can take the time now and go through

20  these, you know, one by one and say the response is

21  sufficient or not.  Or even after this hearing I can

22  sit down and go through and do a very focused written

23  order saying which interrogatories will need to have

24  more full responses.

25         I don't know if there are some of these that

1    we could talk about now that might help inform the

2    Court a little more other than me just, you know,

3    literally going through each one and I'll make a

4    judgment call whether I think that response is correct

5    or incorrect or sufficient or insufficient.

6         **MR. AYLSTOCK:**  I think handling a few or if

7    not all of them now, we're ready to do it, Judge.  If

8    we went through one set, maybe that would guide us on

9    a lot of them because --

10        **THE COURT:**  Okay, we can do that quickly.

11        **MS. BRANSCOME:**  Well, if I may just weigh in

12   on this, given that it's our motion.  I'm happy to

13   do -- obviously, Judge Jones, if it's better for you

14   to go through them orally, we certainly are prepared.

15        I also think, you know, there's one or two

16   that I might think that more explanation and argument

17   would benefit.  But there are some others that I think

18   there are a lot of people on this phone call and we've

19   spent a very long time, that at the end of the day,

20   you know, we would defer to your judgment based on the

21   papers.

22        So I'm not sure that walking through an

23   entire set of the interrogatories and arguing each of

24   them because we just can't help ourselves might

25   actually end up prolonging this beyond what's

1    necessary.

2            But, obviously, if anything would be helpful

3    to you, we certainly are prepared to do it.  But the

4    only one that I wanted to discuss was Interrogatory 50

5    because I think it's just a little more complicated.

6    But other than that, you know, I really think this

7    could be something handled more efficiently on your

8    end.  But that's just my view.

9            **THE COURT:**  Okay.  Let's talk about 50 then.

10           **MS. BRANSCOME:**  Okay.  So Interrogatory 50,

11   the issue that we have here is this is getting at, you

12   know, the key issue of reliance, which, you know,

13   depending on the specific state law that may apply,

14   could be an essential element of a plaintiff's claim.

15           So what we're getting at here is, you know,

16   what statements did individual plaintiffs -- were they

17   aware of, that they relied on, and that they believe

18   are false.

19           I'm sorry, my Apple watch is talking to me.

20           So this is what -- Interrogatory No. 50 was a

21   very straightforward question to the plaintiff,

22   "Identify each statement regarding the CAEv2 that you

23   relied upon in using the product and that you claim is

24   false."

25           And the issue is that the responses that

1    we've gotten from the plaintiff have talked about --

2    they've either been very generic -- and they do vary a

3    little bit between the plaintiffs.  But the

4    overarching theme is that we've gotten back very

5    generic responses or they've described, you know, "see

6    all of the documents produced by 3M."

7          But what is missing, and it is the

8    fundamental core of this interrogatory, is what are

9    the statements on which a specific plaintiff relied,

10   which are the ones that he or she saw and made a

11   decision based upon.

12         And so, what we're getting in response to

13   these interrogatories is sort of the generic claims

14   and instructions that the plaintiffs as a whole are

15   saying might have been false or misleading.

16   Obviously, we contest it, but that's fine.  That goes

17   to a separate issue.

18         This interrogatory is really focused on the

19   individual bellwether plaintiff and what they did or

20   did not see and what they claim they relied on, which

21   is really information that only they can provide.  And

22   if they didn't rely on anything, they should say that.

23   Or if they don't remember anything, they should say

24   that as well.

25         But what we are getting back are sort of

1   these generic references to instructions without any

2   clarification either that they relied on those

3   instructions -- or in some cases we've gotten some

4   supplemental responses -- and this is why I thought

5   this one was worth discussion more than others.

6        We have gotten, in some cases, supplemental

7   responses that have said they relied on instructions

8   on how to use the product and instructions about when

9   to use the product, but there's no detail about, okay,

10  but were those instructions that were given by someone

11  in the military, I mean, was that their commanding

12  officer that said use this product, or are they

13  referring to actual written materials, or are they

14  referring to something that came from 3M.

15       And this is a really important interrogatory

16  because, under different state law, this is an

17  essential element of plaintiff's claims.  And so this

18  is something that we think should be answered to the

19  full extent that the law allows, which would be

20  providing -- and we've cited some case law from

21  Florida that's talking about, you know, this really is

22  an area where there should be full, complete, and

23  comprehensive responses.

24       So that was why I wanted to discuss that one

25  because we have gotten some response but it really

1    isn't going to the core of the interrogatory.

2              **THE COURT:**  Mr. Aylstock?

3              **MR. AYLSTOCK:**   Happy to discuss this one.

4    There's really not that many in dispute anymore, so I

5    would suggest we go through some other ones on that.

6              I am looking at both Mr. Rowe and Mr. Baker

7    in particular as sort of exemplars.  First of all, the

8    Plaintiffs did object to the question itself, and that

9    objection was never a part of any meet and confer.  It

10   is a little bit vague and ambiguous about from whom

11   and so forth the statements were made.  But we do

12   identify the statements that the Defendants are aware

13   of.

14             And then, in particular, for Mr. Rowe, he

15   says that, "In using the CAEv2, I relied upon

16   statements that the CAEv2 had been tested and provided

17   complete protection, that the instructions could

18   enable users to achieve proper fit, allowed users to

19   maintain situational awareness."

20             So, in the context of this case, we have

21   provided a fulsome answer to the question.  Obviously,

22   there are other misrepresentations that were made and

23   intended to be relied upon by purchasers and users,

24   and we've identified those as well as what Mr. Rowe in

25   particular could recall at this time about what

1    representations were made and what he relied upon.

2         **THE COURT:**   So, I guess, Mr. Aylstock, the

3    missing piece -- I see you have provided those

4    responses.   But the issue is -- and, you know, they

5    may say I don't know -- were -- so they were issued

6    these earplugs.   Were statements made by their

7    commanding officer, were statements made by

8    audiologists from audiology, was it none of the above,

9    was it the label in the package that when you open the

10   package there were instructions in the package they

11   relied on that, was it no one really said anything

12   about it but it was generally made known to us in the

13   military that these things protected your ears and we

14   should we're them.

15        That's really what the question is getting

16   at, not generically what is contended to be the

17   misrepresentations, but how were those

18   misrepresentations communicated to the particular

19   plaintiff.   And the answer says nothing about that.

20        And, you know, I'm being pragmatic.   I

21   realize these guys are in the military, and they're

22   not going to remember the name of their commanding

23   officer.   But if that's -- or maybe it was the supply

24   clerk when they got their boots and uniform and they

25   handed them the earplugs and they were told use these,

1    these will protect your ears if you use them in this

2    manner.  But the answer doesn't have any of that in

3    it.

4              And isn't that required, something along

5    those lines, to be responsive to the interrogatory?

6         **MR. AYLSTOCK:**  Well, the interrogatory is

7    fairly generic and vague, and we did object to that,

8    and that objection was not at all part of the issue

9    that is before the Court because we never talked about

10   it with the Defendants.  It just says, "Identify each

11   statement regarding the CAEv2 you relied upon using

12   the CAEv2 and that you claim is false," and that's

13   what Mr. Rowe did to the best of his ability.

14             Obviously, the Defendants will have seven

15   hours with him to explore that in great detail.  But

16   he did respond to the interrogatory as it was written.

17        **THE COURT:**  But doesn't -- are you required

18   to -- when you identify the statement, you're required

19   in the interrogatory to identify the person who made

20   the statement, when the statement was made, something

21   to identify the statement?  Isn't that what "identify"

22   means.

23        **MR. AYLSTOCK:**  Well --

24        **MS. BRANSCOME:**  Yes, Your Honor, it's a

25   defining term in the interrogatory.

1      **MR. KELLY:** Your Honor, this is Max Kelly. I

2  believe that the plaintiff bellwethers objected to the

3  definition of "identify" as overbroad and unduly

4  burdensome.

5      I have not been on every single meet and

6  confer about these interrogatories, but Defendants

7  have not pushed back on that objection in my

8  discussions with them.

9      **MR. AYLSTOCK:** Yeah, it was an objected to

10  term because this was on the market here from '99 to

11  2015, and a lot of these people were in the military

12  for very long time.

13      **THE COURT:** Right, right. So I get that you

14  objected to it. But certainly, in the broad sense,

15  every interrogatory ever drafted has "identify" as a

16  definition. Maybe there should have been a little

17  meet and confer. But the obvious import of the

18  interrogatory, they just want to know what was

19  communicated to your client that they relied on when

20  they used the CAEv2.

21      It may be that they can't point to any

22  statement. And, as Ms. Branscome points out, that

23  could be a critical issue under state law in various

24  states. But you have to point to something. It was

25  the package, it was a superior in the military, it was

1    a fellow soldier.  And it doesn't point to any of

2    that.

3            And even under a modest definition of

4    "identify" it would include to -- you would identify

5    the statement by time, person, something that would

6    give a reference point to it.

7            So my view -- and we're not going to be able

8    to go through all these -- in my view, 50, the

9    response is insufficient because it's sort of the tail

10   wagging the dog.

11           And I recognize your client is not going to

12   say on May 11th Colonel Smith sat me down and he said

13   the following, or the instructions or the packages say

14   anything.  But there has to be -- I think the

15   Defendants is entitled to know what are the particular

16   statements if they -- you know, and the answer here --

17   and I'm not saying it's going to go in this direction,

18   but there may be a problem because the plaintiffs are,

19   despite their best efforts, are just unable to

20   identify any statement made to them.

21           They were issued these earplugs, and they may

22   or may not have been told how to use them.  That's

23   certainly a factual issue in the case.  But they may

24   have been just been given the earplugs and put them

25   in.  As everyone said, you put this end in when you do

1    this and you put this end in when you do that, and

2    that's all they did.

3        But I think the Defendants are entitled to

4    know what are the particular statements that were

5    given to your client upon which they relied in using

6    it.  And it sort of weeds out the issue -- you know,

7    the response here may be, *I didn't rely on any*

8    *statement.  I just used them as anyone normally would*

9    *use them.  And I would have used them with the flanges*

10   *rolled down if someone had the good sense to tell me*

11   *to do that, but no one ever did.*  Maybe that's what it

12   is.

13       But, I mean, these issues need to be, you

14   know, fleshed out.  I understand they're going to ask

15   those kinds of questions to your client at their

16   particular deposition, but there is a duty to respond

17   to this interrogatory.  And simply objecting to the

18   breadth of "identify" is probably not sufficient.

19       So here is what I'm going to do, because I

20   don't think it's going to be a good use of our time to

21   go through here on this telephone conversation each of

22   the interrogatories and your responses.  I see your

23   arguments.  And I'll be candid with you, I don't have

24   sitting in front of me Interrogatory No. 52 and right

25   under it Mr. Rowe's response to 52 and the other

1    plaintiff -- Mr. Baker's response, et cetera.  And I
2    really need to do that.
3            And it's probably easier and more efficient
4    if I do that without having both sides argue about it
5    because I don't think that's necessarily going to
6    help.  So I think I will simply do this in the form of
7    a written order, and I'll do that very shortly.
8            Are there any other particular
9    interrogatories, Mr. Aylstock or Ms. Branscome, that
10   you think would be helpful to talk about in particular
11   before I just go through them one by one?
12           **MR. AYLSTOCK:**  Yeah, Judge --
13           **MS. BRANSCOME:**  Not from our end, Your Honor.
14           Go ahead, Mr. Aylstock.
15           **MR. AYLSTOCK:**  I was going to kind of flag
16   the one related to basically describe every medical
17   condition you ever had.
18           Emily, which one is that one?
19           **MS. MARLOWE:**  That one is Interrogatory No.
20   2.  This is Emily Marlowe, Your Honor.  That's
21   Interrogatory No. 2.  Similarly, there is one on
22   identification of all prescription medications that
23   you've ever been prescribed across your life and, you
24   know, various ones to that extent.
25           **MR. AYLSTOCK:**  And so, what you should know,

1    Judge, is our plaintiffs -- we spent a lot of time
2    with them, everybody on this call and a lot not on
3    this call, spent a lot of time trying to give the
4    Defendants responsive information to all of these.
5            We did refer to documents because we don't
6    want a big game of gotcha if they forgot when they
7    twisted their knee or something.  First of all, what
8    difference does it make.  But they have the medical
9    records.  You ordered them to provide authorizations
10   from literally the beginning of their lives, so they
11   have all of those medical conditions.
12           But we just don't feel like, particularly
13   given that they referred to documents that are
14   business records -- these aren't business records.
15   These are VA records, these are DoD records and so
16   forth.  We did refer them to medical conditions.
17           But I want the Court to know, in looking at
18   these, we did provide the best information that we
19   had, and we went an additional step and said, you
20   know, also you may want to check out all these medical
21   records you've been ordering.  Because nobody can
22   remember every medical condition, and what does that
23   even mean?  Is that a skinned knee?  Is that a twisted
24   ankle?  Is that a -- you know, certainly a cancer
25   diagnosis is one thing.

1          Those, again, were objections that were made,
2     they were made early, and they were not challenged in
3     any of the meet and confers.  So we feel like we've
4     done that.
5          Same with the issue with regard to all
6     persons who were ever present when you fired any
7     weapon, Interrogatory No. 7, including hunting or
8     target shooting.  To the best of their ability, they
9     did.  It's a very broad question over a very --
10    without any time limitation whatsoever.
11         All persons who you served in the military
12    were present when you fired weapons in training or
13    combat.  The individuals have done the best they
14    could.  These are very broad and, in our view,
15    overbroad questions, and we made those objections, and
16    they have never pushed back on the objections for
17    those.
18         **THE COURT:**  Well, probably -- because I'm
19    looking at Mr. Rowe's answer and Mr. Keefer's answer.
20    Certainly reasonable attempt was made to identify and,
21    you know, common sense dictates they're not going to
22    know the name of every human being in the military who
23    saw them fire a weapon in training or combat during
24    their entire time in the military, and they just have
25    to give their best recollection of who may be people

1   that they still remember their name and were with them

2   in various places during their deployments.  So

3   probably the responses to those, you know, may be

4   sufficient.

5           So I'm going to go through these one by one

6   and just I'll put all of it into a written order.  It

7   is probably the easiest to do rather than play

8   ping-pong back and forth on each one.  And it's been

9   briefed pretty well also, so that's helpful.  But I do

10  need to literally have the interrogatory in front of

11  me and then each of the plaintiff's responses, and I

12  can determine whether some or all of those are or not

13  sufficient.  So that's what I will do with regard to

14  Plaintiffs' Motion to Compel.

15          And then there was one other motion which I

16  don't think we really need to talk about a lot at this

17  point, and that was Plaintiffs' Motion to Compel

18  regarding Denise Kelley.  And although we did not

19  speak particularly about Ms. Kelley's situation, it is

20  similar to Mr. Hacker's situation.

21          And there was a redaction -- well, not "a"

22  but redactions, all of which were very similar to an

23  incident that is part of her medical mental health

24  history which is not very relevant to the issues in

25  this case.  I believe she did have a disability rating

1    and that was disclosed.  But the portion that related

2    to one of the conditions was redacted.

3              Am I correct on that?

4         **MR. AYLSTOCK:**  Yes, Your Honor.

5         **THE COURT:**  So, my ruling, unless either side

6    has something more to say on that, would be consistent

7    with my other rulings.  I have looked at her

8    redactions, and I've determined that they really have

9    no business of being brought up in this case.

10             But, to the extent -- I think it was a 30

11   percent disability rating.  The reason for that was

12   excluded or redacted.  That will have to be disclosed.

13             So the Defendants will be able to examine Ms.

14   Kelley as to her disability rating and her 30 percent

15   rating related to what's redacted.  But some of the

16   information behind that particular rating that was

17   redacted, that shall remain redacted.

18             And I, for the love of me, can't tell you how

19   many of her documents were redacted, but I think it

20   was a small number.  It was six or seven, am I right

21   on that?

22        **MR. AYLSTOCK:**  It was small, Your Honor.

23        **THE COURT:**  Yeah, six or seven, yeah.  And I

24   did look at each of those redactions, and I concur

25   that it is appropriate to redact it.  It is based upon

1    relevancy and that information is highly personal,

2    would not serve any good purpose, and I do not believe

3    it is relevant even to support Defendants' theories of

4    providing an alternative explanation for issues

5    relating to loss of enjoyment of life and those kinds

6    of things.  It's just something that you would --

7    there's no reason to get into it, and therefore it is

8    far afield on relevancy, and the Motion to Compel the

9    disclosure of that protected information is denied.

10              Does anyone want to be heard further on that?

11         **MR. AYLSTOCK:**  No, Your Honor.

12         **MR. SEFTON:**  I'm sorry, I thought earlier you

13   said that, consistent with Mr. Rowe, the condition

14   itself sort of the diagnosed name has to be unredacted

15   but not the underlying information.  Is that what you

16   meant?

17         **THE COURT:**  Yes.  And the information that

18   was redacted is not necessarily the VA's analysis of

19   what led to that disability rating.  It is simply

20   information within the analysis that is redacted.  And

21   that is on, I believe, six documents.  And my ruling

22   is those redactions shall remain because they are not

23   relevant.

24              But all of the other information that wasn't

25   redacted, you have access to it, so there's -- you

1     have the rating.  On the face sheet they did redact, I

2     believe, the 30 percent rating, what it was for.  That

3     will be unredacted.

4           But the questionnaire and the other

5     information that was submitted in support of that

6     disability rating, much of that is unredacted.  But

7     there is references to an incident on six documents

8     that's redacted, and I'm holding that those redactions

9     shall remain.

10          **MR. SEFTON:**  Understood.  Thank you.

11          **THE COURT:**  So what I'm going to do later

12    today, early tomorrow will do an order to summarize

13    the things I've orally ruled on in very summary

14    fashion.  And I will also do then an order on the

15    Defendants' Motion to Compel better answers to

16    interrogatories.  And I'll be able to focus on each

17    interrogatory for each plaintiff, and I'll put that in

18    a fairly succinct written ruling.

19          **MR. AYLSTOCK:**  Thank you.

20          **MS. BRANSCOME:**  Thank you.

21          **MR. NOMELLINI:**  Thank you, Your Honor, for

22    all your time today.

23          **THE COURT:**  Anything else?

24          **MR. AYLSTOCK:**  No, judge.

25          **MS. BRANSCOME:**  Nope.

1    **THE COURT:**  Have a good day.

2        *(Proceedings concluded at 2:11 p.m.)*

3                ---------------------

4    *I certify that the foregoing is a correct transcript*
     *from the record of proceedings in the above-entitled*
5    *matter.  Any redaction of personal data identifiers*
     *pursuant to the Judicial Conference Policy on Privacy*
6    *are noted within the transcript.*

7

8    *s/Donna L. Boland*                    *7-17-2020*
     *Donna L. Boland, RPR, FCRR*              *Date*
9    *Official Court Reporter*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25