# <u>**EXHIBIT V**</u>

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG   )   Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,  )
                               )   Pensacola, Florida
                               )   May 20, 2019
                               )   2:10 p.m.
                               )
_____)

*TOUHY* **PRESENTATION**
by
AUSA LEAH BUTLER,
AUSA KATHRYN DREY,
and
MAJ. COLLIN EVANS

BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
(Pages 1-50)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

**A P P E A R A N C E S**


FOR THE PLAINTIFFS:          **BRYAN F. AYLSTOCK, ESQUIRE**
(Liason)                     Aylstock, Witkin, Kreis & Overholtz
                             17 E Main Street, Suite 200
                             Pensacola, Florida  32502


FOR THE DEFENDANT:           **KIMBERLY BRANSCOME, ESQUIRE**
                             Kirkland & Ellis, LLP
                             333 South Hope Street
                             Los Angeles, California  90071

                             **MARK J. NOMELLINI, ESQUIRE**
                             Kirkland & Ellis, LLP
                             300 North LaSalle
                             Chicago, Illinois  60654

|      |    |
|------|----|
|      | 1  | P R O C E E D I N G S |
| 02:10 | 2 | **THE COURT:**  Welcome back, most of you. |
| 02:10 | 3 | And Ms. Branscome and Mr. Nomellini, welcome. |
| 02:10 | 4 | **MS. BRANSCOME:**  Thank you, Your Honor. |
| 02:10 | 5 | **MR. NOMELLINI:**  Thank you, Your Honor. |
| 02:10 | 6 | **THE COURT:**  Happy to have you join us for |
| 02:10 | 7 | this presentation. |

1   P R O C E E D I N G S

2        **THE COURT:**  Welcome back, most of you.

3        And Ms. Branscome and Mr. Nomellini, welcome.

4        **MS. BRANSCOME:**  Thank you, Your Honor.

5        **MR. NOMELLINI:**  Thank you, Your Honor.

6        **THE COURT:**  Happy to have you join us for

7   this presentation.

8        Ladies and gentlemen, it's my honor to

9   introduce Assistant United States Attorneys Leah

10  Butler and Kathryn Drey, who are here along with Maj.

11  Collin Evans of the United States Army.

12       As you know, they have graciously agreed to

13  speak to us this afternoon about navigating the

14  so-called *Touhy* framework, discuss with us the issues

15  that may arise in this litigation as the parties begin

16  to seek documents and then later testimony from the

17  federal government.

18       Before they begin with their presentations, I

19  want to remind everyone that neither the United States

20  Attorney's Office nor the United States Army is

21  obligated to be here today to meet with us about *Touhy*

22  requests.  They're not a party to this litigation.

23  They're not required in any way to even engage with us

24  at all.

25       Their presence here and the work that they've

02:11   1   done to prepare for today has been completely

02:11   2   voluntary, and I appreciate very much their

02:11   3   willingness to be here to work with us as we try to

02:11   4   navigate through what appears to be a complex

02:11   5   discovery journey for us.

02:12   6       Now, also I'm going to ask everyone to please

02:12   7   recognize that this case is not the military's only

02:12   8   priority, and we're very fortunate to have them

02:12   9   involved, again, here from the very outset.

02:12   10      With that said, there are limits to what

02:12   11  Ms. Butler and Maj. Evans are going to be able to say

02:12   12  and do here today.  They are not going to be

02:12   13  committing to any particular course of action, any

02:12   14  particular procedure in regards to the litigation.

02:12   15      I believe, based on my discussions with them,

02:12   16  that their role at this stage is strictly

02:12   17  informational at a macro level.  So please do respect

02:12   18  these boundaries and please try not to overwhelm them

02:12   19  with questions that get into the minutiae or the weeds

02:12   20  too much and push for answers or results that they're

02:12   21  not in a position to give us at this point.

02:12   22      Again, thank you for being here.

02:12   23      I believe, after Maj. Evans and Ms. Butler

02:13   24  present, then Mr. Rasmussen is going to also take a

02:13   25  few moments to speak to you about his own experience

02:13   1    in the military and what he knows about *Touhy* in

02:13   2    making these types of requests and how important it is

02:13   3    to begin the process cooperatively.

02:13   4            Ms. Butler?

02:13   5            And Ms. Butler recently had surgery, and so a

02:13   6    bigger thank you for being here.

02:13   7            **MS. BUTLER:**  I'm trying my best not to fall

02:13   8    down in front of everybody, but Maj. Evans has assured

02:13   9    me he will assist me in getting up off the floor if

02:13   10   that should happen.

02:13   11           I want to thank you for having a chance to

02:13   12   talk with you this afternoon.  And Judge Rodgers has

02:13   13   asked me to speak very basically about what the *Touhy*

02:13   14   regulations are.  So if you're familiar with the *Touhy*

02:14   15   regulations, this would probably be just repeated

02:14   16   information for you.  But for those of you who don't

02:14   17   know about it, I just wanted to let you know the basic

02:14   18   -- what they are, how it works, and then Maj. Evans is

02:14   19   going to talk a little bit more about how it might

02:14   20   apply to this case and to production of documents by

02:14   21   the various branches of the military.

02:14   22           Some of you don't know what *Touhy* regulations

02:14   23   are.  I put the name up there.  We're not doing a

02:14   24   PowerPoint, but it spells so funny, I thought you

02:14   25   might want to see how it looks.  And you might be

02:14   1   wondering what are the *Touhy* regulations and why

02:14   2   should I care about it.  Well, I'm going to tell you

02:14   3   my experience and how I learned to care about it.

02:14   4        Years ago I was a state prosecutor, and I

02:14   5   know there's a couple of people out here who have done

02:14   6   that.  But when we're getting ready for trial, there's

02:14   7   a docket day two weeks before jury selection when

02:14   8   about 80 defendants come in and announce to the Court

02:14   9   whether they need an extension, whether they want to

02:14   10  change their plea and plead no contest or sometimes

02:14   11  guilty or whether they're ready for trial.

02:15   12       And I would leave the courtroom with a big

02:15   13  bucket of about forty cases all set for trial the same

02:15   14  jury trial week.  And obviously they couldn't all be

02:15   15  tried that week, but I didn't know what was going

02:15   16  first, who was going to decide they needed a

02:15   17  continuance within the next two weeks, or who was

02:15   18  going to decide to plead guilty, so I had to get

02:15   19  everything ready.

02:15   20       One of my cases that trial period was a first

02:15   21  degree murder case.  And it just happened that a

02:15   22  federal agent, an ATF agent, had appeared at the

02:15   23  scene.  And he was not a long witness, but he was an

02:15   24  important witness.

02:15   25       And so about a week before trial, I get this

02:15  1   call from some person with the government who tells
02:15  2   me, 'I'm sorry, the agent is not going to be there
02:15  3   because you didn't make a *Touhy* request.'
02:15  4        And so my first thought was, 'Is this some
02:15  5   kind of government form like a 2E request, or what is
02:15  6   this?'  And she said, 'You have to tell us why this
02:15  7   testimony is relevant, why do you need it, what
02:15  8   information you're going to need, and, oh, by the way,
02:15  9   you have to do that 14 days before you want the
02:15  10  testimony.'
02:15  11       Well, you can imagine I was freaking out at
02:16  12  that point saying, 'I don't have two weeks.  I don't
02:16  13  even have time to stop and do this.  I'm getting ready
02:16  14  for trial, getting subpoenas out, prepping witnesses,
02:16  15  getting all this ready.  I cannot believe the
02:16  16  government is intruding in this and you're requiring
02:16  17  me to do this.'
02:16  18       Well, we worked it out.  She helped me, and
02:16  19  we got the witness there, and everything went well.
02:16  20       But years later when I came to the U.S.
02:16  21  Attorney's Office and I had to start dealing with
02:16  22  *Touhy* requests from requesters, I began to realize
02:16  23  that those rules are not rules that just keep you from
02:16  24  getting testimony or keep you from getting evidence;
02:16  25  they're actually regulations that enable you to get

| | | |
|---|---|---|
| 02:16 | 1 | it.  Because of the Supremacy Clause and sovereign |
| 02:16 | 2 | immunity, you wouldn't be able to get those documents |
| 02:16 | 3 | unless the *Touhy* regulations were there.  So that's |
| 02:16 | 4 | the first thing. |
| 02:16 | 5 | It does require some work on your part. |
| 02:16 | 6 | There are some restrictions to it, time limitations |
| 02:16 | 7 | and that sort of thing.  But in the end, it helps you |
| 02:16 | 8 | to get what you want.  So I'm asking you to keep that |
| 02:16 | 9 | in mind as you go forward making requests. |
| 02:17 | 10 | Now, you might wonder how the *Touhy* name came |
| 02:17 | 11 | up.  It came from a case called *Touhy v. Ragen* back in |
| 02:17 | 12 | 1949.  And Roger "The Terrible" Touhy was a person who |
| 02:17 | 13 | filed a request for FBI documents from the FBI office |
| 02:17 | 14 | in Chicago.  And the resident agent in charge showed |
| 02:17 | 15 | up in federal court and told the judge, 'Respectfully, |
| 02:17 | 16 | Your Honor, based on orders from the Attorney General, |
| 02:17 | 17 | I'm not going to be able to produce any documents,' to |
| 02:17 | 18 | which the federal judge said, 'I'm going to hold the |
| 02:17 | 19 | person in contempt the highest person who will stand |
| 02:17 | 20 | in your shoes.' |
| 02:17 | 21 | And so the case went on from there and it |
| 02:17 | 22 | ultimately ended up at the Supreme Court where the |
| 02:17 | 23 | Court ruled that that was something that was in the |
| 02:17 | 24 | authority of agency heads like the Attorney General. |
| 02:17 | 25 | And after that, the regulations became known |

02:17  1   as the *Touhy* regulations, because actually they were
02:17  2   in place before the *Touhy* case came along, they just
02:17  3   weren't called that.
02:17  4        The regulations are important because they
02:18  5   set out the method by which you can get the testimony
02:18  6   or get the documents, and they also have another side
02:18  7   to them for the various agencies about how they're
02:18  8   going to go about gathering those documents, producing
02:18  9   them, or producing the witnesses.  There's a few
02:18  10  little hitches along the way that I wanted to talk
02:18  11  with you about today.
02:18  12       First of all, when you make the *Touhy*
02:18  13  request, each agency has regulations.  They're set out
02:18  14  in CFR, and they explain what the agency -- the
02:18  15  factors they're looking at in making the productions
02:18  16  and what you have to do to comply.
02:18  17       So there are time limits.  And while most of
02:18  18  these *Touhy* regulations are similar if not the same,
02:18  19  there are some differences.  So you should always
02:18  20  check the regulation for the particular agency that
02:18  21  you're going to make the request from to see what the
02:18  22  time limitations are and what you need to include.
02:18  23       But basically you need to include, with
02:18  24  respect to the documents or testimony that you're
02:18  25  seeking, why that's relevant to your case, why you

02:18   1   need it, and then you need to set out specifically

02:19   2   what you're going to -- in the case of having

02:19   3   witnesses come, what you're going to be asking them

02:19   4   about.

02:19   5        Because when your request makes its way to

02:19   6   the lawyer with the federal agency, they're going to

02:19   7   be looking at it for a number of things.  They have to

02:19   8   look at those to see if they meet any of the

02:19   9   exemptions.  Some of the exemptions are things like we

02:19   10  don't give out documents that would reveal the

02:19   11  identity of confidential informants, and obviously you

02:19   12  can see why that would be important.  We don't give

02:19   13  out information that reveals sensitive law enforcement

02:19   14  techniques because obviously we don't want people who

02:19   15  are committing crimes to know what officers are

02:19   16  developing and learning or using to try to catch them

02:19   17  while they're doing that.

02:19   18       But there are also other things like we don't

02:19   19  give out classified information, information that

02:19   20  would affect national security, information that

02:19   21  contains Privacy Act information.  So in that case,

02:19   22  you have to either get a waiver from the person who

02:19   23  the information applies to or get a court order before

02:19   24  that information can be released.

02:20   25       So you have to think about the kinds of

02:20  1   documents you're looking for and whether they fall

02:20  2   into any of those categories.

02:20  3        Just because something falls into a category

02:20  4   doesn't mean that you won't necessarily get anything

02:20  5   or any document or any response.  You may get

02:20  6   something that's heavily redacted.

02:20  7        So, again, when you're making your *Touhy*

02:20  8   request, a little more carefully you can think about

02:20  9   where this is coming from and what it is you really

02:20  10  need from those documents.  Maybe you just need the

02:20  11  information about how many people had a particular

02:20  12  illness, but you don't need to know the name of every

02:20  13  specific person who had that.  So those are some

02:20  14  considerations that you can look at when you're making

02:20  15  your *Touhy* request.

02:20  16       One thing that's significant and important is

02:20  17  that *Touhy* requests are not under the same rules as

02:20  18  the Federal Rules of Civil Procedure.  So when you

02:20  19  make a request, if you say things like, I want any and

02:20  20  all documents that refer to mentioned name, whatever,

02:20  21  whatever of this particular person, that's going to be

02:20  22  way too broad in a *Touhy* request.  Because one of the

02:21  23  considerations is whether, in making that request, the

02:21  24  government would have an undue burden or undue cost in

02:21  25  producing it, so you have to try to be reasonable with

02:21   1   your request.

02:21   2          And secondly, if your request was too broad

02:21   3   and you get a huge, big batch of documents back, many

02:21   4   of them are not going to be even what you're looking

02:21   5   for, and then you're going to have to go through all

02:21   6   that and ferret out what's important and what's

02:21   7   helpful.  So it really helps not only on the producing

02:21   8   side but on the receiving side if you can make your

02:21   9   requests more specific.

02:21  10          You also need to keep in mind that the first

02:21  11   request that you make isn't the only one that you can

02:21  12   make.  You can work with the agency counsel to sort of

02:21  13   hone that, to expand it, to add things as you learn

02:21  14   more.  So you don't need to try to take a really broad

02:21  15   brush, you know, the "any and all" and "every single"

02:21  16   and whatever.  As you kind of narrow down through

02:21  17   discovery what you need, you can make subsequent

02:21  18   requests.

02:21  19          You'll also make your request much quicker

02:22  20   the more narrow it is.  Because what the agency has to

02:22  21   do, they have to locate the document, which, in the

02:22  22   case of something like the Air Force or the Army,

02:22  23   that's worldwide.  They have to find what you're

02:22  24   looking for, who has it, how to get it.  And then when

02:22  25   they get it, they have to review it for privileges,

02:22   1    exemptions.  And then they have to figure out how best
02:22   2    to produce it.  That would be producing it to how many
02:22   3    people they're producing it to or producing it in what
02:22   4    form, how they're going to do that.
02:22   5         So those are all considerations as you guys
02:22   6    are developing your discovery plans that you should
02:22   7    think about if your goals are to get what you need and
02:22   8    get it more quickly and make it not an undue burden or
02:22   9    undue cost to the government in doing that.
02:22   10        When you subpoena a witness to testify, there
02:22   11   are special rules that apply to that.  And generally
02:22   12   speaking, the government doesn't really want to have
02:22   13   employees coming out and testifying.  Some of the
02:22   14   thinking is you don't want to appear to be on one side
02:22   15   of litigation when the government is not a party.  And
02:23   16   the other thing is you want to have government
02:23   17   employees working and completing the missions of their
02:23   18   agencies or their military branch, not out testifying
02:23   19   all the time.
02:23   20        But usually the agency will ask, if they can
02:23   21   answer your request, if they can answer it with a
02:23   22   declaration or an affidavit, and sometimes that will
02:23   23   suffice or at least get you started with what you
02:23   24   need.  Other times you may need the witness to
02:23   25   actually come and testify.

02:23 1          When you do that, you need to understand that

02:23 2     federal employees who are called to testify in a case

02:23 3     in which the government is not a party about something

02:23 4     that they know because of their employment and within

02:23 5     the scope of their employment, they don't have

02:23 6     authority to testify about anything.  Even if they get

02:23 7     a subpoena, court order, they don't have authority to

02:23 8     testify about it.

02:23 9          So what happens is, they have to get

02:23 10    authority from the agency, and the agency -- that's

02:23 11    why they need you to tell them 'these are the things I

02:23 12    want to ask about.'  And again, you need to be pretty

02:23 13    specific with what you want, but include what you want

02:24 14    to ask.

02:24 15         I had a request from an attorney in state

02:24 16    court not long ago who was really angry when he found

02:24 17    out that he had to comply with it, and so his request

02:24 18    said something like:  'I want to know everything that

02:24 19    the DEA agent thought about this case, knew about this

02:24 20    case, suspected about this case, or dreamed about this

02:24 21    case.'  And so, of course, we had to respond and say

02:24 22    you're not going to get all that.

02:24 23         So, if you make your request reasonable, the

02:24 24    agency can figure out what it is you need and whether

02:24 25    they can give authority to the witness to testify

02:24  1    about it.

02:24  2          When these witnesses show up at deposition,

02:24  3    they'll have a written authority letter telling them

02:24  4    what they can testify about.  And if they testify

02:24  5    about something that's not within their authority or

02:24  6    they don't have any authority, they just come because

02:24  7    they got a subpoena, they can be criminally prosecuted

02:24  8    for that or fired or both.

02:24  9          So it's not up to the witness whether they

02:24  10   have authority and it's not up to the witness what

02:24  11   authority they have to testify about.

02:25  12         If they come and there's something that

02:25  13   they're asked about that's outside their authority and

02:25  14   they can't answer that, then you can always seek

02:25  15   subsequent authority to see if they can tell you about

02:25  16   it.

02:25  17         There's one issue that I think might come up

02:25  18   in this case and that's involving expert witnesses.

02:25  19   Generally speaking, government employees are not

02:25  20   allowed to testify as experts except in exceptional

02:25  21   circumstances.  So you have to show a really

02:25  22   substantial particular need for it and almost to the

02:25  23   point of showing that you can't get the testimony

02:25  24   anywhere else.

02:25  25         When witnesses come in and testify as

02:25    1    treating physicians, they're not experts.  So when

02:25    2    they come in, they can testify to information that's

02:25    3    in their record, but they can't give expert opinions.

02:25    4    And that's not their decision, not because they

02:25    5    necessarily don't want to or couldn't.  It's because

02:25    6    it's not within their authority to testify about it.

02:25    7    And so, the issue with the experts comes up frequently

02:25    8    in that area.

02:25    9         And then another example I think that shows

02:25   10    it really kind of more clearly is sometimes it's

02:26   11    really hard to tell what's expert testimony and what's

02:26   12    not.

02:26   13         For example, I had a case with the Army Corps

02:26   14    of Engineers.  Wetlands are a really big issue here in

02:26   15    Florida.  And they often go out and observe the area

02:26   16    and determine whether it's a wetlands or was a

02:26   17    wetlands or whatever the issue is.

02:26   18         And an attorney subpoenaed one of the

02:26   19    engineers to come to a -- to testify in a trial down

02:26   20    in St. Joe in a state court case.  And I called the

02:26   21    attorney and said, 'He's not going to be able to come

02:26   22    and do that because you're wanting him to say whether

02:26   23    the land he saw was wetlands and that's an expert

02:26   24    opinion." And he said, 'Oh, well, I don't really need

02:26   25    him to testify about that.  Could he just say when he

02:26   1    went there whether he saw hydrant soil and this and
02:26   2    that, particularly vegetation that grows in wetlands?'
02:26   3    And I said, 'Well, the Court takes the position that
02:26   4    that's expert testimony as well because you and I and
02:26   5    the average person wouldn't know if they saw that, so
02:26   6    no, he won't be permitted to testify about that.'
02:27   7         So when you're making requests for experts or
02:27   8    for witnesses who you don't think are experts, you
02:27   9    need to think in terms of some of those issues,
02:27   10   because those things may come up and make it difficult
02:27   11   for the witness to get authority to appear and
02:27   12   testify.
02:27   13        One other thing is some of these depositions,
02:27   14   particularly ones with physicians, there may be a
02:27   15   third-party attorney there that would be the agency
02:27   16   counsel or the military counsel who may appear with
02:27   17   the witness so that they can help the witness know
02:27   18   when the witness is testifying outside their
02:27   19   authority.  And that makes it a little bit different
02:27   20   than your normal depositions.
02:27   21        But I can't stress enough that it's not
02:27   22   really up to the witness.  And oftentimes attorneys
02:27   23   will get very angry when the witness is there alone
02:27   24   and be very upset if the witness isn't answering or
02:27   25   refusing to answer or isn't sure they can answer.  And

02:27  1   I want to make sure that you understand that's not

02:27  2   their decision.  They're required to do that, and

02:27  3   there are important, significant consequences to them

02:27  4   if they don't abide by that.

02:27  5        So I guess the bottom line that I would point

02:28  6   out is that you make your -- you don't have to wait

02:28  7   until the 14 days before the *Touhy* regulation allows

02:28  8   that.  And in fact, if you wait that long, it may not

02:28  9   be able for the agency to comply within that period of

02:28  10  time.

02:28  11       So the sooner you can make your request and

02:28  12  the more narrow in asking specifically for what you

02:28  13  want that you can make in the request, the more

02:28  14  quickly that you'll get it back.  And you'll also have

02:28  15  an opportunity, if the government is objecting, to

02:28  16  know why that's happening and try to figure out ways

02:28  17  perhaps with agency counsel how you can remedy that or

02:28  18  get around that.  And just know that there's some

02:28  19  circumstances where you're just simply not going to

02:28  20  get it or you're going to get a piece of paper where

02:28  21  it's mostly black where it's been redacted.

02:28  22       But if you look at it like it's not such a

02:28  23  negative thing and you can work with the agency, you

02:28  24  can have a much better, more pleasant experience, you

02:28  25  can get what you want much sooner.  And when you're

02:28   1   working on the case, as you learn specific things, you

02:28   2   should ask for those.  Because it's much easier for

02:29   3   the agency to find it if you're asking for particular

02:29   4   things.  And especially in this case if you know where

02:29   5   something is, where a report is, a person who did

02:29   6   something, if you can give as much specific

02:29   7   information as you can, that will help the agency in

02:29   8   responding to that request.

02:29   9        So now I'm going to let Maj. Evans talk with

02:29   10  you a little bit about what it looks like coming from

02:29   11  the producing attorney's perspective.

02:29   12       **THE COURT:**  Thank you, Ms. Butler.

02:29   13       Maj. Evans, as you come forward, Maj. Evans

02:29   14  is a member of the United States Army, and he has been

02:29   15  designated as the point of contact for this litigation

02:29   16  for the Army.  But he is here also today with the

02:29   17  authorization of the Department of Defense because the

02:29   18  other branches were not able to send an individual

02:29   19  attorney from those branches.  So Maj. Evans is here

02:30   20  sort of on behalf of all of the branches today.

02:30   21       He's going to do his best, based on the

02:30   22  limited information he has about this litigation, to

02:30   23  sort of walk us through how it's best for us to get

02:30   24  started with the document requests.  Because there are

02:30   25  two categories -- this is what Maj. Evans has been

02:30  1   told -- there are two categories of information at
02:30  2   least here initially that you all are going to be
02:30  3   needing from the military, and one pertains to the
02:30  4   servicemen and women's personnel files, training
02:30  5   records, and then the other pertains to the research
02:30  6   and development data on the earplugs at issue.
02:30  7         Thank you, Maj. Evans.
02:30  8         **MAJ. EVANS:**  Thank you, Your Honor.
02:30  9         Good afternoon.  I'm Maj. Collin Evans.  I've
02:30  10  been a judge advocate for about 11 years, and so,
02:30  11  unfortunately for me, I do a lot of *Touhy* practice.
02:30  12  And that can be an interesting area to practice and it
02:31  13  can involve reviewing a lot of documents.
02:31  14        So what I want to walk you through today is
02:31  15  how this process looks from inside the DoD and how we
02:31  16  can make it easier on your end to facilitate getting
02:31  17  you the information that we are trying to get or that
02:31  18  you are trying to get.
02:31  19        The main thing I want to say is we're
02:31  20  impartial.  Most of you are used to dealing with
02:31  21  adversarial processes on a day-to-day basis when
02:31  22  you're dealing with opposing counsel.  But we're not
02:31  23  your opposing counsel.  Our job is just to follow the
02:31  24  regulations that we've been given.  And I'll list out
02:31  25  each branch's regulations at the end of this for you.

02:31  1          Our job is just to receive the requests and
02:31  2  process them in a way that is in line with the
02:31  3  regulations and get you the information that we can
02:31  4  give you.  And a lot of times that can be confusing
02:31  5  because I think most of you are used to writing very
02:31  6  broad discovery requests, at least in my experience
02:31  7  from receiving *Touhy* requests.  And what you're going
02:31  8  to get when you send that to me is a phone call back
02:31  9  trying to narrow that down to specifically what you
02:31  10 want.
02:32  11         So if you can take some time early -- and you
02:32  12 know your cases better than I will.  So if you can
02:32  13 take some time early and list out specifically things
02:32  14 that you know you specifically want, that would be a
02:32  15 huge help.  And the reason it's in your best interest
02:32  16 is it will be a lot faster for you.
02:32  17         Because I think the other thing a lot of
02:32  18 people think is, if I, Maj. Evans, called a private in
02:32  19 the Army and tell them to get me something, that
02:32  20 private is going to salute and move out swiftly and
02:32  21 get that.
02:32  22         But the problem is, if I, Maj. Evans, from
02:32  23 the Office of the Judge Advocate General call a
02:32  24 private in a hospital in Korea, that private has no
02:32  25 idea who I am and is probably going to hang up the

02:32  1    phone and forget about me in hopes that I will forget

02:32  2    them and they won't have to do anything.

02:32  3              So, if you know specifically what you want,

02:32  4    it makes it easy because I can call that private's

02:32  5    boss rather than just cold calling that private, and

02:32  6    we can move the system a little bit faster.

02:32  7              One thing I do want to say is how this

02:32  8    process works.  So the regulations, when y'all start

02:33  9    to read them, you'll see the regulations tell you that

02:33  10   the servicing staff judge advocate for the

02:33  11   installation or the respective litigation divisions

02:33  12   for the different departments can approve or deny a

02:33  13   request.

02:33  14             Right now we're processing through -- because

02:33  15   I will tell you two weeks ago my boss walked into my

02:33  16   office and said, "Hey, I have a really exciting

02:33  17   opportunity for you" -- and I had been seeing about

02:33  18   this in my social media, so your advertisements are

02:33  19   out there and they work -- but he said, "I have an

02:33  20   exciting opportunity to excel for you," which I don't

02:33  21   -- we'll find out at the end of the year if it's true.

02:33  22             But basically when those requests come in, it

02:33  23   is probably going to come to the litigation division

02:33  24   because there's going to be a lot of information.  So

02:33  25   don't hold me to that yet because I've only had this

02:33    1   for two weeks.  And the DoD, who is my higher boss, is
02:33    2   working that out.  But it's likely going to be the DoD
02:33    3   is going to take the requests and then they're going
02:34    4   to filter them out to the rest of us.
02:34    5        What I'm going to do is, after that decision
02:34    6   gets made, DoD and myself and the other
02:34    7   representatives at the branch will probably talk with
02:34    8   Ms. Butler and we'll be able to push that information
02:34    9   out.  And that should be coming very, very shortly.
02:34   10   It's not going to take a long time for that decision
02:34   11   to be made, it's just not for me to make that
02:34   12   decision.
02:34   13        What that means is the DoD and the respective
02:34   14   litigation branchs are responsible for making a
02:34   15   determination as to whether or not your requests are
02:34   16   going to be approved.
02:34   17        Most of the time what you're requesting is
02:34   18   particular information about either a servicemember or
02:34   19   a particular test that was done or things of that
02:34   20   nature.  Most of those will be approved because that's
02:34   21   why you're requesting them.  And it's not like we're
02:34   22   dealing with national security or any of the
02:34   23   exemptions that Ms. Butler talked about.
02:34   24        But what I want you to understand is the
02:34   25   approval doesn't mean you're going to get it very

02:34  1   quickly.  Because if you've never been in the

02:34  2   military, it may be easy to think that all the

02:35  3   information is stored on one large server just like a

02:35  4   company, and you can made a request and the IT

02:35  5   department for the corporate head does a search, and

02:35  6   all of a sudden the next thing you know you have all

02:35  7   the data or all the emails, things like that.

02:35  8        That's not how the DoD works.  There are

02:35  9   going to be servers in a variety of locations, and

02:35  10  you're going to have to figure out -- by "you" I mean

02:35  11  me -- we're going to have to figure out who is the

02:35  12  right wicket to go through to acquire that

02:35  13  information.

02:35  14       And it may be that I have to go to the test

02:35  15  and research command versus going to the 82nd Airborne

02:35  16  Division or, you know, some sort of flight wing to

02:35  17  find that information.  So you need to -- this kind of

02:35  18  goes back to why we need specifics.

02:35  19       If you know that a certain test was done on a

02:35  20  certain -- you know a report was produced on a certain

02:35  21  date by a certain type of command or unit, let us know

02:35  22  that in your request.  Because what that does is that

02:35  23  cuts down the time for me or whoever else has to find

02:35  24  it from reaching out to 20 different people to narrow

02:36  25  down that type of information.

02:36    1          The next thing I want to talk about is

02:36    2    servicemembers' particular records.  So I did this

02:36    3    before I came down here to make sure I wasn't lying to

02:36    4    you.  I went on TRICARE online because I'm an active

02:36    5    duty servicemember and I looked to make sure I can

02:36    6    access all my records.  I can.  And so that means all

02:36    7    the clients can as well if they're on active duty.

02:36    8    We'll talk about people who are off active duty in a

02:36    9    second.

02:36    10          The reason I'm bringing that up is, if you

02:36    11    request from me all of their medical records -- just

02:36    12    to give you an example, I'm a fairly healthy Army

02:36    13    officer, I've not had a lot of medical issues, and I

02:36    14    have over 600 pages of medical records.  So I'm going

02:36    15    to send you, if you ask for that and we either have a

02:36    16    Privacy Act waiver or court order, I'm going to send

02:36    17    you 600-plus pages for each individual servicemember.

02:36    18    Now, you can see how that's going to get out of

02:36    19    control very quickly for all of you.

02:36    20          So, if you want just certain types of test

02:36    21    data -- I mean, I have my hearing tested every year

02:37    22    and I have bloodwork done every year.  If you want

02:37    23    specific types of data from those reports, either a)

02:37    24    have the servicemembers pull them themselves and

02:37    25    provide them to you -- that would be my

02:37  1   recommendation; or b) when we start to do the search

02:37  2   and deploy that information out, let us know that so

02:37  3   that we don't give you 600, 1,000, 2,000 pages of

02:37  4   medical data that you don't need nor do you really

02:37  5   want because it's not helpful for you.

02:37  6        If the servicemember is out -- I'm going to

02:37  7   tell you this whether you use it or not, I hope you do

02:37  8   -- if you go -- so the National Archives is who

02:37  9   controls records for servicemembers after they leave

02:37  10  the service, whether that be from retirement or

02:37  11  whether that be they left because their time in

02:37  12  service was up.

02:37  13       Www.vetrecs.archives.gov/veteransrequest/home

02:37  14  -- if you just Google "veteran records National

02:37  15  Archives" it will be the first thing that pops up.

02:38  16       If you have the person submit a request that

02:38  17  way, the National Archives advertises that 90 percent

02:38  18  of those responses are in ten days to that

02:38  19  servicemember.  That servicemember will get their

02:38  20  records by a web link that they can download in ten

02:38  21  days.  I think that 10 percent is probably people who

02:38  22  were out of the service for a long period of time and

02:38  23  so they may not have digitized those records yet and

02:38  24  they have to actually go into the archives to find

02:38  25  them.

02:38  1          The reason I bring this up is it may be

02:38  2   faster to do it that way for those records because you

02:38  3   can have each individual person pull them and provide

02:38  4   them to your staffs and you can do it that way versus

02:38  5   an IT person from the DoD being designated to pull

02:38  6   thousands of people's records.

02:38  7          Because the way the system works from my

02:38  8   understanding from when I've talked to people who

02:38  9   manage it, they can't do just 'here is a spreadsheet

02:38  10  of the names, the Social Security numbers, the dates

02:38  11  of birth,' and feed it into a system and pull it out.

02:39  12          One person is going to have to individually

02:39  13  pull out each one of those records -- or it won't be

02:39  14  one person, it'd probably be multiple people, but it's

02:39  15  going to take some time.  So I'd just ask you to

02:39  16  consider that when you're considering it.

02:39  17          We don't have a problem pulling that

02:39  18  information, but it may take more time than if you

02:39  19  just had your clients pull that information and

02:39  20  provide it.  I don't know.  I've never been in private

02:39  21  practice, so you guys can tell me if I'm a little off

02:39  22  base there, but I'm trying to save a little bit of

02:39  23  time there for everybody.

02:39  24          **THE COURT:**  Maj. Evans, I have a question.

02:39  25  What is included in that information?

| | |
|---|---|
| 02:39 | 1 |

**MAJ. EVANS:**  In the National Archives?

**THE COURT:**  Well, in the personnel -- like you were referring to medical records.  Is there more than that?

**MAJ. EVANS:**  Yes, Your Honor.

**THE COURT:**  What all would we expect to see from somebody's file?

**MAJ. EVANS:**  So my understanding -- I've never pulled one from the National Archives, but from what I've read, what would be in there is what's called your official military personnel file.  So that's any sort of awards you've ever received, any sort of what's called our servicemember group life insurance plans like who we made designees, all this administrative data from our time in service.  And then additionally it would be your medical records as well, so it would be your entire medical records for your time in service that they have access to.

**THE COURT:**  Duty stations as well?

**MAJ. EVANS:**  Yes, Your Honor.

**THE COURT:**  And training records?

**MAJ. EVANS:**  Yes, Your Honor.  And I'm going to talk very briefly about kind of how our -- how you can easily tell where we've been and when, because there's a one-page document that does deal with that.

02:40    1          **THE COURT:**  Thank you.

02:40    2          **MAJ. EVANS:**  Yes, Your Honor.

02:40    3          So, yeah.  So, if you -- the way our data

02:40    4    works for a servicemember is just, if you take me,

02:40    5    Maj. Evans, I have what's called an officer record

02:40    6    brief.  Each branch has it's own type of -- they'll

02:40    7    call it an different acronym.  For the Army it's an

02:40    8    officer record brief.

02:40    9          But there will be a one-page brief that has

02:40   10    my picture on it and then it has all of the places

02:41   11    I've ever served, when I've been promoted, all the

02:41   12    different ranks I've served at, my family data, so how

02:41   13    many kids I have, if I have a spouse, things of that

02:41   14    nature.  And then anything else that's relevant such

02:41   15    as skill identifiers, like if you went to airborne

02:41   16    school or if you were a jump master or things of that

02:41   17    nature.  That's all on a one-page document.

02:41   18          The big thing is it lays out the specific

02:41   19    dates that you were in a certain assignment.  So it

02:41   20    will say, you know, Maj. Collin Evans, from June of

02:41   21    2014 to July of 2018, Army Litigation Division, Fort

02:41   22    Belvoir, Virginia.  So it will lay out the specific

02:41   23    times and dates that I was -- or whoever was where.

02:41   24          That data is important to you because it will

02:41   25    tell you where they were and when and for how long and

02:41   1    also when they left the service.

02:41   2         Something that is important -- and this is

02:41   3    just I'm taking off my DoD hat and I'm just jumping

02:41   4    into the Army hat here because I can't speak for the

02:41   5    Air Force or the Navy on how they manage records.

02:42   6    When I move, because I move every two years -- it's an

02:42   7    exciting life sometimes -- if you take that -- when I

02:42   8    move, I'm given a hard copy of my medical records.

02:42   9    They're all digitized so I don't know why they give me

02:42   10   this hard copy because it just seems rife for me

02:42   11   losing it.  But they give me a hard copy of my medical

02:42   12   records when I leave, and then I take them, and then

02:42   13   when I in-process into a new location I give them

02:42   14   those medical records.  But still just remember

02:42   15   they're all digitized now, for the most part, and so

02:42   16   you should have everything there.

02:42   17        But why it's important is, if you're dealing

02:42   18   with an active duty servicemember right now, their

02:42   19   records, instead of -- some of their records, if they

02:42   20   didn't make it into the digital file, will be at the

02:42   21   location where they're at.  They're not going to just

02:42   22   be at some large facility warehoused.  You would have

02:42   23   to -- I would have to request that medical record from

02:42   24   the Fort Bragg Community Hospital where those records

02:42   25   are stored.

02:42  1          So it can be important with some of the

02:43  2     individuals involved in this because you'd be dealing

02:43  3     with the local installation.  And again, that just

02:43  4     adds time.  But just if we go ahead and go down and

02:43  5     reach down to them, we'll get them, and it will just

02:43  6     take a little bit of time to make that additional

02:43  7     request.

02:43  8          If you are going to request from us the

02:43  9     individual records for each soldier, the more

02:43  10    information you provide about them, the better.

02:43  11    Because I don't think I need to explain this, but how

02:43  12    many John Smiths or Megan Joneses were in the

02:43  13    military?

02:43  14         That name alone isn't going to get me

02:43  15    anywhere.  So I need you to provide at least the name,

02:43  16    the social, the date of birth, the branch of service,

02:43  17    and then, if you can, their time in service.  Because

02:43  18    that will help me or whoever is reviewing for these

02:43  19    records ensure that we have identified the right

02:43  20    person so we're not giving you the records for

02:44  21    somebody else.

02:44  22         That's important for two reasons.  One, you

02:44  23    want the right records; two, I don't want to violate

02:44  24    the Privacy Act and give you the wrong records of

02:44  25    somebody -- or HIPAA -- for someone who is not there.

02:44  1          To the extent possible, I need you to limit

02:44  2  the number of requests you make.  That's not the

02:44  3  number of requests that are inside of a request.

02:44  4  That's just how many times you ask me for something.

02:44  5  So, to the extent you can avoid asking me for one

02:44  6  thing and then a week later asking me for another

02:44  7  thing versus you lump together 14 requests into one

02:44  8  document and then I can more easily keep track of

02:44  9  those items.  And also, when you call me, it's easier

02:44 10  for me to understand what request you're talking

02:44 11  about.

02:44 12          Now, I understand that you're going to think

02:44 13  of things after you make one request and you're going

02:44 14  to have to submit another request.  But just to the

02:44 15  extent possible, that's just a favor I'm asking,

02:44 16  because it will make everybody's life a little bit

02:44 17  easier.

02:44 18          Additionally, if you call and we talk --

02:45 19  well, there's two points I want to make about calling.

02:45 20  One, acronyms can get confusing in the Army.  If I say

02:45 21  ORB, it doesn't really make sense.  I may talk in

02:45 22  acronyms to you on the phone, and I apologize.  Just

02:45 23  ask me to say what I'm trying to say.

02:45 24          But you can call and say, 'I'm dealing with

02:45 25  this acronym and I don't know what it is, how can I

02:45  1    best make this request?'

02:45  2          We're impartial, so we can facilitate helping

02:45  3    you -- helping all the parties make a request that's

02:45  4    easy to identify versus you just writing some sort of

02:45  5    vague thing that I then have to call you about anyway.

02:45  6    So just keep that in mind.  I probably will regret

02:45  7    that because my phone will probably ring off the hook

02:45  8    but -- no.  We're here to help, so we can definitely

02:45  9    do that for you.

02:45  10         The next thing is, if you call me, just

02:45  11   because we talked about it on the phone, you have to

02:45  12   make a request in writing.  *Touhy* requires that, so

02:45  13   you have to follow that up with a written request.

02:45  14   Otherwise, there is nothing I can do.  And I am not

02:45  15   going to call you back to say, 'Hey, are you ever

02:45  16   going to submit a *Touhy* request?'  It's your job, so

02:46  17   just please make sure you remember that.

02:46  18         So the next thing is just witnesses.  Most of

02:46  19   you are probably not used to dealing with a

02:46  20   third-party attorney in a deposition, and it can get a

02:46  21   little bit confusing, so I just want to touch on that

02:46  22   briefly.

02:46  23         First, you don't need to send a subpoena.

02:46  24   That subpoena signed by an attorney is not from a

02:46  25   court of competent jurisdiction from DOJ's

02:46  1    perspective.  So you need to send me a written request
02:46  2    for a witness, and then we make a determination if
02:46  3    they can be approved.  If they're approved, we send
02:46  4    you a response letter that lays out what areas they
02:46  5    can talk about.  Your request needs to ask for those
02:46  6    areas and then we will make a determination whether
02:46  7    those areas are approved.  The reason we send you that
02:46  8    letter back is so that it's clear for all parties
02:46  9    where we are and what we're doing.
02:46  10          And the third-party attorney who -- for the
02:46  11   Army it will probably be me most of the time, unless
02:46  12   my schedule conflicts, and we don't want to hold up
02:47  13   progress just because one attorney isn't there, so it
02:47  14   may be another attorney.  But what we will do there --
02:47  15   we don't object to form, we don't object to
02:47  16   foundation, we don't object to anything like that.  We
02:47  17   don't even object.
02:47  18          We just advise -- and I shouldn't say
02:47  19   "advise" because "advise" is the wrong word.  We
02:47  20   instruct the witness not to answer a question if it's
02:47  21   outside of the scope, and that's the end of it in the
02:47  22   sense that we cannot allow them to answer what's
02:47  23   outside of the scope.
02:47  24          So if you ask for an opinion, we would not
02:47  25   allow them to answer that question because they're not

02:47   1    allowed to give their opinion on behalf of the

02:47   2    government.  A lot of people get a little confused by

02:47   3    that, but we're not there to object, we're just there

02:47   4    to instruct.

02:47   5         The other thing is, send me your documents,

02:47   6    if you have exhibits, beforehand.  It will go much

02:47   7    faster.  Because if I can review what you're using as

02:47   8    an exhibit or as exhibits in your deposition, I can

02:47   9    bring my own binder so you don't have to make one for

02:47  10    me, and I can be prepared and I can understand where

02:47  11    you're going with things so that I don't instruct the

02:47  12    witness not to answer but really you weren't even

02:47  13    going in that direction and then we're kind of sitting

02:48  14    there loggerheads over something that I just didn't

02:48  15    understand.  So just send your exhibits to the

02:48  16    attorney beforehand and it will make everyone's life a

02:48  17    lot easier.

02:48  18         We -- the witness cannot be a government

02:48  19    expense.  So typically what happens is the attorneys

02:48  20    come to the witness wherever they may be unless you

02:48  21    want to pay for the witness to come to you.  That

02:48  22    doesn't count the attorney that's coming on behalf of

02:48  23    the government.  My office pays for me, the Air Force

02:48  24    will pay for the attorneys to be there.  It's just the

02:48  25    witness themselves.  Everyone just typically comes to

02:48  1    where the witness is, I know you're probably used to

02:48  2    that.

02:48  3          And I do want to harp on something that Leah

02:48  4    talked about.  This applies to former and present

02:48  5    government employees.  So just because someone is

02:48  6    retired or they have left federal service and now they

02:48  7    work for company X, that doesn't matter because

02:48  8    they're talking about information that they gathered

02:49  9    while they were working officially for the government.

02:49  10         Please keep that in mind and don't get them

02:49  11   in trouble, don't make me call you the night before a

02:49  12   deposition because I just found out about it and tell

02:49  13   you that this deposition isn't going to happen and

02:49  14   that we need to reschedule it because you haven't

02:49  15   submitted a *Touhy* request.  It's really just to avoid

02:49  16   getting the witness in trouble.  You're not doing them

02:49  17   any sort of service by kind of trying to skirt that

02:49  18   rule.  Nine times out of ten, we're going to approve

02:49  19   the witness anyway, so you're not really trying to --

02:49  20   you're not getting anywhere.

02:49  21         So the regulations.  I do want to hit this

02:49  22   just to make it easy for you so you don't have to

02:49  23   search for these, so you may want to write these down.

02:49  24   The main DoD regulation is Department of Defense

02:49  25   Directive 5405.2, and that's from November 21st, 2003.

02:49　1　The Army regulation -- and I'm embarrassed to say this

02:49　2　-- is Army Regulation 27-40 but it's from 1994.  The

02:50　3　Air Force regulation is Air Force Instruction 51-301,

02:50　4　and that's from October 2nd, 2018.  And then the Navy

02:50　5　one is SECNAV I. 5820.8A, and that's from January

02:50　6　10th, 2005.  I say the dates because it's very easy to

02:50　7　Google these and then you get the wrong date because

02:50　8　some website has published it and that's the first one

02:50　9　that pops up in Google.  So just make sure you're

02:50　10　using the most recent one.

02:50　11　　　　　With that, there isn't anything else that I

02:50　12　think I need to say off the bat.  Just keep in mind

02:50　13　it's going to be a little bit of a learning curve for

02:50　14　those who have never been in the military to

02:50　15　understand how the records are kept.  But once you get

02:50　16　it, it's really just a one-page document, and then the

02:50　17　health records are pretty standard, so...

02:50　18　　　　　THE COURT:  I have a quick question.  What

02:51　19　does the Court do, in your experience, when the Court

02:51　20　decides that the information is not coming quickly

02:51　21　enough?

02:51　22　　　　　MAJ. EVANS:  I would say in that situation

02:51　23　the Court would want to talk with DOJ, because DOJ

02:51　24　represents the executive branch in litigation or in

02:51　25　any matters related to the Court, and then DOJ can

02:51  1    help us do that.  If you issued a court order,

02:51  2    obviously, Your Honor, we would abide by the court

02:51  3    order.

02:51  4         **THE COURT:**  And I'm not anticipating that.

02:51  5    Just I've had this in other litigation not of this

02:51  6    magnitude, and what I did in one case in particular

02:51  7    was I found a point of contact at that branch.  I

02:51  8    don't think I went to DOJ.  But it ultimately worked

02:51  9    out.

02:52  10        So, anyway, thank you very much for your

02:52  11   presentation.

02:52  12        I believe, Mr. Rasmussen, are you going to --

02:52  13   and then we'll allow for some questions in just a

02:52  14   moment.

02:52  15        Mr. Rasmussen, do you wish to speak?

02:52  16        **MR. RASMUSSEN:**  Yes, Your Honor.

02:52  17        Just to make it clear to everyone here,

02:52  18   though, whatever I say is absolutely nothing -- my

02:52  19   presentation is completely separate, distinct, and

02:52  20   apart from both the Department of Justice's and from

02:52  21   the Army's and the Department of Defense's.

02:52  22        **THE COURT:**  Thank you.

02:52  23        **MR. RASMUSSEN:**  I think Ms. Butler would have

02:52  24   strong words if I didn't say that.

02:52  25        And then, Your Honor, you asked what was

02:52   1   included in the official military personnel file.  It

02:52   2   has dates and locations of all your duty stations,

02:52   3   service and combat zones, list of all your job titles,

02:52   4   which is like your -- *(inaudible)* -- all of your

02:52   5   medical records, auditory reports, physical

02:53   6   examinations, and then your separation health

02:53   7   assessment.  All of those records are contained in

02:53   8   your official personnel file.  And that can be

02:53   9   downloaded even for veterans who are no longer on

02:53   10   active duty.

02:53   11        Thanks, guys.  Just to echo really what Maj.

02:53   12   Evans said, Ms. Drey is here, and I'm just going to

02:53   13   talk about some of my experience, not necessarily as a

02:53   14   JAG officer, but really more recently in the opioid

02:53   15   litigation and then also in Abilify.

02:53   16        And so with Abilify, that litigation was

02:53   17   moving very, very swiftly.  And I believe Ms. Drey got

02:53   18   a call like, I don't know, a Sunday evening one night,

02:53   19   and she was informed that there was a deposition the

02:53   20   following day.  And it just created I guess some -- it

02:53   21   was just a little more disjointed and not quite as

02:53   22   efficient as it could have been.  And so that's why I

02:53   23   think that talking on the front end and having this

02:54   24   conversation now so that we can very quickly identify

02:54   25   the most important information that we need so that

02:54   1    those documents can be expedited and then we can begin
02:54   2    to schedule depositions.  And then, to the extent that
02:54   3    these depositions aren't all going to occur here
02:54   4    necessarily in the Northern District of Florida and we
02:54   5    need to get this letter or whatever it be the
02:54   6    understanding regarding the scope is, we can get that
02:54   7    information out to those lawyers that are going to
02:54   8    actually participate in the deposition.  And that will
02:54   9    give us more consistency and continuity and I think
02:54   10   will move all of those depositions along much, much
02:54   11   swifter.
02:54   12        And then the other thing I was going to say
02:54   13   is, the surest way to protract this litigation
02:54   14   unnecessarily and do all of our clients a disservice
02:54   15   would be for us to have some sort of unnecessary
02:54   16   motion practice where we're sending these overbroad
02:55   17   requests that require the government in each of the
02:55   18   respective service branch to turn over heaven and
02:55   19   earth.
02:55   20        And we really don't need to have a request
02:55   21   that's nearly so broad when in reality we know that
02:55   22   the information or documents we want are primarily
02:55   23   located, you know, wherever in whatever file they're
02:55   24   located in at whichever branch they're located in.
02:55   25   Otherwise, we end up with a situation very similar to

02:55  1    the situation with the opioid litigation where, you

02:55  2    know, there's several iterations of *Touhy* requests

02:55  3    that ultimately get some document production, and then

02:55  4    after the production is made there's a database that

02:55  5    needs to be produced, and then there's objections, and

02:55  6    then the judge allows plaintiffs to issue a subpoena

02:55  7    and it's still objected to.

02:55  8            So, again, all that does is delay the

02:55  9    discovery and delay us being able to move this

02:56  10   litigation forward.

02:56  11           So I guess that's really all I had to say,

02:56  12   Your Honor.

02:56  13           **THE COURT:**  Thank you.  That was certainly a

02:56  14   message, overly broad requests are going to lead to

02:56  15   delay.

02:56  16           Maj. Evans, I'm hoping that down the road

02:56  17   you'll be willing to work with our leadership team in

02:56  18   helping us draft a request that you'll be able to

02:56  19   respond to, and to have you at the table in that

02:56  20   regard would be extremely helpful.

02:56  21           **MAJ. EVANS:**  Yes, Your Honor, we would be.

02:56  22           **THE COURT:**  So that we give you the

02:56  23   information you need.

02:56  24           All right.  I know Ms. Butler and Maj. Evans

02:56  25   were open to questions, if anyone had questions that

02:56   1   they wanted to ask.

02:56   2           Yes, sir?

02:56   3           **MR. TRACEY:**  My name is Sean Tracey.

02:56   4           You told me -- or you talked about opinions.

02:56   5   And one thing that I wonder is, most of our clients --

02:57   6   all of my clients on exit from the military have

02:57   7   audiological exams.  And sometimes the opinion of

02:57   8   whether or not the serviceman or woman had a

02:57   9   noise-induced hearing loss is addressed in the exam

02:57   10  and sometimes it's not.

02:57   11          So in this kind of case, that's one of the

02:57   12  seminal issues, that is, will the audiologist be able

02:57   13  to testify about his opinion that he's already given

02:57   14  or conclusions he's already reached based on the

02:57   15  audiological exam?

02:57   16          **MAJ. EVANS:**  That, I don't know.  I can't

02:57   17  commit to that one way or another.

02:57   18          **MR. TRACEY:**  Are we on the record?

02:57   19          **MAJ. EVANS:**  It's being recorded so -- I'm

02:57   20  not sure.  I don't have an answer for that right now.

02:58   21          **MR. TRACEY:**  Okay.  And then one other

02:58   22  question.  I sent out FOIA requests early on before I

02:58   23  had heard of *Touhy*, before there was any litigation,

02:58   24  and to my shock and delight the Department of Defense

02:58   25  produced a lot of documents.  And I did learn about

02:58  1   "any and all" -- they'd call me and say, 'You want me

02:58  2   to cross out "any and all," don't you, Mr. Tracey?'

02:58  3   And I'd say, 'Yes.'

02:58  4         One thing they did, though, is they -- in the

02:58  5   criminal file -- the criminal investigation that I

02:58  6   requested, they produced a ton of documents and today

02:58  7   they produced some more, but they're whiting out

02:58  8   everybody's names, all the witnesses on the

02:58  9   statements.  How do we get that?

02:58  10        **MAJ. EVANS:**  Well, FOIA -- (b)(6) under FOIA

02:58  11  prevents us from impeding on someone's privacy, so we

02:58  12  don't give out the names of the individuals.  That's

02:58  13  the reality of how FOIA works.

02:59  14        So how would you get the names of the agents?

02:59  15        **MR. TRACEY:**  The witnesses.  So to be clear,

02:59  16  the investigator for the Department of the Army was

02:59  17  taking witness statements of Department of Defense

02:59  18  employees.  And so they said some things that are

02:59  19  important to us.  We'd like to go take their

02:59  20  depositions.  In order to do that, we have to have

02:59  21  their identity.

02:59  22        **MAJ. EVANS:**  So, to take you out of the FOIA

02:59  23  process, you would want to go into the *Touhy* process,

02:59  24  and then we would have to consider whether or not we

02:59  25  were going to release it.  Because FOIA rules FOIA

02:59  1  requests.  *Touhy* is a whole separate issue.  So, if

02:59  2  you submit as *Touhy* request for the name, what I would

02:59  3  recommend is you attach the specific statement so that

02:59  4  it's easy to cross-reference who you're requesting,

02:59  5  and then the deciding official would make a

02:59  6  determination whether to release that.

02:59  7       That would be the only thing I can recommend.

03:00  8  I can't say whether it would be released or not

03:00  9  because I don't know what's in the statements and I'm

03:00  10  not the deciding official.  But that would be the way

03:00  11  to navigate that, my recommendation.

03:00  12       **MR. TRACEY:**  Is there an appeals process?

03:00  13       **MAJ. EVANS:**  There is no appeals process to

03:00  14  *Touhy*.  There is an appeals process to FOIA.  So you

03:00  15  could, depending on who you submitted the FOIA request

03:00  16  to, you could appeal it to their office of general

03:00  17  counsel to make a decision on whether or not they

03:00  18  should release it.

03:00  19       I'm not sure how familiar you are with FOIA,

03:00  20  but FOIA is a discretionary release standard.  And so,

03:00  21  I mean, anything can technically be released under the

03:00  22  discretion of the officials who are the initial denial

03:00  23  authority.  So you could submit a FOIA appeal.  But

03:00  24  *Touhy*, there is no appeals process, no.

03:00  25       **MR. TRACEY:**  Thanks, Major.

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
| 03:00   | 1  | **MS. DREY:** One or two of the things you                   |
| 03:00   | 2  | mentioned, you asked about the expert.  I can tell you        |
| 03:00   | 3  | in Abilify we took the position that, if there was an         |
| 03:00   | 4  | expert opinion contained within the document, the            |
| 03:01   | 5  | physician could read the statement and not answer any        |
| 03:01   | 6  | question beyond that, and that's not opining medical         |
| 03:01   | 7  | opinion, what's based on medical evidence and training       |
| 03:01   | 8  | -- *(inaudible).*  It was the government's position that      |
| 03:01   | 9  | the witness was limited to reading what was in that          |
| 03:01   | 10 | report, that anything beyond that crossed the line of        |
| 03:01   | 11 | an expert's testimony.  So hopefully that's --               |
| 03:01   | 12 | *(inaudible)* --                                             |
| 03:01   | 13 | And I will tell you, where FOIA and *Touhy* are             |
| 03:01   | 14 | concerned, everybody with the government just wants to       |
| 03:01   | 15 | work with you or me.  And so your question is a very         |
| 03:01   | 16 | common question.  But I sent a FOIA request and I got        |
| 03:01   | 17 | a bunch of stuff redacted -- *(inaudible)* -- under          |
| 03:01   | 18 | *Touhy*.  But they are two entirely distinct statutory       |
| 03:01   | 19 | regimes governed by two entirely different sets of           |
| 03:01   | 20 | rules.                                                        |
| 03:01   | 21 | So I would encourage you from this point               |
| 03:01   | 22 | forward, once they finish the *Touhy*, you're better off     |
| 03:01   | 23 | trafficking under a consistent *Touhy*.  It would be         |
| 03:01   | 24 | pretty much everybody's opinion about that, once you         |
| 03:01   | 25 | get it in a format that, you know, everybody agrees          |

03:02    1    to.

03:02    2              **MR. TRACEY:**  Thank you.

03:02    3              **THE COURT:**  It would seem that it would

03:02    4    behoove everyone to begin to think about those items

03:02    5    that you've requested that you did not receive from

03:02    6    the military presuit and then work with leadership in

03:02    7    collecting that, and then we can work with Maj. Evans

03:02    8    on a proper *Touhy* request that hopefully would result

03:02    9    in the release of that information.

03:02   10              **UNIDENTIFIED PERSON:**  How does the government

03:02   11    view contractors who were once federal government

03:02   12    employees serving in that capacity and now are working

03:02   13    as contractors almost performing the same work?

03:02   14              **MAJ. EVANS:**  So are you asking --

03:02   15              **UNIDENTIFIED PERSON:**  I'm asking basically if

03:02   16    those people can actually serve as experts because

03:02   17    they're now no longer federal employees, they're

03:03   18    contractors.

03:03   19              **MAJ. EVANS:**  If you have them review -- if

03:03   20    you hired them as an expert and they're reviewing

03:03   21    documents for you and they're your retained expert,

03:03   22    that's not information that they've obtained as a

03:03   23    result of their federal service.

03:03   24              If, however, you hired them because you know

03:03   25    that they did report X and everything they're advising

03:03     1    you on is from report X, all that information is

03:03     2    obtained as a result of their federal service, so that

03:03     3    would require a *Touhy* request.

03:03     4         **UNIDENTIFIED PERSON:** Okay. And so to

03:03     5    clarify, as long as they're not testifying regarding a

03:03     6    document that they prepared basically or were involved

03:03     7    in; is that correct?

03:03     8         **MAJ. EVANS:** As long as they're not

03:03     9    testifying about information they gathered while they

03:03    10    were in federal service. So if it's something that

03:03    11    they -- if it's something you're asking them a

03:03    12    question "When you were a federal employee you did

03:03    13    this study on hearing tests" and that's what you want

03:03    14    -- all that information you're obtaining from them is

03:03    15    a result of that so you're just trying to kind of

03:04    16    backdoor around the federal rule, the rules that

03:04    17    govern this, then, no, you couldn't ask them that.

03:04    18    That's part of the *Touhy* process.

03:04    19         If it's just you hired them, though, because

03:04    20    they're an expert in the field of audiology -- they're

03:04    21    an expert in the field of audiology, so just because

03:04    22    they attained part of that expertise while they were

03:04    23    working in federal service, that doesn't cover it.

03:04    24    It's a fine line, but it's not that fine.

03:04    25         **THE COURT:** Major, did you give any -- did

03:04  1   you have time -- I know you didn't have much time --

03:04  2   thought to the other categories of document requests

03:04  3   that will be coming from this litigation in terms of

03:04  4   procurement records as well as the research and

03:04  5   development and how we -- and you can speak with

03:04  6   leadership more about this, but have you had a chance

03:04  7   to --

03:04  8          MAJ. EVANS:  A little bit, Your Honor,

03:04  9   because I had heard about the categories over the

03:04  10  weekend.

03:04  11         THE COURT:  I wasn't kidding when I said you

03:04  12  hadn't had a lot of time.

03:05  13         MAJ. EVANS:  I know, Your Honor.  There are

03:05  14  prohibitions towards us giving out information that's

03:05  15  a part of the acquisitions process.  I am not an

03:05  16  expert in that nor do I know what really happened in

03:05  17  this acquisition because I haven't had a chance to

03:05  18  review any of the documents.  So there could be some

03:05  19  prohibitions that prevent us from releasing that

03:05  20  information, say source selection data or something

03:05  21  like that.

03:05  22        A lot of the research testing, though, I can

03:05  23  say from my personal experience from dealing with

03:05  24  other cases, we've released -- when we have been

03:05  25  testing a product -- for example, I had a case related

03:05  1    to a vehicle of whether it could be dropped out of an
03:05  2    aircraft and still perform, and they did all these
03:05  3    tests on it, and as part of the case they wanted a
03:05  4    copy of these tests, and we've released those because
03:05  5    that's not source selection data.  That's the Army
03:05  6    testing a piece of equipment.  So we can release that
03:05  7    because it's our tests.
03:05  8            THE COURT:  In terms of discovering whether
03:06  9    these specific earplugs were at a specific base in a
03:06  10   specific unit or platoon as standard issue to a
03:06  11   soldier, is that information obtainable?
03:06  12           MAJ. EVANS:  I don't know offhand, Your
03:06  13   Honor, and I don't want to speak out of turn.  I can
03:06  14   say that these earplugs, from my personal experience,
03:06  15   I have seen them.  And so they were -- they filtered
03:06  16   far enough down to the JAG Corps, so I think they were
03:06  17   pretty standard, at least in the Army.
03:06  18           MR. RASMUSSEN:  Your Honor, quick question.
03:06  19   If the Court enters a protective order that's specific
03:06  20   for these purposes, would it help expedite production
03:06  21   both in terms of the time that you spend if you didn't
03:06  22   have to review documents to redact individual names to
03:06  23   get to what Mr. Tracey was asking you about earlier or
03:06  24   other specific personal identifying information?
03:06  25           MAJ. EVANS:  Anytime there's a court order

03:07  1   that prevents us from having to redact anything it

03:07  2   will speed up the process, as long as it's a

03:07  3   protective order that was issued by -- I mean, in this

03:07  4   case, yes, that would speed up the process because we

03:07  5   don't have to assign someone to just redact names and

03:07  6   then an attorney has to review that, et cetera, et

03:07  7   cetera.

03:07  8          **THE COURT:**  Very good question.

03:07  9          Anything else?

03:07  10          *[No response.]*

03:07  11          Thank you again very much.  We look forward

03:07  12   to continuing to work with you, and really appreciate

03:07  13   the DoD's participation and the Army's.

03:07  14          **MAJ. EVANS:**  Thank you.

03:07  15          **THE COURT:**  Thank you, Leah and Kathryn,

03:07  16   thank you very much.

03:07  17          We're going to take a very short recess,

03:07  18   maybe just five minutes, reconvene hopefully at 3:15

03:07  19   continuing with the presentations.

03:09  20          *(Touhy presentation concluded at 3:09 p.m.)*

21          *I certify that the foregoing is a correct*
*transcript from the record of proceedings in the*
22   *above-entitled matter.*

23

   *s/Donna L. Boland*                    *5-29-2019*
24   *Donna L. Boland, RPR, FCRR*                 *Date*
   *Official Court Reporter*

25