**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG          )      Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,         )
                                       )      Pensacola, Florida
                                       )      August 4, 2020
                                       )      12:58 p.m. EST
                                       )
                                       )
_____)



**TELECONFERENCE**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-85)

**A P P E A R A N C E S**

FOR THE PLAINTIFFS:        **BRYAN F. AYLSTOCK, ESQUIRE**
                           **NEIL D. OVERHOLTZ, ESQUIRE**
                           Aylstock, Witkin, Kreis & Overholtz
                           17 E Main Street, Suite 200
                           Pensacola, Florida  32502

                           **DAVID R. BUCHANAN, ESQUIRE**
                           Seeger Weiss, LLP
                           55 Challenger Road, 6th Floor
                           Ridgefield Park, New Jersey  07660


FOR THE DEFENDANTS:        **KARL B. GUNDERSON, ESQUIRE**
                           **MARK J. NOMELLINI, ESQUIRE**
                           Kirkland & Ellis, LLP
                           300 N Lasalle
                           Chicago, Illinois  60654

```
1                      P R O C E E D I N G S
2            THE COURT:  I don't need to know everybody on
3    the phone line but just who is going to be speaking
4    for each party.  So let me begin with Plaintiffs.  Who
5    is going to be speaking on behalf of the Plaintiffs?
6            MR. OVERHOLTZ:  Good afternoon, Your Honor.
7    It's Neil Overholtz.  I'll be speaking on behalf of
8    the Plaintiffs.  And Mr. Aylstock is on, too, and he
9    may speak as well.
10           MR. AYLSTOCK:  Good afternoon, Judge.
11           MR. OVERHOLTZ:  And there may be others who
12   may need to pipe in.
13           THE COURT:  Okay.  And for the Defendants,
14   who is going to be speaking on behalf of the
15   Defendants?
16           MR. GUNDERSON:  Good afternoon, Your Honor.
17   It's Karl Gunderson.
18           THE COURT:  Okay.  Do we need to be waiting
19   for anyone else?
20           MR. OVERHOLTZ:  No, Your Honor.
21           MR. NOMELLINI:  No, Your Honor.
22           THE COURT:  Is Mr. Buchanan going to be
23   involved?
24           MR. BUCHANAN:  I'm on, Your Honor, but Mr.
25   Overholtz will be taking the lead.
```

1           **THE COURT:**  Okay, sounds good.  So let me

2      start off with the Plaintiffs.  This is, just to

3      review the bidding, a dispute involving five

4      custodians that the Plaintiffs wish to add and which

5      Defendants say they're too late and not really going

6      to change the course of history in terms of what

7      documents may be in their custodial files.

8           So, let's do this:  I'll start with the

9      Plaintiffs, and you can go down each custodian one by

10     one.

11          But, Mr. Overholtz, before you begin telling

12     me about each of these custodians, I did have one

13     general question.  I know this came up a while ago

14     when we were talking about the Mexican subsidiary and

15     custodial files.

16          It seems that the custodians may generally

17     relate to the issue of -- there was some issue with

18     quality control on the production of the earplugs.  As

19     I understand it, they were assembled in Mexico, and

20     the Plaintiffs are suggesting there were some quality

21     control issues.

22          My first question is:  How are quality

23     control issues in the assembly relevant to the claims

24     in the case?  Because, you know, there isn't a claim

25     in the case for manufacturing defect.  It's failure to

1    warn and design defect that these things just don't

2    work as designed, and there was no notice or warning

3    about the use of them.

4         How is that relevant to the claims in the

5    case?  And then you can go through the five custodians

6    and tell me why their custodial files may be of

7    interest.

8         **MR. OVERHOLTZ:**  Sure, Your Honor.  We do

9    believe that this evidence that we're seeking to

10   uncover and that we've uncovered to date -- the small

11   amount of evidence we've uncovered to date through the

12   depositions of Mr. Klun and Mr. Zielinski and the

13   others is highly relevant to Plaintiffs' claims.  We

14   believe they are relevant both to the negligence

15   claims that have been brought by Plaintiffs as well as

16   the failure to warn claims brought by Plaintiffs.

17        Essentially, when these plugs were sold to

18   the United States military, the Defendants, 3M, Aearo

19   at the time, developed a quality test that would allow

20   them to determine whether or not the plug had been

21   assembled correctly, whether or not the filter had

22   been manufactured correctly, the plastic stem adaptor

23   -- the component parts had been manufactured correctly

24   and whether they had been put together correctly.

25        And more importantly, the test that was

1   created was tied directly to whether or not the plug

2   would provide the attenuation, the reduction in sound

3   levels, the protection for the soldiers.  And that

4   test was specifically communicated to the United

5   States military on multiple occasions as a proprietary

6   test owned by Aearo and 3M that other earplug

7   manufacturers didn't have that would assure that the

8   yellow end -- the filtered end of the plug would work

9   whenever a soldier was impacted by a loud noise.

10          So we think these go directly to the heart of

11   our case both from a design defect -- a manufacturing

12   -- a failure to warn claim and -- and, Your Honor, I

13   will let you know that Plaintiffs do anticipate, based

14   on what we've found, seeking leave to amend the

15   complaint to add a manufacturing defect claim as well

16   based on evidence that we've recently learned.  But

17   even without that, we believe that they are highly

18   relevant to our failure to warn.

19          And I think the evidence that -- some of the

20   evidence attached to this letter brief and others that

21   came out in the Klun and Zielinski depositions bear

22   that out, that, as of late 2004, Mr. Zielinski, in his

23   trip to Mexico, was observing and reported back to the

24   company as well as to their outside contractors that

25   they were seeing up to 90 percent failure rate of the

1  plugs.  And then, when these plugs were shipped out,

2  they were shipped out with labels and certainly no

3  warnings were ever given to the United States military

4  or to the soldiers that they were operating under a

5  waiver that the plugs had tested out of spec, and that

6  these promises and warranties -- which, you know,

7  certainly Plaintiffs have brought a breach of warranty

8  claim as well -- regarding the testing of what it

9  could show had ever been met.

10          So that's our basis for the relevance of

11  these claims, Your Honor, and I'm happy to get into

12  that more.

13          **THE COURT**:  No, that's -- I just wanted to

14  key it in to -- what you told me was generally what I

15  thought.  So, assuming there was some failure in

16  assembly or manufacturing in some way, the bottom line

17  is that relates directly to the attenuation testing;

18  if you don't put it together correctly, that impacts

19  the attenuation.

20          And there was -- assuming there were problems

21  with the earplugs in a certain time frame, that would

22  have affected the testing and the testing was

23  communicated to the military or the fact that the

24  tests might not have accurately reflected attenuation

25  because problems was not communicated to the military.

1   Is that right?

2   **MR. OVERHOLTZ:**  That's exactly right, Your

3   Honor.  And in fact, the original ranges that were

4   developed -- the quality ranges that were developed

5   for specifications for this acoustic testing that was

6   being done on the plugs were actually created using

7   plugs that were part of the real-ear examination, the

8   retesting that has been the high point of relevance in

9   this case that is laid out in the flange report.

10  So those exact set of plugs were the original

11  plugs used by Mr. Kieper to establish the acceptable

12  ranges on the arc machine for manufacturing assembly.

13  So it is very much tied together.

14  So, on July 9th, Your Honor, the Plaintiffs

15  requested these seven custodians that we believe are

16  related to these manufacturing, assembly, and quality

17  issues, five of which were from TJR and ATM, two of

18  which were from Aearo Indianapolis.

19  The Defendants agreed to produce Ms. Ramirez

20  and Mr. Martinez -- that was the product manager and

21  the quality manager from TJR Mexico -- and asked for

22  additional information regarding the other three TJR

23  Mexico custodians as well as Mr. Power and Mr. Grogan

24  regarding that relevance.

25  In the meantime, we learned on July 17th that

1    the TJR custodians -- and Your Honor will recall this

2    came up in one of the previous calls -- that the TJR

3    custodian Your Honor had ordered on June 11th, Selina

4    Ramirez, despite her being a customer service

5    representative, seemed to have significant involvement

6    in many of these issues, could not be found, did not

7    exist, and could not be produced and added to the TAR

8    corpus.

9         The -- we continued to provide additional

10   information to the Defendants regarding what we

11   believed to be the relevance of Mr. Rodriguez,

12   Ms. Mendoza, Juan Rodriguez, who went by Rod, the

13   quality engineer over that time period, as laid out in

14   our briefing, Your Honor, and I'm sure you have that.

15        We believed, based upon the parties' ability

16   the week leading up to -- and I know this is a date

17   the Defendants have raised that a disputed issue

18   should have been brought to Your Honor's attention.

19   We believed that we were going to be able to resolve

20   these issues that week.  The parties were working

21   literally around the clock to resolve the supplemental

22   TAR issue, which we concluded on the 20th, which we

23   were able to work out.

24        We had agreed on these two other custodians.

25   And we believed that, by providing the additional

1     information the Defendants had requested on the three

2     Aearo Mexico custodians and the two Indianapolis

3     custodians, Mr. Power and Mr. Grogan, that we would be

4     able to work that issue out as well.

5           As Your Honor can tell from the briefing, we

6     provided additional information twice more that week.

7     And sometime last week, prior to the hearing with

8     Judge Rodgers and yourself, we realized that we were

9     not going to be able to resolve those issues, and

10    that's why we're here.

11          Unfortunately, Your Honor, you know, it's

12    become clear that there simply may be a very

13    significant issue with respect to a lack of files or

14    documents from the TJR Mexico custodians.  And

15    therefore, it's Plaintiffs' position that, in light of

16    the fact that Ms. Ramirez's file couldn't be located,

17    it's extremely important that these other custodians

18    who, according to the documents and the organizational

19    charts, certainly were involved in this quality

20    assurance testing for these plugs.

21          And I think we can deal with Mr. Javier

22    Rodriguez separately, but Ms. Mendoza and

23    Mr. Rodriguez reported directly up the line to the

24    quality manager Rafael Martinez.

25          The Defendants have often in their arguments

1     said that -- *Well, can Plaintiffs establish what these*
2     *witnesses had to do with this plug and the testing?*
3          Well, unfortunately, no custodian from TJR
4     Mexico has ever been produced or added to the corpus.
5     The only documents we have come from the noncustodial
6     production from other custodians that may have made
7     their way, whether it's emails or files, made their
8     way to Indianapolis at some point.
9          So Plaintiffs are largely handicapped in our
10    ability to establish that.  But the evidence we have
11    is that they did have relevance.  Their job
12    specifically included the quality testing that would
13    be involved.  And the limited emails that have been
14    produced to date show a connection between these
15    witnesses.
16         And therefore, in light of the fact that we
17    do not yet have a file for Selina Ramirez and we won't
18    be getting one, the two witnesses they agreed to
19    produce I have an understanding we may hear today that
20    actually the files cannot be located for them as well,
21    of course, the Plaintiffs -- the only way we're going
22    to get the small amount of documents that may exist
23    from TJR Mexico is to collect and include in the TAR
24    corpus as many custodians as possible from the TJR
25    Mexico location.

1          Mr. Javier Rodriguez, I know the Defendants

2   have raised some arguments regarding his production.

3   Mr. Javier Rodriguez, he is the "JR" of TJR Mexico.

4   He was the founder and operating manager.  According

5   to the organizational charts, he reported directly --

6   after the merger, directly to Mr. Zielinski in Aearo

7   Indianapolis, who was part of the outsourced contract

8   managing group led up by Mr. Power.

9          Mr. Rodriguez's name appears on multiple

10   documents.  We only have a small smattering of

11   documents to date in light of the fact that no

12   documents from Mexico have been produced, but his name

13   shows up as the author of multiple spreadsheets that

14   relate to the quality plans for the Combat Arms

15   Earplugs as well as -- and we included this in our

16   briefing, Your Honor -- documents indicating wiring

17   errors in the Combat Arms testing device, the infamous

18   arc box No. 4 that had multiple problems in testing.

19          And the Defendants have raised the issue that

20   the metadata of those documents only list

21   Mr. Rodriguez as an author and that later edits or

22   changes were made by, according to the Microsoft

23   metadata, by unknown Aearo employees.

24          We don't think those arguments really

25   suffice.  Because, first of all, those documents, if

1    they -- if Mr. Rodriguez does have a custodial file

2    that can be located and added to the corpus, documents

3    like those spreadsheets that we attached would be

4    found and be part of his custodial file.

5         And whether or not they were edited by later

6    witnesses or later employees at Aearo really doesn't

7    matter because those documents are clearly relevant

8    documents.  They've already been produced in this

9    litigation.  Documents like them, if they existed in

10   Mr. Rodriguez's file, would also be relevant.  Whether

11   or not they were later edited by others, they have his

12   name on those Excel spreadsheets.  And the one with

13   the wiring errors, of course, occurs in that 2003 to

14   2005 time frame in which these plugs were being

15   manufactured in the hundreds of thousands per month in

16   Mexico -- or assembled, I should say.

17        And so, we believe that Mr. Rodriguez's file,

18   as the owner and founder, not to mention the issue of

19   the contract outsourcing itself, what was expected out

20   of TJR Mexico, but the fact that he was an author of

21   documents that were titled "Quality Plans" as early as

22   1998, the fact that he was involved in those issues we

23   believe could make documents in his custodial file

24   highly relevant in light of that timing.

25        So that's why we --

1          **THE COURT:**  Let me interrupt you for just one
2     second and ask you --
3          **MR. OVERHOLTZ:**  Sure.
4          **THE COURT:**  So for the Aearo employees,
5     you've got Olga Mendoza; Javier Rodriguez, who you
6     pointed out is the "JR" of TJR; and then you have Juan
7     Rodriguez.
8          So, in the pecking order, Olga Mendoza was a
9     quality line superintendent who reported to Martinez
10    and there might not be many documents for Martinez.
11    Juan Rodriguez, Roz, was a quality engineer.  And then
12    Javier Rodriguez, owner and founder, he communicated
13    with Zielinski in Indianapolis.
14          Is that correct?
15          **MR. OVERHOLTZ:**  That's right, Your Honor.
16    And we know that Mr. Rodriguez would make trips to
17    Indianapolis occasionally with Ms. Selina Ramirez,
18    whose file we don't have, to deal with issues as well.
19    So it wasn't like he was just an owner of the company;
20    he was actively involved in the operation.
21          **THE COURT:**  Yeah, that really becomes the
22    issue is was he just a figurehead or involved.
23          So you took Zielinski's depo and you have
24    documents from Zielinski.
25          Were there substantive communications between

1   Zielinski, Aearo, and Javier Rodriguez?

2          **MR. OVERHOLTZ:**  So, Your Honor, we have four

3   total emails produced to date that involve Javier

4   Rodriguez, which is why we're so interested in getting

5   his custodial file.

6          So, from all of the other witnesses,

7   including Mr. Zielinski, we only have four emails

8   regarding Mr. Javier Rodrigues, and we were unable to

9   open three of those.  But the one we can open actually

10  involved him being on an email chain with Mr. Santoro,

11  whose file and deposition has been taken, as well as

12  Mr. Zielinski, regarding a trip to Indianapolis to go

13  over various issues as part of a production plan which

14  involved manufacturing and Combat Arms related issues.

15  So we don't have much, Your Honor, and that's our

16  issue.

17         I do want to address the Defendants'

18  argument, but I want to make sure I answer your

19  question first, regarding the idea that, well, you

20  have these other custodial files, they could be

21  duplicative.  I want to address that issue because

22  this issue kind of goes with that, you know, if we

23  don't have documents from Mr. Zielinski on

24  Mr. Rodriguez, where might they come from.

25         **THE COURT:**  Yeah, go ahead.

1      **MR. OVERHOLTZ:**  Okay.  So, Your Honor, one of

2   the arguments that has been raised besides just

3   obviously being late in the day, though I think Your

4   Honor is well aware that we have been actively seeking

5   these documents and these custodians related to the

6   assembly and quality issues with the plugs for several

7   months now, interrupted slightly by the COVID process.

8   But there's this argument that these witnesses'

9   custodial files may be duplicative of others that may

10  have had either similar jobs or worked on the same

11  team.

12      So I did a little bit of research into the

13  produced files to date to try to address that issue.

14  Because what we believe, as we've started to see

15  recently, is that there are many productions of

16  custodians, especially the later custodians, you know,

17  not necessarily the Elliot Bergers and the Brian

18  Myers, the first custodians that were identified when

19  the case started, but the later custodians that have

20  been identified that there is a real limited number of

21  documents.

22      For example, Mr. Todor, who is one of the

23  witnesses the Defendants claim is duplicative of what

24  we are seeking today with Mr. Power and Mr. Grogan and

25  the other TJR Mexico witnesses.  For Mr. Todor only

1    103 documents were produced out of his custodial file

2    at all.  And, you know, because of that -- and of

3    those 103 documents, only nine emails did Mr. Todor

4    send.

5           And so we think, you know, look, if the

6    product has been around for a long time, there were

7    obviously likely, you know, email retention policies

8    in place, we know they existed.  Emails have been --

9    we now know files have been deleted, destroyed, lost,

10   what have you, which we think is an issue that we need

11   to address, but I think we can address that

12   separately.  But, because of that, we don't believe

13   there's a duplication problem.

14          Because, for example, Mr. Todor, while he

15   only had 103 documents in his file, there are over 420

16   emails in which he was the "to" or the "from"

17   recipient but were not located in his custodial file,

18   meaning that, had we not received the productions from

19   the other custodians, we would have never seen those

20   documents despite him being clearly listed as the "to"

21   or the "from."

22          You know, some of the bigger witnesses that

23   Your Honor knows, such as Elliot Berger, nearly 8,000

24   of the documents that we have in which Mr. Berger

25   either received or sent an email actually came out of

1    others' files and were not included in Mr. Berger's

2    custodial production.  And the way we know that, Your

3    Honor, is that each and every time the Defendants

4    produced documents, they upload a file, what they call

5    an overlay file, that updates the metadata statistics

6    for all of the documents.  And if a document has been

7    found in a witness's file, their name is added to an

8    "all custodians" field for each and every document.

9          So, if four people on an email chain all have

10   the document in their custodial file as it is

11   collected, that "all custodians" field will show us

12   that it came out of all four witnesses' file.  So we

13   know that thousands and thousands of emails produced

14   in this litigation to date only were produced because

15   we got the files of other custodians.

16         And we believe that's an important point

17   because, as we get to the end here and we come up

18   against -- and I think Your Honor is aware of this,

19   but it was just last week and we reported last week at

20   the hearing that we agreed to, absent good cause, a

21   discovery cutoff of September 1st for all the trial

22   group cases.

23         So, with that deadline approaching, we

24   believe it's very important that, while Mr. Todor may

25   not have had an email in his file, that same email,

1    even if Mr. Todor was involved in it, may only exist

2    in Mr. Grogan's file, who we know, for example,

3    Mr. Grogan had emails with Mr. Zielinski and Mr. Todor

4    related to the need to get the testing machines back

5    down to Mexico after they had been repaired so that

6    the quality testing could be done that had been

7    promised would be done to the U.S. military.

8         So the duplicative custodian argument we

9    don't think really applies when you have a situation

10   in which there have been observable deletions, lost,

11   destroyed files and emails custodian by custodian.

12   And because you cannot guarantee that you've actually

13   gotten the documents from -- collecting Mr. Todor's

14   file clearly did not get the emails -- all of the

15   emails in which he was involved.

16        So I'm taking Mr. Todor's deposition in a

17   couple of weeks.  I won't have all of his emails

18   potentially because there are only nine "from" emails

19   that he sent.  Clearly there are more relevant than

20   that.

21        I took Mr. Doty's deposition last week.  We

22   only had a couple hundred documents total -- or a few

23   hundred documents out of Mr. Doty's file, 27 emails.

24   Almost all of the emails and documents I used in

25   Mr. Doty's deposition we only had because we found his

1    name in other custodians' emails.

2         And while that seems like the process is

3    working, it could also definitely leave many relevant

4    documents.  And in light of the deletion that we know

5    now has occurred of email files based on these

6    statistics and recent productions, we think it's

7    important to be overinclusive on the custodians within

8    a team, not underinclusive.

9         So that's what we would argue.

10         And with respect to Mr. Power and Mr. Grogan,

11   I know I've addressed those some.  I think it's worth

12   saying that we don't have a lot of emails on

13   Mr. Power.  I think Mr. Power's total emails to date

14   that we have is somewhere in the less than 100 range

15   that he actually sent or was cc'd on.  And most of

16   those documents -- or all of those documents at this

17   point come from other files.  But what we do know is

18   that Mr. Power oversaw this outsourced manufacturing

19   assembly and quality division of the company that Mr.

20   Zielinski and Mr. Grogan --

21        **THE COURT:**  Zielinski reported to Power?

22        **MR. OVERHOLTZ:**  That's correct, that's

23   correct, Your Honor.  But we think that Mr. Power

24   stood in a very unique position as well besides -- in

25   other words, we know now that, because of quality

1    testing issues, to meet orders by the military, that

2    there were waivers -- at least two waivers that we're

3    aware of, there could be more, and that's one of the

4    reasons why we're here -- waivers that were issued to

5    go ahead and ship those assembled earplugs to

6    Indianapolis for distribution to the military even

7    though they had tested out of spec.

8         Those decisions, those are management-level

9    decisions, and we think they are relevant to the

10   Plaintiffs' claim that how do you balance the fact

11   that your testing is not coming up as it's supposed

12   to, you're having to operate under waivers in order to

13   deliver orders.

14         We know that the emails we do have for

15   Mr. Power is his concern and his discussions with both

16   his team as well as other people in management

17   regarding how to meet those orders.  And those

18   decision-making, the idea of putting -- meeting orders

19   and selling product ahead of potentially

20   safety-related issues, because we know this testing

21   was safety related/protection related, that's highly

22   relevant to our claim as to why a company like

23   Aearo/3M would make the decision to sell products that

24   are potentially defective even though they have

25   testing problems beforehand.

1           So we believe people like Mr. Power are
2   especially important in that regard in the Plaintiffs'
3   ability to understand that decision-making and put
4   that evidence before a jury one day.
5           So, not to mention that -- I know we included
6   in our brief, Your Honor, but the big issue when it
7   kind of came to a head that they had had two or three
8   years of quality problems in Mexico that were
9   described as quality problems, that was the Klun memo
10   on quality issues in Mexico document.
11           Mr. Klun only sent that to a handful of
12   people, and those handful of people included
13   Mr. Power, to indicate his level of importance in that
14   type of decision-making and what to do about a problem
15   with outsourced manufacturing and quality in Mexico.
16           **THE COURT:**  Okay.  Thank you, Mr. Overholtz.
17           Mr. Gunderson, let me hear from you.  And you
18   can sort of break it down into the Aearo Mexico
19   people, the Mendoza, Javier Rodriguez, and Juan
20   Rodriguez, and then separately talk to me about Grogan
21   and Power.
22           **MR. GUNDERSON:**  Thank you, Your Honor.  As
23   you can imagine, we disagree with many of the
24   allegations Mr. Overholtz made in his presentation.
25   This isn't necessarily the place to resolve those

1    factual disputes, but just wanted to make sure that
2    was clear on the record.

3           From our perspective, Mr. Overholtz hasn't
4    been involved in a lot of these prior discussions
5    about additional custodians, and so I do want to cover
6    a couple of the key points that I think he's failing
7    to appreciate given the long history the Court knows
8    we've had in discussing the custodians.

9           Before getting into that, though, I did want
10   to clarify the record in terms of the timing of
11   Plaintiffs' request.

12          As the Court knows, Judge Rodgers ordered a
13   September 1st close of corporate discovery deadline.
14   On July 9th, Plaintiffs sent a barebones request to
15   Defendants to add a handful of additional custodians,
16   and then, on the July 10th call with the Court,
17   requested a deadline for submitting their brief.

18          As we laid out in our letter brief, we
19   responded on July 15th agreeing to add two of the
20   seven custodians.  And Mr. Overholtz is correct that
21   we had numerous communications with each other the
22   rest of that week, and in none of those communications
23   did Mr. Overholtz ask to, like, extend the deadline
24   that the Court set for submitting a brief, never
25   indicated that Plaintiffs intended to dispute or

1    continue pursuing the other five custodians.

2         It wasn't until a week after Defendants

3    responded to Plaintiffs' request and more than two

4    days after the Court's deadline for submitting a brief

5    on the issue that Plaintiffs responded at all,

6    providing a little bit of additional information.  But

7    it really wasn't until a week after the Court's

8    deadline that Plaintiffs put forth any real

9    substantive information for why they believed these

10   custodians should be added.

11        As you know, Defendants, in December,

12   informed the Court and Plaintiffs that it takes us 60

13   days to get through the full process of adding -- you

14   know, from a request to add custodians to any

15   production of -- you know, completion of the

16   production of their documents.

17        From our perspective, Plaintiffs' delays in

18   pursuing these additional custodians is, you know,

19   highly prejudicial to Defendants in our ability to,

20   you know, meet our production deadlines in light of

21   that September 1st deadline.

22        In addition, just so that the Court knows,

23   last Thursday Plaintiffs sent a request for six

24   additional custodians, four of which were new.  And

25   then, on Friday, literally at the eleventh hour, at

1   11:52 p.m. Eastern, Plaintiffs sent another request to

2   add 16 additional custodians.

3          As you can imagine, from our perspective, you

4   know, these requests are late.  It's inconsistent with

5   the timeline for handling custodians.  And Plaintiffs

6   essentially are, at this point, you know, attempting

7   to force Defendants to scramble to meet, you know, the

8   September 1st corporate discovery cutoff for no reason

9   other than they failed to raise these issues earlier

10  in the case.

11         The ATM issue and the quality issues Mr.

12  Overholtz has identified came up in depositions in

13  December and have repeatedly been discussed both with

14  the Court and in various meet and confers since that

15  time.

16         There's really no reason that we are now

17  dealing with these issues with less than 30 days

18  before the corporate discovery cutoff that was set by

19  the Court.

20         The Court was clear that she wants the

21  parties to move on and focus on bellwether discovery.

22  And it seems clear, from our perspective, that

23  Plaintiffs are doing everything they can to delay that

24  process.

25         In terms of the -- apologies, Your Honor,

1     were you --

2              **THE COURT:**  No, go ahead.

3              **MR. GUNDERSON:**   In terms of the specific

4     custodians Plaintiffs have requested, as described in

5     our brief and completely overlooked by Plaintiffs in

6     their brief, Defendants, over the course of the

7     winter, undertook a very extensive effort to

8     investigate and locate from ATM in Mexico their

9     quality files.

10             As part of that effort, Defendants collected

11    more than 30,000 documents from ATM's quality

12    department, which included various electronic

13    documents that had been saved to those files as well

14    as scanned copies of hard copy documents including

15    some of the documents that Plaintiffs now cite in

16    their letter brief.

17             From our perspective, that is the source most

18    likely to contain the most relevant information

19    regarding the issues Plaintiffs have raised in the

20    case with respect to ATM.

21             In particular, our understanding is that

22    those files contain numerous documents related to

23    quality plans, numerous documents related to issues

24    that arose during manufacturing, numerous documents

25    related to how both ATM and then Aearo responded to

1    issues that came up during the course of assembling

2    the Combat Arms Earplugs and other product.

3          To be clear, ATM was not only manufacturing

4    or assembling the Combat Arms Version 2, they were a

5    contract manufacturing facility that produced a large

6    number of products for a lot of different divisions in

7    a lot of different contexts.  You know, Combat Arms

8    was not their sole focus by any means.

9          As described in our letter brief, we think

10   that three additional custodians Plaintiffs seek from

11   ATM are based only on speculation on their part that

12   they might contain relevant information.

13         As we went into a lot of detail, the

14   documents Plaintiffs cite for Javier Rodriguez are

15   based solely on an author metadata field that we

16   understand to be inaccurate in terms of reflecting who

17   actually generated the content on the documents.

18         Mr. Overholtz cited a Quality Plan that was

19   authored or created in 1998.  This was well before the

20   Combat Arms Version 2 began being manufactured.  And

21   it is our understanding that Mr. Rodriguez, at some

22   point in time, created a -- you know, whether it was

23   one or a handful of template documents that then got

24   used and reused and reused and reused by numerous

25   people within ATM and ultimately sent on to Aearo

1    also.  And every time someone else edited the document

2    or forwarded it on or, you know, changed it up enough

3    to make it product specific, make it specifically

4    related to the Combat Arms issues or whatever, that

5    those edits were made not necessarily with any

6    knowledge of Mr. Rodriguez or the template he at one

7    point in time created.

8          In addition, the one document Plaintiffs cite

9    with a big reference to the manager in Mexico is --

10   our understanding is that document is -- it is very

11   unlikely they're actually referring to Mr. Rodriguez

12   and instead were referring to the other individuals at

13   ATM that become part of the chain later on that

14   Plaintiffs failed to cite.

15         From our perspective, Mr. Rodriguez was

16   sitting atop the pyramid, and yes, he may have

17   communicated with one of the ATM/TJR's most important

18   clients in Indianapolis.  But our understanding is

19   that those discussions were more likely to have

20   involved big picture sort of business strategy

21   decisions than, you know, getting into the weeds or

22   the nuances of the production of any individual

23   product.

24         In addition, as the Court and Mr. Overholtz

25   sort of described with respect to Ms. Mendoza, our

1    understanding is she -- her role, to the extent she

2    had any role at all with the Combat Arms Version 2,

3    was opening up packages of raw materials that were

4    delivered to ATM and conducting a sort of initial

5    inspection before any of the sort of raw materials

6    were used in the actual assembly of the product.

7          As Mr. Overholtz, you know, explained,

8    Plaintiffs' focus is on the post-assembly attenuation

9    testing that took place as part of the manufacturing

10   process, and we have zero reason to believe that

11   Ms. Mendoza was involved in that process.

12         In addition, with respect to Mr. Juan

13   Rodriguez, Plaintiffs really rely on his appearance on

14   an organizational chart to suggest, well, maybe he had

15   some documents, too.  And, you know, from our

16   perspective, that fails to meet the burden that

17   Plaintiffs have to show that any of these custodians

18   really have unique and important data.

19         So, in light of the extensive efforts that

20   Defendants undertook to locate, collect, and then

21   produce from the quality file at ATM, we just don't

22   think that any of these three additional custodians

23   are likely to have any data or, you know, relevant

24   data to the issues that Mr. Overholtz has described.

25         **THE COURT:**  Let me -- Mr. Gunderson, let me

1    just stop you there for a second and let me ask you a

2    few questions.

3           So, in general, the custodial files from ATM

4    that you have produced -- and I know we talked about

5    this briefly in a previous hearing -- what is there?

6    I mean, is ATM still a company in Mexico?  How do you

7    go about identifying and collecting custodial files at

8    this point in time from ATM?

9           **MR. GUNDERSON:**  So, since 3M acquired ATM --

10   and just to recap the history for the Court's

11   reference, TJR was an independent company, an

12   independent sort of contract manufacturer that Aearo

13   contracted with to assemble and manufacture a variety

14   of products, which includes Combat Arms.

15          At one point, Aearo entered into a joint

16   venture agreement with TJR whereby I believe Aearo

17   purchased something like 70 percent of TJR, and then,

18   you know, they were going to continue as a joint

19   venture.

20          That was shortly before 3M acquired Aearo.

21   And our understanding is that, during that process of

22   acquiring Aearo, 3M decided to buy out essentially the

23   remaining interest in the TJR entity such that now 3M

24   *[sic]* is a wholly-owned subsidiary of 3M.

25          As part of that process, the sort of

1    integrating of ATM into the 3M landscape, our

2    understanding is that the IT that is used at ATM in

3    Mexico is still -- while they do have a local server

4    there, which is where we -- from which we collected

5    the ATM quality files, our understanding is that email

6    and other sort of data that is used at ATM are

7    controlled by 3M's sort of corporate parent in the

8    United States, such that for live email that data

9    exists within the 3M corporate servers and can be

10   collected from those servers.

11            As you can imagine, however, this is a

12   multiple-entity, multiple-integration into, you know,

13   the different IT worlds process.  And so our

14   understanding is that, as described in the data sort

15   of separation that we went through with the Court and

16   Mr. Buchanan in the fall -- and I don't know if Mr.

17   Overholtz was involved in that process at all -- you

18   know, those efforts just sort of lay out how data got

19   transferred from the Aearo IT landscape into the 3M IT

20   landscape and what was sort of imported over onto the

21   new system and what would have been allowed to roll

22   off, you know, pursuant to the retention policies in

23   place at that time.

24            Our understanding is that, for many of these

25   ATM custodians, if not all of them, you know, they are

1  not -- *(inaudible)* -- employees at 3M.  And in fact,

2  for most of them our understanding is that they

3  haven't been employees at 3M/Aearo for a significant

4  period of time, you know, in some cases potentially

5  more than ten years.

6        As a result of that, the data we have is

7  whatever data might exist on the Aearo backup tapes

8  that were the subject of litigation and a lot of

9  discussion in the fall as well as any data that might

10  exist on these sort of shared servers that we have,

11  you know, already collected from.

12        Does that answer Your Honor's question?

13        **THE COURT:**  Yeah, it does.  I mean, the

14  bottom line is, putting aside whether custodians would

15  or would not be added, it is a challenge to get,

16  collect -- identify and collect documents from Aearo

17  Mexico, and that essentially, when we go back ten

18  years or more, your data that you're looking at is on

19  backup tapes.  Is that right?

20        **MR. GUNDERSON:**  That is, Your Honor, you

21  know, for employees who left the company a long time

22  ago, you know, well before the Combat Arms litigation

23  and MDL, you know, that data in general was only

24  retained to the extent by happenstance it existed on a

25  backup tape that was located or if it had been copied

1    over to one of the other sources that we are now

2    checking, right, the other sources we've described in

3    our data source declarations and that we check for

4    sort of all of the custodians who don't have custodial

5    files.

6           **THE COURT:**  One other comment before you get

7    to Grogan and Power, and that's somewhat a little bit

8    of a separate issue.

9           With Javier Rodriguez, I guess the dispute

10   here is, obviously, the Plaintiffs think he's going to

11   have relevant documents in his file relating to the

12   quality issue.

13          Your retort to that is, he was at the top of

14   the pyramid.  The documents they have identified in

15   which he was on the metadata identified as author,

16   these are, for lack of a better word, templates that

17   he may have been involved in and that, in the few

18   documents they have pointed to, there doesn't appear

19   to be evidence that he was an author of in terms of

20   actually producing documents during the relevant time.

21          But, having said all of that, it seems to me

22   that Javier Rodrigues -- and I understand you say, oh,

23   he was a big picture policy guy, and I recognize ATM

24   didn't just assemble Combat Arms Earplugs, they had

25   other products.  But the Combat Arms Earplugs were a

1   significant product for their company.  He interfaced

2   with Zielinski.

3         And it just seems to me that, if you were

4   looking for a relevant custodian -- and this is, as I

5   understand, a fairly small company -- the founder and

6   the guy at the top very well may be involved in -- if

7   you can term these things "problems" -- quality

8   control problems, that -- I don't know if you'd have

9   documents of him communicating that to Zielinski.  But

10   problems on the manufacturing floor you would think

11   would find their way in many instances to the guy that

12   owned the company.

13         You know, certainly in my experience, a small

14   company where you have the owner of the company -- and

15   years ago I represented some small companies, small

16   manufacturing companies, and the guy at the top, you

17   know, although he was looking at big picture issues,

18   when there was a problem, he or she would be in the

19   loop.

20         So it seems to me, if you were attempting to

21   identify a potential custodian that might have some

22   documents, a very good place to look might be the

23   founder, the guy at the top of the pyramid, the guy

24   from whom the communications would percolate to the

25   top and possibly the guy who would communicate any of

1    these types of issues to Indianapolis.

2            And I recognize the documents that the

3    Plaintiffs have pointed to, they don't have a lot of

4    evidence that he was involved in this, but that's sort

5    of the tail wagging the dog, they're trying to find

6    some source of information.

7            So, as to him, Javier Rodrigues, I do think

8    that he could be a very relevant custodian.

9            As to --

10           **MR. GUNDERSON:**  Your Honor, just to --

11   *(inaudible)* -- to Mr. Rodriguez?

12           **THE COURT:**  Yes.

13           **MR. GUNDERSON:**  I think the first thing to

14   keep in mind here -- and I think this is relevant for

15   our general understanding of the ATM issue -- is that,

16   you know, unlike some manufacturing plants that are

17   continually sort of producing a product, right, over

18   months or years or whatever, you know, ATM was a

19   contract manufacturer where there was an order and

20   they produced the product.

21           So the assembly line for Combat Arms was

22   running, you know, periodically, at best.  Even the

23   significant order Mr. Overholtz references, you know,

24   relates to like 12 weeks of production.  It really was

25   the case that ATM's focus was on a lot of other

1    products, and Combat Arms really wasn't a significant

2    product to it necessarily.  Its relationship with

3    Aearo in general wasn't important largely because of

4    the large number of different products that ATM

5    produced for the Aearo company.

6          And the other point I just wanted to sort of

7    put in here, too, is that, you know, our understanding

8    in terms of communicating issues between ATM and

9    Aearo, you know, our understanding is that that

10   relationship existed and those communications were had

11   with Ms. Selina Ramirez, who we discussed in June.

12         As I think we described then and, you know,

13   put into our letter brief here, too, there are

14   hundreds of emails back and forth between Ms. Ramirez

15   and folks at Aearo in Indianapolis describing various

16   aspects of the quality program in production and the

17   like.

18         And so, you know, from our perspective,

19   Javier wasn't really the guy who was communicating

20   those issues with respect to individual products back

21   to Indianapolis.  It really was Ms. Ramirez who had

22   that role.

23         **THE COURT:**  What percentage of the products

24   they -- you say "manufacture" and it sounds like they

25   assembled -- were the Combat Arms Earplugs?  I mean,

1    is it like 1 percent and it was a minor player, or was

2    it more than 50 percent of their business?

3            It sounds like it must have been in -- well,

4    I don't know.  How much -- what was the percentage, if

5    you know?

6            **MR. GUNDERSON:**  I don't have that number off

7    the top of my head.  I do know that, apart from very,

8    you know, some large significant runs in terms of

9    producing the product in the early 2000s, you know,

10   the amount of, you know, assembly done at ATM was, you

11   know, relatively minor later on.

12           And as I said, Your Honor, even this one big

13   order, you know, they were concerned about like, you

14   know, getting it out within 12 weeks and, you know,

15   tying up the assembly line for 12 weeks, which is much

16   less than, say, the full year would be.

17           So, I mean, frankly, our understanding is

18   that it wasn't a -- it wasn't 50 percent of their

19   business.

20           **THE COURT:**  Right.

21           **MR. GUNDERSON:**  It may have been in any given

22   month or something.  But, you know, for the most part,

23   it was not, you know, the big focus of their business

24   by any means.

25           **THE COURT:**  Let me ask you this again before

1   you get into Grogan and Power.

2            So, Olga Mendoza, although I guess you could

3   say she had something to do with quality assurance,

4   you're really talking about someone out on the factory

5   floor receiving and processing raw materials?  I mean,

6   she did not have a high-level managerial -- she wasn't

7   head of production or anything like that?

8            **MR. GUNDERSON:**  That's our understanding,

9   Your Honor.

10           **THE COURT:**  Okay.  Then I'm probably a little

11  bit less clear about Juan Rodriguez.  I guess his

12  title was -- let me find that.  So he was a quality

13  engineer.

14           What did he do with the company?

15           **MR. GUNDERSON:**  Your Honor, we haven't seen

16  any connection to him in Combat Arms at all, and

17  frankly, we don't have good insight into exactly what

18  he did.

19           As Plaintiffs point out in their briefing and

20  some of the documents that they cite, you know, his

21  title was connected to a particular kind of

22  engineering certification, and our speculation is that

23  he was sort of the guy who helped coordinate part of

24  that process.

25           You know, again, our understanding is that

1    documentation -- that certification documentation was
2    saved in the ATM quality files that we collected and
3    produced from as part of our, you know, the ATM shared
4    drive collection I was describing earlier.
5            And so, I mean, we really have no reason to
6    believe he had any role with respect to the Combat
7    Arms in general or the Combat Arms Version 2 at all.
8            **THE COURT:**  Well, talk to me about Power and
9    Grogan.  That's a different issue.
10           **MR. GUNDERSON:**  It is a different issue.  And
11   I think, as Plaintiffs recognize in Mr. Overholtz's
12   presentation and in their briefing, there is this --
13   to the extent Plaintiffs say there is a gap in our
14   lack of individual custodians from ATM, you know, that
15   issue just doesn't apply to the folks working at Aearo
16   and at 3M.
17           As the Court knows, we have a significant
18   number of custodians that Plaintiffs have added
19   continually over the last year related to a whole host
20   of issues.
21           Our understanding for Grogan and Power is
22   that both are highly related to other custodians that
23   have been added to the TAR process either voluntarily
24   by Defendants or through the Court's orders.  And as
25   we sort of describe in our letter, you know, there are

1   literally tens of thousands of documents that were

2   sent to and from these individuals that have already

3   been incorporated into the TAR process by virtue of

4   them being duplicative of other custodians we already

5   have.

6          Mr. Overholtz has sort of, you know,

7   highlighted this fact that there may not be a lot of

8   documents for them individually or for certain

9   custodians individually, but we think that is a

10  significant sign that the individuals themselves had a

11  much less significant role in this case than the key

12  players we have been talking about.

13         Mr. Overholtz hasn't been involved in every

14  discussion we've had with Plaintiffs or with the Court

15  regarding custodians or the backup tapes or the data

16  that exists.  We've described to the Court before and

17  to Plaintiffs before, because of the way the backup

18  tapes exist, you know, documents that would normally

19  dedup if all collected from the same source don't

20  dedup.

21         And so it is the case that when we collect a

22  certain mailbox from the backup tapes for data that,

23  you know, predates 2008, those documents don't always

24  dedup against other documents in other custodians'

25  mailboxes.  That doesn't mean they are unique

1   documents by any means.  The exact same email can

2   exist in two different backup tape mailboxes and not

3   dedup against each other just by virtue of the way

4   that the backup tapes were created, the way the

5   extraction from the backup tape has to occur, and the

6   like.

7        And so, you know, I think, from our

8   perspective, certainly, the sort of lack of particular

9   emails from some of these individuals for whom we have

10  tens of thousands of documents is reflective of, you

11  know, the minimal, shortened duration role they might

12  have played in connection with the issues in this

13  case.

14       And further to that, our view is that the

15  documents Plaintiffs cite really are documents that

16  have other custodians and other deponents all over

17  them and sort of were communicated to the other key

18  players in the case who have been custodians for a

19  significant period of time.

20       **THE COURT:**  Let me ask you this.  So, Power

21  -- well, let's go back to Grogan.  The real argument

22  on Grogan here is the Plaintiffs say that Todor's

23  custodial files were more sparse than one would

24  expect.  I understand documents were produced, but the

25  documents that the Plaintiffs identified relevant to

1    Mr. Todor for a number of instances did not come out
2    of Todor's custodial files, they came out of others'
3    custodial files.

4            Is that accurate?

5            **MR. GUNDERSON:**  That is accurate, I think,
6    subject to the point I was just making regarding the
7    nonautomatic deduplication that occurred, right?

8            It is possible, you know, Mr. Overholtz --
9    you know, we would need to do a much deeper dive to
10   sort this out, but it is certainly possible that the
11   400 documents Mr. Overholtz identified for Mr. Todor
12   really are just 100 documents that were collected from
13   four different custodians given the way the backup
14   tapes work.  We would need to do that in the office
15   to, like, confirm or reject that hypothesis.

16           But, from our perspective, Mr. Todor's file
17   is small because he didn't play a significant portion
18   or have any significant role at all with respect to
19   the Combat Arms Version 2.

20           **THE COURT:**  And Grogan was involved in the
21   design review process but he reported to Todor; is
22   that correct?

23           **MR. GUNDERSON:**  That is my understanding.

24           **THE COURT:**  And then Power is a different
25   issue.  So Zielinski, who has been deposed, he

reported to Power; is that correct?

**MR. GUNDERSON:**  That is my understanding as well, yes, for at least -- *(inaudible)* -- that was the relevant period of time.

**THE COURT:**  And Power was, am I correct, directly involved, well, to some degree, in the ATM or TJR quality issues; is that correct?

**MR. GUNDERSON:**  So, our understanding is that Mr. Zielinski was involved in those issues and that on occasion he looped in his boss to get, you know, insight, make sure he was in the loop, you know, to the extent something was more significant or was, you know, needed to be raised up the chain, to keep him in the loop on that.

I don't think we have any reason to believe that Mr. Power was sort of uniquely situated to dealing with the quality issues that Plaintiffs have identified.

Plaintiffs do cite to one document where Mr. Power appears to be, like, sorting out some of the logistics of the timing and ships and how many earplugs can be manufactured at one point in time or the other.  But, you know, we don't think that's at all related to the actual acoustic testing Mr. Overholtz was talking about.

1      **THE COURT:**  Okay.  Let me give Mr. Overholtz

2  a chance to respond.

3      Mr. Overholtz?

4      **MR. AYLSTOCK:**  Your Honor, before Neil chimes

5  in, could I address the timeliness issue?

6      **THE COURT:**  Yes.

7      **MR. AYLSTOCK:**  I certainly have been

8  involved.  Karl keeps talking about how Mr. Overholtz

9  hasn't been involved.  He really has.  But I've been

10  at every one of your hearings, Your Honor.  And from

11  the beginning, the focus, at Defendants' request, of

12  our discovery was on government contractor, and now

13  that's been resolved.  But that was where we directed

14  our efforts, at the Court's instructions and at the

15  Defendants' request, and that was a laborious process.

16  The briefing ended February 1.

17      And it is true that we tried to handle other

18  issues that came up that may not be directly related

19  to that as we could.  But Mr. Gunderson cites the fact

20  that this manufacturing assembly issue came up in

21  December.  Well, it did.  It took them a month to tell

22  us whether TJR Mexico were actually third parties, and

23  we figured that out.  It took them four months to

24  really start even looking for documents.

25      In the meantime, we were briefing government

1    contractor, and we had Mr. Klun set for deposition in

2    late March.  That didn't happen because of COVID.  But

3    we continued working.  In fact, in April, we asked for

4    the custodial files of Ms. Ramirez at ATM, also

5    Mr. Edwards related to Cobra.  It took 3M a month to

6    respond, and they resisted our efforts, and Your

7    Honor, on June 10th, asked them to be added.

8            Only after that did we realize that there was

9    no file to even add.  Had Mr. Gunderson done some

10   investigation and said, *Well, there's no file for*

11   *them, maybe you want somebody else,* we really wouldn't

12   be in this position to begin with.

13           And with regard to this general discovery

14   deadline, again, it was the Defendants asking for this

15   deadline ultimately with regard to these cases.  And

16   we're prepared to meet that deadline, but not at the

17   expense of not uncovering extremely relevant evidence

18   that we only relatively recently became aware of and

19   certainly have worked diligently to discover, taken

20   now multiple depositions on the issue.

21           I asked Mr. Gunderson about custodial files,

22   and we really haven't received the cooperation on that

23   that you would expect.

24           In the meantime, we did discuss this issue at

25   one of the biweekly conferences at the same time we

1    were negotiating the TAR corpus and the elusion

2    testing.  The parties worked extremely hard, late into

3    the night, including Mr. Overholtz, Mr. Buchanan, all

4    of us, to come to an agreement on that.

5         At the same time, we're negotiating and

6    providing additional information on these custodians,

7    and we expected and hoped that maybe we'd get an

8    agreement there as well.  We obviously didn't.  But on

9    July 28th Mr. Gunderson agreed that we could go ahead

10   and brief this issue.  But this is an important issue.

11        The timeliness of it, obviously, it's

12   important for us to get this done.  It's important for

13   us to discover this information.  And the prejudice

14   would be on the side of the many tens of thousands of

15   servicemen who don't get this information where

16   custodial files may or may not exist but we don't have

17   visibility into that.

18        So I'll shut up about the timeliness issue.

19   But if there's fault, then I'll take that fault.  But

20   we were acting in good faith at all times, and we've

21   been pursuing this case as diligently as humanly

22   possible under the circumstances and really in the

23   manner that the Defendants asked the Court, and the

24   Court agreed to proceed with government contractor

25   going first.  So, if there is any prejudice, Your

1    Honor, it's on the Plaintiffs' side, not on the

2    Defendants' side.

3              **MR. NOMELLINI:**  Your Honor, may I respond to

4    just one issue?  It's Mr. Nomellini.

5              **THE COURT:**  Yes.

6              **MR. NOMELLINI:**  I heard Mr. Aylstock refer to

7    a lack of cooperation, quote, on the part of Mr.

8    Gunderson.  I was quite surprised to hear him say

9    that.

10             I think Mr. Aylstock knows as well as anybody

11   that Mr. Gunderson has been extremely cooperative, has

12   worked as hard as anybody in this litigation.  So I'd

13   just rise to his defense on that issue.  He has been

14   working tirelessly on these issues and very

15   cooperative and was only trying to adhere to the

16   Court's deadlines.

17             **MR. AYLSTOCK:**  I don't quarrel, Your Honor,

18   with Mr. Gunderson's work ethic.  What I do quarrel

19   with is that just the lack of transparency with regard

20   to just the utter lack of custodial files down there.

21   And Your Honor did ask Mr. Gunderson about, you know,

22   sort of the process for getting those files down

23   there.

24             I recognize that it's not easy.  It's a

25   company down in Mexico.  And what I think Karl had

1  indicated was that, for the former employees, yes,

2  there was backup tapes.  What I didn't hear an answer

3  to was whether there was other current 3M employees

4  who were involved down there at that time.

5          This is a critical issue in the case where

6  this testing that was required by the MPID that was

7  represented to the government that is absolutely

8  essential to ensuring that these earplugs actually

9  work, which is the core issue of the case.

10          If there's information out there that

11  somebody doesn't have a custodial file that we're

12  arguing about, it would be good to know that before we

13  waste a bunch of time arguing about it.

14          But that's what I quarrel with is, you know,

15  some investigation into figuring out, okay, well,

16  there's nothing there for Ms. Ramirez, maybe look

17  somewhere else.  And instead it's sort of a stiff arm

18  for a month, and then we get a little impasse, we have

19  Your Honor rule, and then only after that do we find,

20  well, there was nothing there to begin with, and three

21  months have gone by, and then I'm accused of blowing

22  deadlines and waiting until the last minute.  So I do

23  quarrel with that aspect of it but not Mr. Gunderson's

24  work ethic.

25          **THE COURT:**  Okay.  Mr. Overholtz?

```
 1                    [No response.]

 2              Are you still there, Mr. Overholtz?

 3         MR. AYLSTOCK:   Neil, are you on?

 4         MR. OVERHOLTZ:   I am.   I'm sorry, Your Honor,

 5   I put you on mute for a second.

 6              Yes, Your Honor, I want to address a couple

 7   of issues that came up with your discussion with Mr.

 8   Gunderson.   And I also don't quarrel with Mr.

 9   Gunderson's work ethic.   We were working and emailing

10   until midnight and early in the morning much of that

11   week, as Mr. Aylstock discussed.   So I certainly

12   understand that.   But I think it is important, though,

13   that we try to get to the bottom of these files from

14   Mexico and, if there are missing files, try to come up

15   with a solution to deal with that.

16              A couple of points that I think Your Honor --

17   just kind of questions that you raised.   We obviously

18   don't have all the documents year to year from ATM

19   Mexico to really know about this.   But one of the

20   documents that we do have indicates -- and this is a

21   document that is related to Mr. Power and emails

22   related to meeting those sales order requirements and

23   making those determinations.

24              In 2004, the Combat Arms plugs made up at

25   least 25 percent of all the plugs that were being made
```

1   by ATM Mexico, and they were making lots of plugs.
2   They were making a million UltraFits a year.  They
3   were making 500,000 Peltor plugs a year.  But they
4   were making well over 600,000 plugs in 2004 that were
5   Combat Arms plugs.
6           And those numbers only increased after that
7   because we know that they became standard issue for
8   all Marines in 2005 when they presented to the joint
9   chiefs of staff to make that happen, and they also
10  became standard issue for all training plugs for the
11  Army in 2006 and 2007.
12          So we know those numbers increased.  And we'd
13  like to see more of those documents related to that
14  issue because one of the issues that came up was the
15  waiver issue.  And the waiver issue -- *(inaudible;*
16  *interrupted by loud music.)*
17          Somebody put us on hold.
18          **THE COURT:**  Yeah, I think someone -- it's not
19  from my end.
20          *-- (inaudible) --*
21          I'm going to end the call and reconnect.
22          **MR. AYLSTOCK:**  We'll call right back in,
23  Judge.
24          **THE COURT:**  Okay.
25          *(Conference ended at 1:08 p.m. and continued*

1    *at 1:09 p.m.)*

2         **THE COURT:**  Mr. Overholtz and Mr. Aylstock,

3    are you there?

4         **MR. AYLSTOCK:**  I am, Your Honor.

5         **MR. OVERHOLTZ:**  I am, Your Honor.

6         **THE COURT:**  And Mr. Gunderson, are you there?

7         **MR. GUNDERSON:**  I am, Your Honor.

8         **THE COURT:**  And Mr. Nomellini?

9         **MR. NOMELLINI:**  Yes, I'm here, Your Honor.

10        **THE COURT:**  Okay.  I think we have everyone

11   that was talking.  I'm not sure who that was, but

12   someone was on the call that obviously went to music.

13        So, before we stopped, Mr. Overholtz, you

14   were talking about, I believe, Mr. Power and

15   Mr. Grogan.

16        **MR. OVERHOLTZ:**  Yes.  And so we started

17   talking about the waiver issue.  And we know that

18   Mr. Grogan was involved in actually approving the

19   waiver, which was the waiver on the quality testing so

20   that the earplugs, as assembled and tested in TJR

21   Mexico, could be delivered to Indianapolis.

22        And I think there's another level of

23   importance there, which Your Honor mentioned

24   Mr. Rodriguez, Javier Rodrigues, and the founder and

25   head of the company being involved in problematic

1   issues.

2           Well, of course, they are, especially an

3   issue that means that, without the waiver coming from

4   Aearo Indianapolis to TJR Mexico, TJR may not get paid

5   for those plugs.  They needed the waiver to be able to

6   have the ability to deliver them.

7           The waiver was will Indianapolis accept the

8   plugs as-is.  And in fact, it was actually described,

9   quote, as an "as-is," quote, "waiver."  And

10  Indianapolis is agreeing to accept the product, quote,

11  "as-is," even though it tested in Mexico.  So the

12  importance of something like that I think can't be

13  understated.

14          A couple of other issues, Your Honor, that I

15  wanted to raise.  You know, we've talked a little bit

16  about, you know, duplicative custodians at this time

17  and the amount of time -- Your Honor, I think a couple

18  of examples may help play that out.

19          One of the most important documents in the

20  litigation -- and I know Your Honor saw it in the

21  government contractor briefing as well as the

22  government contractor hearing, which was the email

23  between Bryan Myers and Elliot Berger, "Do we tell

24  Ohlin."

25          Well, that email was never found in

1    Mr. Berger's file.  It was only found in Mr. Myers's

2    file.  So, even though those were the only two on it,

3    somehow those custodians -- if you only get one of

4    those custodians and it's only Mr. Berger, you never

5    get the email between two people regarding such an

6    important task.

7              The email that is cited here is one of the

8    supports for including Mr. Power's file, the quality

9    in Mexico memo that Mr. Klun wrote.  Well, that email

10   was sent out to five or six different people,

11   including Mr. Todor, Mr. Zielinski, Mr. Klun, and it

12   wasn't found in any of their files.  It was only found

13   in Mr. Knauer's file and Mr. Zielinski's file -- a

14   different version in Mr. Zielinski's file.  It wasn't

15   found in the other people who received this file.  So,

16   significant documents can be lost without the

17   including of custodians.

18             And on that point, Your Honor, you know, we

19   agreed in this process largely with Your Honor's

20   guidance to engage in a TAR process.  And unlike the

21   typical custodial reviews that occur that require the

22   review of full custodial files by the Defendants when

23   they get produced, the TAR model is working.

24             We just finished the process of the

25   supplemental TAR model to address some gaps, perhaps,

1    that the TAR model didn't address initially.  But the

2    TAR model works.  It's been trained.  It generates

3    relevant scores for documents.

4         The Defendants only review the documents that

5    meet certain scores as review, and they review them

6    based on scores and tranches of scores, and therefore

7    there is much less work, effort, or any kind of

8    prejudice at all, if any, of adding custodial files to

9    this TAR corpus.

10        Because the TAR process is going to find

11   those documents that are more relevant, score those

12   higher, those will be reviewed by the Defendants as we

13   move toward our discovery deadline.  The less relevant

14   documents get pushed down and maybe never get reviewed

15   now.  And if the custodians don't have relevant

16   documents, as Mr. Gunderson says, then those documents

17   won't score.

18        But the idea of leaving those documents

19   potentially out there when we know there are gaps in

20   the production I think is important.

21        You know, Mr. Todor, while we only received

22   nine -- we only received 51 emails in his production

23   where he received the email either as a "to" or "cc".

24   So there were another 352 emails that he received that

25   were found in others' files.  So these custodial file

1    productions simply are not complete, and therefore the

2    inclusion of more than one custodian from departments,

3    from teams, from superior reporting to worker, worker

4    reporting to superior, those are all very important

5    that the entire team get collected, not just

6    individuals, when you know there are gaps in the

7    custodial files.

8              The other thing that I wanted to address is

9    Mr. Gunderson talked about the idea that they had

10   found some files from the ATM quality files, general

11   server files.  And while there were documents that

12   were produced as part of that -- and frankly, without

13   that production, we would have even less on this very

14   important, very critical issue to the case regarding

15   the quality testing done on these plugs -- that

16   production doesn't include things like emails, unless

17   someone just happened to save an email into a Word

18   document or pdf an email and put it into a general

19   file.

20             And we know from the documents that you've

21   seen, Your Honor, already and have been part of the

22   briefing, the emails are where the Plaintiffs learn

23   about notice of issues, notice of problems, actions

24   that are taken, decisions of whether or not to take

25   actions.  There may be an official action document in

1    a general file, but the email in which is discussed
2    the three options and what are available, that doesn't
3    get into the final ATM quality file.  It's through
4    those emails and those personal custodial files that
5    you obtain that type of information which makes those
6    important.
7            With respect to Javier Rodriguez, I think
8    Your Honor was right about his role.  Mr. Gunderson
9    made an argument that the fact that some documents may
10   have had his name on it but were reused over and over
11   again -- and just to reiterate, Your Honor, I think
12   that that is actually a point for us, for the
13   Plaintiffs to obtain these files because, thankfully,
14   Mr. Rodriguez's name is on that.
15           And the fact that these documents were reused
16   over and over again is great, but the fact that
17   Mr. Rodriguez's name is on there tells us that
18   relevant documents have his name on them for that
19   company, and therefore the production of his file will
20   be entirely productive.
21           Now, what we don't know at this point in time
22   -- and I think this gets to the issue that Mr.
23   Aylstock was discussing, which is do they have these
24   witness files at all or have they been deleted or
25   destroyed, and what do they know about the custodians

1   that might exist that do have documents that are

2   important.

3          This process is supposed to be collaborative

4   in identifying custodians.  We believe that some of

5   these custodians, in light of the importance of this

6   issue, should have been revealed to us as early as the

7   initial Rule 16 conferences last summer.

8          But, you know, it's kind of my position that,

9   on this issue regarding the TJR/ATM and assembly

10  quality issues, the Defendants are really kind of

11  playing a Princeton four corners kind of game to run

12  out the clock based on the discovery deadline.

13         I mean, Mr. Gunderson described this entire

14  investigation that they have been involved in to look

15  at whether or not Olga Mendoza may or may not have

16  files, and he was able to tell us more than we've ever

17  been able to discern from any of the documents, that

18  she was a line superintendent, that she just made sure

19  that the parts, the components that came out of the

20  bags were made part of the line.

21         Well, if he learned that, who did he learn

22  was involved?  Because what we know is that 100

23  percent of all plugs had to be tested.  That was

24  guaranteed by emails from the company to military

25  officials as well as included in the medical

1    procurement identification document, the MPID, which

2    specifically made a promise to the DLA that 100

3    percent of plugs would be tested using these arc

4    boxes.  So, if Ms. Mendoza wasn't involved in that,

5    who was involved?

6          As the Defendants learn that information or

7    as their counsel learn that information, tell us who

8    that custodian is and collect their folders and

9    produce the documents, and then let us know if these

10   documents don't exist.  It took over six weeks to

11   learn that the file of Ms. Ramirez didn't exist, and

12   now we're hearing arguments from Mr. Gunderson that,

13   well, the Plaintiffs are waiting too long and this is

14   too late.

15         Well, if we had been told on June 11th, the

16   date it was ordered to be produce, *hey, there's no*

17   *file for Ms. Ramirez*, we could have jumped on this

18   more.  I mean, we had an argument before Your Honor

19   that said that Ms. Ramirez was the most likely

20   custodian because she did seem to be involved in a lot

21   of the communications, maybe as a result of language

22   or some other issue.  But we could have learned that

23   file didn't exist, and we could have moved on to these

24   other custodians right away.

25         So -- *(inaudible)* -- I really don't know.  We

know that there were some Indianapolis custodians that
were produced from the backup tapes.  There was a
backup set that existed.  And this raises an issue,
Your Honor, and this may be something that we have to
proceed further on, which is, we know at some point in
the mid-2000s, around 2006, 2008 time frame I believe,
that there was a legal hold in place and that there
were backup tapes that were found as part of this
litigation from that legal hold.  And that's how we
got additional productions from Mr. Berger's
deposition that led to the delay in his deposition to
December and being able to add some additional
questions in December as part of the 30(b)(6) as a
result of those late productions.

          I don't know the answer to whether or not
those backup tapes included TJR Mexico.  I don't know
whether the legal hold applied to TJR or ATM Mexico.
We certainly believe there's a reason why it might
have, but we don't have the facts.  The Defendants
have those facts.  But whether or not there was a
legal hold that should have required these files to
have been preserved I think is something that we are
entitled to know and understand.  I think we need to
address those issues.

          But I would like to know further information

1    from the Defendants and I think they should have to

2    produce to us are there backups of the TJR files that

3    can be located.  Because these are key custodians.

4    This is a key aspect of the case.

5            Every Combat Arms Earplug was either

6    assembled or mostly assembled at TJR Mexico for the

7    history of this product, and we learned that from Mr.

8    Zielinski's deposition.  Even though for many, many

9    months we were under the impression that that had been

10   switched over to New Dynamics, the AbilityOne

11   contractor, we now know that it was TJR Mexico that

12   was engaged in the entire production.

13           So we think that something has to be done if

14   there are missing files.  So we'd like to know right

15   away if these files we're even asking for exist.  They

16   agreed to produce Roberta Ramirez and Rafael Martinez,

17   but we don't know whether they even exist and if

18   they're going to be found and, if they can't be found

19   or if the others that we've requested now can't be

20   found, what can be done to resolve those issues.

21           So those are my counterpoints, Your Honor.

22   I'm happy to address any further questions you may

23   have.

24           **THE COURT:**  Okay.  Thank you.

25           **MR. GUNDERSON:**  Your Honor, I would like to

1    have the opportunity to respond to some of the

2    allegations in there.

3              **THE COURT:**  Go ahead.

4         **MR. GUNDERSON:**  As the Court knows, we've

5    spent extensive time and multiple hearings discussing

6    the backup tapes with both Your Honor and the

7    Plaintiffs and the sort of origin of them and, you

8    know, our understanding of the legal hold issues that

9    they were connected to.

10         So, Mr. Overholtz's suggestion that now is

11   the time to revisit those subjects with less than 30

12   days before the corporate discovery deadline is, you

13   know, from our perspective, you know, not the time to

14   be raising those issues.

15         Mr. Overholtz and I had an extensive

16   discussion about, you know, the investigations we have

17   done to date and our understanding of those issues.

18   And we are happy to, like, continue those discussions

19   on the side with Mr. Overholtz in terms of the data

20   that we think does exist or doesn't exist.

21         But the fact remains that, you know,

22   Plaintiffs keep circling back to information that they

23   have had in some cases for more than a year and

24   claiming they didn't have knowledge of these issues or

25   knowledge of ATM's role or whatever.

1          As we, I think, describe in our brief,

2    communications involving Ms. Ramirez were produced --

3    significant communications with Ms. Ramirez were

4    produced as far back as September.

5          The reality is, as Mr. Overholtz has

6    described, TAR identifies the relevant documents.  And

7    we don't dispute the characterization of TAR being

8    effective in this case.  The fact that there are so

9    few communications related to these issues we think is

10   indicative of the fact -- with the core custodians,

11   right, with the core witnesses, you know, that

12   Plaintiffs have identified, that Defendants have

13   identified as being relevant to this case, the fact of

14   the matter is we are now scraping the bottom of the

15   barrel and finding people who have had, at most, a

16   very short duration of connection to the issues or to

17   the Combat Arms Earplugs, and that just is what it is.

18         From our perspective, the Court asked the

19   parties to wrap up corporate discovery once in January

20   and, you know, had made it clear that September 1st is

21   the deadline -- is the cutoff.  And from our

22   perspective, you know, this has been clear to

23   Defendants for a while, it's been clear to Plaintiffs

24   for a while.  And their attempts to sort of reopen and

25   restart corporate discovery with, you know, having

1    different Plaintiffs counsel take the lead on those

2    issues we think is, you know, as we talked about

3    before, too little to late.

4           And with respect to the particular custodians

5    at issue in this dispute, you know, as we have

6    described multiple times, we just don't think they

7    rise to the standard the Court has described for

8    custodians who have unique, non-duplicative data about

9    important issues.

10          **THE COURT:**  Okay.  Thank you.  That was very

11   helpful from both sides.

12          Here is what I'm going to do.  First, you

13   know, with regard to the timing issue regarding when

14   this issue was briefed to the Court and it was, you

15   know, past the July 20 deadline, I get it.  That's not

16   going to be a reason for me to not address the

17   arguments being made by the parties.  Yes, you know,

18   it could have been briefed a few days sooner.

19          But, you know, in timing, I'm not going to be

20   blind to the fact that we have a September 1 deadline.

21   You know, we're not having preliminary discussions

22   about custodians.  In September/October we're getting

23   towards -- well, not towards -- we're getting to the

24   deadline for corporate discovery.  So, when I make a

25   decision as to whether a new custodian or an

1    additional custodian will or will not be added, you

2    know, I have that in mind.

3           But, having said all of that, with respect to

4    these five custodians, here is my view and my ruling

5    on this.

6           First, as to the ATM custodians, I am

7    convinced that Javier Rodriguez should be added as a

8    custodian.  He's relevant.

9           You know, these quality control issues, from

10   what I can extract from your briefs and from documents

11   referred to in your briefs, you know, is a fairly

12   important issue.  This was not just some side issue.

13          And although I recognize ATM assembled other

14   products, certainly the Combat Arms was an important

15   client for it, before it actually got bought by 3M.

16   So I would think that, to the extent there were

17   significant quality control issues, Javier Rodrigues

18   would have -- and I'd be sort of shocked if he was not

19   involved in those issues, even if it was at a macro

20   level.  Because it appears that Indianapolis and ATM

21   were talking about these issues, and there's the issue

22   of the waiver, should they go forward and manufacture

23   and what are they going to do with the problems, even

24   though it may have been in a very finite period of

25   time.

1          So I am going to direct that the Defendant

2     add Javier Rodrigues as an additional custodian.   I

3     think it's justified, and I think he could be a source

4     of relevant documents.

5          Now, I recognize that, you know, Mr.

6     Gunderson may come back and tell you in fairly short

7     order and say -- *There is no Javier Rodrigues*

8     *custodial file.  We did reasonable inquiry and we*

9     *couldn't locate it.*  And that will be an issue

10    certainly for another day.

11         But, you know, we're talking about the guy

12    was the founder of the company, owner of the company,

13    at least in the early days.  And I would think that,

14    not only would there be relevant information in the

15    custodial files, I think there will actually be a

16    custodial file to review so that data can be collected

17    from the files.

18         Now, as to the other two custodians, Olga

19    Mendoza and Juan Rodriguez, I'm really not convinced

20    that they are going to add much, if anything, in the

21    case.

22         So Olga Mendoza -- and I understand she was

23    involved in quality assurance in some way, but she

24    seems to be very far afield from quality issues that

25    might have happened after the assembly of the Combat

1   Arms Earplugs, and so I do not see her as a rich
2   source of data that are going to move this case
3   forward in one direction or another.
4          And, as to Juan Rodriguez, although he was a
5   quality control guy, it's really doubtful at this
6   point whether he really had anything to do with the
7   Combat Arms Earplug or the problems.
8          And I recognize Plaintiffs, you know, you
9   have just a small amount of documents to rely upon in
10  making your argument that an individual should be
11  added as custodians.  But other than him being
12  involved as a quality control manager, there just
13  doesn't seem to be much, if any, reference to him
14  having anything to do with the issues relevant to this
15  case.
16         So, at this late date -- because I do
17  recognize there is burden in adding custodians.  The
18  TAR review process is efficient.  It's turned out to
19  be a reliable tool in this case.  But when you add a
20  custodian, you've got to talk to the custodian or even
21  see if you can find them.  We've talked about the
22  backup tapes, you've got to collect the data.  So
23  there's a lot that has to be done to get the data into
24  the TAR process.
25         So, when you add a custodian, I don't want it

1   to be just, well, it's not going to be a lot of

2   documents that the Defendants are going to have to

3   review.  It's a little more involved than that.  So,

4   in my mind, there needs to be some showing where it

5   catches my attention that a custodian indeed was

6   involved in some way in the issues that we're talking

7   about.  And I find that Juan Rodriguez and Olga

8   Mendoza do not pass that threshold.

9          Now, that leaves us with the Aearo witnesses,

10   and that's a different situation, Gordon Grogan and

11   Larry Power, and Larry Power in particular.

12          You know, Power, according to the emails that

13   were produced, looks like he may have been involved in

14   the -- well, he was the -- that's who Zielinski

15   reported to.  And it seems like Power had involvement

16   with the earplugs in not just the testing but with the

17   quality testing issues that we've been talking about

18   that arose in Aearo Mexico.

19          And, you know, the argument is, *Well, why do

20   *we need Powers?  We've got Zielinski.  It's*

21   *duplicative*.

22          But Zielinski's files were a little thin.

23   And so I think, because of the involvement that Power

24   had, that his custodial files may have further

25   relevant information that Zielinski also may have been

involved in but that were not in Zielinski's file.

So I'm going to direct that Larry Power's custodial file be collected and added to the TAR corpus.

And then, as to Grogan, you know, he's, I guess, below Todor.  But it seems like Grogan was involved in the waiver issue, you know, the waiver issue being -- *Fine, we understand there's problems in Aearo Mexico, but go ahead and assemble them and ship them.*

And it's being represented that Todor's custodial file really did not have that much information in it.  And therefore, the argument that Grogan's file would simply be duplicative of Todor's file doesn't seem real convincing.  It seems like Grogan -- his custodial file may be a relevant source of documents relating to this quality issue.

So I am going to direct that both Grogan and Power's custodial files be reviewed, collected, and added to the TAR corpus.

Now, I didn't talk about timing on this because I have no idea how long it's going to take, other than I know we have a September 1 deadline.

So, let me ask you, Mr. Gunderson, adding Javier Rodrigues and then Grogan and Power, what kind

1    of realistic time frame do you think would be
2    necessary for you to collect the data and add it to
3    the TAR corpus and then conduct your review of the
4    documents?
5          **MR. GUNDERSON:**  Your Honor, that's a little
6    hard to predict.  You know, just so the Court is
7    aware, I'll sort of lay it out on the table here.
8          You know, our team is still reviewing
9    documents pursuant to the supplemental TAR agreement
10   that we discussed earlier.  That process is not
11   complete.  I think we have produced some of those
12   documents to the Plaintiffs last week.  They are going
13   to see -- *(inaudible)* -- stuff.
14         But, you know, pursuant to that agreement, we
15   are, you know, continuing to review documents --
16   *(inaudible)* -- via that process and are, you know,
17   really pushing to get that done by September 1st and
18   the deadline there.
19         You know, in terms of Mr. Javier Rodrigues,
20   our understanding is that he left the TJR/ATM/3M world
21   likely or potentially before the sort of 3M
22   acquisition was fully completed.  And so, we actually
23   don't expect there to be a file for Mr. Rodriguez.
24         We will finish our investigation and make
25   sure we have run all of the traps there.  But I just

1    wanted to make sure the Court is well aware and
2    Plaintiffs are well aware that, at this point we don't
3    expect there to be a file for him in terms of, you
4    know, his email that had been, you know, preserved for
5    some reason going back to 2007, 2008.
6          In terms of Mr. Grogan and Mr. Power, the
7    amount of time it takes us to conduct the review and
8    collection and all of that is dependent on a number of
9    different factors.  In particular, despite Mr.
10   Overholtz's suggestion that TAR is a simple process
11   and we only have to review the documents that are
12   identified as relevant by TAR, in fact, as we have
13   discussed with the Court -- and Mr. Buchanan knows all
14   about it -- there's a separate agreement in terms of
15   how the parties handle certain file types that the
16   parties sort of agreed are not sort of susceptible to
17   the TAR analysis.
18         And so, depending on how many image files and
19   Excel files and a whole host -- there's a long list of
20   file types that Defendants have to review every single
21   document without respect to a search term hit, without
22   respect to the timing of the document, without respect
23   to, you know, anything.  That adds a significant
24   amount of time to review for some of the custodians.
25         In some cases, we've reviewed 100,000 image

1   or cell files and had, you know, less than one percent

2   be responsive.  So all of that just depends on how big

3   of files they have in terms of those non-TAR

4   documents.

5          So I hate to like put a concrete deadline, in

6   any event.  Depending on when we wrap up the TAR

7   review and when we wrap up the supplemental TAR review

8   and when we could really, like, nail down the

9   selection -- I am pushing as hard as I possibly can

10  and will push as hard as I possibly can for our team

11  to complete the review by September 1st.

12         I think this is one of those situations where

13  a week from now we'll probably know more information,

14  especially in terms of, you know, once we have the

15  collection processed and loaded into the system and we

16  know how many extensions there are and image files and

17  the like.  We'll be happy to report back to the

18  Plaintiffs and the Court whether that September 1st

19  deadline seems reasonable.

20         That said, I do want to circle back to an

21  issue I highlighted earlier, which is late last week

22  Plaintiffs added essentially -- or requested that 20

23  additional custodians be added to the system at this

24  point.  You know, frankly, it's unrealistic for anyone

25  to think that that would get done by the September 1st

1    deadline, and it's certainly inconsistent with the 60

2    days we informed Plaintiffs of and the Court of back

3    in December.

4              So, you know, I do have concerns with that

5    additional set of custodians that we're still in the

6    process of meeting and conferring about and still in

7    the process of having to litigate.  So the September

8    1st deadline for anybody who is added to that process

9    is just not going to be realistic.

10             **THE COURT:**  Well, okay.  I mean, that's a

11   fair point when I asked you probably an unfair

12   question to put some kind of finite deadline on when

13   you would collect the data from these three additional

14   custodians how long it would take.  And I fully

15   appreciate that you don't know, until you see their

16   custodial files, how much is in it and what's in it.

17             So I'll just encourage the parties and

18   encourage the Defendants to continue to work

19   diligently to collect that data.  We have a September

20   1 deadline out there that's right now apparently cast

21   in stone.  But anything is subject to modification for

22   good reason and cause.  So that will be an issue that

23   Judge Rodgers and I will look at, if necessary, as we

24   get closer to September 1.

25             Your mention of the 16 additional custodians,

1    I have no idea who they are, what they are.  Obviously
2    the parties need to talk about it.  Just adding, in
3    the eleventh hour, peripheral players are probably
4    going to fall on deaf ears.  But, you know, if there's
5    some custodian out there that, despite due diligence,
6    has been discovered as having some significance in the
7    events in the case, then that can certainly change the
8    Court's view on that.
9         This would not be the first case in modern
10   history where, you know, a custodian or two was
11   identified late in the game.  Because, as I've said
12   before, and as the parties recognize on both sides,
13   the discovery is a learning process.
14        You know, the keys are diligence -- again, it
15   falls on deaf ears if one or both sides aren't
16   diligent -- and then, of course, there has to be, you
17   know, concrete reasons for adding additional
18   custodians, not simply this person had this title,
19   maybe they would be interesting.  It takes more than
20   that to add custodians.
21        So, you'll add the three custodians, Mr.
22   Gunderson.  Do it as reasonably diligent as you can.
23   Keep the Plaintiffs in the loop on that.
24        And then, although this is not something I
25   can rule on at this point, if, in short order, you

1    come back and you tell the Plaintiffs -- *Javier*
2    *Rodrigues, he's gone, we have no idea where he is, and*
3    *despite looking where we think we should look, there's*
4    *no custodial file, and we're never going to find a*
5    *custodial file* -- I think both sides need to have a
6    more robust discussion exactly what custodial files,
7    if any, relevant to this quality control issue are in
8    existence.

9         Because it's sort of a waste of everyone's
10   time to argue about the relevance of adding a
11   custodian when it doesn't matter if they're relevant
12   or not, there are no custodial files in existence at
13   all.  And as Mr. Overholtz said, that may bring up
14   issues for another day.  But we don't need to be
15   arguing over other custodians from ATM if there just
16   are no custodial files.

17        That may be the reality of it is that there
18   just -- during the relevant period of time when they
19   were TJR, there are just no custodial files in
20   existence.  So if that's the case, you do need to let
21   the Plaintiffs know that.

22        And I think in looking, Mr. Gunderson, for
23   Mr. Javier Rodrigues's custodial file, what knowledge
24   you don't have, you would certainly gain additional
25   knowledge as to what custodial files, if any, still

1    exist.

2         But I'm hearing through the grapevine that

3    you are somewhat doubtful that there are going to be

4    really any meaningful custodial files from ATM at this

5    point.  Is that right?

6         **MR. GUNDERSON:**  That is our understanding of

7    the individuals who were most involved, yes, I think

8    both because there was a significant turnover issue in

9    the transition to, you know, an entirely third-party

10   contract manufacturer to a joint venture to, you know,

11   Aearo, to 3M, you know, in terms of how that data got

12   transitioned from one to the other.

13        And we have this -- as I discussed with Mr.

14   Overholtz, we've had discussions with the IT manager

15   who helped transition that IT process back in 2007 and

16   2008.  I think, you know, this issue came up in June

17   when we were discussing Ms. Ramirez, and the fact

18   remains that, you know, for these people who left the

19   company so long ago, we just don't have the same data

20   that we would have versus somebody like Mr. Berger who

21   has been with the company for -- or was with the

22   company for decades or Mr. Myers or Mr. Moses or any

23   of the rest of those.  And that is our understanding.

24        In terms of the additional custodians that

25   Plaintiffs requested late last week, you know, for the

1   purpose of moving that along, Defendants would ask the
2   Court to set a real deadline for Plaintiffs to
3   initiate any briefing on those custodians so that we
4   can make sure that any disputes about those are
5   resolved and then we can figure out how to get that
6   production done, if possible, by September 1st.
7          We still have to meet and confer about it,
8   and so maybe we'll be able to magically resolve
9   everything.  As the Court knows, we have --
10  (inaudible) -- on any of these issues, so we expect
11  there to be at least something that gets litigated.
12          **THE COURT:**  I was going to ask Mr. Aylstock
13  what kind of realistic time frame do you need to go
14  through the meet and confer process before you would
15  reach the point that you have recognized there is a
16  disagreement among both sides?
17          **MR. AYLSTOCK:**  Yeah, we're happy to jump on
18  that, Judge.
19          A couple of things.  Today was the first time
20  we heard that Juan Rodriguez probably has no file.  I
21  think Your Honor asked them to let us know before we
22  have a big argument about sort of others.
23          And I'd also really like some clarity -- and
24  maybe Karl is willing to tell us this -- if TJR Mexico
25  or ATM material are on those backup tapes, because

 1    maybe that's another way to skin the cat, and we don't
 2    have visibility into that.
 3            So if we could kind of get information on
 4    both of those, I think we can meet and confer this
 5    week and probably have it teed up by mid next week.
 6    And I'm probably getting kicked on the telephone by
 7    some of my brief writers as I speak, but we're
 8    prepared to jump on it.
 9            **MR. GUNDERSON:**  Your Honor, I just wanted to
10    make a point here.  Mr. Overholtz and I discussed both
11    of those issues on a long discussion we had before the
12    briefing on these custodians.
13            I'm happy to have another conversation with
14    them.  But, you know, for the sake of moving this
15    along, we think any briefing Plaintiffs want to submit
16    should be submitted by this Friday so we have time to
17    respond and get it teed up to the Court by early next
18    week.
19            **MR. AYLSTOCK:**  Well, as long as --
20            **MR. OVERHOLTZ:**  Your Honor --
21            **MR. AYLSTOCK:**  I'd like to -- sorry, Neil, go
22    ahead.
23            **MR. OVERHOLTZ:**  I was just going to say, yes,
24    Your Honor, I'm happy to get on the phone with Mr.
25    Gunderson and talk through the additional custodian

1    requests, along with Mr. Buchanan and Mr. Aylstock,

2    and talk about that and see if we can't reach any kind

3    of resolution.

4         But I would request -- and this is largely --

5    as Bryan said, I was probably the one kicking him

6    under the virtual table -- is probably, to be able to

7    brief the issue, would need to be early next week.  I

8    just have some personal things and some other

9    litigations happening the end of this week.

10        **THE COURT:**  Well, why don't we do this:  Why

11   don't you meet and confer.  And any unresolved issues

12   on the custodians, file a brief with the Court by the

13   close of business on Monday.  I don't have my calendar

14   in front of me.

15        And then, do we have a leadership call that

16   -- not this Friday but the following Friday?

17        **MR. AYLSTOCK:**  We do, Your Honor, it's at

18   10:30 Central on Friday the --

19        **THE COURT:**  So, by Monday, Plaintiffs, to the

20   extent you can't work out things -- and, you know,

21   working it out is a two-way street.  There may be on

22   one or more custodians where you think there's some

23   passing interest in it, but for your discussions with

24   Mr. Gunderson you may make the decision that it's just

25   not worth your time to go after certain custodians.

1   Because, remember, the standard isn't just are the

2   custodians relevant, you know, it's a little bit of a

3   higher standard than that.

4           But, to the extent you've got custodians

5   where you think, to prepare your case, you need to

6   have those custodial files searched, and the

7   Defendants do not agree, by the close of business on

8   Monday you will file your brief on that.

9           And then, Mr. Gunderson, if I gave your side

10  until close of business on Thursday, is that enough

11  time for you to respond to the letter brief?

12          **MR. GUNDERSON:**  That is, Your Honor.

13          **THE COURT:**  Okay.  So let's do that.  And

14  then, that Friday we'll have a conference call.  So we

15  won't talk about what we have to do, it will be done,

16  and the Court can rule on that pretty promptly.

17          **MR. AYLSTOCK:**  Your Honor, could we get

18  visibility from 3M on which of those custodians they

19  may not have files for?  It's a bit of a waste of

20  everybody's time, including Your Honor's, if they're

21  not going to have files, to really go through that

22  process.  And it would be good to know whether Javier

23  has a file or not because that might guide us on some

24  of these other requests.

25          **THE COURT:**  Well, they are going to -- with

1    due diligence, they're going to get back to you on
2    that and tell you indeed whether he has a custodial
3    file or they've been able to locate his custodial
4    files.

5         And then, Mr. Gunderson, I do want you to
6    tell them whether indeed you have any ATM custodial
7    files.  Because, if there are none, you know, that
8    might bring up other issues.  But we don't need to be
9    arguing over custodians if there simply are none or
10   are none from a certain time frame.

11        **MR. NOMELLINI:**  We will do that.  And Mr.
12   Gunderson has been diligent about that and will
13   continue to be and will report on that.

14        I think Your Honor was quite -- *(inaudible)*
15   -- in the June 10th hearing we had on this in
16   forecasting some of the issues.  When Your Honor
17   ordered the production for Ms. Ramirez, Your Honor
18   said, "I recognize there may be a real problem in
19   locating the data that may be collected.  This could
20   be a very short road.  I don't think data preservation
21   in Mexico is the same as we have in this country,
22   certainly not back in 2004 to 2012."  And then Your
23   Honor correctly pointed out, "but the Defendant has
24   the obligation, because it's going to be a custodian,
25   to try to locate the custodial file."

1           And so, I think these are somewhat difficult

2    circumstances, but Mr. Gunderson has been and will

3    continue to be diligent and will continue to

4    collaborate with Plaintiffs and provide information as

5    soon as we have it.

6           **THE COURT:**  Okay, great.

7           **MR. OVERHOLTZ:**  And, Your Honor, just a

8    couple of things.  One is that also the two custodians

9    that Mr. Gunderson's team agreed to provide, if we

10   could get information on those two as well, Ms.

11   Ramirez and Mr. Rafael Martinez, that would be

12   important.

13          And just so Your Honor is aware, the issue of

14   the IT issues and whether or not there are files

15   available from TJR Mexico, the Plaintiffs did include

16   that as one of the topics in the 30(b)(6) deposition

17   notice that the parties are meeting and conferring on

18   as well as potentially briefing in the middle of this

19   month as well.  So I just wanted Your Honor to be

20   aware of that.

21          **THE COURT:**  Okay.

22          **MR. OVERHOLTZ:**  And there are two depositions

23   scheduled at the end of this month, Mr. Todor's

24   deposition and Ms. Schaefer Childress *[phonetic]*, who

25   also worked in the quality department.

```
 1              I don't anticipate -- and I haven't spoken to
 2    any of my colleagues about the -- (inaudible).  But,
 3    to the extent that Mr. Gunderson can keep us updated
 4    on the inclusion of these three files that Your Honor
 5    has ordered today, I just wanted Your Honor to be
 6    aware that -- I don't know that we would ever seek
 7    leave to take those depositions after those files are
 8    produced or not, you know, beyond the deadline.  But I
 9    certainly didn't want to be accused later of not
10    raising it.  So I just wanted to bring to the Court's
11    attention of those two depositions that might be
12    impacted by these productions.
13              THE COURT:  Right.  It certainly would be of
14    assistance if a Todor email showed up in a Grogan or
15    Power file that you did not already have, you probably
16    would want to use that at the deposition.
17              But you say that Todor's deposition is not
18    until the end of this month?
19              MR. OVERHOLTZ:  It's the 25th, Your Honor.
20              THE COURT:  Okay.  Well, today is the 4th, so
21    that probably should be enough time for the Defendants
22    to know, one, to collect the additional custodial
23    files and run them through the TAR process, but
24    certainly for them to know whether additional
25    documents authored by or sent to Todor that they did
```

1    not already have are going to be produced.  So, yeah,

2    keep that in mind.

3         **MR. GUNDERSON:**  Your Honor, when we talk

4    about investigating whether there's a custodial file,

5    it's often that it's easy to sort of visualize a,

6    like, you know, paper file in a file cabinet or a

7    single server that has the file labeled, you know,

8    "Rodriguez file" -- *(inaudible)* --

9         As we've described to the Court and the

10   Plaintiffs on numerous occasions that that's --

11   *(inaudible)*.  It is significantly more involved than

12   that.  And as we have described to Mr. Overholtz and I

13   think in our letter brief, too, you know, since we

14   have -- *(inaudible)* -- declarations in the fall, we

15   have been running the traps for any custodians we

16   think may have a custodial file on all of those

17   additional potential sources to see if there is

18   anything else out there.

19        Those data source declaration resulted from

20   some custodians last fall who didn't have custodial

21   data, and so we have been using that same process for

22   any additional custodians.

23        **THE COURT:**  Okay.

24        **MR. GUNDERSON:**  So I just wanted to sort of

25   be clear in terms of our -- I think this came up on

1    July 10th, too.  You know, there's the easy-to-check

2    sources and then there's the much-more-involved

3    sources to get confirmation on.

4          In terms of confirming whether there's a

5    custodial file or not, we will certainly communicate

6    to Plaintiffs whether they are easy to locate in terms

7    of custodial files for any of these.  But I think, you

8    know, Plaintiffs and our team will want to make sure

9    that we run the full traps of these as well, which

10   will just take us, you know, additional time to get

11   that file confirmation.

12         **THE COURT:**  Okay, very good.  One last

13   issue -- this is a disconnect but in terms of

14   deadlines.  On the Defendants' Motion for

15   Reconsideration that was just filed recently -- and

16   this has to do with the Rowe deposition -- I am

17   operating under the assumption that the Plaintiffs

18   will file a response.  And, obviously, I'm not going

19   to rule on that motion until I have a response.

20         Mr. Aylstock, what was your side intending to

21   do?  I don't know if there's any pressing emergency on

22   that.  Was it your intention to file your response

23   within the normal time limits or was there some other

24   view on that?

25         **MR. AYLSTOCK:**  No, Your Honor.  We were going

1  to definitely file a response within the normal time

2  limits.  All the plaintiffs were deposed and one

3  spouse was deposed, and so we'll have that briefed.

4  And actually, that's our law and briefing committee,

5  Michael Sacchet probably heading that up.  And he's

6  not on the call, but I know he's aware of the deadline

7  and will have a timely response.

8          **THE COURT:**  Okay.  I didn't think that had an

9  urgency flag next to it at this point.  But when

10  that's briefed, then I can address that in due course.

11          **MR. AYLSTOCK:**  Thank you, judge.

12          **THE COURT:**  Anything else from the parties?

13          **MR. AYLSTOCK:**  No, Your Honor.  Appreciate

14  the time today.

15          **THE COURT:**  Anything else from the Defense?

16          **MR. NOMELLINI:**  Thank you, Judge.

17          **THE COURT:**  Thank you all.  Have a good day.

18          ***(Proceedings concluded at 3:00 p.m. EST.)***

19              --------------------

20  *I certify that the foregoing is a correct transcript*
   *from the record of proceedings in the above-entitled*
21  *matter.  Any redaction of personal data identifiers*
   *pursuant to the Judicial Conference Policy on Privacy*
22  *are noted within the transcript.*

23

24  *__s/Donna L. Boland__                    8-5-2020*
   *Donna L. Boland, RPR, FCRR                    Date*
25  *Official Court Reporter*