UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to All Cases | Case No. 3:19md2885<br><br>Judge M. Casey Rodgers<br>Magistrate Judge Gary R. Jones |

# ORDER

The Plaintiffs in this multidistrict litigation allege hearing loss and/or tinnitus following use of the Combat Arms Earplug Version 2 (CAEv2). Discovery remains ongoing for the bellwether plaintiffs, with fact discovery for Trial Group A Plaintiffs closing on October 9, 2020. Pretrial Order No. 43, ECF No. 1204. The Court recently held a second Science Day on ototoxic medications and illicit substances associated with hearing loss and/or tinnitus. Each side's expert addressed ototoxicity generally, and then more specifically the question of whether there is a relevant scientific association between certain medications and illicit substances and hearing loss and/or tinnitus. On careful consideration of the parties' presentations, including a review of the publications cited, the undersigned concludes that discovery in this litigation is limited to only a select few ototoxic medications and illicit substances.

"[D]iscovery, like all matters of procedure, has ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (internal

quotation marks and citation omitted). Parties to litigation in federal court may discover only "nonprivileged matter[s] that [are] relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Relevance is broadly construed and includes "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Oppenheimer*, 437 U.S. at 351. Proportionality contemplates "whether relevant information is discoverable in view of the needs of the case," *Kadiyala v. Pupke*, No. 17-80732-CIV, 2019 WL 3752654, at *2 (S.D. Fla. Aug. 8, 2019) (internal quotation marks and citation omitted), and requires consideration of "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit," Fed. R. Civ. P. 26(b)(1). The discovery sought need not be admissible at trial to be discoverable. *Id.*

The Court has "broad discretion to compel or deny discovery." *Jones v. RS & H, Inc.*, 775 F. App'x 978, 983 (11th Cir. 2019); *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1306 (11th Cir. 2011). Pursuant to Rule 26(b)(2)(C), the Court, "[o]n motion or on its own, . . . must limit the frequency or extent of discovery" when it determines that "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." "[I]f there is an objection that discovery goes

beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses." Fed. R. Civ. P. 26(b)(1), Advisory committee's notes (2000 Amendment). Where relevance of the discovery sought is not readily apparent, the party seeking the discovery bears the burden of showing its relevancy. *See Pediatric Servs. of Am., Inc. v. Kendrick*, No. 3:18CV1372-RV-CJK, 2019 WL 580786, at *2 (N.D. Fla. Jan. 17, 2019); *Vision Constr. Ent., Inc. v. Argos Ready Mix, LLC*, No. 3:15cv534-MCR-CJK, 2017 WL 10084359, at *2 (N.D. Fla. June 28, 2017); *Bacchus v. Benson*, No. 4:07CV186-RH/WCS, 2007 WL 9736176, at *1 (N.D. Fla. Nov. 29, 2007) ("The burden of establishing relevance to a claim or defense is on the party seeking discovery.").

Defendants seek discovery related to 49 "classes" of medications and illicit substances they claim are ototoxic.[1]  *See* July 17, 2020 Letter from Defs. to J. Rodgers (attached hereto as Exhibit A).  An ototoxic substance is a substance considered toxic to the inner ear, which is comprised mainly of the cochlea and the vestibular organs, as well as the auditory nerve. Defendants' expert identified four different mechanisms for ototoxicity, three of which impair the cochlea or cochlear function, and one that damages the vestibular organs, which surround the cochlea.

---

[1] Within the 49 "classes" sought, Defendants have specifically identified 49 subclasses and examples of medications and substances within these classes.

The cochlea contains the auditory system and is responsible for a person's hearing function.  *See* C Lanvers-Kaminsky, et al., *Drug-induced Ototoxicity: Mechanisms, Pharmacogenetics, and Protective Strategy*, 101 Clinical Pharmacology & Therapeutics 491, 491 (2017).  Damage to the cochlea, its components or cochlear function can lead to hearing loss.  *See* Jin Guo et al, *Protection of Hair Cells from Ototoxic Drug-Induced Hearing Loss*, Hearing Loss: Mechanisms, Prevention and Cure 2019 at 18.  In particular, damage to the hair cells in the cochlea can result in permanent hearing loss.  *See id.* at 18; Yan Chen et al., *Hair Cell Regeneration*, Hearing Loss: Mechanisms, Prevention and Cure 2019 at 1-2.  Although there are many forms of tinnitus, to the extent a person's tinnitus generates from the ear, it similarly originates in the cochlea or from cochlear activity.  *See* Haûla F. Haider et al., *Pathophysiology of Subjective Tinnitus: Triggers and Maintenance*, 12 Frontiers in Neuroscience 1, 4-5 (2018); Santosh Kumar Swain, et al., *Tinnitus and its Current Treatment—Still an enigma in medicine*, 115 J. Formosan Med. Ass'n 139, 141 (2017).  The vestibular organ, however, does not control auditory function and thus vestibulotoxic medications and substances do not impair a person's hearing ability.  Instead, vestibulotoxicity manifests as dizziness, vertigo, and balance problems, not hearing loss and tinnitus.  *See* Lanvers-Kaminsky, *Drug-induced Ototoxicity* at 491.

Notably, the Plaintiffs do not allege they suffer from dizziness, vertigo, or balance problems as a result of using the CAEv2. Although vestibular disorders are also frequently "comorbid" with mental health issues such as panic, agoraphobia, and depression, *see id.*, the Court has already ruled that a plaintiff's mental health is not relevant where the plaintiff's mental health is not at issue. *See* Order, ECF No. 1258 at 8-13 (July 17, 2020); Order, ECF No. 1065 at 5-7 (March 26, 2020); *see also* Pretrial Order No. 39, ECF No. 1154 at 2 (June 1, 2020). Accordingly, ototoxic medicines and/or illicit substances that do not cause damage to the cochlea are not relevant to Plaintiffs' claims. *See Oppenheimer*, 437 U.S. at 351; Order, ECF No. 748, at 4 (Oct. 9, 2019) (Information must bear on the theories or defenses raised in the case to be relevant.). On the other hand, any medicines and/or illicit substances on Defendants' list for which there is scientific evidence showing a cochleotoxic affect, whether permanent or transient, are clearly relevant to the claims of hearing loss and tinnitus in this litigation. Those medications include aminoglycosides, platinum-based antineoplastics, to include alkylating, and the NSAID, naproxen.[2]

Defendants' presentation did not address how transient hearing loss or tinnitus differs from temporary hearing loss, or hearing loss that is completely reversible. Medications and substances with reversible cochleotoxicity have reversible

---

[2] Because Defendants' cited literature reported only hearing loss and not tinnitus as a possible permanent cochleotoxic effect of naproxen, naproxen is thus relevant only to claims of permanent hearing loss.

cochleotoxic affects that "disappear[] after drug withdrawal." Lanvers-Kaminsky, *Drug-induced Ototoxicity* at 492. Reversible cochlear toxicity does not square with hearing loss or tinnitus that is transient, which by definition means it comes and goes. *See transient*, Merriam-Webster's Dictionary, available at https://www.merriam-webster.com/dictionary/transient. Here, Plaintiffs have not claimed that their hearing loss or tinnitus was, or is, only temporary. Thus, reversible cochleotoxic medications—NSAIDs *other than naproxen*, loop diuretics, macrolides, and the antimalaric drug quinine—are only arguably relevant to Plaintiffs' hearing loss and/or tinnitus claims in those limited instances when a Plaintiff's use of these medications or illicit substances coincided with his or her hearing loss or tinnitus diagnosis, whether by audiogram or doctor's visit, and the plaintiff continues to use these medications or illicit substances today.[3] However, because of this limitation, the Court finds that the potential relevance of reversible cochleotoxic medications and illicit substances to the Plaintiffs' claims of permanent and transient hearing loss and/or tinnitus is outweighed by the substantial burden of records review and production, particularly when Plaintiffs may be questioned about this information at their depositions. Should Defendants learn at deposition that a particular Plaintiff was using a reversible cochleotoxic medication or illicit

---

[3] Specifically, NSAIDs, macrolides and quinine are arguably relevant in these limited instances to both hearing loss and tinnitus claims, whereas loop diuretics are arguably relevant to only hearing loss claims.

Case No. 3:19md2885/MCR/GRJ

substance at the time of his or her hearing loss and/or tinnitus diagnosis and continues to use that drug today, Defendants may seek leave of Court for additional records.

The same is true for marijuana and amphetamines, two "drugs of abuse and/or addiction" on Defendants' list. Although Defendants' expert did not reference these drugs as being cochleotoxic or present medical literature supporting marijuana's cochleotoxicity, he nonetheless referenced studies showing hearing loss or tinnitus in a number of subjects while using these drugs. For marijuana, Defendants' expert cited a study analyzing audiometric testing data of nearly 3,000 subjects that was specifically designed to "evaluate associations between marijuana use and the prevalence, severity, and rate of occurrence of tinnitus." Z. Jason Qian and Jennifer C. Alyono, *An Association between marijuana use and tinnitus*, 41 Am. J. Otolaryngology at 1 (2020). That study concluded that "regular marijuana use," or at least once per month for 12 months was "significantly associated" with experiencing tinnitus during that time of use. *See id.* at 1, 3. Thus, the Court concludes that regular marijuana use has at least some relevance to Plaintiffs' tinnitus claims if it coincided with a tinnitus diagnosis. Similarly, with respect to amphetamines, Defendants cited a study where subjects dependent on amphetamines self-reported recoverable hearing loss. Nayyer Iqbal, *Recoverable Hearing Loss with Amphetamines and Other Drugs*, 36 J. Psychoactive Drugs 285, 286 (2002).

Although the study itself points out that its complete reliance on self-reports for the study was a "shortcoming," *see id.*, the Court acknowledges that this discovery dispute is not the place for a *Daubert*[4] analysis. The Court concludes that amphetamine abuse has some relevance to Plaintiffs' claims of hearing loss.

However, because tinnitus symptoms for marijuana users and hearing loss symptoms for amphetamine users are reversible, the Court applies the same proportionality analysis it applied to reversible cochleotoxic medications and concludes that discovery of Plaintiffs' marijuana and amphetamine use is not proportional to the needs of the litigation. Defendants remain free, however, to seek leave of Court for further records discovery on learning of (1) a Plaintiff's regular marijuana use at the time of his or her tinnitus diagnosis and/or regular amphetamine use at the time of his or her hearing loss diagnosis and (2) that Plaintiff continues to use marijuana or amphetamines.

Regarding alcohol use, the Court is unable to conclude that it has any relevance to the Plaintiffs' claims. Defendants' expert relied on one study that found that "hazardous" drinking "coexist[s] with hearing impairment in men." *See* Jin-A Park and Michelle J. Suh, *Hazardous Alcohol Consumption and the Risk of Hearing Impairment in Adults Based on the Korean National Health and Nutrition Survey: A*

---

4    *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).

*Retrospective Study*, 23 J. Audiol. Otol. 63, 63 (2019). However, neither the study nor Defendants' expert defined "hazardous" drinking in standard terms, such as a threshold number of drinks per day, that could be applied to Plaintiffs. *See id.* at 64 (defining "hazardous" drinking as an "AUDIT score" of 20-40, and higher than "risky" or "appropriate drinking habits). Defendants' expert instead stated that "heavy" alcohol use was associated with hearing impairment, yet was not able to distinctly define "heavy" when specifically asked by the Court. Moreover, in another publication cited by Defendants, the study determined that "[u]se of other substances such as alcohol . . . was not associated with tinnitus." *See* Qian, *An association between marijuana use and tinnitus* at 1. In light of this, Defendants have not met their burden to show how alcohol use is relevant to Plaintiffs' claims of hearing loss and/or tinnitus.

Regarding hydrocodone use, the Court finds some support in the science for a possible association between one drug containing a combination of hydrocodone and acetaminophen, i.e. Vicodin, and hearing loss. Defendants' expert cited several small studies (12 patients or less) where Vicodin abuse resulted in irreversible hearing loss and required cochlear implantation to restore hearing. *See* Rick A. Friedman et al., *Profound Hearing Loss Associated with Hydrocodone/Acetaminophen Abuse*, 21 Am. J. Otology 188, 188-91; Ivan Lopez et al., *Sudden Sensorineural Hearing Loss Due to Drug Abuse*, 33 Seminars in Hearing

251, 255-56 (2012). Because these studies are limited to Vicodin abuse, however, the Court will limit discovery to Vicodin use[5] (as opposed to general hydrocodone use) in cases where Plaintiffs allege permanent hearing loss.[6]

Finally, Defendants' list includes several medications and substances which were not referenced by Defendants' expert as being cochleotoxic; those which are not supported by the medical literature as being cochleotoxic; and/or those which lack a known mechanism of ototoxicity. For the medications on Defendants' list that were not referenced at all in the presentations or otherwise referenced in cited publications, such as antiadrenergics and carbapenems, Defendants clearly did not satisfy their burden of showing relevance.[7] For the remaining drugs on Defendants' list, Defendants have not explained how they bear on hearing loss and/or tinnitus other than to say there is an "association." In several instances, such as for

---

[5] This includes any generic form of Vicodin.

[6] Plaintiffs' expert also cited a study on controlled hydrocodone use with ibuprofen where subjects did not report hearing loss, which suggests that not all hydrocodone use can impair hearing. *See* Mark Palanagio, MS et al., *Combination Hydrocodone and Ibuprofen Versus Combination Codeine and Acetaminophen for the Treatment of Chronic Pain*, 22 Clinical Therapeutics (200).

[7] There are some "classes" of medication and substances on Defendants' list that also do not appear to be medications or substances at all, such as "metabolic" and "dementia." Still others are duplicative—for example "opioids" are duplicative of the several "drugs of abuse and/or addiction" also sought by Defendants, such as heroin, methadone, and oxycodone, and bexarotene is on the list twice. And a few are vague and overbroad, such as "sedatives" and "vaccines." *See* Ex. A.

methadone[8], cocaine[9], and heroin[10], the claimed "association" with hearing loss, is based, at most, on a handful of case reports, each involving only a single patient. Moreover, at least one study cited by Defendants' expert even observed that "cocaine . . . and heroin [were] not associated with tinnitus." Qian, *An association between marijuana use and tinnitus* at 1. For other drugs and substances, the claimed "association" with hearing loss and/or tinnitus is based exclusively on adverse event and pharmaceutical reporting data. Specifically for both antidepressants and opioids, Defendants' expert admitted there is no known mechanism of ototoxicity, but nevertheless concluded that antidepressants were "associated" with hearing loss, and to a greater extent, with tinnitus, based on review papers that gathered data from adverse event reporting. The remaining medications on Defendants' list were seemingly pulled from two publications that list medications and substances as causing hearing loss and/or tinnitus based solely on reviews of drug formularies and

---

[8] *See* Seeded Ghasemi et al., *Methadone associated long term hearing loss and nephrotoxicity; a case report and literature review*, Substance Abuse Treatment, Prevention, and Policy (2019).

[9] The single case study cited to support an "association" between cocaine and hearing loss actually reported on the use of heroin in combination with cocaine that resulted in hearing loss. *See,* Cynthia G. Fowler et al., *Sudden Bilateral Sensorineural Hearing Loss Following Speedballing*, 19 J. Am. Acad. Audiology 461 (2008); Lopez, *Sudden Sensorineural Hearing Loss Due to Drug Abuse* at 256.

[10] Nair et al.*, The Impact of Sudden Hearing Loss Secondary to Heroin Overdose on Fitting Outcomes*, 19 Am. J. Audiology 86 (2016); Lopez, *Sudden Sensorineural Hearing Loss Due to Drug Abuse* at 256.

adverse event reporting. Those medications are, at most, marginally relevant to this litigation but, even if marginally relevant, discovery of those remaining medications and substances—amounting to over 70 classes and subclasses of medications—are not proportional to the needs of this case, given the time consuming burden associated with records review and production, especially when the same information may be obtained through sworn deposition testimony.

Accordingly, it is **ORDERED** that, regarding medical and mental health records for those Plaintiffs where mental health is not placed at issue:

1. Aminoglycosides and platinum-based antineoplastics, including alkylating are discoverable in cases where Plaintiffs allege they suffer from either or both hearing loss and tinnitus. Naproxen and Vicodin are discoverable only where Plaintiffs allege permanent hearing loss. Plaintiffs are hereby **ORDERED** to remove any such redactions from previously produced records, and going forward, must disclose this information in their productions to Defendants.

2. Defendants request for discovery of all other ototoxic medications and illicit substances on their list (Exhibit A) is hereby **DENIED**.

**SO ORDERED**, on this 17th day of August, 2020.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**