**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG       )       Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,      )
                                    )       Pensacola, Florida
                                    )       August 14, 2020
                                    )       10:29 a.m.
                                    )
                                    )
_____    )


**LEADERSHIP PHONE CONFERENCE**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-103)

**A P P E A R A N C E S**

**JUDGE DAVID R. HERNDON** (ret.)

**FOR THE PLAINTIFFS:**      **BRYAN F. AYLSTOCK, ESQUIRE**
                         **JENNIFER HOEKSTRA, ESQUIRE**
                         **NEIL OVERHOLTZ, ESQUIRE**
                         Aylstock, Witkin, Kreis & Overholtz
                         17 E Main Street, Suite 200
                         Pensacola, Florida  32502

                         **DAVID R. BUCHANAN, ESQUIRE**
                         Seeger Weiss, LLP
                         55 Challenger Road, 6th Floor
                         Ridgefield Park, New Jersey  07660

                         **SHELLEY HUTSON, ESQUIRE**
                         Clark Love & Hutson, GP
                         440 Louisiana Street, Suite 1600
                         Houston, Texas  77002

                         **MICHAEL A. SACCHET, ESQUIRE**
                         Ciresi Conlin LLP
                         225 South 6th Street, Suite 4600
                         Minneapolis, Minnesota  55402


**FOR THE DEFENDANTS:**      **ROBERT C. BROCK, ESQUIRE**
                         Kirkland & Ellis, LLP
                         1301 Pennsylvania Avenue NW
                         Washington, D.C.  20004

**MICHELLE SIX, ESQUIRE**              **KIMBERLY BRANSCOME, ESQUIRE**
Kirkland & Ellis, LLP               Dechert, LLP
601 Lexington Avenue                633 W 5th Street, Suite 4900
New York, New York 10022            Los Angeles, California  90071

**MARK J. NOMELLINI, ESQUIRE**
Kirkland & Ellis, LLP
300 N Lasalle
Chicago, Illinois  60654

```
 1                    P R O C E E D I N G S

 2         JUDGE RODGERS:  Good morning, everyone.  This

 3  is Casey Rodgers.  Let me ask who is present.  And I

 4  really just need to know who is going to be addressing

 5  the Court from each side on the agenda items.  And

 6  then, to the extent someone who has not identified

 7  themselves needs to speak, then you're free to do that

 8  and just identify yourself at that time.

 9         Who will be the spokesperson or persons for

10  the Plaintiffs?

11         MR. AYLSTOCK:  Good morning, Your Honor.

12  This is Bryan Aylstock.  I'll be speaking on certain

13  items.  My partners, Jen Hoekstra and Neil Overholtz,

14  will be speaking on certain other items.  I know Mr.

15  Buchanan, Ms. Hutson, and Mr. Sacchet will also be

16  chiming in on certain agenda items.

17         JUDGE RODGERS:  All right.  Thank you for

18  that.

19         And from 3M?

20         MS. BRANSCOME:  Good morning, Your Honor.

21  It's Kim Branscome.  And it will primarily be myself,

22  Mark Nomellini, and Michelle Six.  And then, to the

23  extent something comes up about which you have a

24  question, we probably have a few others on the line.

25         JUDGE RODGERS:  Okay, thank you.
```

1          **MR. BROCK:**  Judge Rodgers, this is Mike

2    Brock.  I was just going to let you know I'm on the

3    call, but it will be on mute and, as Kim indicated,

4    others will be having the speaking roles today.  So,

5    thank you.

6          **JUDGE RODGERS:**  Thank you, Mr. Brock.

7          I'm just going to track your agenda, which I

8    appreciate you submitting.  The first item on the

9    agenda was an update on the meet-and-confer process

10   regarding document stipulations in an effort to narrow

11   the scope of case-specific bellwether depositions.

12         **MR. NOMELLINI:**  Yes, Your Honor.

13         **MR. AYLSTOCK:**  Yes, Your Honor.

14         **JUDGE RODGERS:**  We'll start with the

15   Plaintiffs, and then, Mr. Nomellini, I'll hear from

16   you.

17         **MR. AYLSTOCK:**  Sorry about that Mark.

18         Thank you, Judge.  This is Bryan.  Yeah, we

19   have had a series of meet-and-confers.  Mr. Pennock

20   has been very helpful and Ms. Hutson.  We've been

21   talking with the Defendants about document

22   stipulation.

23         I think both sides have taken to heart what

24   the Court had said at the preconference last time that

25   these won't be counting against either side's

1    deposition limits pursuant to the PTOs, and so we've

2    had some drafts go back and forth.

3         One of the issues is there's obviously a lot

4    of medical records and a lot of corporate discovery as

5    well, corporate documents.  We're working on a

6    stipulation that would be reciprocal, in that, we

7    don't want to be fighting about authenticity or

8    business records of certain 3M documents as well.

9         In our experience collectively, we've never

10   had this issue really come up and bite us in any other

11   MDL or MDL trial.  It does get worked out, but

12   typically it gets worked out much closer to trial,

13   once the parties can narrow their witness lists, their

14   exhibit lists, and things like that, and kind of

15   figure this out as far as what documents are more

16   likely to come in.

17        So, there is some language that's going back

18   and forth, but I don't think that this issue really

19   holds up anything as it relates to the discovery

20   cutoffs because of what the Court had said.  And the

21   parties have agreed that, as it relates to records

22   custodian depositions, that, if there is an issue

23   later on, that, again, what the Court had said is we'd

24   be able to deal with that later on.  But we don't

25   anticipate this being an issue that's going to come up

1    to bite us.

2              **JUDGE RODGERS:**  Okay, very good.  Thank you.

3              Mr. Nomellini, anything you'd like to add?

4              **MR. NOMELLINI:**  Yes, Judge.  We had a good

5    call with Judge Herndon yesterday on this.  The

6    Plaintiffs' stipulation covers medical, personnel,

7    education, and employment records.  It's simple, it

8    just says the documents are authentic and not hearsay,

9    and then there's an Appendix A to that which covers

10   the list of documents.

11             Plaintiffs indicated they need some more time

12   to go through that through next Wednesday, and we

13   certainly understand that and the need to review the

14   documents.

15             To the extent Plaintiffs do have documents

16   where they object on authenticity or hearsay, it's

17   good to know now so that the parties can get the

18   custodian of records depositions in.  And the parties

19   have an understanding that they don't count against

20   the limit of six, which is good.  We don't want to

21   defer these issues until right before trial.

22             On the language of the stipulation itself,

23   Plaintiffs are going to let us know today if they're

24   good or if they have any other issues, in which case

25   we'll have a call with Judge Herndon to try to wrap

1    this up.

2        **MR. AYLSTOCK:**  I do think, Your Honor, there

3    are some issues.  Certainly, business records are a

4    hearsay exception, and we understand what that means

5    under the Rules of Evidence.

6            As far as just a general waiver that it's not

7    hearsay, you know, we may have issues there that may

8    or may not affect things.  And there may be some

9    trustworthiness issues or hearsay within hearsay and

10   things like that, as these records come in -- and

11   they're still coming in -- that may arise later on.

12           And the parties can kind of narrow those

13   issues as we proceed down the discovery course.  But

14   we don't see the pressing desire, when some of these

15   people have tens of thousands of records, to have to

16   go through and identify every issue at this point

17   because there is obviously more discovery to be done.

18           And the way that the stipulation is set up is

19   it's got an appendix and so forth.  Certainly, we do

20   want reciprocity.  We do not want to not have to be

21   fighting about this as it relates to 3M records as

22   well.

23           So, again, those issues will be more clearly

24   in focus as we proceed to trial.  And this, as I

25   mentioned, has never been -- I've tried a lot of these

1    cases, as have my colleagues, and we've never had to

2    resort to record custodian depositions in my

3    experience yet, so I don't anticipate that here.

4         **MR. NOMELLINI:**  Your Honor, our point would

5    simply be, if there is an authenticity issue or

6    hearsay issue with a particular document, let's raise

7    it sooner rather than later so that we can have a

8    custodian of records deposition, if necessary, and not

9    defer it.  Because, otherwise, that expands the number

10   of depositions we would need to take if we're not

11   certain.  So, our view would be to do it sooner.

12        **JUDGE RODGERS:**  So, you all are in dispute,

13   for lack of a better word, or disagreement about the

14   need to identify these objections, to the extent you

15   have objections now?  I mean, you're working on a

16   stipulation, so is that where you're having trouble?

17        **MR. AYLSTOCK:**  Well, the stipulation, Your

18   Honor, has an appendix with all of the records.  We

19   certainly would like a stipulation, if they're going

20   to get a stipulation as to 3M records and business

21   records exception to the hearsay rule and things like

22   that.

23        So, again, this does happen in every case,

24   and it gets worked out.  But, while we're all sort of

25   in the throes of discovery, sorting through tens of

thousands of pages of medical records, most of which
will never come in at trial -- because the jury isn't
going to be able to really digest all the medical
records and all of the documents and everything else,
we're going to have to narrow the focus.  When the
focus is appropriately narrowed, these issues work
themselves out, and we have no reason to believe that
they won't here as well.

**MR. NOMELLINI:**  Your Honor, I think that
there's a solution for this, which is that there's a
stipulation and there's an appendix listing documents.
There's some documents where there can't be any
dispute on, you know, this is a W-2 or something,
certainly other documents where Plaintiffs won't
object that they're authentic.

All we're saying is, if there are documents
on which there is a problem, let's flesh out those
authenticity or hearsay issues now, and then they
won't make them part of their appendix to the
stipulation -- that's their right -- so that we can
start to cure those issues now or figure out if we
need depositions now and not defer the issues until
later.

**JUDGE RODGERS:**  Well, I --

**MR. AYLSTOCK:**  I've just never had a --

1   sorry, Judge.

2       **JUDGE RODGERS:**  Well, I can see the benefit

3   of doing that.  On the other hand, there's a lot of

4   work to be done right now in getting the substantive

5   depositions taken.

6       So, if you know there are problems with a

7   particular document, then I'd prefer to go ahead and

8   deal with those problems now.  But I don't think it

9   should be at the risk of either side being prejudiced

10  down the road.

11      This process is going to be refined as you go

12  forward towards trial, so I don't think I would

13  prejudice anyone, obviously, from raising an objection

14  later.  I'd prefer you take these custodian

15  depositions, to the extent they're necessary, if they

16  are, that you take them during the discovery period.

17  But, if you have to take a custodian deposition to

18  authenticate records later, that's not the end of the

19  world.

20      So, I guess I have to leave it at that, which

21  is basically encouraging you to continue to look at

22  this and to identify problems where you know you have

23  problems, with the understanding that I think we all

24  recognize, as we move forward and closer to trial,

25  that other issues will be identified.  As you start to

1    refine and look seriously at your exhibit lists, then

2    you may have objections that need to be dealt with.

3         But, again, I do agree with Mr. Nomellini.

4    To the extent you know, Bryan, and you can agree to

5    authenticity or state an objection such that the

6    custodian's deposition can be taken, I'd rather you do

7    that sooner rather than later.

8         **MR. AYLSTOCK:**  Yeah, I think authenticity is

9    just a lot easier than hearsay as it relates to some

10   of these documents.  So we can work together, with

11   Judge Herndon's help, to see if we could narrow that.

12        And like I said, a lot of these -- I don't

13   see a lot of point in having a lot of argument to

14   documents that never even would make a trial list.

15        We certainly would like them to stipulate to

16   the authenticity of all the business records of all

17   the 3M documents that they produced --

18        **JUDGE RODGERS:**  Right.

19        **MR. AYLSTOCK:**  -- but I don't know if they're

20   willing to do that either.

21        But happy to continue this process, and

22   certainly understand the Court's admonition that

23   sooner is better than later.

24        **JUDGE RODGERS:**  And I guess I thought the

25   last time this was discussed I was focused on

1    authenticity.

2         **MR. AYLSTOCK:**   Right.

3         **JUDGE RODGERS:**   And the question about

4    whether records custodians were going to need to be

5    deposed and whether those would count against your

6    deposition limit.

7         And so I don't think I realized you all were

8    seeking to identify objections other than authenticity

9    at this point.

10        **MR. AYLSTOCK:**   That was our understanding as

11   well, Judge.  Obviously, to the extent we can handle

12   some records that might fall within the hearsay

13   objection, we can do that.  But authenticity is where

14   we were coming from, and that, I think, is a lot

15   simpler issue than hearsay exceptions and the federal

16   rules and hearsay within hearsay and trustworthiness.

17        And some of this might arise later on by a

18   further deposition of a substantive witness that we

19   might not have identified prior.  So, authenticity, if

20   we can limit it to that, I think we'd make a lot more

21   headway.

22        **JUDGE RODGERS:**   Mr. Nomellini, where did you

23   get off on the track of hearsay?  I don't remember

24   that being discussed.

25        **MR. NOMELLINI:**   Yes, Your Honor, that was

1    part of the earlier discussions that we had with
2    Shelley Hutson on this, the idea of addressing both
3    hearsay and authenticity.

4          And the stipulations that have gone back and
5    forth has addressed the 'prepared in the regular
6    course of business' hearsay issue.  Because, if
7    they're going to reserve objections as to hearsay that
8    something, for example, wasn't prepared in the
9    ordinary course of business, that's something that
10   should be cured -- that, if the parties have an
11   opportunity to address it, now is the time to address
12   it with a custodian deposition or other foundational
13   deposition to address it.

14         Otherwise, we'll have all kinds of records
15   that, if they can't -- if we can't get the depositions
16   within our six, then there will be disputes about
17   whether the hearsay rule has been satisfied.  And all
18   we're saying is, if Plaintiffs want to raise those
19   issues now, that's fine, but just let us know.  And we
20   should lay the cards out on the table as to the
21   documents as to which there are hearsay issues, if
22   they don't want to include them in the stipulation, so
23   that the parties can lay the foundation to address
24   these issues.

25         Otherwise, if they reserve it as to all

1    documents, then essentially what that's forcing us to

2    do is to take foundational depositions as to all the

3    documents.  So we would prefer to flesh these issues

4    out and address them.

5           If they don't want to include -- if they want

6    to object to hearsay now, that's fine, based on what

7    they know.  But just let us know, and then we can

8    exclude it from the appendix, or at least exclude it

9    on hearsay and get the necessary depositions taken.

10           **MS. BRANSCOME:**  And I would note, Your Honor,

11    that, for instance, if the Plaintiffs are going to

12    challenge some of the government records for lacking

13    indicia of trustworthiness, we will need to take

14    government employee depositions to lay the foundation

15    for how the VA establishes its records, how they

16    maintain their records, you know, how they ensure that

17    the contents of their records are accurate and

18    trustworthy.

19           And so, that was really the impetus for the

20    original discussions was we would actually need, in

21    some instances, to be talking to current government

22    employees to lay the government records foundation.

23    It might be a public record, it might be a government

24    record, it might be a business record, but we would

25    actually need to now be deposing current government

1    employees.

2          So that was really what led to a lot of this

3    and wanting to prioritize it sooner rather than later.

4          **JUDGE RODGERS:**  Okay.  Well, I guess I'm

5    surprised to hear of a potential objection to the

6    government records.

7          **MS. BRANSCOME:**  We are as well, Your Honor.

8    But we've just been told that the Plaintiffs are

9    concerned about indicia of trustworthiness, which is a

10   component of the business record rule to employ the

11   hearsay exception.

12         And so, what we've asked for -- and I believe

13   we got agreement on this -- is that, by next

14   Wednesday, the Plaintiffs would identify the specific

15   records where they have concerns, and we're happy to

16   take a look at those.  It may turn out those are not

17   records we intend to use or we think we could cure

18   them with a record custodian, and we'd get that

19   noticed now.

20         But I really thought we had actually already

21   reached agreement on that, in concept, and we just

22   were waiting until next Wednesday to get the narrowed

23   list.  Because, in our view, if it was produced by the

24   VA as a complete set of medical records, it has a

25   certificate with it, we shouldn't have problems.  But

we're open to hearing from the Plaintiffs if there are examples where they're troubled by it.

**JUDGE RODGERS:**  So, for purposes of the government documents -- again, this is a bit of a surprise to me -- that does need to be teed up.  And I can't imagine that, if there are objections, that there are that many.

But that does need to be framed for the Court.  And I would prefer it be framed before the Defendants feel it necessary to start deposing government witnesses and taking the time and requiring those depositions of those people strictly to satisfy some aspect of the hearsay rule.

So, before the Defendants will be permitted to take those type of depositions, the Court would need to make a ruling on the Plaintiffs' objection.  And then, to the extent we feel it's a valid objection, then perhaps a deposition of a government witness is necessary.

Bryan, what is y'all's position on this?  What is Ms. Branscome -- from your perspective, what is she referring to?

**MR. AYLSTOCK:**  Well, these VA records are extremely voluminous, so there's no way, and we did not agree, that we would be able to get through them

1    all by Wednesday.  We, in the meet-and-confers,

2    haven't agreed that we just waive hearsay.  There are

3    hearsay exceptions, and we've always been able to work

4    through them with our counterparts on the other side

5    in other MDLs.

6         It's about 10,000 pages per plaintiff.  So,

7    there are situations -- and the VA is human and, not

8    only human, it's government workers that are human,

9    where certain things get copied and pasted from

10   information that were not contemporaneous for when the

11   statements were made that need to be carefully

12   reviewed, many of which may or may not even be

13   relevant or may not even be on the Defendants'

14   interest for some kind of a trial exhibit.

15        So, we're not trying to be difficult here at

16   all.  But what we've been asked to do is just give a

17   general hearsay waiver, it's not even an exception,

18   just say it's not hearsay and all the government

19   records come in when we have not been able to review

20   them all.

21        And there are instances where there are

22   inaccuracies and they get repeated over and over again

23   just because that's sometimes how the VA does it.

24   And, unlike normal medical records, the VA records are

25   sort of a history of one's life that continues on, and

1   the people don't see the same doctor all the time.

2   And there are certain instances that will get

3   worked out, we're confident.  And if not, we've made

4   the commitment, look, we'll be able to get these

5   records custodian depositions done.

6   But to have it done now when we're in the

7   throes of all of these other deadlines in Group B

8   depositions coming up is premature, and it will create

9   a lot of make-work, not just for the plaintiffs and

10   their counsel, but for the Court, because a lot of

11   these will get worked out, if not all of them, when it

12   comes time.

13   So we're good with the authenticity --

14   **JUDGE RODGERS:**  What do you mean when you say

15   "when it comes time," Bryan?  Again, I'm particularly

16   focused on the government records in regards to my

17   comments.  But, you know, getting depositions of

18   government witnesses is not as easy as it is with a

19   nongovernment witness, and we have several issues

20   right now pending in that regard.

21   **MR. AYLSTOCK:**  And I think a schedule makes

22   sense.  But a schedule on top of all these other

23   deadlines doesn't make sense.  I mean, Mr. Keefer, for

24   example, was referred to as an African-American male

25   multiple times in his VA records.  He's not

1   African-American.  There are mistakes, and they need

2   to be gone through --

3        **JUDGE RODGERS:**  But that doesn't make the

4   document inadmissible or admissible.

5        **MR. AYLSTOCK:**  Well, it certainly doesn't

6   affect authenticity.  It might indicate a lack of

7   trustworthiness, particularly where perhaps the doctor

8   didn't even see the patient on that day or something.

9        So it's a lot more complicated than simply

10  saying they're all admissible, none of them are

11  hearsay, and that's been contemplated with an appendix

12  to the stipulation.  And as we get through and finish

13  the discovery, all of those issues will become

14  crystallized as to what is trustworthy or not.

15       We do have a general discovery cutoff in

16  Group A.  And at that point in time, we can sit down

17  and look at everything that's been produced, look at

18  the deposition testimony of the treating physicians

19  that have been deposed, and say, okay, now we can

20  stipulate to business records exception for the

21  government witnesses for certain things, and some

22  maybe not.

23       But to do it now before the close of

24  discovery when we would have literally I guess about

25  eight months to reach a stipulation or have the

1    government witness records custodian I think is a

2    waste of everybody's time in this critical period.

3         **MR. BUCHANAN:**   Your Honor, just one overlay.

4    And I think, as I appreciate it and as it's commonly

5    done, I mean, you can usually check the boxes of

6    803(6)(A) through (C) with a certification rather than

7    even a deposition, and it's commonly done this way.

8    You know, we get the business record, you know,

9    prerequisites of (A) through (C) handled through a

10   certification of a custodian or another qualified

11   person.  And so most of these issues, to the extent

12   they exist, are reached by stipulation.

13        **JUDGE RODGERS:**   That doesn't address the

14   trustworthiness issue and reliability issue.

15        **MR. BUCHANAN:**   Yeah, the challenge with

16   trustworthiness is sometimes that's informed by other

17   issues in the case and not evident from the document

18   itself, which is why it's kind of a separate component

19   of the business record consideration.

20        And often -- I mean, we baked in time in the

21   pretrial phase to cooperate back and forth and reach

22   stipulations on this document or that document, which

23   is what we commonly do.

24        So I do -- I certainly understand the issue.

25   It's one that we generally reach stipulations on in

1   cases involving the government and not involving the

2   government, but it does require a record from which

3   you can assess some of the other considerations around

4   hearsay.

5          It's easy to stipulate to, you know, Rule

6   902, you know, it's a certified record under (A)

7   through (C).  The final component of that is why it's

8   generally handled in the pretrial window.

9          **JUDGE RODGERS:**  Well, in this case we're not

10   going to wait until the pretrial window.

11          **MR. BUCHANAN:**  Fair enough, Your Honor.

12          **JUDGE RODGERS:**  Not in this litigation.  But

13   I do agree also, though, with Mr. Aylstock that this

14   is not going to be resolved by next Wednesday.

15          Judge Jones, I'm interested in your thoughts,

16   if you have any.

17          **JUDGE JONES:**  Well, I really didn't.  I tend

18   to agree that -- it sort of surprises me that this is

19   going to be a hot button issue.  I tend to agree with

20   Mr. Buchanan that these things do normally get worked

21   out with a certification from the custodian.

22          And, you know, maybe there are other issues

23   down the road.  But in terms of, you know,

24   authenticity and those kinds of issues, I'm sort of

25   surprised that they're not all ironed out through

1   certification or a stipulation between the parties.

2        **JUDGE RODGERS:**  Yeah, the authenticity, I

3   guess I'm detecting, based on what everyone said,

4   Plaintiffs and Defendants, that that's going to get

5   worked out.  It's the hearsay exception that is giving

6   me some pause, and particularly with regard to the

7   Veterans Administration records.

8        So I'm going to ask Judge Herndon to work

9   with the parties to come up with a schedule.  And I'm

10  comfortable if this follows the close of discovery.  I

11  do think you have enough -- your plates are very full

12  right now trying to get these depositions taken, so I

13  don't have a problem if it follows October 9th, but

14  not by too much.  In the next 30 to 60 days, I think

15  we need to be able to identify, if there are problems,

16  what they are and with what records, and then that

17  needs to be teed up for the Court.

18        And then, to the extent there's a need for a

19  deposition, for instance, on the issue of reliability

20  or trustworthiness under the business records

21  exception, then there will be time for that to be

22  taken.  But, again, the government depositions is not

23  as easy as just saying we'd like to take this person's

24  deposition.

25        Everyone understand?

1       **MR. AYLSTOCK:**  Yes, Judge.

2       **JUDGE RODGERS:**  Thank you.

3       The next item is bellwether discovery update.

4   And I think there was some need for the newly added

5   bellwether plaintiffs in Groups C and D, the three

6   individuals, Stelling, Montero, and Wilkerson, to

7   catch up, if you will.  And then you've got a list of

8   sub-issues.

9       So, who wants to address this from the

10  Plaintiffs' side?

11      **MR. AYLSTOCK:**  I believe Ms. Hoekstra was

12  going to address this.

13      Jen, are you on or muted?

14      **MS. HOEKSTRA:**  I'm on.  Sorry.

15      **JUDGE RODGERS:**  Hi.

16      **MS. HOEKSTRA:**  My understanding is that there

17  are still open issues relating to some of the

18  productions from the bellwether plaintiffs.  We have

19  continued to have several meet-and-confers, but at

20  this point -- the most recent one was in relation to

21  Mr. Rowe's materials yesterday.  I don't know if

22  Defendants have any specific issues they wanted to

23  discuss.

24      **MR. AYLSTOCK:**  We do have, I think, agreement

25  on the initial catch-up deadline schedule for the

1    newly added plaintiffs.

2         **MS. HOEKSTRA:**   Correct, yes, that went over

3    to Mr. Gunderson this morning.   I believe he's

4    preparing an order for the Court to send over that the

5    authorizations for the new three will be provided by

6    August 18th.   I think we've already produced

7    authorizations for two of the three, and we're working

8    on the others.

9         And then we will do the Social Security

10   disability letter by the 28th of August.   And we will

11   agree that, within 30 days of the RFP responses being

12   provided, we will provide the ESI for each of the new

13   three bellwether plaintiffs.

14        **JUDGE RODGERS:**   Okay.   Thank you for that.

15   Sounds good.

16        From the Defendants, is there anything you

17   want to add?

18        **MR. NOMELLINI:**   Your Honor, we agree with Ms.

19   Hoekstra on the order for the three new plaintiffs.

20   We'll get that submitted to the Court shortly.

21        With respect to what Jennifer was referring

22   to on Mr. Rowe, we did have a couple of

23   meet-and-confers with Plaintiffs this week.   He

24   testified about Facebook and text messages with three

25   witnesses, including one he regularly texted with, and

1    testified that he had produced those after the

2    deposition.  We've learned that they have not been

3    produced, and this week we've learned that they may

4    have been deleted.

5           So we -- that was the call with Ms. Hoekstra.

6    We're working through that issue.  The Plaintiffs have

7    some questions.  And if there's anything we need to

8    follow up with the Court on, we will do that.

9           I think, then, on Mr. Baker, I think Kim

10   Branscome may have an issue to report.

11          **JUDGE RODGERS:**  All right.  Thank you.

12          Ms. Branscome?

13          **MS. BRANSCOME:**  Yes, Your Honor.  This is

14   one, I believe, we had talked about generally at the

15   preconference at the last CMC about the email that

16   showed up in one of the plaintiffs' employer files but

17   was not in the plaintiff's email, even though there

18   were emails in the same time frame and even on the

19   same email chain that were produced.

20          And so, we have been working with that

21   individual's counsel to get more information about why

22   it was that this one email, which referred to his

23   hearing loss being minor and not interfering with his

24   ability to do his job, that that one email is missing.

25          And so, at this point, we have sent a letter

1  to plaintiff's counsel asking for some additional

2  information, and we have made a request that their

3  vendor actually do some analysis within the email

4  account to see if we can obtain information about when

5  that email was deleted and whether it was deleted

6  while the preservation obligations were in place.  And

7  we do not yet have a response from plaintiff's

8  counsel.  So that's where it sits.

9      **JUDGE RODGERS:**  And when was that request

10  made?

11      **MS. BRANSCOME:**  Just one moment.  I am

12  looking to see when the letter went out.  We were

13  going to follow up with plaintiff's counsel; it's

14  Shawn Fox.

15      The letter was sent on August 10th.  We have

16  not heard a response.  We did have a meet-and-confer

17  prior to the letter, and then we were going to follow

18  up with Mr. Fox today again to see if we can get a

19  response.

20      **JUDGE RODGERS:**  All right.  Then I presume

21  the letter did not indicate a date you were hoping to

22  have a response?

23      **MS. BRANSCOME:**  I don't believe we set a

24  specific time frame.  We had done a meet-and-confer

25  prior to the letter and were formalizing it.  We

1    wanted to get information about, you know, what

2    information could be obtained -- I believe it's a

3    Yahoo account -- and so then we have sent the letter.

4    I don't believe we gave a deadline for a response.

5          **JUDGE RODGERS:**  All right.  Well, I guess my

6    understanding, from the discussion we had at the

7    preconference meeting before the last case management

8    conference, was that I believe you had had some

9    discussions with Mr. Fox, or at least Leadership had,

10   and you were expecting -- or someone had an

11   expectation that he would be cooperative.

12         And hopefully that's what's happening now,

13   and you'll get answers to your questions, Ms.

14   Branscome.  But if not and if you need Court

15   involvement, then just let us know.

16         **MS. BRANSCOME:**  Certainly.  And I believe I'm

17   the one who characterized it that way, and that really

18   has been our relationship with this particular

19   plaintiff's counsel.

20         And let me correct myself.  The response

21   deadline we gave was today, so we'll just follow-up

22   with him.  And if we need the Court's guidance, we

23   will certainly come to you, but we're still hopeful

24   that perhaps we can get this worked out.

25         **JUDGE RODGERS:**  All right.  Thank you.

```
 1              Let me ask -- item b and c and d pertain to
 2    the government discovery, requests of the government.
 3              I know that, in terms of scheduling
 4    depositions, I had left it with you all.  And I
 5    believe Judge Herndon has reinforced this, that I --
 6    and I see you followed this in your deposition
 7    calendar.  But I want you to go ahead and set dates
 8    yourselves for these depositions and don't wait for
 9    the authorizations, go ahead and get your dates set.
10    It looks like you're doing that.
11              What other updates can you give me on the
12    government discovery?
13              MR. NOMELLINI:  Your Honor, it's Mark
14    Nomellini.  On Item 2b, Status of Government
15    Identification of Hearing Conservation Program
16    Managers and Industrial Hygiene Program Managers,
17    Judge Herndon has been very helpful following up with
18    the government several times.  The government has
19    indicated that the identification of those individuals
20    is forthcoming several times, however, we have not yet
21    received it.
22              I don't know if Judge Herdon has received a
23    new update on that.  As soon as we do receive it,
24    we'll, of course, share it with Plaintiffs because it
25    is important information in terms of depositions we'll
```

1    want to get scheduled as soon as we can.

2         **JUDGE HERNDON:**  I have not.  I keep asking,

3    but I've yet to get a response.

4         **JUDGE RODGERS:**  Well, I know the government

5    is aware of the deadline.

6         **JUDGE HERNDON:**  Right.

7         **JUDGE RODGERS:**  Mark, do you have any idea,

8    from other records review, as to how many people we're

9    talking about with regard to the program managers?

10        **MR. NOMELLINI:**  So -- and I might ask Judge

11   Herndon's help on this.  I have a vague recollection

12   that they were looking at a list as big as fifty.

13        Judge, is that your recollection or do you

14   recall anything on that?

15        **JUDGE HERNDON:**  It's pretty close to that, I

16   think.

17        **MS. BRANSCOME:**  But just to be clear, Your

18   Honor, we would not be seeking that many depositions.

19        One of the challenges is I think -- and this

20   was a note that Judge Herndon passed along to us -- I

21   think that what they said was there could be as many

22   as -- I think it was forty.  And we have asked for

23   both the hearing conservation program managers and the

24   industrial hygiene program managers.  For different

25   plaintiffs, as we have gotten farther into discovery,

1    different bases will be important.  And so, once we

2    get the list, we will figure out which depositions we

3    actually need.

4         We've also discussed internally that we could

5    cross-notice the depositions across multiple

6    plaintiffs if there's any overlap.  Some of the

7    plaintiffs just happened to serve at the same bases.

8         Our understanding is that the reason why

9    there may be as many as forty is that people changed

10   positions over time.  So it may be that we're

11   interested in who the person was at Fort Carson from,

12   you know, 2010 to 2015, that will just be one

13   individual.

14        But, until we get the list, we don't have any

15   way of knowing who we need and when.  But I just

16   didn't want to leave the impression that we were

17   intending to take forty depositions, because that's

18   certainly not the case.

19        **JUDGE RODGERS:**  Thank you.  I appreciate

20   that.

21        **JUDGE HERNDON:**  Well, if I could add one

22   thing, that, in the initial conversations that I had

23   with Maj. Kim, she said, just based on some

24   preliminary checking, she didn't expect too many of

25   these people to remember anything, because it's just

1   not -- it's more of a routine job, and to specify

2   something that happened on a certain date five, ten

3   years ago is going to be very difficult.

4        But she also said that she's willing to sort

5   of reverse the position that Jacqui Snead took before

6   about no interviews, so that, if they can identify

7   some people, there could be some conversations which

8   may, and more likely would, eliminate the need for a

9   deposition.

10       **JUDGE RODGERS:**  That would be extremely

11   helpful if --

12       **JUDGE HERNDON:**  Yeah, it's a little different

13   approach on this one, so, yeah.

14       **JUDGE RODGERS:**  Judge Herndon, when did your

15   discussions with -- or, more specifically, the request

16   for the list, when was that made to Maj. Kim?

17       **JUDGE HERNDON:**  So that was a little over a

18   week ago, and the last time I checked was the day

19   before yesterday.

20       **JUDGE RODGERS:**  Okay.  Well, hopefully

21   they'll get back with you.  And it would, like I said,

22   be very helpful if interviews could suffice at least

23   to narrow that field.

24        All right.  Let me ask about -- I was

25   curious, on 2d, Status of Government Identification of

1    Current Versus Former Employees, what's happening with

2    that?  I did not realize the government was doing

3    this.

4         **MS. BRANSCOME:**  So, this, Your Honor, we

5    actually -- we have gotten information from the

6    plaintiffs, largely in their initial disclosures,

7    although there may have been instances where it came

8    in a record, where there's reference to an individual

9    who obviously was a government employee at some time,

10   so a fellow servicemember or someone who may have been

11   employed with the VA, for example, but it was such a

12   long time ago that we were not certain if they were

13   still a government employee.

14        We did not want to necessarily just reached

15   out if the timing was such that we thought there was a

16   chance they were still with the government.  We did

17   some investigation on our end.  And where we could

18   actually rule out the fact that they were with the

19   government, for example, finding someone had moved

20   into private practice, we have handled that on our

21   own.

22        But it left us with a group of individuals

23   where we simply didn't know, and we didn't want to

24   violate the government's trust by just reaching out to

25   these individuals on our own, to the extent that we

1    could find them.

2         So we thought that an approach that would at

3    least, you know, put the government in the loop was to

4    ask Maj. Kim's preference.  And she indicated that she

5    would check on her end through the employee database

6    if we gave her a list of names.  And that way, you

7    know, if she could tell us they are not a government

8    employee, we're free to contact them.  And if she

9    could confirm they were, then we knew that we needed

10   to go through the *Touhy* process.

11        So we sent a list -- Judge Herndon was very

12   helpful with this.  We sent a list of individuals, and

13   we actually received a response back very quickly from

14   Maj. Kim.  Unfortunately, for a number of individuals

15   the response back was "unsure" because either the

16   individual had a common name or we just didn't have

17   enough identifying information.

18        So we have clarity on a portion of them.  The

19   good news is, for a lot of them, they turned out not

20   to be current government employees, so we can move

21   forward if we want their depositions.  A few, they

22   are, and we will evaluate if we want to submit any

23   additional *Touhy* requests.

24        And then, for the additional individuals who

25   are all in the "unsure" category, some of them we also

1     need to get additional identifying information.  So we

2     may be coordinating with plaintiffs counsel to see if

3     they have any more information about people who were

4     listed in the initial disclosures.

5             To the extent that we get additional

6     information, we can either go back to Maj. Kim or I do

7     think it would be helpful to seek clarity from her if,

8     for the individuals that were marked as "unsure," if

9     she is comfortable with us reaching out to them and

10    just the very first question we ask is *Are you a*

11    *current government employee?* and if the answer is yes,

12    we would cease any discussion and then reach out to

13    her.

14            And so, I think at this point it's just a

15    matter of what her preference is, whether she would

16    like to continue looking or if she's comfortable with

17    us, if we can find them, calling and just ceasing

18    discussion if it turns out they are a current

19    employee.

20            **JUDGE RODGERS:**  Well, I appreciate your

21    patience with the process, and I appreciate Maj. Kim

22    taking a look at this list as she has.  But, to the

23    extent she can't tell you whether someone is or is not

24    a current government employee, then to me the

25    presumption is that they're not.

1     **MS. BRANSCOME:**  Okay.

2         **JUDGE RODGERS:**  And you just need to move

3     forward.

4         It's the government who has the interest in

5     supervising or overseeing this request for what they

6     consider to be official information, and it seems to

7     me it's incumbent upon the government to determine if

8     the person is or isn't.  It's really not incumbent

9     upon you all to have to do that.

10        So, I'm not critical of the steps you've

11    taken.  I appreciate them.  And I think you have been

12    very courteous with the government and patient.  But,

13    at this point, if they can't tell you, then I think

14    you just proceed as if the person is a former

15    employee.

16        **MS. BRANSCOME:**  Understood, Your Honor, and

17    we're happy to do that.  We're trying to be mindful --

18    I think, you know, Judge Herndon has developed a very

19    good relationship with Maj. Kim, and so in some

20    instances, you know, we're sort of going out of our

21    way to be respectful of them and hoping it pays off in

22    other instances like the situation that we are facing

23    with scheduling depositions where --

24        **JUDGE RODGERS:**  You can blame it on Judge

25    Rodgers and that Judge Herndon had nothing to do with

1    it.  That bridge is probably burned already, so I'm

2    fine to be the bad guy here.

3         **MS. BRANSCOME:**  We will definitely move

4    forward.

5         **MR. AYLSTOCK:**  Your Honor, it would be

6    helpful if that list could be shared with us as soon

7    as it's received.  Obviously, we all have an interest

8    in scheduling of depositions.  And that kind of bleeds

9    into agenda Item No. 3 that Neil is going to address

10   because we do have a proposal on it.  Obviously, some

11   of these witnesses are medical providers, and there

12   are rules for that.

13        Neil, do you want to kind of explain what

14   we're talking about?

15        *[No response.]*

16        Maybe we have missed Neil.

17        **MR. OVERHOLTZ:**  I'm here, Bryan.  Sorry about

18   that, it was a mute issue.

19        Your Honor, I think 2c and 3 have gone

20   together, at least through the parties' discussions.

21   We had a very productive call with Judge Herndon on

22   Monday regarding the scheduling of these depositions.

23   The Defendants significantly narrowed their list of

24   requested medical personnel that had treated the

25   bellwether plaintiffs.  And based on their requests

1    and Judge Herndon's guidance and our efforts, we were

2    able to provide them with available dates for the

3    Plaintiffs on those depositions that they were

4    requesting, and so that process I think is working.

5         I think, just before the call, Ashley with

6    Kirkland's office was able to send around an updated

7    deposition schedule that reflects that those dates had

8    been communicated to DoD so that we can secure dates

9    for the depositions where we have available dates from

10   both sides.

11        So I think that part is working.  And

12   certainly we don't want to delay anything with respect

13   to obtaining dates and setting these depositions and

14   getting the government's consent to those depositions

15   and being able to put up the witness.

16        As to Item No. 3, the parties also have been

17   exchanging proposals with exactly how the process

18   works, from whose deposition -- if there are

19   overlapping depositions, for example, we both want to

20   take the same VA doctor, whose deposition does that

21   count against, how do you count that for our overall

22   deposition count, as well as issues related to the

23   priority, who gets to go first in questioning.

24        And these issues are worked out in many

25   different MDLs, and so these are not new issues for

1   the parties and for the parties' lawyers, but we're

2   working out those protocols.

3          We've exchanged protocols this week.  We

4   believe we're getting closer.  We had a pretty lengthy

5   discussion with Ms. Branscome on the phone and

6   Mr. Fields the other day on the call about how this

7   would actually work, and we exchanged a proposal

8   yesterday to their side, and we're waiting to hear

9   back.

10          One of the issues, of course, comes down to

11   priority, who gets to go first.  And we've made a

12   proposal to them as far as how that would work and in

13   response to their proposal.

14          And second, the issue that Bryan was just

15   talking about, which is the scheduling, we would like

16   to get the list back of who are the current and former

17   employees so that we can make determinations as well.

18          And in other cases, other MDLs, it's been the

19   plaintiffs' position that communication as far as

20   scheduling the deposition and finding available dates

21   should go through the plaintiffs' office.  And we have

22   made that proposal to the Defendants that that

23   communication should come through Plaintiffs.  It's

24   the Plaintiffs' case, it's communications with

25   personnel.

1          And unfortunately, many on our side have been

2     on cases where simple communications to receive dates

3     from medical providers have ended up with information

4     being exchanged that may or may not should have been

5     exchanged.

6          And so, because of the plaintiffs' privacy

7     rights, it's our position that that communication

8     should go through Plaintiffs.  And we've made that

9     proposal to the Defendants, and we expect to hear

10    something back from them very soon.  But that's where

11    the current status of that is, and we're hoping we can

12    get that issue resolved.

13         **MS. BRANSCOME:**  Just a few small things to

14    add to that, but largely I agree with what Neil said.

15         I would say, with respect to agenda Item 2c,

16    the scheduling of the deposition, I agree completely

17    that the parties have worked well on this.

18         But I did want to reflect for the Court, to

19    the extent that you are not aware, that the government

20    has taken the position that they need to approve the

21    deposition before they will even speak to the

22    individual about dates.

23         Judge Herndon, very helpfully, politely

24    pushed back and said, you know, can we go ahead and

25    get dates and then use the time to work out the limits

1    of the deposition, if there are any.

2         I don't know, Judge Herndon, if you've heard

3    back yet.

4         But this is something that, to us, is

5    somewhat concerning, given how tight our discovery

6    schedule is.  I think we've done everything we can do,

7    so it's more that it's concerning that the government

8    is essentially saying, you know, they can't even talk

9    to these witnesses about dates before they go through

10   their whole approval process, which, obviously, you

11   know, you need to talk to people ahead of time to get

12   dates.

13        So I don't know, Judge Herndon, if there's

14   been any more on that, but I just wanted to make the

15   Court aware.

16        **JUDGE HERNDON:**  So what I got from Jacqui

17   Snead last on this issue was -- and it was preceded by

18   a request by her as to whether or not Judge Rodgers

19   had reduced to writing her sort of procedural

20   guidance, and in that she was referring to what I

21   advised her of, which was that we've been getting

22   guidance all along that we should get dates first and

23   get agreement between the parties on dates, and then,

24   if we need the government approval, work on that after

25   that and in other instances.  And so, she sort of

1    asked me for proof of that.

2          So, fortunately, Donna, late at night, sent

3    me transcripts that I did not yet have, and I was able

4    to find a blurb in one of the Leadership calls that

5    referred to that process and sent that to Jacqui, and

6    so she then responded that she would now discuss with

7    the agencies Judge Rodgers's preferences with respect

8    to the procedure for setting up the depositions.

9          So that's where it is now.  I got that from

10   her yesterday, so hopefully that will sort of grease

11   the skids a little bit.

12         **JUDGE RODGERS:**  Well, I guess I'm not very

13   optimistic.

14         **JUDGE HERNDON:**  With some reason.

15         **JUDGE RODGERS:**  I'm sorry that you had to --

16   and Donna, too -- scurry and find my comments to the

17   parties about those discovery issues buried in some

18   transcript.  Jacqui Snead knows how to email me.

19         So, what I am a little bit still on the fence

20   but certainly I would like to talk to you all about it

21   and I'm thinking seriously about it, maybe it's better

22   to just subpoena these people and subpoena them for

23   the dates you've set.  *Touhy* doesn't require you to do

24   anything more than that, and it doesn't even really

25   require that.  But once that's done, then the ball is

```
 1    totally in their court.  And those individual
 2    witnesses, they've been deposed, they've been
 3    compelled to appear for a deposition, and the
 4    government is going to have to have a pretty good
 5    reason for why they don't show up.
 6            So, what do you think about that?
 7            MS. BRANSCOME:  I mean, we're happy to do it.
 8    I think, you know, we tried to sort of, again, you
 9    know, go kind of the more polite route.
10            I think the thing that's hard is that, for
11    some of these individuals, they are medical providers.
12    And when we deal with medical providers in the private
13    sector, we understand how difficult their schedules
14    can be.  So, for many of the witnesses, for example,
15    we gave a range of dates to try to accommodate, you
16    know, the individual, because, you know, no one can
17    reach out to them, being a current government
18    employee.
19            But I also think, if we issued a subpoena and
20    there was some way that they could come back and say,
21    well, I can't do September 10th but I can do September
22    11th --
23            JUDGE RODGERS:  Right.
24            MS. BRANSCOME:  -- we can obviously
25    accommodate that.  We're happy to do it.
```

1          You know, I don't know -- I probably would

2     defer to Judge Herndon on whether, you know, you think

3     maybe a couple of days would change anything.  But I

4     certainly read the tone of the response from the

5     government to basically be you have a very small

6     chance that we're going to give you these deposition

7     dates anytime soon.

8          And quite honestly, these are not individuals

9     -- I mean, these are -- you know, it's a medical

10    provider who happens to work at a VA facility.  The

11    idea that they have information that threatens

12    national security I find unlikely.

13         So, I think, Your Honor, if you think that's

14    the direction to go in, I mean, we certainly can do it

15    and then try to work on the scheduling on the back end

16    if we don't think we're going to make any progress.

17         Some of these dates are coming up soon.  That

18    doesn't mean we couldn't make adjustments on our end.

19    We all have large teams.  But, you know, we also are

20    mindful of not cramming everything into the end of

21    September.

22         **JUDGE RODGERS:**  Right.

23         **MR. AYLSTOCK:**  Yeah.

24         **JUDGE RODGERS:**  My concern is that you may

25    not -- I guess I'm reading the tea leaves or between

1    the lines, and that Judge Herndon has much better

2    firsthand discussions or experience with Jacqui Snead

3    on this, but I'm not feeling the warm and fuzzy here.

4         And so, you know, the fact, Dave, that she

5    wouldn't accept your word about what my preference was

6    doesn't give me a lot of comfort for how this is going

7    to bear out.

8         So, how many people -- I haven't seen this

9    list.  How many people are on this list?

10        **MS. BRANSCOME:**  It's roughly, I would say,

11   two per plaintiff.  I think for some there may be

12   three, and for some there is one.  So I think it

13   would, you know, probably average out to 12.

14        I don't know, Mark, if you have the exact

15   number, but it's somewhere in that range.

16        **JUDGE RODGERS:**  Okay.  And the Plaintiffs are

17   aware of -- because they have agreed to the dates,

18   these dates are in the calendar, right?

19        **MR. AYLSTOCK:**  Yes, Your Honor, they are.

20        And I think it's probably time to get those

21   subpoenas out, I agree with Your Honor, if we're going

22   to keep with the schedule.

23        **JUDGE RODGERS:**  Yeah, October 9th is going to

24   be here quickly.

25        Judge Herndon, when did you first speak --

1    and I'm sorry, you may have said this and I don't

2    recall.  When did you first communicate with Jacqui

3    about this list of individuals?  How long has she had?

4         **JUDGE HERNDON:**  If you'll hold on a second, I

5    can pull up my email and tell you exactly.  Part of my

6    problem is, for each of these topics for which I have

7    a folder in my email, there's a whole lot of emails in

8    each one of them.  But it's -- oh, here we go.

9         Well, it looks like it, for the most part,

10   came up on August 12th, so it's not been long.  And I

11   think it was the night before last that Donna got me

12   those transcripts, so it might have been the 11th, but

13   the 11th or 12th, it looks like.

14        **MS. BRANSCOME:**  And just for reference, Your

15   Honor, we had sent all of the dates on Friday the 7th.

16   I think that we narrowed our list maybe early this

17   week to a smaller number and gave some additional

18   agreed upon dates.

19        **JUDGE HERNDON:**  Looking also at Ms. Cooper's

20   -- yeah, I see your email on the 7th and then Jacqui

21   responded and Cooper responded then on the 11th.

22        So, as far as a response from the government,

23   it appears it was somewhere around the 11th.  And then

24   I immediately asked that they take a different tack,

25   and then there were a couple of emails after that, so

1  back and forth.

2  **JUDGE RODGERS:**  But it sounds like 3M -- or

3  Kim sent the list which later got, I guess, narrowed,

4  but the list was sent on the 7th.

5  **JUDGE HERNDON:**  Right.

6  **MS. BRANSCOME:**  We did, Your Honor, yes.

7  **JUDGE HERNDON:**  That did take a little bit

8  for them --

9  **JUDGE RODGERS:**  All right.  So that's been a

10  week ago.

11  **JUDGE HERNDON:**  Yeah, it took a little bit

12  for them to respond to it.

13  But, you know, the -- I pretty much agree

14  with the subpoena issue, even though it's not been

15  that long since I last communicated with her.

16  But I sort of followed the guidance that you

17  have provided all along, Judge Rodgers, with respect

18  to let's try to go along with them as long as we can,

19  but then there's a time limit, there's a limit to how

20  long we can do that.

21  **JUDGE RODGERS:**  Yes.

22  **JUDGE HERNDON:**  And so, those are the kind of

23  conversations I had, for example, with Mark relative

24  to the Defendants' Motion to Compel, which was, look,

25  you've given it your best shot, why don't you -- let's

1    go ahead with that.  So, I have the same feeling about

2    this.

3             I never get a warm and fuzzy about my

4    relationship with Ms. Snead, nor Ms. Cooper, for that

5    matter, because she was kind of out of the loop for a

6    while.

7             **JUDGE RODGERS:**  Right.

8             **JUDGE HERNDON:**  So, yeah, I don't think we

9    can expect anybody to bend over backwards here for us.

10            **JUDGE RODGERS:**  Well, my big concern is the

11   deadline.  And then, you know, her comment to you

12   requesting or demanding, however you want to look at

13   it, proof or evidence that this was the way I wanted

14   to proceed, that doesn't feel cooperative.

15            So, I think that -- and I will be the one --

16   or, Judge Herndon, you can and just say it's from me,

17   or I can do it myself directly to let them know that I

18   have directed the parties to proceed with subpoenaing

19   these witnesses and it's based on the deadline, and go

20   from there.

21            **JUDGE HERNDON:**  Yeah, I'm happy to send that

22   email to Jacqui Snead and just tell her that's what

23   your direction was today in this call.

24            **JUDGE RODGERS:**  Okay.

25            **MR. OVERHOLTZ:**  And, Your Honor, in my

1    previous experience with dealing with this similar

2    situation is, you know, we would go ahead and contact

3    the VA facility and try to obtain dates through the

4    facility, but we did issue the subpoenas and, my

5    experience is, the subpoenas worked, because then we

6    got a call from whoever the VA representative was

7    there and we were able to get dates.  So I think it's

8    a good process.

9          As far as scheduling, though, I think as --

10   you know, I think that that is something that we could

11   go ahead and do, if the Defendants want those dates,

12   you know, we can go ahead and contact and seek the

13   dates, if the Court agrees.

14        **JUDGE RODGERS:**  Yes, I think that's the

15   approach going forward.

16        **MS. BRANSCOME:**  That makes sense to us, Your

17   Honor.  And then that dovetails with what Mr.

18   Overholtz was discussing about the order of

19   questioning and allocation of time, which is agenda

20   Item No. 3.

21          I don't have much to add on this, other than

22   we do have a proposal from the Plaintiffs in terms of

23   contacting nongovernment witnesses.  The first we

24   heard that the Plaintiffs took the position that it

25   should only be them was when they sent their proposal

1   forward.

2          So, in the interest of full transparency, we

3   have had some legal assistants reaching out to some

4   private medical providers just to get dates.  No

5   lawyers have made contact.

6          But we can work with the Plaintiffs on the

7   best process going forward.  We just didn't want to

8   let additional time keep burning because, you know,

9   some doctors are difficult to schedule.  And for some

10  plaintiffs there won't be private medical providers at

11  issue, and others there will be.

12         But on this one, I would simply say we are

13  working it out.  Mr. Fields has been working on it

14  with me.  He is actually taking his son to Vanderbilt

15  for grad school today, which is why he's not able to

16  join.

17         We are going to do a meet-and-confer with the

18  Plaintiffs early next week, perhaps even Monday.  If

19  we can't reach agreement, we will come to the Court to

20  get that resolved.  But otherwise, we should be able

21  to submit either, you know, probably a -- I would say

22  probably a joint proposed order; or if we have areas

23  of dispute, we'll submit that to get the protocol in

24  place, or we'll just do it informally between us if

25  we've reached agreement.

1          **JUDGE RODGERS:**  All right, that sounds good.

2          Does that sound good for you all, Neil and

3    Bryan?

4          **MR. OVERHOLTZ:**  It does, Your Honor.  I think

5    we actually made a good bit of progress on the process

6    the other day.  Ms. Branscome has some really good

7    ideas about exchanging dates and how we track that

8    information with perhaps even a trackable just shared

9    calendar of exchange dates.  And we are working on

10   that process now, so I think that all works.  And

11   we'll get with the Defendants early Monday.

12         **JUDGE RODGERS:**  Okay.  And then, if you're

13   not able to reach agreement, let us know quickly.

14   Hopefully you will.

15         **MR. OVERHOLTZ:**  Yes, Your Honor.

16         **JUDGE RODGERS:**  If not, let us know quickly.

17         **MS. BRANSCOME:**  We will.

18         **JUDGE RODGERS:**  And please just -- in terms

19   of the subpoenas, 3M, are you going to issue the

20   subpoenas or are they going to be joint?

21         **MS. BRANSCOME:**  I think that's something we

22   should discuss with the Plaintiffs because we don't

23   know yet if any of the individuals we have identified

24   for the government are individuals that the Plaintiffs

25   also seek to depose, so we can make that part of our

1   meet-and-confer on Monday.

2         **JUDGE RODGERS:**  Okay.  And are there to be

3   other government witnesses and case-specific

4   depositions taken?

5         **MS. BRANSCOME:**  As I sit here today, I don't

6   know if we got anyone back on the list for Maj. Kim

7   where we are, you know, ready to say that we're taking

8   a deposition.  I just can't speak across all of the

9   cases.

10         There are still some individuals who may have

11   served with a plaintiff, so they're not a medical

12   provider, who may be current government employees.  We

13   would anticipate their scheduling is a little easier.

14         We definitely prioritized the medical

15   providers, and I think we -- I don't anticipate

16   additional current government employee medical

17   providers.  Whether there may be a fact witness or

18   two, I don't know, but it would not be a high number.

19         And now that we have the chart back from Maj.

20   Kim, we would get any of those requests out

21   immediately.

22         **JUDGE RODGERS:**  And coordinate with the

23   Plaintiffs?

24         **MS. BRANSCOME:**  Of course.

25         **JUDGE RODGERS:**  Okay.  2e, this is a matter

1   before Judge Jones on a Motion for Clarification or

2   Reconsideration regarding Mr. Rowe and his records, so

3   I don't know that that needs to really be discussed in

4   any detail at this point.

5          Anyone disagree?

6          **MR. AYLSTOCK:**  We agree, Your Honor.

7          **MS. BRANSCOME:**  We agree.

8          **JUDGE RODGERS:**  Okay.  And then f relates to

9   a Schedule For Motions to Compel Discovery From the

10  Group B Plaintiffs.

11         **MR. NOMELLINI:**  Yes, Your Honor.  We thought

12  the last time putting in place a schedule for the

13  Group A plaintiffs made sense.  We would suggest,

14  since the Group B plaintiffs' depositions are coming

15  up, that we slot in August 21st for any motions to

16  compel -- hopefully we can work out as much as

17  possible -- and August 28th for any responses.

18         **MS. HUTSON:**  And, Judge, this is Shelley.  We

19  don't have a problem at all with the August 21st date.

20  However, we would ask for a bit more time on the

21  response and respond September 1st.  The local rule

22  allows 14 days but that would give us 10.

23         **JUDGE RODGERS:**  That's fine by me.  Those

24  dates are set.

25         We've discussed 3.  I think that's settled,

1       you'll be meeting on Monday about that.

2              No. 4 is Depositions of Individuals

3       Identified in Initial Disclosure and Trial Witness

4       List.

5              **MS. BRANSCOME:**  Yes, Your Honor.  This

6       relates to an issue that we discussed.  We've raised

7       it a few times kind of in the abstract, and I think

8       we're getting to a place where it's a little bit more

9       concrete, and that is, we have requested that, for

10      individuals who are, at some point in time -- and this

11      is part of the discussion -- identified by the

12      Plaintiffs as individuals who will be testifying live

13      at trial, if those were not individuals who were

14      deposed as part of the six depositions that occurred

15      before October 9th, we have asked that we be permitted

16      to take a deposition of any trial witnesses no later

17      than 72 hours before the start of trial.

18             And what we're really referring to here, Your

19      Honor, is what we typically think of as damages

20      witnesses.  So, you know, it might be someone ends up,

21      you know, their sibling comes and testifies or a

22      servicemember or, you know, we've got some plaintiffs

23      who have listed their in-laws in their initial

24      disclosures.

25             And the reason why we would like to get an

1    order in place on this is that, for many of the

2    servicemember plaintiffs, their initial disclosures

3    may be 15 individuals, 10 of whom are servicemembers

4    that they served with at some point in time over their

5    careers, and there is simply nothing that allows the

6    Defendants to distinguish which of these witnesses, if

7    any, the Plaintiffs intend to call live at trial.

8         And, because we have six depositions, you

9    know, we are kind of in the dark about how to use

10   them, so we have been prioritizing the six based on,

11   you know, information from discovery that we would

12   need to advance our defense of the case.  But we

13   understand that, you know, trial should not be a

14   surprise.

15        And so I guess what we're trying to

16   anticipate is, you know, we pick our six deponents

17   based on who we think is important to provide to our

18   experts or to simply understand the scope of, you

19   know, causation, and then we find out a few weeks

20   before trial or whenever we have our trial witness

21   list exchange date that there were three

22   servicemembers who were just really good friends with

23   the plaintiff and they have agreed to come to

24   Pensacola and testify and they were people that we

25   would have never been able to distinguish from the

1   initial disclosures would have been trial witnesses.

2          And so, you know, we're not trying to use

3   this as a way to get a bunch of additional

4   depositions.  Far from it.  And we are willing to wait

5   until close to trial when the Plaintiffs really know

6   who they're bringing live.  But we also, you know,

7   don't want to just be guessing as to who the

8   Plaintiffs intend to bring as a live trial witness.

9          And this has not been an area that we have

10  been able to reach agreement with the Plaintiffs.  We

11  have had multiple meet-and-confers.  And my

12  understanding of the Plaintiffs' position is that we

13  should just be able -- well, I don't want to

14  articulate their position, but my understanding of it

15  is essentially they think we should just be able to

16  tell.  And, in all honesty, we just can't.

17         When someone lists ten servicemembers and all

18  of them have identical descriptions next to them in

19  their initial disclosures, we have no way of

20  distinguishing, which just puts it in a slightly

21  different position than your typical case where you

22  know, okay, they have listed a sibling, they have

23  listed a wife, and they have listed a coworker, okay,

24  we anticipate that those might be three witnesses who

25  might come live to trial.

1          So I have had this in other cases where

2     someone, for example, has a large family and they

3     don't know who might actually come to trial and, if

4     they end upbringing one of the siblings, we get to

5     take their deposition so that it's not, you know, us

6     examining someone cold in a case like this.

7          So we're just -- at this point, we do

8     actually need guidance from the Court.

9          **JUDGE RODGERS:**  Okay.  Thank you.

10         **MR. AYLSTOCK:**  Your Honor, I'll be happy to

11    articulate the Plaintiffs' position on this, because

12    it really goes back to PTO 28 where the parties agreed

13    that we would have four depositions per side.  That

14    was obviously amended by the Court in PTO 43 where

15    it's six depositions per side.

16         What's happening now is that the Defendants

17    want more.  Six isn't enough.  They're lying in wait

18    and they're deliberately not scheduling witnesses of

19    obvious relevance.  But for one of the six, not even

20    any of the spouses have been asked to be deposed.

21         These initial disclosures were made.  They

22    were ordered by Judge Jones because that's not typical

23    in an MDL.  Interrogatory responses were provided

24    detailing who these people are and what they may know.

25    Seven hours of depositions were taken where the

1    Defendants had an opportunity to ask as many questions

2    as they wanted about every one of these witnesses to

3    determine which ones were of obvious relevance.

4         And what the Defendants want to do is to burn

5    the six on other witnesses and then take God knows how

6    many witnesses 72 hours before trial that were

7    disclosed well in advance of the depositions and

8    really bust the cap that the Court ordered in PTO 43.

9         With regard to the issue of whether they're

10   in the dark, they're not in the dark.  They have had

11   the opportunity to depose these plaintiffs.  If, in

12   fact, there's somebody that wasn't disclosed or maybe

13   the plaintiff said something to indicate that this

14   witness wasn't really going to be important in the

15   deposition, then, you know, maybe that's good cause to

16   have an additional deposition.

17        But to simply say spouses, people that were

18   in the foxhole that the plaintiff testified saw them

19   wear the earplugs or whatever should just be deferred

20   until 72 hours before trial because the Defendants

21   don't want to take them now is not only inconsistent

22   with PTO 43 and what the Court ordered of six

23   depositions, it's inconsistent with the orderly

24   administration of these cases and getting the

25   discovery done within the discovery deadline as the

1   Court ordered.

2           **MS. BRANSCOME:**  Well, let me just clarify, we

3   would not intend to use this on a spouse.  I mean,

4   this is not -- if we want to depose the spouse, we

5   will depose the spouse.  That would be someone that I

6   would say we would reasonably anticipate would come to

7   trial.

8           So I just want to clarify, this is not at all

9   a procedure we're seeking to use to just expand our

10  numbers.  And to the extent that someone was described

11  at the deposition as having relevant knowledge, like

12  Mr. Aylstock just said, the person in the foxhole who

13  saw them wearing their earplugs, that's probably

14  someone we're going to depose as part of the six.

15          What we're more concerned about is -- and I

16  took two of the plaintiffs depositions where I ran

17  down the list of the people on the initial disclosures

18  and the description was roughly the same, which was, *I*

19  *served with this person, I haven't been in touch in*

20  *five years, you know, I just served with them, I don't*

21  *remember how often I was with them*.

22          And if we turn around and suddenly the

23  plaintiffs have reached out to that individual and

24  that individual has agreed to come to trial, they

25  would not be someone we would have deposed as part of

1    our six, and we just don't think we should be

2    examining witnesses cold on the stand.

3          And the reality is, if this is simply just,

4    you know, we only get six, the Plaintiffs similarly

5    could engage in gamesmanship by they have listed more

6    than six witnesses on all of their initial

7    disclosures, we only get six, and then they bring to

8    trial the ones that we don't depose and,

9    strategically, we are at a significant disadvantage.

10          So, you know, this is one where we can put

11   parameters on it, if we need to, but I'm saying this

12   is something we would only exercise in good faith if

13   it's someone that the Plaintiffs are bringing live to

14   trial.  And by the reverse, I can assure you that we

15   will be deposing the spouses if we think the spouses

16   are coming live.  For some individuals they have

17   ex-spouses so we're less clear.  But we're not trying

18   to use this just to increase our numbers.

19          **MR. AYLSTOCK:**  If that's the case, Judge,

20   they should reserve some of the depositions, knowing

21   there will be a servicemember or damage witness at

22   trial.

23          What's happened is, although Ms. Branscome

24   may have asked some of the witnesses -- the plaintiffs

25   who these people are and so forth -- sometimes that

1    doesn't get asked.  But witnesses of obvious

2    relevance -- look, if somebody pops up late and it

3    wasn't obvious or reasonably known that this person

4    was going to be relevant, then, okay, that's good

5    cause, and that's something the Court can consider.

6         But what's happening here is the six

7    deposition limit that they asked for and the Court

8    ordered, they would like to have more.  And as I

9    said -- I'm happy to hear spouses will be within the

10   six deposition limit, but other witnesses of obvious

11   relevance also need to be in the six deposition limit.

12   That's consistent with what MDLs have done across the

13   country, and in fact I've been involved in where it's

14   been four and that was what --

15        **MS. BRANSCOME:**  Well, perhaps, then, Mr.

16   Aylstock, if it's so obvious who is of significant

17   relevance, if you all are willing to tell us that

18   earlier, you know, who you are contemplating bringing

19   to trial, we could do the depositions earlier.

20        I mean, my bigger concern is getting to trial

21   and facing witnesses that we have not deposed and

22   suddenly the first trial is a trial by ambush, which I

23   just don't think anyone wants to be facing.

24        So, if you all are willing to identify what I

25   would refer to as a "may call" list of witnesses, then

1    that is an alternative to having the depositions

2    closer to trial, it would be that you all would

3    identify your "may call" list who you may reasonably

4    anticipate calling at trial earlier.  We're open to

5    either option.

6            **JUDGE RODGERS:**  Excuse me.  So, here is what

7    we're going to do.

8            The parties are limited to six depositions.

9    It's impossible for me or Judge Jones at this

10   juncture, having not reviewed interrogatory responses,

11   at least I haven't and I don't know that he has on

12   this issue, and certainly not having been present at

13   any deposition or reviewed any deposition transcripts,

14   it's impossible for us to determine whether, in the

15   exercise of due diligence, the Defendants should have

16   identified a particular witness as one of its six

17   depositions.

18           So, I agree with both sides a little bit

19   here.  If the plaintiffs have answered the

20   interrogatories in a descriptive way, and if the

21   plaintiff has responded fully in response to a

22   deposition question, then, you know, the Defendants,

23   you need to decide whether you want to depose that

24   family member or friend -- nonspouse, family member or

25   friend or former servicemember.

1      If, on the other hand, you didn't ask the

2  question or the interrogatory is nondescriptive, then

3  I'm more sympathetic to the Defendants' position.  But

4  again, there's no way for Judge Jones or I to ferret

5  this out right now.

6      And so, I do think at some point -- and we're

7  not anywhere near there yet -- but maybe at some

8  point, an early "may call" witness list for both sides

9  is not a bad idea.

10      And then, to the extent there's a request for

11  a deposition at that point beyond the six, if the

12  Defendants or the Plaintiffs, depending on who is

13  wanting to take the additional deposition, you're just

14  going to need to show good cause.

15      But we're certainly not going to do this

16  within 72 hours of trial, and we wouldn't anyway, not

17  with -- I mean, the witness lists will be exchanged

18  well in advance of 72 -- although I don't --

19      Did you all provide an actual date for

20  exchange of -- we didn't go that far, did we, in this

21  litigation?

22      **MR. AYLSTOCK:**  I think we did, Judge.  We

23  have a pretrial order, which is due on March 19th,

24  that we'll incorporate with the Plaintiffs' and

25  Defendants' witness lists.

1        **MR. BUCHANAN:**  And there are exchanges among
2    the parties in advance of that date, Your Honor.
3        **JUDGE RODGERS:**  I don't have that right here
4    in front of me, so I need to take a look at that.  But
5    I'm firm on the six depositions per side.  I set four,
6    the Defendants asked for eight, and I've compromised
7    at six, and that's where you all are.
8        And it was always with the understanding that
9    there may be good cause for an additional deposition,
10   but at this point I can't make that call on the people
11   that, Ms. Branscome, you're referring to.
12       **MS. BRANSCOME:**  Understood, Your Honor.  And
13   many -- I think it's almost less of a concern about
14   the number of depositions than just trying to predict
15   by, you know, early October who the Plaintiffs might
16   bring live to trial.
17       So, you know, I really don't see this
18   necessarily us wanting to expand the number.  For many
19   cases, we may be under six.  I think it's more we just
20   can't predict who they might get to agree to come to
21   Pensacola when we're facing such large initial
22   disclosure lists of fellow servicemembers.
23       So, to the extent that we could do a "may
24   call" list at some point in time and then be permitted
25   to take a deposition --

1          **JUDGE RODGERS:**  I didn't say that.  I didn't

2    say that you would be permitted to take a deposition

3    based on the "may call" list.  What I said is, if we

4    do an early sort of "may call" witness list, then, if

5    there is a witness on that list that you did not

6    depose, then you can seek leave of Court to depose

7    that witness for good cause shown.

8          **MS. BRANSCOME:**  Understood, Your Honor.

9    Would it be permissible, as a variation, if we did not

10   use our six, you know, let's say we took five, so to

11   Mr. Aylstock's point about reserving a deposition, if

12   we ended up using less than six during this period of

13   time and a witness shows up on the "may call" list who

14   was not deposed, would we have -- is it permissible

15   that we would be able to take that deposition without

16   needing a full good cause showing?

17         **JUDGE RODGERS:**  Mr. Aylstock?

18         **MR. AYLSTOCK:**  I still think there needs to

19   be good cause.  They have had plenty of time to ask

20   the plaintiffs about every single one of these

21   witnesses.  But if it's somebody who -- nobody thinks

22   Your Honor is going to allow trial by surprise.  I

23   certainly don't, and I think they don't either.  So,

24   if there's a surprise and it pops up, I know Your

25   Honor will be fair and say good cause.

1            But if there's not a surprise and whether

2     it's -- if they didn't ask the questions that they

3     needed to ask, which are fairly obvious, who is this

4     person, who is that person -- they fought and had

5     Judge Jones order this, even though it's not typically

6     done, of course they should ask who are these people.

7            But, again, if it's going to be good cause,

8     we might be able to agree to it.  If it's somebody who

9     comes out of the woodwork or we didn't think was -- or

10    the plaintiff testified, *I don't think he's got any*

11    *information,* but he was on the list, then that's one

12    thing.  But we do want to get this nailed down.

13         **JUDGE RODGERS:**  Ms. Branscome, I agree with

14    the Plaintiffs.  You need to identify your six based

15    on the information that you have, and you do need to

16    ask good questions, and the plaintiffs needed to have

17    responded descriptively in the interrogatories.  And

18    if that's not the case, then that will be your good

19    cause.

20         **MS. BRANSCOME:**  Understood, Your Honor.  I

21    just would add that, you know, for many of these

22    individuals, they are alleging a causation, period,

23    over many, many years, and they've served with way

24    more than six individuals over that time frame.  And

25    so, when they describe the servicemembers as people

1    who observed their use of hearing protection devices

2    and their exposures to noise, that's true for maybe a

3    dozen servicemembers during the relevant period.

4            In theory, all of those individuals have

5    potentially relevant knowledge.  What we don't know is

6    which of those individuals might agree to come live to

7    Pensacola.  And that's the challenge that we're facing

8    is that there are more than six potentially relevant

9    witnesses for each of these plaintiffs, and we simply

10   can't guess which of those individuals has a personal

11   relationship with the plaintiff strong enough that

12   they would show up and testify live.

13           **JUDGE RODGERS:**  Well, you can always file a

14   motion and seek leave to take a deposition beyond the

15   six before the close of discovery, if you think you

16   have the cause to do that.  My ruling is firm at this

17   point.

18           **MR. AYLSTOCK:**  Thank you, Your Honor.

19           **MS. BRANSCOME:**  Understood.

20           **JUDGE RODGERS:**  So the next item pertains to

21   the 3M sales personnel.  And I don't need briefing on

22   this.  I can tell you what my decision is without your

23   briefing and taking the time to do that.

24           These sales personnel, their depositions are

25   not limited by the 40 deposition days.  That was never

1    contemplated.  When I entered that order, I never

2    contemplated case-specific depositions.  And so that's

3    an easy decision for me.

4          However, they are limited by the six.  So I

5    don't know if there was any disagreement about that,

6    but they are limited by the six, obviously.

7          **MR. AYLSTOCK:**  There was not, Your Honor.

8    And we've asked the Defendants if they could provide

9    -- we're a little bit lacking visibility as to exactly

10   which ones of these were on which bases, and we've

11   asked for time and expense reports to help us sort

12   that out.  They have indicated we're not going to get

13   those.  We've asked if you could help us out and let

14   us know.  We don't want to take a deposition of a

15   salesperson who wasn't on Fort Bragg, if our person

16   got his earplugs at Fort Bragg, for example.

17         So, we have been trying to work through that

18   issue, but I think, with the Court's guidance,

19   hopefully we can get some visibility.  But we totally

20   understand that they're within our six, Your Honor.

21         **JUDGE RODGERS:**  So, Ms. Branscome, how -- or

22   I'm not sure if this is your issue.  But how are the

23   Plaintiffs to identify these individuals if you're not

24   providing the information to them to do that?

25         **MS. BRANSCOME:**  This one, actually, is Mr.

1  Nomellini.

2          **JUDGE RODGERS:**  Oh, okay.

3          **MS. BRANSCOME:**  Although, that was one of our

4  concerns is that, thus far, these individuals had not

5  been tied to specific bellwether plaintiffs.  But Mr.

6  Nomellini is much closer to this issue than I am.

7          **JUDGE RODGERS:**  Okay, thank you.

8          Mr. Nomellini?

9          **MR. NOMELLINI:**  Yes, Your Honor.  I'm not

10  aware of any requests that we haven't responded to.  I

11  think that the issue of discovery on identifying these

12  individuals has been the subject of some

13  interrogatories and motion practice before Judge

14  Jones, and he's ruled on those, and I think, in fact,

15  he's ruled in our favor.

16          I'm happy to meet and confer with Bryan to

17  find out what additional information he's seeking.

18  And then, if there are any disputes, we can raise

19  those again with Judge Jones.

20          **JUDGE RODGERS:**  Okay.  I'm not privy to that,

21  so I apologize for not being -- I haven't been a part

22  of that, so I wasn't clear on what had been done in

23  the past.

24          So, Judge Jones, I assume you have some

25  familiarity with this, with the sales reps?

1          **JUDGE JONES:**  Well, I think, too, I was going

2    to ask Mr. Nomellini, what was it that I ruled in your

3    favor regarding salespeople?

4          **MR. NOMELLINI:**  I think it had to do with

5    base-specific information, communications with bases,

6    Your Honor.  I'd have to look back at that.  I think

7    it had to do with the last Motion to Compel hearing

8    and what we produced in terms of communications with

9    bases.  And actually, I do not have it at my

10   fingertips.

11         **JUDGE JONES:**  Okay, that jogs my memory, yes,

12   okay.

13         **MR. AYLSTOCK:**  I think Your Honor ruled that

14   their interrogatory answers were sufficient inasmuch

15   as they pointed us to documents and that those were

16   sufficient under the rule.

17         What we're just asking for is, to the extent

18   that time and expense reports are there -- and we know

19   that that's what's done for salespeople in these major

20   corporations -- that can help us narrow, we'd ask the

21   cooperation.  But either way, we're prepared to go

22   forward within our six.

23         **MR. NOMELLINI:**  I think what we need to do on

24   this is take a look at Judge Jones's rulings, and

25   then, Bryan, I'm happy to meet and confer with you on

1   any requests that you have that are permissible under

2   his rulings.  And then I think we also need to figure

3   out, you know, which ones are actually case-specific.

4         We had a discussion with Judge Herndon about

5   this, about what is the meaning of "case-specific" and

6   is somebody global or are they case-specific.  But I

7   think we need to further meet and confer on this issue

8   to crystallize it.

9         **JUDGE RODGERS:**  Well, I assumed, in making

10  the comment I just did, that these were case-specific.

11  So, if I'm wrong about that, then this would need to

12  be revisited in terms of what I just said about the 40

13  deposition days.

14        **MR. AYLSTOCK:**  They are case-specific, Your

15  Honor, we're seeking.  And that's why we're trying to

16  get the information for which of these people were on

17  which bases at certain times that relate to our

18  specific plaintiffs.  It's no different than in

19  *Abilify* where we know sales reps visited various

20  locations, and that's how we're treating it, and

21  that's how we're moving forward, Your Honor.

22        **JUDGE RODGERS:**  Let me ask if you all can

23  meet and confer about this, Mr. Nomellini and Bryan,

24  you all get together, review Judge Jones's order -- I

25  have not done that.  So you all look at that in terms

 1    of specificity and if it gives you enough direction in
 2    terms of how to proceed.
 3            If not and, Bryan, if you feel that the --
 4    well, I'm going to take a look at Judge Jones's order
 5    as well, and Judge Jones, I'm sure, will do that, too.
 6            If you all can't come to an agreement and,
 7    Bryan, if you believe that there's good cause for you
 8    to go forward and seek additional production, then you
 9    can move for that.
10            **MR. AYLSTOCK:**  Yes, Your Honor, thank you.
11            **JUDGE RODGERS:**  I'll leave it there.
12            **MR. NOMELLINI:**  Thank you, Judge.
13            **JUDGE RODGERS:**  Thank you.
14            All right.  I appreciate your efforts to
15    reach agreement on additional custodians.  I know Mr.
16    Gunderson worked on that as well, and my understanding
17    is that that is resolved.
18            **MR. OVERHOLTZ:**  That's right, Your Honor,
19    it's resolved.  We had one issue pop up.  One of the
20    custodians that we had agreed, I guess there was some
21    misinformation on Mr. Gunderson's side, and it turned
22    out they did not have a file for Ms. Rhodes.
23            However, yesterday Mr. Gunderson let me know
24    that they were going -- and agreed to produce the file
25    for Mr. McLean, who we had also requested.  And so I

1   was letting Mr. Gunderson know that we would accept

2   the file of Mr. McLean.  So that's the status of that.

3          But we were able to work out the disagreement

4   regarding this custodian.  We shared information about

5   which custodians they had files for and which

6   custodians they did not.  They were able to provide

7   that information to us and, based on that, we narrowed

8   the files that we wanted to have produced.

9          **JUDGE RODGERS:**  Okay, very good.

10         And as to the 30(b)(6), that is an open

11  question still.  Defendants, if necessary, will file a

12  motion for protective order, and that deadline was

13  extended from the 12th to today.

14         Are you all planning to file that motion?

15         **MR. NOMELLINI:**  Your Honor, we're having

16  another meet-and-confer with Neil after this call.  If

17  we can reach agreement, that's great, and if not,

18  we'll file the motion.

19         **JUDGE RODGERS:**  Okay.  And my understanding

20  is, if it is filed, the Plaintiffs will respond by the

21  17th, and then Judge Jones has timely scheduled a

22  hearing for that issue on the 19th.

23         **MR. OVERHOLTZ:**  That's right, Your Honor.

24         **JUDGE RODGERS:**  Very good.

25         There was a Motion to Compel that the

1   Defendants filed recently as to the CDC.  That's been

2   referred to Judge Jones.  No need for any more

3   discussion about that.

4          Update, Mr. Buchanan and Ms. Six, as to the

5   TAR training and review?

6          **MR. BUCHANAN:**  I think, at this point, Your

7   Honor, Ms. Six probably has the most current

8   information.

9          **JUDGE RODGERS:**  Okay.

10          **MS. SIX:**  Thank you.  Good afternoon, Your

11   Honor.

12          **JUDGE RODGERS:**  Good afternoon.

13          **MS. SIX:**  So Defendants are in the process of

14   adding data to the TAR protocol for the new additional

15   custodians that Mr. Overholtz mentioned, and we will

16   review that data accordingly with some files being

17   reviewed in a linear document-by-document fashion and

18   others based on the TAR model cutoff.

19          We are still training the system by reviewing

20   tranches of a thousand documents, and we have not yet

21   hit the stopping criteria to freeze the model, which

22   is contemplated in our supplemental TAR protocol.  In

23   other words, we have not yet, in those tranches of one

24   thousand documents, found less than 45 responsive

25   documents, so the review is continuing and the

 1    training is continuing.  But we have produced roughly

 2    5,000 documents so far from this review, and we will

 3    continue to produce documents on a rolling basis.

 4         And as an update for the Court, I believe we

 5    owe this to Judge Jones from our last hearing.  We

 6    feel confident that we can complete a review and

 7    production of documents even to the additional

 8    custodians by September 1st.

 9         **JUDGE JONES:**  Great.

10         **JUDGE RODGERS:**  Very good.  Thank you for

11    that update.

12         Any further update regarding the deposition

13    calendar, anything else we need to discuss?  That's

14    Item 6e.

15         **MS. BRANSCOME:**  No, Your Honor.  Mr.

16    Overholtz referenced this earlier.  One thing we've

17    been discussing as part of working out the protocol

18    for the bellwether depositions, who goes first, so on

19    and so forth, is actually some kind of live calendar

20    that a representative on each side could maintain and

21    update.

22         And then we could actually provide that to

23    Judge Herndon or to yourself, if you would like it at

24    any time so that you have an understanding of what

25    depositions have been requested, what dates have been

 1    accepted.  It will probably have more information than

 2    you would ever want to know.  But we are contemplating

 3    a process for doing that so that, at any given time,

 4    if you all would like to know the status, we would

 5    have a current document that would reflect it.

 6              **JUDGE HERNDON:**  I would certainly like that.

 7              **JUDGE RODGERS:**  Yes, that's a good idea.

 8              **MR. BUCHANAN:**  Your Honor, there is one

 9    real-time issue that we have been working on with Mr.

10    Nomellini and counsel for the witness that relates to

11    the deposition of Eric Fallon, current 3M employee,

12    but he has separate counsel currently.

13              We learned last night that, as part of the

14    preparations, there were additional documents that

15    were found, many of which require government review

16    and screening prior to production.  Those went over,

17    if you will, on real-time to the government last week.

18              It raises a scheduling complication that

19    we're trying to work through with the Defense.  Mr.

20    Nomellini may have more current information than I on

21    where that stands.

22              **MR. NOMELLINI:**  Yes, Your Honor.  So, a

23    little background on this.  Mr. Fallon had a CD from

24    his days in the military.  It contains personal

25    documents and some military documents.  He retained

1    counsel to deal with the process of clearing the

2    documents with the military.

3          And Judge Herndon was on a call with Mr.

4    Buchanan and I and some others to talk about where the

5    government stands in terms of clearing those

6    documents.  And we're trying to urge them along as

7    quickly as we can.  Neither 3M nor Mr. Fallon nor his

8    counsel have any objection to producing the documents,

9    and we want them to be produced as quickly as

10   possible.

11         In the event that the documents cannot be

12   cleared by the government today or shortly, we wanted

13   to make a backup plan, with Your Honor's permission,

14   for his deposition.

15         He is having surgery next week, and so we

16   wanted to get Your Honor's permission, if the

17   government does not come through in terms of giving us

18   approval on the documents, to use either September 3rd

19   or 4th, assuming he's recovered from his surgery, or

20   the week of September 14th as backup dates for his

21   deposition.

22         **JUDGE RODGERS:**  Well, he's scheduled for the

23   19th and 20th?

24         **MR. NOMELLINI:**  Yes, that's correct, Your

25   Honor, he is scheduled for that, and he's ready to go

1    forward.  The issue is getting government -- I think

2    the Plaintiffs are concerned with whether the

3    government is going to approve production of various

4    documents from this CD that he sent to them in an

5    efficient time for them to review.  Sorry, Your Honor.

6         **JUDGE RODGERS:**  When is his surgery, Mr.

7    Nomellini?

8         **MR. NOMELLINI:**  August 24th.

9         **JUDGE RODGERS:**  So, it's the following week,

10   all right.  I misunderstood what you said about his

11   surgery.

12        But, listen, you all -- again, we all

13   recognize the efforts that have gone into working

14   collaboratively and cooperatively and patiently with

15   the government in this litigation.  And you all have

16   bent over backwards, in my opinion, to comply with

17   *Touhy*.

18        In this instance, number one, Fallon is no

19   longer -- he's not a government employee.  Now, I'm

20   assuming that this CD was something that he put

21   together while he was a government employee, correct?

22        **MR. NOMELLINI:**  That's my understanding, Your

23   Honor, correct.

24        **JUDGE RODGERS:**  Okay.  I'm not sure how that

25   works under *Touhy* when the person is no longer a

1    government employee.  But you have fulfilled your

2    obligation under *Touhy*, in my opinion, in this way:

3    You have notified the government that you're taking

4    this deposition.  I have told you you could go forward

5    with the former employee deposition.  This is a little

6    unique situation because he has this CD.  You have

7    provided that CD to the government.

8         And now the ball is in the government's

9    court.  If the government wants to take steps to stop

10   the production of these records and questioning of

11   Mr. Fallon about these records, it's incumbent upon

12   them to do so and to file the appropriate motion in

13   this Court.

14        **MR. BUCHANAN:**  Your Honor, I think that the

15   challenge, as we understand it -- and obviously, the

16   Plaintiffs would be prepared to go forward next week

17   -- is that the documents that were sent to the

18   government for review by virtue of -- I don't know

19   whatever the glitch was, they were just identified by

20   Mr. Fallon's counsel yesterday and sent to the

21   government last night.

22        **JUDGE RODGERS:**  Well, his deposition is not

23   until Monday.  How much volume is on this CD?

24        **MR. NOMELLINI:**  Your Honor, my --

25        **MR. OVERHOLTZ:**  Go ahead, Mark.

1     **MR. NOMELLINI:**  Sorry, Neil.

2          My understanding of what went over last night

3     is 75 documents.  And also my understanding is that,

4     prior to that, there was a smaller set that had gone

5     over that the government has been reviewing for some

6     time.

7          **MR. OVERHOLTZ:**  That was about 40 documents,

8     I believe, Your Honor.

9          **JUDGE RODGERS:**  Forty of the 75 or --

10         **MR. OVERHOLTZ:**  No, 40 more.

11         **MR. BUCHANAN:**  An additional 40.  There was a

12    call with the government I think on Tuesday, and they

13    said they would get back to us by Friday with respect

14    to the 40.  We're expecting I think a letter from the

15    government today releasing the final documents from

16    the CD and reserving on those that they consider to be

17    internal deliberative documents.

18         And then there's the 75 that went last night,

19    Your Honor, that I don't know that we have heard any

20    preliminary indication from the government, which is

21    why we secured a backup date the week of -- or

22    September 3rd and 4th.

23         **JUDGE RODGERS:**  I have no problem with the

24    backup dates.  That's not a problem with me.  I know

25    it, obviously, is beyond the deadline by a couple of

1    days, but there's good cause for that.  Anyway, I'll

2    leave it at that.

3          I wouldn't move it just yet.  I would wait to

4    see what you hear from the government today.

5          **MR. BUCHANAN:**  We can do that.

6          **JUDGE RODGERS:**  I don't know what their

7    position will be on the 75.

8          But then you said they have pulled back some

9    of the 40, held back?

10         **MR. BUCHANAN:**  They indicated that there may

11    be a few in the 40 as to which they're going to assert

12    deliberative process privilege on and therefore object

13    to turning them over.  But anything final, I

14    understand, is coming our way, which may be acceptable

15    to the parties and Plaintiffs.  I don't know what the

16    Defense position will be on that.  I'll have to see

17    the government's letter today on the 40.

18         With regard to the 75, we don't have

19    visibility yet to the content of those on the

20    Plaintiffs' side.  We haven't received a log.  I

21    understand that 3M or Mr. Fallon's counsel are

22    preparing a log of what was sent to the government

23    last night which we'll receive today.

24         **JUDGE RODGERS:**  That was going to be my next

25    question, Mr. Buchanan, is is there a log and so you

1   can look to see what is contained on that disc.

2          **MR. BUCHANAN:**  Counsel for Mr. Fallon or 3M,

3   I think, is preparing that today and will get that to

4   us and we'll have some visibility.

5          As I said, Your Honor, we have received those

6   backup dates, anticipating we may need to work through

7   a view issues with the government or Defense counsel

8   on that next week.  And if the backup dates that first

9   week of September work for the Court, we will

10  accommodate our -- shift our schedule to accommodate

11  his deposition at that time.

12         **JUDGE RODGERS:**  My preference is you go

13  forward, obviously.  My preference is the 19th and

14  20th.  But right now I guess that's impossible to

15  determine if you can do that because you don't know

16  enough about these documents.

17         But, to the extent there are documents on

18  that disc that you really don't care about, then

19  acknowledge that and move on.

20         I would -- I guess I'm a little bit hesitant.

21  Mr. Fallon is scheduled for surgery the week of the

22  24th.  I have no idea what that surgery involves.  I

23  just -- whenever someone undergoes surgery, there's

24  always the potential for delay in recovery.  I hope

25  that's not the case for Mr. Fallon.  But it would be

1    better to have his deposition taken and of record than

2    to have to wait beyond the 3rd and 4th, in my opinion.

3    But he's your witness so --

4         **MR. BUCHANAN:**  Yeah, Plaintiffs are obviously

5    prepared to go forward next week, or we were until we

6    learned what we learned late last night.  So this

7    would compose the bulk of the witness's personal

8    production.  We received ten documents of his

9    production a few months ago.  We received the log two

10   weeks ago saying they tendered another 40.  And then

11   there's this production that would, by far, be the

12   most significant in terms of number.

13        So, obviously, there's some concern and

14   importance, and we haven't seen a log.  But we'll wait

15   to hear from the government today, Your Honor.  And

16   happy to work with Defense counsel if we can't hear

17   from them -- if we don't hear from them today.

18        **JUDGE RODGERS:**  Mark, do you have -- or who

19   has contact with Mr. Fallon's individual counsel?

20        **MR. NOMELLINI:**  I think both Dave and I and

21   others from our side have been talking to his

22   individual counsel, Your Honor.

23        **JUDGE RODGERS:**  Well, I --

24        **MR. NOMELLINI:**  And I think he is -- sorry,

25   go ahead.

```
 1           JUDGE RODGERS:  I was just going to say,
 2    Mark, I would like him to get that log to the
 3    Plaintiffs sooner rather than later.
 4           MR. NOMELLINI:  Understood, Judge, we'll have
 5    that occur ASAP.
 6           JUDGE RODGERS:  Thank you very much.
 7           Timing for production of Touhy documents for
 8    the 1 percent.
 9           MR. AYLSTOCK:  This is Ms. Hoekstra.
10           Go ahead, Jen.
11           MS. HOEKSTRA:  Yes, this is Ms. Hoekstra's
12    issue, more than anything else.
13           JUDGE RODGERS:  Okay.
14           MS. HOEKSTRA:  As the Court is aware, there
15    have been a volume of authorizations from the VA in
16    the VA production documents that have come through for
17    the 1 percent.  We still have a very small volume of
18    DoD records that have come through, but we anticipate
19    those will continue to proceed as well.
20           At this point, I think we're slightly more
21    than 50 percent of the way through the 1 percent
22    production, and we have received north of two million
23    documents so far.
24           We are continuing to go through the process.
25    But as you and the Court may be aware, additional
```

1    requests have been coming through for extensions on

2    the 14 days because some of the volumes are

3    exceedingly large.

4            Part of the reason for that is how the VA

5    documents are produced.  For example, if someone goes

6    to multiple VA facilities and the records are accessed

7    at those different facilities electronically so that

8    the doctor has access to their full VA record, that

9    full record from all of their visits to every VA

10   facility they have gone to at that point is then

11   available at that specific location.  And for

12   individuals who have records coming in from more than

13   one regional office, there's a large volume of

14   duplication.

15           But because it's coming in in both paper

16   and/or in some sort of watermarked or confidential

17   fashion, it is very difficult to dedup.  And as part

18   of the production protocol, we're not having MDL

19   Centrality trying to dedup.  We're just saying it's

20   from a different facility, you have to load it.

21           So there's a significant volume of documents

22   that are coming in for these individuals, and we

23   wanted to see if the Court would be open to the idea

24   of shifting the 14-day turnaround to 30 days moving

25   forward.

1          We have reached the majority of the deadlines

2    to this point.  But with everything else going on and

3    the fact that the 1 percent overlaps significantly

4    with some bellwether plaintiff firms, we wanted to see

5    if there would be any wiggle room on the amount of

6    time because it may cut down on the volume of

7    extensions that we're going to receive in the next few

8    weeks.

9          **MR. NOMELLINI:**  Your Honor, may I comment on

10   that?  We haven't heard the proposal in terms of

11   making it 30 days and would like to talk through that

12   with Jennifer.  And, you know, we won't delay, we'll

13   be quick.  But there are other issues that we would

14   like to talk about in connection with that.

15         So, if we could just have a few days to meet

16   and confer and circle back to Your Honor, that would

17   be appreciated, and it would help us to understand the

18   issue.

19         **JUDGE RODGERS:**  Well, I certainly don't mind

20   you meeting and conferring.  I'd like to hear back

21   from you on it by Tuesday.  I will say my initial

22   reaction to Ms. Hoekstra's request was favorable.  But

23   I'm not making any ruling, since you've asked for an

24   opportunity to meet and confer about this.

25         But it is an extraordinary effort to -- it

1    sounds like, with many of these plaintiffs, there are

2    volumes and volumes of records.  We are moving the

3    Group A along.  Group B and then C and D are on a

4    schedule.

5         So, to ask for 30 days -- or an additional 16

6    days to produce the records for the 1 percent, which

7    is a large number of cases, doesn't seem really like

8    too much to ask.

9         But I do have a question, Ms. Hoekstra, of

10   you.  Remind me when -- and I'm asking you to remind

11   me of what's in my order, to be honest here.

12        So, when the order says 14 days to produce,

13   is this the production to the Defendants, or is this

14   the production into BrownGreer, or is this the -- or

15   it wouldn't be into BrownGreer -- or is this the

16   production to Leadership?  Remind me, please.

17        **MS. HOEKSTRA:**  This is the production to

18   Defendants.  Essentially the records come into

19   BrownGreer.  When a notification goes out, various

20   firms have 14 days from the date of that notification

21   to review, redact for the privacy issues, if needed,

22   provide a log, and produce the redacted documents.

23        Leadership has been very involved in making

24   sure that, as those notifications come out, the firms

25   are aware.  Ms. Hunt and I probably spend about 15

1   hours a week on the phone with various firms that are

2   receiving these documents to make sure they understand

3   the privacy issues and are following the protocols

4   within the 14-day time frame and telling them why it's

5   so important.

6        It's just in the last week or two, in part

7   because there were over -- almost 100,000 pages of

8   documents produced on July 27th alone, there have been

9   increases in the amount of people asking for an

10   extension of 14 days, approximately, from Defendants

11   and leave of the Court.  And we think that making the

12   shift may impact that.

13        And we're happy to meet and confer with

14   Defendants further about it.  It was an agenda item,

15   and we just wanted to raise it with everyone.

16   **JUDGE RODGERS:**  All right.  Well, Mark, I'll

17   hear from you on Tuesday, if you feel strongly that

18   you have an objection to the request for the 16-day

19   extension.  But at this point it doesn't seem

20   unreasonable to me.

21   **MR. NOMELLINI:**  Thank you, Your Honor.  There

22   are some other issues we would like to discuss with

23   Jennifer as well that are related, and we will get

24   back to the Court.

25   **JUDGE RODGERS:**  Okay.  Well, I know I do not

1    know everything that you all know, so there may be
2    something else that bears on this that you need to
3    discuss with her that may impact what she's asked of
4    the Court, so that's fine.
5              Next on the agenda is the exchange of
6    information regarding 3M's net worth.  The Defendants
7    agreed to an extension from the 12th to the 14th for
8    the Plaintiffs to provide their estimate and the
9    methodology for that.
10             Are you all meeting that deadline?
11             **MR. BUCHANAN:**  Yes, Your Honor.  And we
12   appreciate the Defendants' consent to two additional
13   days on that.  It was a little more involved.
14   Apparently, a lawyer's understanding of what financial
15   condition means in terms of net worth is a little
16   different than what an expert might say financial
17   condition is, so we needed a little more time.  But
18   we'll be getting that information over to the Defense
19   today.
20             **JUDGE RODGERS:**  Okay, very good.
21             And then the Defendants, your objections are
22   due on the 26th.
23             **MS. BRANSCOME:**  Understood, Your Honor.
24             **JUDGE RODGERS:**  So I had a couple of
25   additional agenda items, but they pertain to

1    scheduling.

2          The October 23rd CMC -- we have scheduled

3    these out pretty far in advance.  I did not realize

4    that that is the day before my daughter's wedding, so

5    I'm going to need to ask you, please, to consider

6    moving that date.

7          I can do the 16th, which is preferable, but I

8    could also do the 30th.  You don't have to tell me

9    right this moment, but if you could get back with

10   Hillary and let us know if the 16th or the 30th works

11   for you all.

12         **MS. BRANSCOME:**  Well, I can tell you for sure

13   we will agree that we should move it.  That's far too

14   important.

15         **JUDGE RODGERS:**  Thank you.

16         **MS. BRANSCOME:**  Yes, that is far too

17   important.  We're happy to check among our team to see

18   which of those two dates is better.  But understanding

19   your preference for the earlier one, I suspect we can

20   make that work.

21         **JUDGE RODGERS:**  Okay, thank you.

22         **MR. AYLSTOCK:**  Your Honor, it looks like the

23   16th works for the Plaintiffs or we could do the 30th.

24         **JUDGE RODGERS:**  Well, the 16th works -- if

25   you all can live with that, that works best for me.

1    Like I said, if you had a conflict, I could do the

2    30th.

3              Judge Jones and Judge Herndon?

4              **JUDGE JONES:**  I'm available the 16th.  I am

5    out of town on the 30th, so that's not a great day for

6    me.

7              **MS. BRANSCOME:**  I suspect we can make the

8    16th work.  And in fact, it makes some sense because

9    our September CMC is actually a little earlier than

10   usual, it's on the 18th.

11             **JUDGE RODGERS:**  Right.

12             **MS. BRANSCOME:**  So, to me, that strikes me as

13   a good date to move it to.  I just don't want to speak

14   for my whole team without having checked with them,

15   but I would put that in the probably 90 percent

16   category that we can do the 16th.  And we can maybe

17   send Hillary or Tevenia a note by the end of the

18   today; does that work?

19             **JUDGE RODGERS:**  Hillary is fine.  And I had

20   the same thought, Kim, myself, but it was closer to a

21   month anyway from the September date, so it's good

22   that works, plus I don't want to hold it without Judge

23   Jones.

24             Judge Herndon, are you able on the 16th?

25             **JUDGE HERNDON:**  I am, indeed.

1    **JUDGE RODGERS:**  Okay.  Very good.  And if you
2    want to travel to Pensacola, you can attend a wedding
3    -- or no, I guess that would be the next week.  Never
4    mind.  That would be the next week.  I was going to
5    say I'll send you an invitation.

6    All right.  So the other -- it's a possible
7    conflict, it deals with the November CMC.  It's set
8    right now for the 20th, which is the week before
9    Thanksgiving.  I have a five-day criminal trial that
10   right now I have every reason to expect to go.  It's a
11   multi-defendant case, and all the defendants who are
12   going to plead have pled, and the ones who are left
13   are digging their heels in, so I think that probably
14   is going to go.

15   It could end before the 20th.  I would hate
16   to have to cancel on you all at the last minute, so I
17   wanted to just throw out the possibility of moving the
18   November CMC to the 13th.  Or, if you'd would prefer
19   to leave it on the 20th, we can do that, just
20   understanding that it may end up being cancelled,
21   possible.

22   **MS. BRANSCOME:**  We can check on this one as
23   well.  I, again, think if we move the October one to
24   the 16th, moving the November one to the 13th kind of
25   keeps us roughly checking in every month.  So we can

1    check on this one as well, but I think it makes sense

2    to move it and then we don't have the last minute

3    cancellation, particularly right before the holidays.

4        **JUDGE RODGERS:**  Yeah.  And just so you know,

5    following along the thoughts about staying on track

6    every month, the December CMC is the 14th, so that

7    would keep us on track if we could move this one to

8    the 13th.

9        Well, again, if you all would let Hillary

10   know.

11       Judge Jones, does that work with you, the

12   13th?

13       **JUDGE JONES:**  Yes, I'm available.

14       **JUDGE RODGERS:**  Judge Herndon?

15       **JUDGE HERNDON:**  Yes.

16       **JUDGE RODGERS:**  All right.  And then this is

17   our last scheduled biweekly Leadership call, so

18   Hillary will be reaching out to you with proposed

19   dates for the next few Leadership calls, if that's all

20   right.

21       **MS. BRANSCOME:**  That sounds great.

22       **MR. AYLSTOCK:**  Thank you, Your Honor.

23       **MR. SACCHET:**  Your Honor, this is Michael

24   Sacchet.  I don't know if this is the appropriate time

25   to interject, but we did have one last remaining item

1   that, unfortunately, didn't make it on the agenda but

2   Plaintiffs were hoping to raise with Your Honor, and

3   we have put 3M on notice of the same.

4          **JUDGE RODGERS:**   Okay, Mr. Sacchet, go ahead.

5          **MR. SACCHET:**   Yeah.   And this issue involves

6   the choice of law assignment.   And Plaintiffs

7   appreciate the Court's attention in response to the

8   parties' prior email of Monday, August 10th, for

9   clarification on it.   And respectfully, we're still

10   seeking minor clarification of the Court's recent

11   guidance to determine which state law applies and the

12   standard and an explanation with one case citation

13   thereto.

14          And our question revolves around the idea

15   that, if the standard mentioned by the Court is the

16   choice of law test or principle that would control the

17   choice of law analysis, some confusion still remains

18   about how that inquiry would inform this additional

19   request to identify the relevant state law.

20          I understand Barry Fields isn't on the phone,

21   and I don't want to speak for him.   And perhaps Kim or

22   -- I don't know if Cole Carter is on the phone.   But

23   my understanding of 3M's position is that they believe

24   the Court would like the parties to pin down the final

25   substantive state law that actually flows out of the

1    choice of law analysis.

2         Our issue with that is it seems that reading

3    of the Court's directive seems intentioned with the

4    Court's directive to identify a singular state law.

5         And, as the Court knows, when choice of law

6    analysis is conducted under the dépeçage doctrine,

7    there could be multiple state laws in play.

8         The easiest example of this issue would be,

9    if, in the context of statute of limitations, the

10   designated forum has procedural borrowing as opposed

11   to substantive borrowing, so there could be the law of

12   the forum state and then the substantive law of other

13   states, which Plaintiffs suggest it could be multiple

14   states at issue, which is why, in trying to make sense

15   of the Court's directive and read it collectively,

16   we're curious if the Court intended the state law to

17   really just mean the forum state law that would

18   trigger the choice of law inquiry rather than the

19   actual substantive state law that would flow out of

20   that inquiry.

21        I'm happy to -- I don't know if that is

22   helpful in terms of understanding the issue, but I

23   wanted to put it forward to Your Honor.

24        **JUDGE RODGERS:**  My intent would be the

25   former.  This is not intended as a full briefing

1   schedule on choice of law, and I'm not going to be

2   making a decision based on this chart -- or I'll call

3   it brief that you provide.

4        So what I'm looking for is for you all -- and

5   if you can do it jointly, great, you know, that's

6   obviously always the preference.  To the extent

7   there's disagreement, and I suspect there will be,

8   then I want you to set forth your own respective

9   positions.

10       And if it happens to be that your position as

11   a party is that any one of multiple states' law might

12   apply in a particular case, and it might even apply on

13   a particular issue, then I want you to spell that out

14   for me in summary fashion in this document.

15       Now, that may mean that you need to be able

16   to cite another case or two, and you may need a few

17   more words, which I'm fine with that in expanding that

18   number, if need be.

19       This was not intended to be a full-blown

20   brief by each side, by any stretch, and I'm not

21   intending to make a decision based on this document.

22   This is helpful guidance for me that's going to help

23   me -- I'm hoping it will crystalize some of the issues

24   and frame the issues for me, but it's not the final

25   say by either side on choice of law in these six

1    cases.

2          **MR. SACCHET:**  That's very helpful, Your

3    Honor.

4          **MS. BRANSCOME:**  Well, if I may, now I want to

5    make sure that we're clear on this.  Mr. Sacchet is

6    correct that Mr. Fields is the one that we want on the

7    choice of law committee and he's been working much

8    closer on this.

9          But I think where the confusion came up is,

10   if I understand what Mr. Sacchet was suggesting, he

11   was suggesting that the chart essentially stop at an

12   articulation of the law of the forum state.

13         And what we think would be helpful is not so

14   much that the parties forever and all time have

15   settled on this singular state substantive law that

16   applies, but that at least the parties should be

17   articulating their position as to what application of

18   the forum state law would lead to in terms of the

19   potential options for the substantive state law.

20         So, if I understood what Your Honor was

21   saying correctly, if we think multiple state laws may

22   apply, we should articulate that.  But my

23   understanding of the Plaintiffs' position is they

24   essentially want to stop the analysis at identifying

25   the law of the forum state, which in most of these

1    cases is not really up for much question.  I mean,

2    they have a designated forum.  We know the legal

3    standard for choice of law principles.  I just don't

4    know that that's all that helpful of a chart.

5         I think what's helpful is to get to the next

6    step, which is what do the parties think application

7    of that choice of law principle would lead to in terms

8    of the substantive state law.  And if the parties

9    think it may be multiple states, then that should just

10   simply be articulated.  But I think stopping at just

11   the forum state just doesn't really move the ball

12   forward much, from our perspective.

13        **JUDGE RODGERS:**  Right.

14        So, Mr. Sacchet, when I say if you believe or

15   you feel that multiple states' substantive laws apply,

16   you've got to tell me why, which would necessarily

17   include an analysis of the forum state choice of law

18   rule.

19        **MR. SACCHET:**  Yes, I totally understand and

20   agree, Your Honor, and I appreciated the Court's

21   position and understood it well, and I believe 3M did

22   in reiterating it.

23        I just was seeking clarity because there is

24   some nuisances to, even if the designated forum's

25   choice of law should apply for directly filed cases,

1    whether that designation should control the choice of

2    law principles.  And there has been a few courts that

3    have attempted to iron out that wrinkle, so I did have

4    a question in the back of my head as to whether that

5    was the issue the Court was seeking to address in

6    terms of this assignment.

7         But now that you have clarified the issue, I

8    fully understand it, and was simply seeking final

9    clarification of it so that both Plaintiffs and 3M can

10   work together and hopefully come to a decision about

11   what state law might apply, and if not, present our

12   positions in summary order for this initial exercise,

13   and never assumed it would be the final position of

14   either party or that the Court was treating it as

15   such.

16        **JUDGE RODGERS:**  Okay.  So let me ask -- maybe

17   charts is -- I don't know if that's too confining for

18   this exercise.

19        I don't have a problem revisiting the format

20   for this.  I'm sorry Mr. Fields is not on this call,

21   and it may be that maybe Monday we need to get on a

22   call with just him and you, Mr. Sacchet, and we can

23   talk more about what you all think, as a committee,

24   the best format would be, understanding that I don't

25   want 100-page briefs in all six of these cases.

1      **MS. BRANSCOME:** Understood, yes.  No, I think

2   that would not be helpful at this point.  I think the

3   goal really is to just start us moving forward.  And

4   to the extent that we end up with agreement, then we

5   put it to bed or at least subject to additional

6   discovery coming to light.

7          Whether the format is a chart versus

8   something else, perhaps it would make sense, now that

9   we have gotten clarification, or at least Mr. Sacchet

10  has gotten clarification from the Court, that perhaps

11  we could meet and confer with each other, determine

12  what we think format might work.  And if we think we

13  would need some modification perhaps of your initial

14  guidance to do another format, we could come to you,

15  or it may turn out that the chart format is perfectly

16  fine.

17     **JUDGE RODGERS:** Yeah, and I'm fine with that.

18  The chart, initially that made sense to me, but maybe

19  this is too complex or comprehensive for a chart.  And

20  I'm open to, like I said, to revisiting the format.

21          It could be -- Mr. Sacchet, you were a

22  circuit court of appeals law clerk -- it may be a

23  bench memo format.

24          But I don't want, like I said, voluminous

25  briefs submitted by each side for each case.  There

1  will be a time for that, that time will come, but I

2  don't need that right now.

3          MR. SACCHET:  We're happy to hear that, too.

4  I personally was not super interested in doing that

5  either right now, so everyone is on the same page.

6  And I think we can work with 3M to just iron out the

7  format and let the Court know if there's an

8  alternative that Your Honor would be satisfied with.

9          JUDGE RODGERS:  Okay.

10          MS. BRANSCOME:  Because it may be that a

11  chart does make sense in the sense that you have to

12  look at the forum state law to then look at what the

13  substantive law might be, and it may be that we agree

14  on the forum state but we don't agree on the

15  subsequent substantive law, and you could very clearly

16  see we have agreement in one category but not in the

17  other, which could lend itself to a chart.

18          So, I think, now that we're at least on the

19  same page of what information is going in there, we

20  have your guidance that it should not be overly

21  voluminous, with which we strongly agree, I think

22  we're in a good position to move forward.  And if we

23  need some additional modification, we will come to you

24  sooner rather than later.

25          JUDGE RODGERS:  Okay.  I appreciate that.

1    And I also have no problem moving the deadline to the

2    September CMC, if that provides some comfort.  There's

3    a lot going on right now, and no decision is going to

4    be made on this issue in the next 60 days.  So you all

5    incorporate that into your discussions and just know

6    that I'm open to moving the deadline.

7         **MS. BRANSCOME:**  Will do.

8         **MR. SACCHET:**  Thank you, Your Honor.

9         **JUDGE RODGERS:**  Mr. Sacchet, since I have you

10   on, may I ask a question not on the agenda.  I'm

11   curious, when is the Plaintiffs planning to respond to

12   the Defendants' interlocutory appeal motion for

13   certification?

14        **MR. SACCHET:**  Our draft is done, but we

15   intend to file it on Monday, which would be 14 days

16   after 3M filed its motion for 1292 certification.

17        **JUDGE RODGERS:**  All right.  Thank you.

18        Anything from anyone else?

19        Judge Jones, let me start with you.

20        **JUDGE JONES:**  Nothing further.

21        **JUDGE RODGERS:**  Judge Herndon?

22        **JUDGE HERNDON:**  So, while we were talking, I

23   emailed Jacqui Snead and gave her what I termed a

24   heads-up, and she just replied and said "Thanks."  I

25   then got an email from Maj. Kim on the issue of the

1    hearing conservation program and the industrial

2    hygiene program requests saying that they were busy

3    with complying with all these other things this week,

4    and they expect to get those out by the end of next

5    week.  And so I replied and said that similar

6    pressures apply to this issue and please expedite it

7    as much as possible.  And other than that, that's all

8    I've gotten.

9         **JUDGE RODGERS:**  So, Judge Herndon, when you

10   say you got a response back from Jacqui Snead, was

11   that in you telling her about the subpoenas?

12        **JUDGE HERNDON:**  Yes.  And all she said was

13   "Thanks for the heads-up."

14        **JUDGE RODGERS:**  All right.  Well, thank you.

15        Bryan, from your side, from you all,

16   anything?

17        **MR. AYLSTOCK:**  Nothing from the Plaintiffs,

18   Your Honor.  Thank you for all the time today.

19        **JUDGE RODGERS:**  And Kim?

20        **MS. BRANSCOME:**  Same from us, Your Honor.

21   Thank you.

22        **MR. NOMELLINI:**  The only other thing, Your

23   Honor, is we just got last night the government's

24   appeal of Judge Jones's order, or objection, and we

25   will be filing a response to that.  That is his order

1    with respect to the Motion to Compel.

2              **JUDGE RODGERS:**  Right.  So I actually have

3    reviewed that and will be looking forward to your

4    response.

5              **MR. NOMELLINI:**  Thank you, Judge.

6              **JUDGE RODGERS:**  All right.  You all take

7    care, have a nice weekend.  Thanks so much.

8              *(Proceedings concluded at 12:45 p.m.)*

9                    --------------------

10   *I certify that the foregoing is a correct transcript*
     *from the record of proceedings in the above-entitled*
11   *matter.  Any redaction of personal data identifiers*
     *pursuant to the Judicial Conference Policy on Privacy*
12   *are noted within the transcript.*

13

14   *s/Donna L. Boland*                    *8-17-2020*
     *Donna L. Boland, RPR, FCRR*                *Date*
15   *Official Court Reporter*

16

17

18

19

20

21

22

23

24

25