# **EXHIBIT 13**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | | |
|---|---|---|
| IN RE: 3M COMBAT ARMS | ) | Case No. 3:19md2885 |
| EARPLUG PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | |
| | ) | Judge M. Casey Rodgers |
| This Document Relates to All Cases | ) | Magistrate Judge Gary R. Jones |

**NOTICE TO TAKE DEPOSITION**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6)**

TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 9:30 a.m. on August 25, 2020, Plaintiffs will take the deposition of Defendant 3M Company pursuant to the provisions of Federal Rule of Civil Procedure 30(b)(6). The deposition will be taken at: Kirkland & Ellis LLP, 300 North LaSalle, Chicago, IL 60654.

The deposition will be taken upon oral examination, pursuant to the provisions of Federal Rule of Civil Procedure 30, before a Notary Public or other official authorized to administer oaths, who is not a party to the above-captioned action. Such deposition shall continue from day to day, excluding weekends and holidays, until completed. The deposition will be recorded by videotape and stenographic methods pursuant to Federal Rules of Civil Procedure, Rule 30. Plaintiffs reserve the right to conduct the deposition remotely in light of the ongoing COVID-19 pandemic, pursuant to Pretrial Order No. 35, and request a list of anticipated attendees pursuant to Pretrial Order No. 13.  If the deponent requires the services of

an interpreter, you must advise this office in writing no later than ten (10) business days before the date set for the deposition of both the need for the interpreter and the language required.

## DEFINITIONS

1.     "Document" as used in these requests shall include any written document, tangible thing, or electronically stored information ("ESI"), including ESI on hard drives, USB or thumb drives, databases, computers, floppy disks, CD-ROM, magnetic tape, optical disks, or other devices for digital data storage or transmittal; as well as electronic or hard-copy writings, records, files, correspondence, reports, memoranda, calendars, diaries, minutes, E-mail, text messages, voicemails, removable computer storage media such as tapes, discs and cards, printouts, document image files, Web pages, instant messages, social media posts and communications, online access data (*e.g.*, temporary internet files, browser history, cookies), databases, spreadsheets, books, ledgers, journals, orders, invoices, bills, vouchers, checks statements, worksheets, summaries, compilations, computations, charts, diagrams, PowerPoints or other demonstrative media, graphic presentations, drawings, films, charts, digital or chemical process photographs, video, phonographic, tape or digital records and any transcripts thereof, sound recordings (*e.g.*, .WAV and .MP3 files), video and animation (*e.g.*, .AVI and .MOV files), drafts, jottings and notes, studies or drafts of studies or other similar such  material.

A draft or non-identical copy is a separate document within the meaning of these terms. Information that serves to identify or locate such material, such as file inventories, file folders, indices, and metadata, are also included in this definition.

2.      "Relating to," "referring to," "regarding," "with regard to," and/or "concerning," mean evidencing, regarding,  concerning, discussing, embodying, describing, summarizing, containing, constituting, showing, mentioning, reflecting, pertaining to, dealing with, relating to, referring to in any way or manner, or in any way logically or factually, connecting with the matter described in that paragraph of these demands, including documents attached to or used in the preparation of or concerning the preparation of the documents. The terms relating to, referring to, regarding, and concerning are intended broadly, but not in a way designed to seek information that is irrelevant or beyond the scope authorized by Rule 26(b). Accordingly, the terms should be understood and read in their commonsense meaning: "to have to do with, to be of importance to, to involve, or to in some manner, direct or indirect, to evidence, define, describe, or explain."

3.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and, with respect to oral communications, includes any document evidencing such oral communications. It includes the transmittal of information by any means, including email, SMS, MMS, or other "text" messages, messages on "social networking" sites (including, but not limited

to, Facebook, Google+, and Twitter), shared applications from cell phones, or by any other means. "Communication" shall also include, without limitation, all originals and copies that are provided by you or to you by others.

4.      The word "or" appearing in a Request should not be read so as to eliminate any part of a Request but, whenever applicable, it should have the same meaning as the word "and." For example, a Request stating "support or refer" should be read as "support and refer" if any answer that does both can be made.

5.      "3M" or "Defendants" includes 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding LLC, Aearo Intermediate, LLC, and Aearo, LLC and any of their related or affiliated entities.

6.      "3M Earplugs" refers to the dual-ended Combat Arms earplugs (Version 2 CAEv2) that were designed, manufactured and sold by 3M to the U.S. military from the early 2000s through approximately 2015, together with any like-design earplugs marketed or sold under any other name, moniker, brand for non-military use, including the 3M E-A-R ARC Plug, the AOSafety Peltor Indoor/Outdoor Range E-A-R Plug, and the Browning Duo Ear Plug.  This definition includes, but is not limited to, single ended and double ended passive nonlinear earplugs.

7.      "Competing Product" means a product targeting the same market segment, customers, users, non-user purchasers, or uses or types of uses, as the 3M Earplugs

8.      "Including" means "including but not limited to."

9.       "Marketing" means efforts to promote the use of 3M Earplugs, and includes branded advertising, the use of unbranded and sponsored publications, educational programs, and independent medical education activities.

10.     "First MPID" refers to the Medical Procurement Item Description dated April 9, 2003, produced by the Department of Defense on October 22, 2019.

11.     "Second MPID" refers to the Medical Procurement Item Description dated August 4, 2006, bearing Bates stamps 3M_MDL000000078.

12.     As used herein, the terms "tests" or "testing" include, without limitation, reports, presentations, articles, data compilations, data collections, analyses, evaluations, studies, experiments, scientific literature, and slide presentations, complete or incomplete, published or unpublished, finalized or unfinalized, peer reviewed or non-peer reviewed.

13.     "The U.S. Government" means the United States Federal Government together with any entity, agency, person, bureau, commissioner, division, branch, or other subpart controlled or owned thereby, and any employees or agents acting on or purporting to act on its behalf including the United States Department of Defense,

Defense Logistics Agency or any federal department responsible for safeguarding national security of the United States, including all branches of the military (including state branches) and subsidiary branches and agencies, including, inter alia, the Department of the Army, Department of the Navy, Department of the Air Force, and Defense Logistics Agency.

14.     "Defendants' Pleadings" shall refer to Defendants' Master Answer (Dkt. 800), Defendants' Amended Master Answer (Dkt. 959) and each and every Answer Defendants have filed or will filed in response to each Bellwether Plaintiff's Short-Form Complaint.

15.     "You" and "Your" shall refer to 3M.

## TOPICS OF EXAMINATION

Defendants pursuant to Federal Rules of Civil Procedure 30(b)(6) are hereby required to designate and produce a person or persons to testify on behalf of Defendants, on the following matters:

1.     The factual contentions contained within Defendants' Pleadings including all facts, documents, and circumstances underlying or supporting such contentions.

2.     The "blister pack" containers of the CAEv2, including their assembly, testing, distribution, and sale to the U.S. Government and to any other entity.

3.      All visits, communications, or other contacts between any 3M agent and any individual Duty Station to which any Bellwether Plaintiff was assigned, as identified in Bellwether Plaintiffs' Interrogatories and Bellwether Plaintiffs' Interrogatory Responses.  This includes, but is not limited to, any presentations, including vendor presentations, at which any person working on behalf of 3M or any of its distributors was present and wherein the CAEv2 was discussed, distributed, and/or demonstrated.

4.      The meaning of all terms contained within the First MPID and Second MPID.

5.      Your process for determining the language and other information contained within all published labels and packaging for the 3M Earplugs.

6.      The purpose of the content of the labeling, instructions, and fitting tips that you provide for hearing protection, including the CAEv2.

7.      The final, original, published, or draft status of labelling and packaging materials for the CAEv2.

8.      Your knowledge and the timeline of that knowledge with regard to legal requirements governing labeling information for hearing protectors as applied to the CAEv2, including (i) the substance of those requirements; (ii) 3M's compliance with those requirements at all times from 1999 to the present, and the identity of individuals charged with ensuring such compliance; (iii) the feasibility of 3M's

compliance with those requirements at all times from 1999 to the present; (iv) any waiver 3M contends it received with regard to any such requirements as they relate to the CAEv2.

9.      The ANSI Method B testing protocol, including (i) 3M's knowledge regarding the requirements of Method B testing; (ii) the chronology of 3M's ability to perform such tests, including whether and when Method B testing was commercially impossible for 3M to perform; (iii) 3M's knowledge with regard to the U.S. Government's use of the Method B standard versus other ANSI standard; (iv) 3M's process for determining whether to apply Method B testing to any product; (v) any Method B testing in which 3M has engaged; (vi) 3M's contentions with regard to the quality of Method B testing versus other ANSI testing methods.

10.      All communications described in Defendants' October 18, 2019 Rule 30(b)(6) deposition as having taken place between Mr. Myers and the entity or persons referred to as 3M's "technical group" or "somebody from technical" or "technical," and all activities that any such entities or persons engaged in related to those communications.

11.      Your actual or contemplated use of patents or any other intellectual property protections in order to protect your monopoly on the 3M Earplugs, including your position with regard to design elements licensed from ISL, and the ownership of all pieces of intellectual property relating to the 3M Earplugs.

12.   The identity of all third-party entities or persons involved in the marketing, advertising, or sales of the 3M Earplugs, and the substance, scope, and purpose of any marketing, advertising, or sales campaign relating to the 3M Earplugs, including consumer marketing, advertising, or sales campaigns.

13.   3M's "Operation COBRA," including (i) the identity of all individuals involved in COBRA; (ii) all marketing, sales, or advertising campaigns or strategies relating to Operation Cobra; (iii) the use and content of marketing collateral relating to Operation Cobra, including the use and content of Operation COBRA "Kits" (*see* 3M_MDL000825402), as well as the use and content of mailers or leave-behind tubes distributed by 3M's sales force; (iv) business projections relating to COBRA and impact on sales attributed to Operation Cobra, including but not limited to in September 2005; (v) the use and content of CAEv2 ad placements in publications such as the National Defense, Armed Forces Journal, Army Magazine, and the Stars and Stripes Newspaper; and (vi) the use of Operation Cobra as it relates to the expiration of a multi-million dollar contract between the US Army and Sordin, which was set to expire in 2006.

14.   Your policies and procedures for quality inspections of both component parts and final, assembled versions of earplugs with flanges, including whether upturned flanges are considered or ever have been considered defective or deformed, such as on the Ultrafit Earplugs without Through Holes.

15.     The extent to which Technologies de Javier Rodriguez (TJR) and Aearo Technologies Mexico and (ATM) adhered to the First MPID or Second MPID, including whether "[s]ampling for inspection of sound attenuation of the level-dependent yellow end [was] 100 percent" and "verified using an acoustical impedance test" and whether "[s]ampling inspection of the sound attenuation of the camouflage green end [was] conducted in accordance with ANSI/ASQC Z1.4."

16.     Any contracts, agreements, or operations between Aearo (Indianapolis), Javier Rodruiguez and TJR (Mexico), and Aearo Technologies Mexico (ATM), and any involvement by Ability One contractors such as AlphaPointe and New Dynamics, for the manufacture, assembly, and testing of Combat Arms earplugs (all versions),  including the policies and procedures related to and the identity of the person(s) responsible for (i) ordering and receipt of component parts for Combat Arms earplugs; (ii) the assembly of the Combat Arms earplugs; (iii) inspection of Combat Arms earplugs; (iv) quality and efficacy testing, of Combat Arms earplugs (v) the use of Acoustic Resistance Checkers (ARC) boxes (or Z-Boxes) on the non-linear open end of the Combat Arms earplugs and (vi) the testing of the linear or closed end of the Combat Arms earplugs; and (vii) the distribution and shipping of assembled and tested plugs by TJR and/or ATM.

17.     3M's knowledge with regard to the potential of safer alternative designs of the 3M Earplugs, including potential safety effects of changes to (i) the length of

the 3M Earplugs; (ii) the thickness of the 3M Earplugs; (iii) the number, orientation, and size of flanges on the 3M Earplugs; and (iv) the materials used in the manufacture of the 3M Earplugs.

18.     3M's discussions and considerations of any Competing Product or alternative designs for Combat Arms earplugs (all versions), and any other earplug models that would provide non-linear attenuation hearing protection, including: (i) the evaluation of any intellectual property or patent rights, (ii) drafts, design plans, drawings, and testing, (iii) the dimensions, specifications, materials used, and (iv) whether or not flanges were a component.

19.     The corporate organizational and operation structure and function of TJR and ATM, including the relationship with the Defendants, with respect to the assembly, testing, and distribution of the Combat Arms earplugs

20.     The maintenance, storage, deletion, backup, and retention of documents including electronic documents and email communications related to the Combat Arms earplugs by TJR or ATM and their employees and agents, as well as any legal holds or other document retention instructions provided to the employees of TJR and ATM.

21.     The net worth of 3M, and the information and process(es) upon which that value is based.

22.    Defendants' revenue on a state-by-state basis from the sales of the 3M Earplugs in each of the United States.