## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | | |
|---|---|---|
| IN RE: 3M COMBAT ARMS | ) | |
| EARPLUG PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | Case No. 3:19-md-2885 |
| | ) | |
| | ) | Hon. Judge M. Casey Rodgers |
| *This Document Relates to All Actions* | ) | Magistrate Judge Gary R. Jones |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER CONCERNING PLAINTIFFS' NOTICE OF RULE 30(B)(6) DEPOSITION

## TABLE OF CONTENTS

FACTUAL BACKGROUND ............................................................................1

LEGAL STANDARD ...................................................................................6

ARGUMENT ...............................................................................................7

   I.   Plaintiffs' 30(b)(6) Notice is Timely and Proper.................................7

   II.  Defendants Cannot Show Good Cause for a Protective Order With Respect to Topic Nos. 2, 3, 5, 10, 11, 12, 13, 17, and 18.......................9

      A.  Topic No. 2 ................................................................................10

      B.  Topic No. 3 ................................................................................13

      C.  Topic No. 11 ..............................................................................16

      D.  Topic No. 12 ..............................................................................19

      E.  Topic No. 13 ..............................................................................21

      F.  Topics Nos. 17 and 18.................................................................25

CONCLUSION............................................................................................28

# TABLE OF AUTHORITIES

Page(s)

Cases

*Aubin v. Union Carbide Corp.*,
  177 So.3d 489 (Fla. 2015) ..................................................................... 27

*Blackwell v. City & Cnty. of San Francisco*,
  2010 WL 2608330 (N.D. Cal. June 25, 2010)............................................ 7, 8, 23

*Bondhus v. Provident Life & Accident Ins. Co.*,
  2008 WL 11331762 (S.D. Fla. Sept. 17, 2008)...................................... 6, 8, 9, 23

*Cummings v. Gen. Motors Corp.*,
  2002 WL 32713320 (W.D. Okla. June 18, 2002) ............................................ 27

*JP Morgan Chase Bank v. Liberty Mut. Ins. Co.*,
  209 F.R.D. 361 (S.D.N.Y. Sept. 16, 2002)........................................................ 17

*QBE Ins. Corp. v. Jorda Enterprises, Inc.*,
  277 F.R.D. 676 (S.D. Fla. 2012)....................................................................... 17

*Sevi v. Nationstar Mortgage, LLC*,
  2015 WL 12911709 (M.D. Fla. Feb. 4, 2015)..................................................... 9

*Taillard v. Rooto Corp.*,
  787 F. App'x 281 (6th Cir. 2019) ..................................................................... 16

Rules

Federal Rule of Civil Procedure 26(b)(2) ............................................................. 6, 7
Federal Rule of Civil Procedure 30(b)(6) ............................................................... 12

Plaintiffs respectfully submit this Memorandum of Law in Opposition to Defendants' Motion for Protective Order. Plaintiffs' Rule 30(b)(6) Deposition Notice[1], dated July 24, 2020, is not duplicative of prior discovery. However, to the extent any potential overlap could arguably exist, Plaintiffs' 30(b)(6) Notice properly seeks relevant testimony that defense counsel previously deemed beyond the scope of the prior notices, as demonstrated by their objections in the prior 30(b)(6) depositions and their decision not to prepare any corporate witness to testify on these topics. For the reasons that follow, good cause is lacking and Defendants' Motion for Protective Order should be denied.

## FACTUAL BACKGROUND

Although Defendants' Motion is directed at Plaintiffs' July 24, 2020 30(b)(6) Deposition Notice, the procedural and factual history underlying Defendants' Motion dates back to the inception of this litigation.

On June 20, 2019, this Court entered Case Management Order No. 2 ("CMO 2"). CMO 2 created the first discovery deadlines in this litigation. CMO 2 included a deadline of September 30, 2019 for "substantial completion" of Defendants' document production and October 15, 2019 for Plaintiffs to complete 30(b)(6) depositions. As the Parties and the Court acknowledged, early 30(b)(6) testimony

---

[1] Ex. 1 July 24, 2020 30(b)(6) Depo. Notice

was necessary to get the "lay of the land."[2] At the time those Initial 30(b)(6) Depositions were set, the Parties understood—*and the Court had ordered*—that Defendants' production would be substantially complete before the 30(b)(6) depositions of Mr. Moses, Mr. Myers, and Mr. Berger.[3]

At the outset, Plaintiffs disagree with Defendants' characterization of the October 10, 2019 and November 5, 2019 calls at issue in this case. Defs.' Br. at 10. While no transcripts exist to elucidate the entire substance of those calls, contemporaneous notes reflect that the Court and Parties agreed that 30(b)(6) testimony on government contractor issues was immediately necessary. The Court was also aware of Defendants' deficient document production and the potential impact thereof on the 30(b)(6) process, but anticipated that Defendants would nonetheless provide fulsome testimony, including testimony Defendants have yet to provide on the current 30(b)(6) topics.

*First*, with regard to prioritized discovery, at the Seventh Case Management Conference on November 22, 2019[4], Judge Rodgers specifically requested that the parties prioritize discovery related to affirmative defenses in order to assist the Court

---

[2] *See* Dkt. 667, Transcript of Fourth Case Management Conference at 4–5.

[3] *See* Dkt. 452, CMO 2 (providing substantial completion date). Defendants' designees for the Initial 30(b)(6) Topics were Mr. Moses and Mr. Myers, who gave testimony on October 17 and 18 respectively, and Mr. Berger, who gave testimony on November 13, and December 12—all dates well after Defendants' court-ordered substantial completion deadline.

[4] *See* Dkt. 840, Transcript of Seventh Case Management Conference at 23-25.

in disposing of the government contractor defense in a timely manner. At that conference, in a discussion about requesting additional custodians, Mr. Buchanan acknowledged the Court's recent guidance to "focus principally on [custodians] we think bear on the affirmative defenses." *See* Dkt. 840, Transcript of Seventh Case Management Conference at 29 Plaintiffs disagree with Defendants' characterization of the Court's comments at the January 2020 CMC as a bar on future 30(b)(6) depositions. *See* Defs.' Br. at 10-11. In fact, CMO 7, issued shortly after the Eighth Case Management Conference, specifically directed the parties to confer "in an effort to more clearly delineate the distinction between affirmative defense discovery and 'general liability' or 'merits' discovery." Dkt. 924 at 2. Plaintiffs did so, and tailored their subsequent discovery requests per the Court's instructions, prioritizing discovery on the affirmative defenses and deferring discovery on other issues.

*Second*, Defendants mischaracterize the extent to which Plaintiffs "elected to proceed" with depositions in spite of incomplete document production. Defs.' Br. at 9-10. As discussed above, document production was ordered to be complete by the time of the depositions, and Defendants' attempt to blame Plaintiffs for the untimeliness and deficiency of Defendants' own production should be rejected. Indeed, the Court addressed Plaintiffs' concerns during the October 11, 2019 and November 5, 2019 conferences with the parties, and it was determined that the 30(b)(6) testimony would ***cure*** Defendants' production deficiencies—not be

3

hampered by those deficiencies. For example, on the subject of labeling, Plaintiffs expressed concern about Defendants' incomplete production of documents relating to label changes. The Court stated on the October 11 call its assumption that Defendants' designee would not say, for example, "Here's a label, I don't know when we used it, I don't know when it changed," and that such testimony would not meet Rule 30(b)(6). But that is ***precisely*** the testimony Defendants' labeling designee provided. *See infra* Section II.B.

Similarly, despite Defendants' assertion, it is not simply the case that on the November 5, 2019 call, Plaintiffs' counsel "elected" to proceed with Mr. Berger's 30(b)(6) deposition.  At the time, Plaintiffs' counsel noted the incomplete nature of the document production, and stated that if the deposition went forward as scheduled, there would likely be a need for further examination as later documents were produced (because 30(b)(6) testimony from Mr. Berger would likely relate to custodial files and non-custodial documents that Defendants had not yet produced). In the same call, Mr. Nomellini restated the parties' and Court's understanding of the preliminary nature of the initial 30(b)(6) depositions, and the implicit availability of supplemental corporate testimony – that we don't need all the documents for the very first deposition, we just need the "lay of the land."  Ultimately, on November 5, Judge Rodgers ordered the Parties to proceed with the first day of Mr. Berger's 30(b)(6) deposition as scheduled, and Plaintiffs took that deposition at that time in

compliance with the Court's order.  Subsequently, to deal with the further production of documents related to certain topics, the Court granted Plaintiffs an additional 3 hours to continue the 30(b)(6) deposition on those topics for which Berger had been designated in December, following his individual deposition.

As the Court is well aware, Defendants' production was not timely completed (and, nearly a year later, is still in progress). Defendants suggest that the inadequacy of their production at the time of the 30(b)(6) depositions is attributable to Plaintiffs' requests for additional custodians. The "addition" of those relevant custodians, however, was due to the inadequacy of Defendants' initial disclosures, which identified only eleven living people as possessing relevant information.[5] Had Defendants made a timely and fulsome identification of their custodians, the "additional" custodial files would have been timely produced.

Plaintiffs proceeded with the initial "lay of the land" 30(b)(6) depositions, with mixed results. As discussed more fully in the subsections regarding individual topics below, Defendants' witnesses often denied knowledge on many of the issues near the edges of the noticed topics. Other times, defense counsel prevented the witnesses from providing any 30(b)(6) deposition testimony—either through instructions not to answer or through statements that testimony was being provided

---

[5] *See* Ex. 2 Defendants' Initial Disclosure, dated June 28, 2019.

only in an individual capacity—on topics defense counsel deemed (at the time) beyond the scope of Plaintiffs' notices.

Following oral argument on June 15, 2020, but before the Court rendered its decision on the government contractor defense on July 24, 2020, Plaintiffs shifted the primary focus to general corporate discovery issues unrelated to the affirmative defenses, in light of the September 1, 2020 discovery cutoff. On July 24, 2020, the same day that Plaintiffs learned of the Court's summary judgment decision, Plaintiffs promptly served the current 30(b)(6) notice. Following extensive meet and confers, counsel for Plaintiffs agreed to withdraw multiple topics and narrow several others. Defendants ultimately agreed to produce only a single witness, who would testify only to issues related to Topics 14, 15, 16, and 19, which deal primarily with the CAEv2's quality issues at TJR/ATM, Aearo's assembly facility in Mexico, and other quality issues. Defense counsel has refused to offer a witness on any other topic, and has moved for a protective order, which Plaintiffs now oppose.

## LEGAL STANDARD

Rule 26 permits a party to "move for a protective order" upon a showing of good cause to "limit the frequency or extent of discovery." Fed. R. Civ. P. 26(b)(2)(C), (c). The movant "must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order." *Bondhus v. Provident Life & Accident Ins. Co.*, 2008 WL

11331762, at *1 (S.D. Fla. Sept. 17, 2008). "The burden of showing good cause to preclude a deposition altogether is a heavy one," which is "why protective orders prohibiting depositions are rarely granted." *Id.* at *2. The party seeking to take additional 30(b)(6) depositions, on the other hand, need not demonstrate good cause. *Blackwell v. City & Cnty. of San Francisco*, 2010 WL 2608330, at *1 (N.D. Cal. June 25, 2010) ("Whether a second deposition is to be permitted should be based on the factors identified in Rule 26(b)(2), none of which is good cause.").

## ARGUMENT

### I.     Plaintiffs' 30(b)(6) Notice is Timely and Proper.

As discussed above, the current 30(b)(6) notice should come as no surprise to Defendants. Plaintiffs' discovery request is timely and procedurally proper, and Plaintiffs' entitlement to additional 30(b)(6) testimony was not waived.

*First*, at the Court's request Plaintiffs deferred discovery on issues that relate to general liability and instead prioritized discovery on the government contractor defense, which was resolved less than one month ago. *Second*, Defendants' argument that Plaintiffs were required to move to compel Defendants to testify on topics that ***Defendants themselves*** argued were beyond the noticed scope, or refused to prepare a witness on, has no good-faith basis, and Defendants' change in positions on the scope of the noticed topics can only be explained as a litigation-driven convenience. *Third*, Defendants have pointed to 30(b)(6) testimony as the proper

vehicle for the topics at issue here in other motion practice, such as in claiming that Defendants provided 30(b)(6) testimony duplicative to Plaintiffs' Interrogatories regarding marketing.[6] But once confronted with the prospect of actually providing the claimed testimony, Defendants now argue that for certain topics at issue, "a response can be provided with far less burden in the form of an interrogatory response."[7]

The few cases that Defendants cite are of no help to them. In *Blackwell*, the court declined to permit a second 30(b)(6) deposition because "Plaintiff's counsel explained that she sought a second deposition . . . not because of new evidence that came to light after the first deposition, but because she came across [an old] court decision which suggested a new theory to support [the] claim." *Blackwell v. City & Cnty. of S.F.*, 2010 WL 2608330, at *2 (N.D. Cal. June 25, 2010). Here, Plaintiffs seek additional 30(b)(6) testimony based in part on the substantial production of evidence since the first round of corporate discovery. Defendants' own case confirms that "second depositions have been allowed where there is new evidence since the first deposition." *Id.*

*Bondhus* is similarly distinguishable. There, the plaintiff argued that the first 30(b)(6) witness's answers "were insufficient and non-compliant with the scope of

---

[6] *See* Dkt. 1252, Defs.' Opp'n to Pls.' Mot. to Compel, July 15, 2020, at 26.
[7] Defs.' Br. at 20.

the deposition notice." *Bondhus v. Provident Life & Accident Ins. Co.*, 2008 WL 11331762, at \*1 (S.D. Fla. Sept. 17, 2008). If Plaintiffs were seeking to reopen a prior 30(b)(6) deposition to compel testimony about previously-noticed topics, *Bondhus* and its waiver rule would potentially be on point. But Plaintiffs make no such claim here, instead contending a new 30(b)(6) deposition is warranted based on new documents and new topics post-summary judgment. Defendants' suggestion that a motion to compel should have been made in January 2020 therefore misses the mark. *See id.*

*Bondhus* is also inapposite for another reason: the plaintiff "did not *timely* move to compel better answers," 2008 WL 11331762, at \*1 (emphasis added), and instead waited until after "the passage of the discovery cutoff," *id.* at \*5. So too in *Sevi*, a fact Defendants conveniently omit. *See Sevi v. Nationstar Mortgage, LLC*, 2015 WL 12911709, at \*1–2 (M.D. Fla. Feb. 4, 2015) (noting that plaintiff "asks that discovery be reopened" for a second 30(b)(6) deposition, after dispositive motions had been filed). In this case, on the other hand, Plaintiffs' request is timely because corporate discovery is ongoing. *See* Dkt. 1295 at 2 & n.1.

## II.    Defendants Cannot Show Good Cause for a Protective Order With Respect to Topic Nos. 2, 3, 5, 10, 11, 12, 13, 17, and 18.

Plaintiffs' 30(b)(6) topics are not duplicative of prior discovery from Defendants. Despite Defendants' newly broad readings of Plaintiffs' previously noticed topics, and in spite of Defendants' apparently significant preparation work,

it is simply untrue that Defendants offered testimony on the specific topics now in dispute.

### A. Topic No. 2

Defendants did not previously provide—and refuse to now provide—testimony explaining the removal of "fitting tip" language from the CAEv2 blister pack in or around 2014. Plaintiffs now seek such testimony, and Defendants' Motion should be denied.

The fitting tip reads: "Fitting is easier if the ear is pulled upward and outward during insertion and is also improved if the sealing rings of the outward-directed plug are rolled back upon themselves." Ex. 3 Fitting Tip, 3M_MDL000425566. 3M blister packs were sold through distributors to the military and consumers. This topic is important to 3M's defenses, as 3M argues that the fitting tip instructed users to fold back the opposing flanges prior to inserting the plug.

Defendants' prior 30(b)(6) deponents did not provide testimony on the issue of the change to the "fitting tip." At his 30(b)(6) deposition, Brian Myers was asked multiple times how Defendants determined what information to include on the labeling of an earplug, but he could not provide a substantive answer:  Instead, he testified that 3M's "technical group ensures that we comply with regulatory requirements, so they would have dictated what content would have been included." Ex. 4 Myers 30(b)(6) Tr. 90:2-14; *see also id.* at 169:22–170:9, 215:13–217:16

10

(explaining only that "technical" would have had to approve packaging, and no further details of the process). Mr. Moses could not explain the purpose of the fitting tip, again testifying merely that technical would have told him to include the language. *Id.* at 215:13–217:16. Further, Myers could not provide ***any substantive testimony*** on behalf of 3M explaining why the fitting tip was removed from 3M's packaging, and instead deferred to Cyd Kladden, who Myers claimed was the "approver for technical." *Id.* at 314:3–316:6.

But Kladden denied the role Myers ascribed to her. Kladden testified that she was simply "provided with the fitting instructions to use," and she did not know who "reviewed and drafted" changes to the labeling. Ex. 5 Kladden Tr. 157:17–158:17. She also had no recollection of the "fitting tip" language. *Id.* at 252:11-17. Berger was also asked why the fitting tip was removed from 3M's packaging in or around 2014, and he did not recall why. Ex. 6 Berger 12/10/2019 Tr. 329:8–330:5.

Perhaps in response to the clear distinction in subject matter between the testimony Plaintiffs now seek and the testimony Defendants' previously provided, 3M reaches to other discovery sources in search of an argument for redundancy. 3M seeks to rely on a "111 page" binder of labeling and packaging that Mr. Myers prepared[8] in connection with his October 2019 30(b)(6) deposition. But these

---

[8] Motion at 19.

documents do not address **why, how, or by whom** the labels and packaging were changed, which is the relevant testimony Plaintiffs seek.

Similarly, in its Responses and Objections[9] 3M argues that this topic is "redundant, duplicative, and cumulative" of Plaintiffs' prior 30(b)(6) topics. This is untrue. *First*, none of the prior topics cited in 3M's Responses and Objections addressed specific instructions and labeling information contained in blister packaging, and none of these prior topics focused on the sale of CAEv2s in blister packs specifically. *Defs' Br. at Ex. 26, see e.g.*, Topic Nos. 7, 8, 9, and 13 of August 2, 2019 3M 30(b)(6) Notice (addressing REAT and NRR testing of the CAEv2, but not ARC testing).

*Second*, regardless of the literal scope of the Notice, Defendants are well aware that the topic **was not actually covered** in the prior 30(b)(6) depositions of Berger and Myers. At his November 13, 2019 30(b)(6) deposition, Mr. Berger was repeatedly instructed not to answer questions concerning blister packaging on the grounds that such questions were outside the scope of Plaintiffs' prior topics. *See, e.g.*, Ex. 7 Berger Nov. 13, 2019 30(b)6) Tr. 184:24–185:9; 186:2–187:16. Furthermore, Berger had no specific recollection of the CAEv2 blister packs. *See id.* at 185:18–186:1. Similarly, multiple times during Mr. Myers October 18, 2019

---

[9] Ex. 8 August 7, 2020 Defendants' Responses and Objections to Notice to Take Deposition Pursuant to Federal Rule of Civil Procedure 30(b)(6) ("Responses and Objections")

deposition, Mr. Nomellini allowed Myers to provide testimony ***only in his personal capacity*** concerning the sale of the CAEv2 blister pack, on the grounds that this issue was "outside the scope" of Plaintiffs' prior topics. *See, e.g.*, Ex. 4 Myers Tr. 174:19–175:4; 191:13-22. And as noted above, Myers could not provide testimony concerning the contents of the blister pack labeling, instead deferring to "technical." *See, e.g.*, *id.* at 89:15–90:14; 214:7–217:16. The inability of Berger, Myers, and Kladden to provide any testimony on the relevant label changes demonstrates that Defendants did not prepare those witnesses on the topic of changes to the blister pack fitting tip.

Clearly, Defendants took the position that the topic was not a requested or agreed topic in any of the previous 30(b)(6) depositions, yet now when Plaintiffs have requested a very specific and focused 30(b)(6) topic, narrowed to the issue of the inclusion and removal of the fitting tip on the CAEv2 Blister Packs, Defendants now claim that it was a covered topic.

### B.  Topic No. 3

In Topic No. 3, Plaintiffs seek Defendants' knowledge on the representations concerning the CAEv2 their agents made to the individual duty stations to which Bellwether Plaintiffs were assigned.  Any misrepresentations made by Defendants' agents concerning the capabilities of the CAEv2, or how to insert and use the earplug, would be especially relevant to Plaintiffs' fraud claims in this action.

Defendants objects that its prior corporate designee, Mr. Moses, covered this case-specific topic in his October 17, 2019 30(b)(6) deposition. But that is impossible due to the fact that the Bellwether Plaintiffs were not even selected until the end of February 2020. *See* Dkt. 1015.

The limited testimony Mr. Myers provided during his 30(b)(6) deposition concerning 3M's efforts to "seed" the CAEv2 into military bases, or to sell the CAEv2 in base stores, was high-level and did not identify any specific interactions with any individual duty station, let alone any interactions with Bellwether Plaintiffs' duty stations. *See, e.g.*, Ex. 9 Moses 30(b)(6) Tr. 46:3–47:2; 315:9–316:19; 317:18–318:3.   Indeed, Plaintiffs could not seek 30(b)(6) testimony regarding 3M's interactions at specific duty stations until the Bellwether Plaintiffs were selected, and 3M admits that the parties agreed to exclude "'case specific' discovery" from the Rule  30(b)(6) depositions that occurred in 2019. Defs.' Br. at 4. Thus, any purported literal overlap between this topic and the initial 30(b)(6) topics is inconsequential, because those prior topics were not directed at 3M's interactions with the individual duty stations to which Bellwether Plaintiffs were assigned—not only because no Bellwether Plaintiffs had yet been identified, but also because discovery on these duty station contacts is inherently case-specific.

Indeed, during the October 11, 2019 telephonic conference, the Court made clear that Mr. Moses would not be expected to provide the kind of granular

information that Defendants now claim was within the scope of the initial 30(b)(6) topics. The Court stated that the parties and Court could agree that, for example, asking a 30(b)(6) witness "Who, in 2006, would have sent emails to the government about the CAEv2?" was a question that Defendants' designee would not have been prepared for in the initial 30(b)(6) depositions—and the question of who would have contacted dozens of individual duty stations worldwide would require even further granularity.

In its Responses and Objections, Defendants make the boilerplate objection that this topic is "vague, overly broad, or unduly burdensome." Ex. 8 Responses and Objections at 13-14. This argument should also be rejected, as this topic is tailored to seek only 3M's interactions with military personnel concerning the CAEv2 at the particular duty stations where Bellwether Plaintiffs were assigned. Lastly, Defendants' objection that this topic is duplicative of a bellwether plaintiff interrogatory response that the Court previously found was "sufficient" is irrelevant Contrary to 3M's assertions, the Court did not prohibit Plaintiffs from seeking 30(b)(6) testimony from 3M on the issues discussed in the July 17 order, and indeed, the Court noted that other "remedies" were available to Plaintiffs under the Federal Rules of Civil Procedure for discovery on such issues. Dkt. 1258 at 5–6.

### C. Topic No. 11

Plaintiffs seek corporate testimony regarding Defendants' use of patents or other intellectual property protections to protect its monopoly or exclusivity of military sales for the CAEv2, including its corporate understanding of the applicability of patents to the CAEv2's component parts. Ex. 1 July 24, 2020 30(b)(6) Notice at 8 (Topic 11). 3M argues that this topic is irrelevant, impermissibly seeks 3M's legal opinions or theories, and has been addressed by the deposition of Mr. Moses. Defs.' Br. at 26. None of these arguments has merit.

*First*, 3M's knowledge and use of intellectual property with regard to the CAEv2 is directly relevant to the claims and defenses at issue. Whether Defendants used intellectual property considerations to make design related decisions and in furtherance of the efforts to keep alternative hearing protectors from being sold to the Military and others bears directly on Plaintiffs' design-defect claims. *See* Dkt. 704 at 52, 56. Under the law of a number of states, design-defect claims may require evidence of a reasonable or feasible alternative design. *See, e.g.*, *Taillard v. Rooto Corp.*, 787 F. App'x 281, 283 (6th Cir. 2019) (reasonable alternative design a requirement of Michigan product liability law). And even where, as in Florida, there is an alternative standard for design defect, the product's conformance to state-of-the-art knowledge at the time of manufacture is relevant. *See, e.g.*, Ex. 10 Florida Pattern Jury Instruction 403.7 (instructing the jury to consider "state-of-the-art"

16

knowledge for design-defect claim). Moreover, the Master Complaint includes claims for gross negligence and punitive damages based in part on Defendants' alleged misuse of intellectual property protections to prevent safer earplugs from being adopted by the military and used by servicemembers. Dkt. 704 at 77, 86.

Defendants makes the befuddling argument that Topic No. 11 seeks 3M's legal opinions and theories, citing *JP Morgan Chase Bank v. Liberty Mut. Ins. Co.*, 209 F.R.D. 361, 362 (S.D.N.Y. Sept. 16, 2002) for the proposition that 30(b)(6) depositions are designed to discover only facts. *JP Morgan* is inapplicable here, as that case involved plaintiffs seeking information learned by the defendant after the litigation began. *Id.* at 363. But, in any event, Rule 30(b)(6) is not nearly as limited as 3M claims. "Not only must the designee testify about facts within the corporation's collective knowledge, including the results of an investigation initiated for the purpose of complying with the 30(b)(6) notice, but the designee must also testify about the corporation's position, beliefs and opinions." *QBE Ins. Corp. v. Jorda Enterprises, Inc.,* 277 F.R.D. 676, 689 (S.D. Fla. 2012). Here, Plaintiffs seek 3M's collective knowledge and position regarding the applicability and use of CAEv2-related intellectual property to keep alternative designs from reaching the market. Specifically, Plaintiffs seek testimony on the fact of whether patent applicability, intellectual property rights, or other similar considerations affected the company's design decisions, licensing agreements with the French designers, the

17

lack of consideration or rejection of reasonable alternative or feasible designs, and the effort to foreclose competition from other safer alternative plugs.

Finally, 3M argues that Topic No. 11 was covered when Mr. Moses answered a question about trademarks. But Defendants fail to mention that they themselves objected to those very exchanges as beyond the scope of Mr. Moses's 30(b)(6) designation to the very exchanges cited it its brief. *See* Ex. 9 Moses 30(b)(6) 224:1-4 ("I just want to preserve the objection it's not within the scope [of the 30(b)(6)], so it's not on behalf of company."); 224:17 ("Same objection."); 415:1-3 (objecting as "outside the scope of the 30(b)(6) notice to inquiry about "patent exclusivity").During the deposition of Robert Falco, on February 11, 2020, Plaintiffs obtained testimony showing that Aearo obtained a patent on a single ended alternative design for the CAE plug, that was not dual ended, but instead used a mechanism to open and close the filter for impulse noise protection in 1998.  That patent became the basis for the later version of the CAE, the CAEv4.  The relevance of the consideration of the applicability of patents, as it pertained to Aearo's earlier design and marketing decisions is highly relevant in light of that evidence.  *See* Ex. 11 Falco Tr.at 293 -309; *see also* Ex. 12 Falco Depo. Ex. 25, United States Patent 6,148,821, Selective Nonlinear Attenuating Earplug.

### D. Topic No. 12

Topic No. 12 seeks information related to third-party marketers, including their identity, the scope of their roles, and their work product. Ex. 1; July 24, 2020 30(b)(6) Depo. Notice at Topic 12. Defendants have persistently failed or refused to provide this information. Defendants' claim that this information was already addressed in the deposition testimony of Doug Moses is false. See Defs' Br. at 27. In fact, as discussed below, Moses was unable to answer many basic questions relating to third-party marketing, and he himself testified to the inadequacy of his investigation.

Mr. Moses was completely unprepared to testify as to third-party marketing to consumers:

> Q. Okay. And did Mitsch Communications also develop marketing collateral for the consumer division?
> A. I don't know that.
> Q. Who developed marketing collateral for the consumer division?
> A. I don't know.
> Q. Who would have been the point person within the consumer division for the development of marketing collateral for the consumer versions of the Combat Arms?
> A. I don't know specifically, but they had a similar structure with brand managers.

Ex. 9, Moses 30(b)(6) Tr. at 202:3-16.

With regard to third-party marketers other than Mitsch Communications, such as Defense Solutions, Mr. Moses revealed a similar lack of knowledge and preparation as to the scope and substance of their work:

>Q. Now, it's your understanding that Defense Solutions had a role in assisting Aearo or trying to assist Aearo in -- from a government contracting perspective?
>A. I don't know the nature of this relationship.
>MR. BUCHANAN: To be clear, Counselor, are these exemplars that were gathered as opposed to all of them?
>MR. MORRISS: Yes.
>MR. BUCHANAN: So it's possible, for example, that Defense Solutions, there may be agreements for any number of years?
>MR. MORRISS: Yeah, I have no idea.

*Id.* at 359:1-10.

Mr. Moses was not prepared to identify who at Aearo was the responsible party, "point person," or contact for third-party marketers.[10] Mr. Moses was not prepared to identify what third-party marketers, if any, were successors or predecessors to Mitsch Communications as Defendants' third-party marketing agent.[11]   Mr. Moses was not prepared to testify as to whether various marketing firms with which 3M contracted worked on the CAEv2 at all.[12] Mr. Moses speculated that third-party Ovation may have conducted market research, but then denied having any information on whether market research was conducted with regard to the CAEv2.[13]

---

[10] Ex. 9, Moses 30(b)(6) Tr. at. 201:21-25 ("I don't know exactly which person because they predated me...").
[11] *Id.* at 201:1-6; 360:24–361:3 (denying knowledge regarding third-party marketing before 2005).
[12] *Id.* at 204:12-20 ("I think we saw some contracts with a few marketing firms. What they did for us, I don't know if we can tie them back to Combat Arms or not.").
[13] *Id.* at 354: 16–355:3 ("I don't have information that suggests there was.").

Finally, Mr. Moses expressly testified to the unreasonably cursory nature of his investigation. In preparing to testify on third-party marketing for the CAEv2, Mr. Moses conducted *no investigation at all* into the marketing budget for the CAEv2, neither reviewing it himself, nor asking any person what information it contained.[14]

Plaintiffs are entitled to information related to third-party marketers, including their identity, roles, and work product. Defendants claim that they have provided adequate discovery on this topic, or that this topic was meaningfully addressed in the Initial 30(b)(6) Depositions, is false. *See* Def. Br. at 27. Accordingly, Defendants' Motion as to Topic No. 12 should be denied.

### E. Topic No. 13

Defendants' own Motion demonstrates the need for additional 30(b)(6) testimony on Topic No. 13. In Topic No. 13, Plaintiffs seek information on "Operation Cobra," including "(i) the identity of all individuals involved in Cobra; (ii) all marketing, sales, or advertising campaigns or strategies relating to Operation Cobra; (iii) the use and content of marketing collateral relating to Operation Cobra, including the use and content of Operation Cobra "Kits" (*see* Ex. 13, 3M_MDL000825402), as well as the use and content of mailers or leave-behind tubes distributed by 3M's sales force; (iv) business projections relating to Cobra and

---

[14] *Id.* at 364:16-23.

impact on sales attributed to Operation Cobra, including but not limited to in September 2005; (v) the use and content of CAEv2 ad placements in publications such as the National Defense, Armed Forces Journal, Army Magazine, and the Stars and Stripes Newspaper; and (vi) the use of Operation Cobra as it relates to the expiration of a multi-million dollar contract between the US Army and Sordin, which was set to expire in 2006." Ex. 1 July 24, 2020 30(b)(6) Depo Notice at Topic 13.

Operation Cobra was a marketing effort by Aearo (apparently named as a tribute to the Allied Forces' efforts during World War II) to "carpet bomb" the military with its products.[15] Aearo undertook this operation to drive sales by aggressively advertising to the military.[16] Gavin noted in his "Operation Cobra" overview that "[a]s the war in Iraq progresses and Defense spending reaches an all-time high, so too does the demand for Aearo productions."[17] Aearo was clearly looking to profit off this growing demand, but soon realized that its current military sales force was "too small . . . to obtain the desired penetration of the military market"; Aearo thus decided to "[combine] the Government and NAI sales teams for a period of 90-days [to increase] the size of the sales force fivefold."[18]

---

[15] *See* Ex. 14, 3M_MDL000825309, produced on Mar. 11, 2020.

[16] *Id*.

[17] *Id*.

[18] *Id*.

In their Responses and Objections, Defendants object on the basis that "[m]arketing issues were covered during the 30(b)(6) deposition of Douglas Moses on October 17, 2019" and "Plaintiffs had ample opportunity at Mr. Moses's 30(b)(6) deposition to obtain the information now sought."[19] Yet Defendants were unable to cite to a *single* Operation Cobra-related document produced in *advance* of Mr. Moses' deposition.[20] If any such documents were produced prior to Mr. Moses' deposition, Defendants most certainly would have identified them. They could not, however, because their production of Operation Cobra documents was inexcusably delayed.

In fact, every relevant document concerning Operation Cobra was produced *after* CMO 2's substantial completion date, after the 30(b)(6) deposition of Douglas Moses, and in many cases, well into 2020. *See, e.g.*, Ex, 15, 3M_MDL000825310; Ex. 16, 3M_MDL000825293; and Ex. 14, 3M_MDL000825309 (describing the scope of Operation Cobra logistically, geographically, and financially). All three of these key documents were produced on March 11, 2020 and, incredibly, Mr. Myers was the custodian of all three of these documents. Mr. Myers was one of just eleven

---

[19] Defendants, in their Responses and Objections, cited *Blackwell v. City & Cty. of San Francisco*, 2010 WL 2608330, at *2 (N.D. Cal. June 25, 2010) (denying a 30(b)(6) deposition because "Plaintiff had an opportunity to obtain the information now sought through the first deposition"); *Bondhus v. Provident Life & Accident Ins. Co.*, 2008 WL 11331762, at *5 (S.D. Fla. Sept. 17, 2008), cases so inapplicable to the situation at bar that Defendants declined to cite them in their Motion.

[20] *See* Defs' Motion at p. 29, citing to documents produced in November 2019 and January 2020.

living witnesses identified in Defendants' Rule 26 Disclosures. Moreover, Defendants certified Myers' production *as complete* on November 22, 2019, nearly four months *prior to* the date these documents were produced. See Ex. 17 Nov. 22, 2019 Letter from K. Branscome to B. Aylstock re: Prod Vol. MDL025. Defendants have no excuse for the late production of these documents, which were not produced to Plaintiffs in time to elicit deposition testimony from Mr. Myers or any other 30(b)(6) witness. Stated simply, Plaintiffs had *none* of the information described in these documents until March 2020, meaning that, contrary to Defendants' assertions, Plaintiffs could not have "indisputably" requested a 30(b)(6) deposition on this topic in January 2020. Defs.' Br. at 29.

Given their delayed production of Operation Cobra documents, Defendants' argument that Plaintiffs should have set an Operation Cobra 30(b)(6) deposition in January 2020—at the same time the Court was most focused on ensuring that the parties concentrated on discovery related to 3M's affirmative defenses—is specious. To preclude Plaintiffs from seeking additional discovery on Operation Cobra would be an outrageous limitation on Plaintiffs' right to information concerning the claims at the heart of 3M's liability in this case and would ignore the significance of Defendants' late disclosure of this information to Plaintiffs. Accordingly, Defendants' Motion as to Topic No. 13 should be denied.

### F.  Topics Nos. 17 and 18.

Finally, Defendants have not shown good cause to avoid 30(b)(6) testimony regarding alternative designs under Topic Nos. 17 and 18. Defendants conveniently omit the substance of these requests, using ellipses to suggest these are generic requests for "safer alternative designs." Defs.' Br. at 29–30. On the contrary. Topic No. 17 seeks corporate testimony about alternatives to the CAEv2, and specifically "3M's knowledge . . . [of] potential safety effects of changes to (i) the length of the [CAEv2]; (ii) the thickness of the [CAEv2]; (iii) the number, orientation, and size of flanges on the [CAEv2]; and (iv) the materials used in the manufacture of the [CAEv2]." Ex. 1, July 24, 2020 30(b)(6) Depo. Notice at 10–11. Topic No. 18 seeks "3M's discussions and considerations of any Competing Product or alternative designs," including "(i) the evaluation of any intellectual property or patent rights; (ii) drafts, design plans, drawings, and testing; (iii) the dimensions, specifications, materials used; and (iv) whether or not flanges were a component." *Id.* at 11. This is just the sort of "reasonable particularity" contemplated by Fed. R. Civ. P. 30(b)(6). Defendants further claim that Plaintiffs "fail to specify the communications is sought [*sic*]," Defs.' Br. at 30, ignoring the definitions section of Plaintiffs' Notice defining that term. *See* Ex. 1, July 24, 2020 30(b)(6) Depo. Notice at 3.

Knowing that Topics No. 17 and 18 are relevant matters set forth with reasonable particularity, Defendants claim these topics are duplicative of Berger's

prior 30(b)(6) testimony. But there was no mention of "alternative designs" in Plaintiffs' August 2, 2019 Notice, in response to which Defendants designated Berger to testify about "the design of the CAEv2" and "to describe generally the design decisions regarding the CAEv2." Defs.' Ex. 26 at 14–15 (Topic Nos. 11 and 12). At most, Berger's 30(b)(6) deposition encompassed the issue that the "*length* of the UltraFit Earplug end . . . is too short for proper insertion*," which touches on Topic No. 17(i). *Id.* at 14 (emphasis added). There was no testimony about the number of flanges or the CAEv2's material and thickness, which is what Topic No. 17(ii)–(iv) seeks to discover. Nor did Berger testify about, for example, "the dimensions, specifications, [and] materials" of alternative designs, as contemplated by Topic No. 18. Simply put, testimony about these design decisions—affirmative choices that Defendants made—is distinguishable from testimony about alternative designs that Defendants knew about but ignored, or considered but disregarded.

Defendants' citations do not, in fact, support their bold claim that Berger "addressed this exact topic at his November 12 [*sic*], 2019 30(b)(6) deposition." Defs.' Br. at 30. The claim crumbles upon cite-checking their proffered pincites:

- 120:19–123:25, Berger is asked about the dimensions of the ISL filter, which were changed from 3mm in diameter in the CAEv2 to 2.5mm in "later versions." This passing reference to a component part of the CAEv2 does not amount to testimony about alternative designs or competing products. To the extent it did, Berger himself admits he was "not certain" which later version of "plugs [Pascal Hamery is] referring to there."

- 139:4–142:5, Berger recalls that "one of the ideas was that shortening the stem" by "6 to 7mm" could "improve the performance of the UltraFit plug with the filter." Once again, at best this testimony speaks to Topic No. 11 and that the "length of the UltraFit Earplug end . . . is too short for proper insertion." It says nothing of other ways to shorten the plug, such as by altering the number or size of flanges.

- 156:22–160, Berger affirms that Garinther's notes reflect three different design alternatives: (1) two different plugs, (2) dual-ended plug with a twist function for dual modes, like the CAEv3 that "eventually got produced by 3M," or (3) the dual-ended, dual-mode design of the CAEv2. Here, Berger parroted what the document itself said, offering no insight into these design alternatives and decisions. He admitted on the record that he "d[idn't] know if [he] was aware of any of these memorandums at that time," and accordingly defense counsel objected for lack of foundation.

- 342:1–344:14, Berger again mentions "shorten[ing] the stem" and the possibility of having a "two-sized product" or offering "two plugs" for each soldier to address comfort issues. These passing references to alternative designs do not address what Plaintiffs now seek to discover.

*See* Defs.' Br. at 30 (citing Defs.' Ex. 9). Berger's prior 30(b)(6) testimony about "design decisions" generally and "who made those design choices," which was relevant to the government contractor defense, does not even scratch the surface of alternative designs.

This information is relevant not only to Plaintiffs' claims but also Defendants' defenses. *See, e.g.*, *Aubin v. Union Carbide Corp.*, 177 So.3d 489, 511 (Fla. 2015) ("[T]he plaintiff is not required, but is permitted, to demonstrate the feasibility of an alternative safer design and . . . defendant may present evidence that no reasonable alternative design existed."). Accordingly, Plaintiffs are entitled to additional 30(b)(6) testimony on Topic Nos. 17 and 18. *See, e.g.*, *Cummings v. Gen. Motors*

27

*Corp.*, 2002 WL 32713320, at *7, *9 (W.D. Okla. June 18, 2002), *aff'd*, 365 F.3d 944 (10th Cir. 2004) ("Given the arguable relevance of the alternative design to Defendant's awareness of any deficiencies in the designs at issue in this case . . . Defendant shall designate a person who will testify on Defendant's behalf, pursuant to Rule 30(b)(6).").

As described with respect to Topic No. 11 above, the issue of reasonable and feasible alternative designs, and the Defendants consideration with respect to those issues is highly relevant. Mr. Berger when questioned about alternative design decisions testified in the 30(b)(6) deposition that Mr. Falco was the "designer" of the plug, and that Marc Doty would have drawn the designs. Ex. 7 Berger 30(b)(6) at 325. Plaintiffs deposed Mr. Falco and Mr. Doty, neither of which w=could provide any testimony regarding the facts concerning the decision making related to the consideration of alternative design options. Therefore, Plaintiff is now seeking the testimony from a corporate representative who can address the factual issues related to the design considerations for the Combat Arms plugs.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for a Protective Order.

Dated: August 19, 2020

Respectfully submitted,

*/s/ Bryan F. Aylstock*
Bryan F. Aylstock, Lead Counsel
Florida State Bar No. 078263
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street
Suite 200
Pensacola, FL 32502
Tel.: (850) 202-1010
baylstock@awkolaw.com

Christopher A. Seeger, Co-Lead Counsel
(Admitted Pro Hac Vice)
New Jersey State Bar No. 042631990
Seeger Weiss LLP
55 Challenger Road 6th Floor
Ridgefield Park, NJ 07660
Tel.: (212) 584-0700
cseeger@seegerweiss.com

Shelley V. Hutson, Co-Lead Counsel
(Admitted Pro Hac Vice)
Texas State Bar No. 00788878
Clark, Love & Hutson, GP
440 Louisiana Street
Suite 1600
Houston, TX 77002
Tel.: (713) 757-1400
shutson@triallawfirm.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH LOCAL RULE 7.1(F)</u>

I hereby certify that this motion complies with the word limit of Local Rule

7.1(F) and contains 6,657 words.

*/s/ Bryan F. Aylstock*

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2020, I caused the foregoing Memorandum of Law to be filed with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record.

_/s/ Bryan F. Aylstock_

31