# EXHIBIT 12

## AFFIDAVIT OF MICHAEL SHAHNASARIAN, PH.D.
## AFFIDAVIT IN SUPPORT OF NEED FOR CONDUCTING A
## REHABILITATION EXAMINATION

STATE OF FLORIDA

Before me, an officer duly authorized to take acknowledgments and administer oaths, personally appeared Michael Shahnasarian, Ph.D., who being over the age of eighteen and after being duly sworn, deposes and says:

1. I am Michael Shahnasarian, Ph.D., president of Career Consultants of America, Inc. In this capacity, I am engaged in the professional practice of vocational rehabilitation and life care planning.

2. I am a licensed psychologist in the state of Florida. Additionally, I am a certified rehabilitation counselor, certified life care planner, certified vocational evaluator, certified career counselor, and certified counselor. I specialize in career guidance, vocational rehabilitation, human resources counseling, and life care planning and have devoted in excess of 3,000 hours to continuing professional education concentrating in career development, vocational psychology, vocational rehabilitation, life care planning, and organizational behavior. I have also been elected to Fellow status by the following organizations: American Psychological Association, International Association of Life Care Planners, and National Career Development Association. A copy of my curriculum vitae is attached (Exhibit A).

3. I evaluate individuals with various impairments/disabilities and offer rehabilitation services and life care planning. As it applies to rehabilitation one of the primary purposes of vocational rehabilitation is to assist individuals with physical and mental impairments/disabilities to obtain and/or maintain employment. In addition to my professional training, I have been providing vocational rehabilitation and life care planning services professionally to individuals since 1981. I am experienced in providing these services to individuals with both physical and mental impairments.

4. I perform vocational rehabilitation evaluations throughout the State of Florida and elsewhere approximately 100 times per year. I have been permitted to conduct vocational rehabilitation examinations in numerous jurisdictions, and have been hired in equal proportion by plaintiff's counsel and defense counsel (Exhibit B).

5. Prior to examining a plaintiff, I review available records that address claimed damages. These records include: medical records (both before and after the onset of an alleged condition), academic records, employment records, earnings records, testimony, and other damages-related documents. This records review facilitates establishing a plaintiff's baseline record of vocational functioning, which is necessary to evaluate a claim of loss of earning capacity. In particular, records reflecting a plaintiff's prior claims of disability or unemployability, the information and statements he or she makes in connection with those claims, and any information and documents used to evaluate those claims are highly relevant to my analysis of a plaintiff's vocational functioning and the causes of any impairments.

6. To render as accurate of a rehabilitation opinion as possible, my practice is to conduct a face-to-face examination with the individual I am evaluating. The examination is broken down into a clinical interview and the administration of various tests. During the interview portion of the examination the examinee is asked detailed questions about their presenting problems, treatment, limitations and capabilities, medical history, activities of daily living, mental health status, educational background, work history, and vocational rehabilitation. This questioning is to assist in the determination of the person's ability to secure and maintain employment, assess work ability, competency, and the like. Given the complexities involved in each examinee's history the entirety of an examination may take anywhere from six (6) to eight (8) hours.

7. The face-to-face component of my examination is instrumental in helping me formulate independent opinions. It allows me to observe and assess the individual's physical functioning (e.g., problems with sitting, walking, writing, performing various tasks requested), mental functioning (e.g., concentration ability, remote/recent memory, interpersonal functioning), and general clinical presentation. It also provides me an opportunity to elicit information not available in records.

8. During a clinical interview, a vocational evaluator may further inquire about information gained from a pre-examination records review. For example, if records show irregularities in earnings and/or work participation, absences from the workplace, and/or a pattern of job instability, further inquiry about reasons for these is indicated. It is imperative to divest pre-existing and/or unrelated factors (including medical conditions) from issues in dispute when evaluating vocationally-relevant data and performing a claim of loss of earning capacity assessment. As an example, a history of substance abuse unrelated to issues in dispute can have profound implications on a plaintiff's vocational capacities. To name a few: problems with work attendance, job performance, and job stability; limitations on work participation (e.g., during periods of symptom exacerbation, relapse, and treatment); and, accessibility to work opportunities (e.g., potential need to submit to drug testing, work contraindications associated with potential exertional and non-exertional substance use problems, employer bias). The same is true even if a plaintiff's lost earning capacity claim is limited to damages of hearing loss from the use of a product. For example, if an aspiring dancer sought damages for lost dancing-related earning capacity after her foot was injured due to alleged defective shoes, a vocational evaluator would still inquire about a history of substance abuse when assessing her baseline vocational functioning.

9. Pre-existing medical conditions and/or medical conditions unrelated to a dispute can affect one's earning capacity in a myriad of ways, including imposing impairments and restrictions that have implications for accessing the workplace and, by extension, affecting earning capacity. Further, many medical conditions, which may pre-date and/or be unrelated to an issue in dispute, can manifest in ways that include periods of symptom exacerbation, progression and worsening over time, and patterns of relapse and remission - all of which can affect a plaintiff's vocational capacities. It is imperative that a vocational evaluator carefully evaluate these contingencies in order to isolate the effects of claimed damages.

10. I have no interest, intention, or expertise in assessing matters of fault, blame, or liability. I make no attempt to depose or interrogate any plaintiff; however, in order to provide an assessment, a normal history is necessary to perform the examination. To that extent, basic history questions will be asked.

11. In addition to conducting a clinical interview, my examination protocol involves administering a battery of standardized tests that enable me to elicit vocationally relevant information. The tests I administer provide objective measures of personality functioning, intellectual functioning including aptitudes and abilities, and occupational interests. Results from testing allow me to more thoroughly assess an individual to arrive at an opinion within a reasonable degree of vocational rehabilitation probability. The examination is done in usual, reasonable, and customary standards of practice. These testing procedures are designed to provide real identifiable data concerning the ability and functionality of a person post-injury.

12. The methodology I apply comports with standards of practice in the rehabilitation profession. It has been favorably peer-reviewed in several professional publications and is implemented by practitioners worldwide. Further, I apply the same methodology regardless of whether plaintiff or defense counsel has retained me. My textbook, *Assessment of Earning Capacity (4th Edition),* details the methodology I apply. Exhibit C contains several peer-reviewed publications that comment favorably on this methodology.

13. At all times during my examination, the evaluee being assessed is at will to take breaks as required. Every effort is made to make the evaluee as comfortable as possible, including offering various seating positions and reading test items to the evaluee, when needed.

14. The views expressed in this affidavit are by no means idiosyncratic. The opinions herein are entirely consistent with applicable standards of practice and care in my field.

**FURTHER AFFIANT SAYETH NAUGHT**

_____
Michael Shahnasarian, Ph. D.

STATE OF FLORIDA
COUNTY OF Hillsborough

The foregoing instrument was acknowledged before me the 20th day of August, 2020, by Michael Shahnasarian, Ph.D., who after being sworn deposes and says that the foregoing is true and correct to the best of his knowledge and who is personally known to me/has produced _____ and who did/did not take an oath.

_____
Notary Public - State of Florida
Commission: GG 200728
My Commission Expires: 5·1·22

KAREN J. BUSH
Commission # GG 200728
Expires May 1, 2022
Bonded Thru Budget Notary Services