# Appendix C

## Peer-Reviewed Publications

# The Rehabilitation Professional

The Official Journal of the International Association of Rehabilitation Professionals



Volume 19 Number 1  •  2011

and work to improve his/her unrelated issues such as overweight, smoking, and drug and alcohol abuse, and control chronic illness conditions.

As we advocate for workers who are ill, injured, or who have disabilities, we have an obligation to educate them about the reality of the benefits they receive; to help them weigh choices and decide the course of action they want to take for their own lives. Each rehabilitation professional has his/her own style and technique to facilitate client change. If we want to have the most impact, we need to ensure that as we discuss the resources available to aid in RTW we are also helping clients to see how and where it is in their own best interest to resume working.

Whatever tools and techniques we use to facilitate return to work, we need to purposefully tip the balance toward changes in thinking, choices, behaviors, and actions. Our goal is to create more incentives to change than the worker is receiving—or perceiving.

*DT North is a Commissioner with the Certification of Disability Management Specialists Commission (CDMS Commission) and President of Achieve Consulting Team, Inc.*



## Book Review

**Shahnasarian, M. (2011). Assessment of Earning Capacity, Third Edition. Tucson, AZ: Lawyers & Judges Publishing Company, 289 pages.**

As in earlier editions of this book, Dr. Shahnasarian's goal is to promote precision and objectivity in matters involving the valuation of earning capacity. The intended audience includes vocational rehabilitation experts, economists, accountants, annuitants and other financial experts, lawyers, triers of fact appraisers, and subjects of earning capacity assessments. The book is organized into three parts. Foundation Issues are presented in Part I, Conducting Vocational Assessment in Part II and Forensic Practice Issues in Part II.

Foundation issues includes the arenas in which vocational expert consultation is utilized, the scope of involvement for a vocational expert, bases for earnings capacity opinions, and the selection of a vocational

expert. Tables illustrating the components of the decision to use a consulting expert versus a testifying expert, sequential assessment of vocational alternatives and earning capacity damages, and the basis of an earning capacity opinion illustrate key concepts discussed in the text. Logistical and contextual considerations include litigation phases and expert involvement, administrative issues, expert retention, and the litigation environment. A detailed sample retention letter/agreement, response to a request for raw data and position statement on recording an evaluation are provided. The chapter on expert evidence includes a brief overview of methodologies, presentation of evidence, and a report outline. The chapter on processes for earning capacity assessment details items to be considered for a records review, and "subject" examination. Sample deposition questions are provided as well as examples of frequently administered tests. Appendices include a full client intake form and sample clinical interview transcript. The chapter on earning capacity and loss of earning capacity provides an in-depth discussion of Shahnasarian's ECAF-2 (Earning Capacity Assessment Form) including factors that affect career development and earning capacity (inhibitors, drivers), and assessing the effect on earning capacity. Examples of unconventional and questionable approaches to earning capacity assessment are introduced (e.g., failure to develop a full vocational profile, computation based on a theoretical loss of job accessibility and over reliance on selected statistical data of little value).

Topics included in the section on conducting vocational assessments include cases of acquired disabilities, those involving the Americans with Disabilities Act, long term disability, as well as employment and family law. Central vocational questions and noteworthy considerations are addressed for each type of case with extensive sample reports.

The final section on forensic practice issues includes an overview of the trial environment, trial preparation, pretrial conference, deposition of testifying experts and trial testimony (e.g., direct, cross, redirect examination issues, and exhibits). Sample proposed direct examination questions, and a sample scheduled deposition letter are provided. The final chapter in this section includes three case studies.

While this book does not include an exhaustive bibliography on earnings capacity assessment, the breadth and depth of the text is excellent as are the

sample forms and case examples. Social Security case development and testimony is not included due to the unique nature of this analysis and testimony. The reader is referred to other sources such as the *Vocational Expert Handbook – Revised and Updated* (2005) for an overview of this process. One of the jewels is Shahnasarian's ability to provide a complete review of his research and the earning capacity assessment form he developed, which has been discussed in prior editions of the book and presented/published in multiple peer reviewed journal articles.

Michael Shahnasarian provides a synopsis of critical issues in the assessment of earning capacity. This book is an excellent resource for the beginning vocational expert, but is also beneficial for the experienced professional. It provides clear concise guidance for case analysis, report writing, and testimony. Dr. Shahnasarian accomplishes his stated goal and provides the field with another valuable book. Assessment of Earning Capacity is a recommended purchase for every vocational expert's library.

### Reference

Blackwell, T., Field, T., Johnson, C., Kelsey, M., & Neulicht, A. (2005). *The vocational expert: Revised and updated.* Athens, GA: Elliott & Fitzpatrick.

### Reviewer

Ann T. Neulicht is a private practitioner as a vocational and life care planning expert in the areas of social security and personal injury in Raleigh, North Carolina.





INTERNATIONAL ASSOCIATION OF
REHABILITATION PROFESSIONALS

*The Rehabilitation Professional*

Volume 23  Number 2  •  2015

*The Rehabilitation Professional, 23(2), pp. 119–120*

# Book Review

Shanasarian, M. (2015). *Assessment of Earning Capacity.* Tucson, AZ: Lawyers & Judges. (ISBN: 978-1-936360-35-2)

I. *Assessment of Earning Capacity* was published in 2015 by Michael Shahnasarian, PhD. This book is a fourth edition. It is currently available in a hardback copy via lawyersandjudges.com. The Review attained the book via complimentary copy.

II. Aesthetically, *Assessment of Earning Capacity* has a tan hardback cover (3 previous editions were all different colors with the same design). The book is aesthetically appealing to professionals providing vocational expert services and lawyers involved in loss of earning capacity claims. There is a table of contents, preface, 12 chapters divided into 3 sections, and a bibliography. The book is well manufactured and the pages are sturdy and are appropriate for studying and general wear and tear.

III. Related to organization, *Assessment of Earning Capacity* has 12 chapters divided into 3 sections and 334 pages (including bibliography, index, and an about the author section). The chapters are divided into 3 parts with the following titles; Foundation Issues, Conducting Vocational Assessments, and Forensic Practice Issues. Also included are numerous graphs, charts, pictures, and samples of vocational expert documents. At the end of each chapter Dr. Shanasarian includes samples of documents discussed in the chapter which allow the reader to visualize the said documents esthetically.

IV. This publication is an important work in the field of vocational expert services as it promotes and offers the latest techniques on offering scientifically based opinions in loss of earning capacity claims. This review will discuss each of the 3 sections in the text and touch on the highlights of each.

## Part 1: Foundation Issues:

This first section of Dr. Shanasarian's text covers the following topics; vocational expert consultation, logistical & contextual considerations, expert evidence, processes undergirding the assessment of earning capacity, and earning capacity & loss of earning capacity. In discussing vocational expert consultation, Dr. Shanasarian touches on different types of litigated matters in which a vocational expert would be hired to provide expert testimony. Also discussed is the need for an expert to have a systematic process for assessing an individuals earning capacity. The difference between an individual's earnings and earnings capacity is described, which the review found informative as many individuals unfamiliar with assessment of earning capacity may not be clear on this. The scope of vocational expert's services is discussed and the difference between a consulting expert and testifying expert is discerned utilizing tables.

In discussing logistical and contextual considerations, Dr. Shanasarian takes the reader through the litigation phases (presuit, discovery, trial). Expert retention is discussed including maintaing integrity in the litigation environment. Dr. Shanasarian also covers how vocational experts are selected and how they formulate their opinions on assessment of earning capacity. Pictures of a vocational evaluation in which the plaintiff attorney setup video recording equipment are provided. Also included in this section are sample of various forms including a jury verdict form, sample retention letter, etc. As a vocational professional who has little experience in forensics, I found these visual samples useful in understanding litigated matters.

In the section on expert evidence, Dr. Shanasarian discusses methodologies that experts use to formulate opinions on earning capacity and gives examples of different models. The presenting of expert evidence is also included such as expert interrogatories and affidavits. The steps involved in assessing earning capacity are covered such as; records review, subject examination, clinical interview, etc. Again samples are given for the clinical interview, client intake form, testing materials, etc. Dr. Shanasarian lists factors affecting career development and earning capacity and the use of the ECAF-2. Vocational handicaps, drives, motivation, etc are included in this section.

Chapter 4 covers the processes undergirding the assessment of earning capacity. Dr. Shanasarian goes through the multiple steps involved in forming an opinion on earning capacity including; subject examination, and the clinical interview. Samples of the components of the clinical interview are provided along with examples. Chapter 5 covers earning capacity & loss of earning capacity. Dr. Shanasarian begins with a discussion of the ECAF & ECAF-2 which he wrote with Leiteten in 2008 and 2010 respectively. The ECAF & ECAF-2 were developed as tools to assess earning capacity. Chapter 5 covers factors affecting career development including inhibitors and drivers. Samples and examples are given at this end of this section.

## Part 2: Vocational Assessments:

This second sections covers the actual administration of vocational evaluations that experts use to assess earning capacity in several different types of situations including; cases of acquired disabilities, cases involving the Americans with Disabilities Act, employment law cases, family law cases, and cases of long-term disability insurance. Samples and examples are given for conducting evaluations in each of these different types of scenarios. Examples of life

care plans are also provided for different types of cases.

## Part 3: Forensic Practice Issues:

This last section deals with forensics and discusses each step of a vocational expert witness's testimony all the way through trial. Dr. Shanasarian closes with several case studies which aid in giving the reader a clear picture of a vocational expert's role in several different types of cases.

*Assessment of Earning Capacity* (4th ed.) is well written as are the earlier editions. Dr. Shanasarian shares his expertise with the reader in a clear, easy to follow format. As a vocational rehabilitation professional who works in the State-Federal VR system, I found this book informative as well as enjoyable to read. The review would recommend this book to anyone interested in the topic of the assessment of earning capacity.

*Reviewed by Kathleen Ceaser*

*The Rehabilitation Professional 20(2), pp. 147–148*

# Review of the ECAF-2

Timothy F. Field

**Shahnasarian, M. (2010). Earning Capacity Assessment Form (2nd ed.). Lutz, FL: PAR, www.parinc.com**

The *ECAF-2* is a product designed to assist the forensic rehabilitation and economic professional in determining the earning capacity of an individual. Based on research and writing over the last decade, Dr. Michael Shahnasarian has developed a method and approach that is well-founded in rationale, research, and related literature that is both easy to understand and use.

The *ECAF-2* comes in the form of a kit (attractively boxed) which contains a 40 page booklet, and 25 rating forms (11 x 17 sheet folded to 8.5 x 11). It would be my estimation that a professional, new to this product, would be able to study the booklet and develop an estimate of earning capacity of an individual within a few hours. Subsequent evaluations would, of course, take much less time as practice would quickly speed the process.

The booklet is the essence of this product. The four chapters will provide the professional with all that is needed to successfully utilize this method in case evaluations. Chapter 1 presents a discussion of related methodologies, the rationale for the development of the *ECAF*, the rating form, and the development process of the early *ECAF* and *ECAF-2*. Chapter 2 is the longest section which details the administration and scoring of the rating sheet in determining earning capacity. This section is particularly well-done and it is here that the reader will need to spend the greatest amount of time in learning the process. Likewise, Chapter 3 is an equally important section which discusses the various interpretations of the *ECAF-2 Rating Form*. Finally, Chapter 4 presents data and information on such critical factors as validity, reliability, and related statistics of the *ECAF-2*'s development. Understanding these elements is important when the *ECAF-2* is used in cases than could potentially involve litigation. In the world of admissibility of expert testimony, one needs to be acutely aware of the requirements as set forth in the famed *Daubert* trilogy (*Daubert v. Merrill Dow Pharmaceutical, Carmichael v. Kunho Tire,* and *General Electric v. Joiner*), and, in particular, *Federal Rules of Evidence 401, 403,* and *702*. In my opinion, the *ECAF-2* would meet the "reliability" and "relevance" requirements inherent to admissibility in federal (and state) court.

With regard to this product being "generally accepted," and "peer reviewed," Dr. Shahnasarian again has provided ample evidence of both requirements in the Reference section of the booklet. Since 2001 and beyond, Dr. Shahnasarian has consistently and progressively published empirical and discussion papers in peer reviewed journals on the *ECAF* approach. For seven of those articles, I was serving as editor of two peer reviewed journals in which Dr. Shahnasarian published, thus giving me some perspective over time of the continuing developing and research on the *ECAF-2*. In my opinion, Dr. Shahnasarian has made a significant contribution to the assessment and evaluation of earning capacity with an individual. The *ECAF-2* could reasonably become part of a professional's stable of resources for earning capacity assessments that could result in defensible outcomes in the forensic arena. I recommend strong consideration of this resource to rehabilitation and economic professionals who are involved in making assessments of earning capacity.

## Author Notes

Timothy F. Field is President of Elliott & Fitzpatrick, Athens, Georgia and is a publisher of resources for the forensic rehabilitation profession.

HAMMILL INSTITUTE
ON DISABILITIES

# Test Review: The Earning Capacity Assessment Form–2nd Edition

Rehabilitation Counseling Bulletin
57(1) 57–59
© Hammill Institute on Disabilities 2013
Reprints and permissions:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0034355213496168
rcb.sagepub.com

SAGE

Shahnasarian, M. (2010). *Earning Capacity Assessment Form–2nd Edition Professional Manual.* Lutz, FL: Psychological Assessment Resources. ECAF-2 Introductory Kit (includes professional manual and 25 rating forms): $90.00.

## Purpose and Nature of the Test

The Earning Capacity Assessment Form–2nd Edition (ECAF-2) is a 14-item rating form that is designed to provide a systematic way for vocational experts to assess the loss of earning capacity, particularly in forensic cases where a claim is being made for such damages. Although the ECAF-2 is not intended to be a "definitive measure to assess a claim of loss of earning capacity," it aims to "facilitate the synthesis of information for the purpose of framing analysis" (Shahnasarian, 2010, p. 19). According to the manual, the ECAF-2 "promotes objectivity, standardization, and systematic consideration of factors pertinent to evaluating such claims" (p. 3) and is most effective when used alongside a thorough clinical interview, review of records, and in addition to various methodologies such as the RAPEL method (Weed, 1999) and the Labor Market Access/Wage Loss model (Field & Field, 2001). The ECAF-2 is especially useful in cases where future wage loss must be determined, such as in pediatric cases or in cases where the individual has just entered the workforce. It can be used to assess the earning capacity of individuals at any age and any stage of their career.

The ECAF-2 is appropriate for use with individuals who "(a) possess an earning capacity, (b) contend their earning capacity has eroded due to an event that may prompt or is prompting litigation, and (c) are pursuing a claim of loss of earning capacity" (p. 5). It is neither necessary that the individual being evaluated is currently working nor is it necessary that he or she has ever worked. However, the individual must have possessed an earning capacity, which prevents use of the ECAF-2 in certain populations, for example, people with preexisting disabilities that prevented them from working. The ECAF-2 takes into account premorbid as well as postincident factors that could have a bearing on earning capacity, and thus it is important that the evaluator has access to both types of information prior to using the ECAF-2.

## Practical Applications

The ECAF-2 consists of a user's manual and a pencil-and-paper rating form. The evaluator is responsible for filling out the form on behalf of the individual he or she is evaluating, using his or her own clinical judgment after reviewing all pertinent information. At the heart of the ECAF-2 is the rating of both "Inhibitor" and "Driver" items. "Inhibitor" items are those factors that could adversely affect the individual's vocational rehabilitation such as the individual's prognosis and ability to apply prior skills, whereas "Driver" items are those factors that could mitigate the individual's vocational problems, such as the individual's career motivation and stability of his or her career development. Each item, whether considered an "Inhibitor" or a "Driver," is rated using a hierarchical sequence of four statements that are assigned a number from zero to three. The first statement corresponds to factors that would correlate to vocationally high functioning (zero), while the statements following correspond with progressively poorer vocational functioning (numbers one to three). The user is also given the option to choose "insufficient basis to assess" or "not pertinent" for each item being rated if the information required to evaluate a specific item is missing or an item is not applicable to the individual's situation.

There are nine inhibitor items that are rated in the ECAF-2. The "phase of career development" item assesses the individual's ability to progress in his or her career and the normal phases of career development (Super, 1957) such as growth, exploration, establishment, maintenance, or withdrawal. It is important to assess the individual's age, vocational accomplishments, and level of career maturity when assessing this item. The "subject-specific issues" item assesses any personal barriers and the effect these have on the individual's career. Examples of subject-specific issues include childcare responsibilities, a criminal record, or chemical dependency. The "ability to apply prior skills" assesses if the individual has any transferrable skills, and "future career development prospects" assesses future employability, taking into account factors such as labor market trends and accommodations. These factors are accounted for based on research through the U.S. Department of Labor, Bureau of Labor Statistics' (2012) *Occupational Outlook Handbook's* projections of positive and negative trends for employment as well as knowledge of necessary accommodations based on the individual's disability. "Prognosis" is used to assess whether or not the individual's impairment(s) is/are stable, if there could be a relapse, or if his

or her medical condition could be progressively degenerative. In the case that the individual is unable to assume past employment, the "need and capacity for retraining" assesses if retraining would enable the individual to return to premorbid earning levels. "Preexisting vocational handicaps" assess any premorbid medical, psychological, or social issue(s) the individual had prior to the event in question. Finally, the assessment of "acquired vocational handicaps" and "vocational adjustment issues" determines to what level either will affect the individual's future employment.

There are five driver items that are assessed in the ECAF-2. When assessing "stability of career development," it is important to assess the number of past jobs the individual has held, the length of time he or she spent in each job, any advancements or demotions, earning history, and the individual's opportunity to be rehired by past employers. "Work propensity" assesses the individual's work ethic and takes into account if he or she generally worked full-time, part-time, or only sporadically. Also assessed is the individual's "demonstrated earnings history" and "career motivation," which assesses an individual's motivation to succeed. The last driver item assesses "cognition" to determine if it is intact or if there are deficits.

The rating form also includes an Inhibitor and Driver Profile, which is a space to graph the results of the rating of each item to provide a visual of both inhibiting and driver factors. The final part of the rating form is the Impairment to Earning Capacity Rating Scale which is a summary of all of the information assessed. The rating scale ranges from 0% which corresponds to no loss or impairment of earning capacity, to 100% which corresponds to a catastrophic loss of earning capacity. A mild loss is considered to be 1% to 20%, a moderate loss 21% to 50%, a severe loss 51% to 80%, and an extremely severe loss 81% to 99%. This scale allows the evaluator to choose a single percentage of loss of earning capacity (e.g., 25%), a range of scores (such as 25%—50%), or a qualitative descriptor (none, mild, moderate, severe, extremely severe, or catastrophic) that best describes the individual's lost earning capacity.

The ECAF-2 user's guide provides guidelines on how the scores for each individual item may foreshadow a certain score on the rating scale, although there are no direct rules or correlations. Generally, a score of zero on either an inhibitor or driver item means that the item is going to be beneficial in helping the individual obtain "optimal earning capacity." A score of two or three generally indicates that the item will hinder the individual's earning capacity.

The manual states that the qualifications to administer the ECAF-2 include "Advanced training and years of clinical experience in many areas—including medical and psychosocial aspects of rehabilitation, vocational rehabilitation, career development, standardized testing, and the forensic process" which are "essential to the responsible and valid interpretation of the ECAF-2" (p. 5).

## Technical Aspects

The ECAF-2 professional manual reports the results of testing on the reliability and validity of the ECAF-2 conducted by the author. The inhibitor items had a test–retest reliability of .76 to .96, and the driver items had a test–retest reliability of .70 to .80. The impairment to earning capacity rating scale's test–retest reliability was found to be .85 to .90. Interrater agreement was also measured for the ECAF-2, and it was found to be between 57% and 100%. Interrater agreement was at or above 70% on 10 items of the form. Contrary to many traditional "testing" measures, the ECAF-2 is completed by the evaluator and not the individual in question. Thus, it was not "normed" on any particular population but rather was developed based on input and an agreed-upon protocol from a team of experts.

In addition to reliability, the validity of the ECAF-2 was also measured. An expert review of the items was conducted and "Vocational rehabilitation experts agreed or strongly agreed that the ECAF-2 facilitated analysis of loss of earning capacity assessments in 74.5% of the 70 cases" (p. 36). The internal consistency was found to be .82, which is moderate to strong.

## Conclusion

The ECAF-2 is a tool to assist the vocational expert in assessing loss of earning capacity in an individual who has experienced an injury with resulting disability and/or some type of adverse life event. When assessing earning capacity, it is important to consider an individual's work history, loss of opportunity, transferrable skills, and industry, among other factors (Weed & Field, 2001). The use of the inhibitor and driver item profiles helps the expert to examine pertinent areas of premorbid and postincident functioning. The advantage of using the ECAF-2 is being able to demonstrate a systematic way of assessing loss in earning capacity. A potential disadvantage is that there is no exact scoring system that will give users a specific number corresponding to earning capacity despite the use of numbers zero to three to "score" each item. This may lead the vocational expert to expect that a composite score can be calculated which corresponds to a scale of some sort. Perhaps changing the numbers to letters may help prevent the user from expecting some sort of formula for earning capacity. Shahnasarian (2004) addressed this issue when introducing the ECAF, stating that "It is important to note that no parametric relationship between ECAF factors, or among rating statements within an ECAF factor, has been established" (p. 45). In addition, it would be useful if the professional manual addressed the scoring system in more detail than is currently provided. The user must take caution not to rely on the ECAF-2 as the sole piece of information when determining earning capacity, as it must be used in conjunction

with all other relevant information and resources available. The vocational expert must also endeavor to obtain all relevant data to minimize "insufficient basis to assess" or "not pertinent" choices when ranking "Driver" and "Inhibitor" items. The more of these choices, the likelihood of a credible process is diminished. Although the user still ends up with a somewhat subjective result due to his or her reliance on clinical judgment when completing the ECAF-2, factual data from the evaluee's medical, rehabilitation, and work history provide a defensible foundation for the expert's decision-making process. The ECAF-2 can be a useful instrument for inclusion in the expert's process of assessing loss of earning capacity.

Reg L. Gibbs and Ashley K. Crtalic
*Billings, Montana*
Terry L. Blackwell
*Montana State University–Billings*

## References

Field, J., & Field, T. F. (2001). Labor marker access (2000 version) [Computer software]. Athens, GA: Elliott & Fitzpatrick.

Shahnasarian, M. (2004). The Earning Capacity Assessment Form: An introduction and study of its efficacy. *The Rehabilitation Professional, 12,* 41–54.

Shahnasarian, M. (2010). *Earning Capacity Assessment Form–2nd Edition Professional Manual.* Lutz, FL: Psychological Assessment Resources.

Super, D. (1957). *The psychology of careers: An introduction to vocational development.* New York, NY: Harper & Row.

U.S. Department of Labor, Bureau of Labor Statistics. (2012, September 7). *Occupational outlook handbook* (2012–2013 ed.). Retrieved from http://www.bls.gov/ooh/

Weed, R. O. (1999). Forensic issues for life care planners. In R. O. Weed (Ed.), *Life care planning and case management handbook* (pp. 351–357). Washington, DC: CRC Press.

Weed, R. O., & Field, T. F. (2001). *Rehabilitation consultant's handbook revised.* Athens, GA: Elliott & Fitzpatrick.

*The Rehabilitation Professional 20(2)*, **pp. 51–62**

# Estimating Earning Capacity: A Historical Review

## Timothy F. Field

Estimating the earning capacity of a person with an injury or disability is an essential part of a forensic rehabilitation consultant's role in litigated personal injury or compensation cases. Since the early 1980's, the literature has addressed various notions and methods regarding the estimation of earning capacity, including collateral issues such as work life expectancies, partial and total disabilities, and a variety of personal demographic variables of the person with an injury or disability. A review of various approaches is offered that have appeared in the vocational rehabilitation literature over the last three decades.

*Keywords: earning capacity, wage loss, comparison of methods*

## Wage Loss and Earnings Capacity Analysis

Wage loss analysis refers to a procedure that addresses the amount of wages lost by a worker as a result of injury. For instance, if a worker was being paid $12,000 a year at a rate of $1,000 a month or approximately $250 per week, what would be the total amount of wages lost taking into account number of days, weeks, or months the worker was unable to return to his or her job as a result of the injury? If the injury were of such a nature that it prevented the worker from returning to work for a period of one year or more, a simple tabulation of all of the months and/or years of lost time would be added to determine the amount of lost wages as a result of the injury. The calculation of lost wages is a rather simple and straightforward process and really does not take into account many of the other factors related to the issue in question of lost earnings capacity.

Earnings capacity (Horner & Slesnick, 1999) is related to the notion of lost future earnings to be expected from the client's reasonable vocational potential. In some cases, the loss of earnings capacity is straightforward. For example, a man who was 55 years old and who had been driving a truck for a living since he was 19, was injured in a motor vehicle accident leaving him tetraplegic. His loss of earnings was based on the amount of money he was making at the time of injury and projected over his remaining work life expectancy. In this case the individual probably also had achieved his realistic earnings capacity.

In other cases, this may be less clear. For example, the man in the above case also had his 18-year-old nephew in the car with him. The boy suffered extensive head injuries, which rendered him incapable of gainful employment for the rest of his life. Since he had very little work history (paper boy), the task for estimating loss of future earnings or earnings capacity is more complicated.

One method is to opine about which specific jobs or job categories the individual might have been able to engage in (Deutsch & Sawyer, 1999). A second is based on the LPE method, which is an estimation of the life expectancy (L), work force participation (P), and probability of being employed (E) as supported by government statistics (Brookshire & Smith, 1990; Lees-Haley, 1987). Another is to estimate the educational level the person was capable of and turn to research data on the median income a person with the those traits could be expected to earn over his or her lifetime. For clarification, the loss of earnings would generally be based on past history whereas earnings capacity would be based in prognostication or estimation based on selected factors that are inherent in each approach or method.

The first method seems somewhat flawed in that the expert's opinion may be criticized as pure speculation depending on how the opinion was reached (Ryals v. Home Insurance Company, 1982). The second and third methods are not specific to the injured party and rely on global data for a just award. This has its own problems for both the plaintiff and defense attorneys (Field, Weed, & Grimes, 1986; Lees-Haley, 1987; Weed, 1987; Weed & Field, 1994). For example, an 18 year old was a high school graduate but his I.Q. was 85 (average is 100), and he graduated 988 in a class of 988. Clearly the defense attorney would argue that the government statistics would overestimate the earnings as they apply to the individual. On the other hand, say the 18 year old was class president, consid-

*Field*

ered well above average in intelligence and graduated in the upper third of his class. In this case, even if the parties agreed that the plaintiff had not planned to continue with his education, the plaintiff's attorney would likely argue that the government data are too conservative.

In any event, most cases do not fit neatly into various categories. It is not unusual for a plaintiff to be in their late 20s with a lower level job history but active plans to complete college "starting the next term after the injury", or a 35 year old who had just started her own business last year but has sustained an injury so severe that she can not continue in the business venture but can work at some other job, or a housewife who has a college degree and was planning to return to work after the kids were old enough to take care of themselves. In yet other cases, a person may have been severely injured but able to return to a modified job with his old employer where he earned the same income; in this case, the worker clearly has lost the opportunity to work in the occupation of his choice and has lost access to a wide variety of occupations or been prevented from advancement within his chosen profession.

Everyone's earnings capacity is not achieved at the same life stage. One author offers an age-earning cycle concept, which indicates that the average individual may not hit their peak earnings until about the age of 40 (Dillman, 1989). For children, adolescents, and young adults, the accuracy of loss is dependent a number of individual factors and the ability of the rehabilitation expert to take these factors and translate them into defensible figures. Earnings capacity analysis, rather than reliance on earnings history, generally seems more defensible for persons under the age of forty, although independent professional judgment makes the final determination.

Depending on the individual, one would expect the reliance of actual wage history for determining earnings capacity would increase as the age increased. After the peak earning years, previously suggested at about the age of 40, actual earnings would likely be the base from which the economist would project losses if the person were totally disabled (Dillman, 1987). If the individual were unable to return to work at their usual occupation, then the expert would compare actual pre-injury earnings with expected post-injury earnings. It is recommended that a similar approach, i.e., identify classes of jobs based on post-injury worker trait information rather than specific jobs, be used as the basis for the opinion. For adult clients, this can be supplemented by a labor market survey conducted in the local labor market about the availability of these suggested job titles and their wages. In many cases, the survey will fail to identify a job. On the other hand, this can be misleading since the vocational rehabilitation counselor can cultivate an occupation for most "motivated" clients with a physical disability.

At the other end of the spectrum, opinions about younger persons who have not yet settled into a career need to be approached somewhat differently, i.e., loss of earnings capacity, and a limited earnings history. For children, work and earnings capacity can rely on worker traits that can be identified from school records, standardized testing, work history to date, family background, including aunts, uncles, and grandparents, and other factors (Isom, 2001; Weed, 2000). Worker traits include the physical demands and working conditions of the job, general educational level, vocational preparation time generally required to learn the occupation, and the aptitudes, interests, and temperaments needed to perform the occupation.

For the forensic rehabilitation expert, the task of estimating earning capacity is sometimes both confusing and difficult. The work of the rehabilitation consultant may be clouded, controversial, and muddied, to say the least, especially when trying to understand the world of estimating capacity and providing a dollar value to individual cases involving injury and disability. In addition to the concept of earnings capacity, collateral issues also come into play (e.g., current and future earnings, estimating lost earnings, and estimating future lost earnings). What appears to be most confusing relates to the issue of methodology; namely, how does a professional go about making determinations on any of the issues related to earnings. In particular, what method or methods would meet the requirements as set forth by the Daubert (1993) and Kumho (1999) rulings of the U.S. Supreme court and also the expectations as identified by the Federal Rules of Evidence (2002, i.e., FRE 403 and 702; see also Field, 2011).

## Legal and Program Definitions

This section reviews the legal definitions of many of the more critical constructs related to earning capacity. A review of the significant program areas, including civil settings, addresses the various program approaches for understanding the similarities and differences that exist relative to earning capacity.

A reasonable starting point in this discussion is to provide adequate definitions of the major constructs related to earning capacity. All of the following definitions are taken from *Black's Law Dictionary* (2000) and the U.S. Department of Labor *Occupational Employment Statistics* (2011).

> *Capacity: The role in which one performs an act (Black's, p. 163).*
>
> *Damages: Money claimed by, or ordered to be paid to, a person as compensation for loss or injury (Black's, p. 320).*

*Diminution: The act or process of decreasing, lessening, or taking away (Black's, p. 369).*

*Earnings: Revenue gained from labor or services. (Black's, p. 414).*

*Earnings: Remuneration (pay, wages) of a worker or group of workers for services performed during a specific period of time. The term usually carries a defining word or phrase, such as straight-time average hourly earnings. Because a statistical concept is usually involved in the term and its variations, the producers and users of earnings data should define them clearly. In the absence of such definitions, the following may serve as rough guidelines:*

*Hourly, daily, weekly, annual: period of time to which earnings figures, as stated or computed, relate. The context in which annual earnings (sometimes weekly earnings) are used may indicate whether the reference includes earnings from one employer only or from all employment plus other sources of income.*

> *Average: usually refers to the arithmetic mean; that is, total earnings (as defined) of a group of workers (as identified) divided by the number of workers in the group.*

> *Gross: usually refers to total earnings, before any deductions (such as tax withholding) including, where applicable, overtime payments, shift differentials, production bonuses, cost-of-living allowances, commissions, etc.*

> *Straight-time: usually refers to gross earnings excluding overtime payments and (with variations at this point) shift differentials and other monetary payments. (OES).*

*Future Damages: Money awarded to an injured party for an injury's residual or projected effects that reduce the person s ability to function (Black's, p. 321).*

*Lost earnings: Wages, salary, or other income that a person could have earned if he or she had not lost a job, suffered a disabling injury, or died. There can be past lost earnings and future lost earnings (Black's, p. 414).*

*Future Lost Earnings: See lost earnings (Black's, p. 414).*

*Income: The money or other form of payment that one receives, usually periodically, from employment, business, investments, royalties, gifts, and the like (Black's, p. 611).*

*Income: The receipt by an individual of any property or service which he can apply to meeting basic needs. (CFR 416.120).*

*Wage: Payment for labor or services, usually based on time worked or quantity produced (Black's, p. 1275).*

*Mean wage: An average wage; an occupational mean wage estimate is calculated by summing the wages of all the employees in a given occupation and then dividing the total wages by the number of employees. (OES).*

*Median days away from work (Safety and Health Statistics): The measure used to summarize the varying lengths of absences from work among the cases with days away from work. The median is the point at which half of the cases involved more days away from work and half involved fewer days away from work. (OES)*

*Median wage: An occupational median wage estimate is the boundary between the highest paid 50 percent and the lowest paid 50 percent of workers in that occupation. Half of the workers in a given occupation earn more than the median wage, and half the workers earn less than the median wage. (OES)*

*Wages and salaries: Hourly straight-time wage rate or, for workers not paid on an hourly basis, straight-time earnings divided by the corresponding hours. Straight-time wage and salary rates are total earnings before payroll deductions, excluding premium pay for overtime and for work on weekends and holidays, shift differentials, and nonproduction bonuses such as lump-sum payments provided in lieu of wage increases. (OES)*

*Worklife estimates: Estimates of the number of years individuals would spend in the labor force based on mortality conditions, labor force entry and exit rates, and demographic characteristics. BLS has not produced worklife estimates since February 1986. Last publication: Worklife Estimates: Effects of Race and Education PDF 1.32 MB*

## Methods for Evaluating Lost Earning Capacity

There are several different approaches or methods of estimating the loss of earning capacity in cases of partial but permanent disability. The following methods are often referenced by practitioners, but are not all-inclusive regarding methods that might be used. These methods have all had an impact on the development and progression of methods used today by most professionals. While each of the methods discussed emphasizes the use of data and information, each method requires a significant degree of clinical judgment and decision-making on the part of the professional (see Choppa et al., 2004, for a discussion of the efficacy on professional clinical judgment; for a discussion of opinion development and validity, see Barros-Bailey & Neulicht, 2005).

## Labor Market Access/Wage Loss

The LMA approach emphasizes the necessity to ana-lyze lost wages with respect to labor market condi-tions. The advantage of the labor market approach de-veloped by Field and colleagues during the 1980s (Field & Field 1999; Field, 1987, 1993; Field, Choppa, & Shafer, 1984; Field & Weed, 1988; Vander Vegt, Summit, & Field, 1981; Weed, 1986, 1987, 1988) is that it establishes a "reasonable approximation" of a beginning wage base at the time of the injury, which then can be compared with estimated earning based upon a reduced level of functioning post-injury. The alternative to this approach is to use the actual wages that were earned by the worker at the time of injury, and then to estimate what the worker might be able to do in particular jobs post-injury. The LMA approach has the added advantage of taking into account the is-sue and question of lost opportunity to be employed post-injury by comparing an individual's pre and post-injury level of functioning to a particular labor market. In this sense, the LMA approach takes into account specifically the questions of geography and la-bor market conditions within geographical areas. The other aspect of the LMA approach is that it provides approximations of potential wages for an injured worker, pre- and post-injury, which can be provided to the economist who then can make projections of lost earnings or lost future earnings. However, as with any computerized approach, the professional must understand the data that is generated as well as how the computer processes the data with an explanation to the satisfaction of the court (*Perez v. IBP, Inc., 1991, & Hughes v. Inland Container Corp.*, 1990).

The approach of assigning a percentage to a loss has been a long-standing method to the determination of a disability. In some cases, it has been utilized as a guide in determining lost earnings or wages and fu-ture lost earnings as a direct relationship to the per-centage losses identified by the appropriate category. For instance, a loss of an arm will result in x% loss of functioning for the person (in the insurance industry this is referred to as "scheduling"). This has often-times been translated to a similar percent loss of em-ployment opportunity for that worker for the remain-ing years of his or her work life. This is an erroneous assumption since it cannot be assumed that the loss of a bodily function by percentage is directly related to the loss of employment opportunities and/or function-ing in the worker's future. Assume for a moment that a business executive, due to some accident, had to have several of his toes amputated from his left foot. According to the *AMA Guide to the Evaluation of Per-manent impairment* (2000), this would result in a 15% loss of bodily functioning for this particular injury. However, the loss of three toes on the left foot has no direct bearing on the types and kinds of work that the business executive was performing either before this

injury or following the injury. Although it can be ar-gued that there is a percentage loss of bodily functioning due to the loss of the toes, it also true there is not necessarily a direct relationship to the loss of functioning on the job. Sometimes the loss of a body part, or a reduction in functioning, are not relevant to the skill set of a worker.

On the other hand, for example, a person who is em-ployed as a dancer, whose job requires a great deal of balance and agility, might purport that there is a di-rect relationship between the loss of functioning in the left foot and potential loss of functioning on the job. The injury will probably result in a loss of job oppor-tunities for the dancer. In other words, a determination has to be made of the level of functioning both pre- and post-injury as it relates to jobs and future jobs of the worker. It is not adequate, nor satisfactory, to argue that a percentage loss of bodily function is a direct cor-relation to the loss of vocational functioning. The LMA approach emphasizes the necessity of both pre- and post-injury functional capacity assessment.

## The Deutsch/Sawyer Model

Deutsch and Sawyer (1986) have suggested that pre-injury earnings and post-injury earnings really do not reflect an accurate picture of the person's ability to earn money. More importantly, "the client's post-acci-dent earning capacity, or the potential to earn" (p. 8-2) is really the target of an assessment of diminished earnings. An assessment of earnings capacity would include

1. Whether the client has a relatively well-estab-lished work identity or vocational goal;

2. The degree to which the client is established in this vocational goal;

3. To what degree the individual has developed the necessary skills and abilities required to show proficiency in the chosen vocational goal;

4. The number of years of experience the individual has in the vocational goal; and

5. The degree to which a difference exists between the individual's earned wages and the average earnings for most workers in the chosen voca-tional goal (p. 8-3).

In addition to the obvious emphasis on a career goal, the model suggests that "pre-accident earnings do not accurately and consistently reflect the actual capacity to earn or develop earnings in cases involving individ-uals under the age of 30" (p. 8-3). This emphasis on vo-cational goals and age is somewhat of a departure from the LMA model, which emphasizes the pre- and post-injury functional capacity evaluations, and sug-gests a relationship between functional capacity and selected jobs and wages. The Deutsch and Sawyer model does include other factors for earning capacity

assessment including education, intellectual development, academic development, work history, and transferable skills. In establishing a wage earning capacity it is also necessary to choose a representative sample of jobs that reflect an individual's maximum capacity for developing vocational and earning potential (p. 8-5).

The model then proceeds to suggest that a referral to an economist is appropriate to calculate an estimate of the diminution of lifetime earnings. This model, while suggesting a number of variables to consider, does not provide any guidelines on procedurally what to do; a great deal of judgment and experience is required in the decision-making process for capacity assessment.

## L-P-E and The New Worklife Tables

Brookshire and Cobb (1983), Brookshire, Cobb, and Gamboa (1987), and Brookshire and Smith (1990) proposed an innovative approach in assessing damages following an injury. Relying upon federal government data (Bureau of Labor Statistics), The L-P-E method (Life-Participation-Employment) This approach essentially is designed to provide an estimate of a person's worklife and earnings by age. Earnings are adjusted by calculating the joint probabilities of Living (L) through the various ages, Participating (P) in the labor force, and being Employed (E).

Gamboa (1987) introduced the notion of assessing earnings capacity, disability, and future earnings by utilizing US government statistics to estimate the impact of sex and level of education for persons who were identified (globally) as either disabled or not disabled.. A "global" estimate usually involves the use of large data sets that are not specific to the individual. In subsequent research and writings, Gamboa and his colleagues have continued to develop the approach of using government to evaluate the capacity to work and earn money by persons who have been disabled (Gamboa, 2006; Gamboa & Gibson, 2006; Gamboa, Holland, Tierny, & Gibson, 2006; Gamboa et al., 2009; Gibson, 2000).

While these approaches justifiably take into account such factors as age, education, gender, living and employment participation, including the level of disability (if any), there are two distinct disadvantages of utilizing government statistics. First, the Gamboa approach is often cited for using global estimates of the present and level of a disability. "Global" estimates of the presence of a disability with a worker can be somewhat inaccurate and certainly is not worker specific in terms of the worker's specific functional capacities and potential for working and earning money. Secondly, the reliance on government data is generally not current as government employment data and demographic statistics are often times dated by one to three years.

## Compensation Programs

Workers' compensation, both federal and state programs, include objectives for returning injured workers to their same job, a similar job, or a new job (following training and work adjustment) and are generally referred to as "return-to-work" programs. Given the wide ranging efforts at both the state and federal levels, there are many times considerable differences in both the objectives of the programs and how these programs manage financials issues such as loss of wages, disability ratings, earnings capacity, and future earnings. Over the last three decades, state programs have often reduced or eliminated funding for rehabilitation programs as a means to improve the probability that injured workers would return to work. Oftentimes, state legislatures have viewed these programs as too costly for the state budget. Prior to the 1980's, most state workers' compensation program included a section of their law "mandating" rehabilitation services for injured workers. The mandatory rehabilitation law was a major area of support for private sector rehabilitation programs as insurance companies with hire rehabilitation consultants to address this requirement for rehabilitation services. In the late 1980s, state governments began to cut or eliminate the mandatory requirement as a cost saving measure. While rehabilitation programming has taken on several forms, such as a lump sum payment for the injury, or severe restrictions on services offered, states continue to search for ways to address issues of compensation for injured workers while maintaining the central focus of returning injured workers employment.

In terms of assessing disability and evaluating work capacity have relied on basic approaches to address the issue. Several state programs have relied upon a "schedule of impairments" that assign a disability rating by body part; for example, a loss of a thumb and four fingers might be rated as a nine percent loss of total body functioning. The percentage loss would become the basis for a percentage loss of earnings for future work and income. Related to this approach is the use of the *AMA Guides to the Evaluation of Permanent Impairment* (2000) for evaluating injury. California, as a result of the *Ogilvie* (2009a; 2009b) rulings, is attempting to draft a workable "formula" approach to address the issue of earnings capacity (see the following articles for a review of *Ogilvie* ruling and the response to *Ogilvie*. As a result of the flux with the California Workers' Compensation Board on how to best determine "diminished earning capacity," Van de Bittner (2003, 2006) proposes a methodology and approach involving pre and post functional capacity assessment and evaluating related socioeconomic factors before calculating future earnings. Van de Bittner also discussed in detail over 50 factors than might have some bearing in determining diminished earning capacity for the injured worker.

## The RAPEL Method

The RAPEL method (Weed, 1995, 2000; ) is a comprehensive approach which includes all elements needed to determine loss of access (incorporating the LMA information), loss of earnings capacity, future medical care, worklife expectancy, rehabilitation plan, as well as placeability and employability factors. The word RAPEL is a mnemonic designed to assist the rehabilitation expert with collecting the data for a jury, lawyer, judge, economist and others in order to arrive at damages. It may not be evident, but many of the articles on loss of earnings are written by economists. Generally the economist will rely on the numbers provided to him or her by the rehabilitation expert. It is very important for the economist to receive the "right" information so a "bottom line" figure can be determined.

In litigation, the rehabilitation expert retained by the defense may not have access to the evaluee. Although a personal interview is preferred, the expert may utilize other information/data to offer a reliable opinion with regard to each of the below categories. Examples include, but are not limited to:

1.  When not permitted access to the evaluee, the expert may help the attorney develop deposition or interrogatory questions that mimic the interview process.

2.  Request all related depositions (regarding the evaluee, family members and healthcare providers.

3.  Obtain all available related work history/employment records.

4.  Obtain tax records.

5.  Comprehensively review records (including medical) that might address any of the topics below.

6.  With regard to the rehabilitation plan, the rehabilitation consultant may work with other defense retained experts (such as physicians and neuropsychologists) to develop opinions about future care.

7.  Review Day-in-the-Life video if available.

The authors suggest that an organized report summarizing the opinions be attached as a separate document to the narrative. This facilitates the economist's role, offers a well organized easy to read document, and is ready to be made into a trial exhibit.

**R = Rehabilitation Plan.** The client's vocational and functional limitations, strengths, emotional functioning, and cognitive capabilities are assessed utilizing information gathered from the professionals listed earlier in this chapter. This may include additional future testing, counseling, training fees, rehabilitation technology, job analysis, job coaching, placement, and other needs for improving the client's potential for em-

ployment. If there is a Life Care Plan (usually for catastrophic injuries and complex healthcare needs), it should be noted in this section and refer the reader to that document for future medical and related care.

**A = Access to Labor Market (Employability). In many of t**hese cases, an individual may very well be able to return to a job that is custom-designed around their disability or with an employer who is interested in helping an employee with mild to moderate cognitive deficits. However, the client/evaluee may not have access to the same level of vocational choices as he or she did prior to the injury. In essence, it may be that the person would appear to have no particular loss of earnings capacity but at the same time be at high risk for losing a job and then having a significant problem locating suitable employment. The access to labor market can be determined through a variety of means. One option is to utilize a computer program like SkillTRAN™ to assess the effects of the disability on the person's access to the labor market (LMA) (Field & Field, 1999), based on worker traits, and the client's ability to choose in the labor market. For example, one client/evaluee may have a 50% personal loss of access to the labor market and another individual may have a personal loss of access to 95% of the labor market. Obviously, an individual who has access to 5% of the labor market should be employable or placeable, however, the difficulty factor for obtaining suitable employment has increased significantly. By placing a loss of access percentage to labor market, one can sensitize the reader to the potential difficulty for placement. Generally, this is described in a particular percentage loss of access to the client's personal labor market rather than to the national labor market. Few unimpaired people have access to 100% of the total labor market.

**P = Placeability.** This represents the likelihood that the client will be successfully placed in a job with or without rehabilitation or rehabilitation consultant assistance. One may need to conduct labor market surveys, job analyses, or, in pediatric cases, rely upon statistical data to opine about ultimate placeability (Weed, 2000). In some situations, the economic condition of the community may also be a factor. It is important that the rehabilitation consultant recognize that the client's personality, cognitive limitations, and other factors certainly influence the ultimate outcome. For adults, it is generally useful to include an opinion about jobs that are available (actual openings) in addition to jobs that exist but are not currently available to the client.

It is likely that the client will have worker traits which match to various job titles. Matching to a job title does not suggest that the person can indeed be placed in a particular occupation. Other factors, such as location, experience, education, personality, etc. can adversely impact placement. Also, many jobs

which may be appropriate for the client/evaluee are difficult to obtain. The vocational opportunity may be highly competitive or there may be very few positions available.

For example, one administrative law judge (ALJ) for a Social Security hearing was frustrated with the consistent opinion by the vocational expert that an injured employee, particularly in the poultry industry, could return to work as a "chick sexer." The ALJ was heard to tell a vocational expert that "if you ever provide me with another opinion that a person can return to work as a chick sexer, you will no longer work as a vocational expert"!

**E = Earnings Capacity.** Based on the rehabilitation plan, access to the labor market, and placeability factors, the client may or may not be employable in the labor market. If employment is likely, an estimate of the earnings potential is important. It is assumed that the reader is familiar with the difference between wage loss and earnings capacity analysis; however, if not, refer to topic earlier in this chapter. In general, the earnings capacity for an individual is that which they can reasonably attain and hold. For example, consider a 17-year-old who delivers papers for an income when he is catastrophically impaired and is never able to work again. Certainly, the earnings history from the paper delivery does not represent the individual's capacity. On the other hand, a 55-year-old union truck driver may exhibit earnings history that is consistent with his capacity. The considerations include whether the individual is a child or an adult and, if an adult, the industry for which they are best suited. For an example, a drywall hanger of marginal intelligence may have very well reached their earnings potential by the time they reach their 20's or early 30's. On the other hand, an attorney may not reach their potential until very late in their career.

**L = Labor Force Participation.** This category represents an opinion about the client's expected length of time expected to be in the labor force (also known as work life expectancy). Usually an individual who has a reduced life expectancy will also be expected to have a reduced work life expectancy. At the other end of the spectrum, the client's participation in the labor force may be unchanged. An individual may also be expected to work six hours per day rather than eight hours per day, which represents a 25% loss of normal work life expectancy. Some clients have demonstrated consistent extra income by working overtime hours and this situation can be considered in this arena as well. Generally speaking the counselor will express the opinion of loss by percentage or perhaps a number of years. Generally the economist will make the actual projections. This particular area is quite complicated and most vocational counselors are not prepared to address the subtleties and the complexities of economic projections. However, the counselor can review

work life estimates in the aging Worklife Estimates: Effects of Race and Education (Bulletin # 2254, USDOL, 1986). Author's note: Although some more currently privately produced worklife data are available, the data may or may not be valid. Until more peer review is available on these data, government publications are recommended.

## Computer Programs

Following the early development of the Labor Market Access program (Field, J. & Field, T., 1985-1999), other vocational estimating programs were developed and have contributed significantly to the assessment of work capacity, earnings capacity, and employment opportunities. The programs all suffer from the obsolete occupational data base of the *Dictionary of Occupation Titles* (1991) and related data sets, although developers of each of the programs have attempted to adjust the data to accommodate this deficiency as much as possible. The programs that are currently available to the forensic rehabilitation community are the *Skilltran* program (Jeff Truthan), *OASYS* (Occupational Analysis System, now of Skilltran, formerly by Gale Gibson), *SEER* (Software for Employment, Education and Rehabilitation by Robert Hall), and the *MVQS* (McCroskey Vocational Quotient System by Billy McCroskey). Additional information can be obtained by reviewing each program's respective website.

| | |
|---|---|
| SkillTran | www.skilltran.com |
| Oasys | www.vertekinc.com |
| SEER | www.seersoftware.net |
| MVQS | www.vocationalogy.com |

While these programs can be very useful in obtaining employment and earnings information that matches to a specific client, consultants should always consider computer generated output as tentative conclusions for any client analysis, and should be further tempered by clinical judgment (Choppa et al., 2004) in reaching final estimates of employment and earnings (The same holds of the L-P-E and New Worklife Tables).

## The Court or Jury Decides (Summary Judgment)

*Summary judgment: This procedural device allows the speedy disposition of a controversy without the need for a trial.* (Black's, 2000).

*Jury Instruction: A direction or guideline that a judge gives a jury concerning the law of the case.* (Black's, 2000).

It is not uncommon for state and federal courts to present all relative information through presentations (attorneys and experts) and then to charge the jury to decide the outcome on damages, including fu-

ture lost earnings. This approach requires that the jury receive adequate information to presumably make an informed decision regarding damages. In cases involving a summary judgment, the same necessary information is needed by the court. Under the Virginia Model Jury Instructions (9.000), this instruction outlines the categories for damages that the jury can consider:

> *If you find for the plaintiff, then in determining the damages to which he is entitled, you may consider any of the following which you believe by the greater weight of the evidence was caused by the negligence of the defendant:*
>
> *any bodily injuries he sustained and their effect on his health according to their degree and probable duration;*
>
> *any physical pain and mental anguish he suffered in the past and any that he may be reasonably expected to suffer in the future;*
>
> *any disfigurement or deformity and any associated humiliation or embarrassment;*
>
> *any inconvenience caused in the past and any that probably will be caused in the future;*
>
> *any medical expenses incurred in the past and any that may be reasonably expected to occur in the future;*
>
> *(1) any earnings he lost because he was unable to work at his calling;*
>
> *(2) any loss of earnings and lessening of earning capacity, or either, that he may reasonably be expected to sustain in the future; any property damage he sustained.*
>
> *Your verdict should be for such sum as will fully and fairly compensate the plaintiff for the damages sustained as a result of the defendant's negligence.*

In *Aivaliotis v. S.S. Atlantic Glory* (1963), Aivaliotis, the plaintiff, was ordered to remove water from below

deck of an ocean-going transport vessel. Initially, the plaintiff was hauling buckets of water from below and then dumping the water overboard while two workers below filled the buckets. After a period of time, the plaintiff switched jobs with one of the workers below, and while moving to a forward position, fell through an open hatch, fractured his left leg, and suffered a compound fracture of his right ankle, with multiple contusions over his body. Nearly a year later, after seven surgeries and infections and extensive pain, the left leg was amputated. A physician's report (over two years later) indicated the he had reached maximum improvement medically and could be discharged. The physician stated that "I do not feel that he is fit for work as a seaman aboard a ship, but I do feel that he is fit for sedentary or light work, or work that does not involve climbing ladders, lifting or stooping." Plaintiff received a rating of "permanent-partial disability."

The court concluded that plaintiff would not "sustain any actual loss of future earnings by reason of his impairment when his previous station in life is considered." The court learned that during the long period of hospitalization, the plaintiff married an American citizen, gradually learned to speak English, improved upon his educational level, and the potential to earn more in the United States than he could if he had continued on the vessel. The court observed that ""there can be little doubt as to the impairment of his earning capacity." The court reached the final conclusion:

> *Taking into consideration the many elements of damage which must be weighed in an effort to reasonably compensate [plaintiff] for his pain, suffering, mental anguish, embarrassment, actual loss of wages to the point of attaining maximum improvement, impairment of future earning capacity, the expense of maintenance and replacement of the prosthesis in futuro, and considering life expectancy, discounted to the present value of one dollar where appropriate, the court is of the opinion that [plaintiff] is entitled to a decree against the vessel....in the sum of $115,000.00.*"

**Table 1**
*Methods of Earning Capacity Assessment Compared on Selected Factors*

| Factors | LMA+ | Deutsch | LPE | Computer | RAPEL | Court/Jury | Practical |
|---|---|---|---|---|---|---|---|
| Func Assessment | Y | Y | N | Y | Y | M | Y |
| Career Goal | N | Y | N | M | Y | M | Y |
| Job Matching | Y | N | N | Y | Y | M | Y |
| Survey Data | Y | Y | Y | Y | Y | M | Y |
| Worklife Tables | N | N | Y | N | Y | M | Y |
| Future Earnings | N | N | Y | Y | Y | M | Y |

*Note.* Y=Yes; N=No; M=Maybe.

In terms of how the court decided the settlement amount is not clear since all elements were considered together and under the single category of damages.

In the case of *Exxon Corp. v. Fulgham* (1982), the plaintiff was involved in an automobile accident, which caused injury to his left hand and wrist, knee, neck, and back. Following surgery and treatment (arm was in cast for six months), the physician opined that the plaintiff "has approximately a 50 percent loss of use of his wrist and hand as a result of the accident . . . and would be restricted in his working ability because of restriction of motion in his wrist." The court, in instructing the jury, is required to be supported by the evidence. In this case, the jury was instructed to consider a loss of earning capacity that was supported by the opinion of the physician who indicated that there was a loss of 50 percent of functioning in the wrist. Exxon objected to the jury charge of a lessened earning capacity based on the fact that the plaintiff was earning $1000 per month after the injury versus only $700 per month prior to the injury. Relying on the previous case of *Aivaliotis v. Steamship Atlantic Glory*, the court ruled in the case that "one of the measures of his damage is based upon his earning capacity and not merely the amount actually earning." Consequently, the appeals court ruled that the evidence presented by the physician (50% loss of functioning, pain, loss of motion) "was sufficient for the jury to have found that by reason of the injury to the wrist, the plaintiff has sustained a lessening of earning capacity in the future." The finding was summarized:

> *The plaintiff is a man of limited education and earns his livelihood by physical effort and manual labor, specifically with the use of his arms and hands. At the time of the trial, he was an office-machine repairman. Although not a certified cabinet-maker, plaintiff is adept and skilled in the area of woodworking. There is credible evidence from which the jury could have concluded that because of his background, education, skills, and the work he performs, the type and character of the injury sustained by the plaintiff to his left wrist is such as will lessen his earning capacity and could diminish his opportunity to secure employment in the future. We find no error in the action of the trial court in permitting the jury to consider any lessening of plaintiff's future earnings capacity or his expectation of life in determining damages.*

Note that the court relied upon the client factors of the injury and its restrictions, background, education, skills, and the work performed as evidence presented to the jury. In *Scott v. Mid-Atlantic Cable* (2006), the determination of damages was addressed by consideration for a summary judgment consistent with Rule 56 of the Federal Rules of Civil Procedure as summarized in this court case:

> *Summary judgment is appropriate when the moving party can show affidavits, depositions, admissions, answers to interrogatories, pleadings, or other evidence, that has no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.*

Scott, following an accident resulting in injuries, filed a claim seeking damages for "medical care expenses, pain and suffering, mental anguish, lost earning capacity, and the lost future retirement benefits." The defendants filed a motion for partial summary judgment (lost earning capacity and lost future retirement benefits). As noted in the *Exxon* case, "Virginia law permits a claim for lost earning capacity where the plaintiff established that the type and character of the injury" will reduce one's earning capacity and the opportunity to be employed. Further, a consideration of earning capacity includes such factors as background, education, skills, and experience. The court denied the motion for a partial summary judgment based on the fact that there was a material fact (estimating lost earning capacity of the plaintiff) did not rely on speculation or conjecture, and the issue could be adjudicated.

In all three cases noted above, a court (via summary judgment) or a jury could determine a proper conclusion (damages) on the issue of estimating lost earning capacity and/or future employment when the relevant facts of the case are presented in a sufficient manner. The relevant elements of such a determination would include background, the nature of the injury, education, skills, and experience.

## A "Practical" Approach

The estimation of earnings capacity would seem to be a very complicated task given all the information that is available. Much of the confusion for forensic rehabilitation professionals results from the various approaches that have been discussed, including the pros and cons of computer programs, various occupational databases, and the identification of the most critical and salient variables necessary in the analysis. In fact, Shahnasarian (2001, 2004) has emphasized the necessity of organizing and synthesizing all relevant information in the development of a case, including the use of a worksheet that has been developed for such purposes.

This proposed basic and practical approach (Weed & Field, 2012) is perhaps a synthesis of the more useful (and least controversial) concepts that have evolved over the years. Personal preference for alternative resources and/or approaches is certainly within the realm of possibility. However, what is suggested below can serve as a "benchmark" for professionals to consider and then incorporate personal preferences and experiences into an individual and preferred model.

The following steps are suggested:

Following a review of the case records, develop a pre-injury assessment of earning capacity.

1. Identify a pre-injury base wage (not necessarily wage at time of injury) by identifying jobs and wages that best represent the claimant's functional capacity.

2. Identify a post-injury base wage by identifying jobs and wages that best represent the claimant's residual functional capacity.

3. Estimate the difference between the pre-injury earnings capacity and the post-injury earnings capacity.

4. Estimate the remaining work life of the claimant.

5. Calculate a range of economic loss by multiplying the difference from pre-to-post-earnings capacity by the work life remaining.

6. If not qualified, refer to an economist for adjustment to present value. The economist's general method can serve as a guide and blueprint for the rehabilitation professional. Resources to be used might include the following:

   • A computerized job matching program to expedite the job identification process.
   • Either the DOT or the O*NET for describing occupations.
   • The on-line CareerInfo.NET database for wages and numbers of jobs in a local economy, or the CPS data generated by the Bureau of Labor Statistics (BLS).
   • The BLS Worklife Tables (1986)
   • The New Worklife Tables (Gamboa, 2006)

The various methods cited above serve as guidelines for the professional to follow in the development of a case. Of course, there will be variations for each of the methods and much of the variation will depends upon the facts of a case. Table 1 displays some of these differences in how a case can be developed. The RAPEL method appears to be the most comprehensive of all the methods, although this method draws upon resources and strategies from a variety of sources. The LMA method, of course, is a computerized approach developed during 1980s and 1990s, and the results may be used for a portion of the RAPEL report. The original program is no longer available, although the rationale is one to consider (see website listing at the end of the chapter for three computer programs which are currently available and may be used in earnings capacity assessment). As noted earlier, the Deutsch/Sawyer model is rather global and non-specific, while the Court/Jury model is interesting and may be employed in some states. The Practical method is just that: a rather straightforward and common-sense method quite similar to the RAPEL. In terms of which method to use, the choice is really the prerogative of the practicing professional. All have been published in peer-reviewed literature, and all are generally accepted by the professional community.

## References

Anderssen, G. & Cocchiarella, L. (Eds.). (2000). *Guides to the evaluation of permanent impairment.* Chicago, IL: American Medical Association.

*Aivaliotas v. SS Atlantic Glory*, US Dist Ct, Virginia, Norfolk Div, 214F Supp. 568, 1963.

Barros-Bailey, M., & Neulicht, A. (2005). Opinion validity: An integration of quantitative and qualitative data. *Rehabilitation Professional, 13*(2), 33–41.

Brookshire, M., & Cobb, W. E. (1983). The life-participation-employment approach to worklife expectancies in personal injury and wrongful death cases. *For the Defense*, July, 20-25.

Brookshire, M., Cobb, W. E., & Gamboa, A. M. (1987). Work-life of the partially disabled. *Trial, 23*(3), 44-47.

Brookshire, M., & Smith, S. (1990). *Economic/hedonic damages: The practice book for attorneys.* Cincinnati, OH: Anderson.

Choppa, A., Johnson, C., Fountaine, J., Shafer, K., Jayne, K., Grimes, J., & Field, T. (2004). The efficacy of professional clinical judgment: Developing experts testimony in cases involving vocational rehabilitation and care planning issues. *Journal of Life Care Planning, 3*(3), 131-150.

Deutsch, P.D. , & Sawyer, H. (1999). *Guide to rehabilitation.* New York, NY: Mathew Bender.

Dillman, E. (1987). The necessary economic and vocational interface in personal injury cases. *Journal of Private Sector Rehabilitation, 2*(3), 121-142.

Dillman, E. (1989). The age-earnings cycle: Earnings by education. *Journal of Forensic Economics, 2*(1), 105-116.

Dillman, E., Field, T., Horner, S., Slesnick, F., & Weed, R. (2002). *Approaches to estimating lost earnings: Strategies for the rehabilitation consultant.* Athens, GA: Elliott & Fitzpatrick.

*Daubert v. Merrill Dow Phariceutical*, 92-102, US Sp Ct 1993.

*Exxon Corp. v. Fulgham.* Sup Ct of VA, 294 S.E.2nd 894 (1982).

Field, J. (Annually). *Labor market surveys.* Athens, GA: Elliott & Fitzpatrick.

Field, J., & Field, T. (1985, 1988, 1992, 1999). *Labor market access (computer program).* Athens, GA: Elliott & Fitzpatrick.

Field, T. (1987). *Labor market access: Rational and research.* Athens, GA: Elliott & Fitzpatrick.

Field, T. (1993). *Strategies for the rehabilitation consultant: Transferability, loss of employment, lost earnings, and damages.* Athens, GA: Elliott & Fitzpatrick.

Field, T. (2011). Federal rule 702: What is the meaning and implications of this rule for the forensic rehabilitation counselor. *The Rehabilitation Professional, 19*(4), 113-119.

Field, T., Choppa, A., & Shafer, K. (1984). *Labor market access (Rev. ed.).* Athens, GA: Elliott & Fitzpatrick.

Field, T., & Weed, R. (1988). *Transferable work skills.* Athens, GA: Elliott & Fitzpatrick.

Field, T., Weed, R., & Grimes, J. W. (1986). *The vocational expert handbook.* Elliott & Fitzpatrick.

Gamboa, A. M. (1987). *Worklife expectancy of disabled versus non-disabled persons by sex and level of educational attainment.* Louisville, KY: Vocational Economics Press.

Gamboa, A. M. (2006). Key issues in assessing economic damages in cases of acquired brain injury. *Brain Injury Professional, 3*(3), 36-37.

Gamboa, A. M., & Gibson, D. S. (2006). *The new worklife expectancy tables: Revised 2006 by gender, level of educational attainment, and level of disability.* Louisville, KY: Vocational Econometrics.

Gamboa, A. M., Holland, G. H., Tierney, J. P., & Gibson, D. S. (2006). American community survey: Earnings and employment for persons with traumatic brain injury. *NeuroRehabilitation, 21*(4), 327-333.

Gamboa, A. M., Tierney, J. P., Gibson, D. S., Clauretie, T. M., Missum, R. E., Berla, E. P., . . . Newton, J. (2009). A vocational economic rationale. *Estimating Earning Capacity: A Journal of Debate and Discussion, 2*(2), 97-124.

Garner, B. A. (Ed.). (2000). *Black's law dictionary* (7th ed.). St. Paul, MN: West Group.

Gibson, D. S. (2000). Disability and worklife expectancy tables: A response. *Journal of Vocational Economics, 13*(3), 309-318.

Horner, S. M., & Slesnick, F. (1999). The valuation of earning capacity: Definition, measurement and evidence. *Journal of Forensic Economics, 12*(1), 13-32.

*Hughes v. Inland Container Corp.*, Sup Ct of Kansas, 247 Kan 407, 1990.

Isom, R. (2002). Pediatric earning capacity: Developing a defensible estimate of potential earnings. In E. Dillman, T. Field, F. Slesnick, & R. Weed (Eds.), *Approaches to estimating lost earnings: Strategies for the rehabilitation consultant.* Athens, GA: Elliott & Fitzpatrick.

*Kumho Tire Company v. Carmichael*, 526 US Sp Ct 137, 1999.

Lees-Haley, P. (1987). Proof of economic loss with LPE: Disability, validity, and balony. *Journal of Private Sector Rehabilitation, 2*(4), 191-199.

*Ogilvie v. City and County of San Francisco*, WC Appl Bd, No. ADJ1177048 (SFO 0487779), 2009.

*Perez v. IBP, Inc.*, 16 Kan. App. 277, 826 P.2nd 520 (Kan. Ct. App., 1991)

U.S. Department of Labor. (2011). *Occupational employment statistics.* Retrieved from www.usdol.gov/oes/

Van de Bittner, E. E. (2003). Evaluating workers' compensation claims for permanent and total disability in California: A vocational rehabilitation methodology. *Journal of Forensic Vocational Analysis, 6*(1), 77-88.

Van de Bittner, E. E. (2006). Determining diminished future earning capacity in state workers' compensation: The California model. *Journal of Forensic Vocational Analysis, 9*(1), 19-31.

Vander Vegt, D., & Summit, W., & Field, T. (1981). *Labor market access.* Athens, GA: Elliott & Fitzpatrick.

Weed, R. O. (1995). Forensic rehabilitation. In A. E. Dell Orto & R. P. Marinelle (Eds.), *Encyclopedia of disability and rehabilitation* (pp. 326–330). New York: Macmillan.

Weed, R. O. (1986). Labor market access and wages loss analysis. *Journal of Private Sector Rehabilitation, 1*(1), 28-40.

Weed, R. O. (1987). A study of the efficacy of labor market access analysis. *Journal of Private Sector Rehabilitation, 2*(3), 157-170.

Weed, R. O. (1988). Earnings vs. earnings capacity: The labor market access method. *Journal of Private Sector Rehabilitation, 3*(2), 57-64.

Weed, R. O. (2000). The worth of a child: Earnings capacity and rehabilitation planning for pediatric personal injury litigation cases. *The Rehabilitation Professional, 8*(1), 135-147.

Weed, R. O., & Field, T. (2012). *Rehabilitation consultant's handbook* (4th ed.). Athens, GA: Elliott & Fitzpatrick.

## Author Notes

Timothy F. Field is President of Elliott & Fitzpatrick, Athens, Georgia and is a publisher of resources for the forensic rehabilitation profession.

This paper is adapted with permission from Chapter 11 of the *Rehabilitation consultant's handbook*, Weed & Field, 2012.

*The Rehabilitation Professional 20(2), pp. 75–86*

# Comparison of a Consensus Methodology for Evaluating Employability and Earning Capacity by the CA-IARP DFEC Work Group with Published, Peer-Reviewed Methodologies

Eugene E. Van de Bittner, Ann Wallace,
Robert B. Cottle, and Scott Simon

This article provides a comparison of a consensus methodology for evaluating employability and earning capacity prepared by the California Chapter of the International Association of Rehabilitation Professionals' (CA-IARP) Diminished Future Earning Capacity (DFEC) Work Group vocational experts with methodologies presented in published, peer-reviewed professional journal articles and other publications. In this context, consensus methodology means the methodology that was developed and agreed upon by CA-IARP DFEC Work Group vocational experts. The consensus methodology by CA-IARP DFEC Work Group vocational experts is presented first and is followed by a review of peer-reviewed methodologies published in professional journals and texts over the past 15 years. Issues related to educational qualifications and ethics for vocational experts are also discussed. Implications for practice are provided both in terms of general applications for vocational evaluations in multiple jurisdictions and venues as well as those specific to California workers' compensation regarding the evaluation of diminished employability and diminished future earning capacity.

In the spring of 2009, 19 vocational experts met as part of a grassroots effort that was later sponsored by the California Chapter of the International Association of Rehabilitation Professionals to develop a methodology for evaluating employability and earning capacity that could be followed by vocational experts and consumers of their services in multiple judicial venues, such as personal injury, medical malpractice, employment law, family law, workers' compensation, and others. The methodology was also developed for use in vocational evaluations related to *Wanda Ogilvie v. City and County of San Francisco* (2009, February 3), commonly referred to an *Ogilvie I*. Issues related to the professional qualifications of a vocational expert and ethics were also addressed. The results of these activities were published in White Paper: IARP–DFEC Work Group (White Paper) (Austin et al., 2009a). An addendum (Austin et al., 2009b) was added to the White Paper later in 2009 regarding guidelines for addressing the nature and scope of a long-term loss of income evaluation under *Ogilvie I* and *Wanda Ogilvie v. City and County of San Francisco* (2009, September 3), commonly referred to as *Ogilvie II*. The present article develops further the original work of the White Paper: IARP – DFEC Work Group by comparing the consensus methodology for evaluating employability and earning capacity developed by the CA-IARP DFEC Work Group with methodologies that have been published in peer-reviewed professional journals and other publications over the past 15 years.

It is anticipated that the outcome of this comparative analysis of methodologies will be informative and useful to vocational experts, judges, attorneys, and other consumers of their services in various judicial venues and geographic jurisdictions throughout the United States. The results are also expected to have specific application to the evaluation of diminished employability and diminished future earning capacity in the

*Van de Bittner et al.*

California workers' compensation system in relation Labor Code sections 4660 and 4662 and court decisions such as *Ogilvie v. WCAB* and *City and County of San Francisco v. WCAB* (2011), commonly referred to as *Ogilvie III*. The comparative analysis of methodologies is also expected to be particularly useful in the development of a vocational expert fee schedule in California as mandated by California Assembly Bill 1168 (AB 1168) and California Labor Code section 5307.7 (Bae, 2012).

The White Paper provided the following recommendations for an evaluation of employability:

a. An interview that includes review of work, medical and educational background, psychosocial data, activities of daily living, and other relevant information

b. Assessment of existing employment related skills and abilities

c. Consideration of the current physical and/or mental limitations as established in medical and psychiatric records and as presented by the evaluee

d. Transferable skills analysis

e. Vocational testing, if necessary to determine the evaluee's employability

f. Occupational and labor market research

g. Identification of factors that may delay, prevent, or enhance employability

h. Consideration of additional services that may enhance employability when appropriate

i. Other factors as determined by the expert

Specific components of an earning capacity evaluation were described as follows:

a. Develop opinions on past and future earning capacity, based on the outcome of the employability evaluation

b. Complete wage and benefit research

c. Sources of wage and benefit research are:

   1) W-2 forms, Social Security Administration records, and other authenticated records

   2) California Employment Development Department

   3) U.S. Department of Labor and Bureau of Labor Statistics

   4) Other publicly available and statistically reliable published wage and benefit data

   5) As required, labor market sampling, research, and relevant contacts with employers, unions, schools and/or organizations to verify wage and benefit data

d. Apply the most appropriate diminished future earning capacity or loss of earning capacity

method for comparing pre-injury and post-injury earning capacity.

e. Report the findings

The addendum to the White Paper later in 2009 provided guidelines to address the nature and scope of a long-term loss of income evaluation under *Ogilvie I* and *II*. The recommended methodology was outlined as including the following:

a. Review medical records and wage data

b. Review information regarding the worker

c. Analyze long term loss of income

d. *Ogilvie I & II* assessment

e. Consider training, if appropriate

The next section of this article will provide a literature review regarding published, peer-reviewed and a few related methodologies for evaluating employability and earning capacity. This will be followed by a comparison of the various components of the published methodologies with the components of the consensus methodology outlined in the White Paper.

## Literature Review

The first article reviewed in this section is by Toppino and Boyd (1996) where they described a vocational expert foundation and methodology for a wage loss analysis. Their methodology includes the following components:

a. Medical reports and consultations

b. Medical restrictions

c. Functional capacities

d. A vocational diagnostic interview

e. Formal educational level

f. Current level of aptitudinal functioning

g. Transferable skills assessment

h. Age

i. Wage and benefit projections

j. Loss calculations

Cohen and Yankowski (1997, Summer) described the following procedural steps that are typically used by vocational experts in personal injury vocational analysis:

a. Review of records

b. Job analysis

c. Personal interview

d. Vocational testing

e. Transferable skills analysis

f. Reasonable accommodation recommendations

g. Labor market assessment

h. Vocational plan recommendations

i.   Analysis of lost and future earning capacity

j.   Analysis of job search activities

In addition, Cohen and Yankowski described how the results of a work tolerance evaluation and a physical capacity assessment can be used in a forensic vocational evaluation.

Dillman (1998), an economist, described the vocational expert's role in personal injury cases as follows:

> The vocational portion of the analytical process involves the determination of the number, type, and wage levels of jobs an individual would have been capable of performing without the particular limitations (which are the focus of the litigation) and the number, type, and wage level of jobs capable of being performed given the limitations. Appraisal of the individual's ability to compete in the open labor market is also an essential element in the vocational role. Job availability, the selection ratio (i.e., ratio of the number of available jobs to the number seeking the jobs), as well as employer attitudes toward hiring an individual with the specific limitations, are all vocational considerations and often form a foundation for the economic analysis.

> The vocational role will determine the extent of the client's residual earning capacity, if any. The process of establishing this capacity may be quite complex, however, as a number of significant factors must be considered and interrelated. . . (p. 20)

Dillman described an impairment to earning capacity equation as follows:

Impairment to Earning Capacity = f(L,P,T,C)

Where:

L = Reduction in labor market access

P = Reduction in the average pay for the residual jobs

T = Reduction in worklife or hours available for work

C = Reduction in the ability to compete – increase in rate of unemployment (p. 20)

Toppino and Agrusa (2000) described 6 factors that they had identified as "essential methods in reliably establishing employability and post-incident mitigation earning capacity" (p. 60). The 6 factors include:

a.   The medical record

b.   Workers' compensation and/or Social Security records

c.   Data from work tolerance physical capacities testing and psychometric testing

d.   Demographic factors, including age, gender, and education

e.   Transferable skills analysis

f.   Private labor market survey data

Weed (Weed & Field, 2001) outlined the *RAPEL Method*, a process for evaluating employability and earning capacity, as addressing the following:

a.   Rehabilitation plan

b.   Access to the labor market

c.   Placeability

d.   Earnings capacity

e.   Labor force participation

Van de Bittner (2003) described a 9-step *LeBoeuf* Evaluation Process that can be used to develop vocational evidence to combine with medical evidence in establishing an accurate permanent disability rating. The 9-step process includes the following:

a.   Medical records review

b.   Review of school, work and vocational rehabilitation records

c.   Interview and test the injured worker

d.   Review deposition transcripts and videotapes

e.   Evaluate self-initiated return to work efforts

f.   Complete a transferable skills analysis

g.   Determine vocational feasibility

h.   Analyze employability

1)   Labor market access

a)   Medical labor market access

b)   Vocational labor market access and placeability

2)   Labor market survey

i.   Reporting

Berg (2003) presented a methodology to standardize assessments by vocational experts in appeals regarding permanent and total disability determinations before the Washington Board of Industrial Insurance Appeals. The Leeper Evaluation Methodology was developed and includes the following components:

a.   Record review

b.   In-person interview

c.   Psychometric testing

d.   Transferable skills analysis

e.   Determination of likely ability to benefit

f.   Labor market survey

g.   Employability determination

h.   Special re-employment issues such as age, geographic location, etc.

i.   Job analysis

j.   Re-employment efforts

k.  Written report

Bakkenson (2003) described how vocational experts assist in the determination of an employee's loss of earning capacity in workers' compensation claims in Arizona involving permanent partial disability and temporary partial disability. Components of a loss of earning capacity assessment can include:

a.  Job analysis

b.  Employability determination

c.  Transferable skills analysis

d.  Special re-employment issues such as age, transportation, geographic location, etc.

e.  Earning capacity analysis

f.  Labor market survey

g.  Wage data

h.  Reporting

Hultine (2003) outlined a process for determining loss of earning capacity and rehabilitation planning in workers' compensation cases in Nebraska. Evaluation components include:

a.  Earning capacity analysis

b.  Written report

c.  Ability to seek work

d.  Ability to hold a job

e.  Capacity to perform tasks assigned

f.  Wages

g.  Special re-employment issues, such as age, geographic location, etc.

h.  Transferable skills analysis

i.  Labor market access

Johnston and Growick (2003b) described how vocational experts develop an opinion regarding a claimant's employability based on the impact of non-medical factors on work potential. An employability assessment is completed for each claimant scheduled for a hearing regarding permanent and total disability. The following components are included in an employability assessment:

a.  File review

b.  Possible phone contact

c.  Special re-employment issues, such as age, education, etc.

d.  Potential for retraining

e.  Transferable skills analysis

f.  Labor market research

g.  Motivation to return to work

h.  Review of test results

i.  Written report

Spitznagel and Cody (2003) described the various components included in an evaluation by a vocational expert in workers' compensation in Florida, as follows:

a.  Review of records

b.  Vocational diagnostic interview

c.  Written evaluation plan

d.  Testing

e.  Transferable skills analysis

f.  Labor market survey/job analysis

g.  Written report

h.  Assessment of loss of earning capacity

Williams, Dunn, Bast, and Giesen (2006) identified factors that contribute to vocational rehabilitation assessment of earning capacity. Examples of important variables in developing employability opinions include:

a.  Physical demands of work

b.  Workers' actual history of performance of job and/or tasks

c.  Specific vocational preparation (SVP)

d.  Number and/or percentage of job title matches found that require judgment to identify from the results of an automated TSA process (pre-incident or post-incident or both)

e.  Aptitude

f.  Degree of transferability of skills (relative)

g.  Workers' actual history of job-related choices

h.  Number and/or percentage of available job openings that relate to job title matches identified in a TSA process

i.  Labor market trends/projections

Van de Bittner (2006) developed the Workers' Compensation Earning Capacity Formula (WCEC Formula) to be used in the calculation of diminished future earning capacity. The formula was described as follows:

$$DFEC = f(WLE) \; x \left[ \frac{PRE - POST}{PRE} \right]$$

Where:

   DFEC = diminished future earning capacity

   WLE = worklife expectancy

   PRE = pre-injury earning capacity

   POST = post-injury earning capacity

   f = function of

The following steps are completed in determining diminished future earning capacity:

a.  Clarify worklife expectancy

b. Establish pre-injury earning capacity

c. Calculate post-injury earning capacity

d. Calculate future earning capacity

e. Calculate the impact of any additional disability factors on FEC

Hall (2006) described his Stepwise Estimate of Diminished Earning Capacity (SEDEC) method that includes the following steps:

a. Determine average past earnings and convert to hourly rate

b. Determine single job and/or pool of jobs that most reasonably offer greatest employment potential to worker

c. Calculate median entry-level hourly wage for job or pool of jobs

d. Calculate median expected wage (within 3-5 years experience) for a single job or a pool of jobs

e. Determine pre-injury worklife or pre-injury work period to be considered

f. Consider potential loss due to reduced worklife

g. Calculate loss scenarios using SEDEC formula

h. Develop alternative scenarios to consider the impact of receiving vocational rehabilitation, job accommodations, training, etc.

Owings (2007) provided an earning capacity assessment methodology based on the rehabilitation counseling process. This process consists of the following steps:

a. Reviewing medical, educational, employment and other records

b. Interview with the evaluee

c. Administer necessary and appropriate vocational tests

d. Determine suitable employment options from an analysis of the records, interview information, test results, etc.

e. Discuss presently available job alternatives via education, wages, etc.

f. Outline a plan of action to achieve the job goal

Field (2008) described relevant factors in estimating earning capacity and loss. The following steps were suggested in the Practical Approach:

a. Following a review of the case records, develop a preinjury assessment of earning capacity. Identify a preinjury base wage (not necessarily wage at time of injury) by identifying jobs and wages that best represent the claimant's functional capacity.

b. Identify a postinjury base wage by identifying jobs and wages that best represent the claimant's residual functional capacity.

c. Estimate the difference between the preinjury earnings capacity and the postinjury earnings capacity.

d. Estimate the remaining work life of the claimant.

e. Calculate a range of economic loss by multiplying the difference from pre to post earnings capacity by the work life remaining.

f. If not qualified, refer to an economist for adjustment to present value. The economist's general method can serve as a guide and blueprint for the rehabilitation professional. Resources to be used might include the following:

• A computerized job matching program to expedite the job identification process. (optional – see website).

• Either the DOT or the O*NET for describing occupations.

• The on-line CareerInfoNET database for wages and numbers of jobs in a local economy, or the CPS data generated by BLS, or ACS (see website).

• The BLS Worklife Tables

Hankins (2009) explained that evaluating a plaintiff's employment and earning potential "includes, but is not necessarily limited to, a review of medically and vocationally relevant records, an investigation of prior earnings history, a vocational assessment, consideration of demographic factors affecting employment, a transferable skills analysis and a LMA analysis" (p. 82).

Tracy and Wallace (2010) described the elements of a vocational examination process in family law cases as including:

a. A face-to-face interview with a vocational expert

b. Vocational testing which includes assessment of interests, aptitudes, and abilities

c. Assessment of abilities through transferable skills analysis and occupational research

d. Research of the labor market to determine employment opportunities available and suited to the party, as well as the general state of the national and local labor market

e. Comprehensive report

Van de Bittner and Toyofuku (2010) described 3 types of *Ogilvie* analyses that complied with *Ogilvie I* and *Ogilvie II*. An *Ogilvie* analysis report format was provided. Claims for permanent and total (100%) disability were also discussed.

Shahnasarian (2011) described the processes that form the basis of an assessment of earning capacity as including the following:

a. Reviewing relevant records, such as employment, academic, earnings, medical, psychological, job

search, military, criminal, tax returns, standardized test data, Social Security Administration records, and depositions of various parties

b. Performing a subject examination, including a clinical interview and the administration of standardized tests

c. Conducting labor market and related research

d. Consulting with other experts and collateral sources of information, if necessary

Robinson, Pomeranz, and Young (2012) described a set of construct domains and variables to consider when assessing an individual's vocational earning capacity in a forensic setting. The most significant construct domains are as follows:

Medical – functional capacity

Labor market sampling information

Medical – history and treatment

Household activities

Past work experience – variables specific to the job

Education – general variables

Past work experience – variables specific to the employee

Worklife participation

Behavioral health

Rehabilitation planning and services

Job acquisition and maintenance

Activities of daily living

Economic

Language skills

Military service experience

Transportation

Transferable skills

Professional resources

Education – higher education (college)

Past work experience – variables specific to the employer

Psychometric measurement

Education – vocational and apprenticeship

Labor market statistical information

Financial

Socioeconomic

Legal jurisdiction

Avocational activities

Education – compulsory (K-12)

Cultural

Robinson and Pomeranz (2011) described core analyses necessary in the Vocational and Rehabilitation Assessment Model (VRAM) as follows:

a. Psychometric measurement

b. Analysis of future medical care needs

c. Transferable skills analysis

d. Analysis of employability

e. Analysis of placeability

f. Analysis of earning capacity

g. Analysis of worklife participation

h. Rehabilitation planning and services

i. Final opinion formulation

This completes the presentation of the components of published, peer-reviewed methodologies for evaluating employability and earning capacity. The next section will included a comparison of the general evaluation methodologies from the literature review with the consensus methodology by the CA-IARP DFEC Work Group as described in the White Paper.

## Comparison of Published, Peer-reviewed Evaluation Methodologies with the CA-IARP DFEC Work Group Consensus Methodology

Table 1 initially outlines the components of the consensus methodology developed by the CA-IARP DFEC Work Group as presented in the White Paper. This is followed by a listing of the various components of an evaluation of employability and earning capacity from the 21 published, peer-reviewed and related methodologies described in the Literature Review section above.

At a glance, Table 1 depicts the comprehensive nature of the consensus methodology presented by the CA-IARP DFEC Work Group. One also readily sees the comprehensive nature of nearly all of the published, peer-reviewed methodologies. Therefore, the most significant outcome from the comparison of the methodologies is the consistency between the California consensus methodology and the published, peer-reviewed methodologies. For example, 100% of the published, peer-reviewed, and related methodologies included a record review and consideration of a plaintiff's or applicant's education and work history. In addition, 95% included a consideration of labor market access, labor market research, or labor market survey results. Ninety-one percent included a transferable skills analysis. Eighty-six percent included rehabilitation plan or return to work options and a comparison of pre-incident with post-incident wages or earning capacity. Another 77% included an interview and testing of the plaintiff or applicant and an assessment of placeability. In addition, 73% considered age

**Table 1**

*Components of an Evaluation of Employability and Earning Capacity*

| | Rec. Rev. | Int. | Ed. | Wrk. | Test | TSA | Voc. Feas. | LMA | Age/ WLE | Sp. Re. | Plan/ RTW Op. | Plc. | JP | WC | Rpt. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| White Paper (2009) | x | x | x | x | if needed | x | | x | x | x | x | x | | x | x |
| 1. Toppino & Boyd (1996) | x | x | x | x | x | x | | x | | | | | | x | x |
| 2. Cohen & Yankowski (1997, Summer) | x | x | x | x | x | x | | x | x | x | x | x | x | x | x |
| 3. Dillman (1998) | x | | x | x | | | | | | | | | | | x |
| 4. Toppino & Agrusa (2000) | x | | x | x | x | x | | x | x | | x | x | | x | x |
| 5. Weed & Field (2012) | x | x | x | x | x | x | | x | x | | x | x | | x | x |
| 6. Van de Bittner (2003) | x | x | x | x | x | x | x | x | | | x | x | | x | x |
| 7. Berg (2003) | x | x | x | x | x | x | x | x | | | x | x | x | | x |
| 8. Bakkenson (2003) | x | | x | x | | x | | x | x | x | x | x | | x | x |
| 9. Hutline (2003) | x | | x | x | | x | | x | x | x | x | x | | x | x |
| 10. Johnston & Growick (2003b) | x | x | x | x | x | x | x | x | x | x | x | x | | x | x |
| 11. Spitznagel & Cody (2003) | x | x | x | x | x | x | x | x | x | x | x | x | | | x |
| 12. Williams, Dunn, Bast, & Giesen (2006) | x | x | x | x | x | x | | x | | x | x | x | | x | x |
| 13. Van de Bittner (2006) | x | x | x | x | x | x | | x | x | x | x | x | x | x | x |
| 14. Hall (2006) | x | x | x | x | x | x | | x | x | x | x | | | x | x |
| 15. Owings (2007) | x | x | x | x | x | x | | x | x | x | x | | | x | x |
| 16. Field (2008) | x | x | x | x | | x | | x | x | x | x | x | | x | x |
| 17. Hankins (2009) | x | x | x | x | x | x | | x | x | | x | x | | x | x |
| 18. Tracy & Wallace (2010) | x | x | x | x | if needed | x | | x | x | x | x | x | | x | x |
| 19. Van de Bittner & Toyofuku (2010) | x | x | x | x | if needed | x | | x | x | x | x | x | x | x | x |
| 20. Shahnasarian (2011) | x | | x | x | | | | x | | | | | | x | x |
| 21. Robinson, Pomeranz, & Young (2012) | x | x | x | x | x | x | | x | x | x | x | x | | x | x |
| 22. Robinson & Pomeranz (2011) | x | x | x | x | x | x | | x | x | | x | x | | x | x |
| Total | 22 | 17 | 22 | 22 | 17 | 20 | 4 | 21 | 16 | 13 | 19 | 17 | 4 | 19 | 22 |
| Percent | 100 | 77 | 100 | 100 | 77 | 91 | 19 | 95 | 73 | 59 | 86 | 77 | 19 | 86 | 100 |

*Note.* Rec. Rev. = Record review; Int. = Interview; Test = Testing; Ed. = Education; Wrk. = Work history; TSA = Transferable skills analysis; Voc. Feas. = Vocational feasibility analysis; LMA = Labor market access, labor market research, labor market survey; Age/WLE = Age/Worklife expectancy; Sp. Re. = Special reemployment issues; Plan/RTW Opt. = Rehabilitation plan/return to work options; Plc. = Placeability; JP = Analysis of job placement or return to work efforts; WC = Wage or earning capacity comparison; RPT = Written report

or worklife expectancy issues. Finally, 19% of the methodologies addressed vocational feasibility and an analysis of post-incident return to work efforts.

## Qualifications of a Vocational Expert

The White Paper provided recommended education, certification, and other qualifications of a vocational rehabilitation expert. The qualifications of a vocational rehabilitation expert are greater than those of a rehabilitation counselor, job placement counselor, return to work coordinator, or other direct service provider. The recommended qualifications of a vocational rehabilitation expert in the White Paper will be compared with recommended or required qualifications described in published, peer-reviewed professional journal articles and related publications, as summarized in Table 2 below. The White Paper recommended qualifications of a vocational rehabilitation expert are:

1) *Graduate degree in vocational rehabilitation, the behavioral sciences, human services or a related field;*

2) *Specialized training in the area of vocational rehabilitation as it relates to forensics;*

3) *Certification as a Certified Rehabilitation Counselor (CRC), with no additional experience or Certified Disability Management Specialist (CDMS) and 3 years of experience. Both certifications require passage of a national certification examination, adherence to a code of ethics, continuing education requirements, and a peer review process (certifications are awarded and monitored by the Commission on Rehabilitation Counselor Certification and the Certification of Disability Management Specialists Commission respectively);*

4) *Vocational Rehabilitation Experts have the knowledge, skill, experience, training and education to provide opinions and testimony regarding the effects of impairments and disabilities on employability and earning capacity;*

5) *Membership in relevant professional organizations or associations. (pp. 147–148)*

In terms of qualifications of a vocational expert, Weed and Field noted in the fourth edition of the *Rehabilitation Consultant's Handbook* (2012), "One qualification that generally supersedes other qualifications for expert status is the attainment of a terminal degree or doctorate in a vocationally related area such as guidance and counseling, vocational counseling, and/or vocational rehabilitation counseling" (p. 32). They also recommended relevant professional work experience, professional association membership, knowledge of the current professional literature, and national certification (p. 32).

Johnston and Growick (2003a) summarized their research regarding the qualifications of a vocational expert, as follows:

> To be considered qualified as a VE, the expert should possess some combination of the following: graduate degrees in behavioral science or vocational rehabilitation related fields, specialized training in vocational rehabilitation, professional licensure and certifications administered by recognized rehabilitation groups, demonstrated evidence of expertise via teaching, lectures or publication, association with professional organizations, (Blackwell, 1992; Machovec, 1987; Williams & Reavy, 1993), work experience including vocational assessment, job analysis, and job placement, familiarity with current literature (Havranek, 1997), knowledge of vocational tests, references and resources, and skills allowing one to accurately convey information in depositions, hearings, and trials (Blackwell, 1992). Additionally, the expert should adhere to an ethical code. The ethical codes within the various professional rehabilitation organizations have in common several important traits. It is essential for the expert to identify accurately qualifications, emotionally distance themselves from the referral source, refrain from basing fees on trial outcome, accurately report and represent facts, and maintain levels of confidentiality that protects the clients from unnecessary harm. (Johnston & Klein, 2001) (p. 37)

Berg (2003) reported that, "The vocational rehabilitation counselor assigned must have a master's degree and a certified rehabilitation counselor or American Board of Vocational Experts credential to receive forensic referrals from the state fund" (p. 93). Johnston and Growick (2003b) reported that Employability Assessors retained by the Ohio Industrial Commission are required to, among other things:

> Possess a minimum of a Master's Degree in Rehabilitation, Education, Psychology, or related field; Have five years experience in vocational rehabilitation services; Be certified by the American Board of Vocational Experts (ABVE), or be a Certified Vocational Evaluator (CVE), Certified Rehabilitation Counselor (CRC), or Certified Insurance Rehabilitation Specialist (CIRS). . . (p. 115)

Hultine (2003) reported that according to Nebraska Workers' Compensation law:

> Under Rule 40, the Court may certify a Nebraska Vocational Rehabilitation Counselor (NVRC), if they have completed a Master's degree in Rehabilitation Counseling or a Master's degree in a related field with experience. Recently, the court has simply stated that if the American Board of Vocational Experts (ABVE) has certified an individual as a Vocational Expert (VE), or the Commission on Rehabilitation Counselor Certification has recog-

*nized an individual as a Certified Rehabilitation Counselor (CRC), those professionals are then qualified to complete LOEC's (loss of earning capacity evaluations). (p. 107)*

Van de Bittner (2006) suggested that referring parties consider the minimum requirements for certification as a vocational expert by the American Board of Vocational Experts (ABVE) when retaining a vocational expert. Certification as a vocational expert by ABVE requires a Master's degree or a doctorate in human services or a related field plus 3 years of vocational expert experience at the Fellow level and 7 years of vocational expert experience at the Diplomate level.

Shahnasarian (2011) reported that:

*Vocational experts should hold a graduate degree – preferably a doctorate – in rehabilitation counseling, psychology, or an allied discipline. Other credentials that help qualify practitioners include a state license to practice psychology or mental health counseling, and certification as a rehabilitation counselor, vocational evaluator, or career counselor. (p. 6)*

The California Family Code has established minimum qualifications for vocational training counselors who conduct vocational expert evaluations in marriage dissolution matters. Family Code section 4331(e) (Retrieved on 1/9/12) states:

A vocational training counselor (vocational expert) shall have at least the following qualifications:

a. A master's degree in the behavioral sciences
b. Be qualified to administer and interpret inventories for assessing career potential.
c. Demonstrated ability in interviewing clients and assessing marketable skills with understanding

of age constraints, physical and mental health, previous education and experience, and time and geographic mobility constraints.

d. Knowledge of current employment conditions, job market, and wages in the indicated geographic area.

e. Knowledge of education and training programs in the area with costs and time plans for these programs.

In summary, the White Paper (Austin et al., 2009a) recommended a graduate degree in vocational rehabilitation, the behavioral sciences, human services, or a related field as well as national certification such as designation as a Certified Rehabilitation Counselor by the Commission on Rehabilitation Counselor Certification. When comparing the recommended qualifications in the White Paper with those listed in the 8 published, peer-reviewed professional journals and related texts, it is interesting to note that 100% recommended or required a Master's degree or doctorate in vocational rehabilitation or a related field. Four out of 8, or 50%, recommended or required certification as a vocational expert at the Fellow or Diplomate level by the American Board of Vocational Experts. Six out of 8, or 75%, required designation as a Certified Rehabilitation Counselor by the Commission on Rehabilitation Counselor Certification.

## Ethics and Vocational Experts

The White Paper (Austin et al., 2009a) noted that vocational experts should abide by the code of ethics associated with their professional certification (p. 148). Johnston and Growick (2003a, 2003b) reported that a vocational expert should adhere to a code of ethics and

**Table 2**
*Qualifications of a Vocational Expert*

| Article or Text | Masters or Doctorate | ABVE certification | CRCC certification |
|---|---|---|---|
| White Paper (2009) | x | | x |
| 1. Weed & Field (2012) | x | | x |
| 2. Johnston & Growick (2003a) | x | | x |
| 3. Berg (2003) | x | x | x |
| 4. Johnston & Growick (2003b) | x | x | x |
| 5. Hultine (2003) | x | x | x |
| 6. Van de Bittner (2006) | x | x | |
| 7. Shahnasarian (2011) | x | | x |
| 8. California Family Code (2005) | x | | |
| Total | 7 | 4 | 6 |
| Percent | 100% | 50% | 75% |

follow the principles contained therein. Van de Bittner (2006) commented on the need for vocational experts to abide by codes of ethics with respect to financial conflicts. The Code of Ethics by the American Board of Vocational Experts (2011) and the Code of Professional Ethics for Rehabilitation Counselors by the Commission on Rehabilitation Counselor Certification (2010) each apply to the evaluation of employability and earning capacity.

## Summary and Recommendations

A consensus methodology for evaluating employability and earning capacity by the CA-IARP DFEC Work Group was found to be quite consistent with published, peer-reviewed methodologies. The results of this comparative analysis provide further support to vocational experts as they evaluate employability and earning capacity in a variety of judicial venues and geographic jurisdictions. In addition, the recommended minimum education and certification qualifications in the White Paper were found to be consistent with those recommended in peer-reviewed articles and related publications. The White Paper education and certification qualifications were also found to be consistent with those required by several states regarding vocational expert services. Finally, research for this article revealed consistency between the White Paper recommendation regarding professional ethics with those in peer-reviewed articles published in professional journals.

## References

American Board of Vocational Experts. (2003). Certification requirements and categories. In *Membership directory*. Santa Cruz, CA: Author.

Austin, T., Barzegarian, B., Ciddio, M., Cottle, R., Diaz, F., Ferra, K. P., . . . Winn-Boaitey, K. (2009a). White paper: IARP-DFEC work group (recommended standards for vocational rehabilitation experts in California). *The Rehabilitation Professional, 17*(3), 147-156.

Austin, T., Barzegarian, B., Ciddio, M., Cottle, R., Diaz, F., Ferra, K. P., . . . Winn-Boaitey, K. (2009b). Guidelines to address the nature and scope of a long term loss of income evaluation under *Ogilvie I & II*. (Unpublished).

Bae, R. D., (Ed.). (2012). *Workers' compensation laws of California* (2012 ed.). San Francisco, CA: Matthew Bender and Co., Inc.

Bakkenson, G. (2003). Role and function of the vocational expert in workers' compensation in Arizona. *Journal of Forensic Vocational Analysis, 6,* 99-106.

Berg, J. F. (2003). Evaluating workers' compensation claims for permanent and total disability in Washington State: A forensic vocational rehabilitation methodology. *Journal of Forensic Vocational Analysis, 6,* 89-98.

California Division of Workers' Compensation. (1997). *Schedule for rating permanent disabilities*. Sacramento, CA: Publications & Information Unit.

California Division of Workers' Compensation. (2005). *Schedule for rating permanent disabilities*. Sacramento, CA: Publications & Information Unit.

California Family Code (2005). Section 4331. Retrieved January 9, 2012 from http://www2.courtinfo.ca.gov/protem/courses/support/stats/fc4331.htm

*Code of ethics.* (2007). American Board of Vocational Experts. Retrieved January 6, 2012 from http://www.abve.net/Assets/ABVE_Code_of_Ethics_2007_cover.pdf

*Code of professional ethics for rehabilitation counselors.* (2010). Commission on Rehabilitation Counselor Certification. Retrieved January 6, 2012 from http://www.crccertification.com/

Cohen, M. D., & Yankowski, T. P. (1997, Summer). Methodologies to improve economic and vocational analysis in personal injury litigation. *Litigation Economics Digest, 11*(2), 126-135.

Commission on Rehabilitation Counselor Certification. (2002). *Code of professional ethics for rehabilitation counselors*. Rolling Meadows, IL: Author.

Dillman, E. G. (1998). Interfacing the economic and vocational in personal injury cases. *Journal of Forensic Vocational Assessment, 1*(2), 19-39.

Field, T. F. (2008). Estimating earning capacity: Venues, factors and methods. *Estimating Earning Capacity 1*(1), 5-40.

Hall, R. (2006). *Determining diminished earning capacity in the California workers' compensation program: The "SEDEC" method.* San Diego, CA: Author.

Hankins, A. B. (2009), Assessing the critical concept of earning capacity in forensic vocational analysis. *Estimating Earning Capacity, 2*(1), 67-84.

Havranek, J. E. (1997). *Forensic rehabilitation: A resource for vocational experts*. Athens, GA: Elliott & Fitzpatrick.

Hultine, B. W. (2003). Workers' compensation in Nebraska: An examination of the rehabilitation counselor's role and how the ABVE mentoring program may improve services. *Journal of Forensic Vocational Analysis, 6,* 107-112.

Johnston, C., & Growick, B. (2003a). Utilizing vocational experts in employment discrimination cases. *Journal of Forensic Vocational Analysis, 6,* 27-40.

Johnston, C., & Growick, B. (2003b). The use of vocational experts by the Ohio Industrial Commission: Building a better employability assess-

ment. *Journal of Forensic Vocational Analysis, 6,* 113-125.

LeBoeuf v. WCAB, 34 C3d 234, 193 CR 549, 48 CCC 587 (1983).

Machovec, F. J. (1987). *The expert witness survival manual.* Springfield, IL: Charles C. Thomas.

*Ogilvie v. City and County of San Francisco,* Opinion and Decision **after Reconsideration,** En Banc, WCAB No. ADJ1177048 (SFO 0487779), 74 CCC 248 (2009, February 3).

*Ogilvie v. City and County of San Francisco,* Opinion and Decision **after Reconsideration,** En Banc, WCAB No. ADJ1177048 (SFO 0487779), 74 CCC 1127 (2009, September 3).

*Ogilvie v. WCAB* and *City and County of San Francisco v. WCAB,* California District Court of Appeal, A126344; A126427 (2011).

Owings, S. (2007). *A rehabilitation counselor's practical and historical guide to earning capacity assessment.* Athens, GA: Elliott & Fitzpatrick.

Robinson, R., & Pomeranz, J. (2011). The vocational and rehabilitation assessment model (VRAM): Introduction of an empirically derived model of forensic vocational and rehabilitation assessment. *The Rehabilitation Professional, 19*(4), 91-104.

Robinson, R., Pomeranz, J., & Young, M. E. (2012). Identification of construct domains and variables considered core to vocational earning capacity assessment in a legal-forensic setting: A Delphi study. *Forensic Rehabilitation and Economics, 5*(1), 5-34.

Shahnasarian, M. (2011). *Assessment of earning capacity* (3rd ed.). Tucson, AZ: Lawyers & Judges.

Spitznagel, R. J., & Cody, L. S. (2003). The role and functions of vocational experts in workers' compensation in Florida. *Journal of Forensic Vocational Analysis, 6,* 127-134.

Toppino, D. C., & Agrusa, J. (2000). Earnings capacity mitigation: Three paradigms and a common investigative approach. *Journal of Forensic Vocational Analysis, 3*(1), 55-66.

Toppino, D. C., & Boyd, D. (1996). Wage loss analysis: Vocational expert foundation and methodology. *American Rehabilitation Economics Association Journal, 1*(1), 1-12.

Tracy, L., & Wallace, A. (2010). The impact of case law on vocational expert examinations and opinions in marital dissolution. *The Rehabilitation Professional, 18*(1), 19-30.

Van de Bittner, E. E. (2003). Evaluating workers' **compensation** claims for permanent and total **disability in California:** A vocational rehabilitation methodology. *Journal of Forensic Vocational Analysis, 6,* 77-88.

Van de Bittner, E. E. (2006). Determining diminished future earning capacity in state workers' compensation: The California model. *Journal of Forensic Vocational Analysis, 9,* 19-31.

Van de Bittner, E. E., & Toyofuku, M. I. (2010). Combining medical and vocational evidence to achieve accurate permanent disability ratings under *Ogilvie* in workers' compensation cases in California. *Journal of Forensic Vocational Analysis, 13*(1), 9-22.

Weed, R. O., & Field, T. F. (2012). *Rehabilitation consultant's handbook* (4th ed.). Athens, GA: Elliott & Fitzpatrick.

Williams, J. M., Dunn, P. L., Bast, S., & Giesen, J. (2006). Factors considered by vocational rehabilitation professionals in employability and earning capacity assessment. *Rehabilitation Counseling Bulletin, 50*(1), 24-34.

## Author Notes

Eugene E. Van de Bittner is a certified rehabilitation counselor, certified life care planner, Diplomate with the American Board of Vocational Experts, and president of Mirfak Associates, Inc. in Walnut Creek, California.

Ann Wallace is a certified rehabilitation counselor, certified life care planner, and a Diplomate with the American Board of Vocational Experts. She is also a Social Security Vocational Expert, Licensed Marriage and Family Therapist, and president of Wallace & Associates, Inc. in Santa Ynez, California.

Robert B. Cottle is a vocational rehabilitation counselor, vocational expert, certified disability management specialist, Diplomate with the American Board of Vocational Experts, and is president of Robert Cottle & Associates in Walnut Creek, California.

Scott Simon is a certified rehabilitation counselor, licensed marriage and family therapist, Diplomate with the American Board of Disability Analysts, and president of The Simon Group Inc., in Los Gatos, California.

Case 3:19-md-02885-MCR-HTC   Document 1343-42   Filed 08/21/20   Page 33 of 33