**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG   )   Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,   )
                              )   Gainesville, Florida
                              )   August 21, 2020
                              )   1:00 p.m. EST
                              )
                              )
_____)

**TELECONFERENCE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-133)

## A P P E A R A N C E S

FOR THE PLAINTIFFS:            **BRYAN F. AYLSTOCK, ESQUIRE**
                               **NEIL D. OVERHOLTZ, ESQUIRE**
                               Aylstock, Witkin, Kreis & Overholtz
                               17 E Main Street, Suite 200
                               Pensacola, Florida  32502

                               **MAXWELL H. KELLY, ESQUIRE**
                               **DAVID R. BUCHANAN, ESQUIRE**
                               Seeger Weiss, LLP
                               55 Challenger Road, 6th Floor
                               Ridgefield Park, New Jersey  07660

                               **MICHAEL A. SACCHET, ESQUIRE**
                               Ciresi Conlin LLP
                               225 South 6th Street, Suite 4600
                               Minneapolis, Minnesota  55402

                               **AMANDA J. HUNT, ESQUIRE**
                               Clark Love & Hutson, GP
                               440 Louisiana Street, Suite 1600
                               Houston, Texas  77002


FOR THE DEFENDANTS:            **MARK J. NOMELLINI, ESQUIRE**
                               Kirkland & Ellis, LLP
                               300 N Lasalle
                               Chicago, Illinois  60654

**MICHELLE SIX, ESQUIRE**              **JAY L. BHIMANI, ESQUIRE**
Kirkland & Ellis, LLP                  Dechert, LLP
601 Lexington Avenue                   633 W 5th Street, Suite 4900
New York, New York 10022               Los Angeles, California  90071

```
 1                      P R O C E E D I N G S
 2           THE COURT:  Good afternoon, everyone.  This
 3   is Judge Jones.  I know we have a number of parties
 4   online.  So why don't I just find out who is going to
 5   be speaking on behalf of each of the parties rather
 6   than doing a whole rollcall.  So let's start with the
 7   Plaintiffs.
 8           Who is present and will be speaking on behalf
 9   of the Plaintiffs?
10           MR. AYLSTOCK:  Good afternoon, Your Honor.
11   This is Bryan Aylstock.  Mr. Michael Sacchet, Neil
12   Overholtz, Max, as well as Amanda Hunt will be
13   primarily speaking for the Plaintiffs.
14           THE COURT:  Okay.  And on behalf of the
15   Defendants, who is present and going to be speaking on
16   behalf of the Defendants?
17           MR. BHIMANI:  Good afternoon, Your Honor.
18   This is Jay Bhimani from Dechert.  I will primarily be
19   speaking.  But also on the line and who may address
20   some of the issues are Mark Nomellini and Michelle Six
21   from Kirkland & Ellis.
22           THE COURT:  Okay.  Good afternoon to
23   everyone.
24           What we have scheduled for a hearing this
25   afternoon was the Defendants' Motion for Protective
```

1    Order, and this relates to the Rule 30(b)(6)

2    deposition notices, and this is ECF 1332.

3            And it looks like we have about nine of the

4    topics in dispute.  The parties, through

5    meet-and-confers, have successfully worked out some of

6    the other issues.  Plaintiffs have withdrawn some,

7    Defendants conceded on some, and you've worked out

8    some.  And now you are at loggerheads over Topics 2,

9    3, 5, 10, 11, 12, 13, 17, and 18.

10           So I think the most efficient way of

11   addressing these is -- you know, the burden here is on

12   the Defendants; they filed the motion, and they are

13   requesting a protective order from the Court.  So I'll

14   generally first hear from the Defendants, and then

15   we'll go through each of the topics.

16           They are, for the most part, separate issues.

17   There might be a little overlap with some of them.

18   But I think the most efficient is I can hear from the

19   Defendants generally their position, and then we can

20   address, to begin with, Topic 2; I can stop there.

21   I'll hear from the Plaintiffs, their general overview

22   in response to Topic 2; and then we can go back and

23   forth like that on each topic.

24           So let's start with the Defendants and let me

25   hear from them first.

1      **MR. BHIMANI:**  Yes, Your Honor.  For the
2  record, this is, again, Jay Bhimani from Dechert.
3          I'll try not to repeat what's in the briefs.
4  I know Your Honor has looked at that.  But before we
5  do as Your Honor suggests and go through the topics, I
6  do want to set the stage a little bit and talk about
7  what has happened already; because, as Your Honor has
8  probably seen from Defendants' papers, we think that
9  is really essential and dispositive of Plaintiffs'
10  request here for a fourth 30(b)(6) deposition.
11          So, historically, there have been three
12  30(b)(6) depositions already; those happened in
13  October, November, and December of 2019, and they
14  covered an array of issues.  The witnesses there were
15  Mr. Myers, Mr. Berger, and Mr. Moses, who, as between
16  them, have responsibilities relating to marketing,
17  technical, and the product itself.
18          So these were not issues that were limited in
19  any way to any particular affirmative defense or the
20  government contractor defense.  They really span the
21  breadth of the litigation in all sorts of issues, as
22  Plaintiffs' prior notices themselves sort of evidence.
23          And the prior 30(b)(6) deposition testimony
24  was not a small undertaking.  The testimony on the
25  record spanned over 20 hours; it covered over 40

1    topics.  Preparing for those depositions was an

2    extraordinary burden for the company.  As each of the

3    witnesses laid out in their own depositions, it took

4    extensive preparation for these witnesses.

5          Mr. Myers, for example, testified that he

6    spent seven full days of preparation, and those are

7    eight- or nine-hour days, and that's exclusive of

8    interviewing the people that he interviewed and the

9    work that others at the company did to come up with

10   the responsive information.

11         And there were, in addition to the testimony

12   itself, binders with responsive information organized

13   for the Plaintiffs in response to their prior topics

14   with literally thousands of pages of responsive

15   information.  And, as Your Honor might imagine,

16   putting that together, again, was no small

17   undertaking.

18         It was with this context that we came into

19   July of 2020 and received correspondence from

20   Plaintiffs about another 30(b)(6), and in that

21   correspondence there were referenced issues about TJR

22   Aearo Mexico and net worth issues.  And so we sort of

23   understood that to be the scope of the notice that we

24   were to expect and were, frankly, a bit surprised when

25   we received a notice that was far broader than those

1    issues.

2           Your Honor is correct that, with respect to

3    some of the topics, they have been withdrawn; on

4    others, Defendants have already agreed to put up a

5    witness primarily on the TJR topics that Defendants

6    recognize and acknowledge are new topics and something

7    that is appropriate to be addressed.

8           But the witness that we have put up on those

9    TJR topics, Annette Childress, cannot possibly cover

10   in any reasonable way the remaining topics that are in

11   dispute between the parties, which, again, encompass

12   essentially all of the key issues -- many of the key

13   issues, at least, in the litigation, and many of which

14   were addressed in these prior depositions that took

15   three witnesses and 20 hours and much more in terms of

16   prep to prepare and have be deposed.

17          Just very quickly, as kind of table setting,

18   I want to just address the big argument that the

19   Plaintiffs make in their opposition papers, the first

20   of which is a suggestion that the initial 30(b)(6)

21   depositions that were taken were sort of initial

22   depositions to, quote, "get a lay of the land."

23          And I would respectfully submit, Your Honor,

24   that that was not the purpose of those initial

25   depositions or the scope of those depositions.

1          For the proposition that these were initial

2     depositions to get the lay of the land, the Plaintiffs

3     cite a transcript from about a year ago, but the

4     transcript actually doesn't ever use the phrase "lay

5     of the land," and it doesn't say anything about the

6     three depositions that occurred at the end of 2019

7     being initial depositions.

8          There's discussion about the first round of

9     these three depositions that occurred last year

10    getting scheduled, but that's what the discussion is

11    limited to.

12          And in fact, as Your Honor can see from the

13    chart that we have provided with our brief that sort

14    of lays out the topics that were included in those

15    notices, they were very broad, and they overlap with

16    the topics that are in Plaintiffs' fourth deposition

17    notice.

18          The second thing that Plaintiffs suggest in

19    their papers is that the first three depositions were,

20    again, focused on the government contractor defense.

21    And, Your Honor, that's just not right.

22          Again, we provided a chart, and we've also

23    provided annotated transcripts of the depositions

24    themselves with an acknowledgment that it is not an

25    easy task for Your Honor to kind of dig through the

1   prior testimony.  We've tried to make it as easy as
2   possible for Your Honor to look at the testimony and
3   to see the breadth of the testimony that was provided
4   both beyond the government contractor defense and
5   addressing the topic that we're dealing with here
6   today.  And it's just -- it's not limited.

7          And that's consistent with the parties' 26(f)
8   report that was filed earlier in the case where it was
9   clear to everybody that government discovery could
10  fully proceed, and that is exactly what happened.

11         There's also a suggestion in Plaintiffs'
12  papers that document productions were ongoing and that
13  it was always understood that there would be a need
14  for supplemental 30(b)(6) depositions.  And again,
15  that's not right.

16         We can address that in a little bit more
17  detail as we go through each of the topics.  But I
18  would submit to Your Honor, when we get to it, the
19  Operation Cobra topic is sort of the perfect example
20  of why Plaintiffs' arguments as to the nature of the
21  document productions just don't hold water.

22         And finally, the last rebuttal point that
23  I'll preview for Your Honor before we get to the
24  topics themselves is this idea that Defendants'
25  witnesses somehow were not prepared or were instructed

1    not to answer in the prior deposition.

2          And taking those in turn, sure, there are

3    some instances in which a reasonably prepared 30(b)(6)

4    witness may not remember a specific detail about a

5    specific issue.  But, again, as Your Honor has heard

6    from Defendants on other issues, it is not perfection

7    that is required under the rules; it is

8    reasonableness.

9          We think that the scope of the testimony, the

10   preparation that went into these prior depositions

11   speaks for itself.  There were very limited issues on

12   which the witnesses said that they did not have a

13   memory.

14         If the Plaintiffs thought that those were

15   material, the proper remedy, under the cases that

16   we've cited in our brief, would have been to move to

17   compel further testimony after the deposition

18   concluded.  And of course, that never occurred here.

19         And with respect to the idea that witnesses

20   were instructed not to answer, that's not the case

21   either.  And again, some of this we can go through in

22   more detail for individual topics.

23         But just as an example, with respect to Topic

24   2, the Plaintiffs suggest, quote, that Mr. Berger, who

25   is a 30(b)(6) witness on technical issues, was

1    repeatedly instructed not to answer questions

2    concerning blister packaging on the grounds that such

3    questions were outside the scope of Plaintiffs' prior

4    topics.  And if you look at the testimony that's cited

5    there, it doesn't support that proposition.

6         Mr. Berger did not answer an initial question

7    about whether he recalled a specific blister card, but

8    he testified at length in response to questions about

9    the design of the blister card and many, many other

10   issues that are now within the scope of the new

11   Topic 2.

12        And it's a similar issue with respect to the

13   recollection issues.  Plaintiffs argue that Mr. Berger

14   had no recollection of the blister packs, and again,

15   that's just not right.  And even beyond that,

16   Mr. Myers and Mr. Moses, who were the other 30(b)(6)

17   witnesses, testified at length on those issues.

18        And there are other examples; I won't get

19   into each of them now.  We can do that when we get to

20   the topics.  But, again, I think that the transcripts

21   themselves and the scope of the prior notices speak to

22   the reasonableness point, which is, you know,

23   Defendants have taken their obligations under Rule

24   30(b)(6) seriously.  Plaintiffs have gotten a lot of

25   discovery in the 20 hours of 30(b)(6) testimony that

1   they've already taken, and we would submit there is no

2   cause for a fourth deposition at this point.

3        **THE COURT:**   Let me ask you one question

4   before I hear from you specifically on Topic 2, so, on

5   the issue of were the 30(b)(6) limited to just the

6   government contractor defense or were they full

7   depositions including on the merits.

8        And quite frankly, it's a little bit gray on

9   that.  But, am I correct that, when you look at the

10  government contractor defense, certainly with regard

11  to some of those issues, they bleed over into merits

12  issues?

13       You know, for instance, notice, you know, *Did*

14  *you know there was a defect and did you fully inform*

15  *the government about the defect*; so in order to get

16  into that issue, you have to talk about the defects,

17  what are the defects, what are the problems, and then

18  what, if anything, did you communicate.

19       So, I guess my point is, am I correct that,

20  even if in some way the deposition was -- the

21  30(b)(6)'s were limited to the government contractor

22  defense, by necessity they would have gotten into the

23  merits; and that is why, quite frankly, there is

24  certainly some testimony in the prior 30(b)(6)'s that

25  deal with what we would call merits type issues.

1          Is that accurate?

2          **MR. BHIMANI:**  Yes, Your Honor, that is

3     accurate.  So I would add one layer of additional

4     nuance to that, which is to say, Your Honor is

5     absolutely correct that, even if these depositions

6     were limited to that defense -- which we submit that

7     they are not -- they would have touched on many, many

8     substantive issues just incidentally that overlap with

9     that defense.

10         I would just make clear, though, for the

11    record, Your Honor, that it's not as though the

12    questioning or the topics were limited in some way or

13    that there was an instruction that, you know, to the

14    extent there were questions asked that went beyond the

15    scope of the government contractor defense, that that

16    would not be testimony that was provided.

17         So, it wasn't -- it didn't act as a

18    limitation.  But Your Honor is, of course, correct

19    that there are overlapping issues that came up, which

20    is, frankly, a reason that the depositions were not

21    limited to a narrow issue; nor do think that, you

22    know, there really would be a reason to take 20 hours

23    of deposition testimony about the government

24    contractor defense.

25         **THE COURT:**  Okay.  Well, let me hear your

1   specific comments regarding Topic 2.

2        **MR. BHIMANI:**  Absolutely.  So, with respect

3   to Topic 2, Topic 2 deals with blister packs.  This

4   was a topic that was covered by Mr. Myers in his

5   October 2019 deposition.

6        We've provided, again, annotated transcripts

7   that highlight at least some of the testimony that we

8   think addresses the issues.  I can give examples of

9   that.

10        But in the meet-and-confer process,

11   Plaintiffs sort of addressed three different areas

12   that they contended were gaps in Mr. Myers's

13   testimony.  And so, in our brief, we tried to explain

14   and address why those three areas were not actually

15   the subject of any kind of gap in Mr. Myers's

16   testimony.  So I can go through each of those.

17        The first one was a gap relating to what

18   Plaintiffs said were the specific locations and

19   settings where the blister packs were distributed and

20   sold.

21        As we lay out in our brief, that is actually

22   not a gap in Mr. Myers testimony.  Mr. Myers's

23   testimony on this is that, in order to answer that

24   question, which he was asked that at his 30(b)(6)

25   deposition, is that he would need to check his

records.  And in fact, he did bring the records to his
deposition, and within the records, which he said at
his deposition, is a spreadsheet that shows the sales
of the blister packs.  And so we think that there was
responsive information provided in the deposition on
that very question.

The second gap that the Plaintiffs identified
was the, quote, "chronology and reasoning behind the
edits to the blister pack labeling with respect to the
fitting tips."

And again, here Mr. Myers and his team spent
dozens of hours preparing a binder that has packaging
and labeling information organized for the Plaintiffs
in chronological order.  He brought that binder with
him to his prior 30(b)(6) deposition.  There's over a
hundred pages of material in the binder.  He was
questioned in detail on issues relating to the edits
that were made to the labeling on the blister packs,
which is exactly the gap that the Plaintiffs have
identified.

I would point Your Honor specifically to
testimony on page 389, which is highlighted, in
Mr. Myers's 30(b)(6) transcript where he's asked about
those exact issues.

And again, Your Honor, I would submit that,

1    to the extent Plaintiffs thought that Mr. Myers was

2    not adequately prepared to address these issues, they

3    could have sought to compel better answers, and they

4    didn't, nor do we think that they needed to because

5    Mr. Myers addressed these issues in detail.

6          The third and final gap that the Plaintiffs

7    identified was with respect to, quote, "patent

8    coverage with respect to the blister packs."

9          As a threshold matter, we would submit that

10   that's not a reasonably particular request.  There's

11   no detail on what precisely Plaintiffs are interested

12   in as it relates to patent coverage.

13         Mr. Moses -- not Mr. Myers, but Mr. Moses did

14   testify about a number of issues with respect to

15   patents in his deposition, and that's highlighted for

16   Your Honor.

17         But, again, to the extent that there were

18   some specific factual issues that Plaintiffs wanted to

19   follow up about, they either could have moved for that

20   at the time or, frankly, you know, served some written

21   discovery or find some lesser burdensome ways to get

22   that information, to the extent it's relevant.  And we

23   previewed that in our papers also.

24         And just as a general matter, with respect to

25   all of these gaps, the Plaintiffs have pointed to

1    Mr. Myers's deference to somebody in technical as a

2    reason to say that somehow he was not adequately

3    prepared to address these issues.  But Mr. Myers --

4    that's not the full story.

5           Mr. Myers identified Mr. Berger as a member

6    of the technical group.  And of course, Plaintiffs

7    have deposed Mr. Berger for four days as a 30(b)(6)

8    and then in his individual capacity and had ample

9    opportunities to ask any questions they had for him.

10          And Plaintiffs have also deposed Cyd Kladden,

11   who is also in the technical group and have answered

12   Plaintiffs' questions in detail also.

13        **THE COURT:**  So, one question.  Tell me about

14   the binders.  You reference that your 30(b)(6)

15   witnesses had detailed binders they brought with them

16   that I understand, I guess, they were made available

17   to the Plaintiffs in their questioning.

18          Were these simply a collection of documents

19   that had been produced, or were these outlines, or

20   notes, or all of the above, or something else?

21        **MR. BHIMANI:**  Yes, Your Honor, so there's

22   folks on the line who were at those depositions,

23   including Mr. Nomellini, who may be able to shed

24   additional light.  But I can, at a high level, answer

25   your question to say they included several things.

1           My understanding is the witnesses each

2    produced handwritten notes that they had themselves

3    taken in the course of interviewing people to get up

4    to speed on the various topics.  And so one of the

5    witnesses -- I don't recall which one at the moment --

6    oh, sorry -- Mr. Moses produced 47 pages of the notes

7    that he had prepared in preparing himself for the

8    deposition.  So that is one thing that was produced.

9           The other thing that was produced, my

10   understanding, is produced documents sort of in an

11   order than made more sense than just kind of their

12   production order that addressed the topics that were

13   requested in Plaintiffs' prior notices.

14           **THE COURT:**  Okay.

15           **MR. NOMELLINI:**  Your Honor --

16           **THE COURT:**  Yes, go ahead, Mr. Nomellini.

17           **MR. NOMELLINI:**  -- I can provide a little

18   more detail on that, if Your Honor wants some.

19           So, some examples of some of the binders

20   Mr. Myers brought are, one, a bill of materials for

21   each of the Combat Arms related products, and it

22   indicates what would be included in the packaging by

23   number.

24           Then, a second binder was the actual artwork

25   and inserts that were included in packaging materials.

1    And then another binder was a more extensive version
2    of the packaging and labeling materials that had
3    packaging and labeling in chronological order,
4    including materials that Mr. Myers instructed
5    employees to go to an Iron Mountain storage facility
6    to retrieve.
7           Another binder included a spreadsheet with
8    every sale on the CAEv2 over the last 20 years and had
9    over fifty fields of information on each sale,
10   including dates of sales and orders, price, quantity
11   of units sold, entities who received the shipments,
12   purchaser identity, shipping destination, and the 3M
13   or Aearo representative who was involved.
14          And another binder -- I could keep going, but
15   there's another one that had the notes of the
16   interviews that he conducted.  He conducted
17   approximately 20 interviews to prepare for his
18   30(b)(6) deposition, so he included those.
19          A section containing organizational charts of
20   the company so he could identify people who were
21   involved; a section relating to the creation of a
22   national stock number; a section relating to labeling
23   instructions from the government; a section relating
24   to government procurement contracts and a licensing
25   agreement; a section related to distributor

1       agreements; and then documents relating to the

2       acquisition of Aearo.

3               And I would just note with these that these

4       weren't just mass productions of documents in binders.

5       Mr. Myers and others who worked under him, in

6       preparation for the 30(b)(6) deposition, spent a great

7       deal of time organizing them so that they were in a

8       logical order and could be helpful to Plaintiffs.

9               **THE COURT:**  So, for example -- because I'm

10      just trying to envision the use of these at the

11      deposition.

12              So, if, for example, the witness was asked

13      about sales during a certain period of time or to a

14      certain facility or base or customer, the witness

15      wouldn't have all that information in his or her head;

16      the witness would simply refer to the binder and say,

17      *The information* -- because, obviously, he wouldn't

18      have personal knowledge of that -- *The information*

19      *that reflects the sales over the last 20 years is*

20      *Exhibit 12 in the binder*.

21              Did it work that way during the deposition?

22              **MR. NOMELLINI:**  That's correct, Your Honor.

23      And in addition, in some cases, the witness actually

24      went to the binder and looked up the relevant row in

25      the binder to find out, for example, when was the

1    first sale of product X, so the witness would consult

2    the spreadsheet to find that information.  But in

3    addition, the witness would sometimes say that

4    information would be in the binder; and sometimes

5    counsel would ask the witness to follow up on it and

6    look at the binder, and sometimes they would not.

7         **THE COURT:**  So, lastly, before I hear from

8    the Plaintiffs on the blister pack issue, if you can

9    call it that.  The Plaintiffs want to find out

10   information concerning the warnings that were

11   essentially on the blister packs and why certain

12   things were included or not included.

13        And you're saying that, with at least one of

14   these 30(b)(6) witnesses, in the binders were the

15   company's best knowledge as to what blister packs were

16   used -- what labeling and blister packs were used over

17   the course of the sale of this product, but the

18   witnesses did not have information on the reasons why

19   certain things were included or not included or were

20   added or removed.  Is that correct?

21        **MR. NOMELLINI:**  Your Honor, with respect to

22   the chronology, yes, that is in the binders.  In terms

23   of the reasons, you know, this change we made for X

24   reason, as Mr. Bhimani said, in some cases, Mr. Myers

25   would say that that is an issue for the technical

1    group; and Plaintiffs then deposed Mr. Berger and Cyd

2    Kladden.

3          Cyd Kladden is actually the person who was

4    involved in making the change that I think they're

5    most concerned about, and they did not ask Cyd Kladden

6    the reason for the change in her deposition.

7          **THE COURT:**  Okay.  Thank you.  Let me turn to

8    the Plaintiffs, and let me hear from you generally and

9    then you can specifically talk to me about Topic 2.

10          **MR. SACCHET:**  Your Honor, this is Michael

11   Sacchet.  And out of fear of a large *non sequitur*, I

12   am addressing Plaintiffs' opportunity to set the table

13   as a matter of law, even though it does not

14   specifically address Topic 2 and the facts thereto,

15   which Mr. Kelly and others will hop on after me to

16   deal with those nuisances.

17          **THE COURT:**  Okay.

18          **MR. SACCHET:**  But, as a matter of law, as

19   Your Honor recognized, 3M bears the burden here to

20   show good cause under Rule 26.  And they've also cited

21   a number of cases, none of which are remotely

22   analogous to the case at issue.

23          As Your Honor also knows, Rule 26 does set up

24   this good cause standard, and 3M must show an undue

25   burden in order to entitle itself to a protective

1    order for these topics.

2         3M makes no mention of the fact that, beyond

3    a blanket prohibition on these depo topics, Rule

4    26(c)(1) also sets forth numerous other remedies that

5    could suffice instead of a blanket prohibition, such

6    as setting forth specific time limits, perhaps, for

7    certain depo topics under 21(c)(1)(B).

8         But, in any event, zooming back out to this

9    good cause standard of 26(c)(1), 3M's own cases

10   establish that it, quote, "bears a heavy burden to

11   preclude a deposition altogether," and that, quote,

12   "protective orders prohibiting depositions are rarely

13   granted," end quote.  That's from the *Bondhus* case

14   that 3M itself cites.

15        I mean, this is an extraordinary remedy that

16   3M is seeking, notwithstanding the fact that prior

17   30(b)(6) depositions have occurred in this case, and

18   3M simply cannot meet that extraordinarily heavy

19   burden here.

20        First and foremost, to set the stage, putting

21   COVID delays aside, Plaintiffs' notice of these

22   depositions is timely.  They were served on July 24th,

23   and there's a discovery deadline of September 1st.

24        So, the idea that Mr. Bhimani suggested that

25   Plaintiffs have, quote, "requested" a new deposition

1    is a red herring.  Plaintiffs haven't requested a new

2    depo.  We have noticed a new depo under the timeline

3    and within that timeline that the MDL court had set

4    for us to do just that.

5         In addition, Plaintiffs were expeditious in

6    terms of serving this deposition.  The very day the

7    Court dismissed the government contractor defense,

8    which 3M has touted and championed as the key to

9    dismissing this whole case since before this MDL even

10   occurred, Plaintiffs served the depo notice on that

11   day.

12        And ultimately, as a footnote, it would have

13   been anachronistic for Plaintiffs to have served a

14   30(b)(6) depo notice on certain topics like reasonable

15   alternative design because 3M would have simply

16   claimed the government contractor defense preempts the

17   design defect claims.

18        There's also no objection whatsoever for the

19   relevance in -- I mean, there's some objection to

20   proportionality.  But as to relevance, 3M's own brief,

21   except for Topic 11, concedes that every single one of

22   the topics in dispute is relevant as to

23   proportionality under 26(b)(1).

24        I heard Mr. Bhimani, you know, basically say

25   3M is complaining that they had to have a couple of

1    people from their billion dollar company spend a

2    number of days creating binders and prepping for a

3    deposition.  That might be one thing in an individual

4    action like in *Bondhus, Blackwell,* and *Sevi*, the three

5    unpublished cases they cited.  But this is a massive

6    MDL involving a multi if not nearly hundred billion

7    dollar company with billions of dollars at stake.  And

8    to assume that that kind company was overly burdened

9    by having a few employees put together binders and

10   prep for deposition, to me, is truly a head scratcher.

11        I mean, in other MDLs, you know, 30

12   depositions is middle of the road, if not kind of

13   beginning of the road.  In the *Abilify* MDL -- and

14   Bryan can talk more about this than me, but there was

15   much more than even the 31 depos that have occurred in

16   this case thus far.

17        And in any event, we have additional days to

18   conduct more depositions.  So this idea of

19   proportionality, I believe, is misplaced, as is the

20   idea that the original depos were not supposed to be

21   to determine the lay of the land.

22        I mean, I don't know if Mr. Bhimani was

23   involved in the MDL at this time, but I'm looking at

24   an October 2nd, 2019, letter from Kirkland to Dave

25   Buchanan at Seeger Weiss that is accusing Plaintiffs

1   of not being able to do more because the depos were,

2   in fact, for determining the lay of the land.   So the

3   idea that the Plaintiffs had ginned up the idea that

4   these depos were supposed to be just to understand the

5   general issues is contrary to Kirkland & Ellis's own

6   letter to Plaintiffs on October 2nd, 2019.

7           Besides these general --

8           **MR. AYLSTOCK:**   On that, Michael -- I'm sorry,

9   Judge.   Because I was directly involved -- I think I

10  was the one who had made the quote -- and I'm looking

11  at the CMC from 9/27/19 where I talk about we'd like

12  to do some 30(b)(6)'s to get the lay of the land.

13          So Mr. Bhimani wasn't involved in this case

14  at this time, but the letter that Mr. Sacchet

15  references is from Mr. Nomellini, who is on the call.

16  We all know that these depositions were early -- very

17  early in the case, and they were designed to get the

18  lay of the land, to some extent.

19          But what we're not doing and what we're not

20  asking this Court to do is to go rehash stuff that's

21  already been covered.   These are new topics that have

22  not been covered, in fact, could not have been covered

23  at the time because of the fact that we didn't have

24  visibility into a lot of issues that we now have, and

25  we also didn't have a lot of the documents.

1        So I'll pass the torch back to Michael.  But

2   Mr. Bhimani is completely mistaken by saying that the

3   lay-of-the-land comment wasn't uttered, wasn't not

4   only uttered, but a part of this case from the

5   beginning.

6        We all know that it was the Defendants that

7   wanted to tee up government contractor first, the

8   Court was okay with that, and we proceeded along that

9   course.  And we did do these depositions to get the

10  lay of the land, and Mr. Nomellini well knows that

11  because he put it in writing to Mr. Buchanan shortly

12  after that CMC in objecting to us to go beyond the

13  topics that he wanted us to go in going beyond the lay

14  of the land.

15       **MR. NOMELLINI:**  Your Honor, may I address

16  that, since my name has been mentioned here?

17       **THE COURT:**  Yes, go ahead.

18       **MR. NOMELLINI:**  So, it was Mr. Aylstock, in

19  fact, who said these depositions will be limited to

20  the lay of the land, and then Plaintiffs went far, far

21  beyond that, as any reasonable reader of the

22  transcripts, which we've laid out and highlighted in

23  detail, can show.

24       And when we tried to say, no, these should be

25  limited because it's just lay of the land, Plaintiffs

1    went far beyond that.  The proof of that is in the

2    actual transcripts.  I was there, and these

3    depositions were not limited to the lay of the land.

4    They went to specific dates, for example, what was the

5    specific date when this product started being sold.

6    Very, very detailed questions.

7           **MR. AYLSTOCK:**  And I'm looking at Mr.

8    Nomellini's letter where he says, quote, "Plaintiffs'

9    overbroad 30(b)(6) topics conflict with the arguments

10   Plaintiffs have used to get early 30(b)(6) depositions

11   scheduled.  For example, on the parties' call on

12   September 26th, Mr. Aylstock justified early Rule

13   30(b)(6) depositions by stating they were designed to

14   get, quote, 'the lay of the land,' end quote, and,

15   quote, 'set the stage,' end quote."

16          So that was the justification.  Mr. Nomellini

17   well knows it.  Certainly, where possible, we asked

18   questions, and we're not asking to rehash questions.

19   But we have learned a tremendous amount since that

20   period of time.  We were limited in what we knew, we

21   were limited in what we were allowed to ask, and we

22   were limited by Mr. Nomellini himself saying,

23   *Objection, you may not answer that in the corporate*

24   *capacity.*

25          So we can get to those details with regard to

1   the individual topics, and I'm happy to do so.  But

2   this idea that somehow we've waived or we were laying

3   in wait on this is completely belied by the parties'

4   conduct and Mr. Nomellini's own letter where it

5   absolutely was quoting me saying these were

6   lay-of-the-land type depositions.

7           **MR. NOMELLINI:**  That's exactly right, Your

8   Honor, I was quoting Mr. Aylstock saying that's how

9   the depositions would be limited.  I was not quoting

10  myself.  I was saying Mr. Aylstock said the

11  depositions would be limited to that.

12          And then what did they actually cover?  You

13  don't need to listen to me or Mr. Aylstock.  You can

14  look at the transcripts of the depositions and the

15  exhibits thereto.  They're exhaustive.  There were

16  detailed binders prepared, there are detailed

17  questions that went far beyond the lay of the land.

18  We tried to get a limit to that, and we did not

19  succeed.  Plaintiffs went far beyond that.

20          Plaintiffs were also told by the Court -- by

21  Judge Rodgers, *There are additional documents being*

22  *produced; do you still want to go forward?*  And they

23  said yes.

24          So I think that the answer, instead of from

25  me or Mr. Aylstock, is the Court can just look at the

```
 1    actual questions that were asked.  They're not just
 2    lay-of-the-land questions by any stretch of the
 3    imagine.
 4           The actual binders that were prepared, the
 5    actual exhibits that were used, it speaks for itself;
 6    and we'll see that as we get into the individual
 7    topics.
 8           MR. AYLSTOCK:  I think we're going down a
 9    rabbit hole; but what I heard Mr. Bhimani say is that
10    I never said that and that was not the context of the
11    deposition.  So I did say it.  It is on the record.
12    It is in the record.  And I heard Mr. Bhimani tell the
13    Court the exact opposite.  That's simply not true.
14           MR. NOMELLINI:  Well, the point is that Mr.
15    Aylstock did say it.
16           THE COURT:  Let me just stop y'all there.
17    Just to give some context, you know, my view on things
18    is -- it's an interesting dynamic.
19           In the beginning-beginning, I think the
20    thought was by the Plaintiffs that they would take
21    some 30(b)(6) depositions.  I don't know if "lay of
22    the land" is the correct nomenclature, but these were
23    to set the stage to gain information to allow the
24    issues to refine and develop.
25           And there certainly was some focus or attempt
```

1    to focus on government contractor defense; but as I

2    pointed out, they certainly bleed over into the

3    merits.  I'm not sure there's some demarcation of what

4    information goes to government contractor and what

5    information goes to the merits.

6            And, as Nomellini points out, the deposition

7    transcripts had certainly developed more information

8    than simply getting the lay of the land and setting

9    the stage.

10           But having said that, the task at hand and

11   the exercise right now is to essentially make sure

12   someone doesn't get a second 30(b)(6) notice of

13   deposition of something that reasonably was covered

14   and now they want to ask better questions; or whether

15   this is a situation where, in fairness, there ought to

16   be some or all of these topics examined either because

17   the information was not then developed, was not then

18   aware, or maybe in some instances because a production

19   has been a rolling production because the underlying

20   documentation that supported questioning of certain

21   topics wasn't available to the Plaintiffs.

22           And that's really the dynamic.  So this is

23   not going to win or fall on whether I decide these

24   depositions were just, you know, set-the-stage

25   depositions or these depositions were meant from day

1    one to cover everything under the sun.  And, you know,

2    we can compare the testimony, we can compare the

3    topics.

4          But that leads us -- this is a good segue

5    into Topic No. 2, which deals with the blister

6    packages.

7          And, yes, there was questioning -- well, as

8    Mr. Nomellini points out, the samples or exemplars of

9    the blister packages and those kinds of things were

10   available at the 30(b)(6) depositions.

11         There were questions asked of the witnesses

12   about the reason for the changes in particular having

13   to do with the fitting issue.  The response at the

14   deposition was, *Well, those changes were determined by*

15   *the technical people*.

16         But the issue on that becomes whether there

17   actually was ever information provided by the

18   technical people that answered that question.

19         So what was learned from the deposition was

20   the decision-making was a technical issue, not an

21   overall high-level marketing issue; it was a technical

22   issue.  But I'm not sure in the record if there is

23   30(b)(6) deposition testimony that tells us what the

24   technical people actually determined.

25         I know there was some mention that there was

1   a deposition of Cyd Kladden, but I don't think that

2   was a 30(b)(6) notice; that was just an individual

3   deposition.

4        But, having said all of that, in fairness,

5   let me give Plaintiffs a chance to talk about Topic

6   No. 2 and why you ought to be able to go into Topic

7   No. 2 even though there was questioning, and you can

8   look at prior deposition notices and see there was

9   some reference in topics about labeling and those

10  kinds of things.

11       **MR. KELLY:**  Good morning, Your Honor.  This

12  is Max Kelly on behalf of Plaintiffs -- or good

13  afternoon, Your Honor.

14       You pointed to the fact that Ms. Kladden's

15  subsequent deposition testimony was not in a 30(b)(6)

16  corporate designee capacity, it was in her individual

17  capacity.  That is one reason why that later testimony

18  does not fill the gap that Plaintiffs are now trying

19  to fill.

20       The other reason why that testimony does not

21  fill that gap is because Ms. Kladden was unable to

22  provide substantive testimony on that issue.  Despite

23  representations by Defense counsel in this call,

24  Ms. Kladden was not involved in -- or Ms. Kladden

25  testified at least that she was not involved in

1   changing those fitting tips; she was guided by someone
2   else.  She does not know who reviewed and drafted
3   changes to labeling.  She said she was just provided
4   with the fitting instructions to use.  She had no
5   recollection of the specific language.
6        And essentially it's difficult for Defendants
7   to say that we have later testimony that fills this
8   gap when that testimony is not only not on behalf of
9   the corporation but the testimony contradicts the
10  other testimony we got.
11       We essentially have a 30(b)(6) deponent and
12  then we have individual Kladden testimony and
13  individual Berger testimony, all of whom are pointing
14  the finger at each other; and we have no position from
15  the company on who was actually involved in this
16  decision; and more importantly, we haven't had the
17  ability to actually elicit testimony on the substance
18  of that decision.
19       I also did want to respond with regard to the
20  111-page binder that Defendants have referred to
21  several times.  As Your Honor noticed, this binder
22  contains the labels, and perhaps they're in
23  chronological order, but it does not get into the why,
24  how, who made the changes.
25       And also, much of the material in there had

1   not been produced prior to the deposition.  We had to

2   have about half of our deposition team break off into

3   a separate room to effectively speed read through the

4   binders that the Defendants provided on the day of the

5   deposition, and it did not create a meaningful

6   opportunity for examination on those points.

7           **THE COURT:**  Okay.  Thank you, Mr. Kelly.

8           Let me go back to the Defendants and let me

9   hear from you.  But that really does seem to be the

10  issue on Topic 2, that you had available in the

11  binders some of the labeling of blister packages, that

12  kind of thing.  Your 30(b)(6) witnesses said this was

13  a technical decision, the technical people made the

14  decision.  They pointed to Kladden.  Kladden was

15  deposed, not as a 30(b)(6), and Kladden said, *I'm not*

16  *sure why that issue was changed*, and it was left

17  there.

18          So, the question to the Defendants is, why

19  shouldn't the Plaintiffs -- and these are individual

20  cases now, they're bellwethers -- why shouldn't they

21  be permitted to take a 30(b)(6) deposition of a

22  company representative to find out, you know, why

23  changes were made and who made the changes?

24          I'm not suggesting this would be the answer,

25  but, you know, the 30(b)(6) witness might say, *We*

1  *don't know.  It was a technical issue.  We don't know.*
2  I mean, maybe that's a possible result.
3          But why shouldn't the Plaintiffs have an
4  opportunity to make examination on that very focused
5  topic?
6          **MR. NOMELLINI:**  So, Your Honor, I'll let
7  Mr. Bhimani address it, but a couple of points.  So,
8  first of all, in Plaintiffs' brief they focused on the
9  chronology and reasoning.
10          So the chronology is provided by the binder
11  which people spent a great deal of time preparing.  I
12  don't hear any issues being raised with that.
13          And with respect to the specific change at
14  issue, that is covered at -- it's a change in 2012, so
15  I think that's the change the Plaintiffs are concerned
16  about.  That is covered at pages 262 and 263 of Cyd
17  Kladden's dep.  And the question about why that change
18  was made was not asked.
19          And we're happy to provide that to Your
20  Honor.  But I think the -- what really -- what it
21  really boils down to is, the reason for the 2012
22  change and that specific question was not asked.  But
23  with that, I'll turn it over to Mr. Bhimani.
24          **MR. BHIMANI:**  Yes, Your Honor.  And the only
25  thing that I would add to that, Your Honor, is, in

1    addition to Ms. Kladden, who was not a 30(b)(6)

2    witness, Plaintiffs did take the deposition for four

3    days, including as a 30(b)(6), of Mr. Berger.

4         And again, to the extent that they believe

5    there were questions that he was not adequately

6    prepared to answer, the procedure under the rules is

7    that they should have filed a motion to compel better

8    answers and not seek a serial 30(b)(6).

9         Now, finally -- you know, this is covered in

10   our brief, so I won't cover it in any detail.  But the

11   Court did raise this issue at the January 2020 CMC.

12   It was raised earlier than that also, but at least by

13   January.  And the Court made very clear, to the extent

14   that there were issues to be raised on 30(b)(6)

15   testimony that had already occurred, it didn't want a

16   situation where the 30(b)(6) issues trickled out over

17   a period of time, that the issue should have been

18   raised then.

19        So, in response to Your Honor's question, I

20   would say they have had an opportunity already in

21   Ms. Kladden's individual deposition and in

22   Mr. Berger's 30(b)(6) and individual depositions over

23   the course of four days.

24        And as we note in our brief and as we said to

25   the Plaintiffs before the motion was filed, you know,

1    we've also indicated a willingness to discuss the

2    designation of that testimony as 30(b)(6) testimony,

3    and so I will note that also, Your Honor.

4        **THE COURT:**  Okay.  Anything else from the

5    Plaintiffs?

6        **MR. OVERHOLTZ:**  Your Honor, just to respond

7    to Mr. Bhimani's point.

8        **THE COURT:**  Oh, yeah.

9        **MR. OVERHOLTZ:**  The Berger's 30(b)(6), the

10   second part, as Your Honor knows, we scheduled in

11   December when we got additional documents.

12   Specifically, questions related to blister packs were

13   objected to as -- not that he -- it wasn't that he

14   couldn't answer the question.  They were specifically

15   objected to as not covered within our 30(b)(6) notice

16   and the scope of the notice.

17        And secondly, at the same time, down the hall

18   at Kirkland & Ellis in Chicago, they're delivering

19   these notebooks that have, for the first time, these

20   documents related to the packaging of the blister

21   packs.  That's happening down the hall in another room

22   at the same time.  Certainly when I'm questioning

23   Mr. Berger, I didn't have access to those documents

24   that had just been produced.

25        So I disagree with Mr. Bhimani's

1   characterization of Mr. Berger's capability of

2   answering those questions.  It was simply their

3   objection that it was outside the scope entirely.

4        **MR. NOMELLINI:**  And, Your Honor, if I could

5   just clarify that.  On those objections in

6   Mr. Berger's deposition, they were to the effect of

7   it's outside the scope of the 30(b)(6), but you can

8   answer the question, and then he would provide the

9   testimony in his personal capacity.

10        So, what we've offered to do with Plaintiffs

11   is to designate such testimony as 30(b)(6) testimony

12   as a way to address this issue, and that circles back

13   to what Mr. Bhimani was referring to.

14        **THE COURT:**  Yeah, that's a -- I wouldn't say

15   an important point, but yes, that's a point that, from

16   the briefing, I understood that in some instances that

17   was done.  Because, as y'all know, when you have the

18   30(b)(6) notice, you have an obligation to prepare the

19   witness.  And if your interpretation of the 30(b)(6)

20   notice didn't include that and then the witness was

21   not thoroughly prepared from the corporate

22   perspective, that's one thing.  But, you know, if, on

23   the other hand, the witness has personal knowledge of

24   it, that makes sense to allow the witness to testify

25   to it.

1        But, on Topic 2, I am going to allow the

2   Plaintiffs to make examination on it, and I think it's

3   probably necessary.  Using the standard for protective

4   order, based on what's been presented, I don't think

5   the Defendant has met its burden.

6        And here is the problem, and I've alluded to

7   this.  So there was testimony about the blister packs.

8   There was some questioning about the changes.  And the

9   30(b)(6) witnesses said, *That's a technical issue;*

10  *That's not my issue; I'm not prepared on that issue;*

11  *It would have been made by the technical people.*  And

12  the answer from the technical person Kladden wasn't

13  real helpful.  But whether it was helpful or not

14  helpful, that was an individual deposition; that was

15  not a 30(b)(6) witness.

16       So I think, ultimately, the Plaintiffs are

17  entitled to examine someone who will speak on behalf

18  of the corporation as the corporation's witness so

19  that will be the corporation's position.

20       And there's probably a variety of responses:

21  The corporation, despite reasonable diligence and

22  inquiry, doesn't know why the changes were made; We

23  know why the changes were made, we just haven't been

24  able to figure out who was the technical person who

25  suggested the changes.  Or any other combination.

1           But I think the Plaintiffs are entitled to

2     make examination on that issue, even though there

3     certainly was discussion about it in the 30(b)(6)

4     notices.  I think they're entitled to get an answer to

5     that question, if indeed there is an answer.  And

6     someone will be questioned about why, how, and by whom

7     those changes were made, and certainly the information

8     will be produced.

9           To the extent that, in responding to that

10    topic, the Defendants have to produce information

11    relating to the chronology, that was already in the

12    binder; so that can't be burdensome to have that

13    available for a witness.

14          Now, the precise 30(b)(6) topic in 2 is,

15    quote, "The blister pack containers of the CAEv2,

16    including their assembly, testing distribution, and

17    sale to the U.S. Government, and to any other entity."

18          So my question is -- and this is directed to

19    the Plaintiffs -- is:  What is the extent -- or how do

20    you interpret the breadth of that topic?  Just so we

21    don't run into a problem a week or so down the road

22    and your focus on that topic is much broader than

23    maybe I'm looking at it.

24          **MR. KELLY:**  Sorry for the delay, Your Honor;

25    I was on mute.

1              So, with regard to this topic, obviously, in

2    our briefing we focus on the changes to the packaging

3    language in the fitting tip for the blister pack.  But

4    effectively, I mean, this topic was not touched on by

5    our prior notices as this -- the blister pack is

6    effectively a different form of packaging that was

7    subject to different testing requirements.

8              I do not believe that at this point

9    Defendants are going to have any sort of 30(b)(6)

10   testimony on the distribution of these products based

11   on Defendants' corporate knowledge of the distribution

12   of other products.

13             But specifically on these, we're interested

14   in those changes to the labeling as well as

15   potentially some topics related to the quality control

16   Aearo Mexico assembly, which my colleague, Mr.

17   Overholtz, can speak to with regard to some later

18   topics.

19             **THE COURT:**  What about the testing, the

20   blister pack --

21             **MR. KELLY:**  Yes, so that's testing -- sorry.

22             **THE COURT:**  Yeah, how does that -- you don't

23   mean testing of the blister pack?  Or, no.  Testing of

24   the product in the blister pack?

25             **MR. KELLY:**  Yes.  And this is, again,

1   something that is going to -- well, actually, I'm not

2   sure.  If the Mexico topics aren't at issue today,

3   then it might not come up.  But Mr. Overholtz has been

4   kind of our specialist on this.  Essentially we've

5   gotten very little testimony or evidence out of Mexico

6   about testing, and it's my understanding that that's

7   -- the testing of these blister packs was not actually

8   at issue in those prior depositions.

9           **THE COURT:**  Okay.  So --

10          **MR. NOMELLINI:**  Your Honor --

11          **THE COURT:**  Go ahead, Mr. Nomellini.

12          **MR. NOMELLINI:**  Yeah, so I think we're

13  shifting a little bit here.  The only question that

14  Plaintiffs have pointed to that the witness did not

15  have testimony for is the reason for the change that

16  was made in 2012, and that was the focus of their

17  brief.

18          So -- and that was the question that they

19  were talking about with respect to Ms. Kladden.  So

20  with respect to Topic 2, it's the reasoning for the

21  change, you know, who -- and Your Honor's question

22  with respect to, you know, when, how, and by whom the

23  changes were made, that is the only question that they

24  pointed to in terms of a change in the blister pack

25  for which the witness could not provide testimony.

1        **THE COURT:**  All right.  What about that,

2  Mr. Kelly?  Because that's certainly the way I'm

3  looking at it on that issue, you ought to be given

4  leave to make inquiry into that.  Is there some other

5  area that you want to inquire about that we haven't

6  talked about?

7        **MR. KELLY:**  Thank you, Your Honor.  I

8  actually believe that those other nonlabeled,

9  noninstruction, nonwording related topics that would

10  be within the literal scope of Topic 2, we've actually

11  -- the issue related to testing that I was alluding to

12  I think is actually covered in the Mexico topic that

13  we've already agreed on.

14        So this is -- I think that with regard to

15  Topic 2, specifically it's those changes to fitting,

16  labeling, instructions, and warnings.  And again,

17  although we already have information on the chronology

18  of those changes, we have been unable to get discovery

19  on who made those changes and why.

20        This also relates, Your Honor -- I wanted to

21  raise now, this also relates to Topics 5 and 10.  We

22  were under a very tight briefing schedule on this, as

23  Your Honor knows, and there was an error with regard

24  to headings in our document where our arguments on 5

25  and 10 dropped out of the briefs.

1           The evidence relating to those arguments,
2    though, and ultimately the substance of the arguments
3    themselves are reflected also are in here and
4    ultimately are largely addressed by Topic 2.
5           We are also seeking essentially very similar
6    testimony with regard to Topics 5 and 10 on the same
7    basis, that effectively we have not been able to get
8    from Defendants discovery on what kind of changes were
9    made to the labels when.
10          We have those references in the prior
11   30(b)(6) testimony about vague conversations with
12   technical, and that's effectively the same argument
13   that we've just had on Topic 2, from our perspective.
14          **MR. NOMELLINI:**  Your Honor, just to focus
15   back on Topic 2 for a second, you know, I think Your
16   Honor had it right, it's when, how, and by whom the
17   changes were made in 2012 to the blister pack.  And
18   that's the only thing that they have pointed to that
19   the 30(b)(6) deponent was unable to cover.
20          So I think I'm -- and that is what is
21   addressed in their brief as something that was unable
22   to be covered.  So, for Topic 2, that is the issue.
23          **MR. AYLSTOCK:**  It's broader than just 2012.
24   Obviously, there was a big change in 2012.  But the
25   decision on who, what, when, how, or any changes in

1    the instructions, warnings, and packaging of the

2    blister packs over time is something we would be

3    interested in.  And presumably, preparing them for --

4    whoever it is for 2012, they have got the chronology.

5    But the who, what, how, and when for any change is

6    fairly within Topic 2.  It's certainly something we're

7    interested in and we believe we're entitled to.

8          **MR. NOMELLINI:**  Well, that highlights the

9    issue, Your Honor, because they haven't pointed to any

10   testimony in terms of who, what, how, and when for

11   changes other than 2012 that couldn't be provided by

12   the 30(b)(6) witness, and that's not what was argued

13   in the brief.

14          So, if they didn't ask the 30(b)(6) witness a

15   question about, you know, who or how was the change

16   made in a year different from 2012 and they don't have

17   any evidence of that, then we should focus on what

18   they argued in their brief, which is that there was an

19   absence of testimony on what change occurred in that

20   year and who, how, and when it happened.

21          **THE COURT:**  Well, in fairness --

22          **MR. AYLSTOCK:**  Well, the 30(b)(6) witness

23   just went to technical -- I'm sorry, Judge.

24          **THE COURT:**  In fairness, there isn't other

25   testimony in the 30(b)(6) depositions about

specifically changes in other years because the
general inquiry in that area, the response was those
changes were made by the technical people.  And that's
really what this follow-up is for is to find out what
changes were made in the blister packs and labeling,
what changes, who made the changes, and why the
changes were made.  That's really the area of inquiry.

And Topic 10 is subsumed in this.  This is
the identical issue that we were talking about because
it references the testimony from Myers.

And 5, although there wasn't much argument --
or any argument about it in the brief, relates to this
issue; but 5 is asking about the process for
determining the language in the labeling, and that
might be just slightly different.

So, I guess the question is, was there any
questioning about the process for determining the
language in the labeling or was that subsumed in the
questioning to the 30(b)(6) witnesses where they said,
*Well, that's the technical people suggested those*
*changes*.

**MR. AYLSTOCK:**  That's basically what the
testimony was, Your Honor, everything was pushed off
to technical.  And, you know, it's obviously important
information that we think we need for these cases, and

1    again, it's the Defendants' heavy burden to meet, and

2    they haven't met it.  They haven't pointed to the

3    testimony that says that they met that heavy burden,

4    and because they didn't really.  It was -- obviously

5    the witness was prepped to push a bunch of stuff off

6    to technical, and that's what happened.  And then we

7    get to technical and really it's not a 30(b)(6).

8            **THE COURT:**  Mr. Nomellini, was there specific

9    inquiry of the 30(b)(6) witnesses?  Your argument, I

10   assume, is they didn't ask about any other changes so

11   they can't ask now, right?

12           **MR. NOMELLINI:**  Yes, that's correct, Your

13   Honor.  And he did not push everything off to

14   technical at all.  In fact, there are maybe 20 or 30

15   pages on the blister packs where he talked about the

16   blister packs, people who were involved in them,

17   people who were involved in making changes, the

18   process for that.

19           And so they're focusing on one question where

20   he couldn't provide the reason for a change in 2012

21   and trying to blow it up from there.  We provided

22   specific quotes in our brief where he talked --

23   testified specifically about the process, including

24   with respect to the blister packs.

25           So there is a great deal of testimony.  And

1    there's now being a shift from the reason for the
2    change in 2012 to a broader inquiry.
3          **THE COURT:**  Okay.  Well, we'll -- here is how
4    that will fit into my ruling.  So, I'm denying the
5    protective order with regard to 2, 5, and 10 of the
6    topics, and I've explained the reasons why I included
7    that.
8          But, if, in the off chance -- and I know the
9    Defendants suggested at the end of their brief they
10   want to just refer to certain facts and that would be
11   a reason for them not to appear for deposition.
12   That's not the way it works.
13         But if it turns out your 30(b)(6) witness,
14   with regard to information on the blister packs, is --
15   the position of the company dovetails with what
16   Mr. Myers or Berger said in their 30(b)(6) deposition,
17   you can point to that.  You're allowed to do that.
18         So the witness can say -- when asked, you
19   know, what is the company's position as to why a
20   certain thing happened, a 30(b)(6) witness can say,
21   *Our position is as succinctly stated in the deposition*
22   *of Joe Smith, pages 111 to 121, and that will*
23   *therefore be the official position of the company,* if
24   indeed that's what you're going to do, if some of this
25   information on blister packs was alluded to in the

1    prior deposition.

2             My ruling is that Plaintiffs are entitled to

3    determine the reason for the changes in the blister

4    packs, the labeling, when they were made, and by whom

5    they were made, and as part of that, the process, if

6    there was a process, how those changes were made.

7             And again, the answer may be that there is no

8    process; the technical people made the decisions as to

9    what should go in the blister pack, and they sent it

10   to the marketing people, and that was the process.  Or

11   maybe there was some committee that looked at these

12   things, which I doubt.

13            But in any event, that will be the Court's

14   ruling on Topics 2, 5, and 10.

15        **MR. NOMELLINI:**  Your Honor, may I ask for

16   clarification on something with respect to the date?

17            **THE COURT:**  Yes.

18        **MR. NOMELLINI:**  So, their brief was about a

19   change that was made in 2012.  And Mr. Myers prepared

20   for and answered many questions.

21            For example, there's a change made in 2005.

22   Mr. Myers was not asked what was the reason for the

23   change made in 2005.

24            For questions that were within the scope but

25   that they did not ask, I can't see how it would be

1    fair to give another opportunity to ask those same
2    questions.

3         So, it's circling back to the previous issue
4    that we discussed.  Since their brief focused on 2012
5    and the example that they gave of a question that
6    could not be answered focused on 2012, is that also
7    the focus of the 30(b)(6) testimony?  Since we have no
8    way to know, if Mr. Myers wasn't asked the question,
9    would it have been one that he couldn't answer or
10   would it have been one of the, you know, 90 percent of
11   the questions that he spent days preparing to answer
12   and could answer.

13        **THE COURT:**  Well, if he didn't answer it
14   because he wasn't asked, in fairness, I think it's a
15   very myopic reading of the topics in the previous
16   30(b)(6).

17        So, if they talked about a 2005 change but
18   didn't ask him the reason, so, like you say, we don't
19   know if his answer would be, *I don't know, it's the*
20   *technical person,* or, *I do know and they just didn't*
21   *ask the question,* in fairness, I think they should be
22   able to ask about all changes to the labeling in the
23   blister package, what was the reason for the change,
24   when were the changes made, and who made the changes,
25   i.e., the process, if there was a process, because you

1    really can't segregate out one change from another

2    change because they may be interrelated.  And that

3    certainly would not be a burden.

4         And you're not going to be required to have

5    Mr. Myers reappear to answer a question which you say

6    the Plaintiffs did not ask at the prior deposition.

7    You're going to, I assume, put up a 30(b)(6) witness

8    who -- and they might have talked to Mr. Myers, I

9    don't know -- but who will be prepared on these issues

10   who will be able to say, here is the chronology of our

11   blister packs from the beginning to the end; the

12   changes that were made were made in 2002, 2005, 2012;

13   these changes were made solely for technical reasons;

14   we don't know who in the technical department

15   suggested the changes in a certain year, or we do; and

16   you can talk about the process and how those changes

17   are communicated to the individuals within the company

18   who actually give the directive to place the change on

19   the labeling.

20        So that will be the extent of the subject

21   matter of the 30(b)(6) for Topics 2, 5, and 10.

22        **MR. NOMELLINI:**  And that's very clear, Your

23   Honor.  So just to highlight an issue that was

24   addressed in prior 30(b)(6) depositions, the question

25   would be asked -- *Well, for example, the flange memo*

1    *says X, Y, Z.  Why wasn't that included in the*

2    *changes?* -- and then there would be a number of

3    questions about the flange memo.

4         Am I correct that Your Honor is more focused

5    on, you know, just the facts of who made the change,

6    when, and the other things that you talked about?  I

7    don't mean to exclude things that you talked about,

8    but I do want to keep it a little focused.

9         **THE COURT:**  Well, that would sound like

10   appropriate questioning.  If there was a change and,

11   you know, the Plaintiffs wanted to make examination

12   why changes were made or were not made in light of the

13   flange report, I think they can ask the witness if

14   there's -- if the witness says, *It was Joe Smith in*

15   *our technical department who is the one that suggested*

16   *changes*, and the question is why were certain changes

17   not made in view of the flange report, you know, the

18   answer may be, *The technical people never even knew*

19   *about the flange report*; or, *We don't know, despite*

20   *reasonable inquiry, we don't know*; or, *The technical*

21   *person thought it was not necessary.*

22        **MR. NOMELLINI:**  Understood, Judge.  Thank

23   you.

24        **MR. AYLSTOCK:**  And that would apply to Topics

25   2, 5, and 10, Your Honor?

1          **THE COURT:**  Yes, 2, 5, and 10.

2          **MR. AYLSTOCK:**  Thank you, Judge.

3          **MR. KELLY:**  Your Honor, I just wanted to

4    clarify that I think that -- Topics 5 and 10 are not

5    limited to the blister pack, and I wanted to clarify.

6    I think that in your discussion of the scope here you

7    mentioned the blister pack a couple of times possibly

8    in reference to Topic 2.  The reasoning behind and

9    people behind changes to the instructions for other

10   products are also encompassed within 5 and 10.  I

11   would assume that Plaintiffs can question on that

12   reasoning and changes as well?

13         **THE COURT:**  I didn't read 10 that way.  But

14   yes, I've conflated labeling and packaging.  To me

15   they're the same, but I guess they are different.

16   There's what you have on an insert that's not in the

17   blister pack; is that right?

18         **MR. KELLY:**  Yeah.  Just for clarity, the

19   blister pack was one way in which these were

20   distributed.  They were also distributed in a variety

21   of other types of packaging.  So I just wanted to be

22   clear.  We were unable to elicit testimony from

23   Mr. Myers -- or he pointed to technical with regard to

24   changes across all kinds of packaging, not just the

25   blister pack.

1    So, although Topic 2 was focused on the
2  blister pack, 5 and 10 are broader than that, and I
3  just want to make sure that we're not going to get an
4  objection from Defendants that Your Honor's order was
5  limited to testimony on changes to the blister pack
6  and is instead about testimony on changes to any other
7  instructions.
8    **THE COURT:**  Yeah.  Is that right, Mr.
9  Nomellini, other than blister packs, there's other
10  packaging?
11    **MR. NOMELLINI:**  I would want to know what
12  specifically Mr. Kelly is referring to.  I think that
13  the packaging that Mr. Myers was asked about was
14  indeed the blister pack.
15    **THE COURT:**  Yeah.  Mr. Kelly, is there other
16  packaging that comes into play here?
17    **MR. KELLY:**  Well, as I think Mr. Nomellini
18  knows, the blister packs were not the only way in
19  which these were distributed, as reflected in the
20  testimony.
21    So, if we have testimony on the reasoning
22  behind changes to blister pack packaging and
23  instructions and fitting, that's good for that.  But I
24  would hope that we can get similar testimony with
25  regard to other changes that we also were unable to

1    get testimony on before.

2         **THE COURT:**  But, in particular, what other

3    way was it packaged?  So, if it wasn't in a blister

4    package, how was it sold?

5         **MR. KELLY:**  Well, I'm aware that, in some

6    cases, yes, it was sold in a bulk box, effectively in

7    a bag that had I think maybe fifty pairs inside of it.

8         The issue is just -- I just want to make sure

9    that we -- Mr. Myers punted to technical with regard

10   to essentially all conversations about decisions on

11   what to put in labels and instructions, and I just

12   wanted to make sure that we're not limited in our

13   questioning to changes for instructions on blister

14   packs.

15        **MR. NOMELLINI:**  Just to be clear --

16        **THE COURT:**  Let me ask a technical question,

17   and this is directed to Mr. Nomellini.  Because,

18   obviously, we're focused on labeling here.  We're not

19   focused on, you know, how you manufacture blister

20   packaging; it's what's printed on the blister package

21   or included in it.

22        Am I right, whether we're talking about a

23   blister package or a box of earplugs, it's all going

24   to be the same labeling?  You're not going to have a

25   difference of labeling in a box of fifty compared to a

1   blister pack that was sold at the same time, right?

2        **MR. NOMELLINI:**  Well, Your Honor, the point

3   here is that Mr. Kelly is not able to identify another

4   document other than the blister pack that Plaintiffs

5   asked Mr. Myers about at his deposition or other

6   documents that went in there.

7        So I think Your Honor was focused on, you

8   know, are there other documents that have instructions

9   other than the ones that are in the blister packs that

10  Mr. Myers was asked about.  And the answer is no.  So

11  that's -- it's pretty straightforward.

12       **MR. KELLY:**  Your Honor, there's -- I think

13  that we've talked about the legal standard here a few

14  times.  I don't think there's a requirement that we

15  have to have asked Mr. Myers about a topic --

16       **THE COURT:**  Right.

17       **MR. KELLY:**  -- previously in order to serve a

18  30(b)(6) notice on him.

19       **MR. NOMELLINI:**  But I don't even know what

20  the topic is.

21       **MR. KELLY:**  Individual cardboard boxes that

22  have instructions printed on them.  There's the

23  blister pack.  There's also a separate instruction

24  sheet that we believe sometimes accompanied the bulk

25  shipments.

1      **MR. AYLSTOCK:**  And this is a failure to warn

2    case, and this is key testimony as to when any changes

3    were made, whether they were on the blister pack,

4    whether they were -- if there were instructions within

5    the bulk boxes or other means to instruct on this,

6    this is -- and Mr. Myers punted to technical.  We

7    don't have to ask him thirty times -- technical,

8    technical, technical.

9           He punted to technical, and he didn't qualify

10   and say, *Well, for 2012 blister packs it's technical,*

11   *but for everything else it was me,* or you know -- so

12   it's a little bit disingenuous, I think, to say that

13   now we've lost our right to obtain this testimony for

14   all of the people that we have in this case, and

15   particularly when it's their burden.

16          **THE COURT:**  So what we're --

17          **MR. NOMELLINI:**  Your Honor, Mr. Myers wasn't

18   even given an opportunity -- if there's no documents

19   that they can point to, you know, and certainly no

20   documents that were introduced at Mr. Myers's

21   deposition that he couldn't answer questions about,

22   you know, I'm not sure what we're talking about.  The

23   only instructions that they're referring to are

24   instructions on the blister pack.

25          So, I think Your Honor's question was a good

1    one.  That's what was at issue.  That's what they

2    pointed to in the brief as in terms of specific

3    questions and answers.  We're going now into documents

4    that -- entire categories of documents that weren't

5    covered at the deposition.

6         **THE COURT:**  Well, it's all the same thing;

7    it's labeling.  So the area of inquiry is changes in

8    labeling, by whom, when, through what process; and

9    it's for the labeling that was included with the

10   packaging of this product, many of which were probably

11   sold in blister packs, but apparently some of which

12   were actually shipped not in blister packs but in

13   boxes of fifty with, I assume, the same labeling and

14   instructions in the box of fifty that you would have

15   in the blister pack.  I can't believe --

16        **MR. NOMELLINI:**  And I think Your Honor has

17   hit on a key issue.  It's not the same.  The testimony

18   is that the boxes of fifty were sold to the military.

19   And Mr. Santoro testified that the military instructed

20   -- Mr. Ohlin instructed that instructions not be

21   included in the boxes.  Mr. Myers also covered that at

22   his deposition, so there are no changes to speak of.

23        In other words, the binder that Mr. Myers

24   prepared with the 110 pages that we were talking about

25   earlier, that's a binder of blister pack instructions.

There aren't instructions from the box of fifty in that binder.

Does that make sense to Your Honor?

**THE COURT:**  Well, it does.  So there were no instructions in the boxes of fifty?

**MR. NOMELLINI:**  So, in the boxes of fifty -- I think Mr. Myers's testimony was that his recollection was that the military instructed him not to include instructions in the boxes.

**THE COURT:**  Right, right.  I've heard that before, and that was already -- *(inaudible)* --

**MR. KELLY:**  Your Honor, I do want to clarify, though, that these -- I don't think it's a worthwhile use of the Court's time to go through each way in which these products were packaged individually, but there were additional ways in which these were packaged.

There was consumer packaging.  There were third-party branded packages.  Although we have received testimony, as Mr. Nomellini notes, that there were no instructions contained in that cardboard box, the bill of materials that Mr. Nomellini has also cited here did indicate that there were instructions contained in those boxes.  Apart from the bulk box, there were smaller, individual cardboard boxes that

1    had printing on them.

2          Again, I don't think it's helpful for us to

3    go through each of these and have counsel describe the

4    testimony we've received on them.  I think that it

5    just makes sense for us to seek just testimony on

6    changes to instructions across all of these because

7    Mr. Myers was unable to testify as to all of them.

8          **THE COURT:**  Yes, I mean, that's the area of

9    inquiry.

10         And, Mr. Nomellini, if there were no

11   instructions in the boxes of fifty that were sold to

12   the military, then no harm, no foul.  That's already

13   been presented to the Court previously, I believe.

14         But to be clear, we're talking about labeling

15   of the product that was included in the packaging --

16   that would include blister packs, obviously -- when

17   the changes were made, who made them, and why the

18   changes were made, and, as part of why the changes

19   were made, was there a process for making the changes.

20         And that would apply whether it's a single

21   carton or a box of fifty.  If it's a box of fifty,

22   then that one is no harm, no foul, the witness is

23   simply going to say there were none.  And if they ask

24   why were there none, your 30(b)(6) witness can say

25   because the military told us not to include it.  And

1    then that's the end of that inquiry.

2            But I would be surprised, though -- and I've

3    been surprised in other cases, but I'd be surprised if

4    the situation here is you had one set of instructions

5    printed on a blister pack and at the same time we sold

6    the identical product to someone else in a box that

7    had different instructions on it; because, if so, that

8    would be certainly a fair line of inquiry why one had

9    it and one didn't.

10           But I asked the question before, and you

11   probably don't know the answer, but I mean, could that

12   possibly be the case here?

13           **MR. NOMELLINI:**  Your Honor, I do know that

14   the instructions changed over time.  And there were

15   different divisions, you know, there was a consumer

16   division, et cetera.  And all this is laid out in the

17   chronology that Mr. Myers prepared.

18           So I think what we can do is, to focus the

19   testimony, we can use the binder that was prepared as

20   the starting point.  And then, you know, if Plaintiffs

21   want to ask questions about that and any changes and

22   any differences, they can do that.

23           I do think Mr. Bhimani wanted to address

24   something.

25           **THE COURT:**  Go ahead.

```
1        MR. BHIMANI:  Yes, Your Honor.  So we
2   understand Your Honor's ruling on this.  But the other
3   thing that I would note here that is not related to
4   the substance of the ruling is, part of our concern is
5   there was -- this came from one question with respect
6   to the change of 2012; it has gotten broader in the
7   discussion today.
8        So, one concern that Defendants have and part
9   of the reason that this has been the subject of as
10  much discussion as it has, is, in light of the
11  extensive testimony that's already happened on this
12  issue -- put aside whether it's been addressed or not
13  in the prior testimony, we have gone over that -- you
14  know, Defendants have some concern that this is going
15  to turn into, you know, a many-hour endeavor that goes
16  far beyond anything that should be warranted based on
17  what's already happened and, you know, the true
18  follow-up that, to the extent there is any, that Your
19  Honor is anticipating.
20       And so, I heard Plaintiffs counsel at the
21  outset reference time limitations.  We do think that
22  some time limitation on this topic would make sense to
23  protect against the burden on Defendants here, in
24  light of the burden that they have already undertaken
25  on this.
```

1          **MR. AYLSTOCK:**  Could I address that, Your

2     Honor?

3          **THE COURT:**  Yes.

4          **MR. AYLSTOCK:**  As Your Honor is aware, there

5     was a -- and Mr. Bhimani wasn't in the case at the

6     time, but we did have a discussion, and Judge Rodgers

7     ruled at that time, when we had a grand total of 11

8     custodians identified in their initial disclosures,

9     that we would be limited by 40 deposition days.

10         Since that time, as Your Honor is aware,

11    there's been many, many other custodians, full other

12    lines of inquiry that were completely unknown,

13    unanticipated, and undisclosed, despite our two-day

14    Rule 26 conference.

15         Nonetheless, we do still have this

16    40-deposition-day limit.  And at this point, in order

17    to take this deposition, we're not needing the Court

18    to lift that cap.  I'm not saying we might never for

19    some other deposition.  But we already have time

20    limitations.  We've already agreed, in conjunction

21    with Mr. Todor's deposition that's happening next

22    week, that we would limit that one to three-and-a-half

23    hours because of his health issues.

24         We're trying to be accommodating and we're

25    already limited by the Court's ruling where we were

1    asking for more depositions and the Court limited us

2    to 40 at a time when none of us knew about TJR Mexico,

3    none of us knew about Operation Cobra, none of us knew

4    about multiple other witnesses that were not disclosed

5    to us.

6           So we have that cap.  We're cognizant of it.

7    We're counting our days because we're loath to

8    approach the Court, particularly with overall

9    discovery deadlines.  And so we already have that, and

10   we have been efficient with our time, and we'll

11   continue to be in this deposition.

12          **THE COURT:**  Mr. Bhimani, in response to your

13   request for limitation, I'm not going to do that for

14   two reasons:

15          One is the reason Mr. Aylstock just pointed

16   out.  There is some kind of overall built-in

17   limitation to discovery, and the Plaintiffs are going

18   to have to choose wisely.  And if they want to spend

19   more time than maybe you ought to with a witness, then

20   they're going to back up against their predetermined

21   number of deposition days.

22          And I'm not commenting on whether they would

23   at some point ask for more or whether the Court would

24   be favorably disposed to do that.  But I can guarantee

25   you, if they took a two- or three-hour deposition and

1    made it seven hours and then came to the Court and

2    said we need more days for depositions, they would

3    have a pretty tough time -- probably have a tough time

4    anyway convincing Judge Rodgers, but they'd really

5    have a tough time convincing her at that point.

6         So I'm not going to place a limitation on it

7    because certainly the incentive from Plaintiffs'

8    perspective is to be efficient because it can

9    prejudice them down the road if they, for lack of a

10   better word, waste time examining a witness.

11        But certainly labeling, changes in labeling,

12   the process of how changes were made, who made it,

13   what was the decision-making, if any, for changes in

14   labels is very relevant and is a fairly important

15   issue in this case.

16        So the Plaintiffs will be entitled to make

17   examination on that, and I am not at this point going

18   to place arbitrary limits.  And one of the reasons I

19   can't really and shouldn't place arbitrary limits is I

20   have no idea what are going to be the responses.

21        You know, what you have on the record now is

22   Mr. Myers saying that was a technical issue, Kladden

23   saying he or she didn't know -- wasn't involved in it

24   or didn't know why certain changes were made at a

25   certain time.

1           You know, there could be a whole fertile area

2      of inquiry, you know.  If the second question is, what

3      was the process by which changes were made, and, you

4      know, it turns out there was a 32-person committee

5      that examined changes and debated why labeling changes

6      should be made, you know, it might be a longer

7      deposition than one might think.

8           If it was simply, you know, the guy in the

9      technical department who sends a memo and he decides

10     to put these in because of certain regulations, then

11     it certainly wouldn't be as long a deposition.

12          But I don't know, so I really can't, in good

13     faith, place, you know, a limitation on the deposition

14     at this point other than the limitations already in

15     place previously imposed by the Court.

16          **MR. BHIMANI:**  I understand that, Your Honor.

17          **MR. AYLSTOCK:**  Thank you, Your Honor.

18          **MR. BHIMANI:**  If I could just add one thing,

19     Your Honor, just to flag this for the Court, to the

20     extent the Court is not aware of it.

21          The deposition of Mr. Berger and Mr. Myers

22     were limited by the Court, in October of 2019, to one

23     day of seven-and-a-half hours.

24          **THE COURT:**  Right.

25          **MR. BHIMANI:**  And so, we're going beyond

that, which I acknowledge.  But I just wanted to
clarify that.  Our position would be, in light of
those casts having been set and in light of those
already being exceeded, putting aside the overall
limitation, we think that some time limitation makes
sense.

Understanding Your Honor's views about that,
I won't press the issue, other than to flag, to the
extent it makes a difference to Your Honor's ruling,
that there were limitations set by witness.

**THE COURT:**  Well, no, that doesn't.  And
you're, I guess, suggesting that your 30(b)(6) witness
on this is going to be Myers or Berger.  And it can
be.  Or you could hire Ben Affleck to be your
corporate representative, if you want.

That's your call who is going to be the
corporate representative.  But it seems like, at least
at the time of his deposition, Myers didn't know much
about it -- when I say "much about it," didn't know
the details; he said that was suggested by the
technical people.

So that will be your call who you designate.
But I hope you're not suggesting you're going to
designate Myers and then say, well, he's already
reached his limit so he doesn't have to testify.

1     **MR. BHIMANI:**  No, Your Honor, that was not

2   the suggestion.  My only suggestion is Mr. Berger is a

3   technical person who was deposed.  And I think that,

4   at that time at least, the Court had some

5   understanding that he would be deposed on issues

6   within his notice and our view is that this was within

7   his notice for seven-and-a-half hours.  And

8   understanding that there is some follow-up that is

9   occurring, we just didn't think it should be

10   unlimited.

11        But we understand Your Honor's ruling, so I

12   will submit on the arguments made.

13     **THE COURT:**  Okay.  Let's move on to Topic 3

14   and let me hear from you, Mr. Bhimani, on Topic 3.

15   Let me just pull it up here so I can look at the

16   actual topic.

17        Topic 3 deals with communications between 3M

18   and the duty station where the bellwether plaintiffs

19   were assigned.  So let me hear from you on that.

20     **MR. BHIMANI:**  Yes, Your Honor.  So, with

21   respect to Topic 3, Your Honor is correct that the

22   topic, as phrased, encompasses all business

23   communications or other contacts, which, before we

24   even get to the prior depositions that have occurred,

25   I would submit is overbroad and not reasonably

1    particular.

2         But beyond that, this was the subject -- in

3    general terms, was the subject of deposition testimony

4    by Mr. Moses.  And we cited in the chart attached as

5    Exhibit 27 to our brief the topics in Plaintiffs'

6    previous notice that we think cover these types of

7    issues.

8         But, for example, Moses Topic 1 covered the

9    national distribution of the product through military,

10   civilian, and other distribution channels.  Topic 8

11   asked us to identify the individuals employed by

12   Defendants who had primary responsibility for

13   communicating with the United States and to describe

14   generally the government communication related role of

15   those individuals.

16        There's many other topics that talk about the

17   shipping processes, the distribution processes, the

18   people involved in the sale of the product, and

19   marketing strategies for the government.  So there are

20   a whole host of topics that are cited in our chart

21   that apply to this.

22        The Plaintiffs have made an argument that,

23   because bellwether selections hadn't been made at the

24   time the prior depositions occurred, that they should

25   get more granularity, I think is the phrase that the

1    Plaintiffs have used, and probe into individual duty

2    stations.  And there I think Your Honor's prior ruling

3    on the written discovery is instructive.

4         Your Honor will recall that the bellwether

5    plaintiffs served two interrogatories, 4 and 5, that,

6    similar to the topic here, sought the identification

7    of every communication relating to the CAEv2 between

8    Defendants and the government for each of the

9    bellwether plaintiff's duty stations.

10        The Defendants, in response to those

11   interrogatories, provided a host of information in

12   spreadsheets that was laid out in our prior briefing

13   on the interrogatories, and the Court did deny the

14   Plaintiffs' motion for further response to that.

15        And so we think the same burden arguments and

16   sufficiency arguments and the reasonableness of the

17   information that's already been provided that were

18   raised in that context apply equally in full force

19   here.

20        And again, we, in the annotated transcripts

21   and in the chart, have done our best to show the Court

22   that this has been addressed.

23        **THE COURT:**  Okay.  Mr. Kelly?

24        **MR. KELLY:**  Yes, Your Honor.  This is core

25   case-specific discovery.  We are seeking on this topic

1    the interactions between 3M and the specific duty

2    stations at issue in our specific bellwether cases.

3           The prior testimony, as we flag in our brief,

4    dealt with 3M's broader marketing strategy and

5    communications with the government; so, as for

6    example, the sort of Berger/Ohlin-level type

7    communications.

8           These seek discovery on the specific

9    communications with the specific duty stations where

10   our bellwethers were stationed, the same way that in,

11   for example, a pharma case there would be

12   case-specific discovery on the detailing of specific

13   positions.

14          We were not able, in November, to ask about

15   the duty stations at which, for example, Plaintiff

16   Rowe was stationed because Plaintiff Rowe was not

17   identified as a bellwether at that time.

18          I have a lot of trouble accepting the

19   suggestion from Defendants that their marketing

20   designee back in the fall was prepared to answer

21   questions like who visited Fort Bragg in 2002, if

22   anyone, and what materials did they bring with them.

23          This is just -- it's very specific; it's

24   case-specific discovery, and there was no way to get

25   it before.

1           This also relates to Topic 13, which I

2   believe is going to be addressed later on.  Topic 13

3   relates to Project Cobra, which is also about

4   detailing individual duty stations.  And on both of

5   these, the issue is that we just didn't have -- the

6   Defendants had not provided discovery on this -- on

7   Project Cobra, which was that individual contact

8   mechanism, to some extent, back in the fall, and we

9   hadn't identified the plaintiff duty stations back in

10  the fall.

11          It's unreasonable for Defendants to now claim

12  that we should have asked about individual contacts,

13  individual stations for individual cases that were not

14  yet selected.

15          **THE COURT:**  Right.  Let me ask a question,

16  Mr. Kelly.  So, you make the analogy this is like a

17  detail of a salesperson in a drug case who details a

18  doctor.

19          Is that essentially what you're getting at?

20  Because your topic says, "All visits, communications,

21  or other contacts between 3M agent," and now you're

22  focusing on the individual duty stations involving the

23  five bellwethers.

24          Are you talking about a marketing person or

25  someone, a salesperson who was assigned to that duty

1  station, or none of the above?

2       **MR. KELLY:**  So, we were -- you know, as is

3  often the case in discovery requests, you don't want

4  to cast too narrow a net and exclude things.

5       This would include, for example, if someone

6  was sent to a specific base to do a presentation on

7  how the CAEv2 are a hearing protection device that

8  people at that base should adopt.  Or, if, for

9  example, 3M sent someone or Aearo sent someone to an

10  individual base to provide training on how to insert

11  and wear the earplugs or the context in which they

12  were appropriate for use.

13       And even beyond sort of individual

14  plaintiff-directed communications, there could have

15  been detailing type visits from a 3M salesperson or

16  marketing person to the higher-ups at the base.  There

17  could be a presentation attendant to that and material

18  that said, *Please put this up around the base to keep*

19  *people safe.*  This also goes to this.

20       It's marketing, sales, and training is the

21  set of topics we're going to cover here, because

22  effectively those can all be the same things under

23  different names.  We don't want it to be the case that

24  Defendants call a particular visit -- the way in which

25  they choose to designate it means that it's beyond the

1    scope here.

2         **THE COURT:**  And this would be important for

3    the issues in the case because it would develop

4    potentially information relating to representations or

5    lack of information given to the military at specific

6    facilities?  Is that the point of all this?

7         **MR. KELLY:**  That's close, Your Honor.  But

8    it's less about information and specific

9    representations given to the military because I feel

10   that's sort of more what we were covering with

11   government contractor, and this is more

12   representations made to two specific plaintiffs or to

13   their supervisors.  There is a chance that Defendants

14   assert some sort of intermediary argument here that

15   could be -- that this would certainly be relevant to.

16        And additionally, there's a chance that

17   Defendants argue that they did not make certain

18   fraudulent representations to our clients.  And we are

19   entitled to testimony -- if Defendants, in fact, know

20   that they sent someone to a base and they did a

21   presentation on how to insert the earplugs or the

22   cases in which they're supposed to be used, we're

23   entitled to discovery on that for that specific case

24   and particularly the fraud claims in it.

25        **THE COURT:**  Yeah.

1       **MR. AYLSTOCK:**  Your Honor, they have

2   specifically raised a defense of -- it's not exactly

3   learned intermediary, but a sophisticated

4   intermediary.

5       And in the *Touhy* request letters for the

6   various audiologists who saw, fitted, tested our

7   individual plaintiffs, they have specifically asked

8   for information regarding how they told people to put

9   it in, things like that.  And we firmly believe that

10  we're entitled to know if they were out at Fort Bragg

11  and they did a training presentation that had a

12  particular way to put it in or a particular way that

13  when, where, how it should be used.

14      We know that there were posters that were put

15  up and how those were -- and we know that samples were

16  even given from the Project Cobra documents that we

17  didn't get and didn't have at the time of any of the

18  prior 30(b)(6)'s.

19      So it goes directly to their defense, it goes

20  directly to our claims about the failure to properly

21  train, the failure to warn, and as well as the fraud

22  and misrepresentation claims.

23      **THE COURT:**  Okay.  Mr. Bhimani, let me go

24  back to you.

25      Why shouldn't they be entitled to discover on

1    this defense -- your defense and also it would go to

2    one or more of their claims as to -- you know, this is

3    not asking for what was 3M's overall corporate policy

4    or approach to how they dealt with the military.

5           Because they now want to know, and it seems

6    like they would be entitled to know, at a particular

7    duty station where this particular plaintiff was

8    stationed, what marketing sales and training was

9    provided by your client to that duty station.

10          Why should they not be allowed to do that?

11          **MR. BHIMANI:**  Your Honor, there's a couple of

12   things going into this.  The first thing is, the prior

13   depositions covered, from the company's perspective

14   and the company's testimony, the processes that

15   applied to this issue.  That's number one.

16          Number two, the Defendants have already

17   provided, in response to the interrogatories,

18   spreadsheets.  And, among other things, those

19   spreadsheets contained information on the locations of

20   where the product was shipped, including Fort Bragg,

21   to use the example that was given, and the 3M and

22   Aearo representatives that were associated with the

23   sale.

24          So, for example -- and this came up in the

25   interrogatory briefing -- Defendants produced

1  spreadsheets that listed, you know, Tim McNamara as

2  somebody who has relevant knowledge as to a shipment

3  provided to Aberdeen Proving Ground, and somebody else

4  -- Frank Gavin in connection with another shipment to

5  somebody else.

6      And then Plaintiffs, unsurprisingly, went and

7  took the deposition to discover the facts about what

8  those entailed.  And so that is discovery to which

9  Plaintiffs may seek.  But it is not the point of the

10  30(b)(6) to get the company's position on the

11  company's policies and procedures, which has already

12  been covered.

13      So, to the extent they want to depose a

14  member of the company who went to one of the

15  individual duty stations and ask questions about the

16  presentation that was provided, they can seek to do

17  that.

18      But with respect to a 30(b)(6), when there is

19  a topic that says every communication and visit or

20  contact between any 3M agent and any individual duty

21  station, from our perspective, I don't know how to

22  prepare a single company witness to address every

23  visit, communication, or contact between any 3M agent

24  and any individual duty station.

25      It is far overbroad.  To the extent it is

legitimate, case-specific discovery, they can seek to
depose the witnesses that are relevant there.  But,
from the company's perspective, that is not something
that is appropriate at that level of breadth for one
company witness to testify about.  And to the extent
it is appropriate at a higher level, that's already
been addressed.

**THE COURT:**  Well, they're not asking at a
higher level; that's been addressed.  They're now
asking with regard to at least five, if not more than
five, duty stations what have been the contacts.

So it's not just look at the chart and see it
was McNamara that was the salesperson for that
shipment to Fort Bragg, for example.  They want to
know marketing, sales, and training with regard to
that duty station, and they want to know the company's
position, not their policy.  This is what does the
company say actually happened.

So the company would have to produce a
witness who would say, *During the relevant period of*
*time when these earplugs were sold to Fort Bragg, we*
*did not provide any onsite training*; or, *We provided*
*onsite training, onsite training was provided one time*
*a year*; *Sales only had telephonic contact*, or, *Sales*
*was required to make quarterly visits to each duty*

1    *station*; or, marketing, *We provided posters that were*

2    *put in all the barracks of how to use these things,*

3    *they were provided by the salespeople.*

4          You know, so, I mean, this is not high-level

5    corporate policy.  This is actually what was done to

6    each of these duty stations.  Because it does go to

7    your defense.

8          You know, if it turns out 3M provided a very

9    thorough training, instructional demonstration to

10   someone -- let's use Fort Bragg as an example -- and

11   then said, *This is how you use the earplugs, This is*

12   *the right way to do it, This is the wrong way to do*

13   *it* -- and that official at Fort Bragg then never told

14   any of the officers in charge of the servicemembers

15   and it was never communicated to the servicemembers, I

16   think that would be a pretty good defense on your

17   part.  But they need to know that.

18         You know, maybe there was -- on training,

19   maybe there was training provided at a particular

20   facility and every soldier, sailor, servicemember was

21   required to attend the training.  That would be

22   something to know.

23         That's the information that they are asking

24   for these particular duty stations.  And the answer

25   isn't just look on the chart and see who was the

1    salesperson and depose that salesperson, because maybe

2    the salesperson, all he or she did was sell these

3    things and they had nothing to do with training or

4    marketing efforts.

5           So, in any event, I'm going to permit this

6    area of inquiry.  And this will require 3M to produce

7    a representative or representatives to testify

8    reasonably about all communications, contacts of

9    marketing, sales, and training provided by 3M and/or

10   3M's agents to individual duty stations of only the

11   duty stations where the bellwether plaintiffs were

12   assigned.

13          And I'm assuming this is not going to be a

14   separate dispute to figure out where the bellwethers

15   were assigned.

16          Mr. Kelly, you know where your clients were

17   assigned, and that has been communicated to the

18   Defendants or will be communicated to the Defendants

19   so they'll know what they need to prepare for?

20          **MR. AYLSTOCK:**  We do, Your Honor.

21          **MR. KELLY:**  Your Honor, one of Defendants'

22   interrogatories sought plaintiffs' deployment

23   locations.

24          I do want to flag that certain plaintiffs

25   have been swapped out within the last month, and I do

1    not believe discovery has been served on those.  To be

2    clear, I certainly know my own clients' duty stations.

3    But for some of the newly substituted bellwether

4    plaintiffs, I don't have that information handy this

5    afternoon, but we can certainly get it very quickly.

6              **THE COURT:**  Yeah, you've got to do it

7    quickly.  Because the task of 3M is not to survey all

8    of their sales and marketing efforts.  Right now the

9    focus is not on what was the corporate policy; it is

10   what was actually done; it is communications and

11   contacts of the marketing, sales, training personnel

12   to only those duty stations.

13             Because I think that's important.  There

14   could be a company policy of providing training to the

15   military but it turns out that the duty stations of

16   one or more plaintiffs were not provided.  The

17   Plaintiffs need to know that.

18             Let's move on quickly to -- we have covered

19   Topics 5 and 10 -- 11.

20             Now, 11 deals with -- this is a separate

21   animal here.  This is Plaintiffs' attempt to get into

22   the intellectual property strategy, if any, that 3M

23   had with regard to their sale of these products.

24             So let me hear from -- first from the

25   Defendants, and then let me hear from the Plaintiffs

1    on this.

2          **MR. BHIMANI:**  Yes, Your Honor.  So I will

3    keep this argument relatively brief.  I think our

4    position is fairly straightforward on this, which is,

5    we've made a relevancy objection.  I think, in

6    Plaintiffs' opposition, their relevancy argument seems

7    to be that, to the extent that intellectual property

8    issues motivated design decisions, that that would be

9    something that's discoverable.

10          So, to the extent this relates to design

11   issues, I think that overlaps with our argument on

12   Topics 17 and 18 and some other testimony that's been

13   provided already about design issues.

14          And we've also interposed an objection that,

15   to the extent that this will get into legal

16   contentions or, you know, analyses about what the

17   intellectual property coverage might extend to or

18   anything like that, that would be beyond the scope of

19   a 30(b)(6) notice.

20          I don't know exactly what this topic is

21   intended to cover.  But to the extent it covers those

22   issues, we would have that additional objection.  But

23   this is primarily a relevancy objection.

24          And then, understanding at least the

25   relevancy link that the Plaintiffs are articulating,

1    an objection that these are design issues that have

2    already been covered and that overlap with the other

3    topic.

4            **THE COURT:**  Okay.  Mr. Kelly?

5            **MR. OVERHOLTZ:**  It's going to be me, Your

6    Honor, Mr. Overholtz.

7            **THE COURT:**  Oh, okay.

8            **MR. OVERHOLTZ:**  Thank you, Your Honor.  So, a

9    couple of things.  One is, I'll address kind of the

10   legal argument that the Defendants raised in their

11   brief.  They cited a couple of cases -- the *JP Morgan*

12   case out of New York and the *Halifax* case.

13           Both of those cases are -- *(inaudible)* -- and

14   really distinguishable from the case here.  Both of

15   those cases involve the attempted discovery of

16   information after the fact -- after litigation has

17   been brought to determine what the defendant's basic

18   reasonings were for the defense.

19           *JP Morgan* was an insurance case in which the

20   party was seeking discovery as to the basis of the

21   legal decision to deny coverage, so, you know, during

22   the litigation, after the fact.  So, really

23   distinguishable.

24           And then, the *Halifax* case was specifically a

25   *qui tam* case in which the defendant was attempting to

1   take the depositions of the government agencies at

2   issue regarding their legal determinations and legal

3   decision-making.

4        And neither one of those cases really are

5   distinguishable from here where we're specifically

6   seeking discovery related to the company's

7   determinations of the applicability of patents,

8   intellectual property to their design decisions.

9        I mean, the patents that were in existence at

10  the time, how they looked at the ability to patent

11  those design decisions, how they looked at whether or

12  not they had patent protection, and how those affected

13  the design decisions that they were making at the time

14  for the products they would ultimately sell, not to

15  mention specifically how those would apply to the

16  license agreements that they decided to enter.

17       For example, the license agreement with ISL

18  in France to license the two-sided design, even though

19  they had a -- we learned in the Falco deposition, or

20  put together at least, that there was a patent that

21  they held on a single-ended design that did not have

22  the issues the two-sided design had that ultimately

23  became the patent that covered the Version 4.

24       We had an opportunity to request -- to talk

25  to Mr. Berger, as the Defendants pointed out, about

1      some design decisions related to the CAEv2.  But

2      specifically related to how patents affected those

3      decisions, that was objected as being outside the

4      scope of the notice -- it wasn't described in the

5      notice, it was objected as being outside the scope of

6      the notice, and was unable to discuss this

7      relationship between patents and those designs.

8            The testimony from Mr. Falco and then

9      Mr. Doty as to whether or not these patents affected

10     those decisions made this an important, relevant issue

11     to this case.  We believe it's relevant to our

12     negligence claim, it's certainly relevant to our

13     design defect claim.

14           And their considerations -- and this goes

15     to -- Mr. Bhimani is right, this topic is tied, at

16     least in part, to No. 17 and 18, their considerations

17     of the feasibility of alternate designs, which, of

18     course, could be an element that Plaintiffs either

19     have to prove or need to prove.

20           And it's also relevant to their motive and

21     the credibility of their testimony related to why

22     certain design decisions were made or not made.

23           So that would be our argument to why this is

24     highly relevant.  You know, Plaintiffs cited the case

25     -- the company's position on respect to this issue

1   regarding whether or not they could enforce a patent

2   on the design that they had -- the two-sided

3   design that they had licensed from ISL compared to

4   other designs they were looking at -- considerable,

5   feasible alternative designs -- is relevant to our

6   design defects claim and the other claims Plaintiffs

7   have brought.

8          **THE COURT:**  Well, let me just make a couple

9   of comments, and we'll get into this in 17 and 18.

10         Design defect claims and alternative designs

11  under the state law from various jurisdictions, you

12  know, might be necessary.  But I'm looking at Topic

13  11.  And just looking at this, it almost seems like

14  this is a -- this is discovery you would take in a

15  monopolization case of, you know, how this company

16  decided to use its patents in order to, quote,

17  "maintain their monopoly on the 3M earplugs."  There's

18  a lot of problems with that.  A patent is a monopoly,

19  it's a government granted monopoly.

20         And in my view, it's a stretch as to how use

21  of a patent really dovetails into whether there were

22  alternative designs.  You know, patent issues are

23  really separate from that.  But how you decide to use

24  your intellectual property, to me, is really divorced

25  from the issue of whether there is an alternative

```
 1   design.
 2          So, based on what the parties have put in
 3   their briefs and what I've heard, I'm not persuaded
 4   that Topic No. 11 should be pursued.
 5          MR. OVERHOLTZ:  Your Honor, could I attempt
 6   to draw a distinction there as to what we're seeking?
 7          THE COURT:  Yes.
 8          MR. OVERHOLTZ:  So I think there is a
 9   difference, as Your Honor has pointed out, between
10   what decisions did they make regarding whether or not
11   they believed they had patent protection could --
12   would this patent allow them to perhaps pursue Moldex
13   to prevent a competitor, as opposed to what we're
14   seeking, which is their consideration of the patent,
15   the patent life.
16          You know, we regularly get discovery on
17   patent life information and how that affected
18   decisions with respect to whether or not to add
19   warnings and labels in pharmaceutical cases.  Your
20   Honor is certainly aware of that from the Abilify
21   case.
22          How the patent -- the factual determination
23   of do we have a patentable, protectable design here
24   and why -- and it's really relevant in this particular
25   case.  Because they had a patent on a single-sided
```

1   design, we know, from the Falco deposition.  They have

2   a patent on a single-ended design with a filter.

3           And after receiving the results of the flange

4   report which indicates significant problems with the

5   design that they held, why did they stick with that

6   design?

7           Did they believe that the two-sided design

8   from the French -- did they make those determinations

9   because the two-sided design was the patent that could

10  be protected as opposed to considering alternative

11  designs?

12          And so it's -- I'm not actually asking for

13  their legal -- we're not getting into the issue of

14  whether or not it was or was not protectable.  But to

15  the extent that that affected the design decisions at

16  the time, I think that is a distinguishable fact and

17  distinguishable relevance between the issue, the fact

18  that they made a decision to license this patent from

19  ISL so they could sell this device.

20          And with respect to the monopoly, I certainly

21  understand Your Honor's distinction there.  And I

22  don't think it's -- we're not seeking information as

23  to whether or not they believed that they could

24  prevent competition.  But to the extent that they

25  believed that this design was the only design that was

1    going to allow them to have patent protection going

2    forward as a reason for sticking with that design,

3    that goes to their motive of not considering the

4    alternative.  And that's where I think the distinction

5    is drawn.

6         **THE COURT:**  Mr. Bhimani, let me give you a

7    chance to respond.

8         **MR. BHIMANI:**  Yes, Your Honor.  First of all,

9    I agree with what Your Honor said before, this is

10   something more akin to what you would see in sort of

11   an antitrust kind of monopolization claim.

12         But beyond that, to the extent -- to respond

13   directly to the argument that was just made, to the

14   extent the focus is on relation to design decisions

15   and how it affected design decisions, Mr. Berger was

16   designated to testify, one, describe generally the

17   design decisions regarding the CAEv2, and two, to

18   testify regarding the design of the CAEv2 as described

19   in what we're calling the flange memo that counsel

20   just described.

21         So there was extensive testimony on those

22   issues.  He was formally designated by Defendants on

23   those issues.  And again, to the extent this was an

24   issue to be explored on that, the time to do it was in

25   the deposition of Mr. Berger on that.

1        Otherwise, this is an endless process where

2   Plaintiffs can come back and say, well, we asked about

3   design decisions, but now we want to know about

4   patents and how that relates to design decisions, and

5   we want to know about how -- you know, list four other

6   things applied to design decisions.

7        They had an opportunity to ask those

8   questions.  We provided a witness on those questions

9   in accordance with the prior notice.  And to the

10  extent they had questions that ought to have been

11  asked -- and he was asked some questions about design

12  decisions or issues.  And so, to the extent that that

13  is the testimony they have gotten on that, that is the

14  testimony they have.

15       **THE COURT:**  Was Mr. Berger asked any about

16  the *Moldex* litigation?

17       **MR. OVERHOLTZ:**  Your Honor, if I could

18  address that.  I specifically asked Mr. Berger

19  regarding the patent information and the patents that

20  were held on the devices.  Defense counsel

21  specifically objected that that was outside the scope

22  of the litigation.

23       I specifically asked then regarding whether

24  the document indicated that there was a patent that

25  was on the device.  The witness was instructed not to

 1    answer except for with respect to did the document

 2    list the patent.  So we were unable to make those

 3    connections.  And there were no specific questions

 4    related to the *Moldex* litigation at all.

 5         And so when I specifically argued with

 6    Defense counsel regarding whether the implications of

 7    patent considerations would be an issue covered within

 8    that 30(b)(6) notice, they said it was not, and they

 9    instructed the witness that he could only answer

10    questions about design and not about patent.

11         And so that was -- and that's covered in

12    Exhibit 7 to our brief, Your Honor, the testimony that

13    Mr. Berger gave in that regard, those pages are

14    particularly pulled out regarding that issue.

15         **MR. BHIMANI:**  Your Honor, if I can address

16    that argument?

17         **THE COURT:**  Yes.

18         **MR. BHIMANI:**  So it is not that Mr. Moses was

19    prevented from answering the question.  There was an

20    objection interposed that it was beyond the scope of

21    the notice.  An answer was given by the witness.

22         To the extent that the Defendants should

23    formally designate that as 30(b)(6) testimony, that's

24    something that we can do.  It's not as though we

25    instructed him not to answer the question and then

1    there was no answer given.

2            And Mr. Moses was also asked about the *Moldex*

3    litigation.  That should be in the transcript that was

4    provided with our brief.  We don't agree that we

5    precluded questioning on these issues in the

6    deposition.

7            **MR. OVERHOLTZ:**  So I asked, "If we flip over

8    to the first page, this is the 079, right?

9            "Objection.  Outside the scope.  I'd instruct

10   you not to answer."

11           "I'm specifically asking about the design of

12   the filter that was part of this Combat Arms Earplugs

13   and this design."

14           Counsel for Defendants:  "The patent issues

15   are not within the scope of the 30(b)(6) topics that

16   you've noticed."

17           And I argued, "The patent describes the

18   design.  This is the document that describes it."

19           "You can ask him questions about the design."

20           And that was -- so that was all that was

21   allowed.  I specifically tried to get into the patent

22   issue.

23           And then later, Mr. Berger asked, "Am I

24   answering or not answering?"  And she said, "You can

25   answer whether that appears on the top of the page."

1          It was -- we were not allowed to talk about
2     the patent issues.  And whether or not this patent
3     played a roll we believe is highly relevant here in
4     their determinations, especially with the discovery
5     that has taken place in the case determining that
6     there were patents available to the Defendants, that
7     those patents were held by members of the company that
8     eventually were turned back to in 2008 and 2009 as
9     alternative designs to improve the product that were
10    feasible back in time, the company's understanding of
11    that issue.
12         And why they would have stuck with the ISL
13    patent and the two-sided design after getting the
14    flange report we think is relevant.  And none of the
15    witnesses have been able to be questioned about that
16    or know about it.  So the company's position on it, we
17    think, is relevant and should be allowed to be
18    inquired into.
19         **MR. BHIMANI:**  Your Honor, if I may just
20    address the intention that there was a preclusion?
21         **THE COURT:**  Yes.
22         **MR. BHIMANI:**  That may be in Mr. Berger's
23    transcript that I believe counsel is pointing Your
24    Honor to.
25         In the Moses transcript, which is what is

1    cited in Plaintiffs' opposition, and in the annotated

2    transcript that's attached as Exhibit 8 to our brief,

3    there is testimony in that Topic 11, including

4    starting on page 223 and on page 415.

5         And again, there is an objection that says

6    it's outside the scope of the notice, but then Defense

7    counsel says, "You can ask the question, though."  And

8    then there's extensive question about trademark issues

9    and about intellectual property issues in the Moses

10   transcript.  And that's, again, Exhibit 8, highlighted

11   and annotated within the Topic 11.

12        So the idea that this was somehow precluded

13   is not the case.

14        **MR. OVERHOLTZ:**  Your Honor, I would say that

15   the questioning of Mr. Moses was limited to marketing

16   and trademark issues.  Mr. Moses was in marketing, had

17   nothing to do with design.  And so we don't think

18   really Mr. Moses's testimony is really relevant there.

19        **THE COURT:**  Well, I've heard you all, and I'm

20   not convinced that Topic 11 is an appropriate -- well,

21   I shouldn't say appropriate -- is an area of inquiry

22   that the Court should permit.

23        I get the relevancy argument that you're

24   trying to make, and we're probably going to get into

25   alternative designs in a moment when we talk about 17

1   and 18.  But the topic, as drafted, in 11 is corporate

2   testimony on actual or contemplated use of patents or

3   other intellectual property in order to maintain the

4   monopoly.

5          And I don't believe that is sufficiently

6   connected to fleshing out alternative designs, and

7   therefore I am going to grant the Motion for

8   Protective Order on Topic 11.

9          Now, let's segue very quickly into Topic 12.

10  And this one also is a little bit different, but this

11  is focusing on, I guess, third parties who were

12  involved in the marketing and sale of the earplugs.

13         And what's the problem here, from your view,

14  Mr. Bhimani?  And then I'll hear from the Plaintiffs.

15         **MR. BHIMANI:**  Yes, Your Honor, so the problem

16  here is that Mr. Moses was a marketing manager and

17  provided extensive testimony already on this topic.

18  He was designated to describe generally the

19  responsibilities of third parties with respect to the

20  marketing, packaging, and labeling of the CAEv2.

21         And again, as we have annotated in the

22  transcript, he was asked a lot of questions on this

23  topic and provided answers on this topic.

24         And so, to have us put a witness up again to

25  address the same thing, you know, consistent with the

1   arguments that we've made to these other topics, is

2   burdensome, and it's not something that's warranted

3   under the applicable standards here.  And I don't know

4   if --

5         **THE COURT:**  That's fine.  Let me hear from

6   Plaintiffs.

7         Why is -- I can see why you want information

8   on it.  But why is this different from what you've

9   already made inquiry into?

10        **MR. KELLY:**  I'll be taking over for this

11   topic.  This is not different from what we've already

12   -- I mean, we attempted to make inquiry into this, and

13   Mr. Moses was deeply unprepared on this topic.

14        And in light of the direct communications

15   between Defendants and the government which relate to

16   the government contractor defense, and because

17   third-party marketing relates to the claims of

18   individual people who received that third-party

19   marketing, we deferred seeking further testimony on

20   this topic.

21        To be clear, I want to respond -- Mr. Bhimani

22   said -- noted accurately that Mr. Moses was questioned

23   on this, but I would take significant issue with his

24   claim that Mr. Moses provided testimony on this.

25        Mr. Moses was able to identify one --

1    effectively one third-party entity with any reasonable

2    particularity, and that's Mitsch Communications.

3    Mr. Moses had direct contact with one person at Mitsch

4    Communications but could not say who else works there.

5        He could not say who came after Mitsch

6    Communications in the role of the third-party

7    marketer.  He said he did not know who came before

8    Mitsch Communications in the role of third-party

9    marketing, and in fact knew nothing about third-party

10    marketing before 2005.

11        We asked about third-party marketing with

12    regard to the consumer division, and Mr. Moses said he

13    did not know that Mitsch Communications was involved

14    in that, he did not know who was involved in that or

15    what third-party, and he didn't know what individuals

16    at Aearo would have been involved in that third-party

17    marketing.

18        He was able to identify two other entities on

19    which he was able to provide essentially no

20    information.  He identified Defense Solutions, and

21    stated that he did not know the nature of this

22    relationship or how many years that relationship

23    lasted for, could not identify any work product

24    Defense Solutions created, although he did provide a

25    contract that said that Defense Solutions was going to

1    be involved in third-party marketing.

2            We received similar testimony with regard to

3    a third-party entity called Ovation where Mr. Moses

4    said Ovation may have been involved in market research

5    but that he has no knowledge as to whether any market

6    research was conducted on the CAEv2.

7            Mr. Moses identified certain third-party

8    marketers and said that he had no idea as to whether

9    they had worked on the CAEv2 or on some other 3M item.

10            And ultimately, I mean, not to -- this is

11    more of a subjective point, I guess.  But I think that

12    if I were trying to prepare to speak to third-party

13    marketing that a company conducted, one helpful source

14    of that information would be that company's budget

15    with regard to that marketing.  I would probably even

16    make that my first stop.  Mr. Moses did not look at

17    that budget.  Mr. Moses did not ask anyone about that

18    budget.

19            While Mr. Moses did provide testimony on

20    other marketing issues, his knowledge on these

21    third-party marketers, their work product, their roles

22    just didn't exist.  He didn't provide any testimony on

23    that.

24            And Plaintiffs' election to not pursue that

25    at the time was in light of the Court's directive to

1    focus on government contractor to which these

2    third-party communications are not relevant.

3         **THE COURT:**  So this would fall within the

4    area, in the alternative universe, what would have

5    happened if this was, you know, the 30(b)(6)

6    deposition that was taken in a case, this was one of

7    the topics, third-party marketing.  You would have, in

8    the normal course of events, filed a Motion to Compel

9    and say the witness was not adequately prepared.  And,

10   based on those answers, there would be a high

11   likelihood the Court would tell the corporate

12   defendant to produce that person better prepared or

13   someone else.  The difference here is now this is in a

14   separate 30(b)(6) notice.  Is that right?

15        **MR. KELLY:**  Yes, Your Honor.  I do want to

16   just reiterate something that Mr. Sacchet said earlier

17   in this call, which is the procedural posture here.

18   Discovery has not closed.

19        Plaintiffs did not request that Defendants

20   provide a new witness, nor are Plaintiffs seeking

21   leave to reopen discovery or leave to, you know,

22   modify the deposition protocol to seek additional

23   testimony, or leave to redepose the same individual

24   beyond the hour limits set in the rules.

25        This is Plaintiffs' notice of deposition on a

1    relevant topic within the discovery timeline, and

2    that's where we are.

3           Another thing I do want to flag, though, is

4    that Plaintiffs have attempted to conduct third-party

5    discovery on these third-party marketers, and that

6    effort began essentially when Mr. Moses revealed he

7    had no information on them.

8           And additionally, Plaintiffs have -- or

9    Defendants have, in this year, this calendar year,

10   began producing documents relating to that third-party

11   marketing.

12          So there is an additional documents/new

13   evidence issue on this as well, in addition to the

14   fact that Mr. Moses was clearly not prepared at all to

15   testify.

16          **THE COURT:**  So, Mr. Bhimani, if this was in

17   the form of a Motion to Compel, it looks like they

18   have a pretty good argument.  Mr. Moses, while there

19   were a number of pages of the deposition talking about

20   this, didn't really know too much and was not very

21   prepared.

22          **MR. BHIMANI:**  Yes, Your Honor, if I can

23   address that.  I actually don't agree at all that he

24   wasn't prepared well or adequately.  I'll use two

25   examples.  I don't know that it's possible to address

1    every single one in this hearing.  But there were two
2    examples at least provided in the brief, and I think I
3    heard Plaintiffs' counsel say it again, that, quote,
4    he denied knowledge regarding third-party marketing
5    before 2005.  That's not the case.
6           If you look at the transcript, he, to be
7    sure, did not know whether Mitsch Communications was
8    providing marketing work prior to 2005, but he didn't
9    deny knowledge on any third-party marketing before
10   2005.
11          Similarly, there's a quotation about -- a
12   selective quotation about Mr. Moses not knowing which
13   person was responsible for marketing because they
14   predated him.  But he did give two names of people
15   that he thought the person could be, which was Erick
16   Miller and Marc Santoro.
17          So it is not the case that he was entirely
18   unprepared to address this.
19          I will also say, to the extent that
20   Plaintiffs' reason for not moving to compel after the
21   deposition is that these issues did not relate to the
22   government contractor defense, that, also putting
23   aside the legal merits of that, is also not internally
24   inconsistent.
25          Plaintiffs, in the past, have argued that

1    third-party marketers talked to the military.  So

2    there is some relevance, even under Plaintiffs'

3    contention, that there is, you know, some relevance to

4    the government contractor defense.

5            But Mr. Moses was deposed in October of last

6    year.  It is now August of 2020.  We've had multiple

7    hearings with the Court, including one in January

8    where the Court urged that any other issues with

9    respect to 30(b)(6)'s should be raised at that time,

10   and nothing was raised.

11           And, look, I can go through in more detail on

12   the testimony that Mr. Moses provided here.  He

13   identified Mitsch Communications.  He talked about the

14   third-parties.  He talked about the marketing firms

15   that were involved in developing the communications,

16   including specific people that he spoke with on that

17   issue.

18           So I don't agree that he wasn't prepared, and

19   I don't agree that they have cause to raise this at

20   the time they're raising it now.

21           And to the extent Your Honor will allow this,

22   I also don't agree that simply the identity of third

23   parties involved in this is something that requires a

24   deposition as opposed to less burdensome discovery.

25   But that's really a secondary argument is I don't

1    think that this topic is something that needs to be

2    revisited at all.

3         **THE COURT:**  Well, he was probably somewhat

4    prepared, as you point out.  And you cited to this in

5    your brief, he did provide some information.  But the

6    reality is there was a bunch of information about

7    third-party marketers that he was unable to provide.

8         And although the Defendants are correct, we

9    probably should have been talking about this issue a

10   while ago, we didn't.  Here we are; we're in the

11   eleventh hour.  But the twelfth hour has not struck;

12   discovery has not ended.

13        So, you know, this would definitely fall

14   within a category.  If this was a Motion to Compel, I

15   would grant it.

16        And I'm not going to, though, grant the

17   protective order because there was a fair amount of

18   information on third-party marketing that was not

19   provided.  And to provide the information responsive

20   to this topic really shouldn't be all that burdensome.

21        And, as Mr. Kelly pointed out, you know, a

22   good starting point would be to view, during the

23   relevant period of time, the marketing budget; because

24   that would be probably a good roadmap for who were the

25   third-party marketers, the beginning of inquiry as to

1    the extent of the services, if any, that they

2    provided.

3            So I'm going to deny the motion as to 12.

4            Now, 13 deals with an issue we've just

5    touched on briefly here, the Cobra issue.  And I

6    understand why Plaintiffs are really hot to trot on

7    that issue.  But let me first hear from Mr. Bhimani in

8    support of why a protective order should be granted on

9    this subject matter.

10           **MR. BHIMANI:**  Yes, Your Honor.  So there's a

11   few points that I think are relevant on Operation

12   Cobra.  The first thing I will say is there's a gloss

13   that's been added to Operation Cobra in the briefing

14   on this.  And I think it's important, as a threshold

15   matter, to keep in mind that Operation Cobra -- it was

16   a marketing effort in 2005.

17           So, to the extent there are documents that

18   talk about marketing from the summer of 2005, those

19   marketing efforts would be part of something that I

20   guess would fall into the designation of Operation

21   Cobra.  But there is nothing secret or special about

22   Operation Cobra specifically.  That is the threshold

23   question.

24           The other issue I wanted to just make clear

25   is that there's a contention in Plaintiffs' papers

1    that there was not a single Operation Cobra related

2    document produced in advance of Mr. Moses's

3    deposition, and that is not the case.

4         Mr. Moses was deposed on October 17th.  At

5    the end of September, on September 30th, there was an

6    email produced that referenced Operation Cobra.  There

7    was another email produced that talks about Operation

8    Cobra on October 13th.

9         And, look, I fully acknowledge that that was

10   shortly before the deposition, and it's possible that

11   Plaintiffs had not completed their review of the

12   production, had not seen those documents.

13        But, look, there were also documents produced

14   on Operation Cobra in November and in December of

15   2019.  They used those documents at a deposition of

16   Marty Salon in January of 2020.

17        So, to the extent that, again, there was some

18   need to update the marketing testimony that had been

19   provided by prior witnesses to discuss something

20   specific to Operation Cobra, our argument and our

21   contention is that should have been raised at least in

22   response to the Court's directive at the January 2020

23   CMC that any issues relating to 30(b)(6) topics as a

24   result of ongoing production -- and that's how it was

25   framed in the CMC, to the extent there were ongoing

1    document productions that require updates of a

2    30(b)(6) testimony, that that be raised at that

3    hearing or shortly thereafter, at a bare minimum.   And

4    that hasn't happened, and we're now eight months

5    later.

6          And so we would submit that there's a

7    timeliness issue in light of the directive from the

8    Court, in light of also the timing of the production

9    of these documents and when Plaintiffs knew of these

10   issues.

11         **THE COURT:**  Okay.  Let me hear from the

12   Plaintiffs.

13         **MS. HUNT:**  Sure, Judge.  This is Amanda Hunt

14   on behalf of the plaintiffs.  Just a few things I want

15   to touch on since I know we're getting to a late hour

16   and obviously Your Honor has read the brief.  Just a

17   couple of things I would take issue with in terms of

18   Jay's analysis of the situation.

19         On our side, this has nothing to do with our

20   not completing review of documents timely.  As others

21   have noted, we've made a real effort to be judicious

22   about deposition days, knowing that we are capped at

23   40.

24         And given the documents that had been

25   produced up to January, we didn't know the

1    significance of Operation Cobra.  In fact, we didn't

2    know the significance of it to Aearo until March 11th,

3    which, coincidentally, was the day of Mr. McNamara's

4    deposition, a salesperson with Aearo who interacted

5    with many of these military bases.

6         So, you know, I don't want to necessarily

7    lend credence to Defendants' argument that, you know,

8    as a threshold issue whether we had the opportunity to

9    question on this or not.  You know, I don't think

10   that's necessarily the issue here.

11        As Your Honor has acknowledged, it may be the

12   eleventh hour, but it's certainly not the twelfth.  We

13   moved as quickly as possible as soon as we became

14   aware of the scope and scale of Operation Cobra.

15   Because these documents were produced March 11th.  We

16   obviously had a pause in depositions in the litigation

17   due to COVID.

18        And we were also under the impression at the

19   time, I think rightly so, that Judge Rodgers really,

20   you know, strongly felt that we needed to prioritize

21   the resolution of the affirmative defenses, and we

22   tried to organize our discovery that way.  We moved

23   promptly to seek this additional deposition, again, as

24   others have described.

25        So I don't think I need to go into the

1   relevance of the topic.  As you said, Judge, we are

2   hot to trot on the topic, for good reason, I believe.

3   So that's sort of where we are on our side.

4          **MR. AYLSTOCK:**  The only thing I would add,

5   Judge, because I was at both Marty Salon's deposition

6   and I took Tim McNamara's, is we asked questions about

7   it.  Initially, there was no recollection of it at

8   all.  We had from Mr. Salon just a document or two,

9   and he pretty much deferred any knowledge, didn't know

10  a whole lot, couldn't remember much of anything.  Same

11  with Mr. McNamara, couldn't remember a whole lot,

12  wasn't able to give us much information.

13          Certainly, those were personal depositions,

14  not 30(b)(6)'s, so, you know, they can only do what

15  they can do as far as their memory goes.  But I think

16  we're entitled to this information from a corporate

17  designee to really help us understand what went on,

18  because right now we don't have visibility into that

19  effort, what happened, when it happened, and so forth.

20          **THE COURT:**  Okay.  I think I understand this

21  issue.  And, you know, granted, although Operation

22  Cobra was under the umbrella -- was part of marketing,

23  and I do recognize that the Defendants correctly point

24  out there were several documents produced shortly

25  before Mr. Moses's deposition that referenced

1    Operation Cobra, the reality is, this did not really

2    emerge as -- I don't want to call it an important

3    issue, but something where the Plaintiffs obviously

4    have an interest until well into 2020, probably the

5    February/March time period.

6         And although this area of inquiry could have

7    been sought sooner, I'm not blind to the fact that the

8    approach to this case did change a little bit in terms

9    of strategy after the pandemic hit just in terms of

10   how the case was being worked up, and there was a

11   focus on the government contractor defense, for

12   obvious reasons.

13        So, yes, the request is a little bit late,

14   but nonetheless, it does seek information where

15   Plaintiffs, other than in documents, do not have

16   30(b)(6) testimony.  And while it could have been done

17   a little sooner, it's not too late.

18        So I will deny the Motion for Protective

19   Order with regard to Topic No. 13, which I believe

20   leaves us with Topics 17 and 18.

21        And so this goes to alternative designs.  And

22   I guess they are a little bit different, but I think

23   we can deal with them at the same time.  So let me

24   hear from the Defendants first on 17 and 18, then I'll

25   hear from the Plaintiffs.

1            **MR. BHIMANI:**  Yes, Your Honor.  So our

2    arguments on 17 and 18, as I previewed earlier, are

3    not all that different from our arguments on many of

4    these topics, which is Mr. Berger addressed this in

5    great detail.  It's in the annotated transcript we

6    provided.

7            He was designated expressly on topics

8    including, quote, "to testify regarding the design of

9    the CAEv2 as described in the flange memo," and to,

10   quote, "describe generally the design decisions

11   regarding the CAEv2."

12           And during the deposition -- and this is in

13   the transcript also -- Plaintiffs' counsel also

14   construed these topics as, quote, "having to do with

15   design choices and who made the design choices."

16           So, you know, I really think this is

17   something that was covered.  And again, to the extent

18   that -- you know, the standard, again, is

19   reasonableness.  I think we have to keep that in mind.

20           And to the extent there were, you know,

21   particular questions that the Plaintiffs now point to

22   as things that Mr. Berger didn't recall, those were

23   not a core part of the testimony that he provided,

24   because he provided extensive testimony on this.  And

25   the preparation that he did on it was certainly to the

1     standard of reasonableness that's required to prepare

2     a corporate representative.

3          I will also say, as I have said on some of

4     the other topics, to the extent there was an issue on

5     his testimony regarding design decisions, that should

6     have been the subject of a motion to compel.  This is

7     not one where, you know, perhaps the Plaintiffs can

8     say we did not move to compel because we thought that

9     the deposition was limited to something specific to an

10    affirmative defense.

11         The topics on which Mr. Berger was designated

12    were expressly about the design of the product.  That

13    was expressly part of the scope of what he was

14    testifying about.  And they know what testimony they

15    got at the deposition, and there was never any motion

16    filed saying that that was inadequate, that the

17    preparation was inadequate, that his answers were

18    inadequate.

19         So this really has been the subject of

20    extensive testimony, and I think we have met our

21    burden on giving the information that we are required

22    to give on this topic.

23         **THE COURT:**  Okay.  Let me hear from the

24    Plaintiffs.

25         **MR. OVERHOLTZ:**  Yes, Your Honor.  And I know,

1    Your Honor, we made some of these arguments with

2    respect to Topic No. 11, so you're well aware of that.

3            But, you know, with respect to what Mr.

4    Bhimani has just said, we don't believe that this was

5    part of the deposition that was covered with

6    Mr. Berger back in November, which is when any

7    design-related issues related to the Combat Arms

8    Version 2 plug, which was the topic that was covered,

9    and the design decisions related to the Combat Arms

10   Version 2 that was way back in November -- I'd remind

11   the Court of the discussion earlier regarding the

12   lay-of-the-land type depositions these were.  We had

13   very limited discovery at the time.

14           And certainly our inquiry into Mr. Berger was

15   limited to those design decisions related to the

16   CAEv2.  Our discovery has taken us a lot further now

17   with respect to the information that was available for

18   them related to these design decisions.

19           We've taken depositions of the people that

20   Mr. Berger identified in that deposition who would

21   have more information about the design, including Mr.

22   Falco, who was described as the designer, and

23   Mr. Doty, who was described as the drawer.

24           Mr. Falco was unable to say whether or not --

25   who made those decisions related to the CAEv2 or who

1    considered or whether anyone considered those

2    alternative designs.  And Mr. Doty testified, as Your

3    Honor, I think, is aware, that essentially, *I was the*

4    *drawer, I drew on the CAD machine, and I did what the*

5    *people above me told me to do with respect to those*

6    *drawings.*

7           But I think, even more importantly, as Your

8    Honor can tell from these topics, these were

9    specifically following up related to the issue of what

10   the company's position and knowledge was regarding the

11   consideration of alternative feasible designs, which,

12   of course, will be a burden that we will have at

13   trial, depending on the state law that we have, or

14   certainly have the capability of introducing evidence

15   on those issues.

16          And while Mr. Bhimani will try to basically

17   equate Topics 17 and 18 as being about design issues

18   or design -- or, you know, alternative designs, it's

19   really well -- way more specifically laid out seeking

20   what were the safety effects changes to the length of

21   the plugs, the thickness of the plug, as well as the

22   flanges, the number and orientation of those flanges.

23          These were all questions that were asked of

24   Mr. Falco that he was unable to provide answers to.

25   And then, of course, the material decisions that were

1    related, and then, of course, whether or not there

2    were any intellectual property-related decisions

3    related to these alternative design considerations.

4        And so, therefore, you know, again, we

5    believe that their consideration of the alternative

6    design and whether or not alternative design options

7    were available to them at the time, whether they were

8    feasible and reasonable is highly relevant to both the

9    Plaintiffs' claims as well as what we expect we will

10   hear from the Defendants in the trial from their

11   defense perspective.

12        Getting the company's understanding and their

13   decisions is an important factor.  Mr. Berger did not

14   have information and was not questioned about those

15   issues related to the Version 3, the Version 4, and

16   then for Topic 18 competitor product, additional

17   design decisions that were available to them that we

18   now know and have learned through discovery over the

19   course of a year.

20        To attempt to say that that 30(b)(6) in

21   November of 2019 could have possibly covered these

22   topics is really not true.  And I think our brief lays

23   out the examples of where Mr. Berger really was unable

24   to provide complete information about the alternative

25   designs beyond what the few documents that we had at

1    the time shared, you know, with respect to the fact

2    that there were potential considerations being made.

3         We now have significant more information

4    through discovery that we would like to take the

5    company's deposition and understand what was the

6    company's position and knowledge regarding the

7    feasibility of these alternative designs.

8         **THE COURT:**  The difference here, in summary,

9    Mr. Overholtz, is, although Mr. Berger was questioned

10   about the design of the CAEv2, and it looks like he

11   nibbled around the edges of trying to get into

12   alternative designs, the difference now is you want to

13   make examination about feasibility of alternative

14   designs and the company's knowledge, if any,

15   concerning real alternative designs.

16        Is that really the difference here?

17   Deposition one, we're getting into the design of this

18   product.  Now you want to get into alternative designs

19   and how that was considered or even known by 3M?

20        **MR. OVERHOLTZ:**  That's right, Your Honor.

21   And of course, you know, the ability to, you know --

22   it's exactly that issue and the fact that now we

23   believe that a corporate representative deposition is

24   the best deposition.  Because Mr. Berger, Mr. Myers

25   certainly pushed this decision off to -- you know,

1    this concept off to Mr. Falco, who we deposed, and

2    Mr. Doty, who we deposed.

3           We believe we're entitled to a corporate

4    deposition on this from someone who can answer these

5    questions about the alternative.  And you made the

6    distinction characteristic perfectly.

7           **MR. AYLSTOCK:**  And, Judge, there was a very

8    good reason for that.  Back in November, you know,

9    again we were focused, as the Court directed, on *Boyle*

10   and government contractor defense.  And, you know, the

11   specifications and the compliance and things like that

12   are highly relevant under the Court's analysis for

13   government contractor.  Reasonable alternatives,

14   feasibility, things like that go directly to our

15   burden in many states, if not most, to come up with a

16   reasonable, feasible design and what should they have

17   done and things like that.

18          So it was a strategic -- obviously, I was

19   involved in these decisions on where we need to focus,

20   and that was where our focus was at the time.  And now

21   we're beyond that, and our focus needs to be now on

22   proving -- giving us the evidence that we believe is

23   necessary to help prove our claims.

24          And I think we would just be greatly

25   prejudiced, because I can -- rest assured there will

1    be argument that we haven't met our burden to show

2    some reasonable alternative design.  We know they had

3    alternative designs.  They used them.  They

4    implemented them.  And that wasn't the focus of the

5    first deposition because that wasn't really a relevant

6    consideration for government contractor.

7            **THE COURT:**  Mr. Bhimani?

8            **MR. BHIMANI:**  Yes.  So, Your Honor, I would

9    just point out that those two arguments seem to be

10   inconsistent.

11           So, in their brief they argued we asked all

12   of these questions about design choices, Plaintiffs'

13   counsel referred to these topics in the deposition as

14   being about design choices and, you know, an argument

15   that Mr. Berger wasn't prepared to address this, which

16   I disagree with.

17           And now the argument also seems to be that

18   they didn't know to ask these questions because they

19   were focused on the government contractor defense.

20           So, respectfully, Your Honor, I would submit

21   that those two things are inconsistent.  I do think

22   this was covered.  And I think, you know, if Your

23   Honor looks at the transcript that we have provided,

24   design choices -- so it's within the scope of design

25   decisions -- is something that the Plaintiffs asked

1    about, and it is something that Mr. Berger testified

2    about.

3              **THE COURT:**  Well, you are partially correct

4    -- or I don't want to say partially -- but you are

5    correct that the concept of looking at alternative

6    designs or feasibility of design choices has been

7    touched upon in this case.

8              But, in fairness, that didn't have much, if

9    anything, to do with the focus of the case at the

10   time, the government contractor defense.  Certainly

11   the design of the product had a lot to do with the

12   government contractor defense because one of the

13   issues was whether what they knew about the design,

14   that there were problems, did that information -- was

15   that communicated to the military as part of the

16   military's decision-making process.

17             Feasibility of design really had not a whole

18   bunch to do with it.  It is clearly a merits inquiry.

19   It will go to Plaintiffs' burden, but it also could

20   form a viable defense under the law of many states,

21   probably not Florida, but --

22             Does Florida require plaintiff to prove an

23   alternative feasible design?

24             **MR. AYLSTOCK:**  We don't think so, Judge.  We

25   may hear differently from the Defense.

1     **THE COURT:**  Okay.  We don't need to resolve

2   that.  But I do know the law in other states does

3   require that.

4          And, again, you know, it's a little late in

5   the game, but it is both a relevant area of inquiry,

6   and I do not believe it has been adequately covered

7   before.  And there is certainly not a showing here of

8   an undue burden that would support a protective order.

9          So I will deny the Motion for Protective

10  Order as to 17 and 18, which leads me to the million

11  dollar question.  And this is for my own curiosity,

12  not necessarily as part of my ruling.

13         Today is August 21.  And I'm sure the

14  Defendants contemplated that they might have to

15  produce another corporate representative for a

16  30(b)(6) depo.

17         Where are the parties at in terms of when

18  this would take place?  Are there dates scheduled,

19  potentially penciled in, or how are y'all going to do

20  this before the twelfth hour?

21     **MR. BHIMANI:**  Yes, Your Honor, if I may

22  address that.

23         So, you are correct.  So, with respect to the

24  topics that have been agreed to between the parties,

25  which relate to TJR that were not the subject of this

```
1    briefing, Ms. Childress is being deposed on Wednesday.
2    She is the witness that will address those topics.
3           There was some discussion that we can combine
4    her personal deposition and her 30(b)(6) deposition on
5    that.  I think we're meeting and conferring further
6    about that in response to some correspondence this
7    morning or afternoon, but I don't think that will be a
8    big issue.
9           And Your Honor is also correct that we have,
10   of course, been diligent on our end.  We have not
11   been, you know, sort of sitting on our hands on these
12   issues.
13          But I will say, as Your Honor has recognized
14   -- and I'm not casting blame on anybody.  I think the
15   casting blame phase of this hearing is now behind us.
16   But the notice did come fairly late, I mean, it came
17   at the end of July.
18          And so, while we've done a little bit on our
19   -- not a little bit.  While we've been diligent on our
20   end, you know, I do think, in terms of scheduling --
21   we can confer with the Plaintiffs about this, but, you
22   know, I do think there may need to be some time
23   provided for us to continue our preparation to
24   adequately address these topics.  I mean, they are
25   broad and they cover a lot of things.
```

1            And so, again, we're happy to confer with the

2    Plaintiffs to get it done.  But I think, you know, to

3    preview for Your Honor, I do think that, you know, we

4    are going to need some time to prepare adequately.

5            And I understand September 1st is currently

6    the cutoff for company discovery.  But, as it relates

7    to this deposition, I do think we'll have to confer

8    about a date that is reasonable that makes sense.

9            And Your Honor's rulings, frankly -- to add

10   one more thing, I think Your Honor's rulings provided

11   some clarification as to the scope of some of these

12   topics and precisely, you know, what is within them,

13   and so I think that will help us.  But, you know, I do

14   want to just be clear that we think some time will be

15   required to prepare a witness.

16        **MR. AYLSTOCK:**  Your Honor, we understand the

17   realities of it.  I do think -- I know the judge would

18   not permit anything without her approval.

19        **THE COURT:**  Right.

20        **MR. AYLSTOCK:**  But there does appear to be a

21   little bit of laxity in that September 1 deadline.

22   The case-specific discovery cutoff for Group A is not

23   until October 9.  And so we wouldn't be asking to push

24   that September 1 deadline for -- *(inaudible)*.  And

25   certainly, if the judge ordered us to take it before

1    September 1, we'd do it.

2         But, given the realities of prepping a

3    witness, we would be fine if the Court was open to a

4    short extension maybe to September 15th, September

5    18th, something like that, to prepare a witness.  It

6    wouldn't otherwise affect any of the other Court's

7    deadlines pursuant to Group A or any of the other

8    groups.

9         **THE COURT:**  Okay.  Well, let me encourage

10   both sides to talk further.  You know, the Defendants

11   should be given reasonable opportunity to prepare

12   these witnesses, or a witness.  And it is a really

13   short period of time to find a date.  You know, they

14   have got to identify who, they have got to prepare the

15   person.  That is going to take some time.

16        And although I'm not blessing an extension

17   beyond September 1, I think Judge Rodgers would

18   understand the situation.  Certainly, to the extent

19   she was to ask for my input, I would say it would not

20   be unreasonable to extend that a little further.

21        But having said all of that, talk soon.  And

22   if you think it makes sense to go beyond September 1

23   to finish these 30(b)(6)'s, get a motion filed as

24   quickly as possible, and hopefully it's a joint

25   motion, so that Judge Rodgers can address it sooner as

1    opposed to later.

2          And assuming such a motion is filed, I will

3    definitely talk to her as well that, under these

4    circumstances with these topics and other exigent

5    circumstances, that it would not be unreasonable to

6    allow a little bit more time to complete these

7    depositions.

8          **MR. AYLSTOCK:**  Thank you, Your Honor.

9          **THE COURT:**  Is there anything else on behalf

10   of the Defendants that we need to address?

11         **MR. NOMELLINI:**  Yes, Your Honor.  If Michelle

12   Six is still on, she would like to address one topic.

13         Michelle, are you there?

14         **MS. SIX:**  I am.  Thank you, Your Honor.  If

15   you could -- I know this has been a long call, if you

16   could give us five more minutes.

17         **THE COURT:**  Oh, sure.

18         **MS. SIX:**  Thank you so much.

19         So, even though it was not on our scheduled

20   agenda today, we did want to alert the Court to a new

21   document collection issue that has arisen this week

22   for the Defendants, unrelated to the 30(b)(6)

23   discussions we've been having.

24         Plaintiffs should not be surprised to hear

25   that we are raising this issue today.  We've been in

1    pretty constant contact this week with Mr. Buchanan,

2    Mr. Overholtz, Ms. Hoekstra, and they have been good

3    enough to make themselves available for updates on

4    this collection issue on a daily basis.  So I informed

5    them yesterday that we hoped to raise this issue with

6    Your Honor today.

7          This involves the identification of new

8    backup tapes that have been found by 3M.  And while we

9    currently have a reasonable belief that these tapes

10   will contain very, very minimal new custodial data, in

11   other words, we believe they will contain very minimal

12   data not duplicative of custodial data 3M has already

13   collected and put through the TAR process, we did want

14   to be completely forthcoming and transparent about

15   this new data source.

16         Last week, in the process of collecting data

17   for one of our newly added custodians, Larry Power,

18   3M's paralegal team identified a note that was

19   associated with Mr. Power's files.  And the note

20   stated that certain backup tapes had been searched for

21   Larry Powers's data, but that no data existed for him

22   on those tapes.

23         The 3M litigation team went looking for those

24   backup tapes in question since they hadn't previously

25   been aware of the existence of those tapes.  And it

1    turns out that a number of backup tapes were being

2    preserved in connection with a separate case, with a

3    Foreign Corrupt Practices Act case.

4         So the total number of tapes that were

5    uncovered is 197 tapes.  Some of these tapes were

6    searchable by 3M's IT department; many of them were

7    not.

8         And so all of these tapes have been sent to

9    the forensic investigation team at Xact, who is

10   Defendant's e-discovery vendor.  They have been

11   working, since the weekend, day and night to catalog

12   these tapes.  And amazingly, they have restored and

13   searched 142 of the tapes.  So they are making good

14   progress.  I would expect them to be done sometime in

15   the next couple of days.

16        The good news is that what we have found so

17   far is very, very little custodial data for the

18   custodians at issue in our case.  And of the custodial

19   data that has been found, the large percentage of it

20   is duplicative of data we already have.

21        So, what we have shared with Plaintiffs this

22   week is that, as we identify unique or, rather, new

23   custodial documents, we are prioritizing the review of

24   these.  And so far I think for six -- we have found

25   out that for 13 custodians, six of those custodians'

1    data has been processed.  And for those six, we have
2    less than 300 unique documents.
3              In an effort -- a good faith effort to try to
4    make sure we're not missing anything at all, we're
5    going to do a linear review of any unique documents
6    that are found.  In other words, we're not going to
7    put them through the TAR process lest something would
8    be missed.  We are going to look at every single
9    document on a priority basis.
10             And as we find additional material, we will
11   let Plaintiffs know what is going on.  We did find 32
12   unique documents for custodian Sal Mohammed, whose
13   deposition is scheduled next week in London.  But all
14   32 documents were reviewed.  I personally reviewed
15   them myself, and there was nothing responsive in those
16   documents.
17             We will also provide Plaintiffs with an
18   overlay.  So, as the identified duplicative documents,
19   to the extent that anything is duplicative of what has
20   been produced to Plaintiffs so far, we will give them
21   an overlay to identify whether some custodian had one
22   of those documents in their old custodial files.
23             So hopefully we can expect the whole process
24   of searching the tapes and restoring the tapes to be
25   completed by the end of the weekend.  And right now,

1  based on the volume that we are aware of, we see no

2  reason why this would impact our ability to complete

3  discovery by September 1st.

4        Did Your Honor have any questions for us?

5        **THE COURT:**  No.  I'm glad you shared all of

6  that.  You know, it raises some concerns.  But it's

7  not the first time in the history of mankind something

8  like this has happened.

9        And it's good to know that you're going to do

10  a linear review, so we'll know if there's any, as you

11  called them, unique documents out there.

12        Mr. Buchanan, are you still on the line?

13        **MR. BUCHANAN:**  I am, Your Honor, yes.

14        **THE COURT:**  What's your reaction?

15        **MR. BUCHANAN:**  Well, initially it was

16  certainly concern.  There was a high volume of backup

17  tapes.  And I think the unique custodians, 12 to 14 of

18  them, were identified on tape 1, and so we obviously

19  have concern about bleed through across the 50 to 60

20  custodians.

21        We do understand at this point that these are

22  3M tapes, and therefore they are from the 3M period of

23  time, so necessarily focus on those custodians.

24        I want to -- unique documents I think is a

25  relevant metric and an important one.  That would be

1    new information that we had not yet seen in the case,

2    and we obviously have an eye on that.

3          We separately have an eye on documents that

4    are being, quote, "deduplicated."  But one of the

5    aspects of deduplication is that we now have knowledge

6    of somebody's involvement perhaps with an issue that

7    we didn't have knowledge of before.

8          So we have to keep an eye on the overlay set

9    to see -- for example, the witness like Brian

10   McGinley, who may only have 32 new documents, we're

11   told 9500 were deduplicated out.  So that's

12   information I think we have to, you know, just pause

13   and analyze what that broader impact is.

14         But at this point, Your Honor, the Defense

15   has advised us of a situation of some concern.  They

16   are working through it in what seems to be a

17   reasonable manner to identify, isolate, review, and

18   then share with us.

19         So I don't have anything other than concern

20   and hopefully optimism, but I'm sure we'll be back to

21   you next week if this evolves further.

22         **THE COURT:**  Yeah, you'll look at what the

23   overlay is, you'll look at, you know, quote, "unique

24   documents," and, as you say, you will make a

25   determination of what impact, if any, that has on

1   previous custodians' depositions that have been taken.

2   It may alert you that someone, because he or she was

3   copied on something, may have knowledge about a

4   subject matter area where previously they said they

5   didn't know anything about it.  So that could be a

6   potential issue that comes up.  But, you know, it's

7   curious.

8           So, Ms. Six, how the tapes were found, so

9   there was a note somewhere in a custodial file about

10  backup tapes.  And were they stored with the IT

11  department or someplace else?

12          **MS. SIX:**  Yeah, that's a good question, Your

13  Honor.  My understanding is that these tapes had been

14  placed in what 3M's legal department is calling a

15  vault.  It was a climate controlled room that was a

16  high security room and that, for the record, I believe

17  that only a couple of the tapes were referenced in

18  connection with our custodian, with Larry Power.

19          But, out of an abundance of caution and not

20  having been aware of these tapes previously, we wanted

21  to just collect everything that was found and get it

22  processed and searched.

23          I will say that, with respect to email, there

24  should not be any sort of custodial surprise, in that,

25  you know, we -- in our production of email documents,

1   the header information would contain all the, to,

2   from, cc, and bcc information available.

3          So whether there could conceivably be an

4   overlay question that may be on a document that was a

5   loose file that was in a custodian's loose documents,

6   but as I mentioned, we will absolutely give Plaintiffs

7   that overlay so that all custodial information will be

8   provided to them.

9          **THE COURT:**  Okay.  Well, I appreciate you all

10  bringing this to my attention.  Hopefully it doesn't

11  become an insurmountable problem.  But I'm sure the

12  Plaintiffs will be taking a look at what you've

13  produced.  And you're fairly comfortable that you

14  think sometime maybe mid next week you will have gone

15  through all 197 tapes and completed the search of all

16  of those tapes by then?

17         **MS. SIX:**  Yes.  So, Your Honor, this is

18  definitely more technical than I totally understand,

19  but the individuals who work in the forensic lab are

20  restoring all of the tapes to a separate environment

21  that recreates the server and recreates the

22  environment from which the tapes were originally

23  pulled.  So it's sort of a two-step process to search

24  them.  They first restore them to that environment and

25  then they search.  And what they're searching for are

1   the names of our custodians and then separately

2   searching for the 3M PIN numbers, which is, for the

3   most part, how all of 3M's custodial information is

4   collected, preserved, and backed up by the individual

5   sort of unique identifying PIN number within the

6   company.

7           Once they identify that information, either

8   information related to that PIN or information related

9   to the person's name, those documents and folders and

10  emails are then pulled off of the tape, forensically

11  copied, and then put through processing.  And at that

12  point, that is when the vendor is able to see whether

13  there's a duplicative hash number or whether a

14  document has a new hash number that's never been put

15  into our review environment previously.

16          **THE COURT:**  Okay.  Well, that sounds like a

17  fairly thorough process.

18          And then -- I'm not suggesting you're going

19  to individually conduct the entire linear review.  You

20  do sort of have your frontline team actually looking

21  at documents once they have been identified?

22          **MS. SIX:**  Yes.  Given the volume so far, Your

23  Honor, it will be me.  I will be the one looking at

24  every single document, for better or for worse.  I

25  think if the volume becomes larger, which we will

1    share with Plaintiffs in real time as we find that

2    out, then we may have additional reviewers look at

3    them.  But for right now, it will be either myself or

4    Mr. Gunderson, my colleague.

5           **THE COURT:**  Okay.  Well, that's reassuring to

6    know then.  Thank you for sharing that information.

7           Anything else on behalf of the Defendants?

8           **MR. NOMELLINI:**  No, Your Honor.  Thank you

9    very much for your time today.

10          **THE COURT:**  Anything else on behalf of the

11   Plaintiffs?

12          **MR. AYLSTOCK:**  Nothing from us, Your Honor.

13   Thank you for your time.

14          **THE COURT:**  Thank you.  Have a good weekend.

15          *(Proceedings concluded at 4:04 p.m. EST)*

16          --------------------

17   *I certify that the foregoing is a correct transcript*
     *from the record of proceedings in the above-entitled*
18   *matter.  Any redaction of personal data identifiers*
     *pursuant to the Judicial Conference Policy on Privacy*
19   *are noted within the transcript.*

20

21   *s/Donna L. Boland*                      *8-24-2020*
     *Donna L. Boland, RPR, FCRR*                 *Date*
22   *Official Court Reporter*

23

24

25