**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION,

Case No. 3:19md2885

Gainesville, Florida
September 11, 2020
1:59 p.m. EST

**TELECONFERENCE**
**Re: Brandon Adkins, Plaintiff**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-42)

# A P P E A R A N C E S

**FOR THE PLAINTIFFS:**

**ROBERT W. COWAN, ESQUIRE**
Bailey, Cowan, Heckaman, PLLC
5555 San Felipe Street, Suite 900
Houston, Texas 77056

**JENNIFER HOEKSTRA, ESQUIRE**
Aylstock, Witkin, Kreis & Overholtz
17 E Main Street, Suite 200
Pensacola, Florida 32502

**FOR THE DEFENDANTS:**

**CHARLES F. BEALL, JR., ESQUIRE**
Moore, Hill & Westmoreland, P.A.
25 West Cedar Street
Pensacola, Florida 32502

P R O C E E D I N G S

**THE COURT:** It's almost two o'clock, so let's do a very brief rollcall. Our court reporter, Donna Boland, is online. And first, who is going to be speaking this afternoon on behalf of the Plaintiff?

**MR. COWAN:** Hello. This is Robert Cowan for Plaintiff.

**THE COURT:** Good afternoon, Mr. Cowan.

And who is going to be speaking on behalf of the Defendants?

**MR. BEALL:** Your Honor, this is Charles Beall with Moore, Hill & Westmoreland in Pensacola. I'll be speaking for the Defendants today. And Donna knows me, but it's B-e-a-l-l, just pronounced Bell.

**THE COURT:** Anyone else on the line that's going to be chiming in on this?

*[No response.]*

Okay. So, just to review the bidding, I set the hearing to address the Plaintiffs' *[sic]* Motion to Compel. And this was filed in the main MDL case under ECF 1343. And Mr. Adkins, through his counsel, filed a response at ECF 1378. And then, with the Court's permission, the Defendants then filed a brief five-page reply.

And I did receive -- Mr. Cowan had sent to me

this morning a copy of what looks like revised Interrogatory No. 52. It's revised interrogatories, but it includes the No. 52, as well as, I guess, the current state of affairs of the privilege log, so I have those before me as well.

So, let me first turn to the Defendants. It's your motion, and you are requesting medical records and mental health records and other records.

And you make a number of arguments, but two of the arguments, I think, that are worth talking about are, first, argument number one. We all know that, at least in my view, the majority view throughout the country of whether in a case like this you are entitled to get into mental health records is if you have put your specific mental health condition in controversy and/or were going to support your claims of mental anguish, et cetera, with expert testimony.

In the absence of that, garden variety claims of, *I've suffered emotional distress and mental damage*, without more flesh on the bones or without specificity, normally would not be enough to force a plaintiff to disclose mental health records. So that's sort of issue number one that permeates this case and this motion.

Issue two relates particularly to VA disability records. And the Defendants say, notwithstanding the law on these things, that where someone has filed a claim for VA disability -- or this would apply as well to Social Security disability -- there's a waiver. These are records submitted to a third-party, similar to what you would have if you were involved in an auto accident and you submitted records to the auto insurance carrier, even assuming these were privileged or not placed in controversy, they have been by disclosure. And they seem to be the two issues I do want to talk about.

And then the third issue relates to -- and this is why I set the hearing after the reply -- Interrogatory 52, which is the interrogatory where the Plaintiff specifies his damages seems to have gone through various levels of change.

I guess initially the Plaintiff was claiming depression, sleep problems -- I'm looking for the -- I think that was in some of the motions. Yeah, it did include a claim of depression and other things. Let me just -- just give me a moment. Yeah, here it is.

So the original interrogatory claimed -- you know, it's a matter of semantics as to causation, but essentially the plaintiff is claiming, quote,

"depression, mood disorder, and lethargy induced by sleep deprivation." That was amended on September 3 to include "frustration, sleep issues, focus issues, irritability, social isolation, and more."

And now there has been, I guess, yet another change to the interrogatory, and the Plaintiff says, "I suffer from frustration as a result of my hearing loss, the constant humming and buzzing in my ear, sleep issues as a result of the tinnitus, focus issues as a result of the hearing loss and tinnitus, irritability caused by hearing loss, and the migraine headaches I get, and social isolation," and it goes on to disclaim what he is not claiming.

So why don't we start there with the Defendants. Tell me first, in your view, is this a significant change in the damages the Plaintiff is requesting or is this really the same bottle of wine with just a different label on it?

**MR. BEALL:** Your Honor, again, Charles Beall for the Defendants. And I like that last analogy with the different bottle of wine and different label. It's a distinction without a difference, to be candid; and what they're doing here and what is going on, it's pretty obvious.

We have now gotten three sworn interrogatory

responses from the same plaintiff, each time slightly changing his story to try to back away from the line a little bit, because they want to go as close to the line as you can on these issues. And as I'll explain in a second, they're still over the line where we are.

And I think maybe the best way to sort of combine your first and third points and explain the way we view this, there really are two sort of, you know, extremes in this. We have the first, which is, as you mentioned, your ruling about your standard garden variety mental anguish claim does not in and of itself open up mental health records for discovery. That was your ruling, and we understand that. That's sort of on one extreme.

On the other extreme are those cases where the plaintiff has put mental health at issue to the point where the plaintiff's counsel agrees and are simply just producing the records and not fighting it.

So, you know, one of the things in their brief they argue is that, you know, they're basically undefeated with this issue, I think is the way they would characterize it. Well, it's because you don't see the cases where they basically concede that we've got an issue. So we've got those two extremes.

The line is in the middle somewhere, and they

have decided they want to cross up to the line as close as they can, but they're over it. And no matter how much they tried to change their sworn statements, they're still over the line.

And I think the best way to explain that would be to a) distinguish this from the Rowe case that you've already decided and they argued in their motion, and then to explain why these new changes don't matter.

And the distinction between where we are here and where we were in Rowe is, in Rowe there were records involving mental disorders, disability, mental health issues, and substance abuse issues, and there were claims of hearing issues from the Combat Arms Earplugs. But there was nothing in the records that tied those two together. And you found at that point that it was not -- there was no waiver, they were not discoverable. And obviously, we clearly disagreed with that ruling, but we understand the ruling is what it is there.

But this is a very different situation with Mr. Adkins. Because in his interrogatory responses, all three versions of them, he is tying his use of the Combat Arms Earplug and his alleged hearing loss and tinnitus to the mental health disorders that are

replete throughout his history. And so, there is an actual direct tie between what he says is his hearing issues and the mental health disorders.

And the way they tried to sort of move the ball here on us and on the Court, as you pointed out, is in the initial responses they explicitly said that, because of his hearing issues, that he suffered from depression, mood disorder, and lethargy, all three of which are mental health disorders that he has been diagnosed with. So he -- they actually used sort of the same labels there.

When they realized that was a problem, they changed it and decided they would not mention the labels; they would mention the symptoms. So they said that the result of the use of the Combat Arms led to frustration, sleep issues, focus issues, irritability, social isolation, and more, and left it like that.

And then we pushed that in their reply. They have now basically done the same thing but expanded it and included a disclaimer sentence in the middle. So what they say is, you know, "I suffer from frustration, I suffer from sleep issues, I suffer from focus issues, I suffer from irritability, I suffer from social isolation, all because of the Combat Arms Earplugs and hearing issues."

Then he says, "I am not claiming that the CAEv2 caused any of my diagnosed mental health conditions. Instead, my hearing loss and tinnitus present me with additional health-related burdens that I must overcome distinct from my mental health diagnoses."

The problem with that effort on their part is that mental health conditions are not like, say, COVID where you simply do a test and either you have it or you don't. Instead, mental health conditions and diagnoses are essentially a constellation of symptoms, that's what they are, and you look at the DSM and other guidelines, and you diagnose based upon that, but you're looking at symptoms.

And so the key is to focus on what they have said in the interrogatory response, even as recently as last night, the symptoms that he has -- frustration, sleep issues, focus issues, irritability, and social isolation.

What they're basically saying is that -- Mr. Adkins is saying that his hearing loss did not cause his diagnosed mental health conditions. But at the same time, he is saying that his hearing loss caused these symptoms that led to the diagnosis of his mental health conditions, which is a distinction without a

difference.

And I think, going back to my COVID analogy, the best way to describe it would be to say they're kind of saying, *Well, my trip to Publix did not cause me to contract COVID; instead, my trip to Publix caused me to contract fever, shortness of breath, congestion, loss of sense of smell, loss of sense of taste, and shortness of breath* -- basically the symptoms of COVID.

So that's what they're doing here, they're saying, we're not going to say that the hearing loss and tinnitus that they're alleging caused the name of the disorder; they're just saying it caused all of the various symptoms which are, in fact, the disorder.

And the best way to do that, Your Honor, is pick the DSM up off your desk, if you have it, or get on Google and do what I did and just look at the various symptoms -- the various diagnoses he's had.

In his records, he has, among other diagnoses, adjustment disorder with disturbance of conduct, which is something that is exhibited by behavior problems such as fighting and reckless driving. He's been diagnosed with adjustment disorder with mixed disturbance of emotions and conduct, which is a mixture of depression and anxiety, the various

things he's talking about in his interrogatory responses.

He's been diagnosed with antisocial personality disorder which involves significant irritability. Again, irritability is one of the symptoms he has talked about in his interrogatory responses. Social isolation is the obvious result of antisocial personality disorder, which is something he says he blames on the Combat Arms Earplugs.

Most important, depressive disorder, which is something he's been diagnosed with, is essentially the exact same thing he's saying he's got from the Combat Arms. Depressive disorder symptoms include irritability, it includes frustration, it includes sleep disturbances, it includes trouble thinking and concentrating, which is essentially focus issues.

The very things he says he's got because of Combat Arms are the very symptoms that are one and the same with his mental health diagnoses.

So, essentially, if you were to draw a Venn diagram of the various symptoms that he is alleging and also the symptoms of depressive disorder and the other disorders that he's been diagnosed with, they would overlap completely. There would be no difference. There's no symptoms he's alleged to be

caused by the hearing loss in that stuff I read earlier that is not also a significant symptom of the mental health disorders that he has been diagnosed with.

So, unlike every other case you have considered in this litigation, which isn't many because we have not done that many of these -- despite their suggestion that we keep going back to the well, these are case-by-case issues. You have not faced this case before, because this is the first time you have faced a case, to my knowledge, where the plaintiff says that my hearing issues have caused me the very symptoms that are synonymous with his mental health diagnosis in the records.

So, for that reason, he has put his mental health records directly at issue in this case. Because we're not just talking about garden variety mental anguish claims; we're talking about economic damages claims here.

He's claiming loss of earning capacity, both present and future. He's claiming -- the latest is he's claiming reduced family services contribution. And those are various things that he says he's suffered damages because of these symptoms, which are symptoms of the various mental health disorders that

they are now trying to redact to keep us from discovering.

And for that reason, he has waived that, he's opened the door. It's clearly relevant to this case, and therefore they should be produced.

And I should also -- just on the substance abuse issue, in addition to the various things we have talked about earlier, there is actually a redacted record that we were able to -- where he admitted that his substance abuse issues he believes were the reason he could not find work in 2017.

The records show that he smokes marijuana on a daily basis. He's got a severe cannabis disorder and dependency in this situation. So, if he is unable to work and says he can't work because of his use of marijuana and his DUI, then, a) they should not be able to redact that statement and hide it from the jury, and b) we should be entitled to all the records to prove that he is, in fact, correct, that the reason he can't work is because, among other things, that he smokes marijuana every single day and he's antisocial. Those are the reasons he can't work, not because of his alleged hearing loss.

So, for those reasons, Your Honor, we would ask the Court to grant the Motion to Compel even

notwithstanding the eleventh hour attempt to amend both the privilege log and the interrogatory responses.

**THE COURT:** Okay. Thank you.

Let me hear from you, Mr. Cowan.

**MR. COWAN:** Thank you, Your Honor, for taking time this afternoon to help us resolve this issue.

And let me start out by saying I'm obviously not counsel on the Rowe case. I'm not as familiar with the issues in that case as Mr. Beall and some of the members of the Leadership team. So I may ask, with the Court's permission, to have Ms. Emily Marlowe or Ms. Jennifer Hoekstra to chime in on those issues, if the Court will allow it.

But let me start out by saying that, initially Mr. Adkins responded to Interrogatory 52 before the issues that have been raised over the summer in various cases concerning mental health issues and where the line is with respect to various plaintiffs' records. And so, there has been some iteration of those responses over time.

But most recently, the alterations in Mr. Adkins's responses are consistent with exactly what we have been telling Defense counsel in our meet-and-confer sessions when all of this came up, and

that is that Mr. Adkins is not claiming that -- despite what Mr. Beall is arguing, and I don't know how it could be more clear in an interrogatory response -- that he is not claiming that his mental health conditions are linked to his hearing and the CAEv2 use.

And really, the last amendment to the interrogatory response was prompted by a statement in the reply that was filed a couple of days ago on this issue, and that statement was, quote -- in the reply brief, quote, "Adkins has not abandoned his assertion that the manifestation and symptoms of his mental health conditions are causally related to his use of the CAEv2."

So that is exactly what he has done and what we have been trying to communicate to Defense counsel through our meet-and-confers. 3M's primary argument, then, is that Mr. Adkins's answer to Interrogatory 52, which asks about the type and amount of damages he is seeking in the case, implicates and puts at issue his extensive mental health history, which we are trying to protect.

As the Court has ruled repeatedly, a plaintiff does not put his or her mental health at issue by claiming damages for garden variety mental

health conditions. And to be clear, Mr. Adkins has disclaimed in Interrogatory 52 any causal connection between his use of the CAEv2 earplugs in the military and his mental health diagnoses.

Mr. Adkins's answer to Interrogatory 52 clarifies his position, which is the same position that we have been attempting to make clear to counsel through our meet-and-confers, that, quote, "I am not claiming that the CAEv2 caused any of my diagnosed mental health conditions."

Instead, Mr. Adkins treats his hearing loss as a distinct health burden that he must live with but he does not connect his hearing loss with causing his other diagnosed mental health conditions.

Now, the problem with 3M's argument -- and Mr. Beall just reiterated it just now -- is that they suggest that all of this is so intertwined that they must be entitled to unfettered access to the redacted records.

But what 3M's argument boils down to is this: They're saying that, if there is an overlap of garden variety symptoms, such as sleep issues or frustrations or headaches, triggered by Mr. Adkins's hearing issues or his mental health conditions, then everything should be discoverable. But that would render

meaningless this Court's prior orders protecting mental health records, for example, if stress is a symptom of PTSD, but this Court has already expressly ruled that the garden variety mental health issues such as emotional distress do not put one's mental health at issue.

In his answer to Interrogatory 52, Mr. Adkins states he is suffering from frustration, sleep issues, focus issues, irritability, migraines, and social isolation, all the result -- he's very clear -- of his inability to hear well. If any of those symptoms overlap with symptoms of his diagnosed mental health conditions, as 3M is arguing, that cannot serve as the basis to give 3M access to Mr. Adkins's sensitive records, especially where he has disclaimed any of his mental health conditions were caused by the CAEv2.

And with respect to Mr. Beall's argument on the damages claim for loss of services, that is something that has come up in Plaintiff's initial disclosures. It's an argument that Defendants have now first raised in their reply brief. We don't think that is proper argument given that this was not part of the original Motion to Compel.

And so, we would argue that, any arguments with respect to loss of services damages that were

disclosed in the initial disclosures should not be considered as part of the argument today given that it was not part of the initial motion.

In any event, case law --

**THE COURT:** Let me interrupt you for just one second because I didn't really understand. What is, in layman's terms, reduced family services?

I have thought about it in different ways, but I'm not sure generally what that means. So give me an example.

**MR. COWAN:** Sure. I think it's a -- and I'm going to attempt to characterize this. I believe it's something of a catch-all term that was used and kind of seized upon by Defendants in the initial disclosures that's meant to capture, whether artfully or not, things such as -- and I'm looking -- flipping through the initial disclosures.

He has a statement in here that says, "The following comprise Plaintiff's preliminary economic damages ranges from 30 to 50 percent reduced family services contribution," and it lists such things as earnings in future years, household services in past years, household services in future years, child care in past years, child care in future years, et cetera.

**THE COURT:** So these are things that your

client either can't contribute or can't do, so he's not able to effectively contribute to child care? It's not that he can't afford to hire a child care worker; it's he can't perform it?

**MR. COWAN:** That's correct, Your Honor.

**THE COURT:** Yeah, okay. That's sort of what I thought it was. I'm sorry I interrupted you. You can go ahead.

**MR. COWAN:** No, no. I had one brief point to add on that. Despite the fact that we think the argument is improperly made given that it's part of the reply, the case law says the Defendant's position is wrong.

Plaintiffs claiming damages for loss of services does not put mental health records at issue. And I would cite the Court to, for example, the *Reed vs. Maersk Line* case from the Southern District of Texas, 2020 WL 2842032 at *3. And that case stands for the proposition that, "The mere assertion of a damage claim for mental anguish, loss of consortium, loss of services, et cetera, does not give defendants an unfettered right to explore plaintiff's darkest and deepest secrets by accessing their mental health records."

And I do have one other cite, Your Honor,

*Boyd vs. City and County of San Francisco*, 2006 WL 1390423 at *6.

**THE COURT:** Okay. Talk to me very briefly about -- and this is a slightly different issue, and Defendant alluded to it at the end of their argument -- about substance abuse.

And we know the Court has sort of carved out substance abuse records, in general. And the theory behind that is, you know, simply because someone may have used drugs doesn't necessarily, just because they file a lawsuit, open the door to past drug usage, except in a situation where substance abuse issues directly relate to employability.

And I know the Defendants have this argument from their vocational expert that they need to know the substance abuse history of every human being because the vocational expert always has to take that into account in determining employability.

And I think I've said at a hearing, you know, that sort of doesn't make a lot of sense. I mean, that's like saying someone who smoked pot in the '70s can't be president of the United States because it goes to employability.

But certainly substance abuse history -- I think I was quoted in one hearing as saying, if

someone has a serious heroin addiction problem, we can all agree that is going to impact the ability of that individual to obtain employment.

And here, one of the things that the Defendants point to is they say that your client represented -- and I think this is in some VA disability proceedings or appeals of decisions -- that his use of controlled substances do impact or have impacted his ability to obtain employment.

So is that true? Is there some evidence of that? And if that's true, why wouldn't substance abuse then be relevant?

**MR. COWAN:** Your Honor, I'm not familiar with the precise record that Mr. Beall refers to offhand. It's something that I may have seen.

However, I can tell you, in speaking with Mr. Adkins -- and his employment history reveals this -- that he would definitely disagree with Mr. Beall's statement that he is a marijuana user every day, and especially more recently, now that his epileptic seizures have gotten under control through pharmaceutical medication.

However, the work history itself reveals that, in the course of his time since he's been back in the United States and honorably discharged from the

service, that he has had a number of jobs, has moved around to jobs, but some of those jobs he's held for a year or almost two years. And so -- and has been employed currently with a construction firm.

And so it simply doesn't bear out -- whatever this statement -- whether it was Mr. Adkins in the records, as Mr. Beall represents, or it was the assessment of the person that he was speaking with at the VA, I don't know that. However, I can tell you for certain that Mr. Adkins would disagree with the statement that he cannot work because of his marijuana use.

And I know that in the Court's July 17th, 2020, order, which I believe was the reconsideration of which was denied, the Court, you know, at least in the hearing, addressed the situation of, for example, a person who is a heroin addict and using heroin on a daily basis, that might get you into an area where you could argue that the person is nonetheless not employable.

But that's not the situation here, Your Honor. Mr. Adkins is not a heroin addict, nor is he using heroin at all, or ever, or marijuana even on a daily basis. He's been treated for his marijuana use, which has been legal in his home state of Washington

where he's lived since 2012, but it has not prevented him from getting a job. He's been steadily employed through various employers, as I have mentioned.

3M has his employment records, which are sufficient for 3M to obtain information relating to any performance issues or manifestation of ailments that limit him from his work opportunities. There's just no basis or need for 3M to access his private treatment and counseling records based on the arguments they have made.

**THE COURT:** Right. Yeah, what they quote is a VA record from 2017 which cites that Mr. Adkins, I believe, in 2017 that legal issues for a DUI from February of '14 and chronic marijuana addiction were preventing him from getting a job, and they reference one of the exhibits to their motion. That's really what I was focusing on.

One other collateral issue. You mentioned an honorable discharge. The Defendants here say that your client was separated from the Army for a drug rehabilitation failure. But he did receive an honorable discharge?

**MR. COWAN:** Yes, he did, Your Honor. That was revisited, and he was ultimately honorably discharged. And he has a number of honors that we

have identified in our interrogatory responses and Defendants are well aware of.

**THE COURT:** Okay.

**MR. COWAN:** And with respect to the record, I apologize, I do recall that exhibit now. I'm sorry. I'm working on the road and looking at a laptop screen and -- *(inaudible)* -- the ability to flip back and forth.

But I can tell you again and I believe -- in Mr. Adkins's deposition next week, I believe Mr. Adkins will take serious umbrage with the statement in that record.

**THE COURT:** Okay. Let me go back to Mr. Beall and hear from you in response or rebuttal to Plaintiff's argument.

**MR. BEALL:** Sure. And, Your Honor, I think the way I would respond is to say, you know, going back to where the line is, you know, there are cases where the line is -- you know, cases close to the line, other side of the line, whatever. And respectfully, this is not one of those cases.

This is not a situation where, for example, he's saying that my loss of hearing has caused me stress or caused stress in my marriage, using sort of a generic buzz word that everybody in the world has

stress at some point or another, and therefore that doesn't open up the mental health records. You know, we can address a case like that if it comes up down the road when you're dealing with a situation like that as far as earning capacity and the like. That's not what we've got here.

As I mentioned earlier, if you look at the interrogatory responses and you mention -- it talked about all of the symptoms he quotes are exactly the symptoms you would expect someone with his disorders to have.

So it's not a situation where just mentioning a symptom that happens to be coexisting with depression would be enough; it is the entire universe of symptoms. And, like I said, it's like a Venn diagram; it fits entirely there.

And I hate to keep going back to my COVID analogy, these days especially. But having fever does not mean you have COVID. But if you've got fever and loss of taste and loss of smell and congestion and shortness of breath and you have been exposed, then that's a different thing.

And that's kind of what we're dealing with here. We're not talking about one isolated reference to a symptom that might be part of a mental health

disorder. We're talking about a litany of symptoms which he claims are caused solely, apparently, by this earplug allegedly failing, even though those exact same symptoms are present and have been present in his mental health disorders for years.

For example, social isolation is one thing he claims, "I am socially isolated because of my hearing." Well, he's also been diagnosed with antisocial personality disorder, which is the ultimate social isolation. Nobody wants to be around somebody with antisocial personality disorder. So if you're feeling socially isolated, it's very likely not because you think you can't hear; it's because of your personality disorder.

And again, all the other things he's got going on -- frustration, sleep issues, focus issues, irritability -- all of those are exactly what you would expect from somebody with the constellation of diagnoses this man has.

So we can talk later if we get to a case where there's one isolated thing and you can decide that issue then. But here we have a case that we don't think is close to the line at all because of the various symptoms that he has mirror the symptoms from his mental health diagnoses.

And the same thing, by the way, is true with the substance abuse issue. Counsel made a very good jury argument just now as to why those records may not be relevant. They may not be admissible. We don't have to make that decision right now. We're not talking about whether they're going to be persuasive to a jury today and whether they have arguments against them. We're not talking about admissibility. We're simply talking about can we get them, can we look at them, can we have discovery into these documents.

And we're not talking about a situation where a person is, you know, every Saturday night they go out with their friends and they might smoke a joint. We're talking about a person who has been diagnosed with a marijuana/cannabis disorder, who has been treated for that, who has -- whether counsel agrees or disagrees, at least there is a statement in the record suggesting that he believed that could be a reason why he's unable to find work all the time.

And our own expert, as you point out, has, not surprisingly, said that's exactly what you would expect. I don't think it takes a vocational expert to understand that somebody who has a marijuana habit to the point where they are smoking every day -- what the

records say. Whether he is or not now, I can't say. But at the time of the records we've been aware of, he was smoking every day, and that led to his discharge from the military.

Those are the kinds of things that are unquestionably relevant. And again, we're not talking about a person having a beer on a weekend. We're talking about a person every single day, according to these records.

So while there may be close-to-the-line cases that you'll address down the road, this is not one of them.

**THE COURT:** Okay. Thank you very much, both sides. It's helpful sometimes to have oral argument and, as I put in the order, one of the reasons I felt I should have oral argument. Because, since I did let the Defendants file a reply, you know, there were some things raised in there I wanted to give Plaintiff an opportunity to respond to so I'd have the full picture.

In my view, this case is different from Rowe and Hacker. And I know neither of you were really involved in that. Although there was, I believe, in both of those cases, some measure of a disability rating for a mental health issue, ultimately, the

Defendants did not get access to those records because the cause of the mental health -- there was no causation between that and tinnitus, but the incident or circumstances that gave rise to the mental health issue, as I put in the order, were, quote, "far afield from the issues in this case and were of a highly personal nature."

And it wasn't just because under no set of circumstances would the Court ever allow that type of evidence to be admitted at a trial; because it was so far afield, I found it was not relevant, but I thought really not proportional, there was no need to get into that. Because, when you look at proportionality, you look at the importance of the information to resolution of the issues in the case, and I concluded there that it really would not be of much, if any, importance.

Now, the challenge always with these cases is to distinguish what's garden variety and what's not garden variety. And as some judges have cited in their decisions, the challenge is to find out what is in the garden.

And we can all agree that a garden variety claim of mental anguish, emotional distress, where a plaintiff gets on the witness stand and says, *As a*

*result of a car accident, I've been upset, this is the worst thing that ever happened to me, I'm very sad, and I cry, and this is a horrible thing*, just because they allege that and give that testimony, that does not necessarily put into issue all of their mental health history.

But what we have here is, you know -- though it was a bit of a moving target in the amendment to Interrogatory No. 52, and it certainly has been more narrowed down, but, as the Defendants points out, really what's been narrowed down is some of the labels have been taken off, but certainly the symptomology is specific and does relate to identifiable mental health issues here. We're talking about social isolation, sleep issues, irritability, and those kinds of things, all of which relate to identifiable mental health issues.

So, in this instance, I do find that this case does not present garden variety claims of mental anguish, emotional distress; but indeed, do present identifiable issues, and those identifiable issues clearly relate to some of the mental health issues that the Plaintiff has suffered.

And because there is a causal connection -- and I understand the Plaintiff is saying, I, the

Plaintiff, do not assert a causal connection between my isolation and mental health issues. You know, in the past, he has been diagnosed with issues -- mental heath issues relating to social isolation, and that puts it in controversy.

And therefore, at least at the discovery stage, in my view, entitles the Defendant to discover information relating to that so, if appropriate, the Defendant can make an argument at trial and say, well, this person suffers from isolation, but that is a result of their mental disorder, they were diagnosed in such and such period of time with isolation, something identified under the DSM, they have suffered that for some time, and therefore we say that is the causal connection with the claimed damages in this case, and then the jury can resolve that.

So, in my view, this is not, despite Plaintiff's best efforts in amending Interrogatory No. 52, is not a garden variety mental health issue case. It is one where there have been specific issues raised in the answer to interrogatory, and there is clearly information in the Plaintiff's past mental health history that do relate directly to those types of things.

And then, on substance abuse. Substance

abuse, in my view, is a little bit of, you know, a different issue. But here, Defendants have asserted some information in the record where there is a serious substance abuse issue where, in 2017, Mr. Adkins -- and you may need a deposition to explain that or deny it or something else, but he said, according to this record, that one of the issues impacting his employability is his severe cannabis addiction.

And, you know, if the Plaintiff himself, at some point, took the position that using marijuana had seriously impaired his ability to obtain employment, then it becomes relevant in this case. Because there are claims in this case for diminished earning capacity and future diminished earning capacity. And therefore, because we're at the discovery stage, the Defendants should be entitled to get into it.

So, on that basis, I am going to grant the Motion to Compel, which leads me to one last issue. And there was some issues here relating to the privilege log and some of the redactions.

Does the Court's ruling on this issue, does that essentially moot the issues on the redactions, or are there other issues that I'm not aware of that relate to the sufficiency of the privilege log and/or

the redactions?

**MR. COWAN:** Your Honor, may I be heard on that issue?

**THE COURT:** Yes.

**MR. COWAN:** With respect to Your Honor's ruling just now and the very sensitive nature of these records and the volume of them -- there's something like 8,000 pages involved -- there is no question -- and I don't even think Defense counsel would disagree with this -- that there are voluminous records about Mr. Adkins's mental health issues, PTSD and otherwise, that cannot be said to have any relation to hearing loss.

And so, I know this has been done in other cases, but I would urge Your Honor to, as the Defendants have offered, take the opportunity to do a small sample *in camera* review of some of these records selected by Defense counsel and selected by Plaintiff's counsel before we just throw them open.

I do think the Court is going to find, as has happened in the past, that there's a large amount of documents that simply cannot be said to be related to claims for hearing loss and are very, very sensitive issues with respect to mental health conditions.

**THE COURT:** Well, there's, you say, 8,000

documents and you have a deposition on Wednesday. You know, these -- maybe this helps. These records all will be produced under the protection of a protective order/confidentiality agreement. So no one, other than counsel and whoever assists counsel, paralegals, et cetera, et cetera, are going to have access to these documents.

And just so everyone understands, the issue of whether any of these records ultimately are going to be admissible is certainly a discussion for another day.

So, for example, Mr. Cowan, if there is some record there that's produced relating to PTSD that you think is really far afield from anything that would be involved in this case, that does not mean that it's going to be introduced into evidence. There may be a number of motions in limine and/or maybe the parties even agree that it's not relevant.

But I'm not quite sure how, in an *in camera* review, I'm going to, between now and Wednesday, be able to cull out records that have been redacted that you say are far afield.

For some reason I thought that information -- pages had not been withheld; it was just information in what was produced was redacted.

**MR. COWAN:** That's correct, Your Honor, it would be an *in camera* review of the redacted materials, not anything that was withheld.

**THE COURT:** Well, I'm not sure what would be accomplished. I mean, there's really been very little claim here -- you know, for example, I'll use the Rowe case as an example, Rowe or Hacker, one or both of them, arguments were made along the lines that you have advanced to the Court, you know, it's garden variety and whatnot.

Ultimately the Court did look at documents. And the information that was redacted -- and, again, for one, it was either Hacker or Rowe, I forget which one -- it was 16 documents. And essentially, an incident had been redacted, and that incident was something that was referred to in mental health records and mental health history, but it was an incident that, to use my words in the July 17th order, was far afield from any issues in the case. And I'm being very oblique about it.

Are you saying that type of thing is evident here? Because I haven't seen any argument on that, that, you know, they ought not get the records because of, you know, highly personal stuff. You know, I'll just give you an example, like there's something in

the record that, you know, Mr. Adkins is a pedophile or something like that. I mean, are you suggesting it's that kind of situation? Because we can all agree that that has nothing to do with anything. Or are you simply saying there is, you know, personal, sensitive information, of course, when you get into mental health history, but not of that nature like the example I just gave?

**MR. COWAN:** It's certainly not of the nature of the example you have given or anything like that. It's, you know, it -- there are incidents that I would characterize as far afield. I think, you know, there's family history related stuff.

If Your Honor would like additional detail right now, I can ask Ms. Hoekstra or others that have reviewed the documents more on a page-by-page basis than I have, but --

**THE COURT:** Well, let me do this. At this point, I am not inclined to do an *in camera* inspection. So the documents will need to be produced, but subject to confidentiality and protective order so that any sensitive information -- so in a mental health record maybe, like you say, there's some family history and, you know, came from a broken home and, you know, that kind of thing, that,

you know, is not going to be disclosed to the world.

But, you know, in the absence of some proffer that there is something highly inflammatory -- maybe that's the correct word -- I'm not inclined to do an *in camera* review at this point, nor, quite frankly -- you have a deposition set for Wednesday -- am I really going to have time between now and Tuesday to do an *in camera* review and make a decision on a sampling or even a document-by-document basis.

So, at this point, your request for an *in camera* review, I'm going to deny it.

Now, let's talk about production. I don't think it was that many documents that were involved in this.

What kind of time frame would be involved in producing the unredacted records to the Defendants in sufficient time so they would be able to use them, if they so chose, at the deposition on Wednesday?

**MR. COWAN:** Your Honor, thanks for considering the *in camera* request, I appreciate that.

Let me defer to Andrea McGinnis at my office, if she's on, or Ms. Hoekstra, if she's not, about the timing of that.

**THE COURT:** Is Jennifer Hoekstra on?

**MS. HOEKSTRA:** I am on, Your Honor.

**THE COURT:** I just wondered what kind of time frame to get the documents -- unredacted documents produced.

**MS. HOEKSTRA:** Understood. And I don't know if we could do it this afternoon, but I believe we could do it over the weekend before Monday.

**THE COURT:** Okay. That would be great. So why don't you do this: Get the documents --

**MR. COWAN:** Your Honor --

**THE COURT:** Yes, go ahead.

**MR. COWAN:** I'm so sorry to interrupt. I do want to make Your Honor aware of one issue that Defense counsel is already aware of but it's out of our control.

There are documents that we received from the VA that the VA had redacted information in the documents, and so we will be producing those as we received them. So, if there are any redactions remaining in the documents, those will be ones, as we have made Defense counsel aware, that already had redactions in them when we received them.

**THE COURT:** I did see that you had made reference to that. When I was looking at some of the examples of documents that were provided, I was trying to figure out for myself what would have been VA

redactions, and I really couldn't tell what they would have redacted, unless it's things like Social Security numbers and personal identifying information. I don't know if you all did that or the VA did that, if you know.

**MS. HOEKSTRA:** The VA did the majority of those. There were not privacy redactions that were done, Your Honor.

**THE COURT:** Okay. So let's do this. If you could get the documents produced by the close of business on Monday, then the Defendants will have the benefit of those for the deposition on Wednesday.

And I assume this deposition -- well, I shouldn't assume. Is the deposition going to be done remotely?

**MR. BEALL:** No, Your Honor. We're doing it actually in person in Houston, and so that's going to require a little travel. I would respectfully request that the Court accelerates the deadline for that production to be done.

I recognize they can't do it this afternoon, so I want to be reasonable. But if we don't get the documents until close of business Monday, with traveling on Tuesday, it's going to be virtually impossible to use those documents. And I think, since

we're simply removing redactions as opposed to having to do like a -- *(inaudible)* -- review or whatever, I think it could be done over the weekend. And so, I would request that it be provided to us, if not, you know, first thing Monday morning or some sort of time in the morning, if not, on Sunday. That way we can at least have the ability to put them together in a usable way Monday afternoon into Tuesday.

**THE COURT:** Ms. Hoekstra, could you do it by, let's say, lunchtime on Monday? That will give you some time and you can maybe do some over the weekend but get it finished early Monday so that they had the benefit of it?

**MS. HOEKSTRA:** Absolutely not a problem. And we'll coordinate with Mr. Cowan and send an email to Defendants saying when it's produced as well, so that, if they don't have anyone available checking the system over the weekend, they'll get email confirmation.

**THE COURT:** Okay, great. Anything else from the parties?

Mr. Cowan, anything else on behalf of your client?

**MR. COWAN:** I don't believe so, Your Honor.

**THE COURT:** Okay. And Mr. Beall, anything

more on behalf of your clients?

**MR. BEALL:** No, Your Honor. Thank you.

**THE COURT:** Okay. Thank you both. Have a good day.

***(Proceedings concluded at 3:01 p.m. ECT)***

--------------------

*I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy are noted within the transcript.*

***s/Donna L. Boland*** — ***9-11-2020***
***Donna L. Boland, RPR, FCRR*** — ***Date***
***Official Court Reporter***