# EXHIBIT F

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

## for the

### Northern District of Florida

<table>
<tr><td>_____<br><i>Plaintiff</i><br>v.<br>IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS<br>LIABILITY LITIGATION<br>_____<br><i>Defendant</i></td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Civil Action No.   3:19-md-02885</td></tr>
</table>

## AMENDED SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:
<div align="center">Dr. William J. Murphy<br>1147 Springdale Court, Lawrenceburg, Indiana 47025</div>

<div align="center"><i>(Name of person to whom this subpoena is directed)</i></div>

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Section II.A of Exhibit 1

<table>
<tr><td>Place: The Westin Cincinnati<br>21 E. 5th Street<br>Cincinnati, Ohio 45202</td><td>or, Alternatively, via<br>Remote Deposition</td><td>Date and Time:<br>09/16/2020 9:00 am</td></tr>
</table>

<div align="center">The deposition will be recorded by this method:   Stenographic and Videographic</div>

❏ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   08/26/2020

<table>
<tr><td><i>CLERK OF COURT</i><br><br>_____<br><i>Signature of Clerk or Deputy Clerk</i></td><td>OR</td><td>/s/ Ashley Neglia<br>_____<br><i>Attorney's signature</i></td></tr>
</table>

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* ___Defendants.___ , who issues or requests this subpoena, are:

Ashley Neglia, Kirkland & Ellis LLP, 555 S. Flower St., Los Angeles, CA 90071; Ashley.Neglia@kirkland.com; (213) 680-8114

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   3:19-md-02885

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT 1

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, IL 60654
United States

Nicholas F. Wasdin
To Call Writer Directly:
+1 312 862 3254
nick.wasdin@kirkland.com

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

February 6, 2020

**Via Email**

Robert R. Redfield, MD
Director, Centers for Disease Control and
Prevention
1600 Clifton Road, N.E., MS D-14
Atlanta, Georgia 30333

Re:     Touhy Request Relating to *In re: 3M Combat Arms Earplug Products
          Liability Litigation*, 3:19-md-02885-MCR-GRJ (N.D. Fla.).

Dear Dr. Redfield:

In connection with *In re: 3M Combat Arms Earplug Products Liability Litigation*, a multidistrict litigation pending before the Northern District of Florida, this letter constitutes Defendants 3M Company ("3M") and Aearo Technologies LLC's ("Aearo") second *Touhy*[1] request to the United States Department of Health and Human Services ("DHHS") for certain documents described below, and to interview and depose two current or former employees of the National Institute for Occupational Safety and Health ("NIOSH"), a federal agency within the Center for Disease Control ("CDC"), who were involved in testing of the Combat Arms Earplugs Version 2 ("CAEv2"). Pursuant to 45 C.F.R. §§ 2.1 - 2.4, Defendants set forth the basis for their *Touhy* requests as follows:

## I.     Summary of the Litigation

3M was founded in 1902 as a small-scale mining venture in Northern Minnesota, and has grown into a global science company employing over 90,000 people and produces more than 60,000 products world-wide. Many of 3M's brands have become universally known, including Scotch™ Brand adhesive tapes, Post-it® Brand sticky notes, and Thinsulate™ thermal insulation, to name just a few. In addition to its consumer-side business, 3M also had a long-standing relationship with federal and state governments for well over fifty years and provides thousands of products designed to protect American troops and support their missions. In 2008, 3M

---

[1]     *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

# KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 2

purchased Aearo, who, at the time, was a global leader in personal protection equipment, headquartered in Indianapolis, Indiana. The acquisition helped 3M expand its occupational health and environmental safety platform by adding hearing protection, eyewear protection, and fall protection to its product lines, including Combat Arms Earplugs - the subject of this litigation. Combat Arms Earplugs represented a significant advance in hearing protection in that they were one of the first hearing protection devices to offer protection from high-level impulse noises, like gun-fire, while still allowing the user to hear lower level sounds, like speech, with limited interruption. Hearing loss is a common injury among military veterans. The U.S. military has provided hearing protection and preservation services to soldiers for decades. In support of that mission, the military employs audiologists to administer hearing conservation programs and work with outside contractors, like 3M, to advance their hearing protection goals.

The complaints in this litigation assert claims for alleged hearing loss or tinnitus allegedly caused by noise exposure to plaintiffs while wearing the CAEv2. CAEv2 was developed and designed by Aearo at the request of and in close consultation with U.S. military audiologists, including Dr. Doug Ohlin, former Program Manager, Hearing Conservation, U.S. Army Center for Health Promotion and Preventative Medicine. Specifically, the U.S. military and Aearo decided to modify and update Aearo's Ultrafit® triple-flanged earplug by including a specially patented filter created by the French-German Institute in Saint Louis, France ("ISL"). Thereafter, Aearo worked with the U.S. military and ISL to develop an earplug embodying ISL's patented technology, which ultimately became CAEv2. CAEv2 consists of two Ultra-fit type tips, one green and one yellow, attached to opposite sides of a plastic stem with a small opening at the center. The green end works like a conventional passive earplug, providing steady and continuous protection from ambient noise. In contrast, the yellow end allows sound to travel into the opening at the center of the earplug and through a sound channel and the patented filter before entering the ear. The filter allows lower-level sounds, such as speech, to pass through while reducing higher-level impulse noises, like gun-fire. Throughout the design process, Aearo worked closely with the U.S. military to ensure that CAEv2 would appropriately balance performance with military operational needs for soldiers and military personnel. These specifications were memorialized in a Medical Procurement Item Description ("MPID") that was used by the Defense Logistics Agency to solicit bids from Aearo for CAEv2.

On April 3, 2019, the Judicial Panel on Multidistrict Litigation entered an order transferring the consolidated cases and any tag-along actions to the Northern District of Florida. To date, tens of thousands of actions have been filed on behalf of current or former military personnel who allegedly were issued and used the CAEv2 during their service. Plaintiffs typically allege hearing loss and/or tinnitus as a result of noise exposure in military and combat settings, and assert claims for design defect, negligence, failure to warn, breach of warranties, and/or fraud. For example, Plaintiffs allege that the CAEv2 was "dangerously defective" because, among other things, (i) the CAEv2 does not provide adequate attenuation for certain noise exposures, (ii) the short length of the CAEv2 "prevented Plaintiffs from obtaining a proper fit and seal when inserting the device

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 3

into their ear canals," and (iii) the "design of the [CAEv2] also caused the device to loosen imperceptibly in Plaintiff's ear canals." (*See* Compl. ¶¶ 2, 6-7, 194)  According to Plaintiffs, (i) Defendants "supplied this dangerously defective product to Plaintiffs and the United States military for more than a decade without Plaintiffs or the United States military having any knowledge of those defects and risks," and (ii) Defendants never warned Plaintiffs or the U.S. government that, to obtain the attenuation ratings achieved during product testing, "they reconfigured the device by folding back the flanges of the open end before inserting the closed end of the device into the ear canals of the test subjects." (*Id.* ¶ 5)

3M and Aearo deny these allegations.  Among other things, product testing performed by the U.S. Government, Aearo, and other third parties demonstrates that the CAEv2 provides the intended levels of attenuation.  Defendants were in active communication with the government during product development, and the government was aware of the product's performance capabilities and limitations.

In addition to defending Plaintiffs' claims on the merits, 3M and Aearo have also asserted the federal government contractor defense set forth in *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1998), because Aearo sold the CAEv2 to the U.S. military under government contracts and in accordance with the government's specifications.  The government contractor defense applies where, as here: "(1) the United States approved reasonably precise specifications [for the product at issue]; (2) the [product] conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the [product] that were known to [it] but not to the United States." *See id.* at 512.  Here, the CAEv2 was designed and manufactured in accordance with the military's specifications, which included a reasonably precise instruction to shorten the earplug to its allegedly defective length.  The government was aware of CAEv2's performance capabilities and limitations, including any alleged "fitting" limitations caused by the product's length.

Much of the materials relevant to Plaintiffs' claims are in the possession of the U.S. Government.  For example, service and medical records for individual Plaintiffs are in the possession of the VA and DOD.  The DOD also has records related to, among other things, CAEv2 design and development, CAEv2 testing, noise exposure data, and hearing protection usage rates. The parties have been working with the VA, DOD and the Court to identify and produce these records, and to schedule the depositions of related government witnesses.  The Court has directed the parties to endeavor to complete this phase of government discovery in February and March, 2020.

## II.      Interview And Deposition Requests

Defendants request an interview and deposition with (i) NIOSH employee William J. Murphy (wmurphy@cdc.gov; wjm4@cdc.gov); and (ii) former NIOSH fellow Dr. Mark Little

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 4

(tzl3@cdc.gov).[2]  Defendants request interviews occur prior to the depositions, and believe that such interviews will make the deposition process more efficient, including by (i) identifying the location of relevant documents and data in advance of the deposition, which will help avoid the need for additional depositions if a witness identifies relevant materials for the first time during a deposition; and (ii) minimizing unnecessary depositions through pre-deposition identification of any witness with minor roles or immaterial knowledge, which may reduce the time and expense of organizing a formal depositions for that witness.

A.     **William Murphy**

Mr. Murphy is or was a program coordinator for the NIOSH Hearing Loss Prevention Program.  Documents produced to date show that Mr. Murphy conducted testing on CAEv2 on various occasions between 2001 and 2015, and communicated the results of his testing to others in the government, including Army audiologist Doug Ohlin, and individuals at Aearo.  For example, the email attached as **Exhibit A** is an example of Mr. Murphy transmitting the results of 2001 impulse testing on CAEv2 to Doug Ohlin, Mark Little, others in the government, representatives of ISL, and representatives of Aearo.  Defendants seek to interview and depose Mr. Murphy regarding:  (i) test procedures, test protocols, and test results related to testing on the CAEv2, including an overview of the tests Mr. Murphy ran on the CAEv2, how Mr. Murphy fit the CAEv2 during his testing, how Mr. Murphy determined the appropriate procedure for fitting CAEv2 during his testing, whether Mr. Murphy was able to maintain an adequate fit during his testing, the results of Mr. Murphy's testing, and the attenuation achieved with CAEv2 under various testing and fit conditions; and (ii) correspondence and/or communications pertaining to CAEv2 between Mr. Murphy and others in the government, including the military, and/or representatives of Aearo or 3M.

The testing performed by Mr. Murphy is relevant to show that CAEv2 provides adequate attenuation and is not defective.  Mr. Murphy's testing, and his communications with Aearo or others in the government regarding the CAEv2, are also relevant to show that the government was on notice of CAEv2 performance capabilities and limitations, which is relevant to both Plaintiffs' failure to warn claims and Defendants' federal government contractor defense.  This information is not available from other less burdensome sources.  To be sure, some of Mr. Murphy's test reports

---

[2]     Defendants understand that Dr. Little is presently the chief of audiology at Eisenhower Army Medical Center. Accordingly, Defendants served a *Touhy* interview and deposition request related to Dr. Little on the Army. However, after subsequent discussion with counsel for NIOSH, Defendants are separately serving this *Touhy* request regarding Dr. Little on the CDC.  The point of contact for the related Army *Touhy* request is: Major Colin Evans, Litigation Attorney, General Litigation Branch, U.S. Army Legal Services Agency, 9275 Gunston Road, Ft. Belvoir, VA 22060, Office: 703-693-0352, Email: Collin.p.evans2.mil@mail.mil.   It is Defendants' understanding that Major Evans has been in contact with Dr. Little and can provide current contact information, if needed.

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 5

are publicly available, but (i) Defendants do not know if all of Mr. Murphy's test results are publicly available, and (ii) in any event, publicly available test reports do not describe details relevant to the claims and defenses in this case, including how CAEv2 was "fit" during testing, whether the flanges on the opposite end of the earplug were folded back during testing, and whether Mr. Murphy had difficulty achieving or maintaining an adequate fit during his testing.

Furnishing Mr. Murphy for an interview and deposition is in the interests of the federal government. In addition to the government's general interest in being a good federal citizen, furnishing Mr. Murphy for an interview and deposition will help expedite the discovery process between the federal government and Defendants in this case, and help aid the Court's desire that the parties complete government discovery related to the federal government contractor defense in a timely manner.

### B.     Dr. Mark Little

Dr. Mark Little was an Army audiologist who did a fellowship with NIOSH in the 2001 time period. Documents produced to date show that Dr. Little corresponded with Aearo representatives in 2001 regarding the CAEv2 while at NIOSH. For example, the correspondence attached as **Exhibit B** includes communications between Dr. Little and an Aearo representative in August and September 2001 regarding (i) CAEv2 test data; (ii) CAEv2 instructions for use; and (iii) certain product testing that Dr. Little intended to perform (referred to in Exhibit B as "Method B" testing). Defendants seek to interview and depose Dr. Little regarding: (i) test procedures, test protocols, and test results related to his testing on the CAEv2, including an overview of the tests Dr. Little ran on the CAEv2, how Dr. Little fit the CAEv2 during his testing, how Dr. Little determined the appropriate procedure for fitting CAEv2 during his testing, the results of Dr. Little's testing, and the attenuation achieved with CAEv2 under various testing and fit conditions; and (ii) correspondence and/or communications pertaining to CAEv2 between Dr. Little and others in the government, including the military, and/or representatives of Aearo or 3M.

The testing performed by Dr. Little is relevant to show that CAEv2 provides adequate attenuation and is not defective. Dr. Little's testing, and his communications with others in the government and Aearo regarding the CAEv2, are also relevant to show that the government was on notice of CAEv2's performance capabilities and limitations, which is relevant to both Plaintiffs' failure to warn claims and Defendants' federal government contractor defense. This information is not available from other less burdensome sources. Defendants' *Touhy* requests to the Department of Defense—including to each branch of the Armed Forces—have not resulted in discovery from the government related to the tests conducted by Dr. Little, or any communications with Dr. Little involving the CAEv2 (the communications attached as **Exhibit B** were located in Aearo's files, not the government's). Further, searches in the public domain have not revealed the details of any testing conducted by Dr. Little.

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 6

Furnishing Dr. Little for an interview and deposition is in the interests of the federal government. In addition to the government's general interest in being a good federal citizen, furnishing Dr. Little for an interview and deposition will help expedite the discovery process between the federal government and Defendants in this case, and help aid the Court's desire that the parties complete government discovery related to the federal government contractor defense in a timely manner.

## III.   Document Requests

Defendants request certain documents related to the government's testing of, and communications regarding, the CAEv2. Defendants are presently aware of at least two buckets of CAEv2 testing performed by or at NIOSH. *First*, as noted above, documents produced to date indicate William J. Murphy tested the CAEv2 on numerous occasions between 2001 and 2015. (*E.g.*, **Exhibit A**) *Second*, documents produced to date indicate that Dr. Mark Little tested the CAEv2 while doing a fellowship with NIOSH in approximately late 2001. These documents show that Dr. Little communicated with Defendants in August and September of 2001 regarding his intention to perform testing on the CAEv2 while at NIOSH, including so called "Method B" testing pursuant to certain ANSI standards. (*See* **Exhibit B**)

### A.     Specific Documents Requested

Defendants request the following documents from NIOSH:

1.     Test reports, protocols, results, and analyses pertaining to any testing conducted on CAEv2 by William J. Murphy.[3]

2.     Communications between Mr. Murphy and others in the United States government, including Doug Ohlin and others in the military, pertaining to testing on, or the performance of, the CAEv2. An example of such a communication is attached as **Exhibit A**.

3.     Communications between Mr. Murphy and Defendants pertaining to testing on, or the performance of, the CAEv2. An example of such a communication is attached as **Exhibit A**.

---

[3]     For reference, Defendants are aware that Mr. Murphy conducted, among other tests on the CAEv2: (1) an October 2001 where Mr. Murphy performed impulse peak testing on the CAEv2 using a 9mm handgun and M16 rifle; and (2) a December 23, 2014 test entitled "Measurement of Impulse Peak Insertion Loss from two Acoustic Test Fixtures and Four Hearing Protector Conditions."

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 7

4.    Test reports, protocols, procedures, results, and analyses pertaining to any testing conducted on CAEv2 by Mark Little.

5.    Communications between Dr. Little (tzl3@cdc.gov) and Defendants (@compuserve and @aearo.com domain names) related to CAEv2, including instructions to be used during testing, test results, test procedures, test protocols, and analyses related to continuous and impulse noise testing on CAEv2.  Examples of such communications attached at **Exhibits A and B**.

6.    Communications between Dr. Little and others in the United States government, including Doug Ohlin and others in the military, related to CAEv2, including product instructions, test results, test procedures, test protocols, and analyses related to continuous and impulse noise testing on CAEv2.  An example of such a communication is attached at **Exhibit A**.

7.    Test reports, protocols, procedures, results, and analyses pertaining to any other testing conducted on CAEv2 by current or former employees of NIOSH.

### B.    Relevance of the Documents Requested

The requested documents are relevant for two reasons.  ***First***, they are relevant to rebut two of Plaintiffs' core allegations in this case: (1) that the CAEv2 does not adequately attenuate noise; and (2) that the government was not aware of the CAEv2's performance capabilities and limitations.  Defendants anticipate that the documents requested will show that the CAEv2 ***does*** adequately attenuates noise, and is not defective, and that the government was aware of the product's performance capabilities and limitations.  ***Second***, they are also relevant to Defendants' federal government contractor defense.  For example, the third prong of the government contractor defense requires Defendants to show that "the supplier warned the United States about the dangers in the use of [it] product] that were known to [it] but not to the United States."  *See Boyle* at 487 U.S. at 512.  Government testing, and the requested communications, are relevant to both (i) what product limitations were "known … to the United States" and (ii) the warnings provided to the United States by Defendants.

This information is not available from other less burdensome sources.  To be sure, some of Mr. Murphy's test reports are publicly available, but (i) Defendants do not know if all of Mr. Murphy's test results are publicly available, and (ii) in any event, publicly available test reports do not describe details relevant to the claims and defenses in this case, including, for example, how CAEv2 was "fit" during testing, whether the flanges on the opposite end of the earplug were folded back during testing, and whether Mr. Murphy had difficulty achieving or maintaining an adequate fit during his testing, all of which details may be contained in non-publicly available documents and communications.  Additionally, Defendants' *Touhy* requests to the Department of Defense—

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 8

including to each branch of the Armed Forces—have not resulted in discovery from the government related to the tests conducted by Dr. Little, or any communications with Dr. Little involving the CAEv2. Further, searches in the public domain have not revealed the details of any testing conducted by Dr. Little.

## IV.    Additional Considerations

These requests comply with the policy of the DHHS regarding the provision of documents, and of information by its employees in connection with litigation in federal court:

1.    Disclosure of the requested information is not unduly burdensome or otherwise inappropriate under the federal discovery rules.

2.    Disclosure of the requested information would be appropriate under the Federal Rules of Evidence and appropriate under the rules of the Northern District of Florida.

3.    Disclosure of the requested information would be appropriate under the Federal Rules of Civil Procedure and would not impact any concerns regarding privileged information pursuant to the rules of procedure governing this litigation.

4.    Disclosure of the requested information would not violate any statute, executive order, regulation, or directive.

5.    Disclosure of the requested information would not reveal any classified information, data restricted pursuant to AR 380-5, unclassified technical data withheld from public release pursuant to 32 C.F.R. § 250 or DoD Directive 5230.25, privileged safety information restricted from public release by DoD Directive 6055.7, AFI 31-401,   or other matters exempt from unrestricted disclosure.

6.    Disclosure of the requested information would not interfere with ongoing enforcement proceedings, compromise any constitutional rights, reveal the identity of an intelligence source or confidential informant, disclose trade secrets or similarly confidential commercial or financial information, or otherwise be inappropriate under the circumstances.

7.    Disclosure would not violate any person's expectation of confidentiality or privacy.

8.    The United States is not, and is not reasonably anticipated to be a party in this litigation.

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 9

**V.      Administrative Matters**

      Defendants will bear the costs of producing the documents and witnesses sought by this *Touhy* request.  Costs will be paid by check or money order payable to the Treasury of the United States.  To the extent the DHHS believes any of the requested information does not implicate the statutory considerations set forth above, Defendants are willing to work with the DHHS to narrow the scope of the requested interviews and depositions.

      Should you have any questions or require additional information about this *Touhy* request, please do not hesitate to contact me at (312) 862-3254 or nick.wasdin@kirkland.com.

                 Sincerely,

                 Nicholas F. Wasdin

                 One of the Attorneys
                 Representing 3M

# EXHIBIT A

| From: | Murphy, William J. <wjm4@cdc.gov> |
|---|---|
| To: | Elliott Berger <eberger@compuserve.com>;Vern Larson (E-mail) <vlarson@bacou-dalloz.com>;Per Hiselius (E-mail) <phiselius@dallozsafety.com>;Armand Dancer (E-mail) <dancer@newel.net>;Doug Ohlin (E-mail) <douglas.ohlin@apg.amedd.army.mil> |
| CC: | Franks, John R. <jrf3@cdc.gov>;Little, Mark B. <tzl3@cdc.gov> |
| Sent: | 10/23/2001 11:22:57 PM |
| Subject: | Impulse peak levels |

```
Elliott, Vern, Per, Armand and Doug
I just finished the very preliminary analysis of peak levels and peak level
reductions of different protectors on the ISL mannequin. I thought you
might be interested in the external and internal peak levels and peak level
reductions.
B707II is Bilsom 707 impact II
CAELin and CAELin2 are the linear side of the Combat Arms Plug
CAENLin and CAENLin2 are the nonlinear side of Combat Arms Plug
ISLNLin and ISLNLin2 are the Bilsom 656/ISL nonlinear plug
PT6s is the Peltor Tactical 6S
SilELP97 is the Silencio Electronic Low Pro muff
PH10A is the Peltor H10A double shelled muff
PH9Bullseye is the Peltor Bullseye H9 muff
HLLeight is the Howard Leight Leightning with Pro-Ears
HLThunder is the Howard Leight Thunder muff with Pro-Ears
and the EAR Classic is well... Classic right?
=================Data Follows=================
Weapon Protector Elect. On? Outside  Inside Attenuation
9MM B707II Yes 166.78 141.19 25.59
9MM B707II No 164.11 131.49 32.61
9MM CAELin No 163.86 135.08 28.78
9MM CAELin2 No 162.99 134.17 28.83
9MM CAENLin Yes 166.22 138.04 28.18
9MM CAENLin2 Yes 162.47 135.80 26.68
9MM EARClassic No 165.56 137.82 27.74
9MM HLLeightning Yes 166.01 135.81 30.20
9MM HLLeightning No 166.54 136.48 30.06
9MM HLThunder Yes 164.69 130.90 33.79
9MM HLThunder No 164.74 131.80 32.94
9MM ISLNLin Yes 166.73 150.32 16.41
9MM ISLNLin2 Yes 163.13 145.79 17.34
9MM PH10A No 164.47 130.26 34.21
9MM PH9Bullseye No 165.01 136.79 28.22
9MM PT6S Yes 163.37 135.71 27.66
9MM PT6S No 164.06 136.19 27.87
9MM SilELP97 Yes 167.66 149.71 17.95
9MM SilELP97 No 167.06 149.40 17.66
M16 B707II Yes 161.67 129.33 32.34
M16 B707II No 161.60 129.57 32.03
M16 CAELin No 169.38 141.10 28.28
M16 CAELin2 No 169.08 140.22 28.86
M16 CAENLin Yes 168.25 143.18 25.07
M16 CAENLin2 Yes 169.34 143.61 25.73
M16 EARClassic No 163.40 137.18 26.21
M16 HLLeightning Yes 169.02 137.02 32.00
M16 HLLeightning No 170.07 139.19 30.87
M16 HLThunder Yes 170.78 145.01 25.77
M16 HLThunder No 170.70 144.68 26.03
M16 ISLNLin Yes 166.78 150.88 15.90
M16 ISLNLin2 Yes 170.64 152.83 17.81
M16 PH10A No 162.84 130.43 32.40
M16 PH9Bullseye No 163.05 135.36 27.70
M16 PT6S Yes 160.78 133.79 26.98
M16 PT6S No 160.16 134.54 25.62
M16 SilELP97 Yes 163.65 144.60 19.05
M16 SilELP97 No 163.55 144.81 18.74
```

3M Confidential

3M00027126

Confidential - Subject To Protective Order

3M_MDL000024875

# EXHIBIT B



**Contact Log**

Type: Email   ⦿ Incoming   ○ Outgoing   Assign to... Elliott
From: Mark Little, Maj, US Army
Email Address: tzl3@cdc.gov   Category: C-Serv
Date: Mon-Aug 20,2001   12:00am

☐ Purge After 60 Days

**Notes** | Custom Fields | Linked Entries | Attachments

Courier New   10   **B** *I* U A

Dr Berger, I got your e-mail from the EARLog web pg
and you may also have
received an e-mail from Dr Doug Ohlin at the Army
Center for Health
Promotion and Prev. Med.(CHPPM) requesting some
info for me.  I am an Army
Audiologist doing a 1 yr research fellowship at

OK   Cancel   Help

**Notes** | Custom Fields | Linked Entries | Attachments

Courier New   10   **B** *I* U A

Audiologist doing a 1 yr research fellowship at
NIOSH.  I would like to run
some studies on the Army's Combat Arms Earplug
(CAE), which I'm told and
have read reference to is made from the EAR
Ultrafit plug.  What info can
you provide or discuss with me on actual studies

OK   Cancel   Help

**Notes** | Custom Fields | Linked Entries | Attachments

Courier New   10   **B** *I* U A

have read reference to is made from the EAR
Ultrafit plug.  What info can
you provide or discuss with me on actual studies
done on this plug by your
company??  Looking forward to hearing from you as
there is very little info
out there re: the CAE.

OK   Cancel   Help

w

3M Confidential                                                                3M00020409

Confidential - Subject To Protective Order                        3M_MDL000018428

Major Mark Little                                                September 18, 2001
NIOSH
Robert Taft Laboratories
Mailstop C-27
4676 Columbia Pkwy.
Cincinnati, OH  45226-1998

Dear Mark:

In response to our conversation this morning I have put together the following information on the Combat Arms Earplug (CAE).

- A consumer package is enclosed.  In that market we sell the product as the Indoor/Outdoor Range E•A•R® Plugs.  You can use the instructions from the package for your Method B testing.  You can also find that product listed on our web site under the AO Safety brand name, consumer products, hunters/shooters.  The exact address is: http://www.aosafety.com/shooters/products/ear_03.htm.
- A copy of a letter from Pascal Hamery from January 2000 in which he provides insertion loss data in impulsive noise, measured on the ISL blockhead for the CAE.
- REAT test reports for both ends of the CAE measured according to ANSI S3.19.

Regarding our quality tests on the CAE, I reviewed our files and can verify that we conduct quality checks using an acoustic impedance device to assure that the plugs have been assembled properly, that the cartridges are in place, and that the dimensions of the orifice fall within our specifications. Our quality program is in conformance with ISO 9001.

This should provide you the information you require to develop your own program of evaluation of the CAE.  I look forward to hearing from you as you embark upon your research.

Sincerely,


Elliott H. Berger
Senior Scientist, Auditory Research

Encl.:   1 consumer pkg. Of Indoor/Outdoor Range plugs
         Copy of ISL impulsive data for the CAE
         REAT evaluations for CAE, both ends




Mark Little CAE1.doc



3M Confidential - Attorneys' Eyes Only                                    3M00008624

Confidential - Subject To Protective Order                            3M_MDL000008624





Contact Log

Type: Email ◉ Incoming ○ Outgoing

Assign to... Elliott

From: Mark Little, Maj. US Army

Email Address:

Category: C-Serv

Date: Tue-Sep 25,2001 12:00am

☐ Purge After 60 Days

Notes | Custom Fields | Linked Entries | Attachments

Arial 10 B I U A

more questions:

Thanks again; received your mailing and will make use of the instructions.
Do you know why no instructions get included with the bags of 50 pr sent
with military orders??
As I said, right now the volumes are very small. Costs were kept low, and I don't
believe any were requested.

OK | Cancel | Help

Notes | Custom Fields | Linked Entries | Attachments

Arial 10 B I U A

Also, can you tell me how much your commercial CAE
plugs cost??
suggested retail price is $15.56 is sporting goods store

additionally, i notice the instructions make no mention on how
far into the ear canal the plug should go for a correct fit. Must all 3
flanges/sealing rings be well seated??

OK | Cancel | Help

Notes | Custom Fields | Linked Entries | Attachments

Arial 10 B I U A

flanges/sealing rings be well seated??
neither do our ultrafit instructions. since it is a one sized plug the number of
flanges in canal varies with canal size. users should practice with the sealed
end in so that they can get an acoustic seal and learn how far into the earcanal
a plug must be inserted to achieve that effect. you can also use the tug and
pump tests described in earlog 19 which you can access at
http//www.aearo.com/html/industrial/earlog.htm

OK | Cancel | Help

Confidential - Subject To Protective Order