# EXHIBIT H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:20-mc-00025 |
| Petitioner, | |
| v. | |
| 3M COMPANY, | |
| Respondent. | |

## UNITED STATES OF AMERICA'S PETITION TO QUASH SUBPOENA

Petitioner the United States of America respectfully petitions the Court to quash the amended subpoena issued by Respondent 3M Company ("3M") for the deposition of Dr. William J. Murphy, an employee of the United States Centers for Disease Control and Prevention (the "CDC").  The amended subpoena seeks to compel Dr. Murphy to be deposed on September 16, 2020.

A memorandum in support of this Motion follows.

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney


  s/ Matthew J. Horwitz
MATTHEW J. HORWITZ (0082381)
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513)684-3711
Email: Matthew.Horwitz@usdoj.gov

## MEMORANDUM IN SUPPORT

### I.    INTRODUCTION

The CDC files this Petition to quash a subpoena by 3M for deposition testimony from a CDC scientist, Dr. William J. Murphy, in litigation in which neither the United States nor the CDC is a party.  As required by federal law, 3M previously submitted an administrative request for Dr. Murphy's testimony and associated documents.  The CDC granted, in part, 3M's request.  The CDC denied 3M's request for a deposition of Dr. Murphy, but produced a detailed declaration from Dr. Murphy with related agency records.  Nonetheless, 3M has served a subpoena on Dr. Murphy seeking the same testimony that it sought, and was denied, in its administrative request.  In so doing, 3M ignores both the intervening denial of its government contractor defense, which was one of the principal reasons proffered in its administrative request for Dr. Murphy's deposition, and the fact that the CDC has provided substantial responsive information to 3M by declaration. CDC has objected in writing to the subpoena, and it now files this Petition requesting the Court quash the subpoena.

3M's subpoena for Dr. Murphy's testimony should be quashed for several reasons.  First, the Court may only compel testimony by federal officials when it finds that an agency's denial of such testimony is arbitrary and capricious.  Here, CDC denied the request for Dr. Murphy's testimony after performing a reasonable and thorough analysis of 3M's request.  CDC's denial was neither arbitrary nor capricious.  Second, the requested deposition would be needlessly duplicative and

cumulative, given the declaration and records previously produced by the CDC. Third, and finally, the requested deposition would be unduly burdensome to the CDC, both individually and cumulatively.  Dr. Murphy is actively engaged in the CDC's efforts to address the COVID-19 pandemic, and Dr. Murphy should not be compelled to set aside those important duties to prepare for and attend a deposition for litigation in which neither the United States nor the CDC are parties.

## II.    BACKGROUND

### A.    Applicable *Touhy* Regulations

The federal government authorizes the head of every Executive Branch agency to "prescribe regulations for the government of his department, the conduct of its employees, the distribution of its business, and the custody, use, and preservation of its records, papers, and property."  5 U.S.C. § 301; *see also, United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951).  Such regulations allow federal agencies to determine "whether subpoenas . . . will be willingly obeyed or challenged," thereby avoiding "the possibilities of harm from unrestricted disclosure in court."  *Touhy*, 340 U.S. at 468.  These regulations impose a binding legal duty on federal employees.  *Frank v. U.S. Food and Drug Admin.*, 998 F.Supp.2d 596, 602 (E.D. Mich. 2014) (citing *Boron Oil Co. v. Downie*, 873 F.2d 67, 69–70 (4th Cir. 1989)).

The CDC is a component of the United States Department of Health and Human Services ("HHS").  Pursuant to HHS regulations, current and former HHS employees are not authorized to participate, give depositions or trial testimony, or

provide consultation regarding information acquired in the performance of their

official duties in private litigation or other proceedings in which the United States

is not a party, absent authorization by the agency.  45 C.F.R. § 2.3.  To request

testimony from an HHS employee, a litigant must submit a request to the agency in

writing, state the nature of the requested testimony, explain why the testimony is

unavailable from any other source, and explain why the testimony would be in the

interest of, and promote the objectives of, the agency.  45 C.F.R. § 2.4.  HHS,

however, may only authorize an employee to testify in private litigation when

"compliance with the request would promote the objectives of the Department."  45

C.F.R. § 2.3.  This policy exists to minimize the disruption of official duties and to

further HHS's interest in maintaining impartiality in disputes between private

litigants.  45 C.F.R. § 2.1.

        **B.      Procedural History**

        3M is a defendant in multi-district litigation pending in the Northern District

of Florida related to the safety of 3M's products.  *See In re 3M Combat Arms*

*Earplug Products Liability Litigation*, Case No. 3:19-md-2885 (N.D. Fla.).  The

United States is not a party to that litigation, nor is the CDC or HHS.

        In connection with that MDL, on February 6, 2020, 3M submitted a *Touhy*

request to CDC seeking to interview and depose Dr. Murphy and another CDC

employee not at issue here.[1]  (Exhibit 1, Request Letter, at 1.)  3M asserted that a

deposition of Dr. Murphy was necessary because he was "involved in the testing of

---

[1] The February 6, 2020 *Touhy* request was 3M's second such request.  3M's first *Touhy* request is not
at issue here.

the Combat Arms Earplugs Version 2 ("CAEv2")," one of the products at issue in the MDL action.  (*Id*.)  3M sought to depose Dr. Murphy on the following topics: (1) test procedures, test protocols, and test results related to testing on the CAEv2, including an overview of the tests Dr. Murphy ran, how Dr. Murphy fit the CAEv2 during his testing, how Dr. Murphy determined the appropriate procedure for fitting the CAEv2 during testing, whether Dr. Murphy was able to maintain an appropriate fit, the results of Dr. Murphy's testing, and the attenuation achieving under various testing and fit conditions; and (2) correspondence or communications regarding the CAEv2 by Dr. Murphy and others.  (*Id*. at 4.)  3M asserted this information was needed to show that the CAEv2 is not defective and that the government was on notice of CAEv2's performance capabilities and limitations, which 3M asserted to be relevant to its government contractor defense.  (*Id*.)

3M asserted that public information was not sufficient for its purposes and a deposition was necessary because public information does not describe "how CAEv2 was 'fit' during testing, whether the flanges on the opposite end of the earplug were folded back during testing, and whether Mr. (sic) Murphy had difficulty achieving or maintaining an adequate fit during his testing."  (*Id*. at 5.)  3M further asserted that a deposition would further the agency's interest in "being a good federal citizen" and would "aid the Court's desire that the parties complete government discovery related to the government contractor defense in a timely manner."  (*Id*.)

The CDC responded to 3M's *Touhy* request on July 23, 2020.  (Exhibit 2, Response Letter, at 1.)  The CDC denied 3M's request for a deposition of Dr.

Murphy, but agreed to provide a declaration from Dr. Murphy regarding the information requested by 3M, along with various responsive documents.  (*Id*. at 2.) The CDC explained that providing requested information by declaration rather than deposition was "less burdensome . . ., more time efficient, and will avoid significant interruption of Dr. Murphy's official duties as a federal government employee."  (*Id*.)  The CDC also noted that a declaration was particularly appropriate given Dr. Murphy's "minor role in this matter" and "the ever-present demands that have been placed on [the National Institute for Occupational Safety and Health ("NIOSH")], CDC, and the Department in responding to the ongoing Coronavirus Disease 2019 pandemic."  (*Id*.)  Moreover, the CDC did not authorize Dr. Murphy to address testing that was not published or that did not concern the CAEv2 product.  (*Id*.)

Dr. Murphy's declaration was provided by CDC to 3M contemporaneously with CDC's response letter.  (Exhibit 3, Declaration of William J. Murphy.)  Dr. Murphy's declaration set forth his background as a research physicist with NIOSH, as well as his duties as a team leader for the Hearing Loss Prevention Research Team.  (*Id*. at 1.)  Dr. Murphy's declaration also described his testing procedures regarding the CAEv2, the fitting of the CAEv2 during testing, test results, and the attenuation results achieved with the CAEv2 during testing.  (*Id*. at 2-6.)  Dr. Murphy's declaration attached and explained his test reports, noting attenuation achieved during his testing by referencing specific portions of the testing reports. Dr. Murphy's declaration also explained in detail how the CAEv2 was fit during

testing.  (*Id*. at 4-5.)  Finally, in response to 3M's request for communications regarding CAEv2 testing, Dr. Murphy's declaration attached all responsive communications that Dr. Murphy could locate concerning CAEv2 and confirmed that he had no independent recollection of the communications or the circumstances surrounding the communications.  (*Id*. at 6.)

On August 25, 2020, 3M issued a subpoena to Dr. Murphy for a deposition to be held on September 9, 2020.  The following day, however, 3M issued an amended subpoena for Dr. Murphy.  (Exhibit 4, Amended Subpoena.)  The amended subpoena commanded Dr. Murphy to appear for deposition on September 16, 2020 in Cincinnati, Ohio or, alternatively, by remote means.  (*Id*. at 1.)  The amended subpoena stated that the topics for deposition would be the same topics as identified in 3M's written *Touhy* request.  (*Id*.)  Indeed, rather than separately set forth the topics for deposition, 3M's subpoena simply attaches and incorporates its written *Touhy* request.  (*Id*.)

On September 9, 2020, CDC objected in writing to the subpoena.  (Exhibit 5, Rule 45 Objection Letter.)

## III.   ARGUMENT

### A.   The Court Should Not Permit the Deposition of Dr. Murphy Unless it Determines that the CDC's Partial Denial of 3M's *Touhy* Request was Arbitrary or Capricious.

It is well-established that federal agencies have discretion to restrict testimony from or production of documents by their subordinates through properly promulgated regulations.  *Touhy*, 340 U.S. at 468; *Boron Oil*, 873 F.2d 67, 69-70

(4th Cir. 1989) ("*Touhy* is part of an unbroken line of authority which directly supports [the] contention that a federal employee may not be compelled to obey a subpoena contrary to his federal employer's instructions under valid agency regulations."); *State of Louisiana v. Sparks*, 978 F.2d 226, 234 (5th Cir. 1992) ("As the Supreme Court has long held, such regulations unquestionably give [federal] employees the authority, when so ordered by supervisors, to refuse to comply with a subpoena ordering disclosure of confidential files when the United States is not a party to a legal action.").  Such regulations ensure that federal employees' official time is spent on federal business and that agencies remain impartial in private litigation.  *See, e.g., United States v. Marino*, 658 F.2d 1120, 1125 (6th Cir. 1981) (holding that federal agencies have "a legitimate interest in regulating access to government information contained in files or obtained by its employees during the scope of their official duties.");  *Frank*, 998 F.Supp.2d at 602 ("this compromise between public and private interests is necessary to conserve agency resources and to prevent an agency from becoming embroiled in private litigation") (internal quotation and citation omitted).

If a litigant's *Touhy* request is denied, the litigant may challenge that decision only by seeking a ruling under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, that the agency's decision was arbitrary and capricious. *Rimmer v. Holder*, 700 F.3d 246, 262-63 (6th Cir. 2012) (plaintiff seeking review of FOIA denial "*could* have obtained review under the APA rather than FOIA if . . . he had pursued a *Touhy* request . . . ") (emphasis added); *see also, e.g., United States v.*

*Threet*, No. 09-20523, 2011 WL 5865076, at *1 (E.D. Mich. Nov. 22, 2011) ("if

[d]efendant is dissatisfied with the DEA's response to his *Touhy* request, his remedy

is an action against the DEA pursuant to the Administrative Procedure Act, and not

pursuant to a motion to compel."); *Metcalfe v. Ultimate Sys., Ltd.*, 346 F. Supp. 2d

950, 954 (N.D. Ohio 2004) (the requesting party "is not without a remedy: they may

file a collateral action seeking review of the agency's refusal to release the records

in federal court under the Administrative Procedure Act . . . "); *OhioHealth Corp. v.

U.S. Dep't of Veterans Affairs*, No. 2:14-cv-292, 2014 WL 4660092, at *3 (S.D. Ohio

Sept. 17, 2014) (finding that "[i]n reviewing a federal agency's decision pursuant to

its promulgated *Touhy* regulations under the Administrative Procedure Act, the

Court's role is 'narrow' . . . ").

     The Sixth Circuit has not directly addressed whether challenges arising from

the denial of a *Touhy* request are treated differently based on whether the subpoena

for documents or testimony is issued by a federal or state court, and district courts

have split on this issue.  Compare *U.S. v. Threet*, 2011 WL 5865076, *1 (E.D. Mich.

Nov. 22, 2011) with *Gischel v. University of Cincinnati*, 2018 WL 9945170, *3 (S.D.

Ohio June 26, 2018).  Although *Rimmer* does not directly resolve this issue, the

Sixth Circuit held that APA standards would have governed the denial of a *Touhy*

request in that matter and cited decisions in which the applicable subpoenas were

issued from both federal and state courts. 700 F.3d at 263.  The *Rimmer* decision

relies, for example, on *In re Boeh*, 25 F.3d 761, 767 (9th Cir. 1994), which held that

"an APA claim was the proper method for challenging an agency's refusal to produce

information" after agency denial of a *Touhy* request arising from a federal-court issued subpoena. Moreover, the rationale underlying the requirement that a litigant proceed in such circumstances under the APA—that the United States is entitled to sovereign immunity and may not be sued without its consent—applies with equal force to state and federal subpoenas. Finally, no such ambiguity exists in the Eleventh Circuit, where the MDL action is pending. In the Eleventh Circuit, a litigant may only enforce a subpoena following denial of their *Touhy* request if the district court determines that the agency's decision regarding the *Touhy* request was arbitrary and capricious under the APA. *Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1197 (11th Cir. 1991).

### B.   The CDC's Partial Denial of 3M's *Touhy* Request was not Arbitrary or Capricious.

An agency's decision is arbitrary and capricious only if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. Nat'l Park Serv.*, 463 U.S. 29, 43 (1983). In assessing whether agency action is arbitrary and capricious, a court's review should be "narrow," and it should not substitute the judgment of the agency with its own preference. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). Rather, the Court's task is to determine whether the agency's decision is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S.

87, 105 (1983); *Hazelhurst v. Centers for Disease Control*, 2017 WL 3037808, *6

(W.D. Tenn. July 18, 2017) (holding that CDC's denial of *Touhy* request was not

arbitrary and capricious because CDC Director "offered detailed and case specific

reasons for declining Plaintiff's request . . . .").

Here, 3M's subpoena seeking Dr. Murphy's testimony is nothing more than

an attempt to compel the deposition of Dr. Murphy that it previously sought in its

*Touhy* request and that CDC previously denied.  Yet, the CDC thoroughly

considered 3M's *Touhy* request and provided a detailed and case-specific response

granting the request in part and denying the request in part.  As described above, in

response to 3M's Request, CDC produced a detailed declaration from Dr. Murphy

disclosing: (1) his testing procedures regarding the CAEv2, (2) how the CAEv2 was

fit during testing, (3) test results regarding the CAEv2, and (4) the attenuation

achieved with the CAEv2 during testing.  (Ex. 3, at 2-6.)  Dr. Murphy's declaration

also included all responsive communications that Dr. Murphy could locate

concerning CAEv2.  (*Id*. at 6.)

The only substantive limitation placed on Dr. Murphy's response to the

request for testimony was that Dr. Murphy was not authorized to address testing

that did not concern CAEv2 or testing that was not published.  This limitation was

not arbitrary or capricious.  Testing unrelated to the CAEv2 was outside the scope

of 3M's request and is irrelevant.  Similarly, unpublished testing data is not

representative of an official CDC position or conclusion, and the CDC properly

determined that it would be inappropriate for Dr. Murphy to offer testimony concerning such testing.

The CDC's approval of a response by declaration, rather than by deposition testimony, was also not arbitrary or capricious. As explained by the CDC in its response to 3M, the CDC's approval of a declaration from Dr. Murphy reflected his limited role regarding the CAEv2 product and avoided the substantial burden of a deposition on Dr. Murphy and the CDC. The CDC is actively engaged in responding to the ongoing COVID-19 pandemic, and Dr. Murphy is temporarily assigned to a team handling COVID-19 responsibilities relating to worker safety and health. (Ex. 5.) Compelling Dr. Murphy to sit for deposition would require Dr. Murphy to set aside his important duties to prepare for and attend a deposition covering the same topics for which he has already provided a sworn declaration. Such a deposition is duplicative and cumulative, offers no benefit to the agency, and would only serve to substantially burden Dr. Murphy's and the CDC's work.

It is also notable that one of 3M's primary assertions in its *Touhy* request was that the requested information was needed to support its government contractor defense. (Ex. 1, at 4.) This defense, however, was rejected by the MDL Court on summary judgment. (N.D. Fla Case No. 3:19-md-2885, Order, ECF No. 1280.) 3M has not limited its request for testimony or offered any explanation for why it still seeks testimony from Dr. Murphy purportedly on that issue.

Finally, in the unlikely event that the Court determines that the CDC's response to the *Touhy* request for testimony from Dr. Murphy was, in some manner,

arbitrary and capricious, "the proper remedy is to remand [the] issue back to the [agency] for further investigation and explanation," rather than to compel Dr. Murphy to attend a deposition. *OhioHealth Corp.*, 2014 WL 4660092, at *7 (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

### C.   The Amended Subpoena Should be Quashed Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure.

Rule 45(d)(3) of the Federal Rules of Civil Procedure requires the Court to quash or modify a subpoena that subjects a nonparty to an undue burden.  Although Rule 45(d)(3) does not expressly include irrelevance as a basis for quashing a subpoena, "the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26." *Hendricks v. Total Quality Logistics*, LLC, 275 F.R.D. 251, 253 (S.D. Ohio 2011).  Moreover, "[w]hen a nonparty challenges a subpoena on grounds that the request is over-burdensome, the party seeking the discovery must establish that the information sought is relevant." *Doe v. Ohio State University*, 2018 WL 1373868, *2 (S.D. Ohio Mar. 19, 2018).  "Courts will balance the need for discovery against the burden imposed on the person ordered to produce documents, and that person's status as a nonparty is a factor weighing against disclosure." *Id.* (citing *Katz v. Batavia Marine and Sporting Supplies, Inc.*, 984 F.2d 422, 424 (6th Cir. 1993)).

Here, the burden that a deposition would impose on the CDC and Dr. Murphy substantially outweighs any potential benefit to 3M.  As discussed above, Dr. Murphy is presently engaged in important work relating to the ongoing COVID-19 pandemic, and a deposition would substantially disrupt that work.  Moreover, it

is appropriate for the Court to consider the burden imposed on the federal government not only by this single request for deposition, but also the cumulative effect of depositions of the sort sought by 3M here.  *See Hazlehurst*, 2017 WL 3037808, at *8 (CDC properly considered the "cumulative impact of allowing employees . . . to testify in private litigation" in denying *Touhy* request).  Indeed, if each study, test, or report prepared by the CDC rendered its scientists proper subjects for deposition in private litigation relating to the subject matter of the study, test, or report, CDC personnel could be required to expend increasingly substantial portions of their time participating in private litigation rather than attending to their assigned duties.

In contrast to this heavy burden, the deposition seeks information that is irrelevant, cumulative, and duplicative.  As discussed above, any information sought for purposes of bolstering 3M's government contractor defense is now irrelevant, as that defense has been rejected by the MDL Court.  Moreover, any deposition of Dr. Murphy would be unnecessarily duplicative and cumulative, given the detailed declaration provided by Dr. Murphy in this matter, which addressed all—or substantially all—of 3M's topics of inquiry outlined in its *Touhy* request and amended subpoena (with the exception of information concerning any unpublished testing that may have been conducted by Dr. Murphy).

3M recently asserted in the MDL litigation that a deposition of Dr. Murphy is necessary to ask Dr. Murphy "detailed follow up questions about his published

studies." (N.D. Fla Case No. 3:19-md-2885, Motion, ECF No. 1317.)[2]  As examples, 3M identified a desire to ask Dr. Murphy why his studies were conducted, who requested the studies, and why the particular type of study was conducted, as opposed to other types of testing.  (*Id*. at Page 3-4.)  None of these questions, however, were posed by 3M in its *Touhy* request and none is identified in the amended subpoena (which simply refers back to 3M's *Touhy* request).  The Court should not compel Dr. Murphy to testify at deposition because his written declaration failed to answer questions that 3M never asked.[3]  Such a ruling would allow parties to avoid the consequences of making incomplete *Touhy* requests, and would vastly expand the circumstances in which agency personnel are subject to deposition.

## IV.   CONCLUSION

For the foregoing reasons, the CDC respectfully requests that the Court issue an Order quashing the Amended Subpoena.

(Signature on following page)

---

[2] 3M's motion regarding Dr. Murphy was denied by the Court as moot.  (N.D. Fla Case No. 3:19-md-2885, Order, ECF No. 1358.)

[3] In contrast, 3M's Touhy request specifically requested information for how the CAEv2 product was fit during testing, and Dr. Murphy's declaration provided a specific and detailed explanation.

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney


  s/ Matthew J. Horwitz
MATTHEW J. HORWITZ (0082381)
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513)684-3711
Fax: (513)684-6972
Email: Matthew.Horwitz@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of September, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which serves copies to all parties of record.  In addition, I served a copy of the foregoing by electronic mail to:

Ashley Neglia, Esq.
Kirkland & Ellis LLP
555 S.Flower Street
Los Angelos, CA 90071
(213) 680-8114
Ashley.Neglia@kirkland.com

Finally, to the extent that Respondent will not consent to service by electronic mail, the United States will promptly serve a copy of the forgoing by certified mail to Respondent and/or Respondent's counsel.

s/Matthew J. Horwitz
MATTHEW J. HORWITZ (0082381)
Assistant United States Attorney

16

## KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Nicholas F. Wasdin
To Call Writer Directly:
+1 312 862 3254
nick.wasdin@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

February 6, 2020

**Via Email**

Robert R. Redfield, MD
Director, Centers for Disease Control and
Prevention
1600 Clifton Road, N.E., MS D-14
Atlanta, Georgia 30333

Re:   Touhy Request Relating to *In re: 3M Combat Arms Earplug Products
      Liability Litigation*, 3:19-md-02885-MCR-GRJ (N.D. Fla.).

Dear Dr. Redfield:

In connection with *In re: 3M Combat Arms Earplug Products Liability Litigation*, a
multidistrict litigation pending before the Northern District of Florida, this letter constitutes
Defendants 3M Company ("3M") and Aearo Technologies LLC's ("Aearo") second *Touhy*[1]
request to the United States Department of Health and Human Services ("DHHS") for certain
documents described below, and to interview and depose two current or former employees of the
National Institute for Occupational Safety and Health ("NIOSH"), a federal agency within the
Center for Disease Control ("CDC"), who were involved in testing of the Combat Arms Earplugs
Version 2 ("CAEv2"). Pursuant to 45 C.F.R. §§ 2.1 - 2.4, Defendants set forth the basis for their
*Touhy* requests as follows:

**I.     Summary of the Litigation**

3M was founded in 1902 as a small-scale mining venture in Northern Minnesota, and has
grown into a global science company employing over 90,000 people and produces more than
60,000 products world-wide. Many of 3M's brands have become universally known, including
Scotch™ Brand adhesive tapes, Post-it® Brand sticky notes, and Thinsulate™ thermal insulation,
to name just a few. In addition to its consumer-side business, 3M also had a long-standing
relationship with federal and state governments for well over fifty years and provides thousands
of products designed to protect American troops and support their missions. In 2008, 3M

---

[1]   *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

Beijing   Boston   Dallas   Hong Kong   Houston   London   Los Angeles   Munich   New York   Palo Alto   San Francisco   Shanghai   Washington, D.C.

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 2

purchased Aearo, who, at the time, was a global leader in personal protection equipment, headquartered in Indianapolis, Indiana. The acquisition helped 3M expand its occupational health and environmental safety platform by adding hearing protection, eyewear protection, and fall protection to its product lines, including Combat Arms Earplugs - the subject of this litigation. Combat Arms Earplugs represented a significant advance in hearing protection in that they were one of the first hearing protection devices to offer protection from high-level impulse noises, like gun-fire, while still allowing the user to hear lower level sounds, like speech, with limited interruption. Hearing loss is a common injury among military veterans. The U.S. military has provided hearing protection and preservation services to soldiers for decades. In support of that mission, the military employs audiologists to administer hearing conservation programs and work with outside contractors, like 3M, to advance their hearing protection goals.

The complaints in this litigation assert claims for alleged hearing loss or tinnitus allegedly caused by noise exposure to plaintiffs while wearing the CAEv2. CAEv2 was developed and designed by Aearo at the request of and in close consultation with U.S. military audiologists, including Dr. Doug Ohlin, former Program Manager, Hearing Conservation, U.S. Army Center for Health Promotion and Preventative Medicine. Specifically, the U.S. military and Aearo decided to modify and update Aearo's Ultrafit® triple-flanged earplug by including a specially patented filter created by the French-German Institute in Saint Louis, France ("ISL"). Thereafter, Aearo worked with the U.S. military and ISL to develop an earplug embodying ISL's patented technology, which ultimately became CAEv2. CAEv2 consists of two Ultra-fit type tips, one green and one yellow, attached to opposite sides of a plastic stem with a small opening at the center. The green end works like a conventional passive earplug, providing steady and continuous protection from ambient noise. In contrast, the yellow end allows sound to travel into the opening at the center of the earplug and through a sound channel and the patented filter before entering the ear. The filter allows lower-level sounds, such as speech, to pass through while reducing higher-level impulse noises, like gun-fire. Throughout the design process, Aearo worked closely with the U.S. military to ensure that CAEv2 would appropriately balance performance with military operational needs for soldiers and military personnel. These specifications were memorialized in a Medical Procurement Item Description ("MPID") that was used by the Defense Logistics Agency to solicit bids from Aearo for CAEv2.

On April 3, 2019, the Judicial Panel on Multidistrict Litigation entered an order transferring the consolidated cases and any tag-along actions to the Northern District of Florida. To date, tens of thousands of actions have been filed on behalf of current or former military personnel who allegedly were issued and used the CAEv2 during their service. Plaintiffs typically allege hearing loss and/or tinnitus as a result of noise exposure in military and combat settings, and assert claims for design defect, negligence, failure to warn, breach of warranties, and/or fraud. For example, Plaintiffs allege that the CAEv2 was "dangerously defective" because, among other things, (i) the CAEv2 does not provide adequate attenuation for certain noise exposures, (ii) the short length of the CAEv2 "prevented Plaintiffs from obtaining a proper fit and seal when inserting the device

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 3

into their ear canals," and (iii) the "design of the [CAEv2] also caused the device to loosen imperceptibly in Plaintiff's ear canals." (*See* Compl. ¶¶ 2, 6-7, 194)  According to Plaintiffs, (i) Defendants "supplied this dangerously defective product to Plaintiffs and the United States military for more than a decade without Plaintiffs or the United States military having any knowledge of those defects and risks," and (ii) Defendants never warned Plaintiffs or the U.S. government that, to obtain the attenuation ratings achieved during product testing, "they reconfigured the device by folding back the flanges of the open end before inserting the closed end of the device into the ear canals of the test subjects." (*Id.* ¶ 5)

3M and Aearo deny these allegations.  Among other things, product testing performed by the U.S. Government, Aearo, and other third parties demonstrates that the CAEv2 provides the intended levels of attenuation.  Defendants were in active communication with the government during product development, and the government was aware of the product's performance capabilities and limitations.

In addition to defending Plaintiffs' claims on the merits, 3M and Aearo have also asserted the federal government contractor defense set forth in *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1998), because Aearo sold the CAEv2 to the U.S. military under government contracts and in accordance with the government's specifications.  The government contractor defense applies where, as here: "(1) the United States approved reasonably precise specifications [for the product at issue]; (2) the [product] conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the [product] that were known to [it] but not to the United States." *See id.* at 512.  Here, the CAEv2 was designed and manufactured in accordance with the military's specifications, which included a reasonably precise instruction to shorten the earplug to its allegedly defective length.  The government was aware of CAEv2's performance capabilities and limitations, including any alleged "fitting" limitations caused by the product's length.

Much of the materials relevant to Plaintiffs' claims are in the possession of the U.S. Government.  For example, service and medical records for individual Plaintiffs are in the possession of the VA and DOD.  The DOD also has records related to, among other things, CAEv2 design and development, CAEv2 testing, noise exposure data, and hearing protection usage rates.  The parties have been working with the VA, DOD and the Court to identify and produce these records, and to schedule the depositions of related government witnesses.  The Court has directed the parties to endeavor to complete this phase of government discovery in February and March, 2020.

## II.    Interview And Deposition Requests

Defendants request an interview and deposition with (i) NIOSH employee William J. Murphy (wmurphy@cdc.gov; wjm4@cdc.gov); and (ii) former NIOSH fellow Dr. Mark Little

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 4

(tzl3@cdc.gov).[2]  Defendants request interviews occur prior to the depositions, and believe that such interviews will make the deposition process more efficient, including by (i) identifying the location of relevant documents and data in advance of the deposition, which will help avoid the need for additional depositions if a witness identifies relevant materials for the first time during a deposition; and (ii) minimizing unnecessary depositions through pre-deposition identification of any witness with minor roles or immaterial knowledge, which may reduce the time and expense of organizing a formal depositions for that witness.

### A.    William Murphy

Mr. Murphy is or was a program coordinator for the NIOSH Hearing Loss Prevention Program.  Documents produced to date show that Mr. Murphy conducted testing on CAEv2 on various occasions between 2001 and 2015, and communicated the results of his testing to others in the government, including Army audiologist Doug Ohlin, and individuals at Aearo.  For example, the email attached as **Exhibit A** is an example of Mr. Murphy transmitting the results of 2001 impulse testing on CAEv2 to Doug Ohlin, Mark Little, others in the government, representatives of ISL, and representatives of Aearo.  Defendants seek to interview and depose Mr. Murphy regarding:  (i) test procedures, test protocols, and test results related to testing on the CAEv2, including an overview of the tests Mr. Murphy ran on the CAEv2, how Mr. Murphy fit the CAEv2 during his testing, how Mr. Murphy determined the appropriate procedure for fitting CAEv2 during his testing, whether Mr. Murphy was able to maintain an adequate fit during his testing, the results of Mr. Murphy's testing, and the attenuation achieved with CAEv2 under various testing and fit conditions; and (ii) correspondence and/or communications pertaining to CAEv2 between Mr. Murphy and others in the government, including the military, and/or representatives of Aearo or 3M.

The testing performed by Mr. Murphy is relevant to show that CAEv2 provides adequate attenuation and is not defective.  Mr. Murphy's testing, and his communications with Aearo or others in the government regarding the CAEv2, are also relevant to show that the government was on notice of CAEv2 performance capabilities and limitations, which is relevant to both Plaintiffs' failure to warn claims and Defendants' federal government contractor defense.  This information is not available from other less burdensome sources.  To be sure, some of Mr. Murphy's test reports

---

[2]    Defendants understand that Dr. Little is presently the chief of audiology at Eisenhower Army Medical Center. Accordingly, Defendants served a *Touhy* interview and deposition request related to Dr. Little on the Army. However, after subsequent discussion with counsel for NIOSH, Defendants are separately serving this *Touhy* request regarding Dr. Little on the CDC.  The point of contact for the related Army *Touhy* request is: Major Colin Evans, Litigation Attorney, General Litigation Branch, U.S. Army Legal Services Agency, 9275 Gunston Road, Ft. Belvoir, VA 22060, Office: 703-693-0352, Email: Collin.p.evans2.mil@mail.mil.  It is Defendants' understanding that Major Evans has been in contact with Dr. Little and can provide current contact information, if needed.

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 5

are publicly available, but (i) Defendants do not know if all of Mr. Murphy's test results are publicly available, and (ii) in any event, publicly available test reports do not describe details relevant to the claims and defenses in this case, including how CAEv2 was "fit" during testing, whether the flanges on the opposite end of the earplug were folded back during testing, and whether Mr. Murphy had difficulty achieving or maintaining an adequate fit during his testing.

Furnishing Mr. Murphy for an interview and deposition is in the interests of the federal government. In addition to the government's general interest in being a good federal citizen, furnishing Mr. Murphy for an interview and deposition will help expedite the discovery process between the federal government and Defendants in this case, and help aid the Court's desire that the parties complete government discovery related to the federal government contractor defense in a timely manner.

### B.    Dr. Mark Little

Dr. Mark Little was an Army audiologist who did a fellowship with NIOSH in the 2001 time period. Documents produced to date show that Dr. Little corresponded with Aearo representatives in 2001 regarding the CAEv2 while at NIOSH. For example, the correspondence attached as **Exhibit B** includes communications between Dr. Little and an Aearo representative in August and September 2001 regarding (i) CAEv2 test data; (ii) CAEv2 instructions for use; and (iii) certain product testing that Dr. Little intended to perform (referred to in Exhibit B as "Method B" testing). Defendants seek to interview and depose Dr. Little regarding: (i) test procedures, test protocols, and test results related to his testing on the CAEv2, including an overview of the tests Dr. Little ran on the CAEv2, how Dr. Little fit the CAEv2 during his testing, how Dr. Little determined the appropriate procedure for fitting CAEv2 during his testing, the results of Dr. Little's testing, and the attenuation achieved with CAEv2 under various testing and fit conditions; and (ii) correspondence and/or communications pertaining to CAEv2 between Dr. Little and others in the government, including the military, and/or representatives of Aearo or 3M.

The testing performed by Dr. Little is relevant to show that CAEv2 provides adequate attenuation and is not defective. Dr. Little's testing, and his communications with others in the government and Aearo regarding the CAEv2, are also relevant to show that the government was on notice of CAEv2's performance capabilities and limitations, which is relevant to both Plaintiffs' failure to warn claims and Defendants' federal government contractor defense. This information is not available from other less burdensome sources. Defendants' *Touhy* requests to the Department of Defense—including to each branch of the Armed Forces—have not resulted in discovery from the government related to the tests conducted by Dr. Little, or any communications with Dr. Little involving the CAEv2 (the communications attached as **Exhibit B** were located in Aearo's files, not the government's). Further, searches in the public domain have not revealed the details of any testing conducted by Dr. Little.

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 6

Furnishing Dr. Little for an interview and deposition is in the interests of the federal government. In addition to the government's general interest in being a good federal citizen, furnishing Dr. Little for an interview and deposition will help expedite the discovery process between the federal government and Defendants in this case, and help aid the Court's desire that the parties complete government discovery related to the federal government contractor defense in a timely manner.

### III.    Document Requests

Defendants request certain documents related to the government's testing of, and communications regarding, the CAEv2. Defendants are presently aware of at least two buckets of CAEv2 testing performed by or at NIOSH. *First*, as noted above, documents produced to date indicate William J. Murphy tested the CAEv2 on numerous occasions between 2001 and 2015. (*E.g.*, **Exhibit A**) *Second*, documents produced to date indicate that Dr. Mark Little tested the CAEv2 while doing a fellowship with NIOSH in approximately late 2001. These documents show that Dr. Little communicated with Defendants in August and September of 2001 regarding his intention to perform testing on the CAEv2 while at NIOSH, including so called "Method B" testing pursuant to certain ANSI standards. (*See* **Exhibit B**)

#### A.    Specific Documents Requested

Defendants request the following documents from NIOSH:

1.    Test reports, protocols, results, and analyses pertaining to any testing conducted on CAEv2 by William J. Murphy.[3]

2.    Communications between Mr. Murphy and others in the United States government, including Doug Ohlin and others in the military, pertaining to testing on, or the performance of, the CAEv2. An example of such a communication is attached as **Exhibit A**.

3.    Communications between Mr. Murphy and Defendants pertaining to testing on, or the performance of, the CAEv2. An example of such a communication is attached as **Exhibit A**.

---

[3]    For reference, Defendants are aware that Mr. Murphy conducted, among other tests on the CAEv2: (1) an October 2001 where Mr. Murphy performed impulse peak testing on the CAEv2 using a 9mm handgun and M16 rifle; and (2) a December 23, 2014 test entitled "Measurement of Impulse Peak Insertion Loss from two Acoustic Test Fixtures and Four Hearing Protector Conditions."

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 7

4.   Test reports, protocols, procedures, results, and analyses pertaining to any testing conducted on CAEv2 by Mark Little.

5.   Communications between Dr. Little (tzl3@cdc.gov) and Defendants (@compuserve and @aearo.com domain names) related to CAEv2, including instructions to be used during testing, test results, test procedures, test protocols, and analyses related to continuous and impulse noise testing on CAEv2. Examples of such communications attached at **Exhibits A and B**.

6.   Communications between Dr. Little and others in the United States government, including Doug Ohlin and others in the military, related to CAEv2, including product instructions, test results, test procedures, test protocols, and analyses related to continuous and impulse noise testing on CAEv2. An example of such a communication is attached at **Exhibit A**.

7.   Test reports, protocols, procedures, results, and analyses pertaining to any other testing conducted on CAEv2 by current or former employees of NIOSH.

**B.    Relevance of the Documents Requested**

The requested documents are relevant for two reasons. *First*, they are relevant to rebut two of Plaintiffs' core allegations in this case: (1) that the CAEv2 does not adequately attenuate noise; and (2) that the government was not aware of the CAEv2's performance capabilities and limitations. Defendants anticipate that the documents requested will show that the CAEv2 *does* adequately attenuates noise, and is not defective, and that the government was aware of the product's performance capabilities and limitations. *Second*, they are also relevant to Defendants' federal government contractor defense. For example, the third prong of the government contractor defense requires Defendants to show that "the supplier warned the United States about the dangers in the use of the [product] that were known to [it] but not to the United States." *See Boyle* at 487 U.S. at 512. Government testing, and the requested communications, are relevant to both (i) what product limitations were "known … to the United States" and (ii) the warnings provided to the United States by Defendants.

This information is not available from other less burdensome sources. To be sure, some of Mr. Murphy's test reports are publicly available, but (i) Defendants do not know if all of Mr. Murphy's test results are publicly available, and (ii) in any event, publicly available test reports do not describe details relevant to the claims and defenses in this case, including, for example, how CAEv2 was "fit" during testing, whether the flanges on the opposite end of the earplug were folded back during testing, and whether Mr. Murphy had difficulty achieving or maintaining an adequate fit during his testing, all of which details may be contained in non-publicly available documents and communications. Additionally, Defendants' *Touhy* requests to the Department of Defense—

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 8

including to each branch of the Armed Forces—have not resulted in discovery from the government related to the tests conducted by Dr. Little, or any communications with Dr. Little involving the CAEv2. Further, searches in the public domain have not revealed the details of any testing conducted by Dr. Little.

**IV.   Additional Considerations**

These requests comply with the policy of the DHHS regarding the provision of documents, and of information by its employees in connection with litigation in federal court:

1.   Disclosure of the requested information is not unduly burdensome or otherwise inappropriate under the federal discovery rules.

2.   Disclosure of the requested information would be appropriate under the Federal Rules of Evidence and appropriate under the rules of the Northern District of Florida.

3.   Disclosure of the requested information would be appropriate under the Federal Rules of Civil Procedure and would not impact any concerns regarding privileged information pursuant to the rules of procedure governing this litigation.

4.   Disclosure of the requested information would not violate any statute, executive order, regulation, or directive.

5.   Disclosure of the requested information would not reveal any classified information, data restricted pursuant to AR 380-5, unclassified technical data withheld from public release pursuant to 32 C.F.R. § 250 or DoD Directive 5230.25, privileged safety information restricted from public release by DoD Directive 6055.7, AFI 31-401,  or other matters exempt from unrestricted disclosure.

6.   Disclosure of the requested information would not interfere with ongoing enforcement proceedings, compromise any constitutional rights, reveal the identity of an intelligence source or confidential informant, disclose trade secrets or similarly confidential commercial or financial information, or otherwise be inappropriate under the circumstances.

7.   Disclosure would not violate any person's expectation of confidentiality or privacy.

8.   The United States is not, and is not reasonably anticipated to be a party in this litigation.

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 9

**V.      Administrative Matters**

Defendants will bear the costs of producing the documents and witnesses sought by this *Touhy* request.  Costs will be paid by check or money order payable to the Treasury of the United States.  To the extent the DHHS believes any of the requested information does not implicate the statutory considerations set forth above, Defendants are willing to work with the DHHS to narrow the scope of the requested interviews and depositions.

Should you have any questions or require additional information about this *Touhy* request, please do not hesitate to contact me at (312) 862-3254 or nick.wasdin@kirkland.com.

Sincerely,

Nicholas F. Wasdin

One of the Attorneys
Representing 3M

# EXHIBIT A

| From: | Murphy, William J. <wjm4@cdc.gov> |
|-------|-----------------------------------|
| To: | Elliott Berger <eberger@compuserve.com>;Vern Larson (E-mail) <vlarson@bacou-dalloz.com>;Per Hiselius (E-mail) <phiselius@dallozsafety.com>;Armand Dancer (E-mail) <dancer@newel.net>;Doug Ohlin (E-mail) <douglas.ohlin@apg.amedd.army.mil> |
| CC: | Franks, John R. <jrf3@cdc.gov>;Little, Mark B. <tzl3@cdc.gov> |
| Sent: | 10/23/2001 11:22:57 PM |
| Subject: | Impulse peak levels |

```
Elliott, Vern, Per, Armand and Doug
I just finished the very preliminary analysis of peak levels and peak level
reductions of different protectors on the ISL mannequin. I thought you
might be interested in the external and internal peak levels and peak level
reductions.
B707II is Bilsom 707 impact II
CAELin and CAELin2 are the linear side of the Combat Arms Plug
CAENLin and CAENLin2 are the nonlinear side of Combat Arms Plug
ISLNLin and ISLNLin2 are the Bilsom 656/ISL nonlinear plug
PT6s is the Peltor Tactical 6S
SilELP97 is the Silencio Electronic Low Pro muff
PH10A is the Peltor H10A double shelled muff
PH9Bullseye is the Peltor Bullseye H9 muff
HLLeight is the Howard Leight Lightning with Pro-Ears
HLThunder is the Howard Leight Thunder muff with Pro-Ears
and the EAR Classic is well... Classic right?
==================Data Follows===================
Weapon Protector Elect. On? Outside Inside Attenuation
9MM B707II Yes 166.78 141.19 25.59
9MM B707II No 164.11 131.49 32.61
9MM CAELin No 163.86 135.08 28.78
9MM CAELin2 No 162.99 134.17 28.83
9MM CAENLin Yes 166.22 138.04 28.18
9MM CAENLin2 Yes 162.47 135.80 26.68
9MM EARClassic No 165.56 137.82 27.74
9MM HLLeightning Yes 166.01 135.81 30.20
9MM HLLeightning No 166.54 136.48 30.06
9MM HLThunder Yes 164.69 130.90 33.79
9MM HLThunder No 164.74 131.80 32.94
9MM ISLNLin Yes 166.73 150.32 16.41
9MM ISLNLin2 Yes 163.13 145.79 17.34
9MM PH10A No 164.47 130.26 34.21
9MM PH9Bullseye No 165.01 136.79 28.22
9MM PT6S Yes 163.37 135.71 27.66
9MM PT6S No 164.06 136.19 27.87
9MM SilELP97 Yes 167.66 149.71 17.95
9MM SilELP97 No 167.06 149.40 17.66
M16 B707II Yes 161.67 129.33 32.34
M16 B707II No 161.60 129.57 32.03
M16 CAELin No 169.38 141.10 28.28
M16 CAELin2 No 169.08 140.22 28.86
M16 CAENLin Yes 168.25 143.18 25.07
M16 CAENLin2 Yes 169.34 143.61 25.73
M16 EARClassic No 163.40 137.18 26.21
M16 HLLeightning Yes 169.02 137.02 32.00
M16 HLLeightning No 170.07 139.19 30.87
M16 HLThunder Yes 170.78 145.01 25.77
M16 HLThunder No 170.70 144.68 26.03
M16 ISLNLin Yes 166.78 150.88 15.90
M16 ISLNLin2 Yes 170.64 152.83 17.81
M16 PH10A No 162.84 130.43 32.40
M16 PH9Bullseye No 163.05 135.36 27.70
M16 PT6S Yes 160.78 133.79 26.98
M16 PT6S No 160.16 134.54 25.62
M16 SilELP97 Yes 163.65 144.60 19.05
M16 SilELP97 No 163.55 144.81 18.74
```

3M Confidential                                                                3M00027126

Confidential - Subject To Protective Order                                     3M_MDL000024875

# EXHIBIT B



Major Mark Little                                                      September 18, 2001
NIOSH
Robert Taft Laboratories
Mailstop C-27
4676 Columbia Pkwy.
Cincinnati, OH  45226-1998

Dear Mark:

In response to our conversation this morning I have put together the following information on the Combat Arms Earplug (CAE).

- A consumer package is enclosed.  In that market we sell the product as the Indoor/Outdoor Range E•A•R® Plugs.  You can use the instructions from the package for your Method B testing.  You can also find that product listed on our web site under the AO Safety brand name, consumer products, hunters/shooters.  The exact address is: http://www.aosafety.com/shooters/products/ear_03.htm.
- A copy of a letter from Pascal Hamery from January 2000 in which he provides insertion loss data in impulsive noise, measured on the ISL blockhead for the CAE.
- REAT test reports for both ends of the CAE measured according to ANSI S3.19.

Regarding our quality tests on the CAE, I reviewed our files and can verify that we conduct quality checks using an acoustic impedance device to assure that the plugs have been assembled properly, that the cartridges are in place, and that the dimensions of the orifice fall within our specifications. Our quality program is in conformance with ISO 9001.

This should provide you the information you require to develop your own program of evaluation of the CAE.  I look forward to hearing from you as you embark upon your research.

Sincerely,


Elliott H. Berger
Senior Scientist, Auditory Research

Encl.:   1 consumer pkg. Of Indoor/Outdoor Range plugs
         Copy of ISL impulsive data for the CAE
         REAT evaluations for CAE, both ends




Mark Little CAE1.doc

3M Confidential – Attorneys' Eyes Only                                    3M00008624


Confidential - Subject To Protective Order                               3M_MDL000008624



3M Confidential

3M00020410

Confidential - Subject To Protective Order

3M_MDL000018429



U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES                    Public Health Service

Centers for Disease Control
and Prevention (CDC)
Atlanta GA 30329-4027

July 23, 2020

Nicholas Wasdin
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois  60654

      Re: Request for Documents, Interview, and Deposition Testimony –
      In re: 3M Combat Arms Earplug Products Liability Litigation, 3:19-md-02885-MCR-
      GRJ (N.D. Fla.).

Dear Mr. Wasdin:

This is in response to your February 6, 2020, letter requesting documents, an interview, and
testimony from an employee of the National Institute for Occupational Safety and Health
(NIOSH), within the Centers for Disease Control and Prevention (CDC), a component of the
Department of Health and Human Services (HHS or the Department), and a former fellow of
NIOSH, on behalf of Defendants 3M Company (3M) and Aearo Technologies LLCs (Aearo) in
the above-captioned litigation. In your letter, you sought to interview and depose two
individuals, Drs. William Murphy and Mark Little, on a number of aspects of NIOSH's tests of
the CAEv2 earplugs that are at the heart of the underlying litigation.

Pursuant to HHS regulations codified in 45 C.F.R. Part 2, current and former HHS employees
are not authorized to participate, give depositions or trial testimony, or provide consultation
regarding information acquired in the performance of their official duties in private litigation or
other proceedings in which the United States is not a party, absent authorization by the agency.
The bases for this policy, as articulated in Section 2.1(b), are to minimize the disruption of
official duties and the necessity of the Department to maintain impartiality in disputes between
private litigants. In United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951), the Court
recognized the authority of federal agencies to direct their employees' involvement in such
actions. The Eleventh Circuit U.S. Court of Appeals has also specifically recognized HHS's
authority to limit the involvement of CDC employees in such litigation.

Section 2.4 of the Touhy testimony regulations requires the satisfaction of three criteria before
testimony by a current or former HHS employee is allowed. First, the request must be made in
writing and state the nature of requested testimony. Second, the request must explain why the
testimony is unavailable by any other means. Finally, the request must provide reasons why the
testimony would be in the interests of or promote the objectives of HHS.

Section 2.1(b) of the Touhy regulations provides that it is HHS's policy to provide information,
data, and records to private litigants to the same extent and in the same manner that they are
made available to the general public. Further, when subject to the jurisdiction of a court
presiding over non-federal party litigation, it is HHS's policy to abide by all applicable
procedural and substantive rules when releasing such documents.

Page 2 - Nicholas Wasdin

Dr. William Murphy:

After consulting with the Office of the General Counsel (OGC) regarding your request, I have determined that Dr. William Murphy's providing a declaration in lieu of an interview and deposition, in addition to certain records, is appropriate and in the best interests of NIOSH. This is because specific aspects of the testimony and documents you seek are in the interest of HHS/CDC to provide, to the extent not otherwise available through production of documents through the Freedom of Information Act (FOIA) or through relevant testimony and documents available in the private sector or from other federal agencies.

Please note, however, that your request for records is denied to the extent that it includes all test reports, protocols, results, and analyses pertaining to the testing conducted on CAEv2 by Mr. Murphy and any other current or former NIOSH employees that have been released previously to Mr. Wasdin via email on April 22, 2019, and/or are also materials that are made publicly available. Only relevant documents relating to communications between Dr. Murphy, 3M, Aearo, and any other federal entity on the testing of CAEv2 will be disclosed.

While the U.S. government is not currently a party intervenor to this litigation, providing a declaration and certain responsive documents is in NIOSH's interest because disclosing the requested information in this manner is less burdensome on the Institute, more time efficient, and will avoid significant interruption of Dr. Murphy's official duties as a federal government employee.  Further, the provision of information in the format of a declaration is a more suitable approach given Dr. Murphy's minor role in this matter and the ever-present demands that have been placed on NIOSH, CDC and the Department in responding to the ongoing Coronavirus Disease 2019 pandemic.

Moreover, it serves NIOSH and HHS's best interest to respond affirmatively to this request given the involvement of other Federal entities, by virtue of the Defendant's Touhy requests served on those departments, and for purposes of assisting in the coordinated approach of providing relevant information on behalf of the Federal Government for this matter.

Thus, in the interest of NIOSH in this litigation, I am authorizing the requested documents and allowing for the submission of the enclosed declaration by CDC employee William Murphy subject to the parameters below:

1. The scope of the declaration will be limited to a general explanation of Dr. Murphy's testing procedures, the fitting of the CAEv2 during his testing, his test results, and the attenuation achieved with the CAEv2. Dr. Murphy has not been authorized to address any testing he conducted that was not published or that did not concern the CAEv2.
2. The production of documents is partially granted with the permitted release of relevant communications between Dr. Murphy, the Defendants, and other federal entities pertaining to the testing of the CAEv2. As previously stated, any documents on the testing and results concerning the CAEv2 that were finalized and published by NIOSH were provided to Mr. Wasdin prior to this Touhy request. As a result of Dr. Murphy's and the CDC IT department's thorough search of his electronic and hard copy records, the aforementioned relevant documents are enclosed herein.

Page 3 – Nicholas Wasdin

Dr. Mark Little:

Your request seeks the interview and deposition of, including records pertaining to, Dr. Mark Little who participated in a fellowship with NIOSH in 2001. During his fellowship with NIOSH, however, Dr. Little was and remains an employee of the Department of the Army. Accordingly, I have coordinated our response to your requests with both HHS OGC and the Department of the Army, as detailed below.

First, with regard to your request for an interview and deposition of Dr. Little, in consultation with OGC and the Department of the Army, I am denying that request and, alternatively, authorizing a declaration, which is enclosed. Dr. Little lacks almost any recollection of his duties during his fellowship with NIOSH or his participation in any study of the CAEv2. Moreover, the published results of all NIOSH testing on CAEv2 during Dr. Little's fellowship already have been provided to 3M. Thus, to minimize any burden on NIOSH and to obviate any inefficient use of time or resources by Dr. Little, NIOSH, or OGC, while still accommodating your request, Mr. Little has provided the enclosed declaration.

Regarding your request for documents, NIOSH and Dr. Little have conducted a search for documents, including email correspondence, and identified a small number of responsive documents. Accordingly, in coordination with the Department of the Army, as his employer, I am authorizing the release of the enclosed requested email communications involving Dr. Little.

This limited approval of your Touhy request is not an endorsement by HHS or CDC of the accuracy of any statements made by Dr. Murphy or Dr. Little in their declarations.

Please contact L. Michael Rafky in the HHS Office of the General Counsel with any questions regarding this Touhy approval. You can reach him at LRafky@cdc.gov or (404) 267-3455 (cell).

Sincerely,

Robert R. Redfield, MD
Director, CDC

cc:   Jacqueline Coleman Snead
      Frank Hearl
      Brandy Vaughn
      Dr. William Murphy
      Dr. Mark Little

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

|  |  |
|---|---|
| Plaintiffs, | ) ) ) ) ) ) |
| v. | ) Civil Action No. 3:19-md-02885 ) |
| 3M Company, 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC and Aearo Technologies LLC Defendant. | ) ) ) ) ) ) |

**DECLARATION OF WILLIAM J. MURPHY**

I, William J. Murphy, declare as follows:

(1)     I am a research physicist with the National Institute for Occupational Safety and Health (NIOSH) in Cincinnati, OH.  I completed a Ph.D. in physics with an emphasis in hearing science at Purdue University in December 1992. I was hired by NIOSH as a civil servant Physical Scientist, GS Series-1310, and started work at NIOSH on December 14, 1992.  I was commissioned as a scientist officer with the temporary rank of Lieutenant in the Commissioned Corps of the United States Public Health Service on February 8, 1993.  I was promoted to the temporary rank of Lieutenant Commander January 1, 1996, promoted to temporary rank of Commander January 1, 2001, and promoted to temporary rank of Captain on January 1, 2008.  I served as a team leader for the Hearing Loss Prevention Research Team in the Engineering and Physical Hazards Branch, Division of Applied Research and Technology, NIOSH, from October 1, 2004 to May 1, 2015. Since May 1, 2015, I have served as the Coordinator for the Hearing Loss Prevention Research Cross sector at NIOSH.

1

(2)      In my official capacity as a research physicist with NIOSH, I managed several research projects related to understanding the performance of hearing protection devices.  Some of the devices are passive linear earplugs, earmuffs, and semi-aural insert devices.

## I. Defendant's Touhy Request to NIOSH

(3)      By letter dated February 6, 2020, Defendants submitted a revised Touhy request in accordance with the requirements set forth in the Department of Health and Human Services (HHS) Touhy regulations codified in 45 C.F.R. Part 2.  The request concerns NIOSH's testing of the Combat Arms Earplugs Version 2 (CAEv2) during the period 2001 - 2015.

(4)      The revised Touhy request, in pertinent part, requests my deposition and an interview concerning:

(a) test procedures, test protocols, and test results related to testing on the CAEv2, including an overview of the tests I ran on the CAEv2, how I fit the CAEv2 during my testing, how I determined the appropriate procedure for fitting CAEv2 during my testing, whether I was able to maintain an adequate fit during my testing, the results of my testing, and the attenuation achieved with CAEv2 under various testing and fit conditions; and

(b) correspondence and/or communications pertaining to CAEv2 between me and others in the government, including the military, and/or representatives of Aearo or 3M.

## II. Response to Defendant's Touhy Request

(5)      In lieu of providing an interview and deposition, pursuant to the HHS Touhy regulations, CDC's Director, in consultation with OGC, has authorized me to provide a declaration addressing my testing of the CAEv2 and communications with others in the Federal Government or Defendants concerning the CAEv2.  Specifically, I have been authorized to describe my testing

2

procedures, the fitting of the CAEv2 during my testing, my test results, and the attenuation achieved with the CAEv2. I have not been authorized to address any testing I conducted that was not published or that did not concern the CAEv2.

### CAEv2 Testing and Results

(6)     Attached hereto as Exhibit A is a study I presented in or around April 2006 entitled *Attenuation of Measurements of Passive Linear and Nonlinear Hearing Protectors for Impulse Noise*. This study examined the attenuation characteristics of passive linear and passive nonlinear hearing protectors in response to impulsive noises. Exhibit A describes the measurements conducted at Fort Collins Police Services (FCSP) as a part of a NIOSH Health Hazard Evaluation (HHE) of electronic hearing protection. The HHE included an evaluation of nineteen hearing protectors (including the CAEv2) with ten firearms at an indoor firing range and seven firearms at an outdoor range. The measurement methods are described in the HHE report. However, only the results for the three hearing protectors used by the FCSP were reported in the HHE: the David Clark model 27 earmuff, the Electronic Shooter Protection ESP Elite earplug, and the 3M (Aearo Technologies) EAR Classic formable earplug.

(7)     The tests in Exhibit A were all conducted with the first version of the NIOSH acoustic test fixture (ATF) purchased from the French/German Institute of Saint Louis (ISL). This ATF had only one instrumented ear and the usable length of the ear canal was 10 mm. The CAEv2 was inserted into the canal such that two flanges of the earplug were completely in the canal and the third largest flange was in contact with the outer edge of the ear canal. The largest flange of the opposite (distal) end of the earplugs was not folded back. The tests were only conducted with a hearing protector in place because the microphone in the ATF was limited in its maximum response.

(8)       Exhibit A reports the results from tests of the CAEv2 earplug conducted with firearms at an indoor and outdoor firing range.  The results reported are peak noise reduction, the difference between the peak impulse level measured with an external microphone and the peak level underneath the hearing protector.  *See* Ex. A at 15, 16, 19, 20, 22.

a.  On slide 15, the linear side of the CAEv2 is shown in terms of the attenuation achieved from outside the earplug to the ATF microphone.  The CAEv2 linear earplug exhibited peak noise reduction of approximately 30 dB across all of the frequencies 25 to 10,000 Hz.

b.  On slide16, the one-third octave band attenuation results for the CAEv2 nonlinear earplug are presented. The nonlinear CAEv2 provided 20 dB or more attenuation from 250 Hz to 10,000 Hz.

c.  On slide 19, the growth of attenuation with external peak level is shown. The CAEv2 nonlinear earplug is shown in contrast to two other products.  The CAEv2 provided greater peak reduction of the impulse than the other products over the range of ten firearms tested at the indoor firing range.  According to these data the 167 dB peak sound pressure level of the most energetic firearm was reduced by slightly more than 24 dB. The data shown in slide 19 indicate that the protected peak exposure levels for the CAEv2 nonlinear earplug would be between 138 and 143 dB.

d.  The data on slide 20 were a distillation of the average peak reduction across firearms and the slopes of the lines shown in slide 19.  The average reduction and slope were calculated for each protector and then plotted on slide 20.  The CAEv2 linear earplug had less of a change in protection as a function of level and a higher

4

average peak reduction. Only the EAR Classic foam earplug exceeded the

CAEv2 nonlinear earplug.

(9)     The presentation attached as Exhibit A or a variant of it was presented at several

meetings: Cincinnati National Hearing Conservation Association meeting on impulse noise, April

7, 2003; Nashville meeting of the Acoustical Society of America, April 28, 2003; NIOSH National

Occupational Research Agenda meeting, July 16, 2003; Seattle meeting of National Hearing

Conservation Association, February 12, 2004; San Diego meeting of the American Industrial

Hygiene Association, May 9, 2004; Chicago meeting of the American Industrial Hygiene

Association May 18, 2006; and at a briefing with the Army Research Laboratory at Aberdeen

Proving Ground on March 8, 2007.

(10)     Attached hereto as Exhibit B is a copy of a poster entitled *Impulse Peak Insertion

Loss for Hearing Protection Devices Tested with an Acoustic Shock Tube* that I presented at the

National Hearing Conservation Association Meeting held in San Diego in February 2016.

(11)     Regarding the fitting during testing, the CAEv2 was inserted into the GRAS 45

CB acoustic manikin such that the third flange of the CAEv2 was in contact with the outer edge of

the ear canal and partially, but not completely within the ear canal. No wrinkles of the largest

proximal flange were present as that might reduce the attenuation of the earplug. The largest flange

of the opposite (distal) end of the earplug was not folded back (away from the head).

(12)     The CAEv2s were inserted multiple times according to the American National

Standards Institute (ANSI) S12.42-2010 standard. The ANSI standard describes that five sample

earplugs will be inserted three times at each of three impulse levels, nominally 132, 150, and 168

dB peak sound pressure level (SPL). The five samples were cycled per the ANSI standard and all

tests were completed at an impulse level for all samples before proceeding to a different level.

5

(13)     At 132 dB, the CAEv2 nonlinear earplug provided approximately 10 dB of impulse peak insertion loss (IPIL). At 150 dB, the CAEv2 nonlinear earplug provided about 19 dB IPIL. At 168 dB, the CAEv2 nonlinear earplug provided about 33 dB IPIL.  These results suggest that the peak protected exposure levels would be 122, 131, and 135 dB peak SPL for the nonlinear side of the CAEv2.  For the linear side of the CAEv2, the IPIL were about 38, 40, and 46 dB for the 132, 150, and 168 dB impulse levels, respectively.

### My Communications with Defendants or Others Within the Federal Government Regarding the CAEv2

(14)     CDC IT staff and I conducted a thorough search of my work email account and I have attached hereto as Exhibit C all responsive communications concerning the CAEv2. I do not recall any specifics about the communications that are attached hereto.

(15)     I have also attached two other communications, as Exhibits D and E, already in the possession of 3M that include me as a sender or recipient. I also do not recall any specifics about these communications.

(16)     I have had other deliberations about how electroacoustic models of hearing protectors might be created, implemented and tested.  To date, none of the presentations about hearing protector models has included the CAEv2 product.

## CONCLUSION

(17)      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my recollection.

Executed this 29th day of July, 2020.


WILLIAM J. MURPHY, Ph.D.
Coordinator,
Hearing Loss Prevention Research Cross Sector
Noise and Bioacoustics Team
Engineering and Physical Hazards Branch
Division of Field Studies and Engineering
National Institute for Occupational Safety and Health
Cincinnati, OH 455226-1998

William J.
Murphy -S7

Digitally signed by
William J. Murphy -S7
Date: 2020.07.29
13:30:17 -04'00'

# Attenuation Measurements of Passive Linear and Nonlinear Hearing Protectors for Impulse Noise

William J. Murphy, Ph.D.

Chucri A. Kardous, M.S.

National Institute for Occupational Safety and Health

Hearing Loss Prevention Section





WORKPLACE SAFETY AND HEALTH



# New Technology

- Nonlinear Orifice
  - Circular Orifice (Institute de Saint Louis)
    - EAR Combat Arms & Bilsom 655
  - Slit Orifice: EAR Ultra 9000
- Sound Restoration
  - Level-limiting: Peltor, Bilsom
  - Compression Circuits: Howard Leight Pro-Ears
- Active Noise Reduction
  - Bose, Telex, David Clark

WORKPLACE SAFETY AND HEALTH

CDC



# New Standards?

- International Standards Organization
  - ISO 4869 parts 4-7
    - Primarily Electronic
- Proposed European Standards
  - EN352 parts 5-7
    - Electronic Devices
- American National Standards Institute
  - Not yet proposed

WORKPLACE SAFETY AND HEALTH

# What about Nonlinear Devices?

- Real Ear Attenuation at Threshold (REAT)
  - Low levels = Low attenuations
- Microphone in Real Ear (MIRE)
  - High levels = Increased risk to subjects
  - Microphone placement for earplugs
    - Impractical (disrupts seal with ear canal)
    - Insufficient acoustic isolation





WORKPLACE SAFETY AND HEALTH





# Methods

- Generate impulsive signals with gunshots
- Measure the protected and unprotected signals
  - ¼" B&K 4136 microphone outside HPD
  - ISL mannequin with 4165 B&K ½" under HPD
- Record signals with Tascam DA-P1 digital audio tape (DAT) recorder.
  - 48000 samples/second.



NIOSH

CDC   WORKPLACE SAFETY AND HEALTH



# Methods

- Measured ten weapons
  - 0.357 Smith & Wesson 586 and 686 pistols
  - 0.450 Colt 1991A1, Para-ordinance pistols
  - 0.400 Glock 22 and 27 pistols
  - 9mm Pocket 9 and Sig Sauer P228 pistols
  - 12 gauge Remington 870 & 11-87 shotguns
- Five shots per condition and weapon





WORKPLACE SAFETY AND HEALTH

# Methods

- Measured Earplugs and Earmuffs
  - Six passive linear earplugs
    - Bilsom 555, 655 NST
    - EAR Combat Arms, HiFi, UltraTech, Classic
  - Three passive nonlinear earplugs
    - Bilsom 655 with ISL cartridge
    - EAR Combat Arms with ISL cartridge
    - North Sonic Earvalve
  - One passive nonlinear earmuff
    - EAR Ultra 9000



WORKPLACE SAFETY AND HEALTH

# Gunshot Impulse Analysis

- 42.67 msec analysis window (2048 samples)
- Maximum Impulse Levels,
  - Unprotected & Protected
- Peak Level Reduction
  - Unprotected – Protected
- Third-octave Analysis of Attenuation
  - Unprotected – Protected





WORKPLACE SAFETY AND HEALTH





















# Auditory Hazard Assessment Model

- Proposed Model to determine exposure criteria for U.S. Army
- Mathematical model of the auditory periphery
  - Estimates the basilar membrane velocity
  - Estimates impulsive stress on the BM
  - Yields Auditory Damage Units
- Verified with an animal model

WORKPLACE SAFETY AND HEALTH




# Conclusions

- Simple Relationship for Impulsive Risk
  - Verified by AHAAH model
  - $ADU = -12.9 + 0.00086 \; e^{(0.0829 \; * \; Protected \; Peak)}$
  - $N = 500 / ADU$

- Ultra 9000 and Bilsom 655 NST protectors have not completely saturated.



WORKPLACE SAFETY AND HEALTH

| | |
|---|---|
| **From:** | EHBerger |
| **To:** | Murphy, William J. (CDC/NIOSH/DART) |
| **Subject:** | Re: Compilation of Peak Reduction measurements for a range of HPDs using gunshots |
| **Date:** | Tuesday, October 20, 2009 3:20:12 PM |

can one explanation of the increasing peak reduction with increasing SPL be that the spectrum of the impulses changes with level and the high level impulses have more high freq content? it would be useful to see a chart of the spectrum of your blast with level.

by the way, wed nov 4 is confirmed for me and my boss will probably join us.

eb

At 01:03 PM 10/14/2009, you wrote:

> Elliott,
> Attached is a distillation of the gunshot measurements that were conducted at Fort Collins during the 2002 NIOSH Health Hazard Evaluation. The data were presented in a different form at the 2003 Impact Noise Conference held in Cincinnati. I had show several of the level dependent products Combat Arms, Linear/nonlinear, Ultra 9000 and then summarized them with a plot of the slope and average peak reduction  The protectors are listed on the plots. I have included the data for both indoor and outdoor firing ranges. If I can get it completed today, I will update the summary plot for both indoor and outdoor shooting where you'll be able to locate the average peak reduction and the slope of the regression on each product.

> Dave Byrne and I will evaluate several more earplugs with the GRAS test fixture in continuous noise tomorrow morning. We have the long and short ear canals that will be used. I have scrounged up a number of other protectors. As I said earlier today, the premolded products are not affected appreciably by the ear canal length. The foam plugs are dramatically influenced by canal length. Thus that leads to the question of what canal length should be specified.

> Bill Murphy
> <<Effects of Peak Level and Peak Reduction.pdf>>



# Impulse Peak Insertion Loss for Hearing Protection Devices Tested with an Acoustic Shock Tube

William J. Murphy[1], Pamela S. Graydon[1], Matthew Strobel[1,2], Katrina Freeland[1,3]

[1]National Institute for Occupational Safety and Health, [2]New York Institute of Technology, [3]Gonzaga University

## INTRODUCTION

Several hearing protection devices were tested for impulse peak insertion loss (IPIL) using an acoustic shock tube according to the ANSI S12.42-2010 standard. The protector types included earmuffs with electronic level-limiting circuitry, standard earplugs and earplugs with an orifice or filter that provided increasing attenuation with impulse level. Measurements were conducted using two GRAS 45 CB test fixtures and nominal peak impulse levels of 132, 150 and 168 dB. This poster will report the results from tests of sixteen products tested at the NIOSH Impulse Noise Testing Laboratory. Nonlinear earplug IPIL ranged between about 10-15 dB for 132-dB and 25-35 dB for the 168-dB impulses. Earmuff IPIL exhibited a similar range of performance. The passive foam earplug provided upwards of 40-55 dB IPIL.





Figure 1. Arrangement of two GRAS 45 CB fixtures in front of the NIOSH and WMU fixtures in the NIOSH Impulse Laboratory. Test levels are achieved with the shock tube were 132, 150 and 168 dB peak SPL as measured with the GRAS 6758 probe microphone.

## METHODS

A variety of nonlinear hearing protection devices (HPDs) were tested in the NIOSH Impulse Laboratory. Earmuffs and earplugs were selected based upon the products that were included in the Army's AHAAH Hearing Protection Module. A variety of muffs and plugs with the nonlinear features (valves, filters or electronic sound restoration) were purchased for testing.

The acoustic shock tube was used to generate impulses at 132, 150 and 168 dB peak sound pressure level and the HPDs were fitted on the GRAS 45 CB acoustic manikins shown in Figure 1 owned by NIOSH (left) and Western Michigan University (right). A GRAS 6758 blast probe sampled the impulse waveform.

Six models of nonlinear earplugs, five models of electronic earmuffs and four models of passive earplugs were selected for testing. Five samples of each model were purchased for testing. The samples were fitted on each manikin, once for each test shot and were cycled across the fixtures and levels. The blast probe was used to establish the average transfer functions for 132, 150 and 168 dB impulse levels between the blast probe and the uncicluded fixture, $H_{ATF-PF\Delta,t}(f) = \frac{1}{N} \sum_{t=1}^{N} \frac{P_{ATF,f,t,t}(f)}{P_{PF,t,t}(f)}$.

The transfer function was used to estimate the unoccluded impulse level for each occluded impulse, $\hat{P}_{ATF,t,t}(f) = FFT^{-1}(H_{ATF-PF\Delta,t}(f) \times P_{PF,t,t}(f))$.

The estimated unoccluded waveform was then used to determine the Impulse Peak Insertion Loss by comparing the dB ratio of the peaks in the occluded and unoccluded conditions, $IPIL_{L,t,t} = 20 \log_{10} \left( \frac{\max(\hat{P}_{ATF,t,t}(t))}{\max(P_{ATF-J,t}(t))} \right)$.

## RESULTS

### Earplugs in Open Condition:

Measurements were conducted for open earplugs. The 3M Combat Arms earplug (CAE) version 2 and Version 4, the Ear Blast Busters with Hocks Noise Brake, the Surefire EP-3 and EP-4 and the Etymotic Research ETYPlugs were evaluated. Although the ETYPlugs are not strictly an earplug with a nonlinear valve, the acoustic filter acts in a nonlinear manner and provides more attenuation at the highest impulse levels.

First the results are compared between fixtures with a scatter plot of the IPIL values from each fixture. The red diagonal line indicates equality between the two fixtures. For the Open valve conditions, the two fixtures exhibit excellent agreement. The standard deviations all intersect the diagonal line. Each protector is depicted with different symbols and different colors.

Second, the IPIL values measured with the NIOSH and WMU fixtures are shown for each protector and Impulse level. The NIOSH IPIL values are the three bars on the left and the WMU IPIL are the three bars on the right of each group of six bars. The standard deviations are indicated at the top of each bar as a line. Generally we see that the open ear conditions yielded about 10 dB IPIL at 132 dB peak SPL for the CAE version 2 and 4, Hocks and SureFire products. The IPILs for the same products were about 15 to 18 dB at 150 dB and about 30 to 35 dB at 168 dB impulse level. At the 168 dB impulse level, the ETYPlug had the lowest IPIL of about 26 dB. The other protectors had IPIL values between 30 and 45 dB.



Figure 2. Comparisons of the IPIL values for the NIOSH and WMU fixtures for the Open Earplug Conditions. Error bars represent 1 standard deviation. Each group of bars shows the NIOSH fixture at 132, 150 and 168 dB in that order.



### Earplugs in Closed Condition:

The 3M Combat Arms, SureFire EP3 and EP4 earplugs were tested. Other foam earplugs have been tested, but due to a tear in the silicon of the GRAS 45 CB fixture in the pinnae and/or ear canals, the data are not presented. For these earplugs, the comparison of the two fixtures exhibit agreement to within a few decibels. For instance the UltraFit earplug provided IPIL of about 38 to 45 dB. For the 3M Combat Arms version 4, the IPILs from NIOSH fixture (left 3 bars) were about 2 dB less than those of the WMU fixture. The 3M Combat Arms version 2 IPIL values were higher for the 150 dB impulses on the WMU fixture. Generally, the NIOSH fixture exhibited IPIL values that were 1 to 2 dB less than the WMU fixture. These differences can be attributed to the seal of the pinna portion with the ear canal because the right and left ears exhibited small but consistent differences, that are not seen on the earmuff data.



Figure 4. Comparisons of the IPIL values for the NIOSH and WMU fixtures for the Closed Earplug Conditions. Error bars represent 1 standard deviation. Each group of bars shows the NIOSH fixture at 132, 150 and 168 dB in that order.

## RESULTS

One earmuff combination and two electronic earmuffs were tested in the passive condition, with the electronics turned off. The earplug combination was the Peltor Tactical Pro earmuff and Etymotic Research ETYPlug. The other earmuffs were the Peltor Tactical Pro earmuff and the Peltor SoundPlug earmuff. The Passive conditions exhibited excellent agreement between the fixtures. For the Peltor Tactical Pro and the combination of the TacticalPro and ETYPlug at 150 dB, the WMU fixture yielded lower IPIL results than the NIOSH fixture. Similarly, the Peltor SoundPlug earmuff was lower for the 130 dB impulses.



Figure 5. Comparisons of the IPIL values for the NIOSH and WMU fixtures for the Passive Earmuff Conditions. Error bars represent 1 standard deviation. Each group of bars shows the NIOSH fixture at 132, 150 and 168 dB in that order.

Finally in Figure 4, the electronic earmuffs tested with the electronics turned off are displayed. The Peltor Tactical Pro and Etymotic Research ETYPlugs were tested twice. In the earlier test, the ear canal exhibited a slight tear that compromise the seal of the ETYPlugs.



Figure 6. Comparisons of the IPIL values for the NIOSH and WMU fixtures for the Electronic Earmuff Conditions. Error bars represent 1 standard deviation. Each group of bars shows the NIOSH fixture at 132, 150 and 168 dB in that order.

## SUMMARY / RECOMMENDATIONS

➤ Hearing protector tests with acoustic fixtures are sensitive to the seal of the protector with the manikin head and ear canal. Minor tears in the material of the GRAS 45 CB fixture can significantly degrade the measured IPIL values by as much as 8 decibels.

➤ The position of the blast probe relative to the acoustic test fixtures in the sound field of the impulse source (e.g. shock tube, rifle or explosive charge) should be carefully measured and the arrival time of the impulses at the manikin ears used to check the rotation of the test fixture.

➤ Attenuations for the open filter conditions exhibit remarkable similarity for the SureFire and Combat Arms earplugs. The ETYPlug has greater IPIL for the low level but more than 5 dB less IPIL than the other earplugs.

The findings and conclusions in this poster are those of the authors and do not necessarily represent the views of the National Institute for Occupational Safety and Health

| From: | Murphy, William J. <wjm4@cdc.gov> |
|---|---|
| To: | Elliott Berger <eberger@compuserve.com>;Vern Larson (E-mail) <vlarson@bacou-dalloz.com>;Per Hiselius (E-mail) <phiselius@dallozsafety.com>;Armand Dancer (E-mail) <dancer@newel.net>;Doug Ohlin (E-mail) <douglas.ohlin@apg.amedd.army.mil> |
| CC: | Franks, John R. <jrf3@cdc.gov>;Little, Mark B. <tzl3@cdc.gov> |
| Sent: | 10/23/2001 11:22:57 PM |
| Subject: | Impulse peak levels |

Elliott, Vern, Per, Armand and Doug
I just finished the very preliminary analysis of peak levels and peak level
reductions of different protectors on the ISL mannequin. I thought you
might be interested in the external and internal peak levels and peak level
reductions.
B707II is Bilsom 707 impact II
CAELin and CAELin2 are the linear side of the Combat Arms Plug
CAENLin and CAENLin2 are the nonlinear side of Combat Arms Plug
ISLNLin and ISLNLin2 are the Bilsom 656/ISL nonlinear plug
PT6s is the Peltor Tactical 6S
SilELP97 is the Silencio Electronic Low Pro muff
PH10A is the Peltor H10A double shelled muff
PH9Bullseye is the Peltor Bullseye H9 muff
HLLeight is the Howard Leight Leightning with Pro-Ears
HLThunder is the Howard Leight Thunder muff with Pro-Ears
and the EAR Classic is well... Classic right?
==================Data Follows==================
Weapon Protector Elect. On? Outside Inside Attenuation
9MM B707II Yes 166.78 141.19 25.59
9MM B707II No 164.11 131.49 32.61
9MM CAELin No 163.86 135.08 28.78
9MM CAELin2 No 162.99 134.17 28.83
9MM CAENLin Yes 166.22 138.04 28.18
9MM CAENLin2 Yes 162.47 135.80 26.68
9MM EARClassic No 165.56 137.82 27.74
9MM HLLeightning Yes 166.01 135.81 30.20
9MM HLLeightning No 166.54 136.48 30.06
9MM HLThunder Yes 164.69 130.90 33.79
9MM HLThunder No 164.74 131.80 32.94
9MM ISLNLin Yes 166.73 150.32 16.41
9MM ISLNLin2 Yes 163.13 145.79 17.34
9MM PH10A No 164.47 130.26 34.21
9MM PH9Bullseye No 165.01 136.79 28.22
9MM PT6S Yes 163.37 135.71 27.66
9MM PT6S No 164.06 136.19 27.87
9MM SilELP97 Yes 167.66 149.71 17.95
9MM SilELP97 No 167.06 149.40 17.66
M16 B707II Yes 161.67 129.33 32.34
M16 B707II No 161.60 129.57 32.03
M16 CAELin No 169.38 141.10 28.28
M16 CAELin2 No 169.08 140.22 28.86
M16 CAENLin Yes 168.25 143.18 25.07
M16 CAENLin2 Yes 169.34 143.61 25.73
M16 EARClassic No 163.40 137.18 26.21
M16 HLLeightning Yes 169.02 137.02 32.00
M16 HLLeightning No 170.07 139.19 30.87
M16 HLThunder Yes 170.78 145.01 25.77
M16 HLThunder No 170.70 144.68 26.03
M16 ISLNLin Yes 166.78 150.88 15.90
M16 ISLNLin2 Yes 170.64 152.83 17.81
M16 PH10A No 162.84 130.43 32.40
M16 PH9Bullseye No 163.05 135.36 27.70
M16 PT6S Yes 160.78 133.79 26.98
M16 PT6S No 160.16 134.54 25.62
M16 SilELP97 Yes 163.65 144.60 19.05
M16 SilELP97 No 163.55 144.81 18.74

3M Confidential

3M00027126

| From: | Ohlin, Douglas W Dr USACHPPM |
|---|---|
| To: | "Murphy, William J."; Ohlin, Douglas W Dr USACHPPM; Little, Mark B. |
| Cc: | Elliott H. Berger (E-mail); "dancer@isl.tm.fr"; Sachs, Felix Z Mr USACHPPM |
| Subject: | RE: NLEarplugSummary.xls |
| Date: | Friday, October 12, 2001 2:12:17 PM |

Thanks, more better....

-----Original Message-----
From: Murphy, William J. [mailto:wjm4@cdc.gov]
Sent: Friday, October 12, 2001 1:58 PM
To: 'Ohlin, Douglas W Dr USACHPPM'; Little, Mark B.; Murphy, William J.
Cc: Elliott H. Berger (E-mail); 'dancer@isl.tm.fr'; Sachs, Felix Z Mr
USACHPPM
Subject: RE: NLEarplugSummary.xls


Doug,
These data are at levels where you have to protect the troops. What I sent
to everyone was the integrated power levels measured over 0.125 sec
triggered by the impulse event. The recordings of the impulses which we
collected show peak levels of 167 dB for the 9mm pistol and 162 dB for the
M16. Again the spreadsheet I sent out was a first analysis conducted at the
time the recording was made. I have not had the time to do much more than
look at the waveforms at this point.

Bill Murphy

-----Original Message-----
From: Ohlin, Douglas W Dr USACHPPM
[mailto:Douglas.Ohlin@APG.AMEDD.ARMY.MIL]
Sent: Friday, October 12, 2001 1:17 PM
To: 'tzl3@cdc.gov'; 'wjm4@cdc.gov'
Cc: Elliott H. Berger (E-mail); 'dancer@isl.tm.fr'; Sachs, Felix Z Mr
USACHPPM
Subject: FW: NLEarplugSummary.xls


Just an observation on these data. The operative word here is "nonlinear."
I'd be more interested in the performance of these devices up at the levels
where we usually have to protect our troops, i.e., between 156 to 190dBP.



-----Original Message-----
From: Murphy, William J. [mailto:wjm4@cdc.gov]
Sent: Thursday, October 04, 2001 11:18 AM
To: Doug Ohlin (E-mail); Little, Mark B.
Cc: Elliot Berger (E-mail); Armand Dancer (E-mail); Franks, John R.
Subject: NLEarplugSummary.xls


Sorry to have to send this again. I am not a whiz with Excel, and
consequently had some mistakes in the previous sheet. Delete the previous
Excel file and replace it with this one.

Thanks,
Bill Murphy
 <<NLEarplugSummary.xls>>

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Florida

| | |
|---|---|
| _Plaintiff_ | ) |
| v. | ) |
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | ) |
| _Defendant_ | ) |

Civil Action No.   3:19-md-02885

## AMENDED SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                    Dr. William J. Murphy
                    1147 Springdale Court, Lawrenceburg, Indiana 47025
                              _(Name of person to whom this subpoena is directed)_

☑ _Testimony:_ **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Section II.A of Exhibit 1

| Place: The Westin Cincinnati 21 E. 5th Street Cincinnati, Ohio 45202 | or, Alternatively, via Remote Deposition | Date and Time: 09/16/2020 9:00 am |
|---|---|---|

The deposition will be recorded by this method:   Stenographic and Videographic

☐ _Production:_ You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      08/26/2020

               _CLERK OF COURT_
                                                    OR
                                                                      /s/ Ashley Neglia
      _____          _____
      Signature of Clerk or Deputy Clerk                    Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_      Defendants.
_____ , who issues or requests this subpoena, are:

Ashley Neglia, Kirkland & Ellis LLP, 555 S. Flower St., Los Angeles, CA 90071; Ashley.Neglia@kirkland.com; (213) 680-8114

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  3:19-md-02885

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00   .

I declare under penalty of perjury that this information is true.

Date: _____       _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT 1

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Nicholas F. Wasdin
To Call Writer Directly:
+1 312 862 3254
nick.wasdin@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

February 6, 2020

**Via Email**

Robert R. Redfield, MD
Director, Centers for Disease Control and
Prevention
1600 Clifton Road, N.E., MS D-14
Atlanta, Georgia 30333

Re:   Touhy Request Relating to *In re: 3M Combat Arms Earplug Products
Liability Litigation*, 3:19-md-02885-MCR-GRJ (N.D. Fla.).

Dear Dr. Redfield:

In connection with *In re: 3M Combat Arms Earplug Products Liability Litigation*, a
multidistrict litigation pending before the Northern District of Florida, this letter constitutes
Defendants 3M Company ("3M") and Aearo Technologies LLC's ("Aearo") second *Touhy*[1]
request to the United States Department of Health and Human Services ("DHHS") for certain
documents described below, and to interview and depose two current or former employees of the
National Institute for Occupational Safety and Health ("NIOSH"), a federal agency within the
Center for Disease Control ("CDC"), who were involved in testing of the Combat Arms Earplugs
Version 2 ("CAEv2").  Pursuant to 45 C.F.R. §§ 2.1 - 2.4, Defendants set forth the basis for their
*Touhy* requests as follows:

## I.   Summary of the Litigation

3M was founded in 1902 as a small-scale mining venture in Northern Minnesota, and has
grown into a global science company employing over 90,000 people and produces more than
60,000 products world-wide.  Many of 3M's brands have become universally known, including
Scotch™ Brand adhesive tapes, Post-it® Brand sticky notes, and Thinsulate™ thermal insulation,
to name just a few.  In addition to its consumer-side business, 3M also had a long-standing
relationship with federal and state governments for well over fifty years and provides thousands
of products designed to protect American troops and support their missions.  In 2008, 3M

---

[1]   *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 2

purchased Aearo, who, at the time, was a global leader in personal protection equipment, headquartered in Indianapolis, Indiana. The acquisition helped 3M expand its occupational health and environmental safety platform by adding hearing protection, eyewear protection, and fall protection to its product lines, including Combat Arms Earplugs - the subject of this litigation. Combat Arms Earplugs represented a significant advance in hearing protection in that they were one of the first hearing protection devices to offer protection from high-level impulse noises, like gun-fire, while still allowing the user to hear lower level sounds, like speech, with limited interruption. Hearing loss is a common injury among military veterans. The U.S. military has provided hearing protection and preservation services to soldiers for decades. In support of that mission, the military employs audiologists to administer hearing conservation programs and work with outside contractors, like 3M, to advance their hearing protection goals.

The complaints in this litigation assert claims for alleged hearing loss or tinnitus allegedly caused by noise exposure to plaintiffs while wearing the CAEv2. CAEv2 was developed and designed by Aearo at the request of and in close consultation with U.S. military audiologists, including Dr. Doug Ohlin, former Program Manager, Hearing Conservation, U.S. Army Center for Health Promotion and Preventative Medicine. Specifically, the U.S. military and Aearo decided to modify and update Aearo's Ultrafit® triple-flanged earplug by including a specially patented filter created by the French-German Institute in Saint Louis, France ("ISL"). Thereafter, Aearo worked with the U.S. military and ISL to develop an earplug embodying ISL's patented technology, which ultimately became CAEv2. CAEv2 consists of two Ultra-fit type tips, one green and one yellow, attached to opposite sides of a plastic stem with a small opening at the center. The green end works like a conventional passive earplug, providing steady and continuous protection from ambient noise. In contrast, the yellow end allows sound to travel into the opening at the center of the earplug and through a sound channel and the patented filter before entering the ear. The filter allows lower-level sounds, such as speech, to pass through while reducing higher-level impulse noises, like gun-fire. Throughout the design process, Aearo worked closely with the U.S. military to ensure that CAEv2 would appropriately balance performance with military operational needs for soldiers and military personnel. These specifications were memorialized in a Medical Procurement Item Description ("MPID") that was used by the Defense Logistics Agency to solicit bids from Aearo for CAEv2.

On April 3, 2019, the Judicial Panel on Multidistrict Litigation entered an order transferring the consolidated cases and any tag-along actions to the Northern District of Florida. To date, tens of thousands of actions have been filed on behalf of current or former military personnel who allegedly were issued and used the CAEv2 during their service. Plaintiffs typically allege hearing loss and/or tinnitus as a result of noise exposure in military and combat settings, and assert claims for design defect, negligence, failure to warn, breach of warranties, and/or fraud. For example, Plaintiffs allege that the CAEv2 was "dangerously defective" because, among other things, (i) the CAEv2 does not provide adequate attenuation for certain noise exposures, (ii) the short length of the CAEv2 "prevented Plaintiffs from obtaining a proper fit and seal when inserting the device

KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 3

into their ear canals," and (iii) the "design of the [CAEv2] also caused the device to loosen imperceptibly in Plaintiff's ear canals." (*See* Compl. ¶¶ 2, 6-7, 194)  According to Plaintiffs, (i) Defendants "supplied this dangerously defective product to Plaintiffs and the United States military for more than a decade without Plaintiffs or the United States military having any knowledge of those defects and risks," and (ii) Defendants never warned Plaintiffs or the U.S. government that, to obtain the attenuation ratings achieved during product testing, "they reconfigured the device by folding back the flanges of the open end before inserting the closed end of the device into the ear canals of the test subjects." (*Id.* ¶ 5)

3M and Aearo deny these allegations.  Among other things, product testing performed by the U.S. Government, Aearo, and other third parties demonstrates that the CAEv2 provides the intended levels of attenuation.  Defendants were in active communication with the government during product development, and the government was aware of the product's performance capabilities and limitations.

In addition to defending Plaintiffs' claims on the merits, 3M and Aearo have also asserted the federal government contractor defense set forth in *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1998), because Aearo sold the CAEv2 to the U.S. military under government contracts and in accordance with the government's specifications.  The government contractor defense applies where, as here: "(1) the United States approved reasonably precise specifications [for the product at issue]; (2) the [product] conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the [product] that were known to [it] but not to the United States." *See id.* at 512.  Here, the CAEv2 was designed and manufactured in accordance with the military's specifications, which included a reasonably precise instruction to shorten the earplug to its allegedly defective length.  The government was aware of CAEv2's performance capabilities and limitations, including any alleged "fitting" limitations caused by the product's length.

Much of the materials relevant to Plaintiffs' claims are in the possession of the U.S. Government.  For example, service and medical records for individual Plaintiffs are in the possession of the VA and DOD.  The DOD also has records related to, among other things, CAEv2 design and development, CAEv2 testing, noise exposure data, and hearing protection usage rates.  The parties have been working with the VA, DOD and the Court to identify and produce these records, and to schedule the depositions of related government witnesses.  The Court has directed the parties to endeavor to complete this phase of government discovery in February and March, 2020.

## II.    Interview And Deposition Requests

Defendants request an interview and deposition with (i) NIOSH employee William J. Murphy (wmurphy@cdc.gov; wjm4@cdc.gov); and (ii) former NIOSH fellow Dr. Mark Little

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 4

(tzl3@cdc.gov).[2]  Defendants request interviews occur prior to the depositions, and believe that such interviews will make the deposition process more efficient, including by (i) identifying the location of relevant documents and data in advance of the deposition, which will help avoid the need for additional depositions if a witness identifies relevant materials for the first time during a deposition; and (ii) minimizing unnecessary depositions through pre-deposition identification of any witness with minor roles or immaterial knowledge, which may reduce the time and expense of organizing a formal depositions for that witness.

### A.    William Murphy

Mr. Murphy is or was a program coordinator for the NIOSH Hearing Loss Prevention Program.  Documents produced to date show that Mr. Murphy conducted testing on CAEv2 on various occasions between 2001 and 2015, and communicated the results of his testing to others in the government, including Army audiologist Doug Ohlin, and individuals at Aearo.  For example, the email attached as **Exhibit A** is an example of Mr. Murphy transmitting the results of 2001 impulse testing on CAEv2 to Doug Ohlin, Mark Little, others in the government, representatives of ISL, and representatives of Aearo.  Defendants seek to interview and depose Mr. Murphy regarding: (i) test procedures, test protocols, and test results related to testing on the CAEv2, including an overview of the tests Mr. Murphy ran on the CAEv2, how Mr. Murphy fit the CAEv2 during his testing, how Mr. Murphy determined the appropriate procedure for fitting CAEv2 during his testing, whether Mr. Murphy was able to maintain an adequate fit during his testing, the results of Mr. Murphy's testing, and the attenuation achieved with CAEv2 under various testing and fit conditions; and (ii) correspondence and/or communications pertaining to CAEv2 between Mr. Murphy and others in the government, including the military, and/or representatives of Aearo or 3M.

The testing performed by Mr. Murphy is relevant to show that CAEv2 provides adequate attenuation and is not defective.  Mr. Murphy's testing, and his communications with Aearo or others in the government regarding the CAEv2, are also relevant to show that the government was on notice of CAEv2 performance capabilities and limitations, which is relevant to both Plaintiffs' failure to warn claims and Defendants' federal government contractor defense.  This information is not available from other less burdensome sources.  To be sure, some of Mr. Murphy's test reports

---

[2]    Defendants understand that Dr. Little is presently the chief of audiology at Eisenhower Army Medical Center. Accordingly, Defendants served a *Touhy* interview and deposition request related to Dr. Little on the Army. However, after subsequent discussion with counsel for NIOSH, Defendants are separately serving this *Touhy* request regarding Dr. Little on the CDC. The point of contact for the related Army *Touhy* request is: Major Colin Evans, Litigation Attorney, General Litigation Branch, U.S. Army Legal Services Agency, 9275 Gunston Road, Ft. Belvoir, VA 22060, Office: 703-693-0352, Email: Collin.p.evans.mil@mail.mil.  It is Defendants' understanding that Major Evans has been in contact with Dr. Little and can provide current contact information, if needed.

KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 5

are publicly available, but (i) Defendants do not know if all of Mr. Murphy's test results are publicly available, and (ii) in any event, publicly available test reports do not describe details relevant to the claims and defenses in this case, including how CAEv2 was "fit" during testing, whether the flanges on the opposite end of the earplug were folded back during testing, and whether Mr. Murphy had difficulty achieving or maintaining an adequate fit during his testing.

Furnishing Mr. Murphy for an interview and deposition is in the interests of the federal government. In addition to the government's general interest in being a good federal citizen, furnishing Mr. Murphy for an interview and deposition will help expedite the discovery process between the federal government and Defendants in this case, and help aid the Court's desire that the parties complete government discovery related to the federal government contractor defense in a timely manner.

**B.     Dr. Mark Little**

Dr. Mark Little was an Army audiologist who did a fellowship with NIOSH in the 2001 time period. Documents produced to date show that Dr. Little corresponded with Aearo representatives in 2001 regarding the CAEv2 while at NIOSH. For example, the correspondence attached as **Exhibit B** includes communications between Dr. Little and an Aearo representative in August and September 2001 regarding (i) CAEv2 test data; (ii) CAEv2 instructions for use; and (iii) certain product testing that Dr. Little intended to perform (referred to in Exhibit B as "Method B" testing). Defendants seek to interview and depose Dr. Little regarding: (i) test procedures, test protocols, and test results related to his testing on the CAEv2, including an overview of the tests Dr. Little ran on the CAEv2, how Dr. Little fit the CAEv2 during his testing, how Dr. Little determined the appropriate procedure for fitting CAEv2 during his testing, the results of Dr. Little's testing, and the attenuation achieved with CAEv2 under various testing and fit conditions; and (ii) correspondence and/or communications pertaining to CAEv2 between Dr. Little and others in the government, including the military, and/or representatives of Aearo or 3M.

The testing performed by Dr. Little is relevant to show that CAEv2 provides adequate attenuation and is not defective. Dr. Little's testing, and his communications with others in the government and Aearo regarding the CAEv2, are also relevant to show that the government was on notice of CAEv2's performance capabilities and limitations, which is relevant to both Plaintiffs' failure to warn claims and Defendants' federal government contractor defense. This information is not available from other less burdensome sources. Defendants' *Touhy* requests to the Department of Defense—including to each branch of the Armed Forces—have not resulted in discovery from the government related to the tests conducted by Dr. Little, or any communications with Dr. Little involving the CAEv2 (the communications attached as **Exhibit B** were located in Aearo's files, not the government's). Further, searches in the public domain have not revealed the details of any testing conducted by Dr. Little.

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 6

Furnishing Dr. Little for an interview and deposition is in the interests of the federal government. In addition to the government's general interest in being a good federal citizen, furnishing Dr. Little for an interview and deposition will help expedite the discovery process between the federal government and Defendants in this case, and help aid the Court's desire that the parties complete government discovery related to the federal government contractor defense in a timely manner.

### III.    Document Requests

Defendants request certain documents related to the government's testing of, and communications regarding, the CAEv2. Defendants are presently aware of at least two buckets of CAEv2 testing performed by or at NIOSH.  *First*, as noted above, documents produced to date indicate William J. Murphy tested the CAEv2 on numerous occasions between 2001 and 2015. (*E.g.*, **Exhibit A**)  *Second*, documents produced to date indicate that Dr. Mark Little tested the CAEv2 while doing a fellowship with NIOSH in approximately late 2001. These documents show that Dr. Little communicated with Defendants in August and September of 2001 regarding his intention to perform testing on the CAEv2 while at NIOSH, including so called "Method B" testing pursuant to certain ANSI standards.  (*See* **Exhibit B**)

#### A.    Specific Documents Requested

Defendants request the following documents from NIOSH:

1.    Test reports, protocols, results, and analyses pertaining to any testing conducted on CAEv2 by William J. Murphy.[3]

2.    Communications between Mr. Murphy and others in the United States government, including Doug Ohlin and others in the military, pertaining to testing on, or the performance of, the CAEv2. An example of such a communication is attached as **Exhibit A**.

3.    Communications between Mr. Murphy and Defendants pertaining to testing on, or the performance of, the CAEv2. An example of such a communication is attached as **Exhibit A**.

---

[3]    For reference, Defendants are aware that Mr. Murphy conducted, among other tests on the CAEv2: (1) an October 2001 where Mr. Murphy performed impulse peak testing on the CAEv2 using a 9mm handgun and M16 rifle; and (2) a December 23, 2014 test entitled "Measurement of Impulse Peak Insertion Loss from two Acoustic Test Fixtures and Four Hearing Protector Conditions."

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 7

4.    Test reports, protocols, procedures, results, and analyses pertaining to any testing conducted on CAEv2 by Mark Little.

5.    Communications between Dr. Little (tzl3@cdc.gov) and Defendants (@compuserve and @aearo.com domain names) related to CAEv2, including instructions to be used during testing, test results, test procedures, test protocols, and analyses related to continuous and impulse noise testing on CAEv2. Examples of such communications attached at **Exhibits A and B**.

6.    Communications between Dr. Little and others in the United States government, including Doug Ohlin and others in the military, related to CAEv2, including product instructions, test results, test procedures, test protocols, and analyses related to continuous and impulse noise testing on CAEv2. An example of such a communication is attached at **Exhibit A**.

7.    Test reports, protocols, procedures, results, and analyses pertaining to any other testing conducted on CAEv2 by current or former employees of NIOSH.

**B.    Relevance of the Documents Requested**

The requested documents are relevant for two reasons. *First*, they are relevant to rebut two of Plaintiffs' core allegations in this case: (1) that the CAEv2 does not adequately attenuate noise; and (2) that the government was not aware of the CAEv2's performance capabilities and limitations. Defendants anticipate that the documents requested will show that the CAEv2 *does* adequately attenuates noise, and is not defective, and that the government was aware of the product's performance capabilities and limitations. *Second*, they are also relevant to Defendants' federal government contractor defense. For example, the third prong of the government contractor defense requires Defendants to show that "the supplier warned the United States about the dangers in the use of the [product] that were known to [it] but not to the United States." *See Boyle* at 487 U.S. at 512. Government testing, and the requested communications, are relevant to both (i) what product limitations were "known … to the United States" and (ii) the warnings provided to the United States by Defendants.

This information is not available from other less burdensome sources. To be sure, some of Mr. Murphy's test reports are publicly available, but (i) Defendants do not know if all of Mr. Murphy's test results are publicly available, and (ii) in any event, publicly available test reports do not describe details relevant to the claims and defenses in this case, including, for example, how CAEv2 was "fit" during testing, whether the flanges on the opposite end of the earplug were folded back during testing, and whether Mr. Murphy had difficulty achieving or maintaining an adequate fit during his testing, all of which details may be contained in non-publicly available documents and communications. Additionally, Defendants' *Touhy* requests to the Department of Defense—

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 8

including to each branch of the Armed Forces—have not resulted in discovery from the government related to the tests conducted by Dr. Little, or any communications with Dr. Little involving the CAEv2. Further, searches in the public domain have not revealed the details of any testing conducted by Dr. Little.

**IV.    Additional Considerations**

These requests comply with the policy of the DHHS regarding the provision of documents, and of information by its employees in connection with litigation in federal court:

1.    Disclosure of the requested information is not unduly burdensome or otherwise inappropriate under the federal discovery rules.

2.    Disclosure of the requested information would be appropriate under the Federal Rules of Evidence and appropriate under the rules of the Northern District of Florida.

3.    Disclosure of the requested information would be appropriate under the Federal Rules of Civil Procedure and would not impact any concerns regarding privileged information pursuant to the rules of procedure governing this litigation.

4.    Disclosure of the requested information would not violate any statute, executive order, regulation, or directive.

5.    Disclosure of the requested information would not reveal any classified information, data restricted pursuant to AR 380-5, unclassified technical data withheld from public release pursuant to 32 C.F.R. § 250 or DoD Directive 5230.25, privileged safety information restricted from public release by DoD Directive 6055.7, AFI 31-401,  or other matters exempt from unrestricted disclosure.

6.    Disclosure of the requested information would not interfere with ongoing enforcement proceedings, compromise any constitutional rights, reveal the identity of an intelligence source or confidential informant, disclose trade secrets or similarly confidential commercial or financial information, or otherwise be inappropriate under the circumstances.

7.    Disclosure would not violate any person's expectation of confidentiality or privacy.

8.    The United States is not, and is not reasonably anticipated to be a party in this litigation.

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 9

### V.    Administrative Matters

Defendants will bear the costs of producing the documents and witnesses sought by this *Touhy* request. Costs will be paid by check or money order payable to the Treasury of the United States. To the extent the DHHS believes any of the requested information does not implicate the statutory considerations set forth above, Defendants are willing to work with the DHHS to narrow the scope of the requested interviews and depositions.

Should you have any questions or require additional information about this *Touhy* request, please do not hesitate to contact me at (312) 862-3254 or nick.wasdin@kirkland.com.

Sincerely,

Nicholas F. Wasdin

One of the Attorneys
Representing 3M

# EXHIBIT A

| From: | Murphy, William J. <wjm4@cdc.gov> |
|---|---|
| To: | Elliott Berger <eberger@compuserve.com>;Vern Larson (E-mail) <vlarson@bacou-dalloz.com>;Per Hiselius (E-mail) <phiselius@dallozsafety.com>;Armand Dancer (E-mail) <dancer@newel.net>;Doug Ohlin (E-mail) <douglas.ohlin@apg.amedd.army.mil> |
| CC: | Franks, John R. <jrf3@cdc.gov>;Little, Mark B. <tzl3@cdc.gov> |
| Sent: | 10/23/2001 11:22:57 PM |
| Subject: | Impulse peak levels |

```
Elliott, Vern, Per, Armand and Doug
I just finished the very preliminary analysis of peak levels and peak level
reductions of different protectors on the ISL mannequin. I thought you
might be interested in the external and internal peak levels and peak level
reductions.
B707II is Bilsom 707 impact II
CAELin and CAELin2 are the linear side of the Combat Arms Plug
CAENLin and CAENLin2 are the nonlinear side of Combat Arms Plug
ISLNLin and ISLNLin2 are the Bilsom 656/ISL nonlinear plug
PT6s is the Peltor Tactical 6S
SilELP97 is the Silencio Electronic Low Pro muff
PH10A is the Peltor H10A double shelled muff
PH9Bullseye is the Peltor Bullseye H9 muff
HLLeight is the Howard Leight Leightning with Pro-Ears
HLThunder is the Howard Leight Thunder muff with Pro-Ears
and the EAR Classic is well... Classic right?
=================Data Follows=================
Weapon Protector Elect. On? Outside Inside Attenuation
9MM B707II Yes 166.78 141.19 25.59
9MM B707II No 164.11 131.49 32.61
9MM CAELin No 163.86 135.08 28.78
9MM CAELin2 No 162.99 134.17 28.83
9MM CAENLin Yes 166.22 138.04 28.18
9MM CAENLin2 Yes 162.47 135.80 26.68
9MM EARClassic No 165.56 137.82 27.74
9MM HLLeightning Yes 166.01 135.81 30.20
9MM HLLeightning No 166.54 136.48 30.06
9MM HLThunder Yes 164.69 130.90 33.79
9MM HLThunder No 164.74 131.80 32.94
9MM ISLNLin Yes 166.73 150.32 16.41
9MM ISLNLin2 Yes 163.13 145.79 17.34
9MM PH10A No 164.47 130.26 34.21
9MM PH9Bullseye No 165.01 136.79 28.22
9MM PT6S Yes 163.37 135.71 27.66
9MM PT6S No 164.06 136.19 27.87
9MM SilELP97 Yes 167.66 149.71 17.95
9MM SilELP97 No 167.06 149.40 17.66
M16 B707II Yes 161.67 129.33 32.34
M16 B707II No 161.60 129.57 32.03
M16 CAELin No 169.38 141.10 28.28
M16 CAELin2 No 169.08 140.22 28.86
M16 CAENLin Yes 168.25 143.18 25.07
M16 CAENLin2 Yes 169.34 143.61 25.73
M16 EARClassic No 163.40 137.18 26.21
M16 HLLeightning Yes 169.02 137.02 32.00
M16 HLLeightning No 170.07 139.19 30.87
M16 HLThunder Yes 170.78 145.01 25.77
M16 HLThunder No 170.70 144.68 26.03
M16 ISLNLin Yes 166.78 150.88 15.90
M16 ISLNLin2 Yes 170.64 152.83 17.81
M16 PH10A No 162.84 130.43 32.40
M16 PH9Bullseye No 163.05 135.36 27.70
M16 PT6S Yes 160.78 133.79 26.98
M16 PT6S No 160.16 134.54 25.62
M16 SilELP97 Yes 163.65 144.60 19.05
M16 SilELP97 No 163.55 144.81 18.74
```

3M Confidential

3M00027126

Confidential - Subject To Protective Order

3M_MDL000024875

# EXHIBIT B



The email content reads:

Dr Berger, I got your e-mail from the EARLog web pg and you may also have
received an e-mail from Dr Doug Ohlin at the Army Center for Health
Promotion and Prev. Med.(CHPPM) requesting some info for me.  I am an Army
Audiologist doing a 1 yr research fellowship at

Audiologist doing a 1 yr research fellowship at NIOSH.  I would like to run
some studies on the Army's Combat Arms Earplug (CAE), which I'm told and
have read reference to is made from the EAR Ultrafit plug.   What info can
you provide or discuss with me on actual studies

have read reference to is made from the EAR Ultrafit plug.   What info can
you provide or discuss with me on actual studies done on this plug by your
company??  Looking forward to hearing from you as there is very little info
out there re: the CAE.

3M Confidential

Confidential - Subject To Protective Order

3M00020409

3M_MDL000018428

Major Mark Little                                                          September 18, 2001
NIOSH
Robert Taft Laboratories
Mailstop C-27
4676 Columbia Pkwy.
Cincinnati, OH  45226-1998

Dear Mark:

In response to our conversation this morning I have put together the following information on the Combat
Arms Earplug (CAE).

- A consumer package is enclosed.  In that market we sell the product as the Indoor/Outdoor Range
  E•A•R® Plugs.  You can use the instructions from the package for your Method B testing.  You can
  also find that product listed on our web site under the AO Safety brand name, consumer products,
  hunters/shooters.  The exact address is: http://www.aosafety.com/shooters/products/ear_03.htm.
- A copy of a letter from Pascal Hamery from January 2000 in which he provides insertion loss data in
  impulsive noise, measured on the ISL blockhead for the CAE.
- REAT test reports for both ends of the CAE measured according to ANSI S3.19.

Regarding our quality tests on the CAE, I reviewed our files and can verify that we conduct quality checks
using an acoustic impedance device to assure that the plugs have been assembled properly, that the
cartridges are in place, and that the dimensions of the orifice fall within our specifications. Our quality
program is in conformance with ISO 9001.

This should provide you the information you require to develop your own program of evaluation of the
CAE.  I look forward to hearing from you as you embark upon your research.

Sincerely,


Elliott H. Berger
Senior Scientist, Auditory Research

Encl.:   1 consumer pkg. Of Indoor/Outdoor Range plugs
         Copy of ISL impulsive data for the CAE
         REAT evaluations for CAE, both ends



Mark Little CAE1.doc



3M Confidential - Attorneys' Eyes Only                                      3M00008624


Confidential - Subject To Protective Order                                 3M_MDL000008624







**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

Office of the General Counsel

Public Health Division
12501 Ardennes Ave., Ste 301
Rockville, MD 20857
(301) 443-2644
FAX: (301) 443-2639

September 9, 2020

BY EMAIL (ashley.neglia@kirkland.com)

Ashley Neglia, Esq.
Kirkland & Ellis LLP
555 S. Flower Street
Los Angeles, CA 90071

RE: Amended Subpoena to Testify at a Deposition in a Civil Action Issued to Dr. William J.
Murphy; In Re: 3M Combat Arms Earplug Products Liability Litigation, CA 3:19-md-02885
(N.D. Fl.)

Dear Ms. Neglia:

The U.S. Department of Health and Human Services, Office of the General Counsel, Public Health
Division, CDC Branch is in receipt of your Subpoena to Testify dated and served August 26, 2020,
on behalf of your client 3M Company *et al.* ("3M") under Federal Rule of Civil Procedure 45
("Rule 45"). The subpoena commands CDC/NIOSH employee Dr. William J. Murphy to provide
testimony via deposition pursuant to Section II.A of Exhibit 1 of the subpoena.

This letter serves as HHS' Rule 45 objections to your subpoena.  Please note we reserve the right
to supplement these objections in the future and we do not waive other objections that may be
applicable in discovery or at trial.

First, we object to the subpoena on the ground that the scope of the subpoena exceeds the scope of
permissible discovery under Fed. R. Civ. P. 26(b), as it seeks testimony that does not appear to be
relevant to any party's claim or defense and/or is not proportional to the needs of the case.

Specifically, in your February 6, 2020 Touhy request letter, you stated that the testimony you
sought was in part "relevant to . . . [your] federal government contractor defense," and would "help
aid the Court's desire that the parties complete government discovery related to the federal
government contractor defense in a timely manner." By simply tying your subpoena to this Touhy
request, you continue to rely on this justification.

However, as you are no doubt aware, this defense has been summarily dismissed by the court in
this litigation. See Summary Judgment Order, ECF No. 1280 (July 24, 2020); Order Denying Def.
1292(b) Mot. at 1-2 (Aug. 17, 2020). You have made no attempt to provide a new basis for this
subpoena, and are merely renewing your Touhy request using a now-invalid basis. This is
unacceptable and in no way can justify CDC's compliance with the subject subpoena.

Ashley Neglia, Esq.– Page 2

Moreover, to the extent you continue to seek testimony on "[t]he testing performed by Mr. Murphy," that information has already been provided to you in Dr. Murphy's July 29, 2020 declaration and in the documents provided by the CDC accompanying that declaration and previously to Mr. Wasdin, as well as in documents already publicly available. Specifically, the CDC has produced or otherwise released all of Dr. Murphy's published studies on the CAEv2 and provided you with a declaration describing those studies and results, and you and your experts are free to draw whatever inferences you wish from the proffered information. In sum, the information you seek is already in your possession. *See* Fed. R. Civ. P. 26(b)(2)(C).

Relatedly, we object to your subpoena because it is unduly burdensome, unreasonably cumulative and duplicative in violation of Rules 26 and 45 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(b)(2)(C)(i); Fed. R. Civ. P. 45(d)(1), (d)(3). Courts routinely protect non-parties from the undue burden of discovery. *See, e.g., Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998). "Although discovery is by definition invasive, parties to a lawsuit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs." *Id.*; *Sahu v. Union Carbide Corp.*, 262 F.R.D. 308, 317 (S.D.N.Y. 2009) (stating that courts are more sensitive to discovery burdens on third parties).

HHS has a judicially cognizable interest in preserving scarce resources and we have determined that your request for Dr. Murphy's testimony is duplicative and unduly burdensome on the agency and Dr. Murphy because the requested information is already in your possession.

In response to your colleague Mark Wasdin's February 6, 2020 Touhy request to CDC Director Redfield, the Director, by letter dated July 23, authorized the submission of a declaration from Dr. Murphy. That declaration was provided to your colleague Mark Wasdin by me via email on July 30, 2020.

Specifically, Director Redfield permitted Dr. Murphy to provide a declaration "limited to a general explanation of Dr. Murphy's testing procedures, the fitting of the CAEv2 during his testing, his test results, and the attenuation achieved with the CAEv2." In other words, Dr. Murphy's declaration addressed the topics set forth in Mr. Wasdin's Touhy request. Dr. Murphy was not authorized "to address any testing he conducted that was not published or that did not concern the CAEv2." Noting that the CDC is not a party to the underlying litigation, Director Redfield explained that providing a declaration was "a more suitable approach given Dr. Murphy's minor role in this matter and the ever-present demands that have been placed on NIOSH, CDC and [HHS] in responding to the ongoing Coronavirus Disease 2019 pandemic."

Your August 26, 2020 subpoena for testimony does nothing more but refer back to this Touhy request. It makes no effort to explain why Dr. Murphy's proffered declaration is in any way insufficient, and makes no argument regarding what if any information sought remains unreleased and why the CDC should expend further agency resources to provide information already in your possession, particularly when the agency is focused on combatting the ongoing COVID-19 pandemic. To that point, as noted above, Dr. Murphy is currently performing COVID-19-related

Ashley Neglia, Esq.– Page 3

work as part of a CDC Workplace Safety and Health team, and anticipates doing so through the date of the proposed deposition.

Thus, complying with your subpoena would require HHS to spend taxpayer dollars and utilize government resources in the midst of a pandemic to prepare for and submit to a deposition for information that is currently in your possession and control. Rule 45 expressly provides that "[a] party or attorney responsible for issuing a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Based on our review of the August 26 subpoena for testimony, we have determined that you have failed to take reasonable steps to avoid imposing an undue burden that is unreasonably cumulative and duplicative on HHS and Dr. Murphy.

Finally, the subpoena is objectionable to the extent that it seeks privileged materials. See Fed. R. Civ. P. 45(d)(4)(A)(iii). In particular, to the extent your Touhy request seeks information about Dr. Murphy's work regarding the CAEv2 that is unpublished or otherwise not final, or work unrelated to the CAEv2, the subpoena implicates the deliberative process privilege, which applies to "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002), cert. denied, 538 U.S. 1056 (2003) (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)). Such documents include unpublished data and other work where Dr. Murphy and/or the agency did not reach a final conclusion or a position deemed suitable or worthy of publication or other public dissemination. *See, e.g., Moye, O'Brien, O'Rourke, Hogan & Pickert v. Nat. R.R. Passenger Corp.*, 376 F.3d 1270, 1280 (11th Cir. 2004); *Hamilton Sec. Grp. Inc. v. Dep't of Housing & Urban Dev.*, 106 F. Supp. 2d 23, 29-32 (D.D.C. 2000); *see also* Fed. R. Civ. P. 45(d)(3)(A)(iii).

For the foregoing reasons, we object to your Rule 45 subpoena for testimony in the above-described proceedings.

Sincerely,

L. Michael Rafky

cc:  Jacqueline Coleman Snead
     Joshua Kolsky
     Matt Horwitz