UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to All Cases | Case No. 3:19-md-2885<br><br>Judge M. Casey Rodgers<br><br>Magistrate Judge Gary R. Jones |

**DEFENDANTS' MOTION TO COMPEL
AGAINST THE DEPARTMENT OF DEFENSE**

Defendants move that the Court compel the Department of Defense to produce: (1) the noise and ototoxin exposure data discussed below; (2) sales and distribution data for the CAEv2; (3) documents related to the annual Military Audiology Association "Short Course" meetings from 1999 to 2005; and (4) testing data on other hearing protection devices distributed to the Group A bellwether plaintiffs.

**BACKGROUND**

The Department of Defense has had many months to response to the document requests at issue in this motion. Defendants submitted their first *Touhy* request to the Department of Defense over fifteen months ago, on June 21, 2019. (Ex. A.) The request covered, among other things, the noise and ototoxin exposure data and the sales and distribution data that Defendants seek in this motion. (*Id.*) Defendants submitted another *Touhy* request more than six months ago, on March

17, 2020, that requested the Short Course documents sought in this motion. (Ex. B.) And on August 7, 2020, Defendants requested testing data related to the hearing protection devices other than the CAEv2 that the bellwether plaintiffs wore during their service. (Ex. C.)

Pursuant to the Court's order, Defendants served the Department with a subpoena for these documents on September 4, 2020, which requested production by September 23. (Ex. D.) The Department made no response, and Defendants now move to compel production.

## ARGUMENT

In the Eleventh Circuit, courts review the government's responses to discovery requests, whether subpoenas or *Touhy* requests, under the Administrative Procedure Act. *See Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1197 (11th Cir. 1991). The APA permits courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Department has unreasonably delayed all production of the documents discussed herein, and the Court should compel their production at the earliest possible date.

> **A. The Department Has Unreasonably Delayed In Producing Noise And Ototoxin Exposure Data, Including Health Hazard Assessments.**

Judge Jones concluded in July that the Department has unreasonably delayed in producing the noise and ototoxin exposure data, and the delay has not become any more reasonable in the subsequent two months. Dkt. 1292 at 25.

On June 21, 2019, Defendants submitted *Touhy* requests for eight categories of noise and ototoxin exposure data, including, for example, "[n]oise dosimetry data or other documents regarding the amount of noise service members are exposed to in particular specialties, in particular situations, or when operating particular weapons." (Ex. A, at 10-11.) At the Department's request, on July 26, 2019, Defendants resubmitted that *Touhy* request to adhere to the Department's preferred formatting. (Ex. E, at 12-13.) In subsequent telephonic discussions, Major Evans stated that he had been unable to locate the information and believed it did not exist. In response, on March 17, 2020, Defendants submitted a supplemental *Touhy* request that specifically identified potential sources of this information, and noted that the Army's regulations *require* that it be collected. (Ex. B, at 3.) All of Defendants' requests for this information remain "open" and unanswered. Indeed, the Department sent a "comprehensive" update letter on June 26, 2020 stating that the Department had not even begun "processing" the March 17, 2020 request because it was still working on the earlier request from July 2019. (Ex. F, at 3.)

Notwithstanding the government's suggestion that the requested data may not exist, noise exposure data is required by various Department regulations. For

example, pursuant to Army Pamphlet 40-501, Hearing Conservation Program: the Industrial Hygiene Program Manager at every Army installation must, among other thing, (i) survey all known and suspected noise-hazardous areas and equipment and ototoxic exposures, (ii) maintain a current inventory of all noise-hazardous areas, (iii) compile the names and Social Security numbers of noise-exposed and ototoxic-exposed personnel and the magnitude of their noise exposure, and (iv) track noise exposure violations for inclusion on a violation inventory log. (Dkt. 1071, Ex. 8 at 1-4.) Similarly, the regulations require Hearing Conservation Officers to, among other things, (i) notify noise-exposed and ototoxin-exposed personnel of their exposures, and (ii) ensure that noise-exposed and ototoxin-exposed personnel wear noise and ototoxin dosimeters when requested. (*Id.*) Defendants understand that, pursuant to these regulations, the Army collects the required data and calculates the average daily noise exposure of individuals working in each military occupational specialty.

Other public documents confirm that the Army has the data the regulation requires it to collect. The website of the Army Public Health Center notes that, consistent with the regulation, "Army industrial hygienists are responsible for conducting noise surveys in the workplace to identify military and civilian workers potentially exposed to noise hazards." (Ex. G.) A factsheet for the Department's industrial hygiene database (DOEHRS-IH) explains that two "key features" of the

4

database are that it "[c]aptures comprehensive, operational and work task potential exposures-based medical surveillance recommendations," and "[t]racks DoD lifetime personnel exposure data." (Ex. H.) It also says a "key benefit" of the database is that it "[c]aptures information to monitor compliance with occupational health and safety federal law and directives." (*Id.*) The 2006 book *Noise and Military Service: Implications for Hearing Loss and Tinnitus*, published by the National Academies of Sciences, observes that each "Army installation evaluates work environments for potential noise hazards from steady-state noise in industrial-type operations. Since 1988, the sound pressure level and noise dosimetry measurements have been collected . . . ." (Ex. I, at 76.)

In addition to the average daily noise-exposure data discussed above, Department regulations also require that the military determine the noise exposures caused by individual weapons systems and transport vehicles. In particular, per Department regulations, the Army performs health hazard assessments ("HHAs") on the following military systems: "weapons platform, munitions, equipment, clothing, training devices, and other materiel systems." (*See* Ex. J, Army Regulation 40-10, Health Hazard Assessment Program in Support of the Army Acquisition Process, at § 1-5.) According to the Army regulation, an HHA is "[t]he application of biomedical knowledge and principles to document and quantitatively determine the health hazards of Army systems." (*Id.* at 25.) "This assessment identifies, evaluates,

5

and recommends controls to reduce risks to the health and effectiveness of personnel who test, use, or service Army systems," and includes within itself: "(a) [t]he evaluation of hazard severity, hazard probability, risk assessment, consequences, and operational constraints[,] (b) [t]he identification of required precautions and protective devices[,] [and] (c) [t]raining requirements." (*Id.*)  Health hazards addressed in the HHA include, among other things: "[a]coustic energy (steady-state noise, impulse noise, and blast overpressure)," including, for example, "[c]ontinuous noise from engines and helicopter rotors," "[i]mpulse noise from shoulder-fired weapons," and "[b]last overpressure created from the firing of mortars, towed artillery, and heavy weapons on crew-served vehicles." (*Id.* at C-2.)

Thus, HHAs should exist for, among other things, each weapon system operated by the bellwether plaintiffs, and each military vehicle the bellwether plaintiffs operated or were transported in.  In an effort to assist the government's production of relevant HHAs, on May 20, 2020, Nick Wasdin of Kirkland & Ellis provided Major Evans with the list of weapons the bellwether plaintiffs had identified using in their bellwether selection sheets. (Ex. K, at 3-4.)  The Department has not yet produced any of the relevant HHAs.

The Department has unreasonably withheld production of any of the noise and ototoxin exposure data discussed above.  By this motion, however, Defendants seek just four categories of noise and ototoxin exposure data that Defendants understand

6

exist based on their review of the Army regulations and other publicly available materials:

- First, average noise and ototoxin exposure per military occupational specialty. This data may be kept as average daily, weekly, monthly or yearly exposures.

- Second, data regarding noise and ototoxin exposures at the bellwether-relevant Army installations. A list of the relevant installations and time periods is contained in Defendants' June 3, 2020 *Touhy* request. (Ex. L.)

- Third, the health hazard assessments for the weapons operated by the bellwether plaintiffs. A list of the bellwether-relevant weapons identified to date is contained in Defendant's May 20, 2020 email to Major Evans. (Ex. K.)

- Fourth, the "comprehensive, operational and work task potential exposures-based medical surveillance recommendations," and "DoD lifetime personnel exposure data," that are referred to in the promotional materials related to the DOEHRS-IH database. (Ex. H.)

### B. The Department Has Unreasonably Delayed In Producing Sales and Distribution Data For The CAEv2.

Defendants requested data on when and where the military distributed the CAEv2 in their very first *Touhy* request on June 21, 2019. The Department has yet to provide any response. The data is clearly relevant to the litigation, as it can confirm or deny the plaintiffs' allegations that they received the CAEv2 at a particular base at a particular time.

Judge Jones already concluded that the Department has unreasonably delayed producing the noise and ototoxin data, and the delay in producing the

sales[1] and distribution data is just as long. Though the Department previewed that it would take time for them to provide this information, Defendants have patiently waited for long enough. The data should be produced.

### C. The Department Has Unreasonably Delayed In Producing Documents "Short Course" Meetings.

The Department has also unreasonably delayed in producing documents related to the Military Audiology Association "Short Course" meetings from 1999 to 2005. On February 27, 2020, defendants took the deposition of LTC John Merkley. During the deposition, LTC Merkley testified that Doug Ohlin had discussions regarding the CAEv2 with "most of the Army audiologists" "at the military audiology short course" conferences that Merkley attended between 2001 and 2005. (Ex. M (Merkley Dep. Tr.) at 105:4-107:2.) Based on that information, on March 17, 2020, Defendants submitted a supplemental *Touhy* request seeking, among other things, documents related to annual Military Audiology Association Short Course meetings from 1999 to 2005. Over six months later, the Department has yet to provide any documents in connection with this request, let alone any explanation as to why they have yet to provide such documents. The Department's delay is particularly unreasonable given that the request is narrowly tailored to documents related to seven total events.

---

[1] The military may have purchased the CAEv2 not only from Defendants but also from various third-party distributors.

Moreover, the requested documents are critically relevant to establishing the military's knowledge with respect to whether and when to roll back the flange of the CAEV2s to improve fit. Indeed, LTC Merkley testified that, during these meetings, Dr. Ohlin informed Army audiologists that some users might find it beneficial to roll back the opposing flanges of the CAEv2 in order to obtain a better fit. (*Id.* at 98:4-99:2.) Thus, any materials corroborating these discussions, and any discussions that Dr. Ohlin may have had about the CAEv2s at Short Course meetings predating LTC Merkley's involvement, would demonstrate the military's knowledge of the product's capabilities and limitations, which will be critical to Defendants' sophisticated intermediary defense.

### D. The Department Has Unreasonably Delayed In Producing Testing Data On Other Hearing Protection Devices Used By the Group A Plaintiffs.

Finally, the Department has unreasonably delayed in producing testing data of other hearing protection devices used by the Group A Plaintiffs. On August 7, 2020, shortly after Plaintiffs served supplemental discovery responses and sat for deposition, Defendants submitted a supplemental *Touhy* request seeking testing data relating to non-Combat Arms hearing protection devices used by the Trial Group A Plaintiffs. The Department has yet to provide a response.

The request covers eighteen total hearing protection devices, each of which has undisputed relevance given that the Trial Group A Plaintiffs testified to using

9

such products during their military service. Information about the relative performance capabilities of these hearing protection devices as compared to the CAEv2s is necessary to evaluate the Trial Group A Plaintiffs' other noise exposures as well as other potential causes of their alleged injuries. The Department's failure to provide any information, including whether they even intend to respond to Defendants' request, is unreasonable.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court compel the production of the information and documents identified above.

Dated: October 2, 2020

Respectfully submitted,

/s/Robert C. Brock
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
mark.nomellini@kirkland.com

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC and Aearo, LLC*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

I HEREBY CERTIFY that this brief complies with the word limit of Local Rule 7.1(F), and contained 1,994 words, excluding the parts exempted by the Rule.

Dated: October 2, 2020

                                        */s/Robert C. Brock*
                                        Robert C. "Mike" Brock

**CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1(B)**

On September 28, 2020, counsel for Defendants, Mark Nomellini, spoke with counsel for the United States, Josh Kolsky of the Department of Justice. Mr. Kolsky could not commit that the Department of Defense would produce the requested documents. Mr. Kolsky also stated that Defendants should await the Department's objection letter, and that the Department had not been properly served. Mr. Nomellini responded that Defendants could not await the objection letter because of the litigation schedule, and that Defendants had properly served the general counsel of the Department of Defense via certified mail. *See* Ex. N.

Dated: October 2, 2020

*/s/Robert C. Brock*
Robert C. "Mike" Brock

## **CERTIFICATE OF SERVICE**

I, Robert C. Brock, hereby certify that on October 2, 2020, I caused a copy of Defendants' Motion to Compel Against the Department of Defense to be submitted via email to Tevenia Jacobs, law clerk to Judge Rodgers. Jacqui Snead of the Department of Justice and Major Nicole Kim of the Department of Defense were copied on that email.

Dated: October 2, 2020

                                              */s/Robert C. Brock*
                                              Robert C. "Mike" Brock