# EXHIBIT F

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 5:20-mc-01085-DAE |
| | ) | |
| v. | ) | |
| | ) | |
| 3M COMPANY, | ) | |
| | ) | |
| Respondent. | ) | |

## MOTION TO TRANSFER UNDER RULE 45(F)

3M Company respectfully moves that this Court transfer the United States'
motion to quash the subpoena served on its employee, LTC Martin Robinette, to the
issuing court in the Northern District of Florida.

## BACKGROUND

3M issued a subpoena to LTC Robinette in connection with *In re 3M Combat
Arms Earplugs Products Liability Litigation*, Case No. 3:19-md-2885, a multi-
district litigation involving over 200,000 plaintiffs that has been pending before
Judge Rodgers in the Northern District of Florida for nearly a year and a half. The
plaintiffs in the MDL allege that the dual-ended Combat Arms earplug, which was
developed in part by a company later acquired by 3M, caused them to develop
hearing loss and tinnitus. The vast majority of the plaintiffs are former
servicemembers who used the Combat Arms during their military service.

The Court and parties have selected 24 plaintiffs, all former members of the Army, for bellwether trials scheduled to begin in April 2021. Many of the fact witnesses in the bellwether cases are currently employees of the federal government—principally physicians and audiologists who have treated the plaintiffs and current soldiers and officers who knew the plaintiffs during their service, as well as more senior government employees who worked with or tested the Combat Arms earplug. 3M subpoenaed LTC Robinette, a senior Army audiologist, because, among other reasons, he can testify to whether the Army's audiology leadership knew that some individuals might obtain a better fit with the Combat Arms earplug if they folded back the flanges on the opposing side of the earplug before insertion. The United States filed its motion to quash the subpoena in this Court on September 11, 2020.

## **ARGUMENT**

Rule 45(f) permits the court where compliance is required to transfer a subpoena-related motion to the issuing court "if the court finds exceptional circumstances." In deciding whether to transfer a motion, "the prime concern should be avoiding burdens on local nonparties subject to subpoenas." FED. R. CIV. P. 45(f) advisory committee's note (2013 amendments). In some cases, however, "transfer may be warranted in order to avoid disrupting the issuing court's management of the

2

underlying litigation," such as when "the same issues are likely to arise in discovery in many districts." *Id*. When the interest in sound management "outweigh[s] the interests of the nonparty served with the subpoena in obtaining local resolution of the motion," the motion to transfer should be granted. *Id*.

Here, the balance of interests weighs heavily in favor of transfer. The United States is contesting this subpoena on behalf of LTC Robinette, and the federal government has zero interest in local resolution of its motion to quash. The United States is just as much at home in the Northern District of Florida as in the Western District of Texas, and it is equally capable of contesting 3M's subpoena in either court. *See Duck v. SEC*, 317 F.R.D. 321, 326 (D.D.C. 2016) (granting motion to transfer under Rule 45(f) in part because the Securities and Exchange Commission "fail[ed] to identify any burden").

The United States' nonexistent interest in "local" resolution of its motion to quash cannot "outweigh" the enormous administrative benefits of transfer. FED. R. CIV. P. 45(f) advisory committee's note (2013 amendments). There is a near certainty that "the same issues" presented by this motion "are likely to arise in discovery in many districts. *Id*. As already discussed, 3M will soon have issued over 10 subpoenas to current federal employees in connection with the first group of bellwether cases, and it will issue a similar number of subpoenas in connection

3

with the three groups to follow. In the past two weeks, the United States has moved to quash subpoenas seeking the deposition of five different government in four different judicial districts. (Ex. A; Ex. B; Ex. C; Ex. D; Ex. E). There is every reason to suspect that more motions to quash are forthcoming. These motions will involve very similar arguments over the sufficiency of already produced records and the burden that depositions impose on government employees. It would be a needless waste of resources for dozens of federal courts across the country to become familiar with the facts of this litigation when Judge Rodgers could easily resolve the motions herself.

Piecemeal resolution of the government's motions to quash would also undermine the statutory role of the MDL court and threaten the integrity of the bellwether process. The purpose of forming an MDL is to allow a single judge to conduct "consolidated pretrial proceedings" for a group of cases involving common questions of fact. 28 U.S.C. § 1407(a). Scattering these important discovery disputes across the country would directly against that purpose, sacrificing the efficiency of consolidated MDL proceedings for no gain. Accordingly, district courts have repeatedly held that "*the MDL status of the underlying litigation is surely an 'exceptional circumstance' that weighs strongly in favor of transfer to the Issuing Court under Rule 45(f).*" *In re Disposable Contact Lens Antitrust Litig.*, 306 F.

4

Supp. 3d 372, 378 (D.D.C. 2017) (emphasis added); *see also Mylan, Inc. v. Analysis Grp.*, 2018 WL 1204183, at *1 (D. Mass. April 20, 2018); *Visionworks of Am., Inc. v. Johnson & Johnson Vision Care, Inc.*, 2017 WL 1611915, at *2 (W.D. Tex. April 27, 2017); *In re Niaspan Antitrust Litig.*, 2015 WL 3407543, at *1 (D. Md. May 26, 2015) ("[W]here the underlying action is a multidistrict litigation, transfer may be warranted to avoid piecemeal rulings by different judges, reaching different conclusions, in resolving identical disputes.").

The MDL status of the underlying litigation is a particularly important factor in this case, where Judge Rodgers has overseen the parties' discovery requests to the federal government since the beginning of the MDL, and has set up centralized procedures for the parties to follow. In May 2019, representatives of the Department of Defense and Department of Justice gave an on-the-record presentation to Judge Rodgers and the parties on the *Touhy* regulations that govern the response of federal agencies to civil subpoenas and other discovery requests. (Ex. F.) Judge Rodgers also appointed Special Master Judge David Herndon (ret.) to coordinate government discovery issues. (*See* Ex. G ("More specifically, the Special Master will help facilitate and manage discovery from the United States Department of Defense and Department of Justice. As part of his duties, the Special Master is entitled to interact with the parties and federal government officials to explore ways to manage and

expedite discovery from the United States that is reasonably necessary and relevant to the claims and defenses of the parties in this case, and to report to the Court and/or the parties ex parte regarding the status of such efforts.")).

Indeed, 3M and the United States have already spent months litigating a discovery dispute before Judge Rodgers and Magistrate Judge Gary Jones, which culminated in orders from Judge Rodgers that the parties should serve subpoenas on the government, in addition to administrative *Touhy* requests. (Exs. H-J). The government's motion to quash 3M's subpoena, therefore, arises directly from an order that Judge Rodgers entered just over two weeks ago.

Taking bellwether discovery out of Judge Rodgers' hands would also render her carefully constructed bellwether schedule unworkable. Judge Rodgers has divided the 24 bellwether plaintiffs into four trial groups, with a staggered schedule for fact discovery, and with the first bellwether trial beginning in April 2021. If different courts have responsibility for resolving the governments' motions to quash, it will be difficult if not impossible to keep the cases moving on a uniform timeline. A single bellwether case could involve subpoenas to government employees in three or four states, meaning three or four different courts might have to resolve motions to quash before fact discovery could close. Only Judge Rodgers is aware of the complicated and fast-moving schedule in this litigation, and only she can resolve the

6

government's motions to quash in a manner consistent with the requirements of that schedule.

The government's motion to quash could not be a better candidate for transfer under Rule 45(f). Transfer imposes no burden on the government and has significant administrative benefits. To the extent this Court has any doubt about those benefits, 3M would encourage the Court to contact Judge Rodgers directly and discuss the many practical reasons she should maintain sole control over discovery disputes in this litigation. *See* FED. R. CIV. P. 45(f) advisory committee's note (2013 amendments) ("Judges in compliance districts may find it helpful to consult with the judge in the issuing court presiding over the underlying case while addressing subpoena-related motions.").

## CONCLUSION

For the foregoing reasons, 3M respectfully requests that this Court transfer the United States' motion to quash the subpoena served on LTC Robinette to the court of Judge Rodgers in the Northern District of Florida.

DATED: September 15, 2020      Respectfully submitted,

*/s/ Kenneth A. Young*
Kenneth A. Young
KIRKLAND & ELLIS LLP
609 Main Street

7

Houston, Texas 77002
Telephone: (713) 736-36-36
kenneth.young@kirkland.com

*Attorneys for Respondent 3M Company*

## CERTIFICATE OF ATTORNEY CONFERENCE

Counsel for 3M have previously contacted counsel for the United States in connection with the motions to quash the United States has filed in this litigation to inquire whether the government will consent to transfer to the Northern District of Florida. 3M has been advised that the Civil Division at the Department of Justice is considering the request, that the government will advise when it has reached a decision, and that 3M should proceed with its motions to transfer in the interim.

DATED: September 15, 2020          */s/ Kenneth A. Young*
                                    Kenneth A. Young

9

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth A. Young, hereby certify that on September 15, 2020, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.


DATED: September 15, 2020          */s/ Kenneth A. Young*                
                                   Kenneth A. Young

10

# EXHIBIT A

BRYAN SCHRODER
United States Attorney

STEVEN E. SKROCKI
Chief, Civil Division
U.S. Attorney's Office, District of Alaska
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Rm. 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail: Steven.Skrocki@usdoj.gov

Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

UNITED STATES OF AMERICA,

      Petitioner,

v.                            Case No.

3M COMPANY,

      Respondent.
_____/

**MOTION TO QUASH SUBPOENA**

"Rule 26(c) and Rule 45(c)(3) give ample discretion to district courts to quash or modify subpoenas causing undue 'burden.' The Federal Rules also afford nonparties special protection against the time and expense of complying subpoenas." *Exxon Shipping Co. v. United States Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994); *see also Pebble Ltd. Partnership v. EPA*, 310 F.R.D. 575, 581 (D. Ak. 2015). The United States of America invokes these authorities to quash a subpoena seeking testimony from Rosemarie Rotunno ("LTC Rotunno"), who while serving in

the National Guard conducted a single audiology examination almost twelve years ago of one of the plaintiffs in the above-captioned action. This subpoena should be quashed because it seeks information already in defendants' possession, and LTC Rotunno has no independent recollection of that examination and thus cannot provide any additional information through testimony. Moreover, the cumulative impact of the subpoena warrants quashing it or requiring that the United States be ordered to provide the declaration that it proffered in lieu of the burdensome testimony.

## BACKGROUND FACTS

3M is a defendant in multi-district litigation in the Northern District of Florida related to the safety of 3M products. *See In re 3M Combat Arms Earplug Products Liability Litigation*, Case No. 3:19-md-2885-MCR-GRJ (N.D. Fla.). The United States of America is not a party to this litigation.

In connection with that MDL, on July 28, 2020, 3M submitted a *Touhy* request seeking LTC Rotunno's deposition. 3M then issued a subpoena on August 18, 2020 seeking documents and testimony. Ex. A, attached hereto. 3M served the subpoena on August 20, 2020, 11 business days prior to the September 4, 2020 return date.

The subpoena seeks testimony, as well as documents concerning the one-time examination by LTC Rotunno of Plaintiff Vernon Curtis Rowe ("Plaintiff Rowe") almost twelve years ago, while an employee of the National Guard. The Department of Defense ("Department") has already produced all medical records pertaining to the plaintiff. LTC Rotunno has no independent recollection of the plaintiff and could provide no relevant information other than what is contained in the medical records. On August 29, 2020, the Department on behalf of its then-employee LTC Rotunno sent its official denial to the request for

U.S. v. 3M
Case No.                 2

testimony and documents and provided objections to the Rule 45 subpoena. *See* Ex. B, attached hereto.

As of filing, 3M has refused to withdraw the subpoena or otherwise compromise its requests or reschedule the deposition. 3M has also refused compromise offers for a declaration from LTC Rotunno in lieu of a deposition. For the following reasons, the subpoena should be quashed.

## ARGUMENT

Federal Rules of Civil Procedure 26(c)(1) and 45(c)(3) protect parties or persons from an "undue burden," and courts are particularly sensitive to burdens on non-parties. The "Ninth Circuit has long held that nonparties subject to discovery requests deserve extra protection from the courts." *High Tech Med. Instrumentation v. New Image Indus.*, 161 F.R.D. 86, 88 (N.D. Cal. 1995) (citing *United States v. CBS*, 666 F.2d 364, 371-72 (9th Cir. 1982)). This is because "[n]onparty witnesses are powerless to control the scope of litigation and discovery, and should not be forced to subsidize an unreasonable share of the costs of litigation to which they are not a party. . . . [A] witness's nonparty status is an important factor to be considered in determining whether to allocate discovery costs on the demanding or producing party." *CBS*, 666 F.2d at 371-72; *see also Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998). "Although discovery is by definition invasive, parties to a lawsuit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs." *Id.* Thus, "[i]mplied throughout Rule 45 is the concern that non-parties *not* be unduly burdened with discovery. Of course, third parties are not exempt from producing evidence in their possession, but the requesting party must

U.S. v. 3M
Case No.                                    3

demonstrate need and must limit the discovery to reduce the burden it imposes." *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2016 WL 11689073, at *1 (N.D. Ala. June 20, 2016). Indeed, "sanctions are appropriate if the subpoenaing party fails to take reasonable steps to avoid imposing an undue burden on a third party." *High Tech Med.*, 161 F.R.D. at 88.

The need to reduce the discovery burden on nonparties is especially important where, as here, the request is for the deposition of a government employee. The Government has a "legitimate interest in orderly governmental operations and the proper use of officials' time." *Alex v. Jasper Wyman & Son*, 115 F.R.D. 156, 157 (D. Me. 1986); *see also Sharon Lease Oil Co. v. F.E.R.C.*, 691 F. Supp. 381, 384 (D.D.C. 1988) (same). Indeed, "[c]ourts generally refuse to compel the deposition of a government witness if the [requesting party] may obtain discovery by an alternative and less burdensome method to the government." *See, e.g., Gomez v. City of Nashua,* N.H., 126 F.R.D. 432, 436 (D. N.H. 1989). Here, 3M has failed to demonstrate a need for the requested documents or testimony, and 3M has likewise failed to reduce the burden of its overbroad and unnecessary subpoena by accepting the proferred declaration in lieu of the deposition.

I.   **BECAUSE THE DEPARTMENT ALREADY HAS PRODUCED THE RECORDS REQUESTED, THE SUBPOENA IS DUPLICATIVE AND CUMULATIVE.**

Although styled a subpoena for testimony, the subpoena attaches a Request for Production, seeking documents either already in defendant's possession or in the public domain. Specifically, the subpoena seeks LTC Rotunno's production of the following categories of documents:

1. All documents concerning the hearing evaluation and audiogram conducted on Plaintiff Rowe by you on December 12, 2008 or any subsequent evaluation and audiogram.

U.S. v. 3M
Case No.                          4

2. All documents relating to Plaintiff Rowe and his hearing evaluation, hearing, and tinnitus.

3. All documents, communications, and correspondence between Plaintiff Rowe and DoD employees stationed at Elmendorf Air Force Base and Fort Richardson Army Base in Anchorage, Alaska, including you, concerning any follow-up evaluations, appointments, or discussions related to Plaintiff Rowe's December 12, 2008 hearing evaluation and audiogram.

4. Written policies and procedures related to military audiological evaluations.

5. Written policies and procedures related to the selection, distribution, fitting, and training for hearing protection devices.

Ex. B at 1. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (prohibiting discovery if the request is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."). Here, the Government has already produced the relevant records pertaining to the Plaintiff Rowe's care, and the additional records sought are publicly available. Thus, to the extent the subpoena seeks documents, it is cumulative and duplicated and should be quashed. Fed. R. Civ. P. 26(b)(2)(C)(i).

II. **BECAUSE LTC ROTUNNO HAS NO INDEPENDENT RECOLLECTION OF HER EXAMINATION OF PLAINTIFF ROWE, THE DECLARATION THE DEPARTMENT PROFFERED IS A MORE CONVENIENT AND LESS BURDENSOME SOURCE OF HER LIMITED INFORMATION.**

LTC Rotunno's limited information about Plaintiff Rowe can be obtained through means less burdensome than a deposition. Fed. R. Civ. P. 26(b)(2)(C)(i). Depositions are usually the most burdensome means of obtaining facts in litigation. The government has a "legitimate interest in orderly governmental operations and the proper use of officials' time." *Alex v. Jasper Wyman & Son*, 115 F.R.D. 156, 157 (D. Me. 1986). These concerns are especially significant when live testimony is requested from a federal agency. In the face of such a request, "an agency's choice of whether or not to comply with a third-party subpoena is essentially a policy decision about the best use of the agency's resources." *Puerto Rico v. United States*, 490 F.3d

U.S. v. 3M
Case No.                                        5

50, 61 (1st Cir. 2007). Once an agency determines not to provide testimony "in the context of private litigation when the government is not a party, a court should not order testimony to be given . . . without the showing of a compelling interest." *Alex*, 115 F.R.D. at 157; *Comsat Corp. v. National Science Found.*, 190 F.3d 269, 278 (4th Cir. 1999) (to conserve agency resources and prevent a non-party agency from becoming embroiled in private litigation, the decision to permit employee testimony is committed to the agency's sole discretion). Thus, a court may require that information be sought by means that are "more convenient, less burdensome, or less expensive." *See* Fed. R. Civ. P. 26(b)(2)(C). Indeed, "[c]ourts generally refuse to compel the deposition of a government witness if the [requesting party] may obtain discovery by an alternative and less burdensome method to the government." *See, e.g., Gomez v. City of Nashua*, N.H., 126 F.R.D. 432, 436 (D. N.H. 1989).

LTC Rotunno has no additional information to provide through testimony or otherwise concerning Plaintiff Rowe beyond what is contained in the medical records. Ex. B at 3. Her examination of Plaintiff Rowe was almost twelve years ago. Defendants have not indicated why LTC Rotunno's testimony is needed outside of the medical records contained in Defendants' possession. Indeed, the subpoena provides no description at all of the requested testimony except by reference to its attached Requests for Production. Under these circumstances, the limited extent of LTC Rotunno's relevant information is more appropriate for a declaration. The Department proffered such a declaration in lieu of the requested deposition. Specifically, the Department offered to provide a declaration stating that based on LTC Rotunno's review of Plaintiff Rowe's medical records, she did conduct his hearing exam on December 12, 2008 but has no recollection of that hearing exam. Ex. B. at 4. She can further attest to the fact she conducted all hearing exams similarly and describe how she conducted them. *Id.* Finally, LTC

U.S. v. 3M
Case No.                                                                6

Rotunno can attest that she provided pertinent details in the medical record to inform the next audiologist who saw her patients. *Id.* Because Defendants failed to accept this reasonable compromise, the Court should quash the subpoena in its entirety. At minimum the Court should limit the reach of the subpoena to require only the production of such a declaration. Fed. R. Civ. P. 26(c)(1).

## III. THE CUMULATIVE IMPACT OF DEFENDANTS' SUBPOENA IS UNDULY BURDENSOME.

The Court should consider the cumulative impact similar requests would have on the Department. *Westchester Gen. Hosp., Inc. v. HHS, Ctr. for Medicare & Medicaid Servs.*, 770 F. Supp. 2d 1286, 1298 (S.D. Fla. Feb. 23, 2011) ("[A]ny given request may seem small in isolation, but an agency has an interest in protecting itself against the cumulative disruption to its duties that would come with routinely granting requests for testimony.") (citing *Moore v. Armour Pharmaceutical Co.*, 927 F.2d 1194, 1198 (11th Cir. Apr. 2, 1991)). The 3M litigation involves more than 150,000 plaintiffs who likely were examined at some point during their military careers by various Department personnel. 3M sent *Touhy* or subpoena requests for at least 10 current or former Department employees in the span of two weeks without regard to the information already in defendants' possession or the Department's reasonable offer of accommodation. 3M is likely to continue serving these unnecessary, burdensome subpoenas absent court intervention. The cumulative impact of complying with 3M's s requests would be highly disruptive to the Department.

## CONCLUSION

For the foregoing reasons, the Court should grant this motion and quash the subpoena. In the alternative, the Court should order the Department to provide the proffered declaration of LTC Rotunno.

U.S. v. 3M
Case No.          7

RESPECTFULLY SUBMITTED, on September 3, 2020, at Anchorage, Alaska.

BRYAN SCHRODER
United States Attorney

s/ Steven E. Skrocki
Chief, Civil Division
Attorney for the Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2020,
a copy of the foregoing was served electronically to:

Mark J. Nomellini
Kirkland & Ellis LLP

s/ Steven E. Skrocki
Office of the U.S. Attorney

# EXHIBIT B

FILED

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

2020 SEP -2 AM 9: 04

CLERK, US DISTRICT COURT
MIDDLE DISTRICT FLORIDA
TAMPA, FLORIDA

UNITED STATES OF AMERICA,

      Petitioner,

v.                              Case No. **8:20mc 79 33 AAS**

3M COMPANY,

      Respondent.

_____/

## PETITION TO QUASH SUBPOENA

    The United States of America moves to quash the subpoena served on Dr. Leslie

Schulman, an employee of the Department of Veterans Affairs. In support of the instant

motion, the United States states as follows:

**I.**    **Introduction**

    3M is a defendant in multi-district litigation occurring in the Northern District of

Florida related to the safety of 3M products. See In re 3M Combat Arms Earplug Products

Liability Litigation, Case No. 3:19-md-2885-MCR-GRJ (N.D. Fla.). The United States of

America is not a party.

    In connection with that MDL and an earlier request for testimony and documents

from Dr. Leslie Schulman, 3M issued a subpoena on August 19, 2020 seeking testimony of

Dr. Schulman relating to information acquired by her as an employee of the Department of

Veterans Affairs ("VA") and while carrying out her duties as a federal employee. Exhibit A.

The subpoena itself does not require documents, but a request for production of documents

is attached. While the VA previously informed 3M that Dr. Schulman would not be

appearing at the September 2, 2020 deposition, on September 1, 2020, the VA sent its

1

official denial to the request for testimony and documents and provided objections to the

Rule 45 subpoena.

**II.    The Regulatory Scheme**

VA regulations limit the disclosure of VA records and testimony of present or former

VA personnel relating to any official information acquired by any individual as part of that

individual's performance of official duties where the United States government is not a

party.  38 C.F.R. §§ 14.800 through 14.810.  Under these provisions, the VA may produce

agency records and/or provide testimony in such proceedings only if the Department

determines that the disclosure is appropriate based on the factors, requirements, and

procedures set forth in 38 C.F.R. §§ 14.804-807.

> In determining whether to authorize testimony or the production of
> records, the determining official will consider the effect in this case, as
> well as in future cases generally, based on the factors set forth in §
> 14.804, which testifying or producing records not available for public
> disclosure will have on the ability of the agency or VA personnel to
> perform their official duties.

38 C.F.R. § 14.803.  This includes the need to avoid spending the time and money of the

United States for private purposes, to conserve the time of VA personnel for conducting

their official duties, and to minimize the Department's possible involvement in issues

unrelated to its mission.  See 38 C.F.R. § 14.804.

**III.    The VA's response to the request.**

In response to the request for Dr. Schulman's testimony and for documents, as well

as in response to the subpoena, the VA analyzed the factors and decided not to authorize

Dr. Schulman's appearance or for her to produce documents.  In addition, the VA objected

to the subpoena as contrary to Rules 26 and 45 in several respects.

First, in looking at 38 C.F.R. §§ 14.804(a)&(d), the VA analyzed the undue burden

on the agency, including taking Dr. Schulman away from her mission-related duties to treat

veterans, particularly after the backlog of patients created by the current public health

emergency.

> § 14.804(a): The need to avoid spending the time and money of the
> United States for private purposes and to conserve the time of VA
> personnel for conducting their official duties concerning servicing the
> Nation's veteran population.

> § 14.804(d): Whether the demand or request is unduly burdensome or
> otherwise inappropriate under the applicable court or administrative
> rules:

As a preliminary matter, with regard to the documents 3M may be seeking, 3M is

asking for documents the VA already produced or that VA does not have.  Specifically,

Requests for Production No. 1-3 relate to plaintiff Rowe, who Dr. Schulman treated.  3M

previously submitted twenty-four "Request for and Authorization to release Health

Information" forms to the VA in connection with twenty-four (24) Veteran plaintiffs,

including for plaintiff Rowe, which requests "the entire health and compensation and

pension claim files, but not education or mortgage records" for the respective Veterans.  In

response, the VA produced to 3M's counsel the entire healthcare file and compensation and

pension files, excluding education and mortgage records, for each of the 24 bellwether

plaintiffs, including Rowe.  These would include all records of treatment and

communications with Lowe.  Requests Nos. 4-5 ask for certain policies and procedures that

the VA's response explained are not in the possession of the VA.

3

As part of its response to the requests, the VA contacted Dr. Schulman to determine whether her testimony would affect her ability to conduct her official duties.[1] The VA explained in its denial that Dr. Schulman works as a triage audiologist in a VA health clinic. As a triage audiologist she conducts virtual calls to Veterans in order to help program and setup their hearing aids. She is also responsible for daily communications to and from Veterans; and she occasionally sees Veterans that have an appointment. Due to the COVID-19 pandemic, the clinic was forced to close for four months from March 2020 until July 2020. Now that the clinic has reopened with reduced staffing, the current clinic staff must catch up on those Veterans whose appointments were canceled during the closure. Due to VA's health and safety COVID protocols, the clinic no longer provides walk-in visits and Veterans cannot make physical appointments; instead appointments are conducted virtually or telephonically. Dr. Schulman conducts appointments and communicates with Veterans daily via virtual telehealth or by phone; each appointment is approximately 90 minutes long.

The VA further explained in its denial that, due to the four-month shutdown and the reduced staff, new appointments are scheduled six weeks out. Removing Dr. Schulman from her duties to participate in this private litigation will be at the detriment of those Veterans who went without care during the four-month closure. Participating in this matter will require Dr. Schulman to cancel the current Veterans' appointments on the dates and times needed to prepare for the deposition and for the actual deposition. Those Veterans'

---

[1] In the VA's correspondence denying the request, this analysis of Dr. Schulman's responsibilities is part of its Fed. R. Civ. P. 26 & 45 "undue burden" analysis discussed below, but the considerations for rejecting the request for testimony under the VA's regulations are largely the same.

4

whose appointments will be canceled will be forced to make another appointment six weeks beyond their original appointment date. Unfortunately, Dr. Schulman's colleagues are unable to take on her appointments during these dates and time because they also have their own scheduled virtual and telephonic appointments to conduct. The time spent in prepping Dr. Schulman for the deposition and the time spent in the actual depositions equate to significant time away from providing our nation's Veterans with essential healthcare services.

Therefore, the VA concluded that 3Ms requests to depose Dr. Schulman places an undue burden on the agency because it involves removing her from her official duties; specifically, from providing much needed service, care, and treatment to Veterans, to participate in a private litigation. The VA further advised that during the current public health global pandemic, all health care resources are being committed to mission-essential resources. The interest in obtaining the deposition of Dr. Schulman versus the government's interest in maximizing the use of its limited resources during a global pandemic crisis is minimal and incomparable. The VA also noted that it is unclear how authorizing the depositions of Dr. Schulman will serve governmental interest and not the interests of the parties to this private litigation. The time spent in prepping the witness for the depositions and attending the deposition equates to hours or days away from providing our nation's Veterans with essential healthcare services.

Moreover, the VA explained that Dr. Schulman does not have any independent recollection of Mr. Rowe's examinations or healthcare visits beyond what is in the records. As a result, the VA determined that this mission-essential employee will not be able to provide any additional information regarding the Veterans' respective medical history,

including but not limited to, hearing-related medical history, environmental and noise exposures, healthcare visits, and communication with VA providers.

The VA also considered 38 C.F.R. §14.804(b), which asks "how the testimony or production of records would assist VA in performing its statutory duties," and §14.804(c), which asks "whether the disclosure of the records or presentation of testimony is necessary to prevent the perpetration of fraud or other injustice in matter in question." The VA explained that "even if the court finds that 3M earplugs were in fact defective, causing Veterans' hearing loss, that outcome would not assist VA in performing its statutory duties of providing services and benefits to our nation's Veteran population; nor would the release of the documents prevent the perpetration of fraud or other injustice. VA compensation benefits are based upon the occurrence of an event causing a disease or disability during a period of service. The source of the event is not relevant to a determination of service-connection nor would the fault of a third-party impact VA's obligation to care for Veterans' resulting disability or continue to provide compensation for service-connected hearing loss disability. You have failed to identify any manner in which authorization of these depositions would assist VA in performing its statutory duties and we are unable to identify one. Finally, you have not identified any fraud or injustice relevant to the matter in question."

The VA also explained that numerous other factors counseled against providing the information including §§14.804(f), (i), (j) & (l). Subsection (f) concerns "whether the testimony or production of records would violate a statute, executive order, regulation or directive" including the Privacy Act. The VA explained that the information sought is protected by various statutes, including the Privacy Act and that orders entered to date in

6

the MDL do not include authorization to disclose information through deposition

testimony.

Subsection (i) and (j) ask whether documents or testimony could result in the

appearance that the VA favored one litigant or supported the position of one litigant, while

Subsection (l) asks whether the disclosures fits with the "need to minimize VA's possible

involvement in issues unrelated to its mission."  The VA explained that the government has

no apparent interest in the litigation, that disclosing information would not assist the VA in

performing its statutory duties to provide services and benefits to the nation's Veterans, and

that it would be inappropriate to favor or support one party to the matter.

The VA also objected that the requests were unduly burdensome under Fed. R. Civ.

P. 26(b)(2)(C)(i) and 45(d)(1)&(3).  The VA argued that "courts routinely protect non-parties

from the undue burden of discovery."  (citing Cusumano v. Microsoft Corp., 162 F.3d 708,

717 (1st Cir. 1998) ("Although discovery is by definition invasive, parties to a lawsuit must

accept its travails as a natural concomitant of modern civil litigation.  Non-parties have a

different set of expectations.  Accordingly, concern for the unwanted burden thrust upon

non-parties is a factor entitled to special weight in evaluating the balance of competing

needs."); Sahu v. Union Carbide Corp., 262 F.R.D. 308, 317 (S.D.N.Y. 2009) (stating that

courts are more sensitive to discovery burdens on third parties))

The VA explained that the government has a "legitimate interest in orderly

governmental operations and the proper use of officials' time."  Alex v. Jasper Wyman &

Son, 115 F.R.D. 156, 157 (D. Me. 1986).  These concerns are especially significant when

live testimony is requested from a federal agency.  In the face of such a request, "an

agency's choice of whether or not to comply with a third-party subpoena is essentially a

policy decision about the best use of the agency's resources." Puerto Rico v. United States,

490 F.3d 50, 61 (1st Cir. 2007). Once an agency determines not to provide testimony "in

the context of private litigation, when the government is not a party, a court should not

order testimony to be given . . . without the showing of a compelling interest." Alex, 115

F.R.D. at 157.

Relying on the information already described as to how a deposition would keep Dr.

Schulman from participating in her mission-related duties of seeing patients, many of whom

have had care delayed due to the current health emergency, the VA took the position that

"the requests to depose a mission-essential VA healthcare employee places an undue burden

on the agency because it involves removing this employee from her official duties;

specifically, from providing much needed service, care, and treatment to Veterans in order

to participate in a private litigation."

## IV.   Unless the VA's position is arbitrary and capricious, VA employees may not be compelled to provide testimony or documents.

As noted above, the testimony of VA employees and production of government

records is governed by the regulations found at 38 C.F.R. § 14.801-14.810.  These type of

regulations have been upheld by the United States Supreme Court.  See United States ex rel.

Touhy v. Ragen, 340 U.S. 462 (1951).  Moreover, the Eleventh Circuit Court of Appeals has

also affirmed the validity of similar regulations.  United States v. Bizzard, 674 F.2d 1382,

1387 (11th Cir. 1982) (Justice Department regulations are constitutional).

Currently, the primary statutory source for such regulations is 5 U.S.C. § 301, the

federal government's so-call "housekeeping" statute, which authorizes the head of every

Executive Branch agency to "prescribe regulations for the government of his department,

the conduct of its employees, the distribution of its business, and the custody, use, and

preservation of its records, papers, and property." See, e.g., Touhy, 340 U.S. at 468 (relying

on predecessor to current 5 U.S.C. §301). Such regulations also serve to "centraliz[e]

determinations [within the agency] as to whether subpoenas * * * will be willingly obeyed or

challenged," thereby avoiding "the possibilities of harm from unrestricted disclosure in

court." Touhy, 340 U.S. at 468.

Because regulations like the one in this case are universally recognized to be valid, it

has been repeatedly held that the regulation impose a binding legal duty on federal

employees that the court cannot force the employees to disobey. In the words of a Fourth

Circuit decision, "an unbroken line of authority directly supports [the] contention that a

federal employee may not be compelled to obey a subpoena contrary to his federal

employer's instructions under valid agency regulations." Boron Oil Co. v. Downie, 873

F.2d 67, 69 (4th Cir. 1989).

The leading case in this area of the law is, of course, the Supreme Court's decision in

Touhy. In Touhy, an employee of the Department of Justice was subpoenaed to provide

departmental records to a prisoner in a federal habeas corpus proceeding. 340 U.S. at 464.

Acting pursuant to a regulation like the one involved in this case, the Attorney General

withheld permission for the employee to comply with the subpoena. Id. at 464-65. The

district court that issued the subpoena held the employee in contempt for complying with

the Attorney General's directive. Id. at 465. On appeal, the Supreme Court held that the

agency regulation was valid under the predecessor to present 5 U.S.C. § 301 and that

because the regulation was valid, the employee could not be compelled to obey the district

court's subpoena. Id. at 467-49. The Court noted that it had reached the same result a half-

century earlier in Boske v. Comigore, 177 U.S. 459 (1900).

9

Eleventh Circuit precedent permits a district court to overturn the VA decision not to permit an employee to participate in private litigation only "if such action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" pursuant to 5 U.S.C. § 706(2)(A). Moore v. Armour Pharmaceutical Co., 927 F.2d 1194, 1197 (11th Cir. 1991). Under this "exceedingly deferential" standard, the Court may not substitute its judgment for the agency's as long as the agency's conclusions are rational." Wilborn v. Trant, No. 4:15-cv-02071, 2017 U.S. Dist. LEXIS 229698, *9 (N.D. Ala. July 12, 2017) (citing Miccousukee Tribe of Indians of Florida v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009)). "To determine whether an agency decision was arbitrary and capricious, the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there been a clear error of judgment." N. Buckhead Civic Ass'n of Skinner, 903 F.2d 1533, 1538 (11th Cir. 1990) (internal quotation marks omitted).

Here, the VA's decision not to permit Dr. Schulman to testify is far from arbitrary and capricious. The VA has already provided all of the records in its possession related to Dr. Schulman's treatment of the relevant plaintiff. The VA analyzed Dr. Schulman's workload, including how the current health emergency has delayed Veteran access to care, which is further delayed by decreased staff, leaving more of the burden of serving the Veteran population on Dr. Schulman. Requiring Dr. Schulman to prepare for and participate in a deposition would lead to further delays for the care of Veterans, which is obviously contrary to the mission of the agency. Furthermore, the VA determined based on conversations with Dr. Schulman that she has no independent recollection of her interactions with the Plaintiff, thereby limiting the usefulness of her testimony.

The VA could therefore reasonably conclude, based on appropriate factors, not to permit Dr. Schulman to testify or to provide any additional documents others than those already provided.  For example, § 14.804(a) asks the VA to consider the need to avoid spending time and money on private purposes and conserve the time of VA personnel to conduct their official duties.  Refusing to let Dr. Schulman participate in a deposition where she has little or nothing to add when she could be taking care of patients who have been waiting for care is more than reasonable.  Similarly, under § 14.804(d), such a request is unduly burdensome for the same reasons.  Nor does Dr. Schulman's testimony "assist the VA in performing its statutory duties" (§ 14.804(b)) or prevents the perpetuation of fraud or other injustice (§ 14.804(c)).  As the agency's action is not arbitrary or capricious, the Court must quash the subpoena to Dr. Schulman.

**V.**     **The subpoena should be quashed under Rules 26 and 45.**

In addition to quashing the subpoena under the agency's Touhy regulations, the Court should also quash the subpoena under Rules 26 and 45.  First, Rules 26(c)(1) and Rule 45(c)(3) protects parties or persons from an "undue burden."  "Notably, many of the factors that the VA weighed in determination whether to grant the Touhy request, such as the detrimental impact on the agency, the VA employees, and other patients, are also applicable to the Court's analysis under the Rules as the 'undue burden standard requires district courts supervising discovery to be generally sensitive to the costs imposed on third parties.'"  Solomon v. Nassau County, 274 F.R.D. 455, 460 (E.D.N.Y. 2011) (quoting Watts v. S.E.C., 482 F.3d 501, 509 (D.C. Cir. 2007)).

To summarize what has been covered above, 3M has all of the relevant documents concerning the relevant plaintiff, and the witness has no independent recollection of her

encounters with this one bellwether plaintiff in the MDL.  On the other hand, the VA needs

Dr. Schulman to provide care for the backlog of Veterans needing audiology services.

In addition, the Court must consider the cumulative impact on the VA given that the

3M litigation involves more than 150,000 plaintiffs who likely were examined at some point

subsequent to their military careers by various VA personnel.  Indeed, 3M has already

served subpoenas and Touhy requests on the VA seeking documents and depositions of

other VA personnel in addition to Dr. Schulman and may continue to do so.  The

cumulative impact of removing mission-essential healthcare providers from their official

duties and responsibilities in order to comply with 3M's requests, especially during a global

pandemic, would be highly disruptive to the agency.  "[A]ny given request may seem small

in isolation, but an agency has an interest in protecting itself against the cumulative

disruption to its duties that would come with routinely granting requests for testimony."

Westchester Gen. Hosp., Inc. v. HHS, Ctr. for Medicare & Medicaid Servs., 770 F. Supp.

2d 1286, 1298 (S.D. Fla. 2011) (citing Moore, 927 F.2d at 1198).  3M's subpoena critically

"fails to take into account the VA's 'legitimate concern with the potential cumulative effect

of granting such requests.'"  Solomon, 274 F.R.D. at 459 (quashing subpoenas for testimony

of VA employees).

The subpoena is also unreasonably cumulative and duplicative.  Courts limit the

"frequency or extent of discovery" if they determine that "the discovery sought is

unreasonably cumulative or duplicative."  Fed. R. Civ. P. 26(b)(2)(C).  As discussed above,

the VA already provided the entire healthcare file and compensation and pension files,

excluding education and mortgage records, for plaintiff Rowe.  Any and all

communications between VA Medical Centers healthcare employees and Veterans and any

information regarding audiograms and hearing/tinnitus evaluations, if conducted, would be included in the Veterans healthcare records that were produced by the agency.

Lastly, the subpoena fails "to allow a reasonable time to [comply]." Fed. R. Civ. P. 45(d)(3)(A)(i). 3M served the subpoena on Dr. Schulman on August 19, 2020, with a return date of September 2, thus affording the agency only nine business to respond. Particularly in light of Dr. Schulman's busy schedule and the complications relating to the COVID-19 pandemic, providing only nine business days for Dr. Shulman to attempt to reschedule her patients' appointments, to be prepped for the deposition, and to participate in the deposition is unreasonable. See In re Sulfuric Acid Antitrust Litigation, 231 F.R.D. 320, 327 (N.D. Ill. Aug. 26, 2005) ("What would be reasonable . . . may take on a very different cast where, as here, . . . the schedules of the deponents and a number of lawyers would be unable to accommodate the belatedly filed notices."); Minor Doe I Through Parent I Doe v. School Board for Santa Rosa County, 2009 WL 10674249, at *2 (N.D. Fla. Nov. 23, 2009) ("Although the rule does not specify what constitutes reasonable time to comply, common sense dictates that reasonableness is determined in relation to the extent of the materials requested and other underlying circumstances in the case.").

Accordingly, for all of these reasons, the Court should quash the subpoena under Rules 26 and 45.

## VI.   To the extent the subpoena seeks expert testimony, regulation prohibit Dr. Schulman from providing such testimony.

Finally, 38 C.F.R. § 14.808(a) prohibits VA personnel from providing opinion or expert testimony "in any legal proceeding, concerning official VA information, subjects or activities, except on behalf of the United States or a party represented by the United States Department of Justice" unless there are exceptional circumstances and special authorization

has been granted.  To the extent the 3M seeks any expert or opinion testimony from Dr.

Schulman, the Court should limit the subpoena to preclude such testimony.

## Conclusion

For the foregoing reasons, the United States respectfully requests that the Court

quash the subpoena issued to Dr. Schulman.


Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By:     *s/Michael R. Kenneth*
MICHAEL R. KENNETH
Assistant United States Attorney
Florida Bar No. 44341
400 N. Tampa Street, Suite 3200
Tampa, FL 33602
Telephone No. (813) 274-6000
Facsimile No.  (813) 274-6198
Email: Michael.Kenneth@usdoj.gov

14

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Florida

Exhibit A

| VERNON CURTIS ROWE | ) | |
|---|---|---|
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.   7:20-cv-00026 |
| 3M COMPANY et al. | ) | |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:         Dr. Leslie Schulman
5837 Carriage Drive, Sarasota, FL 34243
_(Name of person to whom this subpoena is directed)_

☑ _Testimony:_ **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
SEE ATTACHMENT.

| Place: | Sarasota Ritz-Carlton, 1111 Ritz-Carlton Drive, Sarasota, FL 34236 | or, Alternatively, via Remote Deposition | Date and Time: 09/02/2020 9:00 am |
|---|---|---|---|

The deposition will be recorded by this method:   Stenographic and Videographic

☐ _Production:_ You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   08/18/2020

|  _CLERK OF COURT_ | | |
|---|---|---|
| | OR | |
| | | /s/ Mark Nomellini |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_   Defendants.
, who issues or requests this subpoena, are:
Mark Nomellini, Kirkland & Ellis LLP, 300 N. LaSalle Str., Chicago, IL 60654, mnomellini@kirkland.com, (312) 862-2000

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  3:19-md-02885

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____   on *(date)* _____   ; or

    ☐ I returned the subpoena unexecuted because: _____

_____ .

    Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

    $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

                         _____
                                   *Server's signature*

                         _____
                                  *Printed name and title*

                         _____
                                  *Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

### DEFENDANTS' REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Defendants 3M Company, 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC (collectively, "Defendants"), by and through their counsel, hereby request that you produce documents responsive to these Requests for Production of Documents (the "Requests") to Defendants in the time and manner set forth in this Subpoena.

### DEFINITIONS

1. "Communications" encompasses used in the requests below includes any transmission or exchange of information, ideas, facts, data, proposals, or other matters, between or among Persons, by any means. For example, communications would include text messages (short message service (SMS) and multimedia message service (MMS)), or any messaging application (e.g., WhatsApp, Facebook Messenger). The definition also includes Documents evidencing oral communications.

2. "Document" or "documents" as used below includes hard copy documents as well as electronically stored information.

3. The terms "you" and "your" shall refer to Dr. Leslie Schulman.

## INSTRUCTIONS

1.    The preceding Definitions apply to these Instructions and each of the succeeding Requests.  All terms defined above shall have the meanings set forth therein, whether capitalized in the Requests or not.

2.    You are required to produce all responsive documents in your possession, custody, or control, wherever located, including but not limited to electronic sources, such as:

(a) any of your email accounts (*e.g.,* Gmail, Yahoo, and Hotmail);

(b) any of your computers (*e.g.*, desktop or laptop computers);

(c) any of your mobile and handheld electronic devices (*e.g.*, smartphones, computer tablets, portable music players, and digital cameras);

(d) any of your other hardware storage devices (*e.g.*, external hard drives, network storage drives, memory cards, USB flash ("thumb") drives, and CDs/DVDs);

(e) any messaging applications you use (*e.g.* text messages, iMessage, Facebook Messenger, WhatsApp, Telegram, and Snapchat);

(f) any social media accounts/platforms you use (*e.g.*, Facebook, Instagram, LinkedIn, Twitter, MySpace, YouTube, Pinterest, or other online collaboration tools such as Google+ or Yahoo! groups);

(g) any website where you have made online postings (*e.g.*, Reddit, Tumblr, and other blog or message boards);

(h) any cloud storage you use (*e.g.*, DropBox, Microsoft Office365 Account, Google Drive, iCloud, and Amazon Drive).

2

3.      If you cannot comply with any Request in full, you must comply to the fullest extent possible, and you should provide an explanation as to why full compliance is not possible.

4.      If any document called for by these Requests has been destroyed or discarded, you must identify that document in writing by providing the following information:  (a) any sender/author and any addressee; (b) any indicated or blind copies; (c) the document's date, subject matter, number of pages, and attachments or appendices; (d) all Persons to whom the document was distributed, shown, or explained; (e) its date of destruction or discard, manner of destruction or discard, and reason for destruction or discard; (f) the Persons who authorized and carried out such destruction or discard; and (g) whether any copies of the document presently exist and, if so, the name of the custodian of each copy.

5.      If no document exists that is responsive to a particular Request, you must state so in writing.

6.      Defendants request that you produce all photographs, films, movies, and video recordings as native files, in their original resolution and file size.

3

## REQUESTS FOR PRODUCTION

1.     All documents concerning the hearing evaluation and audiogram conducted on Plaintiff Rowe by Dr. Schulman on March 11, 2020, or any subsequent evaluation and audiogram.

2.     All documents relating to Plaintiff Rowe and his hearing evaluation, hearing, and tinnitus.

3.     All documents, communications, and correspondence between Plaintiff Rowe and Bay Pines VA Healthcare System employees, including Dr. Leslie Schulman, concerning any follow-up evaluations, appointments, or discussions related to Plaintiff Rowe's initial March 11, 2020 hearing evaluation and audiogram.

4.     Written policies and procedures related to military audiological evaluations.

5.     Written policies and procedures related to the selection, distribution, fitting, and training for hearing protection devices.

4

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | 3M COMPANY |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Out of state
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Michael R. Kenneth, Assistant United States Attorney
400 N. Tampa Street, Suite 3200, Tampa, FL 33602 (813) 274-6087

Attorneys *(If Known)*
Mark Nomellini
Kirkland & Ellis LLP
300 N. LaSalle Street, Chicago, IL 60654 (312) 862-2000

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | Exchange |
| | Medical Malpractice | | Leave Act | | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. 301

Brief description of cause:
Petition to quash subpoena

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 09/02/2020 | s/ Michael R. Kenneth |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| | ) |
| 3M COMPANY | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

Civil Action No. 8: 20 mc 79 T 33 AAS

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  3M Company
c/o Mark Nomellini
Kirkland & Ellis LLP
300 N. LaSalle Street
Chicago, IL  60654

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Michael R. Kenneth, Assistant United States Attorney
400 N. Tampa Street, Suite 3200
Tampa, FL  33602

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  SEP - 2 2020

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# EXHIBIT C



United States District Court
Western District of Texas
San Antonio Division

United States of America,
    Petitioner,

v.

3M Company,
    Respondent.

No. SA-20-CV-01063

## Motion to Quash Deposition Subpoena to Taurin J. Mosby

    The United States of America files this action and moves to quash the Subpoena to Testify at Deposition Respondent 3M Company served on Sergeant First Class ("SFC") Taurin J. Mosby, an employee of the Department of Defense ("DOD"). The Subpoena to Testify at Deposition is attached as Exhibit 1.

## I.  Background

    3M is a defendant in multi-district litigation ("MDL") occurring in the Northern District of Florida related to the safety of 3M products. *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885-MCR-GRJ (N.D. Fla.). The United States is not a party to that litigation.

    In connection with the MDL, 3M submitted a Touhy request on August 7, 2020 for SFC Mosby's documents and deposition. Ex. 2. 3M issued a subpoena on August 27, 2020 for SFC Mosby's deposition. Ex. 1. 3M served the subpoena on August 28, 2020. 3M unilaterally scheduled SFC Mosby's deposition for 9 a.m. on September 9, 2020, which is seven business days after service. Ex. 1.

    In 3M's Touhy Request, 3M asserts that SFC Mosby's relevance is connected solely to his time in the military with Lewis Keefer, one of the plaintiffs in the MDL. *See* Ex. 2 at 2. In its Touhy request, 3M asserts the same relevance in requesting documents and depositions from two other DOD personnel that also served with Keefer. *Id.*

    DOD provided a response to the Touhy request and objections to the deposition subpoena on September 8, 2020. Ex. 3. In that response, DOD explained that compliance was not possible

**Motion to Quash Subpoena**                                                                1

on September 9 but that it was authorizing SFC Mosby to be deposed on a mutually convenient date subject to certain conditions. *Id.* Despite DOD objecting to the subpoena and agreeing to the deposition on an alternative date, 3M responded via email indicating that it would not withdraw the subpoena and would move forward with the deposition unilaterally set for September 9, 2020. Ex. 4.

## II.  Regulatory Scheme

DOD established policies and procedures for release of DOD information and testimony of DOD personnel as witnesses in litigation. 32 C.F.R. § 97.1 et seq. DOD limits the disclosure of DOD information and testimony of DOD personnel related to information obtained during the individuals' performance of official duties. 32 C.F.R. § 97.6. DOD personnel are not allowed to testify in litigation without prior written approval. *Id.* DOD has set forth factors for DOD to consider in determining whether to allow DOD personnel to testify. 32 C.F.R. § 97.6(b). Under these provisions, DOD may produce agency records or provide testimony in such proceedings only if DOD determines that the disclosure is appropriate based on the factors, requirements, and procedures set forth in the regulations. These regulations help the United States (1) avoid spending the time and money to benefit private parties, (2) conserve the time of DOD personnel for conducting their official duties, and (3) minimize DOD's possible involvement in issues unrelated to its mission.

## III. Argument

### A.  The Court Should Quash the Subpoena under Touhy

As noted above, the testimony of DOD employees and production of government records is governed by 32 C.F.R. § 97.1 et seq. The United States Supreme Court has upheld these types of regulations. *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). Moreover, the Fifth Circuit has upheld similar regulations. *See CF Indus., Inc. v. Dept. of Justice Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 692 F. App'x 177, 181 (5th Cir. 2017) (per curiam).

Currently, the primary statutory source for such regulations is 5 U.S.C. § 301, the federal government's so-call "housekeeping" statute, which authorizes the head of every Executive

**Motion to Quash Subpoena**                                                                                      **2**

Branch agency to "prescribe regulations" for governing the department, the conduct of its employees, the distribution and performance of its business, and "the custody, use, and preservation of the records, papers, and property appertaining to it." *See, e.g., Touhy*, 340 U.S. at 468 (relying on predecessor to current 5 U.S.C. §301); *see also id.* at 463 n.2. Such regulations also serve to centralize department or agency determinations as to whether subpoenas will be willingly obeyed or challenged. *Id.* at 468. These regulations thereby avoid "the possibilities of harm from unrestricted disclosure in court." *Id.*

Because courts universally recognize the validity of regulations like the one in this case, court have repeatedly held that the regulations impose a binding legal duty on federal employees that the courts cannot force the employees to disobey. In the words of the Fourth Circuit, "an unbroken line of authority directly supports [the] contention that a federal employee may not be compelled to obey a subpoena contrary to his federal employer's instructions under valid agency regulations." *Boron Oil Co. v. Downie*, 873 F.2d 67, 69 (4th Cir. 1989).

The leading case in this area of the law is the Supreme Court's decision in *Touhy*. In *Touhy*, an employee of the Department of Justice was subpoenaed to provide departmental records to a prisoner in a federal habeas corpus proceeding. 340 U.S. at 464. Acting pursuant to a regulation like the one involved in this case, the Attorney General withheld permission for the employee to comply with the subpoena. *Id.* at 464–65. The district court that issued the subpoena held the employee in contempt for complying with the Attorney General's directive. *Id.* at 465. On appeal, the Supreme Court held that the agency regulation was valid under the predecessor to present 5 U.S.C. § 301 and that because the regulation was valid, the employee could not be compelled to obey the district court's subpoena. *Id.* at 467–69. The Court noted that it had reached the same result a half century earlier in *Boske v. Comigore*, 177 U.S. 459 (1900).

Compliance with Touhy regulations is mandatory. *United States v. Wallace*, 32 F.3d 921, 929 (5th Cir. 1994). "[A]n agency's choice of whether or not to comply with a third-party subpoena is essentially a policy decision about the best use of the agency's resources." *Puerto Rico v. United States*, 490 F.3d 50, 61 (1st Cir. 2007). The court can only set aside an agency's

**Motion to Quash Subpoena**                                                                                          **3**

decision not to produce documents or allow testimony if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *CF Indus.*, 692 F. App'x at 181. "The scope of review under this standard is narrow, and a court is not to substitute its judgment for that of the agency." *Id.* (quoting *Hasie v. Office of the Comptroller of the Currency*, 633 F.3d 361, 365 (5th Cir. 2011)).

In response to the request for SFC Mosby's testimony, DOD analyzed the factors, objected to the subpoena, and decided to authorize SFC Mosby's appearance on a limited basis on a mutually agreeable date to be determined. Ex. 3. On September 8, 2020, DOD provided its response and reasoning. *Id.* DOD's factual basis for agreeing to a limited deposition is that SFC Mosby served for no more than two months with Keefer at the end of 2015. *Id.* at 3–4. SFC Mosby has little recollection of Keefer. *Id.*

Here, the DOD's decision to allow a limited deposition of SFC Mosby on a mutually agreeable date to be determined is neither arbitrary nor capricious. As DOD explained, 3M's proposed September 9 deposition date gave DOD insufficient time to comply, particularly considering the government-wide telework environment due to the COVID-19 pandemic and the many other subpoenas 3M has recently issued on DOD personnel. Moreover, the September 9 deposition date would place an undue burden on SFC Mosby's duties, which include meeting a suspense for a project that is due on or about September 11, 2020. A deposition on September 9 would interfere with SFC Mosby's ability to meet that deadline

The Court must also consider the cumulative impact on the DOD given that the 3M MDL involves more than 150,000 plaintiffs who likely all had significant interactions with other DOD employees during their military service. Indeed, 3M included two other individuals in its Touhy request for SFC Mosby, seeking essentially the same information from all three people. 3M has also served several other subpoenas and Touhy requests on DOD and Department of Veterans Affairs ("VA") seeking documents and depositions of other DOD and VA personnel and may continue to do so. The cumulative impact of removing DOD personnel from their official duties

and responsibilities to comply with 3M's requests, especially during a global pandemic, would be highly disruptive to DOD.

"[A]ny given request may seem small in isolation, but an agency has an interest in protecting itself against the cumulative disruption to its duties that would come with routinely granting requests for testimony." *Westchester Gen. Hosp., Inc. v. HHS, Ctr. for Medicare & Medicaid Servs.*, 770 F. Supp. 2d 1286, 1298 (S.D. Fla. 2011) (citing *Moore v. Amour Pharm. Co.*, 927 F.2d 1194, 1198 (11th Cir. 1991). 3M's subpoena critically "fails to take into account the [agency's] 'legitimate concern with the potential cumulative effect of granting such requests.'" *Solomon v. Nassau Cnty.*, 274 F.R.D. 455, 459 (E.D.N.Y. 2011) (quashing subpoenas for testimony of VA employees). Parcticularly in light of these concerns, the DOD's decision to object to the September 9 deposition date but authorize SFC Mosby for testimony on a mutually agreeable date is not arbitrary and capricious. Thus, the Court should quash the subpoena for SFC Mosby's deposition based on *Touhy*.

**B. The Court should Quash the Subpoena Pursuant to Rule 45**

Federal Rule of Civil Procedure 45 sets forth numerous protections for third parties faced with subpoenas from litigation of which they are not a party. A court "must quash or modify a subpoena" if the subpoena:

> (i) fails to allow a reasonable time to comply;
> (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
> (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
> (iv) subjects a person to undue burden.

Fed. R. Civ. P. 45(d)(3)(A).

The need to reduce the discovery burden on nonparties is especially important where, as here, the request is for the deposition of a government employee. The government has a "legitimate interest in orderly governmental operations and the proper use of officials' time." *Alex v. Jasper Wyman & Son*, 115 F.R.D. 156, 157 (D. Me. 1986); *see also Sharon Lease Oil Co. v. F.E.R.C.*, 691 F. Supp. 381, 384 (D.D.C. 1988) (same). Indeed, "[c]ourts generally refuse to

compel the deposition of a government witness if the [requesting party] may obtain discovery by an alternative and less burdensome method to the government." *See, e.g., Gomez v. City of Nashua, N.H.*, 126 F.R.D. 432, 436 (D. N.H. 1989).

The Court should quash the subpoena because it does not allow sufficient time to comply, which also creates an undue burden. 3M scheduled SFC Mosby's deposition for less than two weeks after it issued the subpoena. *See S.E.C. v. Art Intellect, Inc.*, No. 2:11-CV-00357-TC-DN, 2012 WL 776244, at *3 (D. Utah Mar. 7, 2012) ("Although Rule 45 does not define 'reasonable time,' many courts have found that anything less than fourteen days from the date of service is not reasonable"); *cf. Parra v. State Farm Lloyds*, No. 7:14-CV-691, 2015 U.S. Dist. LEXIS 185386, at *3–4 (S.D. Tex. Jan. 13, 2015) (quashing a subpoena requiring production in 22 days, because "thirty days is a 'reasonable time' to respond to a subpoena duces tecum, and Defendant should have been given at least thirty days."). With the holiday weekend, the subpoena does not provide SFC Mosby and DOD sufficient time to prepare for the deposition and provide cover for SFC Mosby's missed work. In this instance, SFC Mosby has to meet a suspense for a project that is due on or about September 11, 2020. Ex. 3 at 2. The deposition requested in this case would interfere with his ability to meet that deadline. *Id.* In addition, as noted above, the Court must consider the cumulative impact on the DOD given that the 3M MDL involves more than 150,000 plaintiffs and 3M is seeking numerous depositions across the country on essentially this same, short timeline. DOD provided this information to 3M as part of its objections. Ex. 3. 3M refused to reschedule the deposition and sought to push forward on its timeline without regard for the reasonable requests of a third party in seeking to accommodate the deposition. Ex. 4.

Thus, based on the Federal Rules of Civil Procedure, the Court should quash the subpoena for SFC Mosby's deposition.

## IV. Conclusion

For the foregoing reasons, the Court should quash the subpoena.

Respectfully submitted,

John F. Bash
United States Attorney

By:   */s/ Matthew Mueller*
      Matthew Mueller
      Assistant United States Attorney
      Texas Bar No. 24095592
      601 N.W. Loop 410, Suite 600
      San Antonio, Texas  78216
      (210) 384-7362 (phone)
      (210) 384-7358 (fax)
      matthew.mueller@usdoj.gov

**Certificate of Service**

I certify that on September 8, 2020, I electronically filed this document with the Clerk of Court using the CM/ECF system.


/s/ Matthew Mueller
Matthew Mueller
Assistant United States Attorney

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

No. SA-20-CV-01063

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida

| | |
|---|---|
| Lewis Keefer | ) |
| _Plaintiff_ | ) |
| v. | ) |
| 3M Defendants, et al. | ) |
| | ) |
| _Defendant_ | ) |

Civil Action No.   7:20-cv-00104-MCR-GRJ

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:          Taurin J. Mosby, ▮▮▮▮, San Antonio, TX ▮▮

_(Name of person to whom this subpoena is directed)_

☑ _Testimony:_  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: | Courtyard San Antonio Riverwalk, 207 N Saint Marys Street San Antonio Texas 78205 or, in the alternative, via remote deposition | Date and Time: 09/09/2020 9:00 am |
|---|---|---|
| | The deposition will be recorded by this method: | Stenographic and Videographic |

❏ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      08/27/2020

CLERK OF COURT

OR

_____          /s/ Larry Hill
_Signature of Clerk or Deputy Clerk_                _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_  Defendants, 3M Company, et al.                                                  , who issues or requests this subpoena, are:

Larry Hill, Moore, Hill & Westmoreland, 350 W. Cedar St., Pensacola, FL 32505, lhill@mhw-law.com, 850-434-3541

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Exhibit 1 Page 1 of 3

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.    7:20-cv-00104-MCR-GRJ

**PROOF OF SERVICE**
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                        *Server's signature*

                                                        _____
                                                        *Printed name and title*

                                                        _____
                                                        *Server's address*

Additional information regarding attempted service, etc.:

Exhibit 1 Page 2 of 3

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Exhibit 1 Page 3 of 3

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

No. SA-20-CV-01063

Barry E. Fields, P.C.
To Call Writer Directly:
+1 312 862 2081
barry.fields@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

August 7, 2020

**By E-Mail**

Major Nicole Kim
nicole.m.kim2@mil.mail.mil
Tel: (703) 693-1092

Re:   *Touhy* Request Relating to *In re: 3M Combat Arms Earplug Products
Liability Litigation*, 3:19-md-2885-MCR-GRJ (N.D. Fla.), Bellwether
Plaintiff Lewis Keefer

Dear Major Kim:

In connection with *In re: 3M Combat Arms Earplug Products Liability Litigation*—a multidistrict litigation pending before Judge Rodgers in the Northern District of Florida—this letter constitutes Defendants' 3M Company ("3M") and Aearo Technologies LLC's ("Aearo") *Touhy*[1] request to the United States Department of Defense ("DoD") to take the depositions of: (1) SFC Taurin Mosby, who served as Plaintiff Keefer's supervisor when he was stationed at Schofield Barracks in Hawaii; (2) SFC Anthony Howard (possibly also known as Anthony Howard-Barnhardt), a servicemember who allegedly brought the charges which lead to an investigation and Article 15 disciplinary proceedings against Plaintiff Keefer; and (3) MSG Orville Bennett who served as Plaintiff Keefer's supervisor when he was stationed at Fort Benning, Georgia.

This letter also constitutes Defendants' *Touhy* request SFC Mosby, SFC Howard, and MSG Bennett to produce certain documents related to Keefer's noise exposure, use of hearing protection devices, and disciplinary proceedings.  Pursuant to 32 C.F.R. § 516.40-57 and 32 C.F.R. § 97, 33 C.F.R. § 1.20-1 and 6 C.F.R. § 5.45, DoD Directive 5405.2 § 6.2, Navy Instruction 5820.8A, and Air Force Instruction 51-301, Defendants set forth the basis for their *Touhy* requests as follows:

---

[1] *United States ex rel. Touhy v. Ragen,* 340 U.S. 462 (1951).

Beijing   Boston   Dallas   Hong Kong   Houston   London   Los Angeles   Munich   New York   Palo Alto   Paris   San Francisco   Shanghai   Washington, D.C.

Exhibit 2 Page 1 of 5

# KIRKLAND & ELLIS LLP

Major Nicole Kim
August 7, 2020
Page 2

I.      **Summary of the Litigation**

Plaintiffs in this litigation include servicemen and women who claim to have been issued Combat Arms Earplugs Version 2 ("CAEv2") in connection with their military service, including Plaintiff Keefer.  The CAEv2 was initially designed and distributed by Aearo.  In 2008, 3M, purchased Aearo and continued to market and sell the CAEv2.  Servicemember plaintiffs in this litigation, including Plaintiff Keefer, allege that the CAEv2 was defective and caused them to sustain serious injuries during their military service, including hearing damage.  The information sought by these *Touhy* requests will assist Defendants in establishing that the CAEv2 did not cause Plaintiff Keefer's alleged hearing loss, and/or will relate to the alleged seriousness of Plaintiff Keefer's injuries.

On February 27, 2020, the Court issued Pretrial Order No. 29, which selected twenty-five cases for the initial bellwether pool. The parties are now conducting discovery in initial bellwether cases.  Defendants took the deposition of Plaintiff Keefer on July 23, 2020.

II.     **Summary of the Depositions Requested**

Defendants seek to depose SFC Mosby regarding: (i) Plaintiff Keefer's exposure to noise; (ii) Plaintiff Keefer's alleged hearing loss and tinnitus injuries, and conditions Plaintiff Keefer claims were caused or exacerbated by his alleged hearing loss and/or tinnitus; (iii) Plaintiff Keefer's use of hearing protection devices, including the CAEv2; (iv) the policies and practices regarding hearing protection devices in Plaintiff Keefer's units; and (v) any alleged misconduct by Plaintiff Keefer, disciplinary proceedings brought against Plaintiff Keefer, or Plaintiff Keefer's reasons for separating from the military, including but not limited to the Article 15 disciplinary proceedings brought against Plaintiff Keefer while he was stationed in Hawaii and/or deployed to Thailand.

Defendants seek to depose SFC Howard regarding: (i) Plaintiff Keefer's exposure to noise; (ii) Plaintiff Keefer's alleged hearing loss and tinnitus injuries, and conditions Plaintiff Keefer claims were caused or exacerbated by his alleged hearing loss and/or tinnitus; (iii) Plaintiff Keefer's use of hearing protection devices, including the CAEv2; (iv) the policies and practices regarding hearing protection devices in Plaintiff Keefer's units; and (v) any alleged misconduct by Plaintiff Keefer, disciplinary proceedings brought against Plaintiff Keefer, or Plaintiff Keefer's reasons for separating from the military, including but not limited to the Article 15 disciplinary proceedings brought against Plaintiff Keefer while he was stationed in Hawaii and/or deployed to Thailand.

Defendants seek to depose MSG Bennett regarding: (i) Plaintiff Keefer's exposure to noise; (ii) Plaintiff Keefer's alleged hearing loss and tinnitus injuries, and conditions Plaintiff Keefer claims were caused or exacerbated by his alleged hearing loss and/or tinnitus; (iii) Plaintiff

Exhibit 2 Page 2 of 5

## KIRKLAND & ELLIS LLP

Major Nicole Kim
August 7, 2020
Page 3

Keefer's use of hearing protection devices, including the CAEv2; (iv) the policies and practices regarding hearing protection devices in Plaintiff Keefer's units; and (v) any alleged misconduct by Plaintiff Keefer or disciplinary proceedings brought against Plaintiff Keefer.

**III.     Summary of the Documents Requested**

### Specific Documents Requested

- All documents, communications, and correspondence concerning Plaintiff Keefer's exposure to noise.

- All documents, communications, and correspondence concerning Plaintiff Keefer's use or non-use of hearing protection devices.

- All documents, communications, and correspondence related to Plaintiff Keefer's alleged hearing loss and tinnitus injuries, and conditions Plaintiff Keefer claims were caused or exacerbated by his alleged hearing loss and/or tinnitus.

- All documents, communications, and correspondence related to the investigation and Article 15 proceedings against Plaintiff Keefer, as well as any other alleged misconduct by Plaintiff Keefer, disciplinary proceedings brought against Plaintiff Keefer, or Plaintiff Keefer's reasons for separating from the military.

- Written policies and procedures related to the selection, distribution, fitting, use, and/or training for hearing protection devices.

**IV.     Relevance of the Requested Deposition and Documents**

Servicemember plaintiffs in this litigation, including Plaintiff Keefer, allege that the CAEv2 was defective and caused them to sustain serious injuries during their military service, including hearing damage. The information sought by these *Touhy* requests will assist Defendants in establishing that the CAEv2 did not cause Plaintiff Keefer's alleged hearing loss, and/or will relate to the alleged seriousness of Plaintiff Keefer's injuries. The requested deposition and documents are relevant to address Plaintiff Keefer's allegations that his hearing was injured due to use of the CAEv2 and to the extent/severity of his alleged injuries.

**V.     Additional Considerations**

These requests comply with the policies of the DoD, DLA, Army, Navy, Marine Corps, Air Force, and Coast Guard regarding the provision of information by its employees in connection

Exhibit 2 Page 3 of 5

## KIRKLAND & ELLIS LLP

Major Nicole Kim
August 7, 2020
Page 4

with litigation in federal court:

     1.    Disclosure of the requested information is not unduly burdensome or otherwise inappropriate under the federal discovery rules.

     2.    Disclosure of the requested information would be appropriate under the Federal Rules of Evidence and appropriate under the rules of the Northern District of Florida.

     3.    Disclosure of the requested information would be appropriate under the Federal Rules of Civil Procedure and would not impact any concerns regarding privileged information pursuant to the rules of procedure governing this litigation.

     4.    Disclosure of the requested information would not violate any statute, executive order, regulation, or directive.

     5.    Disclosure of the requested information would not reveal any classified information, data restricted pursuant to AR 380-5, unclassified technical data withheld from public release pursuant to 32 C.F.R. § 250 or DoD Directive 5230.25, privileged safety information restricted from public release by DoD Directive 6055.7, AFI 31-401, or other matters exempt from unrestricted disclosure.

     6.    Disclosure of the requested information would not interfere with ongoing enforcement proceedings, compromise any constitutional rights, reveal the identity of an intelligence source or confidential informant, disclose trade secrets or similarly confidential commercial or financial information, or otherwise be inappropriate under the circumstances.

     7.    Disclosure would not violate any person's expectation of confidentiality or privacy.

     8.    The United States is not, and is not reasonably anticipated to be, a party in this litigation.

*See* 32 C.F.R. §§ 97.6(b)(1)-(6); 32 C.F.R. §§ 516.41(d), 516.44; Navy Instruction 5280.8A(1)-(10); Department of Defense Directive 5405.2 § 6.2; 33 C.F.R. § 1.20-1; 6 C.F.R. § 5.45; Air Force Instruction 51-301, 9.5.1-9.5.6.

**VI.**    **Administrative Matters**

    Defendants will bear the costs of duplicating and producing the documents sought by this

Exhibit 2 Page 4 of 5

# KIRKLAND & ELLIS LLP

Major Nicole Kim
August 7, 2020
Page 5


*Touhy* request.  Costs will be paid by check or money order payable to the Treasury of the United States. For ease of production, all electronically stored information can be produced via a secure file transfer protocol site that will be provided free of charge or via electronic storage media that will be provided to you at no charge and upon your request. Any requests for assistance with the transmittal of electronically stored documents, or coordination of the inspection of documents should be made to Mark Nomellini, counsel for Defendants, at (312) 862-2410 or mnomellini@kirkland.com.  Additionally, to the extent the DoD believes any of the requested information does not implicate the statutory considerations set forth above, Defendants are willing to work with the DoD to narrow the scope of the request.


***


    If you anticipate that full production will require more than ten (10) days from the date of service, we request that you notify the parties and/or the Court. Should you have any questions or require additional information about this Touhy request, please do not hesitate to contact me. Thank you for your assistance.


                                    Sincerely,

                                    */s/ Barry E. Fields*

                                    Barry E. Fields

cc:     Jacqueline Snead, Associate General Counsel
        Department of Justice
        jacqueline.snead@usdog.gov

        Plaintiff Co-Lead and Co-Liaison
        Counsel, Discovery and ESI Subcommittee, Jennifer Hoekstra
        jhoekstra@awkolaw.com

        Major Robert Wald, U.S. Army
        robert.e.wald.mil@mail.mil


Exhibit 2 Page 5 of 5



**DEPARTMENT OF THE ARMY**
UNITED STATES ARMY LEGAL SERVICES AGENCY
LITIGATION DIVISION
9275 GUNSTON ROAD
FORT BELVOIR, VA  22060-5546

No. SA-20-CV-01063

September 8, 2020

SUBJECT:  Response to Subpoena and *Touhy* request related to Mr. Taurin Mosby for release of official information in the case of *In Re: 3M Combat Arms Earplug Products Liability Litigation,* Civil Action File No.: 3:19-md-02885, United States District Court for the Northern District of Florida

Barry E. Fields
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
barry.fields@kirkland.com

Larry Hill
Moore, Hill & Westmoreland
350 W. Cedar St.
Pensacola, FL 32505
lhill@mhw-law.com
(Via Email)

Dear Mr. Hill and Mr. Fields,

This letter responds to Defendants' subpoena for Mr. Mosby's testimony dated August 27, 2020, and *Touhy* request dated August 7, 2020.  Your subpoena for testimony dated August 27, 2020, served on August 28, 2020, seeks unspecified testimony from Mr. Taurin Mosby.

Regarding the subpoena for Mr. Mosby's testimony on September 9, 2020, the DoD objects to this subpoena under Fed. R. Civ. P. 26 and 45 for the following reasons:

First, the subpoena failed to allow DoD a reasonable time to comply.  *See* Fed. R. Civ. P. 45(d)(3)(A)(i).  "[J]ust as negligence in the air does not exist, neither does reasonableness: the analysis is necessarily case-specific and fact-intensive. What would be reasonable . . . may take on a very different cast where, as here, . . . the schedules of the deponents and a number of lawyers would be unable to accommodate the belatedly filed notices." *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 320, 327 (N.D. Ill. Aug. 26, 2005) (noting that "the plaintiffs were keenly aware of all of these facts and of the competing demands imposed by the other discovery disputes that had been percolating for some period"); *see also Minor Doe I Through Parent I Doe v. School Board for Santa Rosa County*, 2009 WL 10674249, at *2 (N.D. Fla. Nov. 23, 2009) ("Although the rule does not specify what constitutes reasonable

Exhibit 3 Page 1 of 4

2

time to comply, common sense dictates that reasonableness is determined in relation to the extent of the materials requested and other underlying circumstances in the case."). Although, dated August 27, 2020, the subpoena was not served until the following day, allowing only seven business days prior to the specified September 9, 2020, return date. This is an unreasonable time for compliance given factors including the government-wide telework environment due to the COVID-19 pandemic, the many other subpoenas your office issued in the same timeframe, not to mention the numerous other pending discovery requests (some duplicative) that your office has served in this same action.

Although Mr. Mosby is no longer on Active Duty, he is still employed with DoD, and his attendance for a deposition will place an undue burden on his duties, which include meeting a suspense for a project that is due on or about September 11, 2020. Participation at a deposition will interfere with his ability to meet that deadline. Moreover, the assigned DoD counsel has other pending cases and responsibilities requiring attention between the date of service and the scheduled date of deposition, such as responding to three other *Touhy* requests for other cases, preparing for an alternative dispute resolution, preparing for two upcoming depositions, and attending one deposition.

Additionally, DoD has considered the cumulative impact of subpoenas like yours, in light of the fact that this litigation involves more than 180,000 plaintiffs who each had numerous co-workers and supervisors during their time in the military. The cumulative impact of such requests would be disruptive to the agency's functioning. "[A]ny given request may seem small in isolation, but an agency has an interest in protecting itself against the cumulative disruption to its duties that would come with routinely granting requests for testimony." *Westchester Gen. Hosp., Inc. v. HHS, Ctr. for Medicare & Medicaid Servs.*, 770 F. Supp. 2d 1286, 1298 (S.D. Fla. 2011) (citing *Moore v. Armour Pharmaceutical Co.*, 927 F.2d 1194, 1198 (11th Cir. 1991)); *see also Solomon v. Nassau Cty.*, 274 F.R.D. 455, 459 (E.D.N.Y. 2011) (quashing subpoena on federal agency where "the Plaintiff fails to take into account the VA's 'legitimate concern with the potential cumulative effect of granting such requests'").

The DoD separately approves your *Touhy* request dated August 7, 2020, subject to the limitations described herein. This approval is made pursuant DoDD 5405.2, which is published at 32 C.F.R. Sec. pt. 97 (2005). As you know, the release of official information, both written and verbal, for litigation purposes, including a release in response to a subpoena duces tecum is controlled by DoDD 5405.2. This directive was promulgated pursuant to 5 U.S.C. § 301 and consistent with *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), which confirms the authority of the head of a federal agency to control the release of official information. DoDD 5405.2 specifically outlines considerations for granting or denying a request. Relevant considerations include whether the request or demand is unduly burdensome or otherwise inappropriate under the applicable court rules.

On August 7, 2020, you submitted a *Touhy* request seeking the deposition of Mr. Mosby on the following topics:

Exhibit 3 Page 2 of 4

(i) Plaintiff Keefer's exposure to noise;

(ii) Plaintiff Keefer's alleged hearing loss and tinnitus injuries, and conditions Plaintiff Keefer claims were caused or exacerbated by his alleged hearing loss and/or tinnitus;

(iii) Plaintiff Keefer's use of hearing protection devices, including the CAEv2;

(iv) the policies and practices regarding hearing protection devices in Plaintiff Keefer's units; and

(v) any alleged misconduct by Plaintiff Keefer, disciplinary proceedings brought against Plaintiff Keefer, or Plaintiff Keefer's reasons for separating from the military, including but not limited to the Article 15 disciplinary proceedings brought against Plaintiff Keefer while he was stationed in Hawaii and/or deployed to Thailand.

The DoD has considered your request and determined that compliance on September 9, 2020, would be (1) unduly burdensome and (2) inappropriate under applicable court rules. Allowing Mr. Mosby to sit for a deposition would be unduly burdensome because you provided insufficient notice and an unreasonable time to comply, given Mr. Moby's upcoming work deadlines and responsibilities, the assigned Government counsel's other responsibilities, and the current telework environment. Specifically, a mere seven business days did not allow sufficient time for  Government counsel time to find Mr. Mosby, prepare Mr. Mosby for the deposition, and coordinate Mr. Mosby's work schedule to appropriately limit the burden the Agency.  Additionally, for these same reasons, this request is inappropriate under the applicable court rules, specifically with regard to timeliness given the context in which this deposition was scheduled.  The DoD needs to locate and make contact with the witness, and then determine whether the DoD should authorize the request considering all relevant factors, including whether the witness actually has any relevant information being sought.  Your subpoena provided an unreasonable time to comply given the scope of this litigation and the other responsibilities and obligations of the DoD.

However, DoD has decided to authorize Mr. Mosby to be deposed on a mutually convenient date by remote deposition subject to conditions,[1] including that the

---

[1]  These conditions shall include that:

    a.  The government must be provided a list of all participants who will have access to the platform during the deposition, whether or not they are using a video feed.  The examining attorney, the witness, government counsel, and the court reporter should have video feed during the deposition.  The audio of participants other than the examining attorney, witness, government counsel, and court reporter should be on mute during the deposition.

Exhibit 3 Page 3 of 4

4

deposition last no more than four hours.  Mr. Mosby served with Plaintiff Keefer for only two months, and does recall much about him, including whether he suffered from any hearing deficit.  Mr. Mosby can testify to the type of training that Plaintiff Keefer had during the two months and whether any hearing protection was necessary for that training.  Mr. Mosby is not authorized to testify about any other subjects requested in your Touhy request because he lacks personal knowledge about them.

For the foregoing reasons, DoD objects to your subpoena for testimony, but approves your *Touhy* request for testimony of Mr. Mosby, subject to the limitations described above.  Accordingly, he is not authorized to give testimony on September 9, 2020.  We request that you withdraw your subpoena.  If you would like to arrange an alternate date of the deposition subject to the scope and time limits described herein, please notify the agency's points of contact, MAJ Nicole Kim and MAJ Robert Wald, in writing.

Should you have any questions, please contact me at (703) 693-1079 or robert.e.wald.mil@mail.mil.

Sincerely,

*Robert Wald*

Robert E. L. Wald
Major, U.S. Army
Litigation Attorney

---

b.  If government counsel's technology fails, all questioning must be terminated until government counsel is reconnected.  The witness should not be connected without government counsel being on the platform.

c.  Two sets of deposition exhibits should be provided to the Department of Justice counsel and received at her office at least 5 business days before the deposition.

d.  The deposition must be completed within the time period 9:00am – 4:00pm in the witness's time zone and must include at least four scheduled breaks and a one-hour lunch break.  The deposition is limited to 4 hours on the record.  The time on the record will be split between the parties in a manner in which the parties have agreed.

e.  The Government will waive administration of the oath in person and consent to remote administration.

Exhibit 3 Page 4 of 4



**From:** Gunderson, Karl <karl.gunderson@kirkland.com>
**Sent:** Tuesday, September 8, 2020 12:41 PM
**To:** Wald, Robert E MAJ USARMY HQDA OTJAG (USA) <robert.e.wald.mil@mail.mil>; Kim, Nicole M MAJ USARMY HQDA OTJAG (USA) <nicole.m.kim2.mil@mail.mil>; tbouk@levinlaw.com; bbarr@levinlaw.com
**Cc:** Bryan Aylstock <BAylstock@awkolaw.com>; SHutson@triallawfirm.com; cseeger@seegerweiss.com; 'dbuchanan@seegerweiss.com' <dbuchanan@seegerweiss.com>; 'epefile@mostynlaw.com' <epefile@mostynlaw.com>; evan@gorijulianlaw.com; taylor@hgdlawfirm.com; lewis@hgdlawfirm.com; kcharonko@baileyglasser.com; vanello@douglasandlondon.com; Snead, Jacqueline Coleman (CIV) <jsnead@CIV.USDOJ.GOV>; Judge David R. Herndon <dave@herndonresolution.com>; Nomellini, Mark J. <mnomellini@kirkland.com>; Brock, Mike <mike.brock@kirkland.com>; Fields, Barry E. <bfields@kirkland.com>; *Kimberly.branscome@dechert.com <Kimberly.branscome@dechert.com>; Elizabeth, Sierra <sierra.elizabeth@kirkland.com>; Karis, Hariklia <hkaris@kirkland.com>; Kolsky, Joshua (CIV) <jkolsky@CIV.USDOJ.GOV>; Cooper, Shaquana (OGC) <Shaquana.Cooper@va.gov>; lhill@mhw-law.com; Charles Beall <cbeall@mhw-law.com>; Neglia, Ashley <ashley.neglia@kirkland.com>
**Subject:** RE: [Non-DoD Source] In re 3M - subpoena related to Bellwether Plaintiff Lewis Keefer

Major Wald, Major Kim, Brian, and Troy,

Major Wald's letter discusses "mutually convenient dates." Please let us know what dates in the very near future you propose holding Mr. Mosby's deposition.

Defendants have not amended or withdrawn the subpoena for Mr. Mosby's September 9 deposition, and plan to proceed with the deposition absent agreement to the contrary.

Regards,
Karl

**Karl Gunderson**

**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 2379  **M** +1 312 622 7788

karl.gunderson@kirkland.com

**From:** Wald, Robert E MAJ USARMY HQDA OTJAG (USA) <robert.e.wald.mil@mail.mil>
**Sent:** Tuesday, September 8, 2020 10:42 AM
**To:** Neglia, Ashley <ashley.neglia@kirkland.com>
**Cc:** Bryan Aylstock <BAylstock@awkolaw.com>; SHutson@triallawfirm.com; cseeger@seegerweiss.com; 'dbuchanan@seegerweiss.com' <dbuchanan@seegerweiss.com>; 'epefile@mostynlaw.com' <epefile@mostynlaw.com>;

Exhibit 4 Page 1 of 3

evan@gorijulianlaw.com; bbarr@levinlaw.com; tbouk@levinlaw.com; taylor@hgdlawfirm.com; lewis@hgdlawfirm.com; kcharonko@baileyglasser.com; vanello@douglasandlondon.com; Jacqueline.Snead@usdoj.gov; Judge David R. Herndon <dave@herndonresolution.com>; Nomellini, Mark J. <mnomellini@kirkland.com>; Brock, Mike <mike.brock@kirkland.com>; Gunderson, Karl <karl.gunderson@kirkland.com>; Fields, Barry E. <bfields@kirkland.com>; *Kimberly.branscome@dechert.com <Kimberly.branscome@dechert.com>; Elizabeth, Sierra <sierra.elizabeth@kirkland.com>; Karis, Hariklia <hkaris@kirkland.com>; Kolsky, Joshua (CIV) <Joshua.kolsky@usdoj.gov>; Cooper, Shaquana (OGC) <Shaquana.Cooper@va.gov>; Kim, Nicole M MAJ USARMY HQDA OTJAG (USA) <nicole.m.kim2.mil@mail.mil>; lhill@mhw-law.com
**Subject:** RE: [Non-DoD Source] In re 3M - subpoena related to Bellwether Plaintiff Lewis Keefer

Good morning Ashley,

Please see the attached response to your deposition request for Mr. Mosby.

Thank you,
Rob

Rob Wald
MAJ, JA
Litigation Attorney
United States Army Legal Services Agency
9275 Gunston Road
Fort Belvoir, Virginia 22060-5546
Cell: 813-401-0915
robert.e.wald.mil@mail.mil

CONFIDENTIALITY NOTICE

The information contained in this e-mail and any accompanying attachments constitute confidential information which may be legally privileged. This information is the property of the U.S. Government. If you are not the intended recipient of this information, any disclosure, copying, distribution, or the taking of any action in reliance on this information is strictly prohibited. If you received this e-mail in error, please notify us immediately by return e-mail.

**From:** Neglia, Ashley <ashley.neglia@kirkland.com>
**Sent:** Thursday, August 27, 2020 2:43 PM
**To:** Kim, Nicole M MAJ USARMY HQDA OTJAG (USA) <nicole.m.kim2.mil@mail.mil>; Cooper, Shaquana (OGC) <Shaquana.Cooper@va.gov>
**Cc:** Wald, Robert E MAJ USARMY HQDA OTJAG (USA) <robert.e.wald.mil@mail.mil>; Bryan Aylstock <BAylstock@awkolaw.com>; SHutson@triallawfirm.com; cseeger@seegerweiss.com; 'dbuchanan@seegerweiss.com' <dbuchanan@seegerweiss.com>; 'epefile@mostynlaw.com' <epefile@mostynlaw.com>; evan@gorijulianlaw.com; bbarr@levinlaw.com; tbouk@levinlaw.com; taylor@hgdlawfirm.com; lewis@hgdlawfirm.com; kcharonko@baileyglasser.com; vanello@douglasandlondon.com; Jacqueline.Snead@usdoj.gov; Judge David R. Herndon <dave@herndonresolution.com>; Nomellini, Mark J. <mnomellini@kirkland.com>; Brock, Mike <mike.brock@kirkland.com>; Gunderson, Karl <karl.gunderson@kirkland.com>; Fields, Barry E. <bfields@kirkland.com>; *Kimberly.branscome@dechert.com <Kimberly.branscome@dechert.com>; Elizabeth, Sierra <sierra.elizabeth@kirkland.com>; Karis, Hariklia <hkaris@kirkland.com>
**Subject:** [Non-DoD Source] In re 3M - subpoena related to Bellwether Plaintiff Lewis Keefer

All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.

Exhibit 4 Page 2 of 3

Major Kim, Ms. Cooper,

Please see attached *Touhy* request, subpoena, and notice of intent directed at Taurin J. Mosby.  A *Touhy* request for this individual was previously served on the DoD, however, we understand that the witness may currently be a VA employee. Defendants currently estimate that they will need seven hours on the record for this deposition. These documents will be posted to MDL Centrality.

Best,
Ashley

**Ashley Neglia**

**KIRKLAND & ELLIS LLP**
555 South Flower Street, Los Angeles, CA 90071
**T** +1 213 680 8114
**F** +1 213 680 8500

Ashley.Neglia@kirkland.com < Caution-mailto:Ashley.Neglia@kirkland.com%0d >

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email topostmaster@kirkland.com < Caution-mailto:postmaster@kirkland.com > , and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

Exhibit 4 Page 3 of 3

United States District Court
Western District of Texas
San Antonio Division

United States of America,
Petitioner,

v.

3M Company,
Respondent.

No. SA-20-CV-01063

**[Proposed] Order**

Before the Court is United States's Motion to Quash Deposition Subpoena to Taurin J. Mosby. Having considered the Motion, the Court hereby GRANTS the Motion and quashes the deposition subpoena issued to Taurin J. Mosby.

**SIGNED AND ENTERED ON THE DAY _____ OF _____, 2020.**

_____
United States District Judge

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. _____ |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| 3M COMPANY, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**MOTION TO QUASH**

The United States of America, by and through the undersigned counsel and on behalf of the U.S. Department of Veterans Affairs ("VA"), moves the Court for an order quashing the subpoena served by defendant 3M Company directing VA employee Cheryl Parker to testify at a deposition scheduled for September 14, 2020, at 9:00 a.m. A copy of the subpoena is attached as Exhibit 1. The VA is not a party to the associated legal proceeding.

The subpoena should be quashed because (1) Defendant has not identified the testimony sought and its relevance to the proceedings as required by the VA's *Touhy* regulations, and (2) the subpoena places an undue burden on the VA, a non-party, and 3M has failed to show a compelling reason the VA should become embroiled in this private litigation.

**BACKGROUND**

3M is a defendant in multi-district litigation occurring in the Northern District of Florida related to the safety of 3M products. *See In re 3M Combat Arms Earplug Products Liability Litigation*, Case No. 3:19-md-2885-MCR-GRJ (N.D. Fla.).   The VA is not a party to the litigation.

In connection with that MDL, 3M issued a subpoena commanding VA employee Mrs. Parker to appear for a deposition on September 14, 2020 at 9:00 a.m. in Charleston, South

Carolina. Ex. 1. The VA received a copy of the subpoena on August 19. Ex. 2 (3M's notice of intent to serve subpoena). The subpoena fails to provide any details on the topics to be covered.

The VA responded to the subpoena on August 27, with a letter to 3M requesting that 3M voluntarily withdraw the subpoena. Ex. 3. 3M declined and so on September 9, VA sent 3M a letter explaining the agency's final decision not to require the VA employee to testify.  Ex. 4. This letter described the agency's analysis of the relevant considerations under its housekeeping or "Touhy" regulations.

The United States understands that 3M is attempting to depose numerous government witnesses who were involved in the medical treatment of bellwether plaintiffs, like plaintiff Baker. VA has responded to 3M's request for documents and medical records pertaining to plaintiff Baker and the other bellwether plaintiffs in the MDL. Records produced by the agency are VA's official business records and speak for themselves.

Mrs. Parker is a VA audiologist at the Ralph H. Johnson VA Medical Center in Charleston, South Carolina. She apparently treated plaintiff Baker almost eleven years ago. Mrs. Parker does not have an independent recollection of plaintiff Baker's examinations or healthcare visits. Mrs. Parker is also a mission-essential employee, currently detailed to VA's COVID response team.

As of this filing, 3M has refused to withdraw the subpoena or compromise its request.

*VA Touhy Regulations*

The VA limits the disclosure of VA information and testimony of VA personnel related to information obtained during the individuals' performance of official duties.  38 C.F.R. §§ 14.800 through 14.810. VA personnel are not allowed to testify in litigation without prior written approval. 38 C.F.R. § 14.807. Under these provisions, the VA may provide testimony in such proceedings only if the VA determines that the disclosure is appropriate based on the factors,

requirements, and procedures set forth in 38 C.F.R. §§ 14.804-807. These regulations help the VA (1) avoid spending the time and money to benefit private parties, (2) conserve the time of VA personnel for conducting their official duties, and (3) minimize the VA's possible involvement in issues unrelated to its mission. *See, e.g.* 38 C.F.R. § 14.804.

## ARGUMENT

**1.     The Subpoena should be quashed under Touhy**

The subpoena should be quashed because 3M has failed to timely comply with the VA's *Touhy* regulations. Compliance with the VA's Touhy regulations is an essential first step to obtain testimony from a VA employee. 3M has refused to provide a timely written summary of the nature and relevance of the testimony sought containing sufficient information in order for the VA to determine whether Mrs. Parker should be allowed to testify.[1] *See* 38 C.F.R. 14.805. And 3M has refused to withdraw the deposition subpoena, thus requiring the United States to file this motion.

*The VA is authorized to determine whether Mrs. Parker may testify*

"Pursuant to 5 U.S.C. § 301, federal agencies may promulgate so-called Touhy regulations to govern the conductions and procedures by which their employees may testify about work-related issues at trial." *United States v. Soriano-Jarquin*, 492 F.3d 495, 504 (4th Cir. 2007) (citing *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951)). *See also Boron Oil Co. v. Downie*, 873 F.2d 67, 70 (4th Cir. 1989) (explaining that the policy behind *Touhy* and the related regulations is "to conserve governmental resources where the United States is not a party to a suit, and to minimize governmental involvement in controversial matters unrelated to official

_____

1 Earlier today, at the VA's request, 3M's counsel provided a written summary. That information was not provided in time for the VA to consider it in deciding whether to authorize the witness to testify. 3M refused the United States' request to withdraw the subpoena to allow for a review of the written summary.

business").  "The Supreme Court has approved such [*Touhy*] regulations, holding that agencies may legitimately promulgate regulations governing employee testimony and may, pursuant to those regulations, forbid an employee to testify in a court proceeding." *Id.*

The VA's Touhy regulations are found at 38 C.F.R. §§ 14.800-810 and govern requests for testimony "relating to any information acquired by any individual as part of that individual's performance of official duties, or by virtue of that individual's official status, in federal, state or other legal proceedings covered by these regulations."  38 C.F.R. § 14.800.

Furthermore, the VA is not a party to the lawsuit and has a compelling interest to conserve its resources and minimize its involvement in the lawsuit.  *See Boron Oil Co. v. Downie*, 873 F.2d 67, 70 (4th Cir. 1989) (noting federal agencies have a compelling interest in "conserv[ing] governmental resources where the United States is not a party to a suit, and to minimize governmental involvement in controversial matters unrelated to official business"); *see also COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269 (4th Cir. 1999).

*3M failed to provide a written statement with its subpoena*

A party seeking to obtain testimony is first required to provide a written statement summarizing the nature and relevance of the testimony sought, "containing sufficient information for the responsible VA official to determine whether VA personnel should be allowed to testify or records should be produced." 38 C.F.R. § 14.805.

The Fourth Circuit's decision in *Soriano-Jarquin* is instructive.  In that case, the defendant sought to call a federal agent as a witness.  The defendant failed to comply with the agency's *Touhy* regulations, and the district court granted the government's motion to exclude the testimony.  The Fourth Circuit affirmed the district court's decision, holding that the defendant's failure to comply with the agency's *Touhy* regulations provided a proper basis for preventing the defendant from calling the agent as a witness.  *Id.* at 504-05; *see also United*

4

*States v. Archer*, No. 3:09-CR-59, 2010 WL 2633080, at 2 (E.D. Tenn. June 25, 2010) (quashing trial subpoena served on federal agent due to failure to provide a written summary of the testimony sought); *United States v. Guild*, No. 1:07-CR-404-JCC-, 2008 WL 169355, at *2 (E.D. Va. Jan. 15, 2008) (quashing subpoenas to federal employees due to failure to comply with the agency's *Touhy* regulations).

Here, the subpoena should be quashed because 3M has failed to provide a written summary of the information sought and its relevance to the proceedings in time for it to be considered by VA.

The closest thing 3M has provided is in a letter from counsel dated July 28. In it, 3M merely states: "Defendants seek to depose Dr. Parker regarding: (i) the October 2009 hearing evaluation and audiogram appointment with Plaintiff Baker, and Dr. Parker's records relating to that evaluation (and any other hearing evaluations and audiograms that Dr. Parker conducted of Plaintiff Baker); (ii) Dr. Parker's notes from her evaluation(s) of Plaintiff Baker; (iii) Dr. Parker's evaluation of the October 2009 audiogram and associated notes; and (iv) any other evaluation or treatment that Dr. Parker did of Plaintiff Baker or appointments that Plaintiff Baker had with Dr. Parker." Ex. 5, page 2. This is simply a list of all the documents 3M requested and VA produced. 3M goes on to state: "The requested documents and deposition are relevant to address Plaintiff Baker's allegations that his hearing was injured due to use of the CAEv2 and to the extent/severity of his alleged injuries." *Id.*, page 3. Similarly, if this is all of the information 3M is willing to provide, it is not enough to overcome the compelling interest in conserving VA resources where it is not a party to the lawsuit and VA has already provided all of Mr. Baker's medical records. *See Boron Oil Co. v. Downie*, 873 F.2d 67, 70 (4th Cir. 1989) (noting federal agencies have a compelling interest in "conserv[ing] governmental resources where the United

States is not a party to a suit, and to minimize governmental involvement in controversial matters unrelated to official business").

As noted above, this morning, 3M's counsel sent a letter containing further information about the testimony sought, but 3M refused to withdraw its subpoena to allow time for the parties to confer.

Because 3M has failed to follow VA Touhy regulations, VA's decision not to authorize Mrs. Parker's testimony should be upheld.

**2. The subpoena should be quashed under Rule 45 of the Federal Rules of Civil Procedure.**

The subpoena should also be quashed because it places an undue burden on a nonparty to the 3M litigation, the VA. The need to reduce the discovery burden on nonparties is especially important where, as here, the request is for the deposition of a government employee. The government has a "legitimate interest in orderly governmental operations and the proper use of officials' time." *Alex v Jasper Wymann & Son*, 115 F.R.D. 156, 157 (D. Me. 1986); *see also Sharon Lease Oil Co. v. F.E.R.C.*, 691 F. Supp. 381, 384 (D.D.C. 1988) (same). Indeed, "[c]ourts generally refuse to compel the deposition of a government witness if the [requesting party] may obtain discovery by an alternative and less burdensome method to the government." *See, e.g., Gomez v. City of Nashua, N.H.*, 126 F.R.D. 432, 436 (D. N.H. 1989).

Mrs. Parker is a VA audiologist at the Ralph H. Johnson VA Medical Center in Charleston, South Carolina. However, due to the COVID pandemic, she has been detailed to the VA's COVID response team. She is responsible for daily communications with, and the reporting of, VA employees that have been tested or need to be tested for COVID, have tested positive for COVID, and/or have experienced COVID related symptoms. She is also responsible for providing clearance to those employees who can return to work. Mrs. Parker is considered a mission-essential employee due to the increase of employee occupational health concerns and the

6

agency's expeditious response to COVID. Removing Mrs. Parker from her duties to participate in this private litigation would be detrimental to the VA and its COVID response operations because she is an integral part of VA's COVID response team.

Furthermore, the VA has already provided 3M all the information 3M requested regarding Mr. Baker. On June 17, 2020, this Office produced Mr. Baker's entire VA file, excluding education and mortgage records, as per the VA 10-5354 forms 3M submitted to VA. Records produced by the agency are VA's official business records and speak for themselves. 3M's request fails to explain why VA employee Mrs. Parker's testimony is also required. Indeed, 3M's subpoena fails to describe any matters on which you seek Mrs. Parker's testimony. Finally, Mrs. Parker does not have any independent recollection of Mr. Baker's examinations or healthcare visits. Thus, 3M cannot show a compelling reason the VA should permit Mrs. Parker's deposition.

**CONCLUSION**

The United States asks that the court grant this motion to quash. 3M has failed to comply with VA *Touhy* regulations and the VA has not authorized the testimony. Moreover, the VA is not a party to the lawsuit and 3M has failed to show a compelling reason the VA should become embroiled in this private litigation.

Respectfully submitted,

PETER M. MCOY, JR.
United States Attorney

By:    s/James C. Leventis
James Leventis (Fed. I.D. 9406)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, South Carolina 29201
(803) 343-3172
September 11, 2020                          james.leventis@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2020, I electronically filed the foregoing Motion to

Quash with the Clerk of Court using the CM/ECF system, which serves copies to all parties of

record. In addition, I sent copies of the foregoing by email to the following counsel for

Respondent:

Larry Hill
Moore, Hill & Westmoreland
350 W. Cedar St.
Pensacola, FL 32505
lhill@mhw-law.com
850-434-3541

Mark Nomellini
Kirkland & Ellis
300 North LaSalle
Chicago, IL 60654
312-862-2410
mnomellini@kirkland.com

s/James C. Leventis
James Leventis (Fed. I.D. 9406)
Assistant United States Attorney

8

# EXHIBIT 1

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida

| | | |
|---|---|---|
| Lloyd E. Baker | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.    7:20-cv-00039-MCR-GRJ |
| 3M Defendants, et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:           Cheryl A. Parker, 109 Bee Street, Charleston, SC 29401

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: ~~The Belmond Charleston Hotel~~ <br> 205 Meeting Street, Charleston, SC 29401, or, in the alternative, via remote deposition | Date and Time: <br><br> 09/14/2020 9:00 am |
|---|---|

The deposition will be recorded by this method:    Stenographic and Videographic

❐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    08/19/2020

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | /s/ Larry Hill |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Defendants, 3M Company, et al.                , who issues or requests this subpoena, are:
Larry Hill, Moore, Hill & Westmoreland, 350 W. Cedar St., Pensacola, FL 32505, lhill@mhw-law.com, 850-434-3541

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.     7:20-cv-00039-MCR-GRJ

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

     ❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

     ❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | | |
|---|---|---|
| IN RE: 3M COMBAT ARMS | ) | Case No. 3:19-md-2885-MCR-GRJ |
| EARPLUG PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | Judge M. Casey Rodgers |
| | ) | Magistrate Judge Gary R. Jones |
| This Document Relates to: | ) | |
| | ) | |
| Lloyd Baker | ) | |
| Civil Case No. 7:20-cv-000039 | ) | |

## DEFENDANTS' NOTICE OF INTENT TO SERVE SUBPOENAS

Please take notice that Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo holdings LLC, Aearo Intermediate LLC, and Aearo, LLC will serve the attached subpoenas directed to Cheryl A. Parker, 109 Bee Street, Charleston, SC 29401 as soon as practicable. The document subpoena will require production of the items requested therein on or before September 2, 2020.

///

///

///

///

///

///

///

Dated:  August 19, 2020

Respectfully submitted,

/s/ Mark J. Nomellini
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (2020) 389-5991
mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
mark.nomellini@kirkland.com

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company,
3M Occupational Safety LLC, Aearo
Technologies LLC, Aearo Holding,
LLC, Aearo Intermediate, LLC and
Aearo, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 19, 2020, a true and correct copy of the foregoing:

**NOTICE OF INTENT TO SERVE SUBPOENAS** was served as follows:

☒ **[E-Mail]** By causing the above document to be sent via electronic mail to the parties at the email addresses listed below. I am aware that service is presumed invalid if the email transmission is returned as undeliverable.

☒ **[MDL Centrality]** By electronically serving the above document via the MDL Centrality website pursuant to Pretrial Order No. 15 (ECF No. 630).

| | |
|---|---|
| Bryan F. Aylstock, Lead Counsel<br>Aylstock, Witkin, Kreis & Overholtz, PLLC<br>17 East Main Street<br>Suite 200<br>Pensacola, FL 32502<br>Tel.: (850) 202-1010<br>baylstock@awkolaw.com | Shelley V. Hutson, Co-Lead Counsel<br>Clark, Love & Hutson, GP<br>440 Louisiana Street<br>Suite 1600<br>Houston, TX 77002<br>Tel.: (713) 757-1400<br>shutson@triallawfirm.com |
| Christopher A. Seeger, Co-Lead Counsel<br>Seeger Weiss LLP<br>77 Water Street<br>8th Floor<br>New York, NY 10005<br>Tel.: (212) 587-0700<br>cseeger@seegerweiss.com | Brian H. Barr, Co-Liaison Counsel<br>Levin, Papantonio, Thomas, Mitchell, Rafferty, & Proctor, P.A.<br>316 South Baylen Street<br>Pensacola, FL 32502<br>Tel.: (850) 435-7044<br>bbarr@levinlaw.com |
| Michael A. Burns, Co-Liaison Counsel<br>Mostyn Law Firm<br>3810 W. Alabama Street<br>Houston, TX 77027<br>Tel.: (713) 714-0000<br>epefile@mostynlaw.com | Shawn Fox<br>Sean P. Tracy<br>Tracey & Fox Law Firm<br>440 Louisiana Street, Suite 1901<br>Houston, TX 77002<br>Tel.: (713) 495-2333<br>Email: sfox@traceylawfirm.com<br>Email: stracey@traceylawfirm.com |

| | Counsel for Lloyd Baker<br>N.D. Fla., 7:20-cv-00039 |
|---|---|
| Major Nicole Kim<br>Litigation Attorney<br>U.S. Army Legal Services Agency<br>9275 Gunston Road<br>Fort Belvoir, VA 22060<br>Email: nicole.m.kim2.mil@mail.mil | Jacqui Coleman Snead<br>Assistant Branch Director, Federal<br>Programs Branch<br>U.S. Dep't of Justice, Civil Division<br>1100 L Street, N.W., Room 12402<br>Washington, D.C. 20005<br>Email: Jacqueline.Snead@usdoj.gov |

Dated: August 19, 2020          Respectfully submitted,


                               */s/ Mark J. Nomellini*
                               Mark J. Nomellini

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida

| | |
|---|---|
| Lloyd E. Baker | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 7:20-cv-00039-MCR-GRJ |
| 3M Defendants, et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: Cheryl A. Parker, 109 Bee Street, Charleston, SC 29401

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: The Belmond Charleston Hotel | Date and Time: |
|---|---|
| 205 Meeting Street, Charleston, SC 29401, or, in the alternative, via remote deposition | 09/14/2020 9:00 am |

The deposition will be recorded by this method: Stenographic and Videographic

❑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 08/19/2020

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | /s/ Larry Hill |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Defendants, 3M Company, et al.
_____, who issues or requests this subpoena, are:
Larry Hill, Moore, Hill & Westmoreland, 350 W. Cedar St., Pensacola, FL 32505, lhill@mhw-law.com, 850-434-3541

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.    7:20-cv-00039-MCR-GRJ

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____        on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____        _____
                                                    *Server's signature*

                                                    _____
                                                    *Printed name and title*

                                                    _____
                                                    *Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida

| | | |
|---|---|---|
| Lloyd E. Baker | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   7:20-cv-00039-MCR-GRJ |
| 3M Defendants, et al. | ) | |
| | ) | |
| *Defendant* | ) | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    Cheryl A. Parker, 109 Bee Street, Charleston SC 29401

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Schedule A

| Place: Dechert LLP 633 W. 5th Street, Ste. 4900, Los Angeles, CA 90071, or, in the alternative, by electronic service | Date and Time: <br><br> 09/02/2020 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    08/19/2020

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Larry Hill |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Defendants, 3M Company, et al.     , who issues or requests this subpoena, are:

Larry Hill, Moore Hill & Westmoreland, 350 Cedar St., Pensacola, FL 32505, lhill@mhw-law.com, 850-434-3541

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 7:20-cv-00039-MCR-GRJ

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer; or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

## DEFENDANTS' REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Defendants 3M Company, 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC (collectively, "Defendants"), by and through their counsel, hereby request that you produce documents responsive to these Requests for Production of Documents (the "Requests") to Defendants in the time and manner set forth in this Subpoena.

## DEFINITIONS

1.      "Communications" as used in the requests below includes any transmission or exchange of information, ideas, facts, data, proposals, or other matters, between or among Persons, by any means. For example, communications would include text messages (short message service (SMS) and multimedia message service (MMS)), or any messaging application (e.g., WhatsApp, Facebook Messenger). The definition also includes Documents evidencing oral communications.

2.      "Document" or "documents" as used below includes hard copy documents as well as electronically stored information.

1

3. The terms "you" and "your" shall refer to Cheryl A. Parker.

## **INSTRUCTIONS**

1. The preceding Definitions apply to these Instructions and each of the succeeding Requests. All terms defined above shall have the meanings set forth therein, whether capitalized in the Requests or not.

2. You are required to produce all responsive documents in your possession, custody, or control, wherever located, including but not limited to electronic sources, such as:

(a) any of your email accounts (*e.g.,* Gmail, Yahoo, and Hotmail);

(b) any of your computers (*e.g.*, desktop or laptop computers);

(c) any of your mobile and handheld electronic devices (*e.g.*, smartphones, computer tablets, portable music players, and digital cameras);

(d) any of your other hardware storage devices (*e.g.*, external hard drives, network storage drives, memory cards, USB flash ("thumb") drives, and CDs/DVDs);

(e) any messaging applications you use (*e.g.* text messages, iMessage, Facebook Messenger, WhatsApp, Telegram, and Snapchat);

(f)  any social media accounts/platforms you use (*e.g.*, Facebook, Instagram, LinkedIn, Twitter, MySpace, YouTube, Pinterest, or other online collaboration tools such as Google+ or Yahoo! groups);

(g)  any website where you have made online postings (*e.g.*, Reddit, Tumblr, and other blog or message boards);

(h)  any cloud storage you use (*e.g.*, DropBox, Microsoft Office365 Account, Google Drive, iCloud, and Amazon Drive).

3.  If you cannot comply with any Request in full, you must comply to the fullest extent possible, and you should provide an explanation as to why full compliance is not possible.

4.  If any document called for by these Requests has been destroyed or discarded, you must identify that document in writing by providing the following information: (a) any sender/author and any addressee; (b) any indicated or blind copies; (c) the document's date, subject matter, number of pages, and attachments or appendices; (d) all Persons to whom the document was distributed, shown, or explained; (e) its date of destruction or discard, manner of destruction or discard, and reason for destruction or discard; (f) the Persons who authorized and carried out such destruction or discard; and (g) whether any copies of the document presently exist and, if so, the name of the custodian of each copy.

5.      If no document exists that is responsive to a particular Request, you must state so in writing.

6.      Defendants request that you produce all photographs, films, movies, and video recordings as native files, in their original resolution and file size.

## REQUESTS FOR PRODUCTION

1.     All documents concerning the hearing evaluation and audiogram conducted on Plaintiff Baker by Dr. Parker in October 2009, or any previous and/or subsequent evaluation and audiogram.

2.     All documents relating to Plaintiff Baker and his hearing evaluation, hearing, and tinnitus.

3.     All documents, communications, and correspondence between Plaintiff Baker and Ralph H. Johnson VA Medical Center employees, including Dr. Parker.

# EXHIBIT 3



**U.S. Department of Veterans Affairs**
**Office of General Counsel**

Office of Chief Counsel (02FT)
Southeast District
140 Fountain Parkway, Suite 520
St. Petersburg, FL 33716
(727)540-3900

August 27, 2020

VIA EMAIL: lhill@mhw-law.com
Larry Hill, Esq.
HILL & WESTMORELAND
350 W. Cedar Street
Pensacola, FL  32505

Re:     Subpoena; Case #7:20-cv-00039-MCR-GRJ
        *Lloyd E. Baker v. 3M Defendants, et al.*

Dear Mr. Hill:

The United States Department of Veterans Affairs (VA) hereby requests that you voluntarily withdraw the subpoena for the documentation and testimony submitted to the Charleston VA employee Cheryl Parker.  The VA is not a party to this litigation.

VA regulations restrict disclosure of official information by Department of Veterans Affairs employees. Part 14 of 38 CFR provides:

> VA personnel shall not, in response to a request or demand for testimony or production of records in legal proceedings, comment or testify or produce records without the prior written approval of the responsible official designated in §14.807(b).  VA personnel may only testify concerning or comment upon official VA information, subjects or activities, or produce records, that were specified in writing, submitted to and properly approved by the responsible VA official.  38 CFR §14.806

This prohibition against disclosure applies even if the information has been subpoenaed.  The required VA approval has not been obtained.

The United States Supreme Court has specifically recognized the authority of a federal agency to restrict the testimony of its subordinates.  *United States ex rel Touhy v. Ragen*, 430 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951).  In *Touhy*, the Supreme Court held that a United States Department of Justice employee could not be held in contempt for his refusal to obey a subpoena duces tecum when his refusal was at the direction of the Attorney General.

*Touhy* followed settled federal law.  See *Boske v. Comingore,* 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846 (1900).

The procedures and rules governing the production of VA records in private litigation are published at 38 C.F.R. Part 14. At Section 14.803, those regulations expressly prohibit the production of VA records without prior written approval of a VA responsible official. Section 14.807 requires and authorizes the VA District Counsel to determine whether a VA is required to comply with a demand or request in such litigation by applying the factors appearing in Section 14.804. That authority has been delegated to me. At the present time, we have not received information sufficient for us to determine that it is appropriate for the records you have subpoenaed to be released.  Pursuant to the procedure and our authority in §14.807, at this time, it is our determination that the VA employee you have subpoenaed is not authorized by this office or required to comply with the demand.

With the information submitted thus far, our review of the factors in Section 14.804 indicates that compliance with the request would violate the Privacy Act, 5 USC 552a.

> No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains.

Moreover, since the regulations cited above clearly apply in this instant case, the VA's waiver of these regulations and compliance with the demand could result in the appearance that the VA is favoring one litigant over the other.

Based on the foregoing, we conclude that compliance with this request is required because the demand does not satisfy the requirements in 38 C.F.R. Part 14. Please take action to withdraw the subpoena in writing, so that it will not be necessary to request that the U.S. Attorney quash it.

In addition, pursuant to 5 USC 552(a), 38 USC 5701 and if applicable, 38 USC 7332, the above-captioned veteran's records may not be disclosed without either consent from the veteran or an appropriate court order. For information in regard to an appropriate court order, please refer to 38 USC §§5701(b)(2) and (b)(5) and 38 CFR 1.511.

Thank you for your courtesy and cooperation in this matter.

For the District Counsel,

Barbara Kehoe
Staff Attorney

# EXHIBIT 4



**U.S. Department
of Veterans Affairs**

**Office of the General Counsel**
Washington DC 20420

In Reply Refer To:  ILG/024Q
Case No.: 138585

September 8, 2020

Mark J. Nomellini
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

Re: Touhy requests and Third-Party Subpoena for the Deposition of VA Employee:
Mrs. Cheryl A. Parker, *re: 3M Combat Arms Earplug Products Liability Litigation*,
3:19-md-2885-MCR-GRJ (N.D. Fla.).

Dear Mr. Nomellini:

The U.S. Department of Veterans Affairs ("VA"), Office of General Counsel ("OGC"), Information Law Group ("ILG") is in receipt of the following three (3) Touhy requests related to Veteran plaintiffs Vernon Curtis Rowe ("Mr. Rowe"), and Lloyd E. Baker ("Mr. Baker"):

- July 28, 2020, request for documents and deposition of Mrs. Cheryl Parker;
- August 7, 2020, request for documents of Dr. Jennifer Deboodt;
- August 7, 2020, request for documents of Dr. Joseph Tan;

This Office is also in receipt of your subpoena dated August 19, 2020, on behalf of your client 3M Company et al. ("3M") under Federal Rule of Civil Procedure 45 ("Rule 45") seeking unspecified deposition testimony from VA employee Mrs. Cheryl Parker.  This letter serves as VA's denial of your July 28, 2020, Touhy requests for documents and for the deposition of Mrs. Parker; your August 7, 2020 Touhy requests for documents of Dr. Jennifer Deboodt and Dr. Joseph Tan; and VA's Rule 45 objections to your August 19, 2020 subpoena.[1] Please note we reserve the right

---

[1]  Pursuant to your email exchange with Department of Justice attorney Jacqueline Coleman Snead, we are providing our objections to your subpoena for Mrs. Parker's deposition today.  We will provide objections to the deposition subpoena issued to Susan Pomering under separate cover, on or before September 14, 2020, because we determined that service of the subpoena was not effected until August 31, 2020.

to supplement these objections in the future and we do not waive other objections that may be applicable in discovery or at trial.

First, we object to your subpoena because it is unduly burdensome in violation of Rules 26 and 45 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(b)(2)(C)(i); and 45(d)(1) and (d)(3). Courts routinely protect non-parties from the undue burden of discovery. *See*, e.g*., Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("Although discovery by definition invasive, parties to a lawsuit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs."); *Sahu v. Union Carbide Corp.,* 262 F.R.D. 308, 317 (S.D.N.Y. 2009) (stating that courts are more sensitive to discovery burdens on third parties).

VA has a judicially cognizable interest in preserving scarce resources and we have determined that your subpoena places an undue burden on VA's health component, the Veterans Health Administration (VHA). *See* Fed. R. Civ. P. 45(d)(3)(C)(i). Your subpoena to depose a mission-essential VA healthcare employee places an undue burden on the agency because it involves removing this employee from her official duties; specifically, from providing much needed service, care, and treatment to Veterans in order to participate in a private litigation. Rule 45 expressly provides that "[a] party or attorney responsible for issuing a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1).

The government has a "legitimate interest in orderly governmental operations and the proper use of officials' time." *Alex v. Jasper Wyman & Son*, 115 F.R.D. 156, 157 (D. Me. 1986). These concerns are especially significant when live testimony is requested from a federal agency. In the face of such a request, "an agency's choice of whether or not to comply with a third-party subpoena is essentially a policy decision about the best use of the agency's resources." *Puerto Rico v. United States*, 490 F.3d 50, 61 (1st Cir. 2007). Once an agency determines not to provide testimony "in the context of private litigation, when the government is not a party, a court should not order testimony to be given . . . without the showing of a compelling interest." *Alex*, 115 F.R.D. at 157; *COMSAT Corp. v. NSF,* 190 F.3d 269, 278 (4th Cir. 1999) (to conserve agency resources and prevent a non-party agency from becoming embroiled in private litigation, the decision to permit employee testimony is committed to the agency's sole discretion).

Mrs. Parker is a VA audiologist. However, due to the COVID pandemic, she has been detailed to the VA's COVID response team. In this capacity, she is responsible for daily communications with and the reporting of those VA employees that have been tested or need to be tested for COVID, have tested positive for COVID, and/or have experienced COVID related symptoms. She is also responsible for providing clearance to those employees who can return to work. Mrs. Parker is

considered a mission-essential employee due to the increase of employee occupational health concerns and the agency's expeditious response to COVID. Removing Mrs. Parker from her duties to participate in this private litigation would be detrimental to the VA and its COVID response operations because she is an integral part of VA's COVID response team.

Moreover, your request for testimony is unduly burdensome because the information sought can be obtained from the agency in a more convenient, less burdensome, and less expensive manner. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). Indeed, "[c]ourts generally refuse to compel the deposition of a government witness if the [requesting party] may obtain discovery by an alternative and less burdensome method to the government." *See, e.g., Gomez v. City of Nashua,* N.H., 126 F.R.D. 432, 436 (D. N.H. 1989). Here, you already have obtained all the information the agency has regarding Mr. Baker. On June 17, 2020, this Office produced Mr. Baker's entire VA file, excluding education and mortgage records, as per the VA 10-5354 forms submitted to VA by the 3M leadership counsel. Records produced by the agency are VA's official business records and speak for themselves. Your request fails to identify any additional information you seek through deposition testimony that is not available in Mr. Baker's records. Indeed, your subpoena fails to describe *at all* the specific matters on which you seek Mrs. Parker's testimony. Moreover, Mrs. Parker does not have any independent recollection of Mr. Baker's examinations or healthcare visits. Thus, deposing Mrs. Parker will not provide any additional information regarding Mr. Baker's hearing and audiological medical history.

Second, we object to your subpoena because it fails to describe the topics of the proposed deposition. "If the noticing party does not describe the topics with sufficient particularity or if the topics are overly broad, the responding party is subject to an impossible task." *Trustees of Boston Univ. v. Everlight Electronics Co.*, 2014 WL 5786492, (D. Mass. Sept. 24, 2014); *see* also *McBride v. Medicalodges, Inc.*, 2008 U.S. Dist. LEXIS 30212 (D. Kansas April 11, 2008); Fed. R. Civ. P. 26(c)(1) (authorizing a court to protect a person from annoyance or undue burden). Here, the subpoena fails to properly notify Mrs. Parker of the topics on which her testimony is sought and therefore fails to show why a deposition is necessary in light of the documents already produced. *See* Subpoena to Testify at a Deposition in a Civil Action To: Cheryl A. Parker (Aug. 19, 2020). Moreover, your failure to specify the testimony you seek has compounded the VA's ability to determine whether your request is appropriate under Rules 26 and 45 of the Federal Rules of Civil Procedure and other applicable federal law and agency regulations.

Third, we object to your subpoena because it is unreasonably cumulative and duplicative. Courts limit the "frequency or extent of discovery" if they determine that "the discovery sought is unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(b)(2)(C). You previously submitted twenty-four (24) VA 10-5345 "Request for and Authorization to release Health Information" forms to the agency on behalf of the twenty-four (24) bellwether Veteran plaintiffs; Mr. Baker's request form was

included in that submission to the agency. Mr. Baker's VA 10-5354 form requested the "entire health file; entire compensation and pension claims file (not education or mortgage records)" for the respective Veteran—limitations to which you agreed. *See* attached VA 10-5345 "Request for and Authorization to release Health Information" for Mr. Baker (Feb. 27, 2020).

In compliance with the instructions on the requests, VA produced to your contractor BrownGreer, the entire healthcare file and compensation and pension files, excluding education and mortgage records, for each of the 24 bellwether Veteran plaintiffs. Any and all communications between VA Medical Centers (VAMC) healthcare employees and Veterans and any information regarding audiograms and hearing/tinnitus evaluations, if conducted, would be included in the Veterans healthcare records that were produced by the agency. Accordingly, your subpoena, to the extent it seeks documents, is duplicative and cumulative. *See* Fed. R. Civ. P. 26(b)(2)(C)(i).

Fourth, we object to your subpoena to the extent it seeks expert testimony about the respective Veterans' records and/or hearing disabilities. Under federal law, VA employees shall not provide (regardless of compensation) opinion or expert testimony in any legal proceeding concerning official VA information unless it is on behalf of the United States or a party represented by the Department of Justice or exceptional circumstances are shown and a responsible VA official grants special authorization. *See* 38 C.F.R. § 14.808.  None of those circumstances is present here.

Fifth, we object to your subpoena because it apparently seeks Mr. Baker's  VA benefits and healthcare information that is protected by various confidentiality statutes and regulations, including but not limited to the Privacy Act, 5 U.S.C. § 552a, 38 U.S.C. § 7332, VA's implementing regulations at 38 CFR § 1.575-1.582; 38 U.S.C. § 5701, and VA's implementing regulations at 38 CFR § 1.500 -1.527. *See* Fed. R. Civ. P. 45(d)(3)(A)(iii).  VA must have authority under each of the applicable statutes and the implementing regulations before any information within the scope of these statutes may be released.  *See* Fed. R. Civ. P. 45(d)(3)(A)(iii).

Sixth, we object to your subpoena based on its cumulative impact, in light of the fact that this litigation involves more than 150,000 plaintiffs who likely were examined at some point subsequent to their military careers by various VA personnel. The cumulative impact of removing mission-essential healthcare providers from their official duties and responsibilities in order to comply with your requests, especially during a global pandemic, would be disruptive to the agency. "[A]ny given request may seem small in isolation, but an agency has an interest in protecting itself against the cumulative disruption to its duties that would come with routinely granting requests for testimony."  *Westchester Gen. Hosp., Inc. v. HHS, Ctr. for Medicare & Medicaid Servs.*, 770 F. Supp. 2d 1286, 1298 U.S. Dist. LEXIS 28039 (Feb. 23, 2011) (citing *Moore v. Armour Pharmaceutical Co.*, 927 F.2d 1194, 1198 (11th Cir. Apr. 2, 1991)).

Finally, we object to your subpoena because service of the subpoena was improper. Rule 45 (b)(1) provides:

> *By Whom and How; Tendering Fees.* Any person who is at least 18 years old and not a party may serve a subpoena. Serving a subpoena requires *delivering a copy to the named person* and, if the subpoena requires that person's attendance, tendering the fees for 1 day's attendance and the mileage allowed by law. Fees and mileage need not be tendered when the subpoena issues on behalf of the United States or any of its officers or agencies. (*emphasis added*)

Fed. R. Civ. P. 45(b)(1). On August 20, 2020, the process server made three (3) attempts to personally serve Mrs. Parker at her place of residence. During each attempt Mr. Parker answered the door and informed the process server that Mrs. Parker was not home. Mr. Parker declares that at no time during any of these three (3) encounters did he identify himself, his relationship to Mrs. Parker, or the reason for him being at Mrs. Parker's place of residence. On the third (3rd) attempt, the process server handed Mr. Parker an envelope on which the name "Cheryl Parker" had been handwritten and asked him to give the sealed envelope to Mrs. Parker. Mr. Parker did not agree verbally or in writing to accept service of the subpoena on behalf of Mrs. Parker. The process server has made no subsequent attempt to personally serve Mrs. Parker with the subpoena. Rule 45(b)(1) does not authorize substituted service of process on a person by delivery to a person residing in the residence, a clerk, or by mail. Quite the contrary, Rule 45(b)(1) specifically requires that service of a subpoena to testify must be made personally upon the witness.

The VA also denies your three (3) Touhy requests for the deposition of Mrs. Parker and for document production from Dr. Tan and Dr. Deboodt under its applicable Touhy regulations.[2] Five United States Code (U.S.C.) § 301 provides federal agencies with the authority to promulgate regulations restricting third party subpoenas and requests for documents and/or testimony. These regulations, commonly known as Touhy regulations, were named after a U.S. Supreme Court decision in which the Court held that agency employees could not be held in contempt of court for refusing to respond to a subpoena, if instructed not to respond by a superior. *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). VA's Touhy regulations limit the disclosure of VA records and testimony of present or former VA personnel relating to any official information acquired by any individual as part of that individual's performance of official duties where the United States government is not a party. 38 Code of Federal Regulations (C.F.R.) §§ 14.800 through 14.810. *See* also *Boron Oil v. Downie*, 873 F.2d 67 (4th Cir. 1989). Under these provisions, VA may produce agency records and/or provide testimony in such

---

[2] In its agency response letter dated September 1, 20202, the agency submitted its response to 3M's Touhy request to produce documents by Mrs. Parker; therefore, this document will not address that request.

proceedings only if the Department determines that the disclosure is appropriate based on the factors, requirements, and procedures set forth in 38 C.F.R. §§ 14.804-807.

> . . . In determining whether to authorize testimony or the production of records, the determining official will consider the effect in this case, as well as in future cases generally, based on the factors set forth in § 14.804, which testifying or producing records not available for public disclosure will have on the ability of the agency or VA personnel to perform their official duties.

38 C.F.R. § 14.803(a). This includes the need to avoid spending the time and money of the United States for private purposes, to conserve the time of VA personnel for conducting their official duties, and to minimize the Department's possible involvement in issues unrelated to its mission. Upon careful review of your requests, we base our denial in part on the following nine (9) factors (a), (b), (c), (d), (f), (i), (j), (l), and (o) of those regulations. *See* 38 C.F.R. section 14.804.

**(a) The need to avoid spending the time and money of the United States for private purposes and to conserve the time of VA personnel for conducting their official duties concerning servicing the Nation's veteran population:**

We have determined that you have failed to take reasonable steps to avoid imposing an undue burden or expense on VA. VA has a judicially cognizable interest in preserving scarce resources and we find that your request places an undue burden on VA's health component, the Veterans Health Administration (VHA). Your two (2) requests, addressed to Dr. Tan and Dr. Deboodt, for records of bellwether plaintiff Mr. Rowe are duplicative. As explained earlier, in response to the VA 10-5345 "Request for and Authorization to release Health Information" form submitted to the agency on behalf of Mr. Rowe, VA produced to your contractor BrownGreer, his entire healthcare file and compensation and pension files. Any and all communications between VA Medical Centers (VAMC) healthcare employees and Veterans and any information regarding audiograms and hearing/tinnitus evaluations, if conducted, would be included in the Veteran's healthcare records that were produced by the agency in response to the twenty-four (24) bellwether requests. Therefore, your August 7, 2020, Touhy requests impose an undue burden and expense on the agency to reproduce records that have already been produced and are in your possession.

Moreover, the bellwether Veterans' records produced by the agency in connection with this litigation are VA's official business records; the records speak for themselves.

In your July 28, 2020, Touhy request you stated that you

> seek to depose [Mrs.] Parker regarding: (i) the October 2009 hearing evaluation and audiogram appointment with Plaintiff Baker, and Dr. Parker's records relating to that evaluation (and any other hearing evaluations and audiograms that Dr. Parker conducted of Plaintiff Baker); (ii) Dr. Parker's notes from her evaluation(s) of Plaintiff Baker; (iii) Dr. Parker's evaluation of the October 2009 audiogram and associated notes; and (iv) any other evaluation or treatment that Dr. Parker did of Plaintiff Baker or appointments that Plaintiff Baker had with Dr. Parker.

*See Touhy* Request Relating to *In re: 3M Combat Arms Earplug Products Liability Litigation*, 3:19-md-2885-MCR-GRJ (July 28, 2020). Your request to depose Mrs. Parker fails to explain what additional information can be gathered through her deposition that is not already available in the respective Veteran's records that the agency produced. Moreover, you seek to depose this VA mission-essential healthcare provider regarding hearing evaluations and audiogram appointments, medical history, hearing related medical history, providers' medical notes, and scheduled appointments of Mr. Baker. This information is included in Mr. Baker's records that have been provided to you. Additionally, Mrs. Parker has no recollection of Mr. Baker; her examination of him was almost eleven years ago. Therefore, we have determined after speaking with her that this mission-essential employee cannot provide any additional information regarding the Mr. Baker's medical history, including but not limited to, hearing-related medical history, environmental and noise exposures, healthcare visits, and communication with VA providers.

Furthermore, your request to depose Mrs. Parker places an undue burden on the agency because it involves removing a mission-critical employee from her official duties; specifically, her duties of being an integral part of VA's COVID response team. Please also be advised that during the current public health global pandemic, all health care resources are being committed to mission-essential resources. The interest in obtaining the deposition of Mrs. Parker versus the government's interest in maximizing the use of its limited resources during a global pandemic crisis is minimal and incomparable. It is unclear how authorizing the deposition of Mrs. Parker will serve governmental interests, as opposed to the interests of the parties to this private litigation. The time spent in prepping Mrs. Parker for the requested deposition and the time spent in the actual deposition equate to hours or days away from her mission-critical position with VA's COVID response team.

**(b) How the testimony or production of records would assist VA in performing its statutory duties; and (c) Whether the disclosure of the records or presentation of testimony is necessary to prevent the perpetration of fraud or other injustice in the matter in question:**

We have determined that even if the court finds that 3M earplugs were in fact defective, causing Veterans' hearing loss, that outcome would not assist VA in performing its statutory duties of providing services and benefits to our nation's Veteran population; nor would the release of the documents prevent the perpetration of fraud or other injustice. VA compensation benefits are based upon the occurrence of an event causing a disease or disability during a period of service. The source of the event is not relevant to a determination of service-connection nor would the fault of a third-party impact VA's obligation to care for Veterans' resulting disability or to continue provide compensation for service-connected hearing loss disability. You have failed to identify any manner in which the authorization of Mrs. Parker's deposition would assist VA in performing its statutory duties and we are unable to identify one. Finally, you have not identified any fraud or injustice relevant to the matter in question.

**(d) Whether the demand or request is unduly burdensome or otherwise inappropriate under the applicable court or administrative rules:**

As explained above, we find that your requests for the deposition of Mrs. Parker and for the production of records by Mrs. Parker, Dr. Joseph Tan, and Dr. Jennifer Deboodt to be unduly burdensome, duplicative, wasteful, and fail to account for federal governmental interest.

**(f) Whether the testimony or production of records would violate a statute, executive order, regulation or directive. (Where the production of a record or testimony as to the content of a record or about information contained in a record would violate a confidentiality statute's prohibition against disclosure, disclosure will not be made. Examples of such statutes are the Privacy Act, 5 U.S.C. § 552a, and §§ 5701, 5705 and 7332 of title 38, United States Code.):**

The information you seek is protected by various confidentiality statutes and regulations, including but not limited to the Privacy Act, 5 U.S.C. § 552a, 38 U.S.C. § 7332, VA's implementing regulations at 38 CFR § 1.575-1.582; and 38 U.S.C. § 5701, and VA's implementing regulations at 38 CFR § 1.500 -1.527. VA must have authorization under each of the applicable statutes and the implementing regulations before any information may be released.

The Privacy Act prohibits the disclosure of any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless one of the 12 enumerated exceptions apply. *See* 5 U.S.C. § 552a (b).

Similarly, 38 U.S.C. § 5701 is a statutory prohibition related to disclosure of information from Veterans' claims files including the names and current and/or former home addresses of current or past members of the Armed Forces without prior written authorization or a signed court order. VA regulation 38 C.F.R. § 1.511 provides authority to release information upon receipt of a subpoena issued by a court of competent jurisdiction or a signed court order. *See* 38 C.F.R. § 1.511(b)(1) or (2).

Finally, 38 U.S.C. § 7332 requires special confidentiality for records related to HIV and sickle cell status as well as drug and alcohol treatment records. In order to release records covered by § 7332 either a consent meeting the criteria of 38 C.F.R. § 1.475 is required, 38 U.S.C. § 7332(b)(1), or an order meeting the requirements of 38 U.S.C. § 7332(b)(2)(D) is required.

While we are in receipt of the Court's Orders dated December 6, 2019 and February 5, 2020, those orders only provide sufficient authorization for VA to produce records, under the Privacy Act, 5 U.S.C. § 552a, and 38 U.S.C. §§ 5701, and 7332, and 38 C.F.R. § 1.511; the Orders do not provide authorization to disclose information through deposition testimony.

**(i) Whether such release or testimony reasonably could be expected to result in the appearance of VA or the Federal government favoring one litigant over another; (j) Whether such release or testimony reasonably could be expected to result in the appearance of VA or the Federal government endorsing or supporting a position advocated by a party to the proceeding; and (l) The need to minimize VA's possible involvement in issues unrelated to its mission:**

Furthermore, you are seeking information from VA with the sole purpose of your client obtaining a favorable result in this matter. Because VA is not a party litigant, the Federal Government has no apparent interest, and the agency's involvement would not assist VA in performing its statutory duties of providing services and benefits to our nation's Veteran population, it would be inappropriate to favor, endorse, or support a position advocated by either party in this matter.

**(o) Other matters or concerns presented for consideration in making the decision:**

As stated above, your requests for records are duplicative and your request for Mrs. Parker's deposition is unduly burdensome and fails to consider federal governmental interest.

VA requires that a subpoena for documents and/or testimony be issued by a court of competent jurisdiction, specifically, signed by a judge or the court clerk. *See* 38 C.F.R § 1.576 (b)(11). However, the subpoena you submitted, was not issued by

a court of competent jurisdiction and provided no information as to the relevancy of the information requested, in particular, it was not signed by a judge but was rather issued under your signature. *See* Subpoena to Testify at a Deposition in a Civil Action To: Cheryl A. Parker (Aug. 19, 2020).

Additionally, the subpoena should include or be accompanied by, an affidavit or written statement, which contains a summary of the nature and relevance of the testimony or records sought. 38 C.F.R. § 14.805. The affidavit or written statement must include sufficient information to allow VA's Office of the General Counsel (OGC) to determine, in accordance with 38 C.F.R. § 14.804, whether VA personnel should be allowed to produce documents, testify in their official capacity, or testify about matters pertaining to VA. Id. Unfortunately, the subpoena you submitted, provided no information as to the relevancy of the information requested.

Once a proper subpoena is submitted along with an affidavit/written statement, we are required to consider the factors found in section 14.804, including the need to avoid spending the time and money of the United States for private purposes, to conserve the time of VA personnel for conducting their official duties, and to minimize the Department's possible involvement in issues unrelated to its mission.

For the foregoing reasons, we object to your Rule 45 subpoenas and deny your requests pursuant to VA's Touhy regulations in the above-mentioned proceedings. Accordingly, Mrs. Parker is not authorized to testify on September 14, 2020. VA notes that if you are willing to comply with the agency's Touhy regulations and narrow your request by taking reasonable steps to avoid imposing an undue burden or expense on the agency, we will reconsider your request. We look forward to the opportunity to further discuss your request and ways that VA can support our nation's Veterans.

Sincerely,

*Shaquana L. Cooper*

Shaquana L. Cooper, Esq.
Attorney
Office of General Counsel, Information Law Group

cc: DOJ Assistant Branch Director, Ms. Jacqueline Coleman Snead

Attachments:
- Redacted VA 10-5345 "Request for and Authorization to release Health Information" for Mr. Baker (Feb. 27, 2020) – 2 pages

- *Touhy* Request Relating to *In re: 3M Combat Arms Earplug Products Liability Litigation*, 3:19-md-2885-MCR-GRJ (July 28, 2020) – 5 pages

- Subpoena to Testify at a Deposition in a Civil Action To: Cheryl Parker (Aug. 19, 2020) – 3 pages

| Department of Veterans Affairs | **REQUEST FOR AND AUTHORIZATION TO RELEASE HEALTH INFORMATION** |
|---|---|

**PRIVACY ACT AND PAPER WORK REDUCTION ACT INFORMATION:** The Paperwork Reduction Act of 1995 requires us to notify you that this information collection is in accordance with the clearance requirements of section 3507 of the Act. We may not conduct or sponsor, and you are not required to respond to, a collection of information unless is displays a valid OMB number. We anticipate that the time expended by all individuals who must complete this form will average 2 minutes. This includes the time it will take to read the instructions, gather the necessary facts and fill out this form. The execution of this form does not authorize the release of information other than that specifically described below.

The information requested on this form is solicited under Title 38 U.S.C. The form authorizes release of information in accordance with the Health Insurance Portability and Accountability Act, 45 CFR Parts 160 and 164; 5 U.S.C. 552a; and 38 U.S.C. 5701 and 7332 that you specify. Your disclosure of the information requested on this form is voluntary. However, if the information including the last four of your Social Security Number (SSN) and Date of Birth (used to locate records for release) is not furnished completely and accurately, VA will be unable to comply with the request. The Veterans Health Administration may not condition treatment, payment, enrollment or eligibility on signing the authorization. VA may disclose the information that you put on the form as permitted by law. VA may make a "routine use" disclosure of the information as outlined in the Privacy Act system of records notices identified as 24VA10P2 "Patient Medical Record – VA", 08VA05 "Employee Medical File System Records (Title 38)-VA" and in accordance with the Notice of Privacy Practices. VA may also use this information to identify veterans and person claiming or receiving VA benefits and their records, and for other purposes authorized or required by law.

**TO: DEPARTMENT OF VETERANS AFFAIRS (Name and address of VA health care facility):**

All VBA and VHA Facilities

| LAST NAME-FIRST NAME-MIDDLE INITIAL | LAST 4 SSN | DATE OF BIRTH |
|---|---|---|
| Baker, Lloyd E. | ▮ | ▮ |

**NAME AND ADDRESS OF ORGANIZATION, INDIVIDUAL, OR TITLE OF INDIVIDUAL TO WHOM INFORMATION IS TO BE RELEASED**

BROWNGREER PLC, ATTN: ROMA PETKAUSKAS (electronically via secure share site link); 250 Rocketts Way, Richmond, Virginia 23231 - for the benefit of Lloyd Baker, MDL-C Plaintiff ID #19465

**PURPOSE(S) OR NEED: Information is to be used by the organization or individual for**

☐ Treatment    ☐ Benefits    ☒ Legal    ☐ Employment    ☐ Other – Please specify. _____

_____

**INFORMATION REQUESTED:** Check applicable box(es) and state the extent or nature of information to be provided:

☐ Health Summary (prior 2 years)
☐ Inpatient Discharge Summary (dates): _____
☐ Progress Notes:
　　☐ Specific clinics (name & date range): _____
　　☐ Specific providers (name & date range): _____
　　☐ Date range: _____
☐ Operative/Clinical Procedures (name &date): _____
☐ Lab results:
　　☐ Specific tests (name & date): _____
　　☐ Date range: _____
☐ Radiology Reports (name & date): _____
☐ List of Active Medications
☐ Flu Vaccination (dose, lot number, date & location)
☒ Other (describe below):
Requesting both the entire health file, as well as the entire compensation and pension claims file, but not education or mortgage records.

**VA Form 10-5345**
SEPT 2018

Page 1 of 2

| LAST NAME-FIRST NAME-MIDDLE INITIAL | LAST 4 SSN | DATE OF BIRTH |
|---|---|---|
| Baker - Lloyd - E | ▮▮▮▮ | ▮▮▮▮ |

**SENSITIVE DIAGNOSES:** REVIEW AND, IF APPROPRIATE, COMPLETE WHEN RELEASE IS FOR ANY PURPOSE OTHER THAN TREATMENT.

I request and authorize the Department of Veterans Affairs to release the information pertaining to the condition(s) below for the non-treatment purpose(s) listed in this authorization:

☒ Drug Abuse    ☒ Alcoholism or Alcohol Abuse    ☒ Sickle Cell Anemia

☒ Human Immunodeficiency Virus (HIV)

I understand that information on these sensitive diagnoses may be released for treatment purposes without me checking the above boxes, and will be released even if the boxes are unchecked <u>unless</u> I indicate by checking the box below that I do not want this information released for this specific disclosure.

☒ **I do not want sensitive diagnoses released for treatment purposes under this specific authorization. I realize this does not impact other future requests unrelated to this authorization.**

**AUTHORIZATION:** I certify that this request has been made freely, voluntarily and without coercion, or because a condition of VA employment mandates the signing of this authorization. The information given above is accurate and complete to the best of my knowledge. I understand that I will receive a copy of this form after I sign it. I may revoke this authorization in writing, at any time except to the extent that action has already been taken to comply with it. Written revocation is effective upon receipt by the Release of Information Unit at the facility housing records. Any information disclosed per this authorization may no longer be protected by Federal confidentiality laws or regulations and may be subject to re-disclosure by the recipient.

I understand that the VA health care provider's opinions and statements are not official VA decisions regarding whether I will receive other VA benefits or, if I receive VA benefits, their amount. They may, however, be considered with other evidence when these decisions are made at a VA Regional Office that specializes in benefit decisions.

**EXPIRATION:** Without my express revocation, the authorization will automatically expire

☒ After one-time disclosure, if all needs are satisfied

☐ On _____ (enter a future date other than date signed by patient)

☐ Under the following condition(s): _____

| PATIENT SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| *[signature]* | |
| | 02/27/2020 |
| LEGAL REPRESENTATIVE SIGNATURE (if applicable) | DATE (mm/dd/yyyy) |
| | |

| PRINT NAME OF LEGAL REPRESENTATIVE | RELATIONSHIP TO PATIENT |
|---|---|
| | |

**FOR VA USE ONLY**

Type and Extent of Material Released:

| Date Released: | Released by: |
|---|---|

VA Form 10-5345
SEPT 2018

Page 2 of 2

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, IL 60654
United States

Mark J. Nomellini
To Call Writer Directly:
+1 312 862 2410
mnomellini@kirkland.com

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

July 28, 2020

**By E-Mail**

Shaquana L. Cooper, Esq.
General Attorney
Office of the General Counsel
Information Law Group (024)
Shaquana.Cooper@va.gov

> Re:   *Touhy* Request Relating to *In re: 3M Combat Arms Earplug Products Liability Litigation*, 3:19-md-2885-MCR-GRJ  (N.D. Fla.).

Dear Ms. Cooper:

In connection with *In re: 3M Combat Arms Earplug Products Liability Litigation*—a multidistrict litigation pending before Judge Rodgers in the Northern District of Florida—this letter constitutes Defendants' 3M Company ("3M") and Aearo Technologies LLC's ("Aearo") *Touhy*[1] request to the United States Department of Veterans Affairs ("VA") to take the deposition of Dr. Cheryl A. Parker, an audiologist who is a current employee of the VA at the Ralph H. Johnson VA Medical Center located at 109 Bee Street, Charleston, SC 29401. Dr. Parker conducted at least one audiogram and hearing evaluation on Bellwether Plaintiff Lloyd Eugene Baker, including in October 2009 in connection with his application to the VA for disability benefits.

This letter also constitutes Defendants' *Touhy* request to the VA and to Dr. Parker to produce certain documents related to Dr. Parker's October 2009 audiogram and evaluation of Plaintiff Baker. Pursuant to 38 C.F.R. § 14.804 and 14.805, Defendants set forth the basis for their *Touhy* requests as follows:

---

[1] *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

Beijing   Boston   Dallas   Hong Kong   Houston   London   Los Angeles   Munich   New York   Palo Alto   Paris   San Francisco   Shanghai   Washington, D.C.

**KIRKLAND & ELLIS LLP**

Ms. Shaquana Cooper
July 28, 2020
Page 2

## I.    Summary of the Litigation

Plaintiffs in this litigation include servicemen and women who claim to have been issued Combat Arms Earplugs Version 2 ("CAEv2") in connection with their military service, including Plaintiff Baker.  The CAEv2 was initially designed and distributed by Aearo.  In 2008, 3M, purchased Aearo and continued to market and sell the CAEv2.  Servicemember plaintiffs in this litigation, including Plaintiff Baker, allege that the CAEv2 was defective and caused them to sustain serious injuries during their military service, including hearing damage.  The information sought by these *Touhy* requests will assist Defendants in establishing that the CAEv2 did not cause Plaintiff Baker's alleged hearing loss, and/or will relate to the alleged seriousness of Plaintiff Baker's injuries.

On February 27, 2020, the Court issued Pretrial Order No. 29, which selected twenty-five cases for the initial bellwether pool.  The parties are now conducting discovery in the initial bellwether cases.  Defendants took the deposition of Plaintiff Baker on July 21, 2020.

## II.    Summary of the Deposition Requested

Defendants request to take the deposition of Dr. Cheryl A. Parker.  Defendants seek to depose Dr. Parker regarding:  (i) the October 2009 hearing evaluation and audiogram appointment with Plaintiff Baker, and Dr. Parker's records relating to that evaluation (and any other hearing evaluations and audiograms that Dr. Parker conducted of Plaintiff Baker); (ii) Dr. Parker's notes from her evaluation(s) of Plaintiff Baker; (iii) Dr. Parker's evaluation of the October 2009 audiogram and associated notes; and (iv) any other evaluation or treatment that Dr. Parker did of Plaintiff Baker or appointments that Plaintiff Baker had with Dr. Parker.

## III.    Summary of the Documents Requested

### Specific Documents Requested

- All documents concerning the hearing evaluation and audiogram conducted on Plaintiff Baker by Dr. Parker in October 2009, or any previous and/or subsequent evaluation and audiogram.

- All documents relating to Plaintiff Baker and his hearing evaluation, hearing, and tinnitus.

- All documents, communications, and correspondence between Plaintiff Baker and Ralph H. Johnson VA Medical Center employees, including Dr. Parker.

# KIRKLAND & ELLIS LLP

Ms. Shaquana Cooper
July 28, 2020
Page 3

## IV.  Relevance of the Requested Documents and Deposition

Servicemember plaintiffs in this litigation, including Plaintiff Baker, allege that the CAEv2 was defective and caused them to sustain serious injuries during their military service, including hearing damage. The information sought by these *Touhy* requests will assist Defendants in establishing that the CAEv2 did not cause Plaintiff Baker's alleged hearing loss, and/or will relate to the alleged seriousness of Plaintiff Baker's injuries. The requested documents and deposition are relevant to address Plaintiff Baker's allegations that his hearing was injured due to use of the CAEv2 and to the extent/severity of his alleged injuries.

## V.  Additional Considerations

These requests comply with the VA policy regarding the provision of information by its employees in connection with litigation in federal court. Those factors are as follows:

1.  The need to avoid spending the time and money of the United States for private purposes and to conserve the time of VA personnel for conducting their official duties concerning servicing the Nation's veteran population;

2.  How the testimony or production of records would assist the VA in performing its statutory duties;

3.  Whether the disclosure of the records or presentation of testimony is necessary to prevent the perpetration of fraud or other injustice in the matter in question;

4.  Whether the demand or request is unduly burdensome or otherwise inappropriate under the applicable court or administrative rules;

5.  Whether the testimony or production of records, including release in camera, is appropriate or necessary under the rules of procedure in the Northern District of Florida, or matter in which the demand or request arose, or under substantive Florida state law concerning privilege;

6.  Whether the testimony or production of records would violate a statute, executive order, regulation or directive. (Where the production of a record or testimony as to the content of a record or about information contained in a record would violate a confidentiality statue's prohibition against disclosure, disclosure will not be made. Examples of such statutes are the Privacy Act, 5 U.S.C. 552a, and sections 5701, 5705, and 7332 of Title 38, United States Code.);

## KIRKLAND & ELLIS LLP

Ms. Shaquana Cooper
July 28, 2020
Page 4

7.      Whether the testimony or production of records, except when in camera and necessary to assert a claim of privilege, would reveal information properly classified pursuant to applicable statutes or executive orders;

8.      Whether the testimony would interfere with ongoing law enforcement proceedings, compromise constitutional rights, compromise national security interests, hamper VA or private health care research activities, reveal sensitive patient or beneficiary information, interfere with patient care, disclose trade secrets or similarly confidential commercial or financial information or otherwise inappropriate under the circumstances;

9.      Whether such release or testimony reasonably could be expected to result in the appearance of VA or the Federal government favoring one litigant over another;

10.     Whether such release or testimony reasonably could be expected to result in the appearance of VA or the Federal government endorsing or supporting a position advocated by a party to the proceeding;

11.     The need to prevent the public's possible misconstruction of variances between personal opinions of VA personnel and VA or Federal policy;

12.     The need to minimize the VA's involvement in issues unrelated to its mission;

13.     Whether the demand or request is within the authority of the party making it;

14.     Whether the demand or request is sufficiently specific to be answered;

15.     Other matters or concerns presented for consideration in making the decision.

*See* 38 C.F.R. § 14.804.

## VI.    Administrative Matters

Defendants will bear the costs of duplicating and producing the documents sought by this *Touhy* request. Costs will be paid by check or money order payable to the Treasury of the United States. For ease of production, all electronically stored information can be produced via a secure file transfer protocol site that will be provided free of charge or via electronic storage media that will be provided to you at no charge and upon your request. Any requests for assistance with the

## KIRKLAND & ELLIS LLP

Ms. Shaquana Cooper
July 28, 2020
Page 5

transmittal of electronically stored documents, or coordination of the inspection of documents should be made to Mark Nomellini, counsel for Defendants, at (312) 862-2410 or mnomellini@kirkland.com. Additionally, to the extent the VA believes any of the requested information does not implicate the statutory considerations set forth above, Defendants are willing to work with the VA to narrow the scope of the request.

      If you anticipate that full production will require more than ten (10) days from the date of service, we request that you notify the parties and/or the Court. Should you have any questions or require additional information about this Touhy request, please do not hesitate to contact me. Thank you for your assistance.

Sincerely,

*Mark J. Nomellini*

Mark J. Nomellini

cc:    Jacqueline Snead, Associate General Counsel
       Department of Justice
       Jacqueline.snead@usdog.gov

       Plaintiff Co-Lead and Co-Liaison
       Counsel, Discovery and ESI Subcommittee, Jennifer Hoekstra

       Major Nicole Kim, Major, U.S. Army
       nicole.m.kim2@mil.mail.mil

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

## for the

### Northern District of Florida

| | | |
|---|---|---|
| Lloyd E. Baker | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.    7:20-cv-00039-MCR-GRJ |
| 3M Defendants, et al. | ) | |
| | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:        Cheryl A. Parker, 109 Bee Street, Charleston, SC 29401

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: ~~The Belmond Charleston Hotel~~ 205 Meeting Street, Charleston, SC 29401, or, in the alternative, via remote deposition | Date and Time: 09/14/2020 9:00 am |
|---|---|

The deposition will be recorded by this method:    Stenographic and Videographic

❒ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

       The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    08/19/2020

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Larry Hill |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Defendants, 3M Company, et al.                           , who issues or requests this subpoena, are:
Larry Hill, Moore, Hill & Westmoreland, 350 W. Cedar St., Pensacola, FL 32505, lhill@mhw-law.com, 850-434-3541

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.    7:20-cv-00039-MCR-GRJ

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT 5

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

Mark J. Nomellini
To Call Writer Directly:
+1 312 862 2410
mnomellini@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

July 28, 2020

**By E-Mail**

Shaquana L. Cooper, Esq.
General Attorney
Office of the General Counsel
Information Law Group (024)
Shaquana.Cooper@va.gov

Re:     *Touhy* Request Relating to *In re: 3M Combat Arms Earplug Products Liability Litigation*, 3:19-md-2885-MCR-GRJ  (N.D. Fla.).

Dear Ms. Cooper:

In connection with *In re: 3M Combat Arms Earplug Products Liability Litigation*—a multidistrict litigation pending before Judge Rodgers in the Northern District of Florida—this letter constitutes Defendants' 3M Company ("3M") and Aearo Technologies LLC's ("Aearo") *Touhy*[1] request to the United States Department of Veterans Affairs ("VA") to take the deposition of Dr. Cheryl A. Parker, an audiologist who is a current employee of the VA at the Ralph H. Johnson VA Medical Center located at 109 Bee Street, Charleston, SC 29401. Dr. Parker conducted at least one audiogram and hearing evaluation on Bellwether Plaintiff Lloyd Eugene Baker, including in October 2009 in connection with his application to the VA for disability benefits.

This letter also constitutes Defendants' *Touhy* request to the VA and to Dr. Parker to produce certain documents related to Dr. Parker's October 2009 audiogram and evaluation of Plaintiff Baker. Pursuant to 38 C.F.R. § 14.804 and 14.805, Defendants set forth the basis for their *Touhy* requests as follows:

---

[1] *United States ex rel. Touhy v. Ragen,* 340 U.S. 462 (1951).

## KIRKLAND & ELLIS LLP

Ms. Shaquana Cooper
July 28, 2020
Page 2

**I.      Summary of the Litigation**

Plaintiffs in this litigation include servicemen and women who claim to have been issued Combat Arms Earplugs Version 2 ("CAEv2") in connection with their military service, including Plaintiff Baker. The CAEv2 was initially designed and distributed by Aearo. In 2008, 3M, purchased Aearo and continued to market and sell the CAEv2. Servicemember plaintiffs in this litigation, including Plaintiff Baker, allege that the CAEv2 was defective and caused them to sustain serious injuries during their military service, including hearing damage. The information sought by these *Touhy* requests will assist Defendants in establishing that the CAEv2 did not cause Plaintiff Baker's alleged hearing loss, and/or will relate to the alleged seriousness of Plaintiff Baker's injuries.

On February 27, 2020, the Court issued Pretrial Order No. 29, which selected twenty-five cases for the initial bellwether pool. The parties are now conducting discovery in the initial bellwether cases. Defendants took the deposition of Plaintiff Baker on July 21, 2020.

**II.      Summary of the Deposition Requested**

Defendants request to take the deposition of Dr. Cheryl A. Parker. Defendants seek to depose Dr. Parker regarding: (i) the October 2009 hearing evaluation and audiogram appointment with Plaintiff Baker, and Dr. Parker's records relating to that evaluation (and any other hearing evaluations and audiograms that Dr. Parker conducted of Plaintiff Baker); (ii) Dr. Parker's notes from her evaluation(s) of Plaintiff Baker; (iii) Dr. Parker's evaluation of the October 2009 audiogram and associated notes; and (iv) any other evaluation or treatment that Dr. Parker did of Plaintiff Baker or appointments that Plaintiff Baker had with Dr. Parker.

**III.      Summary of the Documents Requested**

**Specific Documents Requested**

- All documents concerning the hearing evaluation and audiogram conducted on Plaintiff Baker by Dr. Parker in October 2009, or any previous and/or subsequent evaluation and audiogram.

- All documents relating to Plaintiff Baker and his hearing evaluation, hearing, and tinnitus.

- All documents, communications, and correspondence between Plaintiff Baker and Ralph H. Johnson VA Medical Center employees, including Dr. Parker.

## KIRKLAND & ELLIS LLP

Ms. Shaquana Cooper
July 28, 2020
Page 3

**IV.    Relevance of the Requested Documents and Deposition**

Servicemember plaintiffs in this litigation, including Plaintiff Baker, allege that the CAEv2 was defective and caused them to sustain serious injuries during their military service, including hearing damage. The information sought by these *Touhy* requests will assist Defendants in establishing that the CAEv2 did not cause Plaintiff Baker's alleged hearing loss, and/or will relate to the alleged seriousness of Plaintiff Baker's injuries. The requested documents and deposition are relevant to address Plaintiff Baker's allegations that his hearing was injured due to use of the CAEv2 and to the extent/severity of his alleged injuries.

**V.    Additional Considerations**

These requests comply with the VA policy regarding the provision of information by its employees in connection with litigation in federal court. Those factors are as follows:

1.   The need to avoid spending the time and money of the United States for private purposes and to conserve the time of VA personnel for conducting their official duties concerning servicing the Nation's veteran population;

2.   How the testimony or production of records would assist the VA in performing its statutory duties;

3.   Whether the disclosure of the records or presentation of testimony is necessary to prevent the perpetration of fraud or other injustice in the matter in question;

4.   Whether the demand or request is unduly burdensome or otherwise inappropriate under the applicable court or administrative rules;

5.   Whether the testimony or production of records, including release in camera, is appropriate or necessary under the rules of procedure in the Northern District of Florida, or matter in which the demand or request arose, or under substantive Florida state law concerning privilege;

6.   Whether the testimony or production of records would violate a statute, executive order, regulation or directive. (Where the production of a record or testimony as to the content of a record or about information contained in a record would violate a confidentiality statue's prohibition against disclosure, disclosure will not be made. Examples of such statutes are the Privacy Act, 5 U.S.C. 552a, and sections 5701, 5705, and 7332 of Title 38, United States Code.);

## KIRKLAND & ELLIS LLP

Ms. Shaquana Cooper
July 28, 2020
Page 4

7.   Whether the testimony or production of records, except when in camera and necessary to assert a claim of privilege, would reveal information properly classified pursuant to applicable statutes or executive orders;

8.   Whether the testimony would interfere with ongoing law enforcement proceedings, compromise constitutional rights, compromise national security interests, hamper VA or private health care research activities, reveal sensitive patient or beneficiary information, interfere with patient care, disclose trade secrets or similarly confidential commercial or financial information or otherwise inappropriate under the circumstances;

9.   Whether such release or testimony reasonably could be expected to result in the appearance of VA or the Federal government favoring one litigant over another;

10.  Whether such release or testimony reasonably could be expected to result in the appearance of VA or the Federal government endorsing or supporting a position advocated by a party to the proceeding;

11.  The need to prevent the public's possible misconstruction of variances between personal opinions of VA personnel and VA or Federal policy;

12.  The need to minimize the VA's involvement in issues unrelated to its mission;

13.  Whether the demand or request is within the authority of the party making it;

14.  Whether the demand or request is sufficiently specific to be answered;

15.  Other matters or concerns presented for consideration in making the decision.

See 38 C.F.R. § 14.804.

## VI.   Administrative Matters

Defendants will bear the costs of duplicating and producing the documents sought by this Touhy request. Costs will be paid by check or money order payable to the Treasury of the United States. For ease of production, all electronically stored information can be produced via a secure file transfer protocol site that will be provided free of charge or via electronic storage media that will be provided to you at no charge and upon your request. Any requests for assistance with the

## KIRKLAND & ELLIS LLP

Ms. Shaquana Cooper
July 28, 2020
Page 5

transmittal of electronically stored documents, or coordination of the inspection of documents should be made to Mark Nomellini, counsel for Defendants, at (312) 862-2410 or mnomellini@kirkland.com. Additionally, to the extent the VA believes any of the requested information does not implicate the statutory considerations set forth above, Defendants are willing to work with the VA to narrow the scope of the request.

If you anticipate that full production will require more than ten (10) days from the date of service, we request that you notify the parties and/or the Court. Should you have any questions or require additional information about this Touhy request, please do not hesitate to contact me. Thank you for your assistance.

Sincerely,

*Mark J. Nomellini*

Mark J. Nomellini

cc:     Jacqueline Snead, Associate General Counsel
        Department of Justice
        Jacqueline.snead@usdog.gov

        Plaintiff Co-Lead and Co-Liaison
        Counsel, Discovery and ESI Subcommittee, Jennifer Hoekstra

        Major Nicole Kim, Major, U.S. Army
        nicole.m.kim2@mil.mail.mil

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:20-mc-00025 |
| Petitioner, | |
| v. | |
| 3M COMPANY, | |
| Respondent. | |

## UNITED STATES OF AMERICA'S PETITION TO QUASH SUBPOENA

Petitioner the United States of America respectfully petitions the Court to quash the amended subpoena issued by Respondent 3M Company ("3M") for the deposition of Dr. William J. Murphy, an employee of the United States Centers for Disease Control and Prevention (the "CDC").  The amended subpoena seeks to compel Dr. Murphy to be deposed on September 16, 2020.

A memorandum in support of this Motion follows.

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney


 s/ Matthew J. Horwitz
MATTHEW J. HORWITZ (0082381)
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513)684-3711
Email: Matthew.Horwitz@usdoj.gov

## MEMORANDUM IN SUPPORT

## I.    INTRODUCTION

The CDC files this Petition to quash a subpoena by 3M for deposition
testimony from a CDC scientist, Dr. William J. Murphy, in litigation in which
neither the United States nor the CDC is a party.  As required by federal law, 3M
previously submitted an administrative request for Dr. Murphy's testimony and
associated documents.  The CDC granted, in part, 3M's request.  The CDC denied
3M's request for a deposition of Dr. Murphy, but produced a detailed declaration
from Dr. Murphy with related agency records.  Nonetheless, 3M has served a
subpoena on Dr. Murphy seeking the same testimony that it sought, and was
denied, in its administrative request.  In so doing, 3M ignores both the intervening
denial of its government contractor defense, which was one of the principal reasons
proffered in its administrative request for Dr. Murphy's deposition, and the fact
that the CDC has provided substantial responsive information to 3M by declaration.
CDC has objected in writing to the subpoena, and it now files this Petition
requesting the Court quash the subpoena.

3M's subpoena for Dr. Murphy's testimony should be quashed for several
reasons.  First, the Court may only compel testimony by federal officials when it
finds that an agency's denial of such testimony is arbitrary and capricious.  Here,
CDC denied the request for Dr. Murphy's testimony after performing a reasonable
and thorough analysis of 3M's request.  CDC's denial was neither arbitrary nor
capricious.  Second, the requested deposition would be needlessly duplicative and

2

cumulative, given the declaration and records previously produced by the CDC.

Third, and finally, the requested deposition would be unduly burdensome to the

CDC, both individually and cumulatively. Dr. Murphy is actively engaged in the

CDC's efforts to address the COVID-19 pandemic, and Dr. Murphy should not be

compelled to set aside those important duties to prepare for and attend a deposition

for litigation in which neither the United States nor the CDC are parties.

## II.     BACKGROUND

### A.     Applicable *Touhy* Regulations

The federal government authorizes the head of every Executive Branch

agency to "prescribe regulations for the government of his department, the conduct

of its employees, the distribution of its business, and the custody, use, and

preservation of its records, papers, and property." 5 U.S.C. § 301; *see also, United

States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951). Such regulations allow

federal agencies to determine "whether subpoenas . . . will be willingly obeyed or

challenged," thereby avoiding "the possibilities of harm from unrestricted disclosure

in court." *Touhy*, 340 U.S. at 468. These regulations impose a binding legal duty on

federal employees. *Frank v. U.S. Food and Drug Admin.*, 998 F.Supp.2d 596, 602

(E.D. Mich. 2014) (citing *Boron Oil Co. v. Downie*, 873 F.2d 67, 69–70 (4th Cir.

1989)).

The CDC is a component of the United States Department of Health and

Human Services ("HHS"). Pursuant to HHS regulations, current and former HHS

employees are not authorized to participate, give depositions or trial testimony, or

provide consultation regarding information acquired in the performance of their official duties in private litigation or other proceedings in which the United States is not a party, absent authorization by the agency.  45 C.F.R. § 2.3.  To request testimony from an HHS employee, a litigant must submit a request to the agency in writing, state the nature of the requested testimony, explain why the testimony is unavailable from any other source, and explain why the testimony would be in the interest of, and promote the objectives of, the agency.  45 C.F.R. § 2.4.  HHS, however, may only authorize an employee to testify in private litigation when "compliance with the request would promote the objectives of the Department."  45 C.F.R. § 2.3.  This policy exists to minimize the disruption of official duties and to further HHS's interest in maintaining impartiality in disputes between private litigants.  45 C.F.R. § 2.1.

**B.  Procedural History**

3M is a defendant in multi-district litigation pending in the Northern District of Florida related to the safety of 3M's products.  *See In re 3M Combat Arms Earplug Products Liability Litigation*, Case No. 3:19-md-2885 (N.D. Fla.).  The United States is not a party to that litigation, nor is the CDC or HHS.

In connection with that MDL, on February 6, 2020, 3M submitted a *Touhy* request to CDC seeking to interview and depose Dr. Murphy and another CDC employee not at issue here.[1]  (Exhibit 1, Request Letter, at 1.)  3M asserted that a deposition of Dr. Murphy was necessary because he was "involved in the testing of

---

[1] The February 6, 2020 *Touhy* request was 3M's second such request.  3M's first *Touhy* request is not at issue here.

the Combat Arms Earplugs Version 2 ("CAEv2")," one of the products at issue in the MDL action. (*Id.*) 3M sought to depose Dr. Murphy on the following topics: (1) test procedures, test protocols, and test results related to testing on the CAEv2, including an overview of the tests Dr. Murphy ran, how Dr. Murphy fit the CAEv2 during his testing, how Dr. Murphy determined the appropriate procedure for fitting the CAEv2 during testing, whether Dr. Murphy was able to maintain an appropriate fit, the results of Dr. Murphy's testing, and the attenuation achieving under various testing and fit conditions; and (2) correspondence or communications regarding the CAEv2 by Dr. Murphy and others. (*Id.* at 4.) 3M asserted this information was needed to show that the CAEv2 is not defective and that the government was on notice of CAEv2's performance capabilities and limitations, which 3M asserted to be relevant to its government contractor defense. (*Id.*)

3M asserted that public information was not sufficient for its purposes and a deposition was necessary because public information does not describe "how CAEv2 was 'fit' during testing, whether the flanges on the opposite end of the earplug were folded back during testing, and whether Mr. (sic) Murphy had difficulty achieving or maintaining an adequate fit during his testing." (*Id.* at 5.) 3M further asserted that a deposition would further the agency's interest in "being a good federal citizen" and would "aid the Court's desire that the parties complete government discovery related to the government contractor defense in a timely manner." (*Id.*)

The CDC responded to 3M's *Touhy* request on July 23, 2020. (Exhibit 2, Response Letter, at 1.) The CDC denied 3M's request for a deposition of Dr.

Murphy, but agreed to provide a declaration from Dr. Murphy regarding the information requested by 3M, along with various responsive documents.  (*Id.* at 2.)  The CDC explained that providing requested information by declaration rather than deposition was "less burdensome . . ., more time efficient, and will avoid significant interruption of Dr. Murphy's official duties as a federal government employee."  (*Id.*)  The CDC also noted that a declaration was particularly appropriate given Dr. Murphy's "minor role in this matter" and "the ever-present demands that have been placed on [the National Institute for Occupational Safety and Health ("NIOSH")], CDC, and the Department in responding to the ongoing Coronavirus Disease 2019 pandemic."  (*Id.*)  Moreover, the CDC did not authorize Dr. Murphy to address testing that was not published or that did not concern the CAEv2 product.  (*Id.*)

Dr. Murphy's declaration was provided by CDC to 3M contemporaneously with CDC's response letter.  (Exhibit 3, Declaration of William J. Murphy.)  Dr. Murphy's declaration set forth his background as a research physicist with NIOSH, as well as his duties as a team leader for the Hearing Loss Prevention Research Team.  (*Id.* at 1.)  Dr. Murphy's declaration also described his testing procedures regarding the CAEv2, the fitting of the CAEv2 during testing, test results, and the attenuation results achieved with the CAEv2 during testing.  (*Id.* at 2-6.)  Dr. Murphy's declaration attached and explained his test reports, noting attenuation achieved during his testing by referencing specific portions of the testing reports. Dr. Murphy's declaration also explained in detail how the CAEv2 was fit during

6

testing. (*Id*. at 4-5.) Finally, in response to 3M's request for communications regarding CAEv2 testing, Dr. Murphy's declaration attached all responsive communications that Dr. Murphy could locate concerning CAEv2 and confirmed that he had no independent recollection of the communications or the circumstances surrounding the communications. (*Id*. at 6.)

On August 25, 2020, 3M issued a subpoena to Dr. Murphy for a deposition to be held on September 9, 2020. The following day, however, 3M issued an amended subpoena for Dr. Murphy. (Exhibit 4, Amended Subpoena.) The amended subpoena commanded Dr. Murphy to appear for deposition on September 16, 2020 in Cincinnati, Ohio or, alternatively, by remote means. (*Id*. at 1.) The amended subpoena stated that the topics for deposition would be the same topics as identified in 3M's written *Touhy* request. (*Id*.) Indeed, rather than separately set forth the topics for deposition, 3M's subpoena simply attaches and incorporates its written *Touhy* request. (*Id*.)

On September 9, 2020, CDC objected in writing to the subpoena. (Exhibit 5, Rule 45 Objection Letter.)

## III. ARGUMENT

### A. The Court Should Not Permit the Deposition of Dr. Murphy Unless it Determines that the CDC's Partial Denial of 3M's *Touhy* Request was Arbitrary or Capricious.

It is well-established that federal agencies have discretion to restrict testimony from or production of documents by their subordinates through properly promulgated regulations. *Touhy*, 340 U.S. at 468; *Boron Oil*, 873 F.2d 67, 69-70

(4th Cir. 1989) ("*Touhy* is part of an unbroken line of authority which directly supports [the] contention that a federal employee may not be compelled to obey a subpoena contrary to his federal employer's instructions under valid agency regulations."); *State of Louisiana v. Sparks*, 978 F.2d 226, 234 (5th Cir. 1992) ("As the Supreme Court has long held, such regulations unquestionably give [federal] employees the authority, when so ordered by supervisors, to refuse to comply with a subpoena ordering disclosure of confidential files when the United States is not a party to a legal action."). Such regulations ensure that federal employees' official time is spent on federal business and that agencies remain impartial in private litigation. *See, e.g., United States v. Marino*, 658 F.2d 1120, 1125 (6th Cir. 1981) (holding that federal agencies have "a legitimate interest in regulating access to government information contained in files or obtained by its employees during the scope of their official duties."); *Frank*, 998 F.Supp.2d at 602 ("this compromise between public and private interests is necessary to conserve agency resources and to prevent an agency from becoming embroiled in private litigation") (internal quotation and citation omitted).

If a litigant's *Touhy* request is denied, the litigant may challenge that decision only by seeking a ruling under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, that the agency's decision was arbitrary and capricious. *Rimmer v. Holder*, 700 F.3d 246, 262-63 (6th Cir. 2012) (plaintiff seeking review of FOIA denial "*could* have obtained review under the APA rather than FOIA if . . . he had pursued a *Touhy* request . . . ") (emphasis added); *see also, e.g., United States v.*

*Threat*, No. 09-20523, 2011 WL 5865076, at *1 (E.D. Mich. Nov. 22, 2011) ("if
[d]efendant is dissatisfied with the DEA's response to his *Touhy* request, his remedy
is an action against the DEA pursuant to the Administrative Procedure Act, and not
pursuant to a motion to compel."); *Metcalfe v. Ultimate Sys., Ltd.*, 346 F. Supp. 2d
950, 954 (N.D. Ohio 2004) (the requesting party "is not without a remedy: they may
file a collateral action seeking review of the agency's refusal to release the records
in federal court under the Administrative Procedure Act . . . "); *OhioHealth Corp. v.
U.S. Dep't of Veterans Affairs*, No. 2:14-cv-292, 2014 WL 4660092, at *3 (S.D. Ohio
Sept. 17, 2014) (finding that "[i]n reviewing a federal agency's decision pursuant to
its promulgated *Touhy* regulations under the Administrative Procedure Act, the
Court's role is 'narrow' . . . ").

The Sixth Circuit has not directly addressed whether challenges arising from
the denial of a *Touhy* request are treated differently based on whether the subpoena
for documents or testimony is issued by a federal or state court, and district courts
have split on this issue. Compare *U.S. v. Threat*, 2011 WL 5865076, *1 (E.D. Mich.
Nov. 22, 2011) with *Gischel v. University of Cincinnati*, 2018 WL 9945170, *3 (S.D.
Ohio June 26, 2018). Although *Rimmer* does not directly resolve this issue, the
Sixth Circuit held that APA standards would have governed the denial of a *Touhy*
request in that matter and cited decisions in which the applicable subpoenas were
issued from both federal and state courts. 700 F.3d at 263. The *Rimmer* decision
relies, for example, on *In re Boeh*, 25 F.3d 761, 767 (9th Cir. 1994), which held that
"an APA claim was the proper method for challenging an agency's refusal to produce

9

information" after agency denial of a *Touhy* request arising from a federal-court issued subpoena. Moreover, the rationale underlying the requirement that a litigant proceed in such circumstances under the APA—that the United States is entitled to sovereign immunity and may not be sued without its consent—applies with equal force to state and federal subpoenas. Finally, no such ambiguity exists in the Eleventh Circuit, where the MDL action is pending. In the Eleventh Circuit, a litigant may only enforce a subpoena following denial of their *Touhy* request if the district court determines that the agency's decision regarding the *Touhy* request was arbitrary and capricious under the APA. *Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1197 (11th Cir. 1991).

### B. The CDC's Partial Denial of 3M's *Touhy* Request was not Arbitrary or Capricious.

An agency's decision is arbitrary and capricious only if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. Nat'l Park Serv.*, 463 U.S. 29, 43 (1983). In assessing whether agency action is arbitrary and capricious, a court's review should be "narrow," and it should not substitute the judgment of the agency with its own preference. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). Rather, the Court's task is to determine whether the agency's decision is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S.

87, 105 (1983); *Hazelhurst v. Centers for Disease Control*, 2017 WL 3037808, \*6 (W.D. Tenn. July 18, 2017) (holding that CDC's denial of *Touhy* request was not arbitrary and capricious because CDC Director "offered detailed and case specific reasons for declining Plaintiff's request . . . .").

Here, 3M's subpoena seeking Dr. Murphy's testimony is nothing more than an attempt to compel the deposition of Dr. Murphy that it previously sought in its *Touhy* request and that CDC previously denied. Yet, the CDC thoroughly considered 3M's *Touhy* request and provided a detailed and case-specific response granting the request in part and denying the request in part. As described above, in response to 3M's Request, CDC produced a detailed declaration from Dr. Murphy disclosing: (1) his testing procedures regarding the CAEv2, (2) how the CAEv2 was fit during testing, (3) test results regarding the CAEv2, and (4) the attenuation achieved with the CAEv2 during testing. (Ex. 3, at 2-6.) Dr. Murphy's declaration also included all responsive communications that Dr. Murphy could locate concerning CAEv2. (*Id*. at 6.)

The only substantive limitation placed on Dr. Murphy's response to the request for testimony was that Dr. Murphy was not authorized to address testing that did not concern CAEv2 or testing that was not published. This limitation was not arbitrary or capricious. Testing unrelated to the CAEv2 was outside the scope of 3M's request and is irrelevant. Similarly, unpublished testing data is not representative of an official CDC position or conclusion, and the CDC properly

11

determined that it would be inappropriate for Dr. Murphy to offer testimony concerning such testing.

The CDC's approval of a response by declaration, rather than by deposition testimony, was also not arbitrary or capricious. As explained by the CDC in its response to 3M, the CDC's approval of a declaration from Dr. Murphy reflected his limited role regarding the CAEv2 product and avoided the substantial burden of a deposition on Dr. Murphy and the CDC. The CDC is actively engaged in responding to the ongoing COVID-19 pandemic, and Dr. Murphy is temporarily assigned to a team handling COVID-19 responsibilities relating to worker safety and health. (Ex. 5.) Compelling Dr. Murphy to sit for deposition would require Dr. Murphy to set aside his important duties to prepare for and attend a deposition covering the same topics for which he has already provided a sworn declaration. Such a deposition is duplicative and cumulative, offers no benefit to the agency, and would only serve to substantially burden Dr. Murphy's and the CDC's work.

It is also notable that one of 3M's primary assertions in its *Touhy* request was that the requested information was needed to support its government contractor defense. (Ex. 1, at 4.) This defense, however, was rejected by the MDL Court on summary judgment. (N.D. Fla Case No. 3:19-md-2885, Order, ECF No. 1280.) 3M has not limited its request for testimony or offered any explanation for why it still seeks testimony from Dr. Murphy purportedly on that issue.

Finally, in the unlikely event that the Court determines that the CDC's response to the *Touhy* request for testimony from Dr. Murphy was, in some manner,

arbitrary and capricious, "the proper remedy is to remand [the] issue back to the [agency] for further investigation and explanation," rather than to compel Dr. Murphy to attend a deposition. *OhioHealth Corp.*, 2014 WL 4660092, at \*7 (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

### C. The Amended Subpoena Should be Quashed Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure.

Rule 45(d)(3) of the Federal Rules of Civil Procedure requires the Court to quash or modify a subpoena that subjects a nonparty to an undue burden. Although Rule 45(d)(3) does not expressly include irrelevance as a basis for quashing a subpoena, "the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26." *Hendricks v. Total Quality Logistics*, LLC, 275 F.R.D. 251, 253 (S.D. Ohio 2011). Moreover, "[w]hen a nonparty challenges a subpoena on grounds that the request is over-burdensome, the party seeking the discovery must establish that the information sought is relevant." *Doe v. Ohio State University*, 2018 WL 1373868, \*2 (S.D. Ohio Mar. 19, 2018). "Courts will balance the need for discovery against the burden imposed on the person ordered to produce documents, and that person's status as a nonparty is a factor weighing against disclosure." *Id.* (citing *Katz v. Batavia Marine and Sporting Supplies, Inc.*, 984 F.2d 422, 424 (6th Cir. 1993)).

Here, the burden that a deposition would impose on the CDC and Dr. Murphy substantially outweighs any potential benefit to 3M. As discussed above, Dr. Murphy is presently engaged in important work relating to the ongoing COVID-19 pandemic, and a deposition would substantially disrupt that work. Moreover, it

is appropriate for the Court to consider the burden imposed on the federal government not only by this single request for deposition, but also the cumulative effect of depositions of the sort sought by 3M here. *See Hazlehurst*, 2017 WL 3037808, at *8 (CDC properly considered the "cumulative impact of allowing employees . . . to testify in private litigation" in denying *Touhy* request). Indeed, if each study, test, or report prepared by the CDC rendered its scientists proper subjects for deposition in private litigation relating to the subject matter of the study, test, or report, CDC personnel could be required to expend increasingly substantial portions of their time participating in private litigation rather than attending to their assigned duties.

In contrast to this heavy burden, the deposition seeks information that is irrelevant, cumulative, and duplicative. As discussed above, any information sought for purposes of bolstering 3M's government contractor defense is now irrelevant, as that defense has been rejected by the MDL Court. Moreover, any deposition of Dr. Murphy would be unnecessarily duplicative and cumulative, given the detailed declaration provided by Dr. Murphy in this matter, which addressed all—or substantially all—of 3M's topics of inquiry outlined in its *Touhy* request and amended subpoena (with the exception of information concerning any unpublished testing that may have been conducted by Dr. Murphy).

3M recently asserted in the MDL litigation that a deposition of Dr. Murphy is necessary to ask Dr. Murphy "detailed follow up questions about his published

studies." (N.D. Fla Case No. 3:19-md-2885, Motion, ECF No. 1317.)[2]  As examples, 3M identified a desire to ask Dr. Murphy why his studies were conducted, who requested the studies, and why the particular type of study was conducted, as opposed to other types of testing.  (*Id*. at Page 3-4.)  None of these questions, however, were posed by 3M in its *Touhy* request and none is identified in the amended subpoena (which simply refers back to 3M's *Touhy* request).  The Court should not compel Dr. Murphy to testify at deposition because his written declaration failed to answer questions that 3M never asked.[3]  Such a ruling would allow parties to avoid the consequences of making incomplete *Touhy* requests, and would vastly expand the circumstances in which agency personnel are subject to deposition.

## IV.  CONCLUSION

For the foregoing reasons, the CDC respectfully requests that the Court issue an Order quashing the Amended Subpoena.

(Signature on following page)

---

[2] 3M's motion regarding Dr. Murphy was denied by the Court as moot.  (N.D. Fla Case No. 3:19-md-2885, Order, ECF No. 1358.)
[3] In contrast, 3M's Touhy request specifically requested information for how the CAEv2 product was fit during testing, and Dr. Murphy's declaration provided a specific and detailed explanation.

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney


 s/ Matthew J. Horwitz
MATTHEW J. HORWITZ (0082381)
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513)684-3711
Fax: (513)684-6972
Email: Matthew.Horwitz@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of September, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which serves copies to all parties of record.  In addition, I served a copy of the foregoing by electronic mail to:

Ashley Neglia, Esq.
Kirkland & Ellis LLP
555 S.Flower Street
Los Angelos, CA 90071
(213) 680-8114
Ashley.Neglia@kirkland.com

Finally, to the extent that Respondent will not consent to service by electronic mail, the United States will promptly serve a copy of the forgoing by certified mail to Respondent and/or Respondent's counsel.

s/Matthew J. Horwitz
MATTHEW J. HORWITZ (0082381)
Assistant United States Attorney

16

## KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Nicholas F. Wasdin
To Call Writer Directly:
+1 312 862 3254
nick.wasdin@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

February 6, 2020

**Via Email**

Robert R. Redfield, MD
Director, Centers for Disease Control and
Prevention
1600 Clifton Road, N.E., MS D-14
Atlanta, Georgia 30333

Re:     Touhy Request Relating to *In re: 3M Combat Arms Earplug Products
        Liability Litigation*, 3:19-md-02885-MCR-GRJ (N.D. Fla.).

Dear Dr. Redfield:

In connection with *In re: 3M Combat Arms Earplug Products Liability Litigation*, a multidistrict litigation pending before the Northern District of Florida, this letter constitutes Defendants 3M Company ("3M") and Aearo Technologies LLC's ("Aearo") second *Touhy*[1] request to the United States Department of Health and Human Services ("DHHS") for certain documents described below, and to interview and depose two current or former employees of the National Institute for Occupational Safety and Health ("NIOSH"), a federal agency within the Center for Disease Control ("CDC"), who were involved in testing of the Combat Arms Earplugs Version 2 ("CAEv2"). Pursuant to 45 C.F.R. §§ 2.1 - 2.4, Defendants set forth the basis for their *Touhy* requests as follows:

### I.     Summary of the Litigation

3M was founded in 1902 as a small-scale mining venture in Northern Minnesota, and has grown into a global science company employing over 90,000 people and produces more than 60,000 products world-wide. Many of 3M's brands have become universally known, including Scotch™ Brand adhesive tapes, Post-it® Brand sticky notes, and Thinsulate™ thermal insulation, to name just a few. In addition to its consumer-side business, 3M also had a long-standing relationship with federal and state governments for well over fifty years and provides thousands of products designed to protect American troops and support their missions. In 2008, 3M

---

[1]     *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 2

purchased Aearo, who, at the time, was a global leader in personal protection equipment, headquartered in Indianapolis, Indiana. The acquisition helped 3M expand its occupational health and environmental safety platform by adding hearing protection, eyewear protection, and fall protection to its product lines, including Combat Arms Earplugs - the subject of this litigation. Combat Arms Earplugs represented a significant advance in hearing protection in that they were one of the first hearing protection devices to offer protection from high-level impulse noises, like gun-fire, while still allowing the user to hear lower level sounds, like speech, with limited interruption. Hearing loss is a common injury among military veterans. The U.S. military has provided hearing protection and preservation services to soldiers for decades. In support of that mission, the military employs audiologists to administer hearing conservation programs and work with outside contractors, like 3M, to advance their hearing protection goals.

The complaints in this litigation assert claims for alleged hearing loss or tinnitus allegedly caused by noise exposure to plaintiffs while wearing the CAEv2. CAEv2 was developed and designed by Aearo at the request of and in close consultation with U.S. military audiologists, including Dr. Doug Ohlin, former Program Manager, Hearing Conservation, U.S. Army Center for Health Promotion and Preventative Medicine. Specifically, the U.S. military and Aearo decided to modify and update Aearo's Ultrafit® triple-flanged earplug by including a specially patented filter created by the French-German Institute in Saint Louis, France ("ISL"). Thereafter, Aearo worked with the U.S. military and ISL to develop an earplug embodying ISL's patented technology, which ultimately became CAEv2. CAEv2 consists of two Ultra-fit type tips, one green and one yellow, attached to opposite sides of a plastic stem with a small opening at the center. The green end works like a conventional passive earplug, providing steady and continuous protection from ambient noise. In contrast, the yellow end allows sound to travel into the opening at the center of the earplug and through a sound channel and the patented filter before entering the ear. The filter allows lower-level sounds, such as speech, to pass through while reducing higher-level impulse noises, like gun-fire. Throughout the design process, Aearo worked closely with the U.S. military to ensure that CAEv2 would appropriately balance performance with military operational needs for soldiers and military personnel. These specifications were memorialized in a Medical Procurement Item Description ("MPID") that was used by the Defense Logistics Agency to solicit bids from Aearo for CAEv2.

On April 3, 2019, the Judicial Panel on Multidistrict Litigation entered an order transferring the consolidated cases and any tag-along actions to the Northern District of Florida. To date, tens of thousands of actions have been filed on behalf of current or former military personnel who allegedly were issued and used the CAEv2 during their service. Plaintiffs typically allege hearing loss and/or tinnitus as a result of noise exposure in military and combat settings, and assert claims for design defect, negligence, failure to warn, breach of warranties, and/or fraud. For example, Plaintiffs allege that the CAEv2 was "dangerously defective" because, among other things, (i) the CAEv2 does not provide adequate attenuation for certain noise exposures, (ii) the short length of the CAEv2 "prevented Plaintiffs from obtaining a proper fit and seal when inserting the device

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 3

into their ear canals," and (iii) the "design of the [CAEv2] also caused the device to loosen imperceptibly in Plaintiff's ear canals." (*See* Compl. ¶¶ 2, 6-7, 194) According to Plaintiffs, (i) Defendants "supplied this dangerously defective product to Plaintiffs and the United States military for more than a decade without Plaintiffs or the United States military having any knowledge of those defects and risks," and (ii) Defendants never warned Plaintiffs or the U.S. government that, to obtain the attenuation ratings achieved during product testing, "they reconfigured the device by folding back the flanges of the open end before inserting the closed end of the device into the ear canals of the test subjects." (*Id.* ¶ 5)

3M and Aearo deny these allegations. Among other things, product testing performed by the U.S. Government, Aearo, and other third parties demonstrates that the CAEv2 provides the intended levels of attenuation. Defendants were in active communication with the government during product development, and the government was aware of the product's performance capabilities and limitations.

In addition to defending Plaintiffs' claims on the merits, 3M and Aearo have also asserted the federal government contractor defense set forth in *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1998), because Aearo sold the CAEv2 to the U.S. military under government contracts and in accordance with the government's specifications. The government contractor defense applies where, as here: "(1) the United States approved reasonably precise specifications [for the product at issue]; (2) the [product] conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the [product] that were known to [it] but not to the United States." *See id.* at 512. Here, the CAEv2 was designed and manufactured in accordance with the military's specifications, which included a reasonably precise instruction to shorten the earplug to its allegedly defective length. The government was aware of CAEv2's performance capabilities and limitations, including any alleged "fitting" limitations caused by the product's length.

Much of the materials relevant to Plaintiffs' claims are in the possession of the U.S. Government. For example, service and medical records for individual Plaintiffs are in the possession of the VA and DOD. The DOD also has records related to, among other things, CAEv2 design and development, CAEv2 testing, noise exposure data, and hearing protection usage rates. The parties have been working with the VA, DOD and the Court to identify and produce these records, and to schedule the depositions of related government witnesses. The Court has directed the parties to endeavor to complete this phase of government discovery in February and March, 2020.

## II.     Interview And Deposition Requests

Defendants request an interview and deposition with (i) NIOSH employee William J. Murphy (wmurphy@cdc.gov; wjm4@cdc.gov); and (ii) former NIOSH fellow Dr. Mark Little

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 4

(tzl3@cdc.gov).[2]  Defendants request interviews occur prior to the depositions, and believe that such interviews will make the deposition process more efficient, including by (i) identifying the location of relevant documents and data in advance of the deposition, which will help avoid the need for additional depositions if a witness identifies relevant materials for the first time during a deposition; and (ii) minimizing unnecessary depositions through pre-deposition identification of any witness with minor roles or immaterial knowledge, which may reduce the time and expense of organizing a formal depositions for that witness.

A.    **William Murphy**

Mr. Murphy is or was a program coordinator for the NIOSH Hearing Loss Prevention Program.  Documents produced to date show that Mr. Murphy conducted testing on CAEv2 on various occasions between 2001 and 2015, and communicated the results of his testing to others in the government, including Army audiologist Doug Ohlin, and individuals at Aearo.  For example, the email attached as **Exhibit A** is an example of Mr. Murphy transmitting the results of 2001 impulse testing on CAEv2 to Doug Ohlin, Mark Little, others in the government, representatives of ISL, and representatives of Aearo.  Defendants seek to interview and depose Mr. Murphy regarding:  (i) test procedures, test protocols, and test results related to testing on the CAEv2, including an overview of the tests Mr. Murphy ran on the CAEv2, how Mr. Murphy fit the CAEv2 during his testing, how Mr. Murphy determined the appropriate procedure for fitting CAEv2 during his testing, whether Mr. Murphy was able to maintain an adequate fit during his testing, the results of Mr. Murphy's testing, and the attenuation achieved with CAEv2 under various testing and fit conditions; and (ii) correspondence and/or communications pertaining to CAEv2 between Mr. Murphy and others in the government, including the military, and/or representatives of Aearo or 3M.

The testing performed by Mr. Murphy is relevant to show that CAEv2 provides adequate attenuation and is not defective.  Mr. Murphy's testing, and his communications with Aearo or others in the government regarding the CAEv2, are also relevant to show that the government was on notice of CAEv2 performance capabilities and limitations, which is relevant to both Plaintiffs' failure to warn claims and Defendants' federal government contractor defense.  This information is not available from other less burdensome sources.  To be sure, some of Mr. Murphy's test reports

---

[2]    Defendants understand that Dr. Little is presently the chief of audiology at Eisenhower Army Medical Center. Accordingly, Defendants served a *Touhy* interview and deposition request related to Dr. Little on the Army. However, after subsequent discussion with counsel for NIOSH, Defendants are separately serving this *Touhy* request regarding Dr. Little on the CDC.  The point of contact for the related Army *Touhy* request is: Major Colin Evans, Litigation Attorney, General Litigation Branch, U.S. Army Legal Services Agency, 9275 Gunston Road, Ft. Belvoir, VA 22060, Office: 703-693-0352, Email: Collin.p.evans2.mil@mail.mil.  It is Defendants' understanding that Major Evans has been in contact with Dr. Little and can provide current contact information, if needed.

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 5

are publicly available, but (i) Defendants do not know if all of Mr. Murphy's test results are publicly available, and (ii) in any event, publicly available test reports do not describe details relevant to the claims and defenses in this case, including how CAEv2 was "fit" during testing, whether the flanges on the opposite end of the earplug were folded back during testing, and whether Mr. Murphy had difficulty achieving or maintaining an adequate fit during his testing.

Furnishing Mr. Murphy for an interview and deposition is in the interests of the federal government. In addition to the government's general interest in being a good federal citizen, furnishing Mr. Murphy for an interview and deposition will help expedite the discovery process between the federal government and Defendants in this case, and help aid the Court's desire that the parties complete government discovery related to the federal government contractor defense in a timely manner.

### B.     Dr. Mark Little

Dr. Mark Little was an Army audiologist who did a fellowship with NIOSH in the 2001 time period. Documents produced to date show that Dr. Little corresponded with Aearo representatives in 2001 regarding the CAEv2 while at NIOSH. For example, the correspondence attached as **Exhibit B** includes communications between Dr. Little and an Aearo representative in August and September 2001 regarding (i) CAEv2 test data; (ii) CAEv2 instructions for use; and (iii) certain product testing that Dr. Little intended to perform (referred to in Exhibit B as "Method B" testing). Defendants seek to interview and depose Dr. Little regarding: (i) test procedures, test protocols, and test results related to his testing on the CAEv2, including an overview of the tests Dr. Little ran on the CAEv2, how Dr. Little fit the CAEv2 during his testing, how Dr. Little determined the appropriate procedure for fitting CAEv2 during his testing, the results of Dr. Little's testing, and the attenuation achieved with CAEv2 under various testing and fit conditions; and (ii) correspondence and/or communications pertaining to CAEv2 between Dr. Little and others in the government, including the military, and/or representatives of Aearo or 3M.

The testing performed by Dr. Little is relevant to show that CAEv2 provides adequate attenuation and is not defective. Dr. Little's testing, and his communications with others in the government and Aearo regarding the CAEv2, are also relevant to show that the government was on notice of CAEv2's performance capabilities and limitations, which is relevant to both Plaintiffs' failure to warn claims and Defendants' federal government contractor defense. This information is not available from other less burdensome sources. Defendants' *Touhy* requests to the Department of Defense—including to each branch of the Armed Forces—have not resulted in discovery from the government related to the tests conducted by Dr. Little, or any communications with Dr. Little involving the CAEv2 (the communications attached as **Exhibit B** were located in Aearo's files, not the government's). Further, searches in the public domain have not revealed the details of any testing conducted by Dr. Little.

### KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 6

Furnishing Dr. Little for an interview and deposition is in the interests of the federal government. In addition to the government's general interest in being a good federal citizen, furnishing Dr. Little for an interview and deposition will help expedite the discovery process between the federal government and Defendants in this case, and help aid the Court's desire that the parties complete government discovery related to the federal government contractor defense in a timely manner.

### III.    Document Requests

Defendants request certain documents related to the government's testing of, and communications regarding, the CAEv2. Defendants are presently aware of at least two buckets of CAEv2 testing performed by or at NIOSH. *First*, as noted above, documents produced to date indicate William J. Murphy tested the CAEv2 on numerous occasions between 2001 and 2015. (*E.g.*, **Exhibit A**) *Second*, documents produced to date indicate that Dr. Mark Little tested the CAEv2 while doing a fellowship with NIOSH in approximately late 2001. These documents show that Dr. Little communicated with Defendants in August and September of 2001 regarding his intention to perform testing on the CAEv2 while at NIOSH, including so called "Method B" testing pursuant to certain ANSI standards. (*See* **Exhibit B**)

#### A.    Specific Documents Requested

Defendants request the following documents from NIOSH:

1.    Test reports, protocols, results, and analyses pertaining to any testing conducted on CAEv2 by William J. Murphy.[3]

2.    Communications between Mr. Murphy and others in the United States government, including Doug Ohlin and others in the military, pertaining to testing on, or the performance of, the CAEv2. An example of such a communication is attached as **Exhibit A**.

3.    Communications between Mr. Murphy and Defendants pertaining to testing on, or the performance of, the CAEv2. An example of such a communication is attached as **Exhibit A**.

---

[3]    For reference, Defendants are aware that Mr. Murphy conducted, among other tests on the CAEv2: (1) an October 2001 where Mr. Murphy performed impulse peak testing on the CAEv2 using a 9mm handgun and M16 rifle; and (2) a December 23, 2014 test entitled "Measurement of Impulse Peak Insertion Loss from two Acoustic Test Fixtures and Four Hearing Protector Conditions."

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 7

4. Test reports, protocols, procedures, results, and analyses pertaining to any testing conducted on CAEv2 by Mark Little.

5. Communications between Dr. Little (tzl3@cdc.gov) and Defendants (@compuserve and @aearo.com domain names) related to CAEv2, including instructions to be used during testing, test results, test procedures, test protocols, and analyses related to continuous and impulse noise testing on CAEv2. Examples of such communications attached at **Exhibits A and B.**

6. Communications between Dr. Little and others in the United States government, including Doug Ohlin and others in the military, related to CAEv2, including product instructions, test results, test procedures, test protocols, and analyses related to continuous and impulse noise testing on CAEv2. An example of such a communication is attached at **Exhibit A.**

7. Test reports, protocols, procedures, results, and analyses pertaining to any other testing conducted on CAEv2 by current or former employees of NIOSH.

**B.      Relevance of the Documents Requested**

The requested documents are relevant for two reasons. *First*, they are relevant to rebut two of Plaintiffs' core allegations in this case: (1) that the CAEv2 does not adequately attenuate noise; and (2) that the government was not aware of the CAEv2's performance capabilities and limitations. Defendants anticipate that the documents requested will show that the CAEv2 *does* adequately attenuates noise, and is not defective, and that the government was aware of the product's performance capabilities and limitations. *Second*, they are also relevant to Defendants' federal government contractor defense. For example, the third prong of the government contractor defense requires Defendants to show that "the supplier warned the United States about the dangers in the use of the [product] that were known to [it] but not to the United States." *See Boyle* at 487 U.S. at 512. Government testing, and the requested communications, are relevant to both (i) what product limitations were "known … to the United States" and (ii) the warnings provided to the United States by Defendants.

This information is not available from other less burdensome sources. To be sure, some of Mr. Murphy's test reports are publicly available, but (i) Defendants do not know if all of Mr. Murphy's test results are publicly available, and (ii) in any event, publicly available test reports do not describe details relevant to the claims and defenses in this case, including, for example, how CAEv2 was "fit" during testing, whether the flanges on the opposite end of the earplug were folded back during testing, and whether Mr. Murphy had difficulty achieving or maintaining an adequate fit during his testing, all of which details may be contained in non-publicly available documents and communications. Additionally, Defendants' *Touhy* requests to the Department of Defense—

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 8

including to each branch of the Armed Forces—have not resulted in discovery from the government related to the tests conducted by Dr. Little, or any communications with Dr. Little involving the CAEv2. Further, searches in the public domain have not revealed the details of any testing conducted by Dr. Little.

### IV.    Additional Considerations

These requests comply with the policy of the DHHS regarding the provision of documents, and of information by its employees in connection with litigation in federal court:

1.  Disclosure of the requested information is not unduly burdensome or otherwise inappropriate under the federal discovery rules.

2.  Disclosure of the requested information would be appropriate under the Federal Rules of Evidence and appropriate under the rules of the Northern District of Florida.

3.  Disclosure of the requested information would be appropriate under the Federal Rules of Civil Procedure and would not impact any concerns regarding privileged information pursuant to the rules of procedure governing this litigation.

4.  Disclosure of the requested information would not violate any statute, executive order, regulation, or directive.

5.  Disclosure of the requested information would not reveal any classified information, data restricted pursuant to AR 380-5, unclassified technical data withheld from public release pursuant to 32 C.F.R. § 250 or DoD Directive 5230.25, privileged safety information restricted from public release by DoD Directive 6055.7, AFI 31-401,  or other matters exempt from unrestricted disclosure.

6.  Disclosure of the requested information would not interfere with ongoing enforcement proceedings, compromise any constitutional rights, reveal the identity of an intelligence source or confidential informant, disclose trade secrets or similarly confidential commercial or financial information, or otherwise be inappropriate under the circumstances.

7.  Disclosure would not violate any person's expectation of confidentiality or privacy.

8.  The United States is not, and is not reasonably anticipated to be a party in this litigation.

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 9

### V.      Administrative Matters

Defendants will bear the costs of producing the documents and witnesses sought by this *Touhy* request. Costs will be paid by check or money order payable to the Treasury of the United States. To the extent the DHHS believes any of the requested information does not implicate the statutory considerations set forth above, Defendants are willing to work with the DHHS to narrow the scope of the requested interviews and depositions.

Should you have any questions or require additional information about this *Touhy* request, please do not hesitate to contact me at (312) 862-3254 or nick.wasdin@kirkland.com.

Sincerely,

Nicholas F. Wasdin

One of the Attorneys
Representing 3M

# EXHIBIT A

| From: | Murphy, William J. <wjm4@cdc.gov> |
|---|---|
| To: | Elliott Berger <eberger@compuserve.com>;Vern Larson (E-mail) <vlarson@bacou-dalloz.com>;Per Hiselius (E-mail) <phiselius@dallozsafety.com>;Armand Dancer (E-mail) <dancer@newel.net>;Doug Ohlin (E-mail) <douglas.ohlin@apg.amedd.army.mil> |
| CC: | Franks, John R. <jrf3@cdc.gov>;Little, Mark B. <tzl3@cdc.gov> |
| Sent: | 10/23/2001 11:22:57 PM |
| Subject: | Impulse peak levels |

Elliott, Vern, Per, Armand and Doug
I just finished the very preliminary analysis of peak levels and peak level
reductions of different protectors on the ISL mannequin. I thought you
might be interested in the external and internal peak levels and peak level
reductions.
B707II is Bilsom 707 impact II
CAELin and CAELin2 are the linear side of the Combat Arms Plug
CAENLin and CAENLin2 are the nonlinear side of Combat Arms Plug
ISLNLin and ISLNLin2 are the Bilsom 656/ISL nonlinear plug
PT6s is the Peltor Tactical 6S
SilELP97 is the Silencio Electronic Low Pro muff
PH10A is the Peltor H10A double shelled muff
PH9Bullseye is the Peltor Bullseye H9 muff
HLLeight is the Howard Light Lightning with Pro-Ears
HLThunder is the Howard Light Thunder muff with Pro-Ears
and the EAR Classic is well... Classic right?
==============Data Follows==============
Weapon Protector Elect. On? Outside Inside Attenuation
9MM B707II Yes 166.78 141.19 25.59
9MM B707II No 164.11 131.49 32.61
9MM CAELin No 163.86 135.08 28.78
9MM CAELin2 No 162.99 134.17 28.83
9MM CAENLin Yes 166.22 138.04 28.18
9MM CAENLin2 Yes 162.47 135.80 26.68
9MM EARClassic No 165.56 137.82 27.74
9MM HLLeightning Yes 166.01 135.81 30.20
9MM HLLeightning No 166.54 136.48 30.06
9MM HLThunder Yes 164.69 130.90 33.79
9MM HLThunder No 164.74 131.80 32.94
9MM ISLNLin Yes 166.73 150.32 16.41
9MM ISLNLin2 Yes 163.13 145.79 17.34
9MM PH10A No 164.47 130.26 34.21
9MM PH9Bullseye No 165.01 136.79 28.22
9MM PT6S Yes 163.37 135.71 27.66
9MM PT6S No 164.06 136.19 27.87
9MM SilELP97 Yes 167.66 149.71 17.95
9MM SilELP97 No 167.06 149.40 17.66
M16 B707II Yes 161.67 129.33 32.34
M16 B707II No 161.60 129.57 32.03
M16 CAELin No 169.38 141.10 28.28
M16 CAELin2 No 169.08 140.22 28.86
M16 CAENLin Yes 168.25 143.18 25.07
M16 CAENLin2 Yes 169.34 143.61 25.73
M16 EARClassic No 163.40 137.18 26.21
M16 HLLeightning Yes 169.02 137.02 32.00
M16 HLLeightning No 170.07 139.19 30.87
M16 HLThunder Yes 170.78 145.01 25.77
M16 HLThunder No 170.70 144.68 26.03
M16 ISLNLin Yes 166.78 150.88 15.90
M16 ISLNLin2 Yes 170.64 152.83 17.81
M16 PH10A No 162.84 130.43 32.40
M16 PH9Bullseye No 163.05 135.36 27.70
M16 PT6S Yes 160.78 133.79 26.98
M16 PT6S No 160.16 134.54 25.62
M16 SilELP97 Yes 163.65 144.60 19.05
M16 SilELP97 No 163.55 144.81 18.74

3M Confidential

3M00027126

Confidential - Subject To Protective Order

3M_MDL000024875

# EXHIBIT B



3M Confidential

Confidential - Subject To Protective Order

3M00020409

3M_MDL000018428

Major Mark Little                                                    September 18, 2001
NIOSH
Robert Taft Laboratories
Mailstop C-27
4676 Columbia Pkwy.
Cincinnati, OH 45226-1998

Dear Mark:

In response to our conversation this morning I have put together the following information on the Combat Arms Earplug (CAE).

- A consumer package is enclosed. In that market we sell the product as the Indoor/Outdoor Range E•A•R® Plugs. You can use the instructions from the package for your Method B testing. You can also find that product listed on our web site under the AO Safety brand name, consumer products, hunters/shooters. The exact address is: http://www.aosafety.com/shooters/products/ear_03.htm.
- A copy of a letter from Pascal Hamery from January 2000 in which he provides insertion loss data in impulsive noise, measured on the ISL blockhead for the CAE.
- REAT test reports for both ends of the CAE measured according to ANSI S3.19.

Regarding our quality tests on the CAE, I reviewed our files and can verify that we conduct quality checks using an acoustic impedance device to assure that the plugs have been assembled properly, that the cartridges are in place, and that the dimensions of the orifice fall within our specifications. Our quality program is in conformance with ISO 9001.

This should provide you the information you require to develop your own program of evaluation of the CAE. I look forward to hearing from you as you embark upon your research.

Sincerely,


Elliott H. Berger
Senior Scientist, Auditory Research

Encl.:   1 consumer pkg. Of Indoor/Outdoor Range plugs
         Copy of ISL impulsive data for the CAE
         REAT evaluations for CAE, both ends


Mark Little CAE1.doc

3M Confidential – Attorneys' Eyes Only                           3M00008624

Confidential - Subject To Protective Order                      3M_MDL000008624



3M Confidential

Confidential - Subject To Protective Order

3M00020410

3M_MDL000018429



bump tests described in earlog 19 which you can access at
http//www.aearo.com/html/industrial/earlog.htm

Finally, do the sealing rings of the
outward facing plug that were rolled back upon themselves during fitting, as
per the instructions, stay this way in the ear or should they be unrolled??
they should stay that way

3M Confidential

Confidential - Subject To Protective Order

3M00020411

3M_MDL000018430

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES                    Public Health Service

Centers for Disease Control
and Prevention (CDC)
Atlanta GA 30329-4027

July 23, 2020

Nicholas Wasdin
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654

Re: Request for Documents, Interview, and Deposition Testimony –
In re: 3M Combat Arms Earplug Products Liability Litigation, 3:19-md-02885-MCR-
GRJ (N.D. Fla.).

Dear Mr. Wasdin:

This is in response to your February 6, 2020, letter requesting documents, an interview, and
testimony from an employee of the National Institute for Occupational Safety and Health
(NIOSH), within the Centers for Disease Control and Prevention (CDC), a component of the
Department of Health and Human Services (HHS or the Department), and a former fellow of
NIOSH, on behalf of Defendants 3M Company (3M) and Aearo Technologies LLCs (Aearo) in
the above-captioned litigation. In your letter, you sought to interview and depose two
individuals, Drs. William Murphy and Mark Little, on a number of aspects of NIOSH's tests of
the CAEv2 earplugs that are at the heart of the underlying litigation.

Pursuant to HHS regulations codified in 45 C.F.R. Part 2, current and former HHS employees
are not authorized to participate, give depositions or trial testimony, or provide consultation
regarding information acquired in the performance of their official duties in private litigation or
other proceedings in which the United States is not a party, absent authorization by the agency.
The bases for this policy, as articulated in Section 2.1(b), are to minimize the disruption of
official duties and the necessity of the Department to maintain impartiality in disputes between
private litigants. In United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951), the Court
recognized the authority of federal agencies to direct their employees' involvement in such
actions. The Eleventh Circuit U.S. Court of Appeals has also specifically recognized HHS's
authority to limit the involvement of CDC employees in such litigation.

Section 2.4 of the Touhy testimony regulations requires the satisfaction of three criteria before
testimony by a current or former HHS employee is allowed. First, the request must be made in
writing and state the nature of requested testimony. Second, the request must explain why the
testimony is unavailable by any other means. Finally, the request must provide reasons why the
testimony would be in the interests of or promote the objectives of HHS.

Section 2.1(b) of the Touhy regulations provides that it is HHS's policy to provide information,
data, and records to private litigants to the same extent and in the same manner that they are
made available to the general public. Further, when subject to the jurisdiction of a court
presiding over non-federal party litigation, it is HHS's policy to abide by all applicable
procedural and substantive rules when releasing such documents.

Page 2 - Nicholas Wasdin

Dr. William Murphy:
After consulting with the Office of the General Counsel (OGC) regarding your request, I have
determined that Dr. William Murphy's providing a declaration in lieu of an interview and
deposition, in addition to certain records, is appropriate and in the best interests of NIOSH. This
is because specific aspects of the testimony and documents you seek are in the interest of
HHS/CDC to provide, to the extent not otherwise available through production of documents
through the Freedom of Information Act (FOIA) or through relevant testimony and documents
available in the private sector or from other federal agencies.

Please note, however, that your request for records is denied to the extent that it includes all test
reports, protocols, results, and analyses pertaining to the testing conducted on CAEv2 by Mr.
Murphy and any other current or former NIOSH employees that have been released previously to
Mr. Wasdin via email on April 22, 2019, and/or also materials that are made publicly
available. Only relevant documents relating to communications between Dr. Murphy, 3M,
Aearo, and any other federal entity on the testing of CAEv2 will be disclosed.

While the U.S. government is not currently a party intervenor to this litigation, providing a
declaration and certain responsive documents is in NIOSH's interest because disclosing the
requested information in this manner is less burdensome on the Institute, more time efficient, and
will avoid significant interruption of Dr. Murphy's official duties as a federal government
employee. Further, the provision of information in the format of a declaration is a more suitable
approach given Dr. Murphy's minor role in this matter and the ever-present demands that have
been placed on NIOSH, CDC and the Department in responding to the ongoing Coronavirus
Disease 2019 pandemic.

Moreover, it serves NIOSH and HHS's best interest to respond affirmatively to this request
given the involvement of other Federal entities, by virtue of the Defendant's Touhy requests
served on those departments, and for purposes of assisting in the coordinated approach of
providing relevant information on behalf of the Federal Government for this matter.

Thus, in the interest of NIOSH in this litigation, I am authorizing the requested documents and
allowing for the submission of the enclosed declaration by CDC employee William Murphy
subject to the parameters below:

1. The scope of the declaration will be limited to a general explanation of Dr. Murphy's
   testing procedures, the fitting of the CAEv2 during his testing, his test results, and the
   attenuation achieved with the CAEv2. Dr. Murphy has not been authorized to address any
   testing he conducted that was not published or that did not concern the CAEv2.
2. The production of documents is partially granted with the permitted release of relevant
   communications between Dr. Murphy, the Defendants, and other federal entities
   pertaining to the testing of the CAEv2. As previously stated, any documents on the
   testing and results concerning the CAEv2 that were finalized and published by NIOSH
   were provided to Mr. Wasdin prior to this Touhy request. As a result of Dr. Murphy's
   and the CDC IT department's thorough search of his electronic and hard copy records,
   the aforementioned relevant documents are enclosed herein.

Page 3 – Nicholas Wasdin

Dr. Mark Little:

Your request seeks the interview and deposition of, including records pertaining to, Dr. Mark
Little who participated in a fellowship with NIOSH in 2001. During his fellowship with NIOSH,
however, Dr. Little was and remains an employee of the Department of the Army. Accordingly, I
have coordinated our response to your requests with both HHS OGC and the Department of the
Army, as detailed below.

First, with regard to your request for an interview and deposition of Dr. Little, in consultation
with OGC and the Department of the Army, I am denying that request and, alternatively,
authorizing a declaration, which is enclosed. Dr. Little lacks almost any recollection of his duties
during his fellowship with NIOSH or his participation in any study of the CAEv2. Moreover, the
published results of all NIOSH testing on CAEv2 during Dr. Little's fellowship already have
been provided to 3M. Thus, to minimize any burden on NIOSH and to obviate any inefficient use
of time or resources by Dr. Little, NIOSH, or OGC, while still accommodating your request, Mr.
Little has provided the enclosed declaration.

Regarding your request for documents, NIOSH and Dr. Little have conducted a search for
documents, including email correspondence, and identified a small number of responsive
documents. Accordingly, in coordination with the Department of the Army, as his employer, I
am authorizing the release of the enclosed requested email communications involving Dr. Little.

This limited approval of your Touhy request is not an endorsement by HHS or CDC of the
accuracy of any statements made by Dr. Murphy or Dr. Little in their declarations.

Please contact L. Michael Rafky in the HHS Office of the General Counsel with any questions
regarding this Touhy approval. You can reach him at LRafky@cdc.gov or (404) 267-3455 (cell).

Sincerely,

Robert R. Redfield, MD
Director, CDC

cc:     Jacqueline Coleman Snead
        Frank Hearl
        Brandy Vaughn
        Dr. William Murphy
        Dr. Mark Little

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:19-md-02885 |
| | ) | |
| 3M Company, 3M Occupational Safety LLC, | ) | |
| Aearo Holding LLC, Aearo Intermediate | ) | |
| LLC, Aearo LLC and Aearo Technologies | ) | |
| LLC | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF WILLIAM J. MURPHY**

I, William J. Murphy, declare as follows:

(1)     I am a research physicist with the National Institute for Occupational Safety and Health (NIOSH) in Cincinnati, OH. I completed a Ph.D. in physics with an emphasis in hearing science at Purdue University in December 1992. I was hired by NIOSH as a civil servant Physical Scientist, GS Series-1310, and started work at NIOSH on December 14, 1992. I was commissioned as a scientist officer with the temporary rank of Lieutenant in the Commissioned Corps of the United States Public Health Service on February 8, 1993. I was promoted to the temporary rank of Lieutenant Commander January 1, 1996, promoted to temporary rank of Commander January 1, 2001, and promoted to temporary rank of Captain on January 1, 2008. I served as a team leader for the Hearing Loss Prevention Research Team in the Engineering and Physical Hazards Branch, Division of Applied Research and Technology, NIOSH, from October 1, 2004 to May 1, 2015. Since May 1, 2015, I have served as the Coordinator for the Hearing Loss Prevention Research Cross sector at NIOSH.

1

(2)     In my official capacity as a research physicist with NIOSH, I managed several

research projects related to understanding the performance of hearing protection devices.  Some of

the devices are passive linear earplugs, earmuffs, and semi-aural insert devices.

I. Defendant's Touhy Request to NIOSH

(3)     By letter dated February 6, 2020, Defendants submitted a revised Touhy request

in accordance with the requirements set forth in the Department of Health and Human Services

(HHS) Touhy regulations codified in 45 C.F.R. Part 2.  The request concerns NIOSH's testing of

the Combat Arms Earplugs Version 2 (CAEv2) during the period 2001 - 2015.

(4)     The revised Touhy request, in pertinent part, requests my deposition and an

interview concerning:

> (a) test procedures, test protocols, and test results related to testing on the CAEv2,
> including an overview of the tests I ran on the CAEv2, how I fit the CAEv2 during my
> testing, how I determined the appropriate procedure for fitting CAEv2 during my testing,
> whether I was able to maintain an adequate fit during my testing, the results of my
> testing, and the attenuation achieved with CAEv2 under various testing and fit
> conditions; and

> (b) correspondence and/or communications pertaining to CAEv2 between me and
> others in the government, including the military, and/or representatives of Aearo or 3M.

II. Response to Defendant's Touhy Request

(5)     In lieu of providing an interview and deposition, pursuant to the HHS Touhy

regulations, CDC's Director, in consultation with OGC, has authorized me to provide a declaration

addressing my testing of the CAEv2 and communications with others in the Federal Government or

Defendants concerning the CAEv2.  Specifically, I have been authorized to describe my testing

2

procedures, the fitting of the CAEv2 during my testing, my test results, and the attenuation achieved with the CAEv2. I have not been authorized to address any testing I conducted that was not published or that did not concern the CAEv2.

## CAEv2 Testing and Results

(6)     Attached hereto as Exhibit A is a study I presented in or around April 2006 entitled *Attenuation of Measurements of Passive Linear and Nonlinear Hearing Protectors for Impulse Noise*. This study examined the attenuation characteristics of passive linear and passive nonlinear hearing protectors in response to impulsive noises. Exhibit A describes the measurements conducted at Fort Collins Police Services (FCSP) as a part of a NIOSH Health Hazard Evaluation (HHE) of electronic hearing protection. The HHE included an evaluation of nineteen hearing protectors (including the CAEv2) with ten firearms at an indoor firing range and seven firearms at an outdoor range. The measurement methods are described in the HHE report. However, only the results for the three hearing protectors used by the FCSP were reported in the HHE: the David Clark model 27 earmuff, the Electronic Shooter Protection ESP Elite earplug, and the 3M (Aearo Technologies) EAR Classic formable earplug.

(7)     The tests in Exhibit A were all conducted with the first version of the NIOSH acoustic test fixture (ATF) purchased from the French/German Institute of Saint Louis (ISL). This ATF had only one instrumented ear and the usable length of the ear canal was 10 mm. The CAEv2 was inserted into the canal such that two flanges of the earplug were completely in the canal and the third largest flange was in contact with the outer edge of the ear canal. The largest flange of the opposite (distal) end of the earplugs was not folded back. The tests were only conducted with a hearing protector in place because the microphone in the ATF was limited in its maximum response.

3

(8)     Exhibit A reports the results from tests of the CAEv2 earplug conducted with firearms at an indoor and outdoor firing range.  The results reported are peak noise reduction, the difference between the peak impulse level measured with an external microphone and the peak level underneath the hearing protector.  *See* Ex. A at 15, 16, 19, 20, 22.

   a.  On slide 15, the linear side of the CAEv2 is shown in terms of the attenuation achieved from outside the earplug to the ATF microphone.  The CAEv2 linear earplug exhibited peak noise reduction of approximately 30 dB across all of the frequencies 25 to 10,000 Hz.

   b.  On slide16, the one-third octave band attenuation results for the CAEv2 nonlinear earplug are presented. The nonlinear CAEv2 provided 20 dB or more attenuation from 250 Hz to 10,000 Hz.

   c.  On slide 19, the growth of attenuation with external peak level is shown. The CAEv2 nonlinear earplug is shown in contrast to two other products.  The CAEv2 provided greater peak reduction of the impulse than the other products over the range of ten firearms tested at the indoor firing range.  According to these data the 167 dB peak sound pressure level of the most energetic firearm was reduced by slightly more than 24 dB. The data shown in slide 19 indicate that the protected peak exposure levels for the CAEv2 nonlinear earplug would be between 138 and 143 dB.

   d.  The data on slide 20 were a distillation of the average peak reduction across firearms and the slopes of the lines shown in slide 19.  The average reduction and slope were calculated for each protector and then plotted on slide 20.  The CAEv2 linear earplug had less of a change in protection as a function of level and a higher

average peak reduction.  Only the EAR Classic foam earplug exceeded the

CAEv2 nonlinear earplug.

(9)     The presentation attached as Exhibit A or a variant of it was presented at several

meetings:  Cincinnati National Hearing Conservation Association meeting on impulse noise, April

7, 2003; Nashville meeting of the Acoustical Society of America, April 28, 2003; NIOSH National

Occupational Research Agenda meeting, July 16, 2003; Seattle meeting of National Hearing

Conservation Association, February 12, 2004; San Diego meeting of the American Industrial

Hygiene Association, May 9, 2004; Chicago meeting of the American Industrial Hygiene

Association May 18, 2006; and at a briefing with the Army Research Laboratory at Aberdeen

Proving Ground on March 8, 2007.

(10)     Attached hereto as Exhibit B is a copy of a poster entitled *Impulse Peak Insertion*

*Loss for Hearing Protection Devices Tested with an Acoustic Shock Tube* that I presented at the

National Hearing Conservation Association Meeting held in San Diego in February 2016.

(11)     Regarding the fitting during testing, the CAEv2 was inserted into the GRAS 45

CB acoustic manikin such that the third flange of the CAEv2 was in contact with the outer edge of

the ear canal and partially, but not completely within the ear canal.  No wrinkles of the largest

proximal flange were present as that might reduce the attenuation of the earplug.  The largest flange

of the opposite (distal) end of the earplug was not folded back (away from the head).

(12)     The CAEv2s were inserted multiple times according to the American National

Standards Institute (ANSI) S12.42-2010 standard.  The ANSI standard describes that five sample

earplugs will be inserted three times at each of three impulse levels, nominally 132, 150, and 168

dB peak sound pressure level (SPL).  The five samples were cycled per the ANSI standard and all

tests were completed at an impulse level for all samples before proceeding to a different level.

(13)      At 132 dB, the CAEv2 nonlinear earplug provided approximately 10 dB of impulse peak insertion loss (IPIL). At 150 dB, the CAEv2 nonlinear earplug provided about 19 dB IPIL. At 168 dB, the CAEv2 nonlinear earplug provided about 33 dB IPIL.  These results suggest that the peak protected exposure levels would be 122, 131, and 135 dB peak SPL for the nonlinear side of the CAEv2.  For the linear side of the CAEv2, the IPIL were about 38, 40, and 46 dB for the 132, 150, and 168 dB impulse levels, respectively.

### My Communications with Defendants or Others Within the Federal Government
### Regarding the CAEv2

(14)      CDC IT staff and I conducted a thorough search of my work email account and I have attached hereto as Exhibit C all responsive communications concerning the CAEv2. I do not recall any specifics about the communications that are attached hereto.

(15)      I have also attached two other communications, as Exhibits D and E, already in the possession of 3M that include me as a sender or recipient. I also do not recall any specifics about these communications.

(16)      I have had other deliberations about how electroacoustic models of hearing protectors might be created, implemented and tested.  To date, none of the presentations about hearing protector models has included the CAEv2 product.

**CONCLUSION**

(17)     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my recollection.

Executed this 29th day of July, 2020.

WILLIAM J. MURPHY, Ph.D.
Coordinator,
Hearing Loss Prevention Research Cross Sector
Noise and Bioacoustics Team
Engineering and Physical Hazards Branch
Division of Field Studies and Engineering
National Institute for Occupational Safety and Health
Cincinnati, OH 455226-1998

William J.
Murphy -S7

Digitally signed by
William J. Murphy -S7
Date: 2020.07.29
13:30:17 -04'00'

7





# Attenuation Measurements of Passive Linear and Nonlinear Hearing Protectors for Impulse Noise

William J. Murphy, Ph.D.

Chucri A. Kardous, M.S.

National Institute for Occupational Safety and Health

Hearing Loss Prevention Section



# New Technology

- Nonlinear Orifice
  - Circular Orifice (Institute de Saint Louis)
    - EAR Combat Arms & Bilsom 655
  - Slit Orifice: EAR Ultra 9000
- Sound Restoration
  - Level-limiting: Peltor, Bilsom
  - Compression Circuits: Howard Leight Pro-Ears
- Active Noise Reduction
  - Bose, Telex, David Clark



WORKPLACE SAFETY AND HEALTH

**New Standards?**

- International Standards Organization
  - ISO 4869 parts 4-7
    - Primarily Electronic
- Proposed European Standards
  - EN352 parts 5-7
    - Electronic Devices
- American National Standards Institute
  - Not yet proposed

NIOSH

CDC

WORKPLACE SAFETY AND HEALTH



# What about Nonlinear Devices?

- Real Ear Attenuation at Threshold (REAT)
  - Low levels = Low attenuations
- Microphone in Real Ear (MIRE)
  - High levels = Increased risk to subjects
  - Microphone placement for earplugs
    - Impractical (disrupts seal with ear canal)
    - Insufficient acoustic isolation

**NIOSH**

**WORKPLACE SAFETY AND HEALTH**

**CDC**



Case: 1:20-mc-00025-SJD-SKB Doc #: 1-4 Filed: 09/11/20 Page: 13 of 35 PAGEID #: 50



# Methods

- Generate impulsive signals with gunshots
- Measure the protected and unprotected signals
  - $\frac{1}{4}$" B&K 4136 microphone outside HPD
  - ISL mannequin with 4165 B&K $\frac{1}{2}$" under HPD
- Record signals with Tascam DA-P1 digital audio tape (DAT) recorder.
  - 48000 samples/second.



WORKPLACE SAFETY AND HEALTH



# Methods

- Measured ten weapons
  - 0.357 Smith & Wesson 586 and 686 pistols
  - 0.450 Colt 1991A1, Para-ordinance pistols
  - 0.400 Glock 22 and 27 pistols
  - 9mm Pocket 9 and Sig Sauer P228 pistols
  - 12 gauge Remington 870 & 11-87 shotguns
- Five shots per condition and weapon

NIOSH

CDC

WORKPLACE SAFETY AND HEALTH
























# Auditory Hazard Assessment Model

- Proposed Model to determine exposure criteria for U.S. Army
- Mathematical model of the auditory periphery
  - Estimates the basilar membrane velocity
  - Estimates impulsive stress on the BM
  - Yields Auditory Damage Units
  - Verified with an animal model

WORKPLACE SAFETY AND HEALTH





| From: | EHBerger |
|-------|----------|
| To: | Murphy, William J. (CDC/NIOSH/DART) |
| Subject: | Re: Compilation of Peak Reduction measurements for a range of HPDs using gunshots |
| Date: | Tuesday, October 20, 2009 3:20:12 PM |

can one explanation of the increasing peak reduction with increasing SPL be that the spectrum of the impulses changes with level and the high level impulses have more high freq content? it would be useful to see a chart of the spectrum of your blast with level.

by the way, wed nov 4 is confirmed for me and my boss will probably join us.

eb

At 01:03 PM 10/14/2009, you wrote:

Elliott,

Attached is a distillation of the gunshot measurements that were conducted at Fort Collins during the 2002 NIOSH Health Hazard Evaluation. The data were presented in a different form at the 2003 Impact Noise Conference held in Cincinnati. I had show several of the level dependent products Combat Arms, Linear/nonlinear, Ultra 9000 and then summarized them with a plot of the slope and average peak reduction The protectors are listed on the plots. I have included the data for both indoor and outdoor firing ranges. If I can get it completed today, I will update the summary plot for both indoor and outdoor shooting where you'll be able to locate the average peak reduction and the slope of the regression on each product.

Dave Byrne and I will evaluate several more earplugs with the GRAS test fixture in continuous noise tomorrow morning. We have the long and short ear canals that will be used. I have scrounged up a number of other protectors. As I said earlier today, the premolded products are not affected appreciably by the ear canal length. The foam plugs are dramatically influenced by canal length. Thus that leads to the question of what canal length should be specified.

Bill Murphy

<<Effects of Peak Level and Peak Reduction.pdf>>

# Impulse Peak Insertion Loss for Hearing Protection Devices Tested with an Acoustic Shock Tube

William J. Murphy[1], Pamela S. Graydon[1], Matthew Strobel[1,2], Katrina Freeland[1,3]

[1]National Institute for Occupational Safety and Health, [2]New York Institute of Technology, [3]Gonzaga University






## INTRODUCTION

Several hearing protection devices were tested for impulse peak insertion loss (IPIL) using an acoustic shock tube according to the ANSI S12.42-2010 standard. The protector types included earmuffs with electronic level-limiting circuitry, standard earplugs and earmuffs with orifice or filter that provided increasing attenuation with impulse level. Measurements were conducted using two GRAS 45 CB test fixtures and nominal peak impulse levels of 132, 150 and 168 dB. The poster will report the results from tests of sixteen products tested at the NIOSH Impulse Noise Testing Laboratory. Nonlinear earplug IPILs ranged between about 10-15 dB for 132 dB and 25-35 dB for the 168 dB impulses. Earmuff IPILs exhibited a similar range of performance. The passive foam earplugs provided upwards of 40-50 dB IPIL.

## METHODS

A variety of nonlinear hearing protection devices (HPDs) were tested in the NIOSH Impulse Laboratory. Earmuffs and earplugs were selected based upon the products that were included in the Army's ANAM Hearing Protection Module. A variety of muffs and plugs with the nonlinear features (valves, filters or electronic sound restoration) were purchased for testing.

The acoustic shock tube was used to generate impulses at 132, 150 and 168 dB peak sound pressure level and the HPDs were fitted on the GRAS 45 CB acoustic manikins shown in Figure 1 owned by NIOSH (left) and Western Michigan University (right). A GRAS 6758 blast probe sampled the impulse waveform.

Six models of nonlinear earplugs, five models of electronic earmuffs and four models of passive earplugs were selected for testing. Five samples of each model were purchased for testing. The samples were fitted on each manikin, once for each test shot and were cycled across the fixtures and levels. The blast probe was used to establish the average transfer functions for 132, 150 and 168 dB impulse levels between the blast probe and the unoccluded manikin impulse waveform.

The transfer function was used to estimate the unoccluded impulse level for each occluded impulse. $IPIL_{P,z,f}(t) = \Im T\Im^{-1}[F_{blast,P,z,f}(t) \times F_{PT,z,f}(t)]$

The estimated unoccluded waveform was then used to determine the Impulse Peak Insertion Loss by calculating the dB ratio of the peaks in the occluded and unoccluded conditions. $IPIL_{z,x,f} = 20 \log_{10} \left( \frac{max(p_{z,x,f,u}(t))}{max(p_{z,x,f,o}(t))} \right)$



Figure 1. Arrangement of two GRAS 45 CB fixtures in front of the NIOSH acoustic shock tube. Test levels achieved with the shock tube were 132, 150 and 168 dB peak SPL as measured with the GRAS 6758 probe microphone.

## RESULTS

### Earplugs in Open Condition:

Measurements were conducted for open earplugs. The 3M Combat Arms earplug (CAE) version 2 and Version 4, the Ear Blast Busters with Hocks Noise Brake, the Surefire EP3 and EP4 and the Etymotic Research ETYPlugs were evaluated. Although the ETYPlugs are not strictly an earplug with a nonlinear valve, the acoustic filter acts in a nonlinear manner and provides more attenuation at the highest impulse levels.

First the results are compared between fixtures with a scatter plot of the IPIL values from each fixture. The diagonal line indicates equality between the two fixtures. For the Open valve conditions, the two fixtures exhibit excellent agreement. The standard deviations all intersect the diagonal line. Each protector is depicted with different symbols and different colors.

Second, the IPIL values measured with the NIOSH and WMU fixtures are shown for each protector and impulse level. The NIOSH IPIL values are the three bars on the left and the WMU IPIL are the three bars on the right of each group of six bars. The standard deviations are indicated at the top of each bar as a line. Generally we see that the open ear conditions yielded about 10 dB IPIL at 132 dB peak SPL for the CAE version 2 and 4 locks and Surefire open mode products. The plugs for some products were about 15 to 18 dB at 150 dB and about 30 to 35 dB at 168 dB peak impulse level. At the 168 dB impulse level, the ETYPlug had the lowest IPIL of about 26 dB. The other protectors had IPIL values between 30 and 35 dB.





### Earplugs in Closed Condition:

The 3M Combat Arms, Surefire EP3 and EP4 earplugs were tested with the valves closed. In addition, the 3M UltraFit, and Surefire EP5 earplugs were tested. Other foam earplugs have been tested, but due to a tear in the silicon of the GRAS 45 CB fixture in the pinnae and/or ear canals, the data are not presented. For these earplugs, the comparison of the two fixtures exhibit agreement to within a few decibels. For instance the UltraFit earplug provided IPIL of about 38 to 45 dB. For the 3M Combat Arms version 4, the IPILs from NIOSH fixture (left 3 bars) were about 2 dB less than those of the WMU fixture. The 3M Combat Arms version 2 IPIL values were higher for the 150 dB impulses on the WMU fixture. Generally, the NIOSH fixture exhibited IPIL values that were 1 to 2 dB less than the WMU fixture. These differences can be attributed to the seal of the pinna portion with the ear canal because the right and left ears exhibited small but consistent differences, that are not seen on the earmuff data.





## RESULTS

One earmuff combination and two electronic earmuffs were tested in the passive condition. The earplug combination was the Peltor Tactical Pro earmuff and Etymotic Research ETYPlug. The other earmuffs were the Peltor Tactical Pro earmuff and the Peltor SoundTrap earmuff. The Passive conditions exhibited excellent agreement between the fixtures. For the Peltor Tactical Pro and the combination of TactialPro and ETYPlug at 150 dB. The WMU fixture yielded lower IPIL results than the NIOSH fixture. Similarly, the Peltor SoundTrap earmuff was lower for the 130 dB impulse.

One earmuff combination and two electronic earmuffs were tested in the passive condition, the earplug combination and the electronics turned off. The earplug combination was the Peltor Tactical Pro earmuff and Etymotic Research ETYPlug. The other earmuffs were the Peltor Tactical Pro earmuff and the Peltor SoundTrap earmuff. The Passive conditions exhibited excellent agreement between the fixtures. For the Peltor Tactical Pro and the combination of TactialPro and ETYPlug at 150 dB, the WMU fixture yielded lower IPIL results than the NIOSH fixture. Similarly, the Peltor SoundTrap earmuff was lower for the 130 dB impulse.

Finally, in Figure 4, the electronic earmuffs tested with the electronics turned off are displayed. The Peltor Tactical Pro and Etymotic Research ETYPlugs were tested twice. In the earlier test, the ear canal took a slight tear that compromise the seal of the ETYPlugs.

## SUMMARY / RECOMMENDATIONS

▸ Hearing protector tests with acoustic fixtures are sensitive to the seal of the protector on the monikin head and ear canal. Minor tears in the material of the GRAS 45 CB fixture can significantly degrade the measured IPIL values by as much as 8 decibels.

▸ The position of the acoustic test fixtures in the sound field of the impulse source (e.g. shock tube, rifle or explosive charge) should be carefully measured and the arrival time of the impulses at the monikin ears used to check the rotation of the test fixture.

▸ Attenuations for the open filter conditions exhibit remarkable similarity for the Surefire and Combat Arms earplugs. The ETYPlug has greater IPIL for the low level but more than 5 dB less IPIL than the other earplugs.

*The findings and conclusions in this poster are those of the authors and do not necessarily represent the views of the National Institute for Occupational Safety and Health*

CDC
GONZAGA
NYIT New York Institute of Technology
NIOSH

| From: | Murphy, William J. <wjm4@cdc.gov> |
|---|---|
| To: | Elliott Berger <eberger@compuserve.com>;Vern Larson (E-mail) <vlarson@bacou-dalloz.com>;Per Hiselius (E-mail) <phiselius@dallozsafety.com>;Armand Dancer (E-mail) <dancer@newel.net>;Doug Ohlin (E-mail) <douglas.ohlin@apg.amedd.army.mil> |
| CC: | Franks, John R. <jrf3@cdc.gov>;Little, Mark B. <tzl3@cdc.gov> |
| Sent: | 10/23/2001 11:22:57 PM |
| Subject: | Impulse peak levels |

Elliott, Vern, Per, Armand and Doug
I just finished the very preliminary analysis of peak levels and peak level
reductions of different protectors on the ISL mannequin. I thought you
might be interested in the external and internal peak levels and peak level
reductions.
B707II is Bilsom 707 impact II
CAELin and CAELin2 are the linear side of the Combat Arms Plug
CAENLin and CAENLin2 are the nonlinear side of Combat Arms Plug
ISLNLin and ISLNLin2 are the Bilsom 656/ISL nonlinear plug
PT6s is the Peltor Tactical 6S
SilELP97 is the Silencio Electronic Low Pro muff
PH10A is the Peltor H10A double shelled muff
PH9Bullseye is the Peltor Bullseye H9 muff
HLLeight is the Howard Leight Leightning with Pro-Ears
HLThunder is the Howard Leight Thunder muff with Pro-Ears
and the EAR Classic is well... Classic right?
==================Data Follows================
Weapon Protector Elect. On? Outside Inside Attenuation
9MM B707II Yes 166.78 141.19 25.59
9MM B707II No 164.11 131.49 32.61
9MM CAELin No 163.86 135.08 28.78
9MM CAELin2 No 162.99 134.17 28.83
9MM CAENLin Yes 166.22 138.04 28.18
9MM CAENLin2 Yes 162.47 135.80 26.68
9MM EARClassic No 165.56 137.82 27.74
9MM HLLeightning Yes 166.01 135.81 30.20
9MM HLLeightning No 166.54 136.48 30.06
9MM HLThunder Yes 164.69 130.90 33.79
9MM HLThunder No 164.74 131.80 32.94
9MM ISLNLin Yes 166.73 150.32 16.41
9MM ISLNLin2 Yes 163.13 145.79 17.34
9MM PH10A No 164.47 130.26 34.21
9MM PH9Bullseye No 165.01 136.79 28.22
9MM PT6S Yes 163.37 135.71 27.66
9MM PT6S No 164.06 136.19 27.87
9MM SilELP97 Yes 167.66 149.71 17.95
9MM SilELP97 No 167.06 149.40 17.66
M16 B707II Yes 161.67 129.33 32.34
M16 B707II No 161.60 129.57 32.03
M16 CAELin No 169.38 141.10 28.28
M16 CAELin2 No 169.08 140.22 28.86
M16 CAENLin Yes 168.25 143.18 25.07
M16 CAENLin2 Yes 169.34 143.61 25.73
M16 EARClassic No 163.40 137.18 26.21
M16 HLLeightning Yes 169.02 137.02 32.00
M16 HLLeightning No 170.07 139.19 30.87
M16 HLThunder Yes 170.78 145.01 25.77
M16 HLThunder No 170.70 144.68 26.03
M16 ISLNLin Yes 166.78 150.88 15.90
M16 ISLNLin2 Yes 170.64 152.83 17.81
M16 PH10A No 162.84 130.43 32.40
M16 PH9Bullseye No 163.05 135.36 27.70
M16 PT6S Yes 160.78 133.79 26.98
M16 PT6S No 160.16 134.54 25.62
M16 SilELP97 Yes 163.65 144.60 19.05
M16 SilELP97 No 163.55 144.81 18.74

3M Confidential                                              3M00027126

Confidential - Subject To Protective Order                   3M_MDL000024875

| From: | Ohlin, Douglas W Dr USACHPPM |
|-------|------------------------------|
| To: | "Murphy, William J."; Ohlin, Douglas W Dr USACHPPM; Little, Mark B. |
| Cc: | Elliott H. Berger (E-mail); "dancer@isl.tm.fr"; Sachs, Felix Z Mr USACHPPM |
| Subject: | RE: NLEarplugSummary.xls |
| Date: | Friday, October 12, 2001 2:12:17 PM |

Thanks, more better....

-----Original Message-----
From: Murphy, William J. [mailto:wjm4@cdc.gov]
Sent: Friday, October 12, 2001 1:58 PM
To: 'Ohlin, Douglas W Dr USACHPPM'; Little, Mark B.; Murphy, William J.
Cc: Elliott H. Berger (E-mail); 'dancer@isl.tm.fr'; Sachs, Felix Z Mr
USACHPPM
Subject: RE: NLEarplugSummary.xls


Doug,
These data are at levels where you have to protect the troops. What I sent
to everyone was the integrated power levels measured over 0.125 sec
triggered by the impulse event.  The recordings of the impulses which we
collected show peak levels of 167 dB for the 9mm pistol and 162 dB for the
M16.  Again the spreadsheet I sent out was a first analysis conducted at the
time the recording was made.  I have not had the time to do much more than
look at the waveforms at this point.

Bill Murphy

-----Original Message-----
From: Ohlin, Douglas W Dr USACHPPM
[mailto:Douglas.Ohlin@APG.AMEDD.ARMY.MIL]
Sent: Friday, October 12, 2001 1:17 PM
To: 'tzl3@cdc.gov'; 'wjm4@cdc.gov'
Cc: Elliott H. Berger (E-mail); 'dancer@isl.tm.fr'; Sachs, Felix Z Mr
USACHPPM
Subject: FW: NLEarplugSummary.xls


Just an observation on these data. The operative word here is "nonlinear."
I'd be more interested in the performance of these devices up at the levels
where we usually have to protect our troops, i.e., between 156 to 190dBP.


-----Original Message-----
From: Murphy, William J. [mailto:wjm4@cdc.gov]
Sent: Thursday, October 04, 2001 11:18 AM
To: Doug Ohlin (E-mail); Little, Mark B.
Cc: Elliot Berger (E-mail); Armand Dancer (E-mail); Franks, John R.
Subject: NLEarplugSummary.xls


Sorry to have to send this again.  I am not a whiz with Excel, and
consequently had some mistakes in the previous sheet.  Delete the previous
Excel file and replace it with this one.

Thanks,
Bill Murphy
 <<NLEarplugSummary.xls>>

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Florida

| | | |
|---|---|---|
| _____ Plaintiff _____ | ) | |
| v. | ) | Civil Action No.  3:19-md-02885 |
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | ) ) ) | |
| _____ Defendant _____ | ) | |

## AMENDED SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                              Dr. William J. Murphy
                    1147 Springdale Court, Lawrenceburg, Indiana 47025
                    _____
                    *(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Section II.A of Exhibit 1

| Place: | The Westin Cincinnati 21 E. 5th Street Cincinnati, Ohio 45202 | or, Alternatively, via Remote Deposition | Date and Time: 09/16/2020 9:00 am |
|---|---|---|---|

The deposition will be recorded by this method:    Stenographic and Videographic

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     08/26/2020

| _CLERK OF COURT_ | | |
|---|---|---|
| | OR | /s/ Ashley Neglia |
| _____ Signature of Clerk or Deputy Clerk | | _____ Attorney's signature |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Defendants.
_____ , who issues or requests this subpoena, are:

Ashley Neglia, Kirkland & Ellis LLP, 555 S. Flower St., Los Angeles, CA 90071; Ashley.Neglia@kirkland.com; (213) 680-8114

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 3:19-md-02885

# PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT 1

# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

Nicholas F. Wasdin
To Call Writer Directly:
+1 312 862 3254
nick.wasdin@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

February 6, 2020

**Via Email**

Robert R. Redfield, MD
Director, Centers for Disease Control and
Prevention
1600 Clifton Road, N.E., MS D-14
Atlanta, Georgia 30333

Re:     Touhy Request Relating to *In re: 3M Combat Arms Earplug Products
        Liability Litigation*, 3:19-md-02885-MCR-GRJ (N.D. Fla.).

Dear Dr. Redfield:

In connection with *In re: 3M Combat Arms Earplug Products Liability Litigation*, a multidistrict litigation pending before the Northern District of Florida, this letter constitutes Defendants 3M Company ("3M") and Aearo Technologies LLC's ("Aearo") second *Touhy*[1] request to the United States Department of Health and Human Services ("DHHS") for certain documents described below, and to interview and depose two current or former employees of the National Institute for Occupational Safety and Health ("NIOSH"), a federal agency within the Center for Disease Control ("CDC"), who were involved in testing of the Combat Arms Earplugs Version 2 ("CAEv2"). Pursuant to 45 C.F.R. §§ 2.1 - 2.4, Defendants set forth the basis for their *Touhy* requests as follows:

## I.     Summary of the Litigation

3M was founded in 1902 as a small-scale mining venture in Northern Minnesota, and has grown into a global science company employing over 90,000 people and produces more than 60,000 products world-wide. Many of 3M's brands have become universally known, including Scotch™ Brand adhesive tapes, Post-it® Brand sticky notes, and Thinsulate™ thermal insulation, to name just a few. In addition to its consumer-side business, 3M also had a long-standing relationship with federal and state governments for well over fifty years and provides thousands of products designed to protect American troops and support their missions. In 2008, 3M

---

[1]     *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 2

purchased Aearo, who, at the time, was a global leader in personal protection equipment, headquartered in Indianapolis, Indiana. The acquisition helped 3M expand its occupational health and environmental safety platform by adding hearing protection, eyewear protection, and fall protection to its product lines, including Combat Arms Earplugs - the subject of this litigation. Combat Arms Earplugs represented a significant advance in hearing protection in that they were one of the first hearing protection devices to offer protection from high-level impulse noises, like gun-fire, while still allowing the user to hear lower level sounds, like speech, with limited interruption. Hearing loss is a common injury among military veterans. The U.S. military has provided hearing protection and preservation services to soldiers for decades. In support of that mission, the military employs audiologists to administer hearing conservation programs and work with outside contractors, like 3M, to advance their hearing protection goals.

The complaints in this litigation assert claims for alleged hearing loss or tinnitus allegedly caused by noise exposure to plaintiffs while wearing the CAEv2. CAEv2 was developed and designed by Aearo at the request of and in close consultation with U.S. military audiologists, including Dr. Doug Ohlin, former Program Manager, Hearing Conservation, U.S. Army Center for Health Promotion and Preventative Medicine. Specifically, the U.S. military and Aearo decided to modify and update Aearo's Ultrafit® triple-flanged earplug by including a specially patented filter created by the French-German Institute in Saint Louis, France ("ISL"). Thereafter, Aearo worked with the U.S. military and ISL to develop an earplug embodying ISL's patented technology, which ultimately became CAEv2. CAEv2 consists of two Ultra-fit type tips, one green and one yellow, attached to opposite sides of a plastic stem with a small opening at the center. The green end works like a conventional passive earplug, providing steady and continuous protection from ambient noise. In contrast, the yellow end allows sound to travel into the opening at the center of the earplug and through a sound channel and the patented filter before entering the ear. The filter allows lower-level sounds, such as speech, to pass through while reducing higher-level impulse noises, like gun-fire. Throughout the design process, Aearo worked closely with the U.S. military to ensure that CAEv2 would appropriately balance performance with military operational needs for soldiers and military personnel. These specifications were memorialized in a Medical Procurement Item Description ("MPID") that was used by the Defense Logistics Agency to solicit bids from Aearo for CAEv2.

On April 3, 2019, the Judicial Panel on Multidistrict Litigation entered an order transferring the consolidated cases and any tag-along actions to the Northern District of Florida. To date, tens of thousands of actions have been filed on behalf of current or former military personnel who allegedly were issued and used the CAEv2 during their service. Plaintiffs typically allege hearing loss and/or tinnitus as a result of noise exposure in military and combat settings, and assert claims for design defect, negligence, failure to warn, breach of warranties, and/or fraud. For example, Plaintiffs allege that the CAEv2 was "dangerously defective" because, among other things, (i) the CAEv2 does not provide adequate attenuation for certain noise exposures, (ii) the short length of the CAEv2 "prevented Plaintiffs from obtaining a proper fit and seal when inserting the device

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 3

into their ear canals," and (iii) the "design of the [CAEv2] also caused the device to loosen imperceptibly in Plaintiff's ear canals." (*See* Compl. ¶¶ 2, 6-7, 194) According to Plaintiffs, (i) Defendants "supplied this dangerously defective product to Plaintiffs and the United States military for more than a decade without Plaintiffs or the United States military having any knowledge of those defects and risks," and (ii) Defendants never warned Plaintiffs or the U.S. government that, to obtain the attenuation ratings achieved during product testing, "they reconfigured the device by folding back the flanges of the open end before inserting the closed end of the device into the ear canals of the test subjects." (*Id.* ¶ 5)

3M and Aearo deny these allegations. Among other things, product testing performed by the U.S. Government, Aearo, and other third parties demonstrates that the CAEv2 provides the intended levels of attenuation. Defendants were in active communication with the government during product development, and the government was aware of the product's performance capabilities and limitations.

In addition to defending Plaintiffs' claims on the merits, 3M and Aearo have also asserted the federal government contractor defense set forth in *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1998), because Aearo sold the CAEv2 to the U.S. military under government contracts and in accordance with the government's specifications. The government contractor defense applies where, as here: "(1) the United States approved reasonably precise specifications [for the product at issue]; (2) the [product] conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the [product] that were known to [it] but not to the United States." *See id.* at 512. Here, the CAEv2 was designed and manufactured in accordance with the military's specifications, which included a reasonably precise instruction to shorten the earplug to its allegedly defective length. The government was aware of CAEv2's performance capabilities and limitations, including any alleged "fitting" limitations caused by the product's length.

Much of the materials relevant to Plaintiffs' claims are in the possession of the U.S. Government. For example, service and medical records for individual Plaintiffs are in the possession of the VA and DOD. The DOD also has records related to, among other things, CAEv2 design and development, CAEv2 testing, noise exposure data, and hearing protection usage rates. The parties have been working with the VA, DOD and the Court to identify and produce these records, and to schedule the depositions of related government witnesses. The Court has directed the parties to endeavor to complete this phase of government discovery in February and March, 2020.

## II.  Interview And Deposition Requests

Defendants request an interview and deposition with (i) NIOSH employee William J. Murphy (wmurphy@cdc.gov; wjm4@cdc.gov); and (ii) former NIOSH fellow Dr. Mark Little

# KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 4

(tzl3@cdc.gov).[2]  Defendants request interviews occur prior to the depositions, and believe that such interviews will make the deposition process more efficient, including by (i) identifying the location of relevant documents and data in advance of the deposition, which will help avoid the need for additional depositions if a witness identifies relevant materials for the first time during a deposition; and (ii) minimizing unnecessary depositions through pre-deposition identification of any witness with minor roles or immaterial knowledge, which may reduce the time and expense of organizing a formal depositions for that witness.

## A. William Murphy

Mr. Murphy is or was a program coordinator for the NIOSH Hearing Loss Prevention Program.  Documents produced to date show that Mr. Murphy conducted testing on CAEv2 on various occasions between 2001 and 2015, and communicated the results of his testing to others in the government, including Army audiologist Doug Ohlin, and individuals at Aearo.  For example, the email attached as **Exhibit A** is an example of Mr. Murphy transmitting the results of 2001 impulse testing on CAEv2 to Doug Ohlin, Mark Little, others in the government, representatives of ISL, and representatives of Aearo.  Defendants seek to interview and depose Mr. Murphy regarding:  (i) test procedures, test protocols, and test results related to testing on the CAEv2, including an overview of the tests Mr. Murphy ran on the CAEv2, how Mr. Murphy fit the CAEv2 during his testing, how Mr. Murphy determined the appropriate procedure for fitting CAEv2 during his testing, whether Mr. Murphy was able to maintain an adequate fit during his testing, the results of Mr. Murphy's testing, and the attenuation achieved with CAEv2 under various testing and fit conditions; and (ii) correspondence and/or communications pertaining to CAEv2 between Mr. Murphy and others in the government, including the military, and/or representatives of Aearo or 3M.

The testing performed by Mr. Murphy is relevant to show that CAEv2 provides adequate attenuation and is not defective.  Mr. Murphy's testing, and his communications with Aearo or others in the government regarding the CAEv2, are also relevant to show that the government was on notice of CAEv2 performance capabilities and limitations, which is relevant to both Plaintiffs' failure to warn claims and Defendants' federal government contractor defense.  This information is not available from other less burdensome sources.  To be sure, some of Mr. Murphy's test reports

---

[2]   Defendants understand that Dr. Little is presently the chief of audiology at Eisenhower Army Medical Center.  Accordingly, Defendants served a *Touhy* interview and deposition request related to Dr. Little on the Army.  However, after subsequent discussion with counsel for NIOSH, Defendants are separately serving this *Touhy* request regarding Dr. Little on the CDC.  The point of contact for the related Army *Touhy* request is: Major Colin Evans, Litigation Attorney, General Litigation Branch, U.S. Army Legal Services Agency, 9275 Gunston Road, Ft. Belvoir, VA 22060, Office: 703-693-0352, Email: Collin.p.evans2.mil@mail.mil.  It is Defendants' understanding that Major Evans has been in contact with Dr. Little and can provide current contact information, if needed.

KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 5

are publicly available, but (i) Defendants do not know if all of Mr. Murphy's test results are publicly available, and (ii) in any event, publicly available test reports do not describe details relevant to the claims and defenses in this case, including how CAEv2 was "fit" during testing, whether the flanges on the opposite end of the earplug were folded back during testing, and whether Mr. Murphy had difficulty achieving or maintaining an adequate fit during his testing.

Furnishing Mr. Murphy for an interview and deposition is in the interests of the federal government. In addition to the government's general interest in being a good federal citizen, furnishing Mr. Murphy for an interview and deposition will help expedite the discovery process between the federal government and Defendants in this case, and help aid the Court's desire that the parties complete government discovery related to the federal government contractor defense in a timely manner.

**B.    Dr. Mark Little**

Dr. Mark Little was an Army audiologist who did a fellowship with NIOSH in the 2001 time period. Documents produced to date show that Dr. Little corresponded with Aearo representatives in 2001 regarding the CAEv2 while at NIOSH. For example, the correspondence attached as **Exhibit B** includes communications between Dr. Little and an Aearo representative in August and September 2001 regarding (i) CAEv2 test data; (ii) CAEv2 instructions for use; and (iii) certain product testing that Dr. Little intended to perform (referred to in Exhibit B as "Method B" testing). Defendants seek to interview and depose Dr. Little regarding: (i) test procedures, test protocols, and test results related to his testing on the CAEv2, including an overview of the tests Dr. Little ran on the CAEv2, how Dr. Little fit the CAEv2 during his testing, how Dr. Little determined the appropriate procedure for fitting CAEv2 during his testing, the results of Dr. Little's testing, and the attenuation achieved with CAEv2 under various testing and fit conditions; and (ii) correspondence and/or communications pertaining to CAEv2 between Dr. Little and others in the government, including the military, and/or representatives of Aearo or 3M.

The testing performed by Dr. Little is relevant to show that CAEv2 provides adequate attenuation and is not defective. Dr. Little's testing, and his communications with others in the government and Aearo regarding the CAEv2, are also relevant to show that the government was on notice of CAEv2's performance capabilities and limitations, which is relevant to both Plaintiffs' failure to warn claims and Defendants' federal government contractor defense. This information is not available from other less burdensome sources. Defendants' *Touhy* requests to the Department of Defense—including to each branch of the Armed Forces—have not resulted in discovery from the government related to the tests conducted by Dr. Little, or any communications with Dr. Little involving the CAEv2 (the communications attached as **Exhibit B** were located in Aearo's files, not the government's). Further, searches in the public domain have not revealed the details of any testing conducted by Dr. Little.

KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 6

Furnishing Dr. Little for an interview and deposition is in the interests of the federal government. In addition to the government's general interest in being a good federal citizen, furnishing Dr. Little for an interview and deposition will help expedite the discovery process between the federal government and Defendants in this case, and help aid the Court's desire that the parties complete government discovery related to the federal government contractor defense in a timely manner.

**III.    Document Requests**

Defendants request certain documents related to the government's testing of, and communications regarding, the CAEv2. Defendants are presently aware of at least two buckets of CAEv2 testing performed by or at NIOSH. *First*, as noted above, documents produced to date indicate William J. Murphy tested the CAEv2 on numerous occasions between 2001 and 2015. (*E.g.*, **Exhibit A**) *Second*, documents produced to date indicate that Dr. Mark Little tested the CAEv2 while doing a fellowship with NIOSH in approximately late 2001. These documents show that Dr. Little communicated with Defendants in August and September of 2001 regarding his intention to perform testing on the CAEv2 while at NIOSH, including so called "Method B" testing pursuant to certain ANSI standards. (*See* **Exhibit B**)

    **A.    Specific Documents Requested**

Defendants request the following documents from NIOSH:

1.    Test reports, protocols, results, and analyses pertaining to any testing conducted on CAEv2 by William J. Murphy.[3]

2.    Communications between Mr. Murphy and others in the United States government, including Doug Ohlin and others in the military, pertaining to testing on, or the performance of, the CAEv2. An example of such a communication is attached as **Exhibit A**.

3.    Communications between Mr. Murphy and Defendants pertaining to testing on, or the performance of, the CAEv2. An example of such a communication is attached as **Exhibit A**.

---

[3]    For reference, Defendants are aware that Mr. Murphy conducted, among other tests on the CAEv2: (1) an October 2001 where Mr. Murphy performed impulse peak testing on the CAEv2 using a 9mm handgun and M16 rifle; and (2) a December 23, 2014 test entitled "Measurement of Impulse Peak Insertion Loss from two Acoustic Test Fixtures and Four Hearing Protector Conditions."

### KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 7

4.  Test reports, protocols, procedures, results, and analyses pertaining to any testing conducted on CAEv2 by Mark Little.

5.  Communications between Dr. Little (tzl3@cdc.gov) and Defendants (@compuserve and @aearo.com domain names) related to CAEv2, including instructions to be used during testing, test results, test procedures, test protocols, and analyses related to continuous and impulse noise testing on CAEv2. Examples of such communications attached at **Exhibits A and B**.

6.  Communications between Dr. Little and others in the United States government, including Doug Ohlin and others in the military, related to CAEv2, including product instructions, test results, test procedures, test protocols, and analyses related to continuous and impulse noise testing on CAEv2. An example of such a communication is attached at **Exhibit A**.

7.  Test reports, protocols, procedures, results, and analyses pertaining to any other testing conducted on CAEv2 by current or former employees of NIOSH.

**B.    Relevance of the Documents Requested**

The requested documents are relevant for two reasons. *First*, they are relevant to rebut two of Plaintiffs' core allegations in this case: (1) that the CAEv2 does not adequately attenuate noise; and (2) that the government was not aware of the CAEv2's performance capabilities and limitations. Defendants anticipate that the documents requested will show that the CAEv2 *does* adequately attenuates noise, and is not defective, and that the government was aware of the product's performance capabilities and limitations. *Second*, they are also relevant to Defendants' federal government contractor defense. For example, the third prong of the government contractor defense requires Defendants to show that "the supplier warned the United States about the dangers in the use of the [product] that were known to [it] but not to the United States." *See Boyle* at 487 U.S. at 512. Government testing, and the requested communications, are relevant to both (i) what product limitations were "known … to the United States" and (ii) the warnings provided to the United States by Defendants.

This information is not available from other less burdensome sources. To be sure, some of Mr. Murphy's test reports are publicly available, but (i) Defendants do not know if all of Mr. Murphy's test results are publicly available, and (ii) in any event, publicly available test reports do not describe details relevant to the claims and defenses in this case, including, for example, how CAEv2 was "fit" during testing, whether the flanges on the opposite end of the earplug were folded back during testing, and whether Mr. Murphy had difficulty achieving or maintaining an adequate fit during his testing, all of which details may be contained in non-publicly available documents and communications. Additionally, Defendants' *Touhy* requests to the Department of Defense—

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 8

including to each branch of the Armed Forces—have not resulted in discovery from the government related to the tests conducted by Dr. Little, or any communications with Dr. Little involving the CAEv2. Further, searches in the public domain have not revealed the details of any testing conducted by Dr. Little.

**IV. Additional Considerations**

These requests comply with the policy of the DHHS regarding the provision of documents, and of information by its employees in connection with litigation in federal court:

1. Disclosure of the requested information is not unduly burdensome or otherwise inappropriate under the federal discovery rules.

2. Disclosure of the requested information would be appropriate under the Federal Rules of Evidence and appropriate under the rules of the Northern District of Florida.

3. Disclosure of the requested information would be appropriate under the Federal Rules of Civil Procedure and would not impact any concerns regarding privileged information pursuant to the rules of procedure governing this litigation.

4. Disclosure of the requested information would not violate any statute, executive order, regulation, or directive.

5. Disclosure of the requested information would not reveal any classified information, data restricted pursuant to AR 380-5, unclassified technical data withheld from public release pursuant to 32 C.F.R. § 250 or DoD Directive 5230.25, privileged safety information restricted from public release by DoD Directive 6055.7, AFI 31-401, or other matters exempt from unrestricted disclosure.

6. Disclosure of the requested information would not interfere with ongoing enforcement proceedings, compromise any constitutional rights, reveal the identity of an intelligence source or confidential informant, disclose trade secrets or similarly confidential commercial or financial information, or otherwise be inappropriate under the circumstances.

7. Disclosure would not violate any person's expectation of confidentiality or privacy.

8. The United States is not, and is not reasonably anticipated to be a party in this litigation.

## KIRKLAND & ELLIS LLP

Robert R. Redfield, MD
February 6, 2020
Page 9

**V.      Administrative Matters**

Defendants will bear the costs of producing the documents and witnesses sought by this *Touhy* request. Costs will be paid by check or money order payable to the Treasury of the United States. To the extent the DHHS believes any of the requested information does not implicate the statutory considerations set forth above, Defendants are willing to work with the DHHS to narrow the scope of the requested interviews and depositions.

Should you have any questions or require additional information about this *Touhy* request, please do not hesitate to contact me at (312) 862-3254 or nick.wasdin@kirkland.com.

Sincerely,

Nicholas F. Wasdin

One of the Attorneys
Representing 3M

# EXHIBIT A

| From: | Murphy, William J. <wjm4@cdc.gov> |
| To: | Elliott Berger <eberger@compuserve.com>;Vern Larson (E-mail) <vlarson@bacou-dalloz.com>;Per Hiselius (E-mail) <phiselius@dallozsafety.com>;Armand Dancer (E-mail) <dancer@newel.net>;Doug Ohlin (E-mail) <douglas.ohlin@apg.amedd.army.mil> |
| CC: | Franks, John R. <jrf3@cdc.gov>;Little, Mark B. <tzl3@cdc.gov> |
| Sent: | 10/23/2001 11:22:57 PM |
| Subject: | Impulse peak levels |

Elliott, Vern, Per, Armand and Doug
I just finished the very preliminary analysis of peak levels and peak level
reductions of different protectors on the ISL mannequin. I thought you
might be interested in the external and internal peak levels and peak level
reductions.
B707II is Bilsom 707 impact II
CAELin and CAELin2 are the linear side of the Combat Arms Plug
CAENLin and CAENLin2 are the nonlinear side of Combat Arms Plug
ISLNLin and ISLNLin2 are the Bilsom 656/ISL nonlinear plug
PT6s is the Peltor Tactical 6S
SilELP97 is the Silencio Electronic Low Pro muff
PH10A is the Peltor H10A double shelled muff
PH9Bullseye is the Peltor Bullseye H9 muff
HLLeight is the Howard Leight Leightning muff with Pro-Ears
HLThunder is the Howard Leight Thunder muff with Pro-Ears
and the EAR Classic is well... Classic right?
==================Data Follows================
Weapon Protector Elect. On? Outside Inside Attenuation
9MM B707II Yes 166.78 141.19 25.59
9MM B707II No 164.11 131.49 32.61
9MM CAELin No 163.86 135.08 28.78
9MM CAELin2 No 162.99 134.17 28.83
9MM CAENLin Yes 166.22 138.04 28.18
9MM CAENLin2 Yes 162.47 135.80 26.68
9MM EARClassic No 165.56 137.82 27.74
9MM HLLeightning Yes 166.01 135.81 30.20
9MM HLLeightning No 166.54 136.48 30.06
9MM HLThunder Yes 164.69 130.90 33.79
9MM HLThunder No 164.74 131.80 32.94
9MM ISLNLin Yes 166.73 150.32 16.41
9MM ISLNLin2 Yes 163.13 145.79 17.34
9MM PH10A No 164.47 130.26 34.21
9MM PH9Bullseye No 165.01 136.79 28.22
9MM PT6S Yes 163.37 135.71 27.66
9MM PT6S No 164.06 136.19 27.87
9MM SilELP97 Yes 167.66 149.71 17.95
9MM SilELP97 No 167.06 149.40 17.66
M16 B707II Yes 161.67 129.33 32.34
M16 B707II No 161.60 129.57 32.03
M16 CAELin No 169.38 141.10 28.28
M16 CAELin2 No 169.08 140.22 28.86
M16 CAENLin Yes 168.25 143.18 25.07
M16 CAENLin2 Yes 169.34 143.61 25.73
M16 EARClassic No 163.40 137.18 26.21
M16 HLLeightning Yes 169.02 137.02 32.00
M16 HLLeightning No 170.07 139.19 30.87
M16 HLThunder Yes 170.78 145.01 25.77
M16 HLThunder No 170.70 144.68 26.03
M16 ISLNLin Yes 166.78 150.88 15.90
M16 ISLNLin2 No 170.64 152.83 17.81
M16 PH10A No 162.84 130.43 32.40
M16 PH9Bullseye No 163.05 135.36 27.70
M16 PT6S Yes 160.78 133.79 26.98
M16 PT6S No 160.16 134.54 25.62
M16 SilELP97 Yes 163.65 144.60 19.05
M16 SilELP97 No 163.55 144.81 18.74

3M Confidential

3M00027126

Confidential - Subject To Protective Order

3M_MDL000024875

# EXHIBIT B



Contact Log

Type Email    Incoming    Outgoing    Assign to...
                                      Elliott
From Mark Little, Maj, US Army
Email Address lzl3@cdc.gov            Category
Date Mon-Aug 20, 2001  12:00am       C-Serv

Purge After 60 Days

Notes | Custom Fields | Linked Entries | Attachments

Courier New   10   B  I  U  A

Dr Berger, I got your e-mail from the EARLog web pg
and you may also have
received an e-mail from Dr Doug Ohlin at the Army
Center for Health
Promotion and Prev. Med. (CHPPM) requesting some
info for me. I am an Army
Audiologist doing a 1 yr research fellowship at

OK   Cancel   Help

Notes | Custom Fields | Linked Entries | Attachments

Courier New   10   B  I  U  A

Audiologist doing a 1 yr research fellowship at
NIOSH. I would like to run
some studies on the Army's Combat Arms Earplug
(CAE), which I'm told and
have read reference to is made from the EAR
Ultrafit plug. What info can
you provide or discuss with me on actual studies

OK   Cancel   Help

Notes | Custom Fields | Linked Entries | Attachments

Courier New   10   B  I  U  A

have read reference to is made from the EAR
Ultrafit plug. What info can
you provide or discuss with me on actual studies
done on this plug by your
company?? Looking forward to hearing from you as
there is very little info
out there re: the CAE.

OK   Cancel   Help

w

3M Confidential

Confidential - Subject To Protective Order

3M00020409

3M_MDL000018428

Major Mark Little                                                    September 18, 2001
NIOSH
Robert Taft Laboratories
Mailstop C-27
4676 Columbia Pkwy.
Cincinnati, OH  45226-1998

Dear Mark:

In response to our conversation this morning I have put together the following information on the Combat
Arms Earplug (CAE).

- A consumer package is enclosed.  In that market we sell the product as the Indoor/Outdoor Range
  E•A•R® Plugs.  You can use the instructions from the package for your Method B testing.  You can
  also find that product listed on our web site under the AO Safety brand name, consumer products,
  hunters/shooters.  The exact address is: http://www.aosafety.com/shooters/products/ear_03.htm.
- A copy of a letter from Pascal Hamery from January 2000 in which he provides insertion loss data in
  impulsive noise, measured on the ISL blockhead for the CAE.
- REAT test reports for both ends of the CAE measured according to ANSI S3.19.

Regarding our quality tests on the CAE, I reviewed our files and can verify that we conduct quality checks
using an acoustic impedance device to assure that the plugs have been assembled properly, that the
cartridges are in place, and that the dimensions of the orifice fall within our specifications. Our quality
program is in conformance with ISO 9001.

This should provide you the information you require to develop your own program of evaluation of the
CAE.  I look forward to hearing from you as you embark upon your research.

Sincerely,


Elliott H. Berger
Senior Scientist, Auditory Research

Encl.:   1 consumer pkg. Of Indoor/Outdoor Range plugs
         Copy of ISL impulsive data for the CAE
         REAT evaluations for CAE, both ends


Mark Little CAE1.doc

3M Confidential - Attorneys' Eyes Only                          3M00008624

Confidential - Subject To Protective Order                      3M_MDL000008624



3M Confidential

3M00020410

Confidential - Subject To Protective Order

3M_MDL000018429



3M Confidential

Confidential - Subject To Protective Order

3M00020411

3M_MDL000018430

Exhibit 5



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

Office of the General Counsel

Public Health Division
12501 Ardennes Ave., Ste 301
Rockville, MD 20857
(301) 443-2644
FAX: (301) 443-2639

September 9, 2020

BY EMAIL (ashley.neglia@kirkland.com)

Ashley Neglia, Esq.
Kirkland & Ellis LLP
555 S. Flower Street
Los Angeles, CA 90071

RE: Amended Subpoena to Testify at a Deposition in a Civil Action Issued to Dr. William J.
Murphy; In Re: 3M Combat Arms Earplug Products Liability Litigation, CA 3:19-md-02885
(N.D. Fl.)

Dear Ms. Neglia:

The U.S. Department of Health and Human Services, Office of the General Counsel, Public Health
Division, CDC Branch is in receipt of your Subpoena to Testify dated and served August 26, 2020,
on behalf of your client 3M Company *et al.* ("3M") under Federal Rule of Civil Procedure 45
("Rule 45"). The subpoena commands CDC/NIOSH employee Dr. William J. Murphy to provide
testimony via deposition pursuant to Section II.A of Exhibit 1 of the subpoena.

This letter serves as HHS' Rule 45 objections to your subpoena. Please note we reserve the right
to supplement these objections in the future and we do not waive other objections that may be
applicable in discovery or at trial.

First, we object to the subpoena on the ground that the scope of the subpoena exceeds the scope of
permissible discovery under Fed. R. Civ. P. 26(b), as it seeks testimony that does not appear to be
relevant to any party's claim or defense and/or is not proportional to the needs of the case.

Specifically, in your February 6, 2020 Touhy request letter, you stated that the testimony you
sought was in part "relevant to . . . [your] federal government contractor defense," and would "help
aid the Court's desire that the parties complete government discovery related to the federal
government contractor defense in a timely manner." By simply tying your subpoena to this Touhy
request, you continue to rely on this justification.

However, as you are no doubt aware, this defense has been summarily dismissed by the court in
this litigation. See Summary Judgment Order, ECF No. 1280 (July 24, 2020); Order Denying Def.
1292(b) Mot. at 1-2 (Aug. 17, 2020). You have made no attempt to provide a new basis for this
subpoena, and are merely renewing your Touhy request using a now-invalid basis. This is
unacceptable and in no way can justify CDC's compliance with the subject subpoena.

Ashley Neglia, Esq.– Page 2

Moreover, to the extent you continue to seek testimony on "[t]he testing performed by Mr. Murphy," that information has already been provided to you in Dr. Murphy's July 29, 2020 declaration and in the documents provided by the CDC accompanying that declaration and previously to Mr. Wasdin, as well as in documents already publicly available. Specifically, the CDC has produced or otherwise released all of Dr. Murphy's published studies on the CAEv2 and provided you with a declaration describing those studies and results, and you and your experts are free to draw whatever inferences you wish from the proffered information. In sum, the information you seek is already in your possession. *See* Fed. R. Civ. P. 26(b)(2)(C).

Relatedly, we object to your subpoena because it is unduly burdensome, unreasonably cumulative and duplicative in violation of Rules 26 and 45 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(b)(2)(C)(i); Fed. R. Civ. P. 45(d)(1), (d)(3). Courts routinely protect non-parties from the undue burden of discovery. *See, e.g., Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998). "Although discovery is by definition invasive, parties to a lawsuit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs." *Id.*; *Sahu v. Union Carbide Corp.*, 262 F.R.D. 308, 317 (S.D.N.Y. 2009) (stating that courts are more sensitive to discovery burdens on third parties).

HHS has a judicially cognizable interest in preserving scarce resources and we have determined that your request for Dr. Murphy's testimony is duplicative and unduly burdensome on the agency and Dr. Murphy because the requested information is already in your possession.

In response to your colleague Mark Wasdin's February 6, 2020 Touhy request to CDC Director Redfield, the Director, by letter dated July 23, authorized the submission of a declaration from Dr. Murphy. That declaration was provided to your colleague Mark Wasdin by me via email on July 30, 2020.

Specifically, Director Redfield permitted Dr. Murphy to provide a declaration "limited to a general explanation of Dr. Murphy's testing procedures, the fitting of the CAEv2 during his testing, his test results, and the attenuation achieved with the CAEv2." In other words, Dr. Murphy's declaration addressed the topics set forth in Mr. Wasdin's Touhy request. Dr. Murphy was not authorized "to address any testing he conducted that was not published or that did not concern the CAEv2." Noting that the CDC is not a party to the underlying litigation, Director Redfield explained that providing a declaration was "a more suitable approach given Dr. Murphy's minor role in this matter and the ever-present demands that have been placed on NIOSH, CDC and [HHS] in responding to the ongoing Coronavirus Disease 2019 pandemic."

Your August 26, 2020 subpoena for testimony does nothing more but refer back to this Touhy request. It makes no effort to explain why Dr. Murphy's proffered declaration is in any way insufficient, and makes no argument regarding what if any information sought remains unreleased and why the CDC should expend further agency resources to provide information already in your possession, particularly when the agency is focused on combatting the ongoing COVID-19 pandemic. To that point, as noted above, Dr. Murphy is currently performing COVID-19-related

Ashley Neglia, Esq.– Page 3

work as part of a CDC Workplace Safety and Health team, and anticipates doing so through the date of the proposed deposition.

Thus, complying with your subpoena would require HHS to spend taxpayer dollars and utilize government resources in the midst of a pandemic to prepare for and submit to a deposition for information that is currently in your possession and control. Rule 45 expressly provides that "[a] party or attorney responsible for issuing a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Based on our review of the August 26 subpoena for testimony, we have determined that you have failed to take reasonable steps to avoid imposing an undue burden that is unreasonably cumulative and duplicative on HHS and Dr. Murphy.

Finally, the subpoena is objectionable to the extent that it seeks privileged materials. See Fed. R. Civ. P. 45(d)(4)(A)(iii). In particular, to the extent your Touhy request seeks information about Dr. Murphy's work regarding the CAEv2 that is unpublished or otherwise not final, or work unrelated to the CAEv2, the subpoena implicates the deliberative process privilege, which applies to "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002), cert. denied, 538 U.S. 1056 (2003) (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)). Such documents include unpublished data and other work where Dr. Murphy and/or the agency did not reach a final conclusion or a position deemed suitable or worthy of publication or other public dissemination. *See, e.g., Moye, O'Brien, O'Rourke, Hogan & Pickert v. Nat. R.R. Passenger Corp.*, 376 F.3d 1270, 1280 (11th Cir. 2004); *Hamilton Sec. Grp. Inc. v. Dep't of Housing & Urban Dev.*, 106 F. Supp. 2d 23, 29-32 (D.D.C. 2000); *see also* Fed. R. Civ. P. 45(d)(3)(A)(iii).

For the foregoing reasons, we object to your Rule 45 subpoena for testimony in the above-described proceedings.

Sincerely,

*L. Mll 4*

L. Michael Rafky

cc:  Jacqueline Coleman Snead
     Joshua Kolsky
     Matt Horwitz

# EXHIBIT F

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


IN RE: 3M COMBAT ARMS EARPLUG    )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,   )
                            )    Pensacola, Florida
                            )    May 20, 2019
                            )    2:10 p.m.
                            )
                            )
_____)


*TOUHY* PRESENTATION
by
AUSA LEAH BUTLER,
AUSA KATHRYN DREY,
and
MAJ. COLLIN EVANS


BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
(Pages 1-50)

**A P P E A R A N C E S**

FOR THE PLAINTIFFS:          **BRYAN F. AYLSTOCK, ESQUIRE**
(Liason)                     Aylstock, Witkin, Kreis & Overholtz
                             17 E Main Street, Suite 200
                             Pensacola, Florida  32502


FOR THE DEFENDANT:           **KIMBERLY BRANSCOME, ESQUIRE**
                             Kirkland & Ellis, LLP
                             333 South Hope Street
                             Los Angeles, California  90071

                             **MARK J. NOMELLINI, ESQUIRE**
                             Kirkland & Ellis, LLP
                             300 North LaSalle
                             Chicago, Illinois  60654

```
             1                    P R O C E E D I N G S
02:10        2              THE COURT:  Welcome back, most of you.
02:10        3              And Ms. Branscome and Mr. Nomellini, welcome.
02:10        4              MS. BRANSCOME:  Thank you, Your Honor.
02:10        5              MR. NOMELLINI:  Thank you, Your Honor.
02:10        6              THE COURT:  Happy to have you join us for
02:10        7    this presentation.
02:10        8              Ladies and gentlemen, it's my honor to
02:10        9    introduce Assistant United States Attorneys Leah
02:10       10    Butler and Kathryn Drey, who are here along with Maj.
02:10       11    Collin Evans of the United States Army.
02:10       12              As you know, they have graciously agreed to
02:10       13    speak to us this afternoon about navigating the
02:11       14    so-called *Touhy* framework, discuss with us the issues
02:11       15    that may arise in this litigation as the parties begin
02:11       16    to seek documents and then later testimony from the
02:11       17    federal government.
02:11       18              Before they begin with their presentations, I
02:11       19    want to remind everyone that neither the United States
02:11       20    Attorney's Office nor the United States Army is
02:11       21    obligated to be here today to meet with us about *Touhy*
02:11       22    requests.  They're not a party to this litigation.
02:11       23    They're not required in any way to even engage with us
02:11       24    at all.
02:11       25              Their presence here and the work that they've
```

02:11  1  done to prepare for today has been completely

02:11  2  voluntary, and I appreciate very much their

02:11  3  willingness to be here to work with us as we try to

02:11  4  navigate through what appears to be a complex

02:11  5  discovery journey for us.

02:12  6       Now, also I'm going to ask everyone to please

02:12  7  recognize that this case is not the military's only

02:12  8  priority, and we're very fortunate to have them

02:12  9  involved, again, here from the very outset.

02:12  10       With that said, there are limits to what

02:12  11  Ms. Butler and Maj. Evans are going to be able to say

02:12  12  and do here today.  They are not going to be

02:12  13  committing to any particular course of action, any

02:12  14  particular procedure in regards to the litigation.

02:12  15       I believe, based on my discussions with them,

02:12  16  that their role at this stage is strictly

02:12  17  informational at a macro level.  So please do respect

02:12  18  these boundaries and please try not to overwhelm them

02:12  19  with questions that get into the minutiae or the weeds

02:12  20  too much and push for answers or results that they're

02:12  21  not in a position to give us at this point.

02:12  22       Again, thank you for being here.

02:12  23       I believe, after Maj. Evans and Ms. Butler

02:13  24  present, then Mr. Rasmussen is going to also take a

02:13  25  few moments to speak to you about his own experience

02:13   1    in the military and what he knows about *Touhy* in

02:13   2    making these types of requests and how important it is

02:13   3    to begin the process cooperatively.

02:13   4            Ms. Butler?

02:13   5            And Ms. Butler recently had surgery, and so a

02:13   6    bigger thank you for being here.

02:13   7            **MS. BUTLER:**  I'm trying my best not to fall

02:13   8    down in front of everybody, but Maj. Evans has assured

02:13   9    me he will assist me in getting up off the floor if

02:13   10   that should happen.

02:13   11           I want to thank you for having a chance to

02:13   12   talk with you this afternoon.  And Judge Rodgers has

02:13   13   asked me to speak very basically about what the *Touhy*

02:13   14   regulations are.  So if you're familiar with the *Touhy*

02:14   15   regulations, this would probably be just repeated

02:14   16   information for you.  But for those of you who don't

02:14   17   know about it, I just wanted to let you know the basic

02:14   18   -- what they are, how it works, and then Maj. Evans is

02:14   19   going to talk a little bit more about how it might

02:14   20   apply to this case and to production of documents by

02:14   21   the various branches of the military.

02:14   22           Some of you don't know what *Touhy* regulations

02:14   23   are.  I put the name up there.  We're not doing a

02:14   24   PowerPoint, but it spells so funny, I thought you

02:14   25   might want to see how it looks.  And you might be

1    wondering what are the *Touhy* regulations and why

2    should I care about it.  Well, I'm going to tell you

3    my experience and how I learned to care about it.

4         Years ago I was a state prosecutor, and I

5    know there's a couple of people out here who have done

6    that.  But when we're getting ready for trial, there's

7    a docket day two weeks before jury selection when

8    about 80 defendants come in and announce to the Court

9    whether they need an extension, whether they want to

10   change their plea and plead no contest or sometimes

11   guilty or whether they're ready for trial.

12        And I would leave the courtroom with a big

13   bucket of about forty cases all set for trial the same

14   jury trial week.  And obviously they couldn't all be

15   tried that week, but I didn't know what was going

16   first, who was going to decide they needed a

17   continuance within the next two weeks, or who was

18   going to decide to plead guilty, so I had to get

19   everything ready.

20        One of my cases that trial period was a first

21   degree murder case.  And it just happened that a

22   federal agent, an ATF agent, had appeared at the

23   scene.  And he was not a long witness, but he was an

24   important witness.

25        And so about a week before trial, I get this

02:15  1    call from some person with the government who tells
02:15  2    me, 'I'm sorry, the agent is not going to be there
02:15  3    because you didn't make a *Touhy* request.'
02:15  4          And so my first thought was, 'Is this some
02:15  5    kind of government form like a 2E request, or what is
02:15  6    this?'  And she said, 'You have to tell us why this
02:15  7    testimony is relevant, why do you need it, what
02:15  8    information you're going to need, and, oh, by the way,
02:15  9    you have to do that 14 days before you want the
02:15  10   testimony.'
02:15  11         Well, you can imagine I was freaking out at
02:16  12   that point saying, 'I don't have two weeks.  I don't
02:16  13   even have time to stop and do this.  I'm getting ready
02:16  14   for trial, getting subpoenas out, prepping witnesses,
02:16  15   getting all this ready.  I cannot believe the
02:16  16   government is intruding in this and you're requiring
02:16  17   me to do this.'
02:16  18         Well, we worked it out.  She helped me, and
02:16  19   we got the witness there, and everything went well.
02:16  20         But years later when I came to the U.S.
02:16  21   Attorney's Office and I had to start dealing with
02:16  22   *Touhy* requests from requesters, I began to realize
02:16  23   that those rules are not rules that just keep you from
02:16  24   getting testimony or keep you from getting evidence;
02:16  25   they're actually regulations that enable you to get

it.  Because of the Supremacy Clause and sovereign
immunity, you wouldn't be able to get those documents
unless the *Touhy* regulations were there.  So that's
the first thing.

It does require some work on your part.
There are some restrictions to it, time limitations
and that sort of thing.  But in the end, it helps you
to get what you want.  So I'm asking you to keep that
in mind as you go forward making requests.

Now, you might wonder how the *Touhy* name came
up.  It came from a case called *Touhy v. Ragen* back in
1949.  And Roger "The Terrible" Touhy was a person who
filed a request for FBI documents from the FBI office
in Chicago.  And the resident agent in charge showed
up in federal court and told the judge, 'Respectfully,
Your Honor, based on orders from the Attorney General,
I'm not going to be able to produce any documents,' to
which the federal judge said, 'I'm going to hold the
person in contempt the highest person who will stand
in your shoes.'

And so the case went on from there and it
ultimately ended up at the Supreme Court where the
Court ruled that that was something that was in the
authority of agency heads like the Attorney General.

And after that, the regulations became known

as the *Touhy* regulations, because actually they were
in place before the *Touhy* case came along, they just
weren't called that.

The regulations are important because they
set out the method by which you can get the testimony
or get the documents, and they also have another side
to them for the various agencies about how they're
going to go about gathering those documents, producing
them, or producing the witnesses. There's a few
little hitches along the way that I wanted to talk
with you about today.

First of all, when you make the *Touhy*
request, each agency has regulations. They're set out
in CFR, and they explain what the agency -- the
factors they're looking at in making the productions
and what you have to do to comply.

So there are time limits. And while most of
these *Touhy* regulations are similar if not the same,
there are some differences. So you should always
check the regulation for the particular agency that
you're going to make the request from to see what the
time limitations are and what you need to include.

But basically you need to include, with
respect to the documents or testimony that you're
seeking, why that's relevant to your case, why you

02:18  1    need it, and then you need to set out specifically

02:19  2    what you're going to -- in the case of having

02:19  3    witnesses come, what you're going to be asking them

02:19  4    about.

02:19  5         Because when your request makes its way to

02:19  6    the lawyer with the federal agency, they're going to

02:19  7    be looking at it for a number of things.  They have to

02:19  8    look at those to see if they meet any of the

02:19  9    exemptions.  Some of the exemptions are things like we

02:19  10   don't give out documents that would reveal the

02:19  11   identity of confidential informants, and obviously you

02:19  12   can see why that would be important.  We don't give

02:19  13   out information that reveals sensitive law enforcement

02:19  14   techniques because obviously we don't want people who

02:19  15   are committing crimes to know what officers are

02:19  16   developing and learning or using to try to catch them

02:19  17   while they're doing that.

02:19  18        But there are also other things like we don't

02:19  19   give out classified information, information that

02:19  20   would affect national security, information that

02:19  21   contains Privacy Act information.  So in that case,

02:19  22   you have to either get a waiver from the person who

02:19  23   the information applies to or get a court order before

02:19  24   that information can be released.

02:20  25        So you have to think about the kinds of

02:20  1    documents you're looking for and whether they fall

02:20  2    into any of those categories.

02:20  3          Just because something falls into a category

02:20  4    doesn't mean that you won't necessarily get anything

02:20  5    or any document or any response. You may get

02:20  6    something that's heavily redacted.

02:20  7          So, again, when you're making your *Touhy*

02:20  8    request, a little more carefully you can think about

02:20  9    where this is coming from and what it is you really

02:20  10   need from those documents. Maybe you just need the

02:20  11   information about how many people had a particular

02:20  12   illness, but you don't need to know the name of every

02:20  13   specific person who had that. So those are some

02:20  14   considerations that you can look at when you're making

02:20  15   your *Touhy* request.

02:20  16         One thing that's significant and important is

02:20  17   that *Touhy* requests are not under the same rules as

02:20  18   the Federal Rules of Civil Procedure. So when you

02:20  19   make a request, if you say things like, I want any and

02:20  20   all documents that refer to mentioned name, whatever,

02:20  21   whatever of this particular person, that's going to be

02:20  22   way too broad in a *Touhy* request. Because one of the

02:21  23   considerations is whether, in making that request, the

02:21  24   government would have an undue burden or undue cost in

02:21  25   producing it, so you have to try to be reasonable with

your request.

And secondly, if your request was too broad and you get a huge, big batch of documents back, many of them are not going to be even what you're looking for, and then you're going to have to go through all that and ferret out what's important and what's helpful.  So it really helps not only on the producing side but on the receiving side if you can make your requests more specific.

You also need to keep in mind that the first request that you make isn't the only one that you can make.  You can work with the agency counsel to sort of hone that, to expand it, to add things as you learn more.  So you don't need to try to take a really broad brush, you know, the "any and all" and "every single" and whatever.  As you kind of narrow down through discovery what you need, you can make subsequent requests.

You'll also make your request much quicker the more narrow it is.  Because what the agency has to do, they have to locate the document, which, in the case of something like the Air Force or the Army, that's worldwide.  They have to find what you're looking for, who has it, how to get it.  And then when they get it, they have to review it for privileges,

exemptions.  And then they have to figure out how best to produce it.  That would be producing it to how many people they're producing it to or producing it in what form, how they're going to do that.

So those are all considerations as you guys are developing your discovery plans that you should think about if your goals are to get what you need and get it more quickly and make it not an undue burden or undue cost to the government in doing that.

When you subpoena a witness to testify, there are special rules that apply to that.  And generally speaking, the government doesn't really want to have employees coming out and testifying.  Some of the thinking is you don't want to appear to be on one side of litigation when the government is not a party.  And the other thing is you want to have government employees working and completing the missions of their agencies or their military branch, not out testifying all the time.

But usually the agency will ask, if they can answer your request, if they can answer it with a declaration or an affidavit, and sometimes that will suffice or at least get you started with what you need.  Other times you may need the witness to actually come and testify.

Case 3:19-md-02885-MCR-HTC Document 1457-6 Filed 10/08/2015 Page 239 of 318

1    02:23    When you do that, you need to understand that

2    02:23    federal employees who are called to testify in a case

3    02:23    in which the government is not a party about something

4    02:23    that they know because of their employment and within

5    02:23    the scope of their employment, they don't have

6    02:23    authority to testify about anything.  Even if they get

7    02:23    a subpoena, court order, they don't have authority to

8    02:23    testify about it.

9    02:23    So what happens is, they have to get

10   02:23   authority from the agency, and the agency -- that's

11   02:23   why they need you to tell them 'these are the things I

12   02:23   want to ask about.'  And again, you need to be pretty

13   02:23   specific with what you want, but include what you want

14   02:24   to ask.

15   02:24   I had a request from an attorney in state

16   02:24   court not long ago who was really angry when he found

17   02:24   out that he had to comply with it, and so his request

18   02:24   said something like:  'I want to know everything that

19   02:24   the DEA agent thought about this case, knew about this

20   02:24   case, suspected about this case, or dreamed about this

21   02:24   case.'  And so, of course, we had to respond and say

22   02:24   you're not going to get all that.

23   02:24   So, if you make your request reasonable, the

24   02:24   agency can figure out what it is you need and whether

25   02:24   they can give authority to the witness to testify

02:24  1    about it.

02:24  2            When these witnesses show up at deposition,

02:24  3    they'll have a written authority letter telling them

02:24  4    what they can testify about.  And if they testify

02:24  5    about something that's not within their authority or

02:24  6    they don't have any authority, they just come because

02:24  7    they got a subpoena, they can be criminally prosecuted

02:24  8    for that or fired or both.

02:24  9            So it's not up to the witness whether they

02:24  10   have authority and it's not up to the witness what

02:24  11   authority they have to testify about.

02:25  12           If they come and there's something that

02:25  13   they're asked about that's outside their authority and

02:25  14   they can't answer that, then you can always seek

02:25  15   subsequent authority to see if they can tell you about

02:25  16   it.

02:25  17           There's one issue that I think might come up

02:25  18   in this case and that's involving expert witnesses.

02:25  19   Generally speaking, government employees are not

02:25  20   allowed to testify as experts except in exceptional

02:25  21   circumstances.  So you have to show a really

02:25  22   substantial particular need for it and almost to the

02:25  23   point of showing that you can't get the testimony

02:25  24   anywhere else.

02:25  25           When witnesses come in and testify as

| | |
|---|---|
| 02:25 | 1 |
| 02:25 | 2 |
| 02:25 | 3 |
| 02:25 | 4 |
| 02:25 | 5 |
| 02:25 | 6 |
| 02:25 | 7 |
| 02:25 | 8 |

treating physicians, they're not experts.  So when they come in, they can testify to information that's in their record, but they can't give expert opinions. And that's not their decision, not because they necessarily don't want to or couldn't.  It's because it's not within their authority to testify about it. And so, the issue with the experts comes up frequently in that area.

And then another example I think that shows it really kind of more clearly is sometimes it's really hard to tell what's expert testimony and what's not.

For example, I had a case with the Army Corps of Engineers.  Wetlands are a really big issue here in Florida.  And they often go out and observe the area and determine whether it's a wetlands or was a wetlands or whatever the issue is.

And an attorney subpoenaed one of the engineers to come to a -- to testify in a trial down in St. Joe in a state court case.  And I called the attorney and said, 'He's not going to be able to come and do that because you're wanting him to say whether the land he saw was wetlands and that's an expert opinion." And he said, 'Oh, well, I don't really need him to testify about that.  Could he just say when he

02:26 1   went there whether he saw hydrant soil and this and

02:26 2   that, particularly vegetation that grows in wetlands?'

02:26 3   And I said, 'Well, the Court takes the position that

02:26 4   that's expert testimony as well because you and I and

02:26 5   the average person wouldn't know if they saw that, so

02:26 6   no, he won't be permitted to testify about that.'

02:27 7        So when you're making requests for experts or

02:27 8   for witnesses who you don't think are experts, you

02:27 9   need to think in terms of some of those issues,

02:27 10  because those things may come up and make it difficult

02:27 11  for the witness to get authority to appear and

02:27 12  testify.

02:27 13       One other thing is some of these depositions,

02:27 14  particularly ones with physicians, there may be a

02:27 15  third-party attorney there that would be the agency

02:27 16  counsel or the military counsel who may appear with

02:27 17  the witness so that they can help the witness know

02:27 18  when the witness is testifying outside their

02:27 19  authority.  And that makes it a little bit different

02:27 20  than your normal depositions.

02:27 21       But I can't stress enough that it's not

02:27 22  really up to the witness.  And oftentimes attorneys

02:27 23  will get very angry when the witness is there alone

02:27 24  and be very upset if the witness isn't answering or

02:27 25  refusing to answer or isn't sure they can answer.  And

1    I want to make sure that you understand that's not
2    their decision.  They're required to do that, and
3    there are important, significant consequences to them
4    if they don't abide by that.
5        So I guess the bottom line that I would point
6    out is that you make your -- you don't have to wait
7    until the 14 days before the *Touhy* regulation allows
8    that.  And in fact, if you wait that long, it may not
9    be able for the agency to comply within that period of
10   time.
11       So the sooner you can make your request and
12   the more narrow in asking specifically for what you
13   want that you can make in the request, the more
14   quickly that you'll get it back.  And you'll also have
15   an opportunity, if the government is objecting, to
16   know why that's happening and try to figure out ways
17   perhaps with agency counsel how you can remedy that or
18   get around that.  And just know that there's some
19   circumstances where you're just simply not going to
20   get it or you're going to get a piece of paper where
21   it's mostly black where it's been redacted.
22       But if you look at it like it's not such a
23   negative thing and you can work with the agency, you
24   can have a much better, more pleasant experience, you
25   can get what you want much sooner.  And when you're

02:28  1    working on the case, as you learn specific things, you

02:28  2    should ask for those.  Because it's much easier for

02:29  3    the agency to find it if you're asking for particular

02:29  4    things.  And especially in this case if you know where

02:29  5    something is, where a report is, a person who did

02:29  6    something, if you can give as much specific

02:29  7    information as you can, that will help the agency in

02:29  8    responding to that request.

02:29  9        So now I'm going to let Maj. Evans talk with

02:29  10   you a little bit about what it looks like coming from

02:29  11   the producing attorney's perspective.

02:29  12       **THE COURT:**  Thank you, Ms. Butler.

02:29  13       Maj. Evans, as you come forward, Maj. Evans

02:29  14   is a member of the United States Army, and he has been

02:29  15   designated as the point of contact for this litigation

02:29  16   for the Army.  But he is here also today with the

02:29  17   authorization of the Department of Defense because the

02:29  18   other branchs were not able to send an individual

02:29  19   attorney from those branches.  So Maj. Evans is here

02:30  20   sort of on behalf of all of the branches today.

02:30  21       He's going to do his best, based on the

02:30  22   limited information he has about this litigation, to

02:30  23   sort of walk us through how it's best for us to get

02:30  24   started with the document requests.  Because there are

02:30  25   two categories -- this is what Maj. Evans has been

02:30   1   told -- there are two categories of information at

02:30   2   least here initially that you all are going to be

02:30   3   needing from the military, and one pertains to the

02:30   4   servicemen and women's personnel files, training

02:30   5   records, and then the other pertains to the research

02:30   6   and development data on the earplugs at issue.

02:30   7           Thank you, Maj. Evans.

02:30   8           **MAJ. EVANS:**   Thank you, Your Honor.

02:30   9           Good afternoon.   I'm Maj. Collin Evans.   I've

02:30   10   been a judge advocate for about 11 years, and so,

02:30   11   unfortunately for me, I do a lot of *Touhy* practice.

02:30   12   And that can be an interesting area to practice and it

02:31   13   can involve reviewing a lot of documents.

02:31   14           So what I want to walk you through today is

02:31   15   how this process looks from inside the DoD and how we

02:31   16   can make it easier on your end to facilitate getting

02:31   17   you the information that we are trying to get or that

02:31   18   you are trying to get.

02:31   19           The main thing I want to say is we're

02:31   20   impartial.   Most of you are used to dealing with

02:31   21   adversarial processes on a day-to-day basis when

02:31   22   you're dealing with opposing counsel.   But we're not

02:31   23   your opposing counsel.   Our job is just to follow the

02:31   24   regulations that we've been given.   And I'll list out

02:31   25   each branch's regulations at the end of this for you.

02:31  1          Our job is just to receive the requests and
02:31  2   process them in a way that is in line with the
02:31  3   regulations and get you the information that we can
02:31  4   give you.  And a lot of times that can be confusing
02:31  5   because I think most of you are used to writing very
02:31  6   broad discovery requests, at least in my experience
02:31  7   from receiving *Touhy* requests.  And what you're going
02:31  8   to get when you send that to me is a phone call back
02:31  9   trying to narrow that down to specifically what you
02:31  10  want.
02:32  11         So if you can take some time early -- and you
02:32  12  know your cases better than I will.  So if you can
02:32  13  take some time early and list out specifically things
02:32  14  that you know you specifically want, that would be a
02:32  15  huge help.  And the reason it's in your best interest
02:32  16  is it will be a lot faster for you.
02:32  17         Because I think the other thing a lot of
02:32  18  people think is, if I, Maj. Evans, called a private in
02:32  19  the Army and tell them to get me something, that
02:32  20  private is going to salute and move out swiftly and
02:32  21  get that.
02:32  22         But the problem is, if I, Maj. Evans, from
02:32  23  the Office of the Judge Advocate General call a
02:32  24  private in a hospital in Korea, that private has no
02:32  25  idea who I am and is probably going to hang up the

02:32   1    phone and forget about me in hopes that I will forget

02:32   2    them and they won't have to do anything.

02:32   3            So, if you know specifically what you want,

02:32   4    it makes it easy because I can call that private's

02:32   5    boss rather than just cold calling that private, and

02:32   6    we can move the system a little bit faster.

02:32   7            One thing I do want to say is how this

02:32   8    process works.  So the regulations, when y'all start

02:33   9    to read them, you'll see the regulations tell you that

02:33   10   the servicing staff judge advocate for the

02:33   11   installation or the respective litigation divisions

02:33   12   for the different departments can approve or deny a

02:33   13   request.

02:33   14           Right now we're processing through -- because

02:33   15   I will tell you two weeks ago my boss walked into my

02:33   16   office and said, "Hey, I have a really exciting

02:33   17   opportunity for you" -- and I had been seeing about

02:33   18   this in my social media, so your advertisements are

02:33   19   out there and they work -- but he said, "I have an

02:33   20   exciting opportunity to excel for you," which I don't

02:33   21   -- we'll find out at the end of the year if it's true.

02:33   22           But basically when those requests come in, it

02:33   23   is probably going to come to the litigation division

02:33   24   because there's going to be a lot of information.  So

02:33   25   don't hold me to that yet because I've only had this

02:33   1   for two weeks. And the DoD, who is my higher boss, is

02:33   2   working that out. But it's likely going to be the DoD

02:33   3   is going to take the requests and then they're going

02:34   4   to filter them out to the rest of us.

02:34   5         What I'm going to do is, after that decision

02:34   6   gets made, DoD and myself and the other

02:34   7   representatives at the branch will probably talk with

02:34   8   Ms. Butler and we'll be able to push that information

02:34   9   out. And that should be coming very, very shortly.

02:34   10   It's not going to take a long time for that decision

02:34   11   to be made, it's just not for me to make that

02:34   12   decision.

02:34   13         What that means is the DoD and the respective

02:34   14   litigation branchs are responsible for making a

02:34   15   determination as to whether or not your requests are

02:34   16   going to be approved.

02:34   17         Most of the time what you're requesting is

02:34   18   particular information about either a servicemember or

02:34   19   a particular test that was done or things of that

02:34   20   nature. Most of those will be approved because that's

02:34   21   why you're requesting them. And it's not like we're

02:34   22   dealing with national security or any of the

02:34   23   exemptions that Ms. Butler talked about.

02:34   24         But what I want you to understand is the

02:34   25   approval doesn't mean you're going to get it very

02:34    1    quickly.  Because if you've never been in the

02:34    2    military, it may be easy to think that all the

02:35    3    information is stored on one large server just like a

02:35    4    company, and you can made a request and the IT

02:35    5    department for the corporate head does a search, and

02:35    6    all of a sudden the next thing you know you have all

02:35    7    the data or all the emails, things like that.

02:35    8         That's not how the DoD works.  There are

02:35    9    going to be servers in a variety of locations, and

02:35   10    you're going to have to figure out -- by "you" I mean

02:35   11    me -- we're going to have to figure out who is the

02:35   12    right wicket to go through to acquire that

02:35   13    information.

02:35   14         And it may be that I have to go to the test

02:35   15    and research command versus going to the 82nd Airborne

02:35   16    Division or, you know, some sort of flight wing to

02:35   17    find that information.  So you need to -- this kind of

02:35   18    goes back to why we need specifics.

02:35   19         If you know that a certain test was done on a

02:35   20    certain -- you know a report was produced on a certain

02:35   21    date by a certain type of command or unit, let us know

02:35   22    that in your request.  Because what that does is that

02:35   23    cuts down the time for me or whoever else has to find

02:35   24    it from reaching out to 20 different people to narrow

02:36   25    down that type of information.

02:36   1          The next thing I want to talk about is

02:36   2   servicemembers' particular records.  So I did this

02:36   3   before I came down here to make sure I wasn't lying to

02:36   4   you.  I went on TRICARE online because I'm an active

02:36   5   duty servicemember and I looked to make sure I can

02:36   6   access all my records.  I can.  And so that means all

02:36   7   the clients can as well if they're on active duty.

02:36   8   We'll talk about people who are off active duty in a

02:36   9   second.

02:36   10          The reason I'm bringing that up is, if you

02:36   11   request from me all of their medical records -- just

02:36   12   to give you an example, I'm a fairly healthy Army

02:36   13   officer, I've not had a lot of medical issues, and I

02:36   14   have over 600 pages of medical records.  So I'm going

02:36   15   to send you, if you ask for that and we either have a

02:36   16   Privacy Act waiver or court order, I'm going to send

02:36   17   you 600-plus pages for each individual servicemember.

02:36   18   Now, you can see how that's going to get out of

02:36   19   control very quickly for all of you.

02:36   20          So, if you want just certain types of test

02:36   21   data -- I mean, I have my hearing tested every year

02:37   22   and I have bloodwork done every year.  If you want

02:37   23   specific types of data from those reports, either a)

02:37   24   have the servicemembers pull them themselves and

02:37   25   provide them to you -- that would be my

1  recommendation; or b) when we start to do the search

2  and deploy that information out, let us know that so

3  that we don't give you 600, 1,000, 2,000 pages of

4  medical data that you don't need nor do you really

5  want because it's not helpful for you.

6       If the servicemember is out -- I'm going to

7  tell you this whether you use it or not, I hope you do

8  -- if you go -- so the National Archives is who

9  controls records for servicemembers after they leave

10  the service, whether that be from retirement or

11  whether that be they left because their time in

12  service was up.

13       Www.vetrecs.archives.gov/veteransrequest/home

14  -- if you just Google "veteran records National

15  Archives" it will be the first thing that pops up.

16       If you have the person submit a request that

17  way, the National Archives advertises that 90 percent

18  of those responses are in ten days to that

19  servicemember.  That servicemember will get their

20  records by a web link that they can download in ten

21  days.  I think that 10 percent is probably people who

22  were out of the service for a long period of time and

23  so they may not have digitized those records yet and

24  they have to actually go into the archives to find

25  them.

02:38  1          The reason I bring this up is it may be

02:38  2     faster to do it that way for those records because you

02:38  3     can have each individual person pull them and provide

02:38  4     them to your staffs and you can do it that way versus

02:38  5     an IT person from the DoD being designated to pull

02:38  6     thousands of people's records.

02:38  7          Because the way the system works from my

02:38  8     understanding from when I've talked to people who

02:38  9     manage it, they can't do just 'here is a spreadsheet

02:38  10    of the names, the Social Security numbers, the dates

02:38  11    of birth,' and feed it into a system and pull it out.

02:39  12         One person is going to have to individually

02:39  13    pull out each one of those records -- or it won't be

02:39  14    one person, it'd probably be multiple people, but it's

02:39  15    going to take some time.  So I'd just ask you to

02:39  16    consider that when you're considering it.

02:39  17         We don't have a problem pulling that

02:39  18    information, but it may take more time than if you

02:39  19    just had your clients pull that information and

02:39  20    provide it.  I don't know.  I've never been in private

02:39  21    practice, so you guys can tell me if I'm a little off

02:39  22    base there, but I'm trying to save a little bit of

02:39  23    time there for everybody.

02:39  24         **THE COURT:**  Maj. Evans, I have a question.

02:39  25    What is included in that information?

02:39   1    **MAJ. EVANS:**  In the National Archives?

02:39   2    **THE COURT:**  Well, in the personnel -- like

02:39   3    you were referring to medical records.  Is there more

02:39   4    than that?

02:39   5    **MAJ. EVANS:**  Yes, Your Honor.

02:39   6    **THE COURT:**  What all would we expect to see

02:39   7    from somebody's file?

02:39   8    **MAJ. EVANS:**  So my understanding -- I've

02:39   9    never pulled one from the National Archives, but from

02:39   10   what I've read, what would be in there is what's

02:39   11   called your official military personnel file.  So

02:39   12   that's any sort of awards you've ever received, any

02:40   13   sort of what's called our servicemember group life

02:40   14   insurance plans like who we made designees, all this

02:40   15   administrative data from our time in service.  And

02:40   16   then additionally it would be your medical records as

02:40   17   well, so it would be your entire medical records for

02:40   18   your time in service that they have access to.

02:40   19   **THE COURT:**  Duty stations as well?

02:40   20   **MAJ. EVANS:**  Yes, Your Honor.

02:40   21   **THE COURT:**  And training records?

02:40   22   **MAJ. EVANS:**  Yes, Your Honor.  And I'm going

02:40   23   to talk very briefly about kind of how our -- how you

02:40   24   can easily tell where we've been and when, because

02:40   25   there's a one-page document that does deal with that.

02:40  1        **THE COURT:**  Thank you.

02:40  2        **MAJ. EVANS:**  Yes, Your Honor.

02:40  3        So, yeah.  So, if you -- the way our data

02:40  4  works for a servicemember is just, if you take me,

02:40  5  Maj. Evans, I have what's called an officer record

02:40  6  brief.  Each branch has it's own type of -- they'll

02:40  7  call it an different acronym.  For the Army it's an

02:40  8  officer record brief.

02:40  9        But there will be a one-page brief that has

02:40  10  my picture on it and then it has all of the places

02:41  11  I've ever served, when I've been promoted, all the

02:41  12  different ranks I've served at, my family data, so how

02:41  13  many kids I have, if I have a spouse, things of that

02:41  14  nature.  And then anything else that's relevant such

02:41  15  as skill identifiers, like if you went to airborne

02:41  16  school or if you were a jump master or things of that

02:41  17  nature.  That's all on a one-page document.

02:41  18        The big thing is it lays out the specific

02:41  19  dates that you were in a certain assignment.  So it

02:41  20  will say, you know, Maj. Collin Evans, from June of

02:41  21  2014 to July of 2018, Army Litigation Division, Fort

02:41  22  Belvoir, Virginia.  So it will lay out the specific

02:41  23  times and dates that I was -- or whoever was where.

02:41  24        That data is important to you because it will

02:41  25  tell you where they were and when and for how long and

02:41  1    also when they left the service.

02:41  2         Something that is important -- and this is

02:41  3    just I'm taking off my DoD hat and I'm just jumping

02:41  4    into the Army hat here because I can't speak for the

02:41  5    Air Force or the Navy on how they manage records.

02:42  6    When I move, because I move every two years -- it's an

02:42  7    exciting life sometimes -- if you take that -- when I

02:42  8    move, I'm given a hard copy of my medical records.

02:42  9    They're all digitized so I don't know why they give me

02:42  10   this hard copy because it just seems rife for me

02:42  11   losing it.  But they give me a hard copy of my medical

02:42  12   records when I leave, and then I take them, and then

02:42  13   when I in-process into a new location I give them

02:42  14   those medical records.  But still just remember

02:42  15   they're all digitized now, for the most part, and so

02:42  16   you should have everything there.

02:42  17        But why it's important is, if you're dealing

02:42  18   with an active duty servicemember right now, their

02:42  19   records, instead of -- some of their records, if they

02:42  20   didn't make it into the digital file, will be at the

02:42  21   location where they're at.  They're not going to just

02:42  22   be at some large facility warehoused.  You would have

02:42  23   to -- I would have to request that medical record from

02:42  24   the Fort Bragg Community Hospital where those records

02:42  25   are stored.

02:42    1          So it can be important with some of the

02:43    2   individuals involved in this because you'd be dealing

02:43    3   with the local installation.  And again, that just

02:43    4   adds time.  But just if we go ahead and go down and

02:43    5   reach down to them, we'll get them, and it will just

02:43    6   take a little bit of time to make that additional

02:43    7   request.

02:43    8          If you are going to request from us the

02:43    9   individual records for each soldier, the more

02:43   10   information you provide about them, the better.

02:43   11   Because I don't think I need to explain this, but how

02:43   12   many John Smiths or Megan Joneses were in the

02:43   13   military?

02:43   14          That name alone isn't going to get me

02:43   15   anywhere.  So I need you to provide at least the name,

02:43   16   the social, the date of birth, the branch of service,

02:43   17   and then, if you can, their time in service.  Because

02:43   18   that will help me or whoever is reviewing for these

02:43   19   records ensure that we have identified the right

02:43   20   person so we're not giving you the records for

02:44   21   somebody else.

02:44   22          That's important for two reasons.  One, you

02:44   23   want the right records; two, I don't want to violate

02:44   24   the Privacy Act and give you the wrong records of

02:44   25   somebody -- or HIPAA -- for someone who is not there.

```
02:44   1        To the extent possible, I need you to limit
02:44   2   the number of requests you make.  That's not the
02:44   3   number of requests that are inside of a request.
02:44   4   That's just how many times you ask me for something.
02:44   5   So, to the extent you can avoid asking me for one
02:44   6   thing and then a week later asking me for another
02:44   7   thing versus you lump together 14 requests into one
02:44   8   document and then I can more easily keep track of
02:44   9   those items.  And also, when you call me, it's easier
02:44  10   for me to understand what request you're talking
02:44  11   about.
02:44  12        Now, I understand that you're going to think
02:44  13   of things after you make one request and you're going
02:44  14   to have to submit another request.  But just to the
02:44  15   extent possible, that's just a favor I'm asking,
02:44  16   because it will make everybody's life a little bit
02:44  17   easier.
02:44  18        Additionally, if you call and we talk --
02:45  19   well, there's two points I want to make about calling.
02:45  20   One, acronyms can get confusing in the Army.  If I say
02:45  21   ORB, it doesn't really make sense.  I may talk in
02:45  22   acronyms to you on the phone, and I apologize.  Just
02:45  23   ask me to say what I'm trying to say.
02:45  24        But you can call and say, 'I'm dealing with
02:45  25   this acronym and I don't know what it is, how can I
```

1   best make this request?'

2          We're impartial, so we can facilitate helping

3   you -- helping all the parties make a request that's

4   easy to identify versus you just writing some sort of

5   vague thing that I then have to call you about anyway.

6   So just keep that in mind.  I probably will regret

7   that because my phone will probably ring off the hook

8   but -- no.  We're here to help, so we can definitely

9   do that for you.

10          The next thing is, if you call me, just

11   because we talked about it on the phone, you have to

12   make a request in writing.  *Touhy* requires that, so

13   you have to follow that up with a written request.

14   Otherwise, there is nothing I can do.  And I am not

15   going to call you back to say, 'Hey, are you ever

16   going to submit a *Touhy* request?'  It's your job, so

17   just please make sure you remember that.

18          So the next thing is just witnesses.  Most of

19   you are probably not used to dealing with a

20   third-party attorney in a deposition, and it can get a

21   little bit confusing, so I just want to touch on that

22   briefly.

23          First, you don't need to send a subpoena.

24   That subpoena signed by an attorney is not from a

25   court of competent jurisdiction from DOJ's

02:46  1   perspective.  So you need to send me a written request

02:46  2   for a witness, and then we make a determination if

02:46  3   they can be approved.  If they're approved, we send

02:46  4   you a response letter that lays out what areas they

02:46  5   can talk about.  Your request needs to ask for those

02:46  6   areas and then we will make a determination whether

02:46  7   those areas are approved.  The reason we send you that

02:46  8   letter back is so that it's clear for all parties

02:46  9   where we are and what we're doing.

02:46  10          And the third-party attorney who -- for the

02:46  11  Army it will probably be me most of the time, unless

02:46  12  my schedule conflicts, and we don't want to hold up

02:47  13  progress just because one attorney isn't there, so it

02:47  14  may be another attorney.  But what we will do there --

02:47  15  we don't object to form, we don't object to

02:47  16  foundation, we don't object to anything like that.  We

02:47  17  don't even object.

02:47  18          We just advise -- and I shouldn't say

02:47  19  "advise" because "advise" is the wrong word.  We

02:47  20  instruct the witness not to answer a question if it's

02:47  21  outside of the scope, and that's the end of it in the

02:47  22  sense that we cannot allow them to answer what's

02:47  23  outside of the scope.

02:47  24          So if you ask for an opinion, we would not

02:47  25  allow them to answer that question because they're not

02:47  1   allowed to give their opinion on behalf of the
02:47  2   government.  A lot of people get a little confused by
02:47  3   that, but we're not there to object, we're just there
02:47  4   to instruct.
02:47  5        The other thing is, send me your documents,
02:47  6   if you have exhibits, beforehand.  It will go much
02:47  7   faster.  Because if I can review what you're using as
02:47  8   an exhibit or as exhibits in your deposition, I can
02:47  9   bring my own binder so you don't have to make one for
02:47  10  me, and I can be prepared and I can understand where
02:47  11  you're going with things so that I don't instruct the
02:47  12  witness not to answer but really you weren't even
02:47  13  going in that direction and then we're kind of sitting
02:48  14  there loggerheads over something that I just didn't
02:48  15  understand.  So just send your exhibits to the
02:48  16  attorney beforehand and it will make everyone's life a
02:48  17  lot easier.
02:48  18        We -- the witness cannot be a government
02:48  19  expense.  So typically what happens is the attorneys
02:48  20  come to the witness wherever they may be unless you
02:48  21  want to pay for the witness to come to you.  That
02:48  22  doesn't count the attorney that's coming on behalf of
02:48  23  the government.  My office pays for me, the Air Force
02:48  24  will pay for the attorneys to be there.  It's just the
02:48  25  witness themselves.  Everyone just typically comes to

where the witness is, I know you're probably used to that.

And I do want to harp on something that Leah talked about. This applies to former and present government employees. So just because someone is retired or they have left federal service and now they work for company X, that doesn't matter because they're talking about information that they gathered while they were working officially for the government.

Please keep that in mind and don't get them in trouble, don't make me call you the night before a deposition because I just found out about it and tell you that this deposition isn't going to happen and that we need to reschedule it because you haven't submitted a *Touhy* request. It's really just to avoid getting the witness in trouble. You're not doing them any sort of service by kind of trying to skirt that rule. Nine times out of ten, we're going to approve the witness anyway, so you're not really trying to -- you're not getting anywhere.

So the regulations. I do want to hit this just to make it easy for you so you don't have to search for these, so you may want to write these down. The main DoD regulation is Department of Defense Directive 5405.2, and that's from November 21st, 2003.

The Army regulation -- and I'm embarrassed to say this
-- is Army Regulation 27-40 but it's from 1994.  The
Air Force regulation is Air Force Instruction 51-301,
and that's from October 2nd, 2018.  And then the Navy
one is SECNAV I. 5820.8A, and that's from January
10th, 2005.  I say the dates because it's very easy to
Google these and then you get the wrong date because
some website has published it and that's the first one
that pops up in Google.  So just make sure you're
using the most recent one.

        With that, there isn't anything else that I
think I need to say off the bat.  Just keep in mind
it's going to be a little bit of a learning curve for
those who have never been in the military to
understand how the records are kept.  But once you get
it, it's really just a one-page document, and then the
health records are pretty standard, so...

        **THE COURT:**  I have a quick question.  What
does the Court do, in your experience, when the Court
decides that the information is not coming quickly
enough?

        **MAJ. EVANS:**  I would say in that situation
the Court would want to talk with DOJ, because DOJ
represents the executive branch in litigation or in
any matters related to the Court, and then DOJ can

02:51　1　help us do that.  If you issued a court order,

02:51　2　obviously, Your Honor, we would abide by the court

02:51　3　order.

02:51　4　　　　　THE COURT:  And I'm not anticipating that.

02:51　5　Just I've had this in other litigation not of this

02:51　6　magnitude, and what I did in one case in particular

02:51　7　was I found a point of contact at that branch.  I

02:51　8　don't think I went to DOJ.  But it ultimately worked

02:51　9　out.

02:52　10　　　　　So, anyway, thank you very much for your

02:52　11　presentation.

02:52　12　　　　　I believe, Mr. Rasmussen, are you going to --

02:52　13　and then we'll allow for some questions in just a

02:52　14　moment.

02:52　15　　　　　Mr. Rasmussen, do you wish to speak?

02:52　16　　　　　**MR. RASMUSSEN:**  Yes, Your Honor.

02:52　17　　　　　Just to make it clear to everyone here,

02:52　18　though, whatever I say is absolutely nothing -- my

02:52　19　presentation is completely separate, distinct, and

02:52　20　apart from both the Department of Justice's and from

02:52　21　the Army's and the Department of Defense's.

02:52　22　　　　　**THE COURT:**  Thank you.

02:52　23　　　　　**MR. RASMUSSEN:**  I think Ms. Butler would have

02:52　24　strong words if I didn't say that.

02:52　25　　　　　And then, Your Honor, you asked what was

included in the official military personnel file.  It
has dates and locations of all your duty stations,
service and combat zones, list of all your job titles,
which is like your -- *(inaudible)* -- all of your
medical records, auditory reports, physical
examinations, and then your separation health
assessment.  All of those records are contained in
your official personnel file.  And that can be
downloaded even for veterans who are no longer on
active duty.

Thanks, guys.  Just to echo really what Maj.
Evans said, Ms. Drey is here, and I'm just going to
talk about some of my experience, not necessarily as a
JAG officer, but really more recently in the opioid
litigation and then also in Abilify.

And so with Abilify, that litigation was
moving very, very swiftly.  And I believe Ms. Drey got
a call like, I don't know, a Sunday evening one night,
and she was informed that there was a deposition the
following day.  And it just created I guess some -- it
was just a little more disjointed and not quite as
efficient as it could have been.  And so that's why I
think that talking on the front end and having this
conversation now so that we can very quickly identify
the most important information that we need so that

02:54 1  those documents can be expedited and then we can begin

02:54 2  to schedule depositions.  And then, to the extent that

02:54 3  these depositions aren't all going to occur here

02:54 4  necessarily in the Northern District of Florida and we

02:54 5  need to get this letter or whatever it be the

02:54 6  understanding regarding the scope is, we can get that

02:54 7  information out to those lawyers that are going to

02:54 8  actually participate in the deposition.  And that will

02:54 9  give us more consistency and continuity and I think

02:54 10  will move all of those depositions along much, much

02:54 11  swifter.

02:54 12  And then the other thing I was going to say

02:54 13  is, the surest way to protract this litigation

02:54 14  unnecessarily and do all of our clients a disservice

02:54 15  would be for us to have some sort of unnecessary

02:54 16  motion practice where we're sending these overbroad

02:55 17  requests that require the government in each of the

02:55 18  respective service branch to turn over heaven and

02:55 19  earth.

02:55 20  And we really don't need to have a request

02:55 21  that's nearly so broad when in reality we know that

02:55 22  the information or documents we want are primarily

02:55 23  located, you know, wherever in whatever file they're

02:55 24  located in at whichever branch they're located in.

02:55 25  Otherwise, we end up with a situation very similar to

the situation with the opioid litigation where, you know, there's several iterations of *Touhy* requests that ultimately get some document production, and then after the production is made there's a database that needs to be produced, and then there's objections, and then the judge allows plaintiffs to issue a subpoena and it's still objected to.

So, again, all that does is delay the discovery and delay us being able to move this litigation forward.

So I guess that's really all I had to say, Your Honor.

**THE COURT:** Thank you. That was certainly a message, overly broad requests are going to lead to delay.

Maj. Evans, I'm hoping that down the road you'll be willing to work with our leadership team in helping us draft a request that you'll be able to respond to, and to have you at the table in that regard would be extremely helpful.

**MAJ. EVANS:** Yes, Your Honor, we would be.

**THE COURT:** So that we give you the information you need.

All right. I know Ms. Butler and Maj. Evans were open to questions, if anyone had questions that

02:56  1   they wanted to ask.

02:56  2              Yes, sir?

02:56  3       **MR. TRACEY:**  My name is Sean Tracey.

02:56  4              You told me -- or you talked about opinions.

02:56  5   And one thing that I wonder is, most of our clients --

02:57  6   all of my clients on exit from the military have

02:57  7   audiological exams.  And sometimes the opinion of

02:57  8   whether or not the serviceman or woman had a

02:57  9   noise-induced hearing loss is addressed in the exam

02:57  10  and sometimes it's not.

02:57  11             So in this kind of case, that's one of the

02:57  12  seminal issues, that is, will the audiologist be able

02:57  13  to testify about his opinion that he's already given

02:57  14  or conclusions he's already reached based on the

02:57  15  audiological exam?

02:57  16      **MAJ. EVANS:**  That, I don't know.  I can't

02:57  17  commit to that one way or another.

02:57  18      **MR. TRACEY:**  Are we on the record?

02:57  19      **MAJ. EVANS:**  It's being recorded so -- I'm

02:57  20  not sure.  I don't have an answer for that right now.

02:58  21      **MR. TRACEY:**  Okay.  And then one other

02:58  22  question.  I sent out FOIA requests early on before I

02:58  23  had heard of *Touhy*, before there was any litigation,

02:58  24  and to my shock and delight the Department of Defense

02:58  25  produced a lot of documents.  And I did learn about

02:58 1  "any and all" -- they'd call me and say, 'You want me

02:58 2  to cross out "any and all," don't you, Mr. Tracey?'

02:58 3  And I'd say, 'Yes.'

02:58 4       One thing they did, though, is they -- in the

02:58 5  criminal file -- the criminal investigation that I

02:58 6  requested, they produced a ton of documents and today

02:58 7  they produced some more, but they're whiting out

02:58 8  everybody's names, all the witnesses on the

02:58 9  statements.  How do we get that?

02:58 10      **MAJ. EVANS:**  Well, FOIA -- (b)(6) under FOIA

02:58 11  prevents us from impeding on someone's privacy, so we

02:58 12  don't give out the names of the individuals.  That's

02:58 13  the reality of how FOIA works.

02:59 14      So how would you get the names of the agents?

02:59 15      **MR. TRACEY:**  The witnesses.  So to be clear,

02:59 16  the investigator for the Department of the Army was

02:59 17  taking witness statements of Department of Defense

02:59 18  employees.  And so they said some things that are

02:59 19  important to us.  We'd like to go take their

02:59 20  depositions.  In order to do that, we have to have

02:59 21  their identity.

02:59 22      **MAJ. EVANS:**  So, to take you out of the FOIA

02:59 23  process, you would want to go into the *Touhy* process,

02:59 24  and then we would have to consider whether or not we

02:59 25  were going to release it.  Because FOIA rules FOIA

44

02:59  1    requests. *Touhy* is a whole separate issue. So, if
02:59  2    you submit as *Touhy* request for the name, what I would
02:59  3    recommend is you attach the specific statement so that
02:59  4    it's easy to cross-reference who you're requesting,
02:59  5    and then the deciding official would make a
02:59  6    determination whether to release that.
02:59  7            That would be the only thing I can recommend.
03:00  8    I can't say whether it would be released or not
03:00  9    because I don't know what's in the statements and I'm
03:00  10   not the deciding official. But that would be the way
03:00  11   to navigate that, my recommendation.
03:00  12           **MR. TRACEY:** Is there an appeals process?
03:00  13           **MAJ. EVANS:** There is no appeals process to
03:00  14   *Touhy*. There is an appeals process to FOIA. So you
03:00  15   could, depending on who you submitted the FOIA request
03:00  16   to, you could appeal it to their office of general
03:00  17   counsel to make a decision on whether or not they
03:00  18   should release it.
03:00  19           I'm not sure how familiar you are with FOIA,
03:00  20   but FOIA is a discretionary release standard. And so,
03:00  21   I mean, anything can technically be released under the
03:00  22   discretion of the officials who are the initial denial
03:00  23   authority. So you could submit a FOIA appeal. But
03:00  24   *Touhy*, there is no appeals process, no.
03:00  25           **MR. TRACEY:** Thanks, Major.

**MS. DREY:** One or two of the things you mentioned, you asked about the expert. I can tell you in Abilify we took the position that, if there was an expert opinion contained within the document, the physician could read the statement and not answer any question beyond that, and that's not opining medical opinion, what's based on medical evidence and training -- *(inaudible).* It was the government's position that the witness was limited to reading what was in that report, that anything beyond that crossed the line of an expert's testimony. So hopefully that's -- *(inaudible)* --

And I will tell you, where FOIA and *Touhy* are concerned, everybody with the government just wants to work with you or me. And so your question is a very common question. But I sent a FOIA request and I got a bunch of stuff redacted -- *(inaudible)* -- under *Touhy*. But they are two entirely distinct statutory regimes governed by two entirely different sets of rules.

So I would encourage you from this point forward, once they finish the *Touhy*, you're better off trafficking under a consistent *Touhy*. It would be pretty much everybody's opinion about that, once you get it in a format that, you know, everybody agrees

to.

    **MR. TRACEY:**  Thank you.

    **THE COURT:**  It would seem that it would
behoove everyone to begin to think about those items
that you've requested that you did not receive from
the military presuit and then work with leadership in
collecting that, and then we can work with Maj. Evans
on a proper *Touhy* request that hopefully would result
in the release of that information.

    **UNIDENTIFIED PERSON:**  How does the government
view contractors who were once federal government
employees serving in that capacity and now are working
as contractors almost performing the same work?

    **MAJ. EVANS:**  So are you asking --

    **UNIDENTIFIED PERSON:**  I'm asking basically if
those people can actually serve as experts because
they're now no longer federal employees, they're
contractors.

    **MAJ. EVANS:**  If you have them review -- if
you hired them as an expert and they're reviewing
documents for you and they're your retained expert,
that's not information that they've obtained as a
result of their federal service.

    If, however, you hired them because you know
that they did report X and everything they're advising

you on is from report X, all that information is
obtained as a result of their federal service, so that
would require a *Touhy* request.

       **UNIDENTIFIED PERSON:**  Okay.  And so to
clarify, as long as they're not testifying regarding a
document that they prepared basically or were involved
in; is that correct?

       **MAJ. EVANS:**  As long as they're not
testifying about information they gathered while they
were in federal service.  So if it's something that
they -- if it's something you're asking them a
question "When you were a federal employee you did
this study on hearing tests" and that's what you want
-- all that information you're obtaining from them is
a result of that so you're just trying to kind of
backdoor around the federal rule, the rules that
govern this, then, no, you couldn't ask them that.
That's part of the *Touhy* process.

       If it's just you hired them, though, because
they're an expert in the field of audiology -- they're
an expert in the field of audiology, so just because
they attained part of that expertise while they were
working in federal service, that doesn't cover it.
It's a fine line, but it's not that fine.

       **THE COURT:**  Major, did you give any -- did

you have time -- I know you didn't have much time --
thought to the other categories of document requests
that will be coming from this litigation in terms of
procurement records as well as the research and
development and how we -- and you can speak with
leadership more about this, but have you had a chance
to --

**MAJ. EVANS:** A little bit, Your Honor,
because I had heard about the categories over the
weekend.

**THE COURT:** I wasn't kidding when I said you
hadn't had a lot of time.

**MAJ. EVANS:** I know, Your Honor. There are
prohibitions towards us giving out information that's
a part of the acquisitions process. I am not an
expert in that nor do I know what really happened in
this acquisition because I haven't had a chance to
review any of the documents. So there could be some
prohibitions that prevent us from releasing that
information, say source selection data or something
like that.

A lot of the research testing, though, I can
say from my personal experience from dealing with
other cases, we've released -- when we have been
testing a product -- for example, I had a case related

03:05 1  to a vehicle of whether it could be dropped out of an

03:05 2  aircraft and still perform, and they did all these

03:05 3  tests on it, and as part of the case they wanted a

03:05 4  copy of these tests, and we've released those because

03:05 5  that's not source selection data. That's the Army

03:05 6  testing a piece of equipment. So we can release that

03:05 7  because it's our tests.

03:05 8  **THE COURT:** In terms of discovering whether

03:06 9  these specific earplugs were at a specific base in a

03:06 10  specific unit or platoon as standard issue to a

03:06 11  soldier, is that information obtainable?

03:06 12  **MAJ. EVANS:** I don't know offhand, Your

03:06 13  Honor, and I don't want to speak out of turn. I can

03:06 14  say that these earplugs, from my personal experience,

03:06 15  I have seen them. And so they were -- they filtered

03:06 16  far enough down to the JAG Corps, so I think they were

03:06 17  pretty standard, at least in the Army.

03:06 18  **MR. RASMUSSEN:** Your Honor, quick question.

03:06 19  If the Court enters a protective order that's specific

03:06 20  for these purposes, would it help expedite production

03:06 21  both in terms of the time that you spend if you didn't

03:06 22  have to review documents to redact individual names to

03:06 23  get to what Mr. Tracey was asking you about earlier or

03:06 24  other specific personal identifying information?

03:06 25  **MAJ. EVANS:** Anytime there's a court order

03:07  1   that prevents us from having to redact anything it

03:07  2   will speed up the process, as long as it's a

03:07  3   protective order that was issued by -- I mean, in this

03:07  4   case, yes, that would speed up the process because we

03:07  5   don't have to assign someone to just redact names and

03:07  6   then an attorney has to review that, et cetera, et

03:07  7   cetera.

03:07  8        **THE COURT:**  Very good question.

03:07  9        Anything else?

03:07  10       *[No response.]*

03:07  11       Thank you again very much.  We look forward

03:07  12   to continuing to work with you, and really appreciate

03:07  13   the DoD's participation and the Army's.

03:07  14       **MAJ. EVANS:**  Thank you.

03:07  15       **THE COURT:**  Thank you, Leah and Kathryn,

03:07  16   thank you very much.

03:07  17       We're going to take a very short recess,

03:07  18   maybe just five minutes, reconvene hopefully at 3:15

03:07  19   continuing with the presentations.

03:09  20       *(Touhy presentation concluded at 3:09 p.m.)*

       21       *I certify that the foregoing is a correct*
           *transcript from the record of proceedings in the*
       22   *above-entitled matter.*

       23

           *s/Donna L. Boland                    5-29-2019*
       24  *Donna L. Boland, RPR, FCRR                    Date*
           *Official Court Reporter*

       25

# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to All Cases | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

**ORDER OF APPOINTMENT**

Pursuant to Federal Rule of Civil Procedure 53 and its inherent authority, the Court hereby appoints retired Judge David Herndon as a Special Master in this proceeding for the purpose of assisting the Court in moving the affirmative defenses into a posture for dispositive motion practice and to do so as efficiently and expediently as possible.  More specifically, the Special Master will help facilitate and manage discovery from the United States Department of Defense and Department of Justice.  As part of his duties, the Special Master is entitled to interact with the parties and federal government officials to explore ways to manage and expedite discovery from the United States that is reasonably necessary and relevant to the claims and defenses of the parties in this case, and to report to the Court and/or the parties *ex parte* regarding the status of such efforts.  This process is to conclude with a recommendation for a schedule by which the affirmative defense issues will be addressed by the Court.  However, this appointment does not contemplate the

Case 3:19-md-02885-MCR-HEC Document 1457-6 Filed 10/08/20 Page 278 of 318
Case 3:19-md-02885-MCR-GRJ Document 760 Filed 10/15/19 Page 2 of 2

Page 2 of 2

need for any formal report and recommendation from the Special Master to the Court.

The Special Master must maintain normal billing records of time spent on this matter with reasonably detailed descriptions of his activity. If requested by the Court, the Special Master must submit a formal report in writing for electronic filing on the case docket. The Special Master should incur only such fees and expenses as may be reasonably necessary to fulfill his duties under this Order or such other orders as the Court may issue. Fees and expenses for the Special Master will be shared equally among the Plaintiffs' Lead Counsel and Defendants' Counsel.

The Court has previously provided Plaintiffs' Lead Counsel and Defendants' Counsel with notice and an opportunity to be heard regarding its intent to appoint a special master to assist with the above issues. The parties have agreed that Judge Herndon is fair and impartial, and that his appointment as Special Master will be helpful in facilitating discovery from the United States. As such, Judge Herndon is directed to proceed with all reasonable diligence to fulfill the duties set forth herein.

**DONE AND ORDERED**, on this 15th day of October, 2019.

_M. Casey Rodgers_

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

EXHIBIT H

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG PRODUCTS LIABILITY
LITIGATION,                                    Case No. 3:19-md-2885

                                               Judge M. Casey Rodgers
                                               Magistrate Judge Gary R. Jones

This Document Relates to All Cases
_____/

## REPORT AND RECOMMENDATION

Pending before the Court is Defendants' "Motion to Compel Against

the Department of Defense."  ECF No. 1211.  The Department has filed a

response in opposition, ECF No. 1253, and Defendants (with leave of

court) filed a reply memorandum, ECF No. 1275.  The motion is ripe for

consideration and has been referred to the undersigned.  ECF No. 1212.

For the reasons discussed below, it is respectfully **RECOMMENDED** that

Defendants' motion should be **GRANTED IN PART and DENIED IN PART**.

## I.  BACKGROUND

The undersigned has frequently described this multidistrict litigation

as "a products liability action concerned with whether Defendants were

negligent in their design, testing, and labeling of the nonlinear dual-ended

Combat Arms Earplug Version 2 (the 'CAEv2')."  *See, e.g.*, ECF No. 879 at

1; ECF No. 1000 at 1; ECF No. 1048 at 2; ECF No. 1085 at 1; ECF No.

1108 at 2.  More specifically:

> Plaintiffs assert state law claims for negligence and strict product liability based on design defect and failure-to-warn theories, as well as warranty, misrepresentation, fraud, gross negligence, negligence per se, and consumer-protection claims.  Plaintiffs' design defect claims target two features of the CAEv2, alleging that: (1) its stem was too short for certain users—primarily those with medium to large ear canals—to insert the device deeply enough into their ears to obtain the airtight seal necessary to provide hearing protection; and (2) when the earplug was inserted according to standard fitting instructions, the positioning of the opposing flanges relative to the outer ear caused the basal edge of the third flange of the non-inserted side of the earplug to press against some users' ear canal openings and fold up, causing imperceptible loosening of the seal, which, they claim, results in little to no hearing protection for the user.  Plaintiffs' failure-to-warn claims are based on allegations that Defendants failed to provide warnings regarding the alleged dangers inherent in the use of the CAEv2.

ECF No. 1280 at 16–17.  Plaintiffs are servicemembers, veterans, and

civilians seeking damages in this action for hearing loss, tinnitus, and

related injuries caused by their use of the CAEv2.  ECF No. 704.

Defendants dispute these allegations.  ECF No. 959.

The Government is not a party to this litigation, ECF No. 704 at ¶¶

16-20, but its relationship to this matter is undeniable.  The docket reflects

litigation between the parties over the discoverability of government

records, *see, e.g.*, ECF Nos. 977, 1154, and, until recently, Defendants

2

attempted to invoke the government contractor defense as a shield from state tort liability for those plaintiffs claiming injury from using the CAEv2 during their military service, *see* ECF No. 1280 (denying Defendants' motion for summary judgment based on the government contractor defense and granting Plaintiffs' motion for summary judgment on the same as a matter of law).  Moreover, the Court has recognized that "this litigation is nothing if not about the government's procurement of equipment," ECF No. 1280 at 26, namely the CAEv2.

Consequently, the parties have identified the United States as a critical source for third-party discovery.  On May 20, 2019, Assistant United States Attorney Leah Butler, Assistant United States Attorneys Kathryn Drey, and United States Army Major Collin Evans—on behalf of the Government—presented to the parties and the Court on how the parties should proceed with discovery requests for documents from the United States and for the testimony of its employees subject to federal regulations promulgated under the Housekeeping Statute, 5 U.S.C. § 301, and applied in accordance with the Supreme Court's decision in *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).  ECF No. 399.  The Government advised, in pertinent part: (1) on its interpretation of the application of *Touhy* (which the undersigned discusses in more detail below); (2) that a requesting party

3

should avoid broad discovery requests directed to the United States, such

as for "any and all documents" referring to a particular person or subject;

(3) that a requesting party will have an opportunity to know why the

Government objects to the production of discovery, should it raise an

objection; (4) that any request for discovery must be in writing and may be

supplemented; and (5) that a requesting party should not send a subpoena

because, from the Department of Justice's "perspective," a "subpoena

signed by an attorney is not from a court of competent jurisdiction." *Id.*

Since this presentation, Defendants have sent discovery requests to

the Department of Defense requesting the production of: (1) numerous

categories of government/military records; (2) more than 30 potential

witnesses for interviews, depositions, or both; and (3) information that does

not fit neatly in either of the former categories.  Defendants now seek to

compel the depositions of six current government employees (Mary

Binseel, Dr. Mark Little, LTC Martin Robinette, Dr. Leanne Cleveland, LTC

Theresa Schulz, and Dr. John King) and the production of noise and

ototoxin data, "safety release" documentation for the CAEv2, and the

identities of the Hearing Conservation Program Manager and Industrial

Hygiene Program Manager at particular military installations.  ECF No.

4

1211.  The Court will address only the procedural history of the discovery

requests in issue.

On October 25, 2019, Defendants sent Major Evans a nine-page

letter requesting interviews with 30 witnesses (including Ms. Binseel, LTC

Robinette, LTC Schulz, and Dr. John King) and providing the bases for

their request in narrative form.  ECF No. 1211-2.  Defendants revised their

request on December 2, 2019, when they sent Major Evans a second letter

seeking depositions and pre-deposition interviews for two categories of

witnesses—those prioritized "in connection with Defendants' affirmative

defenses" and those who could be "de-prioritized."  ECF No. 1211-3 at 4.

Unlike their first request, Defendants described the supposed relevance of

each witness in turn and provided contact information where available.  *Id.*

Defendants identified Ms. Binseel, Dr. Little, and LTC Schultz as priority

witnesses and LTC Robinette, Dr. Cleveland, and Dr. John King as de-

prioritized witnesses.  *Id.* at 5, 7–10, 13.

The Department has since approved five of the 30 requested

witnesses for deposition and only three depositions have occurred.  ECF

No. 1211 at 3 n.1.  Meanwhile, at an in-person meeting on January 28,

2020, the Department denied Defendants' request for pre-deposition

interviews as to all witnesses and denied Defendants' request to depose

5

Dr. Little. *Id.* at 3. The next day, Defendants asked the Department to

reconsider its decision denying the request to depose Dr. Little and

produced documents in support thereof. *Id.* at 3.

Defendants say they have contacted the Department on multiple

occasions asking for an update on the Department's positions as to the

outstanding deposition requests. *Id.* at 3–4. On June 9, 2020, Defendants

sent a letter to Jacqui Snead (with the Civil Division of the Department of

Justice) requesting the same. ECF No. 1211-4. Two weeks later, on June

23, 2020, United States Army Major Nicole Kim sent the parties a letter

informing them that the Department denied Defendants' request to depose

LTC Robinette. ECF No. 1211-5. Major Kim provided this reasoning:

> After speaking with COL Robinette, it is apparent that he lacks
> relevant knowledge of the information you listed in your requests.
> COL Robinette had a minimal role, if any, in acquiring or
> approving the CAEv2 and his direct communications about
> CAEv2 were limited. Additionally, he served as a DOJ subject
> matter expert in a separate investigation related to the underlying
> facts of this case. Because of this, it is our position that allowing
> this employee to sit for a deposition would not be productive and
> would create an undue burden on the DoD due to the amount of
> time the DoD would expend preparing for and participating in the
> requested deposition. See DoDD 5405.2 and Fed. R. Civ. P. 26.
> Therefore, your request to depose this individual is denied.

*Id.* at 1. The Department nevertheless authorized LTC Robinette "to

provide responses to interrogatories based on the submitted Touhy

requests and his limited knowledge of the CAEv2," but it imposed limitations on the scope of these interrogatories and reserved the right to object on grounds of relevance, undue burden, proportionality, and privilege. *Id.* at 2.

On June 26, 2020, Major Kim informed Defendants that the Department was "not in a position to provide a final determination" on their outstanding deposition requests. ECF No. 1211-6 at 1. As to Ms. Binseel, the Department "reached out" to her but was "unable to speak with her regarding this matter." *Id.* at 2. As to Dr. Little, the Department acknowledged receipt of Defendants' supplemental documentation but "had not determined whether the supplemental information you provided warrants revisiting [the] earlier denial of his deposition." *Id.* As to LTC Schulz, the Department said it had spoken with her and she had "limited knowledge related to the subjects identified" in the December 2, 2019, discovery request. *Id.* And, as to the de-prioritized witnesses (including Dr. Cleveland and Dr. King), the Department stated it had not reached a final agency decision on whether to permit depositions because it had "not expended many resources trying to locate these witnesses so that the agency could work on [Defendants'] other *Touhy* requests," including those Defendants deemed a priority. *Id.* at 3.

7

Defendants first breached the subject of discovery pertaining to noise and ototoxin data in their June 21, 2019, discovery request.  ECF No. 1211-7 at 7, 11–12.  Defendants requested eight categories of "[d]ocuments [r]egarding [n]oise [a]nd [o]toxin [e]xposure [i]n [t]he [m]ilitary," *id.* at 11–12, and provided the basis for this request, *id.* at 7. Defendants clarified this request in their July 26, 2019, letter.  ECF No. 1211-8.  When Major Evans stated "he had been unable to locate the information and believed it did not exist," ECF No. 1211 at 6, Defendants submitted a supplemental discovery request on March 17, 2020, that identified potential sources for this information and noted government regulations requiring the collection of this data.  ECF No. 1211-9. Defendants' June 9, 2020, letter to Ms. Snead asked for an update on the Department's position as to this outstanding discovery request.  ECF No. 1211-4.  On June 26, 2020, Major Kim informed Defendants that the Department had not started processing this discovery request because it was prioritizing Defendants' earlier requests and, therefore, did not have a final determination on the production of this data.  ECF No. 1211-6 at 4.

In Defendants' July 26, 2019, discovery request, they also sought the production of several categories of documents pertaining to the CAEv2, including design specifications, requests for proposal, usage instructions,

8

training materials, testing, and complaints. ECF No. 1211-8 at 8–12.

Defendants have focused these requests on the production of a "safety

release" for the CAEv2, which Defendants assert is "a formal document

issued before any hands-on training, use, or maintenance by troops and

describes the specific hazards of the system or item based on test results,

inspections, and system safety analyses[.]" ECF No. 1211 at 25 (citing

ECF No. 1211-15 at 148). On June 18, 2020, Defendants asked the

Department to prioritize production of the safety release as responsive to

the above-mentioned requests. ECF No. 1211-16 at 3–4. Major Kim

responded on June 23, 2020, that the Department was "looking into

whether there is anything that would be responsive to the request." ECF

No. 1211-17 at 2.

Lastly, and more recently, Defendants have attempted to identify the

Hearing Conversation Program Manager and Industrial Hygiene Program

Manager at the Army installations identified as service locations for the

Bellwether Plaintiffs. ECF No. 1211-18. This was the subject of a June 3,

2020, discovery request to Major Kim, *id.*, which, according to Defendants,

was prompted by direction from Ms. Snead, ECF No. 1211 at 14. On June

17, 2020, Defendants asked the Department to prioritize its response to

this discovery request based on a subcategory of military installations and

9

time periods relevant to the claims of the Bellwether Plaintiffs in Trial Group

A.  ECF No. 1211-19.  Major Kim informed Defendants on June 26, 2020,

that the Department started processing this request but had not made a

final determination as to production.  ECF No. 1211-6 at 4.

## II.  THE HOUSEKEEPING STATUTE, *TOUHY*, AND THE ADMINISTRATIVE PROCEDURE ACT

Typically, the Federal Rules of Civil Procedure—specifically Rule

45—govern the production of third-party discovery and objections thereto.

Fed. R. Civ. P. 45; *Citizens Union of City of New York v. Attorney Gen. of

N.Y.*, 269 F. Supp. 3d 124, 138 (S.D.N.Y. 2017).  Not so here because the

subject third-party is, for all intents and purposes, the United States.

Instead, the Court must look to numerous federal statutes and regulations,

beginning with the Housekeeping Statute, 5 U.S.C. § 301.

The Housekeeping Statute authorizes "the head of an Executive

department or military department" to "prescribe regulations for the

government of his department, the conduct of its employees, the

distribution and performance of its business, and the custody, use, and

preservation of its records, papers, and property."  5 U.S.C. § 301.  The

antecedents of § 301, however, "go back to the beginning of the Republic,

when statutes were enacted to give heads of early Government

10

departments authority to govern internal department affairs." *Chrysler Corp. v. Brown*, 441 U.S. 281, 309 (1979).  Congress first enacted housekeeping statutes in 1789 "to help General Washington get his administration underway by spelling out the authority for executive officials to set up offices and file government documents."  H.R. Rep. No. 85-1461 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3352.  "Those laws were consolidated into one statute in 1874[,] and the current version of the statute was enacted in 1958."  *Chrysler Corp.*, 441 U.S. at 309.

In 1951, the Supreme Court looked to the Housekeeping Statute to determine whether the Attorney General properly issued a regulation prohibiting a subordinate official of the Department of Justice from obeying a subpoena duces tecum ordering the production of records in his possession.  *Touhy*, 340 U.S. at 463.  The Court held the regulation was valid because the Housekeeping Statute authorized the Attorney General "to prescribe regulations not inconsistent with the law for the custody, use, and preservation of the records, papers, and property appertaining to the Department of Justice[.]"  *Id.* at 468.

The Supreme Court's holding prompted federal agencies to adopt so-called "*Touhy* regulations" concerning testimony by agency employees and the production of government documents.  *Moore v. Armour Pharm. Co.*,

927 F.2d 1194, 1197 (11th Cir. 1991); *see also Westchester Gen. Hosp., Inc. v. Dep't of Health and Human Servs.*, 443 F. App'x 407, 409 n.1 (11th Cir. 2011). Relevant here, Department of Defense Directive 5405.2 § 6.1.1 provides:

> In response to a litigation request or demand for official DoD information or the testimony of DoD personnel as witnesses, the General Counsels of DoD, Navy, and the Defense Agencies; the Judge Advocates General of the Military Departments; and the Chief Legal Advisors to the JCS and the Unified and Specified Commands, with regard to their respective Components, are authorized—after consulting and coordinating with the appropriate Department of Justice litigation attorneys, as required—to determine whether *official information originated by the Component* may be released in litigation; whether DoD personnel assigned to or affiliated with the Component may be interviewed, contacted, or used as witnesses concerning official DoD information or as expert witnesses; and what, if any, conditions will be imposed upon such release, interview, contact, or testimony. Delegation of this authority, to include the authority to invoke appropriate claims of privilege before any tribunal, is permitted.

ECF No. 1211-1 at 5 (emphasis added). This regulation applies to all Department "Components"; that is, "the Office of the Secretary of Defense, the Military Departments, the Organization of the Joint Chiefs of Staff, the Unified and Specified Commands, and the Defense Agencies." *Id.* at 3 (§ 2.1). And the Department defines "official information" as:

> All information of any kind, however stored, that is in the custody and control of the Department of Defense, relates to information in the custody and control of the Department, or was acquired by

12

> DoD personnel as part of their official duties or because of their official status within the Department while such personnel were employed by or on behalf of the Department or on active duty with the United States Armed Force

*Id.* at 4 (§ 3.4).

Nevertheless, the *Touhy* decision did not create or endorse an executive privilege for federal agencies to resist entirely discovery efforts. *N.L.R.B. v. Capitol Fish Co.*, 294 F.2d 868, 875 (5th Cir. 1961).[1]  Only two years after *Touhy*, the Supreme Court emphasized that "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." *United States v. Reynolds*, 345 U.S. 1, 9–10 (1953).  What's more, Congress amended the Housekeeping Statute in 1958 to state: "This section does not authorize withholding information from the public or limiting the availability of records to the public."  5 U.S.C. § 301; *see also Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 777–78 (9th Cir. 1994) (discussing the 1958 amendment to the Housekeeping Statute).

Because the Government does not have unfettered discretion to withhold discovery from federal litigants (either in the form of records or testimony), the Government's application of *Touhy* regulations does not

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit decided prior to October 1, 1981.

escape judicial review.  As Defendants and the Department acknowledge,

the Eleventh Circuit cabins such review to the Administrative Procedure Act

("APA") rather than Federal Rule of Civil Procedure 45.  *Moore*, 927 F.2d at

1197.[2]  Generally speaking, the APA provides two types of challenges for a

dissatisfied party to seek redress in federal court.  5 U.S.C. § 706.  First,

when presented with a complaint of agency inaction, a reviewing court may

"compel agency action unlawfully withheld or unreasonably delayed."  §

706(1).  Second, a reviewing court may set aside a final agency action that

it concludes is "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with the law[,]" in addition to other reasons.  § 706(2).

## III.  DISCUSSION

### A.    Preliminary Matters

The Court must begin its analysis by addressing two preliminary

matters.  First, there is no dispute here that the Court may hear

---

[2] This standard of review is the subject of a circuit split.  *See* Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2463.2 (3d ed.) ("The courts of appeals are further divided on the question of what standard of review to apply to an agency's decision not to comply with a subpoena.  The Fourth and Eleventh Circuits review the agency's decision under the arbitrary and capricious standard of Section 706(2)(A) of the APA under the theory that the waiver of sovereign immunity in Section 702 is the only reason the agency's decision is even judicially reviewable.  In contraposition, the D.C., Sixth, and Ninth Circuits subject the agency's refusal to comply to the more stringent standard of review found in Rules 26(c) and 45(c), under which the party refusing to comply bears the burden of showing good cause.  The Second Circuit initially adopted the arbitrary and capricious standard of review in Section 706(2)(A) but later, on reconsideration, vacated their decision and reserved the question for the future." (footnotes omitted)).

Defendants' APA challenge as part of this pending federal civil action.  ECF

No. 1211 at 16; ECF No. 1253 at 13.  The Court agrees with the greater

weight of authority holding that requiring Defendants to initiate a new APA

action against the Department would not only be inefficient and

inconvenient, but it is simply not required.[3]  Indeed, in *Moore*, the Eleventh

Circuit resolved an APA challenge that arose from a motion to quash in the

underlying litigation and did not require the commencement of a separate

APA action. 927 F.2d at 1197.  Therefore, Defendants' motion is properly

before the Court.

The second matter is where Defendants and the Department diverge.

The Department argues it is not subject to the Court's personal jurisdiction

because Defendants have failed to effect service of process.  ECF No.

1253 at 11–13.  A century of hornbook law lends some support to this

argument.  As a starting point, "Personal jurisdiction … is 'an essential

element of the jurisdiction of a district court,' without which the court 'is

powerless to proceed to an adjudication.'"  *Ruhrgas AG v. Marathon Oil*

---

[3] *See Forgione v. HCA Inc.*, 954 F. Supp. 2d 1349, 1353 (N.D. Fla. 2013) ("Significant delay and inconvenience will be avoided simply by construing the instant action as arising under the APA."); *Ceroni v. 4Front Engineered Sols., Inc.*, 793 F. Supp. 2d 1268, 1275 (D. Colo. 2011) ("[T]he proper procedure is for the federal court, on the filing of a motion to compel or for protective order, to review the discovery dispute in the pending action."); *Johnson v. Folino*, 528 F. Supp. 2d 548, 550 (E.D. Pa. 2007) ("The Court has jurisdiction to determine this discovery dispute; petitioner need not file an ancillary proceeding under the APA.").

*Co.*, 526 U.S. 574, 584 (1999) (quoting *Emp'rs Reinsurance Corp. v. Bryant*, 299 U.S. 374, 382 (1937)).   And "service of a summons … is prerequisite to the exercise of personal jurisdiction."   *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1556 (2017) (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)); *see also Miss. Pub. Corp. v. Murphree*, 326 U.S. 438, 444–45 (1946) ("It is true that the service of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served.").   As explained above, however, this discovery dispute is not a new civil action requiring service of a summons.   A summons accompanies a complaint or initial pleading, which does not exist here. Fed. R. Civ. P. 4(b), (c).   Accordingly, the Department's argument that Defendants were required to serve a summons is untenable.

The Department, alternatively, asserts that Defendants should have satisfied service of process by issuing a Rule 45 third-party subpoena. ECF No. 1253 at 12.   The problem for the Department is that this discovery dispute does not arise under Rule 45, at least in the Eleventh Circuit. *Moore*, 927 F.2d at 1197.   If it did, the Government could not avail itself of the APA's more deferential standards of review.   *See, e.g.*, *Watts v. S.E.C.*, 482 F.3d 501, 508 (D.C. Cir. 2007) ("A challenge to an agency's refusal to

comply with a Rule 45 subpoena should proceed and be treated not as an APA action but as a Rule 45 motion to compel (or an agency's Rule 45 motion to quash).") (Kavanaugh, J.).

In any event, Defendants argue that the Government has waived this specific objection to personal jurisdiction.  ECF No. 1275 at 7–9.  A lack of personal jurisdiction is a waivable defect, *Palmer v. Braun*, 376 F.3d 1254, 1259 (11th Cir. 2004), as is the requirement of service of process, *Petrowski v. Hawkeye-Sec. Ins. Co.*, 350 U.S. 495, 496 (1956).  Where a party raises personal jurisdiction in a responsive pleading, the Court may turn to the "critical question" of whether the party's conduct nonetheless gives rise to an implicit waiver.  *Matthews v. Brookstone Stores, Inc.*, 431 F. Supp. 2d 1219, 1223 (S.D. Ala. 2006).  Courts will look "to the extent of the objecting [party's] involvement in the action," *see id.* at 1225 (collecting cases), with the understanding that this type of waiver is "not readily found," *In re Trasylol Prods. Liab. Litig.-MDL-1928*, No. 08-CV-81212, 2011 WL 5529934, at *2 (S.D. Fla. July 21, 2011).

The undersigned agrees that the Department's conduct evinces a waiver of its objection to personal jurisdiction.  Last year, Major Evans, on behalf of the Department, instructed the parties to *not* send subpoenas for their discovery requests because, in its opinion, they would have no legal

17

effect.  *See* ECF No. 399 at 33–34 ("First, you don't need to send a

subpoena.  That subpoena signed by an attorney is not from a court of

competent jurisdiction from DOJ's perspective.  So you need to send me a

written request for a witness, and then we make a determination if they can

be approved.").[4]  In the same breath, Major Evans assured the Court that if

"information [was] not coming quickly enough" it would abide by this Court's

order directing production.  *Id.* at 37–38 ("If you issued a court order,

obviously, Your Honor, we would abide by the court order.").  What's more,

the record before the Court demonstrates Defendants and the Department

have operated in accordance with these instructions for more than one

year, and the Department has appeared on behalf of its current employees

at depositions in this matter.  ECF No. 1211 at 1–15; ECF No. 1275 at 7–8.

In sum, the Department's instructions, assurances, and appearances

throughout this litigation amount to waiver by conduct.[5]

Finally, the fact that Defendants have not served the Government

with a summons or discovery subpoena does not violate due process.

---

[4] This instruction comports with Department of Defense Directive 5405.2 § 6.1.1, which
speaks in terms of litigation requests *or* demands.

[5] Because the Court concludes the Department has waived its objection based on
personal jurisdiction, it will not address Defendants' argument that the doctrine of judicial
estoppel bars the Department's objection.  ECF No. 1275 at 1–3.

Personal jurisdiction is a fundamental tenet of the Due Process Clauses of the Fifth and Fourteenth Amendments, establishing that maintenance of a suit must not offend the traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. and Placement*, 326 U.S. 310, 319–20 (1945); *Prewitt Enters., Inc. v. Org. of Petroleum Exp. Countries*, 353 F.3d 916, 921 (11th Cir. 2003). At bottom, procedural due process requires only that service provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). There is no question here the Government had notice of the discovery disputes in issue (including service of Defendants' instant motion to compel) and is now afforded the opportunity to be heard on its objections.

## B. Unreasonable Delay

Turning to the merits, Defendants advance a two-pronged argument for the Court to compel production of the bulk of discovery sought in the instant motion (except for the deposition of LTC Robinette). First, the Court should consider Defendants' *Touhy* requests constructively denied because the Department has not decided whether to produce this

19

discovery notwithstanding ample time to do so.[6]  Second, the Court should

hold these constructive denials are arbitrary or capricious under the APA.

ECF No. 1211 at 17–26.  The Court declines to navigate this path because

it does not comport with the APA's scope of review.

> APA review under § 706(2) is limited to final agency actions:
>
> As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations omitted).

Stated another way, "The core question is whether the agency has

completed its decisionmaking process, and whether the result of that

process is one that will directly affect the parties."  *Franklin v.*

*Massachusetts*, 505 U.S. 788, 797 (1992).

---

[6] *See, e.g.*, ECF No. 1211 at 5 ("After months of waiting for a decision from the government, Defendants consider their requests [for depositions] to have been constructively denied. Defendants cannot wait any longer for the Department to make up its mind."); *id.* at 7 ("Given the discovery schedule in this litigation and the need for any government discovery to be taken promptly, the government's "update" amounts to a constructive denial of Defendants' request."); *id.* at 11 ("The government's failure to identify and produce this material over a twelve-month time period amounts to a constructive denial of Defendants' request."); *id.* at 15 ("Given the discovery schedule in this litigation and the need for any government discovery to be taken promptly, and the Department's failure to produce other relevant material for over a year, the government's "update" amounts to a constructive denial of Defendants' request.").

For the Court to review the Government's failure to act under §

706(2) as a final agency action, the requesting party must demonstrate the

Government has "engaged in a pattern of inaction that can be said to mark

the consummation of the agency's decisionmaking process or to be one by

which rights or obligations have been determined."  *Nat'l Parks*

*Conservation Ass'n v. Norton,* 324 F.3d 1229, 1238 (11th Cir. 2003).

Defendants have not made this showing.  Indeed, the Department has

engaged with Defendants during the discovery process since last year, and

it has not "disclaimed its intention of responding to [D]efendants' *Touhy*

requests[.]"  ECF No. 1253 at 18.  The undersigned, therefore, will not

consider the Department's failure to resolve Defendants' *Touhy* requests as

constructive denials or final agency action.

Defendants' challenge, instead, must proceed under § 706(1) as a

claim of unreasonable delay.[7]  "A claim under § 706(1) can proceed only

where a plaintiff asserts that an agency failed to take a *discrete* agency

action it is *required to take*."  *Norton v. S. Utah Wilderness Alliance*, 542

U.S. 55, 64 (2004) (emphasis added).  Because Defendants' motion

addresses the Government's failure to respond to individual *Touhy*

---

[7] The Department anticipated this interpretation and argues accordingly.  ECF No. 1253
at 18–24.

21

requests and the Government does not enjoy absolute immunity from third-party discovery in federal court, the Department's alleged inaction is subject to § 706(1). *See Donatoni v. Dep't of Homeland Sec.*, 184 F. Supp. 3d 285, 288 (E.D. Va. 2016) ("[B]efore plaintiff's requests for information from DHS were denied, plaintiff was free to file a lawsuit seeking relief under the APA directing DHS to issue a final decision, which would in turn be reviewable under APA § 706(2).").

"When an agency is required to act … within an expeditious, prompt, or reasonable time, § 706 leaves in the courts the discretion to decide whether agency delay is unreasonable." *Forest Guardians v. Babbitt*, 174 F.3d 1179, 1190 (10th Cir. 1999); *see also W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1279 (D. Utah 2017) ("Because neither Section Three nor Section Four impose explicit statutory deadlines that would warrant the application of the 'unlawfully withheld' standard, the court will treat BLM's alleged failures to act under those sections as action 'unreasonably delayed' and apply the corresponding standard."). In determining whether an agency has unreasonably delayed reaching final agency action, federal courts frequently apply a six-factor test developed by the District of Columbia Circuit Court of Appeals looking at:

(1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Telecomms. Research and Action Ctr. v. F.C.C.*, 750 F.2d 70, 80 (D.C. Cir. 1984) (internal citations omitted).

The Department avers that six reasons militate against a finding of unreasonable delay: (1) no human lives are at stake in this litigation; (2) the *Touhy* requests are numerous and unduly broad; (3) the Department has limited personnel resources to respond to the demands of civil litigation; (4) the Department has been unable to close some of Defendants' *Touhy* requests despite its best efforts; (5) the Department cannot promptly resolve some of Defendants' *Touhy* requests for document productions; and (6) the Department has issued mandatory telework instructions in light of the COVID-19 pandemic.  ECF No. 1253 at 20–23.

The Court has considered carefully the Department's arguments. The Court recognizes that the Department "is in a unique—and

authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *In re Barr Laboratories, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991). This consideration bears more weight for the federal agency tasked with the security of our nation, military, and citizens. Moreover, the Court is sensitive to the fact that the COVID-19 pandemic has impacted all levels of government and strained personnel resources. The Department is no exception, and the Court appreciates its efforts in this matter thus far. These factors weigh against judicial intervention.

On the other hand, the Court must apply a rule of reason to the delay presented. The Department was first aware of Defendants' requests to depose Ms. Binseel, LTC Schulz, and Dr. John King in October 2019. And Defendants requested to depose Dr. Cleveland and Dr. Little late last year. The Department also learned of Defendants' request for the production of noise and ototoxin data and any safety release documentation in June 2019 and July 2019, respectively. Even in view of the Department's limited resources, the Department fails to explain why it has not reached final decisions that can be judged against the APA's arbitrary-and-capricious standard.

The Department has offered examples—namely, one witness it has been unable to reach (Ms. Binseel) and the difficulty locating custodians for 21 years of noise and ototoxin data. ECF No. 1253 at 22. The Department neglects to mention what efforts are being made or to explain why it has not attempted to responded to these requests piecemeal. For instance, LTC Schulz has been interviewed, the Department is aware of what knowledge she has regarding the events underlying this action, but it has not decided whether it will allow her deposition. ECF No. 1211-6 at 2. There is no justification for this inaction.

Accordingly, the undersigned concludes that Defendants' motion to compel is due to be granted to the extent the Department has unreasonably delayed resolving Defendants' *Touhy* requests for: (1) the depositions of Ms. Binseel, Dr. Little, Dr. Cleveland, LTC Schulz, and Dr. King; (2) the production of four categories of noise and ototoxin data described in Defendants' motion to compel (ECF No. 1211 at 24); and (3) the production of safety release documentation for the CAEv2. The Department must provide a final decision on these *Touhy* requests by a date certain (discussed below).

Defendants' motion to compel is due to be denied to the extent the Department has not delayed resolving Defendants' request for the identities

of the Hearing Conservation Program Manager and Industrial Hygiene

Program Manager at particular military installations.  Defendants only sent

this request to the Department on June 3, 2020, and the Department has

since assured Defendants that it is being processed.  ECF No. 1211-6 at 4.

The undersigned is not persuaded that the Department has unreasonably

delayed reaching final agency action on this request.

### C.    Final Agency Action as to LTC Robinette

The Court will now turn to the single final agency action presented in

Defendants' motion to compel—the Department's refusal to authorize a

deposition of LTC Robinette.  The Court may set aside this decision if it is

arbitrary or capricious.  § 706(2).  The scope of review is narrow and

requires only reasoned decisionmaking by the Department.  *Dep't of

Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905

(2020).  The Court must "determine only whether [the Department]

examined the relevant data and articulated a satisfactory explanation for

his decision, including a rational connection between the facts found and

the choice made."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569

(2019).

Major Kim provided the following reasoning for denying Defendants'

*Touhy* request:

26

> After speaking with COL Robinette, it is apparent that he lacks
> relevant knowledge of the information you listed in your requests.
> COL Robinette had a minimal role, if any, in acquiring or
> approving the CAEv2 and his direct communications about
> CAEv2 were limited. Additionally, he served as a DOJ subject
> matter expert in a separate investigation related to the underlying
> facts of this case. Because of this, it is our position that allowing
> this employee to sit for a deposition would not be productive and
> would create an undue burden on the DoD due to the amount of
> time the DoD would expend preparing for and participating in the
> requested deposition. See DoDD 5405.2 and Fed. R. Civ. P. 26.
> Therefore, your request to depose this individual is denied.

ECF No. 1211-5 at 1.  Defendants argue this decision was arbitrary and

capricious because: (1) LTC Robinette's testimony is highly relevant to the

military's knowledge of issues pertaining to the fitting of the CAEv2 ("the

flange-fold instruction"); and (2) the fact that he recently served as a

subject matter expert in a *qui tam* concerning the CAEv2 runs counter to

the Department's assertion that preparing him for testimony in this case

would be unduly burdensome.  ECF No. 1211 at 20–21.  The Department

asserts that its decision should not be overturned because: (1) Defendants

are offering a different basis for LTC Robinette's deposition than initially

disclosed; (2) the Government would need to expend time in preparing for

and attending LTC Robinette's deposition notwithstanding his prior role as

a subject matter expert in a related action; and (3) the Department has

provided Defendants with the opportunity to submit interrogatories in lieu of a deposition.  ECF No. 1253 at 25–28.

The Department's reasoning for denying LTC Robinette's deposition is arbitrary and capricious.  The Department has failed to explain on what relative scale it concluded LTC Robinette had "a minimal role" pertaining to the military's acquisition or approval of the CAEv2.  Moreover, this assertion appears to be contradicted by the Department's statement that LTC Robinette served as a subject matter expert in an investigation related to the underlying facts of this case.  The Department's argument that Defendants have changed the basis for their *Touhy* request is also contradicted by the record.  On December 2, 2019, Defendants requested authorization to depose LTC Robinette regarding "instructions and/or training that military audiologists provided to service member for the use or fit of the Combat Arms Earplugs," which would include a flange-fold instruction.  ECF No. 1211-3 at 7–8.  Lastly, the Department's offer for the parties to submit interrogatories (which are typically unavailable in third-party discovery) to LTC Robinette tacitly recognizes that his testimony is relevant.

The Department's argument as to burden is also unavailing.  The Department asks this court to deny Defendants' motion as to LTC

Robinette because Defendants "do not say … that no preparation time would be necessary" for a deposition.  ECF No. 1253 at 26.  Yet, Directive 5405.2 § 6.2.1 requires the Department to look to whether "the request or demand is *unduly* burdensome[.]"  ECF No. 1211 at 5 (emphasis added).  The fact that any time may be required to prepare an employee for deposition is not a cognizable burden on the Department and would amount to absolute immunity from discovery that the Department does not enjoy.  *See Exxon*, 34 F.3d at 778 ("Neither the statute's text, its legislative history, nor Supreme Court case law supports the government's argument that § 301 authorizes agency heads to withhold documents or testimony from federal courts.").

In sum, the undersigned concludes the Department's denial of Defendants' *Touhy* request to depose LTC Robinette is arbitrary and capricious because there is no rational connection between the facts before the Court and the Department's decision.  Accordingly, Defendants' motion to compel is due to be granted to the extent the Department's decision is set aside under § 706(2).

### D.   Compliance Deadline

In view of the procedural posture of this case, the Court recommends that the Department authorize LTC Robinette for deposition and enter final

29

agency action on Defendants *Touhy* requests for the depositions and productions addressed in the motion to compel (except for the identities of the Hearing Conservation Program Managers and Industrial Hygiene Program Managers) within 14 days of the district court's order adopting this report and recommendation. This is because the parties have not had the opportunity to address this issue. Should the parties object to any portion of this report and recommendation, they should include proposals for the Court's consideration of a compliance deadline.

## IV.  CONCLUSION

Accordingly, it is respectfully **RECOMMENDED** that:

1.  Defendants' "Motion to Compel Against the Department of Defense," ECF No. 1211, should be **GRANTED IN PART and DENIED IN PART**.

2.  The Department of Defense should be **ORDERED** to respond to Defendants' outstanding *Touhy* requests for: (1) the depositions of Ms. Binseel, Dr. Little, Dr. Cleveland, LTC Schulz, and Dr. King; (2) the production of four categories of noise and ototoxin data described in Defendants' motion to compel (ECF No. 1211 at 24); and (3) the production of safety release documentation for the CAEv2, no later than **14 days from the district court's order on the instant motion.**

3.    The Department of Defense's denial of Defendants' *Touhy* request to depose LTC Robinette should be **SET ASIDE**, and the Department should be **ORDERED** to authorize LTC Robinette for deposition no later than **14 days from the district court's order on the instant motion.**

**IN CHAMBERS** this 30th day of July 2020.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**

31

# EXHIBIT I

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to All Cases | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## PRETRIAL ORDER NO. 50
### Amendment to Pretrial Order No. 13

This Order amends Pretrial Order No. 13 to provide the parties with further instruction on how to proceed with requesting depositions of witnesses who are currently employed by the United States Government, as well as documents in the possession of those witnesses and/or the Government.

After many months of discovery, during which the parties have sent numerous discovery requests to the Department of Defense (the "Department") pursuant to the Department's *Touhy* regulations and Directive 5405.2, the Department has taken the position that the Court does not have the authority to compel Department action in this litigation in the absence of subpoenas.[1] *See* DoD Obj. to R. & R., ECF No. 1320 at 16-26; DoD Opp., ECF No. 1253 at 7-12. Defendants disagree with the Department's position. *See* Reply, ECF No. 1275 at 3-9. In other words, the

---

[1] *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

Department and Defendants disagree not over whether a subpoena is required to obtain Government discovery under *Touhy*, but rather whether a subpoena is required before this Court may compel the Department, who is not a party to this litigation, to submit the requested discovery. *See* Fed. R. Civ. 37(b).

This ongoing disagreement between the Department and Defendants has resulted in nearly two months of motions practice, during which none of the requested depositions have been taken or relevant documents produced. In light of the fast-approaching discovery deadlines for the Trial Group A cases, including the close of Government discovery in less than two weeks on September 1, 2020 and the close of fact discovery on October 9, 2020, *see* Pretrial Order No. 43 (ECF No. 1204), as well as the upcoming and not-so-distant fact discovery deadlines for Trial Groups B, C, and D, *see* Pretrial Order No. 46 (ECF No. 1295), the Court will require the parties to this litigation to issue appropriate subpoenas for any Government witness deposition and any Government documents, pursuant to Fed. R. Civ. P. 45. This Order applies to all Government witness depositions and document requests going forward as well as to those that are the subject of Defendants' pending Motion to Compel (ECF No. 1211). [2]

---

[2] The Court acknowledges that within the past two weeks, the Department provided Defendants with its position on three of the six deposition requests and one of two production requests that are the subject of Defendants' pending Motion to Compel (ECF No. 1211). Defendants are directed to issue subpoenas for any witness or document requests the Department has denied, given the Department's threshold objection that a subpoena is required before it can be compelled to act.

In multi-district litigation (MDL) such as this, the Court has "broad discretion to structure a procedural framework for moving the cases as a whole" and the authority to "uncomplicate matters" to promote fair and efficient resolution of the litigation.  *See In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 460 F.3d 1217, 1231-32 (9th Cir. 2006); *In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*, 496 F.3d 863, 867 (8th Cir. 2007) ("[C]ourts must be given greater discretion to organize, coordinate and adjudicate its proceedings.").[3]  Here, the parties' practice of not issuing subpoenas for Government witnesses and documents is complicating matters and interfering with the fair and efficient progress of discovery, although the undersigned certainly understands why the parties have proceeded in this manner to date.  Accordingly, and in light of the minimal burden associated with issuing these subpoenas, the Court amends Pretrial Order No. 13.

**SO ORDERED**, on this 20th day of August, 2020.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[3] *See also McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 701 (5th Cir. 2014) ("A district court has broad discretion in all discovery matters."); *Jenkins v. Sec. Engineers, Inc.*, 798 F. App'x 362, 369 (11th Cir. 2019) (similar).

# EXHIBIT J

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to All Cases | Judge M. Casey Rodgers<br>Magistrate Judge Gary R. Jones |

## ORDER

This matter is before the Court on Magistrate Judge Gary Jones's July 30, 2020 Report and Recommendation recommending that Defendants' Motion to Compel Against the Department of Defense (ECF No. 1211) be granted in part and denied in part. *See* ECF No. 1292. As a threshold matter, Judge Jones concluded that the Court has personal jurisdiction over the Department of Defense (the "Department") because the Department waived any objection to personal jurisdiction, and that exercise of jurisdiction is not unconstitutional. *See id.* at 14-19.

Pretrial Order No. 50 (ECF No. 1340), filed after Judge Jones' Report and Recommendation, requires the parties to subpoena the United States Government with any requests for depositions or production of documents, including those that are the subject of Defendants' Motion to Compel (ECF No. 1211). Because Pretrial Order No. 50 now moots the threshold dispute between the parties and, should

subpoenas issue, will provide the Department with an opportunity to respond to the subpoena, the Court hereby **REJECTS** the entire Report and Recommendation (ECF No. 1292) and **DENIES** Defendants' Motion to Compel (ECF No. 1211) as moot. Should a motion to compel still be necessary following the subpoena process, Defendants may renew their arguments in a new motion to compel.

      **SO ORDERED**, on this 20th day of August, 2020.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 5:20-mc-01085-DAE |
| | ) | |
| v. | ) | |
| | ) | |
| 3M COMPANY, | ) | |
| | ) | |
| Respondent. | ) | |

## [PROPOSED] ORDER GRANTING MOTION TO TRANSFER UNDER RULE 45(F)

Respondent 3M Company ("3M") filed a Motion to Transfer Under Rule 45(f). After considering this motion, the Court is of the opinion that the motion should be GRANTED. It is hereby ORDERED that the United States' motion to quash the subpoena served on LTC Martin Robinette be transferred to the court of Judge Rodgers in the Northern District of Florida (3:19-md-02885-MCR-GRJ).

DATED: _____    _____
David A. Ezra
United States District Judge