**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

|  |  |  |
|---|---|---|
| **IN RE: 3M COMBAT ARMS EARPLUG PROUCTS LIABILITY LITIGATION** | ) ) ) ) | **No. 3:19-md-02885-MCR-GRJ** |
| **THIS DOCUMENT RELATES TO ALL ACTIONS** | ) ) ) ) ) | |

**DECLARATION OF MAJOR (MAJ) NICOLE M. KIM**

1.  I am a Major in the Judge Advocate General's (JAG) Corps currently assigned to the Army's Litigation Division in its General Litigation Branch.  The Litigation Division supports the Department of Justice in defending the Department of the Army and its personnel and the Department of Defense and its personnel (in delegated cases) in civil litigation.  The General Litigation Branch's portfolio of cases includes handling all requests for Army official information (otherwise known as *Touhy* requests) submitted to the Department of the Army for use in civil litigation.  The General Litigation Branch consists of five litigation attorneys and one paralegal, and handles a caseload of approximately 250 cases at any given time.  Each attorney handles a caseload of approximately 40-60 cases at any given time.

2.  In July 2019, the Army's Litigation Division, General Litigation Branch was assigned as the lead counsel on behalf of Department of Defense in responding to requests for official information in the above captioned case.  In July 2019, MAJ Collin Evans was assigned as lead counsel.  In August of 2019, I was assigned to this case as a co-counsel, and in June 2020, I was assigned as lead counsel.  I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

3.  On September 22, 2020, defendants notified the DoD that they mailed a subpoena to the DoD.  The return date on the subpoena was September 23, 2020. The DoD's Office of the General counsel did not receive the mailed subpoena. Defendants filed a motion to compel on October 2, 2020.  The DoD was served the operative subpoena by a process server on October 14, 2020.

4.  Defendants submitted a *Touhy* request dated June 21, 2019, and a supplemental *Touhy* request dated July 26, 2019, requesting multiple categories of government information.  During telephonic communications in 2019, MAJ Evans informed defendants their *Touhy* request(s) was extensive and overly broad.  In order to assist the DoD in processing the request, on December 2, 2019, defendants submitted a letter prioritizing and clarifying the requests set forth in the July 26, 2019 request.  The DoD focused efforts on the prioritization of the categories identified in the December 2, 2019 letter.

5.  Since October 2019, the DoD has produced 14 disclosure letters attaching various amounts of information to each disclosure.  DoD has produced approximately 10,000 pages of documents through those disclosures.  That page count does not include additional documents produced in response to subpoenas 3M served on various DoD employees.

6.  In January or February 2020, MAJ Evans informed defendants the DoD was unable to identify certain information they were seeking in their July 26, 2019, *Touhy* request, specifically paragraphs I(1) and I(2) because the requests were vague.  Paragraphs I(1) and I(2) seek:  "(I(1)) Noise dosimetry data or other documents regarding the amount of noise service members are exposed to in particular specialties, in particular situations, or when operating particular weapons; and (I(2))Sound level data and recommendations for hearing protection in particular situations or when operating particular weapons, such as those documented on DD Form 2214."

7.  On March 17, 2020, defendants submitted a supplemental *Touhy* request to further identify the information being sought in paragraphs I(1) and I(2) of the July 26, 2019, *Touhy* request.  Shortly after defendants submitted this request, the COVID-19 pandemic started.  The pandemic significantly impaired the processing of all requests both at the Litigation Division and in the Army commands and entities necessary to search for and provide the requested information due to

personnel focusing on the COVID-19 pandemic response and implementing telework schedules, which limited the ability of individuals to access databases and necessary network resources (e.g. share drives).

8.   After reviewing the March 17, 2020, *Touhy* request and conducting further inquiries, DoD determined the request was overbroad and unduly burdensome.  In May 2020, MAJ Evans advised defendants of this and requested defendants identify specific weapons systems to narrow the scope of the defendant's request.  On May 30, 2020, the DoD received an email from Nick Wasdin, counsel for 3M, providing additional information purportedly to aid the DoD's search for noise and ototoxin data requested in the July 26, 2019, *Touhy* request.

9.   Soon after, MAJ Evans received military orders assigning him to Fort Leavenworth, Kansas.  He departed the Litigation Division in June 2020.  His departure coincided with the departures of other attorneys as required by military orders.  From June to August 2020, I and one other litigation attorney were responsible for the branch's approximately 250 cases.  Defendants were aware of MAJ Evans' departure and I advised them I was solely responsible for the pending *Touhy* requests.  At the time of MAJ Evans' departure the DoD was still processing defendant's request for noise dosimetry data and sound level data.

*Defense Occupational Environmental Health Readiness System-Industrial Hygiene*

10.  The Army Industrial Hygiene Program Office (IHPO) at each Army installation is responsible for conducting industrial hygiene surveys of potential hazardous areas on DoD installations, which includes samplings related to noise and ototoxins.  The information is entered into a database known as Defense Occupational Environmental Health Readiness System-Industrial Hygiene (DOEHRS-IH).  The Army Public Health Center is the representative to the Defense Health Agency, Clinical Support Program Management Office, Solution Deliver Division (SDD), which maintains this database.  Generally, the database collects longitudinal occupational and environmental health exposure for DoD workplaces and uses this information to evaluate personnel exposures to hazardous substances.  Ultimately, the database is an internal process to identify areas of hazardous concern and determine controls to reduce the hazardous exposure.

11.  The DOEHRS-IH database was established in 2006 and may contain as many as 1,500 Army military occupational specialties.  In order to search the DOEHRS-IH, data analysists need to build a query.  To build the query the data analyst needs specific identifiable information to include in the search.  After building and running the query, assuming the query was successful, the data analysts need to analyze the data.

12.  The DOEHRS-IH database does not contain "average noise and ototoxin exposure per military occupational specialty."  To attempt to determine

5

such information would require DoD to perform an analysis of other data, which is not an analysis the DoD currently does and therefore defendants' request requires the generation of new work product solely for this private litigation.

13. DOEHRS-IH houses the Army's Health Hazard Information Model (HHIM), a legacy system to capture data prior to 2006. DoD transcribed and uploaded the HHIM data that was available for upload into DOEHRS-IH in 2006. Each installation industrial hygiene program office may have written reports and or memorandums that were unable to be uploaded into DOEHRS-IH. To locate Army installation noise and ototoxin exposure data, the various installation industrial hygiene program managers would need to conduct searches of the hard copy records located at the installations, which may or may not have been retained. Additionally, many industrial hygiene program managers are working remotely, do not have daily access to records, and have limited staff.

14. The 2018 DOEHRS-IH promotional pamphlet, attached to the May 30, 2020, email from Nick Wasdin, shows certain capabilities of the DOEHRS-IH database. Some capabilities such as, "tracks DoD lifetime personnel exposure data," are continuing to be developed and are currently in a testing phase. DOEHRS-IH does not contain a field for "lifetime exposure" and it is unclear what specific information the defendants are seeking. To locate any sort of exposure data would require DoD to conduct searches for particular individuals and examine

6

information that would be generated through that search to attempt to locate data regarding "exposure."

15.   The DOEHRS-IH database contains a field titled recommendations. However, this is not a standardized field within the database and there is no requirement to input information into this field.  Because there is no standardization use of this field, in many instances the information captured in this field contains other information besides recommendations.

16.   The DOEHRS-IH database contains sensitive, privileged information about all DoD civilians and Service Members, even those not a part of this litigation.  It contains information protected by the Privacy Act and Health Insurance Portability and Accountability Act (HIPPA).  Further, it contains sensitive information regarding military installations.  Additionally, the construction of the DOEHRS-IH database is itself proprietary information.

*Health Hazard Assessments*

17.   Health Hazard Assessment Reports (HHAs) contain information concerning what level of noise Service Members are exposed to when operating particular weapon systems in particular manners, as well as certain recommendations for mitigating excessive noise exposure.  In addition, these reports contain proprietary information for individual weapon systems and information on weapon use and effectiveness.  Typically, an HHA is produced at

7

the time the Army acquires a new weapon, a new part of a weapon, or a new platform from which to fire the weapon or round.

18.   The noise information in the HHA is specific to how the weapon or item is used.  It is particular to several variables.  These variables include but are not limited to the model number of the weapon, and (for small arms systems) the type of cartridge used, the caliber of the round, and the position of the firer (prone, kneeling, sitting, or standing).  For large caliber weapons systems, such as mortars and howitzers, variables involved include weapon azimuth and elevation, crew position (gunner, loader, etc.), ammunition temperature conditioning, and charge weight (how much propellant is used).  Weapon platforms (vehicles) fitted with weapon systems have other variables including hatch or ramp conditions and crew location.  Other variables may be involved if the weapon can be fired from an enclosed space rather than in the open.  Accordingly, there are not necessarily specific HHAs corresponding to the weapons systems defendants have identified, such as "M16" or "grenades."  Identifying a particular HHA would require additional information.

19.   The HHA reports are stored in a database kept in a shared drive.  The shared drive contains folders for each year of report production, which are named by the project number under which the reports were created.  There have been approximately 3,400 such reports created since the HHA process began in 1982.

8

The project numbers use a file-naming convention using symbols and digits that relate the report to a specific project and the author of the report, but not to any aspect of the content.  Specifically, the project numbers do not relate what type of weapons were analyzed in the HHA.  The HHAs vary in length from two pages to several hundred pages.  The earlier HHA reports are not searchable documents.

20.  DoD cannot produce HHAs publically because they contain privileged information.  Specifically, the HHAs contain propriety information regarding the weapons systems and their capabilities.  The HHAs have limited distribution due to national security concerns.  Redacting the non-releasable information from 3,400 HHAs would be extremely time-consuming, as it would require a line-by-line review of each document by the Noise Control Engineer, some of which are hundreds of pages long.  Additionally, some of the privileged information is intermingled with the releasable information, making it more difficult to redact.

21.  The task of identifying, extracting, consolidating, and providing data contained in the HHAs is also extremely burdensome.  Without a specific request that identifies a particular HHA, the Noise Control Engineer would have to: (1) read or search each of the thousands of HHAs to find HHAs pertaining to a particular weapon system; (2) identify the relevant data for the particular weapon system sought; (3) copy and paste the data into a separate document, separating the data based on the necessary variables; and (4) annotate the variables used during

9

the testing.  The Noise Control Engineer may have to search several thousands of files to provide a complete responsive answer.  Although the U.S. Army Public Health Command has two Noise Control engineers, only one is able to process this request.  This process would take many months to complete because of his normal day-to-day duties.

22.  Defendants requested the HHAs for various weapon systems and vehicles; however, they did not provide the variables or details needed for the Noise Control engineer to search the above-described database.

*Documents Related to Annual Military Audiology Association Short Course Meetings from 2001 to 2005*

23.  The DoD has no repository of information specifically related to military audiology association short courses.  After the defendant submitted its March 17, 2020, *Touhy* request, the Army Hearing Program Manager at the Army Public Health Center conducted a secondary search for documents specifically related to military audiology association short courses.  The Army Hearing Program Manager found no additional responsive information different than what DoD had already produced.

*Documents related 18 non-Combat Arms hearing protection devices*

24.  In the supplemental *Touhy* request, dated August 7, 2020, defendants seek REAT and impulse "testing data relating to non-Combat Arms hearing protection devices used by Bellwether Plaintiffs in Trial Group A during their

military service." Although it is unclear precisely what information defendants are seeking, defendants appear to seek information that is publically available. Specifically, the Army publically publishes articles regarding tests completed on the various hearing protection devices. Defendants have not identified particular studies, and it would be unduly burdensome for the Army to search publically available studies to attempt to determine what studies may be of interest to defendants. Further, if defendants are seeking non-publically available information, such as the raw data underlying the studies, in many cases that information would contain proprietary information belonging to manufacturers, and not subject to discovery. Any such protected information would have to be redacted from any production of releasable information, to the extent any releasable information may exist.

25. I declare under penalty of perjury that the foregoing is true and correct. Executed on October 23, 2020.

_____

MAJ NICOLE M. KIM

11