UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION  ) ) ) ) ) This Document Relates to All Cases ) ) | Case No. 3:19-md-2885-MCR-GRJ<br><br>Judge M. Casey Rodgers<br><br>Magistrate Judge Gary R. Jones |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL AGAINST THE DEPARTMENT OF DEFENSE

The United States repeatedly contends in its response that Defendants' *Touhy* requests did not sufficiently describe the documents at issue. But the United States' own conduct belies its assertions. Since the filing of Defendants' motion to compel, the United States has informed Defendants, and now the Court, that it does possess many of the documents Defendants seek. The Court should compel the United States to produce those documents, along with the other documents and information sought in Defendants' motion.

## ARGUMENT

### I. NOISE AND OTOTOXIN EXPOSURE DATA

The United States attempts to make its delay in producing noise and ototoxin exposure, which Defendants requested in June 2019, seem more reasonable by pointing out Defendants "deprioritized" their request on December 2, 2019. But

Defendants deprioritized that request at the order of the Court, which instructed the parties to concentrate on discovery requests that were relevant to the resolution of the government contractor defense. (*See* Ex. A at 1-2.). It has now been nearly a year since Defendants made that prioritization, and seven months since the parties filed their summary judgment motions on the contractor defense. The United States finished its contractor-relevant production long ago, and should have moved on to the rest of Defendants' requests, which are no less critical to the upcoming bellwether trials.

### A. Exposure Data By Military Occupational Specialty

The United States argues that Defendants' *Touhy* requests did not mention "average noise and ototoxin exposure per military occupational specialty." But Defendants' *Touhy* request sought "documents related to the noise surveys, identification of noise hazardous areas, and identification of noise-exposed and ototoxin-exposed personnel, which are performed and maintained by the Industrial Hygiene Program Managers for each Army installation per Army Pamphlet 40-501." (Dkt. 1433, Ex. B at 3.) And the United States acknowledges that, pursuant to this obligation, the Department collects "data from the Health Hazard Information Module separated by Military Occupational Specialty (MOS) as it relates to different noise and ototoxin hazards." (Dkt. 1483 at 9 n.3.) The Department's objection that Defendants did not sufficiently describe the data in their *Touhy* request rings false

given that the Department has been able to locate the data. It would be unreasonable, moreover, to expect Defendants to have described with precision non-public data collected by the Department.

The Court should compel the Department to produce the exposure data for military occupational specialties (MOSs), to which the Department admittedly has access. In order to lessen the burden of production on the Department, Defendants have limited their request to the 24 MOSs for the bellwether plaintiffs in Groups A and B.

### B.     Exposure Data By Installation

The United States contends that Defendants' *Touhy* request did not seek data regarding "noise and ototoxin exposures at the bellwether relevant Army installations." (Dkt. 1483 at 10.) In fact, Defendants' *Touhy* request expressly asked for the data that Army regulations require "the Industrial Hygiene Program Managers *for each Army installation*" to collect. (Dkt. 1433, Ex. B at 3.) The United States also claims that the Defendants have not specified the type of data they are seeking, but the *Touhy* request identified precisely the data that the regulations require: an inventory of all noise- and ototoxin-hazardous areas, "the names of … exposed personnel," and "the magnitude of their noise exposure." (*See* Dkt. 1433, Ex. B at 4; Dkt. 1071, Ex. 8 at 1–4(h).)

As the United States seems to acknowledge, some of this data is contained in the DOEHRS-IH database. *See* Kim Decl. ¶¶ 13-16. The United States suggests that Defendants are unreasonably asking for the production of the entire database, but this is a distortion. Defendants simply want access to the data identified in their motion, which the United States is required to collect, and which is stored in the DOEHRS-IH database, among other places. The United States has not explained why the extraction of this digital information from the DOEHRS-IH database would be unduly burdensome.

### C.   Health Hazard Assessments

The United States also suggests that Defendants did not adequately identify health hazard assessments (HHAs) in their *Touhy* requests, but, as the United States acknowledges, Defendants did request "documents regarding the amount of noise service members are exposed to … when operating particular weapons," and later granted United States' request to provide a list of the bellwether relevant weapons. HHAs plainly fall within the category of documents identified in Defendants' request, and the United States understood as much. Indeed, the United States acknowledges that it has already proposed to produce information from the relevant HHAs to Defendants. (Dkt. 1483 at 12 n.4.) The Court should compel the Department to produce the bellwether-relevant exposure data contained in the HHAs, to which the Department admittedly has access. Defendants have already

provided the Department with a list of 25 bellwether-relevant weapons and vehicles, and accept that the Department will need to redact sensitive information. (*See* Ex. B.) The Department should provide whatever HHAs are relevant to the weapons on that list, many of which (*e.g.*, "Sig Sauer P365") are quite specific.

### D. Recommendations and Lifetime Exposure Data

Defendants are not seeking lifetime exposure data for every single servicemember, as the United States suggests. Defendants ask for exposure data relevant to the litigation, which at this stage means exposure data for the Military Occupational Specialties corresponding to the bellwether plaintiffs.

## II. SALES AND DISTRIBUTION DATA

These documents are critical because they determine whether plaintiffs would have had access to CAEv2 earplugs. The United States contends that it already produced sales and distribution documents to Defendants on March 6, 2020, and that it "has provided all of the responsive records it possesses." (Dkt. 1483 at 14.) But the *single document* the United States produced that even purports to relate to sales and distribution was a spreadsheet that contains no dates, and references other distribution documents that have *not* been produced. (Ex. C (references to other documents highlighted). Defendants have asked the United States to: (1) produce the documents referenced in the spreadsheet; (2) provide a representative to explain the spreadsheet; and (3) check for distribution documents with the Defense Logistics

5

Agency and base distribution centers, where Defendants are informed such documents are housed. The United States has stated it is considering these requests.

### III. TESTING DATA ON EARPLUGS OTHER THAN THE CAEV2

Contrary to the United States' assertion, testing data on earplugs other than the CAEv2 is critical to this litigation. The list of non-CAEv2 earplugs for which Defendants seek testing data is *limited to the devices bellwether plaintiffs claimed they they used*. As soon as that discovery was provided in Trial Group A depositions at the end of July 2020, Defendants requested test data on *those* non-CAEv2 earplugs from the United States. Plaintiffs have argued that the CAEv2 caused them to suffer hearing injuries that other earplugs would have protected against—a claim that can only be assessed with data showing how those other earplugs worn by bellwether plaintiffs perform. And the United States fares no better with its assertion that the documents contain "proprietary information belonging to manufacturers." (Kim Decl. ¶ 22.) The Court has entered a Protective Order, and the alleged "proprietary" nature of critical documents is not a reason to withhold them from discovery.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion to compel.

Dated: October 30, 2020	Respectfully submitted,

*/s/ Robert C. Brock*
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
mnomellini@kirkland.com

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC and Aearo, LLC*

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(I)**

Pursuant to Local Rule 7.1(I), counsel for Defendants certify that this brief contains 1,212 words, excluding the case style, signature block, and certificates of compliance with the Local Rules.

Dated:  October 30, 2020                         Respectfully submitted,

/s/ Robert C. Brock
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (2020) 389-5991
mike.brock@kirkland.com

*Counsel for Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC and Aearo, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 30, 2020, a copy of the foregoing was filed on the Court's CM/ECF system, which will serve all counsel of record.

DATED: October 30, 2020

*/s/ Robert C. Brock*
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
mike.brock@kirkland.com

*Counsel for Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC and Aearo, LLC*