# EXHIBIT A

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

Mark J. Nomellini
To Call Writer Directly:
+1 312 862 2410
mnomellini@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

December 2, 2019

**Via E-mail**

Major Collin Evans
Litigation Attorney, General Litigation
Branch
U.S. Army Legal Services Agency
9275 Gunston Road
Ft. Belvoir, VA 22060
Collin.p.evans2.mil@mail.mil
703-693-0352

Re: Supplemental Touhy Request For Documents Relating to *In re: 3M Combat Arms Earplug Products Liability Litigation, 3:19-md-02885-MCR-GRJ (N.D. Fla.)*

Dear Major Evans:

In connection with *In re: 3M Combat Arms Earplug Products Liability Litigation*—a multidistrict litigation pending before Judge Rodgers in the Northern District of Florida—this letter constitutes Defendants 3M Company ("3M") and Aearo Technologies LLC's ("Aearo") supplemental *Touhy*[1] request to the United States Department of Defense ("DoD"), Defense Logistics Agency ("DLA"), Army, Navy, Marine Corps, Air Force, and Coast Guard for certain contracts and other documents related to, among other things, the design, sale and use of Combat Arms Earplugs Version 2 ("CAEv2"); and (ii) noise exposure data and hearing conservation efforts in the various military branches.

Case Management Order No. 6 in MDL No. 2885 (Dkt. 6) states: "With the assistance of Judge Herndon, the parties must review Defendants' supplemental DOD *Touhy* request dated July 26, 2019, as well as each side's DOD *Touhy* requests for interviews and/or depositions, and segregate the requests that are relevant to Defendants' affirmative defenses from those which are not relevant to the defenses. By December 13, 2019, the parties must submit the two lists to Major

---

[1] *United States ex rel. Touhy v. Ragen,* 340 U.S. 462 (1951).

Beijing Boston Chicago Dallas Hong Kong Houston London Munich New York Palo Alto Paris San Francisco Shanghai Washington, D.C.

KE 65491569.1  12/2/2019

## KIRKLAND & ELLIS LLP

Major Collin Evans
December 2, 2019
Page 2

Evans and Major Kim, along with a request that the Government defer action on the *Touhy* requests that are not relevant to the affirmative defenses until after it responds to the *Touhy* requests for documents, interviews, and depositions that are relevant to the defenses." Pursuant to the Court's Order, this supplemental *Touhy* requests contains two categories of document requests: (i) document requests which should be prioritized in connection with Defendants' affirmative defenses; and (ii) document requests which should be de-prioritized.[2]

Pursuant to 32 C.F.R. § 516.40-57 and 32 C.F.R. § 97, 33 C.F.R. § 1.20-1 and 6 C.F.R. § 5.45, DoD Directive 5405.2 § 6.2, Navy Instruction 5820.8A, and Air Force Instruction 51-301, Defendants set forth the basis for their *Touhy* request as follows:

## I.    SUMMARY OF THE LITIGATION

3M was founded in 1902 as a small-scale mining venture in Northern Minnesota, and has grown into a global science company employing over 90,000 people. 3M produces more than 60,000 products world-wide. Many of 3M's brands have become universally known, including Scotch™ Brand adhesive tapes, Post-it® Brand sticky notes, and Thinsulate™ thermal insulation, to name just a few. In addition to its consumer-side business, 3M also has a long-standing relationship with the federal government and provides thousands of products designed to protect American troops and support their missions. In 2008, 3M purchased Aearo, who, at the time, was a global leader in personal protection equipment, headquartered in Indianapolis, Indiana. The acquisition helped 3M expand its occupational health and environmental safety platform by adding hearing protection, eyewear protection, and fall protection to its product lines, including Combat Arms Earplugs - the subject of this litigation.

Hearing loss is a common injury among military veterans. The U.S. military has provided hearing protection and preservation services to soldiers for decades. In support of that mission, the military employs audiologists to administer hearing conservation programs and work with outside contractors, like 3M, to advance their hearing protection goals.

The complaints in this MDL assert claims for alleged hearing loss or tinnitus allegedly caused by noise exposure while wearing the Combat Arms Earplugs Version 2. CAEv2 was developed and designed by Aearo at the request of and in close consultation with U.S. military audiologists, including Dr. Doug Ohlin, former Program Manager, Hearing Conservation, U.S. Army Center for Health Promotion and Preventative Medicine. Specifically, the U.S. military and Aearo decided to modify and update Aearo's Ultrafit® triple-flanged earplug by including a

---

[2] Certain document request which should be de-prioritized may have some relevance to defendants' affirmative defenses. Nonetheless, Defendants understand that the Court wishes to move expeditiously with respect to government discovery and, accordingly, deprioritizes certain requests.

**KIRKLAND & ELLIS LLP**

Major Collin Evans
December 2, 2019
Page 3

specially patented filter created by the French-German Institute in Saint Louis, France ("ISL"). Thereafter, Aearo worked with the U.S. military and ISL to develop an earplug embodying ISL's patented technology, which ultimately became CAEv2.

CAEv2 is a "dual ended" earplug that consists of two Ultra-fit type tips, one green and one yellow, attached to opposite sides of a plastic stem with a small opening at the center. The green end works like a conventional passive earplug, providing steady attenuation of ambient noise. In contrast, the yellow end is nonlinear and attenuates different sounds differently. In particular, sound travels into the opening at the center of the earplug and through a sound channel and the patented ISL filter before entering the ear. The filter allows lower-level sounds, such as speech, to pass through with minimal attenuation, but provides increased attenuation for higher-level impulse noises, like gun-fire. This enables the user to experience enhanced situation awareness while receiving some protection from unexpected impulse noise.

Throughout the design process, Aearo worked closely with the U.S. military to ensure that CAEv2 would appropriately balance performance with military operational needs for soldiers and military personnel. These specifications were memorialized in a Medical Procurement Item Description ("MPID") that was used by the Defense Logistics Agency to solicit bids from Aearo for CAEv2. Design decisions regarding the CAEv2 may be contained in emails and other communications with Dr. Doug Ohlin. And one or more branches of the military may have tested the products' performance.

To date, over 900 cases have been filed on behalf of current or former military personnel. These claims allege plaintiffs were provided CAEv2 by various branches of the military, and used CAEv2 during training and/or deployment. Plaintiffs asserting these claims typically allege hearing loss and/or tinnitus as a result of noise exposure in military and combat settings, and assert claims for design defect, negligence, failure to warn, breach of warranties, and/or fraud. On April 3, 2019, the Judicial Panel on Multidistrict Litigation entered an order consolidating the cases in an MDL before Judge Rodgers in the Northern District of Florida.

## II.  SUMMARY AND RELEVANCE OF THE PRIORITY DOCUMENTS REQUESTED

Government actions and knowledge are critical issues in this litigation. The DoD, DLA, Army, Navy, Marine Corps, Air Force and Coast Guard exclusively possess necessary information concerning the military's decision to buy CAEv2 from Defendants, the precise specifications Defendants were required to follow in designing, evaluating, and selling the earplugs, military procurement and Indefinite-Quantity contracts, design features, operational considerations in the design of the earplugs, product testing, audiology reports and studies, and training, safety, and fitting information provided to service members. These materials speak to, among other things,

KIRKLAND & ELLIS LLP

Major Collin Evans
December 2, 2019
Page 4

Plaintiffs' allegations that there was a product defect or failure to warn, Defendants' affirmative defenses, and various bases for the Court's subject matter jurisdiction over certain claims. Accordingly, the DoD, DLA, Army, Navy, Marine Corps, Air Force and Coast Guard possess information that is necessary for the Court to evaluate the parties' claims and defenses.

Defendants' specific priority document requests are contained in Section III, below. In short, Defendants request documents regarding: (a) design specifications and requests for proposals; (b) instructions for CAEv2 and other earplugs; (c) complaints or recalls related to CAEv2; (d) communications with Dr. Doug Ohlin and other government representatives regarding CAEv2; (e) CAEv2 testing; and (f) policies and procedures regarding earplug fit for service members. These documents are relevant to the claims and defenses in the above-referenced litigation for numerous reasons, including the following.

**Documents regarding design specifications and requests for proposals**. *First*, documents regarding design specifications and requests for proposals will rebut Plaintiffs' claims that CAEv2 was defectively designed, including by showing that design decisions balanced military performance requirements with operational needs for soldiers and military personnel. *Second*, these documents are relevant to establish Defendants' "government contractor" defense, under which a defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). In particular, the requested documents will show, among other things, that the military established reasonably precise specifications governing CAEv2's performance, testing, inspection, packaging, and labeling. *Third*, these documents are relevant to the Court's subject matter jurisdiction under the "federal officer removal statute," 28 U.S.C. § 1442(a)(1), which provides for federal jurisdiction where, as here, the complained of conduct was taken under the direction of a federal officer, and the defendant has "colorable" federal defenses (such as the "government contractor" defense referenced above). *See e.g., Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180 (7th Cir. 2012) (removal under the federal officer removal statute "promotes litigating federal defenses … in a federal forum so that 'the operations of the general government [are not] arrested at the will of one of [the states]'").

**Documents regarding instructions for CAEv2 and other earplugs**. *First*, documents regarding instructions for CAEv2 and other earplugs may rebut Plaintiffs' principal allegation that Defendants failed to adequately instruct the military or individual service members on proper use, including in particular Plaintiffs' allegation that Defendants did not instruct the military to "roll back" the flanges on the opposite end prior to insertion. *Second*, a central issue in this litigation is whether and to what extent the Plaintiffs received and/or followed training on how to properly

KIRKLAND & ELLIS LLP

Major Collin Evans
December 2, 2019
Page 5

insert earplugs, such as CAEv2, in their ears. Plaintiffs' failure to properly insert an earplug in their ears could decrease the attenuation provided by that earplug, and thus undermine any argument that a product defect caused their alleged injuries. *Third*, for similar reasons, these documents may support that particular Plaintiffs misused CAEv2, which is a common law defense to certain claims. *Fourth*, these documents may be relevant to Defendants' "government contractor" defense, which, as discussed above, requires a showing that the government was on notice of alleged product dangers. For example, to the extent the military included in service member instructions a reference to the product characteristics Plaintiffs now challenge—such as "rolling back" any flanges prior to insertion—then that would support that the government was on notice of the issue.

**Documents regarding complaints or recalls related to CAEv2**. *First,* to the extent there are no or few complaints or recalls, then that may undermine any assertion that CAEv2 was defective. *Second,* complaints by any particular Plaintiff are relevant to showing the date on which the Plaintiff was on notice of the alleged defect, which is relevant to whether the statute of limitations has run on his or her claims. *Third*, complaints by individual Plaintiffs may show that they continued to use CAEv2 after gaining knowledge of the alleged issue, which would support various common law defenses to Plaintiffs' tort claims, such as "assumption of the risk" and "failure to mitigate." *Fourth,* to the extent the government continued to purchase and use CAEv2 after receiving complaints about its performance, then that would support Defendants' government contractor defense, which, as noted above, requires a showing that the government was on notice of the alleged product dangers.

**Communications with Dr. Doug Ohlin and other government representatives regarding CAEv2**. *First,* communications with Dr. Ohlin and other government representatives regarding CAEv2 will rebut Plaintiffs' allegations that CAEv2 was defectively designed by showing that the military participated in the design of CAEv2 and made decisions that balanced performance requirements with operational needs for soldiers and military personnel. *Second*, these documents will help to establish Defendants' "government contractor" defense by showing that the military approved reasonably precise specifications, engaged in a continuous back-and-forth dialogue with Defendants regarding design specifications, and was on notice of the alleged product dangers. *Third,* like the design specifications and requests for proposals discussed above, Ohlin's and other government representatives' communications regarding CAEv2 are relevant to the Court's jurisdiction under the federal officer removal statute, which provides for federal jurisdiction where, as here, the complained of conduct was performed under the direction of a federal officer. 28 U.S.C. § 1442(a)(1).

**Documents regarding CAEv2 testing.** *First,* CAEv2 test results will undermine Plaintiffs' allegation that the product was defective. *Second,* testing documents in the military's possession—whether or not the test was performed by the military—will show that the military

**KIRKLAND & ELLIS LLP**

Major Collin Evans
December 2, 2019
Page 6

was on notice of CAEv2 performance capabilities, which is relevant to, among other things, Plaintiffs' failure to warn claims, Defendants' "government contractor" defense, and the Court's jurisdiction under the federal officer removal statute.

**Policies and procedures regarding earplug fit for service members**. *First,* policies and procedures regarding earplug fit for service members will show whether and how the military determined that CAEv2 would fit in particular Plaintiffs' ear canals. To the extent such a determination was made, then that would undermine any allegation that the earplug did not "fit" a particular Plaintiff. To the extent it was not, then that may show that Plaintiffs were not using the earplug appropriately. *Second,* policies showing that the military required trained medical staff to make an individual determination of fit for each service member will undermine any allegation that Defendants were responsible for fitting individual service members. *Third,* these documents may show whether and how the military trained soldiers to insert earplugs like CAEv2 into their ears. As discussed above, Plaintiffs' failure to properly insert CAEv2 could significantly impact attenuation, and thus undermine Plaintiffs' argument that a product defect caused their alleged injuries. *Fourth,* these documents may provide the basis for a defense that Plaintiffs' misused CAEv2 by failing to follow military policies.

### III.     PRIORITY DOCUMENT REQUESTS FOR AFFIRMATIVE DEFENSES.

Pursuant to *United States ex rel. Touhy v. Ragen,* 340 U.S. 462 (1951), Case Management Order No. 6 in MDL No. 2885, and the above-referenced statutes, directives and instructions, Defendants request the following prioritized documents from the DoD, DLA, Army, Navy, Marine Corps, Air Force, and Coast Guard. To the extent that these documents relate to the procurement, design specifications, and audiology-related studies of CAEv2, Defendants understand that the contracting officer, the contracting officer's representative, and the hearing conservation program manager may be likely sources of the requested information.

### A.     Documents Regarding Design Specifications And Requests For Proposals.

1. Specifications and drawings for the CAEv2.

2. Specifications and drawings, including those transmitted via email, related to the stem size and/or length of the CAEv2 from 1996 to 2000.

3. Documents related to Georges Garinther's APEX trip to the ISL Institute in France December 5-23, 1995.

KIRKLAND & ELLIS LLP

Major Collin Evans
December 2, 2019
Page 7

4. Documents pertaining to the December 16, 1997 meeting at Aberdeen Proving Ground, Maryland attended by G. Richard ("Dick") Price, Dr. Doug Ohlin, Georges Garinther, Theresa Schultz, Armand Dancer, Pascal Hamery, and Elliott Berger.

5. Documents, including those transmitted via email, related to CAEv2 prototype samples received by Dr. Ohlin from Defendants in 1998.

6. Specifications and drawings for the earplug carrying case (national stock number (NSN)) 6515-01-100-1674, olive drab color.

7. Specifications and drawings for the earplug carrying case (national stock number (NSN)) 6515-01-533-6168, navy blue color.

8. Request for Proposal known as Solicitation No. SP0200-06-R-4202.

9. Request for Proposal known as Solicitation No. SP0200-07-D-4103.

10. Responses to Solicitation No. SP0200-06-R-4202, including from 3M and Aearo.

11. Responses to Solicitation No. SP0200-07-D-4103, including from 3M and Aearo.

12. Requests for Proposals, Commerce Business Daily announcements, or solicitations including design and/or performance specifications, features or performance requirements for any "nonlinear," "level-dependent," "sound transmission," "amplitude-sensitive," "pass-through," "gunshot-reactive," "shooter's earplug," "dual state," or "situation-awareness enhancing" hearing protection device or earplug or ear insert style, from January, 1998 to December, 2015.

13. Request for Proposals, Commerce Business Daily announcements, or solicitations that include any design and/or performance specifications, features or other requirements related to the sizing of any hearing protective earplug, the distribution of military personnel to be accommodated by various sizes of earplugs, or the means of matching earplug sizes to individuals, from January, 1998 to December, 2015.

14. Request for Proposals, Commerce Business Daily announcements, or solicitations that include any design and/or performance specifications, features or other requirements related to the length and/or diameter of any hearing protective earplug, and/or the compatibility of any hearing protective earplug with other headgear such as helmets or earphones, from January, 1998 to December, 2015.

## KIRKLAND & ELLIS LLP

Major Collin Evans
December 2, 2019
Page 8

    **B.**    **Documents Regarding Instructions For CAEv2 And Other Earplugs.**

1. Wallet Card instructions, Blister Pack instructions, Retail Pack instructions, instructions on or with bulk earplug boxes, and other bulk packaging instructions for CAEv2 from January, 1998 to December, 2015.

2. Training materials regarding the proper use, fit, maintenance, and/or care of CAEv2 from January, 1998 to December, 2015, including but not limited to, presentations, slide decks, computerized tutorials, on-line instructions, printed instructions, pamphlets, or memoranda.

3. Specifications, instructions or training materials relating to folding back, flipping backward, rolling back, or reversal of the flanges of any flange-style hearing protective earplug from January, 1998 to December, 2015.

4. Documents and photos, including drafts, input into the "Visual Information (VI) Work Order System" related to wallet-size, laminated instruction cards for CAEv2 from 2000 to 2005.

5. Communications related to information input into the "Visual Information (VI) Work Order System" related to wallet-size, laminated instruction cards for CAEv2 from 2000 to 2005.

6. Documents and drafts of wallet-size, laminated instruction cards for CAEv2 produced from the "Visual Information (VI) Work Order System" from 2000 to 2005.

    **C.**    **Documents Regarding Complaints Or Recalls Related To CAEv2.**

1. Feedback and complaints relating to the CAEv2 provided by service member users.

2. Feedback and complaints relating to the CAEv2 provided by military audiologists and medically trained personnel.

3. Feedback and complaints relating to CAEv2 provided by service member uses to military audiologists.

4. Product recalls and accident or injury documentation related to CAEv2 from January, 1998 to December, 2015.

## KIRKLAND & ELLIS LLP

Major Collin Evans
December 2, 2019
Page 9

**D.   Communications With Dr. Douglas Ohlin And Other Government Representatives Regarding CAEv2.**

1. Communications relating to the CAEv2 that are to, from, copying, or involving Dr. Douglas Ohlin, Lieutenant Colonel Eric Fallon, Lieutenant Colonel Marjorie Grantham, Lieutenant Colonel Martin Robinette, Lieutenant Colonel John Merkley, Colonel Kathy Gates, and Brian Hobbs from 1996 forward. 3M requests that the following search terms be used to search these communications: "CAE" OR "CAEP" OR "Combat Arms" OR "CAEv2" OR "CEP" OR "Aearo" OR "Aero" OR "3M" OR "Berger" OR "wallet card" OR flange OR "NRR" OR "ISL" OR "Institut Saint- Louis" OR "Moldex" OR "battleplug" OR "hear-through" OR "pass-through" "level-dependent" OR "amplitude-sensitive" OR "CAEP" OR "double-ended" OR "double-sided" OR "imperceptible" OR "imperceptibly" OR "slippage" OR "carrying case" OR "prototype" OR "production sample" OR "cut down the stem" OR "one-quarter inch" OR "1/4 inch" OR "wallet card." To the best of 3M's knowledge, Dr. Ohlin's and the other government representatives' email addresses during this time frame were: doug.ohlin@us.army.mil; Douglas.Ohlin@,APG.AMEDD,ARMY.MIL; Douglas.Ohlin@AMEDD.ARMY.MIL; mariorie.grantham@us.army.mil; marjorie.grantham@arl.army.mil; mariorie.a.grantham.mil@mail.mil; martin.robinette@us.army.mil; martin.b.robinette.mil@mail.mil; iohn.a.merklev.mil@mail.mil; iohn.merklev@us.af.mil; John.Merkley@us.army.mil; John.Merklev2@AMEDD.ARMY.MIL; Kathy.Gates@us.army.mil; kathy.e.gates.ctr@mail.mil; brian.hobbs@med.navv.mil; eric.fallon@us.armv.mil; Eric.Fallon@med.navy.mil.

**E.   Documents Regarding CAEv2 Testing.**

1. CAEv2 test results (excluding test results that are publicly available) provided to the Army, Navy, Marine Corps, Coast Guard, Air Force, Defense Logistics Agency, and Department of Defense from testing laboratories *internal* to the DoD:

    a. CAEv2 attenuation testing for continuous and impulsive noise (on either end of the earplug) performed according to any of the following standards: ANSI/ASA S3.19-1974, ANSI/ASA S12.6-1997, ANSI/ASA S12.6-2008, ANSI/ASA S12.6-2016, ANSI/ASA S12.42-1995, ANSI/ASA S12.42-2010, and MIL-STD-912;

## KIRKLAND & ELLIS LLP

Major Collin Evans
December 2, 2019
Page 10

      b.    CAEv2 test results from Army Research Laboratory, Aberdeen Proving Ground, Maryland;

      c.    CAEv2 test results from U.S. Army Aeromedical Research Laboratory, Ft. Rucker, Alabama;

      d.    CAEv2 test results from Air Force Research Laboratory, Wright-Patterson Air Force Base, Ohio;

      e.    CAEv2 test results from Naval Air Systems Command, Patuxent River, Maryland;

      f.    CAEv2 test results from White Sands Missile Range, New Mexico;

      g.    CAEv2 test results publications, or research authored or presented by any of the following individuals: Dr. Lorraine Babeu, Dr. Kathy Gates, Dr. Nancy Vause, Dr. Richard Price, Dr. Joel Kalb, Dr. P. Fedel, Dr. Georges Garinther, Dr. Tomas R. Letowski, Richard McKinley, Dr. Doug Ohlin (deceased), Dr. William Ahroon, Dr. Douglas Brungart, Dr. Eric Fallon, Douglas Moses, and/or Elliott Berger.

2.    Data and protocols relating to any of the above-listed tests, including if the test results are publicly available but the data and protocols are not publicly available.

3.    CAEv2 test results (excluding test results that are publicly available) provided to the Army, Navy, Marine Corps, Coast Guard, Air Force, Defense Logistics Agency, and Department of Defense from testing laboratories *external* to the DoD:

      a.    CAEv2 attenuation testing for continuous and/or impulsive noise (on either end of the earplug) performed according to any of the following standards: ANSI/ASA S3.19-1974, ANSI/ASA S12.6-1997, ANSI/ASA S12.6-2008, ANSI/ASA S12.6-2016, ANSI/ASA S12.42-1995, ANSI/ASA S12.42-2010, and MIL-STD-912;

      b.    CAEv2 test results from NIOSH; and

      c.    CAEv2 test results from A.L. Dancer or P.J.F. Hamery of French-German Research Institut of Saint-Louis.

4.    Data and protocols relating to any of the above-listed tests, including if the test results are publicly available but the data and protocols are not publicly available.

**KIRKLAND & ELLIS LLP**

Major Collin Evans
December 2, 2019
Page 11

  F. **Policies And Procedures Regarding Earplug Fit For Service Members.**

  1. Policies and procedures relating to compliance with ST 4-02.501 (Feb. 1 2008), Army Hearing Program, § 4-54, that medically trained personnel must fit service members with triple-flanged earplugs to ensure a proper fit.

  2. Policies and procedures relating to compliance with Department of the Army Pamphlet 40-501, Hearing Conservation, that medically trained personnel must fit service members with triple-flanged earplugs to ensure a proper fit.

  3. Policies and procedures relating to compliance with DoD Instruction 6055.12 (Dec. 3, 2010), DoD Hearing Conservation Program, Enclosure 3, § 7(i), that medically trained personnel must fit service members with preformed earplugs to ensure a proper fit.

  4. Policies and procedures relating to compliance with TM6260.51.99-2 (Sept. 15, 2008), Navy Hearing Conservation Program Procedures, § C1.4.1, that medically trained personnel must fit service members with preformed earplugs to ensure a proper fit.

  5. Policies, procedures, and instructions given to military audiologists regarding proper fit, use, and care

**IV. SUMMARY AND RELEVANCE OF THE DE-PRIORITIZED DOCUMENTS REQUESTED**

  Defendants' specific de-prioritized document requests are contained in Section V, below. In short, Defendants request documents regarding: (a) the military's purchase and distribution of CAEv2; (b) noise and ototoxin exposure in the military; and (c) hearing protection usage in the military. These documents are relevant to the claims and defenses in the above-referenced litigation for numerous reasons, including the following.

  **Documents regarding purchasing and distribution data**. *First,* documents regarding purchasing and distribution data will help identify which Plaintiffs may have used CAEv2, which is a threshold issue for any claim. *Second,* these documents will help determine when a particular Plaintiff used CAEv2 and are thus relevant to whether any claims are barred by the applicable statute of limitations. *Third*, these documents may show whether and to what extent CAEv2 was distributed in combat zones, which is relevant to Defendants' "combatant activities" defense. Although Congress waived sovereign immunity for tort claims against the United States and those acting on its behalf in the Federal Tort Claims Act, it excluded "claims arising out of combatant

## KIRKLAND & ELLIS LLP

Major Collin Evans
December 2, 2019
Page 12

activities of the military or armed forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). This "combatant activities" exception has been applied to contractors like Defendants to create a federal defense shielding manufacturers from tort claims arising from war.[3] *Fourth*, these documents will show that CAEv2 was distributed at least in part at military bases, which is relevant to the Court's subject matter jurisdiction under the "federal enclave" doctrine. In particular, "[f]ederal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves,'" such as military bases, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006), and Defendants have removed certain cases from state court to federal court in part on that basis.[4]

**Documents regarding noise and ototoxin exposure in the military**. *First*, documents regarding noise exposure data—such as noise dosimetry and sound level data—will show that Plaintiffs were exposed to a wide variety of potentially dangerous noises or ototoxins unrelated to their use of CAEv2, which will undermine Plaintiffs' allegation that CAEv2 caused their alleged injuries. *Second*, these documents may show that individual Plaintiffs violated military hearing protection recommendations by performing dangerous activities with no or insufficient hearing protection, which would also undermine any assertion that CAEv2 caused their alleged injuries. *Third*, these documents may also support Defendants' "combatant activities" defense by showing that service members were required to wear CAEv2 in combat situations. *Fourth*, these documents are also relevant to the Court's subject matter jurisdiction under the federal officer removal statue, which requires a showing that Defendants have "colorable" defenses under federal law.

**Documents regarding (actual) hearing protection usage in the military**. These documents are relevant to the issue of whether or not service members typically use recommended or required hearing protection—including both in training and in combat settings—which is relevant to, among other things, Plaintiffs' assertions that CAEv2 caused their alleged injuries.

### V.     DE-PRIORITIZED DOCUMENT REQUESTS FOR AFFIRMATIVE DEFENSES.

Pursuant to *United States ex rel. Touhy v. Ragen,* 340 U.S. 462 (1951), Case Management Order No. 6 in MDL No. 2885, and the above- referenced statutes, directives and instructions,

---

[3] *See, e.g., Saleh v. Titan Corp.*, 580 F.3d 1, 6 (D.C. Cir. 2009) (applying § 2680(j) exception to tort claims arising from treatment of inmates in military prison in Iraq brought against private contractor); *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1492 (C.D. Cal. 1993) ("The combatant activities exception generates a federal common law defense which immunizes manufacturers such as Hughes from state tort suits arising from war.").

[4] *See Jamil v. Workforce Resources, LLC*, 2018 WL 2298119 (C.D. Cal. May 21, 2918) ("Camp Pendleton is a federal enclave"); *see also Haining v. Boeing Co.*, 2013 WL 4874975, at *2 (C.D. Cal. Sept. 11, 2013) (concluding Vandenberg AFB is a federal enclave).

# KIRKLAND & ELLIS LLP

Major Collin Evans
December 2, 2019
Page 13


Defendants request the following de-prioritized documents from the DoD, DLA, Army, Navy, Marine Corps, Air Force, and Coast Guard.

    **A.**    **Documents Regarding Purchasing And Distribution Of CAEv2.**

    1.    Documents sufficient to show: (i) the number of CAEv2 earplugs purchased by the United States; (ii) the dates on which CAEv2 earplugs were purchased by the United States, and the number purchased on each such date; (iii) the number of CAEv2 earplugs purchased for the (a) Army, (b) Navy, (c) Marine Corps, (d) Air Force, and (e) Coast Guard; and (iv) the identity of the distributor who made each sale of CAEv2 earplugs to the United States on each date.

    2.    Documents sufficient to show: (i) the specific locations to which CAEv2 earplugs were distributed, including the number distributed to each; (ii) if applicable, the military unit (e.g., division, brigade, battalion/battery, regiment, fleet, squadron, company, etc.) to which CAEv2 earplugs were distributed, including the number distributed to each; (iii) if applicable, the bases to which CAEv2 earplugs were distributed, including the number distributed to each base; and (iv) if applicable, the audiology or public health program directors to whom CAEv2 were distributed, including the number distributed to each.

    **B.**    **Documents Regarding Noise And Ototoxin Exposure In The Military.**

    1.    Noise dosimetry data or other documents regarding the amount of noise service members are exposed to in particular specialties, in particular situations, or when operating particular weapons.

    2.    Sound level data and recommendations for hearing protection in particular situations or when operating particular weapons, such as those documented on DD Form 2214.

    3.    Documents that contain recommendations and/or guidelines for specific hearing protectors to be worn when using specific weapons or when encountering other noise exposures.

    4.    Documents regarding military noise exposures or hearing protection recommendations or guidelines authored by the following individuals, excluding documents that are publicly available: Dr. Richard Price, Dr. Joel Kalb, Dr. P. Fedele, Dr. Georges Garinther, Dr. Tomas R. Letowski, Richard McKinley, Dr.

## KIRKLAND & ELLIS LLP

Major Collin Evans
December 2, 2019
Page 14

>  Lorraine Babeu, Dr. Doug Ohlin (deceased), Dr. William Ahroon, Dr. Douglas Brungart, and Dr. Eric Fallon.

5. Research by Dr. Richard Price and/or Dr. Joel Kalb of the Army Research Laboratory that has used the Auditory Hazard Assessment Algorithm for Humans ("AHAAH") model in connection with nonlinear earplugs, including the CAEv2, excluding documents that are publicly available.

6. Studies or policies relating to the prevention of service member exposure to the following ototoxins: toluene, xylene, n-hexane, organic tin, carbon disulfide, mercury, organic lead, hydrogen cyanide, diesel fuel, kerosene fuel, jet fuel, organophosphate pesticides, and nerve agents, excluding documents that are publicly available.

7. Internal research and results relating to the Noise Outcomes in Service Member Epidemiology ("NOISE") Study.

8. Policies and procedures regarding effective quiet areas (e.g., effective quiet areas on a U.S. Navy aircraft carrier) designed to expose service members to lower levels of noises, excluding documents that are publicly available. See also ST 4-02.501, Army Hearing Program, Section 4-18 (Feb. 1 2008) ("The most effective administrative control is to provide quiet areas where Soldiers can gain relief from workplace noise. Areas used for breaks and dining facilities should be located away from noise. If these areas must be near noise, they should have noise barriers appropriately placed to minimize background noise levels."); https://www.ncbi.nlm.nih.gov/pubmed/30943127 (abstract of article entitled "Noise characterization of 'effective quiet' areas on a U.S. Navy aircraft carrier").

**C.  Documents Regarding Hearing Protection Usage In The Military.**

1. Studies regarding the actual (as opposed to suggested or required) usage of hearing protection (including, but not limited to, CAEv2) by service members in training or combat from 2000 to the present.

**VI.  ADDITIONAL CONSIDERATIONS**

These requests comply with the policies of the DoD, DLA, Army, Navy, Marine Corps, Air Force, and Coast Guard regarding the provision of information by its employees in connection with litigation in federal court:

# KIRKLAND & ELLIS LLP

Major Collin Evans
December 2, 2019
Page 15

1. Disclosure of the requested information is not unduly burdensome or otherwise inappropriate under the federal discovery rules.

2. Disclosure of the requested information would be appropriate under the Federal Rules of Evidence and appropriate under the rules of the Northern District of Florida.

3. Disclosure of the requested information would be appropriate under the Federal Rules of Civil Procedure and would not impact any concerns regarding privileged information pursuant to the rules of procedure governing this litigation.

4. Disclosure of the requested information would not violate any statute, executive order, regulation, or directive.

5. Disclosure of the requested information would not reveal any classified information, data restricted pursuant to AR 380-5, unclassified technical data withheld from public release pursuant to 32 C.F.R. § 250 or DoD Directive 5230.25, privileged safety information restricted from public release by DoD Directive 6055.7, AFI 31-401, or other matters exempt from unrestricted disclosure.

6. Disclosure of the requested information would not interfere with ongoing enforcement proceedings, compromise any constitutional rights, reveal the identity of an intelligence source or confidential informant, disclose trade secrets or similarly confidential commercial or financial information, or otherwise be inappropriate under the circumstances.

7. Disclosure would not violate any person's expectation of confidentiality or privacy.

8. The United States is not, and is not reasonably anticipated to be, a party in this litigation.

*See* 32 C.F.R. §§ 97.6(b)(1)-(6); 32 C.F.R. §§ 516.41(d), 516.44; Navy Instruction 5280.8A(1)-(10); Department of Defense Directive 5405.2 § 6.2; 33 C.F.R. § 1.20-1; 6 C.F.R. § 5.45; Air Force Instruction 51-301, 9.5.1-9.5.6.

## VII.     ADMINISTRATIVE MATTERS

Defendants will bear the costs of duplicating and producing the documents sought by this *Touhy* request. Costs will be paid by check or money order payable to the Treasury of the United States. For ease of production, all electronically stored information can be produced via a secure file transfer protocol site that will be provided free of charge or via electronic storage media that will be provided to you at no charge and upon your request. Any requests for assistance with the

# KIRKLAND & ELLIS LLP

Major Collin Evans
December 2, 2019
Page 16

transmittal of electronically stored documents, or coordination of the inspection of documents should be made to Mark Nomellini, counsel for Defendants, at (312) 862-2410 or mnomellini@kirkland.com. Additionally, to the extent the DoD, DLA, Army, Navy, Marine Corps, Air Force, or Coast Guard believe any of the requested information does not implicate the statutory considerations set forth above, Defendants are willing to work with the DoD, DLA, Army, Navy, Marine Corps, Air Force, or Coast Guard to narrow the scope of the request.

If you anticipate that full production will require more than one hundred twenty (120) days from the date of service, we request that you notify Defendants and/or the Court. Should you have any questions or require additional information about this *Touhy* request, please do not hesitate to contact me. Thank you for your assistance.

Sincerely,

*/s/ Mark J. Nomellini*

Mark J. Nomellini

cc:   Michael J. Fucci
      Associate General Counsel
      Department of Defense
      Michael.j.fucci.civ@mail.mil