**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG     )      Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,    )
                                  )      Gainesville, Florida
                                  )      October 9, 2020
                                  )      1:30 p.m. EST
                                  )
                                  )
_____   )


**TELECONFERENCE**
**Re: Vernon Rowe, Plaintiff**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-49)


*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*1 N Palafox Street * Pensacola, Florida  32502*
***Donna_Boland@flnd.uscourts.gov***

**A P P E A R A N C E S**

FOR THE PLAINTIFFS:       **BRYAN F. AYLSTOCK, ESQUIRE**
                          **JENNIFER HOEKSTRA, ESQUIRE**
                          Aylstock, Witkin, Kreis & Overholtz
                          17 E Main Street, Suite 200
                          Pensacola, Florida  32502

FOR THE DEFENDANTS:       **MARK J. NOMELLINI, ESQUIRE**
                          Kirkland & Ellis, LLP
                          300 N Lasalle
                          Chicago, Illinois  60654

                          **MICHELLE SIX, ESQUIRE**
                          Kirkland & Ellis, LLP
                          601 Lexington Avenue
                          New York, New York 10022

1          P R O C E E D I N G S

2          **THE COURT:**   This is one of the 3M cases; this

3    is the one involving Vernon Rowe, and that individual

4    case is filed under Case 7:20cv26.

5          And what I had scheduled for hearing was

6    Defendant's Motion to Compel the forensic analysis of

7    Mr. Rowe's mobile device.

8          And without doing a rollcall, which I do not

9    want to do, let me just first ask, on behalf of the

10   Plaintiffs, who will be appearing this afternoon and

11   speaking on behalf of Mr. Rowe?

12         **MR. AYLSTOCK:**   Good afternoon, Your Honor.

13   This is Bryan Aylstock and Jennifer Hoekstra.   We also

14   have representatives from iOS.

15         **THE COURT:**   Okay.   And how do you pronounce

16   -- your e-discovery vendor, how do you pronounce his

17   last name?

18         **MS. HOEKSTRA:**   Mike, if you're on, would you

19   mind pronouncing it, so none of us butcher it, for

20   Judge Jones?

21         **MR. CIARAMITARO:**   Sure.   This is Michael, and

22   the last name is pronounced Cia-rami-taro.

23         **THE COURT:**   Ciaramitaro.   I'm glad you did

24   that because I would not have said it like that.

25   Ciaramitaro, okay.

1          And then, who is appearing on behalf of the

2   Defendants this afternoon and will be speaking on

3   their behalf?

4          **MR. NOMELLINI:**  Your Honor, it will be Mark

5   Nomellini and Michelle Six from Kirkland & Ellis.  And

6   then our technical experts are Brad Bogar of TCDI and

7   Preston Miller of Stroz Friedberg.

8          **THE COURT:**  Okay.  So good afternoon to

9   everyone.  We have extensive briefing.  There's the

10  motion, the response, with the Court's permission -- I

11  allowed the Defendants to file a reply, and then the

12  Plaintiffs filed a sur-reply.  And I do have

13  affidavits from both experts.

14         And I wanted the parties to have their

15  experts online, not that this is a full-blown

16  evidentiary hearing.  But I don't want to get bogged

17  down into the details of e-discovery and one side

18  says, *You can do this,* and the other side says, *Well,*

19  *I don't know if you can do that, I'd have to talk to*

20  *my e-discovery expert*.  So we have them on the line,

21  and, if we need to have details filled in, we can have

22  details filled in.

23         And before I hear from each side, I wanted to

24  narrow, really, the focus of what I wanted to talk

25  about and make sure we're all on the same wavelength.

1   So, for starters, we're not talking about emails.

2   We're talking about two things -- text messages, and

3   then, I guess, Facebook Messenger messages, some of

4   which can be ephemeral.  But we're not talking about

5   WhatsApp; we're not talking about email.  We're just

6   talking about, really, those two things.

7            And there seems to be three reasons but three

8   things advanced by the Defendants as to why they want

9   a forensic examination of Mr. Rowe's phone.

10           First, in a way, it seems like, I'm not sure

11  -- say you want to, belt and suspenders, to make sure

12  that the collection of the mobile device that was

13  accomplished in this case was done appropriately.

14           Secondly, because there allegedly were a very

15  discrete number of emails deleted or missing from

16  Mr. Rowe's mobile device to three of his friends --

17  Hall, Oddsen, and Ravada -- the Defendants want to do

18  a forensic analysis to show or to document what they

19  say would support or disprove Mr. Rowe's claim of

20  pattern and practice of ending text message chains

21  when the conversations were completed.

22           And then, there is some reference to wanting

23  to get fragments of what would be on the mobile device

24  as to text messages which allegedly could be used to

25  reconstruct -- that's the way I'm reading it.  I'm

1    trying to find the exact words the Defendants used

2    here.  I have it highlighted.

3          **MR. NOMELLINI:**  Your Honor, I could help with

4    that.

5          **THE COURT:**  Yeah.

6          **MR. NOMELLINI:**  I think it's in your order.

7    It said, quote, "message fragments or partial data

8    available on the phone could be used to recover

9    messages."

10          **THE COURT:**  Yes, exactly, there it is, right.

11    And that was the other reason for it.

12          So, you know, we all know there's a standard,

13    before you even get into the arena of where you would

14    have a forensic examination, of law.  I wouldn't say

15    the law is clear.  But, to summarize, it's really the

16    exception.  Forensic analysis, in my view, is not an

17    available means to test the other side's collection to

18    see if they have collected properly.

19          Because, based on the affidavits and what I

20    see here, I don't see a problem with the collection in

21    which the method -- the software that was used.  This

22    was a remote collection of a cell phone.  Remote

23    collections of phone calls have been industry standard

24    for a long time.  Obviously, in a pandemic, that's

25    what litigants are using.

1          So, in my mind, there is a reasonable,

2     adequate, defensible collection that was done.  And if

3     all we were arguing about was whether there should be

4     a forensic examination to have a neutral expert assure

5     the Court that the collection was done properly, in

6     the absence of other evidence, I would, in all

7     likelihood, deny that.

8          But, even if there was a need for forensic

9     examination, I'm not sure whether a deleted text, or

10     certainly a deletion of a Facebook Messenger chat, can

11     be recreated or recaptured.

12          I know with an email, that can be done.

13     Browsing history, those kinds of things, can all be

14     captured even if deleted out of a computer.  But I

15     think text messages and probably Facebook Messenger

16     messages are a different thing.

17          So, what I wanted to do was start with the

18     Defendants and narrow your comments to me to explain

19     to me how a forensic examination would -- not --

20     theoretically, maybe it could -- but would identify --

21     so, if there were deleted messages and you did a

22     forensic examination, any reasonable forensic examiner

23     would be able to identify all text messages that were

24     deleted.

25          And the question is, can you do that and how

1    would you do that in this case.  Because, if you can't

2    do that or it's a very low likelihood that that could

3    be done -- there may be, in exceptional circumstances,

4    depending upon the type of phone and software used,

5    you could do that.  But if you can't do that, there's

6    surely no reason for forensic examination, or not --

7    and I'm not -- I just want the parties to understand,

8    when you talk about deletion, if, indeed, there was

9    deletion after a preservation order, you know, is a

10   serious thing; that's not something you brush under

11   the rug.

12          And the Defendants will have at least some

13   emails from one of the three friends.  You know,

14   you're going to be free to use those at trial in the

15   cross-examination of Mr. Rowe.  You know, you think

16   their emails are highly charged; you can obviously use

17   those on cross-examination.  And you'll be free to say

18   that, *Everything was collected in your phone and those*

19   *messages were missing*, and even making the suggestion

20   that they were deleted, and the jury will probably be

21   able to digest that.

22          But a forensic analysis only is going to make

23   sense if you've got a high probability of identifying

24   text messages and deleted Facebook Messenger messages.

25          So that's sort of what I wanted to start to

1    talk about, and then we can talk about some of the

2    other issues.

3          **MR. NOMELLINI:**  Yes, Your Honor.  Thank you.

4    That's very helpful.  Your Honor's order was also

5    helpful in terms of flagging the issues to be

6    addressed.

7          So, to make this concise, Michelle Six, who

8    is our Kirkland e-discovery expert, put together a

9    short series of questions for Mr. Miller that starts

10   with the direct question you posed and a few

11   follow-ups.  And we think that that would be the most

12   expedient way to proceed, and then the experts are,

13   obviously, available to answer any other questions

14   Your Honor may have.

15         So, with your permission, I'd like to ask

16   Michelle Six to ask those questions.

17         **THE COURT:**  Okay.

18         **MS. SIX:**  Thank you, Your Honor.  This is

19   Michelle Six.

20         From your order and from your statements just

21   now, Your Honor, which were very helpful, the question

22   that I would like to ask Mr. Miller from Stroz

23   Friedberg is whether or not message fragments or

24   partial data from deleted messages could be available

25   on the phone.

1        **MR. MILLER:**  This is Preston Miller from

2    Stroz Friedberg to address your question, Michelle.

3    The answer, in short, is, yes, I would expect message

4    fragments to be available on the phone, although

5    that's dependent on the collection that was made

6    whether those fragments would be available or not.

7            Additionally, the second part of that

8    question, whether those fragments were associated with

9    deleted messages or whether they would be relevant to

10    the matter at hand would be a purpose of the forensic

11    examination.

12            I will say that performing such an exercise,

13    that is, for example, reviewing databases to

14    understand patterns and behavior in terms of deletion

15    and also attempting to recover deleted content, if

16    it's available, is a fairly routine request that we

17    receive in our mobile forensic matters.

18        **THE COURT:**  Let me ask you a question, Mr.

19    Miller.  So you talk about message fragments.  What is

20    a message fragment?  How is that used to recover a

21    deleted message?  And if there aren't message

22    fragments, am I correct you're not going to find

23    deleted text messages?

24        **MR. MILLER:**  So, Your Honor, let me address

25    that in two parts.  First I'll take the second part of

1   that question in regards to if you don't find message

2   fragments you're not going to be able to recover

3   deleted messages.

4           Yes.  The way in which iOS has evolved over

5   the years and the way in which it handles deleted

6   messages has changed.  In years past, it was possible

7   that, within the underlying database that stores

8   messages, let's say, for example, with the messages

9   application, it was possible to recover partial or

10  complete deleted records.

11          These days that likelihood has decreased in

12  the sense that the operating system cleans up, if you

13  want to put it in layman's terms, cleans up the

14  database regularly.  So, in that regard, the chances

15  would be limited.

16          However, where we transition from now is that

17  there are additional, more comprehensive collections

18  that can be performed on more modern iOS devices,

19  which this device at hand may have been a candidate

20  for, that would allow for the collection of additional

21  datasets on the phone that may have recorded fragments

22  of messages.

23          And what that means, to your first question,

24  is that a fragment of a message could be a part of

25  messages recorded in other databases on the phone.

1    So, for example, there are databases that exist on the

2    device to help, for example, customize the user

3    experience, especially in terms of predicting what the

4    user might type next.  You know, with typing text

5    messages and having words appear after you type

6    another word as far as a prediction to what the next

7    word might be, that type of concept relates to data on

8    the device that can record fragments of messages that

9    roll into that type of behavior and functionality.

10           So, therefore, it is possible to have

11   fragments of messages which may have since been

12   deleted in the underlying database still present on

13   the device in other databases.

14           **THE COURT:**  And that would be -- this is an

15   iPhone.  Do you know what -- is this a 10?  A 6?  Does

16   anyone know?

17           **MR. CIARAMITARO:**  This is Michael from iOS.

18   It's an iPhone 8.

19           **THE COURT:**  IPhone 8, okay.

20           **MS. SIX:**  Your Honor, could we ask Mr. Miller

21   to just explain to you, because I think it might be

22   helpful -- it was certainly helpful for me -- to just

23   understand how he would find those types of messages

24   or message fragments, sort of what an examiner would

25   typically do to find those?

1            **THE COURT:**  Yes.

2            **MS. SIX:**  Thank you.

3            **MR. MILLER:**  So, in terms of that question,

4    what one would look to do is, for a more modern iPhone

5    like an iPhone 8, if it's a candidate for what is

6    referred to in the field as a full file system

7    acquisition, then you would want to make such a

8    collection to be able to collect the requisite data

9    sources to allow for that type of examination,

10   specifically the identification of message fragments.

11           What you would be looking for -- what an

12   examiner would be looking for, in particular, are, for

13   example, temporary files associated with the databases

14   that are in scope here, so the messages database and

15   the Facebook Messenger database.  Those temporary

16   files are associated with the databases, and they

17   aren't captured in other acquisitions, which is why

18   I'm underscoring the availability for full file system

19   acquisition being relevant here.

20           The other component which we were just

21   speaking to a moment ago are other datasets on the

22   device separate and apart on the underlying

23   applications themselves that have functionality

24   relating to messages on the device, like we had talked

25   about an example of predictive queries in the sense

1  that, you know, as you type words on, for example, the

2  Messenger's application, the phone will try to predict

3  what the next word is and allow you to select it, if

4  it's the word you would like to use, and create a

5  sentence that way.  That manifests itself, for

6  example, as a database on the underlying full file

7  system collection that can contain parts of messages

8  or message fragments.

9       So those are the two -- broadly speaking,

10  those are the two types of data sources you would be

11  -- a forensic examiner would be looking for in a full

12  file system acquisition of a particular iPhone.

13       **THE COURT:**  And I guess you're saying that,

14  in a typical collection such as the collection that

15  was done in this case, you normally would not collect

16  from the temporary files; is that accurate?

17       **MR. MILLER:**  Yes, although it's not entirely

18  clear -- and I'm glad the experts are on the line --

19  it's not entirely clear to me what additional

20  collection was made.

21       I understand a logical collection was made

22  using UFED 4PC and then followed by an advanced

23  logical collection.  However, it's not clear if that

24  advanced logical collection was a full file system

25  collection or just a file system collection.  So,

1    knowing that answer would help address that particular

2    question.

3         **THE COURT:**  Okay.  Well, let me -- I'm going

4    to do something unusual here.  Hold that thought, Mr.

5    Miller.

6         Let me ask you, Mr. Aylstock and through your

7    expert, was -- I guess there were really two

8    collections done.  Were either of the collections

9    what's described as a full file system collection?

10        I'm not suggesting that that was either

11   necessary or reasonable when the collection was done

12   on the phone.  But were either of those -- in those

13   collections, were either of them a full file system

14   collection that would, to answer my question, capture

15   the temporary files and the other data files that

16   would have sort of the auto add feature to it?

17        **MR. AYLSTOCK:**  I'll let Ms. Hoekstra address

18   that so I don't mess it up.

19        **MS. HOEKSTRA:**  And I do appreciate, Your

20   Honor, your identifying the fact that it wasn't

21   actually required under the protocol.  And under PTO

22   10, there's actually an agreement that, absent a

23   particularized need or good cause shown, there's no

24   need to collect ESI from deleted or fragmented or

25   other data that would only be accessible by forensics.

1          However, Mike would be able to explain in

2     more detail what fragmented information or partial

3     messages were collected as part of the collection.

4          **THE COURT:**  Okay.  Let's do that.  Let me

5     hear from your expert on just that issue.  I don't

6     need a whole explanation of your collection; I think I

7     understand it.  But as to whether it would have

8     collected deleted or fragmented files.

9          **MR. CIARAMITARO:**  Thank you.  This is Michael

10    from iOS.  So the methodologies that were used to

11    collect through Cellebrite, both the UFED logical

12    image and the UFED advanced logical image, do, in

13    fact, support the recovery of available deleted text

14    communications.

15         In particular, in an iOS environment, there

16    are three categories of text communications.  You have

17    your SMS, your MMS, and then you have your chat

18    communications.  Most individuals transact in iMessage

19    when the two that are talking both have an iPhone and

20    that iMessage is in the category of chat.

21         With regards to the SMS and MMS, those

22    databases do not support deleted recovery.  However,

23    the chat communications -- again, that database is the

24    largest typically and in this case it was also the

25    largest of the three databases -- does support the

1     recovery of deleted fragments of text communications.

2          Those deleted fragments of text

3     communications that were supported and recovered by

4     the Cellebrite software were included in our

5     production to Plaintiffs' counsel, and it's my

6     understanding that they searched all of the text

7     communications that were provided to them to review

8     for responsiveness.

9          **THE COURT:**  So, in your view, if there were

10    deleted fragments or fragments of deleted discussions,

11    they would show up in the -- is it the iChat database

12    and as part of the collections -- because I think

13    there was more than one collection -- as part of the

14    collections, it did capture that data as well?

15         **MR. CIARAMITARO:**  To answer your question

16    directly, yes.  But just to qualify, you know, and to

17    be clear, as so far as they were recoverable and still

18    on the phone.

19         As you had mentioned during your introduction

20    of the technologies, some of these technologies are

21    ephemeral, and your phone is really designed as a

22    transactional device, it's not designed as a mass

23    storage device like your computer might.  So, you

24    know, data comes in, data gets deleted, data, in very

25    short order, especially if there's high traffic, moves

1    out quickly.

2          So I just wanted to qualify that.  Yes, that

3    is correct.  But it's based on all of these sort of

4    questions and -- I don't want to call them necessarily

5    vagaries, but they're -- stipulated statements are

6    because of the transaction on the device.

7          Again, to answer your question directly,

8    though, if there were deleted text communications or

9    chat communications that were still on the phone

10   during the time of collection, then they would have

11   been recovered during the collection process that I

12   described in my declaration.

13         **THE COURT:**  Okay.  That's very helpful.

14         Let me go back to you, Mr. Miller.  Are there

15   other -- if you were or a third-party was to do a

16   forensic examination, are there other collection

17   methods that could be used that would identify deleted

18   fragments of chat discussions and -- I think you both

19   sort of agreed on one issue and agreed with me that,

20   when we deal with text messages -- not all text

21   messages, but by their very nature, some of that data

22   is ephemeral, and that's one of the challenges in the

23   discovery in text messages because the information is

24   transitory and we don't know what that means.  It may

25   depend upon how the phone was used, the model of the

phone, how many text messages someone sends.  You

know, if you're an 18-year-old teenager, there's

probably a lot more than if you're a 40-year-old

individual.  And I guess all of that impacts it.

But the Plaintiffs' expert is saying that, in

the collection, they did collect, to the extent they

were there, any fragmented portions of a deleted chat.

Is there something else that would be done

other than that that would, with some reasonable

degree of certainty, be able to mine deleted messages

from the iPhone?

**MS. SIX:**  Your Honor, this is Michelle Six.

I think, because a full file system acquisition could

have been done but was not performed, that the

collection, as it was made, would not be adequate to

do the necessary review to look for deleted messages

or a pattern or practice of deletion or artifacts that

might have searchable message fragments from texts.

But I'll defer over to Mr. Miller so I don't get

myself under water here.

**MR. MILLER:**  Thank you, Michelle, and thank

you, Your Honor.

Just to address that question and

specifically, Your Honor, your question around

additional collection methods that might be

1   appropriate here to address this type of question

2   regarding message fragments, Cellebrite's full file

3   system acquisition, which is an option under the

4   advanced logical umbrella, in the same software UFED

5   4PC, would be the comprehensive collection method that

6   you would want to perform in order to address this

7   type of question because it gets you the most complete

8   dataset.

9          What I don't know or what I'm not certain

10  about is whether, one, that was an option, right?  To

11  do such an acquisition, the iPhone has to be running a

12  certain version of iOS, starting at iOS 12.3 or later.

13  And then, two, if there was an option, if it was

14  performed, that didn't, you know, come across in the

15  declarations.

16         So, if a full file system is possible for

17  this phone and it wasn't performed, then that would be

18  the most comprehensive collection that could be made

19  of the device, therefore, give a forensic examiner the

20  greatest opportunity to identify and recover message

21  fragments which may be associated with deleted

22  messages.

23         **THE COURT:**  Let me go back to Plaintiffs'

24  expert again.  We're trying to fill in the details

25  here because I don't know what software this iPhone 8

1    was running; Plaintiffs' expert might not know that.

2           But, through your Cellebrite collection tool,

3    were you able to run a full file system acquisition?

4    And if so, was that done?  Was that an available

5    option with the tool you were using, and was that an

6    available option on this particular phone, if you

7    know?

8           **MS. HOEKSTRA:**  Your Honor, I'm going to defer

9    to Michael on the specifics of this.  I do not know

10   personally the operating system that was used on

11   Mr. Rowe's phone.

12          **MR. CIARAMITARO:**  Your Honor, this is

13   Michael.  I don't have the version of the phone's

14   operating system in front of me.  I'm assuming that it

15   is version 12 or newer, which would be supported in

16   what's being described by Mr. Miller.

17          And I just wanted to clarify that the

18   distinction between a full file system and a file

19   system collection -- the full file system collection

20   in Cellebrite is defined by a jailbreaking of the

21   device, which is Cellebrite's -- Cellebrite introduced

22   a method in which it will root or alter the operating

23   system such that the normal limitations imposed by

24   Apple are bypassed.  It's, for lack of a better term,

25   a method of hacking the phone to lower its guards and

1   to give you full access to the device.

2           A full file system -- or what, you know, the

3   industry standard has called the Checkm8, you know,

4   sort of jailbreak, is not standard process for the

5   collection of a phone for e-discovery purposes.  And

6   so we did not create a full file system Checkm8

7   jailbreak image of the phone for many reasons.

8           However, you know, again, to reiterate, the

9   images that we did create did, in fact -- were, in

10  fact, you know, created in support of deletion

11  recovery from the databases that are maintained by the

12  phone.

13          **THE COURT:**  Right.  Let me ask you one more

14  question.  And I agree with you that what you've

15  described as Checkm8 or jailbreak full file

16  acquisition is not required, is not the norm.  To my

17  knowledge, that would not be consistent with ESI

18  protocol.  And, you know, we're really talking now

19  about forensics as opposed to a collection, so I

20  understand why that wasn't done.

21          But what is your view on what Mr. Miller is

22  saying, if, indeed, a full file acquisition could be

23  done, there would be -- not could be, but would be

24  other databases that could be consulted to attempt to

25  identify fragments of text messages?

1      **MR. CIARAMITARO:**  You know, I think, you

2  know, answering that question truthfully, every phone

3  is conditional.  There are, you know, hundreds, if not

4  thousands, of databases on an iOS device that may

5  change depending on, you know, a myriad of conditions.

6      However, you know, in my 19 years of

7  experience in digital forensics, the attempts to

8  recover deleted content from a mobile device rarely

9  results in recovery of coherent or understandable

10  recovered content that is above and beyond what I

11  would normally obtain through the imaging

12  methodologies that we used.

13      Is it possible?  You know, I couldn't

14  maintain being a professional in this industry if I

15  said that there wasn't always a possibility.  But is

16  it likely or probable?  I would say very low

17  probability.

18      **THE COURT:**  Okay.  That's sort of what I

19  thought.

20      But let me go back to you, Mr. Miller.  So,

21  you know, the Cellebrite full file acquisition or, to

22  use the words of Plaintiffs' expert, a jailbreak or

23  Checkm8 acquisition wasn't done, nor was it required

24  to be done as part of the collection.

25      So, let me ask you the same question that

1   Plaintiffs' expert just responded to.

2           Assuming you could do a full file acquisition

3   on this particular iPhone, which we don't know if you

4   would be able to do that, but let's assume, for the

5   sake of argument, you would be able to do that.  I'm

6   not asking you whether there is some possibility that

7   a fragment could be discovered.

8           But, in your view and based on your

9   experience, what is the likelihood and probability,

10  because of the transitory nature of text data, that

11  fragments would actually be identified sufficient to

12  extract deleted text messages?

13          **MR. MILLER:**  Yes, Your Honor.  So, to address

14  that question, what I would say is that the likelihood

15  of there being message fragments in a full file system

16  would be high.  Whether there are message fragments

17  associated with deleted messages or not, you know, I

18  don't have a great sense on the probability of that.

19          But what I would say is that what you could

20  do with those message fragments is to search them, for

21  example, with key words, if there are key words that

22  are relevant to this matter, to try to surface

23  relevant fragments that are found on the device.

24          **THE COURT:**  Okay.  And one last question for

25  you, Mr. Miller.  It sounds like you are familiar with

1   the Cellebrite tool for doing mobile device

2   collections.  Is that right?  It's something you've

3   heard of?

4            **MR. MILLER:**  Yes, Your Honor.

5            **THE COURT:**  Have you, in your practice, come

6   across that before, or have you ever used Cellebrite

7   for a collection?

8            **MR. MILLER:**  Yes, we have used Cellebrite

9   regularly for mobile device collections.

10            **THE COURT:**  Right.  And for me -- and, you

11   know, I'm a judge, not an expert, but I know a little

12   bit about e-discovery.  And that's probably -- I don't

13   know if that's the best software, it's always a best

14   tool, it's always changing.  But it is certainly a

15   tool that, at least in the past, I have heard about in

16   other cases that experts have used.

17            And I have never heard -- I'm not saying

18   anyone is saying that in this case -- never heard

19   someone saying, well, that's an inferior product,

20   that's not going to work, that's not a reasonable tool

21   to use.

22            And we all understand with collection that

23   everyone has their favorite tool and there's also cost

24   and expense involved, and you can buy a really, really

25   cheap tool and get a really cheap result and probably

1    a super-duper expensive tool and maybe get a little

2    bit of a better result.

3         But let me go back to you, Ms. Six.  You were

4    asking a series of questions.  So that was on the

5    fragments.  I think that was helpful, and I think I

6    have an understanding of what you are all saying in

7    your papers, because I wasn't sure that was even

8    within the realm of possibility that you could do that

9    because of the transitory and ephemeral nature of text

10   data.

11        But you had some other questions you wanted

12   to ask.

13        **MS. SIX:**  Well, I wanted to make a couple of

14   points, if I can, Your Honor.

15        **THE COURT:**  Yeah.

16        **MS. SIX:**  I think that you are absolutely

17   right, that the standard in e-discovery for collection

18   is being reasonable.  And when I am in the process of

19   collecting phones for different matters, Cellebrite is

20   an industry-relied-upon tool; it does the job, and

21   it's commonly deployed for routine collection.

22        When I have a case where there is indicia of

23   deletion activities where we think there may have been

24   either an inadvertent bad act or some more deliberate

25   bad act whereby we no longer think data exists on the

phone in its present form and may have been deleted,
we will use a full file acquisition system like
Checkm8 system for those instances for the purpose, as
Mr. Miller described, of getting that more fulsome
opportunity to see what can be recovered and searched.

And so, with that said, I think, you know,
3M, the Defendants, are prepared to offer to pay for
this forensic level of work here to see if we can't
recover -- and it may be that we can't, right -- but
to see if there is anything responsive to the case
that may have been deleted when we know from counsel
that Mr. Rowe's practice was to delete as a matter of
course.  It may be that we are able to recover
information here that is vital to the case.

**THE COURT:**  What about the Facebook Messenger
messages that were -- not that they were deleted --
but that were made, if they are deleted, is that
really a lost cause?

**MS. SIX:**  My understanding is that there
could be messaging fragments as well that could be
recoverable.  But I'll defer to Mr. Miller on this to
make sure I'm not misdescribing it.

**MR. MILLER:**  Thank you, Michelle.

Yes, you could recover in a similar way where
we talked about the messages application, for example,

containing temporary files associated with its database which can contain transactional records associated with the database even for messages that have since been deleted.

The Facebook Messenger application, if it is on the phone, could also contain similar temporary files associated with it -- sequel database -- which could allow for the recovery of deleted contents or just recovery of deleted fragments of deleted messages, perhaps not metadata, but perhaps fragments. So, yes, it could.

**THE COURT:**  Yeah, if you used your phone for Facebook.  If you were on your computer -- well, I guess you could do the same thing on your computer, try to identify temporary files and other databases.

But through the Facebook itself, once it's deleted on Facebook, there's nothing you can do vis-a-vis Facebook to identify deleted messages; is that right?

**MR. MILLER:**  Yes, Your Honor, besides the option we just discussed in terms of temporary files that might exist on the phone itself.  And besides, for example, other devices that might contain that data, there would be little you could do if the messages had been deleted and they're not recoverable

 1    from the devices they reside on.

 2            What I would say is that, when it comes to an

 3    exercise of attempting to recover deleted content,

 4    having the most complete or comprehensive image is

 5    typically the desired evidence source to work off of,

 6    because that gives you the best odds of being able to

 7    recover fragments of messages which may be deleted.

 8            **THE COURT:**  So --

 9            **MS. SIX:**  Your Honor --

10            **THE COURT:**  Yeah, go ahead.

11            **MS. SIX:**  I'm sorry.  I just wanted to

12    clarify something and ask Mr. Miller to clarify

13    something to make sure I understand.

14            Because we know Mr. Rowe has asserted he's

15    always tended toward deletion of text message chains

16    when the discussion is complete, is that something

17    that a forensic exam could address?  In other words,

18    could we quantify that pattern of deletion with a

19    forensic exam?

20            **MR. MILLER:**  Yes, you could do that.  And not

21    to get too into the details here, but with the

22    underlying database, for example, for the messages

23    application that houses the SMS, MMS, iMessages

24    contents, for instance, there is a concept of a unique

25    identifier or a unique ID, or RowID, as it sometimes

1   is referred to, associated with each message.

2          And when messages are removed from the

3   device, whether that's based off of a system setting

4   on the device or the user actively deleting messages,

5   those unique IDs, which increment by one with each

6   successive message sent or received on the device,

7   leave the database.  However, the other active content

8   is still present.

9          So, what you end up having are what is

10  supposed to be an auto-incrementing unique ID column

11  that increments by one with each message, you end up

12  having gaps where there were once messages that no

13  longer exist.

14         So you can use those gaps to, one, quantify

15  the count of record of messages that are no longer

16  present; and two, you can put them within date ranges,

17  not when they were deleted, you won't be able to

18  determine when a particular message was deleted, in my

19  experience, but that were received on the device, so

20  you can get a sense of, over time, you know, whether

21  deletion occurred periodically or normally or if there

22  were, you know, perhaps a particular month where

23  deletion -- there were a significant more amounts of

24  deletion than -- or messages deleted in a particular

25  month than would be typical for that device.

1          So, yes, there is a way to quantify deletion

2     from the device itself from the databases that are

3     collected and also get an understanding of what is

4     normal in terms of deletion for that device for a

5     particular application.

6          **THE COURT:**  Okay.  Let me go back to you, Mr.

7     Nomellini, and just turn from the technical side just

8     a little bit and just give you a chance, in summary,

9     to tell me why forensic examination passes the pretty

10    high threshold here and why it is -- because we're

11    talking about a full forensic examination of the

12    device.

13         And when you talk about full file

14    acquisition, I mean, that's everything.  That's, you

15    know, tons of information that would not have anything

16    remotely to do with this case.  This would be just

17    everything on Mr. Rowe's phone, because your expert

18    said that, and I think that -- I understand that.  And

19    it makes sense, if you have any chance of identifying

20    fragments, you really have to have everything or as

21    much as possible because of all of the diverse

22    databases that you do have on your phone.

23         But let me hear your best argument of why

24    that full forensic examination should be done and it's

25    essential that it be done in this case.

1          **MR. NOMELLINI:** Yes.  Thank you, Judge.  So

2    we would seek the full file system acquisition.  And,

3    as Michelle Six said, our client would be willing to

4    pay for that, given the importance here.  This is

5    anything but a run-of-the-mill situation.

6          Mr. Rowe testified he communicated in writing

7    with three individuals -- Ravada, Oddsen, and Hall --

8    asking them to serve as witnesses.  There was some

9    indication in Plaintiffs' briefs that Mr. Rowe

10   testified that the communications were oral.  But I

11   read over the testimony three times, and he clearly

12   testified they were in writing as to the three.

13         In the deposition, he was not forthcoming

14   that he had deleted anything.  And we -- the only

15   reason we were able to obtain something was via a

16   third-party subpoena to Mr. Oddsen.

17         In the same text where he asks Oddsen to

18   serve as a witness, he stated, quote, "I might get no

19   money at all.  But if for some crazy reason I get a

20   lot, I got you, bro."

21         It would be a significant understatement to

22   say that my client is deeply concerned about that

23   message and its implications for a bellwether trial as

24   well as the deletion in light of the PTO.

25         The communications with Ravada and Hall

1    asking them to serve as witnesses have not been

2    produced, and these are critical messages.

3           At the heart of the dispute is Rowe's

4    statement which he has made repeatedly that he has

5    always tended toward deletion of text message chains

6    once the discussion is complete.

7           We know that we can obtain information

8    relating to that claim from a forensic examination.

9    It's not merely a possibility.  We know we can obtain

10   information about that.  And there was really no

11   response on that point from the other side.

12          And again, that's a statement that Mr. Rowe

13   injected, not a statement that we made, he has always

14   tended toward deletion.  That is a claim that can be

15   tested and is a claim that's critically important to

16   my client's defense.

17          Why is that?  Because, if the forensic

18   examination confirms that he has not always tended

19   toward deletion of text message chains once the

20   discussion is complete, as he claims, and we already

21   have strong reason to believe that Mr. Rowe's claim is

22   not accurate based on the old messages he has

23   produced, some of which are five or six years old,

24   then it further reinforces that he is not telling the

25   truth about what happened to these messages, and it

1    would show that he is not telling the truth about what

2    happened to a vitally important message in which he

3    asked somebody to serve as a witness and also stated,

4    "If for some crazy reason I get a lot, I got you,

5    bro."

6              So, even if you were to go no further, we

7    have that claim that Mr. Rowe has made that he's

8    always tended toward deletion, and the forensic

9    examination would produce information to test the

10   credibility of that claim.  This is not mere

11   speculation.

12             And some of the cases that have been cited by

13   both sides support this.  One of the things that's key

14   in these cases is, you know, what's the value to the

15   litigation.  So, if it's minimal value to the

16   litigation, you know, that's one thing.  But if it's

17   high value to the litigation, as it was in *Stryker* or

18   as it was in the *Antioch* case, then that's another,

19   and the forensic examination can be ordered.

20             And I would note that, in the *Hardy* case, the

21   District of Massachusetts case that Plaintiffs cite

22   for their likelihood of recovery standard, the *Hardy*

23   court cited the *Antioch* case which we cited.

24             And the parenthetical from the *Antioch* case

25   that the *Hardy* court included was, "allowing access to

1    defendant's computer hard drive to attempt to

2    resurrect data that had been deleted where the

3    defendant's expert attested to the possibility that

4    data could be recovered and that further delay risks

5    loss of relevant data."

6         And I think Mr. Miller has very ably done

7    what the expert in *Antioch* did and, even better, to

8    explain why forensic examination is merited here.  We

9    have -- it's high value to the litigation, there's

10   strong evidence that the message existed, there's a

11   lack of disclosure of deletion, there is a claim that

12   the witness always tended toward deletion, we have an

13   unrebutted assertion by our expert that the forensic

14   examination would be useful to test Mr. Rowe's claim

15   that he always tended toward deletion.

16        So those factors in combination distinguish

17   this case from the cases that Plaintiffs had cited.

18        The other thing I would note on the

19   proportionality is on the importance of having a

20   neutral examiner here.  So we recognize the fact that

21   there are other things on the iPhone.  We recognize

22   that privacy is an issue.  We recognize that burden is

23   an issue.

24        And that is precisely the things that neutral

25   examiners work on and that our experts would work with

1    Plaintiffs' experts to work out a protocol where all
2    of those things would be addressed and Mr. Rowe's
3    privacy would be respected as it is in other neutral
4    examinations.

5          But I just wanted to come back to what we
6    really view is at the heart of this is Mr. Rowe's
7    assertion that he always, always tended toward
8    deletion of messages.

9          **THE COURT:**  Let me ask you this question:  So
10   you have subpoenaed and, I guess, deposed -- well, I
11   don't know about all three -- Oddsen, Ravada, and
12   Hall, is it?

13         **MR. NOMELLINI:**  Correct, Your Honor.

14         **THE COURT:**  And you had Mr. Oddsen produce
15   all of his text messages he received from Mr. Rowe;
16   that's where you've got the "I got you covered, bro"
17   email -- I mean, sorry -- text message from.

18         Ravada produced all of his text messages or
19   he did not have any?

20         **MR. NOMELLINI:**  He produced -- he did produce
21   text messages, Your Honor, the day after we filed our
22   motion.  He also testified that he also deleted text
23   messages and the deleted messages may have included
24   this litigation.

25         The text messages that Mr. Ravada produced

1    were from July 1st, 2020, going forward, so not from

2    the time period when Mr. Rowe asked Mr. Oddsen,

3    Mr. Ravada, and Mr. Hall to be witnesses.

4            In the case of Mr. Hall, we served a

5    third-party subpoena.  The response date has past and

6    we have not received a response.

7            **THE COURT:**  Okay.  So you don't know there,

8    okay.

9            All right.  Let me stop you there and give

10   Mr. Aylstock, *et al.*, a chance to respond in support

11   of your position that the Court should not order a

12   forensic examination by a third-party.

13           **MR. AYLSTOCK:**  Ms. Hoekstra is going to

14   handle this, Judge.

15           **THE COURT:**  Okay.

16           **MS. HOEKSTRA:**  Thank you, Your Honor.  Again,

17   as we explained in the briefing, part of the issue

18   with the demand or request for a forensic collection

19   is that everything that we have been discussing to

20   this point has still been couched in terms of "could"

21   or "may" or "theoretically".  And what has not been

22   proven is that there was any sort of intentional

23   destruction or attempt to hide evidence that might

24   justify this type of invasion in Mr. Rowe's privacy.

25           Part of what goes along with that is, well,

1    you know, the Defendants have concerns about the

2    trustworthiness of Mr. Rowe's statements and the

3    accuracy of what he has instructed.  He is the one who

4    has described the communications and indicated that

5    the Defendants should have them because everything

6    that he had was collected.  If he had been trying to

7    hide that, I don't know if we would have been here

8    today, in all honesty.

9         To the extent possible, everything that was

10   collected from Mr. Rowe's ESI was produced.  We went

11   and followed a detailed forensic collection and review

12   process that had been negotiated quite some time with

13   Defendants in order to meet both the terms of the

14   scheduling protocol for the bellwether cases and to

15   ensure that a professional collection could be done in

16   situations where it was warranted.

17        There has been no evidence to show that the

18   collection that was done failed.  While there are

19   messages that apparently do exist and they've obtained

20   them now from a third-party, there is no evidence that

21   there are additional deleted messages that are out

22   there.  There has been no suggestion that they are so

23   relevant or prejudicial to the case that they are

24   necessary for litigating Mr. Rowe's case.

25        And what we have been finding generally is

```
 1    that these type of third-party requests for documents
 2    are generating additional ESI because obviously the
 3    person who is receiving the notice then reaches back
 4    out to the Plaintiffs via some sort of electronic
 5    means and causes there to be additional
 6    communications, which is what happened with
 7    Mr. Ravada's case, which is why there were additional
 8    communications that were produced.
 9             THE COURT:  What --
10             MS. HOEKSTRA:  Typically at this point -- I'm
11    sorry, go ahead.
12             THE COURT:  No, no, go ahead.  I interrupted.
13             MS. HOEKSTRA:  Part of our concern in
14    relation to the full forensic collection is the fact
15    that it could honestly destroy his phone; it could
16    void a warranty, if he has one on the phone; it's an
17    invasion of the privacy, because there are items
18    that's on there that are likely not relevant in any
19    way, shape, or form to this litigation.
20             And as part of the procedure and discussions
21    that we have had to this date, there has been no
22    explanation as to what the forensic collection may
23    look like, even if it was justified, which in our case
24    it does not appear to be such vital information that
25    it would be necessary to proceed.
```

1          While there are benefits to ESI collections

2     and productions, knowing whether someone deletes

3     messages or knowing if you can recover the portions of

4     those deleted messages doesn't seem central to the

5     litigation relating to Mr. Rowe's hearing loss.

6               **THE COURT:**  Let me ask you this --

7          **MR. AYLSTOCK:**  The only thing I would --

8               **THE COURT:**  Yeah, go ahead.

9          **MR. AYLSTOCK:**  The only thing I would add,

10    Judge, is this whole issue about tended toward

11    deletion, that's sort of a red herring, in my view, in

12    that, first of all, what does that even mean?  And

13    then we're going to have expert testimony at trial

14    about -- assuming, and it is an assumption, not a fact

15    -- but assuming that any evidence could even be

16    unearthed, which was not what I think the experts have

17    said, there's a possibility that maybe there could be

18    some information that would be valuable or somehow

19    could be ascertained about deletion patterns.  And

20    again, what I heard was that that's a possibility, not

21    a certainty.  What does that even lead to?  A side

22    show at trial about, okay, tended to deletion.

23          So, to me, what we have is a whole lot of

24    speculation and possibility.  We have complied with

25    the ESI protocol.  We have -- Mr. Rowe has cooperated

1   with our ESI vendor.  We have collected everything
2   that was required of us.
3         And now this additional step I don't think
4   meets the high threshold that the cases suggest and
5   just isn't appropriate under the law.
6         **THE COURT:**  One last --
7         **MR. NOMELLINI:**  Your Honor --
8         **THE COURT:**  Let me just ask one question to
9   Mr. Aylstock and Ms. Hoekstra to make sure I
10  understand this.
11        And I think this is addressed somewhat in the
12  papers.  The way the record stands now on Mr. Rowe and
13  emails to these three individuals that we're -- not
14  emails -- text messages to these three individuals
15  that we're focusing on, what Mr. Rowe has openly
16  admitted under oath is he contacted all three of these
17  guys and he talked to them about being witnesses.  He
18  probably or may have texted them, but it also may have
19  been on the phone.
20        And then, did Ravada say, *Well, yeah, I*
21  *talked to him; he contacted me.  I think it might have*
22  *been by text, but I don't know, it might have been on*
23  *phone, because here are all the text messages I have*
24  *and I don't have that*?
25        Is that sort of the state of the record, that

1    both Mr. Rowe and Mr. Ravada are not confirming that

2    indeed they discussed his witness participation via

3    text?  They may have, but they have not conceded that

4    point at this point; is that correct?

5            **MR. AYLSTOCK:**  Yes, Your Honor, that is the

6    state of the record, as I understand it.  And, you

7    know, what I'm not hearing is a request for a

8    deposition on this or anything like that.  They just

9    want basically to jailbreak the phone, which, you

10   know, that's an extreme measure.

11           If they want to ask him some other questions

12   about it, we would be prepared to put him up for that,

13   but not a full jailbreak of the phone.

14           **THE COURT:**  Yeah.

15           **MR. NOMELLINI:**  Your Honor, may I address

16   that point?

17           **THE COURT:**  Yes.

18           **MR. NOMELLINI:**  It's just not true that

19   Mr. Rowe testified that they might have been oral

20   communications, as Mr. Aylstock asserted.  And I just

21   checked the deposition before this oral argument three

22   times for that, and the exact quote is:

23           "**Q.**  So Mr. Ravada, Mr. Hall, and Mr. Oddsen,

24   you contacted all of them through Facebook?

25           "**A.**  Yes, sir, just to inform them about

using their name and making sure they didn't mind.

       **"Q.**  So did you contact them in writing?

       **"A.**  Yes.

       **"Q.**  Did you communicate with them other than through Facebook?

       **"A.**  Just through text with Ravada because I communicate with him regularly."

       **THE COURT:**  So, you're saying with the other two, with Oddsen and Hall, it was through Facebook Messenger; with Ravada, because we know he didn't have Facebook Messenger, or hasn't since 2018, that would have been text, right?

       **MR. NOMELLINI:**  That's correct, Your Honor. And there's no testimony by Mr. Rowe that he communicated with them other than in writing.

       **THE COURT:**  Yeah.

       **MR. AYLSTOCK:**  And Mr. Ravada testified, I believe, that it could have been by phone, so --

       **THE COURT:**  Yeah, I think he did --

       **MR. NOMELLINI:**  That's true -- that's --

       **THE COURT:**  I think he did say that.  But Mr. Ravada has produced, pursuant to a subpoena, his text messages.  And he doesn't have text messages around -- well, I don't know if there is a relevant time -- but doesn't have these types of text messages

1    that you're focusing on.  And was he asked whether he

2    deletes text messages?

3          **MR. NOMELLINI:**  Yes, and he said he did

4    delete text messages.

5          **THE COURT:**  Okay.  So there may be a deletion

6    problem there as well.  Okay.

7          Well, here is what I'm going to do.  It's an

8    interesting issue.  Sorry to spend so much time on it.

9    And the one thing I set the hearing for and to focus

10   on, you know, was this issue through the fragmented

11   messages, is there a chance of finding deleted

12   messages.  And I think both experts have been somewhat

13   consistent on it and explained it in detail.

14         And, you know, this is something that we, as

15   judges, deal with from time to time on the criminal

16   side.  Because in the criminal context where you have

17   a search warrant issued and an iPhone seized, it is

18   not a collection; it is a full file acquisition

19   forensic examination of the phone looking at all of

20   the file systems, looking for, obviously, messages and

21   photos, but also looking for anything that's missing,

22   deleted messages.

23         And it has been my experience -- probably

24   falls somewhere within the range of what the

25   respective experts are telling me -- it is not

1      impossible; computer experts can do some amazing
2      things.  There are, however, a lot of variables
3      involved as to the system on the phone, the use of the
4      phone, you know, those kinds of things.

5           But, generally, if you had to extract a
6      general statement, it is extremely challenging, and it
7      is the exception more than the rule that, through
8      doing these types of forensics, you will most
9      successfully identify fragmented messages and be able
10     to then extract deleted messages.  Possible, but, you
11     know, not -- you know, if we had to put percentages on
12     it, it would not be a high percentage endeavor.  And
13     that's something I'm taking into account here.

14          And I fully understand why the Defendants
15     have latched on to this issue.  If they found more
16     text messages like the one they have identified to
17     Mr. Oddsen, they think that would be valuable, useful
18     information on cross-examination at trial as to
19     truthfulness and those kinds of things.

20          And I'm not surprised that you can, through a
21     forensic examination, identify potentially some
22     patterns of deletion.  But I'm not sure that's going
23     to answer a lot of questions.  Because I don't think
24     the testimony here from Mr. Rowe was ever, *It was my*
25     *pattern and practice to delete text messages once the*

1    *conversation was done,* because I'm sure text messages

2    have been produced here where they weren't deleted and

3    the parties were done talking.

4         So it's not that, you know, a situation where

5    plaintiff is saying, *Yeah, I did it, and that was my*

6    *practice, that was what our business or I did on a*

7    *routine basis.*

8         It sounds to me Mr. Rowe is speculating

9    saying, *Well, I tend to do that.*

10        So I'm not sure where pattern of deletion is

11   really going to find valuable information.  It will

12   probably show that he did sometimes and he didn't

13   sometimes.  And I'm not sure where that really gets

14   us, so I'm not super-enamored by that argument.

15        But what I am going to do here, because I

16   know this is an important issue for the Defendants --

17   and Mr. Nomellini has pointed me to a couple of cases

18   that have been cited by the parties, and, you know,

19   I've looked at them, but I'm not going to tell you

20   I've examined them in detail.  So I'm going to take a

21   fresh look at those cases after this hearing, and then

22   I will issue my order on this.

23        I'll preview that I'm certainly not leaning

24   towards a forensic examination.  But I think, you

25   know, the Defendant has said enough here to make me

```
 1    continue to give it serious thoughts.  Let me take a
 2    look at those cases, and I'll get something out real
 3    shortly on that.
 4         If we did go to a third-party forensic
 5    examination, you know, the parties would have to
 6    identify who the third-party would be, and we would
 7    have to have some protocols.  Because, you know, we
 8    don't want this to be a fishing expedition into
 9    everything on there.
10         So the forensic examination, if I was to
11    order one -- and I'm not so sure I will -- but it
12    would be very, very targeted as to deleted messages
13    and certainly limited to a time frame, and it would
14    most likely be limited to these three individuals.
15              MR. NOMELLINI:  Understood.
16              THE COURT:  Because that seems to be --
17              MR. NOMELLINI:  Understood, Your Honor.
18              THE COURT:  Yeah, they're the three guys that
19    he said he contacted and --
20              MR. NOMELLINI:  Yeah, absolutely, Your Honor,
21    and that's all we are seeking is targeted to these
22    three individuals.  We don't want to see anything
23    else.  We don't want to know anything else about, you
24    know, personal or whatever, and we want to agree on a
25    way to limit it.
```

1          Just so Your Honor has the cites, it's the

2     *Zimmer* case is 2015 WL 13700949.  And in that case

3     actually there was a forensic examination ordered for

4     -- that included deletion of messages from a --

5     deletion of texts from an iPhone, so you're dealing

6     with the same, you know, uncertainties that you would

7     here.  But the court ordered the forensic examination,

8     in part, because of the high value of the evidence.

9          And here again, you know, from my client's

10    perspective, this kind of evidence, it's harder to

11    imagine higher value evidence than this and the

12    concern that it gives rise to.

13         And then the other citation is the *Antioch*

14    case that I mentioned, which is cited in the *Hardy*

15    case.  So the *Antioch* case is 210 F.R.D. 645.

16         **THE COURT:**  And *Antioch* is cited in *Hardy*?

17         **MR. NOMELLINI:**  *Antioch* is cited in *Hardy*,

18    correct, Your Honor.

19         **THE COURT:**  Okay.  Well, I am going to take a

20    look at that.

21         And I guess, on an unrelated note, I guess

22    today is the discovery deadline, right?

23         **MR. AYLSTOCK:**  And the expert witness

24    deadline, Judge.

25         **THE COURT:**  Yep.  Okay.  I don't think

1   there's -- anything else before I complete the hearing

2   -- and I'll turn to Plaintiffs.

3          Anything else on behalf of Plaintiffs you'd

4   want to bring to my attention?

5          **MR. AYLSTOCK:**  No, Your Honor.  I trust your

6   ability to review the cases.  I'm not going to reargue

7   it.

8          **THE COURT:**  Okay.

9          And, Mr. Nomellini, anything else?

10         **MR. NOMELLINI:**  No, nothing else, Your Honor.

11  We appreciate your time on a Friday afternoon.

12         **THE COURT:**  Okay.  Thank you all very much

13  and have a good weekend.  Take care.

14         **MR. AYLSTOCK:**  Thank you, Judge, appreciate

15  it.

16         **MR. NOMELLINI:**  Thank you.

17         *(Proceedings concluded at 2:44 p.m. EST)*

18         --------------------

19  *I certify that the foregoing is a correct transcript*
    *from the record of proceedings in the above-entitled*
20  *matter.  Any redaction of personal data identifiers*
    *pursuant to the Judicial Conference Policy on Privacy*
21  *are noted within the transcript.*

22

23  *s/Donna L. Boland*                    10-19-2020
    *Donna L. Boland, RPR, FCRR*              *Date*
24  *Official Court Reporter*

25