**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG    )     Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,  )
                                )     Pensacola, Florida
                                )     October 30, 2020
                                )     2:59 p.m.
                                )
                                )
_____)


**LEADERSHIP PHONE CONFERENCE**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
(Pages 1-34)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*1 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

**A P P E A R A N C E S**

**JUDGE DAVID R. HERNDON** (ret.)

**FOR THE PLAINTIFFS:**     **BRYAN F. AYLSTOCK, ESQUIRE**
Aylstock, Witkin, Kreis & Overholtz
17 E Main Street, Suite 200
Pensacola, Florida  32502

**CHRISTOPHER A. SEEGER, ESQUIRE**
**DAVID R. BUCHANAN, ESQUIRE**
Seeger Weiss, LLP
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey  07660

**SHELLEY HUTSON, ESQUIRE**    **PAUL J. PENNOCK, ESQUIRE**
Clark Love & Hutson, GP    Weitz & Luxenberg, P.C.
440 Louisiana Street    700 Broadway
Suite 1600    New York, New York  10003
Houston, Texas  77002

**FOR THE DEFENDANTS:**    **ROBERT C. BROCK, ESQUIRE**
Kirkland & Ellis, LLP
1301 Pennsylvania Avenue NW
Washington, D.C.  20004

**MICHELLE SIX, ESQUIRE**    **KIMBERLY BRANSCOME, ESQUIRE**
Kirkland & Ellis, LLP    Dechert, LLP
601 Lexington Avenue    633 W 5th Street, Suite 4900
New York, New York 10022    Los Angeles, California  90071

**MARK J. NOMELLINI, ESQUIRE**
**BARRY FIELDS, ESQUIRE**
Kirkland & Ellis, LLP
300 N Lasalle
Chicago, Illinois  60654

1          P R O C E E D I N G S

2          **THE COURT:**  Good afternoon.  This is Casey Rodgers.

3   Let me ask first if I have Donna Boland on?

4          **COURT REPORTER BOLAND:**  Yes, Judge, I'm on.

5          **THE COURT:**  Okay, very good.

6          And Sue Simms?

7          **MADAM CLERK SIMMS:**  Yes, Judge, I'm on the call.

8          **THE COURT:**  Very good.

9          Judge Jones, are you on?

10         *[No response.]*

11         Judge Herndon, are you on?

12         **JUDGE HERNDON:**  I'm on.

13         **THE COURT:**  Okay, very good.

14         And Judge Jones?

15         *[No response.]*

16         We'll wait just a minute for Judge Jones.

17         Do I have Bryan Aylstock?

18         **MR. AYLSTOCK:**  Good afternoon, Your Honor.  It's

19   Bryan, I'm here.

20         **THE COURT:**  Hi, Bryan.

21         Shelley and Chris, are you on?

22         **MR. SEEGER:**  Yes, Your Honor.

23         **MS. HUTSON:**  I'm here.  Good afternoon.

24         **THE COURT:**  Kim and/or Mike?

25         **MS. BRANSCOME:**  I am here, Your Honor.

1          **THE COURT:**  Very good, thank you.

2          Mike?

3          *[No response.]*

4          All right.  Well, let me ask again if Judge Jones has

5     joined us?

6          *[No response.]*

7          Let me go back to 3M's side.  Is Mark Nomellini on?

8          **MR. NOMELLINI:**  I'm on, Judge.

9          **THE COURT:**  Okay, very good.  We'll wait just a couple

10    of minutes to see if Judge Jones joins us.

11          Judge Jones?

12          *[No response.]*

13          **MR. BROCK:**  Good afternoon.  This is Mike Brock just

14    joining.  I think I'm No. 27.

15          **THE COURT:**  Okay, very good.  I inquired, and there

16    were several beeps coming in, so, glad you've joined us.

17          **MR. BROCK:**  Thank you, Judge.

18          **THE COURT:**  Judge Jones?

19          *[No response.]*

20          Judge Jones is a critical part of any call, so I'm

21    going to sit tight for just a minute because I suspect he'll

22    join.

23          Let me check to see -- Hillary, are you on?

24          **MS. DANG:**  Yes, I'm on.

25          **THE COURT:**  Okay.  So I understand Judge Jones may not

1  join us, so we're going to go ahead and get started.  He's

2  actually traveling this week, and so he may or may not join us.

3  But it is 3:00 p.m. Central, 4:00 Eastern, 1:00 Pacific, so

4  we'll go ahead and get started.

5           I appreciate your joint agenda.  Thank you for

6  providing that.  Let's just start off with the first item on

7  the agenda which is an update on Government discovery.

8           **MS. BRANSCOME:**  Yes, Your Honor, I'm happy to take

9  this one.  This is another area where we have got some good

10  news.  I think we had previewed that we were headed in a better

11  direction, and it has continued in that direction.

12           So, Gary Feldman has now been tasked -- I believe he,

13  as a technical matter, may report to Jacqui Snead, but he has

14  been tasked with really coordinating with us to find ways to

15  move forward with Government discovery.

16           You may have seen, Your Honor -- I think we sent you a

17  copy -- the Government did actually -- they have now authorized

18  Cheryl Parker for deposition.  She was one where the Motion to

19  Quash was denied by Judge Jones, and they chose not to appeal

20  that and have authorized her to sit for deposition.  We have

21  proposed a date that works with the Plaintiffs, so we are off

22  and running.

23           I will preview that we may need to file a motion for

24  good cause because there are two depositions that are pending

25  Government authorization in the *Baker* case.  And understanding

1     the order that the plaintiffs count as one of the six, we may

2     need to file a motion for good cause to take one of the

3     Government depositions.  We have met and conferred with

4     Plaintiffs.  We will likely file that on Monday, so just

5     knowing that's coming.

6           But in terms of a larger agreement with the

7     Government, we have taken pretty significant steps towards

8     reaching an agreement with them on both health care providers

9     who are current government employees and also individuals who

10    are either the hearing conservation program manager for a base

11    where one of the plaintiffs obtained their Combat Arms Earplug

12    Version 2, or we just learned this morning there may be another

13    position that has the relevant information with respect to

14    instruction, training, and providing the earplug.

15          We have been working with the Plaintiffs in this

16    process as well to make sure that we can come up with an

17    agreement.  Although it is discovery requested by Defendants

18    from the Government, we don't want to reach an agreement with

19    the Government to which the Plaintiffs may object down the

20    line, so we have been having productive meet-and-confers; Judge

21    Herndon has been involved in these conversations.  And I am

22    cautiously optimistic that we may be able to reach an

23    agreement.

24          It, as a technical matter, will probably be presented

25    to the Court as a stipulation to moot the pending Motions to

1    Quash and would technically apply to Trial Group A.  But the
2    thinking behind it is that it would be sort of the operating
3    procedure going forward for Groups B, C, and D.  So this is a
4    very welcomed development on our side, and I think the dialogue
5    is going well.

6            There are a few one-off issues here or there that
7    we're still working on with the Government, getting contact
8    information, some specific document requests, et cetera.  But I
9    think we have finally shifted into a more productive dialogue,
10   with a lot of credit going to Gary Feldman.

11           So that is the good news to report.  I don't know if
12   the Plaintiffs want to add anything.

13           **MR. AYLSTOCK:**   Thanks, Kim.  I'll just add -- I'll
14   echo what Kimberly has said, it's been a productive experience
15   of late.  And Judge Herndon -- we had another call this morning
16   with the Government, and things do seem to be moving along,
17   also credit to Judge Herndon for that.

18           One of the things that Jacqui Snead brought up today
19   was, where the Government has agreed that a deposition can go
20   forward but the date doesn't work for the deponent, would the
21   Court consider releasing them from the subpoena pending the new
22   date such that a motion didn't need to be filed just related to
23   the date, not so much the ability to take the deposition in the
24   first place.  And maybe Judge Herndon has already spoken to
25   Your Honor about that, but that seems reasonable to us.

1    **THE COURT:**  Yes, he did speak to me about that.  And

2    as long as both sides are in agreement, I have no problem with

3    it.  So, in terms of proceeding, I don't have an issue with it.

4    **MS. BRANSCOME:**  Thanks, Judge.  Our only concern that

5    we just want to make sure that we get from the Government is

6    that we would need that authorization in writing so that they

7    are committed to it.  Because, obviously, if we pull the

8    subpoena down and then we have to go back again and pursue

9    motion practice, that will have wasted everyone's time.

10    The other thing that we flagged is that there may be

11    circumstances in which a date is not worked out and may have to

12    be after the close of fact discovery for that particular group,

13    particularly Trial Group B, which is now -- you know, that

14    deadline is about two weeks away, and we have not yet gotten

15    authorization for anyone; and obviously, Trial Group A, we are

16    beyond the deadline.  But I think those are details we can work

17    out.

18    We just didn't want to agree with the Government to

19    pull down subpoenas and then end up in a place where we would

20    need to come back to you for relief and we'd sort of let the

21    time go.

22    **THE COURT:**  Yeah, no, I appreciate that.  I can enter

23    an order so that you can send that to the Government.

24    I'm okay exceeding the fact discovery deadline as long

25    as everyone is in agreement.  It was not the fault of either

1  party here that these depositions haven't -- so, I don't have a

2  problem with it.  I suppose if a deposition leads to the need

3  for further discovery, we would need to have a discussion about

4  that.  But for purposes of the respective depositions, I don't

5  have a problem with extending the time.

6          **MS. BRANSCOME:**  Understood.  Thank you.

7          **THE COURT:**  We'll get an order out to that effect.

8          Judge Herndon, anything to add to Item No. 1 on the

9  Government discovery update?

10          **JUDGE HERNDON:**  No.  They summed it up very, very

11  well.

12          **THE COURT:**  All right.  Then, as to Item No. 2, I'll

13  ask 3M to start the discussion off, and I'm not sure who, but

14  if you'll start the discussion off.

15          **MR. NOMELLINI:**  Sure, Judge, it's Mark Nomellini.  So,

16  on this item, I think it's before Judge Jones at this point.

17  We have filed our motion, the Plaintiffs responded, we filed a

18  Motion for Leave to Reply, and Judge Jones ordered Plaintiffs

19  to respond to that today.  So I think it's before him.

20          I don't know if Your Honor wants to hear anything

21  further on that; if so, happy to provide it.

22          **THE COURT:**  Well, Mark, without a lot of argument,

23  just tell me what is underlying this.  What are you asking for?

24  I haven't seen the motion.

25          **MR. NOMELLINI:**  Yep.  So, we're asking for facts or

1   data considered by experts in forming their opinions, which is
2   required to be provided under Rule 26.
3           **THE COURT:**  But what is it you're not getting in the
4   report?
5           **MR. NOMELLINI:**  Yep.  So, for example, Judge, since
6   the October 9th disclosure, there have been notes or
7   questionnaires that Plaintiffs have provided in amended
8   reports.  These are notes or questionnaires that were taken
9   from interviews with plaintiffs.
10          So, since October 9th, we have gotten 14
11  amended/updated disclosures.  By my count, eight included notes
12  or questionnaires from interviews with plaintiffs.  In our
13  view, those are consideration materials that should have
14  already been provided, and we would like to receive anything
15  else that's outstanding.
16          Another example is from the Eddins report.  There are
17  various graphs, and we would like the actual data underlying
18  those graphs, which we understand he has.  For example, his
19  notes reference audio files, and we don't have those audio
20  files.  So, those materials are materials that we would like to
21  receive and are discussed in our briefs.
22          **THE COURT:**  Okay, very good, thanks.
23          So, Bryan -- and I'm not sure if you're the one to
24  address this -- does the Plaintiffs, in your response, do you
25  make a distinction between the two, the notes or questionnaires

1    versus --

2              **MR. AYLSTOCK:**  Yes, Judge.  I'm sorry.  Yeah, I'll be

3    the one to address this.

4              From our perspective, we have absolutely complied with

5    the rule.  We have provided the materials relied upon or

6    considered by the expert pursuant to the rule.  It's really a

7    matter of semantics.

8              In our experience, in our collective experience,

9    including Chris and Shelley and everybody, yeah, maybe notes

10   need to be provided.  But it's not the notes that are relied --

11   it's the interview, it's what's -- you know, the expert has

12   that.

13             So we're going above and beyond to try to -- we had

14   Judge Herndon's help, and we're trying to moot this issue.  It

15   didn't get mooted, unfortunately.  We will be responding,

16   pursuant to Judge Jones's order, to their Motion for Leave to

17   File a Reply today.

18             From our perspective, we have provided everything.

19   We're trying to provide more just to moot the issue, I guess,

20   but it's not working.  Happy to go into greater detail.  But as

21   you may have seen from -- I'm sorry, Judge.

22             **THE COURT:**  No, I guess I don't need greater detail,

23   thank you.  But, as you, Bryan, may or may not be aware, I have

24   addressed this issue, sounds like, in a similar context in

25   *Abilify* fairly recently regarding the 2010 amendments to Rule

```
 1    26(b)(4)(B) regarding interviews and notes of discussions with
 2    individual plaintiffs.  So, I'm going to share that with Judge
 3    Jones.  I don't want to preempt anything here, but I will share
 4    that with him.
 5             MR. AYLSTOCK:  To the extent they exist, Judge, they
 6    have been provided by the experts either with the report or
 7    with the supplement when it was brought to our attention.  So,
 8    again, I'm not exactly sure what we're fighting about, but I'm
 9    sure Judge Jones will sort it out.
10             THE COURT:  He will.  All right.  Very good.
11             Item No. 3, I was just informed -- I saw an email from
12    you all that you all have resolved that or it can be removed
13    from the agenda.  I appreciate that.
14             MR. AYLSTOCK:  We have, Your Honor.
15             And thank you, Judge Herndon, for helping us get
16    there.
17             MR. NOMELLINI:  Yep, I second that.  Thank you, Judge
18    Herndon.
19             THE COURT:  I third.  Thank you, Judge Herndon, big
20    third.  Thank you.
21             JUDGE HERNDON:  I like that trifecta.
22             THE COURT:  All right.  So, then, No. 4, I see that
23    the certification or declaration was to be provided by the end
24    of business yesterday.  Was that done?  I haven't seen it, if
25    it was.
```

1          **MS. SIX:**  Good afternoon, Your Honor.  This is

2      Michelle Six.  Yes, we sent those over to Plaintiffs yesterday

3      afternoon.  There were two declarations, one from 3M's IT

4      individual and one from Paul Laven at Xact vendor.

5          **THE COURT:**  All right.  Is there any issue for me to

6      address on this item?

7          **MR. BUCHANAN:**  None, Your Honor.  We have the

8      certifications.  We forwarded them to our tech consultants.

9      And to the extent there's any followup, we'll direct it in the

10     first instance to Ms. Six.

11         **THE COURT:**  Okay.  Do y'all mind forwarding those to

12     Hillary, please, just so we have them?

13         **MS. SIX:**  Will do, Your Honor.

14         **THE COURT:**  I'm not going to ask you to file them; I

15     don't believe they were filed.  But I would like to just have

16     them.  So, if you would forward them, that would be good.

17         **MS. SIX:**  Absolutely.

18         **THE COURT:**  Thank you.

19         No. 5, DoD 30(b)(6) depos.  Who wants to start on this

20     item?

21         **MR. AYLSTOCK:**  I can start on it --

22         **MS. BRANSCOME:**  Your Honor, I can -- I'm sorry, Bryan,

23     if you want to, that's fine.

24         **MR. AYLSTOCK:**  No, no, go ahead.

25         **MS. BRANSCOME:**  I actually think this issue may be

1    moot, in light of what we're working on with the Government in

2    the phone call we had with them this morning.

3              Just so Your Honor has a bit of background on this,

4    the Government is concerned about the resources that would be

5    devoted to putting up witnesses in the individual bellwether

6    cases.  And this really is focused on the category of the

7    hearing conservation program managers.

8              The Government had made some proposals to us of ways

9    to streamline that discovery, one of which was to do a hybrid.

10   They would produce one individual to answer questions about the

11   hearing conservation program that would essentially be

12   foundational and then produce individuals from each of the --

13   you know, for each of the cases from the relevant base and time

14   period to talk about the implementation of the hearing

15   conservation program at that particular base.

16             The goal of the Government, at least as they expressed

17   it, was to make the individual depositions shorter and try to

18   make it overall a more streamlined process.

19             We were open to that when it was proposed, although it

20   seemed a little overly complicated.  And we met and conferred

21   with the Plaintiffs; the Plaintiffs objected to it on the

22   grounds that, you know, that was sort of general discovery.  We

23   explained how it came to be, and it really was a Government

24   proposal, not ours, and how it all fits together.

25             And I think where we have landed is that we would be

1    better off having one hearing conservation program manager per
2    bellwether case and they would just be subject to a time limit.
3            We have taken one of these depositions who just
4    happened to be a former government employee, and I think her
5    deposition is a fairly good model for the type of questions and
6    the length of questioning.
7            So this is one where we are working with the
8    Government, but I suspect we're going to head in the direction
9    of time limits and not actually trying to do some kind of
10   hybrid general deposition for all the bases.  So it's sort of a
11   general/case-specific plus the individuals.  I think that's
12   overly complicated, but we were trying to be accommodating of
13   the Government.
14           So, bottom line is, I think this is moot.  If the
15   Government comes back and says this is the only way they're
16   willing to do it, then there may be something we bring to you.
17   But right now I think we might be able to work it out without
18   that.
19           **THE COURT:**  All right, very good.
20           Bryan, do you want to add anything?
21           **MR. AYLSTOCK:**  Yes.  I think Kim summarized it
22   correctly.  We were concerned when we learned about this, that,
23   and unfoundedly so, that there may be an attempt to reopen
24   general discovery.  And that's not what's happening; we all
25   know that general discovery of the Government is closed.  So

1    they were trying to limit the burden on the Government.

2            We spoke again with them this morning, with Judge

3    Herndon's help.  And I think we can come up with a limited

4    reasonable time limitation that satisfies the Government and

5    satisfies our concern that these depositions really are

6    strictly limited to case-specific issues pursuant to the

7    Court's order.  So I think we're all on the same sheet of music

8    on that.

9            **THE COURT:**  Okay, very good.  Well, that makes sense

10   to me if it makes sense to you all.

11           No. 6.  Do both sides agree to expand PTO 52 to the

12   other groups?

13           **MR. AYLSTOCK:**  Judge, on this one, Mr. Pennock is on

14   the on line.  And I know he hasn't been able to make it down to

15   many CMCs because of COVID and everything, but he's been

16   invaluable to our side in helping get PTO 52 and some others

17   entered and negotiated, so Mr. Pennock will speak on our behalf

18   on this one.

19           **THE COURT:**  All right.  Paul, go ahead.

20           **MR. PENNOCK:**  Thank you, Your Honor.  Thank you,

21   Bryan.

22           Judge, I think we are in agreement that it should be

23   expanded.  There are a couple of issues that the Defendants

24   have raised, three that I'm aware of.

25           I actually have reached out to them just a few hours

1   ago with a solution that I think will work -- I haven't had a

2   chance to talk with them on it -- to resolve their three

3   issues.

4        I recognize and acknowledge that their issues have to

5   be resolved, and so we just need to tweak a couple of things.

6   And I can go over those, or I can try and get them resolved and

7   report back to the Court on Monday, whatever the Court's

8   preference is.

9        **THE COURT:**  My suggestion would be, why don't you all

10  try to resolve it instead of taking time now here to go over

11  items that it might not be necessary.  So try to resolve those

12  three items that Defendants have.

13       And then, to the extent you can't resolve them, then

14  just email Hillary.  I can jump on the phone with you all, if

15  necessary, next week.  You don't need to -- at least at this

16  juncture, I don't think you're going to need to file motions or

17  any kind of motion practice.  But just let me know if you need

18  to bring this to my attention, and I can get back on the phone

19  with you next week.

20       **MR. PENNOCK:**  Very good.  Thank you, Your Honor.  And

21  I am optimistic that we'll be able to get this taken care of.

22       **THE COURT:**  Okay.

23       **MR. FIELDS:**  Your Honor, this is Barry Fields.  How

24  are you doing?

25       **THE COURT:**  Hi, Barry.

1            **MR. FIELDS:**  Hi.  I think there's a possibility -- I

2    think both sides agree that PTO 52 has been a good template,

3    and we've only raised two or three issues that we think are

4    minor tweaks to the order from lessons learned from applying

5    the order to Group A, and our hope is that we can resolve these

6    issues.

7            And I also agree I don't think there is going to be a

8    need to file any kind of motions.  I think, to the extent we

9    get close or get it resolved, that's one thing.  Even if we

10   don't get it resolved, I think, just by having Your Honor on a

11   quick phone call, we can probably address these issues.

12           They're not significant issues.  They're important

13   issues, but I don't think they're insurmountable, and I think

14   they can be resolved either between the parties or through a

15   short call with Your Honor.

16           **THE COURT:**  Okay.  Well, just, like I said, let

17   Hillary know, and we can set that up.

18           Moving on to the Defense medical exams.  I know you

19   all have been working very cooperatively on this issue as well

20   as so many others.  But, as we said, this has been a model of

21   cooperation.

22           Now, have they all be scheduled?  My understanding is

23   maybe there's one outstanding -- Mr. McCombs?

24           **MS. BRANSCOME:**  That is correct, Your Honor.  So the

25   others have actually not only been scheduled, but completed.

1   So the other exams have been completed.

2         I believe at this point we have already produced the

3   objective test data from the exams to Plaintiffs.  We had an

4   agreement to do that within seven days of the exam.  I don't

5   know if Mr. Keefer's time has run yet, but I think we have

6   produced them from all of the others, and I think it went well.

7         In fact, we have on the agenda scheduling Group B

8   exams.  Obviously, we will meet-and-confer with the Plaintiffs.

9   Our original stipulation only covered Group A, but I think we

10  could use it as a model for Group B; we sort of negotiated it

11  with that in mind.

12        So we will get started on that, understanding sort of

13  our similar timing so that we can get dates reserved in case

14  people need to take time off of work.

15        The one exam that is still potentially pending is for

16  McCombs.  That is not a case that I personally manage, so I

17  don't know if either Hari Karis or maybe Barry might cover the

18  status of that on our end.

19        **THE COURT:**  All right, thank you.

20        Barry or --

21        **MR. BROCK:**  Judge, this is Mike Brock.  I can cover

22  this one very quickly.

23        With regard to Mr. McCombs, he lives up in the eastern

24  Ohio area.  His examination by the Plaintiffs was conducted in

25  New Orleans.  Our desire was to have an expert who we have

1   retained in New Orleans to also conduct an exam.

2              The Plaintiffs have mentioned in meet-and-confers that

3   Mr. McCombs was required to drive to New Orleans for his exam

4   with his expert, and that was a three- or four-day ordeal, and

5   that he couldn't do it again.

6              We have had discussions about the fact that

7   Mr. McCombs has been flying during the COVID period and that

8   that doesn't seem to be an issue, and can he fly to New

9   Orleans.  They don't want him to do that.  They want him to

10  appear for an exam within a five-hour drive from where he

11  lives.

12             We don't have an expert within a five-hour drive.  But

13  we're trying to work in a cooperative way to see if there's a

14  way that we could find an acceptable expert -- we would have to

15  engage someone, but someone who could conduct the exam in his

16  general geographic area.  And we're trying to be cooperative

17  about it, but we don't have it worked out yet.

18             As things have unfolded, our expert in New Orleans is

19  -- I think you heard from us today -- is now communicating by

20  fax only and has got some construction issues at his office.

21             **THE COURT:**  Right.

22             **MR. BROCK:**  We do have an expert in Pensacola who can

23  conduct the exam.  We're not finished with the discussions with

24  the Plaintiffs yet.  It may be that we can find someone who can

25  do the exam in his geographic area.  But if we don't, we may

1   need to come back to the Court early next week on that.

2          **THE COURT:**  All right.  Bryan, can you address this

3   or --

4          **MR. PENNOCK:**  Your Honor, this is Paul Pennock.

5          **THE COURT:**  Okay, Paul.

6          **MR. PENNOCK:**  And, if you please, I was speaking with

7   the Defendants on this.

8          Mike has essentially laid out how it's proceeded.  I

9   would just add a couple of things.

10         From our very first conversation -- and I think the

11  Defendants will recall and Judge Herndon will recall -- I said

12  I was concerned -- and this is going back some weeks -- that

13  McCombs would not be able to drive from where he is down to New

14  Orleans again, but I would look into it in good faith, and I

15  did so.

16         And as Mike reported, I learned that he had been

17  knocked out of work for three days for the prior exam.  And I

18  asked them at that time -- actually in the initial call -- to

19  look for something closer to where he is, because there are

20  centers in Pittsburgh and Columbus, Ohio; Cincinnati;

21  Cleveland, and they're all easily within a five-hour driving

22  distance.  And I didn't limit it to five.  I said five -- five,

23  six -- four, five, six.

24         And I just want the Court to realize we're not trying

25  to be difficult and Mr. McCombs is not trying to be.  We did,

1    out of the box, agree to send people from Nevada to California

2    for these exams, inside California to Los Angeles, which is

3    never an easy haul, and down to Pensacola or up to Pensacola,

4    as the case may be for a couple of the plaintiffs.

5            So, I agree with Mike's sentiment that I think we're

6    both trying to cooperate and get this done, and hopefully we

7    can get it resolved without having to seek the Court to resolve

8    it.

9            **THE COURT:**  Well, you know, my thought on this is, if

10   Mr. McCombs came down to New Orleans to meet with the

11   Plaintiffs' expert, he ought to come down and meet with the

12   Defendants' expert.

13           Mr. Brock mentioned that he has flown during the

14   pandemic.  Why can he not get on an airplane and fly to

15   Pensacola for this?

16           **MR. PENNOCK:**  I think he actually did fly down for the

17   Plaintiffs' exam.  My understanding is that the reason it took

18   three days was the nature of the connecting flights to get down

19   there and get back, and that's what consumed the three days.

20           **THE COURT:**  Where does he live?  Does he live in Ohio

21   or West Virginia?

22           **MR. PENNOCK:**  My understanding is -- I'm sorry.

23           **THE COURT:**  It may be that I need to talk with Taylor

24   Bartlett or Lew Garrison.

25           **MR. BROCK:**  He's about a two-hour drive from Columbus,

1    Ohio.  He lives, as I appreciate it, just across the West

2    Virginia line in a small community in Ohio.

3           And I was not aware -- I have not been involved in all

4    the meet-and-confers, let me be clear about that, too.  But I

5    thought he had driven to New Orleans, that that was the big

6    issue.  If he flew to New Orleans, all the more reason that he

7    could come to Pensacola now.  He's also flown on a vacation in

8    August; we've got pictures of him with his family on an

9    airplane flying to South Florida for a vacation in early

10   August.

11          So there's no reason he can't come down to Pensacola

12   on an evening, be examined the next morning, and get back to

13   where he lives the next afternoon.  That should be workable.

14          **THE COURT:**  Okay.  Paul, absent some really compelling

15   reason, I would require him to drive -- he can drive to

16   Columbus, he can get on a plane, he can fly to Atlanta, and

17   then he can connect and fly to Pensacola, and it's not going to

18   take him three days.

19          So you need to communicate that to Taylor Bartlett or

20   Lew Garrison and see if y'all can't work this out.  But if it's

21   going to get teed up in a formal manner before me, I'm giving

22   you a preview.

23          **MR. PENNOCK:**  Understood, Judge.

24          **THE COURT:**  It will have to be something that I'm not

25   aware of for me to change my mind on that.

1          **MR. PENNOCK:**  Understood.  And this is the first --

2    and I was out of pocket, unavoidably, for a week or so, but

3    this is the first that I have heard the Pensacola suggestion.

4    And that may be really the solution to the problem.  Because,

5    as the Court has pointed out, you get to Atlanta, you get to

6    Pensacola.  New Orleans is considerably more difficult.  But I

7    will report back and we'll get this resolved in the manner that

8    the Court suggests.

9          **THE COURT:**  Okay, very good.  Thank you.

10         Is there anything with the Defense medical exams that

11   we need to discuss?

12         **MR. FIELDS:**  Your Honor, this is Barry Fields.  I just

13   wanted to raise one issue that we have raised with the

14   Plaintiffs, if I may?

15         **THE COURT:**  Yes.

16         **MR. FIELDS:**  One of the things that we learned once --

17   as you may recall, going back in time, the Plaintiffs and

18   Defendants began talking about medical examinations -- Defense

19   medical examinations on the audiology front well before

20   Plaintiffs served their expert reports.

21         Once they served their expert reports, we learned that

22   they had retained a vocational rehabilitation expert; I believe

23   it was Elizabeth Davis.  And Dr. Davis, as part of her work in

24   the case, had conducted interviews of at least four of the

25   plaintiffs.

1          After getting this information and looking at this

2     information, we reached out yesterday to the Plaintiffs and

3     requested that our vocational rehabilitation expert be allowed

4     to conduct a brief interview of those four plaintiffs.

5          And we said, you know, obviously, given the time

6     constraints and schedule for the plaintiffs, et cetera, and

7     COVID-19, it did not need to be in person; we could obviously

8     arrange for a videoconference with the expert, and we could,

9     you know, accommodate the plaintiffs' schedule, if it needed to

10    be in the evenings or whatever.

11         And we even said, you know, if there's a concern

12    about, you know, the plaintiffs not being on there by

13    themselves, we can set up a similar situation as we did with

14    respect to the DMEs, which is to have a nonlawyer on the

15    videoconference as a representative of the plaintiffs.

16         Thus far, the Plaintiffs have not been willing to

17    agree to the vocational rehabilitation interview.  And we're

18    hoping that they will agree because we want it to be as

19    convenient as possible for the plaintiffs.  But that may be

20    something that needs to be discussed further, but we just don't

21    have a lot of time, obviously, with it being due on the 9th of

22    November.

23         **THE COURT:**  So, Mr. Fields, my response to that is, if

24    the Plaintiffs are resisting -- in my experience, under Rule

25    35, that would be unusual for a voc rehab examination of a

1   plaintiff -- defense examination of a plaintiff.

2          So, my reaction is, you need to file a motion to

3   compel, and you need to get that filed pronto.

4          **MR. FIELDS:**  Okay.

5          **MR. AYLSTOCK:**  Judge, we just learned of this issue

6   ourselves, and Mr. Fields is correct that we do oppose it.  I

7   didn't know it was going to come up today because it just came

8   up yesterday, but they have had our expert reports for three

9   weeks.  And we negotiated this entire DME protocol, Mr. Pennock

10  did primarily.

11         But voc rehabs, in my experience -- and we've done a

12  lot of these -- there's not a DME for a voc rehab.  And that's

13  why you get seven hours in a deposition and you ask whatever

14  questions you need.  But we're happy to brief the issue and

15  bring it before the Court.

16         **THE COURT:**  Yeah, that's been my experience, this does

17  not fall within Rule 35, within the scope of that rule.

18         But I really haven't done the research, Barry.  So

19  again, I'm not going to preempt it here, but I do think it's

20  something that would have to be the subject of briefing.

21         **MR. FIELDS:**  Thank you, Your Honor.

22         **THE COURT:**  All right.  Item No. 8.  Depositions

23  scheduling, how is that going?

24         **MS. HUTSON:**  Hello, Your Honor, this is Shelley.

25  They're going well.  I gave you the chart at the last CMC that

1    showed the 24 experts and the proposed dates, and we have been

2    working daily to try to get things confirmed.

3            I'm very pleased to announce, of the 24, we have 17

4    confirmed.  And of the unconfirmed, the reason why they're not

5    is either because we're still going back and forth between

6    remote and/or in person or it's a date issue.  And we have been

7    daily fixing some of those issues.

8            I feel very comfortable that we're doing this at warp

9    speed as much as possible.  The experts are bending over

10   backwards, we are, and Defendants are as well.  That is not to

11   say that we may not reach a snag at some point in terms of

12   either scope or time of some of these depositions that we may

13   some Court intervention.  But for now, I can safely say that I

14   feel like it's going in the right direction at a very good

15   clip.

16           **THE COURT:**  All right.  Excellent.  Yeah, with only

17   seven that are not yet scheduled as firm, that's commendable.

18           **MS. BRANSCOME:**  And those are close, Your Honor.  They

19   are actually -- I think we'll narrow that down to only a

20   handful where we're still going back and forth.  In fact, I

21   think we just sent one more confirmation date.  So I agree with

22   Shelley, we're making great progress.

23           One thing we have been talking about is to put an

24   expert deposition protocol in place similar to what we have for

25   PTO 52 that governs the bellwether depositions; we thought it

1    would be helpful to lay it out.

2          The Federal Rules, obviously, give us a little bit

3    more guidance on expert deps, so we may decide we don't need a

4    formal protocol, but we are having discussions now.

5          One of the issues that we are discussing -- so nothing

6    is ripe for Your Honor -- is how to handle experts who give

7    opinions in multiple cases as well as experts who give a

8    general opinion across multiple cases but only one

9    case-specific opinion.

10         So we had a really productive meet-and-confer --

11   Shelley, was that yesterday or maybe the day before yesterday?

12   -- where we kind of walked through the key things that we would

13   need to deal with including, you know, the number of

14   questioners, because there obviously are individual plaintiff

15   counsels involved and different lawyers on our side have

16   handled different cases.

17         But we don't want to end up with a circus, so we're

18   really trying to anticipate everything we can think of and get

19   that nailed down.  It would apply to both Plaintiff and Defense

20   experts, so we're really sort of thinking through the

21   complications, and so far I think it's going very well.

22         **THE COURT:**  All right, excellent.  Well, if there is

23   an issue as to scope, better that Judge Jones or I hear about

24   that sooner rather than later.

25         **MS. HUTSON:**  I agree, Your Honor, we'll bring it to

```
 1    your attention -- because we have agreed to certain dates, and
 2    we're going to talk more specifically about -- we may have
 3    agreed to two days, whereas on our side we feel like it's not a
 4    two-day deposition; we just wanted to get dates on the
 5    calendar.  And if issues arise as to how long a deposition
 6    should take or anything else, we will definitely let the Court
 7    know sooner than later.
 8             But I do agree with Kimberly -- and by the way,
 9    Kimberly, that conversation was last night.
10             MS. BRANSCOME:  Oh!
11             MS. HUTSON:  So it's been busy, but we are getting
12    there and it's going well.
13             THE COURT:  Well, I'm with Kimberly on the time warp,
14    so I totally get it.
15             MS. HUTSON:  I do too, I do too.
16             THE COURT:  All right, that sounds good.  You'll let
17    us know if you hit a snag with the scope.  I have given you a
18    little wiggle room on the timing of scheduling, so hopefully
19    that won't be an issue.
20             No. 9, the last item on the agenda relates to the
21    supplemental record production for those plaintiffs who
22    continue to treat with the VA.
23             Is this you, Mark?
24             MR. NOMELLINI:  Yes, Your Honor, it is.  I have some
25    positive news to report.
```

1              So, with Judge Herndon's assistance, we worked out an

2      agreement with Plaintiffs for a proposal that we would make to

3      the DOJ on this.  And that joint proposal is that the parties

4      asked for the VA to provide for the remaining 23 bellwether

5      plaintiffs, first, an updated production of the VA records for

6      any records generated through October 31st; and second, a

7      second updated production of the VA records by January 15th,

8      2021.

9              And then, after the second update, the 23 bellwether

10     plaintiffs would be responsible for obtaining their own VA

11     records subject to an offer that the DOJ made on a call to

12     assist them should they encounter any issues.

13             So the Plaintiffs and Defendants agreed on that,

14     jointly proposed it to Gary Feldon.  We had a productive

15     discussion with Mr. Feldon on that.  He just got back to us

16     with some questions.  And we're optimistic that we can reach a

17     resolution on that, at which time we will present it to Your

18     Honor.

19             **THE COURT:**  All right.  Excellent.  That's good.

20             Anything from the Plaintiffs that you want to add to

21     what Mark said?

22             **MR. AYLSTOCK:**  No, Judge.  I think he reported it.

23     And we'll get back to Mr. Feldon on the questions and hopefully

24     get a resolution.

25             **THE COURT:**  Okay, very good.

1           Let me ask -- this is not on the agenda, but I do have

2      a question in regards to the choice of law oral arguments that

3      we have scheduled.

4           Do you all have a preference on the time of the

5      hearing, like, you know, time of day, morning or afternoon?

6      I'm pretty flexible, but I do need to probably get it firm on

7      my calendar.

8           **MR. FIELDS:**  Judge, what I can do is I can reach out

9      to Nicole Berg and Michael Sacchet over this weekend and maybe

10     get back to you early next week, if that's okay.

11          **THE COURT:**  That's fine, that's fine.

12          And then maybe, Bryan, you all talk to Mr. Sacchet as

13     well and -- oh, I guess, Nicole Berg, is that the same

14     committee you're --

15          **MR. FIELDS:**  Yes, that's the same.  I was going to

16     reach out to them and talk with them.

17          **THE COURT:**  Okay, yes.

18          **MR. AYLSTOCK:**  I think midday will probably work best,

19     to the extent they may want to try to get in and out the same

20     day, since the oral arguments are fairly limited in time.  But

21     I'll reach out to them and confirm and reach out to Barry, and

22     we can report back to the Court jointly.

23          **THE COURT:**  You know what, I'm not sure -- is that the

24     same day as our CMC, or no?

25          **MR. AYLSTOCK:**  If so, that would make sense just to do

1    it right after.

2            **THE COURT:**  Well, I'm just wondering is our CMC --

3            Hillary, is our CMC --

4        **MS. DANG:**  The CMC is on Friday, November 29th, and

5    then the choice of law is not for another almost two weeks on

6    Thursday, December 3rd.

7            **THE COURT:**  Oh, I'm thinking of your briefing -- never

8    mind.  I'm sorry.  I got that all confused.  So the hearing

9    would be on the 3rd, then.

10           I'm amenable to moving it up, but that would be a

11   crunch on your part.  Well, actually, your briefs aren't even

12   due until the 23rd, so that doesn't make sense.

13           So just let me know about December 3rd for the oral

14   arguments, whether you prefer morning or afternoon.  It's only

15   an hour time frame, so it's not a huge deal, but it would be

16   good so I can firm that up on my calendar.

17           **MR. AYLSTOCK:**  I think the morning will work best,

18   Your Honor, but we'll confirm and let you know.

19           **THE COURT:**  Okay.  Well, Barry, y'all discuss it and

20   then we'll -- I can accommodate whatever suits you all.

21           **MR. FIELDS:**  Okay.  Thank you, Your Honor.

22           **THE COURT:**  Anything else?

23           I don't think Judge Jones has joined us, but let me

24   ask if he has.

25           Judge Jones?

1    *[No response.]*

2    No, okay.

3    Judge Herndon, anything you'd like to add?

4    **JUDGE HERNDON:**  I do not.  Everything is covered.  I

5    appreciate it.

6    **THE COURT:**  Okay.  Bryan, Chris, or Shelley?

7    **MS. HUTSON:**  Not from us.

8    **MR. AYLSTOCK:**  No.  Thank you, Judge.

9    **MR. SEEGER:**  Not from me.

10   **THE COURT:**  Kim, Mike, Mark, Barry?

11   **MS. BRANSCOME:**  One, actually, just as a quick update,

12   Your Honor.  I realize we didn't put it on our agenda, but we

13   did have an initial meet-and-confer with the Plaintiffs about

14   the consolidation briefing issue.

15   We have not yet gotten really into substance, but we

16   did have some good preliminary discussions about setting a

17   briefing schedule.  So I would anticipate we might be in a

18   position to propose that briefing schedule to Your Honor maybe

19   early or mid next week.  We can adjust it depending on your

20   preference, but I wanted to let you know that was underway.

21   **THE COURT:**  Okay, good.  I'll look forward to seeing

22   what you propose.  Thank you for that update.

23   Anything else from anyone?

24   *[No response.]*

25   All right.  Well, wherever you are, I hope you're

1    enjoying today as beautiful as we are in Pensacola.  It's very,

2    very lovely here.  I hope you all have a nice weekend.

3                    *(Proceedings concluded at 3:46 p.m.)*

4            ---------------------------------------------

5    *I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any*

6    *redaction of personal data identifiers pursuant to the Judicial
     Conference Policy on Privacy are noted within the transcript.*

7

8    *s/Donna L. Boland*                          *11-4-2020*
     *Donna L. Boland, RPR, FCRR*                 *Date*
     *Official Court Reporter*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25