**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG        )        Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,       )
                                     )        Gainesville, Florida
                                     )        November 17, 2020
                                     )        2:01 p.m. EST
                                     )
                                     )
_____)


**TELECONFERENCE**
(Re: Lloyd Eugene Baker 7:20cv39)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-42)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*1 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

**A P P E A R A N C E S**

FOR THE PLAINTIFFS:        Tracey & Fox Law Firm
by:  **SHAWN P. FOX**
     *sfox@traceylawfirm.com*
440 Louisiana Street, Suite 1901
Houston, Texas  77002

Clark Love & Hutson, GP
by:  **EMILY B. MARLOWE**
     *emarlowe@triallawfirm.com*
440 Louisiana Street, Suite 1700
Houston, Texas  77002

FOR THE DEFENDANTS:       Dechert, LLP
By:  **JAY L. BHIMANI**
     *jay.bhimani@dechert.com*
633 W 5th Street, Suite 4900
Los Angeles, California  90071

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | **THE COURT:**  Good afternoon, everyone.  This |
| 3 | is Judge Jones.  Let me find out who is going to be |
| 4 | addressing the motion. |
| 5 | So it is Defendants' motion.  Who is going to |
| 6 | be speaking on behalf of the Defendants? |
| 7 | **MR. BHIMANI:**  Good afternoon, Your Honor. |
| 8 | It's Jay Bhimani from Dechert.  I will be speaking. |
| 9 | My colleague, Ally Ozurovich, is also on, but I will |
| 10 | be arguing the motion. |
| 11 | **THE COURT:**  Okay.  And Donna Boland, you're |
| 12 | online; is that right? |
| 13 | **COURT REPORTER:**  Yes, Judge, I'm on. |
| 14 | **THE COURT:**  Okay.  Who is going to be |
| 15 | speaking on behalf of the Plaintiff? |
| 16 | **MR. FOX:**  Good afternoon, Your Honor.  It's |
| 17 | Shawn Fox on behalf of Baker.  And also on the phone |
| 18 | is Emily Marlowe with the Clark, Love, Hutson law |
| 19 | firm.  This has been a joint project with me and |
| 20 | Emily, and so we will both be speaking, but primarily |
| 21 | Emily will be handling the oral argument today. |
| 22 | **THE COURT:**  Okay.  Good afternoon to you as |
| 23 | well. |
| 24 | **MS. MARLOWE:**  Good afternoon. |
| 25 | **THE COURT:**  This is Defendants' renewed |

1    motion for leave to take the deposition of Cheryl

2    Parker, and this is in the individual case of

3    7:20cv39.

4          And just a little bit of background.  As

5    y'all know, the Defendant filed a motion to take

6    Cheryl Parker's deposition, and I denied that as

7    premature.

8          And I'll be candid with you, the reason I

9    denied it as premature, I was operating under the

10   assumption that the deposition of Lt. Hannah was not

11   set in stone and that the Defendants might not be able

12   -- not a matter of whether it wants to take his

13   deposition, but might not be able to take the

14   deposition.

15         At some of the past leadership calls or case

16   management conferences, I forget which one, it was

17   disclosed that Lt. Hannah is in Europe, and there was

18   some resistance from the Government.

19         And it seemed to me, since it was

20   questionable whether Lt. Hannah's deposition would

21   really ever be taken, there was no need for the Court

22   to rule on it because Cheryl Parker would have been

23   the sixth deposition.

24         Defendants have now filed a renewed motion

25   and put a little more flesh on the bones as to whether

1   it is or is not premature and represents to the Court

2   that, other than getting a date for Lt. Hannah's

3   deposition, this is something that has been set in

4   stone fairly concrete, the Government is going to

5   produce him, it's going to be a remote deposition, and

6   it will happen; the only contingency really would be

7   the date that the deposition is scheduled, and

8   therefore it is not premature.

9        But having said all of that, whether it is

10  premature or whether they're going to take six or

11  seven, the question really is whether the Defendants

12  here should be granted leave to take seven, not six,

13  depositions.

14       And one other comment by way of background

15  before I hear from the Defendants and then hear from

16  Plaintiff.  Ms. Parker's deposition was the subject of

17  a motion to quash.  So the Government resisted under

18  *Touhy* and took the position that she's not of really

19  any consequence in this case because she conducted an

20  exam back in 2009 and the records would be fine, there

21  would be no need to take her deposition, and therefore

22  the Defendants had not satisfied *Touhy.*

23       I disagreed; I denied the motion to quash.

24  And although her examination was more remote in time,

25  I found that certainly it met the *Touhy* standard and

1    the Government was arbitrary and capricious for trying

2    to block the Defendant from taking her deposition.

3            So, at that point, I was convinced somewhat

4    that she's a relevant, important witness of some sort.

5    Which leads us to -- and both sides sort of ignore

6    this a little bit -- Lt. Hannah.

7            So, first I'd like to hear from you, Mr.

8    Bhimani.  What is Lt. Hannah's role as a conservation

9    officer -- why is this substantial?

10           Just because you get permission to take a,

11   quote, "seventh" deposition, you've got to convince

12   the Court that the depositions that you have taken

13   and/or have scheduled to take were necessary and

14   relevant.

15           So, let me hear from you.  And I'm interested

16   in hearing the alleged importance of Lt. Hannah.

17           **MR. BHIMANI:**  Yes, Your Honor, I'm happy to

18   address that.

19           So, Lt. Hannah was the hearing conservation

20   program manager at Fort Benning at the time that Mr.

21   Baker was a trainee at Fort Benning and at the time

22   that Mr. Baker was issued his first pair of Combat

23   Arms Earplugs.

24           And so, in that role, you know, according to

25   the military's -- the DoD instructions and the Army

1    regulations, Lt. Hannah really would have been in

2    charge of overseeing the hearing conservation program

3    at Fort Benning and would really be the only person

4    that would know kind of, in addition to what the

5    regulations were, more importantly for Mr. Baker's

6    case, how they were implemented at Fort Benning at the

7    time.

8          So, with respect to how the Combat Arms

9    Earplugs were distributed, whether fittings were

10   conducted of the earplugs, which is something that's

11   required under the regulations, but, you know, we've

12   heard from other hearing conservation program managers

13   in other cases that it didn't always happen as it was

14   required to under the regulations.  And also, what, if

15   any, instructions or training were provided in

16   connection with the Combat Arms Earplugs to Mr. Baker

17   or what the practice was with respect to that at the

18   time Mr. Baker was at Fort Benning.

19         And really, it does fill -- in addition to

20   being relevant in its own right, it does fill a gap

21   from Mr. Baker's deposition, because Mr. Baker

22   actually did not have a lot of detail about these

23   matters at the time that he was first issued his

24   initial pair of Combat Arms Earplugs.

25         And so, that -- you know, the matters that

1    Lt. Hannah will testify about are really not something
2    that another witness has addressed, or frankly, I
3    can't think of another witness other than a hearing
4    conservation program manager would be able to address,
5    which is why we have been very diligent about seeking
6    the right hearing conservation program manager in Mr.
7    Baker's case.

8          And I'm happy to walk through some of that
9    timeline in talking about the ripeness arguments but,
10   you know, I do want to convey to Your Honor that those
11   are really the matters of central relevance, and it is
12   something that is unique among the people who have
13   been deposed in the case as a matter of kind of a
14   lineup for the depositions that we've taken.

15        **THE COURT:**  So, let me ask you this question,
16   because I was unaware that any hearing conservation
17   managers depositions had been taken.

18        So, in other cases, you all have taken other
19   hearing conservation managers depos?

20        **MR. BHIMANI:**  Yes, Your Honor.  So, I can
21   speak to the one that I personally have taken.   I
22   don't have perfect knowledge across all of the cases,
23   but in the *Hacker* case, Your Honor, I personally took
24   the deposition of the hearing conservation program
25   manager for Fort Campbell, which was Melissa Leccese's

1   deposition, and she did have extensive knowledge about

2   the ways in which the hearing conservation program was

3   actually implemented on the ground at Fort Campbell.

4         And, you know, I don't want to characterize

5   her testimony too much, but, you know, in Defendants'

6   view at least, there were some differences between how

7   the regulations are supposed to work and, you know,

8   the fittings and the training and the instruction that

9   was both actually provided to servicemembers and the

10  information that was provided to the hearing

11  conservation program manager's team that was actually

12  doing the fittings relating to the Combat Arms

13  Earplugs and information that, you know, Defendants

14  contend was within the scope of knowledge that the

15  military had that didn't, in some instances, find its

16  way to the people that were actually doing the

17  fittings.  And so that has played actually a prominent

18  role in the expert reports that have been issued on

19  both sides, right?

20        So, the Plaintiffs have issued a number of

21  expert reports that talk about the Army's hearing

22  conservation program and safety culture; and the

23  Defendants, in the reports that they have issued, are

24  also addressing the ways in which the hearing

25  conservation program was supposed to work and what we

1    know about the way that it worked, at least in

2    Mr. Hacker's case from Dr. Leccese.

3          **MS. MARLOWE:**   Your Honor, may I respond to

4    that point briefly?

5          **THE COURT:**   So they would -- these hearing

6    conservation managers actually -- it's not their only

7    job, but they would have, by necessity, had some

8    involvement with servicemembers in the use or

9    instruction on ear protection devices?

10         **MR. BHIMANI:**   Absolutely, Your Honor.   So, by

11    regulation --

12         **MS. MARLOWE:**   Your Honor --

13         **MR. BHIMANI:**   By regulation, they would, Your

14    Honor.   The regulations required medically trained

15    personnel to conduct fittings of hearing protection

16    devices that were issued to servicemembers, and

17    hearing conservation program managers had an oversight

18    in the management role with respect to that.

19          And there is more detailed regulations as

20    well about, you know, annual evaluations being

21    conducted after initial fittings, but it really was

22    the hearing conservation program manager and the team

23    under the hearing conservation program manager that

24    oversaw, among other things, the selection of hearing

25    protection devices for servicemembers and the issuance

1    of those devices, working with servicemembers during

2    initial fittings to make sure that the earplug fit

3    properly, dissemination of training materials and

4    instruction materials, and regular kind of annual

5    conferences that were provided with information about

6    various hearing protection devices, the pros and cons

7    of various hearing protection devices, including the

8    Combat Arms Earplugs.

9         And we saw that in Dr. Leccese's deposition.

10   And actually, Dr. Leccese also produced, you know,

11   some PowerPoint documents that reflected training that

12   she would have given at Fort Campbell.

13        And so, sort of by regulation, they have a

14   defined role and a function with respect to those

15   things which are of core relevance, I would submit, in

16   all of these cases.

17        **THE COURT:**  Now, tell me about Cheryl Parker

18   and also talk to me about the timeline in which, as

19   you're putting together your discovery plan, you

20   sought to depose Parker, you know, through a *Touhy*

21   request, and when the process began of attempting to

22   identify the hearing conservation manager that

23   eventually led to the disclosure that Lt. Hannah was

24   the guy, it wasn't someone else, walk me through that

25   and tell me about Cheryl Parker.

1      **MR. BHIMANI:**  Absolutely, Your Honor.  And I

2  do want to say at the outset, having reviewed the

3  opposition papers that were filed this morning, I want

4  to make very clear that, you know, to the extent there

5  is a suggestion that -- you know, putting aside

6  gamesmanship, to the extent there's a suggestion that

7  there's some sort of prioritization that had been

8  provided for Ms. Parker over a hearing conservation

9  program manager, it really is not supported by the

10 timeline.

11      So, here is the timeline as that occurred.

12 So, in late July and in early September -- July 28th

13 and September 11th are the two relevant dates -- the

14 Defendants issued a *Touhy* letter seeking Ms. Parker's

15 deposition, and the Government moved to quash on

16 September 11th.

17      That motion was pending when, on August 21st,

18 the Department of Defense issued its ninth disclosure

19 letter.  And in the opposition papers filed today, the

20 Plaintiffs states that the ninth disclosure letter

21 from the Department of Defense said, quote, "Wherein

22 various hearing conservation program managers were

23 identified including LTC Hannah."

24      So, that's actually a very misleading

25 statement, Your Honor, and here is why:  The ninth

1    disclosure letter that was provided on August 21st,

2    2020, disclosed a different individual, a Dr. Norvis

3    Haygood, as the hearing conservation program manager

4    at Fort Benning during the time period that was

5    relevant to Mr. Baker.  So Dr. Haygood was disclosed

6    as being at Fort Benning from 2003 to 2006.

7          It is correct -- literally correct that Kevin

8    Hannah appeared on the table, but he appeared as being

9    the hearing conservation program manager from 2007 to

10   2009, which is not the relevant time period for Mr.

11   Baker's case.

12         And so, Defendants, relying on the

13   Government's disclosure, scheduled Dr. Haygood's

14   deposition.  It was set for late September --

15   September 29th.

16         The evening before the deposition, the

17   Government informed the parties that the disclosure

18   letter actually was inaccurate and that Dr. Haygood

19   was not the correct individual who was present at Fort

20   Benning as the hearing conservation program manager

21   during the time period relevant for Mr. Baker.

22         At the time, the Government actually wasn't

23   aware of the correct -- the identity of the correct

24   witness, and so we hadn't learned yet that it was Lt.

25   Hannah.  And so, we asked the Government to

1    immediately provide the identity of the correct

2    witness.  Our hope, at that time, was that the

3    deposition could occur before the fact discovery

4    cutoff.

5            And so, just to pause there for a moment.

6    You know, but for the Government's error in its ninth

7    disclosure letter, the hearing conservation program

8    manager, which we had understood to be Dr. Haygood,

9    would have been deposed on September 29th.  That

10   deposition would have taken place before the fact

11   discovery cutoff, and we would be in a position now

12   where we would have deposed six witnesses instead of

13   the five with two outstanding.

14           And all of this is happening at a time which

15   is before the Government's motion to quash our

16   subpoena to Ms. Parker had not been -- was still

17   pending, because that motion wasn't denied by Your

18   Honor until October 14th.

19           And so, you know, we learned of Lt. Col.

20   Hannah's identity for the first time on October 6th.

21   We received his address on October 22nd following

22   motion practice.  And, you know, since that time, we

23   really had a number of conversations with DOJ counsel

24   about getting his deposition scheduled.

25           As we explained in our papers, it's a unique

1    situation given his location in Germany.  So we have

2    been trying to be efficient about that rather than

3    getting bogged down in the details of international

4    service and the like.

5         And where things stand is, as of November

6    6th, 2020, I personally had a conversation with DOJ

7    counsel, and the Government is amenable to producing

8    Lt. Col. Hannah.  They're working on getting dates for

9    him, and it's being formally approved by DoD subject

10   to mutual availability for the parties and for the

11   witness.  But, you know, what the Government has said

12   is that it is in the works and we are awaiting dates.

13        And so, you know, I am as confident as I can

14   be, without having dates in hand, that the deposition

15   will occur.  Our hope is that it can occur as soon as

16   possible.  And we have followed up a number of times,

17   but we're waiting to hear back from the Government on

18   specific dates.

19        But that is really the timeline on how all of

20   this unfolded.  And so, of course, if we had our

21   druthers and it wasn't Government witnesses and it was

22   people subject to our subpoena power, it would have

23   unfolded such that we would have deposed these people

24   much earlier within the fact discovery period, and I

25   think we would have deposed Dr. Haygood before

1    Ms. Parker.

2            **THE COURT:**  Okay.  Now, tell me about

3    Ms. Parker.  I'm aware she, awhile ago, conducted an

4    audiology test, so I can see it has something to do

5    with the merits.  But you suggest that her testimony

6    is also important because it could have some relevance

7    to choice of law and statute of limitations.  Explain

8    that to me.

9            **MR. BHIMANI:**  Yes, Your Honor.  So, the thing

10   about Ms. Parker is, in addition to conducting

11   audiometric testing on Mr. Baker, which is similar to

12   the Toyama issue that was addressed in the *Keefer*

13   case, Ms. Parker actually documents Mr. Baker's

14   military and recreational noise exposures and the date

15   on which he reported those injuries.

16           And so, you know, there's information that,

17   you know, I believe Ms. Parker will have about when

18   those noise exposures occurred or Mr. Baker reported

19   them in the context of a diagnostic setting occurring,

20   which, depending on where they occurred and when they

21   occurred, may be relevant to the choice of law and the

22   statute of limitations issues in the case.

23           **THE COURT:**  Okay.  So, if the injuries

24   occurred not at Fort Benning but occurred some other

25   place or overseas possibly, in your view, that could

1   be facts that would support an argument one way or the

2   other on choice of law?

3        **MR. BHIMANI:**  Yes, it could be relevant to

4   the analysis.  Without knowing, you know, of course,

5   what the testimony will be, you know, place of injury,

6   if it's under South Carolina law as an example, is

7   something that factors into the choice of law

8   analysis.  And so, yes, Your Honor has it correct.

9        **THE COURT:**  Okay.  And then, lastly, before I

10  hear from the Plaintiff, so, even though Ms. Baker's

11  *[sic]* evaluation -- I think it's from 2009.  Even

12  though that's a long time ago, there is also -- I

13  don't want to say added relevance -- relevance because

14  her testing would have been fairly close in time to

15  when Mr. Baker allegedly incurred or was exposed to

16  loud gunfire and explosions and those kinds of things;

17  is that correct?

18       **MR. BHIMANI:**  Yes, Your Honor.  So, one of

19  the -- it is October of 2009.  The first thing is it

20  was conducted in connection with a disability benefits

21  application, which I think has some independent

22  relevance.

23       But putting that aside, there is an issue in

24  Mr. Baker's case about the threshold shift that Mr.

25  Baker experienced between 2005 and 2009.  And so,

1    October of 2009 is actually a very relevant time

2    period for Mr. Baker's allegations, particularly as

3    they relate to his left ear hearing loss and the

4    audiometric testing history relating to that ear.  So

5    it's a relevant time period and it is a relevant

6    context, we think.

7          She would also be really the only medical

8    provider that will be deposed in Mr. Baker's case,

9    which I think underscores the fact that she is really

10   adding something unique to the lineup that we have

11   constructed as part of the discovery plan.

12         **THE COURT:**  And then the other people you

13   took, you took his -- in terms of depositions, you

14   took his wife, a friend, a former coworker Dimoff, an

15   employment supervisor, and then -- what is Triple

16   Canopy?

17         **MR. BHIMANI:**  Yeah, so Triple Canopy is a

18   former employer, and also, Mr. Baker was attempting to

19   get another position with Triple Canopy.

20         It has been -- since his deposition, it has

21   turned out that he ultimately did not get that

22   position.  But they're a former employer, at the time

23   potentially a current employer.

24         But also, Triple Canopy, it's a defense

25   contractor, so Mr. Baker would be working -- has

worked and was intending to work again as a private
security contractor for government facilities abroad
in the Middle East.

But in connection with its role as an
employment entity, Triple Canopy also required Mr.
Baker to pass a physical and conducted some medical
evaluation in connection with his application for a
renewed position there and also in connection with his
prior position there.

And so, there was some additional information
including, you know, with respect to his hearing and
testing of his hearing that Triple Canopy -- it was
uniquely in the possession of Triple Canopy.  And
those facts have also turned out to be very relevant,
including in the parties' expert reports.

**THE COURT:**  Okay.  Now, let me give the
Plaintiff an opportunity, so let me turn to Mr. Fox
and Ms. Marlowe and hear from you, and then, Mr.
Bhimani, I'll come back to you for rebuttal, if
necessary.

**MR. FOX:**  Emily, you want to --

**MS. MARLOWE:**  Hi, Your Honor --

**MR. FOX:**  Sorry, go ahead.

**MS. MARLOWE:**  That's okay, I'll go ahead.

Hi, Your Honor.

1     **THE COURT:**  Hi.

2     **MS. MARLOWE:**  Emily Marlowe here.  So I

3  wanted to first address the point that was raised in

4  the question that you asked Mr. Bhimani regarding the

5  relevance as to hearing program managers generally.

6     He mentioned that he took personally the

7  deposition of Melissa Leccese in the *Hacker* matter and

8  that she was the hearing conservation program manager.

9  And I think it's important to note the differentiation

10  between that case and this case.

11     In that case, Ms. Leccese was one of the

12  actual treaters who examined Mr. Hacker, the plaintiff

13  at issue.  She was on record -- on Mr. Hacker's

14  records by name.  So it wasn't as attenuated as Lt.

15  Col. Hannah would be where at this point we don't know

16  if Lt. Col. Hannah has any relevant knowledge related

17  to Plaintiff Baker.

18     Originally Defendants sought the deposition

19  of Dan Ohama who was another hearing program

20  conservation manager related to the *Baker* case.  And

21  in response to Defendants' subpoena, in that

22  deposition, Lt. Col. Ohama responded that he didn't

23  know Plaintiff Baker, he had never met Plaintiff

24  Baker, and he had no knowledge, documents, or

25  information relevant to Plaintiff Baker.

1           So, you know, we anticipate that Lt. Col.

2     Hannah would issue a similar type of response

3     considering that he is not on any of the records --

4     Plaintiff Baker's records, medical records or

5     otherwise.

6           But I just wanted to note that

7     differentiation for the Court because I think in the

8     *Hacker* case Ms. Leccese was potentially relevant

9     because she was on record, and that's just not the

10    case with Lt. Col. Hannah here.

11          A couple of other points that I wanted to

12    address -- and please feel free to interrupt me if you

13    have any questions --

14          **THE COURT:**  Okay.

15          **MS. MARLOWE:**  -- is that Plaintiffs have

16    never disputed the deposition of Cheryl Parker.  From

17    the outset, we have always agreed that she is relevant

18    because she is on record and that she would have

19    discoverable information.  We have never disputed it.

20          In fact, when Defendants originally requested

21    the deposition in July of this year, we didn't dispute

22    it.  They then served a notice of intent to take a

23    deposition and did in fact take a certificate of

24    nonappearance deposition on September 14th of Cheryl

25    Parker, and at that time we didn't dispute it.

1            We had an opportunity to join the Government

2    in a motion to quash, if we wanted to, as to Ms.

3    Parker, and we did not do that, because we have always

4    agreed that Ms. Parker was fair game and a potentially

5    relevant witness, which is very different from the

6    Plaintiffs' position as to Lt. Col. Hannah.

7            From the outset, we have made it known to

8    Defendants that we believed Lt. Col. Hannah does not

9    have discoverable information and is not relevant to

10   Plaintiff Baker, separate and aside from all of the

11   issues related to scheduling.

12           So, Defendants have continued to push forward

13   and, you know, through motions practice and take

14   extensive efforts to kind of perpetuate the deposition

15   of Ms. Parker, which is why we believe that she would

16   constitute the sixth deposition case-specific.

17           Her deposition is scheduled to go forward on

18   Thursday of this week and so -- there hasn't been any

19   other deposition in the interim, so she will be the

20   technical sixth deposition to proceed in the case.

21           And so I guess where we're having a little

22   bit of confusion is that Defendants haven't sought

23   leave to take a deposition of Lt. Col. Hannah.  At

24   this point, which I understand the scheduling issues,

25   but we have yet to see a notice of intent to serve

1    subpoena.  And once we see that, then we will be in a

2    position to potentially file a motion to quash or

3    motion for protection, but that just hasn't happened

4    yet due to various things outside of either of the

5    parties' hands.

6         But, as to Ms. Parker, you know, we've always

7    been of the position that we're okay with moving

8    forward on her deposition and otherwise.  And I think

9    that the timeline shows that Defendants have intended

10   all along to use her as a case-specific deposition.

11   It only recently kind of occurred, I suppose, that

12   they wanted to have an excess of numbers and then they

13   started pushing forward for her seeking leave rather

14   than doing so for Lt. Col. Hannah.

15        **THE COURT:**  Well, I mean, you make a good

16   point.  And that is why I asked Mr. Bhimani to address

17   the issue of Lt. Hannah, because it seems to me that's

18   -- I don't know if that was going to be the sixth

19   deposition or seventh deposition, but I'm assuming

20   that Ms. Parker's deposition will occur before Lt.

21   Hannah's deposition.  And then the argument will be

22   should they be permitted -- they, the Defendants, be

23   permitted to take Lt. Hannah's deposition.

24        Now, the Defendants say that Lt. Hannah, who

25   has now been correctly identified as the hearing

conservation program manager at Fort Benning during

the relevant period of time when your client was

there, would have information regarding distribution,

fitting, and training practices during the time that

your client was issued the CAEv2 earplugs.

And, you know, his name may or may not appear

on your client's documentation, but they say two

things.  They say, one, the hearing conservation

manager would know about those things, what are the

practices, what was actually done as a matter of

course during that relevant period of time by the

military, were regulations followed or not followed;

and they say that, assuming they're permitted to take

that deposition, that is extra-important because they

currently do not have any deposition information as to

what was, if any, the practices utilized by the

military for handing these things out, doing fittings,

and training, which we can all agree are important

issues in the case, particularly I guess for the

Defendants, maybe not as much for the Plaintiffs.

But what is your response to that?

**MS. MARLOWE:**  Yes, Your Honor.  I think the

main argument would be that everything that Defendants

mentioned regarding how they were distributed at the

base, whether they were fit -- special plaintiff

1    fittings were done, that should have been done back

2    months ago as part of the general process.  That's

3    general information.  Defendants had the opportunity

4    to depose Plaintiff Baker on all of these things, and

5    they asked him, and he gave his recollection of events

6    as to what happened, as to what he experienced, you

7    know.

8           And some speculation whether it was done one

9    way or another, you know, is really only speculatory

10   that Lt. Col. Hannah would even have that information.

11          **THE COURT:**  Has -- I know you are just

12   representing this particular plaintiff, but are you

13   aware in any of the other cases, other than the one

14   you just mentioned in *Hacker*, have these conservation

15   program managers been deposed or have they sought to

16   depose or are there depositions even scheduled of

17   other conservation program managers?

18          **MS. MARLOWE:**  Yes, Your Honor.  So,

19   currently, actually, as we started this hearing, the

20   hearing program conservation manager, Dan Ohama, who

21   was previously noticed in the *Baker* case that the

22   Defendants later withdrew, just started being deposed

23   in a few of the other plaintiffs cases.  So he's the

24   only one that's currently scheduled.

25          Defendants have sought to depose various

```
1    other hearing program conservation managers, but
2    nothing has been conclusively scheduled at this time.
3              THE COURT:   To your knowledge, other than in
4    the Hacker case, was this other hearing officer -- is
5    his deposition completed or it's in the process of
6    being completed?
7              MS. MARLOWE:   It's ongoing right now, Your
8    Honor.  It started at 1:00 p.m. Central, so about 30
9    minutes ago today.  So it's in the very early intro
10   stages of being ongoing as we speak.
11             THE COURT:   So this is real time, okay.
12             MS. MARLOWE:   Yes, Your Honor.
13             THE COURT:   Well, that's very interesting.
14             So, in terms of whether these conservation
15   program managers turn out to be important witnesses or
16   not, the jury is out on that at this point, since this
17   other individual is being deposed right now; is that
18   right?  What case is that, do you know?
19             MS. MARLOWE:   Your Honor, Mr. Ohama, who is
20   the witness currently being deposed, was noticed in
21   the Adkins case as well as the Blum case, and I
22   believe there is one more as well, so a couple of
23   cases primarily in Group B.
24             THE COURT:   Okay.
25             MS. MARLOWE:   But he was originally noticed
```

1    in this *Baker* case as well, but Defendants decided to

2    not move forward on him in that case.

3         **THE COURT:**  Okay.  Let me stop you, and I

4    want to go back to Mr. Bhimani on this.

5         I guess you were aware, or if not, you just

6    became aware that one of these conservation program

7    managers is being deposed right now?

8         **MR. BHIMANI:**  Yes, Your Honor.  So, I

9    actually knew that Mr. Ohama was going to be deposed.

10   I actually did not realize it was happening today, but

11   I was aware that the deposition was in the process of

12   being scheduled and taken.

13        **THE COURT:**  Let me just sort of cut to the

14   quick here.  It seems to me that what I'm really

15   focusing on as the seventh deposition is Lt. Hannah's.

16        And you make a pretty good argument, Mr.

17   Bhimani, that the conservation manager, although his

18   name won't appear on the plaintiff's paperwork, this

19   is the person who would have relevant knowledge about

20   how these things were distributed to the

21   servicemembers, fitted, if at all, trained, if at all.

22        And that could be relevant information, but

23   we really don't have that nailed down because this

24   other conservation officer is being deposed right now.

25        And it seems to me, after this deposition is

1      completed, if the parties came back to me and the

2      Plaintiff, for example, said, well, they took the

3      conservation manager in the *Atkins* and these other

4      cases, and the sum total of the testimony is he or she

5      has no clue how these things were handed out, how they

6      were fitted, if at all, and the hearing conservation

7      program managers had very little, if anything, to do

8      with training practices, you know, I'd be reluctant to

9      just say, well, go ahead and you take Lt. Hannah,

10     maybe he'll say something different.

11            On the other hand, if this conservation

12     manager who is presently being deposed says, yes, this

13     is how it operated, that was under my charge, these

14     are the protocols we followed, although I can't tell

15     you I remember the particular plaintiff, I wouldn't

16     expect, but this is how it happens, here is how we

17     scheduled it, here is how the training sessions

18     happened, here is how the fittings happened, here was

19     the literature given them, here were the instructions

20     that were handed out, you know, I would agree that Lt.

21     Hannah's deposition would be very relevant, and it

22     might not be fair to your client to simply say you

23     can't take his deposition because it's the seventh and

24     you are limited to the six.

25            So, at this point, although I said at the

1   beginning of the hearing I don't think this is

2   premature, it's premature because I really do not have

3   a sense of whether Lt. Hannah and these conservation

4   managers really have much information that's going to

5   add to the calculus of the issues that are going to be

6   tried in this case, you know, and makes me

7   reluctant --

8         **MR. BHIMANI:**  Your Honor --

9         **THE COURT:**  Yes?

10         **MR. BHIMANI:**  If I could just address that

11   very briefly, Your Honor?

12         **THE COURT:**  Yeah.

13         **MR. BHIMANI:**  I actually don't think that we

14   have to wait for Mr. Ohama's deposition because of

15   Ms. Leccese's deposition.  And so, let me just provide

16   some context with respect to Ms. Leccese's deposition.

17         It is correct that she did conduct some of

18   the audiograms on Mr. Hacker, and frankly, she didn't

19   remember Mr. Hacker at all and didn't remember her

20   records at all.

21         I would say the vast majority -- I don't want

22   to put a percentage on it, but, you know, easily over

23   90 percent, probably over 95 percent of the

24   questioning of Ms. Leccese was about these very things

25   that we're talking about now -- practices and

1    procedures at Fort Campbell under her supervision.

2         And Ms. Leccese is actually a deposition that

3    was split as an overlapping witness between the

4    Plaintiffs and the Defendants.  And on both sides, the

5    vast majority of the questions -- Plaintiffs actually

6    questioned her first, as is their right to do under

7    the pretrial order under that circumstance, and asked

8    very detailed questions about the practices and the

9    procedures at Fort Campbell, how they worked, how she

10   oversaw them, how they were implemented under the

11   regulations.  And she addressed that in a lot of

12   detail in ways that were interesting to Defendants and

13   feature in the Defendants' expert reports because they

14   are not consistent with the regulations.

15        And actually, the Plaintiffs actually wanted

16   to split -- when Dr. Haygood's deposition had been

17   noticed, Plaintiffs in this case, in the *Baker* case,

18   also wanted to split the Haygood deposition as an

19   overlapping witness.  And so, I do think there was

20   some concession there that the hearing conservation

21   program manager has relevant information.

22        And actually, just to address something Your

23   Honor said, I will say again, the regulations that are

24   in place require the hearing conservation managers to

25   do certain things, including, quote -- I'm reading

from the regulation -- "ensuring that medically
trained personnel fit individuals with preformed
earplugs and then annually to ensure proper earplug
condition and fit."  And there is other requirements
about maintaining an education program and providing
instructions.

And so, to the extent, Your Honor, the
testimony was that the hearing conservation program
manager at Fort Benning at the relevant time period
didn't remember any information about fitting or any
information about training, that, I think, would be
even more relevant than anything else somebody in that
position could say, from the Defendants' perspective,
given what the regulations actually require of Lt.
Hannah.

I suspect that won't be his testimony.  But,
you know, if that were his testimony that he's never
heard of this, I do think that would have a lot of
independent relevance in and of itself.

**THE COURT:**  Ms. Leccese, her title was
hearing conservation program manager?

**MR. BHIMANI:**  Correct, she was the hearing
conservation program manager for a different duty
station, for Fort Campbell, at a time period that was
relevant to the plaintiff in the *Hacker* case.

1          **THE COURT:**  And individuals in those
2    positions may have also done or conducted audiology
3    tests; is that correct?
4          **MR. BHIMANI:**  That's right.  So, they don't
5    always do them, but they are among the team that would
6    do them.  And so, in the *Hacker* case, as it happened,
7    she was the audiologist who conducted the audiometric
8    evaluation of Mr. Hacker.  She also has a staff of
9    people, and so it just depends on who the
10   servicemember would see.
11         But, under the regulation, as the hearing
12   conservation program manager, she was, quote,
13   "responsible for managing and coordinating all aspects
14   of the hearing conservation program."  And so, they're
15   really in a management level position.
16         And again, sometimes as a -- I don't want to
17   call it happenstance but, you know, these teams
18   weren't that big, and so sometimes servicemembers
19   actually did see the program manager him or herself
20   rather than a technician or something like that.
21         **THE COURT:**  And what do you have left to do
22   to nail down the deposition of Lt. Hannah?
23         **MR. BHIMANI:**  We are just waiting to hear
24   back from the Government on dates, and that's really
25   it.  And, you know, there's been discussion with the

1   Government about a broader agreement for how hearing

2   conservation program manager depositions will be

3   handled across cases, because the Government, you

4   know, reasonably, I think, wants to have some

5   understanding of the time limitations that should

6   apply, how many hearing conservation program managers

7   will be deposed in a case.  And so those discussions

8   are ongoing.

9         The agreement with the Government is that the

10  Hannah deposition will actually be kind of treated as

11  a one-off, because we conveyed to the Government that

12  we didn't want to have to wait for there to be a more

13  global agreement given the progress of the *Baker* case

14  and where we are.  And so, the Government has

15  indicated that they are amenable to not waiting on a

16  global agreement and to treating Hannah as a one-off.

17        So, you know, we're waiting for formal

18  approval subject to mutual availability, is what I

19  have been told, and we're waiting for dates from the

20  Government.

21        **THE COURT:**  So the Government is not going to

22  -- or who knows what they might do.  But you don't

23  anticipate that they're going to do a 360 and say, no,

24  he's in Europe, you can't depose him, and raise some

25  belated *Touhy* argument?  You're not anticipating that?

1    **MR. BHIMANI:**  I am not at all anticipating

2    that.  I have had a number of conversations with DOJ

3    counsel.  And actually, before, Your Honor, I sent my

4    email to Your Honor laying out the issues preceding

5    our renewed motion, I actually checked in again --

6    this was last week -- and informed the Government that

7    I would be telling the Court that we were very

8    confident that the deposition was near certain to

9    proceed and, if there were any issues with that, for

10   them to please reach out.  And there's really been no

11   objection.

12        And Your Honor, I will say, I will never be

13   100 percent confident until the deposition proceeds

14   and is completed and we have a transcript in hand.

15        **THE COURT:**  Right.

16        **MR. BHIMANI:**  But I am as confident as I can

17   reasonably be, based on my conversations with the

18   Government, that this deposition will proceed and

19   we're just waiting on dates.

20        **THE COURT:**  Okay.  Ms. Marlowe, let me go

21   back to you and see if there is anything else you'd

22   like to respond to or bring to the attention of the

23   Court.

24        **MS. MARLOWE:**  Yes, Your Honor.  My only thing

25   to add would be that, for any of these hearing program

1    conservation managers, that the Government has been

2    very, very specific that the testimony is exclusive to

3    their role as a hearing conservation manager as it

4    relates to each specific plaintiff under the notice.

5         So, you know, I think that, again, to the

6    extent that we're talking about general practices at

7    any given base at any particular time on a general

8    matter, that that would be outside the scope of what

9    these witnesses are being authorized to testify on,

10   not only based upon the Government, but I think also

11   as far as in terms of relevance.

12        And I think that, you know -- I tend to

13   disagree with Mr. Bhimani's generalization about

14   Dr. Leccese's knowledge and testimony regarding

15   general practices and procedures while she was at

16   Mr. Hacker's base.

17        But that's about all that I have to add on at

18   this time, unless Your Honor has any additional

19   questions.

20        **THE COURT:**  No.

21        **MR. FOX:**  Your Honor, Shawn Fox.  I have

22   something that dovetails with that.  May I?

23        **THE COURT:**  Yes, go ahead.

24        **MR. FOX:**  So, Your Honor, we keep talking

25   about relevance and whether or not these hearing

1    conservation managers may or may not have relevant

2    information to a specific plaintiff.  But I think

3    we're getting a little bit off on this.

4         I think that the real issue is whether or not

5    these are case-specific depositions.  And if we go

6    back and look at the Pretrial Order No. 52, Judge

7    Rodgers, in section A(1)(b) says that you get six

8    depositions, case-specific depositions of third-party

9    witnesses who are relevant only to the claims of a

10   particular plaintiff.

11        And I've got to think that Judge Rodgers used

12   the term "only" there to try to narrow these down to

13   witnesses that are really, truly case-specific

14   witnesses and not some general witness who can testify

15   about general practices at some base over a five-year

16   period, because that's exactly what these are.  And if

17   you listen to what Jay Bhimani just said, that's

18   exactly what he described is a general witness.

19        So I would just add that as instructive on

20   what the analysis should be as far as allowing a

21   seventh case-specific deposition.  That's all I have,

22   Your Honor.

23        **THE COURT:**  Yeah, okay.  Well, I think that's

24   a fair point, Mr. Fox.  And, you know, the two things

25   we know is Judge Rodgers's order said six depositions.

We talked about she used the word "case-specific" and probably all of us thought that would be, you know, the wife, the friend, the doctor, you know, those type of people.

But I do see how these conservation program managers are arguably case-specific, and that's because the distribution, fitting, training, if any, took place at the military facility where each particular plaintiff was scheduled.

And I know from a plaintiff's perspective, to prove use, I think the plaintiff could simply say, *They handed them out to me and told me I needed to use them and when I was in the military I used them,* and the plaintiff probably has met their burden.

But for the Defendants to really discover the details of that, then they have to drill down to "a" witness at the particular facility where these were distributed, fitted, if at all, and where training took place. Because I don't think anyone in this case is suggesting, you know, out in Afghanistan or Iraq in the middle of the field they were receiving training on these things; this all happened at the front end, I'm assuming when they went into the military.

So, to that extent, there is going to be "a" witness who would be specific to a plaintiff's case as

 1    to those issues.

 2          My sort of questioning during this hearing

 3    was whether indeed that would be the hearing

 4    conservation program manager.  And that may be as good

 5    as it's going to get.  I don't know if you could take

 6    the deposition of the commanding officer of a

 7    particular plaintiff and get that kind of information,

 8    because I don't think they pay attention to those

 9    things.

10          And, since this individual, that is their job

11    to deal with hearing issues on the military base, you

12    know, that makes them, in my view, relevant, but also

13    cross the line from just a general deposition to a

14    case-specific deposition.

15          Anyway, I think I've got it.  I understand

16    the position of both sides.

17          And, you know, this now -- I'll tell you

18    right now, I am going to permit the Defendants to take

19    the seventh deposition, whether that is considered

20    Ms. Parker's or Lt. Hannah's.

21          What I'm finding is that Ms. Parker -- it's

22    reasonable, necessary, relevant for them to take her

23    deposition.  And I have seen enough to convince me

24    that Lt. Hannah also is relevant and necessary and may

25    have useful information as to issues concerning

1    distribution, fitting, and training, which are

2    important issues in the case.

3          Now, I know this is a third time, you know,

4    we have gone past the six-person deposition limit.

5    And I can tell everyone -- I said this in my order

6    before -- when Judge Rodgers entered that order, she

7    absolutely meant six included the deposition of the

8    plaintiff, and that's why we're having this discussion

9    for leave to take the deposition.

10         But also, in this particular case, in

11   addition to I'm persuaded that both of these

12   depositions are necessary and important, when you go

13   back to when the Defendant was putting together its

14   discovery plan -- and I said this before -- I don't

15   think it was unreasonable for the Defendants to

16   conclude that the plaintiff's deposition was not

17   included in the six depositions -- a reasonable

18   interpretation, just the wrong one -- and that this

19   discovery plan was implemented certainly before I

20   issued my order and said six means six.

21         So, you know, there was some reliance there

22   and, you know, they went ahead and did the *Touhy* on

23   Dr. Parker, and then, of course, had to subpoena

24   Dr. Parker and then deal with a motion to quash, but

25   that was underway for some time.

1          And then there was and has been an effort to

2     identify these hearing conservation managers and, you

3     know, it was -- I'm not saying the fault of the

4     Government, but Lt. Hannah was incorrectly identified.

5          So, all of this, in my view, was pursued as

6     part of the discovery plan.  And, in my view, it would

7     be unfair at this point to essentially put the

8     Defendants in the position of they have got to choose

9     Parker over Lt. Hannah.  That's really what it comes

10    down to.

11         So, I will grant the motion, permit the

12    Defendants to depose Cheryl Parker and Lt. Hannah.

13         And I'll add this one caveat that I added

14    before.  It's now the third time you have convinced me

15    that leave should be granted.  This really is on a

16    case-specific basis.

17         And if this issue comes up in the future in

18    another case, the analysis will not be, well, I let

19    the Defendants three times before add a, quote,

20    "seventh" deposition on; that's going to be the new

21    modus operandi in this case.

22         That is certainly not the situation, and I

23    will continue to look at the whole discovery plan.

24    And if, you know, it turns out that, of the six

25    depositions taken, Defendants really weren't paying

1   attention and took a meaningless deposition, you know,

2   that's going to be their fault; that will not be a

3   reason to allow the Defendants to get yet a seventh

4   deposition.  So, the standard is not, oh, I took six,

5   this seventh one is really important.  It is the six

6   were reasonable and necessary and there is a

7   compelling reason to take the seventh.

8            So, in any event, I will grant the motion,

9   and the Defendants will be entitled to take Cheryl

10  Parker's deposition.

11           Is that scheduled, Mr. Bhimani?

12           **MR. BHIMANI:**  Yes, Your Honor, it's scheduled

13  for the 19th.

14           **THE COURT:**  The 19th?

15           **MR. BHIMANI:**  Yes.

16           **THE COURT:**  And then, Lt. Hannah's remote

17  deposition -- I assume he will be in Europe and it

18  will be taken remotely, that will be taken on a

19  mutually agreeable date once the Defendants hear from

20  the Government as to an agreeable date.

21           Mr. Bhimani, is there anything else on behalf

22  of the Defendants?

23           **MR. BHIMANI:**  Nothing, Your Honor.  And we

24  thank you for scheduling the hearing so quickly.  We

25  appreciate it.

1        **THE COURT:**  And Ms. Marlowe and Mr. Fox,

2   anything else on behalf of your client?

3        **MR. FOX:**  Nothing here, Your Honor.

4        **THE COURT:**  Okay.  Thank you very much and

5   have a good day.

6            *(Proceedings concluded at 2:57 p.m.)*

7            --------------------

8   *I certify that the foregoing is a correct transcript*
    *from the record of proceedings in the above-entitled*
9   *matter.  Any redaction of personal data identifiers*
    *pursuant to the Judicial Conference Policy on Privacy*
10  *are noted within the transcript.*

11

12  *s/Donna L. Boland                           11-17-2020*
    *Donna L. Boland, RPR, FCRR                      Date*
13  *Official Court Reporter*

14

15

16

17

18

19

20

21

22

23

24

25