# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: | Judge M. Casey Rodgers<br>Magistrate Judge Gary R. Jones |
| *Baker*, 7:20-cv-39<br>*Estes*, 7:20-cv-137<br>*Hacker*, 7:20-cv-131<br>*Keefer*, 7:20-cv-104<br>*McCombs*, 7:20-cv-94 | |

## PLAINTIFFS' MEMORANDUM ON
## CHOICE OF LAW FOR BELLWETHER GROUP A

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

LEGAL STANDARD.........................................................................................2

ARGUMENT ......................................................................................................3

I.    Under each forum's choice-of-law rules, Indiana law cannot apply to the Group A cases.................................................................................................3

    A.    Plaintiffs suffered injuries in various states, but never Indiana ............4

    B.    Defendants' misconduct transcended Indiana's borders, and Defendants are now domiciled in Minnesota........................................5

    C.    Precedent and public policy do not support blanket application of Indiana law ...........................................................................................7

    D.    Indiana law cannot apply if the military bases where Plaintiffs were injured qualify as federal enclaves.......................................................9

II.    The substantive legal issues in *Baker* and *Keefer* are controlled by the *lex loci delicti*—the alleged place of injury—not the place of wrongdoing .......11

    A.    Washington law governs *Baker*..........................................................11

        1.    South Carolina courts consistently apply *lex loci*.....................11

        2.    Washington law applies because Baker was first injured by the CAEv2 in Washington .......................................................13

        3.    Applying Indiana law would violate South Carolina's choice-of-law rules and the federal enclave doctrine ...........................15

    B.    Georgia law governs *Keefer* ..............................................................17

        1.    Georgia courts remain committed to *lex loci*............................17

        2.    Georgia law applies because Keefer was first injured by the CAEv2 in Georgia.................................................................18

       3.     Applying Indiana law would violate Georgia's choice-of-law rules and the federal enclave doctrine .......................................20

III.   The substantive legal issues in *Hacker* and *McCombs* are controlled by Minnesota's five-factor test, not the place of wrongdoing ...........................23

    A.    Kentucky law governs *Hacker* ...........................................................26

        1.     Hacker purchased, used, and was injured by the CAEv2 in Kentucky ...................................................................................26

        2.     Maintenance of interstate order favors Kentucky law because Kentucky has the most significant contacts to *Hacker* .............27

        3.     Unlike Indiana law, Kentucky law advances Minnesota's interest in compensating tort victims such as Hacker ...............29

        4.     Kentucky law controls even if Minnesota's choice-of-law factors are neutral or the federal enclave doctrine applies .......31

    B.    Alaska law governs *McCombs* .............................................................32

        1.     McCombs received and used the CAEv2 in Alaska, encountered ototoxic noise in Alaska, and returned to Alaska after deployment ......................................................................32

        2.     Maintenance of interstate order favors Alaska law because Alaska has the most significant contacts to *McCombs* .............33

        3.     In contrast to Indiana law, Alaska law furthers Minnesota's interest in compensating tort victims such as McCombs..........35

        4.     If Minnesota's five-factor test is neutral, the *lex fori* controls because the international *lex loci* does not apply ......................37

    C.    Defendants' recommendation to apply Indiana law contradicts the great weight of case law and 3M's own arguments in a recent MDL .....................................................................................................38

IV.   New York's interest analysis supports the parties' agreement that Georgia law governs the substantive legal issues in *Estes* ...........................................40

CONCLUSION ......................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Alliant Techsystems, Inc.*,
  201 F. Supp. 2d 700 (W.D. Va. 2002) .................................................................. 9

*Adventure Outdoors, Inc. v. Bloomberg*,
  2007 WL 9735875 (N.D. Ga. Dec. 18, 2007) ...................................................... 21

*Alexander v. Gen. Motors Corp.*,
  478 S.E.2d 123 (Ga. 1996) .................................................................................. 22

*Alley v. MTD Prods., Inc.*,
  2017 WL 6547996 (W.D. Pa. Dec. 20, 2017) .................................................... 7, 8

*Andrews v. Pride Indus.*,
  2017 WL 5623681 (E.D. Cal. Nov. 22, 2017) ..................................................... 10

*Auld v. Forbes*,
  2020 WL 5753317 (Ga. Sept. 28, 2020) ......................................................... 17, 21

*Bailey v. Cottrell, Inc.*,
  721 S.E.2d 571 (Ga. App. 2011) ......................................................................... 22

*Balderrama v. Pride Indus., Inc.*,
  963 F. Supp. 2d 646 (W.D. Tex. 2013) ............................................................... 10

*Bell Helicopter Textron, Inc. v. Arteaga*,
  113 A.3d 1045 (Del. 2015) ................................................................................ 5, 9

*Bel-Ray Co. v. Chemrite (Pty.) Ltd.*,
  181 F.3d 435 (3d Cir. 1999) ................................................................................ 15

*Bilotta v. Kelley Co.*,
  346 N.W.2d 616 (Minn. 1984) ........................................................................ 31, 36

*Blake Marine Grp. v. CarVal Investors LLC*,
  829 F.3d 592 (8th Cir. 2016) ..................................................................... 23, 38, 39

*Boone v. Boone*,
  546 S.E.2d 191 (S.C. 2001) ................................................................................. 11

*Brewer v. Dodson Aviation*,
  447 F. Supp. 2d 1166 (W.D. Wash. 2006) ............................................................. 3

*Burks v. Abbott Labs.*,
  639 F. Supp. 2d 1006 (D. Minn. 2009) ......................................................... *passim*

*Buzbee v. Streicher Mobile Fueling, Inc.*,
  2007 WL 2781172 (M.D. Fla. Sept. 24, 2007)...................................................... 40

*Cavic v. Grand Bahama Dev. Co.*,
  701 F.2d 879 (11th Cir. 1983) ............................................................................. 37

*Celli v. Shoell*,
  40 F.3d 324 (10th Cir. 1994) ............................................................................... 10

*Coon v. Med. Ctr., Inc.*,
  797 S.E.2d 828 (Ga. 2017) .................................................................................. 17

*Danielson v. Nat'l Supply Co.*,
  670 N.W.2d 1 (Minn. App. 2003) ........................................................................ 35

*DeMoss v. Eli Lilly & Co.*,
  234 F. Supp. 3d 873 (W.D. Ky. 2017) .................................................................. 31

*Dillon v. Frazer*,
  678 S.E.2d 251 (S.C. 2009) ................................................................................. 11

*Dowis v. Mud Slingers, Inc.*,
  621 S.E.2d 413 (Ga. 2005) ...................................................................... 17, 20, 21

*Erickson v. Hertz Corp.*,
  2006 WL 1004385 (D. Minn. Apr. 17, 2006) ...................................................... 29

*Erwin v. Ford Motor Co.*,
  309 F. Supp. 3d 229 (D. Del. 2018) ...................................................................... 7

*Fed. Ins. Co. v. Nat'l Distrib. Co.*,
  417 S.E.2d 671 (Ga. App. 1992) ......................................................................... 18

*Fee v. Great Bear Lodge of Wisc. Dells, LLC*,
  2004 WL 898916 (D. Minn. Apr. 9, 2004) ............................................. 29, 31, 36

*Foster v. St. Jude Med. Inc.*,
  229 F.R.D. 599 (D. Minn. 2005) .......................................................... 35

*Frank Briscoe Co. v. Ga. Sprinkler Co.*,
  713 F.2d 1500 (11th Cir. 1983) ........................................................... 17

*Gareis v. 3M Co.*,
  2018 WL 1835988 (D. Minn. Apr. 17, 2018) ......................................... 31, 37, 39

*Gruenwald v. Toro Co.*,
  2019 WL 6524894 (D. Minn. Dec. 4, 2019) ................................................ *passim*

*Hime v. State Farm Fire & Cas. Co.*,
  284 N.W.2d 829 (Minn. 1979) ...................................................... 23, 25

*Holliday v. Extex*,
  2005 WL 2158488 (D. Haw. July 6, 2005) ........................................... 9

*Hughes v. Wal-Mart Stores, Inc.*,
  250 F.3d 618 (8th Cir. 2001) .............................................................. *passim*

*In re Agent Orange Prod. Liab. Litig.*,
  580 F. Supp. 690 (E.D.N.Y. 1984) ......................................................... 8

*In re Agent Orange Prod. Liab. Litig.*,
  597 F. Supp. 740 (E.D.N.Y. 1984) ......................................................... 8

*In re Agent Orange Prod. Liab. Litig.*,
  818 F.2d 145 (2d Cir. 1987) ................................................................. 8

*In re Air Crash Near Clarence Ctr., N.Y., on Feb. 12, 2009*,
  798 F. Supp. 2d 481 (W.D.N.Y. 2011)....................................................... 6, 7, 41

*In re Baycol Prods. Litig.*,
  218 F.R.D. 197 (D. Minn. 2003) .................................................... *passim*

*In re Bridgestone/Firestone, Inc.*,
  288 F.3d 1012 (7th Cir. 2002) ......................................................... 9, 40

*In re Conagra Peanut Butter Prods. Liab. Litig.*,
  251 F.R.D. 689 (N.D. Ga. 2008) ....................................................... 2, 3

*In re Crash of Aircraft N93PC on July 3, 2013, at Soldotna, Alaska*,
  2020 WL 2739173 (D. Alaska May 26, 2020) ....................................................... 3

*In re Mirapex Prods. Liab. Litig.*,
  2007 WL 9636345 (D. Minn. Nov. 27, 2007) .............................................. *passim*

*In re Takata Airbag Prods. Liab. Litig.*,
  462 F. Supp. 3d 1304 (S.D. Fla. 2020) .................................................................. 2

*In re Tri-State Crematory Litig.*,
  215 F.R.D. 660 (N.D. Ga. 2003) ......................................................................... 20

*Indus. Graphics, Inc. v. Asahi Corp*,
  485 F. Supp. 793 (D. Minn. 1980) ...................................................................... 37

*Int'l Bus. Mach. Corp. v. Kemp*,
  536 S.E.2d 303 (Ga. App. 2000) ........................................................................ 20

*J. McIntyre Mach., Ltd. v. Nicastro*,
  564 U.S. 873 (2011) ........................................................................................... 22

*Jacobson v. Universal Underwriters Ins. Grp.*,
  645 N.W.2d 741 (Minn. App. 2002) ................................................................... 36

*Jepson v. Gen. Cas. Co. of Wisc.*,
  513 N.W.2d 467 (Minn. 1994) ................................................................... *passim*

*Johannessohn v. Polaris Indus., Inc.*,
  450 F. Supp. 3d 931 (D. Minn. 2020) .................................................... 29, 30, 39

*Johnson v. Oroweat Foods Co.*,
  785 F.2d 503 (4th Cir. 1986) .............................................................................. 15

*Karimi v. Crowley*,
  324 S.E.2d 583 (Ga. App. 1984) ........................................................................ 22

*Kenney v. Indep. Order of Foresters*,
  744 F.3d 901 (4th Cir. 2014) .............................................................................. 16

*King v. Car Rentals, Inc.*,
  813 N.Y.S.2d 448 (N.Y. App. Div. 2006) ........................................................... 41

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
   313 U.S. 487 (1941) ............................................................................................ 2, 8

*Lambert v. B.P. Prods. N. Am., Inc.*,
   2006 WL 924988 (S.D. Ill. Apr. 6, 2006) ........................................................ 16

*Liberty Corp. v. NCNB Nat'l Bank of S.C.*,
   984 F.2d 1383 (4th Cir. 1993) ........................................................................ 11

*Lister v. NationsBank of Del., N.A.*,
   494 S.E.2d 449 (S.C. App. 1997) ............................................................. 11, 16

*Macias v. Saberhagen Holdings, Inc.*,
   282 P.3d 1069 (Wash. 2012) ............................................................................ 3

*Max Foote Constr. Co. v. MWH Constructors, Inc.*,
   2018 WL 5297744 (E.D. La. Oct. 25, 2018) .................................................. 10

*Mbatha v. Cutting*,
   2020 WL 5627126 (Ga. App. Sept. 21, 2020).......................................... 17, 21

*McCarthy v. Yamaha Motor Mfg. Corp.*,
   994 F. Supp. 2d 1329 (N.D. Ga. 2014)........................................................... 18

*Myers v. Gov't Emp. Ins. Co.*,
   225 N.W.2d 238 (Minn. 1974) ...................................................................... 25

*Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.*,
   843 F. Supp. 1027 (D.S.C. 1993) .................................................................. 16

*Nelson v. Delta Int'l Mach. Corp.*,
   2006 WL 1283896 (D. Minn. May 9, 2006) ............................................... *passim*

*Nesladek v. Ford Motor Co.*,
   876 F. Supp. 1061 (D. Minn. 1994)........................................................... 23, 34

*Neumeier v. Kuehner*,
   286 N.E.2d 454 (N.Y. 1972) ......................................................................... 41

*Nodak Mut. Ins. Co. v. Am. Fam. Mut. Ins. Co.*,
   604 N.W.2d 91 (Minn. 2000) ........................................................... 25, 31, 37

*Nw. Airlines, Inc. v. Astraea Aviation Servs. Inc.*,
    111 F.3d 1386 (8th Cir. 1997) .......................................................................... 30, 31

*Parish of Plaquemines v. Total Petrochemical & Refining USA, Inc.*,
    64 F. Supp. 3d 872 (E.D. La. 2014)........................................................................ 10

*Parker v. Asbestos Processing, LLC*,
    2015 WL 127930 (D.S.C. Jan. 8, 2015) ................................................................. 11

*Percy v. AC & S, Inc.*,
    2014 WL 6735166 (E.D. Pa. Aug. 5, 2014) ............................................................. 3

*Phillips v. FedEx Ground Package Sys. Inc.*,
    2020 WL 2212769 (N.D. Ga. Feb. 6, 2020) .......................................................... 22

*Purcell v. Catlin*,
    2010 WL 786611 (M.D. Ga. Mar. 5, 2010) ........................................................... 22

*Purnell v. United States*,
    1987 WL 11211 (E.D. Pa. May 21, 1987).......................................................... 12, 14

*Rogers v. Lee*,
    777 S.E.2d 402 (S.C. App. 2015) ...................................................................... 11, 16

*Schmelzle v. ALZA Corp.*,
    561 F. Supp. 2d 1046 (D. Minn. 2008) ..................................................... 25, 30, 38

*Schultz v. Boy Scouts of Am., Inc.*,
    480 N.E.2d 679 (N.Y. 1985) ................................................................................. 40

*Shanks v. Upjohn Co.*,
    835 P.2d 1189 (Alaska 1992) ................................................................................ 36

*Shannon-Vail Five Inc. v. Bunch*,
    270 F.3d 1207 (9th Cir. 2001) ................................................................................. 3

*Sims v. Atrium Med. Corp.*,
    349 F. Supp. 3d 628 (W.D. Ky. 2018) ..................................................................... 3

*SIS, LLC v. Stoneridge Software, Inc.*,
    2018 WL 10582334 (N.D. Ga. July 17, 2018) ...................................................... 21

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004)........................................................................ *passim*

*Terrill v. Electrolux Home Prods. Inc.*,
  753 F. Supp. 2d 1272 (S.D. Ga. 2010) ................................................ 21

*Thornton v. Cessna Aircraft Co.*,
  703 F. Supp. 1228 (D.S.C. 1988) ........................................................ 14

*TRW Vehicle Safety Sys., Inc. v. Moore*,
  936 N.E.2d 201 (Ind. 2010) ................................................................ 31

*Valentino v. Bond*,
  2008 WL 3889603 (N.D. Fla. Aug. 19, 2008) ...................................... 3

*Velten v. Regis B. Lippert, Intercat, Inc.*,
  985 F.2d 1515 (11th Cir. 1993) .................................................... 17, 20

*Vishipco Line v. Chase Manhattan Bank, N.A.*,
  660 F.2d 854 (2d Cir. 1981) .................................................... 15, 21, 37

*Wahl v. Gen. Elec. Co.*,
  786 F.3d 491 (6th Cir. 2015) ................................................................ 2

*Wells v. Liddy*,
  186 F.3d 505 (4th Cir. 1999) .............................................................. 16

*Whitney v. Guys, Inc.*,
  700 F.3d 1118 (8th Cir. 2012) ............................................................ 23

*Wong v. Marriott Hotel Servs., Inc.*,
  2009 WL 5538644 (E.D.N.Y. Dec. 18, 2009)...................................... 41

## Statutes

28 U.S.C. § 5001(b) .......................................................................... *passim*

Alaska Stat. § 09.10.055(b)(1)(E).......................................................... 36

Ind. Code § 34-20-2-2 ........................................................................... 3

Ind. Code § 34-20-3-1 ..................................................................... 31, 36

Ind. Code § 34-51-3-4 .............................................................................. 22

O.C.G.A. § 51-1-11 .............................................................................. 3, 22

O.C.G.A. § 51-12-5.1(e) ........................................................................ 22

**Other Authorities**

Restatement (First) of Conflict of Laws § 377 (1934) ............................................ 20

## INTRODUCTION

On October 31, 2020, the parties provided a chart to the Court setting forth their positions on choice of law for Group A Bellwethers. Faithfully applying the choice-of-law rules of the designated forums, Plaintiff Lloyd Baker recommends Washington law, Plaintiffs Luke Estes and Lewis Keefer recommend Georgia law, Plaintiff Stephen Hacker recommends Kentucky law, and Plaintiff Dustin McCombs recommends Alaska law. Defendants promote Indiana law in every case except *Estes*, where they instead recommend Georgia law. Because the parties agree Georgia law governs *Estes*, the Court must decide only whether Indiana law or the competing state laws identified by Plaintiffs should govern the remaining cases.

Washington law governs *Baker* because the applicable choice-of-law rule depends on the alleged place of injury and Baker was first injured by the CAEv2 in Washington. The same rule favors Georgia law in *Keefer* because Keefer was first injured by the CAEv2 in Georgia. For *Hacker* and *McCombs*, a multi-factor test applies. Under that test, Kentucky law governs *Hacker* because Hacker purchased, used, and was injured by the CAEv2 in Kentucky. Likewise, Alaska law controls *McCombs* because McCombs encountered ototoxic noise in Alaska, where he received the CAEv2 and used the plugs for most of his service.

1

Defendants propose applying Indiana law to *all* those cases—even though *none* of the Plaintiffs were injured in or have any connection to Indiana—because Indiana bars strict-liability claims, caps punitive damages, and restricts tort claims through its rigid statute of repose. Defendants' tortured application of choice-of-law rules reveals their backwards reasoning. For *Baker* and *Keefer*, Defendants ignore the binding place-of-injury test. For *Hacker* and *McCombs*, Defendants purport to apply the correct test but erroneously elevate some facts and minimize others to again miraculously land at Indiana. The Court should reject Defendants' analytical gymnastics. Each forum's choice-of-law test must be applied to the unique facts of each case. Different state laws therefore govern different bellwether cases.

## LEGAL STANDARD

When analyzing choice of law, the Court must determine "the substantive state law dictated by the choice of law rules of the transferor court's state." *In re Takata Airbag Prods. Liab. Litig.*, 462 F.Supp.3d 1304, 1313 (S.D. Fla. 2020); *see Klaxon Co. v. Stentor Elec.*, 313 U.S. 487, 494-96 (1941). All Group A cases were filed directly in this MDL, so the transferor court is the "designated forum" where each case would have originated but for the direct-filing order. Dkt. 252 (PTO 5); *see Wahl v. Gen. Elec.*, 786 F.3d 491, 496-99 (6th Cir. 2015). An "independent choice of law determination is necessary for the states of all transferor courts." *In re*

*Conagra Peanut Butter Prods. Liab. Litig.*, 251 F.R.D. 689, 693-94 (N.D. Ga. 2008).

That *independent* analysis is the starting point for each *individual* case. *See, e.g.*, *id.*

Choice-of-law determinations are mixed questions of law and fact. The Court must first "select the correct choice-of-law rule, a pure legal question, and then apply that rule to the facts of [the] case." *Shannon-Vail Five v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001). As when adjudicating choice of law at summary judgment, *see, e.g.*, *Valentino v. Bond*, 2008 WL 3889603, at *1 n.3 (N.D. Fla. Aug. 19, 2008) (Rodgers, J.), the Court should construe all facts in the light most favorable to Plaintiffs, *see, e.g.*, *Brewer v. Dodson Aviation*, 447 F.Supp.2d 1166, 1172-73 (W.D. Wash. 2006) (accepting as true "uncontroverted statements from the parties' [choice-of-law] briefs" and viewing all remaining facts "in the light most favorable to Plaintiffs").

## ARGUMENT

### I. Under each forum's choice-of-law rules, Indiana law cannot apply to the Group A cases.

Assuming a conflict of laws, each Group A case has a different legal starting point and different factual inputs for the choice-of-law analysis.[1] *See Jepson v. Gen.*

---

[1] Conflict exists here. For example, the Indiana Products Liability Act does not recognize strict-liability design-defect claims, Ind. Code § 34-20-2-2, whereas the laws of all other proposed states do, *see* O.C.G.A. § 51-1-11; *In re Crash of Aircraft N93PC*, 2020 WL 2739173, at *3-6 (D. Alaska May 26, 2020); *Sims v. Atrium Med.*, 349 F.Supp.3d 628, 638-39 (W.D. Ky. 2018); *Macias v. Saberhagen*, 282 P.3d 1069, 1074 (Wash. 2012). Regardless, the Court should assume a conflict "because if there is no conflict, which law is applied is immaterial and any error in choice of law is harmless." *Percy v. AC & S*, 2014 WL 6735166, at *1 n.1 (E.D. Pa. Aug. 5, 2014).

*Cas. Co.*, 513 N.W.2d 467, 470 (Minn. 1994) (requiring courts to "wrestle with each situation anew" and "be true to the method" when analyzing choice of law). Baker and Keefer designated forums that adhere to *lex loci delicti*—a choice-of-law rule that depends on the alleged place of injury. Hacker and McCombs designated the District of Minnesota, which applies a multi-factor test that weighs "maintenance of interstate order" and "advancement of the forum's governmental interest." Estes designated the Southern District of New York, which employs an "interest analysis."

Remarkably, Defendants assert Indiana law applies in *every* case except *Estes*, even though *none* of the Group A Plaintiffs were injured in Indiana or otherwise have *any* connection whatsoever to that state. Defendants' distorted logic is as follows: (1) Plaintiffs "sustained [their] alleged injuries in foreign countries," not domestically; and (2) the "conduct allegedly resulting in [their injuries] occurred in Indiana," Aearo's principal place of business; (3) ergo, "other states have little interest" in these bellwether cases so "Indiana law should govern." *E.g.*, PX1(Chart-1). Syllogisms are venerable tools of logic, but their conclusions are only as sound as their premises.

**A.    Plaintiffs suffered injuries in various states, but never Indiana.**

Defendants' first premise is fatally flawed because the record shows *all* Group A Plaintiffs suffered injuries in domestic locations other than Indiana. Baker was injured during MOUT training at Fort Lewis, Washington, *infra* II.A.2; Keefer

4

suffered significant threshold shifts in his hearing at Fort Benning, Georgia, years before deploying to Iraq, *infra* II.B.2; Hacker was injured and diagnosed while stationed at Fort Campbell, Kentucky, *infra* III.A.1; McCombs was injured in Afghanistan but also was exposed to ototoxic noise at Fort Richardson, Alaska, *infra* III.B.1; and Estes was injured while on the range at Fort Benning, Georgia, *infra* IV.

Because Plaintiffs' evidence must be credited at this stage, 3M's maneuver to limit Plaintiffs' injuries to international locations cannot control the choice-of-law inquiry. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 705-06 & n.3 (2004) (traditional and modern rules generally "appl[y] the law of the place where the injury occurred"); *Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1053-54 (Del. 2015) (place of injury is not "fortuitous" when plaintiff works or has contacts there).

## B. Defendants' misconduct transcended Indiana's borders, and Defendants are now domiciled in Minnesota.

Defendants' second premise is also wrong because Indiana is *not* the sole jurisdiction tied to Defendants' domicile and deceit. Defendants are all citizens of Delaware and Minnesota. Dkt. 959 ¶¶ 16-20. 3M purchased the Aearo entities in 2007, and the 3M entities have always had their principal places of business in Minnesota. *Id.* ¶¶ 16-18. Aearo Holding LLC and Aearo Technologies LLC operate out of Minnesota as well, while only the two remaining Defendants—Aearo Intermediate LLC and Aearo LLC—do so in Indiana. *Id.* ¶ 20. Accordingly, "the theory underlying [Defendants'] approach—that [Indiana] has the greater interest in

regulating the conduct of its residents—is severely undermined [because Defendants have] changed domiciles." *See, e.g.*, *In re Air Crash Near Clarence Ctr., N.Y., on Feb. 12, 2009*, 798 F.Supp.2d 481, 490-92 (W.D.N.Y. 2011).

Defendants also designed, developed, manufactured, marketed, and sold the CAEv2 through a complex web of locations involving different states and countries. ISL developed and tested the CAEv2's filter and dual-end design in France, and initially shortened the stem there. *See* Dkt. 1280 at 2-6. Aearo, ISL, and Army officials discussed potential prototypes at Aberdeen Proving Ground in Maryland. *Id.* at 7-8. Defendants manufactured the CAEv2 in Massachusetts and Mexico, Dkt. 1072-40 at 15; PX2(3M_MDL000423277); they contracted with New Dynamics in New York and Defense Logistics Agency in Pennsylvania to assemble and distribute the CAEv2, *e.g.*, PX3(3M_MDL000423337); Dkt. 1072-40 at 2-3; they visited military bases nationwide to peddle the CAEv2, Dkt. 1089-13 at 18; PX35(30(b)(6)-Ex.7); and they sold the CAEv2 to those bases, including the bases where Plaintiffs were stationed in Alaska, Georgia, Kentucky, and Washington, Dkt. 1072-71 at 21; Dkt. 1072-50 at 4, 6, 24. The MPID itself makes clear Indiana was the tertiary—not primary—place of performance. *See* Dkt. 1072-40 at 15 (limiting Indiana's role to "package [and] ship"); *In re Air Crash*, 798 F.Supp.2d at 490-92 (rejecting defendant's choice-of-law argument because "although most of the corporate acts underlying Plaintiffs' [claims] may have occurred in Virginia, not all of them did").

Defendants continued to sell the CAEv2 long after 3M acquired Aearo in 2007, dooming Defendants' claim that their misdeeds occurred only in Indiana circa 2000. For over a decade thereafter, 3M continued to represent to servicemembers and the public that the CAEv2 was safe and effective despite knowing otherwise. *Compare* PX4(3M_MDL000010065), *with* PX5(3M_MDL000010140). In 2011, 3M executives celebrated that "[i]n US Hearing Protection . . . CAE is 5% of 3M's US revenue and 19% of the [operating income]. *CAE pays the bills*." PX6(3M_MDL000020026) (emphasis added).

On this record, Indiana is not, as Defendants presuppose, the only jurisdiction connected to their domicile and deceit. *See Alley v. MTD Prods.*, 2017 WL 6547996, at *6 (W.D. Pa. Dec. 20, 2017); *see also Erwin v. Ford*, 309 F.Supp.3d 229, 235-37 & n.1 (D. Del. 2018) (concluding that interests of state where defendant is domiciled and wrongdoing occurred do not outweigh interests of state of injury).

### C.   Precedent and public policy do not support blanket application of Indiana law.

Defendants' position is also unmoored from the law. Defendants cite *In re Agent Orange* for the proposition that "[c]ourts have declined to apply the law of the place of the injury in similar situations." PX1(Chart-1, 4). But that *sui generis* case is just as irrelevant now as it was on summary judgment. *See* Dkt. 1280 at 31 n.26.

*Agent Orange* declined to apply the law of international places of injury because of "special" facts: "the jurisdiction where most of the use of herbicides took

place, South Vietnam, no longer exists," and it would have been "ludicrous to allow North Vietnam [a country then at war with the United States] to determine the law of th[e] case." 580 F.Supp. 690, 693, 707, 711 (E.D.N.Y. 1984). The court instead held that all states would apply a national-consensus law because plaintiffs were injured in *solely* international locations and from exposure to an *exclusively* military product provided by a government contractor. *Id.* at 705, 711 (state contacts were "dwarfed by the national contacts"). Even still, the court recognized "the probability of appeal and possible reversal or modification [was] substantial." *In re Agent Orange Prod. Liab. Litig.*, 597 F.Supp. 740, 755 (E.D.N.Y. 1984). Indeed, the Second Circuit concluded that "*every jurisdiction* [should] be free to render its own choice of law decision." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 165 (2d Cir. 1987) (emphasis added).

Blanket application of Indiana law would also violate the fundamental policy of state sovereignty. *See Klaxon*, 313 U.S. at 496 ("It is not for the federal courts to thwart such local policies by enforcing an independent 'general law' of conflict of laws."); *Jepson*, 513 N.W.2d at 471 (choice-of-law principles consider "whether the application of [one state's] law would manifest disrespect for [another state's] sovereignty"). Not to mention, a place-of-conduct rule would impermissibly incentivize defendants to forum shop by relocating to states with stricter tort laws. *See, e.g.*, *Alley*, 2017 WL 6547996, at *10 (warning against "perverse incentives" if

courts "reflexively applied the law of the state where products were produced"); *Bell Helicopter*, 113 A.3d at 1054-55 (refusing to focus on state of wrongdoing for choice of law because of the "obvious downside" of "encourag[ing] jurisdictions to change their laws to restrict remedies to victims so as to attract manufacturers").

In sum, "[n]either Indiana nor any other state has applied a uniform place-of-the-defendant's-headquarters rule to products-liability cases," as Defendants suggest here. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002).

> **D.   Indiana law cannot apply if the military bases where Plaintiffs were injured qualify as federal enclaves.**

Finally, if Plaintiffs were injured on "federal enclaves," as Defendants say, applying Indiana law would violate the federal enclave doctrine. PX1(Chart-1-5); *see also* Dkt. 1432 at 2 n.5. "In a civil action brought to recover on account of an injury sustained in a place [subject to the exclusive jurisdiction of the United States], the rights of the parties shall be governed by the law of the State in which the place is located." 28 U.S.C. § 5001(b). Section 5001(b) thus permits courts to bypass the forum's choice-of-law rules because the federal enclave doctrine itself operates as a choice-of-law doctrine. *See Adams v. Alliant Techsystems*, 201 F.Supp.2d 700, 705-06, 710 (W.D. Va. 2002) (citing predecessor statute).

Under the federal enclave doctrine, the law of the state of injury applies even when the wrongful conduct occurred elsewhere. *See Holliday v. Extex*, 2005 WL 2158488, at *1, 4-6 (D. Haw. July 6, 2005). Thus, *if* the military bases where

Plaintiffs were injured qualify as federal enclaves, subject to the *exclusive* jurisdiction of the United States, then the Court must apply the law of the state surrounding the enclave. *See* 28 U.S.C. § 5001(b); *cf. Balderrama v. Pride Indus.*, 963 F.Supp.2d 646, 657-60 (W.D. Tex. 2013) ("[N]ot all lands owned and used by the federal government are subject to its exclusive jurisdiction."). Washington, Georgia, Kentucky, and Alaska law would therefore govern the Group A cases because Plaintiffs were stationed and injured there. *See infra* II-IV.

Accordingly, whether the Court applies each forum's choice-of-law rules or the federal enclave doctrine, Indiana law should not—and ultimately cannot— govern any of the Group A bellwethers.[2]

---

[2] Whether the federal enclave doctrine applies is a "complex question, resting on such factors as whether the federal government exercises exclusive, concurrent or proprietarial [sic] jurisdiction over the property, when the property became a federal enclave and what the state law was at that time, whether that law is consistent with federal policy, and whether it has been altered by national legislation." *Celli v. Shoell*, 40 F.3d 324, 328 (10th Cir. 1994); *see Andrews v. Pride Indus.*, 2017 WL 5623681, at *1-2 (E.D. Cal. Nov. 22, 2017) ("[A]pplication of the federal enclave doctrine requires particularized findings as to where the events at issue occurred and whether those specific tracts are areas over which the United States has exclusive jurisdiction."). Because Defendants have not satisfied their burden to show that the federal enclave doctrine applies to any of the Group A cases, traditional choice-of-law rules apply. *See Max Foote Constr. Co. v. MWH Constructors*, 2018 WL 5297744, at *4 n.41 (E.D. La. Oct. 25, 2018); *see also Balderrama*, 963 F.Supp.2d at 657-61 (defendant failed to show conduct occurred on specific areas of Fort Bliss where federal government exercised exclusive jurisdiction); *Parish of Plaquemines v. Total Petrochemical*, 64 F.Supp.3d 872, 900-06 (E.D. La. 2014) (similar).

II.   **The substantive legal issues in *Baker* and *Keefer* are controlled by the *lex loci delicti*—the alleged place of injury—not the place of wrongdoing.**

A.   **Washington law governs *Baker*.**

1.   **South Carolina courts consistently apply *lex loci*.**

South Carolina choice-of-law rules apply because Baker designated the District of South Carolina. *Baker* Dkt. 4. The parties agree South Carolina courts follow *lex loci delicti*. *See* PX1(Chart-1) (citing *Boone v. Boone*, 546 S.E.2d 191, 193 (S.C. 2001)). Under *lex loci*, the substantive law applied in a tort action is "the law of the state in which the injury occurred." *Rogers v. Lee*, 777 S.E.2d 402, 404 (S.C. App. 2015). Put differently, the *lex loci* is "the state where the last event necessary to make an actor liable for an alleged tort takes place," "not [where] Defendants' acts or omissions occurred." *Parker v. Asbestos Processing*, 2015 WL 127930, at *12-13 (D.S.C. Jan. 8, 2015).

South Carolina courts have "long adhered to the rule of *lex loci delicti*." *Liberty Corp. v. NCNB Nat'l Bank*, 984 F.2d 1383, 1386 (4th Cir. 1993). Although this traditional approach has lost favor in some states, South Carolina is one of "a good many States [that] still employ essentially the same [*lex loci*] analysis," *Sosa*, 542 U.S. at 708-09, instead of the "modern choice of law test found in the Restatement," *Lister v. NationsBank*, 494 S.E.2d 449, 456 (S.C. App. 1997). To this day, South Carolina courts apply *lex loci* without hesitation. *E.g.*, *Dillon v. Frazer*, 678 S.E.2d 251, 254 (S.C. 2009).

11

*Purnell v. United States*, 1987 WL 11211 (E.D. Pa. May 21, 1987), is instructive. There, an Army doctor prescribed an anticoagulant to a servicemember hospitalized in South Carolina. *Id.* at *1. The servicemember then traveled to Pennsylvania, where he experienced cramps after ingesting the anticoagulant with alcohol. *Id.* He attempted to return to South Carolina but died en route from a gastrointestinal hemorrhage in North Carolina. *Id.* His estate sued the United States for failing to warn about the anticoagulant's dangers. *Id.* at *1-2. The parties agreed South Carolina's choice-of-law rules applied but disagreed about the outcome. The estate argued for Pennsylvania law because the servicemember's "first harmful result" occurred there; the United States argued for South Carolina law because the alleged malpractice occurred there. *Id.* at *2-3.

Like here, the court decided choice of law before dispositive motion practice. *Id.* at *1. Applying South Carolina's *lex loci* rule to this "multistate situation," the court accepted the estate's facts and concluded the "last event necessary" for liability occurred in Pennsylvania. *Id.* at *3. Indeed, the servicemember was not injured from the malpractice in South Carolina until he relocated to Pennsylvania. *Id.* at *1, 5. His continuing injury in Maryland, Virginia, and North Carolina did not alter the *lex loci* because "the first harmful result" occurred in Pennsylvania. *Id.* at *3. Even though "the *lex loci delicti* rule is rigid, emphasizes the situs of the impact which may be

12

fortuitous, and has been abandoned by many states," the court applied Pennsylvania law because the servicemember's injury first occurred there. *Id.* at \*3 & n.3.

### 2. Washington law applies because Baker was first injured by the CAEv2 in Washington.

Baker served in the Army from May 2005 to October 2009 and in the Army Reserves from December 2009 to July 2014. PX7(Rog-5); PX8(Baker-106:11-107:16). He received his first pair of CAEv2 circa May 2005 at basic training in Fort Benning, Georgia, but he never used the CAEv2 there. PX7(Rog-27); PX8(Baker-35:2-6, 90:13-91:23); PX9(Packer-14). Baker received a second pair later that year at Fort Lewis, Washington. PX7(Rog-27); PX8(Baker-28:21-29:3). From December 2005 to early 2012, Baker used the CAEv2 in Washington, Germany, Iraq, and South Carolina. PX7(Rogs-5, 30); PX8(Baker-35:2-11, 37:1-38:23, 90:13-19); PX9(Packer-12).

Baker reports he was first injured in Washington, shortly after he began using the CAEv2. He recalls "a distinct event associated with an acute onset of severe tinnitus and hearing loss" occurring during MOUT training at Fort Lewis. PX9(Packer-12-13, Ex.D-2). Baker has suffered from hearing loss and tinnitus in his left ear ever since. PX9(Packer-13); *see* PX8(Baker-174:15-24) (tinnitus began in 2006, *before* tour of duty in Iraq).

All of Baker's experts agree he was first injured by the CAEv2 in Washington. Dr. Packer opines that Baker's "loss manifested subjectively—later confirmed by

13

audiogram—during urban combat pre-deployment training at Ft. Lewis, WA[,] when he was wearing the CAEv2." PX9(Packer-26, Ex.D-4); PX9(Packer-13) ("onset of severe tinnitus and hearing loss during urban warfare training at Ft. Lewis"). Experts Davis and Kucsma likewise report that Baker "began having ringing in his ears in 2006 after Urban Warfare training at Ft. Lewis." PX10(Davis-6); PX11(Kucsma-4).

Although Baker was later injured in Germany, Iraq, and/or South Carolina, the place of his "first harmful result" governs the choice-of-law inquiry.[3] *See Purnell*, 1987 WL 11211, at *3; *see also* PX9(Packer-26-27) ("additional subclinical injury"); PX9(Packer-28) ("This unprotected exposure [in Iraq] *follows* initial instances at the onset of training resulting in muffled hearing and onset of tinnitus during *pre-deployment* Urban Warfare Training.") (emphasis added). Given the record evidence of Baker's initial injury in Washington, Washington law controls.[4]

---

[3] Defendants may argue Baker was not injured from a specific event during MOUT training. This argument fails because Baker's testimony and Packer's opinion must be credited at this stage. *See, e.g.*, *Purnell*, 1987 WL 11211 at *1-2 (crediting plaintiff's facts regarding onset of injury in deciding choice of law); *see also* PX12(TG250_11) ("Most noise-induced hearing loss occurs during training.").

[4] Applying Washington law does not offend due process. *See Thornton v. Cessna Aircraft*, 703 F.Supp. 1228, 1231 (D.S.C. 1988) ("Although courts have rejected application of a specific state's law as violative of due process in isolated cases, none of those cases involved the *lex loci*.").

### 3. Applying Indiana law would violate South Carolina's choice-of-law rules and the federal enclave doctrine.

Ignoring Baker's initial injury in Washington, Defendants recommend Indiana because it is the location of Aearo's principal place of business and "[t]he conduct allegedly resulting in Baker's injury" occurred there. PX1(Chart-1). Indiana law does not apply for three reasons.

First, if Baker was injured in Iraq rather than Washington, as Defendants claim, then foreign or forum law—not Indiana law—would govern. "For a plaintiff injured in a foreign country" like Iraq, "the presumptive choice . . . [is] to apply foreign law." *Sosa*, 542 U.S. at 706. When the presumptive choice is international law and the parties do not endorse that law or carry their burden to prove it, courts apply the forum's state law pursuant to Rule 44.1. *See, e.g.*, *Vishipco Line v. Chase*, 660 F.2d 854, 860 (2d Cir. 1981) (applying the *lex fori*, "even though the forum's choice of law rules would have called for the application of foreign law," because neither party advocated for foreign law); *Bel-Ray Co. v. Chemrite*, 181 F.3d 435, 440-41 (3d Cir. 1999) (collecting cases).

Second, applying Indiana law would violate South Carolina's *lex loci* test. Granted, two of six Defendants have their principal places of business in Indiana and Aearo conducted some testing there, but the *lex loci* is "where the injury was suffered, not where the wrongful act took place." *Johnson v. Oroweat*, 785 F.2d 503, 511 (4th Cir. 1986). Predicting defeat under *lex loci*, Defendants invoke an entirely

different test, *see* PX1(Chart-1), despite binding precedent, *e.g.*, *Rogers*, 777 S.E.2d at 406-07 (denying request to "depart from our courts' traditional application of *lex loci*" for a more predictable test based on domicile). This Court "must apply" Washington law based on South Carolina's *lex loci* test. *Myrtle Beach Pipeline Corp. v. Emerson Elec.*, 843 F.Supp. 1027, 1033 (D.S.C. 1993); *see Wells v. Liddy*, 186 F.3d 505, 522, 530 (4th Cir. 1999) (failure to apply *lex loci* is reversible error).[5]

Third, *if* Fort Lewis qualifies as a federal enclave, as Defendants intimate, Washington law—where Fort Lewis is located—governs *Baker*. *See* 28 U.S.C. § 5001(b). Washington law thus controls under the federal enclave doctrine or the *lex loci* test. *See Lambert v. B.P. Prods.*, 2006 WL 924988, at *2 & n.1 (S.D. Ill. Apr. 6, 2006) (finding the "same result would obtain" if the federal land was a "federal enclave").

---

[5] No South Carolina court has rejected *lex loci* where, as in *Baker*, there is a defined time and place of injury. But even under a multi-factor analysis, the result would be the same. *See Lister*, 494 S.E.2d at 456; *Kenney v. Indep. Order of Forester*, 744 F.3d 901, 908 (4th Cir. 2014) ("[W]e prefer to leave it up to [state] courts to develop [state] law in this fact-intensive area."). Indeed, the Restatement's most-significant-relationship test "frequently leads to the traditional application of the law of the jurisdiction of injury" because it "includes a default rule for tort cases rooted in the traditional [*lex loci*] approach." *Sosa*, 542 U.S. at 709.

### B.     Georgia law governs *Keefer*.

#### 1.     Georgia courts remain committed to *lex loci*.

Keefer designated the Middle District of Georgia, so Georgia's choice-of-law rules control. *Keefer* Dkt. 4. Defendants admit Georgia generally "applies the law of the place of the injury." PX1(Chart-4). In *Dowis v. Mud Slingers*, 621 S.E.2d 413 (Ga. 2005), cited by Defendants, the Georgia Supreme Court considered adopting four alternative choice-of-law tests. *Id.* at 414-16. Despite "the complexities of modern litigation," the court held fast to *lex loci*, "not out of blind adherence but rather out of the candid recognition that the subsequently-developed theories have significant problems." *Id.* at 416, 419; *see Auld v. Forbes*, 2020 WL 5753317, at *2 (Ga. Sept. 28, 2020) ("[F]or over 100 years, the state of Georgia has followed the doctrine of *lex loci*."); *Coon v. Med. Ctr.*, 797 S.E.2d 828, 834-35 (Ga. 2017) ("[W]e have never disavowed this choice-of-law approach."); *Mbatha v. Cutting*, 2020 WL 5627126, at *5-6 (Ga. App. Sept. 21, 2020) (collecting cases).

As in South Carolina, the *lex loci* is "the jurisdiction where the harm was suffered," which is "where the last event necessary to make an actor liable for the alleged tort takes place." *Velten v. Regis*, 985 F.2d 1515, 1521 (11th Cir. 1993). Only two exceptions exist. First, the *lex loci* is limited to statutory claims; the *lex fori* (Georgia law) controls all common-law matters. *Coon*, 797 S.E.2d at 833-34; *Frank Briscoe Co. v. Ga. Sprinkler*, 713 F.2d 1500, 1503 (11th Cir. 1983). Second, if the

*lex loci* is out-of-state, that sister state's law controls only if it aligns with Georgia's public policy. *Fed. Ins. v. Nat'l Distrib.*, 417 S.E.2d 671, 674 (Ga. App. 1992).

In sum, Georgia's choice-of-law rules require the application of Georgia law to all common-law issues, but the law of a foreign *lex loci* may apply to statutory matters if it does not violate Georgia's public policy. *McCarthy v. Yamaha*, 994 F.Supp.2d 1329, 1332 (N.D. Ga. 2014).

### 2. Georgia law applies because Keefer was first injured by the CAEv2 in Georgia.

Keefer served our country from March 2007 through April 2015. PX13(Keefer-153:6-8, 226:13-23). He received two pairs of CAEv2 during basic training at Fort Benning, Georgia, circa March 2007; he acquired additional pairs in Georgia and Hawaii. PX13(Keefer-169:17-172:7, 200:14-202:14); PX14(O'Brien-67:1-68:9, 79:11-24, 96:5-97:19, 122:7-22).

Keefer used the CAEv2 throughout his service—for over two years in Georgia, during an 11-month tour in Iraq, again in Georgia, briefly in California, and when stationed in Hawaii. PX15(Rog-30); PX16(Lustig-14). While at Fort Benning from April 2007 to July 2009, he used the CAEv2 "in [r]ange qualification, range training, combat training, aircraft training, driving training, demo range, [and] live fire exercises." PX16(Lustig-14).

Keefer does not recall a "specific event . . . that caused his hearing loss and tinnitus." PX15(Rog-48). His ex-wife, however, "noticed a difference" in his hearing

when they were stationed at Fort Benning in 2008. PX17(E-Keefer-32:2-35:11). She was aware of Keefer's injury long before he deployed to Iraq in July 2009. PX17(E-Keefer-38:14-21).

Medical records and expert reports corroborate that Keefer was injured while training at Fort Benning from 2007 to 2009. An October 2007 audiogram revealed "a shift in [Keefer's] hearing at 3000 and 4000 Hz in the left ear," which is "consistent with a mild hearing loss." PX18(Spankovich-5). Testing one year later also showed a "significant threshold shift" in Keefer's left ear, while his "right ear showed an early warning change." *Id.*; PX19(Ostacher-9). Finally, testing on June 16, 2009, right before Keefer deployed to Iraq, "showed progression of hearing loss with a [significant threshold shift] at 2000 to 4000 Hz." PX18(Spankovich-5). Keefer was thus first injured by the CAEv2 in Georgia. PX18(Spankovich-5-8); *see also* PX16(Lustig-14-15).

The fact that Keefer's injuries were exacerbated in Iraq,[6] Georgia, Hawaii, and/or California is of no moment for choice of law. To be sure, subsequent testing shows "progressive sensorineural hearing loss" attributable to "noise exposure while in the military." PX16(Lustig-7, 12); PX18(Spankovich-5, 8) (noting "further

---

[6] Defendants might argue that Keefer was initially injured in Iraq by an IED. This argument ignores evidence of Keefer's preexisting injury in Georgia. *See also* PX12(TG250_11). In any event, Keefer was hundreds of meters away from the blast, and "no one in his vehicle sustained any injury." PX16(Lustig-8).

worsening in thresholds" and "sustained hearing loss"); PX17(E-Keefer-43:3-5)
("Throughout his whole military career, there was a pretty steady decline."). But
Keefer's initial injury at Fort Benning is the defining moment for the *lex loci* inquiry.
As the place where "the last event necessary" occurred, Georgia law controls. *See
Velten*, 985 F.2d at 1521; *Int'l Bus. Mach. v. Kemp*, 536 S.E.2d 303, 306-07 (Ga.
App. 2000) ("In torts of a transitory nature, the place of the wrong is the place where
the last event occurred necessary to make an actor liable for the alleged tort."); *see
also* Restatement (First) of Conflict of Laws § 377 n.1 (1934) ("[T]he place of wrong
is the place where the harmful force takes effect upon the body."). Because Georgia
is both the *lex loci* and *lex fori*, the distinction between statutory and common-law
claims is inconsequential.[7]

### 3. Applying Indiana law would violate Georgia's choice-of-law rules and the federal enclave doctrine.

Like in *Baker*, Defendants recommend Indiana law even though it is
undisputed Keefer was not injured there. PX1(Chart-4). For the same reasons
Indiana law cannot override Washington law in *Baker*, it cannot override Georgia
law in *Keefer*. *See Dowis*, 621 S.E.2d at 416 (rejecting request to "abrogate
[Georgia's] long-used conflict of laws rule in order to bypass Georgia law").

---

[7] Applying Georgia law is consistent with due process because Georgia is the *lex
loci*. *See In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 678-79 (N.D. Ga. 2003).

As a threshold matter, Georgia law must apply to all common-law issues, regardless of where Keefer was injured. *See Terrill v. Electrolux*, 753 F.Supp.2d 1272, 1280 (S.D. Ga. 2010). Moreover, if Keefer was injured in Iraq instead of Georgia, as Defendants argue, then Iraqi statutory law is "the presumptive choice." *Sosa*, 542 U.S. at 706. However, the Court should apply forum law rather than Iraqi law because neither party has endorsed that law or carried their burden to prove how it applies in *Keefer. See, e.g.*, *Vishipco*, 660 F.2d at 860. Therefore, even if Keefer was first injured abroad, Georgia law governs.

Defendants also play choice-of-law hopscotch by jumping over Georgia to land on Indiana based on an alternative "interest analysis." PX1(Chart-4). Georgia law is crystal clear that the *lex loci* is "the place where the injury sustained was suffered rather than the place where the act was committed." *Auld*, 2020 WL 5753317, at *2; *see Dowis*, S.E.2d at 414-19. This remains the rule for "multi-state" injuries. *See Adventure Outdoors v. Bloomberg*, 2007 WL 9735875, at *2-3 (N.D. Ga. Dec. 18, 2007) ("Based on the strong language in *Dowis* rejecting the more 'modern' approach, the court finds that Georgia would not apply the Restatement (Second) Conflict of Laws *under any circumstances*.") (emphasis added). Therefore, applying anything but Georgia law would be reversible error. *See Mbatha*, 2020 WL 5627126, at *5-6 (reversing district court for failure to apply *lex loci*); *see also SIS, LLC v. Stoneridge Software*, 2018 WL 10582334, at *3 n.5 (N.D. Ga. July 17, 2018)

(refusing to apply law of state where defendants "maintain their primary places of business"); *Purcell v. Catlin*, 2010 WL 786611, at *3 (M.D. Ga. Mar. 5, 2010) (declining to apply any "exception to the traditional principle of *lex loci delicti*").[8]

Applying Indiana law would not only violate *lex loci delicti*; Georgia law expressly forbids it. *See Karimi v. Crowley*, 324 S.E.2d 583, 585 (Ga. App. 1984). In *Bailey v. Cottrell*, the court held the Indiana Product Liability Act's "failure to recognize a strict liability claim for design defects" directly "contravene[d] the public policy of [Georgia] as expressed in OCGA § 51-1-11," which permits such claims. 721 S.E.2d 571, 574 (Ga. App. 2011). Thus, as in *Bailey*, Keefer is "entitled to have Georgia law . . . applied to [his] claims." *Id.*; *see Alexander v. Gen. Motors Corp.*, 478 S.E.2d 123, 124 (Ga. 1996) (failure to recognize strict liability is "contrary to public policy").

Additionally, Georgia law—unlike Indiana law—does not cap punitive damages in product-liability cases. *Compare* O.C.G.A. § 51-12-5.1(e), *with* Ind. Code § 34-51-3-4. Therefore, even if Indiana were somehow the *lex loci delicti*, Georgia's public-policy exception forbids this Court from applying Indiana's punitive-damages statute. *See, e.g.*, *Phillips v. FedEx*, 2020 WL 2212769, at *2

---

[8] In the extraordinary event the Georgia Supreme Court overruled itself, the Restatement's test yields the same result. *See supra* n.5; *see also J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 904 n.11 (2011) (Ginsburg, J., dissenting) ("Even as many jurisdictions have modified the traditional rule of *lex loci delicti*, the location of injury continues to hold sway in choice-of-law analysis in tort cases.").

(N.D. Ga. Feb. 6, 2020) (refusing to apply Mississippi's cap on noneconomic damages because it "contravenes Georgia's public policy").

Finally, Defendants' claim that Fort Benning is a "federal enclave" decimates their argument. PX1(Chart-4). Even if Defendants were to carry their burden to prove that point, the federal enclave doctrine operates as a *lex loci* test and Georgia law applies in *Keefer. See* 28 U.S.C. § 5001(b). Applying Indiana law would thus violate the very doctrine Defendants' invoke.

**III.    The substantive legal issues in *Hacker* and *McCombs* are controlled by Minnesota's five-factor test, not the place of wrongdoing.**

Hacker and McCombs designated the District of Minnesota, so Minnesota choice-of-law rules govern their cases. *Hacker* Dkt. 5; *McCombs* Dkt. 4. Minnesota employs a three-step analysis that incorporates a five-factor test at step three. *Blake Marine v. CarVal Investors*, 829 F.3d 592, 595 (8th Cir. 2016). Step one considers "whether the different states' laws actually present a conflict." *Whitney v. Guys*, 700 F.3d 1118, 1123 (8th Cir. 2012). Conflict exists here. *See supra* n.1. Step two asks "whether the different states' laws constitutionally may be applied to the case." *Whitney*, 700 F.3d at 1123. Courts often "merge" this inquiry with the next step. *Nesladek v. Ford*, 876 F.Supp. 1061, 1068 (D. Minn. 1994); *see Hime v. State Farm*, 284 N.W.2d 829, 833 (Minn. 1979).

At step three, Minnesota courts consider five "choice-influencing" factors depending on the facts of each case: "(1) predictability of result; (2) maintenance of

23

interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law." *See Jepson*, 513 N.W.2d at 470 (requiring courts to "consider each new fact situation"). In tort cases, Minnesota courts typically find "the first and third factors have little value," and "the fifth factor does not appear to carry much weight." *Burks v. Abbott*, 639 F.Supp.2d 1006, 1013 (D. Minn. 2009). Simply put, the second and fourth factors often control. *See, e.g.*, *id.* at 1013-14; PX1(Chart-3).

Factor two—maintenance of interstate and international order—considers whether applying one state's law would "manifest disrespect for [another state's] sovereignty or impede the interstate movement of people and goods." *Jepson*, 513 N.W.2d at 470-71. This "factor weighs in favor of the state which has the most significant contacts with the facts relevant to the litigation." *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 207 (D. Minn. 2003).

The state where the plaintiff suffers injury has a greater interest than the defendant's home state. In *Hughes v. Wal-Mart*, the Eighth Circuit found the second factor favored Louisiana law in a products-liability case where the defendant's principal place of business was in Arkansas, but the plaintiff purchased, used, and was injured by the defective gas container in Louisiana. 250 F.3d 618, 621 (8th Cir. 2001). *Burks* similarly held the second factor supported Louisiana law because the plaintiff used the defective infant formula and was diagnosed with his injury there.

639 F.Supp.2d at 1013. Those contacts outweighed the interests of the state where the defendant had manufactured the formula. *See id.* The place where a defendant designed a defective device does not tip the scale. *See, e.g.*, *Gruenwald v. Toro*, 2019 WL 6524894, at *3-4 (D. Minn. Dec. 4, 2019).

Factor four—advancement of the forum government's interest—ensures that Minnesota courts do not apply laws inconsistent with Minnesota's concept of fairness and equity. *Hime*, 284 N.W.2d at 833. This factor again favors the state "in which the injury occurred." *In re Mirapex Prod. Liab. Litig*., 2007 WL 9636345, at *4 (D. Minn. Nov. 27, 2007). "Minnesota's interest in compensating tort victims is lessened where the injury occurred in another state, the injured party is not a Minnesota resident and did not receive medical care [in Minnesota]." *Schmelzle v. ALZA*, 561 F.Supp.2d 1046, 1050 (D. Minn. 2008). The interests of other states must be respected in such situations because the interest of the defendant's home state is "tenuous." *Hughes*, 250 F.3d at 621; *see also Myers v. Gov't Emp. Ins.*, 225 N.W.2d 238, 242 (Minn. 1974) (emphasizing that the competing forum's interest must also be considered).

When all "relevant choice-of-law factors favor neither state's law, the state where the accident occurred has the strongest governmental interest." *Nodak Mut. Ins. Co. v. Am. Fam. Mut.*, 604 N.W.2d 91, 96 (Minn. 2000). Stated differently, where the second and fourth factors are neutral, the *lex loci* applies to the case. *Id.*

### A.    Kentucky law governs *Hacker*.

Minnesota's five-factor test compels application of Kentucky law in *Hacker*. Factor two favors Kentucky law because Hacker purchased, used, and was injured by the CAEv2, and was first diagnosed with tinnitus, while stationed at Fort Campbell. Those contacts, and the fact that Kentucky law advances Minnesota's interest in compensating tort victims, also favor Kentucky law under factor four.

### 1.    Hacker purchased, used, and was injured by the CAEv2 in Kentucky.

Hacker served in the Army from 1998 through 2018. PX20(DD214). He wore the CAEv2 from 2003 to 2011. PX21(Rog-30). During that time, he was stationed in Texas, Kentucky, and Colorado, and he deployed to Kuwait, South Korea, and Iraq. PX22(Enlisted-Record-Brief); PX20(DD214). Hacker was first issued the CAEv2 in Texas; he later purchased another pair at Fort Campbell, Kentucky, from the clothing and sales store. PX23(Hacker-24:15-25:3, 84:2-19).

Hacker was stationed at Fort Campbell when his tinnitus was first documented and diagnosed at the LaPointe Health Clinic on April 3, 2006. PX23(Hacker-96:16-17); PX24(Arriaga-4, 6, 13) ("[T]innitus and its sequelae are an ongoing and documented clinical problem for Mr. Hacker beginning in April 2006."); PX25(Spankovich-9, 12) ("Hacker began complaining of tinnitus in April 2006."). Additional testing in July 2007—again, while Hacker was stationed at Fort Campbell—"showed a pattern of a slight to mild sensorineural hearing loss at 6000

Hz in his left ear, which generally indicates hazardous noise exposure." PX25(Spankovich-12); *see* PX24(Arriaga-7, 20) (opining that Hacker developed an "early noise notch in the left ear" in 2007 due to "unprotected toxic noise exposure" from the CAEv2).

> ## 2. Maintenance of interstate order favors Kentucky law because Kentucky has the most significant contacts to *Hacker*.

Minnesota's second factor favors the state with the most significant contacts to the case. *Baycol*, 218 F.R.D. at 207. In practice, this factor prioritizes the place of purchase, injury, and diagnosis over the defendant's principal place of business or the locus of wrongdoing. *See, e.g.*, *Hughes*, 250 F.3d at 621. Here, Kentucky has the most significant contacts because it is where Hacker purchased, used, and was injured by the CAEv2, as well as where his hearing-related injuries were diagnosed. PX24(Arriaga-6-7).

Kentucky is also where Hacker read the CAEv2's packaging and relied upon Defendants' false representations. PX23(Hacker-181:2-183:24). Additionally, Hacker lived in the Fort Campbell barracks in 2006, PX23(Hacker-100:5-9), and resided in Kentucky with his wife after they married in 2007, PX26(E-Hacker-13:23-14:4); PX23(Hacker-33:17-18). Finally, Hacker suffered from his hearing-related

injuries in Kentucky. *E.g.*, PX23(Hacker-55:16-56:11); PX26(E-Hacker-45:23-46:6).[9]

Although Hacker used the CAEv2 elsewhere, those contacts are comparatively insignificant. For example, Hacker received his first pair of CAEv2 in Texas, but his use was more significant while in Kentucky. PX22(Enlisted-Record-Brief); PX21(Rog-30). Defendants maintain Hacker was injured "in foreign countries such as South Korea," PX1(Chart-3), but he was there for only a year and experienced "limited loud noise exposure," PX22(Enlisted-Record-Brief); PX24(Arriaga-5). To the extent Hacker's injuries were aggravated in Iraq, those tours post-date "his onset of tinnitus . . . in 2006" and "early noise notch" when he was stationed in Kentucky. PX24(Arriaga-6-7). Regardless, Hacker returned to Fort Campbell after his tour in South Korea, he deployed to Iraq from Fort Campbell, and he returned to Fort Campbell thereafter. PX22(Enlisted-Record-Brief); PX23(Hacker-150:13-20, 151:23-25). Kentucky remained the epicenter of his contacts throughout those tours of duty.

Defendants also emphasize that "[t]he conduct allegedly resulting in Hacker's injury occurred in Indiana," PX1(Chart-3), but they ignore that Indiana is not the sole jurisdiction tied to their malfeasance, *see supra* I.B. Even if it were, Indiana's

---

[9] Applying Kentucky law would not violate due process given those significant contacts. *See Mirapex*, 2007 WL 9636345, at *2 (finding no constitutional issue with applying the law of place of injury).

contacts "pale in comparison" to where Hacker "bought" the CAEv2, he "used" the CAEv2, and his injury "occurred." *Gruenwald*, 2019 WL 6524894, at *3; *see, e.g.*, *Hughes*, 250 F.3d at 621; *Burks*, 639 F.Supp.2d at 1013; *Nelson v. Delta*, 2006 WL 1283896, at *4 (D. Minn. May 9, 2006).

Because Kentucky has the most significant contacts with Hacker's case, applying Indiana law would subvert Kentucky's sovereignty. *See Johannessohn v. Polaris*, 450 F.Supp.3d 931, 963-65 (D. Minn. 2020) (refusing to apply law of state where defendant was headquartered, even though "some relevant conduct occurred or emanated from [there]," because doing so would subvert interests of states where plaintiffs were injured). The maintenance of interstate and international order thus favors, if not compels, the application of Kentucky law.

### 3. Unlike Indiana law, Kentucky law advances Minnesota's interest in compensating tort victims such as Hacker.

Factor four "requires the Court to consider not only Minnesota's governmental interest . . . but also [the competing states'] public policy." *Fee v. Great Bear Lodge*, 2004 WL 898916, at *3 (D. Minn. Apr. 9, 2004); *see Erickson v. Hertz*, 2006 WL 1004385, at *4-5 (D. Minn. Apr. 17, 2006). When a plaintiff is injured outside the forum, the law of the state where the injury occurred generally applies unless it offends Minnesota's interest in compensating tort victims. *See, e.g.*, *Nelson*, 2006 WL 1283896, at *1, 4.

29

Kentucky "clearly has a strong interest in having the rights of [Hacker] adjudicated with its own law" because his injuries occurred "within [its] borders." *Burks*, 639 F.Supp.2d at 1013; *see Baycol*, 218 F.R.D. at 207 (collecting cases finding that the fourth factor generally favors application of the state law "in which the injury occurred"). While Minnesota (the forum) may have "some interest in protecting nonresidents from tortious acts committed within the state," its interest "is only slight and does not support application of [its] law to [this] litigation." *Hughes*, 250 F.3d at 621. Likewise, even assuming all of Defendants' misdeeds occurred in Indiana, Indiana's relative "interest in compensating tort victims is lessened" because Hacker's "injury occurred in another state," he "is not an [Indiana] resident," and he "did not receive medical care" there. *See Schmelzle*, 561 F.Supp.2d at 1050. There is "no reason to believe that [the] laws of [Kentucky] could not equally or more effectively hold [Defendants] accountable for [their] alleged wrongdoing" in Indiana and Minnesota. *See Johannessohn*, 450 F.Supp.3d at 966. Kentucky's interest in applying its laws is therefore significantly stronger than Indiana's or Minnesota's. *See, e.g.*, *Gruenwald*, 2019 WL 6524894, at *3.

What's more, Kentucky law—unlike Indiana law—advances Minnesota's interest in compensating tort victims. *See Nw. Airlines, Inc. v. Astraea, Inc.*, 111 F.3d 1386, 1394-95 (8th Cir. 1997); *Jepson*, 513 N.W.2d at 472. Like Minnesota, Kentucky permits plaintiffs to pursue both negligence and strict-liability claims. *See*

*DeMoss v. Eli Lilly*, 234 F.Supp.3d 873, 878-81 (W.D. Ky. 2017); *Bilotta v. Kelley*, 346 N.W.2d 616, 622 (Minn. 1984). Indiana, however, prohibits strict-liability design-defect claims altogether. *TRW Vehicle Safety v. Moore*, 936 N.E.2d 201, 209 (Ind. 2010). While Indiana law restricts tort recovery in myriad other ways, *e.g.*, Ind. Code § 34-20-3-1 (10-year statute of repose), this example alone demonstrates that Kentucky law better advances Minnesota's interest in compensating Hacker, *see Fee*, 2004 WL 898916, at *3; *cf. Nw. Airlines*, 111 F.3d at 1395. The fourth and final factor thus favors Kentucky law.[10]

### 4. Kentucky law controls even if Minnesota's choice-of-law factors are neutral or the federal enclave doctrine applies.

Even if the foregoing factors were neutral, which they are not, Kentucky law would still govern *Hacker*. "[W]hen all other relevant choice-of-law factors favor neither state's law, the state where the accident occurred has the strongest governmental interest, and that state's law should therefore be applied." *Nodak*, 604 N.W.2d at 92. The record makes clear Hacker suffered hearing-related injuries while stationed in Kentucky. *E.g.*, PX24(Arriaga-4, 13) ("[T]innitus and its sequelae are

---

[10] To the extent the Court considers the remaining factors, they are neutral or favor Kentucky law. For example, factor one—predictability—favors Kentucky law because "Defendants shipped the [CAEv2] into [Kentucky] and [Hacker] could have expected any claims arising from his [use of the CAEv2 in Kentucky] to be governed by its law." *See Gareis v. 3M Co.*, 2018 WL 1835988, at *1 (D. Minn. Apr. 17, 2018); *see also* PX23(Hacker-24:15-25:3) (Hacker purchased CAEv2 at Fort Campbell); Dkt. 1072-50 at 4 (Defendants shipped CAEv2 to Fort Campbell).

an ongoing and documented clinical problem for Mr. Hacker beginning in April 2006."). No evidence shows he was injured in Indiana. Kentucky law thus controls "even if the choice-of-law analysis did not favor [it]." *Burks*, 639 F.Supp.2d at 1013.

Moreover, if Fort Campbell is a "federal enclave," as Defendants claim, then 28 U.S.C. § 5001(b) also compels the application of Kentucky law. *See supra* I.D.

### B.   Alaska law governs *McCombs*.

Minnesota's choice-of-law test requires the application of Alaska law to *McCombs*. Under the second factor, Alaska has the most significant contacts with McCombs's case given his lengthy use of the CAEv2 and exposure to injury in Alaska. Under the fourth factor, applying Alaska law would further Minnesota's interest in compensating tort victims while Indiana law would undercut it.

### 1.   McCombs received and used the CAEv2 in Alaska, encountered ototoxic noise in Alaska, and returned to Alaska after deployment.

McCombs used the CAEv2 during his entire career in the Army Airborne Infantry from March 2008 to July 2011. PX27(Rogs-5, 30). He first received the CAEv2 in March 2008 while in Georgia, but his use was limited as he transferred to Alaska soon thereafter. PX27(Rog-27); PX28(DL-McCombs-DOD-0047). McCombs was issued at least one other pair at Fort Richardson, Alaska. PX27(Rog-29). He used the CAEv2 there from August 2008 to March 2009, prior to his deployment to Afghanistan. PX29(McCombs-216:5-18; 415:16-19). After returning

to Fort Richardson, McCombs again used the CAEv2 in Alaska for 17 months until discharge. PX29(McCombs-415:16-19).

McCombs was exposed to hazardous noise while wearing the CAEv2 in Alaska. Though McCombs first complained of tinnitus symptoms a few weeks after he left Alaska for Afghanistan, the IED blast in Afghanistan was not the sole cause of his injury. McCombs's "exposure to noise from rounds during active engagement with the enemy *in addition to* rounds fired during training constitute[d] an ototoxic dose of impulse noise exposure." PX30(Arriaga-4) (emphasis added). McCombs was also "'unprotected' from military noise exposure" when he returned to Alaska and used the CAEv2 "during firearm training." PX30(Arriaga-10). And he continued to suffer from tinnitus when stationed in Alaska for the remainder of his service. *See* PX29(McCombs-312:10-21, 415:16-19).

## 2. Maintenance of interstate order favors Alaska law because Alaska has the most significant contacts to *McCombs*.

Minnesota's second factor favors the law of the state with the "most significant contacts." *Nelson*, 2006 WL 1283896, at *3. Alaska has the most significant contacts with McCombs's case, including his lengthy use of the CAEv2.

Except for a few brief trainings in Georgia and California, as well as a one-year tour of duty abroad, all of McCombs's CAEv2 use occurred in Alaska over the span of two years. PX29(McCombs-415:16-23); PX28(DL-McCombs-DOD-0047); PX31(DD214). During that time, McCombs noticed the CAEv2 "would start to

33

loosen" when merely "walking at a fast pace" or from "hitting bumps" while driving over Alaska's "rough terrain." PX29(McCombs-415:5-11).

McCombs also encountered "impulse noise exposure during firearm training and weapons qualifications" while wearing the CAEv2 at Fort Richardson. PX30(Arriaga-10); PX29(McCombs-216:5-217:8). Another servicemember testified that McCombs completed extensive training cycles in Alaska involving "three days of heavy weapons training in a row" with frequent "noise of the actual firing." PX32(Thompson-22:22-23:10, 128:19-130:23). Expert reports similarly show McCombs's tinnitus was not only caused by combat noise, but also "rounds fired during training." PX30(Arriaga-4). In short, McCombs was "unprotected from military noise exposure" when using the CAEv2 during training at Fort Richardson. PX30(Arriaga-4, 10-11).

Finally, McCombs received at least one pair of CAEv2 and instructions for use in Alaska before his deployment. *See* PX27(Rog-29); PX32(Thompson-71:12-74:18). And he continued to suffer from tinnitus in Alaska after his deployment. *See* PX29(McCombs-312:10-21, 415:16-19). The totality of these contacts, which the Court must credit, favors Alaska law. *See Gruenwald*, 2019 WL 6524894, at *3.[11]

---

[11] Applying Alaska law is consistent with due process given McCombs's significant contacts with Alaska. *See Nesladek*, 876 F.Supp. at 1068.

Against this evidence, Defendants again contend "Indiana has a much greater interest in [this] dispute than any other state" because "[t]he conduct allegedly resulting in McCombs's injury occurred in Indiana." PX1(Chart-5). Not so. Defendants' tortious conduct touched many other states and countries beyond Indiana, including Minnesota, Maryland, Pennsylvania, Mexico, and France. *See supra* I.B. In any event, Defendants disregard McCombs's prolonged and significant contacts with Alaska. *See Gruenwald*, 2019 WL 6524894, at *3 (interests of state where defendant was headquartered and designed the product "paled in comparison" to the interests of state where plaintiff received and used the product); *see also Baycol*, 218 F.R.D. at 207 (emphasizing place where drug "was prescribed and ingested"); *Mirapex*, 2007 WL 9636345, at *4 (same); *Foster v. St. Jude*, 229 F.R.D. 599, 605 (D. Minn. 2005) ("[P]roper consideration of Minnesota's choice-of-law factors reveals that the law of the state where the [device] was implanted [should] apply."). Maintaining interstate order thus favors Alaska law.

> **3.   In contrast to Indiana law, Alaska law furthers Minnesota's interest in compensating tort victims such as McCombs.**

Factor four considers "which choice of law most advances a significant interest of the forum." *Burks*, 639 F.Supp.2d at 1013. "In considering which law will advance the governmental interest of Minnesota, the court is to consider the public policy of both (or in this case, all three) forums"—here, Minnesota, Indiana, and Alaska. *See Danielson v. Nat'l Supply*, 670 N.W.2d 1, 8 (Minn. App. 2003).

Although Minnesota has a significant interest in compensating tort victims, its interest in compensating nonresidents such as McCombs for out-of-state injuries is only "slight." *Hughes*, 250 F.3d at 621. Indiana's interest is equally "tenuous" because McCombs is not from Indiana and he was not injured there. *Id*. Alaska, on the other hand, has an undeniable interest in applying its tort laws to compensate a veteran like McCombs, who was exposed to ototoxic noise as a result of the CAEv2 and suffered from tinnitus while residing there. *See id.*

Alaska law also better serves Minnesota's policy interests. *See, e.g.*, *Jacobson v. Universal Underwriters*, 645 N.W.2d 741, 746 (Minn. App. 2002). Alaska and Minnesota both allow tort victims to pursue strict-liability and negligence claims, whereas Indiana forecloses the former. *Compare Shanks v. Upjohn*, 835 P.2d 1189, 1198-1200 (Alaska 1992); *Bilotta*, 346 N.W.2d at 622, *with Moore*, 936 N.E.2d at 209. Other aspects of Alaska products-liability law align with Minnesota law, while Indiana law is out of step. *Compare* Alaska Stat. § 09.10.055(b)(1)(E) (10-year statute of repose inapplicable to product-related claims), *with* Ind. Code § 34-20-3-1 (10-year statute of repose). Alaska law, in stark contrast to Indiana law, would therefore "advanc[e] both Minnesota's and [Alaska's] governmental interests." *Fee*, 2004 WL 898916, at *3.[12]

---

[12] If the Court considers the remaining factors, they are neutral or favor Alaska law. For instance, factor one—predictability—favors Alaska law because "Defendants

### 4. If Minnesota's five-factor test is neutral, the *lex fori* controls because the international *lex loci* does not apply.

If the choice-of-law analysis "d[oes] not favor either state's law, . . . the law of the state where the accident occurred should be applied." *Burks*, 639 F.Supp.2d at 1013. This alternative analysis defeats Defendants' arguments on their own terms.

Assuming McCombs's "only alleged injury occurred in Afghanistan," as Defendants insist, Indiana law cannot apply to his case. PX1(Chart-5). Either the law of Afghanistan (the *lex loci*) applies because McCombs's injury occurred there, *Nodak*, 604 N.W. 2d at 96, or the law of Minnesota (the *lex fori*) applies because neither party has endorsed Afghan law or carried their burden to prove how it applies, *see, e.g.*, *Cavic v. Grand Bahama*, 701 F.2d 879, 882-83 (11th Cir. 1983); *Vishipco*, 660 F.2d at 860 (applying the *lex fori*, "even though the forum's choice of law rules would have called for the application of foreign law," because neither party advocated for foreign law); *Indus. Graphics, Inc. v. Asahi*, 485 F.Supp. 793, 797 n.2, 800 (D. Minn. 1980) (applying Minnesota law because "defendant ha[d] waived any contention that Japanese law applies").

This approach coheres with Minnesota's third factor regarding "simplification of the judicial task." *Nodak*, 604 N.W.2d at 95; *Jepson*, 513 N.W.2d at 472

---

shipped the [CAEv2] into [Alaska] and [McCombs] could have expected any claims arising from his [use of the CAEv2 in Alaska] to be governed by its law." *See Gareis*, 2018 WL 1835988, at *1; PX27(Rog-29) (McCombs received CAEv2 at Fort Richardson); Dkt. 1072-71 at 21 (Defendants shipped CAEv2 to Fort Richardson).

(considering whether foreign law "could be applied without difficulty"). Thus, if the factors are neutral and Defendants are correct that McCombs was injured exclusively abroad—which McCombs contests—then Indiana law cannot govern his lawsuit. Instead, the Court should apply the law of the forum, here, Minnesota.[13]

### C.   Defendants' recommendation to apply Indiana law contradicts the great weight of case law and 3M's own arguments in a recent MDL.

At bottom, Indiana law cannot apply to *Hacker* or *McCombs* because Indiana has little to no interest in "ensuring that nonresidents [Hacker and McCombs] are compensated for injuries that occur[red] in *another state.*" *Hughes*, 250 F.3d at 621. Courts applying Minnesota's five-factor test have "not given the [domicile] of the corporate defendant much weight in tort cases." *Baycol*, 218 F.R.D. at 207; *see, e.g.*, *Nelson*, 2006 WL 1283896, at *4 ("[T]he court attributes little weight to the domicile of a corporate defendant in determining the law applicable to tort.").

This is so even though some of Aearo's misconduct occurred in Indiana. *See Blake Marine*, 829 F.3d at 595-96 (Alabama law applied to resident's claims even though tort originated in defendant's Minnesota office); *Schmelzle*, 561 F.Supp.2d at 1048-50 (applying Wyoming law even though defendant had operations in Minnesota); *Gruenwald*, 2019 WL 6524894, at *4 ("That Toro is headquartered in Minnesota and might have designed the mower in Minnesota simply does not

---

[13] This is especially true because McCombs used the CAEv2 after 3M bought Aearo.

outweigh the fact that the focus of this litigation is in Illinois."); *Nelson*, 2006 WL 1283896, at *4 (applying Colorado law to products-liability claims against Minnesota corporation because plaintiff lived in New Mexico and was injured while working in Colorado); *see also Hughes*, 250 F.3d at 621 (rejecting argument that states have an "interest in having [their] product liability laws enforced against [their] own corporate residents when the products they sell to others injure the residents of other states"); *Johannessohn*, 450 F.Supp.3d at 965 (rejecting argument that a state "has a compelling interest in redressing wrongs committed within its borders because the reputations of other [businesses within the state] are tarnished").

Citing *Hughes*, *Blake Marine*, and *Nelson*, 3M argued in the *Bair Hugger* MDL that the law of the state where the injury occurred—*not* the place of domicile or wrongdoing—controlled. Based on Minnesota's five-factor test, 3M asserted that the law of South Carolina applied to the first bellwether because the plaintiff was injured there. *See Gareis v. 3M Co.*, No. 16-cv-4187, Dkt. 24 at 31-34 (D. Minn. Feb. 20, 2018). Tellingly, 3M emphasized that "[e]ven where tortious conduct *originated* in Minnesota, Minnesota has no overriding interest in compensating nonresidents for injuries outside Minnesota." *Id.* at 34 (emphasis in original). The MDL court agreed and held that South Carolina law applied because "South Carolina's governmental interests dominate Minnesota's interest in policing local manufacturers." *Gareis*, 2018 WL 1835988, at *1.

3M cannot flip-flop here. In 3M's own words, even if its misconduct "originated" entirely in Indiana, Indiana has "*no overriding interest in compensating nonresidents for injuries outside*" Indiana. *See Gareis*, Dkt. 24 at 34 (emphasis added). Indiana law therefore cannot apply in *Hacker* or *McCombs*. *See Mirapex*, 2007 WL 9636345, at *4 (refusing to apply the law of "one state to plaintiffs from multiple states where individual state laws differ"); *Bridgestone/Firestone*, 288 F.3d at 1016 (emphasizing that "a uniform place-of-the-defendant's-headquarters rule . . . has not carried the day with state judges" in products-liability cases).

## IV.   New York's interest analysis supports the parties' agreement that Georgia law governs the substantive legal issues in *Estes*.

The parties agree Georgia law governs *Estes*. PX1(Chart-2). Although the Court need not conduct its own choice-of-law analysis, *see, e.g.*, *Buzbee v. Streicher*, 2007 WL 2781172, at *2 (M.D. Fla. Sept. 24, 2007), the analysis supports the parties' agreement that Georgia law applies.

Estes designated the Southern District of New York, *Estes* Dkt. 5, which applies an "interest analysis" test that distinguishes between "conduct-regulating" and "loss-allocating" issues, *Schultz v. Boy Scouts*, 480 N.E.2d 679, 682-84 (N.Y. 1985). For conduct-regulating issues, if the "defendant's negligent conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred" (*i.e.*, the *lex loci*). *Id.* at 682-83. For loss-allocating issues, if the

parties are domiciled in different states and the accident occurred in yet another state, the general "rule of decision will be that of the state where the accident occurred" (*i.e.*, the *lex loci*). *Neumeier v. Kuehner*, 286 N.E.2d 454, 458 (N.Y. 1972). In short, the law of the place of injury typically has the greatest interest. *See In re Air Crash*, 798 F.Supp.2d at 490 (noting New York's "adherence to *lex loci delicti* in conduct-regulating choice-of-law situations"); *King v. Car Rentals*, 813 N.Y.S.2d 448, 454 (N.Y. App. Div. 2006) ("[T]he third *Neumeier* rule [for loss-allocating issues] requires the application of the law of . . . the *lex loci delicti*.").

Estes used the CAEv2 while in New York, but his noise exposure there was minimal compared to Georgia. *Compare* PX33(Estes-215:4-8) ("fewer rounds . . . maybe hundreds during the summer"), *with* PX33(Estes-215:12-216:5) (exposure to "thousands" of rounds). Estes first noticed hearing issues in 2014 when stationed in Georgia, and his injury was confirmed by audiogram in Georgia. *See, e.g.*, PX34(Packer-20, Ex.D-4) ("His loss temporally occurred while on the training range at Fort Benning."). Defendants do not dispute Estes was injured in Georgia. PX1(Chart-2). As the place where Estes both used the CAEv2 and was injured, Georgia's interest is paramount under New York's interest analysis. *See, e.g.*, *Wong v. Marriott*, 2009 WL 5538644, at *3-5 (E.D.N.Y. Dec. 18, 2009).

Defendants agree Georgia law applies, yet they sidestep New York's choice-of-law test and instead invoke the federal enclave doctrine. PX1(Chart-2). Their

reliance on 28 U.S.C. § 5001(b) is curious—citing the statute when it serves them and otherwise ignoring it. Equally perplexing, Defendants disregard each forum's binding choice-of-law test in a results-oriented play for Indiana law in all but two cases. Their gamesmanship should not be rewarded in *Estes* or any other case.

## CONCLUSION

For these reasons, the Court should apply Washington law in *Baker*, Georgia law in *Estes* and *Keefer*, Kentucky law in *Hacker*, and Alaska law in *McCombs*.


DATED: November 23, 2020

*s/ Bryan F. Aylstock*
Bryan F. Aylstock, Lead Counsel
Florida State Bar No. 078263
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel.: (850) 202-1010
baylstock@awkolaw.com

Shelley V. Hutson, Co-Lead Counsel
(Admitted Pro Hac Vice)
Texas State Bar No. 00788878
Clark, Love & Hutson, GP
440 Louisiana Street, Suite 1600
Houston, TX 77002
Tel.: (713) 757-1400
shutson@triallawfirm.com

Christopher A. Seeger, Co-Lead Counsel
(Admitted Pro Hac Vice)
New Jersey State Bar No. 042631990
Seeger Weiss LLP

77 Water Street, 8th Floor
New York, NY 10005
Tel.: (212) 587-0700
cseeger@seegerweiss.com

Michael A. Sacchet, Chair of Law & Briefing
(Admitted Pro Hac Vice)
Minnesota State Bar No. 0395817
Ciresi Conlin LLP
225 South 6th Street, Suite 4600
Minneapolis, MN 55402
Tel.: (612) 361-8220
mas@ciresiconlin.com

Nicole C. Berg, Law & Briefing
(Admitted Pro Hac Vice)
Illinois State Bar No. 6305464
Keller Lenkner LLC
150 North Riverside Plaza, Suite 4270
Chicago, IL 60606
Tel.: (312) 948-8477
ncb@kellerlenkner.com

**Counsel for Plaintiffs**

## <u>CERTIFICATE OF COMPLIANCE</u><br><u>WITH PRETRIAL ORDER NO. 55</u>

I hereby certify that this memorandum complies with Pretrial Order No. 55 and contains 10,000 words.

*s/ Bryan F. Aylstock*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 23, 2020, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*s/ Bryan F. Aylstock*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |
| *Baker*, 7:20-cv-39 *Estes*, 7:20-cv-137 *Hacker*, 7:20-cv-131 *Keefer*, 7:20-cv-104 *McCombs*, 7:20-cv-94 | |

## DECLARATION OF MICHAEL A. SACCHET IN SUPPORT OF PLAINTIFFS' MEMORANDUM ON CHOICE OF LAW FOR BELLWETHER GROUP A

1.     My name is Michael A. Sacchet, and I am a partner at Ciresi Conlin LLP. I am a member of the Plaintiffs' Steering Committee. I am also the Chair of the Law, Briefing, and Legal Drafting Committee.

2.     Attached hereto as PX1 is a true and correct copy of the Choice-of-Law Chart for Bellwether Group A, submitted to the Court on October 31, 2020.

3.     Attached hereto as PX2 is a true and correct copy of a CAEv2 brochure, dated February 2006, bearing Bates No. 3M_MDL000423277.

4.     Attached hereto as PX3 is a true and correct copy of a CAEv2 brochure, dated March 2014, bearing Bates No. 3M_MDL000423337.

5.      Attached hereto as PX4 is a true and correct copy of an email from Elliott Berger to Scott Rice, dated January 7, 2010, bearing Bates Nos. 3M_MDL000010065-66.

6.      Attached hereto as PX5 is a true and correct copy of an email from Elliott Berger to Ted Madison, dated July 11, 2014, bearing Bates Nos. 3M_MDL000010140-47.

7.      Attached hereto as PX6 is a true and correct copy of an email from Doug Moses to Mike Cimino, dated March 25, 2011, bearing Bates Nos. 3M_MDL000020026-29.

8.      Attached hereto as PX7 is a true and correct copy of excerpts from Plaintiff Lloyd Eugene Baker's Third Supplemental Objections and Answers to Defendant 3M's First Set of Interrogatories to Plaintiff, dated July 20, 2020.

9.      Attached hereto as PX8 is a true and correct copy of excerpts from the deposition transcript of Lloyd Baker, dated July 21, 2020.

10.     Attached hereto as PX9 is a true and correct copy of the Rule 26 Case Specific Expert Report of Mark Packer, M.D., for Lloyd Baker.

11.     Attached hereto as PX10 is a true and correct copy of the Rule 26 Case Specific Expert Report of Elizabeth Davis, RN, Ph.D., for Lloyd Baker.

12.     Attached hereto as PX11 is a true and correct copy of the Rule 26 Case Specific Expert Report of Kristin Kucsma, M.A., for Lloyd Baker.

13.    Attached hereto as PX12 is a true and correct copy of a U.S. Army Public Health Command publication titled "Readiness through Hearing Loss Prevention: Technical Guide 250," dated July 2014.

14.    Attached hereto as PX13 is a true and correct copy of excerpts from the deposition transcript of Lewis Keefer, dated July 30, 2020.

15.    Attached hereto as PX14 is a true and correct copy of excerpts from the deposition transcript of Shane O'Brien, dated October 7, 2020.

16.    Attached hereto as PX15 is a true and correct copy of excerpts from Plaintiff Lewis Keefer's Supplemental Response to Defendant 3M's First Set of Interrogatories to Lewis Keefer, dated July 29, 2020.

17.    Attached hereto as PX16 is a true and correct copy of the Rule 26 Case Specific Expert Report of Lawrence Lustig, M.D., for Lewis Keefer.

18.    Attached hereto as PX17 is a true and correct copy of excerpts from the deposition transcript of Emily Keefer, dated September 23, 2020.

19.    Attached hereto as PX18 is a true and correct copy of the Rule 26 Case Specific Expert Report of Christopher Spankovich, Au.D., Ph.D., M.P.H., for Lewis Keefer.

20.    Attached hereto as PX19 is a true and correct copy of the Rule 26 Case Specific Expert Report of Michael J. Ostacher, M.D., M.P.H., M.M.Sc., for Lewis Keefer.

21.     Attached hereto as PX20 is a true and correct copy of the Certificate of Release or Discharge from Active Duty (DD214) for Stephen Hacker, dated May 11, 2018.

22.     Attached hereto as PX21 is a true and correct copy of excerpts from Plaintiff Stephen Hacker's Fourth Supplemental Objections and Answers to Defendant 3M's First Set of Interrogatories to Plaintiff, dated July 29, 2020.

23.     Attached hereto as PX22 is a true and correct copy of the Enlisted Record Brief for Stephen Hacker.

24.     Attached hereto as PX23 is a true and correct copy of excerpts from the deposition transcript of Stephen Hacker, dated July 31, 2020.

25.     Attached hereto as PX24 is a true and correct copy of the Rule 26 Case Specific Expert Report of Moises Arriaga, M.D., for Stephen Hacker.

26.     Attached hereto as PX25 is a true and correct copy of the Rule 26 Case Specific Expert Report of Christopher Spankovich, Au.D., Ph.D., M.P.H., for Stephen Hacker.

27.     Attached hereto as PX26 is a true and correct copy of excerpts from the deposition transcript of Eileen Hacker, dated September 25, 2020.

28.     Attached hereto as PX27 is a true and correct copy of excerpts from Plaintiff Dustin L. McCombs's Supplemental Objections and Answers to Defendant 3M's First Set of Interrogatories to Plaintiff, dated July 25, 2020.

29.     Attached hereto as PX28 is a true and correct copy of the Enlisted Record Brief for Dustin McCombs.

30.     Attached hereto as PX29 is a true and correct copy of excerpts from the deposition transcript of Dustin McCombs, dated July 27, 2020.

31.     Attached hereto as PX30 is a true and correct copy of the Rule 26 Case Specific Expert Report of Moises Arriaga, M.D., for Dustin McCombs.

32.     Attached hereto as PX31 is a true and correct copy of the Certificate of Release or Discharge from Active Duty (DD214) for Dustin McCombs, dated June 10, 2011.

33.     Attached hereto as PX32 is a true and correct copy of excerpts from the deposition transcript of Zachary Thompson, dated October 7, 2020.

34.     Attached hereto as PX33 is a true and correct copy of excerpts from the deposition transcript of Luke Estes, dated July 28, 2020.

35.     Attached hereto as PX34 is a true and correct copy of the Rule 26 Case Specific Expert Report of Mark Packer, M.D., for Luke Estes.

36.     Attached hereto as PX35 is a true and correct copy of Exhibit 7 to the 30(b)(6) deposition of Jason Jones, which Mr. Jones prepared for the deposition on September 24, 2020.

37.     I swear under penalty of perjury that the foregoing is true and correct.

DATED: November 23, 2020         */s/ Michael A. Sacchet*
                                  Michael A. Sacchet
                                  Chair of Law & Briefing
                                  (Admitted Pro Hac Vice)
                                  Minnesota State Bar No. 0395817
                                  Ciresi Conlin LLP
                                  225 South 6th Street, Suite 4600
                                  Minneapolis, MN 55402
                                  Tel.: (612) 361-8220
                                  mas@ciresiconlin.com