**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG    )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,   )
                                 )    Pensacola, Florida
                                 )    December 3, 2020
                                 )    10:42 a.m.
                                 )
                                 )
_____  )


**CHOICE OF LAW HEARING**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-98)

A P P E A R A N C E S

**JUDGE DAVID R. HERNDON** (ret.)
*dave@herndonresolution.com*

**FOR THE PLAINTIFFS:**     Ciresi Conlin LLP
                            by:  **MICHAEL A. SACCHET**
                                 *mas@ciresiconlin.com*
                            225 South 6th Street, Suite 4600
                            Minneapolis, Minnesota  55402

                                 ---------

                            Aylstock, Witkin, Kreis & Overholtz, PLLC
                            by:  **BRYAN F. AYLSTOCK**
                                 *baylstock@awkolaw.com*
                            17 E Main Street, Suite 200
                            Pensacola, Florida  32502

                                 ---------

                            Clark Love & Hutson, GP
                            by:  **SHELLEY HUTSON**
                                 *shutson@triallawfirm.com*
                            440 Louisiana Street, Suite 1600
                            Houston, Texas  77002

**FOR THE DEFENDANTS:**     Kirkland & Ellis, LLP
                            by:  **MARK J. NOMELLINI**
                                 *mnomellini@kirkland.com*
                            300 N Lasalle
                            Chicago, Illinois  60654

                                 ---------

                            Moore, Hill & Westmoreland, PA
                            by:  **CHARLES F. BEALL, JR.**
                                 *cbeall@mhw-law.com*

                                 **HALEY J. VANFLETEREN**
                                 *hvanfleteren@mhw-law.com*
                            350 W Cedar Street, Suite 100
                            Pensacola, Florida  32502

```
 1              P R O C E E D I N G S
 2        JUDGE RODGERS:  Good morning.  I do apologize
 3   for the delay.  I know you all have been advised that
 4   I have a criminal jury trial taking place currently.
 5   The jury is deliberating.  We were able to get closing
 6   arguments and instructions done this morning.
 7              However, should the jury have a communication
 8   or a need to speak with me, that will take priority.
 9   I will ask for your patience, and we'll just have to
10   recess oral argument for just the brief time that it
11   takes me to resolve that issue.  But I'm not going to
12   make them wait, I'm sure you understand.
13              Good morning, Judge Jones and Judge Herndon.
14   Again, I apologize for the delay in getting started.
15        JUDGE HERNDON:  Understandable.
16        JUDGE RODGERS:  Thank you.
17              Here in the courtroom, for the Plaintiffs, I
18   have Mr. Sacchet, Mr. Aylstock, and Ms. Hutson; for
19   the Defense, Mr. Nomellini, Ms. VanFleteren, and Mr.
20   Beall.
21              I believe Mr. Sacchet and Mr. Nomellini are
22   conducting the argument?
23        MR. SACCHET:  That's correct.
24        MR. NOMELLINI:  That's correct, Judge.
25        JUDGE RODGERS:  Okay, very good.
```

```
 1              My understanding is you all have been advised
 2    Plaintiffs will go first.
 3              Mr. Sacchet, I understand you will most
 4    likely reserve your full five minutes?
 5              MR. SACCHET:  Yes, please.
 6              JUDGE RODGERS:  Okay.  And, Mr. Nomellini,
 7    you'll have the 30.
 8              And so, 25, and we'll be back to you, Mr.
 9    Sacchet, for the final five minutes.
10              I will ask that you not spend any time on Mr.
11    Estes's case.  My understanding is, from what you've
12    submitted, there is no dispute that the law of Georgia
13    will apply in that case.  And that is as to all
14    claims, correct?
15              MR. SACCHET:  Yes.
16              JUDGE RODGERS:  All right, then, Mr. Sacchet,
17    you're up.
18              MR. SACCHET:  May I remove my mask, Your
19    Honor?
20              JUDGE RODGERS:  Yes.  And I would ask,
21    though, that you argue from the lectern.
22              MR. SACCHET:  Yes.
23              JUDGE RODGERS:  And, Mr. Sacchet, as you're
24    getting settled, I will focus you on one issue that I
25    do want to hear from you on, and you can plug this in
```

1    wherever you like.

2           In terms of deciding issues of fact on this

3    choice-of-law question, that's certainly an issue that

4    I've been pondering, so I'd like to hear your position

5    on it.  I'll hear from Mr. Nomellini as well.  But it

6    could be that in at least -- well, I won't identify

7    the number, but there are some number of these cases

8    where the place of injury seems to be in dispute.

9          **MR. SACCHET:**  Very well, Your Honor.  And I'm

10    happy to address that.  And if I don't get to it soon

11    enough, just let me know, and I'll go right to it.

12          **JUDGE RODGERS:**  All right.  Thank you.

13          **MR. SACCHET:**  May it please the Court?

14          **JUDGE RODGERS:**  Yes, sir.

15          **MR. SACCHET:**  Michael Sacchet on behalf of

16    the Group A plaintiffs.

17          Given the 10,000-word brief that Plaintiffs

18    have already submitted to the Court in a relatively

19    short amount of time for oral argument this morning,

20    Plaintiffs would like to focus their presentation, in

21    addition to the question about the standard of review,

22    on why 3M's request to apply Indiana law simply cannot

23    hold up as a matter of either fact or law.

24          In short, 3M's request to apply Indiana law

25    depends on a two-part faulty syllogism.  The first

premise of their syllogism is that plaintiffs were

stationed on federal enclaves subject to the exclusive

jurisdiction of the United States Government.

3M has not cited a single piece of evidence

in the current record, now or at any time in this

litigation, to show that any of the bases that

plaintiffs were stationed on are in fact federal

enclaves subject to exclusive federal jurisdiction.

**JUDGE RODGERS:**  So, tell me, if the factual

finding is that a particular plaintiff was injured

overseas, then what interest would the state that the

plaintiff now is stationed within on a military base,

what interest would that state have with that case?

**MR. SACCHET:**  So, there are two ways to

approach the question.  The first is, is that, based

on the very cases that 3M cites, the federal enclave

doctrine would not apply if the claim did not arise on

the military base.

**JUDGE RODGERS:**  Correct.

**MR. SACCHET:**  So, in the event that there is

a foreign injury, there might be federal enclave

jurisdiction; but the federal enclave doctrine itself,

for purposes of choice of law, bears no import

whatsoever.

Moreover, although Plaintiffs did not have an

1    opportunity to submit a response brief, given the

2    simultaneous briefing, Plaintiffs have identified one

3    unusual case in which there was a servicemember who

4    was injured abroad in Iraq, exactly like 3M says some

5    of the plaintiffs in this litigation were.

6           And the Court in that case, which is called

7    the *Linfoot* case -- *Linfoot* is actually a case that 3M

8    cited as part of their Combat Arms defense --

9    combatant activities defense, but is no longer raising

10   that defense.

11          But, in any event, the *Linfoot* case -- and

12   the citation for this case, Your Honor, once I find

13   it, is 2015 WL 1190171.  It's out of the Northern

14   District of Tennessee from 2015.

15          In that litigation, the Court recognized that

16   the plaintiff had been injured in Iraq, the plaintiff

17   was a citizen of Tennessee; nonetheless, the plaintiff

18   was stationed at Fort Campbell in Kentucky, just like

19   Plaintiff Hacker.

20          Notwithstanding the fact that the federal

21   enclave doctrine may or may not have applied to Fort

22   Campbell, the Court applied Kentucky law to the

23   choice-of-law question under the Restatement (Second)

24   because of the plaintiff's contact at Fort Campbell

25   that necessarily impact the broader state, even though

1    the injury had occurred in Iraq and even though the

2    plaintiff was not a citizen of Kentucky.

3         **JUDGE RODGERS:**  Was there any analysis -- you

4    said the Court applied the Restatement (Second) -- in

5    terms of the contacts?

6         **MR. SACCHET:**  In terms of the contacts, yes,

7    Your Honor.

8         **JUDGE RODGERS:**  Well, what about the argument

9    3M makes that a servicemember stationed at a

10   particular duty station within a state is not

11   domiciled within that state, and therefore the state

12   could have no interest in the case because the person

13   is not technically or legally a resident of that state

14   and there are no contacts with the case otherwise.

15        **MR. SACCHET:**  So, as a threshold matter,

16   neither the *lex loci* test or the Minnesota five-factor

17   test, that are applicable to all four plaintiffs

18   currently in dispute, depend on whether the plaintiff

19   is domiciled in the state where the choice-of-law

20   inquiry would point in terms of application of state

21   law.

22        **JUDGE RODGERS:**  But I think their argument

23   is, is that the person is stationed at a base within a

24   state and the jurisdiction over that space is all

25   federal, and so the state has no interest in that

1   plaintiff, if you will.

2        **MR. SACCHET:**  So, assuming for the sake of

3   argument that these bases are indeed subject to the

4   exclusive jurisdiction of the United States --

5        **JUDGE RODGERS:**  Right, I saw that in your

6   brief.

7        **MR. SACCHET:**  -- which 3M hasn't shown, a

8   number of cases have also addressed the symbiotic

9   relationship between federal bases and the surrounding

10  states.

11       **JUDGE RODGERS:**  What are some of those cases?

12       **MR. SACCHET:**  So, for example -- again, these

13  were not set in in our opening brief because we didn't

14  know that this was necessarily going to be 3M's

15  argument and we didn't get to respond but --

16       **JUDGE RODGERS:**  I understand.

17       **MR. SACCHET:**  But one such case is *In re Air*

18  *Crash Diaster at Gander, Newfoundland*.  The reporter

19  and pincite are 660 F.Supp. 1202, page cite 1214,

20  Western District of Kentucky, 1987.

21            In that case, the Western District of

22  Kentucky said, states retain, quote, "an interest in

23  actions of military personnel based within Kentucky."

24            Moreover, the Court went on to explain,

25  quote, "There is a real and substantial economic and

1  social impact on the area of Kentucky surrounding Fort

2  Campbell through the families and the soldiers

3  stationed at that facility."

4       And, of course, that is true and it makes

5  good sense.  Because, when you think about it from a

6  practical perspective, the servicemembers who are

7  stationed at these bases -- although I've never been

8  one and I don't know that many outside of the

9  plaintiffs in this litigation -- they're not confined

10 to the enclave as if it was only the enclave.  They

11 have other interactions with the state.  And when one

12 is injured in the enclave, that has ramifications

13 beyond just the enclave itself.

14       **JUDGE RODGERS:**  Right.  But we're assuming

15 that the injury did not occur in the enclave.

16       **MR. SACCHET:**  Okay.  So, even if the injury

17 did not occur in the enclave, the plaintiffs still

18 used the plug at the enclave, the plaintiffs still was

19 issued instructions at the enclave, the plaintiffs

20 still may have resided at the enclave longer than any

21 other place in which he or she used the plug.

22       **JUDGE RODGERS:**  But none of that -- the

23 lawsuit doesn't stem from any of that.

24       **MR. SACCHET:**  In which case, the federal

25 enclave doctrine wouldn't apply because the injury

1    arose abroad.

2        **JUDGE RODGERS:**  Right.  But what interest

3    does the state have in terms of the litigation?

4        **MR. SACCHET:**  The state has an interest, in

5    that 3M sent its product to the state, went into the

6    state and then to the enclave.

7        **JUDGE RODGERS:**  But the injury didn't occur

8    there.

9        **MR. SACCHET:**  There is still a contact via

10   the shipment of the product to the state that went to

11   the enclave.  There still is the fact that the

12   plaintiff used the plug there, even if injury

13   exclusively occurred abroad.  There still is the fact

14   that, when assuming, for the sake of argument, the

15   plaintiff was injured exclusively abroad, they came

16   back, of course, to that base, and they suffered

17   injury there, they may seek treatment there outside of

18   just the enclave.

19        These are all facts that show that the

20   contacts still persist as to an injury even if the

21   injury itself occurs abroad.  And that is particularly

22   important under Minnesota's five-factor test because

23   that test is not predicated only on the injury

24   location.

25        **JUDGE RODGERS:**  Even if the treatment is all

1    on base, your position still would be the same?

2         **MR. SACCHET:**  Yes.  So, let me give a

3    fact-specific example.  So, for example, Mr. Hacker

4    and his wife both testified that he was injured -- he

5    suffered injury while he was in Kentucky.  And one of

6    the examples they give for that, based on the

7    deposition that both of them testified to -- and I

8    know it sounds a little bit nominal, but it's still

9    true.

10        When they first met in Kentucky circa 2006,

11   they used to go to karaoke, outside of the enclave, of

12   course; they engaged in social activities outside of

13   the enclave.

14        Both his wife and Mr. Hacker himself

15   testified that, over time, from 2006 until

16   approximately 2009, before he deployed, their span of

17   time of going to karaoke in town totally stopped

18   because Mr. Hacker wasn't able to participate anymore.

19        **JUDGE RODGERS:**  Before he went to Germany?

20        **MR. SACCHET:**  The only plaintiff I'm aware of

21   that went to Germany was Baker.

22        **JUDGE RODGERS:**  Okay.  I'm confusing him with

23   Hacker.

24        **MR. SACCHET:**  This is Hacker.

25        **JUDGE RODGERS:**  Okay.  '06 is important in

1    Baker's case, I guess.

2         **MR. SACCHET:**  '06 is also important in *Baker*,

3    yep, but '06 is the time in which he arrived in April

4    of 2006 at Fort Campbell.  He was in Fort Benning from

5    circa '06 to approximately the end of '08, then he

6    deployed to Iraq.  And during that time, both of those

7    plaintiffs testified that he used to go to karaoke and

8    he can't go anymore.

9         That's an impact on the state exactly as the

10   type of social and both economic impacts that the *In*

11   *re Air Crash* case was discussing about and recognizing

12   the symbiosis between a federal enclave and the state.

13        Moreover, there is a line of cases that

14   recognize, for purposes of due process, when the Court

15   considers a minimum contacts inquiry for personal

16   jurisdiction, the contacts on the base are not

17   stripped for purposes of determining whether there are

18   minimum contacts in the state.

19        **JUDGE RODGERS:**  What are those cases?

20        **MR. SACCHET:**  So, one such case is the *Matter*

21   *of Libel.*  This is 1996 WL 544236, at page 2, Southern

22   District of Texas, 1996.

23        **JUDGE RODGERS:**  544236?

24        **MR. SACCHET:**  Yes.  And the quote is, "In

25   cases where a cause of action stemmed from an

occurrence on a federal enclave, courts have concluded that acquisition of personal jurisdiction necessary to give the Court the power to hear a case is not defeated by the fact that the activity giving rise to the cause of action occurred in the federal enclave."

There are other courts that reference the same thing.  For example, *Bowles vs. Ranger,* 2012 WL 12882079, at 4, Western District of Texas (2012), collecting such cases affirming that the state retains minimum contacts even when activities occur on federal bases.

**JUDGE RODGERS:**  Let me ask also for any of these plaintiffs in which this issue is in dispute as far as injury here in the States versus overseas.  Any of those plaintiffs set up -- and I'll use the term "residence" loosely -- quarters off base, do you know?

**MR. SACCHET:**  So, the primary plaintiff I know how to answer that question to is Mr. Hacker, again, who his first year at Fort Campbell he lived in the barracks, his second and third year he lived in Kentucky outside of the barracks with his wife.

**JUDGE RODGERS:**  Where does he live now?

**MR. SACCHET:**  Now I believe Mr. Hacker is located in -- it is not in the record.

**MR. NOMELLINI:**  Nevada.

1      **MR. SACCHET:**  Nevada.

2      **JUDGE RODGERS:**  But he lived for a period of

3   time with his wife off base in Kentucky?

4      **MR. SACCHET:**  In Kentucky, yes.

5      So, as to this first premise that 3M has

6   built their entire argument for the application of

7   Indiana law on, it assumes that these bases are

8   federal enclaves subject to exclusive federal

9   jurisdiction.

10     And, to be clear, there are numerous

11  instances in which there is federal land but it is not

12  subject to exclusive jurisdiction.  The federal

13  government simply retains a proprietarial *[sic]*

14  ownership of those lands for use, but the federal

15  government does not have exclusive jurisdiction over

16  that property.

17     And 3M has made no showing whatsoever that,

18  for any of the bases at issue here, that the federal

19  government has exclusive rather than either concurrent

20  or proprietarial *[sic]* jurisdiction.  And the cases

21  that we cited in footnote 2, Your Honor, make that

22  clear.

23     For example, in *Balderrama,* that court

24  analyzed whether Fort Bliss was a federal enclave.

25  The court recognized that certain parts of Fort Bliss

1    might be federal enclaves, however, the defense had

2    not shown that all of its parts were.

3         And that is critical because other cases,

4    like *Alexander*, also cited in footnote 2 of our brief,

5    say that, "In order for a court to apply federal

6    enclave jurisdiction and the doctrine for purposes of

7    choice of law, it needs to make a particularized

8    finding," not just an assumption, as 3M does in its

9    briefing, a particularized finding based on an

10   evidentiary hearing showing aerial maps, the whole

11   shebang, to say that where the injury or another act

12   occurred was on a tract, a specific segment of that

13   base that is indisputably a federal enclave.  And when

14   the party has not met its burden to show that, the

15   doctrine does not apply.

16        And that's what the *Max Foote* case did and

17   also cited in footnote 2 of our brief.  It said the

18   parties are suggesting federal enclave, party hasn't

19   met it's burden, therefore I am applying ordinary

20   choice-of-law rules subject to state law.

21        Therefore, this is a serious, serious,

22   serious hole in 3M's argument that it did no discovery

23   on.  It should not be given the benefit --

24        **JUDGE RODGERS:**  Well, that's not arguing that

25   federal enclave applies.  It's arguing that, because

```
 1    these bases in the states have -- the servicemembers
 2    are located within those bases, but the state has no
 3    interest in the case or in the plaintiff because the
 4    base is exclusively federal jurisdiction.
 5              But federal enclave, for them to be arguing
 6    that, they would have to be arguing that the injury
 7    occurred on the base.
 8         MR. SACCHET:  But they would still need to
 9    show that the bases are subject to exclusive federal
10    jurisdiction.
11         JUDGE RODGERS:  I agree with you.  But that's
12    not the same thing as them positing that federal
13    enclave jurisdiction applies.  They're saying that I
14    should, I guess, consider that the jurisdiction on the
15    base is exclusive, but their argument is independent
16    of the injury.
17         MR. SACCHET:  It could be independent of the
18    injury.  But whether the base is a federal enclave or
19    not is dispositive.  Because, if it's not subject to
20    exclusive federal jurisdiction, of course, there's no
21    question that the state retains an interest in the
22    context of what happens on the base because it has
23    concurrent jurisdiction --
24         JUDGE RODGERS:  Right.  But federal enclave
25    jurisdiction, it arises when you have an injury on
```

1    that base.

2         **MR. SACCHET:**  Yes.

3         **JUDGE RODGERS:**  They're not arguing that.

4         **MR. SACCHET:**  The doctrine for choice of law

5    arises when there is an injury on the base.

6    Hypothetically, there could still be federal enclave

7    jurisdiction on the base.

8         **JUDGE RODGERS:**  I'm talking about the federal

9    enclave doctrine.

10        **MR. SACCHET:**  Doctrine, yes.

11        **JUDGE RODGERS:**  I don't think they're arguing

12   for application of that.

13        **MR. SACCHET:**  No.  But they're arguing that

14   the bases are federal enclaves and that that by itself

15   strips the states of their contacts for purposes of

16   choice of law.

17        And I would like to add on that that the very

18   two cases that they cite, *La. United* and *Allison*,

19   actually stand for the opposite proposition.

20        If you read those cases in full, both cases

21   recognize that, even where the federal enclave

22   doctrine applies and you need to determine what state

23   law is applicable, the state law continues to apply;

24   it either applies at the time of cession and it's

25   frozen in time and the state retains its interest; or,

1    in the event that that's not true, there is federal

2    legislation allowing for an exception in the words of

3    *Allison* by which, via 5001(b) in this case, the state

4    law would continue to apply.

5        So, the idea that the state law wouldn't

6    apply and that the contacts simply don't exist is

7    belied by the very two cases that they cite.

8        The only reason they cite *Allison* is because

9    it was this extreme circumstance where the plaintiff

10   brought wrongful termination employment claims which

11   were not recognized by the State of New Mexico in 1952

12   when cession occurred, and there was no federal

13   statute allowing for an exception to the federal

14   enclave doctrine via 5001(b).

15       So, in that unusual circumstance, Judge

16   Tymkovich of the Tenth Circuit, sitting with Judge

17   Gorsuch, said there's no state law to apply.  That's

18   not even close to this case.  It's undisputed 5001(b)

19   would apply.

20       So the idea that there are no state contacts

21   is a red herring.  And that's the first premise that

22   3M has built its argument on.

23       The second premise that 3M has built its

24   argument on is arguing, without any expert evidence

25   whatsoever, that plaintiffs were not injured

1  domestically and, instead, were exclusively injured

2  abroad.

3       As a global matter, this argument fails based

4  on two key facts, both of which are on the record.

5       Fact 1, PX12.  This is the Army's own

6  technical guidance.  The Army's technical guidance

7  says, "Most noise-induced hearing injuries occur

8  during training."  That's what the Army has concluded,

9  base on all of its years analyzing hearing-related

10  injuries, most of it occurs during training.

11       **JUDGE RODGERS:**  Most is not all.

12       **MR. SACCHET:**  It's not all, but it's most.

13  And that's just a fact that kind of frames the inquiry

14  in its -- there is no other contesting global facts.

15       The second fact is Mr. Berger's own internal

16  admission, PX5.  There, Mr. Berger, 3M's 30(b)(6)

17  witness, admitted in 2014, when he was a 3M employee,

18  that the Combat Arms Version 2 was insufficient or

19  inadequate for use on the range.

20       Unfortunately for plaintiffs in this

21  litigation, they all used the plug on the range when

22  they were engage in domestic training.

23       So, if their own 30(b)(6) witnesses were

24  recognizing that this very product doesn't work for

25  those people, yet 3M now, in its litigation-driven

1    opinion for choice of law, is claiming no domestic

2    injury when these people are on the bases, I mean, it

3    smacks of gamesmanship.  That's what their own

4    employees recognized.

5           **JUDGE RODGERS:**  Mr. Sacchet, you still have

6    to have record evidence of the injury.

7           **MR. SACCHET:**  And we believe that we do.  And

8    at this point, I'd like to address the standard of

9    review, because that's what Your Honor asked at the

10   beginning of the hearing.

11          In the standard of review, there is a number

12   of ways to look at it.  And we believe that, when the

13   standard of review is properly applied and the facts

14   are viewed in the light most favorable to the

15   plaintiffs and those disputes are resolved also in

16   favor of the plaintiffs, there is no question that

17   there is a domestic injury.

18          But even if, even if -- and this is key --

19   the Court credited both sides' statement of the facts,

20   i.e., plaintiffs claiming they were injured

21   domestically, 3M claiming injury abroad, and you had

22   both injuries, you would still get to the same place

23   that plaintiffs advocate.

24          **JUDGE RODGERS:**  Why wouldn't I resolve this

25   as an evidentiary matter as I would if the issue bore

1  on personal jurisdiction?  Why would I not go ahead

2  and do that here?

3          I mean, one -- I can answer my own question.

4  One reason is I don't have record evidence from your

5  experts, which -- I mean, I don't have testimony from

6  your experts, obviously, because that just started.

7          But my thinking is, as long as I'm not

8  adjudicating an issue on the merits by deciding where

9  the injury occurred, I think I'm free, under Eleventh

10  Circuit case law, to make that determination here and

11  now -- maybe not today, but at this point in the

12  litigation.

13          If that be the case, then I wouldn't use a

14  Rule 56 standard, and I would probably conduct an

15  evidentiary hearing.

16          **MR. SACCHET:**  Okay.  So I'll approach it a

17  couple of different ways.  I'm going to do it first a

18  little bit indirectly, and then I'm going to do it

19  directly, so I'll get there.

20          But I just want to point out that, when this

21  Court has considered choice of law before, it has

22  viewed the evidence in the light most favorable to

23  plaintiffs and it has resolved fact disputes in favor

24  of the plaintiff.  That's what this Court did in the

25  2008 *Valentino* decision in which Mr. Beall and Mr.

1    Hill's firm were defense counsel of record.  That's
2    what happened.
3              **JUDGE RODGERS:**  That was a long time ago.
4         **MR. SACCHET:**  A long time ago, but that's
5    what happened, and that was this Court's opinion.
6              Moreover, one of the cases that 3M cites,
7    *Norwood* out of the Western District of Pennsylvania --
8    they cited it, not us, they cited it -- applied the
9    same standard, you view the facts in the light most
10   favorable to the plaintiffs and you resolve the facts
11   in favor of the plaintiffs.  So that's their own case
12   saying the same standard.
13             Moreover, we have cited cases which aren't on
14   the summary judgment standard but are simply
15   considering choice of law in a vacuum.  Those are the
16   *Brewer* case from the Western District of Washington,
17   and the *Purnell* case from Pennsylvania.
18             In both of those situations, choice of law in
19   a vacuum, the courts still credited plaintiff's
20   presentation of the facts, not the defense, because
21   they are plaintiff's claims.
22             And now this is where it goes to the heart of
23   the issue.  3M has cited *Facebook* for the proposition
24   that the Court should act as a factfinder and resolve
25   these questions of fact.

1          Your Honor pointed out that it would require

2     an evidentiary hearing.  Indeed, 3M doesn't mention

3     that, in *Facebook*, the court did conduct an

4     evidentiary hearing.  It did make credibility

5     determinations based on live testimony of all the

6     parties involved in this case and, only after that,

7     did it consider resolving those facts as the

8     factfinder would otherwise do.

9          But more importantly, there is no Eleventh

10    Circuit authority that that case cited and there's

11    none that I'm aware of resolving the issue.  But the

12    key here is 3M cites that case, stops the pincite at

13    page 1161, and then you read the next two pages, and

14    it directly contradicts their argument here.

15         And this is what the *Facebook* court said:

16    Quote, "It is possible a choice-of-law fact dispute is

17    so bound up in the substantive claims that the court

18    cannot" -- "cannot decide it without compromising the

19    constitutional guarantee of a jury resolution," under

20    the Seventh Amendment.

21         The court then went on to cite, *Mattel* and

22    *Marra*, a Second Circuit case and a case out of the

23    Central District of California.  And *Mattel*, it's like

24    footnote 56 or something.

25         Both those cases recognize that, when a

1    choice-of-law determination is inextricably

2    intertwined with the merits of the case, the court

3    cannot resolve that question without violating the

4    Seventh Amendment.

5        **JUDGE RODGERS:**  And that's the law of this

6    circuit.

7        **MR. SACCHET:**  Okay.  And that's exactly the

8    case here.  3M -- in this litigation, all the

9    plaintiffs with expert evidence are saying that they

10   were injured in domestic locations.

11       **JUDGE RODGERS:**  But how is that an

12   adjudication on the merits of the case?

13       **MR. SACCHET:**  If the Court were to determine

14   that they were not, in fact, injured there, it would

15   be saying they weren't injured there.  That's their

16   claim, and that's the very thing that their experts

17   are supporting.

18       **JUDGE RODGERS:**  The claim is that they were

19   injured, not that they were injured in a particular

20   location.  That's not in your -- that may be what

21   you're arguing now, but that's not an element of your

22   claim.

23       **MR. SACCHET:**  Well, our experts, for example,

24   Dr. Packer in Mr. Baker's case, says that it is to a

25   reasonable degree of medical certainty that Mr. Baker

1    was injured during his training in Washington.

2         If the Court were to determine that that's

3    not true, it would essentially be a *sua sponte Daubert*

4    ruling on Dr. Packer's opinion.  It's not just his

5    summary of the facts.  That is his opinion as a matter

6    of medical certainty in this litigation.

7         And in *Facebook* --

8    **JUDGE RODGERS:**  Did he consider injury

9    anywhere else?

10   **MR. SACCHET:**  Yes, he says there could be

11   ongoing injury, but his first injury occurred in

12   Washington, and that's dispositive for the *lex loci*

13   inquiry because it depends on the place where the

14   first injury was suffered.

15   **JUDGE RODGERS:**  Dispositiveness for the *lex*

16   *loci* injury, I'm not sure if that is dispositive for

17   injury in your case.

18   **MR. SACCHET:**  So, in the *Mattel* and the *Marra*

19   cases that the *Facebook* court cites, what was at issue

20   there was, in *Marra*, there was a claim that there was

21   an affair in another state.  In *Mattel*, there was an

22   argument that misappropriation occurred in a

23   particular state.

24        In both those instances, the Second Circuit

25   in the Central District of California *In re Facebook*,

1    the court explains that, by determining whatever the

2    plaintiff said happened in that particular place

3    didn't in fact happen, it would still go to the merits

4    of those claims, because the plaintiffs are stating

5    that that's where an injury occurred and that should

6    be reserved for the jury.

7          So, the territoriality of where an injury

8    arises is still, according to the very case that 3M

9    cites and the only case that it cites, improper for

10   the Court to resolve under the Seventh Amendment.

11         **JUDGE RODGERS:**  Well, then, this will be an

12   issue for the jury in these cases.

13         **MR. SACCHET:**  I don't think it needs to be,

14   because the Court can do what it's done in *Valentino*

15   and other courts continue to do, which is on choice of

16   law which was only raised independently of motions for

17   summary judgment on 3M's request so it would have

18   advanced notice of what to do when filing their

19   motions -- that's how this whole thing came about, Mr.

20   Fields asked the Court whether we could do this a

21   month before, so we're doing it.

22         In every other litigation I'm familiar with,

23   including in mass torts, you brief it with the motion

24   for summary judgment on the statute of limitations

25   defense that the defendant brings, and therefore you

1     view the facts in the light most favorable to the
2     plaintiffs.
3              **JUDGE RODGERS:**  Not in *Purnell*.
4              **MR. SACCHET:**  Not in *Purnell* because it was
5     defended independently.  But even in *Purnell*, the
6     court credited plaintiff's statements because that's
7     what you do because it would otherwise be brought on
8     the motion for summary judgment.
9              But, the point I want to end on for purposes
10    of the standard review is the point that I first
11    started with.  Even assuming the Court doesn't view
12    the facts in the light most favorable to the
13    plaintiffs, as I think the Court should do, but if it
14    does not and it credits both the parties' statements
15    of the facts, domestic injury and international
16    injury, the result is unchanged from how you apply the
17    choice-of-law determination, and Washington law should
18    apply in *Baker* via *lex loci*, Georgia law should apply
19    in *Keefer* via *lex loci*, Kentucky law should apply in
20    *Hacker* via Minnesota's five-factor test, and Alaska
21    law should apply in *McCombs* also via the five-factor
22    test.
23              And at the end of the day --
24              **JUDGE RODGERS:**  But you do think the contacts
25    are sufficient in each of those states with the

litigation?

**MR. SACCHET:**   Yes.   That's what the case law reflects.

And even if -- and I'm happy to reserve this argument for rebuttal, and I'm respective of the Court's time.   But even if you accept that there was an exclusive international injury, if the Court were to engage in that factfinding and actually rule on the merits and reach some kind *sua sponte Daubert* decision without a *Daubert* motion that Plaintiffs' experts are wrong in their expert reports in saying that an injury occurred where they opine that it did occur, subject to their reasonable degree of medical certainty, even if you accept that premise from 3M, you still don't get to Indiana, you still don't get to where they want to go.   And there is a number of reasons for that that I'm happy to explain.

**JUDGE RODGERS:**   I'm going to let -- I'll give equal time, but I want to hear you speak to that.

**MR. SACCHET:**   Right now or on rebuttal?

**JUDGE RODGERS:**   Right now.

**MR. SACCHET:**   Okay.   So, there are global reasons why that's true, and then there are case-specific reasons why that's true.

On a global basis, there's three reasons why

1    it's true.  One, 3M claims all of the misconduct

2    occurred in Indiana.  Just simply false.  They don't

3    cite any facts to support that barebones assertion.

4    The record belies it.

5          This misconduct didn't just occur in Indiana.

6    3M acquired the company in 2007, halfway between the

7    use of the CAEv2.  Minnesota has just as an equal

8    interest as does Indiana in terms of the misconduct

9    that occurred in this case.

10          There are failure-to-warn claims.  The

11    failure-to-warn claims are impacted where the failure

12    to warn didn't happen, not where Indiana was.

13          The misrepresentation claims, those happened

14    where the misrepresentations were made, not where

15    Indiana is located.  There are a potpourri of contacts

16    that far transcend Indiana's borders in this

17    litigation.

18          So, for 3M to come in here, without any

19    evidence whatsoever in this brief or any other brief,

20    and say all of the misconduct occurred in Indiana is

21    just simply false.

22          **JUDGE RODGERS:**  Well, just assume on the

23    product design-defect claims that they're claiming

24    that the conduct occurred, if it occurred, it occurred

25    in Indiana because of research and design.

1        **MR. SACCHET:**  Okay.  Other courts -- we're

2   going to assume that that's true?  I don't think it

3   is.  But we're assuming it's true?

4        **JUDGE RODGERS:**  Well, where else did that

5   take place?

6        **MR. SACCHET:**  There were design decisions

7   made elsewhere, and 3M continued those design

8   decisions by never recalling the product, hiding the

9   flange report from the very beginning to the very end

10  that dealt with the design --

11       **JUDGE RODGERS:**  Well, that's your concealment

12  claim.  But, in terms of the actual product design --

13  so I certainly know that the filter was designed by

14  ISL in France, but it was also designed in Indiana.

15       **MR. SACCHET:**  Also designed in Indiana.

16       **JUDGE RODGERS:**  Or not the filter but the

17  earplug.

18       **MR. SACCHET:**  Also designed in Indiana, not

19  exclusively.  There were meetings in France about how

20  the design would go.  There were meetings in Maryland

21  about what the design would look like.

22        There are courts that have made clear that,

23  when the contacts of the company in terms of design

24  exceed the borders of the principal place of business,

25  it extremely dilutes the impact of the place where

1    maybe some or most of the conduct occurred.

2              And that's exactly what the *In re Air Crash*

3    court out of New York said.  The claim that the

4    principal place of business should control any of the

5    claims is, quote, "severely undermined" when there are

6    contacts regarding the company that occurred

7    elsewhere.

8              But more importantly, 3M falls back on this

9    idea that its principal place of business is in

10   Indiana?

11             I mean, that might be true, but all -- every

12   single one of the six-Defendant entities in this

13   litigation are domiciliaries of Minnesota and

14   Delaware.

15             **JUDGE RODGERS:**  You're talking about the

16   Aearo Defendants?

17             **MR. SACCHET:**  All of them, the four Aearos

18   and the two 3Ms, they're all citizens of Minnesota and

19   Delaware.  They're not citizens of Indiana.

20             The Aearo entities are LLCs.  Their

21   citizenship is determined by their member.  Their

22   member is 3M Corporation.

23             Therefore, this idea that the principal place

24   of business of two now of the four Aearo entities,

25   Aearo Intermediate and Aearo LLC, which isn't even the

primary Aearo entity, which is Aearo Technologies, has
a principal place in Indiana, again, it's a red
herring.  It's not the legal contact here.

So, that's the second reason.

But the third is the most important, and this
is the most -- 3M hasn't cited a single case -- none,
zilch, zero -- under the *lex loci* test or Minnesota's
five-factor test applying the law of the principal
place of business.  They haven't cited a single case
in their brief because there is none.

The *lex loci* test depends on the place of
injury.  How could the law of the PPB apply?

**JUDGE RODGERS:**  Their default is due process,
right?

**MR. SACCHET:**  The due process argument
doesn't hold up as a matter of law for two reasons:
One, they haven't shown that there is exclusive
federal jurisdiction, and even if they had, the
contacts remain, as all the cases that I just read
into the record made clear.

And even if that were true, *lex loci* says it
still should be the place of the injury.  And if it's
the place of the injury, it's not the place of the
PPB, it's the place of the injury.  And if 3M wants to
say that the place of the injury was international,

1    then the presumptive choice under United States

2    Supreme Court precedent in *Sosa* is that the

3    international law should apply.  But because 3M hasn't

4    proved it, pursuant to Rule 44.1, the default should

5    be the *lex fori*.

6         **JUDGE RODGERS:**  *Sosa*, is that one of the ones

7    you just cited or --

8         **MR. SACCHET:**  No.  It's in the brief.

9         **JUDGE RODGERS:**  Okay.

10        **MR. SACCHET:**  So I can go into the --

11        **JUDGE RODGERS:**  No.  I'm going to stop you

12   now and ask -- I'm freezing your time at 35 minutes.

13   I'm going to ask Judge Jones if he has any questions

14   for you.

15        **JUDGE JONES:**  Yeah, I had just a couple of

16   questions of Mr. Sacchet, first on Indiana law.

17        I don't know if this is developed in the

18   briefs or not.  But I'm assuming the Defendants are

19   arguing for Indiana law because that is favorable to

20   the Defendants on punitive damages?  Is that really

21   the endgame here?

22        **MR. SACCHET:**  No.  The endgame is that

23   Indiana has a ten-year statute of repose.  So 3M

24   intends to move on summary judgment to probably

25   dismiss maybe half of the cases in this MDL on the

1    grounds that these occurred prior to 2008, which, if

2    that's true, it would be ten years from there.  So

3    Indiana law would, if the statute of repose is not

4    tolled, which it should be, but if it's not, results

5    in many, many cases in this litigation being

6    dismissed.

7         **JUDGE RODGERS:**  Also doesn't recognize strict

8    liability.

9         **MR. SACCHET:**  Doesn't recognize strict

10   liability under the IPLA, which is key, because

11   Georgia courts have said, under the public policy

12   exception, that they will not apply the Indiana

13   Products Liability Act to their cases.  So, therefore,

14   in *Keefer*, it's uncontested that Georgia law should

15   apply in that case.

16        **JUDGE JONES:**  That's very helpful.  The

17   second question that I had -- and this is, I think,

18   what Judge Rodgers alluded to.  I'll be candid with

19   you, this was a little confusing.  And this has to do

20   with determining, as a matter of fact, where is the

21   place of injury.

22        And correct me if I'm wrong.  Your argument

23   gives some traction to this.  If a motion for summary

24   judgment was filed in the normal course, as the court

25   does in most cases, it would have to make a

1    choice-of-law analysis.

2         And you say, for summary judgment purposes,

3    the summary judgment standard should apply, so

4    inferences should be in favor of the plaintiff, and

5    therefore, your choice-of-law analysis and your

6    evidence as to place of injury would apply.

7         Let's assume that's true, and the Court does

8    not hold an evidentiary hearing, then the case gets

9    past summary judgment, and then we go to trial because

10   you're raising a Seventh Amendment issue here, and the

11   Court actually hears the testimony.  And when the

12   testimony is presented at trial, it becomes apparent

13   that the place of injury is different from what you

14   all suggested it might be on summary judgment.

15        Does the Court then, before the jury

16   instructions are submitted to the jury, make a

17   different determination on choice of law, or is the

18   Court bound by the choice-of-law determination it

19   makes with the inference in your favor on summary

20   judgment?

21        **MR. SACCHET:**  I think that's a wonderful

22   question, Judge Jones.  And I'm not aware of a case

23   that has dealt with that circumstance.

24        My response would be that the testimony

25   should not be different at trial compared to what it

1    was pretrial because there are expert reports that

2    we're relying on both for this choice-of-law briefing,

3    and presumably our experts will testify to that at

4    their depositions and subsequently at trial.  So I see

5    no reason why there would be a change in fact.

6         If there were a change in fact for some

7    reason, I would view the adjudication on summary

8    judgment as a pretrial ruling that, you know, as it

9    happens at trial there could be different evidence.

10   But I don't think the choice of law should change

11   because that's the entire reason why we make this

12   determination now as opposed to incorporating it as a

13   jury charge and essentially creating a bifurcated

14   trial where we have a choice-of-law determination and

15   then other findings of fact, which is totally

16   unwieldy.

17        **JUDGE JONES:**  And then the last question I

18   had -- you made reference to with injury abroad,

19   injury in Afghanistan or Iraq.

20        I mean, arguably, under choice-of-law

21   analysis, I guess you could apply foreign law.  But

22   you're saying we don't even need to go there because

23   under 44.1 the Defendant here has never made any

24   argument proving up what foreign law is; is that

25   correct?

**MR. SACCHET:**  That's correct, Your Honor.  3M cites two cases.  One, *Harris* from Pennsylvania, and *Agent Orange* itself.  They both recognize that the default rule -- when a party puts in facts where the choice-of-law determination suggests that foreign law should apply, if they don't explain it and they don't prove it, just like in the *Harris* case -- again, 3M cited it, not us -- we also cited *Bel-Ray*, we also cited *Vishipco*, we also cited the Eleventh Circuit's decision in *Cavic*.

In all those circumstances, the default rule is, if the parties aren't going to support the international location, the default is the *lex fori*. It's not Indiana.  Indiana -- there is no *lex fori* in this litigation of Indiana.  The *lex fori* in *Baker* is South Carolina.  The *lex fori* in *Keefer* is Georgia, the same place as the *lex loci*.  The *lex fori* in *Hacker* is Minnesota, and the *lex fori* in *McCombs* is Minnesota.  None of those places are Indiana.

So, if 3M wants to play the international injury card, that still doesn't get them to the place that they want to go.

**JUDGE JONES:**  Okay, thank you.

**JUDGE RODGERS:**  Mr. Sacchet, why are there cases -- and particularly there is an old Fifth

1    Circuit case that would be binding here, I believe

2    it's *Orr*.  Why would courts ever send choice of law to

3    the jury then?

4         **MR. SACCHET:**  If a court believed that, to

5    make the underlying fact determination, as the

6    *Facebook* court said with *Marra* and *Mattel*, that it

7    would strike at the heart of claim.

8         **JUDGE RODGERS:**  Right.  But you're telling me

9    that here it does.

10        **MR. SACCHET:**  I'm saying here it does.  But

11   the Court should do what many courts do, which is not

12   decide that choice of law needs to be treated like

13   personal jurisdiction or other evidentiary matters

14   that require an evidentiary hearing and decide it as

15   it normally happens on summary judgment, which the

16   only reason it didn't happen here is because 3M

17   requested it to be briefed a month before the motions

18   for summary judgment.

19        **JUDGE RODGERS:**  But what Eleventh Circuit law

20   do you have to support --

21        **MR. SACCHET:**  I don't have an Eleventh

22   Circuit case.  I just have *Valentino*, which is Your

23   Honor's decision.

24        **JUDGE RODGERS:**  Because I'm looking at the

25   Fifth Circuit case that I just mentioned, which sent

1    it to the jury.  And then there is another more recent
2    -- well, not really recent, but it's not binding
3    precedent, I think it's an '87, Fifth Circuit case in
4    which the court said, fine to make the decision -- by
5    the court to make the decision early as long as the
6    choice-of-law decision factual issue is not
7    inextricably intertwined or meshed with the merits.
8    But if it is, then it goes to the jury.
9         MR. SACCHET:  Well, the Court could either
10   credit Plaintiffs' statements of the facts, as would
11   normally happen on summary judgment.  The Court could
12   engage in factfinding.
13        We still believe that, if the Court did that
14   and didn't view these underlying issues as striking at
15   the heart of the merits but viewed the issue as we're
16   not saying there's no injury, there just wasn't injury
17   where the plaintiffs say they were, notwithstanding
18   their expert reports supporting that, that it would
19   still support where plaintiffs has said injury
20   occurred.
21        3M has cited no expert evidence to contradict
22   plaintiffs.  3M simply claims injury could not have
23   happened there and it only happened somewhere else.
24   They have no evidence to support that.  There is no
25   expert evidence from 3M in the record.  They didn't

1   cite a single report.

2       **JUDGE RODGERS:**  The expert reports aren't

3   evidence, though.  You're asking me to construe the

4   evidence in the light most favorable to the plaintiffs

5   as if I'm applying a Rule 56 standard.  But I wouldn't

6   consider an expert report at summary judgment without

7   expert testimony.

8       **MR. SACCHET:**  And I understand that.  But the

9   only reason, of course, that that's happening in this

10  litigation is because of the light-speed in which this

11  case is progressing and that the expert depos are set

12  to occur in the next couple of weeks and neither party

13  was able to cite their testimony.

14      **JUDGE RODGERS:**  That's unfortunate that it's

15  happened this way and, as sort of captain of the ship,

16  I take responsibility for it.  But I still think that,

17  in order for me to do what you're asking me to do or

18  what maybe 3M is asking me to do, I have to have

19  admissible evidence.

20      **MR. SACCHET:**  There is admissible evidence,

21  in that, all of the reports in Exhibit D attach the

22  assessment notes from the Plaintiffs' experts.  Those

23  assessment notes are medical records.  The statements

24  that the plaintiffs gave during those sessions are

25  statements for the purposes of seeking treatment or a

1    diagnosis.  They both fall under 804(3) and 804(6), I

2    think.  And the committee notes to 803 make clear that

3    those types of statements, even though they occurred

4    during the time of litigation, are still admissible

5    and nonhearsay.

6            **JUDGE RODGERS:**  Well, that may be, but not

7    the opinion.

8            **MR. SACCHET:**  Not the opinion.  But all the

9    expert reports have an Exhibit D that are the

10   assessment notes that each of the Plaintiffs' experts

11   took when evaluating the plaintiffs that corroborate

12   the same evidence that's put forth in their reports.

13           And moreover, there is --

14           **JUDGE RODGERS:**  Are you saying that they were

15   statements -- they weren't statements in support of

16   treatment?

17           **MR. SACCHET:**  In diagnosis.

18           **JUDGE RODGERS:**  The experts are treating your

19   clients?

20           **MR. SACCHET:**  They're not treating.  They're

21   offering statements about whether they have bilateral

22   hearing loss or whether they have tinnitus, and

23   they're saying that in the reports.  I don't think the

24   rule is --

25           **JUDGE RODGERS:**  I'll probably need briefing

1    on that, whether that would qualify under the rule.

2         **MR. SACCHET:**  But, even beyond those reports,

3    there is deposition testimony from the plaintiffs

4    that, in many respects, corroborate --

5         **JUDGE RODGERS:**  Now we're getting somewhere.

6         **MR. SACCHET:**  I didn't realize that the

7    expert reports would be a hang-up, and I also didn't

8    realize that the assessment notes attached thereto

9    would be a hang-up.  But they are there.

10        And there is also deposition testimony in

11   many of the bellwether cases -- I'll admit not all of

12   them -- that speaks directly to where the plaintiff

13   experienced injury.

14        So, for example, Mr. Hacker, as I said, he

15   testified that his hearing loss occurred during the

16   second half of his military career.  3M opines that

17   the injury happened in Korea.  Korea is not the second

18   half of his military career.

19        Likewise, in *Keefer*, Keefer's wife testified

20   that Keefer's injury -- that she noticed hearing loss

21   in her husband, or then husband -- they're now

22   divorced -- just before he deployed to Iraq.  That's

23   deposition testimony from a third-party corroborating

24   the statement that he was injured in Georgia, not

25   Iraq.

1          So, those are examples in which, not only the

2     expert report, not only the assessment notes, but also

3     the deposition testimony of either the plaintiff

4     themselves or the third-party corroborates where an

5     injury occurred.

6          **JUDGE RODGERS:**  Let me ask, the reference to

7     Mr. Baker recalling a distinct event associated with

8     an acute onset of severe tinnitus and hearing loss

9     during his urban warfare training in Washington, is

10    that a statement that Mr. Baker made to the expert and

11    so it's in those -- that's what you're referring to

12    the assessment notes?

13         **MR. SACCHET:**  Yes.  So, Dr. Packer's report,

14    which is PX9 and his assessment notes are Exhibit D

15    thereto, in that exam Dr. Packer makes clear that Mr.

16    Baker reported to him as part of that assessment that

17    there was acute onset of both hearing loss and

18    tinnitus during and after MOUT training in Washington.

19         Mr. Baker also testifies that his injury

20    occurred circa 2006.  3M claims that 2006 must mean

21    Germany.  Not true.  He was in Washington also for a

22    few days in 2006.

23         **JUDGE RODGERS:**  He was?

24         **MR. SACCHET:**  Yes.

25         **JUDGE RODGERS:**  Was he --

1          **MR. SACCHET:**  Two days.

2          **JUDGE RODGERS:**  Was he on the range or

3    handling weapons?

4          **MR. SACCHET:**  I mean, the training -- as a

5    precise matter, the training in which Mr. Baker was

6    in, on MOUT training in Washington, occurred from

7    December 6th, '05, to January 2nd, '06.

8          **JUDGE RODGERS:**  Doesn't he report in his

9    deposition -- I thought this was the one that reported

10   first noticing the ringing in his ears after he got to

11   Germany maybe when he was -- he might have been

12   staying with a friend or something.

13         **MR. SACCHET:**  So, Mr. Baker did testify that

14   he recalled onset occurring when he was staying at a

15   friend's apartment.  The record does not explain where

16   that apartment was.  It's a possibility the apartment

17   was in Washington, it's possible it was somewhere

18   else.  The record does not illuminate that fact.

19         Mr. Baker also made clear in his deposition,

20   when asked a question by 3M's attorney whether the

21   onset of his tinnitus occurred after he returned from

22   Iraq, he said, *No, I never said that it occurred when*

23   *I returned from Iraq.*

24         **JUDGE RODGERS:**  All right.  One moment.

25         Judge Herndon, do you have anything that

1   you'd like to ask Mr. Sacchet?

2   **JUDGE HERNDON:**  No, I do not.  Thanks.

3   **JUDGE RODGERS:**  Well, Mr. Sacchet, thank you.

4   You still have five minutes reserved.

5   **MR. SACCHET:**  Thank you very much.

6   **JUDGE RODGERS:**  And, Mr. Nomellini, you have

7   35 minutes for argument, and I may keep you longer.

8   **MR. NOMELLINI:**  Thank you, Your Honor.  May I

9   have a few minutes to get set up?

10  **JUDGE RODGERS:**  Yes, sir.

11  **MR. BEALL:**  Your Honor, I have a plane to

12  catch for a deposition, so I'm going to move to the

13  back, just wanted to not be rude and --

14  **JUDGE RODGERS:**  Thank you, Mr. Beall.

15  **MR. NOMELLINI:**  May it please the Court?

16  Mark Nomellini on behalf of Defendants.

17  Your Honor, I have a PowerPoint presentation

18  here.  I actually think that Your Honor anticipated a

19  lot of the issues that it addresses, so I'll go

20  through it.  If Your Honor would like to direct me

21  somewhere else, that's perfectly fine, but I actually

22  think it works out pretty well.

23  And I wanted to start out with some of the

24  facts because I think that's helpful in analyzing the

25  legal principles.  Your Honor and Judge Jones both

referred to the evidentiary record, so I'll go through
the four plaintiffs here.

I'll start with Mr. McCombs.  He does not
have hearing loss; he's made that clear.  He does
claim tinnitus.  So, the key thing to look at is the
evidentiary record on tinnitus and where that lines up
with where he was stationed over time.

And, as you can see from slide 4, he was
involved in an IED blast in Afghanistan April 23rd,
2009, and he reported ringing in his ear on April
26th, 2009.  And we see from his deposition testimony
he was asked if he ever had ringing in his ear before
then, April 23rd, 2009, when he was in Afghanistan,
and he says, no, and he says it happened instantly on
April 23rd, 2009.

He also reported to the VA in 2016 that his
tinnitus first began when his truck was hit by an IED
while serving in Afghanistan.

**JUDGE RODGERS:**  So let's assume the record
supports that he was first injured in Afghanistan.

Why doesn't *lex fori* apply?

**MR. NOMELLINI:**  Your Honor, because there has
to be a state with a significant contact.  The
Alaska --

**JUDGE RODGERS:**  So you jump straight to sort

1    of the due process analysis --

2            **MR. NOMELLINI:**  Yes, we do, Your Honor.

3            **JUDGE RODGERS:**  -- from Afghanistan?

4            **MR. NOMELLINI:**  Yes, we do, we do.  And the

5    cases that are cited by Mr. Sacchet where there's some

6    kind of default to *lex fori*, those aren't cases where

7    somebody is arguing about a defendant's conduct in a

8    certain location.

9            **JUDGE RODGERS:**  You all don't believe that a

10   -- and correct me if I'm wrong, but the way I read

11   your brief is that a plaintiff/servicemember injured

12   overseas who returns back to the States and is

13   stationed --

14           Well, let's take Mr. McCombs.  So, actually,

15   he's stationed in the States.  He's issued earplugs;

16   he's used the earplugs in the States.  Then he's

17   deployed to Afghanistan, and he's injured there.  And

18   then he returns to the States where he's stationed and

19   continues to train but also receives treatment.

20           In those cases, your client's position is

21   that state -- and here I believe we've got for Mr.

22   McCombs it's going to be Arkansas for the most part --

23           **MR. NOMELLINI:**  Alaska, Your Honor.

24           **JUDGE RODGERS:**  I'm sorry, Alaska, he is

25   Alaska, Fort Richardson -- that Alaska has no interest

1    whatsoever in the case?

2            **MR. NOMELLINI:**   That's correct, Your Honor,

3    because it occurred at a federal enclave.  And we'll

4    get to that --

5            **JUDGE RODGERS:**   Because what occurred --

6    nothing occurred at a federal enclave.  This injury

7    was on a federal enclave in Afghanistan.

8            **MR. NOMELLINI:**   So the things that are being

9    described by Mr. Sacchet like issuance of the earplug,

10   use of the earplug, those things also occurred at a

11   federal enclave.  And we'll get to that with the

12   *Hacker* example and the karaoke.

13           **JUDGE RODGERS:**   But what if -- and I'm not

14   referring to any specific plaintiff here at the

15   moment, although there is some evidence that this was

16   some of them -- but that the injury was exacerbated,

17   so maybe the injury occurred overseas, but the

18   plaintiff returns to the States where he continues to

19   use the earplug in training, and then there is

20   audiograms that show an exacerbation of a hearing

21   deficit.

22           Why wouldn't a state like Alaska or any of

23   the others have an interest in that?

24           **MR. NOMELLINI:**   Your Honor, because it's

25   still occurring at a federal enclave as to which there

1    is exclusive federal jurisdiction.

2           **JUDGE RODGERS:**  That doesn't make a lot of

3    sense to me.  If the federal enclave doctrine

4    itself -- I mean, Congress recognized, presumably,

5    that the state in which the federal enclave is located

6    does have an interest.

7           Now, I understand that presumes the premise

8    is the injury occurred on that enclave.  But still to

9    say that the state has zero policy interest is hard

10   for me to accept.  I'm not ruling and I haven't ruled.

11   I'm still giving this a great deal of thought.

12          **MR. NOMELLINI:**  Yes.  So, if I could address

13   that, Your Honor.  So, Your Honor asked Mr. Sacchet

14   for a case, and he cited the *Linfoot* case, and so we

15   took a look that.

16          The *Linfoot* case doesn't mention federal

17   enclave.  So it's not as if the defendant in that case

18   said the state doesn't get credit for that activity on

19   the federal base because it happened in a federal

20   enclave.  The court didn't address and rule on that

21   issue in the *Linfoot* case.

22          **JUDGE RODGERS:**  Part of what you've argued,

23   though, in connection with this argument, is that the

24   plaintiff is not domiciled in that state because they

25   are not considered domiciled on base, right?

1      **MR. NOMELLINI:**  Correct.

2      **JUDGE RODGERS:**  Because, arguably, it's a

3  temporary duty station.  And the case that you cited

4  for that proposition cites the Restatement (Second)

5  conflict, and specifically "Presence Under Compulsion"

6  is the title of that section of the Restatement.

7          And while it's true that the restatement does

8  -- I mean, you cited a bankruptcy case for this, and

9  that case was looking at personal jurisdiction, and

10  that case cited this section of the Restatement.

11          And while it is true that Restatement says a

12  person does not acquire a domicile of choice in a

13  place to which he goes and in which he remains under

14  compulsion of the sort described in the rule of this

15  section.  And so military, you know, is compelled.

16          But then there is a comment about soldiers

17  and sailors within the Restatement section.  And it

18  suggests that there should be a factual analysis of,

19  for instance, whether the soldier or the sailor is

20  compelled to live on base versus does that soldier or

21  sailor actually live off base or off post in the

22  community, you know, did he get married, buy a home, I

23  mean, what are the levels of his contacts outside of

24  that base.

25          So that suggests to me that this federal

1　exclusive jurisdiction argument -- I'm not sure I

2　agree with it, because it seems like you premised it

3　on this idea that the plaintiff is not domiciled

4　within the state of Alaska.

5　　　　**MR. NOMELLINI:**  I'm glad that Your Honor

6　raised that argument because it dovetails with what

7　Mr. Sacchet was arguing with respect to Mr. Hacker,

8　that is, where is the record evidence that relevant

9　off-base choice-of-law contacts were occurring.

10　　　　So we focused on that as well and exactly the

11　kinds of questions that Your Honor was asking.  So

12　let --

13　　　　**JUDGE RODGERS:**  I don't remember you all in

14　your briefs acknowledging that there may be a

15　situation where a soldier lived off base.

16　　　　**MR. NOMELLINI:**  Well, that's because of the

17　absence of record evidence of that, Your Honor.  And

18　let me address that with respect to Mr. Keefer.

19　　　　So, karaoke.  Slide 22.  So, first of all,

20　Fort Campbell is Kentucky and Tennessee, and it's

21　actually more Tennessee than Kentucky by geographical

22　area.

23　　　　So I pulled the -- you know, the exemplar

24　that Plaintiffs cited for things happening off base is

25　Mr. Hacker.  So we pulled the deposition page from

1    Mr. Hacker, which is page 56 and 57, and he complains

2    about less karaoke singing.

3            He was asked:

4            "When did you first go to karaoke with your

5    wife?

6            "Around the first time I met her, so in 2006,

7    2007 area.

8            "And when did you say it became difficult for

9    you to go to karaoke with your wife?

10           "It seems like it was getting less and less,

11   I would say almost nonexistent probably by 2011,

12   2012."

13           Well, Mr. Hacker was out of Fort Campbell by

14   2009, so that doesn't -- all that establishes is that

15   he was doing karaoke in the Tennessee and Kentucky

16   area, by the way, in 2006, 2007.  It doesn't establish

17   any injury.  Apparently the injury of doing less

18   karaoke occurred when he moved on after Fort Campbell.

19   But the exact testimony is:

20           "Where were you living at this time you were

21   doing the karaoke singing?

22           "At the time it was in Tennessee and

23   Kentucky, so when I met my wife I lived in the

24   barracks on Fort Campbell."

25           And there is no -- we looked for this, we

1   didn't see any record evidence that he lived in

2   Kentucky outside of the barracks on Fort Campbell.

3            So I think that's a good example, Your Honor.

4   That was their primary example of things happening off

5   the base.

6            **JUDGE RODGERS:**  Well, he wouldn't live in the

7   barracks with his wife.  He might live in married

8   housing on base, but he wouldn't live in --

9            **MR. NOMELLINI:**  Yeah, I was just going off

10  his testimony.  I totally credit your point, Your

11  Honor.

12           So, *Hacker* was their, you know, their shining

13  example of something that occurred off the base, which

14  was the karaoke singing.  But karaoke singing is not

15  actually part of the injury.  The karaoke singing is

16  what he actually was enjoying doing in 2006 and 2007

17  in Tennessee and Kentucky, not just Kentucky.

18           **JUDGE RODGERS:**  I think the point is, though,

19  that, because of the injury, it interfered with his

20  ability to enjoy karaoke.

21           **MR. NOMELLINI:**  Later on.  And by that time,

22  he had moved off of Fort Campbell, Your Honor.

23           So, for *McCombs*, for example, there is no

24  record cites as to things that happened in Alaska

25  outside of Fort Richardson.  There is nothing, nothing

 1   at all.

 2          So, what Plaintiffs rely on for Mr. McCombs

 3   is they cite a page from the Arriaga report.  Arriaga,

 4   in slide 7, most of his discussion is actually of

 5   events that occurred in Afghanistan.  There's two

 6   paragraphs.  Everything but one sentence of Arriaga's

 7   discussion of McCombs's injury is in Afghanistan.

 8          And then the last says, "His exposure to

 9   noise from rounds during active engagement with the

10   enemy in addition to rounds fired during training

11   constitute an ototoxic dose of impulse noise

12   exposure."

13          So they latch on to the words "in addition to

14   rounds fired during training."

15          Mr. McCombs has never previously, or even

16   until now, claimed that any injury occurred in Alaska.

17   He never sought treatment in Alaska.  He never

18   testified or asserted that anything that happened in

19   Alaska caused his tinnitus.  It's just the expert

20   report here.

21          So, let me get to the point that Your Honor

22   raised, which is whether factual assertions have to be

23   credited, because that is an important point.

24          So, Plaintiffs say that Plaintiffs' evidence

25   must be credited at this stage.  And the important

1  thing here is -- and I'll explain why -- there is no

2  later stage that is appropriate for choice-of-law

3  facts to be determined.

4        Plaintiffs are going to seek to use their

5  choice-of-law facts to obtain a state law that they

6  want and then use that state law to obtain summary

7  judgments or jury verdicts.

8        The *Facebook* case, the court said, "the best

9  approach is for the court to resolve fact disputes

10  subsumed in deciding choice of law."  So, let's go to

11  the *Facebook* case and the portions cited by Mr.

12  Sacchet.

13        In particular, I wanted to refer Your Honor

14  to 185 F.Supp.3d 1161.  And it talks about why it

15  would be a bad idea to have fact disputes relating to

16  choice of law determined by a jury.

17        And it said, "The reasons why that would be a

18  bad practice are self-evident.  The litigants and the

19  fair and efficient administration of justice would

20  suffer immensely from slogging through all the

21  pretrial activities of discovery, class certification,

22  and dispositive motions, and then a full trial without

23  knowing which law governs the case.  The consequences

24  of double or trebled litigation costs, destabilizing

25  uncertainty about dispute outcomes, and overall case

1  management chaos are too plain to be debated.  And the
2  court can only imagine with apprehension what jury
3  instructions and verdict forms would look like."
4       **JUDGE RODGERS:**  Well, I don't disagree.  But
5  there is the issue of the Seventh Amendment.
6       **MR. NOMELLINI:**  Yes, Your Honor.
7       **JUDGE RODGERS:**  So, why is this determination
8  not inextricably intertwined with the merits?
9       **MR. NOMELLINI:**  That's a perfect segue, Your
10 Honor.  So, the *Facebook* case, first of all, says it's
11 a rare situation, it's a rarity, it's an unusual
12 circumstance.  And here, I think we have to focus on
13 the facts for that question.
14      So, let's look, for example, at Mr. McCombs
15 and see how inextricably intertwined it is and look at
16 the Arriaga report.
17      So, we have Arriaga saying McCombs described
18 the onset of his tinnitus and auditory symptoms
19 occurring during his employment in Afghanistan on
20 April 23rd, 2009.  The next sentence relates to
21 Afghanistan.  The remainder of the paragraph relates
22 to Afghanistan.  The first sentence of the next
23 paragraph relates to Afghanistan.  The next sentence
24 relates to Afghanistan, with the exception of the
25 words they latch on to "in addition to rounds fired

1    during training."

2         That's not inextricably intertwined enough

3    for us to have to engage in what the *Facebook* court

4    says is chaos.  That's the tail wagging the dog.

5         And the key, as Your Honor pointed out, is --

6    the issue is not whether there is some ancillary

7    exposure in Afghanistan.  The key is did he suffer an

8    injury.  I think the way Your Honor framed that

9    question is absolutely correct.

10        **JUDGE RODGERS:**  So, is it your position that

11   the Court can make this determination, say, for

12   instance, at an evidentiary hearing?

13        **MR. NOMELLINI:**  Correct, Your Honor.

14        **JUDGE RODGERS:**  Is your client willing to

15   waive its Seventh Amendment right to a jury

16   determination on that issue on the chance that it is

17   inextricably intertwined?

18        **MR. NOMELLINI:**  Yes, Your Honor.  If the

19   Court thought that an evidentiary hearing was needed

20   and it was just limited to that issue, just the

21   choice-of-law issue, then, yes.

22        Now, I'm glad that Plaintiffs raise their

23   factual assertions cases.  They've cited the *Brewer*

24   *vs. Dodson* case.  They said this case is not summary

25   judgment, it's not motion to dismiss, so it's not

1    getting us tangled up in the choice-of-law standard,

2    it's just choice of law.

3         But that case is perfect because the *Brewer*

4    case said that the court had construed all other facts

5    in the light most favorable to plaintiffs, but the

6    facts necessary to make a choice-of-law determination

7    are undisputed.  So that's not a case they can rely on

8    for that proposition.

9         The other cases are summary judgment.  Your

10   Honor, in the *Valentino* case -- I was speaking to Mr.

11   Beall about it.  In that footnote 3, Your Honor

12   accurately sets forth the summary judgment standard.

13   That footnote does not itself discuss choice of law.

14        In the *Purnell* case, there was no dispute

15   that the injury manifested in Pennsylvania.

16        There has been some talk about federal

17   enclave doctrine, and Your Honor correctly separated

18   out federal enclave doctrine from 28 U.S.C. 5001(b).

19        **JUDGE RODGERS:**  Maybe a little confusingly,

20   but I tried to.

21        **MR. NOMELLINI:**  No, you did, and it's

22   important.  Because we're not arguing that the federal

23   enclave doctrine requires dismissal of claims here.

24   That's what a lot of these cases are about.  We're not

25   arguing that.

1          It makes -- 28 U.S.C. 5001(b), thank god,

2    makes the analysis much simpler.  Because, in the

3    federal enclave doctrine, you have to look at things

4    like, okay, you know, what was the state law that was

5    in effect in 1928 when this base was established.

6    Very confusing.

7          Now you have a statute that says, "In a civil

8    action brought to recover on account of an injury

9    sustained in a place [subject to the exclusive

10   jurisdiction of the United States within a state]" --

11   I put brackets around that because I borrowed that

12   from subsection (a) which it refers to -- "the right

13   of the parties shall be governed by the law of the

14   state in which the place is located."

15         So, if Mr. McCombs's injury occurred at Fort

16   Richardson, we agree Alaska law would apply.

17         **JUDGE RODGERS:**  And that's why Mr. Estes is

18   Fort Benning.

19         **MR. NOMELLINI:**  Correct, correct.  If

20   overseas, 28 U.S.C. 5001(b) does not apply.  Here any

21   injury by McCombs was suffered overseas, so it does

22   not apply.  McCombs still argues for Alaska law.  But

23   again, McCombs does not point to any relevant

24   choice-of-law facts occurring in Alaska outside of a

25   federal enclave.

1          There is no question that military bases are

2     federal enclaves.  Plaintiffs cite the *Parish of*

3     *Plaquemines* case, which actually cites Article 1,

4     Section 8, Clause 17 of the Constitution of the United

5     States, which says, "Congress shall have power to

6     exercise exclusive jurisdiction in all cases

7     whatsoever," et cetera, "by the consent of the

8     legislature of the state in which the same shall be

9     for the erection of forts."

10          So, forts are expressly laid out in the

11     Constitution.

12          The *Parish of Plaquemines* case, by the way,

13     distinguished the Delta Reservoir because it said it

14     was not a fort.  Here, we do have a fort.

15          And *Plaquemines* also cites a Fifth Circuit

16     case, 1952, which would govern here, saying the U.S.

17     has exclusive jurisdiction over Fort McPherson, and a

18     later Fifth Circuit case which says that Fort Bliss is

19     a federal enclave.

20          There's also --

21          **JUDGE RODGERS:**  What case have you cited or

22     can you cite me to in the context of a personal injury

23     claim like we have here where the injury didn't

24     occur -- because if it did, then the statute would

25     apply -- the injury didn't occur on the federal base

1    in the States, but nonetheless, you have a soldier

2    residing on that base in that state who has suffered

3    an injury that occurred elsewhere, and the court has

4    said in that instance the state has absolutely no

5    interest in that plaintiff or his claims?

6              **MR. NOMELLINI:**  So, Your Honor, there are --

7              **JUDGE RODGERS:**  Because of the federal

8    exclusive jurisdiction.

9              **MR. NOMELLINI:**  Yes, yes.  There aren't a lot

10   of cases on either side of this issue.  The one case

11   that Plaintiffs cited, the *Linfoot* case, just simply

12   didn't confront the federal enclave issue.

13             And actually, we would like to have a chance

14   to look at that, Your Honor, because I was not totally

15   prepared in the *Linfoot* case.  But I think -- I

16   believe it was cited for the first time and I believe

17   we looked at it, and it does not use the words

18   "federal enclave" in it.

19             The *Norwood vs. Raytheon* case, the plaintiff

20   worked on the Hawk defense system in Homestead,

21   Florida, at the Homestead Air Reserve Base, Korea, and

22   Germany.  The court applied Massachusetts law in that

23   case.  But again, there wasn't analysis on that case

24   in what you're talking about, that is, does the events

25   occurring at the federal enclave provide any credit at

1   all.

2           And what I would say, Your Honor, is that we

3   can look at the Constitution in this regard, which

4   says that, "Congress shall have the power to exercise

5   exclusive legislation."  It's been recognized for a

6   long time.

7           There is a Fifth Circuit case from 1981,

8   before the Eleventh Circuit time, *United States vs.*

9   *Bowers*, 660 F.2d 527, where the court took judicial

10  notice of the fact that Fort Benning is a judicial

11  enclave.

12          So, Plaintiffs cite cases in which defendants

13  invoke the federal enclave doctrine to dismiss claims

14  brought by plaintiff on the ground that those claims

15  did not exist under state law at the time.

16          That's what we were talking about, the very

17  complicated analysis, were there discrimination laws

18  back in, you know, 1935.

19          **JUDGE RODGERS:**  At the time of the transfer

20  of the land to the federal government.

21          **MR. NOMELLINI:**  Right.  Happily, we're not

22  invoking that.

23          So, at this stage, the parties have an equal

24  burden.  Plaintiffs have put forth no evidence to show

25  that the plaintiffs ever used the Combat Arms in parts

1    of the bases that were not subject to federal

2    jurisdiction.

3            What do Plaintiffs cite?  They cite cases in

4    which a plaintiff was involved in nonmilitary

5    activities who avoided dismissal or summary judgment

6    under the federal enclave doctrine because the conduct

7    might have occurred off base.

8            So, a lot of these cases are like landscaping

9    cases where people are doing landscaping work, and

10   they're going -- you know, these areas are huge, and

11   two of them involved the same landscaping company.

12   *Balderrama* involved Pride Industries, and so does

13   *Andrews* involved Pride Industries, where the parties

14   exclusively argued that defendant's unlawful actions

15   did not take place wholly within the enclave.  And

16   another one contended that the claims arose outside

17   the area designated as Travis Air Force Base,

18   specifically, a, quote/unquote, "trailer at the Pride

19   yard."

20           And so, these courts are getting into things

21   like, you know, was there an easement for the state on

22   this street where the landscaping occurred, things

23   like that.  These are not military-activity cases.

24           And here, Plaintiffs aren't really saying, *We*

25   *dispute that this activity occurred on a base*.  All

1     they say is Defendants haven't proved it.  Right?  And
2     at this stage, neither side bears the burden of proof
3     on that.
4            Also, if you look back at *McCombs*, all we
5     have is that one line from the expert report saying he
6     had various exposures.  It's not as if we can go
7     street by street, like they did in the *Pride* case, and
8     say, okay, we're going to prove now that this street
9     was not subject to an easement.
10           The *Max Foote* case, the same thing, questions
11    were raised whether --
12           **JUDGE RODGERS:**  I'm not sure -- Mr.
13    Nomellini, I'm sorry, but I'm not sure -- even if
14    there was -- let's just say there was a portion of the
15    base at issue in which the state had concurrent
16    jurisdiction.  That, in and of itself, is not going to
17    give the state contacts with the litigation.
18           **MR. NOMELLINI:**  I agree with that, Your
19    Honor, I agree with that.
20           **JUDGE RODGERS:**  So, I'm not sure we're not
21    getting caught up in this federal enclave and
22    exclusive federal jurisdiction too much in the weeds
23    on that.  My -- I'll start -- or I'm not finishing
24    you, but I'll remind you of something I said earlier,
25    and that is that I guess I have trouble concluding --

and I haven't made my conclusion -- that a state just
has zero interest whatsoever in the litigation brought
by a servicemember living on a base who is receiving
treatment, may have had his diagnosis there, wore the
earplugs there, the earplugs were sent to the base
which would have crossed state lines.  It's not as
black and white as I think 3M is making it.

**MR. NOMELLINI:**  What I would say on that is
two things, Your Honor.  Number one, they haven't
cited a case in which the Defendant said this is a
federal enclave and then the court said we're going to
give the plaintiff credit for contacts within that
base -- we're going to give the state credit for
contacts on that case.  And the *Linfoot* case doesn't
qualify.

Number two, I would simply point to the
Constitution, Your Honor, which says that Congress
shall have the power to exercise exclusive legislation
for the erection of forts.

**JUDGE RODGERS:**  Well, I don't disagree with
you that the State of Alaska -- the state legislature
can't pass a law that impacts Fort Richardson, within
the confines of that base.  But, again, I'm not sure
that is the equivalent of saying the State of Alaska
has no interest in Mr. McCombs's litigation, given all

1   that the Plaintiffs say is happening on Fort

2   Richardson with this plaintiff.

3          **MR. NOMELLINI:**  And what I would say, Your

4   Honor, is that there is a lapse of law establishing

5   the state's interest, whether it be the Constitution,

6   whether it be, you know, a federal statute or the

7   state statute or case law.

8          **JUDGE RODGERS:**  What about policy interest?

9          **MR. NOMELLINI:**  Your Honor, there is no case

10  holding that a plaintiff has a choice-of-law policy

11  interest because of contacts that occurred within a

12  base, and Mr. Hacker is a good example of that, Your

13  Honor.

14         **JUDGE RODGERS:**  But you don't have a case

15  that says the converse, do you?

16         **MR. NOMELLINI:**  Yeah, there are not a lot of

17  cases addressing this issue.  But Mr. Hacker, who I'm

18  segueing to, is a good example of that.

19         Because Fort Campbell, for example, is both

20  Kentucky and Tennessee, so it shows you this just

21  doesn't really neatly map onto states.  What it is is

22  forts.  And forts may be a state, it may be part of a

23  state, it may be part of two states, or a fort could

24  be part of four states.

25         **JUDGE RODGERS:**  So, if he was injured on

1   base, we would need to determine whether that was in

2   Kentucky or Tennessee for the federal enclave --

3   excuse me -- for the statute to apply?

4           **MR. NOMELLINI:**  I think that's right, Your

5   Honor, I think that's right.  And there is no record

6   evidence on that point.

7           But, happily, the timeline is clearer with

8   respect to Mr. Hacker.  He had his tinnitus diagnosis

9   in April 2006, less than two months after he arrived

10  at Fort Campbell.

11          And, as Your Honor pointed out, he testified,

12  "I first reported it in 2006."  This is slide 19.

13  "I'm sure I had it prior to that," and then he says,

14  "at least a few months before that," which would take

15  him before Fort Campbell.

16          And then he says, in his April 3rd, 2006,

17  appointment, "ringing in the ears occurring in both

18  ears and lasting only a few minutes for the past

19  several years now."  So, that would take him back to

20  Texas, where he received his first set of earplugs, or

21  Kuwait.

22          And tinnitus is, again, key for Mr. Hacker.

23  His expert, Mr. Spankovich, states that there is no

24  question the right-sided hearing loss is not related

25  to military service.  His left ear was determined by

1   the VA to be normal after military service.

2              **JUDGE RODGERS:**  So, with Mr. Hacker -- well,

3   he was South Korea as well.

4              **MR. NOMELLINI:**  Right, South Korea.

5              **JUDGE RODGERS:**  But, arguably, I mean, there

6   is an argument that he was injured in Kentucky.

7              **MR. NOMELLINI:**  Well, Your Honor, with

8   respect to Kentucky, he reported it in Kentucky in

9   April of 2006.

10              **JUDGE RODGERS:**  Right.

11              **MR. NOMELLINI:**  And at the time he had said

12  it had been occurring for the past several years.  And

13  if Your Honor -- referring to the timeline, "past

14  several years" would put him either in Texas or

15  Kuwait, because he was in Texas through April 2005.

16              So, this is actually an example where Mr. --

17  in his response brief, Plaintiffs don't deny that his

18  injury occurred in Texas.  All they say is he received

19  his first pair of CAEv2 in Texas, but his use was more

20  significant while in Kentucky.  But the cited

21  documents, PX21 and 22, only confirm that he had the

22  CAEv2 in Texas.  And he doesn't deny that in April of

23  2006 --

24              **JUDGE RODGERS:**  Well, not that he had -- he

25  wore it in Texas.

1          **MR. NOMELLINI:**  Yes, yeah, he wore it in

2     Texas.  And he doesn't deny that, in April 2006 -- and

3     this is key -- he said that he had tinnitus "for the

4     past several years now."

5          **JUDGE RODGERS:**  Possibly.  Didn't he say

6     "possibly for the past several years"?

7          **MR. NOMELLINI:**  No.  The quote from the

8     document is "ringing in the ears occurring in both

9     ears, not constant, and lasting only a few minutes for

10    the past several years now."

11         **JUDGE RODGERS:**  Well, what -- there is also

12    reference to "at least a few months before."

13         **MR. NOMELLINI:**  Right, yes.  So, it's either

14    "at least a few months" or "past several years."  So,

15    where does that take us on the timeline?

16         **JUDGE RODGERS:**  I see.

17         **MR. NOMELLINI:**  So, if it's "at least several

18    months," that would be, you know, either South Korea

19    or Texas.  If it was "past several years," that would

20    take us back to Texas or Kuwait.  He received his

21    first pair in Texas.

22         So, whether we go with what he said about "at

23    least several months," it would be, in that case,

24    South Korea or Texas; or we go "past several years,"

25    that would be South Korea or Texas or Kuwait.  In

1    either case, it's not Kentucky.

2         **JUDGE RODGERS:**   Let me ask you to address Mr.

3    Sacchet's argument in regards to Aearo in Indiana.

4         **MR. NOMELLINI:**   I will do that, Your Honor.

5    Let me fast-forward in the slides here.   If I could go

6    back to Mr. Baker briefly later on, I would love to do

7    that.

8         **JUDGE RODGERS:**   Well, you can talk about Mr.

9    Baker for two minutes and then my questions start.

10        **MR. NOMELLINI:**   That's perfect.   So, the

11   Plaintiffs argue that various conduct occurred in

12   non-Indiana jurisdictions, Your Honor.

13        But, as an initial matter, they don't seek to

14   apply the law of any of those non-Indiana

15   jurisdictions, they don't seek to apply the law, for

16   example, of Maryland or Mexico.

17        In any event, Plaintiffs don't dispute that

18   Aearo's testing work occurred in Indiana, where the

19   lab visit in this case was done.   The flange memo was

20   written there.   Aearo emails and phone calls occurred

21   there.   Aearo's packaging and labeling work and

22   marketing decisions occurred in Indiana.   Aearo's

23   design drawings and work occurred in Indiana.

24        The one design meeting Plaintiffs point to

25   involving an Aearo employee actually occurred on a

1    federal enclave, Aberdeen Proving Ground in Maryland.
2    So that doesn't give credit to law of any state.
3         Plaintiffs' citations to sales visits and
4    earplug shipments also involve federal enclaves; for
5    example, Fort Benning.  So, again, you're not getting
6    credit for the law of any state there.
7         The Plaintiffs -- you know, there are a lot
8    of documents cited by Plaintiffs in their summary
9    judgment exhibits.  I counted them up.  There were 58
10   summary judgment exhibits they cited which were from
11   Indiana.
12        In their choice-of-law briefs, they try to go
13   for some that are Minnesota-based, but even those they
14   can't get away from Indiana.
15        The 2004 team test data and gun range emails
16   sent by Elliot Berger, cited in their briefs, they
17   show he was still working in Indiana.  The 2011 email
18   sent by Doug Moses cited by Plaintiffs shows he was
19   still working in Indiana.
20        Aearo Company in Indianapolis was listed in
21   the contract in the August 2000 government contract
22   Plaintiffs cite in their brief.  Aearo is listed as
23   the place of packaging and shipping.
24        There is a Massachusetts reference for
25   injection moulding, which none of their experts take

 1     issue with.  That's for the tips, injection moulding,

 2     as opposed to the filter.

 3              **JUDGE RODGERS:**  How do you get around -- in

 4     the *Keefer* case, how do you get around the *Bailey* case

 5     in which a Georgia appeals court refuses to apply

 6     Indiana law because it doesn't recognize a strict

 7     liability claim for design defects because that's in

 8     violation of Georgia public policy?

 9              **MR. NOMELLINI:**  I'm glad you asked that, Your

10     Honor.  So, the Plaintiffs cite the *Auld vs. Forbes*

11     case, which is slide 35 of our presentation, cited in

12     December of 2020, so it's a recent case.

13              And the court in that case, Georgia Supreme

14     Court, clarified that the public policy exception

15     applies only if the out-of-state law is so radically

16     dissimilar to anything existing in our own system of

17     jurisprudence that it would seriously contravene the

18     policy embedded in Georgia law.

19              **JUDGE RODGERS:**  Well, does *Auld* discuss

20     *Bailey*?

21              **MR. NOMELLINI:**  No, but it says, "We hereby

22     disapprove of cases where the public policy exception

23     has been construed more liberally," and then it gives

24     a "See e.g." --

25              **JUDGE RODGERS:**  How can it be more radically

1   different than Indiana, which doesn't recognize a

2   strict liability claim in a product design defect

3   context, and Georgia that does?

4         **MR. NOMELLINI:**  So, Your Honor, again, I'm

5   glad you asked that question.  There is no significant

6   difference of slide 36 between the strict liability

7   claim in Georgia and an Indiana products liability

8   claim.  The cases show that the plaintiff --

9         **JUDGE RODGERS:**  That surprises me.  I'm not

10   doubting you because I haven't dug this deep, but that

11   would surprise me.

12         **MR. NOMELLINI:**  So *Banks vs. ICI Americas* --

13         **JUDGE RODGERS:**  They just don't call it

14   strict liability?

15         **MR. NOMELLINI:**  Right.  They say the

16   manufacturer -- it must show that the manufacturer

17   acted reasonably in choosing a particular product

18   design.  So reasonableness still enters into the

19   inquiry.

20         **JUDGE RODGERS:**  Right, which is very

21   different.

22         **MR. NOMELLINI:**  Right, yes, yes, it's the

23   reasonableness entering into the analysis.

24         **JUDGE RODGERS:**  Oh, under Georgia law is what

25   you're saying?

1         **MR. NOMELLINI:**  Under Georgia law, right.

2         **JUDGE RODGERS:**  What year is that?  1994.

3  I'll have to see if *Bailey* talks about that case.

4         **MR. NOMELLINI:**  Okay, Your Honor.

5         **JUDGE RODGERS:**  I don't remember if it did.

6  All right.

7         **MR. NOMELLINI:**  Can I go back to Mr. Baker

8  just for two minutes, Your Honor?

9         **JUDGE RODGERS:**  Well, all right, I'm going to

10  allow it, and I'm going to add two minutes on to --

11  because we're past your 35 minutes, but I'll add two

12  minutes on to Mr. Sacchet's five minutes.

13         **MR. NOMELLINI:**  Thank you, Your Honor.

14         So, with respect to Mr. Baker, the Plaintiffs

15  claim that Washington law applies.  But he was only at

16  Fort Lewis for 26 days in Washington.  That's slide

17  25.  And he does not even know --

18         **JUDGE RODGERS:**  Say that again.  I'm sorry,

19  say it again.

20         **MR. NOMELLINI:**  Plaintiffs claim that

21  Washington law applies.

22         **JUDGE RODGERS:**  Right, Fort Lewis, right.

23         **MR. NOMELLINI:**  He was only at Fort Lewis for

24  26 days.

25         **JUDGE RODGERS:**  Mr. Baker is the one that

1   went to Germany?

2            **MR. NOMELLINI:**  Yes.

3            **JUDGE RODGERS:**  And he noticed his tinnitus

4   when he was sleeping over at a friend's apartment.

5   But now Mr. Sacchet says he apparently went back -- he

6   left Germany --

7            Did you say that, Mr. Sacchet?  I thought you

8   did.  So we didn't know whether his friend's apartment

9   was in Germany or in the States?

10           **MR. SACCHET:**  Yeah, there is not a date

11  attached to where the apartment stay occurred.  It

12  could have been in Washington, it could have been

13  anywhere.

14           **MR. NOMELLINI:**  He has testimony on this,

15  Your Honor.

16           **JUDGE RODGERS:**  Okay.

17           **MR. NOMELLINI:**  He says, "The first time I

18  noticed it was in 2006."  So, he left Fort Lewis

19  January 1st, 2006.  He said it was probably in the

20  winter.  He said in his VA examination that he

21  reported exposure to machine gun fire following his

22  return from Iraq.  His initial census form dates it

23  even later as 2007.

24           **JUDGE RODGERS:**  Let me stop you here, and I

25  want to ask a question, but this is back to the

1    record.  So let me just agree with your assessment for

2    this discussion purposes of his testimony and that he

3    first noticed his tinnitus when he was in Germany in

4    2006.  But you have Dr. Packer who has evaluated Mr.

5    Baker, and he has said that he believes, in his

6    opinion, that he experienced the tinnitus in

7    connection with the MOUT training, the warfare

8    training at Fort Lewis, which, obviously, would have

9    been at Fort Lewis in the state of Washington.

10           So do I just dismiss that?

11           **MR. NOMELLINI:**  Let me address that, Your

12   Honor.  Slide 30 addresses that.

13           So, Dr. Packer states Mr. Baker had recalled

14   a distinct event at Fort Lewis.  He reports that he

15   had intense tinnitus and muffled hearing in the left

16   ear in December of 2006.

17           Well, the first issue there is, in December

18   of 2006, Mr. Baker was in Germany, not in Fort Lewis.

19   So, that actually helps us.

20           And then, even if it wasn't clear that in

21   December of 2006 he was in Germany, which it is, his

22   testimony is clear.  He was asked -- he says, "The

23   first time I noticed it was in 2006."

24           He was asked:  "Was there a specific event

25   that precipitated it?

1          "No."

2          So, Mr. Baker says no specific event in 2006

3     that precipitated it.

4          **JUDGE RODGERS:**  Well, where does Dr. Packer

5     come up with the opinion that Mr. Baker first

6     experienced ringing in his ears during his urban

7     warfare training?

8          **MR. NOMELLINI:**  That's a good question, Your

9     Honor, because, number one, he says December of 2006,

10    but he was in Germany then, so that would be --

11         **JUDGE RODGERS:**  I'll let Mr. Sacchet address

12    that.

13         **MR. NOMELLINI:**  Yep.  And then, number two,

14    Dr. Packer says specific event, but Mr. Baker says no

15    specific event.

16         And this is a good reason why we should look

17    at the testimony of --

18         **JUDGE RODGERS:**  Didn't Baker refer to it as a

19    distinct event?

20         **MR. NOMELLINI:**  No.  He said there was no

21    specific event that precipitated it in his testimony.

22         **JUDGE RODGERS:**  Maybe that's Packer's

23    language.

24         **MR. NOMELLINI:**  Yep.  So, and then --

25         **JUDGE RODGERS:**  No.  I need to stop you now.

1    And I'm going to ask Judge Jones first if he has any

2    questions for you.

3              Judge Jones?

4         **JUDGE JONES:**  I just have two quick questions

5    of Mr. Nomellini.

6              As I said to Mr. Sacchet, one of the knotty

7    issues here in resolving choice of law because --

8    *(inaudible)* -- different views on the facts what is

9    the standard the Court applies -- (inaudible) --

10        **JUDGE RODGERS:**  Judge Jones, you're trailing

11   off, we're losing you.

12        **JUDGE JONES:**  Can you hear me now?

13        **JUDGE RODGERS:**  Yeah, better.

14        **JUDGE JONES:**  So, my question, Mr. Nomellini,

15   was related to the knotty issue of -- *(inaudible)* --

16             And isn't the burden of proof -- like in

17   every case, a party is a proponent of a particular

18   choice of law, a proponent of what should be the

19   appropriate choice of law.  Isn't the burden on that

20   party to produce evidence to support its choice-of-law

21   analysis, and then ultimately, even if it's on summary

22   judgment, the court weighs the evidence and makes a

23   legal call as to what law applies or what law does not

24   apply?

25             Isn't that the standard, as Mr. Sacchet said,

1   the Court should choose all inferences in favor of the

2   plaintiff, the typical summary judgment standard.

3          **MR. NOMELLINI:**  Your Honor, I would say it is

4   not the typical summary judgment standard.  So

5   Plaintiffs here will seek to use the choice of law

6   that they're looking for to themselves obtain summary

7   judgment or to obtain a judgment on a jury verdict.

8          What I would say is each party has the burden

9   of coming forward with evidence, and then there is a

10  level playing field at that point in time, and the

11  Court makes the determination for all the reasons set

12  forth in the *Facebook* case.

13         **JUDGE JONES:**  Secondly, let me raise another

14  knotty issue -- or maybe it's not a knotty issue.

15         As you all know, in choice-of-law analysis

16  there can be a different result depending upon the

17  issue here.  And I see both sides arguing Indiana law

18  should apply or Washington law.

19         Is there, indeed, a different choice-of-law

20  analysis that the Court will have to apply in

21  determining what is the substantive law, what might be

22  an appropriate statute of repose, what might be an

23  appropriate standard for punitive damages, and what

24  might be available damages?

25         So, could the choice-of-law analysis be

1    different for all of those or is it your position the

2    choice-of-law analysis applies -- the same analysis

3    applies to all of that?

4         **MR. NOMELLINI:**  Your Honor, with respect to

5    these plaintiffs, it's the same choice-of-law

6    analysis.

7         With respect to Georgia, the parties are not

8    in dispute that, when Georgia looks outside of the

9    jurisdiction for law, it does that for statutes and

10   then the common law is Georgia law.

11        **JUDGE JONES:**  Okay.  Thank you.

12        **MR. NOMELLINI:**  Thank you, Your Honor.

13        **JUDGE RODGERS:**  Okay, Mr. Nomellini, thank

14   you very much.

15        All right, Mr. Sacchet, you've got nine

16   minutes.

17        **MR. SACCHET:**  Thank you very much.

18        So, what I would like to do very quickly,

19   Your Honor, is address some of the specific rebuttals

20   that Plaintiffs would like to respond to in light of

21   what 3M has argued and then revert to what would

22   happen even if you accepted everything that 3M has

23   said as true not still leading to Indiana.

24        First and foremost, I would like to point the

25   Court's attention to an Alaska Supreme Court decision

called *Lauterbach*.  The reporter is 392 P.2d 24 from
1964.  There the Alaska Supreme Court said, which
would be applicable to Mr. McCombs, "These facts are
pointed out to show that Alaska has a real and
substantial basis for its interest in the affairs of
service families that reside here for a year."

And there the plaintiff was not a domiciliary
or a citizen of Alaska.  But nonetheless, the Alaska
Supreme Court, as Your Honor has pointed out,
recognized that there is a relationship between the
States and the bases, even in a place like Alaska,
assuming that Fort Richardson were a federal enclave,
which hasn't been shown.

In addition, it is true that *Linfoot* did not
specifically address whether Fort Campbell was a
federal enclave, but it still specifically addressed
Fort Campbell itself, and that is where Hacker was
based.  So it is still relevant to the Court's
determination about whether Kentucky would have
interest in events that occurred at Fort Campbell.

The Court asked whether there were cases in
which there was a foreign injury and what happens for
choice-of-law purposes when there is a foreign injury.

Again, in *Linfoot*, there was a foreign
injury, and the Court applied the law of the state in

1    which the plaintiff was based, that being Kentucky.

2    That should control with equal force in Hacker's case.

3        Moreover, in *Harris*, which is the case cited

4    by 3M, the court found that, because there was an

5    international injury that the party who was the

6    proponent of a different law didn't explain, Iraqi

7    law, that the *lex fori* applied.

8        In general, Your Honor, if you want a

9    different choice of law, you have a burden to show it.

10   Here, if 3M is going to say there is international

11   injury but not prove up the international choice of

12   law, the default under Rule 44.1 and a long line of

13   federal circuit authority is you go to the *lex fori*.

14   And here, the *lex fori* is never Indiana; it's either

15   South Carolina, Georgia, or Minnesota.  It's not

16   Indiana.

17       Finally, the *Lauterbach* decision, as I

18   mentioned, also considers the contacts between Alaska

19   and its bases.

20       I'd also like to point the Court to *Howard,* a

21   United States Supreme Court decision from 1953, 344

22   U.S. 624.  There, the court stated that the idea of a

23   fiction -- "The fiction of a state within a state can

24   have no validity to prevent a state from exercising

25   its power over the federal area within its

1    boundaries."

2              That's what the United States Supreme Court

3    said in *Howard*, that the idea of a state within a

4    state is a fiction.   That's 3M's argument here.

5              **JUDGE RODGERS:**   Does *Howard* involve a

6    military installation?

7              **MR. SACCHET:**   It involves an area of

8    exclusive federal jurisdiction.   It wasn't a military

9    installation, but it was exclusive federal

10   jurisdiction.

11             In addition, Your Honor, the idea that

12   Hacker's claims are only limited to tinnitus is not

13   true.   We heard a lot of discussion about tinnitus --

14   Hacker's tinnitus occurring two years before 2006 or a

15   couple of months before 2006.

16             He has a left-ear hearing loss claim, and his

17   experts make that clear.   And that hearing loss, based

18   on the audiograms in the reports, document that it

19   started when he was in Kentucky.   So, the idea that

20   this inquiry is limited to his tinnitus claim is not

21   true, and even if it were, it was aggravated when he

22   was in Kentucky.

23             As to the standard of review, 3M claims that

24   *Brewer* is irrelevant because all the facts regarding

25   choice of law were uncontested.   Not true.   Page 1173

1    of that decision shows that it credited the

2    plaintiff's statements about where the defendant sent

3    its warning letters in determining what choice of law

4    should apply.

5         The same thing in *Valentino*.  Although

6    footnote 1 talks about the choice-of-law standard in

7    the context of a motion for summary judgment, in page

8    7 Your Honor expressly stated that, for purposes of

9    determining whether phone calls were made between the

10   plaintiff and the defendant in that case involving an

11   investment scheme, the Court credited the plaintiff's

12   rendition of the facts --

13        **JUDGE RODGERS:**  You've got to slow down.

14        **MR. SACCHET:**  Sorry -- that the calls

15   occurred in Florida.  So the Court accepted as true --

16        **JUDGE RODGERS:**  You've got to start that

17   over.  I'm thinking about my court reporter.

18        **MR. SACCHET:**  Yeah, I'm sorry.  In *Valentino*,

19   footnote 1 is specific to summary judgment.  On page 7

20   of the *Valentino* decision, Your Honor cited the

21   plaintiff's statements that a call had occurred in

22   Florida.  That was contested between the plaintiff and

23   the defendant.  For purposes of choice of law, the

24   Court credited the plaintiff's statement that the call

25   occurred in Florida and applied Florida law as a

1    result.  So the idea that *Valentino* somehow limited

2    the undisputed facts is not true.

3            At the end of the day, even 3M, the cases

4    they cite, *Norwood*, recognize that the standard should

5    not be what they're claiming it is.

6            But nonetheless, even if we accept everything

7    that 3M has said as true, every single thing they've

8    said as true, other than the idea that there are no

9    contacts between a state and a federal enclave, which

10   is not supported by any case that I'm aware of or any

11   case that they've cited in their papers, you still

12   don't get to Indiana.

13           So I'm going to go through this plaintiff by

14   plaintiff, and I'll try to do it slowly while still

15   staying within the time limits.

16           For *Baker*, if 3M is going to claim the injury

17   occurred in Iraq, under Supreme Court precedent and

18   the *lex fori* analysis, Iraq is the presumptive place

19   of injury under *lex loci*.  3M hasn't met its burden to

20   show why Iraq should apply.  Therefore, under Rule

21   44.1, it's defaulted; it goes to the *lex fori*.  The

22   *lex fori* in Baker's case is South Carolina.

23           Their very own cases applied this standard.

24   In *Harris*, again, cited by 3M, that's what the court

25   did.  The court in one of 3M's cases did exactly that.

1  But 3M totally ignores the Rule 44.1 burden issue as

2  well as the default to the *lex fori*.  Their own cases

3  support it; they just don't admit it.

4        Moreover, even the *Agent Orange* case, Judge

5  Weinstein went on to explain why that makes sense.

6  And it makes sense because, if you have the burden to

7  show why international law is different than the *lex*

8  *fori* and don't do it, you default to the *lex fori*

9  because you haven't shown why it's different, and

10  ultimately you've acquiesced to the law of the *lex*

11  *fori*.

12        Here in *Baker*, not Indiana; it's South

13  Carolina.

14        Moreover, in *Keefer*, same preliminary

15  analysis obtained.  The only difference -- well, it's

16  really not a difference -- is it would be Iraq,

17  presumptively.  Haven't shown Iraq.  Rule 44.1,

18  *Bel-Ray, Cavic*, long line of federal circuit

19  authority, you go to the *lex fori*.  *Lex fori* is the

20  same place as the *lex loci*, Georgia.

21        So, in *Hacker*, same type of analysis, but now

22  we're under Minnesota's five-factor test, not the *lex*

23  *loci* inquiry.  Under Minnesota's five-factor test,

24  according to the *Bair Hugger* court in the last 3M MDL,

25  the first factor or predictability favors the place

```
 1   where the product was shipped.
 2           Here, even if you assume for argument's sake
 3   that the product eventually made its way to a federal
 4   enclave, it was still shipped through the state to get
 5   to the federal enclave.  So, therefore, it should
 6   support in Hacker the application of Kentucky law as
 7   to factor one.
 8           Under factor --
 9           JUDGE RODGERS:  Even though the lawsuit -- I
10   have to confess, I didn't read the Bair Hugger case
11   before coming in here.  In that case, was the
12   lawsuit -- did it arise out of something related to
13   the shipping of that product --
14           MR. SACCHET:  The product was -- yeah.  So,
15   in Bair Hugger, the product was shipped to South
16   Carolina, the device was used in South Carolina.  And
17   the court found that, because it was shipped to South
18   Carolina, the first factor favored South Carolina.
19           JUDGE RODGERS:  Used there and injury there?
20           MR. SACCHET:  Injury occurred there, yeah.
21           Under the second factor, again, for
22   Minnesota's test, the injury location is not
23   dispositive.  So, if 3M wants to say it's exclusive
24   international injury, okay.  We don't agree with
25   that --
```

1        **JUDGE RODGERS:**  Under the what?

2        **MR. SACCHET:**  Under the second factor, which

3   is the maintenance of interstate commerce.  Under that

4   factor, in Hacker's case, there is a myriad of other

5   contacts.  And we're going to disagree with 3M about

6   whether those contacts matter, but the contacts for

7   Hacker in Kentucky are manifold.  Purchased the plug

8   there.  Didn't just receive it; he purchased it there.

9   He read the instructions from the product as he

10  purchased it there.

11       **JUDGE RODGERS:**  But that's not the exact

12  earplug that there is evidence that he was injured

13  while wearing.

14       **MR. SACCHET:**  We don't know if he was wearing

15  that specific plug or whether he was wearing the plug

16  that he was issued before.  But nonetheless, he did

17  purchase the plug there, he did read the instructions

18  there, and the instructions would have presumably

19  informed his decisions as to how he used any one of

20  the pairs.

21       But, moreover, he used the plug there longer

22  than anywhere he used the plug anywhere else during

23  his long time in the military service.  He was

24  diagnosed there.  He lived in the barracks there.  And

25  he also lived in town there.  And the cite for that is

1   PX26 at 13 and PX23 at 33, which 3M says isn't in the

2   record.  It is.

3           He also suffered injury there, regardless of

4   when it occurred.  If it occurred in Iraq, he came

5   back to Kentucky and its effects were there.

6           Ultimately, Kentucky was the epicenter of

7   where he deployed from and where he returned both from

8   Korea and Iraq.

9           So, factor two, even if you assume an

10  international injury, still favors the application of

11  Kentucky law because there is all these other

12  contacts.

13          Moreover, factor three, admittedly, we would

14  argue is neutral.  We're not going to change our

15  position there.  That's what we said in our briefing.

16          In factor four, this is dispositive.  I mean,

17  factor four asks would Minnesota, as the forum's

18  interest, be furthered by the application of Kentucky

19  law or Indiana law?

20          It's clear that Minnesota would choose

21  Kentucky law.  Indiana law is antithetical to

22  Minnesota law as to the statute of repose, as to the

23  failure to recognize strict liability design-defect

24  claims, as to cap on punitive damages.  So, if a

25  Minnesota court was going to choose what to apply,

1    guaranteed it would apply Kentucky law.

2            And the idea in 3M's briefing that that

3    standard doesn't apply when an injury occurs due to a

4    resident out of state is not true.  The *Jacobson* case

5    from the Court of Appeals in Minnesota debunks that

6    entire theory.  3M has no citation to prove otherwise.

7            Thus, under Minnesota's five-factor test,

8    even if the fifth factor is neutral, factors one, two,

9    and four still favor Kentucky law, even if the injury

10   occurred abroad.  Therefore, Kentucky law should apply

11   either way.

12           Assuming *arguendo* it was neutral, let's just

13   say none of the factors point in any direction.  Under

14   *Nodak*, a Minnesota Supreme Court case, the *lex loci*

15   controls.  Again, the *lex loci* here, according to 3M,

16   is in Iraq.  If Iraq is *lex loci* and they're not going

17   to play in Iraqi law, then it goes to the forum, which

18   is Minnesota.  So, either way, it's either Kentucky or

19   it's Minnesota.  No question it's not Indiana.

20           Under *McCombs*, same type of remixed analysis.

21   First point to make clear:  When McCombs used the plug

22   the entire time in service, 3M owned Aearo.  Totally

23   Minnesota-Delaware domiciliary.  Principal place of

24   business is irrelevant.

25           So, the idea that Indiana law should apply to

1   *McCombs* makes no sense because the case law has made

2   clear that you look at it perhaps at the time in which

3   the injury occurred.  That stuff that happened before,

4   even if it wasn't all in Indiana, doesn't apply to

5   *McCombs*.

6          Moreover, the same analysis.  Factor one,

7   predictability, favors Alaska.  The plug was shipped

8   there; the plug was used there.  Under the *Bair Hugger*

9   case, Alaska law is favored.

10          Factor two.  Even if you have an exclusive

11   international injury, which we dispute, McCombs

12   received the plug in Alaska, he received instructions

13   in Alaska, it was the primary place of his use, and he

14   suffered the effects of his tinnitus there.  Even if

15   the onset occurred in Afghanistan, he came back to

16   Alaska after.  Therefore, factor two still favors

17   Alaska.

18          **JUDGE RODGERS:**  Your time is up.

19          **MR. SACCHET:**  Okay.

20          **JUDGE RODGERS:**  I do have a question, though,

21   and I'll ask Mr. Nomellini as well.  I don't believe

22   either side discussed the loss of consortium claim

23   here in your briefing.

24          **MR. SACCHET:**  We did not.  And this sheds

25   light on Judge Jones's question, in addition.  I think

1    both your question, Your Honor, and perhaps Judge

2    Jones's question was asking whether different issues

3    should be viewed differently.

4         **JUDGE RODGERS:**   I think the claims have to be

5    perhaps in terms of injury.

6         **MR. SACCHET:**   So, there, of course, is the

7    doctrine of dépeçage, which in some jurisdictions

8    require a claim-by-claim type analysis or a

9    defense-by-defense type analysis.

10        Dépeçage is not recognized in a *lex loci*

11   jurisdiction.   In a *lex loci* jurisdiction, you apply

12   the law of the place of the injury to the claims.

13        In Minnesota, I'm not aware of a Minnesota

14   court applying a dépeçage doctrine to the five-factor

15   test.

16        **JUDGE RODGERS:**   So if we're looking at --

17        **MR. SACCHET:**   Only *Estes* has a loss of

18   consortium claim, I'm told.

19        **JUDGE RODGERS:**   Oh, is it just *Estes*?

20        **MR. AYLSTOCK:**   Yes, Your Honor.

21        **JUDGE RODGERS:**   Oh, okay.   But again, I don't

22   know that I can assume anything, unless you all agree

23   that her loss of consortium, I guess, is Georgia?   Is

24   that --

25        **MR. SACCHET:**   I would need to speak with

1    Estes's counsel.

2            **JUDGE RODGERS:**  Okay.  So, in terms of

3    Seventh Amendment and burdens, Mr. Sacchet, is it the

4    Plaintiffs' position that 3M doesn't have a Seventh

5    Amendment jury trial right on choice of law?

6            **MR. SACCHET:**  The cases that the *Facebook*

7    case cites speak of the Seventh Amendment right in

8    terms of the plaintiff.

9            **JUDGE RODGERS:**  Do you have a case that not

10   just speaks of it, but it explicitly says that, that

11   it's only the plaintiff's --

12           **MR. SACCHET:**  The *Marra* and *Mattel* decisions

13   talk about the merits of the claims, not the defenses.

14           **JUDGE RODGERS:**  You said this early in your

15   argument and it stuck with me, so I wanted to raise it

16   again with you.

17           Let me ask Judge Jones and Judge Herndon if

18   there are any questions for you, and then I'm going to

19   invite Mr. Nomellini back up.

20           **JUDGE JONES:**  I've no further questions.

21   Thank you.

22           **JUDGE HERNDON:**  I do not.

23           **JUDGE RODGERS:**  Thank you very much, Mr.

24   Sacchet.

25           **MR. SACCHET:**  Thank you very much.

1           **JUDGE RODGERS:**  Mr. Nomellini, what is your
2   position on the Seventh Amendment?  Because, frankly,
3   I'm not sure.  I need to --
4           **MR. NOMELLINI:**  Right.  So, the question is
5   with respect to whether a defendant has a Seventh
6   Amendment right --
7           **JUDGE RODGERS:**  To a choice-of-law
8   determination.
9           **MR. NOMELLINI:**  Yes.  Frankly, Your Honor, I
10  don't know the answer to that.
11          **JUDGE RODGERS:**  And it may be you don't, I'm
12  not sure, particularly when it goes to the merits, I
13  don't know --
14          **MR. NOMELLINI:**  Yeah, what I would say, Your
15  Honor, is it's not inextricably tied.  But I know Your
16  Honor's question assumes it is --
17          **JUDGE RODGERS:**  I'm assuming it is.
18          **MR. NOMELLINI:**  Yeah.
19          **JUDGE RODGERS:**  I'm glad you brought that up
20  because I meant to ask you this in your argument time
21  earlier.
22          What is your position in response to Mr.
23  Sacchet's argument about choice of law and -- well,
24  you say maybe not a Seventh Amendment right, but in
25  terms of whether it's inextricably intertwined?  He

1    says it absolutely is, choice of law and place of

2    injury.  What is your position there?

3              **MR. NOMELLINI:**  Your Honor, it is not

4    inextricably intertwined.  I think the questions are

5    different.  As Your Honor framed them correctly, the

6    question for the jury would be was there an injury and

7    not did an injury occur on this base as opposed to

8    this base.

9              **JUDGE RODGERS:**  But he says if I decide --

10   his experts have made their opinion that the injury

11   occurred on base, say, on Fort Richardson, and then I

12   decide the injury occurred overseas, that that is

13   extinguishing their claim, essentially.

14             **MR. NOMELLINI:**  I don't think that's the

15   case, Your Honor.  Your Honor's decision would be

16   limited to choice-of-law purposes.  And I don't

17   remember any party in a jury trial saying, *Ah-Ha! Look*

18   *what this Court determined on choice of law; this*

19   *actually gives me the basis to get summary judgment*

20   *now or nullify the jury's verdict.*  I have never heard

21   of that happening anywhere.  And I think, you know,

22   we've reviewed a lot of choice-of-law cases, and I

23   don't think that's ever come up.

24             **JUDGE RODGERS:**  Okay.  Well, thank you very

25   much.

1        **MR. NOMELLINI:**  Your Honor, would you like to

2    have a copy of the PowerPoints?

3        **JUDGE RODGERS:**  Sure.

4        **MR. NOMELLINI:**  And then, it's totally up to

5    Your Honor, but would you like us to address at all

6    the *Linfoot* and *Lauterbach* cases?

7        **JUDGE RODGERS:**  I don't think so right now.

8    If I need it, I'll definitely invite both sides to

9    speak to it or, if I have a particular issue that I

10   feel needs further briefing, I certainly will invite

11   that.

12       **MR. NOMELLINI:**  Totally understand.  The only

13   reason I raise it is because the first time they were

14   cited and they went to the important issue of, you

15   know, does the state have any kind of interest in the

16   federal enclave.  But I respect Your Honor.

17       Okay, I'll hand up a copy of the PowerPoint.

18       **JUDGE RODGERS:**  Okay, thank you.

19       **MR. AYLSTOCK:**  Mr. Nomellini, could we get a

20   copy?

21       **MR. NOMELLINI:**  Yes, of course.

22       **JUDGE RODGERS:**  All right.  And I'll share

23   the PowerPoint with both of you.

24       All right.  Well, I think that concludes the

25   argument.  I thank you both very much for your oral

1   presentations, and thanks to everyone for the

2   excellent written briefing as well.

3           We have a case management conference, I

4   believe, on 17th, is that correct, is our date?  I'm

5   actually in trial that week, and I've been told that

6   trial is still on.  So, as we move a little bit

7   closer, I'll know for sure, I guess.  I'm being told

8   it's still on, but things obviously can change in

9   criminal cases pretty quickly.  If I'm not able to

10  attend, then I'm sure Judge Jones will stand in for

11  me.

12          Anything else we need to discuss?

13          **MR. AYLSTOCK:**  No, Your Honor.

14          **JUDGE RODGERS:**  All right.  Well, thank you

15  again very much, safe travels, and we'll be in recess.

16          *(Proceedings concluded at 12:35 p.m.)*

17                    --------------------

18  *I certify that the foregoing is a correct transcript*
    *from the record of proceedings in the above-entitled*
19  *matter.  Any redaction of personal data identifiers*
    *pursuant to the Judicial Conference Policy on Privacy*
20  *are noted within the transcript.*

21
    *s/Donna L. Boland*                    *12-7-2020*
22  *Donna L. Boland, RPR, FCRR*                *Date*
    *Official Court Reporter*
23

24

25