# EXHIBIT 3

Confidential - Pursuant to Protective Order

```
 1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF FLORIDA
 2                 PENSACOLA DIVISION
 3
     IN RE: 3M COMBAT ARMS  )  Case No.
 4   EARPLUG PRODUCTS        )  3:19md2885
     LIABILITY LITIGATION    )
 5   _____ )  Judge M. Casey
                             )  Rodgers
 6   THIS DOCUMENT RELATES   )  Magistrate Judge
     TO ALL CASES            )  Gary R. Jones
 7
 8           WEDNESDAY, NOVEMBER 13, 2019
 9   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
10                    - - -
11           Videotaped 30(b)(6) deposition of
12   Elliott H. Berger, M.S., held at the offices
13   of KIRKLAND & ELLIS LLP, 300 North LaSalle,
14   Chicago, Illinois, commencing at 9:04 a.m.,
15   on the above date, before Carrie A. Campbell,
16   Registered Diplomate Reporter, Certified
17   Realtime Reporter, Illinois, California &
18   Texas Certified Shorthand Reporter, Missouri
19   & Kansas Certified Court Reporter.
20                    - - -
21
             GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1              A P P E A R A N C E S :
 2
        AYLSTOCK, WITKIN, KREIS & OVERHOLTZ,
 3      PLLC
        BY:  NEIL D. OVERHOLTZ
 4           noverholtz@awkolaw.com
             JENNIFER HOEKSTRA
 5           jhoekstra@awkolaw.com
             BRYAN F. AYLSTOCK
 6           baylstock@awkolaw.com
        17 East Main Street
 7      Pensacola, Florida  32502
        (850) 202-1010
 8
        and
 9
        SEEGER WEISS, LLP
10      BY:  DAVID R. BUCHANAN
             dbuchanan@seegerweiss.com
11           MAX KELLY
             mkelly@seegerweiss.com
12      77 Water Street
        New York, New York  10005
13      (212) 584-0700
14      and
15      CLARK, LOVE & HUTSON, PLLC
        BY:  SHELLEY HUTSON
16           shutson@triallawfirm.com
             EMILY MARLOWE
17           emarlowe@triallawfirm.com
        440 Louisiana Street, Suite 1600
18      Houston, Texas  77002
        (713) 757-1400
19
        and
20
        TRACEY & FOX
21      BY:  SEAN P. TRACEY
             stracey@traceylawfirm.com
22      440 Louisiana Street, Suite 1901,
        Houston, Texas  77002
23      (713) 495-2333
24      and
25
```

Confidential - Pursuant to Protective Order

```
 1       MONSOUR LAW FIRM
         BY:  DOUGLAS C. MONSOUR
 2           doug@monsourlawfirm.com
         404 North Green Street
 3       Longview, Texas   75601
         (903) 999-9999
 4
         and
 5
         COLSON HICKS EIDSON
 6       BY:  ROBERTO MARTÍNEZ
             bob@colson.com
 7       255 Alhambra Circle Penthouse
         Coral Gables, Florida   33134
 8       (305) 476-7400
         Counsel for Plaintiffs
 9
10
         KIRKLAND & ELLIS LLP
11       BY:  SIERRA ELIZABETH
             sierra.elizabeth@kirkland.com
12       333 South Hope Street
         Los Angeles, California   90071
13       (213) 680-8122
14       and
15       KIRKLAND & ELLIS LLP
         BY:  MIKE BROCK, P.C.
16           mike.brock@kirkland.com
         1301 Pennsylvania Avenue, NW
17       Washington, DC   20004
         (202) 389-5996
18
         and
19
         KIRKLAND & ELLIS LLP
20       BY:  NICHOLAS WASDIN
             nick.wasdin@kirkland.com
21           SIMON GOTTLIEB
             simon.gottlieb@kirkland.com
22       300 North LaSalle
         Chicago, Illinois   60654
23       (312) 862-2000
         Counsel for Defendants
24
25
```

Confidential - Pursuant to Protective Order

```
 1   ALSO PRESENT:

 2        ERIC RUCKER, in-house counsel, 3M

 3        JAMES BATTLE, Aylstock, Witkin,

          Kreis & Overholtz

 4

          ZACH HONE, trial technician, Golkow

 5        Litigation Services

 6

     V I D E O G R A P H E R :

 7        DAN LAWLOR,

          Golkow Litigation Services

 8

                         - - -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Pursuant to Protective Order

1    forensic copying.

2             We went into an office within

3    the acoustical laboratory where various

4    technicians and engineers have had their

5    office space over the years, and in that

6    office there are five-drawer file cabinets

7    with paper copies of test reports, our

8    accreditation documents, et cetera, and I

9    pointed them to those.

10        Q.    And this was the lab where?

11        A.    In Indianapolis.

12        Q.    Indianapolis.  Okay.

13        A.    There's also an area in the

14   building where we have paper copies of all of

15   our technical reports dating from the early

16   1970s, and we took a look at those, showed

17   them to the attorneys.

18             I guided them to computers in

19   the laboratory that we use today that have

20   data on them, indicated what network drives

21   would contain data, pointed to older

22   computers that have been retired that we

23   still had.

24        Q.    Those network drives, can you

25   identify those for me as to, you know,

Confidential - Pursuant to Protective Order

```
 1    whether they went by a name or a letter

 2    designation or something like that?

 3            A.      Letters.  You know, I, H, S.

 4            Q.      Okay.  Did those different I,

 5    H, S drives, did they represent different

 6    types of information that would be stored

 7    there?

 8            A.      Yes.

 9            Q.      Okay.  Can you tell me about

10    that?

11            A.      I can tell you a little.

12            Q.      Okay.

13            A.      They're established by the IT

14    group.  They have to do with who has access

15    to them.

16                    Our data from our technical

17    group primarily relied -- resides on the I

18    drive; also to some extent, I believe, on S.

19    It would be, you know, much easier to have

20    the computer in front of me and give you

21    those details, but -- and I can't tell you

22    whether those actual physical drives are in

23    Indianapolis or in St. Paul.

24            Q.      So let's talk a little bit

25    about the topics that you've been designated
```

Confidential - Pursuant to Protective Order

1    on, and we can look at the amended notice.

2              And so you understand, you've

3    been designated by the company as the person

4    who can speak on behalf of the company

5    regarding certain topics, and I just want to

6    make sure we go through those.

7              The first is Topic Number 6, if

8    we could pull that one up.

9              MS. ELIZABETH:  So this is your

10         Exhibit 7.

11             MR. OVERHOLTZ:  It's Exhibit 7.

12   QUESTIONS BY MR. OVERHOLTZ:

13        Q.    Topic 6 is the "decision to

14   perform NRR labeling tests on open and closed

15   ends of the CAEv2."  Test ID is 213015,

16   213016 and 213017, starting in December 1999

17   continuing into 2000.

18             Do you see that?

19        A.    Yes.

20        Q.    Okay.  And it also says, not --

21   "including but not limited to discussions,

22   meetings and communication regarding that

23   decision to perform such an NRR test."

24             Do you see that?

25        A.    Yes.

Confidential - Pursuant to Protective Order

```
1            Q.     All right.  So I'm just going
2    to kind of refer to this one as the decision
3    to perform the labeling test, as we talk
4    about it today.
5                   But you've prepared yourself to
6    talk on behalf of the company regarding that
7    decision to perform those labeling tests?
8            A.     Yes.
9            Q.     Okay.  Why did Aearo at the
10   time need to perform NRR labeling tests on
11   the Combat Arms plug back in '99?
12                  MS. ELIZABETH:  Objection.
13        Form.
14                  THE WITNESS:  Could you repeat
15        the question?
16   QUESTIONS BY MR. OVERHOLTZ:
17           Q.     Yeah, sure.
18                  Why did Aearo need to perform
19   the NRR labeling test on the Combat Arms
20   version 2 plug back in 1999?
21                  MS. ELIZABETH:  Same objection.
22                  THE WITNESS:  We perform
23        labeling tests on products when
24        they're ready to come to market.
25
```

Confidential - Pursuant to Protective Order

1   QUESTIONS BY MR. OVERHOLTZ:

2        Q.     So in order to be able to sell

3   the product commercially, you were going to

4   need to perform an NRR labeling test; is that

5   right?

6              MS. ELIZABETH:  Same objection.

7              THE WITNESS:  There is an EPA

8        regulation that dictates that products

9        that are sold wholly or in part to

10       reduce noise must have an

11       EPA-specified label.

12             So to commercialize a product,

13       put it in the marketplace, we would

14       conduct a labeling test to compute the

15       NRR.

16  QUESTIONS BY MR. OVERHOLTZ:

17       Q.     Okay.  And the NRR, you told

18  me, was a noise reduction rating.  It's a

19  calculation that's performed when you do

20  testing on the plug; is that right?

21       A.     Yes.

22       Q.     Okay.  Do you consider that the

23  NRR to be pivotal in purchasing decisions for

24  earplugs?

25             MS. ELIZABETH:  Objection.

Confidential - Pursuant to Protective Order

```
 1          Foundation.

 2                THE WITNESS:  I don't know what

 3          drives -- in the consumer's mind that

 4          drives all their decisions, so, no, I

 5          can't say that it's pivotal.

 6    QUESTIONS BY MR. OVERHOLTZ:

 7          Q.    Okay.  Did the company have an

 8    understanding that NRR labels and those NRR

 9    ratings were pivotal in purchasing decisions

10    for the product?

11                MS. ELIZABETH:  Same objection.

12                THE WITNESS:  I'm not sure I

13          can accept the word "pivotal."  They

14          were -- I'd say no.

15    QUESTIONS BY MR. OVERHOLTZ:

16          Q.    Okay.  Let's take a look at the

17    next topic, which is Topic Number 7, which is

18    all REAT testing.

19                That's real ear attenuation

20    testing; is that right?

21          A.    No.

22          Q.    Okay.  What is it?

23          A.    Real ear attenuation at

24    threshold.

25          Q.    At threshold, sorry.
```

Confidential - Pursuant to Protective Order

1                   "Real ear attenuation at

2      threshold testing performed on the open and

3      closed ends of the CAEv2 prior to tests

4      213015 and 213016, including, but not limited

5      to, the laboratory protocol for the test,

6      insertion methods used in such test, the

7      selection of test subjects used for such

8      testing, and the test IDs and results of such

9      testing."

10                  Do you see that?

11          A.     Yes.

12          Q.     Was there any REAT testing

13     performed on the CAEv2 prior to the 015 and

14     016 test?

15          A.     There was testing on versions

16     of that product, but those are the first

17     tests on the version 2 product, yes.

18          Q.     Okay.  And when we talk about

19     the version 2 product, we're talking about

20     the dual-sided Combat Arms plug; is that

21     right?

22          A.     Yes.

23          Q.     Okay.  The tests that were

24     performed prior to that were different

25     versions of the Combat Arms through its

Confidential - Pursuant to Protective Order

```
 1    development; is that right?
 2         A.    Yes.
 3         Q.    Okay.  Can you tell me what
 4    those were?
 5         A.    They were single-ended versions
 6    that had been developed that still
 7    incorporated the nonlinear filter and looked
 8    very much like the V2, similar flange shape,
 9    the same material for the earplug, similar
10    dimensions.
11              The sole difference was they
12    weren't a double-ended product.
13         Q.    Okay.  Were any of those tests
14    labeling tests?
15         A.    No.
16         Q.    So there was no NRR labeling
17    test performed on these earlier models until
18    the 015, 016 and 017 tests were done on the
19    dual-sided Combat Arms plug; is that right?
20         A.    Yes.
21         Q.    Okay.  That testing, that
22    testing that was performed prior to the 015
23    and 016, who conducted that real ear
24    attenuation at threshold testing?
25         A.    Those would have been conducted
```

Confidential - Pursuant to Protective Order

 1    in our laboratory by Ron Kieper.

 2         Q.    Okay.  And that testing that's

 3    performed, would it have been documented by

 4    Mr. Kieper?

 5         A.    We would have reports of those

 6    results.

 7         Q.    Okay.  So back in that time

 8    period, was there a database in which results

 9    were put into for those results?

10         A.    Yes.

11         Q.    Okay.  And what was the name --

12    what was that database?

13         A.    We called it HPDA, hearing

14    protection data analysis.

15         Q.    Okay.  And HPDA has persisted

16    throughout the existence of the laboratory

17    since you've been working for 3M?

18         A.    It's been continuously upgraded

19    and modified.  In the early days it was a

20    FORTRAN program; today it's not.  But, yes.

21         Q.    Today is it an access database?

22         A.    Yes.

23         Q.    Okay.  The data from early

24    retests that were conducted on these earlier

25    versions of the UltraFit plug with the French

Confidential - Pursuant to Protective Order

1    filter, would that data still exist in the

2    HPDA database; do you believe?

3                    MS. ELIZABETH:  Objection.

4         Form.

5                    THE WITNESS:  Yes.

6    QUESTIONS BY MR. OVERHOLTZ:

7         Q.    That was a yes?

8         A.    We have test reports in the

9    HPDA database on those earlier versions.

10        Q.    Okay.  The next topic is the

11   selection of test subjects used in the 015,

12   016 and 017 tests.

13                   Do you see that?  It's Topic

14   Number 8.

15        A.    Yes.

16        Q.    All right.  And you understand

17   you're designated to talk about that

18   selection process for those tests as well as

19   the protocols, policies and procedures at the

20   E-A-RCAL lab that would have governed that

21   testing.

22                   Do you understand that?

23        A.    Yes.

24        Q.    Okay.  And are there policies

25   and procedures at 3M that govern how test

Confidential - Pursuant to Protective Order

1    subjects are selected?

2         A.     We have a policies and

3    procedures manual that talks about the

4    training of subjects and how they become part

5    of the overall test panel.

6         Q.     And is that -- that selection

7    policy that's followed at the E-A-RCAL lab,

8    has that changed over time?

9         A.     Yes.

10        Q.     Okay.  The next topic is the

11   NRR testing of the open and closed end of the

12   CAEv2 starting in '99, continuing in 2000,

13   the 013 -- the 213015, 016 and 017.

14             Do you see that?

15        A.     Yes.

16        Q.     Including the decision to stop

17   the 015 after testing eight test subjects,

18   right?

19        A.     I see that.

20        Q.     Okay.  Now, the 015 was the NRR

21   labeling test for the closed end of the

22   dual-ended Combat Arms Earplug; is that

23   right?

24             MS. ELIZABETH:  Objection.

25        Form.

Confidential - Pursuant to Protective Order

```
 1              THE WITNESS:  It was our

 2         beginning of a test to create data

 3         that we would use to label that

 4         product.

 5    QUESTIONS BY MR. OVERHOLTZ:

 6         Q.     Okay.  And for the closed end?

 7         A.     For the closed end.

 8         Q.     Okay.  And the 017 was an NRR

 9    labeling test for the closed end?

10         A.     Yes.

11         Q.     The 016 was an NRR labeling

12    test for the open end; is that right?

13         A.     Yes.

14         Q.     Okay.  Also described here are

15    the "E-A-RCAL lab protocols, policies and

16    procedures concerning the premature

17    termination of NRR labeling tests and the

18    identification of outlier test results."

19              Do you see that?

20         A.     Yes.

21         Q.     Okay.  And you familiarized

22    yourself with the policies and procedures at

23    3M and Aearo regarding termination of an NRR

24    labeling test?

25         A.     Yes.
```

Confidential - Pursuant to Protective Order

1       Q.     Okay.  "Also, regulations

2   including ANSI standards and EPA regulations

3   governing the fitting, testing, labeling and

4   sale of the CAEv2, the conducting of such

5   tests by E-A-RCAL lab personnel, discussions

6   and communications between such lab personnel

7   during such testing, and the decision to roll

8   back the yellow, non-inserted flanges of the

9   CAEv2 prior to insertion of the olive, closed

10  end, during test 213017, the closed-end

11  retest."

12            Do you see that?

13      A.     Yes.

14      Q.     So essentially this topic is

15  the NRR labeling tests that were conducted on

16  the Combat Arms plugs and what went into

17  those, right?

18      A.     Yes.

19      Q.     Okay.  You're familiar with the

20  technical report, how folding the flanges

21  back affects REAT results of the UltraFit

22  plug?

23      A.     Yes.

24      Q.     Okay.  And we'll talk about

25  that later.

Confidential - Pursuant to Protective Order

1                      You said you've looked into the

2      design of the -- the design issues related to

3      the CAEv2, as the dual-ended Combat plug was

4      described in that flange report, right?

5           A.     Yes.

6           Q.     Okay.  Topic Number 12 is "any

7      design decisions beyond those discussed in

8      the flange report, including when and where

9      3M designed the CAEv2 and whether the design

10     was based on preexisting technology."

11                     Do you see that?

12          A.     Yes.

13          Q.     And you're prepared to testify

14     on that topic, correct?

15          A.     Yes.

16          Q.     Okay.  Topic 13 is "any

17     representations made by defendants relating

18     to the NRR testing and CAEv2 results to the

19     military and/or public."

20                     Do you see that?

21          A.     Yes.

22          Q.     Okay.  And you're prepared to

23     discuss that topic as well, right?

24          A.     Yes.

25          Q.     Okay.  14 is "any approval of

Confidential - Pursuant to Protective Order

1    the CAEv2 design by the military/Department

2    of Defense and any documentation of

3    discussions with the military on the same."

4              Do you see that?

5        A.    Yes.

6        Q.    Okay.  And you're prepared to

7    testify on that topic?

8        A.    Yes.

9        Q.    Okay.  And was it your

10   understanding that in order to purchase the

11   Combat Arms plug from 3M or Aearo, that the

12   military needed to approve those purchases?

13       A.    Yes.

14       Q.    Okay.  Number Topic 15 is "any

15   internal or external communications or

16   decisions about communications made with

17   regard to instructions for use or fit of the

18   CAEv2."

19              Do you see that?

20       A.    Yes.

21       Q.    Okay.  And you're prepared to

22   talk about that topic?

23              MS. ELIZABETH:  Counsel, I

24         would note for the record that we've

25         limited that topic to instructions for

Confidential - Pursuant to Protective Order

```
 1        use or fit during product testing,

 2        which Mr. Berger is prepared to

 3        testify to today, but not to

 4        instructions to end users, which is

 5        covered by other 30(b)(6) witnesses.

 6             MR. OVERHOLTZ:  Okay.  We can

 7        talk about that whenever we get to it.

 8             I think my understanding was

 9        that you were limiting it the internal

10        and external communications about

11        those instructions for use but not the

12        actual going through the instructions

13        because that was covered by a

14        different 30(b)(6) witness.

15             MS. ELIZABETH:  Instructions

16        for use regarding product testing,

17        which is in our letter of November 6,

18        2019.  I'm happy to talk about it off

19        the record.

20             MR. OVERHOLTZ:  Sure.  We'll

21        clarify that, what we mean by that.

22   QUESTIONS BY MR. OVERHOLTZ:

23        Q.    Topic 17 is "the retention and

24   storage of the flange report, including, but

25   not limited to, disclosure of the flange
```

Confidential - Pursuant to Protective Order

 1    report or information contained in it."

 2              Have you prepared to testify on

 3    that topic?

 4         A.    Yes.

 5         Q.    Okay.

 6              MS. ELIZABETH:  Counsel, I'd

 7         also like to note for the record that

 8         we limited that topic to the flange

 9         memo and how it was stored and

10         retained in the ordinary course but

11         not issues related to the production

12         in Moldex cases or otherwise.

13              MR. OVERHOLTZ:  Yeah.  I'm not

14         going to ask you lawyer questions

15         about it.  I'm going to ask you where

16         it was and how to find it.

17              THE WITNESS:  Yes.

18    QUESTIONS BY MR. OVERHOLTZ:

19         Q.    Okay.  And then there was a

20    Topic 16 from the first notice related to the

21    decision to -- the size of the carrying case

22    that the military used.

23              Are you prepared to testify on

24    that topic as well?

25         A.    Yes.

Confidential - Pursuant to Protective Order

```
 1              MS. ELIZABETH:  Counsel, one
 2        more note for the record.
 3              MR. OVERHOLTZ:  Yes.
 4              MS. ELIZABETH:  We've also
 5        limited that topic to the military's
 6        request to redesign CAEv2 so that it
 7        would fit into the military's existing
 8        carrying case and/or its desire to
 9        modify its carrying case to
10        accommodate the CAEv2's original
11        design.
12    QUESTIONS BY MR. OVERHOLTZ:
13        Q.     And based on that, you're
14    prepared to testify on that topic as well; is
15    that right?
16        A.     Yes.
17              MR. OVERHOLTZ:  Okay.  We've
18        been going about an hour and ten
19        minutes.  Do you want to keep going
20        for a while?
21              It's up to you guys.
22              MR. BROCK:  If it feels okay,
23        let's get another 20 minutes --
24              MR. OVERHOLTZ:  Let's get
25        another 10, 15, 20 minutes in.  All
```

Confidential - Pursuant to Protective Order

```
 1          right.
 2                  MR. BROCK:  It's up to you,
 3          though, Dr. Berger.  If you'd like to
 4          take a break now --
 5                  THE WITNESS:  I'm okay.
 6   QUESTIONS BY MR. OVERHOLTZ:
 7          Q.    Okay?
 8                  All right.  So one thing, if I
 9   could get the ELMO for a minute.  We'll talk
10   about a little bit -- kind of talk Topic 6
11   and 7 which involves -- I'll try to make this
12   a little smaller here.
13                  Topic 6 and 7 is the decision
14   to do the labeling test on the Combat Arms
15   plug, and then Topic 7 is the early testing
16   on the versions of the plug.
17                  And then, of course, there was
18   the Topic 12, design decisions beyond those
19   actually discussed in the flange report.
20                  So we can understand what we're
21   talking about, I want to -- see if I can grab
22   this.  And -- so to make sure we're talking
23   about the same thing -- and I'll give you one
24   of these so you can hold it.  But I want the
25   jury to be able to see what we're talking
```

Confidential - Pursuant to Protective Order

1          describe that.

2    QUESTIONS BY MR. OVERHOLTZ:

3          Q.    Okay.  And according to this

4    document, Exhibit 18, the inventors of the

5    filter, the French filter, are Pascal Hamery,

6    Armand Dancer and Georges Evrard, all of

7    France, correct?

8          A.    They are listed as the

9    inventors here.

10         Q.    And the assignee is ISL, right?

11         A.    That is the assignee that is

12    listed.

13         Q.    Okay.  Now, if we flip over to

14    the next page, another key element of the

15    design of the Combat Arms Earplug was a

16    two-sided design for both an open end and a

17    closed end, correct?

18         A.    Yes.

19         Q.    And this document shows a

20    picture of a two-sided design with a filter

21    included, correct?

22              MS. ELIZABETH:  Objection.

23         Foundation.

24              THE WITNESS:  It describes a

25         hearing protector that appears to have

Confidential - Pursuant to Protective Order

1          two ends to it, yes.

2     QUESTIONS BY MR. OVERHOLTZ:

3          Q.    Right.

4                And this is -- the 6,070,693

5     patent number matches what Brian Myers from

6     Aearo described as covering the concept of a

7     dual-ended purpose earplug, correct?

8                MS. ELIZABETH:  Objection.

9          Form.

10               THE WITNESS:  That is the way

11         Mr. Myers referred to it in his e-mail

12         of July 2006, yes.

13    QUESTIONS BY MR. OVERHOLTZ:

14         Q.    Right.

15               And according to this document,

16    the inventor of the '693 patent that includes

17    this two-sided earplug design for open and

18    closed end would be Pascal Hamery again of

19    ISL, right?

20         A.    That's what is listed on the

21    document.

22         Q.    Okay.  Do you know if the

23    documents that describe design of the product

24    include the patent information whenever the

25    product is distributed?

Confidential - Pursuant to Protective Order

1          MS. ELIZABETH:  Objection.

2     Vague.  Foundation.

3          THE WITNESS:  Could you repeat

4     that question or clarify it?

5  QUESTIONS BY MR. OVERHOLTZ:

6     Q.    Sure.

7          Do you know whether or not the

8  packaging of the product includes the patent

9  information so that someone can look at the

10  design?

11          MS. ELIZABETH:  Objection.

12     Foundation.  Vague.

13          THE WITNESS:  I know that over

14     the years we have been endeavoring to

15     put patent numbers on packaging.  I

16     don't know when that happened, which

17     ones it's on, but that certainly does

18     appear on some 3M packaging.

19  QUESTIONS BY MR. OVERHOLTZ:

20     Q.    Okay.  Let's shift gears a

21  little bit here.

22          All right.  So one of the

23  things that we want to talk about today is

24  the actual NRR labeling testing for the

25  Combat Arms plug, correct?

Confidential - Pursuant to Protective Order

1              You're ready --

2              MR. BROCK:  One of the

3       things --

4       QUESTIONS BY MR. OVERHOLTZ:

5         Q.    That's one of your topics that

6       you've been designated to talk to on behalf

7       of the company; is that right?

8         A.    Yes.

9         Q.    Okay.  So let's go back to the

10      ELMO.

11             All right.  And so -- all

12      right.  So if -- so again, we've labeled

13      this -- this is the Combat Arms version 2,

14      and this is the open end and this is the

15      closed end, right?

16        A.    Yes.

17        Q.    Okay.  And for testing purposes

18      for labeling, the type of testing that is

19      being done is referred to as NRR labeling

20      testing; is that fair?

21        A.    You can use that as a shorthand

22      to refer to it.

23        Q.    Okay.  One of the goals of that

24      testing is to establish a noise reduction

25      rating for the product, right?

Confidential - Pursuant to Protective Order

1      A.     Yes.

2      Q.     Okay.  And because this is a

3   dual-ended plug, the testing that was

4   conducted by Aearo and 3M was conducted to

5   determine NRRs for both sides of the plug?

6              MS. ELIZABETH:  Objection.

7         Form.

8              THE WITNESS:  We needed to

9         determine an NRR for both the open end

10        and the closed end performance.

11   QUESTIONS BY MR. OVERHOLTZ:

12      Q.     Okay.  So the first REAT NRR

13   labeling testing that was performed by Aearo

14   was the 213015; is that right?

15      A.     Yes.

16      Q.     Okay.

17      A.     Well, let me correct that.  Two

18   tests were started at that time.

19      Q.     Okay.

20      A.     015 and 016.

21      Q.     Okay.  So the 213015 was a test

22   that was started in December of 1999; is that

23   right?

24      A.     I believe it was started at

25   that point.  The testing report indicates

Confidential - Pursuant to Protective Order

1    January of 2000, so I'm thinking in December

2    it had begun.

3         Q.    Okay.  And I see you

4    referencing the notebook that you brought.

5    Can you tell me what tab and what document

6    you're looking at?

7         A.    I'm looking at 23015 and 23016

8    {sic}.

9         Q.    Okay.  The test reports?

10        A.    Yes.

11        Q.    Okay.  And then the test that

12   was started on the open end was the 213016;

13   is that right?

14        A.    Yes.

15        Q.    Okay.  And these tests were

16   going to be conducted under EPA regulations;

17   is that right?

18             MS. ELIZABETH:  Objection.

19        Form.

20             THE WITNESS:  I'm not sure what

21        you mean when you say "under EPA

22        regulations."

23   QUESTIONS BY MR. OVERHOLTZ:

24        Q.    In order to be able to

25   establish an NRR that can be labeled on the

Confidential - Pursuant to Protective Order

1    product, you have to comply with certain

2    regulations from the EPA, correct?

3              MS. ELIZABETH:  Objection.

4         Form.  Vague.

5              THE WITNESS:  There is an EPA

6         labeling regulation that specifies

7         that testing will be conducted in

8         conformance with an ANSI standard.

9    QUESTIONS BY MR. OVERHOLTZ:

10        Q.    Okay.  So there was an EPA

11   regulation, and it said that we need to do

12   the testing in performance with an ANSI

13   standard; that's right?

14        A.    Yes.

15        Q.    Okay.  And the ANSI standard

16   that the 213015 and 213016 testing that was

17   going to be conducted was with which

18   standard?

19        A.    ANSI S3.19-1974, 3.19-1974,

20   also designated ASA STD1-1975.

21        Q.    Okay.  A lot of times in the

22   documents we see it referred to as either the

23   319 standard or the ANSI 1974 standard; is

24   that right?

25        A.    Yes.

Confidential - Pursuant to Protective Order

1        Q.      Okay.  And when it comes to

2   earplugs, one of the things that this

3   standard calls for is how the plugs are fit

4   in the subjects; is that right?

5        A.      It describes an experimenter

6   fit, which is what is required under the EPA

7   regulation.

8        Q.      Okay.  And Aearo has -- or at

9   the time had policies that covered how they

10  conducted testing under this ANSI 1974

11  standard?

12       A.      Yes.

13       Q.      And can you tell me what the

14  Aearo policy was for how experimenter fit was

15  conducted in the testing conducted in 213016

16  and 213015?

17              MS. ELIZABETH:  Objection.

18       Form.  Vague.

19              THE WITNESS:  You're asking for

20       a complete description of all the

21       features?

22  QUESTIONS BY MR. OVERHOLTZ:

23       Q.      Well, what would -- if you

24  could describe for a layperson what

25  experimenter fit meant according to Aearo's

1    policies back then that would have been

2    required to be conducted for the 016 and 015

3    studies.

4          A.    It would require the hearing

5    protector being fitted for the goal of

6    achieving optimum performance, which is

7    what's called for by the experimenter fit

8    section of ANSI S3.19 as dictated by the EPA.

9              There would be an experienced

10   experimenter, such as Ron Kieper who

11   conducted these tests, who would work with

12   subjects who were on our panel, who already

13   had some familiarity with testing hearing

14   protectors and had met the requirements of

15   the standard with respect to their hearing

16   sensitivity and being able to track their

17   sequential thresholds within a certain degree

18   of variability.

19         Q.    Okay.  So the experimenter in

20   the 016 and 015 --

21              MS. ELIZABETH:  Were you

22        finished with your answer?

23              THE WITNESS:  No.

24   QUESTIONS BY MR. OVERHOLTZ:

25         Q.    Okay.  You had more?

Confidential - Pursuant to Protective Order

1                Okay.

2        A.      So what I described for you is

3    the experimenter and the subjects and the

4    name of the procedure.

5                Ron would enter the chamber and

6    work with those subjects.  He would be

7    fitting the hearing protectors as per the

8    requirements of that standard.  And then

9    through some interaction with them, the goal

10   would be to achieve an optimum fit before the

11   test was conducted.

12       Q.      Okay.  The experimenter in the

13   015 and 016 would have been Ron Kieper?

14       A.      Yes.

15       Q.      Okay.  Is it i-e-p-e-r?

16       A.      Yes.

17               MS. ELIZABETH:  Yes.

18               MR. OVERHOLTZ:  You threw me

19       off for a second there.

20   QUESTIONS BY MR. OVERHOLTZ:

21       Q.      So Ron Kieper would be the

22   experimenter.

23               And would Mr. Kieper be the

24   first to insert the plug into the subject's

25   ear?

Confidential - Pursuant to Protective Order

1      A.    I'd like to refresh my memory

2  on that.  Just a moment.

3      Q.    Okay.  Just tell me where

4  you're going to go to refresh your memory.

5      A.    When I get there, I will tell

6  you.

7      Q.    Okay.

8      A.    Yes.  I just wanted to assure

9  myself that indeed the first fit is the

10  experimenter's.  I'm on page 10 of --

11          MR. BROCK:  Tell him the tab

12      number in your notebook.

13          THE WITNESS:  Tab 1, which is

14      the policies manual from 1999.

15          MS. ELIZABETH:  I think you're

16      in -- you want to say this tab number,

17      too.  It has a 2.

18          THE WITNESS:  I'm on 1.

19  QUESTIONS BY MR. OVERHOLTZ:

20      Q.    Which policy are you looking

21  at?

22          MS. ELIZABETH:  Tab 2, and then

23      under Tab 2, Tab 1.

24  QUESTIONS BY MR. OVERHOLTZ:

25      Q.    Would this have been the

Confidential - Pursuant to Protective Order

```
 1    February of '99 version 5.2?

 2          A.     Yes.

 3          Q.     Okay.

 4          A.     And I'm on page 10.

 5          Q.     You're looking at page 10.

 6                 Okay.  And so I have that up

 7    here on the screen now.

 8                 Is this what you're looking at?

 9          A.     Yes.

10                 So in the first paragraph, the

11    third sentence:  "The technician enters the

12    chamber, and using the manufacturer's

13    instructions as a guide, fits the protector

14    to the subject to obtain a best fit as

15    assessed by a visual and tactile inspection."

16                 And "best" is in quotes.

17          Q.     Okay.  And then it says, "This

18    assessment should also include subjective

19    feedback from the subject based upon his or

20    her listening to the technician's voice and a

21    perception of the magnitude and bilateral

22    balance of the occlusion effect."

23                 Correct?

24          A.     Correct.

25          Q.     Okay.  Once the technician is
```

Confidential - Pursuant to Protective Order

1   satisfied with the fit, the technician leaves

2   the room, the experimenter leaves the room;

3   is that right?

4           A.      Well, at this time, once he is

5   satisfied of the fit, the fitting noise is

6   turned on while they're in the chamber and

7   the subject is asked to assess that fitting

8   noise.

9                   And so while the experimenter

10  is still in the chamber, if there's any

11  further adjustments, they're made.  And then

12  the technician makes another assessment to

13  confirm the final fit.

14                  And then if the technician

15  feels the fit -- good fit can't be obtained,

16  the subject's excused.  Otherwise, the

17  technician then leaves the room, and after a

18  five-minute waiting period the test is begun.

19          Q.      Okay.  And, by the way, there's

20  some notes on this version.  This is the

21  version from your file.

22                  These are your notes; is that

23  right?

24          A.      Yes.

25          Q.      Okay.  And once this --

Confidential - Pursuant to Protective Order

1      A.     Actually, this was not the

2   version from my file.  This was the version

3   from the NVLAP retained files --

4      Q.     Okay.

5      A.     -- NVLAP being the Department

6   of Commerce National Voluntary Laboratory

7   Accreditation Program that accredits our

8   laboratory, and we retain all versions of the

9   policy manual as per our procedures.

10      Q.     So this version of this policy

11   and procedure was kept at the lab?

12      A.     Yes.

13      Q.     Okay.  And these notes, they're

14   your notes?

15      A.     Those are my notes.

16      Q.     Okay.  And once final fit

17   occurs, the experimenter can leave the room;

18   is that right?

19      A.     Yes.

20           MS. ELIZABETH:  Objection.

21      Form.

22           You need to --

23   QUESTIONS BY MR. OVERHOLTZ:

24      Q.     And with final fit, once the

25   technician leaves the room, neither the

Confidential - Pursuant to Protective Order

1    technician nor the subject are allowed to

2    touch the plug; is that right?

3              MS. ELIZABETH:  Objection.

4         Form.

5              THE WITNESS:  Once the

6         experimenter leaves the room, then the

7         test begins.  There's no further

8         adjustments at that time.

9    QUESTIONS BY MR. OVERHOLTZ:

10        Q.    Okay.  Now, the testing that is

11   done, the testing -- there are three rounds

12   of the tests for each subject; is that right?

13        A.    You could describe it that way.

14   They fit the device three times.  They take

15   three open thresholds and three occluded or

16   protected thresholds.

17        Q.    Okay.  So there's three tests,

18   both open and occluded, right?

19        A.    Yes.

20        Q.    And here, open means no plug,

21   right?  No protector?

22        A.    Yes.

23        Q.    And occluded means with the

24   plug?

25        A.    Yes.

Confidential - Pursuant to Protective Order

1    Q.    Okay.  And the fitting that we

2    just went through in the policy and

3    procedure, is it fitted for each one of the

4    three tests?

5    A.    Yes.

6    Q.    Okay.  So the experimenter goes

7    back into the room for the second test; is

8    that right?

9    A.    Yes.

10    Q.    Does the policy call for that

11    test to be conducted immediately following

12    the first test, or can it be done later or a

13    different day?

14    A.    I don't think our policy manual

15    speaks specifically to that, but in general,

16    the intention is that all of the fits for a

17    given test of a product take place within one

18    session while the subject is still in the

19    chamber.

20    Q.    Okay.

21    A.    And I'm not sure if those words

22    actually appear in here, but that's normally

23    the way they're conducted.

24    Q.    All right.  So in the 213016

25    test, how many subjects are tested?

Confidential - Pursuant to Protective Order

```
1          A.      I don't want to misspeak, so I

2    just want to --

3          Q.      Sure.

4          A.      -- make sure we're referring to

5    the correct test.

6                  So the 016 test, there are ten

7    subjects tested.

8          Q.      Okay.  So I'm just going to --

9    so the 213016, there are ten subjects.

10                 Does the ANSI standard require

11   a minimum of ten subjects?

12         A.      Yes.

13         Q.      Okay.  And is that what Aearo

14   did back then, was do the minimum ten?

15                 MS. ELIZABETH:  Objection.

16         Form.

17                 THE WITNESS:  When we're doing

18         label testing, at that time and still

19         today, we do ten subjects, which is

20         what you will find to be the case for

21         every labeled product from every

22         manufacturer on the market.

23                 So you may characterize it as

24         the minimum of ten, but that is the

25         industry standard, the laboratory
```

Confidential - Pursuant to Protective Order

1        standard, that everyone uses.

2    QUESTIONS BY MR. OVERHOLTZ:

3        Q.    And based on testing that ten

4    subjects, you establish an NRR that's

5    labeled -- or so that the company can sell

6    and market the product; is that right?

7        A.    We establish an NRR so that

8    when we're selling the product, we're in

9    conformance with the requirements of the EPA

10   regulation.

11       Q.    And those ten subjects, would

12   the 213015 have also required ten subjects to

13   be tested?

14            MS. ELIZABETH:  Objection.

15       Form.

16            THE WITNESS:  There is no

17       requirement that once a test is

18       started it be concluded.  We have

19       tests in our lab that have been

20       conducted on three subjects, on five

21       subjects.  This particular one was

22       stopped at eight subjects.

23   QUESTIONS BY MR. OVERHOLTZ:

24       Q.    Okay.  So --

25       A.    The requirement is that if

Confidential - Pursuant to Protective Order

1   you're going to use a test as a test for

2   labeling a product, it will have ten

3   subjects.

4        Q.    Right.

5              So the 213015 was stopped at

6   eight subjects?

7        A.    Yes.

8        Q.    In order to establish an NRR

9   label that can -- so the product can be sold,

10   you have to have at least ten?

11        A.    Yes.

12        Q.    So based on the results of the

13   213015, 3M could not have sold the Combat

14   Arms Earplug?

15              MS. ELIZABETH:  Objection.

16        Form.

17              THE WITNESS:  Based on the fact

18        that it was an incomplete test.

19   QUESTIONS BY MR. OVERHOLTZ:

20        Q.    Okay.  Based on the fact that

21   the 015 was not completed, 3M, Aearo, could

22   not have sold the Combat Arms Earplug; is

23   that right?

24              MS. ELIZABETH:  Objection.

25        Form.

Confidential - Pursuant to Protective Order

1          THE WITNESS:  It would have

2     been in violation of the EPA law to

3     put it in commerce with a label based

4     on testing less than ten subjects.

5  QUESTIONS BY MR. OVERHOLTZ:

6     Q.     Okay.  Do you know when the 016

7  study completed?  When it started and when it

8  completed, if you can give me that

9  information?

10     A.     What I can tell you with

11  certainty is that it was completed around

12  January 25th, since that's the date I see on

13  the 016 report.

14     Q.     So around 1/25/2000?

15     A.     Yes.

16     Q.     Okay.  When was the 213015

17  stopped?

18     A.     The date on that test is listed

19  as, again, the same date.  I'm not exactly

20  certain of when it was stopped, but in that

21  time frame.

22     Q.     Okay.  Let's talk a little bit

23  about -- so -- well, let's go back to this.

24          So the 213015 was stopped at

25  eight subjects.  You made the decision to

Confidential - Pursuant to Protective Order

1   stop it?

2        A.     I would say that decision was

3   made in collaboration between myself and my

4   manager at the time.

5        Q.     Your manager at the time --

6        A.     Would have been Dick Knauer.

7        Q.     Okay.  So...

8        A.     I don't recall exactly.  I

9   certainly had involvement in that decision.

10  I do not believe it was solely my decision.

11       Q.     You think that Mr. Knauer had a

12  part in that?

13       A.     The way the chain of command

14  works, for me to have made that decision at

15  that time, I would in all likelihood have

16  been talking to my supervisor.

17       Q.     Okay.  And what about

18  Mr. Kieper, did he have a say in that

19  decision?

20       A.     I would say his input about

21  what he was observing was considered.  I

22  don't believe he had a say in the decision.

23       Q.     He was told to stop the study?

24       A.     Yes.

25       Q.     Okay.  The 213015, the company

Confidential - Pursuant to Protective Order

```
 1    calculated at the end of the eight subjects

 2    the NRR, right?

 3         A.     We did have an estimated NRR.

 4    It wouldn't be an NRR because an NRR by

 5    definition must be computed from ten

 6    subjects.  But could be an estimated NRR.

 7         Q.     The estimated NRR, call it

 8    estimated NRR, was 10.8?  10.9?

 9         A.     10.9.

10         Q.     10.9.

11                Almost 11, right?

12         A.     It would round to 11.

13         Q.     When it comes to selling an

14    earplug for steady-state noise, a 10.99 NRR,

15    if it was a final NRR, would be unacceptable,

16    correct?

17                MS. ELIZABETH:  Objection.

18         Form.

19                THE WITNESS:  We've been

20         selling three-flanged earplugs like

21         that since the mid-1980s.  We knew

22         what to anticipate for the performance

23         of that type of product, which would

24         have been on the order of 10 dB or so

25         higher than that number.
```

Confidential - Pursuant to Protective Order

```
 1                 So it was a number that didn't
 2          make sense to us at the time, and we
 3          decided to look into it in more
 4          detail.
 5   QUESTIONS BY MR. OVERHOLTZ:
 6          Q.    Okay.  And so you expected at
 7   least 10 dB higher?
 8          A.    Something in the range of 20.
 9          Q.    Did Mr. Kieper tell you why he
10   believed the estimated NRR was so low?
11                 MS. ELIZABETH:  Objection.
12          Form.
13                 THE WITNESS:  At the time we
14          stopped the test, I don't recall what
15          he did or didn't say to me.
16   QUESTIONS BY MR. OVERHOLTZ:
17          Q.    Okay.  He was an experienced
18   earplug fitter, wasn't he?
19                 MS. ELIZABETH:  Objection.
20          Form.
21                 THE WITNESS:  He had been in
22          his role for a number of years, so he
23          did have a good degree of experience.
24   QUESTIONS BY MR. OVERHOLTZ:
25          Q.    Okay.  And he had been involved
```

Confidential - Pursuant to Protective Order

```
 1   as being the experimenter in many of the
 2   tests involving versions of the three-flange
 3   UltraFit plug, right?
 4        A.     Versions of it, which were not
 5   a dual-ended version.  And as we had
 6   discovered over the years with competitors'
 7   earplugs or our own earplugs, as you learn to
 8   work with earplugs, you can fit them better.
 9             This was a new style of earplug
10   that he had not been -- as we discussed
11   earlier, this was the first REAT test on a
12   dual-ended product, so although he was
13   experienced in general, he was not
14   experienced with this design.
15        Q.     So the 016 test, that was on
16   the open end, right?  We talked about that
17   before.
18        A.     Yes.
19        Q.     And it was completed?
20        A.     Yes.
21        Q.     And an NRR was calculated for
22   the 016; is that right?
23        A.     Yes.
24        Q.     And the NRR that the company
25   calculated for the 016 was a negative
```

Confidential - Pursuant to Protective Order

1    point -- a negative 2.0, right?

2        A.    Yes.

3        Q.    So let me show you what we'll

4    mark...

5              (Berger 30(b)(6) Exhibit 19

6        marked for identification.)

7    QUESTIONS BY MR. OVERHOLTZ:

8        Q.    I'm showing you the testing

9    results from the 213016 study, MDL000188143,

10   signed by yourself and Mr. Kieper.

11             You're familiar with this

12   document and have it in your notebook, right?

13       A.    Is there a question?

14       Q.    Yes.

15             You're familiar with this

16   document, and you have it in your notebook;

17   is that correct?

18       A.    Yes.

19       Q.    Okay.  So this test report,

20   this is produced out of the testing database

21   that's held at Aearo; is that correct?

22       A.    Yes.

23       Q.    Now, this describes that there

24   were ten subjects, as we talked about, and

25   you had to review these results and sign off

Confidential - Pursuant to Protective Order

1    on them; is that right?

2        A.    Yes.

3        Q.    Okay.  Now, if we turn over to

4    the second page, there is a breakdown of the

5    individual subject data.

6             Do you see that?

7        A.    Yes.

8        Q.    Okay.  And so for each

9    subject -- this shows that there are three

10   tests conducted for each subject, correct?

11       A.    Yes.

12       Q.    As we talked about.

13            And it provides their

14   attenuation numbers over these different

15   frequency ranges, correct?

16       A.    Yes.

17       Q.    And then it shows a comfort

18   scale number.

19            Do you see that?

20       A.    Yes.

21       Q.    And then it also provides canal

22   size.

23            Do you see that?

24       A.    Yes.

25       Q.    Now, we haven't talked a lot

Confidential - Pursuant to Protective Order

 1    about canal size today, but it's fair to say

 2    that different people have different ear

 3    canal sizes; is that right?

 4         A.     Yes.

 5         Q.     And as part of their testing

 6    protocol at Aearo, 3M, you tested subjects

 7    with different size ear canals; is that

 8    right?

 9         A.     Yes.

10         Q.     Was there a specific rule or

11    policy that you followed with respect to how

12    many of each different type of ear canal size

13    you needed?

14         A.     Yes.

15         Q.     Okay.  And what was that?

16         A.     Having only a group of ten

17    listeners, it's difficult to get a

18    representative range for the entire

19    population.

20                Also, when you look at the

21    difficulties of maintaining a listener panel,

22    expecting people to show up, you know, for

23    two-hours tests, et cetera, you have

24    difficulty in maintaining a panel that would

25    have a wide range of sizes.

Confidential - Pursuant to Protective Order

1              So we did have a policy in our

2    procedures manual that I can review with you

3    if you want, but it talked about the goal was

4    to obtain a range of sizes so that not

5    everyone would be at one end of the

6    distribution or not everybody would just be

7    an average-sized ear canal.

8         Q.    Okay.

9         A.    Something that is a policy that

10   we have implemented over the years, I think

11   because it's an appropriate one, and we also

12   learn more about products.  I'm not aware if

13   any other laboratory does that.

14        Q.    Okay.  So you described the

15   size of the different subjects.

16              These subjects on this report,

17   we have them by their initials, right?

18        A.    Yes.

19        Q.    These subjects were people

20   known to the company?

21              MS. ELIZABETH:  Objection.

22        Form.

23              THE WITNESS:  Could you --

24   QUESTIONS BY MR. OVERHOLTZ:

25        Q.    Did the company know who these

1    subjects were, or was this a random sample of

2    earplug test subjects?

3         A.    This was a sample of subjects

4    from the master panel of subjects.  And those

5    subjects were a wide range of people who --

6    whoever we could get.  So it was -- could be

7    employees of the company, relatives of

8    employees, friends who the employees said,

9    "hey, this person might be interested in

10   doing a test," or someone we might have heard

11   of who was available.

12             It was a wide net.  Wherever we

13   could find someone to come in and take a test

14   and see if they could qualify, we'd go for

15   them.  So this was a range of people.

16        Q.    The selection -- sorry.

17        A.    Some of them -- some of them at

18   the time would have been -- they're all being

19   paid.  Obviously you have to pay people to

20   come in and do this.  Some of them were being

21   paid as employees of the company.  They might

22   have been getting in on overtime.  They might

23   have been doing it if they were salaried just

24   to assist.  And the ones who were not company

25   employees would have been paid an hourly rate

Confidential - Pursuant to Protective Order

1    through a part-time firm.

2        Q.    Okay.  So these subjects in the

3    213016 came from a master panel that was kept

4    by Aearo at the time; is that right?

5        A.    Yes.

6        Q.    Okay.  And these subjects had

7    been qualified as subjects to serve on those

8    panels; is that right?

9            MS. ELIZABETH:  Objection.

10    Form.

11    QUESTIONS BY MR. OVERHOLTZ:

12        Q.    You put them through testing of

13    different types of plugs to determine whether

14    they were a qualified subject for testing

15    hearing protecting devices; is that right?

16        A.    They would test a range of

17    products during multiple sessions at the same

18    time that we were gathering their anatomic

19    data and their audiometric capability so that

20    they would have familiarity with doing these

21    sorts of tests.

22        Q.    And would Aearo grade these

23    subjects on their sufficiency as a hearing

24    protection device test subject based on the

25    type of hearing protection they were being

Confidential - Pursuant to Protective Order

1    tested on?

2              MS. ELIZABETH:  Objection.

3         Form.

4              THE WITNESS:  Tell me a little

5         more about that.

6    QUESTIONS BY MR. OVERHOLTZ:

7         Q.    Sure.

8              Did Aearo grade these subjects

9    based on how good of a subject they were for

10   testing as opposed to, for example, a

11   muff-type device compared to a three-flanged

12   plug device?

13             MS. ELIZABETH:  Objection.

14        Form.

15             THE WITNESS:  Not at that time,

16        per se.

17   QUESTIONS BY MR. OVERHOLTZ:

18        Q.    That happened over time?

19        A.    In -- yes, subsequent to these

20   tests.

21        Q.    Okay.  And we'll talk that a

22   little bit more.

23             These subjects, you said they

24   could be employees.  Do you know whether or

25   not the subjects to the 213016 test were

Confidential - Pursuant to Protective Order

```
 1    employees of Aearo?

 2         A.     I know one or two of the

 3    initials, but not all of them.

 4         Q.     Okay.  One of those initials I

 5    see on here is DLP.

 6                Do you see that one?

 7         A.     Yes.

 8         Q.     You knew DLP, right?

 9         A.     I'm not certain.  I believe

10    that was a person I knew.

11         Q.     Okay.  Is that Don Peyton in

12    your department?

13         A.     I think it may have been.  I'm

14    not certain.

15         Q.     Okay.

16         A.     At times we have -- and I'm not

17    sure.  At times we have multiple people who

18    have similar initial sets, but I believe that

19    was Don Peyton.

20         Q.     You believe this was Don

21    Peyton?

22         A.     Yeah.

23         Q.     And Don Peyton was on the

24    testing panel for Aearo at the time?

25         A.     If he was included here, he
```

Confidential - Pursuant to Protective Order

1    would have been on the testing panel.

2         Q.    Okay.  And he was also a member

3    of your department that reported to you,

4    correct?

5         A.    At one point in time he did.  I

6    think he had another role as well.  I'm not

7    sure what his role was at this time.

8         Q.    We looked at that performance

9    evaluation earlier where they were

10   congratulating you for being a leader to Don

11   Peyton in the department.

12              Do you recall that?

13        A.    Yes.

14        Q.    Okay.

15        A.    As I said, he certainly

16   reported to me at one point in time.  I

17   believe he may have done other things before

18   he came into my group.  I don't know what he

19   was doing at this point in time.

20        Q.    So there was no policy or

21   procedure at Aearo at the time that employees

22   of the department in charge of conducting the

23   testing could serve on the actual subject

24   panels for the testing?

25              MS. ELIZABETH:  Objection.

Confidential - Pursuant to Protective Order

 1          Form.

 2                  THE WITNESS:  There was not a

 3          restriction that employees could not

 4          be on the panel.

 5  QUESTIONS BY MR. OVERHOLTZ:

 6          Q.    The NRR that was calculated on

 7  this report was a negative 2.0, right?

 8          A.    Yes.

 9          Q.    A decision was made that the

10  reported NRR would be a zero?

11                  MS. ELIZABETH:  Objection.

12          Form.

13                  THE WITNESS:  We reported a

14          zero for the product.

15  QUESTIONS BY MR. OVERHOLTZ:

16          Q.    Okay.  And why did you report a

17  zero if the NRR was calculated at negative

18  2.0?

19          A.    As I recall, there were two

20  reasons.  One is that the EPA label states

21  that NRRs for hearing protectors fall within

22  a range of approximately zero to 30, so that

23  would look confusing on a label.

24                  The other reason is that when

25  you compute an NRR, there is a two-standard

Confidential - Pursuant to Protective Order

1   deviation correction that is part of that

2   computation, with the intention being that

3   the computed number represents what

4   98 percent of those listeners are obtaining.

5            There's an assumption in that

6   computation that the distribution of

7   measurements follows what's called a normal

8   distribution.  We know typically that as you

9   get devices that have attenuation near zero,

10  that normality assumption, you would end up

11  predicting more people below the line than

12  are actually there.  So it doesn't really

13  make sense for that.

14           The other reason is that for a

15  number of these negative numbers that are

16  close to zero, that it's as likely that that

17  was a -- due to errors on the two individual

18  thresholds.  So, for example, the subject has

19  to be able to reproduce thresholds within

20  6 dB to be a listener, according to the

21  standard.

22           So we don't know what the

23  reproducibility was on that test, but we know

24  in general they have a scale that fall within

25  6 dB on three repeat thresholds.

Confidential - Pursuant to Protective Order

```
1                    So they take one test; they
2     take their open.  That threshold could, let's
3     say, be 6 dB off in one direction.  Their
4     other threshold could be 6 dB off in the
5     other direction.  So we now have a device
6     that could be showing 12 dB of apparent
7     amplification that's simply due to the
8     variability at that point.
9                    So for a number of reasons, we
10    felt that the minus 2 was not a
11    representative value, and we decided to
12    report the value of zero.
13         Q.    So the company decided to
14    report a zero at that time?
15                    MS. ELIZABETH:  Objection.
16    Asked and answered.
17    QUESTIONS BY MR. OVERHOLTZ:
18         Q.    For the 016?
19         A.    We decided to report a zero at
20    that time.
21         Q.    Some of the people in the 016,
22    looking back at the last exhibit, actually
23    had negative attenuation numbers.  That's
24    what you were describing, right?
25         A.    Yes.
```

Confidential - Pursuant to Protective Order

1      Q.     In their individual data?

2      A.     Yes.

3      Q.     Which would almost indicate

4    that they heard better with the plug in than

5    with the plug out; is that right?

6              MS. ELIZABETH:  Objection.

7         Form.

8              THE WITNESS:  If that number

9         was an entirely correct number, yes,

10        it would indicate that.

11             In my estimation, those numbers

12        were likely due to the threshold

13        variability issues that I mentioned.

14   QUESTIONS BY MR. OVERHOLTZ:

15     Q.     On that particular test, the

16   difference between their open with the plug

17   out and with the plug in showed that they

18   heard better with the plug out than the plug

19   in?

20             MS. ELIZABETH:  Objection.

21        Form.

22   QUESTIONS BY MR. OVERHOLTZ:

23     Q.     Heard better with the plug in

24   than the plug out?

25     A.     You know, in that particular

Confidential - Pursuant to Protective Order

1  frequency on that particular test, that would

2  be one inference to take from that.

3              As I said, I think the likely

4  inference is the threshold variability

5  issues.

6      Q.    Who made the decision to report

7  zero instead of the minus 2?

8              MS. ELIZABETH:  Objection.

9      Form.

10             THE WITNESS:  I don't recall.

11             I'm sorry.

12  QUESTIONS BY MR. OVERHOLTZ:

13     Q.    That's okay.

14     A.    I don't recall.

15     Q.    All right.  The goal of the

16  213016 open test, the goal, because you were

17  trying to demonstrate situational awareness,

18  was to get as low of an NRR as possible,

19  correct?

20             MS. ELIZABETH:  Objection.

21     Form.

22             THE WITNESS:  The goal was to

23     get the appropriate NRR for that

24     product.

25             May I remind you that the NRR

Confidential - Pursuant to Protective Order

1        is the noise reduction rating; it's

2        not the audibility reduction rating.

3    QUESTIONS BY MR. OVERHOLTZ:

4        Q.    Right.

5        A.    So the NRR is directed towards

6    issues of protection from noise, not issues

7    of the ability to hear noise.

8              And we never made any claims

9    about directly relating an NRR to what

10   audibility.

11             So the goal of the NRR was to

12   get the correct number, period.

13       Q.    For situational awareness, the

14   less interruption of sound, the better; is

15   that right?

16             MS. ELIZABETH:  Objection.

17        Form.

18             THE WITNESS:  For situational

19        awareness, yes, the less you interrupt

20        the sound, the more you will hear

21        sounds at quiet levels.

22   QUESTIONS BY MR. OVERHOLTZ:

23       Q.    And a lower NRR would indicate

24   a less -- a smaller interruption of sound for

25   an earplug, correct?

Confidential - Pursuant to Protective Order

```
 1                MS. ELIZABETH:  Objection.
 2        Form.
 3                THE WITNESS:  That could be an
 4        inference that you take from that,
 5        although the purpose of the NRR, as I
 6        said, is to indicate protection from
 7        noise, not audibility of noise.
 8   QUESTIONS BY MR. OVERHOLTZ:
 9        Q.    So for the 213015 test that was
10   stopped at eight subjects -- you told me
11   about the decision to stop.
12                Have you reviewed Mr. Kieper's
13   testimony regarding the decision to stop the
14   test?
15        A.    Testimony?
16        Q.    Did you review his deposition
17   transcript?  Have you reviewed that?
18        A.    No.
19        Q.    Okay.  Have you ever reviewed
20   it at any time in the past?
21        A.    No.
22        Q.    And you didn't review it in
23   preparation of the deposition today?
24        A.    No.
25                MR. OVERHOLTZ:  Okay.  All
```

Confidential - Pursuant to Protective Order

```
1        right.  Why don't we take a quick
2        break.
3                VIDEOGRAPHER:  Going off
4        record.  The time is 2:01.
5         (Off the record at 2:01 p.m.)
6                VIDEOGRAPHER:  We're going back
7        on record.  The time is 2:20.
8    QUESTIONS BY MR. OVERHOLTZ:
9        Q.    Okay.  Mr. Berger, we were
10   talking about the NRR labeling testing that
11   was conducted in late '99, early 2000, on the
12   Combat Arms dual-sided earplug, and we were
13   looking at the 213016 studies and the 015.
14                And if we can pick back up on
15   the 015, you testified that the decision was
16   made to stop the 015 after eight subjects.
17                At some point a decision was
18   made to do a retest to determine a NRR for
19   labeling for the closed end of the Combat
20   Arms Earplug, right?
21       A.    Yes.
22       Q.    Okay.  And who made that
23   decision --
24       A.    Actually, I wouldn't call it a
25   retest because there had been no completed
```

Confidential - Pursuant to Protective Order

1    initial test on label.

2         Q.    Okay.

3         A.    I would say the decision was

4    made to start another test to see if we would

5    have a labeling test.

6         Q.    Okay.  Who was involved in the

7    decision to make -- to do another test to

8    establish an NRR label for the closed end of

9    the Combat Arms Earplug?

10        A.    I would have certainly been

11   involved.  My supervisor.  And I don't know

12   who else might have been involved, but I

13   suspect more than that.

14        Q.    Okay.  Now, in order for --

15   under the ANSI standards and the policies and

16   procedures of Aearo, in order to conduct

17   another test there has to be some change made

18   with respect to the plug; is that right?

19        A.    No.

20             MS. ELIZABETH:  Objection.  Let

21        me -- object to form.

22   QUESTIONS BY MR. OVERHOLTZ:

23        Q.    You don't agree that there has

24   to be some type of change made with respect

25   to the plug?

Confidential - Pursuant to Protective Order

1        A.      My answer to your initial

2   question is no.

3        Q.      Okay.  You don't agree that the

4   policies and procedures of Aearo require

5   there to be some type of physical change to

6   the plug to improve the plug in some way

7   before another test is performed?

8             MS. ELIZABETH:  Objection.

9   Form.

10  QUESTIONS BY MR. OVERHOLTZ:

11       Q.      Is that right?

12       A.      No.

13       Q.      Your understanding of the

14  policies and procedures is if there is a

15  change in the instructions, that that can be

16  a change that can relate to the ability to

17  conduct another test?

18       A.      Yes.

19       Q.      Okay.  And so a decision was

20  made to change the instructions by Aearo with

21  respect to the fitting of the Combat Arms

22  Earplug for another test to try to get an NRR

23  for labeling for the Combat Arms plug; is

24  that right?

25             MS. ELIZABETH:  Objection.

Confidential - Pursuant to Protective Order

```
 1          Form.
 2                  THE WITNESS:  We decided then
 3          to change the instructions and to
 4          start a labeling test with that new
 5          type of instruction set.
 6   QUESTIONS BY MR. OVERHOLTZ:
 7          Q.    Okay.  And so with respect to
 8   you're going to conduct another test and the
 9   change that's required under the policies,
10   you agree some type of change is necessary,
11   right?
12                  MS. ELIZABETH:  Objection.
13          Form.
14                  THE WITNESS:  Our policies,
15          although on that one there is not a
16          written policy, but our policy and
17          practice has been that we don't simply
18          do a retest for the purpose of a
19          retest.  We make a change in the
20          function of the product or in some
21          aspect of how the product is used.
22   QUESTIONS BY MR. OVERHOLTZ:
23          Q.    Okay.  Either in function or
24   how it's used, right?
25          A.    (Witness nods head.)
```

Confidential - Pursuant to Protective Order

```
1          Q.     And did, in fact, a change in

2    the instructions for fitting the plug get

3    implemented before the other tests to get an

4    NRR label was begun?

5                 MS. ELIZABETH:  Objection.

6          Form.

7                 THE WITNESS:  There was a

8          change in the guidance at this time --

9          and it's not instructions.  They're

10         not instructions on the package.  It's

11         guidance to the experimenter on how

12         he's going to be working with that

13         product.

14   QUESTIONS BY MR. OVERHOLTZ:

15         Q.     Okay.  And so what you describe

16   as guidance, what was -- the method of

17   fitting the plug was changed for the new

18   test; is that right?

19         A.     There was another procedure

20   implemented besides what Ron had been doing,

21   which is that now, as needed for listeners,

22   he could fold back the opposing flange on the

23   earplug as he was inserting it.

24         Q.     He could fold back the -- you

25   said the opposing flange?
```

Confidential - Pursuant to Protective Order

1        A.     The flange of the end of the

2   plug that was sticking out of the ear.

3        Q.     Okay.  So if I'm looking at

4   this Combat Arms Earplug and I'm sticking the

5   green end into the ear --

6        A.     Yes.

7        Q.     -- I can fold back this

8   yellow --

9        A.     Yes.

10       Q.     -- flange.

11              And that was the difference in

12   how Ron Kieper, the experimenter, was

13   instructed to fit the plugs in the new NRR

14   test?

15              MS. ELIZABETH:  Objection.

16         Form.

17              THE WITNESS:  If that was

18         necessary for those listeners, he

19         would do that.

20   QUESTIONS BY MR. OVERHOLTZ:

21       Q.     So if it was necessary.

22       A.     (Witness nods head.)

23       Q.     And the test that was conducted

24   to get the other label, that was the 213017;

25   is that right?

Confidential - Pursuant to Protective Order

```
 1        A.     I believe so, but just so I
 2   don't misspeak...
 3               Yes.
 4        Q.     Okay.  So he would fold back
 5   the flange and then insert the plug as part
 6   of the fit process; is that right?
 7               MS. ELIZABETH:  Objection.
 8        Form.
 9               THE WITNESS:  For some of the
10        subjects he did that.
11   QUESTIONS BY MR. OVERHOLTZ:
12        Q.     And after he got the plug
13   fitted, would the flange remain folded back,
14   or would he put it back?
15        A.     He would --
16               MS. ELIZABETH:  Objection.
17        Form.
18               THE WITNESS:  He would leave
19        the flange folded back.
20   QUESTIONS BY MR. OVERHOLTZ:
21        Q.     Okay.  And why would he leave
22   the flange folded back?
23        A.     There would be no reason to
24   unfold it.
25        Q.     Okay.  Well, if you left it
```

Confidential - Pursuant to Protective Order

1    folded back, wouldn't that allow the wind to

2    make wind noise over the top of it if a

3    soldier was out in the field?

4              MS. ELIZABETH:  Objection.

5         Form.

6              THE WITNESS:  We had no

7         information on the dual end of the --

8         dual-ended product about the wind

9         noise issues in practice.

10             All of the information provided

11        to us that was available -- and

12        actually I didn't see all those

13        reports we've looked at.  But as we

14        look back at them, all of those

15        studies' feedback from soldiers was on

16        single-ended earplugs with wind noise.

17   QUESTIONS BY MR. OVERHOLTZ:

18        Q.    And so part of the reason for

19   going for the two-sided design was that these

20   flanges being so close together would protect

21   this hole from wind noise, right?

22             MS. ELIZABETH:  Objection.

23   QUESTIONS BY MR. OVERHOLTZ:

24        Q.    That was one of the advantages?

25             MS. ELIZABETH:  Objection.

Confidential - Pursuant to Protective Order

1        Form.

2              THE WITNESS:  That was

3        something that Doug Ohlin thought

4        might be the case.  There was no data

5        to support that.  That was his

6        supposition.

7   QUESTIONS BY MR. OVERHOLTZ:

8        Q.     So Ron Kieper could fold back

9   this opposing flange and insert it into the

10   ear and leave it folded back, would be the

11   process --

12        A.     Yes.

13        Q.     -- for the test?

14              What was the reason why --

15   well, the reason why the decision was made to

16   fold this flange back was because there was

17   concern that this flange, this opposing

18   flange on the other end of the plug, was

19   pressing against parts of the ear

20   requiring -- making the plug loosen in some

21   imperceptible way to the user; is that right?

22              MS. ELIZABETH:  Objection.

23        Form.

24              THE WITNESS:  Ron had spent a

25        period of time between the cessation

Confidential - Pursuant to Protective Order

1          of the initial 015 testing and the

2          commencement of the 017 testing

3          working with subjects, both enhancing

4          his own skill set in terms of

5          inserting the plug and understanding

6          what issues there might be working

7          with subjects.

8               And his determination was that

9          it was the potential that when that

10         flange was folded back, it could

11         interfere.

12              The imperceptible nature of

13         that loss in seal relates to the

14         person in the test chamber.  What you

15         must realize is that in the test

16         chamber, in the absence of fitting

17         noise, which is only on briefly, that

18         there is no sound.  That's the whole

19         purpose of the chamber.  It's a room

20         in which you cannot hear a thing.

21              So whether a plug changes its

22         fit or seal, you had no auditory

23         feedback to suggest that there's been

24         a change in the noise reduction

25         characteristics once you're sitting

Confidential - Pursuant to Protective Order

 1          there in this effectively totally

 2          silent room.

 3                 Were you wearing the plug in

 4          any sort of realistic environment,

 5          either noise hazardous or simply loud

 6          enough for sounds to be present, if

 7          there was a change in the fit, I would

 8          not suspect it would be imperceptible

 9          at that point because you would notice

10          a change in the sound levels at your

11          ear.

12                 So the imperceptible refers to

13          during that artificial type of test

14          environment.

15   QUESTIONS BY MR. OVERHOLTZ:

16          Q.    Okay.  So the concern is that

17   this flange is pressing against parts of the

18   ear causing the earplug to loosen, correct?

19                 MS. ELIZABETH:  Objection.

20          Asked and answered.

21                 THE WITNESS:  His statement was

22          that he presumed that that's what he

23          observed with some of the test

24          subjects.  There's not an in-depth

25          measurement on a particular person to

Confidential - Pursuant to Protective Order

1          demonstrate that.  That is what he

2          felt he observed and what he wrote

3          about.

4     QUESTIONS BY MR. OVERHOLTZ:

5          Q.    So we're going to talk about

6     that a little bit more, but before we do --

7     okay.  So before we do, the subjects that

8     were part of the 015 -- and only eight got

9     tested, right?

10         A.    Yes.

11         Q.    Had any other subjects been

12    identified to be tested in the 015 before the

13    test was stopped?

14         A.    I don't know.

15         Q.    Okay.  Those subjects, did all

16    eight of those subjects then get -- were they

17    part of the 213017 test?

18         A.    Not all of them.

19         Q.    Okay.  So only some of the

20    subjects in the 015 were tested in the 017?

21         A.    Yes.

22         Q.    Okay.  Some of the people were

23    switched out, right?

24              MS. ELIZABETH:  Objection.

25         Form.

Confidential - Pursuant to Protective Order

```
 1              THE WITNESS:  You are aware
 2        that the retest is taking place in
 3        May.  The original test was in
 4        January.
 5   QUESTIONS BY MR. OVERHOLTZ:
 6        Q.    Okay.
 7        A.    As I indicated to you, one
 8   of -- or maybe I didn't make it clear, but
 9   one of the most difficult parts of being the
10   experimenter in Ron's role is getting people
11   to show up and take the test.  So people may
12   be sick, they may have other assignments,
13   they may not want to show up.
14              So just because you had ten
15   people in January doesn't mean you have ten
16   people in May.  You're going to have whomever
17   you can get.
18              So he would be looking at his
19   master panel and trying to select subjects
20   who were involved before, and likely unable
21   to obtain all of them, and so he would need
22   other subjects on that test.
23        Q.    Did Aearo ever consider hiring
24   like a contractor company that could have a
25   panel of subjects to be tested that would
```

Confidential - Pursuant to Protective Order

1  always be available to Aearo so they could

2  have consistency in their testing when they

3  need to do another test like this?

4       A.     We didn't consider that.  And

5  if you explore that idea a little, I don't

6  think it would solve the problem.

7              You're paying someone a nice

8  price to be in the building for two hours,

9  let's say $25, so, you know, that's a

10  relatively high hourly rate for unskilled

11  labor to sit there and listen in a room.

12             But the person shows up -- or

13  is asked to show up maybe once or twice a

14  week, so you're paying somebody $50 a week to

15  be your subject.  They're always doing

16  something else for a living.  They're either

17  a student, housewife, they have another job.

18  This is like a side job.

19             The amount you'd have to pay to

20  have people consider "this is my employment,

21  and I'm going to be there on call" would be

22  an absurd amount of money, and I don't know

23  any lab that does that.

24       Q.     How long does this test take?

25       A.     The person is in the building

Confidential - Pursuant to Protective Order

1   on the order of an hour to two hours.

2          Q.     An hour to two hours?

3          A.     Yes.

4          Q.     And that's to conduct all three

5   runs of the test?

6          A.     Yes.

7          Q.     Okay.  So if we look at this

8   chart that we made up, this shows the people

9   that were part of the 213015 test, the eight

10  people that were tested.

11              Do you see that?

12              MS. ELIZABETH:  Counsel, can I

13      get a copy?

14              MR. OVERHOLTZ:  Sure.

15              MS. ELIZABETH:  And this is a

16      plaintiff's created document?

17              MR. OVERHOLTZ:  Yeah, a

18      demonstrative.

19              THE WITNESS:  I'm not sure this

20      is critical at this point, but I'm

21      surprised to see persons' names as

22      opposed to initials.

23              MS. ELIZABETH:  Okay.

24  QUESTIONS BY MR. OVERHOLTZ:

25          Q.     And if you need to look back

Confidential - Pursuant to Protective Order

1    and match the initials, you can, but we've

2    done our work in establishing who these

3    people were.

4              Now, the first one, Mandy

5    Falco, was part of the 213015 and the 016,

6    right?

7              MS. ELIZABETH:  Objection.

8         Foundation.

9    QUESTIONS BY MR. OVERHOLTZ:

10        Q.    MKF, if you want to check your

11   reports.

12        A.    I believe we could accept that

13   they have converted the initials to names or

14   do you --

15             MS. ELIZABETH:  If you know

16        that these names are accurate, then

17        you can testify as such.

18             THE WITNESS:  I know that Mandy

19        Falco was a name that rings a bell,

20        and I see MKF there.

21   QUESTIONS BY MR. OVERHOLTZ:

22        Q.    Okay.  And was Mandy Falco an

23   employee at Aearo?

24        A.    No.

25        Q.    Was she related to an employee

Confidential - Pursuant to Protective Order

1   at Aearo?

2        A.     Yes.

3        Q.     She was actually related to

4   Mr. Falco, who was one of the designers of

5   the Combat Arms Earplugs, correct?

6        A.     Yes.  And she was used on many

7   tests, some of which were products he

8   designed and some of which were products he

9   didn't design.

10       Q.     Okay.  And did you in any way

11  think it might be a conflict that the

12  daughter of the person responsible for

13  designing the plug that 3M is going to sell

14  around the world to militaries worldwide is

15  part of the subject testing for the plug --

16             MS. ELIZABETH:  Objection.

17       Form.

18  QUESTIONS BY MR. OVERHOLTZ:

19       Q.     -- to establish the noise

20  reduction rating?

21       A.     Our policy was that the

22  designer would not be involved in the

23  testing.  Beyond that, there was no

24  restriction.

25             When you look at the method of

Confidential - Pursuant to Protective Order

1   doing the test, it's an experimenter fitting

2   the product, and the person is responding to

3   sounds and would need to be incredibly

4   talented to figure out how to bias this

5   self-reporting audiogram in a consistent

6   manner to be able to move the results one way

7   or another.

8        Q.    Under the following --

9        A.    And in fact, if you were a

10  subject wanting to do that, it wouldn't even

11  be clear what you'd want to do.  Because

12  ideally, for the best results, your results

13  would be just like everybody else's.

14           But if you decided, oh, I want

15  this plug to look better, I'm really going to

16  make these attenuation values look high, that

17  could end up causing the NRR to go down

18  because of high variability.

19           So to presume that this young

20  woman, who isn't an engineer, doesn't know

21  anything about the product, would have the

22  smarts to figure out how to bias this test, I

23  think, is an unwarranted presumption.

24           We used people who were not

25  design engineers on the product, and I think

Confidential - Pursuant to Protective Order

1  that's completely valid.

2      Q.    The plug had a yellow end and a

3  green end, right?

4      A.    Yes.

5      Q.    Yellow was the open end, green

6  was the full end, right?

7      A.    Yeah -- no.  The yellow

8  sticking out would be the closed end in.

9      Q.    Right.

10     A.    Yes.

11     Q.    Okay.  Green --

12     A.    It's easier --

13     Q.    Green in is closed; yellow in

14  is open?

15     A.    Yes.

16     Q.    Okay.  So the experimenter and

17  the subject know which end they're putting in

18  the plug when they get ready to run the test,

19  right?

20         MS. ELIZABETH:  Objection.

21     Form.

22         THE WITNESS:  Yes, the

23     experimenter knows which end is in.

24  QUESTIONS BY MR. OVERHOLTZ:

25     Q.    Right.

Confidential - Pursuant to Protective Order

```
 1              And we know for situational

 2   awareness the yellow end, when it's in, the

 3   lower the NRR, the less indication of

 4   interruption of sound there's going to be?

 5              MS. ELIZABETH:  Objection.

 6         Asked and answered.

 7              THE WITNESS:  We discussed that

 8         before.  The NRR is not directly

 9         related to audibility.  One might

10         infer that lower attenuation would

11         suggest best audibility.

12   QUESTIONS BY MR. OVERHOLTZ:

13         Q.    And a poorer fit, a less of a

14   seal, is going to result in less interruption

15   of sound on the yellow end?

16              MS. ELIZABETH:  Objection.

17         Form.

18              THE WITNESS:  A poorer fit

19         would cause there to be lower

20         attenuation values.

21   QUESTIONS BY MR. OVERHOLTZ:

22         Q.    Do you recognize any of the

23   other names of the people that were being

24   tested as being involved in working for

25   Aearo?
```

Confidential - Pursuant to Protective Order

```
 1            MR. BROCK:  Could you pull it
 2       down a little bit so we can see?
 3            MR. OVERHOLTZ:  Sure.
 4            THE WITNESS:  Yes.
 5  QUESTIONS BY MR. OVERHOLTZ:
 6       Q.    Okay.  Who else?
 7       A.    Tracey Scott.
 8       Q.    Okay.
 9       A.    Garyl Gibson.  Bruce Kennedy.
10  Others I'm unsure of.
11       Q.    Okay.  And then, of course, for
12  the 016 test, we know that Don Peyton was an
13  employee in your department, right?
14       A.    Yes.
15            Not sure he was an employee in
16  the department at the time.  I think he was
17  also potentially involved in quality control
18  and then moved over.
19            You know, as I'm saying, I
20  think he was not someone who walked in off
21  the street that I hired.  He was someone who
22  was in the building, had an interest, and he
23  moved over to my group, and I don't know when
24  that happened.
25       Q.    Okay.  So then we conduct the
```

Confidential - Pursuant to Protective Order

1   213 --

2              MS. ELIZABETH:  Can you pull it

3         down just a little bit so we can see

4         the -- yeah.

5              MR. OVERHOLTZ:  Yeah.

6   QUESTIONS BY MR. OVERHOLTZ:

7         Q.    Then we conduct the 213017

8   test.  And again, as we discussed, that was

9   again on the green end, right, the closed

10  end?

11        A.    Yes.

12        Q.    Okay.  And we can see that for

13  some of the subjects that were in the 015,

14  they match, but Tim Swartz was not tested in

15  the 017, Mandy Falco was not tested in the

16  017, and Michael Vorovsky -- well, he wasn't

17  in the 015.

18              So Jake Walsh was not tested in

19  the 017; is that right?

20        A.    Let me just confirm from my --

21        Q.    Sure.

22        A.    So you're asking was JKN on the

23  017?

24        Q.    Right.

25        A.    And, no, he was not.

Confidential - Pursuant to Protective Order

1    Q.    Okay.  And so people that were

2    not included in the 015 would have been these

3    bottom four:  KKS, EAS, DLW and JTH, right?

4    These right here.

5    A.    Those people, Katrina Smith,

6    Eric Schommer, Diana Wood, Jessica Harvey,

7    were not on the 015.

8    Q.    Nor were they on the 016; is

9    that right?

10   A.    They were not on the 016.

11   Q.    Okay.  So if we can look for a

12   minute at a couple of the people that were

13   involved in both, Tracey Scott, 28.3 NRR on

14   the initial test, right?

15   A.    Yes.

16   Q.    And the second test goes down

17   to a 19.6, right?

18   A.    Yes.

19   Q.    Gary {sic} Gibson goes from a

20   16.9 to a 32.1?

21   A.    Okay.

22   Q.    Doubled the score, right?

23   A.    Yes, I just -- I'm presuming

24   you got those numbers correct, but I'll --

25   Q.    Yeah, double-check.

Confidential - Pursuant to Protective Order

1          A.      -- take a look.

2                  So we're on Garyl Gibson.

3          Q.      Yeah, I think it's the second

4    one down from the top on the --

5          A.      Yeah.

6          Q.      -- on the 017 report.

7          A.      And the other one you asked me

8    about was --

9          Q.      Yeah.  So if we look at --

10         A.      -- Tracey Scott?

11         Q.      Yeah.

12                 If we look at Bates

13   number 3_MDL000053565 {sic},

14   Plaintiff's 1112, that's -- has the results.

15   And we see the GWG had a 32.1 on the 017,

16   right?

17         A.      Yes.

18         Q.      Now, GWG, if we look at the

19   front page of that 017 results, this was --

20   if we look down at the bottom, it says

21   "Comments."

22                 Do you see that?

23         A.      Yes.

24         Q.      "GWG failed the extreme range

25   test at 125 and 500 hertz.  He was retested.

1    The original NRR was 20.7."

2              Do you see that?

3         A.    Yes.

4         Q.    Okay.  Failed the extreme range

5    test.  That meant that GWG came back and was

6    retested a second time; is that right?

7         A.    Yes.

8         Q.    Okay.  And the extreme range

9    test, that was a statistical test that Aearo

10   used to determine if someone was an outlier?

11        A.    Yes.

12        Q.    Okay.  So based -- and I think

13   the name of the test that you guys used was

14   called the Dixon outlier test, something like

15   that; is that right?

16        A.    Yes.

17        Q.    So based on this Dixon outlier

18   extreme range test, GWG was excluded and

19   retested; is that right?

20              MS. ELIZABETH:  Objection.

21        Form.

22              THE WITNESS:  He was retested.

23   QUESTIONS BY MR. OVERHOLTZ:

24        Q.    His initial results were

25   excluded?

Confidential - Pursuant to Protective Order

1          A.     They were excluded and noted,

2    so that's why we have the comment there.  We

3    noted that were he included and what his

4    tests results were, that the NRR would have

5    been 1 dB lower.

6          Q.     So instead of excluding him and

7    getting a different subject, a decision was

8    made to retest GWG, Garyl W. Gibson, again?

9               MS. ELIZABETH:  Objection.

10        Form.

11               THE WITNESS:  Yes, for a very

12        particular reason.

13   QUESTIONS BY MR. OVERHOLTZ:

14        Q.     Okay.  Who made that decision?

15        A.     I would almost tell you the

16   decision was made independent of anybody.

17   Because if you look at our policy manual and

18   the dictates of how the Dixon test is to be

19   applied, it specifically says that the first

20   thing you do is retest.  Then if the retest

21   fails, there can be a replacement.

22               So on his retest, he didn't

23   fail, so he maintained.

24               If you want to go through our

25   requirements, which we follow explicitly, it

Confidential - Pursuant to Protective Order

1    tells you the sequence in which you apply

2    either the outlier for range, the outlier for

3    means, and whether you retest or replace.

4              So it's -- the whole purpose of

5    that is to define a set of procedures to

6    remove bias in the determination of how you

7    would make these choices.

8              We decided in advance what we

9    think are reasonable test practices, and then

10   those are implemented uniformly for our test

11   in terms of statistical criterion.

12        Q.    So he gets -- if his original

13   results were included, the NRR would have

14   only been 20.7; is that right?

15        A.    It would have been lower by

16   1 dB.

17        Q.    Lower by 1 dB.  Okay.

18              Now, if we look at the 213017

19   results, there's also an outlier test

20   reported on extreme ranges on the third page.

21        A.    Yes.

22        Q.    Okay.

23              MS. ELIZABETH:  Wait one

24         second.

25              Has that been entered as an

Confidential - Pursuant to Protective Order

```
 1        exhibit yet?
 2               MR. OVERHOLTZ:  I don't know
 3        that it has.  I thought it had.
 4               MS. ELIZABETH:  No, that's
 5        okay.
 6               MR. OVERHOLTZ:  So we'll mark
 7        this as an exhibit so everybody can
 8        have a copy.  It's Plaintiff's 112.1,
 9        which we'll mark as Exhibit Number 20.
10               (Berger 30(b)(6) Exhibit 20
11        marked for identification.)
12    QUESTIONS BY MR. OVERHOLTZ:
13        Q.    So you see that -- if we look
14    back at these results on the extreme range
15    part of the 213017 on page 3 of 4 of the
16    report --
17               MS. ELIZABETH:  Bates 57210?
18               MR. OVERHOLTZ:  Right.  I'm
19        sorry.
20               THE WITNESS:  I'm looking at my
21        actual report.
22               MS. ELIZABETH:  Okay.
23    QUESTIONS BY MR. OVERHOLTZ:
24        Q.    It's actually page 3 of 4 of
25    the 017, to make sure we have the right page.
```

Confidential - Pursuant to Protective Order

1          There's a note here that RTM,

2    right, which was Reuben T. Moffitt, was also

3    noted as having failed the Dixon outlier test

4    with respect to -- at the 3150 range.

5          Do you see that?

6          MS. ELIZABETH:  Objection.

7      Form.

8          THE WITNESS:  That's not

9      correct.

10   QUESTIONS BY MR. OVERHOLTZ:

11       Q.     Okay.  Explain to me why that

12   number is shaded for RTM.

13       A.     The test is applied frequency

14   by frequency.  So at any one frequency, a

15   value that fails the criterion, which you see

16   for this is extreme value rejected at the R

17   equals .477, would be rejected.  So his R was

18   .6 at that frequency.

19       Q.     So it was greater than the

20   .477?

21       A.     At that frequency.

22       Q.     Okay.  And so it was a rejected

23   value at that frequency?

24          MS. ELIZABETH:  Let him finish

25      his answer.

Confidential - Pursuant to Protective Order

```
 1                 THE WITNESS:  It was rejected

 2           at that frequency.

 3                 The difficulty in applying

 4           statistical tests -- or a

 5           consideration in applying statistical

 6           tests to data of this nature where you

 7           have nine frequencies is that it's a

 8           statistical test.  You know, it says

 9           that X percentage of the time that

10           person was really an outlier, but a

11           portion of the time you made the wrong

12           decision; they really weren't.

13                 So when you apply that test

14           again and again and again and again,

15           you're more likely to come up with

16           some times that you made the wrong

17           decision.

18                 So typically you end up saying,

19           all right, when I'm looking at

20           something like this, how many do I

21           want to see before I really believe

22           that that person was an outlier.

23                 And so our criteria is that two

24           or more frequencies, somebody must

25           fail.  So there's nothing unusual
```

Confidential - Pursuant to Protective Order

1          here.  We'll often find at a given

2          frequency someone may have a failure,

3          but unless it's two or more

4          frequencies, our criteria would not

5          fail them on that test.

6     QUESTIONS BY MR. OVERHOLTZ:

7          Q.     Okay.  So for the one failure

8     here, that's a rejected value, but for

9     someone to have considered to have failed the

10    Dixon outlier test, extreme range test, they

11    would have needed to have had two or more

12    rejected values?

13         A.     Correct.

14         Q.     That was the Aearo policy?

15         A.     That was, yes, how we decided,

16    beginning in the 1980s when we started

17    looking at this with an in-house statistical

18    expert, how we would develop and implement

19    that policy.

20         Q.     And did Aearo Company believe

21    that that policy of considering someone to

22    have failed the tests based on a statistical

23    Dixon outlier test, did Aearo's policy -- did

24    the company believe that that complied with

25    ANSI standards?

Confidential - Pursuant to Protective Order

 1           MS. ELIZABETH:  Objection.

 2      Form.

 3           THE WITNESS:  The ANSI standard

 4      does not speak to specifically

 5      applying a statistical test.  It talks

 6      about rejecting subjects, not

 7      including subjects for whom an

 8      adequate fit cannot be obtained.  It

 9      talks about obtaining optimum

10      performance.

11           In creating this test we

12      developed in the 1980s, we thought

13      about it and refined it.  By the time

14      it became part of this policy manual

15      in 1991 for our first accreditation,

16      it was reviewed by -- on 15 different

17      occasions by independent government

18      assessors who were accrediting our

19      laboratory and had no concern with

20      that being the way we implemented our

21      understanding of the ANSI standard.

22           The standard itself doesn't

23      speak to testing or not.  It's -- one

24      of the problems -- as you know, I was

25      the chair of that committee for

Confidential - Pursuant to Protective Order

```
 1          35 years.  I did not write that

 2          standard, but I was involved in

 3          subsequent ones.  And one of the

 4          problems that we addressed over a

 5          period of a decade was how sloppily

 6          worded that standard was.  There were

 7          many ways to interpret paragraphs

 8          within it, many things that weren't

 9          stated clearly.

10               So there is no guidance in that

11          standard whether or not you can do

12          this, but in our opinion and in the

13          independent assessor's opinion, this

14          is a way to assure you're getting

15          optimum performance and not including

16          subjects who don't obtain an adequate

17          fit.

18     QUESTIONS BY MR. OVERHOLTZ:

19          Q.   So you were on the committee

20     that evaluated the standards that -- then you

21     created a policy that you believe complied

22     with those standards?

23               MS. ELIZABETH:  Objection.

24          Misstates the testimony.

25
```

Confidential - Pursuant to Protective Order

```
 1    QUESTIONS BY MR. OVERHOLTZ:

 2         Q.    That's sort of like the fox

 3    guarding the hen house, right?

 4              MS. ELIZABETH:  Is that a

 5         question?

 6              THE WITNESS:  No.

 7              This standard was written

 8         before I became a member of that

 9         committee.

10              As I said, the standards

11         subsequent to that occurred under my

12         leadership on that committee, and you

13         will find that those standards with

14         time change these words, make them

15         much more explicit.

16              What was at the time of this

17         standard 200 words of guidance to an

18         experimenter on how to do the fitting

19         became 600 words, so that it would be

20         much more clear exactly what was

21         intended by the standard.

22              So I had no involvement with

23         the development of this standard, and

24         this standard is still -- it was

25         selected by the EPA in 1979, and it's
```

Confidential - Pursuant to Protective Order

```
 1        still the law of the land today.
 2   QUESTIONS BY MR. OVERHOLTZ:
 3        Q.    So based on -- so these results
 4   that are reported here for GWG, based on
 5   his -- this was the -- these would have been
 6   his retests under the Dixon outlier tests; is
 7   that right?
 8              MS. ELIZABETH:  I'm sorry, did
 9        you change pages?
10              MR. OVERHOLTZ:  I'm still on
11        213017, Dixon outlier test.
12              THE WITNESS:  I think he's on
13        the --
14              MR. OVERHOLTZ:  I just brought
15        it up to GWG.  We were on RTM before.
16              MS. ELIZABETH:  Okay.
17              THE WITNESS:  And he's on the
18        range page as opposed to the means
19        page.
20              MS. ELIZABETH:  Means page.
21              MR. OVERHOLTZ:  Right.
22              THE WITNESS:  Repeat your
23        question.
24   QUESTIONS BY MR. OVERHOLTZ:
25        Q.    Yeah.
```

Confidential - Pursuant to Protective Order

1                So for the extreme ranges test

2    that GWG failed the first time around, he

3    didn't fail it the second time around is what

4    this reflects, right?

5          A.      Correct.

6          Q.      And so these individuals'

7    subject data from 213017 where he got a 32

8    that resulted in an NRR of 21.7, one point

9    higher, resulted from his new results; is

10   that right?

11               MS. ELIZABETH:  Objection.

12         Form.

13               THE WITNESS:  That is correct.

14               And if you look at the

15         comments, there is the indication

16         there -- and I have to verify that.

17         There is two numbers that are

18         provided, and I don't recall exactly

19         what those parenthetical numbers are,

20         if they refer to his range values or

21         his mean values.  But that could be

22         potentially tracked back to see what

23         the offending data were that caused

24         his failure.

25

Confidential - Pursuant to Protective Order

```
 1    QUESTIONS BY MR. OVERHOLTZ:

 2         Q.    Right.

 3               And then if we look at the top

 4    of this individual subject data from the

 5    213017 test from 5/9 of 2000 -- that's

 6    May 9th of 2000, right?

 7         A.    Yes.

 8         Q.    It says, "The plugs are the

 9    green end of the Combat Arms plug."

10               So this was testing the green

11    end, as we talked about.

12               And it says, "The yellow

13    flanges were folded outward to allow a deeper

14    insertion of the green plug."

15               Right?

16         A.    Yes.

17         Q.    That was the difference in the

18    017 to the 016, right?

19               MS. ELIZABETH:  Objection.

20         Form.

21    QUESTIONS BY MR. OVERHOLTZ:

22         Q.    I mean -- sorry.  That was the

23    difference between 017 to the original 015

24    test that was stopped?

25         A.    Yes.
```

Confidential - Pursuant to Protective Order

1                    (Berger 30(b)(6) Exhibit 21

2          marked for identification.)

3   QUESTIONS BY MR. OVERHOLTZ:

4          Q.     Let me show you -- I'll show

5   you what we've marked as Exhibit Number 21.

6                    21, which is Bates

7   number 3M_MDL000195517, P0135A.1.  This is

8   the attenuation test report for tests ID

9   213017.

10                   Do you see that?

11         A.     Yes.

12         Q.     Okay.  And this is part of your

13  notebook as well.  You got these results in

14  your notebook as well that you used in

15  preparation; is that right?

16         A.     Yes.

17         Q.     Okay.  And again, it's

18  described that it was compliant with

19  ANSI 3.19-1974, and it reports that NRR of

20  21.7 that we've talked about before, correct?

21         A.     Yes.

22         Q.     Okay.  So if we can look over

23  at the -- it's page 7, so it's A.7 at the top

24  right, if you have it.

25                   MS. ELIZABETH:  It's this page.

Confidential - Pursuant to Protective Order

1          MR. OVERHOLTZ:  It's this chart

2      here that I have on the screen.

3  QUESTIONS BY MR. OVERHOLTZ:

4      Q.    You referred to this as the

5  short-stemmed UltraFit plug.

6          Do you see that?

7      A.    Yes.

8      Q.    Okay.  And why was it referred

9  to as the short-stemmed UltraFit plug?

10          Is that talking about the green

11  end of the plug?

12      A.    It's talking about the fact

13  that the stem on both ends of the plug was

14  shortened so the flanges would meet more

15  closely in the middle.

16      Q.    All right.  So both sides of

17  the plug had the same sized stem?

18          MS. ELIZABETH:  Objection.

19      Form.

20          THE WITNESS:  I believe the

21      stem length is the same on both ends.

22  QUESTIONS BY MR. OVERHOLTZ:

23      Q.    Okay.

24      A.    Yes.

25      Q.    The diameter may be different

Confidential - Pursuant to Protective Order

```
 1   between the two stems?

 2        A.     No.

 3               What's different is that one --

 4   so the two ends, the difference is that one

 5   end has the hole through it.

 6        Q.     Okay.  All right.  So, I mean,

 7   one of the issues that was occurring with the

 8   testing of these people was that the plugs

 9   were loosening during the testing procedure

10   in a lab with an experienced fitter, right?

11               MS. ELIZABETH:  Objection.

12          Form.

13               THE WITNESS:  It appeared from

14          Ron's observations that that may have

15          occurred on one or more listeners.

16               It's not something that we had

17          not observed from time to time with

18          flanged earplugs.

19               In the literature, there is

20          much discussion of how flanged plugs

21          can work loose and need to be

22          reseated.

23   QUESTIONS BY MR. OVERHOLTZ:

24        Q.     I mean, sometimes the plugs

25   were loosening so badly they would slide out
```

Confidential - Pursuant to Protective Order

1   of the ear even before the testing could get

2   started, right?

3              MS. ELIZABETH:  Objection.

4       Form.

5              THE WITNESS:  I'm not sure

6       that's stated anywhere.

7              MR. OVERHOLTZ:  Could I get the

8       ELMO?

9   QUESTIONS BY MR. OVERHOLTZ:

10       Q.    Look here on the last page from

11   the notes of the test for KJC.  It says --

12   well, S and S-plus, that stands for the ear

13   canal size.

14              So this would be a small to a

15   small-plus ear canal?

16       A.    You are correct.  I had

17   forgotten that note, and it does say, "Plugs

18   slid out of ears after evaluator leaves

19   room."

20       Q.    I'm sorry, go ahead.

21       A.    Those notes are written by Ron

22   particular to each subject.

23              And the term "slides out," you

24   know, could be breaks seal, could be loosens.

25   I'm not sure exactly what he means by those

Confidential - Pursuant to Protective Order

1    words.

2                    But it was not a unique

3    observance that had never happened with

4    earplugs before, that you would fit the plug,

5    in spite of your best efforts, the plug

6    wasn't fitted quite well enough.  That's one

7    of the features with flanged earplugs.

8                    Even though this was a highly

9    regarded and successful product that had been

10   sold for years, that is still a feature in

11   some ears of that plug.

12        Q.    And this was the second time

13   trying to do this test, right?

14              MS. ELIZABETH:  Objection.

15        Form.

16              THE WITNESS:  This was the

17        second test, yes.

18   QUESTIONS BY MR. OVERHOLTZ:

19        Q.    Right.

20                    And if plugs are sliding out of

21   people's ears during the testing, what did

22   Aearo expect was going to happen when a

23   soldier tries to put the plug in their ear

24   out in the field?

25              MS. ELIZABETH:  Objection.

Confidential - Pursuant to Protective Order

```
 1          Form.

 2                 THE WITNESS:  As I said, this

 3          sort of observation was not unique to

 4          this product.  It certainly happened

 5          on these tests.  We had seen instances

 6          of this with our plugs and

 7          competitors' plugs when we've tested

 8          them.  That's a feature of flanged

 9          earplugs.

10                 Even after you give it your

11          best effort as a user, somebody might

12          be fitting it, they feel the seal

13          break, they reseat it.

14                 Those are instructions that are

15          part of Army training.  They're part

16          of articles that I've written.  That's

17          guidance that needs to be given to

18          users.

19     QUESTIONS BY MR. OVERHOLTZ:

20          Q.     Sure.

21                 That can happen for any plug,

22     right?  Any plug can have a difficult-to-fit

23     issue sometimes for certain users?

24                 MS. ELIZABETH:  Objection.

25          Form.
```

Confidential - Pursuant to Protective Order

1             THE WITNESS:  Yes.

2   QUESTIONS BY MR. OVERHOLTZ:

3        Q.    But for this plug, the results

4   of the original tests were so bad that you

5   had to stop it after eight people, right?

6             MS. ELIZABETH:  Objection.

7        Form.

8             THE WITNESS:  I don't know that

9        I accept the wording you've used, but

10       the results were such that we weren't

11       obtaining the anticipated values of

12       protection for that type of product,

13       and we decided to go back and look at

14       changing the instructions that might

15       be used for it.

16   QUESTIONS BY MR. OVERHOLTZ:

17       Q.    The NRR that you got was half

18   of what you expected to get, the fitting was

19   so bad in the first run.

20             MS. ELIZABETH:  Objection.

21       Form.

22             THE WITNESS:  The test was not

23       concluded, so we didn't have an NRR.

24       We had an estimated NRR.

25             I don't -- I can't tell you,

Confidential - Pursuant to Protective Order

1            looking at that number, where it might

2            have ended up with two more subjects,

3            but, yes, the estimated NRR was lower

4            than anticipated.

5       QUESTIONS BY MR. OVERHOLTZ:

6            Q.     And because that estimated NRR

7       was so low, you and Dick Knauer decided to

8       stop the test and told Ron Kieper to stop it,

9       right?

10            MS. ELIZABETH:  Objection.

11            Form.  Argumentative.

12            THE WITNESS:  The NRR was less

13            than we anticipated, and so we wanted

14            to look into what might be done to

15            improve the likelihood of getting an

16            adequate fit and optimum performance

17            for that test.

18       QUESTIONS BY MR. OVERHOLTZ:

19            Q.     Right.

20            And the only change that was

21       made was with respect to how to fit the plug,

22       right?

23            A.     Yes.

24            Q.     So it was a fit problem that

25       the company determined had resulted in this

Confidential - Pursuant to Protective Order

1    extremely low estimated NRR of only 10.9?

2              MS. ELIZABETH:  Objection.

3         Form.

4              THE WITNESS:  It was a problem

5         due to fitting on some subjects that

6         was leading to us obtaining an NRR

7         lower than anticipated for the goal of

8         achieving optimum performance.

9    QUESTIONS BY MR. OVERHOLTZ:

10        Q.    And as a result of having to do

11   a second test to get an NRR of 22, the

12   company made the decision to document what

13   had happened with respect to this testing,

14   right?

15        A.    If by "the company" you refer

16   to me, my policy had been over the years that

17   we document observations in the laboratory.

18              As a scientist, my goal is to

19   keep adequate records of what I've done so

20   that in the future, as I embark on new

21   assignments, I can benefit from the

22   information that had been learned in the

23   past.

24              This was not the only instance

25   of a report being written that described

Confidential - Pursuant to Protective Order

1   issues with a product that we wanted to look

2   at.  This particular one describes these

3   issues.

4          Q.     So you wrote a report about

5   this issue.  And was it your decision to

6   write the report?

7                 MS. ELIZABETH:  Objection.

8          Form.  Assumes facts.

9                 THE WITNESS:  I didn't write

10         the report.

11  QUESTIONS BY MR. OVERHOLTZ:

12         Q.     Who wrote the report?

13         A.     Ron Kieper.

14         Q.     Did you tell him to write the

15  report?

16         A.     I don't recall.

17         Q.     Did you have the opportunity to

18  evaluate the report before it was filed?

19         A.     Yes.

20         Q.     Okay.  Did you make comments on

21  the report?

22         A.     I don't recall.

23         Q.     Who asked Ron Kieper to write

24  the report?

25                MS. ELIZABETH:  Objection.

Confidential - Pursuant to Protective Order

```
 1          Form.

 2                  THE WITNESS:  I believe that I

 3          asked Ron to write the report.

 4  QUESTIONS BY MR. OVERHOLTZ:

 5          Q.     Okay.  And at what point in

 6  time did you ask him to write the report?

 7          A.     I don't know.

 8          Q.     Okay.  Was it after the

 9  conclusion of the 017 test?

10          A.     I don't know.

11          Q.     I think you described this

12  earlier as a technical report?

13                  MS. ELIZABETH:  Objection to

14          the --

15  QUESTIONS BY MR. OVERHOLTZ:

16          Q.     Was that how you described it?

17                  MS. ELIZABETH:  We don't have

18          anything in front of us.

19                  MR. OVERHOLTZ:  The flange

20          report?

21                  We can go ahead and mark it.

22          It's Plaintiff's 389C.  It's

23          3M_MDL000005285.

24                  (Berger 30(b)(6) Exhibit 22

25          marked for identification.)
```

Confidential - Pursuant to Protective Order

```
 1    QUESTIONS BY MR. OVERHOLTZ:

 2         Q.    So I'm showing you what's

 3    marked as Plaintiff's 389 C1.

 4               The report 0012, "How Folding

 5    the Flanges Back Affects REAT Results of the

 6    UltraFit Earplug End of the Combat Arms

 7    Plug."

 8               Do you see that?

 9         A.    Yes.

10         Q.    Okay.  And listed is the --

11    it's listed as E-A-R 00-12.

12               Is that the report number?

13         A.    Yes.

14         Q.    Okay.  And what does the HP

15    stand for?

16         A.    Hearing protection.

17         Q.    Okay.  And Ron Kieper and

18    yourself are both listed as the authors of

19    the report, correct?

20         A.    Yes.

21         Q.    Okay.  And the date we have is

22    July 10, 2000, right?

23         A.    Yes.

24         Q.    And it says "version 1.2."

25               Do you see that?
```

Confidential - Pursuant to Protective Order

1      A.     Yes.

2      Q.     And I think you agree there

3  would have been an earlier version before 1.2

4  of this report, correct?

5      A.     I believe there would have been

6  an earlier version.

7      Q.     Okay.  Have you attempted to

8  find the earlier versions of the report?

9      A.     Yes.

10      Q.     Okay.  Where would you go look

11  for a technical report in Aearo's files like

12  this report 00-12, the flange report?  Where

13  would you go look for that in Aearo's system?

14      A.     I would go to our network

15  drive.  I would go to my work computer.  I

16  would go to the hard copy files.

17      Q.     Okay.

18      A.     And what I would tell you is

19  that there is no policy to maintain every

20  version of a document prior to the final

21  version.  Sometimes that occurs.

22             When I look back at my own

23  computer, I find that for the more intricate

24  reports that are multiple pages, I might have

25  kept -- if there were six versions, I might

Confidential - Pursuant to Protective Order

1   have kept two or three of them just to be

2   able to track back if I wanted to understand

3   how changes were made.  I don't know that

4   I've ever looked back at them.

5           On a report of this nature,

6   which is one page long, probably would not

7   have maintained them.

8           So there's not a policy on it.

9      Q.    Okay.  You said you would look

10  at a network drive.

11          Was there a particular place

12  where you saved technical reports that were

13  numbered and authored and on official NVLAP

14  report format like this?

15     A.    The principal place they were

16  saved, especially at that time -- in fact I

17  think this one, the only saved version may be

18  a PDF, not the original Word document.

19          So at that time, the place they

20  would have been saved would have been the

21  actual lateral file drawers that all of the

22  hard copies are in.

23          At some point, as computer

24  technology improved and it wasn't so arduous,

25  you know, you had storage available, we

Confidential - Pursuant to Protective Order

1    started scanning all of these so that they

2    could be on a network drive.  And all of

3    these were also -- for my convenience were on

4    my own work computer as well.

5        Q.    You mentioned that you talked

6    to some employees of Aearo, 3M, in getting

7    ready for this deposition.

8              Have you spoken to Ron Kieper

9    in preparation for this deposition?

10       A.    No.

11       Q.    Have you asked him if he knows

12   where there might be versions of the flange

13   report saved?

14             MS. ELIZABETH:  Objection.

15       Asked and answered.

16             THE WITNESS:  No.

17   QUESTIONS BY MR. OVERHOLTZ:

18       Q.    Is that something you think

19   we'll do at these deposition, call Ron Kieper

20   and see if he knows where the flange report,

21   the other versions, might be saved?

22       A.    I don't know.

23       Q.    Okay.  So this report was kept

24   in the lateral files at the company at Aearo;

25   is that correct?

Confidential - Pursuant to Protective Order

1    A.    Yes.

2        Q.    And where were these lateral

3    files?

4        A.    Actually, to be clear, at that

5    time they were probably five file cabinets in

6    the area where the admin worked, and then as

7    offices were moved and the spaces changed,

8    they became lateral file drawers that were

9    still within the technical department.

10            Now that things have gone

11   electronic, these lateral file drawers are

12   still maintained near the technical

13   department but they've been moved elsewhere

14   in the building.

15       Q.    Okay.  So let's look --

16       A.    And they --

17       Q.    Sorry.

18       A.    They are under lock and key.

19   The key is in what used to be my desk in my

20   office.  So, I mean, they aren't accessible

21   to people in general.

22       Q.    Okay.  So if anybody in the

23   Army or the public wanted to come get a copy

24   of the flange report, they'd need to come to

25   your files and get a key to open up the

Confidential - Pursuant to Protective Order

1   cabinet to get a copy of this, right?

2        A.     No, they would be able to

3   request it from someone who would access it

4   from a network drive.

5        Q.     Did anyone ever request from

6   you a copy of the flange report from the

7   United States military?

8        A.     I don't know.

9        Q.     You don't have any recollection

10  of that, right?

11       A.     I don't recall.

12       Q.     You don't have any recollection

13  of ever providing this to anyone in the

14  United States military, correct?

15            MS. ELIZABETH:  Objection.

16       Form.

17            THE WITNESS:  I don't recall.

18            As you see, this document --

19       technical reports don't have

20       distribution lists on them.  So there

21       were from time to time technical

22       reports that would go out with a cover

23       memo saying, "This has been done;

24       here's the technical report."

25            No memorandum was revealed in

Confidential - Pursuant to Protective Order

```
 1          our searches.  I don't recall how this

 2          was distributed or if it was

 3          distributed.

 4   QUESTIONS BY MR. OVERHOLTZ:

 5          Q.     You didn't find any e-mails

 6   where you e-mailed this to anyone, right?

 7          A.     Correct.

 8          Q.     And you searched your e-mails?

 9          A.     Yes.

10          Q.     Okay.  Let's see what you

11   documented back in July of 2000 in this

12   version 1.2.

13                 Let's look at the Introduction

14   section if we can.  Blow that up.

15                 It says, "The Combat Arms" --

16          A.     Could you just give me one

17   minute?

18          Q.     Sure.

19          A.     I just wanted to pull up one

20   thing in my book.

21          Q.     Okay.

22          A.     Okay.  Go ahead.

23          Q.     It says, "The Combat Arms

24   Earplug was shortened, at the request of the

25   Army, so that it would fit into a carrying
```

Confidential - Pursuant to Protective Order

1   case."

2              Do you see that?

3        A.    Yes.

4        Q.    Okay.  Did you provide that

5   information or did Ron Kieper have that on

6   his own?

7        A.    That information would have

8   been provided by me.

9        Q.    Okay.  And do you have any

10  documented evidence of the Army asking you to

11  shorten the plug to fit into their case?

12       A.    We have documented evidence of

13  Doug Ohlin indicating that he cut the plug

14  down by a quarter of an inch, and we have

15  documented evidence of our responses to that.

16  And we have a series of the 20/41 drawings of

17  the earplug showing the initial versions from

18  1998 being approximately one-quarter inch

19  longer than the subsequent versions in 1999.

20       Q.    Okay.  So we'll look at some of

21  those '99 files.  But sometime in '99, Aearo

22  shortened the plug, Mr. Falco redid drawings

23  shortening the plug, to end up with the final

24  length of the Combat Arms version 2 plug; is

25  that right?

Confidential - Pursuant to Protective Order

1      A.      Yes.

2      Q.      It says, "Because of this, the

3   plug is shorter than any other UltraFit plug

4   design."

5              Right?

6      A.      That's what it says, yes.

7      Q.      All right.  Now, let's read

8   this.

9              "The purpose of this report is

10  to document that the current length of the

11  UltraFit earplug end of the Combat Arms plug

12  is too short for proper insertion."

13             Right?

14     A.      That is a portion of the

15  sentence that you're abbreviating --

16     Q.      Right.

17     A.      -- which goes on to discuss how

18  changing the fitting technique affected the

19  results of REAT tests.

20             And so my reading of that

21  sentence is that the proper insertion refers

22  to the REAT tests and the ability to obtain

23  optimum performance in these tests.

24     Q.      So you say, "The purpose of the

25  report is to document that the current length

Confidential - Pursuant to Protective Order

1  of the UltraFit earplug end of the Combat

2  Arms plug is too short for proper insertion

3  and how changing the fitting technique

4  affected the results of real-ear tests of

5  this plug."

6          Right?

7      A.    That's what's written there,

8  yes.

9      Q.    Okay.  Now, the UltraFit

10  earplug end of the Combat Arms plug, that's

11  talking about the green end that was tested,

12  right?

13      A.    Yes.

14      Q.    But it actually applies to both

15  ends, right?  They're both the UltraFit plug

16  end on both ends?

17          MS. ELIZABETH:  Objection.

18          Vague.

19          THE WITNESS:  This report is

20          directed at fitting the plug with the

21          sealed end in.  It could apply to both

22          ends.

23  QUESTIONS BY MR. OVERHOLTZ:

24      Q.    Okay.  It says that the current

25  length, the current length, of the UltraFit

Confidential - Pursuant to Protective Order

1    fit earplug end of the Combat Arms plug is

2    too short for proper insertion.

3              After this July 2000 report,

4    was the length of the UltraFit earplug end of

5    the Combat Arms plug changed in any way?

6              MS. ELIZABETH:  Objection.

7         Form.

8              THE WITNESS:  Once the plug was

9         shortened, I did have conversations

10        with Doug about that.

11             You will find in the records we

12        revealed that at one point he

13        requested a larger earplug carrying

14        case, which was one of the initial

15        principle reasons for the shortening

16        of the plug.  The case was never

17        enlarged.

18             And he made it clear that

19        lengthening the plug was not an

20        option.  His requested specification

21        was the length to which we had changed

22        the plug.

23   QUESTIONS BY MR. OVERHOLTZ:

24        Q.    All right.  So in --

25        A.    So we were making a product for

Confidential - Pursuant to Protective Order

1  the military to meet their design

2  requirements.

3       Q.    All right.  So in '99, the

4  plug -- Aearo changed the length of the plug,

5  right, April of '99?

6       A.    Yes.

7       Q.    Okay.  And in July of 2000, the

8  purpose of the report is to document that the

9  current length of the UltraFit earplug end of

10  the Combat Arms plug is too short.

11            That was referring to the

12  shortened plug, right?

13            MS. ELIZABETH:  Objection.

14       Form.  Asked and answered.  Misstates

15       the document.

16            THE WITNESS:  It refers to the

17       shortened earplug and being able to

18       insert it for the closed-end

19       attenuation.

20  QUESTIONS BY MR. OVERHOLTZ:

21       Q.    So the testing that we've been

22  talking about, the 015 and the 017 that was

23  done on the green end, this was the shortened

24  plug, right?

25       A.    Yes.

Confidential - Pursuant to Protective Order

1          Q.     The testing was conducted on

2    the shortened plug?

3          A.     Yes.

4          Q.     And when it describes the

5    current length, it's talking about this plug,

6    right?

7          A.     Yes.

8          Q.     Okay.  So if we can go back to

9    the...

10                And the length was -- of the

11   Combat Arms version 2 was not changed after

12   this, right?

13         A.     Correct.

14         Q.     Okay.  So it's still too short

15   for proper insertion?

16                MS. ELIZABETH:  Objection.

17         Form.  Argumentative.  Misstates the

18         testimony.

19                THE WITNESS:  It's too short

20         for proper insertion for obtaining

21         optimum performance in a real-ear test

22         without also including this fitting

23         tip that we utilized for some

24         subjects.

25

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. OVERHOLTZ:

 2        Q.     And there is no evidence that

 3   you ever communicated that Aearo and 3M

 4   believed that this plug was too short for

 5   proper insertion, was ever communicated to

 6   anyone in the United States military, right?

 7               MS. ELIZABETH:  Objection.

 8        Misstates the testimony.  Asked and

 9        answered.

10               THE WITNESS:  When you say "no

11        evidence," I have no written evidence

12        about communicating this fact.

13               My testimony is that I was in

14        open communication with Doug Ohlin at

15        that period of time and discussed

16        these issues with him over the phone.

17   QUESTIONS BY MR. OVERHOLTZ:

18        Q.     Okay.  You have no written

19   evidence of providing this information that

20   the plug -- the current length of the

21   UltraFit earplug was too short for proper

22   insertion, that you communicated that to the

23   United States military?

24               MS. ELIZABETH:  Objection.

25        Form.
```

Confidential - Pursuant to Protective Order

```
 1                THE WITNESS:  I have
 2          documentary evidence that the military
 3          knew that the flanges needed to be
 4          folded back to obtain the optimum
 5          performance in our tests, as evidenced
 6          by providing our instruction card to a
 7          military officer, as evidenced by the
 8          military's own wallet card which shows
 9          pictures of a folded-back flange and
10          directs the need of that.
11                MR. OVERHOLTZ:  Objection.
12          Nonresponsive.  And we'll get to that.
13     QUESTIONS BY MR. OVERHOLTZ:
14          Q.    But do you have any evidence
15     that you communicated that Aearo believed
16     that the current length of the CAEv2 plug was
17     too short for proper insertion?
18                MS. ELIZABETH:  Objection.
19          Asked and answered for the third time.
20                THE WITNESS:  I have no
21          documentary evidence that this report
22          was shared or that the concept that it
23          was too short for proper insertion for
24          optimum fit in an S3.19 procedure was
25          communicated.
```

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. OVERHOLTZ:

2         Q.    But it's your testimony that

3    you were speaking to Doug Ohlin about this as

4    this was occurring?

5         A.    In this time frame, Doug and I

6    were in communication and talking about

7    issues about the plug.  I don't recall

8    specific time/date phone call.  I know that

9    we were in open communication.

10              There's an e-mail in the

11    documentary record where I communicate with

12    Brian Myers saying, "Should I share the

13    results of this study?"

14              In collecting background

15    information for this 30(b)(6), I spoke to

16    Brian and asked him if he had any

17    recollection of either approving or not

18    approving that sharing of the information.

19    He had no specific recollection.  His memory

20    was, as mine, that there'd be no reason he

21    wouldn't have been able to share it.

22              We were working closely with

23    Doug.  This was his baby.  He would need to

24    know what we were finding.

25         Q.    So it's your testimony that you

Confidential - Pursuant to Protective Order

1  specifically told Doug Ohlin that the company

2  believes that it's too short for proper

3  insertion?

4            MS. ELIZABETH:  Objection.

5  QUESTIONS BY MR. OVERHOLTZ:

6      Q.    Is that your testimony that you

7  told Doug Ohlin, that the company believed

8  that the plug was too short for proper

9  insertion?

10            MS. ELIZABETH:  Objection.

11       Form.  Argumentative.  Asked and

12       answered.

13            THE WITNESS:  I do not believe

14       I used those words.  I believe I spoke

15       to him about the fact that the

16       shortened earplug was creating a

17       problem in the initial test and that

18       the work we had done to try and

19       resolve that problem to get optimum

20       performance for labeling purposes

21       would require this fold-back

22       instruction.

23  QUESTIONS BY MR. OVERHOLTZ:

24      Q.    Did you tell him that failing

25  to fold back the flange of the opposing plug

Confidential - Pursuant to Protective Order

1  would compromise the fit of the earplug in

2  soldiers?

3      A.    I do not recall the specific

4  words of the conversation.  This entire

5  development project was discussed with him,

6  and the issues from shortening it to how it

7  affected our testing were reviewed.

8      Q.    Because that's what the company

9  believed, that you if you didn't fold back

10  the flanges, the fit was compromised, right?

11          MS. ELIZABETH:  Objection.

12      Form.

13          THE WITNESS:  I think you're

14      mischaracterizing what I said.

15  QUESTIONS BY MR. OVERHOLTZ:

16      Q.    Okay.  If we can look down at

17  the one, two, three, four, fifth paragraph,

18  and it says, "For test 213017" -- that's the

19  second test on the green end, right?

20      A.    Yes.

21      Q.    "For 213017, the yellow flanges

22  of the level-dependent end of the plug were

23  folded back prior to the green, solid plug

24  being inserted into the subjects' ears."

25          Did I read that right?

Confidential - Pursuant to Protective Order

1       A.     Yes.

2       Q.     And that says the yellow

3   flanges, right?

4       A.     Yes.

5       Q.     Okay.  Can I get the ELMO real

6   quick?

7              So earlier we were talking

8   about just folding back the opposing flange,

9   but this is describing folding back all three

10  flanges, right?

11             MS. ELIZABETH:  Objection.

12         Form.

13             THE WITNESS:  I think the

14         wording is indeterminate.

15  QUESTIONS BY MR. OVERHOLTZ:

16      Q.     Can you fold back all three

17  flanges?

18      A.     And nor would I want to fold

19  back all three flanges.  I think flanges

20  refers to flanges across the variety of

21  earplugs as opposed to all the flanges on one

22  earplug.

23      Q.     So it's your belief that only

24  the outside flange?

25      A.     It's my belief that that is the

Confidential - Pursuant to Protective Order

1    way you would fold back the flange.

2        Q.    Okay.  Have you talked to

3    Mr. Kieper about whether he folded back just

4    the outside flange or all the flanges upon

5    themselves?

6            MS. ELIZABETH:  Objection.

7        Asked and answered.

8            THE WITNESS:  As I've said, I

9        had no conversations with Mr. Kieper.

10   QUESTIONS BY MR. OVERHOLTZ:

11       Q.    That's different, right?

12           MS. ELIZABETH:  Objection.

13       Vague.

14           THE WITNESS:  What's the

15       question?

16   QUESTIONS BY MR. OVERHOLTZ:

17       Q.    It's different.  I mean, just

18   folding back one flange is different than

19   folding back all the flanges upon themselves?

20       A.    That is physically different,

21   yes.

22       Q.    Okay.  Now, when you fold the

23   flanges back, which I can barely do -- I

24   don't know how the soldier was supposed to do

25   this when they're in the field of battle.

Confidential - Pursuant to Protective Order

1            But, you know, once you fold

2    them all back upon themselves like that, that

3    allowed you to get a better grip of it, to

4    stick it in the ear further, right?

5            MS. ELIZABETH:  Objection.

6        Form.

7            THE WITNESS:  Would you ask

8        your question again?

9    QUESTIONS BY MR. OVERHOLTZ:

10       Q.    Yeah.

11           When you fold them all back

12   upon themselves, now you can grab the end a

13   little better and stick it in?

14           MS. ELIZABETH:  Objection.

15       Form.

16           THE WITNESS:  I don't agree.

17   QUESTIONS BY MR. OVERHOLTZ:

18       Q.    Okay.  Let's see what -- Kieper

19   wrote this report, you said?

20       A.    Kieper would have drafted the

21   initial report.  I reviewed it.  I don't

22   recall what, if any, changes I had or our

23   conversations about it, but his name being on

24   top indicates that he was the original

25   drafter.

Confidential - Pursuant to Protective Order

1          Q.    Well, let's see what he said

2     about which flanges got folded back.

3                He says, "The folded-back

4     flanges and the hard plastic stem," singular.

5     So he's got flanges with a solid stem, right?

6                So he's not talking about

7     different plugs.  He's talking about one plug

8     that had multiple flanges and a stem, right?

9                MS. ELIZABETH:  Objection.

10          Form.

11                THE WITNESS:  I think the

12          wording of this is -- lacks the

13          precision to understand that.

14                I could refer to -- think of

15          the flanges across plugs.  It's also

16          the potential that when you fold back

17          one flange, he might have folded back

18          another one in folding the first one.

19                I think the key point is that

20          the large flange is folded back.

21     QUESTIONS BY MR. OVERHOLTZ:

22          Q.    Okay.  He says, "The

23     folding-back flanges and the hard plastic

24     stem provided a long, stiff quasi-stem for

25     the experimenter to grasp and allowed for a

Confidential - Pursuant to Protective Order

```
 1   deeper and more consistent fit of the solid

 2   plugs for test 213017."

 3                   Right?

 4         A.     Those are the words, yes.

 5         Q.     "When folded back in that way,

 6   the yellow flanges never {sic} touched the

 7   subjects'" -- is that conchae?  Conchae?

 8   Conchae?

 9         A.     You are misreading that.

10         Q.     "When folded back in that way,

11   the yellow flanges never touched the

12   subjects'" --

13         A.     You're still misreading it.

14         Q.     Okay.  Well, I think I read the

15   words right, right?

16         A.     No.

17         Q.     "When folded back in that way,

18   the yellow flanges neither touched the

19   subjects'" --

20                   Did I read it right now?

21         A.     Yes.

22         Q.     Okay.  I missed a word, right?

23                   "When folded back in that way,

24   the yellow flanges neither touched the

25   subjects'" --
```

Confidential - Pursuant to Protective Order

1                    Is it conchae?

2          A.      Conchae.

3          Q.      -- "nor compromised the fit of

4    the solid earplugs."

5                    Right?

6          A.      Those are the words.

7                    And again, in reading that

8    sentence, the yellow flanges could refer to

9    the fact that there's a plug in each ear, so

10   there's flanges in both ears that need

11   folding back.

12                   I don't believe the precision

13   of this was trying to address if I'm folding

14   back one, two or three flanges.

15         Q.      Okay.  But what is described

16   here is that when you fold the flanges back,

17   the fit isn't compromised, right?

18                   MS. ELIZABETH:  Objection.

19         Form.

20                   THE WITNESS:  Those are the

21         words in this document.  It says that

22         the "subjects' conchae neither

23         compromise the fit -- neither touch

24         the subjects' conchae nor compromise

25         the fit of the solid earplugs."

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. OVERHOLTZ:

 2        Q.     Okay.  So did you ever

 3   communicate to the United States military

 4   that if the yellow flanges touch the

 5   subjects' ear, the conchae of the ear, that

 6   that would compromise the fit of this Combat

 7   Arms plug?

 8             MS. ELIZABETH:  Objection.

 9        Form.

10             THE WITNESS:  As I said, I

11        don't recall the details of the words

12        of our conversations.

13             What I recall is being in

14        direct communication with Doug about

15        this project and discussing what we

16        were observing and whether that was

17        going to be acceptable then --

18        acceptable to the military to have

19        this additional type of instruction

20        included.

21   QUESTIONS BY MR. OVERHOLTZ:

22        Q.     This is 2000, right?  May

23   of 2000?

24             MS. ELIZABETH:  I think it says

25        July --
```

Confidential - Pursuant to Protective Order

```
1    QUESTIONS BY MR. OVERHOLTZ:

2         Q.    This is when the 015 was

3    redone?

4              The testing was done in May

5    of 2000; is that right?

6         A.    Yes.

7         Q.    Finishes up on May 9th, right?

8         A.    Yes.

9         Q.    A couple days later you write

10   an e-mail asking Brian Myers:  Is it okay for

11   me to tell Doug Ohlin this?

12             Right?

13             MS. ELIZABETH:  Objection.

14        Form.

15             THE WITNESS:  We should look at

16        the exact words of that, but it

17        referred to, is it okay to communicate

18        something?  If you want to ask me, we

19        should pull up that e-mail.

20   QUESTIONS BY MR. OVERHOLTZ:

21        Q.    You recall reviewing an e-mail

22   in which you asked Brian Myers whether you

23   should tell Doug Ohlin about the test

24   results?

25        A.    Share something with him.  I
```

Confidential - Pursuant to Protective Order

1    don't recall the words in that e-mail.

2         Q.    Okay.  Why were you talking to

3    Doug Ohlin in 2000 about this plug, about the

4    testing that was done?

5         A.    Because we're in the process of

6    developing and finalizing this product that

7    he's interested in.

8         Q.    You had already started selling

9    it to the military, right?

10             MS. ELIZABETH:  Objection.

11        Form.  Misstates the testimony.

12             THE WITNESS:  I believe that

13        was addressed by other 30(b)(6)

14        witnesses.  I don't know if you want

15        me to speak to that or not.

16             MS. ELIZABETH:  You can answer

17        the question.

18             THE WITNESS:  I believe that it

19        had been distributed to various

20        military users.  I know, for example,

21        that the original longer version was

22        shared with Doug Ohlin, which is how

23        we ended up coming up with the

24        feedback that said I want the plug

25        shortened.

Confidential - Pursuant to Protective Order

```
 1                  So at that time it was being
 2          shared with the military and, I would
 3          presume, being evaluated by them.
 4                  Doug's group at USACHPPM was a
 5          large group that worked directly with
 6          the soldiers, and much of the guidance
 7          that was developed for this product
 8          and other products came from their
 9          experience interacting with soldiers.
10                  MR. OVERHOLTZ:  Okay.
11                  MS. ELIZABETH:  Are you good on
12          time?  Do you want to take a break?
13                  THE WITNESS:  I'm good, unless
14          you want --
15                  MR. OVERHOLTZ:  Let me ask a
16          couple of questions and we'll take a
17          break.  It's getting pretty close to
18          the time for a break.
19                  MS. ELIZABETH:  Okay.
20  QUESTIONS BY MR. OVERHOLTZ:
21          Q.    You had mentioned the fact that
22  there was -- the military had later put out a
23  wallet card?  Do you recall that, saying that
24  to me?
25          A.    Yes.
```

Confidential - Pursuant to Protective Order

 1          Q.     Okay.  Do you believe that the

 2     information that Doug Ohlin put out in that

 3     wallet card -- did everything that you tell

 4     Doug Ohlin about what happened in that test

 5     get communicated in that wallet card?

 6                 MS. ELIZABETH:  Objection.

 7          Form.  Foundation.

 8                 THE WITNESS:  No.

 9                 MR. OVERHOLTZ:  Let's take our

10          break.

11                 VIDEOGRAPHER:  Going off the

12          record.  The time is 3:33.

13            (Off the record at 3:33 p.m.)

14                 VIDEOGRAPHER:  We're going back

15          on the record.  The time is 3:50.

16     QUESTIONS BY MR. OVERHOLTZ:

17          Q.     Okay.  Mr. Berger, we've been

18     talking about the report that was 00-12 and

19     how folding back the flanges affects REAT

20     results of the UltraFit Combat Arms Earplug.

21                 I want to go back, and let's

22     take a look at a little bit about what was

23     documented in this report that you said that

24     Mr. Kieper wrote and you had a chance to

25     review back in 2000.

Confidential - Pursuant to Protective Order

1         Okay?

2    A.    Yes.

3    Q.    We can go up to the section

4  Test Procedure.

5         Do you see that?

6    A.    Yes.

7    Q.    Okay.  So it says that both

8  tests followed the 1974 experimenter fit

9  protocol, right?

10   A.    Yes.

11   Q.    And that's talking about the

12  015 that was stopped after eight and then the

13  017 test, right?

14        MS. ELIZABETH:  Objection.

15     Form.

16        THE WITNESS:  Yes, I presume

17     that's what he's referring to.

18  QUESTIONS BY MR. OVERHOLTZ:

19   Q.    Okay.  Right up above there he

20  says, "The solid plug is green, and it was

21  this plug that was evaluated in two separate

22  REAT tests, 213015 and 213017," right?

23   A.    Yes.

24   Q.    And then it says, "So the plugs

25  were tested three times each on subjects from

Confidential - Pursuant to Protective Order

1    the E-A-RCAL laboratory test panel.  After

2    each fitting by the experimenter, prior to

3    the experimenter leaving the test chamber, a

4    fitting noise was presented and the subject

5    was allowed to adjust the plugs for maximum

6    noise reduction if she/he deemed necessary."

7                Right?

8        A.    Yes.

9        Q.    Okay.  If we could go down, it

10   says, "For test 213015" --

11               That's the first test that was

12   stopped, right?

13       A.    Yes.

14       Q.    -- "the plugs were fit

15   according to the standard plug's fitting

16   instructions with no modifications," right?

17       A.    That's what's written.

18       Q.    So there were fitting

19   instructions for this plug as of the time of

20   this 015 test, right?

21               MS. ELIZABETH:  Objection.

22        Form.

23               THE WITNESS:  In this era of

24        our testing, we did not always have a

25        set of written instructions, I don't

Confidential - Pursuant to Protective Order

1    believe, that Ron Kieper would have

2    been following.  It could have been

3    his understanding of the standard way

4    that an UltraFit earplug is fitted,

5    the standard use.

6         The ANSI standard in the

7    current version does not speak to

8    that.  The current version is much

9    more explicit about having actual

10   written instructions and documentation

11   of what was done.

12        So I don't recall whether there

13   was a written set of instructions or

14   his understanding from his experience

15   with the product of what standard

16   fitting would be for that.

17   QUESTIONS BY MR. OVERHOLTZ:

18        Q.    Okay.  He says, "According" --

19   they were fitted "according to the standard

20   plug's fitting instructions with no

21   modifications.  Because the stem of the

22   green, solid end of the plug is so short, it

23   was difficult for the experimenter to insert

24   the plug deeply into some subjects' ear

25   canals, especially those subjects with medium

1    and larger ear canals."

2              Do you see that?

3       A.    Yes.

4       Q.    Okay.  Now, it ought to be

5    easier to put a plug in someone with a larger

6    ear canal than a smaller ear canal, right?

7              MS. ELIZABETH:  Objection.

8         Form.

9              THE WITNESS:  Ear canal size is

10        one measure of the difficulty one

11        might have in inserting a plug.

12        There's also the tortuosity, how

13        quickly it necks down, what bends

14        there might be in the ear canal.  And

15        then another issue is where the ear

16        canal is situated relative to this

17        little bump in front of the ear called

18        the tragus.

19              So ear canal size is one

20        feature, but it may not be the

21        determinant for that particular

22        person.

23   QUESTIONS BY MR. OVERHOLTZ:

24        Q.    He was indicating it was harder

25   to get it into people with the medium and

Confidential - Pursuant to Protective Order

```
 1   larger ear canals in this report, right?

 2              MS. ELIZABETH:  Objection.

 3        Form.

 4              THE WITNESS:  That's what he

 5        says there.

 6   QUESTIONS BY MR. OVERHOLTZ:

 7        Q.    And that was your

 8   understanding, and you were a coauthor of

 9   this report, right?

10              MS. ELIZABETH:  Objection.

11        Form.

12              THE WITNESS:  That was my

13        understanding at the time.

14   QUESTIONS BY MR. OVERHOLTZ:

15        Q.    Okay.  You talked about the

16   different bends and the different things of a

17   plug.  I mean, this plug -- and I think you

18   took off your end before, but there's a solid

19   plastic insert on the inside, right, that

20   holds the stem -- that's part of the stem and

21   part -- and holds the filter, right?

22        A.    Yes.

23        Q.    And this solid plastic insert

24   extends up through the plug through where the

25   flanges are, right?
```

Confidential - Pursuant to Protective Order

1        A.      It extends through a portion of

2   that.

3        Q.      Right.

4                So this center part is not

5   flexible, right?  It's solid?

6        A.      A small portion of it is not.

7        Q.      Right.

8                From basically the center

9   between the largest and medium-sized flanges

10  on both sides is a hard, plastic insert,

11  right?

12       A.      You know, I would just want to

13  refer to the drawing to see exactly how far

14  that filter extends if you're going to ask

15  that question.

16       Q.      It's back on the fifth page of

17  the flange report.

18               MS. ELIZABETH:  We can't hear

19       you.

20  QUESTIONS BY MR. OVERHOLTZ:

21       Q.      I said it's on about the fourth

22  or fifth page of the flange report, if you

23  want to look at that.

24       A.      Yeah.  So in that report you

25  can see that the stem extends to just behind

Confidential - Pursuant to Protective Order

 1    the base of the largest flange.

 2        Q.     Right.

 3               So that's the plastic stem in

 4    the middle there, if we can hold steady.

 5    This is the yellow end with the filter up

 6    there, right?  And this is the green end down

 7    here, right?

 8        A.     Yes.

 9        Q.     Okay.  And so this part in the

10    middle here, that's represented right here,

11    that's this hard plastic insert, right?

12        A.     Yes.

13        Q.     And then this thing that D is

14    pointing to, that's the filter, right?

15        A.     Yes.

16        Q.     Okay.  So this hard plastic

17    insert extends almost to the very end of the

18    big flange on both sides, right?

19        A.     Or I would say to the base of

20    the big flange.

21        Q.     To the base on the big flange

22    on both sides the plastic inserts extends to,

23    right?

24               But if I take a look at --

25    let's see, your UltraFit plug, right, it

Confidential - Pursuant to Protective Order

1  doesn't have a hard, plastic insert in the

2  middle, right?

3       A.    Correct.

4       Q.    It can flex and bend pretty

5  easily all the way through the stem, right?

6       A.    Yes.

7       Q.    The UltraFit was the basis of

8  the Combat Arms plug, right?

9            MS. ELIZABETH:  Objection.

10       Form.

11            THE WITNESS:  The UltraFit is

12       the basis of the flange part of the

13       Combat Arms.

14  QUESTIONS BY MR. OVERHOLTZ:

15       Q.    All right.  But the difference

16  is that this UltraFit can flex all the way

17  through, and there's nothing hard extending

18  up through the flanges, right?

19            MS. ELIZABETH:  Objection.

20       Form.

21            THE WITNESS:  You changed your

22       wording there.

23            There's nothing hard extending

24       up through the flanges in the Combat

25       Arms either.  There is a stem that

Confidential - Pursuant to Protective Order

1    extends to the base of that first

2    flange.

3  QUESTIONS BY MR. OVERHOLTZ:

4    Q.    The base of the largest flange?

5    A.    Yes.

6    Q.    Okay.  So we go back to the

7  flange report again and go to that page we

8  were reading under Test Procedure.

9         This says, "Additionally" --

10        MS. ELIZABETH:  Where are you?

11        MR. OVERHOLTZ:  In the middle

12    of that second paragraph --

13        MS. ELIZABETH:  Okay.

14        MR. OVERHOLTZ:  -- under Test

15    Procedure.

16  QUESTIONS BY MR. OVERHOLTZ:

17    Q.    "Additionally, the geometry of

18  the ear canal opening sometimes prevented

19  deep plug insertion required for maximum of

20  attenuation values."

21         Do you see that?

22    A.    Yes.

23    Q.    "When the solid plug was fitted

24  during the first test, 015, the basal edge of

25  the third flange of the yellow,

Confidential - Pursuant to Protective Order

1    level-dependent plug sometimes pressed

2    against the subject's ear canal opening and

3    folded up."

4              Do you see that?

5        A.    Yes.

6        Q.    So it would fold up on its own

7    because it was pressing against the ear?

8              MS. ELIZABETH:  Objection.

9    Form.

10   QUESTIONS BY MR. OVERHOLTZ:

11       Q.    Is that right?

12       A.    I believe, again, the wording

13   is not as accurate as I would like to see.  I

14   don't think "folded up" means that it folded

15   backwards but that it had a little fold in it

16   because it could be pressing against the

17   tragus or the ear canal opening.

18       Q.    Right.

19             If it presses against my finger

20   there, it kind of bends a little bit?

21       A.    Correct.

22       Q.    But it may not fold it all the

23   way back on itself?

24       A.    And I don't think that would

25   likely happen, that it would fold back on

Confidential - Pursuant to Protective Order

1    itself.

2         Q.    But he's documenting what he

3    observed, right --

4              MS. ELIZABETH:  Objection.

5    QUESTIONS BY MR. OVERHOLTZ:

6         Q.    -- in this report?

7              MS. ELIZABETH:  Form.

8    QUESTIONS BY MR. OVERHOLTZ:

9         Q.    That would have been the

10   scientific method that should have been

11   applied in documenting this problem, is to

12   document what was observed, correct?

13             MS. ELIZABETH:  Same objection.

14             THE WITNESS:  The goal here was

15        for him to document what he observed,

16        and it's also likely that these

17        observations include his two or three

18        months of experimentation before the

19        017 test was commenced.

20             I don't know that to be the

21        case, but it's likely that this would

22        have been a result of all of his work

23        during that period of time.

24   QUESTIONS BY MR. OVERHOLTZ:

25        Q.    And he's reported that what he

Confidential - Pursuant to Protective Order

1    observed was the basal edge of the third

2    flange of the yellow end pressed against the

3    subject ear canal and folded up, sometimes.

4         A.    Yes.

5         Q.    "When the inward pressure on

6    the plug was released, the yellow plug's

7    flanges tended to return to their original

8    shape, and this sometimes loosened the plug,

9    often imperceptibly to the subject."

10              That's what he wrote, right?

11        A.    That's what's written.

12        Q.    Now, you said that you were in

13   communication with Doug Ohlin about this; is

14   that right?

15        A.    I said that I was in

16   communication with Doug Ohlin about our

17   testing, the product meeting user needs.

18        Q.    Would you have talked to anyone

19   else besides Doug Ohlin about this during

20   that period of time?

21              MS. ELIZABETH:  Objection.

22        Vague.

23   QUESTIONS BY MR. OVERHOLTZ:

24        Q.    Was Ohlin the only person you

25   talked to?

Confidential - Pursuant to Protective Order

1            MS. ELIZABETH:  Objection.

2       Form.

3            THE WITNESS:  Would you like to

4       clarify the question?

5  QUESTIONS BY MR. OVERHOLTZ:

6       Q.    Sure.

7            At the United States military,

8  at this time when this was happening and you

9  testified that you talked to Doug Ohlin, was

10  Doug Ohlin the only person with the military

11  that you spoke to?

12       A.    The only one I recall.

13       Q.    Okay.  So if we can go back to

14  the drawing for a second, the top of this is

15  the yellow end of the plug, the bottom is the

16  green, right?

17       A.    Correct.

18       Q.    Both ends are the same length,

19  right?

20       A.    Yes.

21       Q.    So if you insert the yellow end

22  into the ear, the same issue can occur where

23  the green, the outer green flange, could

24  press against parts of the ear, just as was

25  described in the flange report, right?

Confidential - Pursuant to Protective Order

```
 1        A.     Yes.

 2        Q.     Okay.  Did you discuss, either

 3   with your boss or Mr. Kieper or anyone at 3M,

 4   redoing the 213016, the yellow end test, as a

 5   result of the findings of this flange report

 6   and the fit issues when the other side of the

 7   plug touches the ear?

 8        A.     I don't recall.

 9        Q.     Is it possible it was

10   discussed?

11        A.     I don't recall.

12        Q.     You don't recall at all?

13        A.     Correct.

14        Q.     Have you talked to Mr. Kieper

15   about it?

16               MS. ELIZABETH:  Objection.

17        Asked and answered.

18               THE WITNESS:  As I said, I've

19        not had any discussions with

20        Mr. Kieper about this issue.

21   QUESTIONS BY MR. OVERHOLTZ:

22        Q.     So even though you were

23   designated to talk about Topic 10 and

24   Topic 17 related to this flange report, the

25   drafting of this report, the testing that was
```

Confidential - Pursuant to Protective Order

1    done that was described in the report, that

2    Mr. Kieper was the experimenter on, you've

3    not attempted or had the occasion to speak to

4    Mr. Kieper about it?

5                    MS. ELIZABETH:  It's a yes or

6         no question.

7                    THE WITNESS:  Do you want to

8         please ask one question?

9    QUESTIONS BY MR. OVERHOLTZ:

10        Q.     You didn't understand my

11   question?

12        A.     You asked me two questions.

13        Q.     Even though you were designated

14   on topics about this testing that was done in

15   2000 and Mr. Kieper was the experimenter,

16   you've not attempted to talk to Mr. Kieper

17   about --

18        A.     Yes.

19        Q.     -- the results?

20        A.     I have not.

21        Q.     Okay.  You talked to Brian

22   Myers about -- in preparation for this

23   deposition?

24        A.     Yes.

25        Q.     And you talked to him about the

Confidential - Pursuant to Protective Order

1  flange report and the issues related to it?

2      A.    What I discussed with Brian was

3  the details of sharing the report with

4  others.  I didn't discuss with him the issues

5  that we're now discussing, which are the

6  details of the report itself, what it means,

7  how it came to be, any of those issues.

8      Q.    So if we look at the bottom of

9  the page real quick, there's a description in

10  the middle for signatures.

11          Do you see that?

12      A.    Yes.

13      Q.    And it's drawn by M. Doty.

14          Do you know who that was?

15      A.    Yes.

16      Q.    And who was that?

17      A.    He was a toolmaker, designer,

18  who worked with and under the direction of

19  Bob Falco, R. Falco.

20      Q.    Okay.  And R. Falco was

21  considered the project engineer on the

22  project; is that right?

23      A.    That's the way it's written

24  there, yes.  He was the person who designed

25  that product.

Confidential - Pursuant to Protective Order

1        Q.      Okay.  Did you tell anyone at

2    Aearo, 3M at the time, that, "Hey, I've told

3    Ohlin about this"?

4        A.      I don't recall.

5        Q.      So we know that the 017 test

6    ended on May 9th of 2000, right?  That's the

7    date on the individual data there on the top

8    left, 5/9/2000?

9        A.      Yes.

10              (Berger 30(b)(6) Exhibit 23

11       marked for identification.)

12   QUESTIONS BY MR. OVERHOLTZ:

13       Q.      Okay.  So let me show you what

14   we'll mark as Exhibit Number 23.  This is

15   3M_MDL000258590.  It's P0925.

16              So I'll let you take a quick

17   glance at this e-mail, I know you're familiar

18   with it, and just ask a couple of questions.

19   Okay?

20              So on May 12th, three days

21   later, at the end of the 213017 test, you

22   wrote an e-mail to Brian Myers in the

23   marketing department at Aearo regarding REAT

24   on the Combat Arms, right?

25              MS. ELIZABETH:  Do you need a

Confidential - Pursuant to Protective Order

1          minute --

2                  THE WITNESS:  I just wanted to

3          check your dates a minute.

4     QUESTIONS BY MR. OVERHOLTZ:

5          Q.     Sure.

6          A.     Okay.  Would you say that one

7     more time?

8          Q.     Sure.  We'll break it apart.

9                  On May 12, 2000, you wrote an

10    e-mail to Brian Myers regarding the REAT on

11    the Combat Arms, right?

12         A.     Yes.

13         Q.     Okay.  And that was three days

14    after the report date of May 9, 2000, on the

15    213017, second in our labeling test for the

16    green end of the Combat Arms Earplug, right?

17         A.     It was the completed labeling

18    test on the closed end of the Combat Arms.

19         Q.     Okay.  And you say, "Here are

20    the data on the UltraFit end of the Combat

21    Arms."

22                 So you provided him with some

23    form of the data from that testing, right?

24         A.     That is what appears from this

25    memo.

Confidential - Pursuant to Protective Order

1          MR. BROCK:  Hold on just one

2      second.

3          MR. OVERHOLTZ:  Sure.

4          MR. BROCK:  Sorry about that.

5          MR. OVERHOLTZ:  No problem.

6  QUESTIONS BY MR. OVERHOLTZ:

7      Q.    All right?  The next thing you

8  say is, "Note:  The original study was

9  stopped with eight subjects."

10          That was the 015, right?

11     A.    Yes.

12     Q.    "The second study was with the

13  folded-back flanges on the end sticking out

14  of the ear."

15          Right?

16     A.    That's what written there.

17     Q.    So you're telling Myers about

18  what happened in the study now, right?

19          MS. ELIZABETH:  Objection to

20      form.

21          THE WITNESS:  I'm sharing with

22      him a general statement of what

23      happened, yes.

24  QUESTIONS BY MR. OVERHOLTZ:

25     Q.    And then you ask a question:

Confidential - Pursuant to Protective Order

1    "Should I share this with Ohlin?"

2         A.    Yes.

3         Q.    Wasn't it pretty clear you

4    should share it with Ohlin?

5              MS. ELIZABETH:  Objection.

6         Form.

7              THE WITNESS:  No.

8    QUESTIONS BY MR. OVERHOLTZ:

9         Q.    I mean, the United States

10   military was going to buy this for their

11   soldiers; they deserve to know the truth,

12   right?

13             MS. ELIZABETH:  Objection.

14        Form.

15             THE WITNESS:  We were in

16        communication with them.  At the same

17        time, we have a policy that internal

18        reports are not shared unless they're

19        approved for going out of the

20        building.

21             So I'm not going to share a

22        report on any topic about anything

23        without having approval from

24        higher-level supervisors.  Even though

25        I think it's appropriate and it's

Confidential - Pursuant to Protective Order

1          likely to happen, I'm going to need to

2          get approval before that document

3          leaves the building.

4     QUESTIONS BY MR. OVERHOLTZ:

5          Q.    So --

6          A.    Or that information.

7                And so I'm following the

8     reporting chain here to find out, to get the

9     permission on doing that.

10         Q.    All right.  So if I can get the

11    ELMO real quick.

12                So here you're e-mailing Brian

13    Myers, right?

14         A.    Correct.

15         Q.    And he's in marketing, right?

16         A.    Correct.

17         Q.    And are you telling me that

18    Brian Myers in marketing was your

19    higher-level supervisor to approve the

20    release of scientific information?

21                MS. ELIZABETH:  Objection.

22         Form.

23                THE WITNESS:  I'm telling you

24         that it would have had to go through

25         both my technical supervisor at that

Confidential - Pursuant to Protective Order

```
1          time as well as Brian, who was

2          basically the overall manager on this

3          project, before I could release the

4          report.

5    QUESTIONS BY MR. OVERHOLTZ:

6          Q.    So marketing had a say in

7    whether information regarding bad test

8    results should be communicated with the

9    military back in 2000 at Aearo?

10               MS. ELIZABETH:  Objection.

11         Form.  Misstates the testimony.

12               THE WITNESS:  Marketing would

13         have a say on releasing internal

14         reports to external sources.

15   QUESTIONS BY MR. OVERHOLTZ:

16         Q.    You say your other supervisor

17   within your department would also have a say.

18               That would have been Dick

19   Knauer at the time?  Knauer?

20         A.    Well, he was my supervisor.

21   Brian was not my supervisor at that time.

22   Brian was involved with this project.

23         Q.    But is it your testimony that

24   Dick Knauer would also have to approve

25   release of information regarding --
```

Confidential - Pursuant to Protective Order

```
 1          A.     Yes.

 2          Q.     -- internal test reports?

 3          A.     Yes.

 4          Q.     Did you talk to Dick Knauer

 5    about whether you should share this with the

 6    US military?

 7          A.     I don't recall if I did.

 8                 What I can tell you is that

 9    Dick's office was three doors down from mine.

10    Brian was in another building.

11          Q.     Okay.

12          A.     So I would see Dick multiple

13    times a day.  Brian I might or might not see.

14          Q.     Okay.  Have you talked -- have

15    you spoken to Dick Knauer since -- in

16    preparation for this deposition or in the

17    past regarding whether or not you shared this

18    information with the United States military

19    in some way?

20          A.     I did have a conversation with

21    Dick.

22          Q.     All right.  And what did he

23    say?

24          A.     And --

25                 THE WITNESS:  Would you remind
```

Confidential - Pursuant to Protective Order

1            me which 30(b)(6) topic is this?

2                    MS. ELIZABETH:  Sure.

3            Number -- what number are you on?

4                    THE WITNESS:  Well, I spoke to

5            Dick about 11, 12 --

6                    MR. OVERHOLTZ:  It would either

7            be 10 or 11.

8                    THE WITNESS:  I did speak to

9            him about Topic 11.

10   QUESTIONS BY MR. OVERHOLTZ:

11           Q.    Okay.  And did he say anything

12   about whether or not the fact that the 015

13   test had been stopped and that the 017 test

14   had been conducted with flanges rolled back

15   to get the NRR of 22, whether that had been

16   communicated to the United States military?

17                   MS. ELIZABETH:  Objection.

18           Form.

19                   THE WITNESS:  He had no

20           recollections of those details.

21   QUESTIONS BY MR. OVERHOLTZ:

22           Q.    Okay.  And he had no documents

23   to provide to you that would indicate that

24   that information had been shared with the

25   United States military; is that right?

Confidential - Pursuant to Protective Order

```
 1        A.     Correct.

 2        Q.     Okay.  You go on and say, "It

 3   looks like the existing product has problems

 4   unless the user instructions are revised."

 5               Right?

 6        A.     That's what's written there.

 7        Q.     Okay.  And it's your testimony

 8   that you told Doug Ohlin that the 017 test

 9   had been conducted by rolling back the

10   flanges?

11               MS. ELIZABETH:  Objection.

12        Asked and answered.

13               THE WITNESS:  Yes.

14   QUESTIONS BY MR. OVERHOLTZ:

15        Q.     You told me before that

16   Mr. Kieper could roll back the flanges if it

17   was necessary.

18               Do you recall that?

19               MS. ELIZABETH:  One second.

20               Objection.  Asked and answered.

21        Form.

22   QUESTIONS BY MR. OVERHOLTZ:

23        Q.     During the 017 --

24               MR. OVERHOLTZ:  If we can just

25        keep the objections to form, please.
```

Confidential - Pursuant to Protective Order

1   QUESTIONS BY MR. OVERHOLTZ:

2       Q.    During the 017 tests, is it

3   your testimony that Mr. Kieper could fold

4   back the flanges if he thought it was

5   necessary?

6           MS. ELIZABETH:  Same

7       objections.

8           THE WITNESS:  Yes.

9   QUESTIONS BY MR. OVERHOLTZ:

10      Q.    Okay.  And did he tell you --

11  or did you determine when it would be

12  necessary to roll back the flanges?

13      A.    I did not make a determination

14  subject by subject.

15          Ron was someone who had been

16  doing this testing for a number of years.  In

17  my supervisory capacity I would coach him if

18  he was having problems.  I would observe from

19  time to time his test practices to assure

20  that I thought they were appropriate.

21          If he had questions on a

22  particular subject, my office was just

23  outside the lab.  He'd call me in, and we

24  would take a look and discuss it together.

25          I don't recall what our

1    interactions were over this particular test.

2        Q.    Okay.  You don't remember

3    discussing with Mr. Kieper about when it

4    would be necessary to roll back the flanges?

5        A.    No.

6        Q.    Speaking of -- you mentioned

7    observing.  When the testing was going on in

8    these tests, where you would have been in the

9    lab?

10            MS. ELIZABETH:  Objection.

11        Vague.

12            THE WITNESS:  I could have been

13        multiple places.  I could have been on

14        a business trip.  I could have been in

15        my office.  I could have been in the

16        laboratory waiting to see the results

17        of a given test.

18            You know, he was able to do the

19        testing independent of my constant

20        involvement, so it was in a

21        supervisory role, a collaborative

22        role.  I would certainly be checking

23        to make sure that in general things

24        were being done as I thought was

25        appropriate.

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. OVERHOLTZ:

2         Q.    Were you ever in the testing

3    lab and observed the rolling back of the

4    flanges during the testing during the 017

5    test?

6         A.    I don't have a recollection

7    specifically for my time.

8         Q.    Okay.  Did you tell Doug Ohlin,

9    "We rolled back the flanges in the 017 test

10   to get that NRR"?

11             MS. ELIZABETH:  Objection.

12        Asked and answered.

13             THE WITNESS:  I discussed with

14        him that we had determined that

15        rolling back the flanges would be

16        important for some people and that it

17        was something that we were doing on

18        the most recent test.

19             (Berger 30(b)(6) Exhibit 24

20        marked for identification.)

21   QUESTIONS BY MR. OVERHOLTZ:

22        Q.    Let me show you what we'll mark

23   as Exhibit Number 24.  It's Exhibit 913A.

24             This is Bates -- ends in

25   3M_MDL000192859, Plaintiff's 913A.

Confidential - Pursuant to Protective Order

1              I'll let you take a look,

2     glance at it, and then ask you some questions

3     about it.

4              Okay?

5         A.    Yes.

6         Q.    So on November 15, 2004, you

7     send an e-mail from your CompuServe e-mail

8     address to Doug Ohlin, and you copy both

9     Brian Myers and Richard Knauer, right?

10        A.    Yes.

11        Q.    And the subject was "CAE

12    Comfort Issues."

13             Do you see that?

14        A.    Yes.

15        Q.    Okay.  And you say, "Doug, good

16    to see you at the beach."

17             Do you see that?

18        A.    Yes.

19        Q.    Which beach did you see Doug

20    Ohlin at?

21        A.    My recollection is that there

22    was a -- perhaps the Acoustical Society of

23    America or a military conference that both of

24    us attended that took place at Virginia

25    Beach.

Confidential - Pursuant to Protective Order

1      Q.    Okay.

2      A.    And so we were at the beach.

3      Q.    Okay.  Were you actually out on

4   the beach with him?

5      A.    I don't recall.  I hope I was.

6   I don't recall.

7      Q.    But you don't remember it.

8            Have you ever been to the beach

9   with Doug Ohlin?

10     A.    I don't recall.  I don't think

11  so.

12     Q.    If you had gone to the beach

13  with Doug Ohlin, you'd remember, right?

14           MS. ELIZABETH:  Objection.

15      Form.

16           THE WITNESS:  I don't know.

17  QUESTIONS BY MR. OVERHOLTZ:

18     Q.    Okay.

19     A.    I grew up on the beach.  I've

20  been at the beach many times.  I'm landlocked

21  these days, but I grew up on the beach.

22     Q.    Okay.  You say, "I took back

23  your concerns on the CAE and have some

24  thoughts."

25           Do you see that?

Confidential - Pursuant to Protective Order

```
 1                    CERTIFICATE
 2
 3          I, CARRIE A. CAMPBELL, Registered
    Diplomate Reporter, Certified Realtime
 4  Reporter and Certified Shorthand Reporter, do
    hereby certify that prior to the commencement
 5  of the examination, Elliott H. Berger, M.S.
    30(b)(6), was duly sworn by me to testify to
 6  the truth, the whole truth and nothing but
    the truth.
 7
            I DO FURTHER CERTIFY that the
 8  foregoing is a verbatim transcript of the
    testimony as taken stenographically by and
 9  before me at the time, place and on the date
    hereinbefore set forth, to the best of my
10  ability.
11          I DO FURTHER CERTIFY that I am
    neither a relative nor employee nor attorney
12  nor counsel of any of the parties to this
    action, and that I am neither a relative nor
13  employee of such attorney or counsel, and
    that I am not financially interested in the
14  action.
15
16
17  _____
    CARRIE A. CAMPBELL,
18  NCRA Registered Diplomate Reporter
    Certified Realtime Reporter
19  California Certified Shorthand
    Reporter #13921
20  Missouri Certified Court Reporter #859
    Illinois Certified Shorthand Reporter
21  #084-004229
    Texas Certified Shorthand Reporter #9328
22  Kansas Certified Court Reporter #1715
    Notary Public
23
    Dated:  November 15, 2019
24
25
```