# EXHIBIT 5

Confidential - Pursuant to Protective Order

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF FLORIDA

 3                   PENSACOLA DIVISION

 4  IN RE:  3M COMBAT ARMS       )  Case No. 3:19md2885

 5  EARPLUG PRODUCTS LIABILITY   )

 6  LITIGATION                   )  Judge M. Casey

 7  ------------------------     )  Rodgers

 8                               )  Magistrate Judge

 9  THIS DOCUMENT RELATES TO     )  Gary R. Jones

10  ALL CASES                    )

11

12            FRIDAY, SEPTEMBER 25, 2020

13       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

14                     - - -

15           Remote 30(b)(6) videotaped deposition of

16  DEFENDANT 3M COMPANY THROUGH ELLIOTT BERGER, held

17  remotely at the location of the witness, commencing at

18  approximately 9:12 a.m., on the above date, before

19  Juliana F. Zajicek, Registered Professional Reporter,

20  Certified Shorthand Reporter and Certified Realtime

21  Reporter.

22                     - - -

23            GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

24                 deps@golkow.com
```

Confidential - Pursuant to Protective Order

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3         AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
           17 East Main Street, Suite 200
 4         Pensacola, Florida 32502
           850-202-1010
 5         BY:  BRYAN AYLSTOCK, ESQ.
                baylstock@awkolaw.com;
 6              NEIL D. OVERHOLTZ, ESQ.
                noverholtz@awkolaw.com;
 7              JENNIFER M. HOEKSTRA, ESQ.
                jhoekstra@awkolaw.com
 8
                      -and-
 9
           CLARK, LOVE & HUTSON, PLLC
10         440 Louisiana Street, Suite 1600
           Houston, Texas 77002
11         713-757-1400
           BY:  EMILY MARLOWE, ESQ.
12              emarlowe@triallawfirm.com;
                AMANDA HUNT, ESQ.
13              AHunt@triallawfirm.com
14                    -and-
15         LAMINACK, PIRTLE & MARTINES, L.L.P.
           5020 Montrose Boulevard, 9th Floor
16         Houston, Texas 77006
           713-292-2750
17         BY:  THOMAS W. PIRTLE, ESQ.
                tomp@lpm-triallaw.com
18
                      -and-
19
           PULASKI LAW FIRM
20         2925 Richmond Avenue, Suite 1725
           Houston, Texas 77098
21         713-664-4555
           BY:  KATHERINE CORNELL, ESQ.
22              kcornell@pulaskilawfirm.com
23
24
```

Confidential - Pursuant to Protective Order

```
 1    APPEARANCES: (Continued)
 2    ON BEHALF OF THE MINNESOTA PLAINTIFFS:
 3         PAUL LLP
           601 Walnut Street, Suite 300
 4         Kansas City, Missouri 64106
           816-984-8100
 5         BY:  SEAN COOPER, ESQUIRE
                Sean@paulllp.com
 6
 7    ON BEHALF OF THE DEFENDANTS:
 8         KIRKLAND & ELLIS LLP
           300 North LaSalle
 9         Chicago, Illinois 60654
           312-862-2000
10         BY:  HARIKLIA KARIS, ESQ.
                hariklia.karis@kirkland.com;
11              COLE CARTER, ESQ.
                cole.carter@kirkland.com
12
                     -and-
13
           KIRKLAND & ELLIS LLP
14         333 South Hope Street
           Los Angeles, California 90071
15         213-680-8122
           BY:  SIERRA ELIZABETH, ESQ.
16              sierra.elizabeth@kirkland.com
17
      ALSO PRESENT:
18
           CHRIS EPPERSON, Legal Assistant,
19         THOMAS DALY, Legal Assistant,
           TERRY GRINER, Legal Assistant,
20           Aylstock, Witkin, Kreis & Overholtz, PLLC
21         CHRIS GRIMM, Trial Technician,
              Golkow Litigation Services
22
      THE VIDEOGRAPHER:
23
           DAVID LANE,
24            Golkow Litigation Services
```

Confidential - Pursuant to Protective Order

1      Q.    All right.  And did you receive some data

2   from Bob Zielinski?

3      A.    Through a Kirkland associate.

4      Q.    All right.  What was that data that you

5   received from Bob Zielinski?

6      A.    It had to do with the ordering of parts

7   for the manufacture of Combat Arms Version 3.

8      Q.    For the Version 3?

9      A.    For the Version 3.

10     Q.    And is that -- is that data --

11     A.    And also -- and also it was -- that was

12   the primary interest, but it also included some data

13   on parts, specifically the filters for that plug and

14   for Combat Arms 2.

15     Q.    Okay.  The nonlinear filter?

16     A.    Yes.

17     Q.    Okay.  And is the data that you received

18   from Ziel -- from Mr. Zielinski, is that contained

19   within the binder?

20     MS. ELIZABETH:  Objection; form.

21   BY THE WITNESS:

22     A.    No, the data is not in the binder.

23   BY MR. OVERHOLTZ:

24     Q.    Okay.  You have that in the e-mail form?

Confidential - Pursuant to Protective Order

```
1      A.    Yes.

2      Q.    All right.

3      MR. OVERHOLTZ:  Counsel, we are going to ask to

4  get a copy of the data.  I -- I understand if it's

5  through counsel communications, you may have to modify

6  it in some way, but if there was data transmitted,

7  we'd like to -- that Mr. Zielinski -- and that

8  Mr. Berger was able to evaluate and prepare for his

9  testimony, we'd like to get a copy of that.

10          Just let me know if you have an objection

11  to that.

12      MS. ELIZABETH:  Not at this time.

13      MR. OVERHOLTZ:  Okay.

14  BY MR. OVERHOLTZ:

15      Q.    All right.  Okay.  So we went through

16  Myers, Madison, Kladden, Santoro, Hamer, Knauer,

17  Zielinski.

18          Anyone else?

19      A.    No.

20      Q.    Okay.  And did you make notes of your

21  conversations with those people in preparation for

22  your testimony on behalf of the company?

23      A.    Yes.

24      Q.    Okay.  And do you have those notes there
```

Confidential - Pursuant to Protective Order

1    with you?

2         A.    Yes.

3         Q.    Okay.  And have you --

4         MR. OVERHOLTZ:  Counsel, do you guys have a copy

5    of those notes that you can also send the link for?

6         MS. ELIZABETH:  We can do that.

7         MR. OVERHOLTZ:  Okay.  You can send it to the

8    same people, Cole, if you have that.

9         MR. CARTER:  Will do.

10   BY MR. OVERHOLTZ:

11        Q.    Okay.  All right.  Well, we'll talk a

12   little bit more about the material that you reviewed

13   and your interviews once we've had a chance to take a

14   look at those materials, but why don't we get started

15   and talk a little bit about some of the topics we are

16   going to talk about today and then we can jump in.

17        MR. OVERHOLTZ:  If we can go to the next slide,

18   Chris.

19   BY MR. OVERHOLTZ:

20        Q.    So, you have been designated on several

21   topics, a lot of them were kind of legal, I tried to

22   break them down here, but essentially one of the

23   topics that you've been designated to talk about is

24   the determination of language or other information

Confidential - Pursuant to Protective Order

1   contained within the published labels and packaging

2   for earplugs.

3          Do you understand that's one of the

4   topics?

5      MS. ELIZABETH:  Objection; form.

6   BY THE WITNESS:

7      A.   My understanding is that it's related to

8   that topic, but there were limitations placed on that

9   discussion.

10  BY MR. OVERHOLTZ:

11     Q.   Okay.  Tell me what your understanding of

12  the limitation is, just so I can understand where --

13  what your level of preparation is?

14     MS. ELIZABETH:  I can just make a --

15  BY THE WITNESS:

16     A.   I don't have the -- go ahead.

17     MS. ELIZABETH:  One second.

18          I can just make a note for the record that

19  my -- my notes reflect that both Topics 2, 5 and 10,

20  which Mr. Berger has been designated for, are limited

21  to specifically pertaining to changes to the labeling,

22  reasons for the change, when the changes were made,

23  and who made them.

24  BY MR. OVERHOLTZ:

Confidential - Pursuant to Protective Order

1      Q.    Was that the basis of your understanding

2   in preparation, Mr. Berger?

3      A.    Yes.

4      Q.    I don't know that we are going to have too

5   much to fuss about on that.  I think that's probably

6   going to be the focus of any questions that we talk

7   about that topic.  If we get to a point where we have

8   some disagreements on the scope, we can talk about it

9   then, but there is no reason to fuss about that now.

10          Certainly we understand the topic is about

11   information contained in the labels and when and how

12   changes were made to the labels.  That's certainly

13   within the scope of what we are talking about, is that

14   right?

15      A.    Yes.

16      Q.    Okay.  There was also some questions that

17   you were designated to testify about that I believe

18   that Mr. Myers was unable to provide answers during

19   his 30(b)(6).

20          Did you have a chance to review those as

21   well?

22      A.    Yes.

23      Q.    Okay.  And then there was the -- and a lot

24   of those issues did have to do with labeling as well.

Confidential - Pursuant to Protective Order

1              The other topics we are going to talk

2     about, the potential for safer alternative designs,

3     including potential safety effects of different

4     aspects of the plugs, including the length and

5     thickness, flanges and the materials used.

6              Do you understand that's one of the

7     topics?

8        MS. ELIZABETH:  Objection; form.

9     BY THE WITNESS:

10       A.    That is not exactly the wording that I

11    read in the subpoena, but it covers those issues.

12    BY MR. OVERHOLTZ:

13       Q.    It covers those issues.

14             And then the -- and then the final topic

15    is the discussion and consideration of competing

16    products or alternative designs that provide nonlinear

17    protection, including the company's evaluation of

18    intellectual property; drafts, designs, plans,

19    drawings and testing; the dimensions, specification

20    and materials used; and whether flanges were a

21    component of those alternative designs.

22             Is that generally your understanding of

23    the topic?

24       A.    Again, not having the subpoena in front of

Confidential - Pursuant to Protective Order

1  me, I don't have the exact words.  That's generally

2  the idea.  I don't think that's exactly what I read.

3      Q.   Okay.  I tried to break it down to get rid

4  of the legalese out of it and just have the -- the

5  subject matter, okay.

6           I don't think we'll have much to fuss

7  about.  It sounds like you are prepared to talk about

8  the company's evaluation of alternative designs and

9  competing products as part of your testimony today.

10          Is that fair?

11     A.   Yes.

12     Q.   Okay.

13     A.   Yes.

14     Q.   All right.  Just -- we don't know when we

15  are going to -- you and I have been through this

16  before, so we'll do it quickly, but we don't know when

17  these videos may get played and to who they will get

18  played.  So just for orientation, let's just talk

19  about the Combat Arms Version 2 for a second, if

20  that's okay.

21     A.   Okay.

22     Q.   All right.

23     MR. OVERHOLTZ:  Chris, if we can pull up the

24  next slide.

Confidential - Pursuant to Protective Order

1    BY MR. OVERHOLTZ:

2        Q.    All right.  So we see here a picture on

3    the screen of a Combat Arms Version 2 plug there in

4    the middle.

5             Do you see that?

6        A.    Yes.

7        Q.    Okay.  And you and I have talked about

8    this before, but we know that the Combat Arms plug is

9    dual-ended, it has a yellow end and a green end.  The

10   yellow end is the end that has the nonlinear filter

11   that allows the plug to provide passthrough hearing,

12   situational awareness as sometimes we use the term, it

13   has lower attenuation, a lower NRR, and but it also

14   can provide level-dependent protection in the case of

15   impulse noise.

16            Is that fair?

17       MS. ELIZABETH:  Objection; form.

18   BY THE WITNESS:

19       A.    Yes.

20   BY MR. OVERHOLTZ:

21       Q.    That's the concept of the yellow end of

22   the plug, is that right?

23       MS. ELIZABETH:  Objection; form.

24   BY THE WITNESS:

Confidential - Pursuant to Protective Order

```
 1        A.    Yes.

 2   BY MR. OVERHOLTZ:

 3        Q.    And then the green end, that's the solid

 4   or closed end of the plug that's meant to provide

 5   higher level protection, higher NRR for steady state

 6   noise, is that fair?

 7        MS. ELIZABETH:  Objection; form.

 8   BY THE WITNESS:

 9        A.    Let me read your box there.

10   BY MR. OVERHOLTZ:

11        Q.    Yep, sure thing.

12        A.    Yes.

13        Q.    Okay.  And so you agree that that's

14   generally the concept of the green end of the plug?

15        A.    Yes.

16        Q.    And then we see on the right a cutaway

17   drawing of the plug that cuts away halfway through so

18   that we can see that connecting the two plugs, and we

19   see the hole in the -- in the photograph, but in the

20   cutaway we can see that there is a white plastic

21   adapter in the middle that holds the two plugs, holds

22   both ends of the plugs together, is that right?

23        A.    Yes.

24        Q.    And throughout the day I think we might
```

Confidential - Pursuant to Protective Order

```
 1        Q.    Yes, sir.

 2        A.    Okay.  Your question?

 3        Q.    Yep.  So, you're familiar with this

 4   document, this is Georges Garinther's trip visits when

 5   he went over to visit with ISL in France in late '97,

 6   early '98 that we are seeing on Exhibit 8?

 7        A.    Yes.

 8        Q.    Okay.  I want to direct your attention to

 9   Page 10.

10        A.    Okay.

11        Q.    Okay.

12              (Background noise.)

13        MR. OVERHOLTZ:  Someone may want to go on mute,

14   Tom.

15   BY MR. OVERHOLTZ:

16        Q.    If we can look on this page, if we look at

17   the bottom of the page, there is an "As a result"

18   section.

19              Do you see that?

20        A.    Yes.

21        Q.    Okay.

22              It says:  "As a result of this experiment,

23   the French Army is presently issuing a 'request for

24   proposal' for 300,000 earplugs.  It is probable that
```

Confidential - Pursuant to Protective Order

1    the earplug would be manufactured by the same company

2    that manufactures the EAR earplug.  The earplugs would

3    be received by the French Army in late 1998.  The main

4    question being" -- "presently being discussed is the

5    configuration of the non-linear earplug."

6          Do you see that?

7       A.    Yes.

8       Q.    Now, the -- the French Army that was at

9    this time, they ended up, as we discussed before,

10   they -- they chose the single-ended UltraFit Plug with

11   the filter inside and not the comp -- the dual-ended

12   Combat Arms Version 2 plug, right?

13      A.    Yes.

14      Q.    And you don't quibble with the decision of

15   the French Army to make that choice to go with the

16   single-ended version of the plug, is that right?

17      MS. ELIZABETH:  Objection; form.

18   BY THE WITNESS:

19      A.    We did not argue with them about that.

20   That's what they chose to do.

21   BY MR. OVERHOLTZ:

22      Q.    It says:  "Since the non-linear earplug

23   provides essentially no attenuation against high level

24   steady state noise, such as that produced by armored

Confidential - Pursuant to Protective Order

```
 1    vehicles, it would still be necessary to provide the

 2    soldiers with normal earplugs."

 3            Do you see that?

 4    A.    Yes.

 5    Q.    Okay.  And -- and so that was the decision

 6    the French Army made as well, right, to provide

 7    normal -- normal earplug protection for steady state

 8    noise in addition to the nonlinear protection they

 9    were going to get from the EAR UltraFit with the

10    filter inside?

11    A.    Is there a question?

12    Q.    Was that your understanding of the

13    decision the French Army made?

14    A.    Yes.

15    Q.    The -- and just so we're clear when we

16    talk about that plug, sometimes you guys referred to

17    that as the European plug, is that right?

18    A.    Yes.

19    Q.    Is it also sometimes referred to as the

20    Version 1 of the Combat Arms?

21    A.    Yes.

22    Q.    Okay.

23            "The configuration issue centers about

24    providing soldier" -- "soldiers with," and there were
```

Confidential - Pursuant to Protective Order

1    three options in this report.

2               Do you see that?

3        A.    Yes.

4        Q.    "A non-linear earplug, and a separate

5    normal earplug," which we just talked about that

6    option, right?

7        A.    Yes.

8        Q.    That's the option the French Army chose?

9    Right?

10       A.    Yes.

11       Q.    Okay.  And then the second option:  "A

12   non-linear earplug in which the 2 tiny holes can be

13   closed," right?

14       A.    Yes.

15       Q.    And that's the option, if we go back a

16   slide, that we looked at in the other -- the French

17   report from Dancer and Hamery from ISL, that's this

18   option, right?

19       MS. ELIZABETH:  Objection; form.

20   BY THE WITNESS:

21       A.    I'm not certain if it's that option in

22   particular.

23   BY MR. OVERHOLTZ:

24       Q.    But what it's contemplating by that is

Confidential - Pursuant to Protective Order

1    a -- a plug that can be opened and closed, right, with

2    some type of mechanism?

3        A.    Yes.

4        Q.    Okay.  A plug that you don't have to take

5    out and switch sides with but -- or take out and put a

6    different plug in?

7             Is that right?

8        A.    Yes.

9        Q.    Okay.  And so -- and so be -- and this --

10   and this option as shown on the screen, I mean, that

11   was available by the time the French issued this

12   report as a potential design for the plugs in late

13   1997, right?

14       MS. ELIZABETH:  Objection; form.

15   BY THE WITNESS:

16       A.    That option had been discussed, as

17   indicated in this article, in this memorandum.

18   BY MR. OVERHOLTZ:

19       Q.    Okay.  And in fact -- and in fact, we know

20   that there were drawings made at Aearo's facilities by

21   Falco and Doty, right?

22       A.    I believe they are made by Doty.

23       Q.    Okay.  Falco applied for a patent by April

24   of 1998, a month after this report by Georges

Confidential - Pursuant to Protective Order

```
1    Garinther from March of '98, right?

2        A.    Yes.

3        Q.    And, in fact, prototypes were made by

4    Aearo and sent over to Dancer and Hamery to test,

5    right?

6        A.    Again, not necessarily this drawing, but

7    single-ended prototypes that could be opened and

8    closed.

9    BY MR. OVERHOLTZ:

10       Q.    Okay.  And it was that Falco patent that

11   was applied for in 1998 that became the supporting

12   patent for the Combat Arms Version 4, correct?

13       A.    I'm not certain of that.

14       Q.    Okay.  Well, we'll look at some documents

15   that may elucidate that a little bit more, but

16   certainly the Combat Arms Version 4 was based around

17   the design of a single-ended design involving a filter

18   that could be opened and closed, correct?

19       A.    Involving a plug whose channel or orifice

20   could be opened and closed leading to the filter.

21       Q.    Okay.  And that -- the Version 4 was

22   produced by Aearo in -- it was around 2008, is that

23   right?

24       A.    I was going to say 2009, but that's around
```

Confidential - Pursuant to Protective Order

 1   process to contemplate.

 2        Q.    Okay.  One thing it would do is allow for

 3   that adapter piece to be thinner because it wouldn't

 4   have to house the filter, right?

 5        MS. ELIZABETH:  Objection; form.

 6   BY THE WITNESS:

 7        A.    Yes.

 8   BY MR. OVERHOLTZ:

 9        Q.    Is that yes?

10        A.    That was a yes.

11        Q.    Okay.  And the other thing it would do was

12   allow that the -- the walls of the adapter would not

13   have to be as thin because, again, it wouldn't have to

14   house the filter, right?

15        MS. ELIZABETH:  Objection; form.

16   BY THE WITNESS:

17        A.    You are confusing two different parts in

18   which we are worried about thin walls.

19   BY MR. OVERHOLTZ:

20        Q.    And I should have been more specific.

21        A.    In this --

22        Q.    I'm sorry.  I should have been more

23   specific.  I can ask a more specific question if you'd

24   like me to.

Confidential - Pursuant to Protective Order

```
 1      A.    Go ahead.

 2      Q.    Okay.

 3            Having the filter abut to the end of the

 4  adapter would allow the walls of the adapter to not be

 5  as thin because it doesn't have to house the filter,

 6  is that right?

 7      MS. ELIZABETH:  Objection; form.

 8  BY THE WITNESS:

 9      A.    Say that once more.

10  BY MR. OVERHOLTZ:

11      Q.    Sure.

12            If the filter abuts to the end of the

13  adapter as opposed to being housed inside it, that

14  would mean that the walls of the adapter itself could

15  be thicker in that part of the adapter and not as

16  thin, is that right?

17      MS. ELIZABETH:  Objection; form.

18  BY THE WITNESS:

19      A.    That could -- any of those changes that

20  you are contemplating, and over the years we looked at

21  many for all versions of the plug, all have acoustical

22  consequences.  So I -- I can't answer that question

23  without having designed or tested or thought more

24  thoroughly about those parts.
```

Confidential - Pursuant to Protective Order

```
 1              I can tell you that we designed a thinner

 2     filter for Version 3 and a thinner housing.  We had no

 3     data that it improved the comfort of the plug.  And,

 4     in fact, when we went to Version 4, because of

 5     problems with the thinner filter, we went back to a

 6     thicker filter.

 7              So all of these issues are complex and

 8     interrelated.  It is not simply let's do this and run

 9     with it.

10         MR. OVERHOLTZ:  I'm going to object to your last

11     part of your answer about the 3 and 4 as non --

12         MS. ELIZABETH:  Neil, I am no longer getting

13     sound.

14         MR. OVERHOLTZ:  Oh, sorry.

15         MS. ELIZABETH:  No, I'm just no longer hearing

16     you.  I know you are not on mute.  I just can't hear

17     you anymore.

18         MR. OVERHOLTZ:  How about now?

19              (Simultaneous talking.)

20         MS. ELIZABETH:  Can anyone else hear him?

21         THE VIDEOGRAPHER:  Yes.

22         THE WITNESS:  Can you hear me?

23         MS. ELIZABETH:  Okay.  I know it's strange.

24         THE WITNESS:  Can you hear me, Sierra?
```

Confidential - Pursuant to Protective Order

1       MS. ELIZABETH:  I can, but my sound all of a

2   sudden went really low, so.

3       THE WITNESS:  I think it's at your end.  Neil

4   still sounds like Neil.

5       MS. ELIZABETH:  Okay.  I will get closer.

6       THE WITNESS:  Can you hear me now?

7       MS. ELIZABETH:  I can.

8           Why don't we -- I didn't hear what you

9   said prior to my comment, Neil.  If you could just

10  repeat what you said?

11      MR. OVERHOLTZ:  Yeah.  I objected to the last

12  part of Mr. Berger's answer regarding the be -- 3 and

13  4 as being nonresponsive to my question.  And then I

14  was going to suggest that we take our lunch break.

15      MS. ELIZABETH:  Great.

16      THE VIDEOGRAPHER:  Going off the record at

17  1:02 p.m.

18              (WHEREUPON, a recess was had

19               from 1:02 to 1:54 p.m.)

20      THE VIDEOGRAPHER:  Back on record at 1:54 p.m.

21  BY MR. OVERHOLTZ:

22      Q.   Okay.  Mr. Berger, we were looking at

23  Exhibit 13 before we took our break, which was the

24  e-mail of the communications between you and the folks

Confidential - Pursuant to Protective Order

1   at ISL, Dancer and Hamer.

2          Do you recall that?

3      A.   Yes.

4      Q.   Okay.  And if we can take a look -- well,

5   one of the things that we've been talking about --

6      MR. OVERHOLTZ:  Chris, if we can go to Slide 49

7   again.

8   BY MR. OVERHOLTZ:

9      Q.   We've been talking a little bit about the

10  adapter stem piece of the plug, of the Combat Arms

11  Version 2, that -- that both the green and the yellow

12  end fit onto.

13         Do you recall that?

14     A.   Yes.

15     Q.   Okay.  So if we could go to Slide 55, and

16  this is on Page 2 of Exhibit 13, the section that

17  starts with:  "Another problem which concerns," that

18  the French guys are writing to you.

19         Do you see that?

20     A.   Yes.

21     Q.   So the Hamery and Dancer at ISL write:

22         "Another problem which concerns the

23  compulsory unisize requirement of the future plugs is

24  the increase in diameter of the prototype plug because

Confidential - Pursuant to Protective Order

```
1       Q.    Well, did the company consider, maybe we

2   should use the adapter stem that's used in the

3   semi-aural band for the Combat Arms Version 2, use a

4   similar design to that and we might get better

5   results?

6             Was that a consideration that was made?

7       A.    You have shown the two of them on screen

8   and they have demonstrably different shapes.  The

9   adapter part for the UltraFlex band could not be

10  adapted to holding the nonlinear filter.  It also --

11  we don't want the part to be as long, it needs to be

12  symmetric, dual-ended, and also there are issues when

13  you are putting plastic materials together from --

14  plastic parts together from dissimilar materials, how

15  they go together in production, whether they stay

16  together.  The materials selected for the UltraFlex

17  were for that particular application.  So you are

18  trying to completely reengineer the product at this

19  point.

20      MR. OVERHOLTZ:  Okay.  I'm going to --

21  objection, nonresponsive.

22  BY MR. OVERHOLTZ:

23      Q.    So the answer is, no, the company didn't

24  consider using a design that had provided very good
```

Confidential - Pursuant to Protective Order

1    attenuation results using an UltraFlex tip and they

2    didn't do any testing using an alternative design

3    using a different adapter design with a different

4    material at that time for the Combat Arms, correct?

5         MS. ELIZABETH:  Objection; form.

6    BY THE WITNESS:

7         A.    You have asked multiple questions there.

8    If you want to ask me a question, I can answer that

9    question.

10   BY MR. OVERHOLTZ:

11        Q.    Did you have a hard time understanding it?

12        A.    I understand that there were multiple

13   questions there.  So ask me one at a time.

14        Q.    The company didn't -- your -- so your

15   answer to my question was the company didn't consider

16   using a design of the adapter stem for the green end

17   of the plug more similar to the adapter stem design

18   and material that had been used for the UltraFlex

19   semi-aural band device?

20        MS. ELIZABETH:  Objection; form.

21   BY MR. OVERHOLTZ:

22        Q.    This device.

23        A.    I don't know if we explicitly didn't

24   consider that, but that particular design, material

Confidential - Pursuant to Protective Order

1   and shape would not be adaptive to the Combat Arms 2

2   earplug.

3        Q.    Okay.  Now, after --

4        A.    So that particular part was not suitable.

5   I do not know when the materials were selected for the

6   stem adapter, what was the thinking that went into

7   that.  There are multiple reasons why you pick

8   materials.  One of them is can you mold the part to

9   the tolerances that it needs to be molded to.  There

10  is more rigid tolerances needed for this part because

11  it's holding the nonlinear filter because of the

12  orifice is through it than are the tolerances required

13  for that stem in the UltraFlex part.

14            I don't know what went into the

15  discussions, but it is -- in all likelihood that

16  material would not be adapted to molding this part.

17  You can't just say, Oh, I want this part, I'll make it

18  out of that material, it is the cheapest to produce,

19  the most flexible.  You need to select the material

20  that can be molded and that will give you the feature

21  that you need.  So there is a number of considerations

22  that need to be accounted for.

23       MR. OVERHOLTZ:  Okay.  I'm going to object as

24  nonresponsive.

Confidential - Pursuant to Protective Order

1   BY MR. OVERHOLTZ:

2       Q.    The answer is -- do you -- there -- the

3   truth is, there is no evidence of any consideration of

4   any of the issues that you just brought up regarding

5   whether or not the design of the adapter stem used in

6   the semi-aural UltraFlex band device could have been

7   used for the green end of the Combat Arms Version 2,

8   there is no evidence that Aearo made any of those

9   determinations that that material or that design or a

10  more similar design could not have been used for the

11  Combat Arms Version 2, correct?

12      MS. ELIZABETH:  One second, please.  That was a

13  long question.

14          Objection; form.

15  BY THE WITNESS:

16      A.    You said there is no evidence.  There is

17  no written documentation.  I do not know that there

18  weren't multiple conversations between Dick Knauer,

19  Bob Falco, Marc Doty or others in the technical

20  department or materials people about the selection of

21  that material and the other aspects that went into

22  creating that particular stem adapter.

23  BY MR. OVERHOLTZ:

24      Q.    Now, after you guys got the 213015 test

Confidential - Pursuant to Protective Order

1   results, Mr. Kieper at least wrote a memo to you

2   telling you that he had had difficulty inserting this

3   plug into people with medium and larger ear canals,

4   especially difficult to fit the plug deeply into those

5   canals.

6           When he wrote that memo, did that raise

7   considerations that maybe the complaint that Berger

8   (sic) and Dancer had raised from France in '97 about

9   that adapter being too thick was causing a problem

10  with the plug?

11      MS. ELIZABETH:  Objection; form.  With respect

12  to your statements about the flange memo that have

13  been the subject of multiple depositions, that's

14  outside the scope of this deposition.

15          Would you like to rephrase your question?

16      MR. OVERHOLTZ:  That was not outside the scope.

17  I specifically asked him about the design decision

18  when he received that memo regarding the adapter stem.

19  You might want to read the question again.

20      MS. ELIZABETH:  Why don't you repeat the

21  question?

22      MR. OVERHOLTZ:  We don't have all day.

23      MR. AYLSTOCK:  Ms. Elizabeth, just keep your

24  objections to what's required under the rules and the

Confidential - Pursuant to Protective Order

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, JULIANA F. ZAJICEK, a Registered

 4    Professional Reporter and Certified Shorthand

 5    Reporter, do hereby certify that prior to the

 6    commencement of the examination of the witness herein,

 7    the witness was duly remotely sworn by me to testify

 8    to the truth, the whole truth and nothing but the

 9    truth.

10            I DO FURTHER CERTIFY that the foregoing is

11    a verbatim transcript of the testimony as taken

12    stenographically by me at the time, place and on the

13    date hereinbefore set forth, to the best of my

14    availability.

15            I DO FURTHER CERTIFY that I am neither a

16    relative nor employee nor attorney nor counsel of any

17    of the parties to this action, and that I am neither a

18    relative nor employee of such attorney or counsel, and

19    that I am not interested directly or indirectly in the

20    outcome of this action.

21            IN WITNESS WHEREOF, I do hereunto set my

22    hand on this 30th day of September, 2020.

23

24            JULIANA F. ZAJICEK, Certified Reporter
```