# EXHIBIT 6

Confidential - Pursuant to Protective Order

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


IN RE: 3M COMBAT ARMS    )   Case No.
EARPLUG PRODUCTS         )   3:19md2885
LIABILITY LITIGATION     )
_____ )   Judge M. Casey
                         )   Rodgers
THIS DOCUMENT RELATES    )   Magistrate Judge
TO ALL CASES             )   Gary R. Jones


THURSDAY, DECEMBER 12, 2019

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - -

          Videotaped deposition of Elliott H.

Berger, M.S., held at the offices of KIRKLAND

& ELLIS LLP, 300 North LaSalle, Chicago,

Illinois, commencing at 2:01 p.m., on the

above date, before Carrie A. Campbell,

Registered Diplomate Reporter, Certified

Realtime Reporter, Illinois, California &

Texas Certified Shorthand Reporter, Missouri

& Kansas Certified Court Reporter.

          - - -


GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Confidential - Pursuant to Protective Order

```
 1          A P P E A R A N C E S :

 2

 3    AYLSTOCK, WITKIN, KREIS & OVERHOLTZ,
      PLLC
 4    BY:  NEIL OVERHOLTZ
           noverholtz@awkolaw.com
 5         JENNIFER HOEKSTRA
           jhoekstra@awkolaw.com
 6    17 East Main Street
      Pensacola, Florida  32502
 7    (850) 202-1010

 8    and

 9    MONSOUR LAW FIRM
      BY:  DOUGLAS C. MONSOUR
10         doug@monsourlawfirm.com
           KATY KROTTINGER
11         katy@monsourlawfirm.com
      404 North Green Street
12    Longview, Texas  75601
      (903) 999-9999
13
      and
14
      QUINN EMANUEL URQUHART, LLP
15    BY:  MATTHEW HOSEN
           matthosen@quinnemanuel.com
16    865 South Figueroa Street, 10th Floor
      Los Angeles, California  90017
17    (213) 443-3000
      Counsel for Plaintiffs
18

19
      KIRKLAND & ELLIS LLP
20    BY:  NICHOLAS WASDIN
           nick.wasdin@kirkland.com
21         THOMAS A. WILSON
           taxi.wilson@kirkland.com
22    300 North LaSalle
      Chicago, Illinois  60654
23    (312) 862-2000

24    and

25
```

Confidential - Pursuant to Protective Order

```
 1        KIRKLAND & ELLIS LLP
          BY:  MIKE BROCK, P.C.
 2            mike.brock@kirkland.com
          1301 Pennsylvania Avenue, NW
 3        Washington, DC  20004
          (202) 389-5996
 4        Counsel for Defendants


 5

 6   ALSO PRESENT:

 7        ERIC RUCKER, in-house counsel, 3M

 8        JAMES BATTLE, Aylstock, Witkin,
          Kreis & Overholtz
 9
          JOSHUA URBAN, trial tech, Kirkland &
10        Ellis

11        EVAN WOLFE, trial tech, Golkow
          Litigation Services
12


13
     V I D E O G R A P H E R :
14        DAN LAWLOR,
          Golkow Litigation Services
15
                         - - -
16

17

18

19

20

21

22

23

24

25
```

Confidential - Pursuant to Protective Order

```
 1                      INDEX

 2                                        PAGE

 3   APPEARANCES.................................   2

 4   EXAMINATIONS

 5     BY MR. BROCK..............................   7

 6     BY MR. MONSOUR........................... 128

 7

 8                    EXHIBITS

 9   No.   Description                        Page

10   D1    Elliott H. Berger résumé             8

11   D2    Blast Overpressure Studies, Daniel  38
           L. Johnson,
12         3M_MDL000014015 - 3M_MDL000014292

13   D3    Agenda DOD Hearing Conservation     42
           Working Group Meeting 9 April 1998,
14         DOD00000059 - DOD00000074

15   D4    Meeting at Aberdeen Proving Ground, 56
           12/16/97,
16         3M_MDL000425673

17   D5    Drawing,                            62
           3M_MDL000571966
18
     D7    Aearo March 24, 1998 letter from    64
19         Knauer to Ohlin,
           DOD00000257
20
     D8    E-mail(s),                          66
21         3M_MDL000569995 - 3M_MDL000569996

22   D9    Aearo Company Memorandum, April 9,  70
           1999,
23         3M_MDL000570345

24   D10   E-mail(s),                          74
           3M_MDL000569956 - 3M_MDL000569957
25
```

Confidential - Pursuant to Protective Order

Page 5

| 1 | D11 | E-mail(s), | 75 |
| | | DOD00000135 - DOD00000141 | |
| 2 | | | |
| | D12 | E-mail(s), | 79 |
| 3 | | 3M_MDL000016913 | |
| | | | |
| 4 | D13 | Berger Contact Log file, | 84 |
| | | 3M_MDL000018428 | |
| 5 | | | |
| | D14 | September 18, 2001 letter from | 88 |
| 6 | | Elliott Berger to Major Mark | |
| | | Little, | |
| 7 | | 3M_MDL000008624 | |
| | | | |
| 8 | D15 | Berger Contact Log file, | 89 |
| | | 3M_MDL000018429 - 3M_MDL000018430 | |
| 9 | | | |
| | D16 | AO Safety Indoor/Outdoor Range | 92 |
| 10 | | E-A-R Plugs, | |
| | | 3M_MDL000425526 - 3M_MDL000425527 | |
| 11 | | | |
| | D17 | ISL 1/5/2000 document to Elliott | 96 |
| 12 | | Berger, | |
| | | 3M_MDL000476760 - 3M_MDL000476762 | |
| 13 | | | |
| | D18 | E-A-RCal Attentuations Test Report | 98 |
| 14 | | Per ANSI S3.19-1974, | |
| | | 3M_MDL0001995517 - 3M_MDL0001995524 | |
| 15 | | | |
| | D19 | E-A-RCal Attention Test Report Per | 102 |
| 16 | | ANSI S3.19-1974, | |
| | | 3M_MDL000019339 - 3M_MDL000019373 | |
| 17 | | | |
| | D20 | Berger Contact Log file, | 103 |
| 18 | | 3M_MDL000018429 - 3M_MDL000018430 | |
| | | | |
| 19 | D21 | USACHPPM "Just the Facts...", | 104 |
| | | 3M00155103 - 3M00115104 | |
| 20 | | | |
| | D22 | "Combat Arms Earplugs" PowerPoint, | 110 |
| 21 | | 3M_MDL000229331 -3M_MDL000229332 | |
| | | | |
| 22 | D23 | E-mail(s), | 112 |
| | | 3M_MDL000017331 - 3M_MDL000017332 | |
| 23 | | | |
| | 47 | Doug Monsour handwritten | 145 |
| 24 | | demonstrative | |
| | | | |
| 25 | | (Exhibits attached to the deposition.) | |

Confidential - Pursuant to Protective Order

1    CERTIFICATE..................................162

2    ACKNOWLEDGMENT OF DEPONENT...................164

3    ERRATA.......................................165

4    LAWYER'S NOTES...............................166

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Pursuant to Protective Order

Page 7

```
 1                VIDEOGRAPHER:  We are now on
 2         the record.
 3                My name is Dan Lawlor.  I'm a
 4         videographer with Golkow Litigation
 5         Services.
 6                Today's date is December 12,
 7         2019.  The time on the record is
 8         2:01 p.m.
 9                This video deposition is being
10         held in Chicago, Illinois, in the
11         matter of 3M Combat Arms Earplug
12         Products Litigation.
13                The deponent is Elliott Berger.
14                The court reporter is Carrie
15         Campbell.
16                Mr. Berger, I remind you you're
17         under oath from a previous deposition.
18                Counsel, please proceed.
19                MR. BROCK:  Thank you.
20                     EXAMINATION
21    QUESTIONS BY MR. BROCK:
22         Q.    Will you please introduce
23    yourself to the jury, tell them where you
24    live and what you do.
25         A.    My name is Elliott Berger.  I
```

Confidential - Pursuant to Protective Order

1    live in Indianapolis, Indiana.

2              In the middle of 2018, I

3    retired from 3M Corporation after about 41

4    and a half years of service.

5              Since that point in time I'm a

6    general consultant in acoustics, and I do

7    provide some part-time consulting services

8    under contract to 3M.

9        Q.      **Thank you.**

10               **What was your personal**

11   **involvement in the development of the Combat**

12   **Arms version 2 hearing protector device?**

13       A.      I was involved in the

14   development of that product from its

15   inception at, at the time, Aearo Company.  I

16   was a participant at a meeting in 1997 at

17   Aberdeen Proving Ground where the military

18   was discussing research that they had

19   conducted over the past five to seven years

20   and had come to conclusions about the sort of

21   earplug that the US military would like to

22   have to field to their troops.

23               (Berger Exhibit D1 marked for

24          identification.)

25

Confidential - Pursuant to Protective Order

Page 9

```
 1   QUESTIONS BY MR. BROCK:
 2        Q.      Thank you for that.
 3                Could I have our Exhibit
 4   Number 1, please?  Defendant's Exhibit
 5   Number 1.
 6                I'm going to hand over to you,
 7   Dr. Berger, a copy of your résumé.  And can
 8   you confirm for the Court that that was the
 9   résumé that was in your file?
10        A.      Yes.
11        Q.      Okay.
12        A.      And I appreciate the honorary
13   Ph.D., but it's Mr. Berger.
14        Q.      Yeah.  You correct me every
15   time.  I'm sorry.  I know that's not the
16   first time I've done that.
17                So have you worked with us to
18   create a slide that will allow you to talk
19   about some of the highlights of your
20   educational background, professional awards
21   and experience, that type of thing?
22        A.      Yes.
23        Q.      Okay.  And do the entries that
24   we have on the slide that you helped us put
25   together, are they also items that appear in
```

Confidential - Pursuant to Protective Order

1    your résumé?

2         A.    Yes.

3               And should I be seeing that

4    slide?

5         Q.    I'm going to put it up in just

6    a second.

7               All right.  Now, if you'd put

8    up our first slide, please.

9               Okay.  Is this one of the

10   slides that we just talked about?

11        A.    Yes.

12        Q.    All right.  Now, you show here

13   for your education that you have a BS in

14   physics and an MS in acoustics from North

15   Carolina State University, and you obtained

16   your master's in acoustics in 1976, correct?

17        A.    That's correct.

18        Q.    Okay.  And shortly after that,

19   did you go to work for E-A-R, E-A-R?

20        A.    Upon graduation, I was hired by

21   E-A-R at the time in Westwood, Massachusetts.

22   I began work for them in December of 1976.

23        Q.    And we haven't talked about

24   some of the terminology with you in the time

25   that folks have been asking you questions.

Confidential - Pursuant to Protective Order

1          **Let me ask you about acoustics.**
2  **What is the study and the practice of**
3  **acoustics?**
4          A.      It's the study of the
5  generation, the propagation, the
6  transmission, the control and the reception
7  of sound.
8          **Q.      How does that relate to hearing**
9  **protection devices?**
10         A.      Hearing protection devices are
11  all about sound, either being able to prevent
12  the incidence of sound and, therefore, reduce
13  noise-induced hearing loss, or in terms of
14  electronic products to communicate sound more
15  effectively to the ear to improve
16  communications.
17                 Acoustics is exceedingly a
18  multidisciplinary field, calling on many
19  practices, and so it's been an interesting
20  career over these years.
21         **Q.      We've called out a few**
22  **professional awards and experience with**
23  **regard to your career.**
24                 **Are you prepared to talk about**
25  **a few of those?**

Confidential - Pursuant to Protective Order

1        A.      I am.

2        Q.      All right.  If I could just put

3   you on the spot, we've got one here that is

4   National Hearing Conservation Association

5   Lifetime Achievement Award.

6                Do you see that?

7        A.      I do.

8        Q.      All right.  What is that, and

9   what's its significance with regard to your

10  professional career?

11       A.      National Hearing Conservation

12  Association, or the NHCA, is the leading

13  professional organization in the US and

14  worldwide, effectively, that looks at the

15  prevention of hearing loss due to noise,

16  occupational noise and also environmental

17  factors.

18                I've been involved with NHCA

19  many years as a program chair, president,

20  historian, et cetera.  I've made many

21  presentations, and it was a great honor in

22  2013 to receive -- be only the third person

23  to receive their lifetime achievement award

24  for my developments, presentations and work

25  in hearing conservation.

Confidential - Pursuant to Protective Order

1      Q.      And then there's a second item

2    that we've identified there, Outstanding

3    Hearing Conservationist Award.

4                Can you tell us about that?

5      A.      NHCA has three principal

6    awards.  The lifetime achievement is the

7    pinnacle of those awards.  There's two

8    others:  the outstanding hearing

9    conservationist, which I received, you see,

10   20 years prior to that, and that was for --

11   specifically for my technical work, and I

12   also received their outstanding -- their

13   Michael Beall Threadgill Service Award as

14   well.

15                So I received all three of them

16   and have been a very active member in NHCA

17   since I joined in about 1989.

18     Q.      Okay.  And the third bullet

19   that we've put up for the benefit of the jury

20   in this section is a fellow of the Acoustical

21   Society of America and American Industrial

22   Hygiene Association.

23                How does one become a fellow in

24   that organization?

25     A.      Just briefly, the

1  organization --

**2        Q.        Please.**

3        A.        -- those are two separate

4  organizations.  The Acoustical Society of

5  America is the leading scientific

6  organization worldwide that brings together

7  roughly 12 to 13 different branches of

8  acoustics, from musical acoustics, underwater

9  acoustics, physical acoustics, psychological

10  acoustics, et cetera, and they have a noise

11  group as well.

12            The American Industrial Hygiene

13  Association, as its name clearly implies, is

14  about professional industrial hygiene and the

15  protection of workers in occupational and

16  military environments.

17            I have been active in both of

18  those associations for many years, and they

19  designate a small proportion of their members

20  by reviewing their dossiers in their

21  membership committees and honor them by

22  elevating them to fellow status of those

23  organizations.

**24        Q.        Okay.  Then we've got a**

**25  category for service that you have provided**

Confidential - Pursuant to Protective Order

Page 15

1   as either a member or a chair of a national

2   and international standards committees.  So

3   let's just spend a few minutes on that, if we

4   can.

5              The first one we've identified

6   is the Acoustical Society of America working

7   Group 11, hearing protection, 1985 to

8   present.

9              What is the work of that group?

10       A.      The Acoustical Society of

11  America I mentioned just a moment ago, and

12  they hold the management of the consensus

13  standards groups in the US for the

14  development of acoustic standards.

15              They hold that in four

16  different major committees, and one of those

17  is the noise committee that has within it

18  about 30 different working groups on

19  different topics.  And the working Group 11

20  is the working group that's been responsible

21  for standards development on hearing

22  protection since the early 1970s.

23              So the standard that we test

24  hearing protectors to still today, ANSI

25  S3.9-1974, was written by that working group.

Page 16

```
 1                    That was written before my
 2      tenure on the working group.  It's 1974.  I
 3      joined the working group in the late '70s.
 4      And as you can see, in 1985 I was elevated to
 5      chair of that working group when the chair,
 6      who had been the director of research at
 7      Wright-Patterson Air Force base, stepped down
 8      and asked me to fill that role.  And I've
 9      been the chair of that group since that time,
10      and I still am chairing that group.
11                    And we're responsible for four
12      standards in the US that teach how to test
13      the attenuation of hearing protectors and to
14      create number ratings for hearing protectors.
15           Q.     When you say "create number
16      ratings," are you talking about the NRR that
17      we've talked about in your deposition over
18      the past few days?
19           A.     A number like that.
20           Q.     Okay.
21           A.     The ANSI standard has created a
22      different number.  It hasn't been embraced in
23      law since the EPA hasn't changed their
24      labeling regulations since 1979, but it is a
25      similar type of number that can be used.
```

Confidential - Pursuant to Protective Order

Page 17

1        Q.       The next bullet point we have

2   there is the National Academy of Science,

3   committee on noise-induced hearing loss and

4   tinnitus associated with military service

5   from World War II to the present.

6                Let me ask you first:  What is

7   the National Academy of Science?

8        A.       So the National Academies are a

9   group that is a government-related

10  organization that are tasked with answering

11  important questions in the scientific realm.

12  And this particular committee was tasked by

13  Congress to look into the problems of

14  noise-induced hearing loss and tinnitus in

15  the military.

16                It's been a substantial

17  problem.  It's a very large burden for the

18  military in terms of compensation benefits

19  for hearing loss, hearing aids, tinnitus, and

20  they want to understand more about how that

21  had developed with time, what could be done

22  to ameliorate that, the relationship between

23  noise and those effects.

24       Q.       Okay.  Is the issue of

25  addressing hearing loss with regard to

Confidential - Pursuant to Protective Order

Page 18

1    **members of our military -- military been an**

2    **area of interest for you?**

3         A.     Yes, it's one of my many areas

4    of interest.

5         **Q.     And why is that?**

6         A.     It's one of the areas in which

7    there has been the greatest amount of

8    occupational hearing loss.

9              The hearing conservation field,

10   audiology, really developed its impetus

11   during the 1940s as a result of veterans

12   returning from World War II with hearing

13   loss.  So a lot of the fundamental acoustic

14   research in our field, whether it's been

15   underwater acoustics for submarines or

16   audiological acoustics for hearing loss or

17   what are the limits of noise exposure that

18   people can tolerate, has been work that's

19   been done in the US military.

20        **Q.     And the last bullet that we**

21   **have under this category, International**

22   **Standards Organization working group on**

23   **hearing protection, 1987 to 2018.**

24             **What is that organization, and**

25   **what does it do?**

Confidential - Pursuant to Protective Order

1          A.       In the same way that in the US

2     there are groups like the Acoustical Society

3     of America or the American National Standards

4     Institute that maintain consensus documents,

5     meaning they're not regulations or laws,

6     they're agreed-upon documents on the way that

7     tests will be conducted, in the same way they

8     exist, there is what's called the ISO, or the

9     International Standards Organization.  It

10    does that at an international level for

11    countries, and they, too, have a working

12    group on hearing protection.  I've been

13    active in that since 1987.  I stepped down

14    from that in 2018 when I retired.

15               That was also an important part

16    of my work, and one of my efforts there was

17    to try and bring together the US and the ISO

18    standards in hearing protection to make them

19    more consistent.

20          Q.       All right.  Let's turn to our

21    next slide, if we could, please.  And I want

22    to run through this.  I don't want to be too

23    quick about it, but let's see if we can get

24    through this and make sure that the jury

25    understands what you've done in this area and

Confidential - Pursuant to Protective Order

1    your contributions to the field.

2              So on publications and

3    presentations, we've called out edited books,

4    book chapters, peer-reviewed articles.

5              Why don't you take a minute and

6    just describe sort of what your work has been

7    and what your commitment to writing in the

8    field has been over your career.

9         A.    So one of the highlights of my

10   career was the fellow who interviewed me and

11   hired me for my job in 1976 was a man by the

12   name of Ross Gardner, Junior, who was the

13   inventor of the yellow foam earplug, which

14   has been one of the most popular, widely

15   sold, effective earplugs in the latter part

16   of the century and still to today.

17             And when he hired me, his

18   vision was that his tiny company at that time

19   would become a leader in the industry, both

20   in terms of the products they produced as

21   well as the education and the scientific

22   excellence that they represented.

23             And so not only was my job

24   involved with working with the products, but

25   he wanted me to become a leader in the field.

Page 21

 1    And to do that, you need to conduct research.

 2    You need to disseminate that research through

 3    publications and education.

 4              So I've had the opportunity to

 5    do for many years, and as you can see in that

 6    first bullet, I -- for someone who is not at

 7    a university, I've had a fairly wide range of

 8    publications.

 9              On this slide, I'm just going

10    to call out four of the ones which I am most

11    proud.  I've been the lead editor of the

12    fourth and fifth editions of the American

13    Industrial Hygiene Noise and Hearing

14    Conservation Manual.  I not only edit it, but

15    I've written a number of chapters in it.  I'm

16    currently working together with another

17    person who is the lead editor on the new

18    edition that hopefully will appear in the

19    next year or so.  That has been one of the

20    IHA's best-selling textbooks over the years

21    for a book of that nature, print copies in

22    excess of 10,000.  So it's not a New York

23    Times Best Seller, but it's an American

24    Industrial Hygiene best seller.

**25         Q.      Understood.**

Confidential - Pursuant to Protective Order

1      A.      Earlier in my career, one of

2   the questions I had was "How do you measure

3   hearing protection attenuation correctly?"

4   There had been a lot of debate in the

5   literature about potential problems with

6   various test methods, and seemingly

7   contradictory results.

8              And I spent a couple years

9   putting together a review and tutorial.  It

10  was published in the Journal of the

11  Acoustical Society on methods of measuring

12  hearing protection attenuation devices.

13             I looked at about a dozen

14  different methods.  One of the principal

15  findings there was that the real-ear

16  attenuation at threshold method, which is the

17  way we test products today for labeling

18  purposes, was the gold standard, if you will,

19  and all the other methods needed to assess

20  their efficacy by how well they compared to

21  that.

22      Q.      Okay.

23      A.      Another important question in

24  hearing protection is, if you make the

25  perfect hearing protector, how much sound can

Page 23

```
 1    you block?  If there was no orifice in the
 2    side of your head that lets sound through to
 3    your eardrum, how well could you hear?
 4              So this has to do with what the
 5    bone conduction limits are to hearing
 6    protector attenuation.  And I have done
 7    substantial research over the years on this
 8    topic, culminating in this paper, "Surpassing
 9    the Limits of Attenuation:  Bone Conduction
10    Pathways."
11              Of great interest to the
12    military and others when you're looking at --
13    when plugging the ears with an earplug and an
14    earmuff is inadequate:  What happens if I
15    cover the head?  What happens if I put the
16    body in an entire suit of protective fabric?
17    Things like that were looked at in this
18    paper.
19              MR. MONSOUR:  Objection.
20       Responsiveness.
21              THE WITNESS:  Pardon me?
22    QUESTIONS BY MR. BROCK:
23       Q.    All right.  You can proceed.
24              What's next on your list that
25    you'd like to mention to the jury?
```

Confidential - Pursuant to Protective Order

1          A.     The last paper was an

2    initiative that I became involved in in the

3    early 2000s about field microphone and

4    real-ear approaches to measuring --

5          **Q.     Take a minute.**

6          A.     I have a problem here.

7          **Q.     No, you're okay.**

8          A.     -- hearing protector

9    attenuation.

10          **Q.     Want to take just a minute?**

11          A.     (Witness nods head.)

12                 MR. BROCK:  Okay.  Just go off

13          the record.

14                 VIDEOGRAPHER:  We're going off

15          record.  Time 2:19.

16           (Off the record at 2:19 p.m.)

17                 VIDEOGRAPHER:  We're going back

18          on record.  Time 2:20.

19    QUESTIONS BY MR. BROCK:

20          **Q.     So there was one other**

21    **publication or presentation that you wanted**

22    **to mention, I believe.**

23                 **Is this the development and**

24    **validation of the field microphone?**

25          A.     I think I'm going to need to

Confidential - Pursuant to Protective Order

1    take a break for a moment.

2                    MR. BROCK:  Okay.  That's fine.

3                    VIDEOGRAPHER:  Going off

4           record.  The time is 2:20.

5             (Off the record at 2:20 p.m.)

6                    VIDEOGRAPHER:  We're going back

7           on record.  The time is 2:29.

8    QUESTIONS BY MR. BROCK:

9           **Q.      Thank you, Mr. Berger.**

10                   **Are you good to get going**

11   **again?**

12          A.      Let's give it a try.

13          **Q.      Thank you.**

14                   **We had come to the last bullet**

15   **point on this page in reference to the**

16   **development and validation of the field**

17   **microphone and real-ear approach for**

18   **measuring hearing attenuation.**

19                   **Could you just give us a short**

20   **description of that work and the way in which**

21   **that contributed to the field?**

22          A.      One of the leading practices in

23   the last decade that's being raised by

24   hearing conservationists to improve the use

25   of hearing protection and practice is what's

Page 26

 1   called fit testing.  So you have a method of

 2   actually measuring the quality of the fit and

 3   the noise attenuation that a worker is

 4   obtaining with a device before they go out in

 5   the workplace.

 6                  And we were one of the leading

 7   companies developing this field fit testing

 8   approach with an ear fit system that we

 9   fielded in 2007, and this publication in

10   2011.

11                  And in fact, one of the other

12   activities of my working group has been to

13   promulgate a standard on fit-testing devices,

14   and we successfully did that in 2018.  So

15   this is an important new initiative in the

16   hearing conservation arena.

17         **Q.      Thank you.**

18                  **One of the things that you**

19   **reference in your CV is that you developed**

20   **and managed the internationally recognized 3M**

21   **hearing protector research facility and its**

22   **associated reverberation room.**

23                  **Can you tell us about the 3M**

24   **research facility and your work in developing**

25   **that?**

Confidential - Pursuant to Protective Order

1          A.          I joined the company in '76.

2     We moved to Indianapolis in 1977, and that

3     year was asked to -- we planned on building

4     an acoustical laboratory, a large

5     reverberation chamber, 113 cubic meters, in

6     which we could do a variety of tests.

7                    Over the years it has focused

8     on measuring hearing protector attenuation.

9     So I began doing that in the late 1970s.

10                    In or around the late '80s, the

11    government developed a laboratory

12    accreditation program called NVLAP, National

13    Voluntary Laboratory Accreditation Program,

14    that's within the Department of Commerce.

15    And we decided that we wanted to become

16    accredited.

17                    We were the first lab to become

18    accredited for hearing protector attenuation

19    testing, and have been the only lab to be

20    continuously accredited during that entire

21    period.

22                    We have undergone 14 separate,

23    independent audits from the NVLAP assessors,

24    approximately every other year, and have done

25    exceedingly well on those audits.  Have

1  received comments from five different

2  auditors to the effect that our laboratory is

3  considered a world class laboratory,

4  foundational laboratory for the measurement

5  of hearing protector attenuation.  In fact,

6  one of the glowing comments we received was

7  during an audit when the auditor was being

8  assessed by the manager of the NVLAP program.

9           So I think we could say that

10  NVLAP feels we do a pretty good job, and I'm

11  proud of that because our goal has been to do

12  top-notch testing and research.

13      Q.      All right.  Thank you.

14              Now, you understand that the

15  deposition you're giving today relates to the

16  Combat Arms version 2 earplug, correct?

17      A.      Yes.

18      Q.      And I believe that you

19  testified that the company began shipping

20  some product to the military in the 1999,

21  2000 time frame so that the military would

22  have access to the Combat Arms version 2 for

23  testing and that type of thing?

24      A.      Yes.

25      Q.      Okay.  I want to talk a little

Confidential - Pursuant to Protective Order

1    bit about the design and development timeline

2    for Combat Arms version 2, but before we do

3    that, I want to talk just a little bit about

4    what was the state of the art for hearing

5    protection in the period of time around 1990.

6              Were you familiar with that as

7    part of your job duties and responsibilities?

8         A.    Yes.

9         Q.    Okay.  And have you helped us

10   just to put together a slide with some

11   photographs that show the kinds of hearing

12   protection devices that would have been

13   available in and around 1990?

14        A.    Yes, a brief summary.

15        Q.    All right.  Let's see the next

16   slide, if we could, please.

17        A.    So around the 1990s, what were

18   available were what are called

19   conventional -- within the earplug realm, and

20   we're only discussing earplugs here, would

21   have been conventional linear earplugs.  So

22   that means a product that is effectively a

23   noise barrier between your ear and the sound,

24   like building an enclosure or putting a wall

25   between you and a sound source.

Confidential - Pursuant to Protective Order

1           And that can be done with a

2    foam material, as in the E-A-R Classic, which

3    was a very successful -- is a very successful

4    and effective earplug; with what's called a

5    premolded earplug, and you see two examples

6    of those.

7           The North Safety Com-Fit was a

8    three-flanged plug that was available in and

9    around the 1970s and thereon after.

10           The UltraFit earplug, which is

11    a 3M product, was introduced in around 1985.

12           There were other shapes and

13    types of these foam or premolded, elastic

14    earplugs.  All of them worked in the way that

15    regardless of the level of sound, they would

16    give you the same amount of noise

17    attenuation.

18           So if there was virtually no

19    sound in the room, if you were listening to

20    someone reading quietly next to you and the

21    attenuation of these devices was 30 dB, you

22    would block that sound by 30 decibels.

23           If it was a loud occupational

24    workplace at 100 dB, you would still get

25    30 decibels of protection.

Page 31

```
 1                    And if you were firing a weapon
 2      with impulsive noise at 160 dB, you would
 3      still get 30 dB of protection.
 4                    So the good news was you always
 5      got protection.  The bad news was that when
 6      it's quiet, you really don't want protection;
 7      you'd like to be able to hear better.
 8                    And that's where these devices
 9      would fall short, for noises -- noise
10      environments in which the loudness varied
11      dramatically moment to moment.
12           Q.      Okay.  And we have a second
13      category identified here of nonlinear
14      earplugs.  If you could take just a minute
15      maybe and describe what we're referring to
16      when we say "nonlinear," and then you've got
17      an example there of a Gunfender plug.
18                    Maybe you can describe that
19      device, please.
20           A.      There were a few nonlinear
21      earplugs available at that time.  The first
22      of them that was really popularized was the
23      Gunfender nonlinear earplug.  And you'll see
24      in the picture there that it is a soft,
25      rubbery-type material like the premolded
```

Confidential - Pursuant to Protective Order

1  plugs above.  Plus you'll notice that in its

2  nose there's what looks like a silvery plate,

3  and that's a thin, metal plate with a very

4  tiny pinhole through it, about 12,000ths in

5  diameter.

6           It was discovered that when you

7  make this type of orifice in an earplug, that

8  low sound level sound can pass easily,

9  relatively unimpeded, through that orifice.

10  But as the levels increase, the oscillatory

11  motion of the air molecules through that

12  orifice causes a turbulence that creates more

13  friction and prevents more sound from passing

14  through.

15           So at levels exceeding about

16  110 to 120 dB, the product behaves, what we

17  say is nonlinear, and it starts to provide

18  increasingly attenuation level.  It's not --

19      **Q.     I'm sorry, go ahead.**

20      A.     It's not an all or none.  It's

21  not like the valve opens and the valve

22  closes, but the attenuation starts to

23  increase as the sound level increases.

24           And so this was the product

25  that was available at that time.  It had been

Confidential - Pursuant to Protective Order

1  fielded primarily in the UK with their

2  military.  It did provide some effectiveness.

3              The US military was interested,

4  as were the French, in a device that would

5  show a more rapid increase of attenuation

6  with sound level and also a higher level of

7  sound attenuation at the very lowest sound

8  levels.

9      **Q.      To the soldier, what's the**

10 **benefit of a more rapid attenuation?**

11     A.      It means that when these

12 impulses come along, which hazardous impulses

13 are typically above 135 or 140 dB in level,

14 that the device that started out with a very

15 low level of attenuation, that -- on this

16 plug, let's say the attenuation might have

17 increased a few dB.  By the time of 120 or

18 130, they would like a device that could have

19 a greater increase in the decibels of

20 attenuation at the levels of these hazardous

21 impulse sounds.

22     **Q.      Okay.  Now, you mentioned that**

23 **the French and United States armies were**

24 **interested in improving this device.**

25             **Were there limitations to this**

Page 34

1   **device other than the slowness in which it**

2   **reacted to impulse?**

3        A.     Another one that I alluded to

4   is that at low sound levels in this

5   particular design, there's actually some

6   amplification of the sounds, a resonance

7   effect.

8               And the other feature is that

9   that type of body of earplug, similar to what

10  was called the V-51 R, which was an American

11  military earplug at the time, is somewhat

12  difficult to fit and needs to be provided in

13  five sizes, at least, in order to be able to

14  properly fit the population.

15       **Q.     Okay.  All right.  Now, have**

16  **you worked with us to put together a timeline**

17  **of some of the important facts that relate to**

18  **the design and development of the Combat Arms**

19  **version 2?**

20       A.     Yes.

21       **Q.     All right.  Let's call up our**

22  **next slide, please.**

23               **And is this the design and**

24  **development timeline that you've worked with**

25  **us to put together that identifies some of**

Confidential - Pursuant to Protective Order

1   the important milestones and facts with

2   regard to the development of the Combat Arms

3   version 2?

4        A.     Yes.

5        Q.     All right.  And I see that it's

6   divided into three sections:  military

7   researches nonlinear; military requests

8   dual-ended, single-size earplug from Aearo;

9   and the military directs Aearo to shorten the

10  length of the plug.

11              Do you see that?

12       A.     Yes.

13       Q.     All right.  Are you prepared to

14  address those issues today?

15       A.     Sure.

16       Q.     Okay.  Let me just ask you, if

17  you can, just to give the jury the benefit of

18  an overview of what is happening in the

19  mid-1990s with regard to the development of a

20  new and different device for the protection

21  of the hearing of members of our services.

22       A.     You begin to see in the early

23  '90s publications appearing primarily from

24  Armand Dancer in France, where he is

25  conducting studies with soldiers with

Confidential - Pursuant to Protective Order

1    live-fire weapons and measuring what's called

2    temporary threshold shift.  They're

3    short-term hearing losses from exposure to

4    these weapons.

5                And he's working with a number

6    of types of nonlinear earplugs, the Gunfender

7    style being one of them.  Also, various

8    designs that his laboratory, called ISL,

9    Institute of Saint-Louis, had developed that

10   are in other flanged earplugs, including

11   earplug styles made by Aearo at the time.

12               Just about the same time in the

13   early 1990s, the US military, led by work in

14   Fort Rucker, Alabama, is getting interested

15   in nonlinear earplugs.  And I neglected to

16   mention that these are what are called

17   passive, nonlinear earplugs.  Passive means

18   there's no electronics, there's no powering.

19               Today in electronic products

20   you can do this in a fairly straightforward

21   manner in a much more expensive device.  But

22   these are passive devices that don't require

23   any batteries to operate.

24               So Fort Rucker is also looking

25   at this, and in the July to November time

Confidential - Pursuant to Protective Order

1  frame in 1995 conduct a landmark study --

2  this style of study has never been replicated

3  because of the expense and the potential

4  hazards involved -- in which they exposed

5  soldiers in New Mexico at a research site to

6  explosions of plastic explosives at levels

7  simulating actual weapon systems --

8      **Q.     Okay.**

9      A.     -- both for exposure in bunkers

10  and exposure out of doors.

11         MR. MONSOUR:  Objection.

12      Responsiveness.

13  QUESTIONS BY MR. BROCK:

14      **Q.     Are you referring now to the**

15  **July to November 1995 time frame on the**

16  **design and development timeline, that first**

17  **entry there that refers to the Army nonlinear**

18  **earplug study in New Mexico?**

19      A.     Yes.

20      **Q.     All right.  And you said that**

21  **Fort Rucker was interested in developing a**

22  **nonlinear device?**

23      A.     Yes.

24      **Q.     Okay.  And you've been**

25  **questioned, answered a lot of questions about**

Page 38

1    this study that was conducted from July to

2    November of '95 over the past few days,

3    correct?

4         A.    Yes.

5         Q.    All right.  I want to call your

6    attention to just a couple of things here.

7              This exhibit -- or this

8    document is marked as Exhibit 27.

9              (Berger Exhibit D2 marked for

10        identification.)

11   QUESTIONS BY MR. BROCK:

12        Q.    All right.  Defense 2.  And

13   I'll pass this to you over, Doctor --

14   Mr. Elliott.

15             And is this the blast

16   overpressure study that you have talked about

17   in your deposition?

18        A.    Yes.

19        Q.    Okay.  And I just want to call

20   out a couple of things with regard to this

21   document.  If we could see the next slide,

22   please.

23             And if you'll turn over to --

24   at the bottom there are some numbers, two

25   sets of numbers.  The top number would be

Confidential - Pursuant to Protective Order

1    16138.  And I'm going to direct your

2    attention to the bottom of the page.

3              Do you see the paragraph at the

4    very bottom there that says, "Like the

5    perforated plug of the previous study, the

6    nonlinear plug designed at Fort Rucker was

7    inadequate.  Perhaps with additional

8    subjects," if you turn the page, "the plug

9    might be safe for shots at 175 decibels, 11

10   APA and below; however, like the perforated

11   plug, they made it difficult to understand

12   speech in windy conditions.  Thus, there is

13   no valid reason to use them."

14             Do you see that?

15   A.      Yes.  Not all that's on the

16   slide, but it's in the document.

17   Q.      That's fine.

18             And then the next paragraph

19   says, "The nonlinear plug that used a special

20   filter designed in France performed better

21   and may be a satisfactory solution.  However,

22   not enough subjects were exposed to provide a

23   definitive answer."

24             Do you see that?

25   A.      Yes.

Confidential - Pursuant to Protective Order

1      Q.      The nonlinear plug that used a

2    special filter designed in France, can you

3    describe what that is?

4      A.      You see a picture of that in

5    the lower left.  So it was an UltraFit

6    earplug that had a nonlinear filter in it,

7    and the major advance was seemingly rather

8    simple that ISL was to come up with, which is

9    that instead of using a single plate in a

10   single orifice, you needed to have two plates

11   in series, one behind the other, each of them

12   having an orifice.

13            And so a convenient way to

14   construct that is to make a little canister

15   that has simply a hole in each end.  And so

16   that French nonlinear filter was inserted

17   into a hole through the UltraFit earplug, and

18   you can see there was in the front end of

19   that plug.

20     Q.      Okay.  And then the top

21   sentence that I have there on the callout, if

22   you can turn over to page 16023, it's

23   Section 2-1.

24     A.      160 or 161?

25     Q.      16023.

Confidential - Pursuant to Protective Order

```
 1                    And I just wanted to confirm
 2     that the nonlinear plug study was conducted
 3     from July '95 through November of '95,
 4     correct?
 5          A.     Yes.
 6          Q.     Okay.  Now, was this the
 7     conclusion of the work that was done by the
 8     Army with regard to the development of a
 9     nonlinear earplug?
10          A.     I would say that in ways it was
11     the inception or a step along the way, if you
12     go back to our timeline.
13          Q.     Now, if we look at December
14     of 1996, we have a record relating to a
15     Garinther trip to ISL France to test
16     nonlinear earplug, and then there's a
17     reference to providing Ohlin with samples.
18                    Do you see that?
19          A.     Yes.
20          Q.     And the document I want to talk
21     about that includes this information has
22     already been admitted as Exhibit 14 in the
23     30(b)(6) deposition, but I'm going to mark it
24     as Defendant's Exhibit 3 for purposes of this
25     exam.
```

Confidential - Pursuant to Protective Order

 1              Okay?

 2              (Berger Exhibit D3 marked for

 3         identification.)

 4    QUESTIONS BY MR. BROCK:

 5         Q.    I'll hand this over to you and

 6    ask if this is the document that you were

 7    questioned about with regard to

 8    Mr. Garinther's trips to France to

 9    participate in studies there.

10         A.    Yes.

11         Q.    All right.  So let's turn to

12    our next slide.  And do you see that this is

13    a document that includes the notes of

14    Mr. Garinther from his trips to France?

15         A.    Yes.

16         Q.    All right.  And we have here

17    subject, "Trip report on the visit to the

18    French-German Institute at Saint-Louis,

19    France, 5 to 23 December 1993."

20              Do you see that?

21         A.    '96.

22         Q.    '96, yes.

23              And if we look at paragraph 5,

24    Mr. Gavin has participated in a series of

25    experiments conducted by ISL in December

Confidential - Pursuant to Protective Order

1    of 1996 at a large French training area near

2    the city of -- I am going to say Nimes, but

3    I'm sure they would say it differently,

4    France.

5                Do you see that?

6         A.    Yes.

7         Q.    And they were testing at that

8    time three configurations of nonlinear

9    earplugs, as noted in Mr. Garinther's report,

10   correct?

11        A.    Yes.

12        Q.    And just to pause on this for a

13   second, do you know what Mr. Mr. Garinther's

14   role was with regard to the investigation and

15   development of this product and his role

16   within the military?

17        A.    George Garinther, Dick Price

18   and one other fellow -- well, are the key

19   people I'd like to mention, but George and

20   Dick were the scientists working in the group

21   at USACHPPM, the Center for Health Promotion

22   and Preventative Medicine, where Doug Ohlin

23   was in charge.  And they were the scientists

24   who were involved in what they called

25   advanced prototyping experiment to try and

Page 44

 1   develop an improved earplug concept.

 2              So there's groups working in

 3   the US at Fort Rucker, Alabama, up at

 4   USACHPPM up in the Maryland area, and they

 5   are going overseas now to work with our

 6   colleagues at ISL, which is the Franco-German

 7   Research Institute, and are sort of

 8   collaborating.

 9              And the reason they were over

10   in France is that in the US the blast

11   overpressure study that I described to you

12   had been conducted in this artificial-type

13   setting where soldiers were exposed to

14   explosives.

15              In France, they're monitoring

16   soldiers who are undergoing field games and

17   are firing actual live fire weapons and

18   measuring their temporary hearing loss.

19        Q.    Okay.  If we look at

20   paragraph 6A, preliminary results prior to a

21   detailed analysis indicate that the nonlinear

22   earplug protected hearing as effectively as

23   the Max-Lyte earplug that is normally worn by

24   French soldiers.

25              What is the significance of

1  that?

2       A.    So that's rather surprising.

3  Foam earplugs, as I mentioned, are a

4  conventional, non-level-dependent or linear

5  hearing protector, so they're going to

6  provide, if fitted well, good protection at

7  high levels and the same protection at lower

8  levels, thus impeding communications between

9  the troops or hearing important operational

10  sounds.

11       Q.    Okay.

12       A.    And here you have a nonlinear

13  earplug, which at low levels starts out with

14  much less protection but is offering an

15  increase of attenuation with level, and is

16  found to provide not only adequate but

17  equivalent protection and still provide the

18  ability for localization and signal

19  detection.

20       Q.    And is this testing using the

21  ISL filter at this point in time?

22       A.    It's using the ISL filter in

23  various different earplug bodies.

24       Q.    Can I direct your attention

25  down to paragraph C very quickly, please?

Confidential - Pursuant to Protective Order

Page 46

1          And I'll just read this for the

2     record.  This is at page 0062.

3          "Soldiers were able to detect

4     and localize distant sounds of the five noise

5     sources placed on the training area more

6     accurately and more quickly when wearing the

7     nonlinear earplug in comparison to the

8     standard earplug."

9          Do you see that?

10     A.     Yes.

11     Q.     And is that the design intent

12     of the nonlinear plug, that is, to allow

13     soldiers to detect and localize distant

14     sound?

15     A.     That's one of the aspects of

16     what the military calls situational

17     awareness.

18     Q.     All right.  Looking at

19     paragraph 11, which is on page 0064, it

20     reads, "I have discussed these results with

21     Felix Sachs and Doug Ohlin of CHPPM, who

22     believed that nonlinear earplugs should be

23     included as standard or specialized earplug

24     in the military.  I have provided them with

25     samples of three types of plugs that

Confidential - Pursuant to Protective Order

1    Dr. Dancer asked me to give them."

2                    Do you see that?

3         A.    Yes.

4         Q.    Okay.  Do you read this to say

5    that after seeing this testing, that the

6    recommendation was being made after

7    discussions with Felix Sachs and Doug Ohlin

8    that nonlinear earplugs should be included as

9    standard in the military?

10        A.    I read it that way.

11        Q.    Now, there's a second set of

12   notes attached to this meeting, correct, sir?

13        A.    Yes.

14        Q.    And this would relate to a memo

15   that was written March 2, 1998, with regard

16   to testing of the nonlinear earplug developed

17   by the French to protect the hearing of

18   soldiers exposed to impulse noise while

19   permitting them to hear at low levels,

20   correct?

21        A.    Yes.

22        Q.    Okay.  So if we could see our

23   next slide, please.

24        A.    I do want to point out that

25   although it's dated March '98, it refers to a

Confidential - Pursuant to Protective Order

1    visit which concluded in November of '97.

2         Q.      You're right.  Yeah, thank you

3    for that.

4              And do you see the language in

5    the report, "The main question presently

6    being discussed is the configuration of the

7    nonlinear earplug.  Since the nonlinear

8    earplug provides essentially no attenuation

9    against high-level, steady state noise, such

10   as that produced by armored vehicles, it

11   would still be necessary to provide the

12   soldiers with normal earplugs"?

13             This is on page 0068.  I'm

14   sorry, I should have -- I should have

15   mentioned that.

16             And there's then a section that

17   reads, "The configuration issue centers about

18   providing soldiers with," and then three

19   options are stated there with regard to how

20   to achieve the goal of giving soldiers

21   protection for high impulses while at the

22   same time being able to communicate with

23   their fellow soldiers or to hear things that

24   are necessary to be heard to be a good

25   soldier, correct?

Confidential - Pursuant to Protective Order

1    A.    Yes.

2    Q.    All right.  One option was a

3 nonlinear earplug and a separate normal

4 earplug.  That was one option that was on the

5 table, correct?

6    A.    Correct.

7    Q.    And what that would require is

8 that a soldier would need to keep up with two

9 plugs, and if he was in a situation or she

10 was in a situation where perhaps they were

11 dismounted, they needed to hear instructions

12 and to take instruction from their fellow

13 soldiers or they needed to be aware of noises

14 that can occur on the battlefield with regard

15 to the enemy, that they'd be able to --

16 they'd be able to have a nonlinear earplug

17 for that.

18         But on the other hand, if they

19 were in a steady-state environment, they were

20 riding in a troop transport, they were in a

21 helicopter, they were doing something with a

22 steady state, they'd have a normal earplug.

23    A.    Yes.

24    Q.    They'd have to keep up with

25 two.

Confidential - Pursuant to Protective Order

```
 1        A.     (Witness nods head.)

 2        Q.     All right.  A second option was

 3   a nonlinear earplug in which the two tiny

 4   holes can be closed; that was an option,

 5   correct?

 6        A.     Yes.

 7        Q.     And then the third was an

 8   earplug that is reversible, with a nonlinear

 9   earplug at one end and a normal earplug at

10   the other end.

11               Do you see that?

12        A.     Yes.

13        Q.     Now, you mentioned earlier in

14   your testimony that it was not clear to you

15   who came up with the idea of the dual-ended

16   or reversible earplug.

17               Is this one of the documents

18   that you've looked at that leads you to that

19   conclusion?

20        A.     This is the first time that I

21   see mention of this in a document.  It's a

22   document that was provided to us by the

23   military recently, so it's not something I

24   was aware of at the time.

25               The first -- so this is a
```

```
 1   collaborative effort with a number of people

 2   from CHPPM and ISL.  George Garinther from

 3   CHPPM is summarizing the results, and he

 4   doesn't really say where these ideas

 5   surfaced, but these were apparently the ideas

 6   that were being discussed by that group of

 7   people.  And as I'll discuss in a few

 8   minutes, I hear more about them shortly.

 9        Q.     Okay.

10               MR. MONSOUR:  Objection.

11        Responsiveness.

12   QUESTIONS BY MR. BROCK:

13        Q.     Now, I want to turn your

14   attention to one other paragraph in this

15   document.

16               If we could just go out of the

17   PowerPoint mode and go to this exhibit, and

18   turn to page 0068, please.

19        A.     I think they may be out of

20   order.  You're in the prior document.

21        Q.     Yeah, there's a second --

22   there's a second report.  Here we go.  This

23   is it right here.

24               Okay.  And if you could

25   highlight, please, that top paragraph.
```

Confidential - Pursuant to Protective Order

1    So here we have Mr. Garinther's

2 comments about watching soldiers fire in a

3 demonstration of a rapid-fire mission?

4    Do you see that?

5    A.    Yes.

6    Q.    And he's noting here, "It's

7 apparent why they could not normally wear

8 earplugs nor cover their ears."

9    Do you see that?

10    A.    Yes.

11    Q.    And is this the issue that you

12 have been talking about with regard to

13 soldiers having the need to hear what's

14 around them, to take instruction from others,

15 to communicate, and that they can't do that

16 as well if their hearing is attenuated with a

17 linear device?

18    A.    This would be one of the

19 environments in which that would occur.

20    Q.    Yeah.

21    A.    And he's illustrating the

22 effect that they're not wearing hearing

23 protection, and they're not able to cover

24 their ears, either, because of the need to

25 use their hands to conduct their job.

Confidential - Pursuant to Protective Order

1      Q.      And the loader could not cover
2  his ears with his hands because he was
3  loading the round with his hands.  After
4  releasing the round, he jumped to the ground,
5  off a small stool, and the round would go off
6  before his feet hit the ground.
7              That was what's happening with
8  the loader, right?  According to his
9  observation of the rapid-fire mission,
10  correct?
11      A.      Yes.
12      Q.      And then the aimer was
13  adjusting controls, so he couldn't cover his
14  ears.
15              The ammo loader didn't cover
16  his ears because he was constantly moving
17  rounds up to the loader.
18              And the weapons chief was
19  listening for the mortar settings and passing
20  these settings and other commands to the
21  crew, and he wasn't covering his ears or
22  wearing hearing protection either, was he?
23      A.      Correct.
24      Q.      And is this a pretty good
25  example of why a nonlinear device can be very

Confidential - Pursuant to Protective Order

 1   **helpful to members of our military with**

 2   **regard to protecting their hearing?**

 3            MR. MONSOUR:  Objection.

 4       Leading.

 5            THE WITNESS:  I would say

 6       that's a good example in the last

 7       sentence where George says that it was

 8       apparent from this rapid-fire mission

 9       that a nonlinear earplug, which would

10       permit the crew to hear comments while

11       effectively protecting their hearing,

12       should dramatically reduce hearing

13       loss among the soldiers.

14   QUESTIONS BY MR. BROCK:

15       **Q.    And then Garinther recommends**

16   **that the nonlinear earplug be considered for**

17   **use by the US Army since its use by weapon**

18   **crews would reduce hearing loss among**

19   **soldiers while permitting them to hear voice**

20   **commands and combat-related sounds, correct?**

21       A.    Correct.

22       **Q.    All right.  So let's move to**

23   **the next section of our discussion.  You**

24   **mentioned a little bit ago that pretty soon**

25   **that some of these developments would be**

Confidential - Pursuant to Protective Order

 1    brought to your attention at a meeting.

 2              We've got a section here called

 3    "military request dual-ended, single-size

 4    earplug from Aearo."  And perhaps just for

 5    the benefit of the jury, just give us a brief

 6    overview of what we're going to talk about in

 7    this section, and then we'll look at a few

 8    documents.

 9        A.    So to summarize and sort of

10    frame this, the section we just covered is

11    material that, to my recollection, was

12    unbeknownst to 3M at the time.

13              The 1995 study didn't land on

14    my desk until about 2004.  The other two

15    documents we've just discussed were recently

16    revealed and records provided by the

17    military.

18              So my first real awareness of

19    what's happening is when I'm invited to a

20    meeting in December of 1997 where these

21    people we've been discussing - Dick Price,

22    George Garinther, Doug Ohlin, Armand Dancer,

23    Pascal Hamery - are getting together to

24    brainstorm, if you will, how can we solve

25    these problems for our respective militaries.

Confidential - Pursuant to Protective Order

Page 56

1   And that's a meeting we'll tell you about in

2   December.

3           And then very shortly

4   thereafter, Aearo creates product samples and

5   sends prototypes for evaluation.

6           (Berger Exhibit D4 marked for

7       identification.)

8   QUESTIONS BY MR. BROCK:

9       Q.    Okay.  All right.  Let's look

10   at a couple of documents that are relevant to

11   what you just discussed, and we'll start with

12   Defendant's Exhibit 4.

13           And let me ask you, first of

14   all, is this a document that you created?

15       A.    This is a document I created

16   which was extracted from my files.

17       Q.    Okay.  Is this a document that

18   you would have created at the time or close

19   in time to the meeting that took place at

20   Aberdeen Proving Ground?

21       A.    Knowing the way I work, I

22   probably created this on the airplane on the

23   way home.

24       Q.    And is it an accurate

25   reflection of the events, the important

Confidential - Pursuant to Protective Order

1    events, that occurred with regard to the

2    meeting at -- that took place on 12/16 of

3    1997?

4          A.      That is what I was endeavoring

5    to do, was to accurately recall the

6    highlights of that meeting.

7          Q.      Yeah.

8                  And was this record created as

9    part of your business practice of creating a

10   record of some of the events that would have

11   occurred?

12         A.      This would have been a standard

13   business practice.

14         Q.      Okay.  Now, I want to focus on

15   some of the language of this document, but

16   before I do that, I just want to ask you:  Do

17   you recall what the circumstances were that

18   led to your invitation to this meeting with

19   Dick Price, Doug Ohlin, George Garinther,

20   Theresa Schulz, Armand Dancer and Pascal

21   Hamery?

22         A.      I was very happy to uncover

23   this document because as you can see, this

24   meeting occurred over 20 years ago, so I have

25   a dim recollection of the actual meeting.

Confidential - Pursuant to Protective Order

1            I recall being asked to be

2    involved since all of these people were

3    scientists or officers in the military that I

4    had worked with.  I had been involved with

5    Armand Dancer and Pascal Hamery from the

6    early 1990s.  I was aware of their

7    publications and had corresponded with them.

8            Doug Ohlin was a man I was sent

9    to meet shortly after I started work at E-A-R

10   because he was one of the two principal

11   hearing conservationists in the military, the

12   other being Don Guessaway at Fort Sam Houston

13   in Texas.  And I knew of Dick Price and

14   George Garinther and Theresa Schulz.

15            So they were all effectively

16   colleagues and knew that I had been working

17   in this area because I had been involved in

18   development of a previous style of

19   level-dependent hearing protector in an

20   earmuff form.  So -- and I think I was

21   invited to this because of those reasons, and

22   especially because the results of their

23   evaluations were that the preferred vehicle

24   for using the nonlinear filter would be that

25   E-A-R UltraFit earplug.

Confidential - Pursuant to Protective Order

```
 1                    MR. MONSOUR:  Objection.
 2         Responsiveness.
 3   QUESTIONS BY MR. BROCK:
 4         Q.    Now, if we turn to the second
 5   page of that document, I want to -- I want to
 6   ask you a couple of questions about this.
 7                You see that there is a
 8   paragraph there that is titled "Ohlin."
 9                Correct?
10         A.    Yes.
11         Q.    That's Doug Ohlin, correct?
12         A.    Yes.
13         Q.    And what was Doug Ohlin's role
14   with regard to what he did in terms of his
15   interaction with the military, including
16   military audiologists?
17         A.    I believe his role would have
18   been -- effectively have been director of
19   audiology for the Army.  He established their
20   DOHRA program, one of the arcane military
21   acronyms, Defense Occupational Hearing
22   Readiness Awareness, something like that.  He
23   interfaced with all of their audiologists.
24   He was involved in directing some of the
25   military co-service hearing conservation
```

Page 60

1    groups.

2         Q.      Now, we've called out this

3    paragraph, and you have recorded that "Ohlin

4    accepts our plug because they had good

5    experience with Com-Fit.  Would not accept

6    two different plugs, one nonlinear and one

7    conventional."

8                Did I read those two sentences

9    correctly?

10        A.      Yes.

11        Q.      All right.  And do you remember

12   that when we were looking at the notes about

13   the meeting that took place at ISL in France,

14   one of the options was to create two

15   different plugs:  One being a linear plug,

16   and one being a nonlinear plug, right?

17        A.      Yes.

18        Q.      And Doug Ohlin is conveying

19   that he would not accept that option,

20   correct?

21        A.      Correct.

22        Q.      That's what he said at the

23   meeting?

24        A.      That's what he said.

25        Q.      Right.

Confidential - Pursuant to Protective Order

1              He was interested in two-ended

2    plug, one-size plug, because easier to

3    dispense, and they are losing so many field

4    audiologists that they need a less

5    labor-intensive item to use.

6              Do you see that?

7        A.    Yes.

8        Q.    So one of the design options

9    that the Army could have asked for would have

10   been to make plugs with different sizes, that

11   is, where the flanges would be different

12   sizes, correct?

13       A.    Correct.

14       Q.    All right.  But Doug Ohlin is

15   saying that he is interested in and wants a

16   two-ended plug, one size, correct?

17       A.    Correct.

18       Q.    And he gives a reason for that?

19       A.    Yes.

20       Q.    Now, after this meeting in

21   December of 1997, did Aearo create a design

22   and some product samples?

23       A.    We did.

24       Q.    In early 1998?

25       A.    Correct.

1          And one other point that you

2   perhaps would like to highlight here is that

3   there was a short time frame on this.  It

4   wasn't, let's start looking at this and see

5   when you can come up with products.

6          We're having this meeting in

7   December of '97, and my notes say here they

8   would like delivery of products early in

9   1999.

10     **Q.    Okay.  So they're looking for a**

11  **quick turnaround with regard to design as**

12  **well as delivery of product?**

13     A.    Sounds like about a year and a

14  half.

15          (Berger Exhibit D5 marked for

16     identification.)

17  QUESTIONS BY MR. BROCK:

18     **Q.    And let me ask you then to**

19  **direct your attention to Defendant's**

20  **Exhibit 5.**

21          **And I'll ask you -- we've got**

22  **this up -- if you can you describe for the**

23  **benefit of the jury, what is this document?**

24     A.    This is a design drawing for

25  the initial version of the dual-ended plug as

1    was created by 3M, or Aearo at the time.

2                    You will see in the expanded

3    box on the right that this is dated March of

4    '98, so it's late March.  It's on the order

5    of three months after the meeting that we

6    just discussed.

7                    Although you can't see the

8    details, or maybe you'd like to expand it,

9    the box in the upper left calls out the

10   various component parts.  You'll see there's

11   parts A, B, C and D, which are the various

12   parts that are put together in this assembly.

13   And each of those, if we were to look at

14   those design documents, the various earplugs,

15   the stem and the filter, the design drawings

16   on those date from a couple months prior to

17   this.  So this is the first drawing that

18   shows the assembly of all the bits and

19   pieces.

20        Q.    Okay.  And when we look at the

21   design of the product, is this a dual-ended

22   design as was discussed in the meeting that

23   took place in December?

24        A.    It meets the specifications

25   discussed in that meeting.  It's using the

Confidential - Pursuant to Protective Order

1    UltraFit design earplug at both ends.  It's a

2    single-sized product, and housed in it in

3    the -- what I like to call out in the upper

4    portion there, item D, is the nonlinear

5    filter assembly.

6              There you go.

7         Q.    And I don't think we mentioned

8    the use of the ISL filter, but that was

9    another component of the product that the

10   Army wanted included?

11        A.    That was a key requirement.

12        Q.    At the time the drawings and

13   initial samples were -- at the time of the

14   drawings and the initial samples, had the

15   military instructed as to the size of the

16   product?  Had they given any instructions

17   about it needs to fit in a case or anything

18   like that?

19        A.    My meeting notes don't indicate

20   that, and I don't recall that we were given

21   any instructions of that nature.  So we put

22   together the parts in a way that we thought

23   could work for the military, and this was our

24   initial prototype.

25              (Berger Exhibit D7 marked for

Page 65

1          identification.)

2      QUESTIONS BY MR. BROCK:

3          Q.      Now, I want to turn if we can

4      to the next exhibit, which is a March 24,

5      1998 letter from Richard Knauer to Doug

6      Ohlin.

7                  Exhibit 7 is a March 24, 1998

8      letter to Doug Ohlin from Richard Knauer.

9      Let me hand you that, please.

10                 And is this a letter that

11     documents that Aearo is sending to Doug Ohlin

12     approximately 25 pair of the nonlinear

13     earplugs you requested from Brian Myers at

14     the NHCA conference?

15         A.      It is.  I may have misheard

16     you, but I think you said it was from Ohlin

17     to Knauer.

18         Q.      I apologize.

19                 This is from Knauer to Ohlin.

20         A.      From Knauer to Ohlin.

21         Q.      Thank you.

22         A.      So what he's saying here is

23     that Brian Myers, who was the marketing

24     manager at the time, had apparently ran into

25     Doug Ohlin.  Both of them were frequent

Confidential - Pursuant to Protective Order

1  attenders of the conference of the National

2  Hearing Conservation Association.  As we

3  mentioned earlier, that conference typically

4  takes place in February each year.  And

5  apparently at that conference, Doug Ohlin

6  requested from Brian that he'd like 25 pair

7  for evaluation.

8       **Q.    And Aearo is meeting that**

9  **request and getting those samples to Doug**

10 **Ohlin in a prompt fashion?**

11      A.    As expeditiously as possible.

12      **Q.    Now, after Doug Ohlin receives**

13 **the samples that have been sent to him, does**

14 **Aearo hear from Doug Ohlin with regard to the**

15 **length of the device?**

16      A.    We do.

17           (Berger Exhibit D8 marked for

18      identification.)

19 QUESTIONS BY MR. BROCK:

20      **Q.    All right.  So I'm going to**

21 **draw your attention now to Exhibit 8.**

22           **And this is Exhibit 43 in**

23 **plaintiff's examination, but we're going to**

24 **mark it as Defendant's Exhibit 8.**

25           **And let me just ask if we**

Confidential - Pursuant to Protective Order

1    can -- if we can go back to our third section

2    of our timeline.  We have here "the military

3    directs Aearo to shorten the length of the

4    plug," and then we've got references to three

5    documents there.

6              Do you see that?

7        A.    Yes.

8        Q.    All right.  And I don't want

9    you to get into all the detail, but just so

10   that the jury has an overview, tell us what

11   happened.

12       A.    Doug Ohlin had an opportunity,

13   either personally or presumably sharing the

14   samples with others at CHPPM, to evaluate

15   them, and came back with instructions to us

16   that the sample that we devised was a quarter

17   of an inch too long for their purposes.

18              The first reason I was aware of

19   that it was going to be too long for the

20   carrying case that the military had been

21   using for their earplugs in general, not one

22   specifically designed for this product, but

23   then it turned out in correspondence that

24   there were also other issues that he felt

25   could better be addressed by a shorter

Page 68

```
 1   earplug.
 2         Q.     Okay.  So looking at Exhibit --
 3         A.     8.
 4         Q.     -- 8, which is also Exhibit 43,
 5   let me direct your attention to the bottom.
 6   Well, we've got it at the top here.
 7               So you see that there's an
 8   e-mail of April the 8th, 1999, at 11:41 from
 9   Brian Myers to Doug Ohlin?
10               Do you see that?
11         A.     I do.
12         Q.     All right.  Who is Brian Myers?
13         A.     As I mentioned, he was our
14   marketing manager for the hearing protection
15   product line at the time.
16         Q.     Okay.
17         A.     And he had met Doug Ohlin at a
18   conference, but I believe they also had met
19   and spoken at other times.
20         Q.     All right.  And he records that
21   he spoke with Dick Knauer, and what was Dick
22   Knauer's role at this time?
23         A.     He was my supervisor.  He was
24   the technical director in the hearing
25   protection group.
```

Confidential - Pursuant to Protective Order

1      Q.      All right.  Who believes that
2  "we can probably shorten the plug by a
3  quarter of an inch required to fit your
4  current container."
5              Do you see that?
6      A.      Yes.
7      Q.      It says, "The designer will
8  look at this when he gets back from vacation
9  on the 19th."
10             Who was the designer?
11     A.      That would have been Bob Falco.
12     Q.      Okay.  And Brian says, "It may
13  help to expedite the redesign if we could get
14  a storage container from you."
15             Do you see that?
16     A.      Yes.
17     Q.      In other words, if we're going
18  to try to make something that will fit in the
19  container, it would be a good idea for us to
20  have one of those containers so that we can
21  see if we are meeting your design
22  specification?
23     A.      Yes.
24             MR. MONSOUR:  Objection.
25  Leading.

```
 1   QUESTIONS BY MR. BROCK:
 2        Q.    And the second e-mail is one
 3   from Doug Ohlin to Brian Myers in response to
 4   the e-mail we just talked about, and he says,
 5   "In addition to the plug being too long for
 6   the case and an increased potential for wind
 7   noise, my green suit friends tell me it
 8   sticks out too far for the Kevlar combat
 9   helmet.  The last one is a show stopper."
10             Do you see that?
11        A.    Yes.
12        Q.    Okay.  And I believe you've
13   testified a couple of times that your
14   recollection of that time period was that the
15   predominant issue was the carrying case, but
16   you've seen e-mails and other correspondence
17   where other reasons have been listed for
18   shortening the plug.
19             MR. MONSOUR:  Objection.
20        Leading.
21   QUESTIONS BY MR. BROCK:
22        Q.    Is that right?
23        A.    That's correct.
24             (Berger Exhibit D9 marked for
25        identification.)
```

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. BROCK:

2         Q.    Let's look at Defendant's

3    Exhibit 9.

4              And I don't think this has been

5    previously marked.  I do have some questions

6    about it.

7              Do you see that this is now an

8    April 9, 2000 -- I mean, pardon that.  Strike

9    that.

10             You see that this is an

11   April 9, 1999 design review memo?

12        A.    Yes.

13        Q.    Okay.  And the author of this

14   note is Annette Shaver.

15             Do you see that?

16        A.    Yes.

17        Q.    All right.  If we go down to

18   the product design preliminary, do you see

19   that section?

20        A.    Yes.

21        Q.    All right.  "The technical

22   department provided samples of the products

23   along with Aearo drawings."

24             So not only did you turn over

25   to the military the products, but you also

Confidential - Pursuant to Protective Order

1    sent the drawings; is that right?

2        A.    Yes.

3        Q.    This is what this reports --

4    yeah.

5              "The length of the earplug,

6    once assembled, was discussed.  It was

7    requested by the military that the earplug

8    fit into a case which is in current use by

9    the military.  This would require reducing

10   the length by one-quarter of an inch."

11             Do you see that?

12       A.    Yes.

13       Q.    All right.  And --

14             MR. MONSOUR:  Mike, do you have

15        one of those for me?

16             MR. BROCK:  Oh, of course.

17             MR. MONSOUR:  I thought you

18        said this one hadn't been used before.

19             MR. BROCK:  I don't think it's

20        been used in this deposition.  It may

21        be in his big notebook, but I am not

22        sure about that.

23             THE WITNESS:  No, I don't think

24        it was in this notebook.

25             MR. OVERHOLTZ:  Okay.  It's not

Confidential - Pursuant to Protective Order

1        in that one?

2                    MR. MONSOUR:  Thank you.

3                    And what number is this

4        exhibit?

5                    MR. BROCK:  8.

6                    THE WITNESS:  9.

7        QUESTIONS BY MR. BROCK:

8            Q.    Okay.  This was a design review

9        meeting, correct?

10           A.    Yes.

11           Q.    Okay.  And does this appear to

12       be the kind of meeting that would take place

13       at Aearo with regard to addressing issues of

14       design of products?

15           A.    I was not typically a

16       participant in those meetings.  You don't see

17       my name listed there, but I'm familiar with

18       all of the names there.  And this would be

19       the typical group of technical production and

20       quality who would get together to look at

21       implementing a product design or revising a

22       product.

23                    And I do note that this appears

24       to be occurring only one day after we

25       received the e-mail from Dick Knauer -- from

Confidential - Pursuant to Protective Order

1    Doug Ohlin about shortening the plug.

2            (Berger Exhibit D10 marked for

3        identification.)

4    QUESTIONS BY MR. BROCK:

5        Q.    Sure.  Okay.

6            All right.  Let's look at the

7    next exhibit very quickly.  Exhibit 10.

8            Can I see that back just a

9    second, please?

10            Okay.  All right.  So I think

11    you have looked at this document today with

12    plaintiff's counsel.  This is an e-mail from

13    Doug Ohlin to Belva Hoffman and copies Brian

14    Myers, and he is giving on April 12, 1999,

15    some information about why he's instructing

16    that the samples, the production samples, be

17    shortened.

18            Do you see that?

19        A.    Yes.

20        Q.    And he refers to some of these

21    things that we've talked about so that they

22    fit in the standard case, number one, to

23    minimize wind noise, and to be compatible

24    with the Kevlar helmet when the chinstrap is

25    fastened.

Confidential - Pursuant to Protective Order

1            Do you see that?

2        A.    Yes.

3        Q.    And he uses the show stopper

4    language again, correct?

5        A.    Yes.

6            (Berger Exhibit D11 marked for

7            identification.)

8    QUESTIONS BY MR. BROCK:

9        Q.    All right.  If we look at the

10   next exhibit, number 11.  I want to direct

11   your attention to page 136 in this series of

12   e-mails.  Some of these e-mails have been

13   discussed, but not this one.

14            This is an e-mail that's in the

15   chain of e-mails that we've discussed.  Here

16   on April the 13th, 1999, Doug Ohlin is

17   conveying to other members of the military.

18            Do you know any of these folks

19   that are listed here, Loyborg, Chandler or

20   Robinette?

21       A.    I know Dave Chandler and Marty

22   Robinette.

23       Q.    And what are their roles,

24   please?

25       A.    At this point I'm not sure, but

Confidential - Pursuant to Protective Order

1    Dave Chandler at times was involved at Walter

2    Army Reed Medical Center.  Marty Robinette

3    was a captain working at some bases on the

4    East Coast.

5         Q.    Okay.  And this letter from --

6    or note from Doug Ohlin states that "The

7    production samples Aearo sent me were at

8    least a quarter of an inch too long.  I took

9    the liberty in cutting down the samples I'm

10   sending you under a separate cover.  The

11   production samples didn't fit in the standard

12   earplug carrying case, didn't take advantage

13   of a design to minimize wind noise, and were

14   hit by the Kevlar helmet chinstrap when it

15   fastens."

16              Correct?  That's what he

17   writes?

18        A.    Yes.

19        Q.    Okay.  Now, I just -- just so

20   the jury can appreciate what we're talking

21   about in terms of the length of the device, I

22   have put together, with the assistance of

23   people a lot of smarter than me, a

24   demonstrative aid.  I'm not asking you to

25   sponsor it because I know you didn't develop

Confidential - Pursuant to Protective Order

1    this.  I just want to use it for purposes of

2    discussion.  Okay?

3              And this is the -- this is the

4    document that I wanted to talk about.

5              You see here we're depicting a

6    carrying case and two versions of plugs,

7    correct?

8         A.    Yes.

9         Q.    And the point I just want to

10   make for the jury is that the version of the

11   plug that you first designed and sent to the

12   military is sticking out there of the rim of

13   the case that was already in use by the

14   military, correct?

15        A.    Yes.

16        Q.    And so the military instructed

17   that that be shortened.  In fact, Doug Ohlin

18   even took the samples and figured out a way

19   to shorten them himself so that he could see

20   if they fit in the carrying case, correct?

21        A.    Yes.

22        Q.    And this is just a depiction of

23   how one of the things that the military was

24   saying, how that goal was achieved by

25   shortening the plug, correct?

Confidential - Pursuant to Protective Order

Page 78

```
 1        A.        And it may be obvious to the
 2   jury members, but you might like to highlight
 3   the panel that is projecting outwards to the
 4   left, sticking out over the edge of the case.
 5   That's the top of the case.  And the way the
 6   case closes is that would rotate 90 degrees
 7   around so that it would cover the portion
 8   where you see one earplug sticking up and the
 9   other earplug standing just shy of the edge.
10        Q.        Okay.  And does that carrying
11   case also have as part of the case a tool
12   that can be used to assist in placing
13   different kinds of hearing protection
14   devices?
15        A.        It was specifically designed
16   for the comfort earplug.  So the element that
17   I just described that rotates around, you can
18   also pull that free of the case, and there's
19   a hollow cylindrical extension that would be
20   used as a fitting tool for a comfort style
21   earplug.
22               It does not work with a
23   Com-Fit, and it does not work with a Combat
24   Arms Earplug.  But that was the standard
25   military case that they wanted to use.
```

Page 79

1        Q.      Okay.   Thank you.

2              (Berger Exhibit D12 marked for

3        identification.)

4    QUESTIONS BY MR. BROCK:

5        Q.      All right.   I want to now turn

6    to the next exhibit.   I'm going to hand over

7    to you Defendant's Exhibit 12.

8              And do you see that this is an

9    e-mail from Doug Ohlin to Brian Myers with

10   regard to information on the Combat Arms

11   Earplug?

12             Do you see that?

13       A.      Well, that's part of it.

14       Q.      At the top.

15       A.      The top of it is actually an

16   e-mail to me saying that he sent this to

17   Brian Myers.

18       Q.      Yes.   Okay.

19             And if we look at the e-mail

20   chain, and I appreciate you pointing this

21   out, Doug Ohlin sends to you the note that he

22   sent to Brian Myers, correct?

23       A.      Correct.

24       Q.      So this note would have been in

25   your file and received by you on March

Confidential - Pursuant to Protective Order

1   the 23rd, 2005, at approximately 4:28 p.m.?

2        A.      Correct.

3                And Brian is putting together

4   some marketing materials, and he would like

5   to know if it's appropriate in those

6   materials to say "evaluated and specified by

7   the US Armed Forces."

8                And Doug responds at the top

9   and discusses a number of ways in which the

10  military has evaluated the plug and found it

11  appropriate, and included it in the Army

12  pamphlet 40-501, and concludes by saying,

13  "Yes, I think you can say the Combat Arms

14  Earplug has" -- and there's a typo "has

15  be" -- "has been evaluated and specified by

16  the US Armed Forces."

17       Q.      Okay.  So the first question

18  that is asked by Brian of Doug is, "Is it

19  okay to say that the Combat Arms Earplug is

20  evaluated and specified by the US Armed

21  Forces?"

22               That's the question, correct?

23       A.      Correct.

24       Q.      And then you've given some of

25  the explanation for the answer that Doug

Page 81

```
 1    Ohlin gives, including that "the Army has
 2    conducted blast overpressure studies at White
 3    Sands missile range and at the Army research
 4    lab at the Aberdeen Proving Grounds.  It's
 5    used extensively by the US Army and Marines.
 6    It's been approved by the DOD Hearing
 7    Conservation working group.  It appears in
 8    the Defense Occupational and Environmental
 9    Health Readiness System - hearing
10    conservation applications, lookup table of
11    approved hearing protectors, and in the
12    Department of Army pamphlet."
13              Do you see that?  Did I read
14    that right?
15         A.    Yes.
16         Q.    And then he says, as you noted,
17    "Yes, I think you can say the Combat Arms
18    Earplug has been evaluated and specified by
19    the US Armed Forces."
20              Do you see that?
21         A.    Yes.
22         Q.    All right.  I want to ask you
23    this question:  What was the specification in
24    terms of what the Army expected of this
25    device, as you understood that from your
```

Confidential - Pursuant to Protective Order

1    correspondence and conversations with Doug

2    Ohlin?

3         A.    At this point in time, the

4    specification had been primarily what was

5    transmitted at the December 1997 meeting:

6    that it was to be a nonlinear plug

7    incorporating the ISL nonlinear filter; that

8    that filter was to be housed in a plug based

9    upon the E-A-R UltraFit earplug; and that

10   especially the plug had to be dual-ended and

11   one-sized.

12              There were no other material or

13   dimension or performance specifications at

14   that time because he knew how the nonlinear

15   filter worked, he was familiar with the

16   Combat Arms Earplug, and we were not

17   initially given a length specification.

18              As we've discussed, after we

19   developed a prototype, we were then

20   effectively given a length specification,

21   which is that it shall be approximately

22   one-quarter inch longer than our original

23   prototype -- one quarter-inch shorter than

24   our original design prototype.

25              MR. BROCK:  Okay.  Thank you.

Confidential - Pursuant to Protective Order

Page 83

```
 1          Let's take a short break.
 2                  VIDEOGRAPHER:  We're going off
 3          record.  The time is 3:45.
 4            (Off the record at 3:45 p.m.)
 5                  VIDEOGRAPHER:  We're going back
 6          on record.  Time 4:17.
 7  QUESTIONS BY MR. BROCK:
 8          Q.    Okay.  Mr. Berger, are you
 9  ready to resume?
10          A.    I thought I was.
11          Q.    Okay.  I've put back up on the
12  timeline that we've been talking about the
13  middle section, "the military requests
14  dual-ended, single-sized earplug from Aearo,"
15  and I just want to do a point of
16  clarification here.
17                  In December of 1997, you
18  attended the meeting with Army -- with the
19  United States Army.  You represented Aearo,
20  and ISL was present there also, correct?
21          A.    Yes.
22          Q.    And it was at this meeting that
23  Ohlin requested the dual-ended plus, correct?
24          A.    Yes.
25          Q.    I just want to be clear.  Prior
```

Confidential - Pursuant to Protective Order

1    to this time, Aearo had interacted with ISL

2    with regard to the development of a

3    single-ended plug that would utilize the ISL

4    filter?

5         A.    Yes.  Once they had done

6    preliminary testing with their filter in

7    versions of the Combat Arms that they had

8    modified on their own, they had then asked us

9    to create various samples.

10                And so at one point they came

11   to visit our laboratory, we had interacted

12   with them, so we certainly had had

13   involvement on the single-ended earplug.

14                So when I was speaking about

15   our first awareness -- or my first awareness

16   in '97, that was of the dual-ended design.

17        Q.    Okay.  You were talking about

18   the category that we're referring to here,

19   the dual-ended, single-size earplug which

20   eventually became the Combat Arms version 2?

21        A.    Correct.

22                (Berger Exhibit D13 marked for

23        identification.)

24   QUESTIONS BY MR. BROCK:

25        Q.    All right.  I want to turn to a

Page 85

 1   **different topic now, and I'll hand over to**

 2   **you Exhibit D13.**

 3              **And I'll ask you, if you don't**

 4   **mind, to describe for the benefit of the jury**

 5   **what is Defendant's Exhibit D13 --**

 6   **Defendant's Exhibit 13, sorry?**

 7        A.      So this is back in 2001 when

 8   there were different e-mail systems that we

 9   were using at Aearo, and I also used a

10   program called Daytime Organizer, which was a

11   program in which I maintained my address

12   contacts and a call log of unusual, important

13   or different phone calls, customer calls,

14   that I would make so that I could refer to

15   that from time to time.

16              And as we were putting

17   documents together for this case, this

18   software's -- actually put this together a

19   few years ago.  This software no longer runs

20   on Windows 10 machines.

21              So at the time, I did searches

22   for various topics germane to this

23   litigation, and one of the things that popped

24   up was calls and correspondence with Major

25   Mark Little.

Page 86

1                       And so what you see here are

2      screenshots of various elements of that call

3      log since there wasn't any easier way to

4      output it.

5            Q.      So is this particular document

6      that we're looking at here something that you

7      have copied from e-mail to this file-keeping

8      system?

9            A.      Yes.

10           Q.      And that will allow you at that

11     point in time to more easily access

12     information that you might have generated by

13     e-mail or other means during the course of

14     your regular business?

15           A.      It enabled me at that time,

16     pre-Outlook and other more sophisticated

17     programs, it was a way to assemble telephone

18     call, e-mail and other interactions with

19     customers and others so that I would have one

20     easy-to-access database with all that

21     information.

22           Q.      Okay.  This is, we see at the

23     top, an e-mail from Mark Little, Major, US

24     Army, to TZL3@CDC -- oh, his e-mail address

25     is TZL3@cdc.com.

Confidential - Pursuant to Protective Order

1               **And is this an e-mail from**

2    **Major Mark Little to you?**

3         A.    Yes.  He says, "I got your

4    e-mail," and then he goes on to provide some

5    questions.

6         **Q.    Okay.  And he also references**

7    **that you may have received an e-mail from**

8    **Dr. Doug Ohlin at the Army Center for Health**

9    **Promotion and Preventive Medicine also,**

10   **correct?**

11        A.    Yes.

12        **Q.    All right.  And what does he**

13   **tell you that he is doing at this point in**

14   **time?**

15             **And I've got a callout here**

16   **that you can look at.**

17        A.    So just to point out, Major

18   Little was a major in the US Army.  Had a

19   working relationship, perhaps a dotted-line

20   reporting, I'm not sure, to Doug Ohlin.  At

21   this point he was doing a study program for a

22   limited period of time at NIOSH in

23   Cincinnati.

24             And he says that he'd like to

25   run some studies on the Army's Combat Arms

Confidential - Pursuant to Protective Order

1   Earplug, which I'm told and have read

2   reference to, is made by -- from the E-A-R

3   UltraFit.

4             And so he's asking me for

5   information.

6        Q.    Okay.  And so what you have put

7   in your file here in this exhibit is his

8   e-mail to you; is that right?

9        A.    Yes.

10       Q.    Okay.  And this is a document

11  that you would have kept in the regular

12  course of your business?

13       A.    In the Daytime Organizer.

14       Q.    All right.  Let's go to the

15  next exhibit.

16            (Berger Exhibit D14 marked for

17       identification.)

18  QUESTIONS BY MR. BROCK:

19       Q.    And will you please describe

20  this for the benefit of the jury.

21            D14.  What is D14,

22  Dr. Berger -- or Mr. Berger?

23       A.    The e-mail we just discussed

24  was dated August 20th, and here we see

25  approximately a month later that I'm writing

Confidential - Pursuant to Protective Order

1    a letter to Mark Little providing him the

2    information that he's requesting.

3              And I specifically detail that

4    I'm going to include a consumer package of

5    the product, that I'm going to include a copy

6    of a letter from Pascal Hamery to me from

7    January 2000 in which he has provided impulse

8    and attenuation results measured on the

9    product, and that I'm going to provide a

10   REAT, which stands for real-ear attenuation

11   at threshold, the standardized reports for

12   the plug measured according to the American

13   National Standard.

14             And then at the bottom of that

15   letter, you see that it says "enclosures,"

16   and it describes those three items.

17             (Berger Exhibit D15 marked for

18        identification.)

19   QUESTIONS BY MR. BROCK:

20        Q.    Okay.  Now I'm going to hand

21   over to you D15 and ask you to describe that

22   document for the benefit of the jury.

23        A.    So what I've written at the top

24   is that this is apparently a -- potentially a

25   telephone call.  I say that he has more

Page 90

```
 1   questions.  It looks like it's an e-mail.
 2   And I say there's more questions.  Thanks
 3   again, he's received the mailing, and then he
 4   asked me some particular questions:  Do we
 5   provide instructions in the 50-pair bags that
 6   we send.  He wants to know about the sealing
 7   rings.  Since it's a one-size product and it
 8   has three different sealing rings or flanges,
 9   do all of the flanges have to be in the ear.
10                   And then of particular
11   interest, see down at the bottom -- or no --
12   he says, finally, "Do the sealing rings, or
13   the flanges, of the outward-facing plug that
14   were rolled back upon themselves during
15   fitting, as per the instructions, stay this
16   way in the ear or should they be unrolled?"
17                   So he's pointing out that he's
18   well aware of the fold-back instruction that
19   has been provided to him, and he's asking me
20   further guidance on it.
21        Q.    Okay.  And did you answer?
22        A.    I did.  I said they should stay
23   rolled back.
24        Q.    All right.  And the date of
25   this e-mail exchange is September 25, 2001,
```

Confidential - Pursuant to Protective Order

1    correct?

2         A.     Yes.

3         Q.     And this is a follow-up note

4    from the letter with enclosures that you sent

5    a week earlier on September 18, 2001?

6         A.     Correct.

7         Q.     All right.  And he's

8    acknowledging receiving the mailing and

9    making use of the instructions, correct?

10        A.     Yes.

11        Q.     And you had sent along some

12   information with regard to instructions as

13   part of the enclosures that were included

14   with the letter, correct?

15        A.     Yes.

16        Q.     At the present time in your

17   recordkeeping system, do you have a letter

18   with the actual attachments that were with

19   the letter?

20        A.     No.

21        Q.     Do you know what you sent him?

22        A.     It's described very clearly at

23   the bottom.

24        Q.     Okay.  I want to talk then

25   about what you sent.

1                    (Berger Exhibit D16 marked for

2          identification.)

3    QUESTIONS BY MR. BROCK:

4          Q.      I'm going to have to skip to --

5          A.      At the time in our company,

6    when actual paper e-mail was used, in the

7    course of events we wouldn't normally make

8    copies of all of the attachments.

9                    The purpose of detailing them

10   clearly as enclosures on the bottom of the

11   letter was to indicate what would have been

12   sent.

13         Q.      Okay.  I'm going to hand over

14   to you now Defendant's Exhibit 16.

15                  So you see that your bullet

16   point 1 in your September 8, 2001 letter

17   refers to "a consumer package is enclosed."

18                  Do you see that?

19         A.      Yes.

20         Q.      And is the exhibit there --

21   what number is that again?  I'm sorry.

22         A.      16.

23         Q.      16.

24                  Is Exhibit 16 the consumer

25   package that you enclosed to Major Mark

Confidential - Pursuant to Protective Order

1    Little?

2         A.      Yes, this is for the

3    indoor/outdoor range E-A-R plugs.

4         Q.      And do you tell him that he can

5    use the instructions from the package in

6    testing?

7         A.      Yes.

8         Q.      All right.  And just to help

9    the jury be able to see it because we do have

10   some small font in the copy, is there a

11   Fitting Tips section of the indoor/outdoor

12   range E-A-R earplugs that you are telling the

13   major that he can utilize with regard to

14   testing?

15        A.      I am.

16             And it refers to pulling the

17   pinna, which is illustrated in the picture.

18   The pinna is the flap of your ear on the side

19   of your head that holds your glasses up.  You

20   can -- should pull the pinna upward and

21   outward during insertion.  And then

22   specifically it says, "Fitting is also

23   improved if the sealing rings of the

24   outward-directed plug are rolled back upon

25   themselves."

1          Q.        Okay.

2          A.        And you'll note that in my call

3    log it indicates that he asked me

4    specifically about that part of the

5    instruction.

6          Q.        All right.  And Major Mark

7    **Little is, or was at this time, a major in**

8    **the United States Army?**

9          A.        Yes.

10         Q.        **Was he an audiologist?**

11         A.        I believe he was, and that's

12   why he was interacting with Doug Ohlin, but

13   I'm not certain of that.

14         Q.        **Okay.  Was he involved in**

15   **hearing protection programs for the United**

16   **States Army?**

17         A.        At this time, I'm not sure what

18   his involvements were.  I know he was, as you

19   saw earlier, contemplating doing a study on

20   Combat Arms Earplugs.

21         Q.        **Okay.  And does his e-mail to**

22   **you acknowledge that he has received the**

23   **instructions and will use them?**

24         A.        Yes.

25         Q.        **Now, this letter of September**

Confidential - Pursuant to Protective Order

1    18, 2001, also refers to a copy of a letter

2    from Pascal Hamery from January of 2000 in

3    which he provides insertion loss data and

4    impulsive noise measured on the ISL blockhead

5    for the Combat Arms Earplug.

6          A.     Yes.

7          Q.     That's a lot.

8                 What is that?

9          A.     So we've talked about real-ear

10   attenuation at threshold, and that's a human

11   subjects test that tells you how the product

12   protects against noise at levels in its

13   linear region.  So that's for levels with the

14   open end of the product up to about 110,

15   115 dB.

16                If you want to know how it

17   performs in high-level, impulsive noise, then

18   you need to actually present those noises.

19                And it's not safe to present

20   them routinely to human test subjects, so the

21   way this test is conducted is that you take

22   an acoustical test fixture or a dummy head

23   that's a reasonably accurate simulation of a

24   human head, and you expose that to high-level

25   impulses.

```
 1                  At this time there was really
 2    only one facility worldwide that was doing
 3    that sort of work, and it was ISL.  They
 4    would expose these heads to plastic
 5    explosives detonated out of doors, and so we
 6    were sending them their earplugs -- our
 7    earplugs for their test evaluation.
 8                  (Berger Exhibit D17 marked for
 9           identification.)
10    QUESTIONS BY MR. BROCK:
11           Q.     Okay.  In your September 18,
12    2001 letter, you refer to an enclosure, which
13    is the Pascal Hamery January 2000 letter.
14                  I'm going to hand you
15    Defendant's Exhibit 17 and ask you if this is
16    what was sent.
17           A.     This is the letter.  It's dated
18    January 2000.
19           Q.     Okay.
20           A.     Is when we received the test
21    results.
22           Q.     All right.  And then the last
23    item that's mentioned here -- I'm sorry, go
24    ahead.
25           A.     I wasn't sure if you were going
```

1   to cover that.

**2          Q.      Go ahead.**

3          A.      So what I want to point out is

4   that it includes the results on the final

5   design of the Combat Arms, which was the

6   shortened earplug measured over a range of

7   sound pressure levels from 110 to

8   190 decibels.

9                  But also, interestingly and

10  importantly, it says "the results are the

11  same as those we obtained before with a

12  double-faced earplug prototype."

13                 So that's -- in his French

14  language, double-faced is dual-ended.  And

15  what he's saying is that he had already

16  tested an original, longer prototype, and

17  both it and the shorter plug performed

18  similarly in this impulsive test.

**19         Q.      So by this point in time, the**

**20  plug had been redesigned, and you had sent**

**21  samples to ISL to conduct their impulse test**

**22  in the same way they had tested the longer**

**23  version of the plug, correct?**

24         A.      As well as all of the prior

25  versions they had constructed and we had

Confidential - Pursuant to Protective Order

1  constructed.

2       Q.    Now, the third thing that is --

3  or the third item that's listed in your

4  letter of September 18, 2001, are the REAT

5  test reports for both ends of the CAE

6  measured according to ANSI S3.19, correct?

7       A.    Yes.

8            (Berger Exhibit D18 marked for

9       identification.)

10 QUESTIONS BY MR. BROCK:

11      Q.    And I want to draw your

12 attention to -- I want to draw your attention

13 to Exhibit 18.

14            And this is a document that

15 has been discussed in your deposition, but

16 I'll ask you if the information in this

17 document -- document was transmitted by your

18 letter of September 18, 2001.

19            And if it was all transmitted,

20 tell me that; if some of it was transmitted,

21 tell the jury that, what you sent him.

22      A.    The letter indicated that we

23 sent him a test report, and our reports are

24 labeled in the top right corner page with

25 page numbers.  So the first page says page 1

Confidential - Pursuant to Protective Order

1    of 5, or it may say page 1 of 4.

2                 So routinely when we would send

3    out a report, it would include the cover

4    page, which has a summary of all of the

5    results as you see in this photograph here,

6    the NRR and the frequencies at which the test

7    was conducted over on the left, the mean

8    attenuation values from low to high

9    frequencies in the middle, and the associated

10   standard deviations.

11                And then the second page of the

12   report would include -- and I'm not sure if

13   you're going to show that on the screen --

14   would include a table that shows the data for

15   all of the ten subjects with three

16   measurements per subject.

17                And then in addition, there are

18   either two or three other pages he would have

19   received.  That's the second page I just

20   described, which is a tabular result for ten

21   subjects.  And you see listed on the left,

22   the frequencies are at this time listed

23   horizontally from left to right, 125 hertz up

24   to 8,000 hertz, and then a retest and some

25   other ancillary data.

Confidential - Pursuant to Protective Order

```
 1                  The next page --
 2        Q.      Let me pause you on that for
 3   just one second.
 4                  If we could highlight the
 5   information at the top of the page where it
 6   says "Comments."
 7                  And the comments at the top of
 8   the page -- you've been asked about this in
 9   the deposition -- it says, "Plugs are the
10   green end of the Combat Arms plug.  The
11   yellow flanges were folded outward to allow a
12   deeper insertion of the green plug."
13                  Correct?
14        A.      Correct.
15        Q.      And that information was
16   transmitted to Major Mark Little?
17                  MR. OVERHOLTZ:  Object to form.
18        Foundation.
19                  THE WITNESS:  That was
20        transmitted as part of this report,
21        and, of course, the instructions we
22        already discussed were transmitted on
23        the indoor/outdoor range card.
24                  Would it be worth discussing
25        the difference between the two cover
```

```
 1        pages here?

 2    QUESTIONS BY MR. BROCK:

 3        Q.     I think that would be helpful,

 4    yes.

 5        A.     So the situation you have is

 6    that when we originally conduct the test on a

 7    product, that will be testing the initial

 8    version of the product.  And later on it may

 9    be marketed, the identical product, with

10    other brand names, in other markets or with

11    different colors.

12        Q.     Sure.

13        A.     And so at that time we would go

14    back and reissue the initial report, simply

15    adding on the other products to which it

16    would apply.

17            So in this case, on the second

18    page you see the earlier version of the

19    report, which is just for the UltraFit end of

20    the Combat Arms Earplug, but on the cover

21    page you see what's the current report in our

22    file, which indicates that it also applies to

23    the Arc plug, which was another version of

24    the product that was distributed.

25        Q.     Okay.  Same data, but
```

Confidential - Pursuant to Protective Order

1    **identifying the same data for two different**

2    **names of the plug?**

3        A.    Of the same product.

4        **Q.    Of the same product.**

5            **Okay.  Thank you.**

6            **Did you also transmit the data**

7    **from study -- the one we've been referring to**

8    **as 016?**

9        A.    Yes.

10           (Berger Exhibit D19 marked for

11           identification.)

12   QUESTIONS BY MR. BROCK:

13       **Q.    All right.  So let me hand you**

14   **Exhibit 19, and I'd like for you to identify**

15   **out of Exhibit 19 the pages that you sent to**

16   **Major Mark Little, US Army.**

17       A.    So this particular exhibit

18   you've provided me includes many pages of raw

19   data that were provided when documents were

20   requested for the litigation, but they were

21   not part of the distribution to Mark Little.

22           What he would have received

23   would have again been the cover page, the

24   backside of that cover page, which is the

25   individual subject data, the summary tables

1    showing the ranges and mean attenuation

2    values for the subject, and a graph of the

3    results, along with a picture of the product.

4              (Berger Exhibit D20 marked for

5         identification.)

6    QUESTIONS BY MR. BROCK:

7         Q.    All right.  I'm going to hand

8    over to you now Exhibit 20.

9              Can you tell us what Exhibit 20

10   is?

11             This is -- he's acknowledging

12   receiving the mailing.  He says he'll make

13   use of the instructions, and then he has a

14   question, right?

15        A.    I think we already covered

16   this --

17        Q.    We did.  I have something else

18   I want --

19        A.    -- as another exhibit.

20        Q.    We did, but I have another

21   question there.

22        A.    Okay.

23        Q.    So he says, "Thanks again.

24   Received your mailing and will make use of

25   the instructions."

Confidential - Pursuant to Protective Order

1              And then he asked the question:

2    "Finally, do the sealing rings of the

3    outward-facing plug that were rolled back

4    upon themselves during fitting, as per the

5    instructions, stay this way in the ear or

6    should they be unrolled?"

7              And then did you answer that,

8    "They should stay that way"?

9         A.    I provided him an answer, which

10   was "they should stay that way."

11             (Berger Exhibit D21 marked for

12        identification.)

13   QUESTIONS BY MR. BROCK:

14        Q.    Okay.  You've mentioned in your

15   testimony that you've seen some documents and

16   e-mails that reflect knowledge by the Army

17   that rolling back the flanges are a way to

18   obtain a better fit of the plug.

19             I want to show you this

20   USACHPPM "Just the Facts" document.

21             And, first of all, we haven't

22   talked about this much.  For this document --

23   and this is Exhibit 21?  Is that Exhibit 21?

24        A.    Yes.

25        Q.    Okay.  Let's talk just for a

Confidential - Pursuant to Protective Order

```
 1   minute.
 2              What is USACHPPM?  What is that
 3   organization?
 4        A.    It's the US Army Center for
 5   Health Promotion and Preventative Medicine, I
 6   believe.
 7        Q.    Okay.
 8        A.    And it was essentially a
 9   research group as well as a group that
10   interacted with the Armed Forces to provide
11   them guidance on matters of safety and health
12   for their operational readiness.
13        Q.    And you remember -- oh, go
14   ahead.
15        A.    And also conducted some of the
16   their own research, wrote technical reports,
17   et cetera.
18        Q.    Okay.  Do you remember when you
19   were being asked some questions earlier about
20   Marines that were having difficulty in
21   Fallujah because they weren't being furnished
22   with hearing protection devices or they
23   weren't using them, that members of USACHPPM
24   were actually very involved in that
25   discussion about what would -- what hearing
```

Confidential - Pursuant to Protective Order

1    **protection devices would be provided for the**

2    **Marines in Fallujah and other places?**

3        A.    Yes.

4        **Q.    And did you describe earlier**

5    **that it was your understanding that**

6    **audiologists in the Army or in other service**

7    **branches would have dotted-line reporting to**

8    **Doug Ohlin?**

9        A.    My recollection was in the Army

10   they would have a dotted-line reporting or a

11   close relationship with Doug Ohlin.

12       **Q.    Okay.**

13               MR. MONSOUR:  Objection.

14           Responsiveness.

15               THE WITNESS:  He was the one

16           who basically wrote the program for

17           the military.  He was very involved in

18           managing -- I forget the term we

19           looked at earlier, but the

20           collaborative services branch between

21           the government military groups to come

22           up with the hearing conservation

23           programs for the military.

24               MR. MONSOUR:  Object to

25           responsiveness again.

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. BROCK:
 2        Q.    I want to ask a couple of
 3   questions about this document.
 4              If you turn to the second page,
 5   there is a section on User Tips.
 6              Do you see that?
 7        A.    Yes.
 8        Q.    And if we go to the second
 9   bullet point, just the second bullet point
10   there --
11        A.    Yes.
12        Q.    -- it says, "Like any earplug,
13   it is essential that the Combat Arms Earplug
14   be properly inserted."
15              I know this is CHPPM's
16   statement, but do you agree with that?
17        A.    Yes.
18        Q.    "This is more difficult with
19   this plug because there aren't readily
20   available landmarks of the plug to the ear to
21   verify proper insertion."
22              Do you see that?
23        A.    Yes.
24        Q.    Okay.  Is this the Army's
25   statement about its use of this product?
```

Confidential - Pursuant to Protective Order

1      A.      Yes.

2      Q.      Okay.  It says, "Gently tug on

3  the plug.  If there is tension, that's a good

4  indication of proper insertion."

5              Do you see that?

6      A.      Yes.

7      Q.      Is that the standard type of

8  instruction that an audiologist would give to

9  a soldier about properly fitting a plug?

10     A.      There are a number of commonly

11 accepted tips to give people to assess the

12 adequacy of fit, and that is one of them.

13     Q.      Okay.

14             MR. MONSOUR:  Object to

15             responsiveness.  Object to the form.

16 QUESTIONS BY MR. BROCK:

17     Q.      It's also -- in this document

18 it says, "The voice of the individual wearing

19 the plug will sound more low-toned and

20 slightly muffled to the wearer."

21             Correct?

22     A.      Yes.

23     Q.      And I think you've discussed

24 that in your testimony already?

25     A.      May well have.  It refers to

Confidential - Pursuant to Protective Order

1  the occlusion effect and the change in the

2  quality of your voice because the ear canals

3  are sealed or covered.

4       Q.     Yep.

5             Now, the next bullet point, if

6  we can call that out, please.  "For

7  exceptionally large ear canals, fold the

8  opposing plug back to enhance proper

9  insertion."

10            Do you see that?

11      A.     Yes.

12      Q.     When we looked at your

13 statement about folding back the flanges that

14 appear in the insert that you sent to Major

15 Mark Little, you don't limit folding back the

16 opposing plug, folding back the opposing

17 plug, to large ear canals, correct?

18      A.     Correct.

19      Q.     And this statement here is the

20 statement of CHPPM to users of Combat Arms

21 version 2?

22      A.     Yes.

23      Q.     Was it your understanding that

24 the United States Army and other branches of

25 the military would be responsible for

Confidential - Pursuant to Protective Order

1    training its men and women in the proper use

2    of the plugs?

3                    MR. MONSOUR:  Objection.  Form.

4         Objection.  Responsiveness.

5                    THE WITNESS:  Yes.

6                    (Berger Exhibit D22 marked for

7         identification.)

8    QUESTIONS BY MR. BROCK:

9         Q.    Okay.  I show you now

10   Exhibit 22, which has been previously marked.

11   This is the wallet card that was distributed

12   to members of the Armed Forces by the Armed

13   Forces that you have discussed earlier,

14   correct?

15        A.    Yes.

16        Q.    And this does give a similar

17   instruction to what you say in your

18   instructions for use in the first bullet

19   point where it says, "Check proper fit by

20   gently tugging on plugs for tension."

21             Correct?

22        A.    Yes.

23        Q.    And then again, it uses the

24   language, "For very large ear canals, fold

25   opposing plug back."

1              Correct?

2        A.    Yes.

3        Q.    All right.  Let me ask you to

4   turn the page over there.  And do you see

5   that this is a statement from a soldier in

6   Iraq on the back of the wallet card?

7              "Combat Arms Earplugs work

8   great in this environment.  They probably

9   made the difference between eardrum hearing

10  damage and not.  They definitely allow you to

11  mentally recover very quickly, so you are

12  able to deal with your situation versus

13  standing around line a stunned mullet for a

14  while."

15             Do you see that?

16       A.    Yes.

17       Q.    Did you hear from Doug Ohlin

18  and from others testimonials like this where

19  very positive responses were being given by

20  members of the military to their use of this

21  product?

22       A.    We did receive positive

23  responses.  There is also positive responses

24  published in articles in military magazines

25  talking about the value and benefits of

Confidential - Pursuant to Protective Order

1    having that plug.

2                    (Berger Exhibit D23 marked for

3            identification.)

4    QUESTIONS BY MR. BROCK:

5        Q.      I hand you Exhibit D23.

6                Do you have that in front of

7    you?

8        A.      I do.

9        Q.      D23.

10               You made reference in your

11   testimony to having seen e-mails where Doug

12   Ohlin recognizes that folding back the

13   opposing flange will assist in getting a good

14   fit.

15               Do you see the language here in

16   the e-mail of 4/16/02, and is that one of the

17   things you were referring to?

18       A.      Yes.

19       Q.      And do you see where Doug

20   Ohlin, in talking about this particular

21   product, says, "The dual-ended plug will fit

22   a majority of the adult male population"?

23               Do you see that?

24       A.      Yes.

25       Q.      As early as April of 2002, we

1    at least have this documentary evidence that

2    Doug Ohlin recognizes that the plug will fit

3    the majority of the adult male population.

4         A.    That's what he states there.

5         Q.    And he's also acknowledging and

6    instructing here that "we" -- that is we,

7    CHPPM -- "recommend that the opposing plug be

8    folded back before attempting insertion for

9    those" -- and here he uses the term

10    "excessively large ear canals."

11              Correct?

12              MR. MONSOUR:  Object to form.

13              THE WITNESS:  That's what he

14         says there.

15    QUESTIONS BY MR. BROCK:

16         Q.    Let's make sure we get a good

17    record here.

18              He writes, "For those with

19    excessively large ear canals, we recommend

20    that the opposing plug be folded back before

21    attempting insertion."

22              Correct?

23         A.    Yes.

24         Q.    And he also says that "Aearo

25    also offers a single plug version that works

Confidential - Pursuant to Protective Order

1   better with smaller ear canals," correct?

2        A.    Yes.

3        Q.    And he raises an issue there

4   about the single-sided plug not being

5   available to the right color, correct?

6        A.    Could you point that out to me?

7        Q.    Sure.

8              It says, "Also offers a

9   single-plug version that works better with

10  smaller ear canals.  There is no NSN on this

11  version, but the price is around a 1.50 a

12  pair.  Unfortunately, the company did not

13  confer with us and made the single plug

14  yellow, which is more visible than we like to

15  see for dismounted operations."

16             Do you see that?

17        A.    Yes.

18        Q.    Okay.  "The dual-ended plug

19  precludes this problem with a solid olive

20  drab plug in view when the nonlinear plug is

21  inserted."

22             Correct?

23        A.    Yes.

24        Q.    All right.  And if we can go

25  to -- just go to that document, if we can

Confidential - Pursuant to Protective Order

1  call that out.  I need to make one more point

2  about this one.

3              In the e-mail from Brian Myers

4  to Doug Ohlin, which is just above this,

5  there's a sentence that begins, "Relative to

6  Doug's comment, if we can build sufficient

7  volume on this product."

8              Can you find that?  Yeah, right

9  there.  It starts "relative" -- three lines

10  down in the e-mail on the right-hand side.

11  "Relative to Doug's comment."

12              There you go, thank you.

13              "Relative to Doug's comment, if

14  we can build sufficient volume on this

15  product, I would have no problem making the

16  plug olive green or whatever color you feel

17  would be appropriate given the nature of your

18  use."

19              Do you see that?

20      A.      Yes.

21      Q.      I want to turn to a new topic

22  now.

23              On cross-examination by

24  opposing counsel, you were asked a number of

25  questions about whether Aearo's in-house

Confidential - Pursuant to Protective Order

1    laboratory was subject to bias.

2              Do you remember those

3    questions?

4         A.    Yes.

5         Q.    Okay.  Do you think Aearo's lab

6    was biased?

7         A.    No.

8         Q.    Tell us why.

9         A.    As I said, I think the human

10   condition is that when you make observations,

11   you're subject to bias.  And so what you need

12   to do as a scientific observer is establish

13   procedures that will prevent the influence of

14   bias as much as possible.

15              And that is why we have a very

16   detailed policy manual that describes how the

17   testing will be conducted.  And furthermore,

18   as was discussed in some of my earlier

19   depositions, we have what are called the

20   Dixon outlier tests, which is an objective

21   assessment after the fact of whether or not

22   one would need to retest or replace any of

23   the subjects.

24              In the absence of those, that

25   sort of decision would be left to me as the

Confidential - Pursuant to Protective Order

1   experimenter.  And indeed, I could have a

2   particular wish to change out a subject to

3   see if I could get other results.

4              And my determination of whether

5   a subject might be appropriate for

6   replacement would be subject to my own

7   perceptions at that time.

8              So the reason we built in that

9   type of requirement was to distance the

10  supervisor of the testing from making those

11  subjective assessments.

12      **Q.    Questioners of you in this**

13  **deposition suggested that because some of the**

14  **members of your test pool were employees,**

15  **that they would bias the results in favor of**

16  **Aearo or later 3M.**

17              **Can you address that?**

18      A.    It would be difficult indeed

19  for any one or two subjects to say, "I would

20  like to see their results on this earplug,

21  and I'm going to fit it extremely well or do

22  something unusual to get good results."

23      **Q.    Why is that?**

24      A.    Because the statistics that we

25  use to compute the NRR are affected by both

Page 118

1   the average attenuation value across all the

2   listeners as well as twice the standard

3   deviation value, which is a measure of the

4   variability.

5               So in advance, those subjects

6   would need to know what sort of fit or

7   attenuation were they trying to achieve, and

8   then indeed if they did too well, that could

9   be an influence that would degrade the NRR

10  just as if they did very poorly.

11       **Q.      So let me pause you right**

12  **there.**

13               **If a test subject's goal was to**

14  **give responses to exposures that would**

15  **reflect a higher level of attenuation, what**

16  **would be the impact on that if they were in**

17  **some way trying to bias the results?**

18       A.      It would increase the range of

19  the results, which would increase the

20  variability and the standard deviation.

21               So there could be two ways in

22  which you might suggest someone would do

23  that:  either the way they fitted the plug or

24  the way they took their audiogram.

25               So their test that they're

Confidential - Pursuant to Protective Order

1   taking is they're listening to the quietest

2   sounds they can detect.  They're measuring

3   their hearing threshold levels, and they have

4   to track this for approximately 30 seconds at

5   each frequency.

6            So you might argue that they

7   would distort their threshold responses, but

8   indeed that would be very challenging because

9   not only are you having to distort the

10  responses on one test, but then the test to

11  which it is paired -- the open and the

12  occluded are paired together -- you would

13  then have to determine which way you wanted

14  to distort those responses, and do that in a

15  consistent and uniform manner so that you

16  would get a good set of results.

17           And then by the way, what is

18  the result that you're shooting for.  You're

19  taking these differences.  You don't know if

20  the differences are 5 dB, 10 dB, 25 dB.  It

21  would be an exceedingly challenging task for

22  somebody to figure out in the room.

23           And again, as with the fitting,

24  if they are moving their results, either very

25  bad or very good, that's going to be

Confidential - Pursuant to Protective Order

1    influencing the range.

2              The likeliest thing is that a

3    subject might want to make the results look

4    bad and wouldn't let you fit the plug well,

5    and then they'd not only get poor mean

6    attenuation values but would increase the

7    range.  Be much more challenging to enhance

8    the results.

9              Your best outcome is that

10   you're like everybody else in the study.

11        Q.    Okay.  So if there are dramatic

12   differences in responses that are given by

13   test subjects, whether that's responding that

14   they were somehow achieving more attenuation

15   than they actually were, if they did that,

16   it's going to increase the measure of the

17   standard deviations that you would be looking

18   at when you did your calculation?

19        A.    Yes.

20        Q.    Your lab has been inspected and

21   reviewed by NVLAP on how many occasions?

22        A.    It would be 14 times since

23   1991.

24        Q.    Okay.  And what's the level of

25   detail that those inspections and reviews get

1   to?

2        A.     They spend approximately two

3   days, a little shy of two days, in our

4   laboratory.  They look at all of the

5   paperwork and whether the procedures and

6   documentary responses, ability to respond to

7   problems or issues, meet the myriad

8   requirements of the relevant standard to

9   which you're being accredited.

10             And then the inspectors also

11  observe randomly the experiment -- excuse me,

12  the assessors observe randomly the

13  experimenters conducting various calibrations

14  or doing an attenuation test to see that

15  they're doing it according to the written

16  procedures.

17             So when the assessment is

18  completed, the laboratory is being

19  accredited.  It's not accrediting a

20  particular test result.  But what you're then

21  allowed to say is that these data were tested

22  in a laboratory that tests in conformance

23  with this standard as accredited by that

24  organization.

25        Q.     Okay.  Are you familiar with

Confidential - Pursuant to Protective Order

1    the standards of care and standards of

2    practice with regard to maintaining a pool of

3    candidates for conducting a REAT test?

4          A.      With respect to our standards?

5          Q.      Yes.

6          A.      Yes.

7          Q.      And are your standards and

8    practices with regard to your test pool

9    appropriate for the tests that you are

10   conducting?

11         A.      Yes.

12         Q.      And why do you say that?

13         A.      The standard that we're testing

14   to, S3.19, doesn't really have particulars in

15   that regard.  It says that you are trying to

16   obtain an optimum performance fit.  It says

17   that subjects who cannot obtain an adequate

18   fit should be noted but shouldn't be included

19   in the evaluation.

20               And so we try and maintain a

21   group of listeners that we know can give us

22   uniform and repeatable data appropriate to

23   the types of products that we're testing.

24         Q.      How many NVLAP-approved labs

25   are there in the United States?

Confidential - Pursuant to Protective Order

1         A.      It varies from time to time.   I

2    couldn't tell you this year.   I would say --

3    and this is just NVLAP.   NVLAP accredits to

4    about 14 different acoustical standards.

5         **Q.      Okay.**

6         A.      So with respect to hearing

7    protection, there's always been Kevin

8    Michaels, which is an independent laboratory

9    at NC State -- Pennsylvania State.   There

10   have at times been other manufacturers such

11   as Honeywell.   These days, I believe that

12   Fort Rucker, Alabama, with the Army is

13   accredited.   Sometimes John Casali at

14   Virginia Tech has been accredited, although

15   currently he is not.

16              So other laboratories have been

17   accredited and then at times let their

18   accreditations lapse.   I would say at any

19   point in time, on the order of two to four

20   laboratories.

21        **Q.      And your laboratory is the only**

22   **one that's been accredited for every period**

23   **since NVLAP began inspecting labs with regard**

24   **to auditory testing?**

25        A.      With regard to hearing

Page 124

 1    protection testing, yes.

 2          Q.      **Hearing protection, thank you.**

 3          A.      We've been accredited since the

 4    inception of the program and have maintained

 5    that accreditation every year.

 6          Q.      **We talked a little bit about**

 7    **your background at the beginning of your**

 8    **examination, the contributions you have made**

 9    **to the field, the recognition that you have**

10    **received from peers, the activity that you've**

11    **maintained with regard to publishing,**

12    **speaking and teaching, and I just want to ask**

13    **you this question with regard to the Combat**

14    **Arms version 2.**

15                  **From your perspective, when the**

16    **product was made available to members of our**

17    **military beginning in the early 2000s, what**

18    **was your view about whether or not the**

19    **product was one that would be helpful and**

20    **useful to members of the military and that**

21    **would assist in preventing hearing loss?**

22          A.      I was very excited about that.

23    As I believe I may have said during one point

24    in my depositions over the past few days,

25    level-dependent attenuation, nonlinear

Page 125

```
 1   attenuation, was something that I began
 2   exploring in the early 1980s.  And we had
 3   actually, in conjunction with an inventor,
 4   developed another type of passive
 5   level-dependent hearing protector built into
 6   an earmuff.
 7                 I became aware then of the work
 8   that was being done by ISL and the US Army in
 9   the early 1990s, and when we had the
10   opportunity to participate in 1997 in the
11   development of a new product that would fill
12   a very important niche in the Armed Services,
13   which is a product that people would actually
14   wear in combat -- hearing protection had been
15   dispensed throughout the Armed Forces for a
16   number of years.  What we had discovered in
17   my work on a National Academy panel was
18   that -- what was really quite well-known was
19   that hearing protection was perhaps worn on
20   the firing range but was rarely, if ever,
21   worn in combat because of the problems of
22   communication with other soldiers and hearing
23   situational sounds.
24                 So the ability to develop a
25   product, a relatively inexpensive one -- and
```

Confidential - Pursuant to Protective Order

1  it had to be inexpensive.  And in fact, at

2  that early meeting the price point of no more

3  than $5 per pair was suggested.

4           That was critical because it

5  wasn't a product like we have today that

6  could cost thousands of dollars and would be

7  available for special operations.  This

8  needed to be a product that could be

9  purchased in the hundreds of thousands of

10  units to be made widely available across the

11  Armed Forces.

12           And so it was an exciting

13  accomplishment to create this initial

14  product, and that over the years we've had

15  the opportunity to try and improve that and

16  work on other types of electronic products.

17           So I think it served a valuable

18  niche, was helpful for the military, and I

19  was glad to be a part of it.

20      Q.    With regard to the product, is

21  Aearo and later 3M -- strike that.

22           With regard to the Combat Arms

23  version 2, was the product tested by the

24  military and by others over the period of

25  years?

Confidential - Pursuant to Protective Order

1      A.      We had talked earlier about the

2   testimonials, which were anecdotal

3   testimonials about how well they worked, in

4   some military magazines.

5              But in addition to that, there

6   are a number of research studies beginning as

7   early as 2001 where we have received data

8   either on acoustical test fixtures, as I

9   discussed earlier, or human subject studies

10  exposed to rifle fire, or situational

11  awareness, localization studies conducted by

12  Idaho National Labs, other people in the

13  military, people at NIOSH.

14             And uniformly, the results of

15  those studies were positive.  They didn't

16  particularly focus or point out problems with

17  the products.  They said they improved

18  situational awareness, ability to understand

19  speech, were providing protection along the

20  levels that we had reported, and basically

21  corroborated our findings.

22             MR. BROCK:  All right.  Let's

23        take about a five-minute break.  I

24        think I'm done.

25             VIDEOGRAPHER:  We're going off

Confidential - Pursuant to Protective Order

```
 1              record.  The time is 5:16.
 2                (Off the record at 5:16 p.m.)
 3                     VIDEOGRAPHER:  We're going back
 4           on record.  The time is 5:42.
 5                     EXAMINATION
 6   QUESTIONS BY MR. MONSOUR:
 7           Q.     One of the -- well, let me ask
 8   you, Mr. Berger:  You and I have met before,
 9   correct?
10           A.     Yes.
11           Q.     I've asked you questions
12   before, correct?
13           A.     Yes.
14           Q.     Okay.  I'm Doug Monsour.  I'm
15   from Texas.  I've got a few more questions to
16   ask you.
17                  All right?
18           A.     Okay.
19           Q.     One of the questions that I
20   would like to address with you is, you showed
21   a picture when Mr. Brock was asking you
22   questions, and it showed a plug that was
23   designed by your company, and it was, I
24   guess, the earliest version of the Combat
25   Arms version 2, and there was a diagram of
```

Confidential - Pursuant to Protective Order

1    it.

2              Do you remember you were

3    working with that in your direct examination?

4         A.    It was an engineering drawing,

5    yes.

6         Q.    Yes.

7              And that version of the Combat

8    Arms version 2 was not a symmetrical earplug,

9    was it?

10        A.    Let's take a look at it.

11        Q.    Okay.  Let me see if I can find

12   the picture in here.

13             It was Defendant's Number 5.

14   And if you look -- maybe this side's clearer.

15             Do you remember looking at

16   Defendant's Number 5?

17        A.    Yes.

18        Q.    Okay.  And if you look -- and

19   what I mean by it's not symmetrical, if you

20   look at the document -- or if you look at the

21   design, these have a length of -- I can't

22   read it, but there's -- this length and this

23   length and this length right here are the

24   same, correct?

25        A.    Correct.

Confidential - Pursuant to Protective Order

1        Q.        But if you look at the bottom

2    right here, if you look down below, this is

3    longer than what's on this side, correct?

4        A.        Correct.

5        Q.        So it is not a perfectly

6    symmetrical earplug, correct?

7        A.        Longitudinally, yes.

8        Q.        Okay.  Why was the earplug

9    designed in this way to where the closed end

10    was longer than the open end?

11        A.        I don't recall Mr. Falco's

12    thinking or decisions on that original plug

13    on how it came to be that length.

14        Q.        Okay.  And so we can orient the

15    jury, this would be the yellow side here,

16    correct?

17        A.        Correct.  That would be the --

18    you can see the channel through it.  That's

19    the open end of the plug.

20        Q.        That's the filter right there,

21    correct?

22        A.        Correct.

23        Q.        And then this is where the

24    sound comes in, travels down the channel,

25    goes through the filter and then would go

Confidential - Pursuant to Protective Order

1    into the ear, right?

2          A.      Correct.

3          Q.      On this side, it's just solid

4    plastic, correct?

5          A.      Not all solid.

6          Q.      I'm sorry, it's solid plastic

7    down to right here?

8          A.      Correct.

9          Q.      Okay.  And did you have any

10   input into why the closed side is longer than

11   the open side?

12         A.      I don't recall.

13         Q.      When the plug was shortened, it

14   became symmetrical, and the closed side ended

15   up being the same length as the open side,

16   correct?

17         A.      Correct.

18         Q.      Okay.  Now, were the tests that

19   we have talked about numerous times -- I've

20   talked to you about them, Mr. Brock has

21   talked to you about them -- were test 213015,

22   213016, and 213017.

23               Was it this sized plug, or was

24   it the plug after it had been shortened?

25         A.      Those were all on the final

Confidential - Pursuant to Protective Order

1   product that was delivered, the shortened

2   plug.

3      **Q.    Okay.  Was this size plug ever**

4   **tested by 3M or any of its predecessor**

5   **companies?**

6      A.    I don't believe we found test

7   results for that plug.

8      **Q.    Okay.**

9      A.    Other than, as I said, we had

10  sent a version of that to ISL, and in the

11  January 2000 e-mail that I received from

12  them, they had IPIL, impulse peak insertion

13  loss, data on the long version and the short

14  version.

15          But of course that wouldn't be

16  on the closed end -- actually, I'm not sure.

17  They might have tested both ends.

18          But what they said in that

19  paper was that we've now tested the shorter

20  plug, and the results are similar to the

21  results from the prior double-faced plug that

22  you sent us.

23     **Q.    Okay.  Fair enough.**

24     **Do you know if Doug Ohlin ever**

25  **conducted any testing on the final version of**

Confidential - Pursuant to Protective Order

1    **the version 2 plug before it was used by the**

2    **military?**

3         A.      I don't know how he evaluated

4    them after we provided them.  I don't know

5    what evaluation he went through on the first

6    version and ended up coming back and telling

7    us to shorten it, and I don't know what

8    evaluations he would have gone through on the

9    next version.

10        **Q.      Okay.  With regard to the tests**

11   **213015, 213016 and 213017, do you believe --**

12   **let's start again.  Let me start again.**

13              **Do you believe that the**

14   **military relied upon your findings from the**

15   **test 213016 and 213017?**

16        A.      Relied upon them for?

17        **Q.      For verification of the**

18   **efficacy of the product.**

19        A.      I believe that they relied upon

20   them as the representation of the performance

21   of the product according to the ANSI

22   standard.

23        **Q.      Okay.  Fair enough.**

24        A.      Which was the test procedure at

25   the time and is the test procedure today.

Confidential - Pursuant to Protective Order

1     Q.     If the results of 213016 and

2   213017 had been unsatisfactory, do you

3   believe that the military would have made

4   large purchases of the version 2 Combat Arms?

5              MR. WASDIN:  Objection to form

6        and foundation.

7              THE WITNESS:  I don't know.

8   QUESTIONS BY MR. MONSOUR:

9     Q.     Do you believe --

10    A.     I don't know what

11  unsatisfactory would have been.

12    Q.     Do you believe that if the

13  military had -- do you believe that if the

14  test results of 213016 -- let me start again.

15              Do you believe that if the test

16  results of 213017 showed an NRR of 10.9, that

17  the military would have purchased the plug?

18              MR. WASDIN:  Objection to form

19        and foundation.

20              THE WITNESS:  I don't know.

21  QUESTIONS BY MR. MONSOUR:

22    Q.     Can you ever think of a reason

23  why the military would have wanted to have

24  purchased a closed end of a plug that had an

25  NRR of only 10.9?

Confidential - Pursuant to Protective Order

1            MR. WASDIN:  Objection to form

2        and foundation.

3            THE WITNESS:  I don't know.

4            I know that for our purposes,

5        we wanted to have an attenuation value

6        that was similar to what we had seen

7        for UltraFit earplugs.

8   QUESTIONS BY MR. MONSOUR:

9        Q.      You mentioned earlier you had

10   talked with the military about the historical

11   NRRs of the UltraFit plugs, correct?

12        A.      Could you be a little more

13   precise and refresh my memory?

14        Q.      Sure.

15            The military was -- when you

16   had discussions about putting the filter into

17   the UltraFit plug, there was an understanding

18   from the military as to the efficacy of the

19   UltraFit plug, correct?

20            MR. WASDIN:  Objection to

21        foundation.

22            THE WITNESS:  They had an

23        understanding based on the field

24        studies that had been conducted of the

25        efficacy of the UltraFit open-ended

```
 1          plugs and knew, you know, amounts of
 2          attenuation that had been seen on
 3          those products was in the range of
 4          about 5 dB-ish for the open ends.
 5                They had demonstrated that the
 6          open ends were providing adequate
 7          protection in their small arms fire
 8          and mortar field studies.
 9                I don't recall --
10   QUESTIONS BY MR. MONSOUR:
11          Q.    I'm talking closed end.
12          A.    And I was going to get to that.
13          Q.    Okay.
14          A.    I don't recall right now if
15   those field evaluations included a closed
16   end.
17                You'll notice in my field notes
18   from the '97 meeting it said Doug Ohlin was
19   interested in the three-flange plug because
20   he'd had good results with the Com-Fit, which
21   was another three-flanged, premolded earplug.
22          Q.    And what type of an NRR did it
23   provide?
24          A.    I don't recall.
25          Q.    What did the UltraFit provide?
```

Confidential - Pursuant to Protective Order

1          A.      The UltraFit was, I believe,

2    21.

3          Q.      Okay.  21.

4                  And you went into the

5    production of the version 2 with the

6    understanding that the closed end should be

7    getting something close to a 21 or 22, true?

8          A.      That was our intention, to be

9    in a similar performance range.

10          Q.      And that's what the military

11    was expecting you to come up with, true?

12                  MR. WASDIN:  Objection to

13          foundation.

14                  THE WITNESS:  I don't know.

15    QUESTIONS BY MR. MONSOUR:

16          Q.      Well, I mean, they didn't want

17    an 11, did they?

18                  MR. WASDIN:  Objection to

19          foundation.

20                  THE WITNESS:  I don't know.  I

21          would be guessing.

22                  MR. WASDIN:  Let me get my

23          objection in there.

24    QUESTIONS BY MR. MONSOUR:

25          Q.      Why would they want an NRR of

Confidential - Pursuant to Protective Order

1    **11?**

2              MR. WASDIN:  Objection to

3         foundation.

4              THE WITNESS:  You're asking me

5         to say what particular NRR that they

6         want.  I suspect they would have

7         wanted a number like what they'd been

8         seeing, but we were not given -- in

9         that meeting, if you look at my notes,

10        there was nothing about the NRR of the

11        closed end shall be this or the NRR of

12        the open end shall be this.  It was,

13        you shall build this into an UltraFit

14        type of plug.

15   QUESTIONS BY MR. MONSOUR:

16        **Q.     Do you believe that the**

17   **military would have ever accepted a closed**

18   **end of the version 2 with an NRR that was**

19   **anywhere close to an 11?**

20              MR. WASDIN:  Objection to

21        foundation.

22              THE WITNESS:  I don't know.  I

23        think they wanted a plug like what

24        they were anticipating.  I don't

25        know -- there was not a specification.

Confidential - Pursuant to Protective Order

```
 1                   As you know, in 2006 there was
 2          now an attenuation specification that
 3          the plug must meet, but at that
 4          time --
 5   QUESTIONS BY MR. MONSOUR:
 6          Q.     And it must be what?
 7                 MR. WASDIN:  Let him finish his
 8          answer, please.
 9   QUESTIONS BY MR. MONSOUR:
10          Q.     It must be what?
11          A.     It's not in terms of an NRR.
12   It's in terms of octave band attenuation
13   values at individual frequencies.
14          Q.     You spoke very freely with
15   Mr. Brock on your direct of what Doug Ohlin
16   and people in the military thought.
17                 How come you don't know now,
18   when I'm asking you questions, whether or not
19   the military would have accepted an 11
20   instead of a 22 NRR for the closed end of the
21   version 2?
22                 MR. WASDIN:  Objection to form
23          and foundation.
24                 THE WITNESS:  You're asking a
25          very specific question.
```

1    QUESTIONS BY MR. MONSOUR:

2         **Q.    And he asked you many other**

3    **specific questions, and you answered his, but**

4    **you're not answering mine.**

5                   MR. WASDIN:  Mr. Monsour,

6         please --

7    QUESTIONS BY MR. MONSOUR:

8         **Q.    Answer my questions.**

9                   MR. WASDIN:  Please let him

10        finish his answer.

11                  MR. MONSOUR:  No, I just want

12        him to answer my questions.  I don't

13        want him to talk.

14   QUESTIONS BY MR. MONSOUR:

15        **Q.    Answer my questions.  I'm**

16   **trying to get this done quickly.**

17                  MR. WASDIN:  I'm going to just

18        take a second here.

19                  MR. MONSOUR:  Nope.  Nope.

20   QUESTIONS BY MR. MONSOUR:

21        **Q.    Answer my question.**

22                  MR. WASDIN:  Don't answer this

23        until I get this on the record.

24                  The Court has addressed the

25        issue of interrupting our witnesses,

Confidential - Pursuant to Protective Order

```
 1            and the Court has instructed
 2            plaintiff's counsel to let them finish
 3            their answers and not interrupt them.
 4                     MR. MONSOUR:  And the Court has
 5            also said that they're supposed to
 6            answer our questions, not just talk.
 7                     So, you know, you can't just
 8            filibuster.  Answer the questions.
 9     QUESTIONS BY MR. MONSOUR:
10            Q.    So --
11                     MR. WASDIN:  You may not
12            remember the last question, but if you
13            weren't done with your answer, you can
14            finish.
15                     MR. MONSOUR:  I'm going to ask
16            a different question.
17     QUESTIONS BY MR. MONSOUR:
18            Q.    Does the military -- for the
19     closed end of the version 2, would an NRR of
20     11 ever be acceptable?
21                     MR. WASDIN:  Objection to
22            foundation and foundation.
23                     THE WITNESS:  I think they
24            would want a higher NRR than that.  I
25            don't know what NRR they required.
```

Confidential - Pursuant to Protective Order

```
 1              There was not an NRR specification.
 2    QUESTIONS BY MR. MONSOUR:
 3         Q.      Okay.  Mr. Brock showed you a
 4    picture, I believe, of an earlier version of
 5    a nonlinear plug in your direct.
 6                 Do you remember that?
 7         A.      Yes, and I -- there was at
 8    least one earlier version.
 9         Q.      And I can't remember if it was
10    in a PowerPoint or if it was an exhibit, but
11    I think it showed -- was it a document
12    that -- the version just had like a hole, a
13    small hole, and that was the nonlinear
14    filter?
15         A.      I think you might be referring
16    to a picture from the blast overpressure
17    study.
18         Q.      Correct.
19                 And it was just basically a
20    hole, right?
21         A.      It was an UltraFit-type plug
22    with the nonlinear -- I mean, the nonlinear
23    filter is basically a hole.  What you see is
24    a hole when you look at it.
25         Q.      Right?
```

Confidential - Pursuant to Protective Order

1      A.      And it was a picture of that

2   plug with the filter pushed into the front

3   end of the plug.

4      **Q.      Okay.**

5      A.      So all you would see is a

6   single hole.

7      **Q.      I guess what I'm getting at is,**

8   **you said, I believe, earlier versions of**

9   **nonlinear plugs were basically a hole, and**

10  **then what the folks at ISL came up with --**

11     A.      Oh.  Oh.

12     **Q.      -- was two holes that were**

13  **spaced a certain distance apart.  And to keep**

14  **them spaced a certain distance apart, they**

15  **just made it a cylinder.**

16          **Am I close?**

17     A.      Close.

18     **Q.      Okay.  Tell me --**

19     A.      I like to use the more

20  technical term "orifice," but --

21     **Q.      Okay.  Orifice.**

22     A.      Pinhole.

23          You were referring to the

24  Gunfender earplug.

25     **Q.      The Gunfender?**

Confidential - Pursuant to Protective Order

1          A.       Right.   Which was a

2   substantially different-shaped earplug.   And

3   in that plug, instead of having a canister

4   with a hole at each end of it, it had a plate

5   with a hole through the plate.

6          Q.       Right.

7                   So we went from something like

8   the Gunfender, which was a plate with a hole

9   in it, to the ISL version, which was

10  basically two plates that were kind of held

11  in place with a canister, hole here, hole

12  there?

13         A.       And just to be precise, it's

14  ISL, Institute of Saint-Louis.   You're sort

15  of combining ISL and IPIL over there.

16         Q.       Some I'm misspelling --

17         A.       It's ISL is the abbreviation.

18         Q.       It's a bad day when you

19  misspell ISL.

20                  Okay.   So -- but I'm getting

21  this right.   We went -- the improvement was

22  we went from basically the Gunfender design,

23  which was a plate with a hole, to the ISL

24  design, which is basically two plates with

25  two holes, correct?

```
 1        A.      Correct.

 2        Q.      Okay.  Let me mark this

 3  as -- I'll call it Exhibit 47.

 4                (Berger Exhibit 47 marked for

 5        identification.)

 6  QUESTIONS BY MR. MONSOUR:

 7        Q.      All right.  So the cutting-edge

 8  technology that ISL came up with is they went

 9  from one to two holes?

10                MR. WASDIN:  Objection to form.

11                THE WITNESS:  I see that you're

12        laughing.

13  QUESTIONS BY MR. MONSOUR:

14        Q.      Yes, I am.

15        A.      I guess you don't appreciate

16  the subtleties there.

17                There was actually substantial

18  research looking at varying different designs

19  of multiple orifices in parallel, multiple

20  orifices in series, and it turned out that

21  the simplest design element change that would

22  give them the goal that they were looking for

23  was to put two orifices in series.

24        Q.      Right.

25                So they went from one hole to
```

Confidential - Pursuant to Protective Order

1    two holes?

2        A.    Simple is good if it solves the

3    problem.  And the data demonstrate that it

4    does provide a greater growth of attenuation

5    with sound level than the prior version.

6        Q.    Okay.  Let me ask you this:

7    You mentioned earlier -- you were talking

8    about -- you mentioned the Aberdeen meeting,

9    and you took some notes from that meeting.

10       A.    Correct.

11       Q.    Okay.  Exhibit D4.  I've got

12   one.  I'll hand you this one so you can hold

13   it.

14              Exhibit D4.  I believe you told

15   Mr. Brock that this was basically the

16   specifications that you were kind of working

17   from to develop the plug, correct?

18              MR. WASDIN:  Objection to form.

19              THE WITNESS:  What I said was

20        that these were my trip notes, my

21        report of what I observed at the

22        meeting.

23   QUESTIONS BY MR. MONSOUR:

24       Q.    And you used this as kind of

25   your specifications for making the plug,

Confidential - Pursuant to Protective Order

1    correct?

2              MR. WASDIN:  Objection to form.

3    QUESTIONS BY MR. MONSOUR:

4         Q.    I'm just trying to remember

5    what you said.

6              MR. WASDIN:  Same objection.

7              THE WITNESS:  What I said was

8         that the specifications came out of

9         this meeting; that Doug Ohlin said it

10        needed to be a one-size plug,

11        double-ended; that it was to be built

12        into an UltraFit-style earplug; and

13        that it needed to incorporate the ISL

14        filter.

15   QUESTIONS BY MR. MONSOUR:

16        Q.    So when you were meeting with

17   these various people at the Aberdeen Proving

18   Ground, including Doug Ohlin, you were

19   talking about things that were good about

20   plugs and things that were bad about plugs,

21   correct?

22             MR. WASDIN:  Objection to form.

23             THE WITNESS:  My recollection

24        of the meeting before I had run across

25        this document sometime back was that I

Confidential - Pursuant to Protective Order

1          was at a meeting in roughly the end of

2          '97, '98, that I met with Armand

3          Dancer, Pascal Hamery, Doug Ohlin, I

4          didn't recall the other people at the

5          meeting at the time, and that we were

6          discussing the outcome of studies that

7          the military had conducted and their

8          wishes for an earplug going forward.

9               I can't give you more details

10         than that and what I have written in

11         my memo.

12    QUESTIONS BY MR. MONSOUR:

13         Q.    Okay.  Now, if you look at

14    this, though, they do talk about -- or you do

15    note that there are some problems with

16    certain plugs.  You note that, "But the

17    H. Leight MAX was refit after each round

18    since it worked lose."

19               Correct?

20         A.    I believe that -- I believe

21    that said, but let me just find -- where are

22    you in it?

23         Q.    It's right there.  There's the

24    front, and you go down about a third of the

25    page.

Confidential - Pursuant to Protective Order

```
 1        A.      Oh, you're on the front.
 2                Why am I missing that?
 3        Q.      It should be right -- it should
 4   be right here.
 5        A.      Oh -- okay.  Gotcha.  Gotcha.
 6        Q.      Okay.  Do you see --
 7        A.      Yes.
 8        Q.      Do you see where it says --
 9        A.      I found the -- "both the
10   nonlinear and Leight plug were safe to use,
11   but the Howard Leight was refit after each
12   round since it worked loose."
13        Q.      Okay.  Now, if you look down
14   below, you mention down here, you say, "Can
15   you document H. Leight problem?  Can we use
16   such data?"
17                Now, the only H. Leight problem
18   that I see mentioned above was the fact that
19   it worked loose, correct?
20        A.      Yes.
21        Q.      Okay.  And what you note is
22   "will document in upcoming report on field
23   study."
24                Correct?
25        A.      Correct.
```

Confidential - Pursuant to Protective Order

1        Q.      Okay.  So an issue that was

2    being discussed at this meeting with Doug

3    Ohlin was the fact that the H. Leight MAX

4    plug would work loose, and that was a

5    problem, correct?

6        A.      Yes.

7        Q.      When you found that there was

8    imperceptible loosening with the Combat Arms

9    version 2, and knowing that there was a

10   problem that the H. Leight MAX worked loose,

11   you never told Doug Ohlin that your plug was

12   working itself loose, did you?

13               MR. WASDIN:  Objection to form.

14               THE WITNESS:  I've not said

15          that.  I said that I had conversations

16          with Doug Ohlin.  I cannot document

17          with a paper trail what was told him,

18          but I recall discussing our issues,

19          our fold-back, the need to do another

20          test.

21   QUESTIONS BY MR. MONSOUR:

22       Q.      But you never --

23       A.      I don't know the particulars of

24   whether we said "works loose" or not.

25               And I'd also like to point out,

1  because this was reported in the Garinther

2  studies previously, that this was quite an

3  interesting issue because it was a foam plug,

4  which you would not expect would work loose.

5  And apparently it was uniformly working

6  loose.  It wasn't an occasional problem; it

7  was a substantial problem.

8       **Q.    You have no documentation**

9  **anywhere that you advised Doug Ohlin or**

10 **anyone else in the military that there was**

11 **loosening of the Combat Arms version 2,**

12 **correct?**

13      A.    I have no paper documentation

14 on that.

15      **Q.    Okay.  And you can't tell me or**

16 **identify for me a conversation that you had**

17 **with Mr. Ohlin wherein you discussed the**

18 **matter with him, true?**

19            MR. WASDIN:  Objection to form.

20            THE WITNESS:  Not a specific

21      conversation.

22 QUESTIONS BY MR. MONSOUR:

23      **Q.    Okay.**

24      A.    My recollection of our general

25 conversations over that period of a year or

Confidential - Pursuant to Protective Order

1   so as we were developing the product.

2         Q.      **You actually kept call logs of**

3   **your discussions with Mr. Ohlin; is that**

4   **correct?**

5         A.      I kept call logs of discussions

6   with many people and would typically put in

7   there particular items on people I didn't

8   often speak to or unusual events.

9                 If I was in regular

10  communication with somebody, might or might

11  not have gone in that call log.

12                I searched the call log for

13  what I had.

14        Q.      **We looked through your call**

15  **logs, and do you know that the term**

16  **"loosening" never appears in any entry that**

17  **you have with Doug Ohlin?**

18                **Are you aware of that fact?**

19                MR. WASDIN:  Objection to form.

20                THE WITNESS:  I'm not aware.

21  QUESTIONS BY MR. MONSOUR:

22        Q.      **Okay.**

23        A.      I'm also interested to know

24  what the typical things that I reported in

25  the call log were.  I don't know that -- I

Confidential - Pursuant to Protective Order

1    haven't looked back at the details of that.

2          Q.    Well, you might want to look,

3    and when you do, you won't find the word

4    "loosening" with regard to the Combat Arms

5    version 2.

6                Does that surprise you?

7                MR. WASDIN:  Objection to form.

8                THE WITNESS:  No.

9    QUESTIONS BY MR. MONSOUR:

10         Q.    And it wouldn't surprise you

11   because you never told him --

12               MR. WASDIN:  Objection.

13   QUESTIONS BY MR. MONSOUR:

14         Q.    -- right?

15               MR. WASDIN:  Objection to form.

16               THE WITNESS:  It wouldn't

17        surprise me because it wouldn't

18        necessarily have been recorded.

19   QUESTIONS BY MR. MONSOUR:

20         Q.    Well --

21         A.    It's not a call log of every

22   conversation and every detail.

23         Q.    One of the things that I've

24   noticed with you is you fancy yourself a

25   scientist, true?

Confidential - Pursuant to Protective Order

1       A.      I believe I'm a reasonably good

2    scientist.

3       **Q.      You're a details guy, aren't**

4    **you?**

5       A.      I pay attention to details.

6       **Q.      If we look back at your**

7    **laboratory testing, you mark down people's**

8    **names, their test results.**

9               **When we look at your telephone**

10   **calls, you actually keep a log of your**

11   **telephone calls.**

12              **What we talked about yesterday**

13   **was with regard to your own hearing**

14   **protection.  You have logs about your own**

15   **hearing issues and when you had hearing**

16   **problems and all those types of things.**

17              **You detail everything, don't**

18   **you?**

19              MR. WASDIN:  Objection to form.

20         Move to strike Mr. Monsour's

21         testimony.

22              THE WITNESS:  I detail many

23         things that I feel are worth

24         detailing.

25

Confidential - Pursuant to Protective Order

1  QUESTIONS BY MR. MONSOUR:

2       Q.    But the one thing that you have

3  absolutely no written-down proof of is

4  telling the government that the version 2

5  imperceptibly loosens, true?

6              MR. WASDIN:  Objection to form.

7              THE WITNESS:  According to your

8       reading of my call logs, it's not

9       there.

10  QUESTIONS BY MR. MONSOUR:

11      Q.    Okay.  Well, I mean, you have

12  scanned your e-mails to find the e-mails

13  where you talked about the flange issue with

14  Mark Little, correct?

15      A.    I don't know what I was

16  searching for when that came up.  I might

17  have been searching for "Little."  I might --

18  I was probably searching for "Combat Arms."

19      Q.    Now, one of the things, if we

20  look, you said that you sent the REAT data --

21  you sent the REAT data to -- you sent the

22  REAT data to Mark Little, and for the 213017

23  it says "folded flanges outward," correct?

24      A.    Correct.

25      Q.    But if we look at the 213016

1    that was also sent to Mr. Little, Major

2    Little, there is absolutely nothing in there

3    about those flanges being folded back,

4    correct?

5         A.    Correct.

6         Q.    So he would have to figure out,

7    well, sometimes they've got to be folded back

8    and sometimes they don't, correct?

9         A.    If your assertion is correct,

10   since you already asked me the subtlety about

11   should the flanges stay folded back, I would

12   make the presumption if this was concerning,

13   then he would have asked me, "Should I fold

14   the flanges back on only one end or the other

15   end?"

16              And in fact, the instructions

17   we provided were agnostic in that regard.  It

18   said "fold the flanges back."

19        Q.    Correct.

20              But the testing that you

21   provided him only showed folding back the

22   flanges on one side, true?

23        A.    True.

24        Q.    Okay.  Now --

25              MR. BROCK:  You got about two

Confidential - Pursuant to Protective Order

```
 1        minutes.
 2                 MR. MONSOUR:  I'm going to go
 3        over.
 4                 MR. BROCK:  No, you're not
 5        either.  We're going to stop at 30.
 6                 MR. MONSOUR:  Well, he was
 7        objecting too much, so I'm going to
 8        keep going.
 9                 MR. BROCK:  No.  No, you're
10        not.
11                 MR. MONSOUR:  Well --
12                 MR. BROCK:  I'm telling you
13        that in about three minutes, we're
14        going to conclude the deposition.  You
15        have 30 minutes.  I'm not taking up
16        your time now, so get going.  You got
17        about three minutes.
18    QUESTIONS BY MR. MONSOUR:
19        Q.    You said that you had received
20    some positive responses from the government
21    about this product, correct?
22        A.    Correct.
23        Q.    Did you ever receive any
24    negative responses from the government?
25        A.    Yes.
```

Confidential - Pursuant to Protective Order

1      Q.      And what was that?

2      A.      We looked at one of them

3   earlier about discomfort.

4      Q.      Okay.  Anything else?

5      A.      I think -- I don't recall

6   offhand.  I'm thinking there was more than

7   one negative.  There was certainly a number

8   of positives, but I don't recall right now.

9      Q.      What about when the government

10  sued 3M?  That's a negative, true?

11             MR. WASDIN:  Objection to form.

12             THE WITNESS:  I consider that a

13        very different issue.

14             Are you talking about the DOJ

15        case?

16  QUESTIONS BY MR. MONSOUR:

17     Q.      Correct.

18             You saw in the CHPPM document

19  that you mentioned earlier, you note that it

20  says here, "The Army -- or CHPPM is pointing

21  out that the sound will be low-toned and

22  slightly muffled to the wearer."

23             Correct?

24     A.      Correct.

25     Q.      But we went through yesterday

Confidential - Pursuant to Protective Order

1  **the marketing of these products, and the way**

2  **the company represented it, it said,**

3  **"clearly," "virtually unaffected," "clear,"**

4  **"without impairment," "hear-through clarity,"**

5  **"without interruption" or "Hear-Through®."**

6  **Correct?**

7  A.    I think you're conflating two

8  items.  Those words there refer to hearing

9  external sounds.  His words here are about

10  listening to your own voice while you're

11  wearing an earplug.

12  **Q.    He says, "The voice of the**

13  **individual wearing the plug with sound more**

14  **low-toned and slightly muffled."**

15  **Correct?**

16  A.    Correct.

17  And that's your self-heard

18  voice.  You hear your voice not only

19  emanating from your lips and coming back in

20  through your ear canals, but you also with

21  your vocal cords are vibrating your ear canal

22  walls, which are acting like little loud

23  speakers and generating sound.

24  And now when you cover those

25  ears, you add a fullness or bassiness to your

Confidential - Pursuant to Protective Order

1   voice that you don't hear otherwise.

2        Q.    Did any of your marketing, did

3   any of your marketing, mention that the

4   sounds would be low-toned or slightly

5   muffled?

6              MR. WASDIN:  Objection to

7         foundation.

8              THE WITNESS:  I -- again,

9         that's a fitting tip.  It's not a

10        perception of sounds in the

11        environment.

12  QUESTIONS BY MR. MONSOUR:

13        Q.    Listen to my question.  Listen

14  to my question.

15              Did any of the marketing pieces

16  that you have seen while working at 3M, do

17  they use the term when they're marketing it

18  to soldiers, do they ever use the term

19  "low-toned" and "slightly muffled"?

20        A.    With respect to the speaker's

21  own voice, I don't recall us discussing the

22  occlusion effect as a fitting tip.

23        Q.    Do they ever use those words

24  with regard to how the soldiers will be able

25  to hear?

Confidential - Pursuant to Protective Order

1               MR. WASDIN:  Objection to form.

2               THE WITNESS:  Those words that

3          you're citing are not about how the

4          soldiers can hear.

5    QUESTIONS BY MR. MONSOUR:

6          Q.      Listen to my question.

7               Does your company ever use the

8    terms "low-toned" and "slightly muffled" in

9    any of their marketing materials when talking

10   about a soldier's ability to hear?

11         A.      No.

12              MR. MONSOUR:  Thank you.

13              MR. BROCK:  Good.  Thank you.

14         We gave you an extra minute.

15              VIDEOGRAPHER:  All right.  This

16         concludes the deposition.  We're going

17         off record.  The time is 6:14.

18         (Deposition concluded at 6:14 p.m.)

19                  - - - - - - -

20

21

22

23

24

25

Confidential - Pursuant to Protective Order

```
 1                       CERTIFICATE

 2

 3           I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 4   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 5   of the examination, Elliott H. Berger, M.S.,
     was duly sworn by me to testify to the truth,
 6   the whole truth and nothing but the truth.

 7           I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10
             I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.
14

15

16

17       CARRIE A. CAMPBELL,
         NCRA Registered Diplomate Reporter
18       Certified Realtime Reporter
         California Certified Shorthand
19       Reporter #13921
         Missouri Certified Court Reporter #859
20       Illinois Certified Shorthand Reporter
         #084-004229
21       Texas Certified Shorthand Reporter #9328
         Kansas Certified Court Reporter #1715
22       Notary Public

23       Dated:  December 17, 2019

24

25
```

Confidential - Pursuant to Protective Order

```
 1              INSTRUCTIONS TO WITNESS

 2

 3           Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the

 6   appropriate space on the errata sheet for any

 7   corrections that are made.

 8              After doing so, please sign the

 9   errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13              It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25
```

Page 164

1                    ACKNOWLEDGMENT OF DEPONENT

2

3

4              I,_____, do
    hereby certify that I have read the foregoing
5   pages and that the same is a correct
    transcription of the answers given by me to
6   the questions therein propounded, except for
    the corrections or changes in form or
7   substance, if any, noted in the attached
    Errata Sheet.

8

9

10

11

12   _____
     Elliott H. Berger, M.S.              DATE
13

14

15   Subscribed and sworn to before me this

16   _____ day of _____, 20 _____.

17   My commission expires: _____

18

19   Notary Public

20

21

22

23

24

25

Confidential - Pursuant to Protective Order

```
 1                     _ _ _ _ _ _ _
                            ERRATA
 2                     _ _ _ _ _ _ _

 3      PAGE    LINE    CHANGE/REASON

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```

Confidential - Pursuant to Protective Order

1                      - - - - - - -
                       LAWYER'S NOTES
2                      - - - - - - -

3    PAGE    LINE

4    _____   _____    _____

5    _____   _____    _____

6    _____   _____    _____

7    _____   _____    _____

8    _____   _____    _____

9    _____   _____    _____

10   _____   _____    _____

11   _____   _____    _____

12   _____   _____    _____

13   _____   _____    _____

14   _____   _____    _____

15   _____   _____    _____

16   _____   _____    _____

17   _____   _____    _____

18   _____   _____    _____

19   _____   _____    _____

20   _____   _____    _____

21   _____   _____    _____

22   _____   _____    _____

23   _____   _____    _____

24   _____   _____    _____

25