# EXHIBIT 7

Confidential - Pursuant to Protective Order

```
 1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF FLORIDA
 2                 PENSACOLA DIVISION
 3

     IN RE: 3M COMBAT ARMS  )  Case No.
 4   EARPLUG PRODUCTS        )  3:19md2885
     LIABILITY LITIGATION    )
 5   _____    )  Judge M. Casey
                             )  Rodgers
 6   THIS DOCUMENT RELATES   )  Magistrate Judge
     TO ALL CASES            )  Gary R. Jones
 7

 8          FRIDAY, SEPTEMBER 4, 2020
 9   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
10                    - - -
11          Remote videotaped deposition of
12   Eric Fallon, Volume II, held at the location
13   of the witness in Baltimore, Maryland,
14   commencing at 9:03 a.m. Eastern Time, on the
15   above date, before Carrie A. Campbell,
16   Registered Diplomate Reporter and Certified
17   Realtime Reporter.
18

19

20                    - - -
21

             GOLKOW LITIGATION SERVICES
22       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
23

24

25
```

Confidential - Pursuant to Protective Order

```
 1      R E M O T E   A P P E A R A N C E S :
 2
        TRACEY FOX KING & WALTERS
 3      BY:  SEAN P. TRACEY
                stracey@traceylawfirm.com
 4              SHAWN FOX
                sfox@traceylawfirm.com
 5              LAWRENCE TRACEY
                ltracey@traceylawfirm.com
 6              LANCE WALTERS
                lwalters@traceylawfirm.com
 7      440 Louisiana Street, Suite 1901
        Houston, Texas  77002
 8      (713) 495-2333
 9
        and
10
11      SEEGER WEISS, LLP
        BY:  DAVID R. BUCHANAN
12              dbuchanan@seegerweiss.com
                MAX KELLY
13              mkelly@seegerweiss.com
        77 Water Street
14      New York, New York  10005
        (212) 584-0700
15
16      and
17
        AYLSTOCK, WITKIN, KREIS & OVERHOLTZ,
18      PLLC
        BY:  BRYAN ALYSTOCK
19              baylstock@awkolaw.com
                NEIL D. OVERHOLTZ
20              noverholtz@awkolaw.com
                JENNIFER HOEKSTRA
21              jhoekstra@awkolaw.com
        17 East Main Street
22      Pensacola, Florida  32502
        (850) 202-1010
23
24      and
25
```

Confidential - Pursuant to Protective Order

```
 1      CLARK, LOVE & HUTSON, PLLC
        BY:  SHELLEY HUTSON
 2           shutson@triallawfirm.com
             EMILY MARLOWE
 3           emarlowe@triallawfirm.com
             AMANDA HUNT
 4           ahunt@triallawfirm.com
        440 Louisiana Street, Suite 1600
 5      Houston, Texas  77002
        (713) 757-1400
 6
 7      and
 8
        MONSOUR LAW FIRM
 9      BY:  DOUGLAS C. MONSOUR
             doug@monsourlawfirm.com
10      404 North Green Street
        Longview, Texas  75601
11      (903) 999-9999
        Counsel for Plaintiffs
12
13
14      SCHWEBEL, GOETZ & SIEBEN, P.A.
        BY:  ALICIA N. SIEBEN
15           asieben@schwebel.com
        80 South 8th Street, Suite 5120
16      Minneapolis, Minneapolis  55402
        (612) 377-7777
17      Counsel for the Minnesota Plaintiffs
18
19
        US ARMY LITIGATION CENTER
20      BY:  MAJOR ROBERT E. WALD
             robert.e.wald.mil@mail.mil
21      901 North Stuart Street, Suite 700
        Arlington, Virginia 22203-1837
22      (703) 693-0352
        Counsel for the US Army
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1      KIRKLAND & ELLIS LLP
        BY:  F. CHADWICK MORRISS
 2          chad.morriss@kirkland.com
        1301 Pennsylvania Avenue, NW
 3      Washington, DC  20004
        (202) 389-5996
 4
 5      and
 6
        KIRKLAND & ELLIS LLP
 7      BY:  HARIKLIA KARIS
            hariklia.karis@kirkland.com
 8      300 North LaSalle
        Chicago, Illinois  60654
 9      (312) 862-2000
10
        and
11
12      KIRKLAND & ELLIS LLP
        BY:  SAGHAR ESFANDIARIFARD
13          saghar.esfandiarifard@kirkland.com
        2049 Century Park East
14      Los Angeles, California  90067
        (213) 680-8122
15      Counsel for Defendants
16
17      LEWIS WAGNER LLP
        BY:  A. RICHARD M. BLAIKLOCK
18          rblaiklock@lewiswagner.com
        501 Indiana Avenue, Suite 200
19      Indianapolis, Indiana  46202-6150
        (317) 237-0500
20      Counsel for the Witness
21
22   ALSO PRESENT:
            DANNY OLIVO, Tracey Fox King & Walters
23
            CHARLES BACHMANN, Seeger Weiss
24
            KAITLYN HOLDER, Kirkland & Ellis
25
```

Confidential - Pursuant to Protective Order

1           it can.  It depends on the degree of

2           hearing loss.  It depends on the

3           individual.  But I -- I would say that

4           it can, yes.

5     QUESTIONS BY MR. BUCHANAN:

6           Q.    Okay.  Well, it wouldn't

7     surprise you then if somebody who suffered

8     from noise-induced hearing loss said that it

9     was having a significant impact on their

10    family, would it?

11               MR. MORRISS:  Form.

12          Foundation.

13               THE WITNESS:  It would depend

14          on the degree of hearing impairment.

15          But if that person stated that, then I

16          would not be surprised if they -- if

17          they did, in fact, have some type of

18          cochlear damage.

19    QUESTIONS BY MR. BUCHANAN:

20          Q.    And you also wouldn't be

21    surprised, sir, if they actually had some

22    significant impact on their family or on

23    their relationships, right?

24               MR. MORRISS:  Form.

25          Foundation.

Confidential - Pursuant to Protective Order

1           THE WITNESS:  Yeah, that's a

2      very generalized question, but I would

3      not be surprised under certain

4      conditions if that were the case,

5      especially if it involved

6      communications.

7  QUESTIONS BY MR. BUCHANAN:

8      Q.    Right.

9           Because, I mean, I think you

10  already told us, sir, that hearing loss --

11  and I think you put in the word "can" -- but

12  hearing loss has a significant impact on

13  family, relationships and quality of life.

14           You generally agree with that?

15           MR. MORRISS:  Form and

16      foundation.  Form and foundation.

17           THE WITNESS:  I believe that it

18      can, as I stated, yes.

19  QUESTIONS BY MR. BUCHANAN:

20      Q.    Okay.  Can you continue with

21  the tape, please, Corey?

22           (Video played.)

23      Q.    Can you pause?

24           Was that you, sir, on that

25  video?

Confidential - Pursuant to Protective Order

1        A.    I was one of the individuals on

2   that, yes.

3        Q.    I think the clip we just looked

4   at and that we just hit pause on, can you

5   back it up so we have a -- that Colonel

6   Fallon.

7              (Video played.)

8        Q.    All right.  It's tough to get

9   the queues working, I guess, with my delays

10  being remote.

11             But you recognize your face on

12  that last clip, right, sir?

13       A.    I do, yes.

14       Q.    As opposed to Colonel Gates

15  that's on the screen right now.

16             And I think you told us in the

17  video -- and I guess is this a video that's

18  generally made available by the Hearing

19  Center of Excellence?

20       A.    I don't know how the Hearing

21  Center of Excellence released this video.  I

22  deemed it to be a motivational video to try

23  to encourage people to protect their hearing,

24  but I don't know how they released it.  I was

25  not privy to that.

Confidential - Pursuant to Protective Order

```
 1          Q.     Okay.  And what you said was,

 2    "It doesn't take very much hearing loss to

 3    really make you feel isolated and to realize

 4    that you're not following the conversation."

 5             Do you recall seeing that just

 6    a moment ago, your words, sir?

 7          A.     I do recall seeing it.

 8          Q.     Okay.

 9          A.     I do recall that, yes.

10          Q.     Doesn't take very much hearing

11    loss to really make you feel isolated.

12             And you weren't the only one

13    who was making that point among all those

14    other audiologists and physicians, right?

15                MR. MORRISS:  Object to form.

16                THE WITNESS:  I don't know if

17         they made that exact statement, but

18         they are all discussing isolation and

19         difficulties at family gatherings and

20         such, yes.  I would agree with that.

21    QUESTIONS BY MR. BUCHANAN:

22          Q.     Okay.  And you saw Colonel

23    Packer -- I think you said he was a

24    physician.  "So when we don't hear and we

25    can't communicate, we can't participate in
```

Confidential - Pursuant to Protective Order

1    the world around us.  It's a big effect."

2              You heard him say that, sir?

3         A.    I don't recall those exact

4    words, but I think that that was the general

5    comments that he was making.

6         Q.    You agree with that, right,

7    sir?

8         A.    I would agree, as I said

9    earlier, that most of these are gross

10   generalizations, and they're being stated as

11   a motivational video to try to avoid hearing

12   loss.

13             As I previously said, it really

14   does vary from person to person.

15        Q.    Okay.  I just want to know

16   whether you agree or disagree with Colonel

17   Packer when he said, "So when we don't hear

18   and we can't communicate and we can't

19   participate in the world around us, it's a

20   big effect."

21             Do you agree or disagree?

22        A.    I would say it -- I would agree

23   with that if you can't hear, yes.

24        Q.    Okay.  Lieutenant Colonel Beth

25   Harrison, you know her from the US Air Force?

Confidential - Pursuant to Protective Order

1    jury what the Army hearing conservation

2    program office was tasked with performing

3    during the time you were there?

4         A.    My understanding of our mission

5    was to help guide US Army policy as it

6    related to a hearing conservation program as

7    set forth by the Department of Defense.  And

8    it really kind of -- anything that fit into

9    that, supporting the installation hearing

10   conservation program managers.  And part of

11   that would have been the Surgeon General's

12   responsibility of having adequate policy to

13   support a hearing conservation program.

14        Q.    Okay.

15             MAJOR WALD:  I'm just going to

16        object to the extent he's purporting

17        to speak for the military.

18   QUESTIONS BY MR. MORRISS:

19        Q.    In your personal observations,

20   did the hearing conservation program office

21   implement the military hearing conservation

22   requirements?

23        A.    They did with regards to policy

24   and supporting installation hearing

25   conservation program managers.

Confidential - Pursuant to Protective Order

1        Q.     And did that include policy

2    related to hearing protection devices?

3        A.     That would have included that,

4    yes.

5        Q.     Now, the mandates of the

6    military with regard to hearing conservation

7    for each branch, what governed the

8    requirements for the branches of the

9    military?

10            MAJOR WALD:  Same objection to

11        the extent the question is trying to

12        seek the opinion of the military on

13        this.

14   QUESTIONS BY MR. MORRISS:

15        Q.     So let me rephrase it.

16            What did you understand was

17    the -- governed the individual branches of

18    requirements for hearing conservation were?

19        A.     My understanding was that there

20    was a Department of Defense instruction that

21    instructed all of the components of the

22    Department of Defense, the military branches,

23    to establish a hearing conservation program.

24    My understanding is it outlined some minimum

25    requirements that those components had to

Confidential - Pursuant to Protective Order

1    establish.

2          Q.     Dave, if you can pull Tab 7?

3    If you'll mark this as whatever the next

4    exhibit is.

5                 VIDEOGRAPHER:  Going off

6          record, 4:05 p.m.

7           (Off the record at 4:05 p.m.)

8                 VIDEOGRAPHER:  Back on record,

9          4:06 p.m.

10                (Fallon Exhibit 63 marked for

11         identification.)

12   QUESTIONS BY MR. MORRISS:

13         Q.     Dr. Fallon, do you have in

14   front of you what I think has been re-marked

15   as Exhibit 63?  I know there's been some

16   confusion about that.

17         A.     I have the Department of

18   Defense Instruction Number 6055.12.  I think

19   it was 64 when I clicked on it, but that's

20   what I have open right now.

21         Q.     So that's now been marked as

22   Exhibit Number 63.

23                Can you identify this document

24   for the jury, please?

25         A.     It is the Department of Defense

Confidential - Pursuant to Protective Order

1    Instruction 6055.12, dated April 22, 1996.

2         Q.    And is this what you described

3    as the minimum requirements that the

4    Department of Defense provided to the various

5    branches for their hearing conservation

6    programs?

7         A.    This is what I was referring

8    to, yes.

9         Q.    And in fact, we looked at a

10   later version of this earlier today that I

11   think was dated 2005, correct?

12        A.    I believe so, yes.  It was

13   updated later, yeah.

14        Q.    And if you'll turn over to 6.1,

15   which is on page 3 of the document.

16        A.    Okay.  Bear with me.

17              Could you say that number

18   again, please?

19        Q.    6.1, page 3.  Section 6.1.

20        A.    Okay.  I see that.

21        Q.    And is there a requirement

22   about whether each branch should have a

23   hearing conservation program in writing?

24        A.    There is.

25        Q.    And what is the requirement?

Confidential - Pursuant to Protective Order

1          A.     It says, "The DOD components

2    shall prepare a written plan for the

3    implementation of a comprehensive hearing

4    conservation program."

5          Q.     And if we turn over to

6    Section 6.6.2 that is on page 7, and just let

7    me know when you get there.

8          A.     Okay.  6.6.2?

9          Q.     Right.

10               Does the DOD instruction

11   address whether or not personal hearing

12   protectors should be provided?

13         A.     They do, yes.

14         Q.     And what is the requirement?

15               MR. BUCHANAN:  Counsel, just --

16         excuse me, sir.  I just want to

17         interject my objection.

18               I'm just going to ask the

19         extent to which the witness is being

20         asked to provide a position of the

21         Department of Defense or the military.

22   QUESTIONS BY MR. MORRISS:

23         Q.     Sure.

24               What is your understanding of

25   what the requirement was during the time that

Confidential - Pursuant to Protective Order

1  you were in the hearing conservation program

2  office?

3       A.     It was that DOD components

4  shall issue personal hearing protections --

5  protectors free to all personnel who work in

6  designated hazardous noise areas or operate

7  noise-hazardous equipment.

8       Q.     And if you turn over to 6.6.7

9  on page 8, was there guidance related

10  specifically to preformed earplugs?

11              MR. BUCHANAN:  Same objection.

12              THE WITNESS:  My

13       understanding --

14  QUESTIONS BY MR. MORRISS:

15       Q.     So if you turn over to 6.6.7,

16  does it provide guidance specific to

17  preformed earplugs?

18              MR. BUCHANAN:  Same objection.

19              THE WITNESS:  6.6.7 does.

20  QUESTIONS BY MR. MORRISS:

21       Q.     Let's try it again.  Let me ask

22  a question, let him make whatever objection

23  he's going to make, and then you'll answer

24  it.

25       A.     Okay.

Confidential - Pursuant to Protective Order

```
 1        Q.     If you'll turn to 6.6.7 on

 2   page 8, does it provide instructions specific

 3   to preformed earplugs?

 4             MR. BUCHANAN:  Objection to the

 5        extent the witness is being asked to

 6        provide Department of Defense or Army

 7        interpretation.

 8             THE WITNESS:  Yes, that

 9        paragraph seems to state that, yes.

10   QUESTIONS BY MR. MORRISS:

11        Q.     And can you just read 6.6.7 to

12   the jury?

13        A.     6.6.7 says, "Preformed earplugs

14   shall be fitted and issued only under the

15   supervision of personnel who have been

16   specifically trained to fit earplugs."

17        Q.     All right.  And what was your

18   understanding about a preformed earplug

19   during your time with the hearing

20   conservation office?  What did that mean to

21   you?

22        A.     I would define a preformed

23   earplug as one that does not have to be

24   hand-formed.  That's how I would define it.

25        Q.     And would that include the
```

Confidential - Pursuant to Protective Order

```
 1   Combat Arms dual-ended plug that we talked

 2   about today?

 3        A.    I would consider that to be --

 4              MR. BUCHANAN:  Objection to the

 5        extent it goes beyond his

 6        understanding.

 7   QUESTIONS BY MR. MORRISS:

 8        Q.    Let him -- you're going to have

 9   to let him object so we can get a clean

10   answer.

11        A.    Okay.

12        Q.    Is it your understanding that

13   the preformed earplugs included the

14   dual-ended version of the Combat Arms?

15        A.    That is my understanding, yes.

16        Q.    And did the instruction under

17   6.6.9 describe what kind of personnel was

18   responsible for examining the fit and the

19   condition of these preformed plugs?

20        A.    6.6.9 states:  "Medically

21   trained personnel must examine the fit and

22   condition of preformed and custom earplugs at

23   least annually."

24        Q.    And were these requirements

25   that we've talked about, were they in place
```

Confidential - Pursuant to Protective Order

1  during the entire time that you were part of

2  the Army hearing conservation program office?

3          MR. BUCHANAN:  Objection.  Form

4      and foundation and to the extent to

5      which it goes beyond his

6      understanding.

7          THE WITNESS:  It is my belief

8      and understanding that they were in

9      effect, yes.  That's correct.

10 QUESTIONS BY MR. MORRISS:

11     Q.    And were you made aware of

12 whether or not the Army, in fact, implemented

13 these instructions?

14     A.    Yes, I believe that the Army

15 implemented these instructions.

16     Q.    And, Dave, if you'll pull

17 Exhibit 5 and mark it as Exhibit 64.

18          (Fallon Exhibit 64 marked for

19      identification.)

20 QUESTIONS BY MR. MORRISS:

21     Q.    And just let me know when

22 you've had an opportunity to load it.

23     A.    So what I see as 64 is DA PAM

24 40-501.

25     Q.    What is DA PAM 40-501?

Confidential - Pursuant to Protective Order

1       A.    DA PAM 40-501 is a Department

2  of the Army pamphlet titled "Hearing

3  Conservation Program."

4         And it's my understanding that

5  it outlined how the Army was going to meet

6  the Department of Defense instruction

7  requirements that you mentioned earlier.

8       Q.    And what is the date of this

9  particular pamphlet?

10      A.    This pamphlet is dated 10

11  December 1998.

12      Q.    And was this in force during

13  your time at the Army hearing conservation

14  program office?

15      A.    That is my understanding, yes.

16      Q.    Now, if you'll turn over to

17  Section 6.1, which is on page 5.

18      A.    6.1.  Okay.  I'm at 6.1.

19      Q.    Okay.  Did the Army pamphlet,

20  as you've said, marry up with the DOD

21  instruction in terms of making hearing

22  protection devices available to military

23  personnel?

24         MR. BUCHANAN:  Objection to

25    form and foundation and to the extent

Confidential - Pursuant to Protective Order

 1          to which it goes beyond his

 2          understanding.

 3                    THE WITNESS:  And just so that

 4          we know, what I'm seeing on my screen

 5          is not what I'm seeing on the video

 6          screen.

 7                    But what I'm seeing is

 8          Chapter 6 entitled "Hearing

 9          Protection," and 6-1 is Introduction,

10          and it talks about personnel being

11          issued hearing protection.

12                    I'm sorry, if you could repeat

13          that question.

14     QUESTIONS BY MR. MORRISS:

15          Q.    Yeah.  So I think we now have

16     the right page up.

17                    So if we turn to page 5,

18     Chapter 6, it's entitled "Hearing

19     Protectors," correct?

20          A.    That is correct, yes.

21          Q.    And if I understood your

22     testimony earlier, one of the things that the

23     DOD instruction required was to make hearing

24     protection devices available to military

25     personnel, correct?

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. MORRISS:

 2        Q.     So you have knowledge of these

 3   requirements based on your personal role in

 4   the military, correct?

 5                MR. BUCHANAN:  Objection to

 6        form.

 7                THE WITNESS:  I do, yes.

 8   QUESTIONS BY MR. MORRISS:

 9        Q.     So if we turn now to

10   Section 6-3, which is on page 6, does it also

11   have a section that deals specifically with

12   preformed earplugs?

13        A.     I'm sorry, I'm getting there.

14   6-3?

15        Q.     On page 6.

16        A.     Yes, I do see preformed

17   earplugs.

18        Q.     Okay.  And what does the Army

19   written policy say about how preformed

20   earplugs like the dual-ended Combat Arms

21   Earplug should be fit and examined?

22                MR. BUCHANAN:  Objection to

23        form.

24                MR. TRACEY:  Objection.  Form.

25                THE WITNESS:  This says,
```

Confidential - Pursuant to Protective Order

1          "Preformed earplugs are triple or

2          single-flange earplugs," but I also

3          consider the Combat Arms Earplug to be

4          preformed.

5               And it says, "Medically trained

6          personnel must fit and examine these

7          earplugs at least annually to ensure

8          proper fit and condition."

9   QUESTIONS BY MR. MORRISS:

10       Q.    And was it your understanding

11  that under the Army policy -- well, let me

12  ask it this way.

13            What was your understanding

14  about what Army policy would require for any

15  soldier that was going to be fit with a

16  hearing protection device like the Combat

17  Arms dual-ended plug?

18       A.    My understanding is that that

19  must be fit by medically trained personnel,

20  if I'm understanding the question right.

21       Q.    Let me make sure.

22            So we're looking at 6-3, and

23  this is from the Army pamphlet, correct?

24       A.    This is part of the DA PAM

25  40-501, yes.

Confidential - Pursuant to Protective Order

```
 1         Q.     It has a section on how

 2  preformed earplugs should be fit and

 3  examined; is that right?

 4         A.     That is correct, yes.

 5         Q.     And so based on this policy,

 6  what would be sort of the practical impact of

 7  how a soldier should be fit with a preformed

 8  plug like the Combat Arms dual-ended plug?

 9              MR. BUCHANAN:  Objection to

10         form and foundation and -- to the

11         extent it goes beyond his

12         understanding.

13              THE WITNESS:  That it should be

14         fit by medically trained personnel.

15  QUESTIONS BY MR. MORRISS:

16         Q.     Now, who within the Army had

17  the responsibility to actually fit and

18  examine hearing protection devices as we've

19  been discussing in these Army policy

20  provisions?

21              MR. BUCHANAN:  Objection to

22         form and the extent to which it goes

23         beyond his understanding.

24              THE WITNESS:  Primarily in my

25         experience, it would have been what I
```

Confidential - Pursuant to Protective Order

```
 1        would call a hearing conservation

 2        technician assigned at an installation

 3        level.

 4             It could have been an

 5        audiologist under certain conditions,

 6        but it -- there are also instances

 7        where it could have been an

 8        occupational health nurse if that

 9        person or technician, if they had been

10        through a hearing conservation

11        technician course.

12             But by and large, it would have

13        been a hearing conservation

14        technician, in my experience.

15   QUESTIONS BY MR. MORRISS:

16        Q.    So how were these hearing

17   technicians or industrial hygiene nurses, how

18   were they trained on the fitting of hearing

19   protection devices?

20        A.    Well, it would have been --

21             MR. BUCHANAN:  Objection.

22        Excuse me, sir.  I'm sorry.  Just give

23        me a moment.

24             Objection to form and, again,

25        to the extent it goes beyond his
```

Confidential - Pursuant to Protective Order

1          understanding.

2     QUESTIONS BY MR. MORRISS:

3          Q.     Well, let me ask you this:  Do

4     you know personally how the folks that were

5     fitting these hearing protection devices in

6     the Army were trained?

7          A.     My experience was that they

8     were trained, and I did participate in

9     training courses; that they would have gone

10    through a certification course to become

11    hearing conservation technicians.  And they

12    could have achieved -- they could have been

13    trained at either installation-level or maybe

14    even at the Army hearing conservation program

15    office at USACHPPM.

16         Q.     So did the Army hearing

17    conservation program office that you were

18    part of participate in the training of these

19    technicians and others that actually had the

20    responsibility to fit and examine earplugs?

21              MR. BUCHANAN:  Objection to

22         form.

23              THE WITNESS:  We did conduct

24         the certification courses, yes.

25

Confidential - Pursuant to Protective Order

```
1    QUESTIONS BY MR. MORRISS:

2        Q.    And did you personally make

3    these training presentations to technicians

4    and others about hearing protection devices

5    and hearing conservation?

6        A.    I did personally make these

7    presentations, and I witnessed other -- my

8    other staff members or co-staff members make

9    these presentations as well.

10       Q.    And what were the tools or

11   resources that were used to teach the

12   technicians and others on the specifics about

13   hearing conservation and hearing protection

14   devices?

15            MR. BUCHANAN:  Objection.  Form

16       and foundation.

17            THE WITNESS:  We would use

18       PowerPoint presentations.  We would

19       have -- we made binders up that the

20       students could use as reference

21       materials.  We would have provided

22       pertinent military regulations and

23       guidance.  We would have performed

24       hands-on training either with earplug

25       fitting exercises or hearing testing
```

Confidential - Pursuant to Protective Order

1          exercises.  So we would have used a

2          variety of training materials.

3                  Specifically to the Combat Arms

4          Earplug, we would have handed out

5          wallet cards for the Combat Arms

6          Earplug.

7                  So we would have used a variety

8          of methods.

9     QUESTIONS BY MR. MORRISS:

10         Q.    As it relates --

11                MR. BUCHANAN:  Objection.

12         Counsel, excuse me, sir.  I didn't

13         realize that was going to draw a

14         narrative.  I'm just going to object

15         to the narrative.

16    QUESTIONS BY MR. MORRISS:

17         Q.    As it relates to -- generally

18    to how to fit a hearing protection device,

19    give the jury some examples -- not specific

20    to the Combat Arms, but just generally the

21    kinds of things that these technicians would

22    be taught in these training classes.

23                MR. BUCHANAN:  Objection.

24         Form.  Calls for a narrative.

25                THE WITNESS:  They would have

Confidential - Pursuant to Protective Order

```
 1          been taught how to get the ear ready
 2          to receive a hearing protection
 3          device.
 4                 Actually, I can even back up
 5          from that.
 6                 As part of these courses, they
 7          would have received training on the
 8          anatomy and physiology of the ear.
 9          That would have included diseases and
10          abnormal pathologies of the ear so
11          that they could identify whether or
12          not someone's ear canal was healthy
13          enough to be fit with a hearing
14          protector and that there were no
15          medical contraindications.
16                 They would have been taught how
17          to pull outwards and back on the outer
18          ear to open up the ear canal for
19          fitting, and then based on a variety
20          of hearing protectors, how to get that
21          earplug ready to be fit.
22     QUESTIONS BY MR. MORRISS:
23          Q.    How about how to determine
24     whether or not a particular soldier or
25     personnel actually had a good fit?  Were
```

Confidential - Pursuant to Protective Order

1    there ways to determine that that these

2    technicians were thought?

3                    MR. BUCHANAN:  Objection to

4           form.

5                    THE WITNESS:  We would have

6           taught them a number of things:

7           number one, what we would call a

8           vacuum test.  If you have an

9           appropriately fit hearing protector to

10          tug on it, you should feel a vacuum on

11          the other side of it.

12                   An obvious one is that the

13          sound is reduced.  You're listening to

14          environmental sounds with an open ear

15          canal; you put an earplug in, things

16          should sound muffled.

17                   To say something, and if you

18          have a good seal, your voice should

19          sound deeper to you, what we call the

20          occlusion effect.

21                   Another technique that I would

22          sometime use is if you have an earplug

23          that is appropriately fit, you can

24          take your hand and cup it over the

25          ear, and you really shouldn't hear a

Confidential - Pursuant to Protective Order

```
1          further significant reduction.

2               Those are the types of things

3          that we would have utilized.

4    QUESTIONS BY MR. MORRISS:

5          Q.    I want to shift gears a little

6    bit, and in addition --

7               MR. BUCHANAN:  Just objection

8          and move to strike.  Nonresponsive.

9    QUESTIONS BY MR. MORRISS:

10         Q.    In addition to these trainings

11   that were directed toward the technicians or

12   the people in the field fitting the plugs,

13   did the Army hearing conservation program

14   office also have training sessions or courses

15   that were specific to the audiologists that

16   might be working in a particular

17   installation?

18              MR. BUCHANAN:  Objection to

19         form.

20              THE WITNESS:  There would have

21         been ways of training those

22         audiologists as well.

23   QUESTIONS BY MR. MORRISS:

24         Q.    Can you describe those ways for

25   the jury, please?
```

Confidential - Pursuant to Protective Order

```
 1          A.     One -- one of the training

 2    opportunities would have been what was

 3    called --

 4               MR. BUCHANAN:  I'm sorry.  I'm

 5          sorry.  It's just calling for a

 6          narrative.  Objection to form.

 7               MR. MORRISS:  I'd appreciate

 8          you getting it in before he starts the

 9          answer and not interrupting in the

10          middle of a sentence.

11               MR. BUCHANAN:  Yeah, and I'm

12          doing my -- I'm doing my best, sir, as

13          you know.  We got some technology

14          challenges with COVID.

15    QUESTIONS BY MR. MORRISS:

16          Q.     So let me ask it again.

17               So did the Army hearing

18    conservation program office also train

19    audiologists who would have been at different

20    installations throughout the United States?

21          A.     Yes.

22               MR. BUCHANAN:  Same objection.

23    QUESTIONS BY MR. MORRISS:

24          Q.     And can you describe for the

25    jury the way these audiologists would have
```

Confidential - Pursuant to Protective Order

1    been trained?

2            What were the vehicles that

3    allowed the hearing conservation program

4    office to train audiologists?

5                    MR. BUCHANAN:  Objection.

6         Form.

7                    MAJOR WALD:  Objection to the

8         extent it calls for him to purport to

9         be speaking on behalf of the

10        government.

11                   THE WITNESS:  One method would

12        be what was referred to at that time

13        as military audiology short courses,

14        where all military audiologists were

15        brought to a location for training and

16        presentations and meetings.

17                   Another form would have been to

18        bring new audiologists to the Army

19        hearing conservation program office

20        for training.  The Army hearing

21        conservation program office may also

22        occasionally host just a hearing

23        conservation conference and bring

24        officers to that as well.

25

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. MORRISS:

2         Q.     Now, we've talked a good bit

3    about the Combat Arms dual-ended plug, and I

4    want to follow up on some of that.

5              Were you familiar with the

6    Combat Arms dual-ended plug during the time

7    that you were working at the Army hearing

8    conservation program office?

9         A.     Yes, I was familiar with the

10   dual-ended, the Combat Arms Earplug, during

11   that time.

12        Q.     All right.  And just so we get

13   oriented, can you describe the plug to the

14   jury and your understanding of how it worked?

15        A.     The dual-ended Combat Arms

16   Earplug had two capabilities.  It served as a

17   passive hearing protector, but it also had a

18   functional capacity to serve as what we call

19   a level-dependent hearing protector.

20              So in a nutshell, the passive

21   protector just kind of plugged your ear up

22   and protected you up to a certain point

23   against hazardous noise.

24              The level-dependent capability

25   was designed to be used in quiet, which

Confidential - Pursuant to Protective Order

1    sounds strange, but in quiet to allow some

2    sound to pass through, but if there was a

3    certain -- a sudden exposure to impulse

4    noise, to offer you protection against

5    impulse noise.

6         Q.    These training courses that you

7    led where technicians were the audience, did

8    your training sessions have information

9    specific to the Combat Arms dual-ended plug?

10        A.    Yes, those training sessions

11   addressed the dual-ended Combat Arms Earplug.

12        Q.    Do you recall about how often

13   these technician courses were taught?

14        A.    My recollection is they weren't

15   on a routine.  They were just taught as

16   needed.

17             And remember, we -- at the Army

18   hearing conservation program office, we were

19   just -- we were on a -- some of those

20   courses.  They were also taught at the

21   installation level.  But my recommendation is

22   that we would teach somewhere between six and

23   eight of those at the Army hearing

24   conservation program office.

25        Q.    And when you made your

Confidential - Pursuant to Protective Order

```
 1    presentations, did you include specific

 2    instructions relating to how the Combat Arms

 3    dual-ended earplug should be fit?

 4         A.     I did, yes.

 5         Q.     Now, we had a lot of discussion

 6    about the third flange.

 7               Do you recall learning that

 8    there was a fitting tip relating to the outer

 9    third flange of the dual-ended Combat Arms

10    Earplug?

11               MR. BUCHANAN:  Objection to

12          form.

13               THE WITNESS:  I do, yes.

14    QUESTIONS BY MR. MORRISS:

15         Q.     Okay.  And tell me what you

16    remember learning about that.

17         A.     I don't remember where I

18    learned it, but what I learned was that if

19    you could not achieve a proper fit of the

20    Combat Arms Earplug, that an additional

21    technique that was available to you would be

22    to roll the opposing third flange back and

23    then attempt to fit the hearing protector.

24               And if you could achieve a good

25    fit, then you had a good fit.  You should
```

Confidential - Pursuant to Protective Order

 1   instruct the person to roll the third flange

 2   back.

 3            If you could not achieve a good

 4   fit after attempting that, then you would

 5   have to seek out another hearing protection

 6   device.

 7        Q.    And did the materials that you

 8   used, the PowerPoints or the wallet card or

 9   any of the other materials that you had

10   available, did they include information about

11   rolling back the third flange and present

12   photographs?

13            MR. BUCHANAN:  Objection to

14       form.

15            THE WITNESS:  I do recall those

16       presentation materials showing photos

17       of the third flange being rolled back.

18            I remember them having a

19       statement about rolling the -- that

20       flange back under certain conditions.

21       And it's my recollection that I taught

22       them to try that if they could not

23       achieve a good fit.

24   QUESTIONS BY MR. MORRISS:

25        Q.    Now, Dave, if you'll pull

Confidential - Pursuant to Protective Order

1    Tab 2.

2                  And I think a version of this

3    has been marked, but I want to go ahead and

4    mark this as the next exhibit.

5                  MR. BLAIKLOCK:  Counsel, while

6         you are marking that -- this is Rich

7         Blaiklock -- I am going to exit the

8         deposition as I had mentioned earlier.

9              (Fallon Exhibit 65 marked for

10        identification.)

11                 THE WITNESS:  Okay.  I have it

12        loaded up, hearing protection devices.

13   QUESTIONS BY MR. MORRISS:

14        Q.    And this was similar

15   presentation you were asked about earlier

16   today, correct?

17        A.    That's correct, yes.

18        Q.    And can you just tell the jury

19   what this is and what it was used for?

20        A.    This --

21                 MR. BUCHANAN:  I'm just going

22        to -- excuse me, Mr. Fallon.  Sorry.

23                 I'm just going to object to the

24        extent you're asking him beyond his

25        personal use.  Or an attempt to elicit

Confidential - Pursuant to Protective Order

1        testimony on behalf of the Army.

2    QUESTIONS BY MR. MORRISS:

3        Q.    If you'll take a look,

4    Dr. Fallon, at Exhibit 65, is this a document

5    that you're familiar with?

6        A.    This is a document that I am

7    familiar with, yes.

8        Q.    And in fact, it's a document

9    that you've produced or your lawyers have

10   produced in this litigation, correct?

11       A.    That is correct, yes.

12       Q.    Did you use this slide deck,

13   Exhibit 65, in making training presentations?

14       A.    I used this document when I

15   would teach hearing conservation technician

16   courses, and my colleagues, to my -- best of

17   my recollection, would also use this file.

18       Q.    All right.

19       A.    This document.

20       Q.    And if you'll turn over to

21   slide number -- it has the number 40 at the

22   bottom of it.  I think we looked at this

23   earlier today.

24       A.    40?

25       Q.    It says "FALLON 40" at the

Confidential - Pursuant to Protective Order

1  of these two days, sir, you have not been

2  shown and you have not seen any picture of

3  the Combat Arms in somebody's ear with the

4  flanges folded back, correct?

5      A.     That is correct, I do not

6  recall that.

7      Q.     Okay.  You don't recall any

8  training presentation that you've ever used,

9  sir, with a picture of the Combat Arms in

10 somebody's ear with the flanges folded back,

11 correct?

12     A.     I do not recall seeing a photo

13 in someone's ear of the flange folded back.

14     Q.     Thank you, sir.

15            You showed -- withdrawn.  Let

16 me start over there.

17            On examination with

18 Mr. Morriss, you were shown a clip from a

19 Lieutenant Colonel Merkley.

20            Do you recall that?

21     A.     I do recall that, yes.

22     Q.     Okay.  Corey, could you pull up

23 and play, please, Merkley clip 12?

24            (Video played.)

25     Q.     Stop there, sir.

Confidential - Pursuant to Protective Order

1                      You'd agree, sir, that the Army

2    relies on product information from its

3    vendors with regard to hearing protection,

4    right?

5          A.    I don't know that I would agree

6    with that, no.

7          Q.    You disagree --

8          A.    That doesn't mean never get it,

9    but I -- in my experience, the military will

10   commonly perform its own testing as well, so

11   it's probably a mixture of that.

12         Q.    Probably a mixture, is that

13   what you're saying?

14         A.    Yes.  That's been my

15   experience.  It's more of a let's verify,

16   that kind of mentality.

17         Q.    Okay.  So they do rely on

18   information from the vendors with regard to

19   hearing protectors; is that right?

20         A.    Well, what I'm attempting to

21   say is they may take that, but they would not

22   rely on it.  That's been my experience with

23   military products.

24                      Now, of course I'm not a

25   military product expert, but that has been my

```
 1    general experience.

 2         Q.    Okay.  I just want to make

 3    sure, now that we're at the end day 2 of your

 4    examination, that we understand where you're

 5    coming down on this at this point, sir.

 6              The military does receive

 7    information on products from vendors, right?

 8         A.    They may receive information,

 9    yes.

10         Q.    Okay.  And is it your

11    testimony, sir, that they rely in part on

12    that information, as you just said?

13         A.    I don't think that you can say

14    empathically one way or the other.  What I'm

15    saying is my experience with the military has

16    been that they tend to test out products and

17    make their own determination about how a

18    product performs and how to use the product.

19         Q.    And let's --

20         A.    I'm just -- based on my

21    experience.

22         Q.    Okay.  Well, we have Lieutenant

23    Colonel Merkley's testimony that the Army

24    relies on product information from its

25    vendors.  I want to understand your personal
```

Confidential - Pursuant to Protective Order

1  experience with regard to the Combat Arms

2  version 2.

3              Were you a part of the

4  evaluation of the Combat Arms before it was

5  accepted by USACHPPM?

6      A.    I was not part of the

7  evaluation before that earplug was approved,

8  no.

9      Q.    Okay.  And so you don't know

10  what information was provided or not provided

11  by the manufacturer to the military, fair?

12      A.    It's fair to say that I do not

13  know what information was provided from the

14  manufacturer.

15              My -- what I am more familiar

16  with is what maybe the Army Research Lab did

17  with the product, yes.

18      Q.    Okay.  And I'm focused again

19  specifically on the Combat Arms version 2,

20  and I asked you whether you had

21  familiarity -- you had familiarity with the

22  information that was provided or not provided

23  to the Army in connection with its

24  consideration of the product.

25              You have no information in that

Confidential - Pursuant to Protective Order

```
 1   regard, correct?

 2        A.     I do not have any information

 3   in that regard, you are correct.

 4        Q.     Okay.  Let's play Merkley clip

 5   10, if we could.

 6              (Video played.)

 7        Q.     Okay.  Sir, I didn't see -- I

 8   didn't see you discuss that portion of

 9   Mr. Merkley's testimony in your examination

10   with Mr. Morriss.

11              You'd agree, right?

12        A.     I have not seen that -- that

13   portion of that testimony, you're correct.

14        Q.     Okay.  And so I just want to

15   understand where you come down on this and

16   whether you disagree with Lieutenant Colonel

17   Merkley on this one as well.

18              Do you agree, sir, that if

19   Combat Arms had a particular problem sealing

20   or maintaining a seal, that would be

21   something important to know?

22              MR. MORRISS:  Object to form.

23              THE WITNESS:  I don't know if I

24         agree with it because I don't know

25         what he means by the word
```

Confidential - Pursuant to Protective Order

1                         CERTIFICATE

2

3              I, CARRIE A. CAMPBELL, Registered
    Diplomate Reporter, Certified Realtime
4   Reporter and Certified Shorthand Reporter, do
    hereby certify that prior to the commencement
5   of the examination, Eric Fallon, was duly
    sworn by me to testify to the truth, the
6   whole truth and nothing but the truth.

7              I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
8   testimony as taken stenographically by and
    before me at the time, place and on the date
9   hereinbefore set forth, to the best of my
    ability.

10

             I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
13  that I am not financially interested in the
    action.

14

15

16
             _Carrie A. Campbell_____
17  CARRIE A. CAMPBELL,
    NCRA Registered Diplomate Reporter
18  Certified Realtime Reporter
    Notary Public

19

20

21

22

23  Dated:  September 11, 2020

24

25