# Exhibit G

Confidential - Pursuant to Protective Order

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF FLORIDA
 2                   PENSACOLA DIVISION
 3
     IN RE: 3M COMBAT ARMS  )  Case No.
 4   EARPLUG PRODUCTS       )  3:19md2885
     LIABILITY LITIGATION   )
 5   _____ )  Judge M. Casey
                            )  Rodgers
 6   THIS DOCUMENT RELATES  )  Magistrate Judge
     TO ALL CASES           )  Gary R. Jones
 7
 8          WEDNESDAY, NOVEMBER 13, 2019
 9      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
10                        - - -
11           Videotaped 30(b)(6) deposition of
12   Elliott H. Berger, M.S., held at the offices
13   of KIRKLAND & ELLIS LLP, 300 North LaSalle,
14   Chicago, Illinois, commencing at 9:04 a.m.,
15   on the above date, before Carrie A. Campbell,
16   Registered Diplomate Reporter, Certified
17   Realtime Reporter, Illinois, California &
18   Texas Certified Shorthand Reporter, Missouri
19   & Kansas Certified Court Reporter.
20                        - - -
21
              GOLKOW LITIGATION SERVICES
22       877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
23
24
25
```

1      Q.     And they selected you as the
2   person who would testify on those topics,
3   right?
4      A.     Yes.
5      Q.     Okay.  And have you spent time
6   preparing to testify about the topics for
7   which you've been designated?
8      A.     Yes.
9      Q.     And we'll go through the topics
10  and list them out one by one, but generally
11  can you tell me what you've been doing to
12  prepare to speak on behalf of the company on
13  these topics today?
14     A.     Yes.  I met with my attorneys.
15  I reviewed documents on my 3M computer that's
16  currently assigned to me and others that I
17  had access to.  This included my personal
18  notes, reports, computer files.
19            I provided suggestions to the
20  attorneys regarding potential other places
21  that documents or electronic files would be
22  housed in the various departments in our
23  building.
24            I reviewed documents that were
25  provided to me by the attorneys to help me

1  refresh my memory, and since I was an
2  employee at the company during the period of
3  time we're discussing, I have my own personal
4  recollections that I can rely on.
5           And then additionally, with the
6  attorneys present, I interviewed some current
7  and former employees on various topics to
8  understand their recollections.
9       Q.   Okay.  Let me ask a few
10 follow-up on that.
11          When did you begin preparing to
12 testify as the corporate representative for
13 the 30(b)(6) deposition that we're here for
14 today on these various topics?
15      A.   I believe that occurred
16 sometime in September.
17      Q.   Okay.  You said you had a 3M
18 computer that's available to you.
19          Is that a laptop, or is that a
20 laptop at the office or --
21      A.   It's a laptop.
22      Q.   Okay.  And from that laptop you
23 have access to the server file system at 3M?
24      A.   Yes.
25      Q.   Okay.  Your e-mail account at

1   3M, has it maintained consistent even after
2   you retired and became a part-time consultant
3   for the company?
4           A.      In large part.  There were
5   problems in the transition, and so portions
6   of the e-mail records are no longer on this
7   computer.
8           Q.      Okay.  Do you know where they
9   are?
10          A.      I've had people try and look
11  for them, and they were not locatable.
12          Q.      Who did you have try to look
13  for them?
14          A.      IT in St. Paul.
15          Q.      And they were unable to locate
16  those files?
17          A.      Correct.
18          Q.      Was there a particular person
19  at IT that you asked to look for those
20  e-mails?
21          A.      I don't recall.  I put in an IT
22  support ticket.  You know, there were
23  multiple tries, and the answer was those
24  missing portions couldn't be restored.
25          Q.      Okay.  I've seen in some of the

1   documents you also have a personal e-mail
2   account that you use; is that right?
3       A.   At that time I did.
4       Q.   Okay.  That's your CompuServe
5   e-mail address; is that right?
6       A.   Yes.
7       Q.   And what's the e-mail address
8   for that?  Is it eberger@compuserve?
9       A.   Yes.
10      Q.   Do you still have that e-mail
11  account?
12      A.   I do.
13      Q.   Okay.  And you sometimes use
14  that CompuServe e-mail address for 3M work;
15  is that right?
16           MS. ELIZABETH:  Objection.
17      Vague as to time.
18           THE WITNESS:  Could you please
19      clarify the time frames you're talking
20      about?
21  QUESTIONS BY MR. OVERHOLTZ.
22      Q.   Sure.
23           When you were an employee at 3M
24  before your retirement, you used your
25  CompuServe e-mail address for your work with

Confidential - Pursuant to Protective Order

 1   the company?
 2        A.    Not during my employment at 3M.
 3        Q.    Okay.  How about with Aearo?
 4        A.    With Aearo, yes.
 5        Q.    Okay.  And I imagine you use
 6   that as a convenience feature for being able
 7   to get remote e-mail when you're on the road
 8   and traveling and those type of things?
 9        A.    I don't recall the details from
10   the '90s, but it's -- you know, e-mail has
11   morphed and changed.  And so at that time I
12   was using that, as corporate e-mails were
13   becoming more prevalent and more robust.
14        Q.    Okay.  Your CompuServe e-mail,
15   as part of the preparation for testifying on
16   behalf of the company, did you review any of
17   your CompuServe e-mail?
18        A.    Yes.
19        Q.    Okay.  And did you do
20   anything -- how did you -- how did you go
21   about finding e-mails related to the topics
22   we're talking about today within your
23   CompuServe e-mails?
24        A.    That required the use of an
25   e-mail client that no longer resides on these

 1   computers, so it was done back in 2015.  I
 2   searched those e-mails for the name Doug
 3   Ohlin, and I put together a Word document
 4   where I copied and pasted every e-mail that
 5   had that name in it.
 6        Q.    Okay.
 7        A.    I also -- although that
 8   software no longer works on the computer, I
 9   have that file where all of the files related
10   to that software and e-mails were located,
11   and I provided that to the attorneys.
12        Q.    Okay.  So the search for Doug
13   Ohlin across that e-mail client, do you
14   remember the name of that e-mail client that
15   you used?
16        A.    Eudora.
17        Q.    Eudora.  I do remember Eudora.
18              And you used Eudora to run a
19   search for Doug Ohlin.
20              Did you search for anything
21   else besides Ohlin?
22        A.    I'm not sure.
23        Q.    Okay.  And the e-mails -- you
24   selected e-mails to copy and paste into a
25   Word document at that point in time; is that

```
 1   right?
 2         A.     Every one that I found.
 3         Q.     Okay.
 4         A.     There was no selection.  If it
 5   showed up, it got copied and pasted.
 6         Q.     Okay.  And what was -- and what
 7   happened to that file, that Word file, that
 8   you created?
 9         A.     It's still on the work laptop,
10   and it was provided to the attorneys.
11         Q.     Okay.  Since September have you
12   done anything to go back and look at those
13   CompuServe e-mails related to the topics that
14   we're going to be talking about in this case?
15         A.     I don't have that -- no, other
16   than I -- there was a problem on my -- in the
17   interim between leaving the company and
18   returning to the company, turning in a
19   computer, getting a new computer, and the
20   computer I turned in was imaged up in
21   St. Paul.  I don't know everything that was
22   on it at the time.
23                I wasn't 100 percent certain
24   that all of those Eudora files I just
25   described to you were there, so I had a
```

1  partial backup external drive at work.  I
2  went and looked at that and found, going back
3  in time, that there was a backup of that
4  directory, and so that's what I've uploaded
5  recently to make it available for the
6  attorneys.
7       Q.    Okay.  So --
8       A.    They may already have had it.
9  I didn't know.  I didn't want to get in a
10 situation where I could say, "I don't know if
11 they have the files."
12            So they definitely have them
13 now; they probably had them before.
14      Q.    That was a backup drive that
15 you used as an employee of 3M connected to
16 your computer to back up certain file
17 folders?
18      A.    Yes.  Yes.
19      Q.    Do you know if it did a total
20 backup of your machine or just certain
21 folders that you used?
22      A.    I would have backed up certain
23 folders --
24      Q.    Okay.
25      A.    -- just because of space

Confidential - Pursuant to Protective Order

1  reasons.
2      Q.    Do you know what happened to
3  the image they took in St. Paul?
4      A.    No.
5      Q.    Okay.  You mentioned that you
6  reviewed some of your notes.
7            Can you tell me a little bit
8  more about that?  Which notes did you review?
9      A.    The notes would be more in vein
10 of computer files, whether it was a document
11 that I had written notes in, a technical
12 report, an e-mail, material of that nature.
13 I don't keep a lot of handwritten notes.
14     Q.    Through this process of
15 preparing to testify on these topics, did you
16 make notes as to what you were doing?
17     A.    I jotted some notes down that
18 are marked "privileged and confidential"
19 because of the work we were doing, and other
20 things would have been just a word, "remind
21 me I got to do this tomorrow."
22     Q.    Okay.
23           MS. ELIZABETH:  I just want to
24       caution you, don't discuss the notes
25       between us, but you have notes that

```
 1          are not with us.
 2     QUESTIONS BY MR. OVERHOLTZ:
 3          Q.     Yeah, well, let me ask:  You
 4     made notes on your own through your process
 5     of preparing, not notes of what the attorneys
 6     were telling you but separate notes of your
 7     process of preparing for the deposition; is
 8     that right?
 9          A.     Yes.
10          Q.     Okay.  And you have a copy of
11     those notes here with you today?
12          A.     No.
13          Q.     Okay.  But you did have a -- do
14     you have -- do you still have those copies of
15     those notes?
16          A.     I -- the notes that I primarily
17     took were in the presence of attorneys or for
18     this work, and they're marked "privileged and
19     confidential."
20          Q.     Okay.  But they still -- do
21     they still exist today?
22          A.     Yes.
23          Q.     Okay.  Now, have you brought
24     some notes with you today for the deposition
25     to help you with the deposition?
```

Confidential - Pursuant to Protective Order

```
 1        A.     I brought this binder, which I
 2   believe you have a copy of.
 3        Q.     Okay.
 4        A.     And I have --
 5               MR. BROCK:  Or we'll give you
 6        one if you don't.
 7               MR. OVERHOLTZ:  Is that right?
 8               MR. AYLSTOCK:  We don't have
 9        it.
10               MR. BROCK:  We have a copy for
11        you.
12               MR. OVERHOLTZ:  Okay.
13               MR. BROCK:  I thought you might
14        ask.
15   QUESTIONS BY MR. OVERHOLTZ:
16        Q.     So we'll take a look at the
17   copy, but why don't you -- before we get into
18   the details, why don't you just tell me what
19   this notebook is.
20        A.     I have a sheet of notes that
21   help me recall what I had done for the 30 --
22               MR. BROCK:  Notebook.  He's
23        asking you what's in the notebook.
24               THE WITNESS:  The notebook
25        contains a section on about 20 items
```

Confidential - Pursuant to Protective Order

1           that remind me features of the
2           development process of the Combat Arms
3           earplug.
4    QUESTIONS BY MR. OVERHOLTZ:
5           Q.    Okay.
6           A.    And then there -- and also
7    includes a technical report entitled "The
8    development of the Combat Arms Earplug
9    version 1 through 4."
10                It includes two versions of our
11   policy manual, the one that was in the place
12   at the time and the version that followed.
13                It includes various internal
14   test reports on versions of the Combat
15   Arms --
16          Q.    Okay.
17          A.    -- and a copy of the relevant
18   ANSI standard, ANSI S3.19-1974, also known as
19   ASA STD1-1975.  You might see it both ways.
20                It contains some external
21   testing reports that occurred in the range of
22   2001 to 2017 showing quite positive results
23   on the earplugs.
24                And then there's a
25   miscellaneous section with a few additional

Confidential - Pursuant to Protective Order

1  e-mails and the back section of it contains
2  the various 30(b)(6) notices.
3      Q.    Okay.  And we'll take a look at
4  that, and I'll see if I have some questions
5  about the notebook.
6            You selected the documents that
7  went into the notebook?
8      A.    Yes.
9      Q.    Okay.  You mentioned that you
10 had suggested some places that documents
11 relevant to these topics may be found.
12           Can you tell me where it was
13 that you suggested they go look for
14 documents?
15     A.    Well, my office.
16     Q.    Okay.
17     A.    My office still exists there.
18 They have not put someone else in it yet.
19 Not everything was there that was there when
20 I was there, but there's still some file
21 folders, my laboratory notebooks, so we
22 looked through those.
23           I pointed to some of the
24 folders that I thought would have relevant
25 information, and they were taken away for

Confidential - Pursuant to Protective Order

1  forensic copying.
2              We went into an office within
3  the acoustical laboratory where various
4  technicians and engineers have had their
5  office space over the years, and in that
6  office there are five-drawer file cabinets
7  with paper copies of test reports, our
8  accreditation documents, et cetera, and I
9  pointed them to those.
10        Q.    And this was the lab where?
11        A.    In Indianapolis.
12        Q.    Indianapolis.  Okay.
13        A.    There's also an area in the
14  building where we have paper copies of all of
15  our technical reports dating from the early
16  1970s, and we took a look at those, showed
17  them to the attorneys.
18              I guided them to computers in
19  the laboratory that we use today that have
20  data on them, indicated what network drives
21  would contain data, pointed to older
22  computers that have been retired that we
23  still had.
24        Q.    Those network drives, can you
25  identify those for me as to, you know,

Confidential - Pursuant to Protective Order

 1   whether they went by a name or a letter
 2   designation or something like that?
 3         A.    Letters.  You know, I, H, S.
 4         Q.    Okay.  Did those different I,
 5   H, S drives, did they represent different
 6   types of information that would be stored
 7   there?
 8         A.    Yes.
 9         Q.    Okay.  Can you tell me about
10   that?
11         A.    I can tell you a little.
12         Q.    Okay.
13         A.    They're established by the IT
14   group.  They have to do with who has access
15   to them.
16               Our data from our technical
17   group primarily relied -- resides on the I
18   drive; also to some extent, I believe, on S.
19   It would be, you know, much easier to have
20   the computer in front of me and give you
21   those details, but -- and I can't tell you
22   whether those actual physical drives are in
23   Indianapolis or in St. Paul.
24         Q.    So let's talk a little bit
25   about the topics that you've been designated