**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG LITIGATION LIABILITY LITIGATION | CASE NO.: 3:19-MD-2885-MCR-GRJ |
| This Document Relates to All Cases | Chief Judge M. Casey Rodgers Magistrate Judge Gary Jones |
| | **CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER** |

**DEFENDANTS' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION
<u>FOR CONSOLIDATION OF BELLWETHER GROUP A FOR TRIAL</u>**

# **TABLE OF CONTENTS**

                                                                          Page

ARGUMENT .................................................................................................. 3

I.    Consolidation would thwart the purpose of the bellwether
      process ................................................................................................ 3

      A.    Trying multiple cases together would make it more
            difficult to assess the strengths, weaknesses, and values
            of the claims ............................................................................. 3

      B.    The vast majority of MDL courts have  refused to
            consolidate bellwether cases for trial ........................................ 7

      C.    Consolidation is not necessary to ensure that these five
            Group A cases are representative ............................................... 8

      D.    The sheer volume of cases pending means that
            consolidation will not meaningfully advance the
            litigation .................................................................................. 10

II.   Significant and potentially dispositive factual and legal
      differences between the Group A cases render consolidation
      untenable ........................................................................................... 10

      A.    Plaintiffs assert different claims based on different
            evidence of CAEv2 use, noise exposure, medical history
            and damages ............................................................................ 10

            1.    Injuries claimed ............................................................ 11

            2.    Use of the CAEv2 and other hearing protection ............ 12

            3.    Noise exposures ............................................................ 14

      B.    Consolidation will require applying the laws of multiple
            states, resulting in different, inconsistent jury instructions ..... 17

III.  A consolidated trial will be protracted, unwieldy, and
      potentially unsafe with ongoing COVID-19 restrictions ................... 19

      A.    A consolidated trial will last multiple weeks, if not
months, due to case-specific fact and expert testimony........... 19

      B.    A consolidated trial will fill the courtroom with
additional attorneys and parties during a surge in
COVID-19 ................................................................................... 21

IV.   To the extent consolidation is ever appropriate, it should not be
done with the bellwether cases ........................................................... 22

V.    The Court should try the five Group A cases separately
and using a randomly selected order .................................................. 22

CONCLUSION............................................................................................. 23

# TABLE OF AUTHORITIES

**Case**                                                                                   **Page(s)**

*Bailey v. Northern Trust Co.*,
    196 F.R.D. 513 (N.D. Ill. 2000) .......................................................... 4, 11

*Banks v. ICI Americas*,
    450 S.E.2d 671 (Ga. 1994) ..................................................................... 18

*Bennett v. Ocwen Loan Serv., LLC*,
    Nos. 2:15-cv-170-WCO-JCF and 2:16-cv-14-WCO-JCF,
    2016 WL 4267629 (N.D. Ga. June 13, 2016) .......................................... 2

*Boles v. Eli Lilly & Co.*,
    No. 1:15-CV-00351-JMS,
    2015 WL 6132478 (S.D. Ind. Oct. 19, 2015) ......................................... 14

*In re Bristol-Myers Squibb Co.*,
    975 S.W.2d 601 (Tex. 1998) ..................................................................... 8

*In re Consol. Parlodel Litig.*,
    182 F.R.D. 441 (D.N.J. 1998) .......................................................... 12, 19

*Eghnayem v. Boston Scientific Corp.*,
    873 F.3d 1304 (11th Cir. 2017) ............................................................. 11

*Grayson v. K-Mart Corp.*,
    849 F. Supp. 785 (N.D. Ga. 1994) ........................................................... 4

*Malcolm v. Nat'l Gypsum Co.*,
    995 F.2d 346 (2d Cir. 1993) ................................................................... 17

*Ostendorf v. Clark Equip. Co.*,
    122 S.W.3d 530 (Ky. 2003) .................................................................... 18

*In re Repetitive Stress Injury Litig.*,
    11 F.3d 368 (2d Cir. 1993),
    *on reh'g*, 35 F.3d 637 (2d. Cir. 1994) ................................................... 15

*Rubio v. Monsanto Co.*,
    181 F. Supp. 3d 746 (C.D. Cal. 2016) .................................................... 12

*Shanks v. Upjohn Co.*,
    835 P.2d 1189 (Alaska 1992) .................................................................. 18

*In re Silica Prod. Liab. Litig.*,
    398 F. Supp. 2d 563 (S.D. Tex. 2005).................................................... 14

*Soproni v. Polygon Apartment Ptrs.*,
    971 P.2d 500 (Wash. 1999) .................................................................... 18

*In re: Tylenol (Acetaminophen) Mktg., Sales Practices, and*
    *Prods. Liab. Litig.*,
    181 F. Supp. 3d 278 (E.D. Pa. 2016)........................................................ 3

*Ulysse v. Waste Mgmt., Inc.*,
    No. 11-CV-80723-RYSKAMP/HOPKINS,
    2013 WL 11327137 (S.D. Fla. Sept. 13, 2013)........................................ 4

*In re: Welding Fume Prods. Liab. Litig.*,
    Nos. 1:03CV17000, MDL 1535,
    2006 WL 2869548 (N.D. Ohio Oct. 5, 2006)......................................... 17

## Codes and Statutes

ALASKA STAT.
    § 09.10.070 ............................................................................................ 19
    § 09.17.080 ............................................................................................ 18

IND. CODE
    § 34-20-3(b)(2)....................................................................................... 18
    § 34-51-2-6 ............................................................................................ 19

KENTUCKY REV. STAT.
    § 411.182 ............................................................................................... 18
    § 413.140 ............................................................................................... 19

OFFICIAL CODE OF GEORGIA ANN.
    §§ 51-1-11.............................................................................................. 19
    §51-12-33(g).......................................................................................... 19
    §§ 9-3-33............................................................................................... 19

REV. CODE OF WASH.
    § 4.16.080 ............................................................................................. 19
    §§ 4.22.005-015 ..................................................................................... 18

## Other Authorities

Irwin A. Horowitz & Kenneth S. Borden, *The Effects of Outlier
Presence, Plaintiff Population Size, and Aggregation of
Plaintiffs on Simulated Civil Jury Decisions*, 12 *L. & Hum.
Behav*. 209 (1988) ........................................................................................ 6

Irwin A. Horowitz & Kenneth S. Bordens, *The Consolidation of
Plaintiffs: The Effects of Number of Plaintiffs on Jurors'
Liability Decisions, Damage Awards, and Cognitive
Processing of Evidence*, *J. Applied Psychology* 909 (2000) ..................... 6

John Beisner, Jessica Miller & Nina Rose, et al., *Trials and
Tribulations: Contending with Bellwether and Multi-
Plaintiff Trials in MDL Proceedings*, *U.S. Chamber Institute
for Legal Reform* (Oct. 2019) ................................................................. 8

Krystia Reed & Bryan H. Bornstein, *Juries, Joinder, and
Justice*, 27 *Jury Expert*, 34 (2015) ............................................................ 5

*Manual for Complex Litig*.
    § 22:314 (4th ed. 2004) .................................................................. 2, 8, 22
    § 22:315 (4th ed. 2004) .............................................................................. 3

Matthew A. Reiber & Jill D. Weinberg, *The Complexity of
Complexity:  An Empirical Study of Juror Competence in
Civil Cases*, *U. Cin. L. Rev*. 929, 929 (2010) .......................................... 5

Ryan J. Winter & Edith Greene, "Juror Decision-Making,"
*Handbook of Applied Cognition: Second Edition* 756
(Francis Durso ed. 2007) .......................................................................... 5

Plaintiffs ask the Court to consolidate all five bellwether Group A cases into a single trial, suggesting that consolidation will be more efficient and conserve judicial resources.[1]  Respectfully, it will do no such thing.

While there is a common issue at the center of these cases—the CAEv2 and its background—at heart these are five distinct personal injury cases involving entirely unique facts surrounding causation, defenses, and damages. The five Group A Plaintiffs allege different injuries—some allege hearing loss and some just tinnitus—that arose at different times, in different locations, based upon different noise exposures with different use of hearing protection devices, all to individuals with vastly different medical and hearing histories. And—depending upon the Court's ruling on the choice of law issue—the claims arose under the laws of at least two, and possibly five, different states with significant differences that will require asking the same jury to apply different (and occasionally inconsistent) instructions to the individual claims.

The result of consolidation would be an unwieldy trial involving dozens of witnesses—fact, expert, and medical providers—unique to the individual claims, at least five sets of lawyers on the Plaintiffs' side, and weeks (more

---

[1] The only proposal Plaintiffs made in their motion was consolidating all five cases into a single trial; they did not provide an alternative suggestion.  To the extent Plaintiffs attempt to use their reply brief to propose some other form of consolidation not raised in their initial motion, Defendants reserve the right to seek leave to respond.

likely months) of testimony.  Far from learning the strengths, weaknesses, and values of a representative sample of individual claims—the very purpose of the bellwether process—consolidation will inevitably lead to a mishmash of verdicts unlikely to provide the very information the bellwether process is designed to elicit.

Defendants do not suggest that consolidation will never be appropriate in these proceedings. But the bellwether cases—starting with these five disparate cases—need to be tried individually, in part simply to determine whether *future* consolidation might be appropriate and, if so, under what circumstances.  *See Manual for Complex Litig*. §22:314, at 359 (4th ed. 2004) (providing that holding a series of "single-plaintiff, single-defendant trials" may be needed at first to "test the claims of causation and damages and whether the evidence applies across groups, in order to provide the necessary information as to whether aggregation is appropriate, the form and extent of aggregation, and the likely range of values of the various claims").

It is well established that "[t]he party seeking consolidation bears the burden of establishing that consolidation under Rule 42(a) is appropriate." *Bennett v. Ocwen Loan Serv., LLC*, Nos. 2:15-cv-170-WCO-JCF and 2:16-cv-14-WCO-JCF, 2016 WL 4267629, at *3 (N.D. Ga. June 13, 2016).  As

explained more fully below, Plaintiffs have not met their burden here.  Thus, the motion should be denied.

## ARGUMENT

### I.   Consolidation would thwart the purpose of the bellwether process

#### A.   Trying multiple cases together would make it more difficult to assess the strengths, weaknesses, and values of the claims

The purpose of the bellwether process is to provide "test cases" to gather "reliable information about other mass tort cases."  *Manual for Complex Litig*. §22:315, at 360.  Plaintiffs themselves acknowledge that bellwether trials are designed "to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis and what range of values the cases may have if resolution is attempted on a group basis."  *Id*.; *see also In re: Tylenol (Acetominophen) Mktg., Sales Practices, and Prods. Liab. Litig*., 181 F. Supp. 3d 278, 283 n.2 (E.D. Pa. 2016) (noting that "Bellwether trials should produce representative verdicts and settlements.  The parties can use these verdicts and settlements to gauge the strength of the common MDL claims to determine if a global resolution of the MDL is possible").  That is precisely why this Court established a detailed process to arrive at a representative sample of bellwether cases.

Consolidating the five Group A bellwether cases for a single trial, as Plaintiffs propose, would thwart that goal. Rather than allowing the parties to assess the Group A cases on their own merits—thus giving the parties five data points to use in their analysis—consolidation would, in effect, throw the five individual cases into the same pot to create a stew, causing the merits of the standalone cases to blend together.

Courts have long recognized that combining multiple plaintiffs into a single trial runs the risk that consolidation might render individual verdicts less reliable. As one district court observed in severing the claims of 11 plaintiffs for separate trials, "[t]here is a tremendous danger that one or two plaintiff's unique circumstances could bias the jury against defendant generally, thus, prejudicing defendant with respect to the other plaintiffs' claims." *Grayson v. K-Mart Corp.*, 849 F. Supp. 785, 790 (N.D. Ga. 1994). Another noted that trying five claims together "would require the jury to keep separate each plaintiff's individualized claim and work history" and that "[t]he jury may simply resolve the confusion by considering all of the evidence to pertain to all the plaintiffs' claims, even when it is relevant to only one plaintiff's case." *Bailey v. Northern Trust Co.*, 196 F.R.D. 513, 518 (N.D. Ill. 2000); *see also Ulysse v. Waste Mgmt., Inc.*, No. 11-CV-80723-RYSKAMP/HOPKINS, 2013 WL 11327137, at *5 (S.D. Fla. Sept. 13, 2013)

4

(ordering separate trials in part because "[t]he potential that the jury could find in favor of one plaintiff based on the anecdotal evidence presented by other plaintiffs in these cases would not only prejudice the defendant, but would also violate American jurisprudence").

Academic research confirms that consolidation can skew verdicts, thus rendering them less reliable in determining the strengths, weaknesses, and values of individual cases. The fundamental problem demonstrated by the research is that juror "comprehension declines as complexity increases, particularly when the complexity arises from the presence of multiple parties or claims." Matthew A. Reiber & Jill D. Weinberg, *The Complexity of Complexity: An Empirical Study of Juror Competence in Civil Cases*, *U. Cin. L. Rev*. 929, 929 (2010). Other studies and articles fully support the increased likelihood of juror confusion when multiple plaintiffs and claims are presented in a single trial. *See* Krystia Reed & Bryan H. Bornstein, *Juries, Joinder, and Justice*, 27 *Jury Expert*, 34, 35-36 (2015) (finding that joinder of multiple parties and claims poses significant risk that jurors "may confuse the evidence"); Ryan J. Winter & Edith Greene, "Juror Decision-Making," *Handbook of Applied Cognition: Second Edition* 756 (Francis Durso ed. 2007) (finding that multi-party cases raise complexity to the point that it "raise[s]

questions about the competence of jurors to decide these cases fairly and rationally").

Notably, the risks from multi-plaintiff cases do not fall equally on both sides. Instead, "[t]he research on severance/joinder has found that the chances of a particular defendant being found civilly or criminally liable increase when trials are joined" 1 Mod. Sci. Evid. § 3:29 (2020-21 ed). One study, for example, found that defendants were more likely to be found liable and that damage awards were likely to be higher when multiple claims were consolidated into a single trial. *See* Irwin A. Horowitz & Kenneth S. Bordens, *The Consolidation of Plaintiffs: The Effects of Number of Plaintiffs on Jurors' Liability Decisions, Damage Awards, and Cognitive Processing of Evidence*, 85 *J. Applied Psychology* 909 (2000). The authors concluded that, in a multi-plaintiff case, a "blending effect" occurs, even when jurors profess to be able to distinguish the different plaintiffs. *See id*. at 916-17. Another study found that punitive damages awards were higher for all plaintiffs in multi-plaintiff trials that included an "outlier" plaintiff with significantly more severe injuries than the others. *See* Irwin A. Horowitz & Kenneth S. Borden, *The Effects of Outlier Presence, Plaintiff Population Size, and Aggregation of Plaintiffs on Simulated Civil Jury Decisions*, 12 *L. & Hum. Behav*. 209 (1988).

Plaintiffs undoubtedly know this research themselves, which explains why they have not only pushed so hard for some form of consolidation, but also that they seek to consolidate the largest possible number of Group A cases—all of them.  Far from concern over judicial economy, Plaintiffs want to consolidate all five Group A cases into a single trial to tilt the playing field to their advantage.  That hardly comports with the goal of the bellwether process.

The point is not that consolidation is never appropriate in mass torts or, as explained in more detail below, that it will never be appropriate in this litigation.  Instead, the point is more basic:  for bellwether trials to serve their function, the verdicts must be reliable predictors so that both parties can use them to analyze the strengths, weaknesses—and values—of the *individual* claims.  Consolidating five bellwether cases into a single trial would make that goal illusory here because the parties will not know if the outcomes reflect the strength (or weaknesses) of the individual cases or, more likely, a "blending effect" among the five cases.

**B.    The vast majority of MDL courts have
        <u>refused to consolidate bellwether cases for trial</u>**

Not surprisingly, consolidating bellwether cases is the exception, not the rule.  Indeed, the vast majority of MDL courts have refused to consolidate bellwether cases for trial.  *See* John Beisner, Jessica Miller & Nina Rose, et

7

al., *Trials and Tribulations:  Contending with Bellwether and Multi-Plaintiff Trials in MDL Proceedings*, *U.S. Chamber Institute for Legal Reform*, at 2 (Oct. 2019) (finding from review of the dockets of 135 MDL proceedings active between 2008 and 2019 that just 7 of 73 bellwether trials conducted involved more than one plaintiff).

MDL courts are generally reluctant to consolidate initial bellwether cases for trial in mass torts because—prior to the first trials—the mass tort is not "mature." *See Manual for Complex Litig*. §22:314, at 359.  It is typically only after a mass tort is "mature" that "the cases have a predictable range of values." *Id*.  Mass torts are not "mature" until the parties have engaged in extensive discovery and, most important, "a number of verdicts have been received indicating the value of claims[.]" *Id*.  Before a mass tort is "mature," consolidation decisions "may be more difficult" and often first require "setting several individual cases on a schedule for pretrial motions, discovery, and trial as test cases[.]" *Id*. at 359-60.  As the Texas Supreme Court noted in discussing consolidation in breast implant cases, "[u]ntil enough trials have occurred so that the contours of various types of claims within the …litigation are known, courts should proceed with extreme caution in consolidating claims." *In re Bristol-Myers Squibb Co*., 975 S.W.2d 601, 603 (Tex. 1998).

## C.    Consolidation is not necessary to ensure
that these five Group A cases are representative

Plaintiffs are correct on one point:   the bellwether process is only effective if the bellwether cases "are representative of the whole." Doc. 1551 at 17.   Yet here, consolidation is not necessary to obtain a "representative" sample of cases because the Court and the parties already engaged in a lengthy vetting process designed precisely to arrive at the roughly two dozen representative cases in the current bellwether pool.   Doc. 922 at 1 (Pretrial Order No. 23, describing bellwether selection process and noting that the process was designed "to identify the individual plaintiff characteristics that were most representative of the whole, in terms of branch of service, age, and injury").

As a result of this effort, the five Group A cases, especially taken in conjunction with the Groups B, C, and D cases, should provide the Court and the parties with the representative sample needed to make the bellwether process productive.   Combining the cases for trial would not make the cases more representative; instead, it will cause their individual strengths and weaknesses—among the things that make them representative—to blend into the other cases.

**D.     The sheer volume of cases pending means that
<u>consolidation will not meaningfully advance the litigation</u>**

Finally, Plaintiffs argue that "some consolidation will be necessary for plaintiffs to have their claims heard," referencing the more than 220,000 cases currently pending on the active and administrative dockets.  Doc. 1551 at 18. Setting aside whether some future form of consolidation might be appropriate, the sheer volume of cases demonstrates that consolidating the first five cases into a single trial will do nothing to advance the remaining claims.  Indeed, even if the Court tried 1,000 cases in the first trial—an obvious impossibility—that would not put a dent into the remaining volume.  Thus, the Court should try these five cases as individual test cases—thereby maximizing the effectiveness of the bellwether process—regardless of the volume of cases remaining on the docket.

**II.     Significant and potentially dispositive factual and legal differences
<u>between the Group A cases render consolidation untenable</u>**

**A.     Plaintiffs assert different claims based on different evidence
<u>of CAEv2 use, noise exposure, medical history and damages</u>**

Plaintiffs couch these cases as primarily focused on the CAEv2 and its creation, design, manufacture, and sale with the alleged impact of the CAEv2 on the individual Plaintiffs—causation, damages, and defenses—almost an afterthought.  Not so.  These cases are inherently individual because none of the Group A Plaintiffs used the CAEv2 as their sole means of hearing

protection during their military service—meaning individual product usage testimony will be critical—and when they did use the CAEv2, each of these Plaintiffs used it at different times, in different situations, in different locations, with different information about it, and in the face of different noise exposure histories. All have different medical and hearing histories, as well as different claims about their current hearing problems. (A chart identifying key differences between the five Group A Plaintiffs with record citations is attached as Appendix A).

These differences make consolidating the first five cases untenable. Defendants agree that "differences in causation are not enough, standing alone, to bar consolidation of products liability claims." *Eghnayem v. Boston Scientific Corp.*, 873 F.3d 1304, 1314 (11th Cir. 2017). Here, however, the factual differences between the claims are pervasive, yet subtle: precisely the types of hard-to-track differences that threaten to overwhelm a juror's ability to "keep separate each plaintiff's individualized claim and work history." *Bailey*, 196 F.R.D. at 518. Some of those differences (and why they matter) include the following:

### 1. Injuries claimed

At the most basic level, the five Group A Plaintiffs do not even allege the same injury. Plaintiff McCombs only alleges that he suffers from bilateral

11

tinnitus.  Plaintiff Hacker suffers from conductive hearing loss that at least

one of his own experts has concluded was not caused by noise exposure.

Plaintiff Estes claims noise-induced hearing loss, but only to one ear.  Even

for those claiming hearing loss, the degree of hearing loss varies widely, as

does when the alleged hearing loss began.  So, the jury will be required to

keep track of five different histories of alleged hearing issues to render its

verdicts and to compartmentalize this evidence so that it does not "blend"

together, rendering consolidation, at best, impractical.  *See In re Consol.*

*Parlodel Litig.*, 182 F.R.D. 441, 445–46 (D.N.J. 1998) (denying

consolidation, in part because "Plaintiffs in these fourteen cases presumably

have diverse medical histories and allege, and therefore must present evidence

to a jury of dramatically different injuries to the brain and to the heart" that

"is specific and unique to each Plaintiff's case").

### 2.   Use of the CAEv2 and other hearing protection

On the most critical evidence in these cases—the use of the CAEv2,

training on its use, and the use of other hearing protection devices, the five

Group A Plaintiffs have vastly different stories.  *See Rubio v. Monsanto Co.*,

181 F. Supp. 3d 746, 757 (C.D. Cal. 2016) (severing claims and observing

that "[e]ven in the products liability context, where plaintiffs allege liability

against the same defendant for the same product, permissive joinder may be

barred where there are too many plaintiffs or too many differences in the way that the product was used or in the nature of the injury").

The five Group A Plaintiffs used the CAEv2 and other forms of hearing protection in different manners and at different times. For example, while all five Group A Plaintiffs claim to have used the CAEv2 extensively, Plaintiff Baker—with one exception—only used the yellow end. The other four used both ends, depending upon the situation presented. And all five utilized other forms of hearing protection from time-to-time during their military service— primarily "foamies," though the five Plaintiffs used some combination (unique to each Plaintiff) of triple flange, quad flange, ear muffs and radio helmets. The jury will need to sort through how and when each Plaintiff used the CAEv2 and other forms of hearing protection in detail to decide whether alleged defects in the CAEv2 caused their hearing issues as opposed to problems with any additional hearing protection devices—or whether their alleged hearing issues were caused by something else entirely.

Critically, the five received vastly different forms of instruction on the use and fitting of the CAEv2. Plaintiffs Keefer and McCombs received just oral instructions, while Plaintiffs Baker and Hacker allegedly received written instructions as well. In fact, Plaintiff Hacker purchased his second pair of CAEv2 on his own at a store and received the package insert for the product

13

as a result—something the other four claim not to have received.  In sharp contrast to the others, Plaintiff Estes testified that he was not provided *any* warnings or instructions at all on how to use the CAEv2.

These are precisely the types of differences in product usage that have led federal courts repeatedly to reject consolidation for trial.  *See Boles v. Eli Lilly & Co.*, No. 1:15-CV-00351-JMS, 2015 WL 6132478, at *9 (S.D. Ind. Oct. 19, 2015) (severing claims in part because the claims "require highly individualized inquiries" since plaintiffs "took Cymbalta for different amounts of time, for different reasons, discontinued Cymbalta using different methods and strategies, and suffered different symptoms"); *In re Silica Prod. Liab. Litig.*, 398 F. Supp. 2d 563, 651 (S.D. Tex. 2005) (finding that joinder of silica claims was improper since the plaintiffs' "exposures—and any resulting illnesses—will vary depending upon where each Plaintiff worked, for how long, and with what equipment").

### 3.   Noise exposures

The crux of the claims here is that Plaintiffs allege they suffer from noise-induced hearing loss or tinnitus that they would not have experienced had the CAEv2 performed properly.  The fundamental problem with consolidating these sorts of claims into a single trial is that experts on both sides agree that any number of things besides noise can cause hearing loss and

14

tinnitus.  Consolidation, thus, raises the danger that jurors will assume that, because five different Plaintiffs are suing for noise-induced hearing issues, they must all suffer from injuries caused solely by noise.  *See In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 373 (2d Cir. 1993), *on reh'g*, 35 F.3d 637 (2d. Cir. 1994) (granting writ of mandamus and quashing order consolidating cases in part because "the sole common fact among these cases is a claim of injury of such generality that it covers a number of different ailments for each of which there are numerous possible causes other than the tortious conduct of one of the defendants").

Because noise exposure lies at the heart of Plaintiffs' theory of these cases, consolidation will inevitably require the jury to understand (and to keep track of) the noise exposures each Plaintiff experienced while wearing—or not wearing—the CAEv2.  Yet, their noise exposures differ in type, frequency, and severity.

Two of the Group A Plaintiffs, for example—Estes and McCombs— claim that their hearing issues were caused by a single noise-exposure event. Plaintiff Estes alleges that his hearing issues began one day on a shooting range while Plaintiff McCombs alleges that his issues began after an IED blast.  The other three Group A Plaintiffs cannot point to a specific event that triggered their hearing issues.

The types of military noise exposure experienced by these five Plaintiffs differ as well. Plaintiff Estes, for example, did not deploy overseas so that all of his military noise exposure occurred at Fort Benning during training exercise and on the range. The other four were all deployed to Iraq or Afghanistan (or both) at least once and, therefore, experienced noise in a combat zone. At least two (McCombs and Hacker) experienced incredibly loud IED explosions during their deployments; others did not.

These military noise exposures occurred at different times, in different places, and with different frequency over a two-decade stretch. And they experienced these disparate noise exposures while wearing different types of hearing protection—or, at least in the case of Plaintiff Baker, on at least one occasion without wearing hearing protection at all. The jury will need to keep track of these exposures to each Plaintiff and to determine whether these exposures caused their hearing issues, as opposed to some other cause. The jury will also need to determine whether the alleged defects in the CAEv2 failed to prevent their hearing issues, as opposed to shortcomings with the other forms of hearing protection each of them wore on occasions. Doing so in a single-Plaintiff trial would present a challenge to the average juror; doing so in a five-Plaintiff trial—especially one in which the five Plaintiffs were grouped together by chance—threatens to overwhelm the jury and taint any

16

verdicts it renders. *See Malcolm v. Nat'l Gypsum Co*., 995 F.2d 346, 352 (2d Cir. 1993) (reversing jury verdict and finding that consolidating 48 asbestos cases for trial was improper because "the sheer breadth of the evidence" created an "unacceptably strong chance that the equal apportionment of liability amounted to the jury throwing up its hands in the face of a torrent of evidence").

### B.   Consolidation will require applying the laws of multiple states, resulting in different, inconsistent jury instructions

As difficult as it will be for a jury to keep track of subtle factual differences between the Plaintiffs—keeping the noise exposures Plaintiff Baker encountered in Iraq in 2008 separate from those experienced by Plaintiff McCombs in Afghanistan in 2010—those differences may pale in comparison to asking the jury to apply the laws of as many as five different states to reach its verdict. Even if the Court agrees with Defendants on the choice of law issues, jurors would still be asked to apply the laws of two different states—Georgia for Estes; Indiana for the rest. *See In re: Welding Fume Prods. Liab. Litig*., Nos. 1:03CV17000, MDL 1535, 2006 WL 2869548, at *3 (N.D. Ohio Oct. 5, 2006) (noting that "a requirement that the Court or a jury apply different legal standards to the different cases may present an excessive risk of prejudice and confusion, such that consolidation is not appropriate").

1 /

Here, those differences in the law are significant and material.  (A chart listing the key differences is attached as Appendix B).  Indiana, for example, does not recognize strict products liability, *see* IND. CODE § 34-20-3(b)(2), whereas Georgia, Kentucky, Washington, and Alaska do.  Of the latter four states, the standard for proving a defect is also different, with Georgia and Kentucky following the "risk utility" standard,[2] while Alaska follows the "consumer expectations" test.[3]  Washington accepts either of those two standards.[4]  Kentucky, Washington, and Alaska apply the doctrine of pure comparative fault,[5] while Indiana and Georgia apply a modified comparative fault standard.[6]  Kentucky has a one-year statute of limitations but no statute of repose;[7] Indiana and Georgia have two-year statutes of limitations with 10-year statutes of repose.[8]  Washington and Alaska have three- and two-year statutes of limitations, respectively, but no statutes of repose.[9]

---

[2] *See Banks v. ICI Americas*, 450 S.E.2d 671, 674 (Ga. 1994); *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 535 (Ky. 2003).

[3] *See Shanks v. Upjohn Co.*, 835 P.2d 1189, 1194 (Alaska 1992)

[4] *See Soproni v. Polygon Apartment Ptrs.*, 971 P.2d 500, 505 (Wash. 1999)

[5] *See* KENTUCKY REV. STAT. § 411.182; REV. CODE OF WASH. §§ 4.22.005-015; ALASKA STAT. § 09.17.080.

[6] *See* IND. CODE § 34-51-2-6; OFFICIAL CODE OF GEORGIA ANN. § 51-12-33(g)

[7] *See* KENTUCKY REV. STAT. § 413.140.

[8] IND. CODE § § 34-20-3-1(b) (statute of limitations); *id*. § 34-20-3-1(b)(2) (statute of repose); OFFICIAL CODE OF GEORGIA ANN. § § 9-3-33 (statute of limitations); *id*. § § 51-1-11(b)(2) (statute of repose).

[9] REV. CODE OF WASH. § 4.16.080; ALASKA STAT. § 09.10.070.

All of this means that, if the Court consolidates these cases for trial, the jury will receive different—and occasionally inconsistent—jury instructions to guide its deliberations.  So, the jury will not simply need to keep track of the factual differences to reach its verdicts, but it will also be required to apply different laws to these different facts. *See In re Consol. Parlodel Litig*., 182 F.R.D. 441, 447 (D.N.J. 1998) (denying consolidation for trial, in part because of the need to apply different state laws to the different claims, so that "[c]onsolidation would require the jury not only to assimilate and analyze all of the complicated testimony in each case, but also to apply their factual findings to a host of complex legal principles within each issue and each case. This would be unfair to the jury and to the parties.")

### III.   A consolidated trial will be protracted, unwieldy, and potentially unsafe with ongoing COVID-19 restrictions

#### A.   A consolidated trial will last multiple weeks, if not months, due to case-specific fact and expert testimony

Plaintiffs suggest that consolidation is practical because consolidating the cases together will only marginally increase the length of the trial.  To make this assertion, Plaintiffs estimate that each individual claim will add no more than 12 additional hours—less than two days—to the length of the trial. This assertion has no basis in reality.

19

Each Group A Plaintiff will presumably testify at the trial, as will friends, spouses, fellow soldiers, treating physicians and others identified as potential witnesses.  Most of those fact witnesses have been deposed, and the majority will likely testify through their prior depositions. Thus, the fact witnesses themselves are likely to take one to three additional days to complete their testimony.  Each Group A Plaintiff will offer expert testimony from several case-specific experts, including experts in hearing and audiology, noise exposure, vocational rehabilitation, and damages, while Defendants will offer experts to counter those retained by the Plaintiffs. Again, the expert testimony from both sides is likely to take two to three days to complete for each Plaintiff. Moreover, Plaintiffs' calculations ignore the additional time needed for case-specific opening statements and closing arguments, along with the inevitable additional objections and side bars. Plaintiffs also overlook that each individual case will involve its own set of voluminous trial exhibits, often including hundreds of pages of medical records. Altogether, consolidating all five Group A cases into one trial will likely add well over a month to the total trial time needed for these cases, resulting in a months-long bellwether trial—all the while expecting the jurors to keep track of subtle but significant factual and legal differences among the five Plaintiffs.

**B.    A consolidated trial will fill the courtroom with additional attorneys and parties during a surge in COVID-19**

There are also practical reasons consolidation as the Plaintiffs propose would be unworkable here.  The five Group A Plaintiffs are represented by five different teams of attorneys.  For consolidation to work, the courtroom would need to be able to hold the five Plaintiffs (plus the one loss of consortium Plaintiff), five sets of Plaintiffs' attorneys, Defense counsel, and technical support teams, not to mention any family members or friends who want to witness the proceedings.  Even in a pre-pandemic world, that would undoubtedly prove cumbersome, if not impossible.

We are not, however, operating in a pre-pandemic world.  While the status of the COVID-19 pandemic when the first trial takes place in the spring is impossible to predict, some measure of social distancing will still be required to maintain the safety of the participants, the court staff, and—most important—the members of the jury, who will inevitably be required to sit through the trial in a closed courtroom for weeks or months.  Consolidation as suggested by the Plaintiffs would render social distancing practically impossible.

21

IV.   **To the extent consolidation is ever appropriate,
      it should not be done with the bellwether cases**

Defendants do not take the position that they will oppose all forms of consolidation at all times in these proceedings.  But this is not the time. As noted at the outset, one purpose of bellwether trials is to help the Court and the parties determine whether consolidation will be appropriate *in the future* and, if so, the parameters of any consolidation.  *See Manual for Complex Litig*. §22:314, at 359.  At the conclusion of the bellwether process, the Court and the parties can (and undoubtedly will) revisit the idea of consolidation to determine, based upon the bellwether trials, whether and how consolidation can work.  Put simply, the mass consolidation experiment proposed by the Plaintiffs for the initial trial puts the proverbial cart before the horse.

V.   **The Court should try the five Group A cases
     separately and using a randomly selected order**

Rather than forcing the five Group A cases into a single trial, Defendants propose a more equitable solution:  trying these five cases separately and in a randomly selected order.  That approach recognizes that these cases were selected under a process designed to ensure that they are as "representative" as possible of the entire caseload, while allowing the parties the full benefit of the bellwether process by giving them five data points to assess the strengths, weaknesses, and values of the claims and defenses.  This

approach will also give the Court critical information to assess the feasibility of future consolidation.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion to consolidate should be denied, and the Group A cases should be tried separately in a randomly selected order.

Respectfully submitted:

Dated:  December 15, 2020

*/s/ Charles F. Beall, Jr.*
Larry Hill
Florida Bar No. 173908
lhill@mhw-law.com
Charles F. Beall, Jr.
Florida Bar No. 66494
cbeall@mhw-law.com
Haley J. VanFleteren
Florida Bar No. 1003674
hvanfleteren@mhw-law.com
MOORE, HILL & WESTMORELAND, P.A.
350 West Cedar Street
Maritime Place, Suite 100
Pensacola FL 32502
Telephone: (850) 434-3541

*Counsel for Defendants*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

Pursuant to Local Rule 7.1(F), counsel for Defendants certify that this objection contains 4,991 words, excluding the case style, signature block, and certificates of compliance with the Local Rules.

*/s/ Charles F. Beall, Jr.*
Charles F. Beall, Jr.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 15, 2020, a true
and correct copy of the foregoing document entitled Defendants'
Memorandum of Law in Opposition to Plaintiff's Motion for Consolidation
of Bellwether Group A Trial was submitted via email to the Honorable
Casey Rodgers (flnd_rodgers@flnd.uscourts.gov) and her law clerk Tevenia
Jacobs (Tevenia_Jacobs@flnd.uscourts.gov). A copy of the foregoing was
also sent via email to counsel of record for Plaintiffs' Leadership Counsel at
the following addresses:

| | |
|---|---|
| Bryan F. Aylstock, Lead Counsel<br>Douglass A. Kreis<br>Neil D. Overholtz<br>Aylstock, Witkin, Kreis & Overholtz,<br>PLLC<br>17 East Main Street Suite 200<br>Pensacola, FL 32502<br>Tel.: (850) 202-1010<br>Email: baylstock@awkolaw.com<br>Email: dkreis@awkolaw.com<br>Email: NOverholtz@awkolaw.com | Shelley V. Hutson,<br>Co-Lead Counsel<br>Emily Marlowe<br>Clark, Love & Hutson, GP<br>440 Louisiana Street<br>Suite 1600<br>Houston, TX 77002<br>Tel.: (713) 757-1400<br>Email: shutson@triallawfirm.com |
| Christopher A. Seeger, Co-Lead Counsel<br>David R. Buchanan<br>Seeger Weiss LLP<br>77 Water Street<br>8th Floor<br>New York, NY 10005<br>Tel.: (212) 587-0700<br>Email: cseeger@seegerweiss.com<br>Email: dbuchanan@seegerweiss.com<br>Email: MDL2885@seegerweiss.com | Michael A. Burns<br>Co-Liaison Counsel<br>Mostyn Law Firm<br>3810 W. Alabama Street<br>Houston, TX  77027<br>Tel.: (713) 714-0000<br>Email: epefile@mostynlaw.com<br>Email: maburns@mostynlaw.com |

| | |
|---|---|
| Brian H. Barr, Co-Liaison Counsel<br>Winston Troy Bouk<br>Levin, Papantonio, Thomas, Mitchell,<br>Rafferty, & Proctor, P.A.<br>316 S Baylen St. Ste 600<br>Pensacola, FL 32502<br>Tel.: (850) 435-7045<br>Email: bbarr@levinlaw.com<br>Email: tbouk@levinlaw.com | Taylor C. Bartlett<br>William L. Garrison, Jr.<br>Jeanie Slead<br>Discovery & ESI Subcommittee<br>Heninger Garrison Davis LLC<br>2224 1st Avenue North<br>Birmingham, AL 35203<br>Tel.: (205) 326-3336<br>Email: taylor@hgdlawfirm.com<br>Email: lewis@hgdlawfirm.com<br>Email: jslead@hgdlawfirm.com |
| Katherine E. Charonko,<br>Discovery & ESI Subcommittee<br>Bailey & Glasser LLP<br>209 Capitol Street<br>Charleston, WV  25301<br>Tel.: (304) 345-6555<br>Email: kcharonko@baileyglasser.com | J. Nixon Daniel, III<br>Discovery & ESI Subcommittee<br>Beggs & Lane<br>501 Commendencia Street<br>Pensacola, FL 32502<br>Tel.: (850) 469-3306<br>Email: jnd@beggslane.com |
| Virginia E. Anello,<br>Discovery & ESI Subcommittee<br>Douglas & London<br>59 Maiden Ln, 6th Floor<br>New York, NY 10038<br>Tel.: (212) 566-7500<br>Email: vanello@douglasandlondon.com | |

Dated:  December 15, 2020          Respectfully submitted,

*/s/ Charles F. Beall, Jr.*
          Charles F. Beall, Jr.