**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| | Judge M. Casey Rodgers |
| This Document Relates to: | |
| *Lloyd Baker*, No. 7:20-cv-00039; | Magistrate Judge Gary R. Jones |
| *Luke Estes*, No. 7:20-cv-00137; | |
| *Stephen Hacker*, No. 7:20-cv-00131; | |
| *Lewis Keefer*, No. 7:20-cv-00104; | |
| *Dustin McCombs*, No. 7:20-cv-00094 | **[FILED UNDER SEAL]** |

### PLAINTIFFS' OMNIBUS MOTION AND MEMORANDUM OF LAW TO EXCLUDE DEFENDANTS' EXPERT OPINIONS AND TESTIMONY

FILED USDC FLND PN
JAN 8, '21 PM 1:39

# TABLE OF CONTENTS

I.  Introduction ...................................................................................1

II.  Legal Standard ...............................................................................2

III.  Argument & Authorities ..............................................................5

    A.  General *Daubert* Arguments ...................................................5

        1.  Gregory A. Flamme & Mark R. Stephenson ...........................5

        2.  Harri Kytomaa .....................................................................12

        3.  James Crawford ...................................................................15

        4.  John Casali ..........................................................................22

        5.  Richard Neitzel ...................................................................26

        6.  Jennifer Sahmel ...................................................................35

        7.  Vickie Tuten ........................................................................42

    B.  Hybrid/Percipient Witnesses .................................................45

        1.  Elliott Berger .......................................................................46

        2.  Eric Fallon ..........................................................................51

    C.  Case-Specific *Daubert* Arguments.......................................56

        1.  John House..........................................................................56

        2.  Dennis Driscoll ...................................................................61

        3.  Derek Jones & Jennifer LaBorde ........................................65

        4.  Margaret Richards, Derek Jones & Jennifer LaBorde...........68

IV. Conclusion...................................................................................................69

# TABLE OF AUTHORITIES

**Cases**

*Allison v. McGhan Med. Corp.*,
184 F.3d 1300 (11th Cir. 1999) ................................................................ 4, 32, 35

*Arch Specialty Ins. Co v. BP Invest. Ptrs., LLC*,
2020 WL 5848317 (M.D. Fla. Oct. 1, 2020) ........................................................45

*Arevalo v. Coloplast Corp.*,
2020 WL 3958505 (N.D. Fla. July 7, 2020) ........................................................42

*Banta Props., Inc. v. Arch Specialty Ins. Co.*,
2011 WL 13096476 (S.D. Fla. Dec. 22, 2011) ....................................................37

*Bekaert Corp. v. City of Dyersburg*,
256 F.R.D. 573 (W.D. Tenn. 2009) ......................................................................15

*Chapman v. Procter & Gamble Distrib., LLC*,
766 F.3d 1296 (11th Cir. 2014) ............................................................................16

*City of Tuscaloosa v. Harcros Chems., Inc.*,
158 F.3d 548 (11th Cir. 1998) ..............................................................................52

*Cook v. Sheriff of Monroe Cnty*,
402 F.3d 1092 (11th Cir. 2005) ............................................................... 25, 27, 40

*Cooper v. Marten Transp., Ltd.*,
539 F. App'x 936 (11th Cir. 2013) .......................................................................17

*Dahlgren v. Muldrow*,
2008 WL 186641 (N.D. Fla. Jan. 18, 2008) ........................................................40

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ..................................................................................... *passim*

*Doctors Licensure Group, Inc. v. Cont'l Cas. Co.*,
2011 WL 13182969 (N.D. Fla. Sept. 26, 2011) ..................................................36

*Dugas v. 3M Co.*,
  2016 WL 7327666 (M.D. Fla. Mar. 30, 2016) ............................................. *passim*

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) ................................................................................63

*Feliciano v. City of Miami Beach*,
  844 F. Supp. 2d 1258 (S.D. Fla. 2012) ..................................................................3

*Flury v. Daimler Chrysler Corp.*,
  427 F.3d 939 (11th Cir. 2005) ...............................................................................2

*FNB Bank v. Park Nat. Corp.*,
  996 F. Supp. 2d 1187 (S.D. Ala. 2014) ...............................................................29

*Ford v. Carnival Corp.*,
  2010 WL 9116184 (S.D. Fla. Mar. 4, 2010) ......................................... 33, 35, 62

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ...............................................................................................4

*Guinn v. AstraZeneca Pharm. LP*,
  602 F.3d 1245 (11th Cir. 2010) ..................................................................... 35, 62

*Hartford Steam Boiler Inspection and Ins. Co. v. Menada, Inc.*,
  2018 WL 3911212 (S.D. Fla. Apr. 3, 2018) ........................................................47

*Hendrix ex rel. G.P. v. Evenflo Co.*,
  609 F.3d 1183 (11th Cir. 2010) ..............................................................................2

*Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen & Ret. Sys.*,
  50 F.3d 908 (11th Cir. 1995) ...............................................................................41

*Huskey v. Ethicon, Inc.*,
  29 F. Supp. 3d 691 (S.D.W. Va. 2014) ...............................................................42

*HVLPO2, LLC v. Oxygen Frog, LLC*,
  2018 WL 2041370 (N.D. Fla. Jan. 16, 2018) ......................................................15

*In re Abilify (Aripiprazole) Prod. Liab. Litig.*,

299 F. Supp. 3d 1291 (N.D. Fla. 2018) ................................................................4

*In re Cryolife, Inc. Sec. Litig.*,
2005 WL 8155579 (N.D. Ga. June 17, 2005) ......................................................59

*In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*,
2020 WL 774234 (S.D.W. Va. Feb. 13, 2020)......................................................42

*In re Trasylol Prods. Liab. Litig.*,
709 F. Supp. 2d 1323 (S.D. Fla. 2010)........................................................ 29, 59

*In re: Chiquita Brands Int'l Inc.*,
2019 WL 11497632 (S.D. Fla. Sept. 5, 2019)......................................................31

*Janis v. Pratt & Whitney Canada, Inc.*,
370 F. Supp. 2d 1226 (M.D. Fla. 2005) ....................................................... 28, 40

*Jones v. Novartis Pharm. Corp.*,
720 F. App'x 1006 (11th Cir. 2018)................................................. 11, 33, 35, 61

*Jones v. Royal Caribbean Cruises, Ltd.*,
2013 WL 8695361 (S.D. Fla. Apr. 4, 2013)........................................................45

*Kaplan v. Kaplan*,
2012 WL 1660605 (M.D. Fla. May 11, 2012) ....................................................45

*Kennedy v. Nick Corcokius Enterprises, Inc.*,
2015 WL 9016632 (S.D. Fla. Dec. 16, 2015) .....................................................45

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .........................................................................................2, 3

*Lebron v. Sec'y of Fla. Dep't of Children & Families*,
772 F.3d 1352, 1369 (11th Cir. 2014)................................................................63

*Lee-Bolton v. Koppers Inc.*,
319 F.R.D. 346 (N.D. Fla. 2017)................................................................. 19, 20

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y.2007) ................................................................63

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) ......................................................... 11, 33, 57, 61

*McCorvey v. Baxter Healthcare Corp.*,
  298 F.3d 1253 (11th Cir. 2002) ................................................................... 46, 65

*McDowell v. Brown*,
  392 F.3d 1283 (11th Cir. 2004) ................................................................... 38, 39

*McGee v. Evenflo Co.*,
  143 F. App'x 299 (11th Cir. 2005) ........................................................................60

*McGee v. Evenflo Co.*,
  2003 WL 23350439 (M.D. Ga. Dec. 11, 2003) .....................................................60

*Montgomery v. Aetna Cas. & Sur. Co.*,
  898 F.2d 1537 (11th Cir. 1990) ................................................................... 28, 40

*Navelski v. Int'l Paper Co.*,
  244 F. Supp. 3d 1275 (N.D. Fla. 2017) ........................................................ *passim*

*Payne v. C.R. Bard, Inc.*,
  2014 WL 988754 (M.D. Fla. Mar. 13, 2014) ........................................................17

*Payne v. C.R. Bard, Inc.*,
  606 F. App'x 940 (11th Cir. 2015) .......................................................................17

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
  326 F.3d 1333 (11th Cir. 2003) .......................................................................2, 3

*R.W. v. Bd. of Regents of the Univ. Sys. of Ga.*,
  114 F. Supp. 3d 1260 (N.D. Ga. 2015) ....................................................... 27, 40

*Rangel v. Anderson*,
  202 F. Supp. 3d 1361 (S.D. Ga. 2016) ................................................................45

*Rink v. Cheminova, Inc.*,
  400 F.3d 1286 (11th Cir. 2005) ............................................................... 2, 3, 52

*S.E.C. v. Tourre*,
    950 F.Supp.2d 666 (S.D.N.Y. 2013) ....................................................................29

*Sanchez v. Boston Scientific Corp.*,
    2015 WL 631289 (S.D.W. Va. Feb. 12, 2015)....................................................39

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ................................................................. 3, 4, 56

*United States v. Mejia*,
    545 F.3d 179 (2nd Cir. 2008) ..............................................................................31

*United States v. Reyes-Garcia*,
    798 F. App'x 346 (11th Cir. 2019)......................................................................42

*Williams v. Mast Biosurgery USA, Inc.*,
    644 F.3d 1312 (11th Cir. 2011) ...........................................................................45

**Statutes**

Fed. R. Civ. P. 26 ................................................................................................ 1, 45

Fed. R. Evid. 403 ............................................................................................. passim

Fed. R. Evid. 702 ............................................................................................. passim

Fed. R. Evid. 703 ................................................................................................ 1, 60

Fla. Stat. § 440.13 ...................................................................................................67

**Treatises**

Wright and Gold, *Federal Practice and Procedure* § 6274 ....................................63

Plaintiffs submit this motion and incorporated memorandum of law to exclude the opinions and testimony of Defendants' designated experts.

## I.    <u>INTRODUCTION</u>

On November 9, 2020, Defendants disclosed 19 expert witnesses pursuant to Federal Rule of Civil Procedure 26(a)(2)(B)-(C). As detailed below, Defendants' experts fail to meet the requirements for admissible expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702, 703, and 403. Pursuant to these authorities, Plaintiffs move to exclude the opinions and testimony of (A) general experts[1] Drs. Flamme and Stephenson[2], Dr. Kytomaa, Dr. Crawford, Dr. Casali, Dr. Neitzel, Ms. Sahmel, and Dr. Tuten; (B) "hybrid"/percipient witnesses Mr. Berger and Dr. Fallon; and (C) case-specific experts Dr. House, Mr. Driscoll, and Drs. Jones, LaBorde, and Richards. For the reasons stated below, the Court should exclude the opinions and testimony of Defendants' experts because they fail to satisfy *Daubert* and Rules 702, 703, and 403.

---

[1] Drs. Flamme and Stephenson, Ms. Sahmel, and Dr. Neitzel include inadmissible case-specific opinions in their disclosures, which Plaintiffs challenge herein.

[2] On January 7, 2021,  a few minutes before midnight, Plaintiffs' counsel received an email attaching a "SECOND SUPPLEMENTAL EXPERT REPORT GREGORY A. FLAMME, Ph.D. & MARK STEPHENSON, Ph.D." Plaintiffs will be filing a Motion to Strike the same as untimely.

## II.  <u>LEGAL STANDARD</u>

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining whether expert testimony is admissible under Federal Rule of Evidence 702. *See Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). Rule 702 requires trial courts to perform a "gatekeeping" function to ensure that expert testimony is reliable and relevant. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The proponent of expert testimony must prove its admissibility by a preponderance of the evidence. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010).

Expert testimony is reliable and relevant when it satisfies the criteria of "qualification, reliability, and helpfulness"—"(1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is 'sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1286 (N.D. Fla. 2017). These are "distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

2

To be qualified, an expert must "ha[ve] sufficient 'knowledge, skill, experience, training, or education' to form a reliable opinion about an issue that is before the court." *Navelski*, 244 F. Supp. 3d at 1286. "This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012) (internal quotation marks omitted).

To be reliable, "an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *Navelski*, 244 F. Supp. 3d at 1286 (citing *United States v. Frazier*, 387 F.3d 1244, 1261-62 (11th Cir. 2004)). Relevant factors include whether: (1) "the scientific technique can be or has been tested"; (2) "the theory or technique has been subjected to peer review or publication"; (3) "the technique has a known or knowable rate of error"; and (4) "the technique is generally accepted in the relevant community." *Id.* (citing *Daubert*, 509 U.S. at 593-94). Such factors are illustrative, not exhaustive. *See Quiet Tech.*, 326 F.3d at 1341; *Rink*, 400 F.3d at 1292 (courts "have substantial discretion in deciding how to test an expert's reliability"). Although reliability is a flexible inquiry, *Kumho Tire*, 526 U.S. 141-42, the analytical focus "must be solely on principles and methodology, not on the conclusions that they generate," *Daubert*, 509 U.S. at 595.

To be helpful, "expert testimony must be relevant to an issue in the case and offer insights beyond the understanding and experience of the average citizen." *Navelski*, 244 F. Supp. 3d at 1287. Relevant expert testimony "advances a material aspect of the proposing party's case and 'fits' the disputed facts." *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1305 (N.D. Fla. 2018). When "too great an analytical gap" exists between the facts and the proffered opinion, the expert opinion does not "fit." *Id*. (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997)).

Ultimately, a court's gatekeeping "role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999). Even if expert testimony satisfies the admissibility requirements of *Daubert* and Rule 702, it may still be excluded under Rule 403 if its probative value "is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming." *Frazier*, 387 F.3d at 1263. Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," a trial court must carefully "weigh[] possible prejudice against probative force under Rule 403." *Id*.

### III.   ARGUMENT & AUTHORITIES

**A.**     **General *Daubert* Arguments**

    **1.**     ***Gregory A. Flamme & Mark R. Stephenson***

        ***i.***     ***Opinions Relying upon the Auditory Hazard Assessment Algorithm for Humans Should Be Excluded As Unreliable.***

Drs. Flamme and Stephenson inappropriately rely on the Auditory Hazard Assessment Algorithm for Humans ("AHAAH") as a method to evaluate the safety and efficacy of Combat Arms Version 2 Earplug ("CAEv2"), including to estimate an allowable number of rounds (ANOR) for various weapons.[3]  However, the model is not a reliable method to evaluate damage risk criteria (DRC). Two consecutive independent American Institute of Biological Sciences (AIBS) reviews rejected AHAAH for this reason. The second review recommended the $L_{Aeq8}$ metric as an interim standard.  A variation of the $L_{Aeq8}$ metric is used by the Air Force, Navy, and Marines,[4] and many European Union nations use the $L_{Aeq8}$ metric. AHAAH is used by the US Army at Aberdeen solely for health hazard assessments in weapons systems acquisitions. Otherwise, it has been consistently rejected by the US Army Medical community as a DRC for hearing conservation programs.

---

[3]  PX1(Flamme/Stephenson-(General)-15,72);PX2(Flamme/Stephenson-(General)-App. B,15). Plaintiffs move to limit testimony of Casali for referring to AHAAH for reasons consistent herewith. *See* PX3(Casali-83-84,110-112,151-152).
[4]  MIL-ST-1474E ("PX4").

AHAAH was developed by Dr. Dick Price and Dr. Joel Kalb.[5] The model is derived from predictions based upon animal (cat, chinchilla) studies[6] and data from approximately 70 human subject exposures to impulsive sounds.[7] It contains both "warned" and "unwarned" formulaic adjustment, both attributing assumed middle ear muscle reflex (MEMR) at specified moments in time.[8] At his deposition, the architect of AHAAH, Dr. Price, acknowledged that AHAAH has not been validated:

> **The problem is that there really aren't any data**. It's very hard to do work with people and very intense sounds. **So the problem has been a lack of science**—to help."[9]

In explaining middle ear muscle contractions as a central underpinning of the model, Dr. Price admitted:

> In all fairness, **I would say that there's some disagreement in the technical community**, *even today*, as to exactly what those numbers should be as to how—what the interval is, whether the muscle contracts ahead of time or not.

---

[5] Price,G.R. Upper Limit to stapes displacement: Implications for hearing loss., 56 J. Acoust. Soc. Am. 195–197 (1974) ("PX5"); Price et al., Mathematical model of the effect of limited stapes displacement on hazard from intense sounds, 80 J. ACOUST. SOC. AM. S123 (1986) ("PX6").

[6] G. Richard Price, *Importance of Spectrum for Rating Hazard: Theoretical Basis*, *in* PARAMETERS OF EXPOSURE 349–360 (Ch. 31) (Mar. 1992) (*dist. in* Technical Memorandum 2-92, U.S. Army Human Engineering Laboratory) ("PX7").

[7] PX8(Price-Dep-89:12-94:10); G. Richard Price, A New Method for Rating Hazard from Intense Sounds: Implications for Hearing Protection, Speech Intelligibility, and Situation Awareness, in NEW DIRECTIONS FOR IMPROVING AUDIO EFFECTIVENESS KN2-1–KN2-24 (2005). Meeting Proceedings RTO-MP-HFM-123, Keynote 2. Neuilly-sur-Seine, France: RTO ("PX9").

[8] G. Richard Price et al., The Philosophy, Theoretical Bases, and Implementation of the AHAAH Model for Evaluation of Hazard from Exposure to Intense Sounds ARL-TR-8333 (U.S. Army Research Laboratory, 2018) ("PX10").

[9] PX8(Price-Dep-152:21-153:21).

The model assumes it and all the tests that have been done, it's—that assumption seems to work"[10] (emphasis added).

Dr. Price further noted that the Army's Center for Health Promotion and Preventative Medicine (CHPPM) has not accepted AHAAH as a hazard assessment tool and instead uses A-weighted testing.[11] Dr. Price agreed AHAAH is not accepted for medical purposes by the United States Army Aeromedical Research Laboratory (USAARL) because the model's assumptions regarding the frequency of middle ear contraction were not validated.[12]

Additionally, Flamme testified that AHAAH is only a model, not a standard.[13] He has published his own criticisms of AHAAH.[14] Flamme agreed "the implementation details of AHAAH are perhaps less well developed than they should be for broad use."[15] Indeed, Flamme testified regarding middle ear contractions in humans that "[w]e have found that that component of the AHAAH model is not something that can be substantiated in practice, so it is not a dependable component of protection."[16] Flamme conceded that while ANOR calculations returned by AHAAH may correlate with calculations returned by other DRC, they differ in the

---

[9] *Id*. at 115:7-116:24.

[11] *Id*. at 124:1-127:24.

[12] *Id*. at 165:25-167:24.

[13] PX11(Flamme-Dep-90:8-24).

[14] *Id*. at 91:8-15.

[15] *Id*. at 90:25-91:7.

[16] *Id*. at 94:18-96:5.

threshold for risk and would not agree.[17] He admitted "[t]here are a variety of reasons why there are critics (sic) of the AHAAH model."[18]

Further, in 2001 ABIS rejected AHAAH, noting that human, cat, and chinchilla outer and middle ears are dissimilar, making revalidation of the model in humans "crucial."[19] The Board questioned the definition of when a person was "warned" versus "unwarned."[20]

In 2004, USAARL (Army Medical research component) observed that unwarned AHUs exceeded 500 across all exposure levels in its study and failed to show any expected trend in threshold shifts; in other words, the model consistently overestimated risk and was "not in agreement with the data."[21]

In 2010, ABIS[22] noted "[t]he AHAAH model in its current form does not adequately address all of the MIL-STD 1474D deficiencies in its current form."[23] AIBS determined "[t]here are multiple key features of the AHAAH model that need further study."[24] The panel suggested that AHAAH required considerable refinement before it could be considered as a final standard to guide establishment

---

[17] *Id.*

[18] *Id*. at 101:2-24.

[19] 2001 ABIS Peer Review, at 4 ("PX12"); Greene et al., *Intracochlear Pressure Measurements During Acoustic Shock Wave Exposure*, 365 HEAR. RES. 149–164 (2018). ("PX13").

[20] 2001 ABIS Peer Review, at 6.

[21] Patterson, J. and Ahroon, A., Evaluation of an Auditory Hazard Model Using Data from Human Volunteer Studies, Report No. 2005-01 (U.S. Army Aeromedical Research Laboratory 2004), at 18 ("PX14").

[22] Dr. Flamme was on the 2010 AIBS panel.

[23] 2010 ABIS Peer Review at 10.

[24] *Id.*

of DRC.[25] The panel concluded the $L_{Aeq8}$ metric[26] be used in the interim. A variant of the $L_{Aeq8}$ metric was used in MIL-STD 1474E.  Many European Union nations use the $L_{Aeq8}$ metric as the proper accepted impulsive noise DRC.[27]  The Army Center for Health Promotion and Preventative Medicine (CHPPM) and the United States Army Aeromedical Research Laboratory (USAARL) have not accepted AHAAH as a hazard assessment tool.[28] [29]

Flamme admitted that Dr. William Murphy, an expert on DRC, has questioned AHAAH.[30]  In 2009, Murphy found AHAAH inferior to $L_{Aeq8}$ in both "goodness-of-fit" and "discrimination," both metrics for evaluating the accuracy of a DRC.[31] Murphy later criticized both "warned" (accuracy of MEMC) and "unwarned" (failure of the model to account for impulse protection provided by a well-fit hearing protector, thereby leading to inconsistent risk values) components of AHAAH.[32]

---

[25] *Id*.

[26] *Id*. at 12.

[27] Buck et al., The European Regulation 2003/10/EC and the Impact of its Application to the Military Noise Exposure, 20th INT. CONGRESS ACOUSTICS 1–5 (2010) ("PX15").

[28] PX8(Price-Dep-136:13-18).

[29] PX8(Price-Dep-165:25-167:24); Heath G. Jones et al., Laboratory Evaluation of the Warned Middle-Ear Assumption of the Auditory Hazard Assessment Algorithm for Humans, Report No. 2019-04 (U.S. Army Aeromedical Research Laboratory, 2019) ("PX16").

[30] PX11(Flamme-Dep-93:4-96:20).

[31] William J. Murphy et al., U.S. Dep't of Health and Human Servs., An Analysis of the Blast Overpressure Study Data Comparing Three Exposure Criteria, Report No. EPHB 309-05h (2009) ("PX17").

[32] 2010 ABIS Peer Review at 10.

Flamme and Murphy observed that AHAAH overestimated the risk of small arms fire.[33] Flamme and Murphy later assessed AHAAH's unwarned formulation in the context of referee whistles blown during sporting events, erroneously estimating hearing loss for all spectators, players, and referees.[34] Another co-authored article states that AHAAH relies on "considerable interpolation based on speculation by the developers," questions the utility of MEMCs for high-frequency exposures above 1k Hz, and finds "limited evidence" regarding assumed, sustained "significant stimulation" in the unwarned condition.[35] Thus, opinions based on AHAAH should be excluded under *Daubert* as unreliable.

### ii.    *Flamme & Stephenson's Specific-Causation Opinions Should Be Excluded as Unreliable.*

Experts opining on the specific cause of a plaintiff's injury must apply an accepted methodology within their area of expertise. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005). If they do not, their causation opinion must be excluded. *Id.*

---

[33] Flamme et al., Auditory Risk of Exposure to Ballistic N-waves from Bullets, 58 INT. J. AUDIOL. S19–S25 (2019) ("PX18").

[34] Jerome et al., *Referee Whistles Part I – Permissible Exposures Indoors*, 177th ACOUSTICAL SOCIETY OF AMERICA Paper 3pNS3 (May 15, 2019) (presented in Louisville, KY) ("PX19"); Murphy et al., *Referee Whistles Part II - Outdoor Sound Power Adjustment*, 177th ACOUSTICAL SOCIETY OF AMERICA Paper 3pNS3 (May 15, 2019) (presented in Louisville, KY) ("PX20").

[35] Dieters et al., *Generalizability of Clinically Measured Acoustic Reflexes to Brief Sounds*, 146(5) J. ACOUST. SOC. AMERICA 3993 (2019). ("PX21").

Flamme and Stephenson fail to support their specific-causation opinions regarding Plaintiffs Baker and Estes with a reliable methodology like the differential diagnosis.[36] They opine that Baker's hearing sensitivity changed during his military service and was "the result of the cumulative effects of all the exposures he was subjected to during his military service between May 2005 and October 2009."[37] Similarly, they opine that "[i]t is more likely than not that the reduction in hearing sensitivity sustained by Estes was the result of the cumulative effects of all the exposures he was subjected to during his military service."[38] But they do not follow a methodology or explain the bases for their specific-causation opinions. Instead, the reports for Baker and Estes consist of (1) a summary of select medical records and other materials and (2) bald conclusions. Despite not using any methodology, Flamme and Stephenson hold these specific-causation opinions about Baker and Estes "to a reasonable level of scientific certainty."[39] Surprisingly, Flamme did not conduct a differential diagnosis in rendering specific-causation opinions concerning Baker and Estes even though, as a clinical audiologist, he is familiar with that methodology and its use in isolating potential for hearing loss.[40] Because Flamme

---

[36] *Jones v. Novartis Pharm. Corp.*, 235 F. Supp. 3d 1244, 1275 (N.D. Ala. 2017), *aff'd in part sub nom.*, 720 F. App'x 1006 (11th Cir. 2018) (excluding general and specific-causation opinions that did not stem from reliable differential diagnosis).

[37] PX22(Flamme/Stephenson-(Baker)-28-29).

[38] PX23(Flamme/Stephenson-(Estes)-28).

[39] PX22(Flamme/Stephenson-(Baker)-23); PX23(Flamme/Stephenson-(Estes)-23).

[40] PX11(Flamme-Dep-203:18-204:21, 206:24-207:14).

and Stephenson failed to base their specific-causation opinions on a reliable methodology, these opinions must be excluded.

### 2.   *Harri Kytomaa*

Harri Kytomaa, Ph.D., P.E., CFEI is a mechanical engineer and certified fire and explosion investigator employed by Exponent, Inc., which has a stained reputation as "a hired gun whose findings are for sale" and whose scientists and engineers have been accused of "routinely bend[ing] conclusions to the needs of clients" by creating "doubt science" and "muddying the waters."[41] Kytomaa's opinions should be excluded because he is unqualified and he failed to personally consider relevant material and prepare his report.

Kytomaa proffers opinions in rebuttal to Expert Reports from Juneau, Armstrong, McKinley and Eddins in the field of audiology and acoustics. Plaintiffs seek to exclude Kytomaa's opinions because Kytomaa is unqualified to offer such criticisms. Kytomaa admittedly "never worked on [ ] the acoustic performance of the human ear."[42] He is also not a member of any professional acoustical or audiology societies.[43]  Still, Kytomaa claims his experience "in engineering settings with things like rotating equipment" like "compressors, turbines and the influence

---

[41] Myron Levin & Paul Feldman, *Big Companies in Legal Scrapes Turn to Science-for-Hire Giant Exponent*, BUSINESS ETHICS: THE MAGAZINE OF CORPORATE RESPONSIBILITY, Dec. 13, 2016. ("PX24").
[42] PX25(Kytomaa-Dep-40:19-41:6.).
[43] *Id.* at 110:6-113:8.

of acoustics in those sort of situations"[44] qualifies him to offer opinions in rebuttal to these experts' reports. Though Kytomaa criticizes Plaintiffs' experts based on REAT and MIRE studies, he admits he has no personal or professional experience in those areas of testing.[45] Also, Kytomaa testified that he has never performed ear molds,[46] is not an expert in human ear anatomy,[47] "is not providing any opinions on REAT testing,"[48] and has not "addressed or performed any MIRE testing,"[49] but nonetheless offers opinions throughout his reports concerning the ear models created by Plaintiffs' experts, Dr. Eddins and Mr. Juneau, model-MIRE ($m$MIRE), human-MIRE ($h$MIRE), and REAT studies performed by Dr. Eddins.[50]

Kytomaa is Exponent's Thermal Sciences Group Vice President. As is apparent from its website, the Thermal Sciences Group is largely dedicated to fire and explosion services and investigations which are "the core competency of the practice[.]"[51] The website does not identify acoustics as part of the Thermal Sciences group, let alone a core part of its practice. Kytomaa testified previously that he is a

---

[44] *Id.* at 40:19-41:15.
[45] *Id.* at 105:10-14; 106:8-108:25.
[46] *Id*. at 122:19-123:11.
[47] *Id*. at 123:13-25.
[48] *Id*. at 105:106-11.
[49] *Id*. at 105:3-8.
[50] PX26(Kytomaa-3-5,20-30,35-38); PX27(Kytomaa-1st-Suppl-1-17); *see generally* PX28(Kytomaa-2nd-Suppl).
[51] *See* https://www.exponent.com/services/practices/engineering/thermal-sciences ("PX29").

"mechanical engineer and fire investigator,"[52] with a subspecialty in "fluids mechanics, thermal sciences, and fire."[53] In his 26 years as a professional expert witness, Kytomaa has never been retained as an expert witness on hearing safety devices, MIRE or REAT testing.  Most of his experience as a professional witness involved problems with electrical machinery or gas tubing that caught fire and/or exploded.[54]

Also, Kytomaa's report was largely, if not entirely, prepared by other individuals. He merely developed an outline—apparently with the assistance of defense counsel—then had six other individuals write his reports without his further contribution.[55,56] That Kytomaa did not prepare his own report further demonstrates that he lacks the requisite qualifications to offer opinions in this case. *HVLPO2, LLC v. Oxygen Frog, LLC*, 2018 WL 2041370, at *3 (N.D. Fla. Jan. 16, 2018); *Bekaert Corp. v. City of Dyersburg,* 256 F.R.D. 573, 579 (W.D. Tenn. 2009).

---

[52] PX30(Kytomaa-Dep-Jacqueline Smith v. Monsanto Co.-11:2-3).

[53] PX31(Kytomaa-Dep-*Dublin v. Monsanto Co.*-8:19-23); PX32(Kytomaa-*Miller v. Omega Flex, Inc.*-5,7-9 (retained to investigate a fire caused from gas tubing manufactured by Omega Flex, Inc., which has retained Kytomaa in "dozens of cases" over the last ten years); PX25(Kytomaa-Dep-101:4-21).

[54]  PX33(Kytomaa-Dep-Ex-6) (created with Kytomaa during his deposition identifying approximately 70 prior cases, none of which involved hearing safety devices).

[55] PX25(Kytomaa-Dep-322:4-6, 322:8-328:16).

[56] *Id*. at 311:7-17, 322:20-323:3.

### 3. *James Crawford*

James Crawford, M.D., is a former Army neurotologist who asserts that the Army's hearing-loss prevention program was inadequate.[57] His primary opinions are that the Army did not offer adequate testing and instructions when providing hearing protection to soldiers, and that the Army prioritized "medical readiness" over hearing-loss prevention.[58] The Court should not permit Crawford to testify at trial because his opinions are unreliable, do not fit the case, and do not pass the Rule 403 balancing test.

### i. *Crawford's Opinions Are Based on an Unreliable Methodology.*

Crawford's primary opinion is that the Army's[59] hearing loss prevention program was inadequate because "soldiers were not individually trained on hearing protection devices ("HPDs") in a uniform manner and because the military did not adopt more precise 'fit testing.'"[60]   But his methodology consists exclusively of reading materials selected by 3M's counsel.

---

[57] PX34(Crawford-1-3).

[58] *Id*. at 3.

[59] Crawford's report refers at times to the "military." PX34(Crawford-3). However, he admits that his knowledge is limited to the Army. PX35(Crawford-Dep-86:22-87:12).

[60] PX34(Crawford-3). Crawford also opines that the Army focuses on "medical readiness," rather than hearing loss prevention. But Crawford fails to prescribe any specific action to solve this alleged problem. PX34(Crawford-10). Presumably, this secondary opinion also derives from Crawford's opinion about the lack of fit testing.

Crawford's opinions are not generally accepted within the scientific community. *Daubert*, 509 U.S. at 593-94. He has not submitted his opinions for publication, nor does he rely on any published scientific literature.[61] Crawford admits that the same program he criticizes complied with the "standard of care."[62] He concedes that the Army's regulations did not require fit testing when providing ear plugs to soldiers while the CAEv2 was on the market.[63] Accordingly, none of the four *Daubert* factors support allowing Crawford's testimony. That fact alone is "sufficient to preclude . . . general causation experts from testifying at trial." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1307 (11th Cir. 2014).

Crawford only reviewed documents selected by 3M's counsel,[64] such as depositions, and for only five hours.[65] Crawford also never asked to review any specific materials.[66] Courts have considered this to be an important point in excluding expert witnesses. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317-18 (9th Cir. 1995) ("If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid

---

[61] PX35(Crawford- Dep-76:7-15, 77:12-23).

[62] *Id.* at 261:8-19, 263:5-17.

[63] *Id*. at 254:5-10.

[64] *Id.* at 64:1-9.

[65] *Id.* at 59:3-61:15.

[66] *Id.* at 64:10-14.

principles.'"); *Payne v. C.R. Bard, Inc.*, 2014 WL 988754, at *8 (M.D. Fla. Mar. 13, 2014), *aff'd*, 606 F. App'x 940 (11th Cir. 2015).

Dr. Crawford did not employ reliable methodology and his opinions should be excluded.

### ii. *Crawford's Opinions Are Not Based on Sufficient Facts and Data.*

Crawford's opinions are unreliable because he fails to rely on sufficient facts or data in concluding that the Army's hearing protection program was inadequate.[67] *See Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1201-02 (11th Cir. 2010); *Cooper v. Marten Transp., Ltd.*, 539 F. App'x 963, 965-66 (11th Cir. 2013).

Crawford explained the basis for his opinion that the program is inadequate as: "It doesn't take much. Simply look at the number of hearing loss claims by veterans, the number one disability . . . hearing loss and tinnitus."[68] Thus, Crawford considers a single data point, total disability claims, and from there leaps to the conclusion that the Army is solely to blame. This is illogical. The number of veterans with hearing issues says nothing about why those hearing issues exist.

Crawford also admitted that his opinions are based almost entirely on anecdotal conversations.[69] Indeed, Crawford's report has only a few citations to

---

[67] PX34(Crawford-3.)

[68] PX35(Crawford- Dep-113:6-17.)

[69] *Id.* at 172:23-173:4.

depositions; mostly he relies on his experience or apparent conversations with unidentified people.[70]

Crawford failed to review any data besides the aforementioned statistics about hearing loss. He instead relied on "personal experience with the way that the . . . Hearing Conservation Program was administered."[71] Crawford failed to research: the percentage of soldiers who received CAEv2 instructions or had yearly personal fittings[72]; hearing loss data relevant to when the CAEv2 came on line[73]; specific instances of hearing loss, outside of his own practice[74]; the percentage of hearing loss claims due to inadequate fitting of a hearing protection device[75]; or, the percentage of hearing loss due to faulty hearing protection.[76]

Crawford's personal experience is insufficient. He was rarely, if ever, involved in issuing hearing protection devices.[77] From 2000 to 2010, he never witnessed the CAEv2 being issued to a single soldier.[78] Crawford never trained soldiers on the use or insertion of the CAEv2.[79] And he never fit another soldier with

---

[70] *See, e.g.*, *id.* at 5 ("in my experience …"), 6 ("I understand that …"), 9 ("it was my understanding …").
[71] *Id*. at 114:20-115:5.
[72] *Id*. at 171:1-172:1.
[73] *Id.* at 115:12-17.
[74] *Id.* at 116:1-7.
[75] *Id.* at 118:5-9.
[76] *Id.* at 116:24-117:4.
[77] *Id.* at 141:21-142:2.
[78] *Id.* at 146:8-12.
[79] *Id.* at 164:16-21.

the CAEv2.[80] Thus, Crawford has no first-hand knowledge as to what instructions soldiers were given, including how often soldiers received the "fit test."

Accordingly, Crawford's opinion that the Army needed to provide better testing and instruction should be excluded as unreliable.[81]

### iii.  *Crawford's Opinions Will Not Assist the Trier of Fact.*

Crawford's opinions also should be excluded because they do not help the jury. Helpfulness relates to both relevance and "fit," as the opinions must bear a scientific connection to the pertinent facts that "logically advances a material aspect of the proposing party's case." *Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 371-72 (N.D. Fla. 2017). When a purported "expert" opinion requires too great an "analytical leap," it has no "valid scientific connection to the pertinent inquiry" and should be excluded. *Id.*

Crawford's opinions are irrelevant to Plaintiffs' claims. Through their design defect and failure-to-warn claims, Plaintiffs allege that 3M's design of the CAEv2 failed to protect them from injury, that 3M failed to test the CAEv2 properly and thoroughly, and that 3M sold the CAEv2 with inadequate warnings or instructions

---

[80] *Id.* at 164:22-24.

[81] Crawford's second opinion, that the military focused on "medical readiness" over hearing preservation, should be excluded for similar reasons. PX34(Crawford-10.) The absence of facts or data to support this second opinion is clear, as there are literally no citations in this section of Crawford's report.

regarding the risks of use. Long Form Compl., Doc. 704, at Counts I-IV, VII, XI, and XII. Plaintiffs' claims for fraud and punitive damages center on 3M's conduct and knowledge. *Id.* at Counts VIII, IX, X, XIII, and XVI.

Nevertheless, as Crawford admits, his opinions focus solely on the conduct of the Army, a non-party.[82] Crawford opines that the Army provided inadequate hearing protection training and focused on "medical readiness" over hearing conservation.[83] He offers no opinions about the design of the CAEv2 or the safety information 3M provided.[84] As such, his opinions require the following impermissible analytical leaps to reach 3M's conduct: (1) that the Army's actions caused Plaintiffs' hearing issues; and (2) that the CAEv2 did not cause Plaintiffs' hearing issues.

For Crawford to establish that the Army caused any soldier's hearing issues—an opinion that Crawford disclaims[85]—he would have to opine that the CAEv2 did not cause hearing issues. He does not give that opinion, nor does it logically flow from his opinions. Even when the Army did not do individualized "fit testing," it does not necessarily follow that its absence was harmful. Army regulations did not

---

[82] PX35(Crawford-Dep-89:3-7); PX34(Crawford-3-10).
[83] PX34(Crawford-3).
[84] PX35(Crawford-Dep-89:16-24, 100:11-14); *see generally* PX34(Crawford).
[85] PX34(Crawford-Dep-103:17-22)

require it.[86] The frequency of fit testing has no bearing on the likelihood that the CAEv2 is defective, or that 3M failed to warn of its known defects.

Crawford illustrated this point when he speculated that the CAEv2 "would not have ended up in someone that it didn't fit," had the military gone "above and beyond" the standard of care as stated in the regulations.[87] The issue is not whether the Army went "above and beyond." It is whether 3M violated the law. Crawford's opinions, therefore, are not helpful to the jury.[88]

### iv.   *Crawford's Opinions Should Be Excluded Under Rule 403.*

Crawford's testimony also should be excluded under Rule 403 because any probative value is substantially outweighed by the substantial risks of unfair prejudice, confusing the issues, and misleading the jury. *See* Fed. R. Evid. 403.

This case centers on 3M's conduct, and Crawford's opinions focus solely on the Army. Whether the Army's hearing loss prevention program could have been improved is not probative of whether 3M defectively designed the CAEv2 or provided insufficient warnings.

---

[86] *Id*. at 254:5-255:8, 262:17-263:9, 437:3-13.

[87] *Id*. at 435:20-436:3.

[88] Crawford's testimony also is unhelpful because it is not true "expert" testimony. He relies largely on personal observations and conversations, plus one statistic about hearing loss in the military—not scientific information. Relevant "expert" testimony must offer opinions "beyond the understanding and experience of the average citizen." *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d at 1305) .

The risks of permitting Crawford's testimony are substantial—particularly the risks of confusing the issues and misleading the jury. Crawford's testimony invites the jury to make inferential leaps that he is unwilling or unable to make himself. For instance, when asked if he opines as to 3M's conduct, Crawford says: "Not directly."[89] Crawford also answered "not directly" when asked if he was opining as to whether the military caused or contributed to any individual's hearing loss or tinnitus.[90]

Crawford's intent is clear, and the risk of confusion is immense. Crawford implies that the Army caused soldiers to lose their hearing. He implies that because it was the Army's fault, it was not 3M's fault. But this stacking of inferences is prejudicial and confusing. If Crawford has causation opinions, he should have disclosed them and they must be supported by a reliable methodology. Because he cannot support those opinions, he resorts to stating them "indirectly," and the Court should exclude Crawford's opinions under Rule 403.

For the foregoing reasons, Crawford should be excluded entirely.

### 4.   *John Casali*

Plaintiffs move the Court to exclude certain testimony and opinions of Dr. John Casali, an engineer, because his report includes opinions that are speculative

---

[89] PX35(Crawford-Dep-89:9-13).
[90] *Id.* at 100:21-101:3.

and unreliable, as they are outside Casali's area of expertise and not based on any methodology.  Specifically, Casali opines that:

- The CAEv2 complied with the U.S. military's request for non-linear hearing protection as expressed in DLA Solicitation #SP0200-06-R-4202 and other documents; and

- The military is the "final arbiter for selection and administration of hearing protection that is appropriate" and is responsible for ensuring servicemembers receive adequate fits with the CAEv2.

These opinions fail to meet the *Daubert* standard. Their unreliable nature and prejudicial impact[91] should preclude them from being presented to the jury.[92]

Casali is an engineer who specializes in designing and testing hearing protection devices.  He is not a lawyer, and he had no involvement in the military's acquisition of the CAEv2 starting in 1999.[93]  Casali has no experience procuring equipment or drafting procurement solicitations, and he testified that he is unfamiliar with the military's policies concerning HPD procurement that were in effect at the time 3M began selling the CAEv2 to the military, including what test data HPD

---

[91] Fed. R. Evid. 403.

[92] To the extent Casali intends to offer testimony at trial regarding AHAAH (*see* PX3(Casali-83-84, 110-112, 151-152)), Plaintiffs move to limit that testimony described above. *Supra* 5-10.

[93] *Id.* at 121-126.

manufacturers were required to disclose to the military.[94] Yet he speculates at length regarding what the military knew, or wanted to know, about the defects and risks of the CAEv2.

Casali opines that the CAEv2 "provided all of the features and performance quality that complied with the requests made by Dr. Doug Ohlin, Army Hearing Program Manager, for the ground warfighter, which were enumerated in his request for an NSN designation on April 27, 1997, as well as in other documents," including the MPID contained in the 2006 DLA Solicitation ("Solicitation").[95]   But he then backtracks, stating that the CAEv2 only satisfied the "reasonable and feasible" portions of the MPID, before concluding that Dr. Ohlin and the military "should have known" that certain requirements set forth in the MPID were not feasible.[96] Casali also makes legal opinions in interpreting the Solicitation. In particular:

- Casali blames the military for including an "infeasible" provision in the Solicitation, and implies that 3M is therefore not required to satisfy such provision, when in fact Berger approved of the provision and thanked Dr. Ohlin for recommending the inclusion of that provision[97]; and

---

[94] PX36(Casali-Dep-54:19-57:4) ("I think the military has adopted some policies about the type of data that they would require. I don't know what those requirements were way back in 1998/'99."); *id.* at 48:17-49:8 ("Q: With regard to this product, the [CAEv2], should human factors testing have been done, other than REAT testing, on the product before it was sold? A: "[I]n this instance, I do not know that REAT testing was a requirement in the military.").

[95] PX3(Casali-147); PX36(Casali-Dep-78) ("I conclude that the green end REAT performance satisfies the general needs noted by Dr. Ohlin in his 1997 Department of Defense request for an NSN.").

[96] *Id.* at 126, 147.

[97] *Id.* at 125; PX37(3M_MDL000017366-68).

- Casali concludes that the CAEv2 "was not required to separately satisfy the[] 'salient characteristics,'" contained in MPID.[98]

As "testifying experts may not offer legal conclusions," the Court should exclude Casali's testimony that the CAEv2 satisfied the requirements set forth in the MPID (Opinions 2 and 3). *See Cook v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1112 n. 8 (11th Cir. 2005).

Casali's opinions (Opinions 24 and 25) stressing the importance of personal fitting and training with earplugs in the military, and that the military is the "final arbiter for selection and administration of hearing protection that is appropriate," are improper. Casali's opinion regarding the duty owed by the military to servicemembers is a legal conclusion and should be excluded. *Dugas v. 3M Co.*, 2016 WL 7327666, at *11 (M.D. Fla. Mar. 30, 2016) ("Consistent with the controlling authority in this Circuit, Mr. Spencer may not opine that the Navy had a non-delegable responsibility to act in a certain way."). Casali's opinions are unhelpful as they assume the military was informed of the latent defects associated with the CAEv2, as the military would not have been able to properly train and fit all servicemembers on the CAEv2 unless it was aware of all risks and dangers associated with the earplug. The opinions only serve to distract the jury from key issues in this case, including whether 3M disclosed all information contained in the

---

[98] PX3(Casali-121).

secret Defect Report[99] to the military (it did not).  These two opinions should be excluded.

     **5.**      ***Richard Neitzel***

Richard Neitzel, Ph.D., CIH, is an industrial hygienist. He is not a lawyer, percipient witness, labeling expert, medical doctor, or audiologist. He lacks any personal or professional experience with the military's hearing conservation programs. Neitzel fails to offer any opinions within the scope of his expertise as an industrial hygienist. Instead, all of his proffered opinions are on topics well beyond his expertise and are, therefore, inadmissible. Therefore, Neitzel should be excluded completely.

       **i.**      ***Neitzel Must Be Excluded Because Interpreting the NCA Is for the Court.***

"[T]estifying experts may not offer legal conclusions[.]" *Cook*, 402 F.3d at 1112 n. 8. All witnesses "are prohibited from testifying as to questions of law regarding the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct." *R.W. v. Bd. of Regents of the Univ. Sys. of Ga.*, 114 F. Supp. 3d 1260, 1274 (N.D. Ga. 2015).

---

[99] PX38(3M_MDL000019514-19).

During his deposition, Neitzel testified that his opinions that 3M did not need to label HPDs sold to the military hinge entirely on his lay interpretation[100] of the definition of "product" in the Noise Control Act ("NCA"), 42 U.S.C. § 4902(3)(B).[101] Neitzel's opinions regarding compliance with the NCA must be excluded. *Id.*

### ii.   *Neitzel Must Be Excluded Because Instructing the Jury on Legal Duties Is for the Court.*

"Duty is a matter of law that is to be determined by the Court." *Janis v. Pratt & Whitney Canada, Inc.*, 370 F. Supp. 2d 1226, 1229 (M.D. Fla. 2005). Experts may not testify as to what duties apply in a case, as "the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). Thus, it is improper for an expert to testify as to the Army's obligations to servicemembers, and whether that supposed duty superseded others' duties (such as 3M's duties regarding product defects, failures to warn, negligence, etc.). *Dugas*, 2016 WL 7327666, at *11.

---

[100] At his deposition, Dr. Neitzel conceded, however, he is not a lawyer, does not know any canons of statutory interpretation, did not apply any such canons to his interpretation, and did not research the NCA or its legislative history. PX39(Neitzel-Dep-(12/16/20)-25:20-26:4, 62:21-64:17). He had no answer for the fact that the only specific examples of "combat use" products exempted from the NCA were noise-*emitting* products, and that all other specific examples of exempted products in 42 U.S.C. § 4902(3)(B) are noise-emitting as well. *Id.* at 66:2-72:19; 42 U.S.C. §§ 4902(3)(B)(ii)-(iii).

[101] PX39(Neitzel-Dep-(12/16/20)-72:15-19, 76:7-20, 128:14-21).

Neitzel violates this prohibition. He intends to opine that the Army had duties to (a) distribute HPDs and written information regarding those HPDs to soldiers, (b) provide its "own instructions, training, and fitting practices" to soldiers, and (c) design and implement a hearing conservation program in an "effective" way and in light of the information known to the government from 3M and its own research.[102] As Neitzel conceded, however, he cannot offer any legal opinions on duties for causes of action, such as those Plaintiffs assert here, because he is not a lawyer and does not know the applicable law.[103] Accordingly, his opinions about the Army's supposed obligations and duties are inadmissible.

Neitzel's fact opinions about whether the Army complied with these supposed "duties" are unfounded and clearly an attempt to provide hearsay testimony in the guise of "expert" testimony. Providing opinions on who owes a duty is legal in nature and, therefore, must be excluded.

### iii.    Neitzel Cannot Testify to What the Military "Knew" About the CAEv2.

Pursuant to *Daubert*, an expert witness must apply an expertise to their opinions. "Acting simply as a narrator of the facts does not convey opinions. . . . Mere narration thus fails to fulfill *Daubert's* most basic requirements." *S.E.C. v.*

---

[102] PX40(Neitzel-(General)-3, 33-37).
[103] PX39(Neitzel-Dep-(12/16/2021)-189:2-24); *id.* at 93:8-23 (admitting he could not "cite a particular code" to support his opinion that the Army, not 3M, had the duty to train on proper use of the CAEv2).

*Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013). Accordingly, an expert cannot simply provide "pure factual narrative," such as "improper references to [a party's] knowledge and intent." *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010).[104]

Despite this clear prohibition, Neitzel opines that the Army "knew" to fold back the opposing flanges on the CAEv2.[105] For this proposition, Neitzel cites testimony from percipient witnesses and assumes it is true.[106] He also cites military research reports and concludes, without any analysis, that they demonstrate the Army knew how to use the CAEv2 and of its defects.[107] During his deposition, however, he conceded that he never saw any documents or testimony suggesting that 3M told the military servicemembers they needed to fold back the opposing flanges to use the CAEv2.[108]

This is pure factual narrative dressed up as "expert" testimony. Neitzel applies no specialized knowledge or methodology to these opinions; he merely regurgitates Defendants' preferred factual narrative regarding what the Army supposedly knew,

---

[104] *See id.* at 1346 n.31; *FNB Bank v. Park Nat. Corp.*, 996 F. Supp. 2d 1187, 1190 (S.D. Ala. 2014).

[105] PX40(Neitzel-(General)-3, 47-48).

[106] *Id.*

[107] PX40(Neitzel-(General)-47-48); PX39(Neitzel-Dep-(12/16/20)-163:4-165:15)

[108] PX39(Neitzel-Dep-(12/16/20)-165:17-170:24).

including materials (research reports) he admits he is unable to interpret with any level of expertise. Such opinions violate *Daubert* and are inadmissible.

### iv. Neitzel's Army Training/Fitting Opinions Are Inadmissible Hearsay and Employ No Methodology.

"Although an expert is generally allowed to consider hearsay materials in formulating opinions, he must form his opinions by 'applying his extensive experience and a reliable methodology' to the inadmissible hearsay materials. Otherwise, the expert is simply 'repeating hearsay evidence without applying any expertise whatsoever,' a practice that allows the proponent of the evidence to 'circumvent the rules prohibiting hearsay.'" *In re: Chiquita Brands Int'l Inc.*, 2019 WL 11497632, at *33 (S.D. Fla. Sept. 5, 2019) (quoting *United States v. Mejia*, 545 F.3d 179, 197 (2nd Cir. 2008)).

For his opinions regarding the Army's supposed "inconsistency" in training and fitting soldiers with CAEv2 earplugs, Neitzel—who has no experience with the military—relies on (a) anecdotal hearsay statements from the GAO report, and (b) anecdotal and speculative hearsay testimony from a few military audiologists in this case.[109] Neitzel then extrapolated these hearsay and speculative statements to the entire Army using no methodology at all—he testified that he thought he could trust the GAO report implicitly, despite having no knowledge about the bases the GAO

---

[109] PX40(Neitzel-(General)-73-90).

authors visited, who they interviewed, what they asked those interviewees, what the interviewees actually said about Army life and hearing protection, and whether or how those interviewees could act as a representative sample of the entirety of the Army.[110] He also relied heavily on the GAO report, which cited anonymous statements from a handful of soldiers, and speculation from some Army audiologists about *other* bases' potential hearing conservation failures, despite his view that "one statement or a statement from a handful of soldiers isn't going to convince me in the presence of sort of contradictory evidence that the Army was, in fact, training every soldier."[111,112] Neitzel had no independent knowledge to confirm these speculative anecdotes, made no attempt to do so, and could cite no other evidence in support.[113] He also placed that hearsay and speculation above actual accounts of hearing protection training and enforcement.[114] When asked why he concluded that such anecdotes could be extrapolated to the entire Army, Neitzel admitted he employed no methodology at all.[115]

   Neitzel attempts to circumvent the rule against hearsay and requires exclusion

---

[110] PX39(Neitzel-Dep-(12/16/20)-321:5-326:6).

[111] *Id*. at 334:17-20, 336:8-369:2.

[112]Such contradictory evidence includes direct testimony from the Plaintiffs that they received training and fitting instruction on the CAEv2, testimony from Plaintiff experts about how hearing protection training is one of the first things soldiers learn, and how the Army institutionalizes consistent enforcement of hearing protection.

[113] *Id.* at 29:3-4, 29:20-30:5, 231:6-235:7.

[114] *Id.* at 240:2-242:12.

[115] *Id.*at 321:5-326:6.

on that basis. Furthermore, Neitzel used no methodology to extrapolate the limited hearsay anecdotes and speculation about noncompliance to the entire Army, and these opinions should be excluded as unreliable. *Allison*, 184 F.3d at 1319.

> ### v. Neitzel Has No Expertise in Labeling or Packaging, and He Applied No Methodology to Those Opinions.

Rule 702 prohibits opinion testimony that is not derived from the witness's area of expertise. Neitzel violates this core precept by offering opinions that Defendants' CAEv2 labels and packaging were "clear, conspicuous, and understandable."[116] However, Neitzel conceded that he is not an expert in labeling or packaging, and that he applied no discernible legal or objective standard to concluding that the labels and packaging were "clear, conspicuous, and understandable."[117] Accordingly, these opinions must be excluded because Neitzel no expertise in the subject area, and he applied no accepted methodology.

> ### vi. Neitzel's Plaintiff-Specific Opinions Are Disguised Diagnoses for Which He Has No Expertise nor a Reliable Methodology.

Opinions on the existence and cause(s) of plaintiffs' hearing issues must come from experts in such diagnoses. *Ford v. Carnival Corp.*, 2010 WL 9116184, at *2 (S.D. Fla. Mar. 4, 2010). Such experts include audiologists and otolaryngologists (or

---

[116] PX40(Neitzel-(General)-91-93).
[117] PX41(Neitzel-Dep-(12/17/20)-728:7-730:20).

"ENTs"), not industrial hygienists such as Neitzel.[118] Moreover, opinions on the specific cause of a plaintiff's medical condition (injury) must be based on a reliable methodology, such as the differential diagnosis. *McClain*, 401 F.3d at 1242; *Jones v. Novartis Pharm. Corp.*, 235 F. Supp. 3d 1244, 1275 (N.D. Ala. 2017), *aff'd in part*, 720 F. App'x 1006 (11th Cir. 2018).

For Plaintiffs Estes, Hacker, and McCombs, Neitzel cited epidemiological studies regarding trends in hearing data and concluded that those Plaintiffs' audiograms and tinnitus diagnoses were not "consistent with" NIHL or tinnitus caused by using the CAEv2.[119]

However, Neitzel conceded that an industrial hygienist does *not* have the expertise to diagnose a subject's hearing issues, nor their cause.[120] Neitzel could not explain what he meant by "diagnose," and he could not explain how his opinions that Estes', Hacker's, and McCombs' hearing issues were not due to flaws in the CAEv2 were anything other than diagnostic in nature.[121] Neitzel repeatedly conceded that these opinions were not "diagnoses" of any hearing issues and that he could not diagnose hearing issues because he is neither a medical doctor nor an

---

[118] *See*, *e.g.*, PX41(Neitzel-Dep-(12/17/20)-425:4-20).
[119]  PX42(Neitzel-(Estes)-8-9,  103-111);  PX43(Neitzel-(Hacker)-5-6,  119-123); PX44(Neitzel-(McCombs)-7-8, 104-110).
[120] PX41(Neitzel-Dep-(12/17/20)-478:5-11).
[121] *Id.* at 512:6-520:24.

audiologist.[122] He also repeatedly testified that he had no idea how to diagnose hearing damage.[123] For this testimony, Neitzel engaged in a drawn out, line-drawing exercise wherein he stated that he was *not* providing a diagnosis; rather, he was just opining that the plaintiffs did not have audiological results "consistent with" NIHL or tinnitus, and that such issues were not due to flaws in the CAEv2.[124]

Despite these semantics, the opinions are diagnoses (*i.e.* specific-causation opinions) in disguise. Opining that Plaintiffs' hearing issues are not "consistent with" NIHL or tinnitus based on noise exposure during their CAEv2 usage period is clearly meant to convey that Estes, Hacker, and McCombs cannot prove that hearing damage was caused by the CAEv2. Neitzel's "consistent with" opinions fall well outside his own admitted scope of expertise. *Jones*, 235 F. Supp. at 1279-81; *Ford*, 2010 WL 9116184, at *2.

Additionally, Neitzel applied no accepted methodology[125] to diagnose the cause of the hearing issues of Estes, Hacker, and McCombs. He admitted that he does not know how audiologists or medical professionals diagnose hearing damage

---

[122] *Id*. at 425:4-20; 463:3-484:19; 512:6-520:24.

[123] *Id.* at 463:3-484:19; 512:6-520:24.

[124] *Id.* at 466:17-484:19; 512:6-520:24.

[125] District courts must ensure "the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*." *City of Tuscaloosa*, 158 F.3d at 562. The differential diagnosis is as a reliable methodology under *Daubert* for determining the cause of a patient's medical symptoms. *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010).

and the causes of hearing damage.[126] He also admitted that epidemiological studies—which are the sole basis for his "consistent with" opinions—are only one of many factors hearing professionals consider when diagnosing hearing damage.[127] Given that Neitzel used only one input among many to perform his analysis, and admitted he does not know how one actually diagnoses hearing damage, he cannot establish that he employed any accepted methodology for his opinions. *See Allison*, 184 F.3d at 1319. Accordingly, Neitzel's failure to use any methodology acts as an independent basis to exclude these medical causation opinions.

### 6.    *Jennifer Sahmel*

Although this is a products case under state tort law, 3M designated Jennifer Sahmel, a workplace safety expert—specifically on Occupational Safety & Health Administration ("OSHA")[128]—to tell the jury who was responsible for the safety of the CAEv2. While manufacturers are responsible for the safety of their products under state tort law, Sahmel did not consider any facts or information about 3M in reaching opinions on duties and responsibilities here.[129] Sahmel did not rely on any authorities related to *product* safety, but relied on authorities about *workplace* safety.

---

[126] PX41(Neitzel-Dep-(12/17/20)-463:3-466:16).
[127] *Id*. at 491:1-495:20.
[128] PX45(Sahmel-Dep-104:7-105:10).
[129] *Id.* at 272:7-13, 273:5-12.

### i. *Sahmel Is Not Qualified as a General or Case-Specific Expert.*

An expert must "ha[ve] sufficient 'knowledge, skill, experience, training, or education." *Navelski*, 244 F. Supp. 3d at 1286. When an expert admits she lacks expertise in a discipline, the witness cannot provide opinion testimony in that area. *Doctors Licensure Grp., Inc. v. Cont'l Cas. Co.*, 2011 WL 13182969, at *4-5 (N.D. Fla. Sept. 26, 2011).

Sahmel testified she is not an expert in these fields:

- Medicine, including diagnoses of medical conditions and causation;[130]

- Audiology;[131]

- Design or engineering of products, including the CAEv2;[132] or

- Military hearing conservation programs.[133]

Nevertheless, Sahmel disclosed general and case-specific opinions that fall within these disciplines:

- "the Combat Arms earplugs (CAE)[] do not contribute to overall noise exposure";[134]

---

[130] *Id.* 23:7-20.
[131] *Id.* 23:21-24:12.
[132] *Id.* 24:13-25:4.
[133] *Id.* 25-29.
[134] PX46(Sahmel-9).

36

- Audiology opinions;[135]

- Design opinions;[136] and

- Military hearing conservation program opinions.[137]

Because Sahmel admits she is not an expert in the foregoing fields, Sahmel is not qualified to proffer general or case-specific opinions in these areas. *Banta Props., Inc. v. Arch Specialty Ins. Co.*, 2011 WL 13096476, at *2 (S.D. Fla. Dec. 22, 2011).

### ii. Sahmel's Specific-Causation Opinions Are Unreliable and Should Be Excluded.

Sahmel employs no methodology in her case-specific opinions concerning Baker and Keefer.[138] Her opinions about Baker and Keefer consist of (1) recitations of Baker and Keefer's medical records, military records, depositions, and other materials and (2) bald conclusions that Army hearing conservation policies were violated.[139] These case-specific opinions are unreliable and should be excluded.

---

[135] PX47(Sahmel-(Keefer)-10, 64-66, 69-70, 71-73); PX48(Sahmel-(Baker)-10, 64-66). Sahmel's supplemental case-specific reports are equally inadmissible due to lack of methodology and should be excluded. *See generally* PX49(Sahmel-1st-Suppl-(Keefer)); PX50(Sahmel-1st-Suppl-(Baker)).

[136] *Id.* at 9.

[137] *Id*.

[138] PX48(Sahmel-(Baker)-61-66); PX47(Sahmel-(Keefer)-61-73).

[139] *Id*.

### iii. Sahmel's Opinions Do Not Meet the "Fit" Requirement.

To be admissible, a "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004). "[T]here is no fit where a large analytical leap must be made between the facts and the opinion." *Id*.

Sahmel proffered opinions about the responsibilities of 3M in manufacturing the CAEv2.[140] However, Sahmel failed to consider any of 3M's conduct in reaching her opinions:

> Q. What's the manufacturer 3M's responsibilities, what are they supposed to do?
>
> A. The specific actions and requirements of 3M are outside the scope of my opinions in this case. My analysis is focused on employer responsibility and the responsibilities of the Army to their soldiers and personnel.[141]

> A. 3M's actions are outside the scope of my analysis. I have not performed the research to have opinions about that, and it is outside the scope of what I was asked to do.[142]

---

[140] PX46(Sahmel-9) ("According to the OSHA, DoD, and Army hearing conservation programs, the hearing protection manufacturer was not responsible for these specific functions.").

[141] PX45(Sahmel-Dep-273:7-13).

[142] *Id*. 273:5-12.

Instead, Sahmel relied on workplace safety regulations that are irrelevant to the pivotal issue in every products liability case[143]: the safety of the product.[144] Despite ignoring 3M's conduct and neglecting to consider authorities about product safety, Sahmel nevertheless opined about 3M's responsibilities. Therefore, Sahmel's opinions are inadmissible because her opinions do not satisfy *Daubert's* "fit" requirement. *See McDowell*, 392 F.3d at 1299.

Sahmel's other opinions likewise fail to "fit" because she reached opinions about responsibilities for injuries caused by 3M's products, but ignored 3M and its role as the manufacturer of the products. Without considering anything about 3M, the analytical gap between the facts and her opinions is too vast, and requires impermissible analytical leaps unsupported by methodology. Therefore, Sahmel's opinions are inadmissible and should be excluded.

### iv.  *Sahmel Cannot Interpret Irrelevant Regulations.*

"[T]estifying experts may not offer legal conclusions." *Cook*, 402 F.3d at 1112 n. 8. Witnesses "are prohibited from testifying as to questions of law regarding

---

[143] Because workplace safety regulations do not relate to the safety of products, the evidence is inadmissible in this case under Rule 402. In addition, admission of any evidence about workplace safety, employee training, or HCPs runs the risk of misleading the jury to believe that these standards might be dispositive of Plaintiffs' state law product liability claims. Hence, the evidence is also inadmissible under Rule 403.

[144] "[T]he pivotal issue in products liability cases is the safety of the product." *Sanchez v. Boston Scientific Corp.*, 2015 WL 631289, at *1 (S.D.W. Va. Feb. 12, 2015).

the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct." *R.W. v. Bd. of Regents*, 114 F. Supp. 3d at 1274 (quoting *Dahlgren v. Muldrow*, 2008 WL 186641, at *5 (N.D. Fla. Jan. 18, 2008)). "Duty is a matter of law that is to be determined by the Court." *Janis*, 370 F. Supp. 2d at 1229. Experts may not testify as to what the law is because "the court must be the jury's only source of law." *Montgomery*, 898 F.2d at 1541.

In *Dugas*, 3M designated an expert in an asbestos case involving the Navy to opine on the Navy's workplace responsibilities and duties. 2016 WL 7327666, at *11. The trial court excluded the opinion because "experts may not testify as to what the law is as 'the court must be the jury's only source of law.'" *Id.* (quoting *Montgomery*, 898 F.2d at 1541). As such, the court excluded the expert's opinion that the Navy had a non-delegable responsibility to act in a certain way.

Here, Sahmel relied on workplace safety regulations like OSHA to opine on the Army's duties and responsibilities for the CAEv2:

- "Federal and military guidance, standards, and laws . . . emphasize the hierarchy of controls and specify the use of hearing protection only in certain instances and as a last resort following the implementation of other controls, such as engineering and administrative controls";[145]

- "It is a fundamental principle of workplace health and safety that employers are responsible for the health and safety of their employees . . . . including for hearing conservation programs specifically";[146]

---

[145] PX46(Sahmel-9).

[146] *Id.*

- "Consistent with its responsibility to implement an appropriate hearing conservation program for its personnel with the potential for hazardous noise exposures, it is documented that the Department of the Army actively performed program evaluations related to the Combat Arms earplugs . . . . According to the OSHA, DoD, and Army hearing conservation programs, the hearing protection manufacturer was not responsible for these specific functions."[147]

As in *Dugas*, this Court should exclude all testimony and opinions about the Army's duties or responsibilities—and 3M's lack of duties or responsibilities—for the defective product in this case.

> ### v.   *Sahmel Cannot Read 3M's Corporate Documents to the Jury.*

Courts exclude expert testimony when it is not needed to clarify facts and issues within the common understanding of jurors. *Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen & Ret. Sys.*, 50 F.3d 908-917 (11th Cir. 1995). "[K]nowledge, state of mind, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury." *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 703 (S.D.W. Va. 2014). "[S]imply parroting Defendant's corporate documents or offering a narrative account of events from them will not be helpful to the jury." *Arevalo v. Coloplast Corp.*, 2020 WL 3958505, at *21 (N.D. Fla. July 7, 2020) (citing *United States v. Reyes-Garcia*, 798 F. App'x 346, 354 (11th Cir. 2019)). An expert witness

---

[147] *Id.*

is not necessary to read corporate documents to the jury. *See In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2020 WL 774234, at *7 (S.D.W. Va. Feb. 13, 2020) (Prohibiting expert testimony on "internal corporate documents . . . that is solely a conduit for corporate information."). Here, this Court should preclude Sahmel from reading internal corporate documents or parroting other witness' testimony[148] to the jury.

### 7. *Vickie Tuten*

#### i. *Tuten's Opinions Are Unreliable Because They Are Not Based on Sufficient Facts, Data, Analysis and Methodology.*

Dr. Tuten's expert report does not follow typical formatting conventions with enumerated opinions. Rather, Tuten recites various Army regulations followed by a personal narrative of experiences, ending with five "conclusions" which can be boiled down to the following three criticisms:

- soldiers were non-compliant in their use of hearing protection[149];

- the Army failed to consistently perform proper hearing protector sizing, fitting and instructions for soldiers[150]; and

---

[148] PX49(Sahmel-1st-Suppl-(Keefer)-1-8) (3M supplemented Sahmel's report for Keefer to include the deposition of Toyama as another basis for her opinions. But the new "analysis" just parrots Toyama's testimony and is therefore inadmissible.).
[149] PX51(Tuten-18-19).
[150] *Id*. at 18.

42

- the Army failed to properly train medical personnel to perform hearing conservation functions including proper fitting.[151]

However, Dr. Tuten testified that she did not:

- consider deposition testimony or other material that did not align with her own personal views or experiences[152];

- read depositions of Drs. Gates, Babeau or Fallon, which were provided to her[153];

- review any internal 3M documents;[154]

- review any surveys or studies related to the CAEv2 concerning military compliance with hearing conservation programs nor studies of NIHL rates[155];

- review any published literature related to military hearing conservation programs[156];

---

[151] *Id* at 19.
[152] PX52(Tuten-Dep-66:6-9) ("So I did not spend a lot of time reviewing things that I didn't think were going to be much different from my own views.").
[153] *Id*. at 44:15-45:16 (she reviewed only two of five audiologists' depositions given to her by counsel).
[154] *Id*. at 50:14-19.
[155] *Id* at 69:5-13.
[156] *Id*. at 69:19-25.

- consider any documents in the public domain about the Army hearing conservation other than the regulations and pamphlets she cites in her report;[157] nor

- analyze or review any data as to how many medically trained personnel had appropriate training to instruct and fit the CAEv2.[158]

Tuten's opinions are based solely on her own views and personal opinions[159] without any meaningful review of available information and premised upon unspecified conversations with unidentified patients[160] and audiologists.[161] These *ipse dixit* opinions lack a proper basis for admissible expert testimony. Tuten provided no evidence relating in any way to Trial Group A Plaintiffs that they were not properly instructed by qualified, medically trained personnel on the proper fit and use of the CAEv2 consistent with her testimony,[162] nor that any Plaintiffs failed to use their hearing protectors.

---

[157] *Id*. at 68:23-69:3.

[158] *Id*. at 216:18-218:14.

[159] *Id*. at 66:11-16.

[160] PX51(Tuten-18).

[161] PX52(Tuten-Dep-60:20-62:12).

[162] *Id*. at 295:24-315:21 (concluding that proper fit check under regulations is instructing soldiers to pull up their pinna and not tug tests, otoscope examinations or acoustic feedback from a hand clicker).

### B.   Hybrid/Percipient Witnesses

Elliott Berger and Dr. Eric Fallon have been identified by 3M as "hybrid" witnesses.[163] Hybrid witnesses may testify to their personal knowledge, and to their lay opinions under Rule 701, when such opinion testimony is based upon the witness' personal experience as a professional and is helpful in understanding the witness' decision-making process. *Arch Specialty Ins. Co. v. BP Invest. Ptrs., LLC*, 2020 WL 5848317, at *4 (M.D. Fla. Oct. 1, 2020) (citing *Kaplan v. Kaplan*, 2012 WL 1660605, at *2 (M.D. Fla. May 11, 2012)).[164] To the extent a hybrid witness offers expert testimony, such testimony must comply with the Federal Rules of Evidence and the strictures of *Daubert. Id.* at *5 (citing *Kaplan*, 2012 WL 1660605, at *2); *see generally Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317-18 (11th Cir. 2011).[165]

---

[163] PX53(Fallon-Amend-Disclosure); PX54(Berger-Disclosure).

[164] Under applicable law, Berger and Fallon cannot testify at trial to any expert opinions which were not disclosed in their Rule 26(a)(2)(C) disclosures. Fed. R. Civ. P. 26(a)(2)(C); *Kennedy v. Nick Corcokius Enterprises, Inc.*, 2015 WL 9016632 (S.D. Fla. Dec. 16, 2015); *Jones v. Royal Caribbean Cruises, Ltd.*, 2013 WL 8695361 (S.D. Fla. Apr. 4, 2013).

[165] While hybrid witnesses "need not provide the report required by Rule 26(a)(2)(B), they are still required to disclose the subject(s) of their expert testimony, as well as a summary of the facts and opinions on which they are expected to testify." *Rangel v. Anderson*, 202 F. Supp. 3d 1361, 1364 (S.D. Ga. 2016); *see* Doc. 1561, at 1n.1.

### 1.   *Elliott Berger*

3M disclosed that Berger will testify that "there was no feasible alternative design for the CAEv2."[166] This opinion should be excluded because it is not based on a reliable methodology:  It is mere *ipse dixit* premised only on Berger's bald say-so.

#### i.   *Berger's Alternative Design Opinion Is Unreliable Because He Failed to Consider Alternative Design Possibilities.*

Determining the feasibility of an alternative design requires considerations of potential modifications to the product at issue. *See McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) (affirming District Court's exclusion of alternative design expert whose "opinion was based wholly on speculation" in part because the expert "did not test alternative designs."). However, Berger testified that he lacks knowledge on key design decisions for the CAE product line, and his testimony reveals that he conducted no meaningful analysis on the issue of feasible alternatives prior to the discontinuation of the CAEv2.   Berger testified that he does not know:

- •   why there was no consideration of the use of an ear lock to prevent imperceptible loosening in the CAEv2;[167]

---

[166] PX54(Berger-Disclosure-9-11).
[167] PX55(Berger-Dep-(12/11/2019)-507:9-508:20).

- why an ear lock was implemented in Version 4.1;[168]

- whether Defendants ever conducted any analysis on the suitability of materials for the stem of the CAEv2;[169] and

- whether Defendants had used a hard stem (like that in the CAEv2) in any predecessor HPDs.[170]

Because Berger concedes that he failed to consider an array of potential improvements to the design of the CAEv2 that were feasible and would have improved its efficacy, his methodology for the alternative design opinion is unreliable and unscientific.[171]

### ii. *Berger's Alternative Design Opinion Is Unsupported.*

3M asserted that Berger's Alternative Design Opinion is premised on three facts: (1) the "CAEv2's Adapter Stem Did Not Diminish Its Effectiveness;" (2) "The Nonlinear Filter Used in the CAEv2 Was Effective;" and (3) "Both Militaries Opted Against A Single-Ended Dual-Mode Design."[172] But even assuming that these facts

---

[168] *Id.*

[169] PX56(Berger-Dep-(9/25/2020)-240:6-13).

[170] *Id.* at 63:12-64:6.

[171] In addition to reflecting the flawed nature of his methodology, Berger's lack of personal knowledge on these topics also makes these topics beyond the permissible scope of hybrid witness testimony. *See Hartford Steam Boiler Inspection and Ins. Co. v. Menada, Inc.*, 2018 WL 3911212, at *6 (S.D. Fla. Apr. 3, 2018) (hybrid witness testimony limited to "the witness' direct and personal knowledge 'in the ordinary course' of his or her job function[.]").

[172] PX54(Berger-Disclosure-9-11).

are true and within Berger's personal knowledge and expertise, they fail to justify the conclusion that no alternative deign was feasible.  Indeed, Berger acknowledges that the width of the filter could have been altered to accommodate alternative stem and tip designs.[173]  Accordingly, any statement that an alternative design that leveraged a thinner filter to increase the flexibility and fit of the CAEv2 was not feasible is unsupported by the disclosed facts and premised only on Berger's unsupported assertion.  Berger's claims that the filter in the CAEv3 had similar attenuation to the CAEv2, and that some customers chose not to adopt the single-ended design, provide no support for the conclusion that those designs (or any other designs) were not feasible, and, in fact, support the opposite conclusion.

Indeed, at his deposition, Berger seemed to concede that his "feasibility" analysis was, at its heart, nothing more than a consumer survey. Berger testified that his methodology in determining feasible alternative design was to limit himself within "the guidance and request that we had received" from customers, and that "the product we developed was the one that was feasible to meet those goals."[174] At best, this is simply a product development analysis, and has no bearing on the feasibility of alternative dual-function earplugs.

---

[173] *Id.* at 10.
[174] PX57(Berger-Dep-(12/18/2020)-322:9-323:21).

### iii.   Berger's Regulatory Expert Testimony Should Be Excluded.

Berger's regulatory opinions are unreliable and improper hybrid witness testimony, and therefore should be excluded.

3M disclosed that Berger will testify that the EPA requires HPD manufacturers to include "Noise Reduction Rating[s] on the labels they provide on the *civilian* market,"[175] appearing implicitly to opine that labeling is *not* required in other markets.  But during his employment, and as recently as 2016, Berger held the contrary view—after Berger "researched this topic extensively"—that he determined that "NRR must be on all products, including those sold to the military."[176] Berger's proffered opinion thus directly conflicts with his prior opinion, which he affirmed was competent as recently as December 2020.[177] The Berger Disclosure is devoid of any methodology—whether based on experience, or on statutory or regulatory interpretation—to justify this change in his claimed opinion. Accordingly, the opinion is unreliable and must be excluded.

3M further disclosed that Berger will testify that Aearo's premature stopping of REAT constituted "Aearo lab policies that were approved by NVLAP."[178] But

---

[175] PX54(Berger-Disclosure-5) (emphasis added).

[176]  PX58(3M_MDL000446687-89);  *id.* at 3M_MDL000446689 (2013 Kladden Memorandum to Berger).

[177] PX57(Berger-Dep-(12/18/2020)-184:12-21).

[178] PX54(Berger-Disclosure-7).

Berger has never been an NVLAP auditor and provides no basis for his speculation that Aearo's unwritten test-stopping policy was ever disclosed to—much less approved by—NVLAP.[179]

### iv.   Berger's Fact Testimony Beyond His Personal Knowledge Should Be Excluded.

3M disclosed that Berger will testify that "Aearo's REAT testing of the CAEv2 established that the experimenter did *not* need to fold back the opposing flanges to obtain 'optimum protector performance' for most subjects."[180] But Berger has already testified that he has no personal knowledge about the experimenter's folding of the flanges in that REAT test,[181] and that he does not know (and has no evidence on the issue of) how many of the subjects' flanges were folded back.[182] 3M also expects Berger to testify that "instructing *all* users that they had to fold back the opposing flanges to obtain an adequate fit would have been unnecessary and misleading."  *Id.*  But when asked if it would have been a problem to instruct all users to fold back the flanges, Berger testified, "I don't know why it would be a

---

[179] PX59(Kieper-Dep-893:18-894:20) ("That policy is not written down that I'm aware of.").

[180] PX54(Berger-Disclosure-8).

[181] PX60(Berger-Dep-(12/12/2019)-436:18-437:6 ("All I can go by are the written notes on this test").

[182]   PX61(Berger-Dep-(12/10/2019)-119:5-16);   PX60(Berger-Dep-(12/12/2019)-432:4-19).

problem for everyone. . . . I don't know why it was written that way."[183]  Berger's status as a hybrid witness does not permit him to retroactively adopt opinions and knowledge, and his contradictory fact testimony should be excluded.

### 2. *Eric Fallon*

#### i. *Fallon's Opinions About DoD and Army Hearing Conservation Program Guidance Are Unreliable and Unhelpful.*

Fallon will opine on the Department of Defense ("DoD") and Army Hearing Conservation Program's requirements and guidance on hearing conservation and HPDs "and the manner in which this guidance was or was not implemented" based upon his personal knowledge.[184] These opinions are unreliable and unhelpful to the jury.

Fallon's opinions about implementation of DoD and Army Hearing Conservation Program's requirements and guidance are speculative and based on limited knowledge. He has no basis for opining on Army-wide implementation of such policies and guidance. Fallon testified that DoD hearing conservation guidance was "not always implemented" and "hearing conservation . . . quite often, got put on the unit's back burner" based on his experience as a hearing conservation program manager at Fort Bragg.[185] But he admitted he "[didn't] know anything about the

---

[183]     PX60(Berger-Dep-(12/12/2019)-485:8-486:14);     PX55(Berger-Dep-(12/11/2019)-593:10-594:3).
[184] PX53(Fallon-Amend-Disclosure-1, 4-6).
[185] PX62(Fallon-Dep-(12/22/20)-21:24-23:11).

[Trial Group A] plaintiffs" and "certainly was not suggesting that any of these plaintiffs were at Fort Bragg."[186] Fallon speculated that "it would be very similar across the Army" regarding hearing conservation guidance implementation.[187] Fallon's limited knowledge and "generalized feeling[s]" about Army-wide implementation of DoD hearing conservation guidance do not satisfy *Daubert*'s reliability requirement. *Navelski*, 244 F. Supp. 3d at 1286.

Also, Fallon's opinions about implementation of DoD and Army hearing conservation program regulations and policies are unhelpful because they are unrelated to the Trial Group A Plaintiffs. Fallon does not know whether any pf these Plaintiffs were fitted with the CAEv2, received baseline audiograms, received an annual audiogram, or were issued hearing protection per DoD guidance.[188] He does not know whether any plaintiffs failed to wear hearing protection.[189] Further, he had no knowledge about DoD guidance implementation at the U.S. Military Academy, which Estes attended.[190] Expert testimony must "assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Rink*, 400 F.3d at 1292. Fallon's limited

---

[186] *Id*. at 25:11-22.
[187] *Id*. at 25:21-22, 26:16-27:1; *id.* at 90:20-91:1 ("I just have a generalized feeling that the Army, in my experience, did not have enough resources to do these things 100 percent.").
[188] *Id*. at 32:16-21, 33:22-34:3, 34:23-35:2, 74:14-21, 75:2-9.
[189] *Id*. at 110:12-17.
[190] *Id*. at 35:6-21.

knowledge cannot be extrapolated to how DoD and Army hearing conservation guidance were implemented for the Trial Group A Plaintiffs. These opinions must be excluded as unhelpful.

> ### ii.    *Fallon's Opinions on Fitting the CAEv2 Are Unreliable and Unhelpful.*

Fallon states that as an Army Hearing Program Manager and audiologist he was aware that the CAEv2 was not a "one-size-fits-all-hearing protector" and folding back the opposing flange of the CAEv2 might assist in achieving adequate fit.[191] He states that (1) he instructed certain hearing technicians and others in Army training sessions (including training sessions at or near Aberdeen Proving Grounds) on these facts and (2) certain training materials and tools used by the Army included guidance to roll back the flange of the CAEv2 under certain circumstances.[192] These limited facts, even if true, do not give Fallon a reliable basis to opine about the knowledge of the "military audiology community," specifically whether the military audiology community knew the CAEv2 was not a "one-size-fits-all-hearing protector" or folding back the opposing flange of the CAEv2 might assist in achieving an adequate fit. Even with hearing technician students he trained, Fallon concedes he cannot testify to what knowledge these individuals retained.[193] Such

---

[191]     PX53(Fallon-Amend-Disclosure-4,6-9);     PX62(Fallon-Dep-(12/22/2020)-154:11-155:1) ("I feel like it was common knowledge to roll that flange back[.]").
[192] *Id.*;  PX62(Fallon-Dep-(12/22/2020)-171:8-172:21).
[193] PX62(Fallon-Dep-(12/22/2020)-171:8-172:21).

opinion testimony is rank speculation of the perceived knowledge of others, is unreliable and unhelpful to the jury, and must be excluded. *Arch Specialty Ins. Co.*, 2020 WL 5848317, at *5.

> ### iii.    Fallon Is Unqualified to Opine on Military Testing Practices and His Opinions Are Unreliable and Will Mislead the Jury.

Fallon never reviewed or depended on written instructions from the manufacturer of the CAEv2, including instructions to educate a technician or soldier on proper use.[194] Per Fallon, this would be unusual because the military tends to test products and make determinations about product performance and product use.[195] But reference to Fallon's perceived military *tendencies* is an unreliable basis for expert testimony, since Fallon concedes he: (1) was unaware of the terms of the DoD's contracts with the manufacturer of the CAEv2[196]; (2) was unaware of any labeling provided to DoD by the manufacturer[197]; (3) could not state the source of NRR data for the CAEv2[198]; (4) has no REAT or other testing expertise[199]; and (5) had only a very limited knowledge, "a vague memory," and no specific knowledge of any testing performed by the Army Research Lab on the CAEv2.[200] Any such

---

[194] PX53(Fallon-Amend-Disclosure-8).
[195] *Id.*
[196] PX62(Fallon-Dep-(12/22/2020)-127:13-18, 132:17-140:22).
[197] *Id.* at 113:6-10.
[198] *Id.* at 113:21-114:23.
[199] *Id.* at 41:14-18, 118:24-119:4.
[200] *Id.* at 41:23-43:11, 44:2-44:14, 108:21-109:4, 114:10-115:11, 119:5-18.

opinion conflicts with his deposition testimony that he has *no opinion* concerning who is responsible for providing instructions for the CAEv2 and that, even if the military performed testing, "[t]hat's not to say there was no requirement that a manufacturer do it."[201] Thus, Fallon is unqualified to opine on military practices regarding product testing and performance of the CAEv2. Fallon's opinions on this topic are unreliable, speculative, and would confuse and mislead the jury. They should be excluded under *Daubert* and Rule 403.

> ### iv.   Fallon's Opinions About Widespread Non-Use of Hearing Protection in the Military Are Unreliable and Unhelpful.

Fallon seeks to offer expert testimony of widespread non-use of HPDs in the military.[202] Fallon extrapolates this generalization from his perception of scarce resources in the Army and the fact "he often witnessed service members who did not wear their hearing protection devices properly or at all."[203] This opinion must be excluded as unreliable and unhelpful.

Fallon employed no scientific, technical, or specialized knowledge to reach this conclusion; instead Fallon's speculative opinion is predicated upon limited observations that "service members often elected not to wear hearing protection

---

[201] *Id.* at 171:8-172:21.
[202] PX53(Fallon-Amend-Disclosure-9).
[203] *Id.*

devices."[204] Fallon testified that certain units in Iraq had a standing policy that soldiers not have earplugs in their ears when they would leave a compound.[205] But Fallon could not identify these units and testified: "I don't have any information [regarding proper HPD usage] about these specific plaintiffs."[206] Opinions constituting mere speculation "cannot reach the jury." *Arch Specialty Ins. Co.*, 2020 WL 5848317, at *5. Fallon's generalization of widespread non-use of HPD is unreliable and unhelpful to the jury and therefore must be excluded. The probative value of this sweeping opinion is substantially outweighed by its potential to confuse or mislead the jury, which warrants exclusion. Fed. R. Evid. 403; *Frazier*, 387 F.3d at 1263. Thus, Fallon should be excluded entirely.

### C.   **Case-Specific *Daubert* Arguments**

#### 1.   ***John House***

 Dr. John House, an otologist/neurotologist, opines about the extent and nature of Plaintiffs Estes' and Hacker's hearing loss and tinnitus. Notably, House *agrees* that Estes suffers from NIHL and tinnitus caused by repeated noise exposure during his military service.[207] Regarding Hacker, although House downplays the severity

---

[204] *Id.*
[205] PX62(Fallon-(12/22/2020)-57:9-60:24).
[206] *Id.* at 58:6-11, 110:12-17.
[207] PX63(House-Dep.-181:10-183:19).

of hearing loss in his left ear, House agrees that Hacker has tinnitus of the magnitude and type he has consistently described for years.[208]

However, the following opinions of House should be excluded under Rule 702, Rule 703, and *Daubert*. First, House intends to testify that neither plaintiff used CAEv2 earplugs as extensively as they testified, therefore, plaintiffs cannot prove their hearing damage was caused by defective CAEv2 earplugs. These opinions are not based on his expertise, and House admitted at his deposition that he has no reason to doubt either plaintiff's testimony.

Second, although each plaintiff stated they have difficulty discerning speech in noisy environments, House never performed the test (Speech-in-Noise ("SIN")) required to assess their claims. Instead, he performed a speech discrimination test in a quiet room, which he conceded could not determine their ability to discriminate speech in a noisy environment. House nevertheless will opine that neither plaintiff has difficulty understanding speech in a loud room. Such testimony is unsupported by an accepted methodology; it is therefore inadmissible.

Third, House contends that head injuries caused Hacker's tinnitus rather than noise exposure while wearing the CAEv2. An expert giving a causation opinion must base it on an accepted methodology within their area of expertise. *McClain*, 401 F.3d at 1242.  His failure to do so mandates exclusion. *Id.*

---

[208] *Id.* at 230:16-231:8.

### i.    House Applies No Expertise to Questioning Whether Estes and Hacker Wore the CAEv2.

Although an expert witness can provide opinions that help the jury determine whether certain facts are true, House does not do so here. Instead, he questions the accuracy of Estes' and Hacker's testimony regarding when they used the CAEv2 and developed symptoms of hearing damage.[209] On this basis, he opines that he essentially does not believe either plaintiff can prove their hearing damage is due to using the CAEv2.[210]

At his deposition, however, House readily admitted he has no basis to question Estes' or Hacker's recollections.[211] Indeed, challenging their recollections would be difficult, given the multiple corroborating witnesses, documents, and testimony. The overwhelming evidence establishes that both Plaintiffs were extremely familiar with the CAEv2 earplugs and used them during the noise exposures they claim led to their hearing damage.[212]

House's inferences to the contrary are not based on expertise, but on unsupported lay speculation. Such opinions are not admissible under Rule 702 unless they evince some specialized knowledge or reliable methodology about the objective

---

[209] PX64(House-(Estes)-1st-Am-13-14); PX65(House-(Hacker)-10-11).

[210] *Id.*

[211] PX63(House-Dep-104:13-106:8, 110:7-111:20, 129:7-130:20).

[212] *See*, *e.g.*, *id.* at 104:4-106:8 (confirming that House was aware that Estes and his wife independently confirmed he first developed hearing loss in 2014, and confirming House cannot, and will not, testify they are lying).

truth of the statements. *In re Cryolife, Inc. Sec. Litig.*, 2005 WL 8155579, at *7 (N.D. Ga. June 17, 2005). Because House admits he is applying no such expertise, his testimony is inadmissible. *Id.*; *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d at 1346 n.31 (because expert was not a percipient witness, and her summary lacked relevant expert analysis, her opinion, "will not assist the trier of fact").

> ii.    ***House Cannot Opine That These Plaintiffs Can Discriminate Speech in Noisy Environments, Because He Did Not Test That Issue.***

House admitted that the proper test to assess whether someone has difficulty discriminating speech in a noisy environment is the SIN test.[213] He similarly conceded that conducting a speech discrimination test in a quiet environment (as he did for Estes and Hacker) cannot inform the tester whether the subject has difficulty understanding speech in noise.[214] Nevertheless, House did not conduct a SIN test for either plaintiff; when asked why, he said that he simply choose not to do it during their exams.[215] Based on this record, House will opine that neither Estes nor Hacker has difficulty discriminating speech in a noisy environment,[216] even though he has

---

[213] PX63(House-Dep-179:25-181:7).

[214] *Id.* at 143:11-144:10 (conceding there are studies showing it is harder for people with hearing loss in higher frequencies—such as plaintiffs—to discriminate speech in a noisy environment).

[215] *Id.* at 144:2-145:9, 179:25-181:7, 220:8-221:16.

[216] PX64(House-(Estes)-1st-Am-15-16); PX65(House-(Hacker)-11).

no reason to disbelieve their testimony that they do. House concedes both Plaintiffs provided honest answers to all exam questions.[217]

If the expert fails to perform the substantive testing necessary to make a specific determination, it is unreliable because the opposing party cannot assess it. *See McGee v. Evenflo Co.*, 2003 WL 23350439, at *9 (M.D. Ga. Dec. 11, 2003), *aff'd*, 143 F. App'x 299 (11th Cir. 2005) (collecting cases). Because House bases his opinion on experience alone, it fails under Rules 702 and 703.

### iii. House Used No Methodology to Conclude That Hacker's Tinnitus Is Due to Head Trauma Rather Than Noise Exposure

House failed to perform the type of differential diagnosis that audiological professionals utilize to determine causation for hearing damage. This failure to use an accepted methodology warrants exclusion. *McClain*, 401 F.3d at 1242. At his deposition, House conceded he performed no methodological analysis in concluding that Hacker's tinnitus is due to head trauma, not noise exposure. He testified that all he did was look at Hacker's history of head trauma and then drew on his experience with other patients over the years who suffered head trauma and tinnitus.[218] This is despite House's admission that people, like Hacker, can have minimal—or no— NIHL and still suffer from noise-induced tinnitus.[219] House also conceded he was

---

[217] PX63(House- Dep-129:23-130:20, 165:6-166:7).
[218] *Id*. at 208:1-211:19.
[219] *Id.* at 108:13-25.

completely unaware of how severe Hacker's head injuries actually were (meaning he could not opine about whether they were of the type that could cause tinnitus).[220] Moreover, House conducted no analysis into Hacker's symptoms at the time of his head injuries, despite testifying that tinnitus symptoms at the time of head injury are well-known—or "getting your bell rung"—which indicates a ringing noise resulting from a head injury.[221]

Lacking any analysis, House offers an *ipse dixit* opinion that Hacker's tinnitus is due to head trauma rather than noise exposure that should be excluded. *See McClain*, 401 F.3d at 1242; *Jones*, 235 F. Supp. at 1275.

### 2.   *Dennis Driscoll*

#### i.   *Driscoll Is Not Qualified to Opine on Specific-Causation.*

Dennis Driscoll, a mechanical engineer, is not qualified to opine on the cause of McCombs' tinnitus and related injuries.[222] Driscoll has no medical education, training, or experience, nor is he a licensed audiologist.[223] Driscoll has never treated a patient for hearing loss or tinnitus and admits he *is not* an expert in diagnosing hearing loss.[224] Although he admittedly lacks any expertise in diagnosing hearing

---

[220] *Id.* at 216:10-218:13.

[221] *Id.* at 201:13-207:25.

[222] PX66(Driscoll-3rd-Am-1-2, App. A). Driscoll's report is unpaginated. Page one in the pinpoint citation here is the first page after the cover page.

[223] PX66(Driscoll-3rd-Am-1-2, App. A); PX67(Driscoll-Dep-37:19-38).

[224] *Id*. at 38:5-18.

loss and tinnitus, Driscoll opines that McCombs does not have NIHL arising from his military service.[225] Because Driscoll lacks the qualifications to opine on the cause of McCombs' medical conditions, this opinion must be excluded. *Ford*, 2010 WL 9116184, at *2.

### ii.   *Driscoll Fails to Employ a Reliable Methodology for His Specific-Causation Opinions.*

Driscoll opines that McCombs "does not have noise-induced hearing loss (NIHL) from his military service."[226] However, he fails to support this opinion with a reliable methodology. Instead, Driscoll bases his causation opinion on discovery documents, McCombs' testimony, expert reports, OSHA and NIOSH regulations, scientific literature, and his education, training, and experience.[227] Driscoll failed to perform a differential diagnosis[228] in forming his opinion about the cause of McCombs' hearing loss.[229] Instead, Driscoll relies entirely on the diagnoses by Dr. LaBorde, an audiologist, and Dr. Jones, an otolaryngologist, and other documents.[230, 231] Driscoll testified that he was "not making a medical diagnosis" of

---

[225] PX66(Driscoll-3rd-Am-4-6).

[226] *Id.*

[227] *Id.* at 6.

[228] The differential diagnosis is a reliable methodology under *Daubert* for determining the cause of a patient's medical symptoms. *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010).

[229] *See generally* PX66(Driscoll-3rd-Am); *Guinn*, 602 F.3d at 1253.

[230] Drs. Jones and Richards are joined by Dr. Jennifer LaBorde, also an audiologist, on their expert report in *McCombs*.

[231] PX66(Driscoll-3rd-Am-6); PX67(Driscoll-Dep-44:5-45:10).

McCombs' hearing loss, and he agreed that the opinion that "McCombs does not have NIHL as a result of his military service" was "a fact [he] gained from some evidence within the record."[232] Driscoll's specific-causation opinion is merely a restatement of the diagnoses made by other experts. *Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1369 (11th Cir. 2014) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.") (quotations omitted); Wright and Gold, *Federal Practice and Procedure* § 6274; *Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007). Thus, Driscoll's specific-causation opinion about McCombs' hearing loss warrants exclusion.

### iii.     Driscoll Fails the Requirement of Helpfulness.

Driscoll's testimony will not help the jury because he employs contradictory reasoning for his conclusion about McCombs' risk of hearing injury while in military service. He does so by assigning a hearing protection value of 7 NRR to the CAEv2 based on real-world factors "of improper insertion, discomfort, worker movement, poor or improper fit, worn out or deteriorated devices, etc."[233] This value is far less

---

[232] PX67(Driscoll-Dep-48:23, 48:25-49:7, 49:17-18).
[233] PX66(Driscoll-3rd-Am-5).

than the protection the CAEv2 is labeled with by Defendants (22 NRR).  The labeled amount of protection should be accurate such that it may be relied upon.[234]

Driscoll then estimates the dB of the incoming explosive sound of the IED in McCombs' military service as 180 dB minus 7 NRR, producing 173 dB.[235] This 7 NRR subtraction is the same reduced protection value of the CAEv2 mentioned above, meaning "derated" for "real-world performance."[236] Driscoll concludes from the reduced protection that McCombs suffered "significant risk" of injury from the resulting 173 dB blast noise "even if the CAV2 was tightly inserted and sealed again[st] the entrance of the ear canal."[237]

However, tight insertion and seal are the opposite of the real-world factors ("improper insertion," "improper fit," etc.) which "derate[]" the CAEv2 from 22 NRR down to 7 NRR.  Hence the contradiction.  The "significant risk" of injury Driscoll says McCombs would have experienced even wearing the CAEv2—quantified by Driscoll as 173 dB based on the reduced NRR—conflicts with the conditions given for the risk, namely "if the CAEv2 was tightly inserted and sealed again[st] the entrance of the ear canal."

---

[234]  PX67(Driscoll-Dep-75:18-76:8); PX66(Driscoll-3rd-Am-4-5) (explaining that the label NRR "[e]ssentially . . . represents the 'effective' exposure under the HPD in dB achievable by 98% of wearers tested").

[235]  PX66(Driscoll-3rd-Am-6).

[236]  *Id.* at 5.

[237]  *Id.* at 6.

This testimony fails the helpfulness requirement of *Daubert*. The contradiction renders the opinion unreliable. *See Navelski*, 244 F. Supp. 3d at 1286; *cf. McCorvey,* 298 F.3d at 1257.

Additionally, Driscoll would not help the jury because he recites facts reported by others which are not beyond the understanding of a juror—specifically whether McCombs wore hearing protection while serving in the military—and offers his "personal opinion," not expert opinion that those facts are "conflict[ed]."[238] The basis of this personal opinion is an inference or "assumption," he admits, a further reason to exclude it as unhelpful.[239]

### 3. *Derek Jones & Jennifer LaBorde*

Drs. Jennifer LaBorde and Derek Jones co-authored a joint report in which they opine on a permanent impairment rating for Keefer at two points in time: (1) at the time he left the military (0% impairment for each ear and 0% impairment to his whole person); and (2) at the time of the medical examination conducted by LaBorde and Jones (3.8% impairment in the right ear, 11.2% impairment in the left ear, 5% binaural hearing impairment, and 2% impairment to his whole person). Each

---

[238] PX66(Driscoll-3rd-Am-5) ("There is conflicting evidence as to whether or not plaintiff McCombs was wearing the CAEv2 earplugs at the time of the IED attack of April 23, 2009."); PX67(Driscoll-Dep-147:20-148:14 ("personal opinion"), 158:25-159:23 ("I'm not going to offer an expert opinion on that. I'm going to present the facts and evidence that I have on -- in my record here.").

[239] *See id.* at 173:1-24 ("So I'm inferring that he was not wearing it at the time of the IED . . . I'm making the assumption he was not.").

impairment rating opinion should be excluded because (1) a determination of permanent impairment rating is irrelevant and will not assist the jury to understand the evidence or to determine the facts; and (2) the impairment opinions are not based upon scientifically valid principles, reasoning or methodology.

First, the 1996 Florida Uniform Permanent Impairment Rating Schedule ("FUPIRS") is the sole basis for Jones' and LaBorde's opinions on Keefer's permanent impairment rating. However, the FUPIRS was created by the Florida Legislature, and its purpose is to allocate wage-loss benefits under Florida state law.[240] Once an impairment rating is determined by a qualified physician under the statute, the injured worker is entitled to receive a set amount of benefits for a set amount of time. The FUPIRS is a tool designed for setting workers' compensation benefits for Florida workers. *See* Fla. Stat. § 440.15(3)(b). It is an inappropriate basis for determining the effect of tinnitus and hearing loss for any plaintiff. Therefore, Jones' and LaBorde's opinions based on this Schedule are unreliable.

Also, a purported permanent impairment rating under the FUPIRS is irrelevant because it does not "fit" the disputed facts. Evidence of a permanent impairment rating will not assist the jury in determining whether Keefer suffered an injury or whether it was due to defects in the CAEv2. It is undisputed that Keefer has hearing loss. While the parties dispute the severity of his hearing loss and

---

[240] 1996 Florida Uniform Permanent Impairment Rating Schedule at 1 ("PX68").

whether it was due to exposure to noise while using the CAEv2, opinions on a Florida permanent impairment rating will not assist the jury in determining the extent of Keefer's hearing loss. The opinion by Drs. Jones and LaBorde that provides a 0% or 2% whole body impairment is meaningless. These ratings are set by statute to determine compensation levels for injured workers. They are neither designed nor capable of measuring actual injury or harm caused by a product. In short, Florida permanent impairment ratings do not "advance[] a material aspect of the proposing party's case and 'fit[]' the disputed facts." *In re Abilify*, 299 F. Supp. 3d at 1305.

It is Defendants' burden to show that LaBorde's and Jones' opinion is based on scientifically valid principles. However, neither expert can testify to the validity of the FUPIRS. Jones admitted he did not attempt to determine if there was scientific support for the impairment ratings in the Florida Schedule, or whether it was peer reviewed or published. He decided to use the Florida Schedule because he was familiar with it and had used it before.[241]

Worse, Drs. LaBorde and Jones failed to properly apply the FUPIRS, which further undermines their impairment opinions.

Under the terms of the FUPIRS, LaBorde lacks the necessary credentials to opine on permanent impairment ratings. LaBorde practices as an audiologist. She is not a medical doctor, and a "permanent impairment" is a medical condition. *See*

---

[241] PX69(Jones-Dep-118:13-121:19).

FUPIRS at 1. Evaluation of permanent impairment "is a function that physicians alone are competent to perform." *See* Fla. Stat. § 440.13(1)(p). LaBorde does not meet the definition of "physician" under the statute because audiologists are not physicians. In fact, LaBorde admitted so.[242] Thus, the methodology applied by LaBorde in reaching her opinions on permanent impairment rating are unreliable because she is not competent to apply this methodology under Florida law.

Jones' and LaBorde's methodology also fails because the FUPIRS, by its own terms under Florida law, cannot be used to evaluate a person like Keefer, who suffers from a progressive condition. The FUPIRS forbids physicians from conducting impairment rating evaluations until the injured worker is stable and has reached maximum medical improvement. *See* Fla. Stat. § 440.15(3); FUPIRS at 1. According to Jones and LaBorde's testimony and written report, Keefer's injury is not stable and is progressive.[243]

Because Drs. Jones and LaBorde misapplied this methodology, their opinions on Keefer's permanent impairment are unreliable and should be excluded.

### 4.   Margaret Richards, Derek Jones & Jennifer LaBorde

Dr. Margaret Richards, an audiologist, joins Drs. Jones and LaBorde to testify about McCombs' "hearing status and tinnitus claims."[244] As with Keefer, the experts

---

[242] PX70(LaBorde-Dep-120:15-19).

[243] *See* PX71(Jones/LaBorde-(Keefer)); PX69(Jones-Dep-124:5-125:9).

[244] PX72(Jones/LaBorde/Richards-(McCombs)-1).

based their opinions on the FUPIRS.[245]  Their testimony should be excluded for the same reasons. First, the FUPIRS does not apply to and account for tinnitus (McCombs' injury). Second, the experts acknowledge that McCombs' tinnitus is not stable, [246] and the FUPIRS applies only to impairments which are stable or non-progressive at the time the evaluation is made.[247] Third, Richards is a doctor of audiology, not a physician, so she is not qualified to offer opinions on permanent impairment, because a "permanent impairment" is a medical condition.[248] Fourth, the arguments in the motion to exclude Jones and LaBorde's opinions regarding Keefer apply with equal force to the opinions of all three experts (Jones, LaBorde, and Richards) regarding McCombs. Plaintiffs incorporate by reference those arguments here. Thus, the testimony of Jones, LaBorde and Richards regarding McCombs should be excluded.

## IV.   <u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully request the Court grant Plaintiffs' motion.

---

[245] *Id*. at 7, 12, 17.
[246] PX73(Richards-Dep-112:10-17); PX70(LaBorde-Dep-109:8-13, 133:2-5).
[247] PX72(Jones/LaBorde/Richards-(McCombs)-15).
[248] *Id*. at 3.

<u>Date</u>: January 8, 2021        Respectfully submitted,

*/s/ Bryan F. Aylstock*
Bryan F. Aylstock, Lead Counsel
Florida State Bar No. 078263
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel.: (850) 202-1010
baylstock@awkolaw.com

Shelley V. Hutson, Co-Lead Counsel
(Admitted Pro Hac Vice)
Texas State Bar No. 00788878
CLARK, LOVE & HUTSON, GP
440 Louisiana Street, Suite 1600
Houston, TX 77002
Tel.: (713) 757-1400
shutson@triallawfirm.com

Christopher A. Seeger, Co-Lead Counsel
(Admitted Pro Hac Vice)
New Jersey State Bar No. 042631990
SEEGER WEISS LLP
77 Water Street, 8th Floor
New York, NY 10005
Tel.: (212) 587-0700
cseeger@seegerweiss.com
***Counsel for Plaintiffs***

Shawn Fox
TRACEY & FOX LAW FIRM
440 Louisiana Street
Suite 1901
Houston, TX 77002
Tel: (713) 495-2333
sfox@traceylawfirm.com

70

Sean Patrick Tracey
TRACEY & FOX LAW FIRM
440 Louisiana Street
Suite 1901
Houston, TX 77002
Tel: (713) 495-2333
stracey@traceylawfirm.com
**_Counsel for Plaintiff Lloyd Eugene Baker_**

Katherine Cornell
PULASKI LAW FIRM, PLLC
2925 Richmond Ave., Ste 1725
Houston, TX 77098
Tel: (713) 664-4555
kcornell@pulaskilawfirm.com
**_Counsel for Plaintiff Luke E. and Jennifer Estes_**

Evan D. Buxner
GORI JULIAN & ASSOCIATES
156 North Main Street
Edwardsville, IL 62025
Tel: (618) 659-9833
evan@gorijulianlaw.com

Quinn Robert Wilson
ONDER LAW LLC
110 E Lockwood Avenue
Second Floor
St. Louis, MO 63119
Tel: (314) 963-9000
wilson@onderlaw.com
**_Counsel for Plaintiff Stephen Hacker_**

Brian Hugh Barr
LEVIN PAPANTONIO
316 S Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7045
bbarr@levinlaw.com

Winston Troy Bouk
LEVIN PAPANTONIO
316 S Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7045
tbouk@levinlaw.com
***Counsel for Plaintiff Lewis Keefer***

Taylor Christopher Bartlett
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
Birmingham, AL 35203
Tel: (205) 326-3336
taylor@hgdlawfirm.com

William Lewis Garrison, Jr.
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
Birmingham, AL 35203
Tel: (205) 326-3336
lewis@hgdlawfirm.com
***Counsel for Plaintiff Dustin McCombs***

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B), (C)</u>

Pursuant to Local Rule 7.1(B), counsel for Plaintiffs certify that they conferred with Defendants' counsel on January 8, 2021 regarding the foregoing motion but were unable to resolve the issue with Defendants.

*/s/ Bryan F. Aylstock*

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH COURT'S WORD LIMIT</u>

I hereby certify that the foregoing contains 14,952 words and complies with the Court's directive on January 4, 2021 that Plaintiffs file an omnibus *Daubert* motion and incorporated memorandum of law not to exceed 15,000 words.

*/s/ Bryan F. Aylstock*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 8, 2021, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Bryan F. Aylstock* _____