UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to: *Estes*, 7:20cv137 *Hacker*, 7:20cv131 *Keefer*, 7:20cv104 | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

**ORDER**

The Court must decide what substantive law applies to each of the Trial Group A cases. The parties have submitted briefing on the matter and the Court recently held an evidentiary hearing. The Court is now prepared to rule on the issue in the three cases set for a consolidated trial in April 2021: Estes, Keefer, and Hacker.[1] A ruling in the McCombs and Baker cases will follow by separate order. The parties do not dispute that Georgia law applies to Plaintiff Estes's case.[2] Regarding Plaintiffs Keefer and Hacker, the dispute is between Georgia and Kentucky as

---

[1] The parties have stipulated that the Court will decide the choice of law issue and may decide questions of fact and credibility, notwithstanding their jury trial rights under the Seventh Amendment. The stipulation also provides that the Court's factual findings for purposes of choice of law apply solely to that issue and will not bind the parties, the Court, or the jury at trial. *See* Joint Stipulation, Case No. 3:19md2885, ECF No. 1597.

[2] The Court will also apply Georgia law to Jennifer Estes's loss of consortium claim.

advocated by the Plaintiffs, respectively, and Indiana as advocated by the Defendants.

Generally, a federal court sitting in diversity applies the conflict of law rules of the forum state to determine which state's substantive laws govern a plaintiff's state law claims. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007); *In re Conagra Peanut Butter Prod. Liab. Litig.*, 251 F.R.D. 689, 693 (N.D. Ga. 2008). In the MDL context, the transferee court applies either the choice of law rules of the transferor court's state, or, for cases directly filed in the MDL court, the choice of law rules for the jurisdiction where the plaintiff would have filed his claims in the absence of the MDL—i.e. the transferor court had plaintiff not filed directly in the MDL. *See Wahl v. General Elec. Co.*, 786 F.3d 491, 494 (6th Cir. 2015); *Axline v. 3M Co.*, No. CV 17-511 (JNE/DTS), 2018 WL 4300535, at *2 (D. Minn. Sept. 10, 2018) ("[A]n MDL court should apply the choice-of-law rules of either (1) the forum where the MDL plaintiff originally filed his or her action prior to transfer or (2) the forum where the MDL plaintiff would have filed his or her action but for the possibility of direct filing."); *see also In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 610 (7th Cir. 1981) (applying the choice of law rule of the state where the action was originally filed for each of the wrongful death actions in the MDL). Pursuant to the procedures

for direct filing set forth in this MDL, *see* Pretrial Order No. 5, ECF No. 252, those jurisdictions have been identified by Plaintiffs as their "designated forum."

Relevant to this litigation, however, the traditional choice of law analysis may be supplanted by a federal statute in the event a plaintiff's injury was sustained in a place subject to the exclusive jurisdiction of the United States. *See* 28 U.S.C. § 5001(b). In that case, the statute provides the applicable choice of law rule and instructs that if "a civil action [is] brought to recover on account of an injury sustained in a place described in subsection (a)" of the statute, i.e. a place "subject to the exclusive jurisdiction of the United States within a State," then "the rights of the parties shall be governed by the law of the State in which the place is located." [3] *Id*. Military bases and other military properties located in the United States are subject to 28 U.S.C. § 5001 (or its predecessor, 16 U.S.C. § 457). *See, e.g.*, *Yarbrough v. Hunt S. Grp., LLC*, No. 1:18CV51-LG-RHW, 2019 WL 4345990, at *3 (S.D. Miss. Sept. 12, 2019), aff'd*,* No. 19-60880, 2020 WL 6683028 (5th Cir.

---

[3] When Congress enacted 28 U.S.C. § 5001's nearly identical predecessor, 16 U.S.C. § 457, in 1928, *see* P.L. No. 70-11 , it intended for the State surrounding the federal enclave to dictate the rights of the parties in an action arising from injury sustained there, just as if the injury occurred within the State. *See* H. Rep. No. 70-369 (1928) ("[The proposed legislation] provides that a right of action shall exist as though the place were under the jurisdiction of the State and that the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which [a place subject to the exclusive jurisdiction of the United States] may be."); 69 Cong. Rec. S1486 (1928) (explaining that the proposed legislation would "make the [surrounding] State law applicable" to injury occurring in "places in the United States under the exclusive jurisdiction of the United States," for example, "if under the law of Arkansas a right of recovery could be had if the death occurred outside of the national park, the same right of action would exist if it occurred in the national park").

Nov. 12, 2020) (applying Mississippi personal injury law to plaintiffs' personal injury claims arising from injuries sustained at Keesler Airforce Base, pursuant to 28 U.S.C. § 5001); *Ramos v. Foam Am., Inc.*, No. CV 15-980 CG/KRS, 2018 WL 1684327, at *3 n.2 (D.N.M. Apr. 5, 2018) ("Because the White Sands Missile Range is located within the borders of the State of New Mexico, New Mexico law supplies the parties' substantive rights in this case" under 28 U.S.C. § 5001); *see also Adams v. Alliant Techsystems Inc.*, 218 F. Supp. 2d 792, 801 (W.D. Va. 2002) (concluding in a personal injury action, where the injury occurred on Radford Army Ammunition Plant, 16 U.S.C. § 457 "require[d] the forum to apply the substantive law of the state surrounding the [military property]").[4]

Plaintiffs' claims arise from alleged hearing-related injuries related to their use of the Combat Arms Earplug version 2 ("CAEv2") while in the military. During their military service, Plaintiffs were stationed at and used the CAEv2 on a number of different military bases in the United States and abroad. The question of where each Plaintiff was injured is a key consideration in the choice of law analysis. To be sure, in a forum state like Georgia, the choice of law decision depends entirely on where the plaintiff's injury *first* occurred. *See Auld v. Forbes*, 848 S.E.2d 876, 879

---

[4] Here, no one disputes that 28 U.S.C. § 5001 controls if a plaintiff's injury occurred on a United States military base. *See Burgio v. McDonnell Douglas, Inc.,* 747 F. Supp. 865, 866 (E.D.N.Y. 1990) ("The parties agree that since the airplane accident occurred on a federal military base, this wrongful death action is controlled by [16 U.S.C. § 457]").

(Ga. 2020) (applying *lex loci delicti*, which refers to "the law of the place where the injury was sustained," or, as more generally stated, the law of the place where "the 'last event necessary' to make the defendant[] liable for the alleged tort" took place (citation omitted)); *Argos USA LLC v. Young*, No. 1:18-CV-02797-ELR, 2019 WL 4125968, at *10 (N.D. Ga. June 28, 2019) ("[T]he question [when applying *lex loci delicti*] is not where the tortious act was committed, but where [p]laintiff suffered the injury.). Also, as discussed, place of injury is determinative under 28 U.S.C. § 5001.[5] And, place of injury is an important a consideration in any due process analysis. *See infra* note 8.

Regarding Plaintiff Keefer, the undisputed evidence shows that his hearing injury occurred at Fort Benning, Georgia. Keefer first used the CAVE2 at Fort Benning, and it was there that he was exposed to loud noises as part of his combat training. On October 27, 2008, 18 months after he arrived at Fort Benning, Keefer's audiogram showed a significant threshold shift in his left ear. Subsequent audiograms at Fort Benning on February 26, 2009 and June 19, 2009 reflected sustained changes in Keefer's hearing. Keefer's expert, Dr. Chris Spankovich, testified that these three audiograms demonstrate a sustained significant threshold shift in Keefer's left ear consistent with early hearing loss. Although Keefer was not

---

[5] Based on its plain language, the statute is not limited by the *first* place of injury. The language simply refers to the place of injury.

formally diagnosed with sensorineural hearing loss until a medical examination in July 2010, after he returned to Fort Benning following his deployment to Iraq, he was informed of changes in his hearing after his 2008 and 2009 audiograms while at Fort Benning. Notably, Dr. Spankovich testified that Keefer should have been diagnosed with hearing loss based on the three audiograms in 2008 and 2009. Dr. Spankovich's opinion in this regard was based on his expert review of the audiograms and also on the fact that the results of the July 2010 audiogram from which Keefer was diagnosed with hearing loss by the military are consistent with the 2008 and 2009 audiograms at Fort Benning. The Court also notes that this opinion is consistent with the undisputed testimony of Keefer's ex-wife, who said she noticed Keefer's hearing gradually worsening while they were living at Fort Benning, before he deployed to Iraq.[6]

Based on this undisputed evidence, the Court finds that Keefer's hearing loss manifested at Fort Benning in 2008/2009, and because Fort Benning is a military installation located within Georgia's borders, Georgia law applies to Keefer's claims, pursuant to 28 U.S.C. § 5001.

---

[6] To support their contention that Keefer's hearing loss began in Iraq, Defendants point to Keefer's July 13, 2010 medical record in which it indicates that his "condition" was "deployment-related." However, the record refers to both tinnitus and bilateral hearing loss and does not distinguish whether "condition" refers to either or both, and thus no conclusion can be drawn one way or the other on what "condition" was "deployment-related."

The Court also finds that Plaintiff Hacker's alleged hearing injury occurred while he was stationed at Fort Campbell, Kentucky.[7] On April 3, 2006, shortly after moving to Fort Campbell and purchasing his second pair of CAEv2s on base, Hacker first reported ringing in his ears during an audiological examination. Hacker was diagnosed with tinnitus at that appointment. Although Hacker had been stationed at Fort Campbell for only two months at that time, it is undisputed that he wore the CAEv2 there and was exposed to loud noise while working in the field in and around generators. He also denied experiencing any ringing in his ears before moving to Fort Campbell.

Notably, Hacker's medical records prior to April 2006 do not contain any reports of tinnitus-related symptoms. In fact, a March 9, 2006 audiogram conducted one month after Hacker first arrived at Fort Campbell does not mention any tinnitus-related symptoms. This is consistent with Hacker's testimony denying any ringing in his ears at any time before he met his ex-wife on March 20, 2006. It is also consistent with Hacker's ex-wife's testimony that his tinnitus worsened while they were at Fort Campbell.

Defendants' attempts to discredit this evidence fail. First, Defendants' reference to Hacker's deposition testimony wherein he said his tinnitus symptoms

---

[7] Fort Campbell sits on land within both Tennessee and Kentucky's borders. However, there is no dispute that Hacker lived and worked on the Kentucky side of the base.

began "a few months before" he arrived at Fort Campbell establishes nothing, given that right after saying that, Hacker said "I'm not totally sure." Defendants also attempt to discredit Hacker's testimony about his tinnitus onset by pointing to a single line in his April 3, 2006 medical record under "history of present illness" that references "[r]inging in the ears . . . for the past several years now." Defendants argue that this shows Hacker's tinnitus began while he was stationed in South Korea, before he was transferred to Fort Campbell. The Court disagrees and does not consider this a genuine dispute of material fact, but even if it is, the Court resolves it in Hacker's favor. Aside from this one stray reference, nothing in the record supports a finding that Hacker's tinnitus began anywhere other than at Fort Campbell. Moreover, the medical record is inaccurate in another respect, as it references Hacker's mild conductive hearing loss in his right ear as having not been previously identified, when it is undisputed that Hacker's right ear conductive hearing loss was identified as early as 1998, during his military entrance hearing exam—which is actually acknowledged elsewhere in that very same medical record. Given the inaccuracies and inconsistencies about Keefer's medical history in that record, no reasonable juror would find the single reference to Hacker's tinnitus as ongoing for "several years now" by 2006 sufficient to discredit the other evidence showing that Hacker's tinnitus symptoms began in late March/early April 2006 while he was stationed at Fort Campbell. Accordingly, the Court concludes that

3:19md2885/MCR/GRJ

Hacker's hearing injury was sustained on a military installation located within Kentucky's borders, and Kentucky law thus applies to his claims under 28 U.S.C. § 5001(b).[8]

In light of these decisions, the Court has no occasion to consider whether the law of Indiana should apply to either Keefer's or Hacker's case. Accordingly, the Court will apply the substantive law of Georgia in the Estes and Keefer cases and the substantive law of Kentucky in Hacker's case.[9]

**SO ORDERED**, on this 12th day of January, 2021.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[8] It is well-established that in tort actions, the state where the injury occurred has a significant contact with the litigation, and thus, application of that state's law comports with due process. *See In re Stand "n Seal, Prod. Liab. Litig.*, No. 1:07MD1804-TWT, 2009 WL 2998003, at *2 (N.D. Ga. Sept. 15, 2009) ("Because [plaintiff] suffered injuries in Georgia, Georgia has significant contacts to [plaintiff's] claims against [defendant]" to satisfy due process); *Chilton Water Auth. V. Shell Oil Co.*, No. Civ. A. 98-T-1452-N, 1999 WL 1628000, at *7 (M.D. Ala. May 21, 1999) ("The state in which an injury occurred has, by definition, 'a significant contact or aggregation or contacts' with the class member injured there."); *Thornton v. Cessna Aircraft Co.*, 703 F. Supp. 1228, 1231 (D.S.C. 1988), aff'd and remanded, 886 F.2d 85 (4th Cir. 1989) (applying the law of the place of injury does not violate due process).

[9] This ruling applies to all claims brought by these three plaintiffs, given that the parties have not argued for the application of any other state's law to claims other than the plaintiffs' product liability claims.