**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG   )   Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,  )
                                )   Pensacola, Florida
                                )   January 8, 2021
                                )   8:33 a.m.
                                )
                                )
_____)

**EVIDENTIARY HEARING ON CHOICE OF LAW**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-410)

### A P P E A R A N C E S

**JUDGE DAVID R. HERNDON** (ret.)
*dave@herndonresolution.com*

**FOR THE PLAINTIFFS:**     Aylstock, Witkin, Kreis & Overholtz, PLLC
                            By:  **BRYAN F. AYLSTOCK**
                                 *baylstock@awkolaw.com*

                                 **NEIL D. OVERHOLTZ**
                                  *noverholtz@awkolaw.com*

                                 **JENNIFER HOEKSTRA**
                                  *jhoekstra@awkolaw.com*
                            17 E Main Street, Suite 200
                            Pensacola, Florida  32502

Clark Love & Hutson, GP          Laminack, Pirtle & Martines LLP
By:  **SHELLEY HUTSON**          By:  **THOMAS W. PIRTLE**
     *shutson@triallawfirm.com*       *tomp@lmp-triallaw.com*
440 Louisiana Street, Ste 1600   5020 Montrose Blvd, 9th Floor
Houston, Texas  77002            Houston, Texas  77006

Ciresi Conlin LLP                Levin Papantonio
By:  **MICHAEL A. SACCHET**      by:  **BRIAN H. BARR**
     *mas@ciresiconlin.com*           *bbarr@levinlaw.com*
225 South 6th Street, Ste 4600   316 S Baylen Street, Suite 600
Minneapolis, Minnesota  55402    Pensacola, Florida  32502


**FOR THE DEFENDANTS:**     Kirkland & Ellis, LLP
                            By:  **ROBERT C. BROCK**
                                 *mike.brock@kirkland.com*
                            1301 Pennsylvania Avenue NW
                            Washington, D.C.  20004

Kirkland & Ellis, LLP            Moore, Hill & Westmoreland, PA
By:  **MARK J. NOMELLINI**       By:  **LARRY HILL**
     *mnomellini@kirkland.com*        *lhill@mhw-law.com*

     **NICHOLAS F. WASDIN**           **CHARLES F. BEALL, JR.**
     *nick.wasdin@kirkland.com*       *cbeall@mhw-law.com*
300 N Lasalle                    350 W Cedar Street, Suite 100
Chicago, Illinois  60654         Pensacola, Florida  32502

```
 1                    P R O C E E D I N G S

 2          JUDGE RODGERS:   Good morning, welcome.

 3          We're here this morning for an evidentiary

 4   hearing in the 3M litigation on the choice of law

 5   issue.

 6          What I expect to hear today is largely

 7   related to place of injury and Aearo activities in

 8   relation to the earplug.

 9          I have a number of lawyers here in the

10   courtroom.  I know there are a number appearing by

11   Zoom as well.

12          For 3M, Mr. Brock, Mr. Nomellini, Mr. Wasdin,

13   and I see Mr. Beall just came in, and I believe there

14   are others on Zoom.

15          For Plaintiffs, I have Mr. Aylstock and Ms.

16   Hutson at counsel table along with IT, Mr. Marbut.

17          And then you are IT, sir?  What is your last

18   name?

19          MR. GUILLORY:   Guillory.

20          JUDGE RODGERS:   Guillory, all right.

21          And on Zoom I have -- I can see Judge Herndon

22   and Judge Jones.  Good morning to you both.

23          JUDGE HERNDON:   Good morning.  Thank you.

24          JUDGE JONES:   Good morning.

25          JUDGE RODGERS:   Also, I'd like to introduce
```

1    you all to the newest member of my chambers team, Mr.

2    Justin Ferraro.  And he will be assisting Hillary and

3    Tevenia on 3M matters as well as helping move the rest

4    of my docket as well.  As you all know all too well,

5    it does take a village to handle this litigation, so

6    we have all hands on deck in my chambers.

7            We want to stay on schedule for sure.  It's a

8    full day, so I'm ready for you all to get started.  I

9    understand there has been an agreement or stipulation

10   as to exhibits, at least as far as direct examination

11   for both sides.  I think that will certainly help us

12   move things along with that stipulation.

13           As far as cross-examination, I recognize you

14   all can't fully anticipate what cross will entail.

15   However, I would not expect you to use any exhibit in

16   cross-examination that has not been a part of the

17   record in this litigation.  There should be no

18   surprises, no new exhibits, anything like that.  I

19   think that has been made clear to you through Judge

20   Herndon and some emails from me.

21           Mr. Aylstock, are you going to be handling,

22   at least initially, the presentation?

23           **MR. AYLSTOCK:**  Yes, Your Honor.  I'm going to

24   be conducting the direct examination of Mr. Steven

25   Hacker, who is on Zoom.  And hopefully it works

1     perfectly.

2          **JUDGE RODGERS:**  Okay.  And you are free to

3     remove your mask at the lectern, if you like.

4          **MR. AYLSTOCK:**  Thank you, Your Honor.  And

5     with regard to the stipulation, counsel for 3M and I

6     had a conversation.  The stipulation is limited to --

7     for purposes of this hearing.  We're not stipulating

8     for trial.

9          **JUDGE RODGERS:**  Oh, sure, yeah, I understand

10    that.  Thank you for the clarification, but that would

11    have been my expectation.

12          And then, also, one other thing as far as

13    exhibits.  I understand both sides prefer that the

14    exhibits remain sort of marked or identified as they

15    are now.  And that's fine as long as -- Ms. Simms has

16    assured me she's going to create a master exhibit list

17    which will make clear which side has introduced which

18    exhibits for purposes of this hearing.  We want a

19    record for this hearing.

20          **MR. AYLSTOCK:**  Thank you, Your Honor.  We're

21    happy to work with her to reconcile that at the end.

22          **JUDGE RODGERS:**  Okay, very good.

23          Mr. Brock, you're standing.

24          **MR. BROCK:**  I was just going to alert the

25    Court that we have I think stamped our exhibits as COL

1     (choice of law) exhibit and with a number that we will

2     use in the examination.

3             **JUDGE RODGERS:**  Okay.  So you have numbered

4     these for purposes of the hearing, and that's fine.

5             Plaintiffs, yours are marked as they are in

6     the record now, wherever they are.

7             **MR. AYLSTOCK:**  Yes, Your Honor.

8             **JUDGE RODGERS:**  Okay.  Well, we'll keep track

9     of that, again, for purposes of this record.

10            I look forward to your presentations.

11            **MR. AYLSTOCK:**  Great.  May it please the

12    Court?

13            **JUDGE RODGERS:**  Yes.

14            **MR. AYLSTOCK:**  Mr. Hacker, can you hear me

15    okay.

16            **THE WITNESS:**  I can hear you.

17            **MR. AYLSTOCK:**  Okay, great.

18            Should we swear in the witness, Your Honor?

19            **JUDGE RODGERS:**  Yes.

20            Mr. Hacker, if you would, please rise and

21    raise your right hand to be sworn.

22       **STEVEN HACKER, PLAINTIFF WITNESS, DULY SWORN**

23            **MADAM CLERK SIMMS:**  Please state your full

24    name and spell your last name for the record.

25            **THE WITNESS:**  It's Stephen Alfred Hacker.  My

1   last name is spelled H-a-c-k-e-r.

2           **JUDGE RODGERS:**   Thank you, Mr. Hacker.   You

3   may be seated.

4           And, Mr. Hacker, if at any time there is a

5   disruption in the technology on your end, please let

6   us know that.   It may be that we're not aware of it.

7   So just, I don't know, wave your hands -- if it's with

8   audio, we won't be able to hear you -- and we'll know

9   there is a problem.   In any event, just let us know.

10          **THE WITNESS:**   That's acceptable, Your Honor.

11          **JUDGE RODGERS:**   Very good.   Thank you.

12          Go ahead, Mr. Aylstock.

13                  **DIRECT EXAMINATION**

14   **BY MR. AYLSTOCK:**

15   **Q.**   Good morning, Mr. Hacker.   Thank you for joining

16   us.   I know it's earlier your time.   But why don't you

17   tell the Court where you live.

18   **A.**   I currently live in Las Vegas, Nevada.

19   **Q.**   And what is your current occupation, sir?

20   **A.**   I'm a mail carrier for the post office.

21   **Q.**   I think I saw you actually wearing your mail

22   carrier shirt when you stood up; is that right?

23   **A.**   Yes, sir.   I have work directly after this.

24   **Q.**   We won't keep you long, I promise.

25          We're here, obviously, today about some hearing

1    protection and specifically some earplugs.  But why

2    don't we start by you telling the Court at what point

3    in time you were in the military.

4    **A.**   I was in the military between July 1998 and July

5    2018.

6    **Q.**   Were you ever, during that time, stationed in

7    Indiana?

8    **A.**   I was never stationed in Indiana with the

9    military.

10   **Q.**   All right.  And in the military, did you use

11   hearing protection?

12   **A.**   All of the time.

13   **Q.**   Okay.  And in that context, can you tell the Court

14   what hearing protection that you used.

15   **A.**   In the beginning when I first went in, it was

16   foamies and triple flange.  Once I was issued the

17   CAEv2s, I wore those; that was my hearing plug of

18   choice.  And after 2010, I had gone to triple and quad

19   flange hearing pro.

20   **Q.**   Okay.  So, when you say CAEv2, do you mean the

21   Combat Arms Version 2?  Is that how it's referred to.

22   **A.**   I do, yes.

23   **Q.**   And where were you stationed when you first got in

24   the military?

25   **A.**   I was stationed -- I went to basic training in

1   Fort Sill and then Fort Bliss, Germany, and then Fort

2   Bliss, Texas.

3   **Q.**   Where did you go after Fort Bliss, Texas?

4   **A.**   I went from -- from there, I went to South Korea

5   and then to Fort Campbell and then to Fort Carson and

6   then to Fort Bragg, North Carolina.

7   **Q.**   Okay.  What was your MOS when you were first in

8   the military, sir?

9   **A.**   When I first joined the military, I was a 14

10  Juliet, which was an air defender.  It has a long

11  title; I won't bore you guys with it.

12  **Q.**   Fair enough.  After basic training and after you

13  received your first MOS, could you describe to the

14  Court what types of noises you were exposed to,

15  please.

16  **A.**   For the most part, when I was first going in, it

17  was ranges -- shooting weapons at ranges, generators,

18  and vehicle -- diesel engine vehicles, their engines.

19  **Q.**   Now, as it relates to your particular MOS, let's

20  take South Korea, for example.  Were you exposed to a

21  lot of noise at that time?

22  **A.**   It was -- for the most part, the noise that I

23  would have been exposed to would have been the

24  generators that ran our equipment and ran our radars.

25  That was the most significant and loudest noise I

1    would have been exposed to.

2    **Q.**   Okay.  And did there come a time where you moved

3    to the state of Kentucky, sir?

4    **A.**   I did.  That was in 2006 when I was stationed at

5    Fort Campbell.

6    **Q.**   Do you recall the approximate month that you moved

7    to Fort Campbell?

8    **A.**   I think it was in February, the beginning of

9    February.

10   **Q.**   And before that time, had you been issued a pair

11   of CAEv2s, as you call them?

12   **A.**   I had.  I was issued them at Fort Bliss, before my

13   deployment.

14   **Q.**   And did you get another pair of CAEv2s when you

15   arrived in Kentucky?

16   **A.**   I did because those were getting kind of -- the

17   ones I had were getting kind of worn out because I had

18   worn them so many times.  So going to a new unit

19   there, I wanted to look squared away and make sure

20   that I was also still protecting my ears and hearing,

21   so I purchased another one when I got there.

22   **Q.**   Where did you buy them, sir?

23   **A.**   At the clothing and sales on base.

24   **Q.**   Was that in some kind of a blister pack?

25   **A.**   It was.

1    **Q.**   In some packaging with some instructions, as you

2    recall?

3    **A.**   As far as I remember.

4    **Q.**   And would you -- can you tell the jury, to the

5    extent you can, what you remember about opening that

6    package and whether or not you would have reviewed

7    those instructions, in your best estimation?

8    **A.**   I would have looked over the instructions.  I tend

9    to look over whatever instructions when I open things

10   to at least make sure that nothing had changed on what

11   I understood to wear them as.

12   **Q.**   When did you first -- well, let me ask you this,

13   sir.  Are you claiming hearing loss as a result of

14   your use of these CAEv2s?

15   **A.**   I'm not claiming hearing loss as a result of the

16   CAEv2s.  I had a hearing loss identified when I first

17   joined the military; in my right ear, that is.

18   **Q.**   And did you receive a waiver for that after the

19   military had identified it?

20   **A.**   I did.  I needed a waiver to join.

21   **Q.**   And so, what is your claim in this case, sir?

22   **A.**   The tinnitus in both ears.

23   **Q.**   And when did you first notice -- when and where

24   did you first notice the tinnitus in your ears, in

25   both ears?

1  **A.**   I had known it was pretty significant in about

2  April 2006.

3  **Q.**   Okay.  And did you -- well, let me ask you this:

4  Where were you at that time in April of 2006?

5  **A.**   I was at Fort Campbell in Kentucky.

6  **Q.**   Had you been exposed to any loud noises or

7  hazardous noises prior to that time at Fort Campbell?

8  **A.**   I had done -- when I was with, like, the rear

9  detachment, we had done things to prep the motor

10  pools, so again, there was generators and things

11  there.

12      At Fort Campbell, as far as I remember, when we

13  first got there, they were running a program to make

14  sure that you entered a unit qualified under weapon

15  and had a PT test and were all set to go.

16  **Q.**   All right.  How long did you live and work in Fort

17  Campbell, sir?

18  **A.**   2006 to almost 2010.  I had gone to the end of

19  2009 -- I'm sorry.  Yeah, I had gone to the end of

20  2009 to go to training to become a fueler in Virginia.

21  **Q.**   And did you deploy at any time during your

22  service, sir?

23  **A.**   I did.  I deployed when I was in Texas, and I

24  deployed when I was in Kentucky; I deployed to Iraq.

25  **Q.**   Do you recall when and where you met your ex-wife,

 1    Ms. Eileen Hacker?

 2    **A.**   I do.   I actually met her on her 21st birthday in

 3    Kentucky in March at a local bar.

 4    **Q.**   Okay.   And when you first met Ms. Eileen Hacker,

 5    did you two both go out spending time together at bars

 6    and doing things that young lovers do?

 7    **A.**   We were.   We would try to do karaoke -- it was

 8    kind of our thing -- and kind of go to the local

 9    places, like I think it was -- there was one club that

10    we did, like, country dancing or whatever else, though

11    I'm not necessarily a fan.   That's kind of what we

12    did.

13    **Q.**   Fair enough.   And did there come a point in time

14    where this tinnitus began to interfere with your

15    ability to do those things with Eileen?

16    **A.**   In the beginning, it seemed like we were doing

17    that very much often.   And then, like, it seemed like

18    it became more and more of a problem, as in it's hard

19    to concentrate on doing your karaoke and whatnot when

20    you have, like, the ringing in your ears.

21    **Q.**   And that worsening of the ringing would have been

22    where, sir?

23    **A.**   It progressed throughout Kentucky and then through

24    Colorado, so it just kept progressing.

25    **Q.**   And do you have it today, sir?

1    **A.**   I absolutely have it today.

2    **Q.**   Now, when did you leave the military, sir?

3    **A.**   In July 2018 is when I officially retired, but I

4    left the military itself in May.  I had the

5    transitional leave left.

6    **Q.**   Okay.  And when you left the military, did you

7    submit a claim under the VA for your tinnitus that you

8    experienced in the military?

9    **A.**  I did.

10          **MR. AYLSTOCK:**   Pull up Exhibit 38, if you

11   would, Brian.

12   **BY MR. AYLSTOCK:**

13   **Q.**   It takes just a second to pop up on your screen.

14   **A.**   All right, I can see it.

15   **Q.**   All right.  Do you recognize this form that was

16   used in your deposition?

17   **A.**   It looks familiar.

18   **Q.**   It's a hearing loss and tinnitus disability

19   benefits questionnaire.  Do you see that?

20   **A.**   I do.

21   **Q.**   And that's you, Stephen Hacker, on the left there,

22   sir?

23   **A.**   That is my name.

24   **Q.**   And it looks like this was an in-person

25   examination, if we look down at the bottom?

1    **A.**   It was.

2    **Q.**   Now, if we go to page 5, back in 2018 there is a

3    medical history.  Do you see that?

4         Well, let me let Brian get there.

5         Under medical history section 2, tinnitus, it

6    says, "Does the veteran report recurring tinnitus?

7    Yes."

8         Do you see that?

9    **A.**   I do.

10   **Q.**   So, I take it, somebody else was filling this out

11   based upon what you were reporting?

12   **A.**   They were.  They were kind of going on their -- I

13   didn't actually type anything onto this paper.

14   **Q.**   Okay.  Now, it's reported here that tinnitus began

15   in April 2006.  Do you see that, sir?

16   **A.**   I do.

17   **Q.**   Is that your testimony here today as far as when

18   the tinnitus began for you?

19   **A.**   That's when I was reporting it, so that's when it

20   became a problem.

21   **Q.**   And the date of this form is March -- I'm sorry --

22   April 6th, 2018.  That's right around the time you

23   were leaving the military, correct?

24   **A.**   It was.  That's when I was getting the whole --

25   the whole -- into the VA and the claims and going to

 1    see the specialist there to verify any injuries I was

 2    claiming.

 3    **Q.**   Okay.  And at this point in time, did you have any

 4    clue that you might have been injured from the Combat

 5    Arms Version 2 earplug?

 6    **A.**   No.  I only learned about the problems with the

 7    combat 2 earplugs long after I left the military.

 8    **Q.**   And did you have any inkling you may be here today

 9    by Zoom in this Court telling a federal judge when you

10    might have began suffering from tinnitus?

11    **A.**   No, I had no inclination that that was going to

12    occur.

13              **MR. AYLSTOCK:**   Let's go to Exhibit 14, Brian.

14    **BY MR. AYLSTOCK:**

15    **Q.**   This is another exhibit to your deposition that

16    you were shown there from an audiologist, Melissa

17    Leccese.

18         Do you recognize this document, sir?

19    **A.**   It looks like an excerpt from my military medical

20    records.

21    **Q.**   And what's the date on it, sir?

22    **A.**   I'm seeing April 3rd, 2006.

23    **Q.**   If we look at the history of present illness --

24         -- there in the middle, Brian --

25         -- it says, "Hearing loss in right ear only,

1    difficulty understanding speech, ringing in ears
2    occurring in both ears, not constant, and lasting only
3    a few minutes for the past several years now."
4         To the best of your recollection, is this the
5    first time that you had gone to a physician to report
6    -- or an audiologist, rather, to report the ringing in
7    your ears or tinnitus?
8    **A.**   As far as I remember, it is.
9    **Q.**   And with regard to the next sentence, "Objective,
10   mild conductive hearing loss in the right ear
11   apparently present for many years" -- you see that?
12   **A.**   I do.
13   **Q.**   So, that first part there, is that an accurate
14   statement, "mild conductive hearing loss, right ear,
15   apparently present for many years"?
16   **A.**   That's correct.
17   **Q.**   Now, the next clause says, "but not identified
18   until now."  Is that an accurate statement that this
19   mild conductive hearing loss had not been identified
20   until that date?
21   **A.**   Well, my hearing loss was identified when I joined
22   the military, as in I needed to waiver to get in.  So
23   that part is not entirely correct.
24   **Q.**   All right.  If we look at the sentence right above
25   with regard to the tinnitus or "ringing in the ears,

1    in both ears, not constant, and lasting only a few

2    minutes," it also has another clause at the end, "for

3    the past several years now."  Is that clause accurate,

4    sir?

5    **A.**   That one is probably not accurate either because

6    the tinnitus wasn't for several years.

7    **Q.**   Now, are you testifying to this Court that the

8    tinnitus appeared exactly on this day that you went

9    and saw the audiologist on April 3rd, 2006?

10   **A.**   I'm sure it didn't occur that day, but it wouldn't

11   have been long before then.

12   **Q.**   Would it have been in Fort Campbell, Kentucky,

13   sir?

14   **A.**   That's when it would have been identified, yes.

15   **Q.**   And that's when you would have first began

16   experiencing it, to the best of your recollection,

17   sir?

18   **A.**   To the best of my recollection.

19   **Q.**   Thank you, sir.

20        **MR. AYLSTOCK:**  Pass the witness.

21        **JUDGE RODGERS:**  All right.  Thank you.

22        Mr. Brock?

23                    **CROSS-EXAMINATION**

24   **BY MR. BROCK:**

25   **Q.**   Mr. Hacker, good morning, sir.  My name is Mike

1   Brock.  I represent 3M, and I'll have a few questions

2   for you, please.

3   **A.**   Good morning, sir.

4   **Q.**   First of all, I want to just put up a graphic of a

5   timeline that I'd like to look at with you as we

6   proceed through the examination.

7        Donnie, if you could put up our demonstrative

8   Exhibit 1.

9   **BY MR. BROCK:**

10  **Q.**   And I've tried to summarize from the documents and

11  your testimony sort of the timeline of events leading

12  to the first reports of tinnitus for several years now

13  that you made on April 3rd, 2006.

14       Do you see that that's the last date there on the

15  chart?

16  **A.**   I do.

17  **Q.**   Okay.  Now, I think you've already described for

18  the Court that you enlisted in the military.  And is

19  it correct also that, when you joined the military,

20  you required a waiver for hearing loss in your right

21  ear?  Is that correct?

22  **A.**   It is correct, I did require a waiver for my right

23  -- hearing loss in my right ear.

24  **Q.**   Okay.  And you have an understanding that the

25  hearing loss on the right is what is referred to as

1   conductive hearing loss; that is, it's not a hearing

2   loss that's caused by noise, correct?

3   **A.**   That's what I'm to understand.

4   **Q.**   Okay.  And in fact, you even had a surgical

5   procedure where they were going to try to address a

6   condition called otosclerosis, but in that procedure

7   it was determined that you had a nerve abnormality;

8   and so the issue with not able to be corrected, and

9   you still have conductive hearing loss on the right,

10  correct, sir?

11  **A.**   That is correct.

12  **Q.**   All right.  And you understand that hearing loss

13  can be a condition that can cause tinnitus, correct?

14  **A.**   I'm not fully aware of that.

15  **Q.**   All right, that's fine.  And, as you mentioned to

16  your counsel, you are not claiming hearing loss on the

17  right or the left in the context of this litigation,

18  correct?

19  **A.**   I -- I believe that's true.

20  **Q.**   All right.  So, when we think about the idea of

21  determining for you the time and place of injury,

22  we're looking to the issue of tinnitus only, correct?

23  **A.**   I believe so.

24  **Q.**   All right.  Now, with regard to the Combat Arms

25  Version 2 --

1          **MR. BROCK:**  I know Your Honor doesn't like

2    water, but I've just got a dry mouth, so apologize.

3          **JUDGE RODGERS:**  I'm all right with it without

4    a jury present.

5          **MR. BROCK:**  Thank you, Judge.

6    **BY MR. BROCK:**

7    **Q.**  Sorry about that, Mr. Hacker.

8          So, after you joined the military, there was a

9    period of time, from September of 1998 until around

10   2002, 2003, when you would have been using hearing

11   protection devices other than the Combat Arms Version

12   2, correct, sir?

13   **A.**  That's correct.

14   **Q.**  And then, while you were at Fort Bliss, Texas, but

15   before you were deployed to Kuwait, you received your

16   first pair of Combat Arms Version 2 hearing protection

17   devices, correct?

18   **A.**  That's correct.

19   **Q.**  And as part of the distribution of those earplugs,

20   you actually attended a company session in which a

21   senior officer presented to you information about how

22   to use the earplugs, correct?

23   **A.**  As far as I remember.

24   **Q.**  Okay.  And -- well, that's what you testified to

25   in your deposition, isn't it?

1    **A.**   I again then -- I said as far as I remembered.

2    **Q.**   Okay.  And in that session that you had with the

3    leader of the company about the use of the earplugs,

4    you were instructed in terms of how to place them and

5    then how to conduct the tug test to make sure that the

6    earplugs were in place properly, correct?

7    **A.**   Correct.

8    **Q.**   And it was those instructions that you received in

9    Texas in the 2002-2000 [sic] time frame that you used

10   for the Combat Arms Earplug Version 2 for the entirety

11   of your use of the product, correct, sir?

12   **A.**   I verified again when I received the -- when I

13   bought the blister pack to ensure that I was still

14   doing it the same way and that I was still -- the

15   proper way to insert them.  So that's what I used

16   during my duration of using the CAEv2s.

17   **Q.**   Okay.  So at least from November, December,

18   somewhere in there, of 2002 until very early in 2006

19   you would have used the instructions that you were

20   provided by the Army by a senior officer in terms of

21   how to fit the earplug into your ear and make sure

22   that you had a good seal, correct?

23   **A.**   To my understanding, yes.

24   **Q.**   All right.  Now, when you received the -- when you

25   bought the new pair, the second pair, while you were

1   stationed at Fort Campbell, Kentucky, do you remember

2   any of the specifics that were included in that

3   packaging?

4   **A.**   I remember that it was insert it all the way, to

5   kind of do the little tug test, that these were to be

6   worn -- that they would block noise.  Those are the

7   things that I remember from that blister pack.

8   **Q.**   Okay.  Do you remember a fitting tip in that

9   blister pack that conveyed to you that you could roll

10  back the flanges in order to obtain a better fit?

11          **MR. AYLSTOCK:**  Objection.  I'm not sure what

12  relevance --

13          **JUDGE RODGERS:**  Yeah, I don't -- this seems

14  outside the scope of --

15          **MR. BROCK:**  Well, I'm addressing the issue of

16  -- he's saying that he got something in Kentucky that

17  matters to this case.  I'm just trying to determine

18  what that is.

19          **JUDGE RODGERS:**  Yeah.  Well, just so everyone

20  knows, neither side in the briefing on choice of law

21  did a very good job of arguing choice of law per

22  issue.  So I'm going to allow you to go a little bit

23  further with this, but not much.

24          There was a question on direct about receipt

25  of the instructions.  But I want you to move along in

1    just a minute, Mr. Brock.

2            **MR. BROCK:**  All right.  Let me just ask this

3    question and then we'll move to the next subject.

4    I'll try to shorten it a little bit.

5    **BY MR. BROCK:**

6    **Q.**  Do you recall whether or not the blister pack that

7    you received when you bought the second pair of Combat

8    Arms Version 2 included a fitting instruction about

9    folding the flanges back if you needed to to obtain a

10   better fit?

11   **A.**  If I was getting a good fit and felt that that was

12   blocking the sound, I wouldn't have needed to make the

13   fit better.

14   **Q.**  Okay.  And I believe that you --

15   **A.**  So I -- yeah.

16   **Q.**  Thank you.

17   **A.**  So I don't particularly remember whether that was

18   there or not.

19   **Q.**  Okay.  Thank you.  And I believe you did testify

20   that, when you used the Combat Arms Version 2, you

21   always ensured a good fit by making sure that you had

22   a seal, you'd tug on it a little bit to make sure that

23   seal was there, and then you were instructed even to

24   push it back in a little bit after you tested it with

25   the tug test, correct?

1  **A.**   That's correct, have a good seal to protect your

2  hearing.

3  **Q.**   All right.  Now, the two sets of Combat Arms

4  Version 2 earplugs are the only two sets that you had

5  during your entire experience in the military; is that

6  correct?

7  **A.**   As far as I remember.

8  **Q.**   And it's your testimony that, while you were in

9  the military -- your contention that while you were in

10  the military that you wore the CAEv2 almost

11  exclusively; that is, beginning in 2002 or thereabouts

12  you used it 90-plus percent of the time, correct?

13  **A.**   Yes, that's as far as I remember.

14  **Q.**   Now, one thing I think you might have skipped over

15  just a little bit and I'd just ask you to see if I got

16  this correct:  When you left Fort Bliss the first

17  time, you were deployed to Kuwait, correct?

18  **A.**   That's correct.

19  **Q.**   And while you were in Kuwait, would this have been

20  in the period of November of 2002 until May of 2003?

21  **A.**   That sounds about the right time frame.

22  **Q.**   And then you went back to Fort Bliss, correct?

23  **A.**   That's correct.

24  **Q.**   And while you were deployed in Kuwait, you would

25  have had noise exposure from the Patriot sites, that

1    is the missile launching sites, and from generators;
2    those were your primary noise exposures, correct?
3    **A.**   So, it's generators at the Patriot sites.  I
4    wasn't next to the Patriot missiles while they were
5    firing.  But to make them work you have to have
6    equipment with generators and trucks to move them, and
7    that's the noise I was discussing.
8    **Q.**   Okay.  And the noise was significant enough that
9    you thought, when you would go to those sites to do
10   that, that you would need to wear the earplugs,
11   correct?
12   **A.**   Well, if you're going near generators, I would
13   wear hearing pro anyway.  I like the hearing that I
14   have.
15   **Q.**   I understand.  I'm just asking you to confirm that
16   you felt that you needed to have the earplugs when you
17   would go to the Patriot missile sites and be in the
18   presents of the generators, true?
19   **A.**   It is true, while you're near generators you
20   should wear hearing protection, and I did.
21   **Q.**   Thank you, okay.  Now, you returned to Fort Bliss.
22   And when you were in Fort Bliss, you wore the CAEv2s
23   around generators, at the firing range, around loud
24   trucks, and even some demonstrations for Claymore
25   mines, correct?

1    **A.**   That's correct.

2    **Q.**   And then I show, from your testimony and your

3    records, that you left Fort Bliss and you went to

4    South Korea from April of 2005 to February of 2006; is

5    that correct?

6    **A.**   That sounds about the right time frame.

7    **Q.**   And during that time, you would have been exposed

8    to noise on the weapons range, Avenger missiles,

9    generators, and maintaining vehicles, correct?

10   **A.**   That's correct.  But I would be a good distance

11   because I didn't actually -- when it says around the

12   Avengers, the Avengers was -- I would run a radar

13   site, and the Avengers would be, again, like 100

14   meters away.  It wasn't like I was right next to them.

15   **Q.**   Okay.  And so I'll ask you the same question I

16   asked you earlier.  When you were in Korea and you

17   were working in the presence of Avenger missiles,

18   generators, maintaining vehicles, and at the weapons

19   range, would you have been using the Combat Arms

20   Version 2?

21   **A.**   When I was going to be around loud noises, again,

22   I would be using the CAEv2s.

23   **Q.**   All right.  And then, from South Korea you went to

24   Fort Campbell, Kentucky, correct, sir?

25   **A.**   That's correct.

1   **Q.**   And your duties at Fort Campbell were primarily

2   working in the office, correct?

3   **A.**   When I was first getting there, yes.  But that

4   doesn't mean that I didn't still go to the motor pool

5   to maintain vehicles and I didn't go to ranges to be

6   qualified.

7   **Q.**   But your primary job at Fort Campbell was a desk

8   job where you were assisting people in their travel

9   arrangements and that type of thing if they were

10  leaving the base, correct?

11  **A.**   That's correct.

12  **Q.**   And when you went to Fort Campbell, when you

13  arrived there, you lived on the base, correct?

14  **A.**   That's correct.

15  **Q.**   And then we've talked a little bit about the April

16  6, 2006, record.  I want to direct your attention now

17  to the same callout that you looked at a few minutes

18  ago.

19          **MR. BROCK:**   Donnie, if we could see Choice of

20  Law Exhibit 61, and just show the whole page first.

21  **BY MR. BROCK:**

22  **Q.**   This is the same document that Mr. Aylstock was

23  asking you about, correct?

24  **A.**   It looks like the same one.

25          **MR. BROCK:**   And Donnie, if we could do the

1   specific callout of 61.1.1.

2   **BY MR. BROCK:**

3   **Q.**   And this document says, "ringing in the ears

4   occurring in both ears, not constant, and lasting only

5   a few minutes for the past several years now."  You

6   see that?

7   **A.**   I do see that.

8   **Q.**   All right.  And that's the medical record that was

9   created by your healthcare provider back in 2006,

10  correct?

11  **A.**   That is correct.

12  **Q.**   And you agree that this is an accurate description

13  of what you experienced and reported in April 2006,

14  correct?

15  **A.**   I agree that the ringing in my ears occurred in

16  both ears.  I don't agree with the fact that it says

17  -- and I agree that it was lasting only a few minutes.

18  But I don't agree with the "past several years" part.

19  **Q.**   Okay.  Let's look at, from your deposition that

20  was taken on 7/31/20 --

21      -- at page 205, Donnie, please.

22          **MR. AYLSTOCK:**  Do you have a copy, Mr. Brock?

23          **MR. BROCK:**  I didn't bring extra copies.  Oh,

24  actually, there may be one in that binder I gave you,

25  I'm not sure.

1           **MR. AYLSTOCK:**  We need a copy.

2           **MR. BROCK:**  Donnie, if you could callout the

3    question at the bottom of 204, "my question to you

4    is," and then come right down to the answer that

5    follows.

6           **MR. AYLSTOCK:**  Mr. Brock, I need a copy of

7    this so I can look at the context.

8           **JUDGE RODGERS:**  Do you all not have his

9    deposition?

10          **MR. AYLSTOCK:**  We have it but electronically.

11   We'll deal with it electronically.

12          **JUDGE RODGERS:**  Well, he's given you the page

13   number.

14          **MR. BROCK:**  It's page 205.

15   **BY MR. BROCK:**

16   **Q.**  So, the question that is posed to you in terms of

17   asking about this document is, "My question to you is:

18   Is that an accurate description of what you

19   experienced?"

20        And was your answer, under oath, "I don't remember

21   in 2006 that I was specifically saying I had it then.

22   But if I made the complaint about it on here and the

23   document says written by a medical personnel who would

24   have more knowledge than I do, if I was complaining to

25   them, then I would have to believe that, yes, I was

1    already starting to have tinnitus in my ears."

2            Do you see that?

3    **A.**   I do see that.

4    **Q.**   And, in fact, even in this case you've actually

5    testified that you were sure you had tinnitus before

6    you reported it in 2006, correct?

7    **A.**   I did say this, yes.

8    **Q.**   You said even in this case, in your deposition

9    that was taken on July 30th, 2020, that you would say

10   that you had it for at least a few months before the

11   April 2006 visit, correct?

12   **A.**   That sounds familiar.  But what is a few months?

13   **Q.**   Well, let's look at your testimony on page 130

14   beginning at line 12 --

15   -- and going down, Donnie, to the end of the

16   answer at line 20.

17           Let me ask you, were you asked this question and

18   did you give this answer:  "When you say you're sure

19   had you it prior to that, what kind of time frame are

20   you talking about?"

21           That's the question.

22           Answer:  "I would say for at least a few

23   months before that.  But again, I'm not totally sure.

24   I just know that's when I started complaining about

25   it.  I don't believe I had just started suffering the

1    day I complained about it."

2            Do you see that?

3    **A.**   I do see that.

4    **Q.**   So your best judgment at the time of your

5    deposition on July 31st, 2020, was that you had been

6    experiencing tinnitus for at least a few months prior

7    to the report that you made on April 3rd, 2006; is

8    that correct?

9    **A.**   I had also been at Fort Campbell for a few months.

10   **Q.**   Well, you arrived at Fort Campbell in February of

11   2006, did you not?

12   **A.**   I did.

13   **Q.**   Okay.  And a few months is going to take you back

14   at least to South Korea, isn't it?

15   **A.**   Not necessarily.  A few months -- I could consider

16   a few months February.  February to April, the

17   beginning of April, that would be a few months to me.

18   **Q.**   Well, it's not the end of April, but it's April

19   the 3rd when you first reported tinnitus, wasn't it?

20   **A.**   That is when I reported it.

21   **Q.**   Yeah.  So you have stated under oath "a few months

22   prior to April 3rd" and the medical record that you

23   accept says "for a few years," correct?

24   **A.**   The medical record does say "a few years" and I

25   did say "a few months."

1    **Q.**  All right.  Now, let's talk a little bit about

2    karaoke.

3    **A.**  Okay.

4    **Q.**  You mentioned that you started singing karaoke

5    early in your relationship with your wife, Eileen,

6    correct?

7    **A.**  That's correct.

8    **Q.**  And you would have met her -- I believe you gave

9    the specific date as having met her on her birthday,

10   March 20th, 2006, correct?

11   **A.**  That's correct.

12   **Q.**  Okay.  And to the extent that your wife testified

13   to meeting you at a bar in Clarksville, Tennessee, and

14   not in Kentucky, do you have any reason to disagree

15   with that?

16   **A.**  It's right there, Tennessee, Kentucky.  Fort

17   Campbell sits on both.  So, yes, I met her in

18   Clarksville, Tennessee.

19   **Q.**  All right.  So the meeting that you had -- the

20   first meeting that you had with your wife in a bar in

21   2006 took place in Clarksville, Tennessee, not in

22   Kentucky, correct?

23   **A.**  That's correct, but I was still living in

24   Kentucky.

25   **Q.**  You were living in Kentucky on the base at that

1    time, correct?

2    **A.**   That's correct.

3    **Q.**   Now, you've testified that you stopped singing

4    karaoke in around 2011 or 2012, correct?

5    **A.**   That's correct.

6    **Q.**   And so, by the time you stopped singing karaoke in

7    Tennessee and Kentucky, you were no longer living in

8    the Fort Campbell, Kentucky, area, correct?

9    **A.**   That's correct.  By 2011, 2012, I was living in

10   Colorado.

11   **Q.**   Correct.  And you had by that point in time -- and

12   I think that -- let's go back to our -- let's go now

13   to our Exhibit 2 -- I'm sorry, our Demonstrative 2.

14        All right.  So now, if you can see this, I've

15   picked up on your time in Fort Campbell, Kentucky.

16   And it shows here that your station was Fort Campbell,

17   Kentucky, from 2006 up until April of 2008, correct?

18   **A.**   That's correct, that's what it shows.

19   **Q.**   Okay.  And then did you have a deployment to Iraq?

20   **A.**   It shows that, yes.

21   **Q.**   And that took place in April of 2008?

22   **A.**   That sounds about the right time frame.

23   **Q.**   Okay.  And what was the -- I hate to put you on

24   the spot, but what was the date of your marriage to

25   Mrs. Hacker?

1    **A.**   It was April 26, 2007.

2    **Q.**   Now, up until April 26, 2007, did you live on

3    base?

4    **A.**   I did.

5    **Q.**   After April 2007, at any time did you live on the

6    base at Fort Campbell, Kentucky?

7    **A.**   I did not.  I lived in Oak Grove, Kentucky.

8    **Q.**   Okay.  And so, from April of 2007 to April 2008

9    would have been the period of time when you lived off

10   base in the Kentucky area, correct?

11   **A.**   I believe so.

12   **Q.**   Did you live in Kentucky or Tennessee when you

13   moved off base?

14   **A.**   When I originally moved off base, I lived in

15   Kentucky, and then eventually I moved to Tennessee.

16   **Q.**   Okay.  And in what month and year did you move to

17   Tennessee?  I assume this is before April of 2008 when

18   you were deployed to Iraq.

19   **A.**   I don't remember if it was before or after.  I --

20   I -- honestly, I don't remember specifically when I

21   moved from Kentucky to Tennessee.

22   **Q.**   All right.  So you did not live at Fort Campbell

23   at all from April of 2008 to April of -- excuse me.

24   You did not live in Kentucky from April 2008 to April

25   2009, correct?

1    **A.**   While I was deployed, my home would have been in

2    the states.

3    **Q.**   Okay.  But you weren't present in the United

4    States in either Kentucky or Tennessee for the period

5    April 2008 to April 2009, correct?

6    **A.**   I would have had mid-tour leave, so I would have

7    been there for about two weeks during that period.

8    **Q.**   Okay.  So you had two weeks during that period of

9    time?

10   **A.**   That sounds about right.

11   **Q.**   And when you returned from your military service,

12   where did you go next?  Where were you next stationed?

13   **A.**   After Fort Campbell, Kentucky, it would have been

14   Fort Carson, Colorado.

15   **Q.**   Okay.  And would that have been beginning -- so

16   beginning September 2009 -- excuse me.  Beginning

17   April 2009 until the present day, you have not spent

18   substantial time in Kentucky, correct?

19   **A.**   From -- yeah, I guess from September of 2009 to

20   today was not Kentucky.

21   **Q.**   Nor was April 2008 to April 2009?  You were,

22   during that time, deployed to Iraq, correct, sir?

23   **A.**   I was deployed for all but those two weeks.

24          **MR. BROCK:**  That's all I have.  Thank you.

25          **JUDGE RODGERS:**  All right.  Thank you.

1           Mr. Aylstock, is there brief redirect?

2           **MR. AYLSTOCK:**  Very brief.

3                    **REDIRECT EXAMINATION**

4    **BY MR. AYLSTOCK:**

5    **Q.**  Hi, Mr. Hacker.  Just real quick.  I know you've

6    got to get to work.

7           Let me ask you this:  Tell the Court, if you

8    remember, the date that you first met your wife.

9    **A.**  It was March 20th, 2006.

10   **Q.**  Why do you remember that date?

11   **A.**  It was her birthday, her 21st birthday.

12   **Q.**  Was it a memorable day for you as well?

13   **A.**  It was.  That's when I met her, and we were

14   married for 13 years, and we're still friends now.

15   **Q.**  And to the best of your recollection, on that date

16   when you met her at that bar, were you suffering from

17   this tinnitus, or had you ever suffered from the

18   tinnitus before, to the best of your recollection,

19   when you had met your wife --

20           **JUDGE RODGERS:**  Let's ask --

21           **MR. AYLSTOCK:**  I'm sorry.

22           **MS. CALLAHAN:**  You can ask both of those

23   questions, but that's two different questions.

24           **MR. AYLSTOCK:**  Yes.  Thank you, Your Honor.

25           **JUDGE RODGERS:**  The first one is whether he

1   was suffering from it at the time he met her.

2              **MR. AYLSTOCK:**  Yes.

3   **BY MR. AYLSTOCK:**

4   **Q.**  To the best of your recollection, were you

5   suffering from the tinnitus on that day when you met

6   her that memorable day?

7   **A.**  I -- I'm not really remembering it because I was

8   -- I was conversating with her, but --

9   **Q.**  And do you have any recollection of ringing in

10  your ears at any point in time prior to when you met

11  her?

12  **A.**  I feel I would have complained about it had I been

13  feeling it a lot before then, had it been a problem.

14             **MR. AYLSTOCK:**  Now, if you pull up, Brian,

15  the deposition --

16             Sir, could I ask you to pull up the

17  deposition clip page 205, the very first one.  Sir,

18  thank you for assisting.  Page 204, 205.

19  **BY MR. AYLSTOCK:**

20  **Q.**  The question was asked -- you were shown your

21  deposition here.  If we go to the question:  "My

22  question is, is that an accurate description of what

23  you experienced?"

24             And what you said is:  "I don't remember in 2006

25  that I was specifically saying I had it then.  But if

1   I made the complaint here on the document it says
2   written by a medical personnel who would have more
3   knowledge than I do if I was complaining to them, then
4   I would have to believe, yes, I was already starting
5   to have ringing in my ears."
6        Do you see that, sir?
7   **A.**  I do see it.
8   **Q.**  And is that consistent with your testimony that
9   you gave here today that April 3rd, 2006, was not the
10  exact date that you believe the ringing started?
11  **A.**  Right.  And it's -- I can say that, no, it didn't
12  start on that day.  And I think it said possibly
13  within a few months.  But a few months isn't very long
14  for me.
15  **Q.**  And to the best of your recollection, do you stand
16  by your testimony here today that you began suffering
17  from this tinnitus at Fort Campbell in Kentucky?
18  **A.**  That's when I was complaining about it and it
19  became a problem.
20  **Q.**  You were asked some questions about where you
21  moved on and off base.  You lived off base in Kentucky
22  for a period of time, is that true, sir?
23  **A.**  That's correct, when I was first married, I did
24  live in Kentucky.
25  **Q.**  And were you suffering from tinnitus during that

1    period of time living off base in Kentucky?

2    **A.**   That matches up with the time frame.

3    **Q.**   Thank you.

4         **MR. AYLSTOCK:**  That's all my questions.

5         **JUDGE RODGERS:**  Mr. Hacker, this is Judge

6    Rodgers.  I have a couple of questions for you.  I'll

7    be brief.

8         **THE WITNESS:**  All right, Your Honor.

9         **JUDGE RODGERS:**  You said that you began

10   complaining -- or the record reflects you began

11   complaining or reporting the tinnitus at Fort

12   Campbell.

13        My question to you is:  As you're sitting

14   here today, do you recall experiencing ringing in

15   either ear or both ears at any time prior to Fort

16   Campbell?  So, you know, Fort Bliss, South Korea,

17   Kuwait, do you recall experiencing the ringing in your

18   ears at any point when you were stationed in those

19   locations?

20        **THE WITNESS:**  I don't, Your Honor.  And had

21   it become a problem prior to then, as much as I don't

22   like getting seen by medical personnel in the

23   military, I would have -- on a continuous issue, I

24   would have gotten seen.

25        **JUDGE RODGERS:**  Okay.  Thank you.  Let me ask

1    you about your MOS.  You said you were 14 Juliet when

2    you joined the military?

3             **THE WITNESS:**  That's correct, Your Honor.

4             **JUDGE RODGERS:**  What does that encompass?

5             **THE WITNESS:**  The actual job title is air

6    defense command control computers communications

7    operator maintainer.  Essentially, to break it down,

8    it was running the radars and the early warning

9    systems and the computer and radio systems that would

10   allow for the Avengers, the Stinger missiles, and

11   eventually the Patriot missiles to acquire their

12   targets and to see the airspace.

13            **JUDGE RODGERS:**  All right.  But you've

14   testified about working in and around generators?

15            **THE WITNESS:**  Yes, Your Honor.  To make the

16   equipment work, to make the radars spin, you needed

17   power, which had the generators that we needed to

18   power them; along with our trucks, they would need to

19   be hooked to a power source, again a generator, to

20   continuously go.  And because they were sensitive

21   equipment, they also had to be hooked to environment

22   control units which are like large air conditioners

23   again hooked to a generator.  So that's when I say

24   that I was around generators.

25            **JUDGE RODGERS:**  And was it within your

1    responsibility to maintain that equipment, including

2    the generators, or did you just make sure it was all

3    properly hooked up?

4         THE WITNESS:  I would make sure that it was

5    properly hooked up, but I would also make sure -- we

6    would do the PMCSs, or the preventive maintenance, to

7    ensure that we were making sure that they were kept

8    running.  We also would be the ones that were fueling

9    them up usually with fuel cans and to make sure that

10   they were grounded and placed properly and things of

11   that nature, Your Honor.

12        JUDGE RODGERS:  Okay.  And was this all

13   primarily in the field?

14        THE WITNESS:  It was -- the majority of it

15   was in the field, yes, Your Honor.

16        JUDGE RODGERS:  All right.  Then, when you

17   were at Fort Campbell, did you maintain your same MOS

18   but just work in S3?

19        THE WITNESS:  That's correct, Your Honor.

20        JUDGE RODGERS:  And as part of your duties at

21   Fort Campbell, I believe -- and correct me if I'm

22   wrong, but I believe you've said you still worked

23   around generators, you still were around the

24   generators; is that correct?

25        THE WITNESS:  That's correct, Your Honor, we

1   would still have our generators because when we would

2   go to the field we would live in the drug

3   paraphernalia tents, or the tents, and they would

4   require, again, generators to run the systems.  And

5   being one of the lower enlisted in the S3, it, of

6   course, was my responsibility, Your Honor.

7           **JUDGE RODGERS:**  How often did you go to the

8   field in Fort Campbell between the years when you were

9   there 2006 to I believe it was 2008?

10          **THE WITNESS:**  Before that deployment, again,

11  we ramped up more before the deployment.  I would say

12  it was at least quarterly, sometimes more often.  It

13  varied, I guess, whatever the cycle we were on.

14          **JUDGE RODGERS:**  So, when you say the

15  deployment, specifically what deployment are you

16  referring to?

17          **THE WITNESS:**  The one to Iraq in around the

18  2008.

19          **JUDGE RODGERS:**  Okay.  And compared to your

20  time in South Korea to your time at Fort Campbell,

21  after South Korea, tell me about your field

22  experience, comparatively speaking.

23          **THE WITNESS:**  In South Korea, it would only

24  -- there was only a couple of fields.  There was

25  probably maybe like I'd say between four and six in

```
 1    the year that I was there.  At Fort Campbell it seemed
 2    like it was a little more often, especially, again,
 3    prepping for a deployment, because, again, Your Honor,
 4    before deployments you're in the field more often.
 5              JUDGE RODGERS:  All right.  Thank you very
 6    much, Mr. Hacker.
 7              Mr. Aylstock, any follow-up to my questions?
 8              MR. AYLSTOCK:  No, Your Honor.
 9              JUDGE RODGERS:  Mr. Brock?
10              MR. BROCK:  I have one follow-up to one of
11    Mr. Aylstock's questions for context in the
12    deposition.
13              JUDGE RODGERS:  No, not as to Mr. Aylstock's.
14    Just mine.
15              MR. BROCK:  No, Your Honor.
16              JUDGE RODGERS:  Mr. Hacker, thank you very
17    much.  And we'll let you be on your way now.  We know
18    you have a workday ahead of you.  Thank you.
19              THE WITNESS:  I do, Your Honor.  Thank you.
20              [Witness excused.]
21              JUDGE RODGERS:  Your next witness?
22              MR. AYLSTOCK:  Thank you, Your Honor.
23    Plaintiffs call by video, Eileen Hacker, Mr. Hacker's
24    ex-wife.
25              MR. BROCK:  Your Honor, I was going to raise
```

1    one issue about this.  We have depositions by video

2    for Mr. Hacker also, but I'm also mindful of the

3    schedule.  And I'm fine with playing the videos, but I

4    worry about us meeting our schedule today with the

5    live witnesses if we start that process.  So I just

6    raise that as a --

7              **JUDGE RODGERS:**  Well, I don't have

8    Mrs. Hacker on my list.

9              **MR. AYLSTOCK:**  She was in the binder, Your

10   Honor, it's a two-minute clip.

11             **JUDGE RODGERS:**  If it's two minutes, then --

12   do you have a cross-clip?

13             **MR. BROCK:**  I don't have a cross-clip of this

14   witness, but I do have a clip of a provider,

15   Ms. Leccese, who was referred to in the direct

16   examination and in the cross, and it's very short

17   also.

18             **MR. AYLSTOCK:**  For the record, we don't

19   believe that that is in either the choice of law

20   record or on the MDL docket in any way.

21             **MR. BROCK:**  The exhibit that is referred to

22   is absolutely in the choice of law record.

23             **MR. AYLSTOCK:**  The exhibit, not the

24   deposition, nor any mention of Audiologist Leccese.

25             **JUDGE RODGERS:**  The depo was taken.  I'm

1    going to allow it.  Let's move on.

2              **MR. AYLSTOCK:**  Thank you, Your Honor.

3              **JUDGE RODGERS:**  There is no audio for her.

4    We're not hearing the video.

5          *(Video clip published of Eileen Hacker*

6    *deposition:)*

7    **Q.**  And where did you go after Florida?

8    **A.**  To Tennessee/Kentucky area.  It was Kentucky but

9    right at the border.

10   **Q.**  When did you move there from Florida?

11   **A.**  2005.

12   **Q.**  How long did you live in Florida?

13   **A.**  Just for a semester of college.

14   **Q.**  And where did you go next?

15   **A.**  That was Kentucky.

16   **Q.**  Okay.  How long did you live in Kentucky?

17   **A.**  For many years.  I'm trying to think.  2005 to

18   2010, so -- no -- yeah, about five to six years.

19   **Q.**  When did you meet Mr. Hacker?

20   **A.**  March 20th, 2006.

21   **Q.**  And how did you meet Mr. Hacker?

22   **A.**  It was my birthday.  I honestly -- we were out and

23   -- it was my birthday party, I was out, and he bought

24   me a drink.

25   **Q.**  Where was that?

1    **A.**   Clarksville, Tennessee.

2    **Q.**   Mrs. Hacker, did you ever go to any bars with Mr.

3    Hacker?

4    **A.**   Yes.

5    **Q.**   How often?

6    **A.**   We used to go once a week for karaoke.  And then

7    it got much -- it went to once a month, once every

8    couple of months.  We haven't been to a bar in years.

9    **Q.**   When is the last time you would say you went to a

10   bar with Mr. Hacker?

11   **A.**   I could not give you an exact date.  It was years

12   ago.

13   **Q.**   You mentioned that you went singing with Mr.

14   Hacker at karaoke events.  How loud were the karaoke

15   events?

16   **A.**   Karaoke is loud.

17   **Q.**   What types of music did you listen to or sing at

18   the karaoke?

19   **A.**   There was a whole wide range of genres.  It wasn't

20   just us singing so --

21   **Q.**   Okay.  When is the last time that you and Mr.

22   Hacker went to a karaoke event together?

23   **A.**   Many years.

24   **Q.**   Did Mr. Hacker have trouble hearing you when you

25   went to the karaoke events?

1   **A.**   At some point.  I mean, that was part of why we

2   ended up stopping.

3   **Q.**   Why else did you end up stopping going to the

4   karaoke events?

5   **A.**   Because it was hurting his ears.  He couldn't

6   hear.  He'd get tinnitus.  All of it had to do with

7   his hearing.

8           **MR. AYLSTOCK:**   That's all, Your Honor.

9           **JUDGE RODGERS:**   All right.

10          Okay, Mr. Brock?

11          **MR. BROCK:**   Yes, we have a short clip from

12   Ms. Leccese.

13    *(Video clip published of Melissa Leccese*

14   *deposition:)*

15   **Q.**   My name is Adam Wolfson.  I'm from a law firm

16   called Quinn Emanuel, and I represent the plaintiffs

17   in this matter.

18          So, as we start today, can you please state your

19   full name for the record?

20   **A.**   Sure.  Melissa Leccese.

21   **Q.**   So, when did you first get stationed at Fort

22   Campbell?

23   **A.**   I got to Fort Campbell two thousand -- I was there

24   2006 to 2010 in the clinic.

25   **Q.**   And you said at that time -- what was your

1    official title there?

2    **A.**   So, audiologists have two titles.  We are chief of

3    the clinic -- chief of the audiology clinic, and also

4    the hearing program manager for the installation.

5    **Q.**   And was it your experience, as an audiologist,

6    that soldiers with tinnitus that was not constant

7    would sometimes report it and sometimes not, depending

8    on whether it was going on?

9    **A.**   Well, I mean, in my personal experience, I would

10   ask them when I did a case history -- if I saw a

11   patient in the clinic, I would ask them about their

12   tinnitus, and they would always report that, if it was

13   there.  And, you know, I would ask them is it there

14   all the time or is it just there now and then, and so

15   I would document all of that.

16   **Q.**   We're in this deposition in connection with a case

17   brought by a former soldier who was stationed at Fort

18   Campbell named Stephen Hacker.  Is it fair that,

19   looking at Mr. Hacker's medical records, records of

20   visits with you, is probably the best way for you to

21   either recall or just review what you did with him or,

22   you know, with respect to his treating as a treater?

23   **A.**   That would be the only way.

24   **Q.**   Dr. Leccese, this is a medical record.  I believe

25   this is Exhibit 5.  To the best of your understanding,

1  this is a true and accurate copy of a printout of a

2  record that you created during a medical visit with

3  Mr. Hacker?

4  **A.**  Yes.

5  **Q.**  And there in the date we can see that this is from

6  April 3rd, 2006?

7  **A.**  Yes.

8  **Q.**  So, then, history of the present illness, is it

9  correct that, in taking down the history of the

10 illness, this is information conveyed from the patient

11 to you?

12 **A.**  That -- yes, most of that is.  The hearing loss in

13 the right ear was -- oh, yeah, that could have been

14 his subjective complaint of hearing loss in the right

15 ear, yeah, difficulty understanding speech, ringing in

16 both ears, yep, yep, that was a subjective history

17 that I took from him.

18 **Q.**  Okay.  So, is it fair -- I just want to make sure

19 that I'm understanding this as a layperson.  But what

20 Mr. Leccese -- I'm sorry, what Mr. Hacker was telling

21 you during this visit is that he has some hearing loss

22 in his right ear, that he had difficulty understanding

23 speech, and then he described ringing in --

24 nonconstant, intermittent ringing in his ear,

25 otherwise known as tinnitus; is that fair?

1    **A.**   Yes.

2    **Q.**   Do you have any reason to doubt that he was being

3    truthful when he described that to you in this type of

4    visit in April of 2006?

5    **A.**   I don't recall the visit specifically, and I

6    didn't document anything in the notes stating anything

7    otherwise, which I would have, so I don't have any

8    reason to doubt that he wasn't being honest about

9    that.

10   **Q.**   And if you'll go to Tab 3, it's the next tab.

11   And, for the record, this has been previously marked

12   as Hacker Exhibit 14, and it was referred to earlier

13   as Leccese Exhibit 5.

14        Dr. Leccese, do you see Hacker Exhibit 14 here in

15   front of you?  You would have created this record and

16   the information within it at or near the time of

17   meeting with Mr. Hacker on April 3rd, 2006?

18   **A.**   At the same time.  I always did my notes like

19   almost always right away.

20   **Q.**   All right.  And under A/P written by and then your

21   name, do you see that section of this record?

22   **A.**   Yes.

23   **Q.**   First what does A/P mean?

24   **A.**   Assessment and plan.

25   **Q.**   Okay.  And the second thing there is it says

1    tinnitus, subjective.  Do you see that?

2    **A.**   Yes.

3    **Q.**   And does the designation "subjective" indicate

4    that this was something that was reported to you by

5    Mr. Hacker during the appointment?

6    **A.**   Yes.

7              **JUDGE RODGERS:**  Is that it, Mr. Brock?

8              **MR. BROCK:**  Yes, Your Honor.

9              **JUDGE RODGERS:**  All right.  Let's move on,

10   please.

11             Just for your reference, Mr. Hacker's depo

12   was scheduled to last 40 minutes, and we have now been

13   at -- we're at 70 minutes.

14             **MR. AYLSTOCK:**  We're behind, Your Honor.

15             Ms. Hutson is going to call Mr. Baker.

16             **JUDGE RODGERS:**  Okay.  I presume both sides

17   conferred about the schedule that I was given and how

18   long it would take for each witness?

19             **MR. AYLSTOCK:**  We did, Your Honor.

20             **JUDGE RODGERS:**  All right.  This is Mr.

21   Baker?

22             **MR. BROCK:**  Your Honor, one note on timing is

23   that I think we've got -- and we have discussed this

24   and I just want to let you know.  Our examination of

25   Mr. Myers, the corporate witness, we have two hours

```
 1   set aside for that.  We think our examination will be
 2   30 minutes or less, so we'll be able to make up some
 3   time there.
 4           JUDGE RODGERS:  Very good, very good.
 5           MS. HUTSON:  Would you like for the witness
 6   to be sworn in, Your Honor?
 7           JUDGE RODGERS:  Yes.  Do we have -- oh, there
 8   he is.  Yes.
 9           Mr. Baker, could you state your full name.
10           THE WITNESS:  Yes, ma'am.  Lloyd Baker.
11           JUDGE RODGERS:  Mr. Baker, would you please
12   rise and raise your right hand to be sworn.
13       LLOYD BAKER, PLAINTIFF WITNESS, DULY SWORN
14           JUDGE RODGERS:  Mr. Baker, if you would be
15   seated.  Please let us know if you encounter any
16   technical problems on your end that maybe we're not
17   aware of.  I want to make sure that you hear
18   everything and hopefully see everything.
19           Please spell your last name for the record.
20           THE WITNESS:  Baker.
21           JUDGE RODGERS:  All right, thank you.
22           Ms. Hutson, go ahead.
23                     DIRECT EXAMINATION
24   BY MS. HUTSON:
25   Q.  Good morning, Mr. Baker.  How are you?  Can you
```

1    hear me okay?

2    **A.**   You got a little muffled at the end there, but

3    yes, I can hear you.

4    **Q.**   Great.  How old are you, Mr. Baker?

5    **A.**   38.

6    **Q.**   And when did you enlist in the Army?

7    **A.**   May of 2005.

8    **Q.**   And how many years were you in the Army?

9    **A.**   Active duty four years and then another two years

10   in reserves.

11   **Q.**   While you were in the Army, what's the highest

12   rank that you reached?

13   **A.**   That would be E5, a sergeant.

14   **Q.**   Thank you for your service, Mr. Baker, and thank

15   you for being here today.

16        Do you understand that you're here today to

17   testify about where and when your hearing injuries

18   occurred while you were in the military?

19   **A.**   Yes, ma'am.

20   **Q.**   Prior to today's testimony, you've given other

21   testimony in the form of two depositions -- one in

22   July of 2020 and one in December of 2020.  Do you

23   recall that?

24   **A.**   Yes, I do.

25   **Q.**   In between those two depositions, Mr. Baker, did

1   you find some documents that you were not aware that

2   you had?

3   **A.**   Yes, ma'am, I did.

4   **Q.**   Did those documents help refresh your memory as to

5   the timeline that we're here to talk about today?

6   **A.**   Yes, they did.

7   **Q.**   Tell us how.

8   **A.**   They were transition paperwork for end processes

9   -- *(inaudible)* -- different places that I was at, and

10   it better narrowed down the timeline of when I was at

11   what base.

12   **Q.**   Thank you, Mr. Baker.  Now, let's jump into the

13   timeline.  When was the first time that you were

14   issued the Combat Arms Earplugs?

15   **A.**   I don't recall specifically at what time.  I do

16   remember that it was at Fort Benning in 2005.

17   **Q.**   And what were you doing at Fort Benning while you

18   were there?

19   **A.**   Basic training -- I'm sorry, did --

20   **Q.**   Go ahead.

21   **A.**   Basic training, airborne training, and I went to

22   ranger indoctrination program.

23   **Q.**   Did you use the Combat Arms while you were at Fort

24   Benning, Georgia?

25   **A.**   No, I did not.

1   **Q.**   Where did you go after Fort Benning?

2   **A.**   After Fort Benning, I went to Fort Lewis.

3   **Q.**   And that's in Washington, correct?

4   **A.**   Yes, ma'am.

5   **Q.**   Did your job responsibilities change when you went

6   to Fort Lewis?

7   **A.**   Yes, ma'am.  I went from a training environment to

8   actually doing my job that I was trained for at my

9   unit.

10  **Q.**   And what job were you trained for?

11  **A.**   I was an infantryman.  That's kind of a

12  jack-of-all-trades.  But the position that I was

13  assigned to was 240 machine gunner.

14  **Q.**   And how long were you at Fort Lewis?

15  **A.**   From December 2005 to I believe it was August of

16  2006.

17  **Q.**   And at some point in your -- while you were

18  stationed at Fort Lewis, did you get another pair of

19  Combat Arms?

20  **A.**   I did.

21  **Q.**   Did you use the Combat Arms Earplugs while you

22  were stationed at Fort Lewis?

23  **A.**   I did.

24  **Q.**   Now, what I want to do now, Mr. Baker, is kind of

25  compare the training that you were doing at Fort

1    Benning to the training in Fort Lewis.  And I guess

2    the best way to ask that is for you to describe for us

3    the training that you were doing once you got to Fort

4    Lewis.

5    **A.**  So, when I first got to Fort Lewis, we started

6    right into urban type training.  The unit that I was

7    transferred to had just -- *(inaudible)* -- before me

8    and they --

9         **JUDGE RODGERS:**  Wait, he's going to have

10   to --

11        Mr. Baker, I'm sorry, we're not hearing you.

12   You trailed off so I missed -- you were beginning to

13   discuss, I believe, the urban training.  I'm not sure

14   what the issue is.

15        Thao, any idea?

16        **THE WITNESS:**  I can try and move in a little

17   closer to the mic, if that will work.

18        **JUDGE RODGERS:**  That seems to be helping.

19   Thank you.  If you will start again about the

20   beginning of your training at Fort Lewis.

21        **THE WITNESS:**  Right.  The unit that I was

22   transferred to had just gotten back from a deployment,

23   a very long deployment in Mosul.  And they wanted to

24   retain some of that knowledge, so that was something

25   we focused on for that first month I was there.

1          We did shoot-houses, and then that culminated

2    with a field training exercise at a larger urban

3    training mock city.

4          I was a 240 gunner until about -- I believe

5    it was sometime the -- *(inaudible)* -- of May when I

6    went to the Stryker driver's training course.  After

7    that, I was a Stryker driver until halfway through my

8    deployment in Iraq, which was in -- I believe that was

9    in 2008.  So I spent a fair amount of time on the

10   Stryker.  But that was basically most of what I did

11   while I was at Fort Lewis.

12   **BY MS. HUTSON:**

13   **Q.**  What I would like to stay focused on for the

14   moment, Mr. Baker, is the weaponry that you used while

15   you were doing your training at Fort Lewis and the

16   noise exposure that you had at Fort Lewis.

17        Can you describe that for us?  When you're saying

18   urban warfare, what types of noises are you exposed to

19   in that setting?

20   **A.**  So, during urban training exercise, the field

21   training exercise that all that urban training

22   culminated in, there were, like, room clearing, which

23   we used flash bang grenades -- *(inaudible)* --

24   **Q.**  Mr. Baker, did you say flash hand grenades?

25   **A.**  They were flash bang.  They're a grenade but

1    they're for room entry.

2    **Q.**  Go ahead.

3    **A.**  And then gunfire enclosed inside of buildings.

4    And it's -- it's kind of difficult to describe.  It's

5    different than the normal two-dimensional landscape.

6    **Q.**  Prior to this urban training that you received

7    when you arrived at Fort Lewis, had you ever been

8    exposed to noises at that level?

9    **A.**  No.  Being a 240 gunner, it's a very loud weapon

10   system to begin with.  But when you start to fire that

11   from a covered, concealed position that's inside a

12   building like shooting from a window, it's very loud,

13   it's very concussive.  Even with blanks it's extremely

14   loud.  So there had been nothing up to that point that

15   I had experienced quite like that.

16   **Q.**  Now, Mr. Baker, do you currently suffer from

17   hearing loss and ringing of the ears or tinnitus?

18   **A.**  I do.

19   **Q.**  Are you claiming both of those injuries in this

20   case?

21   **A.**  I am.

22   **Q.**  What I'd like to ask you, Mr. Baker, is, when was

23   the first time you noticed these changes in your

24   hearing?

25            **JUDGE RODGERS:**  Can we keep them separate,

1    please?

2         **MS. HUTSON:**   Certainly, absolutely.

3    **BY MS. HUTSON:**

4    **Q.**   Let me break that down, Mr. Baker.  When was the

5    first time that you noticed hearing loss?

6    **A.**   The first time I noticed temporary -- are you

7    talking about temporary or permanent hearing loss?

8    **Q.**   You can describe it however it occurred to you.

9    **A.**   Okay.  So, while I was in this urban training,

10   firing from inside, I had very muffled hearing and

11   ringing in my ears.  I had never experienced any sort

12   of hearing loss like that, even temporarily.  While

13   that did subside to a certain extent, the tinnitus did

14   not go away.

15   **Q.**   And, if you could, reorient us at the time frame

16   of when these changes in your hearing were noticed by

17   you.

18   **A.**   So, the first time I noticed that the tinnitus

19   wasn't going away was when I was staying at a friend's

20   apartment early on the next month.  He had a very

21   quiet apartment.  It was a newer home compared to the

22   older barracks that I was staying in, so the heating

23   system wasn't as loud.  So it was -- it was dead

24   quiet, and it was the first time I had been in dead

25   quiet since then, and it was probably about a week

1  after the training event, maybe a little bit more.  It

2  kind of kept me up during the night, so I remember

3  that being the first time that I really noticed that

4  the tinnitus wasn't going away.

5  Q.  Fair enough.  And where were you -- when you say

6  your friend's apartment, where was that located?

7  A.  I don't remember the specific address, but it was

8  off base.  He had a -- he was married, so he was

9  allowed to have a home off base.

10  Q.  Were you still in Fort Lewis?

11  A.  Yes, it was in Fort Lewis.

12  Q.  Do you associate the hearing loss that you have

13  today to the training that you received in Fort Lewis?

14  A.  Yes.  That was the first time I had experienced

15  permanent tinnitus and hearing loss -- muffled hearing

16  loss, even temporarily, at that level, up to that

17  point.

18  Q.  In this case, Mr. Baker, Dr. Packer did an

19  evaluation of you.  Do you remember that?

20  A.  Yes.

21  Q.  And he's going to testify later today.  But my

22  question to you is:  Did you report everything you

23  just described to us to Dr. Packer?

24  A.  Yes.

25  Q.  I'm referring to the timing of the noise exposure

1    as well as the timing of both hearing loss and

2    tinnitus.  Did you report that to Dr. Packer?

3    **A.**   Yes.

4    **Q.**   Now, I have a very important question for you, Mr.

5    Baker.  During the time you were doing these training

6    exercises, did you wear hearing protection?

7    **A.**   I did.

8    **Q.**   Did you always wear hearing protection?

9    **A.**   I did.

10   **Q.**   What kind of hearing protection did you wear when

11   you were performing these training exercises in Fort

12   Lewis?

13   **A.**   I used the Combat Arms Earplugs.

14   **Q.**   And when you were performing these field training

15   exercises, which end of the plug did you use?

16   **A.**   I used the yellow end to enhance my situational

17   awareness.

18   **Q.**   Now, while you were at Fort Lewis and you noted

19   this difference in your hearing, did you ever complain

20   to anyone about that?

21   **A.**   No, I did not.

22   **Q.**   Can you tell us why?

23   **A.**   So, our training was -- it was high paced, it was

24   constant, and -- *(inaudible).*  There wasn't any time

25   to really stop and get assessed, first off.  And

1    second, there is a bit of the military culture,

2    especially in combat arms, is that, if you're injured

3    or something but it's not serious, it's not life,

4    limb, or eyesight, you just suck it up and keep going,

5    because you can't call timeout just because your

6    hearing is muffled or you have tinnitus.  So --

7    **Q.**   After you were stationed at Fort Lewis, did you

8    then go to both Germany and Iraq?

9    **A.**   Yes, I did.

10   **Q.**   Did you have an event in Iraq where you had to

11   pull out your hearing protection and then had to shoot

12   a couple of rounds?

13   **A.**   Yes, that did occur.

14   **Q.**   I would like for you to put that in your own words

15   as far as what that event was.

16   **A.**   We were on a patrol, and we had stopped at a

17   location for a key leader engagement.  I was pulling

18   security outside of a building, and some -- the person

19   that I was with said something but I couldn't hear, so

20   I pulled my left earplug out so I could hear them a

21   little bit better.  And at that time, there was one or

22   two gunshots from down the alley I was facing.  I

23   didn't exactly see what happened, but I returned fire

24   as quickly as I could, two shots, and then took cover

25   and replaced my earplug and then reassessed the

1    situation.

2    **Q.**  Did you say that was in Iraq after Fort Lewis?

3    **A.**  Yes, ma'am.  That was in -- I believe that was

4    early 2008.

5    **Q.**  By the time that incident had occurred, had you

6    already noticed the injuries or the changes in your

7    hearing?

8    **A.**  Yes.

9    **Q.**  There has been suggestion in this case that your

10   hearing could have been compromised or the injuries

11   actually occurred while you were in Iraq and in part

12   because of this incident.  Is that possible?

13   **A.**  No.  I had already experienced those prior to this

14   event.

15   **Q.**  As you sit here today, Mr. Baker, do you have any

16   reason to believe that your hearing loss and the

17   changes in your hearing occurred anywhere other than

18   Fort Lewis, Washington?

19   **A.**  No.

20   **Q.**  Are you certain?

21   **A.**  Yes.

22        **MS. HUTSON:**  Pass the witness.

23        **JUDGE RODGERS:**  All right.  Thank you.

24        Mr. Wasdin?

25        **MR. WASDIN:**  Yes, Your Honor.  My colleague

1    is going to bring binders up to the Court.

2              **JUDGE RODGERS:**  Okay.

3              **MR. WASDIN:**  Your Honor, I believe the

4    binders have our choice of law exhibit numbers as the

5    tab numbers, so 40, 41, et cetera, and I will refer to

6    those throughout the exam.

7              **JUDGE RODGERS:**  Okay.  I just need to make

8    sure that you get with Ms. Simms after the hearing to

9    make sure we have the exhibits marked properly for the

10   record.

11             **MR. WASDIN:**  I can also put in along the way

12   where they appear in the broader case record as an

13   exhibit, one thing or another, if that's helpful.

14             **JUDGE RODGERS:**  I just need to know how

15   they're going to be identified for this hearing.  Tab

16   No. 40 I just turned to and the first exhibit says 50

17   -- oh, I see.  I stand corrected.  I see the COL at

18   the bottom.  Okay, I've got it.

19             **MR. WASDIN:**  COL DX 40, COL DX 41.

20             **JUDGE RODGERS:**  Okay, you're good.

21                      **CROSS-EXAMINATION**

22   BY MR. WASDIN:

23   **Q.**  Mr. Baker, can you hear me?

24   **A.**  Yes.

25   **Q.**  My name is Nick Wasdin.  I represent 3M, and I'm

 1    going to ask you some follow-up questions.

 2        First, I want to get the timeline right after you

 3    left Fort Lewis in Washington.

 4        It's my understanding that you left Fort Lewis in

 5    Washington in August of 2006 and at that time went to

 6    Germany.  Is that right?

 7    **A.**   Yes.

 8    **Q.**   And then you were in Germany from August 2006 to

 9    September 2007 when you went to Iraq, right?

10    **A.**   That is correct.

11    **Q.**   You were in Iraq from September 2007 to November

12    2008, correct?

13    **A.**   Yes.

14    **Q.**   And then, after leaving Iraq in November 2008, you

15    went back to Germany; is that right?

16    **A.**   Yes.

17    **Q.**   And then you were in Germany that additional time

18    from November of 2008 to October of 2009, right?

19    **A.**   Yes.

20    **Q.**   And that's when you came back to the States?

21    **A.**   Yes.

22    **Q.**   Now, you testified earlier that you first noticed

23    your hearing loss in connection with an urban warfare

24    training event in Fort Lewis in December of 2005.  Is

25    that correct?

1    **A.**   That is correct.

2    **Q.**   And I think you said you noticed -- you first

3    noticed your tinnitus about a week later at a friend's

4    apartment; is that right?

5    **A.**   Yes.

6    **Q.**   All right.  I want to then put that to the side

7    for a second and focus on the noise exposures you had

8    after that time period from the 2006 to 2012 time

9    period.  Are you with me?

10   **A.**   Yes.

11         **MR. WASDIN:**   Donnie, could we pull up Choice

12   of Law Defense Exhibit 43.

13   **BY MR. WASDIN:**

14   **Q.**   Mr. Baker, can you see that document on your

15   screen?

16   **A.**   Yes, I can.

17   **Q.**   Do you recognize this as your third supplemental

18   responses to some interrogatories in this lawsuit?

19   **A.**   Yes.

20         **MR. WASDIN:**   And, Donnie, if you can go to

21   page 36 of those.  A different callout, Donnie, page

22   36, Interrogatory No. 30 at the bottom.

23   **BY MR. WASDIN:**

24   **Q.**   Interrogatory No. 30 asked you to describe each

25   instance you wore the CAEv2 and then the circumstances

1    around that.  Do you see that?

2    **A.**   Yes.

3         **MR. WASDIN:**   And if you flip the page,

4    Donnie, to 37, there is an answer.  And I want to

5    focus on the big paragraph in the middle that says "to

6    the best of my recollection."

7    **BY MR. WASDIN:**

8    **Q.**   Mr. Baker, this paragraph of your response to

9    Interrogatory No. 30 describes noise exposures you

10   experienced with the Combat Arms Version 2 from the

11   2006 to 2012 time period.  Is that right?

12   **A.**   Yes.

13   **Q.**   And what you said here is that, to the best of

14   your recollection, from 2006 to 2012, while wearing

15   the Combat Arms Version 2, I would have been exposed

16   to noise from various machinery, aircraft, weapons,

17   and explosives, including aircraft, helicopters and

18   various armored vehicles, right?

19   **A.**   Yes.  I lost the document.

20   **Q.**   We'll put it back up.

21   **A.**   Yes, that is what it says.

22   **Q.**   You go on, during that time period, "I recall

23   wearing the CAEv2 under the following circumstances:

24   Riding in a UH60 Black Hawk helicopter, M1151 Humvee,

25   the M1126 Stryker infantry carrier vehicle, while

```
 1    operating an M16A4 rifle live rounds and blanks, M4
 2    carbine live rounds and blanks, M2 .50 caliber machine
 3    gun, automated fire remote controlled top-mounted .50
 4    caliber machine gun on Stryker ICV, manual fire from a
 5    .50 cal machine top-mounted machine gun, Mark 19
 6    grenade machine gun practice grenade rounds, M9
 7    pistol --
 8            JUDGE RODGERS:  Mr. Wasdin, I can read all of
 9    that.
10    BY MR. WASDIN:
11    Q.  Mr. Baker, let me give you a better question.
12    Does this paragraph accurately describe the noise
13    exposures you had from 2006 to 2012 while wearing the
14    Combat Arms Version 2?
15    A.  Yes.
16    Q.  And during that time period, sir, you were in --
17    at least from 2006 to 2009, you were in Iraq and
18    Germany, correct?
19    A.  Fort Lewis, Germany, yes.
20    Q.  Let's turn to some documents from prior to this
21    lawsuit that you've looked at in some of your
22    depositions to date.  You're familiar with something
23    called a compensation and pension exam, correct, sir?
24    A.  Was that the VA compensation?
25    Q.  That's right, yeah.
```

1          **MR. WASDIN:**  Donnie, can we pull up Choice of

2     Law Defense Exhibit 45.

3     **BY MR. WASDIN:**

4     **Q.**  Mr. Baker, do you recognize this as the

5     compensation and pension exam that you submitted to in

6     connection with your VA disability application?

7     **A.**  Yes.

8     **Q.**  This describes an examination that occurred on

9     October 16th, 2009, correct?

10    **A.**  That is correct.

11         **JUDGE RODGERS:**  Mr. Wasdin, this is an

12    exhibit to Mr. Baker's deposition.  Is it otherwise

13    marked separately as an exhibit for Choice of Law, or

14    are we just going to refer to it as Exhibit 17 to his

15    depo?

16         **MR. WASDIN:**  I was referring to it -- Your

17    Honor, I appreciate the confusion.  I was referring to

18    it today as Choice of Law Defense Exhibit 45.

19         **JUDGE RODGERS:**  Oh, is it marked as 45?  I

20    don't see it marked on that document.  Oh, I see, it's

21    in your -- okay, I see it now.

22         **MR. WASDIN:**  I'm sorry, Your Honor.  I think

23    we scrambled this morning to get those on for the

24    Court.

25         **JUDGE RODGERS:**  That's fine.  I'm following

1    you.  I'll keep asking if I'm confused, but I'm no

2    longer confused.  Go ahead.

3    **BY MR. WASDIN:**

4    **Q.**  Mr. Baker, I think I just asked you, but to pick

5    back up where I left off, this describes as

6    examination that occurred on October 16th, 2009,

7    correct?

8    **A.**  That is correct.

9    **Q.**  And at that time you were seeking to apply for VA

10   disability benefits, right?

11   **A.**  Yes.

12   **Q.**  You were trying to give accurate information

13   during this examination, right?

14   **A.**  Yes.

15   **Q.**  If you look to the bottom of the page, there is a

16   section called "Medical History."  Do you see that?

17   **A.**  Yes.

18   **Q.**  And it's calling for a history of military

19   occupational and/or recreational noise exposure,

20   right?

21   **A.**  Yes.

22   **Q.**  It says, "Military.  Infantry four years.  Served

23   in Iraq 1 year 3 months, around machine gunfire,

24   explosions, and loud noises."  Did I read that

25   correct?

1    **A.**   That is correct.

2    **Q.**   Anything about an urban warfare training in that

3    paragraph, sir?

4    **A.**   No.

5    **Q.**   Okay.  If you go to the next page, there is a

6    question that says, "Date and circumstances of

7    tinnitus onset."  Do you see that?

8    **A.**   Yes.

9    **Q.**   Okay.  You were asked basically when your tinnitus

10   started, right?

11   **A.**   I assume so, yes.

12   **Q.**   And what it says here is, quote, "When I got back

13   from Iraq last year," correct?

14   **A.**   That's what it says.

15   **Q.**   Now, after you submitted to this exam when you

16   were seeking compensation from the VA, the VA ended up

17   rendering a ratings decision for you, right, sir?

18   **A.**   Yes.

19   **Q.**   You're familiar with the decision they rendered,

20   correct?

21   **A.**   Yes.

22          **MR. WASDIN:**   Donnie, can we pull up Choice of

23   Law Defense Exhibit 44.

24   **BY MR. WASDIN:**

25   **Q.**   Mr. Baker, do you recognize this as documents from

1   the VA related to your disability decision?

2   **A.**   Yes.

3            **MS. HUTSON:**   I'm going to object, Your Honor,

4   I don't see how this goes to the scope and location of

5   where he was when the injuries occurred.

6            **JUDGE RODGERS:**   Mr. Wasdin, what is the

7   relevance of this document?

8            **MR. WASDIN:**   It says where his injury

9   occurred.

10           **JUDGE RODGERS:**   I'm not seeing it.

11           **MR. WASDIN:**   I'll direct him there.

12           **JUDGE RODGERS:**   Okay.

13           **MR. WASDIN:**   If you can turn, Donnie, to

14   Baker VA 1642 at the bottom.

15           **JUDGE RODGERS:**   Is this still a part of that

16   same exhibit?

17           **MR. WASDIN:**   It is, Your Honor.

18   **BY MR. WASDIN:**

19   **Q.**   Mr. Baker, this is a letter from the VA dated

20   December 11th, 2009, correct?

21   **A.**   That is correct.

22           **MR. WASDIN:**   Donnie, if you'll go one more

23   page, there is a section called "Reason for decision."

24   **BY MR. WASDIN:**

25   **Q.**   Do you see that, Mr. Baker?

1    **A.**   Yes.

2    **Q.**   It says here, "Service connection for tinnitus is

3    granted," right, Mr. Baker?

4    **A.**   That is what it says.

5    **Q.**   "Service treatment records fail to show complaints

6    of, treatment for, or a diagnosis of tinnitus in

7    service."  Did I read that right?

8    **A.**   Yes.

9    **Q.**   And then the next paragraph says, "During the VA

10   examination from Charleston VAMC conducted on October

11   16th, 2009, you reported hazardous exposure to machine

12   gunfire, explosions, and engine noise, and the onset

13   of tinnitus following your return from Iraq," correct?

14   **A.**   Yes.

15   **Q.**   It doesn't say anything about an urban warfare

16   training in 2005, does it, sir?

17   **A.**   No, it does not.

18   **Q.**   Are you familiar -- when you were in the military,

19   did you submit to periodic health assessments?

20   **A.**   Yes, I did.

21   **Q.**   Let's take a look at one of those.

22           **MR. WASDIN:**  Donnie, can you pull up Choice

23   of Law Defense Exhibit 47.

24   **BY MR. WASDIN:**

25   **Q.**   Mr. Baker, do you recognize this as one of your

1    periodic health assessments?

2    **A.**  I believe so.  It's a little fuzzy.

3          **MR. WASDIN:**  Donnie, can you pull up Mr.

4    Baker's name in the top left of the document.

5          **THE WITNESS:**  Yes.

6    **BY MR. WASDIN:**

7    **Q.**  If we turn to page which ends in DoD 000198, there

8    are some signatures at the bottom.  And if Donnie will

9    blow them up, I think you'll see that the date of

10   those signatures is February 10th, 2012.

11       You see those dates, Mr. Baker?

12   **A.**  Yes.

13         **MR. WASDIN:**  And then, Donnie, if we can flip

14   back to the age ending in 192.

15   **BY MR. WASDIN:**

16   **Q.**  There is a question that was filled out during

17   this periodic health assessment; it's question No. 5.

18   And the question was:  "Are you currently receiving

19   any VA disability, Workmen's Compensation, or other

20   type of compensation for health or physical reasons?"

21   And it's checked "Yes," right, sir?

22   **A.**  Yes.

23   **Q.**  And then there's soldier's comments, and they say,

24   "10 percent hearing loss, left ear."  Am I reading

25   that right?

1    **A.**   Yes.

2    **Q.**   Did you report during this periodic health

3    assessment that you were receiving a disability for

4    hearing loss in your left ear?

5    **A.**   That's what it says.

6    **Q.**   Okay.  Beneath that, provider comments.  They

7    state, "Noise induced, 2007 to 2008."  Did I read that

8    right?

9    **A.**   Yes.

10   **Q.**   Where were you at in 2007 and 2008, Mr. Baker?

11   **A.**   Germany and Iraq.

12   **Q.**   In 2012, sir, you applied to work for a private

13   security contractor named Triple Canopy; is that

14   right?

15   **A.**   That is correct.

16   **Q.**   And during that application process you underwent

17   a series of medical examinations; is that fair?

18   **A.**   Yes.

19   **Q.**   Let's take a look at one of those.

20          **MR. WASDIN:**   Donnie, can we put up Choice of

21   Law Defense Exhibit 40.

22   **BY MR. WASDIN:**

23   **Q.**   Mr. Baker, do you recognize this document as the

24   Patient Registration Consent Form that you filled out

25   in connection with your application to Triple Canopy?

1    **A.**   Yes.

2    **Q.**   If you look at the text there, the middle

3    paragraph, there is a paragraph that starts out

4    "Pursuant to LSA R.S."  Do you see that?

5    **A.**   Yes.

6    **Q.**   That paragraph says, "I understand that the

7    failure to answer truthfully any questions related to

8    my health history or current condition may result in a

9    denial of any right I or my dependents may have to

10   Workers' Compensation benefits."

11        Did I read that right?

12   **A.**   Yes.

13   **Q.**   Okay.  And then, at the bottom of that same page,

14   you went ahead and signed this document, right?

15   **A.**   Yes.

16        **MR. WASDIN:**  First page, Donnie.

17        **THE WITNESS:**  Yes.

18   **BY MR. WASDIN:**

19   **Q.**   That's your signature?

20   **A.**   Yes.

21   **Q.**   And the date on that is February 23rd, 2012; is

22   that right?

23   **A.**   Yes.

24   **Q.**   If we turn to the third page of this document that

25   ends in LB0181, there is a question near the bottom

1    that you answered that says, "Are you now or have you

2    ever been exposed to loud noises on the job?"  And you

3    put, "Yes," didn't you, sir?

4    **A.**   Yes.

5    **Q.**   And then you were given the opportunity to

6    actually write in a description of when and where that

7    occurred, right?

8    **A.**   Yes.

9    **Q.**   And what you wrote was, "In the military, Iraq,

10   '07 to '08," right?

11        I think we lost you.  Did you say yes, Mr. Baker?

12   **A.**   Yes, I did.

13   **Q.**   You didn't put anything in this document about

14   urban warfare training in 2005, did you?

15   **A.**   No, because that's a very specific thing to --

16   *(inaudible)* -- question.

17   **Q.**   Mr. Baker, when you started participating in this

18   lawsuit, you were given the opportunity to fill out a

19   form called an initial census, weren't you?

20   **A.**   Yes.

21   **Q.**   All right.  Let's take a look at that.

22        **MR. WASDIN:**   Donnie, can you pull up side by

23   side, if you can, on the same screen Choice of Law

24   Defendant's Exhibit 41 and 42.

25   **BY MR. WASDIN:**

1   **Q.** Mr. Baker, do you recognize these two exhibits, 41

2   and 42 as -- 41 is your initial census form and then

3   42 is the declaration you provided with that form; is

4   that right?

5   **A.** Yes.

6   **Q.** You understood when you signed the declaration

7   that you were swearing to the truth of the answers you

8   gave in the census form, right?

9   **A.** Yes.

10          **MR. WASDIN:** Donnie, if we can go on Choice

11   of Law Defendant's Exhibit 41 to question 6 -- 6,

12   yeah, I think we need to start there.

13   **BY MR. WASDIN:**

14   **Q.** Mr. Baker, question 6 asked you to identify the

15   physical injuries you sustained as a result of using

16   the Combat Arms Version 2, right?

17   **A.** Yes.

18   **Q.** And here you've checked partial hearing loss in

19   your left ear and then tinnitus in both ears, right?

20   **A.** Yes.

21   **Q.** And then, if you go down to question 7, it asked

22   you to identify the approximate year on which you

23   first noticed, and then for B, it was the injury

24   described in question No. 6 above. Do you see that?

25   **A.** Yes.

1   **Q.**   Now, for all of those injuries, the hearing loss

2   and the tinnitus in both ears, what you put was 2007,

3   right, sir?

4   **A.**   Yeah.  I was making a roundabout guess for those.

5   **Q.**   Where were you in 2007, sir?

6   **A.**   Germany and Iraq.

7   **Q.**   And when you say you were making a roundabout

8   guess --

9        **MR. WASDIN:**  If we can go back a page,

10   Donnie, to question No. 4.

11   **BY MR. WASDIN:**

12   **Q.**   In the exact same document you actually had to

13   give us the dates of where you were at over time in

14   the military, right?

15   **A.**   Yes.

16   **Q.**   And you listed, in response to that question, your

17   time at Fort Lewis, right?

18   **A.**   Right.

19   **Q.**   So you knew -- I mean, when you got to question

20   seven, it wasn't like you were confused about when you

21   were at Fort Lewis, right?

22   **A.**   I'm sorry, can you say that again?

23   **Q.**   When you were filling out the initial census, you

24   understood the dates that you were at Fort Lewis,

25   correct?

1    **A.**   Yes.

2    **Q.**   And you understood the dates that you were in

3    Germany and Iraq, right?

4    **A.**   Yes.

5    **Q.**   And when you went to go tell us, under penalty of

6    perjury, when the tinnitus started, you chose the time

7    period that you were in Iraq and Germany, right?

8         Did you say yes, Mr. Baker?  You cut out?

9    **A.**   Yes, I made a roundabout guess as to the year.  I

10   didn't remember specifically at the time.

11   **Q.**   Okay.  Over the course of your participation in

12   this lawsuit, you've supplemented your interrogatory

13   responses a number of times.  Is that a fair

14   statement?

15   **A.**   Yes.

16        **MR. WASDIN:**   Donnie, can we pull back up

17   Choice of Law Defendant's Exhibit 43.

18   **BY MR. WASDIN:**

19   **Q.**   This one in particular, Mr. Baker, is your third

20   supplemental objections in responses to the

21   interrogatories, right?

22   **A.**   Yes.

23   **Q.**   This one is dated July 20th, 2020, right?

24   **A.**   Oh, yes, there it is.

25   **Q.**   Do you happen to remember -- and I would forgive

1    you if you didn't, but that's I think the day before

2    or the same day as the first deposition you gave in

3    the case?

4    **A.**   Yes, I believe, I believe -- I don't remember the

5    -- I do remember it was in July.

6    **Q.**   That's fine.  Now, like all the various

7    interrogatory answers we have gotten from you in the

8    case, this one ends on the final page with a

9    verification that you signed swearing to the accuracy

10   of the answers in the document, right, sir?

11   **A.**   Yes.

12   **Q.**   There you go, Mr. Baker.  Do you see that?

13   **A.**   Yes.

14          **MR. WASDIN:**   Donnie, if we can go to

15   Interrogatory No. 23.

16   **BY MR. WASDIN:**

17   **Q.**   One of the questions that you answered in the

18   interrogatories was to, "Describe all injuries,

19   including head injuries, that you sustained during

20   your military service, including the date that you

21   sustained the injuries and the circumstances

22   surrounding those injuries."

23          Did I read that right?

24   **A.**   Yes.

25   **Q.**   And if you flip the page, you answered that with a

1   chart.  Do you see the chart at the top there, Mr.

2   Baker?

3   **A.**   Yes.

4   **Q.**   Okay.  And in this chart at least you were dating

5   the date you sustained your hearing loss and tinnitus

6   to 2009 or 2010.  Is that what it says?

7   **A.**   That is what it says, but that's not when it

8   occurred.

9   **Q.**   Okay.  Now, after you submitted these

10  interrogatories on July 20th, 2020 -- I'm now looking

11  at my notes, and it looks like the next day, July

12  21st, 2020, is when you gave your deposition in the

13  case.

14         **MR. WASDIN:**   Donnie, if we could pull up Mr.

15  Baker's deposition, and if we could go to page 117,

16  lines 6 to 13.

17  **BY MR. WASDIN:**

18  **Q.**   You were asked the question:  "Was there a

19  specific event that precipitated it?

20        And "it" here -- we can scroll up -- is related to

21  your tinnitus.

22        And the answer you gave during your deposition

23  was:  "No.  I just remember noticing it for the first

24  time at a friend's apartment where I was sleeping over

25  and it was super quiet and I couldn't get to sleep

1    because there was ringing in my ears.  It was not as

2    much as it is now, but it was faint enough to keep me

3    up."  Did I read that right?

4    **A.**  Yes.

5    **Q.**  Didn't mention anything about a specific urban

6    warfare training at Fort Lewis when you answered that

7    question, did you, sir?

8    **A.**  I don't recall being asked that question.

9    **Q.**  Okay.

10            **MR. WASDIN:**  Donnie, can we pull up

11   Choice-of-Law Defense Exhibit 46.

12   **BY MR. WASDIN:**

13   **Q.**  That takes us to your fourth supplemental

14   interrogatory responses.  Do you see these, Mr. Baker?

15   **A.**  Yes.

16   **Q.**  The date of these is December 15th, 2020.  Do you

17   see that?

18   **A.**  Yes, I do.

19   **Q.**  Did you know on December 15th, 2020, that the

20   hearing conservation program manager Kevin Hannah had

21   given a deposition on December 14th, 2020?  He was the

22   conservation program manager at Fort Benning where you

23   joined.

24   **A.**  I believe that we had spoken that he was supposed

25   to give a deposition, but I wasn't aware of the date

1   when it happened.

2   Q.   Okay.  In any event, these are dated December

3   15th.

4        And if we can go to Interrogatory No. 23 here,

5   same question we looked at last time, right?

6   "Describe all injuries, including head injuries, that

7   you sustained during your military service including

8   the date that you sustained the injuries and the

9   circumstances surrounding those injuries."

10       Do you see that question, Mr. Baker?

11  A.   Yes.

12  Q.   And then here on December 15th, just a few weeks

13  ago, really --

14       MR. WASDIN:   If we can go to the answer,

15  Donnie.

16  BY MR. WASDIN:

17  Q.   -- this is where we got the date of January 2006

18  for both of those injuries.  Is that what this says?

19  A.   Yes.

20  Q.   Okay.  And then today I believe you came to court

21  and you took it back even a month further to December

22  of 2005 as the time period of the urban warfare

23  training you described at Fort Lewis, right, sir?

24  A.   What was the date you said?  You were muffled.

25  Q.   I said this interrogatory response tells us that

1    the date of onset, at least as of December 15th, 2020,

2    you were saying was January 2006, right?

3    **A.**   That is what it says.

4    **Q.**   And then I was following up that today, just to

5    the clear, I think you told the Court that it actually

6    happened in December of 2005.

7    **A.**   I'm not sure what you're asking.

8    **Q.**   When did you say earlier in your testimony today

9    that you first noticed your hearing loss?

10   **A.**   I first noticed hearing loss in late December

11   2005.

12   **Q.**   Okay.

13           **JUDGE RODGERS:**   Mr. Wasdin, you all agreed

14   together that this testimony would take 40 minutes,

15   and you've used 30 of those 40 minutes.  So I'm going

16   to ask you to wrap up.

17           **MR. WASDIN:**   Sure, yes, Your Honor.

18   **BY MR. WASDIN:**

19   **Q.**   Let me ask you two more questions, Mr. Baker.

20           **JUDGE RODGERS:**   Brief questions.

21   **BY MR. WASDIN:**

22   **Q.**   Do you have any memory of ever telling anyone

23   about the symptoms you experienced during the urban

24   training exercise prior to this litigation?

25   **A.**   Specifically from the urban training or in

1   general?  Which one are you asking?

2   **Q.**  Specifically from the urban training exercise that

3   you did in 2005 at Fort Lewis, do you have any memory

4   of ever telling anyone about the symptoms you

5   experienced during that training prior to this

6   litigation?

7   **A.**  I don't have any memory of being asked.

8   **Q.**  Okay.  That's not what I asked you, though.

9       Do you have any memory of ever telling anyone

10  about the symptoms you experienced during the urban

11  warfare training in December of 2005 prior to this

12  litigation?

13  **A.**  No, I don't recall.

14          **MR. WASDIN:**  Thank you.

15          **JUDGE RODGERS:**  Thank you.

16          Ms. Hutson?

17                **REDIRECT EXAMINATION**

18  BY MS. HUTSON:

19  **Q.**  Mr. Baker, very quickly.  When we started our

20  direct examination, I talked about documents that you

21  found within the six months that help refresh your

22  memory.  Do you remember us talking about that?

23  **A.**  Yes, ma'am.

24  **Q.**  And I remember very clearly that, while you were

25  giving that answer, you were kind of coming in and

1    out.  So I would like for you to describe for us where

2    you got the documents and how it helped you with the

3    timeline as you've been giving them to anyone who

4    asked you, whether it was the VA, a physician, or in

5    the course of this litigation.

6    **A.**   Like you're asking how I came across the

7    documents?

8    **Q.**   Yes, yes, and how it helped you with the timeline,

9    please.

10   **A.**   So, they were -- they were stuck in a bin with a

11   bunch of old coats -- *(inaudible)* -- wool coat.  And I

12   came across them, and I noticed that they were my

13   permanent change of station -- *(inaudible)* --

14   processing paperwork, and it had some transfer orders

15   that was between Fort Benning and Fort Lewis and then

16   from Fort Lewis to Germany and then from Germany to

17   out.

18        So it more clarified some confusion as to when I

19   was in what place.  And then through that discussion

20   on trying to nail down the timeline a little bit

21   clearer for everyone, it refreshed my memory as to how

22   -- *(inaudible)*.  Because it was a very stressful and

23   tumultuous time moving around and training in my first

24   year of the Army.  It was rather difficult, so my

25   memory wasn't as clear at first.

1    **Q.**  As you have gone through this litigation and had

2    conversation after conversation, deposition after

3    deposition, discovery after discovery, have you had a

4    lot of time to think about the true evolution of where

5    you were and what prompters you had to alert you to

6    your hearing damages?

7    **A.**  Yes.  I've spent a lot of time trying to recall

8    and piece back together pieces of memories.  This was

9    quite a while ago and a difficult time, so my memory

10   wasn't very clear.

11       So, putting it -- taking the time looking at

12   documents, trying to refresh my memory, it's taken a

13   little bit of time, but it's -- *(inaudible)* --

14   **Q.**  You cut out there.

15   **A.**  I think that reviewing documents and trying to

16   work backwards through my memory, refreshing my

17   memory, I think we've been able to provide as clear as

18   I can up to this point.

19   **Q.**  Now, you were asked about this urban training as

20   if it didn't happen.  Let me go back to that for a

21   second.

22       In your very first deposition in July of last

23   year, 2020, did you tell 3M at that time that you did

24   field training?

25   **A.**  Yes.

1   **Q.**   Is urban warfare a type of field training?

2   **A.**   Yes, it was a field training exercise.  Urban is

3   the type of field training exercise it is.

4   **Q.**   Stay closer to the mic, Mr. Baker.  And I'm sorry

5   I cut you off.  What was the last part of that?

6   **A.**   I apologize.  Urban training was a field exercise.

7   Urban just says what type of field training it is.

8   **Q.**   And did you also tell 3M back in July that you did

9   exercises that were overnight training exercises?

10  **A.**   Yes.

11  **Q.**   And is that a type of warfare, urban warfare?

12  **A.**   Yes, I believe so.

13  **Q.**   Now, there were some questions asked of you about

14  applications to the VA and things like that.  Did you

15  have access to the documents that we were talking

16  about that you found in between July and December of

17  2020 at that time?

18  **A.**   No, I did not.

19  **Q.**   And when the document -- because of time I'm not

20  going to pull it back up.  But there was a document

21  that talked about 2009.

22       Mr. Baker, did you possibly interpret that 2009 to

23  be the diagnosis as opposed to the start of when you

24  noticed the injury?

25  **A.**   Yes, I believe so.  To my embarrassment, I kind of

1    didn't understand what the word "onset" means until

2    fairly recently, so there was a little bit of

3    confusion on my part about that.

4    **Q.**   No reason to apologize, Mr. Baker.  But the one

5    final question I have for you:  Is there any doubt in

6    your mind that, when you were in urban warfare

7    training, or whatever we want to call it, field

8    training, overnight training, is there any doubt that

9    that was the time period where you first noticed your

10   hearing loss?

11   **A.**   No, there is no doubt.  My hearing was definitely

12   different after that exercise.

13   **Q.**   And where were you at that time?

14   **A.**   At Fort Lewis.

15   **Q.**   And last question, Mr. Baker.  Is there any doubt

16   in your mind as to when and where you were when you

17   first noticed the symptoms of tinnitus?

18   **A.**   No.  That stuck out in my head pretty clearly.

19          **MS. HUTSON:**  Thank you very much.

20          **JUDGE RODGERS:**  Mr. Baker, I have a quick

21   question.  You were stationed, am I correct, in

22   Charleston, South Carolina, during the years 2009 to

23   2014?

24          **THE WITNESS:**  Yes, roundabout.  2009 is when

25   I joined the reserves, and 2014 is when I transitioned

1    out of the inactive reserves.

2              **JUDGE RODGERS:**  Okay.  And were you active

3    reserve your entire time at South Carolina?

4              **THE WITNESS:**  I was active until 2012 when I

5    was employed by Triple Canopy in Afghanistan.

6              **JUDGE RODGERS:**  And you continued then to

7    live in South Carolina when you were employed by

8    Triple Canopy, or no?

9              **THE WITNESS:**  Up until I believe the last

10   three months I was employed by Triple Canopy.  I moved

11   to Wyoming during that time.

12             **JUDGE RODGERS:**  And during your reserves

13   service in Charleston, you were military police; is

14   that correct?

15             **THE WITNESS:**  Yes, ma'am.

16             **JUDGE RODGERS:**  Did you wear the CAEv2 at any

17   time during your service in Charleston?

18             **THE WITNESS:**  Yes, ma'am, I believe I did.

19             **JUDGE RODGERS:**  And what type of activities

20   would have required that hearing protection?

21             **THE WITNESS:**  We went to the M9 range, a

22   pistol range, one time for a yearly qualification.

23             **JUDGE RODGERS:**  Anything beyond the one

24   yearly qualification at the range?

25             **THE WITNESS:**  No, ma'am, not for official

1   military capacity.

2           **JUDGE RODGERS:**  And that's what I'm asking.

3   In terms of your use of that earplug when you were in

4   Charleston, anything beyond the annual qualification

5   at the range?

6           **THE WITNESS:**  Yes, ma'am, I did use it for my

7   personal use with my own personal pistol.

8           **JUDGE RODGERS:**  And how often did you engage

9   in those activities, the firing activities?

10          **THE WITNESS:**  It was infrequent, but like

11  maybe once every two months or so, give or take.

12          **JUDGE RODGERS:**  And this was at a firing

13  range?

14          **THE WITNESS:**  It was a makeshift firing

15  range.  I couldn't afford membership fees.

16          **JUDGE RODGERS:**  All right.  Anything else

17  military related, though, other than the range

18  qualification?

19          **THE WITNESS:**  No, ma'am.

20          **JUDGE RODGERS:**  Thank you.

21          Judge Jones, any questions for Mr. Baker?

22          **JUDGE JONES:**  I had one very quick question

23  on the timeline, Mr. Baker.

24          **THE WITNESS:**  Yes, sir.

25          **JUDGE JONES:**  Is it correct your urban

1     training at Fort Lewis was sometime in the latter part

2     of 2005?

3          THE WITNESS:  It was right before Christmas

4     leave, so it was prior to Christmas, just before,

5     actually.

6          JUDGE JONES:  And you testified that you,

7     sometime after that, went to a friend's apartment

8     where it was quiet and that is what really brought to

9     your attention the ringing in your ear.  So the

10    question is:  Did that occur, staying at your friend's

11    apartment, in January of 2006?

12         THE WITNESS:  Yes, sir.  It was at the very

13    beginning of January when that occurred.

14         JUDGE JONES:  Thank you.

15         MR. WASDIN:  Your Honor --

16         JUDGE RODGERS:  Judge Herndon, do you have

17    anything you'd like to ask?

18         JUDGE HERNDON:  I just want to confirm -- in

19    2005 when you were at your friend's, you said you

20    didn't know his address.  But was it a town located

21    near Fort Lewis?

22         THE WITNESS:  It was -- if I remember, it was

23    about 20 minutes north -- on the highway north of Fort

24    Lewis.  I don't remember because I didn't drive that

25    often.  I just --

1          **JUDGE HERNDON:**  Thank you.

2          **JUDGE RODGERS:**  Ms. Hutson, any follow-up?

3          **MS. HUTSON:**  Nothing further.

4          **JUDGE RODGERS:**  Mr. Wasdin?

5          **MR. WASDIN:**  No questions, Your Honor.  But I

6    would like to offer the exhibits that I used with Mr.

7    Baker into evidence for purposes of this hearing.

8          **JUDGE RODGERS:**  Those will be admitted.

9    Thank you.

10         All right.  Mr. Baker, thank you very much.

11         **THE WITNESS:**  Thank you, ma'am.

12         **JUDGE RODGERS:**  That completes your

13   testimony.

14         *[Witness excused.]*

15         We're going to take a brief restroom break,

16   five minutes, just use the facilities and return to

17   the courtroom.  Thank you.

18         *(Recess taken.)*

19         **JUDGE RODGERS:**  All right, Mr. Barr, you have

20   Mrs. Keefer on the video?

21         **MR. BARR:**  Yes, Your Honor.

22         **JUDGE RODGERS:**  Not video but the Zoom.

23         Mrs. Keefer, if you would, please rise and

24   raise your right hand to be sworn.

25         **EMILY KEEFER, PLAINTIFF WITNESS, DULY SWORN**

 1          **JUDGE RODGERS:**  Be seated.  Mrs. Keefer state

 2    your full name and spell your last name, please.

 3          **THE WITNESS:**  Emily Ila Keefer.  Last is

 4    K-e-e-f-e-r.

 5          **JUDGE RODGERS:**  Mrs. Keefer, I know there

 6    were some technical difficulties just a moment ago

 7    with the transmission here.  Just keep us informed if

 8    you're not hearing or seeing us, and we'll certainly

 9    know if we're having problems hearing or seeing you.

10          **THE WITNESS:**  Yes, Your Honor.

11          **JUDGE RODGERS:**  Mr. Barr, go ahead.

12          **MR. BARR:**  And Mrs. Keefer, there is a little

13    bit of a delay between when we're seeing your voice

14    and when we're hearing it.  So I'm going to try to be

15    very careful not to speak over you and let's try and

16    do the same, just give a little pause between

17    questions and answers, all right?

18          **THE WITNESS:**  Yes, sir.

19                    **DIRECT EXAMINATION**

20    BY MR. BARR:

21    **Q.**  Mrs. Keefer, where do you presently live?

22    **A.**  Broken Arrow, Oklahoma.

23    **Q.**  And what do you currently do for your occupation?

24    **A.**  I work for the Oklahoma Department of Corrections

25    as a contract monitor specialist.

1   **Q.**   And you realize you're here today about your

2   former spouse, Lewis Keefer, correct?

3   **A.**   Correct.

4   **Q.**   Were you ever married to Lewis Keefer?

5   **A.**   Yes.

6   **Q.**   How did you meet Lewis?

7   **A.**   We actually grew up down the road from each other,

8   went to school, elementary and high school together,

9   kind of parted ways after school, and rekindled, I

10  don't know, it was 2007-ish, after years of not

11  talking.

12  **Q.**   When y'all rekindled your relationship, was Lewis

13  already in the military?

14  **A.**   Yes, sir.

15  **Q.**   And where was he based when you rekindled your

16  relationship with Lewis?

17  **A.**   Fort Benning, Georgia.

18  **Q.**   And you and Lewis ultimately got married, correct?

19  **A.**   Correct.

20  **Q.**   And you're now divorced, right?

21  **A.**   Correct.

22  **Q.**   And when were you divorced?

23  **A.**   In March of 2018.

24  **Q.**   Now, when you rekindled your relationship with

25  Lewis, where were you living at the time?

1    **A.**   I was in Ohio.

2    **Q.**   And if I remember what you just said, Lewis was at

3    Fort Benning, Georgia, right?

4    **A.**   Correct.

5    **Q.**   And when you got married, did you move from Ohio

6    to Georgia?

7    **A.**   Yes, sir.

8    **Q.**   Okay.  And did you move in with Lewis?

9    **A.**   Yes, sir.

10   **Q.**   And where were y'all living?

11   **A.**   On base, on Fort Benning.

12   **Q.**   And do you know what Lewis's job in the military

13   was?

14   **A.**   He was a medic 68 Whiskey.

15   **Q.**   And how long did you live with Lewis in Georgia at

16   Fort Benning?

17   **A.**   From the time that I moved there until he was

18   transferred to Hawaii, with the exception of his

19   deployment period when I moved back to Ohio.

20   **Q.**   So, when Lewis was deployed to Iraq, you moved

21   away from Georgia?

22   **A.**   I did.

23   **Q.**   And where did you go?

24   **A.**   I went back to Ohio with my parents.

25   **Q.**   And after Lewis came back from Iraq, did you move

1    back to Georgia?

2    **A.**   I did.  I actually moved back before he returned.

3    **Q.**   And that was in what year that you moved back to

4    Georgia to live with Lewis?

5    **A.**   2010.

6    **Q.**   And did there come a point in time after 2010 when

7    you were transferred to a different base?

8    **A.**   Yes.  It was February of 2011 is when the move

9    happened.  I couldn't tell you when he received his

10   orders.

11   **Q.**   And where were you transferred to from Georgia?

12   **A.**   Schofield Barracks, Hawaii.

13   **Q.**   Except the time that Lewis was deployed to Iraq,

14   is it correct to say that you lived with Lewis the

15   entire time in Fort Benning, Georgia?

16   **A.**   Yes, sir.

17   **Q.**   Now, given that you were living with Lewis, would

18   it be fair to say you interacted with him on a daily

19   basis?

20   **A.**   Yes, sir.

21   **Q.**   Did you have the opportunity to observe Lewis?

22   **A.**   Can you repeat that, please.  I'm sorry.

23   **Q.**   Sure.  Did you have the opportunity to observe

24   Lewis, how he interacted with you, how he interacted

25   with others?

1    **A.**   Absolutely.

2    **Q.**   Now, I want to focus on the time between your

3    marriage in 2008 and Lewis's deployment in 2009, okay?

4    **A.**   Okay.

5    **Q.**   Now, during the time that you lived with Lewis

6    prior to his deployment, did you notice any changes in

7    Lewis that you attributed to his hearing?

8    **A.**   Yeah.  I mean, he -- it gradually got worse.  I

9    mean, in the time, you know, his service time, it -- I

10   definitely noticed changes.

11   **Q.**   Okay.  Can you give us a description of the types

12   of changes you noticed in Lewis prior to his

13   deployment to Iraq?

14   **A.**   Just having to like raise my voice more so he

15   could hear me.  It was kind of the "Huh?" response or

16   "What did you say?"  Not catching everything

17   completely.

18   **Q.**   And that was a situation that got worse in that

19   year prior to his deployment to Iraq, is that what

20   you're saying?

21   **A.**   It gradually got worse, yes.

22   **Q.**   And did these changes that you perceived in Lewis,

23   did that progress through the marriage?

24   **A.**   Yes, sir.

25   **Q.**   But is there any question in your mind that those

1   changes started when you were living with Lewis at
2   Fort Benning prior to his deployment to Iraq?
3   **A.**   There is no question that it started then.
4             **MR. BARR:**   I pass the witness, Your Honor.
5             **JUDGE RODGERS:**   Thank you.
6             Mr. Nomellini, when you're ready, go ahead.
7             **MR. NOMELLINI:**   Thank you, Your Honor.
8                      **CROSS-EXAMINATION**
9   BY MR. NOMELLINI:
10  **Q.**   I am Mark Nomellini on behalf of 3M.  Good
11  morning.
12  **A.**   Good morning.
13  **Q.**   Let's pull up a timeline to orient us a bit.
14            **MR. NOMELLINI:**   Donnie, if we could have the
15  Emily Keefer timeline up, please.
16  BY MR. NOMELLINI:
17  **Q.**   You said you and Lewis became reacquainted in
18  2007, correct?
19  **A.**   Correct.
20  **Q.**   And then you married in March 1st, 2008?
21  **A.**   Correct.
22  **Q.**   And about a month after that you moved to Georgia,
23  correct?
24  **A.**   Correct.
25  **Q.**   And then Mr. Keefer was deployed to Iraq between

1    2009 and 2010, correct?

2    **A.**   Correct, yes.

3    **Q.**   And then, you and Mr. Keefer moved to Hawaii in

4    2011?

5    **A.**   Yes.

6    **Q.**   And you returned from Hawaii in 2015?

7    **A.**   Correct.  I can't see part of that timeline.  I

8    can't see past that 2015 where it says that we

9    returned from Hawaii.

10   **Q.**   Okay, I'll stop there.

11        So, 2015 you returned to Hawaii, we have that

12   right, correct?  Or returned from Hawaii?

13   **A.**   No.  In 2015, correct, we returned from Hawaii.

14   **Q.**   And you don't recall Mr. Keefer -- I'm going to

15   divide this into two subjects -- first, ringing in the

16   ears, and then hearing loss, okay?  So I'm going to

17   talk about ringing in the ears now.

18   **A.**   Okay.

19   **Q.**   You don't recall Mr. Keefer complaining to you of

20   ringing in his ears before you moved to Hawaii,

21   correct?

22   **A.**   Distinctly I remember in Hawaii.  I can't say that

23   he never complained while we were in Georgia, but I do

24   distinctly remember conversations in Hawaii that he

25   complained of ringing in his ears.

1    **Q.**   Okay.  And you don't recall one way or the other

2    whether he complained of ringing in his ears in

3    Georgia, correct?

4    **A.**   Correct.

5    **Q.**   Okay, so that's ringing in the ears.  And by the

6    way, that ringing in the ears in Hawaii, that was

7    after he was deployed to Iraq, correct?

8    **A.**   Correct.

9    **Q.**   Now let's talk about hearing loss.  You testified

10   that you noticed a change during his military service,

11   correct?

12   **A.**   Correct.

13   **Q.**   Now, when he returned from Iraq in 2010, you

14   noticed a difference in his hearing from the last time

15   you had been together in person, correct?

16   **A.**   It progressively got worse, yes.

17   **Q.**   And with respect to the difference you noticed

18   when he got back from Iraq, it was a more dramatic

19   difference than the gradual change you had described

20   in earlier years, correct?

21   **A.**   Like I said, it progressively got worse.  I don't

22   know that I would say that it was, you know, a

23   dramatic difference.  There was hearing loss from the

24   beginning.  There was hearing loss shortly after I got

25   to Georgia with him, but it was progressive.  Like I

1    said, I wouldn't say it was dramatic.

2    **Q.**   Okay.  But I just want to be specific about this.

3    When he returned from Iraq, was the change in his

4    hearing more dramatic than -- more dramatic difference

5    than the gradual change that you described in earlier

6    years?

7    **A.**   Repeat yourself, please.

8    **Q.**   Yes.  When Mr. Keefer returned from Iraq, was it a

9    more dramatic difference than the gradual change you

10   described in earlier years?

11   **A.**   There wasn't a huge amount of time before he

12   deployed, so there weren't years that I could compare

13   to.  There was a difference, yes, when he got back

14   from Hawaii -- or, I'm sorry, when he got back from

15   Iraq.

16            **MR. NOMELLINI:**  Let's pull up the Emily

17   Keefer deposition, page 39, line 21, and going to page

18   40, line 7.

19   **BY MR. NOMELLINI:**

20   **Q.**   At your deposition were you asked these questions

21   and did you give these answers:

22            **QUESTION:**  When he returned from Iraq in May

23   2010, did you notice a difference from the last time

24   that you had been together in person and his hearing?

25            **ANSWER:**  Yeah.

1      **QUESTION:**  Was it a more dramatic difference

2  than the gradual change that you described in earlier

3  years?

4      **ANSWER:**  I would say so, yes.

5      Were you asked those questions and did you

6  give those answers?

7  **A.**  I was asked those questions, but I'll tell you

8  that I did not get to read the transcript of my

9  deposition.  The Defense never sent that to me.  So I

10  actually didn't see that, and I didn't approve what

11  was transcribed from the deposition.

12  **Q.**  There was a more distinct decline in Mr. Keefer's

13  hearing after his service in Iraq, correct?

14  **A.**  There was a decline, yes.

15  **Q.**  And just to be clear, the decline was more

16  distinct after Iraq, correct?

17      **MR. BARR:**  Your Honor, we've answered this

18  several times now.

19      **THE WITNESS:**  I'll be clear this time as

20  well.  There was a change, yes.

21      **JUDGE RODGERS:**  Please don't ask it again.

22      **MR. NOMELLINI:**  Okay.

23  BY MR. NOMELLINI:

24  **Q.**  Now, you've talked about difficulty that Mr.

25  Keefer had understanding you, correct?

1   **A.**   Correct.

2   **Q.**   And the difficulty he had understanding you before

3   he went to Iraq was not nearly as often as it was

4   after he got back from Iraq, correct?

5   **A.**   The hearing loss was progressive, so, yes, there

6   were more difficult times of hearing made throughout

7   his military career.

8           **MR. NOMELLINI:**   Let's go to Emily Keefer

9   deposition 41/21 to 42/9.

10  **BY MR. NOMELLINI:**

11  **Q.**   Starting at 19:  "Before Mr. Keefer's deployment,

12  was it commonly difficult for you to understand one

13  another?

14          **ANSWER:**   It was near -- it was not --"

15          And then go to the next page, 42, 1 through

16  9.

17          **MR. BARR:**   Your Honor, this is not

18  inconsistent with anything she just said.

19          **JUDGE RODGERS:**   It's not.

20          This is really not proper impeachment, Mr.

21  Nomellini.  She is testified it was a gradual,

22  progressive change.

23          **MR. NOMELLINI:**   Your Honor, I understand.

24  What I was trying to get at is "not nearly as often."

25  I asked her if it was not nearly as often.

1    **MR. BARR:**  I mean, she's testified it's

2    progressive.

3             **JUDGE RODGERS:**  Yeah, okay.  Make your point,

4    Mr. Nomellini, and then please move on.  We do have

5    time constraints here.

6    **BY MR. NOMELLINI:**

7    **Q.**  Not nearly as often as it was until after he got

8    back?  Were you asked that question and did you give

9    that answer?

10   **A.**  I was asked that question, but I'll tell you again

11   that I didn't approve of the transcript from the

12   deposition because I never saw it.  I told you it was

13   progressive.

14   **Q.**  Thank you.  I'll move on.

15        The hearing loss that you noticed before the

16   deployment was gradual, correct?

17   **A.**  It was progressive through his career.

18   **Q.**  And in your deposition you could not give us a

19   specific year when you first noticed Mr. Keefer's

20   decline in hearing, correct?

21   **A.**  It declined.  I mean, I don't know how many times

22   I can say it.  It declined progressively over the nine

23   or ten years that I was with him.

24            **MR. NOMELLINI:**  Thank you.  Nothing further,

25   Your Honor.

1          **JUDGE RODGERS:**  Thank you, Mr. Nomellini.

2          Mr. Barr?  Briefly please.

3          **MR. BARR:**  It will be very brief, Your Honor.

4                    **REDIRECT EXAMINATION**

5     **BY MR. BARR:**

6     **Q.**  Mrs. Keefer, again, prior to Mr. Keefer's

7     deployment to Iraq, did you notice changes in him that

8     you attributed to hearing loss?

9     **A.**  Yes, sir.

10         **MR. BARR:**  That's it, Your Honor.  Thank you.

11         **JUDGE RODGERS:**  Judge Jones, any questions?

12         **JUDGE JONES:**  I do not.  Thank you.

13         **JUDGE RODGERS:**  Judge Herndon?

14         **JUDGE HERNDON:**  I do not.  Thank you.

15         **JUDGE RODGERS:**  Mrs. Keefer, thank you very

16    much.  You're excused.

17         **THE WITNESS:**  Thank you, Your Honor.

18         *(Witness excused.)*

19         **JUDGE RODGERS:**  Next witness, please.

20         **MR. AYLSTOCK:**  Your Honor, just real quick on

21    the scheduling note.  Dr. Packer has got a surgical

22    thing today, so he needs to go right at noon and he

23    has a hard stop at one.  We're trying to check to see

24    if Mr. McCombs can go right after that perhaps.  I

25    know we're running late, but I want to alert that our

```
 1    next witness needs to be done at noon or otherwise
 2    it's going to cut into Dr. Packer's time.  Our direct
 3    isn't going to be that long for Dr. Packer.
 4              JUDGE RODGERS:  You mean for Mr. McCombs
 5    or --
 6              MR. AYLSTOCK:  For Dr. Packer.  I'm sorry.
 7    Mr. McCombs is a very short direct, probably 8 to 10
 8    minutes.
 9              JUDGE RODGERS:  Do you think Mr. McCombs is
10    going to be shorter than Mr. Keefer?
11              MR. AYLSTOCK:  No.  I think we need to do Mr.
12    Keefer now because Mr. Keefer also has -- he's been up
13    all night.
14              MR. BARR:  Yeah, Lewis works the nightshift.
15              JUDGE RODGERS:  All right.  Well --
16              MR. BARR:  I will certainly go as quickly as
17    I can, Your Honor.
18              MS. TRAN:  Mr. Keefer is not on the call.
19    Mr. McCombs is in the waiting room.
20              MR. AYLSTOCK:  We can do Mr. McCombs.
21              JUDGE RODGERS:  Let's move to Mr. McCombs.
22    And, Mr. Barr, if you want to step out and see if you
23    can find Mr. Keefer.
24              MR. BARR:  I will do that, Your Honor.
25              JUDGE RODGERS:  Ms. Hoekstra?
```

1      **MS. HOEKSTRA:**  Is Mr. McCombs there?

2      **JUDGE RODGERS:**  He's in the waiting room.  I

3   think she's bringing him in, Thao is.

4      **MS. HOEKSTRA:**  Dustin, can you hear us?

5      **THE WITNESS:**  Yes, ma'am.

6      **JUDGE RODGERS:**  There he is.  Thank you.

7      Mr. McCombs, if you would, please rise and

8   raise your right hand to be sworn.

9      **DUSTIN MCCOMBS, PLAINTIFF WITNESS, DULY SWORN**

10      **MADAM CLERK SIMMS:**  Be seated.  Please state

11   your full name and spell your last name for the

12   record.

13      **THE WITNESS:**  Dustin lead McCombs,

14   M-c-C-o-m-b-s.

15      **JUDGE RODGERS:**  Mr. McCombs, I'm Judge

16   Rodgers.  Please let us know if there is any technical

17   difficulties disrupting your ability to hear or see

18   us, just let us know.

19      Ms. Hoekstra, go ahead.

20                      **DIRECT EXAMINATION**

21   **BY MS. HOEKSTRA:**

22   **Q.**  Mr. McCombs, thank you for joining us today.

23   Would you mind telling the Court where you live

24   currently?

25   **A.**  I reside in Bidwell, Ohio.

1  **Q.**   And were you originally born in Bidwell, Ohio?

2  **A.**   I was born in Gallipolis, Ohio, which is --

3  they're kind of connected.

4  **Q.**   Okay.  What is your current occupation?

5  **A.**   I am a substance abuse addiction counselor.

6  **Q.**   And how old are you currently?

7  **A.**   I am 32 years old.

8  **Q.**   Do you have any children, Mr. McCombs?

9  **A.**   Yes, ma'am.  I have a two-year-old little boy.

10  **Q.**   Was there ever a point in time when you were in

11  the military?

12  **A.**   Yes, ma'am.

13  **Q.**   Did you serve in the Army?

14  **A.**   Yes, ma'am.

15  **Q.**   And from when to when did you serve in the Army?

16  **A.**   I joined the Army March of 2008, and I finished my

17  contract July 2011.

18  **Q.**   And where were you first stationed when you joined

19  the military?

20  **A.**   My first duty station was Fort Benning, Georgia,

21  for basic training.

22  **Q.**   And how long were you stationed at Fort Benning?

23  **A.**   I was in Fort Benning for basic and airborne

24  school a total of 17 weeks.

25  **Q.**   And after you finished your training at Fort

1    Benning, where were you stationed?

2    **A.**   I got transferred to Fort Richardson, Alaska --

3    well, Alaska.  It's a joint base, Elmendorf-Richardson

4    in Anchorage.

5    **Q.**   Okay.  And that's, you said, a joint based.  So

6    it's a joint Air Force and Army base; is that correct?

7    **A.**   Yes, ma'am.

8    **Q.**   And how long were you based at Fort Richardson?

9    **A.**   I was at Fort Richardson from August 2008 until

10   March of 2009 when I was deployed.  And then I went

11   back to Fort Richardson March of 2010 until I finished

12   my contract in July 2011.

13   **Q.**   And at one point in there -- you said you were

14   deployed from March of 2009 to March of 2010; is that

15   correct?

16   **A.**   Yes, ma'am, that's correct.

17   **Q.**   And where were you deployed during that time?

18   **A.**   I was deployed to Paktia Province, Afghanistan.

19   **Q.**   During your time in the military, did you use an

20   earplug called the Combat Arms Version 2?

21   **A.**   Yes, ma'am.

22   **Q.**   And did you use that plug during training in

23   Alaska?

24   **A.**   Yes, ma'am.

25   **Q.**   And did you use that plug prior to your deployment

1    to Afghanistan?

2    **A.**  Yes, ma'am.

3    **Q.**  What was your rank when you were stationed in

4    Alaska?

5    **A.**  Pre-deployment I was private first class, an E3;

6    and then I was promoted during our deployment, so when

7    I came back I was an E4.

8    **Q.**  What was your role while you were in the military

9    in Anchorage, Alaska?

10   **A.**  I was assigned to weapons squad.

11   **Q.**  And could you explain what weapons squad included?

12   **A.**  Yes, ma'am.  Weapons squad deals with the heavy

13   machine guns.  So I was in charge of, you know,

14   mastering the heavy machine guns and then transferring

15   that training to new soldiers.

16   **Q.**  And while you were in Anchorage prior to your

17   deployment, did you undergo any additional training?

18   **A.**  Yeah.  In Anchorage everyone is required to do a

19   cold weather training, so we went through that.

20   **Q.**  And could you describe the noise that you were

21   exposed to while you were stationed at Fort Richardson

22   prior to your deployment to Afghanistan?

23   **A.**  Prior to my deployment, being a member of weapons

24   squad, we conducted -- did training for heavy machine

25   guns, whether that's the M240 Bravo, the .50 cal

1   machine gun, the Mark 19, any heavy machine guns that

2   can be mounted on top of vehicles as well as carried.

3   **Q.**   And how often would you have training on the range

4   for those weapons?

5   **A.**   Pre-deployment we were training probably three to

6   four times a week.

7   **Q.**   And when you were training, would that be for an

8   hour or two, or would that be for a full-day

9   experience?

10  **A.**   No, those are full-day experiences on the range.

11  **Q.**   When did you first notice a ranging in your ears?

12  **A.**   During my deployment to Afghanistan.

13  **Q.**   And why do you remember -- or do you remember the

14  specific date or time frame when the ringing began?

15  **A.**   It was sometime in April of 2009.

16  **Q.**   And is there a reason that you remember the

17  specific date?

18  **A.**   I can remember it was in April; that was when I

19  received my combat infantryman badge.  I was exposed

20  to an IED blast.

21  **Q.**   Were you exposed to hazardous noise while you were

22  stationed at Fort Richardson following your deployment

23  to Afghanistan?

24  **A.**   Yes, ma'am.

25  **Q.**   And what would that have included?

**A.**   Well, I was still assigned to weapons squad and
was in charge of, you know, training the new soldiers
as they arrived.  So I trained all the new soldiers
that were assigned to weapons squad to, you know,
master the heavy machine guns.

We did a lot of, you know, building and room
clearing inside of, you know, simulated houses.  You
know, they're kind of designed like a maze sort of
inside buildings.

And then we were training for a thing called EIB,
which is the expert infantryman badge.  So we did,
like -- you had grenade throwing as part of that as
well as the room clearing.

**Q.**   Do you believe that the ringing in your ears
gradually worsened during your time at Fort Richardson
following your deployment?

**A.**   Yes, ma'am, yes, ma'am.

**Q.**   Was there ever a point during your training in
Alaska that you realized or had any awareness of
loosening of your earplugs?

**A.**   Yeah, I can recall being on a rough march once
doing land navigation.  You know, the terrain in
Alaska is kind of rough, so stepping over obstacles
and dealing with the snow.  I can remember them, you
know, loosening on one occasion.

1   **Q.**   Did you ever have any training, prior to your

2   deployment to Afghanistan, anywhere outside of Alaska?

3   **A.**   Can you repeat that question?

4   **Q.**   Did you ever receive any training during your

5   pre-deployment military career outside of Alaska?

6   **A.**   Yes, ma'am.

7   **Q.**   And where was that?

8   **A.**   We -- before our deployment, I was sent to Fort

9   Irwin in California for, like, a 30-day pre-deployment

10  training.

11  **Q.**   And where was that located?

12  **A.**   Fort Irwin in California.

13  **Q.**   And the ringing in your ears that you developed in

14  2009 continued throughout your time in Alaska until

15  2011; is that correct?

16  **A.**   Yes, ma'am.

17  **Q.**   And was there a time that you were informed of

18  what that ringing in your ears meant?

19  **A.**   No.  I wasn't aware.

20          **MS. HOEKSTRA:**  Pass the witness.

21          **JUDGE RODGERS:**  Thank you.  Mr. Brock?

22          **MR. BROCK:**  Yes, ma'am.

23                      **CROSS-EXAMINATION**

24  **BY MR. BROCK:**

25  **Q.**   Mr. Hacker -- I'm sorry, excuse me.  Apologies for

1    that.  Mr. McCombs, good afternoon.

2    **A.**   Good afternoon.  Nice to meet you.

3    **Q.**   You, too.  I want to ask you a few questions about

4    your experience in the military and as it relates to

5    the issue of your tinnitus.

6        And just to be clear for the record, when we talk

7    today about the place and kind of injury that you

8    suffer from, we are in agreement that you are not

9    claiming hearing loss in this litigation, correct,

10   sir?

11   **A.**   Yeah, that's correct.

12   **Q.**   Your claim in this case is for tinnitus, correct,

13   sir?

14   **A.**   Yes, sir.

15   **Q.**   And tinnitus only, correct, sir?

16   **A.**   Yes, sir.

17   **Q.**   All right.  Now, I want to call up our timeline of

18   events just so that you and I can have this as a way

19   to reference it.  I want the duty station timeline,

20   please.

21       Can you see that okay?

22   **A.**   Yes, sir.

23   **Q.**   All right.  And some of this you've covered and

24   I'm going to just go over it in summary form.  But

25   there are a few points I'd like to make with you with

1    regard to some of the stations where you are working

2    and serving.

3        First of all, you see March 2008 we have Fort

4    Benning, Georgia, and that runs for about a year to

5    August of 2008?

6    **A.**   Yes, sir.

7    **Q.**   And is that consistent with your recollection

8    about your time of service at Fort Benning?

9    **A.**   Yes, sir, it is.

10   **Q.**   And it's correct, is it not, that it was at Fort

11   Benning, Georgia, where you first received the Combat

12   Arms Version 2 earplug and instructions about how to

13   use the earplug, correct, sir?

14   **A.**   I wasn't directly issued the Combat Arms Earplugs

15   at Fort Benning.  They were available to use, but they

16   were kind of scarce.

17   **Q.**   Did you use the Combat Arms Version 2 earplugs at

18   Fort Benning, Georgia?

19   **A.**   Yes, sir.

20   **Q.**   And you've testified that you also received

21   instruction about how to use the Combat Arms Version 2

22   earplug while you were at Fort Benning, correct, sir?

23   **A.**   Yes.

24   **Q.**   And you've also testified that you received

25   instruction about how to use the Combat Arms Version 2

1    earplug at Fort Irwin in California prior to your

2    deployment to Afghanistan, correct, sir?

3    **A.**   Yeah, I think they retouched on that.

4    **Q.**   You did not say or tell us in your deposition that

5    you ever received any instruction about how to use the

6    Combat Arms Version 2 while you were in Alaska; is

7    that correct?

8    **A.**   That's where I was first issued my Combat Arms

9    Earplugs was in Alaska.  So, if I said that, that's

10   something that they would have.

11   **Q.**   Well, I don't know what the difference is between

12   issued and using is.  You used them and you had

13   instruction on Combat Arms Version 2 at Fort Benning,

14   correct?

15   **A.**   Yes, sir.

16   **Q.**   And you had instruction on the use of Combat Arms

17   Version 2 at Fort Irwin in California -- I mean,

18   excuse me, strike that.

19         You also had instruction on the use of the Combat

20   Arms Version 2 at Fort Irwin, California, prior to

21   your deployment in Afghanistan, correct, sir?

22   **A.**   That's correct, sir.  They retouched on that

23   after, you know, our initial training in Fort

24   Richardson.

25   **Q.**   All right.  So, is it your testimony today that

1  you were trained about the use of Combat Arms Version

2  2 at Fort Richardson?  Are you testifying to that

3  today?

4  **A.**   Yes, sir, I was instructed by leadership how to

5  use and the intended use of those there.

6  **Q.**   I'm asking you if your testimony today is that you

7  received that instruction in Alaska?

8  **A.**   Yes, sir.

9  **Q.**   All right.  I want to turn your attention -- I'm

10  going to have to just call this out and show it to

11  you, your testimony with regard to instruction for

12  use.

13          **MR. BROCK:**  And Donnie, if we could start,

14  please, with page 289, and we'll highlight lines 4

15  through 16.

16  **BY MR. BROCK:**

17  **Q.**   And do you see and do you agree that you are asked

18  the question --

19          **MR. BROCK:**  We'll have to go to the page

20  before it, Donnie, if we could.

21  **BY MR. BROCK:**

22  **Q.**   "At any time prior to November 8th, had you ever

23  been given instructions on how to insert them or use

24  the CAEv2?"  Do you see that question?

25  **A.**   Yes, sir.

1    **Q.**  And your answer to that is:  "In basic training I

2    was instructed on how to use each different form of

3    hearing protection that we received."

4           Do you see that?

5    **A.**  Yes, sir.

6    **Q.**  And basic training was Fort Benning, Georgia,

7    correct?

8    **A.**  Yes, sir.

9    **Q.**  And then you were asked the question:  "And what

10   were you told different than what you were in

11   California as opposed to what you had received from

12   basic training about CAEv2?"

13          And was your answer, "I don't remember any

14   discrepancies"?

15   **A.**  Yes, sir.

16   **Q.**  And then, if we go forward just a little bit

17   further, you were asked some questions about training

18   in California and Georgia, and you've described how

19   you were trained to use the product.  And you were

20   asked the question:  "Have we now talked about all the

21   training that you received with regard to the

22   product?"  And you said, "Yes."

23          Do you remember that?

24   **A.**  Yes, that's what it says.  Or I don't --

25              **JUDGE RODGERS:**  Where is that, Mr. Brock?  I

1   don't see it either.

2           **MR. BROCK:**  If we go to page 293 and we go to

3   line 9.

4   **BY MR. BROCK:**

5   **Q.**  "What, if any, other representations or statements

6   were you told about the earplugs other than what

7   you've told us here today?  And the earplug I mean is

8   the Combat Arms Version 2."  Do you see that?

9   **A.**  Yes, sir.

10  **Q.**  And is the question is then asked, "Is there a

11  certain time frame that we're talking about or just --

12  at any time while you were in the military?

13          **ANSWER:**  "Up until today?

14          **QUESTION:**  "At any time while you were in the

15  military, sir."

16          And your answer was, "Not that I recall."  Do

17  you see that?

18  **A.**  Yes, sir, I see that.

19  **Q.**  And at no time in your deposition had you referred

20  to training on this earplug in Alaska.  Do you agree

21  with that?

22          **MS. HOEKSTRA:**  Object to asked and answered.

23          **JUDGE RODGERS:**  He can answer.  Overruled.

24          **THE WITNESS:**  Yes, from the questions that

25  were asked and the testimony, yes, sir.

1    **BY MR. BROCK:**

2    **Q.**  Let's look at page 289, line 18, going down to

3    maybe line 17 on 290.

4          Question -- this is after that question you

5    were asked a minute ago about California.

6          "And how were you told -- what were you told

7    in terms of how to insert them or use the CAEv2 --

8          "Objection.

9          "-- in California or in basic training?"

10   That's the rest of the question.

11         "I was told that you take -- so it's your

12   opposite hand for which ear you're going to insert it

13   in and raise the top of your earlobe and then use your

14   other free hand to insert them until they make a

15   seal."

16         **QUESTION:**  "And how would you know they made

17   a seal?

18              **ANSWER:**  "By feel.

19         **QUESTION:**  "And what was the feel that you

20   were expecting in order to know you had made a seal?"

21         And you give the answer to that.  You see

22   that?

23         **MS. HOEKSTRA:**  Objection, Your Honor.  This

24   isn't inconsistent with Mr. McCombs's testimony.

25         **JUDGE RODGERS:**  I agree.

1        **MR. BROCK:**  I believe it is, Your Honor.  He

2   is saying he was trained in two places.

3        **JUDGE RODGERS:**  The question you asked him or

4   someone asked him on page, I think it was 193, was

5   whether there was any other representations or

6   statements made to him during his military service

7   about use of the CAEv2.

8        No one asked him if he was ever instructed in

9   Alaska so far.  I haven't been through the whole

10  deposition, but so far you haven't shown where he was

11  asked if he was ever instructed on the use in Alaska.

12  So I don't see the inconsistency.

13       **MR. BROCK:**  All right.

14       **JUDGE RODGERS:**  I mean, assuming the

15  instructions were all the same.  I assume.

16       If his instructions in Alaska were different

17  than the instructions he received in California and at

18  Fort Benning, then I suppose he should answer that.

19       **MR. BROCK:**  So I'll just clean this up.

20  BY MR. BROCK:

21  **Q.**  In Fort Richardson, Alaska, is it your testimony

22  today that you received training about the use of the

23  Combat Arms Version 2?

24  **A.**  Yes, sir.

25  **Q.**  And who provided that training?

1   **A.**   It would have been our leadership when we were

2   issued those and went to a range.

3   **Q.**   Was the training that you received any different

4   than what you heard in Fort Benning?

5   **A.**   Um, they just kind of elaborated, you know, on the

6   feel and the intended use.

7   **Q.**   What do you mean by "elaborated"?

8   **A.**   You know, in basic training we weren't directly

9   issued those, you know, so just the people that

10  directly were received, you know, a full training.

11  **Q.**   And it's also correct, is it not, that, before

12  your deployment to Afghanistan, you were trained on

13  use of the product in Fort Irwin, California, correct?

14  **A.**   Yes, sir, they retouched on it.

15  **Q.**   All right.

16          **MR. BROCK:**  Let's look at 287/8.

17          **JUDGE RODGERS:**  This is a page from the

18  deposition?

19          **MR. BROCK:**  Yes, 287/8.

20  **BY MR. BROCK:**

21  **Q.**   I want to make sure that the record is clear on

22  this.  If we go down to page 288, and it begins with

23  an answer: "We were instructed or I was instructed on

24  how to insert them."

25          Then the question is asked:  "And who gave you

1    that instruction?

2            "It would have been my leadership.

3            Question:  "Anyone in particular?

4            "I can't -- no, I can't name someone in

5    particular.

6            "When were you given that instruction?"

7            And do you give the answer, "The first time I

8    can recall is we went to Fort Irwin, California, for

9    30 days in a pre-deployment type training, and I know

10   we were -- everyone was issued those at that time,"

11   correct?

12   **A.**   Yes, sir.

13   **Q.**   And then the question is asked: "That would have

14   been November of 2009?"

15           And you correct and say, "Well, that would have

16   been 2008," correct?

17   **A.**   Yes, that's correct.

18   **Q.**   And then you were asked, "At any time prior to

19   2008, had you been given any instructions?"

20           And you answer, "In basic training, I was

21   instructed on how to use each different form of

22   hearing protection that we received."

23           That's the question and answer I read to you

24   earlier, correct?

25   **A.**   I believe so, yes, sir.

1    **Q.**  So, you're answering that you received instruction

2    before going to Afghanistan while in Fort Irwin,

3    California, in preparation for deployment, and you

4    received instruction in Fort Benning, Georgia?  That's

5    how you've answered those questions, correct, sir?

6    **A.**  Yes, sir.

7    **Q.**  All right.  Now, you mentioned there was one

8    occasion when you were in Alaska that you noticed that

9    the Combat Arms Version 2 hearing protection device

10    had loosen, correct?

11    **A.**  Yes, sir.

12    **Q.**  And you mentioned that that occurred while you

13    were training in Alaska, correct?

14    **A.**  Yes, sir.

15    **Q.**  But you didn't mention that to anyone, did you?

16    **A.**  No.  You know, that's what we're issued, you know

17    -- *(inaudible)* -- doesn't really make a difference.

18    **Q.**  Sir, did you say to anyone while you were in

19    Alaska that "I have an earplug in and it has

20    loosened"?  Did you ever tell anyone that?

21    **A.**  No, sir, I didn't report that to anybody.

22    **Q.**  But, when you were deployed to Afghanistan between

23    March of 2009 and 2010, you claim that the earplug had

24    loosened during that time and that you did report it,

25    correct, sir?

Dustin McCombs - Cross/Brock                                    128

1    **A.**   I can't recall that.

2    **Q.**   So let's look at your deposition at page 415, the

3    question that begins at line 20.  And the question is

4    being asked, "Was it in this August of 2008 to March

5    of 2009 period that you recall making comments to

6    fellow soldiers that the CAEv2 was appearing to

7    loosen?"  So the 2008 to 2009 time frame would cover

8    Fort Richardson in Alaska and Fort Irwin in

9    California, correct?

10   **A.**   Yes, yes, sir, I would have been at both of those

11   during that time.

12   **Q.**   All right.  And your answer to the question was,

13   "No, it wouldn't have been in between that time."

14        And then the question is asked, "Well, you

15   referenced Alaska like when you were in Alaska?

16        And you answer at line 2 and 3, "Yes, ma'am, after

17   deployment I was in Alaska also during training."

18        And then the very specific question is asked:

19   "During what period of time was it that you would have

20   made this comment to fellow soldiers?"

21        And what was your answer to that?  See line 6?

22   **A.**   Yes, sir, it says, "During deployment."

23   **Q.**   Right.  And during deployment was when you were in

24   Afghanistan, correct?

25   **A.**   Yes, sir.

1   **Q.**   Now, let's come back to our timeline.  And it was

2   during your deployment to Afghanistan that for the

3   very first time you reported ringing in your ear, that

4   it lasted about five minutes, and that the onset was

5   reported as bilateral, constant, which first began

6   after the vehicle that you were riding in was hit by

7   an IED, correct?

8   **A.**   Yes, sir.

9   **Q.**   And despite all this weapons training that you had

10  been doing with all of the heavy machine guns, every

11  mounted machine gun that you described, the big

12  machine guns that you would be training on, and during

13  that time using the Version 2 Combat Arms Earplug,

14  during none of that time prior to this IED explosion

15  had you ever suffered tinnitus or hearing loss,

16  correct?

17  **A.**   That's correct.

18  **Q.**   The first time you experienced tinnitus was in

19  Afghanistan and you make a report about it on April

20  26th, 2009, correct?

21  **A.**   Yes, sir, that's the first report, yes.

22  **Q.**   Well, not only is it the first report; it's also

23  the case that, prior to April of 2009, you had never

24  experienced ringing in your ears, correct?

25  **A.**   Yes, sir.

1    **Q.**   Ringing in your ears was absent from any diagnosis

2    or any experience that you had prior to that time,

3    correct, sir?

4    **A.**   Yes, sir.

5              **MR. BROCK:**   Let's see Exhibit 101, Donnie, if

6    we can.   It's Arriaga Exhibit 30.

7    **BY MR. BROCK:**

8    **Q.**   Now, there came a point later in time, 2015, when

9    you were submitting to a hearing loss and tinnitus

10   disability benefits examination, correct?

11   **A.**   Yes, sir.

12   **Q.**   All right.   And if we go down to the second to the

13   last paragraph --

14             **MR. BROCK:**   Donnie, if you can highlight

15   that, "tinnitus was reported."

16   **BY MR. BROCK:**

17   **Q.**   It says, "Tinnitus was reported within the SMR on

18   4/26/2009.   He reported tinnitus for five minutes

19   after a blast."   Do you see that?

20             **MS. HOEKSTRA:**   Objection.   This is outside

21   the scope.

22             **JUDGE RODGERS:**   I'll allow it.   You can ask

23   about it on redirect.

24   **BY MR. BROCK:**

25   **Q.**   Did you tell the examiner on 11/7 of 2015, or

Dustin McCombs - Cross/Brock                                    131

1    thereabouts, that you suffered from tinnitus as a

2    result of a blast that had occurred while you were

3    serving in Afghanistan?

4    **A.**   Actually, during that examination, I believe that

5    I told that doctor that, you know, I had ringing in my

6    ears.  I wasn't really aware that tinnitus was

7    actually a thing.

8    **Q.**   Okay.  Well, that's fair.  So, you told the

9    examiner that you had ringing in your ears and that

10   that began for the first time for you in April of

11   2009, correct?

12   **A.**   Yes, sir.

13   **Q.**   And it was as a result of a blast that had

14   occurred while you were in the field.  I guess you

15   guys were patrolling?  Or what was the situation?

16   **A.**   We were on a mission in Afghanistan.

17   **Q.**   So, while on a mission in Afghanistan, your

18   vehicle hit an IED, and you had tinnitus for a few

19   minutes following that incident, and that's how you

20   reported it when you met with the examiner, correct?

21   **A.**   Yes, sir.

22   **Q.**   And you saw a lot of doctors between 2009 and 2015

23   without complaint of tinnitus, correct?

24   **A.**   I think I actually reported it, the ringing in my

25   ears, once before that.  This is the first time that I

1    actually received help for that.

2    Q.   What is the date and physician or healthcare

3    provider to which you reported tinnitus prior to your

4    examination, your C&P examination?

5    A.   I'm not exactly sure on the date.  That was so

6    long ago.

7    Q.   Can you identify for me today any record prior to

8    2015 where you report tinnitus to any healthcare

9    provider?  And I'm talking about the period of time

10   April of 2009 until you are in the disability process

11   in 2015.

12   A.   No, sir, I can't point a day or --

13        **JUDGE RODGERS:**  Mr. Brock, I think your time

14   is about up.

15        **MR. BROCK:**  And I am wrapped up.  Thank you

16   very much.

17        **JUDGE RODGERS:**  Very good.

18        Ms. Hoekstra, briefly, please.

19                    **REDIRECT EXAMINATION**

20   **BY MS. HOEKSTRA:**

21   Q.   Mr. McCombs, you used the Combat Arms Version 2 in

22   Fort Benning; is that correct?

23   A.   Yes, ma'am.

24   Q.   And you were assigned a pair of Combat Arms

25   Version 2s in Alaska prior to your training in

1    California; is that correct?

2    **A.**   Yes, ma'am, that's correct.

3    **Q.**   And with the situation you described earlier where

4    you noticed there was a loosening of your Combat Arms

5    while you were in Alaska, could you describe what

6    activity you were doing at the time?

7    **A.**   Yes.  We were on a land navigation course, which

8    is training where they give you longitude and latitude

9    points, and it's up to you to go and find those on the

10   map, you know, find the actual physical locations.  So

11   we were rough marching through the woods, you know,

12   any way that you could get there you kind of -- you

13   take a route.

14   **Q.**   And it didn't occur to you to tell anyone that

15   this physical activity had loosened your Combat Arms

16   Earplugs at the time; is that correct?

17   **A.**   That's correct.

18   **Q.**   Was your noise exposure in Alaska greater or equal

19   to your noise exposure when you were in Afghanistan?

20          **MR. BROCK:**  Your Honor, I'm going to object

21   to that as beyond the scope and calling for an expert

22   opinion for which he does not have qualification.

23          **JUDGE RODGERS:**  I think I agree, Ms.

24   Hoekstra.

25          **MS. HOEKSTRA:**  Okay.

1              **JUDGE RODGERS:**  Sustained.  Go ahead.

2     **BY MS. HOEKSTRA:**

3     **Q.**  Mr. McCombs, when you returned from Afghanistan,

4     was your training the same volume and exposure to

5     weaponry noise that it was prior to your deployment to

6     Afghanistan?

7     **A.**  We did a little bit more training because we were

8     training for the expert infantryman badge, so it was

9     kind of -- that's -- you know, being an infantryman,

10    that's kind of their big thing is, hey, you know,

11    everyone has to have this EIB.  So we trained pretty

12    hard for that for probably about three months prior.

13    **Q.**  And did that noise exposure have any impact on the

14    ringing in your ears when you were in Alaska following

15    your deployment to Afghanistan?

16    **A.**  Yes, ma'am.  Any exposure to any sort of loud

17    noises or shooting or anything, you know, flares it

18    up.

19              **MS. HOEKSTRA:**  Thank you.

20              **JUDGE RODGERS:**  All right.  Judge Jones, any

21    questions?

22              **JUDGE JONES:**  I do not.

23              **JUDGE RODGERS:**  Judge Herndon?

24              **JUDGE HERNDON:**  No, I do not.  Thank you.

25              **JUDGE RODGERS:**  Mr. McCombs, thank you very

1    much.  You're excused.

2            **THE WITNESS:**  Thank you for your time.

3            *(Witness excused.)*

4            **JUDGE RODGERS:**  We're going to hear from Dr.

5    Packer now?

6            **MS. HUTSON:**  Yes.  He has a hard stop at one

7    o'clock so I know on the schedule is says a break

8    right now but --

9            **JUDGE RODGERS:**  Well, no, that's fine.

10           Dr. Packer, if you would, rise and raise your

11   right hand to be sworn.

12       **MARK PACKER, PLAINTIFF WITNESS, DULY SWORN**

13           **JUDGE RODGERS:**  Thank you.  Be seated.  And

14   if you would please give us your full name and then

15   spell your last name for the record.

16           **THE WITNESS:**  Yes.  Mark Packer, P-a-c-k-e-r.

17           **JUDGE RODGERS:**  Mr. Packer, if there is some

18   difficulty with the technical equipment, if you're not

19   able to hear or see us with the Zoom, please do let us

20   know if there is some problem with the transmission.

21           **THE WITNESS:**  Thank you.

22           **JUDGE RODGERS:**  All right, go ahead, Mr.

23   Pirtle, when you're ready.

24           **MR. PIRTLE:**  May it please the Court?

25           **JUDGE RODGERS:**  Yes, air.

1                          **DIRECT EXAMINATION**

2      **BY MR. PIRTLE:**

3      **Q.**   Good afternoon -- or I guess it's morning.  Good

4      morning, Dr. Packer.

5      **A.**   Good morning.

6      **Q.**   I'm Tom Pirtle.  We know each other, correct?

7      **A.**   Correct.

8      **Q.**   Here is what I want to do.  I want to talk about

9      your training and background and your experience so

10     the Court knows who you are and what you're doing.

11     And then I want to talk to you about a very specific

12     area.  And I know you're a surgeon, so we're going to

13     be very surgical in this, all right?

14     **A.**   Very good.

15     **Q.**   You've got an M.D. by your name.  What are you a

16     medical doctor of?

17     **A.**   I'm a medical doctor of otology and neurology.

18     It's a subfield of otolaryngology.

19     **Q.**   And are you board certified in both of those?

20     **A.**   Yes, I am.

21     **Q.**   I'm going to put up on the screen, to help us go

22     through this real quick, your background, and I'm just

23     going to jump to page 2.

24          Can you see that, Dr. Packer?

25     **A.**   I can.

1    **Q.**   It looks like -- the first part appears blacked

2    out.  But you got your bachelor of science at the

3    University of Utah?

4    **A.**   That's correct.

5    **Q.**   And a medical doctor or M.D. degree from the

6    Uniformed Services University of the Health Sciences?

7    **A.**   Yes, sir.

8    **Q.**   And then a general surgery internship at

9    Wright-Patterson Air Force Base.  Were you in the Air

10   Force?

11   **A.**   Yes, sir.

12   **Q.**   And then it goes on.  Why don't I let you just

13   narrate it?

14   **A.**   Okay, yeah.  So I joined the Air Force in 1991

15   when I went to the Uniformed Services University.  I

16   had general surgery internship at Wright-Patterson Air

17   Force Base.  I served for a couple of years as a

18   flight surgeon.  Following that -- *(inaudible)* --

19   medical training in otolaryngology, head and neck

20   surgery, residency in San Antonio, Texas, at Wilford

21   Hall.

22       Between 2002 and 2006, I worked as a general

23   otolaryngologist in Alaska, Elmendorf Air Force Base,

24   and then went back to complete a fellowship in

25   otology, neurotology, and cranial based surgery at

1    Ohio State University 2006 to 2008.

2    **Q.**  I got it, I got it.  And you were awarded, it

3    looks like, the Air Force Legion of Merit?

4    **A.**  Correct.

5    **Q.**  What is that?

6    **A.**  It's a -- I guess it's an award of appreciation

7    for representing work that's been done.  And so that

8    one was based on the work that I did in the Air Force

9    with leading the Department of Defense Hearing Center

10   of Excellence.

11   **Q.**  Let me go to page 4 of this slide deck, and I want

12   to ask you about this thing called the Hearing Center

13   of Excellence.

14       We have heard that name in this courtroom before.

15   What's your involvement with the Hearing Center of

16   Excellence?

17   **A.**  I was asked to be the founding or interim director

18   to stand that up and to develop a center of excellence

19   that was inclusive of DoD services and with a strong

20   relationship with the VA, and then was asked to serve

21   as the director until I retired in 2016.

22   **Q.**  So, when it says founding director, you were the

23   first director of the department -- or for the Hearing

24   Center of Excellence?

25   **A.**  Yes, that's correct.

1   **Q.**   It says below that you have -- you had recurrent

2   reporting responsibilities to the President's Council

3   of Advisors on Science and Technology.  What's that?

4   **A.**   The President has a group of scientists that

5   inform him on different aspects of science and

6   technology.  And so, when there was a need for a

7   section of hearing aids or hearing restoration or

8   hearing conservation, then I had the opportunity to

9   brief the subject.

10  **Q.**   And you also had recurrent reporting

11  responsibilities to the House Armed Services Committee

12  as well as the Senate Armed Services Committee, true?

13  **A.**   Yes, that's correct.

14  **Q.**   What did they have you reporting to them?

15  **A.**   Mostly on the development of the hearing center

16  and some of the issues that led to the development of

17  the hearing center.  So we were responsible for

18  developing the registry system that was joint with the

19  VA that would track and better quantify the hearing

20  injuries -- *(inaudible)* -- hearing conservation

21  programs, clinical care, audiometry for the DoD and

22  the VA.

23      We also had a prevention arm that dealt with

24  hearing conservation and hearing preservation and the

25  development of public service announcements and

1    awareness and identifying best practices in hearing

2    conservation and promoting those across the DoD.

3         We had a clinical care arm that looked at aspects

4    of treating hearing loss and tinnitus and, again,

5    identifying best practices and elevating those to a

6    common standard across the DoD.

7         And we had a research facilitation arm that we

8    developed a Collaborative Auditory Vestibular Research

9    Network across the Department of Defense and the VA

10   and in conjunction with universities and industry to

11   look at best practices and to provide research in the

12   areas that would help these different clinical and

13   preventative and epidemiological arms of the hearing

14   center.

15   **Q.**   Okay.  Dr. Packer, I'm going to move along to the

16   page 5.  And let me simply ask you, does page 5 of

17   this slide deck show your involvement with the NATO

18   organization as it applies to your career?

19   **A.**   Yes, it does.

20   **Q.**   And most of this has been in the area of hearing?

21   **A.**   Yes, that's correct.  So human factors in

22   medicine, we had a work effort transition -- or an

23   exploratory team and then a work effort under human

24   factors in medicine to look at kind of similar

25   functions across the NATO bodies, so the hearing

1    center strategies and registry development and

2    identifying ways to standardize capturing information

3    for hearing injury and treatment.

4    **Q.**  Let's go to the next slide.  This shows what

5    you're doing now.  You're in St. Louis, Missouri,

6    correct?

7    **A.**  Yes, that's correct.

8    **Q.**  And you're in private practice?

9    **A.**  Yes, I am.

10   **Q.**  And you go by Dr., not Col. now?

11   **A.**  That's correct.

12   **Q.**  All right.  Now, the last page, because some of it

13   is important for your qualifications.  You are the

14   author of numerous chapters in textbooks?

15   **A.**  Yes.

16   **Q.**  You've written over 30 peer-reviewed publications?

17   **A.**  Yes.

18   **Q.**  Served as a special editions editor in five

19   publications, and you've served as a peer reviewer for

20   seven peer-reviewed journals, correct?

21   **A.**  Correct.

22   **Q.**  All on hearing?

23   **A.**  Pardon me?

24   **Q.**  All on in the general area of hearing and hearing

25   loss and hearing protection?

1    **A.**   Yes, that's right.

2    **Q.**   And then you've also got experience in product

3    development, including otologic totally implantable

4    hearing aid, Bose ear measurements for the active

5    headset and the rest of them we can see, correct?

6    **A.**   Yes, that's correct.  Yeah, we had a very active

7    implant service, and we had a lot of the technologies

8    that were brought in for evaluation.

9    **Q.**   Fair enough.  In addition, you have looked at a

10   case here for us.  The guy's name is Lloyd Baker,

11   correct?

12   **A.**   That's correct.

13   **Q.**   And Lloyd Baker, have you looked at his relevant

14   medical records concerning his hearing loss?

15   **A.**   Yes, I have.

16   **Q.**   Have you looked at his two depositions that he's

17   given?

18   **A.**   Yes, I have.

19   **Q.**   All right.  And have you looked at all the other

20   relevant documents you need to express an opinion in

21   this case to a reasonable degree of medical and

22   scientific certainty?

23   **A.**   Yes, I feel like I have.

24   **Q.**   All right.  And this is where I want to narrow it

25   down.  What we're looking at right here for this

1    particular exercise -- and when we have a jury, we'll

2    come back talk a lot more and I'll go into a lot more

3    detail about your background.  But I need for you to

4    determine, based on your experience, training, and

5    review of everything, including the records --

6        Oh, by the way, you have examined Lloyd Baker,

7    haven't you?

8    **A.**   Yes.  And I think that, you know, much of my --

9    much of my opinion comes from that interview, the

10   direct responses that he gave me and the examination

11   of his ears.

12   **Q.**   Not only did you examine him, you also interviewed

13   him and got his history, correct?

14   **A.**   That's correct.

15   **Q.**   And you looked at him put in earplugs, and I

16   believe you've even watched him put in Combat Arms

17   Version 2 earplugs, if I'm not mistaken?

18   **A.**   Yeah, that's correct.

19   **Q.**   And you've looked at some of his service records,

20   too, correct?

21   **A.**   Yes, I have.

22   **Q.**   I put together a little timeline, which is --

23   which I'll put up right now.  It's titled Lloyd Baker.

24   Can you see that?

25   **A.**   Yes, I do see that.

1    **Q.**  Over on the far left-hand corner down at the

2    bottom it says, "Fort Benning, Georgia."  Are you with

3    me?

4    **A.**  I am.

5    **Q.**  And see if this comports with what you've told me

6    and what I believe Mr. Baker said.  Lloyd Baker

7    entered the military in about 5/05?

8    **A.**  Correct.

9    **Q.**  About May of '05.  And I believe he has testified

10   he was issued Combat Arms Version 2 while he was at

11   Fort Benning at some point in time.  Do you pull that

12   out?

13   **A.**  Yes, that's what he's mentioned to me as well.

14   **Q.**  What was Lloyd -- based on his baseline audiogram,

15   the audiogram that's taken when the soldiers first

16   come in, what was Lloyd Baker's hearing at the time?

17   **A.**  He had normal hearing.

18   **Q.**  Have you reviewed his audiograms?

19   **A.**  Yes, I have.

20   **Q.**  All of them?

21   **A.**  Yes, to my awareness, yes.

22   **Q.**  Now, have you -- in doing your history with him,

23   did you come across where you believe the first

24   manifestation of Lloyd Baker's injury occurred?

25   **A.**  Yes.  When he was in my office, we talked about

1     that.  And the first recollection that he had of

2     auditory symptoms was during urban warfare training

3     event that happened after he transitioned to Fort

4     Lewis.  So he was in an urban combat environment with

5     a mock city made out of concrete barriers, and they

6     were learning how to operate and move in this urban

7     warfare environment.

8          And he recalled an event where he had, you know,

9     significant ringing and trouble hearing that was

10    related to this shooting environment -- *(inaudible)* --

11    that caused him to take notice of the ringing which

12    seemed to his understanding to get better over the

13    course of, you know, a day.

14         So he -- that's the point he first recalled to me

15    during our interview that he had trouble with his

16    ears.

17    **Q.**  Okay.  Let me button this up.  To your knowledge,

18    and based on what you have learned from interviewing

19    him -- I also believe this is in his second deposition

20    -- was he using the Combat Arms Version 2 earplugs at

21    that point in time?

22    **A.**  That's what he testified to.  He said that he

23    received the Combat Arms in Fort Benning, but he

24    started using those pretty strictly in Fort Lewis

25    during these training events.

1   **Q.**   And was he using the yellow end in?   In other

2   words, was the yellow end inserted?

3   **A.**   That's correct.

4   **Q.**   And the yellow end is the end that has the

5   variable or non-linear attenuation, so to speak?

6   **A.**   Correct.   That was part of the advantage that he

7   gleaned from -- his squadron was excited to have that

8   type of technology so that they could communicate

9   better during these very precise contacts and

10   movements that they were training on.

11   **Q.**   Okay.   Just so we paint this picture out from

12   December of 2005, this urban warfare training.   I know

13   you've talked about it being concrete.   I want you --

14   and you may be in a unique position to do it -- tell

15   me a few things.

16       Like, when you mock up, like, a village, does that

17   involve going around corners and in tight spaces and

18   basically for clearing a village?

19   **A.**   Yes, it does.   So it's in and outside of

20   buildings.   And the description was that these were

21   pretty stark.   They were all concrete walls, ceilings,

22   floors, very little furniture.   And so they would go

23   through -- there were multiple shooters, and these are

24   very reverberant conditions that amplify and extent

25   the noise of the rifles.

1    Q.   Fair enough.  And I also have come to learn -- and

2    you might be able to answer this -- that at this time

3    Mr. Baker was on a gun, so to speak, called an M240, I

4    think it's M240 Bravo, which Mr. McCombs testified

5    about.

6         Does that comport with your recollection what he

7    told you?

8    A.   Yes, it does.

9    Q.   Do you know what an M240 Bravo is?

10   A.   It's a machine gun.

11   Q.   Is it loud?

12   A.   Very loud, yes.  I think it's 160 decibels.

13   Q.   160 decibel range?

14   A.   Uh-huh.

15   Q.   And is it particularly loud in enclosed,

16   reverberant spaces?

17   A.   Yeah.  I think all impact and impulse noises are

18   louder in reverberant conditions, that it extends the

19   signature of the impact or impulse.

20   Q.   I'm wondering was there -- and you may not know

21   this.  Were there roofs on the buildings or were they

22   open?  Because I've seen some layouts that are open.

23   A.   Yeah, I believe he testified that they -- that the

24   -- that it was a covered scenario, but he had worked

25   in environments with open roofs as well.

1   **Q.**   And is that a type of environment that is

2   guaranteed to cause reverberation and amplify the

3   sound of whatever noise is being made, including the

4   firing of an M240?

5   **A.**   Yes.  Sound bounces off of walls.  That's why

6   hearing tests are done in soundproof booths to take

7   away reverberation by special material.  In these

8   training conditions, they try to make them similar to

9   what you would find at war, and so it's -- part of the

10  training is getting used to the noise and the

11  conditions that happen in those type of clearing

12  situations.

13  **Q.**   Fair enough.  Have you seen enough and reviewed

14  enough to form an opinion to a reasonable degree of

15  medical probability or certainty that the initial

16  manifestation of Mr. Lloyd Baker's injury occurred

17  somewhere around either December or January of 2005,

18  2006?

19  **A.**   Yes.  That's really when his training amplified.

20  He was getting ready for deployment.  He was training

21  on different weapon systems.  He has this specific

22  event that symptomatically and temporally are

23  consistent with a temporary threshold shift in his

24  hearing.  And so I'm fairly confident that this is the

25  start of his hearing woes.

1    **Q.**   And where was he located when this event occurred?

2    **A.**   This was at Fort Lewis in Washington.

3    **Q.**   I want to move forward.  We go past this -- and

4    I'm not going to go through his full history because I

5    think the exercise here is to determine where the

6    first injury occurred.  But it's been talked about in

7    2007 he returned two shots, I think, at somebody who

8    was trying to snipe him in Iraq.

9         Did he tell you about that?

10   **A.**   Yes, he did.

11   **Q.**   Do you believe that that either caused or

12   contributed to his hearing loss?

13   **A.**   Well, I think that, in weighing the balance of his

14   exposures and his protection statuses and all, I think

15   that the start of his hearing loss was manifested with

16   that early temporary threshold shift that was

17   manifested during his training at Fort Lewis in

18   Washington.

19        With the two shots, he did have symptoms

20   associated with that as well that seemed to die down

21   over a similar time course.  But the preponderance of

22   his exposures were training in Washington.  And the

23   first manifestation of his tinnitus and his hearing

24   loss subjectively happened in Washington at Fort Lewis

25   during that training.

1    **Q.**   So we don't have an audiogram from baseline until

2    May of 2009, right?

3    **A.**   Yeah, that's correct.  I think that he testified

4    that he had other hearing tests, but these were not

5    preserved in the system.

6    **Q.**   Well, I don't know.  It would seem that there

7    probably should be one every year.  But what we have

8    right now is a gap, and it goes to May of 2009, right?

9    **A.**   That's correct.

10   **Q.**   But looking at the May 2000 *[sic]* audiogram,

11   you've looked at it, haven't you?

12   **A.**   Yes.

13   **Q.**   What does it show?

14   **A.**   The May 2009?

15   **Q.**   Yes.  Well, it's highlighted in red over there.

16   **A.**   Yeah.  He had a left-sided asymmetric

17   sensorineural hearing loss.

18   **Q.**   And that would be consistent with damage that he

19   could have gotten back in 12 of '05 going forward,

20   right?

21   **A.**   Yeah, that's correct.  He's a right-handed

22   shooter.  It would make sense that the manifestation

23   would show up in his left ear.  And subjectively,

24   again, I think that he has an event that temporally

25   with symptoms that links into that urban contact

1    training.

2    **Q.**   Okay.  And it looks like then he was -- he moved

3    forward and he was in Charleston, South Carolina, with

4    the military police.  And then there is a series of

5    audiograms, am I right, if I'm looking at this chart

6    right?

7    **A.**   Yes, that's correct.

8    **Q.**   And while he was in Charleston, South Carolina,

9    progressively his hearing, looks like, got worse; he

10   started showing STS in the right side, too, correct?

11   **A.**   Yes, that's correct.

12   **Q.**   And I won't go into -- let's go to the next slide,

13   if we can.  Can you see this, Doctor?

14   **A.**   Yes, I can.

15   **Q.**   Dr. Packer, are these your opinions for this

16   particular day?

17   **A.**   Yes, it is.

18   **Q.**   First it says Mr. Baker has hearing loss and

19   tinnitus which occurred during his time in the

20   military, agreed?

21   **A.**   That's correct.

22   **Q.**   Mr. Baker first experienced hearing loss and

23   tinnitus during urban warfare training which occurred

24   at Fort Lewis, Washington, agree?

25   **A.**   Yeah, that's his testimony.  That's what he told

1   me in a personal interview.

2   **Q.**   And you said Mr. Baker's injury was as a result of

3   the CAEv2 at Fort Lewis, Washington, at least the

4   initial insult?

5   **A.**   Yeah, that's correct.

6   **Q.**   Briefly, will you explain to the Court what a --

7   well, the Court knows but I need to do it for the

8   record -- what a differential diagnosis is.

9   **A.**   Yes, sure.  That's where you take in all of the

10  possible or potential etiologies that could contribute

11  to or cause a hearing loss, tinnitus, and that sort

12  through that to rule out these that are not likely

13  causes so that you can center on things that are

14  likely causes.

15  **Q.**   And is that what you have done in formulating your

16  opinions here today, looked at this list of factors

17  and maybe more that where you ruled out other causes

18  for his hearing loss, "him" being Lloyd Baker?

19  **A.**   That's correct.  We went through, you know, his

20  past medical history, his family history, social

21  history, any surgical history, medications that he was

22  on, the depositions that he had as well as the

23  audiogram trail, some of his ancillary exposures, like

24  you mentioned, the few shots that were fired,

25  unprotected because he had to take out the earplug to

1   hear a conversation.

2        That was all taken into consideration.  And with

3   the preponderance of his exposures and with the

4   knowledge of the development and the problems that

5   were associated with the Combat Arms Version 2

6   earplugs, I feel that his symptoms are very well time

7   stamped to that urban contact as the start of his

8   hearing loss and tinnitus, which then progressed

9   throughout his career and his exposures wearing these

10  devices.

11  **Q.**  And is the differential diagnosis method of

12  determining what caused the event a standard tool

13  that's used by doctors across the world, in fact?

14  **A.**  Yes, it is, it is.

15  **Q.**  Well, do you have anything else you'd like to add?

16  **A.**  I don't.  I think that Mr. Baker was a reliable

17  historian.  He was -- you know, in our personal

18  interactions, he was forthright and forthcoming and

19  seemed to, you know, be interested in telling a

20  truthful story.  So I feel like it was a reliable

21  interview.

22  **Q.**  Fair enough.  I'm fixing to let the 3M lawyer talk

23  to you now.

24          **MR. PIRTLE:**  I'll pass the witness.

25          **JUDGE RODGERS:**  All right.  Thank you.

1               All right, Mr. Wasdin?

2          **MR. WASDIN:**  Your Honor, I'm going to refer

3     back to the Baker documents that we've already put

4     into evidence.

5          **JUDGE RODGERS:**  Okay, that's fine.

6                    **DIRECT EXAMINATION**

7     **BY MR. WASDIN:**

8     **Q.**  Dr. Packer, my name is Nick Wasdin.  I represent

9     3M.  Can you hear me okay?

10    **A.**  Yes, I can.

11    **Q.**  Great.  I want to start by putting up two of Mr.

12    Baker's audiograms so we can get on the same page

13    about what the audiometric record is in the case.

14         **MR. WASDIN:**  So, Donnie, can you put up --

15    it's a Baker audiogram that ends in DoD00002.

16    **BY MR. WASDIN:**

17    **Q.**  Dr. Packer, are you able to see that document?

18    **A.**  That's better, yeah.  I wasn't at first, and now

19    it's clear.

20         **MR. WASDIN:**  Donnie, can you callout those

21    rows in the middle that have the two May dates on the

22    left and all the numbers going across, that whole --

23    we'll just keep it right here, that's fine.

24    **BY MR. WASDIN:**

25    **Q.**  Dr. Packer, can you see that?

1    **A.**   Yes, I can.

2    **Q.**   Okay.  Am I correct that, in terms of objective

3    audiometric data, what we have for at least the first

4    part of Mr. Baker's timeline is the May 2005 reference

5    audiogram that is the bottom row and then next a May

6    2009 audiogram that's the top row.  Is that right?

7    **A.**   Yes, that's correct.

8    **Q.**   So we don't have any objective audiometric data in

9    between May 2005 on the one hand and May 2009 on the

10   other; is that right?

11   **A.**   Yeah, that's correct.  We just have subjective

12   data.

13   **Q.**   I'm sorry, what did you say?

14   **A.**   Yeah, objective data from audiograms, you're

15   correct, the subjective data from his testimony is all

16   we have.

17   **Q.**   So everything you have in between those two points

18   in time is subjective; is that fair?

19   **A.**   That's his personal testimony, yes, that he -- the

20   symptoms that he espoused were subjective.

21   **Q.**   So the task that you were given in the case, or

22   one of them, was to try to figure out when in between

23   May 2005 and May 2009 the threshold shifts that are on

24   this audiogram occurred, right?

25   **A.**   Well, the task was to identify the timing of his

1    injury, I believe.  And the timing of his injury

2    sounded stamped, again, to that urban warfare training

3    that he mentioned that he first noticed the ringing in

4    the ears and the muffled hearing in relation to the

5    exposure of the urban contact setting.

6    **Q.**   In your report you put out a nice chronology of

7    all of the documents that you had at your disposal,

8    consideration materials, correct?

9    **A.**   Correct.

10   **Q.**   And the first document in terms of chronologically

11   in this gap is a post-deployment health assessment

12   from October 3rd, 2008, right?

13   **A.**   I would have to check.  I can take your word for

14   it, but I don't see it, and I don't have a reference

15   to that right now.

16   **Q.**   Okay, sure.

17          **MR. WASDIN:**   Donnie, can you put up a copy of

18   Dr. Packer's report for him and flip to page 18.

19   **BY MR. WASDIN:**

20   **Q.**   Dr. Packer, take a look at the paragraph at the

21   bottom that begins on October 3rd, 2008, and give that

22   a quick skim, and let me know if that sounds right to

23   you.

24   **A.**   Thank you.  My eyes are getting old.  Yes.

25   **Q.**   So, again, the first document that you had after

1    the May 2005 audiogram that you talk about in your

2    report is this October 3rd, 2008, post-deployment

3    health assessment, correct?

4    **A.**   Correct.

5    **Q.**   And what that says, as you describe it here on the

6    third sentence or third line, is that he reported no

7    trouble hearing but yet still bothered by ringing in

8    his ears, right?

9    **A.**   Correct, that's what it says.

10   **Q.**   Okay.  Now, you also had at your disposal a number

11   of other DoD and VA records that are listed as

12   consideration materials for your report that chronicle

13   Mr. Baker's hearing after this period of time, too; is

14   that fair?

15   **A.**   That's correct.

16         **MR. WASDIN:**   So, Donnie, can we put up what

17   was previously admitted as Defendant's Exhibit 45.

18   **BY MR. WASDIN:**

19   **Q.**   Dr. Packer, do you recognize Defendant's Exhibit

20   45 as a compensation and pension exam report for Lloyd

21   Baker?

22   **A.**   Can you blow that up?  It's a little blurry but it

23   looks like one.

24         **MR. WASDIN:**   Donnie, can you blow the name up

25   at the top.

1          **THE WITNESS:**  There, okay.

2    **BY MR. WASDIN:**

3    **Q.**  And on this report, at the bottom there, it says

4    that the examination here was performed on October

5    16th, 2009, correct?  So that's about a year after the

6    post-deployment health assessment that you just

7    referenced in your report we were talking about?

8    **A.**  Yeah, that's correct.

9    **Q.**  Okay.  Now, if you go down on the same page, there

10   is a history of military occupational and/or

11   recreational noise exposure.  Do you see that?

12   **A.**  History -- yes, I do.

13   **Q.**  During your time in the military -- we heard about

14   your background -- did you develop an understanding of

15   where this type of information comes from during an

16   examination like this?  Is this something that the

17   patient reports to the doctor?

18   **A.**  Generally, yes.

19   **Q.**  And here the noise exposures that are reported are

20   that he was in the infantry for four years, served in

21   Iraq for one year and three months, around machine

22   gunfire, explosions, and loud engine noises, right?

23   **A.**  Correct.

24   **Q.**  It doesn't specifically say anything about urban

25   warfare training there, is that fair, sir?

1   **A.**   Yeah, it generally doesn't get that specific.

2   **Q.**   Okay.  Next page.  There is a section for exam

3   results continued.  Do you see that, Dr. Packer?

4   **A.**   Yes.

5   **Q.**   And one of the things there that's listed is the

6   date and circumstances of tinnitus onset.  Do you see

7   that?

8   **A.**   Yes, I do.

9   **Q.**   That's got quotes around it where it says, "When I

10   got back from Iraq last year," right, sir?

11   **A.**   Correct.

12   **Q.**   Is it your experience that, when information like

13   that is quoted in a record of this sort, it's because

14   that's what the patient told the treating physician?

15   **A.**   Yeah, that's likely what he remembers.  There was

16   a -- there was a medical surveillance monthly report

17   that talked about some of the frustrations that we had

18   in a Hearing Center of Excellence with this kind of

19   document, because the number one and number three most

20   prevalent injuries that were diagnosed within six

21   months of retirement or separation were, number one,

22   tinnitus, and number three, hearing loss.

23        And so, a lot of times, you know, the discussion

24   that gets documented doesn't reflect a real concerted

25   effort to think back and sort through the memories to

```
 1    define when that might have occurred.
 2         And so I think that it does say this, but it's not
 3    surprising that, you know, when he has tried to think
 4    back and remember all the incidents and the locations,
 5    that his memory is able to kind of identify those
 6    events.
 7    Q.   When you were forming your opinions in this case
 8    that you gave the Court earlier, you assumed that this
 9    was inaccurate, didn't you, sir?
10    A.   Yeah, I assumed that he, you know, participated in
11    this plan and, you know, gave accurate -- he's a
12    reliable gentleman, and I think that he probably
13    related what his thought on the subject was.
14    Q.   Now, you also have in your consideration materials
15    the documents that the VA generated rendering a
16    decision on Mr. Baker's disability application, right,
17    sir?
18    A.   That's correct.
19    Q.   Let's take a look at some of those.
20         MR. WASDIN:   Donnie, can we put up Document
21    44, Defendant's Exhibit 44, and if you can take us to
22    the page ending in 1642.
23    BY MR. WASDIN:
24    Q.   Dr. Packer, do you recognize this as the ratings
25    decision for Lloyd Baker by the VA?
```

1    **A.**   Yes.  If you wouldn't mind blowing it up, though;

2    it's blurry.

3    **Q.**   Sure thing.

4    **A.**   Okay.  Yeah, that's better.  Thanks.

5    **Q.**   And is the date on this December 11th, 2009?

6    **A.**   Yeah.

7            **MR. WASDIN:**   If we can go to the next page,

8    Donnie, and blow up the reason for decision.

9    **BY MR. WASDIN:**

10   **Q.**   Dr. Packer, can you see the reason that's given

11   here for the VA's decision on Mr. Baker's disability?

12   **A.**   Yes, I can.

13   **Q.**   The second line says, "Service treatment records

14   fail to show complaints of, treatment for, or a

15   diagnosis of tinnitus in service."  Did I read that

16   right?

17   **A.**   Yes, you did.

18   **Q.**   Was that consistent with your review of the

19   document, sir?

20   **A.**   Yes.  And, again, it's not inconsistent, though,

21   with the medical surveillance monthly report that I,

22   you know, the study that they did that shows that

23   tinnitus oftentimes is the -- well, it is the leading

24   diagnosis that happens within six months of

25   retirement.  And so it's something that a lot of

1    servicemembers put up with and deal with and then seek

2    help before they get out of the service.

3    **Q.**   Did you say that tinnitus claims tend to be

4    highest about six months after servicemembers retire?

5    **A.**   No, prior to.

6    **Q.**   Prior to retirement?

7    **A.**   Yeah.  Meaning that -- my experience in the

8    military was that these servicemembers are like

9    athletes.  They, you know, they don't let something

10   that doesn't bleed or doesn't hurt or, you know, is

11   kind of a bother or nuisance problem, not a health

12   risk or a debilitating problem, get in the way of

13   their service.

14       And so, it's very common that when somebody has --

15   well, not just for the military, but when people go to

16   a concert and they have ringing in their ears and they

17   come home, they don't typically go seek medical help,

18   because generally that's something that goes away, in

19   their experience.  And unless it's persistent, then

20   they tend to put up with it until it becomes something

21   that they need to document or talk about.

22   **Q.**   Was it your experience that servicemembers tend to

23   give accurate information to the VA when seeking a

24   disability?

25   **A.**   Yeah, to their recollection at the time, yes.

1    Q.   If we go to the third paragraph, does it say that

2    "During the VA examination from Charleston VAMC

3    conducted on October 16th, 2009, you reported

4    hazardous exposure to machine gunfire, explosions, and

5    engine noise, and the onset of tinnitus following your

6    return from Iraq."

7         Did I read that right?

8    A.   Yes, you did.

9    Q.   Okay.  When you were forming your opinions in this

10   case that you gave the Court earlier, this is another

11   document that you assumed was inaccurate, right, sir?

12   A.   Was inaccurate?

13   Q.   Correct.

14   A.   No.  I think he had those exposures during his

15   time in Iraq, but I think he had more of that leading

16   up to his deployment.  I think that his training

17   environment was louder and more consistent with

18   weapons fire than what he experienced in the deployed

19   setting.

20   Q.   So this document says that the onset of tinnitus

21   followed his return from Iraq, correct?

22   A.   That's what it says.  What he told me in a

23   personal interview in my office was that he recalled

24   hearing muffling and tinnitus in his ear related to

25   the episode at Fort Lewis that we talked about.

1    **Q.**   That's what I'm saying, I'm pointing out that.

2    You assumed, in forming your opinion in this case,

3    that this document, this VA ratings decision, got it

4    wrong as to when his tinnitus onsets, correct?

5    **A.**   I think -- I don't know that they got it wrong.  I

6    think that his memory at the time in his interview was

7    that the compensation and pension's positions were

8    accurate, to the best of his knowledge at the time.  I

9    don't know how much thought he put into it.  And if

10   somebody asks him, you know, if he had ringing in his

11   ear related to his service in Iraq, then I think he

12   would have said yes.

13   **Q.**   Okay.  Fair to say, though, sir, that this VA

14   ratings decision doesn't say anything at all about

15   urban warfare training in 2005, correct?

16   **A.**   No, it doesn't say that, you're correct.

17           **MR. WASDIN:**   Donnie, let's pull up

18   Defendant's Exhibit 47.

19   **BY MR. WASDIN:**

20   **Q.**   Dr. Packer, also in your consideration materials

21   are some DoD records that contain what are referred to

22   as periodic health assessments, right?

23   **A.**   Yeah, that's correct.

24   **Q.**   Do you recognize this as a periodic health

25   assessment for Lloyd Baker dated February -- well,

1    first, do you recognize it as a periodic assessment

2    for Lloyd Baker?

3    **A.**   Yes.

4            **MR. WASDIN:**   Donnie, go to the very last

5    page, page 198, and let's pull a date off of it.

6    **BY MR. WASDIN:**

7    **Q.**   Dr. Packer, do you see the signatures down at the

8    bottom?  They're surrounded by a couple of dates.  If

9    we can blow those up, I'd like to ask you if it looks

10   like it's dated February 10th, 2012.

11   **A.**   Yes.

12   **Q.**   Was it your experience with servicemembers that

13   they tended to give accurate information to their

14   health care providers during these periodic

15   assessments?

16   **A.**   I do.  I don't know that it's always complete or

17   comprehensive, but I think that they try to be

18   straightforward when they're talking to their

19   physicians, yes.

20           **MR. WASDIN:**   Donnie, take us to page 192,

21   please, and if you can blow up question No. 5 down

22   there.

23   **BY MR. WASDIN:**

24   **Q.**   Dr. Packer, one of the questions that was asked

25   during this periodic health assessment was, "Are you

1   currently receiving any VA disability, Workmen's

2   Compensation, or other type of compensation for health

3   or physical reasons?"  And the answer was, "Yes,"

4   correct?

5   A.   Correct.

6   Q.   And Mr. Baker reports that he has 10 percent

7   hearing loss in his left ear, and the provider

8   comments say, "Noise induced 2007 to 2008."  Did I

9   read that right?

10  A.   Correct.

11  Q.   And do you recall from your timeline that you

12  discussed on your direct examination where Mr. Baker

13  was physically located during 2007 and 2008?

14  A.   Let me just backtrack here.  He was in Germany or

15  deployed at the time.

16  Q.   Not in Fort Lewis, though, fair to say, sir?

17  A.   Fair to say.

18  Q.   So, this is the third document that you and I have

19  talked about that relates to hearing loss or tinnitus

20  onset at some location other than Fort Lewis, right?

21  A.    That's correct.  I'll say, though, that that was

22  part of our frustration in the Hearing Center of

23  Excellence, because most of this data is carried

24  forward, and so physicians who are busy and tend to

25  not necessarily engage in getting a clear, concise

1    history oftentimes perpetuate the tracks that are left

2    before them in asking questions of patients.

3         And so it's a common experience for me, when I'm

4    taking the history, to get bits and pieces of the

5    puzzle that you would consider for a differential

6    diagnosis over time as you talk to patients and as

7    they recall and they reflect upon issues at hand.

8         And so, these do say what they say.  I don't have

9    any reason to believe that Mr. Baker was, you know,

10   lying or trying to misrepresent any truth.  But I do

11   feel like it's a common event for patients to, you

12   know, think back to the most recent episode and that's

13   what gets documented, or the physicians or providers

14   will perpetuate things that have previously been

15   stated in a record.

16        And so that was part of our goal was to clear up

17   the data for the registry based on the congressional

18   mandate and the government accountability

19   recommendations to have better transmission of data.

20        So I think that what it says it says.

21        In his interview with me, after thinking very

22   thoroughly about this, he notes that, in the urban

23   contact warfare at Fort Lewis, he had an event that

24   was consistent with a temporary threshold shift, and

25   in his deposition he brought that up that he

1    recognized that when he was, again, staying at a

2    friend's house in Fort Lewis prior to his deployment

3    to Germany.

4        So I agree that these documents say that.  I don't

5    know that there was any intentional misrepresentation.

6    But from his discussions with me, I feel that he was

7    able to identify an event in his training during a

8    very concentrated noise exposure that is consistent

9    with a temporary threshold shift.

10   **Q.**  Basically what you're saying is he told you

11   something different and you believe him?

12   **A.**  Well, I think, again, that, when you talk to

13   patients in general, bits and pieces of the history

14   come out the more and more you talk to them.  And so,

15   as he's thought about this and discussed it over and

16   over again, I think that, you know, his representation

17   to me was that he had an event at Fort Lewis, which

18   makes sense given the environment that he was in and

19   is consistent with a right-handed shooter with a

20   left-sided exposure.  And so I don't have any reason

21   to not believe him.

22   **Q.**  Yeah, but all of his shooting over the entire

23   course of his military service would be right-handed

24   shooting, right?

25   **A.**  Yeah, that's correct.

1  **Q.**  So the fact that he has a hearing loss that's

2  consistent with right-handed shooting in 2009 doesn't

3  tell us anything about an urban warfare training in

4  2005, right?

5  **A.**  No.  But the subjective information that he says

6  is consistent with a temporary threshold shift at that

7  time.

8  **Q.**  Right.  Now, your report also mentioned, Dr.

9  Packer, that Mr. Baker was hired by a private security

10  contractor beginning in 2012.  Does that sound

11  familiar?

12  **A.**  That does.

13  **Q.**  The security contractor was called Triple Canopy,

14  right, sir?

15  **A.**  Uh-huh, yes.

16  **Q.**  Now, you list Triple Canopy records as part of

17  your consideration materials in the case, so let's

18  take a look at one.

19          **MR. WASDIN:**  Can we pull up Defendant's

20  Exhibit 40?

21  **BY MR. WASDIN:**

22  **Q.**  Dr. Packer, do you recognize this document as a

23  patient registration consent form that Mr. Baker

24  filled out in connection with his application to

25  Triple Canopy?

1    **A.**   Yes.

2    **Q.**   If we go down to the middle, towards the bottom,

3    there is a paragraph that starts out, "Pursuant to LSA

4    R.S."

5          Do you see that, Dr. Packer?

6    **A.**   Yes, I do.

7    **Q.**   Do you remember whether or not you read that

8    paragraph when you first reviewed these materials

9    forming your opinion?

10   **A.**   No, I don't remember.  You know, I went through

11   these records, I remember the record, but I don't

12   remember specific paragraphs.

13   **Q.**   Well, sitting here today, do you know whether or

14   not you ever even read this document at all?

15   **A.**   Yes, I most likely did.

16   **Q.**   Well, let's talk about what that paragraph says.

17          **MR. WASDIN:**   Can we blow it up, Donnie.   You

18   know what, I can read it.

19   **BY MR. WASDIN:**

20   **Q.**   It says, "Pursuant to LSA R.S.," and then there's

21   some numbers, "I understand that the failure to answer

22   truthfully any questions related to my health history

23   or current condition may result in a denial of any

24   right I or my dependents may have to Workers'

25   Compensation benefits."

1       Did I read that right?

2    **A.**   Yes, you did.

3    **Q.**   Would you expect, given the stakes, that Mr. Baker

4    would have given truthful information on this form?

5    **A.**   Yeah, I -- again, you know, I don't feel that Mr.

6    Baker tried to misrepresent anything along the way.

7    And during those interviews and those questionnaire

8    and the compensation and pension exam, I think that,

9    to the best of his recollection at the time, he

10   probably stated what he felt.

11   **Q.**   Let's take a look at what he said.

12          **MR. WASDIN:**   If we go to the next page,

13   Donnie.  One more, I think.  Toward the bottom, if you

14   can blow it up.

15   **BY MR. WASDIN:**

16   **Q.**   There is a section that asks the question:  "Are

17   you now or have you ever been exposed to loud noises

18   on the job?"  And Mr. Baker answered yes, right, Dr.

19   Packer?

20   **A.**   Yes.

21   **Q.**   And then, unlike some of the other records we saw,

22   this one actually gave him a blank space -- a number

23   of blank lines to write in whatever he wanted, right?

24   **A.**   Correct.

25   **Q.**   And what did he write in, sir?

1    **A.**   "In the military Iraq '07, '08."

2    **Q.**   Okay.  He wasn't at Fort Lewis in '07, '08, right?

3    He was in Iraq?

4    **A.**   No.  But he was in the military from '05 to '09.

5    And so, when it asked about exposure, when he says the

6    military, that's comprehensive of his military

7    experience, and then isolates the time frame in Iraq

8    to the '07-08 timeline.

9    **Q.**   I see.  So, when you were doing your differential

10   diagnosis in the case, the way you interpreted this

11   document was, "In the military, period, generally, and

12   then also specifically in Iraq.

13   **A.**   That's what it says.

14          **MR. PIRTLE:**   Objection, argumentative.

15          **JUDGE RODGERS:**   Mr. Wasdin, there was an

16   objection based on argumentative.  I'm going to

17   overrule it, but it's borderline.

18          **MR. WASDIN:**   Okay.

19   **BY MR. WASDIN:**

20   **Q.**   Dr. Packer, is that the fourth or fifth record you

21   and I have talked about today that specifically

22   mentions the onset of either hearing loss or tinnitus

23   in Iraq in 2007 or 2008?

24   **A.**   Well, this one doesn't talk about tinnitus or

25   hearing loss.  This talks about noise exposure.  And I

1    haven't been keeping track, but I think you're

2    probably right, four or five.  This one -- you know,

3    this one talks about his military experience, period,

4    it talks about a separate specific Iraq time frame,

5    and so I don't find that inconsistent with his

6    interview.

7  **Q.**  I looked at your consideration list in preparation

8    for today to see whether or not you had on there a

9    document called an initial census form.  Does that

10   ring any bells with you?

11 **A.**  I don't know.  There are a lot of documents that I

12   reviewed, and I don't recall that one right out, but I

13   -- I may have.

14        **MR. WASDIN:**  Let's pull it up, Donnie.

15        **JUDGE RODGERS:**  Mr. Wasdin, I'm going to ask

16   you to move through this quickly because I don't think

17   the doctor's answers are going to change.  And he has

18   a one o'clock hard stop, and Mr. Pirtle needs to be

19   given an opportunity for redirect.

20        **MR. WASDIN:**  Okay, Your Honor, let me try to

21   do this quickly.  I'd like to make a record of the

22   fact that he didn't consider this, if I can.

23        **JUDGE RODGERS:**  All right, quickly.  You will

24   have taken 30 minutes of the time in two minutes.

25        **MR. WASDIN:**  Okay.

1              Donnie, can we pull up 41 and 42.

2    **BY MR. WASDIN:**

3    **Q.**  Dr. Packer, take a look at this.  You'll see up on

4    the left here, at least on my screen, it says Exhibit

5    B, initial census questions.  Do you see that?

6    **A.**  I do.  It's blurry again, but I see Exhibit B.

7              **MR. WASDIN:**  Can you blow that up for him,

8    Donnie?

9    **BY MR. WASDIN:**

10   **Q.**  Do you just recall one way or another whether this

11   is a document that you looked at during your review of

12   the case?  I didn't see it on your consideration list

13   is why I'm asking.

14   **A.**  I don't recall it one way or the other.

15   **Q.**  Sitting here today, you don't have any memory of

16   looking at this document when you were forming your

17   opinion about when Mr. Baker was injured, right?

18   **A.**  I don't remember this.

19   **Q.**  I'm sorry, you broke up there.

20   **A.**  No, I don't remember this.

21   **Q.**  Okay.  We've talked about a number of documents

22   that talk about noise exposure or tinnitus or hearing

23   loss in the '07 and '08 time period; we just said

24   that.

25       Let me ask you on the other side of the ledger,

1    sir, what material have you seen, if any, that

2    references Lloyd Baker having an acute event while

3    doing urban warfare training at Fort Lewis?

4    **A.**   Well, his interview with me and his depositions, I

5    feel like he -- you know, it's not -- *(inaudible)* --

6    to see the documents like this.  A lot of times those

7    questions are asked -- *(inaudible)* -- deployment

8    statuses, pre- and post-deployment interviews, and a

9    lot of the relevance in the compensation and pension

10   exams go to deployed conditions.  And so I think that

11   those are a highlight when somebody is interviewing a

12   patient for those purposes.

13       And so I -- again, those say what they say.  That

14   was part of my problem with the Hearing Center of

15   Excellence data registry development is that we had a

16   lot of garbage in that leads to garbage out.  And so,

17   to try to clear up those records is an ongoing

18   process.

19       But what he told me and what he testified under

20   testimony was that he had subjective symptoms that are

21   consistent with a temporary threshold shift in a

22   setting that is a credible source of noise, and so

23   that's what I based my opinion on.

24   **Q.**   Okay.  I want to ask you about one more thing

25   that --

1        **JUDGE RODGERS:**  No.  It's time, Mr. Wasdin.

2    I'm sorry, but it's 30 minutes.

3            Mr. Pirtle, quickly.

4        **MR. PIRTLE:**  Very quickly.

5            Can you pull up your Exhibit 47 that was just

6    displayed, Iraq '07-'08, loud noises.

7                   **REDIRECT EXAMINATION**

8    **BY MR. PIRTLE:**

9    **Q.**   Dr. Packer, you remember the exhibit, right?

10   **A.**   Pardon me?

11   **Q.**   I'm trying to pull it back up.

12       **MR. PIRTLE:**  Yes, I think that's it.  Will

13   you go back to where it talks about exposure to loud

14   noises.  That's not it.  That was the one before the

15   last one.

16       **MR. WASDIN:**  What are you looking for, Tom?

17       **MR. PIRTLE:**  The one of exposure to loud

18   noises.

19   **BY MR. PIRTLE:**

20   **Q.**   At any rate, let's see if I can -- they'll work on

21   getting it up, Dr. Packer.

22       In Iraq, in 07 and 08, it's true that Mr. Baker

23   was exposed to loud noises, right?

24   **A.**   That's correct.

25   **Q.**   It's also true at Fort Lewis Mr. Baker was exposed

1    to loud noises?

2    **A.**   That's also correct.

3    **Q.**   Is there any doubt in your mind that both

4    statements are true?

5    **A.**   Those statements are both true.

6    **Q.**   And then moving forward, after '09, when he was in

7    the reserves in South Carolina, and he qualified with

8    his M9 using the Combat Arms Earplugs, he was exposed

9    to loud noises, right?

10   **A.**   That's also correct.

11   **Q.**   The point of this exercise is --

12        Oh, it's up.  Can you see it?

13   **A.**   Yes.

14   **Q.**   That's a true statement, isn't it?

15   **A.**   Yes, it is.

16   **Q.**   It may not be a complete statement, but it's a

17   true statement?

18   **A.**   I believe so.  Mr. Baker -- go ahead.

19   **Q.**   Based on everything that you've gathered -- or let

20   me just ask you this.  Do you rely on histories from

21   your patients to make diagnoses every day?

22   **A.**   Yes, I do.  And sometimes those histories become

23   more detailed as you consult with the patient over and

24   over again.

25   **Q.**   And sometimes some things jar a patient's memory

1    so that they can remember events that otherwise

2    wouldn't be as important in their lives?

3    **A.**   Yes, that's correct.  I think that, you know, it

4    -- when you're training in the military, that's

5    exciting, there is a lot of adrenaline, and you're

6    preparing for Iraq.  So I don't discount that he could

7    have put off that initial memory of an event with his

8    hearing and moved on as a soldier would until, you

9    know, other people were asking him later on down the

10   road and he had other exposures that were more

11   prominent in his mind.

12   **Q.**   And you're a person in a unique position to talk

13   about the DoD's or the Army's medical records because

14   of your position with the Hearing Center of

15   Excellence, correct?

16   **A.**   We talk to a lot of servicemembers about their

17   experiences, and we had a lot of ancillary inputs.  So

18   yes, my career was based on this type of problem in

19   the military and the potential solutions to rectify

20   it.

21   **Q.**   And all the documents you were shown, except for

22   the last one, which I believe is a court document, you

23   had considered in formulating your opinions here

24   today?

25   **A.**   Yes, correct.

1   **Q.**   And has anything happened that has changed those

2   opinions?

3   **A.**   No, sir.

4            **MR. PIRTLE:**   Thank you very much.   Pass the

5   witness.

6            **JUDGE RODGERS:**   Thank you.

7            Doctor, one moment.

8            Judge Jones, do you have any questions?

9            **JUDGE JONES:**   No, I do not.

10           **JUDGE RODGERS:**   And Judge Herndon?

11           **JUDGE HERNDON:**   No, I do not.   Thank you.

12           **JUDGE RODGERS:**   All right, Dr. Packer, thank

13   you very much.   You're excused.

14           **THE WITNESS:**   Thank you very much.   I

15   appreciate your consideration today.

16           **JUDGE RODGERS:**   Yes, thank you.

17           *(Witness excused.)*

18           All right.   How do you all want to proceed

19   from here?

20           **MR. AYLSTOCK:**   Mr. Keefer is ready.   We're

21   also happy if the Court would want to take a short

22   break.

23           I think, in light of the schedule slipping,

24   we'll take Mr. Brock up on his offer to -- probably

25   we'll just submit the depositions that were designated

1    just to speed this along.

2         **JUDGE RODGERS:**  Okay.

3         **MR. BROCK:**  We'll see where we are and what

4    kind of time we have.  I was suggesting that earlier

5    because I thought we were falling behind.

6         **MR. AYLSTOCK:**  We definitely are.

7         **JUDGE RODGERS:**  Yeah, we're behind.

8         Does anyone need a restroom break before we

9    start with Mr. Keefer?  We don't need to take a lunch

10   break, but what about a restroom break?

11        **MR. BROCK:**  I need to step out, but I can do

12   that --

13        **JUDGE RODGERS:**  Well, that's all right.  It's

14   been another couple of hours, so we'll take just five

15   to ten minutes max, and then we'll start with Mr.

16   Keefer.

17        *(Recess taken 12:56 p.m. to 1:12 p.m.)*

18        **JUDGE RODGERS:**  Hi, Mr. Keefer.  I'm Judge

19   Casey Rodgers.  Mr. Barr will be conducting your

20   examination in just a moment, but let me ask if you

21   would please rise and raise your right hand to be

22   sworn.

23       **LEWIS KEEFER, PLAINTIFF WITNESS, DULY SWORN**

24        **MADAM CLERK SIMMS:**  Be seated.  Please state

25   your full name and spell your last name for the

```
 1    record.
 2          THE WITNESS:  Lewis Charles Keefer, Jr.  Last
 3    name is K-e-e-f-e-r.
 4          JUDGE RODGERS:  All right.  Mr. Keefer, if
 5    there is any difficulty with the transmission, the
 6    Zoom audio or video, please let us know if you
 7    experience that.
 8          All right, Mr. Barr, go ahead.
 9                    DIRECT EXAMINATION
10    BY MR. BARR:
11    Q.  Lewis, I know sometimes you tend to speak a little
12    softly, so try and keep your voice up today.  It
13    didn't appear to be an issue with what I was just
14    hearing.
15    A.  Yes, sir.
16    Q.  Lewis, how old are you today?
17    A.  I'm currently 40 years old.
18    Q.  And where do you currently live?
19    A.  Hobart, Oklahoma.
20    Q.  And what do you do in your occupation now, Lewis?
21    A.  I'm a police officer for the City of Hobart.
22    Q.  Was there a point in time that you served in the
23    military?
24    A.  Yes, sir, in the United States Army.
25    Q.  And how long were you in the Army?
```

1    **A.**   March of 2007 to April of 2015, so eight years.

2    **Q.**   And what rank did you achieve while you were in

3    the Army?

4    **A.**   I was honorably discharged at the rank of

5    specialist.

6    **Q.**   And when you were serving in the Army, what was

7    your MOS?

8    **A.**   I was a medic, sir.

9    **Q.**   In 2007, when you enlisted in the Army, where were

10   you stationed?

11   **A.**   Fort Benning, Georgia.

12   **Q.**   And how long were you stationed in Georgia at Fort

13   Benning?

14   **A.**   I was stationed in Fort Benning from March of 2007

15   to March of 2011.

16   **Q.**   And was there a period of time while you were

17   stationed in Fort Benning where you were deployed to

18   Iraq?

19   **A.**   Yes, sir, in July of --

20   **Q.**   And when were you -- I'm sorry, I cut you off.

21   When were you deployed to Iraq?

22   **A.**   July of 2009 to July of 2010.

23   **Q.**   And after your deployment, did you come back to

24   Fort Benning?

25   **A.**   Yes, sir, I returned to Fort Benning.

1   **Q.**   And you were at Fort Benning for how much longer

2   after you returned from Iraq?

3   **A.**   Almost a year.  I had transferred to Schofield

4   Barracks, Hawaii, in March of 2011.

5   **Q.**   Now, while you were stationed at Fort Benning,

6   prior to your deployment to Iraq, did you rekindle a

7   relationship with your ex-spouse, Emily Keefer?

8   **A.**   Yes, sir.

9   **Q.**   And did you and Emily ultimately get married?

10  **A.**   We did, sir.  We wed March 1st, 2008.

11  **Q.**   And how long had you been in the military at the

12  point in time y'all got married?

13  **A.**   Roughly a year.

14  **Q.**   And when you got married, did Emily come to live

15  with you in Georgia?

16  **A.**   She did, sir.

17  **Q.**   And where did y'all live?

18  **A.**   We lived in on-post housing or on-base housing at

19  Fort Benning, Georgia.

20  **Q.**   And did you and Emily interact on a daily basis

21  while you were living in Georgia?

22  **A.**   Yes, sir, as a married couple, we lived together

23  and we saw each other every day.

24  **Q.**   I want to move on, and I want to talk to you about

25  your exposure to noise while you were based at Fort

1   Benning.

2       How long were you stationed at Fort Benning prior

3   to your deployment to Iraq?

4   **A.**   From March of 2007 to July of 2009, so a little

5   over two years.

6   **Q.**   And while you were stationed at Fort Benning, were

7   you exposed to loud noises?

8   **A.**   Yes, sir.

9   **Q.**   If you can, could you just describe for the Court

10   the types of loud noises you were exposed to during

11   that two-year period prior to your deployment to Iraq

12   while you were at Fort Benning.

13   **A.**   Those two years, sir, were primarily training

14   years for me to include basic combat training and

15   ramp-up training for deployment.  So we were

16   frequenting the range throughout basic rifle

17   marksmanship.  For four-to-six-week block of

18   instruction we were at the range every day, firing 500

19   to 1,000 rounds.

20       And then, after basic combat training, it was more

21   rifle ranges and live and training grenade ranges,

22   multiple firing exercises, sir, vehicle noises and

23   aircraft, primarily helicopter.

24   **Q.**   So let's talk about your exposure to gunfire.

25   What types of weapons were you training with at Fort

1    Benning prior to your deployment?

2    **A.**   Sir, I was trained with the M16A2 rifle, the M4A2

3    carbine rifle, M9 Beretta pistol, mounted .50 caliber

4    machine gun, crew-served 240 Bravo machine gun,

5    crew-served 249 machine gun, AT4 shoulder fire

6    rockets, fragmentation grenades, and Claymore mines.

7    **Q.**   Okay.  And you kind of talked about your first

8    instruction on weapons when you first got stationed at

9    Fort Benning.  But was your exposure to gunfire, did

10   that continue throughout your time at Fort Benning?

11   **A.**   Yes, sir.  As part of my daily duties as a medic,

12   I was assigned to range support to provide medical

13   coverage to prevent -- or to treat injuries.  That was

14   a two-to-three-time a week assignment.

15   **Q.**   And so we've talked about your exposure to

16   gunfire.  Now let's talk about your exposure to noise

17   from vehicles.

18        What types of vehicles were you exposed to, what

19   types of noise, and over what period of time?

20   **A.**   Those first two years at Fort Benning prior to

21   deployment I spent the majority of my time in an M997

22   field litter ambulance which is based off the Humvee

23   platform, an M1132 carrier, the Bradley Fighting

24   Vehicles, Strykers, MRAP, and then helicopters, UH-60.

25   **Q.**   Is it fair to say that, over this two-year period

1    prior to your deployment, you were fairly consistently

2    exposed to loud noises?

3    **A.**   Yes, sir.

4    **Q.**   And when you were being exposed to this noise at

5    Fort Benning, did you wear hearing protection?

6    **A.**   Yes, sir, I always carried hearing protection on

7    me and wore it whenever I was exposed to noise that

8    would --

9    **Q.**   And what was your primary hearing protection

10   device?

11   **A.**   Combat Arms Earplugs.

12   **Q.**   And could you describe what your Combat Arms

13   Earplugs looked like?

14   **A.**   It was a double-ended flange plug.  One end was

15   yellow, the other end was olive green.  They were kept

16   in a hard plastic green case.  One end of the plug was

17   designed to protect against sharp impact noises while

18   the other was designed to protect against all noises.

19   **Q.**   And when did you receive your Combat Arms

20   Earplugs?

21   **A.**   Shortly after arriving at Fort Benning for basic

22   combat training.

23   **Q.**   And how many sets did you receive at that time?

24   **A.**   Two sets, sir.

25   **Q.**   And were you trained on the use of the Combat Arms

1  Earplugs while you were at Fort Benning?

2  **A.**   Sir, when I was issued the earplugs at Central

3  Issue Facility at Fort Benning, we were given a

4  demonstration and verbal instruction on how to place

5  the earplugs in our ears and when to use them.

6      The gentleman that instructed us was a civilian

7  that worked at the facility.  He gave us a briefing,

8  20 to 30 soldiers at the time, told us to always carry

9  our earplugs and, whenever we were exposed to noise,

10 to use them.  But they were an inspectable item, so we

11 had to have them on us at all times.

12 **Q.**   And was this training at Fort Benning, was that

13 the extent of your training on the use of the Combat

14 Arms Earplug?

15 **A.**   Yes, sir.

16 **Q.**   Now, Lewis, do you presently have hearing loss and

17 tinnitus?

18 **A.**   Yes, sir.

19 **Q.**   And are you claiming as part of this lawsuit that

20 your hearing loss and tinnitus is due to your use of

21 the Combat Arms Earplugs?

22 **A.**   Yes, sir.

23 **Q.**   Now, do you recall having your hearing checked

24 while you were in the Army?

25 **A.**   Yes, sir.

1  **Q.**  How often would you have your hearing tested?

2  **A.**  I had my hearing tested upon initial entry, and

3  then annually, and then several times for follow-up,

4  and then prior to deployment and post-deployment.

5  **Q.**  And so I want to ask you a little more about this

6  follow-up.  When would you have to follow up on your

7  hearing tests?

8  **A.**  When the technician or the audiologist would call

9  us back in, sir.

10  **Q.**  Now, prior to your deployment to Iraq, do you have

11  a specific memory of ever being told that you were

12  experiencing changes in your hearing?

13  **A.**  I don't have the specific memory, no, sir.

14  **Q.**  Do you recall having a hearing test on October 27,

15  2008?

16  **A.**  I don't recall that particular test, sir.

17  **Q.**  I'd like to show you a document and see if it

18  refreshes your memory on this.

19        **MR. BARR:**  Can I get the October 27, 2008,

20  audiogram?

21        And, Your Honor, if you want to see it, it's

22  Tab 7 of the Plaintiffs' audiograms, the Keefer Tab 7.

23  **BY MR. BARR:**

24  **Q.**  Lewis, can you see this audiogram report?  Can you

25  read that?

1    **A.**   There we go.

2    **Q.**   Is that better?

3    **A.**   Now it's more clear, yes, sir.

4    **Q.**   Could you just take a second to look at that, and

5    then I'm going to take it down and ask you a few

6    questions.  So just take a second and see if this

7    refreshes your memory.

8            **JUDGE RODGERS:**  Mr. Barr, is this considered

9    Plaintiffs' 7 or --

10           **MR. BARR:**  I'm honestly not sure, Your Honor,

11   on how we're numbering the exhibits on this.  I was

12   told that it would be the tab number.

13           **JUDGE RODGERS:**  Okay.  Well, we'll need to

14   get this straightened out.

15           **MR. BARR:**  We will do that, Your Honor.  I

16   apologize.

17           **JUDGE RODGERS:**  That's all right.  But this

18   is the audiogram -- did you say this was '07 or '08?

19           **MR. BARR:**  This was October 27, '08, Your

20   Honor.

21           **MR. NOMELLINI:**  Does it have a Bates number

22   on it?

23           **MR. BARR:**  Could we blow up the Bates number

24   there.  It's LC Keefer DoD 00013.  I've got a copy if

25   you want it, Mark.

1        **MR. NOMELLINI:**  Yes, please.

2   **BY MR. BARR:**

3   **Q.**  Have you had a chance to review this, Lewis?

4   **A.**  There is a big giant block -- okay I can see it.

5   Just a moment.

6   **Q.**  Just let me know when you're ready.

7   **A.**  Okay.

8   **Q.**  We can take that down.

9        Does this document refresh your memory as to

10  whether or not you had a hearing test on October 27,

11  2008?

12  **A.**  Yes, sir.

13  **Q.**  And where was this test conducted?  Where were you

14  when this was done?

15  **A.**  Fort Benning, Georgia.

16  **Q.**  And when were you told about your hearing as a

17  result of this hearing test on October 27, 2008?

18  **A.**  I was notified that there was a change in my

19  hearing, sir, and that I would have to repeat or redo

20  the test.

21  **Q.**  Now, do you recall having your hearing tested just

22  prior to your deployment to Iraq?  Do you recall that?

23  **A.**  I know my hearing was tested.

24  **Q.**  As a result -- do you recall the hearing test on

25  June 16, 2009?

1    **A.**   I don't recall a specific test, sir.

2    **Q.**   Let me see if I can refresh your memory again.

3          **MR. BARR:**  Can I get the audiogram from June

4    16, 2009?

5          And, Your Honor, this is Plaintiffs'

6    audiogram, Keefer Tab 9.

7          **JUDGE RODGERS:**  Okay, thank you.

8          **MR. BARR:**  And, Mark, I will give you a copy.

9    **BY MR. BARR:**

10   **Q.**   And, Lewis, if you could just look at this and see

11   if this refreshes your memory.

12         Have you had a second to look at that, Lewis?  You

13   ready?

14   **A.**   Yes, sir.

15   **Q.**   Okay, we can take that down.

16         So, Lewis, does this document refresh your memory

17   as to whether or not you had a hearing test on June

18   16, 2009?

19   **A.**   Yes, sir.

20   **Q.**   And where were you when this test was conducted?

21   **A.**   Fort Benning, Georgia.

22   **Q.**   And what were you told as a result of this hearing

23   test on June 16, 2009, prior to your deployment to

24   Iraq?

25         **JUDGE RODGERS:**  I'm sorry, stop a moment.

1   We're on Tab 9; is that right?

2           **MR. BARR:**  It's Plaintiffs' audiograms,

3   Keefer Tab 9, yes, Your Honor.

4           **JUDGE RODGERS:**  I'm not showing a date of

5   June 16th on that audiogram.  It looks like July 6th,

6   2010, unless I'm just looking at the wrong --

7           **MR. BARR:**  Your Honor, would it be easier if

8   I just handed you one?

9           **JUDGE RODGERS:**  Yes.  Mine must be out of

10  order, unless I'm just not seeing the right date.

11          **MS. DANG:**  I'm showing Tab 8.

12          **JUDGE RODGERS:**  Oh.  Well, that would be

13  the --

14          **MR. BARR:**  Try Tab 8, see if that makes more

15  sense.

16          **JUDGE RODGERS:**  Yes, it's Tab 8.  Thank you.

17  **BY MR. BARR:**

18  **Q.**  So we're talking about your June 16, 2009, hearing

19  test.  That was done -- where were you when that was

20  done?

21  **A.**  Fort Benning, Georgia, sir.

22  **Q.**  And what were you told about your hearing as a

23  result of this hearing test on June 16, 2009?

24  **A.**  I was informed there was a change in my hearing

25  and I would need to be retested.

1   **Q.**  Now, I want to move to Iraq for a minute, and I

2   want to ask you a few questions about your noise

3   exposure while you were deployed to Iraq, okay, Lewis?

4   **A.**  Yes, sir.

5   **Q.**  Can you just give us a broad view of the types of

6   noise you were exposed to while you were deployed to

7   Iraq?

8   **A.**  There was small arms fire, vehicles noises, ground

9   vehicles, and aerial vehicles, mainly UH-60

10  helicopters, and indirect fire, mortar rounds.

11  **Q.**  Were you in combat ever while you were over in

12  Iraq?

13  **A.**  Yes, sir.

14  **Q.**  When you are in combat, what type of hearing

15  protection would you wear?

16  **A.**  Combat Arms Earplugs if I was outside the vehicle.

17  If I was inside the vehicle, it would be Combat Arms

18  Earplugs and then an over-the-ear earmuff or helmet

19  style hearing protection and communication device.

20  **Q.**  So double protection?

21  **A.**  Yes, sir.

22  **Q.**  Were you ever exposed to mortar fire while you

23  were in Iraq?

24  **A.**  There was mortar fire, sir, but it was never

25  danger close.  It was several hundred meters away.

1    **Q.**   Were you ever exposed to gunfire at a range while

2    you were in Iraq?

3    **A.**   No ranges in Iraq, sir.

4    **Q.**   Was there a point in time where you were exposed

5    to an IED blast while you were in Iraq?

6    **A.**   I wouldn't say I was exposed.  I was in a vehicle

7    convoy that suffered an IED hit.  I was No. 7 vehicle

8    in a seven-vehicle convoy.  The first vehicle was

9    struck and, again, I was several hundred meters from

10   the blast.

11   **Q.**   What type of vehicle were you in, sir?

12   **A.**   It was an up-armored vehicle.  I don't

13   particularly recall if it was a Stryker or an MRAP; it

14   was one of the two.

15   **Q.**   Were the hatches opened or closed?

16   **A.**   The hatches and windows were closed, sir.

17   **Q.**   Were you injured or treated in any way as a result

18   of this IED blast?

19   **A.**   No, sir, I was not.

20   **Q.**   Did you perceive any changes to your hearing at

21   all as a result of this IED blast?

22   **A.**   No, sir, I did not.

23   **Q.**   If there is any assertion that you began to suffer

24   from hearing loss while you were in Iraq, would that

25   be true?

1   **A.**   Sir, I was informed that there was changes in my

2   hearing prior to deployment.

3   **Q.**   So where were you when you first began to

4   experience hearing loss?

5   **A.**   I was notified by the audiology clinics that there

6   was changes in my hearing while I was stationed at

7   Fort Benning.

8   **Q.**   Prior to your deployment to Iraq?

9   **A.**   Prior to deployment.

10          **MR. BARR:**   I pass the witness, Your Honor.

11          **JUDGE RODGERS:**   Thank you.

12          Mr. Nomellini?

13                    **CROSS-EXAMINATION**

14   **BY MR. NOMELLINI:**

15   **Q.**   Good afternoon, Mr. Keefer.  Mark Nomellini on

16   behalf of 3M.

17   **A.**   Good afternoon, sir.

18          **MR. NOMELLINI:**   Could we have up, Donnie, the

19   Lewis Keefer timeline.

20   **BY MR. NOMELLINI:**

21   **Q.**   And I just want to briefly go over some dates with

22   you, sir.  You started at Fort Benning in March of

23   2007, correct?

24   **A.**   Correct.

25   **Q.**   And from June to October 2007, you were actually

1   in Texas for medic training, correct?

2   **A.**   Medical training, yes, sir.

3   **Q.**   And then it was -- after Texas, you returned to

4   Fort Benning until July 2009, correct?

5   **A.**   Yes, sir.

6   **Q.**   And then you were in Iraq from July 2009 to July

7   2010, correct?

8   **A.**   Correct.

9   **Q.**   Okay, sir.  So I'm going to talk to you about

10  tinnitus and then I'm going to talk to you about

11  hearing loss.

12       You've had tinnitus since 2010, correct, sir?

13  **A.**   I don't -- I don't recall a specific date when it

14  began.

15  **Q.**   Okay.  Let me pull up something on that.

16       **MR. NOMELLINI:**   Keefer deposition 380, lines

17  10 to 11.

18  **BY MR. NOMELLINI:**

19  **Q.**   You were asked the question in your deposition:

20  "And how long have you had tinnitus?"  And your answer

21  was, "2010," correct?

22  **A.**   That's what I said, sir.

23  **Q.**   All right, sir.  And you remember you also had a

24  medical appointment with a Dr. Kelley, July 13th,

25  2010, sir?

1   **A.**   I don't recall, sir.

2   **Q.**   All right.

3         **MR. NOMELLINI:**   Let's pull up Choice of Law

4   Defendant's Exhibit 144.

5   **BY MR. NOMELLINI:**

6   **Q.**   You see where it says at the top, "July 13, 2010,

7   Fort Benning, audiology by Kelley, Yolanda"?

8   **A.**   Yes, sir.

9   **Q.**   And then it says a little further down, "Patient,

10  Keefer, Lewis Charles"?

11  **A.**   Yes, sir.

12  **Q.**   And then you go to the second page, and it says,

13  "Reason for visit:  Audiological evaluation."  You see

14  that?

15  **A.**   Yes, sir.

16  **Q.**   And then it says, "History of present illness:

17  The patient is a 30-year-old male."  And that would

18  have been true as of 2010, right?

19  **A.**   Yes, sir.

20  **Q.**   And then it says, "He reported no bilateral

21  hearing loss, no difficulty understanding speech, no

22  earache, and no discharge from the ears.  Tinnitus

23  occurring in both ears and comes and goes."  Right?

24  **A.**   That's correct.

25  **Q.**   And this is post-deployment, correct?

1    **A.**   July 2010, yes, sir.

2    **Q.**   Okay.  So you indicated in July 2010

3    post-deployment that your condition -- oh, sorry,

4    let's go to the next snippet.

5         Then there is a section called, "Personal

6    history," right?

7    **A.**   Yes, sir.

8    **Q.**   And it says, "Military, indicating that condition

9    is deployment-related," right?

10   **A.**   That's what that says, yes.

11   **Q.**   So you indicated in 2010, post your deployment,

12   that your condition was deployment-related, correct?

13   **A.**   I don't recall that, sir.  That says, "Military,

14   indicating that condition" --

15   **Q.**   You don't recall that one way or the other?

16   **A.**   No, sir, I don't, I don't recall.

17   **Q.**   Okay.  And then you go further down to the

18   bottom --

19          **MR. NOMELLINI:**  Donnie, if you could

20   highlight that bottom note.

21   **BY MR. NOMELLINI:**

22   **Q.**   It says note written by Kelley, Yolanda.  That's

23   the doctor we saw at the top, right?

24   **A.**   Yes, sir.

25   **Q.**   It says, "Mild bilateral SNHL," right?

1   **A.**   Yes, sir.

2   **Q.**   So, 2010, July 2010, post-deployment, that was the

3   first time you were diagnosed with hearing loss,

4   right, sir?

5   **A.**   No.  I was told prior to deployment that there was

6   changes in my hearing.

7   **Q.**   Okay.  But I'm asking you about hearing loss.

8   July 2010 was the first time you were diagnosed with

9   hearing loss, correct?

10  **A.**   I -- like I said, I was told before that there was

11  changes in my hearing.

12  **Q.**   Okay.  So let's look at Choice of Law Defendant's

13  Exhibit 145.  You see where it says at the top,

14  "Plaintiff Lewis Keefer's Objections and Responses to

15  Defendant 3M's Request for Admissions to Plaintiff,"

16  correct?

17  **A.**   That's in bold, yes, sir, I see that.

18          **MR. NOMELLINI:**  And then, Donnie, if you

19  could please go to request for admission No. 75.

20  **BY MR. NOMELLINI:**

21  **Q.**   Request for admission No. 75 says, "Admit that you

22  allege your first diagnosed injury date was on or

23  about July 13, 2010."  And then your response is,

24  "Subject to and without waiving said objections,

25  admitted."

1    Did I read that correctly?

2  **A.**   That's what that says.

3  **Q.**   And then 76, "Admit that you are seeking damages

4  from your alleged first diagnosed injury date of on or

5  about July 13, 2010."  And your response reads,

6  "Subject to and without waiving said objections,

7  admitted."

8    Did I read that correctly?

9  **A.**   That's what it says, sir.

10 **Q.**   One more topic for you, sir, and that's going back

11 to the two documents that Mr. Barr read to you.

12    Do you have access to those?

13 **A.**   Do I have access?

14 **Q.**   Yeah.  I guess, Mr. Keefer, you don't have access

15 to them.  So I'll just -- I can cover it.  I don't

16 think --

17    **MR. NOMELLINI:**  Donnie, you don't have them,

18 right?  Okay.

19 **BY MR. NOMELLINI:**

20 **Q.**   So those documents, there is a discussion of a

21 "change in my hearing."  Do you recall that?

22 **A.**   From those documents, yes, sir.

23 **Q.**   Okay.  And just so the record is clear, I'm

24 reading from DoD 12 and DoD 6.

25    Now, you remember before on the timeline we talked

1    about pre-deployment you were both in Fort Benning,

2    Georgia, and Fort Sam Houston, Texas, right?

3    A.   Correct.

4    Q.   And you don't recall anybody ever telling you

5    whether or not any change in your hearing occurred in

6    Texas as opposed to Georgia, correct?

7    A.   I don't recall, sir.

8              **MR. NOMELLINI:**  Thank you, sir.

9              **JUDGE RODGERS:**  Thank you.

10             Mr. Barr?

11             **MR. BARR:**  I'll be brief, Your Honor.

12             Could I get the record, the July 13, 2010,

13   that we were just looking at from Dr. Kelley?

14             **MR. NOMELLINI:**  Donnie, it's Choice of Law

15   Exhibit 144.

16             **MR. BARR:**  If you don't mind, Donnie, go to

17   the second page and blow out the section that says

18   "Past medical surgical history," if you can.  It's

19   just above that, the one you have blown out.  Thank

20   you.

21                      **REDIRECT EXAMINATION**

22   BY MR. BARR:

23   Q.   Mr. Keefer, can you see this record that we have

24   in front of you?

25   A.   Yes, sir.

Lewis Keefer - Redirect/Barr                        202

1    **Q.**   Is it correct that, at the time you were diagnosed

2    with bilateral hearing loss, that you had been exposed

3    to noise in the military for three years?

4    **A.**   In 2010, yes, sir.

5    **Q.**   Okay.  Is it correct that this record says that

6    you have acoustic trauma for gun ranges, that that was

7    what you suffered?

8    **A.**   Yes, sir.

9    **Q.**   Were there any gun ranges at which you were

10   exposed to noise while you were in Iraq?

11   **A.**   No, sir.

12   **Q.**   Now, Mr. Keefer, you're trained as a medic,

13   correct?

14   **A.**   That's correct.

15   **Q.**   As a medic, do you understand the difference

16   between the onset of symptoms and a diagnosis?

17   **A.**   I do, sir.

18   **Q.**   When did your symptoms of hearing loss onset?

19   **A.**   I don't recall a specific time, sir.

20   **Q.**   Let me rephrase it.  When were you told that you

21   were experiencing a change in your hearing?

22   **A.**   Based on those documents we saw earlier, it was

23   October of 2008, I believe the first one we looked at.

24   **Q.**   And what base were you at, again?

25   **A.**   It was at Fort Benning, Georgia, sir.

1          **MR. BARR:**  That's all I have, Your Honor.

2          **JUDGE RODGERS:**  Judge Jones, any questions?

3          **JUDGE JONES:**  No.  Thank you.

4          **JUDGE RODGERS:**  Judge Herndon?

5          **JUDGE HERNDON:**  I do not.  Thank you.

6          **JUDGE RODGERS:**  All right, Mr. Keefer, thank

7    you very much.  You're excused.

8          **THE WITNESS:**  Thank you, Your Honor.

9          *(Witness excused.)*

10         **JUDGE RODGERS:**  Who is next?

11         **MR. WASDIN:**  Your Honor, I believe Brian

12   Myers from the company is next.

13         **JUDGE RODGERS:**  Okay.  Is he ready?

14         **MS. TRAN:**  No.  He hasn't joined the call.

15         **MR. WASDIN:**  He said he logged in in the

16   middle of the last one and logged back out.

17         **MS. TRAN:**  I never saw him logged in.

18         **JUDGE RODGERS:**  Can we reach him?

19         **MR. WASDIN:**  I just texted him.  He's on

20   stand by, so he should join.  There he is.

21         **JUDGE RODGERS:**  Okay, very good.

22         Mr. Myers, I'm Judge Casey Rodgers.  Good

23   afternoon.

24         **THE WITNESS:**  Good afternoon.

25         **JUDGE RODGERS:**  I would like to ask you to

 1   please rise and raise your right hand to be sworn.

 2              **BRIAN MYERS, DEFENSE WITNESS, DULY SWORN**

 3              **MADAM CLERK SIMMS:**  Be seated.  Please state

 4   your full name and spell your last name for the

 5   record.

 6              **THE WITNESS:**  My name is Brian Carl Myers,

 7   M-y-e-r-s.

 8              **JUDGE RODGERS:**  Mr. Myers, if at any time

 9   during your testimony today you experience some

10   difficulty with the Zoom, the transmission, just let

11   us know that, either audio or video, okay?

12              **THE WITNESS:**  Okay.

13              **JUDGE RODGERS:**  Mr. Wasdin, go ahead.

14                        **DIRECT EXAMINATION**

15   **BY MR. WASDIN:**

16   **Q.**  Good afternoon, Mr. Myers.  Please introduce

17   yourself to the Court.

18   **A.**  My name is Brian Myers.  I'm the business unit

19   director with 3M located in Saint Paul, Minnesota.

20   **Q.**  What's your home address?

21              **JUDGE RODGERS:**  No, Mr. Wasdin -- I'm sorry,

22   Mr. Myers, we don't need that.  You'll just have to

23   redact it.

24              **MR. WASDIN:**  Okay.

25              **JUDGE RODGERS:**  Thank you, though.

1  **BY MR. WASDIN:**

2  **Q.**  Mr. Myers, where did you work before 3M?

3  **A.**  I worked for a company called Aearo Company, which

4  was ultimately purchased by 3M in 2008.

5  **Q.**  Where is Aearo Company located?

6  **A.**  Aearo Company was -- there is a lot of moving

7  around that's -- I'm sorry --

8       **JUDGE RODGERS:**  It's probably me.  Go ahead.

9  I apologize.  Go ahead.

10       **THE WITNESS:**  Aearo Company was located in

11  Indianapolis, Indiana.

12  **BY MR. WASDIN:**

13  **Q.**  Can you give us a brief overview of your career at

14  Aearo?

15  **A.**  Certainly.  So I took a job with what at that time

16  was a predecessor to Aearo Company, which was a

17  division of Cabot Corporation, in 1989, November of

18  1989.  That was in Indianapolis.  There were

19  subsequent name changes and a merger that allowed that

20  entity to become Cabot Safety Corporation.  And then

21  ultimately, I want to say around 2000, it became Aearo

22  Company.  And then in 2008, as I previously said, that

23  entity was purchased by 3M.

24  **Q.**  What job titles did you hold over the course of

25  that time period?

**A.**   I started in manufacturing.  But in the early

1990s, I assumed a position where I had responsibility

for marketing and business functions of the hearing

protection group.  And then, through the rest of my

tenure there, I was either called a portfolio manager

or a marketing manager for that line of products all

the way up until 2008 when 3M purchased the entity.

And then I continued on after that time in a similar

role as a portfolio manager or marketing manager for

hearing protection.

**Q.**   Did you have any involvement with respect to the

Combat Arms Version 2 earplug?

**A.**   Yes, I did.

**Q.**   What was your role with respect to that product?

**A.**   So I was -- I was in an initial meeting, that I

recall, around 1997 that took place in Indianapolis.

I believe it was arranged by Elliott Berger.  And I

know there was at least one person there from a

technical research group in Europe that had this idea

of this filter that they thought would perform very

well in cases of loud impulse noise like weapons fire.

     And they were looking for an interest from us to

help them commercialize this idea.  They needed it to

be put into an earplug, and they came to us -- or

Elliott at least facilitated an introduction with us

1    to pursue that matter, see if we had an interest

2    there.  That was in 19 -- I think 1997.

3    **Q.**   Where did that meeting occur?

4    **A.**   That meeting was in our facilities there in

5    Indianapolis, Indiana.

6    **Q.**   After that meeting, did you ever participate in

7    meetings regarding the design and development of the

8    Combat Arms Version 2?

9    **A.**   Yes, I did.  So, ultimately, after we decided that

10   we would try to work with -- with the group and

11   commercialize and bring this to market, I think we

12   secured the rights to the technology, and then we

13   started to design the product.

14        And from time to time -- I don't recall with what

15   frequency -- we held design reviews there in our

16   facility in Indianapolis, you know, to monitor key

17   milestones in development of the product that we

18   ultimately commercialized.

19   **Q.**   I want to show you a document --

20        **MR. WASDIN:**   Donnie, can you pull up what I

21   have is Myers Deposition Exhibit 79, it's a design

22   review memo.  Pull up the first Myers exhibit and it

23   should be it.  I'll let you know.  Nope.  Next one.

24   And when you pull it up, Donnie, can you tell me what

25   the Defendant's Exhibit number is on this one.

1          **MR. GUILLORY:**  122.

2    **BY MR. WASDIN:**

3    **Q.**  Mr. Myers, we're going to put up a document here

4    that's been marked as Choice of Law Defense Exhibit

5    122.  Can you see that on your screen?

6    **A.**  I can see a document.  I'm not necessarily seeing

7    122, but I'm seeing a document.

8          **MR. WASDIN:**  And, Donnie, can you go to the

9    third page of that document, which, for the record, is

10   a native document that bears the Bates No.

11   3MMDL000570345.

12   **BY MR. WASDIN:**

13   **Q.**  Mr. Myers, can you see that document?

14   **A.**  I can see that.

15   **Q.**  Do you recognize it and can you tell us what it

16   is?

17   **A.**  These would be the meeting notes on a design

18   review that was held.  If we scroll down, it's on the

19   Combat Arms Earplug, I can see that much on the

20   screen.  So this was the meeting notes for a design

21   review held in Indianapolis about the Combat Arms

22   Earplug.

23   **Q.**  What types of things were discussed at design

24   review meetings for the Combat Arms Earplugs?

25   **A.**  Potential volumes, design changes, dates for when,

1    you know, tooling would be ready, when we might be

2    able to go into production, when testing might occur,

3    those kinds of things.

4    **Q.**   Now, this one in particular is dated April 9th,

5    1999.  But were there multiple design review meetings

6    like this one?

7    **A.**   There were, there were.

8    **Q.**   And if we scroll to the top, there is a list of

9    recipients to this memo.  Can you tell us, were these

10   some of the folks at Aearo who worked on the Combat

11   Arms Version 2?

12   **A.**   Yes.  You have several different functions

13   represented there, but they were all working out of

14   our Indianapolis facility.

15   **Q.**   And is Indianapolis where these type of design

16   review meetings would have taken place?

17   **A.**   Yes, yes, they would have taken place in

18   Indianapolis.

19   **Q.**   As part of your work on the marketing side of the

20   Combat Arms Version 2, did you also work with folks or

21   interact with folks who were on the technical side,

22   the testing and the folks who would actually make

23   changes to the drawings and things like that?

24   **A.**   Yes.  So the two technical folks that I recall

25   most directly working with were Dick Knauer, who you

1    can see is copied on this memo, as well as Elliott

2    Berger.  I certainly had direct interaction with them,

3    but there were other technical folks that I was aware

4    of such as Marc Doty, Cyd Kladden, Ron Kieper, Bob

5    Falco that did different things within the technical

6    group there that contributed to the design.

7    Q.   And where was the technical group that you just

8    described located?

9    A.   All of those people were located in Indianapolis.

10   Q.   And based on your interaction with that group,

11   what product development activities would have been

12   handled by them in Indianapolis?

13   A.   All of the product design activities would have

14   been held there in Indianapolis.

15   Q.   Would that group have handled product testing?

16   A.   Yes.  We have a test lab there called E-A-RCAL lab

17   that was supervised by Elliott Berger.  And again, Ron

18   Kieper, who I just mentioned, was one of the testers

19   within that lab facility that was located and is

20   located today in Indianapolis.

21   Q.   Would that group have had input into or

22   responsibility for instructions?

23   A.   Yes.  So the technical group was responsible for

24   providing us with -- I assume you're talking about

25   fitting instructions to the product, and they would

1    have created those and provided those to us.

2    **Q.**   Okay.  Changing gears.  Did you, during the course

3    of your work on the Combat Arms Version 2, ever

4    exchange emails with government representatives

5    regarding that product?

6    **A.**   Yes, I can recall exchanging emails with -- well,

7    in email and fax.  So I can recall exchanging an email

8    at least with Dr. Ohlin, who was in the military and

9    was excited about trying to bring this technology into

10   the U.S. military.  I don't recall, I think I probably

11   had emails with the Defense Support Center out of

12   Philadelphia.

13   **Q.**   And to the best of your recollection, where would

14   you have been located when you had those emails?

15   **A.**   I was located in Indianapolis during that time, so

16   those emails would likely have been from there.

17           **MR. WASDIN:**   Donnie, can we put up the first

18   document that you put up for Mr. Myers.

19   **BY MR. WASDIN:**

20   **Q.**   Mr. Myers, you're looking at a document that we're

21   going to mark here in court, Defense Choice of Law

22   Exhibit 120.  Can you see that document?

23   **A.**   I can, yes.

24   **Q.**   Is this the email -- or one of the emails that you

25   were talking about exchanging with Doug Ohlin?

1    **A.**   This was the one that I recall exchanging with

2    Dr. Ohlin, yes.

3    **Q.**   What is the date on this?

4    **A.**   The date on this is April 8th, 1999.

5    **Q.**   Can you tell us what were you talking to Mr. Ohlin

6    about in this email?

7    **A.**   It looks like he had asked for some feedback about

8    some verbiage or a letter, which I assume is in the

9    document that's attached above there.  And I had made,

10   I think, a small recommendation.

11        And then, because Dr. Ohlin had asked us -- he

12   wanted us to be able to fit our earplug into an

13   existing military-issued hearing case.  I think he

14   relayed to me that he would like to have it shortened

15   by about a quarter of an inch so that it would fit.

16        And so I talked with our technical manager, Dick

17   Knauer -- I mentioned him before -- about whether or

18   not we might be able to shorten the plug by about a

19   quarter of an inch.  And obviously, I reflected here

20   that Dick said, yeah, we probably can.

21        But just to make sure that things were going to

22   fit, I had asked Dr. Ohlin if he would send a

23   container so that we can make sure that whatever we

24   develop fits into it to Dick Knauer there in the

25   technical group in Indianapolis.

1  **Q.**  Did Dr. Ohlin, thereafter, send a container?

2  **A.**  Yeah, I think he probably sent more than one, but

3  yes, he did send us that.

4  **Q.**  I'm sorry to interrupt.  Can you tell us to what

5  address or what at least state or city he did send

6  that container to?

7  **A.**  Sure.  He would have sent that, as I requested, to

8  Dick Knauer there in our Zionsville Road facility in

9  Indianapolis, Indiana.

10  **Q.**  After receiving that carrying case, did Aearo end

11  up shortening the earplug?

12  **A.**  We ultimately did end up shortening the earplug to

13  fit in the case.

14  **Q.**  And where did that work take place?

15  **A.**  That -- like all the other design work, that would

16  have taken place there in Indianapolis.

17  **Q.**  You mentioned earlier that the technical group was

18  responsible for testing the Combat Arms Version 2.

19  Where was the laboratory at that they did that work?

20  **A.**  So the test lab, as I previously mentioned, called

21  E-A-RCAL lab is located and was located there in the

22  Indianapolis, Indiana, facility.

23  **Q.**  Turning from testing to marketing, I think you

24  said at the beginning that you were one of the folks

25  who had some responsibility or responsibility for

1    marketing the CAEv2; is that right?

2    **A.**   Yes, that's correct.

3    **Q.**   Who else would have been involved in marketing the

4    CAEv2?

5    **A.**   So the other names that come to mind are Mark

6    Santoro, who actually reported to me.  And I know at

7    some point in time he was doing most of the detailed

8    marketing work.

9        Also, at some point in time, a gentleman named

10   Doug Moses had responsibilities for marketing to the

11   military.  And so he had -- he took over some of those

12   responsibilities.  I'm not sure in detail who had what

13   and at what time, but both of those individuals were

14   located in Indianapolis.

15       And then there was a third individual that I can

16   recall.  He did not work for Aearo Company but instead

17   actually was a third-party ad agency, if you will.

18   His name was Larry Mitsch.  And I believe Mark Santoro

19   worked with him to create some collateral like

20   brochures and things like that.

21   **Q.**   Where was Mr. -- I'm sorry, go ahead.

22   **A.**   Larry Mitsch was also located there in

23   Indianapolis.

24   **Q.**   Mr. Myers, we've talked a little bit about

25   marketing.  I want to turn to sales and draw a

Brian Myers - Direct/Wasdin                    215

1    distinction, if one is appropriate.  But are you a

2    salesperson?

3    **A.**   No, I'm not.  I've not ever had sales

4    responsibilities.

5    **Q.**   What's the difference at Aearo or 3M between sales

6    on the one hand and marketing on the other?

7    **A.**   Well, marketing, just in terms of the

8    interactions -- so marketing would maybe create

9    materials and maybe provide some knowledge or training

10   to the sales force, and then the sales force would,

11   from wherever they were, they would, you know, they

12   would execute going out to either distributors or

13   potential customers and presenting products.

14   **Q.**   As part of your job, did you have interaction with

15   the salespeople for the Combat Arms Version 2?

16   **A.**   Yes, I would have had some interaction with them.

17   **Q.**   Who was the lead or primary salesperson for the

18   Combat Arms Version 2?

19   **A.**   The person that I recall having the most to do

20   with that in our sales function, I think it was

21   because he was the military salesperson within the

22   U.S., was a gentleman named Tim McNamara.

23   **Q.**   Where was Mr. McNamara based out of?

24   **A.**   Tim McNamara is based out of New Palestine,

25   Indiana, just outside of Indianapolis.

1    **Q.**   In addition to Mr. McNamara, were there other

2    folks around the country who worked on the CAEv2?

3    **A.**   So we had a sales force across the country, and

4    they would have, within their assigned geographies or

5    their responsibilities, may have called on military

6    bases or distributors selling to military bases, those

7    kind of things.

8    **Q.**   Where would those other salespeople have been

9    principally based?

10   **A.**   Likely working out of their own homes in the

11   geographies to which they were assigned.  They did

12   report in to sales managers there in Indianapolis.

13   **Q.**   Are you familiar with the details of what those

14   folks did when they reported or called on military

15   bases?

16   **A.**   I just know generally that they presented products

17   and probably tried to understand if the customers were

18   having any issues or concerns about the products.

19   **Q.**   All right.  Let's turn from sales to manufacturing

20   and packaging of the Combat Arms.  As part of your

21   job, did you interact with the folks at Aearo involved

22   in those processes?

23   **A.**   With packaging -- I'm sorry, what was the second?

24   **Q.**   Manufacturing and packaging.

25   **A.**   Yes, I would have interacted with some of those

1    responsible individuals.

2    **Q.**   Let's take a look at a third document.

3            **MR. WASDIN:**   Donnie, can you pull up the last

4    exhibit for Myers.

5    **BY MR. WASDIN:**

6    **Q.**   Mr. Myers, I'm going to show you a document that

7    we're going to mark here in court Choice of Law

8    Defense Exhibit 121.  Let me know if you can see that

9    on your screen.

10   **A.**   I can see that, yes.

11   **Q.**   I think this is a fax cover page.

12           **MR. WASDIN:**   Donnie, can you take us down to

13   the second page of the document.

14   **BY MR. WASDIN:**

15   **Q.**   Mr. Myers, let me know, once we get the second

16   page pulled up here, if you recognize this document.

17   **A.**   Yes, I do.

18   **Q.**   What is it?

19   **A.**   So this is a fax copy of the award for supplying

20   the Combat Arms Earplug to the Defense Supply Center

21   in Philadelphia.

22   **Q.**   Who is listed as the offerer on this document?

23   **A.**   That's listed as Aearo Company from Indianapolis,

24   Indiana.

25   **Q.**   If we can go to the fourth page, there is a

1    schedule of supplies and services I want to callout.

2        Mr. Myers, can you see the schedule of supplies

3    and services here on the fourth page?

4    **A.**   Yes, I can.

5    **Q.**   It lists what looks like several or three

6    different supplies or services.  Can we just sort of

7    walk through these.  So, starting with the left,

8    component manufacturing location, do you see that?

9    **A.**   Yes.

10   **Q.**   What is that --

11   **A.**   There were some --

12   **Q.**   Go ahead.

13   **A.**   There were some components, I think probably the

14   tips of the plugs themselves, that at that point in

15   time were manufactured in Southbridge, Massachusetts.

16   We actually had a manufacturing location there.

17   **Q.**   Okay.  And then --

18   **A.**   And they were injection molded there.  It became a

19   component; it wasn't the whole product.

20   **Q.**   And that was in Massachusetts?

21   **A.**   That was in Massachusetts.

22   **Q.**   And then, if you go to the middle, there is a

23   column headed "Component Assembly Location."  Where

24   was the -- where were the components for the Combat

25   Arms Version 2 assembled?

1   **A.**   So they were assembled, as it says, the address

2   there, in San Luis, Potosi, Mexico.

3   **Q.**   And then on the far right there is an address for

4   packaging, packing, distribution location.  Do you see

5   that?

6   **A.**   I do.

7   **Q.**   And where was the Combat Arms Version 2, at least

8   that was subject to this particular contract, packaged

9   and distributed from?

10  **A.**   From Aearo Company's location there in

11  Indianapolis, Indiana.

12  **Q.**   So, what's your understanding of how it goes from

13  Massachusetts to Mexico and then back to Indianapolis?

14  **A.**   So, some of the components -- others may have been

15  sourced, but clearly some of the components went from

16  Southbridge -- I believe they were actually all kitted

17  in Indianapolis and sent to Mexico for assembly, and

18  then they were all then assembled and returned back to

19  Indianapolis for ultimate packaging, probably

20  labeling, and then ultimately distribution.

21  **Q.**   So when a wholesaler, a distributor, or the

22  military placed an order with Aearo for the Combat

23  Arms Version 2, where did that product come from?

24  **A.**   That would -- it would all have come from our

25  Indianapolis facility.

1   **Q.**   Let's change gears now and talk about the 3M

2   acquisition of Aearo.   When did that occur?

3   **A.**   I recall signing an agreement in April of 2008.   I

4   think that's about when the acquisition actually was

5   consummated.

6   **Q.**   Where is 3M headquartered?

7   **A.**   3M is headquartered in Saint Paul, Minnesota.

8   **Q.**   After the acquisition, did you remain in

9   Indianapolis or go to Minnesota?

10  **A.**   As I was still the hearing protection business

11  manager/portfolio manager, I stayed in Indianapolis

12  for another -- until the end of 2010.   And in 2010, I

13  took a different position, which required me to

14  relocate up to Saint Paul.

15  **Q.**   When you left Indianapolis, did 3M replace you

16  with someone there in Indy?

17  **A.**   They did.   There was a gentleman named Phillip van

18  de Werken that took my position and actually relocated

19  from Saint Paul down to Indianapolis to take that

20  position.

21  **Q.**   Looking back at those other marketing folks we

22  talked about earlier, Santoro and Moses, did they

23  remain in Indianapolis after the acquisition?

24  **A.**   Yes, they did.

25  **Q.**   And what about all the --

1    **A.**   They did, and I believe they're still there to

2    this day.

3    **Q.**   And what about all the folks from the technical

4    group that we talked about, did they stay in Indy

5    after the acquisition?

6    **A.**   They did, they're still there to this day.

7    **Q.**   After you moved to Minnesota, I think you said it

8    was 2010 or 2011, in that time period, did you retain

9    responsibility for the hearing protection business?

10   **A.**   No, I had no responsibilities for the hearing

11   protection business.

12   **Q.**   At some point thereafter, did you regain

13   responsibility for the hearing protection business?

14   **A.**   I did.  So, around the middle of 2015, I had been

15   managing a group of businesses and changed positions

16   to take over managing a different set of businesses,

17   and one of those businesses was the hearing protection

18   business that I had managed some five years ago.

19   **Q.**   After you got that responsibility back, did you

20   ever send out any emails about the discontinuation of

21   the Combat Arms Version 2 earplugs?

22   **A.**   Yeah, I can recall one that I can think of.

23   **Q.**   And where were you at when you sent that email?

24   **A.**   I would have been in Saint Paul, Minnesota.

25           **MR. WASDIN:**   No further questions for Mr.

1    Myers.

2         **JUDGE RODGERS:**  Thank you.

3         Mr. Aylstock?

4         **MR. AYLSTOCK:**  Thank you, Your Honor.  I've

5    got some binders for the Court.

6         **JUDGE RODGERS:**  Okay.  Give me a moment to

7    switch them out.

8                    **CROSS-EXAMINATION**

9    **BY MR. AYLSTOCK:**

10   **Q.**  Good afternoon, Mr. Myers.  Good to see you again.

11   **A.**  Hi.

12   **Q.**  I'm going to start with an exhibit in your

13   deposition, Myers 45.

14        **MR. AYLSTOCK:**  Why don't we just use the

15   PowerPoint, Brian.  It might be quicker.

16   **BY MR. AYLSTOCK:**

17   **Q.**  I'm going to refer to this exhibit a couple of

18   times.  It's an email exchange between you and a Mr.

19   Thomas Sidor, and it's dated -- there is one from July

20   6th and one from July 7th in 2006.

21        Do you see that, sir?

22   **A.**  I do.

23   **Q.**  All right.  And you, Mr. Myers, were emailing Mr.

24   Sidor.  Mr. Sidor is at DLA, the Defense Logistics

25   Agency, correct?

 1    **A.**   Yeah, that's where he was located when I met him.

 2    **Q.**   And that's a facility in Philadelphia,

 3    Pennsylvania, true?

 4    **A.**   Correct.

 5    **Q.**   You knew that when you were emailing him, true?

 6            **JUDGE RODGERS:**  Mr. Aylstock, is that

 7    supposed to be in Tab 45?

 8            **MR. AYLSTOCK:**  It should be.  Actually, these

 9    are in order, Judge.  It's Exhibit 45 to his

10    deposition and hopefully this will be Tab 1.

11            **JUDGE RODGERS:**  Oh, okay.  I'm sorry.  All

12    right.

13            **MR. AYLSTOCK:**  If this goes the way I expect,

14    you'll just be able to go from one tab to the next.

15            **JUDGE RODGERS:**  Very good, thank you.

16    **BY MR. AYLSTOCK:**

17    **Q.**   You knew when you were emailing Mr. Sidor that he

18    was sitting in Philadelphia, true?

19    **A.**   Can I ask a quick question?  To the left there is

20    a small letter and then to the right on my screen is

21    an actual letter that I can read.  Is the one to the

22    right, is that the one we're referring to?

23    **Q.**   They are the same.  One is blown out so you can

24    see it easier.  It's the same document, sir.

25    **A.**   Okay.  I didn't understand that.

Brian Myers - Cross/Aylstock                                    224

1    **Q.**   It's the same one you saw at your deposition as

2    well.  It was Exhibit 45 in your deposition, Tab 1 to

3    the Court's notebook, and it's on your screen.  Are we

4    good?

5    **A.**   Yes.

6    **Q.**   Okay.  And my question was, you knew Mr. Sidor was

7    in Philadelphia at the DLA when you were emailing him

8    on this --

9    **A.**   I know the DLA is in Philadelphia.  I can't speak

10   to where Mr. Sidor was physically.

11   **Q.**   Okay.  Well, and what you tell Mr. Sidor is, when

12   it comes to the Combat Arms Earplugs, you have three

13   patents, you see that?  And the name out the actual

14   patent numbers?

15   **A.**   Yes, I see that.

16   **Q.**   If you go to the next slide, in Tab 2, we're going

17   to pull out one of those patents.  This is the first

18   patent that you referred to when you were speaking to

19   Mr. Sidor.  This is the patent for the filter.

20        Do you see that, sir?

21   **A.**   I do see that.

22   **Q.**   And this is patent 079.  And the inventors are all

23   in France, and the assignee is in Saint-Louis, France,

24   true?

25   **A.**   That's what the document says.

1    **Q.**   And you don't dispute that here today, do you?

2    **A.**   No, sir.

3    **Q.**   All right.  Let's go to the next patent you told

4    Mr. Sidor about.  This is Tab 3 of the binder exhibit,

5    but it's Exhibit 25 to Mr. Hamer's deposition.

6         This is the 693 patent.  This is the filter

7    assembly.  And again, the inventor is Mr. Hamer from

8    France, and the assignee is ISL from Saint-Louis,

9    France, true?

10   **A.**   That's what the document says.

11   **Q.**   And you know about ISL, true?

12   **A.**   I've been to ISL, yes, sir.

13   **Q.**   You went to France to visit with them?

14   **A.**   Yes.

15   **Q.**   And talk to them about the Combat Arms Earplug?

16   **A.**   No.

17   **Q.**   No?  About the filter?

18   **A.**   No.

19   **Q.**   Okay.  Let's go to the next patent that you told

20   Mr. Sidor about.  This is the patent with regard to --

21   the 149 with regard to the Ultra Fit tips that Cabot

22   created before it became Aearo, true?

23   **A.**   Yes, that's right.

24   **Q.**   Right.  So these are the tips of the -- these are

25   -- well, this technology ended up being used in the

1    tips of the Combat Arms Earplug, true?

2    **A.**   That was my understanding.

3    **Q.**   And the assignee here is Cabot Corporation in

4    Boston, Massachusetts, true?

5    **A.**   That's what the document says, yes.

6    **Q.**   And, in fact, the tips, including those flanges

7    the Court sees, are actually manufactured not in

8    Indianapolis at all but in Massachusetts at all times

9    the Combat Arms Version 2 was on, correct?

10   **A.**   I didn't know that.  I thought that at some point

11   in time it was actually manufactured at a facility

12   called PRD, which was in southern Indiana.  But I

13   don't know that.  So I can't say that it was

14   manufactured all the time in Massachusetts.

15   **Q.**   Well, you know it was manufactured a large part of

16   the time in Massachusetts, true?

17   **A.**   Certainly from the documents what we've previously

18   review, at the point of that military award we

19   represented the tip was manufactured in Massachusetts,

20   yes, sir.

21   **Q.**   Because those FAR, the Federal Acquisition

22   Regulation, require you to tell the U.S. Government

23   where things are manufactured, and you're required to

24   tell the truth in that, true?

25   **A.**   Yes, we would have represented what we believed

1   was true.

2   **Q.**  And let's go to the next exhibit, should be Tab 4.

3   This is -- you spoke about some design meetings, and

4   this is another document between you and Mr. Berger

5   from 1997.  Do you see that, sir?

6   **A.**  I do see that.

7   **Q.**  And it speaks about E.H.B.  that means Elliott H.

8   Berger, true?

9   **A.**  Yes, that is Elliott.

10          **JUDGE RODGERS:**  This is Tab 4?

11          **MR. AYLSTOCK:**  Should be Tab 4.

12          **JUDGE RODGERS:**  I'm not seeing it at 4.  Let

13   me check 5.

14          **MR. AYLSTOCK:**  It should be the --

15          **JUDGE RODGERS:**  Maybe it's 5.  It is 5.  This

16   is the December 24, '97, it's Tab 5.

17          **MR. AYLSTOCK:**  Sorry, Your Honor.

18          **JUDGE RODGERS:**  No problem.

19   **BY MR. AYLSTOCK:**

20   **Q.**  Elliott Berger visits Mr. Ohlin in Maryland to

21   talk about this recent French -- or this French filter

22   we were just looking at in those patents, true?

23   **A.**  Let me read this real quick.

24   **Q.**  Sure.

25   **A.**  Yes, that's what he's represented in this report.

Brian Myers - Cross/Aylstock                    228

1    **Q.**  Right, Mr. Berger is telling you that he went to

2    Maryland, visited all these folks in the U.S. military

3    in Maryland, talked to them about this French

4    technology that was received from the French company

5    ISL, and reviewed concepts with those military

6    representatives as well as new bidirectional earplug

7    designs suggested by the French.  And all of that

8    happened in Maryland, true?

9    **A.**  It was at the Aberdeen Proving Ground, which I

10   guess is in Maryland.  That's what you're telling me.

11   We can read the words of the document.

12   **Q.**  Okay.  And you also went to visit Dr. Ohlin in

13   Maryland in 1999, did you not, a couple of years

14   later?

15   **A.**  I don't ever recall going to Aberdeen to visit

16   Doug Ohlin.

17   **Q.**  Okay.  Well, you met with him outside of

18   Indianapolis, true?

19   **A.**  I do recall -- not specific instances, but that I

20   would have bumped into Dr. Ohlin at maybe a trade show

21   or a technical show or symposium.

22   **Q.**  And those wouldn't have been in Indianapolis,

23   true, or Indiana, for that matter?

24   **A.**  I don't have specific knowledge of where they were

25   and where I bumped into him.

1   **Q.**   We may have some examples at the end.  Let me show

2   you this next document.

3        You authored it, and you're sending it to Olivia

4   at the institute of Saint-Louis in France.  You see

5   that, sir?  It's from 1999 in February?

6   **A.**   I do.

7   **Q.**   You're sending to ISL a check and license

8   agreement by FedEx, you want to confirm that it was

9   received in France, true?

10  **A.**   That's the question that I asked in the first

11  sentence there to Mr. Ohlin, yes.

12  **Q.**   And you represent to these folks in France that

13  you're meeting with Doug Ohlin who works with the

14  military later this week.  You see that, sir?

15  **A.**   I do see those words, yes.

16  **Q.**   Obviously, this licensing agreement that's being

17  referred to is licensing the French filter technology

18  that was licensed and used in the Combat Arms Earplug,

19  true?

20  **A.**   This would have been relative to the technologies

21  that we did -- some of the technologies, certainly,

22  that we incorporated into the Combat Arms Earplugs.

23  **Q.**   And you're telling these folks over in France that

24  you're going to go meet with Doug Ohlin who is in

25  Maryland to talk about this technology, true?

1   **A.**   No.   It just says I'm meeting with Doug Ohlin.   I

2   have no idea where that meeting would have taken

3   place.   It could have been in Indianapolis, I don't

4   know.

5   **Q.**   Well, sir, are you representing to this Court that

6   Mr. Ohlin flew to Indianapolis for this meeting where

7   you were going to talk to him about this French

8   technology?   Is that your testimony?

9   **A.**   No, sir.   I said the letter doesn't say where

10  we're meeting.   Again, I don't recall ever going to

11  visit Doug wherever he was.   Perhaps he was going to a

12  show or a trade show, as I mentioned, wherever I was

13  going to be, and maybe we were going to discuss -- we

14  were going to discuss it at that point.

15  **Q.**   Okay.

16  **A.**   I don't know where this meeting was going to take

17  place.   It doesn't say.

18  **Q.**   I've got some of those trade show meetings I may

19  have time for at the end.   But the point is, you're

20  not telling this Court that this meeting occurred in

21  Indianapolis or Indiana, true?

22  **A.**   I'm telling you I don't know where it occurred.

23  **Q.**   Okay.   Now, the license agreement is the next

24  exhibit.

25          **MR. AYLSTOCK:**   I apologize for the not

1    knowing the tabs by heart, Your Honor, but I think

2    it's the very next tab.

3             **JUDGE RODGERS:**  It's 7.

4    **BY MR. AYLSTOCK:**

5    **Q.**  It's a license agreement between your company,

6    Aearo, and this ISL, this French company.  Do you see

7    that, sir?

8    **A.**  Yes, I do see that.

9    **Q.**  It's just a few days after that letter that you

10   sent to P. Olivia over in France, true?

11   **A.**  I'm sorry, I just don't recall the date of the P.

12   Olivia letter.

13   **Q.**  Well, that was February 22nd and now we're 3rd of

14   March; is that fair?

15   **A.**  So, if that's correct, it would have been about a

16   couple of weeks later.

17   **Q.**  All right.  And if we look there, it says Aearo, a

18   Massachusetts corporation.  You know Aearo to be a

19   Massachusetts corporation at this point in time, true?

20   **A.**  So I'm not sure where Aearo was incorporated.  I

21   don't know.  I believe that at this time our corporate

22   headquarters was located in Boston, Massachusetts.

23   **Q.**  Okay.  So, in any event, you don't dispute this

24   document that, wherever the headquarters was, it

25   wasn't Indiana, it was Massachusetts, true?

**A.**   That's what the document says.

**Q.**   All right.  Let's go to the next document, if you could, please.  This is --

**A.**   I was just going to point out the last line there it does say the principal place of business was Indianapolis, so I'm not sure how that gels, I don't know.

**Q.**   Well, when it comes to the filters that were going to be used in the Combat Arms, initially they were sourced out of France from -- well, let me ask you this.  They were sourced out of France and not Indianapolis, true, or Indiana?

**A.**   My initial recollection was that this group from the Institute of Saint-Louis had actually built a tool to make the filters or had it built on their behalf, and they had some obligation to source those filters from a company that was in France; perhaps it was these guys, I don't really recall.

And so, my understanding was that we took on that obligation.

**Q.**   And from this document, and you don't dispute it, those filters were shipped to Aearo in Southbridge, Massachusetts, true, the same place that you represented to Mr. Sidor that they came from, true?

**A.**   I am not -- I'm not sure that this document would

1    indicate where they were shipped to.

2    **Q.**   If we look on the right highlighting, you know

3    Southbridge to be a city in Massachusetts, in fact,

4    that's where Cabot was, right?

5    **A.**   Yes, that -- well, now, Cabot was from a place

6    outside of Boston.  Southbridge was a place about an

7    hour, hour-and-a-half west of Boston, and that's why I

8    think Aearo Company and I think, to your point, Cabot

9    Safety were actually located in Southbridge for a

10   period of time.

11   **Q.**   Right.

12   **A.**   But again, I don't see that this says where those

13   pieces shipped to.  I don't know that that's on this

14   document.

15   **Q.**   Well, if we look over -- and I understand that

16   it's a lengthy document and I don't have a whole lot

17   of time.  But you don't dispute in fact that Aearo has

18   had facilities at all times there in Southbridge,

19   Massachusetts, and it wouldn't surprise you, would it,

20   Mr. Myers, that Aearo would be receiving those

21   materials from ISL to Massachusetts, true?

22   **A.**   It wouldn't surprise me if you presented me with a

23   document that said Aearo and Southbridge received

24   these filters, no, sir, that would not surprise me.

25   **Q.**   Well, this is a shipping thing, it says ship mode

1   UPS and it's Aearo Company to a P.O. Box in

2   Southbridge, Massachusetts.  You see that?

3   **A.**   Yes.

4   **Q.**   Let's go back to --

5        **MR. AYLSTOCK:**   Tab 1, Your Honor.

6   **BY MR. AYLSTOCK:**

7   **Q.**   -- your Exhibit 45, your email to Mr. Sidor, who

8   sits in Philadelphia.

9        If we scroll down a little bit in that email,

10   after you talk about the patents, if we look down, you

11   emailed Tom, in the middle there, Tom Sidor -- this is

12   actually the evening before, 5:40 p.m. on July 6th --

13   going down to the lower part, you're talking about the

14   testing there.

15       And you tell Mr. Sidor, who has asked you about

16   what testing has been done on the Combat Arms, that

17   it's actually been evaluated in three ways, do you

18   not?

19   **A.**   That's what -- that's the verbiage that I used.

20   **Q.**   And I don't expect you to know our master

21   complaint on behalf of the Plaintiffs, Mr. Myers, but

22   I'm going to represent to you that Count One is

23   negligence and has allegations regarding negligent

24   testing.  So, do you know that or don't know that?

25   **A.**   I'm sorry, I don't -- I don't even understand

1    that.

2    **Q.**   Fair enough.

3        Now, what you say to Mr. Sidor here is, first of

4    all, it's been tested, the testing required to

5    establish the NRR for each end of the hearing

6    protector, the testing was conducted only once in our

7    E-A-RCAL lab.  You see that, sir?

8    **A.**   I do see those words in that paragraph.

9    **Q.**   Right.  And the sentence above, you're talking

10   about the NRR, at all times that the Combat Arms

11   Version 2 was being sold, the NRR of the green end was

12   represented to be 22, correct?

13   **A.**   I don't recall specifically what that NRR was.

14   **Q.**   Well, it never changed on any of the packaging or

15   materials or information to the military, true?

16   **A.**   I don't -- I don't know.

17   **Q.**   Okay.  I think the record will reflect that.  But,

18   in any event, you tell him, not that it had been

19   tested multiple times or that it had been tested and

20   the testing was stopped, but it was tested only once.

21   That's what you say to Mr. Sidor in this email, true?

22   **A.**   Those were the words that were used.

23   **Q.**   Okay.  And with regard to this testing in

24   paragraph 1, you talk -- it's just talking about ten

25   human subjects, that's the extent of the testing that

1   you tell Mr. Sidor about in this paragraph, true?

2   **A.**   That's what the first -- the first sentence says

3   that the attenuation testing was performed on ten

4   human subjects.

5   **Q.**   Let's go to the next part of the testing that you

6   talk about with Mr. Sidor.  It says, 2, "In order to

7   measure the ability of the protector"?

8           **MR. AYLSTOCK:**  Blow that up, Brian.

9   **BY MR. AYLSTOCK:**

10  **Q.**   You tell Mr. Sidor, "In order to measure the

11  ability of the protector to provide increasing

12  protection with higher level noises, we had to submit

13  the design test evaluation which would not include

14  human subjects as we don't want to expose them to

15  exceedingly high noise levels," right?  You see that

16  there, sir?

17  **A.**   I do see those words, yes.

18  **Q.**   And what you're talking about there is impulse

19  testing, true?

20          **MR. WASDIN:**  Your Honor, I'm going to object

21  on scope.  We're talking now about negligent testing,

22  and we've already established the only thing that

23  matters, which is that the testing happened in

24  Indianapolis.

25          **MR. AYLSTOCK:**  Well, I'm about to establish

 1   that it didn't.

 2            **JUDGE RODGERS:**  Okay, that's -- I was going

 3   to ask you if you were headed in --

 4            **MR. AYLSTOCK:**  That is exactly where I'm

 5   heading.

 6            **JUDGE RODGERS:**  All right.  Objection is

 7   overruled.

 8   **BY MR. AYLSTOCK:**

 9   **Q.**  This testing you're talking about, Mr. Myers, is

10   impulse testing, true?

11   **A.**  It was testing to see that the protector provided

12   increasing protection with higher-level noises.  Yes,

13   that would be impulse protection.

14   **Q.**  Right.  And the testing that was done in

15   Indianapolis at the E-A-RCAL lab is REAT testing, and

16   that's very different from impulse testing, true?

17   **A.**  Now you're getting into a technical question.  I

18   believe that's true, but I'm not the technical guy.

19   **Q.**  Okay.  Well, let's look at the next exhibit in the

20   -- if we can go back to the PowerPoint.  This is one

21   that you're on.  In fact, you know it because it was

22   in your deposition from Elliott Berger to you.  And

23   what Mr. Berger seems to be doing is copying and

24   pasting an email that he sent to one Armand Dancer

25   from France, true?

1   **A.**   So this is -- I mean, I can only tell you what I

2   can read on the screen was from -- it looks like it

3   was from Elliott Berger to me, but then it's addressed

4   to Armand.  So I'm not completely sure what --

5   **Q.**   Well, Armand Dancer is from France at ISL, true?

6   **A.**   The only Armand that I'm aware of was from ISL in

7   France.  But again, I -- it's a little confusing

8   because it's a memo from Elliott to me, but then it

9   speaks to Armand.  So I'm not sure what to make of

10   that.

11   **Q.**   Well, what I make of it is he copied and pasted it

12   so you would be aware of it.  Because you were his

13   boss at this time, right?

14          **MR. WASDIN:**   Objection to form.

15          **JUDGE RODGERS:**   In what way?  Leading?

16          **MR. WASDIN:**   It's argumentative.  He's

17   testifying, telling the witness what he makes of it.

18          **JUDGE RODGERS:**   Restate your question,

19   please.

20   **BY MR. AYLSTOCK:**

21   **Q.**   All right.  Well, let's just go through it.

22   Because what Elliott is telling Mr. Dancer in France

23   is they don't have REAT data so there will be some

24   REAT testing in the U.S.  But he also says, "Could you

25   be so kind as to conduct non-linear tests on the

1    product and compare them to the values you anticipated

2    based on your last test on the same filter as the one

3    we were using in the product?"

4        Do you see that, sir?

5    **A.**  I do see those words.

6    **Q.**  That non-linear test, those are the same tests

7    you're telling Mr. Sidor about, true, those

8    high-impulse noise testing?

9    **A.**  I would think that's true.  But again, I'm not the

10   technical guy that could tell you that one equates to

11   the other.

12   **Q.**  Well, you were competent enough to tell Mr. Sidor

13   in Philadelphia, true, at the DLA?

14   **A.**  Are you referring to the email that we already

15   looked at?

16   **Q.**  Yeah, in the very first one, you're telling Mr.

17   Sidor about non-linear testing.  So you're competent

18   enough to tell him about it and, in any event, you

19   know that that testing, according to this document,

20   was not being done in Indianapolis, it was being done

21   by ISL in France, true?

22   **A.**  Yes.  But to my understanding, the impulse testing

23   that was done, at least initially on the product, was

24   done in France.

25   **Q.**  And in fact --

1    **A.**   At least that was my knowledge.

2    **Q.**   -- it looks like more than one test was in France

3    because he's referencing some earlier tests because he

4    wants it to be tested and compared to some later tests

5    on the same filter as the one we're using in

6    production, fair?

7    **A.**   I see those words.  I can't speak to how many

8    times it was tested there.  That would have been

9    something that technical would have worked with

10   apparently Armand.

11   **Q.**   Well, you can't represent to this Court that it

12   was ever tested in Indianapolis for impulse noise, can

13   you, sir?

14   **A.**   I don't know that it was ever tested in

15   Indianapolis for impulse noise, that's true.

16   **Q.**   All right.  Let's go back to Tab 1 again when it's

17   talking about the testing because there is another

18   type of testing that's very important to this case

19   that you tell Mr. Sidor about.

20             **MR. AYLSTOCK:**   Can you pull that up, please,

21   Tab 1, testing No. 3, on the second page.

22   **BY MR. AYLSTOCK:**

23   **Q.**   Well, I'm going to read it to you in the meantime

24   and hopefully it will blow up.  And I know you've seen

25   this document before because you saw it at your

1   deposition.

2       What you tell Mr. Sidor is, "We have designed a

3   special test feature we use as a way to test every

4   Combat Arms Earplug which we make.  This test assures

5   that the filter is properly made and assembled into

6   the earplug so that, when a very loud noise occurs,

7   the earplug will function properly."

8       Do you see that, sir?

9   **A.**  Yeah.  And somebody just blew it up, so I can read

10  it now.

11  **Q.**  Even better.  So there was also testing done,

12  impedence testing, on each -- supposedly, according to

13  what you told Mr. Sidor, on each and every earplug,

14  true?

15  **A.**  Yes, that was certainly the process that was

16  supposed to be followed.

17  **Q.**  Now, going to No. 4, you also reference a bunch of

18  testing that may have been done by the military, true?

19  **A.**  Hang on.

20  **Q.**  Evaluated by the U.S. military.

21  **A.**  Yeah, I seem to recall either emails or an email

22  with Dr. Ohlin where I asked about the evaluations

23  within the military.  I'm not sure what they did

24  but --

25  **Q.**  Well, you can't represent to this Court that any

1    of that testing or any of the materials provided by

2    Aearo for that testing by the military was done in

3    Indiana, can you, sir?

4    **A.**   Well, the products would have come from

5    Indianapolis, the materials that -- if that's what

6    you're talking about.  But I don't know where such

7    test would have taken place.

8    **Q.**   Well, let's go back up to No. 3, this impedance

9    testing, because there is another exhibit -- you're

10   aware of this, are you not, Mr. Myers -- if we go back

11   to the PowerPoint, Klun Exhibit 36, you're emailing

12   another person over at DLA in Philadelphia, John

13   Komada.  You know him, right?

14   **A.**   Yeah, the name is familiar, but I don't recall

15   that I ever met him or -- I don't know him, I wouldn't

16   say.

17   **Q.**   Okay.  Well, what you tell him, in any event, is

18   that he's at -- apparently there has been a question

19   about this acoustical impedance test under the

20   sampling for inspection paragraph.  This is talking

21   about a potential purchase order by the U.S. military

22   called an MPID.  You understand that, right?

23   **A.**   I'm not sure what an MPID is.

24   **Q.**   Okay.  Well, there is a question raised and you

25   respond that, "We consider this acoustical impedance

 1   test under sampling for inspection to be proprietary."

 2       Do you see that, sir?

 3   **A.**   I do see those words in my email.   Apparently I

 4   responded to something -- *(inaudible)* --

 5   **Q.**   Now, we looked at a document earlier, but I'm

 6   going to go to the next slide in the PowerPoint, which

 7   is another Myers exhibit, Exhibit 31 to your

 8   deposition.

 9       And if we go to Bates MDL000026, it has, similar

10   to what we looked at before, this place of

11   performance.

12       Do you see that, sir?

13   **A.**   Yes, I do.

14   **Q.**   All right.   And it looks like that the injection

15   molding components are made out of Southbridge,

16   Massachusetts.   That would be the tips and the

17   flanges, right?

18   **A.**   Well, the tips include the flanges.   And my

19   recollection is, if there was any parts made in

20   Southbridge, it would have been those parts.

21   **Q.**   Right.   And then it says that the assembly and

22   testing is done, not in Indianapolis, but down in

23   Mexico.   San Luis, I guess, is Mexico, Potosi, Mexico.

24   I'm been speaking French this morning; sorry to

25   butcher it.

1   **A.**   I'm sorry, I just don't see where you're --

2          **MR. AYLSTOCK:**   Can you blow that up, assembly

3   and test, Brian, right here.

4   **BY MR. AYLSTOCK:**

5   **Q.**   It's in handwriting.  And it does say at the

6   bottom Indianapolis is the pack and ship place, but

7   the materials are made in Massachusetts, and the

8   assembly and the testing is done in Mexico, true?

9   **A.**   Oh, yeah, I see a -- *(inaudible)* -- test there

10  after the Mexico reference, yes, I see that on the

11  sheet.

12  **Q.**   So, when it comes to testing each and every

13  earplug, that's done all in Mexico, true?

14  **A.**   At least, as long as it was assembled there, it

15  was tested there, it looks like.

16  **Q.**   Well --

17  **A.**   Actually, now that I think of it -- you're asking

18  about over the duration.  Certainly, at the point in

19  time that we would have responded to this tender, I

20  would have -- and that's what this sheet appears to

21  be, me collecting information together about who does

22  what and where it's done so that I can respond.  It

23  seems to me that I recall that, at some point in time,

24  a product came from Mexico but was tested in

25  Indianapolis because of an issue or a concern with the

1    proprietary nature of the test fixture which you

2    pointed out earlier.

3    Q.   Well, there was a concern, and I'm going to get to

4    that in just a minute.  But, in fact, when the boxes

5    -- if we go to the next slide, when the boxes come

6    back from Mexico to be packed and shipped from

7    Indianapolis, this is what they look like, isn't it?

8    It says, "Assembled in Mexico with U.S. components,"

9    they're in bag, and nothing more happens in

10   Indianapolis other than they get packaged up and

11   shipped out, true?

12   A.   I don't know how they looked when they arrived

13   from Mexico.  I don't know what they looked like.

14   Q.   So you would defer to Mr. Zielinski on that?

15   A.   If he knew.  I certainly don't know.

16   Q.   Okay.  Well, let's go to the next exhibit, because

17   Mr. Zielinski and Mr. Kieper were involved in a

18   problem that I presume you're aware of where they

19   actually lost the calibration plugs for these machines

20   that you said to Mr. Komada were proprietary, and they

21   lost the plugs that were necessary to calibrate the

22   machine.  Do you see that, sir?

23   A.   I see those words in this email.

24   Q.   Okay.  And if we look at the -- and the date of

25   this, this is May 4th of '03.  Let me back up a bit.

1    In fact, a year before they -- well, let me ask you

2    this.  Etymotic, that's the company that makes the

3    machines that calibrate the plugs, right?

4    **A.**  It was my understanding either they designed or

5    made the unit that we used to check some of our

6    product, including the Combat Arms product.

7    **Q.**  And they're in Illinois, true?

8    **A.**  Yes, if I recall correctly, they're in Elk Grove,

9    Illinois.

10   **Q.**  Now, if we rewind about a year -- actually, more

11   than a year -- going to the next document -- February

12   2003, this issue down in Mexico about these plugs

13   performing out of spec and not having calibration

14   equipment with regard to this very important impedance

15   testing, that was a chronic problem for your company,

16   was it not?

17           **MR. WASDIN:**  Objection, argumentative.  It's

18   also beyond the scope of the hearing.

19           **JUDGE RODGERS:**  Well, I don't see it as

20   argumentative.  He's just asking if it was a chronic

21   problem.  But are you going to tie --

22           **MR. AYLSTOCK:**  Yeah, it's directly relevant

23   to our Count One, Your Honor, our negligence claim and

24   negligent testing claim.  And Mr. Myers testified to

25   this Court under oath that 100 percent of the testing

1   was done in Indianapolis, and that simply is not true.

2        **MR. WASDIN:**  Your Honor, he didn't say that.

3   But beyond that --

4        **JUDGE RODGERS:**  Well, his testimony will be

5   whatever it was.

6        **MR. WASDIN:**  But beyond that, the fact that

7   it's relevant to his negligence claim does not make it

8   relevant to this hearing.  This hearing is about the

9   location of activities, not about whether activities

10  are problematic or negligent.

11       **JUDGE RODGERS:**  Well, Mr. Wasdin, though, you

12  discussed with Mr. Myers where the testing was

13  conducted, and I was certainly left with the

14  impression that all the testing was done at the

15  E-A-RCAL lab in Indianapolis.  So, overruled.

16  **BY MR. AYLSTOCK:**

17  **Q.**  Now, with this next exhibit, Zielinski Exhibit 26,

18  what we see here is permission to advance the

19  manufacturing and waive products that are out of spec

20  because of this issue occurring in the testing down in

21  Mexico.

22       Do you see that, sir?

23  **A.**  I see those words on whatever this document is.

24  **Q.**  Well, it says, "Waiver permission to accept

25  as-is," and there is a checkmark there, sir.  Do you

1    see that?

2    **A.**   I also see those words on this document.

3    **Q.**   And do you see the percent defective and 80

4    percent there, sir?

5    **A.**   Yes, I do.

6          **MR. AYLSTOCK:**   Go to the next slide, please,

7    Brian.

8    **BY MR. AYLSTOCK:**

9    **Q.**   Now let's fast-forward.  This is another exhibit

10   about quality problems at TJR.  Do you see that, sir?

11   **A.**   Again, not familiar with the document.  I see

12   those words on this document.

13   **Q.**   Well, under test equipment it says, "There have

14   been continual problems with the test equipment and

15   calibration procedures not being followed at TJR."

16   You see that, sir?

17   **A.**   I do -- I see bullet No. 1.  I think that's what

18   you just read there, the continual problems with -- I

19   see those words there.

20   **Q.**   Yeah.  And it says, "We operated under waiver for

21   six months because we needed to address backorder

22   issues."  You see that, sir, right?

23   **A.**   I see those words.

24   **Q.**   And you know, in fact, you were selling a lot of

25   them at this time, true?

1    **A.**   I don't recall what the sales were at this time.

2    What was this -- 2004, I think you're representing.

3    So I don't recall what the sales were at that time.

4    **Q.**   Well, in any event, because of these equipment

5    measuring problems, TJR continued to operate with a

6    quality waiver, right?  That's what it says?

7    **A.**   The documents says that.

8            **MR. WASDIN:**  Your Honor --

9            **JUDGE RODGERS:**  Let me --

10           **MR. WASDIN:**  Your Honor, I'm going to object

11   again, and this time I'm going to object on foundation

12   grounds, which is that Mr. Myers has said he doesn't

13   know what this -- he's not involved in this document.

14   When we brought him here, you know, we brought him as

15   a personal knowledge witness.  He is not a --

16           **JUDGE RODGERS:**  Well, you all have exchanged

17   these exhibits; I've required you to do that.

18           **MR. WASDIN:**  No, we did not --

19           **MR. AYLSTOCK:**  The cross exhibits we agreed

20   not.

21           **JUDGE RODGERS:**  Oh, this is cross, all right.

22           **MR. AYLSTOCK:**  But the point I'm making is at

23   the bottom --

24           **JUDGE RODGERS:**  Is this from Mr. Kieper's --

25           **MR. AYLSTOCK:**  It is in the record.  It's

1    from Mr. Kieper's deposition.  It's Exhibit 73.  It's

2    well known to the Defendants.  And in fact --

3          **JUDGE RODGERS:**  Well, I don't think Mr. Myers

4    is disputing that there were these equipment problems.

5    So what's the next step for you?

6          **MR. AYLSTOCK:**  The next point, Your Honor, is

7    at the very bottom there was a joint visit by Bob and

8    Ron to make a big improvement because our quality

9    program -- Bob and Ron are Bob Zielinski and Ron

10   Kieper, went from Indianapolis to Mexico to deal with

11   these problems, or attempt to.  And we contend that

12   they were never dealt with.

13         **JUDGE RODGERS:**  Okay.  And so your point

14   would be that the testing location never changed?

15         **MR. AYLSTOCK:**  It never changed.  And, in

16   fact, these technical people that Mr. Myers testified

17   remained in Indiana and made all these decisions went

18   to where the stuff was being made and tested and

19   assembled personally and visited those to deal with

20   these problems that weren't in Indianapolis but were

21   in Mexico.

22         **JUDGE RODGERS:**  This is an exhibit attached

23   to Mr. Kieper's deposition?

24         **MR. AYLSTOCK:**  Yes, Your Honor, it's in the

25   record.

1              **JUDGE RODGERS:**  Mr. Kieper is in the record,

2      and I'm familiar with him from summary judgment.  So I

3      don't think you need to ask Mr. Myers any more

4      questions about this exhibit.

5              **MR. AYLSTOCK:**  Thank you, Your Honor.

6      **BY MR. AYLSTOCK:**

7      **Q.**  Now, Mr. Myers, are you aware that the company has

8      admitted that it never told the Government about this

9      waiver?

10             **JUDGE RODGERS:**  Mr. Aylstock, why is that

11     relevant to this issue?

12             **MR. AYLSTOCK:**  It goes directly to our claims

13     of fraud.

14             **JUDGE RODGERS:**  But we're talking about

15     location of activities, not whether you can prove your

16     fraud claim or whether fraud occurred.

17             **MR. AYLSTOCK:**  Right.  But the fraud was

18     perpetrated on Mr. Sidor and others where I'm going to

19     get to it because in the MPID it specifically said

20     there would be 100 percent impedance testing and then

21     sampling as well on the green end.  And Ms. Childress,

22     on behalf of 3M in her 30(b)(6) deposition, testified,

23     one, this waiver was never disclosed --

24             **JUDGE RODGERS:**  But here is the problem.  You

25     all, neither side, argued in your briefing any issue

1   related -- there was no argument about fraud and

2   choice of law analysis for the fraud claims.

3           **MR. AYLSTOCK:**  Respectfully, 3M didn't put in

4   any evidence of Aearo activities.

5           **JUDGE RODGERS:**  I understand that.

6           **MR. AYLSTOCK:**  So all I'm trying to do is

7   create an accurate factual record for Your Honor to

8   see that there was much stuff -- but I can move on

9   from this.

10          **JUDGE RODGERS:**  Let me ask you to move on,

11  please.

12          **MR. AYLSTOCK:**  Okay, let's move on to --

13  actually, if we go back to Tab 1, which is your --

14          **JUDGE RODGERS:**  And, Mr. Aylstock, just so

15  it's clear, I'm not telling you you can't continue to

16  ask Mr. Myers about this issue, but not with documents

17  that he is not aware of.

18          **MR. AYLSTOCK:**  Understood, Your Honor.

19  **BY MR. AYLSTOCK:**

20  **Q.**  Now, are you aware, Mr. Myers, that on the very

21  day that you were emailing back and forth with Mr.

22  Sidor, July 6th, 2006, that there was an ARB meeting,

23  an Acquisition Review Board meeting where the Combat

24  Arms were being discussed by folks including Mr.

25  Sidor?

1   **A.**   I don't believe that I was.

2   **Q.**   Okay.  Do you know why he was emailing back and

3   forth with you, one way or the other?

4   **A.**   I can see the email was probably telling me what

5   information he was looking for or what information I

6   was looking for, but I don't recall offhand.

7   **Q.**   Let's move on from this document then.  Let's go

8   to Zielinski Exhibit 14.  This is the MPID we were

9   talking about, Medical Procurement Item Prescription.

10  This is now ten days after you answered Mr. Sidor with

11  the three ways that it had been tested.  Do you see

12  that, July 16th, 2006?

13  **A.**   Yeah.  And I guess I have to take your word for

14  the prior date because I just -- I don't recall what

15  that was.  But I do see this document.

16  **Q.**   Now, if we go a couple of pages in, there is some

17  information in this MPID about sound attenuation.

18  There is 4.3 and 4.3.2.  For each specified salient

19  characteristic, except sound attenuation, samplings

20  for inspections shall be conducted according with the

21  ANSI standards.

22       And then with regard to the sound attenuation,

23  sampling for inspection of sound attenuation of

24  level-dependent yellow end shall be 100 percent and

25  shall be verified using an acoustical impedance test.

1      That's that test out of Mexico, true?

2  **A.**   I believe that's the test that they're referring

3  to here.  Again, I don't recall this document, so I'm

4  not sure what it's out of or what the context is.

5  **Q.**   And sampling for inspection of the sound

6  attenuation of the camouflage green end shall be

7  conducted in accordance with ANSI ASQZ1.4.

8      So the camouflage end is supposed to be sampled

9  for inspection, true, according to this MPID?

10         **MR. WASDIN:**   Objection.  Mr. Myers is not on

11  the email.  He said he doesn't know the document, and

12  the question calls for --

13         **JUDGE RODGERS:**   Do you all agree that this

14  testing was not done in Indiana?

15         **MR. WASDIN:**   The testing for acoustical

16  impedance was done in Mexico, yes, we agree.

17         **JUDGE RODGERS:**   Then objection sustained.

18         **MR. AYLSTOCK:**   Okay.

19  BY MR. AYLSTOCK:

20  **Q.**   Now, Mr. Myers, you're aware, are you not, that

21  the Government had a criminal investigation report and

22  investigation of your company with regard to the

23  Combat Arms Version 2?

24  **A.**   I -- *(inaudible)* -- characterized that way.  And

25  in a deposition I was handed a copy of something that

1    I had no knowledge of.

2    **Q.**  Well, do you know that from that exhibit that you

3    were handed in your deposition that the investigator,

4    Ms. Coleman, interviewed a number of folks from DLA,

5    including Mr. Sidor and Mr. Komada, but she didn't

6    interview you; is that true?

7    **A.**  Again, I think I testified or was deposed and said

8    I did not recall any conversation like that or any --

9    *(inaudible)* -- like that.

10   **Q.**  And in fact, I think the record will reflect that

11   she did not interview any of the folks in Indianapolis

12   with regard to their activities related to the

13   allegations of fraud perpetrated upon the Government.

14   Do you remember that?

15   **A.**  I don't, I don't.  I saw the document.  I was

16   asked to turn to a page and asked if I recall being

17   asked a question about whatever was on that page.

18   **Q.**  Okay.  Now, one of the folks that Ms. Coleman was

19   not able to interview was Doug Ohlin, true?

20   **A.**  I don't know.

21   **Q.**  Well, you know Mr. Ohlin had unfortunately passed

22   away by that time?

23   **A.**  I didn't recall the timing.  I do know he's passed

24   away.  I didn't recall the timing.

25   **Q.**  Fair enough.  Let's go to the next document.

1    We've seen this one.  This is the 1997 meeting.  We

2    know that Doug Ohlin, while he was at the Government,

3    lived in Maryland.  You knew that, right?

4    **A.**   I don't know where he lived.

5    **Q.**   But he worked at Aberdeen Proving Ground, you knew

6    that?

7    **A.**   That was the address that I had for him.

8    **Q.**   And that's not Indiana, true?

9         **JUDGE RODGERS:**  Mr. Aylstock --

10   **BY MR. AYLSTOCK:**

11   **Q.**   Let's move on.  Now, there was also meetings that

12   Mr. Berger and others from your company had with

13   Dr. Ohlin that were also not in Indiana.  In fact,

14   this document reflects that Mr. Berger was reporting

15   to you that he met Mr. Ohlin about comfort issues at

16   the beach.

17        You see that, sir?

18   **A.**   Give me a second to read the memo.

19   **Q.**   Sure.

20   **A.**   Okay.

21   **Q.**   And you know that this meeting didn't occur in

22   Indianapolis because there is no beach in Indiana

23   really, is there?

24   **A.**   Actually, I've been to a beach in Indiana, but I

25   don't think that's what he's referring to here.  I

1    don't know.

2    **Q.**  Well, I'll represent to you that it was Virginia

3    Beach.  Do you have any reason to dispute that?

4    **A.**  I do not.

5    **Q.**  Okay.  Now, one of the things that -- let's go to

6    the next exhibit.  You know Mr. Ohlin came to work for

7    3M and Aearo, true?

8    **A.**  At one point he did, yes, that's correct.

9    **Q.**  And when he did --

10   **A.**  I don't know if it was Aearo or 3M at the time he

11   came to work there.  I don't know.

12   **Q.**  And, when he did, Dr. Ohlin stayed in Maryland,

13   true?

14   **A.**  I don't believe he relocated.

15   **Q.**  Okay.  So, with regard to Dr. Ohlin -- this is Mr.

16   Moses, who we referred to before.  What Mr. Moses

17   reports is that they're very happy with Dr. Ohlin

18   because he has single-handedly drawn in more soldiers

19   and civilians than all other displays, technologies,

20   and products combined when it comes to the Combat Arms

21   Earplug and other products, right?

22   **A.**  I'm not sure I saw all those words here, but they

23   are what they are.

24   **Q.**  All right.  Now, next, this is an invoice from

25   Dr. Ohlin just to, I think, establish he's -- this is

1    invoice one.  It looks like he started in November of

2    2007.  Do you dispute that, sir?

3    **A.**   Again, I don't recall when he started.

4    **Q.**   Okay.  Now -- and his address is Bel Air,

5    Maryland.  You see that at the bottom?

6    **A.**   I see that at the bottom, yes.

7         **MR. AYLSTOCK:**   Skip a couple, Brian.   The

8    next one.   Okay.

9    **BY MR. AYLSTOCK:**

10   **Q.**   And, in fact, Dr. Ohlin would take trips and was

11   asked by 3M to take trips all over the country to

12   CHPPM and these conferences to talk about these

13   conferences, true?

14   **A.**   I couldn't speak to that at that point.  I don't

15   believe he was working in my organization.  He was

16   working for somebody else.  So I'm not sure where they

17   would have sent him or what he would have done.

18   **Q.**   This document reflects he went to meet with Frank

19   Gavin on a trip to Phoenix.  You see that at the very

20   bottom?

21        It's okay.  I really just want to talk to you

22   about Frank Gavin because you brought him up in

23   direct.

24        You know Frank Gavin as one of the folks who was

25   on the sales force and he lives in Phoenix, and has

1   since he started working for Aearo, true, sir?

2   **A.**   Other than this document, I wouldn't have been

3   able to tell you where Frank lives.

4   **Q.**   Well, let's look at one from Frank to you that

5   might be able to help us out.

6           **MR. AYLSTOCK:**   Go ahead, Brian.

7   **BY MR. AYLSTOCK:**

8   **Q.**   This is from Frank, and it copies you and others.

9   "Greetings from Phoenix," and the subject is

10  "Operation Cobra."  I think the Court may have heard a

11  little bit about that earlier in the case.

12         Do you see that, sir?

13  **A.**   I do see this as an email from Frank, and he says

14  "Greetings from Phoenix," so that's probably where he

15  lived.

16  **Q.**   And Frank is sending you and a whole bunch of

17  other people the final version of Operation Cobra; you

18  see that, sir?

19  **A.**   That's what it says.

20  **Q.**   And he's obviously doing that from Phoenix, not

21  from Indianapolis, true?

22  **A.**   That's what the email says.

23  **Q.**   Now let's look at some of the attachments.

24  Operation Cobra was, in fact, implemented by your

25  company.  And as your marketing department, you were

1    involved in that, true, because you were copied on
2    this?
3    **A.**   Yeah.  Honestly, I don't recall this initiative.
4    **Q.**   Well, let's move on to what is talked about with
5    regard to the distribution.  There is materials
6    distributed to various sales teams and some marching
7    orders, they're going to do some ads in *Stars and*
8    *Stripes.*
9         You're copied on this, so you're aware of those
10   activities, are you not, sir?
11   **A.**   Again, I don't recall this operation nor any of
12   its details.
13   **Q.**   All right.  But you don't dispute that all these
14   folks -- your company put boots on the ground to go
15   visit bases with marketing materials, sales aids,
16   samples, running ads, and telling men and women in
17   uniform and their audiologists and commanding officers
18   about the Combat Arms, its characteristics and
19   qualities, how to use the plug, do you?
20   **A.**   Again, I don't know any -- I don't recall this
21   operation or the details.
22   **Q.**   We may get to hear from a couple of them or the
23   Court will have their testimony to tell the Court
24   what's happening.
25        So let's go to the next exhibit, sir.  This is

Brian Myers - Cross/Aylstock                    261

 1   another one that you're copied on.  We talked about

 2   samples, so we'll move forward.  Next, 15, yeah, there

 3   we go, from Daryl Charton.

 4       He's talking about "Operation Cobra is in full

 5   swing and will only solidify and grow our

 6   opportunities in the military."  And there's a whole

 7   bunch of sales numbers, and there's a lot of positives

 8   reflected in those numbers, true?

 9   **A.**  Again, I don't recall this email, so I'm not sure

10   what the pluses mean.  I guess that they were -- but I

11   don't recall this email or what the contents there

12   would be referring to.

13   **Q.**  Well, it says Combat Arms $5,308,000, and then it

14   says, "Any questions why you should be aggressively

15   calling on military bases?"  You see that, sir?

16   **A.**  I do see that highlighted down in the text.

17   **Q.**  Go to the next page, the one about where it talks

18   about distributors.  Here we go.  It also talks about

19   one area for improvement next year will be to focus on

20   professional presentations to our distributors sales

21   forces.

22       You know that distributors also sold these

23   products to military bases all over the country, true,

24   sir?

25   **A.**  Yeah, that's what it -- distributors for us would

1   buy product and then resell it.

2   **Q.**   Right.  And you know, sir, the largest distributor

3   at one time was one called Brock Sales down in

4   Brandon, Florida, true?

5   **A.**   I wouldn't have been able to tell you where Brock

6   Sales is located.  I do recall that they were a large

7   distributor, but I don't know that they were the

8   largest.

9   **Q.**   We'll look at that real quick.  Here is Mr. Dan

10   Brock, Brandon, Florida.  Do you have any reason to

11   dispute that, sir?

12   **A.**   No, I do not.

13   **Q.**   And, in fact, if we look at the next document,

14   it's, again, copied to you from Tim McNamara that

15   Brock, with regard to the Combat Arms Earplug, being

16   the largest purchaser in the open market.

17        Do you see that, sir?

18   **A.**   I do, I see that in the email from Tim.

19   **Q.**   And, in fact, Brock, who is the largest

20   distributor in the open market, actually put

21   instructions for use on their product -- on the boxes

22   that they were shipping out.

23        You see those instructions for use, sir?

24   **A.**   Yes, I do.

25   **Q.**   And there is nothing there about folding flanges

1    or anything like that, true?

2    **A.**   I don't know.  Do you want me to read the

3    document?

4    **Q.**   I'll represent it to you.  The Court will have it.

5         But my question to you, sir, is do you know that

6    Brock -- Mr. Dan Brock got these instructions from Mr.

7    McNamara?  Do you know that to be true or not?

8    **A.**   I don't have any knowledge of what -- I don't have

9    any recollection of how these would have come to be in

10   the box with the Brock Sales name on them.

11   **Q.**   Well, you know Mr. McNamara was pounding the

12   pavement and was out visiting distributors, military

13   bases, anywhere they were, three or four, five days

14   out of the week, true?  He wasn't in Indianapolis?

15   **A.**   So I recall that Tim was certainly one of the

16   salespeople, and he's the one that comes to my mind

17   relative to selling this product and representing the

18   product --

19   **Q.**   Now, later -- I didn't mean to cut you off, I'm

20   just trying to hurry.

21        The next distributor I want to talk to you about

22   is New Dynamics, because there was a point in time

23   when New Dynamics became the sole distributor for

24   Combat Arms later, under the 3M regime, correct?

25   **A.**   My understanding -- I think that was during a

1   period of time when I was not involved in the hearing

2   protection business, but it was my understanding that

3   at some point they did begin to supply the products.

4   Q.   Well, you told this Court that at all times, I

5   believe, the product would come back from Mexico and

6   then be distributed out of Indianapolis.

7        Since you weren't there at that time, how do you

8   know that to be true?

9   A.   Well, I was referring to the time in which I was

10  involved with the business.

11  Q.   Okay.  So, after the time you were out of the

12  business, you're not making any representations to

13  this Court, are you, sir?

14  A.   There are some representations I think I can make.

15  I said, for example, that I was not involved with the

16  hearing protection business after January of 2011.

17  Q.   Okay.  And so, with regard to the distributorship

18  after that or the sales or the marketing, you don't

19  have any personal knowledge to provide the Court any

20  information on that, do you, sir?

21  A.   I might have some ability to provide information

22  on that.  For example, I was asked about an email that

23  was sent in 2015 when I became a part of the -- or had

24  responsibility for the business again.

25  Q.   That was at the summer of 2015 on, right?

Brian Myers - Cross/Aylstock                    265

1   **A.**   Yeah, something like that.

2   **Q.**   Let's go to the next exhibit, because I just want

3   to show the Court one of these sales sheets with New

4   Dynamics insignia on it.  And the address for New

5   Dynamics is Middleton, New York.

6        Do you know that to be true, sir?

7   **A.**   I don't know that to be true, but I wouldn't argue

8   with that.

9   **Q.**   Okay.  And if I represented to you that there came

10  a point in time where -- oh, here we are.  3M will

11  sell components of the Combat Arms.  New Dynamics will

12  source packaging materials and carrying case and

13  assemble into the retail pack.  All future retail

14  packs will be distributed through New Dynamics.

15       You see that, sir?

16  **A.**   I see it on the -- *(inaudible)* --

17  **Q.**   Let's move on to the time when 3M acquired Aearo,

18  because you talked a little bit about that.

19       Now we have the acquisition and merger agreement

20  dated November 14, 2007.  Does that comport with your

21  recollection, sir?

22  **A.**   Seems like I recall that's when it was announced,

23  and then early in 2008 the transaction actually

24  happened.  That was my understanding.

25  **Q.**   Now, the next exhibit is an exhibit to your

1   deposition.  When that acquisition happened, the

2   headquarters of Aearo moved to Saint Paul, correct?

3   The former headquarters were in Indianapolis, and then

4   it moved to Saint Paul, true?

5   **A.**   The headquarters for 3M and certainly for the

6   division in which Aearo joined was in Saint Paul.  But

7   the headquarters of Aearo, I guess, was liquidated; it

8   ceased to exist.

9   **Q.**   Right.  And so the headquarters became Saint Paul,

10  where you went, right.

11  **A.**   Ultimately I went to Saint Paul.

12  **Q.**   Yeah.  Let's look at that next exhibit because

13  I've got your CV; it was Exhibit 3 to your deposition.

14  It looks like April of '08 is when you moved to Saint

15  Paul, true?

16  **A.**   No.

17  **Q.**   So that's wrong?

18  **A.**   Yeah.  So, I mean, I don't recall when this --

19  when I put this document together.  But at the point

20  that I put the document together, the intention was to

21  indicate that I was current -- that I was located in

22  Saint Paul at that time.

23       But if you look on down, you'll see that, from

24  January '11 to November '12, I was located in Saint

25  Paul in this master black belt role.  But from

1    November '08 to December '10 I was in Indianapolis.
2    And even prior to November '08 I was in Indianapolis
3    but at that point working for Aearo.
4    Q.   Now, you were leading the integration of the Aearo
5    protection products, the legacy products into 3M's
6    hearing protection business, and that resulted in
7    sales growth, but that was integrating it into the
8    headquarters in Saint Paul, true?
9    A.   It wasn't integrating it into the headquarters of
10   Saint Paul.  It was taking the product portfolios that
11   existed for both product lines prior to the
12   acquisition and working to determine how we would
13   market those across the world in terms of a single
14   cohesive product line.  That's what that refers to.
15   Q.   All right.  I think the Court might have been
16   under the impression that basically with the 3M
17   takeover all the decision-makers stayed in
18   Indianapolis with regard to the Combat Arms.
19        You didn't mean to suggest that, did you, sir?
20   A.   Well, I stayed in Indianapolis.  I can tell you
21   that my boss was in Indianapolis.  Ultimately we
22   joined a division which was headquartered in Saint
23   Paul.
24   Q.   All right.  Let's look at another document, the
25   next one, Ted Madison.  Ted Madison was located in

1    Saint Paul, and he worked on the Combat Arms in 2013,

2    did he not?

3    **A.**   So, Ted Madison was a -- again, this was not when

4    I was involved with the hearing business, but Ted

5    Madison was located in Saint Paul.

6    **Q.**   Okay.  This was at a time when you had moved out

7    and really had no involvement in Combat Arms from

8    following your transfer to Minneapolis; until summer

9    of 2015, you basically had no involvement in the

10   Combat Arms.  Is that your testimony?

11   **A.**   That's my recollection, yes.

12   **Q.**   Okay.  So you're not here to tell the Court who

13   was doing what, where, and when during that time

14   period, are you, sir?

15   **A.**   For the most part, relative to Combat Arms or

16   hearing protection, I couldn't do that.

17   **Q.**   Okay.  But we do know Mr. Madison was in Saint

18   Paul, and he's working on 3M Combat Arms and talking

19   about flanges and NRRs, true?

20   **A.**   I can only tell you that I know Ted was located in

21   Saint Paul.

22        **MR. AYLSTOCK:**   Go to the next one, Brian.

23   **BY MR. AYLSTOCK:**

24   **Q.**   Mike Cimino was one of those legacy Aearo

25   employees, true?

1    **A.**   Yes, he would have joined 3M as a part of that

2    same acquisition.

3    **Q.**   Now, Mike Cimino was involved in 3M Combat Arms

4    from his Aearo days and his 3M days, true?

5    **A.**   Yeah, I think Mike had some military

6    responsibilities for sales --

7    **Q.**   Looks like he was -- sorry.

8    **A.**   -- prior to the 3M acquisition.

9    **Q.**   According to this, he was business manager of

10   military market center, do you see that, in Saint

11   Paul?

12   **A.**   I do see that.

13   **Q.**   Now, Mike Cimino actually lived in Canada when he

14   was with Aearo, true?

15   **A.**   Yes, and lives in Canada to this day.

16   **Q.**   Yeah.  So when he was doing things with regard to

17   Combat Arms, he was doing them not in Indiana but in

18   Canada, true?

19   **A.**   I can't speak to where Mike was when he was --

20   *(inaudible)* -- for Combat Arms.

21   **Q.**   Well, you know he never lived in Indiana, true?

22   **A.**   To my knowledge, Mike never lived in Indiana.

23   **Q.**   Now, do you know Jason Jones?  In fact, I know you

24   do.  You know Jason Jones, right?

25        **MR. AYLSTOCK:**  Go to the next exhibit, sir.

1    **BY MR. AYLSTOCK:**

2    **Q.**   Jason Jones worked and lived in Saint Paul at the

3    3M headquarters, Aearo headquarters, right, when Aearo

4    was bought by 3M?

5    **A.**   I don't know where he lives.  I know he works in

6    Saint Paul today.

7    **Q.**   And he, from 2008 to 2016, was the U.S. hearing,

8    head, eye, and face marketing manager.  You see that?

9    **A.**   Yes, I see that.

10   **Q.**   And looks, at the very bottom, he directed the

11   U.S. marketing integration of the $1.4 billion Aearo

12   Technologies acquisition, 3M's largest acquisition.

13   You see that?

14   **A.**   I do see that bullet point.

15   **Q.**   All right.  So, all the work he did with regard to

16   the Combat Arms in his role as the marketing manager

17   was done out of Minnesota, true?

18   **A.**   I can only say that, since I've known Jason, he's

19   lived here in Minnesota.

20   **Q.**   And, in fact, Jason was responsible for copy

21   review and these sale sheets and posters and so forth

22   that the sales used when they were pounding the

23   pavement on the military bases, true, when he was

24   there?

25   **A.**   I can't speak to exactly what the detail of

1    Jason's responsibilities were, what he did and did not

2    do.

3    **Q.**   Okay.  Just don't have knowledge of that?

4    **A.**   Correct.

5    **Q.**   Let's go to the next document.  Because you did

6    come back in the summer of 2015 and you actually --

7    you mentioned that you gave the order to cease the

8    shipping, and you did that from -- not from Indiana

9    but from Minnesota, true?

10   **A.**   Yes, that's an email I recall sending while in

11   Saint Paul.

12   **Q.**   And you gave that order the day after Mr. Hamer

13   was deposed and was confronted with the flange report,

14   true?

15   **A.**   I'm not sure what the timing was around Mr.

16   Hamer's testimony.

17   **Q.**   I'll represent to you it was October 7, 2015.

18   Does that refresh your recollection?

19   **A.**   So, then, this is the day after October 7th.

20   **Q.**   Okay.  And, in fact, you did that out of -- you

21   made that decision and 3M made that decision not out

22   of Indiana but out of Minnesota, correct?  You did

23   that out of Minnesota, did you not, sir?

24   **A.**   I sent the email, and I was located in Minnesota.

25   **Q.**   The decisions were being made to withdraw the

```
 1    product from the market because you couldn't sell it
 2    with the current NRR, and those decisions and meetings
 3    were taking place in Minnesota, true, sir?
 4          MR. WASDIN:  Objection, argumentative,
 5    foundation.
 6          JUDGE RODGERS:  In terms of the decision, not
 7    why it was made, where was the decision made?  Mr.
 8    Myers?
 9          THE WITNESS:  Are you asking me?
10          JUDGE RODGERS:  Yes.
11          THE WITNESS:  So, I'm not sure who all was
12    involved in that decision.  I only -- I don't know --
13    I mean, there were attorneys involved, to be sure.
14    And I just -- I recall that I sent that email from
15    Saint Paul, but I'm not sure who all -- at this point,
16    I don't recall who all would have been involved in
17    that decision.
18    BY MR. AYLSTOCK:
19    Q.  So, in summary, Mr. Myers, the Combat Arms Version
20    2 was not invented in Indiana, was it?
21    A.  I don't know.  There may have been patents around
22    the v2 or even other versions of it that came out of
23    our technical group there in Indiana.  You certainly
24    showed me some patents that applied that were not in
25    Indiana.
```

1    **Q.**   Well, two of the three were in France and one had

2    -- one of the inventors in Indiana and then actually

3    the assignee was Cabot in Massachusetts.  Do you

4    remember that?

5    **A.**   I remember those documents.

6    **Q.**   So we know, in fact, and we have seen it was no

7    parts were ever manufactured in Indiana, true?

8    **A.**   I don't know that that's the case.  I thought I

9    recalled that at some point the tips were made in

10   southern Indiana.  But again, I don't know that for

11   sure.

12   **Q.**   Okay.  And with regard to the assembly, that was

13   all done in Mexico, to the best of your knowledge?

14   **A.**   At some point, the assembly was done in Mexico.  I

15   don't know that it was there from the beginning, but

16   at some point it was in Mexico.  And then, based on

17   what you have shown me, at some period when I was out

18   of hearing protection, it moved to this place in New

19   York.

20   **Q.**   Let me try do it the inverse.  You can't tell this

21   Court under oath that any of the assembly was ever

22   done in Indiana, true?

23   **A.**   I don't recall.

24   **Q.**   And you can't tell this Court that any of the

25   distributors were ever in Indiana, true?

 1   **A.**   Again, I don't have detailed knowledge of all the

 2   distributors.  I would not be surprised if a

 3   distributor was in Indiana, but I don't know.  I don't

 4   know the details of the distributors.

 5   **Q.**   And when it comes to the testing, other than this

 6   ten-person REAT testing that you told Mr. Sidor about,

 7   to your knowledge, when we talk about the impedance

 8   testing and the impulse testing and the military

 9   testing for that matter, none of it was done in

10   Indiana that you can testify to this Court under oath

11   about, true?

12   **A.**   You asked the question about the E-A-RCAL lab.  I

13   can tell you that that's located in Indianapolis.

14   There are definitely better people than me to ask

15   about what tests were done and where they occurred.  I

16   know that some testing was done there in our E-A-RCAL

17   lab.

18   **Q.**   So, when you told the Court that all the testing

19   was done at E-A-RCAL, that was inaccurate, fair?

20           **MR. WASDIN:**   Objection.  Misstates his

21   testimony.

22           **JUDGE RODGERS:**   The record will speak for

23   itself.

24   **BY MR. AYLSTOCK:**

25   **Q.**   Is that true, that was an inaccurate statement,

1     Mr. Myers?

2              **JUDGE RODGERS:**  Mr. Aylstock, ask him if that

3     is his recollection of what he told the Court.

4              **MR. AYLSTOCK:**  Thank you, Your Honor.

5     **BY MR. AYLSTOCK:**

6     **Q.**  Do you recall telling this Court that all of the

7     testing on the Combat Arms Version 2 was done out of

8     Indiana?

9     **A.**  Today?

10    **Q.**  Yes, sir.

11    **A.**  I -- I would just -- I don't recall that.  We just

12    -- you showed me documents that indicated that perhaps

13    some testing had been done in France.

14    **Q.**  Fair enough.  Those are my questions.  Thank you,

15    Mr. Myers, for your time.

16             **JUDGE RODGERS:**  Thank you.

17             All right, Mr. Wasdin?

18                   **REDIRECT-EXAMINATION**

19    **BY MR. WASDIN:**

20    **Q.**  Mr. Myers, if you would just bear with me for a

21    few more minutes.  I want to just go back to this

22    testing issue and make sure we have an accurate record

23    on it.

24             So, what was the name of the laboratory that was

25    there in Indianapolis?

1    **A.**   It was the E-A-RCAL lab.

2    **Q.**   So that's a laboratory that physically exists in

3    Aearo's office in Indianapolis; is that right?

4    **A.**   Yes, that's correct.

5    **Q.**   Okay.  Now, you and I talked about the technical

6    group at Aearo.  Do you recall that?

7    **A.**   Yes.

8    **Q.**   Folks like Dick Knauer and Elliott Berger, I

9    believe you mentioned?

10   **A.**   Yeah.

11   **Q.**   Was that the group that had responsibility for the

12   testing done by Aearo on the Combat Arms Version 2 at

13   the E-A-RCAL laboratory?

14   **A.**   Yes, that group would have been responsible for

15   the testing of the product.

16   **Q.**   Okay.  That testing that they were doing in

17   Indianapolis, I think Mr. Aylstock referred to it as

18   ten-subject REAT testing.  Do you recall those

19   questions?

20   **A.**   I remember that was on one of the documents.

21   **Q.**   Okay.  Are you familiar with what REAT testing is,

22   real ear attenuation at threshold testing?

23   **A.**   I mean, I've heard the term, I understand the

24   term.

25   **Q.**   Let's just put the term to the side for one

 1   second.

 2       Was it your understanding that the testing that

 3   was done in Indianapolis at the E-A-RCAL laboratory

 4   was the testing that was used for product labeling?

 5   **A.**   Yes, that's my understanding.

 6   **Q.**   So, when you look at the 22 NRR or the attenuation

 7   data that is affixed on to the product for sale,

 8   that's the testing that would have been done in

 9   Indianapolis, right?

10          **MR. AYLSTOCK:**  Objection --

11          **THE WITNESS:**  Yes, that's --

12          **JUDGE RODGERS:**  I'm sorry, there was an

13   objection and I didn't hear the whole --

14          **MR. AYLSTOCK:**  I'm sorry, Judge, just

15   leading, that's all.

16          **JUDGE RODGERS:**  It is leading.  Sustained.

17   **BY MR. WASDIN:**

18   **Q.**   You separately gave some testimony and saw some

19   documents about testing that could have been done by

20   ISL in France or some acoustical impedance type

21   testing that could have been done down in Mexico.  Do

22   you remember that?

23   **A.**   I do remember that.

24   **Q.**   To the extent anything that we discussed on

25   direct -- I don't remember exactly how good I was at

1    putting my questions, and frankly, I don't remember

2    the testimony that Mr. Aylstock was talking about.

3    But if anything on direct came out into a question

4    that all testing by anybody on the Combat Arms Version

5    2 occurred in Indianapolis, did you mean to say that?

6    **A.**   What I meant to say was that my understanding is

7    the evaluation for the NRR test which we use to market

8    the product came from the lab in Indianapolis.

9         **MR. WASDIN:**   That's all the I have, Your

10   Honor.

11        **JUDGE RODGERS:**   Thank you.

12        Mr. Myers, so are you saying all of the

13   testing related to the labeling for the CAEv2 occurred

14   at the lab in Indianapolis?

15        **THE WITNESS:**   So, to the extent that it was

16   the NRR label, my understanding was that occurred in

17   Indianapolis.  I'm sorry, I don't mean to be evasive.

18        **JUDGE RODGERS:**   Was there other testing done

19   relative to the labeling -- specific to the labeling?

20        **THE WITNESS:**   I don't recall anything else

21   that was incorporated into the label -- any other test

22   data that was incorporated into the label.

23        **JUDGE RODGERS:**   Other than the NRR?

24        **THE WITNESS:**   Correct.

25        **JUDGE RODGERS:**   Okay.  Thank you.

1        Let me ask Judge Jones if he has any

2   questions.

3            **JUDGE JONES:**  I do not.  Thank you.

4            **JUDGE RODGERS:**  Judge Herndon?

5            **JUDGE HERNDON:**  No, I do not.  Thank you.

6            **JUDGE RODGERS:**  Counsel, any follow-up to my

7   question?

8            **MR. AYLSTOCK:**  Just one with regard to the

9   labeling, and maybe Brian can put it up.

10                   **RECROSS-EXAMINATION**

11   BY MR. AYLSTOCK:

12   **Q.**  With regard to the labeling that was contained on

13   the sale sheets and posters that were done and

14   distributed to the bases, do you see here where there

15   is representations made about 190 dBP and the yellow

16   end being protective on high impulse noise and so

17   forth, sir?

18   **A.**  I see that, yes.

19   **Q.**  So that would have been testing that is, at least

20   as it relates to the representations made here, that

21   work was done in France because that's impulse

22   testing, true?

23   **A.**  That makes sense to me.

24   **Q.**  And it also says there is 100 percent product

25   testing for impedance characteristics.  That's talking

1    about the testing in Mexico, true, sir?

2    **A.**   That's what that would refer to.

3              **MR. AYLSTOCK:**   Thank you, sir.

4              **JUDGE RODGERS:**   What exhibit is this, Mr.

5    Aylstock?

6              **MR. AYLSTOCK:**   Tab 39, Your Honor.

7              **JUDGE RODGERS:**   Was this the marketing

8    materials from New Dynamics or from the other

9    distributor, Brock distributors?

10             **MR. AYLSTOCK:**   This would have been from New

11   Dynamics, Your Honor, because this was 3M era.  It's

12   also contained in, I believe, the McNamara cut.

13             **JUDGE RODGERS:**   All right.  Thank you.

14             Mr. Wasdin, any follow-up?

15             **MR. WASDIN:**   Nothing further, Your Honor.

16             **JUDGE RODGERS:**   Okay, very good.

17             Mr. Myers, your testimony for today is

18   complete and you are excused, so thank you very much

19   for your time.

20             **THE WITNESS:**   Thank you.

21             *(Witness excused.)*

22             **JUDGE RODGERS:**   Where are we?

23             **MR. AYLSTOCK:**   Excellent question, Your

24   Honor.  May I have just a second?

25             **JUDGE RODGERS:**   Does anyone need a short

1    recess?

2         **MR. AYLSTOCK:**  A short recess would be

3    perfect.  Or we could do Dr. Spankovich now.

4         **JUDGE RODGERS:**  Let's do a short recess.  I

5    don't want to be brutal.  It's been bad enough without

6    lunch or anybody having anything to eat.  I would

7    never want to be accused of being brutal.

8         Mr. Aylstock, I guess it will be your expert

9    here.  I don't know if you're presenting or Mr.

10   Pirtle.  Whoever is doing this, I don't need the

11   credentials.  And actually, with this expert, I recall

12   him from Science Day anyway, just in the interest of

13   time.

14        **MR. AYLSTOCK:**  Sure.  And it will be part of

15   the record because it's attached to his report.

16        **JUDGE RODGERS:**  Sure.  I had actually

17   reviewed the reports.

18        We'll take a brief recess.

19        *(Recess taken 3:33 p.m. to 3:45 p.m.)*

20        **JUDGE RODGERS:**  Is this Dr. Spankovich?

21        **MR. OVERHOLTZ:**  It is, Your Honor.

22        **JUDGE RODGERS:**  Doctor, you can stay

23   standing.  And if you'd raise your right hand to be

24   sworn.  Everybody else may be seated.

25   **CHRISTOPHER SPANKOVICH, PLAINTIFF WITNESS, DULY SWORN**

1      **MADAM CLERK SIMMS:**  You may be seated.

2   Please state your full name and spell your last name

3   for the record.

4      **THE WITNESS:**  Christopher Spankovich,

5   S-p-a-n-k-o-v-i-c-h.

6      **JUDGE RODGERS:**  Sir, just make sure to let us

7   know if there is any disruption with the Zoom audio or

8   video.  Thank you, Mr. Overholtz, go ahead.

9                    **DIRECT EXAMINATION**

10  BY MR. OVERHOLTZ:

11  **Q.**  Dr. Spankovich, could you just briefly tell us

12  where you work now and what you do.

13  **A.**  Sure.  I live in Jackson, Mississippi.  I am an

14  associate professor and vice chair of research for the

15  department of otolaryngology, head and neck surgery at

16  the University of Mississippi Medical Center.  My

17  position involves direct clinical care as well as

18  research and administrative oversight of our research

19  program for the department.

20  **Q.**  Thank you, Doctor.  I know we prepared some slides

21  to go through your background.  We're going to skip

22  past those, if we can.

23      **MR. OVERHOLTZ:**  Your Honor, we've provided a

24  binder for Your Honor that's got our exhibits that

25  we'll be using.  Tab 4 is his CV.  We've premarked it

1    as Spankovich Choice of Law 4, and that's his CV.  But

2    Your Honor already has it as part of the report.

3              **JUDGE RODGERS:**  I do.

4              And, Dr. Spankovich, this is really just in

5    the interest of time, and also I remember you from our

6    Science Day.

7              **THE WITNESS:**  Yes, ma'am.

8              **JUDGE RODGERS:**  So we can dispense with the

9    credentials.

10   **BY MR. OVERHOLTZ:**

11   **Q.**  So, Dr. Spankovich, we'll move right into

12   Plaintiff Lewis Keefer.  Do you understand you're here

13   today to testify about the injuries of one of our

14   bellwether plaintiffs in the litigation, Lewis Keefer?

15   **A.**  Yes, sir.

16   **Q.**  And you were designated as plaintiff's expert in

17   Mr. Keefer's case; is that right?

18   **A.**  That is correct.

19   **Q.**  And did you serve both a general and a

20   case-specific expert report?

21   **A.**  Yes, I did.  And I also had my deposition taken

22   for two days by Mr. Brock.

23   **Q.**  Okay.  And so, regarding Mr. Keefer, can you just

24   tell us a little bit about his background as far as

25   the relevant facts that you know about Mr. Keefer

1    before we get into your opinions.

2    **A.**   No problem.  Mr. Keefer entered into the military

3    in the year 2007.  He served as an Army combat medic.

4    He received the Combat Arms Version 2 earplug when he

5    was stationed at Fort Benning, Georgia.  And he

6    incurred hearing loss and tinnitus relative to his

7    military noise exposure during that time frame.

8    **Q.**   Okay.  And I understand in your expert report you

9    gave opinions regarding Mr. Keefer's injuries and the

10   cause of those injuries.  And we're going to have a

11   full opportunity to talk about those when we get to

12   trial in a few months.

13        But today we're here to focus on a key issue

14   regarding the timing and location of the military

15   auditory injury that Mr. Keefer suffered because

16   that's relevant to the Court's decision regarding our

17   choice of law.

18        Do you understand that?

19   **A.**   Yes, sir.

20   **Q.**   And do you have an opinion on that issue regarding

21   the timing and location of Mr. Keefer's first

22   injuries?

23   **A.**   Yes, sir.  So, luckily, we have good data because

24   the Army does a good job of doing annual audiograms.

25   And we can observe where we see initial sustained

1   damage to Mr. Keefer's auditory pathway was in October

2   2008 relative to his military noise exposure, and that

3   Mr. Keefer has both hearing loss at multiple

4   frequencies in both ears at that time as well as then

5   reports tinnitus subsequently.

6   **Q.**   And is it your opinion that those injuries that

7   you described were suffered in October of 2008 in Fort

8   Benning, Georgia?

9   **A.**   Yes.  So, we first observed sustained damage in

10   2008 while he was stationed in Fort Benning, Georgia.

11   **Q.**   Can you tell us a little bit about the work that

12   you did to come to the opinions regarding the timing

13   and location of Mr. Keefer's hearing-related injuries?

14   **A.**   Yes.  So, I examined Mr. Keefer's medical records,

15   including his pure tone audiometry, from his Army

16   records.  I also reviewed his VA records as well.  I

17   read his deposition testimony and his discovery

18   responses.  I applied my own differential diagnostic

19   methods to rule in or rule out what different factors

20   may likely have caused the injury and when the injury

21   occurred initially.

22   **Q.**   And, Dr. Spankovich, based on that, did you help

23   us create a timeline showing the key audiograms and

24   key findings that you reviewed in forming your

25   opinions regarding the timing and location of his

1   injuries?

2   **A.**   Yes, sir.  And that is provided here in this

3   image.

4   **Q.**   Okay.  So, if we look at this timeline, could you

5   tell us in a little more detail your opinion regarding

6   the timing and location of his injury and why you have

7   that opinion?

8   **A.**   Yes.  And subsequent slides should help that as

9   well, because we'll see some of the audiometric data

10  that helps support this opinion.

11      Mr. Keefer, upon his reference audiogram, which is

12  essentially his entrance audiogram that he completed

13  while he entered into the military and enlisted,

14  showed fairly good hearing sensitivity in both ears.

15  He had a slight hearing loss at one or two frequencies

16  in the left ear.

17      During the time frame while he was stationed in

18  Fort Benning, Georgia, what we observe is, between the

19  years of 2007 and 2009, significant threshold shifts

20  in his hearing of both ears at multiple frequencies

21  correlated with noise events during that time and his

22  utilization of the Combat Arms Earplug.

23  **Q.**   And that occurred before he was deployed to Iraq;

24  is that right?

25  **A.**   Indeed.  So, when we look at his records and we

1    look at the trends in those records, not focusing on a

2    single audiogram but rather looking at the trends of

3    sustained damage and sustained elevation in his pure

4    tone audiometry, what we can observe is those changes

5    happened before he was deployed.

6         In addition, once he returned from deployment, his

7    hearing at that point was comparable to those

8    pre-deployment tests as well, at least acutely.

9         And so, what we can observe is that the initial

10   onset of damage occurred while he was in Fort Benning,

11   Georgia.

12   **Q.**  And, Dr. Spankovich, I know you helped us prepare

13   some slides of those key audiograms that you've

14   highlighted here on the timeline.  If we look at

15   those, will that help you explain how you came to the

16   opinions regarding the timing and location of his

17   injury?

18   **A.**  Yes, sir, and I think it'll be a little bit more

19   clear for the Court to see what's going on in this

20   case.  And so, I know a lot of you are all familiar at

21   this point with reviewing these audiograms and these

22   tabular formats of them.

23        But what we see here very quickly, we see that

24   this took place at Fort Benning, Georgia.  That is in

25   No. 12, the box there at the top left-hand corner.

1  And then we can see what his current audiogram is, and

2  this is the date of October 27th, 2008.  And you can

3  see the left ear and the right ear, and frequencies

4  from 500 to 6,000 hertz.

5      Below that are the reference audiograms, which are

6  referring to his initial audiogram when he entered

7  into the military.

8      And what we want to look for is thresholds that

9  are above 15 dB HL, and we want to look for changes in

10  hearing that are 10 dB or greater.

11     And what we observed here in 2007, as I mentioned

12  previously, he had fairly normal hearing sensitivity

13  in 2007, except for at 3,000 and 6,000 hertz he has

14  evidence of a slight hearing loss.  And then in the

15  right ear he has normal sensitivities across the

16  frequencies, except at 4,000 hertz there was evidence

17  of a slight hearing loss.

18  **Q.**  And that's at the 2007, Dr. Spankovich?  Not to

19  interrupt you, but that's the 2007 audiogram in row C

20  that we see on the screen, right?

21  **A.**  Yes, sir, correct, that's referring to the

22  reference audiograms.

23  **Q.**  Okay.  Now you can keep going.

24  **A.**  No problem.  So, now we're going to look at the

25  October 27, 2008, data.  And what we observe here is,

1   if we look at, for example, in the left ear at 6,000

2   hertz, he's at 30.  That's just 5 dB above that 25.

3   That's within test-retest reliability.

4       At 4,000 hertz he's at 15.  Now, 15 is considered

5   within the normal range of hearing, but what we have

6   is a significant threshold shift.  His reference

7   audiogram shows zero dB.  This is a 15 dB shift.  This

8   is recognized by the military as a significant

9   threshold shift.

10      We also observed that 3,000 hertz we have a 10 dB

11  change, 2,000 hertz a 15 dB change, and 1,000 hertz a

12  10 dB change.

13      These are all greater than expected from

14  test-retest reliability.  He has a significant

15  threshold shift at multiple frequencies in this left

16  ear.

17      On the right ear, we observe from basically 1,000

18  to 4,000 hertz here that there is minimal shift in his

19  hearing.  The results are essentially within 5 dB.  He

20  actually improves at 4,000 hertz there; you can see

21  it's at 15.  So that's suggesting potentially the test

22  in 2007 at 4,000 hertz is not a sustained elevation

23  into that slight hearing loss range.

24      6,000, hertz, though, we went from 5 to 25 dB.

25  That's a 20 dB change at a single frequency, and that

1   is considered clinically a significant threshold

2   shift.

3        Now, when we consider the idea of a significant

4   threshold shift, this is giving us evidence of injury

5   here in these audiograms.  And when we go to the box

6   underneath this final bottom area, what we can see is

7   it says, D, significant threshold shift.  And for the

8   left ear it has 2-plus and for the right ear it has 1.

9        So what that's telling us is that the left ear

10  indeed has a significant threshold shift at least at 1

11  frequency more than that because it has a plus, and

12  then the right ear is saying there is no significant

13  threshold shift.

14       Like I just mentioned before, though, there is a

15  frequency that has a significant threshold shift --

16  the 6,000 hertz.  It's just that the Army does not

17  consider 6,000 hertz or 500 hertz to be frequencies

18  that they consider critical for determining if there

19  has been a significant threshold shift.

20       Clinically, outside the Army, we would consider

21  this shift at 6,000 hertz to be highly significant.

22  **Q.**  Thank you, Dr. Spankovich.

23  **A.**  What we're seeing here --

24  **Q.**  Go ahead.

25  **A.**  Sorry.  What we're seeing here is evidence of

1    sustained elevated thresholds relative to noise
2    exposure at Fort Benning, Georgia.
3    **Q.**   You mentioned box D.  Does that indicate that the
4    military audiologist evaluating this agreed with you
5    that there has been a hearing injury for Mr. Keefer in
6    October of 2008?
7    **A.**   Yes, sir.  And this would also be something that
8    should be prompted to the soldier or to the
9    servicemember.  Often they should have to be --
10   they're told that they have a significant threshold
11   shift, and usually they have to sign off knowing that
12   they have a significant threshold shift and that they
13   need to return for further testing.
14   **Q.**   Okay.  And then you mentioned the 6,000 hertz
15   hearing loss on the right ear, but the military
16   doesn't evaluate, because that box is grayed out, and
17   that's why you have a 1 beside the right ear; is that
18   right?
19   **A.**   Correct.  And when they're determining significant
20   threshold shifts, they don't consider 500 hertz or
21   6,000 hertz in their test.  They're looking at 1,000
22   to 4,000 hertz to determine if there has been evidence
23   of a significance threshold shift.  Outside of the
24   military, we would consider that a significant
25   threshold shift.

1    **Q.**   The threshold shifts you've described, would they

2    create -- are these the type of threshold shifts, even

3    if they are slight or mild, that would create an

4    impact on someone's life as far as their hearing?

5    **A.**   Indeed.  I mean, this would likely create some

6    perceptual changes in his hearing.

7        Now, hearing loss and the effects of hearing loss

8    can be subtle and can be difficult for an individual

9    to pin down.  So, for example, in a quiet environment

10   at this time and in a one-on-one speaking situation

11   where Mr. Keefer was facing someone, he may have

12   expressed very little difficulty.

13       But if you throw in competing background noise,

14   multiple talkers, someone trying to speak to you from

15   another room, this slight-to-mild degree of hearing

16   loss can create difficulty in speech understanding.

17   Often individuals will request word clarification or

18   say *I can't follow what you're saying*, and

19   particularly when there is multi-talkers have a lot of

20   difficulty following conversations, for example, at a

21   dinner table that has many people speaking.

22   **Q.**   Sure.  And if Mr. Keefer's wife said that, during

23   this time when they were in Fort Benning, she would

24   have to raise her voice more to him or he may say

25   "Huh?" or just not pick up everything that was said,

1    would that be consistent with the type of impact

2    you're describing?

3    **A.**   Indeed, those are some of the early signs of

4    having evidence of a hearing loss.

5    **Q.**   Okay.  Now, you also highlighted on the timeline

6    the audiogram from June of 2009, if we can move

7    forward there.

8            **MR. OVERHOLTZ:**   And Your Honor, it's Tab 2 to

9    the notebook we've premarked as Spankovich Choice of

10   Law 2.  It was also previously referenced as Tab 9

11   from the audiogram notebook.

12   **BY MR. OVERHOLTZ:**

13   **Q.**   This is the June 2009 audiogram.  Can you tell us,

14   Dr. Spankovich, first of all, was this pre-deployment

15   to Iraq for Mr. Keefer?

16   **A.**   Yes, sir.  So, the way you can tell that is,

17   again, looking at the location tab, and you can see

18   that this is in Fort Benning, Georgia.

19   **Q.**   And now, can you walk us through how does this

20   audiogram inform your opinion regarding the timing and

21   location of his injury?

22   **A.**   So, in general, what we're observing in this

23   audiogram is that the thresholds are comparable to the

24   thresholds from 2008.  And there is additional

25   audiograms in between these timeframes that are also

1   showing similar results within 5 dB.

2       So what we're seeing here is evidence of a

3   sustained threshold shift.  We are seeing evidence of

4   hearing loss here relative to his military noise

5   exposure that progressed since he entered into the

6   military.

7       And so, we are indeed observing a slight-to-mild

8   degree of hearing loss in the left ear.  Specifically,

9   we can still see that there is the 15 dB threshold

10  shift and 10 dB threshold shifts as relative to his

11  referenced audiogram.

12      And again, this is showing that we have a

13  sustained shift, not just one audiogram that we're

14  picking out that happens to show hearing loss and then

15  it recovers or something or was poor before and now it

16  got better.

17  **Q.**  Sure.  And if we focus on section D again, this

18  also indicates on the June 2009 audiogram that the

19  military audiologist agreed that there had been a

20  hearing threshold shift for Mr. Keefer at this time in

21  June of 2009 while he was at Fort Benning?

22  **A.**  Correct.  So, again, we have a repeated audiogram

23  that's showing us the sustained threshold shift, and

24  this should have prompted an additional test to

25  determine if that was sustained and at that time

1   should have likely prompted the audiologist to refer

2   them over and make an actual diagnosis of hearing

3   loss.

4   Q.   If we can go to slide 16.  You helped us prepare

5   this chart of his pre-deployment slides, whenever it

6   comes up.  And this shows the difference between the

7   baseline of '07 and then the sustained hearing loss

8   that you've described in '08 and '09; is that correct?

9   A.   Yes, sir.  So, this is just sort of combining some

10  of these audiogram data.  And what we're going to

11  observe here again is, in 2007, we have the normal to

12  having some evidence of slight hearing loss, and then

13  we can see the significant changes that have occurred

14  at those multiple frequencies in the left ear and at

15  6,000 hertz in the right ear.

16       And in general, what we're observing -- because

17  we're looking at overall trends here, not a single

18  audiogram; we're observing a sustained change in his

19  hearing.

20  Q.   And so, if we can turn to the next slide.  Dr.

21  Spankovich, we'll bring up what we're marking as

22  Plaintiffs' Spankovich Choice of Law 3.

23            MR. OVERHOLTZ:   It's Tab 3 in Your Honor's

24  notebook.

25  BY MR. OVERHOLTZ:

```
 1   Q.   This is the July 13, 2010, medical record that we
 2   saw earlier today.  Did you have a chance to review
 3   this medical record?
 4   A.   Yes, sir.
 5   Q.   And based on this medical record, was Mr. Keefer
 6   diagnosed with hearing loss in 2010?
 7   A.    Indeed, that's what appears here, that they give a
 8   diagnosis of sensorineural hearing loss bilateral and
 9   for tinnitus in both ears.
10   Q.   Okay.  And we'll get to tinnitus in just a minute.
11   But this diagnosis, he was diagnosed with
12   sensorineural hearing loss, tinnitus.  And if you look
13   at the bottom with me, we have blown up under
14   "Disposition" it's described as mild and bilateral in
15   both ears; is that right?
16   A.   That is correct.
17   Q.   Now, if we can turn to the next slide, one of the
18   things I want to ask you about -- and we saw this
19   earlier.  You can see in the middle that it indicates
20   that he had been serving with a high level of
21   environmental noise, and then in all caps, "THREE
22   YEARS IN THE MILITARY."  Do you see that?
23   A.   Correct.
24   Q.   And was that consistent with your understanding in
25   reviewing the records that he had been exposed to high
```

1    levels of noise during his full three years in the

2    military back to 2007 at Fort Benning?

3    **A.**   That's how I would interpret what is listed here.

4    And he also denies significant environmental noise or

5    noise from home or recreational, at least during this

6    time frame.

7    **Q.**   There is also a section called "physical trauma."

8    Do you see that?

9    **A.**   I do.

10   **Q.**   And there is description -- first of all, let's do

11   the nos.  There's no acoustic trauma from explosions.

12   Do you see that?

13   **A.**   Yes, sir.

14   **Q.**   And is that consistent with your review of the

15   records and his testimony?

16   **A.**   Yes, sir.

17   **Q.**   No acoustic trauma from music or horns; do you see

18   that?

19   **A.**   Yes.

20   **Q.**   And then no acoustic trauma from jackhammers; do

21   you see that?

22   **A.**   Yes.

23   **Q.**   Acoustic trauma from engine trucks, vehicles, is

24   that something that you believe he was exposed to

25   while he was in the military?

1    **A.**    Indeed he reports that.  And not only is that

2    reported here, but I believe that's also reported in

3    his deposition.

4    **Q.**    And then also we see acoustic trauma from gun

5    ranges; do you see that?

6    **A.**    Yes, and it has ranges with a plural, referring to

7    utilizing firearms on the range probably often.

8    **Q.**    Right.  And if Mr. Keefer said that he was exposed

9    to gun range noise at Fort Benning pre-deployment and

10   then post-deployment but not while he was in Iraq, is

11   that consistent with your opinions that his first

12   injuries happened in 2008?

13   **A.**    Yes, sir.  So, this is providing evidence within

14   the record that he had noise events that were

15   occurring between the time 2007 to 2010 that can

16   explain the threshold shifts that we observed when he

17   entered -- after he entered into the military.

18   **Q.**    If we can go back a slide, this medical record

19   comes from July 13th, 2010.  This is after he returns

20   from deployment in Iraq, correct?

21   **A.**    That is correct.

22   **Q.**    And we have talked about -- was he diagnosed

23   officially this day with bilateral hearing loss?

24   **A.**    Yes, sir.

25   **Q.**    So, if Mr. Keefer wasn't diagnosed officially with

1    hearing loss in the military until 2010, why do you

2    say that that hearing loss started in 2008 when he was

3    at Fort Benning prior to his deployment?

4    A.   Sure, that's easily answered.  It's because it's

5    what the evidence shows us.  It's what the pure tone

6    audiometry shows.  It shows evidence of significant

7    threshold shift observed while he was stationed in

8    Fort Benning prior to his deployment.

9         And when we look post his deployment, what we'll

10   see is that those thresholds are essentially

11   comparable to what they were pre-deployment.  So, the

12   hearing loss that they're diagnosing at this point was

13   something that was consistent with his pure tone

14   audiometry prior to his deployment while he was

15   stationed at Fort Benning.

16   Q.   Slide 19.  And this is -- Dr. Spankovich, you're

17   familiar with the audiogram that was part of this

18   medical report from July of 2010?

19   A.   Yes, sir.

20   Q.   And in your opinion, on the issue of whether there

21   had been progression of his hearing loss on this July

22   2010 audiogram, can you tell us what your opinion is

23   regarding that?

24   A.   Sure.  These thresholds that we can observe here

25   -- and just to orient the Court very briefly, what

 1    we're looking at here is now a depiction -- a

 2    graphical representation of the pure tone audiometry.

 3    And we can see frequency going from left to right.

 4    And as we go down, we're going from very soft to very

 5    loud.

 6         The zero, which is up on the upper portion of the

 7    scale, that's average, normal hearing sensitivity, the

 8    average for a young healthy adult.  The red circles

 9    represent the right ear, and the blue X's represent

10    the left ear.

11         And what we can see here is that the thresholds at

12    this time are comparable to his pre-deployment

13    thresholds around that 2009/2008 time frame.  And so

14    what they're identifying as his hearing loss here is

15    what his hearing was pre-deployment.

16    Q.   You mentioned, in the work that you did in forming

17    your opinions, that you tried to look at and either

18    perform a differential diagnosis type method or rule

19    out certain things.

20         Did you do that also with Mr. Keefer as far as

21    ruling out other causes than just his military noise

22    induction?

23    A.   Yes, sir.  So, when we are considering a

24    differential diagnosis in a patient presenting with

25    changes in their hearing, we consider a number of

1    different factors.  One is noise exposure.  And that

2    is one that we have obviously a positive history of.

3         Number two is age.  And we can rule out age here

4    because Mr. Keefer is a young man.  And three, we

5    consider ototoxic drugs or other health conditions or

6    such as ear diseases.  And indeed, Mr. Keefer was not

7    taking any ototoxic medications at this time, nor did

8    he have any evidence of any type of ear-related

9    disease.

10        So, what we're left with as the most probable

11   factor that has led to this change in his hearing is

12   the noise exposure that he incurred during this time

13   frame.

14   **Q.**  And in going through that methodology, did that

15   inform your opinion as to the initial military noise

16   induced injury that he suffered from in October of

17   2008?

18   **A.**  Yes, sir.  So where we are seeing initial signs of

19   that change in hearing is in the 2008 time frame.

20   **Q.**  If we can go to the next slide.  Dr. Spankovich,

21   you helped us prepare a chart where we listed both the

22   pre- and post-deployment -- some of the key pre- and

23   post-deployment audiograms.

24        Do you have that?

25   **A.**  Yes, sir, I can see it here.

1    **Q.**   And during your review of the records, you

2    reviewed many more audiograms than this, right?  Mr.

3    Keefer had a lot of audiograms?

4    **A.**   Correct.

5    **Q.**   But if we can go to slide 21, you asked us to take

6    a sampling of some of those slides that you identified

7    to show the difference in his hearing over time both

8    pre- and post-deployment.

9          Can you explain how this informs your opinion that

10   his injuries began in October 2008 at Fort Benning,

11   Georgia?

12   **A.**   Indeed.  Again, what we want to look at is the

13   trends.  We don't base things on a single audiogram.

14   A single audiogram can have different factors to it in

15   terms of the person's attention, maybe they had a

16   noise event prior to that that created just a

17   temporary threshold shift.  There could be a number of

18   factors that we want to consider.  So we want to look

19   at the overall trends over multiple audiograms.

20         And what we observe here, as compared to his

21   reference audiogram, where we see this nice shift, and

22   that's the darker line here, this larger shift, in

23   this hearing relative to this light blue line is going

24   to be starting in this 2008 time frame.  And this is

25   where -- it was even happening a little bit before

1   that in 2007, but this is where we're seeing the

2   sustained shift occur is at this time.  And this is

3   pre-deployment, while he was at Fort Benning.

4   **Q.**   Okay.  We also saw in the July 2010 record that

5   Mr. Keefer was diagnosed with tinnitus at that time.

6   Can you tell us about his tinnitus in your opinion

7   regarding the timing of his tinnitus.

8   **A.**   Sure.  So that may have been the initial time that

9   his tinnitus was diagnosed, but the injury that likely

10  resulted in his perception of the tinnitus is related

11  to the noise events that he incurred while he was in

12  the military.  He did not have tinnitus prior to

13  entering into the military, and he has that first

14  indication of diagnosed tinnitus in that 2010.  But it

15  was between that time frame where we're having the

16  damage to his auditory periphery and that we're having

17  onset of his tinnitus perception relative to that

18  noise induced damage.

19  **Q.**   If we can go to slide 22, this is your opinion

20  slide again.  I just want to ask you, do you believe,

21  more likely than not, that Mr. Keefer first suffered

22  his military noise induced related injury in October

23  or around the October 2008 time frame while stationed

24  at Fort Benning, Georgia?

25  **A.**   Yes, sir, that's correct, that's where we're

1    seeing evidence of sustained change in his hearing.

2    **Q.**  And the opinions you've told us today, do you hold

3    those opinions to a reasonable degree of medical,

4    scientific, and audiological certainty?

5    **A.**  Yes, sir.

6          **MR. OVERHOLTZ:**  That's all I have.  Thank

7    you.

8          **JUDGE RODGERS:**  Thank you.

9          Mr. Nomellini?

10                    **CROSS-EXAMINATION**

11   **BY MR. NOMELLINI:**

12   **Q.**  Good afternoon, Dr. Spankovich.

13   **A.**  Hello.

14   **Q.**  Mr. Keefer was deployed to Iraq in 2009, correct?

15   **A.**  I believe it was around July or so 2009, sometime

16   in the latter half of July 2009.

17   **Q.**  And you would agree that 2010 is when Mr. Keefer

18   reports his onset of tinnitus, correct?

19   **A.**  That is where it is indicated in his military

20   record.  I don't know if he had tinnitus that he

21   reported to anyone prior to that.

22   **Q.**  Okay.  Have you reviewed Mr. Keefer's deposition

23   in this case?

24   **A.**  I have reviewed Mr. Keefer's deposition.

25   **Q.**  So you're aware that he admitted in his deposition

1   that he experienced tinnitus beginning in 2010?

2   **A.**   That sounds around this time frame.

3   **Q.**   And you reviewed Mr. Keefer's interrogatory

4   responses, right?

5   **A.**   I reviewed his deposition, yes, yes, and his --

6   yes.

7   **Q.**   Okay.  And in his interrogatory responses, Mr.

8   Keefer said that his tinnitus began at approximately

9   2010, right?

10   **A.**   Again, yes, around that time frame is when it is

11   present in his military record and more than likely

12   when he describes it relevant to that.

13   **Q.**   And you're not aware that Mr. Keefer reported any

14   tinnitus anywhere in the record before his 2009

15   deployment, correct?

16   **A.**   Indeed.  He -- there is no report I could find in

17   his record prior to his entry into the military or

18   before 2010.

19   **Q.**   Okay.  So we talked about tinnitus.  Let's talk

20   about hearing loss.  You further agree that Mr. Keefer

21   was first diagnosed with sensorineural hearing loss in

22   2010 following his deployment to Iraq, correct?

23   **A.**   That's where the initial diagnosis arrives in his

24   record, correct.  But he also has indications of

25   significant threshold shifts prior to that indicated

1    in his military record in 2008.

2    **Q.**   Okay.  Dr. Spankovich, respectfully, if you could

3    just focus on my question.  You agree that Mr. Keefer

4    was first diagnosed with sensorineural hearing loss in

5    2010 following his deployment to Iraq, correct?

6              **MR. OVERHOLTZ:**   Objection, asked and

7    answered, Your Honor.  The answer required an

8    explanation.

9              **JUDGE RODGERS:**   Overruled.

10   **BY MR. NOMELLINI:**

11   **Q.**   You can answer.

12   **A.**   So that's the first place where we see it in his

13   record is in 2010.

14   **Q.**   Let's pull up Defense Choice of Law Exhibit 144.

15        And you're familiar with this document, correct,

16   Dr. Spankovich?

17   **A.**   Yes, sir.

18   **Q.**   And, in fact, this is the document where Mr.

19   Keefer was first diagnosed with hearing loss by an

20   audiologist in 2010 following his deployment to Iraq,

21   correct?

22   **A.**   This is the first place in his military record

23   that has the diagnosis.

24             **MR. NOMELLINI:**   If you scroll down, Donnie,

25   to personal history.

1    **BY MR. NOMELLINI:**

2    **Q.**   Dr. Spankovich, you're aware that Mr. Keefer

3    reported to the audiologist that his condition was

4    deployment-related, correct?

5    **A.**   That's not how I necessarily interpret this.  This

6    just says, "Personal history:  Military, indicating

7    that condition is deployment-related."

8        I don't know if that's something that Mr. Keefer

9    reported or this is something that this Yolanda Kelley

10   placed in the record.  I do not know.

11   **Q.**   Okay.  So you're saying you don't know whether Mr.

12   Keefer reported that his condition was

13   deployment-related or Yolanda Kelley reported that it

14   was deployment-related, is that your testimony?

15   **A.**   I don't know if this is reporting that this is

16   even deployment-related at all.  It just says here,

17   "Personal history:  Military, indicating condition is

18   deployment-related.  Previous medical service

19   deployment in Iraq."  I personally don't know how to

20   interpret that.

21   **Q.**   Did you ask Mr. Keefer about that?

22   **A.**   I did not ask Mr. Keefer.  I did not have an

23   interview with Mr. Keefer.  My opinion is based on his

24   provided records and depositions.

25   **Q.**   Did you ever ask anybody if you could ask Mr.

1   Keefer about that?

2   **A.**   I was never provided the opportunity to perform a

3   telehealth consult with Mr. Keefer yet.

4   **Q.**   You agree that, in evaluating Mr. Keefer's

5   audiograms, you can't go simply on a single audiogram

6   or a single point, right?

7   **A.**   That is correct.

8   **Q.**   Instead, you have to look at the overall pattern

9   of progression of hearing loss, correct?

10  **A.**   Yes, sir.  And that's where we see the sustained

11  damage while he was in Fort Benning.

12  **Q.**   And this is because there could be fluctuations

13  related to temporary threshold shift type of events,

14  correct?

15  **A.**   That's one factor, yes.

16  **Q.**   And as for audiograms, there is obviously going to

17  be test-retest reliability within 5 dB or so, correct?

18  **A.**   5 dB is generally the accepted test-retest

19  reliability.

20  **Q.**   And when you say test-retest reliability within

21  5 dB, could you explain what you mean by that?

22  **A.**   Sure.  So if I was to test the patients and then

23  test them two days later or a day later, if their

24  responses are fairly consistent, if the equipment I'm

25  using is the same equipment or comparably calibrated

1   equipment, we would expect that their measures,

2   without any shift in their hearing relative to some

3   type of incurred noise exposure or something else,

4   would be within approximately 5 dB of their baseline

5   threshold.

6   Q.   Let's talk about pre-military.  You would agree

7   that before Mr. Keefer joined the military he had a

8   slight to mild degree of hearing loss in both ears,

9   correct?

10  A.   So, Mr. Keefer had evidence of a slight pure tone

11  elevation of his audiometric threshold.  So, whether

12  that was hearing loss or not, we would have to see

13  over a number of audiograms to see if that was

14  sustained or relative to what you just spoke of, that

15  there was some type of temporary threshold shift or

16  something else.

17      What we observed in Mr. Keefer's case, though,

18  when he does enter into the military and does have

19  several audiograms within a year time frame, is that

20  some of those thresholds that we had seen prior to his

21  enlistment actually improve, and then we see now

22  elevated thresholds are post his entry into the

23  military which is sustained.

24  Q.   Okay.  And the slight-to-mild pre-military hearing

25  loss was at 8,000 hertz in both ears, correct, for the

1   mild?

2   **A.**   So there was an elevated threshold in each ear at

3   8,000 hertz, correct.

4   **Q.**   And you characterized the measurement for Mr.

5   Keefer in your deposition at 8,000 hertz as a mild

6   degree of hearing loss, correct?

7   **A.**   Correct.  So, once you are above 25 dB HL, that

8   was considered in the mild range.

9   **Q.**   Now, Mr. Keefer also had pre-military audiograms,

10   correct?

11   **A.**   Yes, he had at least two that I'm aware of.

12   **Q.**   And one was in 2001 at -- for an Ace Hardware job,

13   correct?

14   **A.**   That sounds correct, yes.

15   **Q.**   And one was in 2005 for a Norfolk Southern job,

16   correct?

17   **A.**   Yes, sir, that is correct.

18   **Q.**   And then he had various audiograms, including an

19   enlistment audiogram, March 2007, a reference 2215

20   audiogram on March 29,2007, and pre-deployment

21   audiogram June 16th, 2009, among others, correct?

22   **A.**   Yes.  He also had those ones in 2008.

23   **Q.**   Let's pull up Spankovich graphic 2.

24         Sir, can you see that graphic?

25   **A.**   I can.

1    **Q.**  So let's compare his October 1st, 2001, Ace

2    Hardware audiogram to his June 16th, 2009,

3    pre-deployment audiogram, okay?

4    **A.**  Sounds good.  Do you want me to go ahead and

5    review it or --

6    **Q.**  Well, I'll take them one at a time.  500 dB, there

7    is the change of 5 dB, correct?

8    **A.**  It's 500 hertz.

9    **Q.**  Yes.

10   **A.**  And there was -- looking over this time period,

11   he's within 5 dB.  So that would be within test-retest

12   reliability.

13   **Q.**  Okay.  And then, comparing 1,000 hertz from 2001

14   to 2009, that ends up being the same, 5 dB, correct?

15   **A.**  Again, when we're looking at the overall trend

16   here, it's within 5 dB, so within test-retest

17   reliability.

18   **Q.**  And then, if you compare 2001 Ace Hardware

19   audiogram on 2,000 hertz to 2009 at 2,000 hertz, it's

20   again within 5 dB was his test-retest reliability,

21   correct?

22   **A.**  Well, you can't just look at it that way.  You

23   have to look at the audiograms in between as well.

24   And so, what we see as an improvement and a sustained

25   repeated threshold at 10 dB that then we see a shift

1   to 20 dB in the June 2009 pre-deployment, and that was

2   sustained from there.

3   **Q.**   Okay.  But you would agree that, comparing the

4   2001 to the first one we're looking at to the 2009,

5   there is a 5 dB difference, correct?

6   **A.**   If you only look at those two audiograms, it is 5.

7   **Q.**   And then, if you compared 3,000, you're at 30 dB

8   to start with and 30 dB to end with, correct?

9   **A.**   And as I pointed out previously, what we see is,

10  once he enters into the military, we're at 20 where

11  you're in a more controlled testing environment, and

12  we see then that it shifts to 30.  So, again, we can't

13  just look at one audiogram and compare it to the

14  other.  We have to look at the overall trend.

15  **Q.**   Okay.  And then you look at the October 2001 Ace

16  Hardware audiogram at 6,000 hertz, and it's 30 dB to

17  start with in 2001, ends at 30 dB in 2009, correct?

18  **A.**   So, when we look at 6,000 hertz, we're essentially

19  within that 5 dB test-retest reliability at the

20  pre-deployment measure here.  4,000 hertz, again, he's

21  -- which we skipped over but we'll point it out, we

22  can see that his hearing is essentially 0 to 5 while

23  he's in the military.

24       So, again, we have to go based on observing as a

25  trend that he has good hearing here, and then we're

1    seeing a significant threshold shift at 4,000 hertz

2    prior to his deployment.

3    Q.   Okay.  So the 4,000 he starts at 2001 at 15 and

4    ends in 2009 at 15, correct?

5    A.   So, if you just compared those two audiograms,

6    which is not the thing to do, then that is correct.

7    Q.   All right.  And then 8,000, he was at 30 dB in

8    2001, right?

9    A.   That is what that audiogram shows, correct.

10   Q.   And he was at 30 dB in 2005, right?

11   A.   Yes, sir.

12   Q.   And we don't know where he is in 2009 because it

13   wasn't measured at 30 dB in 2009, correct -- excuse me

14   -- at 8,000 hertz in 2009?

15   A.   That is correct.  As you probably noticed, as

16   everyone else has, the military does not consistently

17   measure 8,000 hertz on their annual audiograms.

18   Q.   So you can't draw any conclusions about any

19   threshold shift at 8,000 dB post-military, correct?

20   A.   Well, I can't draw any conclusion pre-deployment.

21   Q.   Okay.  Now, let's go to the Keefer graphics.  This

22   is the last subject I want to talk to you about.

23   Let's go with the Keefer Graphic 1.

24        Now, you're aware, Dr. Spankovich, that Mr. Keefer

25   served in both Georgia and Texas pre-deployment,

1   right?

2   **A.**   I believe, yes.

3   **Q.**   Okay.  And you didn't do any evaluation as part of

4   your work as to whether any hearing injury he suffered

5   pre-deployment occurred in Georgia as opposed to

6   Texas, correct?

7   **A.**   I looked at this overall time frame.  And based on

8   the audiograms, where we see a sustained shift was in

9   Fort Benning, Georgia.

10  **Q.**   But you don't know one way or the other whether he

11  had that shift in Texas, correct?

12  **A.**   Based on the audiograms, it appears to be where

13  we're first observing this is in Fort Benning,

14  Georgia.

15  **Q.**   What audiograms specifically are you pointing to,

16  sir?

17  **A.**   The 2008, 2009 audiograms.

18  **Q.**   And what audiogram are you pointing to to say he

19  did not have that hearing loss as of October 2007 or

20  any change in hearing level as of October 2007?

21  **A.**   Well, in October of 2007, his hearing in both ears

22  are pretty much within 5 dB of his reference

23  audiogram, except for one frequency.  And then where

24  -- again, I don't like to base it on one audiogram.

25  Where I then see sustained levels that are elevated

1    and then multiple frequencies involved is while he was

2    at Fort Benning, Georgia.

3    **Q.**   But you don't express any opinions in your report

4    in this case as to whether any shift occurred in

5    Georgia as opposed to Texas, correct?

6    **A.**   I don't recall if I differentiate Texas or

7    Georgia.  I'm just going based on the time frame, and

8    that appears to be consistent with Fort Benning,

9    Georgia.

10   **Q.**   Okay.  But that's an evaluation that you're doing

11   now since your expert report, correct?

12   **A.**   It was not something I highlighted in my expert

13   report to differentiate that.  It is what is reported

14   in the audiograms -- observed in the audiograms.

15   **Q.**   And, in fact, as part of your method, you did not

16   evaluate Mr. Keefer's noise exposure between

17   audiograms, correct?

18   **A.**   I considered the noise that Mr. Keefer reported.

19   I did not do any type of analysis of the different

20   specific noise events that he might have incurred at

21   different locations, no.

22   **Q.**   You don't analyze the intensity of the noise Mr.

23   Keefer was exposed to in Texas versus Georgia versus

24   Iraq or for how long, correct?

25   **A.**   That would be essentially very difficult to do

1    without him wearing some type of dosimeter to provide

2    us information in terms of his different noise sources

3    in those different areas.  What we have to go on is

4    the threshold shifts that we observe in his pure tone

5    audiometry.

6    **Q.**  And that's not something that you've done in this

7    case, correct?

8    **A.**  I have not performed dosimetry, but I have

9    examined his pure tone threshold audiometry and the

10   observed shifts.

11   **Q.**  And you did not ask him about his exposures,

12   correct?

13   **A.**  I have not interviewed Mr. Keefer yet in a

14   one-on-one type of situation.

15   **Q.**  And finally, you didn't analyze what military

16   exposures Mr. Keefer would have had between the

17   different audiograms you discussed in your report,

18   correct?

19   **A.**  I considered, again, his general noise exposure,

20   which include gun ranges, engine noise, military

21   general noise, but I did not, again, do a survey or

22   measurements of the variable noise exposures that he

23   had, the outputs of those noise exposures, the

24   durations of those exposures, and its relevance.

25        **MR. NOMELLINI:**  Thank you.

1          **JUDGE RODGERS:**  Thank you.

2          Mr. Overholtz?

3                    **REDIRECT EXAMINATION**

4     **BY MR. OVERHOLTZ:**

5     **Q.**  Dr. Spankovich, I want to talk about a couple of

6     things that were raised by Mr. Nomellini.  First, when

7     you were evaluating and forming your opinions

8     regarding the injuries suffered by Mr. Keefer, did you

9     look at the presentation of the audiograms as far as

10    the way they looked as for as the type of loss,

11    whether there was asymmetry or a noise notch or

12    something like that?

13    **A.**  So, yes, we want to consider the frequencies that

14    are involved, if there is some evidence of asymmetry

15    between the ears.  And indeed, what we observed are

16    the frequencies were seeing threshold shifts are

17    consistent with those that are susceptible to the

18    effects of noise.  And we are seeing an asymmetric

19    presentation where the left ear is showing indications

20    of damage prior to the right ear.  And then we're also

21    seeing some evidence in the right ear in the higher

22    frequencies at 6,000 hertz prior to any change at

23    lower frequency.

24    **Q.**  Okay.  So if we could take those one at a time.

25    The presentation of the audiometric data, you know,

1    what frequencies you have the hearing threshold

2    shifts, sometimes we refer to it as a noise notch or a

3    shooter's notch, does that inform your opinion that --

4    would that presentation be consistent with exposure to

5    gun ranges, shooting long guns on a gun range?

6    A.   The asymmetry that is indicated can be a classic

7    sign of use of long barrel firearms.  So, when you are

8    a right-handed shooter, for example, and you're

9    shooting a firearm, your left ear is closer to the

10   muzzle and your right ear is farther away, and there

11   is a head shadow that's created that can reduce the

12   effects of noise on the right ear.

13        So it's very common for us to see individuals who

14   are hunters growing up or previous servicemembers or

15   just gun enthusiasts that don't wear their hearing

16   protection consistently that will have asymmetry

17   sensorineural hearing loss poorer in the ear opposite

18   to their handedness.

19   Q.   And then we also mention the asymmetry between the

20   left ear and the right ear.  Would that also be

21   consistent with someone whose noise exposure primarily

22   related to gun range and shooting long guns?

23   A.   Yes, sir.

24   Q.   And if Mr. Keefer said that, while he was at Fort

25   Benning, Georgia, that was a primary part of his

1    training and getting ready for deployment and combat,

2    would that be consistent with what you saw in the

3    audiograms at Fort Benning, Georgia, related to his

4    hearing loss?

5    **A.**   Yes, sir.  So, definitely firearm use would be a

6    significant factor that could contribute to noise

7    induced pathology and the shifts in the hearing that

8    we were observing in his audiograms during that time.

9    **Q.**   Now, if we could go to slide 18 from my deck, you

10   recall, Dr. Spankovich, that Mr. Nomellini asked you a

11   little bit about the personal history section of that

12   medical record related to his deployment to Iraq?  Do

13   you recall that?

14   **A.**   Yes, sir.

15   **Q.**   I just wanted to go back to a couple of things

16   from that.  The reported history, if we look up at the

17   top here, regarding past medical history, do you see

18   that?

19   **A.**   I do.

20   **Q.**   That describes noise exposure for three years in

21   the military that would go back to 2007, correct,

22   prior to his deployment in Iraq?

23   **A.**   Yes, sir, that's correct.  That's basically

24   covering since he was enlisted into the military.

25   **Q.**   And the acoustic trauma from gun ranges, Mr.

1    Keefer said that never -- he wasn't on gun ranges in

2    Iraq but he did that in Fort Benning.  Would that be

3    consistent with your opinion that the noise exposure

4    from the gun ranges played a part in his hearing loss?

5    **A.**   Yes, sir.  And that's what he's reporting here

6    acute to his experiences.  And so the gun ranges are

7    referring to his time prior to his deployment.

8    **Q.**   We'll go to slide 15 real quick.  This June 2009

9    audiogram related to Mr. Nomellini's questions about

10   when he was diagnosed.  Do you recall those questions

11   about his diagnosis date?

12   **A.**   Yes, sir.

13   **Q.**   And the fact that there was an official diagnosis

14   that showed up in his records in July 2010, you recall

15   that?

16   **A.**   Yes, sir.

17   **Q.**   Now, that diagnosis, those records, that was from

18   an audiological examination that occurred at Fort

19   Benning, Georgia, correct?

20   **A.**   Indeed, it was.

21   **Q.**   And do you know whether he was exposed to noise,

22   from review of his records, once he got back to Fort

23   Benning post-deployment?

24   **A.**   Yes, I believe he was.

25   **Q.**   And -- but if we go back to this June 2009

1    audiogram, if Mr. Keefer said that he was told at this

2    time that he had suffered a change in his hearing as

3    part of this evaluation, would that be consistent with

4    what you would expect for someone showing the type of

5    changes that you described?

6    **A.**   Yes, sir.  I mean, that's letting him know that he

7    has evidence of hearing loss occurring and that he

8    needs to have a retest to see if that is sustained.

9    **Q.**   If we could go to the redirect slide, slide 28,

10   Mr. Nomellini was asking you some questions about some

11   pre-enlistment audiograms prior to Mr. Keefer joining

12   the military.

13        And while we weren't hear to talk about causation

14   and what caused his injuries, you mentioned the fact

15   that you can't simply do a comparison from one

16   audiogram to the next.  Do you recall that?

17   **A.**   Yes.  So, we don't want to just pick one audiogram

18   because that sort of supports something.  We have to

19   look at the overall trends that exist.  And by looking

20   at these charts that you see here, when we look at the

21   trends and where we observe acute to the time frame of

22   his military service is that we see significant

23   threshold shifts occurring relative to his reference

24   audiogram.

25   **Q.**   And so, just for example, if we look at the 3,000

1    hertz range in the left ear, Mr. Nomellini pointed out

2    that the October 2001 audiogram showed a 30 at the

3    3,000 hertz range, and then also in October 27, 2008,

4    showed a 30 as well.  Do you recall that?

5    **A.**  I do, yes.

6    **Q.**  But if we look at the audiograms in between, what

7    does that tell us?

8    **A.**  Well, they're all 20.  So realize, you know, we

9    have different environments.  So I don't know if the

10   2001 testing was performed in a sound-treated room, if

11   the equipment was calibrated correctly.

12       You have a single audiogram from, I think, Ace

13   Hardware at this time.  I don't know where they did

14   this testing or how reliable it was.

15       2005, same thing.  We don't know exactly all the

16   ins and outs of this testing being completed, was it a

17   sound-treated room, the type of transducer that was

18   used when it was calibrated.  It probably has some of

19   that in the record, but again, we don't have all the

20   information regarding that specific test.

21       When he gets into the military, now the military

22   has a very standard way of doing it, they're using

23   comparable equipment that's all calibrated, it's being

24   completed by highly trained audiologists or

25   technicians to complete the testing.

1     And what we can observe now when he's in the

2  military is he's not a 30, he's at 20 at 3,000, and at

3  4,000 hertz he was at 15 and 10, and now he's at 5 and

4  0 in 2007 and '10, so we can see a little shift there.

5  At 6,000, he was 30 and then he goes down to 20 and

6  25.  At 2,000 he was at 15 and now in 2008 he's at 25.

7  Again, he was at 10 in between.

8     So we are seeing, by the time this 2008 time frame

9  is coming along, that we are seeing evidence of a

10  significant threshold shift at multiple frequencies.

11  **Q.**   And so finally, Dr. Spankovich, so is it your

12  opinion, more likely than not, that Mr. Keefer first

13  suffered a military noise-related injury while he was

14  using the Combat Arms Version 2 as his primary hearing

15  protector in a sustained hearing threshold change in

16  2008 while he was at Fort Benning, Georgia?

17  **A.**   That is correct, by 2008, we are seeing that there

18  is a sustained elevation in these thresholds.

19            **MR. OVERHOLTZ:**   Thank you.

20            **JUDGE RODGERS:**   Thank you.

21            Doctor, I have a question.  The audiograms

22  from Fort Benning for Mr. Keefer you've testified show

23  a sustained significant threshold shifts in certainly

24  the left and even the right, correct, as far as the

25  ears?

1      **THE WITNESS:**  For the right, it's just at

2   6,000 hertz where we see a sustained shift, but in the

3   left ear, multiple frequencies, yes, ma'am.

4      **JUDGE RODGERS:**  In your opinion, given that

5   or because of that, should Mr. Keefer have been

6   diagnosed, in your opinion, with hearing loss at Fort

7   Benning?

8      **THE WITNESS:**  I believe so, yes.  So the

9   reason why I make that statement is that he has a

10   couple of testing in a row that are showing a

11   sustained threshold shift.  That should have prompted

12   likely a diagnosis at that time, though I don't know

13   what the situation was in terms of how close this was

14   to deployment and he was being sent over and so it all

15   just got pushed back or put on delay.  But they're

16   recognizing that in his record, making him sign off

17   that he has a threshold shift.

18      **JUDGE RODGERS:**  Okay.  Thank you.

19   Judge Jones, any questions?

20      **JUDGE JONES:**  I have no questions.  Thank

21   you.

22      **JUDGE RODGERS:**  Judge Herndon?

23      **JUDGE HERNDON:**  No, thank you.

24      **JUDGE RODGERS:**  Any follow-up to my question,

25   Mr. Overholtz?

1      **MR. OVERHOLTZ:**  No, Your Honor.

2      **JUDGE RODGERS:**  Mr. Nomellini?

3      **MR. NOMELLINI:**  Thank you, Your Honor.

4                     **RECROSS-EXAMINATION**

5    BY MR. NOMELLINI:

6    **Q.**  One question, Dr. Spankovich, following up on

7    Judge Rodgers's question regarding sustained

8    significant threshold shift.

9        Does Mr. Keefer's October 2007 audiogram show a

10   sustained significant threshold shift, the one in the

11   chart that Mr. Overholtz just had up?

12   **A.**  In October 2007, he has no single frequencies with

13   a 15 dB shift.  So, no, it doesn't.

14            **JUDGE RODGERS:**  I want to make sure I have

15   the number of audiograms correct that I was just

16   referencing when I asked you my question, Dr.

17   Spankovich.  That would have been October '08,

18   February '09, and June of '09.

19            **THE WITNESS:**  So, there are a couple of

20   audiograms in October '08, and then one in February of

21   '09.  And so, where we're seeing, again, this evidence

22   of a sustained shift is in this time period.

23            **JUDGE RODGERS:**  There is not one in June of

24   '09, June 16th?

25            **THE WITNESS:**  Yes, there is an audiogram

1   there, correct, yes, ma'am.

2        **JUDGE RODGERS:**  So there is a couple in

3   October of '08, and then there is February of '09, and

4   June '09 that, in your opinion, show a sustained

5   significant threshold shift?

6        **THE WITNESS:**  At multiple frequencies.

7        **JUDGE RODGERS:**  In the left ear?

8        **THE WITNESS:**  In June '09 -- I'm sorry, I'm

9   trying to look at it here -- in June '09, we're seeing

10   the sustained shift in the left ear.  And then when

11   look at the overall trend in the right ear, we see

12   that there is a shift at 6,000 hertz in the right ear.

13        **JUDGE RODGERS:**  But just in that June '09

14   audiogram, or was it over more than one audiogram?

15        **THE WITNESS:**  It was over more than one.  It

16   was in 2008 where we're seeing the initial robust

17   shift, and then we're seeing some sustained elevation

18   of that.

19        **JUDGE RODGERS:**  Mr. Nomellini, you're

20   standing, so follow-up?

21   **BY MR. NOMELLINI:**

22   **Q.**  Just to be clear, Dr. Spankovich, your testimony

23   is that the October 2007 audiogram does not show a

24   sustained significant threshold shift because there is

25   no 15 dB shift?

1  **A.**   Well, the way that they're looking at a

2  significant threshold shift, according to the Army, is

3  a single frequency with 15 dB.  And then they take an

4  average of multiple frequencies if it's like 10 dB or

5  greater.

6         And so, what we're observing in October of 2007 is

7  that, you know, at 4,000 hertz he was 0 and now he's

8  at 10, so there's some slight shift there.  At 3,000

9  hertz, he was 20 and now he's at 30.  But the other

10  are within 5 dB or no change.

11        And the right ear also, in October of 2007, he's

12  within 5 dB.  He actually improves in the right ear in

13  October 2007.  But in October 2008, we're going from 5

14  to 25 in that right ear at 6,000 hertz, and we're

15  going from 0 to 15 and 10 to 25, for example, at 2,000

16  hertz, 0 to 15 at 4,000 hertz in the left ear.

17        So this is where we're seeing sustained injury is

18  in this 2008 time frame.

19  **Q.**   And it's saying -- and so there is no sustained

20  significant threshold shift as of October 2007 -- I

21  just want to be clear -- is that using the Army

22  standard or is that the Dr. Spankovich standard?

23  **A.**   That's both.  So we have to look -- for something

24  to be sustained, we have to have another test.  And

25  so, we can see some indication of some shift there at

1  3,000 and 4,000 hertz going from 20 to 30 and 0 to 10

2  in October 2007.  But where we see that sustained

3  shift occur in the left ear an expansion of that shift

4  is in 2008.  And where we see the damage in the right

5  ear relative to where the threshold shift in the right

6  ear at 6,000 hertz starts only in 2008.

7          **MR. NOMELLINI:**  Thank you, sir.

8          **JUDGE RODGERS:**  Thank you very much, Dr.

9  Spankovich.  You are free to go.  We appreciate your

10  time.  Thank you.

11          **THE WITNESS:**  No problem.

12          *[Witness excused.]*

13          **JUDGE RODGERS:**  We are not done yet.

14          **MR. AYLSTOCK:**  No, Your Honor.

15          We have Dr. Arriaga next that Ms. Hutson is

16  going to present.

17          **JUDGE RODGERS:**  Okay.  Do we have the doctor?

18          **MS. HUTSON:**  The doctor is in the waiting

19  room.

20          **JUDGE RODGERS:**  Hi, Dr. Arriaga.  I'm Judge

21  Casey Rodgers.  I'm going to ask if you would please

22  rise and raise your right hand to be sworn before we

23  begin your testimony.  Thank you.

24      **MOISES ARRIAGA, PLAINTIFF WITNESS, DULY SWORN**

25          **MADAM CLERK SIMMS:**  Be seated.  Please state

1    your full name and spell your last name for the

2    record.

3              **THE WITNESS:**  Moises Arriaga, A-r-r-i-a-g-a.

4              **JUDGE RODGERS:**  And, sir, if you experience

5    any technical difficulties with audio or video, please

6    let us know.

7              All right, Ms. Hutson, go ahead.

8                        **DIRECT EXAMINATION**

9    **BY MR. HUTSON:**

10   **Q.**  Good afternoon, Dr. Arriaga.  How are you?

11   **A.**  I'm fine, thanks.

12   **Q.**  Good.  I wanted to let you know from the get-go I

13   apologize for us running a little late.  We have had a

14   in lot of witnesses today.  And in light of the

15   lateness of the day and because the Court has your

16   curriculum vitae, we are not going to go through those

17   slides to talk about your extensive credentials, okay?

18   **A.**  Yes, ma'am.

19   **Q.**  So what we're going to do is start with what I've

20   asked you to do, which is take a look at two different

21   cases, one for Stephen Hacker and one for Dustin

22   McCombs.

23        Have you done that for me?

24   **A.**  Yes, ma'am.

25   **Q.**  And in the process of reviewing those records, did

1    you come to a determination -- and we'll start with

2    Mr. Hacker -- as to what types of noise-induced

3    conditions he has?

4    **A.**   So, I did a review on him, and my conclusion in

5    him is that he has a noise-induced tinnitus and

6    symptoms relating from that in terms of aggravating

7    his PTSD, anxiety, and some sleep issues.

8    **Q.**   Let me start off, before we go any further, Dr.

9    Arriaga, and making clear from this -- and this is a

10   very narrowed scope examination, meaning what we're

11   going to be talking about today is what the conditions

12   are for both Mr. Hacker and Mr. McCombs.  But we're

13   going to be focusing on when the injuries occurred,

14   specifically the time they occurred and where they

15   were at that time.

16       Does that make sense?

17   **A.**   Yes, ma'am.

18   **Q.**   So I'm going to keep my questions real geared

19   towards that, and that will help move things along as

20   well.

21       I would like to ask you, though, when you did this

22   review, when you went through and were talking about

23   Mr. Hacker's records, what methodology did you use and

24   what types of records did you review to A) look for

25   the diagnosis and B) make a determination about the

1  timing of that diagnosis?

2  **A.**   I had an opportunity to review his medical records

3  from the military VA evaluations.  I had an

4  opportunity to meet him in person, an opportunity to

5  see records that included evaluation at civilian

6  institutions where he had some surgery and had some

7  medical evaluations.  And then -- *(inaudible)* --

8  **Q.**   You cut out for a minute there, Dr. Arriaga.  Can

9  you hear me okay?

10  **A.**   I can hear you.

11  **Q.**   This happened once earlier in the day, and we

12  found that it helps a little bit if you sit closer to

13  the microphone.  Do you mind doing that?

14  **A.**   Sure.

15  **Q.**   Thank you.  There you go.  We'll see if that

16  helps.

17  **A.**   Is that a little better?

18  **Q.**   That's a little better.  Thank you so much.

19       So, we're going to talk about these two diagnoses.

20  But earlier in the day, to let you know, Mr. Hacker

21  has already testified, and he did talk about another

22  type of hearing condition he has called conductive

23  hearing loss.

24       When you did this evaluation and you determined

25  that these two conditions related to the noise

1  exposure from the military experience, did you rule

2  out the conductive hearing loss as a hearing loss that

3  could be tied to the military noise exposure?

4  **A.**   Well, the conductive loss for him is a congenital

5  issue.  Oftentimes conductive loss can protect you

6  from noise-induced hearing loss.  But he actually has

7  other inner ear issues that eliminate that protection.

8  Specifically, he has an enlarged vestibular aqueduct

9  that makes him more vulnerable to noise-induced

10  injuries on the side of his conductive hearing loss.

11  **Q.**   Let me ask it differently, Dr. Arriaga.  Is there

12  anything about his conductive hearing loss that caused

13  either one of these conditions, the bilateral tinnitus

14  or the noise notch?

15  **A.**   No.  I think the tinnitus that he is having is

16  related to the noise exposure because the conductive

17  loss was there his whole life.

18  **Q.**   Now, this other condition that you just mentioned,

19  the vestibular aqueduct, how does that interact, if it

20  does at all, with the tinnitus?

21  **A.**   Well, it made him more susceptible to noise injury

22  in that ear.  We didn't get a chance to look at the

23  film, so we have to rely on the report.  And so,

24  unlike someone with a normal inner ear with a

25  conductive loss, the conductive loss can essentially

1    act like an earplug.  In him, he is more susceptible

2    to noise than the average person.  And even though he

3    has a conductive loss, having that enlarged vestibular

4    aqueduct makes his inner ear and the whole auditory

5    system mor susceptible.

6    **Q.**  Thank you, Dr. Arriaga.

7         **MS. HUTSON:**  The next slide, please.

8    **BY MS. HUTSON:**

9    **Q.**  So, in reviewing this case and connecting the

10   dots, if you will, to the noise-induced hearing loss

11   and whether or not that was caused by the CAEv2, did

12   you review records that showed you the timing that Mr.

13   Hacker actually used the CAEv2?

14   **A.**  I did.

15   **Q.**  And I'm using this chart, but I would like for you

16   to rely on your review of the records, okay?  I just

17   thought it might make it a little faster if we had a

18   timeline here.

19        Was it your understanding from your review of the

20   records that Mr. Hacker was issued the Combat Arms

21   Earplug back in 2002 in Texas?

22   **A.**  Right, in 2002 or 2003, from my review.  I wasn't

23   that -- one those two dates, yes.

24   **Q.**  Fair enough.  And then he purchased another pair

25   of the CAEv2 in 2006.  Does that correspond with your

1   review of these records?

2   **A.**   Yes, that's when he was getting a more senior

3   position and he wanted to be able to show his troops

4   what a squared away troop he was.

5   **Q.**   And then one question I'm going to ask you before

6   we head over to audiograms.  At the top of this

7   timeline, it shows that Mr. and Mrs. Hacker lived in

8   Kentucky from the time period of February 2006 and

9   through September of 2009.

10       Does that comport with your reading of this

11  record?

12  **A.**   Yes.  I'm not sure he was married at the beginning

13  of that, but he lived in Kentucky and then got married

14  and then they -- *(inaudible)* --

15  **Q.**   And other than the approximate year he was gone in

16  Iraq, that was where he lived with his wife?

17  **A.**   Correct.

18  **Q.**   Now, did you read their depositions?

19  **A.**   Yes.

20  **Q.**   And was there anything in those depositions that

21  was instructive to you for purposes of defining the

22  time frame where Mr. Hacker's tinnitus actually began?

23  **A.**   Well, from his deposition, he timed it as April of

24  '06.  From her deposition, she commented how they had

25  hobbies where they would go listen to music and sing

1    along, things called karaoke, that they liked at the

2    beginning but were less and less able to do so because

3    loud noises kept getting in the way of being able to

4    do that.

5    **Q.**   And that deposition testimony, was that centered

6    around the April 2006 time frame as well?

7    **A.**   Well, April 2006 is when he times it both in his

8    depo and what he told me and what I saw in the medical

9    records.

10   **Q.**   All right.  Let's move then to the April time

11   frame of 2006.

12       Now, you've reviewed all of the audiograms in this

13   case, is that right, Dr. Arriaga?

14   **A.**   Yes, ma'am.

15   **Q.**   And this April 3rd, 2006, audiogram, is this the

16   first instance, based on your review, that there is

17   evidence of this diagnosis you just told us about of a

18   noise notch?

19   **A.**   I think this is the first one.  It's more

20   dramatic, I think, on the 2007 one, but 2006 is the

21   first one.

22   **Q.**   And then in terms of -- would you consider this to

23   be the first bit of evidence, though, that there is a

24   potential noise notch that's later confirmed?  And

25   we're going to go to the audiogram next.  Is that

1   fair?

2   **A.**   In terms of audiometric studies, yes.  This is

3   '06, right, April '06?

4   **Q.**   Correct.

5   **A.**   Yeah.

6   **Q.**   In the audiograms that you reviewed prior to the

7   April 3rd, 2006, audiogram -- and there were several

8   others -- do you recall -- actually, let me go there

9   first -- that there were multiple audiograms prior to

10  this one for Mr. Hacker?

11  **A.**   Yes.  I've got my report here, so I'll pull that

12  table out from my report, if that's okay.

13  **Q.**   That's perfectly fine.

14      Dating back to 1998 when he had his first

15  audiogram, did you see any evidence, until this one on

16  April 3rd, 2006, any evidence of a noise notch?

17  **A.**   Well, we're defining a notch as a dip in the

18  hearing with better thresholds on either side.  So,

19  no.  That's the first time that I see that.  But I

20  need to have higher frequencies to be able to judge it

21  as well.

22  **Q.**   Well, let's move to the next slide, which is the

23  July 31st, 2007, audiogram, which I think you were

24  referring to earlier.

25      Is this a clearer picture of the noise notch that

1   you have told us about that Mr. Hacker had?

2   **A.**   Yes.  If you look at the blue lines, that's the

3   left ear, and you can see that the X at the 6,000 mark

4   is lower than the X's at the 4,000 and the 8,000 point

5   -- *(inaudible)* --

6   **Q.**   You cut out a little bit towards the end there.

7   Could you repeat the last part of what you said.

8   **A.**   The dip at 6,000 hertz is what I'm defining as the

9   noise notch, because the adjacent frequencies have a

10  lower threshold or he's hearing better at those

11  frequencies.

12  **Q.**   And is this July 2006 audiogram in some ways

13  corroboration that there is a noise notch for Mr.

14  Hacker?

15  **A.**   This corroborates that he's been exposed to toxic

16  noise in that ear, and we describe the pattern of the

17  audiogram as noise notch, yes.

18              **JUDGE RODGERS:**  Is this '06 or '07?

19              **MS. HUTSON:**  I said '06 and I apologize.

20  This is '07.  My apologies.

21  **BY MR. HUTSON:**

22  **Q.**   So, from the April '06 to the July 2007 audiogram,

23  was there a progression of this noise notch?

24  **A.**   Well, the bottom of it, if you will, the 20 dB

25  level, is 20 dBs in both.  It's just more apparent

1    here because of the adjacent thresholds, but this is
2    the same noise notch.
3    **Q.**   Thank you, Dr. Arriaga.
4         Now, in your review of Mr. Hacker's file, in his
5    medical records, did you have an opportunity to look
6    at some of his VA records and specifically the VA
7    disability questionnaire for Mr. Hacker?
8    **A.**   Yes.
9    **Q.**   And I've got this blown up here on the screen.
10   Have you seen this exact questionnaire and did you
11   review it in preparation of your report and also in
12   preparation for the opinions you are offering in Mr.
13   Hacker's case?
14   **A.**   Yes.
15   **Q.**   In the top part of this -- and I'll just read it
16   to make this move along -- it says, "The tinnitus
17   began in April 2006 after being exposed to diesel
18   engines, aircraft, air compressors, and gunfire while
19   serving as a fueler."
20        Did I read that correctly?
21   **A.**   Yes, ma'am.
22   **Q.**   And is the beginning of the tinnitus complaints,
23   based on this VA questionnaire, consistent with what
24   you have reviewed in this file as well as Mr. Hacker's
25   testimony about when the problem with tinnitus began?

1   **A.**   Yes.

2          **MS. HUTSON:**   Let's move to the next audiogram

3   now.

4          We talked about the April 2006 audiogram

5   earlier, and we looked at that, and we talked about

6   the noise notch.  But we didn't talk about tinnitus,

7   right?

8          So, in that audiogram, under the history of

9   present illness, it gives a different story.  And I

10  want to walk through that story with you.

11         Here it says, "Ringing in the ears occurring

12  in both ears, not constant, and lasting only a few

13  minutes for the past several years now."

14         Did I read that correctly?

15  **A.**   Yes.

16  **Q.**   Do these appear to be two inconsistent records

17  about when Mr. Hacker's tinnitus began?

18  **A.**   No.  You know, you look at the whole story.  And,

19  you know, the audiogram right before this one, there

20  wasn't any description of tinnitus, and then in

21  addition to that with what we talked about earlier in

22  terms of the family history of when it began.

23         So, there is not really an explanation here of

24  what that means.  Is it a medical problem or is it

25  just something that was noted a few years ago and

1    wasn't an ongoing issue.

2        So, this is specifically with regard to tinnitus,

3    and this is when it becomes inshrined in his records.

4    A revisit after this includes tinnitus as a medical

5    problem.

6        So, I don't think they are inconsistent; I think

7    this is just not fully explained.

8    **Q.**   And do you see that in your practice, Dr. Arriaga,

9    where there may be one record that doesn't completely

10   comport or jibe with another record that you have?

11   **A.**   That's our reality.  And so we have to take a

12   sense of what the totality of the picture is, be it a

13   biological test or multiple tests or history features,

14   and we just have to take a view at 30,000 feet and

15   see, you know, what the reality is when you put it all

16   together.

17   **Q.**   And do you do that every day in your clinical

18   practice as an ENT?

19   **A.**   Yes.

20   **Q.**   We're not going through credentials, but I do want

21   to ask you a quick question.  Were you in the military

22   after you received your M.D. degree?

23   **A.**   Yes.

24   **Q.**   And do you see and do you have experience

25   reviewing military records in that capacity?

1    **A.**   Both in the military and since being in the

2    military, I periodically review medical records from

3    the military, yes.

4    **Q.**   And is this something that you were talking about

5    earlier that kind of forces you to look at the

6    totality of the circumstances when you've got what

7    seeming on its face could be considered inconsistent

8    evidence in front of you?

9    **A.**   When I was in the military, I thought that that

10   was the only place that this happened.  But this is

11   the real world, and data points in a lot of different

12   directions, and it's just what we deal with.

13   **Q.**   At the end of the day, can you make a credible

14   determination about an individual's file even if all

15   the records don't match perfectly?

16   **A.**   Well, that's what we have to do every day, so yes.

17   **Q.**   After your review of all of the medical records in

18   Mr. Hacker's file, did you come to a determination as

19   to whether he had tinnitus that is noise induced

20   during a time period where he was wearing the Combat

21   Arms?

22   **A.**   Yes.

23   **Q.**   And what was that time frame that you determined

24   he sustained noise-induced tinnitus while wearing the

25   CAEv2?

1    **A.**   Based on his history and what he told me, what

2    were the totality of his medical records, and his

3    wife's history, I think the onset was April of '06

4    when he was using the CAEv2.

5    **Q.**   Same question with regard to the noise notch.

6    Based on your totality of the records that you

7    reviewed, did you make a determination as to whether

8    or not the noise notch was subject to or caused by

9    noise exposure while Mr. Hacker was wearing the Combat

10   Arms Earplugs?

11   **A.**   So, that's the indication that there was toxic

12   noise exposure, and yes, that's my determination.

13   **Q.**   And do you base those opinions upon a reasonable

14   degree of medical and scientific certainty?

15   **A.**   Yes.

16   **Q.**   I'd like to move now to Mr. McCombs.

17   **A.**   Okay.

18   **Q.**   You've told us about your methodology when you do

19   a review like this.  Did you use the same methodology

20   in Mr. McComb's case as you did with Mr. Hacker's?

21   **A.**   Yes.

22   **Q.**   Did you review medical records, review deposition

23   testimony, and any other records that were available

24   to you?

25   **A.**   Yes.

1  **Q.**  Is it your understanding that Mr. McCombs received

2  the first pair of Combat Arms Earplugs in Georgia in

3  2008?

4  **A.**  Yes.

5  **Q.**  Do you have an understanding that he received a

6  second pair in Alaska later that year?

7  **A.**  Yes.

8  **Q.**  And we can go back a slide here; I want to talk

9  about Mr. McCombs's injuries.

10      Based on your review of all of the records that

11  you had available for Dustin McCombs, what hearing

12  impairment does he have or what diagnosis does he

13  have?

14  **A.**  He has tinnitus and a related injury from that

15  noise-induced tinnitus.

16  **Q.**  Why is it that people don't get the type of

17  hearing loss measured on an audiogram after hazardous

18  levels of noise and instead get tinnitus or other

19  issues?

20  **A.**  Well, you know, there is a lot of biological

21  variability.  We don't all suffer the same effects

22  from the same exposure to the same level of toxin.

23  You know, one person can walk next to a jackhammer and

24  they lose all of their hearing, then the next person

25  can work that jackhammer all their lives and not have

1    any indication there.  We have different biological

2    susceptibilities, and there are a lot of different

3    explanations that go into the genetics and features

4    like that.

5    **Q.**  Going back to the timeline for a moment.  In

6    reviewing Mr. McCombs's file, did you make a

7    determination as to when the onset of the tinnitus for

8    him began?

9    **A.**  For him, the onset of the tinnitus began after the

10   IED exposure in April of '09.

11   **Q.**  And when you look at that as the triggering event,

12   did he go on after that to have a continuous

13   impairment or continuous injury to his ears after the

14   initial IED in Afghanistan?

15   **A.**  Based on what he told me and what we see in

16   tinnitus patients, loud noise exposure to him causes

17   an aggravation that exacerbates the tinnitus.  And so,

18   his continued exposure to loud noise afterwards in the

19   military when he was in Alaska and doing, you know,

20   heavy weapons training, I think that continued to --

21   *(inaudible)* -- the auditory system and aggravated the

22   tinnitus.

23   **Q.**  So that we're clear, so the tinnitus was initially

24   triggered by the IED explosion back in 2009 while he

25   was overseas.  But did it continue to worsen over time

1   when he was in Alaska?

2   **A.**   Yes.

3   **Q.**   So, did injury occur to Mr. McCombs that

4   ultimately turned into tinnitus while he was in

5   Alaska?

6   **A.**   Well, the original injury was before that, but

7   while in Alaska receiving loud noise exposure with

8   inadequate protection continued to aggravate it, yeah.

9   **Q.**   And he was in Alaska, based on your review of the

10  records, between March of 2010 and July of 2011?  Does

11  that comport with your review of these records?

12  **A.**   Yes.

13  **Q.**   And while in Alaska, do you believe that the

14  exposures, the noise-induced exposures that he had

15  made the tinnitus worse?

16  **A.**   Yes.  And I base that on what he tells me even now

17  that he's meticulous about avoiding loud noise

18  exposure because it continues to just aggravate him

19  and sometimes can make a spell go on for a few days,

20  so yes.

21  **Q.**   I'm going to ask you the same question with Mr.

22  McCombs that I asked you with Mr. Hacker.  Did you

23  base all of the opinions that you just gave us about

24  Mr. McCombs upon a reasonable degree of medical and

25  scientific certainty?

1   **A.**   Yes.

2           **MS. HUTSON:**   Thank you, Dr. Arriaga.

3           **JUDGE RODGERS:**   Thank you.

4           Mr. Brock?

5           **MR. BROCK:**   Yes, Your Honor.

6           **JUDGE RODGERS:**   Do we need to spend time on

7   Afghanistan?   It doesn't seem like there is a dispute

8   here about the onset, at least for Mr. McCombs.   I

9   know you've got to deal with Mr. Hacker, too.   But at

10  least for Mr. McCombs, the onset of his tinnitus

11  occurred in Afghanistan.

12          **MR. BROCK:**   Okay.   If we're agreed upon that,

13  I think that's --

14          **JUDGE RODGERS:**   Well, that's what I just

15  heard Dr. Arriaga say.

16                      **CROSS-EXAMINATION**

17  **BY MR. BROCK:**

18  **Q.**   Dr. Arriaga, my name is Mike Brock.   Good

19  afternoon.   And I have a few questions for you.   I'll

20  try to take these in the order that you testified

21  about on behalf of the Plaintiffs.

22          So, the first thing I want to do is I want to turn

23  to your report that you prepared and submitted on

24  October 27th, 2020.

25          Do you have the report there?

1   **A.**   I do.   I thought it was October 9th, but okay.

2   **Q.**   It may be.   I've written the 27th, but I've made

3   other mistakes today, so I'll --

4              **JUDGE RODGERS:**   My decision won't be based on

5   that so --

6              **MR. BROCK:**   Thank you.   All right.

7   **BY MR. BROCK:**

8   **Q.**   I want to turn to page 7.   Do you have it?

9   **A.**   Let's see, I think so, yes.

10  **Q.**   I'm going to call out for you what I want to draw

11  your attention to.   On page 7, there is a sentence

12  there that begins, "The onset of tinnitus was first

13  reported" -- Do you see that?

14  **A.**   I see that, yes.

15  **Q.**   All right.   And you write, "The onset of the

16  tinnitus was first reported in 2006 while he was

17  participating in multiple deployments in toxic noise

18  environments and three years after initiating noise

19  protection with CAEv2 plugs."   Do you see that?

20  **A.**   I see that.

21  **Q.**   And just one question for qualification here.

22  When you used the language "multiple deployments,"

23  you're aware that, before he reported tinnitus in

24  2006, he was participating in multiple deployments in

25  Korea, Kuwait, and also had been exposed to noise in

1    Texas before he arrived at Fort Campbell, Kentucky, in

2    2006, correct?

3    **A.**   Right.

4    **Q.**   In other words, he got to Fort Campbell, Kentucky,

5    in early April of 2006, and he had just come from a

6    combat zone in Kuwait, correct?

7    **A.**   Right.  I think that sentence is inartfully

8    written, but basically globally that he was exposed to

9    toxic noise and kind of including all of the other

10   things that come afterwards in the report.

11   **Q.**   Okay.  We won't go into it in detail again, but

12   the time at which he first presents with a complaint

13   of tinnitus is this April 3rd, 2006, medical record

14   with regard to the visit with Melissa Leccese,

15   correct?

16   **A.**   Yes.

17   **Q.**   You're also aware that Mr. Hacker has not -- had

18   not reported and made no reference to tinnitus prior

19   to this visit with Ms. Leccese, so this is the first

20   time that the issue is being reported, correct?

21   **A.**   Yes.

22   **Q.**   And in your entire report, the only reporting of

23   tinnitus that Mr. Hacker does during his time at Fort

24   Campbell is the April 3rd, 2006, record, correct?

25   **A.**   Well, but every record after that includes that is

1    a problem in his -- every visit after that includes

2    tinnitus in the problem list after that.

3    **Q.**   Well, there are visits that he has post-Fort

4    Campbell, for instance, in January of 2010, where he

5    reports occasional ringing in his ear and he's been

6    unable to tune it out.  But that's the next report of

7    tinnitus that we see in the record, isn't it?

8    **A.**   No.  If you look at the problem list that's part

9    of his visits, the problem list that includes other

10   medical problems includes -- pretty much everyone that

11   has a problem list includes tinnitus after that.

12   **Q.**   Do you know what period of time that he was

13   stationed in Kentucky?

14   **A.**   February '06, and then he did that deployment, and

15   then he came back to Kentucky.  I think we just saw

16   that slide a little while ago.

17   **Q.**   Right.  So is it your testimony that you believe

18   that, while he was stationed in Kentucky, before he

19   was deployed the second time in 2008, that there are

20   other references to tinnitus?

21   **A.**   I think so.  You know, I don't have his medical

22   records in front of me, but as I recall -- and, in

23   fact, it's in my report -- that starting with that

24   April '06, every medical visit after that that has a

25   problem list includes tinnitus in there.  And that's

1    in my report.

2    Q.   Okay.  And I'm asking you a slightly different

3    question.  Assuming that Mr. Hacker left Kentucky in

4    2008, do you know of any medical records or audiology

5    records that would reflect he was complaining of

6    tinnitus in the 2006 to 2008 time frame?

7    A.   Well, we have got this visit with Leccese.  And

8    then in terms of a visit just for tinnitus, I think we

9    made the reference earlier in terms of his medical

10   records.  In terms of it being included in his medical

11   records, every visit that has a problem list after

12   April '06 included tinnitus.

13   Q.   Okay.  And you believe that there would be some

14   records that would show that he was reporting tinnitus

15   in the 2006 to 2008 time frame?

16   A.   I think -- I think it's in the problem list of

17   those records, but, you know, we would have to pull

18   those out for me to show you.  The problem list is

19   where you need to look.

20   Q.   You don't report to us in the expert report that

21   you prepared that there were specific incidents where

22   he was reporting that he has tinnitus in the 2006 to

23   2008 time frame, do you?

24   A.   In my report is that one comment that I have just

25   made to you about what's in the medical record after

1    that, that that's kind of the time -- April '06 is

2    when he comes in for a visit regarding it.  And every

3    visit that includes a problem list after that includes

4    tinnitus in the problem list.

5    **Q.**   Okay.  And I guess what I'm saying is that might

6    include reports that were made while he was still in

7    Kentucky, and those records might be related to later

8    visits at other bases, perhaps even in other

9    countries, correct?

10   **A.**   I'm not sure I understand the question.

11   **Q.**   Well, I guess where I'm trying to see if we have

12   agreement, I've looked at the records, and I'll just

13   represent to you that I see some records where there

14   is reference to reports of tinnitus.  The next one I

15   see is January 28th, 2010, where he reports occasional

16   ringing in his ear and has been unable to tune it out.

17       And I'm asking you if you know of any specific

18   reports between April 3rd, 2006, and January 28th,

19   2010?

20   **A.**   I think we're just having a little bit of a

21   disagreement of what it means about being included in

22   the records.  I'm agreeing that there are not other

23   visits specifically for tinnitus, but I am saying

24   that, even in visits not related to tinnitus, that

25   tinnitus is listed in the problem list of every

1   medical visit that includes a problem list after April

2   of '06.

3   **Q.**   Okay.  And I'll just ask this one more time.  Can

4   you testify that any of those visits where tinnitus is

5   listed occurred between 2006 and 2008?

6   **A.**   You know, I don't have the records that well

7   memorized.  But if there are any general visits in

8   that time frame -- let me look at my report.  There

9   was a visit that included a problem list after April

10  '06 that included tinnitus.

11       And so I don't have the glossary of every one of

12  his visits at that point, though I did list -- where

13  all his medical issues are listed, it has the dates of

14  those visits.  It doesn't look like he had a lot of

15  medical visits after '06.  Starting in about 2010 or

16  so, I see more.  So there aren't a lot of visits.

17  **Q.**   You're kind of making my point, aren't you, that

18  there is not a complaint about tinnitus in the record

19  until January 28th, 2010, and that's after he leaves

20  Fort Campbell, true?

21  **A.**   No, I'm not making your point.  What I'm saying is

22  that April '06 was the onset and that all the medical

23  visits, you know, after that include tinnitus in the

24  problem list.  So I don't think I'm making your point.

25  **Q.**   All right.  Now, you say April '06 is the onset.

1   You do know that there is a medical record that

2   reports ringing in the ears occurring in both ears and

3   constant and lasting only a few minutes for the past

4   several years, and you've also looked at his

5   deposition where he has testified that the onset of

6   the tinnitus was a few months prior to April 2006,

7   correct?

8   **A.**   So, in terms of his visit with me, he was very

9   clear as to when that started.  And if you take a look

10  at the testimony from his life in terms of activities

11  and what's going on, so it goes back to that

12  conversation we just had about the totality of the

13  records and how you develop that timing.

14  **Q.**   All right.  Let's look at the Hacker deposition,

15  7/31/20, at page 130, line 12, and going down through

16  line 20.

17       And you reviewed Mr. Hacker's deposition, did you

18  not?

19  **A.**   Some time ago, but yes.

20  **Q.**   And I'll just ask you and draw your attention to

21  this question and this answer:

22       "When you say you're sure you had you it prior to

23  that," talking about the April visit, "what kind of

24  time frame are you talking about?"

25                 Answer:  "I -- I would say for at least a few

1    months before that, but again, I'm not totally sure.

2    I just know that's when I started complaining about

3    it.  I don't believe I just started suffering the day

4    I complained about it."

5              Do you see that?

6    **A.**   I see that.

7    **Q.**   All right.  And then we also have a record where

8    he makes a statement to a health care provider that

9    it's only lasting a few minutes for the past several

10   years now, correct?

11   **A.**   Which medical statement are you referring to?

12   **Q.**   That's the statement in the Leccese record.

13   **A.**   So, again, I mean, that goes back to the comments

14   we had a little bit earlier about that record.  And

15   that thing you just showed me doesn't -- *(inaudible)*

16   -- isn't timing any differently -- *(inaudible)* --

17   **Q.**   Well, if he transfers in to Fort Campbell,

18   Kentucky, in March and the onset of the tinnitus is a

19   few years before March of 2006 or April of 2006, then

20   we know that the onset was not in Kentucky, correct?

21             **JUDGE RODGERS:**  Is it March or --

22             **MR. BROCK:**  I mean in Alaska.  I'm sorry.

23             **THE WITNESS:**  Alaska?

24             **MR. BROCK:**  Where are we?

25             **JUDGE RODGERS:**  You're in Kentucky.

1        **MR. BROCK:**  I'm sorry, I apologize.

2        **JUDGE RODGERS:**  But, actually, it's not March

3    of '06, is it?  Isn't it February of '06?

4        **MR. BROCK:**  I was thinking it was April.  Let

5    me just keep going.  I'll withdraw that question.

6        **JUDGE RODGERS:**  Okay.

7    **BY MR. BROCK:**

8    **Q.**  Mr. Hacker testified that he was sure he had

9    tinnitus before he reported it in April of 2006,

10   correct?

11   **A.**  No.  Let's go back and look at what you just

12   showed me.  He said -- that's not what that said.  The

13   April '06 is when he reported it as a medical problem.

14   And that's how, as a physician, you know -- you know,

15   everybody on this conference call at some point might

16   have a little bit -- *(inaudible).*  But when it became

17   a problem was April of '06 when he went to see

18   somebody and when it became a medical issue.

19   **Q.**  Okay, we're talking about the same time frame.

20   So, in April of '06, he is reporting it to a

21   healthcare provider.  And he's asked the question at

22   his deposition, "For how long prior to that time frame

23   of April of '06 did you have tinnitus," and he says in

24   response to that, "At least a few months," correct?

25   **A.**  "But I'm not sure," he says after that, if I

1    remember the testimony you just showed me.

2         And then, if we look at his March '06 audiogram

3    when he visited with an audiologist I think also at

4    Fort Campbell, he denied tinnitus at that time.

5    **Q.**   All right.  Now, if we look at this issue that you

6    were talking about earlier of the noise notch -- I

7    just want us to be clear about this.

8         You are not stating the opinion in this case that

9    he has hearing loss from the noise exposure, correct?

10   **A.**   That's correct, the level -- the bottom of the

11   noise notch doesn't reach the level that you would

12   diagnosis the hearing loss.  I'm simply stating that

13   the noise notch is corroboration of toxic noise

14   exposure.

15   **Q.**   Your testimony has been that you think he has a

16   conductive loss related to conductive problems there,

17   and you're also of the opinion that -- or you would

18   also say that you might see a little notch that makes

19   you suspicious but that it doesn't reach the level

20   where it is abnormal, correct?

21   **A.**   I'm not sure I would phrase it that way.  But he

22   does have a conductive loss on the right, and on the

23   left side there is a notch that's corroborative of

24   toxic noise exposure.

25   **Q.**   All right.  It's true, is it not, that you are not

1    stating the opinion in this case that he has

2    sensorineural loss related to the failure of the

3    CAEv2; is that correct?

4    **A.**   My opinion is that he has tinnitus and related

5    issues as a result of the failure of the CAEv2.

6    **Q.**   Try to answer my question yes or no; and then, if

7    you need to give an explanation, that will be fine.

8         You are not opining that Mr. Hacker has

9    sensorineural hearing loss related to the failure of

10   the CAEv2, correct?

11             **MS. HUTSON:**   Objection, asked and answered.

12             **JUDGE RODGERS:**   Overruled.

13             **THE WITNESS:**   Correct, I'm not opining that

14   he has sensorineural loss.  I'm opining that the notch

15   simply is corroborative to exposure to toxic noise,

16   and I'm opining that he has tinnitus.

17   **BY MR. BROCK:**

18   **Q.**   Okay.  And the toxic noise that you say he has

19   been exposed to has not caused hearing loss, correct?

20   **A.**   That it's not caused sensorineural hearing loss,

21   but it's simply a noise notch.

22   **Q.**   Fair enough.  And sensorineural hearing loss is

23   the kind of hearing loss that is caused by noise,

24   correct?

25   **A.**   Sensorineural loss is one of the damages that

1    noise can do to the ear.  Tinnitus and other issues

2    are also things it can do to the ear.

3    **Q.**  I want to look now at Hacker Exhibit 21, which

4    focuses on the left ear.

5           **MR. BROCK:**  And if you could, go to the

6    second page of that and, the best you can, callout the

7    audiogram.

8    **BY MR. BROCK:**

9    **Q.**  And this is the graph that you talked to

10   Plaintiffs' counsel about, correct?

11   **A.**  Yes.

12   **Q.**  And if we look at this audiogram of Mr. Hacker,

13   what we see is that at 4,000 hertz on the left he's at

14   5 dB?

15   **A.**  Agreed.

16   **Q.**  And based on this graph, at 6,000 on the left he's

17   at 20 dB?

18   **A.**  Yes.

19   **Q.**  And based on this graph, if you look at 8,000

20   hertz, which is a high frequency, he's at 10 dB,

21   correct?

22   **A.**  Yes.

23   **Q.**  And so, what you've said to us is that, for Mr.

24   Hacker, these values are within normal limits, and

25   that's one of the reasons that you cannot say that

1    this change is a hearing loss induced by noise?

2    **A.**   It's not beyond the limits of noise, correct.  So

3    it would have to be a 25 or more for it to be --

4    **Q.**   And that's one of the reasons that you are not

5    opining that there is hearing loss on the left,

6    correct?

7    **A.**   Correct, because his audiogram is not below that

8    range.

9    **Q.**   Thank you.  I want to look at one additional

10   exhibit, which is designated as McCombs VA Benefits

11   126.  It's a note of visit April 9th.  I'm sorry, I

12   don't need to use that.

13        Okay, that's all I have.  Thank you.  Or that's

14   not all I have.  I've got another case to ask you

15   about.  That's all I have on that case.

16        Moving on to Mr. McCombs.  For Mr. McCombs, your

17   finding is that there is no noise-induced hearing loss

18   but that Mr. McCombs has tinnitus, correct?

19   **A.**   Correct.

20   **Q.**   So, the two cases that you're talking about today,

21   neither one of them has noise-induced hearing loss,

22   correct?

23   **A.**   That's correct.

24   **Q.**   And you, in preparation of your expert report,

25   interviewed Mr. McCombs a couple of times in

1    connection with the opinions that you formulated,
2    correct?
3    **A.**   That's correct.
4    **Q.**   You interviewed him on September 14th, 2020, via
5    Zoom, correct?
6    **A.**   Yes.
7    **Q.**   And again on September 25th in person, correct?
8    **A.**   Correct.
9    **Q.**   And when you were with Mr. McCombs on the 25th,
10   you took some notes during the meeting, correct?
11   **A.**   Yes.
12   **Q.**   And you conducted those interviews so that you
13   could understand the facts surrounding Mr. McCombs's
14   allegation and contention about tinnitus, correct?
15   **A.**   Well, at the time when I conducted the interview,
16   I didn't know what the symptom was going to be because
17   I hadn't really finished the whole review, but yes,
18   the facts regarding his auditory symptoms.
19   **Q.**   Did you review any of the medical records before
20   you met with Mr. McCombs?
21   **A.**   I had reviewed most of the medical records, but I
22   hadn't formed an opinion until I met him.
23   **Q.**   Okay.  So the interviews were conducted in order
24   for you to understand the facts, correct?
25   **A.**   The facts, yeah.  But you had just mentioned

1    tinnitus by itself, and at that time I didn't know if

2    it was going to be more than -- *(inaudible)* --

3    **Q.**   And I don't want to get all into the details, but

4    there are a couple of points that I need to make about

5    the timing.

6          **JUDGE RODGERS:**   Mr. Brock, I don't really

7    think you do, as far as the timing of the onset of his

8    tinnitus.  I'm agreeing with you all, based on the

9    record that's before me, that his tinnitus started --

10   the onset of it was in Afghanistan as a result of the

11   IED blast.

12         **MR. BROCK:**   Okay.

13         **JUDGE RODGERS:**   I'm not saying you can't ask

14   the doctor anything else, but please don't ask him

15   about when his tinnitus began.

16         **MR. BROCK:**   Your Honor, I think that covers

17   our examination.  Thank you.

18         **JUDGE RODGERS:**   Okay.

19         Anything else, Ms. Hutson?

20         **MS. HUTSON:**   Nothing, Your Honor.  Thank you.

21         **JUDGE RODGERS:**   All right, Doctor -- oh, I'm

22   sorry.  I don't have any questions.

23         Judge Jones, do you have any questions?

24         **JUDGE JONES:**   I do not.

25         **JUDGE RODGERS:**   Judge Herndon?

1           **JUDGE HERNDON:**  No, I do not.  Thank you.

2           **JUDGE RODGERS:**  Doctor, thank you very much.

3   We apologize for running a little late this evening.

4   We appreciate your time.

5           **THE WITNESS:**  Not at all.  Thank you.

6           **JUDGE RODGERS:**  Thank you.

7           *[Witness excused.]*

8           Is that all of the evidence?

9           **MR. AYLSTOCK:**  That's all of the witnesses

10  coming live, Your Honor.  I think we've all at this

11  hour -- we would just submit our deposition cuts that

12  we provided and exchanged on Tuesday.

13          **JUDGE RODGERS:**  Are these witnesses that you

14  were presenting or --

15          **MR. AYLSTOCK:**  The Plaintiffs' deposition

16  cuts that we would proffer into the record, as well

17  as, I guess for housekeeping purposes, would proffer

18  the cross-examination exhibits, Tabs 1 through 55.

19          **MR. BROCK:**  We also have some deposition

20  clips to offer, and we can do so now, perhaps, marking

21  them as specific exhibits.  We do want to offer the

22  exhibits that we utilized today in examination, to the

23  extent that they're not in the record.  We've been

24  trying to keep a list.  If you would give us an hour

25  or so, we could probably send an email or get

1     something to you tomorrow about the ones we think we

2     had mentioned.  We could even meet-and-confer about

3     it.

4             **JUDGE RODGERS:**  Is there any objection to any

5     of the exhibits that either side has used?

6             **MR. AYLSTOCK:**  No, Your Honor.

7             **JUDGE RODGERS:**  I mean in cross as well?  I

8     didn't hear any objections but --

9             **MR. AYLSTOCK:**  Not from our side.

10            **MR. BROCK:**  I think for Brian Myers, you

11    know, we were proceeding on the idea that he would

12    talk about those things that he had personal knowledge

13    about.  He was asked about a lot of exhibits that he

14    did not know about.  So, if they come in through a

15    deposition clip or foundation is established, we won't

16    have an objection.  But --

17            **JUDGE RODGERS:**  Well, to the extent you have

18    an objection, it's overruled.  He was offered as your

19    corporate witness on Aearo's contacts in Indiana,

20    primarily in Indiana because that's your argument.

21    And the exhibits that were shown to him, most of them

22    he was copied on.  But the ones he wasn't copied on,

23    they all related to this issue of Aearo's contacts.

24    So the objection is overruled.

25            **MR. AYLSTOCK:**  Thank you, Your Honor.

1     **JUDGE RODGERS:**  I'm fine with you all getting
2   together, even if it's Monday, and getting us a
3   comprehensive list of the exhibits that were
4   introduced and admitted here.  I admitted everything
5   that you all wanted to use that you said you had
6   exchanged and there weren't any objections.  But we do
7   need a list of the exhibits, and I don't know that Ms.
8   Simms can put it together without your help.
9     **MR. AYLSTOCK:**  We'll be happy to help.
10     **JUDGE RODGERS:**  And it's late, and I'm not
11   going to ask her to stay.
12     All right.  I have a couple of questions I
13   want to ask whoever -- who is arguing?  Is it Mr.
14   Sacchet?
15     **MR. AYLSTOCK:**  Mr. Sacchet on behalf of the
16   Plaintiffs.
17     **MR. BROCK:**  Mr. Nomellini for us.
18     **JUDGE RODGERS:**  Mr. Nomellini, all right.
19     It's not that I don't want to hear from you
20   all.  Love hearing from you, I hope you know that by
21   now.  But it's late and I am -- and I'll ask Judge
22   Jones, certainly, if he's got questions about the
23   evidence.  I feel very well versed in the evidence
24   now.  It's more the law that I want to talk to you
25   about.

```
 1              So let me start with the standard and sort of
 2     what I'm supposed to be doing here as far as -- you
 3     know, we talked about this at the last oral argument.
 4     I thought I had in my head how I would proceed to
 5     address the briefing.
 6              And let me just stop and footnote here, live
 7     and learn.  The next grouping, Group B, we are
 8     probably going to proceed differently -- not
 9     probably -- we are going to proceed differently in
10     regards to choice of law for the next groups.  But
11     anyway, we are where we are.
12              At the first oral argument, I think I started
13     out with you all on this issue of the standard and
14     whether I could decide issues of fact, whether the
15     issues that I was looking at in terms of injury,
16     particularly in the lex loci context which has to be
17     decided, whether that is inextricably intertwined with
18     the merits of the claims such that the Seventh
19     Amendment comes into play and, if there is a factual
20     determination that is inextricably intertwined, the
21     jury has to make that finding absent a waiver from you
22     all.
23              So, the one case that I have at this point
24     particular concern over about that and do not see any
25     way around it -- and I want to hear from you on this
```

1    -- is Mr. Baker's case.  Mr. Baker is probably the

2    primary reason I set this evidentiary hearing,

3    although I felt it certainly wouldn't do any harm and

4    it would be helpful for me to hear the facts from the

5    other plaintiffs as well as the Aearo activities,

6    because, frankly, the record was not developed that

7    way on that issue.

8           Plus, as we discussed at the first oral

9    argument, I didn't have any testimony.  And that's,

10   again, something we're going to do differently next

11   time, but I didn't have any testimony, no real

12   admissible evidence from the experts.  We just had

13   reports.  And that's just because of the timing of

14   this and how it got set up.  And I'll take

15   responsibility for that.

16          But now I have the testimony, I've heard from

17   the experts.  Particularly, again, with regard to Mr.

18   Baker, I mean, there is a direct issue of fact, issue

19   of credibility on where this injury occurred.  And

20   given that he's a South Carolina forum, the *lex loci*

21   doctrine applies.  And I don't see any way around the

22   need for that factual determination to be made.

23          And so, what I want to hear from you first,

24   Mr. Sacchet, is do you think I can make that factual

25   determination.

1    I mean, if we were on a summary judgment

2    setting or standard, I would not be able to make -- I

3    would identify an issue of fact.  So help me out.

4    **MR. SACCHET:**  Of course, Your Honor, I'll

5    help you out as best as I can.

6    To the extent that the Court has decided to

7    hold this evidentiary hearing in order to resolve

8    findings of fact, there is case law to support the

9    Court doing that.  It is, of course, not exactly what

10   Plaintiffs argued in the first instance at the prior

11   hearing.  But now that the evidence has been received

12   based on live testimony from Mr. Baker himself, Dr.

13   Packer himself, the Court may make the credibility

14   determinations that the jury would have otherwise made

15   as long as the Court has concluded, which Plaintiffs

16   understand, that the Court does not believe that

17   finding to be inextricably intertwined with the merits

18   of the claim.

19   **JUDGE RODGERS:**  I'm not sure about that any

20   longer.  I'm also not sure that it's not inextricably

21   intertwined for the reason you argued to me back at

22   the original argument, and that is --

23   For instance, with Mr. Baker.  If I determine

24   that his injury did not occur at Fort Lewis, that he

25   did not suffer any problem of tinnitus from his urban

1    warfare training in this concrete environment, as Dr.

2    Packer has testified to, and then the case goes to

3    trial, I'm going to get, no doubt, a Motion in Limine

4    from the Defendants in which they argue that Mr. Baker

5    should not be permitted to testify in any way about

6    what happened in urban warfare training in Fort Lewis.

7    But yet, you and your expert believe that that's where

8    he suffered his injury.

9         I'm not saying whether I agree with that or

10   not, obviously.  But, to me, that seems inextricably

11   intertwined.  And you argued this to me at the first

12   hearing.  I was hoping that I could conclude that it

13   wasn't.  He is the most stark example of this.  It may

14   not be an issue on the other cases.  But absent a

15   waiver from you all or some case law and really good

16   argument that tells me my hesitation is unfounded, I

17   don't see any way around it.

18        **MR. SACCHET:**  This may not be what Your Honor

19   wants to hear, but unfortunately, that was concern

20   that Plaintiffs had, of course, as you mentioned at

21   the first argument.

22        And we cited cases such as *Marra* and *Mattel*,

23   which cited by the *Facebook* case that 3M itself cited.

24   That made clear in both of those circumstances, the

25   Central District of California and the Second Circuit

1   each determining that in those cases the affair was
2   conducted extraterritorially and in the other case the
3   misappropriation was done in another state.  And in
4   light of those situations, in order for the Court to
5   have determined that the misappropriation didn't occur
6   in that state or the affair didn't occur in that
7   state, that went to the heart of that plaintiff's
8   claim.
9          And so, too, it is Plaintiffs' argument here
10  that it's a direct analogy to Mr. Baker's case, and
11  even in the other cases the same cases hold true.
12         So it is our belief that that was the reason
13  why in this context, in that circumstances, just like
14  *Marra* and *Mattel* held in contrast to *Facebook*, that
15  the Court needs to accept plaintiff's statement of the
16  facts at this stage.
17         **JUDGE RODGERS:**  But I can't do that.  There
18  is no case, no case in a setting like this case is in
19  -- use *Baker* -- where I'm not on summary judgment and
20  I have a glaring issue of fact.  I don't know of any
21  law that would permit me to construe the evidence in
22  your favor and rule in your favor.  I mean, I would be
23  -- again, because the issue is inextricably
24  intertwined, I would be entering judgment in your
25  favor on the injury.

1       **MR. SACCHET:**  If I can make three comments?

2       **JUDGE RODGERS:**  Okay.

3       **MR. SACCHET:**  The first is that, the only

4  reason, at least in Plaintiffs' view -- and I'm not

5  sure that 3M would oppose this contention -- that

6  there was a bifurcation of choice of law from summary

7  judgment was simply to ease the judicial task for

8  purposes of summary judgment.

9       I don't think there was ever an argument that

10  the choice of law briefing and the argument was

11  somehow separate from the motions for summary

12  judgment.  We only did so for efficiency's sake so

13  that there would be enough time to know that law to

14  then move on the summary judgment.

15       **JUDGE RODGERS:**  Well, that's true.  But what

16  do you do -- in terms of summary judgment, what law

17  are you going to apply if I don't make the decision?

18       **MR. SACCHET:**  The Plaintiffs would apply the

19  law that we believe should apply, which is the law

20  that we recommended in our choice of law briefing.

21  And hypothetically, the Court could issue an order,

22  once the summary judgment briefing is in, either

23  making a determination on choice of law in the summary

24  judgment context and then determining what the answer

25  should be on summary judgment.  I think that would be

1    complicated.

2        **JUDGE RODGERS:**  Well, I'm telling you the

3    answer in Mr. Baker's case will be there is an issue

4    of fact on where the injury occurred.

5        **MR. SACCHET:**  And I think our response to

6    that is an argument that I closed the past choice of

7    law hearing on, which is, even under the situation

8    that Mr. Baker was not injured in Washington, as both

9    he testified and Dr. Packer testified today, it still

10   does not support the application of Indiana law.

11       **JUDGE RODGERS:**  Well, that's a different

12   issue for me.  Right now what I'm talking about is

13   place of injury.  And with a *lex loci* state, which is

14   -- you all chose what forums to designate here -- with

15   a *lex loci* state, how do I ignore place of injury?

16       Even if I -- and this is if I was to assume

17   that the injury -- and I'm not going to do this -- but

18   if I was to assume the injury occurred overseas, then

19   I'm going to apply *lex fori*, and I'm going to apply

20   the law of South Carolina which doesn't have -- I

21   won't say no contacts, but not a plethora of contacts

22   with this litigation.

23       **MR. SACCHET:**  To be 100 percent certain, I

24   would prefer to confer with the bellwether counsel in

25   Mr. Baker's case.  But I am fairly confident that, if

the Court determined that South Carolina should apply,
that Mr. Baker's counsel would accept that, and so
would I.  And we do believe, on behalf of Mr. Baker,
that there were enough contacts in South Carolina to
support a due process analysis.

**JUDGE RODGERS:**  That may be -- if you all are
willing to accept that, that I assume for purposes of
choice of law that the injury, without making a
finding -- I wouldn't need to -- but just assume in
Defendants' favor that the injury occurred overseas
and then I apply *lex fori*, that would be South
Carolina --

I'm sure, Mr. Nomellini, you're following
this.

-- but I would apply South Carolina, there is
going to be a legal debate about whether I should
apply South Carolina or Indiana.  It's not going to
be, you know, a default to South Carolina without any
consideration of Indiana.  I don't think I could do
that under due process; I'll get an argument from
these guys.

So, I wouldn't want to mislead Mr. Baker and
his counsel that, oh, hey, if you agree to *lex fori*,
then you get South Carolina.

**MR. SACCHET:**  Your Honor, if I could just

 1   mention, there is, of course, a legal pathway, though,
 2   that supports South Carolina despite Indiana.  I mean,
 3   I explained it at the last hearing and I think Your
 4   Honor is --
 5          **JUDGE RODGERS:**  Remind me.
 6          **MR. SACCHET:**  -- well aware of it.
 7          But in the event that the injury did occur
 8   abroad in Iraq, as 3M contests, neither party has
 9   advocated for the application of Iraqi law.
10          **JUDGE RODGERS:**  Correct.
11          **MR. SACCHET:**  So, under Rule 44.1, both
12   parties have essentially failed their burden to
13   support the meaning of what Iraqi law would be to this
14   case.
15          **JUDGE RODGERS:**  Then don't I apply *lex fori*
16   at that point?
17          **MR. SACCHET:**  Yes.  When that occurs, the
18   case law is clear, the Eleventh Circuit decision in
19   *Cavic*, the Second Circuit's decision in *Vishipco* --
20          **JUDGE RODGERS:**  Right, you're right, you're
21   right.  And I'm sorry to cut you off, but it's late.
22   You're right.  But you can't apply the law of the
23   forum if there is not due process.
24          So I would have to first -- as part of that
25   decision, I would certainly have to analyze whether

1    South Carolina had sufficient contacts with the

2    litigation.  I understand you think South Carolina

3    does.  And I would definitely require more briefing on

4    this because this wasn't something that was really

5    drilled down into initially.  And if I conclude that

6    South Carolina doesn't have sufficient contacts, then

7    is the default Indiana?  What would South Carolina

8    tell me to do?

9        **MR. SACCHET:**  There would be a question about

10   under that jurisdiction's -- I mean, I don't want to

11   say too much.  But if there were not contacts in South

12   Carolina, there could be a personal jurisdiction issue

13   with filing in South Carolina, to be frank.

14       **JUDGE RODGERS:**  We have discussed that.

15       **MR. SACCHET:**  So, you know, I'm being candid.

16   But we believe that there are contacts.  I could tell,

17   based on Your Honor's questions this morning, that you

18   were trying to figure out that question for the Court

19   by the questions you asked.

20       Mr. Baker used the plug in South Carolina.

21   He used it on the range.

22       **JUDGE RODGERS:**  Yeah, I don't -- let's -- I

23   know you have a position on this, and I would

24   definitely provide the opportunity.  It just so

25   happens his trial is the last trial, so it's June, I

1    believe.  So we would have time to address this, for

2    y'all to brief it.  It would just put off your summary

3    judgment, I suppose, yeah, it would put off the time

4    for your summary judgment.  But again, given that it's

5    not until June, although June is going to be here

6    before any of us know it or want it to be -- but it

7    doesn't sound like you disagree with me, Mr. Sacchet,

8    as far as the analysis of the -- the problem with the

9    issue of fact.

10           **MR. SACCHET:**  I don't disagree that there is

11   a question of fact.  I do disagree, respectfully, with

12   the Court that this can't be handled part and parcel

13   at summary judgment and that the facts in that context

14   could be viewed in the light most favorable to the

15   plaintiff, as courts have done, respectfully, again,

16   as this Court did in Valentino.

17           **JUDGE RODGERS:**  But I ruled in the

18   defendant's favor.  And you've read that decision, and

19   I had to go back and reread it, it's been so long.

20   But in that case I said -- in the order I said for the

21   purposes of this discussion only I'm going to accept

22   the plaintiff's facts, and then I ruled in the

23   defendant's favor.

24           **MR. SACCHET:**  I would certainly never

25   question what Your Honor intended by the decision.

1    And if I missed that caveat to the overall context of

2    the case, I apologize.

3            **JUDGE RODGERS:**  Well, I'm just not accustomed

4    to --

5            Judge Jones, Judge Herndon, chime in here.

6    Maybe I'm drowning.  But in all my years on the bench,

7    I don't think I have ever construed facts in the favor

8    of one party and then ruled in their favor

9    definitively, as a matter of judgment, and rendered a

10   finding in that party's favor.

11           I don't know, Judge Herndon, do you know

12   different?  Not to put you on the spot.  You can tell

13   me, "I'm retired, I'm not going to answer this

14   question."

15           **JUDGE HERNDON:**  I'm retired and dead tired.

16           **JUDGE RODGERS:**  Retired and tired, okay, fair

17   enough.

18           **MR. BROCK:**  Judge Herndon has slipped out and

19   started his grill, he's probably cooking.

20           **JUDGE HERNDON:**  I personally think I have

21   done that, but I'd have to go -- I don't know how in

22   the world -- I guess I could get in touch with my law

23   clerks and find out.

24           **JUDGE RODGERS:**  And you'd have to cite me the

25   case.

1          **JUDGE HERNDON:**  Yeah.  Well, I can't do that.

2          **JUDGE RODGERS:**  Well, look at that.  I'm not

3     going to decide it right now.

4          Judge Jones, what do you think?

5          **JUDGE JONES:**  I have maybe a little bit of a

6     different view.  I think it's, as you put in a

7     previous order, it's a preponderance of the evidence

8     standard, and the simple task of the Court -- I know

9     it's a close question whether these issues are

10    inextricably intertwined with the merits.  I sort of

11    thought before they might be.  Now I don't.  And I

12    think the Court simply has to weigh the evidence that

13    was presented not viewing it in the light most

14    favorable to either side and, based on a preponderance

15    of the evidence standard, make a determination.

16         I do understand how there can be a real

17    serious problem if the Court determines that the

18    injury occurred later in the chronology than the

19    Plaintiffs have argued so far, that, you know, you

20    really can't bring up at trial things that happened to

21    you before the injury occurred.

22         **JUDGE RODGERS:**  How can that not be

23    inextricably intertwined?  It sets the date for his

24    injury and damages.  And I just -- I don't see how --

25    I mean, if I rule -- if I find I don't believe Mr.

```
1   Baker about that warfare training, then I've gutted a
2   big part of their case.
3           MR. SACCHET:  Your Honor, if I may add one
4   case just for the illumination for the Court.  3M did
5   cite Norwood from 2009 --
6           JUDGE RODGERS:  I know, and I don't agree
7   with that case.
8           MR. SACCHET:  Okay.  I just wanted to bring
9   up that --
10          JUDGE RODGERS:  I don't know how -- with all
11  due respect to that judge, I don't know how he did
12  what he did.  I don't even follow it.
13          MR. SACCHET:  I don't have any more citations
14  for you.
15          JUDGE RODGERS:  I'll hear from Mr. Nomellini.
16  But I was curious about something else from you all.
17  None of the argument discussed application --
18  particularly with Minnesota this is the issue, but
19  none of the argument discussed application of the
20  forum's substantive law.
21          What interest does Minnesota have in deciding
22  whether or not to apply Alaska or Indiana's law in
23  Minnesota?  What interest?  And you all just
24  completely ignored Minnesota.
25          Every case I have read -- and I don't think
```

1   I've read as many as you all have, but every case that

2   I've read, the forum is in contention for the

3   substantive law.  And the question is whether that

4   forum should apply the law of a sister state under the

5   choice of law test in that state.  And that's not what

6   we've done here.

7          **MR. SACCHET:**  So, Your Honor, we did cite in

8   our briefing situations where multiple states were

9   considered by a Minnesota court in terms of the

10   application of choice of law, albeit one of those

11   multiple states --

12          **JUDGE RODGERS:**  Was Minnesota.

13          **MR. SACCHET:**  -- was Minnesota.  But I do

14   want to make clear it wasn't just Minnesota versus one

15   other option.  It was Minnesota versus multiple

16   options.

17          **JUDGE RODGERS:**  I understand multiple states

18   can satisfy due process and might be in contention, if

19   you will.  But I have not seen a case where the forum

20   wasn't the principal question was should you apply --

21   particularly in Minnesota with the test that it

22   applies.

23          **MR. SACCHET:**  Yes.

24          **JUDGE RODGERS:**  I haven't seen the case.

25          **MR. SACCHET:**  I have not either, based on the

1   cases that I have reviewed, in full candor.
2   Nonetheless, under the fourth factor of the Minnesota
3   five-factor test, one of the questions, of course, is
4   the forum's interest in the application of the
5   competing loss.
6           And here, 3M has tried to argue that, because
7   these plaintiffs are non-residents of Minnesota, that
8   somehow strips the interest of those competing states
9   for support by a Minnesota court.  And that's just not
10  true.
11          The *Jacobson* case, which I cited at the last
12  hearing but I'll cite again -- and I actually do have
13  a slide of it, if we could pull up -- well, it's not
14  really necessary.  But the cite, again, is 645 N.W.2d
15  741 at 746.
16          The Minnesota Court of Appeals in that case
17  expressly stated that Minnesota retains an interest in
18  compensating victims who are residents of other
19  states.
20          So, here, under the fourth factor, a
21  Minnesota court would still consider which law would
22  we prefer to apply based on that policy interest.
23          **JUDGE RODGERS:**  I don't know that Minnesota
24  could envision a situation where a case filed in
25  Minnesota that there wasn't consideration of whether

1    Minnesota should apply its own law to that case.

2         **MR. SACCHET:**  So, none of the five factors

3    that the Minnesota five-factor test considers is

4    whether the forum is Minnesota.

5         **JUDGE RODGERS:**  Well, you start off with

6    whether there is a conflict, and that conflict is

7    between Minnesota and the other -- the sister or

8    foreign state.

9         **MR. SACCHET:**  And to the extent that the

10   Court were to find that neither one of the two options

11   were preferable, it could lead back to the *lex fori*.

12   And that was one of the hypotheticals that I offered

13   at the last hearing.

14        To the extent that those factors are neutral

15   and that it ends up being the *lex loci*, which is

16   debated --

17        **JUDGE RODGERS:**  *Lex loci* or *fori*?

18        **MR. SACCHET:**  So this gets complicated.  So

19   there's the five factors.  If the five factors are

20   neutral -- the *Nodak* case says, when the five factors

21   are neutral, you apply the *lex loci*.

22        **JUDGE RODGERS:**  Yeah, but you've got to --

23   before you get to the five factors, you've got to look

24   at the conflict.

25        **MR. SACCHET:**  You have to look at the

1    conflict.  And if the Court were to find that it can't

2    determine a conflict because no party perhaps is

3    supporting Minnesota law, you just apply the *lex fori*,

4    which is Minnesota law.

5         **JUDGE RODGERS:**  Exactly, which nobody argued.

6         **MR. SACCHET:**  Well, we didn't argue that

7    directly, but we did argue it indirectly by saying,

8    even under 3M's set of facts, if the injury occurred

9    elsewhere, abroad, and somehow the factors were still

10   neutral, which we argue they would not be, they would

11   still favor the forum that we selected, that then you

12   have a neutrality analysis under *Nodak.*  And the

13   neutrality analysis under 3M's narrative would be

14   abroad.  But neither party supported the international

15   law, so therefore, you default to the *lex fori* under a

16   long line of cases, including *Indus. Graphics*, which

17   is a Minnesota case from 1985 or so.

18        **JUDGE RODGERS:**  And it's also the principal

19   place of business of the Defendant.

20        **MR. SACCHET:**  Currently, yes.

21        So, again, Your Honor, we would, of course,

22   prefer Minnesota over Indiana, if that were part of

23   the Court's equation.  And we believe that the Court

24   can get to Minnesota by determining A) that there is

25   no conflicts to apply the *lex fori*; or under a very

1    complicated situation of fact that we can't resolve if
2    it was here or there, or even if it is abroad like 3M
3    says, that the default is the *lex fori*.  In almost
4    every jurisdiction, including the cases 3M cited in
5    their own brief, recognize that *lex fori* is the
6    default in that circumstance.
7         **JUDGE RODGERS:**  I haven't found anything to
8    the contrary.  And *Agent Orange* is not anything I'm
9    going to hang my hat on.
10        **MR. SACCHET:**  And even Judge Weinstein in
11   *Agent Orange* says it's the *lex fori* and gives the two
12   policy rationales for why it should be.  And he
13   basically got reversed by the Second Circuit in doing
14   national consensus law, so the Court should not do
15   that.
16        **JUDGE RODGERS:**  We're not doing national
17   consensus law.  That is not going to happen.
18        Last question I have for you.  You've heard
19   me say this a couple of times today that the briefing,
20   really, you've only focused on the product liability
21   claims, I think.  I don't recall there being specific
22   argument with regards to any of the other claims,
23   fraud, unjust enrichment, I don't know, there are some
24   others but -- and I'm not sure what to do with those.
25        What's going to happen?  Are you just going

1   to address these based on what you think should be the

2   law in your summary judgments, even though I haven't

3   heard anything on choice of law for those claims?

4        **MR. SACCHET:**  If I can say two things.  The

5   first, of course, is that, for the *lex loci* analysis

6   for *Baker* and *Keefer*, dépeçage is not done.  It's just

7   the singular monolithic law that would apply.

8        **JUDGE RODGERS:**  I don't have to look at

9   whether it's statutory or common law?

10        **MR. SACCHET:**  Based on my understanding, if

11   it's a *lex loci* analysis, you apply the place of

12   injury and that's what binds the claims.

13        **JUDGE RODGERS:**  Even to common law claims?

14        **MR. SACCHET:**  I believe so.  In Georgia, of

15   course, there is a common law exception.

16        **JUDGE RODGERS:**  Public policy?

17        **MR. SACCHET:**  Yes, the public policy

18   exception that -- well, it's actually different.

19   There is the public policy exception that applies to

20   contradictory statutory claims, but Georgia courts

21   remain committed to applying its common law, because

22   the view among Georgia courts is that the common law

23   should be for any court to determine so why shouldn't

24   Georgia courts have the upper hand in saying what they

25   want the common law to be.

1          So, no matter how you cut *Keefer*, no matter
2     where you say the injury was, no matter what *lex loci*
3     analysis you apply, the common law claims have to be
4     Georgia.
5          **JUDGE RODGERS:**  Well, I agree with -- I may
6     not get there the same way you just did, but I agree
7     with that for the common law claims.
8          **MR. SACCHET:**  And the second point I was
9     going to make is, just by way of background, I felt a
10    little bit self-responsible when you made the comment
11    that we didn't do a dépeçage analysis.  And there was
12    a reason for that.
13         I mean, the setup for the choice of law
14    briefing was, of course, the chart.  It started with
15    the chart.  The chart was limited to 100 words, 150
16    words with one case cite.  To be honest, I had
17    discussions with my team, you know, how nuanced is
18    this going to be.  And we made the decision based on
19    what I thought was the understanding of the parties
20    that we're essentially choosing one law.
21         **JUDGE RODGERS:**  Okay.  I don't think I knew
22    that, but that's an explanation, okay.
23         **MR. SACCHET:**  Again, just in full candor,
24    that's why -- that was part of the decision.  And of
25    course, the other part of the decision was, when there

1   is one opening brief at 10,000 words for five
2   plaintiffs with a global argument about why it can't
3   be Indiana, it would be very difficult to brief every
4   single potential claim in that amount without writing
5   a treatise.
6       **JUDGE RODGERS:**  Lesson learned.  Next time,
7   *Hey, Judge Rodgers, this is not possible to do.  We*
8   *have to brief every claim.*
9       **MR. SACCHET:**  Okay.  And I think we've
10  learned a lesson, and I think all parties have.
11      **JUDGE RODGERS:**  But how are we going to deal
12  with it on summary judgment?  What's going to happen?
13      **MR. SACCHET:**  Well, to my understanding, the
14  way that the parties went into this exercise was
15  deciding it was going to be one law.  If that's what
16  the parties are advocating on both sides, I think that
17  can still be done.  It doesn't mean it has to be --
18      **JUDGE RODGERS:**  That's how I interpret what
19  you submitted to me.
20      **MR. SACCHET:**  Yes.
21      **JUDGE RODGERS:**  And for my workload, that's
22  what I would prefer.
23      **MR. SACCHET:**  Yes.
24      **JUDGE RODGERS:**  But you have discussions with
25  the Defendants where -- I know Mr. Fields, I don't

1    believe, is here.

2        **MR. SACCHET:**  He's not here.  But in the

3    initial meet-and-confers when the discussion was what

4    are we putting in the 100 words, it's what state law

5    applies; it wasn't what state laws apply to different

6    claims.

7        **JUDGE RODGERS:**  Yeah.  I've entertained

8    telling you all you've abandoned argument as to any

9    other law for any other claims.

10       **MR. SACCHET:**  And we understand that, and

11   that's how we briefed it.

12       **JUDGE RODGERS:**  All right.  Well, thank you

13   very much, Mr. Sacchet.

14       Let me hear from Mr. Nomellini.  And you can

15   start wherever you like.

16       **MR. NOMELLINI:**  Thank you, Your Honor.

17   Certainly there are some very complicated issues here,

18   and I appreciate you working through them with us.  I

19   appreciate Mr. Sacchet's comments.

20       Let me start where you started, which is, for

21   example, in the *Baker* case, if you ruled in somebody's

22   favor, you know, is that going to create problems

23   later on, right?

24       **JUDGE RODGERS:**  Well, meaning, I have -- the

25   law in the Eleventh Circuit is, if choice of law issue

1   is inextricably intertwined with the merits, then I

2   can't decide it without a waiver.  So that's -- I

3   mean, I told you you could start where you want, but

4   that really is the starting point is, is this issue

5   inextricably intertwined.  And if you don't feel that

6   it is, why isn't it?  Particularly in the *lex loci*

7   context.

8            **MR. NOMELLINI:**  Yep.  So, Your Honor, we

9   don't believe it's inextricably intertwined.  We think

10  that the *Baker* record, up until the recent briefing,

11  was clear.  There are some, you know --

12           **JUDGE RODGERS:**  It wasn't clear, and that's

13  why we're here today.  I'm sorry, I'm just going to

14  have to disagree with you that, Mr. Nomellini.  That's

15  why we're here.

16           **MR. NOMELLINI:**  But I do have an idea, and

17  that is -- and I need to clear this with our client,

18  and Mr. Sacchet will probably have to clear it with --

19           **JUDGE RODGERS:**  I won't hold you to anything.

20           **MR. NOMELLINI:**  And that is that it seems

21  like the concern is, you know, what bleedover does the

22  choice of law have to other contexts.  That's at least

23  one concern, right?

24           **JUDGE RODGERS:**  You mean the other claims?

25           **MR. NOMELLINI:**  No, to -- even to the trial.

1    Like you mentioned, a Motion in Limine, right?

2         **JUDGE RODGERS:**  Oh, yes, right.

3         **MR. NOMELLINI:**  And so, you know, we would

4    definitely have to check with our client, but one

5    possible way to resolve it is, if -- if -- I'm just

6    assuming, if the parties were to agree that the choice

7    of law issues are not binding or could not be

8    preclusive as to other issues --

9         **JUDGE RODGERS:**  That could work.

10        **MR. NOMELLINI:**  -- that could be a solution.

11   And I think that's something -- you know, we would

12   definitely need to explore and to get back to Your

13   Honor, understanding, you know, that time is an issue.

14        But if the framework were these are choice of

15   law issues and is limited to the choice of law

16   context, and then we would have that done and then we

17   move on.

18        **JUDGE RODGERS:**  And I think I mentioned this

19   I believe maybe in the email that was sent out to you

20   all.  In the jurisdictional context, you can

21   oftentimes -- and that's done, and you don't have to

22   worry about it coming back to bite you at trial

23   because that's just not going to be an issue at trial.

24   You know, the contacts that a defendant has with the

25   state is not something that the jury is going to be

1    looking at, they're not going to be looking at the

2    long-arm statute.  But sometimes with subject matter

3    jurisdiction it can get a little dicier.  But I don't

4    usually have to worry about that.  So the record for

5    the issue of jurisdiction is the record for the issue

6    of jurisdiction, and it doesn't carry over and bleed

7    into the trial, and there is no prejudice to anyone.

8    But you would both have to agree -- both sides would

9    have to agree to that.

10         **MR. NOMELLINI:**  Yes.  So, with Your Honor's

11   permission, perhaps we can confer about that and

12   report back to Your Honor as soon as we can.

13         **JUDGE RODGERS:**  And I would still apply the

14   analysis we have been discussing, it's just that I

15   would make a factual finding about where the injury

16   occurred.  I would make that credibility -- for

17   instance, in Mr. Baker's case, I would make that

18   credibility determination.

19         **MR. NOMELLINI:**  Right.

20         **JUDGE RODGERS:**  I am curious, Mr. Nomellini,

21   if you have any thoughts about the forum law.

22         **MR. NOMELLINI:**  Yes.  So, the first thing I

23   would like to do is respond to something that Mr.

24   Sacchet said about that, which is that -- he cited the

25   *Indus. Graphics* case.  I think they have also cited

1   the *Vishipco, Bel-Ray, and Cavic* cases.  And those are

2   all Rule 44.1 cases.

3         As Your Honor knows, Rule 44.1 requires

4   parties to raise any foreign, i.e., non-United States,

5   law issue in the pleadings.  And those are cases where

6   the party failed to timely raise the foreign law issue

7   and there wasn't also an argument that the place of

8   conduct is the law that should apply.

9         **JUDGE RODGERS:**  Right.  But no one, thank

10  God, has argued that I should apply Afghanistan law or

11  the law of Afghanistan or Iraq or Kuwait or South

12  Korea.  And I am grateful to you for that.

13        So my understanding is, just under the case

14  law, that I would apply *lex fori*, that I would then

15  apply the law of the forum.  But then I would look to

16  see whether the forum law has to have sufficient

17  minimum contacts.

18        But I don't know how you go from Iraq, if I

19  say, okay, you know, the plaintiff was injured in

20  Iraq, and then default to Minnesota.  How do I get to

21  Minnesota from Iraq?

22        **MR. NOMELLINI:**  We would agree, Your Honor,

23  that you would actually go --

24        **JUDGE RODGERS:**  Not Minnesota.  Indiana.  I'm

25  sorry.

1      **MR. NOMELLINI:** Right, yes.  So in the cases

2      that Mr. Sacchet was citing, there wasn't an argument

3      in *Vishipco, Bel-Ray, Cavic*, *Indus.* that you should go

4      to the place of the conduct.  And so it is -- you

5      know, this is not -- this kind of confluence of facts

6      and scenarios with people serving overseas does not

7      come up a lot.

8           So it's essentially, you know, the place with

9      the strongest interest.  That is, you look at what's

10     out there.  And we say the place of injury is, you

11     know, is -- or the -- not the place of injury -- the

12     things that occurred on bases are in federal enclaves

13     so that state does not get credit for that.  And we

14     say you don't go to Afghanistan or Iraq or Kuwait.  So

15     the question is, is where else do you look.  And so

16     you have to look somewhere.

17          And so, what we would say is, when you weigh

18     all these, you know, possible choices, you know,

19     Indiana -- Mr. Aylstock was referring to Minnesota,

20     Mexico, Maryland, Massachusetts, France, sales to all

21     50 states.  If you stack up all those different

22     things, then Indiana comes out on top, not those other

23     states and not the forum state.

24          **JUDGE RODGERS:** But you can't sidestep the

25     forum state.  And I didn't hear any -- I haven't heard

1    any briefing or read any briefing or heard any

2    argument about the forum state.

3              My understanding of *lex fori* is you apply the

4    law of the forum state unless due process is not

5    satisfied there.  And then there is probably another

6    problem, as Mr. Sacchet raised.  But I don't think you

7    sidestep the forum state and just go to a

8    consideration of which state out there has the most

9    interest.

10             I think you have to -- in terms of the

11   methodology of the analysis, you've got to go back to

12   the forum state and say does this forum state have

13   sufficient contacts.  If it does, that's the law that

14   applies, and you don't look at any other state's law.

15   If it doesn't, then that's where I'm not sure where I

16   go at that point.

17        **MR. NOMELLINI:**  So, Your Honor is right.

18   Number one, it has to have constitutionally sufficient

19   contacts.  So that's one point.  But the other point

20   is, there just aren't a lot of cases that consider as

21   part of this -- well, we've got these overseas issues,

22   but we've also got a state where X, Y, and Z conduct

23   occurred, and yet we're going to go back to the forum

24   state.

25        **JUDGE RODGERS:**  But you have a forum state.

```
1    And I have to decide, sitting in the role I'm in, you
2    know, in the diversity context in an MDL what the law
3    of that designated forum -- what would happen if I was
4    sitting in Minnesota, what law would I apply.
5              And I just -- I can't imagine that if I said
6    the injury occurs in Afghanistan that I default to
7    Indiana and I don't even consider Minnesota or Florida
8    or whenever the designated forum is.
9              MR. NOMELLINI:  Yep.
10             JUDGE RODGERS:  So what do we do about
11   summary judgment?  So you all are going to talk about
12   some of these issues?
13             I mean, your summary judgments are -- they
14   are tolled right now, the deadline, because of my need
15   to make this ruling.  It's set for -- I guess you're
16   going to get me summary judgments on Mr. Estes,
17   though, right?
18             MR. NOMELLINI:  Yes, we're getting that to
19   you today.
20             JUDGE RODGERS:  Oh, boy, along with a few
21   others I bet.
22             MR. NOMELLINI:  But if I could just briefly
23   say one more thing about your comment, Your Honor?
24             JUDGE RODGERS:  Yes.
25             MR. NOMELLINI:  And that is that, when you're
```

1    going back to the forum, it's because -- for example,

2    in these 44.1 cases, the other options are zeroed out.

3    And that's -- what I'm saying is, we really don't have

4    that here.  We don't have, you know -- because what

5    else would you do with it, Judge, right?

6            You know, there is foreign law, but nobody is

7    explaining it.  So there is nowhere else to go, so you

8    go to the forum by default.  And what I'm saying is we

9    don't have that here.  We have another option here.

10           **JUDGE RODGERS:**  In the Minnesota cases --

11   move away from *lex loci* for a minute.  The Minnesota

12   cases, you're asking me to just ignore Minnesota as a

13   contender -- I keep using that term, it's the only one

14   that comes to mind.  But you're asking me to ignore

15   Minnesota.

16           I don't know, I just don't see a way around

17   at least considering whether Minnesota law should

18   apply, even if I find that the injury -- because it's

19   not *lex loci*.  So, even if I find the injury occurred

20   overseas, Minnesota is still -- I've got to start with

21   that conflict.

22           **MR. NOMELLINI:**  Yes.  Your Honor, our

23   argument would be, based on the facts that the

24   Minnesota contacts are nowhere close to the Indiana

25   contacts --

1        **JUDGE RODGERS:**  But it's not a comparison, is
2    it, Mr. Nomellini?  Don't I look at the due process
3    and the contacts, you know, individually by state,
4    separately?  It's not -- I've got to be satisfied that
5    Minnesota has the contacts, and if they do, then I
6    don't know that I would look at Indiana.  I don't know
7    that it's a who has the greater -- it's not the
8    interest analysis of the Restatement that many states
9    use.  It's different than that.
10       **MR. NOMELLINI:**  So, Your Honor is absolutely
11   right, you have to look at the constitutional issue.
12   And what I'm saying is that the cases that Mr. Sacchet
13   cites, they don't say that when the state of the
14   conduct is at issue and you're not going to
15   Afghanistan law, then you abstain from weighing the
16   place of conduct versus the forum state.
17       In other words, those cases don't stand for
18   the proposition that the conduct state doesn't count.
19   They just stand -- for *Vishipco,* et cetera, they just
20   stand for the proposition that the party waived Rule
21   44.1.
22       But I think that the other issue is that, you
23   know, Plaintiffs, in the chart that they put together,
24   they didn't argue for the forum state.  And so we have
25   the issue that Your Honor is confronting is that the

1    parties didn't really analyze it.

2            **JUDGE RODGERS:**  Nobody did.  But I don't

3    think I can conduct a proper legal analysis based on

4    -- I have to conduct the analysis that the law

5    requires me to conduct regardless of -- in this choice

6    of law context I do.

7            Now, as far as the failure to brief choice of

8    law as to the claims other than product liability, I

9    guess I do think you all have waived that or abandoned

10   that.  Nobody has argued that.

11           So I feel like I can say that whatever law I

12   decide applies based on the evidence that I have here

13   and the law, that it applies to all the claims across

14   the board.

15           **MR. NOMELLINI:**  So Your Honor asked Mr.

16   Sacchet that same question.  With Your Honor's

17   permission, is that another thing that we could talk

18   to Mr. Sacchet about?

19           **JUDGE RODGERS:**  Sure.

20           **MR. NOMELLINI:**  Thank you, Your Honor.  And I

21   have two more points to make.  The one is the

22   Minnesota -- the question Your Honor asked about what

23   is Minnesota's interest.

24           And I'm sure Your Honor has already read it.

25   We would point to the *Schmeltzy [phonetic]* case, which

1    says that Minnesota has recognized interest in

2    compensating tort victims but that interest is

3    lessened where, as here, the injury occurred in

4    another state, the injured party is not a Minnesota

5    resident, and did not receive medical care here.

6            **JUDGE RODGERS:**  Right.  I don't know that I

7    disagree with that.  I'm not making any ruling.

8            My reason for discussing this with you all

9    right now as I am is that this just wasn't -- this was

10   carved out of the analysis completely that you all

11   presented to me.  And I don't think I can just carve

12   it out.  I think I've got to make that finding that

13   Minnesota would say we don't have an interest in

14   applying our law to this case.

15           **MR. NOMELLINI:**  Uh-huh.

16           **JUDGE RODGERS:**  But I have to make that

17   determination.

18           Your next --

19           **MR. NOMELLINI:**  Your Honor, my last point,

20   unless Your Honor has further questions for me, is,

21   you know, another federal enclave that's been in the

22   news a lot is the District of Columbia, Washington,

23   D.C., which was formally part of Maryland, seated by

24   Maryland.

25           And it brings to mind this quote from the

1    *Allison vs. Boeing*, the Tenth Circuit case that we

2    cited and that Mr. Sacchet referenced in the oral

3    argument, and that is, "The power of Congress over

4    federal enclaves that come within the scope of Article

5    1, Section 8, Clause 17" -- that's the same provision

6    we were referring to with the first argument -- and

7    this is quoting the Supreme Court -- *Allison* is

8    quoting the *Paul vs. United States* decision by the

9    Supreme Court -- "is obviously the same as the power

10   of Congress over the District of Columbia."

11           So that helps me to think about a structural

12   framework for this, thinking about things like, you

13   know, alleged instructions read by Mr. Hacker on base,

14   you know, what choice-of-law credit, if any, does

15   Kentucky get for that.

16           And what I would submit is, that can be

17   looked at the same way that -- and according to the

18   Supreme Court, it should be looked at the same way as

19   you would look at activity within the District of

20   Columbia that is once part of Maryland.  The Maryland

21   legislature seated it, the Congress agreed to it.

22           And so you won't find cases saying that

23   Maryland, for choice-of-law purposes, gets some credit

24   for activities occurring in the District of Columbia.

25           Now, we would argue here that federal bases,

1    like Fort Campbell, et cetera, are certainly entitled

2    to no less sovereign respect, no less respect in any

3    way than the District of Columbia.

4         **JUDGE RODGERS:**  Okay.  Mr. Sacchet, very

5    briefly, please.

6         **MR. SACCHET:**  I have three points to make.

7    The first is I didn't want to go here in the federal

8    enclave.  But since the door has been opened, I just

9    want to reiterate to the Court, 3M's attempt to

10   summarily support federal enclave jurisdiction in this

11   MDL stands in radical and stark contrast to what it's

12   doing in the district of Minnesota before Judge

13   Tunheim.

14         As Your Honor knows, in the *Sloan* case that

15   was just ruled on a couple of days after we had our

16   last oral argument, 3M, the very same party here with

17   the counsel that I often work with in Minnesota on the

18   other side, submitted evidence of how those places are

19   federal enclaves.  3M has done nothing of the sort

20   here other than to summarily say right now that,

21   because everyone D.C. is a federal enclave, somehow

22   that means Fort Richardson is, too, even though, when

23   you go online, it's clear that, like, five percent of

24   the Fort Richardson acreage is owned by the federal

25   government, and the remaining 95 percent is not.

1              And even Mr. Nomellini just said that in D.C.

2    there has been a showing of cessation and there's been

3    a showing of acceptance.

4              Where is that showing by 3M as to any of the

5    bases at issue in this case?  Zero.  Zippo.  Nothing.

6    They haven't shown it.  They failed to do it.  There

7    is no federal enclave analysis.

8              The second is the citation to *Schmeltzy*, the

9    language is Minnesota's interest might be lessened.

10   It clearly doesn't say it's eliminated.  And that's

11   the key distinction there.

12             And then, finally, really the final point I

13   want to make here is, in this last slide -- I did

14   prepare a whole deck, I've been updating it in the

15   back of the room the whole day with live testimony and

16   every other thing to show how the analysis should go.

17   But the very last slide of Plaintiffs' deck, for

18   purposes of this final evidentiary hearing, it is the

19   same analytical framework about how the Court can get

20   to Minnesota just in a little bit more of a roundabout

21   way.

22             So, although the Court could make a threshold

23   determination that neither party advocated for

24   Minnesota so therefore there is no conflict, you get

25   to the same place when you find that, because

1    Minnesota may not have been advocated, that
2    neutralizes all of the five factors.
3           So, if all the five factors are neutral
4    because it's not Indiana and it's not the other
5    alternative forum like Kentucky or Alaska, then again,
6    under *Nodak*, you have to do a neutrality analysis.
7    And the neutrality analysis first points to *lex loci*.
8    And if the *lex loci* isn't advocated, then you default
9    again to *lex fori*, which is essentially a multi-step
10   place to basically just get back to the place that
11   Your Honor is starting from.
12          So Plaintiffs did provide this framework and
13   did say in their briefing both for *Hacker* that *McCombs*
14   that Minnesota is the alternative option.
15          So I just want to be clear that we understand
16   the analytical framework, we dissected it, presented
17   it in a four-step fashion.  And it leads to the very
18   same place that the Court find if there is no conflict
19   that it has to be Minnesota.
20          **JUDGE RODGERS:**   Thank you.
21          You all are going to get together -- not
22   tonight but soon -- and discuss -- I guess first
23   you're going to discuss the issue of limiting the
24   choice-of-law findings to the choice-of-law record, if
25   your clients are in agreement with that.

1          You're also going to talk about my feelings

2     on your abandonment of -- what's the principal?

3          **MR. SACCHET:**  Dépeçage.

4          **JUDGE RODGERS:**  Dépeçage, okay.

5          And then I'm not quite sure -- Mr. Sacchet,

6     you said you were going to talk with Mr. Fox and Mr.

7     Tracy, I believe.

8          **MR. SACCHET:**  I've received a note, and they

9     have confirmed that, if the Court were to apply South

10    Carolina, that they take no issue with that

11    application.

12         **JUDGE RODGERS:**  But I can't guarantee I would

13    apply South Carolina.

14         **MR. SACCHET:**  Just saying, if you were to.

15         **JUDGE RODGERS:**  But there is not an agreement

16    then as to -- well, I mean, I can't -- I guess what I

17    need to know before going any further is, especially

18    with Mr. Baker, is whether you're going to be in

19    agreement to limiting that finding to this record.

20    Otherwise, I think -- I'm happy to let you brief it,

21    but I think Mr. Baker's issue has to go to a jury.

22         **MR. SACCHET:**  And, Your Honor, just to bring

23    it back to the last hearing -- I don't want to subject

24    you to more commentary, but I specifically remember

25    Magistrate Judge Jones's question where I think he

1    asked me that very same question, and I did answer
2    hypothetically you could limit these findings just to
3    choice of law and move on from there.

4         I wasn't aware that 3M would perhaps
5    stipulate to that, so I do agree the parties should
6    talk about it.  But it is something that I think did
7    come up at the last hearing based on that question
8    that was contemplated, and I didn't want to represent
9    that as an option without knowing whether it was even
10   a possibility.  So, I just wanted to add that.

11        **JUDGE RODGERS:**  Well, that's fine.  If you
12   both agree, then what I would like from you is a
13   recognition that this is inextricably intertwined, or
14   if it is, you recognize you have the right under the
15   Seventh Amendment to a jury determination of it, and
16   your clients have agreed that the Court can make the
17   finding, does not need to be made by a jury, but yet
18   that finding will be limited to the choice-of-law
19   record such that place of injury will be on the table,
20   so to speak, before any jury.

21        **MR. SACCHET:**  Understood.

22        **JUDGE RODGERS:**  I'm sorry, I'm tired.  I know
23   you all are tired as well.

24        **MR. SACCHET:**  And the other last thing I was
25   just -- I didn't know if the Court wanted it, but we

```
 1    did prepare this deck.  I didn't get a chance to go
 2    through it.  Would the Court like a copy?
 3              JUDGE RODGERS:  Yes, that's fine, you all can
 4    give me whatever PowerPoints or demonstrative aides
 5    you want.
 6              MR. NOMELLINI:  We'll do the same.
 7              JUDGE RODGERS:  Mr. Brock, did you have
 8    something?
 9              MR. BROCK:  I was going to raise just one
10    issue quickly.  You had asked us to let you know today
11    what the parties thought about the extra week of
12    trial.
13              JUDGE RODGERS:  Yes, thank you.
14              MR. BROCK:  We don't have agreement on that.
15    The Defense side would like to have the extra week.  I
16    don't think the Plaintiffs don't agree with that.
17    I'll let them speak for themselves.
18              So that's the status of where we are.  I
19    think we're going to need five weeks.  I think we'll
20    be pushed to get it done in five weeks.
21              JUDGE RODGERS:  Well, here is the thing.  If
22    we don't do the extra week, then I'm going to give you
23    time limits.
24              MR. AYLSTOCK:  And Mr. Pirtle and I had spoke
25    with Mr. Brock yesterday, and that's exactly what we
```

1   would proposed.  We have done a lot of these trials on

2   the clock.  And I think without time limits, we'd be

3   here five, ten, twenty weeks.

4        **MR. BROCK:**  Well, I think we should have five

5   weeks and time limits.

6        **JUDGE RODGERS:**  Well, I might be amenable to

7   that, too.  I'm going to think about it.

8        **MR. BROCK:**  Okay, that's fine.

9        **JUDGE RODGERS:**  I was hoping you all would

10  come to an agreement about it.  But I am considering

11  definitely the time limits.

12       **MR. BROCK:**  Thank you.

13       **JUDGE RODGERS:**  I was concerned because,

14  while I do have that extra week, I don't have a minute

15  beyond that.  I mean, that would be it.

16       When we get together -- I think our next case

17  management conference is coming up -- I want to talk

18  to you all about -- I think it's the end of next week

19  -- is it the 22nd?  Anyway, it is what it is.

20       If it's that far off, I might get with you

21  next week about this.  But I want to talk to you about

22  a special juror questionnaire both for purposes of

23  availability of jurors, but then also I'm considering

24  even more substantively as far as questions.  We don't

25  have to go into that tonight.  But I do need to

1    discuss this with you soon because my jury
2    administrator has given me the schedule on when this
3    would have to go out and it's fast approaching.
4          **MR. BROCK:**  Well, we've certainly done that
5    in other cases, and I think both sides would find that
6    to be helpful.  But we can talk about that.
7          **JUDGE RODGERS:**  All right.  Well, thank you
8    all very much for your excellent presentations.  And
9    I'd say I look forward to getting you a ruling, but
10   I'm not sure I am.
11         **MR. AYLSTOCK:**  Thank you, Judge, for all your
12   patience.
13         **JUDGE RODGERS:**  Oh, I'm sorry.
14         Judge Jones, do you have questions of the
15   lawyers, Mr. Sacchet or Mr. Nomellini, on the law?
16         **JUDGE JONES:**  I did not.
17         **JUDGE RODGERS:**  Judge Herndon?
18         **JUDGE HERNDON:**  No, I have none.
19         **JUDGE RODGERS:**  Thank you both for hanging in
20   there as well.
21         Everyone have a nice rest of the evening,
22   safe travels back home, if you're traveling.  I hope
23   to hear from you by Monday on these issues that affect
24   choice of law and thus the summary judgments.
25         **MR. AYLSTOCK:**  Yes, Your Honor.

1          **JUDGE RODGERS:**  Thank you.

2          **(Proceedings concluded at 6:36 p.m.)**

3                    --------------------

4    I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled
5    matter.  Any redaction of personal data identifiers
     pursuant to the Judicial Conference Policy on Privacy
6    are noted within the transcript.

7

8    <u>**s/Donna L. Boland**</u>                          <u>**1-12-2021**</u>
     **Donna L. Boland, RPR, FCRR**                    **Date**
9    **Official Court Reporter**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 | **INDEX**

2 | **PAGE**

3

4 | **STEPHEN HACKER**
   | Direct Examination by Mr. Aylstock | 7
5 | Cross-Examination by Mr. Brock | 18
   | Redirect Examination by Mr. Aylstock | 37
6 | Examination by the Court | 40

7 | Eileen Hacker - Video Clip | 46

8 | Melissa Leccese - Video Clip | 48

9 | **LLOYD BAKER**
   | Direct Examination by Ms. Hutson | 53
10 | Cross-Examination by Mr. Wasdin | 65
   | Redirect Examination by Ms. Hutson | 87
11 | Court Examination | 91

12 | **EMILY KEEFER**
   | Direct Examination by Mr. Barr | 96
13 | Cross-examination by Mr. Nomellini | 101
   | Redirect Examination by Mr. Barr | 108
14
   | **DUSTIN MCCOMBS**
15 | Direct Examination by Ms. Hoekstra | 110
   | Cross-Examination by Mr. Brock | 116
16 | Redirect Examination by Ms. Hoekstra | 132

17 | **MARK PACKER**
   | Direct Examination by Mr. Pirtle | 136
18 | Cross-Examination by Mr. Wasdin | 154
   | Redirect Examination by Mr. Pirtle | 176
19
   | **LEWIS KEEFER**
20 | Direct Examination by Mr. Barr | 181
   | Cross-Examination by Mr. Nomellini | 195
21 | Redirect Examination by Mr. Barr | 201

22 | **BRIAN MYERS**
   | Direct Examination by Mr. Wasdin | 204
23 | Cross-Examination by Mr. Aylstock | 222
   | Redirect Examination by Mr. Wasdin | 275
24 | Examination by the Court | 278
   | Recross-Examination by Mr. Aylstock | 279
25

1

2                                    **INDEX**

3

4     **CHRISTOPHER SPANKOVICH**
          Direct Examination by Mr. Overholtz              282
          Cross-Examination by Mr. Nomellini              304
5         Redirect Examination by Mr. Overholtz           317
          Examination by the Court                        323
6         Recross-Examination by Mr. Nomellini            325

7     **MOISES ARRIAGA**
          Direct Examination by Ms. Hutson                329
8         Cross-Examination by Mr. Brock                  346

9

10

11    CERTIFICATE OF REPORTER                                408

12

13

14

15

16

17

18

19

20

21

22

23

24

25