IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG LITIGATION
LIABILITY LITIGATION

This Document Relates to:

*Lloyd Baker*
Case No. 7:20-cv-00039

*Luke E. Estes*
Case No. 7:20-cv-00137

*Stephen Hacker*
Case No. 7:20-cv-00131

*Lewis Keefer*
Case No. 7:20-cv-00104

*Dustin McCombs*
Case No. 7:20-cv-00094

CASE NO.: 3:19-MD-2885-MCR-GRJ

Chief Judge M. Casey Rodgers
Magistrate Judge Gary Jones

**CONFIDENTIAL - FILED
UNDER SEAL**

### DEFENDANTS' OMNIBUS MOTION TO EXCLUDE PLAINTIFFS' PUTATIVE EXPERT OPINIONS UNDER *DAUBERT* AND RULE 702 AND INCORPORATED MEMORANDUM IN SUPPORT THEREOF

Defendants 3M Company and Aearo move pursuant to Rule 702 and *Daubert*

to exclude the testimony and opinions, in whole or in part, of Plaintiffs' putative

experts Moises Arriaga, Eric Bielefeld, Althea Coetzee, Elizabeth Davis, David

Eddins, Timothy Edens, Marc Fagelson, John Franks, Blaine Huston, Robert

Johnson, Roger Juneau, Kristin Kucsma, Lawrence Lustig, David Madigan,


FILED USDC FLND PN
JAN 8 '21 AM9:04

Christopher Marshall, Richard McKinley, Mark Packer, Eric Rose, and Christopher Spankovich.  Specifically, Defendants move to exclude:

1.      All opinions that characterize or narrate fact evidence;

2.      All opinions regarding the law, including but not limited to those interpreting contracts, opining about Defendants' supposed duties to warn or disclose, asserting that Defendants violated federal labelling regulations, claiming that the CAEv2 is defective or unreasonably dangerous, or that Defendants were negligent or made misrepresentations;

3.      All opinions regarding the state of mind of Defendants, the military, or soldiers, including regarding intent, motive, knowledge, or reliance;

4.      Coetzee's opinions in their entirety;

5.      The opinions of Edens, Huston, and Marshall in their entirety;

6.      All opinions comparing the CAEv2 to other hearing protection devices;

7.      Eddins' opinions in their entirety;

8.      Juneau's opinions regarding his human ear replica, that the CAEv2's stem is too wide, and any opinions relying on conversations with companies that he did not disclose in his report;

9.     Franks' opinions regarding the NRR, fit, and testing of the CAEv2, that Aearo violated labelling regulations, and the CAEv2's testing under ANSI 12.6 Method B;

10.    Rose's opinions that the CAEv2 is defective or has an increased risk of being defective;

11.    The specific causation opinions of Spankovich regarding Estes, Hacker, and Keefer; Packer regarding Baker and Estes; Arriaga regarding Hacker and McCombs; Lustig regarding Keefer; and Fagelson regarding McCombs;

12.    Davis's earning-capacity and worklife-expectancy opinions;

13.    Kucsma's lost-earnings and fringe-benefit opinions;

14.    Johnson's opinions in their entirety;

15.    Opinions regarding "cochlear synaptopathy" or "hidden hearing loss" concerning Baker, Estes, Hacker, Keefer, and McCombs;

16.    Opinions regarding PTSD from Fagelson concerning McCombs, Arriaga concerning Hacker, and Packer concerning Baker;

17.    Arriaga's opinions regarding product testing, labelling, and design features;

18.    Bielefeld's opinions regarding economic loss and mental health;

19.    McKinley's opinions regarding ISO 9001;

20.    Packer's opinions regarding Baker's and Estes' comorbidities;

21.    McKinley's opinions regarding Defendants' Acoustic Resistance Checker ("ARC") box and quality assurance testing; and

22.    Any opinion from Madigan regarding causation.

Defendants' Motion is based upon the attached Memorandum in Support; the complete files and records of this action; and such other matters and arguments as may come before the Court.

# TABLE OF CONTENTS

**Page**

DEFENDANTS' OMNIBUS MOTION TO EXCLUDE
PLAINTIFFS' PUTATIVE EXPERT OPINIONS UNDER
*DAUBERT* AND RULE 702 ..............................................................1

TABLE OF CONTENTS....................................................................5

TABLE OF AUTHORITIES .............................................................11

MEMORANDUM IN SUPPORT OF MOTION ..................................21

INTRODUCTION ...........................................................................21

ARGUMENT ..................................................................................29

I.      Several Experts Impermissibly Act As Attorney Mouthpieces. ..................29

    A.      Summarizing Evidence Is Not Helpful Or Reliable
Opinion. ..............................................................................29

    B.      Experts Cannot Offer Legal Conclusions. .........................................37

    C.      State-of-Mind Opinions Are Impermissible.......................................43

II.     Plaintiffs' Military "Safety Culture" Experts Have No Valid
Basis For Their Opinions.................................................................45

    A.      Their "Safety Culture" Opinions Lack Any Methodology
Or A Sufficient Factual Basis.............................................................46

    B.      Their Opinions Do Not Account For Objective,
Empirical Evidence Establishing Many Soldiers Did Not
Use Hearing Protection. ......................................................51

    C.      Their Opinions Impermissibly Speculate About Soldiers'
State Of Mind. .......................................................................54

D.   Their Opinions Do Not "Fit" With The Facts Of Any
     Plaintiff. ...........................................................................54

III.   Plaintiffs' Hearing Testing Experts' Opinions Use Unreliable
       Methodologies That Do Not Fit The Facts Of This Case.............................56

A.   Plaintiffs' Experts' Evaluations of the CAEv2 Are
     Unreliable. ........................................................................56

B.   The Opinions Of David Eddins And Robert Juneau
     Should Be Excluded. ............................................................58

     1.   Testing On The Eddins Plug Is Unreliable And
          Does Not Support Eddins' Opinions. ..........................................60

     2.   Testing On The Ear Replicas Is Unreliable And
          Does Not Support Eddins' Or Juneau's Opinions. .................67

     3.   REAT Testing On "Naïve" Test Subjects Does Not
          Support Eddins' Opinions. ....................................................74

C.   Certain of Juneau's Other Opinions Should Be Excluded. .................76

     1.   Juneau's Opinion That The CAEv2's Stem Is Too
          Wide Is Not Helpful Or Based On Accurate Data. ...................76

     2.   Juneau Should Not Be Allowed To Offer Opinions
          Based On Undisclosed Information. .........................................77

D.   Certain Of Franks' Opinions Are Unreliable, Without
     Foundation, Or Have Been Disavowed. ..........................................78

     1.   Franks' Opinion That The NRR For The Green
          End Of The CAEv2 Is Inaccurate Is Inadmissible. .................78

     2.   Franks' Opinion That Certain Test Subjects
          Received Inadequate Fits Is Inadmissible. ...............................80

          a.   Franks Admits that He Identified Inconsistent Fits,
               Not Poor or Inadequate Fits. ..........................................80

    b.  Franks' Methodology Has No Scientific Basis. .............81

  3.  Franks' Defect Opinions Are Inadmissible. ............................82

  4.  Franks' Opinion That Defendants Violated EPA Labelling Regulations Is Inadmissible......................................83

  5.  Franks' Opinion That Method B Testing Shows The CAEv2 Provides Inadequate Attenuation Is Inadmissible Because He Provides No Basis For Comparison. ................................................................83

 E.  Eric Rose Lacks Any Methodology Or Basis For Opining Regarding Alleged Product Defects.....................................................84

  1.  Rose Did Not Use Any Methodology To Determine Whether The CAEv2 Has An Increased Risk Of Defects Or Is Defective. ...............................................84

  2.  Rose's Opinions Do Not "Fit" The Case Because He Lacks Evidence That Plaintiffs Used A Defective CAEv2. ....................................................................86

  3.  Rose's Opinions That Aearo's Design Process Increased The Risk Of Product Defects Are Vague And Unspecific. ..........................................................87

  4.  Rose's Opinions Concerning The CAEv2 Being Defective And Unreasonably Dangerous Are Impermissible Legal Opinions.................................................88

IV. Plaintiffs' Experts' Differential Diagnoses Are Unreliable. .........................89

 A.  Other Hearing Protection ....................................................89

 B.  Keefer's Early-Onset Progressive Hearing Loss. ...............94

 C.  Hacker's Existing Hearing Loss And Head Trauma..........................95

V.    Plaintiffs' Economic Loss Experts Lack Any Reliable
      Methodology Reasonably Applied To The Facts..........................98

      A.    Davis And Kucsma's Opinions On Earning Capacity And
            Worklife Capacity Should Be Excluded. .............................98

            1.    Davis's Opinions Are Not Tied To The Facts. .........................98

            2.    Davis Does Not Use A Reliable Methodology.......................101

                  a.    The Gibson Paper Is Unreliable. ...................101

                  b.    Davis Failed To Follow The Gibson Paper. .................104

            3.    Kucsma Relies Entirely On Davis's Unreliable
                  Opinions. ...............................................107

            4.    Kucsma's Fringe Benefits Opinion Is Unreliable...................108

      B.    Johnson Simply Copies Publicly Financial Figures
            Without Any Analysis Or Expert Opinion........................109

VI.   Hidden Hearing Loss Opinions Do Not Fit Plaintiffs' Facts. ....................112

      A.    There Is No Fit Between The HHL Opinions of Arriaga,
            Bielefeld, Packer, and Spankovich And Plaintiffs' Cases. ..............112

            1.    Arriaga Does Not Opine That Hacker or McCombs
                  Have HHL. ..............................................113

            2.    Packer Does Not Opine That Baker Or Estes Have
                  HHL......................................................114

            3.    Spankovich Does Not Opine That Estes, Hacker,
                  or Keefer Have HHL.................................115

            4.    Bielefeld Did Not Testify That Any Plaintiff Has
                  HHL......................................................116

      B.    Fagelson's HHL Opinions Lack *Any* Support..................116

8

        1.    Fagelson Fails To City *Any* Study Or Literature Regarding HHL In His Report. ................................. 116

        2.    Fagelson's Uncited Animal Studies Cannot Support The Existence Of HHL In Humans. .......................... 117

    C.    Fagelson's Opinion That McCombs Has Issue "Consistent With" HHL Is Unhelpful And Not Based On Any Methodology. ................................................................ 118

        1.    Opining That A Person Has Issues "Consistent With" HHL Is Unhelpful To The Trier Of Fact. .................... 118

        2.    Fagelson's McCombs Opinion Is Subjective, Untested, And Is Not Based On Any Reliable Methodology. ........................................................................ 120

VII.   Plaintiffs' Experts' Opinions Regarding PTSD Are Speculative And Inadmissible. ....................................................................... 122

    A.    Fagelson, An Audiologist, Lacks The Qualifications To Opine About Medical Conditions Such As PTSD Or Sleep Disorders. ................................................................ 122

    B.    Arriaga's Opinions Relating To Hacker's PTSD Should Be Excluded As Hacker's Symptoms Are Below The Threshold For PTSD. ............................................................. 123

    C.    Packer's Opinion Regarding Baker's PTSD Are Speculative And Not Based On Sufficient Facts. ............................. 124

VIII.  Other Experts Offer Opinions Beyond The Scope Of Any Expertise. ...................................................................................... 125

    A.    Arriaga Is Not Qualified To Offer Opinions Regarding Product Testing, Labeling, Or Design Features. ............................... 125

    B.    Bielefeld's Opinions About Employment Rates, Earning Capacity, Mental Health Issues And Dementia Are Improper And Inadmissible. ............................................... 126

1.  Bielefeld Is Not An Expert In Economics, Psychology, or Dementia. .......................................127

2.  Bielefeld Utilized No Methodology And Provided No Analysis Or Explanation, So His Opinions Are Unreliable Ipse Dixit. ..............................................128

C.  McKinley Has No Expertise In ISO 9001 .......................................132

IX.  Other Opinions Should Be Excluded. ..........................................133

A.  Packer's Opinions Regarding Estes' Or Baker's Comorbidities Are Speculative And Unreliable. .............................133

B.  McKinley's Opinions About Defendants' Quality Testing Program Should Be Excluded. .........................................134

C.  Madigan Should Not Be Allowed To Testify Regarding Causation. ..............................................................135

CONCLUSION ......................................................................136

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addison v. Arnett*,
    2016 WL 1441803 (S.D. Ga. Apr. 12, 2016) ..............................................121

*Allison v. McGhan Med.*,
    184 F.3d 1300 (11th Cir. 1999) ........................................... 59, 114, 118, 133

*Alsadi v. Intel*,
    2019 WL 4849482 (D. Ariz. Sept. 30, 2019) ............................................119

*Amorgianos v. Nat'l R.R. Passenger*,
    303 F.3d 256 (2d Cir. 2002) ............................................................ 117, 121

*Arevalo v. Coloplast*,
    2020 WL 3958505 (N.D. Fla. July 7, 2020)..................................................41

*Barber v. United Airlines*,
    17 F. App'x 433 (7th Cir. 2001)..................................................................36

*Bliss v. BNSF Ry.*,
    2013 WL 5570231 (D. Neb. Oct. 9, 2013)..................................................50

*Brown v. Burlington Santa Fe*,
    765 F.3d 765 (7th Cir. 2014) ........................................................... 105, 121

*Burkhart v. Washington Metro.*,
    112 F.3d 1207 (D.C. Cir. 1997).....................................................................38

*Cates v. Whirlpool*,
    2017 WL 1862640 (N.D. Ill. May 9, 2017)..................................................53

*Chrysler Credit v. Whitney Nat'l Bank*,
    824 F. Supp. 587 (E.D. La. 1993)..................................................................39

*Ciomber v. Coop. Plus, Inc.*,
    527 F.3d 635 (7th Cir. 2008) ....................................................................125

*City of Tuscaloosa v. Harcros Chems.*,
    158 F.3d 548 (11th Cir. 1998) ..................................................... 29, 30, 122

*Commodores Entm't v. McClary*,
    879 F.3d 1114 (11th Cir. 2018) ...................................................................38

*Companhia Energetica Potiguar v. Caterpillar*,
    2016 WL 7507848 (S.D. Fla. Aug. 1, 2016) ...............................................37

*Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cnty.*,
    402 F.3d 1092 (11th Cir. 2005) ........................................................... 87, 118

*Cordoves v. Miami-Dade Cnty.*,
    104 F. Supp. 3d 1350 (S.D. Fla. 2015) .......................................................38

*Coyote Portable Storage v. PODS Enters.*,
    2011 WL 1870593 (N.D. Ga. May 16, 2011) .............................................39

*Daubert v. Merell Dow Pharms.*,
    509 U.S. 579 (1993).............................................................................112, 117

*Daubert v. Merrell Dow Pharms.*,
    43 F.3d 1311 (9th Cir. 1995) ......................................................................59

*EEOC v. Freeman*,
    778 F.3d 463 (4th Cir. 2015) ............................................................... 36, 56

*Fail-Safe, v. A.O. Smith*,
    744 F. Supp. 2d 870 (E.D. Wis. 2010) .......................................................53

*Figurski v. Trinity*,
    2015 WL 966269 (Mich. Ct. App. Mar. 5, 2015)*,*
    *vacated in part*, 876 N.W.2d 574 (2016)..................................................103

*Gen. Elec. v. Joiner*,
    522 U.S. 136 (1997)............................................................. 47, 84, 117, 118

*Guinn v. AstraZeneca Pharms.*,
    602 F.3d 1245 (11th Cir. 2010) ............................................................ passim

*Hathaway v. Bazany*,
    507 F.3d 312 (5th Cir. 2007) .......................................................................46

*Hendrix v. Evenflo*,
    609 F.3d 1183 (11th Cir. 2010) ............................................................ 89, 97

*Henry v. St. Croix Alumina*,
    572 Fed. App'x 114 (3d Cir. 2014) ............................................................59

*Herman v. Seaworld Parks & Entm't*,
    320 F.R.D. 273 (M.D. Fla. 2017) ...............................................................39

*Highland Capital Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005) .......................................................44

*Hooten v. City of Hondo*,
    2006 WL 5159387 (W.D. Tex. June 8, 2006) ..........................................122

*Hughes v. GEICO Gen. Ins. Co.*,
    2017 WL 7000273 (M.D. Fla. Aug. 31, 2017),
    *decision clarified on reconsideration*,
    2018 WL 490506 (M.D. Fla. Jan. 19, 2018) ..............................................77

*In re Air Crash Disaster at New Orleans, La.*,
    795 F.2d 1230 (5th Cir. 1986) .....................................................................30

*In re C. R. Bard Pelvic Repair Sys. Prod. Liab. Litig.*,
    2018 WL 4212409 (S.D. W. Va. Sept. 4, 2018) .........................................41

*In re C.R. Bard Pelvic Repair Sys. Prod. Liab. Litig.*,
    948 F. Supp. 2d 589 (S.D. W. Va. 2013) .................................................109

*In re C.R. Bard Pelvic Repair Sys. Prods. Liab. Litig,*,
    2018 WL 4220602 (S.D.W. Va. 2018)..................................................41, 88

*In re Connolly*,
    398 B.R. 564 (E.D. Mich. 2008) ...............................................................111

*In re Deepwater Horizon BELO Cases*,
    2020 WL 6689212 (N.D. Fla. Nov. 4, 2020) ...................................... 76, 117

*In re Ethicon Pelvic Repair Sys. Prod. Liab. Litig.*,
    2020 WL 774234 (S.D.W. Va. Feb. 13, 2020)................................................42

*In re Heparin Prod. Liab. Litig.*,
    2011 WL 1059660 (N.D. Ohio Mar. 21, 2011)...................................... 44, 50

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
    341 F. Supp. 3d 213, 242 (S.D.N.Y. 2018),
    *aff'd*, 982 F. 3d 113 (2d Cir. 2020)...................................................................53

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...................................................... passim

*In re Trasylol Prods. Liab. Litig.*,
    709 F. Supp. 2d 1323 (S.D. Fla. 2010)........................................... 29, 43, 45

*Israel Travel Advisory Serv. v. Israel Identity Tours*,
    1993 WL 387346 (N.D. Ill. Sept. 23, 1993)................................................111

*Jinro Am. v. Secure Invs.*,
    266 F.3d 993 (9th Cir. 2001),
    *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001) ...........50

*Joffe v. King & Spalding*,
    2019 WL 4673554 (S.D.N.Y. Sept. 24, 2019) ...........................................108

*Johnson v. Manitowoc Boom Trucks*,
    484 F.3d 426 (6th Cir. 2007) ........................................................................59

*Jones Creek Invs. v. Columbia Cnty.*,
    2013 WL 12141348 (S.D. Ga. Dec. 23, 2013)...........................................111

*Jones v. Novartis Pharmaceutials Corp.*,
    235 F. Supp. 3d 1244 (N.D. Ala. 2017) ................................................ 93, 95

*Kia v. Imaging Sci. Int'l*,
    2010 WL 3431745 (E.D. Pa. Aug. 30, 2010)...............................................109

*Kilpatrick v. Breg*,
    613 F.2d 1329 (11th Cir. 2010) ........................................... 89, 117, 118, 133

*King v. Cessna Aircraft*,
    2010 WL 1980861 (S.D. Fla. May 18, 2010)............................ 43, 46, 48, 81

*Klaczak v. Consol. Med. Transp.*,
    2005 WL 1564981 (N.D. Ill. May 26, 2005)..................................................44

*Kohl v. Young*,
    2018 WL 3104447 (N.D.N.Y. June 22, 2018) ...........................................108

*Kolesar v. United Agri Prods*,
    412 F. Supp. 2d 686 (W.D. Mich. 2006),
    *aff'd*, 246 F. App'x 977 (6th Cir. 2007) ......................................................119

*Kondash v. Kia Motors Am.*,
    2020 WL 5816228 (S.D. Ohio Sept. 30, 2020)....................................... 57, 83

*Kumho Tire v. Carmichael*,
    526 U.S. 137 (1999)......................................................................... 34, 46

*Lachney v. Target*,
    2010 WL 11570518 (W.D. Okla. Apr. 12, 2010) .........................................50

*Lackey v. Bosch*,
    2017 WL 129891 (E.D. Ky. Jan. 12, 2017)..................................................102

*Lee-Bolton v. Koppers*,
    319 F.R.D. 346 (N.D. Fla. 2017)........................................................ 46, 119

*Louis Vuitton Malletier v. Dooney & Bourke*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................ 122, 127

*Mahli v. Admiral Ins.*,
    2015 WL 4915701 (S.D. Miss. Aug. 18, 2015) ...........................................88

*McClain v. Metabolife Int'l*,
    401 F.3d 1233 (11th Cir. 2005) ........................................... 86, 114, 124, 129

*McDowell v. Brown*,
    392 F.3d 1283 (11th Cir. 2004) ............................................................. passim

*MDG Int'l v. Australian Gold*,
    2009 WL 1916728 (S.D. Ind. June 29, 2009) .................................................53

*Michigan Millers Mut. Ins. v. Benfield*,
    140 F.3d 915 (11th Cir. 1998) ........................................................................86

*Mid-State Fertilizer v. Exch. Nat'l Bank of Chicago*,
    877 F.2d 1333 (7th Cir. 1989) ............................................................. 85, 128

*Montgomery v. Aetna Cas. & Sur.*,
    898 F.2d 1537 (11th Cir. 1990) ............................................................. 37, 39

*Moore v. Wright Med. Tech.*,
    2016 WL 1316716 (S.D. Ga. Mar. 31, 2016)................................................57

*Morton v. Gov't Employees Ins.*,
    2019 WL 4739418 (S.D. Fla. Aug. 2, 2019) ...............................................119

*Nemeth v. Citizens Fin. Grp.*,
    2012 WL 3278968 (E.D. Mich. Aug. 10, 2012) .........................................122

*Noel v. Inland*,
    2018 WL 1911821 (E.D. La. Apr. 23, 2018) ..............................................102

*Ohio State Troopers Ass'n, v. Point Blank Enters.*,
    2020 WL 1666763 (S.D. Fla. Apr. 3, 2020)..................................................29

*Omar v. Babcock*,
    177 F. App'x 59 (11th Cir. 2006)..................................................................43

*Paz v. Brush Engineered Materials*,
    555 F.3d 383 (5th Cir. 2009) .......................................................................123

*Pensacola Beach Cmty. United Church. v. Nat'l Union Fire Ins.*,
    2007 WL 9735727 (N.D. Fla. Mar. 9, 2007)..................................... 113, 128

*Piper v. Mo. Pac. R.R.*,
  847 S.W.2d 907 (Mo. Ct. App. 1993) .........................................................119

*Plott v. NCL Am.*,
  786 F. App'x 199 (11th Cir. 2019).................................................................88

*PODS Enters. v. U–Haul Int'l*,
  2014 WL 12628606 (M.D. Fla. July 7, 2014)...............................................43

*Quattry v. Covington Specialty Ins.*,
  2019 WL 7423548 (M.D. Fla. Oct 30, 2019).................................................60

*Quevedo v. Iberia, Lineas Aereas De Espana*,
  2018 WL 4932097 (S.D. Fla. Oct. 11, 2018) .................................................54

*Rider v. Sandoz Pharms.*,
  295 F.3d 1194 (11th Cir. 2002) ........................................................... 59, 129

*Rosen v. Ciba–Geigy*,
  78 F.3d 316 (7th Cir. 1996) ...........................................................................59

*Russo v. Ballard Med. Prods.*,
  2006 WL 2345868 (D. Utah Aug. 10, 2006)..................................................40

*Sackman v. Balfour Beatty Communities*,
  2014 WL 4415938 (S.D. Ga. Sept. 8, 2014) ...............................................121

*Salgado by Salgado v. Gen. Motors*,
  150 F.3d 735 (7th Cir. 1998) ............................................................. 113, 125

*Salinero v. Johnson & Johnson*,
  2019 WL 7753453 (S.D. Fla. Sept. 5, 2019)................................................133

*Scentsational Techs. v. Pepsi*,
  2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018),
  *aff'd* 773 F. App'x 607 (Fed. Cir. 2019) ................................................ 30, 50

*Schaefer-Condulmari v. U.S. Airways Grp.*,
  2012 WL 2920375 (E.D. Pa. July 18, 2012) ................................................123

*SEC v. Tourre*,
　　950 F. Supp. 2d 666 (S.D.N.Y. 2013) ...........................................................30

*Se-Kure Controls v. Diam USA*,
　　2009 WL 77463 (N.D. Ill. Jan. 9, 2009)........................................................39

*Siharath v. Sandoz Pharm.*,
　　131 F. Supp. 2d 1347 (N.D. Ga. 2001)........................................................129

*Silicon Knights v. Epic Games*,
　　2011 WL 6748518 (E.D.N.C. Dec. 22, 2011)..............................................121

*Small v. Amgen*,
　　723 F. App'x 722 (11th Cir. 2018)..............................................................134

*Smith v. Wyeth-Ayerst Labs.*,
　　278 F. Supp. 2d 684 (W.D.N.C. 2003)..........................................................42

*Sorrels v. NCL (Bahamas)*,
　　796 F.3d 1275 (11th Cir. 2015)....................................................................86

*Strong v. E. I. DuPont de Nemours*,
　　667 F.2d 682 (8th Cir. 1981).......................................................................88

*Tillman v. C.R. Bard*,
　　96 F. Supp. 3d 1307 (M.D. Fla. 2015) ................................................... 40, 41

*Trevino v. Bos. Sci. Corp.*,
　　2016 WL 2939521 (S.D. W. Va. May 19, 2016) .............................. 125, 126

*Trilink Saw Chain, LLC v. Blount*,
　　583 F. Supp. 2d 1293 (N.D. Ga. 2008).......................................................132

*Tyree v. Boston Sci.*,
　　54 F. Supp. 3d 501 (S.D.W. Va. 2014) .................................................. 40, 42

*United States v. City of Miami*,
　　115 F.3d 870 (11th Cir. 1997) .....................................................................87

*United States v. Crosby*,
713 F.2d 1066 (5th Cir. 1983) ....................................................122

*United States v. Dukagjini*,
326 F.3d 45 (2d Cir. 2003) .........................................................111

*United States v. Frazier*,
387 F.3d 1244 (11th Cir. 2004) ............................................ passim

*United States v. Freeman*,
730 F.3d 590 (6th Cir. 2013) .........................................................30

*United States v. Hawkins*,
934 F.3d 1251 (11th Cir. 2019) ....................................................29

*Valador, Inc. v. HTC*,
242 F. Supp. 3d 448 (E.D. Va. 2017) ...........................................59

*Valente v. Textron*,
931 F. Supp. 2d 409 (E.D.N.Y. 2013) ........................ 61, 66, 72, 73

*Walker v. Blitz USA*,
663 F. Supp. 2d 1344 (N.D. Ga. 2009).........................................76

*Wal-Mart Stores v. Dukes*,
564 U.S. 338 (2011)......................................................................50

*Wheeler v. Blackbear*,
2013 WL 3323385 (M.D. Fla. July 1, 2013)...............................110

*Whiting v. Boston Edison*,
891 F. Supp. 12 (D. Mass. 1995)................................................127

*Wolfe v. McNeil-PPC*,
881 F. Supp. 2d 650 (E.D. Pa. 2012)...........................................42

*Wu v. Miss. State Univ.*,
2014 WL 5799972 (N.D. Miss. Nov. 7, 2014).............................88

*Zanakis v. Scanreco*,
2019 WL 2215554 (S.D. Fla. 2019) ............................................................40

**Rules**

Fed. R. Civ. P. 26(a)(2)(B)(i)..................................................................113

Fed. R. Evid. 702 ...................................................................................122

## MEMORANDUM IN SUPPORT OF MOTION

## INTRODUCTION

Plaintiffs' putative experts offer opinions that are barred as a matter of law, use unreliable methodologies or none whatsoever, and are divorced from the facts of these five Plaintiffs.  Defendants move to exclude their opinions in whole or in part as described herein.[1]

*First*, several of Plaintiffs' experts—including Coetzee, Lustig, Packer, Arriaga, Bielefeld, Spankovich, Eddins, and Franks—act in whole or in part as attorney mouthpieces rather than applying any legitimate expertise.  Such experts review documents and testimony and purport to testify about what such fact evidence means.  Myriad courts have held that expert narration or characterization of evidence is improper because it lacks any methodology, is not based on any expertise, and is not helpful to the jury.  Defendants move to exclude all opinions narrating or characterizing fact evidence, including but not limited to Coetzee's opinions in their

---

[1] Internal quotation marks, citations, modifications (such as ellipses or brackets), and deposition objections are omitted from quotes unless otherwise indicated.  To avoid repetition, this memorandum uses *supra* and *infra* to cross-reference the pages herein containing relevant case law and other authorities.  For convenience, Plaintiffs' putative experts are referred to as "experts" in the remainder of this memorandum, with Defendants reserving and not waiving all arguments that those putative experts lack qualifications or should otherwise be excluded.

entirety and portions of the opinions of Lustig, Packer, Arriaga, Bielefeld, Spankovich, and Eddins.

Many of these same experts offer legal opinions, such as interpreting contracts, opining about Defendants' supposed duties to warn or disclose, asserting that Defendants violated federal labelling regulations, claiming that the CAEv2 is defective or unreasonably dangerous, or that Defendants were negligent or made misrepresentations. Black-letter law holds that such opinions are impermissible as a matter of law, as only the Court should instruct the jury regarding the law. Defendants move to exclude all legal opinions, including but not limited to Coetzee's opinions in their entirety and portions of the opinions of Lustig, Packer, Arriaga, and Franks.

Such experts also offer opinions regarding the state of mind of Defendants, the military, or soldiers, such as what the Defendants allegedly "knew" about the CAEv2 or that the military and soldiers "relied" on Aearo regarding the CAEv2. The Eleventh Circuit and other courts hold that state-of-mind opinions, including those regarding intent, motive, or knowledge are improper on multiple grounds, including a lack of any methodology, lack of any expertise, and unhelpfulness. Defendants move to exclude all opinions regarding the state of mind of any

corporation, organization, or person, including but not limited to those contained in the opinions of Arriaga, Coetzee, Packer, and Lustig.

*Second*, Plaintiffs offer the opinions of three retired military personnel—Edens, Huston, and Marshall—to opine that the Army has a supposed culture of safety that extends to hearing protection. Their opinions lack any methodology. Nor can they be supported by the limited experience of each expert, who had minimal involvement, if any, with hearing protection. Their opinions also do not consider objective, empirical evidence demonstrating that many soldiers do not use hearing protection. Defendants move to exclude the opinions of Edens, Huston, and Marshall in their entirety.

*Third*, various experts such as McKinley, Packer, and Eddins do not use a reliable methodology in purporting to compare the CAEv2 to other hearing protection devices. They did not compare data between the CAEv2 and other devices, nor conduct testing of other devices. Defendants move to exclude Plaintiffs' experts' comparisons of the CAEv2 and other hearing protection devices, including portions of the opinions of Eddins, Packer, and McKinley.

Eddins' opinions should be excluded in their entirety because they are based on novel methodologies developed for the purpose of this litigation, or methodologies that do not apply to these Plaintiffs. For example, Eddins performed

23

testing on (1) a new earplug he created that differs from the CAEv2, (2) a human ear replica he developed with Juneau that is not anatomically correct, and (3) subjects that are inexperienced with earplugs. Juneau's opinions regarding his human ear replica likewise should be excluded.

Additional Juneau opinions should be excluded. Juneau opines that the CAEv2's stem is too wide, but this is based on female ear canals and he did not know whether a representative sample would affect his measurements. Juneau also testified regarding conversations with companies that he did not disclose in his report; all opinions based on them should be excluded.

Franks opines that (1) the 22 NRR for the green end of the CAEv2 is inaccurate; (2) certain REAT subjects obtained poor fits with the CAEv2; (3) REAT testing reveals certain design defects in the CAEv2; (4) Aearo violated applicable EPA labelling regulations; and (5) the CAEv2's performance on Aearo's Method B test was deficient. These opinions are inadmissible for faulty methodology or being based on Franks' *ipse dixit*.

Rose opines that Defendants' alleged departure from industry standards increased the risk of the CAEv2 being defective and that the CAEv2 was defective, but he lacks any methodology for those opinions, lacks any evidence that Plaintiffs used a CAEv2 with the supposed defects he alleges, his increased-the-risk opinion

24

is vague and will not help the trier of fact, and these opinions are impermissible legal conclusions.  Therefore, Rose's opinions on these topics should be excluded.

*Fourth*, the opinions of Plaintiffs' medical causation experts should be excluded because they fail to take serious account of alternative causes, such as other hearing protection devices, other noise exposures, and prior medical histories. Defendants move to exclude the specific causation opinions of Spankovich regarding Estes, Hacker, and Keefer; Packer regarding Baker and Estes; Arriaga regarding Hacker and McCombs; Lustig regarding Keefer; and Fagelson regarding McCombs.

*Fifth*, Plaintiffs' economic loss expert Davis uses an unpublished paper to estimate Plaintiffs' earning capacity and worklife expectancy, but this paper only applies to those who are deaf or having serious difficulty hearing (which Plaintiffs do not).  The paper does not consider facts Davis concedes are important, such as age, occupation, and veteran status.  Moreover, Davis did not follow the paper, as she did not consider each Plaintiff's education level in determining their earning capacity, which would have shown no reduction in earning capacity for Keefer or McCombs.  Defendants move to exclude Davis's earning-capacity and worklife-expectancy opinions.

Kucsma opines on the value of Plaintiffs' lost earnings relying entirely on Davis, and thus Kucsma's lost earning opinion falls with Davis.  Kucsma also opines about Plaintiffs' fringe benefits, but uses a national average instead of accounting for each Plaintiff's occupation, geography, and other relevant facts.  Defendants move to exclude Kucsma's earning-capacity and fringe-benefit opinions.[2]

Johnson simply copies financial figures from 3M's publicly available financials without offering any opinion about what those figures mean.  Such a regurgitation of factual information through an expert is not helpful to the jury.  Defendants move to exclude Johnson's opinion in its entirety.

*Sixth*, Arriaga, Bielefeld, Fagelson, Packer, and Spankovich opine regarding the hypothesis of "cochlear synaptopathy" or "hidden hearing loss" ("HHL"), which posits that there may be hearing loss not detectable by a standard audiogram, but these opinions do not fit the facts of any of the five Plaintiffs here.  Arriaga, Bielefeld, Packer, and Spankovich did not include in their case-specific opinions that any of the five Plaintiffs has HHL, and thus are barred from offering any such testimony at trial.

---

[2] Plaintiffs have withdrawn Davis' opinions related to household services and Kucsma's opinions on household services, childcare services, and support and accompaniment for each Plaintiff.

Fagelson asserts that Plaintiff McCombs has issues "consistent with" HHL, but does not cite *any* support for HHL in his report, and thus has no basis for his opinion. Furthermore, his "consistent with" opinion is vague and will not help the jury.

Defendants move to exclude all opinions regarding cochlear synaptopathy or HHL as to Baker, Estes, Hacker, Keefer, and McCombs, including from Arriaga, Bielefeld, Fagelson, Packer, or Spankovich.

*Seventh*, the opinions of Fagelson, Arriaga, and Packer regarding individual Plaintiffs' supposed PTSD should be excluded. Fagelson is an audiologist who lacks the qualifications to opine about McCombs' alleged PTSD or sleeping disorders. Arriaga opines that the CAEv2 aggravated Hacker's PTSD, but no expert will opine that Hacker even has PTSD. Packer's opinion that Baker's hearing loss "may" impact his PTSD is speculative and not based on any methodology or analysis.

*Eighth*, some Plaintiffs' experts offer opinions beyond their expertise. Arriaga is not an engineer and has not conducted REAT testing or computed an NRR, and thus is unqualified to offer opinions regarding product testing, labeling, or design features. Bielefeld is an audiologist, but at his deposition purported to offer opinions regarding the relationship between hearing loss and economic loss or mental health. He is not an economist or psychiatrist and lacks the expertise to offer

such opinions, which are without foundation in any event. Defendants move to exclude any opinion from Bielefeld regarding economic loss or mental health.

Similarly, McKinley opines that Aearo did not comply with ISO 9001 standards, but lacks experience with ISO 9001. Defendants move to exclude McKinley's opinion regarding ISO 9001.

*Ninth*, certain other expert opinions should be excluded. Packer opines that Baker and Estes have comorbidities that are projected to or may possibly impact their alleged hearing impairments. Such opinions are speculative and lack foundation, and Defendants move to exclude them.

McKinley opines about alleged deficiencies in Defendant's quality assurance testing program using ARC box testing, but admits he has no personal experience with ARC box testing and does not know what effect the supposed deficiencies would have on product performance. Defendants move to exclude McKinley's opinions regarding Defendants' ARC box and quality assurance testing.

Madigan is a statistician who opines that Aearo's REAT testing of the CAEv2 yielded results with statistically significant differences. While his report suggested these differences were caused by folding the CAEv2's flanges, he admitted he was not giving a causation opinion. Defendants move to exclude any opinion from

28

Madigan that folding the CAEv2's flanges causes any statistically significant differences.

## ARGUMENT

## I.   Several Experts Impermissibly Act As Attorney Mouthpieces.

Six of Plaintiffs' experts—Coetzee, Lustig, Packer, Arriaga, Bielefeld, and Spankovich—purport to provide "opinions" that only impermissibly narrate the factual record, offer legal conclusions, or speculate as to Defendants' state of mind. But experts cannot let "testimony … become[] argument." *United States v. Hawkins*, 934 F.3d 1251, 1265-66 (11th Cir. 2019), and none of these purported opinions are helpful, reliable, or within the experts' qualifications.

### A.   Summarizing Evidence Is Not Helpful Or Reliable Opinion.

Several experts opine that the CAEv2 was defective only on the basis of their own view of particular documents or testimony, not any testing, analysis, or personal knowledge.   But "[s]imply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702." *Ohio State Troopers Ass'n, v. Point Blank Enters.*, 2020 WL 1666763, at *15 (S.D. Fla. Apr. 3, 2020); *see also City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 565 (11th Cir. 1998) (expert's "characterizations of documentary evidence" is inadmissible); *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1337 (S.D. Fla. 2010) (holding that "opinions fall

outside the proper scope of expert testimony [where] they consist of a narrative of selected regulatory events and a summary of [defendant's] internal documents"); *SEC v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) (expert opinion cannot become a "vehicle for factual narrative").  This variety of "opinion" is not helpful: "the trier of fact is entirely capable of determining whether or not to draw such conclusions without ... experts." *Tuscaloosa*, 158 F.3d at 565.  And it is not "traceable to a reliable methodology," either. *Scentsational Techs. v. Pepsi*, 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018).  Indeed, "acting … as a narrator" does not even "convey opinions that are based on an expert's knowledge and expertise," *id.*, and much of the opinions discussed subsequently fall wide of the expert's qualifications.  The prohibition on experts providing factual narrative and characterization of documents or testimony also maintains the distinction between an expert and an attorney advocate.  The "trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument." *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986); *see also United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004); *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013).

*Arriaga:*  In his non-litigation practice, Arriaga does not "have internal company access on a routine basis."  Ex97, Arriaga Dep2. 373:20-375:14. In his

report, however, Dr. Arriaga cites dozens of cherry-picked internal 3M documents and offers speculative opinions relating to the company's conduct. For example, Arriaga states that "[i]t did not 'occur' to 3M that it did not have any data on the earplug until four months after it started selling the earplugs to the military." Ex14, Arriaga General Report 46 (citing 3M_MDL000257805). And he asserts that "3M had no idea whether the CAEv2 was safe and effective when it started selling it." *Id.* He has no scientific basis to draw these or any other such conclusions beyond reading the same documents a lay jury can.

*Bielefeld*:  Bielefeld opines that the CAEv2 was defective, but again relies only on characterizing documentary evidence: "the flange memo spoke for itself." Ex3, Bielefeld Dep. 420:18-421:8. This narration is neither helpful nor necessary. And it again falls outside Bielefeld's expertise:  Bielefeld has never researched hearing protection device ("HPDs"), *id.* 30:1-14, is not an expert on earplug testing, *id.* 34:6-15, has no earplug design experience, *id.* 31:20-23, has never tested an HPD to determine whether it is defective, *id.* 33:13-17; 311:17-20, and has never advised as to whether an earplug is correctly designed before this case, *id.* 33:13-17.

Other opinions, including that 3M failed to give a warning, or that "3M did not share their full test reports," are similarly inadmissible because they rely on narration and have nothing to do with Bielefeld's training. *See*, *e.g.*, Ex4, Bielefeld

Report at 68 ("[t]he evidence indicates that 3M did not share their full test reports or internal documentation about the plug's weaknesses with either the military or other end users."); *see also* Ex4, Bielefeld Dep. 333:20-334:1 (admitting that he is not an expert on warnings or instructions or what training on the plug occurred in the military).

*Coetzee***:**  Coetzee's report contains an entire section—titled "Aearo Did Not Provide What Was Promised"—for which she reviewed no scientific or peer-reviewed literature and conducted no tests or experiments.  Ex5, Coetzee Dep. 30:12–16.  Rather, the opinions in this section are "based on" her review of the "documents and the facts that I pulled from them."  *Id.* 191:2-192:5; *see also id.* 94:13-16, 109:3-110:6, 115:19-116:5, 139:17-140:10.  Like other experts, Coetzee concludes that the CAEv2 is defective simply by reviewing the Flange Memo.  *Id.* 81:1–8.

Coetzee is unqualified to offer these opinions in any event.  She opines that Aearo's acoustical resistance testing violated its contract with the government, Ex6, Coetzee Report 7–8; Ex6, Coetzee Dep. 205:11–22, 253:11–254:7, but she has no experience with acoustical resistance testing, or with HPDs in general.  Ex5, Coetzee Dep. 81:1-8, 84:1-5, 244:12–249:3.  She opines that Aearo "weaken[ed] its testing parameters, giving a false impression (while continuing to sell the CAEv2) that the

failure rate on the CAEv2 was minimal," Ex6, Coetzee Report 9, but admitted that she had no idea what the change in these testing parameters meant because she was "not an audiologist," Ex5, Coetzee Dep. 256:1-18; *see also id.* 261:9-13. She has never tested HPDs, and indeed, could not even describe the functions of each side of the CAEv2 at issue in this case. *Id.* 81:1-8, 84:1–5.

***Lustig:*** Lustig (a treating physician) offers opinions regarding "CAEv2's design defects and 3M's negligence, misrepresentations, and failure to warn of the CAEv2's inadequate hearing protection." Ex1, Lustig Report 44. He opines that the CAEv2 had "variability of attenuation levels" and is a "defective product," *id.* 35, 48, 51-54. He also offers opinions about CAEv2 development, marketing and design. *Id.* at 28-30.

For all of these opinions, Lustig relies only on company documents or other experts' testimony, *id.* 28, not his own analysis. Indeed, Lustig is not qualified to opine on whether the CAEv2 had a defect or was appropriately marketed. He admitted as much at his deposition: he has never tested the CAEv2 or conducted lab research on a HPD, Ex2, Lustig Dep. 91:3-7; has never treated a patient using one, *id.* 83:8-9; has no expertise in labelling or labelling regulations, *id.* 73:24-74:3, 77:18-24, relies on the testimony of other experts, *id.* 116:12-22 ("These are the guys that would know"), speculates about what "medium" or "large" ear-canal size

33

means, *id.* 141:7-11, 144:5-16, and has not conducted noise reduction testing, insertion loss testing, or "***looked at the actual data***" for any device, *id.* 78:22-23, 86:2-7, 91:3-7, 96:14-20 (emphasis added).  His opinions as to defect, marketing, and production are thus outside his treating-physician expertise, and are neither reliable nor helpful to the jury.

**Packer**:  Packer offers opinions about whether there were defects in the CAEv2, as well as what "3M knew," based on rehashing the Flange Memo and other documents.  Ex7, Packer Report 66-73, 92, 100-01.  This summarization should be excluded.  In his non-litigation work, Packer does not routinely review internal company documents in evaluating the effectiveness of hearing protection devices, Ex25, Packer Dep. at 135:4-136:8, confirming that his endeavor to do so here would be unhelpful and unreliable.  *Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999).

**Spankovich**:  Spankovich opines that the CAEv2 contains various defects, including being "too short for proper insertion," and being prone to "imperceptibl[e] loosening."  Ex8, Spankovich General Report 72.  Yet he bases these defect opinions only on a review of the Flange Memo and three other documents, none of which date past 2000.  *Id.*; *see also* Ex9, Spankovich Dep1. 198:20-24 (confirming that he based his opinions on his reliance materials).  This summary should again be excluded.

Whether the CAEv2 was defective also is outside of Spankovich's expertise. Spankovich is an audiologist, but has never "performed a retest on behalf of a manufacturer to determine the attenuation that is being attained"; has not "ever had involvement in evaluating the effectiveness of hearing devices for the military"; has "not been involved in an occupational hearing conservation program," and "do[es] not have any experience in designing hearing protection devices." *Id.* 37:5-9, 52:1621-24, 53:14-16, 156:25-157:4.  Indeed, he admitted that to judge the CAEv2's effectiveness at providing attenuation, "I'd have to compare it to the attenuation of other devices ... but ... that's not my major expertise." *Id*. 201:18-23.

***Eddins:***   Although Eddins' opinions are principally related to his testing (discussed in Section III.A.-B.), his report contains several pages of "background" that summarizes (and misstates) the record.  For example, although Eddins testified that he is "not a military expert," his report contains a narrative description of military noise exposures, the DOD hearing program, and rates of hearing loss among service members.  Ex10, Eddins Dep. 159:12-18; Ex11, Eddins Report 9.  Similarly, his report contains a narrative description of Aearo's design and development of the activities, including numerous erroneous statements such as "Aearo had not tested the CAEv2 for attenuation or insertion loss prior to delivering units to the U.S. Military which began fielding the device to soldiers."  Ex11, Eddins Report 12.  This

35

"background" has nothing to do with his testing or the opinions he offers based on that testing.

Separately, all these experts' summaries are fatally defective because, even apart from just narrating evidence, they also do not narrate a fair sample of that evidence. Spankovich, for example, relied on only a handful of 2000-and-earlier documents, and admitted that he did not consider several more recent, third-party 2012 and 2016 tests showing that the CAEv2 achieved significant mean attenuation across relevant frequencies. *See*, *e.g.*, Ex12, 3M_MDL000005612; Ex13, *Hearing Protector Evaluator Report*, 3M_MDL000275365; *see also* Ex9, Spankovich Dep. 213:21-216:2 ("So you don't consider … the testing that was conducted by ... Kevin Michael, in 2012, correct? ... THE WITNESS:  I have to see if this—the name is not ringing a bell."). Coetzee, meanwhile, admits that the Flange Memo is ***the only earplug testing document she has ever seen***. Ex5, Coetzee Dep. 81:1–8. And Lustig likewise fails to mention (or list in his reliance materials) the significantly more favorable testing ignored by Spankovich. "[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data." *EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (Agee, J., concurring) (collecting cases); *see also Barber v. United Airlines*, 17 F. App'x 433, 437 (7th Cir. 2001) (affirming exclusion of expert testimony where witness "cherry-picked the facts he considered to render

an expert opinion," rejected testimony that contradicted his opinion, and did not adequately explain why he ignored certain facts and data); *Companhia Energetica Potiguar v. Caterpillar*, 2016 WL 7507848, at *8-9, 12 (S.D. Fla. Aug. 1, 2016) (excluding expert opinion because he "blindly relied" on information, improperly cherry-picked facts, and failed to consider alternative explanations).  As the Eleventh Circuit has explained, expert testimony "may be assigned talismanic significance in the eyes of lay jurors," and thus be misleading. *Frazier*, 387 F.3d at 1263.  Plaintiffs' expert narration is thus doubly inappropriate and prejudicial, as it relies on a skewed selection of the record and would improperly elevate that portion in the jury's eyes.

*     *     *

In sum, factual evidence "is properly presented through percipient witnesses and documentary evidence," not expert testimony.  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004).  Plaintiffs should rely on admissible fact evidence—not experts' narrative summaries.

### B.    Experts Cannot Offer Legal Conclusions.

Plaintiffs' experts' opinions should also be excluded where they offer impermissible legal opinion.  An expert witness "may not testify to the legal implications of conduct; the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur.*, 898 F.2d 1537, 1541 (11th Cir. 1990); s*ee also*

*Commodores Entm't v. McClary*, 879 F.3d 1114, 1128-29 (11th Cir. 2018).   An expert "may not testify as to whether [a] legal standard has been satisfied" or not. *Burkhart v. Washington Metro.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997); *Cordoves v. Miami-Dade Cnty.*, 104 F. Supp. 3d 1350, 1365 (S.D. Fla. 2015).   If testimony "track[s] the language of the applicable statute" or uses a term that "has a specialized legal meaning that is more precise than the lay understanding of the term," the testimony is impermissible.  *Burkhart*, 112 F.3d at 1212; *Cordoves v. Miami-Dade County*, 104 F. Supp. 3d 1350, 1365 (S.D. Fla. 2015).

*Coetzee:*  Coetzee wrongly opines as to contract interpretation.  In particular, she asserts that Defendants breached a Medical Procurement Item Description ("MPID") contract with the Defense Logistics Agency ("DLA") within the Department of Defense ("DoD") by failing "to meet the represented performance specifications" in the MPID.  Ex6, Coetzee Report 2.  Coetzee confirmed that she "looked at the contract, what the requirements were, and the documents that were provided to [her] that demonstrated whether or not the Aearo or 3M ... complied with the contract and delivered the product that the Government had required and awarded the contract for."  Ex5, Coetzee Dep. 27:9-17; *see also* 86:3-11, 143:2-6, 193:4-18, 201:13-19, 225:17-19, 247:6-13, 280:20-281:3, 281:7-9, 310:20-22, 318:12-16.  Her opinions on these matters should be excluded:  opinions as to

38

contract interpretation are legal, and so impermissible. *Montgomery*, 898 F.2d at 1540-41 (holding the district court abused its discretion in allowing expert testimony interpreting an insurance contract, holding that it "was a legal conclusion, and therefore should not have been admitted"); *Coyote Portable Storage v. PODS Enters.*, 2011 WL 1870593, at *4 (N.D. Ga. May 16, 2011) ("The question of interpretation of the contract is for the jury, and the question of legal effect is for the judge. **In neither case do we permit expert testimony.**") (emphasis in original); *Herman v. Seaworld Parks & Entm't*, 320 F.R.D. 273, 281 (M.D. Fla. 2017) ("Courts regularly exclude expert opinions that opine on the interpretation of written contracts.") (collecting cases).

Separately, Coetzee asserts that Aearo was "obligated to disclose … information to the DoD" and that Aearo supposedly has information that "should have been disclosed." Ex6, Coetzee Report 7-10.  But whether a party has a duty to disclose is a legal question that cannot be the subject of expert testimony. *E.g.*, *Se-Kure Controls v. Diam USA*, 2009 WL 77463, at *2 (N.D. Ill. Jan. 9, 2009) (expert testimony alleging party's "failure to comply with its duty of disclosure, resulting in equitable conduct, is simply inadmissable.  It is a basic principle that the duty of the district court is to explain the law."); *Chrysler Credit v. Whitney Nat'l Bank*, 824 F. Supp. 587, 602 (E.D. La. 1993) (testimony that defendant had a "duty to disclose …

39

is an impermissible legal conclusion by a witness"); *Russo v. Ballard Med. Prods.*, 2006 WL 2345868, at *16 (D. Utah Aug. 10, 2006) (expert's discussion of whether a party had a "duty to disclose" improperly concerned a question of law); *Tyree v. Boston Sci.*, 54 F. Supp. 3d 501, 563-64 (S.D.W. Va. 2014) (excluding expert's opinion that defendant's product warning "failed to provide adequate instructions" and "did not include adequate warnings" as legal conclusions); *see also Zanakis v. Scanreco*, 2019 WL 2215554, at *3-5 (S.D. Fla. 2019) (excluding expert opinions that defendant should have notified customer of alleged defect as lacking any scientific methodology and not helpful).  Thus, these opinions are barred as well.

*Arriaga:*  Arriaga uses legal terms of art, even though "courts have excluded expert testimony" where the "terms carry special meaning under the law." *Tillman v. C.R. Bard*, 96 F. Supp. 3d 1307, 1325 (M.D. Fla. 2015).  In particular, Arriaga repeatedly offers legal conclusions, including that 3M "Had A Duty To Stop Selling The Product And To Tell The Military," "Had A Duty To Test," and "Failed To Warn." Ex14, Arriaga Report 45, 47, 48.  Such legal conclusions about a defendant's duties or failure to warn are inadmissible legal conclusions.  *See supra* 39-40.

Arriaga's opinion that the CAEv2 "is Defective" also oversteps the boundaries of expert testimony.  Ex14, Arriaga Report 41.  Using such legal terms of art—such as "unreasonably dangerous and defective"—"goes a step beyond"

adequacy and efficacy and "invade[s] the province of the jury." *In re C.R. Bard Pelvic Repair Sys. Prod. Liab. Litig.*, 2018 WL 4212409, at \*3 (S.D. W. Va. Sept. 4, 2018); *see Arevalo v. Coloplast*, 2020 WL 3958505, at \*20 (N.D. Fla. July 7, 2020) (holding that testimony that a device was "defective" and "defectively designed," defendant "failed to warn," and defendant acted "unreasonably" were impermissible legal conclusions or legal terms of arts); *In re C.R. Bard Pelvic Repair Sys. Prods. Liab. Litig,*, 2018 WL 4220602, at \*3 (S.D.W. Va. 2018) (holding expert testimony using "legal terms of art" such as "defective", "unreasonably dangerous," or "failure to warn," constitute legal conclusions, and are properly excluded).

*Packer:*  Packer's opinions are impermissible in part for much the same reason as Arriaga's.  Like Arriaga, Packer opines that the CAEv2 is "Has Design Defects," "was Defective," and is "Unreasonably Dangerous." Ex7, Packer Report 81, 84, 86, 88, 89.  Packer also repeatedly opines as to what a "reasonable" manufacturer would do, *id.* 90-91, and contends that 3M failed to warn, *id.* 93, 103.  Such opinion goes too far:  Packer "may not substitute for the court in charging the jury regarding applicable law." *Tillman*, 96 F. Supp. 3d at 1325.

*Lustig:*  Lustig also includes impermissible legal conclusions.  For example, he offers opinions regarding "CAEv2's design defects and 3M's negligence, misrepresentations, and failure to warn of the CAEv2's inadequate hearing

protection ..." Ex1, Lustig Report 44.  Throughout Section III of his report, Lustig opines that the CAEv2 is a "defective product."  *See*, *e.g.*, *id.* 44-49, 51, 53, 54. Lustig also states that 3M has acted "unreasonably."  *See id.* 48-49.  These are impermissible legal conclusions.

Lustig also opines on the application of statutes governing the CAEv2's labelling.  *See id.* 30, 42, 43 51, 52.  For example, he claims to interpret the Noise Control Act, *id.* 30, and concludes a military exception to this regulation does not apply, *id.* 30 n. 68, 40.  He relatedly concludes that 3M had a duty to provide an NRR on its label.  *Id.* 30, 51, 52.  Putting aside his lack of expertise on this topic, these are improper conclusions for an expert to offer.  *See In re Ethicon Pelvic Repair Sys. Prod. Liab. Litig.*, 2020 WL 774234, at *6 (S.D.W. Va. Feb. 13, 2020) (excluding expert opinion about compliance with federal labelling regulations as inappropriate legal conclusions); *Tyree*, 54 F. Supp. 3d at 542-44 (holding that asserting a product's labelling violated federal regulations "is a legal conclusion, not expert opinion"); *Wolfe v. McNeil-PPC*, 881 F. Supp. 2d 650, 661-662 (E.D. Pa. 2012) (holding that experts "are prohibited from expressing legal conclusions by stating such things as … inadequate warning label rendered Children's Motrin 'unreasonably dangerous'"); *Smith v. Wyeth-Ayerst Labs.*, 278 F. Supp. 2d 684, 702 (W.D.N.C. 2003) (agreeing that testimony about compliance with labelling

requirement would "infringe upon the jury's role in determining an ultimate issue in the case"); *see also supra* 39-40.

   ***Bielefeld***: Bielefeld opines that the CAEv2 was defective, that Defendants put CAEv2 users "at an unreasonable risk of harm," that Defendants failed to warn regarding alleged issues with the CAEv2.  Ex4, Bielefeld Report 69-71. Bielefeld also repeatedly opines as to what a "reasonable" audiologists would do.  *Id.*  All of these statements are improper legal conclusions.

### C.    State-of-Mind Opinions Are Impermissible.

   Finally, an expert cannot opine about a person's or organization's state of mind, including intent, knowledge, or motive.  *Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006) (affirming exclusion of expert testimony "which contain[s] legal conclusions as to another person's state of mind"); *Rezulin*, 309 F. Supp. 2d at 546-47 ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."); *PODS Enters. v. U–Haul Int'l*, 2014 WL 12628606, at *2 (M.D. Fla. July 7, 2014) (excluding "inadmissible opinion on state of mind"); *Trasylol*, 709 F. Supp. 2d at 1337-38 (holding that opinions referring to company and regulatory agency's "knowledge and intent or are personal 'bad company' opinions" were outside the scope of expert testimony); *King v. Cessna Aircraft*, 2010

WL 1980861, at *6-7 (S.D. Fla. May 18, 2010) (holding that expert could not opine "that the passengers' communications *intended* to affect the pilots' actions").[3]

Much of *Coetzee's* report is devoted to describing the state of mind of Aearo, the DLA, and the DoD.  For example, section VI of her report improperly describes why the DLA procured the CAEv2 and the reasons the DLA utilized certain contracting procedures.  Ex6, Coetzee Report 5-6.  Likewise, section VII describes how the DoD purportedly "Reli[ed] on Aearo's Stated Performance of the CAEv2." *Id.* 6-7.  And Section VIII, discussing Coetzee's "review of the evidence," concludes that Aearo/3M was "aware" of alleged issues with the earplugs and "believed" various propositions.  *Id.* 7-10.

*Packer* repeatedly opines as to what Defendants "knew," including by opining that 3M "knew about" defects, "knew ... that the CAEv2 had problems," "knew that ... the CAEv2 did not protect users on the range," "knew the CAEv2 was not being worn in the real world with the flanges folded back," among others.  Ex7, Packer Report 66, 70, 73, 92, 100-01, 101, 103.

---

[3] *See also In re Heparin Prod. Liab. Litig.*, 2011 WL 1059660, at *8 (N.D. Ohio Mar. 21, 2011); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005); *Klaczak v. Consol. Med. Transp.*, 2005 WL 1564981, at *5 (N.D. Ill. May 26, 2005).

*Arriaga* exhaustively attributes different states of mind to 3M.  Ex14, Arriaga Report 38, 46-50 (describing what 3M "hope[d]," what 3M had "no idea" about, and what 3M knew or did not know).

*Lustig* also opines on 3M's state of mind and motivations.  He states 3M was aware or "knew" of various misrepresentations and sold the CAEv2 anyway.  Ex1, Lustig Report 42, 43, 48.  He also suggests that 3M was motivated by financial concerns and discusses supposed internal sales pressures to quickly market "the highest possible NRRs."  *Id.* 37.  He also states that 3M "only stopped" selling the CAEv2 "when it was caught."  *Id.* 49.  These are speculative "musings" far beyond the scope of proper opinions for an otolaryngologist—or any expert for that matter. *Rezulin*, 309 F. Supp. 2d at 546.

These opinions, spanning nearly six pages of Coetzee's 10.5 page report, as well as substantial portions of Packer's and Lustig's, should be excluded. Determining knowledge or intent is the job of the jury, not experts.  *Trasylol*, 709 F. Supp. 2d at 1337-38.

## II. Plaintiffs' Military "Safety Culture" Experts Have No Valid Basis For Their Opinions.

Three of Plaintiffs' experts—Edens, Huston, and Marshall—are retired military personnel who opine about a supposed culture of safety and hearing

protection in the Army. *E.g.*, Ex15, Edens Report 1-2; Ex16, Huston Report 1, Ex17, Marshall Report 4. Their opinions lack any methodology and are *ipse dixit* assertions, are not reliably based on their limited and unquantifiable personal experiences, and are contradicted by objective evidence they did not consider.

## A. Their "Safety Culture" Opinions Lack Any Methodology Or A Sufficient Factual Basis.

"The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Frazier*, 387 F.3d at 1262; *see also Kumho Tire*, 526 U.S. at 152. "[T]he existence of sufficient facts and a reliable methodology is in all instances mandatory." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007); *see also McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004). "The need for an expert to complete and explain his methodology," and how it applies to the facts to yield the expert's opinion, "is at the heart of reliability." *Lee-Bolton v. Koppers*, 319 F.R.D. 346, 377-78 (N.D. Fla. 2017) (Rodgers, J.). If "the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261; *King*, 2010 WL 1980861, at *4.

46

The military culture experts' reports consist primarily of descriptions of their personal experience, with occasional citation to regulations, and nothing more. None of the three cites any empirical evidence in support of their opinions, nor any studies, surveys, literature, or other sources. *E.g.*, Ex18, Marshall Dep. 58:4-10; 94:17-95:6, 102:11-22, 183:15-20; Ex19, Edens Dep. 222:1-223:22; 276:19-277:22. They employ no methodology to arrive at their conclusions, let alone a reliable one. For example, Huston admitted that he had done nearly no analysis of his assertions regarding a culture of safety, and in some cases, admitted that they were simply his "assumption[s]." Ex20, Huston Dep. 111:14-112:4; *see also id.* 58:5-9, 84:19-25; 85:2-22, 94:17-95:6, 102:14-22. And despite opining that the Army Hearing Conservation Program ("HCP") was adequate to protect servicemembers' hearing, Huston conceded that he had not done any analysis of whether the HCP was successful in accomplishing hearing loss prevention. *Id.* 116:16-117:2; *see also id.* 46:19-48:21. Such opinions are not admissible. *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997); *McDowell*, 392 F.3d at 1300.

Nor does these witnesses' limited personal experiences provide a basis for their opinions regarding a supposed Army-wide culture of safety and hearing protection use. Experience-based testimony should be excluded where the expert does not provide "a sufficiently verifiable, quantitative basis for" his opinion.

*Frazier*, 387 F.3d at 1265; *see also King*, 2010 WL 1980861, at *3.  None of the three has sufficient experience to support their sweeping opinions:

- While Edens was the Director of the Army Safety Program for two years, he had little to no responsibility for any hearing protection or conservation activities. Ex19, Edens Dep. 47:21-57:4, 68:13-77:20, 100:2-101:2, 109:5-110:1, 113:13-117:1, 121:2-122:14.  He did not consider hearing protection or conservation one of his priorities, and spent little time on hearing.  *Id.* 91:17-92:3; 100:2-101:2, 103:5-104:21.  Edens provides no reliable methodology or basis to extrapolate his personal experience across the Army to all types of Army soldiers using all types of hearing protection in different situations at all locations over the entire relevant timeframe.  *See id.* 191:21-193:7; 195:2-196:1; 198:23-199:12; 209:4-9 (admitting he could testify only about his personal experiences and observations).

- Huston was never a HCP manager, is not an audiologist, and does not consider himself an expert in hearing or audiology.  Ex20, Huston Dep. 33:16-34:6.  He testified that "the experts of those [hearing conservation] program managers would be better able to talk to you about the specifics [of trainings and instructions] … [b]ut I would be able to talk to you about my experiences, … what I observed."  *Id.* 35:24-36:11; *see also id.* 85:6-11; 99:8-20; 101:10-17.

48

- Marshall is not an audiologist and has no expertise in the field of audiology. Ex18, Marshall Dep. 37:18-38:4; *see also id.* 42:19-54:1. He never trained any servicemember on the use of the CAEv2, nor did he have any conversations with any other servicemember about the efficacy of the CAEv2. *Id.* 49:19-50:5; 53:18-54:1, 95:8-99:22. Marshall's opinion that servicemembers in the Army took their obligation to wear hearing protection seriously and strictly adhered to it is based on his personal observations. *Id.* 167:15-168:6, 182:14-183:10; s*ee also id.* 109:21-111:16. He would defer to the expertise of audiologists and other experts in the Army when asked questions about hearing-related issues. *See*, *e.g.*, *id.* 197:13-21; 241:3-242:1; 290:20-291:5.

None of these witnesses explain how their limited personal experience leads to their broad conclusions, such as Edens' opinion that "all Soldiers and civilian personnel in the Army practice the culture of safety (including with respect to hearing protection)," Ex15, Edens Report 2, or why their experience is a sufficient basis for that opinion. *Frazier*, 387 F.3d at 1261.

Furthermore, nothing in their opinions is either verifiable or quantitative as the Eleventh Circuit precedent requires. *Id.* at 1265. As discussed in Section II.B, the only quantitative and verifiable evidence demonstrates that many soldiers did not wear hearing protection.

49

Courts regularly reject similar opinions about an organization's "culture" because such opinions lack methodological standards, reliability, or sufficient facts. *E.g.*, *Jinro Am. v. Secure Invs.*, 266 F.3d 993, 1006 (9th Cir. 2001), *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001) (holding district court erred by permitting witness to provide expert opinion on Korean business culture, including because expert "provided no empirical evidence or studies to support his sweeping indictment of the Korean business community"); *Lachney v. Target*, 2010 WL 11570518, at *5 (W.D. Okla. Apr. 12, 2010) (excluding expert testimony about corporation's safety culture as not relevant or reliable, where expert relied on cherry-picked evidence and did not make a sufficient "effort to objectively determine those facts"); *Bliss v. BNSF Ry.*, 2013 WL 5570231, at *8 (D. Neb. Oct. 9, 2013) (excluding expert testimony regarding corporation's safety culture for unreliable methodology, including because he "performed no empirical assessment of the prevalence of any organizational problems").[4]  Edens', Huston's, and Marshall's opinions should similarly be rejected.

---

[4] *In re Heparin Prod. Liab. Litig.*, 2011 WL 1059660, at *10 (N.D. Ohio Mar. 21, 2011); *Scentsational*, 2018 WL 1889763, at *13, *aff'd* 773 F. App'x 607 (Fed. Cir. 2019); *see also Wal-Mart Stores v. Dukes*, 564 U.S. 338, 354 (2011).

**B.**     **Their Opinions Do Not Account For Objective, Empirical Evidence Establishing Many Soldiers Did Not Use Hearing Protection.**

The military culture experts' opinions are also contradicted by military data and record evidence that they did not consider.  The three agreed they had not considered, and had no basis to dispute, evidence such as:

- A 2011 report from the Government Accountability Office finding that "a high proportion of servicemembers (sometimes up to 50 percent in certain situations) may not be wearing hearing protection when needed" and "servicemembers told us that they do not always wear hearing protection, citing concerns with comfort and communication."  Ex35, US GAO, *Hearing Loss Prevention*, Introduction, 7, 15; Ex19, Edens Dep. 293:6-294:1, 294:16-295:12, 298:16-19; Ex18, Marshall Dep. 189:1-190:15; Ex20, Huston Dep. 141:15-142:9.

- Research that due "to the life-threatening implications of not hearing important signals for Soldiers, many of them do not use hearing protection, especially when performing certain missions, such as scouting and reconnaissance."  Ex21, John Casali, *et al.*, *A field investigation*, 2; Ex19, Edens Dep. 260:14-22, 266:2-15, 267:15-16.

- Analysis from the Hearing Center of Excellence explaining that "[r]esearchers studying hearing loss over the last decade have found that service members often

don't wear hearing protection because they think the devices block out critical sounds that are necessary to complete the mission."  Ex22, Larine Barr, *Center develops tool to help service members select optimal hearing* 1; Ex19, Edens Dep. 272:21-274:6, 275:6-15, 276:10-16, 282:8-283:8; Ex20, Huston Dep. 171:24-172:16; Ex18, Marshall Dep. 246:19-247:5.

- Reports that the "combat arms earplug was introduced into the military at the start of the war in Afghanistan (operation Enduring Freedom).  However, as with most hearing protection, it was shunned for operations."  Ex23, Scott McIlwain, *Heritage of Army Audiology and the Road Ahead:  The Army Hearing Program* 5; Ex19, Edens Dep. 234:7-235:1; 238:16-21.

- A website where several servicemembers stated they did not wear their HPD, particularly during combat, and that they felt "hearing protection was a detriment."  Ex18, Marshall Dep. 221:1-226:16.

- Testimony from a former HCP manager that servicemembers were not properly fitted with the CAEv2 and that servicemembers were reluctant to wear hearing protection.  Ex18, Marshall Dep. 259:5-18; 265:12-21.

Indeed, Edens acknowledged there would be situations where a solider in combat would choose not to wear hearing protection devices because it would affect their situational awareness or safety, Ex19, Edens Dep. 229:12-230:17, and that he did

not know and had no basis to say how frequently that occurred, *id.* 230:18-231:8. All three experts' opinions should be excluded because they ignore relevant contrary data. "Ignoring relevant data is not a scientifically valid method. … [A]n expert is not permitted to simply ignore evidence that is contrary to her opinion in implementing an accepted methodology." *Cates v. Whirlpool*, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017); *see also In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 242 (S.D.N.Y. 2018) ("Where an expert ignores evidence that is highly relevant to his conclusion, contrary to his own stated methodology, exclusion of the expert's testimony is warranted."), *aff'd*, 982 F. 3d 113 (2d Cir. 2020); *Fail-Safe, v. A.O. Smith*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010) ("[T]he court also finds the witness's methodology unreliable because of how Dr. Keegan uniformly treated all evidence that undermined his underlying conclusion: unwarranted dismissal of the evidence or outright blindness to contrary evidence.").[5]

---

[5] *MDG Int'l v. Australian Gold*, 2009 WL 1916728, at *4 (S.D. Ind. June 29, 2009); *In re Rezulin Products Liab. Litig.*, 369 F. Supp. 2d 398, 425-26 (S.D.N.Y. 2005).

**C.     Their Opinions Impermissibly Speculate About Soldiers' State Of Mind.**

The military culture experts' opinions also should be excluded as improper testimony regarding the Army's and individual soldiers' state of mind. Fundamentally, they opine that the Army and individual soldiers subjectively take safety seriously, including hearing protection. Specifically, Edens' opinions assert what the Army and individual soldiers value, as well as how those values motivate action. Ex15, Edens Report 2. Similarly, Huston opines that the use of hearing protection is "ingrained" in servicemembers. Ex16, Huston Report 5.

Courts regularly exclude such state-of-mind opinions. *See supra* 43-44. Courts specifically have applied the rule against experts testifying about state of mind to exclude opinions regarding an organization's "culture." *Quevedo v. Iberia, Lineas Aereas De Espana*, 2018 WL 4932097, at *4 (S.D. Fla. Oct. 11, 2018) (holding that opinion that airline's "culture *requires* pilots to refrain from questioning decisions" "cannot be considered anything more than rank speculation as to the crew's state of mind").

**D.     Their Opinions Do Not "Fit" With The Facts Of Any Plaintiff.**

Each of the three experts offer general testimony without any basis for drawing conclusions about any particular Plaintiffs. For example, Marshall testified

that it was outside the scope of his opinions to offer testimony about any particular Plaintiff.  Ex18, Marshall Dep. 25:19-23.

The experts also admitted there could be differences among servicemembers regarding HPDs.  For example, Huston agreed that there was variation among the instructions that were provided to servicemembers who received the CAEv2.  Ex20, Huston Dep. 195:16-21.

Moreover, the experts did not provide evidence that any servicemembers under their command used HPD properly.  For example, Huston had no involvement with providing training or instructions, but was merely responsible for making sure that servicemembers had "earplugs on their person and [wore] earplugs as appropriate."  *Id.* 30:12-17; 93:3-14.  He clarified that even "enforcement" of the standards would consist only of an "inspection of the ear … to make sure that the hearing protection device was in the ear."  *Id.* 96:10-14.  In his own words, "[i]t was literally moving forward to the firing line, it was just a visual inspection of the ear."  *Id.* 97:8-17.  The inspection never entailed any verification to make sure the earplug was properly sealed, tug test to make sure the earplug was fitted properly, or inspection to check whether the flanges were rolled back on a CAEv2.  *Id.* 97:18-98:6; 200:25-201:14.

Furthermore, the experts' personal experiences are largely dissimilar to Plaintiffs' allegations.  For example, Edens never personally used any version of the CAEv2.  Ex19, Edens Dep. 125:8-12.  Moreover, Edens only commanded aviation unit soldiers, not ground troops, at specific Army installations, *id.* 59:4-9; 59:21-60:12; 73:13-74:3; 192:8-193:3, and, except for 15 months from May 2007-October 2009, he did not command soldiers in combat situations, *id.* 60:19-61:6; 72:13-73:7. Edens acknowledged that the ability of aviation soldiers to wear hearing protection and maintain their safety may be different from infantrymen.  *Id.* 219:2-9; 220:3-9. Significantly, Edens has no recollection or knowledge of any soldiers he commanded using CAEv2.  *Id.* 64:10-14; 75:15-76:4; 125:17-21.  By contrast, none of the individual Plaintiffs here served in aviation units and all of them claim use of CAEv2, mostly in combat situations.

## III.  Plaintiffs' Hearing Testing Experts' Opinions Use Unreliable Methodologies That Do Not Fit The Facts Of This Case.

### A.  Plaintiffs' Experts' Evaluations of the CAEv2 Are Unreliable.

Plaintiffs' experts' opinions about the safety of the CAEv2 as compared to other devices are unreliable because they assume that other devices are superior without analyzing the same type of data upon which they rely in rendering their opinions on the CAEv2. "[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data."  *Freeman*, 778 F.3d at 469 (Agee, J., concurring)

(collecting cases); *see also supra* 36-37.  Courts also have excluded or disregarded experts who opine that a product performs unacceptably on a metric (such as failure rates), without comparing the product's performance to its competitors or providing another basis for acceptable performance on that metric.  *E.g.*, *Kondash v. Kia Motors Am.*, 2020 WL 5816228, at *9 (S.D. Ohio Sept. 30, 2020) (excluding opinion that product was defective based on supposed failure rate where the expert "does not articulate what would be an acceptable rate" and does not "compare his rate to any similar rates in peer vehicles"); *see also Moore v. Wright Med. Tech.*, 2016 WL 1316716, at *7 (S.D. Ga. Mar. 31, 2016).  That is what Plaintiffs' experts have done here, and thus all their opinions regarding the CAEv2's performance compared to other devices should be excluded.

Despite citing internal company documents as part of their evaluation of the CAEv2, none of Plaintiffs' testing experts reviewed such data regarding devices manufactured by other companies.  *See*, *e.g.*, Ex24, McKinley Dep. 289:19-291:1; 293:9-16; Ex45, Packer Dep2. 423:12-16.  Similarly, while McKinley highlights the need for field testing to adequately evaluate the effectiveness of the CAEv2, he did not cite any field tests conducted on any of the other hearing protection devices that he claims to be more safely designed.  Ex24, McKinley Dep. at 290:10-291:1; 295:3-5.

Eddins' opinions suffer from the same deficiencies.  While Eddins asserts that the CAEv2 is "alarmingly" variable, he concedes that all earplugs produce variable data on a REAT test, *id.* 93:15-94:1, 105:17-106:13, that he "did not consider the variability of any other plug," Ex10, Eddins Dep. 76:8-77:4, 91:15-92:10, 134:6-136:15, does not know if any other earplug "performs any differently" or "would show less variability" than the CAEv2, *id.* 76:1-77:4, 256:19-261:9, and cannot name an earplug with less variability on a Method B REAT test, *id.* at 376:16-19, 378:23-380:10.  He also opines that the CAEv2 improperly loosens, despite acknowledging that all premolded earplugs "loosen," and concedes that he did not consider "how any other plug loosens" during his analysis, and thus that cannot say whether "any other earplug loosens more or less than the Combat Arms Version 2." *Id.* 74:13-19, 75:18-25, 285:21-289:2.

## B. The Opinions Of David Eddins And Robert Juneau Should Be Excluded.

Plaintiffs have proffered audiologist David Eddins to opine on "the fit, function, and usability of the Aearo/3M Combat Arms Version 2."  Ex11, Eddins Report 2-3.  According to Eddins, the CAEv2 has problems including that it is difficult to fit in certain anatomies, that it can "loosen" in a user's ear, and that it provides "variable" attenuation between users.  *Id.*  Eddins' opinions are based on

testing he performed using: (1) a new earplug he created that is materially different than the CAEv2 (the "Eddins Plug"); (2) silicone ear replicas he invented with Plaintiffs' expert Robert Juneau (the "Ear Replicas") that are not anatomically correct; and (3) "naïve" human test subjects who are "inexperienced" using earplugs.

These methodologies are unreliable, including because they are based largely on novel techniques Eddins and Juneau developed for the purpose of this litigation. "[C]ourts may only admit the state of science as it is. Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles. 'The courtroom is not the place for scientific guesswork, even of the most inspired sort. Law lags science; it does not lead it.'" *Rider v. Sandoz Pharms.*, 295 F.3d 1194, 1202 (11th Cir. 2002) (quoting *Rosen v. Ciba–Geigy*, 78 F.3d 316, 319 (7th Cir. 1996)); *see also Allison v. McGhan Med.*, 184 F.3d 1300, 1318-19 (11th Cir. 1999) (affirming exclusion of expert who "indicated that his theories regarding chronic inflammation and systemic disease are in their infancy"); *Henry v. St. Croix Alumina*, 572 Fed. App'x 114, 118 (3d Cir. 2014). That the Eddins Plug and Ear Replicas were created specifically for this litigation also weighs heavily against their admission. *E.g.*, *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1317 (9th Cir. 1995); *Johnson v. Manitowoc Boom Trucks*, 484 F.3d 426, 434-35 (6th Cir. 2007); *Valador, Inc. v. HTC*, 242 F. Supp. 3d 448, 464-65 (E.D. Va.

2017); *Quattry v. Covington Specialty Ins.*, 2019 WL 7423548, at *9 (M.D. Fla. Oct 30, 2019).   In addition to these fundamental reasons for exclusion, Eddins' and Juneau's methodologies are flawed and not reliably applied to the facts.

### 1. Testing On The Eddins Plug Is Unreliable And Does Not Support Eddins' Opinions.

Although his opinions are ostensibly about the CAEv2, Eddins' testing was, in part, performed on a completely different earplug.  Ex10, Eddins Dep. 308:6-14, 308:25-309:17.  Here is the Eddins Plug:[6]

 

It features:  (i) yellow CAEv2 flanges on both ends; (ii) a new, hollow stem Eddins created out of either "silicone," Ex11, Eddins Report 43, or "P48 resin" Ex10, Eddins Dep. 310:9-22; and (iii) a "probe tube" with a microphone inserted through the length of it.  Ex11, Eddins Report 43-44; Ex10, Eddins Dep. 289:3-290:16,

---

[6] Ex11, Eddins Report 43; Ex26, 3M-PTF_EDDINS_00003.

293:22-295:25, 297:3-298:11, 308:6-309:17.  Eddins used this earplug to measure "loosening" after (i) three minutes of jogging; and (ii) four hours of regular use.  *Id.*  Eddins had never tested an earplug in this manner before.  Ex10, Eddins Dep. 87:21-88:10, 289:3-290:16, 293:22-295:25, 297:3-298:11, 302:23-303:16, 308:6-309:17.

The central flaw with Eddins' testing is that he tested ***the Eddins Plug***, and not the CAEv2.  The Eddins Plug fails all of the *Daubert* factors.  It is a novel earplug that was created for litigation, was not made to any recognized design standard, and was not subject to peer review.  *Id.* 312:7-314:20.  And, although the entire point of the testing was to establish that ***the CAEv2*** might "loosen" after certain activities, Eddins admits that he did not validate the Eddins Plug for that purpose.

> Q. Did you do anything to validate that the plug you made loosens in a user's ear, similarly to the Combat Arms Version 2?
>
> A. Given the fact that they were exactly the same flanges from the Combat Arms Version 2 and the stem had such similar characteristics, ***there was no need to do that***. …

*Id.* 315:20-316:8, 317:22-318:8 (emphasis added).  This concession is dispositive because a model that has not been validated is necessarily not reliable.  *Valente v. Textron*, 931 F. Supp. 2d 409, 422 (E.D.N.Y. 2013).

To be sure, Eddins claims to have validated that the Eddins Plug *attenuates noise* like the CAEv2.  Ex11, Eddins Report 43.  The test data Eddins produced, however, shows that it attenuates differently at nearly every frequency.  Ex27,

Eddins Data at "hMIRE Probe Validation."   Above 5500 Hz in particular, the inaccuracies are very large, 6.9 dB on average with a high of 11.8 dB.   *Id.*   This means that the Eddins Plug underestimates the attenuation of the CAEv2 by those amounts.   *Id.*

Eddins' argument that physical similarities with the CAEv2 rendered *loosening* validation unnecessary also is without merit.   The CAEv2 has four essential components:   (1) solid green tip, (2) hollow yellow tip, (3) rigid Delrin stem, and (4) non-linear filter.   The Eddins Plug shares only one of those components (the yellow tip), and is different than the CAEv2 in a number of important ways, including that it (1) is a different weight, (2) has a different stem, (3) is hollow from end to end, and (4) at various times had a probe tube inserted through it.   Ex10, Eddins Dep. 308:15-24, 309:18-312:6.[7]   These differences would influence how it loosens in a user's ear, and thus invalidate any conclusions reached with the Eddins Plug with respect to the CAEv2.

---

[7] Eddins weighed the Eddins Plug and determined it was "no more than 5 percent different from the weight of the Combat Arms when it has the flanges on *and the probe tube through the middle of it*."   Ex10, Eddins Dep. 311:25-312:6.   Putting aside that this measurement shows the weights of the plugs are up to 5% *different*, the probe tube was not "through the middle" of the Eddins Plug at the time the test subjects performed the physical activities, and thus when it mattered, at the moment of supposed "loosening," the weights were even more different.   *Id.* 289:3-290:16, 293:22-295:25, 297:3-298:11; Ex11, Eddins Report 41-52.

Consider, in particular, the absurdity of Eddins creating a new stem. According to Eddins, *the very reason* the CAEv2 can loosen is the "stiffness" and "lack of flexibility" of its rigid Delrin stem.  Ex28, Eddins Rebuttal Report 3; Ex11, Eddins Report 3.  Yet when he endeavored to prove that hypothesis he did testing on an earplug *that did not include the CAEv2's rigid Delrin stem.*  As noted previously, Eddins has taken different positions on whether his stem was "produced out of silicone" or "PR 48 resin."  *Compare* Ex11, Eddins Report 43 *and* Ex10, Eddins Dep. 310:9-22.  But regardless of which of those assertions is true, the material is not Delrin, and Eddins concedes that he "did not use any sort of measurement technique to actually measure it or compare it to [the stiffness of] the Combat Arms stem."  *Id.* 311:16-24.  To the contrary, it is clear from looking at his photographs that the Eddins stem can bend in users' ears in a manner that the CAEv2 does not.

**Eddins** (Ex26, 3MPTF_EDDINS_00008)   **CAEv2** (Ex11, Eddins Report at 27)



So bent, all three of the outer flanges rest almost vertically on the user's ear lobe, a position that, according to Eddins, would be precluded by the real CAEv2's "stiffness" and "lack of flexibility" (which supposedly causes the loosening). Ex28, Eddins Rebuttal Report 3.

Even putting aside that he tested the wrong earplug, Eddins' methodology has a number of other problems. For example, Eddins measured attenuation during his testing by (1) inserting a "probe tube" attached to a microphone through the earplug *after it was seated in a user's ear*, (2) affixing the protruding end of the probe tube to the subject's face with Velcro, and (3) sealing the hole through which the probe tube was inserted with a novel mixture of water and lubricant. Ex10, Eddins Dep. 289:3-290:16, 293:22-295:25, 297:3-298:11, Ex29, Test Protocol 3M-

PTF_EDDINS_02343.  Each of those steps could have impacted the position of the earplug and contributed to the "loosening" that he measured.

Indeed, Eddins' protocol recognizes this danger by emphasizing that the probe tube must be inserted "***without touching the ear or earplug***."   Ex29, 3M-PTF_EDDINS_02343.   However, the hole going through the Eddins Plug was 1.85mm in diameter, the probe tube was 1mm in diameter, and thus the experimenter inserting the probe tube had "basically .8 millimeters of clearance in the hole to slide the probe tube through."  Ex10, Eddins Dep. 290:17-291:24.  This challenging task was further complicated by the fact that, as pictured previously, the Eddins Plug was often bent in half in users' ears, and thus the channel for the probe tube had a bend in it.  Even assuming that the experimenter flawlessly navigated this passage the 480 times the probe tube was inserted and removed,[8] Eddins still has the problem that he did not "take any measurements of the strain that was placed on the earplug by the probe tube" during the period it was inside of the earplug and Velcroed to the test subjects' face.  *Id.* 291:25-292:16; Ex29, 3M-PTF_EDDINS_02343.

Eddins describes this methodology as a form of Microphone in Real Ear ("MIRE") testing.   But the ANSI standard prescribing MIRE testing does not

---

[8] 30 test subjects; 60 ears; insertion/removal before/after two activities.

mention, let alone condone, Eddins' "probe insertion and removal" methodology. Ex10, Eddins Dep. 299:16-301:12, 302:6-303:4, 304:7-25; *see also* Ex30, ANSI S12.42. To the contrary, it says that *any* form of MIRE testing is "not advised" to measure the continuous noise attenuation provided by a passive earplug (*i.e.*, exactly what Eddins did).

| HPD Type | Continuous Noise | |
|---|---|---|
| | MIRE (Clauses 5, 7, 8, 9) | ATF (Clauses 5, 6, 8, 9) |
| Passive earmuff | Applicable | Applicable |
| Passive earplug | Not advised | Applicable |

Ex30, ANSI S12.42 at 5.[9]

Courts regularly exclude expert opinions where, as here, they are based on a novel model that has not been validated. For example, in *Valente*, an expert created his own computer simulation to recreate an accident. 931 F. Supp. 2d at 418. The court excluded opinions based on that model because "Plaintiffs have not provided any evidence that the model has been validated" for the purpose it was used. *Id.* 420-25. Eddins' opinions here fail for the same reasons.

---

[9] Eddins seeks to overcome this problem by analogizing his testing to MIRE testing performed by 3M. But Eddins does not point to any 3M testing *repeatedly inserting a probe tube through an earplug after it was seated in a user's ear.* Ex10, Eddins Dep. 83:15-84:11.

### 2.    Testing On The Ear Replicas Is Unreliable And Does Not Support Eddins' Or Juneau's Opinions.

Where Eddins bothered to test the real CAEv2, he principally did so on the Ear Replicas, rather than a human ear.  The Ear Replicas are silicone replicas of sixty human ears attached to a "spatula with motor" device intended to simulate human jaw movement.  Ex10, Eddins Dep. 319:11-25, 346:18-347:1; Ex11, Eddins Report 52-67.  They look like this:

 

Eddins used the Ear Replicas to measure the continuous and impulse noise attenuation provided by the CAEv2, as well as how much the CAEv2 loosened after simulated jaw movement.  *Id.*

Like the Eddins Plug, the Ear Replicas fail all of the *Daubert* factors.  They were created for purposes of litigation, were not designed to comply with any recognized standard, were not peer reviewed, and have no known error rate.  Ex31, Juneau Dep. 211:23-212:22, 215:10-217:5, 226:8-227:4; 228:19-229:1; Ex10,

67

Eddins Dep  320:12-21, 347:2-348:5.  Indeed, far from being "generally accepted" in the field, Juneau candidly testified that this methodology is "on the brink."  Ex31, Juneau Dep. 211:23-212:22.  Eddins similarly testified:

> Q. Have you [ever] tested hearing protection devices in silicone ear replicas?
>
> A. … No. I have not made measurements of hearing protection devices in silicone ear replicas.
>
> Q. Have you ever heard of anyone, prior to this litigation, testing hearing protection devices in silicone ear replicas?
>
> A. … I don't recall seeing any particular ones using silicone ear replicas.

Ex10, Eddins Dep. 320:12-21, 322:23-323:12.

To create the Ear Replicas, Eddins took ear impressions from thirty human subjects.  Ex11, Eddins Report 54-55. Based on the impressions, Juneau performed a modeling process that resulted in silicone replicas of the subjects' external ears and portions of their ear canals.  *Id.*  Juneau created artificial earwax that was placed into the Ear Replicas.  Ex31, Juneau Dep. 175:11-15.  Eddins and Juneau collaborated on the "spatula with motor" device that manipulated a plunger and supposedly simulated jaw movement.  *Id.* 219:10-18; Ex10, Eddins Dep. 346:9-349:4.

Juneau and Eddins disagree about whether this device is properly called an "acoustical test fixture" ("ATF"), a common industry term for non-human systems

68

used to test hearing protectors.  Ex31, Juneau Dep. 198:8-17 ("We weren't building an acoustical test fixture."); Ex10, Eddins Dep. 319:11-25 ("It was an acoustical test fixture.")  They do agree, however, that their device did not meet the standards contained ANSI S12.42, which provides criteria for ATF testing to ensure reliable measurements, including for (i) anatomical correctness, (ii) critical dimensions, (iii)  self-insertion loss, (iv) ear canal extensions and couplers (both of which are used in the ear replicas), and (v) flesh simulation.  Ex10, Eddins Dep.  324:23-330:7, 332:8-334:9; Ex31, Juneau Dep. 200:10-201:10.

Absent any recognized standard, Juneau and Eddins were left with little guidance on how to design the Ear Replicas.  Juneau relied on the human-subject impressions from Eddins, but those impressions did not capture the subjects' entire ear canal.  Ex31, Juneau Dep. 120:18-121:8, 122:17-123:9, 124:13-17; Ex10, Eddins Dep. 330:8-15.  Juneau reports that the average length of the ear canal from the aperture to the tympanic membrane (eardrum) is typically 26 to 28 millimeters. Ex32, Juneau Report 9.  However, on average, the impressions captured less than half of that distance.  Ex31, Juneau Dep. 125:20-126:4.  Without a complete impression, Juneau was forced to resort to ear "canal extensions" to replicate the remainder of the ear canal.  *Id.* 144:15-146:6.  Juneau claimed that, in creating the "ear canal extension[s]," he was able to predict the balance of the subjects' ear canal,

*id.* 163:15-164:8, but he could not cite any literature or data for this proposition, *id.* 164:9-165:22.

Juneau's assertions are contradicted by Plaintiffs' other experts. For example, Plaintiffs' expert Bielefeld testified that, even if one knows the "shape of somebody's ear canal from the aperture to the cartilaginous bony junction," that information cannot be used to predict the rest of the ear canal "and be accurate a high enough percentage of the time." Ex3, Bielefeld Dep. 100:6-20. And even Eddins acknowledges that, given the "ear canal extensions," the Ear Replicas are "not anatomically correct" and are inaccurate at certain frequencies. Ex11, Eddins Report 55, Ex10, Eddins Dep. 336:16-23.[10] Here are Juneau's canal extensions:

---

[10] Eddins "assumed" the Ear Replicas worked at other frequencies because the data he collected on them lined up with data collected by other researchers on a different ATF that he "assumed" were accurate. Ex10, Eddins Dep. 336:24-337:12.



Juneau's canal extensions are just one of many differences between the replicas and a human ear. Whereas the replicas are made out of silicone, a human ear is made out of flesh, cartilage and bone, each of which has unique acoustical properties. Ex10, Eddins Dep. 334:10-335:3.[11] Whereas a human ear contains earwax, the replicas were filled with an arbitrary mixture of two-thirds artificial wax and one-third artificial sebum. Ex31, Juneau Dep. 191:15-192:3.[12] Neither Eddins

---

[11] Eddins chose silicone not because it was known to accurately simulate human flesh, but rather because it was "widely used … for the purposes of making things that *go in* people's ears." Ex10, Eddins Dep. 336:2-8. That may be true, but Juneau used the silicone to *make an ear*, not to make something that *goes in an ear.*

[12] Juneau did not rely on any literature for that ratio. Ex31, Juneau Dep. 192:19-193:2. Rather, Juneau based the mixture on his own experience with the consistency of human earwax: "*you rub it and you go, that's about right, that's how it feels*" *id.* 192:4-18.

nor Juneau did any testing to determine if the "spatula with motor" device they invented accurately simulates jaw movement. *Id.* 224:11-225:20; Ex10, Eddins Dep. 349:5-351:12.

Given these issues, one would assume that Eddins at least attempted to validate that the replicas worked for their intended purpose. He did not.

> Q. So you didn't do any testing or anything to confirm that the ear replicas [] attenuated noise with the earplug, similar to human ears, and, in fact, you didn't think that was relevant to the study; right?
>
> A. That's correct.
>
> Q. Did you take any measurements to confirm that the Combat Arms Version 2 would loosen in the ear replicas the same way that they would loosen in a real human ear?
>
> A. No. It would be very, very difficult, if not impossible, to do that. …

Ex10, Eddins Dep. 341:4-342:20. Those concessions alone render his opinions inadmissible. *Valente*, 931 F. Supp. 2d at 422.

Eddins' failure to validate the replicas is made all the more remarkable by his own data showing that they do ***not*** perform like human ears. Eddins' data contains measurements taken with (i) each subjects' real ear, and (ii) the ear replica modeled on that subject. The results are much different on the ear replicas, even though the noise and earplugs were supposedly the same. For example:

72

| Test Subject | Human Ear | Ear Replica | Difference |
|---|---|---|---|
| 745<br><br>Left Ear, 1000 Hz | -26.5 dB | -6.4 dB | 20.1 dB<br><br>Human Ear > Replica |
| 784<br><br>Left Ear, 8000 Hz | -5.9 dB | -43 dB | 37.1 dB<br><br>Replica > Human Ear |

Ex27, Test Data.[13]  These measurements show that the replicas are not working.

At bottom, the Ear Replicas are a novel and "on the brink" invention that was created for litigation.  Eddins admits that he did not validate the devices to determine if they perform like a human ear, and his own test data shows they do not.  Courts regularly exclude opinions based on such unreliable methodologies.  *See Valente*, F. Supp. 2d at 425 (excluding opinion based on model in part because "its error rate is unknown and cannot be determined").

---

[13] For 745 human ear, perform cell subtraction from the "summary tab" AD264-AD302; the replica value is in tab "mMIRE_AllSs_PrejogPlug" cell AG41.

For 784 human ear perform cell subtraction from the "summary tab" AE269-AE307; the replica value is in tab "mMIRE_AllSs_PrejogPlug" cell AH50.

### 3. REAT Testing On "Naïve" Test Subjects Does Not Support Eddins' Opinions.

Prior to this litigation, Eddins had never done REAT testing "to assess the effectiveness of an earplug."   Ex10, Eddins Dep. 77:10-79:5.   Unlike his other testing, REAT is a generally accepted methodology done to various ANSI standards. *Id.* 110:19-112:15.  Relevant here, ANSI S12.6 contains two "subject fit" protocols, which are significantly different as they relate to prior experience of the test subjects and role of the experimenter in the preparation of the test subjects prior to testing. *Id.* 154:14-155:1; Ex33, EPA Proposed Rule 39154.   "Method A" tests experienced/trained subjects; "Method B" tests "naïve" subjects who have little or no experience/training with earplugs.  Ex10, Eddins Dep. 121:16-22, 124:24-128:7, 130:3-131:18, 154:14-20, 164:4-15, 168:18-22; *see also* Ex11, Eddins Report  14; Ex34, Franks Dep. 106:7-110:24.

These different protocols yield different results.   In particular, experienced/trained users (*i.e.* Method A) are better at fitting earplugs than inexperienced/untrained users (*i.e.* Method B), and thus Method A produces higher attenuation and lower inter-subject variability than Method B.  Ex10, Eddins Dep. 104:3-19, 132:2-133:22, 154:14-155:1, 156:15-157:3; *see also* Ex33, EPA Proposed Rule 39154.  Importantly, Eddins concedes that testing performed to one REAT

protocol (*e.g.,* Method B) is not predictive of the results that would be achieved for a different protocol (*e.g.*, Method A).  Ex10, Eddins Dep. 193:8-19.

Eddins did his testing to Method B.  Ex11, Eddins Report 26; Ex10, Eddins Dep. 213:14-215:10, 216:21-217:5, 219:16-19.  Critically, unlike Eddins' "naïve" Method B subjects, military servicemembers have experience using their hearing protection device(s).  Ex10, Eddins Dep. 126:16-129:4, 165:1-13.  Indeed, the Method B protocol specifically identifies use of an earplug during "military duty" as disqualifying a test subject.  *Id.* 128:20-129:4.  Thus, as Plaintiffs' experts have testified, Method B is ***not*** the appropriate methodology for measuring performance of an earplug for a military population.  Ex34, Franks Dep. 350:11-19.  ("None of the people serving in the military would qualify as subjects for Method B."); Ex25, Packer Dep. 147:15-148:7 ("I think that, frankly, the military members would be excluded from a lot of that testing because of their experience. … I think as subjects to be considered for testing, military members use devices enough and have had enough training that they would probably be excluded from that type of role.")  The EPA has reached the same conclusion:  "the military require[s] training in the use of hearing protectors, thus supporting the use of *Method A* that reflects the attenuation obtained by trained users."  Ex33, EPA Proposed Rule 39154.  Accordingly, Eddins' Method B test cannot provide a reliable basis for his opinion regarding the

performance of the CAEv2 *when used by military service members*, and any opinions based on that testing would not assist the jury. *E.g.*, *Walker v. Blitz USA*, 663 F. Supp. 2d 1344, 1356 (N.D. Ga. 2009) (excluding expert were test conditions "were markedly different from those" at issue in the case).

### C.   Certain of Juneau's Other Opinions Should Be Excluded.

#### 1.   Juneau's Opinion That The CAEv2's Stem Is Too Wide Is Not Helpful Or Based On Accurate Data.

This Court has held an expert opinion fails the "helpfulness" prong where the expert does not rely on data for the plaintiffs at issue. *In re Deepwater Horizon BELO Cases*, 2020 WL 6689212, at *15-16 (N.D. Fla. Nov. 4, 2020) (Rodgers, J.). Juneau relied on data derived by Wayne Staab for the average diameter of the isthmus to come to the opinion that the CAEv2's stem is too wide. Ex32, Juneau Report 37. Juneau did not realize until his deposition that the paper in question looked mainly at female ear canals precisely because they were known to be smaller. Ex31, Juneau Dep. at 268:8-20 ("I did not know how he selected it. ... According to what's written there, he selected female ears because they were known to be smaller."). And Juneau had no reliable data to determine how much the isthmus measurements contained in his report would change if a representative sample had been used. *Id.* 274:9-16 ("Q. Have you estimated or calculated in any way how much Staab's number would be changed for the isthmus if he had a percentage of

males that corresponded to the actual population?  A.  No.  No, I haven't.").  Thus, Juneau's opinion that the CAEv2's stem is too wide should be excluded.

### 2. Juneau Should Not Be Allowed To Offer Opinions Based On Undisclosed Information.

Rule 26(a)(2)(B) requires that an expert's report contains "the facts or data considered by the witness" in forming their opinions.  If a party fails to provide information in an expert report, then the party is not permitted to use that information at trial.  *Hughes v. GEICO Gen. Ins. Co.*, 2017 WL 7000273, at *2 (M.D. Fla. Aug. 31, 2017), *decision clarified on reconsideration*, 2018 WL 490506 (M.D. Fla. Jan. 19, 2018).

During Juneau's deposition he testified about conversations with representatives of various companies—including Pickering and Factor II—that he failed to disclose in his report.  Ex31, Juneau Dep. at 176:14-195:15.  Juneau testified about hardness data related to the silicone he used in his Ear Replicas provided by Factor II—as well as "reference material" on hardness—not disclosed in his report.  *Id.* at 210:12-211:1.  Because Juneau did not disclose these conversations or materials in his report—and indeed to this day has not disclosed the notes of these conversations—he should not be permitted to testify about them or any conclusions based thereon.

77

**D.    Certain Of Franks' Opinions Are Unreliable, Without Foundation, Or Have Been Disavowed.**

Plaintiffs have proffered John Franks—a former audiologist at the National Institute for Occupational Safety and Health—to opine on the real-ear-attenuation-at-threshold (REAT) testing that Aearo and other labs performed on the CAEv2. Franks offers the opinions, among others, that: (1) the 22 NRR for the green end of the CAEv2 is inaccurate; (2) certain REAT subjects obtained poor fits with the CAEv2; (3) the REAT testing reveals certain design defects in the CAEv2; (4) Aearo violated applicable EPA labelling regulations; and (5) the CAEv2's performance on Aearo's Method B was deficient.  Each of these opinions is inadmissible.  Some rest on faulty methodologies, Franks has disavowed others, and others have no basis other than Franks' own assertions.

**1.    Franks' Opinion That The NRR For The Green End Of The CAEv2 Is Inaccurate Is Inadmissible.**

Franks claims the NRR of 22 for the green end of the CAEv2 is inaccurate because:  (1) it did not include all of the subjects included on the '015 test of the green end, which was abandoned after eight subjects; and (2) because Aearo does not instruct all users to fold back the opposing flanges of the CAEv2.  Ex36, Franks Report 62-66.

Franks provides no support for his opinion that the '017 test should have included all eight of the '015 subjects. Franks identifies no provision of ANSI S3.19 stating that, once a manufacturer begins REAT testing of a product, it has to keep using the same subjects on all future testing. At his deposition, Franks simply claimed it would have been "[n]ormal procedure" to use the same subjects on the two tests. Ex34, Franks Dep. 187:2.

Franks' second critique of the 22 NRR obtained on the '017—that it is invalid because Aearo does "not instruct wearers that they *must* reconfigure the plug by rolling back the yellow flanges prior to insertion" in order to obtain the attenuation recorded on the '017 test—is untenable in light of Franks' own testimony. Ex36, Franks Report 63. During his deposition, Franks was asked why Aearo found such low variability on the 213017 test, on which the flanges were folded back for at least one subject, compared to the '015 test. Franks responded, "[W]e don't know." Ex34, Franks Dep. 233:3. When asked the follow-up question, "Flange rollback might not have made a difference?" Franks stated: "Have no way of knowing. It may well have been that Mr. Kieper was just getting better at doing it." *Id*. 233:8-12. Franks cannot offer the opinion that the 22 NRR is inaccurate unless all users are instructed to fold back the flanges if he has admitted he does not know whether folding back the flanges makes any difference to anyone.

### 2.    Franks' Opinion That Certain Test Subjects Received Inadequate Fits Is Inadmissible.

Franks conducted a subject-by-subject review of the attenuation results from Aearo's REAT testing and identified subjects who, he claimed, had "inadequate" or "poor" fits.  These opinions are inadmissible because Franks has disavowed the methodology he applied, and in any case the methodology lacks any scientific basis.

#### a.    Franks Admits that He Identified Inconsistent Fits, Not Poor or Inadequate Fits.

Franks has admitted that his methodology does not reliably identify individuals who had poor or inadequate fits with the CAEv2.  Franks conducted his analysis by finding individuals who had "large variances" in their attenuation results "across trials."  Ex36, Franks Report 64.  Franks picked out subjects on the '015 test whose attenuation results varied by 10 decibels or more at multiple frequencies, and subjects on the '016 test whose attenuation results varied by 6 decibels or more.  Ex34, Franks Dep. at 313:17-314:5; 316:6-317:2.

In his report, Franks repeatedly states that a subject's "large variances indicate that [the subject] received a poor fit."  Ex36, Franks Report 65; *see also id*. 64-70.  But Franks testified that he actually identified individuals whose attenuation results varied widely, regardless of whether any of those results showed especially low attenuation.  As Franks explained, "I'm concluding that the fit was *inconsistent* with

80

the other two trials.  Okay?  And *that's the word I should have been using instead of the word 'adequate.'*"  Ex34, Franks Dep. Tr. at 284:6-9 (emphasis added).  Franks added:  "*[T]he word 'inadequate' bothers me, and I should have pulled it out*.  I wasn't—I wasn't thorough enough when I did the revision to go pull it out—I should have."  *Id.* at 285:8-11 (emphasis added).

### b.    Franks' Methodology Has No Scientific Basis.

Franks' methodology also lacks any scientific basis.  When asked whether his 10-decibel threshold had been set forth "anyplace … in writing," Franks responded, "Not really, no.  No.  This is a matter of professional experience and looking at data."  Ex34, Franks Dep. 314:11-15.  Similarly, when asked "how you got to the [6-decibel] number" that Franks applied on the '016 test, he answered "Again, this is from experience."  *Id.* 319:8-10.

Franks' methodology is based purely on his own experience and has not been set forth in writing anywhere.  Permitting Franks to give an opinion based on such a methodology would "allow an expert to give a subjective opinion merely because he is an expert and experienced in the field," which would effectively "eliminate the requirement of reliability."  *King*, 2010 WL 1980861, at *4; *see also supra* 46.

81

### 3.      Franks' Defect Opinions Are Inadmissible.

Franks claims that the CAEv2 is defective because its opposing flanges can interfere with a user's fit and because of its wide, rigid stem.  Ex36, Franks Report 12.

Franks cannot offer the opinion that the CAEv2's opposing flanges caused a fitting issue because he has testified he has "no way of knowing" whether folding back the flanges has any effect on attenuation.  Ex34, Franks Dep. at 233:8-12.

Franks also has no basis for his opinion that the CAEv2's stem causes fitting problems.  The putative basis for Franks' opinion is his comparison of the results of the '015 test with an Aearo REAT test (the 213014 test) of the UltraFit Plus.  Franks says the UltraFit Plus is "virtually identical" to the green end of the CAEv2, except for the fact that it has a "far more flexible" stem.  Ex36, Franks Report 52.  Franks observes that, out of the four subjects who were included on both tests, three received lower individual NRRs on the '015 test, and concludes the discrepancy "suggests that the stiffer wide stem used in the CAEv2 was an additional factor that made inserting and wearing the CAEv2 especially difficult." *Id.* 53.

But Franks simply ignores another significant difference between the UltraFit Plus and the CAEv2—the CAEv2 is dual-ended, and on the '015 test none of the flanges of the opposing earplug were folded back.  Franks therefore has no basis to

conclude that the stem of the CAEv2, rather than interference from the opposing flanges, was the cause of the higher variability on the '015 test.

### 4. Franks' Opinion That Defendants Violated EPA Labelling Regulations Is Inadmissible.

Franks offers the opinion that the EPA's labelling regulations apply to military sales and that Aearo violated those regulations. Ex36, Franks Report 38-41. He also purports to interpret the requirements of purchasing contracts. *Id.* 42-44. These are impermissible legal opinions. *See supra* 37-40, 42-43.

### 5. Franks' Opinion That Method B Testing Shows The CAEv2 Provides Inadequate Attenuation Is Inadmissible Because He Provides No Basis For Comparison.

Franks gives the opinion that the results of Aearo's Method B testing of the CAEv2 "illustrates that wearers who fit the plug themselves will not obtain adequate hearing protection." Ex36, Franks Report 12. Franks claims that the NRR(SF) of 4.4 that Aearo obtained on its Method B test of the CAEv2 was "very low" and was driven by "abnormally large standard deviations of at least 10 dB at each test frequency." *Id.* 55-56. But Franks provides *no* basis for his assertion that the CAEv2's Method B results are inadequate, because he does not compare the CAEv2's Method B results to Method B tests on any other earplug. Without a basis for comparison, Franks cannot simply assert that the CAEv2's performance on a particular metric is inadequate. *See*, *e.g.*, *Kondash*, 2020 WL 5816228, at *9

(excluding expert who opined product was defective based on failure rate where the expert "does not articulate what would be an acceptable rate").

### E.   Eric Rose Lacks Any Methodology Or Basis For Opining Regarding Alleged Product Defects.

While Defendants do not seek relief concerning Rose's opinion regarding alleged industry standards, Defendants seek to exclude his unsupported leap to opining that Aearo's supposed departing from industry standards resulted in "Increasing the Risk of Product Defects in the CAEv2 and Contributing to the Sale of a Product that Was Unreasonably Dangerous When Used as Intended" and all other Rose opinions regarding alleged defects.  Ex37, Rose Report 23; *see also* Ex38, Rose Dep. 145:6-12.  Rose's defect-related opinions lack any methodology, would not help the trier of fact, and are impermissible legal conclusions.

### 1.   Rose Did Not Use Any Methodology To Determine Whether The CAEv2 Has An Increased Risk Of Defects Or Is Defective.

An expert must have a reliable methodology, and explain how that methodology applies to the facts to yield the expert's opinion.  *See supra* 46. Nothing "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Joiner*, 522 U.S. at 146.  An "expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions."  *McDowell*, 392 F.3d at 1300;

*see also Mid-State Fertilizer v. Exch. Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) (An "expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

Rose's opinions that the CAEv2 is defective and that Aearo's design process increased the risk of defects lack any methodology. He simply assumes these conclusions based on his interpretation of documents like the Flange Memo, without conducting any testing or analysis. For example:

- Rose opines that changing the center of gravity of the CAEv2 compared to the UltraFit earplug might "negatively affect the ability of the CAEv2 to stay securely fitted in the ear during real world use." Ex37, Rose Report at 38-39, 63. But Rose did not conduct any analysis regarding whether the CAEv2's center of gravity rendered it defective. He testified the conclusion "seemed obvious" to him and he "didn't feel any calculations were necessary," so he "did not do any calculations" or a "head-to-head comparison against the precedent UltraFit earplug." Ex38, Rose Dep. 259:20-261:6.

- Similarly, Rose did not conduct any calculations regarding whether the wall thickness of the CAEv2 rendered it defective, as he "didn't feel it was necessary." *Id.* 276:5-12.

- Nor did Rose conduct any calculations or tests to determine whether internal stresses on the CAEv2 rendered it defective. *Id.* 277:12-19.

Rose's defect-related opinions should be barred under Eleventh Circuit precedent excluding opinions for lack of testing. *E.g.*, *McClain v. Metabolife Int'l*, 401 F.3d 1233, 1251 (11th Cir. 2005) (excluding opinion where theory could be tested but expert "offered no evidence of any testing of his theory, and therefore, he has shown no proof for support of his opinions by the scientific community"); *McDowell*, 392 F.3d at 1300 (affirming exclusion of opinion where expert "has not tested his own theory nor determined any error rate associated with it"); *Sorrels v. NCL (Bahamas)*, 796 F.3d 1275, 1286 (11th Cir. 2015); *Michigan Millers Mut. Ins. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998).

### 2. Rose's Opinions Do Not "Fit" The Case Because He Lacks Evidence That Plaintiffs Used A Defective CAEv2.

Rose is not aware of whether any of the Plaintiffs used a CAEv2 with the alleged defects he describes, and thus his defect-related opinions do not fit the facts of this case. He did not have any evidence that, for example, any Plaintiffs used a CAEv2 with a cracked stem, with the filter inserted backwards, or that was assembled backwards. Ex38, Rose Dep. 237:13-238:16, 239:20-240:7. Without

evidence that the Plaintiffs used a CAEv2 with these alleged defects, Rose's opinions would be confusing and unhelpful to the jury.

### 3.   Rose's Opinions That Aearo's Design Process Increased The Risk Of Product Defects Are Vague And Unspecific.

Rose's defect-related opinions also are unhelpful because they are vague and unspecific.  Rose's report asserts that Aearo's design process resulted in "Increasing the Risk of Product Defects," but does not attempt to quantify or specify by how much this risk increased.  Ex37, Rose Report 23.  Similarly, Rose testified that an inadequate design process would not by default cause defects, but only would make defective products "more likely" or "could have likely led to the product being defective."  Ex38, Rose Dep. 145:6-146:9.  Once again, he did not provide further detail as to what "more likely" or "could have likely" meant or attempt any quantification.

A "trial court may exclude expert testimony that is 'imprecise and unspecific' or whose factual basis is not adequately explained."  *Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1111 (11th Cir. 2005); *see also United States v. City of Miami*, 115 F.3d 870, 873 (11th Cir. 1997).  For example, an opinion that the earlier an injured person received treatment, the better the result would be "was 'too vague' to assist the trier of fact."  *McDowell*, 392 F.3d at 1299; *see also*

*Mahli v. Admiral Ins.*, 2015 WL 4915701, at *11 (S.D. Miss. Aug. 18, 2015) (excluding expert opinion that offered possibilities:  "Mere possibility are not the stuff of competent expert testimony"); *Wu v. Miss. State Univ.*, 2014 WL 5799972, at *12 (N.D. Miss. Nov. 7, 2014).

Rose's assertions that Aearo's design process "increas[ed]" the risk of defects, made them "more likely," or "could have likely" caused defect fall squarely into this case law.  Rose provides no quantification to his opinions, and they mean little more than the possibility that Aearo's design process might have led to an alleged defect, which is not admissible expert testimony.

### 4. Rose's Opinions Concerning The CAEv2 Being Defective And Unreasonably Dangerous Are Impermissible Legal Opinions.

Additionally, under the case law described *supra* 37-38, 40-41, Rose's defect-related opinions are legal conclusions that should be excluded.  Rose's opinion that the CAEv2 was "Unreasonably Dangerous" should be excluded for the same reason. *Strong v. E. I. DuPont de Nemours*, 667 F.2d 682, 685 (8th Cir. 1981) (holding expert testimony that a product was "unreasonably dangerous" was properly excluded as a question for the jury); *In re C.R. Bard, Pelvic Repair System Prods. Liabi. Litig.*, 2018 WL 4220602, at *3 (S.D.W. Va. 2018); *see also Plott v. NCL Am.*, 786 F. App'x 199, 203-04 (11th Cir. 2019).

## IV.     Plaintiffs' Experts' Differential Diagnoses Are Unreliable.

The Court should exclude the experts' specific causation opinions.  An expert "must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation."  *Hendrix v. Evenflo*, 609 F.3d 1183, 1197 (11th Cir. 2010); *see also Kilpatrick v. Breg*, 613 F.2d 1329, 1342–43 (11th Cir. 2010).   In other words, the expert must "take serious account" of alternative causes, and provide "a reasonable explanation as to why he or she has concluded that any alternative cause suggested by the defense was not the cause of the plaintiff's injury."  *Guinn v. AstraZeneca Pharms.*, 602 F.3d 1245, 1253 (11th Cir. 2010).

The medical causation experts do not reliably rule out significant alternative causes here, including those related to other hearing protection devices and prior medical histories.

### A.     Other Hearing Protection

*Spankovich* repeatedly dismisses and fails to provide any analysis as to whether the other hearing devices Plaintiffs used would have provided attenuation. Each of the three Plaintiffs about whom he opines used hearing devices other than

89

the CAEv2 during their military service, such as quad-flange, triple-flange, and Blue Quattro hearing protection:

- Estes' "hearing protection use included the Moldex Battleplug, the CAEv2, foam earplugs, triple flange earplugs, and [a] Crew Vehicle Helmet."   Ex39, Spankovich Estes Report 13.   Estes recalled using foam, triple flange, and Moldex Battleplug earplugs, and admitted to still possessing some of these other devices.  Ex40, Estes Dep. 26:6-22, 117:4-24.

- Hacker used foam and triple flange earplugs until at least 2003, and used quad flange earplugs after he lost his CAEv2s while deployed to Iraq in 2010.  Ex41, Hacker Dep. 23:19-23, 96:14-15, 115:2-6.

- Keefer's records repeatedly show that he used quad-flange earplugs at various points during his military service, *e.g.*, Exs42-43, Spankovich Dep. Exs. 30, 33, and also that he was fitted with Blue Quattros earplugs in 2007, Ex44, Spankovich Dep. Ex. 40.

Pressed on whether these other devices could have defects or provide imperfect protection, he stated only that he was not ***aware*** of defects "with those devices," not that he had actually researched the issue.  He also ***entirely fails*** to consider the issue of user error:  even if these other devices (or the CAEv2, for that matter) worked perfectly, Spankovich's own report explains that failure to properly

insert an earplug may bring attenuation down to zero.   Ex8, Spankovich General Report 68.   Indeed, Spankovich admits that he does "not provide an opinion regarding [Keefer's] ability to insert, fit, and seal the device."   Ex47, Spankovich Dep2. 80:13-15; *see also* Ex40, Estes Dep. 140:24-141:3 (admitting that he could not recall training on how to use the CAEv2 device).

***Packer*** offers similarly defective opinions as to Plaintiffs Backer and Estes. Baker used triple flanges, CVC helmet, SureFire Defenders, MPOW Earmuffs, Peltors, and Walker Earmuffs, while exposed to a myriad of noise exposures.   Ex48, Packer Baker Report 13-17.   Other than ruling out an incident in which Baker fired two rounds without wearing hearing protection, Packer did nothing in his report to evaluate and rule out Baker's other noise exposures in the military while wearing other hearing protection devices.   *Id.* 28-29.

Similarly, Packer acknowledges that Estes sustained military and recreational noise exposure, but offers no analysis regarding whether other earplugs caused his alleged injuries.   Ex49, Packer Estes Report 21.   For instance, when asked if the triple-flange provided Estes with adequate protection, he stated that one must look at "all of the factors," including "if those are used according to the fitting instructions," and "sized," and the "noise environment."   Ex45, Packer Dep2. at

428:21-429:8.   Despite these qualifiers at deposition, Packer's report did not evaluate each of these factors in assessing Estes' use of various devices.

*Arriaga* acknowledges that Hacker wore foam or triple-flange devices until 2003, including while operating weapons during basic training.   Ex50, Arriaga Hacker Report 1-2, 5-6.   Yet he summarily concludes that Hacker's use of those devices "did not cause his tinnitus and related injuries" due to the "temporal relationship of the symptoms to [Hacker's] injuries," *id.* 21, without ever evaluating the noise levels to which Hacker was exposed and the ability of those particular devices to adequately protect against such exposures.   So too with Hacker's recreational noise exposures, where Arriaga determined that the devices he used protected against the pertinent noise levels without any analysis.   *Id.* 22.   Arriaga's analysis with respect to McCombs is equally conclusory.   He states that McCombs' recreational noise exposures could not have contributed because he "had limited recreation [*sic*] exposure with over the ear-muffs as protection."   Ex51, Arriaga McCombs Report 12.   Nothing in the report reveals how Arriaga deduced that the noise levels and protection used did not contribute to his alleged injuries.   *Id.*   The same holds true with respect to McCombs' use of foamies, as Arriaga merely states that the "hearing protection value" of foamies is well-documented without further detail.   *Id.* 13.

92

*Lustig* acknowledges that several audiograms specifically note that Keefer used quad-flange earplugs.  Ex2, Lustig Dep. 338:22-345:6; Ex46, Lustig Dep. Exs. 19, 22-24, 26-27.

*Fagelson* acknowledged that McCombs' audiograms on multiple occasions stated he was wearing quad-flange HPDs and that on other occasions McCombs checked that he was wearing "Other" HPDs.  Ex81, Fagelson Dep. 292:12-293:8. Fagelson did not ask McCombs what McCombs was wearing when he checked "Other," *id.* 293:9-14, and thus failed to rule out McCombs use of other HPDs.

Fagelson also noted that McCombs engaged the enemy twelve times and was exposed to noise from hundreds of machine gun rounds.  *Id.* 293:15-21.  But Fagelson did not ask McCombs, or obtain any independent information about, what HPD McCombs wore during those engagements.  *Id.* 294:4-13.  Fagelson thus failed to rule out McComb's exposure to machine gun fire while wearing an unknown (or no) HPD.

Because these experts do not "take serious account" of other hearing devices, their specific causation opinions are speculative and unreliable, and should be excluded.  *See*, *e.g.*, *Guinn*, 602 F.3d at 1253; *see also Jones v. Novartis Pharmaceutials Corp.*, 235 F. Supp. 3d 1244, 1293 (N.D. Ala. 2017) (excluding

opinion where expert "did not know ... the duration, extent, or timing of [her] use of bisphosphonates other than [defendants']").

### B.    Keefer's Early-Onset Progressive Hearing Loss.

*Spankovich's* and *Lustig's* causation opinion as to Keefer should be excluded for the additional reason that they both fail to reliably rule out an additional obvious alternative cause:  that Keefer suffers from a progressive hearing loss that started before he entered the military.

Spankovich acknowledges that Keefer's pre-military hearing tests showed a "slight" to "mild" hearing loss *before* Keefer's military service.  Ex47, Spankovich Dep2.  68:18-69:18,  78:5-16,  102:10-17,  107:22-108:4.    Spankovich  further acknowledges that the left-ear versus right-ear asymmetry in Keefer's hearing loss he blames on the CAEv2 existed *before* Keefer joined the military.  *Id.* 143:5-19; Ex54, Jones-Laborde Supp. Report 1.   In other words, the exact injuries that Spankovich attributes to the CAEv2 were already showing up in records that Spankovich's report does not consider—even before Keefer joined the military.

Lustig also acknowledges Mr. Keefer's pre-military hearing tests.  Ex2, Lustig Dep. 356:4-16, 359:13-17.   He further acknowledges that Keefer's pre-military audiogram in 2005 shows the same elevated thresholds as Keefer's military audiograms.  *Id.* 359:13-17.

94

Despite these admissions, neither Spankovich's nor Lustig's report addresses Keefer's pre-military hearing loss.  Instead, both look only from the start to the end of Keefer's military career, ignoring the rest of Keefer's hearing records.  Ex53, Spankovich Keefer Report 4-6; Ex55, Lustig Keefer Report 7-8.  Both Spankovich and Lustig fail to identify the cause of Keefer's pre-military hearing loss.  Neither attempts to rule out that whatever caused that pre-military hearing loss also caused the hearing loss identified in Keefer's military career.

Simply put, Spankovich and Lustig fail to consider Keefer's pre-military hearing records, and fail to consider or reliably rule out the alternate causes.  Courts exclude differential diagnosis opinions where they opine despite lacking "full access to [the patient's] medical records," *Jones*, 235 F. Supp. 3d at 1293, and where they do not provide a "reasonable explanation" to rule out "any alternative cause suggested by the defense," *Guinn*, 602 F.3d at 1253.  The same should hold true here.

### C.    Hacker's Existing Hearing Loss And Head Trauma.

***Spankovich*** fails to consider other alternative causes that are plain on the face of Hacker's medical history as well.  As everyone in this case acknowledges, some of Hacker's symptoms have alternate causes:  "there is no question that Hacker has a right-sided hearing loss of a conductive nature not related to his military service."

95

Ex56, Spankovich Hacker Report 12.  Indeed, when Hacker first enlisted in the Army in 1998 as a teenager, he "needed a waiver for some hearing loss in [his] right ear."  Ex41, Hacker Dep. 128:13-14.

Spankovich thus limits his opinions as to Hacker to only (1) tinnitus, and (2) left-ear hearing loss.  Spankovich opines:  "Hacker's tinnitus and mild notched hearing loss of the left ear are at least as likely as not (> 50% probability) caused by a result of his military noise exposure and the defects reported in the CAEv2 report."  Ex56, Spankovich Hacker Report 12.  Spankovich admitted that even this opinion was too broad:  he admitted that he also was not opining as to even tinnitus in the right ear where "it would be difficult to rule out conductive hearing loss as a factor related to the tinnitus of his right ear."  Ex47, Spankovich Dep2. 258:15-259:2; *see also id.* at 217:14-21 (admitting that he is not offering any opinion on right-ear tinnitus).  All of Spankovich's opinions are thus relevant only to  Hacker's left ear.

Yet Spankovich cannot reliably opine as to this left ear, either.  That ear shows only limited changes during Hacker's *twenty* years of service.[14]   And Hacker's

---

[14] Among other examples, audiograms conducted in 2015, 2016, and 2018 showed that hearing in Hacker's left ear was normal.  Exs57-59, S_A_Hacker-DOD Touhy 005, 013, 016.  Hacker's hearing loss may again post-date his service:  he admitted at deposition that it was only in *2020* that he "first felt that [he] was really having the problem" in his left ear.  Ex41, Hacker Dep. 85:12-20.

tinnitus complaints are similarly mixed:  Hacker was diagnosed with tinnitus in 2006, 2010, and 2014, Ex56, Spankovich Hacker Rep. 9, but denied tinnitus in 2007, and said in January 2010 that his tinnitus was something he was able to tune out, *id.* at 6.  In March 2010, Hacker denied having any tinnitus at all.  Ex47, Spankovich Dep2. 245:15-23; Ex60, Spankovich Dep. Ex. 54.

Spankovich thus does not seriously grapple with two significant alternative causes.  ***First***, "[i]t is quite possible ... that Mr. Hacker does not have ***any*** left-ear tinnitus," where "[t]innitus ... can be difficult to localize to one ear," and where there have not been significant changes to Mr. Hacker's left-ear hearing during his military service—or even around 2006, when tinnitus was first reported.  Ex61, House Hacker Report 10-11.  Spankovich himself admits that patients sometimes have difficulty localizing the source of tinnitus.  *See* Ex47, Spankovich Dep2. 259:19-260:6 ("In your experience, do patients ever have trouble localizing tinnitus?  A.  Yes, they did.").  Despite admitting that localization is a problem for many patients—and despite admitting that he cannot opine as to tinnitus in the right ear, *id.* 217:14-21—Spankovich does not analyze this significant potential alternative cause at all.  He likewise does not provide "reasoned explanation" for this cause, which is enough to require that his opinion be excluded.  *Hendrix*, 609 F.3d at 1197.

97

***Second***, Spankovich dismisses in summary fashion Hacker's serious history of head trauma.  Hacker suffered at least ***six concussions*** between 2002 and 2017. Ex62, S_A_Hacker-000128.  Spankovich declares that these injuries were "mild," Ex56, Spankovich Hacker Report 9.  But that is only *ipse dixit*, and it fails to acknowledge the severity of a 2017 incident in which Hacker was "hit in the head by an empty ammo can"—Hacker had to be seen in the ER, and complained of constant headache for days afterward, Ex62, S_A_Hacker-000128.  Any one of these incidents could have caused Hacker's tinnitus all by itself:  "one head trauma is sufficient to cause tinnitus."  Ex61, House Hacker Rep. 11.  Because Spankovich does not "seriously account" for other alternative causes, and he does not provide a reliable causation opinion.  *Guinn*, 602 F.3d at 1253.

## V.    Plaintiffs' Economic Loss Experts Lack Any Reliable Methodology Reasonably Applied To The Facts.

### A.    Davis And Kucsma's Opinions On Earning Capacity And Worklife Capacity Should Be Excluded.

#### 1.    Davis's Opinions Are Not Tied To The Facts.

Davis's opinions are not tied to the facts of each Plaintiff's case, therefore, her opinions are unreliable and unhelpful.  Davis obtained Plaintiffs' loss of earning capacity and worklife expectancy from charts in an unpublished paper (the

98

"Paper")[15] which tabulate certain data from the American Community Survey (ACS) on earnings and worklife based on types of disabilities.  Despite differences in education, occupation, and other factors, Davis concluded that each Plaintiff would experience the same 6% loss of earning capacity.  Ex63, Davis Dep1. 123:15-127:7.

Davis admitted that the Paper upon which she bases her opinion uses a definition of hearing loss that does not apply to Plaintiffs.  Specifically, Davis acknowledges the Paper adopts the ACS hearing loss definition, which only includes people who are "deaf" or "have serious difficulty hearing."  Ex64, Paper Figure 1, 17a; Ex63, Davis Dep1. 118:22-119:8; Ex65, Davis Dep2. 69:16-70:2.

Plaintiffs' medical experts, medical reports, and employment records confirm that none of the Plaintiffs are deaf or have serious difficulty hearing.  Ex53, Davis Dep1. 214:5-10 (Baker); *id.* 349:4-7 (Keefer); Ex65, Davis Dep2. 71:2-9 (Keefer); *id.* 107:8-17 (Estes); *id.* 324:22-325:7 (McCombs).

Plaintiffs' medical reports and employment records show they can function normally without hindrance from any hearing-related disability.  The VA found Baker has 100% speech discrimination in his right ear, which Davis interprets to mean he can "determine spoken words" "at normal conversation level."  Ex63, Davis

---

[15] Gibson, D., *Use of ACS to Estimate Lifetime Loss of Earning Capacity as a Result of Disability* (2015).

Dep1. 226:1-14.  Baker told his employer that his "hearing loss is minor and only in [his] left ear.  It will in no way affect my abilities to perform my duties."  *Id.* 258:22-259:21; Ex66, Davis Dep1. Ex. 17.  Davis acknowledged that Keefer's medical expert said he "is capable of working with accommodations as his hearing loss is mild and he can deal with the impairment."  Ex63, Davis Dep1. 380:14-20.  She admits Keefer only "has mild hearing loss" and is "managing with it."  *Id.* 369:19-23.  Davis acknowledges that Estes's medical experts and VA disability rating do not indicate hearing loss or tinnitus affect his employability.  Ex65, Davis Dep2. 163:22-164:6.  She admits McCombs's employer assessed he had no work limitations based on hearing issues.  *Id.* 265:16-266:9.  Further, she acknowledged McCombs does not allege he suffers hearing loss—only tinnitus, which ACS does not include in its definition of a hearing disability.  *Id.* 323:10-12, 324:14-325:7; Ex63, Davis Dep1. 123:4-14.

The treatment recommended by Plaintiffs' medical experts will improve Plaintiffs' hearing and further disqualify them from meeting the Paper's hearing disability definition.  As confirmed by Plaintiffs' experts, medical records, and employment records, even Plaintiffs' ***unaided*** hearing is not sufficiently impaired to qualify as being deaf or having serious difficulty hearing.  Plaintiffs' impairments will decrease with the treatment identified in their rehabilitation plans.  *See* Ex67,

Davis Baker Report 13; Ex68, Davis Estes Report 11; Ex69, Davis Keefer Report 15; Ex70, Davis McCombs Report 11.

Because by their own terms the Paper's charts apply to people with *serious* hearing difficulties, which the evidence establishes Plaintiffs do not have, Davis's opinions on Plaintiffs' lost earning capacity and worklife expectancy are unreliable and unhelpful.

### 2.      Davis Does Not Use A Reliable Methodology.

Davis's methodology is unreliable because the Paper she used to reach her conclusions regarding loss of earning capacity and worklife expectancy fails to account for several factors Davis admits are key to the evaluation.  Moreover, Davis failed to apply the Paper correctly, ignoring educational data.

### a.      The Gibson Paper Is Unreliable.

Davis obtained the Paper from a free, publicly-accessible file-share website, ResearchGate.  Ex63, Davis Dep1. 110:13-111:10; Ex70, Davis McCombs Report 12 n.3.  It is not published in any peer-reviewed journal.  Ex63, Davis Dep1. 111:6-113:17.  Davis admits that the "review process" on ResearchGate consists only of "looking to make sure there's no offensive material ... that someone is trying to upload on their site."  *Id.* 117:5-13.

Figure 39 of the Paper compares the median worklife expectancy for men with and without disabilities, based on their education and age within five-year cohorts. Ex71, Paper 47.  Figure 21 compares median earnings for men ages 25-64 working full-time-year-round *as a single group* with and without disabilities, based on education level.  Ex71, Paper 32.  The chart upon which Davis relies for earnings capacity does not account for specific ages, occupation, or veteran status—all factors she concedes are important in evaluating Plaintiffs' earnings capacity.  *See* Ex63, Davis Dep1. 123:15-127:7, 136:21-137:6.  Davis acknowledges the importance of Plaintiffs' ages in evaluating earning capacity.  *See* Ex67, Davis Baker Report 4, 13; Ex68, Davis Estes Report 4, 11; Ex69, Davis Keefer Report 4, 15; Ex70, Davis McCombs Report 4, 11.  The Paper also fails to tabulate loss of earning capacity and worklife expectancy by occupation, even though the underlying ACS data includes such information.  Ex71, Paper 8 (comparison within occupation is "beyond the scope of this paper").  These omissions render the Paper unreliable.[16]

---

[16] Gibson provides detailed worklife expectancy charts through Vocational Econometrics. Ex72, Davis Dep1. Ex. 11 at 105 (Ireland, *Why the Gamboa-Gibson Disability Worklife Expectancy Tables Are Without Merit*, Journal of Legal Economics 15(2):  105-109 (2009)).  A number of courts have excluded testimony based even on these more detailed, published worklife expectancy charts.  *See Noel v. Inland*, 2018 WL 1911821, *2 (E.D. La. Apr. 23, 2018); *Lackey v. Bosch*, 2017 WL 129891, *10 (E.D. Ky. Jan. 12, 2017).  While other courts have allowed experts to testify based on the published Gamboa-Gibson worklife charts, those cases did

While Davis vaguely claims she considered certain information regarding Plaintiffs' occupations and veteran status, she fails to explain how she allegedly used such information, *see* Ex65, Davis Dep2. 57:21-58:5 (failing to account for Keefer's occupation as a police officer), and concedes her 6% earnings capacity for each Plaintiff comes from the Paper:

> Q. And you got the six percent figure for all of those Plaintiffs from this chart. Right?
>
> A. Yes. Based on the reduction in full-time, year round earnings.
>
> ***
>
> Q. So I'm clear, you were just using the six percent—the six percent loss of earnings capacity figures, you're using that percentage figure. Right?
>
> A. That is correct.
>
> ***
>
> Q. And as we discussed previously ... you get the six percent figure from Gibson's article. Right?
>
> A. Yes. Well, well referencing—referencing from the Gibson article.

---

not involve the unpublished Gibson Paper earnings capacity chart upon which Davis bases her opinions and also involve factors not present in this case. *See*, *e.g., Figurski v. Trinity*, 2015 WL 966269 (Mich. Ct. App. Mar. 5, 2015)*, vacated in part*, 876 N.W.2d 574 (2016) (expert unable to use actual earnings for child plaintiff but considered parents' education, individual's intellect and capacity to complete formal education; also undisputed that plaintiff fit disability definition).

Ex63, Davis Dep1. 127:3-7; 131:6-10; 316:18-317:1.

Because the Paper fails to account for occupation, Davis determined loss of earning capacity and worklife expectancy based on data for all occupations even though she concedes an individual Plaintiff's occupation is an important factor for earning capacity, and that hearing disabilities would have a greater impact in some occupations than others. *See id.* 92:3-93:6, 135:10-136:20, 137:22-139:5. She acknowledges data on "labor force participation for a given occupation" exists, Ex65, Davis Dep2. 176:20-23, although she did not use such data to form her conclusions on Plaintiffs.

The Paper also fails to address differences based on veteran status. *See* Ex71, Figures 21, 39. Davis acknowledges she failed to use data specific to veterans, even though the underlying ACS data would have permitted her to extrapolate data based on veteran status and VA disability ratings. Ex65, Davis Dep2. at 128:22-130:23.

Davis chose not to review or rely upon charts providing data on the factors she identifies as important to her analysis.

### b.    Davis Failed To Follow The Gibson Paper.

Davis also failed to follow the Paper. *See* Ex63, Davis Dep1. 143:17-144:3. An expert failing to follow her own methodology renders that methodology

inherently unreliable.  *Brown v. Burlington Santa Fe*, 765 F.3d 765, 776 (7th Cir. 2014).

Although the Paper tabulates male earnings by education, Davis departed from this method.  *See* Ex71, Figure 21; Ex65, Davis Dep2. 79:15-80:8, 81:2-20. The Paper identifies education as an important factor in its tabulations.  *See* Ex71, Paper at 5-13 (discussing impact of education on lost earning capacity and worklife expectancy); *id.* at 32, Figure 21 (analyzing earning capacity by ten different education levels ).  Even though Gibson determined different percentages of lost earning capacity for each education level, Davis admits she did not use those percentages.  *See* Ex65, Davis Dep2. 81:21-83:5; *id.* 126:11-23, 138:3-17.  Instead, she used an average of *all* education levels—6% loss of earning capacity.  *Id.* at 81:2-11; Ex63, Davis Dep1. 123:19-23, 126:18-127:7.

Figure 21 compares median full-time-year-round earnings for men ages 25-64 with and without disabilities, based on education level.

*Figure 21 Male Median FTYR Earnings by Level of Education*

| Highest Level of Education | No Disability | Cognitive | Mobility | Vision | Hearing |
|---|---|---|---|---|---|
| Less Than 9th grade | 27,000 | 27,000 (0%) | 29,000 (7%) | 26,500 (-2%) | 29,000 (7%) |
| Some High School | 31,500 | 28,000 (-11%) | 33,500 (6%) | 30,500 (-3%) | 35,000 (11%) |
| GED or Alt. Credential | 38,500 | 34,500 (-10%) | 38,500 (0%) | 34,500 (-10%) | 40,000 (4%) |
| High School Graduate | 42,000 | 33,500 (-20%) | 39,000 (-7%) | 37,000 (-12%) | 44,000 (5%) |
| Some College, No Degree | 48,500 | 40,000 (-18%) | 45,000 (-7%) | 42,000 (-13%) | 50,000 (3%) |
| Associate Degree | 52,500 | 44,000 (-16%) | 49,000 (-7%) | 48,000 (-9%) | 53,500 (2%) |
| Baccalaureate Degree | 73,000 | 56,500 (-23%) | 61,500 (-16%) | 59,000 (-19%) | 68,000 (-7%) |
| Master's Degree | 90,000 | 67,000 (-26%) | 71,000 (-21%) | 73,000 (-19%) | 82,000 (-9%) |
| Doctorate Degree | 104,500 | 80,500 (-23%) | 91,000 (-13%) | 96,500 (-8%) | 93,000 (-11%) |
| Professional Degree | 125,500 | 77,500 (-38%) | 96,500 (-23%) | 99,500 (-21%) | 111,500 (-11%) |
| All Levels of Education | 52,500 | 38,500 (-27%) | 44,000 (-16%) | 41,000 (-22%) | 49,500 (-6%) |

Davis used the 6% average rather than figures reflecting educational attainment.  Ex63, Davis Dep1. 123:15-127:7.  Disregarding individual Plaintiffs' education dramatically affected Davis's conclusions.  Had she applied the data in the Paper, she would have found no reduction in earning capacity for Keefer or McCombs.  For men with some college but no degree, such as Keefer and McCombs, Gibson determined the median male who is deaf or has serious difficulty hearing earns 3% *more* than the median male with similar education and no disability.  *See*

106

Ex71, Paper 32, Figure 1; Ex65, Davis Dep2. 81:2-82:16 (acknowledging Gibson's charts find someone like Keefer gains 3% earning capacity); *id.* at 322:3-323:9 (same for McCombs). According to Gibson's charts, hearing disability affects earning capacity differently depending on education. Yet Davis concluded all Plaintiffs experience the *same* 6% loss, the average of all education levels. Ex63, Davis Dep1. 126:18-127:7; Ex65, Davis Dep2. 138:3-17.

Davis's decision to disregard data specific to Plaintiffs indicating no loss in earnings capacity and her failure to follow her own methodology renders that methodology inherently unreliable.

### 3. Kucsma Relies Entirely On Davis's Unreliable Opinions.

Kucsma's opinions regarding the value of Plaintiffs' lost earnings are unreliable because her calculations rely entirely on Davis's opinions regarding Plaintiffs' loss of earning capacity and worklife expectancy. *See* Ex73, Kucsma Dep1. 116:3-12; Ex74, Kucsma Baker Report 8, 16; Ex75, Kucsma Keefer Report 7-8; Ex76, Kucsma Estes Report 7-8; Ex77, Kucsma McCombs Report 7-8. Kucsma assumed Davis's opinions and data were reliable and accurate. Ex73, Kucsma Dep1. 73:17-74:22; 88:3-89:5. Kucsma was not aware of any analysis Davis conducted, beyond Davis's reports and depositions. *Id.* at 72:18-73:16; *id.* at 93:15-20 ("I did rely obviously on the expert opinion of Dr. Davis as it relates to any reduced earning

107

capacity and any reduced worklife expectancy, [and] specifically how she arrived at her expert opinions is something that only she can answer.").

The unreliability of Davis's opinions renders Kucsma's opinions on lost earnings unreliable as well.

### 4.    Kucsma's Fringe Benefits Opinion Is Unreliable.

Kucsma's fringe benefits opinion was previously excluded for relying on national averages across all sectors because she did not "explain why this nationwide figure is an appropriate estimate for fringe benefits" for a Plaintiff's occupation and geography. *Joffe v. King & Spalding*, 2019 WL 4673554 *8 (S.D.N.Y. Sept. 24, 2019) (rejecting 4.8% national average as unreliable).[17]  Kucsma determined Baker's fringe benefits using the same estimated national average that the court rejected as unreliable in *Joffe*, instead of ascertaining his actual fringe benefits.  Ex74, Kucsma Baker Report 8 (using 4.8% national average); Ex73, Kucsma Dep1. 65:5-67:23 (used the same 4.8% in both cases).  Similarly, Kucsma calculated Keefer's fringe benefits based on an estimated national average of employer contributions to benefit plans for union workers across all professions, instead of looking at specific

---

[17] The court in *Kohl v. Young*, 2018 WL 3104447 (N.D.N.Y. June 22, 2018) did allow Kucsma's fringe benefits calculation.

contributions made by his employer.  Ex75, Kucsma Keefer Report 7; Ex73, Kucsma

Dep1. 361:6-22.

### B. Johnson Simply Copies Publicly Financial Figures Without Any Analysis Or Expert Opinion.

Expert "testimony which merely regurgitates factual information that is better

presented directly to the jury rather than through the testimony of an expert witness

is properly excluded." *In re C.R. Bard Pelvic Repair Sys. Prod. Liab. Litig.*, 948 F.

Supp. 2d 589, 608 (S.D. W. Va. 2013); *see also Kia v. Imaging Sci. Int'l*, 2010 WL

3431745, at *5 (E.D. Pa. Aug. 30, 2010); *In re Rezulin Prods. Liab. Litig.*, 309 F.

Supp. 2d 531, 551 (S.D.N.Y. 2004).

Moreover, expert testimony can assist the trier of fact only "if it concerns

matters that are beyond the understanding of the average lay person." *Frazier*, 387

F.3d at 1262.  "Proffered expert testimony generally will not help the trier of fact

when it offers nothing more than what lawyers for the parties can argue in closing

arguments." *Id.* at 1262-63.  For example, an expert opinion concluding that the

defendant "is capable of paying punitive damages without going bankrupt," was

excluded as not helpful to the jury, as "entitlement to punitive damages, and the

amount, if any, to which Plaintiff is entitled are matters both sides can argue based

upon the financial information defendant has produced in discovery." *See Wheeler v. Blackbear*, 2013 WL 3323385, at *1-2 (M.D. Fla. July 1, 2013).

Johnson's testimony should be excluded under these precedents because he simply copies financial figures from 3M's publicly available financials without offering any opinion, evaluation, or analysis of what those figures mean. Ex78, Johnson Report 1-3. A report listing financial facts such as 3M's net worth, net sales, and current line of credit without any analysis does not involve any expertise or methodology, but are merely regurgitations of factual information. Johnson acknowledged that anyone with the Internet can access 3M's stock price, 10-K, and 10-Q and see the same information. *Id.* 1; Ex79, Johnson Dep. 95:1-4; 99:6-100:23.

Johnson stated that he did no statistical analysis, no computer modeling, and did not use a computer at all in the "arithmetic sense." Ex79, Johnson Dep. 101:1-9. Instead, the extent of his arithmetic in this case consists of three calculations: sales per day, average cash flow over five years, and free cash. *Id.* 102:3-103:10. Johnson acknowledged that the calculations involved to determine these figures used "basic" and "simple" arithmetic. *Id.* 106:17-21; 106:22-107:5; 112:12-113:7. Specifically, sales per day and average cash flow use division, and free cash involves subtraction.

110

Johnson's testimony adds no more value than if parties' attorneys introduced 3M's financial statements into evidence, and read the line items for net worth, net sales, or other similar metrics to the jury, and argued what punitive damages should be. The application of simple math like addition and division does not qualify as specialized knowledge or assist the trier of fact. *See, e.g.*, *In re Connolly,* 398 B.R. 564, 575-77 (E.D. Mich. 2008); *Israel Travel Advisory Serv. v. Israel Identity Tours*, 1993 WL 387346, at *2 (N.D. Ill. Sept. 23, 1993); *see also Jones Creek Invs. v. Columbia Cnty.*, 2013 WL 12141348, at *20-21 (S.D. Ga. Dec. 23, 2013).

Nor can Johnson's statement that "3M is a growing entity" be construed as an admissible opinion. Ex78, Johnson Report 3. Johnson merely looked in the 10-K and saw that the number for net sales in 2015 was smaller than the number listed in 2019. He acknowledged that he made no use of "scientific analysis" nor "scientific principles." Ex79, Johnson Dep. 158:10-159:10. This comparison can easily be performed in Plaintiffs' counsel's closing arguments and understood by any member of the jury, and thus cannot assist the trier of fact through the use of any expertise.

Johnson having no methodology to support his non-opinion provides yet another reason to exclude his testimony. *See United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003). His report does not describe any methodology for picking certain financial facts as opposed to others, and his report states that the list of

metrics he chose "is not exhaustive but is intended to inform of the importance of the numerous financial metrics that comprise an analysis of financial condition." Ex78, Johnson Report 2.  Nor does he employ any methodology or provide any opinion as to how to compare the metrics to each other, which weight to give them, or how they determine a company's financial condition.

## VI.    Hidden Hearing Loss Opinions Do Not Fit Plaintiffs' Facts.

Arriaga, Bielefeld, Fagelson, Packer, Spankovich each opine regarding "cochlear synaptopathy" or "hidden hearing loss" ("HHL"), the hypothesis that there may be hearing loss not detectible by a standard audiogram.  The HHL opinions of Packer, Arriaga, Bielefeld, Spankovich do not fit the facts here because they do not opine that any Plaintiff actually has HHL.  While Fagelson opines that McCombs has issues "consistent with" HHL, he does not cite any support for his opinions, lacks any methodology, and his vague opinion is not helpful to the trier of fact.

### A.    There Is No Fit Between The HHL Opinions of Arriaga, Bielefeld, Packer, and Spankovich And Plaintiffs' Cases.

To meet *Daubert* and Rule 702's relevance requirement, the expert testimony must be "relevant to the task at hand."  *Daubert v. Merell Dow Pharms.*, 509 U.S. 579, 591 (1993).  In other words, "scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts." *McDowell*, 392 F.3d at 1299.

112

Here, the HHL opinions of Arriaga, Bielefeld, Packer, and Spankovich are not relevant and will not help the jury because they do not opine that any Group A Plaintiff actually has HHL.

### 1.    Arriaga Does Not Opine That Hacker or McCombs Have HHL.

Arriaga offers opinions regarding Hacker and McCombs, but offers no conclusion that either has HHL.   Because Arriaga's reports did not include any opinion that Hacker or McCombs have HHL, he cannot offer that testimony at trial. Fed. R. Civ. P. 26(a)(2)(B)(i); *Salgado by Salgado v. Gen. Motors*, 150 F.3d 735, 742 (7th Cir. 1998); *Pensacola Beach Cmty. United Church. v. Nat'l Union Fire Ins.*, 2007 WL 9735727, at *4 (N.D. Fla. Mar. 9, 2007).

Arriaga also testified that "[he] didn't officially opine that [Mr. Hacker] has hearing loss from the noise exposure."   Ex80, Arriaga Dep1. 336:19-21.   He described HHL for Hacker as "kind of an academic issue."  *Id.* 335:22-336:12.  He went on, "with Mr. Hacker, the only hearing issue is … how the tinnitus affects him. ... But I'm not making an opinion of a sensorineural hearing loss on Mr. Hacker." Ex97, Arriaga Dep2. 377:5-12.

As for McCombs, Arriaga testified that "the symptoms of tinnitus are related to a damage past the hair cells.  [HHL] can be part of that mechanism, but that's not

113

germane to the excessive loud sounds that he felt and ultimately developed the tinnitus that his brain is overinterpreting the signals that are coming through." *Id.* at 690:23-691:8.   He clarified that "cochlear synaptopathy can be one of the mechanisms" but did not "opine[] as to what the specific mechanism is." *Id.* at 691:19-692:7.  Thus, in addition to being barred for failure to disclose the opinion, any testimony by Arriaga that McCombs has HHL would be impermissible speculation. *McClain*, 401 F.3d at 1245; *Allison*, 184 F.3d at 1316-17.

### 2.    Packer Does Not Opine That Baker Or Estes Have HHL.

Packer does not opine that either Baker or Estes has HHL.  Nothing in Packer's report regarding Estes opines that Estes has HHL.  Ex49, Packer *Estes* Report at 14-23.  Thus, Packer may not do so at trial. *See supra* 113.

Packer confirmed that Baker does not have hidden hearing loss in his left ear. Ex45, Packer Dep. 566:24-567:2.  With respect to Baker's right ear, Packer testified that, in his opinion, Baker's change in audiograms from 2005 to 2009 reveal ordinary (not hidden) hearing loss. *Id.* 567:22-568:25; Ex25, Packer Dep1. 221:4-13.[18]

---

[18] Moreover, Baker's alleged manifestation of hearing loss does not match the clinical presentation that Packer ascribes to HHL.  Someone with HHL has "a normal threshold audiogram" but has "more difficulty than expected hearing." Ex45, Packer Dep2. 569:1-17.  Packer admits that "the audiogram that [Baker] shows should post [sic] significant hearing difficulty for him and he does have significant hearing difficulty." *Id.* 570:5-571:15.  While Packer maintained at deposition that Baker's

### 3.   Spankovich Does Not Opine That Estes, Hacker, or Keefer Have HHL.

While Spankovich's general report discusses HHL, none of his Plaintiff-specific reports regarding Estes, Hacker, or Keefer opines that they have HHL. Thus, he is barred from offering testimony that any of these three Plaintiffs has HHL. *See supra* 113.

Moreover, Spankovich disavowed that he was opining as to the existence of cochlear synaptopathy in Estes, Hacker, or Keefer.  As to Estes, Spankovich explained that he did "not need to determine whether there's hidden hearing loss." Ex9, Spankovich Dep1. 130:8-11.  He further admitted that "in Mr. Hacker's case, I have not observed any data consistent with evidence of cochlea [*sic*] synaptopathy," and "did not personally perform any tests to determine or rule in or rule out evidence of synaptopathy" as to him.  *Id.* at 133:6-8, Ex47, Spankovich Dep2. 208:20-23. And asked whether he "conduct[ed] any tests to look for signs of synaptopathy" in Keefer, he similarly admitted, "I did not."  Ex9, Spankovich Dep1. at 132:12-18.

---

symptoms may be "consistent with" synaptopathy, that is insufficient under *Daubert*.  *See supra* 46; *infra* 119-20.

115

### 4. Bielefeld Did Not Testify That Any Plaintiff Has HHL.

Bielefeld filed a general report and confirmed at his deposition that his testimony would not relate to any specific Plaintiff.  Ex3, Bielefeld Dep. 22:20–23:1.  Thus, he is barred from offering testimony that any Plaintiff has HHL.  *See supra* 113.

In fact, when Defendants attempted to ask Bielefeld about individual Group A Plaintiffs' speech recognition testing, Plaintiffs' counsel instructed Bielefeld not to answer, stating:  "I think it's just generally inappropriate to take these [] things up with this witness.  He has not been identified as a case-specific expert, nor has he reviewed these plaintiffs' records in their entirety ... ."  Ex3, Bielefeld Dep. 80:4-11.  By Plaintiffs' own admission, Bielefeld has nothing to offer individual Plaintiffs.

### B. Fagelson's HHL Opinions Lack *Any* Support.

#### 1. Fagelson Fails To City *Any* Study Or Literature Regarding HHL In His Report.

Fagelson opines that Plaintiff McCombs has issues "consistent with" HHL, but his opinions lack **any** foundation or grounds, much less the validated, reliable foundation required by Rule 702.  *See supra* 46.  Fagelson has not published any articles or work regarding HHL, and thus purports to rely on studies conducted by others.  Ex81, Fagelson Dep. 361:9-18, 364:1-8, 371:11-373:1.  It is "entirely proper—indeed necessary—for the district court to focus on the reliability of these

sources and methods." *Kilpatrick v. Breg*, 613 F.3d 1329, 1336 (11th Cir. 2010). If the studies or literature do not in fact support the expert's methodology or opinions, then the expert's testimony should be excluded. *Joiner*, 522 U.S. at 146; *Kilpatrick*, 613 F.3d at 1337-1341; *Amorgianos v. Nat'l R.R. Passenger*, 303 F.3d 256, 266, 269-70 (2d Cir. 2002); *In re Deepwater Horizon BELO Cases*, 2020 WL 6689212, at *12-14 (N.D. Fla. Nov. 4, 2020) (Rodgers, J.).

Fagelson admitted that he does not cite a single study or article regarding HHL, either in the report's body or in the list of reliance materials. Ex81, Fagelson Dep. 359:18-360:19, 364:9-13. Without such citations, Fagelson's HHL opinions lack any support, and should be excluded.

### 2. Fagelson's Uncited Animal Studies Cannot Support The Existence Of HHL In Humans.

Extrapolating from existing studies or data requires a methodology based on a scientifically reliable foundation. "[S]cientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591-93. "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

117

Fagelson admits his HHL opinions do not rely on any human studies.  Ex81, Fagelson Dep. 374:9-375:3, 377:6-12.  Instead, his report mentions only uncited and unidentified "animal studies" and "[a]nimal data."  Ex82, Fagelson General Report 11-12.

Experts cannot extrapolate from animal studies to humans without a scientifically valid basis.  *E.g.*, *Joiner*, 522 U.S. at 144-45; *Allison v. McGhan Med.*, 184 F.3d 1300, 1314 (11th Cir. 1999); *Kilpatrick*, 613 F.3d at 1338-39.  Fagelson admits his report does not cite any studies or other materials linking HHL in the uncited animal studies to the hypothesis that HHL can exist in humans.  Ex81, Fagelson Dep. 380:3-23.  Nor does his report provide any scientific basis for extrapolating from these "animal studies" to humans.  Ex82, Fagelson General Report 11-12.  Without any such explanation, Fagelson's human synaptopathy is connected to the (unidentified) animal data only by his own *ipse dixit*, which is insufficient for admissibility.  *Joiner*, 522 U.S. at 146.

## C. Fagelson's Opinion That McCombs Has Issue "Consistent With" HHL Is Unhelpful And Not Based On Any Methodology.

### 1. Opining That A Person Has Issues "Consistent With" HHL Is Unhelpful To The Trier Of Fact.

A "trial court may exclude expert testimony that is 'imprecise and unspecific' or whose factual basis is not adequately explained."  *Cook*, 402 F.3d at 1111; *see*

118

*also McDowell*, 392 F.3d at 1299; *Frazier*, 387 F.3d at 1266; *Lee-Bolton*, 319 F.R.D. at 378.

Fagelson's opinion that McCombs has "issues consistent with" HHL, Ex83, Fagelson McCombs Report 12-13, is "imprecise and unspecific" testimony that should be excluded. Opinions that a conclusion is "consistent with" the facts is speculative, not based on sufficient facts or data, and should be excluded. *See Morton v. Gov't Employees Ins.*, 2019 WL 4739418, at *4 (S.D. Fla. Aug. 2, 2019) (excluding expert who opined that burn pattern analysis for vehicle fire was "consistent with" various scenarios); *see also Kolesar v. United Agri Prods*, 412 F. Supp. 2d 686, 698 (W.D. Mich. 2006) (expert opinion that plaintiffs' symptoms were "consistent with" exposure to chemical was "not helpful to the jury because it does not make more likely or not a conclusion that Plaintiff was injured due to chemical exposure"), *aff'd*, 246 F. App'x 977 (6th Cir. 2007); *Alsadi v. Intel*, 2019 WL 4849482, at *10 (D. Ariz. Sept. 30, 2019) (excluding expert opinion that plaintiff's "symptoms and medical treatment are 'consistent with a diagnosis of'" a syndrome); *Piper v. Mo. Pac. R.R.*, 847 S.W.2d 907, 909 (Mo. Ct. App. 1993) (affirming exclusion of proposed expert testimony that plaintiff's "hearing loss was consistent with a noise induced loss" as stating that "plaintiff's condition was consistent with noise induced loss was not the equivalent of stating that noise was the cause of the

loss, only that it was one of the possibilities"). Many issues or symptoms are "consistent with" a wide range of disorders. Telling the jury that an issue or symptom is "consistent with" some supposed disorder provides nothing useful.

Moreover, Fagelson repeatedly refused to testify that he had reached a conclusion to a reasonable degree of medical certainty as to whether McCombs has HHL, even though he used that standard for other opinions. Ex81, Fagelson Dep. 399:15-403:23; Ex83, Fagelson McCombs Report 8, 15. Fagelson also admitted there was "no way of knowing" whether McCombs had HHL without harvesting his temporal bone and that he had not been able to conduct "some kind of skull scan" to determine if McCombs had HHL. Ex81, Fagelson Dep. 399:23-400:23. Other decisions have excluded opinions where the expert similarly expresses doubt or uncertainty about his conclusions. *See Guinn*, 602 F.3d at 1255-56.

### 2.  Fagelson's McCombs Opinion Is Subjective, Untested, And Is Not Based On Any Reliable Methodology.

Fagelson does not provide any methodology, much less a reliable one, to determine whether a person has "issues consistent with" HHL. He does not identify any recognized or generally accepted method for diagnosing HHL in living humans. Fagelson simply cherry picks certain issues McCombs claims to have. Fagelson's "methodology" is subjective and ad hoc, falling far below the standard for

admissibility.  *See*, *e.g.*, *Addison v. Arnett*, 2016 WL 1441803, at *5 (S.D. Ga. Apr. 12, 2016); *Sackman v. Balfour Beatty Communities,* 2014 WL 4415938, at *26 (S.D. Ga. Sept. 8, 2014); *Silicon Knights v. Epic Games*, 2011 WL 6748518, at *7-8 (E.D.N.C. Dec. 22, 2011).

Fagelson's failure to follow any methodology also is established by his not conducting an audiometric brain stem ("ABR") exam.  ABR is the only test Fagelson identified as potentially being capable of identifying synaptopathy, though he admitted that "the jury is still out" on the "sensitivity and the specificity of the ABR test in terms of a diagnosis for synaptopathy."  Ex81, Fagelson Dep. 398:11-15, 401:7-17.  That the "jury is still out" on the ABR test further demonstrates that Fagelson does not know of any scientifically reliable way to diagnose synaptopathy. Furthermore, Fagelson did not even perform this test on McCombs, *id.* 401:1-23, 399:1-8, confirming that he lacked any reliable methodology.  *See*, *e.g., Brown v. Burlington N. Santa Fe*, 765 F.3d 765, 776 (7th Cir. 2014) (if the expert "failed to follow his own stated methods, the [district] court could reasonably conclude that he had failed to follow any reliable method."); *Amorgianos*, 303 F.3d at 268-69.

## VII.   Plaintiffs' Experts' Opinions Regarding PTSD Are Speculative And Inadmissible.

### A.   Fagelson, An Audiologist, Lacks The Qualifications To Opine About Medical Conditions Such As PTSD Or Sleep Disorders.

To testify as an expert, a witness must be qualified by knowledge, skill, experience, training, or education.   Fed. R. Evid. 702.   The "expert [must be] qualified to testify competently regarding the matters he intends to address." *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 562 (11th Cir. 1998).   "Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702." *Louis Vuitton Malletier v. Dooney & Bourke,* 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) (collecting cases).

Fagelson opines about PTSD in general and McCombs' PTSD and sleep disorders in specific, Ex82, Fagelson General Report 16-19, Ex83, Fagelson McCombs Report 8, but admits he is not a psychiatrist, psychologist, and does not hold any medical degrees or licenses, Fagelson Dep. 145:14-16, 146:4-23, 147:1-9, 148:9-149:6, 149:18-20, 151:3-10.   Because PTSD is a medical condition, only a licensed psychiatrist, psychologist, or physician experienced with mental health issues can be qualified to diagnose or testify about PTSD. *E.g.*, *United States v. Crosby*, 713 F.2d 1066, 1077 (5th Cir. 1983); *Hooten v. City of Hondo*, 2006 WL 5159387, at *1 (W.D. Tex. June 8, 2006); *Nemeth v. Citizens Fin. Grp.*, 2012 WL

122

3278968, at *6 (E.D. Mich. Aug. 10, 2012); *Schaefer-Condulmari v. U.S. Airways Grp.,* 2012 WL 2920375, at *5 (E.D. Pa. July 18, 2012). This same logic applies to sleep disorders. As Fagelson has no medical licenses, he is not qualified to testify regarding PTSD or sleep disorders, and all such testimony should be excluded.

### B. Arriaga's Opinions Relating To Hacker's PTSD Should Be Excluded As Hacker's Symptoms Are Below The Threshold For PTSD.[19]

Arriaga opines that Hacker's PTSD was aggravated by his use of the CAEv2. Ex84, Arriaga General Report 21. But no expert will offer an opinion that Hacker even has PTSD. In particular, Arriaga does not intend to do so. *See* Ex80, Arriaga Dep1. 491:12-13 ("I'm relying on the fact that he carries the diagnosis of PTSD.").

"Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials*, 555 F.3d 383, 388 (5th Cir. 2009). Although Hacker received a PTSD diagnosis between February and April 2016, Ex85, S_A_Hacker-VA Touhy 532, his more-recent records from October, November, and December 2017 each state his symptoms are subthreshold: "Given his current report of symptoms, it appears [Hacker] may have symptoms which are

---

[19] Based on Hacker's representations to Defendants and this Court, Defendants are moving separately on non-*Daubert* grounds to preclude any expert testimony in Hacker's case relating to health conditions beyond hearing loss and tinnitus.

subthreshold at this time.  He does not currently appear to have significantly compromised functioning, or a cluster of symptoms wholly consistent with current PTSD."  Exs86-89, S_A_Hacker-VA Touhy 1334, 1336, 1354, 7213.  Accordingly, Arriaga's opinion is based on insufficient facts, and he should not be allowed to opine that the CAEv2 aggravated Hacker's now non-existent PTSD.

### C.    Packer's Opinion Regarding Baker's PTSD Are Speculative And Not Based On Sufficient Facts.[20]

Packer asserts that Baker's "[h]earing loss may also impact on PTSD as an additive factor in the anxiety and depression that often develops as a consequence." Ex48, Packer Baker Report at 27.  Whether Baker's alleged hearing impairment *may* impact his PTSD is speculative.   "Subjective speculation that masquerades as scientific knowledge does not provide good grounds for the admissibility of expert opinion."  *McClain*, 401 F.3d at 1245.  Courts regularly exclude opinions that an event is possible, which is the substance of Packer's opinion that Baker's hearing loss "may" impact his PTSD.  *See supra* 87-88.

Furthermore, Packer admits that Baker's PTSD is currently in remission and that he has not reviewed all of his psychology records.  Ex45, Packer Dep2. 582:10-

---

[20] Defendants will be separately moving on non-*Daubert* grounds to preclude testimony related to Baker's PTSD based on Baker's interrogatory responses.

15, 586:21-24. And though Packer admits that the impact of hearing impairment on PTSD is dependent upon high cortisol levels, Packer has never looked at Plaintiff Baker's cortisol levels. *Id.* 586:2-17. Thus, without any analysis or methodology set forth in his report or at deposition, Packer's testimony about a hypothetical impact that Baker's hearing-related injuries may have on his PTSD is speculative. *See Salgado*, 150 F.3d at 742; *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008).

## VIII.  Other Experts Offer Opinions Beyond The Scope Of Any Expertise.

### A.  Arriaga Is Not Qualified To Offer Opinions Regarding Product Testing, Labeling, Or Design Features.

Arriaga's report includes opinions on product testing, design, and labeling. But he is not an expert in these areas.

Arriaga is not an engineer. Ex80, Arriaga Dep. 71:15-18. He has "not designed a preformed earplug." *Id.* at 73:3-6. Nor has he conducted any testing on the CAEv2. *Id.* at 77:3-6. In fact, he has never even performed REAT testing on a preformed earplug. *Id.* at 74:16-76:17. Although Arriaga testified that he "kind of ha[s] to work with [engineers]" because he creates impressions for custom hearing aids (not preformed earplugs), *id.* at 71:19-73:2, his experience as an ENT is not sufficient under Rule 702 to proffer testimony to a jury on the specific issues of the design, testing, and labeling of the CAEv2. *Trevino v. Bos. Sci. Corp.*, 2016 WL

2939521, at *13 (S.D. W. Va. May 19, 2016).  To the contrary, Arriaga stated that he primarily relies on the NRR in "[r]ecommending and evaluating hearing protection," not an analysis of design issues.  Ex14, Arriaga General Report 4.

Arriaga has never tested a preformed earplug to compute a noise-reduction rating.  Ex80, Arriaga Dep. 76:18-77:2.  "And there is no indication in Dr. [Arriaga's] expert report or otherwise that he has additional experience with product testing or clinical trials that sets him apart from the average [ENT] on this particular matter."  *Trevino*, 2016 WL 2939521, at *13 (excluding pelvic surgeon from opining about product testing or clinical trials).  In short, Arriaga did take the CAEv2 "apart to see the – the contents inside and to see what that filter looks like."  Ex80, Arriaga Dep. 77:20-22.  But even his "best tinkering, pseudo-engineering approach," *id.* at 77:23, cannot evade the requirements of Rule 702.

## B. Bielefeld's Opinions About Employment Rates, Earning Capacity, Mental Health Issues And Dementia Are Improper And Inadmissible.

Of his 89 page report, Bielefeld devotes only one short paragraph to concluding there is a relationship between hearing loss and (1) rate of employment, (2) earnings, (3) psychological distress, (4) loneliness, (5) social isolation, and (6) dementia.  But Bielefeld's *ipse dixit* is not proper expert testimony.  First, Bielefeld is not an expert on any of these issues.  Second, Bielefeld fails to utilize any

methodology, or provide *any* explanation or analysis as to why his opinions are accurate.  Third, Bielefeld's testimony about correlation is unrelated to any specific Plaintiff and therefore will confuse the trier of fact.  Correlation is not causation, and general correlation testimony without Plaintiff-specific facts to consider will not assist the trier of fact.  Finally, experts are restricted to the opinions offered in their report.  Bielefeld, for the first time at his deposition, offered testimony that he believed that there may be causal links among the aforementioned issues.

### 1.  Bielefeld Is Not An Expert In Economics, Psychology, or Dementia.

Under Rule 702 "a witness must be qualified in the *specific* subject for which his testimony is offered." *Whiting v. Boston Edison*, 891 F. Supp. 12, 24 (D. Mass. 1995); *see also Louis Vuitton Malletier,* 525 F. Supp. 2d at 642 ("An expert qualified in one subject matter does not thereby become an expert for all purposes.  Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702.").

Bielefeld is not an expert in economics and has no background in economics. Ex3, Bielefeld Dep. 262:15-17; 263:21-23.  Bielefeld is not qualified to provide expert opinions related to psychology.  *Id.* 263:13-20.  Nor does he claim to be

qualified to provide expert opinions on dementia.  *Id.* 320:2-4.  He thus is not qualified to testify about economic loss or mental health issues.

### 2. Bielefeld Utilized No Methodology And Provided No Analysis Or Explanation, So His Opinions Are Unreliable Ipse Dixit.

An "expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid-State Fertilizer*, 877 F.2d at 1339.  When opining that hearing loss correlates to lower rates of employment and earnings, Bielefeld simply declares, "[i]ndividuals with hearing loss have shown lower rates of employment than those with normal hearing, and those with hearing loss who are employed earn lower incomes."  Ex4, Bielefeld Report 57.  Similarly, when opining about the relationship between hearing loss and mental health issues, Bielefeld declares, "adults with self-reported hearing loss also report higher levels of psychological distress and had greater odds of reporting loneliness and social isolation compared with those with self-reported excellent hearing."  *Id.*

To support his conclusory opinions Bielefeld relies on a series of articles that relate only to correlation, not causation.[21]  An opinion of mere correlation, without

---

[21] Bielefeld improperly speculated for the first time at his deposition that there may be a causal relationship between hearing loss and the aforementioned issues. Bielefeld is not allowed to opine about issues not included in his report.  *See Pensacola Beach Cmty. United Church v. Nat'l Union Fire Ins.*, 2007 WL 9735727,

an opinion as to causation, is not helpful to the finder of fact and is therefore inadmissible. *See e.g. Siharath v. Sandoz Pharm.*, 131 F. Supp. 2d 1347, 1373 (N.D. Ga. 2001) (refusing to allow in expert testimony that did not establish causation, but relied on "unfounded extrapolations" and "leaps of faith."), *aff'd Rider v. Sandoz Pharm.*, 295 F.3d 1194 (11th Cir. 2002).

To support his claim that individuals with hearing loss are less employable and have a diminished earning capacity, Bielefeld cites an article that only hypothesized about a potential correlation between hearing loss and decreased employment and income. The study itself warned that it had limitations, that suggested changes to healthcare policy based on the study would be "premature," and that "further studies are warranted." Ex90, Jung & Bhattacharyya, *Association of Hearing Loss* 774. The other article Bielefeld cites notes that the research in this area is not well developed and that "[t]here are few prior studies investigating the socioeconomic impact of hearing loss." Ex91, Emmett & Francis, *The Socioeconomic Impact* 548.

---

at *4 (N.D. Fla. Mar. 9, 2007). Furthermore, Bielefeld provides no support for this assertion, every article he relies on relates only to correlation. "Subjective speculation that masquerades as scientific knowledge does not provide good grounds for the admissibility of expert opinion." *McClain*, 401 F.3d at 1245.

To support his threadbare opinion that hearing loss and psychological distress are correlated, Bielefeld relies on a study that merely found a correlation between hearing loss and psychological distress.  Ex92, Bigelow, *Association of Hearing Loss* 1.  This study does not discuss causation and warns that "[f]urther research is needed to investigate whether HL [hearing loss] may be a modifiable risk factor for these outcomes." *Id.*  Furthermore, Bielefeld failed to mention that the article states, "[t]he existing literature suggests potential associations between hearing loss and psychological distress, but studies have been limited by small sample sizes or nongeneralizeable cohorts." *Id.* 2.  Thus, this July 2020 concludes that no reliable study has found even a *potential association* between hearing loss and psychological distress.

To support his conclusory assertion that individuals with hearing loss are more likely to experience loneliness, Bielefeld cites a June 2020 study that stressed, "[t]his study is also cross-sectional and causality cannot be established." Ex93, Huang, *Hearing Impairment and Loneliness* 4.  The study noted that "[p]revious studies demonstrate mixed associations between impaired hearing and loneliness" and described the literature on the topic as "sparse and mixed." *Id.* 1, 4.

To support his claim that hearing loss increases social isolation Bielefeld cites an article that concluded that it could not "determine whether the observed

130

associations are causal." Ex94, Shukla, *Hearing Loss, Loneliness* 631.  The article notes that "there are relatively few epidemiologic studies exploring hearing loss and social isolation and/or loneliness among older adults." *Id.* 623.  Moreover, "three of the 9 cross sectional studies [the article reviewed] did not find an association between hearing and loneliness." *Id.* 624.  Additionally, the article reviewed only two longitudinal studies and neither found a significant association between hearing and loneliness.  *Id.* 625-28.

Bielefeld also relies on an article that only discusses a potential correlative relationship between hearing loss and dementia.  Ex95, Livingston, *Dementia prevention, intervention*.  The article contains a risk model that indicates that 9.1 percent of dementia *may* be attributable to hearing loss.  *Id.* 2677.  However, Bielefeld failed to cite a newer version of the same study from 2020 that reduced the modifiable risk factor from 9.1 percent down to 8.2 percent.  Ex96, Livingston, *Dementia prevention:  2020 report* 417.  Furthermore, the article added traumatic brain injury ("TBI") as a risk factor and assigned it a 3.4 percent modifiable risk, noting that "[m]ilitary veterans have a high risk of occupational TBI."  *Id.* 420.  Additionally, Bielefeld stated that a TBI could result in hearing loss and that he did not know whether a TBI could cause dementia because it was "outside of his area of expertise."  Ex3, Bielefeld Dep. 282:23-283:5.

Bielefeld's failure to utilize any methodology in forming his opinions, and his lack of analysis and explanation of these opinion independently makes his testimony inadmissible. *See supra* 46. Furthermore, the studies that Bielefeld cites do not provide a reliable basis for his opinion. *See supra* 116-17.

### C.    McKinley Has No Expertise In ISO 9001.

McKinley seeks to proffer testimony related to Aearo's noncompliance with ISO 9001:1994 (ISO 9001) in the design and manufacturing of the CAEv2 despite not having the expertise to do so. A "witness may not qualify—through reading and preparation—as an expert in 'an entirely different field or discipline.'" *Trilink Saw Chain, LLC v. Blount*, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008). And "many courts have excluded testimony when they determine that the witness is testifying to an area outside of—but related to—his expertise." *Id.*

At most, McKinley testified that he had "some exposure" to ISO 9001 when working with BOSE to develop certain hearing protection devices and has generally reviewed quality assurance programs for other product manufacturers. Ex24, McKinley Dep. 276:6-15. Setting aside that McKinley's work with BOSE ended prior to the issuance of ISO 9001, *id.* 277:7-11, "some exposure" to ISO 9001 is hardly the level of expertise that is required to offer expert testimony under Federal Rule of Evidence 702. And his role at the Air Force Research Laboratory cannot

132

provide him with the necessary expertise, as it was never certified by ISO 9001. *Id.* 277:21-23. So even though McKinley may have expertise *related to* the evaluation of hearing protection devices, that expertise does not qualify him to render opinions regarding ISO 9001.

## IX. Other Opinions Should Be Excluded.

### A. Packer's Opinions Regarding Estes' Or Baker's Comorbidities Are Speculative And Unreliable.

Packer's opinions about certain effects of Baker's and Estes's alleged hearing-related injuries are speculative. First, though opining that their comorbidities will certainly impact their hearing impairments, Packer admitted at deposition that the comorbidities are "projections," and "likely possibilities." Ex45, Packer Dep2. 399:24-401:3. Because neither Baker nor Estes currently have these comorbidities, Packer's "future prognosis is mere speculation based solely on *ipse dixit*," so it must be excluded. *Salinero v. Johnson & Johnson*, 2019 WL 7753453, at *7 (S.D. Fla. Sept. 5, 2019). Moreover, testimony regarding "possibilities" does not aid the jury. *See supra* 87-88.

Second, Packer's opinions regarding cognitive decline are based on association that is "becoming better understood." Ex7, Packer General Report at 40. But "showing association is far removed from proving causation." *Allison*, 184 F.3d at 1315 n.16; *Kilpatrick*, 613 F.3d at 1338. Packer agrees. Ex45, Packer Dep.

133

579:24-580:10.  Indeed, Packer posited:  "Does that mean that the elevation of risk [regarding cognitive decline] is causative?  That is not necessary what [he is] saying."  *Id.* 463:1-15.  If Packer cannot draw a causal relationship between cognitive decline and hearing impairment, a lay jury cannot either.  *Small v. Amgen*, 723 F. App'x 722, 726 (11th Cir. 2018).

**B.    McKinley's Opinions About Defendants' Quality Testing Program Should Be Excluded.**

McKinley's opinions about alleged deficiencies in Defendants' quality assurance testing program using ARC box testing are speculative and would be unhelpful to the jury.  McKinley has no personal experience with ARC testing.  Ex24, McKinley Dep. 282:9-11.  Despite stating in his report that the ARC testing revealed significant problems, McKinley admitted at deposition that he did not know "the practical effect of the deviation because the measurements and the calibration of the [ARC] devices was never anchored in the acoustic performance of the device."  *Id.* 283:5-12.  Additionally, "[t]here's no documentation at the previous limits, the adjusted limits, the widened limits of what effect those limits had on the acoustic performance of the device."  *Id.* 283:13-17.

McKinley lacks the basic qualifications to opine about Aearo's quality assurance or ARC Box testing, and does not know what effect—if any—Defendants'

purported deviation from the specifications had on product performance.   His testimony on these issues should be barred.

### C.     Madigan Should Not Be Allowed To Testify Regarding Causation.

Madigan should be precluded from offering causation opinions.   Madigan is a statistician.   To reach his opinions, Madigan compared two REAT tests identified in the so-called "Flange Memo"—the 213015 and 213017 tests.   He assumed that the 213015 test involved subjects wearing the CAEv2 with unfolded flanges and the 213017 test involved subjects wearing the CAEv2 with folded flanges.   And he concluded that, when comparing the tests, the 213015 has (1) "a lower NRR," (2) "mean individual NRRs that are statistically significantly lower," and (3) "mean within-subject variability that is statistically significantly larger."   Ex98, Madigan Report 7-8.

In some instances, Madigan suggested that folding the CAEv2's flanges yielded the different test results.   For example, Madigan testified about "[t]he specific variables that are resulting in the differences":   "[F]or the comparison of 015 to 017, the difference is the folding."   Ex99, Madigan Dep. 69:2-12.   Similarly, in his report, he framed his test comparisons as dependent on the folding of flanges. Ex98, Madigan Report 7-8.

135

But Madigan cannot testify that the differences he identified were *caused* by folding the CAEv2's flanges. Setting aside the validity of Madigan's assumptions, Madigan conceded that he is not offering any causation opinions. At his deposition, he answered "No," when asked, "Are you providing an opinion in this case of causation?" Ex99, Madigan Dep. 175:9-11. His report does not contain the words "cause" or "causation." Ex98, Madigan Report. In addition, as Madigan explained, he only evaluated statistical significance, which is a "different concept[]" than causality. Ex99, Madigan Dep. 175:7-8.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter an order excluding the opinions of Plaintiffs' experts as described herein.

Dated:  January 8, 2021

/s/ Charles F. Beall, Jr.
Larry Hill
Florida Bar No. 173908
lhill@mhw-law.com
Charles F. Beall, Jr.
Florida Bar No. 66494
cbeall@mhw-law.com
Haley J. VanFleteren
Florida Bar No. 1003674
hvanfleteren@mhw-law.com
MOORE, HILL & WESTMORELAND, P.A.

*Respectfully submitted,*

/s/ Robert C. "Mike" Brock
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle

350 West Cedar Street
Maritime Place, Suite 100
Pensacola FL 32502
Telephone: (850) 434-3541

Chicago, Illinois 60654
Telephone: (312) 862-3254
mnomellini@kirkland.com

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company,*
*3M Occupational Safety LLC, Aearo*
*Technologies LLC, Aearo Holding,*
*LLC, Aearo Intermediate, LLC and*
*Aearo, LLC*

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

Pursuant to Local Rule 7.1(F) and the Court's January 4, 2021 decision on the parameters for briefing, counsel for Defendants certify that this memorandum contains 24,499 words, excluding the case style, motion (which is less than 500 words), tables of contents and authorities, signature block, and certificates of compliance with the Local Rules.

Dated:  January 8, 2021                              Respectfully submitted,

*/s/ Robert C. Brock*
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 389-5991
mike.brock@kirkland.com

*Counsel for Defendants 3M Company,*
*3M Occupational Safety LLC, Aearo*
*Technologies LLC, Aearo Holding,*
*LLC, Aearo Intermediate, LLC and*
*Aearo LLC*

138

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)**

Pursuant to Local Rule 7.1(B), counsel for Defendants certify that they held a conference to discuss the relief sought in this motion with Plaintiffs' counsel Michael Sacchet on Friday, January 8, 2021.  Plaintiffs' counsel represented that they would not agree on Friday, January 8, 2021.

Dated:  January 8, 2021

Respectfully submitted,

*/s/ Robert C. Brock*
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 389-5991
mike.brock@kirkland.com

*Counsel for Defendants 3M Company,*
*3M Occupational Safety LLC, Aearo*
*Technologies LLC, Aearo Holding,*
*LLC, Aearo Intermediate, LLC and*
*Aearo LLC*

139

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 8, 2021, a true and correct copy of the foregoing:

**DEFENDANTS' OMNIBUS MOTION TO EXCLUDE PLAINTIFFS' PUTATIVE EXPERT OPINIONS UNDER *DAUBERT* AND RULE 702 AND INCORPORATED MEMORANDUM IN SUPPORT THEREOF**

was served as follows:

☒ **[E-Mail]** By causing the above document to be sent via electronic mail to the parties at the email addresses listed below. I am aware that service is presumed invalid if the email transmission is returned as undeliverable.

| | |
|---|---|
| Bryan F. Aylstock, Lead Counsel<br>Douglass A. Kreis<br>Neil D. Overholtz<br>Aylstock, Witkin, Kreis & Overholtz, PLLC<br>17 East Main Street<br>Suite 200<br>Pensacola, FL 32502<br>Tel.: (850) 202-1010<br>Email: baylstock@awkolaw.com<br>Email: dkreis@awkolaw.com<br>Email: NOverholtz@awkolaw.com<br><br>*Counsel for Plaintiff Luke Estes*<br>Case No. 7:20-cv-00137<br><br>*Counsel for Plaintiff Dustin McCombs*<br>Case No. 7:20-cv-00094<br><br>*Counsel for Plaintiff Stephen* | Shelley V. Hutson, Co-Lead Counsel Clark, Love & Hutson, GP<br>440 Louisiana Street<br>Suite 1600<br>Houston, TX 77002<br>Tel.: (713) 757-1400<br>Email: shutson@triallawfirm.com |

140

| | |
|---|---|
| *Hacker*<br>Case No. 7:20-cv-00131 | |
| Christopher A. Seeger, Co-Lead Counsel<br>David R. Buchanan<br>Caleb A. Seeley<br>Seeger Weiss LLP<br>77 Water Street<br>8th Floor<br>New York, NY 10005<br>Tel.: (212) 587-0700<br>Email: cseeger@seegerweiss.com<br>Email: dbuchanan@seegerweiss.com<br>Email: cseeley@seegerweiss.com<br>Email: MDL2885@seegerweiss.com<br><br>*Counsel for Plaintiff Lewis Keefer*<br>Case No. 7:20-cv-00104 | Michael A. Burns, Co-Liaison Counsel<br>Mostyn Law Firm<br>3810 W. Alabama Street<br>Houston, TX 77027<br>Tel.: (713) 714-0000<br>Email: epefile@mostynlaw.com<br>Email: maburns@mostynlaw.com |
| Evan D. Buxner,<br>Plaintiffs' Executive Committee<br>Gori Julian & Associates<br>156 North Main Street<br>Edwardsville, IL 62025<br>Tel.: (618) 659-9833<br>Email: evan@gorijulianlaw.com<br><br>*Counsel for Plaintiff Stephen Hacker*<br>Case No. 7:20-cv-00131 | Brian H. Barr, Co-Liaison Counsel<br>Winston Troy Bouk<br>Levin, Papantonio, Thomas, Mitchell, Rafferty, & Proctor, P.A.<br>316 S Baylen St. Ste 600<br>Pensacola, FL 32502<br>Tel.: (850) 435-7045<br>Email: bbarr@levinlaw.com<br>Email: tbouk@levinlaw.com<br><br>*Counsel for Plaintiff Lewis Keefer*<br>Case No. 7:20-cv-00104 |
| Taylor C. Bartlett<br>William L. Garrison, Jr.<br>Discovery & ESI Subcommittee<br>Heninger Garrison Davis LLC | Katherine E. Charonko,<br>Discovery & ESI Subcommittee<br>Bailey & Glasser LLP<br>209 Capitol Street |

| | |
|---|---|
| 2224 1st Avenue North<br>Birmingham, AL 35203<br>Tel.: (205) 326-3336<br>Email: taylor@hgdlawfirm.com<br>Email: lewis@hgdlawfirm.com<br><br>*Counsel for Plaintiff Dustin McCombs*<br>Case No. 7:20-cv-00094 | Charleston, WV  25301<br>Tel.: (304) 345-6555<br>Email: kcharonko@baileyglasser.com |
| Virginia E. Anello,<br>Discovery & ESI Subcommittee<br>Douglas & London<br>59 Maiden Ln, 6th Floor<br>New York, NY 10038<br>Tel.: (212) 566-7500<br>Email: vanello@douglasandlondon.com | J. Nixon Daniel, III<br>Discovery & ESI Subcommittee<br>Beggs & Lane<br>501 Commendencia Street<br>Pensacola, FL 32502<br>Tel.: (850) 469-3306<br>Email: jnd@beggslane.com |
| Taylor C. Bartlett<br>William L. Garrison, Jr.<br>Discovery & ESI Subcommittee<br>Heninger Garrison Davis LLC<br>2224 1st Avenue North<br>Birmingham, AL 35203<br>Tel.: (205) 326-3336<br>Email: taylor@hgdlawfirm.com<br>Email: lewis@hgdlawfirm.com | Shawn Fox<br>Sean P. Tracey<br>Tracy & Fox Law Firm<br>440 Louisiana Street, Suite 1901<br>Houston, TX 77002<br>Tel.: (713) 495-2333<br>Email: sfox@traceylawfirm.com<br>Email: stracey@traceylawfirm.com<br><br>*Counsel for Plaintiff Lloyd E. Baker*<br>Case No. 7:20-cv-00039 |
| Katherine L. Cornell<br>Pulaski Law Firm<br>2925 Richmond Avenue, Suite 1725<br>Houston, TX 77098<br>Tel.: (713) 664-4555<br>Email:<br>kcornell@pulaskilawfirm.com | Thomas W. Pirtle<br>Laminack Pirtle & Martines<br>5020 Montrose Blvd., 9th Floor<br>Houston, TX 77006<br>Tel.: (713) 292-2750<br>Email: tomp@lpm-triallaw.com<br><br>*Counsel for Plaintiff Luke Estes* |

| | Case No. 7:20-cv-00137 |
|---|---|
| *Counsel for Plaintiff Luke Estes*<br>Case No. 7:20-cv-00137 | |
| Jeanie Sleadd<br>Heninger Garrison Davis LLC<br>2224 1st Avenue North<br>Birmingham, AL 35203<br>Tel.: (205) 326-3336<br>Email: jsleadd@hgdlawfirm.com<br><br>*Counsel for Plaintiff Dustin McCombs*<br>Case No. 7:20-cv-00094 | Quinn R. Wilson<br>Onder Law LLC<br>110 E. Lockwood Avenue, 2nd Floor<br>St. Louis, MO 63119<br>Tel.: (314) 963-9000<br>Email: wilson@onderlaw.com<br><br>*Counsel for Plaintiff Stephen Hacker*<br>Case No. 7:20-cv-00131 |
| Thomas P. Cartmell<br>Wagstaff & Cartmell<br>4740 Grand Avenue, Suite 300<br>Kansas City, MO 64112<br>Tel.: (816) 701-1100<br>Email: tcartmell@wcllp.com<br><br>*Counsel for Plaintiff Stephen Hacker*<br>Case No. 7:20-cv-00131 | |

DATED:  January 8, 2021                     */s/ Robert C. Brock*
                                                          Robert C. "Mike" Brock

143