# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG LITIGATION
LIABILITY LITIGATION

This Document Relates to:

*Lloyd Baker*
Case No. 7:20-cv-00039

*Luke E. Estes*
Case No. 7:20-cv-00137

*Stephen Hacker*
Case No. 7:20-cv-00131

*Lewis Keefer*
Case No. 7:20-cv-00104

*Dustin McCombs*
Case No. 7:20-cv-00094

CASE NO.: 3:19-MD-2885-MCR-GRJ

Chief Judge M. Casey Rodgers
Magistrate Judge Gary Jones

**CONFIDENTIAL - FILED
UNDER SEAL**

## DEFENDANTS' RESPONSE TO PLAINTIFFS' OMNIBUS MOTION TO EXCLUDE DEFENDANTS' EXPERT OPINIONS AND TESTIMONY

FILED USDC FLND PN
JAN 22 '21 PM1:10

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................6

INTRODUCTION .................................................................................10

ARGUMENT .......................................................................................10

I.    Gregory Flamme And Mark Stephenson.........................................10

      A.    Flamme-Stephenson's Methodology Has Been Validated By The Military And Plaintiffs' Own Expert. ....................10

      B.    Flamme-Stephenson Used A Reliable Methodology For Their Specific-Causation Opinions. ....................................13

II.    Dr. Harri Kytomaa. ......................................................................15

      A.    Kytomaa Is Highly Qualified To Provide His Opinions Applying Mechanical Engineering Principles In This Case. ....................................................................................15

      B.    Kytomaa's Opinions Are Based On His Mechanical Engineering Expertise. ..........................................................17

      C.    Kytomaa Properly Used Assistants In Drafting His Report. ...................................................................................18

III.    Dr. James Crawford. ....................................................................20

      A.    Crawford's Opinions Are Reliable.......................................20

      B.    Crawford's Opinions Are Based on Sufficient Facts and Data.....................................................................................23

      C.    Crawford's Opinions Will Be Helpful for the Jury and Pass Rule 403's Balancing Test. .........................................25

IV.    John Casali...................................................................................26

V.    Richard Neitzel. ...........................................................................28

A.  Neitzel's Noise Control Act Opinions Respond To Plaintiffs' Experts' Opinions About The Same Statute. ....................28

B.  Neitzel Appropriately Evaluates The Army's Hearing Conservation Program............................................................29

C.  Neitzel Appropriately Considers Contemporaneous Communications In Forming His Opinions. ........................30

D.  Neitzel's Training And Fitting Opinions Are Based On A Proper Methodology And Sufficient Facts. ........................31

E.  Neitzel Is Qualified To Opine Regarding Labels And Applied An Appropriate Methodology. ...............................33

F.  Neitzel Is Qualified To Offer Opinions Relating To Audiometric Results. ...................................................35

VI.  Jennifer Sahmel. ..................................................................37

A.  Sahmel Is Qualified To Offer Her Opinions. .......................37

B.  Sahmel's Case-Specific Opinions Are Well Supported.....................39

C.  Sahmel's Opinions Are Relevant To These Cases............................39

D.  Sahmel Is Not Offering A Legal Opinion. ..........................40

E.  Sahmel Will Not Read Corporate Documents Or Other Witnesses' Testimony To The Jury.....................41

VII.  Vickie Tuten. ..................................................................41

VIII. Elliott Berger. ..................................................................43

A.  Berger's Opinions Regarding The CAEv2's Design Are Within His Experience And The Evidence. ........................44

B.  Berger Is Not Opining Regarding Regulations, And Has The Knowledge To Testify Regarding NVLAP's Approval Of Aearo's Testing. ..........................................45

C. Berger's Opinions Regarding Folding Back the CAEv2's Flanges Are Based On His Personal Knowledge And Consistent With His Deposition Testimony........................................46

IX. Dr. Eric Fallon. ..............................................................................48

 A. Dr. Fallon's Opinions Are Reliable As They Are Well-Grounded In His Experience. ...............................................49

 B. Fallon's General Opinions Are Helpful To The Jury. .......................52

 C. Fallon Can Appropriately Opine Concerning The Military's Testing Of The CAEv2. ....................................53

X. John House.....................................................................................54

 A. House Properly Offers Expert Testimony About Hacker's and Estes's Hearing-Related Injuries. .................................54

 B. House Properly Offers Expert Testimony About Speech Discrimination in Noisy Environments...............................56

 C. House Properly Offers Expert Testimony about Hacker's Tinnitus.................................................................58

XI. Dennis Driscoll. ...........................................................................61

 A. Driscoll Is Not Offering An Opinion On Whether McCombs Has NIHL. .........................................................62

 B. Driscoll's Opinion Regarding McCombs' Risk Of Hearing Injury Satisfies the Helpfulness Requirement......................63

XII. Derek Jones, Jennifer LaBorde, and Margaret Richards..............................65

 A. The Percentage Hearing Loss Impairment Opinions Are Helpful.............................................................65

 B. FUPIRS Is A Reliable Standard Reference Work Based On "Medically Or Scientifically Demonstrable Findings." ............................................................67

C.    Jones, LaBorde, and Richards Properly Applied FUPIRS
To Calculate Keefer's and McCombs's Impairment
Ratings. ................................................................................................69

CONCLUSION .....................................................................................................71

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Allmond v. Akal Sec.*,
2007 WL 988757 (M.D. Ga. Mar. 29, 2007) ......................................... 21, 49

*Am. Gen. Life Ins. v. Schoenthal Family*,
555 F.3d 1331 (11th Cir. 2009) .....................................................................41

*Arevalo v. Coloplast*,
2020 WL 3958505 (N.D. Fla. July 7, 2020)..................................................17

*Bath Iron Works Corp. v. Dir., Office of Workers' Comp. Programs,
U.S. Dep't of Labor,*
506 U.S. 153 (1993).......................................................................................67

*Bekaert v. City of Dyersburg*,
256 F.R.D. 573 (W.D. Tenn. 2009)...............................................................19

*Butts v. Georgia State Patrol Div.*,
2011 WL 5597258 (M.D. Ga. Nov. 17, 2011) ..............................................66

*Chapman v. Abbott*,
137 F. App'x 161 (10th Cir. 2005)................................................................67

*Chapman v. Procter & Gamble Distrib.*,
766 F.3d 1296 (11th Cir. 2014) ....................................................................22

*Clay v. Ford Motor*,
215 F.3d 663 (6th Cir. 2000) .................................................................. 32, 39

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993).......................................................................................10

*Dura Auto. Sys. of Ind. v. CTS*,
285 F.3d 609 (7th Cir. 2002) .........................................................................18

*FNB Bank v. Park Nat'l*,
996 F. Supp. 2d 1187 (S.D. Ala. 2014) .........................................................31

*Ford v. Carnival*,
 2010 WL 9116184 (S.D. Fla. Mar. 4, 2010) ................................................36

*Green v. Five Star Mfg.*,
 2016 WL 1243757 (N.D. Ala. Mar. 30, 2016).............................................32

*Green v. Simpson*,
 2016 WL 4492841 (S.D. Ga. Aug. 2, 2016),
 *report and recommendation adopted,*
 No. CV 114-192, 2016 WL 4492859 (S.D. Ga. Aug. 25, 2016)..................66

*Hartford Steam Boiler Inspection & Ins. v. Menada*,
 2018 WL 3911212 (S.D. Fla. April 4, 2018)......................................... 43, 48

*Hendrix ex. rel. G.P. v. Evenflo*,
 609 F.3d 1183 (11th Cir. 2010) ............................................................ 13, 16

*Hendrix v. Evenflo*,
 255 F.R.D. 568 (N.D. Fla. 2009)..................................................................16

*HVLP02 v. Oxygen Frog*,
 2018 WL 2041370 (N.D. Fla. Jan. 16, 2018) ...............................................19

*In re Abilify (Aripiprazole) Prod. Liab. Litig.*,
 299 F. Supp. 3d 1291 (N.D. Fla. 2018) ................................................. 17, 66

*In re Catalyst Litig.*,
 2010 WL 4721333 (V.I. Super. Ct. 2010).....................................................32

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
 2020 WL 6887885 (E.D. Pa. Nov. 24, 2020).................................................29

*In re Yasmin & YAZ (Drospirenone)*
 *Mktg., Sales Practices & Prod. Liab. Litig.*,
 2011 WL 6302287 (S.D. Ill. Dec. 16, 2011) ......................................... 29, 40

*Jones v. Novartis Pharm.*,
 235 F. Supp. 3d 1244 (N.D. Ala. 2017),
 *aff'd in part*, 720 F. App'x 1006 (11th Cir. 2018) .......................................36

*Maiz v. Virani*,
 253 F.3d 641 (11th Cir. 2001) .....................................................................41

*Maynard v. Ferno-Washington, Inc.*,
    22 F. Supp. 2d 1171 (E.D. Wash. 1998)........................................................34

*McClain v. Metabolife Int'l*,
    401 F.3d 1233 (11th Cir. 2005) ....................................................... 36, 37, 60

*McGee v. Evenflo*,
    2003 WL 23350439 (M.D. Ga. Dec. 11, 2003)...........................................58

*Mims v. Wright Med. Tech.*,
    2012 WL 12835870 (N.D. Ga. May 11, 2012) ...................................... 62, 64

*Navelski v. Int'l Paper*,
    244 F. Supp. 3d 1275 (N.D. Fla. 2017) .......................................................64

*Owings v. Chater*,
    62 F.3d 1429 (10th Cir. 1995) ....................................................................67

*Sampson v. Carnival*,
    2016 WL 7377226 (S.D. Fla. Dec. 16, 2016)....................................... 13, 14

*Santoro ex rel. Santoro v. Donnelly*,
    340 F. Supp. 2d 464 (S.D.N.Y. 2004) .........................................................34

*Superior Consulting Servs. v. Shaklee*,
    2018 WL 3059995 (M.D. Fla. May 31, 2018) ..................................... 20, 49

*United States v. An Easement & Right-of-way Over 6.09 Acres of Land*,
    140 F. Supp. 3d 1218 (N.D. Ala. 2015) ............................................... 32, 41

*United States v. Azmat*,
    805 F.3d 1018 (11th Cir. 2015) .......................................................... 67, 68

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ................................................. 20, 21, 25, 49

*United States v. Gish*,
    518 F. App'x 871 (11th Cir. 2013)...............................................................30

*Vision I Homeowners Ass'n. v. Aspen Specialty Ins.*,
    2009 WL 5103606, *2 (S.D. Fla. Dec. 28, 2009) ........................................18

*Vision I Homeowner's Ass'n v. Aspen Specialty Ins.*,
   674 F. Supp. 2d 1321 (S.D. Fla. 2009)..............................................................37

*Wagoner v. Exxon Mobil*,
   813 F. Supp. 2d 771 (E.D. La. 2011) ...............................................................36

*Washington v. City of Waldo, Fla.*,
   2016 WL 3545909 (N.D. Fla. Mar. 1, 2016).......................................... 20, 49

*Yates v. Ford Motor*,
   2015 WL 3448905 (E.D.N.C. May 29, 2015)..................................................36

**Statutes**

Fla. Stat. Ann. §440.15(3)(b) ....................................................................................68

**Rules**

Fed. R. Evid. 702 ................................................................................................. 20, 49

Fed. R. Evid. 803(8)....................................................................................................31

## INTRODUCTION

Plaintiffs' motion seeking to exclude Defendants' experts mischaracterizes the experts' opinions; selectively quotes and misinterprets deposition testimony, while disregarding other parts that defeat their arguments; ignores Defendants' experts' qualifications and the methodologies they actually use; and make arguments better suited to exclude Plaintiffs' putative experts. At most, Plaintiffs' points are suitable for "[v]igorous cross-examination" and "presentation of contrary evidence"—not exclusion. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596 (1993). Accordingly, Plaintiffs' motion should be denied in its entirety.

## ARGUMENT

### I. Gregory Flamme And Mark Stephenson.

#### A. Flamme-Stephenson's Methodology Has Been Validated By The Military And Plaintiffs' Own Expert.

Plaintiffs' arguments that Flamme and Stephenson's opinions related to the AHAAH model should be excluded because it is "unreliable" and not used by the medical community as a medical damage risk criterion are incorrect. Plaintiffs claim without support that the AHAAH model "has been consistently rejected by the US Army Medical community as a DRC." PltfsMot. 5. But they overlook that in MIL-

STD-1474E,[1] the Department of Defense ("DoD") recognizes that "AHAAH has been peer-reviewed and systematically evaluated against various datasets" and "is being used as hazard criteria by at least one other nation, and is used by the automobile industry to evaluate risk of hearing loss from airbag deployment." Ex63, MIL-STD-1474E at 42.

Similarly, Plaintiffs omit the testimony of Price, a former Army Research Lab ("ARL") employee, that, "by the late 1990s, in [his] view," "the AHAAH model [was] validated." Ex1, Price Dep. 93:9-11. As recently as 2007, Price published an article further underscoring the validity of the AHAAH model. Ex2, Price 2007. For example, the 2007 article concluded that the AHAAH model correctly predicted noise hazard outcomes in 95% of situations as compared to the Army's MIL-STD-1474D and A-weighted energy models that Plaintiffs tout here. *Id.* 6. While with ARL, Price evaluated the effectiveness of the CAEv2 using this very model and determined the Allowable Number of Rounds ("ANOR") for the yellow end of the CAEv2 during various training settings. Ex3, ARL HRED Article 2.

Plaintiffs also ignore that their expert, McKinley, described the AHAAH model "as a scientific tool by which certain impulsive noise analysis is beneficial,"

---

[1]   MIL-STD-1474E is the DoD Design Criteria Standard Noise Limits, which "provides specific noise limits and other requirements to equipment designers and manufacturers." Ex63, MIL-STD-1474E at ii.

and that "[c]ertain underlying acoustical properties and the particular computations derived therefrom are sound."   Ex4, McKinley Report 23.   One of those computations is the ANOR.  *Id.* 23-24.  At deposition, McKinley further explained that while there was a "debate" amongst the scientific community as to the "best impulsive noise exposure criteria," "for the U.S. Army, as far as weapons go, qualifications weapons, it has been the AHAAH model and the auditory risk units." Ex5, McKinley Dep. 184:5-185:12.  Indeed, McKinley bases part of his opinions about the design of the CAEv2 on an evaluation using the AHAAH method.  Ex4, McKinley Report 23.

Despite this, Plaintiffs argue that Flamme and Stephenson should not be permitted to present their opinions based on the AHAAH method because it is not meant to be used as a damage risk criterion ("DRC").  PltfsMot. 6.  But Price and the military acknowledge that the AHAAH has been peer-reviewed and systematically evaluated and is used as a DRC by certain entities.  Moreover, Flamme-Stephenson's use of the AHAAH model is entirely consistent with how the Army uses it:  to calculate the ANOR for various weapons systems based on the attenuation characteristics of the CAEv2 presented in their technical report.  Ex6, Flamme-Stephenson Report 72-73.  In other words, they used "[c]ertain underlying acoustical properties" of the CAEv2 and derived "particular computations," here, the ANOR, "therefrom."  Ex4, McKinley Report 23.  According to McKinley, Price,

and the Army, that practice is not just "sound," but is precisely how the AHAAH model has been and should be used.

**B.   Flamme-Stephenson Used A Reliable Methodology For Their Specific-Causation Opinions.**

Plaintiffs' argument that Flamme-Stephenson's specific-causation opinions do not employ a reliable methodology likewise are meritless.  PltfsMot. 11.  There is no dispute that Flamme and Stephenson, both of whom are audiologists with extensive experience in assessing the causes of hearing loss and related conditions, have the expertise to render causation opinions in this case.  Ex6, Flamme-Stephenson Report 2-13.  Plaintiffs likewise have offered audiologists to opine on causation, such as Spankovich.  Ex7, Spankovich Report 1-4.  Flamme and Stephenson both have spent the entirety of their professional careers not just evaluating the causes of such injuries, but also the role that noise and hearing protection devices ("HPDs") play in those injuries.  Ex6, Flamme-Stephenson Report 2-13.

In any event, a differential diagnosis is "not an absolute requirement" and the "Eleventh Circuit has [not] explicitly required this form of analysis."  *Sampson v. Carnival*, 2016 WL 7377226, *4 (S.D. Fla. Dec. 16, 2016) (citing *Hendrix ex. rel. G.P. v. Evenflo*, 609 F.3d 1183, 1195 (11th Cir. 2010)).  Rather, specific causation testimony is reliable where the expert "consider[s] numerous underlying facts in his methodology, including: Plaintiff's clinical presentation [or] [Plaintiff's] medical

history" and relies upon his expertise to render causation opinions based on those underlying facts. *Id.* *6. That is exactly what Flamme and Stephenson did here. *First*, they reviewed the entirety of both Baker's and Estes's audiological record to evaluate what changes, if any, they had in hearing sensitivity from their time in the Army to present. *See* Ex8, Flamme-Stephenson Baker Report 14-23; Ex9, Flamme-Stephenson Estes Report 15-22. *Second*, they assessed the various HPDs and noise exposures that Baker and Estes sustained during the course of their military careers until the present to determine which exposures, if any, caused the purported changes in Baker's and Estes's hearing sensitivity. *See* Ex8, Flamme-Stephenson Baker Report 13-18; Ex9, Flamme-Stephenson Estes Report 12-18. *Third*, they ruled out the CAEv2 as a cause of Baker's and Estes's alleged hearing impairment based on the opinions set forth in their general report, including their own testing of the CAEv2. *See* Ex8, Flamme-Stephenson Baker Report 23, 28-29; Ex9, Flamme-Stephenson Estes Report 23, 25. *Finally*, they evaluated what other factors were causative of Baker's and Estes's alleged hearing impairment, including, the role of the Army's inadequate implementation of the Hearing Conservation Program as to Baker and Estes as well as the noise exposures that both Plaintiffs had while wearing other HPDs. *See* Ex8, Flamme-Stephenson Baker Report 18-23; Ex9, Flamme-Stephenson Estes Report 23-28. Accordingly, their methodology is reliable and should not be excluded.

## II.     Dr. Harri Kytomaa.

Dr. Harri Kytomaa, a knowledgeable and experienced mechanical engineer, offers opinions on topics well within his qualifications:  (1) using ARC boxes for CAEv2 quality control testing and critiquing Armstrong's modeling of the same; (2) Eddins' use of Juneau's novel human ear replicas and MIRE devices to conduct testing on the Eddins Plug, and those devices' material properties, and associated acoustical properties compared to the CAEv2 and the human ear; (3) the CAEv2's hardness, flexibility, and positioning of its components; and (4) Aearo satisfying ISO 9001 standards.

### A.     Kytomaa Is Highly Qualified To Provide His Opinions Applying Mechanical Engineering Principles In This Case.

Plaintiffs' argument that Kytomaa is not qualified ignores Kytomaa's qualifications as a mechanical engineer with extensive experience in acoustics. While Plaintiffs focus on Kytomaa's role as Exponent's[2] Group Vice President of the Thermal Sciences group, PltfsMot. 13-14, he also is the Vice President of Exponent's mechanical engineering group.  Ex10, Kytomaa Dep. 71:9–15.  Kytomaa has a Ph.D. in mechanical engineering from the California Institute of Technology,

---

[2]   Plaintiffs' attempt to characterize Exponent as a "hired gun" whose scientists bend conclusions by relying on a single magazine article, PltfsMot. 12 (citing PX24), is irrelevant to Kytomaa's work.  Kytomaa explained that he has never seen the supposed "bending of conclusions that this article states."  Ex10, Kytomaa Dep. 275:21–276:1.

and 35 years experience in that field.  Ex11, Kytomaa Report, App'x C. He has authored over 50 peer-reviewed publications, two book chapters, and 17 reports, and presented at multiple conferences and invited presentations in mechanical engineering.  *See id.*

Kytomaa has "decades of experience applying the principles of acoustics in multiple areas," Ex11, Kytomaa Report 5, and an "extensive background in acoustics and perform[ing] acoustic analysis," Ex10, Kytomaa Dep. 40:6–8. While he may not have worked on acoustical performance of the human ear, he is "a mechanical engineer with an acoustics background," *id.* 123:22–24, and "has experience in acoustics" and has "performed acoustics-related work," *id.* 108:23-52; *see also id.* 41:11–22 (describing some of Kytomaa's acoustics experience).  Regardless of the application of acoustics, whether in the human ear or other systems, "the laws of physics associated with acoustics don't really have different types."  *Id.* 109:7–10.

Similarly, regarding his opinions about Juneau and Eddins' molded ears, Kytomaa has "done molding before" and "utilized materials for molds." *Id.* 122:11, 21–22.  While Kytomaa is not a member of certain audiological professional societies, he is "a member of the American Society of Mechanical Engineers, and mechanical engineers certainly practice in the area of acoustics." *Id.* 112:25–113:4.

Kytomaa's qualifications exceed the standard for admissibility. *See Hendrix v. Evenflo*, 255 F.R.D. 568, 585 (N.D. Fla. 2009), *aff'd sub nom. Hendrix ex rel.*

*G.P. v. Evenflo*, 609 F.3d 1183 (11th Cir. 2010); *see also In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1348 (N.D. Fla. 2018).  Even if Kytomaa does not have direct experience with REAT or MIRE testing or ear molds, an "expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Abilify*, 299 F. Supp. 3d at 1348.  Instead, "the subject matter of the testimony must be within the scope of his or her expertise." *Arevalo v. Coloplast*, 2020 WL 3958505, *1 (N.D. Fla. July 7, 2020).  Here, Kytomaa's opinions are within his qualifications as a mechanical engineer with extensive experience in acoustics.

## B.   Kytomaa's Opinions Are Based On His Mechanical Engineering Expertise.

Plaintiffs misrepresent Kytomaa's opinions.  Kytomaa is not proffering opinions in rebuttal to "Juneau, Armstrong, McKinley and Eddins in the field of audiology" or acoustics as it relates to human perception.  PltfsMot. 12.  And while some of his opinions may incorporate his knowledge of acoustics, Kytomaa provides opinions in the field of mechanical engineering.

For example, Kytomaa provides opinions on the representativeness and mechanical properties of the materials and structures of the Eddins Plug, Ear Replicas, and testing equipment used in Eddins' MIRE testing.  Ex11, Kytomaa Report §3; Ex12, Kytomaa Suppl. Report §2.  And contrary to Plaintiffs' assertion, Kytomaa has not provided *any* opinions on Plaintiffs' experts' REAT studies.

17

Kytomaa's rebuttals of Armstrong's opinions relating to ARC box testing fall squarely within Kytomaa's expertise.  Ex11, Kytomaa Report §2; Ex13, Kytomma, Second Supp. Report §2; *see also* Ex11, Kytomaa Report 6 (noting modeling methods developed by Kytomaa in the 1990s "were of the same kind as the ones used in the modeling of the ARC box and the CAEv2 earplug.").  Similarly, Kytomaa rebuts McKinley's conclusions regarding the hardness and inflexibility of the CAEv2 stem and the position of the filter.  Ex11, Kytomaa Report §4. Kytomaa's opinions are based on his knowledge and experience as "a mechanical engineer [who has] work[ed] with a variety of materials, including metals, as well as polymers and plastics." Ex10, Kytomaa Dep. at 61:7–11.  As a mechanical engineer with extensive experience in acoustics, Kytomaa is qualified to provide his opinions in this case.[3]

### C.    Kytomaa Properly Used Assistants In Drafting His Report.

Plaintiffs argue that because his report "was largely, if not entirely, prepared by other individuals," including counsel and six others, "he lacks the requisite qualifications to offer opinions in this case." PltfsMot. 14.  Courts routinely hold that an expert witness is permitted to use assistants in formulating their opinions. *See Dura Auto. Sys. of Ind. v. CTS*, 285 F.3d 609, 612 (7th Cir. 2002); *Vision I Homeowners Ass'n. v. Aspen Specialty Ins.*, 2009 WL 5103606, *2 (S.D. Fla. Dec.

---

[3]   Kytomaa also is qualified to rebut Eric Rose's opinions, which plaintiffs do not address.  Ex11, Kytomaa Report 6 and §6.

28, 2009).  In *HVLP02 v. Oxygen Frog*, relied on by Plaintiffs, the court stated that "an expert witness is expected to 'substantially participate in the preparation of his report.'  2018 WL 2041370, \*3 (N.D. Fla. Jan. 16, 2018).  Kytomaa did more than "substantially participate" in the preparation of his report—he created an outline that was the initial core of the report, he reviewed the entire report, and wrote and edited many portions.  Ex10, Kytomaa Dep. 309:6–12; 323:10–16.  Although his "entire team contributed to writing [his] report," Kytomaa "specifically provided to the team on what [he] believe[d] [they] needed to do."  *Id.* 309:6–7; 323:10–16.  Kytomaa had "final say" over each section of his report because each opinion is his own.  *Id.* 309:6–12.

In addition, while Plaintiffs' cases are clear that an expert cannot merely be "a party's lawyer's avatar [that] contributes nothing useful to the decisional process," the case law is equally clear that "there is nothing wrong with counsel helping an expert draft a report."  *HVLP02*, 2018 WL 2041370, \*3; *see also Bekaert v. City of Dyersburg*, 256 F.R.D. 573, 579 (W.D. Tenn. 2009).  But Kytomaa never testified that counsel assisted in writing the report, only that he discussed with counsel "what areas [he] should address."  Ex10, Kytomaa Dep. 323:21-324:7.

### III.   Dr. James Crawford.

#### A.   Crawford's Opinions Are Reliable.

Crawford's opinions are based on his experience as an Army medical doctor neurotologist (a sub-specialty which includes the rehabilitation of hearing loss), including as the Chief of Otology/Neurotology at the Madigan Army Medical Center and representing the Army on the Executive Committee of the Hearing Center of Excellence.   Ex14, Crawford Report 1-3.   Nothing in Rule 702 suggests that "experience alone … may not provide a sufficient foundation for expert testimony. Fed. R. Evid. 702 advisory committee's note (2000 amends.).   Instead, the "text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." *Id.*   An expert testifying based on experience should explain how his experience leads to the conclusion, why that experience is a sufficient basis, and how that experience is applied to the facts.   *Id.*; *see also United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).   Crawford's opinions are grounded in his extensive experience as an Army doctor specializing in, among other things, hearing loss rehabilitation.   *See*, *e.g.*, *Superior Consulting Servs. v. Shaklee*, 2018 WL 3059995, *3-6 (M.D. Fla. May 31, 2018) (admitting expert opinion regarding the unlicensed practice of medicine where expert's findings were "based on his education, training, and experience" and a standard "based on education, certification, and experience"); *Washington v. City of Waldo, Fla.*, 2016 WL

3545909, *2-3 (N.D. Fla. Mar. 1, 2016) (admitting expert opinion regarding police hiring practices where expert "used his law enforcement experience, knowledge, and training in police practices, including his review of court cases, and evaluated the facts of the instant case to form his opinions"); *Allmond v. Akal Sec.*, 2007 WL 988757, *4-5 (M.D. Ga. Mar. 29, 2007) (admitting expert opinion regarding hearing aids where expert drew "on his considerable clinical experience in the field of audiology"). For example, Crawford explains how his Army experience establishes that the Army often provided HPDs to servicemembers without instruction or individual fitting, despite Army training materials emphasizing the importance of proper fit and the use of a fit test. Ex14, Crawford Report 6-9.

Given Crawford's experience, Plaintiffs' criticisms of his methodology are meritless. *First*, Plaintiffs state that his opinions are "not generally accepted within the scientific community," that Crawford has not "submitted his opinions for publication," and does not "rely on any published scientific literature." PltfsMot. 16. This argument ignores that the Eleventh Circuit has held that an expert may proffer "non-scientific, experience-based testimony," as Crawford appropriately does, in addition to other bases for his opinions. *Frazier*, 387 F.3d at 1262. Indeed, by Plaintiffs' own argument, several of Plaintiffs' experts' opinions would be based on an unreliable methodology as they have not submitted their opinions for

publication or do not rely on published scientific literature. *See* Defs.' Daubert Mot. 47, 59, 85, 101.

Plaintiffs' one case cited in support of this argument is inapposite. PltfsMot. 16. *Chapman* precluded expert testimony as to whether use of a denture adhesive could generally cause a nervous systems disorder, as the expert failed to consider "the relationship between dose and effect (dose-response relationship)," which "is the hallmark of basic toxicology." *Chapman v. Procter & Gamble Distrib.*, 766 F.3d 1296, 1307 (11th Cir. 2014). Here, Crawford did not provide an opinion as to such issues; rather, Crawford relied on his experience and the relevant regulations and policies governing the Army, among other bases, to assess the Army's approach to hearing protection.

*Second*, Plaintiffs claim that Crawford's methodology consists "exclusively of reading materials selected by 3M's counsel." PltfsMot. 15. Not so. Among other things, Crawford's opinions are based on his "knowledge and background as a neurotologist in the military and as part of the [DoD's] Hearing Center of Excellence." Ex14, Crawford Report 1. His report details his experience in both fields. *See id.* 1-2. Crawford testified that the basis for his opinions includes his "lifetime of experience and training" and "a lot of [] personal experience, research, etcetera, related to hearing loss." Ex15, Crawford Dep. 53:21-54:3. He also reviewed and considered several publications, including DoD and Army regulations,

22

and websites in forming his opinions rather than exclusively relying on materials selected by 3M's counsel. *Id.* 54:11-55:7.

*Third*, Plaintiffs' arguments based on the length of time he reviewed materials are baseless. PltfsMot. 16. Plaintiffs inaccurately cite Crawford's deposition testimony regarding the five-hour count. Crawford testified that he spent approximately five hours reviewing *only* the deposition transcripts for this case; he testified that he spent between 15 to 18 hours total reviewing documents prior to submitting his report. Ex15, Crawford Dep. 47:4-7; 59:18-23. This is in line with Plaintiffs' own experts and fails to show that Crawford's opinions should be excluded. *See*, *e.g.*, Ex16, Davis Dep. 67:15-68:3 (15 hours spent preparing report for one plaintiff); Ex17, Huston Dep. 66:2-14 (15 to 24 hours spent on the litigation including his report, research, and phone calls with counsel); *see also id.* 45:6-46:18 (only reviewing depositions provided by Plaintiffs' counsel and not asking for anything else).

## B.    Crawford's Opinions Are Based on Sufficient Facts and Data.

Plaintiffs fail to show that Crawford's opinions are not based on sufficient facts and data. Plaintiffs' claim that Crawford considered only one "single data point"—the number of hearing loss claims by veterans—is incorrect. PltfsMot. 17. Crawford explained, both in his report and at his deposition, how his experience in the military and his review of deposition transcripts and other documents led to his

opinions.  *See*, *e.g.*, Ex14, Crawford Report 9 (there were gaps in the training and fitting of HPDs because servicemembers were provided protection without instruction or individual fitting, particularly during the Rapid Fielding Initiative); Ex15, Crawford Dep. 247:12-248:22 (served as the medical professional that oversaw the hearing conservation program in the military).

Plaintiffs also inaccurately suggest that Crawford "admitted that his opinions are based almost entirely on anecdotal conservations." PltfsMot. 17.  But the portion of the transcript Plaintiffs cite only pertains to a narrow topic regarding what percentage of soldiers received instruction related to the proper insertion of the CAEv2.  Ex15, Crawford Dep. 171:1-173:4.

Crawford's overall opinions are grounded in his experience and the Army's documents and regulations.  For example, his opinion regarding fit testing is based, in part, on his role as the medical professional supervisor in the hearing conservation program.  *Id.* 247:12-17.  And his opinions about the military's responsibility for instructions, training, and fitting are based on a thorough review and understanding of the relevant regulations governing the hearing program.  *See* Ex14, Crawford Report 3-9.

Finally, Plaintiffs' claim that "Crawford's personal experience is insufficient" PltfsMot. 18, taken at face value, would mean that a number of Plaintiffs' own experts who rely on their personal experience should be excluded as well.  *See*, *e.g.*,

Defs.' Daubert Mot. 46-49. Key here, however, is that—unlike Plaintiffs' experts—Crawford actually brings relevant expertise to bear. Plaintiffs' putative experts Huston, Edens, and Marshall were never formally part of the hearing conservation program and their experience is limited to their personal observations of whether servicemembers put earplugs in their ears when in noisy environments. Crawford's experience, by contrast, consists of serving as the chairman of the organization that sets the standard for training and organization of hearing conservation programs and representing the Army's Hearing Center of Excellence to lead the effort to address the prevention, treatment, and research of hearing-related injuries, among other things. *See* Ex14, Crawford Report 2. Given his experience, Crawford properly concludes that the Army failed to accomplish the task of protecting servicemembers' hearing. *See Frazier*, 387 F.3d at 1262.

### C. Crawford's Opinions Will Be Helpful for the Jury and Pass Rule 403's Balancing Test.

Plaintiffs' argument that Crawford's opinions should be excluded because they focus "solely on the conduct of the Army, a non-party," PltfsMot. 20, defies logic. Crawford's background as a neurotologist in the military allows him to educate the jury about the regulations governing the Army hearing conservation program, and explain areas in which the Army fell short of implementing those regulations. These issues have direct relevance here. For example, Plaintiffs' experts opine that the CAEv2's alleged design flaws caused Plaintiffs' injuries and

did not allow Plaintiffs to get a proper fit.  If such testimony is presented to the jury, the jury should also hear evidence that the Army never did fit testing to confirm that a proper fit was being obtained.  Plaintiffs served in the Army and the Army is the entity responsible for issuing the product and providing training and instructions on the product.

Indeed, Plaintiffs' own experts recognize the importance of the military's role in this case, as they collectively spent hundreds of hours testifying and writing about exactly the type of information Plaintiffs claim could mislead the jury and confuse the issues—the conduct of the Army and its hearing conservation efforts.  *See*, *e.g.*, Ex18, Edens Report 1-2; Ex19, Huston Report 1; Ex20, Marshall Report 4.  For this reason, Plaintiffs cannot credibly claim that Crawford's opinion could mislead the jury and confuse the issues.  PltfsMot. 22.  Furthermore, Crawford looked at these issues in part to rebut Plaintiffs' experts' own conclusions that the Army had a "culture of safety."  *See* Defs.' Daubert Mot. 46-53.

## IV.    John Casali.

Plaintiffs move to prohibit John Casali, an expert in the design and testing of hearing protection devices at Virginia Tech University, from offering two opinions relating to the military's solicitation and use of hearing protection.  Plaintiffs suggest Casali's opinions contain legal conclusions and speculation about the military's

intentions.  In fact, Casali's opinions are grounded firmly in his technical expertise and his extensive review of the testing data on the CAEv2.

*First*, Plaintiffs attempt to exclude Casali from offering the opinion that the CAEv2 complied with certain specifications issued by the military, including the MPID included in the 2006 solicitation from the Defense Logistics Agency.  Casali cannot and will not offer the legal opinion that the terms of any particular specification applied to the CAEv2, or give any other legal interpretation of the documents.  Instead, he will give the opinion, based on his review of the testing data, that the CAEv2 meets the performance requirements set forth in the specifications, including the quantitative attenuation requirements included in the MPID.  Ex21, Casali Report 121-125.

Casali will also give the opinion, based on his technical expertise, that it is not feasible to require dual-ended earplugs like the CAEv2 to reduce 190 decibel impulses to below 140 decibels—which is an interpretation of the MPID that Plaintiffs have advanced.  *Id*. 125-126.  Contrary to Plaintiffs' assertions, Casali is not "blam[ing]" the military for anything.  PltfsMot. 24.  He is simply applying his expertise and assessing the technical feasibility of Plaintiffs' reading.

*Second*, Plaintiffs attempt to bar Casali from providing opinions related to the importance of training in the fitting and use of earplugs in the military.  Plaintiffs again suggest that Casali will offer an improper legal opinion—specifically, that the

ultimate responsibility for instructing soldiers to use the CAEv2 rested with the military, not Aearo. In fact, Casali will draw on his knowledge of the scientific literature and his own studies to explain the importance of training users to fit earplugs in any setting, including in the military. Ex21, Casali Report 155-156. He will also explain that the military has detailed policies regarding the issuing of earplugs and their fitting and use—none of which is in dispute. *Id.* 156. Casali will not make any claims about whether the military had any sort of legal duty to train soldiers to fit the CAEv2.

## V.   Richard Neitzel.

### A.   Neitzel's Noise Control Act Opinions Respond To Plaintiffs' Experts' Opinions About The Same Statute.

Plaintiffs argue that Neitzel cannot offer opinions about the Noise Control Act ("NCA") despite disclosing the opposite opinions from their experts four weeks earlier. If Neitzel's opinions are inadmissible, so are the opinions of Plaintiffs' experts to which Neitzel responds. Importantly, Neitzel's opinions are far narrower than the opinions of Plaintiffs' experts regarding Defendants' *compliance* with the NCA. Unlike the opinions of Plaintiffs' experts, Neitzel only offers opinions about the NCA's applicability to products designed for combat, Ex22, Neitzel Report 30-32, while Plaintiffs' experts actually opine that "3M violated these regulations," *e.g.*, Ex23, Franks Report 39.

### B.   Neitzel   Appropriately   Evaluates   The   Army's   Hearing Conservation Program.

Plaintiffs ask the Court to exclude opinions from Neitzel about the Army's "legal duties." But Neitzel is not offering opinions about the Army's legal duties; the only instances where Neitzel used the terminology "duty" or "duties" did not relate to the Army's legal obligations. *See* Ex22, Neitzel Report 49, 51, 66.

Instead, as someone with vast experience evaluating employers' hearing conservation programs, Neitzel analyzes the Army's role as Plaintiffs' employer in designing and implementing such a program. *E.g.*, Ex24, Neitzel Dep1. 189:12-13. In offering that opinion, Neitzel refers to the regulations that describe and govern the Army's hearing conservation program, including as it relates to the use of HPDs and the training and fitting provided to servicemembers. Ex22, Neitzel Report 44-73. But Neitzel does not interpret those regulations from a legal perspective, he merely describes what they say and how the Army did—or did not—consistently implement them. *Id.* at 73-90. When complex frameworks or regulatory schemes are involved in litigation, courts may admit expert opinions to help the jury. *See In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2020 WL 6887885, *45 (E.D. Pa. Nov. 24, 2020) (collecting cases).

Here, Neitzel considered whether the Army's program is consistent with other hearing-conservation programs "from a regulatory perspective and from industry standards through h[is] experience, not from a legal perspective." *In re Yasmin &*

*YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, 2011 WL 6302287, *25 (S.D. Ill. Dec. 16, 2011) (Herndon, J.).  His opinion is limited to responsibilities under accepted occupational health practices and as set forth in the Army's own program, not as a matter of law.  And "the jury will be instructed that [] the Court, not [Neitzel] nor any other witness, will instruct the jury on the law in this case."  *Id.*

### C.   Neitzel   Appropriately   Considers   Contemporaneous Communications In Forming His Opinions.

Plaintiffs argue that Neitzel cannot testify to what the military "knew" about the CAEv2 despite disclosing numerous experts with opinions about what Defendants knew, *e.g.*, Ex25, Arriaga Report 46, 47, 49.  Unlike Plaintiffs' experts, Neitzel's opinions do not attribute any state of mind or intent to the military.  Instead, to reach his opinion that the military provided inconsistent flange-fold instructions to servicemembers, Neitzel relied on communications between Defendants and the military, which he identified in his report.  Ex22, Neitzel Report 48.  But far from interpreting those communications to decipher the military's mental state, Neitzel considers them for the *fact* that they occurred.  From that fact, he reaches his opinion that the Army inconsistently and inadequately incorporated information within its possession into soldiers' hearing training and education.  *Id.* at 48-49.

Neitzel's opinion simply "supports an inference as to the [military's] intent or other state of mind," which "is not barred so long as it leaves that inference to the jury to draw."  *United States v. Gish*, 518 F. App'x 871, 875 (11th Cir. 2013).  And

30

Neitzel's discussion of the communications between Defendants and the military "provide the necessary factual underpinning for his opinions." *FNB Bank v. Park Nat'l*, 996 F. Supp. 2d 1187, 1190 (S.D. Ala. 2014). Neitzel's opinions are based on his experience as a leading authority on noise and hearing conservation, his analysis of the materials in this case, and his application of industrial-hygiene principles and exposure science to those materials.[4]

### D.   Neitzel's Training And Fitting Opinions Are Based On A Proper Methodology And Sufficient Facts.

Plaintiffs' request to exclude Neitzel's "training/fitting opinions" amounts to an attack on the materials that Neitzel considered—not his methodology. Plaintiffs reference the GAO report and, without any specificity, "anecdotal and speculative hearsay testimony from a few military audiologists." PltfsMot. 30.

As Plaintiffs concede, "an expert is generally allowed to consider hearsay materials in formulating his opinions." PltfsMot. 30 (quotation omitted). Regardless, the GAO report is not hearsay because it is a public record that "sets out … factual findings," Fed. R. Evid. 803(8), pursuant to a Congressional "mandate [that] GAO [ ] review DOD's hearing protection efforts and report on the status of

---

[4] Plaintiffs incorrectly assert that Neitzel "conceded that he never saw any documents or testimony suggesting that 3M told the military servicemembers they needed to fold back the opposing flanges to use the CAEv2." PltfsMot. 29. Neitzel only testified that folding the flanges is not a requirement "*every time*" the CAEv2 is inserted. Ex24, Neitzel Dep1. 165:17-166:7 (emphasis added).

the hearing center."  Ex26, Neitzel Dep. Ex. 7, GAO-11-114, at 1-2.  Nor is it the only support for Neitzel's opinion that the Army inconsistently trained and fitted soldiers with hearing protection.

Rather, Neitzel notes that the GAO authors' findings are consistent and supportive of his own opinions.  Neitzel reached his opinions by reliably and extensively analyzing relevant literature, documents, and deposition testimony, including from Plaintiffs and individuals with different seniority in the Army's hearing-conservation program.  *See*, *e.g.*, *Clay v. Ford Motor*, 215 F.3d 663, 668-69 (6th Cir. 2000) (upholding district court's assessment of reliability under *Daubert* where expert reviewed depositions, reports, statements, and photographs); *In re Catalyst Litig.*, 2010 WL 4721333, *6 (V.I. Super. Ct. 2010) (finding methodology reliable where industrial hygienist "reviewed the appropriate literature, Plaintiffs' deposition to determine the personal protective equipment, the training they received, the medical treatment they received, and what they did on a daily basis"); *United States v. An Easement & Right-of-way Over 6.09 Acres of Land*, 140 F. Supp. 3d 1218, 1258 (N.D. Ala. 2015) (explaining that "experts are authorized to consider … evidence that is hearsay or that would otherwise be inadmissible as independent evidence").  Then he applied well-established principles in the area of hearing conservation to the facts he reviewed.  *See Green v. Five Star Mfg.*, 2016 WL

1243757, *7 (N.D. Ala. Mar. 30, 2016) (describing "application of general principles" to "testimony" as reliable under *Daubert*).

These opinions are further supported by the findings made by the GAO after it separately reviewed professional journal articles and studies relating to military audiology and hearing conservation; researched relevant standards; and interviewed dozens of hearing-conservation professionals and servicemembers. Ex26, Neitzel Dep. Ex. 7, GAO-11-114 at App'x I. The GAO report relates to all branches of the military, including the Army. Indeed, interviews by the GAO included servicemembers "across each of the armed services" and "senior-level officials from … the armed services, *including the Army.*" *Id.* (emphasis added). The GAO also "visited nine military installations across the country—with at least two locations for each of the armed services … based on the size of the installation, the presence of hazardous noise, and geographic location." *Id.* Thus, Plaintiffs' argument that "hearsay anecdotes" require "extrapolat[ing]" to the Army likewise fail. PltfsMot. 32.

## E.   Neitzel Is Qualified To Opine Regarding Labels And Applied An Appropriate Methodology.

Plaintiffs criticize Neitzel's labeling and packaging expertise and methodology without citing a single case. Plaintiffs state that "Neitzel conceded that he is not an expert in labeling or packaging." PltfsMot. 32. But Neitzel simply explained that his opinion about the label is "not intended to be a regulatory

compliance check."  Ex27, Neitzel Dep2. 725:1-3.  Instead, Neitzel addresses how to clearly and conspicuously convey product information to prospective users, which is well within his expertise.  Ex28, Neitzel Hacker Report 116-18.  Neitzel testified about his twenty years of experience as a hearing-conservation professional and his research relating to how individuals comprehend and understand labels and warnings:

> I have done research with workers presenting them different versions of information about hearing protectors and evaluating the ability of them to update that information.  So, in other words, trying to identify what messaging most clearly is taken up by people getting instructions on hearing protectors.

Ex27, Neitzel Dep2. 728:17-729:10.

Based on his extensive experience with, and research regarding, hearing protectors, Neitzel reliably analyzed how Defendants allegedly conveyed information about the CAEv2's functionality, fit, maintenance, effectiveness, and noise-reduction capabilities.  *See Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 482 (S.D.N.Y. 2004) (finding warnings opinions sufficiently reliable where expert "based [the] opinion on his experience in consumer safety and on several articles"); *Maynard v. Ferno-Washington, Inc.*, 22 F. Supp. 2d 1171, 1179 (E.D. Wash. 1998) (finding expert qualified to testify about whether warnings sufficiently attracted attention based on "his experience in evaluating safety warnings … and instructions" and because "he wrote a text book with a chapter on product labels").

**F.      Neitzel Is Qualified To Offer Opinions Relating To Audiometric Results.**

Plaintiffs seek to disqualify certain case-specific opinions relating to Estes, Hacker, and McCombs by rewriting Neitzel's opinion about noise exposures into a diagnosis from a medical expert.  But, as Plaintiffs acknowledge, Neitzel repeatedly explained that he does not intend to offer diagnostic opinions about hearing damage:

> Well, the difference is I'm looking at patterns in their audiometric results and comparing them to what would be expected based on a -- a host of epidemiological studies to evaluate whether any change that they have appears consistent with noise-induced hearing loss as it's been reported in the literature.

Ex27, Neitzel Dep2. 459:18-23.  Neitzel's opinion on audiometric patterns that are "consistent with noise-induced hearing loss," *e.g.*, Ex28, Neitzel Hacker Report 122, is not a medical diagnosis.

As an industrial hygienist and public health professional with years of specialization in research relating to noise exposures, hearing conservation, and epidemiological consequences of noise, Neitzel is equipped to offer opinions relating to Plaintiffs' noise exposures and audiometric data.  For more than twenty years, he has studied "exposures to occupational and community noise" and "the health impacts associated with these exposures."  Ex22, Neitzel Report 6-7.  Neitzel has performed research on "health impacts of noise that extend beyond noise-induced hearing loss" and "created new approaches to measuring, analyzing, and

35

characterizing exposures to noise." *Id.* 7-8.   Here, Neitzel is comparing the audiometric patterns in the Plaintiffs' audiograms with scientific literature with which he is familiar.

Courts have admitted opinions from industrial hygienists that relate to causation where, like here, the expert "has knowledge and training in the fields of epidemiology and toxicology" and the report "rests on his review of industrial hygiene references." *Wagoner v. Exxon Mobil*, 813 F. Supp. 2d 771, 814 (E.D. La. 2011).   In *Yates v. Ford Motor*, for example, the court permitted testimony on causation from an industrial hygienist, recognizing that "industrial hygiene is 'the science of anticipating, recognizing, evaluating, and controlling workplace conditions that may cause workers' injury or illness.'"   2015 WL 3448905, \*3 (E.D.N.C. May 29, 2015) (quoting OSHA, Informational Booklet on Industrial Hygiene (1998)).

Plaintiffs' cited case, *Ford v. Carnival*, is not to the contrary.   Even there, the court acknowledged that "courts around the country have allowed non-physicians to render opinions *relevant* to causation."   2010 WL 9116184, \*2 (S.D. Fla. Mar. 4, 2010) (emphasis in original, internal quotation marks omitted).   Nor are Plaintiffs' other cited cases on point.   In *Jones v. Novartis Pharm.*, the expert "did not discuss the methodology in his expert report."   235 F. Supp. 3d 1244, 1280 (N.D. Ala. 2017), *aff'd in part*, 720 F. App'x 1006 (11th Cir. 2018).   And in *McClain v. Metabolife*

*Int'l*, the expert relied on principles that "directly contradict[ed]" an article published by the Federal Judicial Center "[t]o help federal judges deal with *Daubert* issues in toxic tort cases."  401 F.3d 1233, 1242 (11th Cir. 2005).

## VI.    Jennifer Sahmel.

### A.    Sahmel Is Qualified To Offer Her Opinions.

Plaintiffs argue that Sahmel is not qualified to render:  (1) opinions that the CAEv2 does not contribute to overall noise; (2) audiology opinions; (3) design opinions; and (4) military hearing conservation program opinions.

Sahmel testified at length during her deposition about her qualifications in analyzing the efficacy of hearing conservation programs:

- Education at University of California, Berkeley on noise and hearing conservation programs;
- Training and professional experience in hearing conservation programs, including while at NASA's Goddard Space Center and the National Park Service;
- Professional experience with improving hearing conservation programs, including training materials and recordkeeping practices; and
- Reviewing pertinent OSHA and other standards to ensure that hearing conservation programs complied with those standards.

Ex60, Sahmel Dep. 451:15-452:23, 455:5-24.  All of this experience is directly relevant to the opinions that Sahmel offers in this case, and more than sufficient to establish that she is qualified to render such opinions at trial.  *Vision I Homeowner's Ass'n v. Aspen Specialty Ins.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009).

The other three opinions Plaintiffs seek to exclude are all made in the context of evaluating the Army's hearing conservation program.  While Sahmel is not an audiologist or an expert in designing HPDs, she is an expert in evaluating the efficacy of hearing conservation programs.  Ex29, Sahmel Dep. 23:22-24:4; *see also id.* 24:5-11, 72:9-73:20.  Defendants proffered Sahmel as an expert in the role of the military in implementing certain workplace safety procedures set forth in the Department of Defense Instructions and in the Army Hearing Program.  Ex30, Sahmel Report 9-10.  An evaluation of the Army Hearing Program necessarily encompasses the processes in place to monitor servicemembers' hearing and use of HPDs, including reading and evaluating audiometry exams and the overall purpose of HPDs (*i.e.*, in reducing noise).  *Id.* 9-10, 31-43.  Sahmel has experience in considering all of these factors as part of her expertise in evaluating hearing conservation programs.  Ex29, Sahmel Dep. 23:22-24:4; *see also id.* 24:5-11.

The opinions Plaintiffs seek to exclude all relate to Sahmel's expertise in evaluating hearing conservation programs.  Plaintiffs seek to exclude Sahmel's "audiology opinions" with respect to Baker on pages 65 to 66 of her report.  PltfsMot. 37 n.135.  The opinion that Sahmel offers therein is that "the Army Hearing Conservation Program as it relates to [Baker's] service in the Army and Army reserves, was not adequately implemented, such as the documentation, fitting, and training requirement for the program."  Ex31, Sahmel Baker Report 65-66.  The

documentation to which Sahmel refers are, among others, Baker's annual audiograms while in service. *Id.* So while documentation related to audiology is a critical component of her overall evaluation of the program, she is not offering an opinion about audiology in and of itself. Thus, this analysis falls squarely within her purview as an expert in the adequacy of hearing conservation programs. The same is true of the opinions that Plaintiffs seek to exclude with respect to Keefer, so that argument likewise should be rejected. Ex32, Sahmel Keefer Report 73.

### B.    Sahmel's Case-Specific Opinions Are Well Supported.

Plaintiffs seek to exclude Sahmel's case-specific opinions on methodology grounds. The only basis for that argument, however, is that Sahmel reviewed Baker and Keefer's "medical records, military records, depositions, and other materials," and rendered conclusions therefrom. PltfsMot. 37. But reviewing all of the available evidence specific to Baker and Keefer and drawing conclusions based on that evidence and her experience with hearing conservation programs satisfies *Daubert*. *See Clay*, 215 F.3d at 668-69.

### C.    Sahmel's Opinions Are Relevant To These Cases.

Plaintiffs' argument that Sahmel's opinions do not "fit" this case because she did not consider 3M's conduct misconstrues her opinions. PltfsMot. 38. Sahmel seeks to offer opinions about the efficacy and implementation of the Army's Hearing Program. *See*, *e.g.*, Ex30, Sahmel Report 9-10. Her opinions have direct relevance

to Plaintiffs' claims.  For example, Packer opines that the "poor quality and fit of the CAEv2" caused Baker's alleged injuries.  *See*, *e.g.*, Ex33, Packer Baker Report 28. Sahmel's opinions would be critical to evaluating the Army's role in causing those alleged injuries.  According to Sahmel, if, as Baker testified, he "was issued and used [CAEv2s] without being fitted by medically trained personnel," that would be a violation of the Army Hearing Program.  Ex31, Sahmel Baker Report 66.  Keefer's experts offer similar opinions.  *See*, *e.g.*, Ex34, Spankovich Keefer Report 8-9 (alleging that Keefer's injuries were due, in part, to "defects reported in CAEv2," including "improper fit & seal").  So Sahmel's opinions on this front are equally as probative for Keefer.  Ex32, Sahmel Keefer Report 73.

### D.    Sahmel Is Not Offering A Legal Opinion.

Plaintiffs seek to exclude Sahmel's opinions about the "Army's duties or responsibilities" as touching on a legal issue, but Sahmel is not offering a legal opinion.  Rather, based on her extensive experience with hearing conservation programs, she opines "from a regulatory perspective and from industry standards through her experience, not from a legal perspective."  *Yasmin*, 2011 WL 6302287, *25.  In other words, her opinion is limited to responsibilities under accepted occupational health practices and as set forth in the Army's own program, not as a matter of law.  And "the jury will be instructed that [] the Court, not [Sahmel] nor any other witness, will instruct the jury on the law in this case."  *Id.*

40

### E.  Sahmel Will Not Read Corporate Documents Or Other Witnesses' Testimony To The Jury.

Plaintiffs seek to "preclude Sahmel from reading internal corporate documents or parroting other witnesses' testimony to the jury." PltfsMot. 41-42. But Sahmel has no intention of reading documents or testimony to the jury. To the contrary, Sahmel intends to testify to the jury about the *opinions* she has reached in this case, which is of course appropriate for an expert. The fact that Sahmel has considered certain facts in reaching her opinions is unremarkable. *See Easement & Right-of-way Over 6.09 Acres*, 140 F. Supp. 3d at 1258.

## VII.  Vickie Tuten.

Plaintiffs mainly attack Tuten for offering opinions based on her own personal experiences managing hearing-conservation programs at different stations and in different senior roles. But an expert can rely on experience so long as it appropriately supports the expert's opinion. *Supra* 20-21; *see also Am. Gen. Life Ins. v. Schoenthal Family*, 555 F.3d 1331, 1338 (11th Cir. 2009) ("A district court may decide that nonscientific expert testimony is reliable based upon personal knowledge or experience.") (internal quotation omitted); *Maiz v. Virani*, 253 F.3d 641, 669 (11th Cir. 2001) ("[T]here is no question that an expert may still properly base his testimony on professional study or personal experience.") (internal citations and quotations omitted).

Tuten has ample personal knowledge and experience relating to the Army's hearing program. She served for approximately 27 years in the Army as a military uniformed audiologist. Ex35, Tuten Report 1. She held operational and strategic positions, including as the Army Hearing Program Manager at different installations, the Audiology Consultant to the Army Surgeon General, and the Chair of the DoD Hearing Conservation and Readiness Working Group. *Id.*; *see also* Ex36, Tuten Disclosure, Ex. A at 2. Tuten sufficiently connects these experiences managing the hearing-conservation program to the conclusions she reaches and the facts of this case. She identified specific program deficiencies relating to issuing soldiers hearing protection, fitting soldiers with hearing protection, training and educating soldiers about hearing protection, and enforcing the use of hearing protection. Ex35, Tuten Report 18-19. The program applied to all Plaintiffs in Group A and each deficiency identified by Tuten increases the chances of injury of the types alleged by Plaintiffs.

In addition, Plaintiffs argue that Tuten "reviewed only two of five audiologists' depositions given to her by counsel." PltfsMot. 43 n.153. As a threshold matter, Tuten's experience is a sufficient basis for her opinions. Moreover, Plaintiffs are misstating Tuten's testimony. Tuten confirmed that she reviewed all six depositions, spending less time on certain depositions or exhibits. Ex37, Tuten Dep. 42:21-47:9.

42

Overall, Plaintiffs' arguments are so strained they claim that Tuten's report "does not follow typical formatting conventions" because she "recites various Army regulations followed by a personal narrative of experiences, ending with five 'conclusions.'" PltfsMot. 42. Formatting conventions have no bearing on whether Tuten's opinions survive *Daubert*. Furthermore, Tuten's opinion is structured *identically* to Plaintiffs' expert Marshall: "Overview and Summary of Opinions" followed by "Background and Experience" followed by "Opinions" followed by "Conclusions." *Compare* Ex35, Tuten Report *to* Ex20, Marshall Report.

## VIII. Elliott Berger.

Defendants have designated Elliott Berger, the former laboratory manager for Aearo's EARCal laboratory, as a hybrid fact and expert witness in this case. As a hybrid witness, his opinions are based on the "direct and personal knowledge" that he acquired about the CAEv2 "'in the ordinary course' of [his] job function." *Hartford Steam Boiler Inspection & Ins. v. Menada*, 2018 WL 3911212, *6 (S.D. Fla. April 4, 2018). Plaintiffs move to bar Berger from offering several opinions. Berger does not intend to offer some of the opinions on which Plaintiffs have moved, and Plaintiffs' challenges to the actual opinions contained in Berger's disclosure lack merit.

### A. Berger's Opinions Regarding The CAEv2's Design Are Within His Experience And The Evidence.

Plaintiffs have moved to prohibit Elliott Berger from offering the opinion that "there was no feasible alternative design to the CAEv2." PltfsMot. 46. But the opinion set forth in Berger's disclosure is more targeted. Berger will testify regarding the two primary features of the CAEv2 that Plaintiffs allege to be defective—its Delrin stem, and the position of the opposing flanges.

Plaintiffs' experts have alleged that the adapter stem of the CAEv2 was made out of a too rigid material, which made it difficult for the plug to conform to users' ear canals. Berger will explain, based on his years of experience in the development of hearing protection products, that "[i]t was necessary to use a stem with an appropriate tolerance to house the nonlinear filter of the CAEv2" to "hold the filter in place" and that the filter itself needed to be rigid to ensure the orifices were of the correct size. Ex38, Berger Disclosure 9. Plaintiffs do not attempt to undermine this opinion, and thus have no basis to object to Berger's opinion that a more flexible stem was not feasible.

Separately, Berger offers the opinion that, contrary to Plaintiffs' defect theory, the width of the CAEv2's stem had no effect on its performance. *Id*. Plaintiffs do not allege this opinion is improper expert testimony. Instead, they attack an opinion that Berger does not give—that it was not feasible to make a thinner filter. PltfsMot.

48.  The point is that a thinner filter was no better than a wider one, not that it was impossible to make a thinner filter.

With respect to the alleged fitting defect caused by the dual-ended CAEv2's opposing flanges, PltfsMot. 46-48, Berger will simply testify that both of the militaries involved in the development of the CAEv2, the French and American, opted against the alternative design proposed by Plaintiffs' experts:  a single-ended earplug that could switch between linear and non-linear protection.  This is fact testimony, not opinion testimony, and Defendants included it in the hybrid disclosure out of an abundance of caution, in case Plaintiffs argue that Berger's explanation of the reasons why the militaries rejected a single-ended design constitutes expert testimony.  Plaintiffs do not make that argument, and offer no other reason why Berger cannot discuss this fact testimony at trial.

**B.    Berger Is Not Opining Regarding Regulations, And Has The Knowledge To Testify Regarding NVLAP's Approval Of Aearo's Testing.**

Plaintiffs have moved to prohibit Berger from opining that the EPA's labeling regulations apply only to civilians.  PltfsMot. 49.  Berger does not intend to offer that opinion in his testimony.  The remark in Berger's disclosure that the EPA labeling regulations apply to the civilian market was made in passing, in the course of explaining the background to Aearo's REAT testing of the CAEv2.

Plaintiffs also accuse Berger of "speculat[ing]" that the National Voluntary Laboratory Accreditation Program ("NVLAP") reviewed and approved a number of Aearo's testing practices.  PltfsMot. 49-50.  That Berger has never served as an NVLAP auditor, as Plaintiffs stress, is irrelevant given his personal experience and knowledge.  Berger was the director of Aearo's EARCal lab for decades, and he can testify from his personal knowledge regarding the scope of NVLAP's annual reviews of Aerao's policies.  Berger need not be a "NVLAP auditor" to know that NVLAP auditors reviewed and approved Aearo's lab policies during their bi-annual audits of the Ear-CAL laboratory.

### C.    Berger's Opinions Regarding Folding Back the CAEv2's Flanges Are Based On His Personal Knowledge And Consistent With His Deposition Testimony.

Plaintiffs contend Berger does not have personal knowledge to support his opinion that it is not necessary for all users to fold back the flanges of the CAEv2 to get an adequate fit.  PltfsMot. 50-51.  Plaintiffs emphasize Berger's testimony that he does not know how many subjects had the flanges folded back on the 213017 test that Aearo used to label the product with a 22 NRR.  But Berger's opinion does not rest on how many subjects had the flanges folded back on the '017 test.  The basis for Berger's opinion is that even on the '015 test, where *no* subjects had the flanges folded back, "[a] majority of the subjects … received attenuation in the range that Mr. Kieper and Mr. Berger expected."  Ex38, Berger Disclosure 7.  Berger reviewed

the '015 test results as they were collected in 2000 and co-authored the memorandum (the so-called "Flange Memo") that discusses the decision to halt the '015 test, so Plaintiffs cannot argue they are beyond Berger's personal knowledge.  Those results support Berger's opinion, formed at the time, that not all users need to fold back the flanges to obtain an adequate fit.

Plaintiffs also cite testimony from one of Berger's six days of depositions to imply that he has agreed all users needed to fold back the flanges.  Berger says nothing of the kind:

> Q.  The company knew that if they told Doug Ohlin that you gotta roll back this plug, the flanges on the outside, for every soldier because that's how we had to do it in our testing, that it would have been impossible to sell a big number to the military.
>
> …
>
> A.  I don't know why it would be a problem for everyone. There's fitting tips.  Pulling a pinna is certainly a somewhat arduous thing for somebody to do, much more challenging than rolling back the flanges on a plug.

Ex39, 12/12/2019 Berger Dep. 486:10-12.  Berger's point was that, if it were true that everyone needed to fold back the flanges, Aearo would have had no reason to withhold that information from the military.  Contrary to plaintiffs' argument, Berger did not concede the premise that it is, in fact, necessary to fold back the flanges.

## IX.   Dr. Eric Fallon.

Dr. Eric Fallon is an audiologist and former Program Manager for the Army Hearing Conservation Program.  Like Berger, Fallon is a hybrid witness whose opinions are based on the "direct and personal knowledge" that he acquired "'in the ordinary course' of [his] job function."  *Hartford Steam*, 2018 WL 3911212, *6. That knowledge comes from a 24-year military career where his roles and responsibilities primarily related to implementing the Army's hearing conservation undertakings.  Fallon's extensive experience and personal knowledge pertaining to hearing conservation within the military, coupled with his education in communication disorders and audiology, make him well-qualified to provide testimony on the following three topics:  (1)  DoD and Army Hearing Conservation Program's hearing-conservation-related requirements and guidance; (2) use of the CAEv2 within the military, including instructions and training in connection with the product; and (3) widespread non-use of HPDs within the military and Fallon's role in increasing awareness about the benefits of HPDs.

Plaintiffs make two basic arguments against Fallon:  (a) his opinions are unreliable because he lacks experience and knowledge to offer them; and (b) his opinions are unhelpful because he does not directly opine regarding the Group A Plaintiffs.  PltfsMot. at 51-56.  Both arguments are meritless.

## A.    Dr. Fallon's Opinions Are Reliable As They Are Well-Grounded In His Experience.

Plaintiffs' argument that Fallon's opinions are unreliable ignores his extensive experience regarding the Army Hearing Conservation Program, which provides a proper foundation for his opinions.  Nothing in Rule 702 suggests that "experience alone … may not provide a sufficient foundation for expert testimony.  Fed. R. Evid. 702 advisory committee's note (2000 amends.).  Instead, the "text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." *Id.*  An expert testifying based on experience should explain how his experience leads to the conclusion, why that experience is a sufficient basis, and how that experience is applied to the facts.  *Id.*; *see also Frazier*, 387 F.3d at 1261.  That is exactly what Fallon does, and therefore his opinions based on his extensive experience regarding the Army's hearing conservation programs are admissible. *See*, *e.g.*, *Superior Consulting*, 2018 WL 3059995, *3-6; *Washington*, 2016 WL 3545909, *2-3; *Allmond*, 2007 WL 988757, *4-5.

Fallon was *the* Program Manager of the Army Hearing Program, and is testifying as to topics directly related to his personal roles and responsibilities in connection with administering the Army Hearing Program.  Fallon was responsible for, among other things, "developing Army policy for hearing conservation," Ex40, 9/4/2020 Fallon Dep. 747:1-11, "guid[ing] U.S. Army policy as it related to a hearing conservation program as set forth by the Department of Defense," *id.* 753:4-

13, "supporting the installation hearing conservation program managers" *id*., and ensuring the Army properly implemented the Hearing Conservation Program, including DoD policy with respect to hearing conservation and protections, *id*. 514:16-19.  Moreover, Fallon had a variety of audiology and hearing conservation related roles throughout his time in the military, in addition to serving as the Army Hearing Program Manager—all of which contribute to his knowledge and expertise in the field of hearing conservation within the military.  Ex46, Fallon Disclosure 2-3.  Unlike Plaintiffs' putative experts regarding the military's "safety culture," Defs.' Daubert Mot. 46-50, Fallon actually has the experience regarding the Army's policies and actions regarding hearing for his opinions to be reliable.

Fallon's decades of personal experience and knowledge regarding Army hearing conservation mean that his opinions are not "speculative" as Plaintiffs assert, PltfsMot. 51, but instead rest on a reliable foundation.  Moreover, Fallon's opinions are not based solely on his experience.  The instructions and information he has discussed are documented in various government pamphlets, PowerPoints, wallet cards, and letters—some of which were distributed throughout the military, including to service members.  Ex40, Fallon Dep. 771:10-772:8, 795:3-7.

Fallon's opinions show how his experience and these documents provide a sufficient basis for his conclusions.  For example, Fallon will opine that there were various teaching tools utilized by the Army that included guidance to roll back the

flange of the CAEv2 under certain circumstances.  Ex42, Fallon Dep. Ex. 65 at FALLON00053 ("[f]or very large ear canals, fold the opposing plug back"); Ex43, Fallon Dep. Ex. 66 at 3M_MDL000229332 ("[f]or very large ear canals, fold the opposing plug back");  Ex44, Fallon Dep. Ex. 67 at 3 ("[f]or exceptionally large ear canals, fold the opposing plug back to enhance proper insertion").  These teaching materials include images of the CAEv2 flanges folded back—and were used by Fallon and other military personnel when training and informing staff and service members about proper insertion of the CAEv2.

Similarly, Fallon's testimony that the CAEv2 was not one-size-fits-all is also documented in an "Information Paper" written by then Lieutenant Colonel Kathy Gates of the United States Army.  Ex45, Fallon Dep. Ex. 68.  This February 24, 2006 paper documents that:  (i) the CAEv2 is "not a 'one size fits all' [product]," and (ii) it "is critical to understand that hearing conservation and hearing injury prevention is not simply a matter of providing earplugs to Soldiers," rather they, "have to be trained and fitted on the appropriate use and insertion of the earplug."  *Id.*

Likewise, contrary to plaintiffs' argument, PltfsMot. 55-56, Fallon's opinions pertaining to widespread nonuse of HPDs in the military are well-grounded in his experience.  As part of his various Army hearing conservation roles, Fallon was tasked with encouraging and ensuring servicemembers utilized requisite HPDs and in a proper manner.  Fallon provided specific testimony regarding circumstances in

which servicemembers were generally instructed not to wear HPDs and those in which he observed service members not wearing HPDs.  Ex41, 12/22/2020 Fallon Dep. 53:17-54:12, 57:9-58:3.

### B.    Fallon's General Opinions Are Helpful To The Jury.

Plaintiffs repeatedly criticize Fallon for not offering opinions about the Group A plaintiffs, PltfsMot. 51-56, but this ignores that Fallon is not a case-specific expert witness, but instead a general one.  Like other general experts retained by both Plaintiffs and Defendants, Fallon is not directly testifying about the specifics of each Plaintiff's particular facts.  Instead, his testimony will be helpful to the jury by explaining facts that are relevant to the case and beyond the jury's understanding. Among other testimony, Fallon will explain to the jury the Army's hearing-related policies and practices, including regarding how to use the CAEv2 and when the Army instructed servicemembers not to wear HPDs.  Fallon also will rebut arguments from Plaintiffs' experts or the Plaintiffs themselves that there was any "culture" of wearing HPDs, and instead explain that servicemembers often did not— and in certain circumstances were instructed not to—wear HPDs.  For example, using his knowledge and expertise regarding DoD and United States Army policy that service members wear hearing protection when exposed to hazardous noise, Fallon can help a jury understand that Baker likely should have been wearing hearing

protection devices when shooting an M4 in Iraq, and why his failure to do so could have contributed to his hearing loss.  Ex47, Baker Dep. 98:25-101:16.

Moreover, Fallon is knowledgeable concerning policies that apply to Plaintiffs, including how servicemembers were supposed to (a) be issued HPDs, (b) be fitted with the CAEv2 and instructed in its use where servicemembers were issued that HPD, and (c) receive regular audiograms.  Ex46, Fallon Disclosure 5-6. This knowledge coupled with the facts in the litigation will assist the jury in understanding the evidence and determining fact issues—including whether or not a Plaintiff's hearing loss was more likely than not caused by their use of the CAEv2. For example, Fallon has testified that pursuant to DoD and Army guidelines, medically trained personnel must fit and examine a servicemember when issuing them with preformed earplugs, such as the CAEv2.  Ex40, 9/4/2020 Fallon Dep. 768:13-769:14, 755:13-761:15.   This opinion in conjunction with bellwether Plaintiff Estes not receiving fitting when he was issued the CAEv2, Ex48, Estes Dep. 140:24-141:3, will assist the trier of fact in considering whether the Army's failure to train Estes in the CAEv2, as opposed to any supposed defect in the CAEv2, is the cause of Estes' alleged hearing loss.

**C.   Fallon Can Appropriately Opine Concerning The Military's Testing Of The CAEv2.**

Plaintiffs mischaracterize Fallon's opinions to argue that he should not be allowed to opine about the product testing and performance of the CAEv2.  PltfsMot.

54-55.   But Fallon explained that "what [he] learned about the Combat Arms Earplug[] came from [testing at] the *Army Research Lab* at USACHPPM."   Ex40, 9/4/2020 Fallon Dep. 844:19-22; *see also* Ex41, 12/22/2020 Fallon Dep. 42:15-44:14.   Fallon discussed "the situational awareness information that we would use. I know that that came from the Army research Lab … I know that the Army Research Lab was producing information that showed ... the difference between an open ear, the Combat Arms Earplug, and a passive hearing protector with regards to auditory situational awareness."   Ex41, 12/22/2020 Fallon Dep. 115:1-9; *see also id.* 44:7-11, 55:24-56:2.   Thus, the evidence demonstrates that—in his role as the manager of Army Hearing Program and various hearing conservation roles within the Army— Fallon was knowledgeable about and relied on the Army for instructions related to fitting, training, and use of an HPD, including the CAEv2.   *Id.* 113:2-5.   Thus, Fallon's opinions regarding military testing practices are well-grounded in his experience.

## X.   John House.

### A.   House Properly Offers Expert Testimony About Hacker's and Estes's Hearing-Related Injuries.

Plaintiffs confuse the scope of House's opinions when they claim that he improperly questions whether Estes or Hacker wore the CAEv2.  PltfsMot. 58. The only evidence that Plaintiffs cite to support this argument are pages from House's

expert reports, but those pages say nothing of the sort.  *See* PltfsMot. 58 n. 209 (citing "PX64(House-(Estes)-1st-Am-13-14); PX65(House-(Hacker)-10-11)").

The cited pages relating to Hacker mention the CAEv2 only:  (1) to note that Hacker's mild loss at ultra-high frequencies in the left ear is consistent with aging or history of head injuries and are "not related to noise exposure or his use of the CAEv2;" (2) to state that "there is no evidence to suggest that Mr. Hacker's right ear hearing loss was caused by the use of CAEv2 or any defective hearing protection device" because his right ear hearing loss is conductive; and (3) to conclude that "there is no evidence to suggest that Mr. Hacker's tinnitus was caused by the use of CAEv2 or any defective hearing protection device."  Ex61, House Hacker Report 10-11.

Similarly, for Estes, the CAEv2 is mentioned to:  (1) opine that Estes's left ear hearing loss and tinnitus could not have been caused by the alleged 2010 incident where the CAEv2 loosened because his audiograms from that timeframe show normal hearing; (2) explain that Estes's audiograms were not consistent with his hearing loss being caused by a separate 2014 incident when Estes claimed the CAEv2 loosened; (3) identify based on Estes's case files and deposition that in addition to the CAEv2 he used other HPDs, and military noise exposures while wearing those other HPDs cannot be ruled out as a cause of Estes's hearing loss; and

(4) conclude that there is "insufficient evidence to link his hearing loss and or tinnitus claims to his use of the CAEv2."  Ex62, House Estes Report 13-14.

Thus, House is not "questioning" whether Estes and Hacker wore the CAEv2. Instead, House opines that there is insufficient evidence to conclude that Hacker's and Estes's hearing-related injuries are linked specifically to the CAEv2, in part because they wore several other HPDs during the relevant time frame.  Ex61, House Hacker Report 3, 10-11; Ex62, House Estes Report 13.  That is not an opinion Plaintiffs challenge and there is ample support for it.  *Id.*

### B.     House Properly Offers Expert Testimony About Speech Discrimination in Noisy Environments.

House conducted a proper analysis to opine that Hacker and Estes do not have difficulty understanding speech in noisy environments.  Plaintiffs' assertion that House admitted the appropriate test is a speech-in-noise ("SIN") test is inaccurate. PltfsMot. 59.  The cited portion of the deposition states that House did not do a SIN test for Estes because he "didn't think [he] needed to do that test for him" based on results from other tests.  Ex49, House Dep. 179:25-181:7.  Nowhere is there testimony from House conceding that the only test to analyze speech discrimination in noisy environments is the SIN test.  House testified that, based on his education and experience as a treating physician for over four decades and as a clinical professor, a SIN test would not be helpful for Estes or Hacker because they have normal hearing.  *See*, *e.g.*, *id.* 144:17-22 (testifying that Estes' "hearing is really

quite good").  House considered doing a SIN test, but after evaluating the cases and data, he determined it was not necessary.  *Id.* 144:25-145:9.

Similarly inaccurate is Plaintiffs' claim that House "conceded" that a speech discrimination test in a quiet environment cannot provide information on hearing in a noisy environment.  PltfsMot. 59.  Plaintiffs' cited testimony shows that House said only that he was "aware of [] literature indicating that it is harder to discriminate speech in noisy environments for [individuals with hearing reduction in the high frequencies] than in quiet environments."  Ex49, House Dep. 143:11-144:10.  He did ***not*** "concede" that a test done in a quiet environment cannot shed light on the level of understanding speech in noise, as Plaintiffs claim.  In fact, House considered the testing that was done here in a quiet environment, along with other available data, to conclude that Estes and Hacker do not have difficulty discriminating speech in a noisy environment.

For example, regarding Estes, though the VA only considers a four-frequency pure tone average for hearing impairment rating (between 500 and 3,000 Hz), House did an average of the higher frequencies to better assess whether Estes could hear speech in noisy environments.  When averaging those numbers for Estes, House found that Estes was "well within the normal range" and that it was unlikely the "very mild ... hearing loss at 3 and 4K is going to affect his ability to … do well in noise."  Ex49, House Dep. 160:5-162:4; 164:17-165:1.  Similarly, for Hacker, House

considered the available testing data as well as record evidence, including testimony from a representative of Hacker's prior employer who explained that Hacker performed well as a blackjack dealer in a noisy environment. *Id.* 222:21-223:3.

Plaintiffs' cited authority supports 3M's position. PltfsMot. 60. In *McGee*, the court excluded the opinions of an expert who opined that the design of a car seat was dangerously defective because he had not conducted any substantive tests or taken any measurements to confirm his opinion. *McGee v. Evenflo*, 2003 WL 23350439, *10 (M.D. Ga. Dec. 11, 2003). The court stressed that testing is useful "to show that an expert adhered to the same standards of intellectual rigor that are demanded in their professional work." *Id.* *10. Here, House went above and beyond the standards that are typically demanded in his professional field by evaluating and averaging higher frequencies to assess the ability to discriminate speech in noisy environments.

### C.    House Properly Offers Expert Testimony about Hacker's Tinnitus.

Contrary to Plaintiffs' argument, PltfsMot. 60, House's opinion about Hacker's tinnitus is grounded in his expertise, supported by the scientific literature, and based on a careful consideration of Hacker's history of head injuries as documented in his medical records. House opines that Hacker's right-ear tinnitus is most likely explained by his conductive hearing loss and it is likely that any left-ear tinnitus is not caused by noise exposure because his exposure to noise is minimal.

Ex61, House Hacker Report 10.  House explained that tinnitus is generated in an area of the brain that is associated with trauma and, thus, Hacker's history of head trauma is an explanation for his tinnitus.  *Id.* 9.  This is particularly true given that Hacker reported at least six concussions from 2002 to 2017, which include the time period during which he first complained of tinnitus, and dates when he reported aggravated tinnitus.  *Id.* 10-11.  Based on these facts, House concludes:  "Because Mr. Hacker does not have sensorineural hearing loss in either ear, it is more likely than not that his tinnitus is caused by head trauma than noise exposure."  *Id.* 11.

The scientific literature that House cites in his report further supports his conclusion.  As one example, House cites Ex50, *Occupational Hearing Loss* (2006) by Robert and Joseph Sataloff, which offers detail about tinnitus after head trauma: they note that "[t]he close relationship of head injury and tinnitus is clearly evident;" "[r]inging tinnitus is experienced commonly after a blow to the external ear."  *Id.* at 490.   Thus, Plaintiffs' assertion that House "conceded he performed no methodological analysis" is incorrect.  PltfsMot. 60.  House considered the various risk factors for tinnitus that Hacker faced from his time in the military, including his noise exposure and history of head injuries, and he testified that "tinnitus can be caused by head injury," which he has seen with his own patients.  Ex49, House Dep. 208:8-14.  He further testified that when analyzing Hacker's case he took "stock of the different noise exposures to which he was faced [as] a soldier" to opine that his

history of head trauma was more likely than not a contributing factor of his tinnitus. *Id.* 209:12-19; 211:9-19.  This is consistent with his report where he opines that tinnitus is multifactorial, and spends pages discussing Hacker's extensive history of multiple head injuries.  *See* Ex61, House Hacker Report 5-6.

Similarly, House did not concede he was unaware of the severity of Hacker's head injuries.  PltfsMot. 60-61.  During his deposition, House did not "recall specifically" how serious Hacker's head injuries were.  Ex49, House Dep. 216:14-19.  However, his report details the medical records containing this information, with citations to the record.  *See*, *e.g.*, Ex61, House Hacker Report 5-6.  Plaintiffs fault House for "conduct[ing] no analysis into Hacker's symptoms at the time of his head injuries," PltfsMot. 61, but this fault is misplaced as House cannot rewrite the medical records to include more detail or revisit prior examinations and ask questions, that in hindsight, the examiner should have asked.

The case Plaintiffs cite in support of their argument is inapposite.  PltfsMot. 61.  *McClain* involved claims that a weight-loss supplement was an unreasonably dangerous drug, which resulted in strokes and heart attacks.  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005).  The Court found that the proffered testimony by a pharmacologic expert was unreliable because he "neglect[ed] the hallmark of the science of toxic torts—the dose-response relationship."  *Id.* at 1240.  Here, House is not faced with a toxic tort case with a relevant dose-response

relationship to analyze.   And unlike the proffered expert in *McClain*, House undertook a detailed analysis of Hacker's noise exposure, use of the CAEv2, and history of head trauma to reach his conclusions.

## XI.   Dennis Driscoll.

Dennis Driscoll is a mechanical engineer and consultant who has "published at least 15 technical journal articles, more than 300 noise control engineering studies on noise measurement, community noise, and hearing conservation seminars, and 800 noise surveys." Ex51, Driscoll Dep. 121:12-17.  Driscoll's profession is to help "companies determine the effectiveness of their hearing conservation programs, which requires using the audiometric results as determined by the professional to determine whether the program is working or not working." *Id.* 46:5-10.  Driscoll has been evaluating hearing conservation program effectiveness, including interpreting audiometric results, for 42 years. *Id*. 48:14-15.

Driscoll intends to offer two expert opinions regarding McCombs:  (1) a significant risk for noise-induced hearing loss ("NIHL") and tinnitus existed for McCombs at the time of the IED attack of April 23, 2009 irrespective of the use of the CAEv2 green end of the earplug; and (2) McCombs' audiograms support that the HPDs he used during his service protected his hearing. Ex52, Driscoll Report 7. Driscoll is more than qualified to opine on these areas, he used reliable methodology

to arrive at these opinions, and his testimony meets the helpfulness requirement of *Daubert*.

### A.    Driscoll Is Not Offering An Opinion On Whether McCombs Has NIHL.

Plaintiffs argue that Driscoll:   (i) is not qualified to opine on whether McCombs has NIHL from his military service; and (ii) did not employ a reliable methodology to opine regarding whether McCombs has NIHL.  PltfsMot. 61–63.  While Defendants believe that Driscoll is highly qualified to opine on the results of McCombs' audiometric examinations and employed a reliable methodology to do so, to be clear, Driscoll is not offering the opinion that McCombs does not have NIHL.  Instead, Driscoll is assuming that McCombs does not have NIHL as the basis for his second opinion (that the HPDs McCombs used protected his hearing).  An "expert may rely upon an assumption in reaching his conclusion if there is evidence in the record which supports that assumption."  *Mims v. Wright Med. Tech.*, 2012 WL 12835870, *2 (N.D. Ga. May 11, 2012).  The factual assumption that McCombs does not have NIHL is well-supported by the record, *see* Ex51, Driscoll Dep. 45:6-14, and does not appear to be in dispute.  Indeed, McCombs *himself* concedes he does not have NIHL and is not bringing a claim for NIHL in this lawsuit.  Ex53, 01/08/2021 Choice-of-Law Hr'g 117:6-11.

Thus, Plaintiffs' arguments regarding whether Driscoll can opine that McCombs does not have NIHL are irrelevant, and their motion should be denied on this issue.

### B. Driscoll's Opinion Regarding McCombs' Risk Of Hearing Injury Satisfies the Helpfulness Requirement.

Plaintiffs argue that Driscoll's first opinion is not helpful because Driscoll assigned a hearing protection value of 7 NRR to the CAEv2 instead of using the 22 NRR the CAEv2 is labeled with.  PltfsMot. 63–64.  As Driscoll stated in his report, however, the labeled "NRR is a laboratory value and not necessarily reflective of the real-world performance afforded by HPDs."  Ex52, Driscoll Report 5.  To obtain an estimate of real-world performance, Driscoll used the derating scheme recommended by the National Institute for Occupational Safety and Health (NIOSH)[5] to arrive at a real-world hearing protection value of 7 NRR (more precisely 6.6), which also "closely reconciles with the value for 3-flange earplugs referenced in *Noise and Military Service: Implications for Hearing Loss and Tinnitus*."  *Id*.

Plaintiffs' argument that using a 7 NRR contradicts the possibility that the CAEv2 was tightly inserted and sealed, PltfsMot. 64, ignores real-world factors that

---

[5]  "Criteria for a Recommended Standard: Occupational Exposure to Noise, *Revised Criteria 1998*," U.S. Dept. HHS (NIOSH), DHHS Publication No. 98-126 (1998), listed as Reference No. 8 in Ex52, Driscoll Report 7.

make derating appropriate.  *See* Ex51, Driscoll Dep. 164:9-15; Ex52, Driscoll Report

5.  McCombs even testified that, despite "always put[ting the CAEv2] in correctly"

and making sure he had a "complete seal[,]" his CAEv2 became loose on a couple

of occasions.  Ex54, McCombs Dep. 417:2-419:20.  Therefore, Driscoll's opinion

does not employ contradictory reasoning, is based on derating to account for real-

world factors, and should not be excluded.

Finally, Plaintiffs argue that Driscoll's testimony regarding McCombs' risk

for NIHL would not be helpful because he recites facts, PltsMot. 65, but these facts

are the assumptions for Driscoll's opinion and are supported by record evidence.

*See Mims*, 2012 WL 12835870, *2.  For example, because the evidence conflicts as

to whether or not McCombs was wearing hearing protection during the IED attack

that purportedly caused his injuries, Driscoll offers opinions assuming either

circumstance.  Ex51, Driscoll Dep. 158:24-159:6.  If McCombs was not wearing

hearing protection, then a significant risk for NIHL and tinnitus existed.   If

McCombs was donning the CAEv2, the noise level from the IED still posed a

significant risk.  *Id*. at 140:25-141:5.  This testimony is clearly "relevant to an issue

in [McCombs'] case and offer[s] insights 'beyond the understanding and experience

of the average citizen.'"  *Navelski v. Int'l Paper*, 244 F. Supp. 3d 1275, 1287 (N.D.

Fla. 2017).

## XII.   Derek Jones, Jennifer LaBorde, and Margaret Richards.

Dr. Jones, MD, and Dr. LaBorde, Au.D. offer opinions including that Keefer suffers from an early onset progressive hearing loss unrelated to his military noise exposure that began before he joined the military, continued while he was in the military, and worsened significantly after he left the military.  Ex55, Jones-LaBorde Keefer Report 15-16.   Jones, LaBorde, and Dr. Richards, Au.D. offer opinions including that McCombs's hearing is within normal limits.  Ex56, Jones-LaBorde-Richards McCombs Report 23.

Plaintiffs do not challenge under *Daubert* these opinions or the methodologies used to arrive at them.  Instead, they challenge only the use of the 1996 Florida Uniform Permanent Impairment Rating Schedule ("FUPIRS") to calculate a percentage hearing loss and impairment rating to describe Keefer's and McCombs's hearing status.  PltfsMot. 65-69.  Plaintiffs' arguments that these calculations "will not assist the jury" and are not "based upon scientifically valid principles, reasoning or methodology" are meritless.  PltfsMot. at 65-66.

### A.    The Percentage Hearing Loss Impairment Opinions Are Helpful.

Jones, LaBorde, and Richards explain that "disability ratings are commonly calculated to determine a percentage hearing loss in social security/disability evaluations as well as workman's compensation cases to determine the extent of impairment a person has from hearing loss."  Ex55, Jones-LaBorde Keefer Report

6; Ex56, Jones-LaBorde-Richards McCombs Report 7.  LaBorde testified that in her clinical practice she has used percentage hearing loss ratings based on FUPIRS to describe to patients the degree of their hearing loss and in other situations when "you want to use objective data to look at potential impairment."  Ex57, LaBorde Dep. 110:4-11; *id*. 132:23-133:1.  Likewise, Richards uses FUPIRS "in [her] everyday practice" because "the concept of an audiogram can feel abstract to people" and FUPIRS can be an effective tool to help "supplement someone that's having a little trouble connecting with this abstract concept of hearing loss."  Ex58, Richards Dep. at 111:21-112:7.

The percentage hearing loss and impairment ratings in the expert reports for Keefer and McCombs serve a similar purpose to contextualize hearing loss information.  These percentages "offer insights beyond the understanding and experience of the average citizen" and "advance[] a material aspect" of the case by helping the trier of fact better understand the hearing status of Keefer and McCombs. *See Abilify*, 299 F. Supp. 3d at 1305 (internal quotation marks and citation omitted). Federal courts have used percentage hearing loss calculations to characterize hearing status in a variety of contexts.  *Green v. Simpson*, 2016 WL 4492841, *2, 10 (S.D. Ga. Aug. 2, 2016), *report and recommendation adopted,* No. CV 114-192, 2016 WL 4492859 (S.D. Ga. Aug. 25, 2016) (discussing "permanent, forty percent loss of hearing" in an action brought under 42 U.S.C. §1983); *Butts v. Georgia State Patrol*

*Div.,* 2011 WL 5597258, *6 (M.D. Ga. Nov. 17, 2011) (accepting plaintiff allegations of a "sixty percent hearing loss" in evaluating claims under the Americans with Disabilities Act); *Chapman v. Abbott*, 137 F. App'x 161, 162 (10th Cir. 2005) (discussing "an eighty percent hearing loss" in habeas corpus appeal); *see also Bath Iron Works Corp. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor,* 506 U.S. 153, 159 (1993) (describing "audiogram indicating an 82.4 percent loss of hearing" in assessing injury under Longshore and Harbor Workers' Compensation Act); *Owings v. Chater*, 62 F.3d 1429 (10th Cir. 1995) (unpublished order and judgment) (discussing "forty percent hearing loss" in Social Security disability appeal).

### B.   FUPIRS Is A Reliable Standard Reference Work Based On "Medically Or Scientifically Demonstrable Findings."

Plaintiffs incorrectly assert that *Daubert* requires Jones, LaBorde, and Richards to independently verify the scientific support underlying FUPIRS in order to rely on them. PltfsMot. 67. The Eleventh Circuit is clear, however, that experts are entitled to rely upon standard reference works they consult in their ordinary clinical practice without independent verification. *See United States v. Azmat*, 805 F.3d 1018, 1041–43 (11th Cir. 2015) (rejecting a *Daubert* challenge finding an expert's opinions "easily pass[] scrutiny" when based on standard reference works, medical texts, and "federal and state standards" and the opposing party offered no argument "that the medical community does not accept those authorities").

Here, Plaintiffs concede that Jones said he used FUPIRS to calculate percentage hearing loss because he was familiar with it and had used it in his clinical practice. PltfsMot. 67. LaBorde testified that she has referenced and used FUPIRS "many times" throughout her twenty-year clinical career. Ex57, LaBorde Dep. 111:2-13. Likewise, Richards described FUPIRS as a "standardized tool that's widely accepted in" the audiology field that she references "in [her] everyday practice." Ex58, Richards Dep. 111:17-112:7.

Significantly, Florida state law *requires* that FUPIRS "must be based on medically or scientifically demonstrable findings" and must be based on the "systems and criteria" set forth in guidelines established by the American Medical Association and other groups. Fla. Stat. Ann. §440.15(3)(b). In addition, FUPIRS was created with the assistance of an advisory panel of representative health care specialties. Ex59, FUPIRS, at ii, 1. However, beyond calling FUPIRS percentage hearing loss calculations "meaningless," Plaintiffs offer no substantive criticisms of the ratings themselves. PltfsMot. 66-67. Plaintiffs do not argue that FUPIRS were adopted in violation of the Florida law requiring that they be "based on medically or scientifically demonstrable findings." Plaintiffs do not argue or cite any sources claiming that the percentage hearing loss impairments calculated by FUPIRS have been rejected by the medical community. *See Azmat*, 805 F.3d at 1041–43 (rejecting a *Daubert* challenge in part when opposing party offered no argument "that the

68

medical community does not accept" guidelines set forth in standard reference texts).

Plaintiffs likewise do not and cannot cite to any rebuttal opinions offered by their

experts disputing the use of FUPIRS or percentage hearing loss calculations.

### C.   Jones, LaBorde, and Richards Properly Applied FUPIRS To Calculate Keefer's and McCombs's Impairment Ratings.

Plaintiffs do not challenge Jones's qualifications or credentials as a medical

doctor to use FUPIRS to evaluate and determine permanent impairment ratings.

PltfsMot. 67-68.  Instead, they seek to limit LaBorde and Richards' ability to discuss

those ratings because, according to Plaintiffs, audiologists are not physicians and

Florida worker's compensation law requires physicians to make the final

determination of permanent impairment.  *Id.* 67-68.  To begin with, regardless of

Florida's requirements for who submits permanent impairment determinations for

worker's compensation claims, audiologists like LaBorde and Richards are qualified

through their clinical experience to use the percentage hearing loss calculated by

FUPIRS to understand and explain the degree of hearing loss and impairment ratings

that typically would be provided for someone with audiograms like Keefer and

McCombs.  *See* Ex57, LaBorde Dep. at 120:23-121:7; *See* Ex58, Richards Dep. at

111:21-112:7.  Moreover, both LaBorde and Richards testified that the permanent

impairment ratings calculated for and reported in their expert reports for Keefer and

McCombs were reached in close collaboration with Jones.  Ex57, LaBorde Dep.

122:8-17, 123:2-8; Ex58, Richards Dep. 115:2-20.  Further, as LaBorde testified, the

percentage hearing loss calculated using FUPIRS simply involves plugging objective audiogram data into the formula provided in FUPIRS that either a physician or an audiologist could perform to calculate a percentage hearing loss. Ex57, LaBorde Dep. at 120:23-121:7.

Plaintiffs' challenge to FUPIRS' use for Keefer is similarly misplaced. Plaintiffs argue that Jones and LaBorde cannot use FUPIRS for Keefer because Keefer has a chronic progressive hearing loss. PltfsMot. 68. But Plaintiffs do not suggest that Keefer's hearing will improve or that he has not reached "maximum medical improvement." *Id.* Nor does FUPIRS "forbid" calculating impairment ratings for degenerative conditions like Keefer's. FUPIRS merely notes that permanent impairment evaluations should be conducted when a physician considers the condition "stable or non-progressive *at the time the evaluation is made*." Ex59, FUPIRS at 1 (emphasis added). Neither Jones nor LaBorde have suggested that Keefer's hearing loss was not stable during Keefer's actual audiograms. Moreover, Plaintiffs' interpretation of FUPIRS is contradicted by FUPIRS itself, which explicitly allows for the determination of permanent impairment ratings for other "progressive" degenerative conditions. *See id.* 104-105 (calculating permanent impairment for "progressive chronic liver disease").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny in its entirety Plaintiffs' motion to exclude Defendants' experts' opinions.


Respectfully submitted:


*/s/ Charles F. Beall, Jr.*  
Larry Hill  
Florida Bar No. 173908  
lhill@mhw-law.com  
Charles F. Beall, Jr.  
Florida Bar No. 66494  
cbeall@mhw-law.com  
Haley J. VanFleteren  
Florida Bar No. 1003674  
hvanfleteren@mhw-law.com  
MOORE, HILL & WESTMORELAND, P.A.  
350 West Cedar Street  
Maritime Place, Suite 100  
Pensacola FL 32502  
Telephone: (850) 434-3541  

*/s/ Robert C. "Mike" Brock*  
Robert C. "Mike" Brock  
KIRKLAND & ELLIS LLP  
1301 Pennsylvania Avenue, N.W.  
Washington, D.C. 20004  
Telephone: (202) 389-5991  
mike.brock@kirkland.com  

Mark J. Nomellini  
KIRKLAND & ELLIS LLP  
300 North LaSalle  
Chicago, Illinois 60654  
Telephone: (312) 862-3254  
mnomellini@kirkland.com  

Kimberly Branscome  
DECHERT LLP  
633 W. 5th St., Suite 4900  
Los Angeles, CA 90071  
Telephone: (213) 808-5762  
kimberly.branscome@dechert.com  

*Counsel for Defendants 3M Company,*  
*3M Occupational Safety LLC, Aearo*  
*Technologies LLC, Aearo Holding,*  
*LLC, Aearo Intermediate, LLC and*  
*Aearo, LLC*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

Pursuant to Local Rule 7.1(F) and the Court's January 4, 2021 decision on the parameters for briefing, counsel for Defendants certify that this memorandum contains 13,880 words, excluding the case style, tables of contents and authorities, signature block, and certificates of compliance with the Local Rules.

Dated:  January 22, 2021                    Respectfully submitted,

                                            */s/ Robert C. Brock*
                                            Robert C. "Mike" Brock
                                            KIRKLAND & ELLIS LLP
                                            1301 Pennsylvania Avenue, N.W.
                                            Washington, D.C. 20004
                                            Telephone:  (202) 389-5991
                                            mike.brock@kirkland.com

                                            *Counsel for Defendants 3M Company,
                                            3M Occupational Safety LLC, Aearo
                                            Technologies LLC, Aearo Holding,
                                            LLC, Aearo Intermediate, LLC and
                                            Aearo LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 22, 2021, a true and correct copy of the foregoing:

### DEFENDANTS' RESPONSE TO PLAINTIFFS' OMNIBUS MOTION TO EXCLUDE DEFENDANTS' EXPERT OPINIONS AND TESTIMONY

was served as follows:

☒ **[E-Mail]** By causing the above document to be sent via electronic mail to the parties at the email addresses listed below. I am aware that service is presumed invalid if the email transmission is returned as undeliverable.

| | |
|---|---|
| Bryan F. Aylstock, Lead Counsel<br>Douglass A. Kreis<br>Neil D. Overholtz<br>Aylstock, Witkin, Kreis & Overholtz, PLLC<br>17 East Main Street<br>Suite 200<br>Pensacola, FL 32502<br>Tel.: (850) 202-1010<br>Email: baylstock@awkolaw.com<br>Email: dkreis@awkolaw.com<br>Email: NOverholtz@awkolaw.com<br><br>*Counsel for Plaintiff Luke Estes*<br>Case No. 7:20-cv-00137<br><br>*Counsel for Plaintiff Dustin McCombs*<br>Case No. 7:20-cv-00094<br><br>*Counsel for Plaintiff Stephen Hacker*<br>Case No. 7:20-cv-00131 | Shelley V. Hutson, Co-Lead Counsel Clark, Love & Hutson, GP<br>440 Louisiana Street<br>Suite 1600<br>Houston, TX 77002<br>Tel.: (713) 757-1400<br>Email: shutson@triallawfirm.com |

| | |
|---|---|
| Christopher A. Seeger, Co-Lead Counsel<br>David R. Buchanan<br>Caleb A. Seeley<br>Seeger Weiss LLP<br>77 Water Street<br>8th Floor<br>New York, NY 10005<br>Tel.: (212) 587-0700<br>Email: cseeger@seegerweiss.com<br>Email: dbuchanan@seegerweiss.com<br>Email: cseeley@seegerweiss.com<br>Email: MDL2885@seegerweiss.com<br><br>*Counsel for Plaintiff Lewis Keefer*<br>Case No. 7:20-cv-00104 | Michael A. Burns, Co-Liaison Counsel<br>Mostyn Law Firm<br>3810 W. Alabama Street<br>Houston, TX 77027<br>Tel.: (713) 714-0000<br>Email: epefile@mostynlaw.com<br>Email: maburns@mostynlaw.com |
| Evan D. Buxner,<br>Plaintiffs' Executive Committee<br>Gori Julian & Associates<br>156 North Main Street<br>Edwardsville, IL 62025<br>Tel.: (618) 659-9833<br>Email: evan@gorijulianlaw.com<br><br>*Counsel for Plaintiff Stephen Hacker*<br>Case No. 7:20-cv-00131 | Brian H. Barr, Co-Liaison Counsel<br>Winston Troy Bouk<br>Levin, Papantonio, Thomas, Mitchell,<br>Rafferty, & Proctor, P.A.<br>316 S Baylen St. Ste 600<br>Pensacola, FL 32502<br>Tel.: (850) 435-7045<br>Email: bbarr@levinlaw.com<br>Email: tbouk@levinlaw.com<br><br>*Counsel for Plaintiff Lewis Keefer*<br>Case No. 7:20-cv-00104 |
| Taylor C. Bartlett<br>William L. Garrison, Jr.<br>Discovery & ESI Subcommittee<br>Heninger Garrison Davis LLC<br>2224 1st Avenue North<br>Birmingham, AL 35203<br>Tel.: (205) 326-3336<br>Email: taylor@hgdlawfirm.com<br>Email: lewis@hgdlawfirm.com | Katherine E. Charonko,<br>Discovery & ESI Subcommittee<br>Bailey & Glasser LLP<br>209 Capitol Street<br>Charleston, WV 25301<br>Tel.: (304) 345-6555<br>Email: kcharonko@baileyglasser.com |

| | |
|---|---|
| *Counsel for Plaintiff Dustin McCombs*<br>Case No. 7:20-cv-00094 | |
| Virginia E. Anello,<br>Discovery & ESI Subcommittee<br>Douglas & London<br>59 Maiden Ln, 6th Floor<br>New York, NY 10038<br>Tel.: (212) 566-7500<br>Email: vanello@douglasandlondon.com | J. Nixon Daniel, III<br>Discovery & ESI Subcommittee<br>Beggs & Lane<br>501 Commendencia Street<br>Pensacola, FL 32502<br>Tel.: (850) 469-3306<br>Email: jnd@beggslane.com |
| Taylor C. Bartlett<br>William L. Garrison, Jr.<br>Discovery & ESI Subcommittee<br>Heninger Garrison Davis LLC<br>2224 1st Avenue North<br>Birmingham, AL 35203<br>Tel.: (205) 326-3336<br>Email: taylor@hgdlawfirm.com<br>Email: lewis@hgdlawfirm.com | Shawn Fox<br>Sean P. Tracey<br>Tracy & Fox Law Firm<br>440 Louisiana Street, Suite 1901<br>Houston, TX 77002<br>Tel.: (713) 495-2333<br>Email: sfox@traceylawfirm.com<br>Email: stracey@traceylawfirm.com<br><br>*Counsel for Plaintiff Lloyd E. Baker*<br>Case No. 7:20-cv-00039 |
| Katherine L. Cornell<br>Pulaski Law Firm<br>2925 Richmond Avenue, Suite 1725<br>Houston, TX 77098<br>Tel.: (713) 664-4555<br>Email: kcornell@pulaskilawfirm.com<br><br>*Counsel for Plaintiff Luke Estes*<br>Case No. 7:20-cv-00137 | Thomas W. Pirtle<br>Laminack Pirtle & Martines<br>5020 Montrose Blvd., 9th Floor<br>Houston, TX 77006<br>Tel.: (713) 292-2750<br>Email: tomp@lpm-triallaw.com<br><br>*Counsel for Plaintiff Luke Estes*<br>Case No. 7:20-cv-00137 |
| Jeanie Sleadd<br>Heninger Garrison Davis LLC<br>2224 1st Avenue North<br>Birmingham, AL 35203<br>Tel.: (205) 326-3336 | Quinn R. Wilson<br>Onder Law LLC<br>110 E. Lockwood Avenue, 2nd Floor<br>St. Louis, MO 63119<br>Tel.: (314) 963-9000 |

| | |
|---|---|
| Email: jsleadd@hgdlawfirm.com<br><br>*Counsel for Plaintiff Dustin McCombs*<br>Case No. 7:20-cv-00094 | Email: wilson@onderlaw.com<br><br>*Counsel for Plaintiff Stephen Hacker*<br>Case No. 7:20-cv-00131 |
| Thomas P. Cartmell<br>Wagstaff & Cartmell<br>4740 Grand Avenue, Suite 300<br>Kansas City, MO 64112<br>Tel.: (816) 701-1100<br>Email: tcartmell@wcllp.com<br><br>*Counsel for Plaintiff Stephen Hacker*<br>Case No. 7:20-cv-00131 | |

DATED:  January 22, 2021          /s/ Robert C. Brock
                                                    Robert C. "Mike" Brock