## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| | Judge M. Casey Rodgers |
| This Document Relates to: *Lloyd Baker*, No. 7:20-cv-00039; *Luke Estes*, No. 7:20-cv-00137; *Stephen Hacker*, No. 7:20-cv-00131; *Lewis Keefer*, No. 7:20-cv-00104; *Dustin McCombs*, No. 7:20-cv-00094 | Magistrate Judge Gary R. Jones [FILED UNDER SEAL] |

## PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' OMNIBUS MOTION TO EXCLUDE PLAINTIFFS' PUTATIVE EXPERT OPINIONS UNDER *DAUBERT* AND RULE 702 AND INCORPORATED MEMORANDUM IN SUPPORT THEREOF

## TABLE OF CONTENTS

I.   Introduction ......................................................................................................1

II.  Argument...........................................................................................................1

    A.  Testing Experts ..........................................................................................1

        1.  Dr. David Eddins ...............................................................................2

        2.  Roger Juneau...................................................................................29

        3.  Richard McKinley............................................................................32

        4.  Dr. John Franks ...............................................................................37

        5.  Eric Rose ........................................................................................46

    B.  Military Experts........................................................................................50

        1.  Explaining   Institutional   Practices,   Procedures,   and   Rules   Is
            Quintessential Expert Testimony..........................................................51

        2.  Plaintiffs' Military Experts' Opinions Are Reliable..............................53

        3.  3M's Anecdotal Evidence Does Mandate Exclusion. ...........................55

        4.  3M's "Fit" Arguments Ignore the Opinions. ........................................57

    C.  Economic Loss Experts .............................................................................58

        1.  Dr. Elizabeth Davis..........................................................................58

        2.  Kristin Kucsma ................................................................................64

        3.  Robert Johnson.................................................................................66

    D.  Other Experts............................................................................................68

1. Dr. Moises Arriaga.................................................................68

2. Dr. Mark Packer.................................................................75

3. Dr. Lawrence Lustig ............................................................83

4. Dr. Christopher Spankovich ....................................................88

5. Dr. Marc Fagelson ..............................................................98

6. Dr. Eric Bielefeld ...............................................................106

7. Adm. Althea Coetzee Leslie ...................................................113

8. Dr. David Madigan .............................................................118

III.  Conclusion.......................................................................120

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Lab. Corp. of Am.*,
 760 F.3d 1322 (11th Cir. 2014) ........................................................41

*Andrade Garcia v. Columbia Med. Ctr.*,
 996 F. Supp. 617 (E.D. Tex. 1998) ..................................................65

*Arevalo v. Coloplast Corp.*,
 2020 WL 3958505 (N.D. Fla. July 7, 2020)......................................70

*Ashford v. Wal-Mart Stores, LP*,
 2013 WL 152853 (S.D. Miss. Jan. 15, 2013)....................................65

*Banks v. ICI Ams., Inc.*,
 450 S.E.2d. 671, 674 (Ga. 1994) ................................................ 25, 26

*Bannon v. GEICO Gen. Ins.*,
 743 Fed. App'x 311 (11th Cir. 2018)................................................85

*Bliss v. BNSF Ry. Co.*,
 2013 WL 5570231 (D. Neb. Oct. 9, 2013)........................................53

*BMO Harris Bank, N.A. v. Richert Funding, LLC*,
 2016 WL 11531452 (N.D. Ga. July 5, 2016) ....................................66

*Calta v. N. Am. Arms, Inc.*,
 2007 WL 4800641 (M.D. Fla. Nov. 27, 2007)..................................46

*Cason v. C.R. Bard, Inc.*,
 2015 WL 9913809 (N.D. Ga. Feb. 9, 2015)......................................44

*Chapman v. Procter & Gamble Distrib., LLC*,
 766 F.3d 1296 (11th Cir. 2014) ........................................................58

*Chavez-Acosta v. Sw. Cheese*,
 2013 WL 12040013 (D.N.M. Aug. 5, 2013)......................................65

*Childress v. Johnson & Johnson*,
  2017 WL 6350524 (S.D.W. Va. Dec. 12, 2017) .................................................81

*Commins v. Genie Indus*.,
  2020 WL 1189937 (W.D. Ky. Mar. 12, 2020) ....................................................63

*Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cnty.*,
  402 F.3d 1092 (11th Cir. 2005) ..................................................................... 49, 50

*Cooper v. Toshiba Home Tech. Corp.*,
  76 F. Supp. 2d 1269 (M.D. Ala. 1999) ..............................................................46

*CSC v. U.S.*,
  2013 WL 6795723 (S.D. Ill. Dec. 20, 2013) ......................................................64

*Cummins v. BIC USA, Inc.*,
  2011 WL 3759415 (W.D. Ky. Aug. 25, 2011) ....................................................64

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ..................................................................................... *passim*

*Dejana v. Marine Tech., Inc.*,
  2013 WL 6768407 (E.D. Mo. Dec. 20, 2013) ....................................................63

*Easly v. Waterfront Shipping Co.*,
  2012 WL 812354 (W.D. Wash. Mar. 9, 2012) ....................................................65

*Eldridge v. Pet Supermarket, Inc.*,
  2020 WL 1076103 (S.D. Fla. Mar. 6, 2020) ................................................ 70, 85

*Emig v. Electrolux Home Prods., Inc.*,
  2008 WL 4200988 (S.D.N.Y. Sept. 11, 2008) ....................................................36

*Evans v. John Crane, Inc.*,
  2019 WL 5457101 (D. Del. Oct. 24, 2019) ......................................................115

*Fagundez v. Louisville Ladder, Inc.*,
  2012 WL 253214 (S.D. Fla. Jan. 26, 2012) ..........................................................7

*Fell v. U.S.*, 2017 WL 5992464

(N.D. Fla. July 17, 2017) ............................................................................ 79, 101

*FNB Bank v. Park Nat. Corp.*,
   996 F. Supp. 2d 1187 (S.D. Ala. 2014) ..............................................................29

*Fox v. Gen. Motors LLC*,
   2019 WL 3483171 (N.D. Ga. Feb. 4, 2019)................................................. 50, 65

*Furmanite v. T.D. Williamson*,
   506 F.Supp.2d 1126 (M.D. Fla. 2007) ................................................................6

*Geyer v. NCL (Bahamas) Ltd.*,
   203 F. Supp. 3d 1212 (S.D. Fla. 2016)...................................................... 105, 106

*Grantham v. CSX Transp., Inc.*,
   2019 WL 2161727 (S.D. Ga. May 17, 2019) .....................................................91

*Haines v. Get Air LLC*,
   2019 WL 3501054 (D. Ariz. Aug. 1, 2019) .......................................................64

*Hendrix v. Evenflo Co.*,
   255 F.R.D. 568 (N.D. Fla. 2009).............................................................. *passim*

*Hendrix v. Evenflo Co.*,
   609 F.3d 1183 (11th Cir. 2010) .......................................................................104

*Hilaire v. DeWalt Indus. Tool Co.*,
   54 F. Supp. 3d 223 (E.D.N.Y. 2014) .................................................................35

*Ho v. Royal Caribbean Cruises Ltd.*,
   2020 WL 5534278 (S.D. Fla. Aug. 4, 2020) ......................................................59

*Humleker v. Bos. Sci. Corp.*,
   2020 WL 6870852 (M.D. Fla. Oct. 2, 2020)......................................................72

*Huskey v. Ethicon, Inc.*,
   29 F. Supp. 3d 691 (S.D.W. Va. 2014) ........................................................ 69, 76

*Hutchens v. Abbott Labs.*,
   2016 WL 10566144 (N.D. Ohio Dec. 22, 2016)................................................59

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
299 F. Supp. 3d 1291 (N.D. Fla. 2018) ................................................ 44, 103, 120

*In re C.R. Bard Pelvic Repair Sys. Prods. Liab. Litig.*,
948 F. Supp. 2d 589 (S.D. W. Va. 2013) ............................................................67

*In re Connolly*,
398 B.R. 564 (E.D. Mich. 2008) ........................................................................67

*In re Delta/Airtran Baggage Fee Antitrust Litig.*,
245 F. Supp. 3d 1343 (N.D. Ga. 2017) ..............................................................87

*In re E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*,
348 F. Supp. 3d 698 (S.D. Ohio 2016)..............................................................118

*In re E. I. du Pont de Nemours & Co. C8 Personal Injury Litig.*,
345 F. Supp. 3d 920 (S.D. Ohio 2015)................................................................67

*In re Namenda Indirect Purchaser Antitrust Litig.*,
2021 WL 100489 (S.D.N.Y. Jan. 12, 2021)................................................. 46, 51

*In re Prempro Prods. Liab. Litig.*,
2012 WL 13034063 (E.D. Ark. Apr. 19, 2012) ..................................................28

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................................67

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) ..............................................................................95

*In re Seroquel Prods. Liab. Litig.*,
2009 WL 3806435 (M.D. Fla. June 23, 2009) ..................................................103

*In re Seroquel Prods. Liab. Litig.*,
2009 WL 3806436 (M.D. Fla. July 20, 2009)......................................................71

*In re Unisys Sav. Plan Litig.*,
173 F.3d 145 (3d Cir. 1999) ...............................................................................61

*In re Welding Fume Prods. Liab. Litig.*,
   2010 WL 7699456 (N.D. Ohio June 4, 2010) ....................................................116

*In re Wright Med. Tech. Inc., Conserve Hip Implant Prods. Liab. Litig.*,
   127 F. Supp. 3d 1306 (N.D. Ga. 2015) ..............................................................74

*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig*,
   2011 WL 6732819 (S.D. Ill. Dec. 16, 2011) ........................................................67

*Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*,
   1993 WL 387346 (N.D. Ill. Sept. 23, 1993) ........................................................68

*Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*,
   716 F.2d 833 (11th Cir. 1983) ..............................................................................5

*Jetport v. Landmark Aviation Miami, LLC*,
   2017 WL 7734095 (S.D. Fla. July 19, 2017) ......................................................32

*Jinro Am. Inc. v. Secure Invs., Inc.*,
   266 F.3d 993 (9th Cir. 2001) ..............................................................................52

*Joffe v. King & Spalding LLP*,
   2019 WL 4673554 (S.D.N.Y. Sept. 24, 2019) ....................................................65

*Johnson v. Montoya*,
   308 P.3d 566 (Utah App. 2013).........................................................................64

*Jones Creek Inv'rs, LLC v. Columbia Cty., Georgia*,
   2013 WL 12141348 (S.D. Ga. Dec. 23, 2013) ....................................................68

*Jones v. Blue Cross Blue Shield of Louisiana*,
   2018 WL 585543 (M.D. La. Jan. 29, 2018) ........................................................63

*Kia v. Imaging Sci. Int'l*,
   2010 WL 3431745 (E.D. Pa. Aug. 30, 2010).......................................................67

*King v. Cessna Aircraft Co.*,
   2010 WL 1980861 (S.D. Fla. May 18, 2010).......................................................85

*Kinney v. Mack Trucks, Inc.*,
2012 WL 12871204 (N.D. Fla. May 14, 2012) ................................................... 104

*Kondash v. Kia Motors Am. Inc.*,
2020 WL 5816228 (S.D. Ohio Sept. 30, 2020) .................................................... 26

*Lachney v. Target Corp.*,
2010 WL 11570518 (W.D. Okla. Apr. 12, 2010) ................................................ 52

*Lackey v. Bosch*,
2017 WL 129891 (E.D. Ky. Jan. 12, 2017) .......................................................... 64

*Lea v. Wyeth LLC*,
2011 WL 13193321 (E.D. Tex. Sept. 16, 2011) ................................................... 66

*Lee-Bolton v. Koppers Inc.*,
319 F.R.D. 346 (N.D. Fla. 2017) ........................................................................... 37

*Lessert v. BNSF Ry. Co.*,
2020 WL 4500218 (D.S.D. Aug. 5, 2020) ........................................................... 64

*Loewen v. Wyeth, Inc.*,
2011 WL 6140908 (N.D. Ala. Nov. 14, 2011) ..................................................... 44

*Long v. Amada Mfg. Am., Inc.*,
2004 WL 5492705 (N.D. Ga. Mar. 31, 2004) ...................................................... 38

*Mahli v. Admiral Ins. Co.*,
2015 WL 4915701 (S.D. Miss. Aug. 18, 2015) ................................................... 50

*Mamani v. Berzaín*,
2018 WL 1010582 (S.D. Fla. Feb. 22, 2018) ....................................................... 52

*Mattingly v. Home Depot U.S.A., Inc.*,
2009 WL 10676568 (E.D. Tex. Oct. 20, 2009) .................................................... 63

*McClain v. Metabolife Intern., Inc.*,
401 F.3d 1233 (11th Cir. 2005) ............................................................................ 85

*McCorvey v. Baxter Healthcare Corp.*,
298 F.3d 1253 (11th Cir. 2002) ..........................................................................52

*Meneely v. Denman Tire Corp.*,
1995 WL 902213 (N.D. Fla. July 20, 1995)......................................................107

*Milne v. Volkswagen AG*,
2009 WL 10702722 (D. Vt. Jan. 22, 2009) ..........................................................63

*Montgomery v. Aetna Cas. & Surety Co.*,
898 F.2d 1537 (11th Cir. 1990) ........................................................................107

*Moore v. Wright Med. Tech., Inc.*,
2016 WL 1316716 (S.D. Ga. Mar. 31, 2016)................................................ 26, 27

*Morgan v. Jacques*,
2010 WL 11537864 (D. Vt. Oct. 5, 2010) ............................................................63

*Nat'l Union Fire Ins. v. Tyco Integrated Sec., LLC*,
2015 WL 11251759 (S.D. Fla. July 6, 2015) ........................................................7

*Navelski v. Int'l Paper Co.*,
244 F. Supp. 3d 1275 (N.D. Fla. 2017) ...................................................... 78, 108

*Noel v. Inland Dredging Co.*,
2018 WL 1911821 (E.D. La. Apr. 23, 2018) ........................................................64

*Ogden v. Saint Mary's Med. Ctr.*,
2007 WL 1675092 (E.D. Mich. June 11, 2007) ....................................................63

*Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*,
2020 WL 1666763 (S.D. Fla. Apr. 3, 2020).................................................. 70, 76

*Ortega v. Cty. of LA*,
2019 WL 2902490 (C.D. Cal. May 15, 2019)......................................................64

*Pledger v. Reliance Tr. Co.*,
2019 WL 4439606 (N.D. Ga. Feb. 25, 2019)............................................ 116, 118

*Ramkelawan v. Globus Med. Inc.*,
2019 WL 8267231 (M.D. Fla. Dec. 10, 2019) ....................................................51

*Richter v. Home Depot U.S.A., Inc.*,
2009 WL 2912781 (M.D. Fla. Feb. 20, 2009).......................................................7

*S.E.C. v. Tourre*,
950 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................................................29

*Salinero v. Johnson & Johnson*,
2019 WL 7753453 (S.D. Fla. Sept. 5, 2019).......................................................82

*Sanchez-Knutson v. Ford Motor Co.*,
181 F. Supp. 3d 988 (S.D. Fla. 2016) ..................................................................6

*Scott v. Chipotle Mexican Grill, Inc.*,
315 F.R.D. 33 (S.D.N.Y. 2016) .........................................................................116

*Seymore v. Penn Maritime, Inc.*,
281 Fed. App'x 300 (5th Cir. 2008) ...................................................................61

*Sorrels v. NCL (Bahamas) Ltd.*,
796 F.3d 1275 (11th Cir. 2015) .................................................................. 49, 100

*Stern v. NCL (Bahamas) Ltd.*,
2020 WL 6820877 (S.D. Fla. Sept. 28, 2020)........................................ 104, 105

*Suazo v. Atl. Sounding Co.*,
2008 WL 57832 (E.D. La. Jan. 2, 2008) ............................................................59

*Thibault v. White*,
2017 WL 1902173 (N.D. Fla. Jan. 18, 2017)....................................................104

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
878 F.2d 791 (4th Cir. 1989) ..............................................................................74

*Tillman v. C.R. Bard, Inc.*,
96 F. Supp. 3d 1307 (M.D. Fla. 2015) ......................................................... 44, 85

*U.S. ex rel. Howard v. Lockheed Martin Corp.*,
  2014 WL 1233081 (S.D. Ohio Mar. 25, 2014) ...................................................115

*U.S. v. Colonial Pipeline Co.*,
  2003 WL 26131791 (N.D. Ga. Jan. 14, 2003) ....................................................52

*U.S. v. Dukagjini*,
  326 F.3d 45 (2d Cir. 2003) ...................................................................................67

*U.S. v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ................................................................. 52, 109

*U.S. v. McCarthy Improvement Co.*,
  2017 WL 10434414 (M.D. Fla. Feb. 3, 2017)......................................................29

*U.S. v. McIver*,
  470 F.3d 550 (4th Cir. 2006) .................................................................................76

*U.S. v. Rouco,*
  765 F.2d 983 (11th Cir. 1985) .............................................................................116

*United Fire & Cas. Co. v. Whirlpool Corp.*,
  704 F.3d 1338 (11th Cir. 2013). ............................................................................41

*Voilas v. General Motors Corp*,
  73 F. Supp. 2d 452 (D.N.J. 1999).........................................................................66

*Webb v. Carnival Corp.*,
  321 F.R.D. 420 (S.D. Fla. 2017) ...........................................................................51

*Weirich v. Horst Realty Co.*,
  2009 WL 920960 (E.D. Pa. Mar. 30, 2009) ..........................................................64

*Wendell v. GlaxoSmithKline LLC*,
  858 F.3d 1227 (9th Cir. 2017) ...............................................................................63

*Westberry v. Gislaved Gummi AB*,
  178 F.3d 257 (4th Cir. 1999) ....................................................................... 71, 72

*Wielgus v. Ryobi Tech, Inc.*,
　2012 WL 3643682 (N.D. Ill. Aug. 23, 2012)........................................................7

*Williams v. Coleman Co.*,
　2015 WL 4077272 (N.D. Ala. July 6, 2015)........................................................7

*Wu v. Miss. State Univ.*,
　2014 WL 5799972 (N.D. Miss. Nov. 7, 2014)....................................................50

*Yaffa v. Sunsouth Bank*,
　2015 WL 11110553 (N.D. Fla. Mar. 30, 2015) ..................................... 38, 42, 45

**Rules**

Fed. R. Civ. P. 26 ....................................................................................................29

Fed. R. Evid. 702 ......................................................................................... 1, 28, 38

Fed. R. Evid. 703 ......................................................................................... 67, 119

Fed. R. Evid. 704 ..................................................................................................106

## I.   <u>INTRODUCTION</u>

Defendants 3M Company and Aearo (hereinafter collectively "Defendants or "3M") have moved to exclude the testimony and opinions of Plaintiffs' experts Moises Arriaga, Eric Bielefeld, Althea Coetzee Leslie, Elizabeth Davis, David Eddins, Timothy Edens, Marc Fagelson, John Franks, Blaine Huston, Robert Johnson, Roger Juneau, Kristin Kucsma, Lawrence Lustig, David Madigan, Christopher Marshall, Richard McKinley, Mark Packer, Eric Rose, and Christopher Spankovich, pursuant to Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).[1] For the reasons stated herein, 3M's motion should be denied.

## II.   <u>ARGUMENT</u>

### A.   <u>Testing Experts</u>

Eddins, Juneau, McKinley, Franks, and Rose are well-qualified in the fields of ear protection device testing, product development and safety, or labeling. Each applies a reliable methodology that fits the facts and will aid the jury in resolving (among other issues) whether the CAEv2 is defective.  As to each expert, 3M's sweeping motion fails to show that their testimony falls outside the range of reliable opinion, or advance any reason why these opinions are inadmissible.

---

[1] References to Defendants' Omnibus Motion to Exclude Plaintiffs' Putative Expert Opinions Under *Daubert* and Rule 702 and Incorporated Memorandum in Support Thereof are abbreviated herein as "Def-Mot."

1.  *Dr. David Eddins*

Dr. Eddins is an esteemed biomedical engineering professor and Director of the Auditory & Speech Sciences Laboratory at the University of South Florida.[2] Through decades of research, Eddins has made significant contributions in the fields of auditory perception, hearing loss, voice quality, and hearing technology.[3]

Eddins conducted testing (the largest and most comprehensive study ever performed on the CAEv2) under controlled laboratory conditions to investigate the fit, function, and usability of the CAEv2 using 30 human subjects, male and female, ages 18 to 34.[4] Eddins employed three established and reliable test methods:

- REAT (real ear attenuation at threshold), which measures the difference in hearing thresholds with and without an earplug;[5]
- *h*MIRE (human-microphone in real ear), which measures that difference using a probe tube positioned inside a subject's ear;[6] and
- *m*Mire (molded-microphone in real ear), which measures that difference using a standard microphone positioned inside a standard ear simulator coupled to silicone molds individualized to the ears of each test subject.[7]

These experiments consistently demonstrated that the CAEv2 provides unacceptable protection due to design defects in the length, width, and rigidity of the stem; the

---

[2] PX1(Eddins-2d-Am-3).
[3] *Id*. at 4-5.
[4] *Id*. at 2, 22.
[5] *Id*. at 12.
[6] *Id*. at 42.
[7] *See generally* PX2(Juneau-2d-Am); PX1(Eddins-2d-Am-52-55).

position of its filter and flanges; and the inability of a wearer to assess whether the plug's open-end is fitted properly.

### a. *Eddins' CAEv2 Tests Using REAT Methods Are Scientifically Reliable.*

3M argues that Eddins misapplied REAT Method B to assess attenuation because servicemembers are not the right class of individuals for such testing.[8] This suggestion is belied by Defendants' own use of Method B to test CAEv2,[9] the military's own requirement to use "hearing protection data based on Method B (subject fit)",[10] and Eddins' actual test process.[11] In fact, when negotiating the Medical Procurement Item Description (MPID), the military expressly requested Method B testing of the CAEv2 from Defendants.[12] Their attempt to exclude Eddins for performing the very testing their lead acoustic engineer recommended[13] and the military ultimately requested is nonsensical. In REAT testing, human subjects "provide subjective feedback to pure tone sounds" in a controlled setting.[14] They

---

[8] Def-Mot-74-76.

[9] PX3(Eddins-Dep-182:7-183:18) (noting Defendants performed REAT Method B testing on CAEv2 and never completed Method A testing"); Berger et al., *Experience With a New ANSI Standard for Measuring the REAT of Hearing Protectors (S12.6-1997)*, 105:2 J. ACOUST. SOC. AM. 1129 (1999) (attached as PX4).

[10] PX5(3M_MDL000478845) (Department of the Army Pamphlet 40-501 at P1136.3).

[11] PX1(Eddins-2d-Am-12).

[12] PX6(3M_MDL000254134-37, at -36) (3M redlining military request for Method B testing of CAEv2).

[13] PX7(3M_MDL000439465).

[14] PX1(Eddins-2d-Am-12).

respond to these sounds with and without earplugs.[15] The difference between those two thresholds is the attenuation the device provides.[16] The REAT experimenter must choose between two methods of training participants how to insert the ear plugs: Method A, which includes a fitting lesson prior to the test, or Method B, which includes only written and photographic instructions.[17]

Eddins considered Method A,[18] but determined Method B was more appropriate.[19] Eddins ruled out Method A, in which an investigator "prescribe[s] exactly, word for word, action for action" how to fit the plug, within minutes of testing,[20] because it would have over-prepared the sample pool as compared to military users because Method A is "intended to give REAT values that represent the upper limits of performance for that particular device" by training subjects in a "very well-controlled environment"—circumstances that do not approximate real-world, military use of the CAEv2.[21]

In contrast, Eddins considered Method B training to better approximate the experience of servicemembers, whose training before using the CAEv2 was more

---

[15] *Id.*

[16] *Id.*

[17] *Id.* at 13-14.

[18] *Id.* at 31.

[19] PX3(Eddins-Dep-377:11-13, 391:15-17).

[20] *Id.* at 122:5-18, 161:22-162:3.

[21] *Id.* at 121:16-22, 162:4-16.

limited and occurred "six months or a year" prior to use.[22] 3M's argument that servicemembers are not a class of persons who may be tested under Method B is therefore wrong. At most, this dispute about the application of Method B goes to the study's weight, not admissibility.

3M also argues that the EPA believes Method B cannot be used for subjects who have received earplug training.  But Eddins' tests used naïve subjects.[23] And the results of a Method B test are informative as to the general protection provided by a hearing protector. The EPA has acknowledged: "[t]here was no consensus on whether EPA should require Method A or Method B,"[24] and "even studies of well-trained users (as opposed to test subjects) showed results similar to Method B [attenuation] data."[25]

3M's arguments fail for the above reasons. Moreover, disagreement over a specific technique used or the accuracy of results generated go to weight, not admissibility. *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 844 (11th Cir. 1983) (holding alleged deficiencies, including poor sampling, inexperienced interviewers, poorly designed questions, and other errors in execution,

---

[22] *Id*. at 160:10-161:2 ("[T]he notion that you would apply the training that you got thirty seconds before to your fitting the same way you would apply the training … that you got, let's say, six months before the fitting, it's apples and oranges. It's not the same."); PX8(Tuten-17-19).

[23] PX1(Eddins-2d-Am-22).

[24] Def-Mot-Ex.33-VI.A.

[25] Def-Mot-Ex.33-VI.A.2.

affected the weight of survey); *Furmanite v. T.D. Williamson*, 506 F.Supp.2d 1126, 1132 (M.D. Fla. 2007) ("Errors in an expert's application of a reliable method go to the credibility of an expert's opinion rather than the opinion's reliability under *Daubert*."). Additionally, any alleged flaw in Eddins' application of Method B is for cross-examination. *Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 993 (S.D. Fla. 2016) (dispute about "chosen sample class" goes to weight); *Quiet Tech. v. Hurel-Dubois*, 326 F.3d 1333, 1345-46 (11th Cir. 2003) (dispute about use of incorrect numbers in reliable formula not grounds for exclusion).

Accordingly, Eddins' Method B tests are applicable to the Plaintiffs and will help a jury assess the CAEv2's attenuation for servicemembers.

### b. *Eddins' CAEv2 Tests Using MIRE Are Also Scientifically Reliable.*

3M also argues that Eddins' use of microphone in real ear (MIRE) techniques to assess attenuation are unreliable. However, MIRE is an accepted measurement tool in clinical audiology and hearing research,[26] Eddins has experience with MIRE,[27] including in the development of a hearing-aid-and-protection device.[28]

Here, Eddins ran two sets of controlled MIRE experiments to measure insertion loss, first with 30 humans (*h*MIRE), and second with test fixtures (*m*MIRE)

---

[26] PX1(Eddins-2d-Am-42).
[27] PX3(Eddins-Dep-86:2-87:20).
[28] PX1(Eddins-2d-Am-5).

including anatomical molds of their ears made by Juneau. These tests, administered under strict MIRE protocols, reliably inform the protection provided by the CAEv2 and are admissible.

### i.      *Eddins' hMIRE Tests Are Scientifically Reliable.*

As with REAT, 3M raises no challenge to the validity of *h*MIRE. 3M claims only that the CAEv2 replica used by Eddins is too unlike the CAEv2 to produce reliable results.

3M's criticisms again fail because they attack the test's conclusions and not the methodology. Criticisms of a study's results, such as the alleged failure to consider certain variables, affect a test's probativeness, not its admissibility. *Quiet Tech.*, 326 F.3d at 1345; *Mizrahi v. Yamaha*, 2019 WL 3318527, *5 (S.D. Fla. July 19, 2019); *Nat'l Union Fire Ins. v. Tyco Integrated Sec., LLC*, 2015 WL 11251759, *15 (S.D. Fla. July 6, 2015). Results that hinge on alleged differences in the product tested are thus admissible. *Wielgus v. Ryobi Tech, Inc.*, 2012 WL 3643682, *5 (N.D. Ill. Aug. 23, 2012); *Richter v. Home Depot U.S.A., Inc.*, 2009 WL 2912781, *3-4 (M.D. Fla. Feb. 20, 2009); *Williams v. Coleman Co.*, 2015 WL 4077272, *6 (N.D. Ala. July 6, 2015); *Fagundez v. Louisville Ladder, Inc.*, 2012 WL 253214, *2 (S.D. Fla. Jan. 26, 2012).

Even if 3M's criticism of the replica plug is relevant for admissibility, the argument is misguided. MIRE testing is commonly performed on *replicas* of ear

plugs with a built-in, internal probe.[29]  This is necessary because MIRE testing relies on microphones to detect the noise levels both inside and outside the ear, without breaking the earplugs' seal. An earplug manufacturer may make the replica, but because Defendants have (incredibly) never performed MIRE testing on the CAEv2, Eddins configured the CAEv2 to be suitable for MIRE testing.[30]

The replica configured for Eddins' testing is "essentially … the same earplug" as the CAEv2.[31] It has the same dimensions and solid core, except for a small vent running the length of the stem,[32] which allows a probe to be inserted.[33] Each end was capped by 3M's yellow-flange tip, which features a hole, so that the probe could pass through.[34] To ensure the inserted end would function like the linear olive end, Eddins applied lubricant to acoustically seal the yellow tip around the probe.[35]  The plug was "physically the same dimensions, the same weight, the same size, [with] the same flanges" as the CAEv2.[36]

None of the differences between the replica and the original CAEv2 bear on the reliability of Eddins' testing, and 3M's objections also fail to show any analytical

---

[29] PX1(Eddins-2d-Am-42.).

[30] *Id*. at 42-43.

[31] PX3(Eddins-Dep-316:3-4).

[32] PX1(Eddins-2d-Am-43); PX3(Eddins-Dep-308:17-21, 310:4-8).

[33] PX1(Eddins-2d-Am-Rep-43).

[34] *Id*.

[35] *Id*.

[36] PX3(Eddins-Dep-317:16-21, 310:4-8).

gap between *h*MIRE testing and Eddins' opinions. 3M argues that the replica configured for Eddins' testing contains only one original 3M part, the yellow flange tip, and uses a yellow tip on both ends instead of one yellow and one green.[37] But 3M never explains how a difference in color would affect *h*MIRE testing, or why a replica need be made of original parts as opposed to copies. 3M further argues that the yellow tip has a small hole and "hollow" stem, but these are essential characteristics of an earplug suitable for *h*MIRE testing. 3M also claims the weight of the CAEv2 used for *h*MIRE testing is less than five percent different, but nowhere does 3M explain how that minor difference—which Eddins testified is immaterial[38]—creates an analytical gap between testing and Eddins' opinions.[39]

3M argues the stem of the replica configured for Eddins' testing is not made of Delrin, a stiff material, even though Eddins opined the stem's stiffness contributed to imperceptible loosening.[40] But Eddins' opinion that the CAEv2's stiffness and rigidity contribute to loosening are not based solely on MIRE testing with the replica; he also tested the CAEv2 itself. Moreover, the CAEv2's stem was not made

---

[37] Def-Mot-62.

[38] PX3(Eddins-Dep-313:7-12).

[39] 3M claims removing the probe tube from the test model created an even greater difference in weight. But this is pure speculation. 3M fails to show whether the model is 5% heavier or lighter or why that would be relevant. PX3(Eddins-Dep-312:2-6).

[40] Def-Mot-62-63.

*exclusively* from Delrin but rather "has been made out of several materials."[41] Eddins replicated the stem with equally stiff, non-pliable resin, "so that it would have a similar hardness and identical measurement characteristics to the . . . original stem" and isn't bendable "with your hand."[42] Inasmuch as 3M believes a single photo shows the stem is pliable (it is not), that disagreement may affect the probativeness of the experiment but not its admissibility.[43] 3M fails to show any link between the stem material Eddins used and the alleged unreliability of the resulting data.

3M's other attacks are also futile. Without prior *h*MIRE testing on a CAEv2 manufactured by Defendants themselves, they say, Eddins cannot validate his *h*MIRE testing. Defendants' failure to perform their own *h*MIRE tests does not change the fact that Eddins' opinions are testable through *h*MIRE, a generally accepted methodology that has been peer-reviewed.[44] *See Mizrahi*, 2019 WL

---

[41] PX3(Eddins-Dep-310:17-18).

[42] *Id*. at 310:9-14 (confirming use of resin in testing model stem), 311:19-24, 313:7-12.

[43] Despite the downward looking angle in the image, Def-Mot-64, experts with knowledge of ear anatomy would know that the ear canal extends posteriorly and superiorly in the skull, PX2(Juneau-2d-Am-8), meaning a properly seated earplug in many ears would tend to protrude downward and forward as shown by 3M. *See* 3M Personal Safety Division Technical Bulletin, *Hearing protection fit testing: What, why and how* (Aug. 2018) (attached as PX9). Further, that expert would see that the outer three flanges are deformed: the larger flange has enveloped the tragus, the middle flange is cupped around the lower portion of the tragus, the anti-tragus, and being pushed into the intertragal notch, providing the impression of a bend.

[44] PX3(Eddins-Dep-293:9-21) (providing peer-reviewed literature approving his probe suspension technique).

3318527, at *5 (rejecting challenge to validity of results when nothing prevented defendant from replicating tests).

3M also claims the CAEv2 in *h*MIRE testing is invalid because it "attenuates differently at nearly every frequency."[45] The record says otherwise. In fact, Eddins has explained that any such difference is negligible, as his model attenuated noise "nearly identically" to the actual CAEv2 up to 5000 Hz, "[w]ithin a very small error difference of less than 3 dB."[46] This low-to-middle spectrum of frequencies provided Eddins a "more than adequate" testing range for making "a highly valid and accurate, repeatable measure" of insertion loss with MIRE technology.[47] Regardless, this dispute does not go to admissibility.[48]

3M argues that Eddins' *h*MIRE testing is incompatible with ANSI standards. But those standards say only that *h*MIRE testing that routes a probe tube *around the device*, causing slit leaks that compromise fit and insertion loss, is problematic. ANSI never criticizes *h*MIRE testing with a probe inserted through an earplug, in fact, the reason Eddins used a replica was to avoid affecting the plugs' seal.[49]

---

[45] Def-Mot-61.

[46] PX3(Eddins-Dep-414:17-415:3, 314:21-315:2).

[47] *Id*. at 319:9-10.

[48] *Valente v. Textron, Inc.*, 931 F. Supp. 2d 409 (E.D.N.Y. 2013), is inapposite. Unlike there, Eddins' methodologies pass *Daubert*, and objections to the inputs Eddins used go to weight, not admissibility. *Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 417-18 (W.D. Ky. 2018).

[49] PX3(Eddins-Dep-301:13-302:5).

Regardless, the absence of an ANSI standard for certain testing does not change the fact that it is widely accepted.[50]

Finally, 3M resorts to pure speculation that Eddins misperformed *h*MIRE testing. 3M raises the possibility that affixing a microphone assembly to the user's face or applying the acoustic seal "could" have altered the earplugs' positioning. They also question Eddins' ability to properly insert the probe and whether applying the acoustic seal after probe insertion could have impacted the earplug's position. Eddins refuted such theories at his deposition.[51] Although unnecessary for him to render his opinions, he also documented his testing with slow-motion video.[52] "[G]iven that his testing was extensively videotaped, 3M's experts are free to show the jury why [Eddins'] conclusions are [allegedly] flawed and unreliable." *Mizrahi*, 2019 WL 3318527, at *5. 3M's unsupported criticisms provide no basis to bar Eddins' opinions.[53]

---

[50] *Id*. at 302:9-14.

[51] *Id.* at 292:8-16 ("it's not producing any strain at all"); *id*. 292:17-24 ("we have strain relief built into the system"); *id*. at 293:9-21 (providing peer-reviewed literature approving his probe suspension technique); *id.* at 293:22-294:11.

[52] *Id*. at 295:8-20.

[53] The parties have agreed the Group A Plaintiffs will not use such video evidence affirmatively at trial, but nothing prevents the Court from considering such evidence in evaluating admissibility.  Eddins himself observed the same findings as the video during the testing itself.

### ii. *Eddins' mMIRE Tests Are Also Scientifically Reliable.*

3M also seeks to exclude Eddins' use of *m*MIRE testing on ear replicas produced by Juneau.[54]  These arguments fail.

### (a) The *m*MIRE Tests Are Reliable.

3M argues that the *m*MIRE testing is unreliable because the use of ear replicas is novel.  However, silicone replicas are not "novel."  Used for decades, they are standard on all acoustic test fixtures (ATF) for scientific measurements.[55] Juneau has used silicone replicas for more than 35 years in his laboratory to create and test hearing devices.[56] Nor are ear canal extensions "novel." All existing ATFs have ear canal extensions—a necessary component to connect the pinna to the ear simulator of an ATF.[57] No ATF has replica ears that are identical to the human ear—it is

---

[54] 3M mischaracterizes the experiment and Juneau's role in it. Def-Mot-69. Juneau did not create the ATF; he supplied Eddins with the ear replicas attached to the ATF RA0045-S9 ear stimulator. PX1(Eddins-2d-Am-55-56); PX3(Eddins-Dep-337:19-338:202).

[55]  PX3(Eddins-Dep-154:13-20); INSTRUCTION MANUAL: 45CB ACOUSTIC TEST FIXTURE ACCORDING TO ANSI S12.42, at 111 (GRAS Sound & Vibration Feb. 19, 2016) (attached as PX10); M.D. Burkhard & R.M. Sachs, *Anthropometric Manikin for Acoustic Research*, 58 J. ACOUST. SOC. AM. 214–222, at 218 (1975) (attached as PX11); TYPE 4128 MANUAL, at 2, ¶2 (Brüel & Kjaer Mar. 2020) (attached as PX12); PX13(Eddins-Dep-Ex-9) (ANSI / ASA S12.42, Annex A, at 32 (listing durometers readings consistent with silicone)).

[56] PX14(Juneau-Dep-154:13-20); PX2(Juneau-2d-Am-1-2).

[57] PX10, at Section 6.6, p. 8; PX10, at 5, Fig. 1; PX11, at 218; PX12, at 2, ¶2.

impossible—and this limitation is an accepted part of ATF design.[58] Nevertheless, 3M argues that Eddins' methodology departed from ANSI S12.42 specifications for *m*MIRE, which refer to traditional ATFs with preformed human-sized and shaped heads and ears that simulate average ear canal resonances.[59]

This mischaracterizes Eddins' study. REAT and *h*MIRE do not strictly measure the effects of mandibular motion (speaking, chewing) and exposure to damaging impulse noises in human test subjects.[60] To evaluate those effects, Eddins used *m*MIRE, a recognized methodology involving simulated models, casting molds of the ears of his 30 human subjects, for a total of 60 ears.[61] Eddins worked with Juneau to create replicas of the individual ears that were anatomically accurate up to the cartilaginous bony junction.[62] Eddins coupled the ear replicas to the GRAS ATF RA0045-S9 ear simulator.[63] Unlike REAT and *h*Mire, Eddins' *m*Mire tests measured insertion loss as a function of frequency for a standard earplug insertion

---

[58] PX3(Eddins-Dep-148:3-15, 151:2-14, 151:22-152:2, 152:15-153:13, 164:17-165:3); PX10 (showing single set of dimensions from ANSI S3.36-1985 "American National Standard Specification for a Manikin for Simulated in situ Airborne Acoustic Measurements."); PX10, at 5, Fig. 1; PX11, at 218 ("I.B Ear canal and ear drum"); PX12, at 2, ¶1.

[59] Def-Mot-67.

[60] PX1(Eddins-2d-Am-52-53).

[61] *Id*.

[62] PX14(Juneau-Dep-158:13-159:7).

[63] PX1(Eddins-2d-Am-53).

depth compared to a subject-specific insertion depth and the effects of repetitive mandibular motion on the attenuation of steady and impulse noises.[64]

Eddins conformed to ANSI standards whenever possible by employing the GRAS RA0045 coupler, recording system, and ear simulator.[65] But ANSI is a guideline, not a regulation, and none of the existing ATFs currently include all of the features listed in ANSI S12.42.[66] ANSI S12.42 Annex B acknowledges such limitations, noting there are *no* ATFs that included all the standard's features.[67] Critically, ANSI thus states "a laboratory may construct its own."[68] Unsurprisingly, none of the ATFs used in previous tests by Defendants and others on the CAEv2 complied with this standard.[69]

Eddins further described that the ANSI-referenced models aren't well-designed for earplugs due to their straight and smaller-diameter ear canals; nor do they capture variations in ear structure.[70] ANSI S12.42 does not account for individualized ear testing, either.[71] Eddins' design overcomes ANSI models'

---

[64] *Id.*
[65] PX3(Eddins-Dep-330:19-331:12).
[66] PX13(Eddins-Dep-Ex-9, ANSI S12.42, Annex B, at34).
[67] *Id.*; PX3(Eddins-Dep-328:19-330:7; 400:18-403:12).
[68] PX13(Eddins-Dep-Ex-9, ANSI S12.42, Annex B, at34).
[69] PX3(Eddins-Dep-402:21-402:20).
[70] *Id.*
[71] *Id.* at 326:4-8.

limitations by faithfully replicating the anatomies of 60 actual human-molded ears of varying shapes and sizes.[72]

In sum, although ANSI S12.42 provides guidance for using ATFs for certain tests, it is common for researchers to use ATFs for different purposes.[73] ANSI does not identify or require any specific ATFs for compliance purposes and permits laboratories to construct their own. "[Y]ou can have scientifically sound research and not use the letter of the law as a standard, as long as you explain your methodologies, and as long as [] they are accurate, reliable, and repeatable."[74] Eddins and Juneau did just that.[75]

The novelty of an experiment or a lack of peer-review does not make it scientifically unreliable. *Mizrahi*, 2019 WL 3318527, at *5. Here, Eddins and Juneau provided a step-by-step explanation of their study design and methodology (including a video) for others to test and reproduce.[76] The results were accurate, reliable, and repeatable.[77] Significantly, 3M does not legitimately challenge the accuracy of Eddins' and Juneau's calculations or the results themselves. That ANSI

---

[72] *Id*.

[73] *Id*. at 324:23-325:12.

[74] *Id*. at 402:21-403:12.

[75] *Id*.

[76] PX1(Eddins-2d-Am-53-69); PX2(Juneau-2d-Am-21-38, Ex. C).

[77] PX3(Eddins-Dep-402:21-403:12).

failed to contemplate ways to test the individual fit and performance of earplugs does not affect the reliability of the experts' *m*MIRE methodology.

> **(b)** **Differences Between Human Ear and Model Ear Canal Lengths Do Not Affect the Study's Reliability.**

3M misleadingly argues that Eddins failed to "validate" the ATFs to perform like human ears. However, it is generally accepted that ATFs do not perform like individual human ears because they are not designed or intended to be anatomical or functional facsimiles of human ears. ATF's are intended to provide performance information regarding a hearing protectors' ability to provide insertion loss or attenuation for sounds that are too loud for human testing, however, they do not provide any human factors data on how the hearing protector fits, seals, and maintains a seal in a human user. Therefore, it is illogical to validate *m*MIRE testing by comparing it to humans.[78]

Rather than attempt to capture the length of the entire ear canal for each ear mold—which is impossible with living subjects—Eddins and Juneau mated the ear replicas to canal extensions.[79] 3M claims this undermines the study because canal extensions are anatomically incorrect and do not accurately "predict" the rest of the ear.[80] This argument misconstrues the design and purpose of the ear canal extension

---

[78] *Id*. at 339:21-340:19.
[79] *Id*. at 331:22-333:16.
[80] Def-Mot-69-70.

and the ATF, and ignores the experts' explanations for the study's design.[81] Acoustical differences between the length of the inner canal of model ears and human ears were irrelevant to this study; what mattered was *anatomical*—not acoustic—similarity.[82] The goal of the ear replica study was to determine whether mandibular motion could also affect attenuation through loosening.[83]

The ear replicas accurately reflect the insertion point of the earplugs, the angle of the bends in the ear canal, and the mandibular junction.[84] They accurately model the humans' ears from the pinna to beyond the second bend of the ear canal, through the mandibular bump and to the cartilaginous bony junction, which envelopes the region interfaced by an earplug and impacted by mandibular motion.[85] It is impossible to create an ear mold of the entire length of the inner ear canal from living human subjects because that area is highly pain-sensitive and susceptible to damage.[86] It is also impossible to measure.[87] More important, 100% accuracy of the entire ear canal length was unnecessary for the ear replica study; even G.R.A.S. or

---

[81] 3M plucks a sound bite out of context from Dr. Bielefeld's deposition; he testified in the abstract that he didn't think one could predict the shape of the ear canal from the cartilaginous bony junction to the tympanic membrane, based on shape of the outer ear canal. PX15(Bielefeld-Dep-100:6-20). But he went on to say that he lacked the knowledge to make that determination. *Id*. at 100:21-101:14.

[82] PX3(Eddins-Dep-340:10-341:3).

[83] *Id*. at 342:21-344:4; 345:6-15.

[84] *Id*. at 330:8-15.

[85] *Id*.

[86] PX14(Juneau-Dep-164:9-165:3); PX2(Juneau-2d-Am-20).

[87] PX3(Eddins-Dep-339:3-18.).

other ATFs referenced in ANSI S12.6 would have failed to mimic the acoustic properties of a real ear canal.[88]

Based his prodigious experience,[89] Juneau explained the canal angulation and other anatomical features provide a good approximation of the shape of the remaining portion of the ear canal to the ear drum.[90] Although 3M says his testimony lacks textual authority, Juneau based this statement on years of experience measuring human ears, which is consistent with published literature.[91] Eddins described the resonance of air volumes in the inner ear canal beyond the insertion point of the earplug and was able to measure its effect on hearing loss.[92] The study used acoustics as a proxy for earplug movement—*i.e.*, to measure the acoustic impact of the earplug moving out of the ear.[93] Eddins explained that this acoustic proxy was limited to below 2000 Hz due to the resonance effects of the replica ear related to the volume of air between the end of the earplug and the ear simulator

---

[88] *Id.* at 339:21-340:19.
[89] PX14(Juneau-Dep-164:9-165:22; 213:18-214:14).
[90] *Id.* at 159:12-20; Ahmad et al., *External Auditory Canal Measurements: Localization of the Isthmus*, 10 Oto. Rhino. Laryngol. Nova 183-186 (2000) (attached as PX16).
[91] *Id.* at 164:9-165:22; 213:18-214:14.
[92] PX1(Eddins-2d-Am-59).
[93] PX3(Eddins-Dep-340:9-341:10).

microphone.[94, 95] Accordingly, Eddins properly based his conclusions on mandibular motion on the lower frequencies.[96]

Furthermore, Eddins and Juneau validated that the acoustic responses were repeatable and reliable.  Eddins tested the ATF with and without cerumen (earwax), which—comparable to human data—showed greater attenuation with cerumen in the ear.[97] Eddins also validated the effects of earplug compromise, based on comparable mean and standard deviations for change in attenuation in the human activity studies[98] and the simulated mandibular motion.[99]

3M misrepresents Eddins' testing by isolating acoustic data sets for two subjects and comparing it to their simulated ear replicas, claiming Eddins' own data show that the replicas "do not perform like human ears," and that somehow this proves Eddins didn't validate his study.[100] This argument misconstrues the data by again miscasting the purpose of Eddins' *m*MIRE testing.  *m*MIRE is neither designed nor intended to replicate attenuation in human subjects, it was not used for those purposes by Eddins, and cannot be validated through such a comparison.[101]

---

[94] PX1(Eddins-2d-Am-59).
[95] PX3(Eddins-Dep-336:16-337:12).
[96] *Id*. at 337:8-12.
[97] PX1(Eddins-2d-Am-64, Fig. 31).
[98] *Id*. at 47 (Fig. 20) & 51 (Fig.23).
[99] *Id.* at 65 (Fig. 32).
[100] Def-Mot-72-73.
[101] PX3(Eddins-Dep-342:8-20).

The goal of Eddins' experiment was not to compare the attenuation values in human and replica ears, but to measure the *change* in attenuation values due to mandibular motion using replicas of the ear and outer half of the ear canal attached to ear simulators.[102] Had Eddins attempted to conduct the testing 3M claims he did, he would have had to create molds of the entire canals and insert a microphone identical to an eardrum at the actual angle of each individual ear drum, which would be physically (and ethically) impossible.[103]

Eddins validated his study for what it was intended to do: measure changes in attenuation from mandibular motion using ear replicas.[104] Eddins refuted the same false comparison made by 3M, explaining the acoustical values in the *h*MIRE data taken from human subjects' ears would not be similar to the *m*MIRE data for the same subjects' ear replicas from the *h*MIRE data. [105] In other words, "[w]e'd be comparing apples and oranges."[106]

Ultimately, 3M takes issue with the *m*MIRE study's design. However, Eddins and Juneau faithfully applied an accepted methodology, which can be reliably reproduced. *Mizrahi*, 2019 WL 3318527, *5.

---

[102] *Id*. at 344:19-345:15.
[103]   PX14(Juneau-Dep-164:9-165:3);  PX2(Juneau-2d-Am-20);  PX3(Eddins-Dep-339:3-18).
[104] PX3(Eddins-Dep-339:21-341:10; 339:21-340:8; 344:19-345:15; 345:1-5.).
[105] *Id.* at 339:21-340:8; 344:19-345:15).
[106] *Id.* at 345:1-5.

### (c) The Materials Used in the Ear Replica and ATF Were Reliably Similar to Human Models.

#### i. The Silicone Material Adequately Replicated Human Ears.

3M argues that because silicone has different acoustical properties than human tissue, Eddins and Juneau should have verified that the silicone material chosen for their ear replicas was appropriate. However, the silicone used is the industry standard for ATFs, and its hardness was acceptable under ANSI S12.42 for flesh simulation.[107] It was the same silicone widely available and used for this very purpose.[108]

#### ii. The Artificial Earwax Adequately Approximated Human Earwax.

3M argues that Juneau's earwax mixture was not based on peer-reviewed literature to determine whether the ingredients were appropriate. This is nonsensical. 3M does not contend that a flaw in the earwax affected the results of the study, and there is nothing methodologically amiss about Eddins' and Juneau's earwax selection from Pickering Laboratories, which produces commercial artificial earwax

---

[107] *Id*. at 335:4-336:1.

[108] PX3(Eddins-Dep-336:2-8); PX14(Juneau-Dep-154:10-20) (testifying that the silicone used here, with a Shore hardness of 13 to 18 durometers, is the hearing industry standard since the late 1990s).

for testing simulations.[109] The formulation Pickering recommended was two-parts artificial cerumen to one-part artificial sebum.[110] Juneau has used the same silicone for in-ear devices since the 1990s. Based on his experience with over 40,000 silicone hearing devices routinely exposed to earwax, it could safely be used on silicone rubber without damaging the surface.[111]

3M points to a compatibility database characterizing the acid components as having "poor" compatibility with silicone. However, Juneau testified the earwax was applied lightly to the surface using a Q-tip and was then wiped off after the test.[112] Juneau observed no damage to ear models or any effect on results.[113] Eddins performed validation testing of the ATF with and without cerumen (earwax), which confirmed greater attenuation with cerumen in the ear than without it.[114] At most, 3M's criticisms of the artificial earwax go to weight.

### iii. The Testing Equipment Was Reliable And Performed As Designed.

3M argues that the mandibular motion testing equipment was a "spatula with a motor" attached. In reality, the test apparatus consists of the ear simulator, motor

---

[109] PX1(Eddins-2d-Am-63); *see generally* PX2(Juneau-2d-Am); PX14(Juneau-Dep-175:11-25).

[110] PX1(Eddins-2d-Am-63); PX2(Juneau-2d-Am-35).

[111] PX14(Juneau-Dep-177:11-178:10, 181:8-22, 183:17-184:14); PX2(Juneau-2d-Am-35).

[112] PX14(Juneau-Dep-188:7-189:3); PX1(Eddins-2d-Am-63).

[113] *Id*. at 188:7-190:11.

[114] PX1(Eddins-2d-Am-64 (Fig. 31)).

assembly, and support structure ("spatula"), a mounting system, and a computer-driven motion simulator.[115] The experts also completed a series of validation tests, which they described in their reports.[116]

Nor is the methodology "novel." Eddins and Juneau based their design in large part on a prior simulation by Danish researchers on hearing aids, whose fit and function in the ear canal are similar to earplugs.[117] The Danish study simulated mandibular motion and measured the amount of egress of the hearing aid earpiece from the ear canal.[118] Although the Danish model's mechanical construction was different and actually less precise, the same basic principles of physics and acoustics provided guidance for the Eddins/Juneau model.[119]

Neither 3M nor its experts allege the testing apparatus itself failed to function as designed. Eddins and Juneau described in detail the test protocol and measurements, which can be replicated. 3M's criticisms of the materials and equipment used are for cross-examination. *Mizrahi*, 2019 WL 3318527, *5.

---

[115] PX1(Eddins-2d-Am-53-56); PX2(Juneau-2d-Am-29-34, Ex. C).
[116] PX1(Eddins-2d-Am-53-54; 54-55 (Fig. 31, 32).
[117] PX3(Eddins-Dep-346:18-347:17).
[118] *Id.* at 347:19-24.
[119] *Id.* at 347:5-348:5.

### c. Testimony That the CAEv2 Was Defective Is Admissible Without Evidence Comparing "Failure Rates."

Plaintiffs' experts opine the CAEv2 was defectively designed, primarily because its configuration created a poor fit and seal.[120] 3M argues that such testimony should be excluded because Eddins and McKinley failed to examine the "failure rate" of CAEv2 compared to competitors' devices.[121] A failure-rate comparison is not required, but even so, Plaintiffs' experts did compare the failure rates of CAEv2 with other earplugs.

3M's argument fails because a failure-rate analysis is not necessary to establish a design defect, nor is it typically required as a foundation for expert testimony. *Banks v. ICI Ams., Inc.*, 450 S.E.2d 671, 674 (Ga. 1994). The factors for the jury include: the usefulness of the product, the gravity and severity of the danger caused by the design, the likelihood and avoidability of the danger, the efficacy of any warnings, the publicity of the danger, the user's knowledge about the product, the ability to eliminate the danger without impairing the product's usefulness, the state of the art at the time the product is manufactured, and the user's ability to avoid the danger. *Id.* at 675 & n.6. Other factors may include cost trade-offs, tactical market decisions, product development, research/testing demands, corporate management styles, and regulatory restrictions. *Id.*   3M interprets the elements of

---

[120] PX1(Eddins-2d-Am-2-3, 9-17).
[121] Def-Mot-56.

design defect far too narrowly; they do not require that a plaintiff produce evidence—much less prove—that a product had a higher "failure rate" than competitors' products. Although comparative failure rate analysis may be *one* way of proving a design defect, under state law it is not the *only* way. *See id.* at 674-75.

One way to establish that a product's risk outweighed its utility is with evidence of a safer alternative design. *Id.* at 674. Under this theory, the jury may consider evidence showing that at the time of manufacture, "an alternative design would have made the product safer than the original design and was a marketable reality and technologically feasible." *Id.* at 674-75.

3M's cases are unavailing. In *Kondash v. Kia Motors Am. Inc.*, the expert purported to testify that a sunroof's failure rate was "higher than what [he] would expect" in the automotive industry. 2020 WL 5816228, *9 (S.D. Ohio Sept. 30, 2020). The court excluded the expert's testimony because the expert had not identified the failure rate in the industry or in other vehicles, but the court did *not* find that evidence of comparative failure rates is a necessary threshold for admissibility of opinion testimony on design defect.

*Moore v. Wright Med. Tech., Inc.* does not suggest otherwise. There, the expert based her design defect opinions on testimony that the failure rate of defendant's hip implant was higher than a competing manufacturer's failure rate. 2016 WL 1316716, *7 (S.D. Ga. Mar. 31, 2016). The court excluded the testimony

based on doubts that a failure rate comparison to one device was an appropriate method to determine a reasonable failure rate for the hip implant device industry. *Id.* The court did *not* exclude the expert's other opinion on design defect regarding alternative surface treatments as a safer alternative design. *Id.* at *6.

Moreover, Plaintiffs' experts compared the failure rates of CAEv2 with other earplugs. Eddins relied on Madigan's statistical analysis comparing the results of Defendants' REAT tests of the CAEv2 (folded and unfolded flange), CAEv3, CAEv4, UltraFit Plus, UltraFit corded, and UltraFit uncorded.[122] Defendants' data showed a statistically significant difference in standard deviation as between the CAEv2 and every other earplug analyzed.[123] Eddins determined that the UltraFit has a narrower and less rigid stem, a single end, and no opposing flanges, resulting in better fit and design than the CAEv2.[124] McKinley similarly based his opinion that the SureFire and Moldex plugs were safer based in part on their comparative performance during testing.[125]

Citing nothing, 3M argues that Eddins may not opine that CAEv2 is "alarmingly" variable in REAT testing without considering the same testing in other

---

[122] PX1(Eddins-2d-Am-33).
[123] PX3(Eddins-Dep-272:11-21).
[124] *Id.* at 272:22-273:13.
[125] PX17(McKinley-1st-Am-92, 107-109);
 PX18(McKinley-Dep-289:10-18, 291:17-292:21).

plugs.[126] But Eddins relied on comparisons of variability and NRR of six different HPDs. Defendants' assertion that Eddins must compare the plugs using a Method B test (which Defendants separately argue is inappropriate) is unsupported by law or science.[127]

3M's no-comparator theory fails to raise a proper *Daubert* issue, and—while meritless—raises an issue that could only be decided on the merits. *In re Prempro Prods. Liab. Litig.*, 2012 WL 13034063, at *2 (E.D. Ark. Apr. 19, 2012) (noting defendants' arguments pertain more to the merits of plaintiffs' design defect claim than to reliability of scientific testimony). Plaintiffs' experts' testimony on CAEv2's defective design satisfies Rule 702's standards for admissibility.

> **d.    *Eddins Is Not A Narrator.*[128]**

3M also moves to exclude a few paragraphs in Eddins' report as impermissible narrative about military matters which, 3M argues, are beyond Eddins' expertise.[129] But the rule prohibiting expert narration is "limited." *FNB Bank v. Park Nat. Corp.*,

---

[126] Def-Mot-8.

[127] Defendants contend McKinley may not opine on their failure to verify performance as expressly required in the 2006 Medical Procurement Item Description because he has not shown that their competitors did the same. Def-Mot-57. But what competitors did or did not do is not relevant to Defendants' failure to comply with conditions of sale.

[128] Plaintiffs respond briefly herein to 3M's arguments that certain experts act as attorney "mouthpieces." As the Court previously indicated to counsel for the parties, however, such arguments are more appropriate for motions *in limine* or trial.

[129] Def-Mot-75.

996 F. Supp. 2d 1187, 1190 (S.D. Ala. 2014). It applies when an expert "[a]cting *simply* as a narrator of the facts does not convey opinions." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013).

Here, as in *FNB Bank*, the brief discussion at issue does not constitute impermissible factual narrative and does not render Eddins "a mere narrator." 996 F.Supp.2d at 1190. "Instead, [it] provide[s] the necessary factual underpinning for his opinions, without which his report would be subject to attack as noncompliant with Rule 26(a)(2)(B)." *Id*. Eddins' discussion of military matters can hardly be objectionable given his well-qualified opinions on noise exposure and hearing loss among military servicemembers. Accordingly, 3M's "narration" objection fails, and any dispute about the accuracy of Eddins' report may be addressed on cross-examination. *See U.S. v. McCarthy Improvement Co.*, 2017 WL 10434414, *5 (M.D. Fla. Feb. 3, 2017).

## 2. *Roger Juneau*

### a. *Juneau's Testimony That the CAEv2's Stem Is Too Wide Is Reliable, Helpful, and Admissible.*

3M argues Juneau's opinion that the CAEv2's stem is too wide should be excluded, erroneously claiming the data he relied on does not support his conclusion and is "unhelpful."[130] But 3M ignores Juneau's testimony and overlooks the published data he relied upon—which firmly supports his opinion that the CAEv2's

---

[130] Def-Mot-76.

stem is significantly wider than the average isthmus (the narrowest part of the ear canal).[131]

3M argues that Juneau's deposition was the first time he learned that data from Staab, one paper he cited, was limited only to Asian women. 3M mischaracterizes Staab, which compared ear canal dimension data from his mostly Asian women subjects, to data from other studies whose populations included both men and women in multiple ethnic groups.[132] Staab also compared his data to a U.K. study by Ahmad. Staab found that the mean width of the isthmus for each of the groups was identical—5.7 millimeters[133]—which is significantly smaller than the 7.67-millimeter width of the CAEv2 nonlinear stem.[134]

Juneau explained Staab's paper included data broken down by gender, data, and ethnicity, and the data on the isthmus measurements Staab found were consistent with data from Ahmad and other researchers.[135] Though 3M maligns Juneau for failing to contact each researcher to determine whether their published study populations were truly representative samples, Juneau explained his goal was to find "what…the generally accepted dimensions were."[136] He found that among the

---

[131] PX2(Juneau-2d-Am-37).
[132] PX19(Juneau-Dep-Ex. 14 at 34-38).
[133] *Id.* at 40, Fig.6.
[134] PX2(Juneau-2d-Am-37).
[135] PX14(Juneau-Dep-268:10-270:22); PX16.
[136] *Id.*

diverse groups of populations studied by various researchers, "there's good agreement" to support his opinion. *Id.*

At best, 3M's quibbles about the limitations of certain data sets in published papers are subjects for cross-examination.

> **b.** ***Juneau's Conversations With Earwax Manufacturers Do Not Merit Exclusion.***

3M moves to preclude Juneau from testifying about the discussions he had with the manufacturers of the artificial earwax formulas he used, claiming Juneau did not disclose these conversations in his report. But Juneau could not have disclosed this information because it did not exist when he wrote his report. At that time, Juneau had no reason to anticipate 3M would assail him for choosing a commercially available product designed specifically for testing in silicone products. After submitting his report, Juneau was surprised to learn that 3M's "doubt-science" expert Kytomaa questioned his choice of earwax.[137] Juneau then spoke with the manufacturer's representative, who confirmed that the formulation he used was safe for use with silicone.[138]

3M does not seriously argue that the Eddins/Juneau ear replica study rises and falls on the use of the earwax formula; in fact, none of 3M's experts have so opined.

---

[137] PX14(Juneau-Dep-179:21-180:5).
[138] *Id.* at 179:11-180:14.

Regardless, Juneau's conversation with the vendor does not alter his opinion reached based on years of experience using this very formula, but merely confirms the same.

### 3. Richard McKinley

#### a. McKinley's Decades of Product Development Experience Qualify Him to Opine on ISO 9001.

3M contends that McKinley "lacks experience with ISO 9001," which they call "an entirely different field or discipline."[139] Neither a field nor a discipline, ISO 9001 provides "well-understood and established standards" for quality control and assurance[140] that "help[] ensure that customers get consistent, good-quality products and services."[141] During McKinley's 40 years as a bioacoustics engineer developing hearing protection and communication products for the U.S. military, a significant portion of his role was ensuring that each defense contractor he worked with had the "capability to design and supply conforming products."[142]

"[A] witness who possesses general knowledge of a subject may qualify as an expert despite lacking specialized training or experience, so long as his testimony would likely assist a trier of fact." *Jetport v. Landmark Aviation Miami, LLC*, 2017 WL 7734095, *2 (S.D. Fla. July 19, 2017). "So long as the witness is minimally qualified, objections to 'the level of the expert's expertise [go] to credibility and

---

[139] Def-Mot-28.
[140] PX17(McKinley-1st-Am-51).
[141] https://www.iso.org/iso-9001-quality-management.html.
[142] PX18(McKinley-Dep-33:21-36:24); PX17(McKinley-1st-Am-47).

weight, not admissibility.'" *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009).

McKinley is more than qualified to apply ISO 9001. He gained experience when working in collaboration with Bose in the manufacturing of the electronics for its active noise reduction headset. This work included "identifying the critical portions of the design that had the most significant effect on the performance," "putting in quality control procedures for those particular components," and "assess[ing] of the overall performance for the limits that were put on those particular components."[143] 3M's only response is that this was "prior to the issuance of ISO 9001," which is incorrect.[144, 145]

McKinley has also reviewed other contractors' ISO-compliant "quality assurance programs" when reviewing their production procedures for systems, "such as aircraft intercom systems for just every aircraft in the Air Force inventory."[146] Further, his opinions rely on testimony from one of 3M's own quality assurance engineers knowledgeable of ISO 9001.[147]

---

[143] PX18(McKinley-Dep-276:8-277:6).

[144] Def-Mot-132.

[145] https://www.iso.org/standard/16533.html (click "60") (last accessed Jan. 16, 2021) ("Since the first ISO 9000 standard was published in 1987, many Department of Defense contractors have used the international quality standards for managing their quality systems, both with and without formal registration."); PX18(McKinley-Dep-277:7-11) (Bose work extended into 1990s).

[146] PX18(McKinley-Dep-277:12-20).

[147] PX17(McKinley-1st-Am-46-50).

McKinley's employer need not be ISO certified for him to opine on its standards.[148] McKinley's employer is the Department of Defense (DoD), which while neither audited nor certified by outside international standards, is intended to benefit from ISO 9001 quality-controlled products.[149] McKinley's working relationships with private contractors have given him general knowledge of ISO 9001's quality control standards, on which he is qualified to offer opinions at trial.

**b.**   ***McKinley's Opinions on Defendants' Failures to Inspect CAEv2 Are Reliable and Helpful to the Jury.***

McKinley intends to testify about Defendants' failure "to provide accurate quality assurance verification by an acoustical impedance test for all CAEv2 it sold on the nonlinear end as required by the 2003 and 2006 MPIDs." Under the specifications for the CAEv2, Defendants agreed to sample 100% of the devices to verify they "would provide insertion loss required for impulsive noise for users" using an "acoustical impedance test," known as Acoustical Resistance Checker

---

[148] Def-Mot-132-133.

[149] PX17(McKinley-1st-Am-46) ("The purpose of such a standard is to establish reliability and other controls in the manufacturing process of new products, such as the Combat Arms Earplug."); PX20(Todor-Dep-169:11-19) (A "customer like the United States military would need and expect that the products will have ... met the quality testing standards that were promised to them when they agreed to buy the product."); Jack McGovern & Nina Brokaw, *How Can DoD Benefit from the New ISO 9000?*, Jan.-Feb. PROGRAM MANAGER 66-69 (2001) (attached as PX21) ("The appropriate implementation of Quality Management System Requirements should result in overall improvement of all parts, materials, and components going into our weapon systems."), *available at* https://bit.ly/3bMP59C (last accessed Jan. 16, 2021).

("ARC"), a proprietary box used for testing.[150] In company documents, Defendants admit "chronic" problems with ARC "whether purportedly calibrated, miscalibrated, or uncalibrated, and whether in in Mexico or Indianapolis."[151] Defendants knew for years that large numbers of earplugs—at one point up to 80%—tested outside of specification.[152] By 2004, this caused Defendants to "operate with a quality waiver" with its subcontractor in order to address "back order issues."[153] McKinley has concluded that Defendants' failure to apprise the government of any of these serious problems in "testing setup, process and procedure, input/output data, presence and prevalence of out of specification results, provisions of waivers, and other information" despite their obligation to provide 100% sampling verification clearly failed to meet the stated requirements of MPIDs 1 and 2.[154]

3M argues McKinley has no personal experience applying Aearo's proprietary ARC, but that is not disqualifying. McKinley's considerable experience as a bioacoustics engineer developing military-use products with private companies more than qualifies him to render his opinion that Defendants failed to verify the quality of their product, as evidenced by the company's internal tests. *See Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014) ("An expert need

---

[150] PX17(McKinley-1st-Am-8-9, 79).

[151] *Id*. at 85-86.

[152] *Id*. at 8, 85-86.

[153] *Id*. at 85.

[154] *Id*. at 86.

not be precluded 'from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute.'"). 3M's contrary view that McKinley lacks certain experience goes to weight. *Emig v. Electrolux Home Prods., Inc.*, 2008 WL 4200988, *5 (S.D.N.Y. Sept. 11, 2008).

3M argues McKinley cannot quantify to what degree ARC testing revealed the product was not performing.[155] This argument ignores that Aearo's ARC testing itself makes such an estimate impossible. McKinley explained, "the measurements and the calibration of the [ARC] devices was never anchored in the acoustic performance of the device."[156] As such, "[t]here's no documentation at the previous limits, the adjusted limits, the widened limits of what effect those limits had on the acoustic performance."[157] In other words, the ARC testing had no direct documented link to acoustic performance such as insertion loss or attenuation. Still, McKinley is certainly equipped to testify that Defendants' failure to perform required quality control measures, of which ARC testing was a piece, means Defendants' quality control was deficient. McKinley need not quantify the role that ARC testing had in particular to provide that assessment. *Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346,

---

[155] Def-Mot-133-34.
[156] PX18(McKinley-Dep-283:5-17).
[157] *Id.*

379-80 (N.D. Fla. 2017) (where expert not tasked with providing quantitative testimony, omission goes to weight).

### 4. *Dr. John Franks*

3M misrepresents Dr. Franks' expert report and testimony relating to the REAT testing performed on the CAEv2, and the CAEv2's labeling. As to qualifications, Franks has 40 years of experience working in the hearing protection industry, 13 of which he spent serving as the Section Chief of the Hearing Loss Prevention Section at the National Institute for Occupational Safety and Health (NIOSH).[158] From 1989-2004, he served as NIOSH's primary advisor to the EPA on all matters regarding the testing and labeling of hearing protection devices (HPDs), including the ANSI standards and EPA regulations at issue here.

Franks is a well-qualified hearing protection device testing and labeling expert who used a reliable methodology. This Court should reject 3M's challenges.

### a. *Franks Has a Reliable Basis For His Opinion That the 22 NRR That 3M Labels on the Closed-End of the CAEv2 Is Inaccurate.*

3M begins by misrepresenting Franks' testimony concerning why the 22 NRR 3M labeled on the closed-end of the CAEv2 for over a decade is inaccurate.[159] First, 3M's statement that Franks "provides no support" for his opinion that Test 213017 should have included all test subjects from 213015 is untrue, as 3M's own testing

---

[158] PX22(Franks-1-2).
[159] Def-Mot-78-79.

expert, Dr. John Casali, admits that 3M should have used the same panel of test subjects.[160] Additionally, Franks testified that based on his four decades in the hearing protection industry, an HPD manufacturer is expected to use the same panel of test subjects when testing each configuration of the same HPD.[161] *Yaffa v. Sunsouth Bank*, 2015 WL 11110553, at *3 (N.D. Fla. Mar. 30, 2015) (opinions based on experience are admissible); *Long v. Amada Mfg. Am., Inc.*, 2004 WL 5492705, at *12 (N.D. Ga. Mar. 31, 2004); Fed. R. Evid. 702 advisory committee's note (2000 amends.) ("Nothing in this amendment is intended to suggest that experience alone … may not provide a sufficient foundation for expert testimony."). Second, Franks clarifies that the flange report confirmed that folding back the opposing flanges was necessary to achieving the best fit possible with the earplug, and that he had no reason to disagree with 3M's findings.[162]

Franks opined that the 22 NRR labeled on the closed-end of the CAEv2 is inaccurate because: (1) 3M violated EPA regulations by retesting the closed-end of the CAEv2 (Test 213017) without changing the design of the earplug; (2) 3M's use

---

[160] PX23(Casali-57-58) (it would have been "a preferable practice" for 3M to use the same test subject panel in Test 213017).

[161] PX22(Franks-¶127-128); PX24(Franks-Dep-186:1-187:11).

[162] PX24(Franks-Dep-465:3-468:17); *id*. 222:1-223:20 (folding back opposing flanges prior to insertion would provide a wearer with more consistent fits).

of test subject panels likely skewed the results of Test 213017;[163] (3) 3M's use of the Dixon Outlier Test skewed the results of Test 213017 and violated ANSI S3.19.[164]

For decades 3M's internal laboratory and company policies have concluded that performing multiple NRR labeling tests on the "same product" is "prohibited by the EPA."[165] A policy in place at the time of the CAEv2 labeling tests prohibited 3M from performing a subsequent NRR labeling test on a preformed earplug like the CAEv2 unless "a modification (physical design or material)" is made to the earplug.[166] In Franks' words, 3M's justification for retesting the closed-end of the CAEv2 "smells of manipulation."[167] The Court should reject 3M's motion to exclude

---

[163] PX22(Franks-¶171-172); PX24(Franks-Dep-375:9-377:18) (3M's HPD testing laboratory had been using "optimized" test subject panels for NRR labeling tests since at least 1988).

[164] PX24(Franks-Dep-386:1-14, 450:23-454:2) (3M's practice of using the Dixon Outlier Test to exclude subject attenuation data after a subject obtains a "best fit" with the earplug is in violation of ANSI S3.19); PX25(Franks-Dep-Ex-5-§3.2.3). Indeed, 3M discarded the test data for one test subject in 213017 (GWG) and retested the subject, because the subject was getting highly variable attenuation results.

[165] PX22(Franks-¶139); PX24(Franks-Dep-437:21-441:8); PX26(Franks-Dep-Ex-4) (November 27, 2002 letter authored by Aearo's CEO, President and Chairman stating, "it goes without saying that Aearo supports that multiple testing attempts with the same [hearing protection] product are not allowed because this is prohibited by the EPA.").

[166] PX22(Franks-¶139); PX24(Franks-Dep-443:13-446:2); PX27(3M_MDL000019669).

[167] PX24(Franks-Dep-243:18-244:1).

Franks' opinion that the 22 NRR 3M labeled on the closed-end of the CAEv2 is inaccurate.

>    **b.**    ***Franks Has Not "Disavowed" the Reliable and Accepted Methodology He Used to Identify Test Subjects Who Received Inadequate Fits with the CAEv2 During REAT Testing.***

By cherry-picking pieces of Franks' testimony, 3M argues that he "disavowed" the methodology he used to identify test subjects who obtained inadequate fits during 3M's REAT testing.[168] However, Franks testified that, in addition to identifying subjects who obtained "inconsistent" fits, he also compared their individual attenuations to the overall means across all test subjects to identify subjects that received low amounts of attenuation, along with each subject's "individual NRR."[169]

3M argues Franks only used his "professional judgment" to determine which subjects received inadequate fits. But Franks used a generally accepted methodology for evaluating fit.[170] Franks uses 6 dB as the threshold in determining whether subjects obtained inadequate fits on the open end of the CAEv2 because ANSI S3.19 requires test subjects to provide consistent "open-ear" (without HPD) thresholds

---

[168] Def-Mot-81-82.

[169] PX24(Franks-Dep-315:13-316:5); *id*. at 304:14-306:12.

[170] Franks clarified why he opined that certain test subjects obtained "inadequate" fits during REAT testing: he used the terminology set forth in ANSI S3.19-1974. PX24(Franks-Dep-446:24-448:24).

within a 6 dB range.[171] Franks also testified that it was "pretty widely accepted" in his field to use a range of 6-10 dB to identify subjects who obtained inadequate fits in REAT test data.[172] In its own motion, 3M describes variances of between 6.9 dB and 11.8 dB as "very large."[173] Simply put, Franks applied a reliable and generally accepted methodology to form his opinions identifying poorly-fit test subjects in CAEv2 REAT tests, and the Court should reject 3M's request to exclude such opinions. *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1328 (11th Cir. 2014) (overturning exclusion of expert testimony in part because the expert relied upon "widely accepted methodology."); *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1342 (11th Cir. 2013).

### c.  *Franks Has a Reliable Basis to Opine That the CAEv2 Is Defective.*

3M misconstrues and omits Franks' testimony concerning his opinions that the CAEv2 has at least three defects: (i) the CAEv2 is too short for proper insertion for many wearers; (ii) once inserted, the CAEv2 has a tendency to loosen imperceptibly due in part to the opposing, non-inserted flanges pressing against the

---

[171] *Id.* at 473:16-474:6, 474:23-475:4; *id.* Ex. 5, § 3.2.2 ("No listener shall be selected as a subject for these tests whose variability for the open threshold of audibility … is such that the range on three successive open threshold measurements at any test band between the 250- and 4000-Hz bands is greater than 6 dB.").

[172] *Id.* at 485:22-486:9.

[173] Def-Mot-61-62.

wearer's ear canal; and (iii) the wide, stiff stem used to connect each end of the CAEv2 prevents many wearers from receiving adequate hearing protection.[174]

As to the first two defects, Franks based the opinions on his review of 3M's findings documented in internal reports, his review of REAT test data on the CAEv2, and his decades of experience evaluating and testing HPDs.[175] Second, Franks' extensive background in testing and evaluating HPDs, including preformed earplugs, certainly qualifies him to opine that an earplug with a stiff, unbending stem is not going to fit comfortably in many wearers' ear canals.[176] *Yaffa*, 2015 WL 11110553, at *3. Third, six months prior to 3M's original NRR labeling test on the closed end of the CAEv2 (Test 213015), 3M tested the UltraFit Plus earplug on five of the same subjects included in Test 213015.[177] The UltraFit Plus is a single-ended, linear earplug using the same tip as the olive-end of the CAEv2, but unlike the CAEv2, had a flexible stem (without a stiff tube running through its center). After analyzing these subjects' data across tests, Franks determined that four out of these five subjects obtained "substantially less attenuation" in Test 213015 compared to the UltraFit Plus test, and attributed the CAEv2's stiff stem as an "additional factor that made inserting and wearing the CAEv2 especially difficult." Franks is not, as

---

[174] Def-Mot-82-83.

[175] PX24(Franks-Dep-463:18-465:21).

[176] *Id*. at 402:12-403:6.

[177] PX22(Franks-¶¶104-106).

3M claims, opining that the "stem of the CAEv2, rather than interference from the opposing flanges, was the cause of the higher variability on the '015 test." Instead, Franks opines that the stiff stem is an additional defective characteristic of the earplug that contributes to users obtaining inadequate fits.

> ### d. Franks Is Qualified to Opine on the Applicability of EPA Regulations to Military Sales and 3M's Failure to Comply With Certain Terms Set Forth in Army Solicitations.

3M challenges Franks' opinions that (i) the EPA's labelling regulations apply to military sales and that 3M violated those regulations, and (ii) 3M failed to satisfy the requirements of the MPID contained in Army solicitations.[178]

First, Franks opines about the EPA's interpretation of the EPA regulations based on his 15+ years of experience advising the EPA on all matters related to HPD labeling and testing.[179] Indeed, to Franks' knowledge, no HPD manufacturer has ever been relieved of complying with EPA labeling regulations under the "combat use" exception of the Noise Control Act.[180] Franks also considered, and agreed with, the analysis of several 3M employees who concluded that the EPA regulations did apply to military sales of HPDs.[181] Contrary to 3M's argument, Franks is not offering legal conclusions about EPA labeling regulations. Thus, the Court should reject

---

[178] Def-Mot-83.
[179] PX22(Franks-3-5); PX24(Franks-Dep-175:16-176:6).
[180] PX24(Franks-Dep-437:5-17).
[181] PX24(Franks-Dep-422:3-14; 428:8-429:9); PX28(3M_MDL000318456).

3M's request to exclude Franks' testimony on the applicability of EPA labeling regulations to military HPD sales. *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1370 (N.D. Fla. 2018) (expert may testify on regulatory process and draw inferences based on experience that are reasonably supported by "regulations, rules, policies, or guidance.").

3M's argument that Franks cannot opine on whether 3M violated EPA labeling regulations or Army solicitation provisions relating to hearing protective device (HPD) testing and labeling is inapposite. He has decades of experience interpreting the regulations and standards at issue in this case, and while at NIOSH, he led several projects related to the development of NRR testing methods for hearing protection devices (HPDs) and the labeling of such devices. *Loewen v. Wyeth, Inc.*, 2011 WL 6140908, at *2 (N.D. Ala. Nov. 14, 2011) (expert may testify regarding FDA rules and regulations, whether defendants complied with these requirements, and the reasonableness of defendants' conduct in light of such requirements). Indeed, several HPD manufacturers have hired Franks to consult on HPD development, testing and labeling issues.[182] 3M's request to exclude this testimony should be denied. *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1329 (M.D. Fla. 2015) (expert testimony on guidelines and regulations, and defendants' compliance therewith, admissible and "helpful to the trier of fact."); *Cason v. C.R.*

---

[182] PX24(Franks-Dep-24:7-21, 25:6-12, 33:20-35:12).

*Bard, Inc.*, 2015 WL 9913809, at *12 (N.D. Ga. Feb. 9, 2015) (expert may "explain to the jury the regulatory requirements applicable to the product at issue and express his opinion as to whether the manufacturer complied with these requirements.").

> **e.**      ***Franks Provides Reliable Testimony That the CAEv2 Performed Poorly on Method B Testing.***

3M attacks Franks' opinion that the 4.4 dB Subject-Fit NRR ("NRR(SF)") 3M obtained on the closed-end of the CAEv2 during Method B testing was "very low" and was driven by "abnormally large standard deviations of at least 10 dB at each test frequency," because Franks did not "compare the CAEv2's Method B results to Method B tests on any other earplug."[183]

Franks has evaluated REAT test results (including Method B results) from many HPDs and has published peer-reviewed literature analyzing the variability in hearing protection afforded by several of these HPDs, including preformed earplugs like the CAEv2.[184] Franks' experience in this area allows him to reliably opine on the performance of the CAEv2 in laboratory REAT tests. *Yaffa*, 2015 WL 11110553, at *3. 3M's own expert and the man credited with inventing the CAEv2, Elliott Berger, agreed that in the Method B test at issue here, the CAEv2 was providing

---

[183] Def-Mot-83-84.

[184] PX24(Franks-Dep-65:15- 66:1, 66:8-67:11, 69:19-70:11, 70:24-72:7, 73:25-75:9, 112:9-113:9, 127:4-128:11); Murphy et al., *Development of a new standard laboratory protocol for estimation of the field attenuation of hearing protection devices: Sample size necessary to provide acceptable reproducibility*, 115(1) J. Acoust. Soc. Am. 311 (2004) (attached as PX29).

very little protection "for some of the users."[185] The Court should reject 3M's request to exclude Franks' opinions on the Method B testing of the CAEv2. *Calta v. N. Am. Arms, Inc.*, 2007 WL 4800641, at *6 (M.D. Fla. Nov. 27, 2007); *Cooper v. Toshiba Home Tech. Corp.*, 76 F. Supp. 2d 1269, 1278 (M.D. Ala. 1999); *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 100489, at *13 (S.D.N.Y. Jan. 12, 2021).

### 5.    *Eric Rose*

3M challenges Rose's opinions that 3M's violations of industry standards increased the risk the CAEv2 was defective and contributed to the sale of a product that was unreasonably dangerous when used as intended.[186]

### a.    *Rose's Defect Opinions Are Reliable.*

3M claims all of Rose's defect opinions "lack any methodology," but addresses only two: (1) his opinion regarding the CAEv2's center of gravity, and (2) his opinion regarding the CAEv2's wall thickness.

First, 3M argues that Rose "did not conduct any analysis regarding whether the CAEv2's center of gravity rendered it defective."[187] This criticism misrepresents Rose's testimony and is incorrect. Rose's actual opinion is that 3M failed to conduct a proper design review to determine whether the center of gravity movement in the

---

[185]  PX30(Berger-Dep-(12/11/2019)-642:1-643:9);  PX31(Berger-Dep-(10/8/2015)-106:2-14).
[186] Def-Mot-24-25, 84-88.
[187] Def-Mot-85.

shortened CAEv2 negatively affected the performance of the plug.[188] This is precisely the type of opinion regarding industry standards that 3M disclaims any challenge to.[189] Rose brings four decades of experience designing and developing products, including 25 years teaching and auditing ISO 9001 design control procedures and guidelines that bear on 3M's design review process.[190] ISO 9001 and 3M's own quality manual direct that design changes must be identified, documented, reviewed, and approved before their implementation.[191] But 3M never conducted any review or validation "to determine whether the center of gravity movement in the CAEv2 negatively affected design outputs and contributed to imperceptible loosening of the CAEv2."[192]

Rose's observation that this omission allowed an earplug that loosens to reach the market is likewise grounded in his experience and review of industry design standards and 3M's records. The CAEv2's propensity to loosen has been known to 3M since 2000,[193] and was observed during Dr. Eddins' testing. Rose explained, "as the center of gravity moves away from the head, the likelihood of the earplug falling out [goes up.]"[194] Rose relied on a mechanical engineer to provide a drawing of the

---

[188] PX32(Rose-1st-Am-39).

[189] Def-Mot-84.

[190] PX32(Rose-1st-Am-1-2).

[191] *Id*. at 29.

[192] PX32(Rose-1st-Am-39); PX33(Rose-Dep-259:21-260:9).

[193] PX34(3M_MDL000019514); PX35(Kieper-Dep-210:12-25).

[194] PX33(Rose-Dep-260:6-9).

center of gravity location of the redesigned product and compared the center of gravity location of the CAEv2 with the UltraFit (i.e., the well-accepted practice of comparing new products with precedent products in the design process). On this basis, Rose concluded that the CAEv2 has its center of gravity moved outward, away from the head, compared to the UltraFit earplug by 0.133 inches.[195] However, 3M did not review, validate, or test the change.

Second, 3M mischaracterizes Rose's opinion that 3M failed to conduct a design for manufacturing review, arguing that Rose's opinions regarding the CAEv2's wall-thickness are unsupported by testing.[196] But no testing was required to identify that 3M's omission of a critical design review phase allowed a product to be sold that was susceptible to failure. For identifying appropriate wall thickness, Rose applied the guidance from the manufacturer of the material used to make the CAEv2's stem—DuPont's "General Design Principles for DuPont Engineering Polymers"—to 3M's design drawings to identify that the CAEv2's design included both areas which were thinner than thinnest industry wall standards for acetal and a stem with walls which significantly exceeded industry standards for thickness.[197] He also looked to assembly cracking failure of the Delrin stem that occurred in Aearo's manufacturing facility in the location he indicated is thinner than industry guidelines.

---

[195] PX32(Rose-1st-Am-37-38).
[196] Def-Mot-85-86.
[197] PX32(Rose-1st-Am-41); PX33(Rose-Dep-148:18-151:13).

48

### b.   *Rose's Defect Opinions Are Relevant.*

3M argues that Rose's defect opinions do not fit because Rose has not demonstrated that any plaintiff used a CAEv2 with a cracked stem, backward filter, or backward assembly.[198] But even if a plaintiff's injury was caused by only one defect, the presence of multiple design failures is relevant to Plaintiffs' negligence claims. Industry standards bear on the standard of care for Plaintiffs' negligence claims, *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1282 (11th Cir. 2015), and any shortcomings in the design and manufacturing review process that would have been detected by industry standard processes likewise bear on whether 3M's design and testing of the CAEv2 were reasonable. Some states direct juries to consider proof of compliance with industry standards.[199] The failures in 3M's design review process support Rose's opinion that 3M's design and development process was out of control and violated industry standards.

### c.   *Rose's Defect Opinions Are Helpful.*

3M argues Rose's defect opinions lack sufficient specificity. But the cases 3M cites belie this assertion. In contrast to *Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1111 (11th Cir. 2005), Rose articulates a generally-accepted standard and provides an explanation of how 3M's processes were

---

[198] Def-Mot-86.

[199] *See, e.g.*, GEORGIA SUGGESTED PATTERN JURY INSTRUCTIONS § 62.670 (attached as PX36).

49

inadequate. *Cf. id.* at 1112. *Mahli v. Admiral Ins. Co.*, 2015 WL 4915701, at *11 (S.D. Miss. Aug. 18, 2015) and *Wu v. Miss. State Univ.*, 2014 WL 5799972, at *12 (N.D. Miss. Nov. 7, 2014) are similarly inapposite. Unlike those cases, Rose does not opine that there is a "mere possibility" of a defect. He expressly relies on Eddins and McKinley's testing and analysis, and also identifies additional design flaws that existed and would have been prevented had 3M's design review process complied with industry standards. *Hendrix*, 255 F.R.D. at 607 n.75 ("An expert may properly rely on the opinion of another expert."); *Fox v. Gen. Motors LLC*, 2019 WL 3483171, at *8 (N.D. Ga. Feb. 4, 2019) (same).

#### d.   *Rose's Defect Opinions Are Not Legal Conclusions.*

3M argues Rose's opinion that the CAEv2 was "unreasonably dangerous" is inadmissible. Plaintiffs do not dispute that the legal implications of conduct are not the proper subject of expert testimony. But Rose's observation that 3M's departures from industry standards contributed to the sale of an "unreasonably dangerous" product are not intended to supplant the fact-finder. Rose uses "unreasonably dangerous" only to reference the conclusions reached by McKinley and Eddins, who each independently concluded that when used as intended, the CAEv2 presents a significant risk of auditory injury.

### B.   **Military Experts**

3M moves to exclude the opinions of General Edens, SGM Huston, and SGM Marshall on the grounds that they are unreliable and do not fit the facts of any

plaintiff. However, it is 3M that has repeatedly attempted to cast all blame for Plaintiffs' auditory injuries on the Army due to alleged failures in the Army's hearing conservation efforts. Edens, Huston, and Marshall address these arguments by explaining the complex workings of the Army's safety programs and regulations, how the Army institutionalizes safety, and how these factors affect servicemembers' use of hearing protection. These explanations are supported by personal experience, provide insight beyond the understanding of the average citizen, and, contrary to 3M's assertions, are regularly admitted.

> ### 1. *Explaining Institutional Practices, Procedures, and Rules Is Quintessential Expert Testimony.*

Courts allow experts to explain complex rule and regulatory regimes to juries. *Ramkelawan v. Globus Med. Inc.*, 2019 WL 8267231, at \*4 (M.D. Fla. Dec. 10, 2019) (explaining "a lay person cannot be expected to understand" complex regulatory frameworks); *Webb v. Carnival Corp.*, 321 F.R.D. 420, 426 (S.D. Fla. 2017); *Maltez v. Trepel Airport Equip. GMBH*, 2017 WL 5903556, at \*3-6 (S.D. Fla. Nov. 30, 2017).

It is unnecessary to apply "scientific" methodologies to such opinions, since they are explanatory in nature; instead, personal experience and expertise suffice. *Namenda*, 2021 WL 100489, at \*11; *Maltez*, 2017 WL 5903556, at \*3-6. An expert providing opinions about industry standards and practices does not need some quantitative method—their experience with such standards and practices *is* their

method. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1258 (11th Cir. 2002).[200]

Plaintiffs' military experts offer specific opinions about the rules governing hearing conservation in the Army and how those rules were implemented as standard practice. Even if these witnesses provided general opinions about the Army's culture, when based on long personal experience, such opinions are admissible. *U.S. v. Colonial Pipeline Co.*, 2003 WL 26131791, at *4 (N.D. Ga. Jan. 14, 2003); *Mamani v. Berzaín*, 2018 WL 1010582, at *5 (S.D. Fla. Feb. 22, 2018).

3M cites inapplicable cases. In *Jinro Am. Inc. v. Secure Invs., Inc.*, the proffered expert opined on the culture of an organization and business sector in which he never worked, relying on newspaper articles as his "principal" source. 266 F.3d 993, 1003-04 (9th Cir. 2001). In *Lachney v. Target Corp.*, the expert was similarly not an insider of the culture on which he opined. 2010 WL 11570518, at *17-20 (W.D. Okla. Apr. 12, 2010). In *Bliss v. BNSF Ry. Co.*, the "expert" sought to opine on BNSF's safety culture, but never set foot on company property, never studied the company's culture, never spoke to anyone at the company, and relied

---

[200] 3M's citation to *U.S. v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004) is misleading. The portion of *Frazier* 3M cites refers to expert testimony that was intrinsically quantitative yet provided no quantitative basis for the opinion. *Id.* The Eleventh Circuit certainly did not hold that all expert testimony must have a quantitative basis. To the extent it mentioned "verifiable" bases for expert testimony, Plaintiffs' military experts each describe the extensive experience and other bases that underlie their opinions.

*solely* on deposition transcripts. 2013 WL 5570231, at *19-26 (D. Neb. Oct. 9, 2013). None of these cases are analogous to Edens, Huston, and Marshall, who have extensive personal experience with the Army's hearing protection procedures and policies.

### 2. *Plaintiffs' Military Experts' Opinions Are Reliable.*

Plaintiffs' military experts all have a sufficient basis to explain how the Army institutionalizes hearing conservation and apply this expertise with sufficient reliability.

### a. *General Edens*

Edens is a Brigadier General (retired) with 33 years of Army leadership experience, including as the Commanding General and Director of Army Safety, U.S. Army Combat Readiness/Safety Center (USACRC).[201] He directed the Army Safety Program,[202] which covered hearing conservation.[203] While serving as Director of Army Safety, Edens oversaw updates to the Army's hearing protection policies, which required him to understand what was then in place and where (and how) it was updated.[204]

Prior to serving as Director of Army Safety, Edens served in other leadership roles in which he "was required to ensure that the units [he] led met the hearing

---

[201] PX37(Edens-1-2).
[202] *Id*.
[203] PX38(Edens-Dep-94:1-8; 103:5-104.21).
[204] *Id*. at 84:8-87:19.

protection requirements directed by the Army."[205] From 2003-2012, he had responsibility for "ensuring that the soldiers under [his] command were wearing their hearing protection,"[206] including as a brigade commander of more than 3,000 soldiers, both stateside and in Iraq.[207]

Edens explains how and when the Army began to place a higher commitment to hearing conservation (1998),[208] how that commitment was implemented and institutionalized from the top down,[209] how the Army updated its procedures over the years,[210] and how the data empirically shows that loss rates to accidents (including hearing damage) "continue[] to average lower."[211]

### b.   *SGM Huston*

Huston offers opinions from two decades of personal experience as a longtime drill sergeant who oversaw new recruits' training and trained other drill sergeants how to conduct basic training.[212] He used the CAEv2 and received training on it and other earplugs.[213] On these bases, he explains how the Army educates recruits about hearing conservation and enforces compliance with hearing protection requirements,

---

[205] *Id.* at 52:7-23.

[206] *Id.* at 77:21-79:15.

[207] PX38(Edens-Dep-72:13-74:12); PX39(Edens-Dep-Exs-10, 12).

[208] PX38(Edens-Dep-184:15-191:20); PX37(Edens-2-7).

[209] PX37(Edens-2-17).

[210] *Id.*

[211] PX38(Edens-Dep-158:8-160:6).

[212] PX40(Huston-1-3).

[213] PX41(Huston-Dep-43:16-44:15, 67:5-69:22).

using both general[214] and specific[215] examples. Huston did not himself train soldiers how to use HPDs, but that is because trained hearing professionals did, and he ensured those under his command received that training.[216]

### c.  *SGM Marshall*

Marshall provides the perspective of a combat medic who ensured that soldiers in the field wore hearing protection and had ready access to HPDs, including the CAEv2.[217] He bases his opinions on experience with the Army's rules and regulations governing HPD use.[218] Oddly, 3M faults him for not being an audiologist, but his opinions pertain to soldiers' standard hearing conservation practices in both training and theaters of war.[219] These opinions do not, as 3M contends, speculate about soldiers' state of mind; they explain the Army's approach to institutionalizing and promoting hearing conservation..

### 3.  *3M's Anecdotal Evidence Does Mandate Exclusion.*

3M argues Plaintiffs' military experts "ignored" anecdotal and unsupported claims that some soldiers do not wear hearing protection. These cherry-picked anecdotes are exactly why Plaintiffs' military experts are necessary. 3M will argue that soldiers regularly did not wear hearing protection based on nothing more than

---

[214] PX40(Huston-3-6, 10-13).

[215] *Id.* at 13-15.

[216] *Id.* at 10-15.

[217] PX42(Marshall-2-4).

[218] *Id*. at 4-10.

[219] *Id.* at 10-21.

hearsay and speculation. Plaintiffs' military experts explain why, even if such exceptions exist, they clearly are not the rule and certainly do not contradict Plaintiffs' testimony that they used the CAEv2.

3M's "evidence" is problematic in multiple respects:

- As discussed in Plaintiffs' *Daubert* motions,[220] the portions of the 2011 GAO report that 3M relies upon are hearsay within hearsay. The report offers no details on how many soldiers did not always wear hearing protection, when or where they failed to do so, or any other verifiable information to substantiate the report.

- Dr. Casali's article[221] cited no independent research and provides no context regarding when and why some soldiers supposedly do not wear HPDs.

- Barr's article[222] cites no evidence substantiating that "researchers" have found service members "often" do not wear HPD.

- McIlwain's article[223] states only that units did not widely use the CAEv2 in 2001 due to cost, but *also* states that the plugs became standard issue by 2004.

---

[220] Pls-Mot-31.

[221] DX21.

[222] DX22.

[223] DX23.

- A handful of random internet commenters claimed they did not always wear hearing protection.[224]

- As 3M's own expert conceded, LTC Battler admitted her base did fantastically well with hearing conservation and only *speculated* that training might be inadequate elsewhere.[225]

None of this is "objective, empirical evidence,"[226] nor is it likely admissible. Even if it were, *Daubert* explains "presentation of contrary evidence" is one of the "traditional and appropriate means" to attack expert testimony. 509 U.S. at 596. Moreover, 3M's citations are not "contrary evidence." The Army recognizes there will be some enforcement issues with hearing conservation and built-in procedures to remedy those exceptions.[227] Given this, it is unremarkable that some soldiers might not have always worn hearing protection.

### 4.    *3M's "Fit" Arguments Ignore the Opinions.*

Each Plaintiff testified they received training on the CAEv2 and wore them in all appropriate situations. Plaintiffs' military experts contextualize why such testimony is consistent with standard Army training practices and hearing conservation policies, yet 3M argues these expert explanations do not "fit" the case.

---

[224] DX18.

[225] PX43(Neitzel-Dep-(12/16/2021)-336:8-369:2).

[226] Def-Mot-51.

[227] PX41(Huston-Dep-91:14-97:17).

Since the context the military experts provide shows a connection between Army policy and Plaintiffs' testimony regarding the CAEv2, the opinions "fit." *Cf. Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014).

### C. Economic Loss Experts

#### 1. *Dr. Elizabeth Davis*

##### a. *Davis Uses Reliable Methodology.*

Davis is a vocational expert with 20 years of experience, a Master's in Rehabilitation Counseling, and PhD in Human Services. Davis is a certified Rehabilitation Registered Nurse and Rehabilitation Counselor and certified International Psychometric Evaluator by the American Board of Vocational Experts.[228] Davis used the Rehabilitation Plan, Access to the Labor Market, Placeability, Earning Capacity, and Labor Force Participation ("RAPEL") method to assess each Plaintiff's earning capacity.[229] After interviewing each Plaintiff, reviewing their employment and medical records, and consulting with medical experts, Davis determined that each Plaintiff would suffer wage loss due to hearing loss and/or tinnitus.[230] 3M's expert could not disagree.[231]

Courts have found this method reliable. *Ho v. Royal Caribbean Cruises Ltd.*,

---

[228] PX44(Davis-(Baker)-2-3); *id.* at Ex. A).
[229] PX44(Davis-(Baker)-1); PX45(Davis-(Estes)-2-3); PX46(Davis-(Keefer)- 2); PX47(Davis-(McCombs)- 2-3).
[230] PX47(Davis-(McCombs)-5,13); PX46(Davis-(Keefer)-5,17); PX44(Davis-(Baker)-5,15); PX45(Davis-(Estes)-5, 13).
[231] PX48(Scarbrough-Dep-(12/21/20)-50:14-51:1).

2020 WL 5534278, at *3 (S.D. Fla. Aug. 4, 2020); *Hekmati v. Iran*, 278 F. Supp. 3d 145, 165-166 & n.13 (D.D.C. 2017); *Suazo v. Atl. Sounding Co.*, 2008 WL 57832, at *2 (E.D. La. Jan. 2, 2008). These cases recognize that a vocational expert can rely on their experience to assess and estimate a person's future earnings loss.

To determine the extent of loss, Davis considered the Census Bureau's American Consumer Survey data, which collects wage data[232] and asked if respondents have "serious difficulty hearing."[233] The ACS is widely used,[234] including by federal agencies.[235] *Hutchens v. Abbott Labs.*, 2016 WL 10566144, at *4 (N.D. Ohio Dec. 22, 2016). Davis considered work by vocational expert David Gibson, among other reliable sources, who compared ACS median earnings data for persons with and without serious difficulty hearing to determine a 6% wage loss for those with hearing loss. [236]

Using the 6% figure as a "touchstone," Davis testified that she then considered whether the 6% figure fit each Plaintiffs' circumstances.[237] Considering each

---

[232] PX49(Davis-Dep-(12/9/20)-113:18-114:4).

[233] *Id.* at 118:6-119:3.

[234] Institute on Disability, University of New Hampshire, *2019 Annual Report on People with Disabilities in America*, (2019) (attached as PX50); Frequently Asked Questions, Disability Statistics, Cornell University (2018), https:// disability statistics.org/faq.cfm#Q1 (attached as PX51).

[235] U.S. Department of Commerce, American Community Survey: Handbook of Questions & Current Federal Uses (Oct. 2014) (attached as PX52).

[236] PX49(Davis-Dep-(12/9/20)- 110:9-16, 113:18-20, 118:6-119:8, 126:5-127:7).

[237] *Id.* at 102:22-104:7; 141:22-142:3); PX53(Davis-Dep-(12/10/20)-50:9-52:4, 347:14-348:16).

Plaintiff's education, experience, occupation, and her consultation with medical experts, and experience assessing individuals as a life care planner and vocational expert, Davis determined that the 6% loss fit each Plaintiff's circumstances.[238] This methodology is reliable.

### b. *3M Distorts the Facts.*

3M argues that Davis' method is improperly applied because none of the Plaintiffs "are deaf or have serious difficulty hearing." 3M confuses "serious" difficulty with "severe" disability.[239] Because each Plaintiff has serious difficulty hearing and/or tinnitus,[240] Davis' opinion is reliable. Baker testified that he has difficulty hearing conversations and just hears "noise."[241] Keefer testified that "in a restaurant where there's other conversations going on or … background noise, it is hard to hear."[242] Estes testified about his serious difficulty hearing on the telephone and communicating, including during his deposition.[243] McCombs reported, "I can't deal with this ringing in my ears all day long" and hears crickets "all day long."[244]

---

[238] PX49(Davis-Dep-(12/9/20)-131:11-134:7).

[239] *Id*. at 122:13-123:11.

[240] *Id*. at 119:14-18.

[241] PX54(Baker-Dep-(7/21/20)-63:9-63:23).

[242] PX55(Keefer-Dep-303:23-304:7).

[243] PX56(Estes-Dep-280:20-281:18).

[244] PX57(McCombs-Dep-210:19-211:7, 351:1-11).

The medical experts also opined that Plaintiffs have serious difficulty hearing.[245] 3M speculates that future treatment will prevent wage loss, but the medical experts opined the injuries are permanent and "will almost certainly worsen with aging."[246] Davis may rely on these opinions. *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, at n.11 (3d Cir. 1999); *Seymore v. Penn Maritime, Inc.,* 281 Fed. App'x 300, 301 (5th Cir. 2008).

### c.     *Davis Reasonably Used a Conservative 6% Touchstone.*

Davis considered each Plaintiff's education, experience, veteran status, and occupation to determine whether the conservative 6% touchstone fit their circumstances.[247] Davis reasonably decided that sample size would greatly diminish if she only looked at persons who (1) have serious hearing loss, (2) in the same age group, (3) with the same education level, (4) with the same veteran status, and (5) with the same job.

Davis explained that breakdown of data based on factors such as veteran status reduces the sample size and makes the resulting figures unreliable.[248] Gibson

---

[245]    PX58(Lustig-(Keefer)-16);    PX59(Spankovich-(Keefer)-8);    PX60(Packer-(Baker)-Ex-D, 3); PX61(Packer-(Estes)-Ex-D, 4); PX62(Arriaga-(McCombs)-10).

[246]    PX60(Packer-(Baker)-27-29);    PX61(Packer-(Estes)-22);    PX59(Spankovich-(Keefer)-8-9); PX62(Arriaga-(McCombs)-13-14).

[247]  PX49(Davis-Dep-(12/9/20)-90:6-22, 102:22-104:7, 105:1-106:6, 272:4-273:11, 364:4-19);    PX53(Davis-Dep-(12/10/20)-16:5-17:9,    51:8-52:4,    127:12-128:3, 153:23-154:4, 254:4-255:15).

[248] PX53(Davis-Dep-(12/10/20)-130:13-23).

recognized the sample size problem.[249] Davis also testified that Keefer did not fit well in the education categories.[250] Davis reached the same conclusion for McCombs.[251] Davis determined this conservative 6% touchstone number fit Plaintiffs' circumstances and that the subclassifications did not.

### d.   *Gibson's Methodology Is Published.*

Because Davis cites peer-reviewed publications,[252] her "theory or technique has been subjected to peer review and publication." *Daubert*, 509 U.S. at 593. 3M argues Gibson's 2015 paper is unpublished, but Gibson presented the paper at the ACS Conference, where speakers included the Census Bureau Director and ACS Chief. [253, 254] The ACS Users Group posted the paper.[255] The International Association of Rehabilitation Professionals has twice published Gibson's

---

[249] David S. Gibson, *Use of ACS to Estimate Lifetime Loss of Earning Capacity as a Result of Disability* (May 12, 2015) (presented at ACS Data Users Conference) (attached as PX63).

[250] PX53(Davis-Dep-(12/10/20)-82:2-83:5).

[251] *Id*. at 246:10-247:5.

[252] PX44(Davis-(Baker)-19-21).

[253] American Community Survey (ACS) Data Users Group, Conference Program (May 11-13, 2015), at 3 (attached as PX64); PX49(Davis-Dep-(12/9/20)-110:21-113:11).

[254] PX64, at 2.

[255] David S. Gibson, *Use of ACS to Improve Occupation Earnings Estimates*, 26(1) THE REHAB. PROF'L 41-56 (2018) (attached as PX65), available at https://acsdatacommunity.prb.org/cfs-file/__key/widgetcontainerfiles/3fc3f82483d14ec485ef92e206116d49-s-AAAAAAAAAAAAAAAAAAAAA-page-02015_5F00_acs_5F00_conference-yUeQ33zvuUaDj0K62vzDpw-html/Gibson2.pdf.

methodology,[256] and Gibson's 2015 paper[257] "rel[ied] on other published studies and articles." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1236 (9th Cir. 2017) (reversing exclusion).

### e. *3M's Arguments Are Best-Suited for Trial.*

Where a vocational expert uses a reliable method, courts generally decline to dictate *how* the expert must apply it. *Jones v. Blue Cross Blue Shield of Louisiana*, 2018 WL 585543, at *9 (M.D. La. Jan. 29, 2018); *Morgan v. Jacques*, 2010 WL 11537864, at n.3 (D. Vt. Oct. 5, 2010); *Bennett v. U.S.*, 2018 WL 6265092, at *6 (C.D. Cal. Mar. 22, 2018). Numerous courts have declined to decide which table a vocational expert should use. *Commins v. Genie Indus.*, 2020 WL 1189937, at *17 (W.D. Ky. Mar. 12, 2020) (rejecting argument that expert has to use age-specific data); *Dejana v. Marine Tech., Inc.*, 2013 WL 6768407, at *15 (E.D. Mo. Dec. 20, 2013) (rejecting argument that expert did not deduct certain income); *Mattingly v. Home Depot U.S.A., Inc.*, 2009 WL 10676568, at *8 (E.D. Tex. Oct. 20, 2009); *Milne v. Volkswagen AG*, 2009 WL 10702722, at *6 (D. Vt. Jan. 22, 2009); *Ogden v. Saint Mary's Med. Ctr.*, 2007 WL 1675092, at *1 (E.D. Mich. June 11, 2007).

Both cases cited by 3M are inapposite as the experts did not consider the type of disability. *Noel v. Inland Dredging Co.*, 2018 WL 1911821, at *2 (E.D. La. Apr.

---

[256] PX65; David S. Gibson & Erin P. Gibson, *Age-Earning Profiles: Refinement and Applications*, 25(1) THE REHAB. PROF'L 13-34 (2017) (attached as PX66).
[257] PX44(Davis-(Baker)-14-15) (citing PX63).

23, 2018); *Lackey v. Bosch*, 2017 WL 129891, *10 (E.D. Ky. Jan. 12, 2017). But the weight of the precedent is that income estimations for disabled persons with general disability statistics[258] and even data for non-disabled people[259] are admissible.

3M cites Dr. Ireland's outdated criticism that the 2002 ACS data did not differentiate between types of disability,[260] but the 2010 ACS does.[261] Courts have held that Ireland's criticism does not justify exclusion. *Lessert v. BNSF Ry. Co.*, 2020 WL 4500218, at *20 (D.S.D. Aug. 5, 2020); *Haines v. Get Air LLC*, 2019 WL 3501054, at *2 & *4 (D. Ariz. Aug. 1, 2019); *CSC v. U.S.*, 2013 WL 6795723, at *16 (S.D. Ill. Dec. 20, 2013).

### 2.   *Kristin Kucsma*

#### a.   *Ms. Kucsma, M.A. Uses Reliable Methodology.*

Contrary to 3M's argument, Kucsma does not solely rely on Davis as she cites the Bureau of Labor Statistics and the ACS.[262] Regardless, an expert may rely on another expert's opinion. *Hendrix*, 255 F.R.D. at 607 n.75; *Fox v. Gen. Motors LLC*,

---

[258] *Haines*, 2019 WL 3501054, at *4; *Ortega v. Cty. of LA*, 2019 WL 2902490, at *6 (C.D. Cal. May 15, 2019); *Rossi v. Groft*, 2013 WL 1632065, at *1, 3-4 (N.D. Ill. Apr. 16, 2013); *Johnson v. Montoya*, 308 P.3d 566, 568-69 (Utah App. 2013).
[259] *Cummins v. BIC USA, Inc.*, 2011 WL 3759415, at *3 (W.D. Ky. Aug. 25, 2011); *Weirich v. Horst Realty Co.*, 2009 WL 920960, at *7 (E.D. Pa. Mar. 30, 2009).
[260] Def-Mot-102, Ex. 72.
[261] PX51.
[262]  PX67(Kucsma-(Baker)-14-19);  PX68(Kucsma-(Estes)-13-24);  PX69(Kucsma-(Keefer)-13-23); PX70(Kucsma-(McCombs)-12-23).

2019 WL 3483171, at *8 (N.D. Ga. Feb. 4, 2019). Kucsma acknowledged that Davis relied upon generally-accepted and reliable methodologies and data.[263]

### b.   *Kucsma's Fringe Benefits Opinion Is Reliable.*

Kucsma is an economist who has testified in more than 350 cases and 490 depositions.[264] Using Bureau of Labor Statistics (BLS) data, Kucsma estimated Keefer's fringe benefits at 9.6% of earnings based upon data for union workers[265] and Baker's benefits at 4.8% based upon data for private employers.[266] This methodology is reliable. *Chavez-Acosta v. Sw. Cheese*, 2013 WL 12040013, at *3 & n.3 (D.N.M. Aug. 5, 2013); *Ashford v. Wal-Mart Stores, LP*, 2013 WL 152853, at *4 (S.D. Miss. Jan. 15, 2013); *Easly v. Waterfront Shipping Co.*, 2012 WL 812354, at *9 (W.D. Wash. Mar. 9, 2012).

3M cites an outlier, *Joffe v. King & Spalding LLP*, 2019 WL 4673554 *8 (S.D.N.Y. Sept. 24, 2019), which prevented the use of national data. The reasoning in *Joffe* conflicts with the cases just cited and the cases showing courts' reluctance to decide which table an expert must use. *Flebotte*, 2000 WL 35538296, at *7 (rejecting challenge to "national and not regional data"); *Andrade Garcia v. Columbia Med. Ctr.*, 996 F. Supp. 617, 623 (E.D. Tex. 1998). Since the majority of

---

[263] PX71(Kucsma-Dep-(12/15/20)-73:17-74:22, 88:3-89:5).
[264] PX71(Kucsma-Dep-(12/15/20)-36:10-17); PX72(Kucsma-Dep-(12/15/20-Ex-1).
[265] PX69(Kucsma-Keefer)-7).
[266] PX67(Kucsma-Baker)-8).

jurisdictions permit use of national data as reliable methodology, 3M's argument fails.

### 3.    *Robert Johnson*

3M argues Johnson's opinions on 3M's financial condition are not helpful.[267] But Johnson's report is more than a "regurgitation" of publicly available facts[268] and provides insight beyond the understanding of the average citizen relevant to damages.

3M does not dispute the relevance of 3M's net worth and financial condition, given Plaintiffs' punitive damages claims. *BMO Harris Bank, N.A. v. Richert Funding, LLC*, 2016 WL 11531452, at *5 (N.D. Ga. July 5, 2016). Nor does 3M question Johnson's methodology.[269] 3M argues Johnson's testimony regarding 3M's financial condition will not be helpful, but courts routinely find that economic analysis of a defendant's financial condition *is* helpful to laypeople without economic training. *Voilas v. General Motors Corp*, 73 F. Supp. 2d 452, 461 (D.N.J. 1999); *Lea v. Wyeth LLC*, 2011 WL 13193321, at *4 (E.D. Tex. Sept. 16, 2011); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig*, 2011

---

[267] Def-Mot-109-112.

[268] Def-Mot-110.

[269] When ordered to describe their objections to Plaintiffs' valuation methodology, if any, Defendants stated: "3M agrees with the method selected by the Plaintiffs to determine corporate net worth." *See* Letter from Robert C. Brock to B. Aylstock, S. Hutson, & C. Seeger re net worth, dated August 26, 2020, at 5 (attached as PX73).

WL 6732819, at *7 (S.D. Ill. Dec. 16, 2011) (Johnson's testimony helpful); *In re E. I. du Pont de Nemours & Co. C8 Personal Injury Litig*., 345 F. Supp. 3d 920 (S.D. Ohio 2015) (same).

Johnson's report explains relevant financial data, including 3M's "financial health, wealth and economic status," from opaque financial statements.[270] Johnson opines on the relevance and interdependence of the various methods and figures that "reflect an entity's financial condition," and then using those metrics to assess 3M's financial condition.[271] Johnson's reliance upon public information to support his opinions does not render them unhelpful. Fed. R. Evid. 703.

Because they encompass topics beyond the understanding of the average citizen, Johnson's opinions are helpful. None of the cases cited by 3M suggest otherwise. Unlike Johnson's testimony, those cases excluded opinions that only served to recite a favorable factual narrative, apply simple arithmetic, or bolster fact testimony. *In re C.R. Bard Pelvic Repair Sys. Prods. Liab. Litig.*, 948 F. Supp. 2d 589, 608 (S.D. W. Va. 2013); *Kia v. Imaging Sci. Int'l*, 2010 WL 3431745, at *5 (E.D. Pa. Aug. 30, 2010); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004); *U.S. v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003); *In re Connolly*, 398 B.R. 564, 575-77 (E.D. Mich. 2008); *Israel Travel Advisory Serv., Inc. v. Israel*

---

[270] PX74(Johnson-1).
[271] *Id*. at 2-3.

*Identity Tours, Inc.*, 1993 WL 387346, at \*2 (N.D. Ill. Sept. 23, 1993); *Jones Creek Inv'rs, LLC v. Columbia Cty., Georgia*, 2013 WL 12141348, at \*21 (S.D. Ga. Dec. 23, 2013).[272]

Here, Johnson's opinions are used not to bolster existing fact testimony or recite information otherwise available in discovery. They provide analysis necessary to educate laypersons on the relevant issue of 3M's financial condition and are therefore helpful to the jury and admissible.

### D.   **Other Experts**

In addition to those experts discussed above, 3M seeks to exclude the opinions of other experts, in whole or in part, for various reasons. 3M's arguments concerning each of these experts are addressed below.

#### 1.   *Dr. Moises Arriaga*

Arriaga currently holds several positions, including Director of Neurotology at Louisiana State University School of Medicine.[273] From 1991-1996 he was active duty with the Air Force, serving as Chief of Otology and Neurotology at Wilford Hall USAF Medical Center at Lackland AFB, where his clinical duties included evaluating and recommending HPD.[274] He simultaneously served on faculty of the

---

[272] 3M itself previously took the position that Johnson's original disclosure set forth not mere facts and arithmetic, but "opinions on what financial metrics should be evaluated when assessing the financial condition of a corporation." *See* PX73.

[273] PX75(Arriaga-(General)-Ex-A); *id*. at 2.

[274] *Id*.

School of Aerospace Medicine at Brooks AFB where he educated residents, physicians' assistants, and hearing conservation technicians on HPD evaluation, selection and use.[275]

Arriaga has general causation opinions and case-specific opinions as to Hacker and McCombs. They are the result of reliable methodology applied by a well-qualified hearing expert. 3M's challenges are without merit.

### a. *Attorney "Mouthpiece" Opinions.*

3M moves to exclude opinions it characterizes as impermissible narrative, state-of-mind opinions, and legal conclusions.[276] The Court should reject these arguments or should address them at the limine stage or trial rather than parsing Arriaga's reports and testimony at this early stage. *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 702-03 (S.D.W. Va. 2014).

3M seeks to exclude two statements regarding 3M's sale of the CAEv2 to the military prior to testing the device, which it mischaracterizes as "speculative opinions relating to the company's conduct."[277] These statements are based on a review of internal 3M documents and support Arriaga's opinions regarding the adequacy of 3M's testing and warnings. Where, as here, an expert testifies "to a review of internal documents for the purpose of explaining the basis for his or her

---

[275] *Id*. at 2-3.
[276] Def-Mot-29.
[277] Def-Mot-31.

opinions," such testimony is admissible. *Arevalo v. Coloplast Corp.*, 2020 WL 3958505, at *21 (N.D. Fla. July 7, 2020).

3M admits the challenged statements are derived from "dozens of ... internal 3M documents."[278] Expert testimony that synthesizes or summarizes data in a manner that streamlines presentation of the facts is admissible. *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*, 2020 WL 1666763, at *15 (S.D. Fla. Apr. 3, 2020).

3M objects to Arriaga's use of certain words or phrases (*i.e.*, "duty," "failed to warn," and "defective"), arguing they use legal "terms of art" or amount to "legal conclusions."[279] There is a critical difference between impermissible legal conclusions, which "directly instruct[] the jury on a legal determination," and expert testimony that embraces ultimate questions of fact by tracking the elements of causes of action. *Eldridge v. Pet Supermarket, Inc.*, 2020 WL 1076103, at *7 (S.D. Fla. Mar. 6, 2020); *Arvelo*, 2020 WL 3958505, at *21. Arriaga does not give a legal conclusion in discussing the CAEv2's flawed design, inadequate testing, and insufficient warnings. He permissibly embraces the ultimate issue, leaving the final determinations to the jury.

---

[278] Def-Mot-31.
[279] Def-Mot-40.

Finally, 3M seeks to exclude unspecified "state-of-mind" opinions. However, Arriaga's opinions simply describe what 3M knew about the CAEv2's design and fit problems and when these matters were known. *In re Seroquel Prods. Liab. Litig.*, 2009 WL 3806436, at *3 (M.D. Fla. July 20, 2009). This notice-related testimony is within the realm of Arriaga's expertise. It should be permitted at trial. *Id.* at *4.

### b.  *Medical Causation Opinions.*

Arriaga opines the ineffective CAEv2 failed to protect users against hazardous noise, causing Hacker and McCombs to suffer tinnitus and related injuries.[280] 3M argues that Arriaga's differential diagnosis is unreliable because he failed to rule out Plaintiffs' hazardous noise exposure while wearing non-CAEv2 HPD.[281] This argument is false.

As this Court has previously recognized, under "circumstances that ensure reliability, differential diagnosis is recognized in the law as a useful and reliable tool for medical practitioners to determine the cause of an ailment." *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 595–96 (N.D. Fla. 2009) (internal quotations omitted); *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262 (4th Cir. 1999). In conducting a reliable differential diagnosis, an expert lists "hypotheses that might explain a plaintiff's condition," then provides "reasons for rejecting alternative hypotheses

---

[280] PX76(Arriaga-(Hacker)-21); PX77(Arriaga-Dep-(12/19/20)-366:1-20, 508:10-509:23); PX62(Arriaga-(McCombs)-4).
[281] Def-Mot-92.

using scientific methods and procedures." *Humleker v. Bos. Sci. Corp.*, 2020 WL 6870852, at *7 (M.D. Fla. Oct. 2, 2020).  As stated in *Guinn v. AstraZeneca Pharms., LP*, 602 F.3d 1245, 1253 (11th Cir. 2010), "although a reliable differential diagnosis need not rule out all possible alternative causes, it must at least consider other factors that could have been ***the sole cause*** of the plaintiff's injury." *Id.* (emphasis added). An expert performing a differential diagnosis need only provide "a reasonable explanation" as to why the expert has concluded that any alternative cause suggested by the defense was not the sole cause of plaintiff's injury. *Id.*

Arriaga's case-specific reports include lengthy patient histories that account for military, occupational, and recreational noise exposure; medical, family, and social history; and non-CAEv2 HPD use.[282] Arriaga addresses other HPD use as a potential cause of Plaintiffs' injuries and explains why he ruled it out, noting that symptom onset is an important factor in determining the cause of injury.[283] *Westberry*, 178 F.3d at 265. Hacker's tinnitus began in 2006, eight years after entering the military and three years after he began using CAEv2 almost exclusively.[284] McCombs' tinnitus began in April 2009 after he experienced an IED blast while wearing the CAEv2.[285] Arriaga's medical causation opinions are reliable,

---

[282] PX76(Arriaga-(Hacker)-21-23; PX62(Arriaga-(McCombs)-12-13).

[283] PX76(Arriaga-(Hacker)-21); PX62(Arriaga-(McCombs)-12-13).

[284] PX76(Arriaga-(Hacker)-1, 4-7, 10, 13, 23).

[285] PX62(Arriaga-(McCombs)-2).

and 3M's arguments should be addressed on cross-examination. *Daubert*, 509 U.S. at 596.

### c. *Hidden Hearing Loss Opinions.*

3M improperly conflates hidden hearing loss ("HHL") and cochlear synaptopathy to argue that Arriaga's opinions on both subjects must be excluded because neither Hacker nor McCombs have been diagnosed with HHL. Plaintiffs agree Hacker and McCombs do not have an HHL diagnosis. But cochlear synaptopathy—the loss of synaptic connections between auditory nerve fibers and inner hair cells—is an established physiological mechanism which explains the presence of tinnitus in patients exposed to hazardous noise while wearing CAEv2, such as Hacker and McCombs. Accordingly, Dr. Arriaga's testimony on cochlear synaptopathy should be allowed.

### d. *Opinions Regarding PTSD.*

3M seeks to exclude Arriaga's opinion regarding the interrelationship between PTSD and tinnitus for Hacker because "no expert will offer an opinion that Hacker even has PTSD" and "Arriaga does not intend to do so."[286] This is false. Arriaga explained that he will not testify about **the relative significance of the PCL-5 questionnaire or Hacker's score of 29**. However, he explains he relies on Hacker's PTSD diagnosis, VA disability status, and interrelationship between PTSD

---

[286] Def-Mot-123.

and tinnitus for his opinion "that the tinnitus and the PTSD are aggravating each other."[287]

An expert witness may rely on the diagnosis of a treating physician. *In re Wright Med. Tech. Inc., Conserve Hip Implant Prods. Liab. Litig.*, 127 F. Supp. 3d 1306, 1323 (N.D. Ga. 2015). 3M's challenges to the severity of Hacker's symptoms or the reliability of these opinions go to their weight, not their admissibility. *Id.*

### e.     *Testing, Labeling, and Design Opinions.*

3M challenges Arriaga's qualifications to opine about the CAEv2's design, testing and labeling, citing his inexperience with designing preformed earplugs and testing them pursuant to ANSI S3.19-1974.[288]

An expert is qualified to opine based on "any combination of knowledge, skill, experience, training, or education; he need not be a leading authority in the field." *Hendrix,* 255 F.R.D. at 578 (internal quotations omitted). Any gaps in an expert's qualifications generally go to the weight, not the admissibility, of his testimony. *Id.*; *accord., Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989).

Evaluating and recommending appropriate HPD for military, occupational, and recreational settings was central to Arriaga's clinical practice while on duty and presently.[289] During his military service, Arriaga instructed residents, physicians'

---

[287] PX77(Arriaga-Dep-(12/19/20)-490:15-491:18).
[288] Def-Mot-125.
[289] PX62(Arriaga-(McCombs)-2-4).

assistants, and hearing conservation technicians on the evaluation, selection, and use of HPD.[290] Arriaga also has extensive experience designing and selecting filters for musicians' earplugs,[291] and designing custom earplugs for servicemembers.[292] This process involves testing HPD efficacy and modifying designs as needed.[293] Given Arriaga's education, knowledge, training and experience with earplug design, testing, labeling, and instruction, he is qualified to opine on these matters. 3M's challenges should be addressed on cross-examination.

### 2. *Dr. Mark Packer*

Packer is Medical Director of Neurotology at Mercy Hospital in St. Louis.[294] He has served in the Air Force as flight surgeon, Chief Otolaryngology Element, and Chief of Neurotology and Cranial Base Surgery—jobs that required him to evaluate the safety and efficacy of HPDs.[295] Notably, from 2009-2016, Packer served as director of the DoD's Hearing Center of Excellence.[296] Packer advised the Assistant Secretary of Defense for Health Affairs and the Surgeons General of the Uniformed Services on hearing-related matters.[297]

---

[290] PX75(Arriaga-(General)-2-3).

[291] PX78(Arriaga-Dep-(12/12/20)-72:2-5).

[292] *Id.* at 71:19-72:2, 73:7-74:4.

[293] *Id.* at 71:19-72:5.

[294] PX60(Packer-(Baker)-1).

[295] *Id.* at 2-3.

[296] *Id.* at 4.

[297] *Id.*

Packer offers general causation opinions and case-specific opinions as to Baker and Estes. Packer is a well-qualified hearing expert who used a reliable methodology. This Court should reject 3M's challenges.

### a.  *Attorney "Mouthpiece" Opinions.*

3M argues that narrative testimony, legal conclusions, and state-of-mind opinions should be excluded, often citing to large swaths of the experts' reports.[298] These arguments should be addressed at the limine stage or trial. *Huskey*, 29 F. Supp. 3d at 702-03. Alternatively, the Court should reject 3M's characterizations of Packer's testimony.

While it is improper to simply narrate a factual record, an expert may "articulate the 'factual underpinning' upon which he bases his opinion." *Ohio State Troopers Ass'n, Inc.,* 2020 WL 1666763, at *15. Packer should be permitted to cite corporate documents that form the basis for his opinions.

3M also contests Packer's use of purported legal conclusions, such as: "design defects," "defective," "unreasonably dangerous," "reasonable," and "failed to warn."[299] Improper legal conclusions "have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *U.S. v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006). While "unreasonably dangerous" meets that

---

[298] Def-Mot-34, 41, 44.
[299] Def-Mot-41.

definition, common words and phrases such as "reasonable," "failed to warn," and "defective" do not have specialized meaning distinct from that in the vernacular. Packer should be permitted to use these terms.

Finally, Packer will not opine as to 3M's state of mind and corporate conduct. However, testimony about the risk information available to 3M is relevant to Plaintiffs' failure-to-warn claims and should not be excluded.

### b.   *General Causation Opinions.*

3M does not challenge Packer's general causation opinions directly but cites his deposition after stating witnesses reviewed internal documents for the CAEv2 but not certain other devices.[300] This point is illogical. Packer reviewed all of the information available to him—including documents about the CAEv2 and other 3M products.[301] Several of the safer alternatives that Packer proposes are 3M products, so he has reviewed those internal documents.[302] 3M's deposition citation is specific to the Moldex BattlePlug. Packer testified that he evaluated the BattlePlug's effectiveness by reviewing attenuation ratings.[303] 3M offers no sound basis to exclude Packer's opinions about safer alternatives.

---

[300] Def-Mot-57.
[301] PX79(Packer-(General)-2d-Am-Ex-C).
[302] *Id*. at 104-06.
[303] PX80(Packer-Dep-423:5-16).

### c.   *Medical Causation Opinions.*

Packer's specific causation opinions—that the ineffective CAEv2 caused hearing loss and tinnitus in Baker and Estes—are reliably drawn from his differential diagnoses.[304]

A reliable differential diagnosis "rules in" the proposed cause and then "rules out" other potential explanations for the injury. *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1289 (N.D. Fla. 2017). A reliable differential diagnosis "need not rule out all possible alternative causes[.]" *Guinn*, 602 F.3d at 1253.

Packer ruled in the CAEv2 as a potential cause through his general report.[305] Both soldiers' hearing difficulties began when they were using the CAEv2. Baker recalled "a distinct event" in 2006 that caused "severe tinnitus and hearing loss" during urban warfare training.[306] Estes perceived the onset of tinnitus in 2014 while using the CAEv2 on the firing range.[307]

3M's arguments are without merit. As to Baker, 3M asserts that Packer failed to rule out other military noise exposures.[308] But Packer's report shows that he "considered other factors," *Guinn*, 602 F.3d at 1253, including Baker's history with

---

[304] PX60(Packer-(Baker)-27-29; PX61(Packer-(Estes)-20-22).

[305] PX79(Packer-(General)-2d-Am-80-106).

[306] PX60(Packer-(Baker)-12-13).

[307] *Id*. at 20.

[308] Def-Mot-91.

sound in the military.[309] Packer notes Baker used the CAEv2 during all qualifying sessions on various weaponry.[310] Baker used the CAEv2 when deployed to Iraq. Once, he took an earplug out and fired two rounds. Packer's report explains why he ruled out this event as causing Baker's injuries.[311] Notably, Baker had significant hearing loss and tinnitus before he was deployed.[312] Packer also ruled out damage due to continuous noise exposure, based on Baker's asymmetrical hearing loss and other factors.[313]

3M ignores much of Packer's thorough differential diagnosis, which addressed numerous potential causes.[314] Packer examined Baker and reviewed Baker's medical records, corporate documents, and scientific literature, among other materials.[315] Merely reviewing medical records can support a reliable diagnosis. *Fell v. U.S.*, 2017 WL 5992464, at *7-8 (N.D. Fla. July 17, 2017). Here, Packer did that and more.

Packer used the same reliable process with Estes, including the physical examination, document review, and differential diagnosis.[316] Packer discussed and

---

[309] PX60(Packer-(Baker)-12-17).

[310] *Id.* at 15.

[311] *Id.* at 15-16, 28.

[312] *Id.* at 18-19, Ex. D at 2.

[313] PX80(Packer-Dep-534:19-535:7).

[314] PX60(Packer-(Baker)-27-29).

[315] *Id.* at 12, 17.

[316] PX61(Packer-(Estes)-13-14, 19-20).

ruled out familial hearing loss, ototoxic medicines, non-military noise exposures, and military noise exposures while using hearing protection other than the CAEv2.[317]

3M ignores this diagnostic process and twists a point that Packer made when asked about the effectiveness of a different device—that it is important to consider all factors.[318] Packer has fully considered the defects in the CAEv2, as well as the circumstances in which Estes suffered hearing loss.[319] Estes suffered hearing loss while wearing the CAEv2 in 2014.[320] Estes experienced "intense tinnitus" and muffled hearing in his left ear after supervising a session on the firing range.[321] Hearing exams confirm a marked difference in his hearing proficiency from October 2013 to March 2015.[322]

Packer's medical causation opinions are reliable, and 3M's arguments should be addressed on cross-examination.

### d.    *Hidden Hearing Loss.*

Because Baker does not currently suffer from hidden hearing loss ("HHL"), 3M moves to exclude all opinions regarding cochlear synaptopathy and HHL. 3M's

---

[317] *Id.* at 20-22.
[318] PX80(Packer-Dep-428:21-429:8); Def-Mot-91-92.
[319] PX79(Packer-(General)-2d-Am-80-106); PX61(Packer-(Estes)-20, Ex. D at 2); PX80(Packer-Dep-393:6-395:16).
[320] PX61(Packer-(Estes)-20).
[321] *Id.* at Ex. D at 2.
[322] *Id.* at 15.

argument is overbroad and misconstrues Packer's testimony. First, cochlear synaptopathy and HHL are not synonymous. "Cochlear synaptopathy" refers to subcellular intracochlear damage, while HHL describes the observation of this damage although testing is normal.[323] Thus, 3M's use of HHL in place of cochlear synaptopathy is misplaced.

Second, Packer will opine that Baker's current injuries in his right ear result from cochlear synaptopathy, which caused his previous hidden hearing loss.[324] 3M argues only that Baker's injuries do not currently "match the clinical presentation that Packer ascribes to HHL."[325] They provide no reason for this Court to exclude Packer's opinions about Baker's cochlear synaptopathy and previous HHL.

### e.   *Future Prognosis Opinions.*

3M challenges certain prognosis opinions regarding PTSD as to Baker, and dementia as to Baker and Estes. Opinions about future prognoses are admissible if grounded in the facts of the case and the physician's expertise. *See Childress v. Johnson & Johnson*, 2017 WL 6350524, at *3 (S.D.W. Va. Dec. 12, 2017).

---

[323] PX60(Packer-(Baker)-28-29).

[324] *Id*. at 28 (stating "the additional hearing loss which manifest on his 2020 audiogram is a progression of pre-existing damage that was only apparent in the highest frequencies of audiograms obtained while he was on Active Duty").

[325] Def-Mot-114 n.18.

3M's complaints are largely based on semantics. 3M asserts that Packer's PTSD opinion is speculative simply because he uses the word "may."[326] But a future prognosis is inherently uncertain. Packer holds all opinions to a reasonable degree of medical or scientific certainty.[327] His deposition clarified that Baker "is at increased risk … for the noise-induced hearing loss and the tinnitus, potentially exacerbating his now in-remission PTSD[.]"[328]

This opinion is based on Packer's extensive experience and training, his literature review, and Baker's prior PTSD diagnosis.[329] Because the PTSD is in remission,[330] examining cortisol levels now would be pointless.[331]

Regarding other comorbidities, 3M's citation to *Salinero v. Johnson & Johnson*, 2019 WL 7753453, at *7 (S.D. Fla. Sept. 5, 2019), is off-base, as that expert employed "no methodology whatsoever."

Here, Packer opines that Baker and Estes have an increased risk of dementia due to early onset hearing issues.[332] 3M claims these opinions are speculative by parsing Packer's words.[333] Packer's general report cites scientific literature in

---

[326] Def-Mot-124.
[327] *Id.* at 1.
[328] PX80(Packer-Dep-585:12-586:1).
[329] *Id.* at 581:13-582:9, 585:15-20.
[330] *Id.* at 585:23-24.
[331] Def-Mot-133.
[332] PX60(Packer-(Baker)-29); PX61(Packer-(Estes)-22).
[333] Def-Mot-133-34.

explaining the heightened risk of dementia among people with hearing loss.[334] He can reliably testify that Baker and Estes have "a considerable elevation of risk," as demonstrated by studies involving hundreds of thousands of people.[335]

### 3. *Dr. Lawrence Lustig*

#### a. *Attorney "Mouthpiece" Opinions.*

3M labels statements from Lustig's General Report as impermissible "narrative," "legal conclusions," and "state of mind" opinions.

While purporting to argue impermissible "narrative," 3M claims Lustig is "not qualified" to testify as to "defect" or whether the CAEv2 was "appropriately marketed." Notably, 3M mischaracterizes Lustig as a "treating physician." Lustig is a board-certified Otolaryngologist and Neurotologist with extensive experience in noise-induced hearing research, consultation, publication, and treatment.[336] He "has been involved in the design and use of hearing protective devices on a daily basis" throughout his prestigious career.[337] Lustig is not just "minimally qualified" but *eminently* qualified to offer these opinions. *Hendrix*, 255 F.R.D. at 585.

---

[334] PX79(Packer-(General)-2d-Am-40-41).

[335] PX80(Packer-Dep-463:1-15).

[336] PX81(Lustig-(General)-2d-Am-1-5, Ex. A); PX82(Lustig-Dep-Ex-10).

[337] PX83(Lustig-Dep-39:9-11; 39:9-45:1; PX81(Lustig-(General)-2d-Am-1-5, Ex. A).

Lustig routinely fits and recommends HPD for his patients[338] and is involved in the design, fitting, and testing of devices inserted into the ear canal.[339] As to hearing devices, Lustig: serves on medical and surgical advisory committees with a number of manufacturers;[340] provides consultation and research concerning development and proper labeling;[341] provides recommendations to the FDA and CMS on behalf of manufacturers[342]; and oversees a "team of audiologists" that routinely perform REAT testing.[343] His opinions as to ear-canal size are not "speculative," given that he "lives in the ear canal" and is routinely sizing it.[344]

Lustig's methodology is not "speculative" because he has not personally tested the CAEv2.[345] *Hendrix*, 255 F.R.D. at 585 (physical testing is not required for the admission of expert testimony). Lustig permissibly uses his specialized knowledge and experience to analyze all of the available evidence, including corporate documents, testing data, testimony, and scientific literature.[346] *Tillman*, 96

---

[338] PX83(Lustig-Dep-39:14-24).

[339] PX83(Lustig-Dep-40:1-42:15; PX81(Lustig-(General)-2d-Am-3-4).

[340] PX81(Lustig-(General)-2d-Am-3-4).

[341] PX83(Lustig-Dep-72:13-73:8); PX81(Lustig-(General)-2d-Am-3-4).

[342] PX81(Lustig-(General)-2d-Am-3-4).

[343] PX83(Lustig-Dep-79:2-11).

[344] PX83(Lustig-Dep-42:20-43:12).

[345] Citing DX12 and DX13, 3M complains that Lustig ignores certain "favorable testing" from 2012 and 2016. DX12 is contained on Lustig's General Reliance List, contrary to 3M's statement. PX81(Lustig-(General)-Ex-C, at 13) (Michaels & Assoc. Ltr., 3M_MDL000005607-618)). DX13 is an irrelevant 2011 e-mail chain.

[346] PX84(Lustig-Dep-Ex-7).

F. Supp. 3d at 1330. Thus, Lustig does not merely "narrate" the record; he offers reliable and helpful opinions.

Next 3M contends specific terms from Lustig's Report, such as "defect," "negligence," "failure to warn," and "duty," are impermissible "legal conclusions." While an expert cannot tell the jury what result to reach, he may opine as to an "ultimate issue." *Bannon v. GEICO Gen. Ins.*, 743 Fed. App'x 311, 314 (11th Cir. 2018).

Lustig opines 3M's conduct "tracks" various elements of the relevant claims. *Eldridge*, 2020 WL 1076013, at *7. He opines as to problems with the design, fitting, testing, and labeling of the CAEv2, and 3M's conduct regarding the same.[347] Lustig leaves the determination of whether 3M's conduct violates the relevant statutes, regulations, and legal standards to the jury. *Id.*

Finally, 3M states that Lustig impermissibly "suggests" 3M's "state of mind and motivations."[348] Although an expert's testimony cannot provide "[s]ubjective speculation that masquerades" as scientific knowledge, it can support inferences based on knowledge and experience. *King v. Cessna Aircraft Co.,* 2010 WL 1980861, at *6 (S.D. Fla. May 18, 2010) (quoting *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005)). Lustig's opinions concerning what 3M

---

[347] PX81(Lustig-(General)-2d-Am-44-55).
[348] Def-Mot-45.

"knew" and when support relevant inferences concerning Plaintiffs' failure-to-warn claims based on his specialized knowledge, experience, and evidentiary review.

### b.   *Differential Diagnosis.*

3M seeks exclusion of Lustig's specific causation opinions regarding Keefer, arguing that Lustig does not adequately consider "other hearing protection" or Keefer's "early on-set" hearing loss.[349] A properly conducted differential diagnosis must "at least consider other factors that could have been the sole cause of the plaintiff's injury," but it need not expressly "rule out all possible alternative causes." *Guinn*, 602 F.3d at 1252-53.

### i.   *Other Hearing Protection*

3M argues that Keefer's "records repeatedly show that he used quad-flange earplugs." 3M cites two forms.[350] Keefer contrastingly offers two forms documenting "Combat Arms Earplug" usage.[351]

Lustig believes Keefer's "very specific" recollection of his primary CAEv2 use from 2007-2015.[352] Although Lustig "recall[s] notations in some of the audiometric exams that [Keefer] was issued other earplugs," he accepts Keefer's statements that he was provided the "blue quad flanges, [but] he thought they were

---

[349] Def-Mot-89-94.

[350] DX42-44. Notably, DX42 contains records pertaining to Estes and thus does not support 3M's assertion.

[351] PX85(L_C_Keefer-DOD-000004); PX86(L_C_Keefer-DOD-000005).

[352] PX58(Lustig-(Keefer)-1st-Am-9, 13-14); PX83(Lustig-Dep-313:3-24).

cheap and didn't bother to use them."[353] Thus, Lustig clearly considered 3M's cited documents, but credits the ample evidence of Keefer's extensive CAEv2 usage. If there is conflicting evidence, it does not demonstrate an unreliable methodology; it merely creates a jury question. *In re Delta/Airtran Baggage Fee Antitrust Litig.,* 245 F. Supp. 3d 1343, 1361 (N.D. Ga. 2017) (explaining that "so long as the expert relies upon record evidence and identifies the facts on which he relies," the weight given to his testimony is the jury's decision).

### ii.     *Keefer's Pre-Military Audiograms.*

3M argues that Lustig's methodology is unreliable because he has not expressly "ruled out" pre-military "hearing loss." 3M refers to 2001[354] and 2005[355] audiograms that show a "very slight" shift at 8 kHz.[356] Lustig considered these audiograms and ruled them out.[357] He concludes that the 2001 and 2005 audiograms are an "unlikely" indication of pre-military noise-induced hearing loss because of their "configuration."[358] He similarly excludes the audiograms as an indication of

---

[353] PX83(Lustig-Dep-313:3-24).

[354] PX88(L_C_Keefer-001297). This medical record is listed on Lustig's initial reliance list, PX58(Lustig-(Keefer)-Ex. C), although it is not expressly referred to in Lustig's Report. 3M's Keefer Expert Reports similarly exclude discussion of this record, although it is also listed on their initial reliance list. PX89(Jones-LaBorde-(Keefer)-47).

[355] PX90(Lustig-Dep-Ex-30). This record was not produced until November 10, 2020, after Lustig's Keefer Report was served.

[356] PX83(Lustig-Dep-326:8-10).

[357] *Id*. at 324:5-332:14.

[358] *Id*. at 332:3-13.

genetic loss, as "he would expect all hearing frequencies to go down" in that instance.[359] Thus, after considering the 2001 and 2005 audiograms, Lustig concludes the CAEv2 caused Keefer's noise-induced hearing loss.[360] In contrast to the "very slight" shift at 8 kHz in 2001 and 2005, Keefer's "characteristic 'notch' in the 4 kHz range is strongly supportive of noise trauma" during his military service.[361] Accordingly, Lustig's Keefer opinions are reliable.

### 4. *Dr. Christopher Spankovich*

Spankovich is a clinical audiologist, Associate Professor and Vice Chair of Research as The University of Mississippi Medical Center in the Department of Otolaryngology and Communicative Sciences.[362] He teaches undergraduate and graduate level courses covering topics such as tinnitus, audiometry, hearing disorders, and auditory system anatomy and physiology.[363] As a clinical audiologist he often applies differential diagnoses of acquired forms of hearing loss and the evaluation and management of the tinnitus and sound sensitivity patient.[364] His research includes noise-induced pathology and cochlear synaptopathy, and he has

---

[359] *Id.* at 326:8-21.
[360] *Id.* at 329:3-8.
[361] PX87(Lustig-(Keefer)-2d-Am-10).
[362] PX91(Spankovich-(Estes)-1).
[363] *Id.* 2.
[364] *Id.* 3.

contributed to many peer-review publications and written book chapters regarding noise-induced hearing loss, tinnitus, and hearing loss prevention.

Spankovich offers general causation opinions and case-specific opinions as to Estes, Hacker, and Keefer. Spankovich is a well-qualified hearing expert who used a reliable methodology. This Court should reject 3M's challenges.

3M seeks exclusion of Spankovich's specific causation opinions regarding Estes, Hacker and Keefer on the grounds that Spankovich purportedly failed: (i) to consider whether "other hearing devices" provided adequate attenuation;[365] (ii) to rule out "user error";[366] (iii) to consider the hearing loss that Keefer experienced prior to joining the military;[367] and (iv) to rule out Hacker's conductive right-ear hearing loss or history of head trauma as to cause of his tinnitus.[368] Additionally, 3M seeks to exclude case-specific opinions concerning cochlear synaptopathy and "hidden hearing loss" ("HHL") because Spankovich does not opine that Estes, Hacker, or Keefer have HHL.[369] While a differential diagnosis must "at least consider other factors that could have been the sole cause of the plaintiff's injury," Spankovich need not "rule out all possible alternative causes." *Guinn*, 602 F.3d at 1252-53.

---

[365] Def-Mot-89-90.

[366] *Id*. at 90-91.

[367] *Id*. at 94-95.

[368] *Id*. at 95-98.

[369] *Id*. at 112, 115.

3M also seeks to exclude Spankovich's testimony that the CAEv2 is defective as evidenced by documents he considered that were created close in time to when 3M developed the CAEv2, tested the earplug, and introduced it to the military market.[370] All of the above arguments should be rejected.

### a. *Spankovich Considered and Ruled Out Plaintiffs' Use of HPDs Other Than the CAEv2.*

3M's argument that Spankovich "dismisses" and "fails to provide any analysis" of Plaintiffs use of other HPDs (not the CAEv2) during their time in the military ignores the testimony of Estes, Hacker, and Keefer, as well as Spankovich's analysis of why the use of these other HPD likely did not cause Plaintiffs' injuries.

Estes testified that the CAEv2 was his primary HPD between 2009-2015, and that his use of other HPDs during this time period was intermittent.[371] Estes perceived ringing in his ears after wearing the CAEv2 in 2014 and specifically recalled several instances where the CAEv2 loosened in his ear during use.[372] Similarly, Hacker testified that when wearing HPDs between 2003 and 2010, "99.9

---

[370] *Id.* at 34-36.

[371] PX56(Estes-Dep-61:1-14 (foam and triple-flange earplugs used as a "backup" to the CAEv2 in cadet training), 121:25-122:3 (does not recall ever using a quad-flange earplug in the military), 166:9-14 (triple-flanged earplugs worn "sporadically" between 2008 to 2015), 128:3-129:15, 130:18-131:4, 131:15-132:4 (the CAEv2 was Estes' "default" earplug of choice that he wore daily during training exercises and at the shooting range); PX92(Spankovich-Dep-(12/10/20)-226:16-227:2).

[372] PX56(Estes-Dep-195:10-24);   PX92(Spankovich-Dep-(12/10/20)-225:21-228:11, 268:20-18).

percent of the time" it was the CAEv2, and he first noticed and reported his tinnitus in or around 2006.[373] Keefer testified that the CAEv2 was his primary hearing protection device from 2007-2015.[374] In ruling out other HPDs as the cause of Plaintiffs' hearing damage, Spankovich testified that unlike the CAEv2, none of these other HPDs (*e.g.*, foam earplugs, triple flanged, "quad flange" earplugs) have been shown to be defective like the CAEv2.[375]

Contrary to 3M's assertions, Spankovich considered the notations on the military records for Estes, Hacker, and Keefer referencing other HPDs, but gave more weight to these Plaintiffs' sworn testimony concerning their extensive use of the CAEv2.[376] Spankovich "has no obligation to accept" 3M's version of the record "and reject the testimony of his client." *Grantham v. CSX Transp., Inc.*, 2019 WL 2161727, at *6 (S.D. Ga. May 17, 2019). An expert's opinion may not be excluded as unreliable simply because the evidence conflicts, as this merely presents an issue for the jury to address.

---

[373] PX93(Hacker-Dep-115:7-19, 245:8-17).

[374] PX55(Keefer-Dep-208:2-22, 246:3-10).

[375] PX94(Spankovich-Dep-(12/11/20)-29:3-21).

[376]     PX92(Spankovich-Dep-(12/10/20)-274:5-25);     PX94(Spankovich-Dep-(12/11/20)-118:19-120:8),246:22-248:3); PX91(Spankovich-(Estes)-Ex-C); PX95(Spankovich-(Hacker)-Ex-C); PX59(Spankovich-(Keefer)-Ex-C).

b.     ***Spankovich Considered Whether Plaintiffs Properly Used the CAEv2.***

3M's next argument, that Spankovich failed to rule out "user error" on the parts of Estes, Hacker, and Keefer when using the CAEv2, is based on pure speculation. 3M references a single out-of-context statement from Estes that he did "not recall" receiving instructions or training for the CAEv2,[377] but Estes confirmed later in his deposition that he knew how to use the CAEv2 but that he did not recall the "persons that may have instructed" him how to use it.[378] These Plaintiffs' military records do not indicate that they failed to properly use the CAEv2 or other HPDs. In fact, Spankovich credits medical records noting Hacker's "excellent insertion technique," and found nothing in his military records indicating that Hacker was ever reprimanded for not wearing hearing protection (or wearing it incorrectly).[379] *Quiet Tech.*, 326 F.3d at 1345.

c.     ***Spankovich Ruled Out Keefer's Pre-Military Noise Exposure as a Cause of Hearing Loss During His Military Career.***

3M argues that Spankovich's methodology is unreliable because he fails to consider Keefer's pre-military hearing loss.[380] However, Spankovich testified that

---

[377] Def-Mot-91.
[378] PX56(Estes-Dep-148:3-12).
[379] PX95(Spankovich-(Hacker)-9).
[380] Def-Mot-94-95.

he reviewed all audiograms and hearing test data available for Keefer.[381] When questioned about Keefer's pre-military audiograms from 2001[382] and 2005[383] showing "slight" to "mild" hearing loss at 8 kHz, Spankovich confirmed that he considered these records after submitting his expert report on October 9, 2020, and that they did not change the opinions he expressed his in report.[384] Spankovich ruled out that the slight hearing loss Keefer had upon entering the military in 2007 as a cause of his hearing threshold shifts and the onset of tinnitus that he experienced during the course of his military career. Spankovich ruled out Keefer's age (40) "as a contributory factor" that could have worsened his pre-existing hearing loss during his time in the military, and Spankovich ruled out hereditary or genetic hearing loss, supported by Keefer's medical records.[385] The progression of Keefer's hearing loss between 2007 through 2015 is documented in audiograms that show sustained hearing threshold shifts at 2 kHz through 6 kHz in the left ear along with the onset of tinnitus, which Spankovich attributes to noise exposure events that Keefer

---

[381] PX94(Spankovich-Dep-(12/11/2020)-65:6-21); PX59(Spankovich-(Keefer)-6, 8 (Spankovich "considered [] Keefer's military and non-military noise exposure" and evaluated "all known audiological exams, clinical history, [and] exposure history.").
[382] PX96(Spankovich-Dep-(12/11/2020)-Ex-21).
[383] PX97(Spankovich-Dep-(12/11/2020)-Ex-22); PX94(Spankovich-Dep-(12/11/2020)-107:16-21).
[384] PX94(Spankovich-Dep-(12/11/2020)-99:3-100:9,  102:10-21,  106:15-107:7, 108:6-14).
[385] PX94(Spankovich-Dep-(12/11/2020)-177:3-178:4);  PX97(Spankovich-Dep-(12/11/2020)-Ex-22).

experienced while wearing the CAEv2.[386] Even 3M's own experts appear to recognize the irrelevance of these pre-military audiograms.[387] There is no basis to exclude any of Spankovich's opinions on Keefer on the grounds they are unreliable for failure to rule out Keefer's minor pre-military hearing loss.

> **d.    *Spankovich Ruled Out Hacker's Conductive Right-Ear Hearing Loss and Head Trauma as the Cause of His Tinnitus in His Left Ear.***

3M's argument that Spankovich failed to rule out Hacker's conductive right ear hearing loss and history of head trauma as the cause of tinnitus in Hacker's left ear is meritless.[388] Spankovich's report showed he considered the conductive hearing loss in Hacker's right ear in his evaluation.[389]

The onset of Hacker's bilateral tinnitus was 2006.[390] 3M speculates it is "possible" Hacker does not have tinnitus in his left-ear because tinnitus can be difficult to localize. However, Spankovich cites Hacker's medical records and testimony to demonstrate Hacker has tinnitus in his left ear that originated from noise exposure while in the military.[391] *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517,

---

[386] PX59(Spankovich-(Keefer)-4-6).

[387] PX89(Jones-LaBorde-(Keefer)).

[388] Def-Mot-95-98.

[389] PX95(Spankovich-(Hacker)-5-7, 10, 12).

[390] PX94(Spankovich-Dep-(12/11/2020)-200:5-17); PX98(Spankovich-Dep-(12/11/2020)-Ex. 56); PX93(Hacker-Dep-130:6-20).

[391]   PX94(Spankovich-Dep-(12/11/2020)-261:2-20) ("It would be unlikely for [Hacker] to have tinnitus in his left ear due to a unilateral hearing loss [in his right ear] of a conductive nature."). While Spankovich testified that patients *can* have

529 (6th Cir. 2008). The VA found Hacker's tinnitus was "[a]t least as likely as not (50% probability or greater) caused by or a result of military noise exposure."[392] When Hacker was examined by 3M's experts, they found reduced otoacoustic emissions in frequencies where he had otherwise "normal hearing sensitivity" (based on audiograms), which also supports existence of tinnitus in Hacker's left ear.[393] Spankovich considered Hacker's "mixed" history of reporting his tinnitus to medical providers and determined that this was to be expected as tinnitus symptoms are not always "constant."[394]

Nor does Spankovich "dismiss" Hacker's history of "head trauma."[395] Spankovich evaluated each occurrence of "trauma" and investigated whether Hacker experienced the onset of hearing loss or tinnitus in the aftermath of these events.[396]

---

trouble localizing tinnitus, he also testified that that is not the case here, where Hacker has consistently reported tinnitus in his left ear. *See* PX98(Spankovich-Dep-(12/11/2020)-Ex. 56) ("Ringing in the ears occurring in both ears[.]"); PX99(Spankovich-Dep-(12/11/2020)-Ex-60 at 2) ("Bilateral intermittent tinnitus").

[392] PX100(Hacker-Dep-Ex-38 at 5); PX101(Spankovich-Dep-(12/11/2020)-Ex-40, at -50) ("Service connection for tinnitus (claimed as ringing in ears) has been established as directly related to military service").

[393] PX94(Spankovich-Dep-(12/11/2020)-206:12-208:20) ("Tinnitus is an outcome of some type of peripheral change to the auditory pathway, and that is what is related to the central compensatory process that occurs that has resulted in Mr. Hacker's tinnitus perception. And that's--the data from 3M helps to support that."); PX102(House-(Hacker)-7).

[394] PX94(Spankovich-Dep-(12/11/2020)-184:11-185:12).

[395] Def-Mot-98.

[396] PX95(Spankovich-(Hacker)-8-9); PX94(Spankovich-Dep-(12/11/2020)-97:9-13) ("The critical thing for all of these different things that can cause a tinnitus

Hacker did not.[397] Almost all of these occurrences were minor incidents.[398] The Court should therefore reject 3M's request to exclude Spankovich's opinions on these issues as unreliable.

>    **e.    3M Confuses Spankovich's Opinions Concerning Cochlear Synaptopathy and Hidden Hearing Loss.**

Spankovich does not offer the opinion that Estes, Hacker, and Keefer currently have HHL, so there is nothing for the Court to exclude in that regard. All three Plaintiffs have observable hearing loss, as shown in pure tone audiograms, otoacoustic emissions testing, and ultra-high frequency testing.

3M's argument that Spankovich "disavowed" opining as to the existence of cochlear synaptopathy in these Plaintiffs is false. Cochlear synaptopathy and HHL are not synonymous. "Cochlear synaptopathy" refers to subcellular intracochlear damage, while HHL describes the inability to observe this damage using traditional testing methods like pure-tone audiometry. Spankovich confirmed during his deposition that elevated pure tone hearing thresholds (like those present with these three Plaintiffs) indicate that, more likely than not, synaptopathy is present.[399] The

---

percept is the timing of the events, what is corresponding to the onset of the tinnitus, is it relative to a noise event?").

[397] *Id.* at 267:23-268:6, 268:25-270:8.

[398] *Id.*

[399] PX92(Spankovich-Dep-(12/10/2020)-129:15-24) (because Estes had evidence of elevated thresholds "we don't necessarily need to rule in that there is evidence of synaptopathy. More than likely, again, noise creates synaptopathy."); *id.* at 130:10-21 ("it is now an accepted pathology of noise that noise creates damage at the level

Court should reject 3M's request to exclude Spankovich's opinions about these Plaintiffs' cochlear synaptopathy and previous HHL.

**f.      *Spankovich Properly Considered That the CAEv2 Was Defective.***

3M argues Spankovich simply "narrates" 3M documents showing the defective nature of the CAEv2.[400] But an expert may "articulate the 'factual underpinning' upon which he bases his opinion." *Ohio State Troopers Ass'n, Inc.*, 2020 WL 1666763, at *15. Spankovich should be permitted to cite 3M documents that form the basis for his opinions. *See id.* at *15.

3M's argument that Spankovich lacks the expertise to conclude that the CAEv2 is defective is also incorrect. Spankovich testified that the CAEv2's design defects "would affect the attenuation that the product provided and therefore, increase the risk for noise-induced pathology related to noise events occurred during utilization of that device."[401] As a clinical audiologist, Spankovich has experience advising patients on the use and selection of HPDs, and fitting patients with HPDs.[402] Spankovich communicates to his patients that having a good fit and seal with an

---

of the synapse as well as can create damage at the level of the hair cells."); *id.* at 131:3-132:3 (synaptopathy is "going to be something that has incurred in every individual that has noise-induced pathology. They are going to have some level of synaptopathy that is also incurred.").

[400] Def-Mot-29, 34-35.

[401] PX92(Spankovich-Dep-(12/10/2020)-198:4-18).

[402] *Id.* 158:21-161:18; 162:11-164:7.

earplug is necessary to achieve levels of hearing protection sufficient to protect against noise induced hearing loss and tinnitus. Thus, he is qualified to provide testimony on the CAEv2's design defects. *Hendrix*, 255 F.R.D. at 585. Crediting the defects documented by 3M's own expert and former employee Elliott Berger in the flange report, Spankovich opines that such defects can "significantly limit attenuation due to improper fit and seal and result in permanent sensorineural hearing loss and tinnitus."[403]

### 5.   *Dr. Marc Fagelson*

Fagelson is an audiologist with "more than 25 years of [clinical] experience," in "interpreting audiologic test results, [and] managing and monitoring patients with [audiologic] conditions."[404] He treated patients at the VA "in a specialty Tinnitus clinic housed in the Audiology section,"[405] and is currently an audiology professor.[406] Fagelson proffers general opinions about audiology and case-specific opinions for McCombs.[407] In his general report, Fagelson opines on the causes, effects, and symptoms of auditory injuries and noise-induced tinnitus. He proffers

---

[403] PX91(Spankovich-(Estes)-12).

[404] PX103(Fagelson-(General)-2d-Am-2).

[405] *Id.*

[406] *Id.* at 1.

[407] *See* PX103(Fagelson-(General)-2d-Am-1,5-23); PX104(Fagelson-(McCombs)-1st-Am-1,8-15); PX105(Fagelson-Dep-17:5-10).

two primary opinions for McCombs: (1) the CAEv2 caused McCombs' tinnitus; and (2) McCombs' tinnitus exacerbates his PTSD and sleep disorder.[408]

3M's motion focused on Fagelson's case-specific opinions[409] and requires the Court to decide whether (1) a differential diagnosis provides a reliable basis to opine on the cause of McCombs' tinnitus, (2) Fagelson supports his hidden hearing loss ("HHL") opinions with a reliable basis, and (3) *Daubert* permits Fagelson to testify about medical records that form part of the factual basis for his tinnitus opinions.

### a.   *Fagelson Conducted a Reliable Differential Diagnosis.*

As 3M acknowledges, Fagelson used a differential diagnosis to reach opinions about the cause of McCombs' tinnitus.[410] "[Fagelson] 'ruled in' potential causes of the injury, then 'ruled out' the least likely causes in order to arrive at the most likely cause."[411] 3M does *not* challenge whether a differential diagnosis is a reliable methodology.[412] Rather, 3M challenges the ***facts*** Fagelson considered in his differential diagnosis for McCombs.[413] 3M claims Fagelson failed to consider and rule out two alternative causes for McCombs' tinnitus: (1) specific "other" types of

---

[408] PX104(Fagelson-(McCombs)-1st-Am-8).

[409] Def-Mot-93-94, 116-123.

[410] Def-Mot-89, 93; PX104(Fagelson-(McCombs)-1st-Am-8) (using a "differential diagnosis…")).

[411] *Id.* at 8.

[412] *See id.*

[413] Def-Mot-93.

HPD's worn by McCombs, and (2) exposure to machine gun fire with unknown or no HPDs.[414] 3M's argument fails for two reasons.

First, 3M's argument is factually untrue. Among at least six potential causes ruled in to begin his differential diagnosis,[415] Fagelson considered both alternative causes that 3M claims were omitted.[416] Fagelson "considered Mr. McCombs' use of…[HPD] other than the CAEv2 during his military service as a potential cause of his tinnitus and related injuries."[417] Fagelson also "considered Mr. McCombs' noise exposure during his military service as a potential cause of his tinnitus and related injuries,"[418] which included exposure to "500 rounds" of "machine gun" fire on average "each of the 12 times he engaged the enemy during his deployment in Afghanistan."[419] Fagelson then ruled out each of these possible causes.[420] His report proves 3M misrepresented the facts underlying his differential diagnosis.

Second, even if 3M's motion was factually true, attacks against "the factual underpinnings of [Fagelson's differential diagnosis] go to the weight and credibility of his testimony, not to its admissibility." *Sorrels*, 796 F.3d at 1285. Although 3M claims McCombs wore other HPDs and was exposed to machine gun fire while

---

[414] *Id.*
[415] *Id.* at 9-10.
[416] *Id.* at 9-11.
[417] *Id.* at 10 (emphasis added).
[418] *Id.*
[419] *Id.* at 6.
[420] *Id.* 9-11.

wearing unknown or no HPDs,[421] both claims are materially controverted by McCombs, who testified he does not recall wearing single-flange, triple-flange, or quad-flange HPDs.[422] McCombs also testified that he always wore hearing protection during combat when exposed to noise and used the CAEv2 almost exclusively during his military service.[423] McCombs' testimony precludes exclusion: "to the extent [the expert's] opinion relies upon any such disputed fact[s], his opinion will be subject to cross-examination," not exclusion. *Syngenta Seeds, Inc.*, 2014 WL 1478846, at *2.

Even if Fagelson omitted these disputed facts from his differential diagnosis, 3M's argument challenges the factual predicates he relied on. But 3M's challenge against the factual predicates "is not a reason to exclude [Fagelson]'s testimony as unreliable." *Fell*, 2017 WL 5992464, at *6. As this issue is appropriately addressed on cross-examination, 3M's motion should be denied.

---

[421] Def-Mot-93.

[422] *See* PX57(McCombs-Dep-241:20-242:6,247:8-248:21,252:23-255:5).

[423] *Id.* 216:5-10, 220:4-17, 268:18-269:21, 270:5-13, 287:3-7.

**b.** ***Fagelson's HHL Opinions Are Supported with a Reliable Basis.***

**i.** ***Fagelson's HHL Opinions Rely on Scientific Studies on Humans.***

3M challenged Fagelson's HHL opinions because he failed to support his opinions with scientific literature on humans.[424] Fagelson testified he inadvertently omitted citations to scientific literature to support his HHL opinions.[425] Fagelson cured the omission during his deposition, listing the following scientific literature that supports his HHL opinions:[426]

- Maison et al., *Efferent Feedback Minimizes Cochlear Neuropathy from Moderate Noise Exposure*, 33(13) J. NEUROSCI. 5542–52 (2013) (showing patient's processing when exposed to excessive noise appears to be degraded far more than would be predicted from puretone audiometric results);[427]

- M. Charles Liberman & Sharon G. Kujawa, *Cochlear synaptopathy in acquired sensorineural hearing loss: Manifestations and mechanisms*, 349 HEAR. RES. 138–47 (2017);[428]

- Sharon G. Kujawa & M. Charles Liberman, *Synaptopathy in noise-exposed aging cochlea: Primal neural degeneration in acquired sensorineural hearing loss*, HEAR. RES. (2015) (showing synaptopathy is hidden from standard testing protocols, even though there is noise-

---

[424] Def-Mot-116-118. Fagelson's testimony shows synaptopathy is synonymous with HHL: "hidden hearing loss is another word for synaptopathy." PX105(Fagelson-Dep-356:15-20).

[425] PX105(Fagelson-Dep-360:8-13, 430:22-432:1).

[426] *Id.* 432:12-433:12, 433:19-434:11, 435:15-436:18.

[427] Attached as PX106.

[428] Attached as PX107.

induced damage to the ear that affects hearing in noisy backgrounds and loudness perception);[429] and

- Wu et al., *Age-Related Hearing Loss Is Dominated by Damage to Inner Ear Sensory Cells, Not the Cellular Battery That Powers Them*, 40(33) J. NEUROSCI. 6357–66 (2020) (showing difficulty in ascertaining synaptopathy in humans).[430]

Because Fagelson supported his HHL opinions with scientific literature applicable to humans, Fagelson supported the opinions with a reliable basis. *See In re Abilify (Aripiprazole) Prods. Liab. Litig*, 299 F. Supp. 3d at 1332; *In re Seroquel Prods. Liab. Litig.*, 2009 WL 3806435, at *10 (M.D. Fla. June 23, 2009). Additionally, the animal studies Fagelson cited provide a reliable basis for his HHL opinions because he explained how the studies can be extrapolated to humans in his deposition.[431] *In re Abilify (Aripiprazole) Prods. Liab. Litig*, 299 F. Supp. 3d at 1310 ("[W]hile animal studies may lend support to a general causation opinion, an expert must explain how and why the studies can be reliably extrapolated to prove comparable effects in humans.").

Fagelson supported his HHL opinions with scientific literature on humans and provided an explanation for how animal studies can be reliably extrapolated to humans. Therefore, Fagelson's HHL opinion is admissible.

---

[429] Attached as PX108.
[430] Attached as PX109.
[431] PX105(Fagelson-Dep-375:18-377:5).

### ii. Courts in the Eleventh Circuit Permit Causation Testimony Using "Consistent With" Language.

3M argues Fagelson's HHL conclusion is unhelpful because he can only opine that McCombs' symptoms are "consistent with" HHL.[432] However, courts in the Eleventh Circuit routinely allow experts to opine on whether a plaintiff's injury is "consistent with" a particular condition or theory. *Hendrix*, 255 F.R.D. at 592, a*ff'd sub nom. Hendrix v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010) (allowing testimony about theory "consistent with" injury); *Kinney v. Mack Trucks, Inc.*, 2012 WL 12871204, at *3 (N.D. Fla. May 14, 2012); *Stern v. NCL (Bahamas) Ltd.*, 2020 WL 6820877, at *4-5 (S.D. Fla. Sept. 28, 2020). Accordingly, Fagelson may opine that McCombs' symptoms are "consistent with" HHL.

Contrary to 3M's challenge,[433] Fagelson used reliable methodology in rendering his HHL opinions: he relied on scientific literature, McCombs' medical records and reports, and McCombs' answers to intake questionnaires to reach his HHL opinions.[434] Fagelson used a reliable methodology to reach his HHL opinions because he based the opinions on McCombs' symptoms and scientific literature. *Thibault v. White*, 2017 WL 1902173, at *6 (N.D. Fla. Jan. 18, 2017).

---

[432] Def-Mot-118-120.
[433] Def-Mot-120-21.
[434] PX105(Fagelson-Dep-400:14-18, 403:14-18).

Because Fagelson employs a reliable methodology for his HHL opinions and the Eleventh Circuit permits expert testimony on the conditions "consistent with" McCombs' symptoms, the HHL opinions are admissible.

### c. *Fagelson Has Sufficient Qualifications to Opine on PTSD and Sleep Disorders.*

Experts may testify about and explain the bases for their opinions. *McKinnond v. Lesco Products, Inc.*, 2010 WL 8266581, at *4 (S.D. Fla. June 2, 2010). An expert may rely on and testify about a medical record if the expert relied on it in forming an opinion. *Geyer v. NCL (Bahamas) Ltd.*, 203 F. Supp. 3d 1212, 1216 (S.D. Fla. 2016); *Stern*, 2020 WL 6820877, at *4-5.

3M argues Fagelson cannot testify about PTSD or sleep disorders because he lacks the qualifications to diagnose PTSD or sleep disorders.[435] Fagelson did not and will not proffer opinions diagnosing McCombs with PTSD or a sleep disorder.[436] Rather, Fagelson opined on tinnitus, and the effects of tinnitus on patients—like McCombs—who have been diagnosed with PTSD or a sleep disorder.[437] As the *factual* basis for his opinions about the effects of tinnitus on McCombs' medical conditions, Fagelson relies on the medical records from McCombs' doctors who

---

[435] Def-Mot-122-23.
[436] PX105(Fagelson-Dep-404:11-15).
[437] PX104(Fagelson-(McCombs)-1st-Am-8).

diagnosed McCombs with PTSD and a sleep disorder.[438] Fagelson may testify about McCombs' PTSD and sleep disorder diagnoses to explain the basis for his opinions on the effects of tinnitus on these medical conditions. *Geyer*, 203 F. Supp. 3d at 1216; *McKinnond*, 2010 WL 8266581, at *4. To the extent 3M's motion seeks to exclude testimony about the factual basis for Fagelson's tinnitus opinions, this Court should deny the motion.

### 6.    *Dr. Eric Bielefeld*

#### a.    *3M's "Mouthpiece" Argument Should Be Rejected.*

3M asserts Bielefeld "narrate[s] the factual record" and relies only on documentary evidence to support his opinion that the CAEv2 is defective.[439] However, Bielefeld's CAEv2 opinions have multiple bases, including scientific literature, materials considered in forming his opinions (including internal 3M documents),[440] and his education, training, and experience in hearing science and audiology.[441] It is fundamental that the bases of an expert's opinions are relevant. Fed. R. Evid. 702(b). An expert witness must provide the facts or data considered when forming opinions. Fed. R. Civ. P. 26(a)(2)(B). That Bielefeld based his CAEv2

---

[438] *See* PX105(Fagelson-Dep-300:1-15); PX104(Fagelson-(McCombs)-1st-Am-7-9) (relying on McCombs' "medical records" as the factual basis for McCombs' medical conditions and relying on McCombs' "medical records and service records" to opine on McCombs' tinnitus).

[439] Def-Mot-29, 31-32.

[440] PX110(Bielefeld-Ex. C).

[441] PX110(Bielefeld-1-5, Ex. A).

opinions, in part, on 3M internal documents does not render these opinions inadmissible. Any disagreement by 3M to the foregoing should be addressed in its motions *in limine* or at trial.

Further, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). "An expert may testify as to his opinion on an ultimate issue of fact." *Montgomery v. Aetna Cas. & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). "The Eleventh Circuit has held that '[t]o be admissible under Rule 704, an expert's opinion on an ultimate issue must be helpful to the jury and also must be based on adequately explored legal criteria.'" *Meneely v. Denman Tire Corp.*, 1995 WL 902213, at *7 (N.D. Fla. July 20, 1995). An expert may not, however, "merely tell the jury what result to reach." *Id*.

Bielefeld does not offer inadmissible legal conclusions or instruct the jury on what result to reach. Bielefeld offers factual opinions: (1) 3M's failure to test the CAEv2 placed users at an unreasonable risk of harm; (2) CAEv2 users were potentially not receiving the expected and needed level of hearing protection; and (3) CAEv2 users did not receive clear instructions and warnings.[442] Bielefeld bases these opinions on the materials he considered in forming his opinions and his training and experience.[443]

---

[442] PX110(Bielefeld-69-71).

[443] *Id*. at Ex. C.

As a hearing scientist, Bielefeld knows the importance of testing HPDs, knowing an HPDs' attenuation value, and instructing users on how to use HPDs.[444] Bielefeld's opinions about the CAEv2's development, testing, efficacy, and warnings and instructions will assist the trier of fact in understanding the evidence and fact issues, since these topics are beyond the understanding of laypersons. The Court should reject 3M's challenge to Bielefeld's CAEv2 testing, efficacy, and warning opinions.

> **b.**   ***Bielefeld's Synaptopathy, or Hidden Hearing Loss (HHL), Opinions Are Admissible.***

General causation "focuses on whether a mechanism or event is 'generally capable of causing' the type of harm alleged by the plaintiff." *Navelski*, 244 F. Supp. 3d at 1289. Bielefeld offers general, not specific, causation opinions about whether synaptopathy is "generally capable" of causing Plaintiffs' injuries. Bielefeld's synaptopathy opinions are admissible.[445]

First, Bielefeld is qualified to offer the general causation opinions in his report. *Id.* at 1286. He holds a Ph.D. in Communicative Disorders and Sciences and has spent 15 years as a research scientist in communicative disorders, 15 years as a professor in speech and hearing science, and 6 years as a clinical audiologist.[446]

---

[444] *Id*. at 10, 42, 53, 60-66.

[445] *Id*. at 45-47, 55-58; PX15(Bielefeld-Dep-64:8-65:21, 231:20-236:2, 449:23-477:21).

[446] PX110(Bielefeld-1-5, Ex. A).

Bielefeld has editorial and peer-review experience with reputable hearing science journals.[447] Therefore, Bielefeld's synaptopathy opinions are within his expertise.

Second, he bases his general causation opinions on "scientific literature, [his] education, training, experience, discussions with peers, and [his] own scientific studies and research in the field of audiology," which includes publications on sensorineural hearing loss.[448] He "arrived at these opinions after review of the aforementioned materials and critical evaluation and analysis of the body of relevant evidence."[449] Thus, Bielefeld supports his synaptopathy opinions with a reliable methodology. *Frazier,* 387 F.3d at 1260.

Third, Bielefeld's synaptopathy opinions are helpful because they help the jury understand the evidence and fact issues, including (1) "the difficulty patients with NIHL [including Plaintiffs] have with hearing speech in competing background noise" even in the absence of an audiogram threshold shift and (2) the sequelae of synaptopathy injury.[450] Bielefeld testified about the process of synapse injury, clinical presentation of synaptopathy, and synaptopathy's "wide acceptance" in otolaryngology and audiology."[451] His synaptopathy opinions encompass permanence of injury and treatment for patients and, therefore, are relevant to

---

[447] *Id.* at 5.

[448] *Id.* at 5-6.

[449] *Id.*

[450] PX110(Bielefeld-45-47); PX15(Bielefeld-Dep-449:23-477:21).

[451] PX15(Bielefeld-Dep-472:8-17); *id.* at 449:23-477:21.

Plaintiffs' claims for damages.[452] Accordingly, Bielefeld's general causation opinions on synaptopathy or HHL are admissible.

### c.   *Bielefeld's Employment Rate, Earning Capacity, Mental Health, and Dementia Opinions Are Admissible.*

### i.   *Bielefeld Is Qualified.*

As a clinician and researcher with a Ph.D. in Communicative Disorders and Sciences, Bielefeld understands hearing loss sequelae, including social isolation or withdrawal, increased stress and decreased quality of life.[453] His education and experience qualify him to opine on NIHL's consequences: lower employment rates, psychological distress and loneliness, and dementia predisposition.[454] Accordingly, Bielefeld's opinions regarding NIHL's consequences are within his expertise. *Hendrix*, 255 F.R.D. at 585; *Furmanite America, Inc.*, 506 F. Supp. 2d at 1129.

### ii.   *Bielefeld's Methodology Is Reliable.*

Bielefeld bases his opinions on "scientific literature, [his] education, training, experience, discussions with peers, and [his] own scientific studies and research in the field of audiology."[455] He "arrived at these opinions after review of the aforementioned materials and critical evaluation and analysis of the body of relevant

---

[452] *Id*. at 474:15-482:3.
[453]   PX110(Bielefeld-1-5,   Ex.   A);   PX15(Bielefeld-Dep-483:15-490:7,   496:4-498:18).
[454] PX110(Bielefeld-56-57).
[455] *Id*. at 5-6.

evidence."[456] This methodology is the same methodology he uses as a hearing scientist.[457] Bielefeld opines that the consequences of NIHL extend beyond difficulty hearing or discerning speech in noise.[458] The consequences of NIHL are relevant to understanding the patient's injury, since NIHL "manifest[s] itself in these downstream consequences" within the "larger spectrum of both sensory and mental health processes."[459] Bielefeld's experience attests to social isolation or withdrawal resulting from NIHL.[460] He supports his opinions with scientific studies regarding the interplay between NIHL and employability, earning capacity, mental health and dementia predisposition.[461] Bielefeld relies on these studies to support his opinion that NIHL is preventable.[462]

3M argues these studies cited by Bielefeld "do not provide a reliable basis for his opinion" and "only relate to correlation, not causation."[463] 3M criticizes Bielefeld's cited studies for acknowledging limitations or stating further research was warranted.[464] But "[t]he identification of [] flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Quiet Tech.*, 326 F.3d at 1345.

---

[456] *Id.*

[457] *Id.*

[458] *Id.* at 56-57.

[459] PX15(Bielefeld-Dep-496:4-497:22); PX110(Bielefeld-56-57).

[460] PX15(Bielefeld-Dep-483:15-490:7).

[461] PX110(Bielefeld-56-57).

[462] PX15(Bielefeld-Dep-497:23-499:6).

[463] Def-Mot-128-132.

[464] *Id.*

"[I]n most cases, objections to the inadequacies of a study [go] to the weight of the evidence rather than its admissibility.'" *Id*. Bielefeld's opinions on NIHL's consequences have multiple bases: his education, experience, training, and scientific research. 3M's objection to Bielefeld's cited studies goes to the weight, not the admissibility, of his opinions regarding NIHL's consequences.

Defendant argues Bielefeld fails to "provide any explanation or analysis as to why his opinions are accurate."[465] However, Bielefeld explains his opinions on NIHL's consequences within the context of damages associated with NIHL.[466] 3M's focus on the accuracy of Bielefeld's opinions is misplaced. "The focus ... must be solely on principles and methodology[.]" *Daubert*, 509 U.S. at 595. Therefore, Bielefeld's opinions on NIHL's consequences are reliable.

### iii.    *Bielefeld's Opinions Are Helpful.*

Bielefeld's opinion regarding NIHL's consequences will help the jury understand damages caused by NIHL. Bielefeld testified that associations between NIHL and employability, earning capacity, mental health and dementia predisposition may be understood as "risk factors."[467] Bielefeld further explains NIHL is preventable through hearing conservation measures, which is relevant to Plaintiffs' arguments that NIHL is preventable and a reasonable alternative design

---

[465] Def-Mot-127.
[466] *Id*. at 55-60.
[467] PX15(Bielefeld-Dep-496:4-504:8).

to the CAEv2 could have prevented Plaintiffs' NIHL. Thus, Bielefeld's opinions regarding NIHL's consequences are helpful and 3M's motion should be denied.

### 7.   *Adm. Althea Coetzee Leslie*

#### a.   *3M Mischaracterizes Admiral Leslie's Opinions and Reliance Materials.*

3M mischaracterizes Leslie's opinions in two ways: (1) by wrongly asserting that she opines "the CAEv2 is defective simply by reviewing the Flange Memo"[468] and (2) by painting her as a scientific expert without qualifications proffering opinions regarding testing and design of hearing protection.[469] Leslie is not proffered for these points but as a procurement specialist, which is within her expertise.[470] Her opinions are threefold: (1) the CAEv2 failed to meet the required salient characteristics, (2) 3M knew that the CAEv2 failed to meet the salient characteristics and hid this from the DoD, and (3) DoD regulations required 3M to provide hearing protection that met the salient characteristics, but it failed to do so.[471]

---

[468] Def-Mot-32. Leslie concludes that the CAEv2 failed to meet the performance required by the contract (MPID) and the earlier-issued NSN based on her review of procurement records and Aearo's own documentation of (a) the CAEv2's performance and (b) Aearo's lack of conformity with its manufacturing specifications (*i.e.*, the waivers evidence). PX111(Leslie-2-10, Secs. III-VIII); PX112(Leslie-Dep-192:20-193:3, 254:16-255:10). These bases show why Aearo's knowledge that the CAEv2 did not perform as required by the procurement – *and was defective for that reason alone*, the witness explains, PX112(Leslie-Dep-192:20-193:18), is an extremely helpful element of Leslie's opinion.

[469] Def-Mot-32.

[470] PX111(Leslie-1-2).

[471] PX111(Leslie-2); PX112(Leslie-Dep-337:12-338:10).

3M does not challenge Leslie's qualifications in acquisition or procurement. Having served for more than three decades as a Naval officer responsible for procuring materiel,[472] she is familiar with what the DoD "expects" from a supplier and what a regulation may mandate from a supplier.[473] Leslie's experience began in 1985 when she was commissioned as a Naval officer and culminated in 2017 when she retired as Chief of Staff to the Under Secretary of Defense for Acquisition, Technology & Logistics.[474] Her Naval assignments centered around contracting, acquisition, and logistics, ultimately earning her Level III Contracting certification (highest level).[475] While much of her opinion is based upon this experience, she supplemented it with her thorough review of evidence.[476] She studied complex documents such as the National Stock Number (NSN) justification memo,[477] the MPID's salient characteristic requirements,[478] and the DLA contract.[479] She explains how DLA compiled the salient performance characteristics and the rule applying to them in the Code of Federal Regulations.[480]

---

[472] PX111(Leslie-1); PX112(Leslie-Dep-29:10-14; 44:15-57:23; 60:23-72:7).

[473] PX112(Leslie-Dep-86:22-87:17; 89:4-12; 110:8-111:5; 133:3-134:11).

[474] PX111(Leslie-1); PX112(Leslie-Dep-29:10-14; 44:15-57:23; 60:23-72:7).

[475] PX111(Leslie-1).

[476] *Id*. at 2-10.

[477] PX112(Leslie-Dep-155:11-18).

[478] *Id*. at 188:12-22; 189:18-190:13; 204:3-208:13; 224:4-227:22.

[479] *Id*. at 136:20-139:14.

[480] *Id*. at 133:3-17, 135:13-136:14); PX111(Leslie-5).

While Leslie opines that one failure by 3M is to meet the required salient characteristic of appropriate acoustical testing,[481] it is inaccurate to state that she needs a complete scientific understanding of how hearing protection and testing works.[482] Her opinions are not within the gamut of an acoustical testing expert, but align with an acquisition and procurement expert like her. Just as any effective procurement specialist would do, Leslie compared the required salient characteristics to what 3M sold the DoD.[483] Leslie did not need the details of how the testing worked as she "was looking at it strictly from the contracting perspective of requirements and what was actually delivered."[484] Thus, her opinions are admissible. *U.S. ex rel. Howard v. Lockheed Martin Corp.*, 2014 WL 1233081, at *7 (S.D. Ohio Mar. 25, 2014); *Evans v. John Crane, Inc.*, 2019 WL 5457101, at *8 (D. Del. Oct. 24, 2019).

> **b.      *Leslie Does Not Summarize Facts or Impermissibly Narrate Evidence.***

Leslie relates what she learned of the CAEv2's passage through the DoD procurement process to (1) her specialized procurement experience and (2) her opinions. Those are permissible uses of the facts. *Pledger v. Reliance Tr. Co.*, 2019

---

[481] PX111(Leslie-8-9).

[482] Def-Mot-32-33 ("Coetzee is unqualified to offer these opinions… she has no experience with acoustical resistance testing, or with HPDs in general.").

[483] PX112(Leslie-Dep-207:12-208:16).

[484] *Id.* at 225:8-19; *id.* 86:3-11.

WL 4439606, at *11-13 (N.D. Ga. Feb. 25, 2019); *In re Welding Fume Prods. Liab. Litig.*, 2010 WL 7699456, at *41 (N.D. Ohio June 4, 2010) .

> **c.** **Leslie's Opinions Are Not Inadmissible Legal Conclusions.**

3M asserts that "Coetzee wrongly opines as to contract interpretation."[485] This misstates the rule of law. Unlike the rationale for the holdings in the cases cited by 3M, Leslie does not offer legal conclusions about an ultimate issue for the jury.

Leslie's role is to provide insight into the complicated process by which the DoD procured the CAEv2,[486] and how 3M failed to comply with the DoD's obligations.[487] She describes an intricate, almost two-decade relationship between the DoD and 3M, along with the regulations and contractual obligations that governed that relationship.[488] Leslie will not opine on the ultimate issue in this case—whether the CAEv2 was the legal cause of injuries to Plaintiffs.

Leslie's opinions are helpful because they offer insight into the dealings and obligations between the DoD and 3M which is "beyond the understanding and experience of the average citizen." *U.S. v. Rouco,* 765 F.2d 983, 995 (11th Cir. 1985). The DoD's procurement of the CAEv2 presents a web of confusing rules,

---

[485] Def-Mot-38.
[486] PX111(Leslie-3-6).
[487] PX111(Leslie-7-10); *Cason*, 2015 WL 9913809, at *12.
[488]  PX111(Leslie-3-6);  PX112(Leslie-Dep-86:22-87:17;  89:4-12;  110:8-111:5; 133:3-134:11).

regulations, and terminology. Here, the jury needs a procurement expert to explain the web of contacts, procurements, and regulations governing the CAEv2 procurement. The jury needs to know the obligations imposed on 3M and it needs to know how and why 3M fell short of these obligations.

### d. *Leslie Is Not Offering Inadmissible "State of Mind" Testimony.*

3M asserts Leslie's report contains inadmissible state of mind testimony.[489] 3M is wrong. First, opinions by Leslie that the DoD relied on 3M to provide what was required under the applicable regulations are within her area of expertise as a procurement expert and are distinguishable from the cases cited by 3M. Leslie knows what is expected when the DoD acquires materiel.[490] This is not mere guesswork for her; she performed these roles while serving in the Navy.[491] Second, the cases cited by 3M either do not hold what 3M says they hold or are so dissimilar from the instant case that their holdings are inapplicable. Leslie is unquestionably qualified to render opinions concerning what the DoD required and expected from 3M regarding the CAEv2, and this testimony is not only reliable from someone like Leslie who served in this type of role—it will be helpful to the jury. The jury should be told not only the *fact* that 3M failed to comply with government rules and

---

[489] Def-Mot-44.
[490] PX111(Leslie-3-4).
[491] *Id*. at 1.

regulations on the CAEv2s, but *how* it happened, *how* it should have been done, and *what* the government was entitled to receive.

3M complains that Leslie offers state of mind opinions that 3M was "aware" of problems with the CAEv2.[492] Generally, when an expert opines about the state of mind of another, such an opinion raises an issue of reliability. At the heart of the cases cited by 3M prohibiting state of mind expert testimony is that the "state of mind" is in dispute, and the state of mind opinion of the expert is vigorously contested by the other party. In the cases 3M cites, the state of mind issue in dispute bears directly on the ultimate issue in the case.

The distinction here, which renders Leslie's opinions admissible, is that all her opinions about 3M's state of mind are supported by deposition testimony or exhibits and are not in dispute. Leslie supports her opinions with citations to the record proving 3M had knowledge or was aware of various issues with CAEv2. *See In re E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 348 F. Supp. 3d 698, 719 (S.D. Ohio 2016).  Even if the testimony bears upon state of mind, the factual basis for it makes it reliable. *Cf. Pledger*, 2019 WL 4439606, at *12.

### 8. *Dr. David Madigan*

Raising no challenge to any of the methods or opinions expressed by Madigan—or his unquestionable qualifications to render them—3M seeks to

---

[492] Def-Mot-44.

preclude Madigan from offering opinions it characterizes as "causation" opinions that appear nowhere in Madigan's report.[493] Unable to challenge Madigan's comparison of Test 213015 (wherein the flanges of the CAEv2's opposing end were not folded) to Test 213017 (wherein the opposing flanges were folded)—which revealed (1) a lower NRR in the test of the unfolded CAEv2; (2) mean individual NRRs that are statistically significantly lower; and (3) mean within-subject variability that is statistically significantly larger[494]—3M avoids Madigan's express opinions, attempting instead to restrict him from stating "that folding the CAEv2's flanges <u>causes</u> any statistically significant differences."[495]

As Madigan concluded—and 3M cannot dispute—the results of Test 213015 are statistically significantly different from 213017 (and that of several other tests he analyzed), and highly unlikely to be due to chance. Though Plaintiffs' other experts discuss the underlying reasons for the observed differences and variability, 3M identifies no legal basis to restrict Madigan from describing the conditions of Tests 213015 and 213017 (e.g., unfolded versus folded flanges) that he fully considered in connection with his analysis.[496] Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware

---

[493] Def-Mot-135.
[494] PX113(Madigan-7-8).
[495] Def-Mot-28 (emphasis added).
[496] PX114(Madigan-Dep-75:2-14, 192:17-194:3).

of[.]"). Madigan plowed no new ground in describing these different testing conditions; his observations wholly align with 3M's contemporaneous technical report comparing the studies, "How Folding the Flanges Back Affects REAT Results of the UltraFit Earplug End of the Combat Arms Plug."[497] 3M has raised no valid challenge under Federal Rule of Evidence 702 to Madigan's opinions. Having failed to do so, Madigan should be permitted to testify to the opinions set forth in his report and the facts and data of the studies that underlie them. *See In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d at 1304.

### III.   CONCLUSION

For these reasons, Plaintiffs respectfully request the Court deny Defendants' motion.

---

[497] PX34(3M_MDL000019514-15) ("For test 213015, the plugs were fit according to the standard plug's fitting instructions, with no modifications… For test 213017, the yellow flanges of the level-dependent end of the plug were folded back prior to [insertion].").

Date:  January 22, 2021            Respectfully submitted,

*/s/ Bryan F. Aylstock*
Bryan F. Aylstock, Lead Counsel
Florida State Bar No. 078263
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ,
PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel.: (850) 202-1010
baylstock@awkolaw.com

Shelley V. Hutson, Co-Lead Counsel
(Admitted Pro Hac Vice)
Texas State Bar No. 00788878
CLARK, LOVE & HUTSON, GP
440 Louisiana Street, Suite 1600
Houston, TX 77002
Tel.: (713) 757-1400
shutson@triallawfirm.com

Christopher A. Seeger, Co-Lead Counsel
(Admitted Pro Hac Vice)
New Jersey State Bar No. 042631990
SEEGER WEISS LLP
77 Water Street, 8th Floor
New York, NY 10005
Tel.: (212) 587-0700
cseeger@seegerweiss.com
**Counsel for Plaintiffs**

Shawn Fox
TRACEY & FOX LAW FIRM
440 Louisiana Street
Suite 1901
Houston, TX 77002
Tel: (713) 495-2333
sfox@traceylawfirm.com

Sean Patrick Tracey
TRACEY & FOX LAW FIRM
440 Louisiana Street
Suite 1901
Houston, TX 77002
Tel: (713) 495-2333
stracey@traceylawfirm.com
**Counsel for Plaintiff Lloyd Eugene Baker**

Katherine Cornell
PULASKI LAW FIRM, PLLC
2925 Richmond Ave., Ste 1725
Houston, TX 77098
Tel: (713) 664-4555
kcornell@pulaskilawfirm.com
**Counsel for Plaintiff Luke E. and Jennifer Estes**

Evan D. Buxner
GORI JULIAN & ASSOCIATES
156 North Main Street
Edwardsville, IL 62025
Tel: (618) 659-9833
evan@gorijulianlaw.com

Quinn Robert Wilson
ONDER LAW LLC
110 E Lockwood Avenue
Second Floor
St. Louis, MO 63119
Tel: (314) 963-9000
wilson@onderlaw.com
**Counsel for Plaintiff Stephen Hacker**

Brian Hugh Barr
LEVIN PAPANTONIO
316 S Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7045
bbarr@levinlaw.com

Winston Troy Bouk
LEVIN PAPANTONIO
316 S Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7045
tbouk@levinlaw.com
***Counsel for Plaintiff Lewis Keefer***

Taylor Christopher Bartlett
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
Birmingham, AL 35203
Tel: (205) 326-3336
taylor@hgdlawfirm.com

William Lewis Garrison, Jr.
HENINGER GARRISON DAVIS LLC
2224 1st Avenue North
Birmingham, AL 35203
Tel: (205) 326-3336
lewis@hgdlawfirm.com
***Counsel for Plaintiff Dustin McCombs***

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH COURT'S WORD LIMIT</u>

I hereby certify that the foregoing contains 24,966 words and complies with the Court's directive that Plaintiffs file an omnibus *Daubert* response not to exceed 25,000 words.

*/s/ Bryan F. Aylstock*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 22, 2021, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Bryan F. Aylstock*