# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG LITIGATION LIABILITY LITIGATION | CASE NO.: 3:19-MD-2885-MCR-GRJ |
| This Document Relates to: | Chief Judge M. Casey Rodgers Magistrate Judge Gary Jones |
| *Luke E. Estes* Case No. 7:20-cv-00137 | |
| *Stephen Hacker* Case No. 7:20-cv-00131 | **CONFIDENTIAL - FILED UNDER SEAL** |
| *Lewis Keefer* Case No. 7:20-cv-00104 | |

## DEFENDANTS' OMNIBUS MOTION *IN LIMINE* TO EXCLUDE THE INTRODUCTION OF CERTAIN EVIDENCE AT TRIAL

FILED USDC FLND PN
FEB 19 '21 AM 8:02

# TABLE OF CONTENTS

**Page**

MOTIONS RELATED TO HACKER ....................................................1

I.      EVIDENCE OR ARGUMENT RELATING TO SUBJECTS
EXCLUDED BY THE COURT'S PRIOR ORDERs ...............................1

II.     EVIDENCE OR ARGUMENT THAT HACKER'S
ALLEGED INJURIES AROSE ANYWHERE BUT
KENTUCKY IN 2006 ..................................................................2

MOTIONS RELATED TO ESTES ......................................................3

III.    EVIDENCE OR ARGUMENT RELATING TO PLAINTIFF
LUKE ESTES' MENTAL HEALTH ISSUES OR
SYMPTOMS BEYOND "GARDEN VARIETY." ...................................3

IV.    STATEMENTS BY MRS. ESTES' FATHER ..........................................3

V.     EVIDENCE OF THE ESTES FAMILY'S RELIGIOUS
UPBRINGING AND BELIEFS ..........................................................4

MOTIONS APPLYING TO ALL PLAINTIFFS ........................................4

VI.    EVIDENCE OF PREVIOUS LITIGATION, INCLUDING
SETTLEMENTS AND AN INVESTIGATIVE REPORT
THEREIN ..................................................................................4

        A.    Evidence Related to Qui Tam Litigation ...............................5

        B.    Evidence Related to the CID Report in the Qui Tam
Litigation ..................................................................6

        C.    Evidence Related to Patent Infringement Litigation.............8

VII.   EVIDENCE REGARDING DEFENDANT'S FINANCIAL
CONDITION, PROFIT MARGINS, NET WORTH,
COMPENSATION PACKAGES OF DEFENDANTS'
EMPLOYEES, PRIVATE EQUITY INTERESTS IN
AEARO AND ANY PROFIT FROM THE SALE OF
AEARO TO 3M............................................................................9

i

VIII.    EVIDENCE OF THE 1993 FINE IMPOSED ON CABOT
         SAFETY CORPORATION.........................................................................11

IX.      CHARACTER EVIDENCE RELATING TO PLAINTIFFS'
         MILITARY SERVICE UNCONNECTED TO THEIR
         ALLEGED CAE**v**2 USE, INCLUDING
         COMMENDATIONS..................................................................................12

X.       EVIDENCE OF ALLEGED INJURIES OF OTHERS,
         INCLUDING THE NUMBER OF claimants ............................................13

XI.      EVIDENCE OF FALCO'S TERMINATION ............................................13

XII.     EVIDENCE RELATED TO DR. FALLON'S
         DOWNLOADING OF DOCUMENTS ....................................................14

XIII.    EVIDENCE AND ARGUMENT RELATING TO "WHAT
         IS YOUR FAVORITE SOUND" VIDEO .................................................14

XIV.     ARGUMENTS REGARDING 3M'S ALLEGED
         MONOPOLY OF HEARING PROTECTION DEVICE
         MARKET ..................................................................................................14

XV.      ARGUMENTS THAT DEFENDANTS WERE REQUIRED,
         SHOULD HAVE, OR ACTUALLY FITTED OR trained
         PLAINTIFFS ...........................................................................................15

XVI.     EVIDENCE RELATED TO 3M'S DISCONTINUATION
         AND LACK OF RECALL OF CAE**v**2.....................................................16

XVII.    EVIDENCE RELATED TO FAMILY MEMBER PAIN OR
         ANGUISH .................................................................................................17

XVIII.   EVIDENCE RELATED TO AEARO'S START AND STOP
         OF NON-CAE**v**2 TESTS ..........................................................................17

XIX.     EVIDENCE OR ARGUMENT THAT THE CAE**v**2 DID
         NOT COMPLY WITH ANY CONTRACTUAL
         SPECIFICATION......................................................................................18

XX.   EVIDENCE SUGGESTING THAT THE RISE IN
      HEARING LOSS IN THE 2000s WAS DUE TO COMBAT
      ARMS EARPLUGS ...............................................................19

XXI.  EVIDENCE REGARDING THE REMOVAL OF THE
      FLANGE-FOLD FITTING TIP FROM RETAIL
      PACKAGING IN 2012 ..........................................................19

XXII. EVIDENCE RELATED TO METHOD B TEST DATA ........................20

XXIII. EVIDENCE REGARDING AEARO'S USE OF PRODUCT-
      SPECIFIC TESTING PANELS AND USE OF
      EMPLOYEES AND THEIR FAMILY MEMBERS AS
      TEST SUBJECTS ..............................................................22

XXIV. ASSERTIONS OF PRIVILEGE ...............................................23

XXV.  INFLAMMATORY COMMENTS REGARDING DOD
      AND VA's RECORD-KEEPING PRACTICES ...................................23

XXVI. EVIDENCE RELATED TO QUALITY CONTROL FOR
      MANUFACTURING OF THE CAEv2 ...........................................23

XXVII. INFLAMMATORY POLITICAL REMARKS .....................................24

XXVIII. REFERENCES TO THE BELLWETHER PROCESS ...........................24

XXIX. DISCOVERY PROCESS AND DISPUTES .....................................24

CONCLUSION ..........................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. Moldex-Metric, Inc.*,
   Civil No. 12-611 (D. Minn.) ...................................................................5

*A.T.O. Golden Constr. Co. v. Allied World Ins. Co.*,
   2018 WL 5886663 (S.D. Fla. Nov. 9, 2018) ..........................................5

*Aetna, Inc. v. Blue Cross Blue Shield of Michigan*,
   2015 WL 1646464 (E.D. Mich. Apr. 14, 2015) .....................................15

*Awalt v. Marketti*,
   287 F.R.D. 409 (N.D. Ill. 2012) .........................................................1, 3

*In re Bluegrass Marine, Inc.*,
   2008 WL 185813 (W.D. Ky. Jan. 18, 2008) ...........................................9

*Brooks v. Caterpillar Global Mining Am., LLC*,
   2017 WL 3401476 (W.D. Ky. Aug. 8, 2017) ..........................................9

*Brough v. Imperial Sterling Ltd.*,
   297 F.3d 1172 (11th Cir. 2002) ..............................................................9

*Broyles v. Cantor Fitzgerald & Co.*,
   2016 WL 7656028 (M.D. La. Sept. 8, 2016) ........................................23

*Bunch v. Pacific Cycle, Inc.*,
   2015 WL 11622952 (N.D. Ga. Apr. 27, 2015) ......................................10

*Capuano v. Consol. Graphics, Inc.*,
   2007 WL 2688421 (N.D. Ill. Sept. 7, 2007) ..........................................12

*Cerrato v. Nutribullet, LLC*,
   2017 WL 6373939 (M.D. Fla. Dec. 13, 2017) .......................................12

*Chrysler Group, LLC v. Walden*,
   812 S.E.2d 244 (Ga. 2018) ......................................................................9

*Compaq Computer Corp. v. Ergonome Inc.*,
  387 F.3d 403 (5th Cir. 2004) ..............................................................13

*Crisostomo v. Kuhn Mgmt., Inc.*,
  2008 WL 11336638 (M.D. Fla. Sept. 25, 2008)..................................6

*Cross v. Wyeth Pharms., Inc.*,
  2011 WL 2517211 (M.D. Fla. June 23, 2011) ...................................10

*Doe v. NCL (Bahamas) LTD.*,
  2012 WL 12844743 (S.D. Fla. Nov. 27, 2012) ....................................4

*Entrust Datacard Corp. v. Zeiser GmbH*,
  2019 WL 7472893 (M.D. Fla. Oct. 29, 2019)....................................25

*Garrison v. Sam's East, Inc.*,
  787 F. App'x 627 (11th Cir. 2019) (per curiam) ...............................16

*In re General Motors LLC Ignition Switch Litig.*,
  2015 WL 7769524 (S.D.N.Y. Nov. 30. 2015)....................................13

*Glazer v. Whirlpool Corp.*,
  2014 WL 12600053 (N.D. Ohio Oct. 6, 2014)...................................10

*Greene v. B.F. Goodrich Avionics Sys., Inc.*,
  409 F.3d 784 (6th Cir. 2005) ..............................................................24

*Grizzle v. Gen. Growth Properties, Inc.*,
  No., 2011 WL 7268176 (W.D. Okla. Oct. 12, 2011) ........................12

*Hardaway Mgmt. Co. v. Southerland*,
  977 S.W.2d 910 (Ky. 1998)..................................................................9

*Hughes v. Stryker Corp.*,
  423 F. App'x 878 (11th Cir. 2001) (per curiam) ...............................16

*Independence Cas. and Surety Co. v. Select Int'l, Inc.*,
  2010 WL 11504826 (S.D. Fla. June 1, 2010)......................................5

*Jakes v. Boudreau*,
  2020 WL 5297007 (N.D. Ill. Sept. 4, 2020)..................................1, 3

v

*Johnson v. Capital One Servs., LLC*,
2019 WL 5190788 (S.D. Fla. Oct. 15, 2019) ......................................................6

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
383 F.3d 1337 (Fed. Cir. 2004) .........................................................................23

*Lampliter Dinner Theater, Inc. v. Liberty Mutual Ins. Co.*,
792 F.2d 1036 (11th Cir. 1986) ...........................................................................5

*Leahy v. Salem*,
2011 WL 13263541 (E.D. Pa. Feb. 4, 2011) .....................................................12

*Lehman Brothers Holdings, Inc. v. Hirota*,
2007 WL 6881841 (M.D. Fla. Nov. 28, 2007) ....................................................6

*Liese v. Indian River Memorial Hosp., Inc.*,
2010 WL 11450507 (S.D. Fla. Nov. 22, 2010) ....................................................6

*McCullum v. Orlando Regional Healthcare Sys., Inc.*,
2012 WL 207025 (M.D. Fla. Jan. 24, 2012) ......................................................17

*McKelvey v. Geren*,
2009 WL 3294830 (E.D. Mich. Oct. 9, 2009).....................................................12

*In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*,
2010 WL 2015146 (M.D. Ga. May 20, 2010).....................................................16

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
608 F.3d 871 (D.C. Cir. 2010) (per curiam).......................................................10

*Moldex Metric, Inc. v. 3M Co.*,
2016 WL 7391250 (D. Minn. Dec. 9, 2016) ........................................................8

*Moldex Metric Inc. v. 3M Co.*,
Civil No. 14-1821 (D. Minn.)...............................................................................5

*United States ex rel. Moldex-Metric v. 3M Co.*,
Case No. 3:16-cv-1533-MBS (D.S.C.)..................................................................4

*Mudd v. Cmty. Capital Corp.*,
2018 WL 4049235 (Ky. Ct. App. Aug. 24, 2018)................................................1

*New Hampshire v. Maine*,
  532 U.S. 742 (2001).................................................................2, 3

*In re Norplant Contraceptive Prods. Liab. Litig.*,
  1997 WL 80526 (E.D. Tex. Feb. 19, 1997).......................................10

*Palmer v. Bd. of Regents of Univ. Sys. of Ga.*,
  208 F.3d 969 (11th Cir. 2000) .....................................................8

*Parrish v. Dollar General Corp.*,
  2016 WL 742925 (W.D. Ky. Feb. 24, 2016)......................................9

*Potts v. Martin & Bayley, Inc.*,
  2011 WL 4740641 (W.D. Ky. Oct. 7, 2011) .....................................9

*United States ex rel. Raven v. Ga. Cancer Specialists I, P.C.*,
  2020 WL 4548744 (N.D. Ga. June 10, 2020).....................................6

*Salinero v. Johnson and Johnson*,
  2019 WL 7753445 (S.D. Fla. Sept. 25, 2019) ...................................5

*Sampson v. Carnival Corp.*,
  2016 WL 11547653 (S.D. Fla. Dec. 9, 2016)....................................10

*Sand Hill Energy, Inc. v. Smith*,
  142 S.W.3d 153 (Ky. 2004) ..........................................................9

*Selliken v. Country Mut. Ins. Co.*,
  2014 WL 12634309 (E.D. Wash. Jan. 21, 2014)...............................12

*Sharp v. St. Jude Med., S.C., Inc.*,
  2020 WL 7647511 (11th Cir. Dec. 23, 2020)....................................24

*Slater v. United States Steel Corp.*,
  871 F.3d 1174 (11th Cir. 2017) (en banc) ........................................2

*Smith v. E-backgroundchecks.com, Inc.*,
  2015 WL 11233453 (N.D. Ga. June 4, 2015).....................................5

*State Farm Mut. Auto Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)....................................................................9

*Steed v. EverHome Mortg. Co.*,
    308 F. App'x. 364 (11th Cir. 2009) (per curiam) ................................................. 5

*United States v. Brown*,
    503 F. Supp. 2d 239 (D.D.C. 2007) ................................................................. 12

*United States v. Lampley*,
    68 F.3d 1296 (11th Cir. 1995) ...................................................................... 11

*United States v. Pendas-Martinez*,
    845 F.2d 938 (11th Cir. 1988) ...................................................................... 8

*United Techs. Corp. v. Mazer*,
    556 F.3d 1260 (11th Cir. 2009) ..................................................................... 8

*Wilkinson v. Carnival Cruises Lines, Inc.*,
    920 F.2d 1560 (11th Cir. 1991) .................................................................... 16

*Williams v. Sprint/United Mgmt. Co.*,
    464 F. Supp. 2d 1100 (D. Kan. 2006) ............................................................ 23

## Statutes

15 U.S.C. §§ 2051-2089 ................................................................................ 17

Ky. Rev. Stat. Ann. §411.186(2)(c) ................................................................. 9

## Rules

40 CFR § 211, Subpart B ............................................................................... 20

40 CFR § 211.203(q) .................................................................................... 20

40 CFR § 211.204-1, 207 .............................................................................. 20

40 CFR § 211.206-1 ..................................................................................... 20

40 CFR § 211.207 ........................................................................................ 20

Fed. R. Evid. 30(b)(6) .................................................................................. 23

Fed. R. Evid. 401 .................................................................................. 9, 17, 24

Fed. R. Evid. 402 ................................................................................. *passim*

Fed. R. Evid. 403 ..................................................................................*passim*

Fed. R. Evid. 404(b) ....................................................................................11

Fed. R. Evid. 407 .........................................................................................16

Fed. R. Evid. 408 ...................................................................................5, 6, 7

Fed. R. Evid. 610 ...........................................................................................4

Fed. R. Evid. 802 ........................................................................................4, 5

Fed. R. Evid. 803(8)(A)(iii) ...........................................................................7

Fed. R. Evid. 804(b) .......................................................................................4

Fed. R. Evid. 805 ...........................................................................................8

Rules 402, 403, 408 and 802...........................................................................5

## Other Authorities

Consumer Product Safety Act, the Consumer Product Safety
    Improvement Act of 2008..........................................................................16

False Claims Act ........................................................................................5, 8

United States Army Criminal Investigation Command (CID) ..................................4

Defendants 3M Company and Aearo move *in limine* to exclude the introduction of the following evidence or argument.

## MOTIONS RELATED TO HACKER

### I.   EVIDENCE OR ARGUMENT RELATING TO SUBJECTS EXCLUDED BY THE COURT'S PRIOR ORDERS.

The Court should preclude any evidence or argument relating to Hacker's health conditions described below beyond hearing loss and tinnitus.  Hacker stated that he has "garden-variety claims for mental anguish, distress, [and] loss of enjoyment of life" which do not rise to the level of diagnosed anxiety or depression. MDL Dkt. 1258 at 10-11.  This Court held in September 2020 that a Bellwether Plaintiff's claims for damages arising from his "frustration," "sleep issues," "focus issues," "irritability," and "social isolation" were more than "the typical garden-variety complaint of mental anguish or distress."  *Hacker* Dkt. 57 at 7 n.2 (*quoting* MDL Dkt. 1390 at 11-12) (citing *Jakes v. Boudreau*, 2020 WL 5297007, at \*2 (N.D. Ill. Sept. 4, 2020) ("Garden variety damages arise from the negative emotions that a plaintiff experienced essentially as the intrinsic result of the defendant's alleged conduct, as opposed to the resulting symptoms or conditions the plaintiff may have suffered (*e.g.*, sleeplessness, nervousness, depression).").  As this Court noted, "these are symptoms of identifiable mental conditions without the diagnoses" and would put mental health at issue.  *See* MDL Dkt. 1390 at 12.  The Court further stated, "it would be unfair for [the Plaintiff] to claim emotional damages based on these precise symptoms without allowing Defendants the opportunity to discover his mental health records."  *Id.* (*citing Awalt v. Marketti*, 287 F.R.D. 409, 418-419 (N.D. Ill. 2012) ("The rule distinguishing between "garden variety" claims for emotional damages and claims in which the plaintiff puts [his] psychological well-being into issue is based upon the obvious principle of fairness that a party cannot inject his or her psychological treatment, condition, *or symptoms* into a case and expect to be able to prevent discovery of information relevant to those issues.").  Because Hacker limited himself to "garden variety" claims, he may not claim damages arising from frustration, sleep issues, focus issues, irritability and isolation.

In addition, the Court already precluded Hacker's experts from testifying about conditions other than hearing loss and tinnitus based on his interrogatory responses.  *See Hacker* Dkt. 57 at 6 (finding that Hacker "violated the duty to supplement his interrogatory answers").  Without expert testimony relating to his other conditions, Hacker cannot show Defendants caused those injuries.  *See Mudd v. Cmty. Capital Corp.*, 2018 WL 4049235, at \*4 (Ky. Ct. App. Aug. 24, 2018).

## II.   EVIDENCE OR ARGUMENT THAT HACKER'S ALLEGED INJURIES AROSE ANYWHERE BUT KENTUCKY IN 2006.

Having successfully presented testimony and argument that his alleged injuries arose in Kentucky in 2006, Hacker is judicially estopped from presenting testimony or argument to the contrary.  The doctrine of judicial estoppel "'prevent[s] the perversion of the judicial process' and 'protect [its] integrity ... by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'"  *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (en banc) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)).  A three-factor test applies: (1) whether the position is clearly inconsistent with the earlier position; (2) whether the party succeeded in persuading a court to accept its earlier position such that it "would create the perception that either the first or the second court was misled"; and (3) whether the party, if not estopped, would "derive an unfair advantage or impose an unfair detriment on the opposing party[.]"  *New Hampshire*, 532 U.S. at 750–51 (quotation marks omitted).

These factors weigh in favor of preclusion here.  First, Hacker has testified to this Court that his tinnitus started in Kentucky:

> Q.  Now, are you testifying to this Court that the tinnitus appeared exactly on this day that you went and saw the audiologist on April 3rd, 2006?
> A.  I'm sure it didn't occur that day, but it wouldn't have been long before then.
> Q.  Would it have been in Fort Campbell, Kentucky, sir?
> A.  That's when it would have been identified, yes.
> Q.  And that's when you would have first began experiencing it, to the best of your recollection, sir?
> A.  To the best of my recollection.

Ex. 1 at 18:7-18.  And he described a medical record suggesting otherwise as "not accurate."  *Id.* at 16:13-18:6.  Thus, any testimony that Hacker sustained his injury elsewhere would be "clearly inconsistent" with this position.  Second, Hacker succeeded in persuading the Court "that Plaintiff Hacker's alleged hearing injury occurred while he was stationed at Fort Campbell, Kentucky" for choice-of-law purposes.  MDL Dkt. 1599 at 7.  Finally, Hacker would derive an unfair advantage

2

if he were permitted to contradict his prior position since he used it to secure the application of his favored state's law: Kentucky. *Id.* at 9.[1]

## MOTIONS RELATED TO ESTES

### III.   EVIDENCE OR ARGUMENT RELATING TO PLAINTIFF LUKE ESTES' MENTAL HEALTH ISSUES OR SYMPTOMS BEYOND "GARDEN VARIETY."

The Court should preclude any testimony or argument relating to non-garden-variety mental health issues or symptoms Estes may experience beyond hearing loss and tinnitus, such as social isolation, sleep issues, depression, frustration, and focus issues. Estes specifically stated that he claimed only "garden variety emotional damages" and distress and "d[id] not intend to waive the mental health privilege." Ex. 2 at No. 52; Ex. 3. Under the Court's rulings, this blocked Defendants from pursuing various discovery into Estes' mental health. MDL Dkt. 1065 at 5-6.

Having limited himself to "garden variety emotional damages" to ward off discovery, Estes may not now offer testimony (lay or expert) or argument relating to "frustration," "sleep issues," "focus issues," "irritability," and "social isolation" at trial. *Hacker* Dkt. at 57 n.2; *see supra* Section I (noting Court's citation of *Jakes* and *Awalt*).

### IV.   STATEMENTS BY MRS. ESTES' FATHER.

Defendants move to exclude any testimony regarding Luke Estes' deceased father-in-law's alleged awareness of Luke Estes' hearing loss because such evidence is inadmissible hearsay.

Plaintiff Jennifer Estes testified that her father, John William Leding, who also served as Luke Estes' former employer at Pacific Monarch Ltd. Transportation Services, died tragically in a car accident shortly before her July 29, 2020 deposition. Ex. 4 at 130:21-131:6.

Jennifer Estes testified that Luke Estes's hearing loss affected his ability to work at Pacific Monarch because he experienced, "having to repeat things and that kind of thing," *id.* at 140:17-24; 143:9-17, and she knew this only because Leding,

---

[1] Defendants are not arguing that *the Court's* factual findings for choice-of-law purposes are binding on the parties, the jury, or the Court at trial, as that is not the case. Dkt. 1599 at 1 n.1. Defendants are arguing only that *Mr. Hacker* cannot "deliberately chang[e] positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 750 (quotation omitted).

"mention[ed] it a few times." *Id.* at 143:25-144:14. When asked if she had knowledge about difficulties with Luke's ability to work at Pacific Monarch other than from her father's statements, Jennifer Estes answered in the negative. *Id.* at 142:19-20. These statements attributed to Leding are classic hearsay and do not fall within any exception. Fed. R. Evid. 802, Fed. R. Evid. 804(b).

## V.   EVIDENCE OF THE ESTES FAMILY'S RELIGIOUS UPBRINGING AND BELIEFS.

Luke and Jennifer Estes are Christians and their testimony and documents are replete with references to their faith and religious beliefs. These references to faith and religion are irrelevant, far more prejudicial than probative, and improper attempts to support their credibility. Their religion does not tend to prove that Estes suffers from hearing loss or tinnitus, much less that it was caused by the CAEv2, and overt references to religion would be an improper attempt to curry favor with jurors. Nor—with potentially very narrow and limited exceptions—does their religion help to prove their alleged damages.[2] Thus, the evidence is inadmissible. *See Doe v. NCL (Bahamas) LTD.*, 2012 WL 12844743, at *2 (S.D. Fla. Nov. 27, 2012) (granting Plaintiff's motion *in limine* "to exclude the reference to Plaintiff's religious belief or lack thereof").

Finally, any argument that evidence of the Estes' faith supports their propensity to tell the truth fails under Rule 610, stating that "[e]vidence of a witness's religious beliefs or opinions is not admissible to ... support the witness's credibility."

## MOTIONS APPLYING TO ALL PLAINTIFFS

## VI.   EVIDENCE OF PREVIOUS LITIGATION, INCLUDING SETTLEMENTS AND AN INVESTIGATIVE REPORT THEREIN.

Defendants move to exclude all evidence and argument regarding prior litigation, including settlements and settlement values. Specifically, 3M moves to exclude evidence related to (1) the qui tam suit in *United States ex rel. Moldex-Metric v. 3M Co.*, Case No. 3:16-cv-1533-MBS (D.S.C.); (2) a report by the United States Army Criminal Investigation Command (CID) written in response to the

---

[2] Plaintiffs have suggested recently, for example, that Mr. Estes' alleged hearing issues *may* preclude him from singing in the church choir. While such evidence would contradict Mr. Estes' testimony and written discovery responses under oath, Mr. Estes can make this claim without referencing *where* he sings.

claims of that suit, and (3) the patent infringement litigation and subsequent lawsuits between 3M and Moldex, including *3M Co. v. Moldex-Metric, Inc.*, Civil No. 12-611 (D. Minn.) and *Moldex Metric Inc. v. 3M Co.*, Civil No. 14-1821 (D. Minn.). Such evidence has no probative value, is prejudicial to Defendants, and its admission would violate Rules 402, 403, 408 and 802.

### A.   Evidence Related to Qui Tam Litigation.

In May 2016, Moldex-Metric, Inc. filed a qui tam action in the District of South Carolina on behalf of the United States Government.  Ex. 5 at 1.  Moldex alleged that 3M made false statements and submitted false claims for reimbursement to the United States in connection with the CAEv2, violating the False Claims Act. The court dismissed the case with prejudice on July 26, 2018 following a settlement agreement.  *See* Ex. 6.  In the agreement, 3M "expressly denie[d] the allegations in the Covered Conduct and all of the allegations in the *qui tam* complaint." Ex. 7 at 2.

*First*, evidence of the Moldex qui tam litigation should be excluded because complaints from prior litigation are hearsay and thus inadmissible.  *See Steed v. EverHome Mortg. Co.*, 308 F. App'x. 364, 369 n.2 (11th Cir. 2009) (per curiam); *A.T.O. Golden Constr. Co. v. Allied World Ins. Co.*, 2018 WL 5886663, at *8 (S.D. Fla. Nov. 9, 2018); *Smith v. E-backgroundchecks.com, Inc.*, 2015 WL 11233453, at *1 (N.D. Ga. June 4, 2015).

Courts also exclude evidence of previous litigation, even when the underlying nature of the suits is similar, as irrelevant under Rule 402 or prejudicial under Rule 403.  *See Salinero v. Johnson and Johnson*, 2019 WL 7753445, at *2 (S.D. Fla. Sept. 25, 2019); *Smith*, 2015 WL 11233453, at *2; *Independence Cas. and Surety Co. v. Select Int'l, Inc.*, 2010 WL 11504826, at *2 (S.D. Fla. June 1, 2010).

Evidence of the qui tam action would be particularly irrelevant and prejudicial here because there was never any adjudication of the allegations—only a settlement in which 3M expressly denied any wrongdoing.  That the qui tam plaintiff made various allegations and arguments—which 3M denied and disputed—says nothing about Plaintiffs' claims.  Moreover, the qui-tam-related evidence would unfairly prejudice 3M, as it would introduce another set of allegations and arguments that 3M would be required to rebut.  Such rebuttals would require a mini-trial of the qui tam litigation, consuming court time that should be spent on each Plaintiff's case.

There are additional reasons under Rules 408 and 403 to bar admission of evidence relating to the settlement that concluded the qui tam litigation.  Rule 408 unambiguously states that evidence of settlements "is not admissible…either to prove or disprove the validity or amount of a dispute claim[.]"  Fed. R. Evid. 408. Courts have applied this Rule to exclude evidence of settlements in prior lawsuits. *See Lampliter Dinner Theater, Inc. v. Liberty Mutual Ins. Co.*, 792 F.2d 1036, 1042

(11th Cir. 1986); *United States ex rel. Raven v. Ga. Cancer Specialists I, P.C.*, 2020 WL 4548744, at *4-5 (N.D. Ga. June 10, 2020); *Liese v. Indian River Memorial Hosp., Inc.*, 2010 WL 11450507, at *2 (S.D. Fla. Nov. 22, 2010). In addition to the prohibitions provided in Rule 408, evidence of settlements is generally irrelevant and unfairly prejudicial. *See, e.g., Johnson v. Capital One Servs., LLC*, 2019 WL 5190788, at *2 (S.D. Fla. Oct. 15, 2019); *Crisostomo v. Kuhn Mgmt., Inc.*, 2008 WL 11336638, at *1 (M.D. Fla. Sept. 25, 2008); *Lehman Brothers Holdings, Inc. v. Hirota*, 2007 WL 6881841, at *1-2 (M.D. Fla. Nov. 28, 2007).

Admitting evidence that 3M settled the qui tam claims would violate Rule 408. Plaintiffs' only use for such evidence would be the improper purpose of creating the inference that 3M settled because it was liable for the alleged claims. Admitting evidence of this settlement would directly undermine the policy basis for Rule 408 by discouraging parties from ever settling. Nor can plaintiffs clear the hurdles of Rules 402 and 403. That 3M settled the qui tam action would not be probative of any issues in the impending trial, especially given that 3M explicitly *denied* liability when it settled. The evidence also would be prejudicial to the Defendants because the jury may improperly conclude that because 3M settled previously, it must be liable here.

Finally, the settlement amount in particular should not be allowed into evidence under Rules 402 and 403 as it lacks probative value, is highly prejudicial, and would confuse the jury. The settlement amount does not have any tendency to either prove or disprove the present allegations of Plaintiffs. However, if permitted to learn the value of the settlement, the jury may draw the improper (and inaccurate) inference that 3M settled because it was liable. A lay jury may not understand that the amount was relatively small for a Fortune 500 company, especially when considering the substantial sum 3M would have spent in attorneys' fees to defend against the allegations.

## B.   Evidence Related to the CID Report in the Qui Tam Litigation.

In addition to the lawsuit and settlement, Defendants also move to exclude a report, authored by Special Agent Jennifer Coleman of the Criminal Investigation Command ("the CID Report"), summarizing the Army's investigation into the qui tam action's allegations. In response to the filing of the qui tam suit, CID began a civil investigation into the allegations of Moldex on May 17, 2016. Ex. 8 at 1. CID issued its final report on December 13, 2018, which summarized interviews taken and documents gathered during the course of the investigation. *Id.*

The CID Report is composed of four parts:  (1) a six-page "summary;" (2) witness interview memos; (3) copies of documents gathered; and (4) a copy of

the settlement agreement terminating the litigation.  *See* Ex. 8.  The Court should exclude the CID report in its entirety.

For the reasons stated previously, the copy of the settlement agreement (the CID's fourth part) should be excluded under Rules 408, 402, and 403.  Copies of the documents gathered (the CID's third part) have already been produced, and thus introducing those documents through the CID Report would be cumulative and duplicative.

As to the first two parts of the CID Report, the "summary" and the witness interview memos are both hearsay, without any exclusion or exception, and neither satisfies Rule 403.  The six-page "summary" of the Report does not qualify as "factual findings of a legally authorized investigation" under Rule 803(8)(A)(iii).  The summary is simply an overview of the origins, course and resolution of the investigation and the qui tam litigation.  *See* Ex. 8 at 1-2.  By Coleman's admission, this "summary" simply repeats unverified hearsay statements.  *See* Ex. 9 at 458:11-17 ("Q.  All right.  So the agent's investigation reports that detail your discussions with witnesses are just a recitation of what those people told you, right? … A.  Correct.").  Coleman summarized what witnesses told her without making any determination of reliability.  *See, e.g., id.* at 457:21-24 ("Q.  Okay.  The interview memos just state what other people told you, right?  A.  Correct, or what I found during document reviews"); *id.* at 459:20-22 ("Q.  You were just writing whatever they were telling you, right?  A.  That's what I was writing."); *id.* at 403:2-13 ("Q.  Okay.  The inclusion of any information in this report is not an indication that you found it to be truthful, right?  A.  Correct."); *id.* at 462:9-15 ("Q.  Is it possible that the witnesses were giving you information that they may or may not be telling the truth?  A.  Yes.").

In addition to being hearsay, the CID Report summary also is inadmissible under Rule 403.  The summary has negligible probative value to Plaintiffs' claims, and any such value is substantially outweighed by the risk of juror confusion and unfair prejudice to Defendants.  Coleman did not interview anyone involved in the design or development of the product, including Doug Ohlin or Elliott Berger.  *See* Ex. 8 at 2-4 (listing individuals interviewed).  Indeed, many of the people she interviewed possessed no knowledge or information regarding the design or development of the CAEv2.  *See id.*  Further, Coleman did not form any conclusions regarding any wrongdoing by 3M.  *See* Ex. 9 at 395:18-22 ("Q.  Does the CID report contain any conclusions of yours regarding whether or not the product works? … A.  No."); *id.* at 396:14-18 ("Q.  Did you include any conclusions in the CID report regarding whether 3M had concealed anything from the federal government?  A.  I don't believe so."); *id.* at 396:19-22.  Relatedly, she explicitly stated in the Report

7

that 3M denied all allegations and that the "Settlement Agreement is [not] an admission of liability by 3M." *See* Ex. 8 at 2.

The unfair prejudice to Defendants from admission of this evidence would be high. The report is littered with the word "criminal" because the investigation was conducted jointly with the Defense Criminal Investigative Service, despite the investigation being civil in nature. *See generally* Ex. 8; *see also* Ex. 9 at 473:9-24 (explaining that CID's investigation here was civil as it related to a claim arising under the False Claim Act). Additionally, Plaintiffs cannot introduce the Report without referencing the qui tam litigation itself, which for the reasons explained previously is impermissible. The Report is cumulative of other evidence produced by Defendants and the government. On balance, the minimal probative value of the summary in the CID Report is vastly outweighed by the prejudice to Defendants and the duplicative nature of the evidence.

Finally, the interview memos collected in the CID Report constitute hearsay within hearsay. As such, the hearsay must be resolved at both levels in order to be admissible. *See* Fed. R. Evid. 805. The Eleventh Circuit regularly excludes witness statements within investigative reports as inadmissible hearsay. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009); *United States v. Pendas-Martinez*, 845 F.2d 938, 942-43 (11th Cir. 1988). Here, the witness statements in the CID Report are hearsay within hearsay that cannot be resolved by any exemption or exception. Notably, Plaintiffs have already acknowledged that these witness statements are inadmissible. *See* Dkt. 1089 at 9 ("Defendants further cite LTC Robinette's statements but admit they are 'inadmissible for numerous reasons.'").

### C. Evidence Related to Patent Infringement Litigation.

For the reasons described previously, Defendants move to exclude all evidence related to the patent infringement suit and countersuit between 3M and Moldex-Metric, Inc. Such evidence does not satisfy the basic standards of relevance. 3M's original suit alleged that Moldex violated a number of 3M's patents, while Moldex's countersuit alleged that 3M violated antitrust laws and had engaged in sham litigation. *See Moldex Metric, Inc. v. 3M Co.*, 2016 WL 7391250, at *1 (D. Minn. Dec. 9, 2016). Neither case focused on allegations of product defect, nor were there any allegations of injury from use of any product. Such dissimilarity only reinforces the need for exclusion. *See Palmer v. Bd. of Regents of Univ. Sys. of Ga.*, 208 F.3d 969, 973 (11th Cir. 2000). Further, admission of such evidence would confuse the jury and unduly prejudice 3M, and should be excluded under Rule 403.

**VII.  EVIDENCE REGARDING DEFENDANT'S FINANCIAL CONDITION, PROFIT MARGINS, NET WORTH, COMPENSATION PACKAGES OF DEFENDANTS' EMPLOYEES, PRIVATE EQUITY INTERESTS IN AEARO AND ANY PROFIT FROM THE SALE OF AEARO TO 3M.**

Under Kentucky law, evidence of the financial conditions of a party is inadmissible regardless of whether punitive damages are alleged. *Hardaway Mgmt. Co. v. Southerland*, 977 S.W.2d 910, 916 (Ky. 1998) ("It has been the law of this Commonwealth for almost one hundred years that in an action for punitive damages, the parties may not present evidence or otherwise advise the jury of the financial condition of either side of the litigation.") (internal citations omitted).  Such evidence "creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences." *Sand Hill Energy, Inc. v. Smith*, 142 S.W.3d 153, 167 (Ky. 2004) (quoting *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003)).  Numerous federal district courts applying Kentucky law have excluded evidence of a party's financial conditions. *See Brooks v. Caterpillar Global Mining Am., LLC*, 2017 WL 3401476, at *1-2 (W.D. Ky. Aug. 8, 2017); *Parrish v. Dollar General Corp.*, 2016 WL 742925, at *2 (W.D. Ky. Feb. 24, 2016); *In re Bluegrass Marine, Inc.*, 2008 WL 185813, at *2 (W.D. Ky. Jan. 18, 2008).  Defendants acknowledge, however, that for the limited purpose of assessing punitive damages, Kentucky law does allow the jury to consider profit margins of the product in question.  *See* Ky. Rev. Stat. Ann. §411.186(2)(c) ("profitability of the misconduct to the defendant"); *see also Potts v. Martin & Bayley, Inc.*, 2011 WL 4740641, at *4 (W.D. Ky. Oct. 7, 2011) (granting motion to exclude evidence of "financial condition or net worth" under Kentucky law yet noting that profits could be considered for punitive damages).  But other than profit margin, other evidence of Defendants' financial condition, net worth, compensation packages of Defendants' employees, and private equity interest and transactions relating to Aearo should be excluded under Kentucky law and Federal Rules of Evidence 401-403.

In Georgia, admissibility of a party's financial conditions is determined by the standards under Federal Rules 401-403.  *See Chrysler Group, LLC v. Walden*, 812 S.E.2d 244, 251 (Ga. 2018).  "That is not to say that party-wealth evidence is now admissible in Georgia—it is frankly quite difficult to see how it would be relevant in nearly any case, at least not involving punitive damages."  *Id.* at 252.  Numerous federal circuit and district courts have excluded such evidence under Rules 401-403. *See, e.g., Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1178 (11th Cir. 2002) ("The general rule is that, during trial, no reference should be made to the wealth or

poverty of a party, nor should the financial status of one party be contrasted with other's.  The erroneous admission of such evidence can constitute reversible error.") (internal quotation marks and citations omitted); *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 897-98 (D.C. Cir. 2010) (per curiam) (vacating judgment because admission of party's wealth was highly prejudicial); *Sampson v. Carnival Corp.*, 2016 WL 11547653, at *1 (S.D. Fla. Dec. 9, 2016); *Bunch v. Pacific Cycle, Inc.*, 2015 WL 11622952, at *10 (N.D. Ga. Apr. 27, 2015); *Glazer v. Whirlpool Corp.*, 2014 WL 12600053, at *2 (N.D. Ohio Oct. 6, 2014); *Cross v. Wyeth Pharms., Inc.*, 2011 WL 2517211, at *6 (M.D. Fla. June 23, 2011); *In re Norplant Contraceptive Prods. Liab. Litig.*, 1997 WL 80526, at *1 (E.D. Tex. Feb. 19, 1997).

Given the nature of the consolidated trial, Defendants move to exclude all evidence of financial condition, with the exception of profit margins on the CAEv2 sold to the military.  Not only does all other financial evidence hold little to no probative value, its introduction would confuse the jury.  This is especially true if the jury is presented with certain types of financial evidence in regards to the Estes and Keefer cases, but then told to consider only profit margins for Hacker.  To the extent net worth is relevant under Georgia law, Defendants are willing to enter into a stipulation with Plaintiffs on that amount.[3]

Thus, any evidence or argument regarding the following should be excluded:

1. The financial condition of 3M, including, but not limited to, its net worth, revenues, profits, and profit margins on all other products.
2. Employee compensation packages of 3M employees, including, but not limited to, base salaries, bonuses, stock and stock options.
3. Private equity and other ownership interests in Aearo, including any profits made by private equity companies, other owners, and employees of Aearo in its sale to 3M.
4. 3M's ability to pay any potential judgment(s).

---

[3]   Defendants have previously offered to stipulate to the following regarding net worth: "As of [date], 3M Company's audited Total equity (net worth) was [value], according to the corporation's Form 10-K Annual Report for the fiscal year ending December 31, 2020."

## VIII.   EVIDENCE OF THE 1993 FINE IMPOSED ON CABOT SAFETY CORPORATION.

In 1993, the DOJ and EPA fined the corporate predecessor to Aearo, Cabot Safety Corporation, for labeling its foam earplug with an NRR that was too high. Ex. 10 at 41:3-13.  The 1993 audit and fine, which concerned earplugs sold from 1986 to 1990, has no relevance for this litigation.  Ex. 11.

First, the test that produced the inaccurate NRR was conducted by an independent laboratory, not by Cabot.  *See* Ex. 10 at 43:2-8 ("The testing that was behind the labeling of the product … was not done in our laboratory.  *It was done by an independent laboratory, Paul Michael & Associates*.") (emphasis added).  Cabot simply labeled the product with the NRR that the independent lab reported.  The fine will not tell the jury anything about the reliability of Aearo's internal EARCal laboratory, which conducted the labeling tests on the CAEv2, because the EARCal lab had nothing to do with the testing that led to the fine.  On the contrary, the EPA used the EARCal laboratory to validate the NRR for the foam earplug, and used the EARCal lab's testing to conclude the higher NRR on the label was inaccurate.  *See id.* at 47:11-48:12.

Second, and independently, the 1993 fine is inadmissible under Rule 404(b). Plaintiffs would use the fine to suggest that the EARCal lab habitually manipulates its testing to obtain higher NRRs.  But Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

A three-part test governs the admissibility of evidence under Rule 404(b). "First, the evidence must be relevant to an issue other than the defendant's character; Second, the act must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act; Third, the probative value of the evidence must not be substantially outweighed by its undue prejudice[.]"  *United States v. Lampley*, 68 F.3d 1296, 1299 (11th Cir. 1995).

The 1993 fine (based on earplugs sold from 1986 to 1990) satisfies none of these factors.  The fine, which concerns testing done on another earplug many years prior to the testing at issue in this case, has no relevance other than impugning EARCal's reputation.  Second, the evidence would not permit a jury to find "that the defendant committed the extrinsic act," because the EARCal laboratory did not conduct the testing that led to the fine.  Third, and for the same reasons, evidence of the fine has no probative value, and is prejudicial.

Any testimony or evidence regarding the 1993 fine is therefore inadmissible. That includes the Department of Justice press release announcing the fine, a 2009

email from Doug Ohlin discussing the fine, and any testimony regarding the fine by any witnesses.  *See* Ex. 11; Ex. 12.

## IX.     CHARACTER EVIDENCE RELATING TO PLAINTIFFS' MILITARY SERVICE UNCONNECTED TO THEIR ALLEGED CAEv2 USE, INCLUDING COMMENDATIONS.

Defendants move to exclude Plaintiffs from using inadmissible character evidence to bolster the credibility of witnesses, including the mention of military commendations or any military activities unrelated to the parties' claims or defenses.[4]

First, this evidence constitutes improper character evidence designed to bolster credibility.  *See*, *e.g*., *Leahy v. Salem*, 2011 WL 13263541, at *4 (E.D. Pa. Feb. 4, 2011); *Selliken v. Country Mut. Ins. Co.*, 2014 WL 12634309, at *2 (E.D. Wash. Jan. 21, 2014); *see also United States v. Brown,* 503 F. Supp. 2d 239, 242 (D.D.C. 2007) (holding that "[c]haracter evidence encompasses evidence of a defendant's prior commendations and awards.  Such information is not 'background evidence' because the only purpose for offering such information would be to portray defendant in a positive light by demonstrating recognition of certain character traits or actions that demonstrate such character traits").

Second, the evidence is not relevant to any claims, defenses, or damages, and presents a high danger of undue prejudice.  *See*, *e.g*., *McKelvey v. Geren*, 2009 WL 3294830, at *1 (E.D. Mich. Oct. 9, 2009) (the court excluded evidence related to Plaintiff's military service because "[t]he court share[d] Defendant's concern that, as Plaintiff concede[d], 'the jury will seek to reward Plaintiff for his service to his country and will disregard the evidence in the case.'") (citation omitted); *Cerrato v. Nutribullet, LLC*, 2017 WL 6373939, at *1–2 (M.D. Fla. Dec. 13, 2017); *Grizzle v. Gen. Growth Properties, Inc.*, No., 2011 WL 7268176, at *3 (W.D. Okla. Oct. 12, 2011); *Capuano v. Consol. Graphics, Inc.*, 2007 WL 2688421, at *6 (N.D. Ill. Sept. 7, 2007).

---

[4]     Defendants do not seek to exclude general evidence related to Plaintiffs' military service, such as length of service, duties, deployments, noise exposures, and injuries sustained during military service.

## X.  EVIDENCE OF ALLEGED INJURIES OF OTHERS, INCLUDING THE NUMBER OF CLAIMANTS.

According to Brown Greer, there are over 230,000 claimants in this multidistrict litigation.  Defendants move under Rules 402-403 to exclude Plaintiffs from introducing alleged injuries to other CAEv2 users and making any reference to the total number of claimants in this multidistrict litigation and the related Minnesota state court litigation.

Other persons' alleged injuries are irrelevant as such evidence does not tend to make any fact of consequence in Plaintiffs' cases more or less probable.  Moreover, the introduction of such evidence would cause unfair prejudice to Defendants and would confuse the jury.  In addition, as noted in the above motion *in limine* regarding prior litigation, the claims of any other plaintiffs constitute hearsay.  *See supra* Section VI.

Relatedly, the number of claimants involved in this MDL is irrelevant to Plaintiffs' claims.  Such evidence lacks any probative value, and its introduction would be highly prejudicial to defendants by creating the inference that defendants must have engaged in tortious conduct if so many persons are suing them.  *See, e.g., In re General Motors LLC Ignition Switch Litig.*, 2015 WL 7769524, at *3 (S.D.N.Y. Nov. 30. 2015); *see also Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 408-09 (5th Cir. 2004).

## XI.  EVIDENCE OF FALCO'S TERMINATION.

Robert Falco, a former employee of the Defendants, was terminated from his position in 2010 for "inappropriate use of the company's computer system."  Ex. 13 at 16:18-17:2.  Plaintiffs have agreed that the specific reason for his termination is not relevant—since it was not based upon job performance or the CAEv2—but insist that the *fact* he was terminated should be admissible.  It should not.

Falco's termination is irrelevant since it does not tend to prove or disprove any fact at issue and does not go to his credibility.  Any possible relevance would be substantially outweighed by the dangers of undue prejudice and confusing the jury, which would speculate if his termination was based upon job performance or competency—or somehow related to the CAEv2.  Defendants agree that the jury can be informed that he is no longer employed by the Defendants, but the fact that it was involuntary should not be mentioned in front of the jury.

## XII.   EVIDENCE RELATED TO DR. FALLON'S DOWNLOADING OF DOCUMENTS.

Plaintiffs should be prohibited from putting forth any evidence or argument relating to allegations that Eric Fallon improperly downloaded or otherwise acquired documents upon concluding his employment with the United States Government. This topic is not relevant, and its introduction would result in a case within a case concerning a collateral matter—whether or not Fallon's retention of the documents was inadvertent—that is far removed from any issue in this litigation.

## XIII.   EVIDENCE AND ARGUMENT RELATING TO "WHAT IS YOUR FAVORITE SOUND" VIDEO.

At depositions, Plaintiffs have used a video of actors depicting the effects of hearing related injuries, including tinnitus and hearing loss.  Ex. 14.  This video was created by 3M to explain the importance of hearing conservation and does not purport to represent any individual's actual experience—much less the experience of these three Plaintiffs.  To depict tinnitus, the video shows a woman who wakes up in pain and discomfort while a loud, high-pitched ringing noise plays.  *Id*.  The actor grimaces in pain and grabs her ears.  *Id.*  To depict hearing loss, an individual sitting in a restaurant attempts to have a conversation, but is visibly uncomfortable and distracted.  *Id.*  The individual he is speaking with is inaudible while loud background noises—car horns beeping, cars rushing by—drown out his words.  *Id.*

The Court should exclude this video under Rules 402-403.  Each Plaintiff will have the opportunity to describe his injuries and this video will be of no help to the jury.  None of the three Plaintiffs has made any effort to demonstrate that their alleged injuries are similar to those depicted in the video.  Nor did Plaintiffs attempt to depose any 3M employees involved in the creation of the video in order to establish that the symptoms depicted in the video are typical or representative.  On the contrary, Plaintiffs' own experts have opined that the experience of tinnitus varies considerably from person to person.  *See* Ex. 47 at 47 (noting that 50 million Americans suffer from tinnitus and only 20–25% consider the symptoms a "significant problem").  The video will not aid the jury in understanding the extent of Plaintiffs' alleged injuries, and is thus irrelevant and unduly prejudicial.

## XIV.   ARGUMENTS REGARDING 3M'S ALLEGED MONOPOLY OF HEARING PROTECTION DEVICE MARKET.

Plaintiffs should be barred from presenting evidence or argument about Defendants' market share as a "monopoly" or "virtual monopoly," pursuant to Rules

402-403.  Plaintiffs have erroneously implied that Defendants unfairly affected competition and dominated the hearing protection market for the military.  *See e.g.* Ex. 15 at 377:3-21; Ex. 16 at 277:10-281:14.  Neither of these assertions is true, so allowing this argument would be misleading, would confuse the jury, and would be highly prejudicial.  For example, hearing conservation documents show that the CAEv2 was only an "optional item[]."  Ex. 17 at 5; Ex. 18 at 29.  Moreover, antitrust violations have never been pleaded and have no relevance in this case.  *See Aetna, Inc. v. Blue Cross Blue Shield of Michigan*, 2015 WL 1646464, at *11 (E.D. Mich. Apr. 14, 2015) (excluding "any reference to the terms monopoly, collusion, conspiracy and their derivatives" from trial).

## XV.    ARGUMENTS THAT DEFENDANTS WERE REQUIRED, SHOULD HAVE, OR ACTUALLY FITTED OR TRAINED PLAINTIFFS.

Plaintiffs have repeatedly and erroneously asserted that Defendants were responsible for training soldiers, *e.g.*, Ex. 10 at 191:11-23—they should not be allowed to do this at trial.

Not only were Defendants not expected to fit or train soldiers in using CAEv2, but there is nothing indicating that manufacturers are even *allowed* to fit or train soldiers on their products.  Lieutenant Colonel Leanne Battler testified that an earplug manufacturer would not be expected train soldiers on fitting an earplug; this was left to military audiologists and medically trained personnel.  Ex. 19 at 73:5-74:10.  The DoD instructions state that "[p]reformed earplugs shall be fitted and issued only under the supervision of personnel who have been specifically trained to fit earplugs."  Ex. 20 at 8.  Similarly, the Army Hearing Conservation Pamphlet states, "[p]reformed earplugs are triple- or single-flange earplugs.  Medically trained personnel must fit and examine these earplugs at least annually to ensure proper fit and condition."  Ex. 21 at 11; Ex. 19 at 23:16-24:24.

By contrast, there is no evidence that Defendants would have been allowed on military bases to fit or train individual soldiers.  *Id.* at 73:5-16.  Any argument that Defendants could or should have done so is unfairly prejudicial and should be excluded pursuant to Rule 403.

In addition, any argument or inferences that Defendants *actually* fitted or trained should also be prohibited because there is no evidence that Aearo or 3M fitted any Plaintiff with the CAEv2, nor any evidence that either trained Plaintiffs.

## XVI.   EVIDENCE RELATED TO 3M'S DISCONTINUATION AND LACK OF RECALL OF CAEv2.

In October 2015, 3M discontinued sales of the CAEv2.  Ex. 22.  Defendants move to exclude evidence of 3M's discontinuation of sales of the CAEv2, as well as to preclude Plaintiffs from asking witnesses why 3M never recalled the CAEv2. Such matters are barred by Rule 407's prohibition against the introduction of subsequent remedial measures to prove liability and are irrelevant.  In any event, any relevance would be substantially outweighed by the potential for unfair prejudice and confusing the jury.

*First*, evidence of the the CAEv2's discontinuation should be excluded because it is a subsequent remedial measure.  Fed. R. Evid. 407.  The Eleventh Circuit has interpreted "remedial measures" broadly in forbidding evidence that could violate the Rule.  *See Hughes v. Stryker Corp.*, 423 F. App'x 878, 880 (11th Cir. 2001) (per curiam) (recall letter considered subsequent remedial measure); *Garrison v. Sam's East, Inc.*, 787 F. App'x 627, 629 (11th Cir. 2019) (per curiam) (store's remodeling after slip and fall incident considered subsequent remedial measure); *Wilkinson v. Carnival Cruises Lines, Inc.*, 920 F.2d 1560, 1567 (11th Cir. 1991) (leaving sliding door open considered subsequent remedial measure). Cessation of a product's sales, regardless of the manufacturer's intent in doing so, falls within Rule 407.  *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 2010 WL 2015146, at *1 (M.D. Ga. May 20, 2010) (rejecting plaintiff's argument that because defendant contended it "did not stop [the product's] sales for safety purposes, … the decision to stop sales was not a subsequent remedial measure").

*Second*, CAEv2's discontinuation is irrelevant because it is not probative of any issue in the case.  That 3M discontinued the CAEv2 in October 2015 has no bearing on whether it caused injuries to these Plaintiffs.  This would be true regardless of when Plaintiffs used the CAEv2.  In any event, Plaintiffs here all claim to have stopped using the CAEv2 before it was discontinued.  *See* Ex. 27 at 23:12-24:2; Ex. 28 at 173:5-14, 175:6-9; Ex. 29 at 259:25-260:2.

*Third,* any relevance would be substantially outweighed by the potential for unfair prejudice and confusing the jury, and thus the evidence should be excluded under Rule 403.  The jury would likely draw the improper inference that 3M discontinued the product because of a defect and 3M would be forced waste time explaining the business decision behind the product's discontinuation.

*Fourth*, any claim by Plaintiffs that Defendants *should have* recalled the product is irrelevant and should be excluded under Rules 402-403.  Recalls of earplugs and other consumer products are governed by the Consumer Product Safety

16

Act, the Consumer Product Safety Improvement Act of 2008, and by the rules promulgated by the United States Consumer Product Safety Commission. *See* 15 U.S.C. §§ 2051-2089. Plaintiffs have not claimed that Defendants violated that statute. Moreover, to evaluate that claim, the jury would be required to weigh the language of the statute, causing juror confusion and unfair prejudice to 3M.

## XVII. EVIDENCE RELATED TO FAMILY MEMBER PAIN OR ANGUISH.

Plaintiffs should not be permitted to introduce evidence on how their alleged injuries affected their family members and friends, who have no claims for damages. Such evidence is not relevant and, even if it had any probative value, its prejudicial impact on Defendants outweighs its relevance. *See McCullum v. Orlando Regional Healthcare Sys., Inc.*, 2012 WL 207025, at *3-4 (M.D. Fla. Jan. 24, 2012).

## XVIII. EVIDENCE RELATED TO AEARO'S START AND STOP OF NON-CAEV2 TESTS.

Plaintiffs should be prohibited from putting forth any evidence or argument relating to Aearo stopping its non-CAEv2 Real Ear Attenuation at Threshold ("REAT") tests. This topic is irrelevant, and any relevance is substantially outweighed by unfair prejudice and the likelihood of confusing and misleading the jury. Fed. R. Evid. 401, 402, 403.

Pursuant to ANSI S3.19, a manufacturer should conduct a REAT test on "not less than ten" human test subjects using "experimenter fit" in order to calculate a final NRR for inclusion on the product label, otherwise known as a "labeling test." Ex. 30 at § 3.3.3.1 (2); 3.4.1. Nothing in the ANSI S3.19 standard prohibits a manufacturer from (a) stopping a labeling test prior to testing 10 subjects; or (b) conducting multiple labeling tests with ten subjects each. *Id.*

The vast majority of the tests conducted at Aearo's lab are not for labeling purposes. The lab conducts tests on its hearing protection devices for many reasons, including: research and development, test subject qualification, product comparisons, ensuring design goals, drafting instructions, and collecting data on ear canal size. Many of these tests use fewer than the ten subjects required by ANSI S3.19 standard ("partial tests") or use other standards entirely. Aearo retained these tests in its hearing protection database—which was produced in discovery—along with the tests that are relevant in this case: tests 213015, 213016, or 213017 and any subsequent CAEv2 tests conducted for research purposes.

Plaintiffs point to Aearo's partial tests on *other* (non-CAEv2) hearing protection products to argue that Aearo's testing lab has a pattern and practice of

17

"killing" REAT tests that produce "low" NRR results to "trick the system" and increase their NRRs for EPA labeling purposes. *See e.g.*, Ex. 31 at 313:11-314:10; 353:1-360:25; 392:24-397:1. Indeed, Plaintiffs suggest that any test "stopped" prior to testing 10 subjects is for the sole purpose of "fishing for the right NRR until you get it" in order to "protect the NRR" for marketing purposes. *See id.*

Plaintiffs' evidence and argument should be excluded because, first, Aearo's **non-CAEv2** testing is irrelevant to Plaintiffs' claims. Second, nothing in the ANSI S3.19 standard prohibits Aearo or any other manufacturer from testing its products more than once, for different reasons, or pursuant to different standards. To introduce evidence of multiple tests of non-CAEv2 products would confuse the jury and would require Defendants to spend significant time justifying each of its tests. Finally, Plaintiffs' purpose of introducing this evidence would be to improperly inflame the jury as evidenced by their inflammatory language regarding "killing studies" and "tricking the system."

## XIX.    EVIDENCE OR ARGUMENT THAT THE CAEv2 DID NOT COMPLY WITH ANY CONTRACTUAL SPECIFICATION.

Plaintiffs should be judicially estopped from arguing that the CAEv2 failed to meet any contractual specification at trial. In connection with the motions for summary judgment on the government contractor defense, Plaintiffs repeatedly, and successfully, argued that there were "no specifications" for the CAEV2, and "no contract" between Aearo and the government. *See, e.g.*, MDL Dkt. 1072 at 19 ("there are no specifications for the CAEv2"); Ex. 32 at 55 ("They didn't have a contract."); *see also id.* at 51-52, 80-81, 143-44. Plaintiffs' argument was broad, and asserted the non-existence of *any* contract with *any* specifications. With respect to the Military Procurement Item Description ("MPID"), Plaintiffs argued that "the 'salient characteristics' [in the MPID] apply to 'equal items,' *not the CAEv2*." MDL Dkt. 1072 at 20 (emphasis added).[5] Since then, Plaintiffs have indicated that they intend to take the contrary position that the MPID *does* apply to the CAEv2, and that the CAEv2 is defective in part because it did not comply with various of the "salient characteristics" therein.

All three factors for judicial estoppel, *see supra* Section II, are met here. First, Plaintiffs previously argued that there was "no contract" between Aearo and the government, and "no specifications" for the CAEv2. Arguing at trial that there *is* a contract (the MPID), and that CAEv2 failed to meet any specification, would be

---

[5]    Ex. 32 at 145:7-9 ("It actually says in the MPID 370-1000. That's its stock-keeping unit. And then it says, here are salient characteristics for an equal earplug.")

plainly inconsistent with their position on the government contractor defense. Second, Plaintiffs succeeded on their prior position, and the Court held that the government contractor defense did not apply because Aearo did not have a contract with the government.  MDL Dkt. 1280 at 26.  Third, if allowed to reverse their position now, Plaintiffs would derive an unfair advantage by arguing that there were "no specifications" in order to prevail on summary judgment, but turning around and arguing at trial that there *were* specifications that the CAEv2 did not meet.

During the parties' meet and confer, Plaintiffs' counsel argued that they were not estopped because Plaintiffs were merely adopting 3M's position as to the applicability of the MPID.  That is not accurate.  Plaintiffs argued that the specifications in the MPID did not apply to the CAEv2 *in their opening brief*, not in response to any assertion made by 3M.  *See* MDL Dkt. 1072 at 20.  And Defendants never "adopted" Plaintiffs' argument; rather Defendants stated in their opening brief that the MPID was "for the CAEv2 and other 'equal' dual-ended earplugs," MDL Dkt. No. 1071 at 17, and argued in subsequent briefs that "even assuming plaintiffs are correct about the MPID [not applying to the CAEv2], it nevertheless memorializes the military's sound attenuation requirements for an 'equal' dual-ended product."  *See, e.g.*, MDL Dkt No. 1088 at 10-11.  Plaintiffs, not 3M, disclaimed the existence of *any* contract or specification.

## XX.   EVIDENCE SUGGESTING THAT THE RISE IN HEARING LOSS IN THE 2000s WAS DUE TO COMBAT ARMS EARPLUGS.

Plaintiffs have implied that the rise in hearing loss in the 2000s was due to the CAEv2.  *See* Ex. 33 at 477:17-478:18.  Allowing Plaintiffs to make such a suggestion at trial is improper for numerous reasons.  Plaintiffs have no foundation for the allegation.  For example, Plaintiffs have not offered an expert who opines that the rise in hearing loss that coincided with wars in Afghanistan and Iraq in the 2000s was attributable to the CAEv2.  Further, any evidence regarding an overall rise in hearing loss in the 2000s has no probative value with respect to these Plaintiffs, and any probative value would be substantially outweighed by the potential for unfair prejudice and juror confusion.

## XXI.   EVIDENCE REGARDING THE REMOVAL OF THE FLANGE-FOLD FITTING TIP FROM RETAIL PACKAGING IN 2012.

In approximately 2012, 3M removed the "fitting tip" regarding folding back the opposing flanges before insertion from the CAEv2's retail packaging.  Ex. 34 at 321:7-11.  None of the Plaintiffs purchased a pair of CAEv2 with these post-2012 instructions and there is no evidence that any of these Plaintiffs saw these

instructions.  Any discussion of the removal of the fitting tip would confuse the jury and waste time.

## XXII.   EVIDENCE RELATED TO METHOD B TEST DATA.

The EPA regulates labeling of hearing protection devices.  *See generally* 40 CFR § 211, Subpart B.  Pursuant to those regulations, manufacturers must calculate a "Noise Reduction Rating" for inclusion on the product label.  40 CFR § 211.204-1, 207.  The EPA regulations define the NRR as "[a] single number noise reduction factor in decibels," and require that the NRR be calculated using "the American National Standards Institute Standard (ANSI STD) S3.19-1974."   *Id.* at §§ 211.203(q), 211.206-1.

ANSI S3.19 is a form of REAT testing.  Ex. 30 at p.2, §3.  Pursuant to ANSI S3.19, a learned experimenter personally fits the hearing protection device on each of the human test subjects to achieve a "best" fit possible.  *Id.* at § 3.3.3(2).

The NRR rating is calculated by subtracting two standard deviations from the mean attenuation achieved on the ANSI S3.19 test.  40 CFR § 211.207.  By selecting S3.19 as the methodology used to calculate the NRR, the EPA made a policy decision that hearing protection devices should be labeled with an NRR that reflects optimum performance under laboratory conditions, rather than the likely attenuation that an average user would achieve with the product when using it in the field.  *See also* Ex. 35 at 39152.

ANSI S3.19 is not the only methodology for conducting REAT testing a hearing protection device.  ANSI S12.6 contains two "subject fit" protocols.  *Id.* at 39154;  *see also* Ex. 36 at 154:14-155:1.   ANSI S12.6 "Method A" tests experienced/trained subjects; "Method B" tests "naïve" subjects who have little or no experience/training with earplugs.  *Id.* at 121:16-22, 124:24-128:7, 130:3-131:18, 154:14-20, 164:4-15, 168:18-22; *see also* Ex. 37 at 14; Ex. 38 at 106:7-110:24.

These different protocols yield different results.  ANSI S3.19 "experimenter fit tests have been shown to produce greater attenuation and noise reduction ratings than subject fit tests" in ANSI S12.6.  Ex. 36 at 102:21-103:4.  Between the two "subject fit" protocols, experienced/trained users (*i.e.* Method A) are better at fitting earplugs than inexperienced/untrained users (*i.e.* Method B), and thus Method A produces higher attenuation and lower inter-subject variability than Method B.  *Id.* at  104:3-19, 132:2-133:22, 154:14-155:1, 156:15-157:3; *see also* Ex. 35 at 39154.

The EPA has specifically rejected calculating NRRs on the basis of Method B data, in part because "the concept of 'naïve' test subjects … is not appropriate for the determination of a product's acoustical performance," and also because "the true potential effectiveness (NRR) of the HPD … could be understated because of low

attenuation measurements that resulted from improper fit by inexperienced test subjects[.]" *Id.* at 39154-55.

Nevertheless, certain documents produced in this litigation, contain "NRR" ratings calculated using Method B data. The "NRR" ratings calculated using Method B data are significantly lower than "experimenter fit" ratings for two reasons: (1) the mean attenuation achieved by "naïve" users is lower, and (2) the variability in attenuation between "naïve" users (and thus the standard deviations in the test data) is much higher. *See id.* at 39152. For example, the Bilsom Quietzone premolded earplug is labeled with an NRR of 24, but when Plaintiffs' expert John Franks tested it using the Method B protocol he calculated an NRR of 1. Ex. 39 at 219, 221. Similarly, the CAEv2 was labeled with an NRR of 22, and when Aearo tested its sister product (the ARC Plug) using the Method B protocol it achieved an NRR of 4.4. Ex. 40.

Defendants argued in their *Daubert* motion that Method B testing is irrelevant to the Trial Group A plaintiffs because they are former military service members who were experienced with their hearing protection devices. *See* MDL Dkt. 1605 at 74-75. Indeed, the Method B protocol specifically identifies use of an earplug during "military duty" as disqualifying a test subject. Ex 36 at 128:20-129:4. And numerous of Plaintiffs' experts have acknowledged that military service members are too experienced with hearing protection to qualify as Method B test subjects. Ex. 38 at 350:11-19 ("None of the people serving in the military would qualify as subjects for Method B."); Ex. 41 at 147:15-148:7 (similar). Defendants incorporate those relevance arguments here, and Method B data should be excluded from trial in these cases for that reason alone.

Moreover, the Court should independently exclude reference to an "NRR" calculated using Method B data under Rule 403 because it will confuse the jury, waste time at trial, and prejudice Defendants. So-called Method B "NRR" ratings have no purpose in this litigation but to confuse the jury. For example, Plaintiffs' expert David Eddins calculated a low "NRR" for the CAEv2 by using Method B data. If the jury hears that "NRR" (or any other "NRR" calculated using the Method B protocol) they will compare it to the 22 NRR on the CAEv2 label, even though the different test protocols make any such comparison inapposite. Defendants, in turn, will be forced to spend significant time explaining Method B, the EPA regulations, the EPA's rejection of Method B for calculating an NRR for product labeling, and the various other ANSI standards, all to clear up the confusion created through the overlapping terminology.

## XXIII. EVIDENCE REGARDING AEARO'S USE OF PRODUCT-SPECIFIC TESTING PANELS AND USE OF EMPLOYEES AND THEIR FAMILY MEMBERS AS TEST SUBJECTS.

During the 2000s, Aearo's EARCal laboratory began assigning individual test subjects to product-specific panels. Ex. 42 at 810:2-14. Because some subjects regularly obtained consistent results, and consistent fits, for particular types of hearing protection devices, Aearo qualified some subjects for tests of earmuffs, others for tests of foam earplugs, others for tests of premolded earplugs, and some for a combination of product types. *Id.* at 809:13-19. And individual test subjects were not limited to just one panel—someone could be on all four panels, or just one. *Id.* Plaintiffs have characterized this practice as Aearo testing its "A students," alleging that Aearo cherry-picked test subjects to deliver the highest NRRs instead of testing subjects who would be an appropriate representation of the overall population of users. Ex. 31 at 324:19-20. But the use of product-specific testing panels is irrelevant because Aearo formed these product-specific panels *after* the CAEv2 labeling tests in 2000. *See* Ex. 42 at 810:12-14 (testifying that the panels were organized "after the testing that was done on the Combat Arms Earplug."). Moreover, any probative value of product-specific testing panel evidence is outweighed by its potential to confuse and mislead the jury. *See* Fed. R. Evid. 403. If Plaintiffs spend time criticizing Aearo's product-specific testing panels, the jury will receive the impression that those panels were used on Aearo's REAT tests of the CAEv2, which will be a major focus of the trial. But as Ron Kieper testified, that is simply not the case, and evidence of product-specific test panels should be excluded. Ex. 42 at 810:12-14.

Further, Plaintiffs seek to introduce evidence that Aearo used its employees and their relatives as test subjects in these test panels. Ex. 31 at 116:3-119:5; 122:4-25. As stated above, product-specific test panels are wholly irrelevant to Plaintiffs' claims. So too are the identities of the test subjects. Plaintiffs' sole purpose for such evidence is to cast Defendants in a negative light by insinuating that Aearo used its employees so that they (or a relative) would manipulate their own results in order to deliver higher NRRs. Not only is this unsubstantiated theory unduly prejudicial to Defendants, it is likely impossible. In fact, Elliott Berger testified that if individual test subjects attempted to manipulate their individual results, the NRR would likely *decrease* as a result of high variability between test subjects. Ex. 46 at 249:10-251:1. Given the undue prejudice and the lack of any probative value, the Court should exclude this evidence.

## XXIV.  ASSERTIONS OF PRIVILEGE.

3M's privilege assertions, and any disputes over such assertions, should not be evidence or be put before the jury.  Specifically:  (1) any privilege marking on otherwise-admissible documents should be redacted, and (2) any privilege objections at trial  should be argued outside of the jury's hearing.  A jury should not be allowed to draw adverse or negative inferences from any privilege invocation. *See, e.g., Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1344 (Fed. Cir. 2004).  There is no reason the jury should be aware of privilege invocations—by either side—which is why this information is routinely excluded from trials.  *See*, *e.g.*, *Broyles v. Cantor Fitzgerald & Co.*, 2016 WL 7656028, at *1-2 (M.D. La. Sept. 8, 2016); *Williams v. Sprint/United Mgmt. Co.*, 464 F. Supp. 2d 1100, 1108 (D. Kan. 2006).

Plaintiffs do not appear to contest this issue in theory, but have suggested that redacting privileged designations would be confusing to the jury and cause the jury to speculate about the reasons for redactions and the contents of redacted information.  Besides being speculative, those concerns can be addressed with standard curative instructions.

## XXV.  INFLAMMATORY COMMENTS REGARDING DOD AND VA'S RECORD-KEEPING PRACTICES.

Plaintiffs' Counsel have referred to the VA and its record-keeping process as "the Piccadilly circus."  Defendants move to prevent Plaintiffs from using this phrase or making any other inflammatory comments regarding the DoD or VA's record-keeping practices.  Such remarks lack probative value, are prejudicial, and, coming from Plaintiffs' Counsel, lack foundation.  Indeed, Plaintiffs have not proffered any expert evidence demonstrating that all or even most VA or DoD records are unreliable or untrustworthy as a general matter.

## XXVI. EVIDENCE RELATED TO QUALITY CONTROL FOR MANUFACTURING OF THE CAEv2.

Plaintiffs' complaints do not contain *any allegations* relating to the CAEv2's manufacturing specifications or allege that any CAEv2 *that they used* deviated from those specifications.  *See* Ex. 43.  Nonetheless, Plaintiffs seek to introduce irrelevant evidence and argument about manufacturing and quality control issues, including testimony on these subjects from plaintiffs' experts (including Armstrong, McKinley, and Coetzee) and Rule 30(b)(6) testimony from Annette Childress-Shaver.  *See, e.g.*, Ex. 44 at ¶¶ 14–16, 19.

Under Georgia and Kentucky law, "a manufacturing defect will always be identifiable as a deviation from some objective standard or a *departure from the manufacturer's specifications* established for the creation of the product." *Sharp v. St. Jude Med., S.C., Inc.*, 2020 WL 7647511, at \*4 (11th Cir. Dec. 23, 2020) (citations omitted) (emphasis added); *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 788 (6th Cir. 2005). "In contrast, 'a design defect claim posits that there is a problem with the entire product line[.]'" *Sharp*, 2020 WL 7647511, at \*5 (citation omitted).

Plaintiffs' expert, Armstrong, acknowledged that Aearo's acoustic resistance checker ("ARC") boxes—which were used for quality control—were not designed to show deviations from Aearo's manufacturing specifications and testified that there is no evidence that any green tips, yellow tips, or CAEv2 stem assembly failed to comply with Aearo's specifications. Ex. 45 at 124:6-125:7; 136:16–24; 137:13–20; 138:24–139:6.

Accordingly, any evidence, expert or fact testimony, or argument related to alleged manufacturing defects or failed quality control in the manufacturing process have no relevance to Plaintiffs' *design defect* claims and should be excluded under Rules 401 and 403.

## XXVII.  INFLAMMATORY POLITICAL REMARKS.

Defendants move to exclude inflammatory political references, including those relating to any political party.  Such statements offer no probative value and would potentially inflame the jury's passions.

## XXVIII.REFERENCES TO THE BELLWETHER PROCESS.

Defendants seek to exclude any references to how these Plaintiffs were selected for the bellwether trial, as well as any reference to these Plaintiffs being in the first bellwether trial.  As explained above, *supra* Section X, other plaintiffs' claims constitute inadmissible hearsay and that there are hundreds of thousands of other plaintiffs is prejudicial to 3M.

## XXIX.  DISCOVERY PROCESS AND DISPUTES.

Defendants seek to exclude any references to disputes among the parties and decisions by the Court during discovery.  This includes motions to compel and protective orders, and any suggestion that documents or information were requested in discovery but not provided.  References to discovery disputes lack any probative

value and would confuse the jury. *See Entrust Datacard Corp. v. Zeiser GmbH*, 2019 WL 7472893, at *5 (M.D. Fla. Oct. 29, 2019).

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant its motions *in limine*.


<div style="display: flex;">
<div>

/s/ Charles F. Beall, Jr.
Larry Hill
Florida Bar No. 173908
lhill@mhw-law.com
Charles F. Beall, Jr.
Florida Bar No. 66494
cbeall@mhw-law.com
Haley J. VanFleteren
Florida Bar No. 1003674
hvanfleteren@mhw-law.com
MOORE, HILL & WESTMORELAND, P.A.
350 West Cedar Street
Maritime Place, Suite 100
Pensacola FL 32502
Telephone: (850) 434-3541

</div>
<div>

Respectfully submitted:

/s/ Robert C. "Mike" Brock
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
mnomellini@kirkland.com

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC and Aearo, LLC*

</div>
</div>

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

Pursuant to Local Rule 7.1(F) and the Court's January 4, 2021 decision on the parameters for briefing, counsel for Defendants certify that this memorandum contains 9,835 words, excluding the case style, motion (which is less than 500 words), tables of contents and authorities, signature block, and certificates of compliance with the Local Rules.

Dated:  February 19, 2021                    Respectfully submitted,

*/s/ Robert C. Brock*
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 389-5991
mike.brock@kirkland.com

*Counsel for Defendants 3M Company,*
*3M Occupational Safety LLC, Aearo*
*Technologies LLC, Aearo Holding,*
*LLC, Aearo Intermediate, LLC and*
*Aearo LLC*

26

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)</u>

Pursuant to Local Rule 7.1(B), counsel for Defendants certify that they held a conference to discuss the relief sought in this motion with Plaintiffs' counsel on February 10 and February 14, 2021.  Plaintiffs' counsel represented that they would not agree on those dates and in follow-up emails exchanged during the week of February 15, 2021.

Dated:  February 19, 2021

Respectfully submitted,

*/s/ Robert C. Brock*
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 389-5991
mike.brock@kirkland.com

*Counsel for Defendants 3M Company,*
*3M Occupational Safety LLC, Aearo*
*Technologies LLC, Aearo Holding,*
*LLC, Aearo Intermediate, LLC and*
*Aearo LLC*

27

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 19, 2021, a true and correct

copy of the foregoing:

### DEFENDANTS' OMNIBUS MOTION *IN LIMINE* TO EXCLUDE
### THE INTRODUCTION OF CERTAIN EVIDENCE AT TRIAL

was served as follows:

☒       **[E-Mail]** By causing the above document to be sent via electronic
mail to the parties at the email addresses listed below. I am aware that service is
presumed invalid if the email transmission is returned as undeliverable.

| | |
|---|---|
| Bryan F. Aylstock, Lead Counsel<br>Douglass A. Kreis<br>Neil D. Overholtz<br>Aylstock, Witkin, Kreis & Overholtz,<br>PLLC<br>17 East Main Street<br>Suite 200<br>Pensacola, FL 32502<br>Tel.: (850) 202-1010<br>Email: baylstock@awkolaw.com<br>Email: dkreis@awkolaw.com<br>Email:<br>NOverholtz@awkolaw.com<br><br>*Counsel for Plaintiff Luke Estes*<br>Case No. 7:20-cv-00137<br><br>*Counsel for Plaintiff Stephen Hacker*<br>Case No. 7:20-cv-00131 | Shelley V. Hutson, Co-Lead<br>Counsel Clark, Love & Hutson,<br>GP<br>440 Louisiana Street<br>Suite 1600<br>Houston, TX 77002<br>Tel.: (713) 757-1400<br>Email: shutson@triallawfirm.com |

| | |
|---|---|
| Christopher A. Seeger, Co-Lead Counsel<br>David R. Buchanan<br>Caleb A. Seeley<br>Seeger Weiss LLP<br>77 Water Street<br>8th Floor<br>New York, NY 10005<br>Tel.: (212) 587-0700<br>Email: cseeger@seegerweiss.com<br>Email: dbuchanan@seegerweiss.com<br>Email: cseeley@seegerweiss.com<br>Email: MDL2885@seegerweiss.com<br><br>*Counsel for Plaintiff Lewis Keefer*<br>Case No. 7:20-cv-00104 | Michael A. Burns, Co-Liaison Counsel<br>Mostyn Law Firm<br>3810 W. Alabama Street<br>Houston, TX  77027<br>Tel.: (713) 714-0000<br>Email: epefile@mostynlaw.com<br>Email: maburns@mostynlaw.com |
| Evan D. Buxner,<br>Plaintiffs' Executive Committee<br>Gori Julian & Associates<br>156 North Main Street<br>Edwardsville, IL 62025<br>Tel.: (618) 659-9833<br>Email: evan@gorijulianlaw.com<br><br>*Counsel for Plaintiff Stephen Hacker*<br>Case No. 7:20-cv-00131 | Brian H. Barr, Co-Liaison Counsel<br>Winston Troy Bouk<br>Levin, Papantonio, Thomas, Mitchell,<br>Rafferty, & Proctor, P.A.<br>316 S Baylen St. Ste 600<br>Pensacola, FL 32502<br>Tel.: (850) 435-7045<br>Email: bbarr@levinlaw.com<br>Email: tbouk@levinlaw.com<br><br>*Counsel for Plaintiff Lewis Keefer*<br>Case No. 7:20-cv-00104 |
| Taylor C. Bartlett<br>William L. Garrison, Jr.<br>Discovery & ESI Subcommittee<br>Heninger Garrison Davis LLC<br>2224 1st Avenue North<br>Birmingham, AL 35203<br>Tel.: (205) 326-3336<br>Email: taylor@hgdlawfirm.com<br>Email: lewis@hgdlawfirm.com | Katherine E. Charonko,<br>Discovery & ESI Subcommittee<br>Bailey & Glasser LLP<br>209 Capitol Street<br>Charleston, WV  25301<br>Tel.: (304) 345-6555<br>Email: kcharonko@baileyglasser.com |

| | |
|---|---|
| Virginia E. Anello,<br>Discovery & ESI Subcommittee<br>Douglas & London<br>59 Maiden Ln, 6th Floor<br>New York, NY 10038<br>Tel.: (212) 566-7500<br>Email: vanello@douglasandlondon.com | J. Nixon Daniel, III<br>Discovery & ESI Subcommittee<br>Beggs & Lane<br>501 Commendencia Street<br>Pensacola, FL 32502<br>Tel.: (850) 469-3306<br>Email: jnd@beggslane.com |
| Taylor C. Bartlett<br>William L. Garrison, Jr.<br>Discovery & ESI Subcommittee<br>Heninger Garrison Davis LLC<br>2224 1st Avenue North<br>Birmingham, AL 35203<br>Tel.: (205) 326-3336<br>Email: taylor@hgdlawfirm.com<br>Email: lewis@hgdlawfirm.com | Katherine L. Cornell<br>Pulaski Law Firm<br>2925 Richmond Avenue, Suite 1725<br>Houston, TX 77098<br>Tel.: (713) 664-4555<br>Email: kcornell@pulaskilawfirm.com<br><br>*Counsel for Plaintiff Luke Estes*<br>Case No. 7:20-cv-00137 |
| Thomas W. Pirtle<br>Laminack Pirtle & Martines<br>5020 Montrose Blvd., 9th Floor<br>Houston, TX 77006<br>Tel.: (713) 292-2750<br>Email: tomp@lpm-triallaw.com<br><br>*Counsel for Plaintiff Luke Estes*<br>Case No. 7:20-cv-00137 | Quinn R. Wilson<br>Onder Law LLC<br>110 E. Lockwood Avenue, 2nd Floor<br>St. Louis, MO 63119<br>Tel.: (314) 963-9000<br>Email: wilson@onderlaw.com<br><br>*Counsel for Plaintiff Stephen Hacker*<br>Case No. 7:20-cv-00131 |
| Thomas P. Cartmell<br>Wagstaff & Cartmell<br>4740 Grand Avenue, Suite 300<br>Kansas City, MO 64112<br>Tel.: (816) 701-1100<br>Email: tcartmell@wcllp.com<br><br>*Counsel for Plaintiff Stephen Hacker*<br>Case No. 7:20-cv-00131 | |

DATED:  February 19, 2021          */s/ Robert C. Brock*_____
                                   Robert C. "Mike" Brock