# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *Luke Estes*, No. 7:20-cv-00137; *Stephen Hacker*, No. 7:20-cv-00131; *Lewis Keefer*, No. 7:20-cv-00104 | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones<br><br>**[FILED UNDER SEAL]** |

## PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' OMNIBUS MOTION *IN LIMINE* TO EXCLUDE THE INTRODUCTION OF CERTAIN EVIDENCE AT TRIAL

# **TABLE OF CONTENTS**

A.   Motions Related to Hacker.................................................................1

    1.   3M Unreasonably Narrows "Garden Variety" Damages............1

    2.   Hacker's Injuries. ..................................................................2

B.   Motions Related to Estes...............................................................2

    1.   Defendants Unreasonably Narrow Estes' "Garden
        Variety" Damages. ............................................................2

    2.   Mrs. Estes' Father. .............................................................3

    3.   Evidence of the Estes Family's Religious Upbringing and
        Beliefs. ..............................................................................3

C.   Motions Applying to All Plaintiffs. ..............................................3

    1.   Previous Litigation, Including Settlements and
        Investigative Report. .........................................................3

        a.   Qui Tam Litigation. ...................................................3

        b.   Evidence from the Moldex Lawsuits................................5

        c.   Patent Infringement Litigation. .......................................5

    2.   Defendants' Financial Condition. ..............................................6

    3.   1993 Cabot Fine. ....................................................................7

    4.   Character Evidence About Plaintiffs' Military Service,
        Including Commendations. ......................................................7

    5.   Other Injuries and Number of Claimants...................................8

    6.   Evidence of Falco's Termination...............................................8

    7.   Fallon's Downloading of Documents. .......................................8

    8.   "What Is Your Favorite Sound" Video......................................9

9.  3M's Alleged Monopoly of Hearing Protection Device Market. ..................................................................9

10. That Defendants Were Required, Should Have, or Actually Fitted or Trained Plaintiffs. ...........................10

11. 3M's Discontinuation and Lack of Recall of CAEv2...............10

12. Family Member Pain or Anguish.............................................11

13. Aearo's Start and Stop of Non-CAEv2 Tests. ...........................11

14. That CAEv2 Did Not Comply With Any Contractual Specification...................................................................12

15. Evidence Suggesting the Rise in Hearing Loss in the 2000s Was Due to the CAEv2. .....................................12

16. Removal of the Flange-Fold Fitting Tip in 2012......................13

17. Method B Test Data. ................................................................13

18. Aearo's Use of Products Specific Testing Panels and Employees and Family Members as Test Subjects...................14

19. Assertions of Privilege..............................................................14

20. Inflammatory Comments Regarding DOD and VA's Record-Keeping Practices.......................................14

21. Quality Control for Manufacturing CAEv2..............................15

22. References to the Bellwether Process. ......................................15

23. Discovery Process and Disputes. .............................................16

D.  Conclusion........................................................................16

## TABLE OF AUTHORITIES

**Cases**

*3M v. Moldex-Metric, Inc.*,
  12-cv-00611 (D. Minn. Mar. 8, 2012) ....................................................5

*Armstead v. Allstate Prop. & Cas. Ins. Co.*,
  2016 WL 4169222 (N.D. Ga. Mar. 7, 2016) ....................................10

*Banks v. ICI Americas, Inc.*,
  450 S.E.2d 671 (Ga. 1994)...........................................................9

*Beech Aircraft Corp. v. Rainey*,
  488 U.S. 153 (1988)...................................................................4

*BMO Harris Bank, N.A. v. Richert Funding, LLC*,
  2016 WL 11531452 (N.D. Ga. July 5, 2016) .....................................6

*Dewit v. UPS Ground Freight, Inc.*,
  2017 WL 4863279 (N.D. Fla. Aug. 22, 2017)................................ 7, 10

*Georgel v. State Farm Mut. Auto. Ins. Co.*,
  2016 WL 867112 (E.D. Ky. Mar. 2, 2016)........................................2

*Gutierrez v. Galiano Enterprises of Miami, Corp.*,
  2019 WL 3302325 (S.D. Fla. July 23, 2019).....................................4

*Hendrix v. Evenflo Co.*,
  255 F.R.D. 568 (N.D. Fla. Jan. 28, 2009).........................................5

*Hessen v. Jaguar Cars*,
  915 F.2d 641 (11th Cir.1990) .......................................................8

*In re Gen. Motors*,
  2015 WL 8270427 (S.D.N.Y. Dec. 7, 2015) ....................................15

*In re Mentor Corp.*,
  2010 WL 1962943 (M.D. Ga. May 14, 2010). ...................................8

*In re Wright Med.*,
   2015 WL 6690046 (N.D. Ga. Oct. 30, 2015) ........................................................8

*Mateti v. Activus*,
   2010 WL 11692306 (D. Md. Apr. 22, 2010)........................................................3

*McKelvey v. Geren*,
   2009 WL 3294830 (E.D. Mich. Oct. 9, 2009) ......................................................7

*Navelski v. Int'l Paper*,
   2018 WL 11206617 (N.D. Fla. May 16, 2018) ....................................................4

*Nowell v. City of Cincinnati*,
   2006 WL 2619846 (S.D. Ohio Sept. 12, 2006) ....................................................4

*Rushing v. Wells Fargo Bank, N.A.*,
   2012 WL 3155790 (M.D. Fla. Aug. 3, 2012) .......................................................4

*Salinero v. Johnson & Johnson*,
   400 F. Supp. 3d 1334 (S.D. Fla. Sept. 10, 2019) ..................................................4

*Sessa v. Reinauer*,
   2005 WL 8160229 (M.D. Fla. June 15, 2005).......................................................2

*Sorenson v. H&R Block*,
   197 F.R.D. 199 (D. Mass. 2000)............................................................................3

*Tomczyk v. Rollins*,
   2009 WL 1044868 (N.D. Ga. Apr. 20, 2009).......................................................8

*Tran v. Wells Fargo Bank, N.A.*,
   2017 WL 1234131 (D. Or. Jan. 20, 2017) ............................................................1

*United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*,
   2016 WL 9185141 (E.D. Pa. Sept. 29, 2016) .......................................................7

*United States of America ex. rel. Moldex-Metric, Inc. v. 3M Company*,
   16-cv-1533. (D.S.C. July 25, 2018) ......................................................................4

*United States v. Lampley*,
    68 F.3d 1296 (11th Cir. 1995) ...............................................................7

*Valentine v. Legendary Marine*,
    2011 WL 13187390 (N.D. Fla. Jan. 18, 2011) .....................................5

*Wells v. Coker*,
    707 F.3d 756 (7th Cir. 2013) ...............................................................12

*Winstead v. Lafayette Cnty. Bd. of Cnty. Comm'ers*,
    315 F.R.D. 612 (N.D. Fla. July 20, 2016) .......................................1, 9

*Zinaman v. Kingston*,
    2014 WL 282633 (N.D.N.Y. Jan. 23, 2014).....................................2, 9

**Regulations**

40 C.F.R. § 211 ........................................................................................14

**Rules**

Fed. R. Civ. P. 30 .......................................................................................7
Fed. R. Evid. 401 ......................................................................................13
Fed. R. Evid. 404 .......................................................................................7
Fed. R. Evid. 407 ......................................................................................10
Fed. R. Evid. 608 .......................................................................................4
Fed. R. Evid. 803 .......................................................................................4
Fed. R. Evid. 807 .......................................................................................5

**Statutes**

K.R.S. § 411.18...................................................................................6, 9
O.C.G.A. § 51-12-5.1 (2010)...................................................................9

Plaintiffs submit the following response in opposition to Defendants' omnibus motion in limine:

## A.   Motions Related to Hacker.

### 1.   *3M Unreasonably Narrows "Garden Variety" Damages.*

Hacker should be permitted to explain how tinnitus affects his daily life. In a discovery Order, Judge Jones limited certain experts to testimony regarding hearing loss and tinnitus.[1] A footnote stated that a different plaintiff claiming damages from "frustration," "sleep issues," "focus issues," "irritability," and "social isolation" had asserted more than "the typical garden-variety complaint of mental anguish or distress."[2] Neither the footnote nor the Order limited Hacker's testimony.

3M's effort to treat that dicta on expert testimony as a list of precluded fact testimony is misguided. Addressing "garden-variety" damages, this Court has held that the "ultimate question" is whether a plaintiff's claim "differs substantially from the typical claim in similar cases." *Winstead v. Lafayette Cnty.*, 315 F.R.D. 612, 615 (N.D. Fla. 2016). These injuries are typical among tinnitus sufferers, so Hacker should be permitted to testify about them.

Common effects of tinnitus include "sleep disturbance, concentration, loss of silence/feeling of inability to escape, and emotional/stress-based issues."[3] Hacker will not claim that tinnitus caused or aggravated any diagnosed condition. Rather, he will explain how tinnitus affects his life, including difficulty understanding his children, frustration, sleep issues that make him tired and cranky, and noises that hurt his head.[4] His complaints are common for tinnitus patients.[5] These may not be "garden-variety" problems associated with employment discrimination or false arrest—the claims asserted in the cases cited by Judge Jones.[6] But they are "garden-variety" **tinnitus** effects.

Importantly, tinnitus is diagnosed by measuring "factors such as sleep, concentration, and emotional reaction."[7] Thus, 3M's proposed limitations would inhibit Plaintiff's ability to prove Hacker's tinnitus.

---

[1] *Hacker*, Dkt. 58 at 9.

[2] *Id.* at 7 n.3.

[3] PX1(Spankovich-2d-Am-48); 3M itself identifies these as anticipated effects of auditory injury. *See infra* C.8.

[4] PX2(Hacker-Dep-(7/31/20)-59:4-62:10).

[5] PX3(Spankovich-Dep-(12/10/20)-107:5-19).

[6] Dkt. 58 at 7 n.2.

[7] PX1(Spankovich-2d-Am-37).

3M's causation argument is illogical. Expert testimony will prove that the CAEv2 caused Hacker's tinnitus, and Hacker may describe the effects thereof. *Georgel v. State Farm Mut. Auto. Ins.*, 2016 WL 867112, *5 (E.D. Ky. 2016).

### 2.   *Hacker's Injuries.*

Hacker is entitled to present evidence or argument that he was injured in 2006 in Kentucky, and at other places and times. For choice-of-law purposes, Hacker argued he was "injured" and "first diagnosed" in Kentucky—not that he was *only* injured there.[8] Hacker's deposition[9] and evidentiary-hearing testimony[10] support this position, as this Court has recognized.[11] Hacker is not estopped from presenting expert testimony or argument about sub-clinical injury pre-2006 or aggravation post-2006—as he argued on summary judgment that his "cumulative" toxic noise exposure while wearing the CAEv2 caused his tinnitus.[12]

## B.   Motions Related to Estes.

### 1.   *Defendants Unreasonably Narrow Estes' "Garden Variety" Damages.*

For the same reasons stated in Section A.1, Estes is entitled to explain to the jury the effects of his injuries. This Court has classified "damages to compensate mental anguish, distress, and loss of enjoyment of life" as "garden-variety."[13] Estes' hearing loss and tinnitus affect his speech understanding, concentration, attention, sleep, ability to relax, and loss of quiet.[14] These are garden-variety consequences of his injuries. *See Sessa v. Reinauer*, 2005 WL 8160229, *3 (M.D. Fla. 2005); *Zinaman v. Kingston*, 2014 WL 282633, *2 (N.D.N.Y. 2014).[15]

3M's assertion that Estes "limited himself" to "ward off discovery" is false.[16] Estes produced unredacted records and Defendants withdrew their only motion to

---

[8] Dkt. 1540 at 26-27; Dkt. 1597 at 2.
[9] PX2(Hacker-Dep-(7/31/20)-204:8-205:16).
[10] PX4(Hearing-Tr-(1/8/21)-18:12-18, 32:4-25, 39:18-19, 40:13-24).
[11] Dkt. 1599 at 7-9.
[12] *Hacker*, Dkt. 67 at 7-8.
[13] Dkt. 1065 at 6.
[14] PX5(Spankovich-(Estes)-14); PX6(Estes-Rog-Responses-13-17-52).
[15] To the extent the discovery order in *Hacker* defined "garden variety" more narrowly, it is not binding in *Estes* and Plaintiff submits it misstates the law and contradicts prior orders. *Compare Hacker*, Dkt. 57 *with* Dkts. 1065, 1258.
[16] Def-Mot-3.

compel.[17] Nor is there prejudice; the scope of Estes' testimony has been known for months,[18] requires no expert testimony, and is comfortably within "garden-variety" mental suffering. *E.g.*, *Mateti v. Activus*, 2010 WL 11692306, *4 (D. Md. 2010); *Sorenson v. H&R Block*, 197 F.R.D. 199, 204 (D. Mass. Nov. 2, 2000).

### 2.  *Mrs. Estes' Father.*

Plaintiffs consent to the exclusion of statements by Mrs. Estes' father.

### 3.  *Evidence of the Estes Family's Religious Upbringing and Beliefs.*

Plaintiffs may properly submit evidence of the impact of Mr. Estes' injury on the activities of their daily life, regardless of their religion. Defendants attempt to use the Estes family's religious observance as both a sword and a shield, seeking to introduce prejudicial testimony relating to their pre-marital abstinence,[19] while also seeking to exclude evidence on the impact of hearing loss and tinnitus on their lives. Many of the Estes family's social activities relate to their religion, which is central in their lives,[20] and proving the impact of their injuries requires discussing those activities, as it would for any plaintiff. For example, Estes' injury has obvious implications for his ability to sing in church choirs as he has in the past.[21] An opera-lover or bird-watcher would be entitled to testify to the impact of auditory injury on their daily activities; a church-goer's testimony is just as permissible. Defendants' suggestion otherwise denigrates religious activities, suggesting they are less important to one's life than secular activities. Defendants' incorrect speculation of improper bolstering can be cured by instructing the jury.

## C.  Motions Applying to All Plaintiffs.[22]

### 1.  *Previous Litigation, Including Settlements and Investigative Report.*

#### a.  *Qui Tam Litigation.*

The *qui tam* litigation against Defendants is relevant to and probative of Defendants' contentions herein that the government was a sophisticated/learned

---

[17] Dkt. 1258 at 8 n.4.

[18] PX6(Estes-Rog-Responses-13-17-52).

[19] Dkt. 1663 at 21.

[20] PX7(Jennifer-Estes-Dep-(7/29/20)-22:9-19, 22:22-24, 49:16-25, 62:11-18).

[21] *Id.*

[22] Plaintiffs do not oppose 3M's MIL 27 about inflammatory political remarks.

intermediary, failed to adequately warn/train/fit servicemembers, and received adequate warnings regarding the CAEv2's defects.[23] *Salinero v. Johnson & Johnson*, 400 F. Supp. 3d 1334, 1346 (S.D. Fla. 2019) ("whether the manufacturer was reasonable in relying on the intermediary" and "fully warned the intermediary").

By intervening in the *qui tam* lawsuit, the government adopted sworn allegations that Defendants defrauded it regarding the CAEv2.[24] The *qui tam* allegations thus directly bear on issues Defendants intend to make central to this case and provide permissible impeachment evidence under FRE 608(b) for Defendant witnesses testifying they told the government everything. *Gutierrez v. Galiano*, 2019 WL 3302325, *4 (S.D. Fla. 2019) (permitting evidence of other lawsuits for impeachment); *Rushing v. Wells Fargo*, 2012 WL 3155790, *1 (M.D. Fla. 2012) (same).

Regarding the CID report, Defendants misconstrue the public-records exception. "A record or statement of a public office" is admissible if it sets out "factual findings from a legally authorized investigation," and such record or statement is not shown to be untrustworthy. FRE 803(8)(A)(iii). Conclusions that are "based on a factual investigation and satisf[y] the Rule's trustworthiness requirement" are admissible. *Beech Aircraft v. Rainey*, 488 U.S. 153, 170 (1988) (admitting JAG report of plane crash); *Nowell v. City of Cincinnati*, 2006 WL 2619846, *1 (S.D. Ohio 2006) (admitting parts of an Internal Investigations Section Report, including investigator's conclusions). A defendant's failure to affirmatively show a public record is untrustworthy dooms any attempt to exclude that record. *Navelski v. Int'l Paper*, 2018 WL 11206617 (N.D. Fla. 2018).

The Criminal Investigative Command is responsible for investigating cases and creating a factual record so the DOJ can decide whether to intervene or bring a lawsuit based on "unbiased investigative findings."[25] Here, the CID report does not contain any of Special Agent Coleman's personal conclusions, opinions, "or anything else to that effect."[26] Instead, Coleman reported the facts and concluded that the CAEv2 "did not perform well in certain individuals."[27]

Coleman confirmed that the "summary" of the report was based on her "factual findings" from the investigation.[28] Coleman's qualifications and the quality

---

[23] Dkt. 959 ¶¶ 99-100.

[24] *U.S. ex. rel. Moldex-Metric v. 3M*, 16-cv-1533, Dkt. 22 (D.S.C. July 25, 2018) ("PX8").

[25] PX9(Coleman-Dep-21:16-22:20, 26:22-28:18).

[26] *Id.* 31:22-32:8, 95:8-15, 400:2-4.

[27] PX10(CID File0001-0260, at -0002).

[28] PX9(Coleman-Dep-464:16-22).

of her report confirm it is trustworthy.[29] The CID report's summary is thus admissible under FRE 803(8) and, while Plaintiffs believe the *qui tam* is also fully admissible, the Court can issue a limiting instruction to curb potential prejudice or confusion. *Valentine v. Legendary Marine*, 2011 WL 13187390 (N.D. Fla. 2011).

As for the interview summaries, Coleman explained the individuals she interviewed were under a legal obligation to tell the truth and that summarizing such interviews is part of her ordinary investigatory process.[30] Just like a police officer's crash report, that portion of the CID report is similarly admissible under FRE 803(8). *Hendrix v. Evenflo*, 255 F.R.D. 568, 580 (N.D. Fla. 2009). Alternatively, it is sufficiently trustworthy for admission under FRE 807.

Finally, Plaintiffs do not intend to offer the qui tam settlement agreement at trial unless needed to rebut 3M's claims about disclosure to the government.

### b.   *Evidence from the Moldex Lawsuits.*

The two *Moldex* lawsuits generated, *inter alia*, a number of depositions and document productions that address the CAEv2's development and features—which are squarely at issue here (including Doug Ohlin's only testimony on the CAEv2 before he passed away). Discovery in those lawsuits also revealed 3M's views on alternatives to the CAEv2 (which Plaintiffs contend were safer designs) and 3M's strategies to maintain sales of the CAEv2 at all costs (which is relevant to punitive damages). Defendants can seek to exclude parts of this record on appropriate showings, but wholesale exclusion is clearly improper.

### c.   *Patent Infringement Litigation.*

3M employed a "three-legged stool" strategy to prevent competitors' earplugs (*i.e.*, safer alternatives) from supplanting the CAEv2 with the military.[31] One of those legs was commencing baseless patent-infringement actions against smaller competitors, like in *Moldex I*.[32] Evidence of *Moldex I* is therefore relevant to punitive damages because it is evidence of 3M's efforts to exclude safer alternatives despite knowing the CAEv2 was defective.[33] As described above, depositions and

---

[29] *Id.* 9:21-11:16 (qualifications), 245:14-246:21 (Coleman received agent-of-the-year award based on her CAEv2 investigation), 65:17-67:23 (timeliness of reporting and breadth of investigation).

[30] PX9(Coleman-Dep-65:17-66:10, 180:8-181:10).

[31] PX11(3M_MDL000274536).

[32] *3M v. Moldex-Metric*, 12-cv-00611, Dkt. 1 ¶¶ 11, 14 (D. Minn. 2012) ("PX12").

[33] *Id.*

documents produced in the course of their patent suit are directly relevant to the development, design, and performance of the CAEv2.

### 2.    *Defendants' Financial Condition.*

Plaintiffs are entitled to introduce evidence relevant to intent, motive, punitive damages and the credibility of Defendants' witnesses, even where such evidence relates to Defendants' finances.

*First*, evidence of profitability and financial condition is relevant to the punitive damages Plaintiffs seek, as it informs the extent to which those damages can serve as a deterrent to Defendants' conduct.[34] Specifically, the "profitability of the misconduct to the defendant" is a relevant factor in assessing punitive damages under Kentucky law, K.R.S. § 411.186(2)(c), and evidence of a party's overall financial condition is relevant to punitive damages under Georgia law. *BMO Harris Bank. v. Richert Funding*, 2016 WL 11531452, at *5 (N.D. Ga. 2016).

*Second*, evidence relating to the sale of Aearo to 3M is relevant to the Defendants' motive—the all-important question of "why not tell the military the truth?" Warren's pitch to 3M stressed and touted the strength of the Combat Arms and the growth of Aearo's military sales,[35] stressing to 3M the importance of the CAEv2 not only to the company's direct profitability, but also to the relationship between Aearo and the military. Evidence of Defendants' military business strategy provides a common-sense explanation for Defendants' motive in continuing to withhold information about the CAEv2's dangers in order to protect and expand their business with military customers. Indeed, Warren, his direct subordinate,[36] Brian Myers, and Elliott Berger all owned substantial stock and options in Aearo and personally and substantially gained from Aearo's sale to 3M.[37]

*Third*, compensation and ownership are relevant both to witnesses' bias towards 3M and stake in, and motive to deny, the underlying misconduct.[38] For example, Berger owns 1,220 shares and 6,142 exercisable options in 3M.[39]

---

[34] Defendants themselves argue jurors "may not understand" the significance of a financial penalty "for a Fortune 500 company," supporting the need to contextualize dollar amounts with evidence of Defendants' financial condition. *See* Def-Mot-6.

[35] PX13(Warren-Dep-(1/23/20)-37:25-40:1, 44:5-46:1).

[36] PX13(Warren-Dep-(1/23/20)-50:2-50:16).

[37] PX13(Warren-Dep-(1/23/20)-308:1-310:6); PX59(Warren-Dep-Ex-53, at 9-11).

[38]    PX13(Warren-Dep-(1/23/20)-307:19-310:10));   PX14(Myers-Dep-(12/13/19)-456:23-458:17; 460:16-461:18; 651:1-652:9).

[39] PX15(Berger-Dep-(12/18/20)-151:10-154:23).

### 3.    *1993 Cabot Fine.*

Berger and Kieper both worked at Cabot when the DOJ and EPA subjected it to what was then the largest ever fine for earplug labeling test violations.[40] *At Cabot's direction* (*i.e.*, as its agent), Paul Michael & Associates selectively ran multiple noise reduction rating ("NRR") labeling tests on the same Cabot earplug, and Cabot chose to label the earplug with the highest NRR.[41]

FRE 404(b)(2) is clear that such evidence is admissible to show *knowledge*; *e.g.*, that Berger and Kieper knew from the 1993 fine that selectively picking the best test result violates EPA regulations. This satisfies the first part of FRE 404(b). *U.S. v. Lampley*, 68 F.3d 1296, 1299 (11th Cir. 1995). Because Cabot—Aearo's predecessor—was responsible for these tests, the second part of the test is also satisfied. *Id.*; *U.S. v. Sanofi*, 2016 WL 9185141, *1 (E.D. Pa. 2016) (similar bad acts by defendant's predecessor relevant to motive, state of mind, and intent). Third, given that various defense witnesses wish to testify that stopping Test 213015 and cherry-picking the higher Test 213017 results were proper actions, this evidence is highly probative that the exact opposite is true.

Additionally, this evidence is permissible impeachment evidence under FRE 608(b), given Defendants' 30(b)(6) testimony that these practices were permissible.

### 4.    *Character Evidence About Plaintiffs' Military Service, Including Commendations.*

Defendants' motion is too broad and vague for Plaintiffs to adequately respond. Nonetheless, evidence related to the Plaintiffs' military service should be admitted in this case for two reasons. First, a person's general background, which necessarily includes evidence related to Plaintiffs' military service and commendations, is important to give the jurors context. Defendants reliance on *McKelvey v. Geren*, 2009 WL 3294830, *1 (E.D. Mich. 2009), is misplaced, as that court denied the motion to exclude evidence regarding his military service, and only noted that "it will not allow Plaintiff to delve *extensively* into his military service." *Dewit v. UPS*, 2017 WL 4863279, *7 (N.D. Fla. 2017) ("testimony regarding … military service [is allowed] for background purposes"). Second, Plaintiffs anticipate that Defendants will attempt to show that Plaintiffs failed to follow orders related to earplugs, and evidence of their military commendations support the contention that the Plaintiffs followed orders.

---

[40] PX16(3M_MDL000024833).
[41] PX17(Berger-Dep-(10/8/2015)-89:22-91:2, 92:17-93:10).

### 5.    *Other Injuries and Number of Claimants.*

Other claimants and their injuries are relevant and probative, outweighing any risk of unfair prejudice. *In re Mentor*, 2010 WL 1962943, *1-2 (M.D. Ga. 2010). "[E]vidence of similar occurrences may be offered to show a defendant's notice of [defect]" and "ability to correct," the defect's "magnitude," and "the lack of safety for intended uses, the strength of a product, the standard of care, and causation." *Hessen v. Jaguar Cars*, 915 F.2d 641, 650 (11th Cir.1990). Likewise, similar-acts evidence is relevant to punitive damages. *Tomczyk v. Rollins*, 2009 WL 1044868, *7 & n.5 (N.D. Ga. 2009). And expert fees earned in other similar cases are relevant to bias. *In re Wright Med.*, 2015 WL 6690046, *8 (N.D. Ga. 2015).

None of this evidence is inadmissible hearsay. If Defendants suggest Plaintiffs' injuries are isolated events, evidence of other claimants and injuries would unquestionably be fair game.

### 6.    *Evidence of Falco's Termination*

Falco's termination for violations of 3M's business conduct policies is of obvious relevance to his credibility. Plaintiffs never stated that the conduct that led to termination was irrelevant, but stipulated to its exclusion only in light of its prejudice.

### 7.    *Fallon's Downloading of Documents.*

Defendants have proffered Fallon, a hybrid-expert who will testify regarding how he personally trained and instructed Army medical personnel on the use of the CAEv2 and how the Army Hearing Program was implemented at certain installations.[42] That DOJ concluded Fallon improperly retained government documents during his transition to 3M is relevant to, *inter alia*, (1) his bias, particularly in light of evidence that during his service he placed large orders for the CAEv2,[43] and that the documents he retained were directly relevant to 3M's businesses; (2) the existence of documents he claims exist but has been unable to locate and produce; and (3) to impeach misleading testimony that he left government service "in good standing."[44]

---

[42] PX18(Fallon-Amend-Disclosure-1-9); Dkt. 1651.

[43] PX19(3M_MDL000273767).

[44] PX20(Fallon-(9/4/20)-750:18-24).

8.      *"What Is Your Favorite Sound" Video.*

Defendants' "What Is Your Favorite Sound" video is clearly relevant, and Defendants have shown no unfair prejudice from its use.

The video reveals Defendants are well aware that injuries such as distraction, isolation, frustration, and sleeplessness, are all intrinsic aspects of auditory injury, and that their present argument otherwise is purely litigation-driven.[45] Defendants produced this video illustrating the kinds of "anxiety … mental suffering, and distress that may flow naturally from" tinnitus and hearing loss, showing that Defendants lack a good-faith basis for their present argument that Estes' and Hacker's injuries "differ[] substantially from the typical claim in similar cases." *Zinaman*, 2014 WL 282633, *2; *Winstead*, 315 F.R.D. at 615.

The severity of the injuries resulting from inadequate hearing protection directly informs the risk-utility standard for Plaintiffs' design claims, *Banks v. ICI Americas*, 450 S.E.2d 671, 675 n.6 (Ga. 1994),[46] and Defendants' conscious indifference to such severe risk is relevant to punitive damages.[47]

Defendants' other arguments for exclusion fail. Plaintiffs repeatedly sought discovery that would have identified the employees involved in the creation of this video,[48] and Defendants' failure to identify those people for deposition is no basis for exclusion. The fact that tinnitus perception varies across individuals is not prejudicial, and it has no impact on the relevance of the video to Defendants' knowledge of the severity, permanence and progression of damages intrinsic to tinnitus and hearing loss.

9.      *3M's Alleged Monopoly of Hearing Protection Device Market.*

Defendants' attempts to quash competitors are relevant to (1) their recognition that there were safer designs available and (2) punitive damages.[49]

Defendants recognized the CAEv2 represented a hugely profitable, extremely important product for their military business.[50] Defendants admitted they were highly motivated to keep that business, which is relevant to establishing their motive

---

[45] *See* Sections A.1, B.1, *supra*.
[46] PX14(Myers-Dep-(12/12/19)-16:15-71:3).
[47] O.C.G.A. § 51-12-5.1(b)(2010).
[48] PX21(Pls-1st-Rogs-14); PX22(Pls-1st -RFPs-20, 28).
[49] O.C.G.A. § 51-12-5.1(b)(2010); K.R.S §411.184, 411.186.
[50] PX23(3M_MDL000020026).

for keeping quiet on the product's defects for so many years.[51] This is not about a "monopoly," but about contextualizing why Defendants opted to stay silent.

**10.** ***That Defendants Were Required, Should Have, or Actually Fitted or Trained Plaintiffs.***

There is ample testimony that Defendants frequented military bases to train and fit soldiers, and Plaintiffs are entitled to introduce such evidence.[52] In fact, Keefer remembers a "civilian" providing "oral instructions and [a] demonstration" about the CAEv2,[53] who arguably was from Defendants' military sales team.[54]

The Court credited this evidence when it denied Defendants' summary-judgment motions, including as to Keefer's misrepresentation, fraud, and warranty claims.[55] Defendants' motion raises no admissibility issue but is summary judgment redux and should be denied. *Armstead v. Allstate*, 2016 WL 4169222, *6 (N.D. Ga. 2016).

**11.** ***3M's Discontinuation and Lack of Recall of CAEv2.***

3M's discontinuation of and failure to recall CAEv2 is relevant to Plaintiffs' design, warning, fraud, and punitive claims, as well as for impeachment. Defendant's request to bar all evidence relating to the CAEv2's discontinuation should be denied.

First, evidence regarding 3M's failure to do more than stop selling the CAEv2—including the military's continued CAEv2 use and later determination that it was "defective"[56]—is not remedial or limited by FRE 407. *Dewit*, 2017 WL 4863279, *5  (FRE 407 does not apply to measures taken by non-parties). That, after discontinuation, 3M allowed servicemembers to "use up" their stock of CAEv2[57]

---

[51] PX24(Moses-Dep-(30(b)(6))-(10/17/19)-319:15-320:14).

[52]  PX25(McNamara-Dep-27:5-28:5, 29:11-30:22, 196:20-197:9, 279:1-3, 300:3-301:12) (weekly visits to military bases; trained soldiers); PX26(Jones-Dep-(30(b)(6))-(9/24/20)-144:1-19,    256:6-19)    (agreeing    Defendants    gave "demonstration[s]" and instructions to "military personnel" at bases); PX27(Jones-Dep-(30(b)(6))-Ex-7).

[53] PX28(Keefer-Dep-167:7-22, 169:2-22, 170:6-179:23); PX4(Hearing-Tr-(1/8/21)-187:2-11).

[54] *Keefer*, Dkt. 44 at Ex.12 (RFA 34, 36).

[55] *Keefer*, Dkt. 59 at 9-12.

[56] PX29(3M_TOUHY00002040).

[57] PX30(3M_MDL000013636).

and considered but decided not to issue additional warnings[58] would not require any discursion into recall law, and is highly probative of Plaintiffs' design, warning, fraud, and punitive claims, *see* K.R.S. § 411.18, as well as 3M's government-fault defenses.

As to discontinuation, it is admissible for multiple purposes, including "impeachment." FRE 407. 3M has opened to door by contending that the CAEv2 was properly tested and labeled[59] and that the military was aware of its defects.[60] Accordingly, Plaintiffs can introduce discontinuation evidence to impeach these contentions and demonstrate that, in fact, when the Flange Report came to light, Defendants stopped producing the CAEv2 and knew it could not be sold with the "current NRR [of 22] on the package."[61] Such evidence is substantially more probative than prejudicial.

### 12.   *Family Member Pain or Anguish.*

Plaintiffs' injuries have inherent interpersonal aspects, including impact on communication, intimacy, and social activities.[62] Although Plaintiffs have no interest in proving separate damages of non-parties, Plaintiffs are entitled to introduce evidence on the intrinsic impact of Plaintiffs' injuries on their personal relationships, including with family.

### 13.   *Aearo's Start and Stop of Non-CAEv2 Tests.*

Evidence that Defendants' off-book policy for all HPDs was to stop REAT tests prior to completion to have the estimated NRR approved[63] is relevant to Plaintiffs' negligent-testing, negligence-per-se, and punitive-damages claims, and is far more probative than prejudicial. For example, in light of Defendants' recognition that "multiple testing attempts with the same product are not allowed,"[64] their repeated decisions to cut short non-CAEv2 REAT tests show they intentionally used

---

[58] PX31(3M_MDL000623891); PX32(3M_MDL000623887); PX33(3M_MDL000623885); PX34(3M_MDL000623879).

[59] PX35(Berger-Exp-Disc-7-8); PX36(Casali-146-47).

[60] PX35(Berger-Exp-Disc-8-9).

[61] PX37(3M_MDL000332061-066); PX14(Myers-Dep-(12/12/19)-352:16-353:16, 362:15-363:21).

[62] PX28(Keefer-Dep-325:12-328:6); Sections A.1, B.1, *supra*.

[63] PX38(Berger-Dep-(12/10/19)-166:21-168:1); PX39(Kieper-Dep-(12/19/19)-162:17-163:3, 351:14-354:1).

[64] PX40(3M_MDL000332845-47); PX41(Hamer-Dep-(10/7/15)-87:5-24, 88:6-89:9, 136:10-12).

in-house testing to label products with unrepresentative NRRs, knew customer NRR expectations, and knew how to appear to satisfy those expectations. The unwritten nature of the policy directly rebuts claims that NVLAP approved Defendants' procedures.[65]

### 14.    *That CAEv2 Did Not Comply With Any Contractual Specification.*

Defendants' failure to comply with the government's expectations for the CAEv2 is probative and relevant to Plaintiffs' claims. Defendants' claim that equity bars Plaintiffs from arguing the CAEv2 failed to comply with *sales* contracts should be rejected.

Plaintiffs argued there was no *design* contract.[66] The Court agreed.[67] The Court was fully apprised that Defendants had contracted "to supply the CAEv2 or its 'equal'" in the MPID.[68] But the defense failed because the CAEv2 "already existed," so the sales contract could not possibly have set forth *design* specifications for the CAEv2.[69]

Although the MPID did not contain specifications, it nonetheless evinced the government's expectations. Indeed, the Court agreed with Plaintiffs that the MPID "expressly contemplated" "affixing warnings to the outside of the boxes," for example.[70] That the CAEv2 is not what the government was promised remains relevant to Plaintiffs' fraud, misrepresentation, and warranty claims.

Defendants' estoppel arguments fail because Plaintiffs have not taken "inconsistent positions," and it is specious to suggest this Court misunderstood the scope and meaning of the contracts at issue. *Cf. Wells v. Coker*, 707 F.3d 756, 760-61 (7th Cir. 2013).

### 15.    *Evidence Suggesting the Rise in Hearing Loss in the 2000s Was Due to the CAEv2.*

Plaintiffs have no intention of offering expert testimony that a rise in hearing loss across the military in the 2000's was due to the CAEv2. However, to the extent 3M claims hearing loss and tinnitus was (and remains) the number-one cause for VA

---

[65] PX35(Berger-Exp-Disc-6).

[66] *See* Dkt. 1102 at 15-16.

[67] *See* Dkt. 1280 at 27.

[68] *Id.* at 13; *see also* Dkt. 1072 at 20.

[69] *See* Dkt. 1280 at 32, 49.

[70] *Id.* at 54.

disability claims or that hearing loss in the military is inevitable, Plaintiffs should be entitled to rebut those claims.

### 16. *Removal of the Flange-Fold Fitting Tip in 2012.*

3M's decision to remove that language from the CAEv2's retail packaging, reveals that the "fitting tip" was never part of the instructions and in no sense an essential component of the label. This undermines Defendants' contention that the "fitting tip" was widely known and/or an important part of the product's instructions. That it was removed after technical responsibilities shifted away from those involved with Test 213015[71] further undermines 3M's contention that the CAEv2's risks were disseminated and known.

### 17. *Method B Test Data.*

Plaintiffs contend that CAEv2 was unreasonably dangerous when used as intended. Accordingly, regardless of labeling regulations,[72] any testing of the CAEv2's ability to provide adequate (and advertised) protection from noise is directly relevant. FRE 401. The relevance of Method B testing to former servicemembers is demonstrated by Defendants' own use of Method B to test the CAEv2[73] and the military's requirement to use "hearing protection data based on Method B."[74] Nor is there any risk of undue prejudice or confusion. Defendants' employees—including Berger—have explained that "subject-fit values provide a closer correspondence to real-world performance for groups of users than do the experiment supervised fit data."[75]

---

[71] PX42(Berger-Dep-(30(b)(6))-(9/25/20)-321:7-322:22).

[72] Product Noise Labeling Hearing Protection Devices, 74(149) Fed. Reg. 39,150, at 39,154 (proposed Aug. 5, 2009) (to be codified at 40 C.F.R. pt. 211) ("PX43") ("[N]o consensus on whether EPA should require Method A or Method B," and "even studies of well-trained users (as opposed to test subjects) showed results similar to Method B [attenuation] data.").

[73] PX44(3M_MDL000473611);     PX45(Eddins-Dep-182:7-183:18)     (noting Defendants performed REAT Method B testing on CAEv2 and never completed Method A testing).

[74] PX46(3M_MDL000478845-(Army Pamphlet 40-501-P1136.3)).

[75] Berger et al., *Experience With a New ANSI Standard for Measuring the REAT of Hearing Protectors (S12.6-1997)*, 105:2 J. ACOUST. SOC. AM. 1129 (1999) ("PX47"); PX48(3M MDL000439465).

18.    ***Aearo's Use of Products Specific Testing Panels and Employees and Family Members as Test Subjects.***

Defendants' policies, procedures, and methodologies for REAT testing, including test-subject/panel composition, are highly probative. All HPDs sold in the U.S. must include a label with an NRR calculated using REAT testing. 40 C.F.R. § 211. HPD manufacturers must consider product variability and test-to-test variability when testing and labeling HPDs. *Id.* at § 211.211.

Conversely, Defendants manipulated testing variability and NRRs by cherry-picking test subjects and/or using pre-selected test panels to fictitiously decrease variability, which allowed Defendants to obtain higher NRRs than they would with randomized test panels.[76] Specifically, Defendants' used pre-selected test panels with "higher and more homogenous [test] values … yielding higher NRRs" on the CAEv2 that had increased from 2000 to 2006.[77]

19.    ***Assertions of Privilege.***

The form of privilege objections is within the Court's discretion—not the parties'—in light of the potential for abuse and delay.

20.    ***Inflammatory Comments Regarding DOD and VA's Record-Keeping Practices.***

Plaintiffs will not use the phrase "the Piccadilly circus," but Plaintiffs do not otherwise agree to withhold evidence or testimony related to the DoD and/or VA's recordkeeping practices or the reliability of such records. Defendants' expert Neitzel testified that the military has a poor recordkeeping system.[78] Rubin testified that VA records frequently contain significant errors to such a hideous extent that the medical staff complained because they were basically useless.[79] Further, this Court previously noted "inaccuracies and inconsistencies" in DoD and/or VA medical records.[80]

To the extent Defendants intend to use DoD or VA medical records or the absence of a record (*e.g.*, an audiogram) to show military fault, Plaintiffs should be

---

[76] PX17(Berger-Dep-(10/8/2015)-30:03-32:4, 81:19-82:10, 148:16-149:22, 151:11-153:2); PX49(3M_MDL000728811).

[77] PX50(3M_MDL000019281, at -97-98); PX51(3M_MDL000005143-45).

[78] PX52(Neitzel-Dep-(12/16/20)-277:4-279:11).

[79] PX53(Rubin-Dep-214:21-216:18).

[80] Dkt. 1599 at 8.

able to rebut and object to the same on grounds of relevance, reliability, foundation, hearsay, and overall admissibility.

### 21. *Quality Control for Manufacturing CAEv2.*

The filter dimensions in the yellow end of the CAEv2 were designed with precise specifications that required 100% quality testing for performance and effectiveness. Even minor defects could result in significant impacts to the plug's effectiveness. As a result, 3M developed the Acoustic Resistance Checking (ARC) Test to determine whether (1) the plug and its non-linear filter would provide protection and sound attenuation as expected and (2) whether there were any assembly problems.[81] 3M established acceptable ARC value ranges for the quality testing of the filter and yellow end of the plug. Nonetheless, when the CAEv2 failed to perform within those acceptable ranges, 3M altered the ranges.[82] 3M also investigated the performance testing issues and determined that the testing failures using ARC machines was a chronic problem.

3M told the military it would perform performance testing on 100% of all plugs, as explicitly outlined in the MPID.[83] Yet 3M never disclosed to nor warned the military or soldiers that the CAEv2 did not pass the performance testing that was promised.

The evidence of this testing is directly relevant not only to Plaintiffs' design-defect claim, but also to negligent-testing, breach-of-warranty, and failure-to-warn claims.[84] Further, Plaintiffs' expert, Admiral Coetzee Leslie, testified that the military would not have accepted the plugs if they failed testing or if 3M had disclosed that it altered the acceptable ranges. Thus, evidence of ARC testing is highly relevant to whether the military would have purchased the CAEv2, whether 3M was aware of the defect, and whether they warned the military and soldiers.

### 22. *References to the Bellwether Process.*

The exclusion of references to the Bellwether selection process[85] requires exclusion of the administrative devices attendant to that process. Defendants' use of

---

[81] PX54(3M_MDL000755464).

[82] PX55(3M_MDL000650091); PX56(3M_MDL000252878).

[83] PX57(3M_MDL000257850); PX58(3M_MDL0000002017).

[84] Dkt. 704, Master Compl. ¶ 300.

[85] That references to Bellwether *selection* should be excluded, *In re Gen. Motors*, 2015 WL 8270427, *5 (S.D.N.Y. 2015), does not impact the admissibility of references to other claimants and injuries, *see* C.5.

the Bellwether Selection Sheet or census form, even if partially redacted, would necessitate contextualization—*e.g.*, they were completed without access to DoD and VA records—thus divulging the Bellwether selection process. These documents should be excluded as confusing and prejudicial.[86]

23.   ***Discovery Process and Disputes.***

Plaintiffs are entitled to prove that certain data, memoranda, instructions, labels, and correspondence (including with the government) do not exist, in part by showing they were "were requested in discovery but not provided."[87] Defendants' attempt to prevent Plaintiffs from proving the non-existence of such documents should be rejected.

**D.   Conclusion**

Plaintiffs respectfully request the Court deny 3M's motions.

Date: February 24, 2021          Respectfully submitted,

*/s/ Bryan F. Aylstock*
Bryan F. Aylstock, Lead Counsel
Florida State Bar No. 078263
AYLSTOCK, WITKIN,
KREIS & OVERHOLTZ, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel.: (850) 202-1010
baylstock@awkolaw.com

Shelley V. Hutson, Co-Lead Counsel
(Admitted Pro Hac Vice)
Texas State Bar No. 00788878
CLARK, LOVE & HUTSON, GP
440 Louisiana Street, Suite 1600
Houston, TX 77002
Tel.: (713) 757-1400
shutson@triallawfirm.com

---

[86] Dkt. 1663 at 14-15.
[87] Def-Mot-24.

Christopher A. Seeger, Co-Lead Counsel
(Admitted Pro Hac Vice)
New Jersey State Bar No. 042631990
SEEGER WEISS LLP
77 Water Street, 8th Floor
New York, NY 10005
Tel.: (212) 587-0700
cseeger@seegerweiss.com
***Counsel for Plaintiffs***

Katherine Cornell
PULASKI LAW FIRM, PLLC
2925 Richmond Ave., Ste 1725
Houston, TX 77098
Tel: (713) 664-4555
kcornell@pulaskilawfirm.com
***Counsel for Plaintiff Luke E. and Jennifer
Estes***

Evan D. Buxner
GORI JULIAN & ASSOCIATES
156 North Main Street
Edwardsville, IL 62025
Tel: (618) 659-9833
evan@gorijulianlaw.com

Quinn Robert Wilson
ONDER LAW LLC
110 E Lockwood Avenue
Second Floor
St. Louis, MO 63119
Tel: (314) 963-9000
wilson@onderlaw.com
***Counsel for Plaintiff Stephen Hacker***

17

Brian Hugh Barr
LEVIN PAPANTONIO
316 S Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7045
bbarr@levinlaw.com

Winston Troy Bouk
LEVIN PAPANTONIO
316 S Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7045
tbouk@levinlaw.com
***Counsel for Plaintiff Lewis Keefer***

18

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH COURT'S WORD LIMIT</u>

I hereby certify that the foregoing contains 4,986 words, exclusive of caption and tables of contents and authorities, in compliance with Pretrial Order No. 69 directing that Plaintiffs file omnibus responses to 3M's motions in *limine* with incorporated memorandums of law not to exceed 5,000 words.

*/s/ Bryan F. Aylstock*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 24, 2021, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Bryan F. Aylstock*