**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG    )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,   )
                                 )    Pensacola, Florida
                                 )    January 22, 2021
                                 )    10:09 a.m.
                                 )
                                 )
_____  )


**NINETEENTH CASE MANAGEMENT CONFERENCE**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-116)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*1 N Palafox Street * Pensacola, Florida  32502*
***Donna_Boland@flnd.uscourts.gov***

A P P E A R A N C E S

**JUDGE DAVID R. HERNDON** (ret.)
*dave@herndonresolution.com*

**FOR THE PLAINTIFFS:**     Aylstock, Witkin, Kreis & Overholtz, PLLC
By:  **BRYAN F. AYLSTOCK**
*baylstock@awkolaw.com*

**NEIL D. OVERHOLTZ**
*noverholtz@awkolaw.com*

**JENNIFER HOEKSTRA**
*jhoekstra@awkolaw.com*
17 E Main Street, Suite 200
Pensacola, Florida  32502

Laminack, Pirtle & Martines LLP
By: **THOMAS W. PIRTLE**
*tomp@lmp-triallaw.com*
5020 Montrose Blvd, 9th Floor
Houston, Texas  77006

**FOR THE DEFENDANTS:**     Kirkland & Ellis, LLP
By:  **ROBERT C. BROCK**
*mike.brock@kirkland.com*
1301 Pennsylvania Avenue NW
Washington, D.C.  20004

Dechert, LLP                          Kirkland & Ellis, LLP
By: **KIMBERLY BRANSCOME**            By: **MARK J. NOMELLINI**
*kimberly.branscome@dechert.com*        *mnomellini@kirkland.com*
633 W 5th Street, Suite 4900          300 N Lasalle
Los Angeles, California  90071        Chicago, Illinois  60654

Moore, Hill & Westmoreland, PA
By: **LARRY HILL**
*lhill@mhw-law.com*

**HALEY J. VANFLETEREN**
*Hvanfleteren@mhw-law.com*

**CHARLES F. BEALL, JR.**
*cbeall@mhw-law.com*
350 W Cedar Street, Suite 100
Pensacola, Florida  32502

1             P R O C E E D I N G S

2        **THE COURT:**  Good morning.

3        We're present this morning for the nineteenth

4   case management conference in the 3M Combat Arms

5   Earplug Products Liability Litigation; it is MDL2885.

6        For the Plaintiffs, present I have Mr.

7   Aylstock, Mr. Pirtle, Mr. Overholtz at counsel table.

8   Defense, I have Mr. Hill, Mr. Beall, and

9   Ms. VanFleteren.

10       I know there are a number of others on Zoom

11   as well as a number of folks on the telephone.  I'm

12   not going to introduce everyone on Zoom or the phone.

13   I believe we have approximately 140 people on the

14   phone.  I would just ask, if you speak, please

15   introduce yourself when you speak.

16       Let me confirm, from the Group B and C trial

17   groups, do we have representatives -- first I'll start

18   with Group B -- from the *Hensley*, *Sloan*, *Taylor* or

19   *Adkins* cases?

20       *[No response.]*

21       And Group C -- what I'm showing is we don't

22   have representatives from these cases:  *Hensley*,

23   *Sloan*, *Taylor*, *Adkins* in Group B; Group C is

24   *Camarillorazo*, *Finley*, *Lopez*, *Palanki*, and *Montero*.

25       **MR. AYLSTOCK:**  So, with regards to Mr.

1   Camarillorazo, Mr. Pirtle and I can speak for that

2   case as well as Mr. Sloan.

3           THE COURT:  As well as Sloan?

4           MR. AYLSTOCK:  And Mr. Palanki and Mr.

5   Finley.

6           THE COURT:  Have you filed notice of

7   appearance in those cases?

8           MR. AYLSTOCK:  *Finley*, yes, Your Honor.  I'm

9   not sure about *Camarillorazo*.

10          I think you may have in *Camarillorazo*.

11          MR. PIRTLE:  I might have in *Camarillorazo*.

12          THE COURT:  All right.  Well, look, we've had

13  this discussion before.  As far as the individual

14  bellwether cases, I need those lawyers to -- they need

15  to be at least on the telephone, or, if you're going

16  to be speaking on behalf of those plaintiffs, you need

17  to have filed a notice of appearance in those cases.

18          MR. AYLSTOCK:  Yes, Your Honor.

19          THE COURT:  That's the rule.

20          I'm just not comfortable discussing -- we

21  have some meaningful discussions that need to take

22  place with these other groups, and I'm not entirely

23  comfortable having those discussions without the

24  representatives that actually have been hired and

25  represent these people and have filed notice of

1  appearance on the docket.  I'm just not comfortable

2  talking about these things without those people

3  present.

4         Judge Jones and Judge Herndon, are you on?

5         I see Judge Herndon.

6         Judge Jones, are you on?

7         **JUDGE JONES:**  I am.  Nice to see you.

8         **THE COURT:**  Very good.  Thank you.  Good

9  morning to you both.

10         We did not have a preconference meeting this

11  morning, so we are going to start from scratch here in

12  the courtroom with the parties' agenda.

13         And I believe your first item on the agenda

14  is the start date of the trials.  And we'll start with

15  the first trial, the consolidated trial.  I believe

16  that's what you're referring to.  And there was a

17  question about a March 29th date versus an April 5th

18  date.

19         You've seen in the draft order setting trial

20  that I shared with you all my inclination is to start

21  the trial on the 29th of March and then utilize the

22  very tail end of that trial period for the pretrial

23  conferences in the second two cases, the *McCombs* and

24  the *Baker* cases.

25         If you want to be heard, Mr. Aylstock or 3M,

1  I'll hear from you in regards to that.  But just so

2  you know, I have a trial that starts immediately

3  following that docket I've given you, and so I just

4  can't afford for you all to run over.

5  **MR. AYLSTOCK:**  We're good with the schedule,

6  Your Honor.  We did preview the pretrial order, the

7  draft one that you provided us, very carefully, and

8  that works for us.

9  By our calculation, that would give the

10  parties, even assuming a seven-hour day and it looks

11  like maybe even a little more than that, 161 hours

12  total.  And we think that's more than sufficient to

13  try this case.

14  We have been able to do multi-plaintiffs

15  trials in a lot less.  So I think, particularly if we

16  have a trial clock, we won't have any problem.  But I

17  don't foresee any problem being done in time for those

18  pretrials, Your Honor.

19  **THE COURT:**  Okay.  Well, I provided you with

20  my schedule.  That's my standard trial daily schedule.

21  And I think, other than Mr. Hill, I don't

22  know if any other lawyers have ever tried a case in

23  front of me.

24  Mr. Beall, I don't know if we've had jury

25  trials; we may have had bench trials.

1        **MR. BEALL:**  I think that's correct, Your

2   Honor.

3        **THE COURT:**  I hope I'm not mistaken.

4        And I do my best to stick to that schedule,

5   and they are full days.  So hopefully that was helpful

6   to you in evaluating what you need to present your

7   case.

8        Who is going to -- anybody want to speak for

9   3M?  I don't know if it's you, Mr. Hill, or if it's

10  Mr. Brock or Ms. Branscome as far as the -- I think 3M

11  asked for the March 29th start date, in any event.

12       **MR. HILL:**  We did, Your Honor.  I don't know

13  if Mr. Brock or Ms. Branscome has something to add.

14       **MR. BROCK:**  I had one question, Judge.  I

15  noted in the draft pretrial order that you asked us,

16  of course, to complete the trial by Wednesday, April

17  28th, with the idea that the pretrial conferences for

18  *McCombs* and *Baker* were to occur on the 29th and the

19  30th.

20       And just for purposes of sort of having our

21  discussions about the trial clock, we wanted to ask if

22  completing the trial means we have concluded all of

23  the argument and the jury instructions and the jury is

24  now deliberating beginning on the afternoon of the

25  28th, or do we need to have completed closing

1    arguments and jury instructions earlier than that?

2         I didn't know if you had in mind that the

3    jury could deliberate while we were conducting those

4    pretrial conferences or if "complete trial" meant try

5    to make a schedule so that we have a verdict on the

6    28th.

7         **THE COURT:**  That's a good question.  We never

8    are able to predict how long a jury is going to

9    require for its deliberations.

10        I would ask that certainly the evidence

11   presentation portion of the trial be completed as well

12   as closing arguments and jury instructions on the

13   27th, and then the jury presumably would deliberate on

14   the 28th.  And then, if they needed the 29th and 30th,

15   they would have that available to them as well.

16        **MR. BROCK:**  Thank you.  That's a helpful

17   clarification.

18        **THE COURT:**  Thank you.  I'm sorry I didn't

19   include that in the draft.

20        Ms. Branscome, did you have anything you

21   needed to add?

22        **MS. BRANSCOME:**  I do not, Your Honor.  That

23   schedule make sense, and that clarification was

24   helpful.

25        **THE COURT:**  All right.  So, then, on your

1   trial clock, I'll call it, you are going to be meeting

2   and conferring regarding those time parameters,

3   correct?  That's what I understand.

4           **MR. AYLSTOCK:**  Yes, Your Honor.

5           **THE COURT:**  You should exclude voir dire.

6   You're not going to have any control over voir dire

7   because I'm conducting voir dire.

8           I can share with you my plan.  If everything

9   goes according to plan, my hope is to actually start

10  the trial either that Monday afternoon or certainly by

11  Tuesday morning.  We will have a jury on Monday.  My

12  standard practice is to start the trial that day.

13          I'm hoping to have a jury selected by

14  lunchtime, take a short recess for lunch, maybe a

15  little bit after that, but they come back and maybe we

16  could get started.  Part of that is going to depend on

17  your opening statements, though, and what you are

18  anticipating.

19          We probably need to have another discussion

20  about this before I tell you exactly whether we're

21  going to start on Monday afternoon or Tuesday morning.

22  Maybe for your purposes it's just cleaner to start

23  Tuesday morning.  On the other hand, if I have a jury

24  picked by noon, I'm loath to send them home and give

25  up four hours of trial time.

1        So maybe what I'm going to ask you to do is

2  to talk with me about -- and if you can't do it now, I

3  understand that; maybe you don't know.  But you need

4  to start thinking about what you need for your opening

5  statements, and then I'll decide if I think that's

6  reasonable.  And I know we have three cases here so --

7        **MR. AYLSTOCK:**  We have discussed internally

8  kind of the timing of that.  We think opening

9  statement could be an hour, an hour-and-15 for each

10  side.

11        With regard to attorney voir dire or court

12  voir dire, I know the Court hasn't -- what the Court's

13  practice is, I'm well aware of that.  I would like to

14  be heard on that briefly, if you may entertain

15  something.

16        **THE COURT:**  Well, that's next on our -- well,

17  the jury questionnaire.  I was going to also talk

18  about voir dire.

19        Let me hear first from 3M about openings.

20        **MR. BROCK:**  On time for opening, we would ask

21  for a little more time than what Mr. Aylstock is

22  suggesting.  We would be thinking about something more

23  in the hour-and-a-half to hour-and-45-minute time

24  frame.  We've got a lot of ground to cover and, you

25  know, three cases to introduce the jury to, plus other

```
1    issues.  And I think it will take a little more than
2    an hour to do that.
3          THE COURT:  All right.  Well, I'm going to
4    give that some thought.  I also need to factor in my
5    preliminary instructions to the jury and the time that
6    it takes for me to do that.  I need to add to those
7    instructions, obviously, language pertaining to the
8    consolidated nature of the trial.  I haven't done that
9    yet.
10          So let me just give this a little bit more
11   thought, and I'll have a decision for you as far as
12   when we will actually swear in the jury and start the
13   trial, whether it will be Monday afternoon or Tuesday
14   morning.
15          Mr. Aylstock, you wanted to be heard.  I
16   think we'll move on to -- well, I'm sorry, before we
17   do that.
18          What are your thoughts, both sides, as far as
19   the time limits?  When do you think you all are going
20   to resolve that?
21          MR. AYLSTOCK:  We --
22          MR. BROCK:  I think we should be able -- with
23   your guidance today, I think we should be able to work
24   out those issues next week.  I mean, there's some
25   fairly standard things that we have done in other
```

 1   cases about how we keep time and how time is charged,

 2   and a lot of those issues have been worked out in

 3   other cases.  And assuming that we're talking about a

 4   50/50 split, I think we can work out the other issues.

 5        **MR. AYLSTOCK:**  Your Honor, I think Mr. Brock

 6   is right as far as working it out next week.

 7        With regard to 50/50 split, that, in our

 8   view, Your Honor, is not equitable.  It sounds

 9   equitable on its face.  But when the Court considers

10   the burden of proof that we have, the fact that we go

11   first because we have the burden of proof, we have to

12   teach the jury the science, we have to teach the jury

13   the science of NRRs and hearing protection generally

14   as well as laying foundation for certain documents

15   that need to come in, explaining differential

16   diagnosis and how that works, whereas the Defendants

17   will have the benefit of that noncontroversial

18   material.

19        And in our experience -- and Ms. Hutson and

20   Mr. Seeger can chime in on this -- when it comes to

21   even multi-plaintiff trials that we have done in *Mesh*

22   and *Vioxx* in other places, the defendants end up

23   taking far less time in their case than we do because

24   so much ground is covered in our case.

25        In the *Vioxx* litigation, Judge Higby did not

do a 50/50 split for those reasons.  Kind of the
general guideline, as I understand, although it wasn't
reduced to an order, I don't think, in the *Actos*
litigation with Judge Doherty over in Lafayette, was
that it was kind of going to be one-third/two-thirds.

     But given the ground that we have to cover
and the burden that we have and our experience in
doing this, it's normally -- in a two-week trial, for
example, there is maybe two or three days of the
defense case.  Obviously, some of that is eaten up in
cross of our witnesses.

     But it's very much not fair to do a 50/50
split since we have to go first and we have to cover
all that ground.

     **THE COURT:**  Yeah, my experience -- I didn't
know this was an issue.  My experience is -- and let
me stop and drop a footnote.  I don't have a great
deal of experience with time limits.

     In fact, if I'm thinking back over the years,
I think my only experience is two tobacco litigation
trials that I presided over in the Middle District of
Florida years ago.  But the parties were able to work
out those parameters themselves I think with the
administrative judge before I came in to try the
cases.  In any event, the plaintiffs did have more

1    time than the defense.

2          So, let me hear from 3M as to why you think

3    this should be a 50/50 split.  That doesn't make sense

4    to me just based on 18 years of trying cases.

5          **MR. BROCK:**  Yes, Your Honor.  So, first of

6    all, giving the parties equal time is what would be

7    fair in these cases.  If I were really advocating for

8    my client, I would say we should have more time than

9    the Plaintiffs.

10          The reason for that in this litigation is,

11   number one, though the Plaintiffs may have a point of

12   view in terms of how they allege a case to jurors, I

13   anticipate that we'll spend a good deal of time

14   cross-examining the Plaintiffs' experts.  I would

15   expect our examinations, you know, to be thorough,

16   and, of course, we would be establishing some of our

17   points in that, we would hope.

18          It's also the case just generally in personal

19   injury cases in a products liability case that -- this

20   is my experience -- that the defense spends more time

21   on the case specifics than do the plaintiffs.  That's

22   usually the case.

23          And here we have three cases, and we've got

24   very thorough presentations to make as to each

25   plaintiff.  And the fact that we have three cases that

1    we're defending instead of one really adds to our
2    burden in terms of presenting all the facts that we
3    think are important for the jury to hear.
4            So, I just don't agree that the Plaintiffs --
5    we don't agree that the Plaintiffs should have more
6    time to present their case than the Defendants would
7    have.
8            **THE COURT:**  So, Mr. Brock, can you cite me to
9    your experience, or Ms. Branscome's, where you have
10   tried a case under time constraints and you had 50/50
11   split?  I may want to talk to some of those
12   colleagues.
13           **MR. BROCK:**  Yeah, I can go back and look at
14   the -- I don't actually recall the specifics of the
15   *Vioxx* cases.  I tried several of those.  I tried one
16   in New Jersey.  I don't remember having less time, but
17   we may well have.
18           I also tried a case down in Tampa in state
19   court.  I can check on that.  I actually don't have a
20   specific recollection of the time split.
21           **MS. BRANSCOME:**  Your Honor, if I may, I have
22   actually tried a series of cases recently that have
23   all been governed by time clocks, and we divided the
24   time equally between the plaintiffs and the
25   defendants.

1        And interestingly, when we got to the end of

2   the trial, neither side had exhausted its time, but we

3   were almost dead even.  So, it was I think informative

4   in that respect in the sense that neither side ended

5   up needing all of their time, but it was remarkably

6   close.  And that was over about a six-week trial out

7   here in California, and it was largely a product of

8   cross-examinations.

9        So I think the split between the two parties

10  -- (inaudible) -- how time is calculated.  In my

11  experience, if a party is on their feet, the time

12  counts against them.  You know, there can be

13  exceptions if there are long sidebars.  But what ends

14  up happening is, if the plaintiffs have a longer case

15  in chief, there are longer cross-examinations by the

16  defendants which also count against it.

17       So, although conceptually a trial may seem

18  like the plaintiff's case takes two-thirds and the

19  defense case takes one third, the actual amount of

20  time that each party is standing is roughly

21  equivalent.

22       One other thing that I wanted to note

23  earlier, Your Honor, is just considering when we begin

24  opening statements.  I would just say that it would be

25  our preference that we not -- (inaudible) -- over two

1    days, that the jury actually hear them in sequence.

2         So I don't know how the exact math works out

3    given the length of the opening that we settle on, but

4    I just wanted to make that point as Your Honor is

5    considering the schedule.

6         **THE COURT:**  I wouldn't split the opening

7    statements.  Either all parties will be heard on

8    Monday afternoon or Tuesday.  I wouldn't split it.

9         Kim, where was the jurisdiction that you're

10   referring to for the series of trials that you had?

11        **MS. BRANSCOME:**  The two that I have done most

12   recently were both in LA Superior Court in Los Angeles

13   and they were in the Johnson & Johnson talc

14   litigation.  That's been my most recent experience.

15        I have had time clocks in prior trials, but

16   both of those are the ones that stand out to me, and

17   both of them ended up roughly even with different

18   plaintiff's counsel in each trial.

19        So it really was -- I realize two does not

20   make a scientific study, but it was at least an

21   important data point from our perspective.

22        **THE COURT:**  Were those single-plaintiff

23   trials or consolidated trials?

24        **MS. BRANSCOME:**  They were single-plaintiff

25   trials.

1              And I do agree with Mr. Brock that, when you

2    talk about a multi-plaintiff trial, the plaintiff's

3    presentation has more commonality across the three

4    plaintiffs necessarily than the defense presentation

5    where we may get into alternative cause.  We have

6    affirmative defenses where we have the burden.  So I

7    think just simply the burden of proof is not

8    necessarily a basis for differential time allotments.

9              But I actually think, given what Mr. Aylstock

10   said in the -- *(inaudible)* -- number of hours that we

11   will have under the current schedule, and

12   understanding that Your Honor does keep very tightly

13   to a schedule -- that's been our experience with you

14   so far -- I actually think we can come up with an

15   amount of time that, even if it's evenly split, the

16   Plaintiffs will have plenty of time to put on their

17   case, we will as well, and I suspect we won't hit the

18   limits.

19             That's just my, you know, thinking given the

20   amount of total trial hours we're looking at even

21   within Your Honor's constraints.

22        **THE COURT:**  And in those cases in California

23   superior court where you said the time ended up 50/50,

24   did that include the rebuttal case?

25        **MS. BRANSCOME:**  In neither case was an

1  official rebuttal put on.  The plaintiffs did not do

2  it.  They would have -- I believe in the first trial

3  we came closer to the time limits because it was a

4  shorter time limit.  In the second trial, there would

5  have been time, the plaintiffs could have put on a

6  rebuttal case, but chose not to.

7       **THE COURT:**  But in terms of what was set at

8  the start of the trial in terms of 50/50, half of that

9  time would have included or did include direct case in

10  chief as well as any rebuttal?  Because certainly the

11  plaintiffs in the trials before me are entitled to put

12  on a rebuttal case.

13       **MS. BRANSCOME:**  It did, it included that.

14  And of course, if the Plaintiffs put on a rebuttal

15  case, we will have cross-examination of the witnesses

16  that were put on in rebuttal.  I really think that's

17  kind of where the philosophy of the 50/50 comes down,

18  you know, it averages out.  But in any event, yes, it

19  contemplated the ability to put on a rebuttal.

20       **THE COURT:**  What I'm going to do --

21       Go ahead, Bryan.  You wanted to say something

22  in response?

23       **MR. AYLSTOCK:**  My only response to Ms.

24  Branscome is -- I'm familiar with those cases she

25  tried out in L.A.; they are mesothelioma cases.

1    They're pretty straightforward.

2            This is a complicated scientific case with

3    complicated science.  And I would just suggest that a

4    lot of it isn't controversial about the cochlea and

5    things like that.  And we do have the burden of

6    proving our case in chief for all three.

7            So, I understand that they're going to

8    cross-examine and they have their case.  But we have

9    the burden to prove all three cases.  And I think

10   particularly with the prospect of rebuttal, it's only

11   fair that we have a little bit more time.

12            **THE COURT:**  Okay.  My plan is to discuss this

13   offline with Judge Herndon and Judge Jones, and then I

14   may speak to a few other colleagues in regards to

15   their experience with time limits.  Particularly in a

16   consolidated context I want to explore that.

17            And I will get back with you with an answer

18   shortly, hopefully.  I'm in trial next week, but I'll

19   do my best to get you an answer soon.  I know you need

20   to know that.

21            **MR. BROCK:**  Okay.  Thank you.

22            **THE COURT:**  Mr. Aylstock, did you want to

23   speak on voir dire?

24            **MR. AYLSTOCK:**  I did, Your Honor.  And I know

25   your custom and practice.  I would just submit these

1   times are a little different and this case is a little

2   different.  I know with regard to Judge Fallon and I

3   think Judge Herndon some attorney voir dire is

4   allowed.

5        **THE COURT:**  It's not going to happen.  It's

6   just not going to happen.  I've given you the

7   opportunity to do something I don't do in any other

8   case and that is to develop a confidential juror

9   questionnaire, but I'm not going to allow attorney

10   voir dire.

11        **MR. AYLSTOCK:**  Okay.  Then I won't hand it

12   off to Mr. Pirtle to --

13        **THE COURT:**  To do what?

14        **MR. AYLSTOCK:**  I was going to defer to Mr.

15   Pirtle because he had some experience, but I

16   understand --

17        **THE COURT:**  No, it's not going to happen.

18   Love to hear from Mr. Pirtle, but you're not going to

19   change my mind.

20        As I said -- I believe I put this in the

21   draft order setting trial -- my practice -- and we can

22   go over this now, if you all prefer, or we can wait

23   and do it at another time, to walk you through sort of

24   how voir dire takes place here in this courtroom.  But

25   I do, to the extent there is individual voir dire

1    that's necessary -- follow-up voir dire that's

2    necessary, it's my practice to allow some very limited

3    follow-up to my questions on whatever that issue is

4    that we need to talk to a potential juror in regards

5    to.

6          This won't surprise any of you, but I'm quick

7    to cut a lawyer off if you've gone beyond where I

8    think you should be.  And really, it's a couple of

9    questions, and it's not much further than that.  So I

10   allow it until somebody abuses it, and then it stops.

11         The parties, are you interested in talking

12   about the voir dire process now?  We can do that or we

13   can wait.

14              **MR. OVERHOLTZ:**  Yes, yes.

15              **MR. AYLSTOCK:**  We would like to hear as much

16   as we can, Your Honor.

17              **THE COURT:**  Okay.  So, I haven't yet decided

18   exactly how many jurors I'm going to ask the jury

19   administrator to make sure we have on the 29th.

20         As you know, we need at least 16 so that we

21   have your number of jurors and we have your number of

22   peremptory challenges taken care of.  Obviously I'm

23   going to call in more than 16, but I'm not going to

24   call in, you know, 50 or 60.  We don't need that.  And

25   I'm not going to burden more people than I feel is

1    absolutely necessary in order to successfully select a

2    jury.  So I'll let you know when I've made that

3    decision.

4         But that group will show up that morning and

5    -- actually, the process of getting them in the door

6    and there is a video that they're shown about jury

7    service and processed.

8         The processing should take less time -- at

9    least that's the idea with the pre-questionnaire --

10   than it takes in a typical case because we will have

11   those questionnaires ahead of time.

12        In every other trial in this court across the

13   district, the jurors bring those questionnaires in

14   with them the morning of jury selection, and so that

15   takes a bit of time to get those questionnaires copied

16   and to the lawyers.  And that will all have been taken

17   care of.

18        We will endeavor to start with the voir dire

19   process at nine a.m.  I'm going to meet with you, as

20   you know from my order, at eight a.m., and that is

21   just so I know I have you all here, you're ready.

22   You'll have time with those questionnaires.  You will

23   have already spent time with them, but you'll have

24   some more time with them.  And my hope, again, is

25   we'll start at nine.

1            The panel will be seated according to a list

2     that you will all be given by Ms. Simms.  That will

3     have them listed in accordance with how they're

4     seated.  We fill up the jury box first, and then

5     overflow goes into the gallery area of the courtroom.

6     She can explain that to you.  We usually start with

7     the next juror -- farthest to my left up against the

8     wall would be the next outside of the jury box.

9            We're certainly going to socially distance.

10    And I know how many I'm talking about with a criminal

11    trial.  I'm not sure with the civil trial.  I'm not

12    sure if we'll utilize the front chairs or not, if

13    we'll need to.  I haven't gotten that far.

14            But the panel members will be seated in an

15    order.  You'll have that list; it will make sense to

16    you.  And they will be appropriately socially

17    distanced throughout the courtroom.  We have plenty of

18    room here to do that.

19            I will start with some comments about the

20    importance of jury duty.  I also speak a little bit

21    about COVID precautions.  And what I have done

22    throughout my career is the jurors have introduced

23    themselves to us during this process, early on in the

24    process.

25            I have ceased doing that during COVID because

1    of the amount of time that it takes.  But here I may

2    go back to my standard practice and have them

3    introduce themselves to you.  You're already going to

4    have the information that they're going to be telling

5    us about, you're going to have it most likely in those

6    questionnaires.  But nonetheless, it's an opportunity

7    for you to see and hear from a juror.

8             In standard practice what they would tell

9    when they stand individually and introduce themselves

10   is their name, where they reside -- not a street

11   address, just the general vicinity in our division.

12            This is the Pensacola division of the Court,

13   as you know.  It's a four-county area, Escambia, Santa

14   Rosa, Okaloosa, and Walton.  So your panel members

15   will come from one of those four counties.

16            Now, that can be a long geographic distance.

17   We can have jurors who travel as much as 100 miles one

18   way for jury duty.  I'm not telling you that's going

19   to happen, but certainly 80 miles is pretty common.

20            If that does happen, just as a footnote, they

21   are given the opportunity of staying over at

22   government expense here.

23            I believe it's 60 miles, is that right, Sue?

24            **MADAM CLERK SIMMS:**  *(Indicating affirmative.)*

25            **THE COURT:**  Sixty miles one way would entitle

```
1   them to accommodations at government expense here

2   locally, so we give them that option.  Some of them

3   have the option and decline.

4        They'll tell us where they live.  They'll

5   tell us if they're married.  They'll give us their

6   spouse's name.  If they've been widowed or divorced

7   within the past ten years, they're going to give us

8   the same information.

9        They'll also tell us how they're employed,

10   same information for that spouse or former spouse.

11        And then they will tell us if they have any

12   military experience.  My guess is that's going to be

13   on your questionnaire, which typically it's not, but

14   my guess is you all are going to want that on your

15   questionnaire.  If it's on your questionnaire, then

16   I'm probably not going to have them tell us that.  But

17   in a standard trial, that is not -- I don't believe

18   it's a question on the questionnaire, so I usually

19   have them tell us that.

20        We have a large military presence in this

21   division, so it is always something that I have the

22   jurors just go ahead and include in their

23   introductions.

24        We also have a large contractor presence,

25   particularly in the Okaloosa County area because of
```

1  Eglin Air Force Base, and there are a number of

2  contractors on the air base there.  And because a lot

3  of times we're in a criminal trial, it's important to

4  know if anyone is working for someone who has a

5  contract with the United States because the United

6  States is the plaintiff in those criminal cases.

7        So getting back to voir dire.  So, once they

8  introduce themselves to us, then I will introduce the

9  case to them.  This is where I'll talk a little bit

10  about the consolidated nature of the trial.  I think I

11  included in the draft order that you all -- I was

12  hoping you would endeavor to come up with a joint

13  statement for me to read to the jury about this

14  litigation, about the trial.  If you can't do that,

15  I'll come up with it for you.

16        It is not the time, obviously -- that

17  statement is to be as vanilla as you can possibly make

18  it.  It is not argument.  It's boilerplate as to what

19  the allegations are and what the defenses are.  I

20  don't need to know anything about the plaintiffs and

21  their backgrounds -- other than their military, that's

22  fine.  But, again, try to come up with it in that

23  spirit.

24        And then I'll introduce all of the attorneys

25  and the parties to the panel, find out if they know

1   anything about the litigation.  Obviously, here, they

2   are likely to have heard about this litigation, so

3   we'll need to explore some of that.  That may result

4   in some individual voir dire, because I am a real

5   stickler for ensuring that one response from one panel

6   member does not infect or poison the entire panel.

7          And so, if I start to hear that someone is

8   going to -- we're going to elicit a response that may

9   do that, I'll cut them off, and I'll make a note to

10  myself this person we need to speak to individually.

11         I ask throughout voir dire or the whole

12  process of jury selection you all make notes to

13  yourself as well if you believe that there has been a

14  response that needs individual inquiry.  And we're

15  going to have a discussion about that.  As you'll hear

16  me say in just a moment, we'll have a discussion about

17  whether we'll conduct that voir dire.  But I make

18  those notes, and I'm asking you to do so as well.

19         **MR. BROCK:**  Your Honor, may I ask one

20  question about that, please?

21              **THE COURT:**  Yes.

22         **MR. BROCK:**  I noticed in one of the protocols

23  I think that for sidebars you were indicating that you

24  wouldn't have the lawyers come up to the bench but

25  rather would try to do that from either a Zoom process

1    on a phone or a laptop or something like that.

2         If we were doing individual questioning, is

3    that how we would do it, we would stay at our table

4    and ask the questions, or would we go to a back room

5    where we could be socially distanced to hear you ask

6    questions and ask ours, if we had any.

7         **THE COURT:**  Great question.  The way it will

8    work for the bench conference, as you saw in my order,

9    we will conduct that by Zoom.  But in terms of the

10   individual voir dire, no.

11        What will happen -- I just hadn't gotten

12   there yet, but that's a good question.  What will

13   happen is the panel is going to be excused -- let me

14   just -- I'll answer that question in a minute, Mr.

15   Brock.  It will make more sense in just a minute.

16        **MR. BROCK:**  Okay, that's fine.  I'm sorry.

17        **THE COURT:**  No, that's fine.  Anybody can

18   chime in if you have a question.

19        So, after the case is introduced, the parties

20   are introduced to the panel, I'll then begin my

21   questioning of the panel.  Obviously, there are

22   certain areas of inquiry that I go into with any jury,

23   whether it's a criminal or civil jury.  And I will

24   also need to introduce the prospective witnesses to

25   this panel.

 1           And one of the things I'm thinking about for

 2   you all in this trial, which I've never done before

 3   but it would seem to make sense, is for you to have a

 4   photograph, electronically, of course, of all of your

 5   witnesses, certainly your experts, certainly -- I

 6   don't know why not all of them.  And when I introduce

 7   the name of the prospective witness, which is

 8   typically all I usually have, we can show the photo

 9   image.  And that way there won't be any confusion.

10           Because sometimes -- it doesn't happen often,

11   but there are times when a prospective juror may not

12   register on a name, but then they see a witness in

13   person and they realize that they're in Sunday school

14   class or something with that person.

15           So, if you can get those photos, I think that

16   could be helpful here.  So, I'll go through that list,

17   see if any of the panel members know any of your

18   witnesses.

19           From there, I'll get into more specific voir

20   dire in regards to this case.  You are going to

21   present requested voir dire, I know, to the Court, and

22   I will put together the questions I intend to ask, and

23   I'll go through those questions.

24           So, let me fast-forward.  So, as soon as we

25   have completed all of that, all of the questions that

1    I intend to ask, then we're going to have a bench

2    conference, and you'll do that from counsel table.

3        We have used this electronic process for

4    bench conferences, and actually it works surprisingly

5    well.  So, at that time, I'm going to ask you if there

6    are any questions of the whole panel that I did not

7    ask that you feel should be asked.

8        You'll let me know.  If I agree with you,

9    then I will make a note, and I'm going to ask the

10    panel those questions.  The panel is still here in the

11    courtroom; that's why we're doing this by Zoom.

12        I'm also going to ask you at that time if

13    there is any individual voir dire that you feel needs

14    to be conducted for a particular panel member.  I'll

15    consider it.  If I agree with you -- and like I said,

16    I will have made notes myself as well, and I'll let

17    you know who I think maybe we need to talk to

18    individually.

19        By the way, if I say, hey, I made a note that

20    Ann Smith, we might need to talk to her, and both

21    sides say, judge, we don't need to talk to Ann Smith,

22    then I don't need to talk to Ann Smith.  So keep that

23    in mind as well.

24        So, once we've had our bench conference, I

25    will ask any general questions that you have asked me

1    to ask of the panel that I agree to ask, and then I'm

2    going to excuse the entire panel.  So all of the panel

3    members are going to leave this courtroom, and I am

4    going to call in one at a time any individual panel

5    members that we both agree need to be spoken to

6    individually.

7         And that's how that will be -- you'll be in

8    the courtroom, Mr. Brock, when that's done.

9         Once all the individual voir dire is

10   completed -- and again, the panel members are out in

11   the lobby area, fortunately we have a large lobby

12   space for them -- then you and I are going to have a

13   conversation about cause challenges.

14        And I can do this one of two ways.  We can do

15   the cause challenges at that time, or I can give you a

16   break, which I'm going to give you anyway to think

17   about your peremptory challenges, and when I come back

18   in we can do peremptory and cause at the same time.

19        Sometimes lawyers like to get the cause out

20   of the way so you know what you have to deal with on

21   your peremptories.  But I'll ask you to think about

22   that.  It doesn't matter to me.

23        So we'll deal maybe with cause challenges,

24   maybe not.  And then I'm going to take a recess, and

25   you'll have time with your notes and your memories,

1  and you'll have your colleagues with you.  And

2  frankly, if one side would like -- if you'd like to

3  return to private areas, I can arrange that.  But

4  you're probably not going to have more than 20

5  minutes, and that's generous.  I don't know if I've

6  ever given lawyers 20 minutes.  Because, remember, the

7  panel is still out in the lobby.  But I'll probably

8  give you 20 minutes.

9          Then you're going to come back in, and I'm

10  going to join you, and you're going to pick your jury.

11  The panel is not going to be in the courtroom when you

12  pick the jury, so you need to have good memories about

13  these people.

14          And you will be in here in this courtroom

15  with them for several hours by this time.  So I've

16  never heard a lawyer say to me, judge, I can't

17  remember what No. 13 -- who that is or who that was,

18  especially if I have them introduce themselves to us,

19  which I'm going to do.

20          So you'll select your jury.  As I've told

21  you, you have eight peremptory challenges.  If we need

22  to do the cause first, we'll do that.  You'll pick

23  your jury -- I'm sorry, four and four challenges.  I

24  need one spokesperson for each side.

25          I'll then bring the jury panel back in.  I'll

1    tell those lucky eight who they are.  I'll excuse them
2    -- depending on the time, but most likely I will
3    excuse them to the jury room.
4         And by the way, we do have a very nice size
5    jury deliberation room.  I'll excuse them there.  I'll
6    have some parting comments for those who weren't lucky
7    enough to be selected, words of thanks, and then
8    they'll be excused.
9         And if we're lucky enough to be near the
10   lunch hour, I will excuse everybody, including the
11   jury that you just selected, for lunch.  You'll return
12   and you'll start your trial.
13        That's how a typical first day of trial is
14   supposed to work.  It doesn't always work that way,
15   and it may not work that way here.
16        Questions?
17        **MR. AYLSTOCK:**  One question, Judge.  I
18   haven't brought this up with Mr. Brock.  But if the
19   parties were both willing to fund an extra $100 a day
20   for the jurors, given the length of the trial and
21   maybe some of them traveling a distance, would the
22   Court consider that?
23        **THE COURT:**  I would not require them to stay
24   here, if that's what you're asking.
25        **MR. AYLSTOCK:**  No.  It's just I know they

1  don't get paid a lot.  And if both sides contributed

2  equally and it wasn't --

3        **THE COURT:**  Oh, I see what you're -- I

4  thought you were talking about accommodations.  You're

5  talking about pay.

6        **MR. AYLSTOCK:**  Just pay, Your Honor.

7  Obviously, both sides would need to agree to it, but I

8  wasn't sure if the Court had ever done that.

9        **THE COURT:**  I haven't ever done it.  I've

10  never even thought about it.  It's interesting.  I'm

11  sure the jurors would like me to say no problem.

12        I'm not opposed to it.  I don't know if there

13  are any rules in our federal system in regards to

14  that.

15        Do you know, Judge Herndon?

16        **JUDGE HERNDON:**  I've never heard of that.  I

17  don't know whether there is or not, quite frankly.

18  I've never heard of it being done, and I've never done

19  it, so --

20        **MR. BROCK:**  That's a topic about which we,

21  yeah, we would need to talk to our client.  We have in

22  some cases sort of chipped in for like a lunch budget

23  for the jurors if they wanted to all stay in instead

24  of going out, and we could consider that.

25        I think our answer would likely be that we

1    would prefer not to be paying the jurors extra sums

2    for serving.

3              THE COURT:   Bryan, have you done that, or

4    Neil, have you done that in the past, and where did

5    you do it?

6              MR. OVERHOLTZ:   Your Honor, we did that in

7    the *Actos* litigation in Lafayette, Louisiana, both

8    parties did it.   It was to alleviate hardship problems

9    for the jurors, you know, the same situation,

10   multi-county, long drives, jobs, those kind of things,

11   and so it was able to eliminate a lot of hardship

12   requests by jurors to get out, and so that helped a

13   lot.

14             In the *Pinnacle* litigation in Dallas, Judge

15   Kinkeade did it as well.   I'm not aware of any bar in

16   Eleventh Circuit or in this district against it, but

17   it has been done in other cases.   We've done it in

18   state court trials before.

19             THE COURT:   Were those federal that you just

20   referenced?

21             MR. OVERHOLTZ:   Those were both federal cases

22   in the Fifth Circuit.

23             THE COURT:   Well, I'm going to ask the

24   parties to discuss this.   A trial of this length is --

25   it's not the longest trial I've ever had, by any

means.  But a trial of this length is a burden on the
jurors, there is no question.  I'm not suggesting you
do this.

And, Mike, don't misinterpret this.  You guys
need to talk about it.  I would not consider it,
obviously, if both sides aren't agreeing and making
the contribution.

**MR. BROCK:**  Sure.

**THE COURT:**  All right.  Well, again, I'm not
shooting it down, but I'm not saying do it either.  So
you all decide and let me know.

And in the meantime, I'll have our clerk
check to see if there is any prohibition.  I'm
assuming not because it sounds like other districts
have done it.  I think having been a chief judge in
the Eleventh Circuit I would probably know if there
was a written policy or rule against it.  But I will
check with our clerk and ask her to check with the
administrative office.

Any other questions by either side as far as
voir dire?  I'm not sure I touched on everything, but
I think I got close.

**MR. AYLSTOCK:**  From the Plaintiffs' side, I
think we would like the cause challenges to go ahead
and get those knocked out of the way.  I don't know if

1   there is a time when we need to let you know that, but
2   we have already figured that out.
3           THE COURT:   Okay.  Well, most lawyers do
4   prefer to do that before rather than later just so you
5   do know what you have left to work with.  No one knows
6   how I'm going to rule on a cause challenge, so you
7   don't know whether you're going to have that panel
8   member available to you for selection or not if we
9   don't get those out of the way.  But I'll need to hear
10  from the Defendants on that.  Whenever you all have
11  had time to think about it, just let me know.
12          MR. BROCK:   Bryan, are you talking about
13  giving some cause challenges to Judge Rodgers based on
14  the information that we have from the questionnaire
15  like in advance of the questioning or -- I'm not
16  really sure what you're talking about in terms of time
17  frame.
18          THE COURT:   Mike, what he's talking -- I
19  hadn't thought about that.  But no.  What he's talking
20  about is, when I excuse the -- the panel is out, we've
21  gone through the individual voir dire, and I'm about
22  to take a recess and let you have your 20 minutes with
23  your paperwork and your memories, most of the time
24  lawyers prefer to go ahead and have me rule on the
25  cause challenges before I take that recess.  Because

1    when I come back in after 20 minutes, that's when

2    you're going to select the jury.  So I've either got

3    to deal with cause challenges before the recess or

4    right after the recess.

5           If I do it before, then you know -- if your

6    challenges have been granted or the Plaintiffs' have

7    been granted, then you know you don't have those

8    people to deal with in terms of your consideration

9    during that 20 minutes; they're off the list, if the

10   cause challenge is granted.

11          **MR. BROCK:**  I follow you.  Okay, thank you.

12          I did have one question, Your Honor.  Will

13   you look at the questionnaires of the jurors that are

14   sent out and come back to see if you see things that

15   you might have -- that you think would need to be

16   asked based on responses in the questionnaire?

17          **THE COURT:**  I will.  And if I see something

18   that is obvious in terms of a problem with a juror --

19   and I'm thinking about something, whether it's a, you

20   know, some indication of a bias or a prejudice that's

21   reflected in the questionnaire, and I mean a serious

22   one, an obvious one --

23          **MR. BROCK:**  Right.

24          **THE COURT:**  -- then I'll probably get with

25   you all and see if you all are in agreement that this

```
1    person just -- there is no point in having this person
2    come in, it's just so obvious that the person is not
3    going to make the cut.
4          I'm assuming you would prefer I do that.  Is
5    that --
6          MR. BROCK:  I think that would be helpful.
7    In other cases where we've had questionnaires, judges
8    have sort of looked at the questionnaires to see,
9    okay, these are some questions that I think the
10   lawyers would be interested in knowing the answers to
11   given some of the responses.  If something looks
12   pretty obvious, we have probably seen it, too, so we
13   would be happy to discuss that prior to your
14   questioning.
15         THE COURT:  So, two different items here.
16   One is what I just raised as far as me looking at the
17   questionnaires and just seeing if there is anything
18   that's blatantly problematic for a potential juror.
19         The other is whether I would look at the
20   questionnaire with an eye towards developing further
21   questions.  And yes, I'll do that, I'll do that.
22         MR. BROCK:  Okay.  Thank you.
23         THE COURT:  Let me look at the order real
24   quick in terms of when I've told you those
25   questionnaires would be available.
```

1          **MR. BROCK:**  I think I saw something -- is it

2     March --

3          **THE COURT:**  March 23rd.  Oh, that's when it

4     will be returned on the 23rd.  I'll get it to you --

5     we might do some sort of secure -- a Dropbox or secure

6     link in order to electronically get these to you, but

7     it would certainly have to be secure.  And right now,

8     there's a question about what is secure.  But let me

9     give that some thought.  I'll get them to you,

10    obviously, quickly.

11         What I'm pondering here is whether I want to

12    give you all an opportunity to propose questions to me

13    based on what you see in the questionnaires.

14         I think I'm amenable to that.  That's

15    probably what you would prefer.  But it's not a

16    guarantee I'm going to ask your questions.  You

17    probably know that as well.  But I could give you an

18    opportunity to share with me the questions you feel

19    should be asked of a particular prospective juror has

20    provided in their questionnaire.

21         Mr. Brock, is that something you all would

22    like to be able to do?

23         **MR. BROCK:**  I think that would be helpful.  I

24    was thinking maybe you were telling us earlier that we

25    would give you those questionnaires when you looked to

1    us and said, *Are there any further questions?*  But I

2    do think providing them ahead of time probably would

3    make it more efficient.

4           I have no idea what number of inquiries we

5    might have.  And if we were trying to convey several

6    questions, you know, sort of in real time, it might

7    even be more efficient and easier for you if we were

8    to give them to you as a submission.

9           **THE COURT:**  I don't disagree.  When I was

10   going through my standard procedure for voir dire,

11   that's what it was, it's my standard procedure.  And

12   my standard procedure in the standard case does not

13   involve an early questionnaire specific to the case.

14   So I think this makes more sense than having you tell

15   me that in a bench conference setting.

16          Mr. Pirtle, Mr. Overholtz, Mr. Aylstock, is

17   this something you would prefer as well, the

18   opportunity to look at these questionnaires and then

19   provide proposed questions to the Court?

20          **MR. AYLSTOCK:**  We think that makes sense,

21   Your Honor.

22          **THE COURT:**  All right.  It will have to be a

23   pretty short turnaround, obviously, but I'm sure you

24   all can do that.  Because I need time to look at what

25   you're suggesting and decide whether I'm going to ask

1    those questions.

2          Any other questions with regard to voir dire?

3    And I'm sorry, before I stop, I have something else to

4    tell you, though, as well.  I should have put this in

5    my order and I just overlooked it.

6          In addition to the availability questionnaire

7    that goes out early first, there is also a -- and I'm

8    happy to share this with you all, nothing secret about

9    it.  It is a memo, if you will, that goes to those

10   prospective jurors about COVID and asks them to notify

11   us immediately if anyone is exposed, believes they may

12   have been exposed between that time and the time of

13   trial.  So you probably don't need to see it.  It's

14   pretty standard.  And that will go with that

15   availability questionnaire.

16          Let's talk a minute, moving on then to --

17   well, no.  One second, I'm sorry.

18          I should have discussed this back when we

19   were talking about the trial date start and talking

20   about the length of trial.  This issue or question

21   pertains to the *McCombs* and *Baker* trials and

22   scheduling.

23          You have the dates of those trials.  I've

24   told you that it's impossible for me to schedule a

25   time for a meaningful pretrial conference before those

1   trial dates -- in between this trial and those trial

2   dates.  So I have set aside the last two dates, the

3   20th and 29th of this docket for that purpose.

4         Well, when I set a pretrial conference date,

5   that triggers other dates for you, meaning your

6   meet-and-confer and your pretrial stipulation and when

7   those have to be provided.

8         So, I am going to need your pretrial stip and

9   the filings that I need for the pretrial conference

10  two weeks before the pretrial conference.  And so,

11  that's April 16th, which, of course, we're going to be

12  in the middle of trial.

13        That means that your meet-and-confer -- I

14  typically set it five or six weeks off of the pretrial

15  conference.  So it will be three weeks later -- you

16  know, the April 16th -- I don't want to confuse you

17  all with this.  I'm sorry I am.

18        My only question is, do you want to have your

19  meet-and-confer set for March 19th or March 26th,

20  knowing that your pretrial stip has to be filed by

21  April 16th?  The 19th is six weeks ahead of the

22  pretrial conference, the 26th is five weeks.

23        You don't have to tell me this today, and

24  I'll be happy to go over it with you again.  But I do

25  need to know because I need to get this set.

1        **MR. AYLSTOCK:**  I think the 26th makes sense,

2    Judge.

3        **THE COURT:**  That gives you less time for the

4    stip, but you're okay with that?

5        **MR. AYLSTOCK:**  I understand a lot of us will

6    be in town for the trial, I think, so that makes

7    sense.

8        **THE COURT:**  All right.  Mr. Brock, you all?

9        **MR. BROCK:**  I think the same will be true for

10   us, but if we could just get it to you later today.

11   And if our answer is different, we'll talk to Bryan

12   also before we send it out to you.

13        **THE COURT:**  All right, very good.

14       Let's move then to Item No. 4, which is

15   coronavirus protocol, you know, planning for the

16   trial.

17       I will tell you that for the trial what we do

18   in our court is, obviously, everyone is required to

19   wear a mask when you enter the courthouse.  The jurors

20   are no exception.

21       For voir dire -- I should have said this --

22   they will all be masked.  They'll be, as I said,

23   socially distanced in their seating appropriately.  I

24   will allow them to remove their masks when they

25   introduce themselves, if they prefer, and that way

1   you're able to see their faces.  But otherwise,

2   they're going to be masked in the courtroom.

3           All of you will be masked in the courtroom

4   except for when you are addressing either a witness or

5   the Court from the lectern.  So when you're at the

6   lectern, you may remove your mask.

7           Also, witnesses, when they enter and exit the

8   courtroom, they will be masked.  When they take the

9   witness stand, they'll be masked.  But when they

10  actually begin their testimony, they will be free to

11  remove their mask.

12          We will endeavor to sanitize the witness

13  stand after each witness; Ms. Simms will do that.

14  She, however, does not sanitize your lectern.  You are

15  free to do that yourselves.  She can't be in two

16  places at once.  So I'm going to leave that up to you

17  all to talk about how you want to handle that area.

18  Just recognize we have electronics there, too, so be

19  mindful of that.

20          But I think they now have -- don't they have

21  sprays and things that don't hurt the equipment?

22          **MADAM CLERK SIMMS:**  The alcohol wipes.

23          **THE COURT:**  Okay, we use the wipes, and we

24  use that on the witness stand.  So we can put wipes on

25  the stand for you.  I don't mind supplying those wipes

1    and we'll be happy to do that.  But in terms of wiping

2    the lectern down, I'm going to ask the lawyers to do

3    that.

4         When the jurors are in the jury deliberation

5    room, they'll be asked to remain masked.  Certainly

6    there is no one in there policing them in that regard,

7    but they're asked to remain masked.

8         Lunch recess, they're free to have lunch on

9    their own, and I don't police them when they leave the

10   courthouse or when they leave at 5:30.

11        Any questions as far as protocol and

12   precautions for coronavirus?  There may be something

13   I'm forgetting.

14        Mr. Aylstock?

15        **MR. AYLSTOCK:**  Not from us, Your Honor.

16        **THE COURT:**  You all, Mr. Brock?

17        *[No response.]*

18        I do have a question, though, something we

19   need to discuss.  Some courtroom is set up for

20   multi-defendant criminal trials.  That's why this side

21   of the courtroom, which is the defense side of the

22   courtroom and it's the defendant's side of the

23   courtroom in a criminal trial has so much more seating

24   availability than the plaintiff's side, which is

25   typically the Government's side.

```
 1              I know you are probably thinking you're going
 2    to have robust trial teams.  That's not as much an
 3    issue on the defense side as it is on the plaintiff's
 4    side.  And you can't encroach on the jury box.  So we
 5    need to think about this.
 6              Sue, have we -- I know we have had civil
 7    trials with more than just a couple of plaintiff's
 8    lawyers.  I don't remember what we have done.
 9              MADAM CLERK SIMMS:  We have flip-flopped
10    before.
11              THE COURT:  So two and two?
12              MR. AYLSTOCK:  I think we'll be okay on the
13    plaintiff's side, judge.  We may have some lawyers --
14              THE COURT:  Where are your clients going to
15    sit?  You have four clients.
16              MR. AYLSTOCK:  Yes, Your Honor.  I think
17    typically we put them behind the bar for part of it.
18              THE COURT:  I don't want to do that.  See the
19    chairs -- those of you who are on Zoom can't see them,
20    but there are chairs that you all in the courtroom can
21    see up against the -- you see them, right?
22              MR. OVERHOLTZ:  (Indicating affirmatively.)
23              THE COURT:  We can put some of those -- there
24    is already some behind the defense tables.  We can put
25    those behind you all.  They can't sit over there;
```

1  that's too close to the jury.  But they can sit behind

2  the plaintiff's counsel table.  You can fit four

3  chairs there.

4      If that's done, do you think you have

5  sufficient space?

6      **MR. AYLSTOCK:**  We would, yes, Your Honor.

7      **THE COURT:**  Mr. Hill, I presume you all have

8  more than enough room?

9      **MR. HILL:**  I think so, Your Honor.

10      **THE COURT:**  All right.  Well, if you all

11  decide differently, I don't mind at all rethinking the

12  configuration.  Just give it some thought in terms of

13  that.

14      **MR. AYLSTOCK:**  Yes, Your Honor.

15      **THE COURT:**  But I do want the parties inside

16  the well.

17      **MR. AYLSTOCK:**  Your Honor, backing up to

18  where we started, I did get a note that the Group B

19  and C plaintiff's lawyers are on the phone.  I guess

20  it was on mute so they weren't able to respond.

21      **THE COURT:**  Oh, good.  All of them?

22      **MR. AYLSTOCK:**  My understanding is every case

23  is represented at least on the phone.  Next time we

24  can have them on the Zoom, if the Court would prefer.

25      **THE COURT:**  It doesn't have to be the Zoom.

1    I just need to make sure that they're present at least

2    by phone.  So, if they're here by phone, very good.

3    Then I appreciate that, and I stand corrected.  When

4    no one spoke, I assumed that no one was on.

5         **MS. BRANSCOME:**  Your Honor, if I may, on the

6    coronavirus protocol planning, I just wanted to let

7    you know that, for the most part, we will be having

8    lawyers coming in from out of state for the trial, so

9    we will be temporarily residents of Pensacola.  So we

10   have engaged a company to help us manage coronavirus

11   issues for our trial team.

12        One thing we just wanted to sort of flag, and

13   we can discuss with plaintiffs, is how we -- if,

14   heaven forbid, anyone were to develop symptoms or

15   become sick at some point in the trial, we obviously

16   -- you know, we want to do our level best to do this

17   trial start to finish.  But, you know, the reality is

18   different people will be in different parts of the

19   city and things like that.

20        So we plan to speak with the Plaintiffs about

21   this and sort of just -- *(inaudible)* -- across both --

22   *(inaudible)* --

23        **THE COURT:**  My understanding from just

24   talking with other lawyers who have had trials during

25   the pandemic and trials of some length, that those

1    team members were regularly tested on a schedule.  I'm

2    not telling you you have to do that, but that was

3    something that was relayed to me that's been done in

4    another trial context.

5            But we do have a facility here that does

6    rapid testing, you know, you get your results back in

7    10 or 15 minutes.  It's not the PCA or R test, it's

8    not the most reliable test out there.  But it's better

9    than I think no testing.  But the problem is they

10    don't take insurance, so it's out of pocket, and I

11    believe it's $85 a test.

12            Does anybody from here know who have you used

13    that?

14            Mr. Beall is nodding.

15            **MR. AYLSTOCK:**  I have, Your Honor.

16            **THE COURT:**  Well, that facility is here.  I

17    have also heard of -- and I don't have any firsthand

18    knowledge of this, but I have also heard that there

19    are some healthcare providers that you can contract

20    with who can provide testing to your office, to you

21    all.

22            I'm probably telling you all something that

23    you know and are experienced with far more than me.  I

24    almost feel silly now in even bringing this up.  I'm

25    sure you all are well versed in COVID precautions.  So

1    I will move on, unless there is something else you all

2    want to raise with me as far as COVID protocol.

3              And if something comes up, you know, just let

4    me know, and I'll consider whatever it is you want me

5    to consider in regards to COVID.  We'll do our best.

6         **MR. BROCK:**  Our plan is to follow our

7    expert's advice with regard to testing and distancing

8    and -- there are some things that are even easier than

9    testing, you know, taking temperatures daily and that

10   type of thing.

11             **THE COURT:**  Sure.

12        **MR. BROCK:**  We hope that the Plaintiffs will

13   have the same kind of program in place.  And if we

14   have an issue, we will report it.

15        **MR. AYLSTOCK:**  I do have access to a

16   healthcare provider that can do a test and get it over

17   to Mobile to a lab for a 24-hour turnaround with a

18   more reliable test.  I'm happy to share that with 3M's

19   counsel.  I'm just hoping that we have a vaccine by

20   then and a plan to actually distribute it.  So I think

21   we might be able to get there.

22        **THE COURT:**  Well, the Defense Production Act

23   has been, I think, invoked, right?  Didn't we hear

24   that?  So maybe we'll see an organized rollout.  Let's

25   all hope and pray for the country that that happens.

1        All right.  I thought there was one other
2   thing.
3        Judge Jones, can you think of anything I'm
4   overlooking?
5        **JUDGE JONES:**  No, not in terms of coronavirus
6   protocols.
7        One question on voir dire on jury selection.
8   Will there be back-striking or not?
9        **THE COURT:**  No.  Did I not put that in the
10  order?  Maybe I didn't.  Thank you, if I didn't, Judge
11  Jones.  There is no back-striking.
12       So, yeah, I cut short the actual selection
13  process.  Let me rewind.  I apologize.  Typically I
14  would go over that with you in my voir dire
15  discussion.
16       So, the way it will work in terms of the
17  actual selection process, of course, you'll have your
18  list.  The cause challenges you'll mark through.  They
19  will be excluded, obviously, if I sustain the
20  challenge.
21       I will start with No. 1 on your list.  They
22  all have a number.  I will turn first to the
23  Plaintiffs because you all have the burden.  I will
24  ask you what your position is as to No. 1.  If your
25  spokesperson tells me -- and I want to hear "accept"

 1   or "reject."  That's all I want to hear.

 2          If you accept, I'm going to move to the

 3   Defense, and I'm going to ask your spokesperson does

 4   the Defense accept or reject.  If you accept, that's

 5   your first juror, obviously.

 6          We then move to No. 2.  And No. 2, I start

 7   with the Defense, and I ask if you accept or reject.

 8   If you reject, that's your first peremptory challenge.

 9          I then move to No. 3.  Go back to the

10   Plaintiffs, accept or reject.  If you reject, I go to

11   No. 4.  That's your first challenge.  I go then back

12   to the Defendants.

13          And we go back and forth in that fashion

14   until you have eight jurors.  And there is no

15   back-striking.  Once I move to the next juror, that's

16   it.

17          Any questions about that?  It moves quickly.

18          **MR. BROCK:**  On your example, Your Honor, if

19   3M in this process said reject on No. 3, does a new

20   juror come the No. 3 spot and the Plaintiff have an

21   option on that juror, or do we proceed to No. 4?  Go

22   to 4 and go to 8 and then come back to wherever there

23   are new jurors.

24          **THE COURT:**  You move to 4.  If either side

25   rejects a -- I'll call them a juror.  If either side

1    rejects a juror, we move to the next number.  We don't
2    go back to that juror, the one that wasn't rejected.
3    So we move to the next line, if that makes sense.
4           **MR. BROCK:**  Yeah, I follow you.  I just
5    didn't know if someone comes out of the pool to sit in
6    3's place or if everybody moves down one place.
7           **THE COURT:**  Maybe I don't understand the
8    question.  So you're asking -- who would go into that
9    place?
10          **MR. BROCK:**  Yes.
11          **THE COURT:**  Who would?  What is your
12   experience with that?  Who would move into that place?
13          **MR. BROCK:**  Generally the next juror in the
14   pool would come down into 3, but I have seen it done
15   different ways.
16          **THE COURT:**  No.  It's --
17          **MR. BROCK:**  Everybody moves down one spot and
18   whoever was 9 becomes 8, I guess?
19          **THE COURT:**  I don't know.  I'm not sure.
20   It's just -- I'm sorry, Mr. Brock.  I don't have the
21   litigation experience you do as a practicing lawyer,
22   so I'm only familiar with what I'm accustomed to and
23   that I've been doing for a lot of years, and I tend
24   not to vary from it.  And so I'm going to stick with
25   my practice in this trial, and it's first juror -- as

1    I just said, I'm going to go to each side -- but if

2    one side rejects, we move to the next juror in line,

3    which is No. 2 and then No. 3.

4         **MR. BROCK:**  I'm with you, I'm with you.  And

5    again, whoever is -- I follow it precisely what you're

6    saying, and thank you for that.

7         **THE COURT:**  There is no one that's out in the

8    lobby waiting to come in to be considered for a spot.

9    Everybody that's here is going to be on your list.  It

10   just depends on whether you get to them or not.

11        We hope that we -- you know, we like not to

12   have a lot of panel members left that weren't

13   considered, but that obviously happens all the time.

14   It just depends on how quickly -- I would rather have

15   too many than not enough, so there is surely to be

16   some left.

17        **MR. BROCK:**  Okay, I follow you.  Thank you.

18        **THE COURT:**  I do have a question so --

19        Oh, go ahead, Bryan.

20        **MR. AYLSTOCK:**  Circling back to the

21   coronavirus, I had a question that popped up about how

22   limited -- will there be a limit to the number of

23   people in the courtroom?  Because, obviously, if there

24   is more people here, they can't socially distance, so

25   either outside or a remote feed somewhere or something

 1    like that.

 2              **THE COURT:**  So, here is the deal.

 3              Don't we have -- I'm not usually --

 4              Mike, don't we have red dots on the floor?

 5         **MR. BURNS:**  Yes, Your Honor.

 6              **THE COURT:**  Okay.  Those are put there by our

 7    clerk's office for social distancing purposes.  So

 8    once we're full, everybody is appropriately spaced,

 9    then I don't have a problem -- we can certainly set up

10    a live feed in another courtroom.  Judge Collier's

11    courtroom, I'm sure, would be available for that or

12    another.  If you need it, you'll have to tell me.

13              You're free -- or I can do it -- maybe even

14    our clerk's office already knows the answer to this.

15              Sue, do you know off the top of your head,

16    how many can sit in the gallery, distanced?

17              **MADAM CLERK SIMMS:**  Ten or 11 across each

18    row.  So like three over here, four or five in the

19    middle, and again three over here.

20              **THE COURT:**  So, 10, 20, 30.  What about the

21    back?

22              **MADAM CLERK SIMMS:**  There are four chairs,

23    and then I think there are five that can sit on the

24    back row.

25              **THE COURT:**  It sounds like about 40 people,

1   39 or 40 people is what it --

2   **MR. AYLSTOCK:**  I think, if the Court is

3   willing to do that, I'm positive we'll need it

4   considering both sides.

5   **THE COURT:**  Okay.  We'll start to explore

6   that.

7   **MR. AYLSTOCK:**  Thank you, Judge.

8   **THE COURT:**  It shouldn't be a problem.  And

9   even -- I'd have to look at the -- I don't even want

10   to bring it up -- I have to look at the trial schedule

11   for other judges, but we'll look into that.

12   What about your witnesses?  I can tell you,

13   as a trial judge, that juries -- they don't like even

14   video testimony, certainly not reading depositions to

15   them.

16   What are your plans with your witnesses, if

17   you know?

18   **MR. AYLSTOCK:**  Yes, Your Honor, we have

19   thought about that as well.  Kind of the bane of the

20   existence of some of the mass tort trials is the video

21   presentation because of the inability to have some of

22   these witnesses within the subpoena power of the

23   Court.  I think I mentioned this on one of our

24   biweekly calls, but we do intend to move under Rule

25   43, I believe it is, to have some of the 3M witnesses

1    appear, if they're not willing to come to this Court,

2    to appear remotely at their local federal courthouse.

3    So we hope to have that motion filed sometime next

4    week or the week after.

5          **THE COURT:**  Have you conferred with 3M about

6    that and they --

7          **MR. AYLSTOCK:**  Not yet, Your Honor.  But we

8    were just talking about it last night and so --

9          **THE COURT:**  Well, before you file the motion,

10    as you know, try to --

11          **MR. AYLSTOCK:**  Absolutely.

12          **THE COURT:**  -- work it out with Judge Herndon

13    first and obviously 3M.

14          **MR. AYLSTOCK:**  Yes.  And we do -- we have

15    been meeting and conferring with the Defense as well

16    as Judge Herndon's involvement.  Mr. Overholtz has

17    spearheaded the deposition designation protocol

18    because there are a lot of witnesses that we would be

19    playing by video.  And that can be a very onerous

20    process for the parties, but more importantly for the

21    Court making those rulings.

22          We haven't finished our meet-and-confer on

23    that, but we intend to do so quickly so that those can

24    be done in accordance with the Court's proposed order

25    and under those time limitations.

1        **THE COURT:**  Okay.  Thank you.

2        Mr. Brock, do you have anything you want to

3   add?

4        **MR. BROCK:**  The extent of my knowledge as I

5   know those discussions are underway.  Mark or Kim or

6   someone may be able to add a little more detail, but I

7   know that the issue is being discussed.

8        **THE COURT:**  Okay.  But what about your

9   witnesses, do you know what --

10       **MR. BROCK:**  Oh, for our witnesses, I expect

11   that we will have some number of witnesses who are not

12   willing to travel.  Of course, it's -- you know, we've

13   got a little time.

14       And if things are better coronavirus-wise,

15   you know, we may be able to get them all to Pensacola.

16   So we will probably be looking to do some examinations

17   remotely.

18       We do have also a number of depositions that

19   will be videotaped that we will need to play to the

20   jury.  I know that's not the -- not necessarily always

21   the best, but we're trying to make those efficient,

22   but a lot of the government depositions, we'll plan to

23   play those depositions and that type of thing.

24       **THE COURT:**  Right, I do know that this is

25   sometimes out of the attorney's control given subpoena

1    restrictions in terms of the Court's authority.  But I

2    hear -- and it's in civil cases only, not in criminal,

3    but in civil cases from jurors after trials I hear

4    practically every time I meet with the jury, if it's

5    been a civil trial, comments from the jurors about the

6    tedium of video depos -- even video depos, not just

7    the reading of depositions.

8         But just keep that in mind and do the best

9    you can.  I understand coronavirus makes this even

10   more difficult, but if you could keep it in mind.

11        The other thing -- we're talking about the

12   trial -- I want you all to keep in mind -- you don't

13   need to tell me this today or tomorrow, and you really

14   don't need to tell me until we're even in trial.

15        In some trials that I've had -- and this

16   would be one that would be, I think, suitable for that

17   where I feel like the attorneys are going to try other

18   cases that are similar in nature -- and certainly we

19   have that here -- then I have asked jurors after the

20   trial, after the verdict to be available to speak to

21   the lawyers about the trial presentation.

22        And I don't mandate it.  Obviously, I can't

23   do that.  But I have been known to encourage it.  I

24   did it in the tobacco litigation trials that I had.

25        If you decide to do it, if you would like to

1   interview the jury, if you will, you would do it

2   together, you would do that together.  And obviously,

3   it would be with the utmost respect for the job that

4   they had to do regardless of the outcome that they

5   came up with.  So think about it.

6        **MR. BROCK:**  Would Your Honor basically tell

7   the jurors, you know, take a few minutes and, if you'd

8   like to talk to the jurors -- if you'd like to talk to

9   the lawyers, come back down, and we would just stay in

10  the courtroom and ask questions that we might have or

11  that type of thing?  Or would we contemplate a

12  separate session that we might set up later where they

13  would agree to attend?

14       I'm just -- I have seen it done both ways.

15       **THE COURT:**  No.  It would be that day --

16  well, depending on the time of day.  But the way I

17  have done it in the past, it's been the day of trial,

18  you know, the verdict is read in open court.

19       I meet with every jury in every case after

20  every trial, in any event.  So I would go in and meet

21  with the jury, talk with them a little bit, thank

22  them, obviously, for their service.  And then I would,

23  at that time, ask them if any of them would be willing

24  to remain and talk with you.

25       I think having them come back, you're going

1    to lose them.  People live too far away, for the most

2    part, to get them back.  So, while we have them,

3    that's usually the time to do it.

4         And in my experience -- I mean, I've had a

5    few that have declined, but most are willing to give

6    the lawyers feedback on everything from -- and some of

7    them can be brutally honest as far as everything from

8    presentations to your witnesses, who they liked, who

9    they didn't like, mainly with the witnesses, not so

10   much the lawyers.  I don't think I have seen anybody

11   say to a lawyer I didn't like you.  But they'll tell

12   you about your witnesses and how they felt about the

13   witnesses.

14        Anyway, again, this is the type of case or

15   trial that I certainly would consider that and be

16   inclined to do it.  But if you don't want to do it or

17   even if one side -- well, I take that back.  I think

18   in the tobacco litigation for one of those trials -- I

19   was lucky enough to have a retrial -- I think maybe

20   the first trial, the -- I can't remember if it was the

21   first or the second, but in any event, one side wanted

22   to do it and one side didn't.  And I know I've had

23   that here as well in a civil trial, and I let the one

24   side that wanted to do it do it without the other

25   side.  So I guess I would probably follow that same

1    course here, if one side wants do it and the other

2    doesn't, that's up to you all.

3              All right.  We're getting into a lot more

4    detail than I anticipated, but hopefully it's helpful

5    to you --

6              **MR. BROCK:**  It is helpful.

7              **THE COURT:**  -- as you're getting ready for

8    trial.

9              Okay.  I'm going to move now to Item No. 5,

10   which you all have identified as the pretrial stip.

11   And you have the dates.  Again, these are dates that

12   are triggered by virtue of the date of the pretrial

13   conference.

14             Now, originally when I had given thought to

15   the pretrial conference, I was assuming I was going to

16   hold or conduct the pretrial conference in all five

17   cases for all trials.  And then I think I heard from

18   somebody, it might have been Mark, through Judge

19   Herndon maybe, there was a question about that, what

20   was my plan with the *Baker* and *McCombs* trials in the

21   pretrial conference.

22             And so I thought, Lord knows, you all are

23   working, I know, very hard.  There's a lot of moving

24   parts and pieces here with all these trial groups and

25   then these cases, the first group going to trial.  And

1    so I thought, well, I won't do that.  I had set aside
2    a whole week for a pretrial conference in the five
3    cases.
4              And when I decided to pull out *McCombs* and
5    *Baker* to give you a little more breathing room -- not
6    a whole lot but a little more -- and move those
7    pretrial conferences to the end, I shortened the time
8    for the consolidated trial pretrial conference to
9    three days.
10             What do you all think you need for a pretrial
11   conference for the first group of trials?
12             And then, also, let me know, if I misread and
13   you want to have the pretrial conference in all five
14   cases that week, then I just need to make some
15   adjustments.  And you can confer about this and let me
16   know after this conference, that's fine, too.  But I
17   just wanted to give you the benefit of my thinking and
18   how this was done and why it was done.
19             I still have that full week available, I
20   believe, the week of -- it's March 15th.  But I'm not
21   going to take a week to do a pretrial conference for
22   three cases.  I think three days should be sufficient
23   for that.  But if it's all five, then I could see
24   where we might need five days.  But you all tell me.
25             I'm hoping to have rulings on some of your

1    motions in limine -- I would like to have all of them

2    ruled on.  But in a case like this, I would expect

3    that I would hear some argument at the pretrial

4    conference on probably some of your motions, hopefully

5    not all of them, or we may need the five days.

6         Go ahead, Mike, and then Bryan is standing.

7         **MR. BROCK:**  Your Honor, I was just going to

8    say three days sounds like plenty of time to me for a

9    pretrial conference, even with the three individual

10   cases.  I guess if we're arguing 20 motions, you know,

11   maybe it would get a little tight.  But I kind of feel

12   like three days is adequate and maybe more than

13   sufficient time, hopefully.  But I think we would be

14   okay with three days.

15        **THE COURT:**  Well, and if we end early -- if

16   we only take two days, then you all have Friday off,

17   right?

18        **MR. BROCK:**  Correct.

19        **MR. AYLSTOCK:**  I've certainly done it in a

20   day in an MDL proceeding, so I agree with Mike it's

21   more than sufficient, and I don't think we need to do

22   more.

23        The other provision in that proposed order 2A

24   requires an attorney conference by February 15th.

25        **THE COURT:**  Right.

 1          **MR. AYLSTOCK:**  And we had discussed this with

 2     Judge Herndon a little bit but also proposed to Mr.

 3     Brock's team that perhaps if we could have a little

 4     bit of leeway on that deadline.  That's Presidents'

 5     Day, and we'll all be together on the 18th for the CMC

 6     on the 19th.

 7          **THE COURT:**  I missed another federal holiday,

 8     I did not realize that.

 9          **MR. AYLSTOCK:**  I'm now celebrating it again.

10          **THE COURT:**  Look, that's not the important

11     date for me.  The important date for me is March 8th.

12     So I'm not opposed to giving you more time for the

13     date for your attorney conference as long as you know

14     that pretrial stip has to be in by the 8th.  So really

15     it's up to you all.  I can live with whatever you all

16     are comfortable with, just know you have that

17     turnaround.

18          **MR. AYLSTOCK:**  Thank you, Your Honor.

19          **MS. BRANSCOME:**  Your Honor, on that note, we

20     were wondering -- we see that your draft order

21     indicated that the -- *(inaudible)* --

22          **THE COURT:**  I'm sorry, Kim, I'm not hearing

23     you.

24          **MS. BRANSCOME:**  That's all right.  I think

25     perhaps there was background near a microphone in the

1   Court.

2           So one request we had is we noticed in your

3   draft order you indicated that the parties should meet

4   in person although Judge Herndon could appear

5   remotely.

6           Given the number of issues that we will be

7   working through, I would anticipate this will be a

8   somewhat iterative process, and we can actually

9   accomplish a lot, you know, sort of in sequence

10  leading up to kind of a final discussion to put

11  everything in one place.

12          And so, we were wondering if Your Honor would

13  be all right if we conduct, you know, some of those

14  interactions remotely with the hope that we might be

15  able to get all of it done remotely.

16          Obviously, if Judge Herndon were to think

17  that we need to physically be in person together, we

18  would, you know, work with the Plaintiffs on a

19  location that might, you know, accommodate all the

20  different attorneys across the country.

21          But we were thinking, you know, being able to

22  -- *(inaudible)* -- over time and remotely --

23  *(inaudible)* -- team members who had specialized in

24  different parts of the things that -- *(inaudible)* --

25  so it might be more efficient.

1          **THE COURT:**  I think I heard you sufficiently

2    to understand what you're asking.

3          Does the Plaintiff, do you all have any --

4          **MR. AYLSTOCK:**  The more we can get done

5    before we're all in person is fine with us.

6          **THE COURT:**  I don't have any objection to

7    that.  So whatever works for you all -- this is

8    probably -- obviously this draft came from a standard

9    order that I modified for this situation.  That's

10   probably language I should have included you all when

11   I said Judge Herndon could appear virtually.

12         One of the things that is standard for

13   conference of counsel is settlement discussion.  And I

14   took that out.  But if it were in, I would require it

15   in person, because I just think those discussions are

16   more meaningful in person.  But I took that out.  I

17   figure you'll let me know if y'all are going to settle

18   before this trial.

19         **MR. AYLSTOCK:**  We did, and we saw the timing

20   on that, Your Honor.

21         **THE COURT:**  Yeah.  Well, that's standard,

22   too, but yes.

23         Okay, I'm fine with that, Kim.  And when I

24   enter this order, I will make that change.

25         Also, will you let me know, though, what date

1    to set for your pretrial conference, the deadline?

2    And it's a "not later than" date, so just you all let

3    me know so I can get this order finalized and have a

4    date in there.

5              **MR. AYLSTOCK:**  I think if we just put the

6    19th, that's the date of the CMC; we can either do it

7    after the CMC or the day before.

8              **THE COURT:**  Kim and Mike, the 19th, is

9    that --

10             **MS. BRANSCOME:**  Yes, that deadline we can

11   certainly work with that.  And hopefully we can even

12   get it done beforehand.  We just mostly wanted to

13   clarify about the meeting in person.

14             **THE COURT:**  Got it, okay.

15             Can we move then to Item No. 6 or is there

16   anything else you want to ask me or inquire as far as

17   the pretrial stipulation?

18             **MR. AYLSTOCK:**  Nothing more.

19             **THE COURT:**  Okay.  Item No. 6, my favorite,

20   motion in limine process.

21             I'm not going to allow replies.  I'm not.  If

22   I feel that a reply would be helpful to me in

23   resolving your motion, I'll hear from you at the

24   pretrial conference.  Otherwise, if I'm able to rule

25   on your motion before the pretrial conference, then I

1    didn't need a reply.

2          You also identified Pretrial Order 63, which

3    requires you all to meet-and-confer with Judge Herndon

4    before filing.

5          Are you all -- maybe that's my own note.  I

6    apologize.

7          Why is this on the agenda?  Let me ask that

8    then.

9          **MR. NOMELLINI:**  Your Honor, we have had some

10   very productive discussions with Mr. Sacchet and Judge

11   Herndon on this.  *-- (inaudible) --* propose to Your

12   Honor, and that is that the parties exchanged with

13   each other and with Judge Herndon a good faith list of

14   motions in limine, not the actual briefing, but a

15   list.

16         And then, the parties get together with Judge

17   Herndon to run through that list and try to reach

18   agreement on as much as they can, try to figure out,

19   you know, what's left and, you know, what number of

20   pages they need for what's left.

21         And then, to the extent that there are items

22   that are left, we file by February 19th with Your

23   Honor as set forth in the Court's order.

24         **THE COURT:**  Just a moment.

25         I'm fine with that process.  And then, if you

1    can't resolve the matter through that process, then,

2    yeah, you'll just file your motion on the 19th.

3              The turnaround for a response, I don't

4    remember if I said in the order.  Did I put 10 days or

5    7 days?  In a criminal trial it's 7 days.  Let me

6    see --

7              **MR. NOMELLINI:**  Ten calendar days, Your

8    Honor.

9              **THE COURT:**  I'm sorry?

10             **MR. NOMELLINI:**  It was ten calendar days in

11   Your Honor's order.

12             **THE COURT:**  All right.  Well, that's what I

13   have, and so I'll leave that.  That's fine with me,

14   Mark, that process.

15             Anything else with the motions in limine?

16             **MR. NOMELLINI:**  Your Honor, I think both

17   sides had a question with respect to the interaction

18   between of *Daubert* issues and motion in limine issues.

19             I think, if I understand correctly, there are

20   certain *Daubert* issues that Your Honor thought might

21   be raised in the motion in limine context.  Correct me

22   if I'm wrong about that.

23             But our question was, should we

24   cross-reference those issues?  Should we have a list

25   of those issues when we submit our motions in limine?

1    **THE COURT:** Well, honestly, given the omnibus

2  nature of the *Daubert* motions and the number of issues

3  particularly on the Defendants' side that are raised

4  in the omnibus *Daubert* motion, my plan is to address

5  as many of those as I can in as short order as I can.

6  We're all working to get you your rulings on that.

7         And the one area that I felt was really more

8  of a motion in limine type matter than a true *Daubert*

9  702 matter was your first -- I think it's your first

10  item in your omnibus motion dealing with the attorney

11  mouthpiece, fact narratives, and legal conclusions.

12  And when I say "yours," I mean 3M's.

13         And so, what I had done in my own mind was

14  set that aside -- I don't know that this is going to

15  help you all that much, but I had set aside.  I want

16  to get to the more substantive truly *Daubert* matters

17  and get those decided.

18         And if I'm not able to do that before the

19  pretrial conference, then I'm just going to consider

20  that aspect of your *Daubert* motion as a motion in

21  limine and deal with it there.

22         So you don't have to refile it.  I will just

23  indicate that that's how I'm considering it.  So one

24  way or the other, you'll get a ruling.  It will either

25  be a ruling in connection with your omnibus *Daubert*

1   motion, or it will be a ruling on what I have

2   construed as a motion in limine on that issue.

3         **MR. NOMELLINI:**  That's very helpful.

4         **THE COURT:**  Does that make sense?

5         **MR. NOMELLINI:**  Thank you, Judge.

6         **THE COURT:**  I hope that makes sense.

7         **MR. NOMELLINI:**  Yes, that makes a lot of

8   sense.

9         And then one more clarification question,

10  Judge, if I may, and that is, with respect to *McCombs*

11  and *Baker*.  Obviously, the parties are going ahead and

12  filing their motions for summary judgments on those.

13        On motions in limine and deposition

14  designations on *McCombs* and *Baker*, would Your Honor

15  like us to meet-and-confer with Plaintiffs to set the

16  dates to align with the March 26th date, if that's

17  what we go with?  Or would Your Honor just like us to

18  leave that as is?

19        **THE COURT:**  You've lost me.

20        What is the March 26th date?  I'm sorry, what

21  is that?

22        **MR. NOMELLINI:**  That is the date -- we were

23  thinking -- Your Honor offered March 19th or March

24  26th, I believe --

25        **THE COURT:**  Oh, yes, yes.  I'm sorry.  I did.

1    I thought you both -- I know Bryan indicated and I

2    think Mike strongly suggested the 26th.

3           **MR. NOMELLINI:**  Right.

4           **THE COURT:**  Okay.  So, understanding that

5    your pretrial stip is due April 16th, regardless of

6    which of those dates you select for your conference.

7           I'm sorry, Mark, now what is your question,

8    now that I have those dates in my head?

9           **MR. NOMELLINI:**  So the question now -- those

10   are for *McCombs* and *Baker*.

11          **THE COURT:**  Right.

12          **MR. NOMELLINI:**  So, for the *McCombs* and

13   *Baker*, we're going ahead and the parties are filing

14   summary judgment motions.

15          For motions in limine and deposition

16   designations, given that *McCombs* and *Baker* are being

17   set off to different dates in some respects, do you

18   want us to meet-and-confer with Plaintiffs to come up

19   with new motion in limine and deposition designations

20   for *McCombs* and *Baker* to set them apart from the three

21   other plaintiffs so that they all don't come in at the

22   same time at the same crush for Your Honor -- do you

23   want us to meet-and-confer and propose separate dates,

24   or do you want us to leave the *McCombs* and *Baker* MIL

25   and dep designation dates with the other three cases?

1    That's my question.

2            **THE COURT:**  Oh.  Well, the summary judgment

3    motions and *Daubert* motions are going -- I believe

4    *Daubert* -- is it *Daubert* as well or just the summary

5    judgment?

6            **MR. AYLSTOCK:**  *Daubert* is already filed and

7    briefed.  And summary judgment I think --

8            **THE COURT:**  *Baker* was already filed

9    yesterday, I believe.

10           **MR. NOMELLINI:**  Yes.

11           **MR. AYLSTOCK:**  We're good with leaving it the

12   way it is.

13           **THE COURT:**  But I want to confirm that we're

14   all on the same page.

15           So the *Daubert* is filed.  Summary judgment in

16   *Baker* is passed; that was yesterday.  Summary judgment

17   in *McCombs* is maybe Saturday or Sunday.

18           **MR. AYLSTOCK:**  It's today.

19           **MR. BEALL:**  It's today, Your Honor.

20           **THE COURT:**  Oh, today?

21           **MR. AYLSTOCK:**  Yes, ma'am.

22           **THE COURT:**  Same day as all your responses.

23   Okay.

24           So, for the motions in limine and your depo

25   designations, my preference is that you have your

1    meet-and-confer on the 26th, and then you have all of

2    that, as you're doing with the other three cases, on a

3    different date but by April 16th.

4        Because I'm not going to have time -- this is

5    the problem, I'm not going to have time in May and

6    June to deal with all those.  Your pretrial conference

7    is the 28th and 29th of April in *McCombs* and *Baker*.

8        So I've got to have time -- and I'm going to

9    be in trial with you every day, but I've got to have

10   time between April 16th and the 28th and 29th to be

11   prepared for those pretrial conferences.

12       So I'm asking you -- again, I'm not so

13   concerned about when your meet-and-confer is as I am

14   about the date of April 16th so I have two weeks to

15   get ready for your pretrial conferences.

16       I don't know if that make sense.

17       **MR. NOMELLINI:**  Yes, I understand, Your

18   Honor, in the importance of April 16th and, you know,

19   making sure everything is done by then.  And Your

20   Honor is correct, the summary judgments, I think those

21   will all be in as of today.

22       **THE COURT:**  Can I ask if you all -- and I

23   greatly appreciate you accommodating me and my staff

24   with the copies that you sent.  The records are,

25   particularly on the *Daubert* side, are just voluminous.

1    I asked you for copies.  You did that kindly.  I

2    appreciate it.

3            Did you do that with your responses?

4            **MR. AYLSTOCK:**  They're being filed today, and

5    we're happy to do that, Your Honor.

6            **THE COURT:**  Right.  Because I have four law

7    clerks working on these motions, and then I'm working

8    on them myself independently, and we can't share the

9    record, if you will.  So I'm sorry to have asked you

10   all to go to that trouble to get all these copies

11   made, but it's got to be done.  So I need it with the

12   responses as well, if you can -- and I know I have one

13   law clerk who is remote, and I don't know if you've

14   ever sent materials --

15           **MR. AYLSTOCK:**  We have.  We'll be happy to

16   send it to them.

17           **MR. BEALL:**  Your Honor, when would you like

18   those materials delivered, given that it's a Friday

19   night tonight and Saturday -- copy services may not be

20   available on the weekend.  I just want to make sure

21   we're clear as to when you want those delivered.

22           **THE COURT:**  Monday, I guess, will be fine, if

23   you don't already have it done.  I'm not going to ask

24   for a Saturday delivery.  Although we'll be here, but

25   I'm not going to ask for that if you don't already

1   have them done.

2       **MR. SACCHET:**  Your Honor, I was hoping to

3   circle back to a fairly trivial point that I think the

4   parties would like some clarification on with respect

5   to the motions in limine that Mr. Nomellini and I did

6   have a chance to meet-and-confer on.

7       And as you know, we've made great progress

8   already on the motions in limine.  But I think one

9   point of tension is, and it may not be able to be

10  resolved today, but that is, after meeting and

11  conferring with Judge Herndon and hopefully narrowing

12  the list of issues down, the parties appear to agree

13  that we can brief motions in limine in an omnibus

14  format, which I think makes it the most easy for both

15  the parties and the Court.  But the word limits on

16  that omnibus motion are still, I guess, hotly disputed

17  despite such a trivial issue.

18      In Plaintiffs' opinion, PTO 43 made clear

19  that these issues should be resolved efficiently.  And

20  we advised 3M that, in our view, all of these MILs for

21  all five plaintiffs could be briefed in no more than

22  that 8,000 words.

23      It's my understanding that 3M, at least

24  yesterday, was suggesting a 25,000 word MIL brief,

25  which is the same amount that was filed in *Daubert*,

1       and, in Plaintiffs' view, is quite excessive.

2              So it may not be a topic we can resolve now,

3       maybe one that, once we meet-and-confer with Judge

4       Herndon, we can have a better understanding of what's

5       left on the table.  But I did want to put it on the

6       table right now just so Your Honor is aware that we're

7       at odds there and may need some guidance.

8              **THE COURT:**  Okay.  So what I heard a moment

9       ago is that you are going to provide Judge Herndon

10      with an anticipated list of the motions in limine that

11      you all expect -- not the motions themselves but the

12      issues, correct?

13             **MR. SACCHET:**  Yes.

14             **THE COURT:**  So, Judge Herndon, I'll ask that,

15      when reviewing those with the parties to see if any of

16      those issues can be resolved without the motion, that

17      you give some thought to the amount of space needed

18      for those issues, and then you and I can talk about

19      it.

20             I like that idea a lot better than me right

21      now just saying 8,000 should be sufficient or you can

22      have 25,000 words, especially now that I know what

23      25,000 words looks like.

24             **MR. SACCHET:**  Thank you.

25             **JUDGE HERNDON:**  Happy to do that.

1           **THE COURT:**  All right.  Thank you.

2           That raised an issue for me that I wanted to

3   talk with you all about.  So I'm trying to determine

4   the most efficient way to get you rulings on all that

5   I have pending.

6           Summary judgment aside, let's just focus a

7   minute on the *Daubert* issues.  I am going to give you

8   rulings in as short order as I can.  There is not

9   going to be a lot of color with the rulings.

10          If I need to, I'm considering having one of

11  your members appear here -- it could be Zoom or it

12  could be local.  If I have some questions, then I may

13  ask you to come, and then I'll rule from the bench

14  after I hear from you on those questions as opposed to

15  putting it in writing.

16          I don't know yet if I'm going to need to do

17  that, but I've had those thoughts with a couple of the

18  issues.  And if I do, let me just ask if a member of

19  your group could be available sometime February 5th

20  for that purpose?  And again, I'm amenable to Zoom, if

21  that needs to be the appearance, if it needs to be

22  remotely, that's fine.

23          **MR. BROCK:**  Your Honor, if we could do

24  something on the 3rd or the next Monday, it would be

25  better for us.  I know we have --

1          **THE COURT:**  Mr. Brock, I can't.  I'm in

2    trial.  I can't.  If the trials go away, then I can

3    let you know.  But otherwise, it looks like that's the

4    only date I have.  And if I'm allowing you to appear

5    remotely, and given the size of your teams and the

6    competence of your teams, I would think you could find

7    one person to appear, if that's the only date I have.

8          And I'm not even sure if I'm going to need

9    it.  But I thought it better to bring it up, ask you

10   if you could pencil it in.  And I'll let you know as

11   soon as I can whether I'm going to need to meet with

12   somebody and just rule from the bench.

13         **MR. BROCK:**  Okay, appreciate that, and we'll

14   have someone available if you need us.

15         **THE COURT:**  Let me go back to the motions in

16   limine for a minute.  If there is a case that's on

17   point and it's persuasive or certainly if it's

18   binding, then, by all means, I want to see it in your

19   motions.

20         If not -- you know, a lot of times motions in

21   limine are just -- most of the time they're purely

22   discretionary, and I don't need a huge law section in

23   terms of -- back to the amount of words you need.  So

24   keep that in mind.

25         Also, just be aware that there are oftentimes

1   motions in limine that I can't rule on without context

2   at trial, particularly if it's bearing on relevance.

3   If that's the case, you're going to get a very short

4   response from me, and I'll just defer, I'll just tell

5   you I'm deferring ruling.  I may ask for some more

6   context at the pretrial conference on that issue, but

7   there may be some of these motions I'm not going to be

8   able to address without hearing beforehand.

9        And if there is a lot of that -- because I

10  don't know what necessarily to anticipate.  But if

11  there is a lot of that, you know, we can always handle

12  it -- we can start the trial a day later, and I could

13  hear either proffers or, if I need to, I can hear from

14  a witness.  If you absolutely need to know, and it's

15  something that we don't want the jury to be

16  potentially prejudiced by, then that's a possibility.

17       **MS. BRANSCOME:**  Your Honor, I have a related

18  question that I would just seek your guidance on.

19       Is it your preference -- do you like trial

20  briefs during trials?  So, as we're considering, you

21  know, what to file in a motion in limine as opposed to

22  what, as you suggested, might be a better context

23  during the trial itself, to the extent that there is

24  legal analysis that we think is important to bear but

25  we do think perhaps it's something that is, you know,

more relevant in context of trial, do you entertain
trial briefs?  What is your preference on that?

**THE COURT:**  No trial briefs unless I ask you
for one at trial.

And in terms of the motions in limine, you
probably -- I'm sure you all read the order -- or it's
not entered yet, but the draft order that you need to
file your motions in limine on any matters that are
known to counsel now or reasonably should be known to
you instead of just raising it at trial.  I want to be
able to deal with as much and narrow the issues as
much as I can before your trial.

Let's take just a few minutes, restroom
break.  We have been in here over two hours.  Usually
I take a break at a couple of hours, because we still
have more to go.  Is that okay with everyone, take a
short recess?

I guess you can sign off of Zoom but can they
sign back in?  Yeah, you all with sign back in, right,
Ms. Simms?

**MADAM CLERK SIMMS:**  Yes.

**THE COURT:**  It's up to you if you want to
leave it on or just mute your audio and video.

We'll take a short recess.

*(Recess taken 12:06 p.m. to 12:18 p.m.)*

1          **THE COURT:**  Something I thought about in

2     relation to the draft order setting trial pertains to

3     jury instructions.  And most often, in terms of

4     pattern instructions, I'm accustomed to the Eleventh

5     Circuit pattern instructions or Florida civil pattern

6     instructions.

7          But with the different states' substantive

8     law that will apply, I don't -- I probably could

9     easily get access to Georgia's; they may be online.

10    But I don't think Kentucky's are online.

11         Could I ask the parties to see if you could

12    find electronic versions of each state's pattern

13    instructions and provide Ms. Dang or myself with a

14    link?  If you're not able to, then I can get the

15    Eleventh Circuit librarian to reach out to other

16    courts.

17         **MR. AYLSTOCK:**  We'll get them for Your Honor.

18         **MR. NOMELLINI:**  Yes, Your Honor.

19         **THE COURT:**  Thank you.

20         Before we move into sort of the second half

21    of the agenda, most of which will be discussing Groups

22    B and C, I would like to have a broader discussion

23    with you about those trial groups.

24         As you know, at your request, I moved the

25    dates for Group D and extended those.

1          But with everything that is going on in your

2    lives and mine trying to get ready for the

3    consolidated trials in April and then the two trials

4    in May and June, I'm thinking that it might make the

5    most sense for me to give you a reprieve from some of

6    these deadlines in the B, C, and D groups.

7          Now, Group B, your -- I was looking back at

8    the deadlines.  In Group B, your fact discovery is

9    over.  Your depositions of your experts are to be

10   completed by February 12th.

11         So, my thought was to ask you to go ahead and

12   finish that discovery and then give you relief from

13   the motions deadlines in that group.

14         And then, in Group C -- and I want to discuss

15   this with you.  I'm not deciding anything, but I'm

16   just letting you know I'm willing to consider this.

17         Group C, your fact discovery closes on the

18   5th of February.  Then the 12th of February is the

19   date Plaintiffs' 26(a)(2) disclosures, and then the

20   Defendants' on the 15th of March.

21         I'm thinking about lifting those disclosure

22   dates, unless you tell me you all have sufficient

23   support and you're ready to keep pressing on.  And

24   maybe you are.  Maybe you've learned enough lessons

25   and gained efficiencies with Group A that you're fine

1  to keep going with Group B and C all the way through

2  motions.

3          But I can tell you, I don't need your motions

4  in these cases right now.  They will just sit on my

5  docket in terms of even Group B.  There is not

6  anything I'm going to look at until after at least the

7  April trials.

8          You don't have to tell me today, but I do

9  need to hear back from you fairly soon about it.  You

10  can meet and confer, you can get with Judge Herndon.

11          What I was going to ask you to do was, if I

12  lifted some of these deadlines, then I would like you

13  all to get together, in light of what you have ahead

14  of you in Group A, which is the April trial dates,

15  then May and June, and put together a schedule for at

16  least B and C.

17          Going through trial D, you can give me dates

18  for D, but I think those will probably be dependent on

19  what happens with B and C.  I would like to get dates,

20  though, for B and C trials on my calendar.

21          And again, this raises the issue of

22  consolidation because, for scheduling purposes,

23  obviously I have to know -- I mean, this far off, I

24  could probably go ahead and carve out time enough to

25  accommodate a consolidated trial.

1            And I'm not saying I'm going to consolidate.

2    I'm going to see how the April trials go before I make

3    any decision about trial consolidation and whether it

4    makes sense for the other groups.  And obviously there

5    may also be some distinctions that we don't know about

6    or I don't know about yet that suggest it doesn't make

7    sense.

8            But I certainly want to see how the

9    consolidated trials in April go in terms of overlap

10   and efficiencies and what I think we've gained and

11   hopefully not lost in terms of consolidating those

12   three cases for trial.

13           So, Bryan, let me start with you all.  Does

14   this make sense or do you prefer to press on and go

15   through at least C?  I know you've probably got

16   defense medical exams as well; I saw that's an issue

17   on the agenda for that group.

18           **MR. AYLSTOCK:**  We have worked all that out

19   and we have them all calendared and scheduled.  We're

20   prepared.  We're staffed to do this.  Obviously, we

21   understood the Court's order, and we're ready to go.

22   Understanding that the Court won't have time to really

23   review the summary judgment motions until after the

24   consolidated trial, it might make sense to push that

25   some.

1      I think if Your Honor is thinking about some
2  Group B trials in the fall, then we can maybe adjust
3  some things there.  I don't know if you had anything
4  in mind.

5      I do know that, as this first trial is
6  obviously the first for everybody in this, as both
7  sides proceed, if history is any measure, we're going
8  to be more efficient.  And by the end of *Mesh*, I think
9  we were doing consolidated trials of four people in a
10  couple of weeks.  So I think both sides will be more
11  efficient and can be put on an even tighter time clock
12  as we proceed.

13      So, in looking at the Court's calendar,
14  whether it's consolidated or not, it might help the
15  parties if you had some general idea about when one or
16  more of those trials might happen in B or C.

17      **THE COURT:**  So I just noted that your expert
18  deposition window or time in C is going to be -- it's
19  going to be intense during the trial.  Your depos are
20  going to be conducted through the month of April.  And
21  I didn't know if you had your teams committed to
22  helping with trial work, you know, your best depo
23  takers are going to be tied up in the trial.  But
24  again, I'm just trying to be thoughtful.

25      **MR. AYLSTOCK:**  Yeah, and I appreciate that.

1    I think some relief for Group C does make sense just

2    given what's on the calendar.

3            On the expert front, there are certainly case

4    specific experts that need to happen and a few general

5    experts here and there.  But it's not going to be near

6    as onerous as this Group A because all of the general

7    experts had to be -- and the case specific -- and

8    again, we're learning and both sides getting more

9    efficient.

10           So, I think some relief on the summary

11   judgment deadline for Group B makes sense,

12   particularly if you're not going to be able to be

13   working on it, given the busy schedule between now and

14   then.  And then some relief on the Group C disclosures

15   and the depositions there make sense as well.

16           But I am cognizant that, you know, this is a

17   big litigation, and we want to have many additional

18   cases in the queue should --

19           **THE COURT:**  Yeah, my intent is not to lift

20   these dates and forget about these cases, by any

21   means.  That's why I was saying I can give you some

22   relief, but I want you to get together -- and not

23   after April, I'm talking about soon --

24           **MR. AYLSTOCK:**  We're ready.

25           **THE COURT:**  -- and put together a schedule

1    that makes sense in light of what we have in April,

2    May, and June.

3            And just so you know, I have 500-plus what

4    they call Backend Litigation Option BP Deep Horizon

5    oil cases, and I've got trials there in those cases in

6    August.

7            So, for Group B, I would think probably mid

8    to late fall, not early fall.

9            **MR. AYLSTOCK:**  Sure.  And that's helpful.  We

10   can certainly meet and confer next week and propose

11   some dates with Judge Herndon's help that would get us

12   a date on the calendar perhaps for mid to late fall.

13           **THE COURT:**  All right.

14           Kim or Mike or Mark, anybody from 3M?

15           **MR. BROCK:**  I'm fine.  We'll get with Bryan

16   and his team and talk about it.  And I think a little

17   breathing room on some of these issues will be

18   appreciated, and thank you.

19           **MS. BRANSCOME:**  Your Honor, while we're

20   talking about schedules, I had two clarification

21   questions for topics we talked about this morning, I

22   just want to make sure I'm clear on it.

23           For the pretrial conference for trial number

24   one, you had mentioned that if we -- *(inaudible)* -- on

25   our three days we would have Friday off.  But I

1    believe we're currently set to do the pretrial

2    conference Monday through Wednesday.  I didn't know,

3    now that we've settled on doing it for the --

4    *(inaudible)* -- get clarification.

5              **THE COURT:**  I think I know what you're

6    asking, but you trailed off and I didn't hear

7    everything.  But I think you're asking about the

8    pretrial conference in Group A, the first three

9    consolidated trials.

10             And I apologize to you, I did set it -- I see

11   in the order 15th through 17th.  For some reason in my

12   mind, I thought I set it 17th through the 19th.  It

13   doesn't matter to me right now.  I told you I had the

14   whole week marked off.

15             I can do either/or or some -- you know, I can

16   do Tuesday, Wednesday, Thursday.  You all tell me what

17   you need.

18             **MS. BRANSCOME:**  Would it make sense, Your

19   Honor, how about we can check with our team and just

20   send a note to Hillary this afternoon?

21             **THE COURT:**  That's fine.

22             **MS. BRANSCOME:**  I'm not sure if that makes a

23   difference.  I just wanted to get clarification.

24             And then the second issue was related on the

25   *Baker* and *McCombs* sort of pretrial issues, and I'm

1    referring there to motions in limine, deposition

2    designations, exhibits, and so on.

3            Would it be acceptable to stagger those based

4    on the new pretrial hearing dates so that they're not

5    all coming -- like all deposition designations being,

6    you know, sort of done at once and on your desk, we

7    could stagger those to match the new pretrial

8    conference date?

9            **THE COURT:**  I think somebody else was asking

10   this similar question, maybe it was Mark.  I'm not

11   sure we're not on the same page or I'm not on the same

12   page with you all.  Because *McCombs* and *Baker* right

13   now we have set for pretrial conference the last two

14   days of the consolidated trials' docket, so it's April

15   28th and 29th.

16           **MS. BRANSCOME:**  Yes.

17           **THE COURT:**  Because of that -- and again, the

18   trials are in May and June, but your pretrial

19   conference is the end of April.

20           Because of that, your pretrial stipulation, I

21   need it two weeks ahead of that pretrial conference.

22   That includes all your motions in limine and your depo

23   designations.  That's April 16th, I believe is the

24   date.

25           **MR. AYLSTOCK:**  Yes.

1    **THE COURT:**  So I would rather have everything

2    by April 16th.  If you want to give me things before

3    April 16th, that's fine.  But I don't want anything

4    after April 16th.  So I don't want to stagger things

5    between the 16th and the 28th, no.  Because, like I

6    said, I'm going to be in here with you every day in

7    the courtroom.

8         **MS. BRANSCOME:**  The 16th is fine, Your Honor.

9    I just wanted to make sure that you weren't expecting

10   them at the same time as *Keefer*, *Estes*, and, *Hacker*.

11   That was the clarification.  I was just trying to make

12   sure that we were dealing with those on the April

13   16th.  And I wasn't entirely clear, so I just wanted

14   to make sure we didn't miss a deadline.

15        **THE COURT:**  No.  The only way -- and I don't

16   mean to complicate, but the reason we had that

17   discussion was because I offered you all the option of

18   going ahead with the five-day pretrial conference in

19   March, so it would be the 15th, Monday through Friday.

20   And if you wanted to do that, then, yes, I would have

21   to have all of that material two weeks ahead of that

22   date, and that would include *McCombs* and *Baker*.

23        But it sounds like nobody is asking for that

24   option.  So where we have settled is the 16th of April

25   for the *McCombs* and *Baker* materials, and then a

1    three-day, maybe two, pretrial conference for the

2    three consolidated trials in March.  And you're going

3    to let me know which of the three days in that week

4    you're interested in, right?

5              **MS. BRANSCOME:**  Thank you.

6              **MR. AYLSTOCK:**  We're clear on that, Judge.

7    March 19th is a scheduled CMC, just to highlight that.

8              **THE COURT:**  That's right, we talked about

9    that.  You know what, that is the reason that I was

10   thinking we would do it the 15th through the 17th was

11   because I knew we had the CMC and I thought we could

12   combine it.  It doesn't matter to me.

13             We may -- I mean, you're going to be in town,

14   though, I guess some of you.  It might make more sense

15   to do the pretrial conference sort of, you know, in

16   conjunction with the CMC.  I know that was what was in

17   my head, but for some reason I didn't put it on paper.

18   I apologize.  But whatever works for you all.

19             I guess I envision a pretrial conference in

20   March, probably need it, although maybe not after we

21   go through two days of a pretrial conference.  And if

22   we lift these dates in B and C and you get some

23   breathing room there -- B, C, and D, actually, you're

24   going to have to put D off, too, because D right now

25   is I think in June.

1          **MR. AYLSTOCK:**   Right.

2          **THE COURT:**   Maybe we don't need the

3     conference, but let's leave it on the books for now.

4     April we will not have, obviously, we will not have a

5     case management conference in April.

6          But I don't want to forget about the cases in

7     Group D, and I don't want anyone to think I'm

8     forgetting about any of these other groups.  I want

9     you to come back to me with a schedule, and we can

10    talk about how much time you need to do that, that

11    takes you through in Group B -- let me just go back

12    over this again so there is no confusion.

13         In Group B, you are going to complete the

14    expert depositions that are to be completed by

15    February 12th.  So those will be done.  So then you

16    will come back to me with a briefing schedule for

17    those cases.

18         In Group C, you are going to complete -- fact

19    discovery will be completed by February 5th.  You're

20    going to come back to me with new dates for the

21    remaining items and trial dates for both of those

22    groups.

23         And the same with D, but that will also

24    include fact discovery, you know, moving that as well.

25    So everything in Group D will be impacted.

1          Also, we're going to need to discuss for

2     those groups choice of law briefing and issues.  We

3     have the stipulation that applied to the Group A

4     cases.  It has not been applied to the other groups.

5          So I need you all to get together to talk

6     about how you want the Court to handle the choice of

7     law briefings in light of the little wrinkles that we

8     had with Group A, which we all know what they were.

9     Thankfully you all were able to resolve those and help

10    me with those with your stipulation.

11         You may not agree with that for the other

12    groups, so this needs to be a meet-and-confer that you

13    all have.  If you can't come to an agreement about how

14    you want the Court to handle the choice of law matters

15    for the other three groups, then talk with Judge

16    Herndon.  If you still can't resolve it, then I will

17    get with you, and we'll get it resolved.  But that

18    needs to be baked into or factored into the schedule

19    you're going to present me with.  Because it's not in

20    this schedule now, so I don't want to forget about it.

21    And it does impact, as you know, your summary judgment

22    briefings.

23         And it may be that you come to me and you say

24    you want to do it all as part of summary judgment.  If

25    that were to be the case, I'm still left with the

1    decision about inextricably intertwined.  And if I

2    find that there is an issue of fact and it's

3    inextricably intertwined, then that gets put off to a

4    jury.

5        **MR. AYLSTOCK:**  We have been down the road

6    already with some meet-and-confers.  Mr. Sacchet can

7    chime in more from our side, but I think we have the

8    makings of a plan.  Because we were not anticipating

9    really from summary judgment in Group B, so we've been

10   thinking about it and discussing it with the other

11   side.  And happy to continue those discussions and

12   finalize them for Your Honor.

13       **THE COURT:**  Okay, very good, very good.

14       Any other questions from either side in

15   regards to Group B, C, and D, and what I'm asking of

16   you?

17       *[No response.]*

18       Another item that's not on your agenda but I

19   don't want to forget to ask it, the Defense has now

20   filed an objection to the R and R on the Motion to

21   Compel government records.

22       My question is, was that served, or how was

23   the Government notified?  Are they on the docket,

24   access to CM/ECF?  Do they follow things?  I'm

25   assuming they do, but I don't know.

1           Mark, do you know?

2           **MR. NOMELLINI:**  Your Honor, my understanding

3    is that they are.  But, as a belt and suspenders, we

4    will also email them a copy.

5           **THE COURT:**  That would be good, because they

6    have a response time.  If you would do that today,

7    that would be great.

8           **MR. NOMELLINI:**  We will do so.

9           **THE COURT:**  Thank you.

10          I'm going to jump to Item No. 12 on your

11   agenda.  I think we may have touched on everything

12   else.  You may want to bring me up to date on some

13   Government discovery in a minute for Group C.

14          But the Defense medical exams for Group C, I

15   would go ahead and have those done.  If you have those

16   scheduled, I don't want you to change those dates.

17          **MR. AYLSTOCK:**  They're all scheduled, Your

18   Honor, and we agree, it was a team effort on both

19   sides.

20          **THE COURT:**  Yeah, that's a herculean task for

21   everybody, including the examiners.  And so please

22   leave those as is.

23          **MR. NOMELLINI:**  Your Honor --

24          **THE COURT:**  Is there an issue with those?  I

25   see it's on your agenda.

1      **MR. NOMELLINI:**  I think -- and Jennifer can

2      correct me if I'm wrong, but I think the issue was

3      there was one plaintiff, I think Mr. Lopez, for whom

4      we were seeking permission from Your Honor to conduct

5      the DME outside of the fact discovery cutoff because

6      he is an active servicemember.

7          **THE COURT:**  That's not a problem.  I don't

8      have a problem with that.  But I would ask, you know,

9      notwithstanding the lifting of deadlines in that

10     group, that you go ahead and get that done.  You're

11     not going to have an issue with anything after the --

12         The 5th of February is the deadline, right?

13     I believe that's what we just looked at; is that

14     right?  I think that was right.  Right.

15         So I don't have a problem with Mr. Lopez's

16     medical exam taking place after February 5th, but go

17     ahead and get it scheduled at some point not too far

18     off.

19         What is the issue with his active duty?  Just

20     his work schedule or is he deployed or --

21         Ms. Hoekstra is standing up.

22         **MS. HOEKSTRA:**  He's currently in the process

23     of moving from one base to another, Your Honor, and

24     it's actually happening at the end of January during

25     like in the next week.  So until he's settled at his

1   new base, he is not able to do that, so we switched

2   locations for the DME.

3           **THE COURT:**  Okay, that's no problem.

4           Was there anything that you all needed to

5   bring to my attention or our attention in regards to

6   Item 8, which is the Government discovery update,

7   given the changes now to some of the deadlines?  But

8   that deadline actually didn't change.  So is there

9   something I need to know?

10          **MR. AYLSTOCK:**  I don't think so, Your Honor.

11          Go ahead, Mark.

12          **MR. NOMELLINI:**  The only thing, Your Honor,

13  is we have had weekly calls with Judge Herndon and the

14  Government that has been extremely helpful.

15  Plaintiffs, of course, also participated.

16          We tried again this time to get the

17  depositions of Government witnesses scheduled on a

18  consensual basis without subpoenas.  I think we gave

19  the Government multiple weeks of notice and were not

20  able to get that done without subpoenas.  So we have

21  again issued subpoenas for Trial Group C for

22  Government witnesses.

23          If any issues arise, Judge Herndon will know

24  about it right away, and we'll let Your Honor know.

25          They have been working with us, Your Honor,

1   it's just that it has taken some time, and we didn't

2   want to be in a situation where, because of a lack of

3   subpoenas, we didn't get done on time.

4           **THE COURT:**  Okay.

5           **MR. AYLSTOCK:**  And there has been good

6   cooperation from the Government, Your Honor, and they

7   actually provided the DOEHRS data on the 1½ weeks

8   ahead of schedule, so we're very pleased about that.

9           **THE COURT:**  And they did that with the hard

10  drive, right?

11          **MR. AYLSTOCK:**  I think it was a flash drive

12  delivered to BrownGreer, and both sides have had

13  access to it for a week or so.

14          **THE COURT:**  And that's the 1500, give or take

15  a few?

16          **MR. AYLSTOCK:**  It's not all of them, Your

17  Honor.  Some of them aren't in the system.  Some of

18  them are no longer active cases.  But it's the vast

19  majority of them.  And I think there is upwards of

20  10,000 or nearly 10,000 individual audiogram data when

21  you add all those audiograms for all the people, so

22  it's a mountain of data.

23          **THE COURT:**  When was that produced?

24          **MR. AYLSTOCK:**  Last Friday.  One week ago.

25          **THE COURT:**  Do you know what the DoD's next

1   step is with DOEHRS data with any --

2        **MR. AYLSTOCK:**  We're going to be discussing

3   that with Judge Herndon to assist the parties in

4   hopefully replicating that process going forward.

5        **THE COURT:**  Is there anything else from the

6   agenda that I need to address with you all that maybe

7   I've overlooked?  I know we have added -- or I have

8   added a lot to it but --

9        **MR. OVERHOLTZ:**  Your Honor, just one thing on

10  the deposition designations in light of the new

11  pretrial order.

12        We have sent over to 3M's counsel as well as

13  Judge Herndon a deposition designation protocol to

14  change the dates for those exchanges.

15        One thing that we have done, Your Honor,

16  because of the large number of depositions, the

17  30(b)(6) depositions, and three case-specific cases

18  going, is we have proposed to 3M as well as Judge

19  Herndon that we prioritize the list so that when the

20  package goes to Your Honor on March 15th that you know

21  which witnesses are likely to play compared to our may

22  play so that we can get rulings before trial, of

23  course, and also to have most of that done by the

24  February 15th or now February 19th meet-and-confer

25  with Judge Herndon.

1           So we have proposed that each side get around

2   12 priority designations that we would submit and then

3   have a secondary list that would come after that as

4   well as case-specific -- stagger them to a degree so

5   that the parties are focusing their attention on the

6   priority designations that really are likely to get

7   played in trial, of course taking Your Honor's advice

8   regarding video depositions to heart and how much we

9   would actually want to play.

10          **THE COURT:**  So, for the nonpriority

11  designations, then, when are you anticipating those

12  would be submitted?

13          **MR. OVERHOLTZ:**  Those would still all be done

14  with the pretrial submission on March 8th.

15          **THE COURT:**  Oh, okay.

16          **MR. OVERHOLTZ:**  But we want to have most of

17  the priority ones done by the February 19th

18  meet-and-confer with Judge Herndon.

19          **THE COURT:**  I see.

20          Does the Defense have an objection to that or

21  are you resisting that for some reason.

22          **MR. BHIMANI:**  Your Honor, we received the

23  proposal yesterday.  I think we all agree -- yeah, we

24  agree with the goal of making this process as

25  manageable as possible, frankly, both for the parties

1   but of course also for the Court.  So we may have some

2   differences in how to streamline and things like that,

3   and we're going to confer with them after looking at

4   their proposal in more detail, but we're working

5   towards that.

6          **THE COURT:**  Very good.  I'm glad to know

7   about it.  And work it out with Judge Herndon now.

8   No.  I didn't know about it.  I'm sorry I overlooked

9   it.  I see I did overlook it on the agenda.

10          If you need the Court's assistance, we're

11  here, so we can help you with that.  But I appreciate

12  you being mindful of not only your own schedules but

13  the Court's.

14          All right.  Anything else?

15          **MR. AYLSTOCK:**  Not from the Plaintiffs, Your

16  Honor.

17          **THE COURT:**  I have something else, but I want

18  to hear, as far as your agenda, if there is anything

19  that's we need to discuss.

20          **MS. BRANSCOME:**  Your Honor, I was just able

21  to circle back.  Our preference for our side of the

22  pretrial conference would be later in the week and

23  either consolidated -- *(inaudible)* -- or at least --

24          **THE COURT:**  Kim, I'm not hearing you at all,

25  and I don't think it's here on this end because I hear

1   everybody else.

2       **MR. BROCK:**  Judge, I can do it.  I'll help

3   out, here.  What Kim is conveying is that, on the

4   pretrial conference we would prefer to do the middle

5   of the week dates that would take us up to the, I

6   guess, the CMC that's scheduled on that Friday,

7   because we'll have a group that will be in town and

8   there is no reason to have an open day in there if we

9   can avoid it.

10      **MR. AYLSTOCK:**  We agree, Your Honor.

11      **THE COURT:**  Bryan, you said the same thing,

12  okay.  I'll reflect that in the order.

13      And, Kim, I'm sorry.  I'm not sure why or

14  what the difficulty is, but you start out strong and

15  then the sound just disappears.

16      **MS. BRANSCOME:**  I apologize.

17      **THE COURT:**  Let me discuss another trial

18  matter with you all.  As you know, I have relied

19  heavily on both Judge Jones and Judge Herndon to

20  manage this litigation, and they have both been a

21  godsend to me.  And I don't want to speak for you, but

22  I suspect I can, they have been extremely helpful to

23  you as well.

24      I know, as of late, Judge Herndon probably

25  deserves a raise, but I won't say anymore about that.

1   He's, I know, been working with you all extensively on
2   issues that I'm not even aware of, and I can't thank
3   him enough for that.
4           So what I want to propose to you all, but I'm
5   mindful that, in doing so, that I'm spending your
6   money or your client's money that -- you know what I'm
7   saying, I mean, Plaintiffs', it's lawyer's money, 3M's
8   money right now in terms of this litigation.
9           But I would like to have Judge Herndon here
10  for the trial.  I would like very much to have him
11  here for the trial.  And I've talked to him about it.
12  He's amenable.  He's also amenable to meeting with you
13  all to discuss, you know, if -- I know he's amenable
14  to talking to you about compensation and maybe a
15  different schedule, perhaps, of that.
16          And so, while I'm not -- I don't feel like
17  I'm in a position to require it, I would tell you that
18  I would like him here very much.  I think he could be
19  very helpful to me.
20          Kim, you alluded to trial briefs.  And I
21  suspect there will be -- I don't want to welcome them
22  today and invite them today, but there is just -- in a
23  trial of this magnitude, even if it was a single
24  plaintiff trial, it's our first one, right, I mean, in
25  this litigation, and there is going to be a lot of

1    trial and error and there is going to be a lot of
2    moving parts, and it would be helpful for me to have
3    him as an interface between us and able to deal with
4    things that come up that might allow me to deal with
5    some other more substantive issues that I need to deal
6    with.  I don't know that I'm going to be able to deal
7    with everything on our timetable.  And maybe there
8    won't be any issues.  That would be terrific.  But I
9    doubt that's going to be the case.  So please give it
10   some thought.
11           If your clients or you have an issue with it,
12   I would ask that just you let Hillary know that.  You
13   can email her directly, and you don't need to copy the
14   other side, and I will talk with you about it.  Judge
15   Herndon will not know, if there is an issue, who
16   brought the issue to my attention.  Just know I'm open
17   to that confidential communication if you want to have
18   it.
19           But otherwise, if you all would talk about
20   it, talk about it with your clients, and then let me
21   know.  And like I said, he will get with you as far as
22   compensation for that time.
23           Minnesota.  I see Mr. Paul is here.
24           So I had a conference call yesterday.  Judge
25   Herndon was on the call.  Judge Keys, I believe, is a

1    special master that Judge Fraser has appointed in

2    Minnesota to help him manage that litigation, and he

3    was on the call as well as Judge Fraser and I were on

4    the call.

5          He brought me up to date on some things that

6    are happening in his court in these cases.  I believe

7    you have 24 cases right now that are pending before

8    him.  There may be more to come.  One is set for

9    trial; that's the *Graves* case.

10         And just as luck has it, it's set the same

11   now -- it was set earlier than mine.  But because of

12   the concern of not having enough time and needing

13   maybe some extra time for these pretrial conferences,

14   now your Group A consolidated trial is set the same

15   day as his.  So I made him aware of that.

16         One thing he discussed with me is apparently

17   the George Floyd case is going to trial that same week

18   in the same courthouse.  I don't know if -- I don't

19   know what he's going to do, but I know that's

20   something that he's considering as far as that trial

21   date.

22         The Eighth Circuit is still considering the

23   *Graves* appeal, and apparently there is eight or nine

24   other -- maybe it's less than that, but there's a

25   handful of other cases that have been appealed on the

1    remand issue.  I don't think the Eighth Circuit has

2    consolidated any of them.  The briefing is complete on

3    *Graves*.  However, to my knowledge, there has not been

4    an oral argument date set.

5          And I think that's -- oh, also in the *Graves*

6    case, though, there has been some summary judgment

7    briefing as well.

8          Is that right, Mr. Paul?  I believe that's

9    pending.

10         **MR. PAUL:**  That's correct, Your Honor, that

11   is pending.  And then we are arguing next week the

12   motion to amend the complaint to add punitive damages,

13   which is a Minnesota procedural rule.

14         **THE COURT:**  Okay.  So I don't -- Mr. Hulse is

15   the 3M counsel, I believe; is that right?

16         **MR. PAUL:**  That's correct.

17         **THE COURT:**  He's not with Kirkland; different

18   law firm.  So, Mr. Brock and I had this discussion

19   many, many moons ago about the difficulty with having

20   the Minnesota trials set so close -- and the MDL

21   trials set so close to the Minnesota trials.

22         What I told Judge Fraser yesterday is this

23   consolidated trial, these cases are going to be tried,

24   absent summary judgment -- I haven't gotten that far

25   yet -- being granted.  But absent that, these cases

1   are going to trial.  The date is not going to move.

2   And if 3M wants Kirkland lawyers at the Minnesota

3   trial, they'll need to find some additional lawyers,

4   because Mr. Brock --

5         Or unless, Mr. Brock, you would rather be in

6   Minnesota than Pensacola.  I leave that to you.

7         **MR. BROCK:**  I love being in Pensacola.  I

8   wouldn't pass up on a chance for that for anything.

9         I will say there is one other issue in

10  Minnesota, and that is -- I mean, you referred to the

11  George Floyd trial.  But our lead lawyer in

12  Minneapolis is actually a prosecutor for the first

13  case in the George Floyd situation, I guess I would

14  call it, but the first case is set for trial at the

15  same time as this trial.

16        So we have had some discussions about

17  potentially adjourning the Minnesota case to sometime

18  in the mid summer, which would be helpful in terms of

19  not having overlapping trials and would still get the

20  Minnesota trial underway pretty soon.  So those

21  discussions are occurring also, so just to bring you

22  up to date on that.

23        **THE COURT:**  Yes.  I should have raised it.

24  Judge Fraser did make me aware of that.  So really the

25  ball is in his court in terms of what he wants to do

1   with the Minnesota 3M trial.  But I do know he's

2   considering what you have just raised, Mr. Brock, and

3   just the activity level I think surrounding that trial

4   in that court.

5           **MR. BROCK:**  Right.

6           **THE COURT:**  So, Mr. Paul, is there anything

7   else that you think I need to be aware of?

8           I don't know if I told you all I was going to

9   be talking with Judge Fraser yesterday, but it was a

10  good call.  It was good to touch base with him.

11          **MR. PAUL:**  I think we have covered all the

12  issues from Minnesota.  I don't know at what time you

13  spoke with him yesterday.  3M did file a formal

14  request for a continuance of the *Graves* trial

15  yesterday.

16          We have not yet responded to that.  But their

17  two bases for that was the George Floyd trial and the

18  overlapping nature of this Court's trial.

19          **THE COURT:**  I don't know if he had the actual

20  motion in front of him at that point.  He may have.  I

21  don't know.

22          Do you remember, Judge Herndon?  I don't

23  remember if he did or didn't, but he certainly knew of

24  the issue.

25          **JUDGE HERNDON:**  He knew about the issue, but

1    I do not think he had the motion before him yet.

2          **MR. PAUL:**  We have a status conference

3    scheduled with Judge Fraser a week from today.

4          **THE COURT:**  Okay.  Well, very good.

5          Can I also confirm, Mr. Paul, one other

6    thing.  I apologize, it's not really trial related.

7          In the MDL -- and this is for everybody --

8    the deposition orders, protocol orders that have been

9    entered in the MDL, we contemplated, at least I did in

10   entering those orders, that there would be

11   participation, perhaps, but participation by state

12   court counsel in some of the discovery in this MDL.

13         Has that happened?  Has there been any sort

14   of overlap?

15         **MR. PAUL:**  It has happened, Your Honor.  So

16   we let the MDL attorneys take the lead in all the

17   depositions.  We sat through them and got to ask

18   questions at the end.  So we had that participation.

19         We have had a little bit of an issue on the

20   expert side because 3M had some of the same experts.

21   We didn't know that they were designating those

22   experts in Minnesota, so we didn't participate.  So

23   we're having a little bit of an issue, but I think

24   we're working through that to retake some of those

25   depositions and let others slide.

1          **THE COURT:** All right, very good. Well,

2     thank you again for serving in the role that you do.

3     I appreciate you keeping us up to date, and I

4     appreciate the chart that you submitted.

5          Hillary, is there anything else I'm

6     forgetting?

7          Judge Jones, are you --

8          **JUDGE JONES:** I have nothing further to add.

9          **THE COURT:** All right. Well, thank you for

10    your help with all those recent motions that have been

11    filed. I know they have piled up for you. I'm not

12    the only one with a lot of motions to deal with.

13         Judge Herndon, do you have anything?

14         **JUDGE HERNDON:** Nothing further. Thank you

15    very much.

16         **THE COURT:** Okay. Anyone else, anything?

17         **MR. AYLSTOCK:** No, Your Honor.

18         **MR. HILL:** No, Your Honor.

19         **THE COURT:** Are you all looking in -- I

20    assume you are -- accommodations here locally for

21    trial? If you're not doing that yet, I would suggest

22    you start. With COVID, I mean, obviously we don't

23    have the issues that we might otherwise have as far as

24    availability of places. But nonetheless, it would

25    certainly I think be in everyone's interest from your

1  standpoint and the parties and the attorneys to go

2  ahead and start looking into that, if you haven't

3  already.

4       **MR. AYLSTOCK:**  I think it's already been

5  done, Your Honor.

6       **MR. BROCK:**  Bryan has invited us to stay with

7  him, so --

8       **MR. AYLSTOCK:**  Mr. Brock reserved the entire

9  hotel next to our office, so we are not allowed in the

10  Holiday Inn Express per the agreement.  But other than

11  that, everything is fine.

12       **THE COURT:**  Okay.  But you all have your

13  arrangements, Bryan?

14       **MR. AYLSTOCK:**  Yeah.  We got snaked on that

15  one, but that's okay.  I say that kidding.

16       **THE COURT:**  No comment.

17       Well, this was productive, I think.  More

18  detail than I intended, but I hope it's been helpful.

19  And let me know if there is anything else that I can

20  do.  If it's logistics or if you have questions about

21  anything that's been discussed here today, just let me

22  know, let Hillary know, let Judge Herndon know, and

23  I'll jump on it.

24       Then, if not, I'm going to be working on your

25  motions.

1          Everybody take care, stay safe and healthy.

2          The Court is in recess.

3          *(Proceedings concluded at 1:01 p.m.)*

4          --------------------

5   *I certify that the foregoing is a correct transcript*
    *from the record of proceedings in the above-entitled*
6   *matter.  Any redaction of personal data identifiers*
    *pursuant to the Judicial Conference Policy on Privacy*
7   *are noted within the transcript.*

8

9   *s/Donna L. Boland*                    *1-23-2021*
    *Donna L. Boland, RPR, FCRR*               *Date*
10  *Official Court Reporter*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25