**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG   )   Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,  )
                                )   Pensacola, Florida
                                )   February 5, 2021
                                )   2:05 p.m.
                                )
                                )
_____)

**ORAL ARGUMENT**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-74)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*1 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

**A P P E A R A N C E S**

**JUDGE DAVID R. HERNDON** (ret.)
*dave@herndonresolution.com*

**FOR THE PLAINTIFFS:**   Aylstock, Witkin, Kreis & Overholtz, PLLC
By:   **BRYAN F. AYLSTOCK**
        *baylstock@awkolaw.com*

        **NEIL D. OVERHOLTZ**
        *noverholtz@awkolaw.com*
        17 E Main Street, Suite 200
        Pensacola, Florida  32502

        Ciresi Conlin LLP
        By:   **MICHAEL A. SACCHET**
        *mas@ciresiconlin.com*
        225 South 6th Street, Suite 4600
        Minneapolis, Minnesota  55402

        Laminack, Pirtle & Martines LLP
        By: **THOMAS W. PIRTLE**
        *tomp@lmp-triallaw.com*
        5020 Montrose Blvd, 9th Floor
        Houston, Texas  77006

**FOR THE DEFENDANTS:**   Moore, Hill & Westmoreland, PA
By:   **CHARLES F. BEALL, JR.**
        *cbeall@mhw-law.com*

        **HALEY J. VANFLETEREN**
        *hvanfleteren@mhw-law.com*
        350 W Cedar Street, Suite 100
        Pensacola, Florida  32502

1            P R O C E E D I N G S

2            *(Court called to order at 2:05 p.m.)*

3            **JUDGE RODGERS:**   Thank you.

4            Thank you, Fred.

5            Good afternoon, welcome.

6            Let me introduce who is present in the courtroom.   For

7      the Plaintiffs, I have Mr. Sacchet, Mr. Aylstock, Mr.

8      Overholtz, and Mr. Pirtle.   For 3M, I have Mr. Beall and

9      Ms. VanFleteren.

10           There are a number of other lawyers, I believe,

11     present and then also on Zoom.   I do see our two judges, Judge

12     Jones and Judge Herndon.

13           And, Judge Jones, you look comfortable.

14           **JUDGE JONES:**   I am.   I actually had sinus surgery this

15     morning.

16           **JUDGE RODGERS:**   Then you're not comfortable.   I stand

17     corrected.   Well, thanks for joining us as well.

18           So, I asked you all to come here this afternoon to

19     talk with me about some of the motions that are pending that

20     relate to the Army's Hearing Conservation Program.   Each side

21     has a number of witnesses to testify either critically of or in

22     favor of that program, and I need some guidance from you all

23     before I can make my decision.   I have some concerns about

24     these witnesses, some of them in whole and others in part.

25           So, the witnesses on the Plaintiffs' side you've

1    identified Gen. Huston -- excuse me, Sgt. Maj. Huston, Gen.

2    Edens or Eddins?

3              **MR. SACCHET:**  Eddins.

4              **JUDGE RODGERS:**  Eddins, okay.  And then Marshall also

5    was identified.

6              For the Defendants, it's Dr. Fallon, Ms. Tuten,

7    Dr. Crawford, and then Ms. Sahmel.

8              Is it Sahmel?  That's how I'll pronounce it.  And then

9    Neitzel.

10              So, it's caught my attention, and, again, one of the

11    reasons that I asked you to come here today, it caught my

12    attention you have mirror images of your criticisms of each

13    side's experts on this.  You criticized them for the same

14    reasons that your experts are being criticized, which tells me

15    there might be a problem.

16              So, let me just -- I think in my email, Mr. Beall, I

17    indicated I wanted to start with the Defense.  And so, I want

18    to hear from you about -- first of all, I want to know why you

19    think the Plaintiffs' experts shouldn't be able to testify in

20    favor of the Hearing Conservation Program or, more broadly, the

21    Army Safety Program, and the training that was implemented as a

22    result of that program but your experts on the Army Hearing

23    Conservation Program and training of audiologists and soldiers

24    should be allowed.

25              From the lectern, please.

1           **MR. BEALL:**  May it please the Court?

2           **JUDGE RODGERS:**  Yes.

3           **MR. BEALL:**  And I do appreciate the Court's

4    clarification of what you were looking for.  And I will say

5    that I have focused primarily on defending our own experts as

6    opposed to the relevance of theirs, because I do think they

7    are, in some ways, mirror images of each other.

8           **JUDGE RODGERS:**  Well, if yours are relevant and

9    reliable, then theirs are.  So, why don't y'all just reach an

10   agreement and they can just all testify to everything?  That

11   would make my job a little easier.

12          **MR. BEALL:**  Well, I'm not saying that we couldn't

13   potentially do that.  I do think there is a couple of

14   differences, and I'd focus on the relevancy issue, which I

15   think is -- the relevancy is, obviously, if they get theirs in,

16   then we should get ours in under relevance ground, right?  I

17   think that's --

18          **JUDGE RODGERS:**  Aren't theirs really rebuttal?  I

19   mean, I'll hear from Mr. Sacchet.  But I was assuming that,

20   that you all would put your experts on and point the finger at

21   the military/the Army in your case, and then theirs would be

22   rebuttal to that.  But it also could depend on your

23   cross-examination of the plaintiffs.

24          **MR. BEALL:**  I think that's -- and I do think the issue

25   has come up both in their case in chief and in our defenses,

1    which are still present.  So, I do think that there is a "who

2    goes first" -- it's sort of the chicken-or-the-egg type

3    situation that is not as important.

4         I think our criticism of their experts is primarily

5    focused -- and I think this is one of the reasons I assumed you

6    wanted us here today is because we each briefed -- you know, we

7    had a word limit.  We spent, you know, 15 pages or something

8    like that combined on these various experts, maybe a little bit

9    more than that.  And we focused on qualifications, to a point,

10   but primarily on sort of methodology and the like.

11        And I think the brief sort of lay those arguments out

12   there, and I think the Court is familiar with that law and

13   certainly could reach that decision.  But we didn't really --

14        **JUDGE RODGERS:**  They said the same -- they really did

15   say the same thing.  If I had just covered up Plaintiff at the

16   top of the page or Defendant at the top of the page, it would

17   have read very similar.

18        **MR. BEALL:**  I don't disagree with you, there are some

19   stark similarities in the legal arguments.

20        **JUDGE RODGERS:**  Well, let's talk about the

21   differences.

22        **MR. BEALL:**  But the primary issue I think is

23   relevance.  But I think on the issue of methodology in the fit,

24   a lot of it is directed to our belief that they focused more on

25   state of mind and on very general highbrow propositions about

```
 1    the wonderful safety program the Army has.

 2              And let's start with a couple of just basic points.

 3    This trial, from our standpoint, is not going to be a five-week

 4    exercise in bashing the military.  So that's not our -- you

 5    know, we are certainly going to discuss the military and --

 6              JUDGE RODGERS:  Just so you -- I'd point out, you've

 7    identified five witnesses to talk about the military's Hearing

 8    Conservation Program, more specifically it's failure --

 9              MR. BEALL:  Yes.

10              JUDGE RODGERS:  -- and how that has impacted these

11    plaintiffs.

12              MR. BEALL:  Sure.  I'm not suggesting -- we are

13    certainly going to argue that the military failed these

14    particular plaintiffs, no question about that.  But what I mean

15    by that is --

16              JUDGE RODGERS:  Maybe, maybe.

17              MR. BEALL:  Maybe.  And I understand that.  But we are

18    -- the point of this is not as if the Army doesn't have a

19    program.  They, in fact -- we are going to put in evidence

20    ourselves -- in fact, if you look at our reports, one of the

21    reasons, for example, Gen. Eddins or Edens, I can't remember --

22    we would stipulate they had a Hearing Conservation Program and

23    that they did it for the following -- you know, for good

24    reasons and all that.

25              So, the point is not to say the Army didn't do
```

1    anything.  The problem with the Army is, quite frankly, the
2    Army is -- or the military, in general, has over a million
3    employees scattered across most of the fifty states and
4    overseas in an occupation that is inherently noisy and cannot
5    be made less noisy.  So, it has a hearing conservation problem
6    that is difficult to get your arms around.
7            And so, you know, the point is not to sit there and
8    say the military is evil, the military is bad, but to say that,
9    look, we know that this is a big task the military has and they
10   do what they can do, but they can't be perfect.  And so, we
11   want to be able to show that there were, in fact, flaws in
12   their system, and that flaws not only are there just in a
13   generic sense, which is true, there are -- you know, there is
14   certainly testimony and evidence that there are failures in
15   fitting hearing protection devices or in wearing hearing
16   protection devices.
17           **JUDGE RODGERS:**  But the problem -- and again, this
18   goes both ways.
19           **MR. BEALL:**  Sure.
20           **JUDGE RODGERS:**  But I've got you here up at the
21   lectern now, so I'll talk with you.
22           But the problem, as I see it, is not so much a
23   discussion by a knowledgeable person about the Hearing
24   Conservation Program, such as Dr. Fallon, Hearing Conservation
25   Program manager at CHPPM, or certainly about the Army Safety

1     Program of which the Hearing Conservation Program would be a

2     component of --

3             **MR. BEALL:**   Sure.

4             **JUDGE RODGERS:**   -- by Gen. Eddins.   And both of those

5     -- I'll call them programs -- they're relevant.   They're

6     helpful background information for this jury in the context of

7     this case, both their case and your case.

8             And so, I think to have someone knowledgeable to

9     discuss the programs, one being broader than the other, but

10    nonetheless relevant, the purpose behind the programs, the

11    intent of the programs, the goals, what the Army was trying to

12    achieve in implementing the safety program and the Hearing

13    Conservation Program, all relevant and admissible.

14            Where I have questions, though, is where your

15    witnesses get more specific about their criticisms of the

16    program's implementation or non-implementation Army-wide or the

17    success of it Army-wide.

18            **MR. BEALL:**   Sure.

19            **JUDGE RODGERS:**   I don't think these witnesses can

20    testify to that.   They are experience-based witnesses solely --

21            **MR. BEALL:**   Yes.

22            **JUDGE RODGERS:**   -- which is fine under 702.

23            But, just because a witness has 30 years' experience

24    in hearing conservation in the military doesn't mean that that

25    witness can give an opinion about any aspect of hearing

1    conservation throughout the military based on that experience.

2          Experience is not a substitute for reliability.

3    Reliability is not based on experience alone.  And you know the

4    *Frazier* case out of the Eleventh Circuit; if you don't, I

5    suggest you read it.  I know you, and I'm sure you have.  But

6    that's what that case says, reliability, again, is not

7    synonymous with experience.

8          And so, none of these experts have done any studies.

9    They don't have any data.  Nothing.  These are just general

10   personal observations that they have made throughout their

11   careers in the military, much of it based on hearsay, and quite

12   a bit of their testimony is speculation.

13         I mean, Gen. Eddins cannot testify, in my view -- I'm

14   going to hear from Mr. Sacchet, maybe he'll convince me

15   differently, and maybe you'll convince me differently, but I'm

16   giving you the benefit of my thoughts right now that these

17   individuals cannot testify about a universally successful Army

18   Safety Program just based on that opinion.

19         There may be studies out there, but they didn't cite

20   them, and they didn't rely on them, nor did your experts.

21         And so, your experts have said things -- Dr. Fallon

22   specifically -- about what the military audiology community as

23   a whole knew and understood.  That is not coming in.  It's just

24   not.  He cannot testify to what the Army audiology community,

25   as a whole, knew.  He didn't testify to what the Army, as a

1    whole, knew.  He can't testify to what the 3M knew.  And

2    likewise, Gen. Eddins can't testify to what was ingrained in

3    every soldier throughout the United States Army.

4         He can testify as to what the Army's intent was with

5    the policy, because these individuals, Fallon and Eddins, were

6    at a high enough level I think they can do that.  They can even

7    discuss the DoD regs and the Army pamphlet.  They can talk

8    about training that was intended to be implemented, the purpose

9    of that training, what it was designed to do; training of

10   audiologists, technicians, what that was designed to do, why it

11   was done.

12        And they can even go so far as to testify about what

13   they did, and they would get into Sgt. Maj. Huston in terms of

14   the NCO training that was done of soldiers and basic training.

15   And then Dr. Fallon and even Ms. Tuten in terms of the training

16   they did of audiologists that they personally did or what they

17   observed.

18        And again, they can testify about the intent of the

19   policy and that the intent was that every installation trained

20   everybody the same way, it was consistent, it was uniform.

21        But what is Dr. Fallon's opinion based on that it

22   wasn't?

23        **MR. BEALL:**  I would suggest his observations in his

24   position.  In other words --

25        **JUDGE RODGERS:**  But he's got to explain that, and he

```
 1    didn't, Charles, he didn't do that in his deposition.  He
 2    didn't explain -- he was at Fort Bragg.  So, if these
 3    plaintiffs had been at Fort Bragg when he was there as the
 4    Hearing Conservation Program manager, absolutely relevant.  And
 5    I would say Fort Bragg -- as large as it is and as many
 6    soldiers that are there, I think he could testify to that.
 7                    MR. BEALL:  Sure.
 8                    JUDGE RODGERS:  But the Army?  I don't know how many
 9    installations there are.  There have got to be, you know,
10    dozens and dozens, if not hundreds of military installations
11    throughout the Army.  Some are very large, some are very small.
12                    And to allow a witness to get on the stand and say,
13    I'm an expert in the Army Hearing Conservation Program, and I
14    can tell you that the Army failed miserably in implementing
15    this program Army-wide, that means every installation, which
16    would cover the installation these plaintiffs served at, and he
17    was never there.
18                    MR. BEALL:  I think the distinction I would draw --
19    and I recognize, maybe broadly, your point there.
20                    But I think the distinction is, if you are offering an
21    opinion that everybody did something, then you've got to have
22    an observation to know that everybody, in fact, did that.
23                    What our witnesses are primarily saying is that the
24    regulations require this, and it was done not uniformly, it was
25    not always done correctly --
```

1      **JUDGE RODGERS:**  But they can't say that, though.  If

2  they do, they have to limit to what they have personal

3  knowledge of.

4      So, if -- and this is a hypothetical, but if

5  Dr. Fallon says, *I was at Fort Bragg, and I was at Fort Bliss,*

6  *and I was at Fort McClellan and Fort Hood*, and he can say, *I*

7  *can tell you that the policies were not implemented*

8  *consistently across those four installations*.

9      That comes in because he was there, and he can say

10  that.  Even at the highest level, even though he might not have

11  been boots on the ground, but he was there at a high level, I

12  think he can say that.  I don't think I would have a problem

13  with that.  But he's gone far beyond that, far beyond that.

14      **MR. BEALL:**  And I guess I would -- my response would

15  be -- and I understand your point.  I would say experts don't

16  have to have personal knowledge.  I recognize experience is a

17  slightly different sort of qualification than doing a testing

18  of a product or something of that nature.

19      But I do think when somebody has people reporting to

20  him from all installations from the whole gamut, he can, based

21  upon that experience, talk about the program and its

22  shortcomings.

23      **JUDGE RODGERS:**  He can't.  It's all hearsay.  It's all

24  hearsay.

25      **MR. BEALL:**  But experts can in fact rely upon hearsay.

1   They can't be a conduit to get the hearsay in, but they can

2   rely upon --

3            **JUDGE RODGERS:**  But that's what you all will be doing.

4   That's what he will be doing.  You'll be getting in hearsay

5   through Dr. Fallon.

6            There is nothing -- where is a study -- I mean, I've

7   read that there -- I've seen citations to studies that were

8   done by -- it's not the National Institute of Health, it was

9   the Institute of Medicine or -- there are other studies that

10  are Army-wide that I haven't read them but I've seen citations

11  to them.  Nobody has cited them.

12           There is even a citation to a study by Kathy Gates and

13  Eric Fallon cited in the GAO report, but it's not anything

14  Dr. Fallon relied on.

15           There has got to be something more than just his

16  experience and his sweeping, broad-based opinion.  And I don't

17  know -- I don't see it.  But here is a footnote:  I don't have

18  all of his testimony.  So, I have to say I only have one --

19           Is that right, Justin?

20           -- one deposition of his, and there were multiple

21  depositions taken.

22           And so, I don't know if there is something -- like,

23  for instance, one of the things he cited for -- and we'll get

24  into this in a minute -- for his opinion about everybody in the

25  military knew to fold the flanges back on these earplugs, and

1    they're not one-size-fits-all, everybody in the military knew

2    that or in the Army knew that.

3              The only thing he relies on -- and apparently it's in

4    a deposition I don't have, but it's a one-and-a-half page media

5    article written by Kathy -- is it Kathy Gates?  I think it is.

6    Is it Kathy Gates?  Yeah, Lt. Col. Gates -- where she gives her

7    opinion that the CAE is not one-size-fits-all, and there are

8    soldiers who cannot use it due to exceptionally small or large

9    ear canal size.  That's it.

10             So, there has got to be something else that he relies

11   upon, not just years of experience in hearing conservation,

12   much of it that was served at Fort Bragg, not in CHPPM.

13             **MR. BEALL:**  And let me -- I learned years ago, when I

14   don't know the answer to a question, I should not try to guess

15   at the answer to the question.  So I'm not going to try to

16   guess at the answer to this question.

17             And the reason, frankly, is I was -- my presentation

18   today is primarily focused on the relevance of this testimony

19   as opposed to the methodology of the testimony based upon the

20   email.  And I apologize for that.  So I did not come armed with

21   Dr. Fallon's deposition testimony and ability to cite that.  It

22   may be there.  I just don't want to venture out what I'm

23   prepared to talk about today because I think that would get me

24   in trouble.

25             **JUDGE RODGERS:**  Well, one thing I think I did also add

1     to the email was 403.

2          **MR. BEALL:**  Sure.

3          **JUDGE RODGERS:**  I mean, none of this is tied to these

4     plaintiffs, none of this.

5          So, you want Dr. Fallon and Vickie Tuten, and then the

6     three others I mentioned, you want them to get on the stand,

7     talk about the Hearing Conservation Program, discuss the regs,

8     the DoD regs and the Army pamphlet guidelines.  And then

9     they're going to say, *We didn't have sufficient resources, the*

10    *operational command leadership didn't support us, and so*

11    *soldiers weren't properly fit and didn't have annual*

12    *audiograms, and therefore the Army failed these plaintiffs, and*

13    *that's why they have a hearing loss.*

14         But none of these people served at a base that these

15    soldiers were ever at.

16         **MR. BEALL:**  We are -- first of all, experts are

17    allowed to offer opinions on the ultimate issue, but they

18    aren't required to, in other words, if you're simply talking

19    about background.

20         And keep in mind we have three different plaintiffs

21    coming to court here.  And for example, we have one of them who

22    I believe testified that he was not fitted, the other two says

23    they don't recall being fitted.  Let's just use --

24         **JUDGE RODGERS:**  I agree you do have that, you do have

25    that.  But then, since you have that -- and actually, I think

1    it's a little stronger than that.

2            **MR. BEALL:**  Yes.

3            **JUDGE RODGERS:**  I think you can make an inference from

4    all three of them's testimony that they weren't fitted --

5            **MR. BEALL:**  Sure.

6            **JUDGE RODGERS:**  -- annually with -- now, I know

7    Plaintiffs have an argument about the causation issue with

8    that.  But nonetheless, you have that.

9            **MR. BEALL:**  Yes.

10           **JUDGE RODGERS:**  So, if you have that -- and now I'm

11   going to turn to 403 more specifically -- then why do you need

12   all of this other?

13           I mean, you have them conceding that they were not

14   properly fit with this plug.

15           **MR. BEALL:**  Well, several points there.  First of all,

16   we need the -- a lot of this is background, foundation, and I

17   think the phrase that Plaintiffs used is contextualize this.

18   Because you've got --

19           **JUDGE RODGERS:**  I don't disagree with you, Charles, on

20   the broad education about the program and the intent of it and

21   the implementation of it.

22           But what I'm talking about is why do you need what I

23   don't believe is reliable testimony -- but let's just say it

24   is -- but why do you need someone to tell this jury that the

25   regulations weren't followed -- the regulations are not

1   complicated -- the regulations were not followed when you have

2   the plaintiffs telling you they weren't followed?

3            **MR. BEALL:**  Well, a couple of them -- and maybe they

4   would stipulate to this.  A couple of them says "I don't

5   recall."  "I don't recall" is slightly different than "I

6   wasn't."

7            **JUDGE RODGERS:**  I think there is only one who says he

8   doesn't recall.

9            **MR. BEALL:**  But either way, for that one person we

10  need to make sure they don't sit there and say, well, he

11  doesn't recall but he probably was.

12           We need to be able to show that, in fact, it was not

13  routinely done.  But also because it shows why it was

14  important, why it was --

15           **JUDGE RODGERS:**  I've got to go back to the

16  reliability.

17           How can Fallon say that it wasn't routinely done?  How

18  can he say that?

19           He can talk about -- he doesn't even have numbers to

20  say, you know, I trained this many audiologists in this -- and,

21  by the way, he and Ms. Tuten both say they did it perfectly,

22  everybody they trained did it perfectly, they knew to fold the

23  flanges back, they knew how to insert it.  So that's a little

24  inconsistent there, but that's what they say.

25           So, I don't know how he can say that, without any

1    numbers, without any data at all, that they didn't have enough
2    people to ensure that all the soldiers were fitted.
3              That's what they want to say.  That's what he and
4    Vickie Tuten both want to say.
5         **MR. BEALL:**  And I guess I would go back to their
6    broad-based experience, their specific roles were the kind that
7    they would be aware of what was happening, and they would --
8    and I recognize, if you're at this fort, you know what's
9    happening at this fort.  If you're overseeing both forts, you
10   would have a better sense of that, like Dr. Fallon was.
11        **JUDGE RODGERS:**  But is there -- obviously, you all
12   know your cases far better than I do and the evidence that you
13   have to support and defend your case.
14             Is there documentation that is going to come in that
15   is going to support what Fallon and Tuten are saying?  Is there
16   something like a memo or something from a couple of different
17   installations that went up the chain and ended up on
18   Dr. Fallon's desk that cited some of these problems or some of
19   these frustrations that people were having and then he took
20   some action on it?  Is there anything like that?
21        **MR. BEALL:**  Well, I don't want to speak broadly
22   because I haven't seen all the exhibits.  But I'm certainly not
23   going to represent that there is something like that --
24        **JUDGE RODGERS:**  I understand there are quite a few.
25        **MR. BEALL:**  Yeah, there are a dozen or two, I think,

1    potentially.  And so, I don't want to say that one exists, but

2    I am certainly not aware of something of that nature.

3           But I think it's important in this situation for the

4    jury to understand that these weren't the only three soldiers

5    in the entire Army that didn't get their hearing protection

6    devices fitted properly or various things.

7           It also goes to why the -- and I recognize you said

8    this may well be admissible as to why the regulations exist,

9    what they're designed to do and all that.  But I think it's

10   important for the jury to understand why this is not some sort

11   of one-off thing.

12          I think if you were to have a case -- if this was a

13   case involving General Motors and something, you would expect

14   an entire bit of presentation about the Hearing Conservation

15   Program at the GM plant and how it was implemented, how it was

16   done, how it failed.  And that's what these --

17          **JUDGE RODGERS:**  There is where you lose me is on how

18   it failed.

19          I'm not saying Dr. Fallon couldn't testify to this

20   based on his experience.  But you don't have the support for

21   his opinion that convinces me it's reliable.

22          For instance, he testified in his deposition that a

23   very low percentage of servicemembers were required to fold the

24   flanges back.  There is no quantification to that.  What is a

25   very low percentage?

1            **MR. BEALL:**  And again, Your Honor, I don't want to

2    speak about Dr. Fallon's whole deposition testimony because I

3    did not go back and review all of the depositions.

4            **JUDGE RODGERS:**  There is no verifiable, quantitative

5    basis for that statement.

6            The testimony or the opinion, again, that everyone

7    knew to fold the flanges back, he cannot say that.  He cannot

8    say that and neither can Tuten.

9            They can testify, certainly, to, again, what was

10   supposed to be told to audiologists, how these people

11   instructed audiologists, what they observed in the audiology

12   community, and then they can give opinions based off of that.

13   But it's got to have a basis to it other than, *I have 30 years'*

14   *experience in Army hearing conservation, so I can testify and*

15   *give an opinion about anything to do with the Army Hearing*

16   *Conservation Program, including the fact that it failed.*

17           So, I'm just forewarning you that it's not likely that

18   this is going to come in.

19           He also testified about military testing practices,

20   but yet he conceded he didn't have any knowledge or experience

21   with the military's testing.  He just assumed that the military

22   tested its own products.  That's a problem.

23           He wants to give opinions about the earplug, but he

24   has no knowledge of the contract; he conceded that.  He didn't

25   arrive at CHPPM until after the earplug was purchased by the

1    Army.  He was at Fort Bragg when the Army first purchased the

2    earplugs.  He doesn't do any attenuation testing himself.

3              So, let me ask you one other thing about Dr. Fallon.

4    His fourth sort of category -- and again, we don't have a

5    report from Dr. Fallon because you all have classified him as a

6    hybrid witness.

7              **MR. BEALL:**  Sure.

8              **JUDGE RODGERS:**  And so we have a disclosure.  And I

9    believe your disclosure sort of put four buckets for his

10   opinions.  And the final one is this widespread nonuse of

11   hearing protection devices.  And I have a problem with that for

12   the same reason I have a problem with widespread knowledge by

13   the audiology community throughout the military about folding

14   the flanges back.

15             But if I let that testimony in by Dr. Fallon that

16   there was widespread nonuse of hearing protection devices

17   throughout the military, why shouldn't the Plaintiffs' experts

18   be able to testify about the success of the program and that

19   military servicemembers always wear their hearing protection?

20             **MR. BEALL:**  And I guess part of the issue is we got

21   their reports first and we responded to their reports.  So they

22   put in reports saying everybody used it, so we put in reports

23   saying there was widespread nonuse.

24             **JUDGE RODGERS:**  Sure, fair enough.

25             **MR. BEALL:**  So in some sense --

1          **JUDGE RODGERS:**  Well, let me ask them that.

2          **MR. BEALL:**  -- we're responding to their testimony.

3          And I think it comes down to this, Your Honor.  If you

4    had the same foundation and the same qualifications of the

5    witness, clearly, if it's relevant for one side, it's relevant

6    for the other.  We're not going to contest differently.

7          We do think there is a difference, as our briefing

8    pointed out, a difference in the methodology.  And we believe

9    they used more sort of state of mind type of, as you pointed

10   out with Gen. Eddins about his, you know, it was ingrained in

11   everyone's mind that there was this culture of safety.

12         So we think there's a difference but I recognize

13   that's --

14         **JUDGE RODGERS:**  But there's not, there's not.  As

15   Tuten testifies over and over in her report, and then she

16   testifies consistent with her report, it's replete with it

17   about state of mind of operational command leaders and their

18   attitudes about hearing conservation.  That's a big part of her

19   testimony.

20         **MR. BEALL:**  But she also testified very specifically

21   about, you know, her own observations of the inconsistent

22   implementation of the program, too.  So, I think that that's,

23   you know --

24         **JUDGE RODGERS:**  At, what, one base in the '80s and one

25   base in the early '90s?

1      **MR. BEALL:**  I think it's more than that, but I think
2  she clearly has some -- the point of all this, again, Your
3  Honor, is, if they're going to say it's done uniformly, we're
4  allowed to, even if it's one base, to show that they're just
5  wrong.  So their experts, if they say everyone does it
6  correctly and we're able to show that at one base it wasn't
7  done correctly, I think that is a fair counter to their expert.

8      So, I think that that is relevant even if the person
9  is not at the base that Mr. Estes was at, for example, if it
10  wasn't Fort Benning.

11      So, I do think that if they're allowed to put in
12  evidence that this was a perfect program, perfectly
13  implemented, then we're allowed to sort of pick at that by
14  showing, well, what about Fort Smith or Fort Jones or whatever.
15  So we're allowed to --

16      **JUDGE RODGERS:**  That may be fair enough, if it comes
17  in on the front end.

18      **MR. BEALL:**  So that's part of it.

19      **JUDGE RODGERS:**  Let me ask just a minute about
20  Ms. Sahmel, who is one of your industrial hygienists who opines
21  about the DoD regs and concludes, based on largely the
22  testimony I've just been going over with you from Dr. Fallon
23  and Ms. Tuten as well as a few other fact witnesses, that the
24  program failed these plaintiffs.

25      So, she is an industrial hygienist and, you know, well

1    qualified with OSHA regs and NIOSH regs, which don't apply to

2    the military.  And so, in terms of helpfulness, fit, relevance,

3    I'm having a struggle with that.

4          She doesn't even do a decent job of telling me why

5    they're even similar enough to -- I mean, the military was not

6    subject to the regs that she is basing her opinion on.  She is

7    saying the military failed as an employer, failed these

8    servicemembers, these plaintiffs as an employer, based on NIOSH

9    and OSHA regs that do not apply to the military.

10         **MR. BEALL:**  And that would, to me, go to the weight

11   and not the admissibility of the opinion.  In other words,

12   they're allowed to cross-examine her on that issue, and I'm

13   sure they will, and they've got it, I'm sure, already ready to

14   go.

15         But that doesn't make -- if she's qualified to offer

16   an opinion, and I think it is a fit here, because, even though

17   the regulations may not apply, Hearing Conservation Programs --

18   there are nuances between, obviously, the military and General

19   Motors or International Paper or any other place with a hearing

20   conservation program.  But an industrial hygienist, with that

21   qualification -- as you pointed out, she's quite qualified to

22   offer those opinions -- is allowed, we believe, to offer

23   testimony about the program and the failures of the program

24   based upon her observations of it, what she's learned from it,

25   whether it's military or whatever.

1          **JUDGE RODGERS:**  But what she's learned of it is from

2    Dr. Fallon's testimony and Ms. Tuten's testimony and maybe a

3    couple of others.  It's not based on much more than that.

4          **MR. BEALL:**  But that's -- experts will often take

5    depositions in a case and then learn from it.  But she is able

6    to --

7          **JUDGE RODGERS:**  Not these kind of experts.  I've never

8    seen it where I have an expert rely so heavily on

9    experience-based testimony without any scientific support for

10   it.  I've just not seen it.  I'm not saying -- but it's

11   unusual.

12         And plus, again, you know, back to *Frazier* and there

13   are other cases, if Fallon's testimony is not reliable, then

14   certainly her reliance on it is not reliable.

15         **MR. BEALL:**  I think she can rely -- well, I mean, I

16   guess we can, you know -- I think those are two separate

17   things, whether Fallon can offer testimony on something based

18   upon the *Daubert* standard that you're addressing in this and

19   whether she is allowed to use his testimony and others to form

20   her own opinions about this.  And again, that's something they

21   can cross-examine her on.

22         But she offered an opinion that the military failed

23   and specifically in very specific areas that relate to these

24   plaintiffs, though it does come into the -- it's all controlled

25   by the pleadings, and everything she is going to ultimately

1    opine to is relevant to issues raised either in their complaint

2    or in our defenses.

3           And, for that reason, I think -- fit, to me, is --

4    it's not exactly relevance, but it's the same idea.  In other

5    words, is there something about this testimony that will assist

6    the trier of fact under these pleadings.  Let's look at what

7    the pleadings say.  And in this case, when we've got pleadings

8    for Estes and Keefer -- and, of course, you've not ruled on

9    these motions, I recognize --

10          **JUDGE RODGERS:**  If we exclude -- and I use that term

11   loosely, not a ruling.  So remove the NIOSH and the OSHA regs

12   from her opinion, because they don't apply, I mean, they don't

13   apply, and they only apply where practicable.  She definitely

14   cannot offer an opinion on whether it was practicable for the

15   Army to adopt a particular OSHA reg in a particular instance.

16   So that won't come in.

17          So, if you set those aside, what is left of her

18   opinion?

19          She's never worked in the military.  She's never given

20   an opinion or assessed or evaluated the military work

21   environment, which is a unique work environment.  I think you

22   would probably agree; most would.  You don't have to serve to

23   know that.

24          So, what's left of her opinion?

25          Everything is based on the opinion of these

1    experience-based experts.  That's what's left.  The regulations

2    are not that complicated.  I guess -- and I'm going to ask you

3    this and I'll ask them similar questions.

4         Why does the jury need an expert to make conclusions

5    about these regulations?  Why can't the jury just do that on

6    its own?  There's nothing complicated about those regulations.

7    You've got to have an annual audiogram.  You've got to have

8    trained people to fit your soldiers.  They have to be fitted by

9    trained personnel at every audiogram.

10         **MR. BEALL:**  Sure.

11         **JUDGE RODGERS:**  It's not very complicated.

12         **MR. BEALL:**  No, and I recognize that.  And obviously,

13   that is something that we intend to do.

14         I think the two responses to that are that most jurors

15   don't have experience with hearing conservation programs in

16   general, so I think that there is a little bit of testimony

17   about that that's necessary.  And --

18         **JUDGE RODGERS:**  Well, I don't disagree with you about

19   that.  I actually agree with you that the education of the jury

20   about the DoD and, more specifically, Army's Hearing

21   Conservation Program is definitely important, contextually,

22   background, you know, it's important.

23         **MR. BEALL:**  Okay.

24         **JUDGE RODGERS:**  But it's where we move from there that

25   I'm not sure about.

1        **MR. BEALL:**  Well, and I -- you know, I think the other

2    half of that is, you know -- and this may go into the same

3    issue you just -- I guess you gave the answer, which is kind of

4    -- I've got this backwards, maybe I should be giving the

5    answers, not you, but --

6        **JUDGE RODGERS:**  I do that sometimes.  I'm sorry.

7        **MR. BEALL:**  It's okay.  You know, while we may have a

8    juror who served in the military, we are going to have many who

9    have not.  And so, there is a sense of people -- the military

10   is unique, and therefore, the military has -- people who have

11   not been in the military don't really know how it works, how

12   the chain of command works.  I mean, they understand the

13   general chain of command.  But, you know, is everything

14   mandatory, is everything uniform, is everything done the exact

15   same way and all that.

16       **JUDGE RODGERS:**  And I agree with you.  That is very

17   important for this jury to learn about and even about readiness

18   and what that means to the military.  Is there a tension with

19   readiness and hearing conservation.

20       But Sahmel has never been in the military.

21       **MR. BEALL:**  Sure.

22       **JUDGE RODGERS:**  She's never evaluated a military base

23   or work environment.

24       **MR. BEALL:**  Sure.

25       **JUDGE RODGERS:**  And the range is not the Solutia

1   plant.

2         **MR. BEALL:**  Sure.  And going back to your question, I

3   mean, obviously, if you were going to conclude that she can't

4   testify as to any of the regulations that she has talked about,

5   we would, obviously, disagree with that, for the reasons -- you

6   know, it's obvious we disagree with that.  But we still think

7   that, even if she's not allowed to talk about regulations, she

8   can talk about hearing conservation programs in general and her

9   experience and whether this program, you know, they met the

10  qualifications of this program.  But I --

11        **JUDGE RODGERS:**  Under different regulations that don't

12  apply to the military.

13        **MR. BEALL:**  Well, and, you know, again, I think that

14  is an issue that goes to the weight and goes to the

15  cross-examination as opposed to the admissibility, because I

16  think that she has a foundation for opinions, she has the

17  qualifications for opinions, and I think that dealing with the

18  type of issue we have here, we have a fit for her opinions to

19  the specifics of this case.  So --

20        **JUDGE RODGERS:**  Well, I'm going to do more research on

21  that specific issue.  Let me ask you a question about

22  Dr. Crawford.

23        So, the way I sort of read his report and his

24  deposition testimony was he really -- I mean, he conceded this,

25  that, first of all -- I think it was Mr. Pirtle questioning

1   him, but maybe not -- but that all of his testimony is

2   anecdotal.

3          I mean, again, he doesn't have any studies or any

4   quantification to his opinions about the failures of the

5   conservation program.  But, also, a significant part of his

6   opinion is that the military should do personal attenuation

7   ratings on all of its servicemembers.

8          That is not the standard.  He admitted it's not the

9   standard.  He said it's not even the standard in private

10  industry, much less in the military industry.

11         I don't think I'm going to let him say that, unless

12  you can convince me that he ought to be able to opine about

13  some higher standard that the military should aspire to but

14  that doesn't apply.

15         **MR. BEALL:**  Well, the rules and regulations do not set

16  the ceiling; they set the floor, basically, in any type of

17  litigation.  So I don't think you can say that, just because

18  there's no specific regulation that requires that, that he

19  can't offer an opinion as to why that would be necessary or

20  helpful to protect --

21         **JUDGE RODGERS:**  But what value does the jury attribute

22  to that opinion?  It's just an opinion of an ENT in the

23  military that the military should do personal attenuation

24  ratings.  But there is nothing that -- there is no duty.  He

25  can't set the duty for the military.  There is no duty to do

```
 1   that.
 2           MR. BEALL:  He can -- I think he can talk about -- you
 3   know, he can talk about what he thinks the duty should be.
 4           JUDGE RODGERS:  I disagree, Mr. Beall.  He can't do
 5   that.  He can't talk about what the military's duty should be.
 6   It's got to stem from something official, something legal,
 7   something that Congress set or DoD set.  But not something
 8   Dr. Crawford said.
 9           All right.  Well, let me see about asking some tough
10   questions of the Plaintiffs, and then I may have a few more for
11   you.
12           MR. BEALL:  And may I ask on --
13           JUDGE RODGERS:  Yes.
14           MR. BEALL:  For Dr. Fallon -- because I was, candidly,
15   as I said, not prepared with his other deposition testimony.
16   And I know the last thing you want is more briefing in this
17   particular case, but I --
18           JUDGE RODGERS:  Oh, I don't want -- no.  I might ask
19   you for the other depos but --
20           MR. BEALL:  And that's what I was going to ask, if you
21   want us to file something that might help you.  I don't know if
22   -- I just want to make sure that I don't leave that out there
23   because I was not ready to address that question.  I don't want
24   to do a disservice by not providing the material you asked for.
25   So, if you would like us to provide something else, I can
```

1     certainly obtain that from him.

2          **JUDGE RODGERS:**   I think it would be more complete --

3     and I have what you all gave me based on your motions and

4     responses, but I think it would be prudent for me to look at

5     all of his testimony.  So, I don't know how many depositions he

6     gave -- maybe three -- and I just have portions of one, if you

7     want to go ahead and just give me all of his testimony.

8          **MR. BEALL:**  We would be happy to do that, Your Honor.

9     Thank you.

10         **JUDGE RODGERS:**   Thank you.

11         All right.  Mr. Sacchet, let me ask you, what are you

12    all -- I know you guys are in warrior mode and don't want to

13    give up strategy and that sort of thing, and I don't want to

14    ask you to do that.  But I am curious, can you tell me where

15    you think these witnesses of yours fit?  Are they rebuttal

16    witnesses?  Are they case-in-chief witnesses?

17         I wasn't thinking -- Mr. Beall made the valid point

18    that you all disclosed your experts first and so they were

19    responding.  I'm thinking more about the courtroom and

20    presentation of evidence in the courtroom.

21         So, tell me, if you can, how you view these witnesses

22    and their place in your trial.

23         **MR. SACCHET:**  So, it is true that we designated

24    Eddins, Marshall, and Huston out of the box as experts.

25    Plaintiffs did so because we assumed 3M would continue to point

1    its finger at the government, as it's done throughout this

2    entire litigation.  And even though the government contractor

3    defense is how dead, they're attempting to do so through

4    apportionment of fault and other doctrines.

5           So, as a matter of practice, 99 percent of our intent

6    in designating these experts was for purposes of rebuttal.

7    There are some portions of some of these experts' testimony

8    that could be part of our case in chief.

9           For example, Sgt. Maj. Huston's opinions about his

10   experience on the range at Fort Benning could educate the jury

11   about the types of noise exposures that servicemembers

12   experience that laypeople may not understand.

13          It's probably very apparent, but I am not someone very

14   familiar with the military outside of this litigation.  I don't

15   have a background in it.  I am not a part of it.  I did not

16   understand the level of training that went on at these ranges

17   until I personally read these reports and saw that there is

18   grenade training, there is land mine training.  I mean, it's

19   very extreme.

20          And I don't think, even though we're in Pensacola,

21   that every member of the jury would understand that, when you

22   train on a range at Fort Benning, that the decibel of noise

23   exposure could be 150, 160.  It's not, you know, your hometown

24   shooting range where you go and fire a pistol.

25          **JUDGE RODGERS:**  So, Sgt. Huston, if he testifies in

1    that regard in your case in chief, then he's going to be

2    providing basically factual information from an expert, someone

3    who has unique knowledge and experience, but no opinions?  I'm

4    not hearing you talk about opinions.

5            **MR. SACCHET:**  This would be his experiential testimony

6    as someone on the ground, has boots-on-the-ground approach that

7    gives him the expertise to talk about what he personally

8    experienced and how he trained people at basic training at Fort

9    Benning.

10           **JUDGE RODGERS:**  Right.  And I think that's fair game.

11   I analogize that to Audiologist Tuten in being able to testify

12   about her own experience in training other audiologists or

13   technicians on proper fit and that sort of thing.

14           The opinion that he's given -- Sgt. Huston -- about

15   the culture and that safety is ingrained in every

16   servicemember, that's not coming in.  No witness, expert or

17   otherwise, is going to be able to comment about what other

18   people knew or understood, what they believed.  And there is

19   quite a bit of that throughout these eight witnesses.

20           **MR. SACCHET:**  So, if I can make a couple of comments?

21           **JUDGE RODGERS:**  Okay, sure.

22           **MR. SACCHET:**  One deals with the way in which the

23   Court could look at the three experts on the Plaintiffs' side

24   versus the experts on the Defense side, just in terms of a

25   basic 401 inquiry in terms of what an expert should be

1    testifying about.

2            So, on 3M's side, Your Honor made the observation that

3    the regs are not complicated.  And we agree.  And, in fact, 3M,

4    in its opposition to the Motions for Summary Judgment that were

5    filed in *Keefer*, in *Estes*, and in *Hacker*, if you turn to page

6    26 of their opposition to our Motion for Summary Judgment in

7    *Keefer*, this is what 3M says even though they're here defending

8    their experts as providing this valuable insight about

9    compliance or nonconformance with these military regulations.

10   And I'm going to quote it, and I'll read the whole paragraph.

11   It may take me a moment.

12           Quote:  "The evidence discussed above," which are all

13   these facts, "is more than sufficient for a lay jury to make a

14   finding of causation without the need for expert testimony.

15           "Any juror will understand that, one, military

16   regulations require medically trained personnel to fit and

17   train servicemembers with earplugs; two, if a servicemember is

18   using an earplug that is not the right size or shape for his

19   ears, he will not obtain adequate protection; and three, if no

20   one tells a user about a technique for improving the fit of an

21   earplug, the user may get less protection.  Jurors do not need

22   expert testimony to draw these conclusions."

23           Why are any of these experts here talking about

24   noncompliance when their own brief admits experts are not

25   necessary?

1          This is black letter law based on *Frazier* that Your

2    Honor just mentioned, *en banc* decision stating that expert

3    testimony is admissible if it concerns matters beyond the

4    understanding of the average layperson.

5          Your Honor, in *Abilify*, said the exact same thing.  In

6    a decision in 2012 called *West Customer Management*, Your Honor

7    excluded the opinion of an expert because it was clear that the

8    expert was simply regurgitating facts that a jury could

9    otherwise understand without the need for an expert.

10          **JUDGE RODGERS:**  How do you know my cases better than I

11    do?

12          **MR. SACCHET:**  Well, that's what I'm supposed to do.

13          **JUDGE RODGERS:**  It seems like you're citing my cases

14    to me and, when you do that, I think, now, what case was that.

15    And Mr. Beall was probably the attorney on the other side.

16          **MR. SACCHET:**  He wasn't.  I checked.

17          I know you know *Hendrix*.  In *Hendrix*, the exact same

18    thing.  And Your Honor made the additional point that the

19    problem with allowing experts to do that is, of course, it

20    cloaks this factual testimony in this shield, this status of an

21    expert opinion.  And that's why in *Hendrix* Your Honor also said

22    that it was improper to have an expert testify about what 3M

23    admits right here in their opposition to Motion for Summary

24    Judgment facts that do not need expert testimony.

25          So, this is their signed statement.  And I think that

1    ends the inquiry about Fallon, Tuten, Crawford, Sahmel, Flamme,

2    and Neitzel.  None of them, under this signed statement, should

3    be saying anything whatsoever about nonconformance with

4    military regulations.  Because, according to 3M, a juror can

5    understand it, and Your Honor just made the same observation.

6            **JUDGE RODGERS:**  So, what you're just referencing in

7    3M's response was to your Motion for Summary Judgment on

8    causation?

9            **MR. SACCHET:**  Yeah.

10           **JUDGE RODGERS:**  And your argument there -- I didn't

11   ask you here to argue this, but your argument there is that

12   there is no evidence that these plaintiffs didn't get a proper

13   fit or have a proper fit on their own, and then there was a

14   discussion about whether you need medical testimony in regards

15   to the causation?

16           **MR. SACCHET:**  Yeah.  So that goes to -- even if the

17   Court assumed that expert testimony were required and that it

18   were helpful under *Frazier* and Your Honor's other decisions,

19   there are numerous analytical gaps, and that's one of them.

20           Even if 3M's experts were able to opine that there

21   were nonconformance, none of them, not a single one have said

22   that they have any evidence to suggest that it altered the way

23   in which the plaintiff would have fit the plug had they been

24   either instructed or fitted or supervised.

25           **JUDGE RODGERS:**  So, then, it sounds like you all don't

1    disagree that the regs are easy to understand and follow and

2    that the jury can conclude on its own from the regs and from

3    the testimony of the plaintiffs who have said, *We were not*

4    *properly fit,* that that could increase their risk of hearing

5    loss.

6            **MR. SACCHET:**  We believe that they still need an

7    expert to opine about causation.

8            **JUDGE RODGERS:**  I understand.

9            **MR. SACCHET:**  Because, if they don't have the

10   testimony from an expert to say, 'had they fit it this other

11   way, there wouldn't have been an injury,' they can't show

12   proximate cause.

13           And under Georgia law and Kentucky law -- we cited the

14   cases in our paper -- *(inaudible)* -- *Union Carbide*.

15           **JUDGE RODGERS:**  Right.

16           **MR. SACCHET:**  Speculative testimony from an expert

17   about third-party liability that doesn't connect the dots isn't

18   enough, and the jury can't make that leap.  So that is one

19   reason why we should get summary judgment, but it's also one

20   reason why these experts have to be excluded under 702 or 403.

21           **JUDGE RODGERS:**  So what do you -- again, let me take

22   you back to your experts.  Are you telling me, other than this

23   testimony by Sgt. Maj. Huston about training, that the rest of

24   it is rebuttal?

25           **MR. SACCHET:**  In large part.  For example -- I think

1     there are some other exceptions.  Maj. Marshall, as a combat

2     medic, also at -- I take that back.

3          He has experience, as a combat medic, observing people

4     fit the plug on the range.  He went to ranges and instructed

5     people to wear it, made sure that they were wearing it.  It's

6     his on-the-ground experience that he has to say that that,

7     indeed, happened.

8          So, that is something that the lay juror wouldn't

9     otherwise know occurs at a base.  So, if he's able to offer

10    that experiential testimony, given his own experience, then

11    that is something that, hypothetically, could be carved out.

12         The same with Eddins, Brig. Gen. Eddins.  He was at

13    both Benning and Campbell.

14         **JUDGE RODGERS:**  Right.

15         **MR. SACCHET:**  And this goes to the other analytical

16    gap that I want to talk about.  And I'm not going to get up

17    here and say that our experts have no gaps.  I'm going to be

18    honest.  Yes, none of our experts on general experts connect to

19    the plaintiffs themselves.  But I think the Court can consider

20    what is the proper proxy, what is the proper proxy to close a

21    gap.

22         And 3M cited the Ninth Circuit decision *In re Jinro*.

23    And in *In re Jinro*, the question was can the Defense put up an

24    expert who is going to opine about Korean business culture and

25    then make a determination about whether the defendant, which

1   was also Korean business engaged in the same type of shirking

2   of the financial regulations that supposedly the majority of

3   them did.

4          The majority excluded it under 702 for reliability,

5   but Judge Wallace wrote a concurrent saying, you know what,

6   hold the horse.  It's a 401 issue.  And it's a 401 issue

7   because the expert has no basis to bring it back to the

8   business at issue, and then said, moreover, not just the

9   business at issue, but the transaction of the business at

10  issue.

11         Here, the businesses are the bases and the

12  transactions are the plaintiffs.  It's a crude way to put it,

13  but that's the analog.  And here, Plaintiffs' experts do have

14  foundation, unlike 3M's experts, in the bases at issue.

15         As I just said, Huston, drill sergeant major at Fort

16  Benning.  Brig. Gen. Eddins served, watched over servicemembers

17  both at Benning and at Campbell.

18         So there is a huge gap on 3M's side because none of

19  their experts, not a single one can say anything about the

20  bases where the plaintiffs were before they were injured, where

21  they received the plugs, whereas Plaintiffs' experts can do

22  that.

23         So, if the Court views the analytical gap in terms of

24  base to base, there is no gap for Plaintiffs.  If the Court

25  views the analytical gap of testimony about the plaintiffs

1    themselves, then, yes, Plaintiffs' experts have not done that.

2          And at the end of the day, both sides' experts should

3    be excluded for the same reason.  That's why Plaintiffs'

4    experts were rebuttal.  Because, if 3M were allowed to come in

5    and start talking about this stuff with no connection to the

6    base, surely Plaintiffs' experts should be allowed to do the

7    same thing.

8          So those two examples illustrate --

9          **JUDGE RODGERS:**  Let me stop you.  What about the GAO

10   report?

11         **MR. SACCHET:**  Yes.  So the GAO report, first it's

12   hearsay.  They say it's not.  It's double hearsay because it

13   contain representations from people who are on the ground that

14   are now in this government document.

15         But putting that --

16         **JUDGE RODGERS:**  Government reports almost universally

17   do.

18         **MR. SACCHET:**  So, the problem, though, is the GAO

19   report is based on I think like a dozen statements of military

20   audiologists and maybe a hundred-plus statements of

21   servicemembers covering nine military installations, not nine

22   Army bases, nine military installations, only two of which in

23   appendix one are Army bases.  One, Fort Meade, Maryland --

24   nothing to do with this case or the plaintiffs at issue; and

25   two, Fort Carson, also --

1        **JUDGE RODGERS:**  Isn't there some parts of that GAO

2   report that could be useful to your case?

3        **MR. SACCHET:**  We do not intend to admit the GAO

4   report.

5        So, because 3M's experts essentially only rely on

6   either the GAO or the RFI, which was an extreme piece of

7   legislation that equipped soldiers in a way none of the

8   plaintiffs at issue here were equipped, that's all they got to

9   bridge the gap from their opinion to noncompliance in the cases

10  at issue.  That is a massive analytical gap.  That's exactly

11  what the Supreme Court in *Joiner* said you can't do, talking

12  about PCBs in -- or carcinogens in infant mice to humans.

13  That's the gap that's not permitted.

14       Here, Plaintiffs actually can ground their opinions in

15  the bases at issue.  So we believe that that is one way in

16  which the Plaintiffs' experts differ from 3M's.

17       In addition, 3M's experts -- this is both a 702 fit

18  issue and a 403 issue.  So, 3M's experts offer these

19  conclusions they admit they're not causal.  Crawford, Tuten,

20  Fallon -- everyone -- Neitzel, Sahmel, Flamme, they all admit,

21  *I'm not offering a causation opinion as to government fault.*

22       Nonetheless, they walk right up to the line and they

23  offer statements like, *There were multiple military failures,*

24  *the military let down* --

25       **JUDGE RODGERS:**  Well, I think maybe Sahmel who

1   actually says the Army's Hearing Conservation Program failed

2   these plaintiffs.

3          **MR. SACCHET:**  Failed these plaintiffs, but is

4   unwilling to actually say from a causal standpoint that that

5   caused them to fit it differently or their injury.

6          **JUDGE RODGERS:**  If I decide they don't need medical

7   expert testimony on that, then what's your response?

8          **MR. SACCHET:**  I still think it raises the inference

9   from someone cloaked as an expert of causation that the expert

10  themselves are unwilling to reach.  And if the expert isn't

11  going to go the distance, I don't think under 403 they should

12  be allowed to stand up, given the minimal probative value of

13  those statements, and make that kind of statement to the juror

14  where the juror is going to hear that from an expert and think,

15  *This person is telling me there's causation.*  It's not true.

16  They're not.

17          And I know that that could be dealt with on

18  cross-examination, but it shouldn't come in in the first place

19  because, under 403, it's unduly prejudicial.

20          I'm not a criminal lawyer.  I know Your Honor has

21  numerous criminal trials.  I don't think in any criminal trial

22  you would allow the prosecutor to say that the defendant was

23  raised or currently lives in a neighborhood where everyone

24  carries a gun and then have that criminal defendant prosecuted

25  for a gun crime.  That's what's going on here.

1          So, all of these opinions from 3M's experts, given the

2     gap that they don't bridge it to a base, they don't bridge it

3     to a plaintiff, and then on top of that they offer speculative

4     opinion that could be interpreted by a jury as causation,

5     whether or not Your Honor believes that causation could be

6     answered by the jury without an expert, it's still prejudicial.

7          And Plaintiffs' experts don't even come close to that

8     line.  They're offering narrow opinions -- *Here are Army*

9     *policies.  These policies were implemented on the ground*.

10    That's it, full stop, nothing more.

11         3M's experts go way and suggest way more beyond that

12    in those leaps in inferences under the mannequin of an expert.

13    Not proper under 403.

14         So that's the second reason.

15         The third reason under 702 is exactly what Your Honor

16    mentioned at the end of questioning Mr. Beall.  Crawford is

17    going beyond what the regulations say in terms of what the

18    military is supposed to do.

19         There is no fit testing requirement.  That's just made

20    up.  Nor does 6055.12 say that anyone from the military was

21    actually supposed to fit the plug.  6055.12 doesn't say that.

22    It says put the plug in under the supervision of military

23    servicemembers.  That doesn't mean the same thing as someone

24    putting the plug in your ear, yet that's what every single one

25    of the experts say.

1          **JUDGE RODGERS:**  Well, wait.  Doesn't the regulation --
2    I have them here --
3          **MR. SACCHET:**  DA pamphlet 4051 does.
4          **JUDGE RODGERS:**  Doesn't the regulation, though,
5    require that at least annually that the Army ensure a proper
6    fit?
7          **MR. SACCHET:**  Exam and fit.  But that doesn't mean
8    having a medical --
9          **JUDGE RODGERS:**  Does it say "examine" or "ensure a
10   proper fit"?
11         **MR. SACCHET:**  I have it.
12         **JUDGE RODGERS:**  Justin, did we bring those in?
13         **MR. FERRARO:**  No, I don't have it.
14         **JUDGE RODGERS:**  No?  Okay.  I thought we had them.
15         **MR. SACCHET:**  "Medically trained personnel must
16   examine the fit and condition of preformed plugs at least
17   annually."
18         **JUDGE RODGERS:**  Say it again.  Examine --
19         **MR. SACCHET:**  I think it's very close, "Medically
20   trained personnel must examine the fit" --
21         **JUDGE RODGERS:**  Are you reading the pamphlet or the
22   reg?
23         **MR. SACCHET:**  I'm reading 6055.12.
24         **JUDGE RODGERS:**  Okay, the reg.
25         **MR. SACCHET:**  Something very similar to it, yeah, not

1   reading the pamphlet.  But, Your Honor, I think the pamphlet

2   does talk about insertion.  So, I don't want to sidetrack the

3   conversation.  I'm not misrepresenting that the -- DA pamphlet

4   4051, I believe, does say something about someone putting the

5   plug in the ear, but 6055.12 does not.

6            **JUDGE RODGERS:**  Okay.  I have them backwards, then.

7            **MR. SACCHET:**  So, my point is, as a third analytical

8   gap, Crawford shouldn't be able to testify that the military

9   should have done fit testing because there is no basis for that

10  opinion, as Your Honor mentioned.

11           So, those are three analytical gaps under 702 that I

12  believe Plaintiffs' experts do not commit that same failure and

13  3M experts do.

14           On the 403 side, we've talked about the undue

15  prejudice of allowing 3M to make statements that raise the

16  specter of causation when they're not even willing to go that

17  far.

18           Another point is, in addition to that, I think it's

19  all cumulative.  It sounds like Your Honor has read these

20  reports front to back, and I did, too, before this hearing.

21  And all I can say is they're just recitations of Battler's

22  testimony, other documents.

23           Why is there an expert that's going to come in and say

24  the same thing as these facts otherwise would?

25           We're not attesting that facts should come in anyway,

1    because I think they're riddled by the same problems as the

2    testimony itself.  But assuming that --

3              **JUDGE RODGERS:**  Well, some of them are -- Babeu and

4    Battler, those are fact witnesses, right?  I don't have any

5    challenges to -- I think I have every expert challenged.  I

6    don't think there is an expert who hasn't been subject to a

7    challenge, so they must be fact witnesses.

8              **MR. SACCHET:**  So, my point, though, is, if an expert

9    is saying things that 3M can just play tape on, it's

10   cumulative.  It doesn't need to come in again through this

11   expert.  Play the tape and put up the fact evidence that this

12   expert is --

13             **JUDGE RODGERS:**  Well, that's what I said to Mr. Beall

14   was part of my concern is you have this person sort of cloaked

15   in the expert title, and then, to a certain extent, he or she

16   just says, I agree with what all these other -- some of them

17   are fact witnesses, not even experts.

18             **MR. SACCHET:**  Yeah, I mean, that's what 3M did at the

19   choice of law evidentiary hearing, they put up the tape of

20   Audiologist Leccese, or however you say her name.  I mean,

21   that's her testimony about what she observed in Hacker's case

22   at Fort Campbell.

23             **JUDGE RODGERS:**  That's relevant.

24             **MR. SACCHET:**  Then play it.  You don't need an expert

25   to come on top of it and make it something more.

1          Same thing with respect to Sahmel's opinion, she goes

2     and cites Crossley, she cites Toyama, she cites O'Brien.

3          Play the tapes.  You don't need an expert to shroud it

4     in the status of the expert saying something more than what it

5     already says.  It's cumulative evidence.  And given the trial

6     times that this Court has ordered, there is no need for this

7     additional stuff from the experts.  There's just not.

8          I mean, if 3M wants to waste its time that way, I

9     mean, it can, but, like, I don't think it should happen.

10          In addition, we know that this is going to be a

11     sideshow.  I mean, I was surprised to hear Mr. Beall kind of

12     suggest that it's not going to all be about blaming the

13     military.  But if nonconformance opinion comes in, there is

14     just going to be a mini trial on whether there was conformance

15     or not when 3M can't show proximate cause.  They can't show

16     that the nonconformance did anything to the plaintiffs.

17          Why is it relevant?  It's not.  They can't cross the

18     bridge.

19          And finally, these experts are being offered as

20     stalking horses for things like the GAO report and other

21     documents that are hearsay that we don't think should come in.

22          I know Your Honor disagrees about the GAO but --

23          **JUDGE RODGERS:**  The GAO report, I assume, is the

24     subject of a Motion in Limine?

25          **MR. SACCHET:**  Yes.  But there is other -- I mean,

1    Casali's article, an internet blog from random people that were
2    one time in the service in some prior decade saying they didn't
3    wear an earplug.  I mean, there shouldn't be an expert that's
4    allowed to be a foil to get this stuff in.
5            And I know it can be dealt with in other ways, but at
6    the end of the day, when you read these reports, it's pretty
7    apparent what these people are being used for, they're stalking
8    horses for this evidence.  And that's not proper, and they
9    shouldn't be allowed to do it.
10           So, these are a number of ways in which the general
11   experts fail.
12           And on the case-specific side, I know Your Honor
13   mentioned Neitzel and Sahmel, but there is also Flamme.  And
14   Flamme gives a case-specific opinion in *Estes*.
15           And all these experts, all these case-specific
16   experts, they commit the same failure again, which is the
17   analytical gap of a showing of nonconformance to bridging it to
18   proximate cause, and none of them do it.
19           And even if they did do it, they offer insinuations of
20   causation, which is improper both for the analytical gap and
21   for the undue prejudice.
22           I mean, some of these statements that they say, I
23   mean, they just raise the specter of causation when they're
24   unwilling to actually go there, yet they all admit no statement
25   --

1           Flamme:  "No statement regarding the exact causal

2    factor leading to the change in Estes's hearing."  That's a

3    quote.

4           Neitzel:  Quote, "I am not offering a causation

5    opinion."

6           **JUDGE RODGERS:**  But why can't they set it up for the

7    jury?

8           **MR. SACCHET:**  Because, again, they set it up for the

9    jury, but they're not willing to go the distance, and the jury

10   hears something about nonconformance and the multiple military

11   failures and that the military let us down, the residue of that

12   is fault.

13          **JUDGE RODGERS:**  So is that a 403 argument?

14          **MR. SACCHET:**  I think it's both.  I think it's

15   analytical gap, and I think, if it's not analytical gap, it's

16   clearly undue prejudice given the minimal relevance of that

17   testimony.

18          **JUDGE RODGERS:**  Let me stop you just a minute.  And I

19   should have done this when Mr. Beall was up.

20          Judge Jones, do you have any questions for Mr.

21   Sacchet?

22          **MR. SACCHET:**  I do not.  I think you know my opinion

23   on some of these issues.  But no, I don't have any specific

24   questions for Mr. Sacchet.

25          **JUDGE RODGERS:**  Judge Herndon, are you curious about

1  anything?

2         **JUDGE HERNDON:**  A lot of things, but not with this.

3         **JUDGE RODGERS:**  All right.  Mr. Sacchet, is there

4  anything else you want to add?

5         **MR. SACCHET:**  I could talk forever.  It's only if you

6  have questions.

7         **JUDGE RODGERS:**  No, I don't have any more.

8         **MR. SACCHET:**  Thank you so much.

9         **JUDGE RODGERS:**  All right.  Mr. Beall?

10        **MR. BEALL:**  Your Honor, just a few points.  On the

11  lead point, I guess, that Mr. Sacchet made about the summary

12  judgment response and how we don't need expert testimony.  As

13  the Court will remember, we made that argument in response to

14  their summary judgment motion where they said we have to have

15  expert testimony.

16              So, it wasn't a suggestion that we wouldn't like to

17  have expert testimony also in this case.  But we're simply

18  saying that, even without the expert testimony, we survived

19  summary judgment.  So that's a very different thing than an

20  admission that we will never want to put expert testimony on.

21              We believe we survived summary judgment without an

22  expert, but that doesn't mean that we couldn't use an expert to

23  help present this case to the jury and do so more effectively.

24        **JUDGE RODGERS:**  Well, I think that the issue related

25  to medical expert testimony.  But then you all did respond, and

1    Mr. Sacchet did quote accurately the argument.

2              **MR. BEALL:**  Sure.

3              **JUDGE RODGERS:**  And it included sort of the duty, the

4    violation of the duty, and then causation.

5              **MR. BEALL:**  Yes.

6              **JUDGE RODGERS:**  But you didn't need an expert for any

7    of it.

8              **MR. BEALL:**  Well, you know, and again, we don't think

9    we have to have an expert.  But that doesn't mean we can't put

10   on an expert that would be reasonable.  Obviously, we have a

11   limited amount of time.

12             And, you know, counsel is correct, if we're given 50

13   hours or whatever the hours we're going to have, we're not

14   going to use 40 of them on expert testimony in this case.  That

15   just isn't going to work, so we're going to have to be more

16   selective.  But we have the right to do it, as long as it fits

17   under 702 and everything.

18             And the idea that we have to have an expert who

19   crosses and gives the ultimate opinion on causation, I mean,

20   can you imagine if we were to put an industrial hygienist up to

21   offer an opinion on medical causation?  The *Daubert* motion

22   would have written it self, right?

23             So, I mean, in some sense, we're being told that we

24   didn't do what we couldn't have done, you know, and so we have

25   to do that.

1        Our experts are out there to explain to the jury, who
2    are probably not going to be in the military or probably not
3    been in the military, who don't have expertise in hearing
4    conservation programs, why these programs exist, which the
5    Court has talked about the fact that you agree with, how they
6    failed in this particular case, and how these failures mattered
7    and why these failures mattered so that, when we get the fact
8    testimony to show that there were failures in these specific
9    cases, the jury can then tie these together, as juries do, and
10    reach a conclusion.

11        The jury may disagree with our argument.  They
12    certainly do.  But we have the right to present that argument,
13    and we thing that's important.

14        The jury needs to understand, you know, why it matters
15    to have a fitted earplug, because most people don't know -- you
16    know, I've used foam earplugs before, you know, but I've never
17    thought about the concept before this case of having one that
18    is properly fitted that fits my ear canal.  It's not something
19    that most jurors would even understand.

20        Why do you need to have annual audiograms, for
21    example, why do you need training on the use of hearing
22    protection devices and --

23        **JUDGE RODGERS:**  And I think all of that is perfectly
24    acceptable, again, the purpose of the program and why it's
25    there.  I don't think you're going to have any hot dispute

1    about the tragic number of injuries from noise induced hearing

2    loss across the military that have resulted in injuries and VA

3    claims.  I don't think anybody is going to be disputed that,

4    that that is a massive number or very large number.  I don't

5    know that anybody has got that exact number, but I don't think

6    that will be in dispute.

7         I mean, that's the purpose -- that's why the Hearing

8    Conservation Program evolved or was introduced was to address

9    that.  So I accept the program purpose, intent, the why of it,

10   why it's important.

11        But how does the fact that there may have been places

12   the military, including the Army, could have improved, which is

13   what the GAO concludes -- that's all it concludes is that the

14   programs could be improved.  But why does that make it more

15   likely that these plaintiffs suffered injury?

16        That's the gap I'm still having trouble with.  How

17   does it make it more likely that they suffered their injuries

18   because of that?

19        **MR. BEALL:**  And I guess it goes back to the

20   foundation.  If you were to assume that these are the only

21   three plaintiffs that this occurred to, that would be something

22   the jury is going to scratch their head and say that doesn't

23   make any sense.  So we need to understand why these three

24   plaintiffs didn't alone slip through the cracks of this --

25        **JUDGE RODGERS:**  But you're going to be offering

1   anecdotal evidence, testimony, nothing quantifiable, nothing,

2   nothing verifiably quantifiable about the number of people who

3   suffered hearing loss because of these failures.

4        **MR. BEALL:**  And I don't know that that study exists or

5   could exist in a situation like this.

6        **JUDGE RODGERS:**  The fact that the study hasn't been

7   done doesn't mean that you don't need to have that support for

8   the testimony, to have that type of support for an opinion.

9        **MR. BEALL:**  And I guess I would disagree.  With

10  somebody who has the experience in this field and who

11  understands and has observed it -- and I recognize that you're

12  not seeing the connections in the reports that we're seeing, or

13  at least not necessarily.  We would, of course, disagree with

14  that.

15       But I think that there is -- I don't think we have to

16  show that, you know, 472,000 of the troops did not get proper

17  fitting and the other 600 or whatever did.

18       **JUDGE RODGERS:**  Well, let's just say it's ten.  I

19  mean, we don't know because your people did not give any

20  numbers.  All Fallon said was a low percentage as far as the

21  folding of the flanges back, and then widespread -- what does

22  that mean? -- widespread nonuse of hearing protection.

23       Nobody, nobody has attempted to quantify how many

24  people in the military -- or the Army, let's limit it to the

25  Army -- how many in the Army suffered injury as a result of the

1   failure of this program.

2           **MR. BEALL:**  The question is not -- we're not trying to

3   say that the military caused 100,000 people to lose their

4   hearing, or whatever the number is.

5           **JUDGE RODGERS:**  Well, then, what are you trying to

6   say?  What are these people saying, then?

7           **MR. BEALL:**  We're trying to say that the program

8   failed in part -- it was implemented inconsistently, it failed

9   in part, and these three plaintiffs were injured as a result of

10  those failures.  That's what we're trying to say.

11          **JUDGE RODGERS:**  But we don't know, because your

12  witnesses don't tell us, what even inconsistently means.  The

13  GAO report is talking about inconsistencies across the

14  militaries.

15          **MR. BEALL:**  Yes.

16          **JUDGE RODGERS:**  The different branches.  That's what

17  that report is talking about.

18          Dr. Fallon and, more specifically, Ms. Tuten, I'm not

19  sure.  Are they talking about inconsistencies at different

20  installations?  Well, what installations and how many?  And

21  what is the basis of their knowledge of that?

22          It can't just be, Charles, that they have been in the

23  Hearing Conservation Program for 30 years and they just know.

24  That's ipse dixit.  That's classic, it is what it is because it

25  is.

1          **MR. BEALL:**  Yeah, and I understand that.  But I think

2    Dr. Tuten's opinion, for example, goes much further than that,

3    I believe, and talks about all the various places she has

4    worked and all the positions she held in leadership and all her

5    interactions with people above her and below her.

6          **JUDGE RODGERS:**  But when you talk about leadership for

7    her or even Fallon at a policy level, there still has to be

8    support for what he's saying, I mean, a study, even a memo,

9    something.  There is just nothing to -- there is certainly no

10   study, there is no data, there is no literature that I have

11   seen.

12         Now, again, I don't know your cases like you do.

13         **MR. BEALL:**  Sure.

14         **JUDGE RODGERS:**  But he didn't cite them, from what you

15   all gave to me.  All I have is this one, one-and-a-half page

16   media release from Lt. Col. Gates that gives her own opinion

17   about the one size fits all.

18         So, I mean, I haven't made my ruling yet, but I'm sure

19   you can glean from what I've been talking to you about that I

20   have some concerns about this testimony.

21         **MR. BEALL:**  I understand that.  A couple of points, if

22   I can, about -- Dr. Fallon, of course, was a hybrid expert, so

23   it's not his job to go out and -- or it would be improper for

24   him to go out and review a bunch of stuff and write a report

25   type expert.  He's simply going to be offering opinion

1    testimony based upon his hybrid nature of fact and expert.  So

2    that's a little different in that situation.

3            **JUDGE RODGERS:**  But you know from *Frazier* that that

4    doesn't excuse him from providing reliable opinions.

5            **MR. BEALL:**  No, I do understand that.  And we, again,

6    disagree on that.

7            For Dr. Sahmel, just to --

8            **JUDGE RODGERS:**  Let me stop you.  Is it 3M's position

9    that his testimony, his opinions about the widespread failure

10   of the program, that that's reliable because he has so much

11   experience?

12           **MR. BEALL:**  Yes.  I mean, I think that's -- given his

13   position in the military at the time he had that position, I

14   think he's the person who would be in a position to offer that

15   testimony.

16           **JUDGE RODGERS:**  I think that's what *Frazier* says you

17   can't do.

18           **MR. BEALL:**  Well, I guess I would -- I think that his

19   testimony would fit the *Frazier* test, and I would disagree with

20   that.  But I understand, you know, your question there.

21           **JUDGE RODGERS:**  Let me bring up something about

22   Fallon, and I guess it applies to Berger, too, although we're

23   not here to talk about Elliott Berger, but he's your other

24   hybrid fact witness.

25           **MR. BEALL:**  Yes.

| 1 | **JUDGE RODGERS:**  I think those are the only hybrids we |
| 2 | have in this trial, right?  Do we have any other hybrids? |
| 3 | **MR. AYLSTOCK:**  *(Indicating negatively.)* |
| 4 | **JUDGE RODGERS:**  I haven't seen any. |
| 5 | **MR. BEALL:**  I believe that's the case.  I don't want |
| 6 | to -- there's a big list of witnesses, as you're aware, but I |
| 7 | think those are the two that I'm aware of. |
| 8 | **JUDGE RODGERS:**  So, when they testify, I'm going to |
| 9 | require for those two witnesses -- and I would be the same if |
| 10 | they had hybrids, typically this would be on the defense side, |
| 11 | but anyway, if they had them -- that it is clearly delineated |
| 12 | before the jury when they are giving fact witness testimony and |
| 13 | when they are giving expert testimony.  The jury will be told |
| 14 | "We are now transitioning into" -- so just for your planning |
| 15 | purposes and the other lawyers on your team, keep that in mind. |
| 16 | **MR. BEALL:**  Thank you.  That's helpful, Your Honor. |
| 17 | And just a logistical question on that.  Will the |
| 18 | direct examination go on through both phases before they cross |
| 19 | on either side?  I'm assuming that -- |
| 20 | **JUDGE RODGERS:**  I've given that some thought, and I'm |
| 21 | leaning towards breaking it up or having the cross-examination |
| 22 | after the -- so, anyway, it will essentially be like you're |
| 23 | calling two witnesses in one. |
| 24 | So, say you put him on as an expert first, it'll be |
| 25 | direct on expert, cross on expert, redirect on expert, and then |

1     you'll move into fact, fact direct, cross, redirect.

2            MR. BEALL:   Obviously, I don't have the outline on

3     what we're going to ask him; it don't think it's been done yet,

4     so I'm not able to really respond.  But that's helpful for me

5     --

6            JUDGE RODGERS:   You don't need to respond.  I just

7     wanted to make sure I didn't forget to tell you this.

8            MR. BEALL:   It's helpful for us to understand your

9     thinking right now.  And if we think that's, for whatever

10    reason, not going to work, certainly we'll bring it up with you

11    now.  But at least we know your inclination, and I appreciate

12    that.

13           JUDGE RODGERS:   Well, I think it's important that it

14    does work --

15           MR. BEALL:   Sure.

16           JUDGE RODGERS:   -- so that the jury is not left

17    confused, particularly in this case where it is all

18    experience-based testimony which is all factual.

19           MR. BEALL:   Yeah.  I don't mean to suggest we would

20    disagree with the concept of breaking it up.  It's the concept

21    of interrupting for cross, I just don't know how that's going

22    to work.

23           JUDGE RODGERS:   Oh, okay.

24           MR. BEALL:   That's what I don't have the answer to.

25           JUDGE RODGERS:   Well, yeah, I'll hear from you all on

1    that, I guess, maybe at our next -- in lieu of the full CMC

2    next Friday, I believe what we're thinking about doing is a

3    brief leadership call or meeting, and then the *Daubert* hearing

4    on the experts I've told you I need to hear from.

5              **MR. BEALL:**  Okay.

6              **JUDGE RODGERS:**  Is that next Friday or the Friday

7    after?

8              **MR. AYLSTOCK:**  The Friday after.

9              **JUDGE RODGERS:**  For some reason in my mind I keep

10   eliminating next week.

11             **MR. BEALL:**  All seven days run together, Your Honor.

12   I don't know the difference between a week and the next, so we

13   all agree on that one thing, Your Honor.

14             Just quickly on Dr. Sahmel, I want to -- and I know

15   you've read her report, but on page 30 of her report she --

16             **JUDGE RODGERS:**  Let me get there real quick.

17             **MR. BEALL:**  Sure, yes.

18             **JUDGE RODGERS:**  It won't take but just a minute.  Is

19   this her general report?

20             **MR. BEALL:**  It --

21             **JUDGE RODGERS:**  Well, I'm on page 30, so go ahead and

22   I'll --

23             **MR. BEALL:**  I don't know which report this is.

24             **JUDGE RODGERS:**  I think she has a general and a

25   specific, but let's see if it's the general.

 1            **MR. BEALL:**  Page 30 starts with the word "Despite."

 2    Is that where you --

 3            **JUDGE RODGERS:**  Yes, "Despite this exemption --"

 4            **MR. BEALL:**  Exactly.  "The DoD, which oversees the

 5    U.S. military forces, including the Department of the Army,

 6    explicitly adopted OSHA standards, when feasible for

 7    workplaces, in operations that were not, quote, 'military

 8    unique.'  The DoD policy regarding its safety and occupational

 9    health program stated in 1998," et cetera, et cetera.

10            And I recognize that is somewhat limited there because

11    it says, you know, "military unique" in that concept.  But --

12            **JUDGE RODGERS:**  I don't know what she cites there?  Do

13    you?

14            The reason I ask is because the GAO report cites --

15    this is language from right out of the GAO report, and it says,

16    "Though military operations are not subject to federal civilian

17    health and safety regulations" -- they're not -- "DoD's hearing

18    conservation instructions direct that the armed services

19    hearing conservation programs comply with federal standards

20    whenever practicable."

21            And then it cites DoDI 6055.1E34.2.1.

22            My point is Sahmel is not going to be qualified to

23    tell us when it would be practicable for the Army to adopt a

24    particular OSHA or NIOSH reg in a particular instance.

25            **MR. BEALL:**  And if you look at the bottom of that

1    paragraph, she says, the Army notes in its industrial hygiene

2    program pamphlet that, although military personnel are excluded

3    from executive order 12196, Army industrial hygienists should

4    refer to federal standards, including OSHA workplace health and

5    safety standards regarding hearing protection, which, quote,

6    "apply to Department of the Army workplaces that are comparable

7    to that of the private sector," end quote.  And she cites DOA

8    regulation --

9          **JUDGE RODGERS:**  I actually have a notation to myself

10   right beside this language.  This is a standard that is set for

11   industrial hygienists.  I have not heard Dr. -- is it

12   Dr. Sahmel or Ms. Sahmel?  I have not heard that she is

13   critical of industrial hygienists.

14         **MR. BEALL:**  My point was simply is that you said

15   earlier that OSHA does not apply, and we're saying that the

16   Army has agreed that OSHA regulations should be adhered to in

17   certain situations.  So, in other words --

18         **JUDGE RODGERS:**  I'll look at this.  I'll look and see

19   if the Army has done something to subject itself to OSHA above

20   and beyond what the DoD has said.  So, yeah, good point.  I'll

21   look at that.

22         **MR. BEALL:**  And on the issue of Dr. Crawford, when

23   he's talking about the personal attenuation rating, that

24   information is what he obtained from the Center for Hearing

25   Excellence.  It's in his report.  It's not his own creation.

1    It's something that he -- you know, it's on the Center for

2    Hearing Excellence, I think, website is where he found that

3    information.  So it's not like he's --

4         **JUDGE RODGERS:**  I haven't looked at that.  What is it,

5    a recommendation or -- because I think Dr. Crawford said the

6    Army is not doing this, they have never done it, they're not

7    doing it.  He thinks they should be doing it, but they're not

8    doing it.  They certainly weren't do it, I don't believe, back

9    at the time frame that's at issue in these cases, which, again,

10   that would go to relevance and fit and --

11        **MR. BEALL:**  I'm just saying -- this is on page 7 and 8

12   of his report, and I'll cite it to you rather than reading it

13   to you.

14        **JUDGE RODGERS:**  Hold on.  Let me get there.  I have it

15   right here.

16             Where are you reading?

17        **MR. BEALL:**  Starting with 7, he says, "To illustrate,

18   in the required training module," and then it goes down and

19   then --

20        **JUDGE RODGERS:**  Wait, I'm sorry.  Okay, I'm with you.

21        **MR. BEALL:**  And then the personal attenuation rating

22   is on the first bullet on page 8 when he discusses that.

23             So, again, this is not something that Dr. Crawford

24   sort of pulled from the air.  This is something that he --

25        **JUDGE RODGERS:**  That's a good point.  But it is a

1    recommended best practice --

2              **MR. BEALL:**  Sure.

3              **JUDGE RODGERS:**  -- for DoD and may or may not be

4    available at your location.

5              So I understand that he thinks it should be.

6              **MR. BEALL:**  Yes.

7              **JUDGE RODGERS:**  But he can't tie that to these

8    plaintiffs, in that, if it was, if the Army had been doing it

9    back then, that they would not have been injured.  Again, just

10   forewarning you that's not likely to come in.

11             **MR. BEALL:**  Sure.  And on the 403, before I -- and

12   I'll answer as many questions as I can, if you have more.  But

13   on 403 -- and I know the Court is aware of this, but the

14   Eleventh Circuit has been very, very clear about that, that 403

15   is sort of an extreme remedy.  When you exclude relevant

16   evidence, it's got to be something that's pretty egregious to

17   get in.  Usually for undue prejudice, it's got to be something

18   emotional, something that is, you know, putting the skunk in

19   the jury box essentially to make them focus on something

20   besides the facts of this case.

21             And also on the issue of confusing or misleading the

22   jury, I want to make sure to make this point.  We are here

23   trying three cases together because the Plaintiffs said that

24   this jury is going to be able to understand three different

25   sets of jury instructions and two different state laws over a

1    bunch of different bases and a bunch of different audiograms

2    and keep it all straight.  And now they're saying, but they'll

3    be confused if you talk about military regulations and military

4    hearing conservation failures and the like, and the jury will

5    just throw up its hands and be confused and misled.

6            I think that's just not the case.  There's nothing

7    misleading or confusing --

8            **JUDGE RODGERS:**  I don't know that that's the argument.

9    I think the argument is, is that -- I can tell you that my

10   decision on this is not going to be based on cumulative or

11   whether it's too much information.  It's going to be based on

12   whether the jury needs expert testimony on those regs.

13           **MR. BEALL:**  Sure.

14           **JUDGE RODGERS:**  I get your point, but that's not going

15   to move me one way or the other.

16           **MR. BEALL:**  And on the issue of relevance, clearly,

17   you know, if our information comes in, then I think, subject to

18   methodology and qualifications, then, you know, it is sort of a

19   goose and the gander type situation.  But we think that the

20   jury needs to have this information in front of it to make its

21   final decision.

22           This is going to be a lot of -- we all know this -- a

23   lot of work for this jury to parse through a whole bunch of

24   facts, a whole bunch of dates, a whole bunch of times, a whole

25   bunch of expert testimony, a whole bunch of audiograms.  They

 1   need to be able to put it all together.  And what the experts
 2   do is they're able to tie things together to the jury in ways
 3   that snippets of fact testimony are not able to do.
 4          So we think that all of this is relevant.  And while I
 5   understand your position on this, we also think that our
 6   experts pass the other portions of 702 to get in.  And we just
 7   don't think it's a 403 issue at all.  We don't think that 403
 8   really comes into play given the testimony we're trying to put
 9   in.
10          **JUDGE RODGERS:**  I'm not sure I'm aware of the Eleventh
11   Circuit case law you're referring to that basically you're
12   telling me says that 403 is rarely applied in the Eleventh
13   Circuit.
14          **MR. BEALL:**  It's *Aycock vs. R.J. Reynolds*, 769 F.3d
15   1063.  And that's a 2014 case, but they cite other cases.  And
16   it says, because it allows the trial court to exclude evidence
17   that is probative, Rule 403 is, quote, "an extraordinary remedy
18   which should be used sparingly," end quote, citing the *King*
19   decision, and, accordingly, the balance should be struck in
20   favor of admissibility.
21          So, it's not just that the rule itself is written that
22   way, because the rule is obviously written to use substantial.
23   But it basically -- you know, the thumb is sort of extra on the
24   scale in favor of admissibility if it's relevant in the
25   situation.

1          And they also make another point that I think is

2   important, that it is easier to exclude under 403 something

3   that is proving causation as opposed to on the defense side.

4   The defense typically is able to pick at things in ways that

5   the plaintiff can't necessarily do because they've got to prove

6   their case.  So, as evidence becomes more essential, its

7   probative value becomes greater --

8          **JUDGE RODGERS:**  So what's the point you're making with

9   that?

10         **MR. BEALL:**  Because the plaintiff bears the burden of

11  proof in these situations, courts have typically been more

12  skeptical of plaintiffs' efforts to keep out defense evidence

13  that might, while it may not be proving its own defenses, might

14  be contrary to the plaintiff's own burden of proof.  So, I

15  think that's what -- this is in the *Aycock* decision.

16         And I recognize these are discretionary rulings with a

17  balancing test.  But the Eleventh Circuit, I think, has made

18  clear that 403 is sort of, again, an extraordinary remedy.

19         And in this situation, even the analysis you gave a

20  second ago about your thinking of whether it's going to be

21  helpful really is a 702 question to me --

22         **JUDGE RODGERS:**  Right.

23         **MR. BEALL:**  -- more than a 403 question.  So, I guess

24  my point really is that we don't see 403 coming into play here

25  at all.

1          **JUDGE RODGERS:**  Mr. Beall, 403 is always in play.

2          **MR. BEALL:**  Well, it's always in play, but we don't

3      see this particular facts -- if it is relevant, we do not see

4      any way it's substantially outweighed by undue prejudice or

5      confusion or misleading the jury.  That's my point.  We think

6      it's relevant.  And so, if it's relevant, it's admissible in

7      this particular case, given these facts, in our opinion.

8          **JUDGE RODGERS:**  I'd have to look at the Supreme Court

9      case law on this, but I believe *Daubert* and its progeny, there

10     is always discussion about 403 and how it plays into the

11     gatekeeper's analysis.

12         **MR. BEALL:**  And I don't mean to suggest that it's not

13     part of the analysis.  We're simply saying that this particular

14     set of evidence, if it's deemed to be relevant, would not fit

15     into the undue prejudice, substantial confusion, misleading the

16     jury.

17         **JUDGE RODGERS:**  But are you saying there is still not

18     a balancing test?  I mean, relevance, it can be marginally

19     relevant or marginally probative, or it can be extremely

20     relevant and highly probative.

21         **MR. BEALL:**  We just don't see any problem with -- we

22     don't see any misleading, confusion, or unfair prejudice here.

23     That's what we're getting at.

24         **JUDGE RODGERS:**  All right.  Judge Jones, any questions

25     for Mr. Beall?

1       **JUDGE JONES:**  I do not have any.  Thank you.

2       **JUDGE RODGERS:**  Judge Herndon?

3       **JUDGE HERNDON:**  No, thank you.

4       **JUDGE RODGERS:**  Thank you, Mr. Beall.  I appreciate

5  it.

6       Mr. Sacchet, do you have anything to respond as far as

7  the Eleventh Circuit, the 403?

8       **MR. SACCHET:**  I'll be brief, Your Honor.  But in your

9  *Hendrix* decision, 255 F.R.D. 568, 579, 591, 2009, Your Honor,

10  wrote, when the trier of fact is, quote, entirely capable of

11  determining issues in the case without any technical assistance

12  from experts, expert testimony is unhelpful and must be

13  excluded from the evidence.  Otherwise, there is a risk the

14  trier of fact will give the expert testimony undue weight.

15       **JUDGE RODGERS:**  That's a 702.  That's 702.

16       All right.  Thank you both very much.  Very helpful

17  and informative.  And we are working through your motions.

18       We have opted collectively -- "we," meaning my

19  chambers staff, we have opted not to issue rulings on a rolling

20  basis.  And so right now the thought is we're going to enter

21  one monster omnibus order.  If that changes, you'll be the

22  first to know because you'll get the rolling orders.  But for

23  now, that's the plan, and we are working through them.

24       As you know, I've told you I need to hear from a

25  couple of the experts on the more scientific questions.

```
 1              Is it Flamme that -- Flamme, I think, is going to
 2    testify, and then Juneau and Eddins.
 3              Do you all know if they're going to testify live or by
 4    Zoom remotely?
 5         MR. AYLSTOCK:  They'll be here live, Judge.
 6         JUDGE RODGERS:  Excellent.  Thanks.
 7         Anything else?
 8         MR. BEALL:  And I should say I have no idea about --
 9         JUDGE RODGERS:  Actually, I've heard from Ms.
10    Branscome that Dr. Flamme is going to testify by Zoom.  But I
11    hadn't heard from Plaintiffs, so that's why I asked.
12         MR. AYLSTOCK:  Your Honor, do you have a preference on
13    the order?  I know you had asked about Flamme and Stevenson,
14    first, or does it matter to you?
15         JUDGE RODGERS:  Well, I said I didn't need both of
16    them.
17         MR. AYLSTOCK:  Right.
18         JUDGE RODGERS:  Right, so either or.  And no, I don't
19    -- well, let me give that a little thought.  It doesn't really
20    matter to me as far as Flamme.  That is kind of separate from
21    the other two.  The other two are related, Juneau and Eddins.
22         MR. AYLSTOCK:  Yeah.
23         JUDGE RODGERS:  And Eddins's MIRE M testing is based
24    on the Juneau ear replica.  And you know more about that that
25    even I do at this point for sure.
```

1              So what makes the most sense to you?

2         **MR. AYLSTOCK:**  Having Dr. Eddins go first and then

3    probably Mr. Juneau.

4              And the email mentioned the MIRE and then, of course,

5    the ear replicas.  Our presentation we had thought, based upon

6    that, would be focused on the *m*MIRE as opposed to the *h*MIRE.

7         **JUDGE RODGERS:**  Yes.

8         **MR. AYLSTOCK:**  Is that correct?

9         **JUDGE RODGERS:**  Yes.

10        **MR. AYLSTOCK:**  Okay.  Thank you.

11        **JUDGE RODGERS:**  Well, let me stop.  I don't want to

12   limit myself if I have a question on *h*.

13        **MR. AYLSTOCK:**  He will be ready for any question, I

14   assure you.

15        **JUDGE RODGERS:**  I probably do have a couple of

16   questions on *h*.

17        **MR. AYLSTOCK:**  Yes, Your Honor.

18        **JUDGE RODGERS:**  So, yeah, I guess have him ready.  I

19   don't want to tell you it's all going to be on *m* and nothing on

20   *h*, and then I'm going to have a question and ask him, and he'll

21   be caught off guard.

22        **MR. AYLSTOCK:**  I'll be ready and he'll be ready,

23   Judge.  I just wanted to understand where you wanted us to

24   focus our presentation.

25        **JUDGE RODGERS:**  Did the email mention *h* or just *m*?

1    **MR. AYLSTOCK:**  It just said MIRE.  But then it talked

2    about the ear molds, so we presumed you --

3         **JUDGE RODGERS:**  Oh, okay.

4         **MR. AYLSTOCK:**  It didn't say *h* or *m*.  It just said

5    MIRE.

6         **JUDGE RODGERS:**  I'm sorry.  I should have been more

7    clear.

8         The ear mold because of the *m* testing.  But I am going

9    to have some questions about the human -- the *h* testing.

10        **MR. AYLSTOCK:**  Understood, Your Honor.

11        **JUDGE RODGERS:**  And how he came up with that earplug

12   and the microphone in the earplug and what impact that had, and

13   the stem, and so, yeah, I guess all of it.

14        **MR. AYLSTOCK:**  Thank you, Judge.

15        **JUDGE RODGERS:**  All right.  Anything else from anyone?

16        *[No response.]*

17        I hope you all have a nice weekend.  I suspect you'll

18   be working like we will, but hope you have a good weekend.

19        Thanks again for the presentations.

20        **(Proceedings concluded at 3:46 p.m.)**

21        --------------------

22   *I certify that the foregoing is a correct transcript from the*
     *record of proceedings in the above-entitled matter.  Any*
23   *redaction of personal data identifiers pursuant to the Judicial*
     *Conference Policy on Privacy are noted within the transcript.*
24
     *s/Donna L. Boland*                          *2-15-2021*
25   *Donna L. Boland, RPR, FCRR*                 *Date*
     *Official Court Reporter*