**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG      )      Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,     )
                                   )      Pensacola, Florida
                                   )      February 11, 2021
                                   )      2:36 p.m.
                                   )
                                   )
_____)

**PRETRIAL CONFERENCE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-60)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*1 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

**A P P E A R A N C E S**

**JUDGE DAVID R. HERNDON** (ret.)
*dave@herndonresolution.com*

**FOR THE PLAINTIFFS:**    Aylstock, Witkin, Kreis & Overholtz, PLLC
By:  **NEIL D. OVERHOLTZ**
    *noverholtz@awkolaw.com*

    **JENNIFER HOEKSTRA**
    *jhoekstra@awkolaw.com*
17 E Main Street, Suite 200
Pensacola, Florida  32502

Laminack, Pirtle & Martines LLP
By: **THOMAS W. PIRTLE**
  *tomp@lmp-triallaw.com*
5020 Montrose Blvd, 9th Floor
Houston, Texas  77006

**FOR THE DEFENDANTS:**    Kirkland & Ellis, LLP
By:  **ROBERT C. BROCK**
    *mike.brock@kirkland.com*
1301 Pennsylvania Avenue NW
Washington, D.C.  20004

Dechert, LLP                  Kirkland & Ellis, LLP
By: **KIMBERLY BRANSCOME**       By: **MARK J. NOMELLINI**
  *kimberly.branscome@dechert.com*    *mnomellini@kirkland.com*
633 W 5th Street, Suite 4900      300 N Lasalle
Los Angeles, California  90071    Chicago, Illinois  60654

Moore, Hill & Westmoreland, PA
By:  **CHARLES F. BEALL, JR.**
    *cbeall@mhw-law.com*

    **HALEY J. VANFLETEREN**
    *hvanfleteren@mhw-law.com*
350 W Cedar Street, Suite 100
Pensacola, Florida  32502

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | *(Court called to order at 2:35 p.m.)* |
| 3 | **JUDGE RODGERS:**  Good afternoon.  Thank you all for |
| 4 | being here present in the courtroom. |
| 5 | For the Plaintiffs, Mr. Pirtle, Mr. Overholtz, and Ms. |
| 6 | Hoekstra.  For the Defense, Mr. Brock, Mr. Nomellini, Mr. |
| 7 | Beall, and Ms. VanFleteren. |
| 8 | There are a number of attorneys who are appearing via |
| 9 | Zoom.  I don't need to introduce all of them.  Thank you all |
| 10 | for being here as well. |
| 11 | I do want to confirm, before we get started, that each |
| 12 | of the individual plaintiffs are represented here. |
| 13 | **MR. OVERHOLTZ:**  Yes, Your Honor. |
| 14 | **JUDGE RODGERS:**  So, Mr. Estes, Mr. Hacker, and Mr. |
| 15 | Keefer? |
| 16 | **MR. OVERHOLTZ:**  Yes. |
| 17 | **JUDGE RODGERS:**  Are they represented by counsel of |
| 18 | record or just leadership? |
| 19 | **MR. OVERHOLTZ:**  Counsel of record.  We have entered |
| 20 | our appearances in those cases, and Mr. Barr is here for Mr. |
| 21 | Keefer. |
| 22 | **JUDGE RODGERS:**  All right.  Very good, thank you. |
| 23 | All right.  I see Judge Herndon and Judge Jones. |
| 24 | Welcome to you both. |
| 25 | So, I apologize at the outset for the uncertainty of |

1   the time for the hearing today.  I appreciate you all

2   accommodating me in that regard, and I hope I didn't

3   inconvenience anyone too much.

4          So, I want to talk about a few things.  We have, as

5   you know, five days set aside for a pretrial conference in

6   March.  My concern is not with the length of that conference, I

7   mean, in terms of being able to get things done.  But I am

8   concerned with how close that conference is to the start of the

9   trial.

10          And it was set, I'm thinking, probably consistent with

11   how I set pretrial conferences in my typical cases in terms of

12   time between the conference and the trial as well as your

13   meet-and-confer date, your stip date, all of that.

14          In this case, though, it is certainly anything but

15   typical and this trial coming up, anything but typical.  And

16   so, I wanted to get together ahead of that pretrial conference

17   in March, in advance of that in sufficient amount of time to

18   identify any issues that we can identify that can be of benefit

19   to you all as well as to me in terms of organizing, getting you

20   rulings.

21          I need to know what to anticipate.  You've probably

22   all gleaned that through your multiple meetings with Judge

23   Herndon that I am interested very much so in knowing what you

24   all are doing and where we are all headed.  I want to avoid any

25   crashes, to the extent I can do that.  And with Judge Herndon's

1    help, I feel much better about where we are in advance of this

2    trial than I would feel had it not been for all of his help,

3    and your work as well.

4             So, let me start with motions in limine.  I know you

5    all have been working with Judge Herndon on that and trying to

6    do your best to narrow those issues for the benefit of all, not

7    the least of which will be me and my needing to rule on those

8    in advance of trial.

9             I've gotten some numbers from Judge Herndon.  I think

10   you all met as recently as last evening, and I've gotten some

11   numbers from him.  I know there is still another meeting; I

12   think maybe Saturday you all are going to get together again on

13   motions in limine.

14            What I am going to tell you now, though, it may help

15   inform some of those discussions that have yet to take place.

16   I'm going to give you your word limits for the motions based on

17   what it sounds like you all may be presenting to the Court.

18            I understand, again, there may be some whittling down

19   or narrowing of that between now and the time that you must

20   file these, which, by the way, is February 19th.  Not news to

21   anyone, I'm sure.

22            So, for the initial motions, I am going to limit you

23   to 10,000 words.  And that is going to be in 14 point font,

24   because my eyesight is not what it used to be.  And that's

25   Times New Roman for your font style.  Based on Word Counter

1    that I went to on Google, that computes to 31.8 pages in single
2    space.
3           I will ask that you please be kind to the reader and
4    do include sufficient spacing between your issues, at least a
5    couple, two or three spaces.  I don't want just one single
6    spaced page, with every line single spaced.
7           So I understand you -- I'll call them buckets.  You
8    have motions that will pertain to -- we'll call it general
9    issues, and then you have case-specific motions as well.  So
10   please organize them into those buckets, unless you all have a
11   different system that you'd like to share with me.  That seems
12   to make the most sense to me, but I'm open to whatever you all
13   think makes the most sense, as long as it's organized.
14          Response time to the motions.  My order setting trial
15   set a response time of ten days.  I am going to narrow that to
16   five days, and I'll tell you why.  But let me tell you first
17   what your word limit is going to be on the responses.  It's
18   going to be 5,000 word limit.  So it's roughly half of what you
19   have for the motion.  It's 15.9 pages.
20          So, for anyone who is sitting here right now feeling
21   heart palpitations, let me tell you why I'm doing this and
22   limiting you the way I am.  Because I know what I need to rule
23   on these motions, right?  I need you to identify the issues, I
24   need you to give me the rule.  I don't need a lot of case law,
25   if any.  I need to know what the issue is.  I need to know what

1    the objection is to the testimony or the document.  And then I

2    need a very brief response.

3          And from there, if I need more from you, I'm going to

4    tell you, right?  Obviously, it's no surprise to anyone I'm not

5    shy about telling you, if I need to have you back in the

6    courtroom or on Zoom to make argument to me, to present

7    testimony to me, I'll do that.  If I need a proffer, if I feel

8    like there is something I need to hear outside the presence of

9    the jury, then I'll have sufficient time to do that.  That's

10   another reason I'm narrowing your response time between now and

11   trial.

12         But I just need you to give me enough -- and I think

13   with these word limitations, you'll have that -- give me enough

14   to where I know I can rule or I need to get you back here for

15   more information or I need even, if it's a proffer or evidence,

16   then I'll let you know that.

17         The other thing is, if I left the ten days in place,

18   which -- and I didn't foresee this, but that would have had

19   your response time to these motions due on -- your responses

20   due on March 1st.

21         Your depo designations are due to me I believe on the

22   3rd.  That's too close together for me for all of this

23   material.  So I need to give myself a little bit of cushion and

24   breathing room, so the response time will be the 24th.

25         Any questions about anything I've discussed with you

1    all about motions in limine?

2            Mr. Beall?

3            **MR. BEALL:**  Your Honor, if I may, one clarification.

4    On the five days, is that calendar days or business days?

5            **JUDGE RODGERS:**  It's calendar days.

6            **MR. BEALL:**  That was my assumption.

7            Second, you had indicated that you would reach out to

8    us if you needed more information, which we appreciate.

9            The lower word count will make it easier for us if we

10   can also at least identify those particular motions that we

11   would like to at least address at the pretrial conference.

12           You may not personally think you -- and you may not

13   need more argument.  But there are preservation arguments we

14   want to make sure we are able to clarify correctly and fully.

15   And so, part of the issue we're trying to figure out which

16   motions do we need to throw everything in knowing we may not

17   get to argue those or which ones we might have five minutes to

18   at least elaborate on our issues.

19           And I suspect the Plaintiffs would probably feel the

20   same way.

21           **JUDGE RODGERS:**  What preservation issue is there?  If

22   you raise it on a motion in limine and I rule on it, I don't

23   want to hear you raise it again.

24           **MR. BEALL:**  No.  But there may be some clarification

25   and there may be some --

1    **JUDGE RODGERS:**  Well, that's different than

2    preservation.

3    **MR. BEALL:**  Well, but to preserve it for the -- but

4    also to make sure we put our argument full.  That's what I'm

5    getting at.

6    **JUDGE RODGERS:**  I don't think you're going to be at

7    any risk of any prejudice before the Eleventh Circuit.  I can

8    make clear in my orders what I've limited you to so they'll

9    understand that.

10    You're certainly free if you want to put a checkmark

11    by -- I suspect, if I let you do this, I'm going to get a

12    checkmark by just about every motion, but that's fine.

13    **MR. BEALL:**  We will not.

14    **JUDGE RODGERS:**  I'm not bound by that.  So you're free

15    to let me know which ones you feel you would like to be heard

16    on, and I will take that into account.  There may be others

17    that I want to hear from you on that you haven't highlighted.

18    But that's fine, Mr. Beall, you can do that.

19    **MR. BEALL:**  Okay, thank you.

20    **JUDGE RODGERS:**  Anything else?

21    *[No response.]*

22    Okay.  I think that's -- oh, no, one other item in

23    regards to motions in limine.

24    I presume you all have a record of everything you've

25    given me in connection with the *Daubert* motions, summary

1      judgment motions that are already in the record.

2              If you file a motion in limine directed to an exhibit

3      or testimony that is already before the Court, I need you to be

4      very specific in telling me where it is, what it's connected

5      with, not just we filed it with our *Daubert* motions.  That's

6      not going to be helpful.

7              Also, if I don't have it, you must include it.  For

8      instance, there may be -- we've talked about the GAO report.

9      Within the GAO report, there is a reference to an Institute of

10     Medicine study or report.  I don't have that.

11             And so, if that's the subject of a motion in limine --

12     don't know whether it will or won't be -- but if it is, then I

13     need that.  I don't have it.  So please don't expect me to be

14     able to rule on a motion for which I don't either have the

15     testimony, the study, the report, the document.

16             All right, I think that now covers it.

17             I wanted to talk with you about the five days that are

18     now set aside.  It was three, and I expanded it to five given

19     my concern about -- and again, I don't have a crystal ball.

20     I've been asking for one for about the past 18 years, and I

21     haven't gotten one.

22             So, I don't have a crystal ball, and I don't know

23     exactly what to expect in terms of your depo designations,

24     although I think, based on what you requested, I think it's

25     going to be a lot to review.  Your objections to exhibits, my

1    guess is, based on the number of exhibits that you all have

2    referenced perhaps being on your exhibit list, I suspect there

3    is going to be objections to a number of those exhibits.

4         So, I expanded that pretrial conference to five days

5    because I'm not sure I'm going to be able to get through

6    everything between the time your stip is due or the

7    designations are due and the pretrial conference.

8         And so, it may be that we spend the first couple of

9    days of the pretrial conference going through depo designations

10   and me giving you your rulings from the bench.  I'm going to do

11   my best, but I'm only one judge, so -- and nobody else is going

12   to be able to help me with those.  So, like I said, it may be

13   that we need to take time at the pretrial conference.

14        Also, I am probably going to hear argument from you on

15   some issues at the pretrial conference, which will add to the

16   length.  And then, I suspect I'm going to do my best to get

17   through exhibit objections at the pretrial conference.

18        I'm not unlike any other judge any of you have ever

19   appeared before.  I loath sending that jury out to the jury

20   deliberation room because we have to resolve an evidentiary

21   issue here in the courtroom.

22        My order setting trial mentions breaks, either that or

23   it's the time order.  But I take a break in the morning, I take

24   a break in the afternoon.  Those are jury breaks.  So, if we

25   have evidentiary issues to resolve, those are going to be

1    resolved during those jury breaks.

2          But, if I send the jury out at nine o'clock and spend

3    a half an hour with you on an evidentiary issue, I'm not taking

4    that typical 10:15 break.  We took it.  The jury got it.  So

5    keep that in mind.

6          I'm going to, like I said, do my best.  That's why

7    I've expanded the pretrial conference to five days.  Hopefully

8    we can get through that.

9          To the extent we aren't able to and there is still

10   matters that I've got to rule on after the pretrial conference,

11   you know you're going to be charged time for that time after

12   the pretrial conference.

13         All right.  As far as those five days, those are my

14   thoughts about how to spend that time.  If we finish up -- if I

15   get a lot more done than I'm anticipating before the start of

16   the pretrial conference and we're done with the pretrial

17   conference by Tuesday, then we're done.  I mean, there is

18   nothing else to do.  It's not that I don't want to have you in

19   court, but I'm sure you've got other things you want to do in

20   terms of getting ready for the trial.  So when we're done,

21   we're done.  And if we start on Monday, I think that's more

22   helpful.

23         Anybody have anything you'd like to add, anyone, about

24   the pretrial conference in terms -- and you can let me know if

25   you want to talk about it amongst yourselves.  I know it was

 1   not exactly clear what I wanted to talk with you all about

 2   today.

 3          But if you have suggestions for how you think it

 4   should be organized, I'm happy to hear from you.  These are

 5   just my preliminary thoughts about it.

 6          Mr. Brock?

 7          **MR. BROCK:**  Yes, Judge, I think your thoughts on this

 8   are clear.  I do think, and I'm sure you have this in mind,

 9   that, as we get a little closer to that week, like if we can

10   sort of understand what the issues are and the sequence.

11          We have got different folks on our team, I'm sure the

12   Plaintiffs do, too, that are experts in different issues,

13   whether it be experts or deposition designations or exhibits.

14          So, we don't need a lot of notice, but, you know, it

15   would be good just to know what the plan is in terms of the

16   sequence.  And obviously we can adjust as we go, but that would

17   be helpful.

18          **JUDGE RODGERS:**  Okay, that's a good point, and I'll do

19   that.  I'll have a better sense of that once I see your stip,

20   the exhibit lists and objections, and then also the depo

21   designations.  But I will, I will do my best to get it to you

22   as soon as I can.

23          Let me raise a question about exhibit lists.

24          I heard word of maybe there being an issue on 3M's

25   part with authentication with stipulating to the authenticity

1    of documents based on how documents were produced in discovery

2    in native format.

3            Is that really an issue?

4        **MR. NOMELLINI:**  Your Honor, I'm not aware of that.

5    Usually authenticity issues are something the parties can agree

6    on, so I'll need to check with my team on that.  Certainly

7    documents produced by 3M, you know, I would assume are

8    authentic.

9        **JUDGE RODGERS:**  Who would know the answer to that,

10   Mark?  Because what I heard was maybe there was a concern on

11   3M's part of stipulating to the authenticity of 3M documents

12   that were produced in native format so that the metadata was, I

13   guess, available -- I'm getting a little bit out of my lane

14   here -- but metadata was available, and there was no way to

15   know whether those documents had been manipulated or altered in

16   some way, and so 3M couldn't possibly stipulate to the

17   authenticity of those documents.

18           If that's -- I need to know that soon.

19       **MR. NOMELLINI:**  Your Honor, let me check with somebody

20   on that ASAP.  I do not know the answer to that question.

21       **JUDGE RODGERS:**  Well, on the chance that it is an

22   issue, I'll tell you how it's going to be handled.  You're

23   either going to identify for me a factual basis for that

24   concern, meaning you have a document that you believe has been

25   altered; or 3M is going to reproduce all those documents in a

 1  form that you're comfortable with that you can stipulate in
 2  terms of the authenticity.
 3          **MR. NOMELLINI:**  Understood, Your Honor.
 4          **JUDGE RODGERS:**  So that might save you some
 5  objections, if that is an issue.
 6          **MR. NOMELLINI:**  Okay.  Yes.  So it sounds like it's
 7  something related to documents produced in native form, and we
 8  want to get to the bottom of whether there is any kind of
 9  authenticity issue that we have and report back ASAP; and if
10  there is an issue, we're going to need to reproduce them.
11          **JUDGE RODGERS:**  Right, or show me that there is truly
12  an issue, not just your suspicion about an issue, right?
13          **MR. NOMELLINI:**  Right.
14          **JUDGE RODGERS:**  So, if you have an issue, then I want
15  to hear it, and I want to resolve it.  But if it's just a
16  suspicion -- and again, maybe we're all speaking in
17  hypotheticals here because maybe this isn't even an issue.  But
18  if that was a concern, I mean, frankly, it should have been
19  raised at the time of production -- Judge, you know, we object
20  to producing them in this format; if you're making us produce
21  them in this format, this is going to be our concern at trial.
22          Judge Jones, have you heard anything like that?
23          **JUDGE JONES:**  I have not.  But I think the parties
24  will be able to compare the hash values of the documents.  If
25  the hash values are identical, there should be no issue.

1          **JUDGE RODGERS:**  Okay hash values.  Don't know what

2     those are, but it sounds like -- I trust Judge Jones.  It

3     sounds like you all probably do know what he's talking about,

4     and you can compare those.

5          But I don't need objections that -- really, there are

6     going to be enough objections that have merit and are legit and

7     need a resolution.  If it's something like this where you all

8     can get together and compare to satisfy you or your client --

9     not you, but whoever has the concern or your client -- then do

10    that, as opposed to raising an objection and having me deal

11    with it at the pretrial conference.

12         **MR. NOMELLINI:**  Understood, Judge.  I understand your

13    concern, and we'll report back ASAP.

14         **JUDGE RODGERS:**  Okay, thank you.

15         So, to witnesses now.  I have your lists, which I

16    appreciate you providing.  Anybody and everybody.  I don't

17    guess there is any way around this in terms of your depo

18    designations.  Obviously, you're identifying people to cover

19    yourself, whether it's just a longer list or there is a

20    separate may-call list.  But it looks like we're going to be

21    designating deposition testimony for a lot of witnesses who are

22    probably not ever going to be called.

23         Does anyone have a magic way around that?

24         **MR. BROCK:**  I think for our side, Judge, we are

25    focused, very focused on the will-call witnesses.  And for

1    deposition designations, we have a few depositions I think in

2    the range of 10 or 12 that relate to individual plaintiffs

3    where we have taken a government deposition or we've taken a

4    friend's deposition or a wife's deposition, some plaintiff

5    designations.

6             And then we've got a few additional individuals on our

7    will-call list that are also in the deposition designation

8    category.  I don't think the total on our will-call is more

9    than, you know, 15 or so witnesses.

10            We do have a lot of may-calls, and they are still in

11   play.  But we are trying to focus on those will-call witnesses.

12        **JUDGE RODGERS:**  Right, and I appreciate that.  Like,

13   for instance, your list, Mr. Brock, doesn't tell me whether

14   someone is a deposition or not.  The Plaintiffs' list, there

15   are a few where it says live/depo where a decision hasn't been

16   made.  But the Plaintiffs have given me a number of witnesses

17   who they have indicated will be deposition.

18        **MR. BROCK:**  We can -- if it will be helpful, we can

19   add a column for the ones that we would expect to be by

20   deposition versus live.

21        **JUDGE RODGERS:**  Well, I would ask you to do that.  I

22   know I'm going to know come March 3rd.  But, again, just so I

23   can anticipate, if you would do that, that would be

24   appreciated.

25        **MR. BROCK:**  Sure.

1        **JUDGE RODGERS:**  Also, are there any witnesses that you

2   are planning to designate deposition testimony for but that who

3   may still, nonetheless, be called live?  I think we should try

4   to avoid that.  I feel like you ought to know who you're --

5        **MR. OVERHOLTZ:**  Your Honor, we're still meeting and

6   conferring.  I know Mr. Aylstock and Ms. Branscome have spoken

7   this week about potentially who may be brought live as a part

8   of their corporate witnesses.  So we're still meeting and

9   conferring on that.

10       We kind of agree with your principle, Your Honor,

11   let's not designate if we know that they're going to be called

12   live in our case in chief, for example.

13       And then, also, whenever we present the deposition

14   designations, as you know, Your Honor's order that changed some

15   of the things we suggested, but it has a priority and a

16   secondary section.  We hope to be able to narrow and focus that

17   priority will-call deposition designation for you when we

18   submit those on March 3rd so you'll know these are the ones

19   that are part of our order of proof that we expect to play for

20   real by that time.  And so hopefully -- and that will be our

21   priority list.

22       **JUDGE RODGERS:**  Okay.

23       **MR. OVERHOLTZ:**  And hopefully that will narrow it for

24   the Court so that they can have -- you know, these are the ones

25   we would like to have rulings on when trial starts so that

1      there is no surprises.

2                **JUDGE RODGERS:**  All right.

3                Ms. Branscome, I see you're on the Zoom.  I don't know

4      if Mr. Aylstock is on or not.

5                Mr. Overholtz just said you and he have spoken

6      recently in terms of I guess the corporate witnesses and

7      whether they're going to be called live or via depo.

8                **MS. BRANSCOME:**  That is correct, Your Honor.  We have

9      had a discussion and we have exchanged a few emails.  This

10     relates -- if Your Honor will recall, Mr. Aylstock raised the

11     possibility that they would be filing a Rule 43 motion.  The

12     Plaintiffs identified the witnesses that they would request

13     that we bring to trial.  All of them are, obviously, outside of

14     the Pensacola area.

15               And they then actually narrowed their list.  And we

16     made a proposal about, you know, some witnesses who we might be

17     able to present.  They took that under consideration.  They

18     responded recently with a clarification question, and we have

19     asked them if they have essentially a counterproposal.

20               So, that's where we are right now.  I think they're

21     productive conversations.  Judge Herndon has been involved with

22     them.  So we hope that we can bring that to resolution.

23               If we cannot reach agreement, then my understanding is

24     that the Plaintiffs will file a Rule 43 motion, we will respond

25     in kind, and then, obviously, we would need the Court to rule

1   on that.  But at the moment, we are waiting on the Plaintiffs'

2   counterproposal.

3           **JUDGE RODGERS:**  Okay.  All right.  Well, I don't know

4   if, again -- Mr. Overholtz, you're here, I don't hear Mr.

5   Aylstock.  But if that motion is going to be filed, please make

6   that determination as quickly as you can and get that filed,

7   because there will be a need for a response time.

8           **MR. OVERHOLTZ:**  Yeah, we would plan on filing that

9   next week.  If we can't resolution by Monday, we'll file the

10  motion next week.

11          **JUDGE RODGERS:**  Very good.  Thank you.

12          Thank you, Ms. Branscome.

13          All right.  Before I came into the courtroom, I

14  emailed our jury administrator to check on -- let me see if

15  she's responded.  Okay, so she did respond.  I was checking on

16  the questionnaires.

17          We are receiving -- I haven't seen them, but

18  Tallahassee is receiving the availability questionnaires,

19  getting those back.  And she is sending out the first batch of

20  special questionnaires today, and she'll send another batch

21  tomorrow.

22          I have asked that all of them be out by the -- I

23  believe I asked her by the 22nd to have them all out.  So, she

24  says we're on track, so that's good news.

25          Okay.  I don't have anything else to go over with you

1   all right now.  We don't have your stipulation.  But I do think

2   this was helpful for me.  I don't have anything else

3   specifically to discuss with you in connection with the

4   pretrial conference coming up in March or the trial.

5        I do have one other matter I want to ask you about.

6   But if anyone has any questions of me, need for clarification

7   or anything like that, now is the time.

8        **MR. BROCK:**  Your Honor, I had two things.  One is just

9   a report.  Mr. Aylstock and I spoke this morning about Judge

10  Herndon's engagement to assist the Court with trial, and the

11  parties are in agreement to work with Judge Herndon to

12  facilitate that.  So we will talk to him about the details of

13  it, but we wanted to give you that report today.

14       **JUDGE RODGERS:**  That's good news.  And let me add to

15  that, if I could.  I have spoken with Judge Herndon as well,

16  actually, this morning about this.  And just for your benefit

17  and your clients' -- and Judge Herndon is the first to

18  recognize this.  If he's here and we're through the first week

19  or maybe into the second and he's twiddling his thumbs, he's

20  going to be the first to say, *I'm not benefiting anyone, and I*

21  *don't need to stay, I probably need to get back home to my*

22  *family and my dog.*  So, that's the understanding that he and I

23  both have.

24       But because this is the first trial and it is not a

25  typical trial, I think he's going to be beneficial.  But we'll

1    keep an eye on that.  I don't expect that he will be needed

2    here physically present for the next two trials.  But I think

3    just to get us off the ground with the first trial, I think

4    it's going to be helpful and beneficial.

5          **MR. BROCK:**  Thank you, Your Honor, and we appreciate

6    that.

7          My second issue was a question, really.  And I just

8    wanted to inquire.  I know Your Honor had indicated that when

9    we get information about the jurors that you would give us

10   maybe some more specific instructions about dos and don'ts

11   about investigation of jurors.  And I didn't know if you had

12   thoughts about that today or if there could be a time when we

13   could hear about that a little bit.

14         We, obviously, want to be very, very careful about not

15   stepping over any lines.  I was reading the note to be some

16   investigation would be appropriate but --

17         **JUDGE RODGERS:**  No investigation.

18         **MR. BROCK:**  No investigation, okay.

19         **JUDGE RODGERS:**  None.  None.  I'm sorry that wasn't

20   clear.  No investigation.  And, again, I'm going to put this in

21   an order and you're going to need to certify to me that you

22   understand it and you're going to agree to follow it.

23         If you don't, you will not get the questionnaires

24   until the morning of the trial like every other lawyer in this

25   district in every trial.

1          **MR. BROCK:**   Okay.  Well, I'm glad I asked.

2          **JUDGE RODGERS:**   There will be no investigation.   That

3   was not the purpose of the questionnaire.

4          Mr. Pirtle?

5          **MR. PIRTLE:**   May it please the Court?

6          If we are good and we don't do anything like

7   investigations, when will we get the questionnaires ahead of

8   time?

9          **JUDGE RODGERS:**   I think I've tracked that -- I believe

10  in my mind -- and I have this in my notes in a different

11  folder.  I apologize, I should have brought it in.  I believe

12  it's the 23rd.  It's a week before.

13         **MR. PIRTLE:**   That's perfect.

14         **JUDGE RODGERS:**   Or I think it's maybe the 29th,

15  whatever that Monday is before.  But I have to have your word

16  and your assurances that you are not going to investigate these

17  people, period.  My colleagues would not be happy with me if

18  that were to occur.

19         **MR. OVERHOLTZ:**   We understand, Your Honor.

20         **MR. PIRTLE:**   We'll make that representation, Your

21  Honor.

22         **MR. OVERHOLTZ:**   100 percent.

23         **JUDGE RODGERS:**   And I'm also working with IT -- it's

24  not that I don't trust the lawyers here in the courtroom and on

25  Zoom with me right now, but -- and I am going to ask you to

1    limit your sharing of these questionnaires with other lawyers.

2    And I'm working with IT to determine if there is a way for me

3    to track through some sort of special identification system in

4    terms of who has access to the documents.  But I don't know how

5    I would do that if you share them with other people.  Now,

6    maybe electronically.  But if you just print them off and hand

7    them to someone else, then I don't see how I would have track

8    of that.  But I'm not IT savvy enough to know.  But I do know

9    there will be a secure link that these document will be

10   uploaded into.

11        Ms. Hoekstra, you're standing.

12        **MS. HOEKSTRA:**  In the Northern District of Texas, I've

13   dealt with this before where we certified -- after receipt, we

14   gave five names to the Court of the only people who would get

15   the electronic link, and then certified that those are the only

16   people who saw them and destruction afterwards.

17        I would be happy to let you all see what that

18   certification looks like, if that's something that would help.

19        **JUDGE RODGERS:**  I would like to see it.  And if

20   anybody on the Defense side has something similar in terms of

21   an experience, I'm happy to look at that as well.  Thank you.

22        I'll tell you how -- if I didn't share this with you

23   the last time we spoke about jury selection and the logistics

24   of that, but how it works.  Again, in every courtroom in this

25   district in front of every judge is these questionnaires -- you

1    saw the questionnaire.  It's dated, but it's the one that's

2    been in use for many years -- Charles can attest to that -- in

3    this district.  And it goes out, and then the jurors do not

4    mail it back in.  They bring it in, hand carry it in the

5    morning of trial.  Copies are made, given to counsel that

6    morning.  You get about maybe 20 minutes with it, maybe 20 or

7    30, if the judge is in a good mood.

8              And at the end of jury selection, those

9    questionnaires, every copy is collected and destroyed.  And the

10   originals are filed under seal in the Court record, and that's

11   it.  But all the copies are destroyed.  No one leaves here with

12   a copy.  The jurors are told that.

13             Obviously, they won't be told -- they're going to know

14   you have had access to these questionnaires.  But I am going to

15   assure them that I am collecting what you all have had, you can

16   bring it with you, and those are going to be destroyed just

17   like we do in every other case.

18             I plan to put this and still do plan to put this into

19   an order.  I'm sorry I haven't gotten to that yet.  But I'll

20   get on that, and hopefully by the first of next week I'll have

21   an order out.

22             But I'm glad you brought that up, Mr. Brock, because,

23   obviously, there's questions on both sides about it.

24             **MR. BROCK:**  Thank you, Judge.  In the hypothetical

25   circumstances where one party or the other might be working

1   with a jury consultant to assist with jury selection, I was

2   wondering if we could have permission to somehow securely share

3   that information with a consultant.

4        **JUDGE RODGERS:**  Are both sides doing that?

5        **MR. BROCK:**  Well, I said in the hypothetical sense.  I

6   stepped too far out.  But it's routinely done in --

7        **JUDGE RODGERS:**  I know it is, I know it is.  So, that

8   juror consultant, to the extent that hypothetical is reality,

9   would be subject to the same rules --

10        **MR. BROCK:**  Sure.

11        **JUDGE RODGERS:**  -- and the same consequences.

12        **MR. BROCK:**  Yes.

13        **JUDGE RODGERS:**  And would need to provide a

14   certification to the Court or there would have to be -- I would

15   have to have some comfort level with that.

16        **MR. BROCK:**  Sure.

17        **JUDGE RODGERS:**  But I'll give that more thought.  But

18   I understand the hypothetical question.

19            Any other inquiries about this or anything else?

20            Mr. Nomellini?

21        **MR. NOMELLINI:**  Yes, Your Honor.  There are two

22   witnesses who were disclosed in Plaintiffs' may-call list

23   specific to the *Hacker* case, Cecil Bundage and Patrick Bettis.

24   And we have not deposed those two individuals.  We would like

25   an opportunity to depose them.

1          We have talked to -- I've just raised it with

2    Plaintiffs' counsel before the hearing.  I can go into with

3    Your Honor the diligence that we took with respect to these

4    witnesses.  We took to heart what Your Honor said with respect

5    to our six deposition limit and the inquiry that we made of Mr.

6    Hacker at his deposition with respect to these witnesses

7    reaching, out to these witnesses, and then the choices we made

8    with respect to the six that we did choose to depose.

9          I could go further into that, or if Your Honor would

10   like us to file something on it, happy to do that also.

11        **JUDGE RODGERS:**  Well, have you all had a chance to

12   discuss this, think about it?  Do you want an opportunity to

13   respond?

14        **MS. HOEKSTRA:**  We have not had a chance to circle back

15   with everyone on the *Hacker* side to verify.  I do understand

16   that subpoenas or documents were issued to those individuals.

17   They were on the initial disclosures, and they were available

18   for the six depositions that were or could have been taken in

19   the *Hacker* case.

20        Beyond that, I haven't had a chance to circle back

21   with everyone to confirm whether we would be open to their

22   additional discovery at this late date.

23        **JUDGE RODGERS:**  Okay.  Well, do let 3M know, and then

24   you'll need to file the motion under these circumstances, not a

25   motion for protective order.  I think you need to file a motion

1    with me.

2            **MR. NOMELLINI:**  Sure, will do, Your Honor.  We'll wait

3    to hear back from Plaintiffs, and then if there is disagreement

4    -- I guess we should file the motion in either event, whether

5    there is agreement or not?

6            **JUDGE RODGERS:**  If there is an agreement, I'm not

7    going to require you to file the motion.  But you need to let

8    me know through Judge Herndon, as we have done with some

9    others, just let me know if there is an agreement.  To the

10   extent there is an agreement, it can't lead to the domino

11   effect, I mean, there is just no way.

12           **MR. NOMELLINI:**  Okay.

13           **JUDGE RODGERS:**  So, if there is not an agreement,

14   you'll need to file a motion to reopen discovery for the

15   limited purpose of taking these -- beyond the discovery

16   deadline for taking these two witnesses.

17           **MR. NOMELLINI:**  Okay.  Thank you, Your Honor.

18           **JUDGE RODGERS:**  That's a good cause standard.

19           **MR. NOMELLINI:**  Thank you, Judge.

20           **MR. SACCHET:**  Your Honor, this is Michael Sacchet.  I

21   had a small item I would like to bring to the Court's

22   attention.

23           I wanted to raise the issue that it hasn't been lost

24   on the parties, Plaintiffs or 3M, that Your Honor had

25   previously asked for the Kentucky pattern instructions, I think

1  a month or more ago.

2        Both parties have had a difficult time procuring any

3  publicly available pattern instructions.  There is a set that's

4  available for purchase on Amazon for a couple of hundred

5  dollars.  And I understand on Lexis that you can purchase gig

6  by gig for something like $50 a pop, which runs up pretty high

7  when all the gigs that are required are purchased.

8        So, we were seeking further guidance from the Court as

9  to whether the Court still needs these instructions; and if so,

10 Plaintiffs have purchased a Kindle book.  We're a little bit

11 concerned about providing it to either 3M or the Court due to

12 copyright restrictions.  Maybe there is an option where each

13 party can throw in a couple of hundred bucks and get the Court

14 a copy.

15        But I've had nice conversations with 3M, and we're

16 both at a little bit of a dead end as to how to get them to

17 Your Honor.

18        **JUDGE RODGERS:**  All right.  Well, I didn't know it

19 would be such a chore.  I appreciate the efforts.  But let me

20 get with our circuit librarian at the Eleventh Circuit and see

21 if she can't obtain a copy for me, and I'll let you know.

22        If not, I mean, I'm going to have to have a copy.  But

23 I think I can probably do this without you all chipping in

24 dollars for that.  But thank you for alerting me to that, so

25 I'll get to work on that.

1      **MR. BROCK:**  I was going to raise one more issue very

2  quickly.  And I have not had a chance to confer with the

3  Plaintiffs on this, but just to alert the Court.

4      We need to have a discussion about whether or not a

5  punitive phase of a trial would potentially be bifurcated.  I

6  think where we will be on that will be to not ask for

7  bifurcation.  I don't know if the Plaintiffs will have a

8  different point of view.  But I just wanted to let you know

9  that is an issue that relates to the structure of a trial, and

10  we probably need to let you know something if there is a

11  dispute about that pretty soon just so that we can plan for

12  that.  It does potentially impact some of the motions in limine

13  and that type of thing.

14      **JUDGE RODGERS:**  Well, I'm accustomed to having that

15  issue framed for me long before now in a trial, Mr. Brock, to

16  be candid.  I mean, this is at a late date.

17      I've been proceeding -- there has been a lot of

18  thought about the trial in this case, certainly once the

19  consolidation order was entered, and that issue just hasn't

20  come up.

21      And so, even if you all -- if 3M wanted bifurcation,

22  I'm not sure if I wouldn't decide it's too late.

23      **MR. BROCK:**  Well, I think what you're saying is where

24  we will end up.

25      **JUDGE RODGERS:**  It sounds like it.

1      **MR. BROCK:**  I just wanted to alert Your Honor.  And

2    we'll talk about it quickly, and if there is an issue, we will

3    certainly let you know.

4          **JUDGE RODGERS:**  All right.

5          Anything else before I get to the final matter that I

6    want to talk with you all about?

7          *[No response.]*

8          This issue, it sort of stems from or relates to our

9    oral argument last Friday on the sort of the culture and

10   compliance, noncompliance.  You've seen my ruling, I'm sure you

11   have.  If you haven't, it's hot off the press.  You should have

12   it, but it was entered earlier today.

13         There are two of those type of experts that have not

14   yet been addressed by the Court, that's Dr. Neitzel and

15   Jennifer Sahmel, who are workplace safety sort of industrial

16   hygienist experts.

17         As you know, I requested depositions from the parties

18   last week on some fact depositions.  These are not witnesses

19   that were subject of any *Daubert* motions, but they were

20   referenced in expert reports, primarily the Defense witnesses

21   on these issues -- Sahmel, Neitzel, and I believe even some

22   others, Crawford, Fallon, and maybe Tuten.  But these are

23   depositions of Lt. Col. Battler and then also Lt. Col. Merkley,

24   and Kathy Gates, Lt. Col. Babeu.  Those were the ones I --

25   there were four witnesses that I had requested.

 1          And this just is, you know, the coincidence of it or
 2   happenstance.  I'm reading through Lt. Col. Battler's
 3   deposition and read about a discussion that she had on an
 4   article she had written, which was a success -- she is an
 5   audiologist, as you all know -- a success story at Fort Carson.
 6          And there was an attachment to that article, and that
 7   attachment had, I believe, a diagram of the Army hearing
 8   program.  And in connection with the questioning by the lawyer,
 9   Lt. Col. Battler said, under oath, she said, *Oh, the Army's*
10   *Hearing Conservation Program really applies only to civilian*
11   *workers, and it's the Hearing Readiness Program that applies to*
12   *soldiers.*
13          Obviously, that caught my attention.  And so, with
14   Hillary's assistance, I got a copy of the Fort Carson success
15   story article, and sure enough, there is that delineation
16   between hearing conservation program and hearing readiness.
17          And there is a reference -- I don't remember if it's
18   in that article or if I saw it in Lt. Col. Merkley's
19   deposition, but there is -- which I was not aware of, okay, and
20   maybe you all are aware of this but I was not through all of
21   Dr. Fallon's report or disclosure and deposition, through
22   Dr. Crawford, through Lt. Col. Tuten, Sahmel, Neitzel, not
23   really much at all, if any, was made of this interim guidance
24   in around 2008 time frame.  It's referred to as a special text,
25   and it's called -- I have it, I mean, it's called the Army

1   Hearing Program.

2          And no one provided this to me.  Again, Hillary

3   printed it from the internet.  But apparently -- and I want you

4   to correct me if I'm wrong, but I mean, I don't think I am,

5   according to your own witnesses, meaning Merkley and Battler,

6   and based on the expressed language of this special text.

7          But, apparently, in the 2008 time frame, somebody in

8   the Army, I presume in the Army Hearing Program or CHPPM,

9   decided that the Army Conservation Program, which was

10  contained, as we all know, the now infamous Army pamphlet

11  40-501 was not sufficient for hearing protection or prevention

12  for soldiers who were being trained and readied for deployment

13  and combat.

14         And so, there is this -- I call it interim guidance,

15  they call it a special text, but it's dated February 1, 2008.

16  And it truly reorganizes the Hearing Conservation Program.

17  And, actually, the Hearing Conservation Program in this interim

18  guidance comprises one page at the very end, Chapter 5.

19         And this is the language under Chapter 5, Hearing

20  Conservation.  For many years, the Hearing Conservation Program

21  served as the flagship for the prevention of noise-induced

22  hearing loss.  This primarily garrisoned-focus program is

23  instrumental in preventing noise-induced hearing loss in

24  primarily industrial settings.  Although some soldiers work in

25  instrumental base settings, hearing conservation efforts are

1    primarily directed at our civilian workforce," which none of

2    these plaintiffs are part of the Army civilian workforce.

3           And as we all know, I believe, at least I know now,

4    the old Army Hearing Conservation Program that existed from

5    1998 up until 2015 and this Army Hearing Program special text

6    that came about in 2008 were combined in 2015 to comprise

7    what's now the Army Hearing Program.

8           And this was not clear to me.  And this is not an

9    insignificant issue for this case.  I'm not sure why the

10   experts -- I mean, Dr. Fallon doesn't even mention this.  And

11   we have two of our plaintiffs that are going to trial in

12   March -- Estes and Keefer -- who didn't come into the Army

13   until the time frame of this document, 2007/2008.  Lt. Col.

14   Merkley said this started in '06, but the publication date is

15   '08.

16          So, Hacker, of course, he's got a 20-year service, and

17   so this old Army Hearing Conservation Program would have

18   applied to him up until 2008 when this document came into

19   existence.

20          But I'm just curious, at a minimum, as to why this has

21   not been something that's been discussed by your experts,

22   particularly on the Defendants' side.

23          Jennifer Sahmel mentions it.  But her and

24   Dr. Neitzel's opinion is that the Army Hearing Conservation

25   Program was a failure.  And they make that conclusion without

1    any discussion of this soldier-based interim guidance special

2    text that applied certainly to Keefer and Estes and also to

3    Hacker, I would say, once it came into being.

4        Plus, none of this, allegedly, injuries occurred in an

5    industrial-based setting.  These guys were on the range.  They

6    were in combat in Iraq or Afghanistan.  They were on the range

7    or they were out in the field working around generators.

8    That's not an industrial-based setting.

9        So I guess I'm going to look first to the Defendants

10   for my question about this.  I don't see how Neitzel and Sahmel

11   testify in this case and give opinions based on an Army Hearing

12   Conservation Program that was at least -- maybe not superceded

13   but was supplemented in a significant way with the Army Hearing

14   Program.

15       The last thing I'll say before I give somebody an

16   opportunity to speak is, you may stand up and say, well, judge,

17   in terms of what's at issue in these cases in terms of the

18   deficiency, the violation of the reg or the guidance, meaning

19   primarily the failure to properly fit, to have a medically

20   trained person fit these soldiers with the CAEv2 and perhaps

21   give them the appropriate instruction related to the CAEv2,

22   that that doesn't differ in terms of whether you're looking at

23   the old 40-501, the interim guidance, or the new existing

24   40-501.

25       And that may be true.  I think it is true.  I would

1  have to agree with you about that.  But back to Neitzel and

2  Sahmel, their opinions are much, much, much, much broader --

3  and Tuten and Fallon as well but I've dealt with those -- but

4  much broader in terms of workplace safety and hearing

5  conservation.

6          So, do you have anyone here today who wants to talk

7  about this with me or do you want to set it for another time?

8          **MR. BROCK:**  I think Ms. Branscome can get us started

9  today, Your Honor, yes.

10         **JUDGE RODGERS:**  All right.  Ms. Branscome?

11         **MS. BRANSCOME:**  Yes, Your Honor.  So, let me -- I was

12  pulling documents as you were speaking, Your Honor.  So we may

13  request -- if I'm not able to sufficiently answer your

14  questions, we may request that we could do a short submission

15  on this just to make sure that we're entirely accurate and

16  complete.

17         **JUDGE RODGERS:**  Well, let me stop you for a minute.  I

18  don't want any more written submissions.  So, if you need to

19  have another lawyer come argue, that's fine, I can set that,

20  and they can do it by Zoom, if that's preferable.  But I don't

21  want any more papers.

22         **MS. BRANSCOME:**  Completely understood, Your Honor, and

23  I would be the lawyer to do it.  I just -- I didn't even think

24  I would be able to attend today's hearing, so I'm just

25  gathering as many documents as quickly as I can.

1       **JUDGE RODGERS:**  One more footnote.  I think we did

2 alert them that I wanted lawyers here who could speak to the

3 issues that we raised and discussed last Friday.

4       So, if you didn't -- I mean, I know you were not

5 necessarily -- I think I got word you weren't going to be here

6 today until just a few minutes ago, but I'm not springing this

7 on anyone.

8       **MS. BRANSCOME:**  I was not suggesting that you were,

9 Your Honor.  I just mean the specific reference to the

10 deposition testimony and to the specific article, I would need

11 to look at that.  But in terms of discussing the structure of

12 the -- *(inaudible)* -- program, I do think I can hopefully

13 answer some questions.  And if it's not sufficient, we could

14 set a time, and I will happily appear again by Zoom at Your

15 Honor's convenience.

16       So the -- (inaudible) -- pamphlet that we all referred

17 to that described the Hearing Conservation Program, obviously,

18 was put in place back in 1998.  That is the one that all are

19 familiar with.  It is titled the Hearing Conservation Program.

20 It does apply to soldiers.

21       So, the understanding of some of the parts of the

22 Hearing Conservation Program applying to civilians, it is our

23 understanding that there are -- *(inaudible)* --

24       **JUDGE RODGERS:**  I can't hear you at all, Kim.  You're

25 fading out.

```
1          MS. BRANSCOME:  Someone is, I believe, shuffling

2    papers next to a microphone, and that's what is taking it away.

3          JUDGE RODGERS:  I don't know if -- my microphone is

4    not covered.

5          MS. BRANSCOME:  It's not yours, Your Honor.  I can

6    just see I think it's perhaps at counsel table just some paper

7    shuffling.

8          The Department of the Army pamphlet, the 40-501, was

9    established in 1998.  It does apply to soldiers.

10          JUDGE RODGERS:  My question, though, is -- or my

11    reason for raising this is it appears to me -- and this isn't

12    -- I mean, this is what the text says, that in 2008 the Army

13    developed something more specific for soldiers, and said, our

14    old Army Hearing Conservation Program that's been around since

15    1998 wasn't -- I mean, actually they say we feel that there

16    were gaps because it was more suited to the garrisoned, the

17    industrial setting, not to what was happening with these

18    soldiers in the field, on the range, and so we developed this

19    Army hearing program document.

20          So, I don't think it's accurate to say that the Army

21    Hearing Conservation Program applied to soldiers after 2008.

22          MS. BRANSCOME:  So the special text itself contains

23    language that says that it is -- (inaudible) -- in combination

24    --

25          JUDGE RODGERS:  I need everyone to, please, refrain
```

1    from moving any papers, because I'm having a hard time hearing

2    Ms. Branscome.

3          Go again, Kim.

4          **MS. BRANSCOME:**  So, the special text actually says in

5    its own language that it's designed to be used by commanders

6    and their staffs in the planning and execution of the

7    prevention of soldier hearing loss.  It says it is not a

8    standalone publication, and it must be used in combination with

9    other publications.

10         **JUDGE RODGERS:**  Right.  But it doesn't reference

11   40-501.  And, in fact, again, if you go to Chapter 5 where it

12   talks about the Army Hearing Conservation Program, which is

13   40-501, it says that applies in the industrial setting to our

14   civilian workforce.

15         **MS. BRANSCOME:**  So, it is our understanding that

16   certain noise limits do.  So there are industrial hygienists,

17   for example, that are on bases that they are largely looking at

18   noise controls in the environment to make sure that civilian

19   employees who are on bases are not exposed to hazardous levels

20   of noise.

21         As Your Honor may be aware, the original version of

22   the Army pamphlet, for example, said that hearing earplugs

23   should not be worn by dismounted soldiers in combat.

24         **JUDGE RODGERS:**  Right.

25         **MS. BRANSCOME:**  And part of the change that happened

1    and with the special text -- in fact, there is a section on the

2    Combat Arms Earplugs -- is there would be a change to that

3    requirement, and now soldiers do, in fact -- they are

4    encouraged to wear earplugs that allow for situational

5    awareness and specifically the Combat Arms Earplug in combat

6    situations.

7              So, the sequence was the Army pamphlet was set up in

8    1998.  There was an update to the DoD Instruction, which is

9    6055.12 in 2004.  That very clearly says that the Hearing

10   Conservation Program applies to soldiers and all branchs of the

11   military.  They had the special text that was meant to be

12   essentially an interim guidance that was adopted -- *(inaudible)*

13   --

14             **JUDGE RODGERS:**  Didn't the DoD Instruction say that

15   the DoD program applies to all branches?

16             **MS. BRANSCOME:**  So, the DoD Instruction, what it says

17   is it is the foundation for establishing the Hearing

18   Conservation Programs that then fall underneath it.

19             **JUDGE RODGERS:**  Correct.

20             **MS. BRANSCOME:**  So that was updated in 2010, and then

21   the Army pamphlet was updated again in 2015.

22             For this entire time frame, the structure of the

23   system does apply both to soldiers and to civilians.  There

24   just are specific concerns for civilians that are different

25   than the soldiers.  For example --

1          **JUDGE RODGERS:**  Well, and vice versa.  There are

2     specific, obviously, specific concerns that exist for soldiers

3     that do not exist in the civilian workplace setting.

4          **MS. BRANSCOME:**  That is absolutely true, Your Honor.

5     But the core parts of our experts' opinions about the

6     applicability of the Hearing Conservation Program with respect

7     to fitting and training and ensuring that they are placed in

8     environments where their hearing protection is sufficient,

9     those are core tenets of the program that do apply to both

10    soldiers and, to the extent civilians necessitate hearing

11    protection devices, it would apply to them as well.

12          So, the 2010 update to the DoD Instruction, the

13    6055.12, actually is very specific.  It postdate this special

14    text, and it specifically says it applies to DoD military and

15    civilian personnel and operations worldwide.

16          So, there are different conditions.  And we understood

17    when we spoke -- I can't remember which Hearing Conservation

18    Program manager it was, or perhaps it may have been one of our

19    witnesses, in all candor, explained that, for example --

20          We had thought about taking the depositions of the

21    base industrial hygienist.  Your Honor may actually remember

22    that.  I think they were on our original list of people we

23    wanted to depose.

24          And then we found out that the base industrial

25    hygienist, who does sit under the umbrella of the Hearing

1    Conservation Program, their job was focused only on civilians

2    because they were monitoring -- you know, if you had a civilian

3    working in an office or a more industrial but kind of civilian

4    setting, would they be exposed to noise levels that were above

5    and beyond the safe levels dictated by OSHA, for example.

6         So, for example, we did not take the depositions of

7    the base industrial hygienist because those were relevant to

8    civilian employees on the bases.  But the Hearing Conservation

9    Program itself, while it has shifted in some ways based off of

10   the invention of the Combat Arms Earplug, the basic tenets have

11   always applied to individuals in the military.

12        This is part of why we actually think this is an

13   appropriate area for experts to look at what the regulations

14   apply, how do they apply to this specific plaintiff, because it

15   is more complicated than it first suggests.  But their core

16   opinion is that the military is required to select the hearing

17   protection device, fit the hearing protection device, train

18   them on it, and make sure that their environments in which it

19   can be effective, those are part of the Hearing Conservation

20   Program.  And when they're tied specifically to Hacker, Keefer,

21   and Estes, those specific opinions, that's what's being focused

22   on by our experts and what's in their expert report.

23        **JUDGE RODGERS:**  Well, why is expert testimony

24   necessary for that?  Let me take it to a different question.

25        These are not complicated regulations.  The pamphlet

1    is not complicated.  You need to have a medically trained

2    person to fit these preformed earplugs, or to provide the

3    instruction, you know, in specific instances to fold the flange

4    back if you don't get a proper fit.

5            You're wanting to put on experts who have no military

6    experience, who have no experience with hearing conservation or

7    hearing prevention with soldiers, completely industrial-based,

8    and what you just recognize is a distinction such that you

9    didn't even take the depositions of the industrial hygienists

10   because they were industrial-based.

11           So, what do these two experts add?  How do they fit in

12   this case?

13           **MS. BRANSCOME:**  Honestly, Your Honor, what I just

14   explained to you about the way the regulations overlap and what

15   pieces come -- (inaudible) -- of them, that would be I think

16   ordinarily difficult to send a jury back with the DoD

17   Instructions, the Army pamphlets, the special texts, and hope

18   that they could review those as exhibits, which I'm not even

19   sure would be admissible because they are regulations, and let

20   a jury sort out whether those standards were met for the three

21   specific plaintiffs in this case.

22           I think the issue --

23           **JUDGE RODGERS:**  Well, the standards that -- you've

24   only identified two standards.  One I have granted summary

25   judgment on for the Plaintiffs yesterday.  So it's two

1    standards.  It was the failure to ensure that a medically

2    trained person fit these plaintiffs with the CAEv2, and it was

3    the failure to properly instruct them in the use and wearing of

4    the earplug.

5         **MS. BRANSCOME:**  It's more than that, Your Honor.  So,

6    I understood your ruling in *Estes* was that the monitoring -- so

7    the monitoring for Mr. Estes, there wasn't sufficient, you

8    know, evidence in the order that, you know, that that didn't

9    survive, and so we understand that.  That's the medical

10   monitoring of what was their hearing doing year to year.

11        **JUDGE RODGERS:**  Right.

12        **MS. BRANSCOME:**  Okay.  So -- but the Hearing

13   Conservation Program itself is more complicated than that.

14   It's how does this function, who is responsible for what.

15        And although, you know, I can simplify it down to

16   selecting the hearing protection device, fitting that hearing

17   protection device, instructing the soldiers on how to use the

18   hearing protection device, training them on how to maintain it,

19   and then checking them every year to make sure that it still

20   fits, and then on top of all of those, also taking into account

21   the appropriateness of the selected hearing protection device

22   for the environment in which the soldiers are operating.

23        Those are all more technical than just simply saying

24   that.  And where the expertise comes in, Your Honor, is not in

25   just the experts conveying to the jury what the regulations

1    say, because we get that from a lot of different witnesses --

2         **JUDGE RODGERS:**  You do.

3         **MS. BRANSCOME:**  What's essential is having an expert

4    being able to apply it to the specific plaintiffs in this case,

5    identify where there are shortcomings, and explain the

6    significance of the shortcomings in the context of hearing

7    protection devices.

8         In terms of the expertise, the fact that neither

9    Dr. Neitzel nor Ms. Sahmel served in the military, in our view,

10   does not make them unqualified experts.  We do have individuals

11   who served in the military.  They will be addressing the jury

12   from that perspective.  But both Dr. Neitzel and Ms. Sahmel

13   have substantial experience with hearing conservation.

14        **JUDGE RODGERS:**  But not only did they not serve in the

15   military, they have done no studies of the military.  They

16   don't have any experience at all, not just service in the

17   military.  They don't have any experience with the military.

18        **MS. BRANSCOME:**  Well, but, Your Honor, I would say the

19   standard under _Daubert_ is not that they had to have published

20   on soldiers.  For example, Dr. Neitzel has studied the

21   difficulties and the challenges with using and wearing hearing

22   protection devices and whether or not written instructions are

23   sufficient to train individuals to wear hearing protection

24   devices properly.  He has that expertise.  And what he's going

25   to explain is that, when the military failed to properly

 1    instruct these individual plaintiffs on how to properly wear

 2    their hearing protection devices, that has significance.

 3          Now, the Plaintiffs are going to disagree with that.

 4    But that is in the realm of expert testimony, and it's

 5    certainly something that Dr. Neitzel is qualified to opine

 6    about.

 7          Ms. Sahmel --

 8          **JUDGE RODGERS:**  But you all argued to me in response

 9    to the Plaintiffs' Motion for Summary Judgment saying you

10    needed expert testimony on causation.  You argued to me that no

11    expert testimony was necessary for, you know, a lay jury to

12    understand that, if someone didn't get properly fitted with

13    their earplug and get proper instruction on that and they were

14    exposed to noise, that a jury could conclude that there was a

15    causation between the two, cause and effect between the two.

16          And so, now you're telling me that expert opinion is

17    important on that issue.

18          **MS. BRANSCOME:**  Well, no.  I'm saying that expert

19    opinion -- just to be clear, neither Dr. Neitzel nor Ms. Sahmel

20    give medical causation opinions.  So, what they're talking

21    about is the importance of the different roles that the

22    military plays, which is relevant under both Kentucky law and

23    Georgia law when we get into our affirmative defenses and the

24    allocation of fault.  So, it's what responsibilities did the

25    government have, did they meet those responsibilities, and, if

1    they didn't, what is the effect of that.

2          **JUDGE RODGERS:**  But that's causation testimony.  I

3    mean, you're actually not just walking right up to the line;

4    you're crossing it.

5          **MS. BRANSCOME:**  I would respectfully disagree, Your

6    Honor, and this is why.

7          What Dr. Neitzel and Ms. Sahmel do is they are a piece

8    of the causation story.  So, for example, the ball essentially

9    gets picked up by Dr. House and Dr. Jones, who are the medical

10   experts.

11         What Ms. Sahmel and Dr. Neitzel are doing is

12   explaining the consequences of the failures of the Hearing

13   Conservation Program as applied to these three plaintiffs.

14   They are there to assist the trier of fact, they have the

15   expertise to do it, and they're providing information that is

16   relevant to the allocation of fault and our affirmative

17   defenses.

18         **JUDGE RODGERS:**  So they're going to say so it's more

19   likely than not that Estes didn't have a proper fit because he

20   didn't have a medically trained person teach him how do that?

21   Is that --

22         **MS. BRANSCOME:**  Well, part of it, Your Honor, is also

23   we have the ability, as Defendants, to respond to the

24   Plaintiffs' theories.

25         For example, I'll take Mr. Hacker as an example.  It

1    is the Defendant's view that Mr. Hacker has no noise-induced

2    hearing loss.  And to the extent he has tinnitus, it's caused

3    by his conductive hearing loss or his traumatic brain injury.

4         We think his hearing protective devices have

5    absolutely nothing to do with his medical causation, and our

6    causation experts say that.  But the Plaintiffs' experts come

7    forward, specifically Dr. Arriaga, and they have produced

8    evidence that, if the put the Combat Arms Earplug Version 2

9    into Mr. Hacker's ear, the third flange of the opposite side

10   contacts the tragus, bunches up, and this is somehow proof that

11   the earplug doesn't fit and that it was defective, and it is

12   their theory that this led to Mr. Hacker's tinnitus.

13        We are entitled to challenge that theory.  A core part

14   of the challenge of that theory is that the military had the

15   obligation, under these regulations, to examine Mr. Hacker

16   every year.  They had to fit him with the Combat Arms Earplug

17   Version 2 initially, and they had to check that fit annually.

18             **JUDGE RODGERS:**  Okay.

19             **MS. BRANSCOME:**  If, in fact, the Combat Arms Earplug

20   Version 2 bunches up in Mr. Hacker's ear such that it hits the

21   tragus and it doesn't fit properly, we will be arguing to the

22   jury that that was, in fact, the military's responsibility, and

23   if he had been properly fit and if that is actually a problem

24   with the product, it should have been caught by the military,

25   and it wasn't.

1          Our causation story is still independent of that

2    because we don't think he has noise-induced tinnitus.  But we

3    are entitled to push back on the Plaintiffs' theory.

4          So that's why I say that Dr. Neitzel and Ms. Sahmel

5    occupy a slightly different role in this case.  It is very much

6    connected to the Plaintiffs' theory about each of these three

7    plaintiffs' injury.  And we would get to explain to the trier

8    of fact that, if they find the Plaintiffs' theory credible,

9    then they need to understand the role that the military played

10   in that and the failures of the military and the significance,

11   potentially, of those failures.

12        **JUDGE RODGERS:**  Yeah, the place where you potentially

13   lose me is when you get to "and the significance of that

14   failure."  Because what you're talking about there is effect or

15   cause.

16        First of all, they disavow Ms. Sahmel and Dr. Neitzel

17   making any causation opinion or giving any causation opinion,

18   although I think that's exactly what they do, and I'm not sure

19   I'm going to allow that.

20        **MS. BRANSCOME:**  Understood, Your Honor.  And again,

21   like I said, our causation theories are, in some cases, you

22   know, very much separate from this.  But Dr. Neitzel and

23   Ms. Sahmel help us to put in context a lot of the plaintiff

24   allegations, and that is a place where the expert testimony

25   does assist the trier of fact, and they're both qualified to do

1    it.

2        **JUDGE RODGERS:**  So, if I agree with you that they're

3    qualified and that their opinions are reliable, I'm going --

4    and be thinking about this, you don't need to respond

5    specifically today.  But you have five experts who you propose

6    to speak about the regs and the guidance, the pamphlet.  That

7    is cumulative.  We're not going to hear from five.  We're not

8    going to hear from Neitzel, Sahmel, Tuten, Fallon, and Crawford

9    about these regs and guidance.

10       **MS. BRANSCOME:**  I agree, Your Honor.  We are very

11   mindful of cumulativeness.  We also don't want to be at the end

12   of a five-week trial and boring the jury to tears.

13       This is the reason why Your Honor will see on our

14   witness list we do make distinctions between our will-call and

15   our may-call witnesses.  Dr. Neitzel and Ms. Sahmel are both

16   will-calls because they address different plaintiffs.  So, to

17   cover all three, we will need them in some capacity, but that

18   does not mean they will be duplicative of each other.

19       Tuten and Crawford ended up on the may-call list

20   because we will be mindful of who presents the testimony.  It

21   may depend on availability, you know, sequence of the trial.

22   But we fully understand our obligations not to be cumulative.

23       **JUDGE RODGERS:**  All right.  Thank you for that very

24   helpful explanation.

25       Mr. Sacchet, do you have anything you'd like to say in

1    response, or anyone else for the Plaintiffs?

2            **MR. SACCHET:**  Your Honor, I'm happy to chime in

3    briefly.  To be honest, I think much of what I argued at Friday

4    puts into question even the explanation that Ms. Branscome has

5    given today.  I'm still scratching my head as to, one, 3M

6    concedes in its Motion for Summary Judgment oppositions that

7    these are matters that a lay juror can answer.  3M concedes

8    that Sahmel, Neitzel, and their other experts do not offer

9    causation opinions.

10           If both of those theories are true, I do not

11   understand why any of these experts fit or help this case.

12   Under this Court's prior precedent and Eleventh Circuit *en banc*

13   decision in *Frazier*, they should be excluded, and that's really

14   the end of the story.  3M can't have it both ways.  They either

15   offer an expert opinion that's helpful or they say that they

16   are not offering expert opinions because these are factual

17   matters and that's it.  And that's what they said in their

18   Motion for Summary Judgment, so it's done.

19           **JUDGE RODGERS:**  Why is it not helpful for them to

20   opine about -- not both of them, but about the regulations, the

21   components of a proper and effective Hearing Conservation

22   Program and how they view the Army's as deficient and stop

23   there?

24           **MR. SACCHET:**  So, my understanding as to testimony

25   from experts as to whether there are these regulations and what

1    they might mean, I read the Court's *Daubert* argument this

2    afternoon, and I understood that that was where the Court was

3    allowing individuals such as Fallon or Tuten or Crawford to

4    offer that type of testimony about there are these regulations,

5    there are these policies, they are in play, they were there,

6    and they stand for safety based on their experience.

7         I don't know why Sahmel and Neitzel need to be layered

8    on top of that based on the cumulativeness concern that Your

9    Honor raised about how many experts need to do that.

10        **JUDGE RODGERS:**  Right.  But if Ms. Branscome is saying

11   Fallon and Tuten may not both be called -- that Sahmel and

12   Neitzel are on their will-call list and Fallon and Tuten on the

13   may-call list.  So let's just say set aside cumulativeness.

14        Why is that not helpful?

15        **MR. SACCHET:**  So I think, based on Your Honor's order

16   this morning, it is helpful, because Your Honor has found that

17   experts should be able to testify about the roles of these

18   regulations and policies within the structure of the Army and

19   what they mean with respect to hearing conservation.

20        I don't think that Sahmel or Neitzel has made any

21   attempt to fill the gap that Your Honor has now pointed out

22   with respect to the Army hearing program and whether those

23   guidelines still apply to the soldiers or not.

24        I understand Ms. Branscome has tried to fill that hole

25   for 3M and those experts, but I'm not aware of any testimony

```
1    from those experts that have done so.
2              So, at the end of the day, I don't think Plaintiffs
3    are disputing that Huston and Eddins and perhaps one 3M expert
4    can testify and allow the jury to understand the backdrop of
5    hearing conservation, but I think that's where the buck stops.
6         JUDGE RODGERS:  So, let me -- you raised a point I
7    wanted to mention to you all.
8              Again, I only have excerpts of Sahmel's and Neitzel's
9    depositions.  I've made requests for other depositions in full,
10   not theirs.
11             But, from the excerpts that we have, Neitzel and
12   Sahmel did not discuss this gap between the 40-501 and the 2008
13   special text or any explanation, really, about the background
14   of this.
15             If it is in her depo or Dr. Neitzel's depo, then I'll
16   ask you to provide that to me.  I don't have it.
17        MR. PIRTLE:  May it please the Court?
18        MS. BRANSCOME:  Yes, Your Honor --
19        JUDGE RODGERS:  Mr. Pirtle is standing.  Just a
20   moment, please.
21        MR. PIRTLE:  I believe it is in Ms. Sahmel's
22   deposition because I believe I used it.  We will provide that
23   text.  And I don't think she took into account this particular
24   special text in her --
25        JUDGE RODGERS:  Oh, no, I know that she does discuss
```

1    the 40-501, the 1998 version, and maybe even the 2015, I'm not

2    sure.  And I'm sure that you talked with her about the DoD --

3    the directive.  But it was just this special text that I didn't

4    see in the excerpts that I have.  But I don't know about the

5    rest of it.  I don't have all of her deposition.

6         **MR. PIRTLE:**  We'll submit that to you.  And in terms

7    of, as far as her testimony being helpful to the jury, she

8    reads into certain regulations things that don't exist in her

9    opinions such as the Army should have kept records of every

10   hearing device ever issued to a soldier.  Now, that's not in

11   either one of these pamphlets.

12        **JUDGE RODGERS:**  Okay.

13        **MR. PIRTLE:**  And that would be a very heavy lift for

14   the Army to try to do that, being most of these folks had

15   various forms of hearing protection, depending on the job and

16   the circumstances.

17        **JUDGE RODGERS:**  Well, I think I addressed in the order

18   on Dr. Crawford's sort of aspirational recommendations for the

19   military.  I think that that might fall in that same category

20   as far as his opinion about personal attenuation ratings and

21   fit testing, so I'll look at that.

22        **MR. PIRTLE:**  We'll supply you with it, Your Honor.

23        **MS. BRANSCOME:**  If I may, Your Honor, on this, the

24   special text is on Ms. Sahmel's reliance list.  I don't recall

25   if Mr. Pirtle asked her about that at her deposition, but that

1    does not mean that she didn't consider it.

2                This is not something that the Plaintiffs had briefed,

3    for example.  To the extent that you need supplemental

4    information, we're happy to do it.  But, you know, Ms. Sahmel

5    has it on her reliance list.  She is familiar with the

6    regulatory structure.

7                I would simply say I don't recall whether Mr. Pirtle

8    chose to ask her about this.  Certainly, I don't recall him

9    asking about it only applying to civilians.  That is not our

10   understanding.

11               And so, there may not be portions of her deposition

12   that directly addressed this, but that does not mean she didn't

13   consider it.  So we can submit her consideration list, if

14   that's helpful to you.

15               **JUDGE RODGERS:**  No, I -- she references it in her

16   report, not in any real detail, but she does reference it.  It

17   was her depo that I didn't see it discussed.

18               And, again, I guess we can end where I started, but

19   it's with the special text and the Chapter 5 on hearing

20   conservation, and it's specifically referring to the program DA

21   pamphlet 40-501, but it does say that it is primarily

22   garrisoned focused at preventing noise-induced hearing loss

23   primarily in industrial-based settings.

24               And so, you know, it says some soldiers did work in

25   industrial-based settings, but hearing conservation efforts are

1    primarily directed at our civilian workforce.

2              I don't think she explained that.

3              **MS. BRANSCOME:**  There are references in the different

4    provisions that very clearly applies to soldiers, so discussion

5    about what hearing protection devices should be worn in combat,

6    for example.

7              So I understand there is some confusion given that

8    there are -- *(inaudible)* -- in industrial settings.  But --

9    *(inaudible)* -- as a whole does show that it applies to

10   soldiers.

11             **JUDGE RODGERS:**  Ms. Branscome, I don't have -- you

12   referenced a supplement or an update to the DoD directive from

13   2010.  I don't have that.  So, if someone could supply that to

14   me, I would appreciate that.

15             **MS. BRANSCOME:**  Of course, Your Honor.

16             **JUDGE RODGERS:**  I think that's all I have.

17             Anyone else have anything?

18             **MR. NOMELLINI:**  Your Honor, I have an update.  We

19   checked with the team.  No authenticity objection to documents

20   we produced natively.  And, if there is anything that needs to

21   be reproduced in another format, we can do that as well.

22             **JUDGE RODGERS:**  Okay.  Well, only if you have an

23   objection, that would be the resolution of that objection would

24   be reproduce it in a format that you're most comfortable with.

25             But thank you for clearing that up.  I certainly do

 1   hope that authenticity of your own documents is not going to be

 2   something that I have to spend time on.

 3           **MR. OVERHOLTZ:**  Your Honor, just a logistics question

 4   for next week.  There were a couple of issues, I think,

 5   outstanding.  The CMC and whether we were going to go forward

 6   with the CMC; and number two, your timing idea for the hearing,

 7   how long we would present the experts.

 8           **JUDGE RODGERS:**  Well, I understood that the CMC was --

 9   I thought we had decided it would not take place.  I may not

10   have entered an order, and I need to do that.  But I think we

11   responded to a question about this and said we would have a

12   brief preconference --

13           **MR. BROCK:**  Like a leadership.

14           **JUDGE RODGERS:**  Right, like a leadership call or

15   moment, we can do that.  We can start that -- really, I have

16   the day set aside for this.  I think I was waiting maybe to

17   hear back from you all on what you thought would be necessary

18   time wise.

19           Is that where we were, Hillary?

20           Have you all thought any more about it?

21           **MR. OVERHOLTZ:**  We're working on that, Your Honor, and

22   we'll be happy to let --

23           **JUDGE RODGERS:**  They're your experts.

24           **MR. OVERHOLTZ:**  Two of them, right.

25           **JUDGE RODGERS:**  Right, and Flamme.

1          **MR. OVERHOLTZ:**  We'll let Your Honor know what we

2     think we'll need for those two right away.

3          **JUDGE RODGERS:**  Right.  And then I can tell you what

4     time we need to get started.

5          I think your two are coming live, Mr. Overholtz; is

6     that right?

7          **MR. OVERHOLTZ:**  That's correct.

8          **JUDGE RODGERS:**  Yours is not, Mr. Brock, is that

9     right, Dr. Flamme?

10          **MR. BROCK:**  Kim, is Dr. Flamme going to be live or

11     video?

12          **MS. BRANSCOME:**  He is not, Your Honor.  He's going to

13     be by video.  He's from Oregon.  But his schedule is flexible.

14     So I think what we can do is work with the Plaintiffs and

15     propose a schedule to Your Honor.  And then, if you would like

16     to make adjustments, obviously we can accommodate that.

17          **JUDGE RODGERS:**  Thank you.  And the examiner will be

18     here?

19          **MR. BROCK:**  Yes.

20          **MR. OVERHOLTZ:**  Yes, Your Honor.

21          **JUDGE RODGERS:**  I just need one for each side.  You're

22     all welcome.  But in terms of travel and your schedules, I just

23     need one for each side that you're comfortable with.

24          So I'll wait to hear from you before I enter that

25     order.

1      **MR. NOMELLINI:**  Your Honor, one final question.  We

2    had a question regarding trial briefs.  There is something in

3    the order relating to trial briefs.  Didn't know if there is

4    anything in particular you were looking for with respect to

5    those, or we could talk to Judge Herndon about that.

6      **JUDGE RODGERS:**  I mean, typically, disputed issues of

7    law that might be outstanding that might be relevant, say, for

8    a motion for judgment as a matter of law.  A lot of times

9    that's been dealt with on summary judgment, but that is usually

10   what that trial brief would be reserved for.

11     **MR. NOMELLINI:**  Understood, Your Honor.  Thank you.

12     **JUDGE RODGERS:**  If you have something more

13   specifically that you can think of that you feel you should

14   address in a trial brief, I'm open to it.  If there is

15   something that's outstanding, again, that wasn't resolved on

16   summary judgment that's still open, maybe you didn't move on it

17   for summary judgment and you want to educate the Court in

18   anticipation of a motion for judgment as a matter of law, that

19   might be appropriate.

20     One thing I haven't heard from you all about from a

21   substantive standpoint is any issue of punitives.  Mr. Brock

22   brought up the mechanical question of bifurcation, but

23   sometimes those trial briefs are addressed to punitive damages.

24     I believe in your stip it speaks to the -- in my order

25   setting trial, it speaks to your trial briefs.  And that's what

1   you're referring to?

2               **MR. NOMELLINI:**  Yes, that's correct.

3               **JUDGE RODGERS:**  So, yeah, you're -- I don't want you

4   to repeat something you've already briefed to me.  But if it's

5   new and it's outstanding and relevant, then, by all means,

6   that's what that's for.

7               **MR. NOMELLINI:**  Thank you, Judge.

8               **JUDGE RODGERS:**  Anyone else, anything?

9               *[No response.]*

10              All right.  Well, this was helpful to me.  I

11  appreciate it.  And I will look forward to seeing you all -- I

12  guess the next time we meet is on Friday.

13              Everyone take care.  Thanks again.

14                 **(Proceedings concluded at 4:09 p.m.)**

15                    --------------------

16  *I certify that the foregoing is a correct transcript from the*
    *record of proceedings in the above-entitled matter.  Any*
17  *redaction of personal data identifiers pursuant to the Judicial*
    *Conference Policy on Privacy are noted within the transcript.*

18

19
    *s/Donna L. Boland*                          *2-15-2021*
20  *Donna L. Boland, RPR, FCRR*                  *Date*
    *Official Court Reporter*

21

22

23

24

25