**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG      )      Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,     )
                                   )      Pensacola, Florida
                                   )      February 19, 2021
                                   )      10:11 a.m.
                                   )
                                   )
_____)

**DAUBERT HEARING**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-303)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*1 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

**A P P E A R A N C E S**

**JUDGE DAVID R. HERNDON** (ret.)
*dave@herndonresolution.com*

**FOR THE PLAINTIFFS:**     Aylstock, Witkin, Kreis & Overholtz, PLLC
                           By:  **BRYAN F. AYLSTOCK**
                                *baylstock@awkolaw.com*

                                **NEIL D. OVERHOLTZ**
                                 *noverholtz@awkolaw.com*

                                **JENNIFER HOEKSTRA**
                                *jhoekstra@awkolaw.com*
                           17 E Main Street, Suite 200
                           Pensacola, Florida  32502

Clark Love & Hutson, GP              Laminack, Pirtle & Martines LLP
By:  **SHELLEY HUTSON**              By:  **THOMAS W. PIRTLE**
    *shutson@triallawfirm.com*           *tomp@lmp-triallaw.com*
440 Louisiana Street, Ste 1600       5020 Montrose Blvd, 9th Floor
Houston, Texas  77002                Houston, Texas  77006


**FOR THE DEFENDANTS:**      Kirkland & Ellis, LLP
                           By:  **ROBERT C. BROCK**
                                *mike.brock@kirkland.com*
                           1301 Pennsylvania Avenue NW
                           Washington, D.C.  20004

                           Dechert, LLP
                           By: **KIMBERLY BRANSCOME**
                                *kimberly.branscome@dechert.com*
                           633 W 5th Street, Suite 4900
                           Los Angeles, California  90071

Kirkland & Ellis, LLP                Moore, Hill & Westmoreland, PA
By:  **MARK J. NOMELLINI**           By: **LARRY HILL**
    *mnomellini@kirkland.com*            *lhill@mhw-law.com*

     **NICHOLAS F. WASDIN**               **HALEY J. VANFLETEREN**
     *nick.wasdin@kirkland.com*           *hvanfleteren@mhw-law.com*
300 N Lasalle                        350 W Cedar Street, Suite 100
Chicago, Illinois  60654             Pensacola, Florida  32502

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | **JUDGE RODGERS:**  Good morning.  We're here for |
| 3 | an evidentiary hearing in the 3M Combat Arms Earplug |
| 4 | Litigation.  This is MDL 2885. |
| 5 | We are here in connection with some of the |
| 6 | expert challenges that have been raised by the parties |
| 7 | in connection with their *Daubert* motions. |
| 8 | I asked for this hearing.  I asked to hear |
| 9 | testimony from three experts specifically -- well, |
| 10 | two, and then the parties were free to choose between |
| 11 | Dr. Flamme or Dr. Stevenson.  I believe I have Dr. |
| 12 | Flamme who is going to testify this morning, followed |
| 13 | by Plaintiffs' experts, David Eddins and Robert |
| 14 | Juneau.  We're going to start with Dr. Flamme. |
| 15 | I see Judge Jones and Judge Herndon are |
| 16 | present.  Good morning.  The attorneys are all present |
| 17 | and accounted for.  The parties are well represented. |
| 18 | I have IT people here as well.  I think we're ready to |
| 19 | get started. |
| 20 | So, Dr. Flamme will start. |
| 21 | Who is going to do the direct examination, |
| 22 | Ms. Branscome? |
| 23 | **MS. BRANSCOME:**  I am, Your Honor. |
| 24 | **JUDGE RODGERS:**  You may proceed. |
| 25 | **MS. BRANSCOME:**  Is it acceptable to the Court |

 1  for me to remove my mask if I'm at the podium?

 2          **JUDGE RODGERS:**  Yes.

 3          **MS. BRANSCOME:**  Thank you, Your Honor.

 4          **JUDGE RODGERS:**  Those are our rules, as well

 5  as any live witness testifying in the courtroom, when

 6  they're at the witness stand, they may remove their

 7  mask as well.

 8          **MS. BRANSCOME:**  Thank you, Your Honor.

 9          **JUDGE RODGERS:**  Dr. Flamme, if you would

10  please rise to be sworn in and raise your right hand.

11      **GREGORY FLAMME, DEFENSE WITNESS, DULY SWORN**

12          **MADAM CLERK SIMMS:**  Be seated, please.

13  Please state your full name and spell your last name

14  for the record.

15          **THE WITNESS:**  My full is name is Gregory Alan

16  Flamme.  The spelling of my last name is F, as in

17  Frank, l-a-m-m-e.

18          **JUDGE RODGERS:**  All right.  I apologize, I

19  was saying Flamme, Dr. Flamme.  I apologize for that.

20          Ms. Branscome, go ahead when you're ready.

21          **MS. BRANSCOME:**  Thank you, Your Honor.

22                  **DIRECT EXAMINATION**

23  BY MS. BRANSCOME:

24  **Q.**  Dr. Flamme, the Court has the benefit of some of

25  your background information from the papers that have

Greg Flamme - Direct/Branscome                    5

1    been filed.  But could you please give the Court an

2    overview of your educational background?

3    **A.**   Yes.  I graduated with a bachelor's degree in

4    communication in 1991.  I practiced for a short time

5    as a hearing instrument specialist, a hearing aid

6    dispenser before entering my master's program from the

7    University of Memphis from which I graduated in 1996.

8        In 1996, after completion of my master's program

9    in audiology, I entered a Ph.D. program in audiology,

10   completed that in 2001, and then moved into

11   postdoctorate studies in epidemiology and

12   biostatistics at the University of Iowa and was in

13   that role until I took a faculty position at the

14   University of Iowa.

15   **Q.**   Dr. Flamme, are you an audiologist?

16   **A.**   Yes, I am.

17   **Q.**   Can you explain to the Court what you did in your

18   professional career from the time that you finished

19   your study until your current employment?

20   **A.**   My primary work was as a faculty member in the

21   university at the University of Iowa as well as at

22   Western Michigan University.  And my roles there

23   involved teaching, research, and service.  Most of my

24   research was focused on the evaluation of hearing

25   impairments, the evaluation of hearing loss prevention

1     programs and hearing loss prevention as well as the

2     epidemiology of hearing loss.

3     **Q.**   Where do you currently work?

4     **A.**   I currently work with a group called Stephenson

5     and Stephenson Research and Consulting.  We go by the

6     acronym SASRAC because that's considerably shorter.

7          And most of our work has to do with research

8     consulting, research tasks, and then, of course, there

9     is some role to be played with respect to expert

10    witness work like this.

11    **Q.**   How did you get involved with your work at SASRAC?

12    **A.**   I began working with the owner of SASRAC, Mark

13    Stephenson, on a research project that we were doing

14    out of Western Michigan University involving the

15    evaluation of audiometric test procedures and the

16    reliability of test procedures as they're applied in

17    occupational audiometry.

18         He and I worked together very well.  And upon his

19    retirement from NIOSH, in which he was my NIOSH

20    project officer through that project, then he and I

21    began discussing the possibility of running a small

22    company.  And when my took a faculty position in

23    Oregon, that gave me the opportunity to join and

24    become part of this company and joined as a senior

25    scientist in this role.

1   **Q.**   Dr. Flamme, the Dr. Mark Stephenson that you just

2   mentioned that you work with at SASRAC, is he your

3   coauthor on the expert reports you have offered in

4   this case?

5   **A.**   Yes, he is.

6   **Q.**   Can you describe -- I know you touched on it a

7   little bit, but can you just describe specifically

8   what work you do as a principal scientist at SASRAC?

9   **A.**   The work that I'm engaged in involves research

10  projects, some of them involving middle ear muscle

11  contractions and damage risk criteria for impulsive

12  noises.  Some of it involves the evaluation of the

13  epidemiology of hearing loss and analyses of large

14  data sets along those lines.

15  **Q.**   During the course of your professional career,

16  have you had the opportunity to work with the

17  Department of Defense?

18  **A.**   Yes.  One of the large projects that we had worked

19  on over a period of years was a project that was

20  housed actually at the U.S. Army Aeromedical Research

21  Lab, which is located at Fort Rucker.

22      My coworkers and I there conducted this study.

23  And during the final portion of that study, which

24  involved fieldwork on a firing range at Fort Rucker, I

25  engaged in and traveled down there for approximately

1    one week a month for over a period of a year.

2    **Q.**   Now, Dr. Flamme, understanding that your expert

3    report touches on a wide variety of issues relevant to

4    this case, do you understand that today you are here

5    to speak specifically about the AHAAH model?

6    **A.**   Yes, I do.

7    **Q.**   And just to lay the groundwork, do you have

8    professional experience using the AHAAH model?

9    **A.**   Yes, I do.

10   **Q.**   Can you explain for the Court what is the AHAAH

11   model?

12   **A.**   The AHAAH model is a mathematical model that is

13   meant to represent the auditory system, the human

14   auditory system.  It began as a model to explain the

15   performance of cats that are exposed to impulsive

16   noise and then was scaled up to humans.  The goal of

17   the model is to take the amount of sound energy that a

18   human might be exposed to and develop a correlation of

19   expectation about what possible harm in the form of

20   temporary changes in hearing sensitivity might be

21   observed.

22   **Q.**   So let me break that down a little bit.  First you

23   mentioned the concept of impulsive noise.  We have

24   some background in that.  But can you just explain in

25   your own words, what is impulsive noise?

1    **A.**   The -- probably the best definition of impulsive

2    noise is a noise that is brief, it is high-level, and

3    frequently it is produced by combustion of chemical

4    agents, small explosions, say, for example, in a

5    firearm, or through the development of a shock wave

6    through another device called a shock tube.

7    **Q.**   And why is it useful to have a mathematical model

8    to study the effect of impulsive noise on the human

9    body?

10   **A.**   The sound levels that we are studying with these

11   sorts of models are quite high.  And it is possible

12   that, if one were to try and conduct this kind of work

13   with a human research volunteer, there would be a

14   chance that those volunteers or the people that are

15   engaged in that study could be harmed in that process.

16        So, in order to properly protect those subjects,

17   you need to do mathematical modeling as a way of --

18   *(inaudible)* -- for that exposure.

19   **Q.**   Okay.  And Dr. Flamme, if you are applying the

20   AHAAH model to study the effect of an impulsive noise,

21   what is the output of the model, meaning what is the

22   unit of measurement that the AHAAH model uses?

23   **A.**   The primary output of the model is something

24   that's been referred to as the auditory damage unit,

25   auditory risk unit, or auditory hazard unit.  But the

1    thing that is most valuable about that is the number

2    of rounds in the case of firearms, how many impulses

3    can you be safely exposed to using those quantities as

4    the basis.

5    **Q.**   And has that been referred to as the allowable

6    number of rounds, or an ANOR for short?

7    **A.**   Yes, that is one of the ways that it's known, yes.

8    **Q.**   Okay.  And, now, is the AHAAH model a damage risk

9    criterion?

10   **A.**   Yes, it is.

11   **Q.**   What does that mean?

12   **A.**   A damage risk criterion is meant to represent or

13   provide an estimate of the relationship between an

14   acoustic exposure -- so in this case the impulsive

15   noise -- and the probability of harm that it might

16   pose to the person that would be exposed to that

17   sound.  So, it is a link between the acoustic exposure

18   and the auditory outcome.

19   **Q.**   Are you familiar with the development of the AHAAH

20   model?

21   **A.**   Yes, I am.

22   **Q.**   Could you explain to the Court when and how the

23   AHAAH model was developed.

24   **A.**   The initial work that gave rise ultimately to the

25   AHAAH model began actually in the early 1970s.  And it

1   started out with a great deal of work that was done

2   with a cat animal model, and that culminated in the

3   first version of an auditory hazard assessment model

4   in 1991.  That was when that was published.

5       Once that work was complete, then the model

6   characteristics, the parameters were transformed

7   upward to the scale of the human, and then it became

8   the auditory hazard assessment algorithm for humans.

9   That was developed and used as early as 1999 and was

10  published in 2007.

11  Q.  You anticipated my next question, which is, has

12  the AHAAH model been the subject of peer-reviewed

13  scientific literature?

14  A.  Yes, it has, multiple times.

15  Q.  Okay.  Prior to the AHAAH model being developed,

16  what method was used by the military as a damage risk

17  criterion?

18  A.  Prior to AHAAH, the damage risk criterion that was

19  used can be referred to as MIL-STD-1474D, a particular

20  section of it.  And that model or that approach has

21  its history established in the late 1960s with a group

22  called CHABA, the Committee on Hearing and

23  Bioacoustics.  Their document was in 1968.

24  Q.  Okay.  Now, let's move forward to the present.

25  Are you familiar with whether or not the military uses

1  the AHAAH model today?

2  **A.**  Yes, I am.

3  **Q.**  Can you explain to the Court how does the military

4  use the AHAAH model and whether that, you know, is

5  different by branches?

6  **A.**  The use of AHAAH in the military is primarily

7  informed by the MIL-STD-1474E, which is a revision of

8  the prior MIL-STD1474D.

9      That was promulgated in 2015, and the AHAAH model

10  was included in that.  And the -- that is a DoD level

11  standard.  And it permits the use of two possible

12  damage risk criterion for impulsive noise.  AHAAH is

13  one of them.  And the Army is compelled -- it is

14  required to use AHAAH for Army-procured materials to

15  be used by Army personnel.

16  **Q.**  Is it also used to conduct health hazard

17  assessments by the Army?

18  **A.**  Yes, it is.

19  **Q.**  Can you explain to the Court what a health hazard

20  assessment is and what information is available about

21  the Army's use of the AHAAH model in that context?

22  **A.**  The health hazard assessments, as I understand

23  them, is an evaluation of the health or the ergonomic

24  limits for a particular piece of military hardware.

25  And the AHAAH model would be used for impulsive noises

1    in this context, but it spans beyond that into other

2    things like air quality as well as continuous noise.

3         Those health hazard assessments are conducted by

4    personnel located at the Aberdeen Proving Ground as

5    part of the Army's public health command, and then

6    they are shared and, as I understand it, moved forward

7    into the training and doctrine command, which is used

8    then to develop limits for training as well as

9    operational aspects of military personnel activities.

10   **Q.**   Dr. Flamme, has the United States military used

11   the AHAAH model in evaluating the Combat Arms Earplug

12   Version 2?

13   **A.**   Yes, it has.

14   **Q.**   In what context?

15   **A.**   It has been used on multiple occasions in this

16   context.  The first use of it that I'm aware of

17   actually took place in 1999 at the time that the

18   Combat Arms Version 2 was first being introduced and

19   considered for use by the military.

20        In addition to that, it has been evaluated in 2012

21   by personnel at the Army Research Lab, and it has --

22   so it has found those uses over the years.

23   **Q.**   Would you agree with the statement that the AHAAH

24   model has been consistently rejected by the U.S. Army

25   medical community as a DRC for hearing conservation

1    programs?

2    **A.**   No, I wouldn't.

3    **Q.**   Why not?

4    **A.**   I wouldn't agree with that.  The -- although there

5    has been discussion and a fair amount of dispute

6    regarding the warned hypothesis in the AHAAH model,

7    that does not imply that the model as a whole has been

8    rejected.

9    **Q.**   Is the United States military the only

10   organization that uses the AHAAH model, to your

11   knowledge?

12   **A.**   No, no, it is not.

13   **Q.**   Could you give the Court some examples of other

14   institutions that use the AHAAH model?

15   **A.**   The AHAAH model has been adopted for use by the

16   Israeli Defense Forces, so it is something that is

17   used in the military.  It has also found use and been

18   identified as one of the leading damage risk criteria

19   for impulsive noises by NIOSH, the National Institute

20   for Occupational Safety and Health, here in the United

21   States.

22   **Q.**   So now I'd like to shift to the use of the AHAAH

23   model in your work in this case, okay?

24   **A.**   Okay.

25   **Q.**   All right.  Can you explain to the Court how you

1    and Dr. Stephenson used the AHAAH model as part of

2    your expert work in this litigation.

3    **A.**   Yes.  We used the AHAAH model as a way of

4    characterizing or explaining the attenuation

5    characteristics that we measured through other means

6    of the Combat Arms Version 2 or the CAEv2 device.

7         The reason why we felt it was necessary and useful

8    to do this is that, in the realm of attenuation

9    measurements, we work very frequently with units,

10   decibels that are difficult for people to understand.

11        For example, 100 decibels plus 100 decibels equals

12   103 decibels.  And that is not a particularly easy

13   concept to deal with.  Likewise, 30 decibels minus 27

14   decibels is 27 decibels.

15        In order to make our report communicate what the

16   attenuation values might mean, we applied the AHAAH

17   model to examine what the difference was in ANORs, or

18   the allowable numbers of rounds, in the open ear and

19   the ear that was occluded with the Combat Arms Version

20   2.

21   **Q.**   So, although the AHAAH model broadly is considered

22   a damage risk criterion, are you using it in this

23   litigation to make any type of determination about

24   causation of injury for a specific plaintiff?

25   **A.**   No, we are not.

1    **Q.**   Okay.  The way in which you and Dr. Stephenson

2    have used the AHAAH model to characterize the

3    performance of a hearing protection device, is that a

4    method of use of the AHAAH model that others have done

5    in the scientific community in the past?

6    **A.**   Yes.  In the 1999 study that had as lead author

7    Joel Kalb, who was one of the developers of AHAAH --

8    he did most of the mathematical modeling -- they

9    tested the Combat Arms Version 2 inside an acoustic

10   test fixture, the predecessor to the one that we used,

11   and evaluated what the allowable number of rounds was.

12        In addition, in 2012 there was a publication

13   prepared again by the Army Research Lab -- Mary Bensel

14   was involved in that -- wherein they also did similar

15   types of measurements.

16   **Q.**   Okay.  Now, you mentioned a few moments ago that

17   there is another mathematical model for evaluating

18   impulsive noise that is mentioned in the DoD

19   regulation.  What is the name of that model?

20   **A.**   That model goes by a couple of different labels.

21   The label that is often used is LIAeq, and then after

22   that there is frequently a time reference, either 100

23   milliseconds or eight hours.

24   **Q.**   When you and Dr. Stephenson were evaluating what

25   model to use to characterize the performance of the

1    Combat Arms Earplug Version 2 in response to impulsive

2    noise, did you consider using the LIAeq, either 8 or

3    100, instead of the AHAAH model?

4    **A.**   We did examine that possibility, and we rejected

5    it.

6    **Q.**   Why is that?

7    **A.**   The LIAeq method is something that was -- that has

8    not been actually subjected to any kind of systematic

9    study or peer review.  It is also something that, as

10   you look into the standard, the MIL-STD-1474E, its

11   characterization of a hearing protector is not

12   something that can be considered reliable.  It is

13   possible to take the same protector in the same

14   waveform and end up with a variety of different

15   answers, which makes it quite difficult to derive a

16   firm conclusion.  And this has been a problem with the

17   LIAeq method and derivatives of it.  It is something

18   that really is a damage risk criterion that is based

19   on a link between, not the signal inside the ear which

20   would be accessible to a hearing protector, but it is

21   outside the ear and the relationship between the

22   signal outside the ear and the ear itself.

23   **Q.**   Can you explain to the Court why, in your view,

24   it's better to use a measurement that is taking a

25   value right at the eardrum, which is what the AHAAH

1    model does, as compared to the LIAeq8 or 100, that

2    takes the measurement from a point in space away from

3    the human ear?

4    **A.**   Well, the simplest answer to that is the purpose

5    of the pinna is that our external ear changes sound.

6    The whole purpose of the pinna, in other words, the

7    external ear to this piece right here, is to funnel

8    sound and its acoustic characteristics.  The ear canal

9    itself changes and provides resonance.  And in order

10   to properly represent the effect of the hearing

11   protector, you need to have a proper way and a stable

12   way of assessing what that impact might be.

13   **Q.**   Is it correct if you were to mathematically model

14   a given impulsive noise, so let's take a specific

15   weapon and a specific hearing loss device and you

16   model it both using the AHAAH model and the LIAeq8,

17   that you might get a difference between the safe

18   allowable number of rounds between the two models?

19   **A.**   Yes, it is.

20   **Q.**   All right.  Does that make either model inherently

21   unreliable for the way in which you have used it in

22   this litigation?

23   **A.**   No, it doesn't.

24   **Q.**   Can you explain why not?

25   **A.**   The differences in absolute numbers across the

```
1    damage risk criteria that are leading right now is a
2    difference of threshold, but it isn't a difference in
3    quality.  All of the damage risk criteria that are out
4    there that are being considered right now really are
5    assessing the same underlying quantity of sound energy
6    as it reaches the inner ear.  They do it more or less
7    directly across the methods, but they're all really
8    measuring the same thing.
9        So they disagree about the actual amount or the
10   allowable number of rounds, but it is easily possible
11   to show that the allowable number of rounds and the
12   relationships between them are quite consistent across
13   the damage risk criteria.
14   Q.  Okay.  So I want to explore --
15            JUDGE RODGERS:  What does that mean in terms
16   of harm?
17            THE WITNESS:  What that means in terms of
18   harm --
19            JUDGE RODGERS:  Risk of harm.  This is a risk
20   model, right?
21            THE WITNESS:  Yes, it is, Your Honor.  The
22   way that it relates to the risk of harm is that,
23   because these are so strongly correlated, the same
24   relative positions are going to be present.
25            In other words, a -- let's just take a
```

1    gunfire or a gunshot, or let's say two gunshots.  By

2    one model of one gunshot is seen as being more harmful

3    in one model, it is also going to be seen as more

4    harmful in another model.  So it still gives you a

5    good impression of the relative positioning of these

6    hazards.  And that is shared across all models, and we

7    have shown that multiple times.

8         **JUDGE RODGERS:**  But what is the difference

9    then?  Because you said the thresholds are different

10   or may be different but the quality is not.  And

11   that's what I'm asking you to explain in terms of risk

12   of harm.

13        **THE WITNESS:**  Uh-huh.  As we characterized it

14   in our report, we presented the attenuation effects of

15   the CAEv2 earplug as a ratio of the allowable number

16   of rounds using AHAAH for the open ear relative to the

17   occluded ear with either the yellow end or with the

18   green end.

19        And that ratio -- because the underlying

20   quantities are strongly related, that ratio can be

21   expected to be consistent across the damage risk

22   criteria that we have.  So it is still providing

23   information about the scale of the benefit that is

24   provided by a given device.

25        I hope that answers your question.

1        **JUDGE RODGERS:**  I think so.  Thank you.

2            Go ahead, Ms. Branscome.

3    **BY MS. BRANSCOME:**

4    **Q.**  I'll see if we can help unpack this a little bit

5    more.  So, if we take -- compare a small arms weapon

6    compared to a heavy artillery weapon, if in both

7    models you were to run those two weapons through the

8    mathematical models, would both models agree on which

9    of those two weapons potentially exposes an individual

10   to more harm?

11   **A.**  Yes, they would agree in the direction of the

12   harm.  I think that is pretty clear.

13   **Q.**  And so, where they would disagree is the number of

14   rounds of each of those weapons that someone could be

15   exposed to; is that fair?

16   **A.**  Yes, that is.

17   **Q.**  All right.  And then, if you were to just take one

18   of the weapons, so let's take a piece of heavy

19   artillery, if you were to look at it in the AHAAH

20   model, let's say an open ear someone could be exposed

21   to one round, but with a hearing protection device

22   they might be able to be exposed to five rounds.

23       If you use the LIAeq8 model, would you see a

24   similar proportion, it just might be 10 rounds versus

25   50 rounds?

1   **A.**   Broadly, that scaling relationship should be

2   present.  Most of the work that I've done has been

3   with small arms, and that relationship has been

4   established.

5   **Q.**   So, for purposes of your expert work in this case,

6   were you looking at the absolute number, meaning how

7   many rounds could be fired safely, or were you simply

8   looking at the change between the number of allowable

9   rounds with an open ear versus what happens when you

10  have the Combat Arms Earplug Version 2 inserted?

11  **A.**   It was the change that we were paying attention

12  to.  The ratio of the allowable number of rounds for

13  the protected or occluded ear relative to the open ear

14  was the way that we were trying to describe what that

15  attenuation was.

16      And again, it was meant to be a demonstration or

17  an approach to make these decibel-type units more

18  useful to people that aren't spending their days in

19  this topic area.

20      **JUDGE RODGERS:**  May I ask a question?  Your

21  explanation, am I right, is based on small arms, the

22  response you just gave to Ms. Branscome?

23      **THE WITNESS:**  The measurements that we took

24  use small arms.  So our report that we were trying to

25  use in the place where we used AHAAH to explain these

1   results was in explaining the attenuation that was

2   provided with the small arms fire.

3          **JUDGE RODGERS:**  But in terms of this

4   explanation about the two different metrics or the

5   DRCs, your explanation about that and the ratio, is

6   that based on small arms?

7          **THE WITNESS:**  The ratios that we presented in

8   our reports are based on the impulsive noises that

9   were recorded with small arms.  So the ratios that we

10  presented were based on that and not with large

11  caliber weapon systems.

12         **JUDGE RODGERS:**  All right.

13         Go ahead, Ms. Branscome.

14  **BY MS. BRANSCOME:**

15  **Q.**  Let me ask it this way, Dr. Flamme.  If you were

16  to have used the LIAeq8 or 100 model as part of your

17  expert analysis in this case instead of the AHAAH

18  model, would your ultimate conclusions have been any

19  different?

20  **A.**  The ultimate conclusions would have been the same.

21  The impression that would have been given the ratios

22  would have actually been considerably higher.

23         As an example, for one of the weapons and weapon

24  conditions that we tested, we ended up showing

25  something on the order of a factor of 300 or a ratio

1   of 300.  In other words, the number of rounds that you

2   could be exposed to with the protected or the occluded

3   ear was 300 times that of the unoccluded ear.  Had we

4   applied the other rule, the LIAeq method, that number

5   would have been something on the order of 500 to 1,000

6   times higher.

7       We decided -- and this is just generally good

8   science -- to take a conservative approach when

9   characterizing the attenuation, and so we applied that

10  here.  The numbers that we're presenting are a low

11  estimate likely of what the protector will do.

12  **Q.**  Okay.  Based on your expertise in the field, Dr.

13  Flamme, is the AHAAH model generally accepted in the

14  scientific community?

15  **A.**  Yes, I think it is.

16  **Q.**  All right.  Now, there have been a few criticisms

17  that have been raised with respect to the AHAAH model

18  and work that needs to be done on the model.

19      Are you familiar, generally, with the criticisms

20  that are out in the published literature, just in the

21  scientific community generally?

22  **A.**  Yes, I am.

23  **Q.**  All right.  And can you explain to the Court what

24  your view is on whether those criticisms actually make

25  the AHAAH model unreliable.

1    **A.**   The primary criticisms, the major ones having to

2    do with the AHAAH model relate to one of the

3    conjectures or one of the possible applications of the

4    AHAAH model called the warned hypothesis.

5        And the warned hypothesis is one in which, if you

6    apply this aspect of the model, you are essentially

7    presuming that two muscles in the middle ear will

8    contract and change the sound characteristics of that

9    middle ear prior to the arrival of the sound.  And

10   that is a an assumption under those analyses.

11       That has been a matter of considerable contention

12   over the years and has been something that many people

13   have criticized, myself included.

14       That particular assumption is not something that

15   our own work has supported, and we don't use that.

16   **Q.**   Okay.  So let me break that down a little bit.  So

17   we've talked about the AHAAH model is present in the

18   DoD regulation 1474E, correct?

19   **A.**   Yes, it is.

20   **Q.**   All right.  Within the AHAAH model, are there two

21   different versions of the model that can be used when

22   dealing with impulsive noise exposures?

23   **A.**   Yes, that's correct.  One could characterize 1474E

24   as actually having three separate damage risk criteria

25   in it -- LIAeq, the warned AHAAH, and the unwarned

 1    AHAAH.  We use the latter.

 2    **Q.**   All right.  So the -- I just want to make sure I'm

 3    understanding this correctly.  So the warned AHAAH

 4    model is the model that is based off of the assumption

 5    that an individual, prior to being exposed to a noise,

 6    so prior to firing a weapon, there is a response in

 7    which their middle ear muscles contract, which

 8    provides an extra level of protection against the

 9    impending sound.  Is that a fair characterization of

10    the warned model?

11    **A.**   Yes, that is the assumption that, prior to the

12    arrival of the acoustic stimulus at the ear, the

13    middle ear muscles will have precontracted.

14    **Q.**   Okay.  And then what is in the unwarned model?

15    **A.**   In the unwarned model, there is an assumption of

16    an acoustic reflex or a reflexive middle ear muscle

17    contraction.

18         That middle ear muscle contraction, like any other

19    kind of -- *(inaudible)* -- is something that would have

20    a lag associated with it -- it wouldn't start right

21    away -- and it wouldn't reach its maturity right away.

22    So, some period after the arrival of the acoustic

23    stimulus, then those contractions will have reached

24    their maturity.  So it is a lagging effect.

25    **Q.**   Okay.  So we've got two different models that also

1   have subparts with respect to middle ear contraction.

2   So, the warned model assumes there is both an early

3   middle ear contraction if someone is anticipating

4   noise, but then also a learned late middle ear

5   contraction that happens with exposure to repetitive

6   noise; is that correct?

7   **A.**   In the warned model -- that's not exactly right.

8   **Q.**   Good, I'm glad I asked.

9   **A.**   In the warned model, the contraction of middle ear

10  muscles is expected to start and reach its maturity or

11  reach its maximum prior to the arrival of the sound

12  and then continue on through the duration of the

13  stimulus.  So there is no second batch of contractions

14  that occurs there; it's just that the contraction

15  happens and reaches its maximum prior to the arrival

16  of the stimulus.

17  **Q.**   All right.  But then, in the unwarned model, there

18  is no assumption that the human body is essentially

19  predicting noise exposure; but if the human body is

20  exposed to multiple impulsive noises, at some point

21  there is a learned response where the middle ear

22  muscles contract.  Is that accurate?

23  **A.**   It is referred to as -- it's complicated, but it

24  is referred to as a reflexive contraction, but there

25  are things that can interfere with it.

1       The key point as regards our work for this
2  litigation is that the reflexive -- this thing that's
3  called the reflexive middle ear muscle contraction is
4  something that happens -- it starts after the impulse
5  arrives and reaches its maturity considerably later.
6  So it has been established, and this idea of a
7  protective acoustic reflex or reflexive contraction is
8  not new with AHAAH.  This is something that goes back
9  to the 1968 standard that I referred to earlier.
10      And, in general, it's been accepted that, for a
11 repeating sound series, so, for example, a three-round
12 burst from a machine gun, that the first shot in that
13 machine gun burst would not have any effect or not be
14 affected at all by the acoustic reflex or the
15 reflexive contraction.  It would be the subsequent
16 ones, the second and third, that might be affected.
17 So, for the first shot, the reflexive contraction
18 plays no role.
19 **Q.**  So, for your analysis in this litigation, which
20 model of AHAAH did you and Dr. Stephenson use?
21 **A.**  We used the unwarned model, which applies no early
22 precontraction of the middle ear muscles, only the
23 reflexive component.
24 **Q.**  Okay.  And given the nature of the reflexive
25 middle ear contraction that's built into the unwarned

1    model, did that play any role in your analysis in this

2    litigation?

3    **A.**   No, because the analyses that we conducted were

4    for single shots at a time.  So, because we did not

5    have a machine gun burst that we were assessing, then

6    there was no opportunity for the reflexive middle ear

7    muscle contraction to play a significant role.

8    **Q.**   So, to the extent there are criticisms of the

9    AHAAH model that relate to the warned response or even

10   the reflexive middle ear muscle contraction, do those

11   criticisms have any bearing on the work you did in

12   this litigation?

13   **A.**   No, they do not.

14           **JUDGE RODGERS:**   Can I ask a question?

15           Doctor, you say you used the AHAAH model,

16   which has two submodels to it, this warned and

17   unwarned.  The warned is based on animal studies -- I

18   believe cat studies.

19           What is the unwarned based on in terms of its

20   scientific support for this reflexive middle ear

21   contraction assumption?

22           **THE WITNESS:**   That is a -- thank you for the

23   opportunity to clarify this, Your Honor.

24           The original development of the AHAAH model,

25   because it is trying to model the physiology of the

1   auditory system, was based on the cat and then scaled

2   up to humans.  And that animal modeling and the

3   scaling to humans is something that applies really, to

4   some degree, to both.

5         The modeling of the early middle ear muscle

6   contractions in the warned hypothesis -- the part that

7   we didn't use -- has been based on some human studies

8   over the years, but it isn't something that, as our

9   own work has shown, is something that becomes a

10   dependable component of protection.

11         The reflexive components in the unwarned

12   model where the middle ear muscles are expected to

13   contract later, those unwarned components have

14   measurements and are based on measurements that were

15   made with humans over the years; some of the earliest

16   ones were in the 1960s, and those have a human basis

17   as well.

18         **JUDGE RODGERS:**  Okay.  So, I guess my next

19   question, since both of these submodels, the warned

20   and the unwarned, are based on certain assumptions

21   that you did not apply in your studies, what is left

22   of AHAAH that -- I mean, it sounds to me -- and again,

23   I'm asking, but it sounds to me like AHAAH, whether

24   you're using the warned or the unwarned model, are

25   based on certain assumptions for it to be an AHAAH

1    criterion.  But you didn't use either of those

2    assumptions.

3         So how do you still call what you did based

4    on AHAAH?  What's left if you don't use either of

5    those two assumptions?

6         **THE WITNESS:**  We processed the results

7    according to the unwarned AHAAH model as it is

8    included in MIL-STD-1474E.  So it was processed

9    without changing any of the characteristics of the

10   model.

11        It is just that, for the unwarned AHAAH,

12   unless you have a series of bursts, so, for example, a

13   series of impulses from a machine gun, that reflexive

14   component that is associated with middle ear muscle

15   contractions, it never takes a role, it is never

16   actually used, no matter how you're involving the

17   application of the model.

18        **JUDGE RODGERS:**  So, is there any

19   peer-reviewed literature or studies on what you all

20   did with the single shot using the unwarned AHAAH?

21        **THE WITNESS:**  Yes, there has been studies

22   that have been conducted.  The AHAAH model was

23   evaluated by the developers, and that was one of the

24   papers that I referred to earlier in 2007 where --

25        **JUDGE RODGERS:**  I'm talking about -- I

1    understand the model itself has been the subject of a

2    great deal of scientific debate.  But in terms of how

3    you used the model, you and Dr. Stephenson, how you

4    all used this model with the single shot, are there

5    studies using it that way with that methodology?

6              **THE WITNESS:**  Ah.  I apologize for not

7    grasping the question.

8              **JUDGE RODGERS:**  My wording, I'm sure.  But do

9    you understand what I'm asking now?

10             **THE WITNESS:**  Yes.  Most studies that have

11   been conducted with AHAAH for the purposes of

12   validation have been done with single shots primarily.

13   So, the application that we put it to is no different

14   from that.  So, we didn't do anything that was out of

15   the norm.  The only thing that we did was just

16   compare, by means of a ratio, the unoccluded to the

17   occluded ear responses.

18             **JUDGE RODGERS:**  So, those similar studies,

19   they, too, then, if they're using the unwarned model,

20   they, too, would have disregarded the assumption of

21   the reflexive middle ear contraction?

22             **THE WITNESS:**  The reflexive middle ear

23   contraction would have played no role in those

24   studies.  That's the nature of them.

25             **JUDGE RODGERS:**  Okay.  And are those studies

1    in your reference materials?  Are they cited?  And

2    they may not be because maybe no one asked you that

3    question, but I guess I'm asking now.

4         **THE WITNESS:**  The analyses that I was

5    referring to or the paper that I was referring to by

6    Price in 2007 was one example where, in the blast

7    overpressure study, those were analyzed one at a time.

8         The work that Joel Kalb did in 1999 actually

9    with the Combat Arms Version 2, that was also analyzed

10   using both the warned and unwarned hypothesis.  So

11   there are multiple places where that has been done.

12        **JUDGE RODGERS:**  Thank you.

13        Ms. Branscome, go ahead.

14        **MS. BRANSCOME:**  And Your Honor, I'm not sure

15   if the Kalb article was in the records submitted to

16   you.  But in our response to the Plaintiffs' *Daubert*

17   motion, the Price 2007 article was.  So that should be

18   part of the current record, and we can confirm on the

19   Kalb article as well.

20        **JUDGE RODGERS:**  All right.

21   **BY MS. BRANSCOME:**

22   **Q.**  So, just to clarify one last time, Dr. Flamme, the

23   way in which you and Dr. Stephenson applied the

24   unwarned AHAAH model, did you make any modifications,

25   did you do anything special to it, or did you just

1   apply it as written?

2   **A.**   We applied it as written.  We made single-shot

3   measures with the occluded ear and the unoccluded ear,

4   and we were using those results to demonstrate, again,

5   illustrate what the value of the attenuation was in

6   terms of the allowable number of rounds.

7   **Q.**   And so, when you were saying earlier that the

8   middle ear reflexive contractions played no role in

9   your analysis, does that just mean the results just

10  wouldn't be different whether that was correct or not

11  because it's a single shot?

12  **A.**   That is correct.

13  **Q.**   Okay.  Now, there has been, obviously, some

14  discussion over the years about needs for additional

15  verification of the AHAAH model and to study it

16  further.

17      In your view, does that suggest the model itself

18  is unreliable?

19  **A.**   No, it doesn't.  We will -- I don't think that

20  we're likely to ever reach a point where we can say

21  that any model is perfect.  But the heart of this

22  model is something that is reliable and it is

23  something that -- and that was a conclusion that has

24  been drawn multiple times by external peer review

25  groups as well.

1          **MS. BRANSCOME:**  Thank you, Dr. Flamme.

2          No more questions for me at this time, Your

3     Honor.

4          **JUDGE RODGERS:**  Thank you.

5          Mr. Pirtle, why don't you go ahead and get

6     started.

7          **MR. PIRTLE:**  May it please the Court and

8     opposing counsel?

9          Your Honor, may I proceed?

10          **JUDGE RODGERS:**  Yes, you may.

11                    **CROSS-EXAMINATION**

12    **BY MR. PIRTLE:**

13    **Q.**  Good morning, Dr. Flamme.  My name is Tom Pirtle.

14    I don't believe we've ever met before.

15    **A.**  I think that's right.  Hello.

16    **Q.**  Hello.  I have some questions for you about the

17    work that you did.

18          First I want to gain an understanding of what you

19    did.  Fair?

20    **A.**  Okay.

21    **Q.**  All right.  You tested two guns, as best I can

22    tell, correct?

23    **A.**  Yes, two guns.

24    **Q.**  You tested one gun that was a bolt action .308

25    gun, correct?

1   **A.**   Yes, that's correct.

2   **Q.**   And you tested one gun which was a .22 Hornet

3   caliber gun, correct?

4   **A.**   That's correct.

5   **Q.**   Did any of the three soldiers that we're

6   representing here use any -- have they testified that

7   they used or were ever exposed to the noise created by

8   those guns?

9          **MS. BRANSCOME:**   I would object, Your Honor.

10   This is outside of the scope of the general

11   reliability of the AHAAH model.  Dr. Flamme did not

12   apply the AHAAH model to any of the specific

13   plaintiffs.

14          **JUDGE RODGERS:**   Right.  And I did indicate,

15   Mr. Pirtle, in my email to you all that -- and I

16   didn't limit it just to the AHAAH model, but I'll

17   quote it, I said I was interested in hearing on the

18   reliability of Drs. Flamme and Stephenson's general

19   causation opinions, including the AHAAH.

20          **MR. PIRTLE:**   Your Honor, if I may be heard

21   for just a second?

22          **JUDGE RODGERS:**   Okay.

23          **MR. PIRTLE:**   What's happened is Dr. Flamme

24   has tested guns and ammunition that these soldiers

25   didn't use.

1          **JUDGE RODGERS:**  Okay.

2          **MR. PIRTLE:**  So, in order to get reliable

3    data out of the model -- and I'm going to go into the

4    model, too -- you have to put reliable data into the

5    model.

6          I won't be longer than about five minutes.

7          **JUDGE RODGERS:**  All right, go ahead.

8    **BY MR. PIRTLE:**

9    **Q.**  Dr. Flamme, is there any testimony that Mr. Estes,

10   Mr. Keefer, or Mr. Hacker used either of the two guns

11   that you tested?

12   **A.**  No.  We did not use military weapons for these

13   analyses.

14         The ammunition that we used with the .308 is

15   actually a 7.62x51mm ammunition.  It is the military

16   M80 ammunition.

17         The barrel length of the gun that we used, the

18   .308, is something that is actually quite similar to

19   the barrel length of military weapons.

20         And for the .22 Hornet, the chamber pressures, in

21   other words, the pressure inside the firing chamber

22   prior to the ejection of the projectile or the bullet,

23   matches up with the 5.56 round that is used in an M-16

24   within about a decibel-and-a-half.

25   **Q.**  All right.  Let me make sure that I understand

1    what you're talking about.  The soldiers have

2    testified that they fired a fully automatic M40

3    machine gun, correct?

4              **MS. BRANSCOME:**  Objection to foundation.

5              **MR. PIRTLE:**  I assume he's read the

6    depositions.

7              **JUDGE RODGERS:**  Ask him if he has.  I don't

8    know if he has.

9    **BY MR. PIRTLE:**

10   **Q.**  Have you read the depositions of the plaintiffs?

11   **A.**  I have read the depositions of Mr. Estes, and I

12   have read the depositions for Mr. Baker, I believe.

13   And you mentioned another name but it wasn't very

14   clear.

15   **Q.**  Mr. Keefer and Mr. Hacker?

16             **MS. BRANSCOME:**  Your Honor, Dr. Flamme didn't

17   offer case-specific opinions in either *Keefer* or

18   *Hacker*.

19             **MR. PIRTLE:**  Okay.  Well, then, I'll stay

20   with *Estes*.

21             **JUDGE RODGERS:**  *Estes*, all right.

22   **BY MR. PIRTLE:**

23   **Q.**  Mr. Estes for sure testified that the .308 round

24   that he fired came from a 240 machine gun, correct?

25   **A.**  I believe there is evidence that I've seen in that

1    case where he fired the M240, yes.

2    **Q.**   And you did not test a machine gun at all, I

3    believe you've already testified about that?

4    **A.**   Yes, we did not test a machine gun.  The purpose

5    of this analysis involving AHAAH, again, was just

6    simply to illustrate the attenuation values provided

7    by the CAEv2.  It was not meant to represent any

8    particular individual's exposures.

9    **Q.**   Well, did you do anything -- by the way, you

10   didn't use military ammunition either, did you?

11   **A.**   The M80 ammunition, that round that we used in the

12   .308 or the 7.62x51mm round, is in fact identical to

13   what the military uses.

14   **Q.**   What did you do to validate that and where can I

15   look at it?

16   **A.**   The exact citation is not something that I have in

17   mind right now, but there is an Army document from

18   1994 that describes the ammunition characteristics for

19   various rounds that are used in the military, and

20   that's what we relied on for that purpose.

21   **Q.**   Okay.  And by the way, so that we have context of

22   what you're talking about, an M80 machine gun is a

23   machine gun that is no longer used and has been

24   obsoleted actually by the M240, correct?

25            **MS. BRANSCOME:**  Objection, foundation.

1    **JUDGE RODGERS:**  Well, he can answer if he

2    knows.  I don't have a jury here.

3    **THE WITNESS:**  When I was referring to the

4    M80, I'm referring to an ammunition round that is

5    designated M80.  I was not referring to a gun.  I was

6    referring to the ammunition.

7    **BY MR. PIRTLE:**

8    **Q.**  Okay.  And you didn't do any type of scientific

9    study to try to validate that; you just looked and

10   said this looks to be the same, and then you put it in

11   a bolt action .308 rifle.  Am I right?

12   **A.**  We compared the specifications for the M80 round,

13   the ammunition that we used was designated as M80, and

14   it matched up with the characteristics from the Army

15   specifications.  So, we did that.

16   **Q.**  Okay.  As far as the .22 Hornet, there is no

17   evidence that Mr. Estes ever fired a .22 Hornet round

18   in his life, correct?

19   **A.**  I don't have any evidence that he fired the .22

20   Hornet.  But once again, that was not the purpose of

21   using AHAAH in our report.

22   **Q.**  And I understand, and we're going to get to AHAAH.

23   But indulge me for just a minute.

24       A .22 Hornet is a varminting round; it's a rimfire

25   round versus a centerfire round.

1    Q.   Do you know enough about the rounds to know that?

2    A.   I'm aware of that.

3    Q.   Do you know what the characteristics of a rimfire

4    round versus a centerfire round is in terms of muzzle

5    velocities or muzzle pressures?

6    A.   The chamber pressures -- as I stated earlier, the

7    chamber pressures for the .22 Hornet match with the

8    chamber pressures of the 5.56x45 NATO round within 1

9    decibel.

10   Q.   What Mr. Estes testified he shot was a 5.56 NATO

11   round in an M4 configuration, correct, AR-15 M4?

12   A.   I know that he fired the M4, that's correct.

13   Q.   And you didn't test that gun, did you?

14   A.   No.  Again, the purpose of this analysis was to

15   take the impulsive peak insertion loss or the IPIL

16   values that we measured and put the attenuation return

17   by those analyses into a form that is more easily

18   understandable.  It was a demonstration.

19   Q.   All right.  Now let's talk about what you actually

20   did.

21        You had a manikin head in a pole barn, correct?

22   A.   Yes, that's correct.

23   Q.   And when I say pole barn, I'm talking about a barn

24   that has metal roof, metal sides, wood poles, and a

25   dirt floor, correct?

1    **A.**    That's correct.

2    **Q.**    And the manikin head itself -- you didn't test

3    this on any humans, you tested it on a manikin head,

4    correct?

5    **A.**    Yes.  It would have been irresponsible to do this

6    kind of testing on humans, especially in the

7    unoccluded ear.

8    **Q.**    I'm not going to criticize you and your

9    responsibility.  This is a manikin head that you

10   inserted the Combat Arms Version 2 into the

11   cylindrical earhole of that manikin head?

12   **A.**    Yes.  That is the standard approach for testing

13   any kind of hearing protector at these levels.

14   **Q.**    Did you have what you call the pinna on the

15   manikin head, or was it off and you just inserted the

16   plug into the metal tube?

17   **A.**    I'm sorry, you were garbled there.  Could you

18   repeat the question?

19   **Q.**    Did you have the earpiece on the manikin or was it

20   off and did you just insert the earplug into the metal

21   tube?

22   **A.**    By "earpiece," I'm not sure what you mean.

23   **Q.**    Were you using a manikin that has an earpiece that

24   can be removed and put back on using screws or some

25   other type of attachment?

1          **MS. BRANSCOME:**  Your Honor, I would object to

2     this continued line of questioning.  The Plaintiffs

3     did not move on the reliability of Dr. Flamme's ATF

4     testing.  They moved on the application of the AHAAH

5     model to the results from the testing and whether the

6     model itself was reliable.  This is outside the bounds

7     of any of their papers.  I understand some foundation,

8     but I think we're getting beyond that point.

9          **JUDGE RODGERS:**  This wasn't part of the

10    challenge that I read.

11         **MR. PIRTLE:**  I understand, Your Honor.  And

12    there was talk during the direct examination about

13    what he did.  And I'm just trying to put some meat on

14    those bones so that the Court understands that he

15    wasn't testing human subjects and that the earplug was

16    placed into basically a metal tube.

17         **MS. BRANSCOME:**  Your Honor, that's not

18    relevant for the AHAAH model.  We didn't get into Dr.

19    Flamme's ATF testing.

20         **JUDGE RODGERS:**  Let me ask Dr. Flamme to

21    answer.  And if it doesn't impact his opinion based on

22    the results of the AHAAH model, then he can tell Mr.

23    Pirtle that.

24         **THE WITNESS:**  I'm sorry, would you repeat the

25    question just so I'm answering the correct one?

1  **BY MR. PIRTLE:**

2  **Q.**  Did you have the -- what I had asked you was did

3  you have the earpiece on the manikin or off and I was

4  explaining that.

5      But what I'm going to is, the earplug was inserted

6  into a metal, cylindrical tube that is perfectly

7  uniform, correct?

8  **A.**  That is not correct.

9  **Q.**  What was in inserted into?

10  **A.**  The device that we used goes by the designation of

11  the 45CB model or type which was manufactured by GRAS

12  Acoustics.

13      The ear canal that is used is an ear canal that

14  has a heater to match human body temperature and it

15  has a cylindrical section of it that is constructed of

16  silicone.  So it is meant to match up with roughly the

17  flesh characteristics to ensure that the measurements

18  that you take are similar to what you would obtain in

19  a human ear.

20  **Q.**  So, if I understand, this was a heated model of

21  the manikin and there was silicone, I guess, on the

22  inside of the metal tube?

23      **MS. BRANSCOME:**  Same objection, Your Honor.

24  None of this has any bearing on the AHAAH model.

25      **MR. PIRTLE:**  I'm just trying to finish.

1        **JUDGE RODGERS:**  I know, Mr. Pirtle, but this

2   was not part of your challenge.

3        **MR. PIRTLE:**  Okay.  Let's go to this, then.

4        **JUDGE RODGERS:**  All right.

5   **BY MR. PIRTLE:**

6   **Q.**  Did I hear you testify that the CAE Version 2 had

7   been tested as early as 1999 using AHAAH?

8   **A.**  That is correct.

9   **Q.**  AHAAH is a computer program, is it not?

10  **A.**  AHAAH is a -- it is expressed as a computer

11  program, but it is a mathematical model that can take

12  the form of a computer program.

13  **Q.**  Well, it is in the form of a computer program and

14  it comes in modules, correct?

15  **A.**  I'm not sure what you mean exactly by "modules."

16  The computer program has taken multiple forms.  It is

17  downloadable as a software package from the Army

18  Research Lab website.

19       So, if that's what you are referring to, it is a

20  self-contained -- expressed as a self-contained

21  software package.

22  **Q.**  Okay, it's software.  What version did you use?

23  **A.**  I believe we used version 2.1.

24  **Q.**  Okay.  Do you know what the difference between

25  version 2.1 and 2.0 is?

1    **A.**   Off the top of my head, I would say my best guess

2    is that it is a hearing protector module, but I would

3    need to actually refer to notes to confirm that.

4    **Q.**   Okay.  CAE Version 2 is a non-linear earplug on

5    the yellow side, correct?

6    **A.**   Yes, that's correct.

7    **Q.**   What is the first module that was available from

8    AHAAH within the computer program that would allow

9    testing of non-linear plugs?

10   **A.**   As I understand it, it is referred to as the

11   Combat Arms Earplug.  It is not specifically

12   designated this way, but I suspect that it is the

13   Combat Arms Version 2 yellow end.  But, again, I would

14   need to open up the software and confirm that.

15   **Q.**   What I'm trying to understand is, when is the

16   first time, to your knowledge, that the Combat Arms

17   Version 2 earplug was inserted into the AHAAH program

18   by Mr. Kalb, by the way, Joel Kalb?

19   **A.**   I don't know what the first time was that Dr. Kalb

20   ran the measurements with the Combat Arms Version 2.

21   But I do know that, in 1999, he was authored on a

22   study that involved the use of a CAEv2 inside a shoot

23   house using this model and calculating allowable

24   numbers of rounds.

25   **Q.**   Isn't it true that the version 2.1 came out in

1    2015 and the CAEv2 data was inserted into the AHAAH

2    model 2.1 in 2015?  And by the way, that is published.

3    **A.**   The hearing protector module that is part of the

4    AHAAH software package, that was, I believe, sent out

5    in 2015.  But the purpose of that hearing protector

6    module is to emulate a hearing protector, not to

7    represent or to replace the possibility of being able

8    to put a hearing protector into a test fixture.  That

9    particular aspect of it has been around for a long

10   time.

11   **Q.**   Well, let me show you a AHAAH Hearing Protection

12   Module Version 2.1 with Level-Dependant Parameters for

13   the Doubled-Ended Combat Arms Earplugs by, among

14   others, Joel Kalb.

15           **MS. BRANSCOME:**  Mr. Pirtle, can I have a copy

16   of the document?

17           **MR. PIRTLE:**  You can.

18           **THE WITNESS:**  Can I see the entire document?

19   I want to make sure that I'm looking at the same

20   thing.

21           Are you able to hear me?

22   **BY MR. PIRTLE:**

23   **Q.**   Yes.

24   **A.**   The whole system went mute.  I just wanted to make

25   sure we hadn't lost the --

1    Q.   We're dropping it into you right now.

2    A.   Thank you.

3         MS. BRANSCOME:   Mr. Pirtle, may I have a

4    copy?

5         MR. PIRTLE:   We're getting it right to you.

6    BY MR. PIRTLE:

7    Q.   Have you had an opportunity to review the

8    document?

9    A.   Yes, I have just received access to it.  I'm

10   saving it, and I'll let you know once I've opened it

11   and given it a look.

12        Okay.

13   Q.   Okay.  Have you looked at it?

14        MS. BRANSCOME:   Mr. Pirtle, I still don't

15   have it.

16   BY MR. PIRTLE:

17   Q.   You see the last page?

18        MR. PIRTLE:   This is Exhibit 22, by my

19   control.  I guess it's going to be our Exhibit 1, Your

20   Honor.

21        JUDGE RODGERS:   Okay.

22   BY MR. PIRTLE:

23   Q.   The last page of the document talks about -- there

24   you go.  Version 2.1 of AHAAH with level-dependant

25   parameters for double-ended Combat Arms Earplug is

1    available for download, and it lists actually the

2    website that you cited, correct?

3    **A.**   I believe that's correct, yes.

4    **Q.**   Now, the AHAAH program actually has to have data

5    in it as to a certain type of -- or an earplug for it

6    to do its analysis, correct?

7    **A.**   No, that's incorrect.

8    **Q.**   Well, it says here Version 2 of the AHAAH

9    level-dependent parameters for double-ended Combat

10   Arms Earplug is available for download, and it's got

11   the user cite, doesn't it, or ARL Army, correct?

12   **A.**   That's what it states.  But the statement that you

13   made is not correct.  It does not need to have hearing

14   protector parameters in order to calculate the --

15   *(inaudible)* -- number of rounds.

16   **Q.**   All right.  And then just to make this record

17   complete, I want to show you Exhibit 21.  This is the

18   published version of the data.

19        Is it true that you don't know what year that came

20   out?

21   **A.**   What year what came out?

22   **Q.**   Version 2.1, was the question.

23   **A.**   Okay.  Yes, this is the 2015 description of the

24   non-linear protector module that was published.  It is

25   -- so that did come out in 2015, yes.

1   **Q.**   Okay.  So, will you also tell me for my reference
2   what 1999 study that you're talking about where this
3   Combat Arms Version 2 was analyzed?  What's the title
4   of it and who is the author?
5   **A.**   The lead author is Joel Kalb.  The second author
6   was Georges Garinther.  The final author is G. Richard
7   Price.  There was a third author in there whose name
8   escapes me at the moment.
9       And the work that was being done, as I understand
10  it, in the 1999 study, was to serve CHPPM, the U.S.
11  Army's Center for Health Promotion and Preventive
12  Medicine, as their evaluation of the safety of the
13  device, of the Combat Arms Version 2.
14  **Q.**   Fair enough.  And you believe that that particular
15  study used AHAAH?
16  **A.**   I know that that study used AHAAH on the CAEv2.
17  **Q.**   On the non-linear end?
18  **A.**   It did not use a hearing protector module.  I
19  believe that I can clarify some things that -- you
20  appear to be describing the hearing protector module
21  as if it is required for accessing the value of a
22  hearing protector.
23      The hearing protector module is actually designed
24  as a way of simulating what a hearing protector --
25  *(inaudible)* -- not simulate what a hearing protector

1   will do.  We're actually inserting it inside the

2   acoustic test fixture so that the hearing protector

3   module is irrelevant to what it is that we did.

4   **Q.**  All right.  Let's move on.  Can you tell me

5   what --

6          **JUDGE RODGERS:**  Is this Plaintiffs' 2?  This

7   is separate from --

8          **MR. PIRTLE:**  It is, it's Plaintiffs' 2.

9          **JUDGE RODGERS:**  That's the 2015 article?

10         **MR. PIRTLE:**  Level-dependent non-linear

11   hearing protector.

12         **JUDGE RODGERS:**  Okay.

13   **BY MR. PIRTLE:**

14   **Q.**  What is the American Institute of Biological

15   Sciences Peer Review of Injury Prevention and

16   Reduction Research Task Area Impulse Noise Injury

17   Model?

18   **A.**  You're citing a title of a document?

19   **Q.**  Yes.

20   **A.**  Can I ask the date of the document?

21   **Q.**  Well, you're on the document -- you're on the

22   panel, it looks like.

23   **A.**  Yes.  The -- I believe what you're referring to is

24   a review that we conducted -- I was one of the

25   panelists -- in 2010.

1    **Q.**   Yes.

2    **A.**   The reason for the clarification is that there was

3    also an American Institute of Biological Sciences

4    review specifically of AHAAH that was dated in 2001.

5    **Q.**   Okay.  And there is also -- okay.

6          Looking at this document, you were on the panel in

7    2010, correct?

8    **A.**   I'd like to actually see the document.  The

9    document that's showing up on the screen is still the

10   Fedele-Kalb hearing protector module.

11          **MR. PIRTLE:**  I'll mark this as Exhibit 3,

12   Control No. 6.

13   **BY MR. PIRTLE:**

14   **Q.**   You're on the first page of the review panel.

15   **A.**   Yes, I have the document open.

16   **Q.**   Okay.  You ready?

17   **A.**   I believe I am.

18   **Q.**   All right.  So, this panel was put together to

19   look at various -- well, in this case, you were

20   looking at AHAAH, correct?

21   **A.**   The charge to the panel, I believe, is described

22   on the first page.  But we evaluated AHAAH as well as

23   other potential damage risk criteria.

24   **Q.**   And you were part of this AHAAH review?

25   **A.**   Yes, that's correct.  Well, it was not just an

1    AHAAH review.  I was part of the panel.

2    **Q.**   If you'll turn to page 10, it's called "AHAAH

3    Model.  Ability to Address MIL-STD Deficiencies."

4        You with me?

5    **A.**   Yes, I can see that.

6    **Q.**   "The AHAAH model, in its current form, does not

7    adequately address all the MIL-STD-1474D deficiencies

8    in its current form."

9        Did I read that correctly?

10   **A.**   That's what's written, yes.

11   **Q.**   And at the time you agreed with that?

12   **A.**   Yes, we agreed with respect to these statements on

13   the AHAAH model.

14   **Q.**   And the last sentence of that paragraph says,

15   "This is the only model that's based entirely on

16   knowledge about the response of the mammalian auditory

17   system to impulse noise."

18       Did I read that correctly?

19   **A.**   That's what's written, yes.

20   **Q.**   Okay.  So I'm clear -- you talked about this on

21   direct.  This model is based on cat ears and a few

22   chinchilla ears, correct?

23   **A.**   No.  I disagree with that statement.

24   **Q.**   Okay.  In what way do you disagree?

25   **A.**   Although the development of the model was done

 1   with cats, the model characteristics have been scaled

 2   to human size.  It has also been evaluated with

 3   chinchillas, but not a few chinchillas.  It was quite

 4   a large database of chinchillas.

 5   Q.   Okay.  So, it was based on cat ears to start with,

 6   and then there's been an evolution where it's been --

 7   where folks like yourself have tried to migrate it to

 8   human ears or make it applicable to human ears?

 9   A.   No, that's not quite right.

10   Q.   Well, tell me what is.

11   A.   The -- it wasn't modified or migrated by people

12   like myself.  It was modified to human scale by the

13   same developers that did the work with the cats.  That

14   was always part of the planned progression of this

15   model.

16   Q.   Okay.  But to start with it was based entirely on

17   knowledge about the response of the cat ears?

18   A.   Yes, that's correct, it was developed on the

19   animal model.

20   Q.   All right.  Going down, "Sufficiency of research

21   continued [sic] on the AHAAH model.  There are

22   multiple key features of the AHAAH model that need

23   studying further.  The effects of metabolic

24   exhaustion."

25        Did I read that correctly?

1  **A.**   Yes, that's written.

2  **Q.**   Metabolic exhaustion is what?

3  **A.**   Metabolic exhaustion relates to the performance of

4  the cells inside the inner ear in response to sounds

5  at lower levels than what the AHAAH model is designed

6  to address.

7  **Q.**   In 2010, you were on a panel that determined this

8  needed to be studied further, correct?

9  **A.**   Yes, that's correct.  It is also important to

10  recognize that, in this 2010 review, we also

11  identified the AHAAH model or some modification of it

12  as the direction that we ought to be going for damage

13  risk criteria.

14  **Q.**   All right.  2) -- what is that word? -- stapes

15  non-linearity.  What is that about?

16  **A.**   The stapes non-linearity.

17  **Q.**   Cats?

18  **A.**   The stapes is one of the middle ear bones, and the

19  non-linearity is something that needed further study.

20  **Q.**   Okay.  "Acoustical consequences of middle ear

21  reflex particularly in the presumed warned and

22  unwarned states."

23       Did I read that correctly?

24  **A.**   Yes, you did.

25  **Q.**   The presumed -- or "particularly in the presumed

1   warned and unwarned states."

2       In the unwarned state, is there a reaction of the

3   middle ear that's built into AHAAH?

4   **A.**   Yes.  As we have described earlier, the unwarned

5   presumption is one where the middle ear muscles will

6   contract later than the arrival of the signal, and

7   that is expected to impact estimates of hazard for,

8   say, the second, third, and successive impulses, say,

9   in a machine gun burst.

10  **Q.**   And in the unwarned state, the middle ear reflex,

11  which is contained within AHAAH, is still accounted

12  for; am I correct?

13  **A.**   Yes, it reaches maturity quite long after -- in

14  the world of impulses, quite long after the arrival of

15  the impulse.  So, if given time and if you have an

16  impulse recording that is long enough, it will act.

17  **Q.**   And it says, "The translation of results from

18  animal studies to predictions of the response of the

19  human ear," correct?

20  **A.**   That's stated, yes.

21  **Q.**   And at the time when y'all were going through this

22  -- turn over to page 11 -- did the panel discuss the

23  issue of extrapolating from cat to human and that that

24  needed more work?

25  **A.**   Yes, that was part of our discussions.

1  Q.   "There is little question that the AHAAH is highly
2  successful in explaining why the acoustic signature of
3  an M-16 assault rifle is, decibel by decibel, more
4  hazardous than the acoustic signature of a howitzer,
5  however there are" --
6           JUDGE RODGERS:  Mr. Pirtle, you've got to
7  slow down.
8           MR. PIRTLE:  I'm sorry.
9           JUDGE RODGERS:  Ms. Boland is not going to be
10  able -- as good as she is, she's not going to be able
11  to keep up with that.
12           MR. PIRTLE:  Just trying to get going.
13           JUDGE RODGERS:  I understand, but I know you
14  want a record.
15           MR. PIRTLE:  I do.
16  BY MR. PIRTLE:
17  Q.   -- "there are questions concerning the
18  extrapolation from cat to human."
19       Did I read that correctly?
20  A.   Yes, that's what's written.
21  Q.   All right.  You had talked about earlier that
22  there was peer-reviewed science regarding AHAAH,
23  correct?
24  A.   Yes.
25  Q.   There is also a lot of science out there that has

1  not been peer-reviewed, correct, on AHAAH?

2  **A.**  Yes.  As with any kind of model, there is

3  considerable work that is presented at publications

4  that are not peer-reviewed or presentations along

5  those lines, so there is always a wealth of --

6  **Q.**  Well, I'm not talking about any model.  I'm

7  talking about this model and what y'all were talking

8  about in 2010.

9      And if you look on page 12 under, "Value and

10  Quantity of AHAAH Model Science Information Products,"

11  it says that, "Work on AHAAH has progressed for

12  decades.  And although there have been some recent

13  peer-reviewed publications describing AHAAH and its

14  relationship with results from humans, e.g., the BOP

15  study" --

16          **JUDGE RODGERS:**  I would like that zoomed in.

17  Can you start over, Mr. Pirtle, please, now that it's

18  highlighted.

19          **MR. PIRTLE:**  Sure.

20  **BY MR. PIRTLE:**

21  **Q.**  "Work on AHAAH has progressed for decades.

22  Although there have been some recent peer-reviewed

23  publications describing AHAAH and its relationship

24  with results from humans, the BOP study, much of the

25  key science information has not been published or has

1   been prepared in the form of non-peer-reviewed white

2   papers available on the developer's website."

3       Did I read that correctly?

4   **A.**   Yes, you did.

5   **Q.**   And the developer being who?

6   **A.**   The Army Research Lab.  The primary person who has

7   been involved in the development and the

8   conceptualization of this is Dick Price.

9   **Q.**   Okay.  And when this paper talks about BOP, that

10  stands for blast overpressure, correct?

11  **A.**   That's correct.

12  **Q.**   And that's a group of studies that were conducted

13  in Albuquerque, New Mexico, chiefly concerning

14  explosions from C-4, correct?

15  **A.**   It is correct that they used C-4.  But the reason

16  for that was not actually to generalize to C-4.  It

17  was actually a mortar simulator that they were trying

18  to generalize to.

19      The purpose of that study was to look at the

20  performance of the human auditory system under a

21  hearing protector for large caliber weapon systems.

22  **Q.**   Well, I'm getting at another point.  C-4, the

23  duration of the explosion is longer than an impulse

24  shot from a gun blast, correct?

25  **A.**   Yes, it would be, unless it's a very small amount

1    of C-4.

2    **Q.**   All right.  And in these studies, what we call

3    Johnson blasts -- you can call it Aberdeen Proving or

4    whatever or Albuquerque -- these were longer duration

5    blasts than, say, an M-16?

6    **A.**   Yes.  The purpose of the study, again, was to look

7    at performance for large caliber weapons.

8    **Q.**   And the model AHAAH has proven itself better at

9    predicting results from longer impulse blasts than

10   short impulses like gunfire, correct?

11   **A.**   The contrast -- no, not exactly.  The contrast

12   that was offered had to do with a comparison between

13   1474D and AHAAH.  So that is more the important

14   contrast.

15   **Q.**   I'm sorry.  Am I right in what I said or wrong?

16   **A.**   I disagree with what you said because the thing

17   that was important was actually that AHAAH performed

18   better than 1474D.

19   **Q.**   Okay.  Continuing on where it says "Panel

20   Recommendations.  The panel is unanimous in its

21   recommendation that a temporary model grounded in

22   mammalian physiology and generalized to humans become

23   the final standard to guide weapons design and

24   establishment of DRC."

25        Did I read that reasonably correct?

1   **A.**   Could we see that on screen, please?

2   **Q.**   It's down in the next section.  We're moving

3   there.

4        Are you with me on "Panel Recommendations"?

5   **A.**   Yes, I can see that.

6   **Q.**   "The panel is unanimous in its recommendation that

7   a temporally based model grounded in mammalian

8   physiology and generalizable to humans become the

9   final standard to guide weapons design and

10  establishment of DRC."

11       Did I read that reasonably corrected?

12  **A.**   Yes, that's what's stated.  What that means is

13  that the AHAAH model or some slight modification to it

14  is the direction that we intend to go for damage risk

15  criteria for the military.

16  **Q.**   Well, what is said with the panel there is,

17  "However, the AHAAH model needs considerable

18  refinement before this can be accomplished.  Research

19  is needed in several areas, as noted above, and this

20  research should be completed before the predictions of

21  the AHAAH model are compared to predictions of the

22  LAcq8 model."

23       Did I read that reasonably correct?

24  **A.**   Yes.  The refinements that we're referring to

25  include primarily the addressing of the warned

1    hypothesis, as we've been describing earlier today.

2    **Q.**  So, this was 2010, and this was a consensus of

3    this group of panelists, including yourself, correct?

4    **A.**  Yes, that's as we stated.

5    **Q.**  I want to show you another paper -- not from 2010.

6        We'll let you have this, too, for your review.

7        Are you familiar with this paper titled, "Human

8    Middle-Ear Muscles Rarely Contract in Anticipation of

9    Acoustic Impulses:  Implications for Hearing Risk

10   Assessments"?

11   **A.**  Just a moment.  Yes, I'm quite familiar with this

12   work.

13   **Q.**  All right.  And this work was published in 2019,

14   correct?

15   **A.**  Yes, it was.

16   **Q.**  I'm almost tempted to say that was last year,

17   based on 2020.  But it was pretty recent, correct?

18   **A.**  You and I are on the same page as far as which was

19   last year.  But, yes, it was published in 2019.

20       **MS. BRANSCOME:**  Mr. Pirtle, which document is

21   this in your numbering?

22       **MR. PIRTLE:**  8.

23       **MS. BRANSCOME:**  Okay, thank you.

24   **BY MR. PIRTLE:**

25   **Q.**  Under the introduction on the second column on the

1    bottom, the author states, "Significant concerns with

2    AHAAH have been raised, many of which were summarized

3    in a peer review by the American Institute of

4    Biological Sciences, AIBS, Whiteman, et al., 2010."

5         Did I read that reasonably correct?

6    **A.**   Yes, that is what's written.

7    **Q.**   Now, that is the document that we were looking at

8    previously, correct?

9    **A.**   I need to review the references, but I suspect

10   that's the case.

11   **Q.**   I'll represent to you it is, if you'll take my

12   representation.

13   **A.**   Okay.

14   **Q.**   And it says in the last -- starting with "Recent

15   studies have focused on investigating specific

16   opponents of sound transmission pathways modeled by

17   AHAAH including responses of the tympanic membrane,

18   ossicular chain motion, and intracochlear pressures

19   while others have focused on updating model parameters

20   and injury estimates validating model results against

21   human exposure data."

22        Second page.  And it goes on to say -- and we'll

23   highlight it -- "These studies have raised issues

24   about the validation efforts of the AHAAH and concerns

25   about the appropriateness of implementing it as a

1    medical standard in any future updated DRC."

2         Did I read that correctly?

3    **A.** Yes, that's what's written.

4    **Q.** What does DRC stand for?

5    **A.** The -- in this application, it stands for damage

6    risk criterion.

7    **Q.** "Medical standard in any damage risk criterion."

8         Can we agree that the AHAAH model has not been

9    used as a medical standard to date?

10   **A.** It has been used as a medical standard *de facto* in

11   the -- in its application to health hazard

12   assessments.

13   **Q.** Oh, let me be very specific with you.  Has it been

14   adopted as a medical standard?

15   **A.** At present, there is no single recognized medical

16   standard for impulsive noises.  The committee -- I'm

17   on this panel that is being handled by the DoD blast

18   office, is actively developing, reviewing, and

19   examining potential damage risk criteria, including

20   AHAAH, for the purpose of DoD-wide acceptance of a --

21   *(inaudible)* -- damage risk criterion.

22   **Q.** Let me see if I can understand you.  Has it been

23   adopted as a medical standard or not as of today?

24   **A.** It is used as a medical standard, and it is used

25   by the Army -- the Army is obligated to use it for

1    that kind of purpose.  The thing that needs to be done

2    and the purpose of this DoD blast office work is to

3    achieve uniformity across all branches of the DoD in

4    order to obtain harmony.

5    **Q.**   Do you remember giving your deposition?

6    **A.**   Yes, I do.

7    **Q.**   And do you remember Mr. Monsour asked you a number

8    of questions?

9    **A.**   I recall him asking me questions, yes.

10           **MR. PIRTLE:**   This is difficult with --

11   impeachment is difficult under these circumstances.

12   How would you like me to proceed?  I can just read it.

13           **JUDGE RODGERS:**   He won't see it on the

14   document camera, I presume, the witness won't; is that

15   right?

16           This is something we're going to have to work

17   out before March 29th.

18           **MR. PIRTLE:**   Well, I'm the guinea pig, looks

19   like, with the documents and the depo.  Let me just

20   ask him --

21   **BY MR. PIRTLE:**

22   **Q.**   Sir, do you remember testifying in your deposition

23   that another reason is that the AHAAH model is

24   currently implemented within the military standard for

25   acquisition that is presently being used, that is the

1    Military Standard 1474E or the echo version of it that

2    was promulgated in 2015?

3              **MS. BRANSCOME:**  I would object to that as

4    improper impeachment.

5              **MR. PIRTLE:**  For sure it is.

6              **JUDGE RODGERS:**  Overruled.  How else is he

7    going to do this?

8              **MS. BRANSCOME:**  I'm just saying --

9              **JUDGE RODGERS:**  You chose to present your

10   witness remotely.  It's cross-examination.  Prior

11   deposition testimony is always fair game.  If you have

12   a better solution --

13             **MS. BRANSCOME:**  Your Honor, I'm not objecting

14   because of the format.  Although I would like to see a

15   copy, that's not why I'm objecting.  I'm objecting

16   because there has not been an inconsistent statement.

17   So it's not about whether the witness can see it or

18   not.  There just actually hasn't been an inconsistent

19   statement, and you can't just testify to what was in

20   the deposition as a form of impeachment.

21             **JUDGE RODGERS:**  I think probably the question

22   should be one designed to clarify use versus adoption

23   of a medical standard.

24             **MR. PIRTLE:**  Okay.

25             **JUDGE RODGERS:**  It seems like you two are not

1    on the same page about that.

2          **MR. PIRTLE:**  Well, let me ask it this way.

3    **BY MR. PIRTLE:**

4    **Q.**  The standard 1474 Echo is used by a part of the

5    Army that does acquisitions, correct, Dr. Flamme?

6    **A.**  It is used by multiple sections of the DoD.  1474

7    Echo, that version is a DoD-wide standard.  And the

8    way that AHAAH is included in that standard is as an

9    option for any branch, so it is up to the particular

10   person that is doing the -- *(inaudible)* -- to choose,

11   with the exception of the Army, which is required to

12   use the AHAAH model.

13        The application of 1474 Echo goes well beyond just

14   simply the procurement aspect of it.  It is also used

15   in the health hazard assessments, and those are done

16   by the public health command, which is part of the

17   medical command.

18   **Q.**  What branch -- where is that at?  Where is that

19   located within the Army?

20   **A.**  Where is -- where is what located within the Army?

21   **Q.**  Are you talking about CHPPM or are you talking

22   about Aberdeen?

23   **A.**  The physical location is Aberdeen where the person

24   who does this work is operating and preparing the

25   hearing sections of the health hazard assessments.  He

1    is part of the Army's public health command.

2    **Q.**   All right.   It is my understanding -- and just

3    correct me if I'm wrong -- and you've testified that

4    the military standard for acquisition -- those were

5    your words, not mine -- that the AHAAH model is used

6    for acquisition.   But it has not been adopted -- and

7    I'm using the word "adopted" specifically -- as a

8    medical standard; is that correct?

9    **A.**   Yes.   As I stated earlier, there is no adopted

10   medical standard.   There has never been an adopted

11   medical standard.   What has happened is 1474, that was

12   only an acquisition standard, has functioned as a *de

13   facto* medical standard while we have been trying to

14   come up with a medical standard.   And that situation

15   has persisted since the 1970s.

16   **Q.**   What is being used as the medical standard today,

17   what version of testing?

18   **A.**   As I understand it, the Army is using AHAAH as the

19   stand-in for the medical standard.   Other branches may

20   be using the alternative of 1474E, which is the LIAeq

21   method, which, again, has never been subjected to

22   study or peer review, unless they elect to choose --

23   or elect to use AHAAH.

24        So, for things that are working their way through

25   the health hazard assessment process, then it is one

1    of the two methods in 1474E that is being used.  So

2    one could refer to that as the utility of it, even

3    though a formal adoption has not taken place.

4    **Q.**   Okay.  The health hazard assessment is part of the

5    acquisition process, isn't it?

6    **A.**   I believe the health hazard assessment has many

7    different uses.

8    **Q.**   But answer my question.

9    **A.**   I'm sorry?

10   **Q.**   Answer my question.  It's part of the acquisition

11   process, isn't it?

12   **A.**   That is one of the uses of it.

13   **Q.**   That's the use you're familiar with, isn't it?

14   **A.**   That is not the only use that I'm familiar with.

15   **Q.**   And one of the problems with AHAAH is that it

16   gives -- and I hate to use this word and I don't want

17   to get called down about it, but sometimes it will get

18   crazy results, depending on what you put in, correct?

19   **A.**   For low-level signals, then it has been shown to

20   provide numbers of auditory hazard units that are

21   quite high.

22   **Q.**   You were involved in what has been called the

23   whistle study, correct?

24   **A.**   I have done studies with whistles.  I'm not sure

25   that -- I'm not sure that I understand exactly how

1    you're referring to it.

2    **Q.**   Sure.  Let me show you Exhibit 4.  We'll go to the

3    second page.  This is part 1.  Go to the next page.

4    This is double-sided on mine.  I guess it will be page

5    3.  Okay.

6         Were you involved in this study?

7    **A.**   Allow me a moment to download the document.  I'm

8    sorry, I'm trying to download the document and it

9    shows that the file does not exist.  Could somebody

10   please reload that?

11   **Q.**   I'm sorry, I can't help you with that.  We'll try

12   to reload it for you.

13   **A.**   That would be great.  Thank you.

14          **MS. BRANSCOME:**  I have it.

15   **BY MR. PIRTLE:**

16   **Q.**   Let me know when you've got it.

17   **A.**   I'm waiting for a reload to show up in the chat

18   window.  I still haven't seen a reload.

19   **Q.**   Try 4A, according to what our technical people are

20   saying.

21   **A.**   Yeah, that's the file.  But when I click on it, it

22   says the file does not exist.

23          **JUDGE RODGERS:**  I'm beginning to rethink my

24   allowing remote witnesses for trial.  This will not

25   work, so you all need to take note of that.

1          **MR. PIRTLE:**  I'm trying.

2          **JUDGE RODGERS:**  I'm not blaming anyone but --

3          **MR. BROCK:**  I think we can work on this.

4          **JUDGE RODGERS:**  Well, you're going to have to

5     because this is not working for the jury.

6          **MR. BROCK:**  It was working well in the

7     deposition process.

8          **JUDGE RODGERS:**  This is not going to work

9     with a jury sitting in the jury box for five weeks.

10    We also have the impeachment issue as well.

11         **MS. BRANSCOME:**  Your Honor, I think we can

12    address the impeachment issue by loading transcripts

13    before witnesses testify, so I think we can handle

14    that pretty easily.

15         Perhaps we can separately meet with the

16    Plaintiffs, because the Plaintiffs have actually

17    directly shared the exhibits with me through Dropbox,

18    and I can pull all of them up.  So I'm wondering if

19    there may just be a different way to manage it.

20         **JUDGE RODGERS:**  I hope so.

21         **MR. PIRTLE:**  We'll work on it.  And the

22    depositions actually worked quite nicely, so I think

23    we can probably come up with something.

24         **JUDGE RODGERS:**  I hope so.  And it may be on

25    our end.  I don't know.  Like I said, I'm not pointing

1   the finger or blaming anyone.  It's just the reality

2   of it is this will not work for a jury trial in March.

3          **MR. PIRTLE:**  Got it.  It's dragging down too

4   much time.

5          Do we have it loaded?

6          **THE WITNESS:**  Yes, I have it.

7   **BY MR. PIRTLE:**

8   **Q.**  Doctor, you were a participant in this study,

9   weren't you?  You're familiar with it?

10  **A.**  Yes, I took part in this project.

11  **Q.**  When is the last time you saw this study?

12  **A.**  The last time I saw this document was quite some

13  time back.  Probably at the time that it was

14  presented.

15  **Q.**  I said "study," not "document."

16  **A.**  Okay.  So the study having to do with referee

17  whistles as it's expressed here, the last time that I

18  paid attention to this particular set of analyses was

19  shortly before or at the time that it was presented.

20  **Q.**  Okay.  So, here is what I understand.  There was a

21  group of researchers, including yourself, who measured

22  the loudness of referee whistles, correct?

23  **A.**  No, that's not correct.

24  **Q.**  All right.  Well, let me see if I can just kind of

25  haggle through it, then.

1    There was a number of referee whistles that were

2  blown.  That's on slide 6, the brands of them are

3  there, 1 through 13?

4  **A.**  Yes, that's correct.

5  **Q.**  All right.  Y'all blew these whistles and took

6  readings; am I correct?

7  **A.**  Yes, we made reportings of the signals.

8  **Q.**  And then you produced charts that showed the

9  results, correct?

10 **A.**  Yes, we processed them and evaluated them in terms

11 of peak pressure, peak sound levels, and then we also

12 plugged these signals into AHAAH.

13 **Q.**  All right.  And then ran them through AHAAH?

14 **A.**  Yes.

15 **Q.**  And then let me see if I can -- look at slide 17.

16 AHAAH permissive exposures, unwarned ear, no

17 protection.  I'll try to pull this one up.

18 **A.**  Thank you.

19 **Q.**  Do you have it in front of you?

20 **A.**  Yes, I do see this.

21 **Q.**  Now --

22 **A.**  Wait a minute.  You're looking at the warned ear

23 or the unwarned ear?

24 **Q.**  Unwarned ear.

25 **A.**  Okay.

1    **Q.**   You with me?

2    **A.**   Yes.

3    **Q.**   All right.  It looks like on the left-hand side

4    there is AHAAH unwarned permissible exposures,

5    correct?

6    **A.**   Yes, that is the vertical axis.

7    **Q.**   And then the horizontal axis are the whistles that

8    were tested, correct?

9    **A.**   That's correct.

10   **Q.**   Now, let's just take, for example, whistle 11.

11   You see that red dot down there?

12   **A.**   For whistle 11 there are 3 dots, yes.

13   **Q.**   And what does the first lowest dot correspond to

14   on the chart?  What does it mean, Doctor?

15   **A.**   That means that, for the whistle blow durations

16   that were used in this study, that this particular

17   signal would be predicted by AHAAH as not having --

18   not allowing any unprotected exposures.

19   **Q.**   Okay.  So, if we're clear, using this AHAAH model

20   and running this data through, this referee's whistle,

21   whistle 11, you could not blow it at all without

22   hearing protection without going over the maximum

23   exposure limit with one blow of the whistle, correct?

24   **A.**   I wouldn't say it as quite that general.  But for

25   the signals and the durations of the tweets from the

1    whistle, that is the general finding.

2    **Q.**  So, these referees who are blowing whistle 11 all

3    ought to have some type of hearing loss at some point

4    in time for not wearing hearing protection, because

5    you can't blow it at all without hearing protection?

6    That's what this AHAAH is saying, correct?

7    **A.**  I don't agree with that statement exactly.

8    Because the purpose of this analysis was to look at

9    and compare low-level performance of AHAAH.  And that

10   is a level of performance that AHAAH was not actually

11   designed to evaluate, so -- *(inaudible)* -- it was not

12   something that was meant to confirm the degree of

13   exposures.

14   **Q.**  Okay.  I'm just -- let me try to understand.  So,

15   if you look at whistle 2, you've got two blows of the

16   whistle, if I'm reading this correctly, before you

17   exceed the maximum allowable limit under AHAAH with

18   that red dot?  Am I reading that right?

19   **A.**  I would state that it would be fewer than five,

20   whether or not -- I think it is 1, 2, 3, 4 -- we have

21   a range of values there, yes.

22   **Q.**  Okay.  And that blue dot indicates that, not only

23   would it -- under AHAAH, not only would this whistle

24   blow exceed the threshold limit for the referee who is

25   actually blowing the whistle, the blue dot indicates

1  bystanders, correct, far mic, or participants in the

2  sporting event?

3  **A.**  No, I wouldn't necessarily make that statement

4  about the far mic.

5  **Q.**  Well, the far mic is not -- how far is the far

6  mic?  Let's just put it that way.  It's not right on

7  top of the referee, correct?

8  **A.**  My recollection is that the far mic was located

9  one meter directly in front of the standing person

10  that was operating the whistle.

11  **Q.**  So, now you're talking about a participant, at

12  least under AHAAH?

13  **A.**  No, that was not what it was meant to represent.

14  **Q.**  Okay.  If someone is 3 foot in front of the

15  referee, wouldn't that normally be a participant in a

16  sporting event?

17  **A.**  No, that was not the purpose of that field mic.

18  The reason why we included the field mic was to

19  account for the sound of fraction characteristics from

20  the whistle to the person's ear.

21  **Q.**  So, let's see if you come to any conclusions here.

22       Go to slide 24.

23       Are these your summary implications?

24  **A.**  I believe those are, yes.

25  **Q.**  First one, "Damage risk criteria vastly disagree

1    on the number of permissible exposure to whistle

2    tweets in this setting."

3         Do you agree with that?

4    A.   That's the statement that we made.

5    Q.   "Bystanders, athletes, spectators, have

6    significant exposure."

7         You had trouble agreeing with me on that point.

8    It's written down here.  Do you agree with it now?

9    A.   I didn't -- what I was trying to clarify when we

10   were talking about the field microphone or the

11   microphone that was approximately one meter in front,

12   is that, in order to establish whether a bystander,

13   whether it's an athlete or a spectator, would have

14   significant exposure, you need to take that field

15   level and then calculate and take into consideration

16   the distance from the person to that spectator.  And

17   that was the problem -- (inaudible).

18        For bystanders that would be within a particular

19   distance, there is a chance that they could have

20   significant exposure that would combine with the

21   amount of sound that they are getting from just being

22   a participant in the sporting event.

23   Q.   Okay.  I think we're saying the same thing; you're

24   just saying it longer.

25        "MIL-STD-1474D is not suitable for DRC for these

1    noises."

2         What is DRC?

3    **A.**   As defined earlier, it is damage risk criterion.

4    **Q.**   Okay.  "AHAAH permissible exposures seem overly

5    conservative."

6         Did I read that correctly?

7    **A.**   That's what we wrote, yes.

8    **Q.**   Overly conservative is a way of saying looks like

9    they may be wrong, correct?

10   **A.**   No, I wouldn't make that statement.  In order to

11   know that it was wrong, you would need to actually

12   correlate the exposure and the predictions for AHAAH

13   to some kind of auditory outcome, and that work has

14   not been done.

15   **Q.**   Well, hold on.  You've got a whistle, whistle 11,

16   it looks like it's over the threshold limit for

17   unprotected hearing with one blow.  And what I'm

18   saying is that's not reasonable, is it?  That's not

19   reasonable, is it?

20   **A.**   The analyses that we were doing for this purpose

21   was to investigate the AHAAH model and its performance

22   for lower level signals that go beneath the level of

23   an impulse.

24        So, to state that it seems overly conservative, I

25   think that's fair statement.  But it is impossible to

1    know, based on the information that we have, whether
2    or not the AHAAH predictions of temporary threshold
3    shift are correct or incorrect.  That hasn't been
4    established.
5    Q.  Well, you didn't inform the manufacturer of the
6    whistle that their whistle was too loud or anything
7    like that after this was done, did you?
8            MS. BRANSCOME:  Objection.  We're beyond the
9    scope at this point.
10           JUDGE RODGERS:  Sustained.
11           Mr. Pirtle, you're actually beyond your time.
12           MR. PIRTLE:  Over?
13           JUDGE RODGERS:  Yes.
14           MR. PIRTLE:  Well, I've got more, but I'll
15   tell you what we'll do, we'll take a break.  And we've
16   had a little technical difficulties.  I'll pass the
17   witness.  I think you get the flavor for it.
18           JUDGE RODGERS:  All right.  I have a question
19   before we let the good doctor go.
20           So, I want to go back to the model, Dr.
21   Flamme.  Where are the studies that show -- well, let
22   me stop.
23           You've testified and it's in your report that
24   the AHAAH model has been scaled to human ears.
25           THE WITNESS:  (Indicating affirmatively.)

1          **JUDGE RODGERS:**  My question is where will I

2    find a study showing how that's been validated?  In

3    other words, showing that it's scientifically reliable

4    to translate from the results of animal studies to

5    predictions about how the human ear is going to

6    respond to impulse noises, where am I going to see the

7    scientific reliability of that?

8          **THE WITNESS:**  The first place that I would

9    look for the description of how that was done would be

10   in the AHAAH user manual and in some of the other

11   materials that were developed by the Army Research Lab

12   to describe that process.

13         **JUDGE RODGERS:**  Are you saying that there

14   were extrapolation studies, I'll call them, done at

15   the Army Research Lab in Aberdeen?

16         **THE WITNESS:**  No.  What I was saying is that,

17   in order to understand the process that they applied,

18   that would be the place to look.  And there are other

19   publications by Dr. Price on that.

20         **JUDGE RODGERS:**  I guess I don't understand.

21   So Dr. Price is the developer of the model?

22         **THE WITNESS:**  Yes, Dr. Price and Dr. Kalb,

23   yes.

24         **JUDGE RODGERS:**  I guess what I'm used to

25   seeing when I'm looking for the ability to

1    scientifically and reliably extrapolate from the

2    results of animal studies to humans, there are studies

3    that do that and show that you can reliably do that

4    and here is why.

5         So, is there anything like that in the

6    research?

7         **THE WITNESS:**  Yes.  The research, when

8    looking at the model as a black box and looking at the

9    predictions of auditory outcomes, which is really the

10   most important aspect of this model, certainly for the

11   purposes of this litigation, you could look into the

12   work that was published in 2007 by Dr. Price.

13        There are two publications or two reports

14   that were prepared by NIOSH, the lead author of

15   William Murphy and colleagues, that looked both at the

16   analysis of the blast overpressure study as well as an

17   analysis having to do with the cross-species transfer

18   to the chinchilla animal model that showed that the

19   AHAAH model did actually a pretty nice job of making

20   that distinction or predicting both permanent

21   threshold shift and performed reasonably well with

22   respect to temporary threshold shift as well.

23        **JUDGE RODGERS:**  If that's so well accepted

24   and established, why did the panel that you served on,

25   the American Institute of Biological Sciences, why did

1    they make the statement that that needed to be done?

2    If it's already been done, why is there a

3    recommendation to do it?

4         **THE WITNESS:**  That work -- the panel that I

5    was on in 2010 was a panel that was -- where we were

6    operating based on the information that was available

7    at the time.

8         **JUDGE RODGERS:**  Right.  But you had the 2007

9    -- the work that you've just referred me to was in the

10   literature at the time this panel made the

11   recommendation, correct?

12        **THE WITNESS:**  Yes, that's correct, and we did

13   review it.

14        The reason for wanting confirmation was that,

15   in order to make sure that -- to get an ideal model

16   that is physiologically based, then you would like to

17   be able to establish a link between the original Kalb

18   model and the transfer characteristics that went to

19   some other mammalian creature.

20        For the human, obviously, you can't do the

21   sorts of work that you can do with an animal model.

22   And that work was being done in the chinchilla study

23   that was just in the process of being released at the

24   time.

25        There has been additional work that has taken

1    place with a modification of AHAAH that was published

2    in 2016, I believe, by some researchers -- Brissi

3    Zagadou was the lead author on that particular paper.

4    And so, that work was actually conducted to look at

5    the transfer functions that they applied.

6            **JUDGE RODGERS:**  The transfer functions of the

7    cat to the chinchilla or the cat to human or the

8    chinchilla to humans?

9            **THE WITNESS:**  I'm sorry, I was not very

10   clear.  It was the transition from cat to human that

11   the Zagadou work was doing for the purposes of --

12           **JUDGE RODGERS:**  I'm sorry, Doctor, where is

13   that in its -- what stage is that in now?

14           **THE WITNESS:**  That was a published manuscript

15   I believe in hearing research.  And there was a

16   response to that work that was also published by the

17   developers of AHAAH shortly after it came out.

18           **JUDGE RODGERS:**  So, if I'm looking for this,

19   what year?

20           **THE WITNESS:**  Oh, sorry.  2016.

21           **JUDGE RODGERS:**  All right.  Thank you.

22           **MR. PIRTLE:**  May I be excused?

23           **JUDGE RODGERS:**  Yes.  Thank you.

24           **MS. BRANSCOME:**  Your Honor, I don't need to

25   ask redirect questions if Your Honor doesn't have any

1    question about it.  But the issue was raised about the

2    availability of the hearing protection device

3    mathematical inserts into AHAAH and them not becoming

4    available until later, and Dr. Flamme said he would

5    like to explain.

6              But if Your Honor doesn't have a question

7    about it, I don't need to revisit it.

8              **JUDGE RODGERS:**  I don't have a question about

9    it.  Thank you.

10             Judge Jones, do you have any questions of Dr.

11   Flamme?

12             **JUDGE JONES:**  Two very straightforward

13   questions.

14             First, Dr. Flamme, about the studies Judge

15   Rodgers was asking about, the studies and the data

16   being translated to humans.

17             You talked about cats and chinchillas.  Are

18   chinchillas used because, physiologically, that's as

19   close to the human auditory anatomy that you can find

20   in an animal?

21             **THE WITNESS:**  Yes, chinchillas have very

22   similar auditory characteristics to humans.  The

23   middle ear on the chinchilla, which is one of the key

24   aspects, actually, of a physiologic model, the middle

25   ear on a chinchilla behaves in much the same way as

1    the human middle ear does.  The hearing sensitivity

2    characteristics are very similar between the

3    chinchilla and the human.

4           There is some difference respect to

5    sensitivity to temporary threshold shift between the

6    human and the chinchilla.  But it is often considered

7    to be one of the better animal models that can be

8    used.

9           I would also like to point out that, even

10   though with AHAAH it is intended to be a physiologic

11   representation in the form of mathematics, the

12   performance of the model as a black box where you're

13   just simply looking at the relationship, the input

14   signal to the auditory outcome, that performance is

15   quite good.

16          It is the details that are sometimes

17   concerning to people that are criticizing the model.

18   And that gets into the matter of the warned hypothesis

19   as well.

20          **JUDGE JONES:**  Thank you.  And then the second

21   question I had, I think this was cleared up.  The use

22   of the AHAAH model, although no medical group has

23   officially approved it, it is used frequently, used by

24   the military, and used in the field for making health

25   hazard assessments, even though it's not officially

1    been approved by any medical organization or board; is

2    that correct?

3            **THE WITNESS:**  Yeah.  It's really important to

4    -- you bring up a very good point.  One would think

5    that there would be a single medical standard that is

6    approved and used DoD-wide for this purpose.  And that

7    has never actually been the case.

8            The standard that is used in medical

9    applications has always been the procurement standard,

10   and that makes sense.  Because, if you're acquiring

11   Army material, it is really important to make sure

12   that, from the time that it is acquired through the

13   time that it is used, that you're applying the same

14   rules.

15           But so far there has been no DoD-approved or

16   DoD-wide approved medical standard.  So that isn't a

17   particular criticism of AHAAH.  It is more of a

18   criticism of the entire state of how -- *(inaudible)* --

19   for impulsive noise is applied.

20           **JUDGE JONES:**  Thank you.

21           **JUDGE RODGERS:**  Judge Herndon, any questions?

22           **JUDGE HERNDON:**  I was concerned about the cat

23   to human extrapolation, but you've covered that, and I

24   appreciate it.

25           **JUDGE RODGERS:**  Dr. Flamme, I have another

1    question based on Judge Jones's first question about

2    the cat and then the chinchilla and the similarities

3    with the chinchilla ear to the human ear in terms of

4    physiologic response.

5            I understand you to have testified that your

6    use of the model disregarded the physiologic reaction

7    of either a cat or a chinchilla in the middle ear to

8    the impulse noise, whether it was sort of over time or

9    if it -- the word I think you used was reflexive in

10   the unwarned model versus immediate and reaching

11   maturity prior to the stimulus in the warned model.

12           So, I guess I'm -- and, look, I don't

13   understand this model like you do, not even close.

14   But I'm wondering, if you disregarded those

15   assumptions which it sounds like the AHAAH model is

16   premised on, what's left?

17           What about the AHAAH model was useful to you

18   if you disregard those assumptions?  And is that

19   scientifically reliable?

20           It sounds like all of the work and the

21   studies have been done on either the warned or the

22   unwarned, and you didn't use either of those, or you

23   used the unwarned but you didn't consider the middle

24   ear reflexive contraction.

25           What's left?

1           **THE WITNESS:**   There are a couple of things.

2    And thank you for the opportunity to clarify this.

3    The aspect of AHAAH that involves middle ear muscle

4    contraction is not actually based on the cats.  Most

5    of the cat work that was done was done with

6    anesthetized cats that were not going to have any kind

7    of middle ear contractions.  And that was for a

8    variety reasons.  Cats' pinnas are very different --

9    the external ears, these are different for a cat,

10   obviously, and there is a different motility there.

11          The implementation of middle ear muscle

12   contractions in AHAAH is based on human data, and it

13   is added into the component of AHAAH that deals with

14   middle ear.

15          And the way that we used AHAAH as a

16   demonstration or an expression of the attenuation

17   provided by this device wasn't actually getting rid of

18   any aspect of the unwarned hypothesis.  It is just

19   that the status of the reflexive contraction doesn't

20   impact our results because we were only looking at

21   single shots at a time.

22          And that is an intended and appropriate use

23   of this model.  So it isn't actually a change in the

24   model that we conducted.  We applied it as intended

25   with a single shot.

1        **JUDGE RODGERS:**  And you told me that there
2   were similar studies done similar to your use of the
3   model?
4        **THE WITNESS:**  Yes.  Most studies that have
5   been conducted where AHAAH is being used, those
6   studies are conducted primarily on the single shot
7   level, not based on, say, a machine gun burst or
8   Minigun burst where you've got impulses coming in very
9   quick succession.
10       So, the status of the middle ear and the
11  issues associated with middle ear muscle contractions
12  are irrelevant, really, to the findings that we had
13  when we're trying to take the impulse peak insertion
14  loss measures that we obtained and applying them to
15  just describe what the probable impact of the device
16  is.
17       I would also add that the issues having to do
18  with the whistles would actually lead to an
19  underestimate of the effect of the protector.  Again,
20  we were purposely conservative in these analyses
21  because it's very important to not overstate what a
22  device is going to do.
23       These low-level performance characteristics
24  that they apply to anything can play a role, they play
25  a role to the occluded measures, not to the unoccluded

1    measures.

2           So, our findings don't actually change based

3    on any of the concerns that were identified, as far as

4    I'm aware.

5           **JUDGE RODGERS:**  And why, again -- I have to

6    ask this.  Why, again, then, didn't you use the warned

7    model?  Because I presume that is used -- that would

8    make sense in a single shot scenario.

9           **THE WITNESS:**  The reason why we didn't use

10   the warned model is that we actually conducted the

11   study -- the study that I was referring to earlier

12   that was conducted at Fort Rucker, that was a direct

13   test of the warned hypothesis.  There is another test

14   of the warned hypothesis and that was the Heath Jones

15   article that was put in as an exhibit earlier.  Those

16   studies were intended specifically to evaluate the

17   likelihood that an early contraction can provide any

18   kind of protective role.

19          In the Jones study where they are using laser

20   Doppler vibrometry to monitor the changes in the ear

21   canal, they referred to it as a reflex.  But it's not

22   a reflex if it happens early.  That's why we referred

23   to as a middle ear muscle contraction.

24          But both of those studies, the ones that we

25   led and that led to actual monitoring of the ear while

1  a soldier was firing an M4 rifle and the laser Doppler

2  vibrometry study refuted quite completely the idea

3  that the warned hypothesis should be used.  And we

4  have recommended that people don't use it.  That's why

5  we didn't use it in our case, because it isn't

6  something that should be used.  That doesn't mean

7  that, for the purposes of this litigation, our use for

8  the unwarned model is in any way compromised.

9      **JUDGE RODGERS:**  What study are you referring

10  to where you were critical and actually to the point

11  of recommending that the warned model not be used?

12  What study is that or where is it published?

13      **THE WITNESS:**  That study was published in

14  long form as a tech report for USAARL, and it was

15  published either very late last year or early this

16  year.  And I'm sure we can get you the title of that.

17  But it starts with -- I'm the lead author on it, and

18  the title starts with I think "early middle ear muscle

19  contractions" or something like that.

20      **JUDGE RODGERS:**  All right.  Thank you.

21      I don't have anything else.  I think we're

22  well pastime for stopping with Dr. Flamme.

23      Thank you very much, Dr. Flamme.  You'll be

24  excused at this time.  I appreciate you taking the

25  time to answer all the questions this morning.

 1          **THE WITNESS:**  Thank you for the opportunity.

 2          *[Witness excused.]*

 3          **JUDGE RODGERS:**  We have next Dr. Eddins, is

 4   that correct, Mr. Aylstock?

 5          **MR. AYLSTOCK:**  Yes, Your Honor, he's ready to

 6   proceed.  If I could indulge the Court on a quick

 7   restroom break?

 8          **JUDGE RODGERS:**  All right.  We'll take ten

 9   minutes, return, and get started with him.

10          **MR. AYLSTOCK:**  Yes.  Thank you, Your Honor.

11          *(Recess taken 12:24 p.m. to 12:39 p.m.)*

12          **JUDGE RODGERS:**  Before we get started with

13   the next witness, I would like to request copies of

14   the studies that Dr. Flamme referenced in his

15   testimony, particularly at the end in response to some

16   of my questions.

17          **MS. BRANSCOME:**  Not a problem at all.

18          **JUDGE RODGERS:**  Thank you.

19          Sir, if you would please rise and raise your

20   right hand to be sworn.  Thank you.

21     **DAVID ALAN EDDINS, PLAINTIFF WITNESS, DULY SWORN**

22          **MADAM CLERK SIMMS:**  Be seated.  Please state

23   your full name and spell your last name for the

24   record.

25          **THE WITNESS:**  David Alan Eddins, E-d-d-i-n-s.

1     **JUDGE RODGERS:**  Dr. Eddins, you can remove

2   your mask, if you'd like, while you're on the stand.

3          **THE WITNESS:**  Thank you.

4          **JUDGE RODGERS:**  Bryan, you can, too.

5        **MR. AYLSTOCK:**  Thank you, Judge.

6        **JUDGE RODGERS:**  Mr. Wasdin is standing.

7        **MR. WASDIN:**  Yes, Your Honor.  Would you mind

8   if I sat in the jury box just so I could see the

9   demonstrative aid?

10         **JUDGE RODGERS:**  That's fine, yes.

11        **MR. WASDIN:**  Thank you.

12        **MR. AYLSTOCK:**  May I proceed, Your Honor?

13        **JUDGE RODGERS:**  Yes, you may.

14                **DIRECT EXAMINATION**

15  **BY MR. AYLSTOCK:**

16  **Q.**  My outline here says good morning, but now it's

17  good afternoon.

18  **A.**  Good afternoon.

19  **Q.**  Can you please state your name for the record.

20  **A.**  Sure.  David A. Eddins.

21  **Q.**  Do you understand that you're here today for an

22  evidentiary hearing on the reliability of certain of

23  your expert opinions in this case?

24  **A.**  Yes, I do.

25  **Q.**  Now, you have offered some opinions in this case,

1   correct?

2   **A.**   I have.

3   **Q.**   Will you agree that any opinions that you give

4   today in this court under oath will be given to a

5   reasonable degree of scientific certainty?

6   **A.**   Yes, I do.

7   **Q.**   Now, are you aware of some of the criticisms that

8   the Defendants' experts or the Defendants' lawyers

9   have raised of your opinions in this case?

10   **A.**   I am.

11   **Q.**   Are you prepared to address those criticisms here

12   today?

13   **A.**   Yes.

14        **MR. AYLSTOCK:**   Can we put up the first slide

15   just so we can orient ourselves?

16   **BY MR. AYLSTOCK:**

17   **Q.**   Now, I have identified four different criticisms

18   here, the first being the new earplug you created is

19   materially different than the CAEv2.

20        Do you see that criticism?

21   **A.**   I did before and I will shortly.  Yes.

22   **Q.**   There you go.  Is that a fair criticism, sir?

23   **A.**   No, it is not.

24   **Q.**   The silicon ear replicas you made with Plaintiffs'

25   expert Mr. Juneau are not anatomically correct.

1          Have you seen that criticism?

2    **A.**   Yes, I have.

3    **Q.**   Is that a fair criticism, sir?

4    **A.**   No, it is not.

5    **Q.**   No. 3, ANSI standards say that any form of MIRE

6    testing is not advised to measure the continuous noise

7    attenuation provided by a passive earplug.

8          Is that a fair criticism, sir?

9    **A.**   No, it isn't.

10   **Q.**   And finally, I have seen a criticism that you and

11   your study failed to validate the ear replicas of the

12   ATF.

13        Is that a fair criticism, sir?

14   **A.**   It is not.

15   **Q.**   Let me turn quickly to your background.  I called

16   you doctor.  What kind of doctor are you?

17   **A.**   I have a Ph.D.

18   **Q.**   In what?

19   **A.**   In experimental psychology.

20   **Q.**   Are you also an audiologist?

21   **A.**   I am a clinical audiologist.

22   **Q.**   Have you treated patients in the past?

23   **A.**   I have.

24   **Q.**   And where do you work, sir?

25   **A.**   I currently work at the University of South

1    Florida in Tampa.

2    **Q.**  Could you describe briefly for the Court your

3    education and training.

4    **A.**  Sure.  I have a bachelor's degree from the

5    University of North Carolina in Chapel Hill in speech

6    and hearing sciences.  I have a master's of science

7    from the University of North Carolina in audiology.

8    And I have a Ph.D. in experimental psychology from the

9    University of Florida.

10   **Q.**  Were you a clinical fellow, Dr. Eddins?

11   **A.**  I was.  After my master's degree and prior to my

12   Ph.D., I practiced as a clinical fellow.

13   **Q.**  And where did you do that, sir?

14   **A.**  At the Veterans Administration Medical Center in

15   Long Beach, California.

16   **Q.**  And that would have been in the field of

17   audiology, treating patients?

18   **A.**  Correct.

19   **Q.**  Military veterans?

20   **A.**  Military veterans and sometimes active military at

21   the VA hospital, yes.

22   **Q.**  So, what, if anything, as a fellow there at the VA

23   center in Long Beach did you study?

24   **A.**  Well, I had two roles there.  I had a clinical

25   fellowship, and I had a research position.  And so, I

1    actually did twice as long of a fellowship as one

2    normally does because I split between those two tasks.

3         As a clinical fellow, I practiced audiology and I

4    -- that consisted of diagnostic procedures for

5    diagnosing hearing loss and balance disorders, and

6    then rehabilitation procedures including fitting

7    hearing aids to people who needed hearing aids.

8    **Q.**   Now, your doctorate is in experimental psychology;

9    is that what you said?

10   **A.**   That's correct.

11   **Q.**   Can you describe the relationship between

12   experimental psychology and hearing and audiology?

13   **A.**   Sure.  There are a variety of similarities between

14   psychology and audiology.  An obvious one is that, if

15   you have hearing loss and it's untreated, you have

16   greater cognitive difficulty, and cognitive psychology

17   is within experimental psychology.

18        In my case what's more relevant is experimental

19   psychology focuses on the experimental method,

20   scientific method, and designing and conducting and

21   analyzing data from experiments.

22        On top of that, in experimental psychology a major

23   focus is sensory science, so the five senses, taste,

24   smell, vision, hearing, touch, are within sensory

25   science.

1      And hearing and vision are the two major
2  components of experimental psychology, so I focused on
3  hearing science with a little coursework in vision
4  science as well.
5  **Q.**   So, would it be fair to say that you have a
6  doctorate from the University of Florida in designing
7  studies related to hearing protectors?
8  **A.**   That's correct.
9  **Q.**   Do you have a certificate, sir?
10  **A.**   I do.  I have a certificate of clinical competence
11  in audiology, which is essentially national licensure
12  for practicing audiology.
13  **Q.**   Have you earned any honors?
14  **A.**   A number of honors.  I don't know that we need to
15  go through all of them, but probably my most
16  significant to me anyway is being honored as a fellow
17  of the Acoustical Society of America.
18  **Q.**   Were you also elected as a member of the National
19  Academy of Inventors?
20  **A.**   I was.
21  **Q.**   For what?
22  **A.**   Several inventions both related to hearing
23  enhancement devices, one multi-microphone beam forming
24  array so that multiple users could use a smart
25  assistive listening device.

1           Most recently for a novel treatment of a condition

2     called hyperacusis or hypersensitivity to sound.  That

3     treatment is particularly interesting because we

4     combined an earplug with a hearing aid so that you

5     could protect people from loud and offensive sounds.

6     **Q.**   Do you have patents on any of those?

7     **A.**   Both of those are patented.

8     **Q.**   And after you received your doctorate degree from

9     the University of Florida, just very briefly where did

10    you -- why don't I just skip to the University of

11    South Florida.

12    **A.**   Sure.

13    **Q.**   What's your position there, sir?

14    **A.**   So, I am a full tenured professor at USF in the

15    Department of Communications, Sciences, and Disorders,

16    and the Department of Chemical and Biomedical

17    Engineering.  And I also have an adjunct faculty

18    position at Michigan State University.

19    **Q.**   Can you tell the Court briefly about your research

20    experience and experience in actually designing

21    studies related to hearing loss, hearing protectors,

22    and so forth?

23    **A.**   Sure.  I've been designing studies and conducting

24    them since 1988.  I have focused primarily, especially

25    early on, on the perception of sound, and that's a

1   field called psychoacoustics.  That then evolved into

2   my work dovetailing that with audiology.

3       So I focused a lot of my career on age-related

4   hearing loss and the perceptual and neural bases of

5   age-related hearing loss.  I've also focused on

6   hearing enhancement devices, so hearing aids and other

7   assistive technology.  And much of my work today is a

8   focused on hearing technology and hearing devices,

9   hearing protection devices included.

10      And then, I have a branch of my work that's

11   perception of pathological voice, so people who have

12   laryngeal disorders.  One of the diagnostic criteria

13   and outcome criteria is perception of that, of voice

14   disorders.  So I have married psychoacoustics with

15   speak language pathology and laryngology in advance of

16   that field.

17   **Q.**   Have you conducted academic research on behalf of

18   industry?

19   **A.**   I have.  I have continually had research projects

20   funded from industry since about 2002, and I currently

21   have several projects funded by industry.

22   **Q.**   How about funded by the government, NIH or DoD,

23   for example?

24   **A.**   Yes, I've had -- most of my funding over my career

25   has been from the National Institutes of Health.  I

1    currently have four awards from the National

2    Institutes of Health.  In fact, this week I just got a

3    new $3.1 million five-year grant from NIH.  I've been

4    funded by the National Science Foundation and the

5    Department of Defense to develop technology for

6    treating tinnitus and speech and noise disorders.

7    Q.  Have you authored research publications, or

8    co-authored, that have been peer-reviewed?

9    A.  Yes.  I have over fifty publications in prominent

10   peer-reviewed journals.

11   Q.  What does it mean to be peer-reviewed?

12   A.  Well, it's a process that I engage in a lot.  In

13   terms of a peer-reviewed journal article, you submit

14   your research for publication, and then the editor

15   sends out the article to two, three, or four experts

16   somewhere in the world who are experts in the content

17   area of that.  And they review it, critique it,

18   sometimes request additional information -- almost

19   always request additional information; occasionally

20   they get rejected.

21   Q.  And have you also been a peer reviewer of

22   articles?

23   A.  Regularly throughout my -- since I was a student,

24   both of journal articles, and I also peer-review NIH

25   grants regularly and grants for other funding

1    agencies.

2    **Q.**   And about how many abstracts have you published?

3    **A.**   I should have looked.  Over 150, 175 maybe.

4    **Q.**   And are you an author of a textbook?

5    **A.**   Yes, I authored really the first e-textbook in my

6    field.  It was 2003, and they didn't have things

7    called e-textbooks.  The publisher didn't know what to

8    do with it, and so they printed it on a CD and sold it

9    as a CD.  The title was *Mathematics and Physics For*

10   *Speech and Hearing Sciences*.

11   **Q.**   Have you also been invited to be a lecturer for

12   hearing issues and --

13   **A.**   Yes, I'm regularly invited to lecture in regional

14   venues, national venues, and international venues.

15   **Q.**   And have you presented at those?

16   **A.**   Absolutely.

17   **Q.**   Could you briefly tell the Court your exact title

18   now at the University of South Florida?

19   **A.**   Sure.  I'm professor in communication sciences and

20   disorders.

21   **Q.**   And do you also oversee a lab, a hearing lab at

22   USF?

23   **A.**   I do.

24   **Q.**   And do you mentor doctoral students?

25   **A.**   I mentor both Ph.D. students as well as doctor of

1    audiology students.

2    **Q.**   And do you serve as an associate director of any

3    research?

4    **A.**   Associate director of the Global Center For

5    Hearing and Speech Research, which is at USF.

6    **Q.**   And now let's turn to the research you performed

7    in this case.  What were you asked to do in this case?

8    **A.**   Well, I was asked to consider previous testing

9    related to the Combat Arms Version 2 earplug.  I

10   evaluated that testing.  And I was asked to consider

11   that in the context of the larger body of scientific

12   and medical literature and then asked to design and

13   conduct an independent study of the performance of the

14   Combat Arms Version 2.

15   **Q.**   In that context, did you review the scientific

16   literature related to hearing protectors and

17   specifically the Combat Arms?

18   **A.**   Yes, I did.

19   **Q.**   And is that something, in the course of your

20   career, you regularly do when designing studies to

21   answer questions about a particular hearing protector?

22   **A.**   That's certainly part of the process and the

23   scientific method.

24   **Q.**   And you mentioned some documents.  Did you also

25   review some internal 3M documents?

1  **A.**   Yes, I reviewed a number of internal 3M documents.

2  **Q.**   And is that part of what you relied upon to design

3  the study and form the basis of your opinion in this

4  case?

5  **A.**   Indeed it was.

6  **Q.**   Now, were you asked to, as well as review stuff,

7  conduct independent new research on the Combat Arms

8  Version 2?

9  **A.**   Yes, that was my primary charge.

10  **Q.**   Now, briefly -- and I know our focus here is the

11  MIRE testing.  What type of research were -- well, let

12  me ask you this:

13      After reviewing the scientific literature and the

14  internal documents, did you create some study -- a

15  protocol to answer certain questions about the Combat

16  Arms Version 2?

17  **A.**   Yes, I did.

18  **Q.**   And that's your creation?

19  **A.**   It is.

20  **Q.**   So, what did you decide to do based upon your

21  research and review of the internal documents to

22  answer certain questions?

23  **A.**   Sure.  Well, my review of the internal documents

24  indicated what appeared to be substantial individual

25  variability in the performance of the Combat Arms

1    Version 2 earplug, as well as one early study in 2000

2    written by Kieper and Berger indicated that a tester,

3    during a real-ear attenuation at threshold test, a

4    REAT test, could actually visibly observe loosening of

5    the earplug during the REAT test.

6        And so, I wasn't sure of the magnitude of those

7    individual differences, but I felt like that we needed

8    to know more about the magnitude of those individual

9    differences.

10       So, really, that was the core focus of my

11   research, to investigate individual differences in

12   performance using a number of different methodologies

13   to see how those different methodologies converge and

14   to see if they resulted in basically the same answer

15   to the question.

16   **Q.**  Did you approach the questions being asked of you

17   in this case just as if you were doing research funded

18   by the NIH, DoD, or 3M, for that matter?

19   **A.**  Yes, I did.  In fact I used some of the same

20   techniques that I use in my other research.

21   **Q.**  Did you base your study design on multiple

22   peer-reviewed scientific publications?

23   **A.**  Absolutely.

24   **Q.**  And have you used -- in your study methods for

25   this case, have you used those same study methods in

1    your prior research for University of South Florida

2    and other institutions?

3    **A.**   I have used those techniques.

4    **Q.**   In total, how many times would you estimate you've

5    employed the scientific principles and methodologies

6    you used in your *m*MIRE study in other aspects of your

7    research over the years?

8    **A.**   A number of times.  As we'll see in a little bit,

9    if the Court will allow us, I've used MIRE testing on

10   models, including acoustic test fixtures, for years,

11   and it's part of acoustics specifically with respect

12   to hearing devices.

13   **Q.**   Okay.  And were all of those studies based upon

14   reliable methods -- were all of your studies based

15   upon reliable methods and techniques generally

16   accepted in the scientific community?

17   **A.**   Yes.

18   **Q.**   Now, did you help prepare a PowerPoint

19   presentation to assist you in explaining those

20   methods?

21   **A.**   Yeah, I did, on many of the concepts and even

22   terminology that we use.  Much of the terminology is

23   sometimes a little confusing, and it gets into the

24   scientific weeds pretty quick.  So I thought some

25   visuals as well as a PowerPoint would be helpful to

1    explain what we did to the Court.

2    **Q.**   Okay.  Before we get there, what were your goals

3    in performing and designing these experiments that you

4    did for this case?

5    **A.**   Sure.  The real goal, as I mentioned earlier, was

6    to investigate whether or not there were significant

7    individual differences in performance of the Combat

8    Arms Earplug and whether or not those -- if there were

9    any individual differences that were concerning,

10   whether or not those were -- those individual

11   differences had been made public and whether or not

12   users of the Combat Arms Version 2 would know to

13   potentially expect such individual differences.

14   **Q.**  Were your experiments approved by any of your

15   peers?

16   **A.**   Yes.  Any human research is required to be

17   approved by institutional review board.  The FDA

18   requires that.  So all research that involves human

19   subjects must be approved.

20        The University of South Florida has two

21   institutional review boards within the university.

22   And my review board that I used for this particular

23   study was the Biomedical Review Board.

24   **Q.**   Okay.  And in addition to looking at issues

25   related to human safety, as part of that, do they look

1    at the study methods and designs and raise any

2    concerns?

3    **A.**   They do.  So, you prepare an application regarding

4    the study and explain the methods that you're going to

5    use, the scientific need for the study, and

6    importantly, the protections that you have put into

7    place for the human subjects who may be participating

8    in the study.

9    **Q.**   So, is it fair to say that the study protocols and

10   the methodology were peer-reviewed, at least to the

11   extent of this IRB?

12   **A.**   Certainly.

13   **Q.**   And were there any concerns raised by any of your

14   peers sitting on the IRB board?

15   **A.**   No.  Again, the board is made up of faculty

16   members who are physicians and scientists.  And the

17   application undergoes a pre-review prior to a full

18   board review.  And mine passed the full board review

19   without any questions or concerns.  It was approved, I

20   believe, June 16th, 2020.

21   **Q.**   I want to focus, if we could, on the MIRE testing.

22   What does MIRE means?

23   **A.**   MIRE stands for microphone-in-real-ear.

24   **Q.**   And how does one who wants to do research do MIRE

25   testing in humans?

1    **A.**   Well, you literally can put a very small

2    microphone in someone's ear, and that microphone will

3    pick up the sound pressure level in the ear canal.

4    More common is to have the microphone itself outside

5    the ear and connected to that microphone a thin rubber

6    tube called a probe tube, and that probe tube is then

7    put in the ear canal.

8         And we use the probe tube because it's thinner,

9    smaller, lightweight, and more comfortable.  But it's

10   still considered microphone-in-real-ear because the

11   inlet to the microphone is actually in the real ear.

12   **Q.**   Okay.  In your MIRE testing, did you use the

13   actual Combat Arms Version 2 earplug?

14   **A.**   I did not.  The Combat Arms Version 2 earplug, to

15   my knowledge, was never made in a version that's

16   suitable for MIRE testing.  Despite the fact that most

17   commercially available earplugs are made with a

18   special probe in it -- a probe tube in it for MIRE

19   measurements to do fit testing, the Combat Arms,

20   again, to my knowledge, was not produced with a MIRE

21   compatible earplug.

22   **Q.**   So, what did you do?

23   **A.**   Well, I used parts of the Combat Arms Earplug and,

24   where I needed to, I substituted an adapter for the

25   two ends of the Combat Arms Earplug that allowed a

1    probe tube to be inserted through it.

2    **Q.**  Did you bring, for the Court, exemplars of each?

3    **A.**  I did.  I have a set myself that I can show, and I

4    have a set for the judge to see, if you would like it.

5    Those have been sanitized.

6            **MR. AYLSTOCK:**  May I approach, Your Honor?

7            **JUDGE RODGERS:**  Sure.

8            **MR. WASDIN:**  Is there one for me?

9            **MR. AYLSTOCK:**  It's the same one you've got

10   pictures of.

11   **BY MR. AYLSTOCK:**

12   **Q.**  So, can you explain to the judge what she is

13   looking at there, sir?

14   **A.**  Sure.  You're probably familiar with the original

15   Combat Arms that has the inhomogenous olive end, the

16   yellow end, and the adapter in the middle.  And you'll

17   notice the yellow end has a hole through it.  That's

18   the non-linear end of the Combat Arms.

19          So you can take these ends off of the adapter.

20   And what you'll see is the yellow end has a hollow

21   center running through the full length of the adapter

22   -- excuse me, through the full length of the stem.

23   That's the perfect size to thread a probe tube that

24   goes with a MIRE system.

25          And so, what we did was we -- it's also important

1    to note that the olive end and the yellow end are the

2    same size, the same shape, the same weight, the same

3    dimensions, made out of the different material.  The

4    only real differences between them are their color and

5    the fact that the yellow end has a hole running

6    through the center.

7         So, we then printed an analogous adapter with a 3D

8    printer that has a hole running through the center.

9    It's the same length, the same dimensions.  The only

10   difference is it doesn't have the chamber for the

11   non-linear filter.  It has a constant diameter hole

12   through the center.

13        And with that, we could thread a probe tube

14   through a yellow end from the Combat Arms on one side

15   and put a yellow end of the Combat Arms on the other

16   side, and the probe tube would thread through both of

17   those.

18        And as long as we acoustically sealed the opening

19   where the probe tube goes into the lateral -- the

20   outer yellow end, then we had a plug that should

21   functionally work as the olive earplug.  And then we

22   did acoustic matching testing to validate that these

23   two plugs worked comparably.

24             **JUDGE RODGERS:**  Could I ask you to explain

25   that, the acoustic matching testing you did to

1  validate?

2          **THE WITNESS:**  Sure.  And it is coming up --

3          **MR. AYLSTOCK:**  We're actually going to get to

4  that.

5          **JUDGE RODGERS:**  All right, that's fine.

6          **THE WITNESS:**  But I'll definitely go through

7  that, because that's essential for doing probe with a

8  surrogate earplug, which is what ANSI S-12.71 calls

9  this sort of a plug.

10          **JUDGE RODGERS:**  Okay.

11  **BY MR. AYLSTOCK:**

12  **Q.**  Well, let's go to ANSI 12.71 because I want to

13  make sure that there is no suggestion that creating a

14  surrogate plug is somehow not generally accepted.

15      Do the ANSI standards actually contemplate for

16  doing exactly what you did in this case?

17  **A.**  They do.  And as I mentioned, most earplug

18  manufacturers produce a probed earplug, which is a

19  surrogate earplug.  It's not what you use in the field

20  for hearing protection, but it functions as that

21  hearing protector and supports fit testing using MIRE.

22  **Q.**  Are there also published studies that allow for

23  surrogate earplug testing in MIRE?

24  **A.**  There are.  You have one there.  This is by Jeremy

25  Voix and colleagues out of Canada.  And what he's

1    showing in this report is three 3M earplugs.  On the

2    top, the regular earplugs, what a consumer would use

3    in everyday use, and on the bottom the manufacturer

4    produced probed earplugs or surrogate earplugs, as the

5    ANSI standard refers to them.  And presumably the

6    manufacturer has validated that these probed earplugs

7    function as the original ones without a probe.

8         On the far right what you can see is an uncorded

9    UltraFit earplug which has the same stem as what we

10   have on the Combat Arms.

11   **Q.**  I think in the box that the Court has there is an

12   UltraFit stem as well?

13   **A.**  That's correct.

14        In the one I prepared for you, Judge, there is a

15   one with a flange tip on it and one without a flange

16   tip on it so that you could compare the two.

17   **Q.**  It's the one with the little bulbus, more flexible

18   one is the UltraFit; is that correct?

19   **A.**  Yeah, that is.  So you can actually see, if you

20   take the flanges off of it, you can bend the core of

21   that or the adapter, and that assists in getting a

22   good fit when you put the UltraFit into the ear.

23   **Q.**  Have 3M's own scientists done what you did, the

24   same methods with the *h*MIRE?

25   **A.**  Not to my knowledge -- oh, yes, using the

1   methods --

2   **Q.**  Using the methods, not the testing, of course.

3   **A.**  Yes, no.  This is a study published by Kieper --

4   or a report published by Kieper, who is the director

5   of the E-A-RCAL laboratory at --

6   **Q.**  It may be Berger.  I get them confused, too.

7   **A.**  Berger.  Thank you.  Yeah, Elliott Berger.

8   **Q.**  Okay.  And for whom was he conducting the MIRE

9   testing in this test report?

10  **A.**  In this test report, for 3M, presumably.  But it's

11  also a report that's been widely read and is one of

12  the seminal reports sort of advancing the 3M E-A-R Fit

13  technology, which is a MIRE technology for earplugs

14  that they market and sell as a field fitting test

15  system.

16  **Q.**  It looks like Mr. Berger had a picture in his

17  report demonstrating how he performed the human MIRE

18  testing.  Can you describe what's going on there for

19  the Court?

20  **A.**  Sure.  In this case, in the ear is a classic E-A-R

21  foam plug, sometimes called the foamy.  It does have a

22  probe.  The quality of this image is not great.  But

23  the probe tube is mounted in that earplug, and then it

24  comes out of the earplug and loops down and goes up

25  and connects to a microphone port on a microphone that

1   is mounted on a pair of eyeglasses.

2   **Q.**  Okay.

3   **A.**  So the microphone for microphone in the real ear

4   is actually outside the ear, but the probe tube inlet

5   is in the ear and threaded through a hollow center in

6   that E-A-R plug.

7   **Q.**  Why don't -- instead of making a surrogate plug,

8   why don't they just thread that little tube on the

9   outside of the earplug?

10  **A.**  Yeah, that is actually done, unfortunately, in a

11  lot of situations.  But, if you put a probe tube

12  between the earplug and the ear canal, you're inviting

13  additional slit leaks, the ability for sound to travel

14  from outside the ear inside the ear in any little

15  cracks or crevices that you might have that are

16  created by that probe tube being between the ear canal

17  and the earplug itself.  So you could essentially

18  compromise the seal of the earplug by putting the

19  probe tube on the outside.

20  **Q.**  Is that why you created the surrogate plug?

21  **A.**  That's right.  And that's why the ANSI standard

22  recommends that as well.

23  **Q.**  Now, this is another slide with another 3M study.

24  What is this showing the Court?

25  **A.**  This is an updated version of the E-A-R Fit

1   technology from 3M.  It's functionally the same as the
2   previous slide.
3       You see in this case it's an UltraFit earplug.
4   It's positioned in the ear canal properly.  You see
5   the probe tube coming out of it, and then the probe
6   tube is going up into a thicker piece of plastic, and
7   that's where it connects to the microphone used for
8   recording in the ear.
9   Q.  Okay.  Let's go to the next slide.  What is this
10  slide showing the Court?
11  A.  Well, on the left is the original E-A-R Fit
12  system, and on the right is the updated one we just
13  talked about.
14      And then we have those samples of original
15  earplugs and the probed version from -- I believe this
16  was from a Voix '14 publication.
17      And on the bottom right is the MIRE system that we
18  used to evaluate the 3M Combat Arms Version 2 Earplug.
19      And as you can see, it's in a person's ear.  The
20  probe tube is threaded through the hollow center of
21  the yellow ear tips as well as our 3D printed adapter.
22      The tube comes out, and it connects to a metal
23  port on the microphone housing there, which is that
24  big piece of black plastic.
25  Q.  Is there any functional difference between how you

1   performed the *h*MIRE testing and the other depictions

2   here?

3   **A.**   Both tests are measuring the sound pressure level

4   in the ear canal in this case and in these pictures

5   with the earplug present.

6   **Q.**   Let's go to the next slide.  Have there been a

7   number of scientific publications that have used the

8   same technique that you used with the surrogate plug

9   for the Combat Arms?

10  **A.**   Yes.  Each one of the ones that you've displayed

11  here -- unfortunately, we can't read the titles, but

12  each one of these that you've displayed here is

13  specifically using the MIRE technique to evaluate the

14  function of earplugs.

15  **Q.**   And would you agree that that's a generally

16  accepted technique, the same technique you used for

17  your study?

18  **A.**   It is, and it's been used widely in research for

19  decades, less so commercially.  And in the 2000s, it

20  was introduced commercially.  But in research, we have

21  been using it for my entire career.

22          **JUDGE RODGERS:**  Can I ask, do any of these

23  studies reflect a situation where someone independent

24  of the manufacturer manipulates the earplug or creates

25  a simulated earplug for use of the MIRE testing?

1        **THE WITNESS:**  That's a great question.  The

2    earlier studies, it's not clear whether the

3    manufacturer made the earplugs or whether the

4    scientists made the earplugs.  But certainly the later

5    studies, the manufacturers have all made the earplugs.

6        **JUDGE RODGERS:**  All right.  Thank you.

7    BY MR. AYLSTOCK:

8    **Q.**  And in this case, are you aware of 3M making such

9    an earplug?

10   **A.**  They certainly have in other versions, but not for

11   the Combat Arms Version 2.

12   **Q.**  Okay.  So, what did you do -- how did you make

13   that adapter stem that Her Honor has with regard to

14   the -- I'll call it the Eddins surrogate?

15   **A.**  Sure.  Well, the original Combat Arms adapter

16   stem, the specifications were made available to me.

17   Here they're shown on the video.  And this is from a

18   drawing by Doty.  I believe this is 4046-0.  And it

19   has the dimensionality of the adapter stem, all of the

20   dimensions.

21       And so, we put those dimensions into the software

22   that you use when you're 3D printing.  And so, we

23   created essentially that schematic in the 3D printing

24   software and then printed a version of an adapter with

25   a resin plastic, which, when cured, has properties

1    that are similar to the original Combat Arms Version 2

2    stem.

3    **Q.**   What can you tell the Court about the material

4    used in the Combat Arms adapter stem?

5    **A.**   I'm not an expert in the material on this, but it

6    most commonly was a Delrin material.  And the Delrin

7    material is a hard, stiff plastic.  It is not

8    flexible, and my understanding is it has a hardness of

9    about 85 on a Shore D scale for hardness.

10   **Q.**   So, let's talk about the resin you used for the 3D

11   printer to 3D print your surrogate stem adapter to the

12   exact measurements.

13   **A.**   Sure.  We have a 3D printing lab with dozens of 3D

14   printers.  One of them is used for prototyping.  This

15   resin is one of the most common prototyping resins

16   used in 3D printing.  It's from Colorado Photopolymer

17   Solutions, CPS.  It's called PR48.  If you Google

18   PR48, you'll get this company, but also find

19   peer-reviewed research where they are investigating

20   properties of PR48, it's so common.

21       And here, I think we have some statistics from a

22   brochure made by the CPS company.

23       On the far right, what you can see is it lists the

24   Shore hardness as 85 on the D scale.

25   **Q.**   The Court may not be familiar with the Shore

1   hardness scale.  Did you make a slide to kind of help

2   you --

3   **A.**   Yeah.  It's arbitrary and, if you weren't in the

4   field, you wouldn't necessarily know.  But this is a

5   helpful graphic.  There are multiple Shore hardness

6   scales, and they are scaled towards the soft end of

7   the spectrum and towards the hard end of the spectrum,

8   and some in the middle.

9       There are nuances that are beyond my understanding

10  between the six different Shore scales that I'm aware

11  of.  But what you can see from this slide is the gist

12  of it that very soft materials are often measured on a

13  Shore 00 scale, and then you max out that scale when

14  you get to a medium or a hard material; you need to

15  shift to a different hardness scale.  And the Shore D

16  scale is the lower scale.  That's not useful for

17  measuring very soft materials, but it's useful for

18  measuring very hard materials.

19      You can see an 80 has an analog of the plastic of

20  a hardhat, and we were talking about our adapters

21  being in the 85 range.

22  **Q.**   And the resin you used is specifically designed

23  for making prototypes?

24  **A.**   That's correct.  It's called the Prototyping

25  Resin.

1  **Q.**  So, let's talk about the differences, if any,

2  between your -- we'll call it the surrogate earplug --

3  and the adapter stem for the Combat Arms Version 2.

4  **A.**  Yes.

5  **Q.**  The color is a little bit different.  Does that

6  have any significance clinically related to your

7  study?

8  **A.**  No, it doesn't.

9  **Q.**  We've talked about the fact that yours has two

10  yellow ends instead of a yellow and olive end.  Could

11  that have any significance whatsoever to your testing?

12  **A.**  No.  I mean, the materials are the same.  The only

13  difference would be the hole through the center.  And

14  as long as that is acoustically sealed, they are

15  functionally equivalent.

16  **Q.**  Is the width the same?

17  **A.**  The widths are the same.

18  **Q.**  The barbs -- or the length, is the length the

19  same?

20  **A.**  The length is the same.

21  **Q.**  The barbs, are they the same?

22  **A.**  They are the same.  And those barbs are what grabs

23  and holds on to the ends.

24  **Q.**  Is the weight the same?

25  **A.**  The weight is the same.

1    **Q.**   The hardness -- we've talked about that Shore

2    scale?

3    **A.**   The hardness is the same.

4    **Q.**   The filter?

5    **A.**   No.

6    **Q.**   Does yours have a filter?

7    **A.**   Mine does not have a filter.  Rather than having a

8    filter in the center, we have a hollow tube.

9    **Q.**   So, what does that do to your results, if

10   anything?

11   **A.**   Well, we were evaluating the function of the olive

12   end of the plug, not the non-linear end of the plug or

13   the traditional yellow end of the plug.  So, it had no

14   impact on our results.

15   **Q.**   And could you have fit the probe tube if there was

16   a filter in there?

17   **A.**   Wouldn't be able to fit the probe tube.  And even

18   if you took out the filter, making that 90 degree bend

19   from the top center to the medial side of that where

20   the filter is now would crimp the probe tube and would

21   not have acoustic fidelity.

22   **Q.**   Okay.  So that's this hollow center here?

23   **A.**   We would have loved to have been able to do that,

24   but it just wouldn't work.

25   **Q.**   Now, the Combat Arms isn't probed, but yours has

1    the probe?

2    **A.**   That's correct.  To my knowledge, there has not

3    been a Version 2 Combat Arms produced with a probe.

4    **Q.**   All right.  So, do any of these -- just to sum up,

5    do any of these differences between the surrogate

6    earplug and the Combat Arms Version 2 have any impact

7    upon the results in your study?

8    **A.**   No, they do not.

9    **Q.**   Well, let's get to the judge's question.  How do

10   you know that?  How do you know that, sir?  What did

11   you do to validate that?

12   **A.**   Well, we did what I mentioned earlier is an

13   acoustic matching test and what you would do anytime

14   when you're comparing one acoustic device to another

15   acoustic device, and it's also a procedure that is

16   recommended in the ANSI S12.71 standard.

17       We basically wanted to show that our surrogate

18   earplug functioned as the olive end of the earplug for

19   the purposes of evaluating individual differences in

20   performance in our main tests.

21   **Q.**   So, how did you do that?  What experiment did you

22   do to validate your plug?

23   **A.**   Sure.  We basically put both of the plugs into the

24   same ear simulator, which is a standard measurement

25   device for acoustics.  We mounted them both in the

1    same ear simulator one at a time, and then we

2    presented what's known as a pink noise, a standard

3    measurement noise, to each one at a time.  We measured

4    the response as picked up by the microphone in the ear

5    simulator and compared them.  And that's what you see

6    there on the right.

7    **Q.**  Has that validation method that you did been done

8    by others in the scientific community?

9    **A.**  Yeah.  I'm assuming that that's the way they

10   validate at the manufacturer.  Each one of their

11   plugs, they have to do something analogous.  But

12   manufacturers, to my knowledge, haven't explained how

13   they do that validation.

14   **Q.**  Well, let's look at some validation from Mr.

15   Berger, if we go to the next slide -- oh, let me back

16   up to the prior slide just for a minute.

17        The figure on the right there, is that figure --

18   Figure 17 in your expert report, is that the graph on

19   the right?

20   **A.**  It is the graph on the right.

21   **Q.**  Now, how would you -- is the yellow line

22   demonstrating the acoustical response of the Eddins

23   surrogate and the green line the acoustical response

24   of the Combat Arms olive end?

25   **A.**  That's correct.  And this is what I referred to

1    earlier as the acoustic matching test.

2    **Q.**   Okay.  And how would you characterize those lines

3    that are demonstrated here in the graph?

4    **A.**   Well, they match very nicely.  They deviate a bit

5    at 5,000 hertz and between 5,000 hertz and about

6    12,000 hertz.  But from the lowest frequency we

7    measured up to 5,000 hertz.  They match extremely

8    well.

9    **Q.**   Now, I've heard criticism that, because they don't

10   match at that narrow hertz range, that all of a sudden

11   all of your results are invalid.

12       Can you address that, sir?

13   **A.**   I can.  There are two reasons why that's not a

14   legitimate criticism of the work.  One is that, you

15   can evaluate how well an earplug is fitting by the

16   results below 5,000 hertz.

17       The main problem with earplug fitting or not

18   fitting well are the slit leaks that may occur because

19   you don't get a good seal of the earplug in the ear

20   canal.  Those slit leaks have their primary effect at

21   low frequencies.  The greater the slit leak, the

22   higher the frequency that it impacts.  But slit leaks

23   tend to have their major effect well below 2,000 hertz

24   and up to 2,000 hertz.  And beyond that, you just

25   compromise the attenuation of the entire plug.

1   **Q.**   So, what does this graph tell you about whether or

2   not there were slit leaks in your surrogate plug?

3   **A.**   There are no slit leaks that aren't in the olive

4   Combat Arms Version 2 earplug because they match so

5   closely.

6   **Q.**   Okay.  Now, what's the cause of -- what does it

7   vary there at 8,000 hertz or whatever it is?

8   **A.**   That variation, we believe, is because the medial

9   side of the earplug, the side of our surrogate that is

10  in the ear canal.  We did not acoustically seal the

11  earplug from that end.  And so, there is a tiny little

12  resident cavity produced by the air that's around the

13  outside of the probe tube and the inside of the tube

14  in the Combat Arms.  And we think that contributed to

15  that small increase in level.

16       Importantly, that washes out when you do a

17  difference measure because that's a constant.  Every

18  time you compare our surrogate to the olive Combat

19  Arms, you'll get that same difference.

20       And so, if we're looking at a change in

21  performance, say, put this in and measure MIRE before

22  jogging and then put it in and measure MIRE after

23  jogging, you're going to get the same bump there.  And

24  when you subtract them, that bump will subtract out.

25  So it's not material in our results.

1   **Q.**  Is that because your *h*MIRE testing was designed to

2   look at change, not attenuation?

3   **A.**  That's correct.  We weren't trying to invalidate

4   or confirm REAT testing at all.  We simply wanted to

5   use it as a highly precise and with minimal error

6   measure to compare pre-activity to post-activity

7   performance of the plug.

8   **Q.**  Let's go to the next slide.  So, what is this

9   slide showing the Court?

10  **A.**  Well, the previous slide had a very large y-axis

11  range; it spanned over 100 decibels.  And so, it's

12  somewhat hard to see the fine details on that previous

13  slide, and that was our previous Figure 17 in our

14  report.

15      And so, for the Court today we have replotted the

16  data but with a smaller y-axis, a smaller vertical

17  axis so that you can better see any differences

18  between the measurements between our surrogate earplug

19  and the original Combat Arms.

20  **Q.**  Does this help confirm your opinion that your

21  validation testing showed an acoustical match, for all

22  intents and purposes?

23  **A.**  Yes.  The difference in the middle graph is

24  one-third octave band levels, subtracting basically

25  the green curve from the yellow curve on the level.

1    And the difference in the center shows that the two

2    plugs are within about plus or minus 2 dB from as low

3    as we plot here, 100 hertz up through 4,000 hertz.

4    **Q.**   So how confident are you in characterizing your

5    surrogate plug as an acoustical match with the Combat

6    Arms for purposes of your testing?

7    **A.**   It looks like a spot-on match.

8    **Q.**   All right.  Now, other scientists, including

9    Dr. -- Mr. Berger or Dr. Berger? -- Mr. Berger have

10   also done this as well, this type of graphically

11   examining a surrogate plug; is that correct?

12   **A.**   That's correct.

13   **Q.**   So, what is this slide showing?

14   **A.**   This is slightly different.  This is showing that

15   test-retest performance of a MIRE system.  The black

16   symbols and the red symbols are from the Berger, et

17   al. 2007 study.  The blue symbols are mine.

18        And I can walk through this graph because I think

19   it's very important and very telling.  It is the

20   validation of the performance of our MIRE system in

21   comparison to the validation of the performance of the

22   E-A-RCAL E-A-R Fit system.

23        So, if I may explain the graph?

24   **Q.**   Yes, absolutely.

25   **A.**   It's a little complicated.  But we have frequency

1   on the x-axis from low frequency to high, and we have

2   mean difference between measurements on the y-axis.

3        So, if you could make repeated measurements and

4   they were literally identical, you would expect zeros

5   all the way across that curve.

6        If we first start with the black symbols from the

7   Berger, et al. study, that's a situation where they

8   had 18 subjects.  They fit an earplug with a probe

9   into each subject's ear.  Actually, this was a subject

10  fit, so the subject fit the earplug into their ear.

11       They had the probe microphone system set up.  They

12  made a measurement using this MIRE system.  They

13  paused.  Didn't change the earplug or the probe tube.

14  Repeated the measurement.  Paused.  Repeated the

15  measurement.  And did that for every subject.

16       They then averaged the data across the subject

17  after they made ten measurements.  And the error among

18  those measurements ranged between 2 and 4 dB up to

19  about 4,000 hertz and then at 8,000 hertz was a little

20  over 10 dB.

21       So that's test-retest without ever adjusting the

22  probe in the ear or the earplug.  Sort of the

23  test-retest of the system itself.

24  Q.  So that showed more variability than your plug?

25  A.  Well, it's not bad variability because it's better

1    than you would get with REAT test-retest, so we can't

2    complain about that too much.  But, yes, in our case,

3    the blue symbols, we were a little bit more

4    conservative in our estimate of test-retest.

5         When we put the plug in and then threaded the

6    probe tube and acoustically sealed it, we made the

7    first measurement.  But then we removed the probe,

8    cleaned it off, put it back in, resealed it, and made

9    the second test.

10   **Q.**  I've seen criticism, Doctor, that somehow that

11   probe movement could have caused errors with your

12   study.  What does this say about that?

13   **A.**  I've seen the same criticism.

14   **Q.**  What does that say about that?

15   **A.**  I think this data speaks to that.  Our range of

16   test-retest values, when averaged across ten people,

17   was plus or minus 1 dB or less.

18   **Q.**  Beyond even this graph, Dr. Eddins, have putting

19   probe tubes through an earplug or hearing device, is

20   that something that you do and your students do every

21   day?

22   **A.**  Yes.  And I think that's really important for the

23   Court to understand.  As audiologists, we're trained

24   in graduate school to do this, and this is a procedure

25   we do every time we fit a hearing aid, we do a MIRE

1    measurement.  And so, as a student I learned, I gained

2    expertise at the VA, and I've been doing it since

3    1988.

4        Furthermore, I teach the class to the graduate

5    students and train them to make these measurements.

6    So this is what I've done for the last ten years at

7    USF is teach the course on how graduate students and

8    future audiologists should do MIRE testing.

9    **Q.**  Did you also go above and beyond that and even

10   make a video recording of that?

11   **A.**  I did, and I now have provided that to the Court

12   and the Defense as well.

13   **Q.**  All right.  So, can you say, to a reasonable

14   degree of scientific certainty, that you have been

15   able to validate your earplug as an acoustic match and

16   identical earplug for the purposes of your study?

17   **A.**  I have.

18   **Q.**  All right.  Now, so, what did the data show

19   regarding your *h*MIRE jogging study, briefly?

20   **A.**  Briefly, we had 30 individuals.  Each time each

21   individual fit the earplug into their own ear.  While

22   the earplug was in their ear and before they did any

23   physical activity, we threaded the probe tube,

24   acoustically sealed it, connected it to our MIRE

25   system, made a MIRE measurement, stored that

1    measurement.

2        We removed the probe tube and escorted them to an

3    area where they jogged in place for three minutes with

4    a backpack.  After they had jogged for three minutes

5    with a backpack, we took the backpack off, took them

6    back into the test room, had them sit down, threaded

7    the probe tube through the earplug, and repeated the

8    measurement.

9    **Q.**  Okay.  And what did that data tell you as a

10   scientist?

11   **A.**  It said, on average, there was a peak of about 3

12   to 4 dB change following jogging for three minutes

13   relative to the pretest.  But for some individuals

14   that change was much greater and on the order of 10 to

15   15 decibels, meaning that the earplug wasn't

16   functioning nearly as well as it was before they

17   jogged when we measured it after they jogged.

18       So that three-minute very brief, mildly vigorous

19   activity was enough to compromise the performance of

20   the earplug in a substantial number of subjects.

21   **Q.**  I saw on one of the 3M's expert reports some

22   suggestion -- or actually a statement that it looked

23   like you had purposefully chosen people with various

24   size ear canals or so forth to bias the study in some

25   way.

1    Is there any truth to that or can we put that to

2    bed?

3    **A.**   I should hope we can put that to bed.  There

4    absolutely was no truth to that.  It is antithetical

5    to doing research.  It would not be permitted by my

6    institutional review board.  I would be in great

7    trouble if I did that and probably wouldn't be able to

8    do research anymore at the University of South

9    Florida.

10   **Q.**   All right.  Now, what were the results of your

11   *h*MIRE four-hour study?

12   **A.**   They were actually very similar to the results

13   from the jogging study.  The four-hour study was

14   modeled after several previous studies in the

15   literature, probably the first one by Berger in 1981,

16   a later study by Casali and Park in 1990, where they

17   had participants/subjects engage in sort of daily

18   routine activities for some period of time; I believe

19   in the Berger study it was between two and three

20   hours.

21        And then they measured, in that case, REAT before

22   and after the three-hour period of time.  In our case,

23   we used MIRE to add precision to our measurements and

24   used that before and after the four-hour period of

25   time --

1    **Q.**   And what were the results of that, just briefly?

2    **A.**   Again, similar to the jogging, the average was

3    significantly different after the four-hour test

4    relative to before, meaning the Combat Arms Version 2

5    worked significantly poorer and for a substantial

6    number of subjects much poorer, and those subjects are

7    the ones we certainly worry about as having problems

8    with loosening of the earplug.

9    **Q.**   Okay.   Now, let's move to the *m*MIRE.

10            **JUDGE RODGERS:**   Before we do, I want to ask a

11   question before we move to the *m*MIRE testing.

12            So, you've explained the validation of the

13   performance of the replica or surrogate plug against

14   the CAEv2 for purposes of attenuation; they attenuate

15   at the same rate.

16            **THE WITNESS:**   Yes.

17            **JUDGE RODGERS:**   Is that the same validation

18   for loosening rate?  I mean, does your validation of

19   an attenuation rate tell us the same thing about a

20   loosening rate between the two?

21            **THE WITNESS:**   Not exactly, no.  The reason

22   why one would conclude that these would loosen in the

23   same way is because the flanged eartip with a

24   comparable size adapter in it is going to fit the same

25   way with ours as it would with the original Combat

1   Arms.  There is no physical size difference.  And the

2   portion that touches the ear is identical.  It's the

3   same plug.

4           So, there is no reason -- and the weight is

5   the same, the counterbalance effect is the same from

6   the stem sticking out.  So, there is no reason to

7   believe that this would egress any differently than

8   the original Combat Arms.  It's physically equivalent.

9           **JUDGE RODGERS:**  But there's not been a

10  validation like you did with the attenuation?

11          **THE WITNESS:**  There has not been a direct

12  validation of the stability of the plug, again,

13  because they are essentially the same plug physically.

14          **JUDGE RODGERS:**  All right.

15          Go ahead, Bryan.

16  **BY MR. AYLSTOCK:**

17  **Q.**  In fact, the flanges are exactly the same?

18  **A.**  They are Combat Arms flanges, yes.

19  **Q.**  Thank you.

20      Now let's move to the *m*MIRE.  Did you also conduct

21  a study using *m*MIRE, and can you tell me and the Court

22  what that means?

23  **A.**  Well, *m*MIRE was our internal code for

24  microphone-in-real-ear with model ears or replica

25  ears.

1   **Q.**   And why did you decide to include that in the

2   studies that you did of the Combat Arms?

3   **A.**   Sure.  All of the studies that we did kind of

4   built on each other, addressing the same basic

5   question from multiple angles.  Using the same sort of

6   scientific methodology you normally would in

7   investigating an issue, you want to see whether any

8   results are consistent across multiple ways of

9   attacking or addressing, investigating those results.

10       So, in our human MIRE testing we tried to minimize

11   measurement error by taking the human out of the

12   measurement part of that equation.  In REAT, there is

13   a human behavioral component of the measurement.  In

14   MIRE, it's an objective measure where you don't have

15   any behavioral response.

16       So the human part of the response has been taken

17   out of it, but there's still a human.  And when

18   they're doing jogging or when they're doing four-hour

19   activity, you can't really control the details of

20   their activity.  One human may be active in a

21   different way from another, and a single human may be

22   active in different ways over different points in

23   time.

24       And so, we wanted to take that variability out of

25   the equation and precisely investigate the effect of

1    physical activity in the same way every single time

2    with the only difference being the size and shape of

3    the ear canal where the earplug actually fits in the

4    ear canal.

5    **Q.**   Okay.  And with regard to that, how does one

6    perform an *m*MIRE study if you're going to take the

7    human out of the equation?

8    **A.**   Well, we use an acoustic test fixture and so --

9    that's got a long history of use in acoustics and I've

10   been fixtures most of my career.  And so, we used an

11   acoustic test fixture that could measure

12   microphone-in-real-ear because acoustic test fixtures

13   have microphones for tympanic membranes.

14   **Q.**   Was the design of your *m*MIRE study based upon

15   peer-reviewed literature?

16   **A.**   Yes, it was.

17   **Q.**   And I think you've cited those in your report; is

18   that correct?

19   **A.**   That's correct.

20   **Q.**   So, did you bring any of those ATFs or acoustic

21   test fixtures with you today?

22   **A.**   I did.  And I brought them for the purposes of

23   sort of demonstrating similarities and differences and

24   capabilities of different ATFs, including our own ATF.

25   **Q.**   I think we have a slide of different ones that we

1    can put up.

2         Did you create this slide, Doctor?

3    **A.**   I did.

4    **Q.**   Are these all different types of ATFs?

5    **A.**   Yeah, each one of these are different ATFs.  I

6    have four of those here today, and I can walk through

7    those.

8         The two on the left -- the one on the left top and

9    the left bottom I don't have and don't own, but

10   they're also ATFs that have been used to study the

11   function of earplugs.

12   **Q.**   Would it be helpful in your presentation to the

13   Court for you to manipulate the various ATFs to

14   demonstrate what you're talking about?

15   **A.**   I think so.  They're somewhat complicated, and I'd

16   be happy to do that.  Stop me if you feel like you've

17   gotten enough.

18        May I step down?

19             **JUDGE RODGERS:**  Yes.

20             **THE WITNESS:**  We'll start briefly with this

21   first one here, the taller one.  This is an ATF that

22   was introduced in 1972.  It's called a Knowles

23   Electronics Manikin for Acoustic Research, a manikin

24   for acoustic research and Knowles Electronics is the

25   company that made it.  We call it KEMAR because that's

1    the acronym.

2              Introduced in '72, still sold today, by far

3    the most widely used ATF in acoustics.  You'll see

4    pictures, if you Google it, in concert halls where we

5    position this ATF in different locations in the

6    concert hall to measure room acoustics.

7              Like all of the ATFs we have here, this one

8    has pinnas.  And these are made out of silicone, so

9    they have a fleshy, cartilaginous-like structure to

10   them.  You can actually remove these pinnas.

11   **Q.**  We'll get to this in a minute.  But is silicone

12   what was used for the ear replicas that you made for

13   your MIRE?

14   **A.**  It is.  Each of the ATFs I have here were made out

15   of a similar silicone.

16   **Q.**  Including the ones for your study for this case?

17   **A.**  That's correct.  You'll see -- it's kind of hard

18   to see, but there is a metal ear canal extension here;

19   it's connected to a metal ear canal and ear simulator.

20        I'm getting into the weeds a little, but the ear

21   simulator simulates some of the acoustic properties of

22   the ear and tympanic membrane.

23        And then, at the end of the ear simulator is a

24   microphone that functions as a tympanic membrane.

25        One of the hallmarks of this ear simulator is that

1    it's a metal tube.  It's cylindrical, so its diameter

2    is exactly the same its full length.  It doesn't have

3    any bends, turns, or twists, and doesn't narrow or

4    flare.

5    **Q.**  Is that anything like any real human on earth?

6    **A.**  It is not.  It's designed for the sole purpose of

7    being the same every time you make a measurement, no

8    more if you use this KEMAR or a different KEMAR,

9    whether you do it today or next year.  It's designed

10   to be standardized.  There is no customizable portion

11   of this ATF, so you can't investigate individual

12   differences in anything with this ATF.

13   **Q.**  Okay.

14   **A.**  The next one I have is -- I'm sort of going in

15   chronological order -- is this one on the back of this

16   cart.  This is the GRAS 45CB, and it's made by the

17   company GRAS who also now sells KEMAR.

18       This was specifically designed for measuring

19   hearing protection devices, whereas KEMAR was designed

20   for many more uses than that.  This particular one is

21   very similar in the sense that it's got a pinna made

22   out of exactly the same silicone material as KEMAR.

23       And then, if we remove the pinna, which is

24   difficult on this one because it screws into the side

25   of the head -- oh, that one is one I unscrewed it

1    already.  I apologize.  We can take it out, and you'll

2    see, again, a metal ear canal extension and ear

3    simulator.  One difference in this one is that the ear

4    canal extension is lined with rubber.  That rubber

5    gives a little more friction when you insert an

6    earplug.

7        It also can be heated to body temperature.  So

8    this actually has a heater built into it.  And, in

9    some applications, it's helpful to heat the ear canal

10   to body temperature.

11       You can tell this has a full torso, which has an

12   acoustic effect on what the ear picks up.  This has

13   sort of an abbreviated torso; it's not much of a

14   torso, but otherwise quite similar.  You would hook up

15   the same electronics to both of these and then measure

16   the sounds from the microphone in the ear.

17   **Q.**  The Court may have heard about the GRAS 45 in

18   connection with Flamme.  Can you point out the little

19   ring that heats up in the cylinder?

20   **A.**  Yes.  Can you see a little pink portion in there?

21   I know it's a long way away.

22       This, I have not sanitized, but if you would like

23   to see it, I have an extra one.

24           **JUDGE RODGERS:**  It's okay, I'm fine.  Thank

25   you, though.

1          **THE WITNESS:**  This was introduced in 2012,

2    and so it's only been available for use since then.

3    There are not many of them.  These are pretty

4    low-production items.

5    **BY MR. AYLSTOCK:**

6    **Q.**  So you can put the hearing protector in that with

7    the pinna in or with the pinna out?

8    **A.**  That's correct.  If you want to make it analogous

9    to testing humans, you would have the pinna on.  If I

10   can just grab an earplug and I can show.

11   **Q.**  We probably don't need to get into that much

12   detail but that would be --

13   **A.**  This guy -- it's in there.

14   **Q.**  That's with the pinna off?

15   **A.**  That's with the pinna off.  It's a little trickier

16   to get it on with the pinna on with one of these.

17   **Q.**  Let's move on to this one, unless I missed

18   something --

19   **A.**  You know, I brought this one in just to show the

20   diversity in ATFs.  Again, ATF is acoustic test

21   fixture.

22          This one is somewhat unique.  You'll notice a head

23   shape here and a head shape here.  The head is not

24   very anatomically correct in this one just in its

25   shape.  But also, it has three pinnas on each side,

1    three ear canal extensions on each side, three ear

2    stimulators, and three microphones.

3        This one is designed to compare or test multiple

4    devices at the same time, and so it can speed up your

5    testing and make sure you're doing apples to apples

6    testing if you have environments that are hard to

7    replicate.

8        It also allows -- if we're doing comparison of A,

9    B, and C devices, we can put three different devices

10   in and have a subject listening to those devices

11   through headphones and instantly switch between them.

12   So just to show difference among these ATFs.

13       The final one I have here is the ATF that we used

14   for our study.  It's hard to see from a distance, and

15   I apologize for that, but I thought it hopefully would

16   be of some value.

17       And what we did, again, all three of these --

18   **Q.**  Before you go there, let me ask you this question,

19   Doctor.  Why didn't you just use one of these?

20   **A.**  That's where I was going.

21   **Q.**  Okay.

22   **A.**  Thank you.  None of these have customizable

23   components.  The manufacturer has never made any

24   component of this that allows you to make it like an

25   individual ear.  You can't make the pinnas like an

1    individual pinna, you can't make the ear canal like an
2    individual ear canal.  So there is no component that
3    is customizable.
4        Our sole focus or overarching focus was to measure
5    or study individual differences in earplug
6    performance.  We can't get individual differences in
7    earplug performance with these.  By design, you should
8    get the same result every single time you use it.
9    Q.  Is that because the ears are always going to be
10   shaped the same?
11   A.  That's right, they never change.
12   Q.  And is there any ability for mandibular motion to
13   simulate --
14   A.  No, none of these could support mandibular motion,
15   particularly because they all have metal ear canals
16   and so you can't bend it.  They're not flexible.
17   They're not like live, human ear canals because
18   they're inflexible.
19   Q.  So the last one over there is one that you created
20   for this study.  Let me ask you this, Doctor:  Is
21   there an ANSI standard or position -- does ANSI have a
22   position on whether that's generally accepted?
23   A.  They do.  In general, they say that you -- an
24   investigator, a laboratory can create their own ATF.
25   And the picture that we showed earlier that had

1    several ATFs, several of those were created in a

2    laboratory.  Indeed, this Klangfinder Klangspektrum

3    twin face over here is not compatible with any ANSI

4    standard but used widely in research.

5    **Q.**  And we're looking here at ANSI S12.42-2010.  Does

6    that say that a laboratory such as your own can

7    construct its own ATF?

8    **A.**  That's correct.

9    **Q.**  So let's go to what you did to construct your own

10   ATF.

11   **A.**  Well, what we wanted to do is make a hybrid of an

12   ATF.  We wanted to customize the portion of the ATF

13   that impacts earplug fit, and we wanted everything

14   else to be standardized.

15       And so, the customized portion is, if I may, the

16   pinna and the ear canal.  Now, the ear canals from

17   these other ATFs, the pinna portion only has about 1mm

18   of depth to the ear canal, and then it immediately

19   goes to a metal ear canal.

20   **Q.**  The cylindrical metal?

21   **A.**  The cylindrical metal ear canal.  So, ours has an

22   anthropomorphically accurate pinna and ear canal.  The

23   ear canal is anatomically accurate through the opening

24   of the ear canal, through the first bend, through the

25   second bend, through the narrowest portion called the

1    isthmus.  And we even can see something called the

2    mandibular bump when you take an impression of the ear

3    that's visible.  And it was visible on our replicas.

4    **Q.**   I think we have a slide to demonstrate the

5    mandible and how that works.

6        Here we go.  What is that showing the Court?

7    **A.**   This is showing -- it actually has a Combat Arms

8    Version 2 earplug in it because it was created

9    specifically for today.

10       It has an earplug and an ear canal, and it has a

11   mandible cartoon shown in front.  And that person is

12   -- the cartoon is opening and closing their jaw,

13   opening, closing, opening closing.  And the mandible

14   sits anterior to the ear canal, right in front of the

15   front ear canal wall.

16       And when you close your jaw and keep it closed

17   tightly, that mandible goes up against the ear canal

18   and depresses the anterior ear canal wall.  It does so

19   because that part of the ear canal is cartilage, and

20   cartilage is highly compressible.  And in fact, from

21   this point outward is cartilage, so all of that can

22   move with jaw movement.  So every place that an

23   earplug touches the ear canal can potentially move

24   with jaw movement.  And that's why it's been studied

25   in peer-reviewed literature before with respect to

1    earplugs.

2        When you open your jaw, it pulls the condyle of

3    the mandible, that tip there, away from the ear canal

4    wall.  And that cyclical action of going back and

5    forth essentially is like pressing a point on the ear

6    canal wall, but then you'll get dispersion of that

7    depression laterally towards the outer part of the ear

8    canal wall.

9    **Q.**  What is that point on the ear canal wall where the

10   mandible compresses?

11   **A.**  We call it the mandibular prominence or the

12   mandibular bump.

13   **Q.**  Has that been described in the medical literature?

14   **A.**  It has.

15   **Q.**  Okay.  And tell the Court, if you would, what you

16   did to create the ears used in your ATF.

17   **A.**  That's a good question.  We used the same process

18   we use anytime we make a custom earpiece, whether it's

19   a custom earplug or a custom earmold for a hearing aid

20   or an in-the-ear hearing aid; it's the same process.

21       We inject silicone material, and it goes in as a

22   viscous liquid, and it hardens within about five

23   minutes, and you can pull it out.

24       In order to protect the eardrum, we put an

25   otoblock, a block of foam or cotton in before we

1   inject the material, and that prevents the material

2   from getting near the tympanic membrane.  If it

3   touches the eardrum, it would stick to it, and when

4   you pull it out, you would pull out the eardrum.

5   **Q.**   Is that why you didn't go all the way to the

6   eardrum?

7   **A.**   That's correct.

8   **Q.**   What would that have done to the four individuals?

9   **A.**   We wouldn't have had that approved by the

10  institution review board to find out.

11  **Q.**   Okay.  So, the earmolds were made just like you

12  would for an ear hearing aid or anything else?

13  **A.**   We do it in the laboratory all the time.

14  **Q.**   And you've done it how many times?

15  **A.**   I've trained people to do it and I've done it

16  myself thousands of times.

17  **Q.**   Okay.  And then, what did you do with the mold?

18  **A.**   So, we contracted with a company called Soft Touch

19  Laboratories to take our impressions and then create

20  the model ears from our impression.  And the process

21  that they use, just like the process when you make a

22  custom earmold or a custom hearing protector, is to

23  make an ideal inverse of the impression that we make,

24  and then use that as a mold to cast this.

25  **Q.**   Why did you go to Soft Touch Labs?

1    **A.**   Well, Soft Touch Labs is owned by Roger Juneau,

2    who I believe you'll hear from later today.  Roger is

3    an expert in designing and producing and manufacturing

4    earmolds, earmolds for hearing aids, custom hearing

5    protection devices.  And he has made model ears

6    before.

7        I knew Roger because we collaborated on another

8    project that existed well before I had heard about

9    this litigation, and I still work with Roger on

10   NIH-funded projects today.

11   **Q.**   Okay.

12   **A.**   So that's why we went to Soft Touch Labs.

13   **Q.**   And what did you ask him to with the earmold

14   specifically?

15   **A.**   I said I would like you to produce an exact

16   replica of this ear, as I mentioned, through those

17   bends and twists and turns, well past the narrowing of

18   the ear canal and past the mandibular bump.  And I

19   also requested that the angle of the ear canal in the

20   model past that point reflect the exact angle of every

21   individual ear so that, when we connected it to the

22   ear stimulator taken out of, say, this ATF -- you can

23   literally take this out and I bought a spare one of

24   these, we used that same ear stimulator to connect to

25   basically the individualized, custom front end of a

1   pinna and ear canal.

2   **Q.**  So, the ear stimulator you used for your ATF is

3   precisely the same as in the GRAS 45?

4   **A.**  It's the same part, a different serial number.

5   And it's very difficult to see, but it's the metal

6   piece back on the backside of it that was taken from a

7   GRAS 45CB.

8   **Q.**  So, the earmolds that the actual ears that were

9   made by Mr. Juneau were -- you asked him to make them

10  anatomically accurate up until the point where it

11  mattered?

12  **A.**  That's right.

13  **Q.**  Is that fair?

14  **A.**  That is true.

15  **Q.**  Now, were they made of the same material that

16  would be made on an off-the-shelf ATF?

17  **A.**  It's analogous material.  It's not the exact same

18  chemical compound, but it's a silicone and it's a soft

19  silicone.

20  **Q.**  Okay.  And so we've got the ear.  And these ears

21  are from the 30 patients -- or 30 study participants

22  in the your REAT testing; is that right?

23  **A.**  That's correct, they participated in all aspects

24  of my study.

25  **Q.**  Was there any validation done to determine whether

1    or not the earmolds were anatomically correct?

2    **A.**   Yes, a series of validation steps were taken.

3    Most importantly, as soon as you make the earmold

4    impression and remove it from the ear, you need to

5    carefully inspect that impression.  You need to make

6    sure that there are no imperfections, no voids or

7    missing material that wouldn't capture some aspect of

8    the ear.  You need to make sure that there are no

9    extra bumps, no pockets of air were in there.  And if

10   you find that, you just have to throw the impression

11   away and make a new one.  You can't -- in a project

12   like this, we couldn't have any imperfections in those

13   impressions.

14        And so, that was our validation step.  We then

15   sent the impressions to Soft Touch Labs.  Soft Touch

16   Labs went through a casting process to make these

17   ears.  But then their validation step was to literally

18   take the replica ear and put the impression we sent

19   them inside the replica ear to make sure that it was

20   not only a snug fit but you could rotate it around 360

21   degrees and inspect it to make sure that the fit was

22   appropriate, that it was tight, that there weren't any

23   voids, that it wasn't pressing out on any part of it

24   that caused a visible stress.

25   **Q.**   So, in your mind, are those ear impressions

1    anatomically accurate?

2    **A.**   They are.

3    **Q.**   So you've got the ears.  But there is something

4    missing, at least as it relates to my kids who always

5    have earwax.  Can you tell the Court about what you

6    did to further validate that through the use of

7    simulated earwax?

8    **A.**   Sure.  We designed a series of studies to be used

9    with this ATF in the individualized pinna and ear

10   canal.  But we also knew that it's difficult to get a

11   silicone earplug into a silicone ear; they tend to

12   have a lot of friction.

13        And so, one of the things we knew serves as sort

14   of a lubricant and a sealant is natural earwax.  And

15   so, we thought it's important to include that to

16   really give the earplug a fair chance in performing as

17   well as it could.

18        At that point, we thought how are we going to

19   include earwax.  You don't really want to sample

20   individual, live, human earwax.  It's a messy process

21   and not very hygienic.  We're not equipped to do that.

22        But also, our goal wasn't to replicate any aspect

23   of any individual's earwax.  Our goal was to factor

24   out any other individual variability other than the

25   shape and size of the pinna.

David Eddins - Direct/Aylstock                    153

1        So we -- I asked Mr. Juneau to order artificial

2   earwax.  And so, he researched it and ordered

3   artificial earwax from a company in California called

4   Pickering Labs, worked out the proper mixture of two

5   different components of the earwax, and that's the

6   mixture that we used to put uniformly on our pinnas.

7   **Q.**  Did you test the product -- did you test these

8   ears and the hearing protector with dry ears and

9   compare it to wet ears to help validate what you were

10  doing with the earwax?

11  **A.**  Yes, we did.  Dry ear is without earwax, and wet

12  ear is with earwax.  And so, we used this ATF to test

13  the 60 earplugs -- 30 people times two ears.  And we

14  tested them without earwax and with earwax and

15  compared the results.

16       The performance of the Combat Arms Version 2 was

17  much better with earwax than without earwax.  And that

18  validated that that's the right thing to do when

19  evaluating an earplug in an ear model.  So, at that

20  point, we knew, for any further studies, we would use

21  earwax to complete those.

22  **Q.**  Okay.  Now, let's go to the mandibular movement

23  portion of the ATF.  What you did for this study, is

24  it based upon scientific literature that's been

25  peer-reviewed?

1    **A.**   Yes.   Each of the four studies that have been put

2    up here have used artificial earwax in some capacity.

3    So we certainly weren't the first people to use

4    artificial earwax.   And the previous slide even

5    illustrated that artificial earwax is actually

6    composed of two components, a cerumen and a sebum.

7        Most medical professionals just call it all

8    cerumen.   An ears, nose, and throat physician or an

9    audiologist, we just call it cerumen.   That's our

10   technical name for earwax.   But technically, cerumen

11   is only one component; sebum is a second component.

12   So, you need to mix those two in order to have

13   lifelike ear stuff.

14   **Q.**   What is sebum?

15   **A.**   Sebum is like an oily substance, and it comes from

16   the sebaceous glands.   And you have sebaceous glands

17   just under the skin in the peripheral part of the ear

18   canal, so that's what produces sort of the wetter

19   portion of the material in your ear.

20       And then cerumen is more of a dry -- it's a

21   keratin, it's more of a dry component.   And your

22   keratin gland is underneath the skin in the ear canal,

23   and they generate that component.   And those two

24   components get mixed together in the ear.

25   **Q.**   Okay.   I'll move on from the earwax.   I think

1    we've probably hit that hard enough.

2         Now, how did you determine how the mandibular

3    movement would be done in your experiment?

4    **A.**   Again, we knew from that illustration before how

5    mandibular motion works.  And that's well known and

6    reasonably worked out in the scientific literature.

7         You can move the mandible and the jaw in multiple

8    ways.  But the way that impacts the ear canal the most

9    is that opening and closing of jaw.

10        When you're sleeping and grinding your teeth,

11   you're not really moving the ear canal wall much.  But

12   when you open and close the jaw -- I think we're a

13   little ahead of ourselves here.

14        When you open and close the jaw, that's what

15   causes movement of the ear canal wall, so that is the

16   jaw movement that's going to potentially impact

17   anything in your ear.

18   **Q.**   Have there been scientific peer-reviewed studies

19   that discuss the amount of jaw movement as it relates

20   to the ear canal?

21   **A.**   Yes.  Not necessarily the amount of jaw movement,

22   but the displacement of the ear canal when you have

23   open and closed jaw.

24   **Q.**   What would that study be?

25   **A.**   There is a paper in 2009 by Darkner.  And Darkner

1    studied jaw movement in several individuals.  And the

2    average data showed that, when the jaw is opening and

3    closing, the change on the interior/anterior wall of

4    the ear canal maximally is about 2.3mm.

5    **Q.**   So, how did you test the earplug as it relates to

6    mandibular movement with your ATF?

7    **A.**   That's a good question.  It's really difficult to

8    get an individual estimate of mandibular movement on

9    any human.  And, in fact, we didn't want to have

10   variability in mandibular movement.  We wanted to see

11   with a fixed amount of mandibular movement how that

12   would potentially impact the fitting of the Combat

13   Arms.

14        And so, we controlled precisely the movement the

15   same way every single time we did the study for every

16   single subject's ears.

17   **Q.**   And did you do it with multiple measurements?

18   **A.**   We did.  And that's important to understand as

19   well.  So, if the condyle of the mandible let's just

20   say moves 5mm posteriorly to push on the ear canal

21   wall, because that portion of the ear canal wall is

22   cartilage, it will absorb some of that 5mm.  So the

23   movement on the inside of the ear canal wall will be

24   less than 5mm.  How much less depends on how absorbant

25   that particular person's ear canal wall is.

1    And so, not having any precise information from

2    any research study or from any measurements, we did

3    what any scientist would do, we spanned the plausible

4    physiological range of ear canal movement due to

5    mandibular motion, and that was from 0mm (no movement)

6    up to 5mm, which, if you base Darkner's data -- if you

7    think about Darkner's data, he said you could get as

8    much as 2.3mm of movement on the interior ear canal

9    wall.

10    And our silicone doesn't compress a factor of 2

11    when you apply pressure to it.  So we more than

12    doubled what you would expect to see and felt like

13    that was well at the maximum range of physiological

14    plausibility.

15    So, we then sampled that range 0 to 5mm in 1mm

16    steps and could draw conclusions based on that range

17    of mandibular motion.

18    **Q.**  Can you show the Court where the mandibular motion

19    would be applied on the silicone ear canal?

20    **A.**  I can.  And again, it's very difficult to see from

21    any distance, but hopefully what you can see is the

22    metal ear simulator going off at an angle.  And

23    perpendicular to that is a white piece of plastic

24    which is connect to a motor-driven piston.

25    When we operate the motor, we can cause that white

1  plastic with a little tip on it to go inwards and

2  impinge upon the ear canal or come back out, and we

3  can drive that cyclical.  We can control through

4  software the rate that it goes in and out, the

5  distance that it goes in and out, and the number of

6  times it goes in and out.

7  Q.  So the software gave you the consistency you

8  needed for the study?

9  A.  Well, we had to validate that the distance was

10  exactly what we were asking for.  So we used calibers

11  to make sure, when we asked for 1mm, it moved 1mm, and

12  when we asked for 3mm, it moved 3mm.

13  Q.  And did that validation prove the concept?

14  A.  Yes.

15  Q.  How did you make sure that the piston or the

16  mandibular motion was accurate anatomically?

17  A.  That's a very important point.  As I mentioned

18  before, when you look at an impression of an ear, you

19  can see the mandibular bump on the impression,

20  particularly if you're schooled at studying the

21  features of an ear impression.

22  Q.  Did you do the mold specifically to help determine

23  where that mandibular bump was?

24  A.  Yes, we did.

25  Q.  And how so?

**A.**   We did one impression with the mouth wide open,
and we actually put a bite block in the mouth of every
subject to do that, and one impression with the jaw
closed.  And by comparing the impressions of opened
and closed jaw, you can see where the mandibular bump
is.

And in this care, Roger Juneau is the -- one of
the world's experts at looking at ear impressions,
having worked with thousands of them over his career.
And in his business, if you get the product wrong, it
gets sent back to you and you have to remake it.  So
he's become very skilled at doing that.

And he looked and identified the location of the
mandibular bump on all 60 impressions and then marked
the corresponding spot on every one of our ear
replicas.  And so, we have a little mark on every one
of these that tells us where the mandibular bump is.

**Q.**   How did you determine the angle of the compression
on the mandibular bump?

**A.**   So, we have the tip of our piston directly on that
mark, and the angle is perpendicular to the angulation
of the ear canal.  And what that does is it mimics
what we saw in the little animation earlier of the
condyle of the mandible being perpendicular to the
anterior portion of the ear canal model.

David Eddins - Direct/Aylstock                              160

Q.   Does the scientific literature support that?

A.   It does.  Multiple papers have described that.

Q.   Now, let's talk now about -- well, your ATF
doesn't have a head on it or some kind of plastic
thing.  Does that matter?

A.   Acoustically it does not matter in this situation.
If we were studying room acoustics and presenting
sound from out in the environment, the head can
function as a baffle.  But in this case, we were
delivering sound to the pinna, and it had no factor at
all.

     We could have built this with a head.  It would
have taken more time, cost more money.  Would have
looked better, but we didn't need it to conduct our
experiments in a scientifically sound way, so we
didn't do it.

Q.   Thank you for not spending more money.

     With regard to the results of that -- well, let me
ask you about this.  There is some criticism that your
ear canal there in the simulated ears or the synthetic
ears doesn't go all the way to the eardrum.

     Why doesn't that matter for your ATF?

A.   Well, it's important to know the anatomy of the
ear canal well.  And the typical ear canal starts out
a little wider and then it narrows in its area until

1    you get about three-quarters of the way down the ear

2    canal -- and that's a little different for every

3    subject, and then it flares out towards the eardrum,

4    and then the ear canal actually goes just right around

5    the outside of the eardrum.  So, the natural ear canal

6    flares out to fit every individual eardrum.

7         What we wanted to use was the standard ear

8    simulator from our other ATFs, and so the flare-out

9    was uniform in every one of our models.  It flared out

10   so that it would perfectly match the diameter of the

11   ear canal of our ATF.

12   **Q.**   Okay.  And why doesn't that matter for the results

13   of this test?

14   **A.**   Well, it doesn't matter because it's a difference

15   test.  We measured the model with the earplug in it

16   and no mandibular motion, get a result, and then we

17   induced mandibular motion and make the same

18   measurement again and subtract those two.

19        And so, the acoustics that might be affected by

20   that differential flaring is a delta, it gets

21   subtracted out.

22   **Q.**   Now, have others used -- or let me put it this

23   way.  Have others done research and made presentations

24   on mandibular impact on hearing protection devices?

25   **A.**   Yes, absolutely.

1  **Q.**  We'll go to the next slide.

2      Can you describe what this is for the Court,

3  please.

4  **A.**  So, this is a study that was done by a group in

5  Denmark.  They actually are in industry.  They're in a

6  company called Sonion.  And Sonion manufacturers

7  earpieces and other hearing devices.  And they also

8  were interested in learning more about how mandibular

9  motion influences ear canal shape and how ear canal

10 shape as a result can cause earplugs to become

11 unstable and possibly fall out.

12     And so, they designed this simulation of ear canal

13 movement that logically would be induced by mandibular

14 motion to investigate various ear tips that they

15 produce.

16 **Q.**  And was this presented at a conference of their

17 peers?

18 **A.**  This was presented at the American Auditory

19 Society, which is a prestigious meeting in Scottsdale

20 every year, or online this year, and it was in 2017.

21 **Q.**  Okay.  Now, tell us a little bit about the results

22 of your *m*MIRE study, what you found and whether or not

23 those further confirmed the results of your other

24 experiments that you did.

25 **A.**  Sure.  So, we did sample statistics, as you would

1    with any large dataset.  And statistically, the

2    mandibular motion led to a significant change in

3    Combat Arms performance when you had 3mm or more of

4    mandibular motion.

5         But, if you look at the individual data, some

6    individuals had much more issues with reduction in

7    insertion loss because of the mandibular movement than

8    other individuals.

9         And so, it was consistent with our *h*MIRE and our

10   other testing in showing large individual differences

11   across ears.

12   **Q.**   Did you also do static testing?

13   **A.**   We did.

14   **Q.**   Tell the Court about that.

15   **A.**   The static testing is using the same rig here but

16   just not using any mandibular motion, so we didn't

17   have the mandibular motion actuator active during that

18   study.

19        And in that experiment, we had four basic

20   measurements.  We measured the olive end of the

21   earplug, the yellow end of the earplug.  And we fit it

22   two different ways, two different depths basically; a

23   standard depth for every model ear, and one in which

24   we tried to estimate the depth that was captured by

25   camera picture for individual subjects in the previous

1    portion of the study.

2    **Q.**   Is that a speaker down at the bottom, underneath?

3    **A.**   It is.

4    **Q.**   Is that what you used to deliver the sound?

5    **A.**   This is what we used to deliver the sound.  And it

6    basically fits on here like this, and then we have a

7    series of nuts that have to be tightened, and a little

8    cam up here.  And then you use --

9    **Q.**   Wing nut?

10   **A.**   -- wing nuts to tighten it down, and now you've

11   got the speaker directly on top of the pinna.

12   **Q.**   Did you do anything to ensure that the pinna

13   itself didn't move with the mandibular movement?  Did

14   you account for that?

15   **A.**   We have some considerable structure back here that

16   is part of the ATF itself as well as part of the

17   stability during mandibular motion.

18        So, behind the silicone ear replica is a

19   Plexiglass plate, and that Plexiglass plate is

20   analogous to the plate that's behind the pinna on a

21   traditional ATF.  So it provides rigidity just like

22   the head would; it's like the temporal bone of the

23   head.

24        And then, the ear simulator itself has substantial

25   weight.  And we wanted to maintain the original

 1    angulation of the ear canal as it goes towards the
 2    eardrum.  And so, we maintained that by using this
 3    rigid articulating arm that locks down to the metal
 4    plate below it.  And that keeps not only the right
 5    angulation throughout all experiments, but when
 6    mandibular motion is active, it keeps that from
 7    moving.
 8    **Q.**  In designing your *m*MIRE study, did you rely upon
 9    generally accepted peer-reviewed medical literature?
10    **A.**  Yes, we did.
11    **Q.**  Are these some of the studies that you referred
12    to?
13    **A.**  I mentioned the Darkner study earlier on
14    mandibular motion.  These other studies also talk
15    about mandibular motion specifically with respect to
16    what happens to the ear canal during mandibular
17    motion.
18    **Q.**  Let me -- if I can move this -- and I think you
19    can probably go back up to the stand.
20        So, I've heard criticism that, even though you
21    used the same ears in part of the ear canal, if you
22    look at the attenuation data from those simulated ears
23    in your ATF compared to the actual 30 individuals that
24    you did REAT testing on, that there is a variance.
25    **A.**  There is.

1   **Q.**  Can you explain why that is and whether that

2   matters at all with regard to your *m*MIRE testing?

3   **A.**  Sure.  The reason why it is is because they're two

4   very different systems.  The human that we used has

5   the human pinna, the human ear canal, the human

6   tympanic membrane, and that functions as one acoustic

7   system.

8       And the ATF that we created has a replica of the

9   pinna and a substantial portion of the ear canal, but

10  the remaining portion of the ear canal and the ear

11  canal extension and the ear simulator and microphone

12  are nothing like any individual human.

13  **Q.**  So, if we put this down, the KEMAR, the GRAS, and

14  the Klangfinder all have a standardized pinna?

15  **A.**  That's correct.

16  **Q.**  But yours had the human replica pinnas?

17  **A.**  That's correct.

18  **Q.**  Now, the ear canal extension would be the same --

19  we're talking about that cylinder that's not like any

20  human ear?

21  **A.**  That's right.

22  **Q.**  But yours had the actual ear canal up until that

23  bend that mattered?

24  **A.**  That's right.

25  **Q.**  Now, the ear simulator here, that's the eardrum,

1   that metal thing we were looking at, all of these are

2   the same?

3   **A.**   They're all standard.  The Klangfinder is

4   different, but the other three can be the same.

5   **Q.**   And the eardrum as well is a standard eardrum on

6   all of these?

7   **A.**   It is.  It's basically a microphone in every case.

8   **Q.**   So, would you at all expect the attenuation data

9   from the ears you used -- replica ears to match your

10   REAT data given the fact that you have a standardized

11   eardrum and a standardized ear simulator?

12   **A.**   No.

13   **Q.**   So, how do you characterize that criticism of your

14   *m*MIRE study?

15   **A.**   It's just not something that one would expect

16   based on, you know, knowing that these two systems are

17   different systems.

18   **Q.**   So, if we put back up the criticisms, just to sum

19   up, in every case that mattered to your scientific

20   study, did you validate the data that you used to rely

21   upon for your *m*MIRE or *h*MIRE opinions?

22   **A.**   Yes, we did.

23   **Q.**   And was the study design not only based upon your

24   doctorate degree in designing studies and your decades

25   of experience doing that, but also based upon

1    peer-reviewed literature?

2    **A.**   Yes, it was.

3    **Q.**   And were the -- that surrogate earplug that you

4    made in any material respect that would affect results

5    different than the Combat Arms Version 2?

6    **A.**   No, it was not, and we validated that.

7    **Q.**   And the replicas that were made with the

8    assistance of Mr. Juneau, were they anatomically

9    correct for purposes of the studies that you did?

10   **A.**   Yes, they were.

11   **Q.**   And was there anything not scientifically accepted

12   in creating an ATF where one did not exist to test the

13   plug in the manner that you did to look at mandibular

14   motion?

15   **A.**   No, there is not.  And I think the one there on

16   the right illustrates that that's also used for

17   scientific studies, the Klangfinder.

18   **Q.**   And I think we went over you've validated the ear

19   replicas?

20   **A.**   Yes.

21        **MR. AYLSTOCK:**   That's all the questions I

22   have.  Thank you, Judge.

23        **JUDGE RODGERS:**   All right.  Mr. Wasdin, you

24   can come on up.  While you do, I have a follow-up

25   question, Dr. Eddins, to an earlier question I had in

1    regards to the *h*MIRE testing that you did.

2         How do you know that the insertion and then

3    removal of the probe, that that didn't impact the

4    loosening potential?

5         **THE WITNESS:**  Good question.  There are two

6    important components of that.  You need the probe to

7    go at the same spot every single time for it to be a

8    valid and replicable measurement.  And so we went to

9    great lengths to make sure that the probe went the

10   same distance and ended at the same spot every time.

11   And I can explain that.  There is several steps

12   involved.

13        But I can tell you we wouldn't have had plus

14   or minus 1 dB of test-retest error had we not done

15   that.

16        **JUDGE RODGERS:**  Okay.

17        **THE WITNESS:**  The second is that we have just

18   incredible skill at doing that particular measure.  We

19   do it in a daily activity every time we fit a hearing

20   aid.  We frequently do it with our hearing protection

21   devices in other NIH-funded studies as well as this

22   one.  We're just very skilled at doing that.

23        We have provided the Court with a video to

24   show that there is absolutely no movement of the

25   earplug when we do that as carefully as we do during

1    the experiment.

2           **JUDGE RODGERS:**  So, with the

3    manufacturer-made surrogates, the tube is inside the

4    plug?

5           **THE WITNESS:**  That's correct, it essentially

6    is the same thing.  They run it straight through the

7    middle, and they have to acoustically seal it.

8           I can't guarantee that they used the same

9    process for every plug to seal it, but it's mandatory

10   that it has an acoustic seal so that you can't get any

11   sound to leak in around the tube.

12          **JUDGE RODGERS:**  All right.  And I'm assuming,

13   for purposes of your surrogate plug, you used the

14   specs from the CAEv2 that --

15          **THE WITNESS:**  Yes, from the Doty drawing.

16          **JUDGE RODGERS:**  Right.  I thought that's what

17   I saw on the slide earlier.

18          **THE WITNESS:**  We literally put those numbers

19   into the software used for printing.

20          **JUDGE RODGERS:**  Thank you.  I may have

21   questions after Mr. Wasdin.

22          Go ahead, Mr. Wasdin.

23                    **CROSS-EXAMINATION**

24   BY MR. WASDIN:

25   Q.  Dr. Eddins, hi.  I'm Nick Wasdin.  I don't know if

1    you can tell through my mask, but I took your

2    deposition.  It's good to see you again.

3    **A.**   Yes, it's good to see you.  A mask and Zoom makes

4    it a little different.  Nice to see you.

5    **Q.**   I can appreciate that.

6        I'm going to start with the *h*MIRE testing first.

7    **A.**   Sure.

8    **Q.**   You said that you have a doctorate in -- that I

9    guess at least included designing studies to test

10   earplugs.  Did I hear that right?

11   **A.**   No, you didn't hear that correctly.

12   **Q.**   Okay.  Prior to this litigation, had you ever done

13   testing to determine how much an earplug loosens after

14   jogging?

15   **A.**   No, I had not.

16   **Q.**   And prior to this case, had you ever done any

17   testing to determine how much an earplug loosens after

18   four hours of use?

19   **A.**   No, I have not.

20   **Q.**   All right.  So let's talk about the protocol you

21   came up with for the *h*MIRE testing in this case.

22   **A.**   Okay.

23   **Q.**   First, the test subjects, the human subjects

24   inserted the Eddins plug into their own ear, right?

25   **A.**   That's correct.

David Eddins - Cross/Wasdin                              172

1   **Q.**   And then the experimenter came and wired the probe

2   tube through the earplug after it was seated in the

3   subject's ear, right?

4   **A.**   That's correct.

5   **Q.**   The experimenter, I guess, swabbed the end of the

6   earplug with the lubricant mixture to close the hole;

7   is that right?

8   **A.**   No, that's not correct.   There was a lubricant

9   applied to the end of the earplug right where the

10  probe tube goes in; an eye dropper was used to put

11  that on there.

12  **Q.**   Okay.   So using like basically a syringe or

13  something like that?

14  **A.**   Yes.   It comes in a squeezable bottle.

15  **Q.**   Okay.   And then the probe tube with the earplug

16  seated in the ear is then sort of wrapped around and

17  affixed to that Velcro structure that we saw in the

18  photo?

19  **A.**   I would sort of say looped around, but yes, in an

20  analogous way that other MIRE systems work.

21  **Q.**   Okay.   And then, once you got the Velcro stuck to

22  the side of the person's face, what did you do with

23  the remaining probe tube and wires?

24  **A.**   Right.   All of that needs to be suspended in sort

25  of a strain-relief mode so that no wires can possibly

1    put any strain on the system.  So those were in a

2    metal sound attenuating chamber, so a magnet just

3    above the head of the subject, and those cables were

4    draped around that magnet without any tension on them.

5    **Q.**   Then a MIRE measurement was taken, right?

6    **A.**   That's correct.

7    **Q.**   And the probe tube was then pulled out of the

8    earplug while it was still in the subject's ear,

9    right?

10   **A.**   That's correct.

11   **Q.**   How did you wipe the lubricant off the back of the

12   plug?

13   **A.**   With a Kleenex basically.  It may have been --

14   actually, we probably used an audio wipe, which is --

15   it also sanitizes it.

16   **Q.**   Was the experimenter careful not to disturb the

17   fit of the plug when they were wiping it with the

18   Kleenex?

19   **A.**   They didn't wipe the plug; they wiped the probe

20   tube.

21   **Q.**   Oh.  So you left whatever remaining lubricant was

22   just on the hole of the plug basically?

23   **A.**   There wasn't any lubricant remaining on the end of

24   the plug that would add any weight or anything to it.

25   **Q.**   Okay.  Once all that was done and then the subject

1    performs the two activities, jogging or four-hour use,

2    right?

3    **A.**   That's correct.

4    **Q.**   And then, after that, you do all of that all over

5    again and take a second MIRE measurement, right?

6    **A.**   That's right.

7    **Q.**   And if the attenuation was lower on the second

8    one, you attributed that to loosening of the earplug

9    during the activity, right?

10   **A.**   That's correct.

11   **Q.**   Now, I thought I heard you say -- and just tell me

12   if I'm wrong -- that the average change before and

13   after the jogging measurement was 3 or 4 dB.

14        Did I hear that right?

15   **A.**   I would need to look at my graph to give you the

16   exact number.

17   **Q.**   Okay.  Let's take a look at it.

18        **MR. WASDIN:**   Jen, can we pull up the report

19   which we're going to called DX Eddins 01, page 47, and

20   call out the paragraph on the bottom.

21   **BY MR. WASDIN:**

22   **Q.**   Dr. Eddins, take a look at this.  This is the

23   relevant piece of your report, right?

24   **A.**   That's correct.

25   **Q.**   And what this says is that the mean difference

 1   across frequency was 1.3 dB, right?

 2   **A.**   That's correct.

 3   **Q.**   That's, after jogging, the average difference in

 4   the attenuation of the Eddins plug was 1.3 decibels

 5   less than before jogging, right?

 6   **A.**   With a peak at 1,000 of minus 3, yes.

 7   **Q.**   Okay.  And then -- we can call it out, too, if we

 8   need to.  But am I right that the mean difference

 9   across frequencies on the four-hour use test was

10   2-and-a-half dB?

11           **MR. WASDIN:**  Jen, put up page 51.

12           **THE WITNESS:**  Yes, that is correct.

13           **MR. WASDIN:**  Can you go ahead and put up page

14   51.

15   **BY MR. WASDIN:**

16   **Q.**   And what you say here in the relevant paragraph is

17   that these data are remarkable for several reasons,

18   and the first one that you give is, "Even changes of a

19   few dB are concerning with considering protection from

20   hazardous sound levels."

21           Did I read that right?

22   **A.**   Yes, you did.

23   **Q.**   So, mean difference of 1.3 dB after jogging or

24   2-and-a-half dB after four hours of use, those are

25   concerning to you, right?

1   **A.**   Certainly in the context of the activity that led

2   to those changes.

3   **Q.**   Okay.  Now, you didn't use the actual CAEv2 during

4   these tests, we've been talking about that all day,

5   right?

6   **A.**   That's correct.

7   **Q.**   Let's take a look at the Eddins plug.

8         **MR. WASDIN:**   Jen, can we put up page 43.2 and

9   call out the plugs.

10  **BY MR. WASDIN:**

11  **Q.**   So, the Eddins plug is there on the left, right?

12  **A.**   That is correct.

13  **Q.**   It's got the two yellow ends, the new stem, and

14  the probe tube hanging out of the top, right?

15  **A.**   Is does.

16  **Q.**   What is that blue blob?

17  **A.**   That is Silly Putty that we frequently use in the

18  field whenever we need to create an acoustic seal.

19  It's often used to close a vent in an earmold of a

20  hearing aid.

21       And the purpose of that was to allow us to test

22  the earplug itself without allowing any sound to go in

23  through the opening of the probe where it would

24  normally hook to a microphone.  You wouldn't want the

25  sound that we present during the test to sneak in

1   through that pathway.

2   **Q.**   Okay.  So, I think this is clear, but let's just

3   make a record out of it.

4        You created this device here on the left, the

5   Eddins plug, for the purposes of this litigation,

6   right?

7   **A.**   I did.

8   **Q.**   The first 3M criticism that you chopped off -- put

9   a red X through on your demonstrative read that it was

10  unfair to say that your earplug is materially

11  different.  Is that right?

12  **A.**   That's correct.

13  **Q.**   Let's talk about that.  First, the Eddins plug has

14  two hollow yellow ends, right?

15  **A.**   That's correct.

16  **Q.**   The Combat Arms Version 2 has a solid green end

17  and a hollow yellow end, right?

18  **A.**   Exactly.

19  **Q.**   I thought I heard you say that those were the same

20  weight.  Is that right?

21  **A.**   They are the same weight.  When we compare the

22  weight of the Combat Arms original to the weight of

23  our surrogate plug with the probe tube in the

24  surrogate plug just the length of the plug itself.

25  **Q.**   Not the plug, sir.  The tips.  I thought I heard

1    you say that you thought the yellow end of the Combat

2    Arms Version 2 tip was the same weight as the green.

3    **A.**   I did not say that.

4    **Q.**   Okay.  They're different weights, is that your

5    view?

6    **A.**   I have not weighed those two things separately.  I

7    have only weighed the entire assembly of the original

8    Combat Arms and our surrogate plug.

9    **Q.**   You don't know whether they're the same weight or

10   different weights; is that fair?

11   **A.**   That's correct.  What I do know is that the

12   overall weight of those two is comparable.

13   **Q.**   Okay.  Now, the Eddins plug -- you said this, but

14   it's hollow from end to end, right?

15   **A.**   Correct.

16   **Q.**   Is the Combat Arms Version 2 hollow?

17   **A.**   It is not -- well, it is hollow from the center to

18   the medial end when the yellow end is in the ear, and

19   then it has a filter in that hollow tube.

20   **Q.**   It's not hollow from end to end, though, is it,

21   sir?

22   **A.**   No, it is not.

23   **Q.**   You said that your plug does not have a non-linear

24   filter mounted in the stem, right?

25   **A.**   No.  We were not evaluating the non-linear

1    component in that experiment.

2    **Q.**   And then, conversely, the Combat Arms Version 2

3    does have a non-linear filter, right?

4    **A.**   Yes, it does.

5    **Q.**   Now, the non-linear filter in the Combat Arms

6    Version 2, that's mounted at one end of the stem,

7    right?

8    **A.**   Yes, it is.

9    **Q.**   Not in the middle of the stem, right?

10   **A.**   Correct.

11   **Q.**   It's off center, right?

12   **A.**   That's correct.

13   **Q.**   How much does the filter weigh?

14   **A.**   That, I don't know.

15   **Q.**   I'm sorry, you said you don't know?

16   **A.**   I do not know the weight of the filter.

17   **Q.**   Where is the center of gravity on the Combat Arms

18   Version 2 plug?

19   **A.**   Well, I would assume it's very close to the center

20   of the Combat Arms Version 2 plug.

21   **Q.**   Did you take any measurements to determine that?

22   **A.**   I did not.

23   **Q.**   Now, I think you put a checkmark next to weight.

24   You said the two plugs weigh the same.  So let's just

25   get to the bottom of it.

1      How much does the Eddins plug weigh?

2   **A.**   I don't remember the number off the top of my

3   head.  But we certainly weighed multiple samples of

4   our plug, multiple samples of the Combat Arms plug,

5   and they were within 3 percent.

6      There is a measurement error on every time you

7   weigh an earplug, the Combat Arms or ours.  So we

8   weighed them multiple times and averaged them, and the

9   difference was about 3 percent -- less than 3 percent.

10  **Q.**   I want to dig into this.  First, sitting here

11  today, you don't know what the Eddins plug weighs; is

12  that right?

13  **A.**   It's somewhere in the neighborhood of, as I

14  recall, about -- gosh, 1100 -- I'm not sure.  I don't

15  recall.  I can look that up.

16  **Q.**   How much does the Combat Arms Version 2 weigh?

17  **A.**   Well, again, they were about the same.

18  **Q.**   Do you know how much it weighs?

19  **A.**   I don't remember the exact value.

20  **Q.**   Okay.  I think you just said that you weighed it

21  multiple times -- weighed both plugs multiple times,

22  and they were always within 3 percent of each other;

23  is that right?

24  **A.**   The average across all of the measurements for the

25  Combat Arms and the average across all of the

1   measurements of the surrogate plug, when you average

2   those, there is no more than a 3 percent difference

3   between the weights.

4   **Q.**   What was the largest difference that you picked up

5   on any of your weights?

6   **A.**   It would have -- I don't remember the largest

7   difference, but within a percent or two of that.

8   **Q.**   Were any of the weights that you did equal?

9   **A.**   I would have to look at the numbers.  I can't

10   recall.

11   **Q.**   Why did you put a checkmark next to they weigh the

12   same?

13   **A.**   Well, 3 percent to me is within the margin of

14   error, and so effectively they are weighing the same.

15   **Q.**   When you talk about how much the -- this

16   comparison you did on weight, is that with the probe

17   tube inserted or without the probe tube inserted?

18   **A.**   It is with the probe tube inserted the length of

19   the Combat Arms itself because we reasoned that the

20   part outside the Combat Arms was suspended from the

21   microphone.

22   **Q.**   But, sir, isn't it true that you removed the probe

23   tube from your plug before the subjects did their

24   activities?

25   **A.**   That's correct.

1    **Q.**   So, how much did the Eddins plug weigh without the

2    probe tube?

3    **A.**   Slightly less.

4    **Q.**   Does that make it more or less different than the

5    Combat Arms?

6    **A.**   It doesn't make it less different.  But, if you

7    have a lighter plug, it's certainly going to be less

8    likely to be jarred during jogging or other activities

9    like that.

10   **Q.**   Did you take any weights of the Eddins plug

11   without the probe tube?

12   **A.**   I believe we did.

13   **Q.**   And how close was it to the actual Combat Arms?

14   **A.**   That, I don't have in my memory.

15   **Q.**   Okay.  The Eddins plug -- I thought I heard you

16   say today that the stem is made out of P48 resin.  Is

17   that right?

18   **A.**   That's correct.

19   **Q.**   Do you know that you state in your report that

20   it's made out of silicone?

21   **A.**   I do know that.

22   **Q.**   Is that just an inaccuracy?

23   **A.**   It's an error.

24   **Q.**   The Combat Arms Version 2 stem, I think you said

25   it's not made out of PR48 resin, is it?

1    **A.**   No, it's not.

2    **Q.**   Are you familiar with the concept of stiffness of

3    a material?

4    **A.**   Generally.

5    **Q.**   What does stiffness mean in structural

6    engineering?

7    **A.**   I'm not sure I can give you the definition in

8    structural engineering.

9    **Q.**   You put hardness up on one of these charts.  Do

10   you know what that means?

11   **A.**   I do.

12   **Q.**   What does that mean in the concept of structural

13   engineering?

14   **A.**   Hardness, it more or less is the potential for

15   being able to compress or depress the material.

16   **Q.**   Stiffness, though, is different, right, sir?

17   **A.**   That's correct.

18   **Q.**   Am I right that you did not use any sort of

19   measurement technique to actually measure the

20   stiffness of the stem you made for the Eddins plug; is

21   that right?

22   **A.**   Well, you can't actually make those sorts of

23   engineering measurements on such small samples.  The

24   standards require you to have larger samples of the

25   material in order to spec it.

1    **Q.** Am I right that you did not use any sort of

2    measurement technique to actually measure the

3    stiffness of the stem you made for the Eddins plug?

4    **A.** That's correct.

5    **Q.** Mass is a separate measurement than stiffness and

6    hardness, right?

7    **A.** It is.

8    **Q.** Did you evaluate the mass of the stem that you

9    made?

10   **A.** No.  We used weight as the surrogate for that.

11   **Q.** Okay.  Do you know what the mass is of the Combat

12   Arms Version 2 plug?

13   **A.** We did not assess the mass.

14   **Q.** What was the -- you said they had the same

15   hardness.  That's a different -- we just said that's

16   different.  But what was the hardness measurement of

17   the stem that you put into the Eddins plug?

18   **A.** It's a hardness measurement on a Shore D scale.

19   **Q.** And what was it?

20   **A.** 85.

21   **Q.** 85.  And what's the hardness measurement for the

22   Combat Arms Version 2?

23   **A.** I understand it's in the range of 85, 86, but I'm

24   not exactly sure at the moment.

25   **Q.** Why did you put a checkmark next to hardness?

David Eddins - Cross/Wasdin                    185

1    **A.**   I'm fairly certain it's 85 or 86.  And to me, a

2    difference of 1 on a Shore hardness scale is not a

3    significant difference.

4    **Q.**   Have you read the *Daubert* briefs in this case?

5    **A.**   I have.

6    **Q.**   In Plaintiffs' brief they say that the Eddins plug

7    has the same weight and the same flanges as the Combat

8    Arms Version 2.  Did you see that statement?

9    **A.**   Yes.

10   **Q.**   It doesn't have the same weight, though, does it?

11   **A.**   Effectively the same weight, not identical in

12   terms of decibel places.

13   **Q.**   It doesn't have the same flanges, does it?

14   **A.**   It does have the same -- on the adapters or the

15   flanges of the ends?

16   **Q.**   The flanges of the ends, sir.

17   **A.**   The flanges of the ends are the same.

18   **Q.**   You said they are the same?

19   **A.**   Yes.

20   **Q.**   Sir, you have two yellow flanges.  The Combat Arms

21   doesn't have two yellow flanges, does it?

22   **A.**   It has a yellow flange and a green flange, but

23   they are made with the same dimensions, other than the

24   hollow center.

25   **Q.**   Am I right that you did not subject the Eddins

1    plug to any type of peer review to see if others

2    believed it was an appropriate surrogate for the

3    Combat Arms Version 2?

4    **A.**   We certainly haven't had time, given the timeframe

5    of this litigation, to submit anything for peer

6    review.

7    **Q.**   Okay.  Let's take a look at some photos of the

8    Eddins plug in people's ears.  You took a lot of

9    those, right?

10   **A.**   We did.

11   **Q.**   And the photos you took I believe are after the

12   subjects put it in their ear but before you disturbed

13   it with the probe tube, right?

14   **A.**   Depending on which images we look at, that's very

15   possible.

16          **MR. WASDIN:**   Jen, can we pull up DX Eddins 06

17   and go to page 7.

18   **BY MR. WASDIN:**

19   **Q.**   This is subject 1292 who has inserted the Eddins

20   plug into their ear before jogging, right, sir?

21   **A.**   Yes.

22   **Q.**   Does that earplug look pretty straight to you?

23   **A.**   It looks like it would when -- there is lots of

24   individual differences from any angle on what an

25   earplug would look like, but it looks good to me.

1    It's in as deep as you can get this earplug just about

2    it.

3    **Q.**   The stem looks straight?

4    **A.**   The stem is differently straight.

5    **Q.**   Okay.  Let's take a look at page 13.  Subject

6    1302.  Does the stem look straight for this subject to

7    you?

8    **A.**   You know, with these images, it's very difficult

9    to tell what it looks like.  But the stem can't flex

10   or bend, so it is most certainly straight.

11   **Q.**   Looks straight to you in these photos?

12   **A.**   You know, I almost -- if I didn't know what we

13   were looking at, you might say the bottom right looks

14   like a bend.  But we know by touching and measurement

15   of these stems that they don't flex, so it could not

16   bend.

17   **Q.**   Let's take a look at page 15.  What about this

18   one, what about the image in the top right there?

19           **MR. AYLSTOCK:**  Do you have copies of these?

20           **MR. WASDIN:**  Yes.

21   **BY MR. WASDIN:**

22   **Q.**   This is, I think we said, subject 1308, right, Dr.

23   Eddins?

24   **A.**   I currently don't see the subject number, but I'll

25   take your word for it, if that's it.

David Eddins - Cross/Wasdin                          188

1    **Q.**   Okay.   Does this one look straight or bent to you?

2    **A.**   It's a straight plug.   You may know that the ear

3    canal geometry is such that, when you go in a typical

4    ear canal, you're going upward and backward, which

5    means the part of the plug that's in the ear is going

6    upward and backward.

7        Because this is a double-ended plug, the portion

8    that's going out is going forward and downward, and it

9    looks to me like it's seated in and contacting the

10   intertragal notch.

11   **Q.**   This one looks straight to you, is what you said?

12   **A.**   No, I didn't say that at all.

13   **Q.**   This one looks bent to you?

14   **A.**   This certainly looks straight.

15   **Q.**   Let's take a look at page 24 and call out the

16   picture on the top left.

17       Straight or bent here for subject 1321, Doctor?

18   **A.**   I would say it's straight.

19   **Q.**   Looks straight to you, okay.   Let's do one more,

20   page 8.   Subject 1294.

21           **MR. WASDIN:**   Can we call out the photo on the

22   right?

23   **BY MR. WASDIN:**

24   **Q.**   Does that appear straight or bent to you?

25   **A.**   That is also straight.

David Eddins - Cross/Wasdin                    189

**Q.**   Can the Combat Arms Version 2 bend at the middle
when it's inserted into a user's ear?

**A.**   It cannot bend in the middle.

**Q.**   You said earlier that one reason you didn't use
the probe tube on the actual Combat Arms Version 2 is
because, to go around the hole that's in the yellow
end in the stem, that turn could crimp the probe tube
and cause you to lose acoustic fidelity.

Did I get that right?

**A.**   You got that correct.

**Q.**   So, inserting a probe tube into a curved stem, you
can't do that, right, Doctor?

**A.**   I wouldn't say that.  Number one, had we tried to
do that with the original Combat Arms stem, we would
have had to damage the stem to get the filter out,
which we weren't interested in doing.  I've never
removed a filter from a Combat Arms, but I assume that
that would cause damage.

But what I did say is, if you, in a very tight
space, make a 90 degree angle with a thin probe tube,
you run the risk of causing a crimp in it, which
means, if I were to bend it like this, then this wall
and that wall could touch each other, or certainly
come close, and restrict airflow, which would
compromise sound flow.

1   **Q.**  I think you answered this when Judge Rodgers asked

2   you, but let me just make sure it's clear.

3        You did not do anything to validate whether the

4   Eddins plug loosens in a user's ear similar to the

5   Combat Arms Version 2; is that right?

6   **A.**  That's correct, we did not.

7   **Q.**  That's loosening.  Now, there is a separate issue

8   that you talked about at length about whether the two

9   plugs attenuate noise the same, right?

10  **A.**  That's right.

11  **Q.**  You believe you validated that; I think you said

12  it was an acoustic matching test, right?

13  **A.**  We have validated that so that it's an acoustic

14  match in order to answer the questions that we were

15  addressing, yes.

16        **MR. WASDIN:**  Jen, can we pull up from the

17  report DX Eddins 01 at 43 and just blow out the whole

18  -- that graph on the right.

19  **BY MR. WASDIN:**

20  **Q.**  Dr. Eddins, this graph is the data that you told

21  the Court shows that the two plugs essentially

22  attenuate noise nearly identically, I think is how you

23  put it.  Is that right?

24  **A.**  That's correct.

25  **Q.**  Now, the difference in attenuation between the two

1  plugs is plotted on that black line at the top, right?

2  **A.**   It is.   That's the difference between the green

3  curve and the yellow curve.

4  **Q.**   If the two plugs were attenuating noise

5  identically, that would be a flat line, right?

6  **A.**   Well, we're making acoustic measurements with

7  noise, so it would have some variation.   But, yes, in

8  theory, it would be right along the zero point.

9  **Q.**   Okay.   That black line is not flat, is it, sir?

10  **A.**   Well, it's -- from an acoustic measurement point

11  of view, it is within acoustic measurement error,

12  again, up to that four or 5,000 hertz place in which

13  case clearly there is a difference.

14  **Q.**   Okay.   Below 5,000 hertz, you would agree there

15  are small bumps in that line?

16  **A.**   There are small bumps in that line.

17  **Q.**   And we can look at your data spreadsheet if we

18  need to.   But would you generally agree that the

19  differences at various frequencies below 5,000 range

20  from zero-point-something up to four to 4-and-a-half

21  dB?

22  **A.**   There potentially could be a peak as big as

23  4-and-a-half dB, but it's hard to tell by just looking

24  at the figure.

25  **Q.**   You want to go through the data?

1    **A.**   I don't necessarily want to go through the data

2    points, but we might -- if we could look at the

3    figures that we had replotted on a smaller scale, it's

4    possible we would see it.

5    **Q.**   I don't have those, so let's go through the data.

6            **MR. WASDIN:**   Jen, can you pull up the Excel

7    spreadsheet that Dr. Eddins produced, and go to the

8    tab at the bottom that's labeled "*h*MIRE probe

9    validation."

10   **BY MR. WASDIN:**

11   **Q.**   Doctor, are you able to read that as we get a

12   little closer?

13   **A.**   I'm good.

14   **Q.**   Let's take a look at row 21, if we can highlight

15   that.  So, row 21 compares the two plugs at the 210

16   hertz, right?

17   **A.**   Correct.

18   **Q.**   And the difference there is +2.3 dB, right?

19   **A.**   Yes, it is.

20   **Q.**   So, that means that, at the 210 hertz, the Eddins

21   plug is underestimating attenuation by 2.3 dB, right?

22   **A.**   I'm trying to think of which one we difference --

23   I believe you're correct.

24   **Q.**   Okay.  And if we look at row 33, this is at the

25   350 hertz, right, sir?

 1   **A.**   That's correct.

 2   **Q.**   And there the Eddins plug is overestimating

 3   attenuation at 3.2 dB, right?

 4   **A.**   Correct.

 5   **Q.**   And then, we've got a couple more, but let me just

 6   skip to the top end that I asked you about, if we can

 7   go to row 123.

 8        Row 123 is approximately 1400 hertz, right, sir?

 9   **A.**   It is.

10   **Q.**   And there you've got the difference at

11   4-and-a-half dB, right?

12   **A.**   Yes.

13   **Q.**   So, the question I asked before we pulled up the

14   spreadsheet was, would you agree that below 5,000

15   hertz the Eddins plug performs somewhere between a

16   decimal place and about 4-and-a-half dB different than

17   the Combat Arms Version 2?

18   **A.**   I agree that those differences are in the

19   measurements.  They're plus or minus, which doesn't

20   tell you that -- because this is a noise measurement,

21   it's a noise measurement that was made once.  It

22   doesn't tell you that there is a systematic difference

23   between them.

24        And it tells you that, if there were systematic

25   differences and these were the actual values, it's

1    between plus or minus 3 to 4 dB, correct.

2    **Q.**   You don't think plus or minus 3 to 4 dB is a big

3    deal here, right?

4    **A.**   In this case, it's nothing compared to, say, the

5    actual data from human subjects where we averaged over

6    60 ears.

7    **Q.**   That's where I want to go.  So let's go back to

8    DX1 at 51.  While she is pulling that up, I want to

9    set this up.

10        When you compared your plug to the Combat Arms

11   plug, differences of 1 to 4-and-a-half dB, no big

12   deal, right?

13            **MR. AYLSTOCK:**  Objection, form.

14            **JUDGE RODGERS:**  Sustained.

15   **BY MR. WASDIN:**

16   **Q.**   When you compared your plug to the Combat Arms

17   plug, you say that they're performing nearly

18   identically, notwithstanding differences of 1 to

19   4-and-a-half dB, right?

20   **A.**   That's correct, I said that.

21   **Q.**   All right.  If we can blow up the bottom paragraph

22   here.  Here, though, a difference of 2-and-a-half dB

23   after a four-hour use you say is remarkable and

24   concerning considering protection from hazardous sound

25   levels, right?

1   **A.**   I did say that.

2   **Q.**   All right.  The third criticism on your chart that

3   you said was unwarranted was that ANSI says that MIRE

4   is not advised to measure a continuous noise with a

5   passive earplug, and there was an X through that.

6        Do you remember that?

7   **A.**   I do.

8   **Q.**   Well, let's take a look at it.  First, the Eddins

9   plug was, as you tested it, a passive earplug, right?

10  **A.**   It was a passive earplug.

11  **Q.**   And you used MIRE to measure insertion loss,

12  right?

13  **A.**   I did.

14  **Q.**   And the noise that was presented was continuous

15  noise, right?

16  **A.**   It was continuous.

17  **Q.**   There was an ANSI standard that talks about

18  techniques for taking MIRE measurements in continuous

19  noise, right?

20  **A.**   There are two ANSI standards.

21       **MR. WASDIN:**  Let's look at S12.42, Jen, at DX

22  Eddins 5.

23  **BY MR. WASDIN:**

24  **Q.**   Dr. Eddins, do you recognize this one?

25  **A.**   I do.

1    **Q.**   This is ANSI S12.42?

2    **A.**   Yes.

3    **Q.**   And it says, "Methods for the measurement of

4    insertion loss of hearing protection devices in

5    continuous or impulsive noise using MIRE or ATFs,"

6    right?

7    **A.**   Correct.

8    **Q.**   Did you know about ANSI S12.42 when you did your

9    testing?

10   **A.**   No, we did not.

11   **Q.**   If we can go to page 5, there is a chart -- or

12   sorry, it's actually page 17 of the PDF, page 5 of the

13   standard.  There is a chart in this titled

14   "Applicability of Test Methods to Different Hearing

15   Protection Device Types."

16       Do you see that, Dr. Eddins?

17   **A.**   I do.  I know this chart well.

18   **Q.**   We talked about it at your deposition, right?

19   **A.**   We did, and I obviously knew this before I

20   conducted my study.

21   **Q.**   Okay.  In the left column, there is a series of

22   HPD types.  Do you see that?

23   **A.**   I do.

24   **Q.**   Yours was a passive earplug, right?

25   **A.**   Yes.

1   **Q.**   And then, if you go right, there is a column for

2   continuous noise MIRE measurements.  Do you see that?

3   **A.**   I do.

4   **Q.**   What does it say there under whether you should

5   use MIRE for passive earplugs?

6   **A.**   It says "not advised."

7   **Q.**   And if you go up to the top of the chart, there is

8   a definition for "not advised."  Do you see that?

9   **A.**   I can't see that.  I have an image in front of

10  that, unfortunately.  There we go.

11  **Q.**   Can you see that?

12  **A.**   Yes.

13  **Q.**   What is the definition of "not advised" here?

14  **A.**   Is says "= this method not recommended."

15  **Q.**   Okay.  Were you aware when you did your *h*MIRE

16  study that ANSI S12.42 says what you were doing was

17  not recommended?

18  **A.**   Absolutely.

19  **Q.**   Okay.  You showed the Court a series of at least

20  the front cover of some studies that you said talked

21  about how probe tube MIRE was appropriate, right?

22  **A.**   Yes.

23  **Q.**   And then you had some callouts from a 3M document

24  that had the similar probe tube coming out of the end

25  of the earplug, right?

1    **A.**   That's right.

2    **Q.**   Now, it's fair, though, isn't it, sir, that the 3M

3    testing that's done with MIRE, those earplugs are

4    manufactured for that purpose, right?

5    **A.**   That's correct.

6    **Q.**   And the probe tube is inserted into the earplug

7    and stationary in it prior to anybody ever putting it

8    in their ear, right?

9    **A.**   It is, which is an interesting concept in and of

10   itself.

11   **Q.**   None of that 3M testing says it's appropriate to

12   repeatedly insert and remove a probe tube into an

13   earplug after it's seated in somebody's ear, correct?

14   **A.**   They do not say that.  To my knowledge, they don't

15   say the opposite either.

16   **Q.**   Okay.  Do you have any idea what 3M does in terms

17   of validation?

18   **A.**   I'm sure they do a measurement very much like I

19   did.

20   **Q.**   You just don't know?

21   **A.**   I see validation in the published studies.  But in

22   terms of their internal work, no, I have not seen

23   internal documents.

24   **Q.**   So, that's the Eddins plug.  And now let's just

25   switch gears and talk about who was using it.

David Eddins - Cross/Wasdin                    199

```
 1        I think you said you used 30 human subjects,
 2   right?
 3   A.   That's correct.
 4   Q.   You identified those folks by putting up flyers in
 5   the Tampa, Florida, area?
 6   A.   Flyers.  We have sort of a number of methods for
 7   recruiting, but we used our normal recruiting methods.
 8   Q.   You screened those subjects to make sure they were
 9   inexperienced with earplugs, right?
10   A.   Yes.
11   Q.   If the subject had reported using an earplug more
12   than ten times over the prior two years, they were
13   out?
14   A.   That's correct.
15   Q.   The subject selection protocol that you use
16   specifically called out use of an earplug during
17   military duty as a criteria for exclusion, right?
18   A.   That's correct.
19   Q.   You similarly screened the subjects to make sure
20   they didn't have any prior training with using
21   earplugs, right?
22   A.   That's correct.
23   Q.   Now, I think the way this is talked about is those
24   test subjects are what we would call naive test
25   subjects, right?
```

1  **A.**   One of the terms that's used, yes.

2  **Q.**   Military servicemembers are not naive earplug

3  users, right, sir?

4           **MR. AYLSTOCK:**  Let me object as outside the

5  scope.  This is going to the REAT testing.

6           **MR. WASDIN:**  This is the same people that

7  were on the *h*MIRE, and it matters how they put the

8  plug in for the reliability of the MIRE --

9           **JUDGE RODGERS:**  But you've established that

10 he excluded those types.  I don't think I need to know

11 why.

12           **MR. WASDIN:**  Well, one of the -- Your Honor,

13 one of the questions that was in the email was the

14 helpfulness of this study.  And so, I'm going to try

15 to make the point that, even if you credit the plug

16 being the same, how much it loosened after a naive

17 user used it is not helpful to how much it would

18 loosen after a military person used it.

19           **JUDGE RODGERS:**  Well, you've established that

20 he excluded military users.  I think you've made the

21 point.

22           **MR. WASDIN:**  And can I make the point that

23 military users are trained and they do better?

24           **JUDGE RODGERS:**  No, I don't think you need to

25 make that point right now.  That's -- you've got a

 1    record of that beyond this witness.

 2            **MR. WASDIN:**   Okay.

 3    **BY MR. WASDIN:**

 4    **Q.**   The experimenter, once those inexperience subjects

 5    put the plug, he or she did not manipulate the plug in

 6    their ear, right?

 7    **A.**   That is correct.

 8    **Q.**   It was tested in whatever manner the subject put

 9    it in, right?

10    **A.**   Correct.

11    **Q.**   Let's take a look at that.

12            **MR. WASDIN:**   Jen, can we put up DX Eddins 06

13    and go to page 30.

14    **BY MR. WASDIN:**

15    **Q.**   Dr. Eddins, this is your subject 1332, right?

16    **A.**   Yes, it looks -- label 1332, yes.

17    **Q.**   Looking at these photos, how deep would you say

18    that subject 1332 put the Eddins plug into his or her

19    ear?

20    **A.**   Well, they've got it into and past the second

21    flange of the inner flange, the portion that goes into

22    their ear.

23    **Q.**   We can still see the second flange, for example,

24    in the bottom left there, right?

25    **A.**   You can see the bottom left.  You can't see it all

1    the way around.  But it looks like on the top left

2    it's equal to the entrance to the ear canal.

3    **Q.**  And then the two largest flanges appear to be sort

4    of pinching or resting upon the base of the pinna,

5    right?

6    **A.**  It looks to me like the -- if you look in the

7    upper right, the gap between the two flanges is on the

8    tragus, and it's suspended in the sort of conchal bowl

9    there.

10   **Q.**  Okay.  And to be clear, this person then jogged

11   and you measured how much the plug loosened or fell

12   out from this position?

13   **A.**  Certainly did.

14   **Q.**  Let's turn to the silicone ear replicas.

15        The main focus of the *m*MIRE study with the

16   replicas was to establish the degree to which the

17   Combat Arms would loosen in response to jaw movement,

18   right?

19   **A.**  No.  Would loosen in response to mandibular

20   motion.

21   **Q.**  Fair clarification.  Of which jaw movement is one

22   type?

23   **A.**  Oh.  I thought you said jogging.  I'm sorry.

24   Mask.

25   **Q.**  Yeah, exactly.  I said jaw movement.

1    **A.**   Jaw movement, yes.

2    **Q.**   I think we said the same thing.

3    **A.**   Yes.  I'm sorry.

4    **Q.**   An ear canal, sir, is, what, about an inch long?

5    **A.**   Yes.

6    **Q.**   25mm, give or take?

7    **A.**   22 to 32mm range.

8    **Q.**   And I'm right that the impressions that you took

9    to make the replicas went about halfway down; is that

10   fair?

11   **A.**   Considerably -- a bit more than half, on average.

12   About 15mm, I believe.

13   **Q.**   Then you sent the replicas to Mr. Juneau at Soft

14   Touch, right?

15   **A.**   That's correct.

16   **Q.**   He returned to you the silicone ear replicas,

17   right?

18   **A.**   That's right.

19   **Q.**   Who invented the motor and plunger system that was

20   attached to it?

21   **A.**   Dr. Juneau had the design on that.

22   **Q.**   Did you give input --

23   **A.**   Mr. Juneau.

24   **Q.**   I'm sorry?

25   **A.**   Mr. Juneau.  Sorry.

1   **Q.**   Oh, okay.  We can give him an honorary doctorate.

2       Did you give input into the design or development

3   of the motor and plunger, or did he just come up with

4   that on his own?

5   **A.**   No.  I gave input as well.

6   **Q.**   And then, as I understand it, it was affixed to

7   that wooden structure over there on that cart?

8   **A.**   Yes.

9   **Q.**   And then, you would put the Combat Arms Version 2

10  into the ear replica, right?

11  **A.**   Yes.

12  **Q.**   And then take attenuation measurements before and

13  after the motor and plunger system was operated?

14  **A.**   That's correct.

15  **Q.**   And the delta you attributed to loosening due to

16  the simulated jaw movement?

17  **A.**   Yes.

18  **Q.**   Now, prior to this litigation, I'm right that you

19  had never made measurements with a hearing protection

20  device in a silicone ear replica, right?

21  **A.**   I had certainly made measurements of earplugs in

22  silicone ears.  They weren't replicas.  They were of

23  our other ATFs.

24  **Q.**   Okay.  But in terms of what you did here, you used

25  a silicone ear replica, right?

**A.**   That's correct, the pinna is individualized to

individualized humans.

**Q.**   Okay.  And you talked a little bit about some of

the expertise you have in testing earplugs, right?

**A.**   Yes.

**Q.**   You're well studied in that area?

**A.**   I am.

**Q.**   Prior to this litigation, had you ever heard of

anyone testing a hearing protection device in a

silicone ear replica?

**A.**   Yes.

**Q.**   You gave a deposition in this case, didn't you,

sir?

**A.**   I did.

**Q.**   Okay.  Let's take a look at it.

          **MR. WASDIN:**  Your Honor, can I play a clip

from the dep, or do you want me to do it old school

with the transcript?

          **JUDGE RODGERS:**  Whatever you want to do.

          **MR. AYLSTOCK:**  I think we need an

inconsistent statement before we --

          **MR. WASDIN:**  It's going to be inconsistent to

his last statement.

          Can we play video DE3.

          **MR. AYLSTOCK:**  Still the same objection.  I

1  think he needs to establish that it's inconsistent and

2  ask him if he remembers giving a deposition and giving

3  this answer.

4       **JUDGE RODGERS:**  That would be the proper way

5  to do it, Mr. Wasdin.

6       **MR. WASDIN:**  Sure.

7  **BY MR. WASDIN:**

8  **Q.**  Dr. Eddins, prior to this litigation, had you ever

9  heard of anyone testing a hearing protection device in

10  a silicone ear replica?

11  **A.**  Yes.

12  **Q.**  Do you remember giving a deposition in this case?

13  **A.**  I do.

14  **Q.**  I'm going to show you some video from your

15  deposition.

16       **MR. AYLSTOCK:**  Can I have the page?

17       **MR. WASDIN:**  323, 4 to 12.

18       Can we play video DE3?

19       *(Video published as followed:)*

20       **"QUESTION:**  Have you ever heard of anyone,

21  prior to this litigation, testing hearing protection

22  devices in silicone ear replicas?

23       **"ANSWER:**  Certainly I've seen people make

24  measurements of hearing protection devices in ATFs of

25  a variety of types.  I don't recall seeing any

1    particular ones using silicone ear replicas."

2    **BY MR. WASDIN:**

3    **Q.**   Dr. Eddins, at your deposition were you asked that

4    question and did you give that answer?

5    **A.**   I did give that answer.

6    **Q.**   These devices -- these silicone ear replicas were

7    created for purposes of this litigation, right, sir?

8    **A.**   Yes.

9    **Q.**   Now, you said that the design of the *m*MIRE process

10   was based on peer-reviewed literature.  That's what

11   you said earlier?

12   **A.**   Each component is grounded in peer-reviewed

13   literature.

14   **Q.**   But the motor and plunger technique you used to

15   replicate mandibular motion is not described in any

16   peer-reviewed literature, sir, is it?

17   **A.**   Mandibular motion certainly is.  And you can

18   induce it in different ways.  And I induced it with

19   this piston that we described earlier.

20   **Q.**   The motor and plunger technique you used is not

21   described in any peer-reviewed literature, is it?

22   **A.**   Not that specific technique.

23   **Q.**   Silicone ear replicas are different than human

24   ears in a couple of ways, right?

25   **A.**   They are.

1   **Q.**   Ear replicas like the ones you made are made out

2   of silicone, right?  Right?

3   **A.**   Correct.

4   **Q.**   Human ears are not made out of silicone, right?

5   **A.**   They are not.

6   **Q.**   Human ears are made out of flesh, cartilage, and

7   bone, right?

8   **A.**   That's correct.

9   **Q.**   Each of those substances has its own unique

10   acoustical properties, right?

11   **A.**   Yes.

12   **Q.**   And more importantly to the issue of loosening,

13   silicone and human flesh have different coefficients

14   of friction, don't they, sir?

15   **A.**   They do.

16   **Q.**   What is the coefficient of friction of the

17   silicone you used in the ear replicas?

18   **A.**   That, I do not know.

19   **Q.**   What is the coefficient of friction of human

20   fresh?

21   **A.**   I don't know that either, and I would assume that

22   it's independent depending on each person and their

23   current state.

24   **Q.**   Human ear flesh is covered not only in wax but

25   also in perspiration and hairs, right?

1    **A.**   Did you say perspiration?

2    **Q.**   Perspiration and hairs.

3    **A.**   Yes, can have perspiration, can have hairs.

4    Neither one of those is mandatory.

5    **Q.**   Okay.  Did your silicone ear replicas have

6    perspiration or hairs in them?

7    **A.**   No, they did not.

8    **Q.**   You've completed your study on the ear replicas,

9    right, sir?

10   **A.**   Yes.

11   **Q.**   And you believe that, having done so, you can now

12   come in and tell the jury how the Combat Arms Version

13   2 loosens in the ear replicas, right?

14   **A.**   I do.

15   **Q.**   But no one in this case is claiming an injury from

16   a Combat Arms loosening in an ear replica, are they,

17   sir?

18   **A.**   I'm not aware of that.

19   **Q.**   I mean, this case is about whether the Combat Arms

20   Version 2 loosens in a human ear, right?

21   **A.**   We're concerned about humans and their hearing

22   protection.

23   **Q.**   You did not take any measurements to confirm that

24   the Combat Arms Version 2 who loosen in the ear

25   replicas the same way that they would loosen in a

1    human ear, correct?

2    **A.**   We did not.  That was not the purpose of the

3    study.

4    **Q.**   Now, in your view, the testing that you did on the

5    ear replica shows that the Combat Arms Version 2

6    doesn't work, right?

7    **A.**   That's a bit of a leap for one piece of

8    information.  If you're talking about the opinions

9    that I gave, those are based on the totality of

10   evidence that I had.

11   **Q.**   Sure.  Your view, based in part on your testing in

12   the ear replicas, is that the Combat Arms Version 2

13   doesn't work, right?

14   **A.**   The measurements that we made with the ear

15   replicas were consistent with the measurements we made

16   with human ears in almost every respect.  And so,

17   again, they were confirmatory, and they were a

18   scientifically valid investigation of the effect of

19   mandibular motion in the absence of many other

20   intervening variables that we controlled for.

21   **Q.**   The CAEv2 loosened in the ear replicas, right,

22   sir?

23   **A.**   In some cases.  In some cases it did not.

24   **Q.**   All right.  Now, prior to this litigation, you did

25   some testing of the Combat Arms Version 2 in real

1   human ears, though, right?

2   **A.**   We did.

3   **Q.**   Back in 2002?

4   **A.**   Yes.

5   **Q.**   Okay.  Let's take a look at that.

6         **MR. AYLSTOCK:**  This is outside the scope.

7   This has nothing to do with *h*MIRE or *m*MIRE or anything

8   else in this case.

9         **MR. WASDIN:**  Your Honor, it goes to the

10  reality of the study and whether it translates to a

11  human ear.

12        **MR. AYLSTOCK:**  It's --

13        **JUDGE RODGERS:**  Mr. Wasdin, I'm not sure how

14  it goes to the reliability of the study.

15        **MR. WASDIN:**  When he tested it in ear

16  replicas, he found that it didn't work.  When he

17  tested it in human ears, he found that it worked.

18        **JUDGE RODGERS:**  Was the testing the same?

19  Were the testing criteria the same?

20        **MR. WASDIN:**  Well, fitting the earplug is the

21  same in both cases.

22        **JUDGE RODGERS:**  All right, I'll let you ask

23  the question.

24        And, sir, you can explain it, if you have the

25  knowledge to.

1          **THE WITNESS:**  Okay.

2          **JUDGE RODGERS:**  Go ahead.

3          **MR. WASDIN:**  Put up DX Eddins 08.

4   BY MR. WASDIN:

5   **Q.**  Dr. Eddins, do you recognize this?

6   **A.**  Yes, I do.  It's a report that I submitted to the

7   Court in the fall, I believe.

8          **MR. WASDIN:**  Can we go to the second page.  I

9   think the first page is a litigation cover page.

10  Maybe the third page.  Sorry.  There we go.

11  BY MR. WASDIN:

12  **Q.**  You're listed on here as one of the authors,

13  right?

14  **A.**  Well, I think it's important for the Court to know

15  that this is -- "author" is a loose term.  This is an

16  incomplete document by a student project that wasn't

17  completed and has never been -- I found the file

18  folder during a search of a file drawer during this

19  case.  It's probably never been read by anybody but me

20  and Leanne Cleveland.

21  **Q.**  Okay.  Let's see what it says --

22         **MR. AYLSTOCK:**  And therefore, I would object,

23  Your Honor.

24         **JUDGE RODGERS:**  So this isn't then a

25  published study?  That's what I was assuming, as you

 1    went into this, that this was going to be --

 2            **MR. AYLSTOCK:**  It's not published, and,

 3    actually, Leanne Cleveland was the student.

 4            **MR. WASDIN:**  I'm only going to ask three or

 5    four questions on it.  I just want to make the point

 6    that --

 7            **JUDGE RODGERS:**  I'll let you do this.  But

 8    don't assume by me allowing you to do this that you'll

 9    be able to do this at trial.

10            **MR. WASDIN:**  Okay.  Jen, go to page 9 and

11    blow up the top there.

12    **BY MR. WASDIN:**

13    **Q.**  Dr. Eddins, I'm right that this study involved 14

14    human subjects, right?

15    **A.**  Yes, seven male and seven female, it says.

16    **Q.**  You tested them with the green end in and the

17    yellow end in, right?

18    **A.**  Yes.

19    **Q.**  And the experimenter, to do the test, would have

20    had to insert the Combat Arms Version 2 into their

21    ears, right?

22    **A.**  I think I remember from our deposition -- and

23    unless it's contradicted here, I don't remember

24    whether this was experiment HINT or subject HINT.

25    **Q.**  Let's take a look at page 10.

1      Dr. Eddins, am I right that, prior to each of the

2  tests, the tester ensured that a proper fit was

3  attained with the Combat Arms Version 2?

4  **A.**   That looks correct.

5  **Q.**   Okay.  Nothing in this report -- did you review

6  this report before you gave it to us?

7  **A.**   I read it briefly, but I didn't study it.

8  **Q.**   You see anything in there about a problem fitting

9  the earplug?

10  **A.**   No.

11  **Q.**   Anything in there about the earplug loosening

12  during the tests?

13  **A.**   As I recall, there was no monitoring for

14  loosening.  There would be no way to answer that

15  question affirmatively or to deny it.

16  **Q.**   If we can go to page 15 and then I'll be done with

17  this one.

18      Based on this test that you did in 2002, you

19  concluded that the results support the implementation

20  of the Combat Arms Earplug for soldiers who are

21  routinely expose to both steady-state and impulse

22  noise as part of their daily routine, right?

23  **A.**   No, that's not text that I wrote.  And as you

24  recall, I said this is an incomplete document.  I see,

25  when I looked at this document, I had handwritten

1   notes.  And by looking at this, I could tell I made no

2   notes towards the latter part of it.  I don't think I

3   ever reviewed the latter part of this.

4   **Q.**  You don't agree with that statement?

5   **A.**  I do not agree with that statement.  I didn't

6   write the statement, and I haven't evaluated it in the

7   context of this report.

8   **Q.**  But your name is on it, right?

9   **A.**  The student who typed up this report as a first

10  draft put my name on it, and it never made it past the

11  first draft stage.  I never finished even editing the

12  report.

13         **MR. AYLSTOCK:**  In light of that, I would move

14  to strike the testimony.

15         **JUDGE RODGERS:**  Well, I'll allow you to

16  redirect, Mr. Aylstock, on this.  I'm, frankly,

17  curious about what the study was.  That's not clear to

18  me at this point.

19         **MR. AYLSTOCK:**  We'll do that, Judge.

20         **THE WITNESS:**  I think it's important to get

21  the historical context into the record at some point.

22         **JUDGE RODGERS:**  We'll give Mr. Aylstock that

23  opportunity after Mr. Wasdin is finished, unless Mr.

24  Wasdin wants to do it.

25         **MR. WASDIN:**  No.  I think I've done what I

1    want to do with it.

2    **BY MR. WASDIN:**

3    **Q.**   Dr. Eddins, I want to talk about the helpfulness

4    of your opinion here at the end.

5    **A.**   Okay.

6    **Q.**   If you come to trial, I think what you're planning

7    on telling the jury is that the Combat Arms Version 2

8    can loosen in a user's ear after jogging, four hours

9    of use, or jaw movement, right?

10   **A.**   Or during REAT testing.

11   **Q.**   Okay.  But, sir, in fairness, the Combat Arms

12   Version 2 is not the only premolded earplug that

13   loosens in a user's ear, right?

14   **A.**   It is not.

15         **MR. AYLSTOCK:**   Objection to form and again

16   outside the scope.

17         **JUDGE RODGERS:**   I agree.  These may be

18   certainly questions for the jury, but they're not

19   questions here for me.

20         **MR. WASDIN:**   I think I have one question that

21   actually does bare directly on helpfulness of this if

22   I could just --

23         **JUDGE RODGERS:**   Ask the question.

24   **BY MR. WASDIN:**

25   **Q.**   Dr. Eddins, after all of this testing that we have

1  talked about today, am I right that you are not

2  offering the opinion that any other earplug loosens

3  more or less than the Combat Arms Version 2?

4          **MR. AYLSTOCK:**  Objection to form -- same

5  objection.

6          **JUDGE RODGERS:**  Overruled.

7          **THE WITNESS:**  Mr. Wasdin, can you please

8  repeat the question.

9  **BY MR. WASDIN:**

10 **Q.**  You are not offering the opinion that any other

11 earplug loosens more or less than the Combat Arms

12 Version 2, correct?

13 **A.**  I am not.

14         **MR. WASDIN:**  That's all I have.

15         **JUDGE RODGERS:**  Thank you.

16         Mr. Aylstock?

17                   **REDIRECT EXAMINATION**

18 **BY MR. AYLSTOCK:**

19 **Q.**  Let's tart with --

20         **MR. AYLSTOCK:**  Could I ask you to put up

21 Eddins 8, the Leanne Cleveland -- maybe just go to

22 page 3 with some handwritten notes on it.

23 **BY MR. AYLSTOCK:**

24 **Q.**  Do you have a copy of that up there?  I can even

25 give it to you.

1    **A.**   I don't.  And if you ask questions where I feel

2    like I need to see something specific, I will request

3    it.

4    **Q.**   Okay.

5           **MR. AYLSTOCK:**  May I approach, Your Honor?

6           **JUDGE RODGERS:**  Yes.

7    **BY MR. AYLSTOCK:**

8    **Q.**   I'm just going to give this to you to try to

9    expedite things.

10          Okay.  I see -- well, you had mentioned that it's

11   important for the Court to understand the historical

12   context of this document.

13          Could you please tell the Court the historical

14   context, and then we'll get into the details.

15   **A.**   Yes.  Well, as a professor -- this was at the

16   University of Buffalo -- I had an opportunity and an

17   obligation to supervise student research.  They're

18   required to complete a research project.

19          I had a student who completed a project completely

20   different from this one.  It was a funded project by

21   the Bose Corporation investigating their QuietComfort

22   2 noise cancellation headphones and the potential

23   effect they may have on tinnitus.  Nothing related to

24   this.

25          That student completed that project, successfully

1   defended it for her requirements, and then, in the

2   spring of her final year in school, decided to become

3   an Army audiologist.  And she was married to a

4   servicemember.

5       So, one day she came in with a bag of Combat Arms

6   Earplugs and said, I got these earplugs, they're new

7   earplugs and really cool.  I'd like to do a study with

8   them.  Would you help me?  And I said, yes, I'll help

9   you do a study with them.

10      And so, I helped the student design the study, and

11  I set up some of the equipment for her.  I may have

12  written some software, I can't remember.  And she

13  conducted the study.  She wrote a report, as a good

14  student would.  And I got this report right before she

15  graduated.

16      I don't know if you can see it, Judge, but I've

17  got my handwritten edit notes on this, and I got part

18  of the way through this report and never completely

19  edited it, much less the normal multiple iterations

20  you would go through to have a complete report.

21      And so, this is an incomplete report from a

22  student project that was a volunteer student project.

23  Q.  You had mentioned it looked like from the

24  handwritten notes you stopped editing it at some

25  point.  How far did you get on the handwritten notes

1    to the typewritten material that Ms. Cleveland had

2    done?

3    **A.**   Well, I'm just looking, and my last note was page

4    3, which was the first page of the actual written

5    report.

6    **Q.**   So, do you -- the typewritten words -- let me be

7    clear -- are not yours?

8    **A.**   No.  I had not seen this in a digital format

9    before.

10   **Q.**   Okay.  And this never went to finalization, much

11   less publication?

12   **A.**   Not close.

13           **JUDGE RODGERS:**  What do you recall happening

14   with this?

15           **THE WITNESS:**  She graduated, she left, went

16   into the Army, and we never revisited the project.

17           **JUDGE RODGERS:**  So, these edits on page 3

18   which you're saying -- that's as far as you got.  So

19   before you got to complete your editing, she

20   graduated?

21           **THE WITNESS:**  That's correct.  And this was a

22   project she started the spring of her last year and

23   probably -- I don't recall well, but probably just

24   completed data collection a week or two or three

25   before graduation and she went into the Army.

1   **JUDGE RODGERS:**  So she never even got your

2   edits?

3          **THE WITNESS:**  No.

4   BY MR. AYLSTOCK:

5   **Q.**  And you never dug into the data to validate

6   anything, did you?

7   **A.**  Not until I mentioned it at my deposition and then

8   was asked about it and submitted this as a report

9   after, because of that.

10  **Q.**  So, was this study designed to answer any of the

11  questions that you designed the study here for today

12  to answer?

13  **A.**  Completely orthogonal.  No overlap.

14  **Q.**  Okay.  So, in your view, what relevance, if any,

15  would this have anything that was done by you in this

16  case?

17  **A.**  It has absolutely no relevance other than I had

18  met the Combat Arms Earplug before.

19  **Q.**  This little guy?

20  **A.**  Correct.

21  **Q.**  Let's look at some pictures.  The Court saw some

22  photographs of the Combat Arms or the surrogate

23  earplug in the ear.  Do you remember those pictures?

24  **A.**  I do.

25  **Q.**  I'll just hold them up.  And the question -- the

1    series of questions was, well, does that look straight

2    to you?

3    **A.**   That was the question.

4    **Q.**   All right.  So, what we're looking at here is a

5    cross-section of the Combat Arms; is that right?

6    **A.**   In this picture, yes.

7    **Q.**   And it looks like that the stem is into the third

8    flange of each one but then the tips can bend, right?

9    **A.**   Absolutely.

10   **Q.**   Now, I'm bending it here.  Is the stem -- well,

11   you do have one up there?

12   **A.**   I do, thank you.

13   **Q.**   So, if you're sticking this in the ear, whether

14   it's the Combat Arms or your earplug, the Eddins

15   surrogate, those tips can bend.  But is either the

16   adapter -- can you bend either the Eddins adapter or

17   the Combat Arms?

18   **A.**   Certainly not with any kind of force that would

19   ever happen when you're putting it in your ear.

20   **Q.**   And the ear, as we mentioned, is cartilaginous.

21   Did I say that right?

22   **A.**   Yes.

23   **Q.**   Now, would cartilaginous material be able to bend

24   material with a Shore hardness of D scale of 85, 86,

25   the same as either your plug or the Combat Arms

1    Version 2?

2    **A.**   Absolutely not.

3    **Q.**   Okay.  So do these pictures, in your view, in any

4    way refute any of the findings of your study?

5    **A.**   As I answered Mr. Wasdin, there was no bending in

6    any of those, so absolutely not.

7    **Q.**   Let's go to your report figure -- well, let's go

8    to slide -- I think it was 19.  Because you were asked

9    to pick a data point here and a data point there from

10   a very, very large spreadsheet and compare them and

11   draw a conclusion.

12   **A.**   That's right.

13   **Q.**   Is that what a scientist does with data like this?

14   **A.**   No, and particularly not acoustics data.

15   **Q.**   And why is that?

16   **A.**   Well, because the stimulus that we were using was

17   a noise stimulus, which, by its very nature, is random

18   from point to point.

19        And the measurement here was a single measurement

20   of each one.  This was an actual recording.  That

21   measurement error is acceptable.  It's expected.  And

22   if we had -- very much like the MIRE measurement

23   itself, if you average it across 60 ears, it will

24   average to 0.

25   **Q.**   Is that why you put Figure 17 in your report and

1    then made these graphs as well?

2    **A.**   Absolutely.  We just wanted to make sure that we

3    could look at very detailed graphs here, so we reduced

4    the y-axis range.

5    **Q.**   As opposed to one point here and one point there

6    and cherry-picking some figure to draw upon --

7    **A.**   That's correct.  There is no aspect of acoustics

8    where we cherry-picked.  The third octave data there

9    would be a typical analysis.

10   **Q.**   Now, I think I heard some questioning about the

11   fact that the Combat Arms Version 2 has only one hole

12   in it and yours has two holes in it, right?

13   **A.**   That's correct.

14   **Q.**   Well, if 3M had gone to any effort to make such a

15   surrogate plug for an *h*MIRE, it would have had two

16   holes in it as well, right?

17   **A.**   By definition, yes.

18   **Q.**   So, any *h*MIRE plug is going to have two holes in

19   it?

20   **A.**   They all do.

21   **Q.**   That's not a fault of your study, is it?

22   **A.**   It is not.

23   **Q.**   Now let's go back to the ANSI standard.  You were

24   shown one ANSI standard.  Do you remember the date of

25   the ANSI standard that you were shown by Mr. Wasdin?

1   **A.**   Yes, that was ANSI S12.42-2010.

2   **Q.**   And you were also -- there is another ANSI

3   standard that says the opposite?

4   **A.**   It does, it supercedes it in that respect.  It's

5   ANSI S12.71 in 2018.

6   **Q.**   That's 2018?

7   **A.**   2018, eight years later.

8   **Q.**   Oh, okay.  All right.  Now, you were also shown --

9   I guess the earlier ANSI said MIRE not advised or not

10  recommended, and I think you testified that you were

11  aware of that and moved forward anyway?

12  **A.**   That's correct.

13  **Q.**   Why did you do that?

14  **A.**   Well, the reason why they didn't recommend it was

15  the authors of that particular standard were assuming

16  that you would run the probe tube on the outside of

17  the earplug and, in doing that, you could potentially

18  create slit leaks that wouldn't exist if you didn't

19  have the earplug, and those slit leaks would result in

20  a measure that indicated compromised performance of

21  the earplug that didn't exist.

22  **Q.**   But in your earplug the probe ran through the

23  middle?

24  **A.**   Correct.

25  **Q.**   So there wouldn't be slit leaks?

1    A.   That's correct.

2    Q.   Now, I think you mentioned that your *m*MIRE tests

3    were -- you were asked about your opinions in this

4    case, and I think you used the word that they were

5    confirmatory; is that correct?

6    A.   That's correct.

7    Q.   What do you mean by that?

8    A.   They were consistent with the other testing that

9    we had done with human subjects, the REAT testing and

10   the MIRE testing.  So, in that way, they were

11   consistent, but they were additive, in that we

12   isolated many intervening variables to hone in on the

13   specific effect of simulated mandibular motion.

14   Q.   Go to page 51 of your report very quickly, the

15   figure and specifically the statement that Mr. Wasdin

16   brought out about a couple or 2, 3 decibels being

17   concerning.

18        Let's look at the Figure 23 right above that

19   statement.  Your prose there is commenting on the

20   figure; is that fair?

21   A.   Yes.

22   Q.   So, what is the figure showing with those red dots

23   and blue dots based upon your *h*MIRE data?

24   A.   Those are insertion loss, so the change in the

25   attenuation, if you will, or the protection provided

1    by the Combat Arms after the activity relative to

2    before the activity.

3    **Q.**   Now, what are the blue dots and what are the red

4    dots?

5    **A.**   The blue dots are for the left ear and the red

6    dots are for the right ear.

7    **Q.**   Now, there's some lines there.  Is that the mean?

8    **A.**   I apologize.  The blue symbols are pre-activity

9    and the red symbols are post-activity.  In audiology,

10   we use blue and red to indicate left and right ears,

11   so my clinical mind jumped in.

12   **Q.**   Fair enough.  I'm trying to move fast, so it's on

13   me.

14        So what does the graph tell you about the

15   performance of the Combat Arms based upon the study

16   that you did?

17   **A.**   Well, the average data across those 30 ears --

18   actually, that's 60 ears -- showed considerably less

19   and statistically significantly less protection or

20   insertion loss following the activity relative to

21   prior to the activity.

22   **Q.**   What did your data tell you about the variability?

23   **A.**   Well, that's the interesting part.  For some

24   subjects you can see that the Combat Arms performed

25   slightly better after the activity than before the

1    activity, and there are very good reasons for that.

2        But what we're really worried about is those poor

3    subjects for whom they lost 25, 30, 35, or 40 dB of

4    attenuation after just doing mundane activities for

5    four hours.

6    **Q.**  So, how would you characterize the variability of

7    this plug?

8    **A.**  It's huge.

9    **Q.**  And the opinions -- the ultimate opinions that you

10   have set forth in your report and your deposition,

11   would they have been the same whether you did the

12   extra step of the *m*MIRE based upon the data that you

13   already had?

14   **A.**  Yes.  Again, those opinions -- there is no one

15   opinion that's based on any one component of a test.

16   The opinions are based on the totality of the data

17   that we collected.

18           **MR. AYLSTOCK:**  Thank you, Doctor.

19           **JUDGE RODGERS:**  Thank you.

20           Doctor, I have a question about the *h*MIRE

21   testing.

22           The manufacturer's plug is stationary -- or

23   the tube is stationary?

24           **THE WITNESS:**  It is.

25           **JUDGE RODGERS:**  So, what, if anything, did

1   you all do to rule out the potential that, by removing

2   the plug, you were going to impact loosening?

3            **THE WITNESS:**  That's a good question.   We

4   just performed that action multiple times to confirm

5   that it had no negative effect on the performance of

6   the plug.   We confirmed it with the test-retest data

7   that we showed.

8            **JUDGE RODGERS:**  And that's in your report?

9            **THE WITNESS:**   It is.   Importantly, the -- if

10  we had permanently mounted a probe and particularly in

11  the Combat Arms, it's difficult enough to grasp this,

12  because it's relatively short, and getting it in and

13  fine tuning it.   And with the probe tube sticking out

14  and trying not -- it could potentially interfere with

15  the insertion.

16           **MR. WASDIN:**   Your Honor, I would just object.

17  That data is not in the report.   We actually have an

18  ongoing dispute about the applicability of that data

19  because we just got it after the deposition.   So it

20  was something that was done after his analysis of that

21  data.

22           **MR. AYLSTOCK:**   There was a video that was

23  done that was provided to Mr. Wasdin that is

24  absolutely supplemented in the report.   And so both of

25  them are there.   That observation is absolutely in the

 1    report, and the video is just confirmatory yet again.

 2         **JUDGE RODGERS:**   Mr. Wasdin, I wasn't

 3    necessarily aware of this dispute.   What is it again

 4    that you're saying has not been available to you?

 5         **MR. WASDIN:**   This is something we resolved

 6    consensually prior to this *Daubert* hearing, which is

 7    why Your Honor is not aware of it.

 8              After Dr. Eddins completed his analysis in

 9    this case and gave us his report, one of our experts

10    criticized the point that Your Honor is making that

11    the probe tube going in and out might have loosened

12    the plug.

13              At his deposition, I learned from the last

14    several minutes of the deposition that, sometime after

15    that, so after the analysis was done, he had done the

16    insertion removal validation that he just described,

17    and after the deposition we received that.

18              And Mr. Aylstock and I came to an agreement

19    that it would not be used at the first trial because

20    it was not part of his Group A report.

21         **MR. AYLSTOCK:**   It would not be used

22    affirmatively because we didn't need it because we had

23    it.   But the video and all of the underlying data has

24    been in Mr. Wasdin's possession for months, at least

25    weeks, a good long time.

1          And if, in fact, the issue comes up at court,

2    there may be a door open.  But, in any event, the fact

3    that he did it is absolutely fair game for *Daubert*,

4    not that it's at all necessary.

5          **JUDGE RODGERS:**  *Daubert* is not -- this is not

6    trial.  Your agreement about what you can do or not do

7    at trial is not going to impact my questioning or what

8    I need to hear from the witness as far as reliability.

9          And so, if you've had the data -- I'll let

10   you cross-examine him on it.  I didn't give you any

11   assurances that I was or wasn't going to ask certain

12   questions.

13         **MR. WASDIN:**  It's just our position that

14   whatever opinion would be offered at trial needs to be

15   supportable at trial.  And so, if we're supporting it

16   with something that we all agree was not timely

17   produced and is not admissible at trial, it shouldn't

18   be the basis of him getting in the door at the trial

19   of the opinion.

20         **JUDGE RODGERS:**  Well, I have to make a

21   threshold determination of reliability.  That is

22   different from the question the jury will have to ask.

23         So, I'm telling you, if you want to

24   cross-examine him now, you need to do that on this

25   issue.  Otherwise, it's a question I asked, and I'm

1    not going to apologize for it.  I don't know about

2    your outside-of-Court agreement.  Nobody made me aware

3    of that.

4          **MR. WASDIN:**  Can I ask him some questions

5    about it?

6          **JUDGE RODGERS:**  Yes.  I just invited you to

7    do that.

8          **MR. WASDIN:**  Could we put up DX Eddins 7.

9                    **RECROSS-EXAMINATION**

10   **BY MR. WASDIN:**

11   **Q.**  Dr. Eddins, it looks like it's coming into focus,

12   but let me know when you can see it.

13   **A.**  Let's proceed and maybe, by the time you get to

14   where you need to be, it will be there.

15   **Q.**  Okay.  I believe -- am I right that, after -- in

16   this way that I just described, at some point after,

17   there was a criticism of the probe technique, you went

18   and you did a validation testing to see if that

19   impacted the fit of the plug?

20   **A.**  That's not exactly correct.  We did validation

21   testing before we ever ran subject 1, but we did

22   validation testing with a system that collects data in

23   real-time and loses the data in real-time.  It was

24   part of the monitoring system we had during our MIRE,

25   so we did not document that, but we knew we had the

 1    measurement error that was as small as we have

 2    documented.  It's not until the question was raised

 3    that we went back and made sure we made the same

 4    measurements again and saved them.

 5    **Q.**  Let me make sure I understand that.  You did probe

 6    insertion and removal validation prior to issuing your

 7    first report?

 8    **A.**  We did it prior to collecting data on any subjects

 9    while we were setting up the experiment.

10    **Q.**  When would that have been?

11    **A.**  I'm guessing in July.

12    **Q.**  And you said that you have a machine that collects

13    the data from that?

14    **A.**  It's not a machine.  It's software.  It's called

15    Adobe Audition.  And you can make an audio recording,

16    freeze it, make another audio recording, freeze it,

17    compare them, clear them, and continue to do that.

18    And that was our validation step early on.

19    **Q.**  Okay.  And so you did the probe insertion and

20    removal validation?

21    **A.**  Yes.

22    **Q.**  And you looked at the data?

23    **A.**  Absolutely.

24    **Q.**  And to you it looked like it was validated?

25    **A.**  It wasn't a look.  You could actually -- the

1    numbers were there.

2    **Q.**   Okay.  And then you deleted the data?

3    **A.**   We didn't save the data.  We were running the

4    analysis in real-time.

5    **Q.**   Did you think it was important?

6    **A.**   The validation step was certainly important.  If

7    we were doing this as a peer-reviewed scientific

8    study, it would have been unnecessary.  But when we

9    were criticized by the -- and had we been criticized

10   by peer reviewers, we would have gone back and done

11   the measurements exactly like we did for you.

12   **Q.**   Is that the only data that you took, relied upon,

13   and then deleted in the course of your work in this

14   case?

15            **MR. AYLSTOCK:**   Objection, mischaracterizes --

16            **THE WITNESS:**   It was not data.  That was just

17   a simple acoustic validation --

18            **JUDGE RODGERS:**   Excuse me, Doctor.

19            I don't think he said it was deleted.  They

20   wrote over it or continued it.  It wasn't that he --

21   it doesn't sound to me like he intentionally deleted

22   it.  This was in real-time and he just kept going.

23            **THE WITNESS:**   That's absolutely correct.

24   BY MR. WASDIN:

25   **Q.**   Could you have saved it?

1    **A.**   It could have been saved.

2    **Q.**   You did not?

3    **A.**   We did not.

4    **Q.**   But you're relying on that in this case?

5    **A.**   We knew that our technique was valid because we

6    did that particular test before we ran subjects.

7    **Q.**   After being criticized, you went back and did it

8    again, which led to this report that we're trying to

9    put up on the screen here?

10   **A.**   That's correct.  I still don't quite see it, but

11   you're right.

12          **MR. WASDIN:**   Jen, can we put up the third

13   page of this, there is a graph.

14          **JUDGE RODGERS:**   Doctor, if you didn't save

15   the data from the first validation, how do you know

16   how it compared to the latter?

17          **THE WITNESS:**   Well, when we did it, we knew

18   we needed to have good test-retest variability -- or

19   small test-retest variability.  We confirmed that with

20   our real-time recordings on multiple insertions on

21   multiple people, just as acoustic measurements that we

22   typically do before we do any studies.  And we went on

23   and conducted our study with the knowledge that our

24   probe technique was a solid technique.

25          **JUDGE RODGERS:**   But then you did this, what

1   Mr. Wasdin is getting ready to --

2           **THE WITNESS:**  That's correct.  One of the

3   experts had criticized us for not doing it.  And we

4   had.  We just didn't put it as part of our report, the

5   data we collected in real-time.  And we had the

6   knowledge that the technique was robust, but with this

7   criticism, we felt compelled to go back and provide

8   data to support it.

9           **JUDGE RODGERS:**  How do you know that this

10  data matches what you saw in real-time back in July?

11          **THE WITNESS:**  Well, it just is the fact that

12  we had less than 1 or 2 dB error when we did it

13  originally.

14          **JUDGE RODGERS:**  And you knew that?

15          **THE WITNESS:**  Yes.

16          **JUDGE RODGERS:**  All right.  Go ahead, Mr.

17  Wasdin.

18  **BY MR. WASDIN:**

19  **Q.**  Dr. Eddins, this chart I think plots out the data

20  that you took during the probe insertion and removal

21  validation; is that right?

22  **A.**  That's correct.

23  **Q.**  And if I'm understanding it right, the circles and

24  the lines in the middle are the means, right?

25  **A.**  That's right.

1    **Q.**   And then the bars at the top and bottom of any

2    particular frequency are the range?

3    **A.**   That's right.

4    **Q.**   Okay.  So, for example -- and, by the way, is each

5    bar like one insertion and removal?

6    **A.**   No.  This would be 20 insertions and removals.

7    **Q.**   Is that the total amount you did during the

8    validation?

9    **A.**   That's right.

10   **Q.**   So you'd put it in and take a measurement, pull it

11   out, take a measurement -- I guess you can't do it

12   that way.

13       You'd put it in and take a measurement, pull it

14   out, put it back in and take a measurement, et cetera?

15   **A.**   Correct.

16   **Q.**   You did that 20 times?

17   **A.**   I did that twice on ten subjects.

18   **Q.**   So, then, the bars represent the range of data

19   that you got at each frequency over the 20 times?

20   **A.**   Correct.

21   **Q.**   So, for example, it looks like -- I'm going to

22   call it about nine hundred -- is that 900 hertz there

23   just to the left of the 1 at the bottom?

24   **A.**   That's 800 hertz.

25   **Q.**   800 hertz.  And it looks like that left ear range

1    goes from approximately minus 2-and-a-half on the low

2    end to plus 1.3 on the high end?

3    **A.**   That's correct.  That's -- this is a standard

4    deviation across all of those measures, I believe.

5    **Q.**   So, does that mean that, at that particular

6    frequency, over the course of the 20 measurements, you

7    recorded data that was different by that amount?

8    **A.**   This was included in our supplemental report,

9    correct?

10   **Q.**   Not to my knowledge.  You tell me.

11   **A.**   Where did you get this slide?

12            **JUDGE RODGERS:**  Where did this come from?

13   **BY MR. WASDIN:**

14   **Q.**   You produced this to me after the deposition as a

15   standalone document.

16   **A.**   Right, it's part of the standalone document.

17            **MR. AYLSTOCK:**  Yes, September 9th, if you'll

18   show him the first page.

19            **THE WITNESS:**  Could I have access to the full

20   document?

21            **MR. WASDIN:**  Yes.

22            **JUDGE RODGERS:**  Is this what you're calling

23   your supplemental --

24            **THE WITNESS:**  Yes.

25            **MR. AYLSTOCK:**  May I approach, Your Honor?

1           **JUDGE RODGERS:**  Yes.

2           **THE WITNESS:**  Okay, I've got it.

3   BY MR. WASDIN:

4   Q.  So, looking again here at what I have on the

5   screen but -- for example, at the 800 hertz, you've

6   got the bar that goes from negative 2-and-a-half up to

7   like 1.3, right?

8   A.  Correct.

9   Q.  And does that mean that, over the course of the 20

10  insertions and removals, the data varied by those

11  amounts?

12  A.  That's correct.

13  Q.  So, it seems like the act of inserting and

14  removing the probe tube is causing the plug to move,

15  right?

16  A.  It's not causing the plug to move necessarily.

17  This minor amount of variability could be for a number

18  of reasons.  It could be the distance that the probe

19  tube goes in, even though we controlled it to

20  certainly within a millimeter accuracy.  A half

21  millimeter could have contributed to some variability.

22  Q.  Okay.  So one reason why you get differences in

23  the data over time is the depth of the probe tube,

24  right?

25  A.  Correct.

1  **Q.**   Another reason is that the plug actually moved,

2  right?

3  **A.**   Correct.

4  **Q.**   What's the third reason?

5  **A.**   No -- well, it could have moved, but I think we

6  can show that it didn't.

7       I don't know a third reason, other than the minor

8  variability that's contributed by making a noise-based

9  measurement and averaging it.

10  **Q.**   Was there a protocol that guided the experimenter

11  on how deep to put the probe in?

12  **A.**   Absolutely.

13  **Q.**   So you shouldn't have variation in the probe tube

14  depth, correct?

15  **A.**   Not by -- as much as a millimeter, possible less

16  than a millimeter.

17  **Q.**   So, the only other cause that you're aware of that

18  would explain the variability we're looking at is that

19  the plug was actually moving when you put the probe

20  tube in and out?

21  **A.**   Again, our video analysis that we provided the

22  Court as a single example shows that there was no

23  movement of the plug.

24  **Q.**   Okay.  I don't want to talk about the video right

25  now.  I want to talk about the data.

1    **A.**   If I may, if you compared this data to any other

2    MIRE measurement, then we're by far more accurate than

3    the MIRE measurements that are widely accepted by the

4    scientific community.

5    **Q.**   What other data do you have of how an earplug

6    reacts to the repeated insertion and removal of a MIRE

7    probe tube 20 times?

8    **A.**   I don't have other data other than our own.

9    **Q.**   So you can't compare this to any other data,

10   right?

11   **A.**   You can in terms of the MIRE measurement itself.

12   And it's much more accurate than MIRE measurements

13   that don't change anything about the earplug.

14   **Q.**   Sitting here today, can rule out with certainty

15   the possibility that the variation we are looking at

16   on this graph was caused by the probe tube impacting

17   the position of the earplug?

18   **A.**   It would be very hard to believe that that's the

19   case because we were -- we observed no movement and we

20   did the procedure in a manner that does not produce

21   movement.

22   **Q.**   Sitting here today, can you rule out the

23   possibility that the variation we are looking at on

24   this graph was caused by movement of the earplug from

25   repeatedly inserting and removing the probe tube?

1    **MR. AYLSTOCK:**  Objection, asked and answered.

2    **JUDGE RODGERS:**  Overruled.

3    **THE WITNESS:**  We did not see movement of the

4    earplug.  I suppose there could be nonvisible movement

5    of the earplug that a trained audiologist cannot see.

6    **BY MR. WASDIN:**

7    **Q.**  Sir, sitting here today, can you rule out the

8    possibility that the variation we see in the data in

9    this graph was caused by repeatedly inserting and

10   removing the probe tube and moving the fit of the

11   earplug?

12            **MR. AYLSTOCK:**  Objection, asked and answered

13   again.

14            **JUDGE RODGERS:**  I don't think he can answer

15   this a yes or no.  That's what I think he's telling

16   you.  He doesn't believe it's possible.

17            **MR. WASDIN:**  I just want to know how he ruled

18   it out, though, or if he did.

19            **JUDGE RODGERS:**  Well, then ask him that

20   question.

21   **BY MR. WASDIN:**

22   **Q.**  Did you rule out the possibility that the

23   variation in this graph was caused by inserting and

24   removing the probe tube?

25            **JUDGE RODGERS:**  What I suggested you should

1    ask him is how would he rule that out.

2           How would you rule that out?

3           **THE WITNESS:**  Is it okay if he states the

4    full question?

5           **JUDGE RODGERS:**  Yes.

6    **BY MR. WASDIN:**

7    **Q.**  How would you rule out the possibility that the

8    variation in this graph was caused by inserting and

9    removing the probe tube?

10   **A.**  We could have done repeated measurements without

11   removing and inserting the probe tube.

12   **Q.**  Did you do that?

13   **A.**  No, we did not do that.

14   **Q.**  Is there any other way to rule it out?

15   **A.**  I don't think so.

16          **MR. WASDIN:**  All right.  I'm done.

17          **JUDGE RODGERS:**  Mr. Aylstock, I'll give you

18   re-redirect, I think is where we are.

19          **MR. AYLSTOCK:**  I'm sorry, Judge, just very

20   briefly.

21                   **FURTHER REDIRECT EXAMINATION**

22   **BY MR. AYLSTOCK:**

23   **Q.**  To rule out the possibility of probe tube

24   movement, what did you do -- let me rephrase that.

25          To rule out that possibility, to a reasonable

1    degree of scientific certainty, what did you do, Dr.

2    Eddins, to rule out the probe moving the plug?

3    **A.**   We ruled that out by first designing the system so

4    that there was enough area to allow us to thread the

5    probe without dislodging any aspect of the probe tube.

6         There was no friction between them.  So when you

7    stick that probe tube in, it doesn't buckle because

8    it's having friction and moving the probe tube.  It

9    goes in smoothly.

10        And we are visually observing the probe tube, in

11   some cases -- the earplug, in some cases recording it

12   with video and later looking at the video.  We don't

13   see movement.

14        So we designed it so it shouldn't and we can't

15   visibly see movement.

16   **Q.**   And again, you've put in a probe tube through an

17   earpiece how many times in your career?

18   **A.**   Hundreds and hundreds and hundreds.

19   **Q.**   And you train students and fellows how do that?

20   **A.**   Correct.

21   **Q.**   And do it without moving the earpiece?

22   **A.**   Correct.

23   **Q.**   And if, you know, if, on the off possibility, it

24   was somehow nonvisible, what, if any, effect would

25   that have had on your results based upon the data that

1   we see?

2   **A.**   I would have to speculate, not much.

3           **MR. AYLSTOCK:**   Thank you.

4           **JUDGE RODGERS:**   Judge Jones?

5           **JUDGE JONES:**   I was just curious, Dr. Eddins,

6   about one thing.  The reason Mr. Aylstock and Mr.

7   Wasdin has been asking you all these questions is so

8   the Court can determine reliability and, to a certain

9   extent, helpfulness.

10          And we talked all about your study and what

11  you did and how you set it up.  But one thing we

12  didn't talk about, maybe because it's not important,

13  is the number of subjects that you used.  For some

14  reason I thought it was 20, but then I took a note

15  that you said it was 30 subjects.

16          How did you come to the conclusion that 30

17  subjects in a study like this was sufficient to give

18  you reliable data?

19          **THE WITNESS:**   That's a great question.  And

20  I'll just give the historical context that much of the

21  data we reviewed prior to designing our study had

22  included 3, 5, 8, 10 subjects, occasionally 20

23  subjects.  And that's sort of the standard in the

24  hearing protection device scientific community.

25          We had indication from review of Aearo data

1    that, with those small numbers of subjects, there

2    looked to be large variability between subjects.

3            So we wanted to make sure we had enough

4    subjects included in the study so that we could get a

5    better handle on the individual variability, not so

6    much focused on the means of the data.

7            So we came up with 30 subjects, which is well

8    beyond -- in some cases a factor of ten times as many

9    subjects have been used previously.

10           **JUDGE JONES:**  Thank you.  And then secondly,

11   very briefly, there was some mention in Mr. Wasdin's

12   questioning about comparing your earplug with the

13   Combat Arms 2 earplug.  And there was a suggestion

14   that there may be a different center of gravity

15   between your plug and the Combat Arms 2 earplug.

16           Two questions.  Was there actually a

17   different center of gravity?  And if so, did that

18   impact in any way, in your view, the movement of the

19   earplug?

20           **THE WITNESS:**  We did not measure center of

21   gravity with the two devices, so I can't answer the

22   question with any kind of precision at all.

23           The relative weight of the filter -- and I

24   don't know the actual weight of it, but just knowing

25   and having held filters before, the relative weight of

 1    that is very small to the overall weight of the Combat

 2    Arms.

 3              So, I can't imagine that it became a factor

 4    in the balance of the weight, but we did not measure

 5    it.

 6              **JUDGE JONES:**  Thank you.

 7              **JUDGE RODGERS:**  Judge Herndon?

 8              **JUDGE HERNDON:**  No questions.  Thank you.

 9              **JUDGE RODGERS:**  All right.  Dr. Eddins, thank

10    you very much --

11              **THE WITNESS:**  Thank you.

12              **JUDGE RODGERS:**  -- for answering all of our

13    questions here today.  You've been very helpful.

14              We have Mr. Juneau, I believe, next as a

15    witness.  We can take a few minutes, if anyone needs a

16    restroom break.  We've been in the courtroom for quite

17    a while, so we can take ten minutes, if you like.

18              **MR. AYLSTOCK:**  Thank you, Judge.

19              *(Recess taken 3:41 p.m. to 3:55 p.m.)*

20        **ROGER JUNEAU, PLAINTIFF WITNESS, DULY SWORN**

21              **MADAM CLERK SIMMS:**  Be seated.  Please state

22    your name for the record and spell your last name.

23              **THE WITNESS:**  Roger Juneau, J-u-n-e-a-u.

24              **JUDGE RODGERS:**  Ms. Hutson, let me just,

25    before you get started, say that I'm familiar with Mr.

```
 1    Juneau's credentials.  They're not challenged.  So,
 2    just in light of the time that we have remaining this
 3    afternoon, I would ask you just to get right into the
 4    heart of my inquiry.
 5            MS. HUTSON:  I will definitely do that.  One
 6    question I would ask.  There are some things about his
 7    40 years of experience that apply directly to what he
 8    did in this case, and I have that woven in.  I'll skip
 9    the front part, the first part.
10            But would it be okay for me to talk about how
11    he used the same processes in his other work with
12    earmolds, and that applies to what he did here?
13            JUDGE RODGERS:  That's fine.
14            THE WITNESS:  Your Honor, I'm having a little
15    trouble hearing.
16            JUDGE RODGERS:  We have hearing devices, if
17    that might help.
18            THE WITNESS:  That might work, I don't know.
19            JUDGE RODGERS:  We can try it.  We can also
20    just speak up.  These usually work.
21            Is that --
22            THE WITNESS:  Yes, that's much better.
23            JUDGE RODGERS:  Is that good?
24            THE WITNESS:  That's very good.  Thank you.
25            JUDGE RODGERS:  All right, Ms. Hutson, go
```

1    ahead.

2                    **DIRECT EXAMINATION**

3    **BY MR. HUTSON:**

4    **Q.**  Can you introduce yourself to the Court, please,

5    Mr. Juneau.

6    **A.**  Yes.  My name is Roger Juneau.  I'm a mechanical

7    engineer and have been in engineering for over 40

8    years.

9    **Q.**  Mr. Juneau, the Judge asked us, because she's read

10   all of your papers, your CV and report and all of

11   that, she's asked us to focus today on what she asked

12   you to come here for.

13        Do you understand that you've been asked to come

14   here to discuss the earmolds that you made in this

15   case as well as the simulator for mandibular motion?

16   **A.**  Yes.

17   **Q.**  All right.  Well, let's jump right to it.  What

18   did we ask you to do when you were first approached

19   about this case?

20   **A.**  Basically to make an anatomical duplicate of a

21   human ear with all the full features and everything

22   that we would have mandibular motion to that would

23   then demonstrate the fit of a Combat Arms Version 2 in

24   terms of does it walk out or does it stay in.

25   **Q.**  So, I'm going to combine this question here

1    because I want to know in a very quick, general

2    fashion what an earmold is and also when you first

3    began making custom earmolds like you did in this

4    case.

5    **A.**   Okay.  Began earmolds back in 1980.  But if you

6    fast-forward, the silicones were refined in the '90s

7    when we began blending them and using a two-part

8    extrusion system that used a side-by-side syringe and

9    then it mixed it for you totally.

10        That material was highly tested in terms of body

11   compatibility, lifecycle testing, hypoallergenic

12   characteristics, all the things that you need to make

13   sure that a material is indeed compatible with the

14   human body.

15   **Q.**   What applications do custom earmolds have?

16   **A.**   They're multiple.  The typical one that I do the

17   most every day are hearing aids, which are Class 2

18   medical devices as an FDA manufacturer; and tinnitus

19   and hyperacusis products, which are Class 2 medical

20   devices.  They have a higher standard because the

21   patients associated with tinnitus are suicidal, so

22   it's a much higher quality standard.

23   **Q.**   One of the issues that we'll be talking about

24   today is how you, when building these earmolds, can

25   determine whether or not they're anatomically correct.

1  **A.**   Yes.

2  **Q.**   So can you tell me what you've done the last 40

3  years to make sure those molds are correct

4  anatomically and what you did in this case to make

5  sure that the molds that you did were anatomically

6  correct.

7  **A.**   Okay.  Perhaps what I should do is go to what we

8  actually built for the ear simulator.  This is the

9  silicone human ear replica.  And if we can get to that

10  slide that we have, the blue --

11  **Q.**   We'll get to it in just a minute.  You can go

12  ahead and just give me -- it's okay, go ahead.  We'll

13  get there, I promise.

14  **A.**   The way we verify it, frankly, is we can inspect

15  this from every angle and see that there are no air

16  pockets or anything, that it's an equilibrium.

17       This was the impression that Dr. Eddins did with

18  South Florida, and this is the duplicate that we made.

19  **Q.**   All right.  Thank you.  I want to address one

20  criticism that's been made in this case about the

21  impressions that were used in the study that was done.

22  And the criticism is that the impressions didn't take

23  an impression of the entire ear canal.

24       Would that be a proper thing to do in your field

25  of science?

1   **A.**   It, indeed, would not.

2   **Q.**   And why not?

3   **A.**   The human ear canal, as the illustration is

4   showing here, if we take a standard ear model such as

5   here, it slopes up slightly, but that -- it's not

6   enough of the ear.

7        If you look at the auricle and the pinna and

8   everything that's in place, if I go into the ear canal

9   -- and Dave's impressions were down to approximately

10  12, 13, 14mm into the ear.

11       You go any deeper than that, now you're past the

12  landmarks.  You're past the isthmus, you're past the

13  second bend, and you're on to the cartilaginous bony

14  junction, as shown here.

15       You start going much past that second bend, you're

16  getting too deep in the ear, you're on the osseous

17  canal where it's bony and everything, and it's

18  dangerous.

19       We've actually had people -- I've taught courses

20  where you're teaching somebody how to do an ear

21  impression properly.  And essentially the danger is,

22  if you go past that, you push your otoblock too far in

23  or you don't do it properly, you can extrude the

24  silicone material past the otoblock on to the TM, you

25  can actually rupture the TM, and you can actually get

1    material to go all the way to the ossicular chain.

2        And as recently as 2008, we observed a case, not

3    with us, but in the world where they actually

4    extracted an impression that had the ossicular chain.

5    So you had immediate pain beyond belief, but you had a

6    medical emergency that was really grave.

7        So, we've never gone -- or we don't recommend

8    going past the second directional bend, which is

9    halfway -- nearly halfway through the ear canal.

10        The second part of it is, the bony canal itself

11    doesn't serve any purpose.  Nobody is sealing a

12    hearing protector that deep in the ear because it's

13    too uncomfortable.  When you get into that part of the

14    ear canal, you have superficial nerve endings, you

15    have the gag reflex, the tearing reflex, everything

16    like that.

17        So, essentially, once you go that deep, it's no

18    good, and you're not going to be able to create a

19    comfortable seal that anybody would wear, whether it's

20    a hearing aid or whether it's a hearing protective

21    device.

22    **Q.**  And have you trained others, including

23    audiologists, how to make impressions that are safe

24    for the subjects who are being given the impression?

25    **A.**  Yes, I have.  In the early stages, one of the

1    things that was important as we were expanding into

2    hearing protection in a custom business in the

3    industry, we needed to train the safety engineers, the

4    hygienists, the nurses, some of the companies have

5    audiologists.  We taught them how to do these ear

6    impressions and how to do them safely.

7        What also came out of that is we developed

8    replicas, because just like somebody that's gone into

9    phlebotomy to do the shots, you don't want someone

10   that's never done an ear impression to do it on a

11   human being.  You'd like to start with something, and

12   that's really how the replicas came about.

13       And they were more important than just

14   demonstrating the ear.  We would actually make an

15   earpiece or a hearing protector in that replica, and

16   then we would teach the audiologist particularly how

17   to cut down the material and how to put the tube in if

18   it was a hearing aid, how to vent it if it needed a

19   pressure release system, or any of the things that it

20   needed along those lines.

21   Q.  Moving to the work that you did in this case, did

22   you rely upon scientific literature that exists, and

23   in fact, did you rely on that same scientific

24   literature over the years as you've been building

25   again and again these earmold or custom earmold

1    replicas?

2    **A.**   Yes.   Essentially a lot of the technology began in

3    late '80s, early '90s with people like Pirzanski,

4    Wayne Staab where they began taking the impressions

5    and tracking what would happen if you had an

6    opened-mouth impression.   Because if the jaw is open,

7    the ear is bigger in diameter, and if it's closed it's

8    going to be smaller, and tracking those differences,

9    and also taking a look at the landmarks that were just

10   showed earlier, how does affect the aperture of the

11   ear, how does it affect the first directional bend,

12   how does it affect the isthmus, how does it affect the

13   second directional bend, and the cartilaginous

14   junction.

15        So, that evolved with people like Oliveira coming

16   in and doing MRI studies and looking at how that

17   worked.   And then going further, you get into people

18   like Ahmed, who was a surgeon, and he's trying to

19   figure out what is the narrowest part of the ear

20   canal, how do you identify it.

21        And his function was totally different than

22   someone in hearing protection or in a hearing aid

23   business, because what he was looking to do was go

24   ahead and, if I get something that gets impacted in

25   that ear and stuck in that ear, how do I extract it

1    out safely.

2         And he identified that the isthmus is, indeed, the

3    cartilaginous bony junction, and that's roughly 9.7mm

4    into the ear, and it's very small in diameter, it's

5    5.7mm typically.

6    **Q.**   And is this the type of literature and scientific

7    evidence that you used when creating the earmolds in

8    this case?

9    **A.**   Yes.

10   **Q.**   Is it the type of literature and science that

11   everyone in your community relies on when doing

12   projects like these, custom earmolds?

13   **A.**   Yes.

14   **Q.**   Now, let's talk about materials for a minute.

15   What types of materials have been used over the years

16   with custom earmolds and what type did you use in this

17   case?

18   **A.**   The basic materials in the hearing industry has

19   been acrylic because it evolved out of the dental

20   industry.  Impression material even actually started

21   out as acrylic but now it's silicone.

22        But long story short, we use acrylic because it

23   lasts the best, you can cut it and grind it on a wheel

24   to make sure it fits the ear comfortably and it works

25   great.

1        The first soft materials were a polyvinyl

2   material.  And they were good, but they didn't hold up

3   very well to earwax.  They degraded pretty quickly, in

4   a year or less sometimes.

5        And then silicone came out, oh, late '80s and into

6   '90s with the Dow Corning like the 4210.  And that

7   material was good, but silicone was very, very

8   reflective and everything, and it didn't work well on

9   a grinding wheel.

10        So, what happened is, it evolved from there where

11   people like Factor II and others that were a cranial

12   facial prosthetic company that used it to replace eyes

13   and things like that, with that happening, that

14   material is a side-by-side syringe, the 588 material.

15   And that's where we are today is in that --

16   **Q.**  And that's my question for you.  In the context of

17   the custom earmolds you made, what type of silicone

18   did you use, and is that industry standard?

19   **A.**  Yes, used the 588.  It's a two-part system,

20   side-by-side syringe.  The Dosper that you just went

21   through was shown being extruded into the cavity of a

22   hydrocolloid to begin making the unit.

23   **Q.**  I want to talk about hardness for a minute.  And

24   this was touched on with Dr. Eddins's testimony, so

25   we're going to go quickly through this.

1     But I just want to ask you, in terms of the

2 hardness of the silicone, is that important?  And if

3 so, why?

4 **A.**   Yes, it's very important.  The trick about

5 something soft is, too soft is generally absorbant

6 like a sponge; too hard is generally glass, something

7 that's impenetrable, inflexible, you can't bend it.

8     So, you're looking for a material that is

9 comfortable in the ear, nonabsorbant, hypoallergenic,

10 and everything.  And silicone does that, particularly

11 on the Shore A hardness at around 12 to 18 durometer.

12 **Q.**   Let's talk about the processes that you used in

13 this case.  Tell us what you did to create the custom

14 earmolds that you provided in this case -- in

15 connection with this case?

16 **A.**   Okay.  The key to doing this was getting a

17 complete human ear replica of the ear, and that means

18 the outer ear canal as well as the external auditory

19 meatus, the canal itself.

20     And the reason for that is the whole ear moves.

21 If you press right on the center of your ear at the

22 crux of the helix, that's the only part of your ear

23 does not move with jaw motion until you get on the

24 bony canal.

25     So, what we wanted to do was take an impression

1   that captured all of the landmarks of the external ear

2   canal and then all of the ear canal up to but not past

3   the second directional bend or cartilaginous bony

4   junction, and that's where we stopped.

5      We believe that information gave us everything we

6   need to know to go ahead and really perfect a model

7   that was true to the ear.

8   **Q.**  Now, you mentioned the word "casting."  Can you

9   tell us briefly what the casting process is as part of

10  this creation of custom earmolds?

11  **A.**  Yeah.  Essentially what you're seeing in this

12  slide is he's taken this hydrocolloid out of the

13  vessel.  He's going to extract this part of the

14  impression that Dave and them have made at the

15  university.  And then we're going to put that back in.

16     Then we're going to fill that cavity with

17  ultraviolet curing acrylic.  Then, once the acrylic

18  comes out, we're going to flip the casting, and then

19  we're going to fill that with silicone, and then we're

20  going to UV cure that under pressure and everything.

21     Now, once all that is done, what you're going to

22  end up with is this *(Indicating)*.  Just the replica

23  itself.

24  **Q.**  Very good.  Thank you very much.  There was also,

25  as I understand it, from what you did in this case,

1    there was an ear canal extension.  So I want to know

2    what that is and why you did it and what you used to

3    do it.

4    **A.**    The ear canal extension is basically this cap here

5    that's on here *(Indicating).*  And what this is for is

6    to hook it up to the GRAS coupler that was shown here

7    in the slides.

8        What we did is the GRAS 45 has the steel -- if

9    you'll get the left side, you see a silicone in the

10   middle, and then right to the right of it you see a

11   stainless steel one.  We molded that precisely.

12       And then you can see that now we have inserted on

13   the slide on the right the silicone duplicate of that

14   stainless steel.

15       Now, the ferrule will -- when we come to this

16   product here, we can actually flip that ferrule right

17   over this thing, and it will still grab this lip so

18   that it will make a proper seal and connection to the

19   GRAS microphone system.

20       And more importantly than that, what we end up

21   doing is we capture all of the information from the

22   impression to the proximal tip of it.  We correctly

23   manage the canal angulation by setting the cap in such

24   a way that it's going to be true to the shape of that

25   ear when it comes out.

1          So, now -- and you can see right here it's now

2     molded just like it is now, except in the slide we

3     have it in place.

4     **Q.**  How did you ensure, Mr. Juneau, that the

5     dimensions and the size and the shape of the earmolds

6     that you created were accurate?

7     **A.**  Basically the blue glove picture of the full human

8     ear impression there is what I'm holding right here.

9     And the way we assured that it was factual, you can

10    inspect this totally and see that, indeed, that

11    impression has been faithfully reproduced.

12         Now, when I extract that, I've got a beautiful ear

13    impression that shows all of the S-turns and

14    everything like that.  That is certainly not a simple

15    upward sloping -- in fact, it's a snake when it goes

16    in there.  But I've got this.

17         Now, if I take -- so, if I put a block at the end

18    of this and I fill this with acrylic and cure it and I

19    pull that out, we should have a slide that follows

20    with the red impression -- or the red replica.

21    **Q.**  Yes.

22    **A.**  Can we move to that next slide?

23    **Q.**  I'm not sure if that's the next slide.  Are you

24    talking about --

25    **A.**  I'm not sure.  Yeah, it is.  Okay, it's clear.

1   But the one I had originally I had red up here.  I'm

2   sorry.

3   **Q.**   That's okay.

4   **A.**   At any rate, you can see the picture on the left

5   is the acrylic duplicate that we molded from the full

6   human ear replica.  And the picture on the right is

7   the same measurement at the aperture on the full human

8   ear impression made at the university.

9       If you look at the scale numbers, they're 6:15mm,

10  6.15mm at the aperture on both.  You don't get any

11  closer than that.  And yet, to me, the proof is really

12  when you take your original and when you can put it

13  back in and marry it to this and it's perfect, you've

14  duplicated it faithfully.

15  **Q.**   Now, you've talked about measurements that you did

16  in conjunction with your work on this case.  Can you

17  give us an estimate of how many measurements you

18  actually took on these 30 subjects?

19  **A.**   Yeah.  Essentially the impressions that we showed

20  earlier were right and left ear each.  The initial

21  impression was a closed-mouth impression, which is the

22  smallest size of the external ear canal.

23      Then we did an opened-mouth impression.  And both

24  of those cases were facing forward.  And then, last

25  but not least, we do one more impression where they do

1   opened-mouth, turned-head, and that gave a third

2   different one.

3       We wanted to make sure with the science that was

4   out there in terms of landmarks and dimensions on the

5   typical landmarks and everything like that.

6       We actually measured the canal length from the

7   aperture to the cartilaginous bony junction.  We

8   measured the aperture, both the width and the height,

9   the isthmus, both the width and the height.  And then

10  we also cataloged the canal -- was that canal feature

11  a straight canal, was it a tortuous canal, and was it

12  small or something like that.

13      And in all those measurements, we did -- two, four

14  five -- six measurements times six, 36 times

15  thirty-something subjects, so 900 or so.

16  Q.  In this case?

17  A.  Uh-huh.  And again, what we were looking to do is

18  make -- look at did we stay within the norm.  Say, of

19  the isthmus, did they, on average, go to a 5.7, such

20  as somebody like Ahmed had indicated or Sune Darkner

21  indicated it would be.

22  Q.  Thank you, Mr. Juneau.  I'm going to talk for a

23  second about the GRAS 45.  It was touched on earlier,

24  so we're just going to quickly talk about it.

25      Can you tell me why the GRAS 45, the acoustical

1   test fixture, is important in the studies like this?

2   **A.**   Because it's a test fixture that you can -- that

3   they can do a bench test on, essentially.

4   **Q.**   So, in Dr. Eddins's testimony, they touched on a

5   concept -- the topic of earwax?

6   **A.**   Yes.

7   **Q.**   And it's my understanding that that was you and

8   Dr. Eddins who discussed this, and you went out and

9   found the artificial earwax.  Can you tell us about

10  that?

11  **A.**   Sure.  Earwax and -- you know, when you really

12  look at it in the medical business, the doctors always

13  refer to earwax as cerumen.  And in talking with Dr.

14  Eddins and making our plan, it was clearly decided

15  that you wanted to have wet ears because that was more

16  truthful of what the ear is like.  You've got a wet

17  environment in your ear with the lipids and the

18  proteins and all things that make up earwax.

19      So, I researched it, talked to a few people in the

20  industry, and called Pickering Labs.  They're one of

21  the top labs that do all body fluids, and they do it

22  artificially.

23      I have used human in the past, many years ago when

24  we were first doing it in the early '90s because they

25  didn't have such a thing as artificial.  And it wasn't

1    a good -- it's not a good remedy.  So, we felt best to

2    call Pickering, and I did, and I received back their

3    cerumen.

4        When I got the cerumen -- I'm a hands-on kind of

5    guy.  The first thing I did was I tested it, and it

6    didn't feel like earwax that I see every day in the

7    lab.

8        So, I called the technical support there.  And

9    when I got with them, they said, well, you need the

10   sebum to go with it.  And so they sent us a bottle of

11   the sebum.  And essentially those two combinations are

12   what really earwax is made of.  Because you have the

13   sebaceous glands but then you have the ceruminous

14   glands as well, and the combination of those two

15   things really gives you the earwax that we look at

16   every day.

17       So, I mixed it.  They said you could mix it to the

18   ratio you wanted, so I did just that.  And when I

19   began messing with it, you know, I did different

20   ratios.  But the one that I came upon that I thought

21   was most consistent with what I see every day in the

22   lab was a two-thirds cerumen to one-third sebum.  And

23   when you mix it between your fingers, it felt like

24   your earwax, you know, it's that creaminess kind of

25   blend, and it felt right.

1      So, I shot a brief video of that, sent it to Dr.

2  Eddins, and we settled on that as a material.

3  **Q.**  All right.  Now, I want to talk about your work

4  with the mandibular motion.

5  **A.**  Okay.

6  **Q.**  Why was it important to you when you were asked to

7  do this project to simulate mandibular motion?

8  **A.**  The thing about anything that you put in the human

9  ear, well, it's like the little issue I'm having today

10 with my hearing aids, they kind of got a little

11 stopped up and everything, so I'm having trouble

12 because of the moisture in the air.  So I go ahead and

13 I've got to take those out.

14     The issue that's causing that is just the chewing

15 and all the things that I've done, you know, coming.

16 And then essentially that space, which is between the

17 first bend and the second bend in the cartilaginous

18 canal, that moves all the time.  So anything you put

19 in the ear, the ear is actively working to treat it

20 like earwax and get it out of the ear.

21     So, if we're going to test anything for a hearing

22 aid or for a hearing protector, what we truly want to

23 do is simulate what's happening.

24     If you look at this slide, this is a model of what

25 everybody thinks is the human ear.  And what it is,

1   it's a frontal view or a coronal view of the slide.

2   The mandible shown in this slide, which this is a

3   traverse cut, which is a top-of-the-head-down view of

4   it, is the mandible or the condyle process that's

5   coming in here, you're not even seeing it.  It's not

6   shown.

7       The other thing is there is a false sense of

8   simplicity.  When you look at a straight canal that's

9   gently sloping up, you go, oh, no problem.  Well, the

10  problem you have is, to get anything to get your ear

11  kind of straight, you've got to pull it back and up,

12  and then you've got to know to push that thing back

13  and up.  And getting something like an acrylic

14  earpiece that's not flexible in your ear that doesn't

15  fit, good luck.  So it's that type of thing.

16  **Q.**   You've mentioned that, as you go down to the ear

17  canal, at some point you get to a bony structure?

18  **A.**   Yes.

19  **Q.**   How did you replicate that?

20  **A.**   We actually stopped at that point.  The Dr.

21  Eddins's impressions that came in, we essentially

22  evaluated them and did a lot of the same process they

23  did on their end to make sure the impressions were

24  proper, solid, no pits, just good duplication of that

25  ear.

1       And essentially, when -- I'm sorry I lost my train

2    of thought.

3    Q.  I was asking how you replicated the bony structure

4    that that defined for us, the bony structure.

5    A.  Yeah, I know that part.  I'm trying to -- from the

6    ear impression standpoint, we know the bony

7    cartilaginous is going to be the proximal tip of this

8    device.

9       And essentially, when you are building a replica,

10   we don't go any further than that.  My universe is the

11   tip of this ear canal.  And then, from there, I'll put

12   the cap extension to come to the GRAS coupler.  And

13   once we do that, now we have the replica that we have

14   in front of us.

15   Q.  So, let's talk about how you ultimately did a

16   simulation of the mandibular movement.  And while you

17   were doing that testing, did you create a couple of

18   videos to show what you did for purposes of showing

19   the mandibular motion?

20   A.  Yes, I did.

21   Q.  We're going to go ahead and start the video, if

22   you could just talk us through the video and what

23   we're seeing here.

24   A.  Okay.  This is a back view of the machine that

25   Dave showed earlier.  If you want, I'll --

1        **THE WITNESS:**  May I step down?

2        **JUDGE RODGERS:**  Yes.

3        **THE WITNESS:**  This is the same view that

4   you're seeing in the picture.  You've got your motor

5   controller, you've got your support on here, a chassis

6   for the stepper motor.  You have a polypropylene

7   driver shaft that you're seeing.  And then on the tip

8   of it is a plunger.

9        Now, in this case it's a different side ear,

10   so you see it's going the opposite that was shown here

11   on the table.  But essentially that plunger is going

12   in and out.  It's computer-controlled.  We can get it

13   to the nearest millimeter that you want in terms of

14   going in and out.  We can change the cycles on it.

15        And essentially, what we're showing there is

16   the external part of that ear canal deflecting from

17   what would be jaw down, jaw closed, jaw down, jaw

18   closed.

19   **BY MS. HUTSON:**

20   **Q.**  Let's go to the next video and you can walk us

21   through that as well.

22   **A.**  This is the external one.  This is the -- now,

23   what we're seeing here in this video, we're showing

24   the deflection actually in the canal.  Because what

25   we're interested in is do we have the right spot and

1    is it flexing the external ear canal properly.

2        Now, my mind jumped on you when you asked me about

3    how do I support the canal in the back of it.  When

4    you have this -- the plate that's holding it, the --

5    what would be the posterior part of the ear canal, the

6    mastoid bone itself, we've actually built up the

7    support plate with Plexiglass so that the plunger only

8    deflects the anterior part of the canal but not the

9    posterior part of the canal.

10   **Q.**  Now, when you created this simulation of

11   mandibular motion, did you base it on science,

12   literature in the community in order to create this

13   simulation?

14   **A.**  There is a lot of literature that addresses the

15   deflection of the mandibular motion, how much does it

16   move.  And they have that -- and Sune Darkner probably

17   is one of the best.  He's the one that defines it at

18   around 2.3mm.

19       But you have some other cadaver studies that show

20   it, and it's something that's coming of time, and

21   again, because the goal on the hearing aid side is

22   we're trying to put more and more electronics into

23   that small space, and we would like to understand how

24   to set up the proper retention so that it doesn't walk

25   out of the ear.

1   **Q.**  So, when you said there are studies, are these the

2   types of studies that you're talking about --

3   **A.**  Yeah.

4   **Q.**  -- that exist with regard to mandibular motion?

5   **A.**  Yeah.  Sune Darkner for sure.  Oliveira did a lot

6   of work on the initial MRIs and the coordinates system

7   because that's what they were working in the late

8   '90s.  And then Wayne Staab, same thing.

9       Pirzanski has done it more through earmolds where

10  he -- in fact, in my report I have it where he shows

11  an opened mouth and a closed mouth on an impression,

12  and you can see that the opened mouth is not going to

13  make a good acoustic seal.

14  **Q.**  Now, Mr. Juneau, in your deposition you were asked

15  about this testing that you've just described for us,

16  and one of your answers was that the technology was on

17  the brink.  What did you mean by that?

18  **A.**  Well, what I think I did there is I got

19  enthusiastic about the work we're doing.  And

20  essentially, the technology that we have, these are

21  all stable.  Most of the body of work goes from 1mm to

22  5mm down the ear canal, and nothing addresses going to

23  13, 14mm down that human ear canal.

24      And that's what we're excited about the most.

25  Because we have a faithful reproduction of those

1    important landmarks and elements that make up the

2    human ear, and I think it's a great test model to do

3    what we're doing.

4    **Q.**  In your opinion, based on the work that you did

5    and the study that you did, did the simulation of the

6    mandibular motion accurately depict mandibular motion

7    in the 30 subjects that were tested?

8    **A.**  My observation, absolutely, yeah.

9    **Q.**  Now -- you can go ahead and take the stand.  We're

10   almost done, Mr. Juneau.  Thank you so much.  That was

11   very helpful.

12       In the opinions that you gave us in your report

13   and deposition and here today, were all of those

14   opinions based on scientifically acceptable studies

15   and literature?

16   **A.**  Yes.

17   **Q.**  Were the methods and techniques that you used in

18   what you did in this case generally accepted in the

19   scientific community?

20   **A.**  Yes.  Essentially, we have always operated under

21   an FDA Class 1, Class 2 establishment rules, and we

22   meet that criteria.  And the key is to be -- to create

23   a quality that's reproducible and repeatable and

24   that's good science.

25   **Q.**  And I'm glad you brought that up because you were

1    mentioning your lab earlier.  What is the name of your

2    lab?

3    **A.**   Soft Touch Labs.

4    **Q.**   And did some of the testing -- or the testing that

5    you did in this case, did you do it in your lab?

6    **A.**   Yes, I did.

7    **Q.**   You mentioned your lab is FDA certified, and you

8    mentioned Class 2 medical device.  Can you briefly

9    tell us why that's important.

10   **A.**   Yeah.  Essentially, the FDA is the watchdog, and

11   they inspect you and come in and make sure you're

12   meeting the proper guidelines to build medical

13   devices.  And that's basically what it is and what you

14   do.  And we think it's an environment that you would

15   want to be part of if you're going to do anything

16   that's ancillary medical or, in fact, something

17   medical.

18          **MS. HUTSON:**  Thank you very much, Mr. Juneau.

19          **JUDGE RODGERS:**  Thank you.

20          Mr. Nomellini?

21          **MR. NOMELLINI:**  Thank you, Your Honor.

22                    **CROSS-EXAMINATION**

23   BY MR. NOMELLINI:

24   **Q.**   Good afternoon, Mr. Juneau.

25   **A.**   Good afternoon.

1   **Q.**   You would agree with me each person -- each one of

2   us has a unique ear canal, right?

3   **A.**   Yes.

4   **Q.**   And, in fact, there is tremendous variation in the

5   morphology, the shape of people's ears, right?

6   **A.**   Yes.

7   **Q.**   To take an example, the aperture, that's the

8   opening of the ear, right?

9   **A.**   Correct.

10  **Q.**   And the aperture has a range I think you cited

11  about 2.4 all the way up to 9.6mm, right?

12  **A.**   That's correct.

13  **Q.**   And I think you talked about the isthmus.  The

14  isthmus is the narrow part of the ear canal, correct?

15  **A.**   That's the narrowest part of the ear canal,

16  generally about 9.7mm medially in and about 5.7mm in

17  width.

18  **Q.**   And each person has a unique isthmus, correct?

19  **A.**   Uh-huh.  And yet more recent science has shown

20  that the isthmus doesn't change very dramatically in

21  terms of the medial distance in as the change of the

22  ear canal.  A really small ear canal is still going to

23  be about the same depth and everything.

24  **Q.**   So, you were approached in September or October

25  2019 to develop a full human ear replica, correct?

 1   **A.**   I was approached to develop an accurate anatomical

 2   model of the human ear and to incorporate mandibular

 3   motion.

 4   **Q.**   And you were told that the ear replica was going

 5   to be used for a test, correct?

 6   **A.**   Yes.

 7   **Q.**   And you provided the human ear replicas to Dr.

 8   Eddins, correct?

 9   **A.**   I collaborated to a great extent with Dr. Eddins

10   on what the features needed to be to achieve what he

11   was trying to do on his end.  And I knew the limits

12   that I had on my end from a molding standpoint.  And,

13   you know, everything to do with a model like this is

14   getting the package to fit, so that's how we did it.

15   **Q.**   Okay.  But my question was just you provided your

16   human ear replica to Dr. Eddins, correct?

17   **A.**   Yes.

18   **Q.**   So you were not involved in creating the

19   impressions, correct?

20   **A.**   No.

21   **Q.**   The impressions were shipped to you, correct?

22   **A.**   Yeah.  The only involvement I had with the

23   impressions were the early discussions on how they

24   were going to do them and make sure we all understood

25   what we were doing.  Because I had done those type of

1    replicas in early classes where we did duplicates of

2    the human ear to teach audiologists how to do ear

3    impressions and things like that.

4    **Q.**  Okay.  Let's go to Tab 2, page 8 of your report,

5    Mr. Juneau.  And there is various illustrations you

6    provided in your report of the human ear, correct?

7    **A.**  Uh-huh, yeah, there are.  I'm not -- okay.  Yes.

8    **Q.**  Okay.  And this shows different curves in the ear

9    canal, correct?

10   **A.**  Yeah, it represents the canal angulation of the

11   ceiling of the ear canal, the superior portion and the

12   anterior portion.

13   **Q.**  Okay.  And the ear canal goes from the aperture or

14   the opening to the tympanic membrane or the eardrum,

15   correct?

16   **A.**  That's correct.

17   **Q.**  And in between, as this illustration shows, there

18   are a couple of curves, right?

19   **A.**  Yeah.  The top part of the graph is a traverse cut

20   of the ear where it's a top-down looking position of

21   the ear.  And what you're seeing is the concavity of

22   the first -- between the first and the second

23   directional bend of that ear canal going into the

24   posterior part of the ear.

25   **Q.**  And you testified earlier about the cartilaginous

1    bony junction, correct?

2    **A.**   Yes.

3    **Q.**   And the ear impressions that you received from Dr.

4    Eddins's lab usually went to approximately the

5    cartilaginous bony junction, correct?

6    **A.**   That is correct.

7    **Q.**   And so, the -- you created the replicas based on

8    the impressions you received from Dr. Eddins's lab,

9    correct?

10   **A.**   That is correct.  And if you're saying did I build

11   them up or do anything different, no.  I used them as

12   received.

13   **Q.**   Okay.  So, on average, the full distance between

14   the aperture, the opening of the ear, and the tympanic

15   membrane is about 27mm, correct?

16   **A.**   Yeah, that's the normal number.  It goes 22 to 32,

17   but on average 27.

18   **Q.**   Okay.  And the human ear replicas that you created

19   based on the impressions that you received were about

20   12 to 14mm, correct?

21   **A.**   That is correct.

22   **Q.**   So, on average, you could not replicate the

23   portion of the ear canal starting from 12 to 14mm in

24   to approximately 27mm in, correct?

25   **A.**   That was the intent, because the bony canal was

1    not part of the subject that we're dealing with.

2    Q.   And so, what you did is you created a canal

3    extension, correct?

4    A.   I molded a currently used canal extension or cab

5    that has been manufactured by GRAS on the RA045 model.

6    Q.   And that canal extension was silicone, correct?

7    A.   That canal extension that they have is stainless

8    steel which we molded it from, that is silicone, yes.

9    Q.   Let's go to page 86 of Tab 2.  And that canal

10   extension was intended to cover the portion of the

11   canal beyond what was covered by the impressions that

12   Dr. Eddins sent you, that is the first 12 to 14mm, up

13   to the tympanic membrane at 27mm, correct?

14   A.   It was actually intended to attach the coupler to

15   the tip of the canal, the proximal tip, and for the

16   taper to basically smoothly go to the distance it

17   needed to for the reference plane on the GRAS 45, and

18   that's where we molded it to.

19   Q.   Was the canal extension intended to cover the

20   portion of the ear canal beyond what was covered by

21   the impressions that Dr. Eddins sent you, from that

22   portion up to the tympanic membrane?

23   A.   The reference distance might not have gone to the

24   tympanic membrane.  It was more a function of building

25   it for the proper coupling that they were going to go

1    ahead and address the distance acoustically in their

2    test coupler.

3         **MR. NOMELLINI:**  Let's go to Juneau

4    deposition, 146, 1 to 7.

5         **JUDGE RODGERS:**  These exhibits are not very

6    clear, Mr. Nomellini.

7              **THE WITNESS:**  I thought it was my eyes.

8         **JUDGE RODGERS:**  No.  This one is really bad.

9         **MR. NOMELLINI:**  If it's not going to get

10   better than this, I've got a hard copy I can hand up.

11        **MR. HILL:**  Your Honor, if it's any help at

12   all, it's clear on the laptop, it's just not clear on

13   the screen.

14        **JUDGE RODGERS:**  Yeah, but the witness is over

15   here, not there.  And if it's not clear on my laptop,

16   I don't think it's clear -- I'm not sure if it's clear

17   on anybody else's, but it's certainly not clear on

18   mine.

19        **MS. HUTSON:**  I would object, Your Honor.  It

20   looks like he's trying to impeach him and a foundation

21   hasn't even been laid.

22        **JUDGE RODGERS:**  I'm going to allow him.

23   Overruled.

24             Go ahead, Mr. Nomellini.

25        **MR. NOMELLINI:**  May I approach the witness,

1    Your Honor?

2              **JUDGE RODGERS:**  Yes.

3    **BY MR. NOMELLINI:**

4    **Q.**  There you go, sir.  Turn to page 146.

5              **JUDGE RODGERS:**  Mr. Hill, this may be our

6    system, if it's clear on your laptop.  I don't know.

7    But --

8              **DEFENSE IT:**  It's been a long day, and I'm

9    trying to troubleshoot it as you guys go.  I'm sorry

10   about this.

11             **JUDGE RODGERS:**  It's all right.  Like I said,

12   I don't know if it's on your end or our end, but I'm

13   glad we have the hard copy and make a note to file.

14   **BY MR. NOMELLINI:**

15   **Q.**  Mr. Juneau, looking at page 146, 1 to 7, of your

16   deposition, were you asked this question and did you

17   give this answer:

18             **"QUESTION:**  Okay.  And the canal -- the canal

19   extension is intended to cover the portion of the

20   canal beyond what was covered by the impressions that

21   Dr. Eddins sent you, from that portion up to the

22   tympanic membrane, correct?

23             **"ANSWER:**  That's correct."

24             Were you asked that question and did you give

25   that answer?

1    **A.**   Wait.  It's on the very top?

2    **Q.**   Yes, page 146.

3    **A.**   Well, it's printed there, so I must have said

4    that.

5    **Q.**   Not everybody's ear canal is the same from the

6    point where the Eddins impression left off to the

7    tympanic membrane, correct?

8    **A.**   That is correct.

9    **Q.**   And there was no way for you to correctly mold

10   beyond the point of the impressions that Dr. Eddins

11   gave you because you just didn't have that from the

12   ear impression, correct?

13   **A.**   Yeah, it wasn't intended, right.

14   **Q.**   Now, the ear canal -- ear canals are curvy,

15   correct?

16   **A.**   Absolutely, yeah.

17   **Q.**   And the ear canal connectors you created are

18   straight, right?

19   **A.**   The ear canal connector is a concaveness, but we

20   set it to the same canal angulation that we do get

21   from the impression.  So, at the end point, the

22   impression at the proximal tip is now pointing in the

23   general direction of the TM.  And generally what

24   happens when you get to that point, you get more of a

25   pear shape or a reverse pear shape, according to

1    people like Ahmed and Darkner.

2    **Q.**   Okay.  But you didn't create any additional angles

3    beyond the initial angle of the ear canal extension

4    that you created, right?

5    **A.**   It's kind of like it will do this and come to

6    that.  I'm at the very tip of the proximal part, so

7    it's already turned -- it's already past the second

8    bend, so now it's angled going into the -- towards the

9    TM in the general direction of the canal angulation

10   that's there.  So it's, in a general way, going into

11   the right area.  You can't predict it 100 percent, but

12   you can get in the neighborhood pretty well.

13   **Q.**   And you haven't done any study yourself of the

14   amount of variation in people's ear canals beyond the

15   point where the Eddins impressions left off, correct?

16   **A.**   It's -- the only way you can really do that safely

17   is on cadavers because it's just too dangerous to do

18   on a live subject.

19   **Q.**   And you did not do that for your work, correct?

20   **A.**   I did not.

21   **Q.**   And you are not an expert in anatomy, correct,

22   sir?

23   **A.**   No.

24   **Q.**   Okay.  Mr. Juneau, there are no written standards

25   that you could point us to that apply to your creation

1    of a human ear replica, correct?

2    **A.**   The -- it's the knowledge base of the literature

3    that, you know, started with the earmold technology of

4    Pirzanski, work I've done, work others have done,

5    Dr. Staab, and, you know, a host of people on the way

6    to here.

7        And so, with proper methods to mold from an

8    impression of the ear, we are going straight to the

9    right place in terms of what we're doing.

10   **Q.**   Okay.  I understand that, sir.  But my question

11   is, there are no written standards you could point us

12   to that applied to your creation of a human ear

13   replica, correct?

14            **MS. HUTSON:**  Asked and answered.

15            **THE WITNESS:**  I'm sorry, I didn't understand.

16            **JUDGE RODGERS:**  He didn't point to any

17   standards, you asked him, and so I'm taking that as a

18   no.

19            **MR. NOMELLINI:**  Okay.  Thank you, Judge.

20   **BY MR. NOMELLINI:**

21   **Q.**   Your creation of human ear replicas have not been

22   subject to peer review, correct?

23   **A.**   No.

24   **Q.**   And you're not aware of any governments having

25   used your human ear replica method, correct?

1    **A.**    Not at this point, no.

2    **Q.**    Not aware of any manufacturers having used your

3    human ear replica method, correct?

4    **A.**    No.

5    **Q.**    And, in fact, you're not aware of anyone having

6    used your human ear replica method other than

7    yourself, correct?

8    **A.**    Well, in connection, right.

9    **Q.**    And you came up with the human ear replica method

10   when you were engaged by Mr. Aylstock in connection

11   with this case, right?

12   **A.**    It was part of the -- yeah, what we were doing was

13   to create an anatomically accurate ear model that was

14   going to have mandibular motion.

15   **Q.**    You did not submit your human ear replica method

16   you used for this litigation for review to anyone

17   other than Dr. Eddins, Steve Armstrong, who is also a

18   Plaintiffs' expert, or plaintiffs attorneys in this

19   case before you issued your report, correct?

20   **A.**    I did not.

21   **Q.**    And you testified that your work for the first

22   time could simulate mandibular motion and demonstrate

23   that that motion affected things that were in the

24   human ear, correct?

25   **A.**    There is a body of knowledge or science out there

1    that people are working in this area from a point of

2    mastication, chewing and everything, in other areas,

3    so there is more and more of a knowledge associated

4    with mandibular motion and what it looks like.  And

5    from just reading a lot of that information by

6    Huckleby and others, you pick up what you're doing.

7    So that's what I did.

8    **Q.**   Okay.  But you were the first to -- you testified

9    you were the first to actually do it, you were the

10   first to actually, for the first time, simulate

11   mandibular motion and demonstrate that that motion

12   affected things that were in the human ear, correct?

13   **A.**   That is true, and it was based on a body of

14   science that is well understood and available out

15   there.

16   **Q.**   Because the plunger and motor system that you

17   testified about is something you developed for

18   purposes of litigation, correct?

19   **A.**   I developed the plunger and motor system because

20   it created mandibular motion in the way that I

21   expected it to.  It was a refinement of coursework

22   that I had done earlier where you simulate mandibular

23   motion using your thumb or your index finger to

24   dislodge a custom-molded earpiece.

25   **Q.**   Sir, if you could turn to your deposition at 223,

1    9 to 13.  Tell me when you're there.

2    **A.**  I am just about there.  Okay.

3    **Q.**  Thank you, sir.  223, line 9 to 13.

4            "**QUESTION:**  So, this plunger and motor system

5    that you've just testified about, that's something

6    that you developed for purposes of this litigation,

7    correct?

8            "**ANSWER:**  Yes, sir."

9            Were you asked that question and did you give

10   that answer?

11   **A.**  I answered that question that way, and it -- yeah,

12   we -- it was part of what we were doing.

13   **Q.**  And you haven't published anything describing the

14   motor and plunger method that you created outside of

15   this case, correct?

16   **A.**  No, sir.

17   **Q.**  The motor and plunger method has not been subject

18   to peer review other than Plaintiffs' experts

19   Armstrong and Eddins, correct?

20   **A.**  That's correct.

21   **Q.**  You recall that Dr. Eddins testified about an ANSI

22   standard?

23   **A.**  Yep, 12.42, is it?

24   **Q.**  Yeah, 12.42.  And I'm just going to assume that

25   it's going to be fuzzy.  So what I'm going to do as

1    quickly as possible is bring you a copy of the ANSI

2    standard.  I'm going to turn to the relevant page for

3    you.

4         You see the Section 6.6 of the ANSI standard that

5    Dr. Eddins testified about is entitled Ear Canal

6    Extension?

7    **A.**   Yes, I do.

8    **Q.**   And it specifies a length for the ear canal

9    extension that shall be added to the ANSI 3.25 coupler

10   of 14 plus or minus 1mm, correct?

11   **A.**   Uh-huh.

12        **MS. HUTSON:**   Your Honor, may I get a copy of

13   that?  I don't have it.

14        **MR. NOMELLINI:**   Sure.

15   **BY MR. NOMELLINI:**

16   **Q.**   And you didn't determine if the ear canal

17   extension that you created met that Section 6.6 of the

18   ANSI standard, correct?

19   **A.**   I did not.

20   **Q.**   You did not do any hardness testing of the human

21   ear replicas, correct?

22   **A.**   I know that the hardness of the human ear replicas

23   is a Shore A 12 to 18 durometer.  And when it's

24   compared to the Shore 00, it's right at the 55 that we

25   have on our GRAS coupler.

Robert Juneau - Cross/Nomellini                    288

1    **Q.**   Okay.   But my question is you did not yourself do

2    any hardness testing of the human ear replicas,

3    correct?

4    **A.**   I accepted the Factor II indication that it was a

5    Shore A 12 to 18 durometer hardness, as it indicated.

6    **Q.**   Okay.   And just to unpack that for the Court, you

7    accepted the Factor II representation.   You had a

8    conversation with somebody from a company, correct?

9    **A.**   It was president of the company, and he's in

10   cranial facial prosthetics, and that's what he does

11   for a living and he's the manufacturer of it.

12   **Q.**   And that was a man by the name of McFall, correct?

13   **A.**   Yes, John McFall.

14   **Q.**   And you did not disclose your discussion with Mr.

15   McFall in any of your reports, correct?

16   **A.**   No.   I asked him for the information, but I didn't

17   disclose anything other than that.

18   **Q.**   Okay.   And you didn't disclose any notes of any

19   conversations you had with Mr. McFall in connection

20   with any of your reports, correct?

21   **A.**   Only in the early days that, you know, this is

22   what we were doing and it was Factor II 588 dual

23   material to Eddins and people like that internal.

24   **Q.**   Okay.   You disclosed it internally to Dr. Eddins,

25   but you did not disclose it to us in connection with

1   your report, correct?

2   **A.**   The fact that I used 588?

3   **Q.**   No.  The fact that you had this conversation with

4   Mr. McFall.

5   **A.**   It was in response to Kytomaa or one of the people

6   that was saying that it wasn't human flesh compatible.

7   And so for that, I wanted to -- I knew it was so, but

8   I just didn't know the number.

9   **Q.**   So, you had this conversation after your report,

10  correct?

11  **A.**   I'm not sure.  There is a lot of confusion around

12  that.  Because I didn't do a rebuttal, and I had the

13  information, and we met on it.  But I'm not sure if it

14  got presented or not.

15  **Q.**   So, in any event, in this conversation with Mr.

16  McFall, you did not keep notes, correct?

17  **A.**   No, I did not.

18  **Q.**   All right.  I think I'm on my last topic, which is

19  earwax.

20  **A.**   Oh, my favorite.

21  **Q.**   So, the earwax, we've talked about cerumen and

22  sebum, correct?

23  **A.**   Yes.

24  **Q.**   And you, Mr. Juneau, came up with a mixture of

25  two-thirds cerumen to one-third sebum, correct?

1    **A.**   That was based on conversations with technical

2    support at Pickering on the very first time around,

3    not after.

4    **Q.**   So, those conversations with Pickering, did you

5    disclose -- did you add those conversations with

6    Pickering in your expert report?

7    **A.**   I disclosed that we were using Pickering for

8    cerumen and sebum.  And it happened where as I said

9    earlier today in the direct where I received the

10   cerumen and it didn't appear to be anything like

11   cerumen.  So I called back technical support.  They

12   said order the sebum, mix that.

13        Because, again, I was going for a mixture that

14   looks like what I see everyday in the laboratory.  And

15   so I mixed it in a ratio.  After doing it several

16   times, I came to -- it was a two-third/one-third ratio

17   of two-thirds cerumen to one-third sebum.  And when

18   you mix it, it wets out and feels exactly like the

19   earwax I see every day in the laboratory.

20   **Q.**   Okay.  So, that two-thirds/one-third mix, that did

21   not come from Pickering, correct?

22   **A.**   Pickering indicated you mix it.  They did not give

23   me a ratio.  And, again, from that perspective, I've

24   seen thousands if not hundreds of thousands of

25   earmolds in the 40 years I've done this for a living.

Robert Juneau - Cross/Nomellini                    291

1    I know what earwax looks like and feels like.  And

2    it's -- and what I produced there I'm comfortable was

3    a very good simulation, a good artificial simulation

4    of human earwax.

5    **Q.**   So, in determining the two-thirds artificial wax

6    to one-third artificial sebum, it's fair to say you

7    relied on your experience as opposed to any literature

8    setting forth that ratio, correct?

9    **A.**   The -- essentially when you look at human earwax

10   -- and they do have studies where they have actually

11   used sebum from hamsters and things like that, and you

12   can do a mixture and everything.  It's essentially you

13   have two glands that are producing a material.  Some

14   people produce it a little more of one than the other.

15        The fact of the matter is, earwax is not cerumen;

16   earwax is cerumen and sebum.  And again, what we were

17   doing was mixing it to get a consistent ratio so that

18   the plunger system with the mandibular motion on the

19   ear was going to be consistent every time to where we

20   took the variable of the varying types of earwax.

21   Because it's inhomogenous material, and so

22   consequently, how do you get there, you know, is --

23   **Q.**   Sir, could you turn to page 192 of your

24   deposition?

25   **A.**   Uh-huh.  I'm there.

1    **Q.**   Line 19.   Read with me.   You were asked this

2    question and gave this answer:

3             **"QUESTION:**   Okay.   So, in determining the

4    two-thirds artificial wax to one-third artificial

5    sebum, it's fair to say you relied on your experience

6    as opposed to any literature setting forth that ratio,

7    correct?

8             **"ANSWER:**   That -- that is correct.   Because

9    it was very obvious to me -- you know, I've looked at

10   earwax for many, many years, and you never get used to

11   it in the hearing industry.   It's always like ick.

12   But at the end of the day, it's -- you know what it

13   feels like.   And again, I've done not one but probably

14   over 10,000 ear impressions in my life, and I know

15   what earwax looks like, and I know what it feels

16   like."

17            **MS. HUTSON:**   Objection, Judge, this isn't

18   inconsistent with what he just said.

19            **JUDGE RODGERS:**   I don't think he answered the

20   question here, and so I think Mr. Nomellini was

21   pointing out that he answered it in his deposition.

22   So, overruled.

23            Go ahead.

24   **BY MR. NOMELLINI:**

25   **Q.**   And you didn't do a chemical analysis of the

```
 1   mixture of the wax and artificial sebum, correct?
 2   A.  No, did not.
 3          MR. NOMELLINI:  All right, sir, thank you
 4   very much.
 5          JUDGE RODGERS:  Mr. Juneau, I have a quick
 6   question.  I wrote down -- I believe this was on your
 7   direct testimony that you said that there was a good
 8   bit of literature on deflection of the mandibular
 9   motion from the aperture to 5mm into the ear canal.
10          THE WITNESS:  Yeah.  Casali talks about it in
11   some of his reports with Thomas.  And generally that's
12   what they do, they go between the first bend out to
13   5mm in terms of the shape of the ear canal.
14          But from a mandibular motion -- if I'm
15   understanding you, you're asking me about mandibular
16   motion at that point?
17          JUDGE RODGERS:  Yes.
18          THE WITNESS:  The mandibular motion comes
19   from things like Darkner where he describes the 2.3mm
20   as being a deflection of the condyle process when he
21   goes into that.
22          JUDGE RODGERS:  And what did Darkner use to
23   measure or test that?
24          THE WITNESS:  It was -- they did -- they
25   developed a finite element model to do it.  But he was
```

1    actually looking at scans of various cadaver ears and

2    looking at those differences in that area.

3              **JUDGE RODGERS:**  And he's Danish?

4              **THE WITNESS:**  Yes, Sune Darkner is Danish.

5              **JUDGE RODGERS:**  I wanted to make sure that

6    was the study I was thinking it was, and from Denmark

7    I think.

8              **THE WITNESS:**  Yes.

9              **JUDGE RODGERS:**  So you went on to say nothing

10   in the literature addresses all the way to 13 to 14mm?

11             **THE WITNESS:**  Right.  And that's where I was

12   kind of referencing back to some of the literature

13   where, really, everything that we're looking at is

14   between 1 and 5mm in from the aperture, you know,

15   medially in from the aperture.

16             **JUDGE RODGERS:**  That's exactly my next

17   question.  So, what you and Dr. Eddins were measuring

18   went how far from the mandibular motion?

19             **THE WITNESS:**  It went from the aperture all

20   the way to the cartilaginous bony junction, which is

21   10mm.  But then the proximal tip of the canals that I

22   got from Dave because the otoblock went slightly past

23   that, and those were generally going to be 12 to 14,

24   maybe 14 and a little bit millimeters long.

25             **JUDGE RODGERS:**  But there is -- again, I just

1    don't want to misunderstand or miss something.  But

2    what I think I understood you to say is there is no

3    literature that addresses the measurement or the

4    testing of mandibular motion to that extent, that

5    depth into the ear canal.

6         **THE WITNESS:**  Right.  The mandibular motion

7    occurs in that part of the ear canal from the aperture

8    to almost the second directional bend.

9         **JUDGE RODGERS:**  Which is how many millimeters

10   in, approximately?

11        **THE WITNESS:**  Call it 9mm, 9-and-a-half

12   millimeters.  So, it's closer -- when you're talking

13   about that soft spot of the ear where I can put a

14   hearing aid and things like that, that's all soft

15   cartilaginous material.  So that material is flexible

16   but it doesn't stretch.  I mean, a prodigal rocking,

17   and it'll regress out, if you're not careful.

18        The other part of the mandibular motion is

19   the entire outer canal, which includes the pinna and

20   everything, all of that moves with the exception of

21   the crux of the helix.

22        **JUDGE RODGERS:**  Right.  But the literature

23   that you said there was a good bit of on the

24   mandibular motion, I understood you to say that

25   literature was focused to a point of about 5mm into

1    the ear canal.  Am I right or wrong?

2            THE WITNESS:  No, wrong.

3            JUDGE RODGERS:  Okay, so I misunderstood.  So

4    what in the literature supports this study of

5    mandibular motion beyond 5mm?

6            THE WITNESS:  Darkner and Ahmed basically

7    identified the isthmus as the narrowest part.  And in

8    the measurements that we did, you could see a nice

9    percentage change of the isthmus only in the

10   anterior-posterior plane, which is the width, and in

11   the aperture.  And that's where most of the mandibular

12   motion occurs is in that area.

13           JUDGE RODGERS:  And that's 5 to 9mm or is it

14   something different?

15           THE WITNESS:  It will go as deep as 9.7mm if

16   you go according to Ahmed.  But generally, it's in

17   that range from a couple of millimeters to just call

18   it 10mm, so 5-ish is probably not a bad estimate of

19   where the mandibular bump may be.

20           Because when you do an opened-mouth

21   impression, the ear canal is at its largest in the

22   mandibular area.  When you close, it's the smallest.

23           When you look at the impressions side by

24   side, you can actually see a bump, a ball -- it's

25   almost like a spot of water on something, and that's

1    what we have come to call the mandibular bump.  And

2    that is what -- we look at the space.

3           When we build the replica, that's what we're

4    doing, we're starting with the largest volume of the

5    open-mouth facing-forward impression.  And now when

6    the plunger is going in, it's going in at the

7    mandibular bump but only to the depth that the

8    closed-mouth impression should be.

9           And so, we looked at it from a range, because

10   I think a range is more consistent with the science of

11   just looking at what is the effect of a cyclic

12   mandibular motion on something egressing out of the

13   ear.

14          **JUDGE RODGERS:**  But those studies were

15   looking at cadavers?

16          **THE WITNESS:**  Some were cadavers, some were

17   just MRIs that they did.

18          **JUDGE RODGERS:**  All right.  That answers my

19   question.  Thank you.

20          **MR. NOMELLINI:**  May we provide those articles

21   to Your Honor?

22          **JUDGE RODGERS:**  I think I have Darkner, I

23   believe.  I'm not sure about Ahmed, maybe we do.

24          **THE WITNESS:**  I can provide any you need.

25          **MR. NOMELLINI:**  I have it here, Your Honor.

 1          **JUDGE RODGERS:**  That's fine, if somebody

 2    wants to -- if you want to leave them today, that's

 3    fine, if you have them.

 4          All right.  I think that's all we have time

 5    for, Mr. Juneau.  Thank you very much.

 6          Oh, I'm sorry, let me ask the judges -- we

 7    have the two judges on Zoom so let me see if they have

 8    any questions.

 9          Judge Jones?

10          **JUDGE JONES:**  I do not have any questions.

11    Thank you.

12          **JUDGE RODGERS:**  Judge Herndon?

13          **JUDGE HERNDON:**  No questions.  Thank you very

14    much.

15          **JUDGE RODGERS:**  Thank you.

16          Mr. Juneau, thank you very much.

17          **THE WITNESS:**  Thank you very much.

18          **JUDGE RODGERS:**  I appreciate you answering

19    our questions today.

20          **THE WITNESS:**  Thank you.

21          *(Witness excused.)*

22          **JUDGE RODGERS:**  Counsel, thank you very much

23    for your presentations today.  I hope you all can

24    quickly get to dinner, because I'm quite sure everyone

25    is hungry, having worked right there the lunch hour.

1          I have a quick point I'd like to raise with

2     you before we adjourn.  I would like to ask the

3     lawyers to identify -- I don't think you did this on

4     your witness list.  I believe I've asked for it

5     certainly in terms of depositions versus live

6     testimony.  I need that to be identified, what

7     witnesses you're intending to call live versus

8     deposition.

9          And then, as far as the live testimony, I

10     need to know who you're anticipating is going to

11     appear remotely as opposed to live testimony.  I need

12     to see that and think about it.

13          **MR. BROCK:**  Your Honor, just very quickly on

14     that, I think we have updated our list to identify the

15     ones that are by deposition versus live in some

16     fashion, either by remote video or in person.

17          We have a couple of witnesses that we are

18     talking to that are sort of watching conditions, and

19     it really is just a question of whether or not they

20     are willing to travel.  And we are encouraging them to

21     do so, but they have their own issues with that.

22          So, I think we can give you our sort of best

23     information about it right now, but I would say it's

24     probably subject to change based on events of the next

25     month or so.

1    **JUDGE RODGERS:**  These are witnesses you want
2  to call?

3    **MR. BROCK:**  Yes, that we would be calling,
4  yes.

5    **JUDGE RODGERS:**  Again, I need to see the
6  numbers that you're contemplating presenting remote
7  via Zoom, because there are technical issues with
8  that --

9    **MR. BROCK:**  I agree.

10    **JUDGE RODGERS:**  -- that interfere or
11  potentially interfere with trial management.

12    **MR. BROCK:**  I agree.

13    **JUDGE RODGERS:**  And so, again, if it's a
14  couple, that's probably not an issue.  If it's a
15  dozen, that's going to be an issue.

16    **MR. BROCK:**  I don't think it will be a dozen.
17  But we'll give you our best judgment as to where we
18  stand now.  And if it's a witness about which we still
19  have a question, we'll let you know that.

20    **JUDGE RODGERS:**  Right.  And it may be that I
21  need to explore the basis for the concern about the
22  travel.  Because other witnesses are going to be
23  traveling here for the trial, and so, are they
24  vulnerable to COVID, are they a caregiver to someone
25  who is vulnerable.  Those are the kind of questions I

1   may have to ask if it seems like there are a number of

2   those types of witnesses.

3          **MR. BROCK:**  Sure.

4          **MR. AYLSTOCK:**  Your Honor, on the Plaintiffs'

5   side, it's our intent to have everybody that we intend

6   to call here live.  Ms. Branscome and I worked out an

7   arrangement for Mr. Myers, so it would be our

8   preference that he be here live, too.

9          **JUDGE RODGERS:**  The vaccines are being

10  administered particularly to those who are vulnerable.

11  So I hope your witnesses who have those concerns, if

12  they are over 65, have loved ones over 65, they have

13  health conditions that make them more vulnerable, I

14  hope they're making efforts to get vaccinated.

15         **MR. BROCK:**  I think where we are right now on

16  vaccinations is it's still -- you've got to be over --

17  most places, you've got to be over 65 with risk

18  factors to be vaccinated now.  There are some

19  exceptions to that, but we don't have to get into

20  that.

21         We will let you know.  It's not going to be

22  12 witnesses that we will have by video presentation.

23  We have a few that --

24         **JUDGE RODGERS:**  Not video.  I'm talking about

25  -- well, I guess it is video.  I apologize.  But I'm

1    not talking about video depos right now.

2        **MR. BROCK:**  No.  When I say video, I mean by

3    live transmission.

4        **JUDGE RODGERS:**  All right.  Well, I need to

5    get that from you by first of next week, what you're

6    intending to present remotely.

7        **MR. BROCK:**  No problem.

8        **JUDGE RODGERS:**  Anybody have any other

9    questions?

10       **MR. AYLSTOCK:**  None from our side, Your

11   Honor.

12       **JUDGE RODGERS:**  Again, thanks very much for

13   your presentations.  We're continuing to work on

14   getting rulings out on your motions.

15       Here are the Dr. Eddins plugs, devices.

16   Y'all have a nice weekend.

17       *(Proceedings concluded at 5:12 p.m.)*

18       --------------------

19   *I certify that the foregoing is a correct transcript*
     *from the record of proceedings in the above-entitled*
20   *matter.  Any redaction of personal data identifiers*
     *pursuant to the Judicial Conference Policy on Privacy*
21   *are noted within the transcript.*

22

23   *s/Donna L. Boland*                        *2-23-2021*
     *Donna L. Boland, RPR, FCRR*                   *Date*
24   *Official Court Reporter*

25

1        **INDEX**

2                                                                    **PAGE**

3    **WITNESS FOR THE DEFENSE:**

4    **GREG FLAMME**
         Direct Examination by Ms. Branscome               4
5        Cross-Examination by Mr. Pirtle                  35
         Examination by The Court                         80

6

7    **WITNESSES FOR THE PLAINTIFFS:**

8    **DAVID A. EDDINS**
         Direct Examination by Mr. Aylstock               93
9        Examination by the Court                        168
         Cross-Examination by Mr. Wasdin                 170
10       Redirect Examination by Mr. Aylstock            217
         Recross-Examination by Mr. Wasdin               232
11       Further Redirect Examination by Mr. Aylstock    243

12   **ROBERT JUNEAU**
         Direct Examination by Ms. Hutson                249
13       Cross-Examination by Mr. Nomellini              273
         Examination by the Court                        293

14

15
     CERTIFICATE OF REPORTER                            302
16

17

18

19

20

21

22

23

24

25