# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to: *Baker*, 7:20cv039 *Estes*, 7:20cv137 *Hacker*, 7:20cv131 *Keefer*, 7:20cv104 *McCombs*, 7:20cv094 | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## ORDER[1]

This Order addresses the parties' respective challenges to Drs. Gregory A. Flamme and Mark R. Stephenson, John Casali, and Harri Kytomaa, and Robert Johnson, and resolves the parties' omnibus motions to exclude these experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

---

[1] As with the Court's prior Orders addressing the parties' omnibus motions to exclude experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), this Order assumes the parties' familiarity with the nature of this multidistrict litigation, the claims and defenses, and the current evidentiary record, and sets out only what is necessary to explain the instant rulings. *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 765019 (N.D. Fla. Feb. 28, 2021); *see also* 2021 WL 684183 (N.D. Fla. Feb. 11, 2021). A separate order will follow resolving the expert challenges to Dr. Richard Neitzel and Jennifer Sahmel. The remaining expert challenges—Dr. Marc Fagelson (PTSD and sleep disorder testimony only), Dr. Mark Packer (PTSD testimony only), and Dennis Driscoll—relate only to Plaintiffs Baker and/or McCombs, and will be resolved at a later date.

## I.    Legal Standard

Rule 702, as explained by *Daubert* and its progeny, governs the admissibility of expert testimony.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Under Rule 702 and *Daubert*, district courts are compelled to act as "gatekeepers" to ensure the reliability and relevancy of expert testimony.  *Id.* (quoting *Daubert*, 509 U.S. at 589).   Expert testimony is reliable and relevant—and, therefore, admissible—when the following criteria are met: (1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is "sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *Id.*  The Eleventh Circuit refers to these criteria separately as "qualification, reliability, and helpfulness," *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate," *Quiet Tech. DC-8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).  The party offering the expert has the burden of showing, by a preponderance of the evidence, that each of these requirements is met.  *Rink*, 400 F.3d at 1292.

To meet the qualification requirement, a party must show that its expert has sufficient "knowledge, skill, experience, training, or education to form a reliable

opinion about an issue that is before the court." *Hendrix ex. Rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (citing Fed. R. Evid. 702) ("*Hendrix II*"), *aff'g* 255 F.R.D. 568 (N.D. Fla. 2009) ("*Hendrix I*").  Importantly, if a "witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments).  The qualifications standard for expert testimony is "not stringent" and "[s]o long as the witness is minimally qualified, objections to the level of [his] expertise [go] to credibility and weight, not admissibility." *Hendrix I*, 255 F.R.D. at 585.

To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue. *Frazier*, 387 F.3d at 1261-62.  The reliability analysis is guided by several factors, including: (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique is generally accepted in the relevant community. *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786.  "[T]hese factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal

court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech.*, 326 F.3d at 1341.  The court's focus must be on the expert's principles and methodology, not the conclusions they generate.  *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786.  The test for reliability is "flexible" and courts have "broad latitude" in determining both how and whether this requirement is met.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999).

Finally, to satisfy the helpfulness requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985).  Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004).  Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).

"Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded [under Federal Rule of Evidence] 403." *Frazier*, 387 F.3d at 1263 (internal citations excluded).  "Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or

needlessly time consuming," or if it is otherwise unfairly prejudicial.  *Id*.  "Indeed, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses."  *Id*.  "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the districts must take care to weigh the value of such evidence against its potential to mislead or confuse."  *Id*.

When scrutinizing the reliability, relevance, and potential prejudice of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate factfinder.  *Frazier*, 387 F.3d at 1272. The court's gatekeeping role "is not intended to supplant the adversary system or the role of the jury."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).  Only the jury may determine "where the truth in any case lies" and the court "may not usurp this function."  *Frazier*, 387 F.3d at 1272. Thus, a court may not "evaluate the credibility of opposing experts" or the persuasiveness of their conclusions, *Quiet Tech.*, 326 F.3d at 1341; instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence," *Frazier*, 387 F.3d at 1272.

## II.     Defendants' Experts

Plaintiffs' expert challenges are directed to the testimony and opinions of Drs. Gregory A. Flamme, Mark R. Stephenson, John Casali, and Harri Kytomaa.  The Court addresses the experts in turn.

### A.     Drs. Gregory A. Flamme and Mark R. Stephenson

Drs. Gregory A. Flamme and Mark R. Stephenson ("Flamme-Stephenson") are audiologists and consultants with Stephenson and Stephenson Research and Consulting, LLC.  Before joining the firm, Dr. Flamme spent nearly two decades as a professor and researcher in the field of hearing conservation and related topics, including the hazards posed by noise.  Dr. Stephenson previously served as an officer and research audiologist in the United States Air Force for 20 years, where he held numerous senior leadership positions, developed hearing damage risk criteria adopted by the military, and provided clinical diagnostic services for the complete spectrum of human auditory disorders and, where necessary, made determinations of fitness for duty.  Thereafter, Dr. Stephenson joined the Centers for Disease Control and Prevention (CDC), National Institute for Occupational Safety and Health (NIOSH), where he performed hearing loss prevention research evaluating the effectiveness of hearing conservation programs and developed updated hearing damage risk criteria "widely adopted by governmental agencies and professional organizations."  Flamme-Stephenson Rep. (General), ECF No. 1595-2 at 12.

In this litigation, Flamme-Stephenson jointly offer a number of general and case-specific opinions, only two of which are challenged as unreliable by Plaintiffs. First, Plaintiffs argue for exclusion of all opinions relying on the Auditory Hazard Assessment Algorithm for Humans. Second, Plaintiffs maintain that the doctors' specific-causation opinions regarding Estes and Baker are not supported by a reliable methodology.

## 1.    Reliability of Opinions Relying on AHAAH Model

Flamme-Stephenson used the Auditory Hazard Assessment Algorithm for Humans (AHAAH) to calculate the allowable number of rounds (ANOR) of weapons fire that wearers of the CAEv2 may be exposed to per day "without an increase in auditory risk."[2] *See id*. at 111. They concluded that, "[w]hen compared to the ANOR with no hearing protection, the yellow end of the CAEv2 increased the ANOR by 148 times or more" and "the green end . . . increased the ANOR by almost 1000 times." *See id*. at 74. Plaintiffs argue that this conclusion, and any related testimony, must be excluded because the AHAAH model is not a reliable method for evaluating hearing damage risk. More specifically, they maintain that AHAAH has not been validated as a reliable method for assessing damage risk in humans (as

---

[2] Flamme-Stephenson used two firearms for their tests: (a) "a Savage Arms Model 110 bolt action rifle with a 0.558 m barrel length," similar to the military's M240 Bravo and M60 firearms; and (b) "a Winchester Model 43 .22 Hornet bolt action rifle with an approximate 0.5 m barrel length," similar to the M16 service rifle. *See* SASRAC Tech. Rep., ECF No. 1595-2 at 90.

opposed to cats and chinchillas, on which the original AHAAH model was based),

is not generally accepted by the scientific or military medical community, and, in

fact, is highly controversial as a damage risk metric.

Based on the evidentiary record, the Court finds that AHAAH has been

sufficiently validated and accepted for use in predicting hazards to the human ear

from exposure to high intensity noise, such as weapons fire.  Although the model

was initially developed using data on the dimensions of the "external, middle and

inner ears of cats" and chinchillas,[3] once the original model was shown to predict

auditory hazard for cats with "high accuracy," a parallel model was developed using

the dimensions of the human ear.[4]  AHAAH's developers tested the validity of the

parallel model by comparing its hazard predictions against "all the available human

data that [was] interpretable with the model," and also against the predictions of two

---

[3] *See* American Institute of Biological Sciences (AIBS) Peer Review of Auditory Hazard Assessment Algorithm for Humans (Review Panel Rep.) (Apr. 2, 2001) ("AIBS 2001"), ECF No. 1595-13; G. Richard Price & Joel T. Kalb, *Mathematical Model of the Effect of Limited Stapes Displacement on Hazard from Intense Sounds*, 80 J. ACOUST. SOC. AM. S123 (1993); *see also* Price Dep., ECF No. 1595-9 at 15-16.

[4] *See* G. Richard Price, *Validation of the Auditory Hazard Assessment Algorithm for the Human with Impulse Noise Data*, 122(5) J. ACOUST. SOC. AM. 2786-2802 (Nov. 2007) ("Price Nov. 2007"), ECF No. 1627-2 at 4; G. Richard Price and Joel T. Kalb, *The Philosophy, Theoretical Bases, and Implementation of the AHAAH Model for Evaluation of Hazard from Exposure to Intense Sounds*, ARL-TR-8333, U.S. Army Rsch. Lab'y (Apr. 2018) ("Price-Kalb 2018"), ECF No. 1595-11 at 21-22; G. Richard Price, *Predicting Mechanical Damage to the Organ of Corti*, 226 HEARING RSCH. 5, 7-8 (Apr. 2007) ("Price Apr. 2007"); G. Richard Price, *A New Method for Rating Hazard from Intense Sounds: Implications for Hearing Protection, Speech Intelligibility, and Situation Awareness*, in NEW DIRECTIONS FOR IMPROVING AUDIO EFFECTIVENESS KN201-KN2-24 (2005), ECF No. 1595-10 at 5-6; Price Dep., ECF No. 1595-9 at 16-17.

other metrics of auditory hazard, the Army's MIL-STD-1474D and the A-weighted energy measure.[5]  The AHAAH model correctly predicted noise hazard outcomes in 95% of situations, as compared to "about 40%" and "about 25%" accuracy, respectively, with the other metrics.[6]  AHAAH has since "been peer-reviewed and systematically evaluated against various [other] datasets."  *See* DEP'T OF DEFENSE, MIL-STD-1474E (Apr. 15, 2015), ECF No. 1627-23 at 49.  It has been adopted as a military acquisition standard for assessing impulsive noise hazards by the Department of Defense, it "is being used as hazard criteria by at least one other nation, and is used by the automobile industry to evaluate risk of hearing loss from airbag deployment."  *See* DEP'T OF DEFENSE, MIL-STD-1474E (Apr. 15, 2015), ECF No. 1627-23 at 49.  And it was used by the Army to evaluate the effectiveness of the CAEv2.[7]

This is not to say that AHAAH is without critics.  Indeed, Plaintiffs have offered an abundance of scientific literature challenging various aspects of the

---

[5] *See* Price April 2007, at 9 (stating that AHAAH requires "a digitized exposure waveform and interpretable hearing loss data," and that "over 70 [human noise] exposures [] met that criteria").  Human noise exposure data of this nature was and remains limited, due to the dangers and cost of exposing humans to high intensity impulse noise.

[6] *See* Price Nov. 2007, ECF No. 1627-2 at 15; *see also* Price-Kalb 2018, ECF No. 1595-11 at 22.

[7] *See* Joel Kalb et al., *ARL-HRED Hearing Protection Device Assessments in Reverberating Environments*, U.S. Army Rsch. Lab'y Human Rsch. & Eng'g Directorate (June 30, 1999), ECF No. 1627-3.

AHAAH model and suggesting ways in which it should be updated or improved.[8]

However, much of that criticism has no bearing here because it is aimed at components of the AHAAH model—namely, assumptions about reflexive middle ear muscle contractions either in anticipation of, or in response to, a noise exposure—that did not actually play any role in Flamme-Stephenson's damage risk analysis for the CAEv2.[9]   In the Court's view, the remaining criticisms and suggested improvements to AHAAH reflect that the model is the focus of considerable controversy in the scientific community, and both sides espouse views that appear to have some support among scientists engaged in the debate.[10]

---

[8] *See, e.g.*, Greene et al., *Intracochlear Pressure Measurements During Acoustic Shock Wave Exposure*, 365 Hearing Rsch. 149-64 (2018), ECF No. 1595-14 at 3, 14-15; AIBS Peer Review of Impulse Noise Injury Models (Review Panel Rep.) (Nov. 9, 2010); William J. Murphy et al., *An Analysis of the Blast Overpressure Study Data Comparing Three Exposure Criteria*, Report No. EPHB 309-05h, U.S. Dep't of Health & Human Servs. (Dec. 3, 2009), ECF No. 1595-18; James H. Patterson & William A. Ahroon, *Evaluation of an Auditory Hazard Model Using Data from Human Volunteer Studies*, Report No. 2005-01 (Dec. 2004), ECF No. 1595-15.

[9] *See, e.g.*, Jones et al., *Lab'y Evaluation of the Warned Middle-Ear Assumption of the Auditory Hazard Assessment Algorithm for Humans (AHAAH)*, USAARL Rep. No. 2019-04, U.S. Army Aeromedical Rsch. Lab'y (Feb. 2019), ECF No. 1595-17.  At the *Daubert* hearing, Dr. Flamme explained that AHAAH's assumptions about reflexive middle ear muscle contractions are only triggered when either: (a) the model is run in the "warned" mode, which assumes anticipatory contractions before a high impulse sound begins; or (b) it is run in the "unwarned" mode but the digitized exposure waveforms involve a repeating series of impulse sounds, in which case the model assumes contractions reflexively develop after the series begins.  Here, Dr. Flamme ran AHAAH in the unwarned mode and used a digitized exposure waveform of a single shot (as opposed to a series of bursts), so the model's assumptions about contractions were not triggered.

[10] *Compare* Brissi Zagadou et al., *Impulse Noise Injury Prediction Based on the Cochlear Energy*, 342 Hearing Rsch. 23-38 (Dec. 2016) and Brissi Zagadou et al., *Reply to "Critical Examination of the Article: Impulse Noise Injury Prediction Based on the Cochlear Energy*," 350 Hearing Rsch. 217-221 (July 2017), *with* G. Richard Price, *Brief Critical Examination of the Article: "Impulse Noise Injury Prediction Based on the Cochlear Energy,"* 350 Hearing Rsch. 43-44 (July 2017).

Rule 702 and *Daubert* do not require exclusion of all but the *most* scientifically supported view, and they clearly contemplate the admission of testimony from experts who have fundamental disagreements about the scientific principles at issue in a case, so long as that testimony is, as here, within "the range where experts might reasonably differ." *Kumho Tire*, 526 U.S. at 153 (citing *Daubert*, 509 U.S. at 596). In other words, where legitimate debate exists within the scientific community, it is for the jury, not the court, to "decide among the conflicting views." *See id*.; *see also Rink*, 400 F.3d at 1293 n.7 ("[A] district court may not exclude an expert because it believes one expert is more persuasive than another expert."); *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co*., 161 F.3d 77, 85 (1st Cir. 1998) ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance."). Applying these principles to this litigation, the alleged shortcomings of AHAAH may be explored vigorously through cross-examination, but they do not preclude the admission of Flamme-Stephenson's auditory risk opinion based on AHAAH.

## 2.    Reliability of Specific Causation Opinions for Estes and Baker

Flamme-Stephenson also offer case-specific opinions that Estes and Baker's hearing problems were not caused by the CAEv2, but rather are the result of the Army's inadequate implementation of its Hearing Conservation Program as to these plaintiffs, as well as each one's noise exposures while wearing other hearing

protection devices.  Plaintiffs argue that Flamme-Stephenson did not follow a proper methodology, such as differential diagnosis, or otherwise explain the basis for their specific causation opinions.  This is incorrect.  Flamme-Stephenson's methodology was straightforward and readily apparent from their case-specific reports.  *See* Flamme-Stephenson (Estes), ECF No. 1627-9; Flamme-Stephenson (Baker), ECF No. 1627-8.  They reviewed Estes and Baker's audiological, military service, and disability records, and evaluated the various hearing protectors used by each plaintiff, as well as their noise exposures, both during their military careers and thereafter.  Flamme-Stephenson also considered Plaintiffs' expert's specific causation opinion for Estes and Baker, documentary evidence produced by the government in connection with this litigation, and reference materials in the scientific literature.  In their reports, Flamme-Stephenson explained how this evidence supported their conclusions about the alleged cause of Estes and Baker's hearing problems, and provided reasoned bases for their criticisms of Plaintiffs' expert's conclusions to the contrary.  Thus, the Court is satisfied that Flamme-Stephenson's specific causation opinions are sufficiently grounded in their expertise as audiologists and their analysis of the evidence related to these Plaintiffs' claims to render their methodology reliable.  The fact that Flamme-Stephenson did not formally perform more traditional differential diagnoses does not compel exclusion of their specific causation testimony.  *See Sampson v. Carnival Corp*., 2016 WL

7377226, at 4 (S.D. Fla. Dec. 16, 2016) (stating that a differential diagnosis is "not an absolute requirement" for the admission of medical causation opinions as the "Eleventh Circuit has [not] explicitly required this form of analysis") (citing *Hendrix II*, 609 F.3d at 1195).

With that said, and consistent with the Court's prior orders, Flamme-Stephenson's opinions related to the Department of Defense ("DoD") safety and hearing conservation programs will be limited as follows.[11]   Flamme-Stephenson will not be permitted to testify that any DoD program was "implemented inadequately" or otherwise failed, either as a general matter or as to Estes and Baker specifically.  *See generally In re 3M*, 2021 WL 684183.  They are also precluded from testifying that the military's failure to conduct an annual audiogram for either Plaintiff contributed in any way to their injuries.  *See* Estes, No. 7:20cv137, ECF No. 59.  As audiologists, Flamme-Stephenson may speak about the importance of training on and fit of earplugs.  However, neither they, nor any other expert, will be allowed to testify that anything the military did placed put Plaintiffs "at greater risk of sustaining a hearing impairment" or otherwise caused their injuries, as testimony of that nature would be unhelpful.  *See In re 3M*, 2021 WL 765019; *see also Coggon v. Fry's Elec., Inc*., 2019 WL 2137465, at *3 (N.D. Ga. Feb. 6, 2019) ("[E]xpert

---

[11] *See, e.g*., Flamme-Stephenson Rep. (Estes), ECF No. 1627-9 at 25, 30; Flamme-Stephenson Rep. (Baker), ECF No. 1627-8 at 26, 31.

testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves.") (quoting *Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen and Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908 (11th Cir. 1995)).

Based on the foregoing, the Court finds that Flamme-Stephenson's specific causation opinions and their opinions based on AHAAH are supported by reliable methodologies. Their opinions thus are admissible, subject to the above limitations.

## B.     Dr. John Casali

John Casali, Ph.D., CPE, is an engineer, professor, and Director of the Auditory Systems Laboratory at Virginia Polytechnic Institute and State University. He is also the founding partner and Chief Technology Officer of Hearing, Ergonomics, & Acoustics Resources LLC, a firm that "specializes in hearing-related, ergonomics and acoustical consulting as applied to, among other things, product and systems design, product testing and evaluation, military research and development." *See* Casali Rep., ECF No. 1595-4 at 6. Dr. Casali offers a broad range of opinions about the design, development and performance of the CAEv2, as well as rebuttals of various opinions from Plaintiffs' experts.[12]

---

[12] Dr. Casali's opinions regarding Dr. Eddins' *h*MIRE testing on the CAEv2 surrogate and his *m*MIRE testing with the mandibular motion simulator (as well as Juneau's related testimony) are excluded, in light of the Court's recent Order excluding Dr. Eddins and Juneau's opinions on those matters. *See* ECF No. 1680. His opinions about AHAAH are admissible for the reasons discussed in Section II(A)(1) of this Order.

Plaintiffs challenge a number of Dr. Casali's opinions relating to the military's solicitation and use of hearing protection as speculative, unreliable, outside his area of expertise, improper legal conclusions, and/or unduly prejudicial.  Consistent with the Court's previous Order discussing so-called "attorney mouthpiece" testimony, Dr. Casali will not be permitted to testify about Defendants or the military's state of mind (e.g., what they believed, intended, knew, should have known, wanted to know, or did not know about various propositions).  *See In re 3M*, 2021 WL 765019, at *40-45.  Moreover, Dr. Casali's Opinion 25, and any related testimony in which he opines about the military's alleged duties, responsibilities and policies, are stricken in their entirety, as beyond his expertise, improper legal conclusions, and unduly prejudicial.  *See* Casali Rep., ECF No. 1595-4 at 161.  Relatedly, Dr. Casali may opine generally about the benefits of training on and fitting earplugs, given his background with the design and testing of hearing protectors.  However, he may not offer opinions about the military's policies and instructions on hearing conservation, or its compliance or noncompliance therewith.  *See id*. at 160-61.

Additionally, the Court agrees that Dr. Casali lacks the education and experience in government acquisition and contracting to qualify him to testify about federal government procurement generally or the specific procurement process for the CAEv2.  He may not offer legal opinions or interpretations of the MPID, or opine on whether Aearo or the CAEv2 "complied with" or "satisfied" the MPID, but he

will be permitted to testify, from an engineering perspective, that the CAEv2 conformed to the performance specifications in the MPID. *See id*. at *43-45. Finally, Dr. Casali may not testify about the reasonableness or infeasibility of any provision in the MPID, who was responsible for a particular provision, or whether Aearo was required to comply with a particular provision. All such testimony amounts to improper legal opinions, is beyond the scope of Dr. Casali's expertise, and/or is unhelpful.

### C.   Dr. Harri Kytomaa

Harri Kytomaa, Ph.D., P.E., CFEI is a mechanical engineer with "decades of experience applying the principles of acoustics in multiple areas[,] including . . . acoustic sensor design and the use of acoustic instrumentation for flow monitoring, imaging and material characterization." Kytomaa Rep., ECF No. 1627-11 at 10. Dr. Kytomaa proffers opinions in rebuttal to those given by Plaintiffs' experts Roger Juneau, Richard McKinley, and Drs. Stephen Armstrong and David Eddins.[13] Plaintiffs argue that Dr. Kytomaa's opinions must be excluded because he is unqualified and also failed to personally consider relevant material and prepare his report.

---

[13] Defendants did not move to exclude Dr. Armstrong's opinions and/or testimony, and Plaintiffs did not challenge Dr. Kytomaa's rebuttal of Eric Rose's opinions.

As an initial matter, Kytomaa will not be permitted to offer opinions regarding Dr. Eddins' *h*MIRE testing on the CAEv2 surrogate and his *m*MIRE testing with the mandibular motion simulator (as well as Juneau's related testimony), in light of the Court's recent Order excluding Dr. Eddins and Juneau's opinions on those matters. *See In re 3M*, 2021 WL 765019, at *22-24.  Moreover, Dr. Kytomaa is not qualified to offer opinion testimony about Dr. Eddins and Juneau's silicone ear replicas or their testing methods because he has never worked in the field of audiology, conducted or evaluated REAT or MIRE testing, otherwise performed research or work with human ears and/or ear molds, or adequately explained how his general engineering background provides a sufficient basis for his proposed opinions on those matters.[14]  *See Frazier*, 387 F.3d at 1261 ("[I]f [a] witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for that opinion, and how that experience is reliably applied to the facts.").  Additionally, Dr. Kytomaa is not qualified to offer opinions about causation as he is not a medical doctor or audiologist.[15]  However, Dr. Kytomaa's education and professional

---

[14] At his deposition, Dr. Kytomaa testified that he was not offering opinions about REAT and MIRE testing; however, his expert reports suggest otherwise.  *See, e.g.*, Kytomaa Rep., ECF No. 1627-11 at 8-9, 25.

[15] *See, e.g.*, Kytomaa Rep., ECF No. 1627-11 at 9 ("Plaintiffs' experts have presented no evidence to support their claim that plaintiffs' hearing loss was caused by out-of-specification components"); *id*. ("No experimental study or evidence that I have reviewed, suggests that the use

experience in the field of mechanical engineering qualify him to offer rebuttals of Richard McKinley and Dr. Stephen Armstrong's opinions related to Aearo's testing with the Acoustical Resistance Checker and its quality assurance processes, as well as the material composition of the CAEv2.

Regarding Dr. Kytomaa's use of assistants in drafting his report, and his discussion with defense counsel about "what areas [he] should address," there are no admissibility problems. *See* Kytomaa Dep., ECF No. 1627-10 at 40-41. "An expert witness is permitted to use assistants in formulating his expert opinion," *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002), and he may also consult with counsel in drafting his expert report, *see HVLPO2, LLC v. Oxygen Frog, LLC*, 2018 WL 2041370, at *3 (N.D. Fla. Jan. 16, 2018). Where, as here, an expert witness "substantially participates in the preparation of his report," and the report reflects his "actual views," the fact that he received assistance in developing his opinions is a matter of weight and credibility, not admissibility. *HVLPO2*, 2018 WL 2041370, at *3, 6; *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co*., 2009 WL 5103606, at *2 (S.D. Fla. Dec. 28, 2009).

---

of CAEv2 leads to an increase in probability of partial or complete loss of hearing as compared to an open-ear hearing scenario.").

### III.   Plaintiffs' Expert—Robert Johnson

Robert W. Johnson is an economist who has been providing forensic economic analyses and expert testimony on both economic and non-economic damages for more than 30 years.  In this litigation, Johnson offers opinions regarding 3M's net worth and financial condition, which Defendants challenge as unhelpful "regurgitations" of publicly available information with no independent, value-added analysis.  Defendants contend that Johnson's testimony is a "non-opinion" that is not supported by any methodology.  *See* Def. Mot., ECF No. 1605 at 111.  Defendants argue that Johnson's testimony consists of simple arithmetic, which does not qualify as specialized knowledge or assist the trier of fact.  Finally, Defendants argue that Johnson's testimony adds no more value than if the "parties' attorneys introduced 3M's financial statements into evidence, and read the line items for net worth, net sales, or other similar metrics to the jury."  *See id.*

Plaintiffs respond by arguing that Johnson's report is more than a regurgitation of publicly available financials, and "provides insight beyond the understanding of the average citizen relevant to damages."  *See* Pl. Resp., ECF No. 1630 at 79.  Plaintiffs point out that courts routinely find economic analysis of a defendant's financial condition is helpful to lay people without economic training.  *See id.*  Plaintiffs further argue that Johnson's report explains relevant financial data from "opaque financial statements" and opines "on the relevance and

interdependence of the various methods and figures that reflect an entity's financial condition and then using those metrics to assess 3M's financial condition." *See id.* at 80 (citing the Johnson Report, ECF No. 1631-18) (internal quotes omitted).  The Court agrees.

To satisfy the helpfulness requirement under Rule 702 and *Daubert*, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985).  Here, while it is true that Johnson's report is largely based on data found in Defendant's public financial disclosures, the Court concludes the report is much more than a mere regurgitation of factual information and that the information contained in it would not be easily understood by the average citizen. Per his report, Johnson reviewed several years of 3M's annual statements (Form 10-K), quarterly reports (Form 10-Q), the 2020 Proxy Statement, and stock market data from the Wall Street Journal, and he summarized his findings in the form of a PowerPoint presentation.  Financial literacy at that high a level, and specifically in the context of large multinational corporations, is not a common skill possessed by the average person or juror.  *See Voilas v. General Motors Corp.*, 73 F. Supp. 2d 452, 461 (D.N.J. 1999) (finding an expert's "summary of a large corporation's business plans could certainly prove helpful to the average juror who presumably lacks such experience in . . . complex financial matters, even if doing so does not

require employing any particular methodology but simply a straightforward review of the corporation's data"); *Lea v. Wyeth LLC*, 2011 WL 13193321, at *4 (E.D. Tex. Sept. 16, 2011) (finding an expert's opinion on net worth will be helpful to the jury who is unlikely to have the requisite expertise or knowledge); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, 2011 WL 6732819, at *7 (S.D. Ill. Dec. 16, 2011) (overruling objections made to Johnson's testimony in that case, which are similar to the objections made by Defendants in this litigation). Additionally, condensing and summarizing multiple sources of financial data, which can often be voluminous in length, would also be helpful to the jurors. *See In re Yasmin & YAZ*, 2011 WL 6732819 at *7 ("Clearly, it is generally more helpful to the trier of fact and efficient for the Court to present voluminous information in the form of a summary."). Defendants criticize Johnson for not utilizing statistical analysis, computer modeling, scientific analysis, or scientific principles in developing his opinion that "3M is a growing entity;" however, none of these are required bases for the sort of expert testimony that will be provided by Johnson. *See Frazier*, 387 F.3d at 1261-1262. To the extent that Defendants object to Johnson's conclusions, or the facts that he utilized in forming his conclusions, it would be appropriate for Defendants to address those perceived weaknesses under cross-examination or with a competing expert witness. *See Quiet Tech.*, 326 F.3d at 1345

("[N]ormally, failure to include variables will affect [an] analysis' probativeness, not its admissibility) (quoting *Bazemore v. Friday*, 478 U.S. 385,  400 (1986)).

## IV.    Conclusion

Based on the foregoing, the parties' omnibus motions to exclude expert opinions under Rule 702 and *Daubert*, ECF Nos. 1595 and 1605, are granted in part and denied in part, consistent with this Order, as to Robert Johnson and Drs. Gregory A. Flamme, Mark R. Stephenson, John Casali, and Harri Kytomaa.  The remaining expert challenges will be resolved by separate order.

**DONE AND ORDERED**, on this 4th day of March, 2021.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**