## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to: *Baker*, 7:20cv39 *Estes*, 7:20cv137 *Hacker*, 7:20cv131 *Keefer*, 7:20cv104 *McCombs*, 7:20cv94 | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## ORDER

This Order addresses Plaintiffs' expert challenges to Dr. Richard Neitzel and Jennifer Sahmel under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).[1]

Defendants seek to admit expert testimony related to the Army Hearing Conservation Program[2] from two Certified Industrial Hygienists (CIH), Dr. Richard

---

[1] This Order assumes the parties' familiarity with the nature of this multidistrict litigation, the claims and defenses at issue, and the current evidentiary record. *See In re: 3M Combat Arms Earplugs Prods. Liab. Litig.*, 2021 WL 830309 (N.D. Fla. March 4, 2021); 2021 WL 765019 (N.D. Fla. Feb. 28, 2021); 2021 WL 684183 (N.D. Fla. Feb. 11, 2021). The Order also incorporates by reference the applicable legal standard set forth in prior similar orders. *See In re: 3M*, 2021 WL 830309 at *1-2; 2021 WL 765019 at *1-2. A separate order will resolve the final expert challenges—Dr. Marc Fagelson (McCombs' PTSD and sleep disorder testimony only), Dr. Mark Packer (Baker's PTSD only), and Dennis Driscoll (McCombs).

[2] *See* Army Pamphlet 40-501 (1998).

Neitzel and Jennifer Sahmel.  Dr. Neitzel currently serves as the Associate Director of the University of Michigan Office of Global Public Health and Associate Director of the Center for Occupational Health and Safety Engineering.  He has over 20 years of research experience in exposure science[3], including in the area of noise exposure audits, health impacts, and hearing conservation.  He earned a Master of Science in Environmental Health Sciences/Industrial Hygiene in 1998 and a Ph.D. in Environmental and Occupational Hygiene.[4]  Jennifer Sahmel is a Certified Safety Professional (CSP) with over 20 years of experience in human health risk assessment and workplace health and safety.  She is currently the Managing Principal Scientist for Insight Exposure and Risk Sciences, Inc., where she performs human health exposure and risk assessments for clients in a variety of industries.

Based on their knowledge of, and experience with, industrial hygiene and workplace safety, Dr. Neitzel and Sahmel both offer opinions about the Army's responsibility to ensure the hearing protection and safety of its soldiers, its failure to fulfill those responsibilities "consistently" or "uniformly," and the impact of that on

---

[3] According to Dr. Neitzel, exposure science is "the study of human exposures to chemical, physical, biological, and psychosocial stressors."  Neitzel Rep., ECF No. 1595-41 at 9.

[4] For his Master's degree, Dr. Neitzel wrote a thesis on personal noise exposure in the construction industry.  His dissertation for his doctorate degree focused on the development of improved methods to better characterize occupational noise exposure.

hearing protection for soldiers.  They both also offer related case-specific opinions.[5] Dr. Neitzel offers opinions in Estes', Hacker's, and McCombs' cases that the Army's failure to comply with its own regulations and hearing conservation program requirements "undermined the overall effectiveness of the program and placed soldiers," including these Plaintiffs, "at risk of noise-induced hearing loss."  *See, e.g.*, Neitzel Rep. (Estes), ECF No. 1595-43 at 112.   He also offers opinions related to the extent and source of these Plaintiffs' injuries.  Sahmel offers opinions in Baker's and Keefer's cases that the Army's Hearing Conservation Program "was not adequately implemented" with respect to them, and that it was the Army's responsibility to ensure their health and safety.  *See, e.g.*, Sahmel Rep. (Keefer), ECF No. 1595-48 at 75.  Plaintiffs move to exclude Dr. Neitzel's and Sahmel's opinions in their entirety on qualifications, reliability, and helpfulness grounds.

## I.    Opinions on Army's Hearing Programs

Dr. Neitzel and Sahmel will not be permitted to offer opinions or testimony on the Army's overall implementation of its hearing-related programs and the impact that has had on soldiers.  More specifically, they will not be permitted to testify that the Army did not consistently or uniformly implement hearing protection device training and fitting requirements, or that failing to do so impacted the efficacy of its

---

[5] Dr. Neitzel offers general opinions for Baker and Keefer, and case-specific opinions for Estes, Hacker, and McCombs.  Sahmel offers general opinions for Estes, Hacker, and McCombs, and case-specific opinions for Baker and Keefer.

hearing programs and placed soldiers at risk of hearing-related injuries. Dr. Neitzel also cannot offer the opinion that "the Army safety culture and safety climate related to hearing conservation were not as strong as they should or could be, and likely undermined hearing loss prevention efforts."[6] *See* Neitzel Rep., ECF No. 1595-41 at 34.

Dr. Neitzel and Sahmel[7] have not served in the military, and they have no firsthand experience with the Army Hearing Conservation Program, the Army

---

[6] Dr. Neitzel's related challenges to the Army safety culture opinions from Plaintiffs' experts SGM Blaine Huston and BG Timothy Edens are moot, given the Court's prior orders. *See In re 3M*, 2021 WL 684183.

[7] As an initial matter, the Court doubts Sahmel is qualified to offer her opinions. "Determining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Jordan v. Celebrity Cruises, Inc.*, No. 1:17-20773-CIV, 2018 WL 3584702, at *5 (S.D. Fla. July 25, 2018), *report and recommendation adopted*, No. 17-20773-CIV, 2018 WL 4776336 (S.D. Fla. Sept. 21, 2018) (citation and internal quotation marks omitted). As Sahmel acknowledges, the design of hearing protection devices is outside the scope of her training and expertise, *see* Sahmel Dep., ECF No. 1627-29 at 8, so she is not qualified to opine on the design of the CAEv2. For example, Sahmel is not qualified to offer the opinion that "[h]earing protection devices, including the Combat Arms earplugs (CAE), . . . are designed to reduce exposure to noise hazards that are present in the environment." *See* Sahmel Rep., ECF No. 1595-47 at 11. Next, all of her professional experience in the past decade has related to chemical and product exposure and risk assessment, *not* noise exposure. *See* Sahmel Curriculum Vitae, ECF No. 1595-47 at 73-88. Nonetheless, she does not conduct an exposure or risk assessment in this litigation, and instead opines generally on employer responsibility from her own reading of the Army regulations— regulations she never read before this litigation. Sahmel Dep., ECF No. 1595-46 at 7-8. Moreover, her hearing conservation experience is very limited. Since attaining a master's degree in industrial hygiene 25 years ago, she recalls only two positions in which she was involved with hearing conservation efforts. *See* Sahmel Dep., ECF No. 1627-60 at 6-9. Those positions terminated by 2007, 14 years ago, *see* Sahmel Curriculum Vitae, ECF No. 1595-47 at 77, 79, and neither one involved any consultation with any branch of the military on its hearing conservation efforts. *See* Sahmel Dep., ECF No. 1627-29 at 9. In fact, as Plaintiffs point out, Sahmel does not identify herself as a hearing conservation program expert. She testified that "expertise in hearing conservation programs is outside the scope of [her] testimony]" in this case. *See* Sahmel Dep., ECF No. 1595-46 at 7. Oddly, she nevertheless testified that she was "well practiced in the OSHA

Hearing Program, or the applicable implementing regulations.[8]  Although firsthand knowledge is not necessary, an expert's opinion must nevertheless be based on sufficient facts or data and "have a reliable basis in the knowledge and experience of his [or her] discipline."  *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592. These experts satisfy neither criteria.

First, Dr. Neitzel's and Sahmel's opinions about Army-wide implementation and efficacy of the Army's hearing-related programs are not based on sufficient facts or data.[9]  There is nothing verifiable or quantifiable offered to support the broad conclusions they reach about the Army's hearing programs.  Instead, their opinions are almost entirely based on anecdotal sources, including (1) an inadmissible 2011 Government Accountability Office Report (hereinafter, "GAO Report") that simply audited efforts by the Department of Defense (DoD)—not the Army—to prevent hearing loss, and commented on the Army's hearing conservation efforts based on

---

requirements as they relate to hearing conservation" and "an expert in employer responsibility as it relates to many different topics, including hearing conservation."[7]  *See id.*  The Court does not fully comprehend the fine line Sahmel attempts to draw in defining her realm of expertise, but in any event, the Court questions whether she is even minimally qualified to opine on the Army's Hearing Conservation Program.

[8] The Army Hearing Conservation Program later became known as the Army Hearing Program.  *See* Special Text No. 4-02.501 (2008); Army Pamphlet 40-501 (2015).

[9] The Court has already excluded similar proposed testimony from other experts on both sides regarding "*Army-wide* success or failure of hearing conservation efforts or a purported 'widespread' culture of compliance or non-compliance with Army safety and hearing conservation program requirements."  *In re 3M*, 2021 WL 684183 at *1-3; *see also In re: 3M*, 2021 WL 848074 at *6-8.  Despite their experience in workplace safety, Dr. Neitzel's and Sahmel's opinions fail for the same reasons these other expert's opinions failed.

interviews with a fraction of servicemembers at two Army installations[10]; and (2) mostly hearsay and speculative fact witness testimony from Dr. Eric Fallon, Lieutenant Colonel Leanne Battler (Retired), Colonel Kathy Gates (Retired), and LTC Lorraine Babeu, PhD (Retired).[11]   No witness, expert or fact, including Dr. Neitzel and Shamel, has reliably tied these anecdotal accounts to the Army as a whole, or to the Plaintiffs specifically.

Additionally, neither Dr. Neitzel nor Sahmel explains how the sources of information on which they rely are of the type experts in their field would "reasonably rely on" in forming opinions about the efficacy of hearing conservation programs.  *See* Fed. R. Evid. 703.  As the Court has previously explained, limited personal accounts of fact witnesses and information these witnesses say they

---

[10] Because the GAO Report does not draw Army-wide conclusions or otherwise draw conclusions affecting the Plaintiffs based on anything verifiable, the Court concluded that it was inadmissible.  *In re: 3M*, 2021 WL 848074 at *6.  Additionally, the Court found that it was due to be excluded under Rule 403 because its marginal probative value is "substantially outweighed by the danger that the jury will be swayed by the Report's 'aura of special reliability and trustworthiness.'"  *See id.* at *7 (quoting *Gehl ex rel. Reed v. Soo Line R.R. Co.*, 967 F.2d 1204, 1208 (8th Cir. 1992) (citation omitted)).

[11] Dr. Neitzel also opines that the "Army had [] information" regarding the flange fold instruction to obtain a better fit but did not necessarily distribute it to soldiers.  *See* Neitzel Rep., ECF No. 1595-41 at 52.  In so opining, Dr. Neitzel cites to documents showing that *certain members* of the military knew this information.  *See id.*  But he employed no methodology in extrapolating that knowledge to the Army as a whole and instead, in this section of the report, simply regurgitates information collected from a handful of emails.  The Court finds this part of his opinion unreliable.  *See Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010) (affirming exclusion of proffered expert testimony as unreliable where the "conclusions were not logically supported by the facts of the case"); *Cook*, 402 F.3d at 1111 ("[A] trial court may exclude expert testimony that is "imprecise and unspecific," or whose factual basis is not adequately explained.").

received from an unspecified number of third parties are not the type of sources reasonably relied on by experts forming opinions. *See In re 3M*, 2021 WL 684183 at *2. The Court has concluded that allowing expert testimony based on this information would "sanction [its] use as a vehicle for introducing hearsay testimony." *See id.* (citing authority).

Dr. Neitzel and Sahmel also fail to "explain *how* [their] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.)); *Umana-Fowler v. NCL (Bahamas) Ltd*., 49 F. Supp. 3d 1120, 1122 (S.D. Fla. 2014) ("[A]n expert cannot rely on 'experience' without explaining in detail how the experience and other materials consulted support the opinion rendered."). Dr. Neitzel does not explain how his occupational noise exposure and hearing conservation program experience in manufacturing and construction, among other industrial fields, reliably informs his evaluation of the Army's hearing conservation efforts in a combat setting (both live and training), which is the relevant setting for these cases.[12] *See* Neitzel Rep., ECF No. 1595-41 at 10; Neitzel Dep.,

---

[12] Dr. Neitzel merely states that "the exposures in many of the occupational groups I have studied have similarities to Army exposure circumstances (e.g., highly variable and unpredictable noise, brief exposures to intense noise, and the need for communication ability and situational awareness)." Neitzel Rep., ECF No. 1595-41 at 10. But he does not specifically explain how those purported similarities or how his experience reliably applies to the facts. As an aside, Dr. Neitzel does not actually opine on noise exposure in the Army either. In his report he cites to

ECF No. 1595-40 at 16. Similarly, Sahmel does not explain how her experience with NASA and the National Park Service's hearing conservation efforts 14 years ago, *see* Sahmel Dep., ECF No. 1595-46 at 5, or her more recent professional experience related to chemical and product exposure risk assessment, provides a sufficiently reliable basis to opine on the Army's institution-wide implementation of its Hearing Conservation Program, particularly in a combat setting. *See, e.g.*, *Plott v. NCL Am., LLC*, 786 F. App'x 199, 204 (11th Cir. 2019) (affirming district court's exclusion of proffered expert testimony where the expert "did not demonstrate how his experience as an architect led to his conclusions and opinions [on what caused and could have prevented a slip and fall accident], why that experience was sufficient, or how his experience applied to [plaintiff's] case"). Accordingly, Dr. Neitzel's and Sahmel's opinions in this regard are speculative, unreliable, and mere conduits for hearsay.[13] *See also id.* at *2-3.

---

publications providing examples of hazardous noise exposures in the Army, but then concludes that these materials "represent a reasonable effort on the part of the Army to disseminate information on Army noise exposures to the Army hearing conservation community, Army leadership, and service members." Neitzel Rep., ECF 1595-41 at 41-46. This conclusion on the Army's efforts as whole is unreliable and impermissible for the same reasons as Dr. Neitzel's other Army-wide conclusions.

[13] For the same reasons, Dr. Neitzel's and Sahmel's case-specific opinions that the Army Hearing Conservation Program and Army Hearing Program were "not adequately implemented" or not effective in reducing the risk of noise-induced hearing injuries for Plaintiffs specifically are unreliable. *Cf. In re: 3M*, 2021 WL 848074 at *8 (allowing expert testimony on the implementation of the Army's hearing conservation efforts only to the extent it is reliably based on the expert's experience with and knowledge of the programs).

Dr. Neitzel's and Sahmel's opinions on Army-wide implementation of the Army's hearing programs are also not helpful because they do not "logically advance[] a material aspect" of the case. *See In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1305 (N.D. Fla. 2018) (Rodgers, J.). A central issue in this litigation is whether the CAEv2 caused Plaintiffs' claimed injuries. Whether the Army played a role in causing Plaintiffs' injuries by failing to properly fit and/or train them on proper fitting and use of the CAEv2 is related to that ultimate causation question. However, the hearing protector device fitting and training requirements Dr. Neitzel and Sahmel say the Army did not comply with are straightforward and easy to understand. They require that "[m]edically trained personnel must examine the fit and condition of preformed and custom earplugs at least annually" and "[p]ersonnel shall receive adequate and effective training in the proper care and use of personal hearing protectors." *See* DoD Instruction 6055.12 ¶¶ 2.2, 6.6.9-.10 (1996); *see also* DoD Instruction 6055.12 ¶¶ 2(b); 7(i)-(j) (2010). A trier of fact does not need expert testimony to decide whether the Army's failure to comply with those requirements with respect to a particular Plaintiff is causally related to their hearing injury if in fact the Plaintiff was not fitted with his hearing protection device or trained properly in the use of it and in fact did not have a good fit or did not use the device properly.

Indeed, Defendants themselves argued in their response to Plaintiffs' summary judgment motions on government fault that jurors "do not need expert testimony" to understand that "military regulations require medically trained personnel to fit and train service members with earplugs," and if no one tells a soldier how to improve the fit of an earplug or the earplug doesn't fit altogether, then the soldier "may get less protection from the earplug than he otherwise would have." *See, e.g.*, Defs.' Opp. to Pls.' Mot. Summ. J., *Keefer*, Case No. 7:20cv104, ECF No. 58 at 26.  Defendants attempted to walk back their statement at oral argument, suggesting instead that the DoD regulations would be difficult for the jury to parse, and that expert testimony would assist the jury in understanding who may be at fault for Plaintiffs' poor fit with the CAEv2 or lack of training.  *See* Feb. 11 Hr'g Tr., ECF No. 1687 at 42-49.  The Court disagrees and reiterates that the information a jury needs to decide whether the Army complied with its fitting and training requirements and the possible repercussions on Plaintiff's use of the CAEv2 is ascertainable through the testimony of non-expert witnesses and thus is not necessary; as a result, it is not admissible.  *In re: 3M*, 2021 WL 848074 at *7-8 (citing authority); *see also Eldridge v. Pet Supermarket, Inc*., No. 18-22531-CIV, 2020 WL 1076103, at *7 (S.D. Fla. Mar. 6, 2020) (excluding expert's opinion on ascertainability of proposed class where the opinion "relie[d] on nothing more than what a factfinder could comprehend through non-expert witnesses and third-party sources"); *E.E.O.C. v. W.*

*Customer Mgmt. Grp., LLC*, 899 F. Supp. 2d 1241, 1251 (N.D. Fla. 2012) (Rodgers, J.) (excluding expert testimony on the issue of speech intelligibility because it was "the type of common-sense determination that an untrained layman is qualified to make intelligently without the aid of an expert."); *Natures Way Marine, LLC v. Everclear of Ohio, Ltd.*, No. CIV.A. 12-316-CG-M, 2014 WL 5817535, at *5 (S.D. Ala. Nov. 10, 2014) (finding expert testimony unhelpful where it "echoe[d] arguments that [d]efendants' attorneys can make at trial"). Allowing either expert's opinion on the issue would be "superfluous and a waste of time." *See* Fed. R. Evid. 702 advisory committee notes.

The Court also finds Dr. Neitzel's and Sahmel's opinions about the Army hearing programs' implementing regulations and policy guidance unreliable and unhelpful to the jury. And, to a certain extent, these opinions also constitute impermissible legal conclusions.

First, the glaring reliability problem. Expert testimony must be based on "sufficient facts or data" and "the product of reliable principles and methods" that have been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. "Every step of [the] expert's analysis must be supported by good grounds, which means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1298 (N.D. Fla. 2017) (Rodgers, J.) (quoting *McClain v. Metabolife, Int'l, Inc.*, 401

F.3d 1233, 1245 (11th Cir. 2005). "To meet this standard, an expert's method need not be perfect . . . [and] a minor flaw in [the] expert's reasoning" will not render [the] expert's opinion *per se* inadmissible." *Id*. However, "where the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions, exclusion of the expert's testimony is warranted." *See id.* (internal quotation marks omitted) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994)). For the reasons that follow, the Court concludes that Dr. Neitzel's and Sahmel's incomplete and inaccurate review of the applicable regulations and policy requirements, and their failure to acknowledge crucial program changes made by the Army during the relevant time frame, renders their opinions and testimony about the regulations and policy guidance unreliable.

Hearing conservation program requirements are located in two sets of materials: (1) DoD Instruction 6055.12, which contains the DoD regulations setting forth requirements for any hearing conservation program within the DoD, including the Army's; and (2) the Army Hearing Conservation Program, later renamed the Army Hearing Program, requirements, as set forth in Army Pamphlet 40-501 and Special Text No. 4-02.501 ("ST 4-02.501" or "the Special Text"). Both sets of requirements were updated several times between 1998 and 2018, the collective time frame in which all five Group A Plaintiffs served in the Army.

Dr. Neitzel's and Sahmel's expert reports and testimony focus primarily on the Army Hearing Conservation Program, which existed from 1998 to 2015. The overarching problem here is that both experts fail to meaningfully address how the Army's Hearing Conservation Program changed during that time frame, specifically with the adoption of the Special Text in 2008, which applied strictly to combat soldiers like the Plaintiffs. The Special Text "establish[ed] guidelines for the prevention of [noise-induced hearing loss] to Soldiers," and signaled the Army's transition from the Hearing Conservation Program to a new Army Hearing Program *for Army soldiers*, in which hearing conservation became only one of four components of the Program and no longer governed hearing protection for combat soldiers. *See* ST 4-02.501 at iii., 1-4 to 1-5; Merkley Dep., ECF No. 1650-4 at 366-67.

Significantly, neither Dr. Neitzel nor Sahmel meaningfully discusses the Special Text at all. This is, frankly, mind-boggling considering that, in the Special Text, the Army expressly acknowledged that its longstanding Hearing Conservation Program, which Dr. Neitzel and Shamel extensively rely on for their opinions about the Army, was a garrison-focused program "primarily directed at [the Army's] civilian workforce" members who worked in "primarily industrial-based settings."[14]

---

[14] "For many years, the Hearing Conservation Program served as the flagship for the prevention of NIHL. This primarily garrison-focused program is instrumental in preventing NIHL in primarily industrial based settings. Although some Soldiers work in industrial-based settings,

Even the GAO Report Dr. Neitzel and Sahmel rely on for their opinions recognizes this fact. *See* GAO Report, ECF No. 1627-26 at 29 (explaining that in the Army's 2005 "broad-based review of its hearing conservation program with regard to training, base, and combat environments," the Army reviewers "concluded that the Army's hearing conservation program was more suitable for industrial rather than military conditions"). The Special Text reconciled the gap between the Army Hearing Conservation Program and combat soldiers by adopting three new, main components and incorporating them into the Army Hearing Program: hearing readiness[15], clinical hearing services, and operational hearing services, all of which applied *strictly to soldiers, including these Plaintiffs,* and were designed to "ensure their maximum combat effectiveness in training as well as during deployments." *See id.* at 1-5; *id.* at 2-1 ("Hearing readiness is a process to ensure that Soldiers have the required hearing capability to perform their job-specific duties and have the correct personal protective equipment for their situation."); *id.* at 3-1 (describing clinical services as "critical to providing leaders with Soldier hearing status information"); *id.* at 4-1 (explaining that the operational hearing services is aimed at "reduc[ing] the impact of noise and [noise-induced hearing loss] on military operations").

_____

hearing conservation efforts are primarily directed at our civilian workforce." ST 4-02.501 at 1-5.

[15] *See* Battler Dep., ECF No. 1650-2 at 27 (describing "hearing readiness" as "designed for soldiers, rather than noise-exposed civilians who would be in a traditional OSHA-type hearing conservation program").

In spite of these highly relevant policy changes, Dr. Neitzel does not mention the Special Text in his report at all, and by failing to do so, completely overlooks the fact that some of his key criticisms of the Army Hearing Conservation Program were actually addressed by the Special Text.  For example, while Dr. Neitzel harshly criticized the requirement from the 1998 Army Pamphlet 40-501 that soldiers in combat not wear hearing protection during dismounted infantry operations and concluded that it "[ran] counter to the goal of the hearing conservation program" and "undermin[ed] the integrity of the hearing protection requirement," *see* Neitzel Rep., ECF No. 1595-41 at 63, he does not acknowledge that the Army changed this requirement in 2008 by requiring soldiers to wear hearing protectors, including nonlinear hearing protection devices, "such as the CAE, during dismounted operations," on deployment.[16]  *See* ST 4-02.501 at 2-3.  At the time of this change, all five Plaintiffs were active duty soldiers in the Army and two had just joined the Army.  In other words, the very provision Dr. Neitzel criticized in the 1998 Army Pamphlet 40-501 (i.e. the Army Hearing Conservation Program) never applied to

---

[16] As another example, Dr. Neitzel states that only the 1996 and 2004 iterations of DoD Instruction 6055.12 are the "most relevant to this specific case."  Neitzel Rep., ECF No. 1595-41 at 48.  But those regulations were updated again in 2010, when four Plaintiffs were still active in the Army and one was in the Army Reserves, and implemented several relevant changes, such as explicitly requiring annual training on hearing protector selection and fit (instead of just care and use) and requiring personnel to be able to demonstrate a proper fitting technique.  *Compare* DoD Instruction 6055.12 (2010) *with* DoD Instruction 6055.12 (1996) and DoD Instruction 6055.12 (2004).

two of the five Plaintiffs and ceased to apply to the other three in 2008.  *See also,*
*e.g.*, Neitzel Rep., ECF No. 1595-41 at 70-73 (praising the 2015 Army Pamphlet 40-
501 for making certain changes to training and hearing protection requirements,
many of which were addressed in the Special Text in 2008).  Dr. Neitzel fails to
acknowledge, much less explain this.

Sahmel also completely fails to acknowledge these highly relevant hearing
program changes, despite purporting to evaluate and opine on the Army's
requirements for hearing safety and conservation in litigation involving Army
soldiers as plaintiffs.  She incorrectly states that the program's name changed to the
Army Hearing Program and the program was restructured into four components in
2015 when Army Pamphlet 40-501 was revised, when in fact the restructuring
occurred  with  the Special Text in 2008.  *See* Sahmel Rep., ECF No. 1595-47 at 41.
As a further example, Sahmel barely refers to the 2015 Army Pamphlet 40-501 that
incorporated many of the changes made to the Army Hearing Program via the 2008
Special Text.  In fact, she claims that the "guidelines and requirements of the Army
Hearing Program updated in 2015 remained largely consistent with the previous
HCP detailed in Pamphlet 40-501."  Sahmel Rep., ECF No. 1595-47 at 38.  This is
incorrect and is not something she even attempted to explain.  As noted, the 2008
Special Text was the beginning of a complete reorganization of the Army Hearing
Conservation Program into the Army Hearing Program, with new components and

requirements *specific to combat soldiers*, including the Plaintiffs. Her failure to identify and explain these highly relevant changes that applied to all five Group A Plaintiffs, and her continued reliance on the hearing conservation provisions that were no longer applicable *to combat soldiers*, and for two Plaintiffs, *never applicable at all*, is not reliable or helpful—and is even misleading—to the jury.[17]

Generally, criticisms of an expert's failure to adequately consider certain data points affect the probative value of the methodology, not its admissibility. *Bazemore v. United States*, 478 U.S. 385, 400 (1986); *Navelski*, 244 F. Supp. 3d at 1301. However, as already explained, "where a flaw is large enough that the expert lacks good grounds for his or her conclusions, the expert's opinion should be excluded." *See Navelski*, 244 F. Supp. 3d at 1301 (quoting Paoli, 35 F.3d at 746); *see also Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009). In this litigation,

---

[17] At oral argument, Defendants' counsel argued that the Special Text was not a stand-alone document, and the hearing conservation provisions in the 1998 Army Pamphlet 40-501 still applied. *See* Feb. 11 Hr'g Tr., ECF No. 1687 at 39. This is only partially accurate. While the Special Text does state that it is not a stand-alone publication and must be used in combination with other publications, it also notes that those other publications are identified throughout the Text *where applicable*. For instance, Chapter 5 of the Special Text on Hearing Conservation references Army Pamphlet 40-501, The Hearing Conservation Program. Army Pamphlet 40-501 is also referenced in Chapter 3 in defining hazardous noise and Chapter 4 in the sections on integrated helmet systems and noise muffs, where particular provisions are noted as "[i]n accordance with" Army Pamphlet 40-501." ST 4-02.501 at 3-2, 4-11, 4-14. What is clear is that the Special Text made significant improvements to the Army Hearing Conservation Program for the vast majority of soldiers, including these Plaintiffs, that these experts failed to address, and in fact replaced the Hearing Conservation Program for soldiers in a combat setting. In any event, the explanation provided by Defendants' counsel should have come from the experts. Counsel cannot fix these experts' failure to meaningfully address the highly relevant Special Text in connection with their opinions in this litigation.

the flaws in Dr. Neitzel's and Sahmel's methodology—that is, their inaccurate, cherry-picked, and incomplete "analyses" of the regulations, including their disregard of program requirements that clearly applied to these Plaintiffs and reliance on those that did not—are significant enough for the Court to conclude that the entirety of their opinions about the regulations and policy guidance are wholly unreliable.   Therefore, their opinions and testimony on those matters must be excluded. *See Fed. Trade Comm'n v. Simple Health Plans LLC*, No. 18-CV-62593, 2021 WL 810262, at *8-9 (S.D. Fla. Mar. 3, 2021) (finding expert testimony unreliable where he did not consider relevant areas of inquiry and his opinion was disconnected from the facts); *Jones Creek Inv'rs, LLC v. Columbia Cty., Georgia*, No. CV 111-174, 2013 WL 12141348, at *21 (S.D. Ga. Dec. 23, 2013) (excluding expert testimony based on incomplete information and speculation); *In re Denture Cream Prod. Liab. Litig.*, 795 F. Supp. 2d 1345, 1363 (S.D. Fla. 2011) (excluding expert testimony based on an inaccurate factual premise); *see also Jordan v. Celebrity Cruises, Inc.*, No. 1:17-20773-CIV, 2018 WL 3584702, at *8 (S.D. Fla. July 25, 2018), *report and recommendation adopted*, No. 17-20773-CIV, 2018 WL 4776336 (S.D. Fla. Sept. 21, 2018 ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based on no research at all.").

Dr. Neitzel's and Sahmel's opinions on the regulations and program guidance are also not helpful to the jury because these publications are straightforward, as

previously explained. *See supra* at 9-11. Defendants have not cited a single case, nor has the Court found one, where a court concluded that expert testimony was needed to explain DoD regulations or requirements of the Army Hearing Program, or anything close.[18] Expert testimony that is "not needed to clarify facts and issues of common understanding which jurors are able to comprehend themselves" should be excluded. *See Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen & Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995); *Coggon v. Fry's Elecs., Inc.*, No. 1:17-CV-03189-SCJ, 2019 WL 2137465, at *3-4 (N.D. Ga. Feb. 6, 2019) (excluding testimony from "professional safety expert" regarding business's responsibility but failure to take certain safety precautions because it was "not needed" and therefore unhelpful to the jury); *see also Estate of Marin-Torres v. Gamo Outdoor USA*, No. 14-22122-CIV, 2016 WL 4051318, at *4-7 (S.D. Fla. May 4, 2016) (excluding proffered expert's opinions that were "mostly presented without scientific basis or are so obvious that they are not helpful to a trier of fact").

---

[18] The cases Defendants cite are readily distinguishable. In both cases, the courts allowed proffered expert testimony on FDA regulations, which courts have repeatedly recognized as requiring expert testimony in light of their complexity. *See In re Suboxone* (*Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2020 WL 6887885, at *44-45 (E.D. Pa. Nov. 24, 2020) (allowing proffered expert, a lawyer, to opine on defendants' compliance with FDA regulations); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 WL 6302287, at *24 (S.D. Ill. Dec. 16, 2011) (allowing proffered expert to opine on meaning and scope of FDA regulations and the duties of pharmaceutical companies under these regulations). That is not the case here.

Dr. Neitzel's and Sahmel's opinions on whether or not the Army Hearing Program was up to par with standards in the industry is also not helpful to the jury because it is not relevant to any issue.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993).

Finally, Dr. Neitzel's and Sahmel's opinions regarding the Army's responsibilities, such as their responsibility for the health and safety of its soldiers, and their responsibility to train soldiers on proper use of the CAEv2 and fit the CAEv2, under the DoD regulations (and in Sahmel's opinion, under Occupational Safety and Health Administration (OSHA) regulations), are impermissible legal conclusions.  Sahmel opines that, based on OSHA and DoD regulations and Army hearing conservation program requirements, the Army is "responsible" for the health and safety of its employees.  This "responsibility," according to Sahmel, includes "implement[ing] an appropriate hearing conservation program" which, in the Army's case, put the responsibility for training and fitting the CAEv2 on the Army and not Defendants.  *See* Sahmel Rep., ECF No. 1595-47 at 11.  Similarly, Dr. Neitzel opines that the Army was "responsible" for providing its servicemembers with proper training and instruction on how to use the CAEv2, and properly fitting each servicemember with hearing protection, including the CAEv2.  *See* Neitzel Dep., ECF No. 1595-40 at 43; Neitzel Rep., ECF No. 1595-41 at 7-9, 98.  The Court

agrees with Plaintiffs that these opinions amount to testimony on the Army's legal duties under the law.[19]   "[A]n expert witness may not testify as to [her] opinion regarding ultimate legal conclusions." *United States v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009).   More specifically, an expert cannot "merely tell the jury what result to reach . . . . [or] the legal implications of conduct." *See Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990); *Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1122 (S.D. Fla. 2014) ("[M]erely telling the jury what result to reach is unhelpful and inappropriate.").   "[T]he court must be the jury's only source of law." *See id.*   In *Dugas*, a certified industrial hygienist and certified safety professional offered an opinion that the Navy had a "non-delegable responsibility" to ensure its employees were not exposed to levels of asbestos exceeding the exposure limits. *Dugas v. 3M Co.*, No. 3:14-CV-1096-J-39JBT, 2016 WL 7327666, at *11 (M.D. Fla. Mar. 30, 2016).   The court determined that the opinion was an opinion on the Navy's legal duty, a matter of law that was to be determined by the court, and thus excluded that testimony. *See id.*   Similarly, here, although neither Sahmel or Dr. Neitzel are lawyers or regulatory experts, they both opine on what the regulations require of the Army.   This is impermissible.[20]   *See,*

---

[19] They are also pure speculation.

[20] Sahmel's opinions do not "fit" this litigation for another reason: her reliance on OSHA. The heart of Sahmel's opinions is that the Army, as an employer, is responsible for the health and safety of its employees, its soldiers.   According to Sahmel, this responsibility "is a critical element of the Occupational Safety and Health Administration rules and requirements with respect to . . .

*e.g., id.*; *Pelletier v. Main St. Textiles*, LP, 470 F.3d 48, 55 (1st Cir. 2006) (affirming district court's exclusion of expert testimony regarding the applicability of OSHA regulations to defendant's conduct because it "is the judge's role, not a witness's, to instruct the jury on the law," and exclusion would also avoid jury confusion); *Wiand v. Wells Fargo Bank, N.A.*, No. 8:12-CV-00557-T-27, 2014 WL 1819616, at *2 (M.D. Fla. May 7, 2014) (excluding as impermissible legal conclusion rebuttal expert's opinion on obligations imposed on banks like defendant under Bank Secrecy Act); *see also Montgomery*, 898 F.2d at 1541 (excluding expert who opined on defendant's duty under an insurance policy).

---

the obligations of the employer to the employee." *See* Sahmel Dep., ECF No. 1627-60 at 8.  She spends ten pages of her report strictly discussing these OSHA regulations and their history.  *See* Sahmel Rep., ECF No. 1595-47 at 22-33.  But "military personnel and uniquely military equipment, systems, and operations" are exempt from OSHA.  Occupational Safety and Health Programs for Federal Employees, 45 FR 12769 (1980).  Even after the DoD adopted OSHA standards, uniquely military equipment, systems, operations, and workplaces—defined as "combat and operation, testing, and maintenance of military-unique equipment and systems such as military weapons" and others—remain exempted from strict compliance with OSHA standards; the standards only apply "insofar as practicable."[20]  DoD Instruction 6055.1 at 14, 22 (1998); DoD Instruction 6055.1 at 12 (2014).  Although Sahmel acknowledges some of these limitations to OSHA, she fails to recognize that OSHA regulations have no bearing on these Plaintiffs' work environments, which were precisely uniquely military.  She also does not explain why or how adherence to OSHA standards would be "practicable;" nor could she, as she is not able to speculate on what the Army would or would not have considered "practicable."  Accordingly, Sahmel's opinions regarding workplace safety under OSHA, or any conclusions regarding the Army's hearing conservation program based on OSHA standards, are also irrelevant and unhelpful to the jury. Additionally, because the Court finds that Sahmel's workplace safety opinions amount to impermissible legal conclusions and are also unhelpful, the Court need not address Plaintiffs' argument that Sahmel's workplace safety opinions are irrelevant in this products' liability case solely where they fail to speak to the safety of the product at issue, the CAEv2.

## II.   Remaining Opinions

### a.  Dr. Neitzel's Labeling Opinions

Plaintiffs challenge Dr. Neitzel's labeling opinions as impermissible legal conclusions and on qualifications grounds.  First, Dr. Neitzel offers the opinion that Defendants were not required to abide by the product labeling requirements set forth in the Noise Control Act, ("NCA"), 42 U.S.C. § 4902(3)(b), because the CAEv2 is equipment designed for combat use and therefore exempted from those requirements.  Neitzel Rep., ECF No. 1595-41 at 34-36.  Despite this exemption, according to Dr. Neitzel, the CAEv2's label and other written accompaniments complied with regulations set forth by the Environmental Protection Agency ("EPA"), and provided clear instruction on proper use of the CAEv2.  *Id.* at 95-97. Plaintiffs argue that Dr. Neitzel cannot offer these opinions because he is not a lawyer and or labeling expert, and interpreting the NCA is a legal question for the Court.  *See* Neitzel Dep., ECF No. 1595-40 at 10-11.   The Court agrees.  *See In re: 3M*, 2021 WL 76509 at *37-40 (N.D. Fla. Feb. 28, 2021) (Rodgers, J.); *Claussen v. PowerSecure, Inc.*, No. 318CV00607ALBSMD, 2019 WL 4941109, at *8 (M.D. Ala. Oct. 7, 2019) ("A non-lawyer expert cannot testify about the meaning of a statute or regulation or about whether someone violated a law.").  Moreover, Dr. Neitzel's reading of the NCA has already been rejected by the Court as a matter of law.  *See, e.g.,* Order, Estes, Case No. 7:20cv137 at 22 (finding that the combat-use

exemption does *not* exempt sound-reducing products like the CAEv2).  His opinion is inadmissible.

Second, Dr. Neitzel also opines that the CAEv2's packaging and 2006 instructions are "clear and conspicuous" to the "reasonable user."  *See* Neitzel Rep., ECF No. 1595-41 at 95-97.  In so opining, Dr. Neitzel testified that he relied solely on his prior experience, specifically his "research related to hearing protectors and how workers use hearing protectors," as well as his "research with workers presenting them different versions of information about hearing protectors . . . . to identify what messaging most clearly is taken up by people getting instructions on hearing protectors."  *See* Neitzel Dep., ECF No. 1627-27 at 13-14.  According to Defendants, this "extensive experience" qualifies him to opine on the CAEv2's packaging and instructions.  The Court disagrees.  Unlike other experts in this litigation, Dr. Neitzel is not an ENT, physician, or audiologist with the necessary qualifications to opine on the completeness and accuracy of the CAEv2 label and warnings from a clinical perspective.  *See In re: 3M*, 2021 WL 765019 at *37-40.  Dr. Neitzel has also never designed an earplug or drafted or consulted on earplug product packaging and instructions, and is not a product safety expert.  *See* Neitzel Dep., ECF No. 1595-40 at 11.  Nor is he a consumer survey expert with the expertise necessary to draw conclusions from unexplained research involving the presentation of hearing protector information to workers.  *See Trilink Saw Chain, LLC v. Blount,*

*Inc.*, 583 F. Supp. 2d 1293, 1305 (N.D. Ga. 2008) (finding expert on product testing was not qualified to opine on how the average consumer would interpret language in advertisements and otherwise interpret consumer research data, when he was not a consumer survey or market research expert).  Accordingly, Dr. Neitzel is not qualified to offer opinions on the clarity of the CAEv2's packaging and instructions. Moreover, without any explanation on how Dr. Neitzel's prior research experience provides a sufficient basis for his opinion on the clarity of written instructions and packaging, Dr. Neitzel's opinion is speculative and unreliable.[21]  *See Frazier*, 387 F.3d at 1261.

### b.  Dr. Neitzel's Case-Specific Opinions

Plaintiffs also challenge Dr. Neitzel's specific opinions in Estes' and Hacker's cases related to the cause of their alleged hearing injuries  as beyond the scope of his expertise and devoid of any reliable methodology.  In Estes' case, Dr. Neitzel opines that his "hearing changes are not due to a flaw in the [CAEv2], but rather, repeated exposures to hazardous noise."  Neitzel Dep., ECF No. 1595-42 at 43; Neitzel Rep. (Estes), ECF No. 1595-43 at 9.  In Hacker's case, Dr. Neitzel opines that Hacker's "hearing thresholds in both ears are not consistent with the expected pattern of

---

[21] Defendants cite *Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 481 (S.D.N.Y. 2004) to support their argument that Dr. Neitzel's opinions are reliable.  But in *Santoro*, the court concluded that the proffered expert's opinion on the product safety warnings were sufficiently reliable because of his experience in consumer safety *and* his reliance on several articles on warnings and labeling.  *See id.*

hearing loss from noise found in epidemiological studies of noise and hearing loss."
Neitzel Dep., ECF No. 1595-42 at 13; Neitzel Rep. (Hacker), ECF No. 1595-44 at
5, 122.  In McCombs' case, Dr. Neitzel opines that "McCombs' tinnitus is not due
to unprotected or insufficiently protected exposures he received while wearing the
Combat Arms Earplugs."[22]  Neitzel Dep., ECF No. 1595-42 at 29.  Plaintiffs argue
that Dr. Neitzel's opinions should be excluded because he is not an audiologist or
otherwise medically trained, and is thus not qualified to provide opinions on
Plaintiffs' medical conditions, let alone the cause of them.  Moreover, Plaintiffs
argue that Dr. Neitzel does not employ any methodology in opining on the case of
Plaintiffs' hearing injuries.  The Court agrees.  Although Dr. Neitzel repeatedly
denied in his deposition that he was offering any "diagnostic" or "causation"
testimony, his proffered opinions speak to the specific cause of Plaintiffs' hearing
injuries.  *See, e.g.*, *Chapman v. Procter & Gamble Distrib.*, LLC, 766 F.3d 1296,
1308 (11th Cir. 2014)  ("Specific causation refers to the issue of whether the plaintiff
has demonstrated that the substance actually caused injury in her particular case.").
The Court agrees with Plaintiffs that Dr. Neitzel is not qualified to offer medical
opinions because he is not an audiologist, otolaryngologist, neurotologist, or any

---

[22] Dr. Neitzel also opines that McCombs' "audiometric hearing threshold levels in his left
ear do not suggest that his hearing was substantially damaged as a result of noise exposure during
his reported use of the CAEv2."  *See* Neitzel Rep. (McCombs), ECF No. 1595-45 at 111.  As a
threshold matter, McCombs does not have a claim for hearing loss; however, in any event, Dr.
Neitzel is not qualified to offer this opinion for the reasons set forth herein.

type of clinician, and has no medical training.[23]   Neitzel Dep., ECF No. 1595-40 at

11.   *See, e.g.*, *Ford v. Carnival Corp.*, No. 08-23451-CIV, 2010 WL 9116184, at *2

(S.D. Fla. Mar. 4, 2010) (finding forensic toxicologist with a Ph.D. in Pharmacology

qualified to offer expert opinion on what concentration of chlorine gas will cause

adverse physiological effects, whether chlorine gas exposure causes delayed toxic

symptoms, and the direct relationship between extent of exposure and degree of

injury, but not the opinion that plaintiff's respiratory illness "was not caused or

aggravated by her alleged exposure to chlorine fumes"); *Magistrini v. One Hour*

*Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609 (D.N.J. 2002), *aff'd*, 68 F.

App'x 356 (3d Cir. 2003) ("It is within the Court's discretion to exclude an opinion

---

[23] The Court acknowledges that other courts have allowed non-physicians, and more specifically, industrial hygienists to offer opinions relevant to causation.  But the cases cited by Defendants are, again, distinguishable.  In *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 771, 813-14 (E.D. La. 2011), the proffered expert, an industrial hygienist, primarily opined on the amount of benzene in one of the products to which decedent was exposed.  The court also allowed him to opine on whether benzene can cause multiple myeloma because he had knowledge and training in epidemiology and toxicology, and relied on industrial hygiene references.  However, unlike Dr. Neitzel, the expert *did not* offer an opinion on specific causation, i.e., in that case, whether the decedent's benzene exposure caused him to suffer multiple myeloma.  *See id.*  Similarly, in *Yates v. Ford Motor Co.*, No. 5:12-CV-752-FL, 2015 WL 3448905, at *3-4 (E.D.N.C. May 29, 2015), the court found the industrial hygienist qualified to opine on matters of *general* causation in an asbestos case where the industrial hygienist had extensive experience with asbestos.  Here, although Dr. Neitzel has experience evaluating noise exposure in various workplace settings, he has no experience with noise exposure in the military, did not perform any noise exposure analysis with respect to Plaintiffs specifically, and did not explain how his prior experience nevertheless leads to or provides a sufficient basis for his *specific* causation opinions.

on specific causation where . . . [t]he expert engaged in very few standard diagnostic techniques by which doctors normally rule out alternative causes.").

The Court also finds that Dr. Neitzel's case specific causation opinions are not reliable for his failure to apply a proper methodology.  He did not apply a differential etiology (which, as noted, he is not qualified to do) and instead relied solely on epidemiological studies—despite recognizing that audiologists would rely on more than that—in opining on the cause of Plaintiffs' hearing injuries.  *See* Neitzel Dep., ECF No. 1595-42 at 37 (Q: "[Y]ou understand as an industrial hygienist that audiologists do not just use epidemiological studies to make a diagnosis?  A: That is correct, an audiologist or ENT presumably would not only rely on epidemiological data.  For example, they would have to collect a hearing measurement to know—to have information to compare to that epidemiological data.").

### c.  Sahmel's Reliance on Litigation Documents

All that is left of Sahmel's report is her summary of corporate documents and witness testimony.  Plaintiffs argue that this evidence is comprehensible without expert testimony, and therefore her narrative account of events gleaned from this evidence is not helpful to the jury.  Defendants deny that Sahmel will read any documents or testimony to the jury, and instead will testify about her opinions only.  Although an expert may testify that she reviewed internal documents to explain the

basis for her opinions, "simply parroting [d]efendant's corporate documents or offering a narrative account of events from them will not be helpful to the jury." *Arevalo v. Coloplast Corp.*, No. 3:19CV3577-TKW-MJF, 2020 WL 3958505, at *21 (N.D. Fla. July 7, 2020); *see In re Trasylol Prod. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346-47 (S.D. Fla. 2010) (finding that expert's recitation of select regulatory events and summary of defendant's internal documents is not helpful to the trier of fact because they are devoid of any expert analysis). Such evidence is properly presented through fact witnesses and documentary evidence, not expert testimony. *See Arevalo*, 2020 WL 3958505, at *21. Sahmel spends eight pages of her general and case-specific reports simply reciting corporate documents and witness testimony to explain the development of the CAEv2 and Defendants' *and* the Army's knowledge and intent with respect to the CAEv2. *See, e.g.,* Sahmel Rep., ECF No. 1595-47 at 50-57. For example, she states that, according to corporate witness testimony, "the military specifically told 3M not to include instructions related to the fit and use of CAEs," and the military performed studies on the CAEv2 "as early as 2001." Sahmel Rep., ECF No. 1595-41 at 52, 55. Problematically, in this part of Sahmel's report, she provides only narrative accounts of events involving the CAEv2, and she does nothing to tie them to her ultimate opinions (which have their own problems, as just described). This kind of narrative testimony is not helpful to the trier of fact— particularly when the opinions they purport to support are inadmissible—nor is it

proper when it purports to explain the Defendants' and the Army's knowledge regarding the CAEv2. *See In re: 3M*, 2021 WL 765019 at \*42 (concluding experts may not opine as to what Defendants "knew," what they intended, or what their motives were); *see e.g.*, *Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006) (finding that an expert may not speculate as to a person's state of mind or "simply recount[] the facts and then offer[] an opinion as to the conclusion which the jury should reach"); *In re Trasylol*, 709 F. Supp. 2d at 1337-38 (finding proffered expert's opinions were improper narrative testimony where expert did not tie them to the opinions that they were intended to support, and also finding opinions regarding the FDA's knowledge and intent were inadmissible because that is a jury question); *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc*., No. 18-CV-63130, 2020 WL 1666763, at \*15-16 (S.D. Fla. Apr. 3, 2020) ("It is improper for an expert to become a vehicle for factual narrative." (citation and internal quotation marks omitted)); *see also Humleker v. Bos. Sci. Corp.*, No. 619CV121ORL31EJK, 2020 WL 6870852, at \*10 (M.D. Fla. Oct. 2, 2020) (excluding expert testimony to the extent they were "solely a conduit for testimony about corporate information").[24]

---

[24] Other parts of Sahmel's case-specific report and her entire supplemental report in Keefer and Baker should also be excluded for the same reasons. For example, for Keefer, she spends ten pages summarizing Keefer's military service, CAEv2 fitting, training, and use; medical records, employment history, and non-occupational noise exposure as reflected in his records and deposition testimony, as well as the deposition testimony of other witnesses. *See* Sahmel Rep. (Keefer), ECF No. 1595-48 at 63-73. She provides a similar summary in her report for Baker. *See* Sahmel Rep. (Baker), ECF No. 1595-49 at 63-67. Additionally, her entire supplemental reports in both cases, for the most part, simply regurgitate deposition testimony; she does not offer any new

Accordingly, Plaintiffs' Omnibus Motion to Exclude Defendants' Expert Opinions and Testimony under Rules 702 and *Daubert*, ECF No. 1595, is **GRANTED** in full as to Dr. Richard Neitzel and Jennifer Sahmel; their opinions are excluded in their entirety.

**DONE AND ORDERED**, on this 13th day of March, 2021.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

opinions or otherwise tie the deposition testimony to her previously proffered opinions.  Sahmel Supp. Rep. (Keefer), ECF No. 1595-50; Sahmel Supp. Rep. (Baker), ECF No. 1595-51. Sahmel's narrative is not necessary for the jury to understand the underlying facts, nor are these facts (other than each Plaintiff's CAEv2 fitting, training, and use) relevant to Sahmel's employer responsibility opinions (which have their own problems as described herein).