# EXHIBIT 2

Confidential - Pursuant to Protective Order

```
 1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF FLORIDA
 2                 PENSACOLA DIVISION
 3
      IN RE: 3M COMBAT ARMS  )  Case No.
 4    EARPLUG PRODUCTS       )  3:19md2885
      LIABILITY LITIGATION   )
 5    _____ )  Judge M. Casey
                             )  Rodgers
 6    THIS DOCUMENT RELATES  )  Magistrate Judge
      TO ALL CASES           )  Gary R. Jones
 7
 8         WEDNESDAY, DECEMBER 18, 2019
 9    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
10                    - - -
11          Videotaped deposition of Jeffrey L.
12    Hamer, held at the offices of KIRKLAND &
13    ELLIS LLP, 300 North LaSalle, Chicago,
14    Illinois, commencing at 8:58 a.m., on the
15    above date, before Carrie A. Campbell,
16    Registered Diplomate Reporter, Certified
17    Realtime Reporter, Illinois, California &
18    Texas Certified Shorthand Reporter, Missouri
19    & Kansas Certified Court Reporter.
20                    - - -
21
              GOLKOW LITIGATION SERVICES
22        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1                A P P E A R A N C E S :
 2

      TRACEY & FOX
 3    BY:   SEAN P. TRACEY
            stracey@traceylawfirm.com
 4          LAWRENCE TRACEY
            ltracey@traceylawfirm.com
 5    440 Louisiana Street, Suite 1901
      Houston, Texas   77002
 6    (713) 495-2333
 7
      CLARK, LOVE & HUTSON, PLLC
 8    BY:   SHELLEY HUTSON
            shutson@triallawfirm.com
 9          EMILY MARLOWE
            emarlowe@triallawfirm.com
10    440 Louisiana Street, Suite 1600
      Houston, Texas   77002
11    (713) 757-1400
12
      WATTS GUERRA LLP
13    BY:   MIKAL C. WATTS
      4 Dominion Drive, Suite 100
14    San Antonio, Texas   78257
      (210) 447-0500
15    Counsel for Plaintiffs
16
17    KIRKLAND & ELLIS LLP
      BY:   CHAD MORRISS
18          chad.morriss@kirkland.com
            THOMAS A. WILSON
19          taxi.wilson@kirkland.com
      1301 Pennsylvania Avenue, NW
20    Washington, DC   20004
      (202) 389-5996
21    Counsel for Defendants
22
23
24
25
```

```
 1   ALSO PRESENT:
          DANNY OLIVO, Tracey & Fox
 2
          MICHAEL KAUFFMANN, trial technician,
 3        Golkow Litigation Services
 4   V I D E O G R A P H E R :
 5      DAVID LANE,
 6      Golkow Litigation Services
 7
 8                      - - -
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Confidential - Pursuant to Protective Order

1               THE WITNESS:  There's no reason
2       that we did -- that we should or
3       should not.
4    QUESTIONS BY MR. TRACEY:
5       Q.     So if you were -- if you were
6    given the opportunity, you would not be
7    against publishing the flange report?
8               MR. MORRISS:  Object to form.
9               THE WITNESS:  I would -- I
10       would not be against publishing
11       findings within the flange report.
12       The report itself I would not publish
13       as is.
14    QUESTIONS BY MR. TRACEY:
15       Q.     How come?
16       A.     Because it's an internal 3M lab
17    report that has a lot of different
18    information that might be proprietary, and we
19    wouldn't necessarily publish that.
20       Q.     What's proprietary in the
21    flange report?
22       A.     I have no idea.  I said "might
23    be proprietary."
24       Q.     Okay.
25       A.     So typically for an internal

```
 1   technical report, we would not publish as is
 2   as a result, because we need to review it and
 3   make sure of those things and...
 4        Q.    Well, certainly there has been
 5   time to review it now, 20 years?
 6             MR. MORRISS:  Object to form.
 7             THE WITNESS:  Yeah, I agree.
 8   QUESTIONS BY MR. TRACEY:
 9        Q.    Do you know whether or not on
10   your company's website dedicated to this
11   litigation they have a copy of the flange
12   report for the public to see?
13        A.    I think I testified earlier I
14   haven't been on that website.
15        Q.    Do you think if your company's
16   got a website dedicated to telling the truth
17   about the Combat Arms Earplug, the flange
18   report should be on it?
19             MR. MORRISS:  Object to form.
20             THE WITNESS:  I don't have an
21        opinion there.
22   QUESTIONS BY MR. TRACEY:
23        Q.    How come?
24        A.    I don't know what's on that --
25   on that website.  I don't know what its
```

Confidential - Pursuant to Protective Order

```
 1   purpose is or -- I don't know anything about
 2   it, so I can't answer your question.
 3           Q.    Okay.  Maybe we'll look at it
 4   after lunch.
 5                 MR. TRACEY:  Should we take a
 6        lunch break?
 7                 MR. MORRISS:  I mean, I'm all
 8        for getting finished.  So, I mean, I'm
 9        happy if you want to break, break,
10        but --
11                 MR. TRACEY:  I won't take long.
12        We're going to be okay.
13                 MR. MORRISS:  Okay.  All right.
14                 MR. TRACEY:  Trust me on this.
15        Unless Watts has a lot of questions.
16                 MR. MORRISS:  Okay.
17                 VIDEOGRAPHER:  Going off the
18        record.  The time is 11:54 a.m.
19          (Off the record at 11:56 a.m.)
20                 VIDEOGRAPHER:  We're back on
21        the record.  The time is 12:38 p.m.
22   QUESTIONS BY MR. TRACEY:
23           Q.    Mr. Hamer, before our lunch
24   break I was asking if you had seen the 3M
25   website on these cases, earplugfacts.com,
```

Confidential - Pursuant to Protective Order

1    3Mearplugsfacts.com, "Our Commitment."
2             Have you seen that website?
3             Here, we got it up on the
4    screen now.
5             MR. MORRISS:  And I have an
6        objection to, you know, live-streaming
7        of whatever the website is.
8             MR. TRACEY:  Even if it's
9        yours?
10            MR. MORRISS:  Even if it's
11       mine.
12            THE WITNESS:  I don't believe
13       I've seen this, no.
14   QUESTIONS BY MR. TRACEY:
15        Q.   All right.  Well, here's what
16   it says.
17            By the way, do you know why 3M
18   puts up websites?
19        A.   Oh, for a variety of reasons.
20        Q.   Communicate things?
21        A.   Yes.
22        Q.   Is this the first time you've
23   ever seen this website?
24        A.   I believe so.
25        Q.   You never heard about it

```
 1   before?
 2       A.    I don't believe so.
 3       Q.    Who would be the people at 3M
 4   who would be responsible for putting this up?
 5       A.    I don't know.
 6       Q.    Okay.  You don't know if
 7   websites are a marketing task?
 8       A.    I think that 3M IT controls the
 9   websites, and a lot of different departments
10   would work with them to put things on a
11   website.  It's not strictly marketing.
12             MR. MORRISS:  So can I ask, is
13        this like a hard copy of the -- you
14        know, a snapshot of the website or --
15             MR. TRACEY:  Click on it.
16        Let's see.  Let's see.  Click on --
17             MR. MORRISS:  That's my
18        objection, is to a live piece.  So if
19        it's a hard copy, I don't have a
20        problem.
21             MR. TRACEY:  Is it a hard copy?
22             MR. OLIVO:  Yeah, it's a hard
23        copy.
24             MR. TRACEY:  Oh, good.
25             MR. MORRISS:  Can we have the
```

Confidential - Pursuant to Protective Order

```
 1         hard copy of it then?
 2                MR. TRACEY:  Yeah.  Here.
 3                (Hamer Exhibit 17 marked for
 4         identification.)
 5                MR. MORRISS:  I know I'm a
 6         pest.
 7                MR. OLIVO:  Exhibit 17.  Here's
 8         a copy for him.
 9                THE WITNESS:  Thank you.  Much
10         easier to read.
11                MR. MORRISS:  Is that 17?
12                THE WITNESS:  Yes, I believe it
13         is.
14    QUESTIONS BY MR. TRACEY:
15         Q.    And it says, "Our commitment to
16    the military and veterans" there in the
17    middle, doesn't it?
18         A.    That's what this says.
19         Q.    Do you remember what year the
20    Twin Towers went down?
21                MR. MORRISS:  Object to form.
22                THE WITNESS:  September 11th,
23         but I don't remember the year.
24    QUESTIONS BY MR. TRACEY:
25         Q.    2001?
```

Confidential - Pursuant to Protective Order

1      A.     Sounds right.
2      Q.     Do you see any reason why 3M
3  couldn't or shouldn't put the flange report
4  on this website?
5             MR. MORRISS:  Object to form.
6         Asked and answered.
7             THE WITNESS:  I believe I've
8         already answered that question.  We
9         would not place an internal document
10        on an external site.
11  QUESTIONS BY MR. TRACEY:
12     Q.     Well, now I'm showing you the
13  site.  Before you hadn't seen the website, so
14  now I'm showing it to you so you can see what
15  it looks like.
16            You still have the same answer?
17     A.     If this -- yes.
18     Q.     If you were committed to the
19  military, wouldn't you expect to see this
20  flange report in the military's hands?
21     A.     I believe the military was
22  aware of the flange-flipping issue.
23     Q.     The military was aware of what?
24     A.     Of the flange-flipping -- the
25  flange-flipping methodology.

Confidential - Pursuant to Protective Order

```
 1          Q.    What flange-flipping
 2   methodology?
 3          A.    To pick the -- to seat the --
 4   to get a proper seal for the earplug, you
 5   could potentially flip the flange.
 6          Q.    And why do you believe they
 7   were aware of the flange-flipping issue?
 8          A.    I believe that Doug Ohlin was
 9   involved directly with that -- the
10   development of that process -- that product
11   and its subsequent testing while he was with
12   the military.
13          Q.    Anything other than that?  Any
14   documents you can show me?
15          A.    No.
16          Q.    You didn't even know Doug Ohlin
17   then, did you?
18          A.    Not then.
19          Q.    Is this information that's come
20   to you since this litigation started?
21          A.    I don't remember where I got
22   the information that -- I believe it would
23   have been during a review of documents, yes.
24          Q.    Okay.  Are you a company man?
25                MR. MORRISS:  Object to form.
```

Confidential - Pursuant to Protective Order

```
 1                      CERTIFICATE
 2
 3            I, CARRIE A. CAMPBELL, Registered
      Diplomate Reporter, Certified Realtime
 4    Reporter and Certified Shorthand Reporter, do
      hereby certify that prior to the commencement
 5    of the examination, Jeffrey L. Hamer, was
      duly sworn by me to testify to the truth, the
 6    whole truth and nothing but the truth.
 7            I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
              I DO FURTHER CERTIFY that I am
11    neither a relative nor employee nor attorney
      nor counsel of any of the parties to this
12    action, and that I am neither a relative nor
      employee of such attorney or counsel, and
13    that I am not financially interested in the
      action.
14
15
16
            _____
17          CARRIE A. CAMPBELL,
            NCRA Registered Diplomate Reporter
18          Certified Realtime Reporter
            California Certified Shorthand
19          Reporter #13921
            Missouri Certified Court Reporter #859
20          Illinois Certified Shorthand Reporter
            #084-004229
21          Texas Certified Shorthand Reporter #9328
            Kansas Certified Court Reporter #1715
22          Notary Public
23          Dated:  December 26, 2019
24
25
```