# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG PRODUCTS
LIABILITY LITIGATION

This Document Relates to:
*Estes*, 7:20cv137
*Hacker*, 7:20cv131
*Keefer*, 7:20cv104

Case No. 3:19md2885

Judge M. Casey Rodgers
Magistrate Judge Gary R. Jones

## ORDER

This Order addresses the following motions in limine for the upcoming bellwether trial, beginning March 29, 2021: Defendants' I, III, VII, X, XII, XXIV, and XXV; and Plaintiffs' D1, G(6), H(1) and (4), I(3) and (4), and J(1)-(3).[1]

## Defendants' Motions

### I. Evidence or argument relating to subjects excluded by the Court's prior order regarding Hacker

Defendants seek to exclude any evidence of Hacker's frustration, sleep issues, focus issues, irritability, and social isolation as beyond "garden-variety" emotional damages.[2] Hacker responds that he should be permitted to explain the effects of

---

[1] The remaining motions in limine—Plaintiffs D(1), G(3), and G(4)—will be resolved by separate order.

[2] The Court has already excluded testimony from Plaintiffs' experts relating to Hacker's medical conditions other than hearing loss and tinnitus after he failed to make the required disclosures. *See generally* Order, Case No. 7:20cv131, ECF No. 58.

tinnitus on his daily life, including difficulty understanding his children, frustration, "sleep issues that make him tired and cranky, and noises that hurt his head," because these are all common, "garden-variety" effects of tinnitus.  Pls.' Resp., ECF No. 1674 at 7.  The Court agrees.

Hacker's alleged mental and emotional symptoms are all "garden-variety" stress and anxiety because they are not clinically-diagnosed medical conditions, but rather, when taken into context, reflect the type of emotional effect that normally accompanies tinnitus.  *See Winstead v. Lafayette Cty. Bd. of Cty. Commissioners*, 315 F.R.D. 612, 615 (N.D. Fla. 2016) (finding plaintiff's anxiety, depression, and insomnia were garden-variety emotional distress claims, when taken in context); *Payne v. Seminole Elec. Coop.*, Inc., No. 3:19-CV-1173-J-32MCR, 2020 WL 7138574, at *5 (M.D. Fla. Dec. 7, 2020) (finding plaintiff's claims of lack of sleep, lack of concentration and comprehension, agitation, confusion, mental disorientation, and other similar mental symptoms resulting from her radiation exposure were "garden variety" emotional distress); *Sessa v. Reinauer Transportation Companies, LLC*, No. 8:04-CV-1559-T-24MSS, 2005 WL 8160229, at *3 (M.D. Fla. June 15, 2005) ("A garden variety claim for emotional distress damages should generally be limited to such emotions as personal humiliation and embarrassment rather than clinical diagnoses.  In the case of a personal injury claim, garden variety emotional distress damages may include the emotions associated with

recovering from an injury.").[3]  In light of this ruling, Defendants will be permitted to introduce evidence of other potential causes or aggravators of Hacker's emotional damages, subject to the limits set forth in the Court's rulings on other related motions in limine.  *See infra* at 21-23.

## III.   Evidence or argument relating to Plaintiff Luke Estes' mental health issues or symptoms beyond "garden variety"

Defendants move to exclude all evidence and argument relating to Estes' non-garden variety mental health issues or symptoms, such as social isolation, sleep issues, depression, frustration, and focus issues.  Defendants argue that Estes alleged only garden variety emotional damages resulting from his use of the CAEv2 and thus they were precluded from obtaining discovery on Estes' mental health per the Court's prior Order, *see* Order, ECF No. 1065 at 5-6.  Defendants contend that Estes should not now be able to offer testimony (lay or expert) or argument relating to these mental health issues or symptoms.  Plaintiffs respond that Estes' "speech understanding, concentration, attention, sleep [difficulty], ability to relax, and loss of quiet" are garden-variety consequences of his hearing injuries, and thus Estes should be able to introduce such evidence and related argument to explain to the jury the effects of his injuries.  *See* Pls.' Resp., ECF No. 1674 at 8.

---

[3] Hacker may not introduce evidence of sleep apnea, post-traumatic stress disorder, or any other diagnosed mental health condition.

The Court agrees with Plaintiffs' characterization of Estes' mental health claims as "garden-variety."[4]  This includes Estes' claims of anxiety, mild depression, and difficulty sleeping.  *See Winstead*, 315 F.R.D. at 615 (finding plaintiff's alleged anxiety, depression, and insomnia, when taken in context, were "the type of anguish that normally accompanies workplace discrimination" and thus were garden-variety emotional distress claims); *cf. Collins v. Frank Mgmt.*, LLC, No. 09-81554-CIV, 2009 WL 10667739, at *2 (S.D. Fla. Sept. 4, 2009) (finding plaintiff placed his mental health at issue where he sought specific damages for ongoing therapy and medication for depression and anxiety arising from his loss of employment).  Estes does not claim that he suffers from clinical anxiety or depression, he was not diagnosed with or professionally treated with these conditions, and there is no indication that he sought treatment outside of the DoD or VA such that Defendants are prejudiced without such records.  To the extent Estes introduces evidence of his garden-variety mental health claims, Defendants will be permitted to introduce evidence of other potential causes of these symptoms (other than erectile dysfunction), as well as testimony from Dr. House that Estes' tinnitus could have been caused and/or exacerbated by his feelings of anxiety and depression.

---

[4] Estes may not introduce evidence of his sleep apnea, a specific condition for which he was diagnosed and sought treatment.  *See* ECF No. 1663-76 at 2-3; D-ESTES-313.

## VII.   Evidence Regarding Defendant's Financial Condition, Profit Margins, Net Worth, Compensation Packages of Defendants' Employees, Private Equity Interests in Aearo and Any Profit from the Sale of Aearo to 3M.

Defendants move to exclude evidence of (1) 3M's financial condition, including but not limited to, evidence of its net worth, revenues, profits, and profit margins on all non-CAEv2 products; (2) employee compensation packages, including but not limited to, base salaries, bonuses, stock and stock options; (3) private equity and other ownership interest in Aearo, including any profits made by private equity companies, other owners, and employees of Aearo in its sale to 3M; and (4) 3M's ability to pay any potential judgment.  Defendants argue that such evidence is specifically prohibited under Kentucky law and is irrelevant and prejudicial under Georgia law, citing *Hardaway Mgmt. Co. v. Southerland*, 977 S.W.2d 910, 916 (Ky. 1998) and *Chrysler Group, LLC v. Walden*, 812 S.E.2d 244, 251 (Ga. 2018), respectively.  Plaintiffs argue in response that this evidence is relevant and admissible in both Kentucky and Georgia in actions for punitive damages citing KY. REV. STAT. ANN. § 411.186(2)(c) (West 2021) and *BMO Harris Bank. v. Richert Funding*, 2016 WL 11531452, at *5 (N.D. Ga. 2016), respectively. The Court agrees, in part.

Because this is a diversity proceeding, the state law applicable in each Plaintiffs' case governs the admissibility of evidence related to Defendants' financial condition for purposes of punitive damages.  *See In re Yasmin & YAZ*

*(Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, 2011 WL 6732819, at *7 (S.D. Ill. Dec. 16, 2011) (citing Republic Tobacco Co. v. N. Atl. Trading Co., Inc., 381 F.3d 717, 735 (7th Cir.2004)).   Under Kentucky common law, "the parties may not present evidence or otherwise advise the jury of the financial condition of either side of the litigation" in an action for punitive damages.   *See Hardaway*, 977 S.W.2d at 916.   Additionally, the Kentucky Supreme Court has decided that that this rule "was not effected by the enactment of KRS 411.186, though subsection (2)(c) of that statute would permit evidence of the extent to which the defendant *profited from the wrongful act, itself.*"  *Id.* at 216 n.2.   Thus, while Kentucky law generally prohibits the admission of evidence related to a party's wealth, evidence related specifically to a defendant's profit from the wrongful act is admissible for punitive damages purposes.   In Georgia, the admissibility of party wealth evidence is a fact-specific analysis based on Fed. R.'s of Evid. 401, 402, and 403.   *See Chrysler*, 812 S.E.2d at 249-253.   Because a different admissibility standard applies under Kentucky law than Georgia law, there is a risk that admitting evidence for purposes of Estes' and Keefer's cases in Georgia, but not Hacker's case in Kentucky, would create undue prejudice against Defendants.   The Court agrees with Defendants that it would be nearly impossible to "un-ring the bell" for the jury if this evidence was admitted for purposes of Estes' and Keefer's cases but not Hacker's due to the consolidated nature of the trial.   *See* March 15, 2021 Hr'g Tr. at 12.

Accordingly, Defendants' motion to exclude evidence related to Defendants' financial condition, such as net worth, revenues, profits, and profit margins on non-CAEv2 products is **GRANTED**.   The Court finds this evidence is explicitly prohibited under Kentucky law pursuant to the holding in *Hardaway* and inadmissible under Georgia law pursuant to Rule 403.   The probative value of evidence related to Defendants' wealth in Plaintiffs' Georgia claims is significantly outweighed by the risk of undue prejudice to Defendants in Hacker's.

To the extent Plaintiffs seek to offer evidence related to employee compensation packages for the purpose of establishing Defendants' wealth, this evidence is also inadmissible under Kentucky and Georgia law for the same reasoning described above.   However, this type of evidence is admissible for purposes of establishing witness bias, and also to the extent the evidence is relevant to a component of Plaintiffs' claims.   *See BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1475 (11th Cir. 1992) (finding the evidence of a witness's compensation and dividend payment from party in the litigation was relevant and admissible for the opposing party's defense and for purposes of showing bias).   For example, Plaintiffs' expert, Robert Johnson, included in his expert report the salary and compensation package for the current CEO of 3M, Michael Roman.   *See* ECF No. 1631-18 at 25.   This information is included on a page under the header "What is 3M Company's Economic Wealth?"   *See id.*   Roman

is not expected to testify at trial; thus, evidence of his compensation package is not relevant to show witness bias.  Additionally, the context provided by the header "What is 3M Company's Economic Wealth?" indicates that this evidence would be offered solely for the purpose of establishing 3M's wealth, which as discussed above, is inadmissible.

Plaintiffs also seek to introduce evidence of Garrad Warren, Brian Myers, and Elliot Berger's compensation packages to show witness bias and for purposes of establishing motive.  Warren, Myers, and Berger are all expected to testify at trial; thus, evidence of their compensation packages is relevant to show bias.  *See BankAtlantic*, 955 F.2d, 1475.  Because neither Warren, Myers, nor Berger are parties to this litigation, this evidence is not precluded by Kentucky common law. *See Hardaway*, 977 S.W.2d at 916 ("*[T]he parties* may not present evidence or otherwise advise the jury of the financial condition *of either side of the litigation*.") (emphasis added).  Thus, Defendants' motion to exclude evidence related to employee compensation is **GRANTED IN PART AND DENIED IN PART**.

Plaintiffs also argue that evidence relating to the sale of Aearo to 3M is relevant to Defendants' motive and should be admissible under Kentucky and Georgia law.  The Court agrees, in part.  For claims subject to Kentucky law, the jury is entitled to consider the profits derived from the wrongful conduct.  *See Potts v. Martin & Bayley, Inc.*, 2011 WL 4740641, at *4 (W.D. Ky. Oct. 7, 2011) (finding

that if plaintiffs had evidence linking defendant's profit margins to the allegedly defective product, the jury would be entitled to consider that evidence).  At oral argument, Plaintiffs argued that the profitability of the allegedly defective product was a key consideration for 3M's corporate leadership, specifically with regard to the acquisition of Aearo by private equity firms and ultimately by 3M.  Plaintiffs' have pointed to the deposition testimony of Warren, and email exchanges between Aearo corporate executives, as support for this argument.  The Court finds that Plaintiffs have sufficiently linked this argument, and the evidence supporting it, to the profitability of the alleged wrongful conduct for purposes of admissibility as well as to punitive damages and more specifically "reprehensibility.".

However, while Plaintiffs are free to argue that the success of the CAEv2 contributed to the subsequent acquisitions of Aearo, the Court cannot at this point determine if the specific *acquisition price* 3M paid for Aearo is sufficiently connected to the alleged wrongful conduct to be admissible.  The Court must consider, within the context of the trial, whether this evidence constitutes inadmissible evidence of party wealth, and/or results in unfair prejudice to Defendants under Rule 403.  *See Chesser v. Fifth Third Bank, Nat'l Ass'n, 2020 WL 3979586*, at *7 (E.D. Ky. July 14, 2020) (finding financial condition evidence can have "an emotional appeal to the jury to find against a defendant who can afford to pay large damages to an individual plaintiff.").  As a result, the Court will defer its

ruling on this matter until trial, when the Court will have the opportunity to hear Plaintiffs' arguments regarding the financial motives of Defendants in light of the other evidence presented. The Court does not consider the prior acquisition prices of Aearo to non-3M buyers to constitute party wealth evidence. As a result, evidence related to the impact that the CAEv2 had on the prior acquisition prices of Aearo, before Aearo was purchased by 3M, is admissible. Defendants' motion to exclude evidence related to private equity and other ownership interest in Aearo, including any profits made by private equity companies, other owners, and employees of Aearo in its sale to 3M is **DENIED IN PART AND DEFFERED IN PART**.

Finally, Plaintiffs have not stated that they intend to offer any evidence regarding Defendants ability to pay a judgement. Thus, Defendants motion to exclude evidence related to 3M's ability to pay any potential judgment is **GRANTED WITHOUT PREJUDICE**. To the extent that Defendants introduce evidence on this topic, the Court can reconsider its finding at that time.

## X.     Defendants' Motion in Limine to Exclude Evidence of Alleged Injuries of Others, Including the Number of Claimants

Defendants move to exclude evidence of alleged injuries to other CAEv2 users and to preclude any reference to the total number of claimants in this multidistrict litigation and the related Minnesota state court litigation. The Court previously found that Defendants' motion was not ripe for decision because no specific similar occurrences had been raised. *See In re 3M Combat Arms Earplug*

*Prods. Liab. Litig.*, No. 3:19md2885, 2021 WL 918214, at *2 (N.D. Fla. Mar. 10, 2021). After considering the parties' arguments at the pretrial conference, the Court finds the motion is due to be **GRANTED, in part**.

The Court finds that evidence of alleged injuries to other CAEv2 users from either this multidistrict litigation and/or the related Minnesota state court litigation is due to be excluded (1) under Rule 802 as inadmissible hearsay and (2) under Rule 403 as unduly prejudicial. Allegations contained in other plaintiffs' complaints in this multidistrict litigation and the Minnesota state court litigation are hearsay not within a recognized exception. *See Smith v. E-backgroundchecks.com, Inc.*, No. 1:13-cv-2658, 2015 WL 11233453, at *1 (N.D. Ga. June 4, 2015) ("Evidence of other lawsuits is generally considered to be inadmissible hearsay." (collecting cases)); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543, 2015 WL 7769524, at *3 (S.D.N.Y. Nov. 30, 2015) (excluding evidence of other ignition switch cases filed against the defendant because the plaintiffs' rationales for introduction of the evidence "depend on the allegations in the complaints being taken as true"). Moreover, Plaintiffs have not explained how unproven allegations from other lawsuits have any probative value in their cases, and the Court finds that any probative value would be substantially outweighed by a danger of unfair prejudice and jury confusion. *See A.T.O. Golden Constr. Corp. v. Allied World Ins. Co.*, No. 17-24223, 2018 WL 5886663, at *8 (S.D. Fla. Nov. 9, 2018) ("[E]ven if [P]laintiff

could demonstrate some probative value from allegations in other lawsuits, presenting evidence of these other cases would lead to a series of mini-trials that would likely confuse and mislead the jury from the task at hand of evaluating plaintiff's claims in this case and result in a waste of time and judicial resources." (quoting *Smith*, 2015 WL 11233453, at *2)).

For similar reasons, the Court finds that any probative value of evidence of the sheer number of claimants alleging injuries caused by the CAEv2—currently exceeding 230,000—is substantially outweighed by a danger of unfair prejudice to Defendants. *See* Fed. R. Evid. 403. Critically, however, this ruling is limited only to Plaintiffs' case-in-chief. If Defendants present evidence or argument that Plaintiffs' experiences with the CAEv2 are aberrational, isolated incidents, then Plaintiffs will be entitled to rebut the argument with evidence that hundreds of thousands of individuals have made similar allegations involving similar experiences with the CAEv2.

Additionally, during the pretrial conference, Plaintiffs' counsel identified two sets of written exchanges between Ted Madison, then an employee in 3M's Personal Safety Division,[5] and 3M customers regarding "complaints" about 3M's earplugs as evidence of "similar occurrences" that Plaintiffs intend to introduce at trial. The first

---

[5] Madison is an audiologist who began working for 3M in 1992 and retired in 2019. *See* Madison Depo. Tr. at 11.

complaint is contained in a December 2013 exchange of messages between Madison and Eric Howald (the "Howald Complaint"), *see* 3M_MDL000096146–49, and pertains to the Combat Arms Earplug version 4 ("CAEv4"), *see* Madison Depo. Tr. at 255, the second complaint is contained in a September 2014 message from Howard Elmer to 3M (the "Elmer Complaint") and pertains to the CAEv2, *see* 3M_MDL000380137; *see also id.* (Madison replying to the Elmer Complaint by stating that "it sounds like you were wearing 3M Combat Arms Earplugs with both yellow and olive green tips").

The Howald Complaint is titled "Danger of 3M Combat Arms Earplugs." In his initial message to 3M, Howald identifies himself as an Army soldier who "only used [the CAEv4] the first day of rifle qualification," and details how "the moment the first shot went off I knew that I had never come close to hearing anything remotely that loud . . . it was the most painful experience. After just a few iterations my hearing disappeared in half and never returned." He also states that "many many other soldiers agreed with me that they suffered hearing loss from those earplugs." Howald further stated that "I strongly urge 3M to take measures to rescind or improve this product as soon as possible." Madison responded to the Howald Complaint, "thank[ing] [Howald] for contacting 3M to share [his] concerns about the hearing protection provided by Combat Arms Earplugs," "suggest[ing] that [Howald] contact the appropriate Army audiology facility," and stating that "[t]he

hearing protection provided by Combat Arms Earplugs is affected by numerous factors." Howald replied that the CAEv4's NRR in open mode was "plain bullcrap" and stated that "[a]s a user of this product, I can assure you that the 'factor' that affects their hearing protection is primarily that it's a terrible product – either 3M knows how poorly these work and use the principle of 'hearing protection' incredibly loosely, or there was a huge blunger in researching the efficacy of this product." Howald again stated that "if 3M cares anything about the health and quality of life of people that use its products, they will work behind the scenes to do more research as soon as possible and look at rescinded [sic] or improving this item." According to Madison, 3M notified the Army about the Howald Complaint, and 3M's "technical team" took steps to "explain [users] in more detail the hazards associated with impulse noise and the decisions that users should make to determine which type of protection is appropriate." Madison Depo. Tr. at 259–63.

The Court finds that the Howald Complaint is not admissible for any purpose. Even assuming, without deciding, that Plaintiffs could demonstrate that an incident involving the CAEv4 instead of the CAEv2 satisfies the "substantial similarity" doctrine, such a showing would require the introduction of a considerable amount of extrinsic evidence and result in a mini-trial on the similarities between the CAEv2 and the CAEv4. *See Wilson v. Bicycle S., Inc.*, 915 F.2d 1503, 1510 & n.10 (11th Cir. 1990) (in products liability case involving injuries allegedly sustained when a

wheel malfunctioned, affirming the district court's exclusion of evidence of an allegedly similar accident involving a different wheel manufactured by the defendants "on the grounds that the evidence was not probative because of the necessity for a considerable amount of extrinsic evidence to determine whether the incidents were substantially similar to meet the standards of [Rule] 403," and "this issue would have required a trial within a trial"); *see also Heath v. Suzuki Motor Corp.*, 126 F.3d 1391, 1396 n.13 (11th Cir. 1997) ("The admission of such [similar occurrence] evidence is also subject to the reasonable discretion of the trial court . . . as to whether the prejudice or confusion of issues which may probably result from such admission is disproportionate to the value of the evidence." (citation omitted)).

The Elmer Complaint, however, is admissible. In Elmer's message to 3M, he stated that he

> inserted the olive end into my ears, as recommended on the back of the package, thought it had seated well, entered the shooting range and set up and began firing.[] At some point I felt a sharp piercing pain/noise in my left ear. Both ears had some ringing, which subsided, but my left ear feels like there is a buzzing/vibrating[] feeling when I speak now. Its been about two weeks since this has occurred with only a slight improvement in my left ear. Loud noises are bothersome to my[] left ear.

Madison responded to the Elmer Complaint, "thank[ing] [Elmer] for letting us know about [his] experience with earplugs while shooting," and requesting that Elmer provide a time for Madison to call him regarding his complaint. At his deposition, Madison testified that he does not recall whether he ever spoke with

Elmer, but said he is "sure that we would have entered this complaint into our complaint system and it would have been identified as an alleged injury and we would have followed that procedure to respond to an alleged injury." *See* Madison Depo. Tr. at 275–76; *see also id.* at 277 ("I have not seen other documents. I assume that there [sic] are in our complaint resolution system."). The Court finds that the Elmer Complaint is admissible to (1) show that Defendants had notice of a defect or danger posed by the CAEv2, and (2) rebut any evidence or argument by Defendants that Plaintiffs' experiences with the CAEv2 are isolated incidents. *See Hessen ex rel. Allstate Ins. Co. v. Jaguar Cars, Inc.*, 915 F.2d 641, 650 (11th Cir. 1990) ("Evidence of similar occurrences may be offered to show a defendant's notice of a particular defect or danger . . . ."). The Court finds that the occurrence described in the Elmer Complaint is substantially similar to Plaintiffs' claims because it involves a similar injury caused by a similar use of the same product.[6] *See Jones v. Otis Elevator Co.*, 861 F.2d 655, 661–62 (11th Cir. 1998) ("[C]onditions substantially similar to the

---

[6] It is not clear whether Elmer used the CAEv2 in a civilian or military setting. However, even assuming that Elmer used the CAEv2 at while at a civilian shooting range, the Court finds that the Elmer Complaint satisfies the requirements of the substantial similarity doctrine. *See Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1287 (11th Cir. 2015) ("The 'substantial similarity' doctrine does not require identical circumstances, and allows for some play in the joints depending on the scenario presented and the desired use of the evidence."). Because the Elmer Complaint involves conditions "substantially similar" to Plaintiffs' claims, its admission will not turn the trial of this case into a "mini-trial" concerning the Elmer Complaint. *See Reynolds v. Fla. Highway Prods., Inc.*, No. CV507-078, 2008 WL 11349688, at *1–2 (S.D. Ga. Dec. 18, 2008) (admitting evidence of a separate incident involving the defendant's product over defendant's objection that its admission would "turn the trial of this case into a mini-trial concerning" where the other incident satisfied the requirements of the "substantial similarity" doctrine).

occurrence in question must have caused the prior accident."). Additionally, Elmer's 2014 incident coincides temporally with Estes', Hacker's, and Keefer's military service.[7] *See id.* at 662 ("[T]he prior accident must not have occurred too remote in time."). Moreover, because Plaintiffs may only tender the Elmer Complaint during their case-in-chief for the purpose of proving 3M had notice of the CAEv2's defect or the danger posed by the CAEv2, it is not hearsay.[8] *See* Fed. R. Evid. 801(c)(2); *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, No. 4:08-MD-2004, 2016 WL 393958, at *3 (M.D. Ga. Feb. 1, 2016) ("Of course, if the [similar occurrence] evidence is tendered only for the purpose of notice, then it would likely not be hearsay.").

---

[7] Based on the parties' arguments at the pretrial conference and the Court's review of the Elmer Complaint, the Court finds that a hearing is not necessary to determine whether the Elmer Complaint satisfies the requirements of the "substantial similarity" doctrine. *See In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, No. 4:08-MD-2004, 2010 WL 2196632, at *1 (M.D. Ga. May 28, 2010) (concluding that the plaintiffs' proffered "similar complications" evidence met the "substantially similar" requirement after considering the parties' arguments at the pretrial conference and receiving additional briefing from the parties).

[8] The Elmer Complaint does not qualify for the business records exception to the rule against hearsay. *See* Fed. R. Evid. 803(6). Although Madison testified at his deposition that his job responsibilities included investigating and resolving complaints related to 3M hearing protection devices, *see* Madison Depo. Tr. at 24–27, 48, and that customer complaints would have been entered "into [3M's] complaint system," *see id.* at 275, Plaintiffs only offer the customer complaints and do not offer records "made" by any 3M employee. *See ADT LLC v. Alarm Prot. LLC*, No. 9:15-CV-80073, 2017 WL 1881957, at *2 (S.D. Fla. May 9, 2017) (holding that a company's "recorded telephone conversations of customer complaints do not qualify for the hearsay exception in Rule 803(6)" because "the customer complaining to [the company] is not acting in the normal course of business"); *cf. Godelia v. Zoll Servs., LLC*, No. 16-60471, 2019 WL 3883682, at *3 (S.D. Fla. Aug. 16, 2019) (admitting evidence of similar occurrences contained in documents "created and maintained" by defendants in response to problems with their products "as opposing party statements and as business record exceptions to the hearsay rule").

## XII.   Evidence Related to Dr. Fallon's Downloading of Documents.

Defendants' motion to exclude evidence related to Dr. Fallon's downloading of documents from his time in the military is **GRANTED IN PART**.  The Court agrees with Defendants that this evidence has limited probative value under Rule 401 and has the potential to mislead or confuse the jury under Rule 403.  However, Plaintiffs are permitted to use this evidence for the singular purpose of rebutting statements made by Dr. Fallon in his declaration or subsequent testimony.

## XXIV.   Assertions of Privilege

Any privilege objections raised at trial will be addressed as discussed at the pretrial conference.

## XXV. Inflammatory Comments Regarding DOD and VA's Record-Keeping Practices.

Consistent with the Court's previous order regarding expert opinions on military-wide "culture" or practices, a witness can speak to his or her own personal experiences with DoD and VA record-keeping practices; however, no witness will be permitted to testify about DoD or VA-wide practices.  Defendants' motion to exclude inflammatory comments regarding DoD and VA-wide record-keeping practices is **GRANTED CONSISTENT WITH THIS ORDER**.

**Plaintiffs' Motions**

**D.     Motions to Exclude Settled Issues**

**1.     Motion to bar untimely disclosed evidence of 3M's knowledge of testing**

**DENIED without prejudice**, as discussed at the pretrial conference.

**G.     Motions to Exclude Prejudicial Evidence Relating to Plaintiffs**

**6.     Motion to exclude unattributed statements in medical records**

**DENIED.**

**H.     Motions Applicable to Luke Estes**

**1.     Motion to exclude evidence or argument relating to erectile dysfunction, virginity, fertility, Viagra, or other issues relating to sex between Mr. and Mrs. Estes.**

Plaintiffs move to exclude all evidence and argument regarding the Estes' sex life at the time they were first married in 2013 and related difficulties due to sexual inexperience.   According to Plaintiffs, this evidence is irrelevant and unduly prejudicial under Rule 403 because these issues occurred and have since been resolved before Luke Estes' hearing loss in 2015, and these issues are different than those at issue in Jennifer Estes' loss-of-consortium claim.[9]  Defendants respond that they should be allowed to present evidence contrary to Mrs. Estes' claim that Mr. Estes' alleged hearing injuries has negatively affected the couples' sex life, including

---

[9] Defendants stated in their response that they do not intend to affirmatively present evidence related to Jennifer Estes' fertility.

evidence of Mr. Estes' prior erectile dysfunction issues.   At oral argument, Defendants also claimed for the first time that they are entitled to introduce evidence of Mr. Estes' erectile dysfunction claims in certain VA disability records from 2017 to attack the Estes' credibility because both testified that to the extent Mr. Estes ever had any erectile issues, they were resolved shortly after the Estes married in 2013.

The Court agrees with Plaintiffs.   Issues related to the Estes' sexual inexperience shortly after their marriage are not relevant, particularly where Mrs. Estes testified at her deposition that the issues were resolved within six months and the couple went on to have three children.   *See* Jennifer Estes Dep., ECF No. 1663-58 at 7-8.   Mr. Estes' 2017 VA disability records reflecting claims of erectile disorder are also not necessarily inconsistent with his wife's testimony[10], and use of this evidence at trial to impeach or attack the credibility of the Estes would require a separate mini-trial on how the VA forms are completed and for what purpose—an explanation that has required multiple, lengthy, adversarial discussions before the Court throughout this litigation.   Thus, any minimal probative value of this evidence is substantially outweighed by the risk of unfair prejudice to the Estes and confusing the jury.   Fed. R. Evid. 403.

---

[10] In one of the forms, the specific history for Mr. Estes' erectile disorder describes the onset of symptoms in Fall 2013 but that "the condition has improved." *See* P-ESTES-11028.

**4.     Motion to exclude evidence or argument that Estes was diagnosed with or suffers from clinical anxiety or depression**

**GRANTED**, in part, with respect to *diagnosed clinical* anxiety or depression for the reasons set forth in Defendants' Section III.  Regarding references to feeling anxious or depressed, Plaintiffs' motion is **DENIED**.

## I.     Motions Applicable to Stephen Hacker

**3.     Plaintiffs' Motion in Limine to Exclude Evidence of Irrelevant and Prejudicial Events in Hacker's Life**

Plaintiffs move to exclude evidence or argument relating to Hacker's history of physical altercations, arrest for obstructing a peace officer, patronizing a strip club, and/or testing positive for cocaine in 2004 and the related Article 15 proceeding and discipline.[11] Plaintiffs argue this evidence violates Rule 403 and constitutes inadmissible character evidence under Rule 404(b)(1). According to Plaintiffs, Defendants will use this evidence to convince the jury that it is in Hacker's character to engage in rule-breaking activity and that his actions conformed to that character when he misused hearing protection. Defendants respond that they should be permitted to introduce evidence of substance abuse to rebut any claims that Hacker

---

[11] Plaintiffs moved to exclude evidence of Hacker's alcohol abuse in their motion in limine G.8 (PC8). Confusingly, Defendants' response to that motion was located in their response to Plaintiffs' motion in limine I.3 (PH4). The Court will address Plaintiffs' motion in limine to exclude evidence of Hacker's alcohol abuse when it rules on Defendants' pending motion for reconsideration on the Court's Order granting Plaintiffs' motion in limine G.8 (PC8).

suffers from mental anguish or emotional distress due to the CAEv2 instead of other factors. Plaintiffs' motion is **GRANTED, in part**.

The Court finds that evidence of specific incidents of Hacker's "bad acts" are inadmissible. *See* Fed. R. Evid. 403; Fed. R. Evid. 404(b)(1). If, however, Hacker argues in his case-in-chief that he suffers mental anguish and emotional distress due to his use of the CAEv2, Defendants will be entitled to rebut such argument with evidence of other stressors in Hacker's life that may have caused or contributed to his alleged mental anguish and emotional distress. *See Lizarazo v. Greaves*, No. 1:16-cv-20558, 2018 WL 8224944, at *2 (S.D. Fla. June 21, 2018) (admitting evidence of the plaintiff's history of drug addiction because the evidence was "relevant to rebut any testimony" pertaining to the plaintiff's mental and emotional damages and was "highly probative to the issue of damages"). To be clear, if Hacker opens the door to such evidence, Defendants may not get into the specific details of Hacker's bad acts, including the Article 15 proceeding and discipline, but instead may only generally reference "issues," "trouble," or "substance abuse" that occurred during his military service. Given this limitation, such evidence is highly probative to the issue of mental and emotional damages and its probative value is not substantially outweighed by a danger of unfair prejudice.

**4.     Plaintiff's Motion in Limine to Exclude Evidence of Hacker's Family Issues**

Plaintiffs move to exclude evidence "of immaterial and prejudicial events in Hacker's family life," including events related to his marriage and his relationship with his children. Defendants respond that they should be entitled to present such evidence to rebut any claim by Hacker that his hearing-related injuries have caused or contributed to his marital and familial problems. The motion is **GRANTED, in part**.

The Court agrees with Hacker that any evidence relating to his relationship with his children is due to be excluded because any probative value of this evidence is substantially outweighed by a danger of unfair prejudice. *See* Fed. R. Evid. 403. If, however, Hacker argues in his case-in-chief that his hearing-related injuries have contributed to his marital problems, mental anguish, or emotional distress, Defendants will be entitled to rebut such argument with evidence that Hacker believed his wife had been unfaithful. Such evidence is highly probative of other stressors in Hacker's life that may have caused or contributed to his mental anguish or emotional distress and its probative value is not substantially outweighed by a danger of unfair prejudice. *See Hiatt v. United States*, 910 F.2d 737, 743 (11th Cir. 1990) (applying Florida law, affirming admission of evidence of "marital discord" because it was probative to plaintiff's claim for non-economic damages).

**J.      Motions Applicable to Lewis Keefer**

**1.      Motion to exclude evidence and argument relating to Keefer's alleged bad acts.**

Plaintiffs move to exclude evidence and argument related to Keefer's Article 15, subsequent demotion, and involuntary separation as irrelevant, improper evidence of prior bad acts, and unduly prejudicial.  The Court agrees, in part.

The Court finds that evidence and argument regarding Keefer's Article 15 proceeding is irrelevant to his claims in this litigation.  Additionally, evidence regarding the circumstances of Keefer's Article 15 proceeding and demotion constitute improper evidence of prior bad acts under Fed. R. of Evid. 404.  However, the Court also finds that Keefer's involuntary separation from the military is relevant to his claim of lost future earnings and his claims of stress and anxiety resulting from his hearing loss and tinnitus.

Regarding the fact of Keefer's demotion, the Court agrees with Defendants that by claiming the demotion was connected to his PTSD, see ECF No. 1673-31 at 4, Keefer has made the fact of his demotion relevant to his PTSD.  Thus, the Court finds that to the extent Plaintiffs' introduce evidence or testimony regarding Keefer's PTSD, Defendants will be able to introduce the fact that Keefer was demoted during his time in service.  However, as discussed above, the actual circumstances of Keefer's demotion are inadmissible character evidence.  *See* Fed. R. Evid. 404(b)(1). Plaintiffs' motion is **GRANTED IN PART**.

**2.      Motion to exclude evidence and argument relating to Keefer's past job performance.**

Plaintiffs move to exclude evidence related to the July 7, 2014 NCO Evaluation Report for Keefer.  Plaintiffs argue that this piece of evidence should be excluded under Fed. R.'s of Evid. 401, 403, and 404.  The Court agrees.  The use of a prior job evaluation report to suggest poor future job performance constitutes improper character evidence under Fed. R. of Evid. 404.  Thus, Plaintiffs' motion on this basis is **GRANTED**.

**3.      Motion to exclude evidence and argument relating to the reasons for Keefer's divorces.**

Plaintiffs' motion to exclude evidence and argument relating to the reasons for Keefer's divorces is **GRANTED.**  The Court finds this evidence is irrelevant under Fed. R. of Evid. 401.

**SO ORDERED**, on this 22nd day of March, 2021.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**