# EXHIBIT A

STATE OF MINNESOTA                     DISTRICT COURT

COUNTY OF HENNEPIN                     FOURTH JUDICIAL DISTRICT

| In re: 3M COMBAT ARMS EARPLUG LITIGATION<br><br>This Document Relates to:<br>CHRISTOPHER GRAVES | Case Type: Personal Injury<br>Hon. Thomas S. Fraser<br><br>FILE NO. 27-CV-19-19916<br><br>**ORDER GRANTING PLAINTIFF'S MOTION TO AMEND COMPLAINT TO CLAIM PUNITIVE DAMAGES** |
| --- | --- |

On January 28, 2021 the Court conducted a hearing on Plaintiff's motion to amend the complaint to claim punitive damages. Daniel Gustafson, Richard Paul III, Alicia Sieben, and Amanda Williams represented Plaintiff Christopher Graves. Benjamin Hulse, Gene Hummel, and Amarachi Ihejirika represented Defendants 3M and Aearo Technologies.

Based upon the record, the Court issues the following:

## ORDER

1. Plaintiff's motion to amend the complaint to claim punitive damages is GRANTED; and

2. The attached Memorandum is part of this Order.

BY THE COURT:

March 5, 2021

Thomas S. Fraser
Judge of District Court

1

## MEMORANDUM

### I.    Facts

This is a failure-to-warn products-liability case.  The product in question is the Combat Arms™ Earplug, Version 2 ("CAEv2").  Plaintiff, who claims that he was injured after using this earplug, moves to amend his Complaint to add a claim for punitive damages.

The CAEv2 is a dual-ended earplug, a description of which is included in the Court's January 29, 2021 Order on Plaintiff's Motion for Partial Summary Judgment. The following facts are relevant for the purposes of Mr. Graves's motion to add a claim for punitive damages.

### REAT Testing

Aearo began selling the CAEv2 in July 1999.  Paul Aff. Ex. 10, at 3M MDL000259196, Dec. 10, 2020 (indicating "initial deliveries made" in July of 1999).  It began testing the earplugs in December 1999.  Paul Aff. Ex. 12, at 150:22–151:2, Dec. 10, 2020 ("I tested the Combat Arms plug … starting in December of 1999.").  The CAEv2 were tested at EARCal, Aearo's hearing protection laboratory.  Hulse Decl. Ex. 3, at 3M_MDL000014573, Jan. 7, 2021 (noting that EARCal was accredited by the National Institutes of Standards and Technology, National Voluntary Laboratory Accreditation Program).

Under 40 C.F.R. § 211.210–1, the Noise Reduction Rating ("NRR") must be included on the packaging of certain products.[1]  The NRR is "[a] single number noise

---

[1] Defendants dispute whether this was required for the CAEv2.

2

reduction factor in decibels, determined by an empirically derived technique which takes into account performance variation of protectors in noise reducing effectiveness due to differing noise spectra, fit variability and the mean attenuation of test stimuli at the one-third octave band test frequencies."  40 C.F.R. § 211.203(q).  The NRR is calculated by conducting the required testing using the "Real Ear Method," also known as REAT testing.  *See* 40 C.F.R. § 211.206-1.  The range of NRRs is 0 – 30, with higher numbers indicating greater hearing protection.  *See* 40 CFR § 211.204-1(c).  To calculate the NRR, testing must be conducted with ten subjects.  40 C.F.R. §. 211.203(b) (defining the test as having ten subjects).

Aearo performed separate REAT testing on the two ends of the CAEv2.

**Testing for Green End**

Aearo anticipated an NRR of approximately 20 for the green end of the CAEv2. Paul Aff. Ex. 9, at 214:13– 215:8, Dec. 10, 2020 (anticipating "[s]omething in the range of 20.").  Preliminary results yielded an NRR of approximately 11, so the testing was terminated after eight subjects.  *See* Paul Aff. Ex 27, Dec. 10, 2020 ("Stopped after eight subjects, NRR 11; a new test will begin because it appears there is a learning effect as the experimenter better understands how to insert this unusual earplug.").  Aearo decided to stop the testing after eight subjects due to the low projected NRR.  Paul Aff. Ex. 28, Dec. 10, 2020 (explaining that "[t]he initial test 213015 was stopped after eight subjects because the results were variable and the NRR was quite low").  Some of the test subjects were Aearo employees.  *See* Paul Aff. Ex. 13, at 223:23–225:1, Dec. 10, 2020.

Aearo later determined that the projected low NRR was due to the issues with the dual-ended nature of the CAEv2:

> When the solid plug was fitted during the first test (-015), the basal edge of the third flange of the yellow level-dependent plug sometimes pressed against the subject's earcanal [sic] opening and folded up. When the inward pressure on the plug was released, the yellow plug's flanges tended to return to their original shape and this sometimes loosened the plug, often imperceptibly to the subject.

Paul Aff. Ex. 30, at 3M_MDL00005286, Dec. 10, 2020.  In other words, when the green end was inserted into the ear, the nearest flange of the opposite end would press against the ear canal and deflect backwards (flatten out).  When the insertion pressure was released, the flange would revert back to its normal shape, loosening the earplug.

Aearo then developed a solution to this issue, which involved folding back the third flange on the opposite end of the earplug.  *Id.* at 3M_MDL00005288.  This way the third flange did not push upon the user's ear and cause the CAEv2 to become dislodged during use.

In 2000, Aearo completed renewed testing of the green end during which "[t]he yellow flanges were folded outward to allow a deeper insertion of the green plug."  *Id.* at 3M_MDL000005288.  These tests yielded an NRR of 21.7 for the green end.  *Id.*  The green end of the CAEv2 was labeled as having an NRR of 22.

In July 2000, Defendants finalized the report labeled "How Folding the Flanges Back Affects REAT Results of the Ultrafit Earplug End of the Combat Arms Plug," which came to be known as the "Flange Report."  Paul Aff. Ex. 30, at 3M_MDL000005285, Dec. 10, 2020.  The Flange Report was written by Elliot Berger

and Ronald Kieper.  *Id.*  Mr. Berger is "an expert in Hearing Conservation/Hearing Protector product design, development and product performance measurement" and was Aearo's "corporate expert in all types of laboratory measurement methods and techniques," including NRR.  *See* Paul Aff. Ex. 65, at P1100A.4, Dec. 10, 2020.  Mr. Kieper was a Senior Acoustic Technician and performed the tests on the CAEv2.

The purpose of the Flange Report was "to document that the current length of the UltraFit Earplug end of the Combat Arms Plug is too short for proper insertion and how changing the fitting technique affected the results of real-ear tests of this plug."  *Id.* at 3M_MDL000005286.  It included details about the above-described fitting issue and Aearo's solution.  The Flange Report was an internal document.

Defendants conducted subsequent testing on the green end in 2005 and 2007.  *See* Paul Aff. Ex. 42, Dec. 10, 2020.  The results were NRRs of 14.8, 15.9, and 14.  *Id.*

**Testing for Yellow End**

Testing showed that the yellow end had an NRR of -2.  *See* Paul Aff, Ex. 27, Dec. 10, 2020 (noting the NRR of -2 for the "Combat Arms Plug").  Defendants labeled the yellow end as having an NRR of 0.  Paul Aff. Ex. 9 at 228:9-12, Dec. 10, 2020.  Testing conducted in 2006 suggested that the NRR was approximately 4.4.  *See* Paul Aff. Ex. 43, Dec. 10, 2020.  The yellow end of the CAEv2 was labeled with an NRR of 0 through the lifecycle of the product.  Paul Aff. Ex. 23, at 499:16-24.

**Sales/Marketing**

Aearo, and later 3M, sold the CAEv2 from 1999 until 2015.  *See, e.g.*, Paul Aff.

Ex. 13, at 3M_ MDL000332061, Dec. 10, 2020 (email from Brian Meyers saying that the

CAEv2 could not be sold with current packaging).

Two distinct product lines existed for these earplugs – the CAEv2, which were

marketed for service members, and the AO Safety Indoor/Outdoor E-A-R® Plugs,

otherwise referred to as the civilian product.  These products were identical except for the

labeling and packaging.

The CAEv2 was distributed in bulk packaging.  Bulk packaging contained 50 pairs

of CAEv2 in individual plastic bags boxed for shipping.  *See* Paul Aff. Ex. 51, at 159:25–

160:10, Dec. 10, 2020.  The bulk packaging, such as the shipments received by the

military, did not contain warning labels or instructions.  There may have been warnings

on the outside of the boxes, but not on individual sets of earplugs.  *See* Paul Aff. Ex. 22,

at 197:3–11, Dec. 10, 2020.  Some bulk packages contained one instruction sheet. Paul

Aff. Ex. 52, at 124:15-23, Dec. 10, 2020.  The instruction sheets did not instruct users to

fold back the flange.  *See* Paul Aff. Ex. 53, Dec. 10, 2020 (instruction sheet from Brock

Sales included with some CAEv2 distributions).  At some point, Defendants provided

warnings to the military audiologists regarding the need to fold back the flange.  *See*

Hulse Decl. Ex. 9, at 97:15-99:20, Jan. 7, 2021 (describing conversations with Doug

Ohlin, who instructed military audiologists about the modification to the CAEv2).

The civilian product was known as the AO Safety Indoor/Outdoor E-A-R® Plugs.

*See, e.g.,* Paul Aff. Ex. 57, Dec. 10, 2020.  They were similarly labeled with an NRR of

6

22 for the green end and 0 for the yellow end.  *See* Paul Aff. Ex. 57, Dec. 10, 2020.  The civilian product included "fitting tips" on the label as follows: "Fitting is easier if ear is pulled upward and outward during insertion and is also improved if the sealing rings of the outward directed plug are rolled back upon themselves."  Paul Aff. Ex. 57, Dec. 10, 2020.  The fitting tip was removed in approximately 2012.  *See* Paul Aff. Ex. 22, at 314:2-23, Dec. 10, 2020.  The fitting tip did not appear on the CAEv2.

The civilian earplugs were marketed for use while firing weapons.  *See, e.g.*  Paul Aff. Ex. 57, Dec. 10, 2020 (describing the product as "a breakthrough in hearing protection for shooters.").  The yellow end was labeled for "outdoor range use" while the green end was labeled for "indoor/outdoor range use."  Paul Aff. Ex. 57, Dec. 10, 2020.

**End of Distribution**

The Flange Report was disclosed in patent litigation.  The day after it was shown to a witness in a deposition in October 2015, 3M directed its employees to stop selling the CAEv2.  *See* Paul Aff. Ex. 13, at 3M_MDL000332063, Dec. 10, 2020 ("[W]e cannot distribute this with the current NRR on the package.").  The email directed employees to "cease shipping immediately."  Paul Aff. Ex. 90, Dec. 10, 2020.

Mr. Graves now requests leave to amend the Complaint to add a claim for punitive damages based on Defendants' knowledge of the potential harms caused by the improper fit of the CAEv2 and the decision to continue marketing and selling the earplugs without proper warnings.  Defendants argue that the CAEv2 were tested in compliance with EPA regulations and were safe and effective products.

## II.     Analysis

**Choice of Law and Standard of Review**

Minnesota Statutes section 549.121 governs claims for punitive damages:

> Upon commencement of a civil action, the complaint must not seek punitive damages. After filing the suit a party may make a motion to amend the pleadings to claim punitive damages. The motion must allege the applicable legal basis under section 549.20 or other law for awarding punitive damages in the action and must be accompanied by one or more affidavits showing the factual basis for the claim. At the hearing on the motion, if the court finds prima facie evidence in support of the motion, the court shall grant the moving party permission to amend the pleadings to claim punitive damages

Defendants argue that Mr. Graves failed to address the choice of law issue arising out of the "or other law" language in Minnesota Statutes section 549.191, and as such his motion should be denied.  Defendants also argue that Mr. Graves has not provided evidence to meet the standard for punitive damages under Mississippi law.  Mr. Graves responds that there is no conflict between Mississippi and Minnesota law, and that the Court has not yet determined which law will apply to this case.

In resolving a choice-of-law issue, "the threshold question is whether there is a conflict between those laws that would affect the outcome of this case." *State Farm Mut. Auto. Ins. Co. v. Great W. Cas. Co.,* 623 N.W.2d 894, 896 (Minn. 2001) (citing *Myers v. Gov't Employees Ins. Co.,* 302 Minn. 359, 363, 225 N.W.2d 238, 241 (1974)).  If there is no conflict, the analysis ends.  If a conflict exists, the Court must analyze the *Milkovich* factors to determine which law applies.  The five factors are "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the

better rule of law." *Jepson v. Gen. Cas. Co. of Wisconsin*, 513 N.W.2d 467, 470 (Minn.

1994) (citing *Milkovich v. Saari,* 203 N.W.2d 408, 412 (1973)).

The Court will therefore address the punitive damages laws of Minnesota (the

forum state and location of Defendant 3M) and Mississippi (Mr. Graves's residence and

the location of his alleged purchased of the CAEv2).

Under Minnesota law, "[p]unitive damages shall be allowed in civil actions only

upon clear and convincing evidence that the acts of the defendant show deliberate

disregard for the rights or safety of others." Minn. Stat. § 549.20, subd. 1(a).

Furthermore,

> A defendant has acted with deliberate disregard for the rights or safety of
> others if the defendant has knowledge of facts or intentionally disregards
> facts that create a high probability of injury to the rights or safety of others
> and:
> (1) deliberately proceeds to act in conscious or intentional disregard of the
> high degree of probability of injury to the rights or safety of others; or
> (2) deliberately proceeds to act with indifference to the high probability of
> injury to the rights or safety of others.

Minn. Stat. § 549.20, subd. 1(b)(1)-(2).

Under Mississippi law,

> Punitive damages may not be awarded if the claimant does not prove by
> clear and convincing evidence that the defendant against whom punitive
> damages are sought acted with actual malice, gross negligence which
> evidences a willful, wanton or reckless disregard for the safety of others, or
> committed actual fraud.

Miss. Code. Ann. § 11-1-65(1)(a).

The evidentiary standards (clear and convincing evidence) of the two states are

identical.  Minnesota's requirement that the defendant in question "show deliberate

disregard for the rights or safety of others" is substantially similar to the Mississippi requirement of "gross negligence which evidences a willful, wanton or reckless disregard for the safety of others."  Mississippi does not require plaintiffs to demonstrate actual malice, gross negligence, *and* actual fraud; only one is necessary.  *See* Miss. Code. Ann. § 11-1-65(1)(a).  Mr. Graves is not pursuing punitive damages under a theory of actual malice or actual fraud on the part of Defendants.  The statutory provision by which he seeks punitive damages under Mississippi law is substantially similar to the Minnesota statute.  Any minor difference is not outcome determinative, which ends the choice-of-law analysis. The Court will apply Minnesota law.

In response to Defendants' contention that Mr. Graves' failure to identify the proper standard in his opening brief warrants denial of his motion, Mr. Graves notes that he did address the Minnesota standard, which the Court will apply to his motion.  The Court declines to deny Mr. Graves's motion on that procedural ground.

At a hearing on a motion to amend the pleadings to claim punitive damages, "if the court finds prima facie evidence in support of the motion, the court *shall* grant the moving party permission to amend the pleadings to claim punitive damages."  Minn. Stat. § 549.191 (emphasis added).  "Prima facie evidence is that evidence which, if unrebutted, would support a judgment in that party's favor."  *McKenzie v. N. States Power Co.*, 440 N.W.2d 183, 184 (Minn. Ct. App. 1989) (internal citation omitted).  The Court does not consider new evidence from Defendants, but Defendants may introduce contextual evidence in response to Mr. Graves's motion.  *Berczyk v. Emerson Tool Col.*, 291 F. Supp. 2d 1004, 1013 (D. Minn. 2003).  *See also* Minn. R. Civ. P 106 ("When a writing or

10

recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.").

 "A mere showing of negligence is not sufficient; instead, the conduct must be done with malicious, willful, or reckless disregard for the rights of others." *Admiral Merchants Motor Freight, Inc. v. O'Connor & Hannan* 494 N.W.2d 261, 268 (Minn. 1992) (citing *Cobb v. Midwest Recovery Bureau Co.,* 295 N.W.2d 232, 237 (Minn.1980)).

### A. Knowledge of Facts or Intentional Disregard of Facts

To qualify for a punitive-damages claim, Mr. Graves must first demonstrate that Defendants had knowledge of facts or intentionally disregarded facts that created a high probability of injury to the rights or safety of others.

One example of Defendants' knowledge of facts that created a high probability of injury to the safety of others was the initial testing of the CAEv2. Defendants began selling the CAEv2 approximately six months *before* they began testing. While Mr. Berger noted that Defendants had conducted testing on similar products and earlier version, he acknowledged they did not have an NRR for the final version of the CAEv2 already being sold. *See* Paul Aff. Ex. 3, at 64:22 - 65:15.

Defendants knew that an issue existed with the CAEv2, as demonstrated by Aearo's decision to stop the initial testing of the green end of the earplugs before reaching ten subjects. Defendants argue that the tests were stopped due to fit issues, not because of the low projected NRR. This is not mere contextual evidence, however. It is

rebuttal evidence contradicted by the Flange Report, which states that "[t]he initial test 213015 was stopped after eight subjects because the results were variable and the NRR was quite low (11)."  Paul Aff. Ex. 30, at 3M_MDL000005286, Dec. 10, 2020.  The report, which was written by two people intimately involved in the testing and design of the CAEv2, specifically notes that these tested were stopped due to the low NRR, not because of an issue with the fit of the product, although the fit of the product may well have contributed to the low projected NRR.

> The Flange Report also noted a substantial problem with the CAEv2:
>
> When the solid plug was fitted during the first test (-015), the basal edge of the third flange of the yellow level-dependent plug sometimes pressed against the subject's earcanal [sic] opening and folded up. When the inward pressure on the plug was released, the yellow plug's flanges tended to return to their original shape and this sometimes loosened the plug, often imperceptibly to the subject.

Paul Aff. Ex. 30, at 3M_MDL000005286, Dec. 10, 2020.  After discovering this problem, Aearo did not alter the product's design.  Hulse Decl. Ex. 8, Jan. 7, 2021 (noting changes to the earplugs made in versions three and four, not the CAEv2).  Rather, it devised the above-described fitting solution involving the folding of the third flange. Aearo had knowledge of a critical flaw in the product, but failed to make any substantive changes or issue a warning or instructions about the fitting technique that might overcome the defect.  Because the design did not change from the initial test, Aearo knew that the CAEv2 provided substantially less hearing protection if users did not fold the flange back.

Defendants argue that they followed EPA regulations by folding the flange back during testing.  *See* Defs.' Opp'n 24-25.  If Defendants knew the importance of folding the flange for purposes of testing in compliance with EPA regulations, they knew the importance of all end users folding the flange back during use.  Despite this knowledge, Defendants failed to provide instructions regarding this modification.  Folding the flange back during testing does nothing to warn end users of the need to do the same while using the product.

Defendants note that Mr. Graves does not accuse Aearo or 3M of violating test procedures set forth by the EPA or using fraudulent data in its tests.  But neither is necessary to demonstrate that Defendants possessed knowledge of facts that created a high probability of injury to the rights or safety of others.  Defendants' internal documents and communications demonstrate a clear, critical flaw with the CAEv2 known to Defendants.  These documents also show that Defendants knew that this flaw caused the earplugs to provide less hearing protection than advertised if the user failed to fold the flange back.

Defendants also point out that the NRR is not a perfect system for determining the effectiveness of hearing protection.  *See* Defs.' Opp'n 3.  This may be true, but does not change the fact that Defendants knew of a problem with the CAEv2 that could be addressed only by folding the third flange and, despite that knowledge, declined to either change the design or provide adequate warnings of the problem to all end users.  At this stage, the Court is not concerned with the precise NRR.  Rather, it is focused on the fact that Defendants knew the label was incorrect unless a specific modification was made

13

and, according to Mr. Grave's evidence, failed to inform all end users of that critical modification.

As to the yellow end of the CAEv2, Defendants note that they could not have listed the NRR as -2 because the appropriate range is 0 to 30.  *See* Defs.' Opp'n 10.  A negative NRR would signal an issue with the earplug itself or with the test as that result falls outside of the possible range.  *See* 40 CFR § 211.204-1(c).

In addition to the testing results and information from the Flange Report, Defendants had anecdotal evidence that the CAEv2 was causing problems for users.  *See, e.g.,* Paul Aff. Ex. 50, Dec. 10, 2020 ("[W]e continue to hear that the soldiers don't understand how the plugs should be used or how to properly wear them."); Paul Aff. Ex. 75, Dec. 10, 2020 (quoting an article about hearing loss in veterans that referenced the CAEv2 as saying "audiologists and combat veterans say many troops who got the earplugs either ignored or misused them for lack of instruction.").

Defendants highlight that they have a history of "comprehensive testing" of hearing protection products.  *See* Defs.' Opp'n  4, 13.  This is rebuttal evidence.  Also, a history of testing does not warn end users of modifications to the CAEv2 found necessary by that testing.

Defendants also argue that the CAEv2 met military standards even without the "fitting tip."  They argue that the military created the Medical Procurement Item Description ("MPID"), which "described the level of noise attenuation required to protect soldiers from gunfire and steady state noises such as heavy machinery."  Defs.' Opp'n 11.  Defendants note that the CAEv2 met all of the military standards for the tests

14

identified by Mr. Graves.  Again, this is rebuttal evidence not to be considered at this stage.  In any event, military testing does not change the fact that Defendants were aware of the need to fold back the flange and failed to adequately provide that information to end users.

For the reasons described above, Mr. Graves has demonstrated that Defendants had knowledge of the issues with the CAEv2 at the early testing stage.  This knowledge was supplemented throughout the life cycle of the product by anecdotal evidence.  Defendants therefore had knowledge of facts or intentionally disregarded facts.

## B.  High Probability of Injury

Second, Mr. Graves must show that the facts known or intentionally disregarded would create a high probability of injury to the rights or safety of others.  Here, Mr. Graves is focused on the safety of consumers like him who purchased and used the CAEv2.

The CAEv2 was specifically marketed for use by service members in combat.  Given that these products were sold to the military during the early stages of the Iraq War, the chances of service members using them in combat were high and the risks obvious.  The civilian product was marketed for use at outdoor gun ranges.

Despite knowledge of a critical issue with the CAEv2, Defendants continued to market the product and sell it without a label or instructions addressing the folding back of the flange.  The CAEv2 did not contain specific instructions regarding the importance of folding back the flange to ensure effectiveness of the earplugs.  Due to the aborted initial testing of the CAEv2, Defendants were aware that failing to fold back the flange

resulted in an NRR of approximately 11, which provided significantly less hearing protection for the end users.  Defendants were also aware that products with an NRR of 11 would not be appropriate to market for use in combat.  *See, e.g.* Paul Aff. Ex. 45, at 84:20-85:15 (discussing that an NRR of 11 would be low for military applications and that 3M's products with an NRR of approximately 11 are marketed for "listening to music," not for combat).

In addition, Defendants knew that the issues with the CAEv2 and civilian counterpart might not be known to end users until it was too late.  Defendants specifically noted in the Flange Report that the seal would break "often imperceptibly to the subject." Paul Aff. Ex. 30, at 3M_MDL00005286, Dec. 10, 2020.  This necessarily means that some users would not know that there was an issue with the way they were using the earplugs.

Defendants were specifically aware that users *were* using the CAEv2 incorrectly (that is, without folding the flange).  *See* Paul Aff. Ex. 50, Dec. 10, 2020.  Defendants also knew about the high probability of risk associated with not using adequate hearing protection. *See, e.g.*, Paul Aff. Ex. 68, Dec. 10, 2020 (slides from Hearing Protection and Conservation Seminar presented by two 3M employees and sponsored by 3M detailing risk of exposure to loud noises without adequate hearing protection).  Defendants leveraged these risks as part of their marketing strategies.  *See* Paul Aff. Ex. 67 (advertisement for CAEv2 and other 3M hearing products including the phrase "Losing your hearing is not a requirement for serving your country.").  Those same risks existed when users did not fold back the third flange of the CAEv2.  Defendants were aware of

this due to the initial and subsequent testing of the CAEv2, which demonstrated substantial differences in hearing protection if the "fitting tip" was not employed.

Defendants point out that the CAEv2 was tested in accordance with the EPA regulations and found to have an NRR of 22 for the green end and 0 for the yellow end, demonstrating that the earplugs were safe and effective. *See, e.g.,* Defs.' Opp'n 23. This is more rebuttal evidence. In addition, all of these assertions are true *only if* the end user modified the product and folded back the flange while using the earplugs. Defendants' own preliminary testing indicated that the green end had a severely decreased NRR when subjects did not fold back the flange. If end users did not fold back the flange, the CAEv2 did not function as they did during the testing, and did not provide hearing protection to the degree advertised.

Defendants were aware that service members were using the CAEv2 incorrectly (without folding the third flange back) and that this would likely cause the earplug to dislodge, perhaps so slightly that the user would not notice. They also knew that this would be sufficient to break the earplug's seal and cause potential damage. The lack of instructions provided and the specific knowledge that the users of the military product, as Mr. Graves claims he was, were not getting proper instructions demonstrate the high probability of injury as a result of using the CAEv2.

Defendants knew that if the CAEv2 were used as intended (i.e., in loud areas to protect against hearing damage) but without the specific adjustment of the flange, a high probability existed that hearing injury would occur. Defendants also knew that users did not receive adequate warnings regarding the folding back of the flange. Defendants

17

therefore had knowledge of facts that created a high probability of risk to the safety of others.

### C. Disregard or Indifference to the High Probability to the Safety of Others

Third and finally, Mr. Graves must demonstrate that Defendants deliberately proceeded "to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others" or "with indifference to the high probability of injury to the rights or safety of others."  Minn. Stat. § 549.20, subd. 1(b)(1)-(2). Defendants sold the CAEv2 and its commercial counterpart without completing testing to calculate an accurate NRR for the green and yellow ends.  Subsequent preliminary testing revealed the problem with the green end.  Defendants devised a solution to address this issue with the product.  Defendants were aware of the importance of hearing protection and the high probability of injury that would result if there were issues with use of the product.  Even with this knowledge, Defendants did not add warnings to the CAEv2 and continued to market them for use in combat where users were exposed to continuous loud noises.

Then, despite knowing that there were issues with the fit/use of the product, Defendants did not modify fit instructions or add warnings.  There may have been a blanket warning on the bulk packaging, but that would have been only one warning for 50 pairs of earplugs.  In addition, Defendants have not been able to produce this alleged warning.  Rather than make changes, they continued to market and sell CAEv2 for combat use for more than a decade.  Defendants never recalled or otherwise modified the

CAEv2 or its civilian counterpart upon discovery of the issues with the flange that cause substantially lower NRRs.

Defendants contend that military audiologists were responsible for providing training for service members on how to properly use the CAEv2.  Defendants knew, however, that there were issues with the execution of this plan – either audiologists were not training service members at all, they were being trained inadequately, or there was some confusion as to the proper use of the earplugs.  *See, e g.*, Paul Aff. Exs. 50, 75, Dec. 10, 2020.  Defendants knew the importance of folding back the flange, and the risk of damage if users did not do so.  Even with this information, Defendants failed to provide specific user instructions for the bulk-packaged CAEv2.

Aearo, and later 3M, did not include detailed warnings or instructions on the CAEv2 that were sent to the military identifying the importance of folding back the flange.  It included this information as a "fitting tip" on the commercial version, which does not reflect the serious threat to the users' hearing posed by the potential dislodging of the earplug during use and indeed was later removed from the packaging.

Mr. Graves speculates that Defendants' motivation for continuing to market and sell the CAEv2 without instructions or modifications was financial in nature – the CAEv2 were extremely profitable as they were manufactured for less than $1.00 per pair and sold for $7.63, a considerable markup.  Paul Aff. Ex. 80, Dec. 10, 2020.  Mr. Graves does not, however, need to prove the motivation for Defendants' actions.  It is sufficient to demonstrate that, even when Defendant knew about serious issues with the CAEv2, they

19

intentionally disregarded the high degree of probability of injury to the safety of users. For the reasons discussed above, Mr. Graves has met his burden.

**Mississippi Law**

As noted above, the application of Minnesota or Mississippi law is not outcome determinative.  Under Mississippi law, Defendants acted with gross negligence (or perhaps acted intentionally) in a way that evidences a reckless disregard for the safety of CAEv2 users by failing to provide adequate warnings about the proper use of the earplugs despite their knowledge of the issues with the earplugs.

## III.    Conclusion

Mr. Graves has established a prima facie case based on clear and convincing evidence that Defendants had knowledge of facts that created a high probability of injury to the safety of others and acted in disregard or with indifference to that high probability of injury.  While Defendants have rebuttal evidence, the Court's role is not to weigh competing evidence at this stage.  Mr. Graves' motion to amend the complaint to add a claim for punitive damages is granted.

TF