## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *Brandon Adkins, 7:20-cv-00012; Michelle Blum, 7:20-cv-00122; Marcus Hensley, 7:20-cv-00093; Ronald Sloan, 7:20-cv-00001; William Wayman, 7:20-cv-00149.* | Judge M. Casey Rodgers  Magistrate Judge Gary R. Jones  **[FILED UNDER SEAL]** |

## PLAINTIFFS' OMNIBUS MOTION AND MEMORANDUM OF LAW TO EXCLUDE DEFENDANTS' EXPERT OPINIONS AND TESTIMONY

FILED USDC FLND PN
AUG 6 '21 AM 9:00

# TABLE OF CONTENTS

I.   Introduction ...................................................................................................1

II.  Legal Standard ............................................................................................1

III. Argument.....................................................................................................4

   A.  Motion to Heed Group A *Daubert* Orders ...........................................4

   B.  General *Daubert* Arguments ...............................................................5

      1.  Casali.............................................................................................5

      2.  Crawford .......................................................................................7

      3.  Flamme & Stephenson................................................................13

      4.  Kytomaa......................................................................................14

      5.  Neitzel.........................................................................................20

      6.  Sahmel........................................................................................22

      7.  Tuten ..........................................................................................23

   C.  Case-Specific *Daubert* Arguments.....................................................24

      1.  Driscoll.......................................................................................24

      2.  House ..........................................................................................27

      3.  Jacobs..........................................................................................29

      4.  Jones & LaBorde.........................................................................37

IV.  Conclusion.................................................................................................39

# TABLE OF AUTHORITIES

**Cases**

*Allison v. McGhan Med. Corp.*,
   184 F.3d 1300 (11th Cir. 1999) ................................................................. 4, 11, 12

*Anderson v. Akzo Nobel Coatings, Inc.*,
   260 P.3d 857 (Wash. 2011) .................................................................................11

*Coggon v. Fry's Elec., Inc.*,
   2019 WL 2137465 (N.D. Ga. Feb. 6, 2019) ........................................................14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ...................................................................................... *passim*

*Drs. Licensure Grp., Inc. v. Cont'l Cas. Co.*,
   2011 WL 13182969 (N.D. Fla. Sept. 26, 2011) ..................................................11

*Feliciano v. City of Miami Beach*,
   844 F. Supp. 2d 1258 (S.D. Fla. 2012) ..................................................................3

*Flury v. Daimler Chrysler Corp.*,
   427 F.3d 939 (11th Cir. 2005) ...............................................................................2

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ...........................................................................................4, 9

*Hendrix ex rel. G.P. v. Evenflo Co.*,
   609 F.3d 1183 (11th Cir. 2010) .............................................................................2

*Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen and Firemen Ret. Sys. of City
   of Detroit*, 50 F.3d 908 (11th Cir. 1995). ............................................................14

*In re: Abilify (Aripiprazole) Prod. Liab. Litig.*,
   299 F. Supp. 3d 1291 (N.D. Fla. 2018) .................................................................4

*In re: Chiquita Brands Int'l Inc.*,
   2019 WL 11497632 (S.D. Fla. Sept. 5, 2019) ............................................... 33, 37

*In re: Deepwater Horizon Belo Cases*,
2020 WL 6689212 (N.D. Fla. Nov. 4, 2020) ......................................................12

*In re: Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*,
2017 WL 8727998, (S.D.W. Va. Jan. 12, 2017) ...................................................9

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .......................................................................................2, 3

*Navelski v. Int'l Paper Co.*,
244 F. Supp. 3d 1275 (N.D. Fla. 2017) ......................................................... 2, 3, 4

*Omar v. Babcock*,
177 F. App'x 59 (11th Cir. 2006).......................................................................37

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
326 F.3d 1333 (11th Cir. 2003) .......................................................................2, 3

*Rink v. Cheminova, Inc.*,
400 F.3d 1286 (11th Cir. 2005) .......................................................................2, 3

*United States v. Frazier*,
387 F.3d 1244 (11th Cir. 2004) .......................................................................3, 4

*Wheeler v. Novartis Pharmaceuticals Corp.*,
944 F. Supp. 2d 1344 (S.D. Ga. 2013) .............................................................11

**Statutes**
Fla. Stat. § 440.15 ..........................................................................................38

**Rules**
Fed. R. Civ. P. 26 ........................................................................................1, 5

Fed. R. Evid. 403 .....................................................................................*passim*

Fed. R. Evid. 404 ..........................................................................................33

Fed. R. Evid. 702 .....................................................................................*passim*

Fed. R. Evid. 703 ....................................................................................................1

Plaintiffs submit this motion and incorporated memorandum of law to exclude the opinions and testimony of Defendants' designated experts.

## I.    INTRODUCTION

On January 8, 2021, Defendants disclosed 18 expert witnesses pursuant to Federal Rule of Civil Procedure 26(a)(2) in the above-captioned Group B cases.[1] As detailed below, Defendants' experts fail to meet the requirements for admissible expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702, 703, and 403. Pursuant to these authorities, Plaintiffs move to exclude the opinions and testimony of Dr. John Casali, Dr. James Crawford, Drs. Gregory Flamme and Mark Stephenson, Dr. Harri Kytomaa, Dr. Richard Neitzel, Ms. Jennifer Sahmel, Ms. Vickie Tuten, Mr. Dennis Driscoll, Dr. John House, Dr. Douglas Jacobs, and Drs. Derek Jones and Jennifer LaBorde.[2]

## II.    LEGAL STANDARD

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides

---

[1] Only 17 expert witnesses remain. Michael Seidemann had been designated as a case-specific expert in *Sloan*, but that designation was later withdrawn by Defendants.

[2] Contemporaneously with this motion, Plaintiffs have filed a motion to preserve their Group A motions to exclude the opinions of certain of Defendants' general expert witnesses, *see* Doc. 1595, that this Court denied in prior Orders. *See* Docs. 1651, 1680, 1690, 1701, 1708.

the analytical framework for determining whether expert testimony is admissible under Federal Rule of Evidence 702. *See Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). Rule 702 requires trial courts to perform a "gatekeeping" function to ensure that expert testimony is reliable and relevant. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The proponent of expert testimony must prove its admissibility by a preponderance of the evidence. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010).

Expert testimony is reliable and relevant when it satisfies the criteria of "qualification, reliability, and helpfulness"—"(1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is 'sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1286 (N.D. Fla. 2017). These are "distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

To be qualified, an expert must "ha[ve] sufficient 'knowledge, skill, experience, training, or education' to form a reliable opinion about an issue that is

2

before the court." *Navelski*, 244 F. Supp. 3d at 1286. "This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012) (internal quotation marks omitted).

To be reliable, "an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *Navelski*, 244 F. Supp. 3d at 1286 (citing *United States v. Frazier*, 387 F.3d 1244, 1261-62 (11th Cir. 2004)). Relevant factors include whether: (1) "the scientific technique can be or has been tested"; (2) "the theory or technique has been subjected to peer review or publication"; (3) "the technique has a known or knowable rate of error"; and (4) "the technique is generally accepted in the relevant community." *Id.* (citing *Daubert*, 509 U.S. at 593-94). Such factors are illustrative, not exhaustive. *See Quiet Tech.*, 326 F.3d at 1341; *Rink*, 400 F.3d at 1292 (courts "have substantial discretion in deciding how to test an expert's reliability"). Although reliability is a flexible inquiry, *Kumho Tire*, 526 U.S. 141-42, the analytical focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

To be helpful, "expert testimony must be relevant to an issue in the case and offer insights beyond the understanding and experience of the average citizen."

*Navelski*, 244 F. Supp. 3d at 1287. Relevant expert testimony "advances a material aspect of the proposing party's case and 'fits' the disputed facts." *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1305 (N.D. Fla. 2018). When "too great an analytical gap" exists between the facts and the proffered opinion, the expert opinion does not "fit." *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997)).

Ultimately, a court's gatekeeping "role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999). Even if expert testimony satisfies the admissibility requirements of *Daubert* and Rule 702, it may still be excluded under Rule 403 if its probative value "is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming." *Frazier*, 387 F.3d at 1263. Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," a trial court must carefully "weigh[] possible prejudice against probative force under Rule 403." *Id.*

### III.   ARGUMENT

#### A.   Motion to Heed Group A *Daubert* Orders

The Group B Plaintiffs incorporate by reference all motions to exclude Defendants' experts asserted in the Group A Plaintiffs' Omnibus Motion and

Memorandum of Law to Exclude Defendants' Expert Opinions and Testimony filed under seal on January 8, 2021. *See* Doc. 1595. Further, Plaintiffs move the Court to heed its prior rulings in the Group A *Daubert* Orders, *see* Docs. 1651, 1680, 1690, 1701, 1780, to the extent that (1) the Court granted the Group A Plaintiffs' motions to exclude the opinions of Defendants' experts, *see* Doc. 1595, and (2) Defendants now offer those same expert opinions for the Group B Plaintiffs.[3]

B.   **General *Daubert* Arguments[4]**

1.   ***Casali***

Because Dr. Casali offers many of the same general opinions as he did for Group A, this Court should also exclude those opinions in Group B.[5] Specifically, Casali should not be permitted to opine about:

---

[3] In Group A, Defendants disclosed Elliott Berger and Dr. Eric Fallon as "hybrid" expert witnesses under Fed. R. Civ. P. 26(a)(2)(C). *See* Group A Expert Witness Disclosure Letter from R. Brock to B. Aylstock, Nov. 9, 2020 ("PX1"). However, Defendants did not disclose Berger and Fallon as expert witnesses in Group B. *See* Group B Expert Witness Disclosure Letter from R. Brock to B. Aylstock, Jan. 8, 2021 ("PX2"). Even if Defendants had timely disclosed Berger and Fallon as "hybrid" expert witnesses in Group B, which they did not, their opinions should still be excluded to the extent set forth in the Court's Group A *Daubert* Orders. *See* Docs. 1651, 1680, and 1690.

[4] In addition to giving general expert opinions, Crawford, Flamme & Stephenson, Neitzel, and Sahmel also give case-specific opinions in certain of the Group B cases. Though listed under the heading "General *Daubert* Arguments," Plaintiffs address these experts' general and case-specific opinions herein. The Court should note that Defendants merely adopted the Group A general reports of the aforementioned experts and Tuten for Group B.

[5] *See generally* PX3(Casali-1-160).

- Defendants' or the military's state of mind;[6]

- The military's alleged duties, responsibilities, and policies;[7]

- The military's hearing conservation policies and instructions, and compliance or noncompliance therewith;[8]

- Federal government procurement, including the specific process for procuring the CAEv2;[9]

- Legal opinions or interpretations of the MPID, including any determination that Defendants or the CAEv2 "complied with" or "satisfied" the MPID;[10]

- The reasonableness or infeasibility of any provision of the MPID, or whether Defendants were required to comply with a particular provision of the MPID;[11] or

- The persons or entities responsible for any particular provision of the MPID.[12]

Additionally, in Group A, the Court excluded testimony from Plaintiffs' expert Eddins regarding *h*MIRE testing on the CAEv2 surrogate and *m*MIRE testing with the mandibular motion simulator (as well as Juneau's related testimony), and correspondingly excluded Casali's testimony regarding the same.[13] If the Court

---

[6] Doc. 1690 at 15.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at 16.

[12] *Id.*

[13] *Id.* at 14, n.12.

similarly limits Eddins' and Juneau's testimony in Group B, Casali's testimony on these subjects should be excluded, too.

### 2. *Crawford*

First, because Dr. Crawford offers the same general opinions as he did for Group A, those opinions should be excluded for Group B. Specifically, Crawford should not be permitted to opine about:

- Army-wide success or failure of hearing conservation efforts;[14]

- Instructions provided to individual servicemembers at fittings;[15]

- Understandings among the military audiologist community;[16]

- The Army's implementation of regulations;[17]

- The Army's alleged emphasis on testing over NRR values;[18]

- The Army's reliance on manufacturer's instructions/training;[19]

- The alleged need for individual fit testing;[20] or

- "HEAR" training materials.[21]

---

[14] Doc. 1651 at 3.
[15] *Id.* at 16.
[16] *Id.*
[17] *Id.* at 16-17.
[18] *Id.* at 17.
[19] *Id.*
[20] *Id.*
[21] *Id.* at 18.

Second, this Court should exclude two of Crawford's opinions in *Adkins*. Crawford's opinion that cochlear synaptopathy (hidden hearing loss) does not exist is an improper general opinion that also lacks foundation. Meanwhile, his opinion regarding Adkins' marijuana use is unhelpful to the jury and should be excluded under Rule 403.

### i.       *Crawford has no foundation for his opinions discounting cochlear synaptopathy.*

The Court should exclude Crawford's opinion that cochlear synaptopathy is not a legitimate condition. In his case-specific report for Adkins, Crawford opines that cochlear synaptopathy is not "a general[ly] accepted medical diagnosis."[22] He later opines that Adkins would not have cochlear synaptopathy "even if [it] were recognized in the scientific literature," and that "hidden hearing loss, as explained by synaptopathy[,] has not ever been shown to exist in humans."[23]

Crawford may opine about Adkins' hearing test results, but this Court should preclude him from opining that cochlear synaptopathy is not a legitimate condition. One reason is straightforward: Crawford is improperly injecting a general causation opinion into a specific causation report. Any opinions about whether cochlear synaptopathy is scientifically legitimate are general. Crawford did not discuss this

---

[22] PX4(Crawford-(Adkins)-5).
[23] *Id.* at 10-11.

issue in his general report.[24] Thus, he should be precluded from giving this opinion as a case-specific expert. *See In re: Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2017 WL 8727998, at *2 (S.D.W. Va. Jan. 12, 2017) (excluding general causation opinions offered by case-specific expert).

Crawford also has no scientific foundation for opining—or suggesting—that cochlear synaptopathy is scientifically invalid. Each time he skeptically references "hidden hearing loss" in his report, Crawford cites no scientific articles or testimony to support his statement.[25] These unsupported opinions are classic *ipse dixit*. *See Joiner*, 522 U.S. at 146 (rejecting opinions "connected to existing data only by the *ipse dixit* of the expert").

Crawford admitted he reviewed three articles on cochlear synaptopathy only because the Plaintiff's expert, Dr. Bennett, had relied on them.[26] Notably, when asked whether he had "looked for any literature that contradicts the theory of hidden hearing loss or cochlear synaptopathy," Crawford responded: "No."[27] When asked if he had reviewed any articles on cochlear synaptopathy from scientific journals, Crawford responded: "I feel like I have, but I couldn't say without going back and

---

[24] *See generally* PX5(Crawford).
[25] PX4(Crawford-(Adkins)-3-5, 10-11).
[26] PX6(Crawford-Dep-63:11-23).
[27] *Id.* at 66:9-13.

looking at it."[28] When presented with the articles cited by Plaintiff's expert, Crawford did not claim they support his opinions, only that they do not contradict his opinions.[29] Crawford further admitted that cochlear synaptopathy is not "on [his] radar as a consideration" when he treats patients.[30]

Although Crawford has no scientific support for his opinions about cochlear synaptopathy, recent guidance from the World Health Organization shows that cochlear synaptopathy is a legitimate condition. The WHO wrote that hidden hearing loss "refers to the condition where an individual experiences common symptoms associated with noise-related auditory damage such as difficulty in hearing noise, tinnitus, and hyperacusis."[31] The WHO adds that "[t]he condition is attributed to the destruction of synaptic connections between hair cells and cochlear neurons (cochlear synaptopathy) which occurs…as a result of exposure to noise."[32]

Crawford has no foundation for claiming that this well-established condition does not exist, and he should be precluded from giving that opinion at trial.

### ii. Crawford's opinions about marijuana use are equivocal and unhelpful to the jury.

This Court should also exclude Crawford's opinions that attempt to link

---

[28] *Id.* at 69:12-18.
[29] *Id.* at 78:1-14, 84:8-17, 88:18-22.
[30] *Id.* at 82:25-83:11.
[31] WORLD HEALTH ORGANIZATION, WORLD REPORT ON HEARING 27 (2021) ("PX7").
[32] *Id.*

Adkins' marijuana use to his tinnitus. Crawford fails to opine about a **causal** impact with any degree of medical certainty, and literature regarding marijuana use does not show a causal connection with tinnitus. Crawford's opinion also should be excluded under Rule 403.

Crawford does not opine that marijuana caused Adkins' tinnitus. Rather, he states that he "cannot rule out the possibility that Adkins' tinnitus is the result of his chronic marijuana usage." Crawford's inability to "rule out" marijuana as a cause of tinnitus is unhelpful to the jury and, therefore, should be excluded. *See Drs. Licensure Grp., Inc. v. Cont'l Cas. Co.*, 2011 WL 13182969, at *2 (N.D. Fla. Sept. 26, 2011).

Expert testimony is inadmissible unless a competent expert testifies that a given event caused the plaintiff's injuries. *Wheeler v. Novartis Pharms. Corp.*, 944 F. Supp. 2d 1344, 1352 (S.D. Ga. 2013) (citing *Allison*, 184 F.3d at 1320). Where an expert's level of certainty is insufficient to establish causation, the expert's opinion is irrelevant. *Allison*, 184 F.3d at 1320. Under Washington law, which applies to the *Adkins* case, "[e]xpert medical testimony must meet the standard of reasonable medical certainty or reasonable medical probability." *Anderson v. Akzo Nobel Coatings, Inc.*, 260 P.3d 857, 864 (Wash. 2011). Clearly, Crawford's testimony regarding marijuana use falls well short of that standard. Failing to rule out marijuana use says nothing about whether marijuana **caused** Adkins' tinnitus.

11

There is also no scientifically established causal link between marijuana use and tinnitus. Crawford's report merely lists marijuana as one of several factors that "have all been associated with tinnitus."[33] Crawford fails to explain why marijuana, among those factors, is the most likely cause of Adkins' tinnitus—which, as discussed above, he may not even believe.

While Crawford cites articles associating marijuana and tinnitus, he admits that none of those articles draw a causal link, adding that "a lot of things…are associated with tinnitus, but…it's…much more difficult to definitively show that something causes tinnitus."[34] Essentially, Crawford admits he cannot give an opinion that meets the required standard under Washington law, and he admits the literature does not causally link marijuana and tinnitus.

As the Eleventh Circuit has stated, "showing association is far removed from proving causation." *Allison*, 184 F.3d at 1315 n.16. An expert who establishes an association can then take the next step to causation by analyzing additional factors. *See In re: Abilify*, 299 F. Supp. 3d at 1307; *In re: Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *10 (N.D. Fla. Nov. 4, 2020). Here, however, Crawford did not do so. He simply noted the association. That opinion is unhelpful to the jury in

---

[33] PX4(Crawford-(Adkins)-5-6).
[34] PX6(Crawford-Dep-101:17-102:3).

determining whether marijuana—as opposed to noise exposure or some other factor—caused Adkins' tinnitus.

Finally, any reference to marijuana use should be excluded under Rule 403. The analysis above explains why the probative value of Crawford's opinion is low. Conversely, the potential for unfair prejudice, misleading the jury, and wasting time is high. *See* Fed. R. Evid. 403. Marijuana is an illegal drug in many places, so jurors might hold Adkins' use against him, causing unfair prejudice. Thus, he likely would face unfair prejudice. There is also a substantial risk of misleading the jury. If Crawford testifies about an "association" between marijuana use and tinnitus, the jury might interpret that testimony as saying marijuana **caused** Adkins' tinnitus. Yet, Crawford is unable and unwilling to make that claim. And, for all these reasons, there is a substantial risk of wasting time with this issue.

This Court, therefore, should exclude Crawford's testimony about Adkins' marijuana use.

### 3. *Flamme & Stephenson*

#### a. *Flamme's and Stephenson's opinions on the Army Hearing Conservation Program should be excluded.*

In Group A, the Court excluded testimony from Drs. Flamme and Stephenson (1) that "any DoD program was 'implemented inadequately' or otherwise failed," (2) that "the military's failure to conduct an annual audiogram" caused any Plaintiff's injuries, or (3) that "anything the military did put Plaintiffs 'at greater risk

of sustaining a hearing impairment' or otherwise caused their injuries."[35] The Court should exclude these same opinions offered by Flamme and Stephenson in Group B.

Flamme and Stephenson now repeat the same excluded opinions regarding Sloan and Wayman. They opine (1) that "inadequate implementation of the DoD hearing conservation program"[36] exacerbated Sloan's and Wayman's injuries; (2) that the military's "failure to conduct monitoring audiometry denied Mr. [Sloan/Wayman] the benefit of annual inspection and fitting instructions for his hearing protectors;"[37] and (3) that these failures "put Mr. [Sloan/Wayman] at greater risk of sustaining a hearing impairment."[38] As this Court has previously held, such testimony is not helpful. *See* Doc. 1680; *Coggon v. Fry's Elec., Inc.*, 2019 WL 2137465, at *3 (N.D. Ga. Feb. 6, 2019); *Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen and Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908 (11th Cir. 1995).

Thus, Flamme's and Stephenson's opinions on DoD safety and hearing conservation programs should be excluded.

### 4. *Kytomaa*

Dr. Kytomaa is a mechanical engineer and certified fire and explosion investigator employed by Exponent, Inc. Kytomaa has produced an original report

---

[35] Doc. 1690 at 13.

[36] PX8(Flamme/Stephenson-(Wayman)-25); PX9(Flamme/Stephenson-(Sloan)-35).

[37] PX8(Flamme/Stephenson-(Wayman)-22); PX9(Flamme/Stephenson-(Sloan)-29).

[38] PX8(Flamme/Stephenson-(Wayman)-25); PX9(Flamme/Stephenson-(Sloan)-35).

and three supplemental reports in this litigation. The opinions expressed in his original expert report and first supplemental report were the subject of a prior *Daubert* challenge and ensuing Order. *See generally* Doc. 1690 at 16-18. In its prior Order, this Court excluded many of Kytomaa's opinions related to ear molds and testing methods employed by Plaintiffs' experts, finding him unqualified to render those opinions. *See id*. Specifically, the Court excluded the following of Kytomaa's opinions in Group A, which should be excluded in Group B also:

- "Kytomaa will not be permitted to offer opinions regarding Dr. Eddins' *h*MIRE testing on the CAEv2 surrogate and his *m*MIRE testing with the mandibular motion simulator (as well as Juneau's related testimony)";[39]

- "Dr. Kytomaa is not qualified to offer opinion testimony about Dr. Eddins and Juneau's silicone ear replicas or their testing methods";[40] and

- "Dr. Kytomaa is not qualified to offer opinions about causation as he is not a medical doctor or audiologist."[41]

However, based on his education and professional experience in mechanical engineering, the Court did permit Kytomaa to offer expert rebuttal testimony regarding three discreet topics: (1) Aearo's testing with ARC; (2) Aearo's quality assurance processes; and (3) the material components of the CAEv2.

Plaintiffs now seek to exclude the opinions set forth in Kytomaa's second and

---

[39] Doc. 1680 at 17.
[40] *Id.*
[41] *Id.*

15

third supplemental reports to the extent those opinions exceed his qualifications and the limits of this Court's prior Order.

### a.   *Kytomaa's Second Amended Supplemental Report*

In his second amended supplemental report, Kytomaa purports to respond to and rebut the expert opinions contained in Dr. Armstrong's November 19, 2020 expert report.[42] Previously, this Court held, *inter alia*, that:

> Dr. Kytomaa is not qualified to offer opinion testimony about Dr. Eddins and Juneau's silicone ear replicas or their testing methods because he has never worked in the field of audiology, conducted, or evaluated REAT or MIRE testing, otherwise performed research or work with human ears and/or ear molds, or adequately explained how his general engineering background provides a sufficient basis for his proposed opinions on those matters.

Doc. 1690 at 17. Accordingly, the Court limited Kytomaa's testimony to rebuttals of "Richard McKinley and Dr. Stephen Armstrong's opinions related to *Aearo's* testing" with the ARC and "its [*Aearo's*] quality assurance processes, as well as the material composition of the CAEv2." *Id*. at 17 (emphasis added).

Despite this limitation, Kytomaa's second amended report still seeks to offer rebuttal testimony on audiology issues, human acoustics, and the testing methods employed by Armstrong (opinions that are unrelated to Aearo's testing or quality assurance processes, or the material composition of the CAEv2). Indeed, the vast

---

[42] PX10(Kytomaa-2nd-Supp-3).

majority of Kytomaa's second amended report attacks Armstrong's modeling and simulations for the CAEv2, with Kytomaa purporting to identify "specific flaw[s] in his [Armstrong's] attempt to model the CAEv2 earplug[.]"[43]

These criticisms range from general opinions that Armstrong's experiments were "too simplistic to explain the complex acoustic behavior present in nonlinear earplugs"[44] to specific allegations that Armstrong failed to "consider or evaluate the multiple flanking paths sound takes as it travels to the ear drum[.]"[45] Because Kytomaa "has never worked in the field of audiology…[or] perform[ed] research or work with human ears and/or ear molds," he is not qualified to render opinions about audiology or the appropriateness of Armstrong's modeling and testing methods with respect to the CAEv2. Doc. 1690 at 17. Kytomaa's opinions should instead be limited to "*Aearo's* testing" with the ARC and "its [*Aearo's*] quality assurance processes, … [and] the material composition of the CAEv2," as authorized by the Court's prior Order. *Id*. (emphasis added).

### b.   *Kytomaa's Third Amended Supplemental Report*

Like his second amended report, the opinions set forth in Kytomaa's third amended report exceed the boundaries of his expertise and this Court's prior Order.

---

[43] *Id*. at 4.

[44] *Id*. at 12.

[45] *Id*. at 2.

Specifically, Kytomaa's third amended report purports to rebut the opinions offered by Plaintiffs' expert Stephen Gilder.[46]

In doing so, however, Kytomaa again oversteps his qualifications. For example, he (1) opines that "slippage is common to earplugs";[47] (2) provides his unsubstantiated "understanding that CAEv2 is a one-size-fits-most design and that soldiers who could not achieve a proper fit were offered alternative HPD options;"[48] and (3) opines about the U.S. military's "outlook" on "provid[ing] trained staff to evaluate earplug fit in soldiers."[49] Even though he has never worked with a hearing protection device before this case,[50] he also purports to offer his "expert" opinion regarding specific aspects of the CAEv2's attenuation and design (unrelated to its material composition).

For instance, after admitting he is not an expert on insertion loss or acoustics attenuation,[51] Kytomaa opines that "even if the stem is not perfectly centered within

---

[46]  PX11(Kytomaa-3rd-Supp-2);   PX12(Kytomaa-Dep-(2/9/2021)-15:13-15)   (Q: "Well, you are rebutting the opinions of Dr. Gilder in your [third amended] report, correct?" A: "Yes[.]").

[47] PX11(Kytomaa-3rd-Supp-8-9).

[48] *Id*. at 9.

[49] *Id*. at 10.

[50] PX13(Kytomaa-Dep-(1/4/21)-40:19-24) (Q: "And you've never worked on the acoustic performance of a hearing protection device before this case, correct?" A: "That's right[.]").

[51] PX14(*EHK*-Trial-Tr-(4/26/2021)-324:24-325:6) (Q: "You gave some testimony about insertion loss at attenuation, but you don't consider yourself an expert in insertion loss and attenuation testing, right?" A: "Yeah. With human beings, I do not

the ear canal, the flexible flanges are able to acoustically seal the ear canal where they are in contact, even if the contact is uneven around the circumference of the ear canal."[52]

He goes on to opine that the "characterization of the CAEv2 dimensions and stem characteristics as 'dangerous design defects' is incorrect and misleading,"[53] concluding "there is no experimental or theoretical evidence to suggest that the design of the CAEv2 stem had any adverse effect on the earplug's attenuation."[54] Kytomaa is unqualified to render such opinions.

Again, Kytomaa is a mechanical engineer. He is admittedly not an audiologist[55] and has never analyzed human ears[56] or performed acoustic work relative to human ears.[57] In other words, he is not a "human acoustic person";

---

consider myself an expert on, let's say how you perceive hearing, but on engineering, yes.").

[52] PX11(Kytomaa-3rd-Supp-10).

[53] *Id*. at 9.

[54] *Id*. at 10.

[55] PX13(Kytomaa-Dep-(1/4/21)-117:12-13) (Q: "And in your professional profile … you don't mention anywhere in there any background or experience in audiology, correct?" A: "That's correct, I'm not an audiologist."); *id*. at 39:15-18 (Q: "You haven't worked in the field of audiology, if you will?" A: "I've done acoustics work, but not specific to the human ear."); PX14(*EHK*-Trial-Tr-(4/26/2021)-307:17-20) (Q: "But you've never done any work with attenuated hearting protectors, right?" A: "No, I'm not an audiologist. I don't work on hearing protectors."); *id*. at 307:21-22; Doc. 1690 at 17 (Kytomaa is not an audiologist).

[56] PX13(Kytomaa-Dep-(1/4/21)-351:19-23) (Q: "How many human ears have you ever analyzed?" A: "I have not – I have not analyzed human ears.").

[57] *Id*. at 39:15-18.

instead, he has experience in "engineering acoustics."[58] He is also not a member of any professional acoustical or audiology societies.[59] He is therefore not qualified to offer expert opinions relative to audiology, human acoustics, or the appropriateness of the CAEv2's design, including with respect to its stem, flexible flanges, and fit.

Accordingly, as this Court previously found, Kytomaa's testimony should be limited to "*Aearo's* testing" with the ARC and "its [*Aearo's*] quality assurance processes [and] the material composition of the CAEv2." *See* Doc. 1690 at 18 (emphasis added).

### 5.   *Neitzel*

As with the Group A Plaintiffs, Dr. Neitzel, an industrial hygienist, offers numerous impermissible opinions against various Group B Plaintiffs, including: (1) the Army supposedly had a legal duty to provide HPDs and written instructions regarding HPDs to soldiers; (2) based on anecdotal reports from some Army audiologists and the excluded GAO report, the Army supposedly did not consistently implement hearing conservation procedures across bases regarding the CAEv2; (3) based on anecdotes, the Army supposedly did not "routinely and consistently" deliver hearing protection fitting and evaluation for some of the Group B Plaintiffs; and (4) the Group B Plaintiffs supposedly do not exhibit hearing issues "consistent

---

[58] PX14(*EHK*-Trial-Tr-(4/26/2021)-324:22-23).
[59] PX13(Kytomaa-Dep-(1/4/21)-110:6-113:8).

with" noise-induced hearing loss, even though Neitzel is not a medical professional and did not apply a medically-accepted methodology for that diagnosis.[60]

In his Group B deposition, Neitzel confirmed that the same deficiencies in his Group A opinions all still apply to his Group B opinions. These problems include, *inter alia*, that he supposedly is not providing a "diagnosis," even though he clearly is; that he has no personal experience or expertise to inform his opinions about Army hearing conservation practices; that he thinks he is qualified to opine on the nature of a legal duty; and various other problems the Court previously found invalidated his opinions entirely.[61]

To avoid unnecessary briefing, Plaintiffs direct the Court to their pre- and post-trial briefing on the reasons Neitzel's opinions should be excluded in the entirety. *See* Doc. 1595 at 26-35. Given that he provides substantively identical

---

[60] PX15(Neitzel-2-5, 36-37, 73-77); PX16(Neitzel-(Blum)-6, 28-29); PX17(Neitzel-(Sloan)-5-6, 35-37); PX18(Neitzel-(Wayman)-5, 26-27); Doc. 1701 at 5-6, 20-22, 25-28.

[61] *See, e.g.*, PX19(Neitzel-(2/11/2021)-65:20-66:16) (no personal experience fitting the CAEv2 and not trained by the Army to fit the CAEv2); *id*. at 167:14-168:9 (not "giving a diagnosis," but opining that Blum's hearing loss is "not consistent with" noise exposure); *id*. at 220:22-223:9 (opining that an employer such as the military is "ultimately responsible for keeping their workers safe and healthy," even if the employer, unknowingly, bought a defective product that was incapable of providing adequate hearing protection); *id*. at 260:23-261:20 (has conducted no studies extrapolating hearing conservation practices from one military base to another base).

opinions against some of the Group B Plaintiffs, his opinions should be excluded for the same reasons. *See* Doc. 1701 at 5-6, 11-28.

### 6. *Sahmel*

Just like Neitzel, Ms. Sahmel's Group B opinions almost completely track the impermissible opinions she offered against the Group A Plaintiffs. These opinions include: (1) that the CAEv2 does not contribute to overall noise exposure; (2) that the Army, and not 3M, was supposedly legally responsible for the safety and effectiveness of the CAEv2, and for providing soldiers with written instructions explaining how to properly wear an unsafe earplug; and (3) that the Army's hearing conservation program was inconsistently implemented based on anecdotal reports and conclusory statements.[62]

Also, like Neitzel, Sahmel confirmed in her Group B deposition that the same deficiencies of her Group A opinions still applied, including that, *inter alia*, there is no evidence that Adkins received inadequate training on using the CAEv2, and that she is not qualified to rule out the CAEv2 as a cause of their hearing injuries.[63]

---

[62] PX20(Sahmel-11-14, 58-60); PX21(Sahmel-(Adkins)-5, 22-23).
[63] PX22(Sahmel-(2/2/2021)-98:11-23) (Adkins simply "did not recall" receiving instructions on the use of the CAEv2); *id*. at 101:7-102:5 (soldiers stationed at Fort Lewis received the wallet card fitting instructions); *id*. at 102:8-17 (does not know whether 3M ever provided instructions on how to use the CAEv2); *id*. at 103:9-16 (outside the scope of opinion whether 3M agreed to provide use instructions to Army); *id*. at 104:2-22 (did not consider that there was a procurement contract between 3M and the Army that required 3M to provide CAEv2 instructions to the

22

Given these continued deficiencies, Plaintiffs respectfully request that the Court exclude Sahmel's opinions for the same reasons as previously briefed and subsequently ordered by the Court. *See* Doc. 1595 at 35-42; Doc. 1701 at 3-22, 28-30.

### 7.    *Tuten*

Plaintiffs respectfully request that the Court exclude Ms. Tuten's opinions[64] for the same reasons as previously briefed and subsequently ordered by the Court. *See* Doc. 1595 at 42-44; *see generally* Doc. 1651. Specifically, this Court should exclude the following opinions:

- Opinions "regarding the *Army-wide* success or failure of hearing conservation efforts or a purported 'widespread' culture of compliance or non-compliance with Army safety and hearing conservation program requirements";[65]

- Opinion that "the [Army Hearing Program] was not implemented consistently *across installations*";[66]

- Opinions "regarding the 'frustrations expressed' by unidentified 'military audiologists' and 'anecdotal information relayed to [her]' by 'soldiers'";[67]

---

Army); *id*. at 108:6-15 (whether Adkins has "normal hearing" is a diagnosis that is outside the scope of Sahmel's opinions); *id*. at 127:4-128:5 (acknowledging Adkins' testimony that he used the CAEv2 until at least November 2007).

[64] *See generally* PX23(Tuten-1-19).

[65] Doc. 1651 at 3 (emphasis in original).

[66] *Id*. at 4 (emphasis in original).

[67] *Id*. at 5.

- Opinion "that any lack of resources and/or operational support constituted a failure of the Army Hearing Program Army-wide and led to hearing injuries in servicemembers as a whole";[68] and

- Opinion that "she 'understand[s] that information was provided by the Army Public Health Command regarding a recommendation to roll the last flange back to get a better insertion of the CAEv2' or that 'anecdotal information relayed to me was that no instruction was provided by the military staff handing out the CAEv2.'"[69]

### C.   **Case-Specific *Daubert* Arguments**

#### 1.   *Driscoll*

Mr. Driscoll is a mechanical engineer and board-certified noise control engineer. Doc. 1780 at 5. He is neither a medical professional nor an industrial hygienist. As such, his area of expertise solely includes measuring noise, *if* he uses appropriate tools to do so.[70] He has no ability to diagnose hearing issues, does not design hearing conservation programs, has no personal expertise in or experience with any hearing conservation program relevant to the bellwether plaintiffs, and has no personal expertise in or experience with any of the bellwether plaintiffs' specific working environments.[71] Moreover, Driscoll conceded at his deposition during the Group B bellwether discovery process that he never visited any of the Group B

---

[68] *Id.* at 15.

[69] *Id.*

[70] PX24(Driscoll-Dep-(2/8/2021)-39:17-40:17) (Driscoll "always" takes his own specialized noise measurements); *id.* at 64:14-65:10 (personal noise dosimeter required to conduct a detailed assessment of an individual's noise exposure).

[71] *Id.* at 12:5-13:3, 15:8-11, 58:13-21, 64:14-65:10, 66:5-14.

Plaintiffs' work locations for his analyses, nor performed any sort of differential analysis regarding any Group B Plaintiff's hearing issues.[72]

Despite these limitations, just as he did with the Group A Plaintiffs, Driscoll once again offers several improper opinions. These include that (1) Hensley's noise-induced hearing loss was not due to his military service,[73] (2) the Army Hearing Program and CAEv2 supposedly "performed as intended throughout Hensley's military service,"[74] and (3) Hensley was periodically exposed to significant noise in his military career.[75] Each of these opinions violate a variety of the Court's previous rulings as to Driscoll specifically and numerous other witnesses generally.

*First*, Driscoll's diagnostic opinion regarding the source of Hensley's NIHL is just as inadmissible as when he provided similar opinions against Group A Plaintiffs. Doc. 1780 at 6-9. He is not a medical professional, he relies on other expert's opinions, and he applies no discernible methodology for the diagnosis.[76] Accordingly, the Court should exclude this opinion.

---

[72] *Id.* at 12:24-13:3, 65:4-10, 225:7-9.

[73] PX25(Driscoll-1st-Am-(Hensley)-8); PX24(Driscoll-Dep-(2/8/2021)-153:5-13).

[74] PX25(Driscoll-1st-Am-(Hensley)-8); PX24(Driscoll-Dep-(2/8/2021)-141:1-6).

[75] PX24(Driscoll-Dep-(2/8/2021)-72:11-73:17).

[76] PX25(Driscoll-1st-Am-(Hensley)-1-8); PX24(Driscoll-Dep-(2/8/2021)-74:2-18) (does not "have enough reference" to offer an opinion on whether Hensley exposed to unsafe sound levels outside the military).

*Second*, Driscoll's opinion that the Army Hearing Program and CAEv2 "performed as intended throughout Mr. Hensley's military service" is a diagnostic opinion in disguise. For this opinion, he lists various audiograms and concludes they show "that Mr. Hensley separated from the U.S. Army with no ear-related issues, including tinnitus."[77] This, of course, is inherently diagnostic in nature and involves no differential etiology. It is therefore inadmissible for the same reasons the Court previously held with respect to Driscoll's inappropriate diagnostic opinions. Doc. 1780 at 6-9. However, these opinions are even more objectionable in that they make specific causation conclusions without applying any sort of rigorous analysis.[78] Accordingly, the opinion should be excluded on that basis as well.

*Lastly*, Driscoll's opinion that Hensley was periodically exposed to loud noises during his military career is unhelpful to the jury. This "opinion" is simply a recitation of lay facts, including that Hensley was near gunfire and some explosions while in the military, and that those events are loud.[79] An expert is unnecessary to convey such facts, particularly given that all Driscoll does for this opinion is repeat facts elucidated by other witnesses and then quote Army and OSHA materials

---

[77] PX25(Driscoll-1st-Am-(Hensley)-8).

[78] PX24(Driscoll-Dep-(2/8/2021)-151:4-153:13).

[79] PX25(Driscoll-1st-Am-(Hensley)-3-5).

26

estimating the dB levels for gunfire and explosions.[80] Given the lack of applied expertise, as well as the unhelpfulness to the jury, this opinion should be excluded.[81]

### 2.   *House*

Dr. House offers various opinions against Group B Plaintiff William Wayman. Among other things, House opines that (1) Wayman's tinnitus was not caused by noise exposure; and (2) his hearing loss and tinnitus do not affect his everyday life.[82]

For the former opinion, House did not take Wayman's full medical history, nor did he perform a differential etiology to rule out the different potential causes for Wayman's tinnitus.[83]

---

[80] *Id.*

[81] *Compare* PX24(Driscoll-Dep-(2/8/2021)-38:21-40:17) ("always" performs risk assessments by gathering his own sound level readings at the worksite) *with id.* at 64:14-65:10 (did not take noise measurements at Hensley's places of employment).

[82] PX26(House-(Wayman)-1, 6-7).

[83] PX26(House-(Wayman)-6-7); PX27(House-Dep-(2/1/2021)-47:2-17) (he did not examine whether Wayman's tinnitus occurred at the time of his head trauma); *id.* at 52:16-53:4 (admitting whether Wayman's tinnitus was caused by running into a wall is "speculation," and that he did not know whether Wayman experienced tinnitus in connection with pneumonia); *id.* at 53:5-20 (nothing in records to suggest Wayman's constant tinnitus caused by head trauma or ototoxic medications); *id.* at 61:7-10 (noise exposure is a common cause of tinnitus); *id.* at 67:4-22 (no evidence that the onset on Wayman's constant tinnitus in 2011 coincided with emotional or anxiety issues); *id.* at 68:22-69:1 (identifying no specific trigger for Wayman's tinnitus becoming constant in 2011).

For the latter opinion, although he concedes Wayman has hearing loss in ultra-high frequencies, House neither analyzed nor applied any methodology to assess how hearing loss in those frequencies affects Wayman's everyday life.[84] Similarly, House concluded in a lay capacity that Wayman has not suffered any work-related issues from his hearing loss and tinnitus simply because his supervisor at work has not complained about Wayman's performance.[85] House conceded, however, that fact provides little insight into how Wayman's hearing issues actually affect his life.[86] Finally, House concluded that tinnitus does not affect Wayman's sleep because he has other conditions that also might affect his sleep.[87] But, again, House applies no methodology to that analysis and instead simply provides his opinion based on his gut feelings.[88]

---

[84] PX26(House-(Wayman)-2, 5); PX27(House-Dep-(2/1/2021)-22:8-23:11) (agreeing that Wayman has ultra-high frequency hearing loss); *id*. at 28:8-29:3 (only study relied upon for this point did not cover individuals as young as Wayman (45)); *id*. at 30:18-31:4 (reviewed no literature concerning link between ultra-high frequency loss and NIHL); *id*. at 50:20-51:15 (no analysis regarding how ultra-high frequency hearing loss affects ability to communicate in noisy environments).

[85] PX26(House-(Wayman)-3).

[86] PX27(House-Dep-(2/1/2021)-124:20-125:20) (he has "no doubt" that Wayman's tinnitus affects his concentration, and noting the "vicious cycle" among tinnitus, anxiety, and depression); *id*. at 128:9-129:4 (nothing to contradict Wayman's account of how tinnitus affects his life); *id*. at 129:17-21 (Wayman's tinnitus measured as "catastrophic" on THI survey).

[87] PX26(House-(Wayman)-7).

[88] PX27(House-Dep-(2/1/2021)-102:16-103:7) (blaming anxiety and depression for Wayman's sleep problems); *id*. at 104:11-19 (tinnitus can amplify the effects of

28

As the Court held regarding House, the failure to apply a differential etiology to his opinions about the source of a plaintiff's tinnitus renders those opinions unreliable and improper. Doc. 1680 at 23-24. Similarly, for any opinions regarding how hearing issues affect a plaintiff's life, House must apply some relevant objective method or expertise, or face exclusion. *Id.* at 25-27. Although House conducted a speech-in-noise ("SIN") test for Wayman,[89] his opinions about Wayman's hearing are not limited to the implications of a SIN test; they also seek to construe the implications of Wayman's work supervisor's testimony. That is improper and relies on no expertise. Similarly, the opinion that some of Wayman's *other* conditions, rather than his tinnitus, might affect his sleep is speculative and not the result of any expertise or accepted methodology. Accordingly, based on the same logic the Court previously employed with respect to House, it should exclude those opinions. *Id*. at 23-27.

### 3. *Jacobs*

#### a. *Jacobs' Opinions about Adkins Should Be Excluded.*

##### i. *Jacobs' opinion that Adkins suffers from Antisocial Personality Disorder is unreliable.*

Dr. Jacobs fails to apply a reliable methodology in support of his opinion that

---

PTSD, anxiety, and depression); *id.* at 130:4-24 (measuring the impact of tinnitus is always based on subjective descriptions offered by the tinnitus sufferer).
[89] PX27(House-Dep-(2/1/2021)-113:8-23).

Adkins suffered from a highly stigmatizing condition, Antisocial Personality Disorder ("APD"), prior to entering the military.[90] Jacobs' APD opinion is based on an incorrect recitation of the American Psychiatric Association's DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS, Fifth Edition ("DSM-5") diagnostic standard for APD, relies on speculation, and is a vehicle for improper character attacks.

According to the DSM-5, a diagnosis of APD requires (1) the presence of three or more of certain antisocial behaviors "occurring since age 15 years;" (2) the individual is over age 18; (3) the individual "*must have had a history of some symptoms of conduct disorder before age 15 years*;" and (4) the behavior is not exclusively "during the course of schizophrenia or bipolar disorders."[91] In his report, Jacobs makes no reference to the third criterion. This failure to address one of the four diagnostic criteria for APD renders his methodology unreliable.

Jacobs repeatedly confirmed at his deposition that he was attempting to rely on the DSM-5's criteria in his APD diagnosis,[92] but he repeatedly failed to read and apply the DSM-5 criteria, both in his report and at his deposition. For example, Jacobs testified that "you only need to have three [of the behaviors] to make the

---

[90] PX28(Jacobs-(Adkins)-6).
[91] PX29(DSM-5-659).
[92] PX30(Jacobs-Dep-(2/11/21)-162:18-163:6); *id.* at 124:9-24.

diagnosis,"[93] and that the DSM-5 "doesn't say" that the symptoms need to manifest before any age: "I don't think it has a timeline when it has to develop, but *since* age 15, which clearly he has" (emphasis added).[94] This is in obvious contrast to the actual DSM-5 standard, which expressly requires "*history of some symptoms of conduct disorder before age 15 years*."[95] When pressed on the diagnosis' relationship to Adkins' behavior before the age of 15, Jacobs persisted in his erroneous methodology, insisting both that "it's really over the age of 15 that's relevant in this case,"[96] and that whether conduct occurred before or after Adkins was 15 years old was irrelevant.[97] Jacobs' APD opinion is based on his misreading or misapplication of the DSM-5 diagnostic criteria that he identified as applicable. This opinion is, therefore, unreliable and should be excluded.

In addition, Jacobs speculated that some of the antisocial behaviors reflected in Adkins' later medical records "more than likely"[98] presented before Adkins was 15. Jacobs acknowledged that Adkins' admitted marijuana use before the age of 15, on its own, does not meet the relevant criterion.[99] Jacobs' only basis for speculating

---

[93] *Id*. at167:14-168:10.
[94] *Id*. at 163:7-15.
[95] PX29(DSM-5-659).
[96] PX30(Jacobs-Dep-(2/11/21)-164:24-165:11).
[97] *Id*. at 165:18-166:1 ("He was less than 18. That's what's relevant to this case.").
[98] *Id*. at 127:17-22.
[99] *Id*. at 128:23-129:4.

that some diagnostically-necessary symptoms of a conduct disorder presented before Adkins was 15 was Jacobs' "clinical experience and having—you know, my clinical experience and the literature" which show that in individuals who have APD, such behaviors "occur usually between the ages of 10 to 16."[100] Jacobs may rely on his clinical experience in forming opinions, but he may not make up facts about Adkins. It is baseless for Jacobs to say that his clinical experience with other individuals proves, on its own, that Adkins' personal history meets a diagnostic criterion. Such an opinion is circular, and fundamentally flawed—it is facially unreliable to find that Adkins meets a diagnostic criterion solely because *other* individuals who *have* the diagnosis at issue meet that criterion.

Moreover, Jacobs' APD opinion is a vehicle for improper character attacks disguised as medical opinions. Jacobs also uses this diagnosis to pathologize innocuous testimony. Adkins' statement to a mental health treater that "I just want to love others and be loved, and I feel like I can never have that" reflects, in Jacobs' expert opinion, a "lack of insight and unwillingness to accept any responsibility for his relationship issues [that] are key features of [APD]."[101] Jacobs leverages his APD diagnosis to add a scientific patina to attorney argument: He opines, for example, that "[t]he characteristic of manipulativeness seems to manifest itself in this case as

---

[100] *Id*. at 166:2-19.
[101] PX28(Jacobs-(Adkins)-14).

32

Adkins acknowledges that he decided to seek a disability from the military for tinnitus only after viewing a commercial" [102] relating to this litigation. *See* Fed. R. Evid. 404 ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.").

In sum, Jacobs' anticipated testimony consists of (1) his unreliable determination that Adkins has APD, (2) "the manipulative qualities of an antisocial personality," and (3) "the lack of any mention of tinnitus in [Adkins'] records until a lawsuit is filed."[103] Without a valid diagnostic basis, this testimony is merely an attempt to unduly bolster standard "malingering" defenses with the credibility of an expert: Jacobs' proffer is the province of attorney argument, not expert opinion. The pretextual nature of the diagnosis is consistent with Jacobs' acknowledgement that, in his clinical practice, he would never diagnose a patient who, like Adkins, he had never examined.[104] "[S]imply 'repeating hearsay evidence without applying any expertise whatsoever,'" is not proper expert testimony, and admitting it would allow "the proponent of the evidence to 'circumvent the rules prohibiting hearsay.'" *In re: Chiquita Brands Int'l Inc.*, 2019 WL 11497632, at *33 (S.D. Fla. Sept. 5, 2019)).

---

[102] *Id*. at 5.
[103] PX30(Jacobs-Dep-(2/11/21)-220:2-11).
[104] *Id*. at 198:6-14.

For these reasons, Jacobs' opinion diagnosing Adkins with APD should be excluded.

        **b.**       ***Jacobs' Opinions about Wayman Should Be Excluded.***

        **i.**       ***Jacobs' 'Unspecified Neurocognitive Disorder' opinion is not based on a reliable methodology.***

Jacobs opines that certain of Wayman's tinnitus symptoms—memory issues and sleep disturbance—are caused not by his tinnitus but by a condition known as Unspecified Neurocognitive Disorder ("UNCD").[105] However, Jacobs applies no reliable methodology in support of this opinion. His assertion is unmoored from any diagnostic standard and fails to rule out alternative causes. Accordingly, Jacob's UNCD opinions must be excluded.

Jacobs all but concedes that his diagnosis of UNCD is not based on any reliable methodology or even an established definition of the condition. For example, the DSM-5 defines UNCD to describe presentations of "symptoms characteristic of a neurocognitive disorder" which "do not meet the full criteria" for other neurocognitive disorders, and for which "the precise etiology cannot be determined with sufficient certainty to make an etiological attribution."[106] Thus, a diagnosis of UNCD requires, at a minimum, (1) a finding of symptoms characteristic of a neurocognitive disorder (or "NCD"), and (2) a determination that the cause of

---

[105] PX31(Jacobs-(Wayman)-6, 8, 11, 17, 19).
[106] PX29(DSM-5-643).

those symptoms is uncertain.

But Jacobs admits that he has no knowledge of the DSM-5 definition of UNCD. At his deposition, Jacobs stated that he is unaware of whether the DSM-5 contains diagnostic criteria for UNCD.[107] Instead, Jacobs stated that "current memory loss and sleep disorder" is the definition of UNCD used by the VA, although he later qualified that the purported (but unidentified) VA criterion "may be mild memory loss."[108] Regardless, Jacobs has not identified (nor have Plaintiffs been able to locate) the purported VA definition for UNCD separate from that in the DSM-5. Jacobs cited no such definition in his report or deposition, and no documents either in the record or cited in Jacobs' report contain any such definition. Accordingly, Jacobs' only basis for the UNCD diagnosis are Wayman's sleep and memory issues alone.[109] Without more—some accepted diagnostic criteria—Jacobs' opinion is disconnected from any known definition of UNCD and must be excluded for lack of a reliable methodology.

Even if sleep and memory issues alone amounted to "symptoms characteristic of a neurocognitive disorder," Jacobs did not analyze the second criterion of a UNCD diagnosis—"the precise etiology cannot be determined."[110] His report and

---

[107] PX30(Jacobs-Dep-(2/11/21)-61:17-22).

[108] *Id*. at 61:17-62:7 ("I'm blocking on whether it's mild or current").

[109] *Id*.

[110] PX29(DSM-5-643).

testimony both omit any reference to this diagnostic requirement, and Jacobs has affirmatively denied conducting the kind of analysis that would be necessary to meet it. Crucially, Jacobs denied any knowledge of the impact of distraction on Wayman's (or anyone else's) ability to create or store new memories.[111]

Furthermore, while Jacobs opines that the cause of Wayman's memory issues "cannot be determined with sufficient certainty," he makes no effort to rule out alternative potential causes. Such causes include Wayman's tinnitus, which Wayman, his litigation experts, and multiple treating physicians all identified as a potential cause of these symptoms.[112] Absent any attempt at ruling out alternative causes, Jacobs' opinion that Wayman's memory loss "cannot be determined with sufficient certainty,"[113] as the DSM-5 requires for a UNCD diagnosis, is unreliable.

Due to his lack of familiarity with the UNCD diagnostic criteria and his failure to find those criteria satisfied by Wayman's condition, Jacobs' UNCD opinion must be excluded.

> ii. **Jacobs' "reports" on the content of records on which he has no expert opinion—including on the etiology of Wayman's tinnitus—should be excluded.**

---

[111] PX30(Jacobs-Dep-(2/11/21)-62:20-63:22).

[112] PX32(Ryder-Dep-(11/23/20)-46:16-47:11; 52:5-54:6); PX33(Knight-Dep-(11/25/20)-106:23-107:11; 133:3-16).

[113] PX29(DSM-5-643).

Jacobs admits he has no opinion on the cause of Wayman's tinnitus.[114] However, at his deposition, he stated that he felt "competent" to read Wayman's treatment records at trial, should he be called upon to do so.[115] Such testimony is based on no methodology, is not helpful to the finder of fact, is beyond Jacobs' expertise, and must be excluded. Such testimony would be inappropriate and unconnected to any opinion Jacobs proffered in his report. *See* Doc. 1680 at 114-115 (citing *Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006) (expert may not "simply recount[] the facts and then offer[] an opinion as to the conclusion which the jury should reach")). Jacobs has no qualifications to diagnose or explain the cause of Wayman's tinnitus and has not set a reliable method for any such opinion. *In re: Chiquita Brands Int'l Inc.*, 2019 WL 11497632, at *33. Accordingly, any such testimony from Jacobs should be excluded.

### 4. *Jones & LaBorde*

Drs. LaBorde and Jones co-authored a joint report in which they opine that Blum had a 0% impairment rating for hearing loss at the time of their medical examination.[116] Pursuant to this Court's prior order, these opinions should be excluded under Rule 702 and Rule 403 because they are based on the 1996 Florida

---

[114] PX30(Jacobs-Dep-(2/11/21)-44:15-20).
[115] *Id*. at 81:17-22; 82:19-83:1.
[116] PX34(Jones/LaBorde-(Blum)-18).

Uniform Permanent Impairment Rating Schedule ("FUPIRS")—an invalid methodology to the pertinent inquiry that will also create jury confusion. Fla. Stat. § 440.15(3); Doc. 1680 at 28 ("The Court finds that these experts' [LaBorde and Jones'] opinions relating to Keefer's and McCombs' permanent impairment ratings are due to be excluded under Rule 702 and Rule 403 because they are unhelpful, and any probative value is substantially outweighed by a danger of confusing the jury.").

Moreover, FUPIRS forbids physicians from conducting impairment rating evaluations until the injured worker is stable and has reached maximum medical improvement. *See* Fla. Stat. § 440.15(3). According to LaBorde and Jones' testimony and report, Blum's hearing loss is not stable and is progressive.[117] Thus, like before, these opinions should be excluded. *See* Doc. 1680 at 30 (excluding LaBorde and Jones' impairment ratings testimony and noting FUPIRS' requirement that the impairment be "stable or non-progressive at the time the evaluation is made[.]").

LaBorde and Jones similarly opine that Sloan had a 0% impairment rating in each ear at the time of the medical examination.[118] As with Blum, the experts based

---

[117] PX34(Jones/LaBorde-(Blum)-15, 19); PX35(Jones-Dep-(2/6/21)-226:15-16) ("It is a—it [Blum's injury] appears to be a progressive sloping sensorineural hearing loss."); PX36(LaBorde-Dep-(2/12/21)-74:3-5) ("Another potential etiology [for Blum] is sloping, progressive, idiopathic sensorineural hearing loss.").
[118] PX37(Jones/LaBorde-(Sloan)-13).

their opinions on FUPIRS.[119] The experts also acknowledge that Sloan's hearing loss is progressive.[120] Thus, their testimony should be excluded for the same reasons.

## IV.     **CONCLUSION**

For these reasons, Plaintiffs respectfully request the Court grant Plaintiffs' motion.


<u>Date</u>:  August 6, 2021

Respectfully submitted,

*/s/ Bryan F. Aylstock*
Bryan F. Aylstock, Lead Counsel
Florida State Bar No. 078263
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel.: (850) 202-1010
baylstock@awkolaw.com
**Plaintiffs' Lead Counsel**

Shelley V. Hutson, Co-Lead Counsel
(Admitted Pro Hac Vice)
Texas State Bar No. 00788878
CLARK, LOVE & HUTSON, PLLC
440 Louisiana Street, Suite 1700
Houston, TX 77002
Tel.: (713) 757-1400
shutson@triallawfirm.com
**Plaintiffs' Co-Lead Counsel**

---

[119] *Id*. at 14.
[120] *Id*. at 15, 26.

39

Christopher A. Seeger, Co-Lead Counsel
(Admitted Pro Hac Vice)
New Jersey State Bar No. 042631990
SEEGER WEISS LLP
77 Water Street, 8th Floor
New York, NY 10005
Tel.: (212) 587-0700
cseeger@seegerweiss.com
***Plaintiffs' Co-Lead Counsel &***
***Counsel for Plaintiff William Wayman***

Kenneth Camp Bailey
Texas Bar No. 24006782
Aaron M. Heckaman
Texas Bar No. 24059920
BAILEY COWAN HECKAMAN PLLC
1360 Post Oak Blvd.
Suite 2300
Houston, TX 77056
713-425-7100
713-425-7101 (fax)
sbuchanan@bchlaw.com
***Counsel for Plaintiff Brandon Adkins***

Michael A. Burns
Florida Bar No. 973130
BURNS LAW LLC
362 Gulf Breeze Parkway #294
Gulf Breeze, FL 32561
850-572-9187
mike@maburns.com

Caroline L. Maida
(Admitted Pro Hac Vice)
Texas State Bar No. 24078906
MOSTYN LAW
3810 West Alabama Street
Houston, TX 77027
713-714-0000
epefile@mostynlaw.com

40

*Counsel for Plaintiff Michelle Blum*

Taylor Christopher Bartlett
Alabama Bar No. 2365-A51B
Heninger Garrison Davis LLC
2224 1ST Avenue North
Birmingham, AL 35203
205-326-3336
taylor@hgdlawfirm.com
*Counsel for Plaintiff Marcus Hensley*

Muhammad S. Aziz
(Admitted Pro Hac Vice)
Texas Bar No. 24043538
Abraham Watkins Nichols, Agosto,
Aziz & Stogner
800 Commerce Street
Houston, TX 77055
713-222-7211
713-225-0827 (fax)
jdean@abrahamwatkins.com
*Counsel for Plaintiff Ronald Sloan*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B), (C)</u>

Pursuant to Local Rule 7.1(B), counsel for Plaintiffs certify that they conferred with Defendants' counsel on July 12, 2021 regarding the foregoing motion but were unable to resolve the issue with Defendants.

*/s/ Bryan F. Aylstock*

# CERTIFICATE OF COMPLIANCE
# WITH COURT'S WORD LIMIT

I hereby certify that the foregoing contains 8,268 words and complies with the Court's directive on July 12, 2021 that *Daubert* motions have no more than 1,350 words per new issue and 1,350 words per new expert.

*/s/ Bryan F. Aylstock*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 6, 2021, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Bryan F. Aylstock*