# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG LITIGATION
LIABILITY LITIGATION

This Document Relates to:
  *Brandon Adkins*
  Case No. 7:20-cv-00012

  *Michele Blum*
  Case No. 7:20-cv-00122

  *Marcus Hensley*
  Case No. 7:20-cv-00093

  *Ronald E. Sloan*
  Case No. 7:20-cv-00001

  *William Wayman*
  Case No. 7:20-cv-00149

CASE NO.: 3:19-MD-2885-MCR-GRJ

Chief Judge M. Casey Rodgers
Magistrate Judge Gary Jones

**CONFIDENTIAL - FILED
UNDER SEAL**

**DEFENDANTS' OMNIBUS MOTION TO EXCLUDE PLAINTIFFS'
GROUP B PUTATIVE EXPERT OPINIONS UNDER *DAUBERT* AND
RULE 702 AND INCORPORATED MEMORANDUM**

Defendants 3M Company and Aearo move pursuant to Rule 702 and *Daubert*

to exclude the testimony and opinions, in whole or in part, of Plaintiffs' putative

experts Marc Bennett, Neil Bennett, Eric Bielefeld, Jessica Dimmick, Marc

Fagelson, Stephen Gilder, Cloie Johnson, Larry Lustig, Paul Kileny, Michael

Ostacher, and Christopher Spankovich.  Specifically, Defendants move to exclude:

1

1.     All opinions regarding "cochlear synaptopathy" and "hidden hearing loss" ("HHL"), including (a) the HHL opinions of Marc Bennett and Fagelson regarding Adkins, and (b) the HHL opinions of Lustig and Spankovich regarding Wayman.

2.     The causation opinion of Marc Bennett regarding CAEv2 users he has not personally analyzed.

3.     The causation and diagnosis opinion of Fagelson regarding Adkins.

4.     The causation and diagnosis opinions of Kileny regarding Hensley.

5.     The causation and diagnosis opinions of Bielefeld and Dimmick regarding Sloan.

6.     The causation and diagnosis opinions of Lustig, Ostacher, and Spankovich regarding Wayman.

7.     Cloie Johnson's earning capacity, work life expectancy, and life care plan opinions regarding Adkins, Blum, Sloan, and Wayman.

8.     Neil Bennett's opinions in their entirety.

9.     All opinions regarding questions of law, including such opinions by Marc Bennett and Gilder.

10.     All opinions regarding state of mind, including such opinions by Marc Bennett and Gilder.

11.     Gilder's opinions regarding hearing loss and tinnitus.

12.     Gilder's opinions regarding ANSI Method B testing approximating the CAEv2's performance for soldiers.

13.     Gilder's opinions on what information Defendants should have provided to the military.

14.     Marc Bennett's opinions regarding the CAEv2's design and safer design alternatives.

15.     Dimmick's opinions regarding the CAEv2's design.

Defendants' Motion is based upon the attached Memorandum in Support; the complete files and records of this action; and such other matters and arguments as may come before the Court.

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...............................................................................13

I.   PLAINTIFFS' HIDDEN HEARING LOSS OPINIONS ARE UNRELIABLE, SPECULATIVE, AND NOT BASED ON ANY METHODOLOGY. ....................................................................16

    A.   Animal Studies Do Not Establish The Existence of HHL In Humans. ............................................................................17

    B.   Plaintiffs' Experts Have No Valid Methodology For Diagnosing HHL. ...................................................................22

II.  PLAINTIFFS' EXPERTS' DIAGNOSES ARE UNRELIABLE. ...............25

    A.   Kileny Is Not Qualified To Render A Differential Diagnosis Or Other Causation Opinion Of Hensley. ............................25

    B.   Marc Bennett Cannot Opine That CAEv2 "Caused" Injuries In Individuals He Has Not Analyzed. ...................................28

    C.   Plaintiffs' Experts Have No Basis For Opinions That Any CAEv2 Defect Caused Plaintiffs' Alleged Injuries. ...........28

        1.   Kileny's Opinion That Any CAEv2 Defect Caused Hensley's Alleged Injuries Should Be Excluded.....................28

        2.   Lustig's Opinion That Any CAEv2 Defect Caused Wayman's Alleged Injuries Should Be Excluded. ..................29

        3.   Spankovich's Opinion That Any CAEv2 Defect Caused Wayman's Alleged Injuries Should Be Excluded................30

    D.   Plaintiffs' Experts Failed To Properly Rule Out Alternative Causes..............................................................................31

        1.   Fagelson's Diagnosis Of Adkins Is Unreliable. .......................32

        2.   Kileny's Diagnosis Of Hensley Is Unreliable. .........................33

|  | a. | Kileny Did Not Perform A Differential Diagnosis. .......33 |
|  | b. | Kileny Cannot Offer Opinions Regarding Hensley's Malingering.................................................................36 |
| 3. | | Bielefeld's Diagnosis Of Sloan Is Unreliable...........................36 |
|  | a. | Increased Risk Of Dementia And Cognitive Decline. ...36 |
|  | b. | Opinions That Other Earplugs Were Not Defective. .....37 |
|  | c. | Opinion That The CAEv2 Caused Sloan's Tinnitus. .....37 |
| 4. | | Dimmick's Diagnosis Of Sloan Is Unreliable. ..........................38 |
|  | a. | Hearing Loss From Natural Aging. ................................38 |
|  | b. | Motorcycle Noise Exposure. ..........................................40 |
| 5. | | Marc Bennett's Diagnosis Of Sloan Is Unreliable. ..................41 |
| 6. | | Lustig's Diagnosis Of Wayman Is Unreliable...........................42 |
|  | a. | Other HPDs.....................................................................42 |
|  | b. | Wayman's Head Injuries. ...............................................43 |
|  | c. | Sleep. ..............................................................................44 |
|  | d. | Mental-Health Disorders. ...............................................45 |
| 7. | | Spankovich's Diagnosis Of Wayman Is Unreliable. ...............45 |
|  | a. | Other HPDs.....................................................................45 |
|  | b. | Traumatic Brain Injury ("TBI"). ....................................46 |
|  | c. | Sleep Issues....................................................................47 |
| 8. | | Ostacher's Diagnosis Of Wayman Is Unreliable.....................48 |
|  | a. | Wayman Refused Treatment. ..........................................48 |
|  | b. | TBIs. ...............................................................................49 |

5

III.   PLAINTIFFS' ECONOMIC LOSS OPINIONS ARE BASED ON FALSE ASSUMPTIONS AND IMPROPER METHODOLOGIES. ...........51

    A.   Johnson's Opinions Are Based On Incorrect Or Unreproducible Data And Are Unreliable. ..........................51

        1.   Johnson Used The Wrong Data for Occupational Access, Rendering Her Opinions Unreliable...........................51

        2.   Johnson Fails to Articulate a Reliable Methodology. ..................................................................55

        3.   Johnson's Conclusions Regarding Lost Earning Capacity Are Not Tied to the Facts. .........................56

        4.   Johnson Did Not Use A Replicable Methodology In Developing Plaintiffs' Life Care Plans. ....................59

    B.   Neil Bennett Lacks A Proper Methodology Reliably Applied To Each Case's Facts. ...........................60

        1.   Bennett Relies On Johnson's Unreliable Opinions. .................60

        2.   Bennett's Present Discount Analysis Is Unreliable. .................61

        3.   Bennett's Worklife Expectancy Is Unreliable. .........................63

        4.   Bennett's Calculation of Adkins' Earnings Ignores His Actual Circumstances..........................................64

        5.   Bennett's Calculation of Blum's Earnings Is Based On An Incorrect Assumption. ....................................65

        6.   Bennett's Calculation of Wayman's Lost Earnings Is Unreliable. ..............................................................66

    C.   Dimmick's Opinions That Sloan Will Suffer Loss Of Income And Consequences To His Familial And Social Relationships Are Unreliable. ..............................................67

IV.   PLAINTIFFS' EXPERTS CANNOT OFFER OTHER UNRELIABLE OR IMPERMISSIBLE OPINIONS. ..............................................69

A. Marc Bennett And Gilder Cannot Offer Legal Opinions....................69

B. Marc Bennett And Gilder Cannot Offer State of Mind Opinions. ...........................................................................70

C. Gilder Cannot Offer Any Opinions About Hearing Loss and Tinnitus....................................................................71

D. Gilder Cannot Opine About Method B Approximating The CAEv2's Performance For Soldiers....................................73

E. Gilder Cannot Opine About What Information 3M Should Have Provided To The Military. ...........................................73

F. Marc Bennett Lacks The Qualifications And Methodology To Opine About The CAEv2's Design Or Safer Alternative Designs. ..............................................................74

G. Dimmick Is Unqualified To Opine That The CAEv2 Had A "Defective Design."............................................................77

CONCLUSION ..........................................................................78

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addison v. Arnett*,
   2016 WL 1441803 (S.D. Ga. Apr. 12, 2016) ....................................................22

*Advent Sys. Ltd. v. Unisys Corp.*,
   925 F.2d 670 (3d Cir. 1991) ..............................................................................54

*Allison v. McGhan Med. Corp.*,
   184 F.3d 1300 (11th Cir. 1999) ...................................................................18, 21

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) ...............................................................17, 59, 60

*Barber v. United Airlines, Inc.*,
   17 F. App'x 433 (7th Cir. 2001) .......................................................................47

*Bayes v. Biomet, Inc.*,
   2020 WL 5594059 (E.D. Mo. Sept. 18, 2020) ..................................................26

*Bland v. Verizon Wireless (VAW) L.L.C.*,
   538 F.3d 893 (8th Cir. 2008) ............................................................................34

*Brown v. Burlington N. Santa Fe Ry. Co.*,
   765 F.3d 765 (7th Cir. 2014) ............................................................................58

*Cates v. Whirlpool Corp.*,
   2017 WL 1862640 (N.D. Ill. May 9, 2017).......................................................58

*City of Pomona v. SQM N. Am. Corp.*,
   750 F.3d 1036 (9th Cir. 2014) ..........................................................................39

*Conde v. Velsicol Chem. Corp.*,
   24 F.3d 809 (6th Cir. 1994) ..............................................................................18

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*,
   402 F.3d 1092 (11th Cir. 2005) ........................................................................36

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ..............................................................18

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)...................................................................*passim*

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000) ..............................................................39

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
744 F. Supp. 2d 870 (E.D. Wis. 2010) ..............................................58

*Ford v. Carnival Corp.*,
2010 WL 9116184 (S.D. Fla. Mar. 4, 2010) ......................................26

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)...........................................................17, 18, 38

*Guinn v. AstraZeneca Pharms. LP*,
602 F.3d 1245 (11th Cir. 2010) ..............................................31, 34, 50

*Hanson v. Colgate-Palmolive Co.*,
353 F. Supp. 3d 1273 (S.D. Ga. 2018) ..............................................39

*Hendrix ex rel. G.P. v. Evenflo Co.*,
609 F.3d 1183 (11th Cir. 2010) ..................................................31, 35

*Hendrix v. Evenflo Co.*,
255 F.R.D. 568 (N.D. Fla. 2009), *aff'd*, 609 F.3d 1183 (11th Cir.
2010) ...............................................................................................21

*In re Deepwater Horizon BELO Cases*,
2020 WL 6689212 (N.D. Fla. Nov. 4, 2020) (Rodgers, J.)................17

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018), *aff'd*, 982 F. 3d 113 (2d Cir.
2020) ...............................................................................................58

*In re Polypropylene Carpet Antitrust Litig.*,
93 F. Supp. 2d 1348 (N.D. Ga. 2000)................................................66

*J&V Dev., Inc. v. Athens-Clarke Cty.*,
  387 F. Supp. 2d 1214 (M.D. Ga. 2005) ............................................................66

*Jones & Laughlin Steel Corp. v. Pfeiffer*,
  462 U.S. 523 (1983)...........................................................................................62

*Kilpatrick v. Breg, Inc.*,
  613 F.3d 1329 (11th Cir. 2010) ............................................................17, 21, 31

*King v. Cessna Aircraft Co.*,
  2010 WL 1980861 (S.D. Fla. May 18, 2010)...............................................42, 56

*Lee-Bolton v. Koppers, Inc.*,
  319 F.R.D. 346 (N.D. Fla. 2017) (Rodgers, J.) ................................................56

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................................68

*Lowery v. Sanofi-Aventis LLC*,
  2021 WL 872620 (N.D. Ala. Mar. 9, 2021) ....................................26, 31, 33, 35

*Magistrini v. One Hour Martinizing Dry Cleaning*,
  180 F. Supp. 2d 584 (D.N.J. 2002), *aff'd*, 68 F. App'x 356 (3d Cir.
  2003) ..................................................................................................................35

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) ...................................................................21, 25

*McDowell v. Brown*,
  392 F.3d 1283 (11th Cir. 2004) ........................................................................25

*Mich. Millers Mut. Ins. Corp. v. Benfield*,
  140 F.3d 915 (11th Cir. 1998) ..........................................................................25

*Mohney v. USA Hockey, Inc.*,
  300 F. Supp. 2d 556 (N.D. Ohio 2004), *aff'd*, 138 F. App'x 804
  (6th Cir. 2005)....................................................................................................40

*Napolitano v. Synthes, Inc.*,
  2014 WL 12867042 (D. Conn. 2014)..................................................................72

*Rider v. Sandoz Pharms. Corp.*,
  295 F.3d 1194 (11th Cir. 2002) ...........................................................................22

*Sackman v. Balfour Beatty Communities*,
  2014 WL 4415938 (S.D. Ga. Sept. 8, 2014) .......................................................22

*Sanderson v. Int'l Flavors & Fragrances, Inc.*,
  950 F. Supp. 981 (C.D. Cal. 1996) ......................................................................23

*Schulenberg v. BNSF Ry. Co.*,
  911 F.3d 1276 (10th Cir. 2018) ...........................................................................58

*Silicon Knights, Inc. v. Epic Games, Inc.*,
  2011 WL 6748518 (E.D.N.C. Dec. 22, 2011) ...............................................22, 24

*Umana-Fowler v. NCL (Bahamas) Ltd.*,
  49 F. Supp. 3d 1120 (S.D. Fla. 2014) ..................................................................35

*United States v. City of Miami, Fla.*,
  115 F.3d 870 (11th Cir. 1997) .......................................................................54, 66

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) .....................................................................42, 56

*Whiting v. Boston Edison Co.*,
  891 F. Supp. 12 (D. Mass. 1995) .........................................................................67

*Whitney Nat'l Bank v. Air Ambulance by B & C Flight Mgmt., Inc.*,
  516 F. Supp. 2d 802 (S.D. Tex. 2007) .................................................................77

*Withrow v. Spears*,
  967 F. Supp. 2d 982 (D. Del. 2003) .....................................................................77

**Statutes**

Mich. Comp. Laws Ann. § 333.16801(2) (West) ......................................................27

**Rules**

Fed. R. Civ. P. 26(a)(2)(B) .........................................................................................59

Fed. R. Evid. 702 ...................................................................................................65, 67

Fed. Rule Evid. 702(d).............................................................................................54

**Regulations**

40 C.F.R. § 211.204-4............................................................................................70

## MEMORANDUM IN SUPPORT OF MOTION

### INTRODUCTION

Plaintiffs' putative Group B experts offer opinions that are barred under the prior orders of this Court, use unreliable methodologies, rest on false assumptions, and disregard the facts of Plaintiffs' cases.  Defendants move to exclude their opinions in whole or in part as described herein.[1]

*First*, Marc Bennett and Fagelson opine regarding the hypothesis of HHL for Adkins, and Lustig and Spankovich do the same for Wayman.  This Court has already expressed "serious concerns about the reliability of Plaintiffs' experts' HHL-related opinions" and stated that "although medical science may in time reliably establish the specific physiological mechanism(s) behind cochlear synaptopathy and HHL, until such time as medical science understands these mechanisms, the 'insights and innovations' discussed by Plaintiffs' experts do not provide a scientifically valid basis for these experts' HHL-related opinions."  ECF 1680 at 40 n.29.  The Group B experts do not provide any reason to change the Court's prior

---

[1]  Internal quotation marks, citations, modifications (such as ellipses or brackets), and deposition objections are omitted from quotes unless otherwise indicated.  To avoid repetition, this memorandum uses *supra* and *infra* to cross-reference the pages herein containing relevant case law and other authorities.  For convenience, Plaintiffs' putative experts are referred to as "experts" in the remainder of this memorandum, with Defendants reserving and not waiving all arguments that those putative experts lack qualifications or should otherwise be excluded.

conclusions.  Indeed, Fagelson has testified that the "literature out there addressing causes of synaptopathy" is "speculative."   Ex1, Fagelson Dep2. 133:5-7.   And Plaintiffs' experts continue to rely on animal studies that cannot be extrapolated to humans, and admit there is no test or methodology to diagnose whether a person has HHL.

Accordingly, all their HHL-related opinions should be barred for lacking a reliable methodology or reliably applying that methodology to the facts of Plaintiffs' cases.

*Second*, the experts' specification causation and diagnosis opinions for Adkins, Hensley, Sloan, and Wayman fail to satisfy *Daubert*.  Some of these experts failed to test whether the Plaintiff could get and maintain a good fit with the CAEv2, and thus lack sufficient facts or data that the CAEv2 caused plaintiffs' alleged injuries.   And almost all these experts fail to seriously account for alternative causes—such as Wayman's multiple injuries to his unhelmeted head, Hensley's history of ear infections and facial/jaw problems, and Sloan's frequent motorcycle riding without hearing protection—and thus have not performed a proper differential diagnosis.   Accordingly, the Court should exclude the causation opinions of (1)  Fagelson regarding Adkins, (2) Kileny  regarding  Hensley; (3) Bielefeld, Dimmick,  and  Marc  Bennett  regarding  Sloan,  and  (4) Lustig,  Ostacher,  and

14

Spankovich regarding Wayman; and (5) Marc Bennett for all CAEv2 users he has not personally analyzed.

*Third*, Plaintiffs' alleged economic losses are based on earning capacity and work life expectancy opinions by Cloie Johnson, but she mistakenly based her opinions on the percentage of jobs that require *handling*, rather than the much smaller number of jobs requiring *hearing*.   She also failed to provide any methodology for determining the reduction of earning capacity for each Plaintiff, and ignores facts such as Plaintiffs having disabilities that would reduce their earning capacity and work life expectancy.   Neil Bennett relies on Johnson's opinions for his economic loss calculations, and thus his opinions fall with hers.   Moreover, his opinions contradict Johnson's worklife expectancy determinations, use incorrect assumptions for Plaintiffs, and ignore conditions that would limit certain Plaintiffs' earning capacity.   Accordingly, the economic loss opinions of Cloie Johnson and Neil Bennett should be excluded in their entirety.[2]

*Fourth*, Plaintiffs' experts offer various other opinions that are barred under this Court's prior rulings and other precedent.   Marc Bennett and Gilder opine regarding the law and parties' state of mind, which this Court has already held are

---

[2] Dimmick, an audiologist, also offers opinions regarding loss of income and social consequences, for which she lacks both qualifications and any methodology.

impermissible.  Gilder also offer opinions for which he lacks a methodology or factual basis, such as regarding hearing loss and tinnitus, whether REAT Method B approximates the CAEv2's performance for soldiers, and the information Defendants should have provided to the military.  Marc Bennett and Dimmick offer opinions regarding the CAEv2's design, for which they lack qualifications or any methodology.  All these opinions should be excluded.

## I.   PLAINTIFFS' HIDDEN HEARING LOSS OPINIONS ARE UNRELIABLE, SPECULATIVE, AND NOT BASED ON ANY METHODOLOGY.

This Court previously explained "that it has serious concerns about the reliability of Plaintiffs' experts' HHL-related opinions."  ECF 1680 at 40 n.29.  The Court cited statements from Plaintiffs' own experts such as Bielefeld, Fagelson, and Arriaga (all of whom are serving as Plaintiffs' experts in the Group B cases) that while animal studies "suggest" HHL may exist, no human studies had confirmed that HHL existed in people.  *Id.*  The Court further stated that "until such time as medical science understands these mechanisms, the 'insights and innovations' discussed by Plaintiffs' experts do not provide a scientifically valid basis for these experts' HHL-related opinions."  *Id.*

Nothing in Plaintiffs' Group B expert reports or opinions changes the Court's conclusion.  Fagelson claims that Adkins experiences "issues consistent with" HHL, while Marc Bennett purports to provide an HHL "diagnosis" for Adkins.  Ex2,

Fagelson Adkins Report 11; Ex1, Fagelson Dep2. 126:20-25; Ex3, MBennett Adkins Report 15.  Lustig and Spankovich both opine that Wayman has HHL.  Ex4, Lustig Wayman Report 21; Ex5, Lustig Dep2. 37:6-13; Ex6, Spankovich Wayman Report 9-11.  These opinions rely on animal studies and are made without any testing to show HHL, just like the opinions the Court rejected for the Group A Plaintiffs.

### A.    Animal Studies Do Not Establish The Existence of HHL In Humans.

Extrapolating from existing studies or data requires a methodology based on a scientifically reliable foundation.  In deciding whether to admit an expert opinion, it is "entirely proper—indeed necessary—for the district court to focus on the reliability of these sources and methods."  *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336 (11th Cir. 2010).  If the studies or literature do not in fact support the expert's methodology or opinions, then the expert's testimony should be excluded.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266, 269-70 (2d Cir. 2002); *In re Deepwater Horizon BELO Cases*, 2020 WL 6689212, at *12-14 (N.D. Fla. Nov. 4, 2020) (Rodgers, J.).

"[S]cientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591-93 (1993).  "Trained experts commonly extrapolate from existing data.  But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court

to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146; *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314 (11th Cir. 1999) ("*Daubert* decisions in other courts warn against leaping from an accepted scientific premise to an unsupported one."). Courts have previously rejected animal studies when an expert has failed to clearly demonstrate a scientific methodology for extrapolating the results of those animal studies to humans. *See e.g.*, *Allison*, 184 F.3d at 1313-14 (excluding expert who argued that studies involving rats injected with silicone showed that silicone could harm humans); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319-20 (9th Cir. 1995) (rejecting experts' opinions who relied on animal studies, chemical structure analyses, and epidemiological data when experts failed to clearly demonstrate scientific methodology); *Conde v. Velsicol Chem. Corp.*, 24 F.3d 809, 814 (6th Cir. 1994) (finding animal studies inadequate for showing causation of disease in humans with chlordane exposure).

Plaintiffs' experts rely on animal studies to opine regarding HHL, and admit that whether HHL exists in humans is unproven. Fagelson's report does not discuss or cite to any human studies on HHL. Ex1, Fagelson Dep2. 377:11-12. He admitted that there are no human studies of HHL that support diagnosing someone with this condition. *Id.* 118:1-5. He stated that the causes of HHL in humans depend on "extrapolating the animal studies to humans," but does not explain how this

extrapolation can be done.  Ex1, Fagelson Dep2.  117:21-23, 121:9-12.  Indeed, Fagelson described the literature addressing the causes of synaptopathy in humans as "speculative":

> Q.  Is there literature out there addressing causes of synaptopathy?
>
> A.  ***It is speculative, but yes.***

*Id.* 133:6-7 (emphasis added).

Similarly, Marc Bennett relied upon data gleaned from animal studies in diagnosing Adkins with HHL.  Ex7, MBennett Dep1. 380:8-381:19; Ex8, MBennett Dep2. 611:13-612:11.  Bennett admitted that he "won't call [HHL] a fact because I don't think it's a fact.  I think it's a strong theory that exists now."  Ex7, MBennett Dep1. 382:5-18.  He further admitted that "there's no definitive proof of cochlear synaptopathy."  Ex8, MBennett Dep2. 622:9-13.  When asked whether HHL had been proven to exist in humans, Bennett claimed such proof would require conducting an autopsy on a live patient and admitted that "it would be hard to have definitive prove [sic] on any of these things."  Ex7, MBennett Dep1. 382:19-383:8.  Bennett also was unaware of any studies of HHL on human cadavers.  *Id.* 383:17-20.  Bennet explained that "we have pathology on the animal side, but we don't have it on the human side.  And so that's—that's the missing link."  Ex8, MBennett Dep2. 612:22-613:15.

Lustig admitted that the development of HHL as a theory was based on animal studies and that "[t]hese are really hard studies to do in humans, and it's going to take years and years for us to definitively prove that in fact the exact same process does occur in humans."  Ex5, Lustig Dep2. 41:5-17.  Like Bennett, Lustig admitted that the only way to definitively prove HHL was to chop up someone's ears and count the synapses.  *Id.* 42:5-14.

Similarly, Spankovich agrees that "[t]he thing that's missing, really, for applying some of these animal models to a human is a baseline" but "[w]e just don't tend to have that baseline measure to help in our differential diagnosis."  Ex9, Spankovich Dep1. 119:2-19.  And he further asserts that "to actually show histological evidence of synaptopathy, we would need to perform a temporal bone study".  *Id.* 118:22-24.

Plaintiffs' expert Bielefeld also agreed the only way to determine synaptic damage in humans is to remove the cochlea.  Ex10, Bielefeld Dep1. 229:20-230:3. Bielefeld stated the "causative relationship between synapse injury and speech impairments has not been able to be made." *Id.* 57:7-13. Indeed, Bielefeld's report also concluded that "synapse injury and hidden hearing loss in animals suggests noise exposure without threshold shifts can be classified as a risk factor [for] speech-in-noise difficulties, but human data have not yet confirmed this relationship." Ex11, Bielefeld Report 56. Bielefeld is unware of a single diagnosis of noise induced

hearing loss that was not accompanied by a threshold shift on an audiogram. Ex10, Bielefeld Dep1. 247:3-10.

In sum, as with the Group A plaintiffs, the Group B experts' HHL opinions are based on animal studies with no scientifically valid extrapolation to humans. Indeed, plaintiffs' experts admit that proving HHL in humans is not currently possible.  Plaintiffs' experts admit that HHL is speculative, and "[s]ubjective speculation that masquerades as scientific knowledge does not provide good grounds for the admissibility of expert opinion." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005); *see also Allison*, 184 F.3d at 1316-17 ("Under the regime of *Daubert* a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.").  Similarly, opinions and "methodologies based on speculative literature"—and Fagelson and the other Plaintiffs' experts admits the literature on HHL in humans is speculative—"are not sufficient to pass *Daubert* review." *Kilpatrick*, 613 F.3d at 1343; *see also Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 602 (N.D. Fla. 2009) (excluding opinion about causes of autism where expert opined that there "is a lot of speculation and a lot of studies, but we don't know" what causes autism), *aff'd*, 609 F.3d 1183 (11th Cir. 2010).  "'Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles.  The courtroom is not the place

for scientific guesswork, even of the inspired sort.  Law lags science; it does not lead it.'"  ECF 1680 at 68-69 (quoting *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002).    Accordingly, Plaintiffs' experts' HHL opinions are unreliable and should be excluded.

### B.    Plaintiffs' Experts Have No Valid Methodology For Diagnosing HHL.

Plaintiffs' experts do not identify any recognized or generally accepted method for diagnosing HHL in living humans.  At most, they cherry pick certain issues Adkins and Wayman claim to have in a subjective and ad hoc manner, falling far below the standard for admissibility.  *See*, *e.g.*, *Addison v. Arnett*, 2016 WL 1441803, at *5 (S.D. Ga. Apr. 12, 2016) (excluding expert opinion based on policies requiring "sound judgment" and consider of various factors because "they cannot produce an objective expert opinion reached by sufficiently reliable methodology"); *Sackman v. Balfour Beatty Communities,* 2014 WL 4415938, at *26 (S.D. Ga. Sept. 8, 2014) (excluding non-scientific testimony where expert "has provided no objective, expert methodology linking the facts to his opinions"); *Silicon Knights, Inc. v. Epic Games, Inc.*, 2011 WL 6748518, at *7-8 (E.D.N.C. Dec. 22, 2011) (excluding expert's opinions, based on a six-factor methodology, as "a series of ad hoc decisions based on subjective considerations, rather than identifiable (or principled) criteria,"  and "ineffective at identifying" a base line for comparison);

*Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981, 995-96 (C.D. Cal. 1996) ("As best anyone could tell from the evidence before the Court, Thrasher simply made [his test] up.  That's hardly the 'objective, independent validation' required under *Daubert*," and even if "[a]ll of Thrasher's criteria are satisfied," no "valid conclusion" can be drawn from the test).

Fagelson opines only that Adkins has issues "consistent with" HHL.  Ex2, Fagelson Adkins Report 11; Ex1, Fagelson Dep2. 120:20-25.  The Court previously rejected Fagelson's opinion that McCombs has issues "consistent with" HHL, and should do so again with his Adkins opinion.  ECF 1680 at 41-42 & n.31.[3]

Moreover, Fagelson acknowledged that Adkins has not had any tests that might identify whether he has HHL.  Ex1, Fagelson Dep2. 126:5-16.  Instead, Fagelson opinion is based on Adkins having a a normal audiogram but claiming to have difficulty hearing.  *Id.* 126:17-127:15.  Fagelson admitted that besides these subjective complaints, he had not seen any testing to determine whether Adkins had HHL.  *Id.* 127:24-128:4.

---

[3] Fagelson also is not qualified to opine on whether someone has HHL.  He has not published any articles or peer-reviewed work in this area.  Ex12, Fagelson Dep1. 364:5-8.  Moreover, he has never diagnosed anyone with HHL.  Ex1, Fagelson Dep2. 120:16-25.

Bennett admitted that "no one has come up with a really good test" for HHL and that "[t]here are not tests out there currently that show a good sensitivity or specificity to be able to differentiate" whether someone has HHL.  Ex7, MBennett Dep1. 385:11-386:9; Ex8, MBennett Dep2. 622:2-8, 622:14-623:12.  Bennett also acknowledged that studies regarding HHL have not identified a test to determine whether a person had HHL.  Ex8, MBennett Dep2. 617:19-621:15.

Similarly, Lustig conceded that "it's going to be years until we come up with really definitive auditory measures that allow us to diagnose cochlear synaptopathy," much less to specifically diagnose it in Wayman.  Ex5, Lustig Dep2. 42:10-14; *id.* 52:2-5 ("I don't think there are any standards currently published about specifically diagnosing cochlear synaptopathy in a human … .").  Indeed, Lustig testified that "it's literally impossible" to document HHL in living humans "at this stage in our science without doing the histology, which we can't do in humans."  *Id.* 48:10-19.

Finally, Spankovich did not perform any tests on Wayman to rule in or out HHL.  Ex13, Spankovich Dep3. 62:14-24.  Instead, Spankovich purportedly relies upon a series of untested results extrapolated from animals to establish the existence of HHL in Wayman.  *Id.* 57:2-11.  But Spankovich agrees that, while he personally finds this information relevant, there is not a "standard battery or protocol that exist[s]."  *Id.* 60:16-23.

24

"Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified." *Daubert*, 509 U.S. at 593.  Failure to test a theory weighs heavily against its admissions.  *E.g.*, *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1251 (11th Cir. 2005) (excluding opinion where theory could be tested but expert "offered no evidence of any testing of his theory, and therefore, he has shown no proof for support of his opinions by the scientific community"); *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) (affirming exclusion of opinion where expert "has not tested his own theory nor determined any error rate associated with it"); *Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998) (affirming exclusion of expert opinion where expert testifying about nature of fire "performed no tests and took no samples").  Plaintiffs' expert's failure to perform any test to determine whether Adkins or Wayman have HHL—and their repeated admissions that no such test exists—further confirms that they lack any reliable methodology for determining whether these Plaintiffs have HHL.

## II.     PLAINTIFFS' EXPERTS' DIAGNOSES ARE UNRELIABLE.

### A.     Kileny Is Not Qualified To Render A Differential Diagnosis Or Other Causation Opinion Of Hensley.

Kileny opines that the CAEv2 caused Hensley's tinnitus, Ex14, Kileny Report 7, but Kileny is an audiologist, not a medical doctor, and is not qualified to provide a medical opinion regarding causation or to exclude other medical conditions, as required by a differential diagnosis.  Kileny's areas of expertise are audiology and

electrophysiology.  Ex15, Kileny Dep. 17:4-21.  He might be qualified to analyze and interpret audiometric testing data and information and opine on the type, degree, and configuration of any hearing loss observed.

But Kileny lacks the requisite medical qualifications to consider other potential medical causes.[4]  *See Ford v. Carnival Corp.*, 2010 WL 9116184, at *2 (S.D. Fla. Mar. 4, 2010) (finding forensic toxicologist with a Ph.D. in pharmacology qualified to offer some expert opinions, but not the opinion that plaintiff's respiratory illness "was not *caused* or *aggravated* by her alleged exposure to chlorine fumes"); *Bayes v. Biomet, Inc.*, 2020 WL 5594059, at *6 (E.D. Mo. Sept. 18, 2020) ("Biomet seeks to exclude Truman from offering any opinion regarding medical causation.  Truman is an engineer, not a medical doctor.  Accordingly, the Court will not permit Truman to opine on the medical causation of Mary's injuries."); *Lowery v. Sanofi-Aventis LLC*, 2021 WL 872620, at *8 (N.D. Ala. Mar. 9, 2021) (finding

---

[4] Similarly, Kileny is not qualified to offer opinions that Hensley's tinnitus causes anxiety or irritability given that his experience with anxiety is limited to being "aware of some of the signs that might indicate" anxiety, and not actually diagnosing it.  Ex15, Kileny Dep. 90:7-91:5.  Both Mr. and Mrs. Hensley testified that Mr. Hensley's PTSD and independent anxiety contribute to problems like irritability and interfere with Mr. Hensley's social life.  Ex16, LHensley Dep2. 39:24-40:6; 85:25-86:10; Ex17, MHensley Dep. 119:8-16.  Because Kileny is unfamiliar with anxiety, he is not qualified to parse out which injury, tinnitus or PTSD, causes Hensley's anxiety issues.

doctor might be qualified to testify about osteoarthritis and its treatment, but not to distinguish between the range of potential diagnoses in the case).  Kileny admitted that he could not determine whether other medical causes resulted in Hensley's alleged injuries.  Ex15, Kileny Dep. 90:7-91:5 (agreeing that he is in no position to diagnose or confirm diagnoses of anxiety); *id.* 71:12-19 (acknowledging that he does not treat certain medical conditions that can cause hearing loss and must refer those to physicians).

Moreover, Kileny agreed that tinnitus is a symptom of an underlying medical condition, not an actual condition itself.  *Id.* 121:5-8.  Kileny further agrees Hensley's tinnitus is not attributable to an underlying condition of noise-induced hearing loss.  Ex14, Kileny Report 6-7.  Kileny, as an audiologist, cannot consider non-noise-related potential causes.  *See* Mich. Comp. Laws Ann. § 333.16801(2) (West) ("Practice of audiology does not include the practice of medicine or osteopathic medicine and surgery or medical diagnosis or treatment.").  Because the tinnitus results from an underlying medical condition, and Kileny is not qualified to testify regarding medical causes of the tinnitus, Kiley is not qualified to opine about what caused Hensley's tinnitus, and his causation opinion should be excluded.

### B.   Marc Bennett Cannot Opine That CAEv2 "Caused" Injuries In Individuals He Has Not Analyzed.

Marc Bennett's report contains the sweeping opinion that "the defective and unreasonably dangerous condition of the CAEv2, and 3M's negligence in failing to adequately design, test, and warn about the CAEv2's risks and dangers, caused users of the CAEv2 to suffer NIHL and tinnitus and pain and suffering and distress resulting therefrom."   Ex54, MBennett General Report 36.   At his deposition, Bennett said this causation opinion was with respect to "all of the … CAEv2 users that had hearing loss." Ex7, MBennett Dep. 374:7-19.   Bennett, however, separately conceded that "in order to to attribute anyone's hearing loss or tinnitus to the Combat Arms Version II, you need to perform a differential diagnosis," and that he has "only performed a differential diagnosis on two users." *Id.* 374:20-375:6.   Thus, Bennett has no basis for any causation opinion for users beyond those he has personally diagnosed, and his sweeping causation opinion regarding other "users" must be excluded.

### C.   Plaintiffs' Experts Have No Basis For Opinions That Any CAEv2 Defect Caused Plaintiffs' Alleged Injuries.

#### 1.   Kileny's Opinion That Any CAEv2 Defect Caused Hensley's Alleged Injuries Should Be Excluded.

Kileny lacks a reliable basis to opine that the design of the CAEv2 more likely than not caused Hensley's tinnitus.   Ex14, Kileny Report 6-7.   *First*, Kileny's experience with hearing protection devices ("HPDs") is limited to evaluating them

for University of Michigan band students, not designing or testing them. Ex15, Kileny Dep. 83:11-85:10. *Second*, Dr. Kileny never explains how the CAEv2 provided Hensley with poor protection—is it too short? Too fat? Too stiff? Imperceptibly loosens? Kileny cannot say because he never tested the earplugs or asked Hensley about the CAEv2's fit for him. *Id.* 120:6-19. Thus, Kileny's analysis is unlike Packer's opinion in *Baker* where Packer "evaluated Baker's ear anatomy both with and without the CAEv2 inserted to assess whether Baker could obtain a proper fit with the device." *Baker* ECF No. 87 at 8. As Kileny provides no explanations of how any alleged defects caused Hensley's supposed tinnitus, and performed no testing of the CAEv2 with Hensley, he lacks a reliable methodology and sufficient facts or data for his causation opinion.

### 2. Lustig's Opinion That Any CAEv2 Defect Caused Wayman's Alleged Injuries Should Be Excluded.

Lustig offers general testimony about CAEv2 defects without any basis for drawing conclusions relating to Wayman. For example, Lustig described the flange-fold insertion as relating to a CAEv2 defect. Ex18, Lustig General Report 51. But "[t]he only way" to know whether Wayman "would have needed to fold back the flanges" would be to "do a test on him with and without the flanges folded back". Ex5, Lustig Dep2. 98:3-99:5. Since Lustig never performed that testing, *id.*, he

"can't tell … specifically if [folding the flanges] was required for [Wayman]"—only that it "could have been possible." *Id.* 73:12-74:10.

Lustig could not point to one "specific defect" that caused Wayman's injuries. *Id.* 2:20-73:9. Despite opining about CAEv2 defects, Lustig admits that "there probably was a subset of people that probably were able to get a seal." *Id.* 75:17-19; *id.* 76:8-9 ("I don't think we really know exactly who this was safe in.").) Thus, Lustig lacks sufficient facts or data to opine that any CAEv2 defect caused Wayman's alleged injuries.

### 3. Spankovich's Opinion That Any CAEv2 Defect Caused Wayman's Alleged Injuries Should Be Excluded.

Spankovich does not have a reliable basis for opining that Wayman's use of the CAEv2 caused his purported injuries. Though Spankovich claims that "the failure of the CAEv2 to provide adequate hearing protection" caused Wayman's injuries, Ex6, Spankovich Wayman Report 15, Spankovich did not do an individualized test on Wayman to determine whether the CAEv2 fit him, Ex13, Spankovich Dep3. 111:24-112:3. Nor did he measure the size of Wayman's ear canals, ask to observe Wayman insert the CAEv2 into his ear canals, or observe whether the CAEv2's opposing flanges pressed against Wayman's outer ear. *Id.* 112:4-9; 113:10-21. Nor does Spankovich know if Wayman needed to fold back the flanges of the CAEv2 in order to get a proper fit. *Id.* 113:22-114:9. Without

verifying whether the CAEv2 failed to adequately protect Wayman specifically, Spankovich has no basis to opine that the CAEv2 did not provide adequate hearing protection for Wayman.

**D.    Plaintiffs' Experts Failed To Properly Rule Out Alternative Causes.**

A reliable differential diagnosis analysis requires the expert to (1) compile a "comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration" and (2) "eliminate all causes but one." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1195 (11th Cir. 2010).  An expert "must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Id.* 1197; *see also Kilpatrick*, 613 F.3d at 1342-43.  In other words, the expert must "take serious account" of alternative causes, and provide "a reasonable explanation as to why he or she has concluded that any alternative cause suggested by the defense was not the sole cause of the plaintiff's injury." *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010).  A "bare-bones reliance ... on the presence of a symptom without any analysis as to why that symptom supports ruling out one diagnosis while also ruling in another" is an unreliable method to establish causation.  *Lowery*, 2021 WL 872620, at *15.

Plaintiffs' medical causation experts do not reliably rule out significant alternative causes (including those related to other HPDs and prior medical histories) and thus failed to perform proper differential diagnoses, rendering their opinions inadmissible.

### 1.    Fagelson's Diagnosis Of Adkins Is Unreliable.

Fagelson was unaware of at least three medical records that could change his opinions.  Fagelson admitted that reviewing all of Adkins' medical records "was just not something I was able to do," Ex1, Fagelson Dep2. 31:19-32:8, and thus he did not take account of these records or their contents in making his diagnosis.

First, Fagelson testified that it "wouldn't make [Fagelson] feel good about [his] opinion" if Adkins denied tinnitus or ringing in his ears after his second deployment to Afghanistan.  *Id.* 175:15-23.  In fact, in two post-deployment records, Adkins denied ringing in the ears.  Ex19, B_L_Adkins-VA-003573-3576; Ex20, B_L_Adkins-VA-003206-3209.

Second, Fagelson testified that if a medical record showed that Adkins experienced sleep issues before his military service, he would need to know "how bad [the complaints] were ahead of time and how bad they are now" to determine if it would impact his opinion.  Ex1, Fagelson Dep2. 179:5-11.  During Adkins' enlistment medical examination (prior to basic training and use of the CAEv2), he stated he had insomnia.  Ex21, B_L_Adkins-VA-003621-3624.  Yet, Fagelson

32

performed no physical examination or interview to illicit the information he claimed he needed to know about Adkins' alleged sleep issues. *See generally* Ex2, Fagelson Adkins Report.

Third, Fagelson performed no analysis detailing other potential causes that may be exacerbating Adkins' alleged PTSD symptoms and sleep disorders. Rather, Fagelson merely asserts that Adkins' "tinnitus is a substantial factor that exacerbates his PTSD symptoms and sleep disorder." *Id.* 8. Fagelson's expert report includes no discussion on whether Adkins' diagnosed personality disorder affects his alleged PTSD symptoms or sleep disorder. Indeed, Fagelson testified that he was not qualified to offer an opinion about the relationship between antisocial personality disorder and sleep issues. Ex1, Fagelson Dep2. 180:13-17.

### 2. Kileny's Diagnosis Of Hensley Is Unreliable.

#### a. Kileny Did Not Perform A Differential Diagnosis.

Hensley has a documented history of ear infections, facial/jaw problems, migraines, and ototoxic medication consumption. Ex22, Phillips Report 17-18; Ex17, MHensley Dep. 236:3-6, 248:8-249:22, 256:3-15. But Kileny did not perform a proper differential diagnosis to determine whether any of these problems caused Hensley's supposed tinnitus, as Kileny neither compiled a comprehensive list of potential causes, nor provided reasons for excluding all other causes besides the

CAEv2.  Kileny failed to even include the term "differential diagnosis" in his report, or reference this process in his deposition.

At no point does Kileny list, much less explain away, other potential causes. Instead, he concludes "[n]oise exposure with inadequate hearing protection can result in tinnitus without hearing loss in some individuals" without ever explaining *why* or *how* "[n]oise exposure with inadequate hearing protection" is the more likely cause of Hensley's alleged tinnitus compared to facial/jaw problems, migraines, ototoxic drugs, or ear infections.  Ex14, Kileny Report 6; *see also Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 897-98 (8th Cir. 2008) (affirming exclusion of differential diagnosis that "failed to eliminate scientifically other possible causes" because a differential diagnosis "must also rule out other possible causes").  And when presented with Defendants' expert's theory of causation, he did nothing to explain why his theory is more likely.  Ex15, Kileny Dep. 281:15-282:17.  *See Guinn*, 602 F.3d at 1253 (an expert "must provide a reasonable explanation as to why he or she has concluded that any alternative cause suggested by the defense was not the sole cause of the plaintiff's injury").

Moreover, Kileny did not perform basic audiometric testing on Hensley that he "always" conducts when seeing new tinnitus patients.  Ex15, Kileny Dep. 102:13-22; 64:3-5).  Kileny cannot render diagnostic opinions without conducting standard tests.  *Id.* 123:13-124:12 (explaining that when tinnitus patients see him, his job is

to "sort of figure out where it's coming from and what it's doing.  It involves doing hearing testing, complete audiological evaluation").  *See Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609-10 (D.N.J. 2002), *aff'd*, 68 F. App'x 356 (3d Cir. 2003) (excluding an expert who engaged in "very few standard diagnostic techniques by which doctors normally rule out alternative causes").  Moreover, Kileny knew (or should have known) from reviewing medical records that Hensley has a history of ear infections.  Ex23, MJHensley-VA-0531; Ex24, MJHensley-VA-0623; Ex25, MJHensley-VA-2702.  Kileny further agreed that ear infections can result in tinnitus.  Ex15, Kileny Dep. at 171:8-11.  But Kileny never discusses ear infections as a potential cause of tinnitus generally, or in the case of Hensley.  The same is true regarding Hensley's facial/jaw problems, migraines, and ototoxic medication, rendering Kileny's diagnosis unreliable.  *Hendrix*, 609 F.3d at 1195; *Lowery*, 2021 WL 872620, at *15 (finding unreliable a differential diagnosis that included a "bare-bones reliance on a treating physician's clinical impressions," without an analysis on why it supported ruling out one diagnosis while ruling in another); *see also Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120 (S.D. Fla. 2014) (granting motion to exclude expert testimony where expert did not elaborate as to how an analysis was conducted, how his experience informed that analysis, and what steps he took to verify the results of his analysis).

35

### b.    Kileny Cannot Offer Opinions Regarding Hensley's Malingering.

Kileny cannot offer malingering opinions.  When asked if he had any way of knowing whether Hensley was attempting to exaggerate the nature of his hearing loss in his right ear, Kileny responded:  "He may have.  I don't know that for a fact.  Or he may have misunderstood.  Or maybe his, you know, cognitive status is such that, you know, he didn't perform accurately."  Ex15, Kileny Dep. Tr. at 303:19-304:11).  This imprecise and equivocal answer shows that Kileny does not have a sufficient basis for offering any opinions regarding Kileny's malingering.  *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.,* 402 F.3d 1092, 1111 (11th Cir. 2005) ("[A] trial court may exclude expert testimony that is imprecise…").

### 3.    Bielefeld's Diagnosis Of Sloan Is Unreliable.

### a.    Increased Risk Of Dementia And Cognitive Decline.

Bielefeld opines in his expert report that among Sloan's injuries is an increased risk of dementia and cognitive decline at a younger age due to his hearing loss.  Ex11, Bielefeld Report 16, 27.  Yet, the Court previously excluded the exact same opinions from Bielefeld in his general Group A report as (a) unreliable, (b) unhelpful, and (c) unduly prejudicial.  ECF 1680 at 45-46.  Bielefeld cannot identify anything that has changed since the Court's prior order—to the contrary, he simply refers to his general report to support his opinion here.   Ex11, Bielefeld Report 27.  Moreover, if Bielefeld's opinion is unreliable to establish general

causation in these cases, it cannot be considered reliable to establish specific causation for Sloan.

### b.    Opinions That Other Earplugs Were Not Defective.

Bielefeld should not be allowed to offer any opinions concerning the effectiveness of any other hearing devices or whether other hearing devices Sloan used were not defective.  First, he did not include any opinions about other hearing devices in his report in this case.  Second, to the extent he intends to offer opinions as to other hearing devices—as a means of contrasting his opinion that defects in the CAEv2 caused Sloan's injuries—those opinions would be unreliable.  During his deposition, Bielefeld pointed to alleged defects in the CAEv2 as the cause of Sloan's hearing loss and tinnitus, in part because "I don't have any evidence to suggest that the CVC helmet or the other devices that he wore failed him."  Ex26, Bielefeld Dep2. 57:3-21.  Yet, he conceded that he had not done *any* investigation into other hearing protection devices because "I have no reason to suspect that the other devices have failed."  *Id.*  57:22-58:4.  Thus, by Bielefeld's own admission, any opinions about other devices would be pure speculation—precisely what *Daubert* is intended to preclude.

### c.    Opinion That The CAEv2 Caused Sloan's Tinnitus.

Finally, Bielefeld opines that service-connected noise, and the failure of the CAEv2 to protect him, caused both Sloan's hearing loss and tinnitus.  Ex11,

Bielefeld Report 16, 25.  Yet, Bielefeld failed to conduct a differential diagnosis of Sloan's complaints of tinnitus.  Bielefeld stated that a differential diagnosis for tinnitus is "harder" than for hearing loss because there are "potentially more contributing causes."  Ex26, Bielefeld Dep2. 105:2-16.  He further conceded that there are cases of idiopathic tinnitus with no known cause.  *Id*. 105:20-106:10. Because there is a "limit" to how much audiologists know about the "underlying pathology of tinnitus," he conceded that "[i]t is hard to really pin it down to one particular event."  *Id*.

Instead of employing a differential diagnosis to his opinion about the cause of Sloan's tinnitus, Bielefeld decided that it was simply a "logical conclusion" that the same thing that caused Mr. Sloan's hearing loss also caused his tinnitus.  *Id*.  That is not a reliable opinion based upon scientific analysis—certainly not one that could be tested or replicated—but rather an opinion based purely upon the *ipse dixit* of the expert, which is not admissible under Daubert.  *See Joiner*, 522 U.S. at 146.

### 4. Dimmick's Diagnosis Of Sloan Is Unreliable.

#### a. Hearing Loss From Natural Aging.

In her report, Dimmick claims that "according to ISO 1999:2013, thresholds should not exceed 10dB HL for a typical American male at 30 years old."  Ex27, Dimmick Sloan Report 21.  She concludes that because Sloan's hearing loss thresholds exceed that standard, she can rule out age causing Sloan's hearing

38

injuries. *Id.* In other words, because Sloan's hearing loss exceeds 10db HL, Dimmick concludes that his hearing loss was not caused by natural aging, but must result from some other cause.

Dimmick admitted that 10 dB figure does not appear anywhere in ISO 1999:2013. Ex28, Dimmick Dep. 249:19-25. Instead, to arrive at that number, Dimmick performed a calculation that required "a rather intensive amount of math". *Id.* 248:21-249:7. Dimmick could not perform that calculation on her own. She required help from "somebody in [her] office who is better at math than [her]." *Id.* 251:2-7. But she could not remember who that person was and she discarded all of her notes regarding the calculation. *Id.* 250:15-251:7. Ultimately, Dimmick admitted that she cannot replicate the calculation on her own. *Id.* 251:25-252:13.

As Dimmick cannot replicate her calculations, she does not have a reliable basis for ruling out natural aging as a cause of Sloan's hearing loss. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014) ("Under *Daubert's* testability factor, the primary requirement is that someone else using the same data and methods be able to replicate the results."); *Elcock v. Kmart Corp.*, 233 F.3d 734, 747 (3d Cir. 2000) (excluding expert evidence where expert did not explain methodology in rigorous detail, making it "nearly impossible" for defendant's experts to repeat the "apparently subjective methods"); *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1284 (S.D. Ga. 2018) (excluding

39

expert testimony because he failed to provide sufficient information to replicate it and holding that "[t]his is exactly the sort of chicanery and *ipse dixit* the Court must exclude"); *Mohney v. USA Hockey, Inc.*, 300 F. Supp. 2d 556, 567 (N.D. Ohio 2004) (excluding expert testimony where methodology was not "an objective scientific test that is replicable and verifiable"), *aff'd*, 138 F. App'x 804 (6th Cir. 2005).  And as she cannot rule out aging as a cause of Sloan's hearing loss, her differential diagnosis is unreliable and should be excluded.

### b.   Motorcycle Noise Exposure.

Sloan owned and rode his first motorcycle from 2006 to 2007, and a second motorcycle from 2010 to 2013.  Ex27, Dimmick Sloan Report 9-10.  Sloan did not wear hearing protection when operating his motorcycles.  Ex28, Dimmick Dep. 217:19-25.

Dimmick did not take serious account or provide any reasonable explanation for ruling out motorcycle noise exposure as a potential cause of Sloan's alleged injuries.  Dimmick concludes that she is able to rule out Sloan's recreational motorcycle riding as causing his hearing related injuries because Sloan purchased his first motorcycle in 2006, after his hearing loss began in 2005, Ex27, Dimmick Sloan Report 20, but does not address whether Sloan's exposure to motorcycle noise caused his hearing loss in 2006 and later.

Moreover, Dimmick conducted no analysis supporting her opinion. While she understands that motorcycles create noise levels in the range of 80 dB while idling, she could not estimate the maximum noise level a motorcycle could reach while being driven. Ex28, Dimmick Dep. 214:1-20. She admitted that she did not conduct any independent research to determine that number. *Id.* 214:21-25.

Dimmick further acknowledged that riding a Harley-Davidson Road King (one of the motorcycles Sloan owned and operated) without hearing protection could cause hearing loss under certain conditions. *Id.* 216:1-9. And Dimmick recognized that Sloan experienced a threshold shift during the time that he used that motorcycle without hearing protection. *Id.* 232:12-233:7.

Dimmick did not properly rule out exposure to motorcycle noise as a cause of Sloan's hearing loss, and thus did not conduct a proper differential diagnosis, and so her opinion that the CAEv2 caused Sloan's hearing loss should be excluded.

### 5.   Marc Bennett's Diagnosis Of Sloan Is Unreliable.

Similar to Dimmick, Marc Bennett purports to rule out Sloan's exposure to motorcycle noise, claiming the exposure was limited and Sloan's hearing loss and tinnitus arose before Sloan began riding his motorcycle. Ex29, MBennett Sloan Report 21. But Bennett acknowledged that rides of only 30 or 40 minutes could cause changes to someone's hearing. Ex8, MBennett Dep 2. 755:13-756:20.

Furthermore, Bennett acknowledged that during the period where Sloan owned and operated motorcycles, his hearing got worse. *Id.* 761:5-12.

During his deposition, Bennett claimed that he was able to rule out Sloan's use of motorcycles in part because the worsening hearing Sloan experienced during that period was not "low frequency." *Id.* 758:2-9. This explanation appears nowhere in Bennett's report, and he was unable to provide any source or even an author for this proposition. *Id.* 761:13-763:4. Bennett also claimed this low-frequency proposition is "included just in [his] general knowledge and what [he] bring[s] to the table as an expert." *Id.* 761:23-762:6. Bennett's claim of experience-based testimony is insufficient because he does not provide "a sufficiently verifiable, quantitative basis for" his opinion. *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004); *see also King v. Cessna Aircraft Co.*, 2010 WL 1980861, at *3 (S.D. Fla. May 18, 2010).

As Bennett did not properly rule out Sloan's exposure to motorcycle noise as a cause of Sloan's hearing loss, he did not conduct a reliable differential diagnosis and his opinion should be excluded.

### 6.    Lustig's Diagnosis Of Wayman Is Unreliable.

#### a.    Other HPDs.

Lustig fails to provide any analysis as to whether other hearing devices Wayman used would have provided attenuation. He describes the CAEv2 "as his

primary hearing protection device" despite conceding that Wayman wore other hearing-protection devices and "that data doesn't exist" regarding "the percentage of time that Mr. Wayman used the [CAEv2] versus some other type of hearing protection." Ex5, Lustig Dep2. 91:8-92:18.  And he failed to evaluate data relating to the attenuation (or lack thereof) afforded by other HPDs Wayman used.  *Id.* 257:8-258:1 (failing to "recall seeing that degree of REAT testing data on the foamies"); *id.* 258:23-259:7 (failing to "recall seeing" underlying REAT testing data used to compute the NRR for triple-flanges); *id.* 259:14-19 (same for communications earplugs / CEPs); *id.* 259:20-22 (same for muffs).)

### b.    Wayman's Head Injuries.

Wayman sustained multiple head injuries, including at or near the time he developed tinnitus. Ex5, Lustig Dep2. 169:22-170:15.  These head injuries in 2007-08 included Wayman hitting his unhelmeted head while running into a concrete bunker, causing him to lose consciousness, and a separate incident where a 100 pound aircraft door struck his unhelmeted head.   *Id.* 178:21-180:7, 187:13-19.  Wayman reported to Lustig that, after sustaining one of these head traumas, he developed ringing in his ears "that lasted … maybe 24 hours" before it resolved.  *Id.* 185:16-186:6.

Because Wayman's tinnitus subsided before it reappeared, Lustig discounts it, *id.* 200:5-23, but provides no reliable basis for doing so.  Lustig has never "seen

a study specifically addressing that issue" of tinnitus developing years after a head injury and is "not aware of such a study ever being done." *Id.* 201:12-14, 202:10-18.  The studies Lustig relies on that address tinnitus did not evaluate patients over an extended period of time.  Lustig even described one study as "short-term," meaning "we can't make any conclusions on … the time frame that the symptoms will last." *Id.* 231:14-23, 233:1-4.

Moreover, Lustig's studies do not provide a sufficient basis for discounting that Wayman developing tinnitus as a result of his head injuries in the military.  Lustig relies on studies that primarily address "concussions or traumatic brain injuries in athletes." *Id.* 203:3-7.  Some do not even "address anything about tinnitus." *Id.* 209:21-210:8 (discussing Dep. Ex. 5); *id.* 213:10-21 (testifying that Dep. Ex. 6 "mentions nothing about tinnitus").)  Lustig attempts to extrapolates from "athletic injury" documented in the concussion studies to military injury, such as when Wayman "r[an] into a concrete bunker," but does not provide a reliable basis for doing so. *Id.* 205:10-206:8, 206:19-207:9. *See supra* 17-18.

### c.    Sleep.

When Lustig opined that Wayman's injuries include sleep disturbances, he did not follow any methodology.  Rather than perform a differential diagnosis to exclude alternative causes of Wayman's sleep disturbances, he is simple parroting Wayman's testimony: "[I]t's a very obvious cause. … So the differential diagnosis

44

is, do you have tinnitus, you know?"  Ex5, Lustig Dep2. 247:1-248:14.  Lustig does not recall even asking Wayman "specifically the number of hours slept per night".  *Id.* 249:13-251:4.  Therefore, his case-specific opinion about Wayman's sleep disturbances is not helpful to the jury and should be excluded.

### d.  Mental-Health Disorders.

Lustig should be precluded from offering case-specific opinions about Wayman's mental-health disorders interacting with his tinnitus.  According to Lustig, the relationship between tinnitus and anxiety or PTSD is "a two-way street."  Ex5, Lustig Dep2. 143:16-21.  But his testimony about Wayman sounds in speculation and generalities.  *Id.* 144:11-17 ("[I]n Mr. Wayman's case associated with service in Iraq, … I would imagine that the person with PTSD is going to experience it more intensely … .").  Lustig admitted that "it's impossible to say 100 percent for certain because no one can stick theirselves [sic] inside Mr. Wayman's brain".  *Id.* 144:18-145:9.

### 7.  Spankovich's Diagnosis Of Wayman Is Unreliable.

### a.  Other HPDs.

Spankovich lacks a basis to rule out the other HPDs Wayman used during his service.  Indeed, in the only two records documenting Wayman's hearing sustaining a temporary shift (which ultimately returned to normal), the records indicate that he

was wearing hearing protection other than the CAEv2. Ex30, 4/2010 Wayman Audiogram; Ex31, 3/2011 Wayman Audiogram.

Moreover, Spankovich did not "perform an assessment of [noise reduction] values of the other hearing protection devices" that Wayman wore while he was in the military. Ex13, Spankovich Dep3. 93:10-25. In fact, he did not research the communications earplugs ("CEPs") or any other helmets that Wayman used at all while in the military. *Id.* 94:1-3. Because Spankovich did nothing to evaluate whether the other HPDs that Wayman wore in the military provided Wayman with adequate protection against pertinent noise exposures, he did not properly rule out those exposures.

### b.    Traumatic Brain Injury ("TBI").

With respect to the cause of Wayman's tinnitus, Spankovich improperly ruled out TBI. Spankovich testified that he has diagnosed patients with tinnitus as a result of a TBI. Ex13, Spankovich Dep3. 95:13-18. He further acknowledged that Wayman was formally diagnosed with a TBI in 2007—the same year in which Wayman reported first experiencing intermittent tinnitus. *Id.* 96:16-97:11. Spankovich does not provide a reliable explanation as to why the transient tinnitus that Wayman experienced in 2007—and which ultimately became constant in 2011—is unrelated to his TBI. Nor does he provide any basis to ignore Wayman's own statements to the VA that tinnitus is a TBI-related symptom. Ex32, 2/26/2020

46

Wayman Ltr. To the VA.  An expert witness cannot "cherry-pick[] the facts he considered to render an expert opinion." *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001).  Spankovich ignores highly pertinent information that renders his diagnosis unreliable.

### c.    Sleep Issues.

Spankovich also seeks to attribute Wayman's difficulty sleeping to his tinnitus.  Ex6, Spankovich Wayman Report 16.  Spankovich did not perform a differential diagnosis in evaluating whether tinnitus is the sole cause of Spankovich's sleeping difficulties.  At most, Spankovich states that "Wayman reported significant effects of the perceived hearing loss and in particular his tinnitus on his daily function including … sleep." *Id.*

Nowhere in Spankovich's report did he rule out *any* other potential cause of Wayman's sleep injuries, including Wayman's sleep apnea or PTSD nightmares, before determining that Wayman's tinnitus is more likely than not the cause. Spankovich acknowledges that Wayman has disruptive sleep apnea.  Ex13, Spankovich Dep3. 120:17-20.  He also testified that sleep apnea and tinnitus "can coexist and they can both impact a person's sleep quality." *Id.* 120:11-15.  He further recognized that nightmares from PTSD may wake someone up and contribute to sleep-related issues.  *Id.* 122:12-123:7.  Thus, Spankovich "needed to consider" sleep apnea and nightmares and "rule it out in giving his causation opinion" as to

Wayman's sleep-related issues.   ECF 1640 at 24.   Having failed to do so, Spankovich's opinion related to sleep issues "is not supported by a reliable methodology and thus is inadmissible." *Id.*

### 8. Ostacher's Diagnosis Of Wayman Is Unreliable.

#### a. Wayman Refused Treatment.

Ostacher opines that Wayman's tinnitus has a causal effect on his PTSD symptoms, but Ostacher ignored alternatives causes.   Wayman first reported experiencing PTSD symptoms as early as 2007.   Wayman did not seek out any treatment for his PTSD symptoms between 2007 and 2017.   Ex33, Ostacher Dep3. 47:14-48:10.   Wayman declined follow-up treatment for his PTSD symptoms when they first surfaced despite a recommendation that he do so.   *Id.* 42:10-14.   Ostacher knew that he was first experiencing these symptoms as early as 14 years ago in 2007 and knew that he was formally evaluated for PTSD by the VA in 2017.   *Id.* 37:18-38:4, 40:19-25.

Ostacher concludes that Wayman's tinnitus worsens his PTSD symptoms but does not mention the possibility that it was Wayman's decision to not seek treatment 14 years ago that could be a cause of his worsened PTSD symptoms.   There is no reasonable explanation from Ostacher as to why he did not consider this possibility, especially considering that Ostacher conceded that that "[t]here are people who get treatment for PTSD who improve."   *Id.* 46:6-13, 47:11-13.   Moreover, Ostacher

admits to not being able to conclude that Wayman's PTSD symptoms would not have improved with treatment. *Id.* 48:4-10. Ostacher's failure to consider this as an aggravating factor is especially unreasonable given that Ostacher admits that once Wayman did start seeking treatment for his PTSD in 2018 and 2019, his symptoms improved. *Id.* 111:2-112:2. Accordingly, Ostacher lacks a reasonable basis for opining that Wayman's tinnitus worsens his PTSD symptoms.

### b. TBIs.

Wayman sustained multiple head injuries, including at or near the time he developed tinnitus. As a part of his analysis, Ostacher reviewed Wayman's medical records from Dr. Knight indicating that Wayman has a history of TBIs from his deployment. Ex33, Ostacher Dep3. 52:9-13. Despite evaluating patient histories of head trauma in his clinical practice, Ostacher relied almost exclusively on one line from Knight's medical report on Wayman that states Wayman has a history of "mild traumatic brain injuries." *Id.* 51:16-54:23. Ostacher concedes, first, that he did not go into the "same detail" about Wayman's TBIs as Knight and, second, there were events leading to Wayman's documented TBIs that Ostacher did not ask about at all. *Id.* 56:16-57:2, 57:7-16, 57:24-58:10, 58:20-59:12.

Despite this, Ostacher devotes a paragraph of his Wayman-specific report to conclude that Wayman's PTSD and worsened mental health symptoms "are not consistent with mild TBI" because "[m]ost symptoms of TBI, including emotional

symptoms, behavioral changes such as irritability, cognitive impairment, and sleep disturbance (insomnia), resolve within a short amount of time."   Ex34, Ostacher Wayman Report 23.  Ostacher alleges that because Wayman's tinnitus, commencing in 2011-2012, results in enhanced symptoms of Wayman's PTSD, Wayman's TBIs from years before are unlikely to contribute to Wayman's PTSD symptoms.  *Id.* 23-24.

This conclusion fails to "take serious account" of alternative causes for multiple reasons.  *Guinn*, 602 F.3d at 1253.  First, Ostacher's conclusion does not consider Ostacher's own concession that Wayman's intermittent tinnitus began in 2007.  Ex33, Ostacher Dep3. 72:22-73:7.  Second, this conclusion fails to consider that Wayman's PTSD symptoms were first reported in 2007, *Id.* 36:11-20, the same year as at least one, if not more, of Wayman's TBI incidents.  *Id.* 55:9-57:12. Finally, Ostacher concedes that there is peer-reviewed literature that explains the correlation between TBIs and PTSD symptoms.  *Id.* 117:2-20.  Accordingly, Ostacher provided no more than "unsupported speculation" that did not "take serious account" of Wayman's TBIs contributing to his PTSD symptoms.  *Guinn*, 602 F.3d at 1253.

III.   **PLAINTIFFS' ECONOMIC LOSS OPINIONS ARE BASED ON FALSE ASSUMPTIONS AND IMPROPER METHODOLOGIES.**

A.   **Johnson's Opinions Are Based On Incorrect Or Unreproducible Data And Are Unreliable.**

Adkins, Blum, Sloan, and Wayman seek to introduce Johnson's opinion on their loss of earning capacity and work life expectancy.   Johnson's opinions are inadmissible because she uses incorrect data, does not use a reliable methodology, and her conclusions are not tied to the facts.

1.   **Johnson Used The Wrong Data for Occupational Access, Rendering Her Opinions Unreliable.**

Johnson's opinions purportedly are based on the RAPEL framework, which relies on factors including access to the labor market, placeability, and labor force participation.  *E.g.*, Ex35, Johnson Adkins Report 2; Ex36, Johnson Sloan Report 2; Ex37, Johnson Wayman Report 2.  Johnson admitted that access to the labor market is a factor in determining lost earnings capacity and worklife expectancy.  Ex38, Johnson Dep1. 70:12-71:4; Ex39, Johnson Dep2. 403:13-405:2, 528:20-529:22; 589:12-17.

To determine Plaintiffs' access to the labor market—and thus opine about Plaintiffs' worklife expectancy and earning capacity—Johnson used the Revised Handbook of Analyzing Jobs (the "Handbook"), but her reports used the incorrect data.  Ex38, Johnson Dep1. 78:8-17, 104:1-106:2.  Johnson's reports purport to reproduce data from the Handbook providing noise-intensity level and hearing

requirements across 12,761 occupations in the Dictionary of Occupational Titles ("DOT"). Ex35, Johnson Adkins Report 19; Ex40, Johnson Blum Report 16; Ex36, Johnson Sloan Report 16; Ex37, Johnson Wayman Report 14-15; Ex38, Johnson Dep1. 107:6-9, 112:5-20.  Based on this data, Johnson opined Plaintiffs lost access to "over 90% of occupations based on [their] hearing impairment alone." *E.g.*, Ex35, Johnson Adkins Report 20; Ex36, Johnson Sloan Report 17; Ex37, Johnson Wayman Report 16; Ex38, Johnson Dep1. 104:1-8, 105:19-106:7.

However, in transposing the data in her report, Johnson erroneously used the Handbook's data on the percentage of jobs requiring capacity for ***handling*** instead of jobs requiring ***hearing***:

**PHYSICAL DEMANDS**

See RHAJ (Chapter 12) - www.skilltran.com/rhaj/chapter12.htm

**PHYSICAL DEMANDS** describe the physical activities   required to perform jobs. These factors are assigned on the basis of the frequency of required performance during a normal work day.

**PHYSICAL DEMANDS - *Frequency Counts***

Below is the frequency with which each factor is rated in the DOT.

1   STRENGTH - (See adjacent panel)
2   CL   CLIMBING ladders, stairs, scaffolding, ramps, poles, etc.
3   BA   BALANCING to prevent fall from hazardous places
4   ST   STOOPING (bending) spine at the waist
5   KN   KNEELING to come to rest on the knees
6   CR   CROUCHING (bending the legs and spine)
7   CW   CRAWLING by moving about on hands and knees
8   RE   REACHING with hand(s)/arm(s) in any direction
9   HA   HANDLING seizing, holding, grasping or turning
10   FI   FINGERING by picking or pinching with finger(s)
11   FE   FEELING for size, shape, temperature or texture
12   TA   TALKING to exchange ideas or information with others
13   HE   HEARING sounds by ear
14   TS   TASTING/SMELLING variations in flavors or odor
15   NE   NEAR ACUITY vision at 20 inches or less
16   FA   FAR ACUITY vision at 20 feet or more
17   DE   DEPTH PERCEPTION to judge distances
18   AC   ACCOMMODATION quick near-point visual refocus
19   CV   COLOR VISION to identify and distinguish colors
20   FV   FIELD OF VISION around the periphery of a fixed point

**PHYSICAL DEMANDS Frequency Counts**

| Work Day | | N Not Present | O Occasional (up to 1/3 day) | F Frequent (1/3 to 2/3 day) | C Constant (> 2/3 day) |
|---|---|---|---|---|---|
| 2 | CL | 11,063 | 1,295 | 399 | 4 |
| 3 | BA | 11,845 | 683 | 223 | 10 |
| 4 | ST | 8,278 | 3,001 | 1,466 | 16 |
| 5 | KN | 10,924 | 1,366 | 470 | 1 |
| 6 | CR | 9,588 | 1,994 | 774 | 5 |
| 7 | CW | 12,322 | 322 | 67 | 0 |
| 8 | RE | 111 | 957 | 10,337 | 1,356 |
| 9 | HA | 98 | 895 | 10,352 | 1,416 |
| 10 | FI | 2,046 | 3,693 | 6,438 | 584 |
| 11 | FE | 10,733 | 1,373 | 605 | 49 |
| 12 | TA | 8,171 | 1,214 | 3,263 | 113 |
| 13 | HE | 7,656 | 1,602 | 3,372 | 126 |
| 14 | TS | 12,856 | 72 | 33 | 0 |
| 15 | NE | 1,742 | 1,730 | 8,537 | 752 |
| 16 | FA | 11,245 | 675 | 789 | 57 |
| 17 | DE | 6,819 | 1,874 | 3,909 | 159 |
| 18 | AC | 7,862 | 2,571 | 2,114 | 214 |
| 19 | CV | 7,926 | 3,439 | 1,313 | 83 |
| 20 | FV | 11,816 | 413 | 483 | 49 |

Ex41, Johnson Ex. 10 at 2 (highlighting added); Ex38, Johnson Dep1. 124:19-125:18.  Using the correct data for ***hearing*** requirements, Johnson acknowledged that Plaintiffs lost access to only 27% of occupations based on hearing requirements—not 90%.  *Id.* 130:21-131:7.  While Johnson argued that the 27% was "still a loss of access," she provided no analysis or other explanation of why this

dramatic change in the number of occupations unavailable to plaintiffs—from 90% to 27%—does not affect her opinions. *Id.* 128:15-131:7, 198:16-199:9.

Thus, Johnson's opinions on loss of access, earning capacity, and worklife expectancy are based on an admittedly false assumption, and thus are inadmissible. *See United States v. City of Miami, Fla.*, 115 F.3d 870, 874 (11th Cir. 1997) (holding that district court erred in admitting opinion that "was premised on erroneous data which he used to determine the relevant labor market"); *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 682 (3d Cir. 1991) ("An opinion based on false assumptions is unhelpful in aiding the jury in its search for the truth, and is likely to mislead and confuse."). Moreover, the fact that she did not change her opinion or provide further analysis after admitting to this mistake further confirms that she has not "reliably applied the principles and methods to the facts of the case." Fed. Rule Evid. 702(d).

Johnson attempted to sidestep her errors by arguing that occupations' noise-intensity levels also cause Plaintiffs to lose access. But the RAPEL framework relies on access to the labor market (among other factors), and Johnson indisputably erred in her access assumption. Moreover, Johnson was not able to provide a reliable opinion regarding occupations' noise-intensity levels. The DOT categorizes occupations' "environmental conditions" as "Very Quiet," "Quiet," "Moderate," "Loud," or "Very Loud." Ex41, Johnson Dep1. Ex. 10 at 2. Johnson believed plaintiffs could only work in "Very Quiet" or "Quiet" occupations. Ex38, Johnson

54

Dep1. 129:21-130:11.   But Johnson could not reliably apply those levels to Plaintiffs' employment because she did not know how the DOT defined those terms. *Id.* 108:3-112:4.   Further, although she claimed Plaintiffs lost access to the 90% of occupations that were not "Very Quiet" or "Quiet," she acknowledged Sloan's current occupation is "Moderate" and saw nothing indicating he would lose his job because of hearing impairments.   Ex39, Johnson Dep2. at 395:13-18, 397:23-398:4.

## 2.   Johnson Fails to Articulate a Reliable Methodology.

Despite differences in their education, age, employment, health, and level of hearing impairment, Johnson concludes that "based solely on the hearing loss and tinnitus," Adkins and Sloan would each "sustain[] a permanent loss of earning capacity of 10% minimum" over their work lives.   Ex35, Johnson Adkins Report 20; Ex36, Johnson Sloan Report 17.   Johnson similarly opines that Blum's earning capacity was reduced by 10% based on her conductive hearing loss, and an additional 3-5% based on her sensorineural hearing loss and tinnitus.   Ex40, Johnson Blum Report 14, 18.   However, Johnson fails to articulate *how* she arrived at these percentage losses; instead relying on generalized statements that her opinion is based on the "totality" of the information, combined with her experience.   Ex39, Johnson Dep2. 527:3-533:4, 588:18-595:15, 592:19-595:15.

"The need for an expert to complete and explain his methodology," and how it applies to the facts to yield the expert's opinion, "is at the heart of reliability."

*Lee-Bolton v. Koppers, Inc.*, 319 F.R.D. 346, 377-78 (N.D. Fla. 2017) (Rodgers, J.). If the "witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  ECF No. 1680 at 3 (emphasis added); *see also Frazier*, 387 F.3d at 1261; *King*, 2010 WL 1980861, at *4.  Johnson's failure to articulate how her experience leads to her opinion on loss of earning capacity requires exclusion.

### 3. Johnson's Conclusions Regarding Lost Earning Capacity Are Not Tied to the Facts.

Johnson fails to explain how she applied any supposed methodology reliably applied to the facts.  Johnson attributes a 10% lost earning capacity to Adkins' "hearing loss and tinnitus," Ex35, Johnson Adkins Report 20, but concedes that Adkins "has normal hearing in the bilateral ears."  Ex39, Johnson Dep2. 494:6-9. Johnson opines that Adkins would have "possessed the ability to earn an income compatible with the average" for those with "some college to an Associate Degree" for "full time, year round employment."  Ex35, Johnson Adkins Report 16.  But by Adkins' own admission, even absent his alleged hearing impairment, he would not be able to work full time due to his seizure disorder.  Ex42, Adkins Dep. 326:7-14. The VA has granted Adkins special monthly compensation for "housebound

benefits"[5]—another fact Johnson failed to consider.   Ex39, Johnson Dep2. 501:14-17.

Johnson acknowledges that Sloan has several other disabilities, including a 100% disability rating for the VA for major depressive disorder, sleep apnea, cervical strain, inflammation of the ulnar nerve, bilateral cubital tunnel syndrome, and left hip strain, among others.  Ex36, Johnson Sloan Report 8.  But Johnson failed to consider how these myriad non-hearing-related conditions impact Sloan's earning capacity or worklife expectancy.  Ex39, Johnson Dep2. 398:12-21, 414:16-415:13.

Blum indisputably has conductive hearing loss.  Ex40, Johnson Blum Report 3-5.  But Johnson does not explain how she distinguished Blum's conductive hearing loss from sensorineural hearing loss or tinnitus when evaluating earning capacity; nor could she explain what occupations Blum may not be able to perform due to her sensorineural hearing loss or tinnitus that were not already precluded by her conductive hearing loss.  Ex39, Johnson Dep2. 566:16-568:2, 562:22-563:23.

"Ignoring relevant data is not a scientifically valid method.  … [A]n expert is not permitted to simply ignore evidence that is contrary to her opinion in

---

[5] Housebound benefits are an increased monthly pension "paid to permanently disabled Veterans who are greatly confined to their homes."   Ex43, https://benefits.va.gov/BENEFITS/factsheets/limitedincome/EnhancedorSpecialPe nsion.pdf at 1.

implementing an accepted methodology." *Cates v. Whirlpool Corp.*, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017); *see also Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1283-84 (10th Cir. 2018) (affirming exclusion of expert whose opinions "simply ignored inconvenient facts, were based on evidence so removed in time from the incident as to be essentially meaningless, and lacked the detail necessary to support [the expert's] conclusions"); *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 242 (S.D.N.Y. 2018) ("Where an expert ignores evidence that is highly relevant to his conclusion, contrary to his own stated methodology, exclusion of the expert's testimony is warranted."), *aff'd*, 982 F. 3d 113 (2d Cir. 2020); *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010) ("[T]he court also finds the witness's methodology unreliable because of how Dr. Keegan uniformly treated all evidence that undermined his underlying conclusion: unwarranted dismissal of the evidence or outright blindness to contrary evidence."). Moreover, failure to consider the impact of Plaintiffs' other conditions is contrary to her own stated methodology—that she considers the "totality" of the records in reaching her opinions. *E.g.*, Ex39, Johnson Dep2. 498:21-499:14. An expert failing to follow her own methodology renders that methodology inherently unreliable. *E.g., Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 776 (7th Cir. 2014) (if the expert "failed to follow his own stated methods, the [district] court could reasonably conclude that he had failed to follow any reliable

method."); *Amorgianos*, 303 F.3d at 268-69 (affirming exclusion of expert who failed to account for the variables required by his methodology and thus "failed to apply his own methodology reliably").

Johnson's opinion on Wayman also is unreliable and contrary to the facts. Johnson concluded Wayman will suffer a permanent, post-injury loss of earning capacity. However, Wayman received a post-injury job offer of $45,000-65,000 more than Johnson's pre-injury earning capacity estimate. Ex38, Johnson Dep1. 261:5-261:18 (pre-injury earning capacity of $174,870), 258:10-15 (post-injury job offer of $220,000-240,000 per year); Ex37, Johnson Wayman Report 4, 12, 16. Johnson also determined Wayman's pre-injury earning capacity using occupations that he cannot hold because he lacks the required education, experience, and certification. Ex38, Johnson Dep1. 274:20-275:1, 277:13-280:20, 297:1-298:8.

### 4.  Johnson Did Not Use A Replicable Methodology In Developing Plaintiffs' Life Care Plans.

Where an expert's results are not replicable by another expert, the methodology is unreliable. *See supra* 39-40. Johnson did not use replicable methodology when determining Plaintiffs' life care plan costs, and failed to disclose the facts and data underlying her opinion. Fed. R. Civ. P. 26(a)(2)(B).

Johnson suggested she "[p]robably [used] Google or some other browser search engine" to identify vendors, Ex38, Johnson Dep1. 306:4-307:1, but could not

recall her search terms, Ex39, Johnson Dep2. 468:14-469:14, or her criteria for selecting vendors or medical providers, *id.* 468:14-469:14, 471:1-8.  Johnson could not recall how the vendors determined costs, or how she reached the final average costs listed in her reports.  Ex38, Johnson Dep1. 307:15-309:11.

Defendants will never be able to replicate Johnson's methodology because she has only "end results," and because she deleted her notes, she "no longer ha[s] access to that information," *id.* 309:20-310:3, 320:14-21, and "genuinely [does] not recall[] the entirety of that process," Ex39, Johnson Dep2. 471:1-8.  Therefore, Johnson's life care plan opinions should be excluded.

### B.    Neil Bennett Lacks A Proper Methodology Reliably Applied To Each Case's Facts.

#### 1.    Bennett Relies On Johnson's Unreliable Opinions.

Bennett's opinions regarding the value of Plaintiffs' lost earnings are unreliable because his calculations fundamentally rely on Johnson's opinions regarding Plaintiffs' pre-injury wage earning capacity, loss of earning capacity, and loss of worklife expectancy.[6]  Ex44, NBennett Dep1. 68:18-69:16; 176:9-20; 214:8-215:2; Ex45, NBennett Dep2. 334:6-335:1; 340:16-341:5; 362:10-22; 368:5-12; 370:11-15; Ex 46, NBennett Adkins Report 1, 3-4; Ex47, NBennett Blum Report 1,

---

[6] For Wayman, Bennett relied upon Johnson's opinions regarding pre-injury wage earning capacity and loss of earning capacity only.

3-4; Ex57, NBennett Sloan Report 1, 3-4; Ex48, 2/21 NBennett Wayman Report 1, 3-4.  Bennett did no valid independent analysis to verify that Johnson's opinions and assumptions were reliable and accurate, and didn't question her rationale.  *E.g.*, Ex44, NBennett Dep1. 230:14-231:7 ("... [Johnson] opined that the bachelor's degree earning capacity level was the appropriate level from which to base reductions.  Q. And you didn't question that rationale[?] ...  A. That is correct."); *see also id.* 76:14-77:4, 234:2-13, 237:10-238:3.   Bennett further was not aware of Johnson's methodology, and does not know what she considered in reaching her opinions beyond generalities.   *E.g.*, *id.* 179:18-181:8; 227:20-229:9; 234:2-13; 229:23:230-6 ("You know, in all honesty, I don't know what she factored in to arrive at that ten percent reduction number.  I don't know the individual factors that she considered."); Ex45, NBennett Dep2. 340:10-15 ("Q. Other than that general understanding that she applied her specialized knowledge, you don't have any additional information as to how she derived that number, do you?  A. I do not.  That's correct.").

The unreliability of Johnson's opinions renders Bennett's opinions on lost earnings unreliable as well.

## 2.    Bennett's Present Discount Analysis Is Unreliable.

For each of Bennett's reports, he uses a below-market discount rate ("BMDR") to discount each Plaintiffs' purported damages to present value.  Bennett

calculated his BMDR by subtracting the average of the Employer Cost Index ("ECI") from 2010 to 2019—meant to reflect inflation—from the 10-year U.S. Treasury Security interest rate over that same time period. Ex44, NBennett Dep1. 106:11-22.

Bennett claims to rely upon the BMDR methodology espoused by the United States Supreme Court in *Jones & Laughlin Steel Corp. v. Pfeiffer*, 462 U.S. 523 (1983). Ex44, NBennett Dep1. 111:11-112:3. Bennett described the *Pfeiffer* decision as "the baseline from which the BMDR methodology can be derived." Ex44, NBennett Dep1. 124:19-125:6. *Pfeiffer* determined that "[i]f full account is taken of the individual and societal factors," then a "below-market discount rate" is calculated by offsetting "against the market interest rate [] an estimate of future price inflation." *Jones & Laughlin*, 462 U.S. at 548.

But in using the ECI as "a measure of inflation," Bennet admits he used wage growth—and ***not*** price inflation—as the offset against the market interest rate for his BMDR calculation. Ex44, NBennett Dep1. 106:11-22; 107:19-108:3. Had Bennett subtracted price inflation (CPI-U)—which is 1.78%—from the market interest rate as opposed to wage inflation (ECI)—which is 2.28%—the BMDR would have been higher, resulting in a larger discount to present value. *Compare* Ex48, 2/21 NBennett Wayman Report 5 *with id.* 3. Thus, if Bennett used CPI-U instead of ECI, the *higher* BMDR would result in a *lower* damages number. In other

words, by using ECI, Bennett inflates each Plaintiff's purported damages at present value.  And at deposition, Bennett was unable to point to any peer-reviewed literature establishing the validity of his methodology.  Ex44, NBennett Dep1. 125:7-126:12; 127:1-128:5.  Having deviated from *Pfeiffer*'s "baseline" methodology in a critical respect, Bennett's entire methodology is unreliable.

### 3. Bennett's Worklife Expectancy Is Unreliable.

Bennett's calculation of lost earnings through age 67—the age of Social Security—for Plaintiffs Sloan, Adkins, and Blum is unreliable.  Ex44, NBennett Dep1. 248:19-249:1; Ex45, NBennett Dep2. 335:10-17; 372:15-20.  Bennett admits that he did not do his own vocational assessment in this case, and instead deferred to Johnson.  Ex44, NBennett Dep1. 22:8-12.  Yet Bennett's worklife expectancy calculations contradict Johnson's.  Johnson concludes that Sloan's worklife expectancy is 19.2 years, meaning he would be expected to work until he was 64.2—three years shorter than Bennett's assumption.  Ex36, Johnson Sloan Report 18.  So too with Adkins, as Johnson concludes that his worklife expectancy is 26 years, meaning he would be expected to work until age 61.  Ex35, Johnson Adkins Report 20.  The same is true for Blum, as Johnson concludes that her worklife expectancy is 12.8 years, meaning she would be expected to work until 62.8.  Ex40, Johnson-Blum Report 18.

By adding three to seven years of additional expected employment, Bennett improperly inflates the amount of lost future earnings that Sloan, Adkins, and Blum will sustain as a result of their purported injuries.  Having not conducted a vocational assessment himself, Bennett's suppositions as to Sloan, Adkins, and Blum's expected worklife expectancy is not the product of a reliable methodology mandated under *Daubert*.

Separate from his inconsistency with Johnson, Bennett's use of Social Security as a proxy for worklife expectancy is independently flawed as it assumes with 100% certainty that each of these Plaintiffs would have never become disabled before age 67, never would have been unemployed, and never would have voluntarily withdrawn from the workforce or reduced their activity before the age of 67.  Bennett sets forth no basis for these assumptions in his report or otherwise, let alone any generally accepted scientific principle endorsing such assumptions.

### 4.    Bennett's Calculation of Adkins' Earnings Ignores His Actual Circumstances.

Bennett's economic loss opinion for Adkins should be excluded for the additional reason that it uses incorrect information for Adkins' education, ignores Adkins' other disabilities, and thus is neither reliable nor based on sufficient facts or data.  Bennett used Johnson's opinion that Adkins had an earning capacity commensurate to males of all races who have "some college, no degree or an

associate degree." Ex45, NBennett Dep2. 368:5-12. This equated to an annual earning capacity of $63,411 to $65,763. *Id*. 368:19-22. However, Adkins never received an associate's degree. Ex42, Adkins Dep. 54:19-22, 55:11-13. Thus, there is no factual basis for the upper range of Bennett's earning capacity estimate.

Moreover, Bennett ignores that, as Adkins himself admitted, his seizures, PTSD, depression and anxiety all affect his ability to find and maintain steady employment. *Id*. 179:24-180:4, 189:5-16, 190:17-191:7, 194:15-20. Bennett also ignores Adkins' troubled employment history, including multiple instances of being disciplined and/or fired. *E.g., id*. 109:13-117:13. Ignoring these relevant facts violates Rule 702, and Bennett's opinion regarding Adkins' economic losses should be excluded. *See supra* 57-58.

### 5.   Bennett's Calculation of Blum's Earnings Is Based On An Incorrect Assumption.

To calculate earning capacity, Bennett relied on Personal Income Tables published by the Census Bureau. Ex47, NBennett Blum Report 3-4. Those Tables include average earnings for (1) men, (2) women, and (3) both sexes, with the average for men generally being higher than for women. Ex49, PINC Table Both Sexes; Ex50, PINC Table Male; Ex51, PINC Table Female. Ms. Blum is a woman, as Bennett knows. Ex44, NBennett Dep1. 216:4-23. Yet, despite Blum being a woman, Bennett chose to use the average earnings for men to calculate her earning

capacity, resulting in substantially higher putative economic losses for Blum than if he used the table for women.  *Id.* 216:4-23.  Bennett did not provide any recognized basis or reliable methodology in choosing to use average earnings for men to calculate lost earning capacity for Blum, a woman.  "Opinions based upon erroneous data, of course, must be excluded."  *In re Polypropylene Carpet Antitrust Litig.,* 93 F. Supp. 2d 1348, 1355 (N.D. Ga. 2000) (citing *City of Miami*, 115 F.3d at 873).  "Consequently, to the degree to which he bases any of his opinions on bad statistics, he has used a flawed methodology, and those opinions are inadmissible."  *J&V Dev., Inc. v. Athens-Clarke Cty.,* 387 F. Supp. 2d 1214, 1225 (M.D. Ga. 2005).

###      6.    Bennett's Calculation of Wayman's Lost Earnings Is Unreliable.

Bennett's calculations of Wayman's pre-trial and post-trial earnings are likewise unreliable.  Bennett originally submitted a report on November 25, 2020, wherein he calculated Wayman's current annual earnings to be $67,040.  Ex52, 11/20 NBennett Wayman Report 4.  Recognizing a typographical error, on February 12, 2021, Bennett submitted an amended report, wherein he calculated Wayman's annual earnings to be $67,940.  Ex48, 2/21 NBennett Wayman Report 4.

Bennett agreed that if his calculation of "Wayman's average annual earnings increased from his November 25, 2020 report" to his February 2021 report, "then the amount of [Wayman's] pre-trial damage should be decrease[d] across the two

reports." Ex44, NBennett Dep1. 98:11-17.  Bennett further agreed that because his "February 12, 2021 analysis now incorporates a higher annual average earning for Mr. Wayman's job as an automotive mechanic," it would "also drive down the total value of Mr. Wayman's purported … loss of future earnings". *Id.* 102:20-103:7.

Yet despite a $900 wage increase reported in the February 2021 report, Bennett's calculation of Wayman's pre-trial damages increased by approximately $60,000 and his post-trial damages increased by over $100,000.  *Compare* Ex52, 11/20 NBennett Wayman Report 6 *with* Ex48, 2/21 NBennett Wayman Report 6; Ex44, NBennett Dep1. 98:18-99:22.  Bennett did not "have an answer" as to why his earnings calculations increased without looking at his source spreadsheet.  Ex44, NBennett Dep1. 97:11-20.  When shown his source spreadsheet, Bennett again had no explanation as to why Wayman's earnings damages increased despite the fact that his new calculation included higher current annual earnings.  Ex45, NBennett Dep2. 312:13-313:17.  As Bennett could not explain why Wayman's damages increased in his February 2021 report, his estimate of Wayman's pre- and post-trial damages are not reliable and do not fit the facts.

### C. Dimmick's Opinions That Sloan Will Suffer Loss Of Income And Consequences To His Familial And Social Relationships Are Unreliable.

Under Rule 702 "a witness must be qualified in the *specific* subject for which his testimony is offered." *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 24 (D.

Mass. 1995); *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007). Dimmick offers opinions for which she has no qualifications or methodology, and thus should be excluded.

Dimmick states that "Sloan will likely experience loss of income as a result of his impaired communication difficulties, as hearing impairment is known to result in under employment." Ex27, Dimmick Sloan Report 26-27. But Dimmick is an audiologist, not a vocational rehabilitation expert. Moreover, she admitted that she had done no analysis of the economics of Sloan's earning potential and that such an analysis was "not within my scope." Ex28, Dimmick Dep. 244:14-245:1. Nor does Dimmick disclose any methodology to support that assertion.

Dimmick also opined that "Sloan's injuries and hearing loss have had and will continue to have dire consequences on his familial and social relationships." Ex27, Dimmick Sloan Report 27. At her deposition, Dimmick explained that her use of the phrase "dire consequences" referred to her understanding that tinnitus and hearing loss can lead to depression and other effects on social life in some individuals. Ex28, Dimmick Dep. 245:9-24. However, Dimmick is not a psychologist, psychiatrist, or mental health expert of any kind, and has no training in diagnosing any mental health condition. *Id.* 245:25-246:7, 246:14-18.

## IV.  PLAINTIFFS' EXPERTS CANNOT OFFER OTHER UNRELIABLE OR IMPERMISSIBLE OPINIONS.

### A.  Marc Bennett And Gilder Cannot Offer Legal Opinions.

This Court previously held that "questions of law are not subject to expert testimony" and experts "cannot testify about the meaning of a statute or regulation or about whether someone violated a law." ECF 1680 at 115-16. Nor can experts couch their opinions in terms that "carry special meaning under the law and are contingent upon application of the appropriate standard of care such as 'defective,' 'duty,' 'unreasonably dangerous,' or 'failed to warn.'" *Id.* 119.

Both Marc Bennett and Gilder offer impermissible legal opinions barred under this Court's rulings. Bennett offers several improper legal conclusions:

- The CAEv2 is "defective and unreasonably dangerous." Ex54, MBennett General Report 36.

- "3M misrepresented the safety and effectiveness" of the product and was therefore negligent. *Id.*

- 3M "fail[ed] to adequately design, test and warn about the CAEv2's risks and dangers." *Id.*

- What a "reasonable" manufacturer of an HPD would do. *Id.* 47.

69

- What 3M was required to do under EPA regulations.  *Id.* 22, 31-32.[7]

Similarly, Gilder offers the following impermissible legal conclusions:

- Defendants "violated EPA regulation 40 C.F.R. § 211.204-4"; Ex55, Gilder Report 13; *id.* ¶¶ 93, 137, 139, 142-145.

- Defendants' "deviations" from ISO 9001 "were a substantial factor in Aearo's and 3M's manufacture and sale of a product that was unreasonably dangerous to users".  *Id.* ¶ 41.

## B.    Marc Bennett And Gilder Cannot Offer State of Mind Opinions.

State-of-mind testimony also is impermissible.  ECF 1680 at 119.  Plaintiffs' experts "may not opine as to what Defendants 'knew,' what they intended, or what their motives were."  *Id.*

Marc Bennett repeatedly opines that Defendants "knew" of various defects and decided not to reveal them to consumers.  Ex54, Bennett General Report 38 ("The bottom line is that 3M ***knew*** by January or February 2000 at the latest that its CAEv2 had problems and was defective, yet it decided not to warn .... 3M decided

---

[7] Moreover, Bennett is not qualified to opine regarding the relevant EPA regulations. He admitted that he "never read in-depth about the individual EPA regulations for NRR labeling or earplug labeling", and does not even specifically recall reading the Noise Control Act or any of the EPA regulations governing labeling of HPDs.  Ex7, MBennett Dep1. 91:1-3, 93:5-15.  He has also never labeled an HPD for sale or consulted on the label for one.  *Id.* 89:9-18.

not to do anything to rectify the defects.") (emphasis added); *id.* 40 ("This test once again confirmed what 3M *already knew*—that the CAEv2 was unreasonably dangerous  and defective.") (emphasis added).

Gilder also seeks to present opinions about what 3M and the government knew about the product.  Gilder asserts that 3M "recognized that the military was looking for an attenuation", Ex55, Gilder Report ¶ 37; "recognized" the consequences of an unprotected ear", *id.* ¶ 59; "intended to bias test results in favor of the outcome desired by 3M", *id.* ¶ 156; "knew that the military desired a very low NRR", *id.* ¶ 101; "knew" that "Dancer was concerned about the size of the filter", *id.* ¶ 107; "knew" that the CAEv2 did not provide an adequate fit, *id.* ¶ 143; and "knew about the defective design of the CAEv2", *id.* ¶ 146.  Yet despite these opinions, Gilder testified that it was outside of his scope to "evaluate what the military knew about the product and when" as well as "the state of mind of 3M".  Ex56, Gilder Dep. 257:5-10, 257:18-21.  Whether Gilder perceives these opinions to be within his scope or not, neither he nor Bennett should not be permitted to offer any opinions as to what the government, 3M, or any other person did or did not know.

### C.    Gilder Cannot Offer Any Opinions About Hearing Loss and Tinnitus.

Though Gilder has no medical training, biomedical engineering experience, or the like, he nevertheless offers opinions about noise and how that relates to the

causes of tinnitus and hearing loss.  Ex55, Gilder Report 14-16.  At his deposition, Gilder further stated that he had expert opinions that "tinnitus is a result of hearing damage" and that "damage to hearing" "certainly affects—causes tinnitus."  Ex56, Gilder Dep. 110:16-111:4.  Not only does the word tinnitus appear nowhere in his report, *id.* 118:3-16, Gilder admits he is not a medical doctor or an audiologist.  *Id.* 109:16-18.  Indeed, Gilder expressly stated he did not intend to offer any medical opinions at trial.  *Id.* 109:19-21.  And he further agrees that giving opinions about the causes of tinnitus "from a medical perspective" is "really not my area."  *Id.* 109:16-18; 110:16-111:11.

But a medical perspective is the only lens through which any expert can discuss the causes of tinnitus and hearing loss.  And supposed expertise in the discipline of design as it relates to hearing protection does not transform Gilder into an expert in the biological mechanisms giving rise to auditory injuries.  *Napolitano v. Synthes, Inc.*, 2014 WL 12867042, at *3 (D. Conn. 2014).  This is especially true given that Gilder's report evinces no reliable methodology as to how he determined the relationship between sound, noise, and auditory injuries, let alone the bases for these conclusions.  Ex55, Gilder Report 14-16.  Without proper qualifications or methodology, Gilder's opinions should be excluded.

### D. Gilder Cannot Opine About Method B Approximating The CAEv2's Performance For Soldiers.

In his report, Gilder asserts that "[t]he results of 3M's ANSI S12.6-1997 Method B testing on the CAEv2 suggest that many soldiers who fit the plug themselves will not obtain adequate hearing protection." Ex55, Gilder Report 87. But Gilder has not looked into "whether Method A or Method B more closely approximates the experience of the soldier in the military". Ex56, Gilder Dep. 252:25-253:9. Thus, Gilder has no basis for his assertion.

### E. Gilder Cannot Opine About What Information 3M Should Have Provided To The Military.

Gilder cannot opine on what information a reasonable manufacturer should have provided to the military. Ex55, Gilder Report 54. This opinion is based solely on Gilder's experience while at Howard Leight. While working at Howard Leight, Gilder admits that he "did not have any personal one-on-one experience with the military" and in fact "did not interact directly with the military at all." Ex56, Gilder Dep. 169:3-17. Rather, he reviewed test summary reports and labeling that came out of his lab prior to being sent to the military. *Id.* 170:3-11. He "may have been copied when the sales and marketing team sent some reports to the military", but ultimately it was the sales and marketing that was responsible for interacting with the military. *Id.* 170:12-171:5. Gilder thus lacks the qualifications or sufficient facts or data to support his opinion.

73

**F.     Marc Bennett Lacks The Qualifications And Methodology To Opine About The CAEv2's Design Or Safer Alternative Designs.**

Marc Bennett is not qualified to offer his opinion that the CAEv2 is defective in design and safer designs would have reduced user injuries.  Ex54, MBennett General Report 36.   He is not an engineer, has never worked for an HPD manufacturer, has never designed any type of commercially available HPD, has never designed a nonlinear earplug, has never reviewed the design of an HPD, and has never made or reviewed a design drawing for an HPD.  Ex7, MBennett Dep1. 62:8-18, 64:19-22, 65:5-13, 67:9-12, 68:2-3, 68:22-23, 69:1-5.  Bennett could not even provide the name of the plastic materials used in commercially available premolded earplugs.  *Id.* 72:17-73:6.  Bennett has never previously conducted a REAT test, used ANSI testing to come up with NRRs, or conducted any test to determine if an earplug loosens in a subject's ear.  *Id.* 75:9-10, 82:10-17, 76:20-21.

Bennett never tested the CAEv2; nor has he ever tested any other earplugs in offering his opinion that a safer alternative design exists.  *Id.* 49:15-21; 50:2-4. While he had treated more than 8,000 patients from July 2000 to July 2020, he admitted that he had never—prior to *this* litigation—discussed the CAEv2 with a patient, discussed whether the CAEv2 was defective, or discussed whether the CAEv2 caused hearing loss or other symptoms.  *Id.* 37:11-14, 38:3-6.  Bennett also admitted he never previously reviewed any literature on the CAEv2.  *Id.* 37:7-10.

74

Bennett's analysis of the CAEv2 in this case suffers from a number of critical problems.  First and foremost, Bennett analyzed the wrong version of the earplug. He conceded at his deposition that, when he was forming his opinion that the CAEv2 was defectively designed, he was under the mistaken impression that the older, longer version of the earplug was the "final" version at issue in this litigation.  *Id.* 69:18-70:6.  Indeed, his expert report includes a picture of this older version, which is erroneously described as the "Final CAEv2 Configuration."  Ex54, MBennett General Report 19.



| Early Design Bennett Mistook For "Final" | Actual Final Design |
|---|---|
| Final CAEv2 Configuration[4] | |
| Ex54, MBennett General Report 19 | Ex58 |

Given that Bennett's design defect opinion is based on his review of a materially different earplug—which is a different length, has the stem in a different location relative to the the green tip, and provides for entirely different prospects of opposite-end flange interaction—it is fundamentally not reliable and thus must be excluded.

Putting aside the fact that Bennett performed his analysis on the wrong earplug, Bennett's defect opinion also lacks any scientifically accepted methodology. Essentially, his "methodology" was (1) looking at the earplug and then (2) looking at other experts' reports. Ex7, MBennett Dep1. 275:18-278:5; Ex54, MBennett General Report 41 (discussing Eddins, McKinley, and Madigan's reports). Far from being "the product of reliable principles and methods," Bennett conceded that he did not know of (1) any publications that say his "methodology" is appropriate, or (2) any other person that has ever used his "methodology" to identify a defect with an earplug:

> Q. Okay. What publication you are aware of says it's appropriate to identify a defect with an earplug based on the methodologies that you used in this case?
>
> …
>
> A. I do not know of a publication.
>
> …

Q. Prior to your analysis in this litigation, are you aware of any other person who has employed the methodologies you used in this case to identify a defect with an earplug?

A. I do not.

Ex7, MBennett Dep. 280:19-282:4.

At bottom, Bennett (1) mistakenly analyzed the wrong version of the CAEv2, and (2) used a novel methodology that is not generally accepted to identify a defect with an earplug. Those two issues render his analysis unreliable. Thus, this Court should exclude his opinion under *Daubert*. *See Whitney Nat'l Bank v. Air Ambulance by B & C Flight Mgmt., Inc.*, 516 F. Supp. 2d 802, 817 (S.D. Tex. 2007) ("Incorrect assumptions critical to an expert's opinion make that opinion unreliable.") (collecting cases); *see also Withrow v. Spears*, 967 F. Supp. 2d 982, 997 (D. Del. 2003) (where an experiment is not similar to actual conditions, courts "have regularly excluded an expert's testimony regarding certain testing, on the grounds that there was insufficient 'fit' between the testing methodology at issue and facts of the case") (collecting cases).

## G. Dimmick Is Unqualified To Opine That The CAEv2 Had A "Defective Design."

Dimmick's report includes opinions on the CAEv2's design, but Dimmick admits that even she "would not say that [she] had the expertise or the information

to make a determination on whether or not a product was broadly defective." Ex28, Dimmick Dep. 60:8-24. And she stated that she would not offer opinions regarding any alleged defective design in the CAEv2. *Id.* 65:5-8. Dimmick should be held to her word, and prohibited from offering any design defect opinions.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court enter an order excluding the opinions of Plaintiffs' experts as described herein.

Respectfully submitted:

*/s/ Charles F. Beall, Jr.*
Larry Hill
Florida Bar No. 173908
lhill@mhw-law.com
Charles F. Beall, Jr.
Florida Bar No. 66494
cbeall@mhw-law.com
Haley J. VanFleteren
Florida Bar No. 1003674
hvanfleteren@mhw-law.com
MOORE, HILL & WESTMORELAND, P.A.
350 West Cedar Street
Maritime Place, Suite 100
Pensacola FL 32502
Telephone: (850) 434-3541

*/s/ Robert C. "Mike" Brock*
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
mnomellini@kirkland.com

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071

78

Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company,*
*3M Occupational Safety LLC, Aearo*
*Technologies LLC, Aearo Holding,*
*LLC, Aearo Intermediate, LLC and*
*Aearo, LLC*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

Judge Herndon on July 12, 2021 conveyed the Court's direction that the parties' Group B *Daubert* motions are limited to 1350 words per new expert and 1350 words per new issue with a Group A expert.  This motion seeks to exclude, in whole or in part, 11 Plaintiffs' experts, yielding a word limit of 14,850.  Pursuant to Local Rule 7.1(F) and this Court's direction, counsel for Defendants certify that this memorandum contains 14,100 words, excluding the case style, motion (which is less than 500 words), tables of contents and authorities, signature block, and certificates of compliance with the Local Rules.

 Dated:  August 6, 2021                                    Respectfully submitted,


                                                    */s/ Robert C. Brock*_____
                                                    Robert C. "Mike" Brock
                                                    KIRKLAND & ELLIS LLP
                                                    1301 Pennsylvania Avenue, N.W.
                                                    Washington, D.C. 20004
                                                    Telephone:  (202) 389-5991
                                                    mike.brock@kirkland.com

                                                    *Counsel for Defendants*
                                                    *3M Company,*
                                                    *3M Occupational Safety LLC,*
                                                    *Aearo Technologies LLC,*
                                                    *Aearo Holding, LLC,*
                                                    *Aearo Intermediate, LLC and*
                                                    *Aearo LLC*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)</u>

Pursuant to Local Rule 7.1(B), counsel for Defendants certify that they held a conference to discuss the relief sought in this motion with Plaintiffs' counsel during a conference with Judge Herndon on July 12, 2021.  Plaintiffs' counsel represented that they would not agree on July 12, 2021.


 Dated:  August 6, 2021                                Respectfully submitted,



                                                            */s/ Robert C. Brock*
                                                            Robert C. "Mike" Brock
                                                            KIRKLAND & ELLIS LLP
                                                            1301 Pennsylvania Avenue, N.W.
                                                            Washington, D.C. 20004
                                                            Telephone:  (202) 389-5991
                                                            mike.brock@kirkland.com

                                                            *Counsel for Defendants 3M Company,*
                                                            *3M Occupational Safety LLC, Aearo*
                                                            *Technologies LLC, Aearo Holding,*
                                                            *LLC, Aearo Intermediate, LLC and*
                                                            *Aearo LLC*

81

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 6, 2021, a true and correct copy of the foregoing:

### DEFENDANTS' OMNIBUS MOTION TO EXCLUDE PLAINTIFFS' GROUP B PUTATIVE EXPERT OPINIONS UNDER *DAUBERT* AND RULE 702 AND INCORPORATED MEMORANDUM

was served as follows:

☒ **[E-Mail]** By causing the above document to be sent via electronic mail to the parties at the email addresses listed below. I am aware that service is presumed invalid if the email transmission is returned as undeliverable.

| | |
|---|---|
| Bryan F. Aylstock, Lead Counsel<br>Douglass A. Kreis<br>Neil D. Overholtz<br>Jennifer M. Hoekstra<br>Aylstock, Witkin, Kreis & Overholtz, PLLC<br>17 East Main Street Suite 200<br>Pensacola, FL 32502<br>Tel.: (850) 202-1010<br>Email: baylstock@awkolaw.com<br>Email: dkreis@awkolaw.com<br>Email: NOverholtz@awkolaw.com<br>Email: jhoekstra@awkolaw.com<br><br>*Counsel for Plaintiff Michelle Blum*<br>Case No. 7:20-cv-00122<br><br>*Counsel for Plaintiff Marcus Hensley*<br>Case No. 7:20-cv-00093<br><br>*Counsel for Plaintiff William Wayman*<br>Case No. 7:20-cv-00149<br><br>*Counsel for Plaintiff Ronald Sloan* | Shelley V. Hutson, Co-Lead Counsel<br>Emily B. Marlow<br>Clark, Love & Hutson, GP<br>440 Louisiana Street<br>Suite 1600<br>Houston, TX 77002<br>Tel.: (713) 757-1400<br>Email: shutson@triallawfirm.com<br>Email: emarlowe@triallawfirm.com<br>Email: bgreif@triallawfirm.com<br><br>*Counsel for Plaintiff Ronald Sloan*<br>Case No. 7:20-cv-00001 |

82

| | |
|---|---|
| Case No. 7:20-cv-00001<br><br>*Counsel for Plaintiff Brandon Adkins*<br>Case No. 7:20-cv-00012 | |
| Christopher A. Seeger, Co-Lead Counsel<br>David R. Buchanan<br>Caleb A. Seeley<br>Maxwell H. Kelly<br>Seeger Weiss LLP<br>55 Challenger Road, 6th Floor<br>Ridgefield Park, NJ 07660<br>Tel.: (212) 584-0700<br>Email: cseeger@seegerweiss.com<br>Email: dbuchanan@seegerweiss.com<br>Email: cseeley@seegerweiss.com<br>Email: mkelly@seegerweiss.com<br>Email: MDL2885@seegerweiss.com<br><br>*Counsel for Plaintiff William Wayman*<br>Case No. 7:20-cv-00149 | Michael A. Burns, Co-Liaison Counsel<br>Caroline L. Maide<br>Mostyn Law Firm<br>3810 W. Alabama Street<br>Houston, TX 77027<br>Tel.: (713) 714-0000<br>Email: epefile@mostynlaw.com<br>Email: maburns@mostynlaw.com<br><br>*Counsel for Plaintiff Michelle Blum*<br>Case No. 7:20-cv-00122 |
| Evan D. Buxner,<br>Plaintiffs' Executive Committee<br>Gori Julian & Associates<br>156 North Main Street<br>Edwardsville, IL 62025<br>Tel.: (618) 659-9833<br>Email: evan@gorijulianlaw.com | Brian H. Barr, Co-Liaison Counsel<br>Winston Troy Bouk<br>Troy A. Refferty<br>Levin, Papantonio, Thomas, Mitchell,<br>Rafferty, & Proctor, P.A.<br>316 S Baylen St. Ste 600<br>Pensacola, FL 32502<br>Tel.: (850) 435-7045<br>Email: bbarr@levinlaw.com<br>Email: tbouk@levinlaw.com<br>Email: trafferty@levinlaw.com |
| Taylor Bartlett<br>Jeanie Sleadd<br>William L. Garrison, Jr.<br>Heninger Garrison Davis LLC | Muhammad S. Aziz<br>Abraham Watkins Nichols<br>800 Commerce Street<br>Houston, TX 77055 |

<table>
<tr><td>

2224 1st Avenue North
Birmingham, AL 35203
Tel.: (205)326-3336
Email: taylor@hgdlawfirm.com
Email: jsleadd@hgdlawfirm.com
Email: lewis@hgdlawfirm.com

*Counsel for Plaintiff Marcus Hensley*
Case No. 7:20-cv-00093

</td><td>

Tel.: (713) 222-7211
Email: jdean@abrahamwatkins.com


*Counsel for Plaintiff Ronald Sloan*
Case No. 7:20-cv-00001

</td></tr>
<tr><td>

Kenneth C. Bailey
Robert W. Cowan
Aaron M. Heckaman
Andrea M. McGinnis
Katie R. Caminati
Bailey Cowan Heckaman PLLC
1360 Post Oak Blvd.
Suite 2300
Houston, TX 77056
Tel.: (713) 425-7100
Email: bailey-svc@bpblaw.com
Email: sbuchanan@bchlaw.com
Email: amcginnis@bchlaw.com
Email: kmcgregor@bchlaw.com
Email: rcowan@bchlaw.com

*Counsel for Plaintiff Brandon Adkins*
Case No. 7:20-cv-00012

</td><td></td></tr>
</table>

DATED:  August 6, 2021          */s/ Robert C. Brock*
                                Robert C. "Mike" Brock