# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG LITIGATION LIABILITY LITIGATION | CASE NO.: 3:19-MD-2885-MCR-GRJ |
| This Document Relates to: | Chief Judge M. Casey Rodgers |
| *Brandon Adkins* Case No. 7:20-cv-00012 | Magistrate Judge Gary Jones |
| *Michele Blum* Case No. 7:20-cv-00122 | **CONFIDENTIAL - FILED UNDER SEAL** |
| *Marcus Hensley* Case No. 7:20-cv-00093 | |
| *Ronald E. Sloan* Case No. 7:20-cv-00001 | |
| *William Wayman* Case No. 7:20-cv-00149 | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' OMNIBUS MOTION AND MEMORANDUM OF LAW TO EXCLUDE DEFENDANTS' GROUP B EXPERT OPINIONS AND TESTIMONY**

FILED USDC FLND PN
AUG 27 '21 AM 9:16

1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................4

INTRODUCTION ..........................................................................................6

I.     GROUP A *DAUBERT* ORDERS. ...................................................6

II.    JAMES CRAWFORD. ......................................................................7

      A.     Crawford's Hidden-Hearing-Loss ("HHL") Opinions Are Well-Grounded In His Experience And The Literature.......................7

      B.     Crawford's Opinions On Adkins' Marijuana Usage And Tinnitus Will Help The Jury And Satisfy Rule 403............................11

III.   GREGORY FLAMME AND MARK STEPHENSON. ...............................13

IV.   HARRI KYTOMAA. ......................................................................15

      A.     Kytomaa's Second Supplemental Report Rebuts Armstrong's Modeling and Purported Experimental Verification..................................................................................15

      B.     Kytomaa Is Qualified to Rebut Gilder's Opinions............................17

V.     DENNIS DRISCOLL. .....................................................................19

VI.   JOHN HOUSE. .............................................................................20

VII.   DOUGLAS JACOBS. ....................................................................23

      A.     Jacobs' Opinion That Adkins Has Antisocial Personality Disorder Is Reliable And Based On Sufficient Facts..........................23

      B.     Jacobs' Opinion Regarding Adkins Is Proper And Probative Of Issues Including Causation And Damages. ..................25

      C.     Jacobs' Opinions About Wayman Are Reliable. ................................28

VIII.   DEREK JONES AND JENNIFER LABORDE............................................30

CONCLUSION ....................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arevalo v. Coloplast Corp.*,
  2020 WL 3958505 (N.D. Fla. July 7, 2020).................................................18

*Bush v. Gulf Coast Elec. Coop., Inc.*,
  2015 WL 5610852 (N.D. Fla. Sept. 23, 2015) .............................................13

*Colley v. PeaceHealth*,
  312 P.3d 989 (Wash. Ct. App. 2013) ..........................................................12

*Daberkow v. United States*,
  2007 WL 2009717 (D. Colo. July 6, 2007)....................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993).......................................................................................6

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).......................................................................................9

*Hendrix ex. Rel. G.P. v. Evenflo Co.*,
  609 F.3d 1183 (11th Cir. 2010) ..................................................................29

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
  299 F. Supp. 3d 1291 (N.D. Fla. 2018) .......................................................18

*In re Ethicon, Inc. Pelvic Repair Sys. Prods. Liability Litig.*,
  2017 WL 8727998 (S.D.W. Va. Jan. 12, 2017) ...........................................11

*Navelski v. Int'l Paper*,
  244 F. Supp. 3d 1275 (N.D. Fla. 2017) .......................................................20

*Redmond v. City of East Point, Ga.*,
  2004 WL 6060552 (N.D. Ga. Mar. 29, 2004) ..............................................28

*Sampson v. Carnival Co.*,
  2016 WL 7377226 (S.D. Fla. Dec. 16, 2016)...............................................29

*Superior Consulting Servs., Inc. v. Shaklee Corp.*,
  2018 WL 3059995 (M.D. Fla. May 31, 2018) ................................................8

*United States v. Beasley*,
  72 F.3d 1518 (11th Cir. 1996) ........................................................................28

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ........................................................................7

*United States v. Hall*,
  93 F.3d 1337 (7th Cir. 1996) ..........................................................................28

*United States v. Heilbron*,
  2016 WL 9489142 (D.N.M. Dec. 1, 2016) ....................................................8

*United States v. Shay*,
  57 F.3d 126 (1st Cir. 1995) .............................................................................27

*United States v. Vallejo*,
  237 F.3d 1008 (9th Cir. 2001) ........................................................................28

**Rules**

Fed. R. Evid. 608(a) ...............................................................................................27

**INTRODUCTION**

Plaintiffs' motion seeking to exclude Defendants' Group B experts mischaracterizes the experts' opinions; ignores Defendants' experts' qualifications and the methodologies they actually use; and selectively quotes and misinterprets deposition testimony, while disregarding other parts that defeat their arguments.  At most, Plaintiffs' points are suitable for "[v]igorous cross-examination" and "presentation of contrary evidence"—not exclusion.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).  Accordingly, Plaintiffs' motion should be denied.

## I.     GROUP A *DAUBERT* ORDERS.

Plaintiffs move to have the Court exclude Defendants' experts to the extent the Court excluded them in its Group A *Daubert* orders, and argue the Court should again exclude opinions that were excluded in its Group A *Daubert* orders.  *E.g.*, Pltfs. Mot. 4-7, 13-15, 20-24, 37-38.  In response, Defendants incorporate their arguments in Defendants' Response to Plaintiffs Omnibus Motion To Exclude Defendants' [Group A] Expert Opinions And Testimony, ECF 1627 ("Defendants' Group A *Daubert* Response").  Defendants incorporate their prior arguments as their response to all Plaintiffs' arguments concerning Casali, Neitzel, and Tuten, as well as for Crawford, Flamme and Stephenson, Kytomaa, Driscoll, House, and Jones and

Laborde to the extent Plaintiffs' arguments rely on the Court's prior *Daubert* rulings.[1]

Defendants reserve all their appellate and other rights.  Defendants confirm any of these experts who testify will continue to do so in compliance with the Court's Group A *Daubert* orders.

## II.    JAMES CRAWFORD.

### A.    Crawford's Hidden-Hearing-Loss ("HHL") Opinions Are Well-Grounded In His Experience And The Literature.

Contrary to Plaintiffs' argument, PltfsMot. 9-10, Crawford has a reliable basis for opining that HHL in humans is an unproven and unsupported hypothesis, Ex1, Crawford Adkins Report 5, 11.   Crawford has decades of experience as a neurotologist who diagnoses and treats hearing loss, has published over 30 works, and has served on multiple committees of the American Academy of Otolaryngology.  *Id.* 1-3.  He also is "actively engaged in" and "up to date" on the "medical literature", is on editorial boards of hearing-related journals, and is a peer reviewer for other journals.  *Id.*; Ex2, Crawford Dep. 64:24-65:13.

Crawford's experience and understanding of medical literature provides a reliable basis for his opinions.  *See*, *e.g.*, *United States v. Frazier*, 387 F.3d 1244,

---

[1] Defendants have withdrawn Sahmel as an expert in the Group B cases, mooting Plaintiffs' *Daubert* motion and arguments against her.

1262 (11th Cir. 2004) (holding an expert may proffer "experience-based testimony"); *Superior Consulting Servs., Inc. v. Shaklee Corp.*, 2018 WL 3059995, *3-6 (M.D. Fla. May 31, 2018) (admitting opinion where expert's findings were "based on his education, training, and experience" and a standard "based on education, certification, and experience"); *United States v. Heilbron*, 2016 WL 9489142, at *2 (D.N.M. Dec. 1, 2016) (finding medical expert qualified based on his "experience and knowledge of current general cardiology literature regarding evaluation and management of patients similar to those seen by Defendant"); *Daberkow v. United States*, 2007 WL 2009717, at *2 (D. Colo. July 6, 2007) (denying motion to exclude testimony of expert who relied on "training, (his) general knowledge of the literature on this subject, and what is practiced in the community") (internal quotations omitted).  For example, Crawford described how the HHL hypothesis is based on animal studies, and he has been involved in studies that attempted to translate "animal models … to humans, and it's a big leap that's often -- doesn't pan out."  Ex2, Crawford Dep. 79:17-80:18.  He explained that for HHL to be translated to humans, it would need "to be demonstrated in humans" and "there needs to be a really clear set of kind of diagnostic parameters that are … controlling variables that show that it's a repeatable and verifiable condition, which today it has not been shown to be."  *Id.*  Crawford also discussed an article regarding HHL relied on by Plaintiffs' experts and explained how that article was "not well controlled"

and thus did not offer any clinical support for the HHL hypothesis. *Id.* 88:6-89:9; *see also id.* 61:13-64:23.

Ironically, Plaintiffs cite *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997), for their argument, which actually supports Crawford's explanation of how HHL is not supported. *Joiner* explains that, while "[t]rained experts commonly extrapolate from existing data", there is no requirement for a district court to admit opinions where there "is simply too great an analytical gap between the data and the opinion proffered." 522 U.S. at 146. Crawford's opinions as to why a HHL diagnosis in humans is speculative and unproven are squarely on point with the Supreme Court's findings in *Joiner*—the gap between extrapolating from animal studies to humans is too great. *See also* ECF 1680 at 40 n.29 (Court's prior *Daubert* opinion stating that the Court "has serious concerns about the reliability of Plaintiffs' experts' HHL-related opinions", citing testimony that studies had not established HHL in humans); ECF 1605 at 116-121 (Defendants' arguments regarding HHL for Plaintiffs' Group A experts); ECF 1864 at 16-25 (Defendants' arguments regarding HHL for Plaintiffs' Group B experts).

Moreover, *Joiner* offers no support to Plaintiffs' argument because Crawford is not extrapolating from existing data with respect to cochlear synaptopathy. Nor is there an analytical gap between any data and Crawford's opinions. Rather,

Crawford's opinions are based on his decades of experience and his knowledge of the medical literature.

Plaintiffs' experts' testimony—and the scientific literature[2]—confirm that Crawford's conclusions are well-grounded in the medical literature. For example, Plaintiffs' expert Fagelson testified that the existence of HHL in humans depends on "extrapolat[ing] from the animal data to humans." Ex3, Fagelson Dep. 121:1-12. He admitted that HHL cannot yet be objectively verified using testing. *Id.* 117:21-23 ("Q. All right. Is synaptopathy something that you can verify objectively using testing? A. In animals, yes. In humans, not yet."). Fagelson also acknowledged that there is no diagnostic test or code for HHL. *Id.* 120:16-19 ("Q. Is there a

---

[2] Ex4, Marmel, *et al.*, *The ongoing search for cochlear synaptopathy in humans: Masked thresholds for brief tones in Threshold Equalizing Noise* at 6, HEARING RESEARCH 392 (2020) ("The present study was not successful in its search for cochlear synaptopathy in humans ...."); Ex5, Budak, *et al.*, *Contrasting mechanisms for hidden hearing loss: Synaptopathy vs myelin defects* at 2, PLoS COMPUT BIOL 17(1) (2021) ("In humans, characterization of [cochlear synaptopathy] remains inconclusive with mixed reports of presumptive AN damage resulting in perceptual deficits despite normal auditory thresholds."); Ex6, Johannesen, *et al.*, *Evidence for age-related cochlear synaptopathy in humans unconnected to speech-in-noise intelligibility deficits* at 45, HEAR RES. 374 (2019) ("We have seen no evidence for noise-induced synaptopathy in humans."); Ex7, *The association between subcortical and cortical fMRI and lifetime noise exposure in listeners with normal hearing thresholds* at 2, NEUROIMAGE 204 (2020) ("The lack of any diagnostic assessment that is sufficiently sensitive and yet adequately specific has hindered the reliable demonstration of cochlear synaptopathy in humans.").

diagnostic code for hidden hearing loss or synaptopathy? A. Not to my knowledge.").

Plaintiffs' argument that Crawford is improperly injecting general causation opinions into his report is equally meritless. PltfsMot. 8-9. Crawford's opinion relates specifically to Adkins because he is rebutting the opinion offered by Plaintiffs' experts that Adkins has HHL. Furthermore, nothing in Rule 702 requires an expert to draft separate reports for general and specific causation opinions. Plaintiffs' reliance on *In re Ethicon, Inc. Pelvic Repair Sys. Prods. Liability Litig.*, 2017 WL 8727998, at *1 (S.D.W. Va. Jan. 12, 2017) ignores that the *Ethicon* court issued pretrial orders requiring expert discovery to be separated between specific causation and general causation. Ex8, *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, Dkt. Nos. 45 and 78. By contrast, although the parties here have issued "case-specific" and "general reports," no Court order or agreement requires expert reports to rigidly separate causation opinions.

### B. Crawford's Opinions On Adkins' Marijuana Usage And Tinnitus Will Help The Jury And Satisfy Rule 403.

Adkins has been a heavy marijuana user, with records reporting he has smoked daily since 2007 and that—at least in 2015—he was smoking 1/8 ounce (or 3.5 grams) per day. Ex9, B_L_Adkins-VA-000987-989; Ex10, B_L_Adkins-VA-006028-6032. Adkins was discharged from the military for "drug rehabilitation failure" due to continued marijuana use. *See* Ex11, B_L_Adkins-VA-003865.

Adkins claims that he first noticed his tinnitus "[p]retty much after [he] got out [of] the military" in 2009.  Ex12, Adkins Dep. 244:21-245:4.  Adkins used marijuana on a daily basis when he left the military.  *Id.* 205:11-15 ("Q. What about marijuana usage, when you got out of the military in 2009, were you using marijuana on a daily basis? . . . THE WITNESS: Yeah.").  When Adkins sought medical attention for tinnitus in 2019, one of his doctors noted his marijuana use.  Ex13, ADKINSL-MDL2885-7FMCSJ-00004-9.

Under this Court's prior orders, Adkins' marijuana is relevant because it coincides with when he allegedly experienced and was diagnosed with tinnitus.  ECF 1330 at 7 ("Thus, the Court concludes that regular marijuana use has at least some relevance to Plaintiffs'' tinnitus claims if it coincided with a tinnitus diagnosis.").  Plaintiffs assert there is no established causal link between marijuana use and tinnitus, PltfsMot. 12, but the Court already has found such a link based on the evidence at the second Science Day.  ECF 1330 at 7.

Plaintiffs' argument hinges on the incorrect premise that Defendants must *prove* an alternative cause of Adkins' alleged tinnitus.  PltfsMot. 12.  To be clear, Crawford is not affirmatively opining that Adkins' marijuana usage caused his tinnitus.  Instead, Crawford's testimony demonstrates why Plaintiffs cannot prove that Adkin's tinnitus was caused by Defendants.  The burden to prove causation lies with Plaintiffs.  *Colley v. PeaceHealth*, 312 P.3d 989, 995 (Wash. Ct. App. 2013)

("The defendant does not have the burden to prove causation or lack of causation."). A proper diagnosis requires Plaintiffs' experts to exclude all other potential causes of tinnitus besides the CAEv2 not protecting Adkins from noise exposure.  ECF 1680 at 31-32.  Crawford's opinion is that Adkins' heavy marijuana use cannot be ruled out as a potential cause of Adkins' tinnitus.  Thus, Crawford's opinion is highly probative and helpful to the jury, as it rebuts any diagnosis by Plaintiffs' experts.

Plaintiffs' Rule 403 argument is similarly meritless.  It "is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403."  *Bush v. Gulf Coast Elec. Coop., Inc.*, 2015 WL 5610852, at *1 (N.D. Fla. Sept. 23, 2015) (emphasis in original, internal quotation marks omitted).  The probative value of Adkins' marijuana use is high because it defeats Plaintiffs' argument that his alleged tinnitus was caused by the CAEv2 not protecting Adkins from noise exposure.  In contrast, any potential prejudice is minimal as numerous states have legalized recreational use of marijuana—including Washington, where Adkins resides.

## III.   GREGORY FLAMME AND MARK STEPHENSON.

Flamme and Stephenson's opinions about the Army Hearing Program as applied to Sloan and Wayman are helpful to the jury and comply with the Court's order from the Group A cases.  Flamme and Stephenson should be permitted to explain "the importance of training and on fit of earplugs."  ECF 1690 at 13.  As part

of that testimony, Flamme and Stephenson may offer testimony about the military's role in promulgating regulations about fitting and training soldiers with hearing protection devices. *See*, *e.g.*, Ex14, 6/17/2021 Baker Trial Tr. 245:13-246:3. Moreover, while (consistent with the Court's order, ECF 1690 at 13) Flamme and Stephenson will not testify as to whether anything the Army did caused or increased the risk of Plaintiffs' injuries, they should be permitted to explain to the jury whether, based on their review of the evidence, Sloan and Wayman were fit with and trained on the CAEv2. Many of Plaintiffs' experts have testified to similar facts throughout prior trials, so there is no reason why Flamme and Stephenson should not be able to do so. *See*, *e.g.*, Ex15, 4/12/2020 EHK Trial Tr. 110:1-112:3; Ex16, 4/13/2021 EHK Trial Tr. 44:18-45:1; Ex17, 6/14/2021 Baker Trial Tr. 165:10-168:3.

These issues of fit and training have direct relevance here. For example, Plaintiffs' experts opine that the CAEv2's alleged design flaws caused Plaintiffs' injuries and did not allow Plaintiffs to get a proper fit. Ex18, Spankovich-Wayman Report 15, Ex19, MBennett Sloan Report 19, Ex20, MBennett General Report 40. If such testimony is presented to the jury, the jury should also hear potential explanations for the claimed inadequate fit that are unrelated to the CAEv2's alleged design flaws. Ex21, Flamme Wayman Report 22.

## IV.   HARRI KYTOMAA.

Plaintiffs' motion seeks to exclude Kytomaa's opinions in his second and third supplemental reports rebutting Plaintiffs' experts, asserting that he is not qualified to offer that testimony.   PltfsMot. 16-19.   Plaintiffs ignore that Kytomaa is a mechanical engineer with "decades of experience applying the principles of acoustics in multiple areas," Ex22, Kytomaa Report 5, and an "extensive background in acoustics and perform[ing] acoustic analysis," Ex23, Kytomaa Dep. 40:6-8; *see also id.* 71:9-15.   This Court already has held that Kytomaa's mechanical engineering experience qualified him to rebut Plaintiffs' experts' opinions relating to Acoustical-Resistance-Checker testing, quality assurance, and the material composition of the CAEv2.   ECF 1690 at 17-18.   He is equally well-qualified to offer the rebuttal opinions in his second and third supplemental reports.

### A.   Kytomaa's Second Supplemental Report Rebuts Armstrong's Modeling and Purported Experimental Verification.

Plaintiffs' argument to exclude Kytomaa's opinions in his second supplemental report mischaracterizes those opinions. The second supplemental report addresses Armstrong's CAEv2 *modeling*.   Ex22, Kytomaa Report 178-191; *see also* Pltfs. Mot. 16-17 ("the vast majority of Kytomaa's second amended report attacks Armstrong's modeling and simulations for the CAEv2, with Kytomaa purporting to identify 'specific flaw[s] in his [Armstrong's] attempt to model the CAEv2 earplug'") (alterations in original). Armstrong is an electrical engineer who

used a software program that models electric components—such as resistors, capacitors, and inductors—to model the CAEv2, and he also created mathematical and physical acoustic models to represent the filter location. Following is a picture of this acoustic system:



Figure 1.  Mr. Armstrong's simple acoustic system consisting of an ear simulator sealed with putty, a 21 mm length of tubing, and a 1500 ohm damper (resistor) placed at various distances along the length.[12]

Ex22, Kytomaa Report 185.

This modeling is directly within Kytomaa's expertise and experience with acoustic properties of mechanical systems. Ex23, Kytomaa Dep. 40:6–8, 41:11-22, 109:7-10, 123:22-24. Section 2.2.1 of Kytomaa's second supplemental report critiques Armstrong's choice of materials and acoustic components, as well as Armstrong's decision to utilize a linear mathematical model and perform linear acoustic characterization measurements to form opinions about the nonlinear acoustical performance of CAEv2. Ex22, Kytomaa Report 184-86. These conclusions are based on common engineering principles. In section 2.2.2, Kytomaa explains a deficiency in Armstrong's verification study—that he ignored the well-

16

known phenomenon of acoustic leakage.  *Id.* 187-91.  This phenomenon is not limited to earplug acoustics, but is a common phenomenon in engineering acoustics, a subject on which Kytomaa is well-qualified.  Ex23, Kytomaa Dep. Tr. 40:6-42:12; 108:19–109:11 ("the laws of physics associated with acoustics don't really have different types …").

Contrary to Plaintiffs' assertion, Kytomaa does not critique "audiology issues" or "human acoustics".  PltfsMot. 16.  Instead, he critiques the modeling and experimental techniques utilized by another engineer, an opinion well within his expertise.

### B.  Kytomaa Is Qualified to Rebut Gilder's Opinions.

Kytomaa's opinions in the third supplemental report similarly fall squarely within his expertise and are within the scope of the opinions authorized by this Court's prior order.  *First*, Plaintiffs' motion appears to seek exclusion of the entire third supplemental report, but provides "example[s]" from only approximately two pages of Kytomaa's 10-page report.  PltfsMot. 18.  Plaintiffs fail to provide any argument that Kytomaa is not qualified to provide the opinions in sections 2.1 (ISO 9001) or 2.2 (100% sampling of the yellow-ends), and exclusion of those sections should be rejected.

*Second*, Kytomaa is qualified to provide the opinions in section 2.3 (tendency of earplugs to slip) and 2.4 (dimensions and stem characteristics) of his third

supplemental report.   While Plaintiffs attempt to construe these opinions as audiology opinions, they are opinions about material properties, contact forces, and friction characteristics of materials on which Kytomaa is well-qualified. Ex23, Kytomaa Dep. 61:7-11 (mechanical engineers work with a variety of materials, including metals, as well as polymers and plastics); *id.* 364:11-20 ("designed multiple experimental fixtures using plastic materials, including acoustic fixtures using [] plastics, as well as [] polymeric, piezoelectric materials"); *id.* 365:22–366:4 ("I've utilized Delrin [used for the CAEv2 stem] extensively.").   As the Court held previously, Kytomaa's "education and professional experience in the field of mechanical engineering qualify him to offer rebuttals … related to … the material composition of the CAEv2." Dkt. 1690 at 17-18.

Plaintiffs suggest that Kytomaa is unqualified to provide the opinions in his third supplemental report based on a mischaracterization of his opinions and an assumption that Kytomaa is unqualified simply because he has not worked with the exact subject matter at issue—earplugs.   But an "expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand."   *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1348 (N.D. Fla. 2018) (internal quotation marks omitted).   Instead, "the subject matter of the testimony must be within the scope of his or her expertise."   *Arevalo v. Coloplast Corp.*, 2020 WL 3958505, at *1 (N.D. Fla. July 7, 2020).   The opinions provided by

Kytomaa fall within the scope of his expertise as a mechanical engineer with extensive experience regarding the acoustic and material properties of various systems.

## V.   DENNIS DRISCOLL.

As stated in Section I, Defendants incorporate their arguments concerning Driscoll from Defendants' Group A *Daubert* Response for Plaintiffs' first and second arguments against Driscoll.  PltfsMot. 25-26.  Driscoll's testimony will comply with the Court's Group A *Daubert* orders.

Plaintiffs' third argument—that Driscoll's testimony regarding Hensley's noise exposure risk recites lay facts—is incorrect.  PltfsMot. 26.  Driscoll employed a detailed analysis to estimate the real-world noise levels that Hensley was exposed to, in part by employing a hearing protection de-rating scheme recommended by the National Institute for Occupational Safety and Health ("NIOSH").  Ex24, "Criteria for a Recommended Standard:  Occupational Exposure to Noise, *Revised Criteria 1998,"* U.S. Dept. HHS (NIOSH), DHHS Publication No. 98-126 (1998), listed as Reference No. 16 in Ex25, Driscoll Report 9.  As explained in his report, the labeled "NRR is a laboratory value and not necessarily reflective of the real-world performance afforded by HPDs."  Ex25, Driscoll Report 5.  Hensley testified that he wore both the CAEv2 and foam earplugs while deployed to Iraq, and that he was exposed to mortar attacks.  Ex26, Hensley Dep. 69:13-71:16, 84:16-85:23.  Driscoll

performed his de-rating analysis for both types of HPDs—both yielding a significant risk to noise exposure regardless of the hearing protector.  Ex25, Driscoll Report 6. This testimony is "relevant to an issue in [Hensley's] case and offer[s] insights 'beyond the understanding and experience of the average citizen.'"  *Navelski v. Int'l Paper*, 244 F. Supp. 3d 1275, 1287 (N.D. Fla. 2017).

## VI.   JOHN HOUSE.

Plaintiffs' arguments to exclude two of House's opinions relating to Wayman mischaracterize House's methodology and this Court's prior order and should be rejected.  PltfsMot. 27-29.  With respect to House's opinion that noise did not cause Wayman's tinnitus, House examined roughly twenty years' worth of Wayman's medical, military, and audiology records.  Ex27, House Wayman Report 6 & Exhibit C.  Based on these facts, he provided a reasoned basis for concluding that there is no evidence that noise exposure was the cause of Wayman's tinnitus, especially given that Wayman has had multiple traumatic brain injuries ("TBIs") that could cause tinnitus.[3]  Ex27, House Wayman Report 6.  While the Court previously excluded

---

[3]  Plaintiffs' statement that House "did not examine whether Wayman's tinnitus occurred at the time of his head trauma", PltfsMot. 27 n.83, is incorrect.  Although House denied "constructing a timeline", Ex28, House Dep. 47:14-17, he specifically considered Wayman's "two separate incidents of traumatic brain injuries around 2007 and 2008, which was the period of time [he] first started noticing his tinnitus." Ex 27, House Wayman Report at 6.

House's opinion regarding Hacker because House did not rule out noise exposure as a cause of Hacker's tinnitus, ECF 1680 at 24, here House specifically reasons that because Wayman does not have sensorineural hearing loss in either ear his tinnitus is not likely to be caused by noise exposure.  Ex27, House Wayman Report 6. House's reasoning also addresses Plaintiffs' argument that House did not "perform a differential etiology to rule out the different potential causes of Wayman's tinnitus."  PltfsMot. 27; *id.* 29.  For Wayman, House did consider noise exposure— the only basis of Wayman's claims against Defendants—and ruled it out, and Plaintiffs do not identify what other potential causes House should have considered. Thus, House's opinion "consider[ed] [noise exposure] and ruled it out in giving his causation opinion," complying with the Court's prior order and making his opinion admissible.  Ex27, House Wayman Report 6.

With respect to House's opinion that Wayman's alleged injuries do not affect his life, Plaintiffs criticize how House assessed Wayman's hearing at ultra-high frequencies.  PltfsMot. 28.  But House specifically explained that his opinions about Wayman's functioning are, among other things, based on Wayman's "normal hearing in the speech frequencies" and "the American Medical Association and Veterans Administration standards" of speech-discrimination impairment.  Ex27, House Wayman Report 7.  That Plaintiffs would place greater weight on Wayman's ultra-high frequency hearing tests is, at most, a cross-examination point and cannot

detract from House relying on a recognized methodology and the facts regarding Wayman's hearing in the speech frequencies.

Plaintiffs also criticize House for relying on testimony from Wayman's supervisor about his work performance.  PltfsMot. 28.  Notably, Wayman's experts considered the same testimony.   Ex29, Lustig Wayman Report Ex C; Ex18, Spankovich Wayman Report Ex C.  Far from a "lay" opinion, House applied decades of experience managing patients' symptoms to understand how, if at all, Wayman's alleged injuries impact his work based on the facts provided by his supervisor.  Ex27, House Wayman Report 7.  Relying on supervisor testimony is an obvious factual basis for determining a person's work performance, and Plaintiffs provide no argument to the contrary.

Finally, Plaintiffs suggest that House's opinions about Wayman's sleep are "based on his gut feelings."  PltfsMot. 28.  Not so.  House specifically excluded tinnitus as a sleep disturbance for Wayman based on his review of the records, including sleep-related medical records that do not mention tinnitus and instead note that Wayman's symptoms are improved by treating his obstructive sleep apnea. Ex27, House Wayman Report 4.

## VII.  DOUGLAS JACOBS.

### A.  Jacobs' Opinion That Adkins Has Antisocial Personality Disorder Is Reliable And Based On Sufficient Facts.

The medical records, Plaintiffs' own experts, and testimony by Adkins himself all support that Adkins has antisocial personality disorder.  In July 2005, a psychologist provisionally diagnosed Adkins with antisocial personality disorder. Ex30, B_L_Adkins-VA-002980-2984.  The psychologist noted that Adkins "is best described as an immature young man with a long history of conduct problems and a propensity for continuation of similar misconduct."  *Id.*  Two months later, Adkins reported a history of "cruelty to animals, fire setting, shoplifting, impulsivity, irritability and recklessness" with the psychologist again noting "antisocial personality traits."  *See* Ex31, B_L_Adkins-VA-003214-3216.  In addition to a history of this behavior, Adkins reported using marijuana since the age of 12 or 13. Ex32, B_L_Adkins-VA-006057-6059.  Throughout Adkins' career in the military, various medical records indicate that Adkins has traits—including irresponsibility— that are consistent with antisocial personality disorder.[4]  Adkins' causation expert

---

[4]  *See, e.g.*, Ex33, B_L_Adkins-VA_002959 (listing antisocial personality disorder on problems list); Ex34, B_L_Adkins-VA_003570-3572 (noting "Evidence of antisocial personality disorder."); Ex35, B_L_Adkins-VA-003220-32222 (noting "History Antisocial Personality Disorder."); Ex36, B_L_Adkins-VA-002823 ("SM was diagnosed an alcohol dependent with episodic cannabis and an Antisocial Personality Disorder in 2005."); Ex37, B_L_Adkins-VA-003218-3219 (listing "[p]ersonality disorder" under assessment); Ex38, B_L_Adkins-VA-003188-3189

(Marc Bennett) notes in his reports that Adkins was diagnosed with antisocial personality disorder in 2005.  Ex40, MBennett Adkins Report 7.  Furthermore, Adkins himself testified that he has been diagnosed with antisocial personality disorder.  Ex12, Adkins Dep. 185:15-21.  Plaintiffs have offered no evidence—expert or otherwise—rebutting these multiple diagnoses and admissions.

Plaintiffs' argument regarding whether Adkins manifested symptoms of conduct disorders before the age of 15 is, at most, a factual dispute and not a basis for a *Daubert* challenge.  PltfsMot. 29-31.  Plaintiffs argue that DSM-5 requires "some symptoms of conduct disorder before age 15 years." *Id.* 30 (emphasis and quotation marks omitted).  Under DSM-5, those conduct disorders include aggression to people and animals, destruction of property, engaging in illegal behaviors, impulsivity, and irritability.  Ex45, DSM-5: Antisocial Personality Disorder 659.  Adkins' cruelty to animals, fire setting, and shoplifting occurred before Adkins was 18, when he entered the military.  Ex41, Jacobs Dep. 164:1-164:20.  Based on Jacobs' clinical experience and familiarity with the literature, he explained that such conduct usually begins between the ages of 10 to 16. *Id.* 166:2-

---

("He was also seen at the SFRS x3 for occupational problems (feelings of rage toward leadership) in Jan 08.  He was diagnosed with Personality Disorder at that time."); Ex39, B_L_Adkins-VA_003178-3181 ("prior to the SM's first deployment the SM was ... diagnosed with Adjustment Disorder with Disturbance of Conduct, Cannabis Abuse, alcohol dependent and Antisocial Personality Disorder.").

19.  Jacobs testified to a reasonable degree of medical certainty that these events began before Adkins was 15. *Id.* 170:23:171:6.  While Plaintiffs quibble that Jacobs cannot point to a specific document saying that Adkins' cruelty to animals, fire setting, shoplifting, and other conduct disorders began before age 15, the records demonstrating that such conduct occurred before age 18 combined with Jacobs' clinical experience and literature review provide a more than sufficient factual basis for concluding that such behavior began before age 15.  Especially considering the numerous pre-litigation diagnoses that Adkins has antisocial personality disorder, Plaintiffs' argument is not a basis for exclusion.

Plaintiffs also argue that Jacobs misinterpreted the DSM as saying the behaviors need to manifest since age 15. PltfsMot. 30-31.  But Jacobs accurately read the DSM-5, which requires a "pervasive pattern of disregard for and violation of the rights of other, occurring since age 15 years" based on certain conduct disorders, in addition to "[e]vidence of conduct disorder with onset before age 15 years." Ex45 at 659.  Thus, Jacobs correctly applied the DSM-5's methodology by describing Adkins' conduct that occurred since age 15 as well as that occurring before age 15, as described in the previous paragraph.

### B.    Jacobs' Opinion Regarding Adkins Is Proper And Probative Of Issues Including Causation And Damages.

Plaintiff mischaracterize Jacobs' opinion as improper character attacks on Adkins.  PltfsMot. 32.  Judge Jones recognized that Adkins himself has placed his

mental health conditions at issue by "seeking damages for 'frustration,' 'sleep issues,' 'focus issues,' 'irritability,' and 'social isolation'", such that Adkins' antisocial personality disorder is relevant because it provides an alternate cause for Adkins' symptoms or a basis to challenge his damages.  ECF 1390 at 11-13, 15-16. Jacobs' opinions directly rebut Adkins' claim that his use of the CAEv2 caused his diminished quality of life, ability to provide childcare and other family services, present and future earning capacity.  *See* Ex42, Adkins Supp. Obj. and Answer to First Interrogatories, Interrogatory 52; Ex43, Adkins Initial Disclosures 9-11.  For example, Jacobs opines that Adkins' termination from various jobs due to aggressive behavior with co-workers is consistent with antisocial personality disorder rather than hearing loss or tinnitus.  *See* Ex44, Jacobs Adkins Report 12-13, 24. Additionally, Jacobs opines that Adkins' isolation, difficulty maintaining relationships, and overall quality of life is due to his antisocial personality disorder, and not his hearing loss or tinnitus.  *Id.* 23-24.

Further, Jacobs' opinions about Adkins' behavior, such as seeking medical care for hearing loss and tinnitus only after seeing lawyer advertisements, directly relates to the characteristics of those diagnosed with antisocial personality disorder. Ex44, Jacobs Adkins Report 5.  The DSM-5 explains that "deceit and manipulation are *central* features of antisocial personality disorder."  *See* Ex45, DSM-5: Antisocial Personality Disorder 659 (emphasis added).  Numerous other standard

psychiatric publications have cited support that patients diagnosed with antisocial personality disorder "may deceive, exploit, con, or manipulate people to get what they want (e.g., money, power, sex)."  Ex46, Zimmerman, *Antisocial Personality Disorder* at 1, MERCK MANUAL (2021).[5]

In addition, Jacobs' opinions will provide information for the jury to consider in evaluating Adkins' credibility and his character for untruthfulness, which is expressly permitted under the federal rules.  *See* Fed. R. Evid. 608(a) ("A witness's credibility may be attached or supported by testimony about the witness's reputation for having a character for … untruthfulness, or by testimony in the form of an opinion about that character."); *United States v. Shay*, 57 F.3d 126, 129-34 (1st Cir.

---

[5]    *See also* Ex47, *Antisocial Personality Disorder* at 1, HARVARD HEALTH PUBLICATIONS, HEALTH TOPICS A-Z ("A person with this disorder has little, if any, ability to be intimate with another person….[P]eople with this disorder are sometimes charming and can be good actors who use lies and distortion to keep relationships going."); Ex48, *Antisocial personality disorder* at 1, MAYO CLINIC ("Individuals with antisocial personality disorder often violate the law, becoming criminals.  They may lie, behave violently or impulsively, and have problems with drug and alcohol use.  Because of these characteristics, people with this disorder typically can't fulfill responsibilities related to family, work or school."); Ex49, Harrison, *et al.*, SHORTER OXFORD TEXTBOOK OF PSYCHIATRY at 400 (Oxford Univ. Press 7th ed. 2018) ("These features of personality are accompanied by a striking lack of guilt or remorse and a failure to change their behaviour in response to punishment or other adverse outcomes.  They avoid responsibility, transferring blame on to other people and rationalizing their own failures.  They are often deceitful and irresponsible about finances.").

1995) (holding that district court should have permitted testimony by psychiatric expert that defendant suffered from a recognized mental disorder causing him to create fantasies to seek attention); *United States v. Hall*, 93 F.3d 1337, 1341, 1344-46 (7th Cir. 1996) (reversing exclusion of psychiatrists who would have testified that defendant was attention seeking, suggestible, and capable of confessing to a crime he did not commit); *United States v. Vallejo*, 237 F.3d 1008, 1019-20 (9th Cir. 2001); *Redmond v. City of East Point, Ga.*, 2004 WL 6060552, *18 (N.D. Ga. Mar. 29, 2004) ("courts generally permit testimony where the expert does not give a direct opinion as to credibility, but only offers to testify as to facts that have a bearing on credibility").[6]

## C.    Jacobs' Opinions About Wayman Are Reliable.

Plaintiffs allege that because Jacobs could not recall the exact wording of the DSM-5 definition of Unspecified Neurocognitive Disorder ("UNCD") his diagnosis should be excluded.  PltfsMot. 35.  This flies in the face of Jacobs' 50-year career in

---

[6]  While in *United States v. Beasley*, the Eleventh Circuit affirmed exclusion of testimony that a witness was a psychopath with no conception of the truth, that case is distinguishable.  72 F.3d 1518, 1528 (11th Cir. 1996) (per curiam).  The opinion does not indicate the expert's basis for opining that the witness was psychopathic, and apparently considered the expert to be giving a direct opinion on credibility.  *Id.* By contrast, Jacobs followed an established methodology and is opining regarding a psychological condition rather than offering a direct opinion on credibility, making his opinion similar to those in *Shay*, *Hall*, and *Vallejo*.

psychiatric medicine and extensive review of over a decade's worth of Wayman's behavior, symptoms, and medical diagnoses.  Ex50, Jacobs Wayman Report 19-20 (discussing Wayman's history of combat trauma related experiences, the resulting PTSD, and Jacobs' opinion to a reasonable degree of medical certainty that Wayman's neurocognitive impairment is a result of this PTSD).  Moreover, Jacobs' UNCD diagnosis is not his primary conclusion.  While Jacobs reliably relied upon prior diagnoses of Wayman's UNCD and applied the facts to come up with the same diagnosis, that diagnosis is only a small part of Jacobs' ultimate opinion that Wayman's PTSD—not his tinnitus—is the cause of his alleged symptoms.  *E.g.*, Ex50, Jacobs Wayman Report 3, 6, 15, 18-20.

Plaintiffs also allege that Jacobs "makes no effort to rule out alternative potential causes," with respect to Wayman's memory issues.  PltfsMot. 36.  However, a differential diagnosis is "not an absolute requirement" and the "Eleventh Circuit has [not] explicitly required this form of analysis." *Sampson v. Carnival Co.*, 2016 WL 7377226, *4 (S.D. Fla. Dec. 16, 2016) (citing *Hendrix ex. Rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1195 (11th Cir. 2010)).  Rather, specific causation testimony is reliable where the expert "consider[s] numerous underlying facts in his methodology, including: Plaintiff's clinical presentation [or] [Plaintiff's] medical history" and relies upon his expertise to render causation opinions based on those underlying facts.  *Id.* *6.

That is exactly what Jacobs did here.  First, Jacobs reviewed the entirety of Wayman's health records to evaluate his psychiatric history and condition.  Ex50, Jacobs Wayman Report 3-16.  Second, Jacobs applied his clinical experience and expertise to those facts to provide analysis as to the cause of Wayman's memory loss and sleep issues.  *Id.* 16-20.  Third, Jacobs ruled out tinnitus as the cause of Wayman's sleep and memory issues based on his analysis of Wayman's severe PTSD symptoms.  *Id.*  Accordingly, Jacobs' methodology is reliable and should not be excluded.  *Compare* ECF 1680 at 36 (ruling that Spankovich and Arriaga adequately and reliably performed a differential etiology by identifying and explaining a relevant temporal relationship between the alleged cause and effect of Hacker's alleged injuries).[7]

## VIII.  DEREK JONES AND JENNIFER LABORDE.

As stated in Section I, Defendants incorporate their arguments concerning Jones and LaBorde from Defendants' Group A *Daubert* Response, and their testimony will comply with the Court's Group A *Daubert* orders.

Plaintiffs raise an argument regarding the facts of Group B plaintiffs Blum and Sloan, and for purposes of preservation Defendants address that argument. While Plaintiffs argue that FUPIRS forbids physicians from conducting impairment

---

[7] Plaintiffs also seek to exclude Jacobs from reading Wayman's treatment records at trial.  PltfsMot. 36-37.  Defendants confirm that Jacobs will not do so.

rating evaluations until an injured worker is stable and has reached maximum medical improvement, they have failed to provide evidence that either Blum or Sloan's hearing will improve or that they have not reached "maximum medical improvement." PltfsMot. 38-39. Plaintiffs' further assertion that Blum and Sloan's hearing loss is progressive is of no import as FUPIRS requires only that a condition be "stable or non-progressive *at the time the evaluation is made*." Ex 51, FUPIRS at 1 (emphasis added). Neither Jones, LaBorde, nor the Plaintiffs themselves have suggested that Blum or Sloan's hearing loss was not stable at the time of their audiograms. Thus, Plaintiffs' arguments on these issues should be rejected.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion to exclude Defendants' expert's opinions.

August 27, 2021                                        Respectfully submitted,

/s/ Charles F. Beall, Jr.                              /s/ Robert C. "Mike" Brock
Larry Hill                                            Robert C. "Mike" Brock
Florida Bar No. 173908                                KIRKLAND & ELLIS LLP
lhill@mhw-law.com                                     1301 Pennsylvania Avenue, N.W.
Charles F. Beall, Jr.                                 Washington, D.C. 20004
Florida Bar No. 66494                                 Telephone: (202) 389-5991
cbeall@mhw-law.com                                    mike.brock@kirkland.com
Haley J. VanFleteren
Florida Bar No. 1003674                               Mark J. Nomellini
hvanfleteren@mhw-law.com                              KIRKLAND & ELLIS LLP
MOORE, HILL & WESTMORELAND, P.A.                      300 North LaSalle
350 West Cedar Street                                 Chicago, Illinois 60654
Maritime Place, Suite 100                             Telephone: (312) 862-3254
Pensacola FL 32502                                    mnomellini@kirkland.com

Telephone: (850) 434-3541

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC and Aearo, LLC*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Judge Herndon on July 12, 2021 conveyed the Court's direction that the parties' Group B *Daubert* motions are limited to 1350 words per new expert and 1350 words per new issue with a Group A expert.  This memorandum responds to Plaintiffs' arguments against one new expert (Jacobs) and new arguments for at least five experts (Crawford, Flamme/Stephenson, Kytomaa, Driscoll, and House), yielding a word limit of at least 8,100 words.  Defendants further note that Plaintiffs certified that their motion contains 8,268 words.  Pursuant to Local Rule 7.1(F) and this Court's direction, counsel for Defendants certify that this memorandum contains 5,726 words, excluding the case style, tables of contents and authorities, signature block, and certificates of compliance with the Local Rules.


Dated:  August 27, 2021                    Respectfully submitted,

                                           */s/ Robert C. Brock*
                                           Robert C. "Mike" Brock
                                           KIRKLAND & ELLIS LLP
                                           1301 Pennsylvania Avenue, N.W.
                                           Washington, D.C. 20004
                                           Telephone:  (202) 389-5991
                                           mike.brock@kirkland.com

                                           *Counsel for Defendants*
                                           *3M Company,*
                                           *3M Occupational Safety LLC,*
                                           *Aearo Technologies LLC,*
                                           *Aearo Holding, LLC,*
                                           *Aearo Intermediate, LLC and*
                                           *Aearo LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 27, 2021, a true and correct copy of the foregoing:

**DEFENDANTS' RESPONSE TO PLAINTIFFS' OMNIBUS MOTION AND MEMORANDUM OF LAW TO EXCLUDE DEFENDANTS' GROUP B EXPERT OPINIONS AND TESTIMONY**

was served as follows:

☒ **[E-Mail]** By causing the above document to be sent via electronic mail to the parties at the email addresses listed below. I am aware that service is presumed invalid if the email transmission is returned as undeliverable.

| | |
|---|---|
| Bryan F. Aylstock, Lead Counsel<br>Douglass A. Kreis<br>Neil D. Overholtz<br>Jennifer M. Hoekstra<br>Aylstock, Witkin, Kreis & Overholtz, PLLC<br>17 East Main Street Suite 200<br>Pensacola, FL 32502<br>Tel.: (850) 202-1010<br>Email: baylstock@awkolaw.com<br>Email: dkreis@awkolaw.com<br>Email: NOverholtz@awkolaw.com<br>Email: jhoekstra@awkolaw.com<br><br>*Counsel for Plaintiff Michelle Blum*<br>Case No. 7:20-cv-00122<br><br>*Counsel for Plaintiff Marcus Hensley*<br>Case No. 7:20-cv-00093<br><br>*Counsel for Plaintiff William Wayman*<br>Case No. 7:20-cv-00149<br><br>*Counsel for Plaintiff Ronald Sloan*<br>Case No. 7:20-cv-00001 | Shelley V. Hutson, Co-Lead Counsel<br>Emily B. Marlow<br>Clark, Love & Hutson, GP<br>440 Louisiana Street<br>Suite 1600<br>Houston, TX 77002<br>Tel.: (713) 757-1400<br>Email: shutson@triallawfirm.com<br>Email: emarlowe@triallawfirm.com<br>Email: bgreif@triallawfirm.com<br><br>*Counsel for Plaintiff Ronald Sloan*<br>Case No. 7:20-cv-00001 |

| | |
|---|---|
| *Counsel for Plaintiff Brandon Adkins*<br>Case No. 7:20-cv-00012 | |
| Christopher A. Seeger, Co-Lead<br>Counsel<br>David R. Buchanan<br>Caleb A. Seeley<br>Maxwell H. Kelly<br>Seeger Weiss LLP<br>55 Challenger Road, 6th Floor<br>Ridgefield Park, NJ 07660<br>Tel.: (212) 584-0700<br>Email: cseeger@seegerweiss.com<br>Email: dbuchanan@seegerweiss.com<br>Email: cseeley@seegerweiss.com<br>Email: mkelly@seegerweiss.com<br>Email: MDL2885@seegerweiss.com<br><br>*Counsel for Plaintiff William Wayman*<br>Case No. 7:20-cv-00149 | Michael A. Burns, Co-Liaison Counsel<br>Caroline L. Maide<br>Mostyn Law Firm<br>3810 W. Alabama Street<br>Houston, TX  77027<br>Tel.: (713) 714-0000<br>Email: epefile@mostynlaw.com<br>Email: maburns@mostynlaw.com<br><br>*Counsel for Plaintiff Michelle Blum*<br>Case No. 7:20-cv-00122 |
| Evan D. Buxner,<br>Plaintiffs' Executive Committee<br>Gori Julian & Associates<br>156 North Main Street<br>Edwardsville, IL 62025<br>Tel.: (618) 659-9833<br>Email: evan@gorijulianlaw.com | Brian H. Barr, Co-Liaison Counsel<br>Winston Troy Bouk<br>Troy A. Refferty<br>Levin, Papantonio, Thomas, Mitchell,<br>Rafferty, & Proctor, P.A.<br>316 S Baylen St. Ste 600<br>Pensacola, FL 32502<br>Tel.: (850) 435-7045<br>Email: bbarr@levinlaw.com<br>Email: tbouk@levinlaw.com<br>Email: trafferty@levinlaw.com |
| Taylor Bartlett<br>Jeanie Sleadd<br>William L. Garrison, Jr.<br>Heninger Garrison Davis LLC<br>2224 1st Avenue North<br>Birmingham, AL 35203 | Muhammad S. Aziz<br>Abraham Watkins Nichols<br>800 Commerce Street<br>Houston, TX 77055<br>Tel.: (713) 222-7211<br>Email: jdean@abrahamwatkins.com |

| | |
|---|---|
| Tel.: (205)326-3336<br>Email: taylor@hgdlawfirm.com<br>Email: jsleadd@hgdlawfirm.com<br>Email: lewis@hgdlawfirm.com<br><br>*Counsel for Plaintiff Marcus Hensley*<br>Case No. 7:20-cv-00093 | *Counsel for Plaintiff Ronald Sloan*<br>Case No. 7:20-cv-00001 |
| Kenneth C. Bailey<br>Robert W. Cowan<br>Aaron M. Heckaman<br>Andrea M. McGinnis<br>Katie R. Caminati<br>Bailey Cowan Heckaman PLLC<br>1360 Post Oak Blvd.<br>Suite 2300<br>Houston, TX 77056<br>Tel.: (713) 425-7100<br>Email: bailey-svc@bpblaw.com<br>Email: sbuchanan@bchlaw.com<br>Email: amcginnis@bchlaw.com<br>Email: kmcgregor@bchlaw.com<br>Email: rcowan@bchlaw.com<br><br>*Counsel for Plaintiff Brandon Adkins*<br>Case No. 7:20-cv-00012 | Michael A. Sacchet<br>Megan L. Odom<br>Ciresi Conlin LLP<br>225 S. 6th Street<br>Suite 4600<br>Minneapolis, MN 55402<br>Tel.: 612-361-8227<br>Email: mas@ciresiconlin.com<br>Email: mlo@ciresiconlin.com<br><br>*Counsel for Plaintiff Brandon Adkins*<br>Case No. 7:20-cv-00012 |
| Matthew S. Hosen<br>Quinn Emanuel Urqhart & Sullivan, LLP<br>1109 1st Avenue, Suite 210<br>Seattle, WA 98101<br>Tel.: (703) 674-8231<br>Email: matthosen@quinnemanuel.com<br><br>*Counsel for Plaintiff Brandon Adkins*<br>Case No. 7:20-cv-00012 | |

DATED:  August 27, 2021            */s/ Robert C. Brock*
                                          Robert C. "Mike" Brock