# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| | |
| This Document Relates to: | Judge M. Casey Rodgers |
| *Brandon Adkins, 7:20-cv-00012* | |
| *Michelle Blum, 7:20-cv-00122* | Magistrate Judge Gary R. Jones |
| *Marcus Hensley, 7:20-cv-00093* | |
| *Ronald Sloan, 7:20-cv-00001* | |
| *William Wayman, 7:20-cv-00149* | **[FILED UNDER SEAL]** |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' OMNIBUS MOTION TO EXCLUDE PLAINTIFFS' GROUP B PUTATIVE EXPERT OPINIONS UNDER *DAUBERT* AND RULE 702 AND INCORPORATED MEMORANDUM

FILED USDC FLND PN
AUG 27'21 PM4:13

# TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES ........................................................ ii

INTRODUCTION ........................................................................1

ARGUMENT ...............................................................................1

  I.  The Hidden Hearing Loss Opinions of Plaintiffs' Experts Are Reliable.........1

    A.  Hidden Hearing Loss .............................................................1

        1.  Extrapolating From Animals to Humans .........................................4

        2.  Good Grounds....................................................................6

        3.  Wayman and Adkins.......................................................11

  II.  Plaintiffs' Experts' Differential Diagnoses Are Reliable. ...........................14

    A.  Kileny is Qualified to Opine on Causation in Hensley.......................14

    B.  Marc Bennett's General Causation Opinion Does Not Require Exclusion.....................................................................................17

    C.  Plaintiffs' Experts Have a Reliable Basis For Their Design Defect Opinions .....................................................................................17

        1.  Kileny's Opinion That the CAEv2 Caused Hensley's Injuries is Admissible .............................................................................17

        2.  Lustig's Opinion That the CAEv2 Caused Wayman's Injury is Admissible .............................................................................19

        3...Spankovich's Opinion That the CAEv2 Caused Wayman's Injuries is Admissible....................................................................20

    D.  Plaintiffs' Experts Properly Ruled Out Alternative Causes ...............21

        1.  Fagelson's Diagnosis of Adkins is Reliable ..................................21

i

2.  Kileny's Diagnosis of Hensley is Reliable ....................................23

    a.  Kileny's Differential Diagnosis .................................................23

    b.  Kileny Can Offer Opinions Regarding Hensley's
Malingering ..........................................................................................25

3.  Bielefeld's Diagnosis of Sloan is Reliable ...................................26

    a.  Dementia Risk ........................................................................26

    b.  Opinions About Other Earplugs .................................................27

    c.  Bielefeld's Opinion That the CAEv2 Caused Sloan's Tinnitus is
Reliable .................................................................................................27

4.  Dimmick's Diagnosis of Sloan is Reliable....................................29

    a.  Hearing Loss From Aging.........................................................30

    b.  Motorcycle Noise Exposure .....................................................31

5.  Marc Bennett's Diagnosis of Sloan is Reliable .............................32

6.  Lustig's Differential Analysis of Wayman is Reliable and
Admissible ............................................................................................33

    a.  HPDs .....................................................................................33

    b.  Head Injuries...........................................................................35

    c.  Sleep ......................................................................................36

    d.  Mental Health..........................................................................37

7.  Spankovich's Diagnosis of Wayman is Reliable...........................38

    a.  HPDs .....................................................................................38

    b.  Head Injuries...........................................................................39

    c.  Sleep ......................................................................................39

8.  Ostacher's Diagnosis of Wayman is Reliable ...............................40

ii

        a. Ostacher Considered Wayman's Treatment ............................40

        b. Head Injuries ................................................................42

III. Plaintiffs' Experts' Economic Loss Opinions Satisfy Rule 702.................43

    A. Johnson's Opinions Are Admissible...................................................43

      1. Johnson's Methodologies Are Reliable ..........................................43

      2. Johnson's Opinion That Plaintiffs Have Lost Access to the Labor Market is Supported by Good Data ........................................................44

      3. Johnson Adequately Explained How Her Conclusions Are Tied to the Facts ................................................................................................46

      4. Defendants Have Misrepresented Johnson's Lifecare Planning Methodology ................................................................................................51

    B. Neil Bennett's Opinions Are Admissible...........................................52

      1. Neil Bennett Can Rely on Johnson ................................................53

      2. Neil Bennett Correctly Uses Wage Data to Estimate Wage Growth................................................................................................54

      3. Neil Bennett Reasonably Uses the Social Security Retirement Age ................................................................................................56

      4. Neil Bennett Accurately Calculated Adkins' Earnings ................57

      5. Neil Bennett Accurately Calculated Blum's Earnings .................58

      6. Neil Bennett's Operative Report Accurately Calculates Wayman's Damages................................................................................................59

    C. Dimmick's Opinions That Sloan Will Suffer Loss of Income and Consequences to His Familial and Social Relationships Are Reliable ..................61

IV. Plaintiffs' Experts Offer Reliable, Permissible Opinions ............................62

    A. Marc Bennett and Gilder Offer Permissible Legal Opinions ............62

      1. Statements of Law ........................................................................62

B.   Marc Bennett and Gilder Do Not Offer Impermissible "State of Mind" Opinions ................................................................................................ 64

C.   Gilder's Opinions About Hearing Loss and Tinnitus Are Admissible ................................................................................................ 65

D.   Gilder's Opinions About Method B Testing Are Admissible ............ 67

E.   Gilder May Opine About What Defendants Should Have Provided to the Military ....................................................................................... 67

F.   Marc Bennett is Qualified and Reliably Opines as to the CAEv2's Design and Safer Alternative Designs ........................................................ 68

G.   Dimmick is Qualified to Opine on Design Defect ............................. 71

CONCLUSION ......................................................................................... 72

# TABLE OF AUTHORITIES

Page(s)

Cases

*Allison v. McGhan Med. Corp.*,
184 F.3d 1300 (11th Cir. 1999)..................................................................... 5, 11

*Alphonso v. Esfeller Oil Field Const., Inc.*,
380 F. App'x 808 (11th Cir. 2010) ...................................................... 15

*Baker v. Socialist People's Libyan Arab Jamahiriya*,
775 F. Supp. 2d 48 (D.D.C. 2011) ........................................................ 57

*Banta Props., Inc. v. Arch Specialty Ins. Co.*,
2011 WL 13096149 (S.D. Fla. Nov. 23, 2011)................................... 60

*Bayes v. Biomet, Inc.*,
2020 WL 5594059 (E.D. Mo. Sep. 18, 2020)................................... 16

*Bazemore v. Friday*,
478 U.S. 385 (1986) ........................................................................ 50

*Best v. Lowe's Home Ctrs. Inc.*,
563 F.3d 171 (6th Cir. 2009).............................................................. 60

*Bonner v. ISP Tech. Inc.*,
259 F.3d 924 (8th Cir. 2001).............................................................. 4

*Brown v. Burlington N. Santa Fe Ry.*,
765 F.3d 765 (7th Cir. 2014)............................................................. 45

*Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*,
2013 WL 351546 (D.D.C. Jan. 29, 2013)........................................ 57

*Chapman v. Procter & Gamble Distrib., LLC*,
766 F.3d 1296 (11th Cir. 2014)......................................................... 21

*Conde v. Velsicol Chem. Corp.*,
24 F.3d 809 (6th Cir. 1994)............................................................... 11

*Cummings v. Standard Register Co.*,
265 F.3d 56 (1st Cir.2002).............................................................. 55

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)........................................................... 1, 2, 3, 10

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995)........................................................... 11

*Deakle v. John E. Graham & Sons*,
756 F.2d 821 (11th Cir. 1985).......................................................... 55

*Dollar Gen. Corp. v. Elder*,
600 S.W.3d 597 (Ark. 2020)........................................................... 15

v

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000)................................................................................. 31
*Eldridge v. Pet Supermarket, Inc.*,
    2020 WL 1076103 (S.D. Fla. Mar. 6, 2020)........................................................ 63
*Floyd ex rel. Ray v. U.S.*,
    2010 WL 4905010 (M.D. Ga. Nov. 26, 2010)...................................................... 32
*Ford v. Carnival Corp.*,
    2010 WL 9116184 (S.D. Fla. Mar. 4, 2010)........................................................ 16
*Franco v. Bos. Sci. Corp.*,
    2016 WL 3248505 (S.D.W. Va. June 13, 2016)................................................... 57
*Guinn v. AstraZeneca Pharm.*,
    602 F.3d 1245 (11th Cir. 2010)................................................................... Passim
*Haines v. Webb*,
    2014 WL 12828962 (N.D. Ga. Sept. 26, 2014) ................................................... 63
*Hanson v. Colgate-Palmolive Co.*,
    353 F. Supp. 3d 1273 (S.D. Ga. 2018)................................................................. 31
*Hekmati v. Islamic Republic of Iran*,
    278 F. Supp. 3d 145 (D.D.C. 2017) ..................................................................... 44
*Hendrix v. Evenflo Co.*,
    255 F.R.D. 568 (N.D. Fla. 2009) ................................................................... 18, 20
*Hendrix*,
    609 F.3d 1183.............................................................................................. 19, 21
*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
    299 F. Supp. 3d 1291 (N.D. Fla. 2018)....................................................... 4, 5, 50
*In re C.R. Bard, Inc.*,
    948 F. Supp. 2d 589 (S.D. W. Va. 2013).......................................................69, 71
*In re C.R. Bard, Inc.*,
    2018 WL 514753 (S.D. W. Va. Jan. 23, 2018)...............................................69, 72
*In re Delta/Airtran Baggage Fee Antitrust Litig.*,
    245 F. Supp. 3d 1343 (N.D. Ga. 2017) ............................................................... 26
*In re Disposable Contact Lens Antitrust*,
    329 F.R.D. 336 (M.D. Fla. 2018)......................................................................... 30
*In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*,
    711 F. Supp. 2d 1348 (M.D. Ga. 2010) ............................................................... 66
*In re Paoli R.R. Yard PCB Litigation*,
    35 F.3d 717 (3d Cir. 1994)............................................................... 5, 9, 11, 14
*In re Polypropylene Carpet Antitrust Litig.*,
    93 F.Supp.2d 1348 (N.D. Ga. 2000) ................................................................... 52
*In re Seroquel Prods. Liab. Litig.*,
    2009 WL 3806436 (M.D. Fla. July 20, 2009) ..................................................... 64

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999)..............................................................46

*In re Wright Med. Tech. Inc.*, *Conserve Hip Implant Prods. Liab. Litig.*,
   127 F. Supp. 3d (N.D. Ga. 2015)...............................................30, 62

*Jones & Laughlin Steel v. Pfeifer*,
   462 U.S. 523 (1983)........................................................................55

*Jones v. Otis Elevator Co.*,
   861 F.2d 655 (11th Cir. 1988).........................................................4

*King v. Cessna Aircraft Co.*,
   2010 WL 1980861 (S.D. Fla. May 18, 2010) ................................51

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) .......................................................................10

*Lee-Bolton v. Koppers Inc.*,
   319 F.R.D. 346 (N.D. Fla. 2017) ...................................................51

*Little v. McClure*,
   2014 WL 5320557 (M.D. Ga. Oct. 17, 2014)................................68

*Lowery v. Sanofi-Aventis LLC*,
   2021 WL 872620 (N.D. Ala. Mar. 9, 2021) ..................................16

*Maiz v. Virani*,
   253 F.3d 641 (11th Cir. 2001).........................................................57

*Manpower v. Ins. Co. of Pa.*,
   732 F.3d 796 (7th Cir. 2013)....................................................51, 56

*Marcano Rivera v. Turabo Med. Ctr. P'ship*,
   415 F.3d 162 (1st Cir. 2005) ..........................................................44

*Mohney v. USA Hockey, Inc.*,
   300 F. Supp. 2d 556 (N.D. Ohio 2004)..........................................31

*Napolitano v. Synthes, Inc.*,
   2014 WL 12867042 (D. Conn. 2014) ............................................66

*Ohio State Troopers Ass'n v. Point Blank Enters., Inc.*,
   2020 WL 1666763 (S.D. Fla. Apr. 3, 2020) ..................................71

*Pomona v. SQM N. Am. Corp.*,
   750 F.3d 1036 (9th Cir. 2014).........................................................31

*Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
   326 F.3d 1333 (11th Cir. 2003)..............................................Passim

*Top Notch Sols, Inc. v. Crouse & Assocs.*,
   2019 WL 4673563 (W.D. Wash. Sept. 25, 2019)..........................55

*Trevino v. Boston Scientific Corp.*,
   2016 WL 2939521 (S.D.W.Va. May 19, 2016)..............................72

*Tuscaloosa v. Harcros Chems., Inc.*,
   158 F.3d 548 (11th Cir. 1998)........................................................62

*U.S. v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004)............................................................................ 51

*Viterbo v. Dow Chem. Co.*,
   826 F.2d 420 (5th Cir. 1987)................................................................................. 62

*Wilson v. Taser Int'l, Inc.*,
   303 F. App'x 708 (11th Cir. 2008) ...................................................................... 15

Rules

Federal Rule of Evidence 702 ............................................................................ 1, 4

Regulations

40 C.F.R. § 211.204-4 ............................................................................................ 63

**INTRODUCTION**

Defendants 3M Company and Aearo (hereinafter collectively "Defendants") have moved to exclude, in whole or in part, the testimony and opinions of Group B Plaintiffs'[1] experts Dr. Marc Bennett ("Marc Bennett"), Neil Bennett ("Neil Bennett"), Dr. Eric Bielefeld ("Bielefeld"), Dr. Jessica Dimmick ("Dimmick"), Dr. Marc Fagelson ("Fagelson"), Stephen Gilder ("Gilder"), Cloie Johnson ("Johnson"), Dr. Larry Lustig ("Lustig"), Paul Kileny ("Kileny"), Dr. Michael Ostacher ("Ostacher"), and Dr. Christopher Spankovich ("Spankovich") pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).[2] For the reasons stated herein, Defendants' motion should be denied.

**ARGUMENT**

I.      **The Hidden Hearing Loss Opinions of Plaintiffs' Experts Are Reliable.**

A.      *Hidden Hearing Loss*

Defendants' argument regarding hidden hearing loss ("HHL") ignores the experts' diagnostic process, claiming that **any** opinion diagnosing HHL is unreliable. This argument misses the mark because *Daubert* focuses on experts' methodology,

---

[1] The Group B "Plaintiffs" include Brandon Adkins ("Adkins"), Michele Blum ("Blum"), Marcus Hensley ("Hensley"), Ronald E. Sloan ("Sloan"), and William Wayman ("Wayman").

[2] References to Defendants' Omnibus Motion to Exclude Plaintiffs' Group B Putative Expert Opinions Under *Daubert* and Rule 702 and Incorporated Memorandum (Doc. 1864) are abbreviated herein as "Def-Mot".

not their conclusions. *Daubert*, 509 U.S. at 595. The ultimate issue here is whether noise exposure and the CAEv2 caused these Plaintiffs' hearing issues, and Defendants do not even address the experts' differential diagnoses.[3]

Humans often experience hearing impairments despite testing within the normal range on pure-tone audiograms. The phrase "hidden hearing loss" simply characterizes that common circumstance.[4] HHL is a clinical diagnosis. Cochlear synaptopathy is an underlying biologic process that plausibly explains HHL. Though not synonymous, the terms are sometimes used interchangeably, as it is widely accepted by scientists that synaptopathy is the most likely contributor to HHL.[5]

To be clear, an HHL diagnosis does not indicate the absence of clinical or other data to support the individual's hearing impairment. It reflects only the result of pure-tone audiograms between 250 and 8,000 Hz in a sound-proof booth.[6] HHL can be diagnosed reliably through a differential diagnosis, even if cochlear synaptopathy cannot be proved with absolute certainty.[7]

---

[3] *See* Def-Mot-16-25.
[4] PX1(Spankovich-(Wayman)-10); PX2(World Health Org., World Report on Hearing 26-27 (2021) (those with HHL experience "common symptoms associated with noise-related auditory damage such as difficulty in hearing noise, tinnitus, and hyperacusis," but those difficulties are "undetectable on pure tone audiometry").
[5] PX1(Spankovich-(Wayman)-10); PX3(Lustig-Dep-(1/26/2021)-53:1-54:13)).
[6] PX4(Fagelson-Dep-(2/19/2021)-67:4-16).
[7] *See, e.g.*, PX1(Spankovich-(Wayman)-10, 14-16).

Accordingly, this Court should reject Defendants' argument that all opinions about HHL are invalid merely because cochlear synaptopathy cannot be definitively proved in a particular patient. This argument contravenes both science and the law. As the Supreme Court stated in *Daubert*, "[t]here are no certainties in science." 509 U.S. at 590 ("[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty.").

The clinical diagnosis of HHL is uncontroversial. One of Plaintiffs' experts, Dr. Marc Bennett, testified that HHL is "mainstream now."[8] Indeed, the World Health Organization's ("WHO") World Report on Hearing described the etiology of HHL in detail and declared that "many people struggle with HHL."[9]

The scientific understanding of HHL's mechanisms has developed substantially in the last decade, with definitive studies in animals and strongly correlative human studies. Defendants' brief cherry-picks comments from Plaintiffs' experts to suggest, incorrectly, that they view HHL as speculative. When Marc Bennett states that HHL is not "a fact," he means that it cannot be proved definitively in a living person. Bennett strongly believes in HHL as good science.[10]

---

[8] PX5(Marc-Bennett-Dep-(2/9/2021)-395:4-17).
[9] PX2(World Report on Hearing-at 26-27).
[10] PX5(Marc-Bennett-Dep-(2/9/2021)-382:5-18, 384:5-385:5 (stating that "this is something that people believe in passionately")).

3

The absence of a conclusive test does not render the science around HHL and cochlear synaptopathy unreliable. *See, e.g.*, *Bonner v. ISP Tech. Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) ("Neither Rule 702 nor *Daubert* requires that an expert opinion resolve an ultimate issue of fact to a scientific absolute[.]"); *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988) (stating that "absolute certainty is not required"); *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1336 (N.D. Fla. 2018) (stating that "the proponent of an expert opinion does not have the burden of proving that [the opinion] is scientifically correct, but that by a preponderance of the evidence, it is reliable"). There are no tests for a variety of well-known conditions, such as migraines.[11] Even evolution is an unproved "theory," but few would reject evolution as unsound science.[12]

Because HHL diagnoses are grounded in sound science, including the differential diagnosis methodology, this Court should permit these opinions. Allowing testimony regarding HHL lets juries evaluate this evidence. Rejecting all HHL testimony would effectively determine that HHL does not exist—a decision contrary to the scientific consensus.

### 1.    *Extrapolating From Animals to Humans*

---

[11] PX6(Marc-Bennett-Dep-(2/11/2021)-622:14-623:12).
[12] *Id.* at 605:16-606:10.

4

Defendants claim that the evidence supporting HHL is based on animal studies alone. However, as described above, HHL is a well-accepted clinical diagnosis, while cochlear synaptopathy is a well-studied biological explanation for HHL. Regardless, it is scientifically valid to extrapolate from animal studies to humans. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 743 (3d Cir. 1994).[13] The Third Circuit held that "for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans." *Id.* In *Paoli*, the district court abused its discretion by excluding opinions based on animal studies, where occupational studies supported the animal data and there was no significant contradictory epidemiological data. *Id.* at 779-80. The analysis is similar here.

---

[13] Both the Eleventh Circuit and this Court have cited *Paoli* on this issue. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314 (11th Cir. 1999); *In re Abilify*, 299 F. Supp. 3d at 1310.

5

##### 2.      *Good Grounds*

Animal studies across multiple species conclusively demonstrate cochlear synaptopathy, a mechanism that causes HHL.[14] As laid out below, there are "good grounds" to conclude that this process occurs in humans.

One key factor is that cochlear synaptopathy is precisely understood—so scientists can cognize it occurring in humans. Traditional audiograms measure inner hair cell loss, but they do not measure the loss of synapses connecting those hair cells to spiral ganglion nerve fibers, which are crucial to hearing.[15] Noise exposure sometimes temporarily damages hair cells—called a temporary threshold shift ("TTS")—while permanently damaging cochlear synapses.[16] A TTS will not cause measurable hearing loss on an audiogram until approximately 80-to-90% of

---

[14] *See* PX7(Lustig-12 (summarizing studies that have "unequivocally documented" cochlear synaptopathy)).

[15] *See* PX8(Arriaga-18-19); PX9(Marc-Bennett-14); PX1(Spankovich-(Wayman)-10); PX10(Liberman-Kujawa (2017) at 138-39). Traditional pure tone audiograms fail to measure hearing loss at frequencies above 8000 Hz, outer ear hair cell dysfunction, or difficulties understanding speech (in quiet and in noise).

[16]      *See*   PX8(Arriaga-19-21);   PX7(Lustig-11-12);   PX11(Fagelson-11); PX10(Liberman-Kujawa (2017) at 139).

synapses have been destroyed.[17] Nonetheless, cochlear synaptopathy causes impairments such as speech-in-noise difficulties, tinnitus, and hyperacusis.[18]

Scientists routinely draw conclusions from animal studies.[19] Studies have shown noise exposure to be the primary source of TTSs that cause cochlear synaptopathy.[20] Because humans have similar anatomies, there is "every reason to believe that human ears behave similarly to sound trauma as do animal ears, in response to noise exposures that cause temporary threshold shifts and cochlear synaptopathy."[21] Humans also have similar presentations to the tested animals, with noise exposure and difficulty hearing in background noise.[22]

Another reason to extrapolate from animal tests to humans is that cochlear synaptopathy has been demonstrated in several mammal species.[23] Initially, studies of mice and guinea pigs demonstrated cochlear synaptopathy.[24] Based on these studies, Kujawa and Liberman concluded that the results likely applied to "all

---

[17] PX12(Marc-Bennett-(Adkins)-15); PX13(Spankovich-Dep-(1/28/2021)-24:10-25:14); PX6(Marc-Bennett-Dep-(2/11/2021)-586:5-587:1); PX14(Viana (2015) at 2).

[18] PX8(Arriaga-21); PX15(Bramhall, et al. (2017) at 2); PX10(Liberman-Kujawa (2017)-138, 144); PX14(Viana, et al. (2015) at 2-3).

[19] PX4(Fagelson-Dep-(2/19/2021)-121:1-12).

[20] PX7(Lustig-11); PX15(Bramhall, et al. (2017) at 1).

[21] PX7(Lustig-13).

[22] PX6(Marc-Bennett-Dep-(2/11/2021)-626:5-9).

[23] PX10(Liberman-Kujawa (2017) at 145 (stating that "synaptopathy has been largely permanent, indeed progressive, in multiple species")).

[24] PX16(Kujawa-Liberman (2015) at 191).

mammalian ears, presumably including human."[25] Now, "there is good data to show a similar process occurs in non-human primates (Valero et al 2017), which are closest to us on an evolutionary scale."[26] In the Valero study, rhesus monkeys lost inner hair cell synapses with little outer hair cell loss, similar to the results in mice and guinea pigs.[27]

Several human studies further support these animal-study results. A definitive test on human ears is not feasible because it would require an autopsy.[28] But the available tests on humans strongly correlate with animal studies on HHL and synaptopathy. Recent research at Eaton-Peabody Laboratories—with Massachusetts Eye and Ear and Harvard Medical School—has validated the applicability of animal studies on HHL and synaptopathy to human ear physiology, through temporal bone studies.[29] Epidemiological studies estimate that 10-12% of people with normal audiometric thresholds have HHL.[30] Bramhall's studies have shown evidence of synaptopathy in veterans, due to noise exposure.[31] Her 2017 study showed that

---

[25] *Id.* at 194.
[26] PX7(Lustig-12).
[27] PX17(Valero, et al. (2017) at 7).
[28] PX3(Lustig-Dep-(1/26/2021)-37:20-38:8, 48:10-19).
[29] *See* PX18(Wu, et al. (2021) at 4439-40 (for those with noise-induced hearing loss, auditory nerve fiber loss was exacerbated, which was associated with hearing impairment even in patients with similar audiometric thresholds)). *See also generally* PX19(Wu, et al. (2019)); PX20(Wu, et al. (2020)).
[30] PX1(Spankovich-(Wayman)-11).
[31] PX21(Spankovich-52).

veterans had reduced levels of auditory brain stem response, which is indicative of synaptopathy.[32] Liberman's 2016 study showed that young adults with greater histories of noise exposure had compromised speech discrimination in noise.[33] Another study evaluated temporal bones from human cadavers, showing "dramatic cochlear synaptopathy,"[34] concluding that "loss of cochlear nerve connections to the hair cells can occur well before the loss of hair cells," and thus neural degeneration is important to hearing loss.[35]

As Dr. Lustig noted, these studies show that "the same changes seen in closely related animals are also seen in human ears."[36] Thus, there are "good grounds" to extrapolate cochlear synaptopathy and HHL from animals to humans. *See Paoli*, 35 F.3d at 743.

Finally, many humans present with the expected symptoms based on the cochlear synaptopathy demonstrated in animals. Marc Bennett testified that he has diagnosed numerous patients with HHL.[37] Lustig diagnoses patients with HHL "all the time." These patients have had noise exposure, auditory complaints such as

---

[32] PX15(Bramhall, et al. (2017)-3).
[33] PX22(Liberman, et al. (2016) at 11).
[34] PX10(Liberman-Kujawa (2017) at 143).
[35] PX14(Viana, et al. (2015) at 12).
[36] PX7(Lustig-13).
[37] PX5(Marc-Bennett-Dep-(2/9/2021)-387:8-20).

9

difficulty hearing in noise, and normal audiograms.[38] HHL is based only on pure-tone audiogram results, but given a patient's injury, HHL can be further characterized through other objective tests, including physiological testing.[39] "Normal" audiograms can hide a history of TTSs and other noise-induced damage, supporting a diagnosis of HHL.[40] Further, for many patients, high-frequency audiograms and otoacoustic-emission testing can "unhide" damage that is "hidden" on standard audiograms—as seen in these Plaintiffs.[41]

One hallmark of *Daubert* is employing the same level of "intellectual rigor" in the courtroom as in practice. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Here Plaintiffs' experts are using the same diagnostic process in this litigation that they use in practice. Defendants paint Plaintiffs' experts as uncertain about their opinions.[42] But these experts are simply honest about the absence of a definitive, non-invasive, objective test for cochlear synaptopathy. They nonetheless believe that "we have shown [HHL] to exist in human beings."[43] Again, science does not require certainty. *Daubert*, 509 U.S. at 590.

---

[38] PX3(Lustig-Dep-(1/26/2021)-42:15-43:10).
[39] PX13(Spankovich-Dep-(1/28/2021)-64:12-65:16).
[40] *See* discussion *infra* at Argument § I.A.3.
[41] PX6(Marc-Bennett-Dep-(2/11/2021)-519:10-520:17, 588:7-19);
PX13(Spankovich-Dep-(1/28/2021)-54:14-55:11).
[42] Def-Mot-18-21.
[43] PX5(Marc-Bennett-Dep-(2/9/2021)-383:21-384:6).

Plaintiffs' experts have reliably diagnosed HHL and have reliably attributed HHL to cochlear synaptopathy as the underlying, biologically plausible, mechanism. The HHL issue here is, therefore, similar to the issues in *Paoli* and *Abilify*, where opinions based in part on animal studies were permitted, and unlike the issues in several cases cited by Defendants. *See Allison*, 184 F.3d at 1314 (human epidemiological studies contradicted animal studies); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) (plaintiffs failed to explain experts' methodology or cite any other sources); *Conde v. Velsicol Chem. Corp.*, 24 F.3d 809, 813-14 (6th Cir. 1994) (human studies contradicted plaintiff's position, and animal studies showed no association or causation).

This Court, therefore, should permit testimony about HHL and cochlear synaptopathy.

### 3.   *Wayman and Adkins*

Plaintiffs' experts reliably diagnosed HHL in Wayman and Adkins. Based on their differential diagnoses, Drs. Bennett and Fagelson (*Adkins*), and Drs. Lustig and Spankovich (*Wayman*), reliably ruled in noise exposure and the CAEv2 as the cause of HHL and tinnitus, and then ruled out alternative causes.[44] *See, e.g., Guinn v.*

---

[44]   PX12(Marc-Bennett-(Adkins)-12-16);   PX23(Lustig-(Wayman)-16-19); PX1(Spankovich-(Wayman)-14-16);   PX4(Fagelson-Dep-(2/19/2021)-131:7-11, 131:12-144:16).

*AstraZeneca Pharm.*, 602 F.3d 1245, 1252-53 (11th Cir. 2010) (differential diagnoses support reliable diagnostic opinions).

These Plaintiffs' symptoms support the experts' differential diagnoses. The WHO states that HHL "refers to the condition where an individual experiences common symptoms associated with noise-related auditory damage such as difficulty in hearing noise, tinnitus, and hyperacusis."[45] Adkins has tinnitus and has difficulty hearing with background noise.[46] Wayman has tinnitus, high-frequency hearing loss, and difficulty hearing in noise.[47] Based on their differential diagnoses, these experts have determined that noise exposure in the military caused these injuries.[48]

Several additional factors support these diagnoses. Lustig based his opinions on audiological testing, conversations with Wayman, Wayman's deposition, and notes from treating physicians.[49] In addition to reviewing Wayman's audiological tests, Spankovich conducted a telehealth consultation with Wayman.[50] Marc Bennett

---

[45] PX2(World Report on Hearing-27).
[46] PX12(Marc-Bennett-(Adkins)-10).
[47] PX1(Spankovich-(Wayman)-15); PX23(Lustig-(Wayman)-16).
[48]   PX12(Marc-Bennett-(Adkins)-15-16);   PX1(Spankovich-(Wayman)-15-16); PX23(Lustig-(Wayman)-19); PX4(Fagelson-Dep-(2/19/2021)-140:4-144:16).
[49] PX3(Lustig-Dep-(1/26/2021)-54:21-55:11); PX23(Lustig-(Wayman)-11-16).
[50] PX1(Spankovich-(Wayman)-6-9, 12).

reviewed audiograms and personally examined Adkins.[51] Fagelson studied Adkins' audiograms, deposition, and medical records.[52]

Both Plaintiffs' testing supports the experts' differential diagnoses of HHL and noise-induced hearing damage. Wayman's testing shows substantial objective evidence of peripheral auditory damage. Per Spankovich, testing shows the absence of acoustic reflexes, compromised and reduced otoacoustic emissions, abnormalities to his auditory brain stem response, and extended high frequency hearing sensitivity—all of which support an HHL diagnosis by confirming noise as the most likely source of Wayman's hearing impairment.[53] In addition to those factors, Lustig noted that Wayman's audiograms show a TTS indicative of cochlear synaptopathy and excess noise exposure.[54] As to Adkins, Marc Bennett noted elevated thresholds in his audiograms over time, consistent with noise-induced cochlear damage. These findings are consistent with HHL caused by synaptopathy from TTSs—even if

---

[51]   PX6(Marc-Bennett-Dep-(2/11/2021)-641:1-6);   PX12(Marc-Bennett-(Adkins)-10-11).

[52] PX24(Fagelson-(Adkins)-7, 10-11).

[53]   PX13(Spankovich-Dep-(1/28/2021)-54:14-55:11).   In addition to supporting an HHL diagnosis, these tests are reliable, independent evidence of Wayman's noise-induced hearing impairments. Defendants' experts conducted these tests, and their reliability has not been challenged.

[54] PX3(Lustig-Dep-(1/26/2021)-44:13-46:3).

Adkins' tests were marginally in the "normal" range.[55] Objective data, therefore, supports these differential diagnoses.

Defendants' arguments focus on the lack of a perfect test to diagnose synaptopathy. But the absence of a **definitive** test of living human synaptic damage does not mean there is no **relevant** test. As explained above, the experts' differential diagnoses are reliable. Animal testing, testing on humans, and the Plaintiffs' audiograms all describe a plausible mechanism for the injury, HHL caused by synaptopathy, and support these experts' opinions. *See, e.g.*, *Paoli*, 35 F.3d at 744 ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect.").

Accordingly, this Court should permit these experts' diagnoses, including their testimony about HHL.

## II.    **Plaintiffs' Experts' Differential Diagnoses Are Reliable.**

### A.    *Kileny is Qualified to Opine on Causation in Hensley.*

Hensley suffers from tinnitus caused by the CAEv2's lack of hearing protection.[56] Paul Kileny, MS, PhD, is an audiologist and is qualified to render that causation opinion. Kileny has a Doctorate in Audiology and has "practiced audiology, published extensively, and held leadership positions in audiology for the

---

[55] PX6(Marc-Bennett-Dep-(2/11/2021)-519:10-520:17).
[56] PX25(Kileny-(Hensley)-6-7).

past 40 plus years."[57] He has treated thousands of patients with tinnitus[58] and his treatment includes determining the cause of his patient's tinnitus.[59] Kileny has previously provided expert testimony regarding the etiology of hearing loss, whether due to noise exposure or ototoxic medication, and the testing of hearing protection devices ("HPDs").[60] Exhibit A to his report details his extensive education, experience, and accolades.[61] Kileny's education, experience, and knowledge of the treatment and diagnosis of tinnitus, along with his knowledge of and experience with HPDs, qualify him to render a causation opinion in this case.

Defendants contend that because Kileny is an audiologist, not a medical doctor, he is unqualified to provide a "medical opinion regarding causation or to exclude other medical conditions, as required by a differential diagnosis."[62] However, there is no requirement under Arkansas law[63] or Eleventh Circuit law[64] that causation be supported by a medical doctor. *See, e.g.*, *Dollar Gen. Corp. v.*

---

[57] *Id*. at 1-2.

[58] PX26(Kileny-Dep-(1/22/2021)-110:22-111:2).

[59] *Id*. at 123:13-124:12.

[60] *Id.* at 20:16-21:4; 79:20-80:5; 80:23-81:14; 83:7-22; 85:11-16.

[61] PX25(Kileny-(Hensley)-1-3 & Ex.A).

[62] Def-Mot-25.

[63] The parties agree that Arkansas law applies to Hensley's claims.

[64] The Eleventh Circuit applies the state's evidentiary law in diversity cases. *See,* e.g., *Alphonso v. Esfeller Oil Field Const., Inc.*, 380 F. App'x 808, 809 (11th Cir. 2010) (applying Alabama law); *Wilson v. Taser Int'l, Inc.*, 303 F. App'x 708, 715 (11th Cir. 2008) (applying Georgia law).

*Elder*, 600 S.W.3d 597, 606-07 (Ark. 2020) (finding that a chiropractor could provide causation testimony). The cases cited by Defendants are not Arkansas law and are distinguishable.[65]

Defendants' statement that "Kileny admitted that he could not determine whether other medical causes resulted in Hensley's injuries" is false.[66] The testimony they cite involves the relationship between anxiety disorders and auditory complaints in general[67] and Kileny's experience in diagnosing cholesteatoma (a condition which Hensley does not have).[68]

Defendants cryptically argue that because Hensley's tinnitus is not due to an underlying condition of noise-induced hearing loss ("NIHL"), Kileny "cannot consider non-noise-related potential causes."[69] However, Kileny, as an audiologist, must consider all causes of tinnitus, not just noise-related potential causes, to treat

---

[65] Def-Mot-26-27. In *Ford v. Carnival Corp.,* 2010 WL 9116184 at *5-8 (S.D. Fla. Mar. 4, 2010), finding was based on expert's area of expertise not whether the expert was a medical doctor. In *Bayes v. Biomet, Inc.,* 2020 WL 5594059, at *17-18 (E.D. Mo. Sep. 18, 2020), expert was an engineer opining on the cause of injury—unlike Kileny who is highly qualified and experienced in diagnosing and treating the injury at issue. In *Lowery v. Sanofi-Aventis LLC*, 2021 WL 872620, at *21-22 (N.D. Ala. Mar. 9, 2021), expert was a general hospitalist, not a specialist like Kileny.
[66] Def-Mot-27.
[67] Defendants contend that Kileny is unqualified to determine whether tinnitus or PTSD causes Hensley's anxiety issues. Def-Mot-26-27 & n.4. As Kileny testified, audiologists must be aware of anxiety disorders because the disorders may manifest in different kinds of auditory complaints. PX26(Kileny-Dep-(1/22/2021)-90:7-18).
[68] Def-Mot-27; PX26(Kileny-Dep-(1/22/2021)-71:12-19; 90:7-91:5).
[69] Def-Mot-27.

16

it.[70] Based on his knowledge, experience, and education, Kileny is qualified to opine about what caused Hensley's tinnitus.

### B.    *Marc Bennett's General Causation Opinion Does Not Require Exclusion.*

Defendants argue Marc Bennett's **general** opinion that the CAEv2 caused "users" to suffer injury requires exclusion as it is not limited to specific plaintiffs.[71] Bennett's General Report permissibly opines that the CAEv2 has the potential to cause injury; whereas his Case Specific Reports opine that the CAEv2 actually caused the injuries of specific plaintiffs.[72] *Guinn*, 602 F.3d at 1248 n.1. Bennett has reliably performed two differential diagnoses as to Group B (Sloan and Adkins), and his specific causation opinions are limited to those Plaintiffs. Defendants provide no basis for exclusion of any of Bennett's general causation opinions.

### C.    **Plaintiffs' Experts Have a Reliable Basis For Their Design Defect Opinions.**

#### 1.    *Kileny's Opinion That the CAEv2 Caused Hensley's Injuries is Admissible.*

Kileny is a multi-board certified audiologist with more than 40 years of experience in the field.[73] Currently, as Director of Audiology and Electrophysiology

---

[70] PX26(Kileny-Dep-(1/22/2021)-123:13-130:9).

[71] Def-Mot-28; PX9(Marc-Bennett).

[72] PX9(Marc-Bennett); PX12(Marc-Bennett-(Adkins)); and PX27(Marc-Bennett-(Sloan)).

[73] PX25(Kileny-(Hensley)-1-2).

at the University of Michigan, he has multiple NIH grants and authored over 175 scientific publications.[74] Defendants argue that Kileny's opinions should be excluded because his HPD experience is limited to evaluation, not testing and design, and he fails to explicitly describe the defects of the CAEv2.[75] These arguments should be rejected.

First, Kileny has a wealth of clinical experience treating NIHL and tinnitus including recommending and evaluating various HPDs.[76] He co-authored a study that analyzed the effects of noise on Naval personnel and has previously testified in hearing loss cases involving HPDs.[77] His background, qualifications, and experiences allow him to opine on the effectiveness of an HPD based on its familiar characteristics.[78]

Second, while Kileny's report broadly notes that the CAEv2 provided a "lack of hearing protection," he is familiar with the CAEv2[79] and relied on many of Plaintiffs' other experts, including Dr. Packer, in reaching his opinions regarding the CAEv2.[80] *See Hendrix v. Evenflo Co.,* 255 F.R.D. 568, 607 n.75 (N.D. Fla. 2009),

---

[74] *Id.*

[75] Def-Mot-28-29.

[76] PX25(Kileny-(Hensley)-1-2).

[77] *Id.*; PX26(Kileny-Dep-(1/22/2021)-80:13-22).

[78] *Id.*

[79] PX25(Kileny-(Hensley)-7); PX26(Kileny-Dep-(1/22/2021)-79:11-15).

[80] *Id.*; PX26(Kileny-Dep-(1/22/2021)-29:2-9; 86:16-87:7.

*aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010) ("An expert may properly rely on the opinion of another expert.").

### 2. *Lustig's Opinion That the CAEv2 Caused Wayman's Injury is Admissible.*

Lustig is a board-certified otolaryngologist and neurotologist with extensive experience treating veterans with NIHL.[81] Defendants' argument regarding Lustig is that he did not perform testing on Wayman and, therefore, cannot opine on the fit of the CAEv2.[82] This challenge is without merit. First, Lustig has extensive clinical experience fitting in-the-canal devices, and he conducted a telemedicine consultation where he observed Wayman inserting the CAEv2.[83] He noted that the characteristics of the CAEv2 make it difficult to insert in medium and larger ears, and that the plug was defective because "a product that you don't know if it's safe, in whom its safe" is one that "shouldn't be on the market."[84] Finally, Lustig properly performed a differential diagnosis by analyzing Wayman's audiograms, HPD use and history, and Wayman's sworn testimony.[85] There is no requirement that Lustig measure Wayman's ear in person—and the fact that his visit was conducted remotely goes to weight, not admissibility.

---

[81] PX23(Lustig-(Wayman)-2-3).

[82] Def-Mot-29-30.

[83] PX23(Lustig-(Wayman)-2-3); PX3(Lustig-Dep-(1/26/2021)-81:15-83:1).

[84] PX7(Lustig-42); PX3(Lustig-Dep-(1/26/2021)-75:12-76:14).

[85] PX23(Lustig-(Wayman)-16-23).

### 3.     Spankovich's Opinion That the CAEv2 Caused Wayman's Injuries is Admissible.

Spankovich is a well-qualified clinical audiologist and professor of audiology who used a reliable methodology in asserting opinions for Wayman.[86] Defendants seek exclusion of Spankovich's opinions regarding Wayman because Spankovich failed to conduct an individualized test on Wayman, including measuring Wayman's ear or observing the CAEv2 in Wayman's ear.[87] These arguments fail.

Spankovich thoroughly evaluated Wayman's available medical and service records and completed a telehealth consultation.[88] There is no requirement that an expert physically measure a subject and the nature of the visit goes only to the weight of his testimony. Further, Spankovich properly conducted a differential diagnosis as to the cause of Wayman's injuries, which included a deep dive into Wayman's audiograms before, during, and after his use of the CAEv2.[89] Spankovich objectively confirmed Wayman's first perceived hearing loss and constant tinnitus while using the CAEv2 with test data and reduced OAEs.[90] In reaching his opinion, Spankovich also properly relied on testing conducted by Defendants, including the Flange

---

[86] PX1(Spankovich-(Wayman))-1-4).
[87] Def-Mot-30-31.
[88] PX1(Spankovich-(Wayman))-4-13); PX13(Spankovich-Dep-(1/28/2021)-62:14-24).
[89] PX1(Spankovich-(Wayman))-4-13).
[90] *Id.* at 14-15.

Report, and Rich McKinley's analysis of the CAEv2 defects.[91] *Hendrix*, 255 F.R.D. at 607 n.75.

### D. Plaintiffs' Experts Properly Ruled Out Alternative Causes.

Plaintiffs' experts properly employ the differential etiology method. A reliable differential diagnosis "need not rule out all possible alternative causes, [but] it must at least consider other factors that could have been the sole cause of the plaintiff's injury."[92] Although an expert need only provide "a reasonable explanation"[93] supporting their exclusion of an alternative sole cause, that explanation must be based on "more than subjective beliefs or unsupported speculation."[94]

#### 1. *Fagelson's Diagnosis of Adkins is Reliable.*

Defendants argue that Fagelson was "unaware" of three specific medical records which render his differential diagnosis of Adkins unreliable.

To begin, Fagelson's opinions are based on all of Adkins' records.[95] As to the first two records Defendants cite,[96] when asked whether a post-deployment denial

---

[91] *Id.*; PX13(Spankovich-Dep-(1/28/2021)-111:3-13).

[92] *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014).

[93] *Guinn*, 602 F.3d at 1253.

[94] *Hendrix*, 609 F.3d at 1197.

[95] PX4(Fagelson-Dep-(2/19/2021)-15:13-19; 18:2-7); PX24(Fagelson-(Adkins)-1 & Ex.C).

[96] DX19 and DX20.

of ringing in the ears would impact his opinions, Fagelson's quoted thought ends, "it wouldn't make me rule out the possibility that he was still experiencing bothersome tinnitus that had changed over the years, no."[97] Fagelson's immediately preceding testimony explaining that the course of tinnitus reporting rarely forms a "straight line" further informs his reasoning.[98] Thus, Fagelson reasonably concludes that Adkins' CAEv2 use led to his tinnitus in the context of all applicable records.[99]

Next, Defendants cite to one record noting pre-military "insomnia" as evidence that Fagelson's sleep opinions are unreliable.[100] Fagelson opines that Adkins' "tinnitus is a substantial factor that exacerbates his PTSD and sleep disorder."[101] Further, that his tinnitus "affects many life functions, primarily sleep,"[102] and that "[l]ack of sleep and fatigue from physical activities also increase tinnitus effects"[103] and can impact PTSD symptoms.[104] Fagelson opines as to the interaction between Adkins' tinnitus, PTSD, and sleep. He does not diagnose Adkins with PTSD or sleep disorders, nor does he opine that tinnitus is the sole cause of Adkins' PTSD or sleep issues. Thus, a pre-enlistment notation of "insomnia" does

---

[97] PX4(Fagelson-Dep-(2/19/2021)-175:20-23).
[98] PX4(Fagelson-Dep-(2/19/2021)-173:23-175:14).
[99] PX24(Fagelson-(Adkins)-8).
[100] DX21.
[101] PX24(Fagelson-(Adkins)-8).
[102] *Id.* at 11.
[103] *Id.* at 12).
[104] *Id.*

not render Fagelson's opinions unreliable. For the same reasons, Defendants' argument that Fagelson should have discussed the relationship between personality disorders, PTSD, and sleep also fails.

### 2. *Kileny's Diagnosis of Hensley is Reliable.*

#### a. *Kileny's Differential Diagnosis*

Defendants seek to exclude Kileny's specific causation opinions regarding Hensley, arguing Kileny did not adequately perform a differential diagnosis.[105]

Kileny based his opinion on Hensley's medical records, the IME performed by Defendants' expert, Dr. Packer's expert report, the depositions of two treaters, the depositions of Hensley and his wife, and Hensley's Tinnitus Functional Index (TFI) and Tinnitus Handicap Inventory (THI).[106] Based on his review of these materials, Kileny concluded that Hensley's tinnitus symptom "is more likely than not associated with noise exposure and poor hearing protection."[107]

Defendants' expert, Dr. Phillips, opined that Hensley's tinnitus could be due to his history of ear infections, facial/jaw problems, migraines, or ototoxic medication consumption.[108] An expert performing a differential diagnosis need only

---

[105] Def-Mot-33.
[106]  PX26(Kileny-Dep-(1/22/2021)-29:2-9;  32:16-18;  66:4-68:15;  74:17-75:12); PX25(Kileny-(Hensley)-Ex.C).
[107] PX25(Kileny-(Hensley)-7).
[108] Def-Mot-33.

provide "a reasonable explanation" as to why the expert has concluded that any alternative cause suggested by the defense was not the sole cause of plaintiff's injury. *Guinn,* 602 F.3d at 1253. In his deposition, Kileny provided reasonable explanations why these alternative causes were not the cause of Hensley's tinnitus.[109]

Hensley's tinnitus is not caused by his ear infections because (1) he started complaining of tinnitus in 2007[110] and his ear infections did not start until 2017[111] and (2) ear infections can cause tinnitus but once the ear is healed (either on its own or with medication), the tinnitus will disappear.[112] Hensley's tinnitus is also not due to headaches or migraines, as Kileny explained. A migraine alone is not typically associated with tinnitus.[113]

Kileny reviewed records noting Hensley's facial twitching but did not find it a possible cause of Hensley's tinnitus.[114] Kileny acknowledged that there are ototoxic drugs associated with tinnitus, but did not conclude that Hensley's use of ototoxic drugs caused his tinnitus.[115] Kileny also ruled out noise exposure, both

---

[109]   PX26(Kileny-Dep-(1/22/2021)-127:12-128:21;  171:9-172:2;  276:21-277:15; 281:22-282:17; 274:7-13); PX25(Kileny-(Hensley)-3-4).
[110] PX25(Kileny-(Hensley)-6).
[111] PX28(M J Hensley-VA-0529-533; M J Hensley-VA-0623-626).
[112] PX26(Kileny-Dep-(1/22/2021)-171:9-172:2).
[113] *Id*. at 276:21-277:15; 281:22-282:17.
[114] *Id*. at 274:7-13.
[115] *Id*. at 127:12-128:21.

24

before and after Hensley's time in the military, as a possible cause of his tinnitus.[116] Kileny ruled out potential causes of Hensley's tinnitus and ruled in that his tinnitus was more likely than not caused by the poor hearing protection provided by the CAEv2.

Defendants attack Kileny for not performing basic audiometric testing on Hensley.[117] Defendants conveniently omit that their own experts performed these standard tests (per protocol)[118] and Kileny reviewed those test results in forming his opinion.[119] In addition to reviewing Hensley's medical records and audiograms, he also reviewed Hensley's TFI and THI.[120] These questionnaires help determine whether the person actually has tinnitus and are used to "determine and classify the magnitude and the level of interference of tinnitus."[121] Although he did not conduct any tests himself, and was not required to do so, he did review them along with other materials to support his opinions.

        **b.**    ***Kileny Can Offer Opinions Regarding Hensley's Malingering.***

---

[116] PX25(Kileny-(Hensley)-3-4).

[117] Def-Mot-34.

[118] *See* Docs. 1542 (CMO 18); 1477 (PTO 56).

[119] PX26(Kileny-Dep-(1/22/2021)-66:4-68:15).

[120] *Id*. at 307:6-308:9.

[121] *Id*. at 73:15-21; 74:5-8.

In his deposition, Kileny was asked whether Hensley was malingering.[122] Kileny responded that "[d]uring [Hensley's] military service evaluations, which formed the basis of my evaluation, I didn't see any indication of malingering."[123] He also did not get a sense that Hensley was malingering from his review of Hensley's post-military service medical records.[124]

Defendants argue that Kileny's testimony regarding malingering should be excluded because it is "imprecise."[125] They support this conclusion by quoting part of Kileny's testimony where he is discussing an inaccurate audiogram and the fact that the audiologist who performed this audiogram should have redone it.[126] This inaccurate audiogram, one part of Hensley's medical records, did not lead Kileny to conclude that Hensley was malingering. Kileny should be allowed to testify as to why he believes Hensley is not malingering. Any conflicting evidence as to malingering, creates a question for the jury. *See In re Delta/Airtran Baggage Fee Antitrust Litig.,* 245 F. Supp. 3d 1343, 1361 (N.D. Ga. 2017).

   **3.**  ***Bielefeld's Diagnosis of Sloan is Reliable.***

     **a.**  ***Dementia Risk***

---

[122] *Id*. at 131:11-18.
[123] *Id*.
[124] PX26(Kileny-Dep-(1/22/2021)-133:12-17).
[125] Def-Mot-36.
[126] PX26(Kileny-Dep-(1/22/2021)-303:19-304:11).

26

Plaintiffs do not challenge the Court's prior limitation that Bielefeld may not testify about the correlation between NIHL and dementia. Doc. 1680 at 45.

### b.      Opinions About Other Earplugs.[127]

Defendants' motion ***does not*** challenge Bielefeld's opinion that the CAEv2 was defective and failed to adequately protect servicemembers, including Sloan, from NIHL and tinnitus.[128] Rather, Defendants argue that Bielefeld offers unreliable opinions on the effectiveness and defects of ***other*** HPDs.[129]

Defendants attempt to curtail Bielefeld's explanation of how the CAEv2 caused Sloan's NIHL and tinnitus. Bielefeld testified that his opinion that the CAEv2 caused Sloan's injuries is supported by the fact that (1) he has no evidence of defectiveness of the CVC helmet and other HPDs (premolded earplugs and foamies) used by Sloan and (2) the infrequent use of other HPDs made those devices unlikely to cause Sloan's injuries.[130] Experts are entitled to explain the bases of their opinions. Doc. 1680 at 46.

### c.      *Bielefeld's Opinion That the CAEv2 Caused Sloan's Tinnitus is Reliable.*

---

[127] Bielefeld offers reliable opinions on the prevention of NIHL through the use of HPDs, such as earplugs. PX29(Bielefeld-60-66). These general opinions are not challenged here.

[128] PX29(Bielefeld-66-74); PX30(Bielefeld-(Sloan)-25).

[129] Def-Mot-37.

[130] PX31(Bielefeld-Dep-(2/2/2021)-57:3-58:18).

Bielefeld conducted a reliable differential diagnosis and concluded that Sloan's hearing loss, tinnitus, and other injuries were caused by the failure of the CAEv2 to protect his hearing from military noise.[131] In diagnosing Sloan, Bielefeld considered and ruled out multiple alternative causes[132] but could not rule out noise exposure during military service and the failure of the CAEv2 to protect against noise exposure as the cause of Sloan's injuries.[133]

Bielefeld concluded that Sloan's tinnitus was causally linked to his NIHL and the CAEv2's failure to protect him from military noise based, in part,[134] on the fact that Sloan's tinnitus was diagnosed as being connected to his NIHL in 2015 and Sloan's self-reported symptoms of tinnitus.[135] As Bielefeld explains in his General Report, "the diagnosis [of subjective tinnitus] is made largely on the basis of the case history report and the patient describing the tinnitus"[136] and "is a common consequence of injury to the cochlea and/or auditory nerve."[137] As Bielefeld testified:

---

[131] PX30(Bielefeld-(Sloan)-7-8, 15-28).
[132] *Id*.
[133] *Id*.
[134] *Id*. at 8 (Bielefeld reviewed the following in performing his differential diagnosis, including Sloan's medical and military records, discovery materials and deposition transcripts, and scientific literature.).
[135] *Id*. at 21.
[136] PX29(Bielefeld-36-37).
[137] *Id*.

> *[T]he overwhelming majority of tinnitus is a consequence of injury to the cochlea*. And so when you have somebody with noise-induced hearing loss, it is, I think, a very logical conclusion to draw that the tinnitus is a consequence of the same injury that caused the hearing loss.[138]

Based on the results of a reliable differential diagnosis of NIHL, the sources listed in his report,[139] and Sloan's self-reported tinnitus—and considering that tinnitus is most commonly associated with injury to the cochlea—Bielefeld reliably concluded that tinnitus was caused by CAEv2 to a reasonable degree of medical certainty.

### 4.   *Dimmick's Diagnosis of Sloan is Reliable.*

Dimmick is the President and founding member of Hearing Doctors of Iowa, Hearing Doctors of Illinois, and Hearing Doctors of the Heartland.[140] As a clinical audiologist she often applies differential diagnoses of acquired forms of hearing loss and the evaluation and management of the tinnitus and sound sensitivity patients, including performing diagnostic audiology procedures, industrial hearing testing, and administering hearing aids.[141] She has performed thousands of audiological examinations, including for the VA, and her practice has served nearly 6,000

---

[138] PX31(Bielefeld-Dep-(2/2/2021)-106:4-10).
[139] *See supra* at n.134.
[140] PX32(Dimmick-CV-(Sloan)-Ex.-A).
[141] PX32(Dimmick-(Sloan)).

veterans since 2017.[142] Dimmick is a well-qualified hearing expert who used a reliable methodology.

### a.    *Hearing Loss From Aging*

Dimmick performed a reliable differential diagnosis and concluded that Sloan's hearing loss, tinnitus, and other injuries were caused by the CAEv2's failure to protect Sloan from military noise.[143] In performing this differential diagnosis, Dimmick ruled out multiple alternative causes, including age-related hearing loss.[144] Defendants argue that Dimmick's differential diagnosis is unreliable based on her underlying reason for excluding age as a potential cause: ISO 1999:2013.[145]

Defendants' argument must be rejected. As this Court has found, disagreements about the bases or persuasiveness of an expert's opinion bear on weight of the opinion, not its admissibility. Doc. 1680 at 46; *see In re Wright Med. Tech. Inc.*, *Conserve Hip Implant Prods. Liab. Litig.,* 127 F. Supp. 3d at 1306, 1325 (N.D. Ga. 2015). Such challenges to the bases or sources of an expert's opinion should be addressed on cross-examination. Doc. 1680 at 22-23; *see also In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 372 (M.D. Fla. 2018).

---

[142] *See id.;* PX33(Dimmick-Dep-(2/11/2021)-17:12-22).
[143] PX32(Dimmick-(Sloan)-3-4, 19-27).
[144] *Id.* at 19-22.
[145] Def-Mot-38.

Further, Defendants' arguments about Dimmick's inability to "replicate" the ISO 1999:2013 calculation at her deposition should be rejected.[146] The methodology underlying Dimmick's opinions is the differential diagnosis; she did not need to perform any testing that would be subject to retesting by other parties. Again, Defendants' argument goes to weight, not admissibility. Further, the case law Defendants cite in support of their argument is inapposite.[147] None of these cases involve physicians or audiologists performing differential diagnoses, nor are they binding precedent.

### b.    *Motorcycle Noise Exposure*

As part of her differential diagnosis, Dimmick ruled out motorcycle riding as a cause of Sloan's hearing loss because he experienced hearing loss before ever riding a motorcycle.[148] Sloan only rode motorcycles periodically during certain years, so his exposure to motorcycle noise was limited.[149] Dimmick testified that

---

[146] *Id*. at 39.

[147] *Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014); *Elcock v. Kmart Corp.*, 233 F.3d 734, 747 (3d Cir. 2000); *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1284 (S.D. Ga. 2018); *Mohney v. USA Hockey, Inc.*, 300 F. Supp. 2d 556, 567 (N.D. Ohio 2004).

[148] Sloan first purchased a motorcycle in 2006. PX32(Dimmick-(Sloan)-20).

[149] *Id*. at 9 ("once or twice a week during warm-weather months" from 2006-2007 and 2010-2013).

31

motorcycle riding "didn't … coincide [temporally] with any shift in his hearing, and that's why I ruled it out."[150]

As the Court has found, a temporal relationship (or lack thereof) is sufficient to reliably rule out other potential causes of an injury in a differential etiology. Doc. 1680 at 36-37 ("Having identified and explained a relevant temporal relationship between the alleged cause and effect of Hacker's alleged injuries, they adequately and reliably ruled out other hearing protectors as part of their differential etiologies."); s*ee also id.* at 34 (citing *Guinn*, 602 F.3d at 1254; *Floyd ex rel. Ray v. U.S.*, 2010 WL 4905010, at *15 (M.D. Ga. Nov. 26, 2010)). In this case, Dimmick adequately considered and ruled out Sloan's motorcycle noise exposure as a cause of his injuries.

### 5.    *Marc Bennett's Diagnosis of Sloan is Reliable.*

Marc Bennett performed a reliable differential diagnosis to conclude that Sloan's hearing loss and tinnitus were caused by noise from right-handed rifle shooting and other significant noise exposure, and inadequate hearing protection from the CAEv2.[151] Bennett ruled out motorcycle noise as a potential cause of Sloan's injuries because (1) "[Sloan's] **exposure was limited** (only 1-2 times per

---

[150] PX33(Dimmick-Dep-(2/11/2021)-216:19-217:6, 224:16-225:10).
[151] PX27(Marc-Bennett-(Sloan)-19-29).

week during warm-weather months)"[152] and (2) "his hearing loss and tinnitus arose in 2005 and 2006, respectively, prior to Mr. Sloan's purchase of his first motorcycle in 2006."[153] *See also* Doc. 1680 at 34, 36-37. Bennett ruled out motorcycle noise based on infrequent motorcycle use and the presentation of hearing loss on Sloan's audiograms.[154] Per Bennett, even Defendants' witness, Dr. Jones, agreed that "the motorcycle did not cause any of Sloan's hearing loss[]."[155]

Marc Bennett ruled out motorcycle use as a cause of Sloan's hearing loss and tinnitus based upon (1) the amount of noise exposure from motorcycle use, (2) the temporal presentation of the hearing loss and tinnitus *before* any motorcycle use, and (3) the type of hearing loss (high frequency rather than low frequency).[156] Even without Bennett's opinion that NIHL from motorcycle riding is typically in the low frequencies, Bennett has a reliable basis for ruling out motorcycle noise as a potential cause of Sloan's hearing loss, tinnitus, and related injuries.

6.     ***Lustig's Differential Analysis of Wayman is Reliable and Admissible.***

a.     ***HPDs***

Lustig's differential analysis identifying exposures while wearing the CAEv2

---

[152] *Id*. at 21.
[153] *Id*.
[154] PX6(Marc-Bennett-Dep-(2/11/2021)-755:21-756:4).
[155] *Id*.
[156] *Id*. at 761:16-22.

as the most likely cause of Wayman's injuries is the result of a reliable methodology. Defendants argue Lustig's recognition of the nonexistence of records detailing relative-HPD use is evidence of a methodology failure, but this assessment was neither incorrect, nor the end of Lustig's analysis. As Lustig testified, he reviewed records and deposition testimony, and interviewed Wayman regarding his HPD use.[157] As the Court previously held, this method is reliable and Defendants' questioning of an expert's reliance on a plaintiff's statement goes to weight.[158]

Lustig's differential analysis properly considered and ruled out non-CAEv2 HPDs as the cause of Wayman's injuries. Defendants' attempt to cherry-pick statements from Lustig's deposition is not to the contrary. Lustig did consider the performance of other hearing protectors,[159] including REAT data.[160] A reliable case-specific diagnosis involves reviewing a plaintiff's "audiological, military service, and disability records, and evaluat[ing] the various hearing protectors used by [] plaintiff, as well as [plaintiff's] noise exposure," considering government documents and scientific literature, and explaining how this evidence supports [the expert's] conclusions.[161] Lustig did just that,[162] and his opinion that Wayman would "more

---

[157] PX3(Lustig-Dep-(1/26/2021)-92:4-18).
[158] *See* Doc. 1680 at 33 n.23.
[159] PX7(Lustig-16-20); PX23(Lustig-(Wayman)-9).
[160] PX7(Lustig-Ex.C-(Reliance List) at 30, 56, 73).
[161] *See* Doc. 1690 at 12.
[162] PX23(Lustig-(Wayman)-19-22).

likely than not" have avoided injury had he used an alternative, adequate HPD is reliable.

### b.   *Head Injuries*

Lustig applies a reliable methodology in excluding traumatic brain injury ("TBI") as causing Wayman's tinnitus. Wayman did not suffer tinnitus at the time of any head injury, and did not suffer permanent tinnitus until 2011, years after the injuries Defendants point to. As Lustig testified, in cases where a TBI causes permanent tinnitus, the "temporal relationship is very obvious," and tinnitus is "permanent from the onset of the TBI."[163] Lustig has never encountered a patient whose TBI symptoms resolved, but later came back on their own,[164] or encountered medical literature describing such a case.[165] Because Wayman did not experience tinnitus as a symptom at the time of or immediately after any head injury, and because his TBI symptoms resolved years before Wayman developed permanent tinnitus, Lustig reliably ruled those injuries out.

Defendants' statement that "after sustaining one of these head traumas, [Wayman] developed ringing in his ears" misrepresents the documentary record.[166] The transient tinnitus Wayman suffered in 2007 came immediately after noise

---

[163] PX3(Lustig-Dep-(1/26/2021)-58:14-61:10).
[164] *Id.* at 61:3-10.
[165] *Id.* at 199:22-200:23.
[166] Def-Mot-43.

exposure from indirect fire while wearing the CAEv2, not head trauma.[167] There is no record or testimony that Wayman perceived tinnitus onset at the time of any head injury. Lustig did not testify otherwise, only that that he would need to "go back and take a look" at his report to identify the cause of the "one instance where [Wayman] did have a temporary period of tinnitus."[168]

Lustig's reliance upon studies of TBIs in non-military settings is reasonable. Lustig testified that both injuries Defendants point to—Wayman hitting his head on a concrete bunker and getting hit in the head by a vehicle door—are "very comparable" to the head traumas suffered by the athletes in the studies Lustig cites, such as football hits:  "Whether you run into it or it runs into you, it's a similar mechanism in terms of the type of injury it would do to the brain."[169] Although some injuries are unique to military settings, Lustig explains that "getting clocked on the side of the head"[170] is an injury whose symptoms are similar across professional contexts.

### c.  *Sleep*

Lustig applied an appropriate methodology in determining that tinnitus

---

[167] PX23(Lustig-(Wayman)-10).
[168]   PX3(Lustig-Dep-(1/26/2021)-189:2-190:1;   185:2-186:9;   199:22-200:23); PX23(Lustig-(Wayman)-10).
[169] PX3(Lustig-Dep-(1/26/2021)-206:19-208:1).
[170] *Id*.

36

interferes with Wayman's sleep. Wayman reports that the ringing he hears "keeps him up at night" and prevents him from falling back to sleep if he wakes.[171] It is reliable to credit a patient's subjective reports regarding their symptoms, including identifying a stimulus, if any, keeping them awake. As to other causes, Lustig explained that Wayman's inability to fall asleep is consistent with tinnitus and inconsistent with sleep apnea:  Tinnitus "makes it hard for you to go to sleep," whereas sleep apnea prevents individuals who generally "don't have a problem falling asleep" from getting restful sleep.[172]

### d.  *Mental Health*

Lustig's opinions on Wayman's mental health are not speculative. Lustig does not opine on the cause of any mental health disorders.[173] Lustig reliably applies his expertise as a neurotologist in concluding that Wayman's tinnitus exacerbates his PTSD[174] and causes sleeplessness in ways distinct from and complementary to other sleep disorders.[175] Lustig has significant experience working with individuals suffering tinnitus and PTSD,[176] and he also relies on a breadth of medical literature

---

[171] PX23(Lustig-(Wayman)-6, 11).
[172] PX3(Lustig-Dep-(1/26/2021)-244:6-248:14).
[173] *Id.* at 145:17-147:4.
[174] PX23(Lustig-(Wayman)-20).
[175] PX3(Lustig-Dep-(1/26/2021)-243:7-22).
[176] PX23(Lustig-(Wayman)-3).

and the testimony and medical records from Wayman's mental health treaters and his own interview with Wayman.[177]

### 7.  *Spankovich's Diagnosis of Wayman is Reliable.*
#### a.  *HPDs*

Spankovich applies a reliable methodology in attributing Wayman's injury to exposures suffered while wearing the CAEv2.

Defendants claim that Spankovich gave insufficient weight to the HPD box check on two of Wayman's audiograms. The evidence is clear that these forms are unreliable at best.[178] Regardless, as the Court has repeatedly noted, "Plaintiffs' experts are entitled to rely on Plaintiffs' representations regarding their use of the CAEv2." Doc. 1680 at 33 n.23.

As with Lustig, Spankovich describes an adequate basis and a reliable methodology for opining that Wayman was injured as a result of his use of the CAEv2.[179] Spankovich considered Wayman's exposures, use of other HPDs, and injuries,[180] as well as the underlying science, and explains how that information

---

[177] PX3(Lustig-Dep-(1/26/2021)-279:5-17; 145:10-16).
[178] PX34(VanDensen-Dep-(12/4/2020)-103:12-19; 113:20-114:8; 117:19-118:13).
[179] PX1(Spankovich-(Wayman)-14.
[180] *Id.* at 5-14.

supports his opinions that "the CAEv2's failure to provide proper hearing protection was the primary cause and the most likely significant contributing factor to Mr. Wayman's hearing loss and tinnitus."[181]

### b.   *Head Injuries*

Spankovich properly ruled out Wayman's alleged TBIs. Defendants' argument that the 2007 head injuries cannot be ruled out relies on a temporal connection that does not exist:  Wayman suffered intermittent tinnitus in 2007 in connection with noise exposure while wearing the CAEv2, and although he did experience head injuries in 2007, he never reported onset of tinnitus at the time of any head injury, including those in 2007.

As Spankovich testified, the 2007 injuries can be ruled out because, based on decades of experience, when tinnitus is caused by physical injury (other than noise), the onset of tinnitus occurs "within two days and generally within immediately of that exposure. So the idea that there's going to be some kind of head injury that results in a tinnitus perception months or years later, developing into constant tinnitus, there's no evidence to support that."[182]

### c.   *Sleep*

---

[181] *Id.* at 15-16.
[182] PX13(Spankovich-Dep-(1/28/2021)-97:12-98:23).

As with Lustig, Spankovich assessed that "tinnitus tends to [a]ffect the ability of an individual to fall asleep," whereas sleep apnea "disrupts sleep by causing a person to wake up."[183] Because Wayman's complaint is that he is kept awake (by ringing) Spankovich opines that the cause is the ringing—not a different sleep disorder, that would present differently.

Spankovich does not rule out PTSD as interfering with Wayman's sleep, and his opinion that tinnitus exacerbates other sleep disorders does not require him to do so. Spankovich opines that an individual might be awakened at night by one disorder but kept awake by another:  PTSD and apnea are "things that cause a person to wake up," and tinnitus, distinctly, "prevents someone from falling to sleep or getting back to sleep."[184]

### 8.   *Ostacher's Diagnosis of Wayman is Reliable.*

Defendants do not challenge the reliability of Ostacher's PTSD diagnosis of Wayman or his opinion that tinnitus can worsen PTSD. Defendants' two critiques of Ostacher's opinions, at most, go to weight and not admissibility. In any event, neither argument suggests an error in methodology.

### a.   *Ostacher Considered Wayman's Treatment.*

Ostacher opines that Wayman's tinnitus exacerbates his PTSD symptoms.

---

[183] *Id.* at 119:10-120:15.
[184] *Id.* at 121:22-122:25.

Ostacher did not "ignore alternative causes"[185] for that injury, but fully considered Wayman's treatment history,[186] and concluded that although Wayman, before developing tinnitus, "felt like he can manage his PTSD symptoms ... what he can't manage is the tinnitus and its impact on his PTSD symptoms."[187]

Potential treatments Wayman has not pursued have no impact on the relationship between tinnitus and PTSD, which is well-documented in medical literature,[188] and which Ostacher has observed specifically in Wayman.[189] Ostacher rules out alternative causes that, like tinnitus, would exacerbate Wayman's PTSD, such as other psychiatric conditions or substance abuse.[190] And Ostacher explained that "[o]ur ability to help people with PTSD through treatment is very limited" and we "can't predict who is going to get better from [PTSD] treatment."[191]

Defendants' argument is no more than misdirection. Wayman has tinnitus, and Ostacher's PTSD diagnosis is unchallenged. An expert need not consider hypothetical worlds, in which the plaintiff may not have been so afflicted, in order to opine on the difficulties tinnitus causes those who have PTSD, such as Wayman.

---

[185] *See* Def-Mot-48.
[186] PX35(Ostacher-(Wayman)-7-14).
[187] PX36(Ostacher-Dep-(2/7/2021)-113:17-115:2).
[188] PX35(Ostacher-(Wayman)-19-n.66-69).
[189] *Id.* at 20.
[190] *Id*.
[191] PX36(Ostacher-Dep-(2/7/2021)-46:6-48:10); PX37(Ostacher-10).

### b.    *Head Injuries*

Ostacher routinely evaluates the impact, if any, of TBI on his patients' symptoms,[192] and he applies a reliable methodology in excluding alleged TBIs as causing Wayman's tinnitus or exacerbating Wayman's PTSD.

Wayman did not, as Defendants claim, "sustain[] multiple head injuries, including at or near the time he developed tinnitus," except to the extent that: (1) in 2007, Wayman suffered transient tinnitus immediately after noise exposure while wearing the CAEv2, and (2) at other times in 2007, Wayman suffered head injuries that did not cause tinnitus at the time.

Ostacher reliably excludes these 2007 injuries, whose symptoms did not include tinnitus,[193] as potential causes of Wayman's 2011 tinnitus injury. Ostacher explains that he does so because the symptoms of those 2007 injuries resolved almost immediately, and because the injuries themselves were mild, [194] conclusions supported by the clinical judgment of Wayman's VA TBI evaluator,[195] as well as by the reports of Spankovich and Lustig on which Ostacher relied.[196] Ostacher has a

---

[192] PX36(Ostacher-Dep-(2/7/2021)-172:17-173:16).
[193] PX35(Ostacher-(Wayman)-12-13).
[194]   PX36(Ostacher-Dep-(2/7/2021)-54:6-55:2);   PX35(Ostacher-(Wayman)-23-24) (*citing* McCrory et al. (2013); Moring et al. (2018)).
[195] PX35(Ostacher-(Wayman)-24-n.93).
[196] *Id.* at 66.

reliable basis to opine that "relatively minor head trauma occurring years before"[197] is unlikely to have caused Wayman's later tinnitus or any exacerbation of PTSD, particularly where TBI symptoms had already resolved.[198]

### III.   Plaintiffs' Experts' Economic Loss Opinions Satisfy Rule 702.

#### A.   *Johnson's Opinions Are Admissible.*

##### 1.   *Johnson's Methodologies Are Reliable.*

Johnson has decades of experience, along with education and certifications, in vocational rehabilitation.[199] She used the RAPEL method to assess Plaintiffs' reductions in earning capacity attributable to their hearing loss and tinnitus.[200] In doing so, she considered discovery responses, medical records, employment records, testimony, interviews with Plaintiffs, consultations with medical experts, the Dictionary of Occupational Titles, and data from the Census Bureau and the Bureau of Labor Statistics.[201] This Court has previously held RAPEL is reliable. *See* Doc. 1680 at 46-57. Other courts, and Defendants' own vocational expert,[202] agree that

---

[197] *Id.* at 24.

[198] PX36(Ostacher-Dep-(2/7/2021)-54:6-55:2); PX35(Ostacher-(Wayman)-23-24).

[199] PX38(Johnson-(Wayman)-1 & CV).

[200]  *Id.*  at 2-16;  PX39(Johnson-(Blum)-2-18);   PX40(Johnson-(Adkins)-2-21); PX41(Johnson-(Sloan)-2-18).

[201] PX38(Johnson-(Wayman)-1, 12, 15 n.15 & Ex.C); PX39(Johnson-(Blum)-1, 16 n.12 & Ex.C); PX40(Johnson-(Adkins)-1, 19 n.16 & Ex.C); PX41(Johnson-(Sloan)-1, 16 n.20 & Ex.C); PX42(Johnson-Dep-(1/27/2021)-145:7-146:3).

[202] PX43(Shahnasarian-Dep-(2/2/2021)-17:19-21, 29:9-14).

RAPEL is reliable. *See Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 165-66 & n.13 (D.D.C. 2017).

Johnson also prepared lifecare plans for Plaintiffs, following the Life Care Planning Standards of Practice and the Majority and Consensus Statements derived from Life Care Planning Summits.[203] Based on her review of medical records, interviews, and consultations with medical experts, she developed a list of items and services aimed to address Plaintiffs' hearing loss and/or tinnitus, along with the costs associated with those items and services.[204] Courts have widely accepted similar lifecare plans. *See Marcano Rivera v. Turabo Med. Ctr. P'ship,* 415 F.3d 162, 170-171 (1st Cir. 2005).

### 2.    *Johnson's Opinion That Plaintiffs Have Lost Access to the Labor Market is Supported by Good Data.*

Johnson initially, mistakenly used figures pertaining to "handling" (abbreviated "HA") rather than "hearing" (abbreviated "HE") in determining the hearing requirements for available jobs, due to the similarity of the corresponding abbreviations.[205] She acknowledged the mistake but explained that the minor error

---

[203]      PX38(Johnson-(Wayman)-17-18);      PX39(Johnson-(Blum)-18-19); PX40(Johnson-(Adkins)-21-22); PX41(Johnson-(Sloan)-18-19).
[204]      PX38(Johnson-(Wayman)-17-18);      PX39(Johnson-(Blum)-18-19); PX40(Johnson-(Adkins)-21-22); PX41(Johnson-(Sloan)-18-19).
[205] PX42(Johnson-Dep-(1/27/2021)-121:1-128:14).

does not change her conclusions that Plaintiffs have lost access to the labor market or that they have reduced earning capacities:

> [T]he bottom line is there is loss of access[.] It's a liability, not an asset to have a hearing impairment in jobs that require both noise intensity and hearing[.] [T]he noise intensity level demand … still puts [Plaintiffs] at a much higher loss category of access.[206]

As she further explained, Plaintiffs generally cannot take jobs that are considered "moderately loud" to "very loud," and data from the Bureau of Labor Statistics shows that more than 90% of available jobs fall into one of those categories.[207] Thus, her conclusion that Plaintiffs have lost access to 90% of the job market is based on good grounds, and her minor mistake is not a basis for exclusion. *See Brown v. Burlington N. Santa Fe Ry.,* 765 F.3d 765, 776 (7th Cir. 2014) ("[I]mperfections in [experts'] presentations are supposed to be tested by opposing counsel and put before the jury.").

Defendants also criticize Johnson for her failure to *recently* review the Bureau of Labor Statistics' definitions for "very quiet," "quiet," "moderate," "loud," and "very loud."[208] However, she testified that she *has* reviewed those definitions— which are simply the generally-understood definitions for those terms[209]—during

---

[206] *Id.* at 128:15-130:11.
[207] *See* PX38(Johnson-(Wayman)-14); PX42(Johnson-Dep-(1/27/2021)-107:6-112:4).
[208] Def-Mot-54-55.
[209] PX44(Revised Handbook for Analyzing Jobs at 12-10).

her decades in vocational rehabilitation.[210] Thus, contrary to Defendants' arguments, Johnson understands and has considered those terms, and the terms do not alter her opinions.[211]

### 3. Johnson Adequately Explained How Her Conclusions Are Tied to the Facts.

While Defendants' criticism of Johnson is directed at alleged flaws in her analysis, such criticism is not grounds for exclusion. *See Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1345 (11th Cir. 2003) (alleged flaws in analysis that impugn accuracy of results rather than the general validity of methods "is precisely the role of cross-examination."); *In re TMI Litig.,* 193 F.3d 613, 692 (3d Cir. 1999) ("So long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process[.]").

Johnson explained her use of the RAPEL methodology, in detail, in each of her reports and during two days of depositions.[212] Yet, Defendants make a deliberately obtuse assertion that Johnson has not explained why she concluded that Adkins and Sloan have a 10% loss of earning capacity due to hearing loss and

---

[210] *See* PX42(Johnson-Dep-(1/27/2021)-109:10-22).

[211] *Id.* at 116:14-117:14.

[212] *See generally* PX38(Johnson-(Wayman)); PX39(Johnson-(Blum)); PX40(Johnson-(Adkins)); PX41(Johnson-(Sloan)).

tinnitus, while Blum has only a 3-5% loss.[213] As Johnson testified, the RAPEL methodology "is not paint by numbers. There is not a formula."[214] Rather, her conclusions are based on the totality of the RAPEL factors and are "reflective of all of the information reviewed, [her] knowledge, training, and experience combined with [her] clinical judgment."[215] Defendants' vocational expert uses a similar method, whereby he considers the totality of the evidence.[216]

Further, Johnson's opinion that Adkins and Sloan suffered a 10% earning capacity reduction is consistent with the VA's impairment ratings.[217] Conversely, Blum's pre-existing conductive hearing loss complicates and reduces the effect her noise-induced sensorineural hearing loss has had on her earning potential.[218] In any event, Johnson's conclusions are supported by literature indicating a reduction in

---

[213] Def-Mot-55.

[214] PX49(Johnson-Dep-(1/28/2021)-594:2-6).

[215] *Id.* at 588:22-594:13.

[216] PX43(Shahnasarian-Dep-(2/2/2021)-17:19-21, 47:12-20, 70:1-4, 102:9-15, 109:15-25, 122:12-23, 128:16-129:14).

[217] PX40(Johnson-(Adkins)-17); PX41(Johnson-(Sloan)-14).

[218] PX49(Johnson-Dep-(1/28/2021)-592:2-12) ("I'd be remiss to not acknowledge that there is, in fact, a negative aspect of the conductive hearing loss and an impact it would have had regardless of the sensorineural hearing loss and tinnitus").

earnings and worklife for those with hearing problems[219]—literature that this Court has found to be a reliable basis of reduction in earning capacity analyses.[220]

Contrary to Defendants' assertions, Johnson fully considered Blum's hearing difficulties, as reflected in her assessment of Blum's reduced earning capacity.[221] Johnson testified that Blum's conductive hearing loss is distinct from her NIHL, that Blum has lost access to 90% of occupations due to her conductive hearing loss, and that her conductive hearing loss is further exacerbated by the "negative impact of the tinnitus further invading her access to employment."[222]

Despite Defendants' assertions, Johnson *did* consider a 2019 audiology exam of Adkins that determined he had "normal hearing."[223] That same medical record also indicates that Adkins' tinnitus—a form of hearing difficulty—was likely caused by military noise exposure.[224] Johnson's opinions are based on consideration of *all* records:

---

[219] PX38(Johnson-(Wayman)-15); PX39(Johnson-(Blum)-16-17); PX40(Johnson-(Adkins)-19); PX41(Johnson-(Sloan)-16-17); PX42(Johnson-Dep-(1/27/2021)-131:8-132:15).

[220] Doc. 1680 at 47.

[221] PX39(Johnson-(Blum)-2-6, 14, 17). PX49(Johnson-Dep-(1/28/2021)-556:19-557:1, 562:23-563:23).

[222] PX49(Johnson-Dep-(1/28/2021)-556:19-557:1, 561:14-563:9, 568:3-12).

[223] PX40(Johnson-(Adkins)-3).

[224] *Id.*

> I'm evaluating Mr. Adkins based on the hearing impairment that brings
> us together, understanding the totality of the records that I've reviewed
> and taking them into account[.][225]

Johnson's conclusions are supported by Adkins' well-documented tinnitus and his own descriptions of his hearing difficulties.[226]

Defendants also take issue with Johnson's conclusion that Adkins can work full-time in light of his testimony that his seizures keep him from doing so.[227] Johnson testified that Adkins' beliefs about his limitations must be considered along with the "entirety and totality" of the records, and after doing so, Johnson concluded that Adkins' seizures, which occur on average three times a year, do not keep him from working full-time.[228]

Defendants' assertion that Johnson failed to account for Adkins' VA benefits as part of her analysis is also contrary to the evidence, as his receipt of VA benefits is noted in her report.[229] Defendants do not articulate how Johnson erred in her consideration of Adkins' VA benefits or why such error requires exclusion of her testimony. In any event, "'[n]ormally, failure to include variables will affect the

---

[225] PX49(Johnson-Dep-(1/28/2021)-500:11-15).
[226] PX40(Johnson-(Adkins)-7-8).
[227] Def-Mot-56.
[228] PX49(Johnson-Dep-(1/28/2021)-496:10-16, 498:21-499:23, 522:1-10).
[229] PX40(Johnson-(Adkins)-13).

analysis' probativeness, not its admissibility.'" *Quiet Tech.*, 326 F.3d at 1346 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).

Contrary to Defendants' assertions, Johnson has not ignored Sloan's non-hearing related medical conditions. Rather, she considered his overall health—as evidenced by the medical history section in her report—in assessing the impact of Sloan's hearing problems on his earning potential.[230] Whatever other ailments Sloan has, his hearing impairment is an occupational liability that reduces his earning capacity.[231]

Defendants, confusingly, argue that Johnson has underestimated Wayman's pre-injury earning capacity—an error that would only render her analysis more conservative.[232] Defendants' argument is based on a lucrative, post-injury job offer that Wayman was unable to accept due to his hearing difficulties.[233] Wayman's inability to accept that offer is merely additional support for Johnson's conclusion that Wayman's hearing difficulties reduced his earning capacity.

Defendants also argue that Johnson erred by comparing Wayman's earnings to those of airline pilots, rather than helicopter pilots, in assessing his lost earning

---

[230] PX41(Johnson-(Sloan)-2-6).
[231] *See* PX42(Johnson-Dep-(1/27/2021)-128:15-130:11).
[232] Def-Mot-59.
[233] *Id.*; PX42(Johnson-Dep-(1/27/2021)-254:16-255:23, 258:10-15, 259:11-23).

capacity.[234] Johnson explained that she considered data related to "pilots, airline pilots, copilots, and flight engineers"—a description that pertains to Wayman.[235] In any event, such criticism of the data sets she considered is grounds for cross-examination, not exclusion. *See Manpower v. Ins. Co. of Pa.,* 732 F.3d 796, 809 (7th Cir. 2013).

Defendants' disagreement with Johnson's conclusions does not render her testimony unreliable. *See In re Abilify,* 299 F. Supp. 3d at 1336. Further, the cases cited by Defendants—in support of their argument that Johnson has not adequately explained her methodology—are inapposite. *See Lee-Bolton v. Koppers Inc.,* 319 F.R.D. 346, 377-78 (N.D. Fla. 2017) (report "woefully inadequate," missing data necessary for conclusions, and identified a methodology she failed to follow); *U.S. v. Frazier*, 387 F.3d 1244, 1261-65 (11th Cir. 2004) (expert could not provide basis for opinion); *King v. Cessna Aircraft Co.,* 2010 WL 1980861, at *6 (S.D. Fla. May 18, 2010) (expert "did not utilize any type of methodology"). Unlike these cases, Johnson identified accepted methodologies and fully explained them.

> **4.    *Defendants Have Misrepresented Johnson's Lifecare Planning Methodology.***

---

[234] Def-Mot-59.

[235] PX42(Johnson-Dep-(1/27/2021)-269:11-23).

Defendants' assertion that Johnson did not document her work in developing Plaintiffs' lifecare plans is a bold misrepresentation. As Johnson explained, she determined the average cost of each item and service in Plaintiffs' lifecare plans by identifying geographically relevant vendors and service providers, obtaining cost information from those vendors and service providers, as well as recently published data on the cost of the relevant services, and calculating the average of those costs.[236] The sources of the costs used by Johnson are identified in her reports.[237] Defendants may verify the costs used by Johnson in her lifecare plans by contacting vendors and service providers, checking published literature, and performing simple math to find the average costs. The methodology is replicable. Moreover, any alleged inadequacy in her note-keeping practices does not render her methodology unreliable. *See In re Polypropylene Carpet Antitrust Litig.,* 93 F.Supp.2d 1348, 1364 (N.D. Ga. 2000) (expert's destruction of notes not grounds for exclusion).

### B.     *Neil Bennett's Opinions Are Admissible.*

Neil Bennett is a Certified Rehabilitation Counselor (CRC), Forensic Vocational Expert (FVE), and Certified Earnings Analyst (CEA), who prepares

---

[236]     PX38(Johnson-(Wayman)-17-19);          PX39(Johnson-(Blum)-18-19); PX40(Johnson-(Adkins)-21-22);   PX41(Johnson-(Sloan)-18-19);   PX42(Johnson-Dep-(1/27/2021)-303:2-311:4).

[237]    PX38(Johnson-(Wayman)-18-n.22-26);    PX39(Johnson-(Blum)-19-n.19-20); PX40(Johnson-(Adkins)-22-n.23-29);          PX41(Johnson-(Sloan)-19-n.28-32); PX42(Johnson-Dep-(1/27/2021)-303:2-311:4).

Vocational Assessment and Wage Earning and Life Care Plan Analyses and Economic Damages reports.[238] He has continuously practiced in this field, including reduction to present value of lost wage-earning capacity. He has been qualified as an expert witness in various jurisdictions throughout the U.S.

### 1.   *Neil Bennett Can Rely on Johnson.*

Defendants argue that Neil Bennett improperly relies upon Johnson's opinions, but it is well-established that it is reasonable for one expert to rely on another expert's opinions. *See Hendrix*, 255 F.R.D. at n.75. This case is no exception. Bennett reasonably relies on Johnson's opinions as Johnson is a Certified Case Manager and Diplomate with the American Board of Vocational Experts, who has practiced in this field since 1987 and holds a Master's degree. Moreover, Bennett testified that Johnson's report contained "a great deal of medical and other information," and Bennett had "confidence that her report was indeed reliable."[239] In short, Johnson's opinions are the type reasonably relied upon by experts like Bennett.

Defendants also attempted to exclude Group A economist Kristin Kucsma because she relied on another expert's opinions. However, this Court correctly rejected that effort, noting that "[a]n expert may properly rely on the opinion of

---

[238] *See* PX45(Neil-Bennett-(Wayman)-Ex.A(CV)).
[239] *See* PX46(Neil-Bennett-Dep-(2/17/2021)-69:10-16).

another expert."[240] Much like Neil Bennett, Kucsma also relied upon Plaintiffs' employment records, expert reports, Bureau of Labor statistics and deposition testimony. This was considered a sufficient basis for Kucsma's opinions, and a similar result should be reached here.

Moreover, Neil Bennett also independently reviewed and analyzed pertinent information. For example, Bennett reviewed Plaintiffs' wage information to make sure that he "concurred and understood [Johnson's] logic" and to "reassure" himself that her report was "accurate."[241] Bennett further examined Plaintiffs' "[e]ducational information [and] work history forms" to verify Johnson's findings.[242] In addition to reviewing Johnson's report, Bennett considered the expert reports of Drs. Lundstrom and Scarbrough, as well as Plaintiffs' employment records, military personnel files and Social Security earnings statements.[243]

> **2.**   *Neil Bennett Correctly Uses Wage Data to Estimate Wage Growth.*

In calculating future wages and prices, Neil Bennett uses the Below Market Discount Rate, which is basically "interest rate minus inflation rate."[244] As the

---

[240] Doc. 1680 at 84.

[241] *See* PX46(Neil-Bennett-Dep-(2/17/2021)-70:1-5).

[242] *See id.* at 68:10-16; 231:19-22.

[243] *See* PX47(Neil-Bennett-Dep-(2/18/2021)-365:16-23 to 366:1, 367:4-5).

[244]   *See*   PX48(Neil-Bennett-(Blum)-2-4);   PX59(Neil-Bennett-(Adkins);   and PX60(Neil-Bennett-(Sloan).

Eleventh Circuit has recognized, experts properly consider "general wage and price inflation" when calculating present value. *Deakle v. John E. Graham & Sons*, 756 F.2d 821, 832 (11th Cir. 1985) (*citing Jones & Laughlin Steel v. Pfeifer*, 462 U.S. 523, 547 (1983)). Following *Deakle*, Bennett uses the Bureau of Labor Statistics' Consumer Price Index to calculate inflation for future medical expenses and the BLS's Employer Cost Index to calculate inflation for future wages.[245]

Defendants argue that Neil Bennett should use *prices* to calculate both *price* and *wage* growth.[246] Contrary to Defendants' argument, Bennett correctly uses *wage* data to estimate *wages*. As Bennett explained:

> The Employer Cost Index specifically measures the increase in employer's costs, i.e., wages and benefits … that is more directly related to future wage earnings than the Consumer Price Index, which is a measure of increase in cost of goods and the cost of living.[247]

Defendants' argument otherwise is—at most—fodder for cross-examination. *See Top Notch Sols, Inc. v. Crouse & Assocs.*, 2019 WL 4673563, at *5 (W.D. Wash. Sept. 25, 2019) ("Whether Dr. DeKay should have relied on separate data to arrive at a different net discount rate is a subject for cross-examination, not a basis to exclude Dr. DeKay's testimony."); *Quiet Tech.,* 326 F.3d at 1345 (citing *Cummings v. Standard Register Co.*, 265 F.3d 56, 65 (1st Cir.2002) (holding that "whatever

---

[245] *See* PX48(Neil-Bennett-(Blum)-2-4.
[246] *See* PX46(Neil-Bennett-Dep-(2/17/2021)-107:7-12).
[247] *See id.* at 110:12-18.

shortcomings existed in [the expert's] calculations went to the weight, not the admissibility, of the testimony")). As these cases recognize, "[w]hether [an expert has] selected the best data set to use ... is a question for the jury, not the judge." *Manpower, Inc.,* 732 F.3d at 809.

Moreover, Neil Bennett has testified multiple times about his present value methodology,[248] and no Court has excluded his opinions on this issue.[249] Indeed, Bennett has given presentations on present value reductions to American Rehabilitation Economics Association (AREA) members,[250] and his methodology is accepted by AREA members and by Forensic Economic Damages experts.[251] This Court should not exclude a sound methodology that is accepted in the field.

### 3. *Neil Bennett Reasonably Uses the Social Security Retirement Age.*

Contrary to Defendants' argument, Neil Bennett reasonably uses the Social Security retirement age to estimate worklife expectancy. As Bennett explained, this is a reliable estimate based upon both his experience and his individual review of Plaintiffs' circumstances:

> [T]he basis of that determination was my years of professional rehabilitation counsel experience and gaining an understanding of how long and for what reasons people remain in the workforce[.] I read

---

[248] *See id.* at 34:5-12 and 41:12-13.
[249] *See id.* at 49:2-8.
[250] *See id.* at 46:9-13.
[251] *See* PX48(Neil-Bennett-(Blum)-2-4).

nothing about [Plaintiff] either in his deposition or Ms. Johnson's report that would cause me to believe that he would not work as long as he could work in order to obtain basic retirement benefits through Social Security[.][252]

Neil Bennett's opinion is properly supported by his "professional study or personal experience." *Maiz v. Virani,* 253 F.3d 641, 668-69 (11th Cir. 2001).

Moreover, many courts have permitted experts to calculate worklife expectancy based upon the Social Security retirement age. *See,* e.g., *Franco v. Bos. Sci. Corp.*, 2016 WL 3248505, at *19-20 (S.D.W. Va. June 13, 2016); *Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, 2013 WL 351546, at *25 (D.D.C. Jan. 29, 2013), amended, 2013 WL 653921 (Mar. 13, 2013); *Baker v. Socialist People's Libyan Arab Jamahiriya*, 775 F. Supp. 2d 48, 80 (D.D.C. 2011). As in these cases, this Court should deny Defendants' motion.

### 4. *Neil Bennett Accurately Calculated Adkins' Earnings.*

Contrary to Defendants' argument, Neil Bennett reasonably relied on Johnson's opinion that Adkins' earning capacity was commensurate to males with "some college, no degree, or an associate's degree."[253] As Johnson explained, "research indicates that there are potential civilian counterparts to the training he received [in the military]," and as a result, "[Adkins] had an educational attainment

---

[252] *See* PX47(Neil-Bennett-Dep-(2/18/2021)-345:1-18).
[253] *See* PX59(Neil-Bennett-(Adkins).

level commensurate to some college to an associate's degree level of earnings."[254] This Court should not exclude Bennett simply because Defendants would have used a different data point. *See Quiet Tech.*, 326 F.3d at 1345.

Defendants also argue that Neil Bennett failed to properly consider Adkins' additional health issues and "troubled employment history."[255] Notably, defense counsel did not ask Bennett about such matters in his deposition. Moreover, as Defendants note, Bennett relied upon Johnson's opinion. For her part, Johnson studied Adkins' job history and determined that his hearing loss contributed to his difficulty in maintaining employment. In other words, Adkins' "troubled employment history" is evidence that his impairment has impacted his ability to work.[256] Bennett could reasonably rely on her conclusion.

### 5.   *Neil Bennett Accurately Calculated Blum's Earnings.*

Contrary to Defendants' argument, Neil Bennett did not need to reduce Blum's earning capacity simply because of her gender. Bennett explained:

> [W]hen we evaluate the earning capacity of individuals, that there is a significant discrimination factor between males and females that is not based on their educational capacity at all. It is based on a calculation of women's choices that are reflected in their reported earnings.[257]

---

[254] *See* PX49(Johnson-Dep-(1/28/2021)-511:21-513:20, 520:23-521:11).
[255] Def-Mot-64-65.
[256] *See* PX49(Johnson-Dep-(1/28/2021)-508:1-23-509:1-3).
[257] *See* PX46(Neil-Bennett-Dep-(2/17/2021)-217:6-14).

On the other hand, Defendants' expert, Samuel Lundstrom, testified that women generally earn less than men because "women leave the workforce" and "miss[] out on experience."[258] Defendants' notion is offensive and ignores the fact that Blum has not left the workforce or missed out on work experience. As a result, Bennett correctly used the table for workers that have "worked year-round, full-time."[259]

Defendants cite inapplicable case law for the general notion that "erroneous data" or "bad statistics" render an opinion inadmissible. However, Bennett has not used "erroneous data." He has used a reliable methodology, and Bennett has offered a reasonable explanation for equating Blum's earning capacity with males. Defendants' argument that Blum should have used a different variable goes to weight, not admissibility. *See Quiet Tech.*, 326 F.3d at 1345.

### 6.    *Neil Bennett's Operative Report Accurately Calculates Wayman's Damages.*

In his current report, Neil Bennett shows his work to the Court and lays out his formula for reaching the current calculation of Wayman's damages. Because Defendants do not challenge Bennett's *current* math, this Court can deny their motion.

_____

[258] *See* PX50(Lundstrom-Dep-(2/23/2021)-143:16-23, 144:1-9).
[259] *See* PX46(Neil-Bennett-Dep-(2/17/2021)-217:20-22).

59

Defendants insist that the Court must exclude Neil Bennett unless Bennett also explains how and why his current report reaches a greater damages estimate than his original report.[260] Although it is unnecessary for an expert to explain why their current math differs from their prior math, the discrepancy in this case is easily explained. The original report mistakenly listed Wayman as both ages 45 and 46 in 2021 whereas the current report lists Wayman as age 45 in 2021, 46 in 2022, and so on.[261] Because Wayman cannot lose two years of his life in a single year, the original report was erroneous and the current report is correct. The end result is that, in the operative report, Wayman has an additional year of worklife and an additional year of damages.

In any event, "[a]n expert's method need not be perfect, nor must he apply it perfectly." *Banta Props., Inc. v. Arch Specialty Ins. Co.*, 2011 WL 13096149, at *4 (S.D. Fla. Nov. 23, 2011); *see also Best v. Lowe's Home Ctrs. Inc.,* 563 F.3d 171, 181 (6th Cir. 2009). Defendants' arguments go to weight, not admissibility. *See Quiet Tech.*, 326 F.3d at 1345.

---

[260] Def-Mot-66-67.
[261] *See* PX51(Neil-Bennett-(Wayman)-(11/25/2020)-3-14) and PX45(Neil-Bennett-(Wayman)-(2/12/2021)-3-14).

60

## C. *Dimmick's Opinions That Sloan Will Suffer Loss of Income and Consequences to His Familial and Social Relationships Are Reliable.*

This Court has previously determined that clinical audiologists, with backgrounds similar to Dimmick, are qualified to offer opinions "on correlative consequences of NIHL, such as declines in rate of employment and earnings, psychological distress, loneliness, and social isolation." Doc. 1680 at 44. As a clinician with a Doctorate degree in Audiology and a B.S. degree in Communication Sciences and Disorders, who founded and operates clinical audiology practices around this country, Dimmick has significant education, experience, knowledge, and training in hearing loss sequelae and the possible consequences of NIHL.[262]

Dimmick's opinions on the correlative consequences of Sloan's NIHL are grounded in scientific literature that was accurately cited within her expert submission.[263] Dimmick's extensive background and experience researching, diagnosing, and treating in the field of audiology provide her with sufficient expertise to review scientific literature and opine on correlative consequences of

---

[262] PX32(Dimmick-(Sloan) at 2-4); PX33(Dimmick-Dep-(2/11/2021)-243:8-243:20; 245:2-245:24).

[263] PX32(Dimmick-(Sloan) at 29-38 (*e.g.* at 33 citing *Association of hearing loss with decreased employment and income among adults in the United* States, Jung, D. & Bhattacharyya, N. (2012); *see also* at 37 citing *Hearing Loss, Loneliness and Social Isolation: A Systematic Review*, Shukla, A., Harper, et. al. (2020)); PX33(Dimmick-Dep-(2/11/2021)-243:8-243:20; 245:2-245:24).

NIHL, such as declines in earnings and income, and social and familial isolation, among other correlative consequences. Doc. 1680 at 44.

"Correlation testimony of this nature will supply helpful 'piece[s] of the puzzle' that a jury may consider in evaluating Plaintiffs' damages claims." *Id.* (citing *Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564 (11th Cir. 1998)). Further, contentions with the sources and strength of Dimmick's opinions bear on the weight rather than the admissibility of her opinions. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987); *Wright Med. Tech.*, 127 F. Supp. 3d at 1325.

IV.   **Plaintiffs' Experts Offer Reliable, Permissible Opinions.**

   A.   ***Marc Bennett and Gilder Offer Permissible Legal Opinions.***

Defendants move to exclude certain opinions of Marc Bennett and Gilder that Defendants characterize as impermissible narrative, state-of-mind opinions, and legal conclusions.[264] The Court should reject these arguments or should address them at trial rather than parsing opinions and testimony at this stage.

   1.   ***Statements of Law***

Defendants object to Marc Bennett and Gilder's use of certain words or phrases, arguing they are legal "terms of art" or amount to "legal opinions."[265] Plaintiffs agree that this Court's prior *Daubert* order prohibits experts from couching

---

[264] Def-Mot-69-71.
[265] *Id.* at 69.

their opinions in terms that carry special meaning under the law, such as "defective," "duty," "unreasonably dangerous," and "failed to warn." Doc. 1680 at 119. But there is a critical difference between impermissible legal conclusions, which "directly instruct[] the jury on a legal determination," and expert testimony that "embrace[s] an ultimate issue of fact" by tracking the elements of causes of action. *Eldridge v. Pet Supermarket, Inc.*, 2020 WL 1076103, at *7 (S.D. Fla. Mar. 6, 2020). The former is inadmissible; the latter is not. *Id.*

In this regard, Defendants' motion to exclude goes too far. For instance, Defendants seek to exclude Marc Bennett's statements regarding what a "reasonable" manufacturer would do.[266] However, because such opinions relate to "industry standards of care," and how a reasonable operator in the industry would comply with relevant statutes and regulations, such opinions are permitted. *See* Doc. 1680 at 117. Similarly, Defendants seek to exclude Gilder's opinion that Defendants "violated EPA regulation 40 C.F.R. § 211.204-4."[267] Again, an expert may "offer opinions as to the applicable standard of care and what conduct he believes fell short of that standard." *Id.* (quoting *Haines v. Webb*, 2014 WL 12828962, at *9 (N.D. Ga. Sept. 26, 2014)). Marc Bennett and Gilder should therefore be permitted "to opine— within their spheres of expertise—on the problems they identified with the design,

---

[266] *Id.*
[267] *Id.* at 70.

fitting, testing, and labeling of the CAEv2" that do not cross these lines. *See* Doc. 1680 at 118.

Insofar as Marc Bennett and Gilder's opinions "track" various elements of the relevant claims, *Eldridge*, 2020 WL 1076013, at *7, they should be permitted to offer opinions with respect to the design, fitting, testing, and labeling of the CAEv2, and Defendants' conduct regarding those issues.

Defendants' final criticism, that Marc Bennett is unqualified to opine regarding EPA regulations, goes to weight, not admissibility.[268] *See* Doc. 1680 at 32 n.22.

### B.   *Marc Bennett and Gilder Do Not Offer Impermissible "State of Mind" Opinions.*

Defendants seek to exclude "state-of-mind" opinions regarding what Defendants "knew, what they intended, or their motives."[269] However, Marc Bennett and Gilder's opinions simply describe what Defendants and the government knew about hearing protection and the CAEv2's design and fit problems and when these matters were known. *In re Seroquel Prods. Liab. Litig.*, 2009 WL 3806436, at *3 (M.D. Fla. July 20, 2009). This notice-related testimony is within the realm of their expertise and is based on their review of record evidence. It should be permitted. *Id.*

---

[268] *Id.*
[269] Def-Mot-70.

at *4; Doc. 1680 at 115 ("An expert may ... explain the basis of admissible opinions through commentary on documents and exhibits in evidence."); *Id.* at 133-34 ("Lustig may testify as to whether information contained in Defendants' internal documents indicated certain risks to users of the CAEv2[.]").

Accordingly, Marc Bennett and Gilder's opinions concerning what Defendants "knew" and when, support relevant inferences concerning Plaintiffs' failure-to-warn claims based on their specialized knowledge, experience, and evidentiary review.

### C.   *Gilder's Opinions About Hearing Loss and Tinnitus Are Admissible.*

Defendants miss the mark in seeking to exclude all Gilder opinions about hearing damage.[270] Gilder is not offering case specific medical opinions; rather, his opinions regarding noise exposure and hearing loss and tinnitus are part of his evaluation of defective hearing protection.[271] The link between inadequate hearing protection and auditory injury is generally accepted in the industry, and Gilder is qualified to offer such opinion.[272]

---

[270] *Id.* at 71-72.
[271] PX52(Gilder-27, 31-32); PX53(Gilder-Dep-(2/12/2021)-110:16-112:4).
[272] *Id.*; PX54(Ex.43-to-Berger-Dep-(12/11/2019)-(3M Technical Bulletin)).

Gilder double majored in chemistry and biology and has a Master's degree in natural science from Delta State University.[273] From 2006 to 2009 he headed the R&D and Quality Assurance division at Howard Leight, a major HPD manufacturer.[274] He oversaw "form, fit, function" testing on hearing protectors, including biocompatibility testing,[275] and supervised the development and testing of several HPDs, including earplugs.[276] He invented six patents related to hearing protection and worked with the military in developing the QuietPro+, a tactical headset with hearing protection capabilities.[277] Gilder was also a National Hearing Conservation Association member and was involved in working committees that reviewed proposed updates to ANSI S12.6.[278] Lastly, Gilder reviewed scientific literature and Defendants' documents and testimony discussing the causes of hearing damage, and explained his methodology as applying industry practices and standards.[279] The Court should thus deny Defendants' motion.[280]

---

[273] PX53(Gilder-Dep-(2/12/2021)-45:6-46:4).

[274] PX52(Gilder-2-3).

[275] PX53(Gilder-Dep-(2/12/2021)-153:6-155:19).

[276] *Id.* at 51:20-52:7.

[277] PX52(Gilder-5-6); PX53(Gilder-Dep-(2/12/2021)-56:17-58:8).

[278] PX52(Gilder-6); PX53(Gilder-Dep-(2/12/2021)-91:4-92:14; 94:7-95:14).

[279] PX52(Gilder-9-11); PX53(Gilder-Dep-(2/12/2021)-112:9-113:18).

[280] Defendants' reliance on *Napolitano v. Synthes, Inc.* is misplaced. 2014 WL 12867042, at *3 (D. Conn. 2014) (expert may "point[] to the opinion's general acceptance as a causation theory."). *See also In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.,* 711 F. Supp. 2d 1348, 1373 (M.D. Ga. 2010) (engineer qualified to opine on types of injuries caused by defective design).

**D.   *Gilder's Opinions About Method B Testing Are Admissible.***

Defendants rehash their "ironic" argument that Gilder has "no basis" to opine that method B testing approximates the protection achieved by servicemembers; an argument the Court has already rejected.[281] Def-Mot-73; Doc. 1680 at 59-60. Defendants' argument fails because Gilder supervised 100 method B tests[282], was involved with method B working committees, and explained why method B provided more "real-world" attenuations.[283]

**E.   *Gilder May Opine About What Defendants Should Have Provided to the Military.***

Defendants argue Gilder is unqualified to opine that Defendants did not act as a reasonable manufacturer in Defendants' dealings with the military. Def-Mot-73. But Gilder worked jointly with the military in developing and testing the QuietPro+.[284] Moreover, given the Court's prior ruling that the EPA's testing and labeling regulations apply to military sales, Gilder's oversight of these functions at

---

[281] *See also* PX55(3M_MDL000556360)(EARLog21) (Method B corresponds to attenuations of "informed users in well-managed … military [hearing conservation programs].").

[282] PX53(Gilder-Dep-(2/12/2021)-71:24-72:22).

[283] PX52(Gilder-42-44); PX53(Gilder-Dep-(2/12/2021)-94:7-95:14).

[284] *See, e.g.*, PX53(Gilder-Dep-(2/12/2021)-56:17-58:16; 59:17-60:5 (joint testing on the QuietPro+); 77:16-79:3 (all internal test results shared with military); 169:18-170:11 (ensured QuietPro+ had accurate use instructions was labeled correctly).

Howard Leight qualifies him to testify that Defendants did not act as a reasonable manufacturer in withholding key data from the military.[285]

F.    *Marc Bennett is Qualified and Reliably Opines as to the CAEv2's Design and Safer Alternative Designs.*

Defendants argue Marc Bennett is not qualified and uses flawed methodology when he opines as to defective design and safer alternative designs.[286] Bennett is an M.D. otolaryngologist and professor at Vanderbilt University.[287] He maintains an active practice in otology and neurotology—which requires him to evaluate the safety and efficacy of HPDs for his patients.[288]

Marc Bennett has worked with numerous device manufacturers in product development and design.[289] He has used earplugs in research for implantable hearing devices[290] and bone-anchored hearing aids.[291] He taught classes on HPD testing and manufacturing,[292] discussed design aspects of different earplugs based on

---

[285] *See Little v. McClure*, 2014 WL 5320557, at *2 (M.D. Ga. Oct. 17, 2014) (allowing expert testimony regarding defendants' failure to meet the industry standard of care based on the expert's experience, knowledge, and research).

[286] Def-Mot-74.

[287] PX9(Marc-Bennett-1).

[288] *Id.* at 2.

[289] *Id.* at 4.

[290] PX5(Marc-Bennett-Dep-(2/9/2021)-25:9-22).

[291] *Id.* at 25:23-26:5.

[292] *Id.* at 65:14-66:21.

engineering drawings,[293] reviewed REAT data and ANSI standards,[294] and consulted on product design drawings.[295]

Marc Bennett estimates over 70,000 to 80,000 patient encounters,[296] and he compares labeling and attenuation of HPDs to advise patients.[297] He regularly designs custom earplugs for a desired attenuation.[298] He typically performs MIRE testing on the custom earplugs he designs,[299] and he has performed MIRE testing on pre-formed earplugs.[300]

Although Marc Bennett is not an engineer, he is eminently qualified to "opine on how various aspects of the CAEv2's design prevented proper fit and seal." Doc. 1680 at 37-39. The totality of Bennett's experience as to earplug and product design, REAT data, ANSI standards, MIRE testing, and earplug labeling, similarly qualifies him to opine as to safer alternative designs. *See id.*; *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 612 (S.D. W. Va. 2013); *In re C.R. Bard, Inc.*, 2018 WL 514753, at *3 (S.D. W. Va. Jan. 23, 2018).

---

[293] *Id.* at 70:10-71:8.
[294] *Id.* at 77:10-78:15; 81:16-22.
[295] *Id.* at 68:6-16.
[296] *Id.* at 28:7-21.
[297] *Id.* at 97:3-98:18.
[298] *Id.* at 62:19-63:16; 67:16-22.
[299] *Id.* at 249:14-20.
[300] *Id.* at 73:15-75:6.

As for methodology, Defendants first argue a reference to Drawing No. 2041-0 as "final" renders Marc Bennett's entire defect analysis faulty as Drawing No. 2041-3 is the "Actual Final Design."[301] Directly below the image Defendants cite[302] (which footnotes iterations of the CAEv2's configuration, including Drawing No. 2041-3),[303] the body of Bennett's report also references the "final product" as Drawing No. 2041-3.[304] Bennett did not mistakenly analyze the wrong plug as Defendants wrongly suggest.

Defendants finally attack Marc Bennett's design defect[305] methodology as unreliable, inaccurately describing it as "(1) looking at the earplug and then (2) looking at other experts' reports."[306] It is clear from Bennett's report that his straightforward and reliable methodology for identifying defects consists of reviewing all materials available to him in the background of his extensive and relevant experience.[307] At the time of his deposition, Bennett had spent over 310 hours[308] reviewing all the materials on his 173 page Materials Considered List, including

---

[301] Def-Mot-75-76; PX9(Marc-Bennett-19).

[302] PX9(Marc-Bennett-19).

[303] PX56(Falco-Dep-Ex.3).

[304] PX57(Marc-Bennett-20-n.7); PX58(3M_MDL000017784).

[305] Notably, Defendants only specifically attack Bennett's methodology as to his defect opinions, not his safer alternative opinions.

[306] Def-Mot-76.

[307] PX9(Marc-Bennett-36-43).

[308] PX5(Marc-Bennett-Dep-(2/9/2021)-14:1-14).

thousands of pages of testing data, internal documents, testimony, and literature.[309] Because Bennett did not recite a publication touting his methodology as accepted,[310] does not render it unreliable.

Marc Bennett's safer alternative design opinions are also based on his review of testing data, design materials, and scientific literature.[311] Specifically, he compared data on the CAEv2 versus other available preformed earplugs by analyzing the NRRs and standard deviations of experimenter fit,[312] and subject fit REAT testing.[313] His methodology as to design defect and safer alternatives is sound. *See* Doc. 1680 at 33.

### G.   *Dimmick is Qualified to Opine on Design Defect.*

Dimmick will not opine on the CAEv2's design from an engineering perspective. However, Dimmick is qualified to opine as to the standards of care in audiology,[314] and she may "articulate the 'factual underpinning' upon which [s]he bases [her] opinion" that the CAEv2's defective design caused or substantially contributed to Sloan's injuries. *Ohio State Troopers Ass'n v. Point Blank Enters., Inc.,* 2020 WL 1666763, at *15 (S.D. Fla. Apr. 3, 2020).

---

[309] PX9(Marc-Bennett-Ex.C).
[310] PX5(Marc-Bennett-Dep-(2/9/2021)-280:19-282:4).
[311] PX9(Marc-Bennett-49).
[312] PX5(Marc-Bennett-Dep-(2/9/2021)-121:16-122:9); PX9(Marc-Bennett-49).
[313] PX5(Marc-Bennett-Dep-(2/9/2021)-122:23-123:8); PX9(Marc-Bennett-49).
[314] *See In re C.R. Bard, Inc.*, 948 F. Supp. 2d at 612.

Dimmick, as a clinical audiologist, has knowledge, education and experience advising patients on the use and selection of HPDs, fitting patients with HPDs, and evaluating patients' hearing.[315] She helped create "custom hearing protection" for her patients.[316] Dimmick is at least "minimally qualified"[317] to render conclusions including that "[t]he decreased hearing protection from the defective design of the CAEv2 directly caused or substantially contributed to Mr. Sloan's complications, including hearing loss, tinnitus, and related injuries."[318]

Dimmick's opinions, which are the product of her differential diagnosis and review of relevant materials, will help the jury understand Sloan's injuries and causation.

## **CONCLUSION**

For these reasons, the Court should deny Defendants' motion.

---

[315] PX33(Dimmick-Dep-(2/11/2021)-30:16-30:20; 47:20-48:18; 55:4-55:6; 58:21-59:14.
[316] *Id.* at 51:11-51:19.
[317] *See In re C.R. Bard, Inc.*, 2018 WL 514753, at *3; *cf. Trevino v. Boston Scientific Corp.,* 2016 WL 2939521, at *12 (S.D.W.Va. May 19, 2016).
[318] PX32(Dimmick-(Sloan)-19).

Date:  August 27, 2021                    Respectfully submitted,

                                          */s/ Bryan F. Aylstock*
                                          Bryan F. Aylstock, Lead Counsel
                                          Florida State Bar No. 078263
                                          AYLSTOCK, WITKIN, KREIS & OVERHOLTZ,
                                          PLLC
                                          17 East Main Street, Suite 200
                                          Pensacola, FL 32502
                                          Tel.: (850) 202-1010
                                          baylstock@awkolaw.com
                                          **Plaintiffs' Lead Counsel**

                                          Shelley V. Hutson, Co-Lead Counsel
                                          (Admitted Pro Hac Vice)
                                          Texas State Bar No. 00788878
                                          CLARK, LOVE & HUTSON, PLLC
                                          440 Louisiana Street, Suite 1700
                                          Houston, TX 77002
                                          Tel.: (713) 757-1400
                                          shutson@triallawfirm.com
                                          **Plaintiffs' Co-Lead Counsel**

                                          Christopher A. Seeger, Co-Lead Counsel
                                          (Admitted Pro Hac Vice)
                                          New Jersey State Bar No. 042631990
                                          SEEGER WEISS LLP
                                          77 Water Street, 8th Floor
                                          New York, NY 10005
                                          Tel.: (212) 587-0700
                                          cseeger@seegerweiss.com
                                          **Plaintiffs' Co-Lead Counsel &**
                                          **Counsel for Plaintiff William Wayman**

Kenneth Camp Bailey
Texas Bar No. 24006782
Aaron M. Heckaman
Texas Bar No. 24059920
BAILEY COWAN HECKAMAN PLLC
1360 Post Oak Blvd.
Suite 2300
Houston, TX 77056
713-425-7100
713-425-7101 (fax)
sbuchanan@bchlaw.com
***Counsel for Plaintiff Brandon Adkins***

Michael A. Burns
Florida Bar No. 973130
BURNS LAW LLC
362 Gulf Breeze Parkway #294
Gulf Breeze, FL 32561
850-572-9187
mike@maburns.com

Caroline L. Maida
(Admitted Pro Hac Vice)
Texas State Bar No. 24078906
MOSTYN LAW
3810 West Alabama Street
Houston, TX 77027
713-714-0000
epefile@mostynlaw.com
***Counsel for Plaintiff Michelle Blum***

Taylor Christopher Bartlett
Alabama Bar No. 2365-A51B
HENINGER GARRISON DAVIS LLC
2224 1ST Avenue North
Birmingham, AL 35203
205-326-3336
taylor@hgdlawfirm.com
***Counsel for Plaintiff Marcus Hensley***

74

Muhammad S. Aziz
(Admitted Pro Hac Vice)
Texas Bar No. 24043538
ABRAHAM WATKINS NICHOLS, AGOSTO,
AZIZ & STOGNER
800 Commerce Street
Houston, TX 77055
713-222-7211
713-225-0827 (fax)
jdean@abrahamwatkins.com
***Counsel for Plaintiff Ronald Sloan***

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH COURT'S WORD LIMIT</u>

I hereby certify that the foregoing contains 13,644 words, which is fewer words than Defendants used in Defendants' Omnibus Motion to Exclude Plaintiffs' Group G Putative Expert Opinions Under *Daubert* and Rule 702 and Incorporated Memorandum.

*/s/ Bryan F. Aylstock*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2021, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Bryan F. Aylstock*