## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to: *Brandon Adkins*, 7:20cv012 *Michele Blum*, 7:20cv122 *Marcus Hensley*, 7:20cv093 *Ronald E. Sloan*, 7:20cv001 *William Wayman*, 7:20cv149 | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## ORDER[1]

This Order resolves certain of the parties' respective omnibus motions to exclude expert testimony and opinions, in whole or in part, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993), for the Trial Group B cases.[2]

## I.    Legal Standard

Rule 702, as explained by *Daubert* and its progeny, governs the admissibility of expert testimony.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

---

[1] The Court assumes the parties' familiarity with the nature of this multidistrict litigation, the claims and defenses, and the current evidentiary record.  Thus, this Order sets out only what is necessary to explain the Court's rulings.

[2] The Order resolves all expert challenges except for those related to the issue of hidden hearing loss, for which a *Daubert* hearing was held on August 31, 2021, and Defendants' challenges to Cloie Johnson and Neil Bennett.

Under Rule 702 and *Daubert*, district courts must act as "gatekeepers" to ensure the reliability and relevancy of expert testimony.  *Id.* (quoting *Daubert*, 509 U.S. at 589).  Expert testimony is reliable and relevant—and, therefore, admissible—when the following criteria are met: (1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is "sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *Id.*  The Eleventh Circuit refers to these criteria separately as "qualification, reliability, and helpfulness," *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate," *Quiet Tech. DC-8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).  The party offering the expert has the burden of showing, by a preponderance of the evidence, that each of these requirements is met.  *Rink*, 400 F.3d at 1292.

To meet the qualification requirement, a party must show that its expert has sufficient "knowledge, skill, experience, training, or education to form a reliable opinion about an issue that is before the court."  *Hendrix ex. Rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (citing Fed. R. Evid. 702) ("*Hendrix II*"), *aff'g* 255 F.R.D. 568 (N.D. Fla. 2009) ("*Hendrix I*").  Importantly, if a "witness

is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments). The qualifications standard for expert testimony is "not stringent" and "[s]o long as the witness is minimally qualified, objections to the level of [his] expertise [go] to credibility and weight, not admissibility." *Hendrix I*, 255 F.R.D. at 585.

To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue. *Frazier*, 387 F.3d at 1261-62. The reliability analysis is guided by several factors, including: (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique is generally accepted in the relevant community. *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786. "[T]hese factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech.*, 326 F.3d at 1341. The court's focus must be on the expert's principles and methodology, not the conclusions they generate. *Daubert*, 509 U.S.

at 595, 113 S.Ct. 2786.  The test for reliability is "flexible" and courts have "broad latitude" in determining both how and whether this requirement is met.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999).

Finally, to satisfy the helpfulness requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985).  Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004).  Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).

"Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded [under Federal Rule of Evidence] 403." *Frazier*, 387 F.3d at 1263 (internal citations excluded).  "Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming," or if it is otherwise unfairly prejudicial. *Id*.  "Indeed, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Id*.  "Simply put,

expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, . . . district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Id*.

When scrutinizing the reliability, relevance, and potential prejudice of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate factfinder. *Frazier*, 387 F.3d at 1272. The court's gatekeeping role "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). Only the jury may determine "where the truth in any case lies" and the court "may not usurp this function." *Frazier*, 387 F.3d at 1272. Thus, a court may not "evaluate the credibility of opposing experts" or the persuasiveness of their conclusions, *Quiet Tech.*, 326 F.3d at 1341; instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence," *Frazier*, 387 F.3d at 1272.

## II.    Defendants' Experts

Plaintiffs move to exclude the testimony and opinions, in whole or in part, of 13 experts proffered by Defendants—Dr. John Casali, Dr. James Crawford, Drs. Gregory Flamme and Mark Stephenson ("Flamme-Stephenson"), Dr. Harri Kytomaa, Dr. Richard Neitzel, Vickie Tuten, Dennis Driscoll, Dr. John House, Dr.

Douglas Jacobs, and Drs. Derek Jones and Jennifer LaBorde.  The Court addresses each expert in turn.[3]

### A.    Dr. John Casali

In the Trial Group A cases, Dr. John Casali offered a broad range of opinions about the design, development and performance of the CAEv2, a number of which this Court excluded under Rule 702 and *Daubert*.  *See In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19md2885, 2021 WL 830309, at *5-6 (N.D. Fla. Mar. 4, 2021).  Plaintiffs assert that Dr. Casali now offers many of the same, previously excluded opinions in the Trial Group B cases, and request that those opinions likewise be excluded here.  The request is granted.

Consistent with the Court's prior rulings, which are incorporated by reference here, Dr. Casali will not be permitted to testify about Defendants or the military's state of mind; the military's alleged duties, responsibilities, and policies; or the military's hearing conservation policies and instructions, or its compliance or noncompliance therewith.  *See id*. at *6.  He is also precluded from testifying about federal government procurement, including the specific process for procuring the CAEv2.  *Id*.  He may not offer legal opinions or interpretations of the MPID, opine on whether Defendants or the CAEv2 "complied with" or "satisfied" the MPID, or

---

[3] Plaintiffs also moved to exclude the opinions of Jennifer Sahmel.  Defendants thereafter withdrew Sahmel as an expert in the Trial Group B cases; therefore, Plaintiffs' challenge to Sahmel's opinions is denied as moot.

testify about the reasonableness or infeasibility of any provision in the MPID, who was responsible for a particular provision, or whether Defendants were required to comply with a particular provision.  *Id.*  However, Dr. Casali will be permitted to testify, from an engineering perspective, that the CAEv2 conformed to the MPID's performance requirements, and he may opine generally about the benefits of training on and fitting earplugs.  *Id.*

### B.    Dr. James Crawford

Dr. James Crawford is a board-certified otolaryngologist and neurotologist. He previously served as a physician in the U.S. Army for 24 years, and now runs the Idaho Ear Clinic and serves as an assistant professor of surgery at the Uniformed Services University.  Dr. Crawford offers general expert opinions related to the DoD and Army's hearing conservation efforts, as well as a medical causation opinion for Adkins.  Plaintiffs challenge several aspects of Dr. Crawford's opinions.[4]

### 1.    General Opinions

In the Trial Group A cases, Dr. Crawford offered a series of opinions related to the DoD and Army hearing programs, some of which the Court excluded as lacking a reliable factual basis.  *See In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19md2885, 2021 WL 684183, at *1-3, 5-6 (N.D. Fla. Feb. 11, 2021).

---

[4] Dr. Crawford also provides Adkins-specific opinions regarding hidden hearing loss, which Plaintiffs challenge as unreliable.  The Court will address this challenge by separate order.

Plaintiffs assert that Dr. Crawford now offers many of the same, previously excluded opinions in the Trial Group B cases, and they request that those opinions likewise be excluded here.  The request is granted.

Consistent with the Court's prior rulings, which are incorporated by reference here, Dr. Crawford may provide general opinions and explanations of the Hearing Center of Excellence, the regulations governing the Army Hearing Program, and the importance of training and instruction related to, and fitting of, hearing protection devices.  *See id*. at 5.  He also may opine on "the fact that medical readiness and hearing conservation are distinct" and testify about his personal experiences and observations of the "significant gaps in the training and fitting of hearing protection devices."  *See id*.  And he may testify to what a particular servicemember told him about hearing protection, to the extent it relates to his diagnosis or treatment of that servicemember.  *See id*.  However, he may not testify regarding: (1) the Army-wide success or failure of hearing conservation efforts; (2) the Army-wide implementation of the hearing program and/or applicable regulations; (3) the Army's alleged emphasis on its own testing over NRR values; (4) his opinion that the military took responsibility for instructing and training soldiers on hearing protection, and did not rely on manufacturers' instructions or training; (5) his "understanding" regarding whether servicemembers were provided instructions or individually fitted when given hearing protection; (6) what the military audiologist community, medical staff

or the military, more broadly, knew or understood about various propositions; (7) the alleged need for "individual fit testing" and personal attenuation ratings for servicemembers; or (6) "HEAR" training materials.  *See id*. at 5-6.  Subject to these limitations, Dr. Crawford's general opinions are otherwise admissible.

### 2.        Case-Specific Opinion Regarding Adkins' Marijuana Use

Dr. Crawford's case-specific report for Adkins includes an opinion that he "cannot rule out the possibility that Adkins' tinnitus is the result of his chronic marijuana usage."  Crawford Rep. (Adkins), ECF No. 1863-5 at 13.  Plaintiffs argue that this opinion is unreliable and unhelpful because there is "no scientifically established causal link between marijuana use and tinnitus," and any marginal probative value is substantially outweighed by the danger of unfair prejudice and misleading the jury.  The Court agrees.  No evidence has ever been presented to this Court establishing general causation—or, more precisely, the existence of a genuine dispute of material fact on the issue of general causation—between marijuana and tinnitus.  Dr. Crawford acknowledges that a causal relationship between the two has "never [been] shown," only an "association," *see* Crawford Dep., ECF No. 1863-7 at 26-27, and he does not appear to have himself performed the sort of analysis well-established in the scientific community for determining whether an association

reflects a true causal relationship.[5]  Moreover, and not for nothing, the scientific literature offered in support of Dr. Crawford's opinion reflects there are conflicting epidemiological findings on the question of whether even a statistically significant association exists between recreational marijuana use and tinnitus.[6]  Given this scientific landscape, Dr. Crawford cannot opine with any degree of reliability that Adkins' tinnitus could be—much less, is—caused by his recreational use of marijuana.  Consequently, Dr. Crawford's opinion on his inability to rule out marijuana use has virtually no probative value, while presenting a substantial danger of unfairly confusing and misleading the jury regarding the science.  *See Frazier*, 387 F.3d at 1263 ("[E]xpert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the districts must take care to weigh the value of such evidence against its potential to mislead or confuse.").  The opinion thus must be excluded on reliability, helpfulness, and 403 grounds.

---

[5] *See, e.g.*, *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1307 (N.D. Fla. 2018) (discussing the "well-established" Bradford Hill analysis that guides a scientific inquiry into whether an observed association represents a "true cause-effect relationship").

[6] *See* Crawford Rep. (Adkins), ECF No. 1863-5 at 7-8 n.1; Narwani et al., *Does cannabis alleviate tinnitus? A review of the current literature*, 5 LARYNGOSCOPE INVESTIGATIVE OTOLARYNGOLOGY 1147, 1150 (2020) (surveying the scientific literature and describing one cross-sectional study that found a statistically significant association between recreational marijuana use and tinnitus, and one cross-sectional study that found no such statistically significant association).

### C.     Dennis Driscoll

Dennis Driscoll is a mechanical engineer and board-certified noise control engineer, who, since 1988, has worked as an acoustical engineering consultant specializing in "noise assessment, engineering noise control, and hearing loss prevention programs" for private industry.  *See* Driscoll Rep. (Hensley), ECF No. 1863-26 at 4.   Driscoll offers case-specific opinions that: (1) Hensley "was periodically exposed to significant noise" during his military service; (2) "the Army Hearing Program and hearing protection devices" that Hensley used "performed as intended throughout [his] military service"; and (3) "Hensley does not have hearing-related issues, including tinnitus, as a result of his military service."  *See id*. at 9-10. In the Trial Group A cases, the Court excluded substantially similar opinions from Driscoll and/or other experts on qualifications grounds and/or as lacking a reliable basis, unhelpful, speculative, and/or impermissible legal conclusions.  *See In re 3M Combat Arms Earplug Prod. Liab. Litig*., No. 3:19md2885, 2021 WL 2028682, at *3-5 (May 11, 2021).  Plaintiffs argue that certain of Driscoll's opinions should be excluded here for the same reasons.  The Court agrees, with one exception.

First, much like before, Driscoll will not be permitted to offer the opinion that Hensley does not have hearing-related issues as a result of his military service or the

CAEv2.[7]  As a mechanical engineer, Driscoll is not qualified to diagnose the cause of any individual plaintiff's hearing loss or tinnitus.  *See id.* at *3 (finding the same regarding Driscoll's diagnostic opinion on the cause of McCombs' hearing problems); *see also In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19md2885, 2021 WL 948839, at *9-10 (Mar. 13, 2021) (same regarding industrial hygienist's opinions on the cause of Estes and Hacker's hearing injuries).  Also like before, Driscoll failed to articulate any methodology, much less a reliable one, that he applied in reaching his specific causation opinion for Hensley.  *See In re 3M*, 2021 WL 2028682 at *3-4.  Because Driscoll lacks qualifications and a reliable basis for offering a specific causation opinion, the opinion is inadmissible.

Second, Driscoll's opinion that the Army Hearing Program "performed as intended" runs afoul of the Court's rulings regarding the success or failure of the Army's hearing conservation efforts.  *See generally In re 3M*, 2021 WL 948839; *In re 3M*, 2021 WL 830309 (citing *In re 3M*, 2021 WL 684183).  Driscoll may not testify regarding the adequacy of the Army Hearing Program, either as a general matter or as to Hensley specifically.  *See id.*

---

[7] This includes Driscoll's opinion that the various "hearing protection devices" worn by Hensley during his military service—e.g., foamies, single-ended triple-flanged, or the CAEv2— "performed as intended" for him.  *See* Driscoll Rep. (Hensley), 1863-26 at 5, 8-10.  As Plaintiffs correctly observe, this is fundamentally a diagnostic opinion that the CAEv2 did not cause Hensley's injuries, which Driscoll lacks qualifications to provide and failed to support with a reliable methodology.

Finally, although it is a close call, the Court finds there is no disqualifying helpfulness problem with Driscoll's observations about Hensley having been "periodically exposed to significant noise."  *See* Driscoll Rep. (Hensley), ECF No. 1863-26 at 9.  To be helpful under Rule 702 and *Daubert*, expert testimony must, among other things, offer insights "beyond the understanding and experience of the average citizen."  *Rouco*, 765 F.2d at 995.  Here, with respect to Hensley's noise exposure history, Driscoll essentially chronicled the timeframes within which Hensley had "some" or "no" noise exposure, and separately recited the estimated sound pressure levels produced by several military weapons systems.  *See* Driscoll Rep. (Hensley), ECF No. 1863-26 at 4-6, 8-9.  He also analyzed and explained the peak sound pressure level that Hensley would have faced during two mortar attacks in 2005.  *See id*. at 6.  This bit of analysis moves Driscoll's observations beyond the realm of lay understanding and experience, rather than merely parroting what is reflected in the documentary evidence that the jury can easily read for themselves.  Again, to be clear, Driscoll will not be permitted to offer any opinion on whether Hensley's noise exposures caused his alleged hearing injuries.  And he may not further expand his analyses beyond that already discussed in his expert report and/or deposition testimony, at least for purposes of the Trial Group B cases.  However, subject to these limitations, his observations regarding Hensley's noise exposure are admissible.

**D.**     **Drs. Gregory Flamme and Mark Stephenson**

Flamme-Stephenson offer case-specific opinions that Sloan and Wayman's hearing problems were not caused by the CAEv2, but rather are attributable, at least in part, to the Army's inadequate implementation of its hearing conservation program.  *See* Flamme-Stephen Rep. (Wayman), ECF No. 1863-9 at 24-25, 27; Flamme-Stephenson Rep. (Sloan), ECF No. 1863-10 at 29-32, 35.   The Court previously excluded this substantially similar portion of their specific causation opinions for Trial Group A Plaintiffs Estes and Baker.  *See In re 3M*, 2021 WL 830309, at *5; *see also In re 3M*, 2021 WL 684183 (excluding generalized opinions regarding the success or failure of the military's hearing conservation efforts, and the military's "culture" of compliance or non-compliance with safety and hearing protection programs and regulations).   Consistent with those rulings, Flamme-Stephenson will not be permitted to testify that any military program was "implemented inadequately" or otherwise failed, either as a general matter or as to Sloan and Wayman specifically.  *See In re 3M*, 2021 WL 830309 at *5.  They are also precluded from testifying that the military's failure to conduct an annual audiogram contributed in any way to their injuries, as there is no medical evidence to support that opinion.  *Id*.  As audiologists, Flamme-Stephenson may speak about the importance of training on and fitting of earplugs.  *Id*.  However, neither they, nor any other expert, will be allowed to testify that anything the military did placed

Plaintiffs "at greater risk of sustaining a hearing impairment" or otherwise caused their injuries, as testimony of that nature would be unhelpful.  *See id*. (citing *Coggon v. Fry's Elec., Inc.*, 2019 WL 2137465 (N.D. Ga. Feb. 6, 2019)); *see also* Flamme-Stephenson Rep. (Sloan), ECF No. 1863-10 at 37; Flamme-Stephenson Rep. (Wayman), ECF No. 1863-9 at 27.   Subject to these limitations, Flamme-Stephenson's specific causation opinions are otherwise admissible.

### E.    Dr. John House

Dr. John House is a board-certified otolaryngologist and neurotologist with over 45 years of clinical experience in private practice at The House Institute in Los Angeles, California. He also serves as a clinical professor in the Departments of Otolaryngology at both the University of Southern California and University of California, Los Angeles.  Dr. House offers a medical causation opinion that Wayman did not suffer hearing loss as a result of his military service or any defective hearing protection device, and that his alleged tinnitus is "caused by factors other than exposure to noise." *See* House Rep. (Wayman), ECF No. 1863-27 at 3, 9.  Plaintiffs challenge Dr. House's opinions that Wayman's tinnitus was not caused by noise exposure, and that hearing loss and tinnitus do not affect Wayman's everyday life.

Regarding the cause of Wayman's tinnitus, the Court agrees with Plaintiffs. Despite Defendants' assertion to the contrary, Dr. House's proffered basis for his opinion regarding the cause of Wayman's tinnitus is materially identical to the

proffered basis for his opinion in Hacker's case. *Compare* House Rep. (Wayman), ECF No. 1863-27 at 8 ("Because Mr. Wayman does not have sensorineural hearing loss in either ear, it is more likely than not that his tinnitus is caused by head trauma than noise exposure.") *with* House Rep. (Hacker), ECF No. 1595-66 at 13 ("Because Mr. Hacker does not have sensorineural hearing loss in either ear, it is more likely than not that his tinnitus is caused by head trauma than noise exposure."). Thus, for the same reasons his tinnitus opinion was methodologically deficient for Hacker, his tinnitus opinion is deficient for Wayman. *See In re 3M*, 2021 WL 765019 at *9. Moreover, because Dr. House agrees that individuals without sensorineural hearing loss as measured by a traditional pure tone audiometry can nonetheless suffer from tinnitus, *see* House Dep., ECF No. 1863-28 at 26, the absence of sensorineural hearing loss of that nature cannot, alone, constitute a scientifically reasoned explanation for rejecting noise exposure as a cause of an individual's tinnitus. Consequently, Dr. House's opinion that Wayman's tinnitus was not caused by noise exposure is excluded.

Regarding whether hearing loss and tinnitus affect Wayman's everyday life, the Court also agrees with Plaintiffs, but only in part. Dr. House has not furnished a basis for his unconditionally broad opinion that Wayman's alleged hearing injuries "do not adversely affect his daily life." *See* House Rep., ECF No. 1863-27 at 9. Based on Wayman's results on well-accepted speech discrimination tests, Dr. House

may opine on Wayman's ability to discern speech in various environments.  Beyond that, however, Dr. House has not described any methodology or reliable factual basis for concluding that Wayman's hearing injuries—more specifically, his hearing loss in ultra-high frequencies and his tinnitus—do not and/or will not affect his sleep, ability to concentrate or PTSD.  And his opinion regarding impacts on Wayman's job performance is unhelpful, as it merely recounts the testimony of Wayman's supervisor, who testified that he had never noticed Wayman have any hearing difficulties at work, which the jury will hear for themselves.  As with Plaintiffs' medical experts, Dr. House has ample expertise to offer opinions discussing the nature of various correlative effects of hearing loss and/or tinnitus, and how those effects typically present, based on the scientific literature and his decades of clinical experience.  But he may not opine on whether Wayman is, in fact, experiencing those effects because he has not articulated an adequate basis for such an opinion.

### F.     Dr. Douglas Jacobs

Dr. Douglas Jacobs is a board-certified psychiatrist and associate professor at Harvard Medical School, with more than 45 years of clinical experience evaluating and treating psychiatric patients in private practice.  Dr. Jacobs offers opinions that many of the symptoms and functional impairments allegedly experienced by Adkins and Wayman are attributable to underlying psychiatric conditions, rather than their

hearing loss and/or tinnitus.  Plaintiffs challenge various aspects of Dr. Jacobs' opinions on reliability grounds.

### 1.  Adkins

Dr. Jacobs opines that many of Adkin's occupational, social and emotional impairments are caused by his comorbid antisocial personality disorder ("APD"), and not any alleged hearing injuries.  Plaintiffs argue that: (a) Dr. Jacobs did not apply a reliable methodology in concluding that Adkins suffers from APD; (b) he offers only speculation, with no factual basis, for his opinion that Adkins manifested certain diagnostically-necessary symptoms of APD before the age of 15; and (c) his APD opinion is a vehicle for improper character attacks.

Regarding Dr. Jacobs' methodology, the Court disagrees.  Adkins' medical records reflect that he was provisionally diagnosed with APD at the Lawrence Joel Army Health Clinic in July 2005, *see* Adkins Health Record, ECF No. 1892-30, and that diagnosis carried forward in numerous subsequent medical records during the course of Adkins' military service.[8]  At his deposition, Adkins himself confirmed that he has been diagnosed with APD.  *See* Adkins Dep., ECF No. 1892-12 at 5-6.

---

[8] *See, e.g.*, Adkins Health Record dated Sept. 17, 2005, ECF No. 1892-31 at 2, 4 (noting history with antisocial personality traits); Adkins Health Record dated Aug. 1, 2006, ECF No. 1892-33; Adkins Health Record dated Oct. 31, 2006, ECF No. 1892-34; Adkins Medical Report dated Oct. 31, 2006, ECF No. 1892-35; Adkins Health Record dated Nov. 30, 2007, ECF No. 1892-36; Adkins Health Record dated Jan. 31, 2008, ECF No. 1892-37; Adkins Health Record dated June 9, 2008, ECF No. 1892-38.

Dr. Jacobs properly relied on that existing diagnosis as part of the factual basis for his opinion regarding the cause of Adkins' functional impairments.  *See In re 3M*, 2021 WL 2028682, at \*5 (finding the same regarding the factual basis for Dr. Packer's opinion on the relationship between McCombs' tinnitus and PTSD).

With that said, Dr. Jacobs will *not* be permitted to weaponize any aspect of Adkins' APD diagnosis to launch facially irrelevant and/or unduly prejudicial assaults on Adkins' character.  Because there is a genuine dispute of material fact on the cause of Adkins' mental health and functional impairments, the fact of Adkins' APD diagnosis, and expert testimony regarding specific features of APD that can cause such impairments, are highly probative on that narrow dispute.  However, there will be no testimony or other evidence introduced at trial—none—regarding certain bases for Adkins' diagnosis, including his reported history of "cruelty to animals, fire setting, [and] shoplifting."  *See, e.g.*, Adkins Health Record, ECF No. 1892-31 at 2; Jacobs Rep. (Adkins), ECF No. 1864-29 at 7; Jacobs Dep., ECF No. 1892-41 at 6-9.   There also will be no testimony describing "deceit and manipulation" as "central features of" APD, or opinions characterizing Adkins and/or his behaviors as deceitful, manipulative and/or lacking in remorse.[9]

---

[9]  *See, e.g.*, Jacobs Rep. (Adkins), ECF No. 1863-29 at 7 ("The characteristic of manipulativeness seems to manifest itself in this case as Mr. Adkins acknowledges that he decided to seek a disability from the military for tinnitus only after viewing a commercial seeking claimant for a lawsuit against 3M."); *id.* at 26 ("It is noteworthy that there is no indication that [Adkins] had any remorse for [his incidents involving domestic violence or threats to others] (a cardinal feature of antisocial personality disorder)"); DSM-V, ECF No. 1863-30 ("Persons with [APD] . . . are

Testimony of this nature is highly prejudicial and not at all relevant to the cause of the mental health and functional impairments at issue in Adkins' case.[10]  Moreover, Dr. Jacobs has never met or spoken with Adkins, and he has not identified any documented instances of deceit or manipulativeness in Adkins' service or mental health records.  Consequently, there is no factual basis for Dr. Jacobs' opinion that Adkins himself is deceitful, or that Adkins' decision to report his alleged tinnitus to the military after viewing a commercial about this litigation "seems" to be a "manifest[ation]" of deceit and manipulativeness attributable to Adkins' APD.  *See* Jacobs Rep., ECF No. 1863-29 at 7.  Dr. Jacobs' unsupported opinion thus improperly "invades the jury's province to make credibility determinations," *see United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996), under the shroud of psychiatric expertise, about which there is overwhelming potential a jury may be easily misled into accepting without critical scrutiny.  In short, the risks of unfair prejudice and misleading the jury far outweigh any marginal probative value of this opinion.  Accordingly, Dr. Jacobs' testimony must be limited as discussed above—

---

frequently deceitful and manipulative in order to gain personal profit or pleasure . . ., [and] [t]hey may repeatedly lie, use an alias, con others or malinger."); *id*. ("Individuals with [APD] show little remorse for the consequences of their acts.  [ ] They may be indifferent to, or provide a superficial rationalization for, having hurt, mistreated, or stolen from someone."); *id*. ("Lack of empathy, inflated self-appraisal, and superficial charm are features" frequently observed in individuals with APD."); Jacobs Dep., ECF No. 1863-31 at 15 (characterizing Adkins' APD traits as including "manipulativeness"); *id*. at 18 (testifying that, at trial, he "will be talking about the manipulative qualities of an antisocial personality").

[10] For the same reasons, these also are not permissible areas for cross-examination of Adkins himself or Plaintiffs' experts, without the door being unequivocally opened.

i.e., to a general description of the relevant characteristics of APD, to the fact of Adkins' APD diagnosis and to specific features of APD that can cause the mental health and functional impairments (e.g., irresponsible work behavior, irritability and aggressiveness towards others) that Adkins attributes to his hearing injuries and damages claims (e.g., diminished present and future earnings and difficulty maintaining relationships).[11]

### 2. Wayman

Dr. Jacobs also offers case-specific opinions for Wayman. As relevant to Plaintiffs' challenges, Dr. Jacobs opines that certain of Wayman's alleged symptoms and functional impairments are caused not by tinnitus but by a condition known as "Unspecified Neurocognitive Disorder" ("UND"). Additionally, as part of his psychiatric opinion, Dr. Jacobs "report[s]" on the "etiology" of Wayman's tinnitus as "documented" in Wayman's medical records. *See* Jacobs Dep., ECF No. 1863-31 at 9. Plaintiffs argue Dr. Jacobs did not follow a proper methodology in forming his UND opinion, and that he lacks qualifications or a reliable basis to "report" on the cause of Wayman's tinnitus.

---

[11] If Adkins does not deny his history of aggressive conduct or the fact that it has adversely impacted his social relationships and work behavior, evidence regarding specific instances of aggressive conduct will be excluded under Rule 403 because its marginal probative value is substantially outweighed by the danger of unfair prejudice. Defendants must seek to be heard outside the presence of the jury before introducing any such evidence.

With respect to UND, it is unclear from the record whether Wayman's medical records include a prior formal diagnosis of UND. According to Dr. Jacobs' report, Wayman's records reflect that he was formally diagnosed with UND in 2017. *See* Jacobs Rep. (Wayman), ECF No. 1863-32 at 8, 10-11, 17-18. However, neither Dr. Jacobs nor Defendants have presented a specific record showing a UND diagnosis.[12] To the extent there is a prior diagnosis of UND in Wayman's records, Dr. Jacobs may properly rely on it as part of the factual basis for his opinion on the cause of Wayman's psychiatric and functional impairments. *See In re 3M*, 2021 WL 2028682 (finding the same regarding Dr. Packer's reliance on Baker's formal PTSD diagnosis in connection with his causation opinion). If there is no formal UND diagnosis in Wayman's records, then Dr. Jacobs may not testify about UND, because he did not demonstrably follow any methodology in diagnosing Wayman with the condition.

Additionally, Dr. Jacobs may not offer any opinion on the cause of Wayman's tinnitus or otherwise "report on what's documented in [Wayman's medical] records" with respect to its etiology. *See* Jacobs Dep., ECF No. 1863-31 at 9. Dr. Jacobs is not an otolaryngologist, neurotologist or audiologist, and he has no specialized training or experience in those fields. He has never before reviewed medical records

---

[12] This differs from the evidence offered in support of Adkins' APD diagnosis, which included numerous mental health records referencing the diagnosis.

and formed an opinion on the etiology of a patient's tinnitus, and he did not perform any independent assessment of causation for Wayman's tinnitus.  *See id*. at 5, 8-9. Thus, Dr. Jacobs is wholly unqualified to diagnose or even comment on the cause of Wayman's tinnitus, and he lacks any reliable basis for doing so.  Moreover, merely restating what is reported in Wayman's medical records would be unhelpful because it does not provide any insight or analysis beyond what the jury can read from the records themselves with the assistance of a qualified audiologist or ENT.  *See In re 3M*, 2021 WL 2028682, at *4 (same regarding unhelpfulness of engineer's recitation of the reported results of an audiogram).  Any such proposed testimony from Dr. Jacobs is inadmissible.

### G.     Drs. Derek Jones and Jennifer LaBorde

Drs. Derek Jones and Jennifer LaBorde co-authored joint reports in which they opine, in addition to other opinions not challenged here, that Blum and Sloan have 0% permanent impairment ratings for hearing loss based on the 1996 Florida Uniform Permanent Impairment Rating Schedule ("FUPIRS").  In the Trial Group A cases, the Court excluded the doctors' substantially similar FUPIRS-based opinions under Rules 702 and 403 "because they [were] unhelpful, and any probative value [was] substantially outweighed by a danger of confusing the jury."  *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19md2885, 2021 WL 765019, at *11 (Feb. 28, 2021).  So too here.  "FUPIRS is a [disability rating] tool designed for

setting workers' compensation benefits for Florida workers" and is not typically used in any other context. *Id*. There are questions about its scientific validity, and certain assumptions on which it is based—for example, a requirement that the worker's impairment be "stable or non-progressive at the time of" any disability evaluation—are incompatible with the progressive nature of Blum and Sloan's hearing problems.[13] *See id*. In short, Plaintiffs' FUPIRS permanent impairment ratings "do not have a valid scientific connection to the pertinent inquir[ies]" in this litigation, and thus, grappling with the limitations of the FUPIRS method will unduly complicate the jury's role. *See id*. Accordingly, consistent with the Court's prior rulings regarding FUPIRS, Drs. Jones and LaBorde's permanent impairment ratings opinions for Blum and Sloan are excluded.

## H.     Dr. Harri Kytomaa

Dr. Harri Kytomaa is a mechanical engineer currently serving as Group Vice President and Principal Engineer for the Thermal Sciences practice at Exponent Engineering & Scientific Consulting. In the Trial Group A cases, Dr. Kytomaa offered opinions in rebuttal to those of certain of Plaintiffs' experts, some of which the Court excluded on qualifications grounds. Plaintiffs assert that Dr. Kytomaa

---

[13] *See* Jones-Laborde Rep. (Sloan), ECF No. 1863-38 at 27-28 (discussing "progressive bilateral changes in [Sloan's] hearing ability that have continued post-military service"); Jones Dep., ECF No. 1863-36 at 4 (characterizing Blum's condition as "idiopathic progressive high-frequency sensorineural hearing loss"); LaBorde Dep., ECF No. 1863-37 (testifying that a "potential etiology" for Blum is "sloping, progressive, idiopathic sensorineural hearing loss").

offers many of the same, previously excluded opinions in the Trial Group B cases, as well as additional opinions that "exceed his qualifications and the limits of this Court's prior Order," all of which should be excluded here.

As to the former, the Court agrees.  Consistent with the Court's prior rulings, which are incorporated by reference here, Dr. Kytomaa is not qualified, and will not be permitted, to offer opinions about: (1) general causation or the specific cause of any individual plaintiff's hearing-related problems; or (2) Dr. David Eddins and Roger Juneau's silicone ear replicas or their testing methods.  *See In re 3M*, 2021 WL 830309, at *6.

Dr. Kytomaa's second supplemental report is a rebuttal of the opinions of Plaintiffs' expert, Dr. Steven Armstrong.  Neither side submitted Dr. Armstrong's report; however, the parties' briefing indicates that he "is an electrical engineer who used a software program that models electric components . . . to model the CAEv2, and he also created mathematical and physical acoustic models to represent the filter location."  Dr. Kytomaa' education and professional experience in mechanical engineering and acoustic modeling qualify him to critique Dr. Armstrong's modeling and other acoustical engineering work in this case, from an engineering perspective.

Dr. Kytomaa's third supplemental expert report offers a rebuttal of the opinions of Plaintiffs' expert, Stephen Gilder.  Plaintiffs do not specifically identify

any qualifications problem with the opinions in §§ 2.1 and 2.2 of Dr. Kytomaa's report; therefore, those sections will not be excluded.  However, Plaintiffs do challenge Dr. Kytomaa's qualifications to offer the opinions in §§ 2.3 and 2.4 of his report, in which he critiques Gilder's opinions that:  (1) "the CAEv2 has a tendency to slip imperceptibly" while in wearer's ears; and (2) the CAEv2's length and width constitute "dangerous design defects" that lead to poor fit and inadequate hearing protection for wearers.  *See* Kytomaa 3rd Suppl. Rep., ECF No. 1863-12 at 10-11 (quoting Gilder Rep., ECF No. 1864-54 at 14).  The Court agrees with Plaintiffs.  As discussed in a prior Order, Dr. Kytomaa "is not a medical doctor or audiologist," "has never worked in the field of audiology, conducted or evaluated REAT or MIRE testing, [or] otherwise performed research or work with human ears and/or ear molds."  *See In re 3M*, 2021 WL 830309 at *6.  Defendants concede that Dr. Kytomaa has not worked with the subject matter at issue here—earplugs, *see* Def. Resp., ECF No. 1892 at 18, and Dr. Kytomaa has not explained how his engineering background or his experience with acoustic telemetry systems in the drilling industry provide a sufficient basis for his proposed opinions regarding the potential effects of the CAEv2's length, width, and alleged tendency to imperceptibly slip in the human ear.  Consequently, he is not qualified, and will not be permitted, to offer testimony related to the opinions reflected in §§ 2.3 and 2.4 of his report.

## I.      Dr. Richard Neitzel

Dr. Richard Neitzel is an industrial hygienist and exposure scientist, and currently serves as a professor and Associate Director of the School of Public Health at the University of Michigan.  Dr. Neitzel offers general opinions regarding the Army's hearing conservation efforts, as well as case-specific opinions regarding the extent and source of Blum, Sloan, and Wayman's hearing-related problems.[14]  In the Trial Group A cases, the Court excluded Dr. Neitzel's substantially similar opinions in their entirety on qualifications grounds and/or as lacking a reliable basis, unhelpful, speculative, improper conduits for hearsay, and/or impermissible legal conclusions.  *See In re 3M*, 2021 WL 948839.  Plaintiffs argue that his opinions should be excluded here for the same reasons.  The Court agrees.  Dr. Neitzel's opinions in the Trial Group B cases are materially identical to the opinions he gave in the Trial Group A cases, in terms of the purported factual bases, methodology, and analytical fit.  Consistent with the Court's prior rulings, which are incorporated by reference here, *see id.*, his opinion is excluded in its entirety from Blum, Sloan, and Wayman's cases.

---

[14] *See* Neitzel Rep. (Blum), ECF No. 1863-17; Neitzel Rep. (Sloan), ECF No. 1863-18; Neitzel Rep. (Wayman), ECF No. 1863-19.

### J.    LTC Vickie Tuten

In the Trial Group A cases, LTC Vickie Tuten offered a series of opinions related to the DoD and Army hearing programs, some of which the Court excluded as lacking a reliable factual basis. *See In re 3M*, 2021 WL 684183, at *1-3, 5. Plaintiffs assert that LTC Tuten now offers many of the same, previously excluded opinions in the Trial Group B cases, and they request that those opinions likewise be excluded here. The request is granted.

Consistent with the Court's prior rulings, which are incorporated by reference here, LTC Tuten may provide general opinions and explanations regarding the DoD and Army Hearing Program regulations and requirements. *See id*. at 5. She also may testify as to her personal experiences and observations of the Hearing Program's implementation, including any perceived lack of resources and support from medical and operational resources at installations where she was stationed or about which she otherwise has personal knowledge. *Id*. However, she may not testify that any lack of resources and/or operational support constituted an Army-wide failure of the Hearing Program or led to hearing injuries in servicemembers as a whole. *Id*. Similarly, she may not testify that she "understands that information was provided by the Army Public Health Command regarding a recommendation to roll the last flange back to get a better insertion of the CAEv2" or that "anecdotal information related to [her] was that no instruction was provided by the military staff

handing out the CAEv2." *See id*.  More broadly, she may not give opinions: (1) "regarding the *Army-wide* success or failure of hearing conservation efforts or a purported 'widespread' culture of compliance or non-compliance with Army safety and hearing conservation program requires"; (2) that "the [Army Hearing Program] was not implemented consistently *across installations*"; or (3) about "'frustrations expressed' by unidentified 'military audiologists' and 'anecdotal information relayed to [her]' by 'soldiers.'"  *See id*. at *1-2.  Subject to these limitations, LTC Tuten's opinions are otherwise admissible.

## III.   Plaintiffs' Experts

Defendants move to exclude the testimony and opinions, in whole or in part, of 9 experts proffered by Plaintiffs—Dr. Marc Bennett, Dr. Eric Bielefeld, Dr. Jessica Dimmick, Dr. Marc Fagelson, Stephen Gilder, Dr. Lawrence Lustig, Dr. Paul Kileny, Dr. Michael Ostacher, and Dr. Christopher Spankovich.[15]

### A.   Differential Etiologies

Defendants move to exclude the specific causation opinions of Drs. Marc Bennett, Eric Bielefeld, Jessica Dimmick, Marc Fagelson, Lawrence Lustig, Paul Kileny, Michael Ostacher and Christopher Spankovich on various grounds.  Briefly, each expert, with the exception of Dr. Kileny, relied primarily on the differential

---

[15] As already discussed, Defendants' challenges to the opinions of Neil Bennett and Cloie Johnson will be addressed in a separate order.

etiology method to link Plaintiffs' injuries to an alleged defect in the CAEv2. "Differential etiology is a medical process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining." *Hendrix II*, 609 F.3d at 1195. "A reliable differential etiology is performed in two steps." *Id*. "First, the expert must compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Id*. (internal quotes omitted). "Second, the expert must eliminate all causes but one" by "appl[ying] the facts of the patient's case to the list created in the first step in order to form an opinion about the actual cause of the patient's symptoms." *Id*. at 1197. The expert must provide scientifically reasoned explanations for rejecting alternative hypotheses, and "the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Id*. While a "differential analysis need not rule out all possible alternative causes, [ ] it must at least consider other factors that could have been the sole cause of the plaintiff's injury." *Chapman v. Procter & Gamble Distrib.*, LLC, 766 F.3d 1296, 1309 (11th Cir. 2014) (internal quotes omitted).

### 1.    Adkins—Dr. Marc Fagelson

Dr. Marc Fagelson conducted a differential etiology for Adkins. Defendants argue that Dr. Fagelson's opinion is unreliable because his report (1) does not discuss whether Adkins' personality disorder affects his alleged PTSD symptoms and sleep

disorder; (2) does not account for the contents of "at least three medical records" that Dr. Fagelson had not seen, which indicate that Adkins denied experiencing ringing in the ears in two post-deployment health assessments and reported having previously experienced trouble sleeping on his pre-enlistment medical history report; and (3) concludes that Adkins' tinnitus exacerbates his PTSD and sleep disorders without analyzing other potential causes of the exacerbation.  None of these arguments is fatal to Dr. Fagelson's specific causation opinion for Adkins.

To begin with, Dr. Fagelson's report and deposition testimony provide a scientifically reasoned explanation for the opinion that Adkins' tinnitus exacerbates his PTSD and sleep problems.  Adkins previously received a formal diagnosis of PTSD from the Department of Veterans Affairs.  Dr. Fagelson properly relied on that diagnosis as part of the factual basis for his opinion on the relationship between Adkins' tinnitus and PTSD.  *See In re 3M*, 2021 WL 2028682, at *5 (finding the same regarding the factual basis for Dr. Packer's opinion on the relationship between McCombs' tinnitus and PTSD).  He also drew on his decades of clinical experience treating tinnitus patients and managing related symptoms—including former service members, like Adkins, with formal diagnoses of PTSD and/or sleep disorders—together with an explanation of how that experience informed his opinions, as well as an apparent wealth of scientific literature linking tinnitus to a reduction in "the quality and quantity" of sleep, and a worsening of PTSD symptoms.  *See* Fagelson

Rep. (Adkins), ECF No. 1864-2 at 2-3, 13; Fagelson Dep. (Feb. 19, 2021), ECF No. 1864-2 at 33-34.  Dr. Fagelson considered and acknowledged that "stress related to family life and employment issues"  also "contributes" to Adkins' worsened PTSD and sleep symptoms.  *See* Fagelson Rep. (Adkins), ECF No. 1864-2 at 12-13.  To the extent Defendants believe Dr. Fagelson did not adequately consider another factor, such as Adkins' reported antisocial personality disorder or his alleged contradictory prior statements regarding his tinnitus and sleep problems, that may present fodder for cross-examination but it is not grounds for exclusion of Dr. Fagelson's specific causation opinion.  Because Dr. Fagelson has provided more than "subjective beliefs or unsupported speculation" for his findings, *see Hendrix II*, 609 F.3d at 1197, his differential analysis is reliable and admissible.

## 2.    Hensley—Dr. Paul R. Kileny

Dr. Paul Kileny offers an opinion that the "lack of hearing protection provided by the CAEv2 . . . was the direct cause of" Hensley's tinnitus.  *See* Kileny Rep. (Hensley), ECF No. 1864-14.  Defendants argue that Kileny is not qualified to render specific causation opinions because he is not a medical doctor, and that his opinion is unreliable because he did not follow a proper methodology, such as differential etiology, or otherwise consider and rule out potential alternative causes of Hensley's tinnitus.

As to Kileny's qualifications, the Court disagrees.  Dr. Kileny is a licensed audiologist and full professor in the Department of Otolaryngology—Head and Neck Surgery at the University of Michigan School of Medicine.  He holds undergraduate and graduate degrees in audiology and communication sciences and disorders, as well as a Ph.D. in audiology.  He also has more than 40 years of experience diagnosing and treating patients with noise-induced hearing loss and/or tinnitus, and he has extensively researched, published, and taught in the field of audiology.  There can be no reasonable dispute that Dr. Kileny possesses the formal credentials necessary to offer an expert opinion on specific causation in this case.  The fact that Dr. Kileny is not a medical doctor does not preclude him from offering an audiological assessment of the causation question presented in Hensley's case.  *See, e.g., In re 3M*, 2021 WL 830309 at *2-5 (finding defense audiologists' specific causation opinions were reliable and admissible); *In re 3M*, 2021 WL 765019 at *11-14 (finding plaintiffs' audiologists' specific causation opinions were reliable and admissible).  Indeed, Defendants have themselves offered audiologists—Drs. Gregory A. Flamme, Mark Stephenson, and Jennifer LaBorde—as specific causation experts in this litigation.  *See* supra §§ II(D), (G); *see also In re 3M*, 2021 WL 765019, at *11.  Consequently, Defendants' challenge on qualifications grounds is overruled.

Defendants' reliability challenge, however, is well-taken.  Dr. Kileny did not perform a formal differential etiology, and nothing in his expert report or deposition testimony suggests that his methodological approach bore any of the hallmark characteristics of a differential analysis.  *See* Kileny Rep. (Hensley), ECF No. 1864-14.  He agrees that tinnitus symptoms can have "a number of different" pathologies, *see* Kileny Dep., ECF No. 1864-15 at 28-29, yet nowhere does he demonstrably identify and rule out alternative potential causes of Hensley's tinnitus symptoms.  This is problematic in light of Hensley's documented history of ear infections, jaw and facial muscle problems, and ototoxic medication consumption.  While there may well be scientifically reasoned explanations for concluding that none of those potential alternatives caused Hensley's tinnitus, Dr. Kileny did not provide them.[16]  Nor did he explain any other aspect of his opinion, which is itself limited to three double-spaced pages summarizing Hensley's service and medical history, followed by three sentences conclusorily declaring that the "lack of hearing protection provided by the CAEv2 . . . was the direct cause of . . . Hensley's injuries."  *See* Kileny Rep. (Hensley), ECF No. 1864-14 at 4-8.

---

[16] While Dr. Kileny was questioned generally about ototoxic drugs and ear infections at his deposition, he did not explain whether or how he considered and ruled out these alternatives—or Hensley's jaw and facial muscle problems—in connection with his case-specific opinion for Hensley.

These are not insignificant failings and they cannot be cured by the fact that Dr. Kileny's opinions may be consistent with those of Plaintiffs' other experts. *See In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000) (experts "may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon"). The focus of the *Daubert* reliability inquiry "must be solely on [an expert's] principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *see also McDowell*, 392 F.3d at 1298. This requires a district court to "undertake an independent analysis of each step in the logic leading to the expert's conclusions; if the analysis is deemed unreliable at any step, the expert's entire opinion must be excluded." *Hendrix I*, 255 F.R.D. at 578. Here, the logic leading to Dr. Kileny's conclusions is not evident from his report and deposition testimony, and critical steps in any specific causation analysis—namely, ruling out potential alternative causes of a plaintiff's injury—were not demonstrably performed. Accordingly, his opinion as to the cause of Hensley's tinnitus must be excluded on reliability grounds.

### 3. Sloan—Dr. Marc Bennett

Dr. Marc Bennett conducted a differential etiology for Sloan. Defendants argue that Dr. Bennett's opinion is unreliable because he did not properly rule out Sloan's exposure to motorcycle noise as a cause of his hearing loss. This is incorrect. Dr. Bennett expressly considered Sloan's "recreational noise exposure . . . from

motorcycle riding" and ruled it out as a cause of his hearing-related injuries because it occurred after Sloan's hearing loss and tinnitus arose, was too infrequent and "limited" in duration to cause hearing problems, and his audiograms showed no evidence of motorcycle-induced hearing loss. *See* Marc Bennett Rep. (Sloan), ECF No. 1864-29 at 22; Marc Bennett Dep., ECF No. 1864-8 at 24-25, 30. This scientifically reasoned explanation, clearly "founded on more than subjective beliefs or unsupported speculation," is all that Rule 702 and *Daubert* require. *Hendrix II*, 609 F.3d at 1197. To the extent Defendants believe Dr. Bennett should have assigned greater weight to Sloan's motorcycle noise exposure, that is a matter for the jury, and does not impact the reliability or admissibility of his opinion under *Daubert*.

### 4.    Sloan—Dr. Eric Bielefeld

Dr. Eric Bielefeld offers specific causation opinions for Sloan. Defendants argue that his opinions must be excluded because: (a) his opinion that Sloan is at increased risk of dementia and cognitive decline is unreliable, unhelpful, and unduly prejudicial; (b) his opinions about the effectiveness of other hearing protectors used by Sloan are "pure speculation"; and (c) he did not employ a differential etiology to reach his opinion that the failure of the CAEv2 to protect Sloan from service-connected noise caused Sloan's tinnitus.

Plaintiffs concede Defendants' challenge regarding dementia and cognitive decline; therefore, Dr. Bielefeld's opinions on those issues are excluded. *See also In re 3M*, 2021 WL 765019, at *16.  Additionally, Dr. Bielefeld's statements about other hearing protectors used by Sloan—i.e., that there was no "evidence to suggest that the CVC or other devices that [Sloan] wore failed him," *see* Bielefeld Dep., ECF No. 1902-32 at 5—are supported by an adequate factual basis.  According to Dr. Bielefeld, Sloan wore single-ended, triple flange earplugs and foamies between 1994 and 2004, and his audiometric and military records establish that he had normal hearing during that period.  Sloan's primary earplug was the CAEv2 from 2004 to 2015, which coincides with his first significant threshold shift in 2005 and subsequent significant threshold shifts in the years that followed.  In Dr. Bielefeld's view, to the extent Sloan wore other devices (such as the CVC helmet) between 2004 and 2015, he did so too "infrequently . . . to attribute any of [his] hearing loss to those devices." *See id*. at 6.  Having offered more than "unsupported speculation" for ruling out other hearing protection devices as a cause of Sloan's injuries, Bielefeld's opinion that those devices did not fail has a sufficiently reliable basis.

As to Dr. Bielefeld's methodology, Defendants are incorrect.  Dr. Bielefeld's report expressly characterizes his approach as a differential diagnosis, *see* Bielefeld Rep. (Sloan), 1902-31 at 18, and its substance reflects that he adhered to the criteria for a reliable differential diagnosis in reaching his opinion on the cause of Sloan's

hearing injuries.  In doing so, Dr. Bielefeld expressly considered and ruled out multiple alternative causes of Sloan's noise-induced hearing loss.  Dr. Bielefeld also observed that Sloan's tinnitus was formally diagnosed as connected to his noise-induced hearing loss in 2015, *see id*. at 22, which he agreed was "a very logical conclusion" given the timing of Sloan's noise exposures and his earliest subjective perception of tinnitus, *see* Bielefeld Dep., ECF No. 1902-32 at 8.  Because Dr. Bielefeld provided more than "subjective beliefs and unsupported speculation" in support of his opinion, it is sufficiently reliable under *Daubert*.  To the extent Defendants believe there are relevant additional factors that Dr. Bielefeld should have considered, that criticism may be appropriately addressed through cross-examination and competing expert testimony.  *See Quiet Tech*., 326 F.3d at 1345.

### 5.    Sloan—Dr. Jessica Dimmick

Dr. Jessica Dimmick also performed a differential etiology for Sloan. Defendants argue that Dr. Dimmick's case-specific opinion for Sloan is unreliable because: (a) she did not reliably rule out natural aging and recreational motorcycle noise as causes of his hearing loss; (b) she lacks qualifications or a reliable methodology for her opinions that Sloan "will likely experience loss of income" and "continue to have dire consequences" to his familial and social relationships due to his hearing injuries; and (c) she is unqualified to opine that the CAEv2 had a defective design.  *See* Dimmick Rep. (Sloan), ECF No. 1864-27 at 27-28.

As to Dr. Dimmick's differential etiology, Defendants are incorrect.   Dr.
Dimmick expressly considered and ruled out Sloan's recreational motorcycle noise
exposure because it occurred after the onset of his hearing loss and tinnitus in 2005,
*see id*. at 21, and, based on relevant audiograms, one of the two time periods within
which he rode motorcycles "once or twice a week during warm-weather months,"
*see id.* at 10, did not "coincide with any shift in his hearing," *see* Dimmick Dep.,
ECF No. 1864-28 at 13.   To rule out natural aging, Dr. Dimmick compared Sloan's
hearing loss thresholds at age 29 to the threshold shift that would be expected for a
typical American male at age 30, as calculated according to ISO 1999:2013, and
found that Sloan's hearing loss "far exceeded" the standard.   *See* Dimmick Rep.
(Sloan), ECF No. 1864-27 at 22.[17]   Given these scientifically reasoned explanations

---

[17] The fact that Dr. Dimmick could not personally replicate the ISO 1999: 2013 calculation during her deposition does not render her opinion unreliable.  As relevant here, *Daubert* requires only that an expert's conclusion be accompanied by "a reasoned explanation that would enable the Court, a jury, or an opposing party to meaningfully evaluate the process by which it was reached." *See Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1296 (N.D. Fla. 2017).  Dr. Dimmick explained that her opinion regarding natural aging is based on her application of ISO 1999: 2013, the internationally accepted standard for calculating noise exposure and risks of permanent threshold shifts in the hearing levels of adult populations.  *See* ISO Online Browsing Platform, https://www.iso.org/obp/ui/#iso:std:iso:1999:ed-3:v1:en (last visited Aug. 26, 2021).  Thus, her methodology is readily discernible by reference to the ISO standard.  Defendants have not challenged either the applicability or reliability of that  standard, nor do they suggest that her calculation is wrong.  More significantly, and what distinguishes Dr. Dimmick's opinion from the cases cited in Defendants' briefing, is that Defendants do not claim *their* experts cannot meaningfully evaluate or replicate Dr. Dimmick's methodology.  See *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014) ("Under *Daubert's* testability factor, the primary requirement is that '*someone else* using the same data and methods . . . be able to replicate the results.'") (emphasis added); *Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) (opinion of plaintiff's expert excluded because "it would have been nearly impossible for [defendants'] experts to repeat [his] apparently subjective methods, or . . . to find that his 'method consists of a testable hypothesis' for which there are 'standards controlling the technique's operation.'"); *Hanson v.*

for ruling out natural aging and recreational motorcycle noise as causes of Sloan's injuries, which are not based on subjective beliefs or unsupported speculation, Dr. Dimmick's differential etiology satisfies Rule 702 and *Daubert*.

Regarding potential loss of income and familial/social consequences, the Court agrees with Defendants, in part. Dr. Dimmick's background and experience researching, diagnosing, and treating in the field of audiology provide her with sufficient expertise to review scientific literature and offer a general opinion on various correlative consequences of noise-induced hearing loss and/or tinnitus, such as loss of earnings, underemployment, psychological distress, and social or familial issues. *See In re 3M*, 2021 WL 765019, at *16 (finding the same regarding audiologist's opinion regarding a correlation between hearing loss and rate of employment, earnings, psychological distress, loneliness, and social isolation). General testimony of this nature may supply helpful "piece[s] of the puzzle" that a jury may consider in evaluating Plaintiffs' damages claims. *See id.* (quoting

---

*Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1284 (S.D. Ga. 2018) (opinion of plaintiff's expert excluded because he did not record the source location for his data samples so defendants' experts could not "replicate his work and test his findings"); *Mohney v. USA Hockey, Inc.*, 300 F. Supp. 2d 556, 567 (N.D. Oh. 2004) (expert's opinion found "insufficient" due to "lack of objective replicable testing or analysis, controlled by any standards"). And another of Plaintiffs' experts applied the same ISO standard and reached the same conclusion regarding the expected hearing loss threshold for a typical American male at age 30—10 dB—as Dr. Dimmick, which indicates that an ISO 1999: 2013 calculation is, in fact, replicable. *Compare* Dimmick Rep. (Sloan), ECF No. 1864-27 at 22 with Marc Bennett Rep. (Sloan), ECF No. 1864-29 at 23. For these reasons, Dr. Dimmick's methodology is sufficiently reliable to support her opinion ruling out natural aging as a cause of Sloan's hearing injuries.

*Tuscaloosa v. Harcros Chems., In*c., 158 F.3d 548, 564 (11th Cir. 1998). However, as an audiologist—and not an economist, vocational rehabilitation expert, psychiatrist, psychologist, or other mental health professional—she lacks qualifications to give, and also has not offered any methodological basis to support, her opinions regarding Sloan's likelihood of experiencing loss of income, underemployment, or deteriorating familial and social relationships. *See* Dimmick Dep., ECF No. 1864-28 at 19-21 (testifying that she "feels that there could be concerns about [Sloan's] employability" but did not "analyze the economics of his earning potential"); *id*. at (testifying that her opinion regarding Sloan's likelihood of familial and social consequences is based on evidence that individuals with hearing injuries "can start to have or exhibit some issues in their social life").

Last, as part of her specific causation opinion, Dr. Dimmick concludes that "[t]he decreased hearing protection from the defective design of the CAEv2 directly caused or substantially contributed to" Sloan's hearing injuries. *See* Dimmick Rep. (Sloan), ECF No. 1864-27 at 20. Defendants argue Dr. Dimmick lacks qualifications to offer opinions on the CAEv2's design and that, in any event, at her deposition, she testified that she would not be offering opinions of that nature. Again, the Court agrees with Defendants, in part. Dr. Dimmick is not qualified to opine on the CAEv2's design from an engineering perspective, as she is not an engineer and has never been involved in designing a preformed earplug. However, as a clinical

audiologist, Dr. Dimmick has specialized education and/or experience evaluating the effectiveness of patients' hearing protection devices, advising patients on the use and selection of hearing protection devices, fitting patients with hearing protection devices, and creating custom hearing devices.  *See* Dimmick Rep. (Sloan), ECF No. 1864-27 at 3-4; Dimmick Dep., ECF No. 1902-34 at 9-13.  Thus, she is qualified to opine, from a clinical perspective, on how particular aspects of the CAEv2's design prevented proper fit and seal due to the variability in the anatomy of the human ear and ear canal, and whether those alleged design defects caused or contributed to Sloan's hearing injuries.  *See, e.g.*, *In re 3M*, 2021 WL 765019, at *37-39.  As with other experts, Dr. Dimmick's opinions regarding the CAEv2's design may not exceed the scope of her training and experience-based expertise in ensuring earplugs fit an individual user's ear anatomy.  *See Bouton v. Ocean Props., Ltd.*, No. 9:16cv80502, at *15 (S.D. Fla. Oct. 23, 2017).

### 6.    Wayman—Drs. Lawrence Lustig & Christopher Spankovich

Drs. Lawrence Lustig and Christopher Spankovich conducted a differential etiology for Wayman.  Defendants argue that the doctors' opinions are unreliable because they did not: (a) offer a reliable basis for concluding that any CAEv2 defect caused Wayman's injuries because they did not measure Wayman's ear canal or test how the CAEv2 fit in his ear; (b) properly analyze whether other hearing protectors used by Wayman would have provided adequate attenuation; (c) provide a reliable

basis for ruling out Wayman's head injuries as the cause of his tinnitus; or (d) follow a proper methodology in opining on the alleged interaction between Wayman's tinnitus and his sleep disturbances, anxiety, and/or PTSD.  These arguments fail.

Briefly, Drs. Lustig and Spankovich articulated reliable bases for opining that alleged defects in the CAEv2 caused Wayman's injuries.  Both opine that various aspects of the CAEv2's design prevent proper fit and seal, and that these alleged design defects present a risk of auditory injury to users.  *See* Lustig Rep. (Wayman), ECF No. 1864-4 at 22-23; Spankovich Rep. (Wayman), ECF No. 1864-6 at 16.  As discussed more fully below, both doctors adequately and reliably differentially diagnosed the cause of Wayman's injuries based on his medical and service records (including audiograms), his noise exposure and hearing protection usage history, telehealth interviews with Wayman, and general evidence regarding the allegedly defective features of the CAEv2.  After ruling out all other potential causes of Wayman's hearing injuries, each doctor concluded to a reasonable degree of medical certainty that Wayman's injuries were caused by noise exposure that occurred because of the inadequate hearing protection provided by the defective CAEv2.  Taken together, the doctors have furnished a sufficient basis for their conclusions that a defect in the CAEv2 caused Wayman's hearing injuries.  *See, e.g., McCombs v. 3M*, 7:20cv094, ECF No. 64 at 4-6.  The absence of formal measurements of Wayman's ear canal or evaluations of Wayman's ear anatomy with the CAEv2

inserted may bear on the weight of the doctors' opinions, but not admissibility. *See id*. at 6 (stating that an "evaluat[ion] [of a plaintiff's] ear anatomy both with and without the CAEv2 inserted" is "not a necessary component of a reliable differential etiology)

Both doctors also adequately considered and discounted Wayman's use of other hearing protectors.  Based on their respective interviews of Wayman, and reviews of Wayman's medical and service records, the doctors each concluded that Wayman did not experience hearing-related problems following his military noise exposures while wearing triple-flange hearing protectors and/or earmuffs between 1997 and 2004.  Rather, according to Dr. Lustig, it was Wayman's reported use of the CAEv2 between 2004 and 2016 that "coincided temporally" with evidence of Wayman's first "perceived difficulty hearing in noise," and complaints of "chronic" and "persistent" tinnitus around 2011.  *See* Lustig Rep. (Wayman), ECF No. 1864-4 at 11, 18, 24.  Dr. Spankovich reached a similar conclusion.  Spankovich Rep. (Wayman), ECF No. 1864-6 at 6, 15-16.  Having identified and explained a temporal relationship between the cause and effect of Wayman's alleged injuries, and offered more than "unsupported speculation" as a basis for ruling out other hearing protectors, the doctors' opinions satisfy Rule 702 and *Daubert*.  *See In re 3M*, 2021 WL 765019 at *13.

The same is true for Drs. Lustig and Spankovich's consideration of Wayman's head injuries. Both doctors reviewed Wayman's history of head trauma, interviewed him about each incident at length, and ruled out all of the incidents as potential causes of Wayman's tinnitus. Each explained that, based on the scientific literature and his own clinical experience, tinnitus associated with head trauma generally presents immediately and is temporary in duration. Dr. Lustig further testified that he had seen no evidence in the scientific literature or in his clinical practice that head trauma-induced tinnitus can develop, in the first instance, months or years after the trauma occurred. Nor had he seen evidence that head trauma-induced tinnitus can present and resolve, then return, months or years later. Here, all of Wayman's head injuries occurred years before he first began experiencing "persistent" and "pervasive" tinnitus. *See* Lustig Rep. (Wayman), ECF No. 1864-4 at 11; *see also* Spankovich Rep. (Wayman), ECF No. 1864-6 at 12, 15-16; Spankovich Dep. (Jan. 28, 2021), ECF No. 1864-13 at 13-15. Only one of the head injuries resulted in auditory symptoms—in 2006 or 2007, he developed temporary tinnitus following exposure to a "blast," which resolved within 24 hours. Based on the nature and timing of Wayman's prior head trauma and his tinnitus, both doctors' conclusions that his head trauma could not have caused or significantly contributed to his tinnitus are adequately supported by the record.

Finally, Drs. Lustig and Spankovich's reports and deposition testimony provide a scientifically reasoned explanation for their respective opinions that Wayman's tinnitus exacerbates his sleep disturbances, PTSD and anxiety symptoms. Wayman previously received a formal diagnosis of PTSD from the Department of Veterans Affairs. Both doctors properly relied on that diagnosis as part of the factual basis for his opinion on the relationship between Wayman's tinnitus and PTSD. *See In re 3M*, 2021 WL 2028682, at *5. As with other experts, Drs. Lustig and Spankovich also drew on their own clinical experience treating and managing symptoms of tinnitus patients—including veterans, like Wayman, with traumatic brain injury, sleep disorders, PTSD and/or comorbid mental health conditions—together with an explanation of how that experience informed their opinions, as well as scientific literature linking tinnitus with sleep difficulties and worsening of PTSD and anxiety symptoms. *See* Lustig Rep. (Wayman), ECF No. 1864-4 at 4, 11-12, 21; Lustig Dep., ECF No. 1864-5 at 40-44, 80-85; Spankovich Rep. (Wayman), ECF No. 1864-6 at 13-14; Spankovich Dep. (Jan. 28, 2021), ECF No. 1864-13 at 23-27. The fact that neither doctor can quantify, with absolute certainty, the extent to which Wayman's tinnitus impacts his sleep and mental health does not compel exclusion of their opinions. *See Daubert*, 509 U.S. at 590 ("[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably there are no certainties in science.").

### 7.      Wayman—Dr. Michael J. Ostacher

Dr. Michael Ostacher is a board-certified psychiatrist, professor of psychiatry and behavioral sciences at Stanford University Medical Center, and Director of the Stanford/VA Bipolar Disorder and Depression Research Program.  Dr. Ostacher has more than 27 years of clinical experience evaluating and treating psychiatric patients, the last 10 years of which have been "fully dedicated to the care of veterans, a high proportion of whom have post-traumatic stress disorder."  Ostacher Rep. (Wayman), ECF No. 1864-35 at 5.  Dr. Ostacher offers opinions regarding: (a) Wayman's PTSD and other mental health symptoms; (b) the effect, if any, of Wayman's tinnitus on his PTSD and mental health symptoms; and (c) Wayman's future prognosis.  Defendants argue that Dr. Ostacher lacks a reliable basis for concluding that Wayman's tinnitus worsens his PTSD symptoms because the doctor did not "take serious account" of Wayman's TBIs or his failure to seek mental health treatment as contributing factors.  This argument is readily rejected.

Regarding Wayman's history of TBIs, Dr. Ostacher expressly considered and ruled it out as a cause of Wayman's heightened PTSD and mental health symptoms because of the short-term nature of TBI-induced emotional and behavior changes (i.e., they generally "resolve within a short amount of time"), and the temporal distance—years—between Wayman's "relative minor head trauma" and the onset of his tinnitus and related symptoms.  *See id*. at 25-26; *see also* Ostacher Dep., ECF

No. 1864-33 at 37-39.  As to mental health treatment, Wayman was only formally diagnosed with PTSD after retiring from the military, at which point he began using medication and seeking counseling for the disorder.  Dr. Ostacher acknowledges that Wayman has reportedly experienced PTSD symptoms since at least 2007, and the fact that some of Wayman's mental health symptoms have improved since he began treatment.  But, as Dr. Ostacher explains, Wayman still struggles because while he has been able to manage or successfully avoid certain PTSD symptoms, "what he can't manage is the tinnitus and its impact on [those] symptoms."  *See* Ostacher Dep., ECF No. 1864-33 at 35.  This is sufficient under *Daubert*.  Because Dr. Ostacher considered and provided scientifically reasoned explanations for ruling out TBIs and delayed treatment as causes of Wayman's tinnitus-related PTSD and mental health symptoms, his opinion is reliable and admissible.

**B.    Dr. Marc Bennett**

Dr. Marc Bennett is a board-certified otolaryngologist and neurotologist.  He is a faculty member at the Vanderbilt University Medical Center, and maintains an active clinical and surgical practice diagnosing and treating hearing loss and other otologic issues.  Dr. Bennett offers general expert opinions that, among other things, the CAEv2 was defective and unreasonably dangerous; Defendants failed to act as a reasonable manufacturer of hearing protectors and failed to adequately warn about the CAEv2's dangers; and there were safer alternative designs to the CAEv2.  He

also provides medical causation opinions for Plaintiffs Adkins and Sloan.[18] Defendants challenge certain aspects of Dr. Bennett's opinions on qualifications and reliability grounds, and characterize other aspects of his opinions as impermissible legal conclusions and state-of-mind opinions.

### 1.      Causation for Individuals Not Examined by Dr. Bennett

Dr. Bennett's general expert report contains an opinion that the CAEv2 "caused [its] users" to suffer noise-induced hearing problems, and he testified to that effect at his deposition as well.  *See* Marc Bennett Rep. (General), ECF No. 1864-53 at 37; Marc Bennett Dep. I, ECF No. 1864-7 at 49 (testifying that he "would assume" the noise-induced hearing problems and resultant distress complained of by "all" CAEv2 users was caused by the CAEv2).  Defendants request that any causation opinions offered by Dr. Bennett at trial be limited to individuals for whom he performed a differential diagnosis, rather than any more "sweeping" opinions regarding noise-induced hearing problems for users of the CAEv2 that he did not examine.  The Court agrees and his testimony will be so limited.  Dr. Bennett may opine on the cause of Adkins and Sloan's hearing problems, based on his differential diagnoses of those plaintiffs.  However, he may not diagnose, the cause of any other individual's noise-induced hearing loss, tinnitus, or related issues, generally or specifically.

---

[18] Defendants do not challenge Dr. Bennett's specific causation opinion for Adkins.

### 2. Reliability of Comparison of CAEv2 to Other Hearing Protectors

Dr. Bennett offers a general expert opinion that there were "several" safer alternative ways that the CAEv2 could have been designed that would have provided a better fit and seal for users, and reduced user injuries. In his view, those safer alternatives included foam earplugs, the original UltraFit, the Moldex BattlePlug, the Surefire Sonic Defender, and the CAEv1, CAEv3, CAEv4, and CAEv4.1. Defendants argue that Dr. Bennett lacks the qualifications or a reliable methodology to opine about the CAEv2's design or safer alternative designs.

Regarding qualifications, the Court agrees that Dr. Bennett is not qualified to opine on the CAEv2's design from an engineering perspective, as he is not an engineer. However, Dr. Bennett designs custom earplugs "fairly regularly" as part of his clinical practice, *see* Marc Bennett Depo. I, ECF No. 1864-7 at 13, counsels his patients on the appropriate hearing protection devices for their individual attenuation needs, *see* Marc Bennett Rep. (General), ECF No. 1864-53 at 3, and has both given and attended lectures on the design, manufacture and testing of hearing protection devices, *see* Marc Bennett Depo. I, ECF No. 1864-7 at 15-16. Thus, he is qualified to offer opinions on how various aspects of the CAEv2's design prevented proper fit and seal, and to compare the CAEv2's design with that of other hearing protection devices in terms of fit and seal, as well as the relative level of attenuation provided by each. *See In re 3M*, 2021 WL 765019 at *37 (N.D. Fla. Feb.

28, 2021) (citing *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 612 (S.D. W. Va. 2013) (finding urogynecologist's "experience with pelvic floor disorders and the use of mesh to treat such disorders qualifies him to render opinions" related to the product's design and materials "notwithstanding his lack of expertise in the particular areas of product design or biomaterials").  To be clear, however, Dr. Bennett's opinions regarding the design of the CAEv2 and/or safer alternative designs may not exceed the scope of his experience-based expertise in ensuring earplugs fit an individual user's ear anatomy.

As to reliability, Defendants argue that Dr. Bennett's opinions about defects in the CAEv2's design are not based on a reliable methodology because he (1) mistakenly examined the wrong version of the CAEv2; and (2) used a novel methodology to identify the design defects with the CAEv2.  This is incorrect.  To begin with, it does not appear that Dr. Bennett based his opinion on an earlier version of the CAEv2 at all; rather, there simply may be a typographical error in his report. *See* Pl. Resp., ECF No. 1902 at 79.  Even if he had, Defendants' argument would go to the credibility and weight of Dr. Bennett's opinion, not its admissibility.

As to methodology, Dr. Bennett's approach was not novel.  His report and deposition testimony reflect that he visually inspected the CAEv2 and reviewed internal company documents, including design drawings for the CAEv2 and the various tests conducted on the CAEv2, as well as data regarding earplugs with

alternative designs.[19]   With respect to the CAEv2's alleged design defects in particular, Dr. Bennett testified that he relied heavily on the opinions and findings of other experts in this litigation—Dr. David Eddins, Dr. David Madigan, and Richard McKinley—in forming his own opinions on the issues.   But he did not simply regurgitate those experts' opinions here; rather, he reviewed and interpreted all of the data presented to him and reached his own conclusion, which is permissible.   *See In re Wright Med. Tech., Conserve Hip Implant Prods. Liab. Litig.*, 127 F. Supp. 3d 1306, 1320 (N.D. Ga. 2015) ("The facts and data upon which an expert may rely in reaching an expert opinion includes the opinions and findings of other experts, if experts in their respective field would reasonably rely on other expert's opinions and findings."); *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("[A]n expert's testimony may be formulated by the use of the facts, data and conclusions of other experts, [but] such expert must make some findings and not merely regurgitate another expert's opinion.").   Consequently, there

---

[19] *See, e.g.*, Marc Bennett Documents, ECF No. 1864-53 at 97 (Schematic Nonlinear Ultrafit Plug); *id.* at 102 (Ultrafit Plus Technical Drawing 2067-A); 123 (CAEv2 and CAEv3 Brochure w FAQs); *id.* at 130 (Thread re CAEv3 Problems and Ill Fit of Regular Size CAE for Smaller Ear Canals); *id.* at 132 (CAEv4 rocker stem design drawing); *id.* at 135 (The Development of the Combat Arms Earplug, Version 1 through Version 4; Michael & Associates Letter re Impulse Testing of CAEv2 and Moldex Battleplug; CAD Drawing of UltraFlex Short); *id.* at 139 (CAEv4.1 PowerPoint slide re product development and sales forecast); *id.* at 140 (Evaluation of the Surefire Sonic Defenders Plug); *id.* at 142 (Email attaching Memos re Similarity of Moldex Battleplugs and CAE); *id.* at 147 (Williams (2014) USAARL Assessment of Four Passive Hearing Protection Devices for Continuous Noise Attenuation, Impulsive Noise Insertion Loss, and Auditory Localization Performance).

is no reliability problem with Dr. Bennett's reliance on, and testimony related to, the design defect opinions of Drs. Eddins and Madigan, and Richard McKinley, to the extent those experts' opinions are admissible.

### 3.      Legal Conclusions and State-of-Mind Opinions

Defendants move to exclude portions of Dr. Bennett's opinions on grounds that they amount to impermissible legal conclusions. As discussed in a prior Order, which the Court incorporates by reference here, questions of law are not the proper subject of expert testimony. *See In re 3M*, 2021 WL 765019 at *40-42. This rule requires exclusion of expert testimony about "the meaning of a statute or regulation or about whether someone violated the law . . . [,] the meaning of legal terms or the legal effect of statutes or laws." *See id*. at 40 (internal marks omitted). It also precludes an expert's use of terminology with distinct and specialized legal import. *See id*. "However, a qualified expert may testify about the industry standards of care, which may be reflected in regulations and statutes, and he can testify about how a reasonable operator in the industry would comply with these statutes and regulations." *Id*. at 41.

Applying these principles here, Dr. Bennett will be permitted to offer opinions—within the sphere of his clinical expertise—on the alleged problems with the design, fit and/or seal of the CAEv2, and on whether Defendants adhered to the general industry standard of care for hearing protector labels, from a clinical

perspective.  *See id.* at *39, 46; *see also Arevalo v. Coloplast Corp.*, 2020 WL 3958505, at *20-21 (N.D. Fla. July 7, 2020).  He may not, however, testify that the CAEv2 is "defective and unreasonably dangerous," or that Defendants were "negligent," "misrepresented" the safety and efficacy of the CAEv2, and "failed to warn" the military and purchasers of alleged risk, because those terms "carry special meaning under the law and are contingent upon application of the appropriate standard of care."[20]  *See id.* at *41 (citing *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1325-26 (M.D. Fla. 2015).  With that said, he may use different words—that is, words that are not legal terms of art—to convey the same opinion.  He is also precluded from offering opinions as to his interpretation of the EPA's regulatory requirements related to the labeling of hearing protection devices, as to whether Defendants violated EPA regulations, or as to whether Defendants had a legal "duty" to test and provide an NRR for the CAEv2 before selling it to the military.  *See id.* at 41, 46 (excluding otolaryngologist/neurotologist's opinions regarding same).

Relatedly, Defendants also object that Dr. Bennett "repeatedly opines" on their state-of-mind by offering opinions as to what Defendants "knew" about alleged problems with the CAEv2, when they knew it, and what their motives were.  The Court agrees that testimony of this nature is improper and must be excluded.  Experts may testify about whether information contained in Defendants' internal documents

---

[20] *See* Marc Bennett Rep. (General), ECF No. 1864-53 at 37, 44.

indicated certain risks to users of the CAEv2, but they may not opine about Defendants' knowledge, intent or motives. *See In re 3M*, 2021 WL 765019, at *42; *see also Tillman*, 96 F. Supp. 3d at 1333 (permitting expert to opine "on what information and knowledge was available to [the defendant]," but excluding opinion on defendant's "intent, motive, or what it should have done with that information"); *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 443 (E.D.N.Y. 2011).

### C.     Stephen Gilder

Stephen Gilder is a scientist and inventor with more than 35 years of professional experience developing, managing, and assessing quality assurance programs for hearing protectors, medical devices and implants, and industrial products.  As part of that work, he implements, teaches and audits International Standards Organization (ISO) 9001 procedures, certification and compliance. Gilder also is the inventor/co-inventor of six United States patents related to hearing protection and sound isolation devices.  In this litigation, Gilder offers opinions that Defendants' design and development process for the CAEv2 departed from both industry and its own design and quality standards, which resulted in "a product that was unreasonably dangerous to users when used as intended." *See* Gilder Rep., ECF No. 1864-54 at 13.   Defendants object to certain of Gilder's opinions on qualifications and reliability grounds.

### 1.    Opinions on Hearing Loss and Tinnitus

Early in Gilder's report, he provides a brief overview of the mechanics of sound and hearing loss. *See id.* at 15-17. At various other points in the report, he opines that alleged shortcomings in Defendants' quality assurance process "contributed" to the CAEv2's design defects, which created "[t]he potential for hearing loss and related injuries" in CAEv2 users who did not receive adequate hearing protection from the device. *See id.* at 13-14, 28. Defendants argue that Gilder is not qualified to offers opinions on the relationship between sound and auditory injuries, and he offers no reliable methodology for how he determined the nature and existence of that relationship. The Court agrees, in part.

Gilder is not a medical doctor or an audiologist; therefore, he is not qualified to offer medical opinions diagnosing the cause of any individual plaintiff's hearing loss or tinnitus. Indeed, Gilder conceded as much at his deposition. *See* Gilder Dep., ECF No. 1864-55 at 4-5. This does not preclude Gilder's more general opinions regarding the potential hearing-related consequences of inadequately designed hearing protectors, however. Gilder holds an undergraduate degree in chemistry and biology, and a master's degree in natural sciences. Moreover, he designed and tested hearing protection equipment—including both active and passive noise attenuation devices—for years, and personally oversaw approximately 400 REAT tests. This knowledge and experience in the field of hearing protection provide a sufficient basis

for Gilder's review of the scientific literature in connection with his opinions in this litigation, and his proposed expert testimony regarding hearing-related problems that can result from alleged deficiencies in the hearing protector design process. Objections to the level of Gilder's expertise go to the credibility and weight of his opinions, not its their admissibility. *See Hendrix I*, 255 F.R.D. at 585.

### 2.   Opinions regarding Method B testing approximating the CAEv2's performance for soldiers

In his report, Gilder offers an opinion that "[the results of 3M's ANSI S12.6-1997 Method B testing on the CAEv2 suggest that many soldiers who fit the plug themselves will not obtain adequate hearing protection." *See* Gilder Rep., ECF No. 1864-54 at 88. Defendants argue that this opinion lacks a factual basis because Gilder admittedly did not, himself, look into "whether Method A or Method B more closely approximates" a soldier's training and experience with earplugs. *See* Gilder Dep., ECF No. 1864-55 at 17-18. Again, the Court agrees, in part. At his deposition, Gilder acknowledged that he has no knowledge of the training and instructions that soldiers received on the use of hearing protection devices, and repeatedly stated that information of that nature was outside the scope of his opinions. *See id*. at 16-18. Without knowledge or information on soldiers' training and experience with hearing protectors, Gilder lacks a sufficient basis for any conclusion that 3M's Method B test results (which assume a user with limited training and experience) approximate the results that "many soldiers" would experience with the CAEv2. Thus, this

opinion must be excluded.  Gilder will be permitted to testify about the differences between Method A and Method B testing, and about whether one or the other more closely corresponds to the real-world protection achievable by ordinary users, based on the scientific literature and his professional experience with REAT testing. However, he may not opine on the implications of Defendants' Method B test results for soldiers specifically, or on the extent to which Method A or Method B test protocols approximate soldiers' training and experience with hearing protection devices.

### 3.      Opinions regarding Information Defendants Should Have Provided to the Military

Defendants argue that Gilder lacks the qualifications and supporting facts or data to support an opinion on what information a reasonable manufacturer should have provided to the military.  They claim that the sole basis for Gilder's "reasonableness" opinion is his experience while working for another personal protection equipment firm, Howard Leight, which they insist is insufficient because he was not in sales and marketing, and he did not personally interact with the military in that role.  This is incorrect.  Gilder has been involved in the design and development, manufacturing, quality assurance, and commercialization of numerous products, including medical and hearing protection devices, for decades, not just during his three-year tenure with Howard Leight.  In those roles, he acquired specialized knowledge of industry standards for quality systems, risk management,

and, with respect to hearing protectors specifically, product development and REAT testing for purposes of NRR labeling.  He has also performed audits for National Voluntary Accreditation Program (NVLAP) accredited acoustical testing labs, and has been involved in National Hearing Conservation Association working committees that reviewed testing methods for hearing protection devices.  On the whole, given Gilder's extensive experience in the product development and quality assurance fields, and his knowledge of hearing protecting testing standards, the Court finds he is qualified to offer an opinion on what information a reasonable manufacturer should have provided to the military, from a quality assurance perspective.  Gilder has also articulated a sufficient factual basis for that opinion as his report clearly explains the relevant conclusions, as well as the bases for those conclusions, and connects the conclusions to his broader opinion that Defendants' quality assurance process for the CAEv2 was flawed.  Objections to the level of Gilder's expertise go to the credibility and weight of his opinion, not its admissibility.  *See Hendrix I*, 255 F.R.D. at 585.

### 4.    Legal Conclusions and State-of-Mind Opinions

Defendants challenge portions of Gilder's opinions as impermissible legal conclusions or state-of-mind opinions.  As already discussed, questions of law and opinions speculating about Defendants' state of mind or that of a third-party, such as the government, are not proper subjects of expert testimony.  *See In re 3M*, 2021

WL 765019 at *40-42.  Consistent with those rules, Gilder may opine about whether Defendants adhered to industry standards of care and/or their own internal corporate standards.  However, he may not couch his opinions in legal terms by, for example, testifying that Defendants "violated" particular standards or regulations, or that the CAEv2 was "unreasonably dangerous."[21]  As with Dr. Bennett, Gilder may use different words—that is, words that are not legal terms of art—to convey the same opinion.  Relatedly, Gilder may testify about whether Defendants' internal documents reflected certain information about the CAEv2 or Defendants and/or the military's actions, but he is precluded from offering opinions about the knowledge, intent, beliefs, or motivations of Defendants, the military, or any other person.[22]  *See id*.; *Tillman*, 96 F. Supp. 3d at 1333; *Deutsch*, 768 F. Supp. 2d at 443.

## IV.   Conclusion

In sum, the parties' omnibus motions to exclude expert opinions under Rule 702 and *Daubert* in the Trial Group B cases, ECF Nos. 1863 and 1864, are granted in part and denied in part, consistent with this Order.  The remaining challenges

---

[21] *See, e.g.*, Gilder Rep., ECF No. 1864-54 at 13 ("[Aearo's] failures were a substantial factor in [its] manufacture and sale of a product that was unreasonably dangerous to users when used as intended."); *id*. at 14 ("3M also violated EPA regulation 40 C.F.R. § 211.204-4"); *id*. at 28 ("In clear violation of ISO 9001, Aearo did not conduct testing on the CAEv2 until months after it began selling the product.").

[22] *See, e.g.*, Gilder Rep., ECF No. 1864-54 at 83 ("[Defendants'] 'unwritten' laboratory policies violate generally accepted scientific principles because they are intended to bias the test results in favor of the outcome desired by 3M"); *id*. at 101 ("Presumably, 3M made this decision because it knew that the military desired a very low NRR on the open-end.")

regarding hidden hearing loss, Cloie Johnson, and Neil Bennett will be resolved by separate order.

      **SO ORDERED**, on this 2nd day of September, 2021.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**