UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to: *Brandon Adkins*, 7:20cv012 *Michele Blum*, 7:20cv122 *Marcus Hensley*, 7:20cv093 *Ronald E. Sloan*, 7:20cv001 *William Wayman*, 7:20cv149 | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

# ORDER

In the Trial Group B cases, two Plaintiffs—Adkins and Wayman—have been diagnosed with a condition referred to in the medical community as hidden hearing loss ("HHL").[1]  HHL is an umbrella term used to describe perceived auditory dysfunctions that are experienced despite normal audiometric thresholds as measured by pure tone audiometry in the traditional test frequency range of 250 to 8,000 Hz.  Defendants have moved to exclude Plaintiffs' experts' HHL-related opinions as unreliable and speculative because, in their view, the existence of HHL in humans has not been scientifically established and there is no valid, reliable methodology for diagnosing it in living humans.  *See* ECF No. 1864 at 16-25.

---

[1] Drs. Marc Bennett and Marc Fagelson provide HHL opinions for Adkins.  Drs. Lawrence Lustig and Christopher Spankovich provide HHL opinions for Wayman.

Plaintiffs challenge the rebuttal opinion on HHL in Adkins' case by Defendants' expert, Dr. James Crawford, as lacking a reliable foundation. *See* ECF No. 1863 at 13-15. A *Daubert* hearing was held on August 31, 2021. Having considered the law, the evidentiary record and the parties' arguments, the Court rules as follows.[2]

I. **Existence of HHL in Humans**

It is well-established in the medical and audiological communities that individuals can experience sensorineural auditory dysfunction not captured by traditional pure tone audiometry.[3] Auditory perceptual deficits of this nature typically manifest as impaired speech perception, difficulty hearing in noisy environments, temporal processing deficits, tinnitus and/or hyperacusis (i.e., abnormal sensitivity to normal environmental sounds).[4] The existence of these deficits in living humans, and the fact that they can "hide" behind normal

---

[2] Given the parties' familiarity with the nature of this multidistrict litigation, the claims and defenses at issue, and the current evidentiary record, this Order sets forth only what is necessary to explain the Court's rulings. The Order also incorporates by reference the applicable legal standard set forth in prior similar orders. *See, e.g.*, *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19md2885, 2021 WL 765019, at *1-3 (N.D. Fla. 2021).

[3] *See, e.g.*, World Health Org., *World Report on Hearing* (2021) ("WHO 2021") (describing noise-induced HHL), ECF No. 1902-3 at 27; M. Charles Liberman & Sharon G. Kujawa, *Cochlear synaptopathy in acquired sensorineural hearing loss: manifestations and mechanisms*, 349 HEARING RSCH. 138, 139 (2017) ("Kujawa-Liberman 2017"), ECF No. 1902-11 at 3.

[4] *See* WHO 2021, ECF No. 1902-3 at 27; Lina Motlagh Zadeh et al., *Extended high-frequency hearing enhances speech perception in noise*, 116(47) PNAS 23753 (2019) ("Zadeh 2019") (speech intelligibility, P-GEN-06294.

audiometric thresholds, are relatively uncontroversial scientific propositions.[5] The impetus of current research has been to explore the pathophysiological bases for HHL in order to develop definitive diagnostic tools and potential treatments for the condition. The capacity of that work to reliably explain the biological mechanisms underlying HHL in humans is the true substance of Defendants' attack on the evidentiary support for the "existence" of HHL.[6]

From a legal perspective, scientific evidence conclusively proving the precise pathophysiological means by which an agent—say, noise—causes a particular condition or adverse effect—like HHL—is not necessary to a finding of reliability under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). *See Daubert*, 509 U.S. at 590 ("Of course, it would be

---

[5] Even scientific literature relied on by Defendants recognizes the existence of this phenomenon. *See, e.g.*, Lynn Megarbane & Adrian Fuente, *Association between speech perception in noise and electrophysiological measures: an exploratory study of possible techniques to evaluate cochlear synaptopathy in humans*, 59(6) INT'L J. AUDIOLOGY 427, 427 (2020), ECF No. 1932-7 at 3; David Kohrman et al., *Hidden hearing loss, a disorder with multiple etiologies and mechanisms*, 10(1) COLD SPRING HARBOR PERSP. MED. 1 (2020), ECF No. 1932-2 at 2-3; Frank E. Musiek et al., *CAPD: The Most Common 'Hidden Hearing Loss,'* 23(3) ASHA LEADER 1, 2-3 (2018); *see also* Crawford Rep. (Adkins), ECF No. 1863-5 at 7 ("Occasionally, patients will present with normal hearing thresholds, but with the complaint of difficulty understanding speech in noisy environments.").

[6] Defendants use the terms HHL and cochlear synaptopathy interchangeably, which, admittedly, the Court has done too, in the past. In fact, given Defendants' characterization of HHL in prior briefing, the Court was stunned to learn, through the instant briefing and related *Daubert* hearing, that such a vast body of scientific literature from highly reputed institutions—including Eaton-Peabody Laboratories at Massachusetts Eye and Ear and Harvard Medical School, and going back decades, placed the existence of HHL beyond debate. Newly armed with this knowledge, the Court now retracts its prior extemporaneous remarks about the potential reliability problems associated with a HHL opinion. *See In re 3M*, 2021 WL 765019, at *14 n.29.

unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science."); *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988) (stating that "absolute certainty" is "not required" for expert testimony). Rather, an expert need only offer a biologically plausible explanation that is derived from and supported by existing scientific knowledge and reasoning, as opposed to conjecture or speculation. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1319 n.23 (11th Cir. 1999); *Jones*, 861 F.2d at 662. The fact that there may be ongoing research or debate in the scientific community as to the pathophysiological mechanism underlying a condition does not preclude admission of an expert's biological plausibility opinion. *See In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Prac. & Prod. Liab. Litig.*, 509 F. Supp. 3d 116, 174 (D.N.J. 2020).[7] So long as there is reliable evidentiary support demonstrating that the expert's proposed mechanism is at least plausible, disputes over the relative merits of his opinion "should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded

---

[7] *See also In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 183 (S.D.N.Y. 2009) ("That the mechanism remains unknown does not mean that the one proposed by the [plaintiffs'] experts is not widely accepted as plausible."); *In re Neurontin Mktg., Sales Prac., & Prod. Liab. Litig.*, 612 F. Supp. 2d 116, 149 (D. Mass. 2009) (biological plausibility opinion admissible despite "robust debate in the scientific community" on the proposed mechanism); *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 289 F. Supp. 2d 1230, 1247 (W.D. Wash. 2003) ("The fact that the mechanism remains unclear does not call the reliability of the opinion into question.").

from a jury's scrutiny." *See In re Neurontin Mktg., Sales Prac., & Prod. Liab. Litig.*, 612 F. Supp. 2d 116, 159 (D. Mass. 2009).

In this litigation, Plaintiffs' experts have offered reliable evidentiary support plausibly demonstrating a mechanistic basis for noise-induced HHL in humans. Indeed, the scientific community has developed several pathophysiological explanations for noise-induced HHL, based on animal studies across mammalian species, temporal bone studies on human cadavers, and studies of physiological function in living humans.

As brief background, sensorineural hearing loss can arise following damage to inner ear structures and/or the auditory nerve. The classic view of this condition focused on damage or loss of hair cells as the primary culprit, the functional effects of which are detectable as changes in hearing thresholds on traditional audiograms.[8] Damage to other parts of the inner ear—e.g., outer hair cells, cochlear neurons and synapses—was previously thought to occur largely as a secondary consequence of hair cell degeneration.[9]

In recent decades, the classic view of the pathophysiology of sensorineural hearing loss has evolved due to a growing body of scientific literature providing

---

[8] *See* PZ Wu et al., *Primary neural degeneration in the human cochlea: evidence for hidden hearing loss in the aging ear*, 407 NEUROSCIENCE 8, 9 (2019) ("Wu 2019"), ECF No. 1902-20 at 3; Kujawa-Liberman 2017, ECF No. 1902-11 at 2.

[9] *See id.*

evidence that damage to other cochlear structures can cause hearing deficits without destroying hair cells or elevating standard hearing thresholds.[10]  Loss or damage to cochlear neurons (primary neural degeneration) and to the synapses connecting inner hair cells to auditory nerve fibers (cochlear synaptopathy) have been identified as significant areas of vulnerability.[11]  Numerous studies across mammalian species—including mice, guinea pigs, gerbils, chinchillas, and non-human primates—have plainly documented that noise exposure can induce "extensive" neural and synaptic damage without permanent hair cell loss or threshold shifts.[12]  And both primary neural degeneration and cochlear synaptopathy have been shown to impair hearing function at suprathreshold levels and disrupt auditory signal processing in animal models.[13]

---

[10] *See* Kohrman, ECF No. 1932-2 at 2-3; Kujawa-Liberman 2017, ECF No. 1902-11 at 3; Sharon G. Kujawa & M. Charles Liberman, *Synaptopathy in the noise-exposed and aging cochlea: Primary neural degeneration in acquired sensorineural hearing loss*, 330 HEARING RSCH. 191 (2015), ECF No. 1902-17 at 2-3.

[11] *See id*.

[12] *See* Sharon G. Kujawa & M. Charles Liberman, *Adding Insult to Injury: Cochlear Nerve Damage after "Temporary" Noise-Induced Hearing Loss*, 29(45) J. OF NEUROSCIENCE 14077 (2009) (mice), P-GEN-05405; *see also* Penelope W.C. Jeffers et al., *Noise-Induced Hearing Loss in Gerbil: Round Window Assays of Synapse Loss*, FRONTIERS IN CELLULAR NEUROSCIENCE 15, Art. 699978 (2021) (gerbil), P-GEN-06313; T.T. Hickman et al., *Blast-induced cochlear synaptopathy in chinchillas*, SCI. REP. 8, Art. 10740 (2018) (chinchillas), P-GEN-05481; Valero et al., *Noise-Induced Cochlear Synaptopathy in Rhesus Monkeys (Macaca mulatta)*, 353 HEARING RSCH. 213 (2017) (monkeys), ECF No. 1902-18; Harrison W. Lin et al., *Primary Neural Degeneration in the Guinea Pig Cochlea After Reversible Noise-Induced Threshold Shift*, 12 J. OF THE ASS'N FOR RSCH. IN OTOLARYNGOLOGY 605 (2011) (guinea pigs).

[13] *See id*.; *see also* Warren Bakay et al., *Hidden hearing loss selectively impairs neural adaptation to loud sound environments*, 9(1) NATURE COMMC'NS 1-11 (2021), P-GEN-05288.

Human studies of primary neural degeneration and cochlear synaptopathy are harder to come by. There is currently no way to biopsy or image the cellular-level structures of the inner ear in living humans, so neuronal and synaptic damage can only be directly observed through post-mortem temporal bone analysis involving manual counts of hair cells, cochlear synapses, neurons, and auditory nerve fibers. Nevertheless, temporal bone studies have confirmed that, as in the animal models, human inner ears can have significant neuronal and synaptic loss despite the presence of a relatively full complement of hair cells.[14] Such studies have also shown—again, as with animals—"acoustic injury" caused by noise exposure can "accelerate" age-related primary neural degeneration and synaptopathy in humans, and "exacerbate" outer hair cell loss in the high-frequency region of the cochlea.[15] Statistical analysis of temporal bone data has found that neuronal loss, although not

---

[14] Wu 2019, ECF No. 1902-20 at 3 (finding age-related neuronal loss was "almost three times steeper than the loss of [inner hair cells]" in study of 20 temporal bones of "normal-aging" people without any explicit otologic complaints); Lucas M. Viana et al., *Cochlear neuropathy in human presbycusis: confocal analysis of hidden hearing loss in post-mortem tissue*, 327 HEARING RSCH. 78 (2015) (finding synaptic loss and neural degeneration despite near-normal hair cell populations in study of 5 temporal bones with no history of otologic disease), ECF No. 1902-15; Chadi A. Makary et al., *Age-Related Primary Cochlear Neuronal Degeneration in Human Temporal Bones*, 12 J. ASS'N FOR RSCH. IN OTOLARYNGOLOGY 711, 715 (2011) ("Makary 2011") (finding "significant" age-related neuronal loss in study of 100 temporal bones with no known history of otologic disease and normal populations of inner and outer hair cells), P-GEN-06290.

[15] Pei-Zhe Wu et al., *Primary Neural Degeneration in Noise-Exposed Human Cochleas: Correlations with Outer Hair Cell Loss and Word-Discrimination Scores*, 41(20) J. OF NEUROSCIENCE 4439 (2021) ("Wu 2021"), ECF No. 1902-19 at 2; *see also* Makary 2011, P-GEN-06290 at 713 (two of three temporal bones with known history of noise exposure had neuronal counts "well below" the study's mean count).

reflected in audiometric thresholds, is correlated with poor speech and word discrimination ability.[16]

There is an obvious gap in the current research because direct observation, measurement and study of the pathophysiological changes associated with neuronal and synaptic dysfunction cannot yet be done in living humans. But there is definitive evidence that primary neural degeneration, synaptopathy and outer hair cell loss can occur in living humans, with heightened effects as a consequence of noise, based on the temporal bone studies. And there is both physiological[17] and epidemiological[18] evidence that living humans with normal audiograms can experience the kinds of auditory deficits that have been conclusively shown to be associated with primary

---

[16] *See* Wu 2021, ECF No. 1902-19 at 2-3, 7, 9.

[17] *See* Naomi F. Bramhall et al., *Auditory Brainstem Response Altered in Humans With Noise Exposure Despite Normal Outer Hair Cell Function*, 38(1) EAR & HEARING e1-e12 (2017) ("Bramhall 2017") (young veterans with high levels of military noise exposure and normal puretone thresholds showed reduced levels of auditory brainstem response "consistent with the data from animal models of noise-induced cochlear synaptopathy"), ECF No. 1902-16 at 12-13; M. Charles Liberman et al., *Toward a Differential Diagnosis of Hidden Hearing Loss in Humans*, 11(9) PLOS ONE 1-15 (2016) ("Liberman 2016") (young adults with high levels of noise exposure and normal audiometric thresholds had "significant elevation" of thresholds at high frequencies, "increased difficulty in noisy environments," and "poorer speech discrimination scores"), ECF No. 1902-23 at 3, 12.

[18] *See* Christopher Spankovich et al., S*elf reported hearing difficulty, tinnitus, and normal audiometric thresholds, the National Health and Nutrition Examination Survey 1999-2002*, 358 HEARING RSCH. 30, 35 (2018) (finding that 10-15% of individuals with self-reported hearing difficulties have normal audiometric thresholds), P-GEN-05300; Kelly L. Tremblay et al., *Self-Reported Hearing Difficulties Among Adults with Normal Audiograms: The Beaver Dam Offspring Study*, 36(6) EAR & HEARING at 14 (2015) (same regarding 12% of individuals with normal audiograms), P-GEN-06312; *see also* George A. Gates et al., *Hearing in the Elderly: The Framingham Cohort, 1983-1985*, 11(4) EAR & HEARING 247, 253 (1990) (same regarding 20.2% of subjects with normal audiograms), P-GEN-06279.

neural degeneration, synaptopathy and/or outer hair cell loss in animal models. It is the animal models, then, that bridge the gap. For biological plausibility purposes, that is enough.

Animal studies may support a biological plausibility opinion so long as an expert explains how and why the animal data can be reliably extrapolated to support conclusions about humans. *See In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1310 (N.D. Fla. 2018) (citing *Gen Elec. Co. v. Joiner*, 522 U.S. 136, 144-45 (1987)). "When courts exclude such opinions, it is often because the comparison between the animals and humans is too attenuated, or because of methodological problems with the [animal] studies themselves." *In re Levaquin Prods. Liab. Litig.*, No. 0:08md1943, 2010 WL 8400514, at *3 (D. Minn. Nov. 8, 2010) (collecting cases). This is not the case here.

Plaintiffs' experts reliably explained that the anatomy and physiology of the inner ear are "very comparable" across mammalian species, including humans. *See* Transcript of *Daubert* Hearing (Spankovich), ECF No. 1906 at 29, 39, 84. In other words, not only do the morphological structures of the inner ear "look very similar" among mammals, they also perform in "very much the same" way on measures of physiological function, such as auditory brain stem response and otoacoustic emissions (more on those later). *Id*. at 39. There are differences, of course. Of particular relevance to this litigation, the level and duration of noise exposure that

will cause auditory injury varies by species. But that fact is not at all dispositive. As already discussed, an extensive body of scientific work definitively establishes that noise overexposure—at varying levels of intensity—can cause cochlear injury in mammals from mouse to man, and that in doing so, impacts largely the same anatomical structures (including cochlear neurons, synapses and outer hair cells) in largely the same ways.[19] In light of these indisputable biological similarities, it is at least plausible that the animal models of primary neural degeneration and cochlear synaptopathy reliably explain the primary synaptic and neuronal loss found in human temporal bones, as well as the observed phenomenon of "hidden" auditory dysfunction in living humans.[20] There being reliable evidentiary support demonstrating the biological plausibility of Plaintiffs' experts' HHL opinions, the opinions are admissible under Rule 702 and *Daubert*.

## II. Diagnosis of HHL in Individual Plaintiffs

Diagnosing HHL in living humans is more complicated. Although its existence is widely acknowledged and accepted, it is not a well-understood

---

[19] Defendants have not argued that any of the underlying animal or other data cited by Plaintiffs' experts is itself methodologically flawed.

[20] Indeed, at least one of Defendants' experts, Dr. Mark R. Stephenson, seems to agree. *See* Mark R. Stephenson, *Occupational Hearing Loss from Non-Gaussian Noise*, 38(3) SEMINARS IN HEARING 223, 224 (2017) ("[N]ew research has found that the physiological effects of noise may extend beyond the outer hair cells of the cochlea to the synapse between the hair cells and auditory neurons. This damage—known as synaptopathy—can create a "hidden" hearing loss not evident on the pure tone audiogram."), P-GEN-06324.

condition. By definition, it cannot be detected by a visual examination of the ear canal or via standard audiometric assessment. Nevertheless, there are established diagnostic techniques that can reveal the cause of certain otherwise "hidden" perceptual deficits. In the Court's view, and based on the evidentiary record, there are essentially two tiers of HHL diagnoses—those that are supported by a measurable indicator of auditory dysfunction, and those that are not. For the following reasons, only the former are admissible in this litigation.

Some forms of "hidden" auditory injuries can be reliably measured and diagnosed in the living. For example, extended high-frequency audiometry can be useful for detecting hearing loss associated with damage to hair cells near the base of the cochlea, which may be a sign of synaptopathy at lower frequencies.[21] Outer hair cell integrity and function can be assessed using distortion product otoacoustic emissions (DPOAEs).[22] Auditory brain response (ABR) testing and electrocochleograms can provide physiological measurements of the activity of auditory nerve fibers in response to sound, which can be an indicator of the

---

[21] *See* Liberman 2016, ECF No. 1902-23 at 3.

[22] *See* Maryam Emadi, et al., *Comparison of the Transient Evoked Otoacoustic Emissions (TEOAEs) and Distortion Products Otoacoustic Emissions (DPOAEs) in Normal Hearing Subjects With and Without Tinnitus*, 70(1) INDIAN J. OTOLARYNGOLOGY AND HEAD & NECK SURGERY 115-118 (2018), P-GEN-06276 at 117.

proportion of intact neuronal synapses.[23] Another electrophysiological measure, the auditory frequency-following response (FFR), can detect deficiencies in the neural coding and processing of sound, including speech, at various points along the auditory pathway.[24] Additional behavioral measures of auditory function (i.e., tests that require a subjective response from the listener)—such as speech recognition thresholds (SRT), word recognition scores (WRS), speech- and other signal-in-noise tests—can be used to assess speech intelligibility, discrimination and auditory temporal processing.[25]

All of the aforementioned diagnostic tools have limitations. None of them can definitively demonstrate the absence of cochlear damage, and none can directly measure cochlear synaptopathy. And some of them, like ABR and FFR, have shown high variability both within and between individual test subjects, and their results can be affected by factors unrelated to auditory injury (such as electrode placement,

---

[23] *See* Naomi Bramhall et al., *The search for noise-induced cochlear synaptopathy in humans: Mission impossible?*, 377 HEARING RSCH. 88 (2019) ("Bramhall 2019"), ECF No. 1932-3 at 25-29; Bramhall 2017, ECF No. 1902-16.

[24] *See* Naomi F. Bramhall et al., *Envelope following response measurements in young veterans are consistent with noise-induced cochlear synaptopathy*, 408 HEARING RSCH., Art. 108310 (2021), P-GEN-06274; Kohrman, ECF No. 1932-2 at 11.

[25] *See* Mark A. Parker, *Identifying three otopathologies in humans*, 398 HEARING RSCH. 1 (2020), P-GEN-06296; Bramhall 2019, ECF No. 1932-3 at 30; Zadeh 2019, P-GEN-06294 at 23753.

physiological noise inherent in the recordings, and tissue conductivity).[26] There is also the problem of test validation because the diagnosis of certain "hidden" pathologies cannot yet be directly confirmed except by post-mortem counting of neurons, synapses, and auditory nerve fibers. Nevertheless, all of the tools are generally accepted and widely employed in the medical and audiological communities to measure auditory dysfunction and perceptual deficits not captured by traditional audiometry. Consequently, the Court finds them sufficiently reliable to support a diagnosis of hidden hearing loss in this litigation. Objections to the limitations of the tools go to the weight of an expert's hidden hearing loss diagnosis not its admissibility.

Now to the trickier question—what about individual plaintiffs with normal audiograms who complain of perceptual difficulties but have no electrophysiological or behavioral/audiometric (high-frequency and/or speech audiometry) support for a diagnosis of HHL? Given the scientific landscape, the Court concludes that a reliable HHL diagnosis is not currently possible for those plaintiffs. There is no established set of diagnostic criteria or even guidelines for diagnosing HHL, and the precise nature and extent of its accompanying functional deficits are ill-defined.[27]

---

[26] *See* Liberman 2016, ECF No. 1902-23 at 11; Richard Hoben et al., *Outer Hair Cell and Auditory Nerve Function in Speech Recognition in Quiet and in Background Noise*, 11 FRONTIERS IN NEUROSCIENCE, Art. 157 at 17 (2017), P-GEN-06282.

[27] The only exception is tinnitus, the diagnostic process for which is far more advanced than, and readily distinguishable from, the other categories of hidden hearing loss. Tinnitus has

At this time, without at least some measurable indicator of auditory dysfunction, there is no universal standard by which to even adequately characterize an individual's perceptual difficulties, much less reliably diagnose them as a recognized medical condition. Consequently, expert testimony doing precisely that would be inherently speculative—somewhat informed speculation, to be sure, but nonetheless lacking a sufficient scientific basis to reliably support a specific causation opinion for HHL. It also injects a separate and very real danger of unfairly misleading and confusing the jury regarding the science, which far outweighs any negligible probative value of such an opinion. *See United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) ("[E]xpert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the districts must take care to weigh the value of such evidence against its potential to mislead or confuse."); *Hull v. Merck & Co., Inc.*, 758 F.2d 1474, 1477 (11th Cir. 1985) (holding that admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed. R. Evid. 702."). This is not to say that an individual plaintiff cannot describe his or her perceived auditory difficulties, whatever they may be. But

---

well-established and universally applied diagnostic criteria, protocols for measuring a patient's subjective perception of tinnitus sound, pitch, and volume (e.g., pitch and loudness matching, minimum masking levels, residual inhibition), questionnaires for measuring the subjective burden of a person's tinnitus (e.g., Tinnitus Handicap Inventory, Tinnitus Functional Index), and a unique International Classification of Disease (ICD) code (H93.1). Moreover, its diagnostic reliability has never been challenged in this litigation.

no expert will be permitted to diagnose or otherwise explain a plaintiff's difficulties as HHL—with the exception of tinnitus—absent a measurable indicator of auditory dysfunction based on a generally accepted audiological technique. Without substantive support, an HHL opinion must be excluded on reliability, helpfulness, and 403 grounds.

Applying the above findings to Adkins and Wayman's cases is all that remains. For Adkins, the HHL opinions of Drs. Marc Bennett and Marc Fagelson must be excluded. Both doctors' HHL opinions are based only on the fact that Adkins: (1) has normal audiometric thresholds across all standard frequencies, albeit a little higher in recent years; and (2) reports difficulty understanding speech in certain environments. *See* Marc Bennett Rep. (Adkins), ECF No. 1864-46 at 11, 16; Fagelson Rep. (Adkins), ECF No. 1864-2 at 12-13. Neither doctor performed any diagnostic test for "hidden" auditory injuries, even though a prior audiometric test in Adkins' records notably reflected that he had "excellent" speech discrimination scores and "normal" acoustic reflexes in 2019. *See* Fagelson Dep., ECF No. 1864-1 at 14. In short, the HHL opinions for Adkins are not supported by any measurable indicator of auditory dysfunction. Therefore, they must be excluded on reliability, helpfulness, and 403 grounds.[28]

---

[28] Because Plaintiffs' experts' HHL opinions for Adkins are excluded, Dr. James Crawford's opinions on HHL for Adkins are likewise excluded. *See* Crawford Rep. (Adkins), ECF No. 1863-5 at 5, 7, 12-14.

Wayman is different. He too has normal audiometric thresholds in the traditional testing frequency range and reports difficulty hearing in complex listening environments, as well as trouble understanding "pitched" voices (such as women and children). *See* Lustig Rep. (Wayman), ECF No. 1864-4 at 11. But there's more. Wayman also has undergone extensive testing—both in connection with this litigation (IME, November 13, 2020) and before it (VA, 2017)—which reflects that he has extended high frequency hearing loss above 10,000 Hz in both ears, "compromised and reduced otoacoustic emission[s]" (DPOAEs) at 4,000 Hz and above in both ears, an absence of acoustic reflexes, and "poor morphology and abnormalities" in his auditory brain stem response (ABR). *See* Spankovich Dep., ECF No. 1902-14 at 17; Spankovich Rep. (Wayman), ECF No. 1864-6 at 8; *see also* Lustig Rep. (Wayman), ECF No. 1864-4 at 17, 25. All of those findings constitute objective evidence that Wayman suffers from auditory injuries that are "hidden" behind his normal audiogram. Because Plaintiffs' experts relied on those findings as the basis for their HHL opinions, the opinions are admissible under Rule 702 and *Daubert*.

## III. Conclusion

Based on the foregoing:

A.   Defendants' motion to exclude the HHL opinions of Drs. Marc Bennett and Marc Fagelson in Adkins' case is **GRANTED**.

B.    Defendants' motion to exclude the HHL opinions of Drs. Lawrence Lustig and Christopher Spankovich in Wayman's case is **DENIED**.

C.    Plaintiffs' motion to exclude the rebuttal opinion on HHL in Adkins' case from Dr. James Crawford is **DENIED AS MOOT**.

**SO ORDERED**, on this 12th day of September, 2021.

*M. Casey Rodgers*
**M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE**