# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG LITIGATION
LIABILITY LITIGATION

This Document Relates to:
 *Guillermo Camarillorazo*
 Case No. 7:20-cv-00098

 *Theodore Finley*
 Case No. 7:20-cv-00170

 *Carlos Montero*
 Case No. 7:20-cv-00067

 *Joseph Palanki*
 Case No. 7:20-cv-02324

 *Carter Stelling*
 Case No. 7:20-cv-00143

CASE NO.: 3:19-MD-2885-MCR-GRJ


Chief Judge M. Casey Rodgers
Magistrate Judge Gary Jones

**CONFIDENTIAL - FILED
UNDER SEAL**

---

## DEFENDANTS' OMNIBUS MOTION TO EXCLUDE PLAINTIFFS' GROUP C PUTATIVE EXPERT OPINIONS UNDER *DAUBERT* AND RULE 702 AND INCORPORATED MEMORANDUM

Defendants 3M Company and Aearo move pursuant to Rule 702 and *Daubert* to exclude the testimony and opinions, in whole or in part, of Plaintiffs' putative experts Moises Arriaga, Benjamin Crane, Hamid Djalilian, David Eddins, James Ezelle, James Hall, Lawrence Lustig, Richard McKinley, Mark Packer, and Christopher Spankovich.  Specifically, Defendants move to exclude:

FILED USDC FLND PN
SEP 17 '21 AM 7:50
*(signature)*

1.   Spankovich's   causation   and   diagnosis   opinion   regarding Camarillorazo.

2.   Arriaga's causation and diagnosis opinion regarding Camarillorazo.

3.   Arriaga's causation and diagnosis opinion regarding Finley.

4.   Spankovich's causation and diagnosis opinion regarding Finley.

5.   Arriaga's hyperacusis and misophonia opinions regarding Finley.

6.   Spankovich's hyperacusis and misophonia opinions regarding Finley

7.   Arriaga's opinion that hearing problems exacerbate Finley's mental issues.

8.   Any opinion by Ezelle that hearing problems exacerbate Finley's mental issues.

9.   Any opinion by Ezelle on the causes of Finley's hearing loss or tinnitus.

10.   Hall's causation and diagnosis opinion regarding Montero.

11.   Packer's causation and diagnosis opinion regarding Montero.

12.   Packer's future prognosis opinion regarding Montero.

13.   Lustig's causation and diagnosis opinion regarding Palanki.

14.   Lustig's causation and diagnosis opinion regarding Stelling.

15.   Spankovich's causation and diagnosis opinion regarding Stelling.

16.   Spankovich's opinions concerning 2021 testing regarding Stelling.

17.   Eddins' opinions regarding his hMIRE testing.

18.     Crane's opinions about the CAEv2's design or safer alternative designs.

19.     Crane's opinions about the mental health or socioeconomic impact of hearing issues.

20.     Crane's opinions about what information Defendants should have provided the military.

21.     Hall's opinions about hearing protection devices ("HPDs"), including the CAEv2.

22.     Any opinion by Hall regarding hidden hearing loss or cochlear synaptopathy ("HHL").

23.     Any opinion by Djalilian regarding HHL.

24.     Crane's legal and state-of-mind opinions.

25.     Djalilian's legal and state-of-mind opinions.

26.     Packer's state-of-mind opinions regarding Montero.

27.     McKinley's rebuttal opinions regarding Flamme-Stephenson.

Defendants' Motion is based upon the attached Memorandum in Support; the complete files and records of this action; and such other matters and arguments as may come before the Court.

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................10

I.   PLAINTIFFS' EXPERTS' SPECIFIC CAUSATION OPINIONS ARE UNRELIABLE AND IMPROPERLY APPLIED TO THE FACTS. ..........................................................12

    A.   Opinions Relating To Camarillorazo Should Be Excluded. ................................................................................13

        1.   Spankovich's Differential Diagnosis Is Unreliable .................................................................13

            a.   Other HPDs.................................................13

            b.   Head Injuries...............................................14

            c.   Sleep. ..........................................................16

        2.   Arriaga's Differential Diagnosis Is Unreliable.........................17

    B.   Opinions Relating To Finley Should Be Excluded. .............................18

        1.   Arriaga's Differential Diagnosis Is Unreliable.........................18

        2.   Spankovich's Differential Diagnosis Is Unreliable...................................................................20

        3.   Arriaga Lacks A Methodology Or Factual Basis For Opining That Finley Has Hyperacusis Or Misophonia...................................................................21

        4.   Spankovich Lacks A Methodology Or Factual Basis For Opining That Finley Has Hyperacusis Or Misophonia. ..........................................................24

        5.   Arriaga And Ezelle Cannot Opine That Hearing Loss Exacerbates Finley's Mental Issues. ................................25

    C.   Opinions Relating To Montero Should Be Excluded. ........................26

1.     Hall Did Not Perform A Differential Diagnosis On Montero. ................................................................26

2.     Packer Did Not Perform A Proper Differential Diagnosis For Montero. .......................................29

     a.     Hearing Loss From Aging. ..............................29

     b.     Other HPDs. ...................................................32

3.     Packer Cannot Testify About Future Prognosis. ......................34

D.     Lustig Did Not Conduct A Proper Differential Diagnosis Of Palanki. ....................................................................35

1.     Head Injuries. ...........................................................35

2.     Other HPDs. .............................................................37

3.     Age. ..........................................................................38

4.     Timing. .....................................................................39

E.     Opinions Relating To Stelling Should Be Excluded. ...........................42

1.     Lustig Did Not Conduct A Proper Differential Diagnosis Of Stelling. ...............................................42

     a.     Head Injuries. ..................................................42

     b.     Timing. ............................................................43

2.     Spankovich's Diagnosis Is Unreliable Because He Did Not Reasonably Explain Ruling Out Head Injuries. ...........................................................45

3.     Spankovich Should Be Precluded From Testifying That 2021 Testing Shows Hearing Loss Caused By The CAEv2. ...................................46

II.     PLAINTIFFS' HEARING TESTING EXPERTS' OPINIONS SHOULD BE EXCLUDED. .......................................47

A.  The Court Should Continue To Exclude Eddins' Opinions Regarding His hMIRE Testing.................................................47

    1.  Eddins' Surrogate Earplug Differs From The CAEv2 In Critical Respects. ...................................................47

    2.  Eddins' Surrogate Earplug Attenuates Noise Differently Than The CAEv2. ................................................50

    3.  Eddins' Technique Is Not Accepted In The Scientific Community. .............................................................51

B.  Crane's Opinions Should Be Excluded................................................52

    1.  Crane Lacks The Qualifications To Opine About The CAEv2's Design Or Safer Alternative Designs.........................................................................52

    2.  Crane Lacks The Qualifications To Opine About Mental Health or the Socioeconomic Impact of Hearing Issues. ....................................................53

    3.  Crane Cannot Opine About What Information 3M Should Have Provided To The Military.............................53

C.  Hall's Opinions Should Be Excluded. ..............................................54

    1.  Hall Lacks The Qualifications To Opine About HPDs. ...............................................................................54

    2.  Hall Ignores Testing That Contradicts His Opinions. ...........................................................................55

    3.  Hall Is Barred From Offering HHL Opinions. .........................55

D.  Djalilian's HHL Opinions Are Precluded Under This Court's Orders. ....................................................................56

III.  PLAINTIFFS' EXPERTS SHOULD NOT BE ALLOWED TO ACT AS ATTORNEY MOUTHPIECES. ...................................................57

A.  Crane Cannot Offer Legal Or State-Of-Mind Opinions. ...................57

      B.     Djalilian Cannot Offer Legal Or State-Of-Mind Opinions. .......................................................................................................58

      C.     Packer Cannot Testify To Montero's State Of Mind. .........................59

IV.     PLAINTIFFS' EXPERTS CANNOT OFFER OTHER UNRELIABLE OR IMPERMISSIBLE OPINIONS. ...................................60

      A.     Certain Of McKinley's Rebuttal Opinion To Flamme-Stephenson Are Unreliable.................................................................60

CONCLUSION ......................................................................................................62

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Barber v. United Airlines*,
17 F. App'x 433 (7th Cir. 2001)...................................................33

*Cates v. Whirlpool Corp.*,
2017 WL 1862640 (N.D. Ill. May 9, 2017)....................................34

*Companhia Energetica Potiguar v. Caterpillar Inc.*,
2016 WL 7507848 (S.D. Fla. Aug. 1, 2016)...................................34

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....................................................................15

*EEOC v. Freeman*,
778 F.3d 463 (4th Cir. 2015) .......................................................33

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....................................................................15

*Guinn v. AstraZeneca Pharms. L.P.*,
602 F.3d 1245 (11th Cir. 2010) ................................ 12, 20, 28, 36

*Hendrix ex rel. G.P. v. Evenflo Co.*,
609 F.3d 1183 (11th Cir. 2010) ...................................................12

*Kilpatrick v. Breg*,
613 F.3d 1329 (11th Cir. 2010) ...................................................12

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ..........................................52

*Lowery v. Sanofi-Aventis LLC*,
2021 WL 872620 (N.D. Ala. Mar. 9, 2021)...................................29

*McClain v. Metabolife Int'l, Inc.*,
401 F.3d 1233 (11th Cir. 2005) ...................................................28

*Sorrels v. NCL (Bahamas) Ltd.*,
    796 F.3d 1275 (11th Cir. 2015) ...................................................................24

*Tyree v. Boston Sci. Grp.*,
    54 F. Supp. 3d 501 (S.D.Va. 2014) ..............................................................23

*Vickery v. Remington Arms Co. LLC*,
    2015 WL 1268013 (N.D. Ala. Mar. 19, 2015)..............................................24

*Whiting v. Boston Edison Co.*,
    891 F. Supp. 12 (D. Mass. 1995)..................................................................52

## MEMORANDUM IN SUPPORT OF MOTION

## INTRODUCTION

Plaintiffs' putative Group C experts offer opinions that are barred under the prior orders of this Court, use unreliable methodologies, rest on false assumptions, and disregard the facts of Plaintiffs' cases.  Defendants move to exclude their opinions in whole or in part as described herein.[1]

*First*, Plaintiffs' experts' specific causation and diagnosis opinions for each Plaintiff fail to satisfy *Daubert*.  Hall effectively did not perform a differential diagnosis at all for Montero, as Hall failed to rule in (much less out) alternative causes.  In particular, Hall failed to rule in or consider Montero's traumatic brain injuries ("TBIs") or age, even though he admitted in his deposition that both can affect hearing.  Other experts ignored Plaintiffs' own testimony and medical records documenting the severity of head trauma and other injuries that could cause hearing issues.  In other cases, a Plaintiff's alleged hearing injury manifested before he ever used the CAEv2, or did not manifest until several years after he last used the CAEv2,

---

[1] Internal quotation marks, citations, modifications (such as ellipses or brackets), and deposition objections are omitted from quotes unless otherwise indicated.  To avoid repetition, this memorandum uses *supra* and *infra* to cross-reference the pages containing relevant authorities.  For convenience, Plaintiffs' putative experts are referred to as "experts", with Defendants reserving and not waiving all arguments that those putative experts lack qualifications or should otherwise be excluded.

yet the experts failed to explain how their opinions could be consistent with these timelines. Accordingly, the Court should exclude the causation opinions of the experts for each Plaintiff.

*Second*, Plaintiffs' hearing testing experts should be barred under this Court's precedents and for their lack of qualification and methodology. After the Court previously excluded Eddins' hMire opinions, he took additional measurements of the surrogate earplug he created. But those new measurements only confirm that his surrogate differs from the actual CAEv2 in stiffness, steam width, center of mass, and other critical factors, reinforcing that the Court correctly excluded his opinions. Plaintiffs also offer the opinions of new experts such as Crane and Hall, who have never designed any HPDs, written about HPDs, tested HPDs, or otherwise have the minimum qualifications to opine about the CAEv2 or other HPDs. Plaintiffs' new expert Djalilian seeks to offer general HHL opinions that are not tied to objective testing of any Plaintiffs, and thus are barred under this Court's opinions regarding HHL.

*Third*, Crane and Djalilian offer improper legal and state-of-mind opinions that the Court has twice barred, and should do so again. Packer also speculates about Montero's state of mind in attempt to explain why Montero took certain actions, another impermissible opinion.

11

*Fourth*, McKinley purports to offer rebuttal opinions to certain of Flamme-Stephenson's opinions regarding Plaintiffs' exposures to sound, but McKinley's opinions lack a factual basis and should be excluded.

## I.   PLAINTIFFS' EXPERTS' SPECIFIC CAUSATION OPINIONS ARE UNRELIABLE AND IMPROPERLY APPLIED TO THE FACTS.

Plaintiffs' experts' specific causation opinions should be excluded, including because they fail to conduct proper differential diagnoses.  A reliable differential diagnosis analysis requires the expert to (1) compile a "comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration" and (2) "eliminate all causes but one."  *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1195 (11th Cir. 2010).   An "expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation."  *Id.* at 1197; *see also Kilpatrick v. Breg*, 613 F.3d 1329, 1342–43 (11th Cir. 2010).   The expert must "take serious account" of alternative causes, and provide "a reasonable explanation as to why he or she has concluded that any alternative cause suggested by the defense was not the sole cause of the plaintiff's injury."  *Guinn v. AstraZeneca Pharms. L.P.*, 602 F.3d 1245, 1253 (11th Cir. 2010).

**A.      Opinions Relating To Camarillorazo Should Be Excluded.**

**1.      Spankovich's Differential Diagnosis Is Unreliable**

**a.      Other HPDs.**

Spankovich does not reliably rule out other HPDs Camarillorazo used. Camarillorazo experienced a standard threshold shift *five years* after he started using the CAEv2. Ex1, Spankovich Dep. 279:1-6. Camarillorazo similarly noticed his tinnitus only around the same time, *five years* after he started using the product. *Id.* 281:21-282:2. When asked how to explain that Camarillorazo used the CAEv2 for five years before experiencing any hearing issues, Spankovich stated that "[s]o many different factors can explain" that discrepancy, including "how often he may have been utilizing the Combat Arms earplug versus some of the other earplugs." *Id.* 282:3-20. Thus, Spankovich himself identified Camarillorazo's use of other HPDs as affecting why and when Camarillorazo experienced his alleged hearing issues. *See also* Ex2, Spankovich Camarillorazo Report 12.

Spankovich does not provide any reasonable explanation for this discrepancy, or for ruling out the other HPDs he acknowledges were relevant in this period. Although Spankovich stated that he is "not aware of any material defects" in the other HPDs Camarillorazo used, Ex3, Spankovich Dep. 378:17-21, that is no "reasonable explanation"—all Spankovich did to determine if other HPDs had defects was to rely on his general familiarity with HPDs and "Googled, you know, defects in hearing protection device products" and "a lot of ads come up if you …

13

Google Combat Arms Version II and defects," including "advertisements regarding litigation", *id.* 378:17-381:14.  Although Spankovich purportedly reviewed the attenuation offered by other products, he did not know specifically which manufacturers manufactured other HPDs used by Camarillorazo because "[t]he other ones can have, you know, variable hearing – hearing protection device manufacturers have versions of those different devices."  *Id.* 385:12-22.

Spankovich's Googling and general familiarity with HPDs do not provide an adequate basis for concluding that the other HPDs Camarillorazo used were not defective.  Moreover, even if the other HPDs were not defective, Spankovich does not know the level of hearing protection Camarillorazo's other HPDs provided, and thus cannot know whether those were sufficient to protect him from noise exposure. Spankovich's efforts to rule out exposures Camarillorazo sustained while wearing other HPDs lack the reliable principles and methods required by Rule 702.

### b.    Head Injuries.

Camarillorazo sustained serious head injuries during his military service, including a motor-vehicle accident resulting in loss of consciousness for ten minutes and memory loss.  Ex4, Spankovich Dep. Ex. Cam-23.  Moreover, Camarillorazo's medical records document nearly two dozen "episodes of striking his head against the Tourette or some other piece of equipment."  Ex5, Spankovich Dep. Ex. Cam-22.  These "repeated head traumas cannot be ruled out as a cause of his hearing loss

and tinnitus." Ex6, Crawford Camarillorazo Report 4, 18. With respect to Camarillorazo's tinnitus, Spankovich improperly ruled out head injuries for three reasons.

*First*, Spankovich is not qualified to rule out head injuries. Spankovich admitted "concussion and brain injury is – is not [his] area of expertise." Ex1, Spankovich Dep. 305:14-23. Nonetheless, he opined that head injuries resulting in concussions do not commonly have tinnitus as a side effect. *Id.* 300:14-301:2. He did so based on a sports-concussion assessment tool, SCAT3, despite never having used SCAT3 and conceding that he "cannot make a diagnosis of a concussion." *Id.* 301:13-302:8.

*Second*, Spankovich cannot reliably extrapolate from a 2013 sports-concussion protocol, *id.* 305:10-13, to conclude that head injuries sustained by servicemembers do not commonly cause tinnitus. As Spankovich acknowledges, head injuries from sports can be different than head injuries sustained by servicemembers. *Id.* 306:1-17; Ex7, Spankovich Dep. Ex. Cam-9 (documenting exposure to explosions). *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591-93 (1993) ("[S]cientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

*Third*, Spankovich testified that he ruled out head injuries based on the timing of Camarillorazo's head injuries relative to the onset of his tinnitus. Ex1, Spankovich Dep. 308:5-10. But the only specific head injury that Spankovich identified and ruled out in his report was in 2011, Ex2, Spankovich Camarillorazo Report 13, roughly three years after Camarillorazo's tinnitus onset in 2008. Spankovich ignored events close in time to when Camarillorazo first experienced tinnitus. *E.g.*, Ex4, Spankovich Dep. Ex. Cam-23 (documenting exposure to "2 explosions" and "one roll over mva" resulting in "LOC [loss of consciousness] on vehicle, 10 mins" and "memory loss"); Ex5, Spankovich Dep. Ex. Cam-22 (medical records from 2017 documenting "over 20 episodes of striking his head against the tourette or some other piece of equipment over the past 15 years", that is, going back to 2002); *see also* Ex8, Camarillorazo Dep. 194:18-20; 224:24-225:5. As Spankovich did not consider Camarillorazo's pre-2008 head injuries, he could not have properly ruled out them out.

### c.    Sleep.

Spankovich also seeks to attribute Camarillorazo's sleep difficulties to his tinnitus. Ex1, Spankovich Dep. 213:17-214:19. But Spankovich failed to perform any analysis of Camarillorazo's individual sleep disturbances, and thus lacks any methodology or factual basis for his opinion. Spankovich simply repeated his general opinion that tinnitus "*can* affect sleep", without explaining whether tinnitus

affected Camarillorazo's sleep.  *Id.* 331:13-23 (emphasis added).  Spankovich could not even state the number of hours Camarillorazo presently sleeps, or that he would sleep absent his injuries, because "[they] didn't specifically go into hours of sleep per night."  Ex3, Spankovich Dep. 355:16-356:1.  And Spankovich conceded that "tinnitus is not the only issue that is likely contribut[ing] to Mr. Camarillo[razo]'s sleep issues."  Ex1, Spankovich Dep. 332:9-12.  Spankovich does not consider or rule out any other potential causes of sleep disturbances, and so conducts no differential diagnosis as to sleep at all.  Like those of Kileny in the Group B cases, Spankovich's opinions on sleep are inadmissible.  *See* ECF 1910 at 34; ECF 1680 at 24.

### 2.   Arriaga's Differential Diagnosis Is Unreliable.

As with Spankovich, Arriaga's differential diagnosis fails to account for head traumas that played a role in causing Camarillorazo's hearing-related injuries. Arriaga acknowledges that Camarillorazo was involved in a motor vehicle accident during his third deployment.  *Id.*  He also agrees that Camarillorazo's tinnitus started between his third and fourth deployment.  Ex9, Arriaga Dep. at 26:22-27:1.  But according to Arriaga, because (1) Camarillorazo denied any loss of consciousness associated with the accident and (2) a TBI inquiry from many years later did not result in a TBI diagnosis, he ruled out that accident as a cause of his hearing-related injuries.  Ex10, Arriaga Camarillorazo Report 15.

Yet Arriaga ignores that Camarillorazo testified, "to the best of my knowledge," he did "in fact, lose consciousness for 10 minutes following the rollover motor vehicle accident" during his third deployment and that he remembered waking up "somewhere else." Ex8, Camarillorazo Dep. 194:18-20; 224:24-225:5. Arriaga agreed that to understand the symptoms of a head injury at the time of the injury, "timing [is] important so that you see what their symptoms are" at the time of the injury. Ex9, Arriaga Dep. at 62:5-25. Arriaga did not reliably consider the testimony of Camarillorazo and ignored that the onset of Camarillorazo's tinnitus occurred during the same period as this accident causing Camarillorazo to lose consciousness for 10 minutes. Thus, Arriaga lacks a reliable basis to rule out head trauma and his opinion should be excluded.

### B.    Opinions Relating To Finley Should Be Excluded.

#### 1.    Arriaga's Differential Diagnosis Is Unreliable.

Arriaga does not reliably rule out significant alternative causes. *First*, Arriaga does not reliably exclude that Finley's alleged hearing injuries could have occurred from exposure to loud noise when he was not wearing hearing protection. For nine or ten months, Finley drove a Humvee equipped with a .50 caliber machine gun. Ex11, Finley Dep. 92:16-18, 95:16-23. Six days a week, once or twice a day, Finley's unit would make contact with the enemy and receive and return fire using the Humvee's machine gun, and Finley would individually return fire with his M4.

18

*Id.* 92:19-93:5, 95:16-23, 96:2-97:16.   Arriaga assumes that Finley always wore hearing protection, "almost exclusively the CAEv2," around loud noises.   Ex12, Arriaga Report 1.   But Finley acknowledges that he was not always wearing hearing protection when his unit encountered the enemy and began taking and returning fire.   Ex11, Finley Dep. 275:15-276:7.   While Finley claimed he would pop in his earplugs if they started taking fire, *id.* 276:8-18, Arriaga admits that inserting the earplugs would take approximately ten to fifteen seconds and Finley could be exposed to a "burst" of machine gun fire without hearing protection, Ex9, Arriaga Dep. 206:13-24, 220:9-17, 223:19-224:10.   Especially given the frequency with which Finley and his team received and returned fire, Arriaga does not adequately explain why Finley's exposure to this machine gun fire without hearing protection could not be the cause of any hearing issues.

*Second*, Arriaga does not reliably exclude that TBI could have caused Finley's hearing issues.   *See* Ex13, Ezelle Dep. 139:20-140:3 (explaining head injuries and TBIs can cause tinnitus "independent of any acoustic trauma").   Finley has experienced multiple TBIs, including (1) striking his head on a concrete metal stairwell, knocking him unconscious, Ex10, Finley Dep. 262:1-18; (2) standing close to a mortar fired by fellow soldiers, where a shockwave knocked him off his feet, caused him to lose consciousness, and caused a change in his hearing, *id.* 264:2-267:15; (3) being approximately ten feet from enemy rocket propelled grenade

("RPG") strikes that knocked him off his feet and caused his head to strike on a truck, *id.* 210:9-211:5.  Arriaga testified that he believed Finley had recovered from TBI.  Ex9, Arriaga Dep. 300:20-301:9.  But Finley's treating psychiatrist states that Finley has an existing TBI, and Arriaga (who lacks any qualifications in treating mental disorders), has no basis to contradict him.  Ex12, Arriaga Finley Report 26-27; Ex13, Ezelle Dep. 139:2-11.

*Third*, Arriaga claims that the RPG strike was not close enough to result in bodily injury, Ex12, Arriaga Finley Report 26, but this ignores the severity of his injuries, including repeated incidents where he was knocked off his feet and lost consciousness.  Arriaga asserts that hearing loss and tinnitus from TBI is usually brief, *id.* 27, but this overlooks that repeated exposure to blasts can result in long-lasting problems.  Ex14, Crawford Finley Report 7-8, 22, 24-25.  Arriaga neither "take[s] serious account" of nor provides a "reasonable explanation" for excluding Finley's TBIs as an alternative cause of his alleged hearing problems, and thus his diagnosis is inadmissible.  *Guinn*, 602 F.3d at 1253.

## 2.    Spankovich's Differential Diagnosis Is Unreliable.

Spankovich's opinion suffers from the same deficiencies as Arriaga.  Spankovich does not discuss Finley's exposure to machine gun fire while not wearing hearing protection, Ex15, Spankovich Finley Report 1-15, and thus provides no reason for excluding it.

Spankovich ruled out TBI because tinnitus "tends to be limited to more severe TBI." *Id.* 9.  But Spankovich did not conduct any testing to determine the severity of Finley's TBI, and provides no explanation of why the events that knocked Finley off his feet and caused him to lose consciousness could not cause Finley's alleged hearing issues.  *Id.*

Spankovich similarly failed to adequately consider and rule out Finley's history of headaches as the source of his tinnitus.  Finley has suffered from headaches since childhood.  At the age of 12, Finley sought emergency treatment for nausea-causing headaches that lasted for weeks.  Ex16, FINLEYT-MDL-2885-99AUMC-00025-31.  Such headaches could cause or contribute to Finley's tinnitus.  Ex14, Crawford Finley Report 17, 22.  Yet nowhere in his report does Spankovich discuss these issues, much less provide a reasonable explanation for ruling them out.  Failure to rule out this significant "potential cause" renders his opinions inadmissible.  ECF 1680 at 24.

### 3. Arriaga Lacks A Methodology Or Factual Basis For Opining That Finley Has Hyperacusis Or Misophonia.

Arriaga purports to diagnose Finley with hyperacusis (sensitivity to every day sounds) and misophonia (emotional reactions to specific sounds).  Ex12, Arriaga Report 24.  But he has no methodology supporting those conclusions, and did not test for either condition.

21

Misophonia is an abnormally strong reaction to specific sounds. Ex17, Spankovich, *Tinnitus and Sound Sensitivity* 353, AUDIOLOGY TREATMENT (2019). There is no scientific consensus on whether misophonia is a psychiatric disorder or an auditory-limbic response. *Id.*; Ex18, Jager, *Misophonia: Phenomenology, comorbidity and demographics in a large sample* 2, 12, PLOS ONE (2020) (confirming "misophonia is a distinct psychiatric disorder"). Arriaga lacks experience with misophonia and did not properly diagnose Finley with that condition. Ex9, Arriaga Dep. 172:8-16; *see id.* 292:21-293:19 (admitting to only diagnosing three patients with misophonia since 1991, and relying on the patients' self-diagnosis). Rather, Arriaga relies instead only on Axelrad, a psychiatrist whose opinions Plaintiffs have since withdrawn.[2] At most, Arriaga parrots a withdrawn expert's view, rather than offering reliable opinion based in his own qualifications.

Moreover, misophonia tests exist and are relied on by specialists. Ex18, Jager, *Misophonia: Phenomenology, comorbidity and demongraphics in a large sample* 4, PLOS ONE (2020). But Arriaga did not use those tests to diagnose Finley, and instead relied only on Finley's subjective statements. Ex9, Arriaga Dep. 290:3-10. Arriaga

---

[2] That a psychiatrist, and not Arriaga, evaluated Finley's misophonia makes sense given the prevailing view that this is a psychiatric condition. *See* Ex18, Jager, *Misophonia: Phenomenology, comorbidity and demographics in a large sample* 12, PLOS ONE (2020).

could not identify Mr. Finley's specific trigger sound, which is key to diagnosing misophonia.  Ex17, Spankovich, *Tinnitus and Sound Sensitivity* 353, AUDIOLOGY TREATMENT (2019); Ex9, Arriaga Dep. 274:12-276:7.  This provides an independent basis for excluding Arriaga's misophonia opinion—he does not even attempt to follow "testing standards" or "scientific methods" used by experts in the field.  *Tyree v. Boston Sci. Grp.*, 54 F. Supp. 3d 501, 555 (S.D.Va. 2014).  Moreover, Finley's current treating psychiatrist, Ezelle, testified that he does not believe Finley has misophonia.  Ex13, Ezelle Dep. 133:8-13.

Nor can Arriaga reliably opine that misophonia is caused by the CAEv2 supposedly not protecting Finley from noise exposures.  Arriaga admitted he is not "not aware of the literature linking noise exposure to misophonia."  Ex9, Arriaga Dep. 291:13-19.  Hearing loss is not correlated with misophonia.  *See* Ex18, Jager, *Misophonia: Phenomenology, comorbidity and demographics in a large sample* 9, PLOS ONE (2020) (the largest misophonia study ever finds less hearing loss in misophonia subjects than in general population); Ex62, Spankovich & Hall, *The Misunderstood Misophonia* 19, AUDIOLOGY TODAY (July-August 2014) ("The literature and our clinical experience suggest that the majority of patients with misophonia have normal hearing sensitivity.").

Similarly, for hyperacusis, Arriaga testified that he is not aware of any objective test.  Ex9, Arriaga Dep. 300:6-10; *see also* Ex19, Crane General Report

28; Ex20, Crane Dep. 228:8-25.   Because Arriaga relies only on subjective complaints and failing to conduct any objective testing, his opinions again should be excluded.  *E.g.*, *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1286 (11th Cir. 2015) (excluding opinion where expert did not perform any tests but just watched a video of the plaintiff; the expert's "subjective physical and mental perceptions are not the sort of reliable methodology Rule 702 demands"); *Vickery v. Remington Arms Co. LLC*, 2015 WL 1268013, at *10 (N.D. Ala. Mar. 19, 2015) ("mere assertions of belief, without any supporting research, testing, or experiments, cannot qualify as proper expert scientific testimony.").  *Compare* ECF 1933 at 14-15 (precluding experts from testifying about HHL "absent a measurable indicator of auditory dysfunction based on a generally accepted audiological technique").

### 4.   Spankovich Lacks A Methodology Or Factual Basis For Opining That Finley Has Hyperacusis Or Misophonia.

Similar to Arriaga, Spankovich did not conduct any tests to determine whether Finley has hyperacusis or misophonia.  Ex15, Spankovich Finley Report 1-15. Instead, he relied only on Finley's self-reported, subjective claims of sound sensitivity, without identifying a misophonic trigger sound.  *Id.* 11; Ex1, Spankovich Dep. 36:12-37:8 (admitting he relied on "patient's complaints" in considering misophonia and hyperacusis).  Nor could Spankovich show that his new theory of misophonia being caused by noise exposure, articulated for the first time in his deposition, was generally accepted in that scientific field.  *Compare* Ex 18, Jager,

*Misophonia: Phenomenology, comorbidity and demographics in a large sample* 9,
PLOS ONE (2020)*, and* Ex62, Spankovich & Hall, *The Misunderstood Misophonia*
19, AUDIOLOGY TODAY (July-August 2014) ("The literature and our clinical
experience suggest that the majority of patients with misophonia have normal
hearing sensitivity.")*, with* Ex1, Spankovich Dep. 43:5-18.  As with Arriaga, as
Spankovich's opinions regarding Finley's hyperacusis and misophonia lack any
objective basis, they should be excluded.

### 5.   Arriaga And Ezelle Cannot Opine That Hearing Loss Exacerbates Finley's Mental Issues.

Arriaga has no factual basis to opine that Finley's hearing loss exacerbates his
mental health issues.  Arriaga admits Finley has significant difficulties besides
hearing issues, such as multiple TBIs and chronic back and neck pain, which could
contribute to his mental health problems. Ex12, Arriaga Report 15–17.  Finley has
other significant stressors, including his father's abuse of him and his mother, his
wife's miscarriages, and the destruction of his home.  Ex21, T_E_Finley-VA-
000170, 170, 172-73.  In combat, he was shot and witnessed a fellow soldier's death.
*Id.* 173.  Prior to this litigation, Finley did not attribute his mental health to his
hearing issues.  *See*, *e.g.*, Ex22, Ottenbacher Dep. 50:21-51:19.

Arriaga simply asserts—without explanation or support—that Finley's
hearing issues "are aggravating factors" in his mental health disorders.  Ex12,
Arriaga Report 24–25.  That is speculation, not a differential diagnosis or reliable

methodology.  Nor is Arriaga qualified to offer this assertion: he is not a psychologist or psychiatrist and has no specialized training in those fields.  Ex12, Arriaga Report Exhibit B.

Similarly, Ezelle does not know whether Finley has hearing loss or tinnitus, and so should not be permitted to opine that Finley's mental health is worsened by those alleged issues.  Ex13, Ezelle Dep. 113:5-15, 117:21-118:3.[3]

### C.    Opinions Relating To Montero Should Be Excluded.

#### 1.    Hall Did Not Perform A Differential Diagnosis On Montero.

Montero is a 51 year-old man with a documented history of head trauma and traumatic brain injury ("TBI") and temporally-related tinnitus complaints.  Ex23, Hall Dep. 383:23-386:12; 361:13-18.  Nonetheless, Hall's causation opinion rests on a "differential diagnosis" that fails to take into account these age- and TBI-related alternative causes for his claimed hearing loss and tinnitus.  Hall's differential diagnosis and causation opinions should be excluded for the same reason the Court excluded House's and Kileny's differential diagnoses in Groups A & B *Daubert* rulings: namely the failure to consider and rule out "obviously" "*potential* cause[s]" of alleged injuries.  ECF 1680 at 24 (emphasis added).  The Court excluded House because he did not "rule out any other potential cause of Hacker's tinnitus, including

_____

[3] Ezelle also states he will not opine on the cause of Finley's hearing loss or tinnitus, and should be held to that.  Ex13, Ezelle Dep. 128:17-129:1.

noise exposure, before identifying Hacker's multiple head injuries as 'more likely than not' the cause," even though "[n]oise exposure [wa]s obviously a *potential* cause of tinnitus." *Id.* Because House did not "**consider [noise exposure] and rule it out in giving his causation opinion**," the opinion was excluded. *Id.* (emphasis added). The Court similarly excluded Kileny's opinion where he did not account for plaintiff's "documented history of ear infections, jaw and facial muscle problems, and ototoxic medication consumption". ECF 1910 at 34-35 (Group B opinion).

The reasons the Court excluded the House and Kileny opinions apply with equal force here. Hall admitted that age and TBIs can both affect hearing. Hall agreed that that age-related hearing dysfunction is a recognized phenomenon in his profession and that age correction factors are used in interpreting audiometric results. Ex23, Hall Dep. 266:2-14, 266:19-22. He further agrees that age-related hearing dysfunction presents as a pattern of best hearing in the lowest frequencies and a gradual decrease in hearing for the highest frequencies—precisely what Montero's test results show.[4] *Id.* 269:22-270:10. While his report asserts that "essentially normal hearing" means "≤ 15 dB HL," Hall does not consider age or

---

[4] *See* Ex24, Seidman Report 16 ("Mr. Montero's ultra high-frequency testing through 14,000 Hz is consistent with the average 50 year old."); *see also id.* 8-9 (charting Montero's audiogram results since 1992 which exhibits general trend in alignment with age-related hearing dysfunction).

analyze what "normal" means in a 50-year-old male population.  Ex25, Hall Montero Report 6-7.  Nor does he address Montero's "consistently good hearing sensitivity." Ex26, 3M_PLT_JWHALL-000001.   Similarly, Hall failed to rule out TB even though he agreed a mild TBI can cause auditory issues, and that Montero had reported headaches and tinnitus following and in connection with multiple TBIs. Ex23, Hall Dep. 388:21-389:4; 390:7-391:9.  Indeed, Hall admitted that a TBI ***"can't be ruled out"*** as a cause of auditory processing disorders.  *Id.* 186:15-20 (emphasis added).

Similar to Hall's other specific causation expert, Packer, Hall admits that Montero used other HPDs.  Ex23, Hall Dep. 313:18-314:8, 335:6-336:4; *see also infra* 32-34.  Yet Hall's report does not even discuss Montero's use of other HPDs, much less provide a reasonable explanation for ruling them out as an alternative cause of any hearing injury.  Ex25, Hall Montero Report 1-8.

Rather than ruling out these "obvious" alternative causes, Hall makes the conclusory statement that "there is no indication in Mr. Montero's history or medical records of a disease or pathology, or any medication, that is associated with hearing loss."  Ex24, Hall Montero Report 8.  But an "expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on a patient."  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005); *Guinn*, 602 F.3d at 1253.

Finally, the reliability of Hall's opinion is further compromised by a conceded "real time crunch" preparing his report.  Ex23, Hall Dep. 372:3-14.  This lack of time is particularly notable because Hall has not had a clinical practice since 2012, *id.* 222:20-223:1; 224:23-225:7, and presumably would need more time to examine a patient than a practicing doctor or audiologist.

In short, "[s]tripped to its bare bones," Hall's differential diagnosis "is nothing more than his own assertion."  *Lowery v. Sanofi-Aventis LLC*, 2021 WL 872620, at *15 (N.D. Ala. Mar. 9, 2021) (excluding differential diagnosis).  Hall's opinions as to Montero should therefore be excluded.

### 2.  Packer Did Not Perform A Proper Differential Diagnosis For Montero.

#### a.  Hearing Loss From Aging.

Packer purports to exclude hearing loss from age (presbycusis) as a causal factor by (in a single sentence) referring to "nomograms"[5]:  "I can rule out age as a relevant factor due to the young age at the onset of his auditory injury and by comparing his age to nomograms for aging hearing."  Ex27, Packer Montero Report

---

[5] "Nomograms are commonly used tools to estimate prognosis in . . . medicine." Vinod P. Balachandran, et. al., *Nomograms in Oncology – More than Meets the Eye*, 16 LANCET ONCOLOGY 173, 173 (2016).  In audiology, they can be used to project hearing loss which naturally comes with age.  Ex28, Packer Dep. 37:15-17.

35.  But the nomograms cannot support Packer's ruling out of presbycusis for two reasons.

*First*, Packer never did the necessary analysis or consulted the nomograms that he claimed to rely on in his expert report.  At his deposition, Packer admitted that he had *not* analyzed any nomograms in Montero's case:  "Q. … So are there nomograms that you have consulted to confirm your opinion in the Montero case?  A. No.  Just the experience I have working with nomograms in general."  Ex28, Packer Dep. 38:17-20; *see also id.* 37:18-22.   Instead, Packer relies on his "recollection" of nomograms—without performing any of the specific calculations—or his past experience.  *Id.* 38:21-39:5; *see also id.* 37:18-38:3, 38:21-39:5.  But when pressed, Packer testified that by "experience," he meant *anecdotal* work he had done at the VA with specific patients.  *Id.* 46:4-11.

*Second*, Montero's nomograms show that he has normal hearing for a 50-year-old man.  If Packer had applied the nomograms, he would have concluded that any changes in Montero's hearing is attributable to presbycusis.  Applying OSHA's age-correction metrics to Montero's July 2021 audiogram demonstrates that Montero performs better than expected at many frequencies and, at worst, is only fourteen Db from what is expected, which still falls within a normal hearing range.[6]

---

[6]  This chart shows Montero's 1995 and 2021 audiograms compared with OSHA's calculations for expected change due to aging.  *See* Ex27, Packer Montero Report

| | Right | | | | | Left | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1000 | 2000 | 3000 | 4000 | 6000 | 1000 | 2000 | 3000 | 4000 | 6000 |
| 1995 to July 2021 Comparison | 5 | 20 | 15 | 15 | 10 | 15 | 15 | 5 | 15 | 20 |
| Expected Change Due to Presbycusis | 4 | 6 | 11 | 16 | 18 | 4 | 6 | 11 | 16 | 18 |
| Age-Corrected Hearing Change | 1 | 14 | 4 | -1 | -8 | 11 | 9 | -6 | -1 | 2 |

Packer's other half-sentence reason for ruling out age does not withstand scrutiny either. In the same sentence that he claimed to consult nomograms, Packer also stated that age was irrelevant "due to the young age at the onset of [Montero's] auditory injury", Ex27, Packer Montero Report 35. But when asked about this conclusion, the only basis Packer could provide for it was that Montero's hearing results did not "jive with [his] memory" of what would be typical of a 30 or 40 year-

19, 24; *Calculations and Application of Age Corrections to Audiograms*, OCCUPATIONAL SAFETY & HEALTH ADMIN., https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.95AppF (last visited Sept. 16, 2021). Montero's "Age-Corrected Hearing Change" is determined by: (1) comparing his 1995 audiogram with his July 2021 audiogram ("1995 to July 2021 Comparison"); (2) comparing the OSHA age correction chart for a 24 year old male with a 50 year old male (*i.e.*, Montero's ages in 1995 and July 2021) ("Expected Change Due to Presbycusis"); and (3) contrasting the results from step one with the results from step two.

old.  Ex28, Packer Dep. 50:15-51:8.  No analysis.  No methodology.  Just Packer's *ipse dixit* memory of what should have been.[7]

### b.  Other HPDs.

Packer also failed to provide any meaningful analysis for his exclusion of other HPDs as a potential cause of Montero's alleged injuries.  Packer excluded other HPDs as the cause of Montero's alleged injuries because his hearing "remained stable" prior to 2001, when Montero was using foam or triple-flanged earplugs. Ex27, Packer Montero Report 34.  Packer also asserted that other HPDs "previously protected him from hazardous noise" and were used "infrequently" after 2001.  *Id.* But Packer's conclusion ignores adverse evidence discussed elsewhere in his report.

*First*, Packer's report shows that Montero's hearing shifted while he was using other HPDs.  In particular, Montero showed slight hearing loss in the left ear at 2000 and 6000 Hz between 1995 and 2000 when Montero used foam or triple-flange earplugs exclusively.  Ex27, Packer Montero Report 19.  Additionally, between 1996 and 2001, Montero exhibited a "significant shift" at the 6000 Hz

_____

[7] This is hardly surprising, given that had Packer provided *some* analysis of Montero's hearing results, he would have found that Montero's hearing would have in some respects *outperformed* the hearing of a typical 30-40 year old, and certainly is better than the average 50-year-old man.  *See* Ex24, Seidman Report 13 ("Mr. Montero's hearing as tested falls in the range of what I would typically see in a normal 15- to 25-year-old person.").

frequency.  Ex28, Packer Dep. 91:10-16.  This shift occurred prior to Montero's use of CAEv2, and demonstrates hearing loss caused by the other HPDs he used at the time (and certainly not the CAEv2).  Packer ignored this adverse evidence, which contradicts his unsupported declaration that Montero's hearing "remained stable" when using other HPDs.

*Second*, Packer excluded other HPDs because Montero's use of other HPDs was supposedly "infrequent."  Ex27, Packer Montero Report 34.  But Packer failed to address that Montero's significant noise exposure was also infrequent.  Montero spent most of his career on assignments with little to no noise, other than occasional range and airborne qualifications.  *Id.* 14-18.  When Montero was exposed to significant noise, he sometimes used foam or triple-flange earplugs.  *Id.*  Thus, Packer ignored that Montero likely used other HPDs, rather than CAEV2, a substantial percentage of the time he was exposed to significant noise.

Had Packer addressed this evidence, he would not have been able to exclude other hearing protection as a potential cause of Montero's purported injury, and the governing case law is clear that an expert cannot simply ignore adverse evidence.  *EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (Agee, J., concurring) ("[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data.") (collecting cases); *see also Barber v. United Airlines*, 17 F. App'x 433, 437 (7th Cir. 2001) (affirming exclusion of expert testimony where witness "cherry-

picked the facts he considered to render an expert opinion," rejected testimony that contradicted his opinion, and did not adequately explain why he ignored certain facts and data); *Cates v. Whirlpool Corp.*, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017) ("Ignoring relevant data is not a scientifically valid method. … [A]n expert is not permitted to simply ignore evidence that is contrary to her opinion in implementing an accepted methodology.").  Nor is this some minor issue—Packer's "remained stable" view was key to his report, yet that belied-by-the-record-and-his-own-report assertion "ignore[s] the great weight of the evidence", is "not based on any methodology or analysis", and is not a reasonably explained differential diagnosis.  *Companhia Energetica Potiguar v. Caterpillar Inc.*, 2016 WL 7507848, at *12 (S.D. Fla. Aug. 1, 2016).

### 3.    Packer Cannot Testify About Future Prognosis.

The Court should exclude Packer's attempt to speculate about Montero's future prognosis for dementia or PTSD as a result of his purported injuries.  Ex27, Packer Report 36.  The Court has previously excluded similar testimony from Packer concerning his opinion that plaintiffs may develop "certain medical conditions (including dementia) in the future" that may affect their hearing problems.  *See* ECF 1680 at 97-98.  The Court should do so again here.

**D.    Lustig Did Not Conduct A Proper Differential Diagnosis Of Palanki.**

**1.    Head Injuries.**

Lustig admits that significant head trauma can lead to auditory processing disorders and difficulty understanding speech in noise—injuries which would not always be apparent on a pure tone audiogram.  Ex29, Lustig Dep. 382:7–383:19. Yet Lustig fails to consider, let alone properly rule out, multiple head traumas that Palanki suffered.  In 1990, a car crash left Palanki hospitalized with serious injuries. Ex31, J_F_Palanki-001820-26.  One of them was a 4-inch laceration on his head.  Ex32, J_F_Palanki-002069.  It went down to the skull.  Ex33, J_F_Palanki-001821.  Palanki's hospital records include a description of his head injury that was "consistent with a blunt head trauma."  Ex34, Pappas Dep. 321:15–16.  Notably, Sherry Collins, Palanki's ex-wife, testified that Palanki attributed his difficulty hearing out of one ear "to the car accident he had in high school".  Ex35, Collins Dep. 30:20–31:7.

Lustig purports to rule out this crash only by downplaying and ignoring the record.  He (thirty years later) calls it "minor."  Ex36, Lustig Palanki Report 13.  He eliminated it as a potential cause of Palanki's hearing difficulty because Palanki attended Army basic training a month later.  *Id*.  He even asserts that "Mr. Palanki has no credible evidence of head trauma".  *Id*.  He wrongly claims that there "is no record of this incident".  *Id*.  But there *is* a record, and it includes an operation report

35

from closing the laceration to Palanki's head.  Ex37, J_F_Palanki-009241.  And he does not bother to consider Palanki's own pre-litigation belief that it was actually this accident that caused his hearing troubles.  Ex36, Lustig Palanki Report 1-18.

Lustig also ignores other significant head injuries.  *First*, in 1994 Palanki visited the emergency room complaining of nausea and headache—symptoms of concussion—after hitting the top of his head on a tow truck.  Ex38, J_F_Palanki-008812; *see also* Ex29, Lustig Dep. 394:7–11.  Nowhere does Lustig reference, let alone rule out, this head trauma.

*Second*, Palanki was involved in a motor-vehicle accident during his second deployment in Iraq, with multiple records reflecting that he experienced "Pos LOC"—positive/possible loss of consciousness—and he has a history of traumatic brain injury as a result, Ex39, J_F_Palanki-002288; Ex40, J_F_Palanki-002791; Ex41, Lustig Dep. Ex25 (Palanki reported "Hx of head trauma MVA in Iraq").  While Lustig acknowledges that later records indicate he suffered a head trauma, Lustig instead relies on Palanki's statement that he "denies it."  Ex36, Lustig Report 4–5.

Accordingly, Lustig did not "take serious account" or provide a "reasoned explanation" of why these injuries did not cause Palanki's alleged hearing issues, and so his causation opinion should be excluded.  *Guinn*, 602 F.3d at 1253.

## 2. Other HPDs.

Palanki spent 30 years in the military.  Ex29, Lustig Dep. 227:16-228:6.  For 20 of them, he never used the CAEv2.  *Id.* 228:7-15.  And for the other 10 (2005–2015), he never used the CAEv2 exclusively.  In particular, Lustig admitted that Palanki "[i]ntermittently" used foam earplugs from April 2003 through at least 2019, and Lustig was not aware of a single year between 1990 and 2019 where Palanki did not report at least some use of foam earplugs.  Ex29, Lustig Dep. 229:5-22. Similarly, Lustig acknowledged that Palanki used over-the-head hearing protection from 1993 to 2020, and Lustig was unaware of any year between 1993 and 2020 when Palanki did not use over-the-head hearing protection.  *Id.* 229:23-230:14. Lustig further admitted that even though Palanki claimed the CAEv2 was his "predominant" form of hearing protection from 2005 to 2015, he also used foam and over-the-head hearing protection during that period.  *Id.* 231:6-12.

Given these facts, Lustig's grounds for excluding other hearing protection as a cause of Palanki's injuries do not withstand scrutiny.  Lustig rules out other HPDs based on the "temporal relationship" to Palanki's injuries, Ex36, Lustig Palanki Report 16, but Palanki used foam and over-the-head hearing protection for the entire time he was in the military, including in the period before his alleged injuries manifested.  And while Lustig also cites Palanki's supposed "infrequent use" of other HPDs, *id.*, that is belied by the record:  other HPDs were Palanki's sole

protection for most of his military career, and Lustig also used those same devices even while he was purportedly also using the CAEv2.  Lustig also claims there is no "allegation or evidence the other HPDs are defective", *id.*, but bases this opinion on having "seen some literature" he does not identify and on the fact that the military uses foam earplugs, Ex29, Lustig Dep. 171:6-13.  Moreover, Lustig has not seen Palanki fit foam earplugs, did not ask him how he inserts foam earplugs, and can only speculate that Palanki inserts them correctly.  *Id.* 221:23-223:12; *see also id.* 223:13-225:15 (same answers for Palanki's fitting of triple-flange earplugs and ear canal caps).

Thus, Lustig does not have a factual foundation for determining that the other HPDs Palanki used were not defective, or that Palanki was using other HPDs correctly, and thus has no basis for excluding other HPDs as an alternative cause.

### 3.    Age.

Lustig rules out age-related hearing loss as a cause of Palanki's hearing troubles because of Palanki's "young age" and the "lack of a family history of hearing loss or tinnitus."  Ex36, Lustig Palanki Report 12.  But Palanki is 49 years old.  That age is within the range when age-related hearing loss is possible; as Lustig concedes, some of his patients are in their forties and suffer from early-onset age-related hearing loss.  Ex29, Lustig Dep. 372:22–373:8.  Lusting even admits that "there's no black-or-white answer" and that if someone is "over the age of fifty, you

can't rule out presbycusis." *Id.* 372:13–20.  But Lustig makes no effort to explain why Palanki is different from other patients or why he can eliminate presbycusis in a man one year away from being old enough that presbycusis is always in play.

Once more, Lustig's opinions rest on insufficient facts and data, thereby rending his analysis unreliable from the start.  Because Lustig lacks a sound basis to look past age as a possible alternative cause of Palanki's difficulties, his opinion should be excluded.

### 4.    Timing.

Lustig states that the "timeline of the auditory injury is also important, including when it started, and the nature of any symptom progression of hearing loss and tinnitus over time."  Ex36, Lustig Palanki Report 12.  "Any temporal relationship between the noise exposure, particularly if repeated, and the onset of the symptoms should be consistent." *Id.*

The timing of Palanki's symptoms, however, does not match with the timing of his CAEv2 use, as demonstrated by Palanki's audiograms.  Lustig admits that the American Academy of Otolaryngology defines "normal [hearing] as being between zero to 25 decibels".  Ex29, Lustig Dep. 71:23-72:11.  Palanki's audiograms confirm that his hearing was normal after he claims to have used the CAEv2 for 10 years.  On February 5, 2016, the first audiogram after reporting he stopped using the

CAEv2, Palanki's hearing thresholds were all 15 dB or lower—normal by any standard:

| TEST DATE | LEFT | | | | | | | RIGHT | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 500 | 1000 | 2000 | 3000 | 4000 | 6000 | 8000 | 500 | 1000 | 2000 | 3000 | 4000 | 6000 | 8000 |
| 04/16/90 | 5 | 0 | 0 | 0 | 15 | 25 | | 5 | 0 | 0 | 0 | 10 | 20 | |
| 08/30/93 | 5 | 5 | 0 | 5 | 10 | 45 | | 10 | 5 | 0 | 10 | 5 | 20 | |
| 12/02/94 | 5 | 0 | 0 | 0 | 10 | 30 | | 5 | 0 | 0 | 10 | 5 | 10 | |
| 08/15/95 | 5 | 0 | 0 | 5 | 10 | 25 | | 0 | 0 | 0 | 5 | 5 | 5 | |
| 12/18/03 | 25 | 5 | 0 | 10 | 5 | 15 | | 5 | 0 | -5 | 5 | 5 | 10 | |
| 03/12/08 | 5 | 5 | 0 | 5 | 15 | 35 | | 5 | 0 | 0 | 5 | 10 | 15 | |
| 03/13/08 | 0 | 0 | 0 | 5 | 15 | 10 | 0 | 5 | 0 | 0 | 5 | 5 | 5 | 0 |
| 09/24/09 | 5 | 5 | 5 | 15 | 25 | 20 | | 10 | 5 | 5 | 20 | 15 | 25 | |
| 01/08/10 | 10 | 5 | 0 | 10 | 20 | 20 | | 5 | 5 | 0 | 10 | 10 | 10 | |
| 06/18/10 | 5 | 5 | 5 | 10 | 15 | 5 | | 10 | 5 | 0 | 5 | 10 | 20 | |
| 08/06/11 | 10 | 5 | 0 | 5 | 20 | 15 | | 5 | 0 | 0 | 5 | 10 | 25 | |
| 02/07/15 | 5 | 5 | 0 | 5 | 5 | 20 | | 5 | 0 | 0 | 5 | 10 | 20 | |
| 02/05/16 | 5 | 5 | -5 | 5 | 15 | 10 | | 0 | 0 | 0 | 5 | 5 | 5 | |
| 02/04/17 | 10 | 5 | 0 | 10 | 25 | 15 | | 5 | 5 | 0 | 15 | 5 | 25 | |
| 02/10/18 | 5 | 5 | 20 | 15 | 25 | 25 | | 5 | 5 | 0 | 15 | 10 | 20 | |
| 02/02/19 | 0 | 5 | 0 | 10 | 10 | 35 | | 10 | 10 | 0 | 10 | 10 | 10 | |
| 02/22/19 | 15 | 10 | 5 | 15 | 20 | 15 | 15 | 15 | 10 | 10 | 15 | 15 | 10 | 0 |
| 02/07/20 | 10 | 10 | 10 | 20 | 20 | 20 | 0 | 15 | 15 | 10 | 15 | 20 | 10 | 5 |
| 3/23/20 | 10 | 15 | 10 | 20 | 20 | 20 | 10 | 10 | 15 | 10 | 20 | 15 | 20 | 15 |
| 1/28/21 | 15 | 10 | 5 | 25 | 25 | 25 | 25 | 10 | 15 | 5 | 15 | 15 | 20 | 20 |

Ex42, Pappas-Gould Report at 15; *see also* Ex36, Lustig Palanki Report 10.

Rather than account for the six hearing tests that show no hearing loss during the time Palanki claims he used the CAEv2, Lustig focuses on Palanki's self-reports of symptoms—specifically those made in connection with this litigation. But even those are inconsistent. Lustig relies on Palanki's testimony that Palanki first noticed hearing loss in 2010–2012. Ex36, Lustig Palanki Report 9. But at his deposition, Lustig conceded that in 2010–2011, Palanki noticed hearing loss in only his right ear—and that he did not notice it in his left ear until 2017 or 2018. Ex29, Lustig Dep. 242:1–19. Moreover, subjective claims of hearing loss are unreliable where

objective testing demonstrates that Palanki's hearing was within a normal range.  *See supra* 24.

Lustig also agrees that Palanki first reported tinnitus on September 24, 2017, more than two years *after* Palanki stopped using the CAEv2.  Ex29, Lustig Dep. 249:5–13; *see also* Ex43, J_F_Palanki-002531.  Other medical records confirm the 2017 or later onset of his tinnitus, including Palanki's own reports.  *E.g.*, Ex44, J_F_Palanki-001486 at 001490 ("The Veteran reported that the tinnitus began in 2017, which was long after his significant noise exposure on active duty."); Ex45, J_F_Palanki-00188–191 (pre-litigation private ENT record where Palanki reports "ringing in right ear" bothered him for "1 year"); *see also* Ex46, Palanki Dep. 251:24-252:1 (reporting that ringing in left ear started in 2018).  Yet Lustig ignores all this adverse data, and (with no reasoning whatsoever) instead relies on Palanki's self-report of tinnitus in just his right ear in 2014–2015 to somehow conclude that a temporal relationship exists between Palanki's CAEv2 use and his tinnitus.  Ex36, Lustig Palanki Report at 9.

In essence, Lustig relies on timing when he thinks it's helpful to Palanki's case, and ignores timing that contradicts Palanki's claims.  Such cherry-picking requires exclusion of Lustig's opinion.  *See supra* 33-34.

### E.   Opinions Relating To Stelling Should Be Excluded.

#### 1.   Lustig Did Not Conduct A Proper Differential Diagnosis Of Stelling.

##### a.   Head Injuries.

In 2006, and again in 2008, Stelling experienced significant injuries. Ex47, C_J_Stelling_VA-000905.  In one instance, Stelling was climbing from a wall, using a rope, when his unit came under fire.  *Id*.  He was left dangling from the rope, which caused him to slam his head multiple times against the wall.  *Id*.  He reported that he didn't remember much about the incident, while his wife reported that she learned he hit his head hard several times and was left dazed and confused.  *Id*.

For the other injury, Stelling was between 10 and 30 feet away from an IED when it exploded.  *Id*.  That was close enough for him to feel the blast wave, which is a wave of highly compressed gas that may feel almost like being smashed into a wall.  *Id*.  And the explosion knocked him against a stationary object, like a wall, vehicle, or the inside a vehicle.  *Id*.

These events affected Stelling.  He reported that immediately afterwards he was dazed, confused, or saw stars and that he didn't remember what had happened. Ex48, C_J_Stelling_VA-001571.  He also reported that the following got worse after the events: memory problems or lapses; balance problems or dizziness; sensitivity to bright light; and irritability.  *Id*.  Doctors screened him for a traumatic brain injury, and the results came back positive.  Ex49, C_J_Stelling_VA-001572.

As Lustig concedes, head trauma can affect hearing and tinnitus:

We know that head trauma can potentially cause hearing loss and damage with significant impact. We also know that in patients with TBI, tinnitus can become louder or more bothersome. So anybody with a history of head trauma can get hearing loss and tinnitus. And we want to see if there's any chance that head trauma is contributing to somebody's hearing loss.

Ex29, Lustig Dep. 42:12–21.

But Lustig did not mention either of these incidents in his report. Instead, he inaccurately stated that "Stelling's records reflect that he has not experienced or been diagnosed with a concussion or TBI", Ex63, Lustig Stelling Report 5, and that "Stelling has no history of head trauma, concussion, or traumatic brain injury", *id*. 17. Lustig's failure to rule in or out Stelling's serious IED explosion and associated TBI—which even Lustig admits "can potentially cause hearing loss"—is the same type of failure to consider a significant potential cause that rendered House and Kileny's opinions inadmissible. ECF 1910 at 34; ECF 1680 at 24.

The same result should apply here. Lustig's failure to discuss these events and Stelling's injuries establishes that his opinion is unreliable and not based on sufficient facts or data, and his diagnosis does not account for alternative causes of Lustig's alleged hearing injuries.

### b.    Timing.

Lustig admits that when symptoms start and their progression over time are important to a diagnosis. Ex63, Lustig Stelling Report 15; *see supra* 39. Stelling's

audiograms show the timing of his symptoms, does not match with the timing of his

CAEv2 use:

March 22, 2006:[1]

| Left Ear | | | | | | |
|---|---|---|---|---|---|---|
| 500 | 1000 | 2000 | 3000 | 4000 | 6000 | 8000 |
| 10 | 5 | 20 | 15 | 30 | 25 | 10 |

April 24, 2006[2]

| Left Ear | | | | | | |
|---|---|---|---|---|---|---|
| 500 | 1000 | 2000 | 3000 | 4000 | 6000 | 8000 |
| 5 | 0 | 15 | 15 | 30 | 25 | - |

A score above 25 reveals hearing loss.  Ex29, Lustig Dep. 71:23-72:11; *see supra*

39.  Both these 2006 tests show hearing loss in Stelling's left ear at 4000hz.  But

Stelling first began using the CAEv2 in February 2007, Ex63, Lustig Stelling Report

7, so this hearing loss predated his CAEv2 use.

As for tinnitus, Stelling did not report having this condition until 2014, Ex50,

Stelling Dep. at 247:8–11, which was four years after he left the military, *id*. at

43:10–11.  After leaving the military, Stelling worked as a welder on offshore oil

rigs up until 2013 or 2014.  *Id.* 95:10-12, 96:6-7.  As part of the job, he was exposed

to loud noises, including metal grinders.  *Id*. 96:8-13.  Even just the operations on

the rig were loud.  *Id*. 96:14-15.

This evidence shows a mismatch in timing.  Stelling had hearing loss *before*

he began using the CAEv2.  And he didn't report tinnitus until years *after* he left the

service, which coincided with his exposure to other loud noises, in a harsh environment.

Lustig brushes aside these timing concerns rather than addressing them and recognizing the difficulties they pose for connecting Stelling's hearing issues to his use of the CAEv2. This renders his opinion unreliable and, thus, inadmissible under Rule 702.

### 2. Spankovich's Diagnosis Is Unreliable Because He Did Not Reasonably Explain Ruling Out Head Injuries.

Similar to Lustig, Spankovich's purported differential diagnosis is inadmissible because Spankovich did not rule out Stelling's significant head injuries. Spankovich's opening report does not address head trauma, apart from single phrase stating that Stelling denied head or neck trauma that caused or changed his hearing or tinnitus. Ex51, Spankovich Stelling Report 10. His rebuttal report similarly states only that Stelling does not have a TBI diagnosis, Stelling denies significant head trauma, and that TBI are more commonly related to blast exposure than "minor" direct head injury. Ex51, Spankovich Stelling Rebuttal Report 2.

But in fact Stelling suffered significant head injuries from slamming his head multiple times against a wall, and then being close to an IED blast. Ex3, Spankovich Dep. 610:18-612:2. As with Lustig, Spankovich's failure to account for these head injuries as alternative causes renders his differential diagnosis unreliable.

### 3. Spankovich Should Be Precluded From Testifying That 2021 Testing Shows Hearing Loss Caused By The CAEv2.

Spankovich also wrongly relies on 2021 audiogram and Distortion Product Otoacoustic Emissions ("DPOAE") testing that Spankovich says shows auditory damage from the CAEv2.  His testimony as to this testing should be excluded.  The testing, to be sure, shows purported changes to Stelling's hearing in the frequencies at or above 8,000Hz.  Ex51, Spankovich Stelling Report 8-9.  But Spankovich has no basis for attributing these issues to Stelling's long-ago military service ending in 2010, Ex50, Stelling Dep. 43:10–11.  After leaving the military, Stelling worked as an oil rig platform pipe and shipyard welder for nearly three years.  Ex3, Spankovich Dep. 508:5-8.  As Spankovich admitted, there is likely research "demonstrating that exposures to those environments can create hearing loss."  *Id.* 508:9-15.  Spankovich further acknowledged that these high frequency and DPOAE test results occurred over a decade after Stelling left the military.  *Id.* 522:11-19.  And he also admitted that there is no baseline of "distortion product otoacoustic emissions [DPOAE] to compare to."  *Id.* 522:20-523:4.

These undisputed facts establish that Spankovich lacks a basis to conclude that these 2021 tests can show auditory damage from Stelling's time in the military over a decade earlier.  Stelling's hearing could have changed over the past decade because of his oil rig and welder job, other noise exposures, aging, or other reasons.  Moreover, there is no evidence of what Stelling's DPOAE looked like before

Stelling's exposure to noise in the military, and thus no basis to conclude that the CAEv2 caused changes to Stelling's DPOAE, or even that his DPOAE changed at all since before he entered the military.  That this 2021 testing reflects auditory injury from over a decade earlier is speculation, and should be excluded.

## II.   PLAINTIFFS' HEARING TESTING EXPERTS' OPINIONS SHOULD BE EXCLUDED.

### A.   The Court Should Continue To Exclude Eddins' Opinions Regarding His hMIRE Testing.

#### 1.   Eddins' Surrogate Earplug Differs From The CAEv2 In Critical Respects.

This Court previously excluded Eddins' opinions relating to his hMIRE testimony because the surrogate earplug he created "differs from the CAEv2 in critical ways that, in the Court's view, impact the reliability of Dr. Eddins' conclusions about the CAEv2's alleged propensity to loosen".  ECF 1680 at 62. Eddins has added measurements of his surrogate earplug to his report, attempting to show the earplug is similar to the CAEv2.  The measurements, however, confirm the Court's prior finding that the surrogate earplug is different from the CAEv2 and cannot be assumed to loosen similarly to the CAEv2.

*First*, the stem of the earplug is made of a different material ("PR48" plastic) than the stem of the CAEv2 (Delrin).[8] Eddins "did not make an effort to obtain Delrin". Ex52, Eddins Dep1. 95:18-19. PR48 and Delrin have different physical properties. For example, although one of plaintiffs' primary criticisms of the CAEv2 is that the stem is "too stiff," the measures of stiffness Eddins provided for PR48 (a tensile modulus of 600 mega-Pascals and tensile strength of 16 mega-Pascals) are significantly different than the corresponding values for Delrin (3300 and 69 mega-Pascals, respectively). *Compare* Ex53, Eddins Group C Report 48 *with* Ex54, 3M_MDL000340512, CAE Data Sheet 21. Eddins' report does not include any data or testing to support that a stem made of PR48 would loosen similarly to a stem made out of Delrin.

*Second*, the stem of the surrogate earplug has a significantly different width than the stem of the CAEv2. Eddins found that, at the position of the lateral flange, the diameter of the surrogate adaptor stem was 4.6% smaller than the diameter of the CAEv2's stem. Ex53, Eddins Group C Report 48. At the medial flange, the diameter of the surrogate stem was 4.8% smaller. *Id*. This disparity is particularly concerning given the centrality of stem width to Plaintiffs' design-defect theory.

---

[8] Eddins' Group A and Group B reports stated that the stem of the surrogate earplug was made out of silicone, but Eddins now says this was a mistake. Ex52, Eddins Dep1. 92:17-93:3.

*Third*, the surrogate earplug's center of mass ("COM") is at the actual center of the earplug, while the COM of the CAEv2 is 0.185 mm closer to the yellow end due to the presence of the filter. *Id*. 51. Eddins speculates that this difference "will have a negligible effect on earplug insertion and earplug retention," but provides no testing, data, or other support for that claim. *Id*.

*Fourth*, Eddins' earplug is significantly lighter than the CAEv2. His measurements found the surrogate earplug is 4.46% lighter than the CAEv2 without the probe tube, which is how the subjects in the experiment wore the earplug during physical activity. *Id*. 52. Eddins' report provides no basis for his speculation that an earplug 4.46% lighter than the CAEv2 would loosen similarly in a user's ear during the physical activities he measured.

*Fifth*, the surrogate earplug is 0.17% shorter than the CAEv2. *Id*. 52. Eddins again asserts that difference is "negligible," but provides no support for this assumption that a shorter earplug will loosen similarly to the CAEv2. *Id*.

At bottom, Eddins created a surrogate earplug that (1) is made out of a different material that has different physical properties than the CAEv2, (2) is lighter, thinner, and shorter than the CAEv2, and (3) has a different center of mass than the CAEv2. Eddins has done no testing to validate whether these differences impact how the earplug loosens in a user's ear. Ex64, Eddins Dep1. 315:20-316:2. Instead, Eddins has merely taken measurements that confirmed these differences,

and offered the baseless new opinion that these differences are small and likely do not matter.  But as the Court has already recognized, "when we are talking about alleged earplug movement on the order of fractions of a millimeter, imperceptible to wearers and trained fitting professionals alike, loosening tests performed on a 'fairly close' approximation of the CAEv2 are not sufficiently reliable to advance the ultimate question of whether and to what extent the actual CAEv2 imperceptibly loosens." ECF 1680 at 63.  Eddins' hMIRE loosening testing should be excluded in Group C for the same reasons.

### 2.    Eddins' Surrogate Earplug Attenuates Noise Differently Than The CAEv2.

Although Eddins has not attempted to validate experimentally whether his surrogate earplug loosens to the same extent as the CAEv2, he did provide attenuation data for his surrogate earplug in his original report.  But the attenuation data, like the physical measurements discussed above, confirm that Eddins' surrogate earplug is materially different than the CAEv2.  Indeed, the surrogate earplug attenuates differently than the CAEv2 at nearly every frequency.  *See* Ex55, Eddins Data at "hMIRE Probe Validation."  Above 5500 Hz in particular, the inaccuracies are very large, 6.9 dB on average with a high of 11.8 dB.  *Id.*[9]  This

---

[9]  Eddins' Group C report does not contain new testing, but does replot the old testing using both power spectral density (his original metric) and 1/3 octave bands (a new metric on which the maximum attenuation differences between Eddins' plug and the

means that the surrogate earplug underestimates the attenuation of the CAEv2 by those amounts. *Id.* Taking an attenuation measurement on a different earplug, which Eddins' own testing shows attenuates differently from the CAEv2 at every frequency (by as much as 11 dB), and using the results of that testing to opine on the CAEv2's attenuation, is not a reliable methodology.

### 3. Eddins' Technique Is Not Accepted In The Scientific Community.

The Court previously noted Eddins had not "identified a single study or other example from the scientific literature in which a manufacturer or a researcher 'engineered' a new earplug … and *h*MIRE-tested it using a 'probe insertion and removal' methodology, then offered the results of those tests as evidence of how another earplug performs." ECF 1680 at 64. That remains true. Eddins' Group C report discusses two studies in which earplugs were *modified* to accommodate MIRE probes, not studies in which the experimenters created surrogate earplugs, and neither study involved the "probe insertion and removal" method Eddins used for his loosening study. Ex53, Eddins Group C Report 47. It follows that, as the Court has already held, "Dr. Eddins' variation of the *h*MIRE technique has not yet been

---

CAEv2 are slightly smaller, at 6-8 dB). *See* Ex53, Eddins Group C Report 54. Measured under either metric, the differences are far larger than the 3 dB Eddins separately argues are cause for concern. *Id*. 16.

considered and generally accepted in the hearing protection community."  ECF 1680 at 64.

**B.    Crane's Opinions Should Be Excluded.**

    **1.    Crane Lacks The Qualifications To Opine About The CAEv2's Design Or Safer Alternative Designs.**

Under Rule 702 "a witness must be qualified in the *specific* subject for which his testimony is offered."  *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 24 (D. Mass. 1995); *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007).

Crane is not qualified to offer his opinion that the CAEv2 is defective in design or safer designs would have reduced user injuries.  Ex19, Crane General Report 59, 70-72.  He has never worked for an HPD manufacturer, has never designed any type of commercially available HPD, has no patents related to HPDs, has never been retained as an expert with respect to the manufacturing of HPDs or any device, has never been involved in clinical trials for HPDs and has no research or publication experience with HPDs or the testing of HPDs.  Ex20, Crane Dep. 81:22-82:12;  82:21-25;  83:1-16;  56:3-13;  108:24-109:13;  110:11-24,  113:2-7.  Crane has never previously conducted a REAT test or used ANSI testing to come up with NRRs.  *Id.* 278:3-280:8; 281:2-10.  He also conceded that he has never designed a product for the military.  *Id.* 121:10-25.

Moreover, Crane never tested the CAEv2; nor has he ever tested any other earplugs in offering his opinion that a safer alternative design exists. *Id.* 122:1-13. He also admitted that he had never—prior to this litigation—discussed the CAEv2 with a patient. *Id.* 100:20-102:16.

### 2. Crane Lacks The Qualifications To Opine About Mental Health or the Socioeconomic Impact of Hearing Issues.

Crane also lacks the expertise to opine on any connection between hearing issues and anxiety, depression, social isolation, or other psychological disorders. Ex56, Crane General Report 10, 17-18, 25.  Crane conceded that he is not a board certified psychologist or psychiatrist, has no training in mental health disorders, and has not actively researched these subjects.  Ex20, Crane Dep. 40:11-41:12, 191:24-192:14, 195:13-197:5, 204:3-11.

Crane also opines in his report that hearing loss "impacts education and employment opportunities."  Ex19, Crane General Report 18.  However, he has no economic background or foundation for those opinions.  Indeed, he conceded that he has no training or education in vocational counseling or economics.  Ex20, Crane Dep. 51:5-52:12.  Thus, his opinions on both subjects should be excluded.

### 3. Crane Cannot Opine About What Information 3M Should Have Provided To The Military.

Crane's opinion that 3M had a "duty to disclose" information to the military, Ex19, Crane General Report at 62, not only is an impermissible legal opinion, *see*

*infra* 57, but Crane also has no basis for this testimony.  Crane conceded in his deposition that, other than serving on three Department of Defense grant boards for projects unrelated to HPDs, he has never worked for the military or produced a product for the military.  Ex20, Crane Dep. 118:23-119:19, 119:24-120:11.  Crane thus lacks the qualifications or sufficient facts or data to support his opinion.

### C.   Hall's Opinions Should Be Excluded.

#### 1.   Hall Lacks The Qualifications To Opine About HPDs.

Under Rule 702, a witness must be qualified in the specific subject for which his testimony is offered.  *See supra* 52.  Hall is not qualified to offer his opinion that the CAEv2 is defective in design or that safer designs would have reduced user injuries.  Ex19, Hall General Report 79-80.

Hall has never worked for an HPD manufacturer; has never designed any type of commercially available HPD; and has never written on the design, manufacturing, testing, or standards related to HPDs.  Ex23, Hall Dep. 65:4-20; 73:17-21. He also has not worked with any government agency on the development of HPDs.  *Id.* 77:3-6.

Hall has never previously conducted a REAT test or used ANSI testing to come up with NRRs, and has no knowledge on the NRR requirements "aside from reading the ANSI standards."  *Id.* 73:22-74:22; 75:11-16; 75:23-76:3.  He has not even been present when REAT testing was performed for the labeling of a product.

*Id.* 74:23-75:3.  Hall conceded that "[i]t is fair to say that [he is] not an expert on the labeling or testing" of HPDs.  *Id.* 77:11-12.

Hall never tested the CAEv2; nor has he ever conducted fit testing on the earplug.  *Id.* 89:20-23, 90:1-91:12.  He also never personally used the CAEv2, nor has he fit patients with the earplug.  *Id.* 119:2-18.

### 2.  Hall Ignores Testing That Contradicts His Opinions.

Courts exclude opinions that cherry-pick data or ignore contradictory facts. *See supra* 33-34.  In formulating his opinion on the effectiveness of the CAEv2, Hall testified that he relied primarily on just two documents—the Flange Memo and Test 213015 of the CAEv2.  Ex23, Hall Dep. 86:21-87:22, 97:6-15.  Hall did not discuss or list in his report, nor did he consider, the dozens of other tests on the CAEv2 conducted by Aero, the Army, and others.  *Id.* 113:14-114:23, 117:16-119:1.  Cherry picking two tests and ignoring numerous others renders Hall's opinion unreliable.

### 3.  Hall Is Barred From Offering HHL Opinions.

While Hall offers HHL opinions in his expert report, Ex19, Hall General Report 33, 71-73, during his deposition Plaintiffs' counsel representing that "we didn't ask him to give any opinions related to [HHL] in his general report … and he's not intended to present any of that testimony at trial", Ex23, Hall Dep. 181:10-182:21.  Accordingly, Hall should be excluded from offering any HHL opinions.

### D.   Djalilian's HHL Opinions Are Precluded Under This Court's Orders.

This Court recently placed limits on experts testifying where "a reliable HHL diagnosis is not currently possible for [a] plaintiff[]."  ECF 1933 at 13. Specifically, "no expert will be permitted to … explain a plaintiff's difficulties as HHL … absent a measurable indicator of auditory dysfunction based on a generally accepted audiological technique."  *Id.* 14-15.  Moreover, the Court has precluded "HHL-related opinions" from experts "as unhelpful" where the experts have failed to opine to "any degree of medical certainty that any Plaintiff has cochlear synaptopathy or HHL."  ECF 1680 at 42.

Those orders render Djalilian's HHL opinions unreliable and unhelpful. Djalilian's HHL-related opinions are limited to stating that synaptopathy in HHL is "*likely* to be related to the synaptic repair after damage that occurs as a result of noise" and that "functional deficits seen in patients with HHL *may* also involve the involvement of the central auditory system."  Ex56, Djalilian Report 12 (emphasis added).  Djalilian also admits that at present, "we don't have a mechanism to look at the cells in the inner ear unless someone has died and we take out their temporal bones.  So that is the only way we can study it in humans.  Anything else would involve killing people".  Ex57, Djalilian Dep. 197:22-198:5.  Without any case-specific opinions, his testimony will lack any connection to a measurable indicator

of auditory dysfunction in a plaintiff.  Thus, Djalilian's HHL-related opinions are unreliable, unhelpful, lack fit, and are due to be excluded.

## III. PLAINTIFFS' EXPERTS SHOULD NOT BE ALLOWED TO ACT AS ATTORNEY MOUTHPIECES.

### A. Crane Cannot Offer Legal Or State-Of-Mind Opinions.

This Court previously held that "questions of law are not subject to expert testimony" and experts "cannot testify about the meaning of a statute or regulation or about whether someone violated a law."  ECF 1680 at 115-16.  Nor can experts couch their opinions in terms that "carry special meaning under the law and are contingent upon application of the appropriate standard of care such as 'defective,' 'duty,' 'unreasonably dangerous,' or 'failed to warn.'"  *Id.* 119; *see also* ECF 1910 at 53-54, 60-61.

Crane offers impermissible legal opinions that should be excluded, including:

- The CAEv2 is "unreasonably dangerous and defective." Ex19, Crane General Report 59.

- "3M had a duty to disclose the results to the military and warn that the 22 NRR is a dangerous exaggeration of the CAEv2's real-world performance." *Id.* 62.

- 3M's sale of the CAEv2 was "inappropriate and inconsistent with regulations and law." *Id.* 64.

- 3M acted "below the standards of a reasonable manufacturer." *Id.*

- 3M had a "duty to remove" the product from the market. *Id.* 66.

- A reasonable manufacturer's duty to disclose and other legal obligations. *Id.* 66-67.

- A manufacturer's duty "to provide truthful warnings and accurate instructions." *Id.* 67.

- 3M violated "EPA regulations and industry standards." *Id.* 67.[10]

State-of-mind testimony also is impermissible. ECF 1680 at 119. Plaintiffs' experts "may not opine as to what Defendants 'knew,' what they intended, or what their motives were." *Id.*; *see also* ECF 1910 at 54-55, 61. Crane repeatedly opines that Defendants "knew" of various defects and decided not to reveal them to consumers. *E.g.*, Ex19, Crane General Report 66 ("3M was on notice of the specific design flaws identified in the Flange Report—*i.e.*, too short, too stiff, susceptible to loosen imperceptibly—by July 10, 2000 (the date of the Flange Report) *at the latest*. Despite the wealth of defect-related information that 3M possessed when CAEv2 sales were in their infancy, 3M never provided this information to the military or to consumers."). These opinions are both improper and beyond the scope of Crane's expertise.

### B. Djalilian Cannot Offer Legal Or State-Of-Mind Opinions.

Djalilian offers impermissible legal opinions that should be excluded, including:

---

[10] Moreover, Crane is not qualified to opine regarding the relevant EPA regulations. He conceded that, prior to this litigation, he had only a "vague" understanding of the regulations and could not recall "looking at the actual regulations and reading them in detail." Ex20, Crane Dep. 275:21-276:17.

- The CAEv2 "is defective".  Ex56, Djalilian Report at 39.

- "3M knowingly misrepresented the CAEv2's efficacy and failed to inform the military and consumers of the CAEv2's insufficient hearing protection."  *Id.*

- "The risks of using the CAEv2 significantly outweighs the potential benefit of using them in both the civilian and military users."  *Id.* 42.

- Defendant's advertising would be "fraudulent" if they were to advertise a one-size-fits-all earplug that actually did not fit everyone.  Ex57, Djalilian Dep. 253:3-16.

- Defendants "did not fulfill the terms of the contract" to the military.  *Id.* 261:7-10.

He also offer impermissible opinions on Defendants' state of mind, including:

- Defendants "intended" to do incomplete testing on the CAEv2 because they "didn't want the test results to come out."  Ex57, Djalilian Dep. 276:9-277:13.

- Opining on Defendant executives' "values" and "what  sort of was important for them. And it seems like what was important for them was burying" test results.  *Id.* 278:17-280:10.

- When asked directly if he would be offering testimony about the intent of Defendants, Djalilian stepped into Elliot Berger's shoes and asked, rhetorically, "But why would he stop the test if the number is looking low. It's only so the number doesn't come out. And that's why they hid the 015 test results."  *Id.* 277:14-278:16.

All of these opinions should be excluded.

### C.    Packer Cannot Testify To Montero's State Of Mind.

During his deposition, Packer speculated as to why (1) Montero's records do not reflect a history of hearing issues or tinnitus, (2) Montero continued to use an allegedly faulty earplug for 15+ years, and (3) Montero has not attempted to receive treatment to mitigate the effects of his purported tinnitus, all by citing Packer's

supposed understanding of Montero's state of mind.  Throughout his deposition, Packer repeated a refrain about Montero's "stoic" nature and the "common practice" of soldiers not wanting to complain.  Ex28, Packer Dep. 269:18-270:3 ("It was not a common practice for soldiers to [disclose fitting issues with earplugs].  He is a stoic individual."); *see also id.* 207:6-20; 388:16-20.  Just as the Court previously rejected Packer's attempt to speculate as to Defendants' state of mind, ECF 1680 at 135, the Court should exclude Packer from opining on Montero's state of mind.

## IV.   PLAINTIFFS' EXPERTS CANNOT OFFER OTHER UNRELIABLE OR IMPERMISSIBLE OPINIONS.

### A.   Certain Of McKinley's Rebuttal Opinion To Flamme-Stephenson Are Unreliable.

Certain of McKinley's rebuttal opinions should be excluded because they are not based on a reliable methodology.  *First*, in Table 1 of their report, Flamme-Stephenson list the peak decibel levels of various weapons to which Plaintiffs were exposed, with that information largely being taken from the Army's Health Hazard Assessments ("HHAs").  *E.g.*, Ex58, Flamme-Stephenson Camarillorazo Report 3-4. McKinley opines that the impulse and continuous noise levels listed in this table do not have a sufficient factual basis.  Ex59, McKinley Rebuttal Report 1-2.  But McKinley agreed that he had not "undertaken the process of looking at the noise levels record in [the Flamme-Stephenson] report and comparing them to any publicly available data or otherwise" to "verify their accuracy."  Ex60, McKinley

Dep. at 20:3-10.  McKinley also did not present any specific noise levels in his rebuttal report.  *Id.* 20:11-19.  Nor has he been provided with the HHA data produced by the Department of Defense.  *Id.* 16:18-17:2.  Thus, without having any data to establish that the noise levels in Flamme and Stephenson's report are inaccurate, he cannot reliably offer that opinion at trial.

McKinley next opines that the Flamme-Stephenson reports fail to account for "the added attenuation properties of helmets worn by soldiers" when evaluating the Group C Plaintiffs' noise exposures.  Ex59, McKinley Rebuttal Report 2.  He did not consult any studies to evaluate the attenuation levels provided by the helmets referenced in his second rebuttal opinion.  Ex60, McKinley Dep. 28:2-11.  McKinley also had no knowledge about the helmets that any of the Group C plaintiffs wore during their service. *Id.* 27:15-28:1.  With no supporting data to assert how, if at all, the helmets that the Group C plaintiffs wore during service affected attenuation, the opinion is again unreliable.

Finally, McKinley's opinions about the acoustic energy of sand are unreliable. The Flamme-Stephenson report notes that the roof of the mortar pit bunker in which Finley worked was lined with sandbags.  Ex61, Flamme-Stephenson Finley 12. McKinley testified he "did a couple of web searches" to look up "the acoustic absorption coefficient of sand," but could not identify any sources with specificity. Ex60, McKinley Dep. 8:21-10:3.  McKinley's unknown sources only looked at *sand*

not *sandbags*, which he acknowledged could, to some degree, affect the overall absorption of acoustic energy. *Id.* 76:9-78:14; 79:14-20. Unable able to identify the sources underpinning those opinions, they should be excluded.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter an order excluding the opinions of Plaintiffs' experts as described herein.

September 17, 2021

*/s/ Charles F. Beall, Jr.*
Larry Hill
Florida Bar No. 173908
lhill@mhw-law.com
Charles F. Beall, Jr.
Florida Bar No. 66494
cbeall@mhw-law.com
Haley J. VanFleteren
Florida Bar No. 1003674
hvanfleteren@mhw-law.com
MOORE, HILL & WESTMORELAND, P.A.
350 West Cedar Street
Maritime Place, Suite 100
Pensacola FL 32502
Telephone: (850) 434-3541

Respectfully submitted:

*/s/ Robert C. "Mike" Brock*
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
mnomellini@kirkland.com

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company,*
*3M Occupational Safety LLC, Aearo*
*Technologies LLC, Aearo Holding,*
*LLC, Aearo Intermediate, LLC and*
*Aearo, LLC*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

Judge Herndon on July 12, 2021 conveyed the Court's direction that the parties' *Daubert* motions are limited to 1350 words per new expert and 1350 words per new issue with an existing expert.  This motion seeks to exclude, in whole or in part, nine[11] Plaintiffs' experts, yielding a word limit of 12,150.  Pursuant to Local Rule 7.1(F) and this Court's direction, counsel for Defendants certify that this memorandum contains 11,700 words, excluding the case style, motion (which is less than 500 words), tables of contents and authorities, signature block, and certificates of compliance with the Local Rules.

 Dated:  September 17, 2021                          Respectfully submitted,


                                                    /s/ Robert C. Brock
                                                    Robert C. "Mike" Brock
                                                    KIRKLAND & ELLIS LLP
                                                    1301 Pennsylvania Avenue, N.W.
                                                    Washington, D.C. 20004
                                                    Telephone:  (202) 389-5991
                                                    mike.brock@kirkland.com

                                                    *Counsel for Defendants*
                                                    *3M Company,*

---

[11] Defendants are not counting Ezelle in this number, given the brevity of Defendants' arguments concerning Ezelle and because those arguments largely are prophylactic.

*3M Occupational Safety LLC,*
*Aearo Technologies LLC,*
*Aearo Holding, LLC,*
*Aearo Intermediate, LLC and*
*Aearo LLC*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)</u>

Pursuant to Local Rule 7.1(B), counsel for Defendants certify that they held a conference to discuss the relief sought in this motion with Plaintiffs' counsel on September 16, 2021.  Plaintiffs' counsel represented that they would not agree on September 16, 2021.


Dated:  September 17, 2021                    Respectfully submitted,


                                             /s/ Robert C. Brock
                                             Robert C. "Mike" Brock
                                             KIRKLAND & ELLIS LLP
                                             1301 Pennsylvania Avenue, N.W.
                                             Washington, D.C. 20004
                                             Telephone:  (202) 389-5991
                                             mike.brock@kirkland.com

                                             *Counsel for Defendants*
                                             *3M Company,*
                                             *3M Occupational Safety LLC,*
                                             *Aearo Technologies LLC,*
                                             *Aearo Holding, LLC,*
                                             *Aearo Intermediate, LLC and*
                                             *Aearo LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 17, 2021, a true and correct copy of the foregoing:

**DEFENDANTS' OMNIBUS MOTION TO EXCLUDE PLAINTIFFS' GROUP C PUTATIVE EXPERT OPINIONS UNDER *DAUBERT* AND RULE 702 AND INCORPORATED MEMORANDUM**

was served as follows:

☒ **[E-Mail]** By causing the above document to be sent via electronic mail to the parties at the email addresses listed below. I am aware that service is presumed invalid if the email transmission is returned as undeliverable.

| | |
|---|---|
| Bryan F. Aylstock, Lead Counsel<br>Douglass A. Kreis<br>Neil D. Overholtz<br>Jennifer M. Hoekstra<br>Aylstock, Witkin, Kreis & Overholtz, PLLC<br>17 East Main Street Suite 200<br>Pensacola, FL 32502<br>Tel.: (850) 202-1010<br>Email: baylstock@awkolaw.com<br>Email: dkreis@awkolaw.com<br>Email: noverholtz@awkolaw.com<br>Email: jhoekstra@awkolaw.com<br><br>*Counsel for Plaintiff Guillermo Camarillorazo*<br>Case No. 7:20-cv-00098<br><br>*Counsel for Plaintiff Theodore Finley*<br>Case No. 7:20-cv-00170<br><br>*Counsel for Plaintiff Carlos Montero*<br>Case No. 7:20-cv-00067 | Shelley V. Hutson, Co-Lead Counsel<br>Emily B. Marlow<br>Marcela J. Arevalo<br>Clark, Love & Hutson, GP<br>440 Louisiana Street<br>Suite 1600<br>Houston, TX 77002<br>Tel.: (713) 757-1400<br>Email: shutson@triallawfirm.com<br>Email: emarlowe@triallawfirm.com<br>Email: bgreif@triallawfirm.com<br>Email: marevalo@triallawfirm.com<br><br>*Counsel for Plaintiff Guillermo Camarillorazo*<br>Case No. 7:20-cv-00098<br><br>*Counsel for Plaintiff Joseph Palanki*<br>Case No. 3:19-cv-02324 |

| | |
|---|---|
| *Counsel for Plaintiff Joseph Palanki* Case No. 3:19-cv-02324 <br><br> *Counsel for Plaintiff Carter Stelling* Case No. 7:20-cv-00143 | |
| Christopher A. Seeger, Co-Lead Counsel <br> David R. Buchanan <br> Caleb A. Seeley <br> Maxwell H. Kelly <br> Parvin K. Aminolroaya <br> Seeger Weiss LLP <br> 55 Challenger Road, 6th Floor <br> Ridgefield Park, NJ 07660 <br> Tel.: (212) 584-0700 <br> Email: cseeger@seegerweiss.com <br> Email: dbuchanan@seegerweiss.com <br> Email: cseeley@seegerweiss.com <br> Email: mkelly@seegerweiss.com <br> Email: paminolroaya@seegerweiss.com <br> Email: MDL2885@seegerweiss.com <br><br> *Counsel for Plaintiff Carter Stelling* Case No. 7:20-cv-00143 | Michael A. Burns, Co-Liaison Counsel <br> Caroline L. Maide <br> Mostyn Law Firm <br> 3810 W. Alabama Street <br> Houston, TX  77027 <br> Tel.: (713) 714-0000 <br> Email: epefile@mostynlaw.com <br> Email: maburns@mostynlaw.com |
| Evan D. Buxner, <br> Plaintiffs' Executive Committee <br> Gori Julian & Associates <br> 156 North Main Street <br> Edwardsville, IL 62025 <br> Tel.: (618) 659-9833 <br> Email: evan@gorijulianlaw.com | Brian H. Barr, Co-Liaison Counsel <br> Winston Troy Bouk <br> Troy A. Refferty <br> Levin, Papantonio, Thomas, Mitchell, Rafferty, & Proctor, P.A. <br> 316 S Baylen St. Ste 600 <br> Pensacola, FL 32502 <br> Tel.: (850) 435-7045 <br> Email: bbarr@levinlaw.com <br> Email: tbouk@levinlaw.com <br> Email: trafferty@levinlaw.com |
| Keith M. Jensen | Thomas W. Pirtle |

| | |
|---|---|
| Keith M. Jensen PC<br>1024 N. Main Street<br>Fort Worth, TX 76105<br>Tel.: (817) 334-0762<br>Email: kj@jensen-law.com<br><br>*Counsel for Plaintiff Guillermo Camarillorazo*<br>Case No. 7:20-cv-00098 | Buffy K. Martines<br>Laminack Pirtle & Martines<br>5020 Montrose Blvd, 9th Fl.<br>Houston, TX 77006<br>Tel.: (713) 292-2750<br>Email: tomp@lpm-triallaw.com<br>Email: buffym@lpm-triallaw.com<br><br>*Counsel for Plaintiff Guillermo Camarillorazo*<br>Case No. 7:20-cv-00098 |
| Jonathan M. Sedgh<br>Panagiotis V. Albanis<br>Paul J. Pennock<br>Morgan & Morgan<br>850 3rd Avenue, Suite 402<br>Brooklyn, NY 11232<br>Tel.: (212) 738-6839<br>Email: jsedgh@forthepeople.com<br>Email: palbanis@forthepeople.com<br>Email: ppennock@forthepeople.com<br><br>*Counsel for Plaintiff Guillermo Camarillorazo*<br>Case No. 7:20-cv-00098 | Katherine L. Cornell<br>Pulasaki Law Firm<br>2925 Richmond Avenue, Suite 1725<br>Houston, TX 77098<br>Tel.: (713) 664-4555<br>Email: kcornell@pulaskilawfirm.com<br><br>*Counsel for Plaintiff Guillermo Camarillorazo*<br>Case No. 7:20-cv-00098 |
| Thomas J. Henry<br>Roger L. Turk<br>Thomas J. Henry Law PLLC<br>521 Starr Street<br>Corpus Christi, TX 78401<br>Tel.: (361) 985-0600<br>Email: tjh.3m@thomasjhenrylaw.com<br>Email: rlt.3m@thomasjhenrylaw.com<br><br>*Counsel for Plaintiff Theodore Finley*<br>Case No. 7:20-cv-00170 | Nicole Corinne Berg<br>Ashley Barriere<br>Kathryn Lee Couey<br>Keller Lenkner LLC<br>150 N. Riverside Plaza<br>Suite 4270<br>Chicago, IL 60606<br>Tel.: (312) 741-5220<br>Email: ncb@kellerlenkner.com<br>Email: ashley.barriere@kellerlenkner.com<br>Email: kathryn.couey@kellerlenkner.com |

| | *Counsel for Plaintiff Carlos Montero*<br>Case No. 7:20-cv-00067 |
|---|---|
| Alexandra M. Walsh<br>1050 Connecticut Avenue<br>Suite 500<br>Washington, DC 20036<br>Tel.: (202) 780-4127<br>Email: awalsh@alexwalshlaw.com<br><br>*Counsel for Plaintiff Carlos Montero*<br>Case No. 7:20-cv-00067 | Jason M. Milne<br>Clark Love & Hutson<br>757 W. Meadow Side Drive<br>Saratoga Springs, UT 84045<br>Tel.: (385) 447-1041<br>Email: jmilne@triallawfirm.com<br><br>Counsel for Plaintiff Joseph Palanki<br>Case No. 3:19-cv-02324 |
| Matthew S. Hosen<br>Quinn Emanuel Urquhart<br>1109 1st Avenue, Suite 210<br>Seattle, WA 98101<br>Tel.: (206) 905-7000<br>Email: matthosen@quinnemanuel.com<br><br>*Counsel for Plaintiff Joseph Palanki*<br>Case No. 3:19-cv-02324 | Muhammad S. Aziz<br>Abraham Watkins Nichols<br>800 Commerce Steet<br>Houston, TX 77055<br>Tel.: (713) 222-7211<br>Email: jdean@abrahamwatkins.com<br><br>*Counsel for Plaintiff Joseph Palanki*<br>Case No. 3:19-cv-02324 |

DATED:  September 17, 2021

/s/ Robert C. Brock
Robert C. "Mike" Brock