**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *Camarillorazo, 7:20-cv-00098* *Finley, 7:20-cv-00170* *Montero, 7:20-cv-00067* *Palanki, 3:19-cv-02324* *Stelling, 7:20-cv-00143* | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones **[FILED UNDER SEAL]** |

**PLAINTIFFS' OMNIBUS MOTION AND MEMORANDUM OF LAW TO**
**EXCLUDE DEFENDANTS' EXPERT OPINIONS AND TESTIMONY**

FILED USDC FLND PN
SEP 17 '21 PM 3:06

**TABLE OF CONTENTS**

I.   Introduction ...................................................................................................1

II.  Legal Standard ..............................................................................................2

III. Argument......................................................................................................6

    A.  General and Case-Specific *Daubert* Arguments ...........................................6

        1.  LaBorde (General) and Jones & LaBorde (Stelling) .............................6

        2.  Flamme & Stephenson (Camarillorazo, Finley, Stelling) ......................9

        3.  Crawford (Camillorazo, Finley) ........................................................21

        4.  Jacobs (Montero, Finley, Camarillorazo) ...........................................26

        5.  Collins (Finley) ................................................................................34

        6.  Seidman (Montero) ..........................................................................36

        7.  Pappas & Gould (Palanki) ................................................................42

    B.  Non-Retained Case-Specific Medical Expert Witnesses ...........................47

IV.  Conclusion....................................................................................................50

# TABLE OF AUTHORITIES

## Cases

*Allison v. McGhan Med. Corp.*,
184 F.3d 1300 (11th Cir. 1999) ..............................................................5

*Arch Specialty Ins. Co. v. BP Invest. Ptrs., LLC*,
2020 WL 5848317 (M.D. Fla. Oct. 1, 2020) .....................................49

*Chapman v. Procter & Gamble Distrib., LLC*,
766 F.3d 1296 (11th Cir. 2014) .................................................. 42, 46

*Cooper v. Southern Co.*,
390 F.3d 695 (11th Cir. 2004) ............................................................21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ................................................................... 1, 2, 4

*E.I. du Pont de Nemours and Co. v. Robinson*,
923 S.W.2d 549 (Tex. 1995) ................................................ 22, 23, 25

*Feliciano v. City of Miami Beach*,
844 F. Supp. 2d 1258 (S.D. Fla. 2012) ...............................................4

*Flury v. Daimler Chrysler Corp.*,
427 F.3d 939 (11th Cir. 2005) ..............................................................3

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ..............................................................................5

*Hendrix ex rel. G.P. v. Evenflo Co.*,
609 F.3d 1183 (11th Cir. 2010) ............................................. 3, 42, 46

*In re 3M Combat Arms Earplug Prod. Liab. Litig.*,
2021 WL 684183 (N.D. Fla. Feb. 11, 2021) ................................ 9, 10

*In re 3M Combat Arms Earplug Prod. Liab. Litig.*,
2021 WL 830309 (N.D. Fla. Mar. 4, 2021)................................... 9, 10

*In re 3M Combat Arms Earplug Prods. Litig.*,
   2021 WL 765019 (N.D. Fla. Feb. 28, 2021) .................................................. 7, 46

*In re: Abilify (Aripiprazole) Prod. Liab. Litig.*,
   299 F. Supp. 3d 1291 (N.D. Fla. 2018) ....................................................... 5, 11

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)...................................................................................3, 4

*Navelski v. Int'l Paper Co.*,
   244 F. Supp. 3d 1275 (N.D. Fla. 2017) ...................................................... passim

*Ohio State Troopers Ass'n v. Point Blank Enters, Inc.*,
   2020 WL 1666763 (S.D. Fla. Apr. 3, 2020)....................................................20

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
   326 F.3d 1333 (11th Cir. 2003) .........................................................................3, 4

*Rider v. Sandoz Pharms. Corp.*,
   295 F.3d 1194 (11th Cir. 2002) .........................................................................46

*Rink v. Cheminova, Inc.*,
   400 F.3d 1286 (11th Cir. 2005) .........................................................................3, 4

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) .............................................................. passim

*Williams v. Mast Biosurgery USA, Inc.*,
   644 F.3d 1312 (11th Cir. 2011) .........................................................................49

**Rules**

Fed. R. Civ. P. 26 ............................................................................... 16, 48

Fed. R. Civ. P. 37 ...................................................................................16

Fed. R. Evid. 403 .....................................................................................1

Fed. R. Evid. 702 ........................................................................ 1, 26, 42

Fed. R. Evid. 703 ........................................................................ 1, 20

Plaintiffs submit this motion and incorporated memorandum of law to exclude the opinions and testimony of Defendants' designated experts.

## I.     **INTRODUCTION**

On August 9, 2021, Defendants disclosed 17 expert witnesses pursuant to Federal Rule of Civil Procedure 26(a)(2) in the above-captioned Group C cases.[1] As detailed below, Defendants' experts fail to meet the requirements for admissible expert testimony under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702, 703, and 403. Pursuant to these authorities, Plaintiffs move to exclude general opinions and testimony of Dr. Jennifer LaBorde.[2] Plaintiffs also move to exclude case-specific opinions and testimony of Drs. Derek Jones and Jennifer LaBorde, Drs. Gregory Flamme and Mark Stephenson, Dr. James

---

[1] *See* Group C Expert Witness Disclosure Letter from R. Brock to B. Aylstock, Aug. 9, 2021 ("PX1").

[2] Plaintiffs also move to exclude, via preservation motion filed simultaneously herewith, the general expert opinions of Dr. John Casali, Dr. James Crawford, Drs. Gregory Flamme & Mark Stephenson, Dr. Harri Kytomaa, Dr. Richard Neitzel, Ms. Jennifer Sahmel, and Ms. Vickie Tuten. *See* PX2(Casali-(General)), PX3(Crawford-(General)),     PX4(Flamme&Stephenson-(General)),     PX5(Kytomaa-(General)), PX6(Neitzel-(General)), PX7(Sahmel-(General)), and PX8(Tuten-(General)). The Group C general expert opinions of these witnesses remain unchanged from Groups A and B. Therefore, Group C Plaintiffs have filed a motion to preserve all Group A and Group B *Daubert* motions to exclude the general expert opinions of Casali, Crawford, Flamme & Stephenson, Kytomaa, Neitzel, Sahmel, and Tuten (*see* Docs. 1595 and 1863), which this Court adjudicated in prior Orders. *See* Docs. 1651, 1680, 1690, 1701, and 1708 (Group A) and 1910 (Group B).

Crawford, Dr. Douglas Jacobs, Dr. Robert Collins, Dr. Michael Seidman, and Drs. Dennis Pappas, Jr. and Dianna Gould.

Additionally, for the first time in this litigation, Defendants have disclosed certain alleged "Non-Retained Case-Specific Medical Expert Witnesses," including: Dr. David Rosario-Rivera (Camarillorazo), Dr. Christie Glick (Camarillorazo), Dr. Melanie Ottenbacher (Finley), Dr. Douglas Holmes (Montero), Dr. Vinjay Saranga (Montero), Dr. Mark Gurley (Palanki), Dr. Rebekah Tripp (Palanki), Dr. Felicia Graf (Stelling), Dr. Gail Farrar (Stelling), and Dr. Kendall Nutt (Stelling).[3] For the reasons stated in Section III.B, any expert opinions of these witnesses should be excluded and the testimony of these witnesses limited to, at most, fact testimony only.[4]

## II.   **LEGAL STANDARD**

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining whether expert testimony is admissible under Federal Rule of Evidence 702. *See Flury v. Daimler Chrysler Corp.*, 427 F.3d 939,

---

[3] *See* Defendants' Disclosure of Non-Retained Case-Specific Medical Expert Witnesses, Aug. 9, 2021 ("PX9").

[4] In Group A, Defendants disclosed Elliott Berger and Dr. Eric Fallon as "hybrid" expert witnesses under Fed. R. Civ. P. 26(a)(2)(C). *See* Group A Expert Witness Disclosure Letter from R. Brock to B. Aylstock, Nov. 9, 2020 ("PX10"). However, Defendants did not disclose Berger and Fallon as expert witnesses in Group C. *See* PX1. Even if Defendants had timely disclosed Berger and Fallon as "hybrid" expert witnesses in Group C, which they did not, their opinions should still be excluded to the extent set forth in the Court's Group A *Daubert* Orders. *See* Docs. 1651, 1680, and 1690.

944 (11th Cir. 2005). Rule 702 requires trial courts to perform a "gatekeeping" function to ensure that expert testimony is reliable and relevant. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The proponent of expert testimony must prove its admissibility by a preponderance of the evidence. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010).

Expert testimony is reliable and relevant when it satisfies the criteria of "qualification, reliability, and helpfulness"—"(1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is 'sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1286 (N.D. Fla. 2017). These are "distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

To be qualified, an expert must "ha[ve] sufficient 'knowledge, skill, experience, training, or education' to form a reliable opinion about an issue that is before the court." *Navelski*, 244 F. Supp. 3d at 1286. "This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's

3

expertise go to credibility and weight, not admissibility." *Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012) (internal quotation marks omitted).

To be reliable, "an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *Navelski*, 244 F. Supp. 3d at 1286 (citing *U.S. v. Frazier*, 387 F.3d 1244, 1261-62 (11th Cir. 2004)). Relevant factors include whether: (1) "the scientific technique can be or has been tested"; (2) "the theory or technique has been subjected to peer review or publication"; (3) "the technique has a known or knowable rate of error"; and (4) "the technique is generally accepted in the relevant community." *Id.* (citing *Daubert*, 509 U.S. at 593-94). Such factors are illustrative, not exhaustive. *See Quiet Tech.*, 326 F.3d at 1341; *Rink*, 400 F.3d at 1292 (courts "have substantial discretion in deciding how to test an expert's reliability"). Although reliability is a flexible inquiry, *Kumho Tire*, 526 U.S. at 141-42, the analytical focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

To be helpful, "expert testimony must be relevant to an issue in the case and offer insights beyond the understanding and experience of the average citizen." *Navelski*, 244 F. Supp. 3d at 1287. Relevant expert testimony "advances a material aspect of the proposing party's case and 'fits' the disputed facts." *In re Abilify*

*(Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1305 (N.D. Fla. 2018). When "too great an analytical gap" exists between the facts and the proffered opinion, the expert opinion does not "fit." *Id*. (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997)).

Ultimately, a court's gatekeeping "role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999). Even if expert testimony satisfies the admissibility requirements of *Daubert* and Rule 702, it may still be excluded under Rule 403 if its probative value "is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming." *Frazier*, 387 F.3d at 1263. Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," a trial court must carefully "weigh[] possible prejudice against probative force under Rule 403." *Id*.

## III.  **ARGUMENT**

### A.  **General and Case-Specific *Daubert* Arguments**

#### 1.  ***LaBorde (General) and Jones & LaBorde (Stelling)*[5]**

##### a.  ***LaBorde & Jones's Impairment Rating Opinions Should be Excluded.***

LaBorde and Jones co-authored a joint report in which they opine that Stelling has a 0% impairment rating for hearing loss according to the Florida Uniform Permanent Impairment Rating Schedule ("FUPIRS"), as well as other compensation formulas, including the AMA Binaural Hearing Impairment, and the Alabama, Kentucky, and Indiana worker's compensation statutes.[6] Opinions relating to the definition and assignment of an impairment rating under all of these disability schemes are unhelpful, and the minimal, if any, probative value is substantially outweighed by the danger of confusing the jury.

In both Trial Groups A and B, "the Court excluded the doctors' substantially similar FUPIRS-based opinions under Rules 702 and 403 'because they [were] unhelpful, and any probative value [was] substantially outweighed by a danger of

---

[5] LaBorde is Defendants' only general expert witness in the Group C cases to offer new opinions. LaBorde issued a general report for the first time in the Group C cases. PX11(LaBorde-(General)). LaBorde also co-authored a case-specific report with Dr. Jones in the *Stelling* case. PX12(Jones&LaBorde-(Stelling)). This section addresses both LaBorde's general opinions and the case-specific opinions of Jones & LaBorde.
[6] PX12(Jones&LaBorde-(Stelling)-17, 22, 26).

confusing the jury.'"[7] So too here. "'FUPIRS is a [disability rating] tool designed for setting workers' compensation benefits for Florida workers'" and is not typically used in any other context."[8] Questions about its scientific validity and the assumptions on which it is based leave the single-number descriptor without a scientific connection to the pertinent inquiries in this case and create risk confusion.[9]

The other compensation formulas cited by Jones & LaBorde suffer from the same flaws. Neither Jones nor LaBorde use the other impairment rating formulas in their clinical practice, as those formulas are primarily used for workers' compensation cases,[10] and, like FUPIRS, are based on a host of unproven assumptions.[11] Consistent with the Court's prior rulings, the impairment rating for Stelling should be excluded.

For the same reasons, LaBorde's general opinions describing these hearing impairment formulas are unhelpful and should be excluded pursuant to Rule 403.[12]

---

[7] Doc. 1910 at 23 (quoting *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 765019, at *11 (Feb. 28, 2021)).

[8] *Id*. at 23-24.

[9] *See id.*

[10] PX13(LaBorde-Dep-(9/9/2021)-40:5-41:15); PX14(Jones-Dep-(9/10/2021)-30:20-33:18).

[11] PX13(LaBorde-Dep-(9/9/2021)-44:2-45:4; 59:20-61:4; 62:1-20); PX15(Ward, 1983)-2) (concluding "all formulae to rate handicap are based on assumptions of a more or less arbitrary nature. A dozen such assumptions are shown to underly the formula of the American Medical Association/American Academy of Otolaryngology.").

[12] PX11(LaBorde-(General)-6-8).

Clinical assessments of hearing impairment depend on the interaction of a number of variables and "no single descriptor can completely summarize" hearing loss.[13] LaBorde has no case-specific opinions regarding any Trial Group C Plaintiff other than Stelling,[14] and abstract testimony regarding hearing impairment formulas would be unhelpful and confusing in those cases.

> **b.** **_LaBorde's Opinions Relating to Other Disorders Should be Excluded._**

LaBorde's general report includes descriptions of "other types of hearing and auditory processing disorders," namely central auditory processing disorder ("CAPD"), Misophonia, and Hyperacusis. [15] However, LaBorde has not diagnosed any Trial Group C Plaintiff with any of these disorders.[16] Nor has she reviewed the medical records of any Plaintiff with one of these disorders.[17] None of these disorders are presented as an alternative cause of any Plaintiff's hearing loss or auditory injury. As to Stelling, the only Plaintiff they opine on,[18] LaBorde & Jones likewise do not make a diagnosis of CAPD.[19] They also agree that Stelling does not

---

[13] _Id._ at 6-7.
[14] PX13(LaBorde-Dep-(9/9/2021)-15:11-17).
[15] PX11(LaBorde-(General)-13-14).
[16] PX13(LaBorde-Dep-(9/9/2021)-92:2-94:22).
[17] _Id._ at 64:7-10; 65:16-20; 92:2-94:22.
[18] PX14(Jones-Dep-(9/10/2021)-22:13-24).
[19] _Id._ at 101:24-102:8; PX13(LaBorde-Dep-(9/9/2021)-93:23-25; 176:13-25).

meet the definition of CAPD because he has abnormal hearing thresholds.[20] Accordingly, these opinions do not fit any of the Group C cases, are unhelpful, and testimony about auditory disorders not at issue would create a significant risk of jury confusion. Accordingly, such testimony should be excluded.

### 2.   *Flamme & Stephenson (Camarillorazo, Finley, Stelling)*

#### a.   *Flamme & Stephenson's Opinions Relating to the Army Hearing Conservation Program Should be Excluded (Camarillorazo, Finley, Stelling).*

Flamme & Stephenson offer case-specific opinions that Camarillorazo, Finley, and Stelling's hearing impairments were caused not by the CAEv2, but rather are attributable, at least in part, to the Army's inadequate implementation of its hearing conservation program. Substantially similar portions of Flamme & Stephenson's general causation opinion have been excluded in both Group A and Group B. *See In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 830309, at *5 (N.D. Fla. Mar. 4, 2021); *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 684183, at *2–3 (N.D. Fla. Feb. 11, 2021); Doc. 1910 at 14.

Flamme & Stephenson now repeat substantially the same excluded opinions regarding Camarillorazo, Finley, and Stelling. Flamme & Stephenson blame the military for these Plaintiffs' injuries because, among other reasons, (1) "[e]ssential

---

[20]   PX13(LaBorde-Dep-(9/9/2021)-176:13-177:8);   PX14(Jones-Dep-(9/10/2021)-101:8-19; 103:5-6).

mandatory elements of the DoD and Army Hearing Conservation Programs were inconsistently implemented for [Camarillorazo/Finley/Stelling]"[21] and (2) "failure to conduct monitoring audiometry denied [Camarillorazo/Finley/Stelling] the benefit of annual inspection and fitting instructions for his hearing protectors;"[22] and (3) the Army failed to provide "adequate and effective training."[23] As this Court has previously held, such testimony is unhelpful and should be excluded. *See In re 3M*, 2021 WL 830309 at \*5; *In re 3M*, 2021 WL 684183 at \*2-3; Doc. 1910 at 14-15.

### b. ***Flamme & Stephenson's Opinion That Burn Pit Exposures Are Associated With Tinnitus Should be Excluded (Camarillorazo, Finley, Stelling).***

Flamme & Stephenson do not opine that burn pit exposures caused any Plaintiff's hearing loss or tinnitus. Rather, they state that such exposures "cannot be ruled out" as a potential cause of tinnitus."[24, 25] But no reliable scientific evidence is

---

[21]  PX16(Flamme&Stephenson-(Camarillorazo)-55);  PX17(Flamme&Stephenson-(Finley)-48); PX18(Flamme&Stephenson-(Stelling)-56).

[22]  PX16(Flamme&Stephenson-(Camarillorazo)-56);  PX17(Flamme&Stephenson-(Finley)-49); PX18(Flamme&Stephenson-(Stelling)-57).

[23]  PX16(Flamme&Stephenson-(Camarillorazo)-55);  PX17(Flamme&Stephenson-(Finley)-48); PX18(Flamme&Stephenson-(Stelling)-56).

[24]  PX18(Flamme&Stephenson-(Stelling)-53,  59);  PX16(Flamme&Stephenson-(Camarillorazo)-32); PX19(Stephenson-Dep-(9/10/2021)-96:4-18).

[25] It is unclear whether Flamme & Stephenson actually opine that burn pit exposures are a potential cause for either Camarillorazo's or Finley's auditory injuries. *See* PX19(Stephenson-Dep-(9/10/2021)-99:13-23);   PX20(Flamme-Dep-(9/13/2021)-265:5-18);   PX21(Flamme-Dep-(9/14/2021)-467:21-470:1).   Regardless,   their reports discuss Camarillorazo's potential exposure to and Finley's denial of

provided that identifies burn pits as a potential cause of any Plaintiff's injury. Therefore, Flamme & Stephenson's inability to "rule out" burn pit exposures as a cause of tinnitus is unreliable, unhelpful, and substantially more prejudicial than probative. These opinions should be excluded.

No reliable science has been presented to suggest a causal relationship between burn pit exposure and any hearing injury, including tinnitus. Not only is there no scientifically established causal link between either burn pit exposures and tinnitus,[26] but Flamme & Stephenson rely on only one article to support their burn pit opinions, an article that expressly makes no attempt to "account for potential confounders" or "disentangle correlation from potential causation."[27] Neither that paper nor Flamme & Stephenson set forth any analysis for determining whether an association between burn pit exposure and tinnitus reflects a true causal relationship. *See, e.g.*, Doc. 1910 at 9-10; *In re Abilify (Aripiprazole)*, 299 F. Supp. 3d at 1307. Nor could such a relationship be demonstrated for any particular plaintiff: Flamme & Stephenson concede that they do not know what, if any, theoretical ototoxin each

---

exposure to burn pits, opinions that should be excluded as unhelpful and pursuant to FRE 403.

[26] PX19(Stephenson-Dep-(9/10/2021)-101:19-24).

[27] PX22(Henry et al. (2021)-14); PX19(Stephenson-Dep-(9/10/2021)-106:18-107:19); PX20(Flamme-Dep-(9/13/2021)-308:20-309:11).

plaintiff was exposed to, nor do they have any information regarding the dose or durations of any Plaintiff's purported exposure.[28]

Flamme & Stephenson's opinion that they were unable to rule out burn pits has no probative value, while presenting a substantial danger of unfairly confusing and misleading the jury regarding the science. *See* Doc. 1910 at 10; *Frazier*, 387 F.3d at 1263 ("[E]xpert testimony may be assigned talismanic significance in the eyes of lay jurors… district courts must take care to weigh the value of such evidence against its potential to mislead or confuse."). Accordingly, these opinions should be excluded on reliability, helpfulness, and 403 grounds.

> c.  ***Flamme & Stephenson's Opinion That Possible Chemical Warfare Exposures Are Associated With Tinnitus Should be Excluded (Stelling).***

Flamme & Stephenson discuss Stelling having "possible" chemical warfare exposures.[29] Flamme testified that they "don't know which chemical agents [Stelling] might have been exposed to,"[30] "are not declaring that he was exposed to chemical warfare agents," and ultimately disclaimed offering any opinion "referring to exposure to chemical warfare agents as a causal factor."[31]

---

[28] *See, e.g.*, PX19(Stephenson-Dep-(9/10/2021)-98:8-101:18;111:18-111:17); PX20(Flamme-Dep-(9/13/2021)-264:15-265:18); PX21(Flamme-Dep-(9/14/2021)-473:7-18).

[29] PX18(Flamme&Stephenson-(Stelling)-33,59,60).

[30] PX20(Flamme-Dep-(9/13/2021)-316:9-317:13).

[31] *Id.* at 317:14-319:11.

Regardless, there is no reliable scientific basis for identifying a chemical warfare exposure as a potential cause of Stelling's injuries as there has been no effort to identify—not to mention quantify—the alleged exposure. A conclusory statement that "possible chemical warfare exposures ... cannot be ruled out"[32] is insufficient. Flamme & Stephenson fail to consider what, if any, chemical warfare agents Stelling may have been exposed to, and therefore cannot offer to any degree of certainty that Stelling was exposed to a chemical warfare agent that can cause tinnitus. Even had they identified a known ototoxin, Flamme & Stephenson made no attempt to evaluate the dose, duration, or timing of this "possible" exposure, nor do they provide a reason for ignoring the conclusion of Stelling's evaluation for a respiratory condition that it was unlikely Stelling even had a symptomatic exposure.[33]

Accordingly, Flamme & Stephenson's opinions regarding Stelling's possible chemical warfare exposures have no probative value, a carry a substantial risk of confusing and misleading the jury regarding the science. *See* Doc. 1910 at 10; *Frazier*, 387 F.3d at 1263. The opinions should be excluded on reliability, helpfulness, and 403 grounds.

---

[32] PX18(Flamme&Stephenson-(Stelling)-59).
[33] *Id.* at 34.

> **d.** ***Flamme & Stephenson's Opinion That Cigarette/Tobacco Use is Associated With Tinnitus Should be Excluded (Camarillorazo, Finley, Stelling).***

For Finley and Stelling, Flamme & Stephenson identify cigarette use as "a risk factor that interacts with noise exposure" to "exacerbate" the hazard from noise, and for Camillorazo (despite no evidence he smokes)[34], Finley, and Stelling as a risk factor "associated with" tinnitus.

However, as the Court has previously concluded, Defendants have failed to present evidence that tobacco is ototoxic such that it could be an alternative cause of Plaintiffs' hearing injuries.[35] The Court hosted a Science Day where both parties and their experts presented evidence of whether a relevant scientific association exists between certain medications and illicit substances—identified by Defendants—and hearing loss and/or tinnitus. Tobacco was not identified on Defendants' list, and the Court found that "cigarette smoke" and nicotine were, "at most," marginally relevant.[36] In a Group B case, Defendants seemed to have conceded the lack of a causal connection, expressly stating that evidence of smoking only served as an alternative cause of loss of enjoyment of life, lost wages, and diminished life expectancy, not as a cause of the alleged hearing injured.[37] Here, a causal connection

---

[34] PX21(Flamme-Dep-(9/14/2021)-508:3-8).
[35] Doc. 1695 at 33, Doc. 1330 at 1, 5.
[36] *See* Doc. 1330.
[37] *Adkins*, 7:20cv12, Doc. 54 at 3.

is again disclaimed.[38] Accordingly, Plaintiffs' tobacco use has no tendency to make any fact at issue more likely, and therefore any limited probative value of this evidence is outweighed by the risk of unfair prejudice and confusing the jury on the relationship between tobacco and Plaintiffs' injuries.[39]

###### e.   *Flamme & Stephenson's Bone/Tissue Conduction Opinions Should be Excluded (Camarillorazo, Finley, Stelling).*

Flamme & Stephenson opine that they cannot rule out whether the hearing loss of the Plaintiffs may have occurred due to blast injury to the cochlea via the bone/tissue conduction pathway.[40] These opinions are unreliable and should be excluded: Flamme & Stephenson fail to provide sufficient scientific evidence to support the concept that any Plaintiff's injury could have been caused by bone conduction. Flamme & Stephenson cite literature discussing bone conduction from noise such as weapons fire. However, the unpublished, non-peer-reviewed presentation cited, and a poster summarizing the same study, expressly state that more research is needed before it can be established that "vibrations and acoustic

---

[38] PX19(Stephenson-Dep-(9/10/2021)-113:22-116:15).

[39] *See* Doc. 1695 at 33-34.

[40] PX16(Flamme&Stephenson-(Camarillorazo)-29); PX17(Flamme&Stephenson-(Finley)-26); PX18(Flamme&Stephenson-(Stelling)-26).

levels inside the head can lead to cochlear or neurological damage in the case of repeated exposure."[41]

Nor should Flamme & Stephenson be permitted to rely on "measurements taken by SASRAC during a breacher training activity sponsored by the Walter Reed Institute for Medical Research and law enforcement services in Washington County, Oregon and Multnomah County, Oregon" to support these opinions.[42]

Rule 26 requires expert reports to contain "the facts or data" considered by the witness in forming any opinions to be offered. Fed. R. Civ. P. 26(a)(2)(B)(ii). Pursuant to Rule 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

However, no facts or data from this supposed training activity have been produced, and Flamme testified that no published results exit.[43] Flamme & Stephenson include a figure allegedly from the breacher training,[44] but the graphs

---

[41] PX20(Flamme-Dep-(9/13/2021)-227:24-228:18);     PX19(Stephenson-Dep-(9/10/2021)-133:11-134:11); *see* PX23(Clavier Wilbur (2012)-13); PX24(Clavier (2012)-1).

[42] PX16(Flamme&Stephenson-(Camarillorazo)-30); PX17(Flamme&Stephenson-(Finley)-26); PX18(Flamme&Stephenson-(Stelling)-30).

[43] PX20(Flamme-Dep-(9/13/2021)-231:5-235:5).

[44] PX16(Flamme&Stephenson-(Camarillorazo)-32); PX17(Flamme&Stephenson-(Finley)-29); PX18(Flamme&Stephenson-(Stelling)-33).

lack any units on either axis and therefore fail to provide a reliable basis for a causation opinion.[45]

Flamme & Stephenson provide no justification for omitting the facts and data from this purported study, leaving Plaintiffs to guess at its relevance, if any. Plaintiffs would be significantly prejudiced if Flamme & Stephenson can wait until trial to fill in details regarding this study including its: findings and conclusion. Accordingly, Flamme & Stephenson should not be permitted to use this evidence at trial or rely on it to support their bone/tissue conductions opinions.

f.  ***Flamme & Stephenson's Opinions Regarding Effective Quiet Should be Excluded (Camarillorazo, Finley, Stelling).***

Flamme & Stephenson opine that the Plaintiffs did not have sufficient effective quiet in order to allow their hearing to recover.[46] These opinions are unreliable: there is insufficient scientific evidence to establish the concept that effective quiet would have made any difference for any of the Plaintiffs. There is also no reliable methodology applied to determine whether any Plaintiff actually lacked effective quiet.

---

[45] PX20(Flamme-Dep-(9/13/2021)-232:19-234:2).
[46] PX16(Flamme&Stephenson-(Camarillorazo)-34-35); PX17(Flamme&Stephenson-(Finley)-29-30); PX18(Flamme&Stephenson-(Stelling)-34).

Generally, neither the Ward 1976 nor the Flamme 2012 article identify lack of quiet as a cause of hearing injury.[47] Indeed, as Flamme wrote in his 2012 paper, while "recent work confirms that the noise environment following high-level noise exposures influences both threshold shift and histological evidence of hair cell pathology (Tanaka et al, 2009), [] the direction and magnitude of effects seems related to a variety of factors."[48] The Tanaka study cited by Flamme actually demonstrated that a louder post-exposure environment reduced NIHL and outer hair cell loss in chinchillas.[49] Flamme conceded that he has not kept up with this area of the science since his 2012 paper, is unaware whether a human test of an augmented post-exposure acoustic environment has been conducted, that "factors that might impact the direction and factors that might impact the magnitude [of recovery from TTS] are many," [50] and "[w]e just don't know exactly what they are."[51]

As to each Plaintiff, Flamme & Stephenson offer no measure as to the level or length of quiet necessary to allow any identified temporary threshold shift to

---

[47] PX25(Ward et al. (1976)-6) ("[I]t has not yet been established just how great a TTS2 can be produced day after day with no cumulative effects."); PX26(Flamme et al. 2012)-1 (identifying objective as "[i]dentify the distribution of typical noise levels present in daily life and identify factors associated with average sound levels.").

[48] PX26(Flamme et al. (2012)-1-2).

[49] PX27(Tanaka et al. 2009).

[50] PX20(Flamme-Dep-(9/13/2021)-197:13-200:6; 205:9-208:17).

[51] *Id.*

recover. They point to no noise dosimetry for any Plaintiff's exposures.[52] They also fail to reach any degree of scientific certainty, simply opining that "[i]t is reasonable to assert that the tempo of operations during deployment *might* have deprived [Camarillorazo/Finley/Stelling] of quiet rest periods, exacerbating the hazards to [Camarillorazo/Finley/Stelling]'s auditory system."[53] These opinions are unreliable and should therefore be excluded.

g.   ***Flamme & Stephenson's Narrative Regarding the Battle of Sadr City Should be Excluded (Stelling).***

Flamme & Stephenson both have training experience as audiologists, but neither is a historian nor an expert in military tactics.[54] Nevertheless, Flamme & Stephenson spend pages of their Stelling case-specific report quoting a blog post and a RAND publication's description of historical combat activities related to the Battle of Sadr City.[55] Because Flamme & Stephenson have no relevant expertise

---

[52] *See, e.g.*, PX21(Flamme-Dep-(9/14/2021)-390:14-393:7).
[53] PX16(Flamme&Stephenson-(Camarillorazo)-55); PX17(Flamme&Stephenson-(Finley)-48,); PX18(Flamme&Stephenson-(Stelling)-56) (emphasis added).
[54] PX20(Flamme-Dep-(9/13/2021)-279:18-281:3).
[55] PX18(Flamme&Stephenson-(Stelling)-9-14, 21, 22) (citing Spencer, J. (2019). Urban advantage: The battle of Sadr City. Downloaded from https://mwi.usma.edu/stealing-enemys-urban-advantage-battle-sadr-city/, last accessed 2AUG2021; Johnson, D. E., Markel, M. W., & Shannon, B. (2011). *The 2008 Battle of Sadr City: Reimagining Urban Combat*: RAND Corporation and JSTOR.).

interpreting historical documents, any opinions relating to on-the-ground conditions in Iraq based on these documents should be excluded.

It is improper for an expert "to become a vehicle for factual narrative." *Ohio State Troopers Ass'n v. Point Blank Enters, Inc.*, 2020 WL 1666763, at *15 (S.D. Fla. Apr. 3, 2020). Flamme & Stephenson's use of historical publications to weave narratives is unreliable. Neither Flamme nor Stephenson explains how these hearsay sources are of the type audiologists "reasonably rely on" in forming opinions about the cause of an individual's hearing injury. *See* Fed. R. Evid. 703.

Narratives unconnected to Stelling's personal experience or other admissible evidence are unhelpful and of limited, if any, probative value. The jury will hear from Stelling along with his squad-mate, Shaun Mennenga. Flamme & Stephenson should not be permitted to lend "expert" credibility to hearsay accounts regarding, for example, the length of Stelling's patrols or the frequency of IED attacks, when these reports come only from historical documents that they are unqualified to interpret.[56]

---

[56] *Id.* at 13.

3.    ***Crawford (Camillorazo, Finley)***

    a.    ***Crawford's Opinions Regarding Design Defect Should be Excluded.***

Crawford has not updated his general opinions since they were originally served in the Group A cases on November 9, 2020.[57] At that time, Crawford testified that he had no opinion as to whether the CAEv2 was defectively designed and he was provided no documents that would allow him to investigate that question.[58] Crawford has not received or independently reviewed any design-related documents since his December 2020 deposition.[59] Nevertheless, for the first time during his case-specific deposition on September 14, 2021, he opined that the CAEv2 is not defective.[60] This opinion, which is not contained in his general or case-specific reports,[61] is mere *ipse dixit*—a hunch that admittedly rests on no methodical investigation of the facts. Furthermore, the untimely and improper disclosure of this new opinion has deprived Plaintiffs of the opportunity to depose Crawford and adequately prepare a response and should be excluded as either a general or case-specific opinion at trial. *Cooper v. Southern Co.*, 390 F.3d 695, 728 (11th Cir. 2004).

---

[57] *Compare* PX3 (Group C) *with* PX28(Crawford-(General)) (Group A).

[58] PX29(Crawford-Dep-(12/28/2020)-89:16-90:10).

[59] PX30(Crawford-Dep-(9/14/2021)-120:16-122:2).

[60] *Id.* at 117:15-19, 184:2-6.

[61] *See* PX3; PX31(Crawford-(Camarillorazo)); PX32(Crawford-(Finley)).

> **b.**   ***Crawford's Opinions About Camarillorazo and Finley Should be Excluded.***

> **i.**   ***Whether the CAEV2's Defects Contributed to Plaintiffs' Hearing Problems.***

Because Crawford has not examined the defect in the CAEv2 earplug, he has no basis on which to opine that such defect did not contribute to Camarillorazo's and Finley's hearing issues.[62]

> **ii.**   ***Whether Hearing Aids Are Available at No Cost Through the Military Health Care System.***

Crawford's opinion that Camarillorazo and Finley may obtain hearing aids at no cost through the military health care system violates the collateral source rule and the Court's order excluding such evidence.[63]

> **iii.**   ***Whether Camarillorazo's Hearing Problems Are Unrelated to Noise.***

Crawford concedes that Camarillorazo has well-documented hearing loss but claims that due to "other cofactors and confounders it is not possible to attribute his hearing loss to the CAEv2."[64] However, Crawford cannot opine *to a reasonable degree of medical certainty* that any of these alleged cofactors or confounders contributed to cause Camarillorazo's hearing problems. *See E.I. du Pont de Nemours and Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). An expert determining the

---

[62] PX31(Crawford-(Camarillorazo)-3, 15); PX32(Crawford-(Finley)-3,18-23).
[63] *See* Doc. 1729 at 3.
[64] PX31(Crawford-(Camarillorazo)-18).

cause of something must rule in or out other causes of damage or his opinion is little more than speculation. *See id.* at 559. Where an expert's level of certainty is insufficient to establish causation, the expert's opinion is irrelevant. Crawford's opinion on potential cofactors or confounders is, therefore, irrelevant under Texas law.

### iv.    *Whether   Medications   Contributed   to Camarillorazo's Hearing Problems.*

Referencing seventeen medications taken by Camarillorazo, Crawford opines that five are associated with hearing loss and sixteen are associated with tinnitus.[65] According to Crawford, "Camarillorazo's use of these ototoxic medications cannot be ruled out as a contributing factor."[66] This equivocal statement falls well short of opining—based on a reasonable degree of medical certainty—that any of these medications contributed to Camarillorazo's hearing problems and tinnitus. Indeed, Crawford has not identified a scientifically valid causal link between any of these drugs and Camarillorazo's hearing issues.[67] In his deposition, Crawford only identified Percocet as having a scientifically studied causal relationship with hearing loss.[68] Although he did not include this study in his reference materials, Crawford

---

[65] *See* PX31(Crawford-(Camarillorazo)-15).
[66] *Id.* at 17.
[67] PX30(Crawford-Dep-(9/14/2021)-196:19-197:10).
[68] *Id.*

testified that a certain study determined the cause-and-effect relationship between Percocet and hearing loss to occur after six months or more of consistent use.[69] However, in his deposition, Crawford conceded that no evidence existed to show that "[Camarillorazo] used [Percocet] for six continuous months."[70] Thus, Crawford's opinion that "Camarillorazo's use of these ototoxic medications cannot be ruled out as a contributing factor" is unreliable, unhelpful, and substantially more prejudicial than probative. Accordingly, this opinion should be excluded under *Daubert* and Rule 403.

> ### v. *Whether Head Trauma or Traumatic Brain Injury Caused Camarillorazo's Hearing Problems.*

Crawford should not be permitted to testify that head trauma or traumatic brain injury ("TBI") caused Camarillorazo's hearing issues. First, Camarillorazo was not diagnosed with a TBI.[71] Second, Crawford cannot offer the opinion to a reasonable degree of medical certainty that any head trauma caused or contributed to Camarillorazo's hearing problems. Crawford's ultimate opinion is merely that "repeated head traumas cannot be ruled out as a cause of his hearing loss and tinnitus."[72] In a previous *Daubert* order, the Court held that a causation opinion was

---

[69] *Id.* at 201:3-10.
[70] *Id.* at 201:12-16.
[71] PX31(Crawford-(Camarillorazo)-15).
[72] *Id.* at 18.

not supported by a reliable methodology because the expert failed to "rule out any other potential cause[s]."[73] For these reasons, Crawford should not be permitted to testify that head trauma or TBI caused Camarillorazo's hearing issues.

### vi. Whether Finley Wore Hearing Protection Devices.

Crawford opines that Finley failed to wear hearing protection.[74] He bases this opinion on videos demonstrating that "many" soldiers were subject to noise exposure without hearing protection.[75] These observations are not specific to Finley, lack foundation and scientific reliability, and are speculative.[76]

### vii. Whether Finley's Tinnitus is Unrelated to Hearing Loss Caused by Military Noise Exposure.

Crawford's expert report claims that "it is impossible to attribute his tinnitus to any one thing."[77] He mentions migraines, TBIs, marijuana use, ear infections, and medications. However, Crawford cannot opine *to a reasonable degree of medical certainty* that any of these alleged events caused or contributed to Finley's tinnitus. *See Robinson*, 923 S.W.2d at 557. Expert testimony is inadmissible unless a competent expert testifies that a given event caused the plaintiff's injuries. *See id.* at 559. Where an expert's level of certainty is insufficient to establish causation, the

---

[73] Doc. 1680 at 24.

[74] PX32(Crawford-(Finley)-10, 19, 20, 28).

[75] *Id.* at 21; PX30(Crawford-Dep-(9/14/2021)-144:23-145:5).

[76] *See* Doc. 1651 at 11, 13, 16.

[77] *Id.* at 22.

expert's opinion is irrelevant. Crawford's opinion on potential causes of tinnitus is, therefore, irrelevant under Texas law.

### viii.   Whether Neurotrauma or TBI is the Cause of Finley's Hearing Problems.

Crawford should not be permitted to testify that neurotrauma or TBI caused Finley's hearing issues. Crawford's ultimate opinion is that "tinnitus, cognitive problems and sleep problems … may be associated with neurotrauma."[78] Crawford's failure to rule out other potential causes renders his causation opinion inadmissible.[79]

### 4.   Jacobs (Montero, Finley, Camarillorazo)

### a.   Jacobs' Opinions About Montero Should be Excluded.

Rule 702 allows expert testimony if, and only if, the "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Testimony concerning a matter the jury can understand *without* the expert's assistance fails that standard. This Court thus prohibited Defendants in Group B from offering purported expert testimony that "merely restat[ed] what is reported in [a plaintiff's] medical records."[80] Such testimony "does not provide any insight or analysis beyond what the jury can read from the records themselves with the assistance of a qualified

---

[78] PX32(Crawford-(Finley)-25).
[79] *See* discussion *supra* at III.A.3.b.v; Doc. 1680 at 24.
[80] Doc. 1910 at 23.

audiologist or ENT."[81] Notwithstanding the clarity of this ruling, Defendants now proffer testimony from Jacobs, a psychiatrist, who again is trying to simply regurgitate information contained in Montero's medical records. The Court should exclude that testimony.

Jacobs' report makes clear that he has no actual opinions to offer. Its "summary of opinions"[82] section includes nothing but alleged facts[83] from which Jacobs draws no conclusions or opinions.[84] At his deposition, Jacobs admitted that this was in fact a summary of records and testimony.[85] And he confirmed that the remainder of his report contained only "summaries of the records and [his] observations … about Mr. Monteros's tinnitus."[86] Those "observations" are limited

---

[81] *Id.*; *see also Navelski*, 244 F Supp. 3d at 1287.

[82] This is the only time the word "opinion" appears in Jacobs' report.

[83] Some facts are summarized incorrectly. *Compare* PX33(Jacobs-(Montero)-3) (no medication to treat symptoms of PTSD) *with* PX34(Jacobs-Dep-(9/8/2021)-36:1-4) (acknowledging Montero took medication that also treats symptoms of PTSD). Some facts are wrong. *See* PX34(Jacobs-Dep-(9/8/2021)-54:18-24) (referring to 2013 record, of which none exists).

[84] PX33(Jacobs-(Montero)-3).

[85] *See, e.g.*, PX34(Jacobs-Dep-(9/8/2021)-61:16-21) (summarized testimony about Montero's sleep); 64:22-65:6 ("pointing out information in the records"); 74:14-20 ("only reference what is referred to in the records" regarding TBI); 83:17-20 (no opinion on cause of Montero's tinnitus)).

[86] PX34(Jacobs-Dep-(9/8/2021)-81:23-82:4).

to content paraphrasing, reciting verbatim facts from the records, and noting that records do not mention tinnitus.[87]

Jacobs also confirmed that his testimony, like his report, would do little more than describe the content of medical records. He acknowledged that he cannot offer opinions on the cause or severity of Montero's tinnitus, hearing loss, or sleep issues,[88] or an opinion regarding any supposed TBI.[89] Instead, Jacobs described his role as offering opinions: "assessing records for noting consistency in records[;]"[90] "that more than likely, the first acknowledgement of tinnitus in the records is 2013, and more than likely that's when Mr. Montero was experiencing it[;]"[91] "that more than likely the medical records are accurate[;]"[92] and "about what the DOD records state in reference to his tinnitus[.]"[93]

Permitting Jacobs to provide his selective, and at times inaccurate, summary of Montero's medical records will not aid the jury's understanding of those records. Instead, it would unfairly prejudice Montero by allowing a witness, bearing the powerful imprimatur of "expert," to present medical records that Defendants believe

---

[87] *See, e.g.*, PX33(Jacobs-(Montero)-5) ("no indication of impact of tinnitus"); 15 ("the record does not document any complaints of tinnitus").
[88] *Id.* at 24; PX34(Jacobs-Dep-(9/8/2021)-62:12-17, 274:6-7).
[89] PX34(Jacobs-Dep-(9/8/2021)-74:14-20).
[90] *Id.* at 99:3-6.
[91] *Id.* at 100:23-101:3. There are no records acknowledging PTSD in 2013.
[92] *Id.* at 101:10-12.
[93] *Id.* at 101:18-20.

support their defense, such as a summary of Montero's marital issues, a topic that has no relevance to the issues in this case.[94]

During his deposition, Jacobs purported to offer an opinion about whether "PTSD and primarily the tinnitus have negatively impacted [Montero's] life."[95] That "opinion" is nowhere contained in his report,[96] nor is it derived from any established or reliable methodology. Instead, Jacobs' opinion that Montero is not suffering is based on what he views as an insufficient number of references to tinnitus in the medical records. Jacobs acknowledged he does not know if different treaters at different appointments asked Montero about tinnitus, such that it would be included in the records; and he agreed that as a clinician it is not a question he has ever asked a patient.[97]

Jacobs did not consider why Montero may have been reluctant to raise his tinnitus and PTSD with medical providers while he was still serving[98]—*e.g.*, reverse

---

[94] *See* Doc. 1910, at 19 (prohibiting Defendants from "weaponiz[ing] any aspect of [a plaintiff's] diagnosis to launch facially irrelevant and/or unduly prejudicial assault on [the plaintiff's] character.").

[95] PX34(Jacobs-Dep-(9/8/2021)-153:14-16).

[96] *See generally* PX33(Jacobs-(Montero)).

[97] PX34(Jacobs-Dep-(9/8/2021)-45:9-16, 48:11-15, 70:13-18).

[98] Jacobs rejected these because Montero purportedly reported his PTSD in 2013, but that is false.

malingering,[99] studies about military-related PTSD,[100] stigma.[101] Jacobs acknowledged tinnitus is a subjective complaint,[102] yet failed to consider Montero's deposition testimony concerning his tinnitus,[103] even though he agreed that talking with patients is key to his clinical practice and that he "tend[s] to … believe what they say."[104]

To the extent Jacobs' belief that Montero's tinnitus is not affecting his life even qualifies as an expert opinion, it should be excluded because it is not the product of any supposed methodology much less one that is "sufficiently reliable" to satisfy Rule 702 and *Daubert. Frazier*, 387 F.3d at 1261-62.

        **b.**     ***Jacobs' Opinions About Finley Should be Excluded.*** [105]

               **i.**     ***Jacobs' Opinions Based on the Nature and Timing of Finley's Tinnitus Reporting Should be Excluded.***

---

[99] PX34(Jacobs-Dep-(9/8/2021)-107:24-108:18).

[100] *Id.* at 51:2-22.

[101] *Id.* at 55:5-19.

[102] *Id.* at 155:17-20.

[103] *Id.* at 147:23-148:7.

[104] *Id.* at 30:9-13, 156:11-157:6.

[105] On September 14, 2021, Plaintiffs withdrew their designations of Finley case-specific experts Dr. David Axelrad, Dr. Joe Gonzales, Dr. Larry Pollock, and Dr. Gard Kronrad. As of the date of this filing, Defendants have refused to withdraw their rebuttal experts, Jacobs and Collins. *See* PX35(Finley-Letter-Expert-Withdrawal).

Jacobs is "not an otolaryngologist, neurotologist or audiologist, and he has no specialized training or experience in those fields."[106] Yet, he proffers opinions regarding Finley's tinnitus diagnosis, when those symptoms were reported, and ultimately concludes that his tinnitus symptoms were "described totally different" after the start of this litigation.[107] Jacobs opines that the only references to the severity of Finley's tinnitus do not appear in his records until after his evaluation by Dr. Axelrad.[108]

As was the case with Montero, Jacobs' report is almost entirely a recitation of Finley's medical records, which was confirmed during his deposition.[109] Indeed, over two-thirds of his report is simply a summary of Finley's medical records. Merely restating the information in Finley's medical records is unhelpful and should be excluded.[110] Moreover, this opinion is not helpful to the finder of fact and is beyond Jacobs' expertise. Jacobs has no qualifications to explain when or how Finley's tinnitus was reported, and he has not set a reliable method for any such opinion. Accordingly, any such testimony from Jacobs should be excluded.

---

[106] Doc. 1910 at 22.

[107] PX36(Jacobs-(Finley)-49).

[108] *Id.* at 51.

[109] *See* PX37(Jacobs-Dep-(9/15/2021)-45:19-46:13; 47:16-48:10; 49:12-16; 49:17-50:19; 90:11-21; 92:20-93:10; 95:12-10; 98:5-98:21; 100:23-101:7; 115:20-116:8; 119:10-19).

[110] *See* discussion *supra* at III.A.4.a.

### ii. Jacobs Should be Precluded From Discussing the Impacts of This Litigation on Finley.

Jacobs report includes discussion of Dr. Ezelle's sessions with Finley and states that the records show Finley experiencing "stress and anxiety from current events in his life (e.g. his involvement in the litigation…)" rather than hearing damage.[111] Jacobs goes on to note that Finley reports feeling "betrayal by the 3M Company" and "fearful that he will mess things up for him and the hundreds of other vets in his position."[112] Any testimony regarding the effects of this litigation are due to be excluded under Rules 702 and 403 because they are unhelpful, and any probative value is substantially outweighed by a danger of confusing the jury.

### c. Jacobs' Opinions About Camarillorazo Should be Excluded.

### i. Jacobs' Opinions Are Not Based on a Reliable Methodology.

Jacobs opines that Camarillorazo's documented mental health issues—PTSD, depression, and sleep disturbance—have not been impacted by his tinnitus or any hearing issues.[113] Rather, Jacobs loosely asserts that these issues "appeared to be related to his deteriorating relationship with his wife."[114] Jacobs has not applied any methodology or expertise as required in reaching his opinions regarding how hearing

---

[111] PX36(Jacobs-(Finley)-50-51).

[112] *Id.*

[113] PX38(Jacobs-(Camarillorazo)-4, 20, 21).

[114] *Id.* at 20.

issues affect Camarillorazo's life.[115] The opinion that some of Camarillorazo's *other* conditions, rather than his tinnitus, might affect his mental health is speculative and not the result of any expertise or accepted methodology. The Court was previously confronted with a similar situation with respect to Dr. House's opinions regarding the impact of hearing injuries on Group B plaintiff Wayman's daily life. In addressing plaintiff's *Daubert* challenge, the Court excluded House's testimony because "House has not furnished a basis for his unconditionally broad opinion that Wayman's alleged hearing injuries 'do not adversely affect his daily life.'"[116]

Jacobs has not supplied any basis for the opinion that Camarillorazo's hearing issues have not impacted his mental health. Accordingly, the opinion should be excluded.

### ii. *Jacobs' Opinions Are Not Helpful.*

Once again, Jacobs' report is comprised almost entirely of information found in Camarillorazo's medical records,[117] and should also be excluded as unhelpful to the jury.[118] Jacobs' recitation of what is or is not stated in Camarillorazo's medical records "does not provide any insight or analysis beyond what the jury can read from

---

[115] Doc. 1680 at 25-27.
[116] Doc. 1910 at 16.
[117] PX38(Jacobs-(Camarillorazo)-4-18).
[118] *See* discussion *supra* at III.A.4.a.

the records themselves."[119] Accordingly, such testimony is unhelpful and inadmissible.

### 5.   *Collins (Finley)*[120]

Collins' opinions regarding Finley should be excluded because he failed to apply a reliable methodology and failed to follow the agreed testing protocol, rendering the results misleading, unreliable, and inadmissible.[121]

First, Collins failed to apply a reliable methodology when reaching his conclusions about Finley. Most notably, Collins' report only stated that it was "possible" Finley was a malingerer, which he agreed means "it could happen."[122] This is insufficient under *Daubert*. Collins admits proving intent is required to diagnose malingering—evidence he doesn't have to make a diagnosis.[123]   Finally, several of the validity tests Collins relies upon are unreliable and lack a credible scientific foundation. He criticized Pollock for allegedly disregarding Finley's score on the TOMM," yet his report failed to disclose that Finley passed TOMM in his exam.[124] Further, he refused to consider overwhelming evidence inconsistent with

---

[119] Doc. 1910 at 23.
[120] *See supra* n.105.
[121] PX39(Collins-(Finley)-17).
[122] *Id.* at 10, 19.
[123] PX40(Collins-Dep-(9/16/2021)-ROUGH156:20-157:18).
[124]   PX39(Collins-(Finley)-12);   PX40(Collins-Dep-(9/16/2021)-ROUGH214:2-215:21).

his opinions; namely, Finley's passing performance on eight different validity tests (majority).[125]  Collins' opinions are based on cherry-picked testing and his disregard of the total weight of the evidence.  He attempts to bolster his position by relying on four different measures in a single exam and a standalone test by characterizing the results as five different validity tests.   Again, his analysis is flawed because four of the five tests that Collins says Finley failed were part of a single evaluation.[126]

Next, Collins failed to follow the testing protocol agreed to by the parties.[127] Collins conducted his interview of Finley with the use of a white noise machine, which was not allowed in the testing protocol or made known to Finley's counsel beforehand.[128] More importantly, the use of white noise improperly altered the testing environment and resulted in the evaluation being conducted in an unrealistic setting—one that his report admitted was optimal for Finley's tinnitus and designed to improve his testing performance.[129] Collins was unable to point to any scientific literature that allowed the use of white noise in evaluating a patient with tinnitus.[130] Collins also noted that Finley exhibited no startle response to minimize the severity

---

[125] PX40(Collins-Dep-(9/16/2021)-ROUGH18:6-20:6).
[126] *Id.* at 220:25-221:11.
[127] PX41(Agreed-Protocol-for-Finley-IME-by-Collins).
[128] PX39(Collins-(Finley)-5).
[129] *Id.*
[130] PX40(Collins-Dep-(9/16/2021)-ROUGH21:12-16).

of PTSD, yet another characteristic of his testing that was not disclosed or allowed under the protocol agreed to by the parties.[131]

Finally, significant portions of Collins' opinions would not be helpful to the jury because he: 1) summarizes Finley's medical records, which this Court has already determined is unhelpful to the jury and thus should be excluded,[132] and 2) rebuts Plaintiffs' experts Pollock and Axelrad, who have been withdrawn by Plaintiffs. Accordingly, Collins' opinions are unhelpful and should be excluded under *Daubert*.

### 6. *Seidman (Montero)*

#### a. *Whether Montero's Hearing Problems Are Unrelated to Noise.*

Seidman opines that Montero's subjective hearing difficulty is not the "result of cochlear injury from noise-exposures."[133] During his deposition, however, Seidman admitted as a general matter that "*nobody* can [say]" the extent to which someone's hearing loss is noise-related.[134] With respect to Montero specifically, Seidman concedes that his "exposure to noise" "*could have*" contributed to his

---

[131] PX39(Collins-(Finley)-5).
[132] *See* discussion *supra* at III.A.4.a.
[133] PX42(Seidman-(Montero)-14).
[134] PX43(Seidman-Dep-(9/1/2021)-100:14-101:3 (emphasis added)).

"changes in his hearing over time,[135] but he "can't tell you how much [hearing loss] is noise, how much is age, how much is genetics, how much is just the normal process."[136]

Perhaps most critically, Seidman admitted that it would be speculation and a leap to conclude that Montero's hearing loss was not noise related.[137] Although Seidman belatedly pointed to the absence of a "noise notch" in support of his opinion—a piece of supporting evidence which is not in his expert report—he could not provide any "literature to support [his] opinion that the notch needs to be as [he] described in order to be able to say that noise caused hearing loss."[138]

Seidman therefore should not be permitted to opine that Montero's hearing difficulty is unrelated to his noise exposure. Taking a leap and engaging in speculation does not constitute "scientifically valid principles, reasoning, and methodology." *Navelski*, 244 F. Supp. 3d at 1286. Seidman's more candid admissions—that it would be mere "speculation" and a "leap" to rule out noise exposure—further underscore that his purported opinions are based on nothing more than a hunch. Rule 702 requires more than this kind of ungrounded guesswork.

---

[135] *Id.* at 97:19-100:6 (emphasis added); *see also id.* at 102:22-23 (stating that he "believe[s] noise is a factor").

[136] *Id.* at 99:19-22; *see also id.* at 98:13-21, 104:10-19.

[137] *Id.* at 99:18, 106:15.

[138] *Id.* at 108:3-13.

      **b.**    *Whether Montero Has the Hearing "Expected" For Someone of His Age.*

Seidman should also not be permitted to opine that Montero's hearing scores are "no worse than expected for his age."[139] The reason is straightforward:  Seidman did not analyze what hearing loss *would be* expected for someone of Montero's age—much less for Montero specifically.

The only piece of medical literature in Seidman's report that details how much age-related hearing loss should be expected is a set of age-correction tables published by OSHA that were added on the eve of his deposition.[140] But Seidman admitted that he himself does not use the OSHA tables,[141] he does not teach his students about these tables,[142] and that he "didn't rely on the OSHA [tables] to say [Montero] has normal hearing for a 50-year-old."[143]

The only *other* support Seidman provided for this opinion is his experience with "the thousands of [50-year-old] people" he has treated over his career.[144] However, this anecdotal evidence has not been published and has not been peer-

---

[139] PX42(Seidman-(Montero)-16); *id.* at 14 (normal sensitivity "for a 50-year-old male").
[140] *See* PX42(Seidman-(Montero)-Ex.C (updated Aug. 30, 2021)); PX43(Seidman-Dep-(9/1/2021)-83:7-22, 93:13-94:12).
[141] PX43(Seidman-Dep-(9/1/2021)-85:15-16).
[142] *Id.* at 91:22-92:2.
[143] *Id.* at 90:20-21.
[144] *Id.* at 355:8-10.

reviewed.[145] In order to test his assertion about expected age-related hearing loss, Seidman conceded that he would have to review 25,000 to 30,000 patient records from his years of practice.[146] Guesswork such as this is a far cry from the "scientifically valid" methodology requirement. *Navelski*, 244 F. Supp. 3d at 1286.

Meanwhile, Seidman admitted that it is "impossible to know" whether age is the only thing that caused Montero's hearing to change.[147] He acknowledges that he "would only be able to speculate" about what Montero's hearing acuity would be in the absence of any noise exposure.[148] And he admitted that some studies show that age-related hearing loss could be exacerbated by early exposure to noise.[149] These concessions make clear that Seidman has no scientific basis on which to opine that Montero's hearing loss is only related to the ordinary aging process, *i.e.*, that his hearing is normal "for Mr. Montero's age."[150]

c.   ***Whether Medications Contributed to Montero's Hearing Problems.***

Seidman refers to "an extensive list of medications Mr. Montero has taken" and suggests that "we cannot be entirely sure [whether] this large list of medications"

---

[145] *Id.* at 356:10-21.
[146] *Id.* at 356:23-357:4.
[147] *Id.* at 97:14-18.
[148] *Id.* at 112:7-15; *see also id.* at 119:3-13 (stating that "a crystal ball" would be required).
[149] *Id.* at 238:16-25.
[150] PX42(Seidman-(Montero)-16).

caused Montero's hearing problems.[151] But Seidman admitted he could not "attribute any specifically" to causing or contributing to Montero's hearing issues.[152] And he admitted that he was *not* opining that Montero's medication use was "the cause of his problem,"[153] that he did *not* believe Montero's hearing issues were "necessarily [from] the drugs,"[154] that he "can't say how much [or] how little" the medications contributed to Montero's hearing injuries,[155] that he "doubt[ed] [they] [contributed] a lot,"[156] and that he "would not" "make the leap" to say that the medications caused Montero's injuries.[157] Seidman has no scientific basis on which to opine that the medications caused or contributed to Montero's hearing issues, and he should be precluded from offering such an opinion.

### d.   *Whether TBI is the Cause of Montero's Hearing Problems.*

Seidman should not be permitted to testify that Montero's hearing injuries are the result of a TBI. He admitted multiple times he is certainly "not an expert in TBI."[158] Seidman admitted that he had *only one* basis for concluding that Montero

---

[151] *Id.* at 18.
[152] PX43(Seidman-Dep-(9/1/2021)-399:8-24).
[153] *Id.* at 399:22-24.
[154] *Id.* at 400:3-4.
[155] *Id.* at 400:17-18.
[156] *Id.* at 400:18-19.
[157] *Id.* at 401:8-10.
[158] *Id.* at 379:18; *see id.* at 380:20 ("[TBI is] not my area of expertise"); *id.* 380:2-3 ("[A]gain, I'm not the world expert on TBI.").

even *had* a TBI—namely that Seidman "thought that he saw a psychiatrist or a psychologist … who in the record called it TBI … So that's what I'm going by."[159] Seidman acknowledged that he had no expertise on whether Montero's TBI was "short-lived or permanent."[160] And he acknowledged that he had no expertise on "whether [Montero] has a TBI" at all.[161] These admissions make clear that Seidman is not "sufficiently qualified" to opine on the existence or extent of Montero's TBI, *Navelski*, 244 F. Supp. 3d at 1286, much less testify that TBI is the cause of Montero's hearing issues.

### e. *Whether the CAEV2's Defects Contributed to Montero's Hearing Problems.*

Seidman opines that the tinnitus Montero experienced "following a 2007 IED blast cannot be attributed to any alleged defect in the CAEv2."[162] But Seidman admitted that he did not determine whether the CAEv2s were defective before rending his opinion.[163] Seidman admitted that his report contains no "opinions about whether or not the Combat Arms Earplugs are defective,"[164] that he did not attempt "to evaluate the earplugs that [Montero] used,"[165] and that he "would love to know"

---

[159] *Id.* at 382:21-383:3.
[160] *Id.* at 385:18-20.
[161] *Id*. at 385:18-386:1.
[162] PX42(Seidman-(Montero)-14).
[163] PX43(Seidman-Dep-(9/1/2021)-404:7-18).
[164] *Id.* at 72:2-8.
[165] *Id.* at 404:14-15.

about the defects in the CAEv2 but was not "privy to that information."[166] Given that Seidman did not evaluate the defect, he has no scientific basis on which to opine that the defect did not contribute to Montero's hearing issues.

### 7.   *Pappas & Gould (Palanki)*

Pappas, a neurotologist, and Gould, an audiologist, are disclosed only as case-specific experts in *Palanki*.[167] They opine that based on Palanki's "extensive audiometric history and review of his IME," he "does not have an injury that would require any type of intervention at this time."[168] As they do not believe Palanki has an auditory injury, the differential analyses that are required of reliable specific-causation opinions were not completed. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014). Thus, any opinion as to the specific cause of Palanki's auditory injuries, symptoms, or abnormal test results is based on "unsupported speculation" and not "sufficient facts or data." *Hendrix*, 609 F.3d at 1197; Fed. R. Evid. 702.

---

[166] *Id*. at 405:6-8, 404:17-18.

[167] PX44(Pappas&Gould-(Palanki)).

[168] *Id.* at 31; PX45(Pappas-Dep-(8/30/2021)-313:4-5) ("I don't know of an injury to his auditory system.").

As to hearing loss, Pappas explained that he did not "rule out" any potential cause as he found "no pathology" and thus ended his differential diagnosis.[169] As demonstrated by their Materials Considered List,[170] and confirmed at deposition, Pappas & Gould did not consider any testing or documents relating to the CAEv2.[171] Pappas stated it is irrelevant to their Palanki opinions whether any earplug "worked or not."[172] As such, their opinion that "one noise protection device" is not "any more or less responsible for Palanki's symptoms" is patently speculative.[173]

Pappas further stated he has no opinion as to the cause of Palanki's tinnitus, as he does not believe he has tinnitus.[174] The report opines generally that "[t]innitus can be caused by other factors aside from hearing loss," and that "[t]innitus can also be caused by ototoxic medications."[175] Any explanation concerning a differential diagnosis of Palanki's tinnitus is presented hypothetically.[176] Thus, any opinion as

---

[169] PX45(Pappas-Dep-(8/30/2021)-173:19-174:6);  PX46(Gould-Dep-(9/10/2021)-86:8-14) (agreeing that she will not offer opinions as to causes of problems with Palanki's hearing as she does not believe he has "a problem with his hearing").

[170] PX44(Pappas&Gould-(Palanki)-Appendix-3).

[171]   PX45(Pappas-Dep-(8/30/2021)-166:4-167:10;   170:4-8);   PX46(Gould-Dep-(9/10/2021)-19:9-20:18; 21:8-23).

[172]   PX45(Pappas-Dep-(8/30/2021)-173:10-24);   PX46(Gould-Dep-(9/10/2021)-214:21-215:1) (agreeing that opinion is no hearing loss, not that the CAEv2 did not cause hearing loss).

[173] PX44(Pappas&Gould-(Palanki)-33).

[174] PX45(Pappas-Dep-(8/30/2021)-180:1-10; 181:1-17).

[175] PX44(Pappas&Gould-(Palanki)-31).

[176] PX45(Pappas-Dep-(8/30/2021)-181:19-182:22; 184:13-20).

to the cause of Palanki's tinnitus, including the opinion that the "CAEv2 is not responsible for Palanki's tinnitus, ear pain, or hearing difficulty" clearly requires exclusion.[177]

Additionally, the report offers speculative opinions as to the cause of Palanki's abnormal DPOAE and Az Bio results. It summarily opines, "[i]t is not possible that use of earplugs five years earlier would be the cause of this loss of DPOAEs from 2020 to 2021 and much more likely an event occurred between the two test dates or the loss of DPOAEs was simply due to aging."[178] At deposition, Gould admitted her opinion as to the cause of the DPOAE results was "speculative."[179] The report itself states, "[t]he etiology of Mr. Palanki's ultimate DPOAE dysfunction is unknown."[180] It goes on to list factors that are all "possible causes" for absent DPOAEs, including "[a]ge, noise, head trauma and ototoxicity."[181] But Palanki's specific results are not attributed to any one of these factors to a reasonable degree of medical certainty.

As to ototoxicity, at deposition, Pappas again referred to a differential diagnosis in the hypothetical sense, stating generally that "any expert" would

---

[177] PX44(Pappas&Gould-(Palanki)-29).
[178] *Id.* at 33.
[179] PX46(Gould-Dep-(9/10/2021)-109:10-110:6).
[180] PX44(Pappas&Gould-(Palanki)-23).
[181] *Id.*

consider medications in diagnosing abnormal DPOAEs.[182] But Pappas explained that he had not reviewed Palanki's medications for ototoxicity, and to the extent he had reviewed his medications, he could not point to any that were ototoxic.[183]

Concerning head trauma, the report states that a "history of head traumas further complicates [] an assessment" of Palanki's DPOAE and Az Bio results.[184] And that "[h]ead trauma can also result in hearing loss and abnormal DPOAE results."[185] It references a medical record from a 1990 motor vehicle accident and testimony from Palanki's ex-wife describing Palanki's reported hearing difficulty following a motor vehicle accident as a teenager.[186] Again, Pappas does not opine that the 1990 accident "caused" the results, just that "we don't know" what a similar test from 1990 would have shown.[187] Although Pappas admits the 1990 record does not mention TBI,[188] concussion,[189] an MRI,[190] or a CT scan,[191] he states the record "implies" "blunt trauma" to the head.[192] He speculates that a CT or MRI should have

---

[182] PX45(Pappas-Dep-(8/30/2021)-313:19-22).
[183] *Id.* at 313:12-315:2.
[184] PX44(Pappas&Gould-(Palanki)-24).
[185] *Id.* at 22.
[186] *Id.* at 22-23; PX47(1990-MVA-Record).
[187] PX45(Pappas-Dep-(8/30/2021)-262:4-23).
[188] *Id.* at 274:23-275:2.
[189] *Id.* at 275:3-7.
[190] *Id.* at 278:6-9.
[191] *Id.* at 278:10-12.
[192] *Id.* at 281:12-19.

been done, and believes there may be "missing records" that demonstrate these results.[193] This alone demonstrates the DPOAE and Az Bio causation opinions are based on nothing more than "speculation, conjecture, [and] inference." *Hendrix*, 609 F.3d at 1194 (citing *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002)).

A proper differential etiology was clearly not performed as to the DPOAE and Az Bio results, as no potential causes are reliably "ruled out." *See In re 3M Combat Arms Earplug Prods. Litig.*, 2021 WL 765019, *9 (N.D. Fla. Feb. 28, 2021) (excluding defense expert head trauma opinion as differential etiology was not performed). Pappas and Gould improperly offer general causation opinions based on speculation as to Palanki. Without any degree of certainty, they point to several potential causes, while only eliminating one: the CAEv2; which they admittedly did not properly consider.[194] *Chapman*, 766 F.3d at 1308. Any opinion from Pappas or Gould as to potential causes of Palanki's auditory injuries, symptoms, or abnormal test results is speculative and requires exclusion.[195]

---

[193] *Id.* at 291:4-25.

[194] *Id.* at 166:4-167:10; 170:4-8; 173:10-24; PX46(Gould-Dep-(9/10/2021)-19:9-20:18; 21:8-23).

[195] PX45(Pappas-Dep-(8/30/2021)-313:16-18)("He doesn't have an injury, so I can't say whether there was a medication that caused an injury.").

**B.**    **Non-Retained Case-Specific Medical Expert Witnesses**

For the first time in this litigation, Defendants have disclosed in the Group C bellwether cases certain alleged "Non-Retained Case-Specific Medical Expert Witnesses."[196] These 10 purported experts include: Dr. David Rosario-Rivera (*Camarillorazo*), Dr. Christie Glick (*Camarillorazo*), Dr. Melanie Ottenbacher (*Finley*), Dr. Douglas Holmes (*Montero*), Dr. Vinay Saranga (*Montero*), Dr. Mark Gurley (*Palanki*), Dr. Rebekah Tripp (*Palanki*), Dr. Felicia Graf (*Stelling*), Dr. Gail Farrar (*Stelling*), and Dr. Kendall Nutt (*Stelling*).[197] Defendants' disclosure of these individuals as hybrid fact and expert witnesses is improper and the Court should limit the testimony of these witnesses to, at most, fact testimony only.

As an initial matter, Defendants admit in their disclosures that they "do not believe any of the testimony provided by these witnesses" constitutes expert testimony.[198] Second, half of the witnesses disclosed by Defendants—Rosario-Rivera, Glick, Ottenbacher, Graf, and Nutt—testified subject to *Touhy* approval letters that limited the scope of their testimony to their personal knowledge and expressly prohibited "opinion testimony, such as hypothetical questions or expert

---

[196] *See* PX9.

[197] *Id.* Defendants did not identify these individuals as potential hybrid witnesses until several months *after* their depositions were taken. *See id.*

[198] *Id.* at 1.

testimony."[199] Moreover, despite Defendants' statement to the contrary,[200] four of these witnesses—Holmes, Saranga, Tripp and Nutt—are not Plaintiffs' treating physicians at all, but merely evaluated one of the Plaintiffs in relation to that Plaintiff's respective application for VA disability benefits.[201] The Court has previously excluded evidence relating to VA disability benefits and should do likewise here.[202]

Defendants' disclosures also do not satisfy the requirements of Rule 26. Defendants did not produce expert reports of any of these witnesses, rather Defendants rely upon Rule 26(a)(2)(C). Rule 26(a)(2)(C) requires disclosure of "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). Defendants have done neither. At most Defendants provide a single sentence or two generally

---

[199] *Id.* at 1; *see also* PX48(Rosario-Rivera-Dep-(2/8/2021)-10:2-12:13), PX49(Glick-Dep-(3/19/2021)-7:4-9:19), PX50(Ottenbacher-Dep-(3/17/2021)-10:4-11:5), PX51(Graf-Dep-(2/25/2021)-9:5-10:13), PX52(Nutt-Dep-(3/12/21)-7:4-8:16).

[200] PX9 at 1 ("Defendants hereby disclose the following treating physicians and/or medical care providers as non-retained experts[.]").

[201] *See* PX53(Holmes-Dep-(1/29/2021)-29:2-8, 36:20-37:9, 76:5-20), PX54(Saranga-Dep-(1/27/2021)-87:13-88:13), PX55(Tripp-Dep-(2/5/2021)-27:25-28:24, 91:1-12), PX52(Nutt-Dep-(3/12/2021)-11:9-13:5).

[202] *See, e.g.*, *Adkins,* 7:20cv12, Doc. 62 at 4-5 (excluding VA disability documents and related testimony under Rule 403 because any probative value is substantially outweighed by a danger of unfair prejudice, juror confusion, and wasting time).

identifying the witness and the Plaintiff he or she evaluated.[203] Defendants have not identified a single expert opinion to which any of these witnesses is expected to testify;[204] to the contrary, Defendants have stated they "do not believe any of the testimony provided by these witnesses falls outside the scope of 'lay testimony.'"[205] A single paragraph of facts and opinions falls "brutally short of satisfying Rule 26(a)(2)(C)(ii)." *Arch Specialty Ins. Co. v. BP Invest. Ptrs., LLC*, 2020 WL 5848317, at *4 (M.D. Fla. Oct. 1, 2020). Here, Defendants don't even have that.

Finally, Defendants have not demonstrated that any opinions they would presumably seek to offer from these lay witnesses satisfy Rule 702 and *Daubert*, as would be required. *Arch Specialty*, 2020 WL 5848317, at *5; *see also generally Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317-18 (11th Cir. 2011). By way of example, Saranga, who evaluated Montero years ago in connection with a VA disability evaluation, "concluded . . . that Mr. Montero had a traumatic brain injury,"[206] and that the purported TBI was linked to Montero's tinnitus and sleep disorders.[207] But Saranga is not an ENT or audiologist or sleep specialist. He did not review Montero's deposition, tinnitus evaluation, hearing tests, or other medical

---

[203] PX9 at 2-3.
[204] *Id.*
[205] *Id.* at 1.
[206] PX54(Saranga-Dep-44:16-45:7).
[207] *Id.* at 51:6-10, 64:9-19, 61:19-23, 66:5-12.

records before he was deposed.[208] His testimony simply regurgitates notes of his one-time evaluation of Montero,[209] which was limited by the VA's parameters,[210] and did not involve any evaluation of "Mr. Montero's tinnitus at all."[211] Given those limitations, Saranga's conclusions about Montero fall far short of *Daubert* or Rule 702 and are far more prejudicial than probative under Rule 403.

Testimony of each of these 10 witnesses is similarly flawed and should be limited, at most, to actual, fact testimony consistent with the Court's motion in limine rulings.

## IV. <u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully request the Court grant Plaintiffs' motion.

---

[208] *Id.* at 91:3-13, 92:2-16.
[209] *Id.* at 40:18-41:5.
[210] *Id.* at 89:6-9.
[211] *Id.* at 90:22-92:2.

<u>Date</u>:  September 17, 2021

Respectfully submitted,

*/s/ Bryan F. Aylstock*
Bryan F. Aylstock, Lead Counsel
Florida State Bar No. 078263
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ,
PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel.: (850) 202-1010
baylstock@awkolaw.com
***Plaintiffs' Lead Counsel***

Shelley V. Hutson, Co-Lead Counsel
(Admitted Pro Hac Vice)
Texas State Bar No. 00788878
CLARK, LOVE & HUTSON, PLLC
440 Louisiana Street, Suite 1700
Houston, TX 77002
Tel.: (713) 757-1400
shutson@triallawfirm.com
***Plaintiffs' Co-Lead Counsel***

Christopher A. Seeger, Co-Lead Counsel
(Admitted Pro Hac Vice)
New Jersey State Bar No. 042631990
SEEGER WEISS LLP
77 Water Street, 8th Floor
New York, NY 10005
Tel.: (212) 587-0700
cseeger@seegerweiss.com
***Plaintiffs' Co-Lead Counsel &***
***Counsel for Plaintiff Carter Stelling***

Keith M. Jensen
Texas Bar No. 10646600
JENSEN & ASSOCIATES
1024 N. Main Street
Fort Worth, TX 76164
817-334-0762
kj@jensen-law.com
***Counsel for Plaintiff Guillermo
Camarillorazo***

Russell W. Endsley
Texas State Bar No. 24026824
Roger L. Turk
Texas State Bar No. 00788561
THOMAS J. HENRY LAW, PLLC
521 Starr Street
Corpus Christi, TX 78401
361-985-0600
361-985-0601 (fax)
Rwe.3m@thomasjhenry.com
Rlt.3m@thomasjhenry.com
***Counsel for Plaintiff Theodore Finley***

Muhammad S. Aziz
(Admitted Pro Hac Vice)
Texas Bar No. 24043538
ABRAHAM WATKINS NICHOLS, AGOSTO,
AZIZ & STOGNER
800 Commerce Street
Houston, TX 77055
713-222-7211
713-225-0827 (fax)
maziz@awtxlaw.com
***Counsel for Plaintiff Joseph Palanki***

Nicole Berg
Illinois State Bar No. 6305464
(Admitted Pro Hac Vice)
KELLER LENKNER, LLC
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
312-741-5220
ncb@kellerlenkner.com
***Counsel for Plaintiff Carlos Montero***

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B), (C)</u>

Pursuant to Local Rule 7.1(B), counsel for Plaintiffs certify that they conferred with Defendants' counsel on September 16, 2021 regarding the foregoing motion but were unable to resolve the issue with Defendants.

*/s/ Bryan F. Aylstock*

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH COURT'S WORD LIMIT</u>

I hereby certify that the foregoing contains 10,047 words and complies with

the Court's directive on July 12, 2021 that *Daubert* motions have no more than 1,350

words per new issue and 1,350 words per new expert.

<u>*/s/ Bryan F. Aylstock*              </u>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 17, 2021, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Bryan F. Aylstock*