# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG LITIGATION
LIABILITY LITIGATION

CASE NO.: 3:19-MD-2885-MCR-GRJ

This Document Relates to:
*Guillermo Camarillorazo*
Case No. 7:20-cv-00098

*Theodore Finley*
Case No. 7:20-cv-00170

*Carlos Montero*
Case No. 7:20-cv-00067

*Joseph Palanki*
Case No. 3:19-cv-02324

*Carter Stelling*
Case No. 7:20-cv-00143

Chief Judge M. Casey Rodgers
Magistrate Judge Gary Jones

**CONFIDENTIAL - FILED
UNDER SEAL**

## DEFENDANTS' RESPONSE TO PLAINTIFFS' OMNIBUS MOTION AND MEMORANDUM OF LAW TO EXCLUDE DEFENDANTS' GROUP C EXPERT OPINIONS AND TESTIMONY

FILED USDC FLND PN
OCT 8 '21 PM1:16

1

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................5

INTRODUCTION ..................................................................................9

I.  JONES AND LABORDE. ...............................................................11

II.  FLAMME AND STEPHENSON. ..................................................13

    A.  Military Opinions. .............................................................13

    B.  Burn Pit Opinions. ............................................................14

    C.  Smoking Opinions. ............................................................15

    D.  Bone Conduction Opinions. ..............................................16

    E.  Effective Quiet Opinions. ..................................................18

    F.  Sadr City Battle Description. .............................................20

III.  CRAWFORD. ...............................................................................22

    A.  Crawford Was Not Required To Examine The CAEv2 To
        Explain That Plaintiffs' Experts Ignored Alternative
        Causes. ...............................................................................23

    B.  That No-Cost Hearing Aids Are Available Is Not
        Collateral Source Evidence And Is Admissible. ...............24

    C.  The Court Should Reject Camarillorazo's Improper
        Attempts to Shift His Burden of Proving Causation Onto
        Defendants. .........................................................................25

    D.  Crawford Reliably Explains That Camarillorazo's
        Medications Are An Alternative Cause Of His Alleged
        Hearing Issues. ...................................................................27

    E.  Crawford Permissibly Opines That Camarillorazo's Head
        Traumas Cannot Be Ruled Out As An Alternative Cause. ...28

F.    Crawford's Opinion Regarding Finley's Failure To Wear Hearing Protection Devices Is Reliable and Based on Sufficient Facts. ..................................................................29

G.    Crawford's Opinions On Other Potential Alternative Causes of Finley's Tinnitus Are Admissible. .....................30

IV.    JACOBS. ...................................................................................31

A.    Jacobs's Opinions Regarding Montero Are Admissible. ...................31

1.    Jacobs's Testimony Will Assist The Jury. ...............................31

2.    Plaintiffs Misconstrue Jacobs's Testimony Regarding Whether PTSD and Tinnitus Have Negatively Impacted Montero's Life. ........................................34

B.    Jacobs's Opinions Regarding Finley Are Admissible. ......................35

1.    Jacobs's Opinions Regarding the Nature and Timing of Finley's Tinnitus Reporting Are Reliable and Helpful. ..................................................................35

2.    Jacobs's Opinions Regarding The Impact Of This Litigation On Finley Are Helpful And Not Confusing. ..................................................................38

C.    Jacobs's Opinions Regarding Camarillorazo Are Reliable And Helpful. ..........................................................38

V.    COLLINS. .................................................................................39

A.    Collins' Opinions Are Well-Grounded In His Discipline And Experience. ..................................................................40

B.    Collins Followed The Testing Protocol. ............................................42

C.    Collins' Opinions Are Helpful. ...........................................................43

VI.    SEIDMAN. ...............................................................................44

A.    Seidman's Opinion About Montero's Normal Hearing Is Reliable. ..................................................................44

B.     Seidman's Rebuttal Opinions About Alternative Causes Are Admissible. ................................................................................47

C.     Seidman Did Not Opine on Whether the CAEv2 Is Defective. ...........................................................................49

VII.   PAPPAS AND GOULD. ................................................................49

VIII.   NON-RETAINED MEDICAL WITNESSES. ..............................54

CONCLUSION .................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alonso Cano v. 245 C & C, LLC,*
  2019 WL 11769102 (S.D. Fla. Nov. 25, 2019) .............................................38

*Arch Specialty Ins. Co. v. BP Invest. Ptrs., LLC,*
  2020 WL 5848317 (M.D. Fla. Oct. 1, 2020) .................................................56

*Aycock v. R.J. Reynolds Tobacco Co.,*
  769 F.3d 1063 (11th Cir. 2014) ....................................................................10

*Black v. Food Lion, Inc.,*
  171 F.3d 308 (5th Cir. 1999) ...........................................................................9

*Daubert v. Merrell Dow Pharms., Inc.,*
  509 U.S. 579 (1993)................................................................................. 9, 30

*Dominguez v. Sec'y of Health, Dep't of Health & Hum. Servs.,*
  2018 WL 2225540 (Fed. Cl. Apr. 2, 2018) ...................................................35

*E.I. du Pont de Nemours and Co. v. Robinson,*
  923 S.W.2d 549 (Tex. 1995) ..........................................................................11

*Fell v. United States,*
  2017 WL 5992464 (N.D. Fla. July 17, 2017)................................................46

*Garcia v. Scottsdale Co.,*
  2019 WL 1318090 (S.D. Fla. Mar. 22, 2019) ...............................................34

*Goodrich v. John Crane, Inc.,*
  2018 WL 4677773 (E.D. Va. Sept. 28, 2018) ...............................................10

*Gutierrez v. Ethicon, Inc.,*
  2021 WL 2431016 (W.D. Tex. Apr. 23, 2021) ................................................9

*Hendrix ex rel. G.P. v. Evenflo Co.,*
  609 F.3d 1183 (11th Cir. 2010) ....................................................................26

*Hendrix v. Evenflo Co.*,
    255 F.R.D. 568 (N.D. Fla. 2009) ................................................................26

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
    299 F. Supp. 3d 1291 (N.D. Fla. 2018) ................................................. 10, 48

*In re Aluminum Warehousing Antitrust Litig.*,
    336 F.R.D. 5 (S.D.N.Y. 2020) ....................................................................10

*In re Davol, Inc./C.R. Bard, Inc.*
    *Polypropylene Hernia Mesh Prods. Liab. Litig.*,
    2020 WL 6605612 (S.D. Ohio Sept. 11, 2020) ...................................... 10, 53

*In re DCP Operating Co.*,
    2019 WL 1908147 (Tex. Ct. App. Apr. 29, 2019) ................................. 24, 25

*In re Delta/Airtran Baggage Fee Antitrust Litig.*,
    245 F. Supp. 3d 1343 (N.D. Ga. 2017) ........................................................29

*In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*,
    2017 WL 6350554 (S.D. W.Va. Dec. 12, 2017) ..........................................52

*In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*,
    2017 WL 6396852 (S.D. W.Va. Dec. 13, 2017) ..........................................10

*In re Mentor Corp. Obtape Transobturator Sling Prod. Liab. Litig.*,
    2010 WL 1782272 (M.D. Ga. Apr. 29, 2010) ..............................................11

*Jacobson v. R.J. Reynolds Tobacco Co.*,
    2013 WL 12094891 (S.D. Fla. Aug. 26, 2013) ............................................55

*Jones v. Otis Elevator Co.*,
    861 F.2d 655 (11th Cir. 1988) ....................................................................42

*Kearney v. Auto–Owners Ins. Co.*,
    2007 WL 3231780 (M.D. Fla. Oct. 30, 2007) ..............................................30

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001) ................................................................ 36, 37

*McSweeney v. Kahn*,
    2008 WL 6875017 (N.D. Ga. Feb. 4, 2008) ................................................37

*O'Brien v. NCL (Bahamas) Ltd.*,
2017 WL 8315925 (S.D. Fla. Aug. 25, 2017) ...............................................56

*Olivero v. Trek Bicycle Corp.*,
2018 WL 3459424 (D. Colo. July 18, 2018)..................................................44

*Pelaez v. Govt. Employees Ins. Co.*,
2020 WL 4458966 (M.D. Fla. May 7, 2020) ..................................................56

*Perez v. Boecken*,
2020 WL 3074420 (W.D. Tex. June 10, 2020)...............................................25

*Roundout Valley Cent. Sch. Dist. v. The Coneco Corp.*,
321 F.Supp.2d 469 (N.D.N.Y. 2004) ............................................................35

*Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*,
2010 WL 4316926 (S.D. Fla. Oct. 21, 2010) .................................................42

*Ruckh v. CMS II LLC*,
2016 WL 7665191 (M.D. Fla. Dec. 21, 2016) ...............................................56

*Shay v. Cty. of Los Angeles*,
2019 WL 5420262 (C.D. Cal. Oct. 21, 2019) ........................................ 37, 44

*Siegel v. Delta Air Lines, Inc.,*
714 F. App'x 986 (11th Cir. 2018)................................................................29

*Sweat v. U.S.*,
2015 WL 8270434 (M.D. Fla. Dec. 8, 2015) .................................................57

*Triolo v. United States*,
2019 WL 5704659 (M.D. Fla. Nov. 5, 2019)..................................................55

*United States ex rel. Armfield v. Gills*,
2012 WL 12918274 (M.D. Fla. July 6, 2012) ........................................ 35, 36

*United States v. An Easement and Right-of-way Over 6.09 Acres of Land*,
140 F. Supp. 3d 1218 (N.D. Ala. 2015) ........................................................21

*United States v. Bilus*,
2013 WL 1898408 (N.D. Fla. May 7, 2013),
*aff'd*, 626 F. App'x 856 (11th Cir. 2015) ............................................. 22, 23

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ...................................................................38

*United States v. Gayden*,
    2018 WL 8808058 (M.D. Fla. Jun. 8, 2018),
    *aff'd,* 977 F. 3d 1146 (11th Cir. 2020) ........................................................22

*Viterbo v. Dow Chem. Co.*,
    826 F.2d 420 (5th Cir. 1987) .......................................................................34

*Wademan v. United States*,
    2017 WL 7794322 (S.D. Fla. May 17, 2017).................................................55

*Waite v. All Acquisition Corp.*,
    194 F. Supp. 3d 1298 (S.D. Fla. 2016)..................................................... 9, 31

*Williams v. Int'l Paper. Co.*,
    2009 WL 10678735 (S.D. Ga. June 30, 2009) .............................................12

*Yang v. Smith*,
    728 S.E.2d 794 (Ga. Ct. App. 2012) ...........................................................10

**Rules**

Fed. R. Civ. P. 26(a)(2)(C) ....................................................................................55

Fed. R. Evid. 702(a).................................................................................................33

Fed. R. Evid. 703 ....................................................................................................43

## INTRODUCTION

Plaintiffs' motion to exclude Defendants' Group C experts mischaracterizes the experts' opinions, ignores their qualifications and the methodologies they actually use, and selectively quotes and misinterprets deposition testimony. At most, Plaintiffs' points are suitable for "[v]igorous cross-examination" and "presentation of contrary evidence"—not exclusion. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). Plaintiffs' motion should be denied.[1]

Plaintiffs also err in arguing that Defendants' experts should be excluded for not opining to a reasonable degree of certainty as to what caused Plaintiffs' alleged hearing injuries. PltfsMot. 19, 22-25, 44, 46. Plaintiffs—not Defendants—bear the burden of "prov[ing] to a reasonable degree of medical certainty" that Defendants caused their alleged injuries. *Black v. Food Lion, Inc.*, 171 F.3d 308, 310 (5th Cir. 1999); *Gutierrez v. Ethicon, Inc.*, 2021 WL 2431016, at *18 (W.D. Tex. Apr. 23, 2021).

To rebut a plaintiff's causation theory, a defendant's expert "may offer evidence of potential alternative causes ... without needing to prove those alternative-cause theories with certainty or probability." *Waite v. All Acquisition*

---

[1] Internal quotation marks, citations, modifications (such as ellipses or brackets), and deposition objections are omitted from quotes unless otherwise indicated. To avoid repetition, this memorandum uses *supra* and *infra* to cross-reference the pages containing relevant authorities.

*Corp.*, 194 F. Supp. 3d 1298, 1309 (S.D. Fla. 2016); *see also In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1368 (N.D. Fla. 2018); *In re Aluminum Warehousing Antitrust Litig*., 336 F.R.D. 5, 29 (S.D.N.Y. 2020). Indeed, the "defendant's ability to present alternate causes is of paramount importance in allowing for an adequate defense." *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069-70 (11th Cir. 2014) (reversing district court for "improperly shift[ing] the burden of proof" on defendants to show "alternative causes be to a reasonable medical certainty").

Defense experts rebutting plaintiffs' differential diagnoses need not affirmatively opine on what caused plaintiffs' alleged injuries, but can explain that plaintiffs' experts failed to exclude potential alternative causes. *E.g.*, *In re Davol, Inc./C.R. Bard, Inc. Polypropylene Hernia Mesh Prods. Liab. Litig.*, 2020 WL 6605612, at *12 (S.D. Ohio Sept. 11, 2020) ("As a defense expert, however, Dr. Renton need not conduct a differential diagnosis in order to rebut Dr. Grischkan's testimony. … Dr. Renton need not have taken an additional step and prove that another alternative cause caused [Plaintiff's] injury; causation is the plaintiffs' burden."); *Goodrich v. John Crane, Inc.*, 2018 WL 4677773, at *9 (E.D. Va. Sept. 28, 2018); *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2017 WL 6396852, at *2 (S.D. W.Va. Dec. 13, 2017); *Yang v. Smith*, 728 S.E.2d 794, 800 (Ga.

Ct. App. 2012); *In re Mentor Corp. Obtape Transobturator Sling Prod. Liab. Litig.*, 2010 WL 1782272, at *3-4 (M.D. Ga. Apr. 29, 2010).

*E.I. du Pont de Nemours and Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995), does not change this analysis.  PltfsMot. 22-23, 25.  In that case, *plaintiffs*—who bore the burden of proof—offered an expert who opined that plaintiffs' orchard was damaged by defendants' chemicals.  *Robinson*, 923 S.W.2d at 551.  The court affirmed plaintiffs' expert's exclusion because (among other reasons) he "conducted no testing to exclude other possible causes of the damages to the … orchard".  *Id.* at 558-59.  That case in no way requires *defendants'* experts to testify to a reasonable degree of certainty.  *Id.* 556-59.

## I.   JONES AND LABORDE.

Plaintiffs argue that, in addition to guidelines informed by statutory workers' compensation schemes, Jones and LaBorde may not rely on other "compensation formulas".  PltfsMot. 6-8.  But Jones and LaBorde's reliance on guidelines from the American Medical Association, World Health Organization, NIOSH, and American Speech-Language-Hearing Association is appropriate.  Ex1, Jones-LaBorde-Stelling-Report 16-17.  Unlike FUPIRS data, guidelines from these medical agencies is not "grafted from Florida workers' compensation law" or solely used for purposes of "workers' compensation cases."  ECF 1680 at 28-29.

Audiologists and otolaryngologists routinely rely on these guidelines. The World Health Organization definition of hearing impairment, which supports the AMA definition, Ex1, Jones-LaBorde-Stelling-Report 16-17, is used to characterize and understand the incidence of hearing impairments across the global population. Ex2, Mathers, et al., *Global Burden of Hearing Loss in the Year 2000* at 1-2. Similarly, the NIOSH definition is used to estimate and evaluate the risk of occupational noise-induced hearing loss. Ex3, NIOSH, *Criteria for a Recommended Standard: Occupational Exposure to Noise* at 23-24 (1998).

Though Plaintiffs assert that LaBorde agreed such guidelines were "primarily" for such purposes, *see* PltfsMot. 7 n.10, her testimony was that she was "not sure that's why it was developed." Ex4, LaBorde-Dep. 40:5-42:1. Jones confirmed that "[s]ometimes patients request, ... that type of information ..." and that he provides it in the course of his clinical practice. Ex5, Jones-Dep. 33:23-34:14.

Plaintiffs also seek to exclude LaBorde's background opinions about other disorders, such as misophonia and hyperacusis. PltfsMot. 8-9. This argument is defeated by the Court's previous ruling that, while a particular plaintiff may not suffer from these disorders, an expert may nevertheless discuss the "non-medical correlative consequences of noise-induced hearing problems" or other hearing disorders "that are discussed in [her] report". ECF 1680 at 98; *see also Williams v. Int'l Paper. Co.*, 2009 WL 10678735, at *5 (S.D. Ga. June 30, 2009).

12

## II.    FLAMME AND STEPHENSON. [2]

### A.    Military Opinions.

Flamme and Stephenson's opinions about the Army Hearing Program are helpful to the jury and comply with the Court's Orders.  The Court has ruled that Flamme and Stephenson can explain "the importance of training on and fit of earplugs," ECF 1690 at 13, which should include the military's role in promulgating regulations about fitting and training soldiers with hearing protection devices, *e.g.*, Ex6, 6/17/2021-Baker-Trial-Tr. 245:13-246:3. While (consistent with the Court's order, ECF 1690 at 13) Flamme and Stephenson will not testify that the Army's actions caused or increased the risk of Plaintiffs' injuries, they should be permitted to explain whether Plaintiffs were fit with and trained on the CAEv2.  Many of Plaintiffs' experts have testified to similar issues, and Flamme and Stephenson should be allowed to do so as well.  *See*, *e.g.*, Ex7, 4/12/2020-EHK-Trial-Tr. 110:1-112:3; Ex8, 4/13/2021-EHK-Trial-Tr. 44:18-45:1; Ex9, 6/14/2021-Baker-Trial-Tr. 165:10-168:3.

Fit and training are relevant.  Plaintiffs' experts opine that the CAEv2's alleged design flaws caused Plaintiffs' injuries and did not allow Plaintiffs to get a proper fit. Ex10, Spankovich-Camarillorazo-Report 17; Ex11, Spankovich-Stelling-

---

[2] Defendants withdraw Flamme and Stephenson's chemical-warfare-exposure opinion regarding Stelling.  PltfsMot. 12-13.

Report 12-13; Ex12, Spankovich-Finley-Report 13-14.  The jury should also hear potential explanations for the claimed inadequate fit that are unrelated to the CAEv2's alleged flaws. Ex13, Flamme-Stephenson-Camarillorazo-Report 55-56; Ex14, Flamme-Stephenson-Stelling-Report 56-57; Ex15, Flamme-Stephenson-Finley-Report 48-49.

### B.    Burn Pit Opinions.

Flamme and Stephenson's opinions about burn pits are reliable. PltfsMot. 10-12.  Plaintiffs' claim that Flamme and Stephenson rely on a single article for such opinions, *id.* 11, but Flamme testified that a DoD meeting from 2003 that "does show up in our materials considered list," "establish[es] that these are factors" and that burn pits "are biologically plausible causes." Ex16, Flamme-Dep1. 313:13-314:3. Counsel asked no questions about that information.  Nor did counsel ask if any of Flamme's other reliance materials supported his opinions about burn pit exposures.

That Flamme could not specify the exact toxins used in the burn pits to which Plaintiffs were exposed is not a basis for exclusion.  Flamme explained he had reviewed Air Force information "regarding what typically went into burn pits," and that such pits were "start it with JP8 [fuel]" because "that's how they would keep it ignited." Ex17, Flamme-Dep2. 472:15-473:6. "[O]ther constituent  components would include things like Styrofoam or polystyrene". *Id.*  Based on that information, "we know that burn pits have toxicants in them that can lead to and compromise a

14

person's ability to withstand noise". *Id.* 468:1-8.  Flamme and Stephenson's opinion is consistent with Plaintiffs' own expert, Spankovich, who has observed that jet fuel, such as JP8, has an "additive/synergism" "interaction with noise," and "styrene" has a "synergism" "interaction with noise." Ex18, Spankovich, et. al., *Chapter 7: Ototoxicity and Otoprotection: Complex Interactions Between Noise and Chemicals* at 4, THE NOISE MANUAL (6th ed. 2018).

Finally, the evidence is probative and will not confuse the jury. Plaintiffs intend to offer expert testimony that the only plausible cause of their tinnitus is their use of the CAEv2.  The jury should likewise hear evidence of other explanations for their tinnitus that cannot be ruled out, including burn pit exposures.

### C.    Smoking Opinions.

Flamme and Stephenson also properly opine that Finley and Stelling's smoking history is a risk factor associated with tinnitus.[3]  PltfsMot. 14-15.  Plaintiffs rely on 3M's decision in another case to withdraw claims that smoking caused that plaintiff's tinnitus.  PltfsMot. 14.  But causation issues in other actions have no bearing on Flamme and Stephenson's opinions here.

Plaintiffs also cite the Court's Science Day order, but the Court did not have the benefit of the literature on which Flamme and Stephenson rely, which confirms

---

[3]  Defendants withdraw Flamme and Stephenson's smoking opinions for Camarillorazo.

a connection between smoking and tinnitus. Ex65, Staudt, et al., *Association of organic solvents and occupational noise on hearing loss and tinnitus among adults in the U.S., 1999-2004* at 1 (1999) (noting that the authors adjusted the model to account for smoking in assessing causes of hearing loss and tinnitus). Flamme testified that a "Sta[u]dt paper from 2019, which was an Army study that also looked into smoking", "treated it as a causal factor" of tinnitus. Ex16, Flamme-Dep1. 312:18-313:7. Flamme and Stephenson's reliance on literature and studies, including those conducted by the Army, confirms that their opinions that smoking causes tinnitus are based on a reliable methodology and sufficient facts.

### D.   Bone Conduction Opinions.

Plaintiffs challenge to Flamme and Stephenson's opinion that bone conduction can cause hearing damage is meritless. PltfsMot. 15-17. Plaintiffs' expert McKinley published an article stating that bone conduction "can be a possible source of hearing damage risk." Ex19, McKinley, *Bone Conducted Noise and Mitigation Techniques* at 2, AIR FORCE RESEARCH LABORATORY (2009). And Flamme and Stephenson's opinion is well-supported—the 2012 Clavier study that Plaintiffs criticize concluded that "when exposed to high acoustic impulse noise, such as from a weapon, the impulse is transmitted to the cochlear through the bones and bone conduction pathways." PX24 at 1. Stephenson thus testified that bone conduction can cause cochlear or neurological damage because "what matters is that

the energy is there" in the cochlea.  Ex20, Stephenson-Dep. 132:17-133:10.  Because (1) "this study demonstrated that energy can get into the cochlea by transmission from bone conduction", and (2) "there are plenty of studies that show the effect inside the cochlea from energy getting there," Flamme and Stephenson concluded that impulses getting to the skull through bone conduction can cause hearing damage.  *Id.*  Flamme is "aware of [a] study that shows whether such vibrations and acoustic levels inside the head can lead to cochlear and neurological damage in a case of repeated exposures", including a "Bennocks (phonetic) report from 1953 as a starting point."  Ex16, Flamme-Dep1. 229:12-20.

Similarly, Flamme and Stephenson's reliance on the Walter Reed breacher training studies is permissible.  PltfsMot. 16-17.  Flamme collected this data during a breacher training sponsored by the Walter Reed Institute for Medical Research and law enforcement services in Oregon.  Ex14, Flame-Stephenson-Stelling-Report 30.  Flamme and Stephenson produced the graphs representative of such data to support their conclusions about bone conduction, as well as "an example set of waveforms ... at various locations within this head model" to compare the waveforms inside and outside of the head.  *Id.* 32-33; Ex16, Flamme-Dep1. 232:10-18.  This exemplar set shows either sound pressure or acceleration as a function of time, Ex16, Flamme-Dep1. 233:12-18, and shows that the sound pressure levels, intracranial pressure levels, and skull vibration recordings from a single shotgun breaching charge at 181

db SPL are substantially similar.   Ex14, Flamme-Stephenson-Stelling-Report 33. This data, along with the 2012 Clavier presentation, the 1953 Bennocks report, and Flamme and Stephenson's own experience is more than sufficient to show that wave forms of substantially similar size and duration can cause skull vibration leading to hearing damage.

### E.    Effective Quiet Opinions.

Plaintiffs seek to exclude Flamme and Stephenson's opinions that Camarillorazo, Finley, and Stelling did not have periods of effective quiet to permit sufficient auditory recovery from each hazardous noise exposure.   PltfsMot. 17-19; *see, e.g.*, Ex14, Flamme-Stephenson-Stelling-Report 34.  As explained in Flamme's 2012 publication, "[e]ffective quiet is the maximum level that does not interfere with the recovery from [temporary threshold shifts]."   PX26 at 1.   A human study establishes that insufficient periods of effective quiet can affect temporary threshold shifts in subsequent high-level exposures.  *Id.*   The Army's own health hazard assessment explains that the "[n]oise level of quiet rest periods" can play a role in the "onset and growth of temporary or permanent hearing loss".   Ex21, *Health Hazard Assessor's Guide, Technical Guide 351A* at 2A-9-10 (2000).   Plaintiffs sidestep this data and point to an animal study cited in Flamme's 2012 publication. PltfsMot. 18.   Flamme explained that the Tanaka study, which was done on

chinchillas, cannot be "generaliz[ed] to the human population". Ex16, Flamme-Dep1. 191:23-192:6.

Similarly, Stephenson has "actually studied" effective quiet and has "a publication" from his time at the Air Force "looking at what effective quiet is." Ex20, Stephenson-Dep. 58:16-59:9. According to that publication, "if you do not have effective quiet 75 dB or less, any temporary threshold shift that you have may not recover," "[a]nd so that means if it doesn't recover, that when you start the next day's exposure, your ears are already in a temporary threshold shift state and can be subject that much more to additional temporary threshold shift and potential harm." *Id.* Both Flamme and Stephenson's experience in assessing effective quiet periods are sufficiently reliable under *Daubert*.

Plaintiffs next argue that because Flamme and Stephenson do not have noise dosimetry for the Plaintiffs' particular exposures, they cannot assess whether any of the Plaintiffs' rest periods were compromised. But Flamme and Stephenson's have identified several factors for each of the Plaintiffs that, based on their experience, compromised each Plaintiff's period of effective rest. *See, e.g.*, Ex13, Flamme-Stephenson-Camarillorazo-Report 34-35; Ex14, Flamme-Stephenson-Stelling-Report 34; Ex15, Flamme-Stephenson-Finley-Report 29-30. Further, during deposition, Flamme explained that with someone like Finley, "during the time when he was functioning primarily as a mortarman, he had his exposures in the mortar pit.

... [But] they needed to have that crew close so they could react in the event of engagement." Ex16, Flamme-Dep1. 159:12-160:11. Thus, "he would also have been exposed to the mortar fire noise wherever it is that he was within a pretty broad zone, and that would deprive him of what would otherwise be a quiet rest period". *Id.* He explained that Finley would not have adequate effective rest while serving on patrol as an MRAP. *Id.* 160:20-161:17. Flamme explained that Stelling would have been exposed to military combat vehicles or power generators during his deployments in environments "when he was not engaged in military operations", creating sound levels that "would be greater than what you'd expect in typical daily life." Ex17, Flamme-Dep2. 389:6-390:13. Flamme also identified Camarillorazo's exposures from living near an airfield in Bagram and his repeated field training exposures. *Id.* 474:17-479:14.

Finally, Plaintiffs claim that Flamme and Stephenson do not offer an opinion to any degree of scientific certainty because they state that the Plaintiffs "might" not have had effective periods of quiet. Plaintiffs bear the burden of proving that the CAEv2 is the sole cause of their injuries, and Defendants' experts are legally allowed to identify potential alternative causes that cannot be ruled out. *Supra* at 9-11.

### F.    Sadr City Battle Description.

Plaintiffs argue Flamme and Stephenson may not offer any opinions about the on-the-ground conditions during Stelling's deployment. PltfsMot. 19-20. *First*,

Plaintiffs claim that Flamme and Stephenson do not have any experience in military operations. *Id.* 19. Not so. Flamme has "expertise in factors that relate to the military as they regard hearing loss and impulse noise", including "in the area of military tactics" "related to military operations as they regard hearing loss prevention and what the exposures would be for personnel that are service members." Ex16, Flamme-Dep1. 279:19-280:12. Flamme has conducted significant research in conjunction with the DoD, including relating to damage-risk criteria for impulsive/blast noise as well as serving as a subject matter expert to the DoD's Auditory Blast Injury Prevention Standards panel. Ex22, Flamme-Stephenson-General-Report 7. Stephenson served in the Air Force for twenty years and has extensive military experience. Ex23, Stephenson CV.

The Sadr City battle is relevant to assessing Stelling's overall noise profile while in the military. Plaintiffs seek to preclude Flamme and Stephenson from "weav[ing] narratives" at trial based on facts that they reviewed in forming their opinions. PltfsMot. 20. But that is not what Flamme and Stephenson intend to do. Flamme and Stephenson intend to testify about *opinions* they have reached in this case based on facts that they have reviewed, which is appropriate for an expert. ECF 1680 at 117. That Flamme and Stephenson considered certain facts beyond just Plaintiff's testimony in reaching their opinions is unremarkable. *United States v. An*

*Easement and Right-of-way Over 6.09 Acres of Land*, 140 F. Supp. 3d 1218, 1258 (N.D. Ala. 2015).

Plaintiffs' last claim is that narratives unconnected to Stelling's personal experience do not have any probative value. PltfsMot. at 25. The Court has rejected arguments of this nature in prior motions *in limine*. *Baker* ECF 112 at 3. Moreover, Plaintiffs' argument boils down to the idea that because Stelling and Mennenga will testify about Stelling's exposures on deployment, any contradictory testimony from Flamme and Stephenson based on their research should not be presented. PltfsMot. 20. "[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *United States v. Gayden*, 2018 WL 8808058, at *1 (M.D. Fla. Jun. 8, 2018), *aff'd,* 977 F. 3d 1146 (11th Cir. 2020).

## III.  CRAWFORD.

Crawford is a highly-credentialed neurotologist with decades of experience diagnosing and treating hearing loss. Ex24, Crawford-Finley-Report 1-2. Crawford properly evaluates whether Camarillorazo and Finley's use of the CAEv2 caused or aggravated their hearing loss, mental health disorders, or other alleged injuries.[4] Ex26, Crawford-Camarillorazo-Report 3-4; Ex24, Crawford-Finley-Report at 3-4.

---

[4] Plaintiffs also challenge Crawford's opinion regarding design defect. PltfsMot. 21. Crawford will not opine on this topic unless Plaintiffs open the door by seeking to question him on this subject. *E.g.*, Ex25, Crawford-Dep. 117:15-118:12. *See United*

## A.   Crawford Was Not Required To Examine The CAEv2 To Explain That Plaintiffs' Experts Ignored Alternative Causes.

Plaintiffs' argument that Crawford was required to examine the CAEv2, PltfsMot. 22, misses the mark, because such an inspection was not necessary for Crawford's opinion that Camarillorazo and Finley's experts improperly ruled out alternative causes.  Ex26, Crawford-Camarillorazo-Report 2-4, 18; Ex24, Crawford-Finley-Report 3-4, 28.   Crawford explains that Camarillorazo's alleged hearing injuries could have been caused by:  (1) high levels of noise exposure that required double hearing protection; (2) exposure to multiple IEDs and explosions; and (3) Camarillorazo misusing the CAEv2; (4) ototoxic agents; and (5) repeated head trauma.   Ex26, Crawford-Camarillorazo-Report 11, 15-16; Ex27, Camarillorazo-Dep. 44:18-45:9, 119:16-120:5, 138:14-139:6, 178:1-4, 194:6-20, 224:14-225:5.  Similarly, Crawford discusses how Finley was repeatedly exposed to mortars generating 177-192 dB, and drove a vehicle sitting in close proximity to an open turret that generated 161 dB per round.  Ex24, Crawford-Finley-Report 19; Ex28, Finley-Dep. 68:15-69:23, 95:13-96:6.  Crawford explains that such high noise levels would cause hearing loss to anyone using any type of single hearing protection,

---

*States v. Bilus*, 2013 WL 1898408, at *1 (N.D. Fla. May 7, 2013) (finding expert testimony admissible when, although it was not previously disclosed, it was elicited on redirect examination *after* opposing counsel had opened the door), *aff'd*, 626 F. App'x 856 (11th Cir. 2015).

Finley admitted he never wore dual hearing protection, and Finley misused the CAEv2 by wearing the yellow end when experiencing high levels of steady-state noise.   Ex24, Crawford-Finley-Report 19; Ex28, Finley-Dep. 83:4-7, 90:20-24, 122:20-23, 123:20-23, 127:11-13, 127:23-128:1, 212:3-7.

None of these alternative causes depends on any CAEv2 defects or could have been protected against by a properly functioning CAEv2.   Moreover, Crawford is not required to opine about the CAEv2 to explain that Plaintiffs' experts' specific causation opinions are unreliable because they ignore alternative causes.   *Supra* at 9-11.

**B.     That No-Cost Hearing Aids Are Available Is Not Collateral Source Evidence And Is Admissible.**

Under Texas law—which governs both Camarillorazo and Finley's cases, *see* Camarillorazo ECF 22, Finley ECF 26—the collateral source rule "precludes a tortfeasor from introducing or obtaining an offset for funds received by the plaintiff from a collateral source." *In re DCP Operating Co.*, 2019 WL 1908147, at *3 (Tex. Ct. App. Apr. 29, 2019).   Because the availability of hearing aids is not offered to show collateral compensation, it is not collateral source evidence, and is admissible.

Camarillorazo and Finley offer opinions from that their alleged injuries impact their earning capacity and seeking to quantify that supposed impact.   Ex29, Davis-Camarillorazo-Report 10; Ex30, Lopez-Finley-Report 2; Ex31, Kucsma-Camarillorazo-Report 3, 15; Ex32, Kronrad-Finley-Report 5.   Crawford properly

rebuts these opinions by explaining that hearing aids are available that will minimize or eliminate any purported impacts on Plaintiffs' earning capacity.  Ex26, Crawford-Camarillorazo-Report 17;  Ex24,  Crawford-Finley-Report  24.  Hearing-aid availability demonstrates that any purported CAEv2 defects have not caused Plaintiffs' purported lost earnings, or that any such alleged earnings damages can be reduced through using hearing aids.

Moreover, "evidence of a collateral source may be admissible for purposes other than the mitigation of damages."  *DCP Operating Co.*, 2019 WL 1908147, at *2-3 (affirming admission of evidence for the alternative purpose of rebutting causation); *see also Perez v. Boecken*, 2020 WL 3074420 at *13 (W.D. Tex. June 10, 2020) (holding collateral source rule was inapplicable to evidence admitted to determine whether estimated charges were excessive).  This evidence rebuts assertions of vocational impact and lost earning capacity and does not violate Texas law or the Court's Order in *EHK*.  ECF 1729 at 2-3.

## C. The Court Should Reject Camarillorazo's Improper Attempts to Shift His Burden of Proving Causation Onto Defendants.

Camarillorazo seeks to exclude Crawford's opinion that other cofactors and cofounders—including significant noise exposure, misuse of the CAEv2, ototoxic exposures, and head trauma and TBI—may have contributed to Camarillorazo's injuries because Crawford cannot offer those opinions "to a reasonable degree of medical certainty."  PltfsMot. 22-25 (emphasis omitted).  Camarillorazo improperly

25

attempts to shift his burden to prove causation onto Defendants, and fails to recognize that Crawford can present alternative causes without opining to a reasonable degree of medical certainty. *Supra* at 9-11.

Crawford's opinion satisfies *Daubert* by relying on record facts and reliable methodologies to present alternative causes of Camarillorazo's alleged injuries. Crawford opines that several other potential alternative causes, *supra* at 23, should not have been ruled out by Camarillorazo's experts and that it "is not possible to attribute [Camarillorazo's] hearing loss to the CAEv2." Ex26, Crawford-Camarillorazo-Report 18. Crawford has more than two decades of experience as an Army medical doctor neurotologist, including as the Chief of Otology/Neurotology at the Madigan Army Medical Center and representing the Army on the Executive Committee of the Hearing Center of Excellence. *Id.* 1. Based on his analysis of Camarillorazo's records, understanding of the deployment environment, and his own experience in the military and treating soldiers, Crawford reliably opines that these other potential causes cannot be ruled out. *Id.* 18. Accordingly, Crawford's opinions are admissible. *See Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 606 (N.D. Fla. 2009)*, aff'd sub nom.*, *Hendrix ex rel. G.P. v. Evenflo Co.,* 609 F.3d 1183 (11th Cir. 2010) (rejecting a challenge under Rule 403 where expert's methodology has been "amply disclosed").

**D.     Crawford Reliably Explains That Camarillorazo's Medications Are An Alternative Cause Of His Alleged Hearing Issues.**

Camarillorazo asserts that Crawford failed to identify a scientifically valid link between ototoxic chemicals and Camarillo's hearing issues. PltfsMot. 23.  But Crawford cites an extensive body of scientific literature in support of this opinion. *E.g.*, Ex26, Crawford-Camarillorazo-Report 15, 17; Ex33, Vernick & Kelley, *Sudden hearing loss associated with piroxicam*, Am J. Otol. 7(2):97-8 (Mar. 1986) (piroxicam noted to cause hearing loss and tinnitus); Ex34, Dille, et al., *Tinnitus Onset Rates from Chemotherapeutic Agents and Ototoxic Antibiotics-Results of a Large Prospective Study*, J. Am. Acad. Audiology June 21(6) 409-417 (2010) (exposure to ototoxic antibiotics increases likelihood of tinnitus); Ex35, McGwin, Jr., *Phosphodiesterase Type 5 Inhibitor Use and Hearing Impairment,* Arch Otolaryngol Head Neck Surg. 136(5):488-492 (2010) (discussing the risk of sudden hearing problems associated with certain drugs, including sildenafil). Camarillorazo's medical records confirm he used such medications, including, sildenafil, isoniazid, cefazolin, and levofloxacin.  Ex36, G_Camarillorazo_DOD_ 00034-39; Ex26, Crawford-Camarillorazo-Report 15.   Plaintiffs' assertion that Crawford only identified Percocet ignores Crawford's report and this literature.  That Plaintiffs asked only cursory questions as to tinnitus and then focused exclusively on the causal relationship of Percocet on hearing loss to the exclusion of all other

medications described in Crawford's report, Ex25, Crawford-Dep. 196:19-203:18, does not render his opinions unreliable.

### E. Crawford Permissibly Opines That Camarillorazo's Head Traumas Cannot Be Ruled Out As An Alternative Cause.

Plaintiffs assert that Camarillorazo was not diagnosed with a TBI, PltfsMot. at 24, but that is immaterial given that he repeatedly experienced head trauma which could have caused his alleged hearing loss and tinnitus. Crawford considered that Camarillorazo was involved in a vehicle rollover where he confirmed that immediately afterwards he felt "dazed, confused, or 'saw stars.'" Ex37, G_Camarillorazo_01311, 01313. Following this incident, Camarillorazo described "waking up somewhere else," and confirmed he lost consciousness for 10 minutes. Ex27, Camarillorazo-Dep. 193:11–196:3, 224:14-225:5 (reviewing Ex38, G_Camarillorazo_DOD_00456, 457). Camarillorazo also confirmed he regularly hit his head on tanks while on duty. Ex27, Camarillorazo-Dep. 106:19-107:9. Scientific literature supports that these repeated traumas cannot be ruled out as a cause of Camarillorazo's hearing loss and tinnitus. *E.g.*, Ex26, Crawford-Camarillorazo-Report 17; Ex39, Knoll, et al., *Patient-Reported Auditory Handicap Measures Following Mild Traumatic Brain Injury*, THE LARYNGOSCOPE 00:1-7, (2019); Ex40, Munjal, et al., *Relationship between severity of traumatic brain injury (TBI) and extent of auditory dysfunction*, BRAIN INJURY 24:3 525-532 (Mar. 2010).

**F.      Crawford's Opinion Regarding Finley's Failure To Wear Hearing Protection Devices Is Reliable and Based on Sufficient Facts.**

In challenging Crawford's opinion that Finley failed to consistently wear hearing protection as "not specific to Finley," lacking foundation and reliability, and speculative, PltfsMot 25, Plaintiffs ignore that Crawford reached this conclusion based largely on *Finley's own sworn testimony*:  "Mr. Finley reported that he usually did not wear hearing protection when driving his vehicle or on patrol unless enemy contact was expected" despite "spend[ing] a great deal of time in aircraft and vehicles" with significant noise exposure.  Ex24, Crawford-Finley-Report 3, 10, 20. Based on Finley's testimony, Crawford identified specific examples where Finley was exposed to high noise levels, including from military vehicles and aircraft, which "can lead to hearing loss without at least single level hearing protection."  *Id.* 20.  Finley's failure to wear hearing protection on patrol despite Army regulations, *see*, *e.g.*, Ex28, Finley-Dep. 274:21-275:18, and his failure to wear double hearing protection at any time, *id.* 83:4-7; 122:20-23; 326:20-22; 327:24-328:1—are evidence "specific to Finley" and form a reasonable and reliable basis for Crawford's conclusions.  *See In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1361 (N.D. Ga. 2017), *aff'd sub nom.*, *Siegel v. Delta Air Lines, Inc.,* 714 F. App'x 986 (11th Cir. 2018); *see also* Ex24, Crawford-Finley-Report, Exhibit C at 1 (identifying Finley's deposition testimony as materials reviewed).

Nor is Crawford's reliance on combat videos as further support for his opinion problematic.  Crawford identified and considered videos showing soldiers doing the same military tasks as Finley, during the same timeframe, in the same region of Afghanistan, fighting the same enemy, and (often) from the same company, battalion, or brigade to determine "what the operational tempo would have been like" for Finley on patrol and to "demonstrate the noise environment that [Finley] was in."  Ex25, Crawford-Dep. 142:20-143:16; 146:17-23; *see also id.* 138:3-24; 144:11-21; 174:18-175:24; Ex24, Crawford-Finley-Report, Exhibit C at 8-10.  That Finley himself may not personally appear in these videos goes to the weight, and not the admissibility, of Crawford's opinion.  *See Kearney v. Auto–Owners Ins. Co.*, 2007 WL 3231780, at *3 (M.D. Fla. Oct. 30, 2007); *see also Daubert*, 509 U.S. at 596.

### G.   Crawford's Opinions On Other Potential Alternative Causes of Finley's Tinnitus Are Admissible.

Plaintiffs argue that the jury should not be able to hear Crawford's opinion that other causes—including TBIs, neurotrauma, ear infections, medications, migraines, or marijuana usage—could have contributed to Finley's tinnitus.  PltfsMot. 25-26; *see* Ex24, Crawford-Finley-Report 3-4 ("Finley has numerous experiences, conditions and exposures that are associated with tinnitus and cannot be ruled out as a the cause of his tinnitus[, including] migraines and headaches, blows to his head, medications, use of marijuana, and exposure to pressure waves

from low-level blasts."). Plaintiffs again argue that these causes are not certain and so should be excluded, *id.*, but that is wrong. *Supra* at 9-11. A defense expert "may offer evidence of potential alternative causes ... without needing to prove those alternative-cause theories with certainty or probability." *Waite*, 194 F. Supp. 3d at 1309.

## IV.   JACOBS.

### A.   Jacobs's Opinions Regarding Montero Are Admissible.

Jacobs is board certified in Psychiatry and Neurology, an active clinician, and an Associate Professor of Psychiatry at Harvard Medical School. Jacobs will assist the trier of fact by offering rebuttal opinions to Montero's experts, Hall and Packer. Ex41, Jacobs-Montero-Report 24. Montero apparently concedes this point, because he has *not* moved to exclude Jacobs's rebuttal opinions. Additionally, Jacobs's testimony will assist the jury in determining whether Montero's tinnitus exacerbates his alleged PTSD by synthesizing decades' worth of medical records and rebutting the opinions of Montero's experts.

### 1.   Jacobs's Testimony Will Assist The Jury.

Montero's argument that the Court should exclude Jacobs's testimony because he supposedly narrates Montero's medical records contradicts this Court's prior rulings. PltfsMot. 26-30. Description of the evidence supporting an expert's opinion "is necessary to provide the facts supporting [his] opinions." ECF 1680 at 126. An expert may "explain the basis of admissible opinions through commentary

on documents and exhibits in evidence." *Id.* 115; *see also id.* 117 (rejecting arguments that an expert's discussion of information is improper where it is "commentary on evidence that explains the factual bases of [his] opinions"). Jacobs does not narrate, and offers reliable and helpful opinions based on technical medical records.

*First*, Jacobs opines that Montero's tinnitus does not exacerbate his PTSD. Ex41, Jacobs-Montero-Report 3, 5. To reach this conclusion, Jacobs analyzes two decades worth of medical records to identify (1) a scarcity of evidence concerning his tinnitus; and (2) a lack of causal connection between Montero's tinnitus and PTSD. *Id.*

Jacobs uses these medical records to identify a temporal discrepancy between when Montero began to exhibit signs of suffering from tinnitus and PTSD. *Id.* 12-13. Jacobs opines that Montero's PTSD-related symptoms—and the likely catalyst for his PTSD—began in 2007, when an IED exploded under Montero's truck in Iraq. *Id.* 3, 11, 23. Montero's complaints of tinnitus, however, do not appear in the medical records until 2017. *Id.* 13. Drawing on his skill and experience as a psychiatrist who regularly cares for PTSD patients, Jacobs pinpoints the temporal disconnect between Montero's tinnitus complaints and his PTSD's triggering, and the complete lack of medical documentation linking the two. *Id.* 3. This specialized

knowledge will "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).

Montero's selective quotation from the Court's prior *Daubert* ruling does not save his argument.  PltfsMot. 26 (quoting ECF 1910 at 23).  The Court previously excluded Jacobs from opining on the etiology of a plaintiff's tinnitus because he is not an audiologist or ENT.  ECF 1910 at 22-23.  The Court held that Jacobs's testimony would not assist the jury because "it does not provide any insight or analysis beyond what the jury can read from the records themselves with the assistance of a qualified audiologist or ENT."  *Id.* 23.  Here, Jacobs is not opining on the etiology of Montero's alleged tinnitus.  Rather, he is opining on whether Montero's alleged tinnitus exacerbates his alleged PTSD—an opinion well within his expertise as a board-certified psychiatrist and neurologist.

Montero also challenges Jacobs for not considering why Montero might have not reported symptoms while he was still serving, due to "reverse malingering, studies about military-related PTSD, [and] stigma."  PltfsMot. 29-30.  But this argument fails to address that Montero continued denying hearing loss years after his discharge, despite having every motivation to be forthcoming.  Ex41, Jacobs-Montero-Report 22.  In particular, Jacobs highlights an incident in 2020, *after filing his lawsuit*, where Montero denied hearing loss.  *Id.*

33

*Finally*, Montero critiques Jacobs's assessments and his report's completeness.  PltsfMot. 29-30.  These issues affect the weight rather than the admissibility of his opinions.  *See Garcia v. Scottsdale Co.*, 2019 WL 1318090, at *2 (S.D. Fla. Mar. 22, 2019) (citing *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

> ### 2. Plaintiffs Misconstrue Jacobs's Testimony Regarding Whether PTSD and Tinnitus Have Negatively Impacted Montero's Life.

Plaintiffs cite to three lines of Jacobs's deposition to argue he submitted a "new" opinion concerning whether Montero's alleged PTSD and alleged tinnitus have negatively impacted Montero's life.  PltfsMot. 29-30.  This is not a "new" opinion.  In his report and deposition, Jacobs relies on the absence of documented impact on Montero's sleep habits, social life, use of medications, and employment to further demonstrate that Montero's contemporaneous medical records do not support his claim that tinnitus exacerbates his PTSD.  Ex41, Jacobs-Montero-Report 22-23; Ex43, Jacobs-Dep1. 60:7-13, 140:1-146:5, 152:22-153:1.  Likewise, the three lines of Jacobs's deposition that Montero cites discusses how—if Montero's claims of tinnitus and PTSD were true—Jacobs would expect to see evidence of a negative impact on Montero's quality of life.  Ex43, Jacobs-Dep1. 140:7-141:14 (discussing a lack of impact on Montero's marriage and employment as undermining Montero's claim of suffering from severe PTSD and tinnitus); *id.* 150:8-14 (similar); *id.* 155:2-

15 ("I'm here to … apply my years of experience in concert with the medical records, … and to say that I don't see objective evidence.").

### B. Jacobs's Opinions Regarding Finley Are Admissible.

#### 1. Jacobs's Opinions Regarding the Nature and Timing of Finley's Tinnitus Reporting Are Reliable and Helpful.

*First*, contrary to what Plaintiffs contend, PltfsMot. 31, Jacobs is well-qualified to interpret and opine on Finley's medical records.  Jacobs has "extensive experience" in psychiatry—including "over 40 years of interpreting medical records"—and applied that specialized knowledge to assess how Finley's documentation "comports with [] the complaints, the history, [and] the symptoms" Finley now alleges.  Ex44, Jacobs-Dep2. 355:21-24; 321:16-22; Ex45, Jacobs-Finley-Report 2.  This analysis is within Jacobs's credentials, training, and experience. *See Dominguez v. Sec'y of Health, Dep't of Health & Hum. Servs.*, 2018 WL 2225540, at *2 (Fed. Cl. Apr. 2, 2018); *United States ex rel. Armfield v. Gills*, 2012 WL 12918274, at *2 (M.D. Fla. July 6, 2012).

Plaintiffs' complaint that Jacobs is "not an otolarynologist, neurotologist, or audiologist," PltsMot. 31, misses the mark.  The *Daubert* inquiry into expert qualifications is liberal and flexible.  *E.g.*, *Roundout Valley Cent. Sch. Dist. v. The Coneco Corp.*, 321 F.Supp.2d 469, 475 (N.D.N.Y. 2004).  A "witness who possesses general knowledge of a subject may qualify as an expert despite lacking specialized training or experience, so long as her testimony would likely assist a trier of fact."

*United States ex rel. Armfield v. Gills*, 2012 WL 12918274, at *2 (M.D. Fla. July 6, 2012); *see also Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001).   Jacobs is a doctor, and need not be a hearing specialist to interpret medical records.

*Second*, Jacobs's testimony analyzing Finley's medical records is helpful to the jury.   Jacobs applied his expertise to identify *which* of Finley's many medical records are most relevant for evaluating the relationship between Finley's mental health and hearing problems and to assess *whether* Finley's medical documentation supports his claims.   Ex44, Jacobs-Dep2. at 343:22-345:14; 347:18-348:1; *compare* ECF 1690 at 19-20 (finding Plaintiffs' expert's summary of data in Defendants' public financial disclosures helpful to the jury).   Jacobs's specialized knowledge in interpreting Finley's medical records will help the jury determine whether Finley's mental health issues are attributable to or exacerbated by his hearing problems (which impacts causation and damages, among other things).

Plaintiffs' attempt to cast Jacobs's testimony as "[m]erely restating the information in Finley's medical records", PlftsMot. 31, is both untrue and provides no basis for exclusion for the same reason that this argument must be rejected as to Jacobs' Montero opinions.   *Supra* at 31-32.   Jacobs properly summarized those records relevant to his assessment of the relationship between Finley's hearing problems and his mental health issues.   *E.g.*, Ex44, Jacobs-Dep2. 343:22-345:7; 347:18-22.

Plaintiffs also ignore that Jacobs is offering rebuttal opinions to Finley's experts, Ezelle and Axelrad.[5]  These experts opine that Finley's PTSD, depression, and anxiety were caused and aggravated by Finley's tinnitus.  Jacobs's rebuttal opinion identifies evidence that Ezelle and Axelrad ignore and offers contrary evidence that Finley's mental health disorders are the result of other stressors.  Ex45, Jacobs-Finley-Report 4, 37, 49-52; *e.g.*, Ex44, Jacobs-Dep2. 327:12-23.  Jacobs's critique of Plaintiffs' experts' methodology is helpful to the jury.  *See McSweeney v. Kahn*, 2008 WL 6875017, at *9 (N.D. Ga. Feb. 4, 2008).

*Finally*, Plaintiffs' argument that Jacobs failed to "set a reliable method" for his opinion is wrong.  PltfsMot. 31.  As explained previously, Jacobs reached his conclusions based on his professional experience and knowledge applied to his review of Finley's medical records.  "[T]here is no question that an expert may still properly base his testimony on 'professional study or personal experience.'"  *Maiz*, 253 at 669.

---

[5]  Though Plaintiffs have withdrawn Axelrad, Jacobs's rebuttal opinion remains admissible because whether Finley's tinnitus exacerbated his mental health problems "remains a material issue" in the case.  *Shay v. Cty. of Los Angeles*, 2019 WL 5420262, at *6 (C.D. Cal. Oct. 21, 2019).

### 2.    Jacobs's Opinions Regarding The Impact Of This Litigation On Finley Are Helpful And Not Confusing.

Plaintiffs argue that Jacobs's opinions regarding the litigation's impact on Finley should be excluded as unhelpful and confusing, PltfsMot. 32, but do not explain why this might be so.  Plaintiffs' failure to articulate any support or basis for their argument alone justifies rejecting it.  *Alonso Cano v. 245 C & C, LLC*, 2019 WL 11769102, at *9 (S.D. Fla. Nov. 25, 2019).  Jacobs's opinion that Finley's stress and anxiety was exacerbated by this litigation—rather than "by any hearing difficulty"—will help the jury evaluate causation and damages.  Ex45, Jacobs-Finley-Report 51.

### C.    Jacobs's Opinions Regarding Camarillorazo Are Reliable And Helpful.

Camarillorazo lobs two meritless criticisms at Jacobs: that his opinions are (1) speculative and not based on a methodology or expertise, and (2) unhelpful. PltfsMot. 32-33.  Jacobs's report and testimony plainly convey his methodology, Ex43, Jacobs-Dep. 264:1–269:11, including "how [Jacobs's] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  ECF 1680 at 26 (quoting *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004)) (emphasis omitted).  Nor are his opinions like those found in *Wayman* to be without an adequate basis.  ECF 1910 at 16.  Here, Jacobs provides multiple explanations for his opinion that

Caramillorazo's tinnitus and hearing loss did not adversely affect his mental health, including the incongruity of Camarillorazo's sleep difficulties improving while being with his wife with such difficulties being caused by tinnitus.  *E.g.*, Ex46, Jacobs-Camarillorazo-Report 8; Ex43, Jacobs-Dep. 266:23–268:3.

Jacob's opinions are not, as Plaintiff asserts, PltfsMot. 33, mere recitations of Camarillorazo's records.  Camarillorazo asserts that noise has aggravated his PTSD, and offers Arriaga's opinion in support.  Jacobs applies his knowledge and expertise to interpret Camarillorazo's records and rebut Camarillorazo's claims.  Plaintiffs offer nothing demonstrating why reliance on medical records to render medical diagnoses is unhelpful, and the Court previously has ruled that experts can comment on documents to explain the bases of their opinions.  *Supra* at 31-32.

## V.    COLLINS.

Collins is a Clinical Neuropsychologist, Licensed Psychologist, and former President of the Association of Postdoctoral Programs in Clinical Neuropsychology who has over 50 published works in his field.  Ex47, Collins-Report, Exhibit A (Curriculum Vitae).  Collins reviewed Finley's records and performed an Individual Neuropsychological Evaluation on Finley to "provide an independent and objective evaluation of [Finley's] cognitive and psychiatric functioning".  *Id.* 1.  Applying the established methods of his discipline, Collins concluded—based on Finley's performance in prior medical assessments, his own evaluation, his professional

experience, and inconsistencies observed in Finley's self-reported cognitive and emotional limitations—that Finley more likely than not is engaged in suboptimal effort, overreporting, and symptom amplification (*i.e.*, is exaggerating his injuries). *E.g.*, *id.* 6, 10, 13, 17, 20; Ex48, Collins-Dep. 178:25-180:3; 135:2-14; 148:3-6; 154:13-18.

## A.   Collins' Opinions Are Well-Grounded In His Discipline And Experience.

Contrary to Plaintiffs' assertion, PltfsMot. 34-35, Collins has a reliable basis for opining that Finley is exaggerating purported injuries to his cognitive and psychiatric functioning.  Ex47, Collins-Report 6.[6]  Collins used established testing methods, applied his extensive expertise, and followed "the practice guidelines from the American Academy of Clinical Neuropsychology" (the "thought leaders" of the discipline) to reach his conclusions.  *See*, *e.g.*, Ex48, Collins-Dep. 221:14-21, 253:9-20, 254:5-10; 153:11-20.   Though Plaintiffs assert—without citation or support— that "several of the validity tests Collins relies upon are unreliable and lack a credible scientific foundation," PltfsMot. 34, they fail to provide any examples, evidence, or authority to corroborate this assertion.  None exists.  No court has ever "limited,

---

[6]  Plaintiffs' methodological challenge largely attacks an opinion that Collins has confirmed he is *not* offering: that Finley is a malingerer.  *See* Ex48, Collins-Dep. 155:25-156:6 ("I'm also not diagnosing [Finley] with malingering."); *see also id.* 157:19-23.  Plaintiffs' critiques of Collins' methodology related to a diagnosis he *does not render* are irrelevant.

restricted or found inadmissible" Collins' expert opinions—much less done so based on the "types of tests that [he] conducted".  Ex48, Collins-Dep. 112:23-113:5.

Plaintiffs next incorrectly assert that Collins "refused to consider" relevant evidence in the record.  PltfsMot. 34-35.  Collins confirmed that his "opinion is based on the results of the validity measures, but also *all* of the other data collected, the data from the previous evaluations with Pollock and Axelrad, [and] the other data within the evaluation that has to do with inconsistencies."  *Id.* 234:4-15 (emphasis added), 255:19-25.  Collins specifically noted that he assessed Finley's TOMM[7] results when rendering his conclusions.  *Compare id.* 256:2-9 *with* PltfsMot. 34.

Nor did Collins rely on "cherry-picked testing" or "disregard [] the total weight of the evidence" in reaching his conclusions.  PltfsMot. 34-35.   While Plaintiffs make much of the fact that Finley "pass[ed]" more validity measures than he failed during Collins' evaluation, *id.*, they ignore that "failing performance validity measures is much more meaningful than passing a validity measure" in neuropsychology.  Ex48, Collins-Dep. 250:11-253:20.  The tests "are designed such that failing a validity measure is highly, highly unlikely, but passing them is quite frequent and doesn't really mean much."  *Id*.  Consequently, "none of the results for

---

[7] The Test of Memory Malingering ("TOMM") is a recognition test designed to discriminate between true memory-impaired patients and those exaggerating or fabricating their symptoms.

the—of validity measures that [Finley] passed are inconsistent with [Collins'] opinions in any way whatsoever." *Id.* 265:20-266:17.

Similarly, that several of the validity measures Finley failed were embedded within a single test has no bearing on the reliability of Collins' analysis. *Id.* 215:23-216:1. Plaintiffs are free to cross-examine Collins. *See Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988). But because Collins' methodology is consistent with the standards of his discipline, there is no basis for exclusion. *See Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, 2010 WL 4316926, at *7 (S.D. Fla. Oct. 21, 2010).

### B.     Collins Followed The Testing Protocol.

Plaintiffs wrongly contend that Collins' use of a white noise machine during his evaluation of Finley was against the testing protocol agreed to by the parties. PltfsMot. 35. The protocol stated that Finley's examination would include "administration of various standardized tests and a clinical interview, interspersed throughout the tests, *in accordance with Dr. Collins' standard practice*." PX-41 (Agreed Protocol for Finley's IME by Collins) (emphasis added). Collins testified that use of a white noise machine is "standard practice in neuropsychological evaluations", "standard practice for myself when I test", and "standard practice for my colleagues as well." Ex48, Collins-Dep. 23:17-19, 236:17-237:1; *see also id.*

27:3-8, 237:14-23.  Use of a white noise machine was part of Collins' "standard practice" and thus was permitted by the protocol.

Plaintiffs' criticism that Collins observed Finley's demeanor while conducting various standardized tests and his clinical interview also is meritless. PltfsMot. 35-36.  Collins evaluated Finley's startle response (or lack thereof) "in a larger context of other indicators from the evaluation" assessing Finley.  Ex48, Collins-Dep. 280:21-281:9.   There is nothing improper about making such observations, nor did they need to be agreed to or disclosed in advance like Plaintiffs now suggest.  *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or *personally observed*.") (emphasis added).

### C.  Collins' Opinions Are Helpful.

Plaintiffs' final argument—that Collins' testimony should be excluded as unhelpful—also fails.  PltfsMot. 36.  *First*, Collins does not simply "summarize[] medical records" as Plaintiffs wrongly contend.  PltfsMot. 36.  Rather, Collins analyzed the neuropsychological testing and psychiatric evaluations that Finley had previously performed and evaluated the raw data from these reports to reach his own conclusions.  *E.g.*, Ex48, Collins-Dep. 234:4-15, 255:19-25.  This analysis provides the facts supporting his opinion and is admissible, as the Court has held.  *Supra* at 31-32.

43

*Second*, Plaintiffs' decision to withdraw its own neuropsychological experts has no bearing on whether *Collins'* opinion is admissible. "There is no rule that, at trial, a rebuttal expert may testify only in response to an affirmative expert's trial testimony." *Olivero v. Trek Bicycle Corp.,* 2018 WL 3459424, at *1-2 (D. Colo. July 18, 2018). Rather, so long as an expert's testimony relates to a topic that "remains a material issue" in the case, it is irrelevant that the affirmative expert he was originally rebutting is withdrawn. *See Shay v. Cty. of Los Angeles*, 2019 WL 5420262, at *6 (C.D. Cal. Oct. 21, 2019).

## VI.   SEIDMAN.

Seidman is a medical doctor and professor who has treated more than 30,000 patients. He is board-certified in otolaryngology and has received numerous honors. Ex49, Seidman-Report 1-2, ExA. Seidman opines that "Montero has normal hearing sensitivity for a 50-year-old male", *id*. 14, and rebuts Plaintiff's experts' opinions that noise caused or substantially contributed to Montero's alleged tinnitus or hearing difficulties. *Id*. 16-19.

### A.   Seidman's Opinion About Montero's Normal Hearing Is Reliable.

Seidman explains that Montero has "great hearing for a 50-year-old. He's much better than most 50-year-olds." Ex50, Seidman-Dep. 115:14-16; *see also* Ex49, Seidman-Report 14. Plaintiffs assert this opinion should be excluded because

it is supported "only" by "anecdotal evidence" and OSHA age-correction tables. PltfsMot. 38-39.  Not so.

*First*, Seidman reviewed 25 years of Montero's "extensive audiometric testing records," including "more than 20 audiograms since 1992" and "several word recognition tests".  Ex49, Seidman-Report 7-9.  He also reviewed contemporaneous documents from 2014 to 2020 in which Montero reported "no subjective difficulty hearing" and "denied having any hearing deficit."  *Id*. 9-10.

Seidman also conducted an in-person IME of Montero and found that Montero's "hearing as tested falls in the range of what [Seidman] would typically see in a normal 15- to 25-year-old person."  *Id*. 13.  Seidman additionally considered Montero's IME, noting that those "results are at least as good as if not better than the average 50 year old without noise-induced hearing loss that I see in my practice."  *Id*. 14.  The audiologist who performed Montero's IME likewise concluded that the "[o]verall results show essentially normal hearing sensitivity in both ears."  *Id.* 17.

Seidman applied his decades of experience when assessing this information.  An otolaryngology specialist's reliance on his experience assessing and treating patients' hearing to opine about what is "normal" hearing is not "anecdotal evidence" or "[g]uesswork", PltfsMot. 38-39—as this Court has already ruled, ECF 1680 at 22.  "Experts are permitted to draw conclusions from a set of observations

that are based on their extensive and specialized experience." *Fell v. United States*, 2017 WL 5992464, at *7-8 (N.D. Fla. July 17, 2017).

*Second*, Seidman's opinion based on his years of experience treating patients, and the materials he cites, is not unreliable simply because it "has not been published and has not been peer-reviewed." PltfsMot. 38. Even Plaintiffs' experts recognize that age impacts hearing. Ex51, Packer-Dep. 37:2-17; Ex52, Packer-Montero-Report at 35; Ex53, Hall-Dep. 267:9-268:6. Moreover, Seidman's opinion *is* supported by ample published literature establishing that hearing deteriorates with age. *See* Ex49, Seidman-Report, ExC. Numerous studies involving individuals of various age groups confirm that humans' ability to hear higher frequency tones decreases as they get older and that hearing in each group predictably decreases with age. *See, e.g.*, Ex54, Valiente, et al., *Extended high-frequency (9-20 kHz) audiometry reference thresholds in 645 healthy subjects*, 53 INT'L J. AUDIOLOGY 531, 543-45 (2014).

Specifically, adults ages 50-59 often experience hearing thresholds in the 20-25 dB range for tested frequencies of 0.125 kHz to 8kHz. *Id.* 536-39, Table 2, Fig. 4. Montero's 2021 audiologic testing results fall within this range and at some frequencies fare better than the average 50-year-old. Ex49, Seidman-Report 8.

*Third*, Plaintiff takes out of context Seidman's acknowledgment that other factors may have had some impact on Montero's hearing. Seidman's opinion is not

that "age is the only thing that caused Mr. Montero's hearing to change." PltfsMot.

39. Rather, his opinion is simply that Montero's hearing is *normal* for his age: "So

his hearing is in the normal range today, 2021, and it was in the normal range in

1995." Ex50, Seidman-Dep. 116:23-25.

## B. Seidman's Rebuttal Opinions About Alternative Causes Are Admissible.

Seidman opines that both Montero experts (Hall and Packer) ignored that

Montero's hearing is normal. Ex49, Seidman-Report 16-18. Seidman also identifies

multiple potential causes of hearing loss or tinnitus that Plaintiffs' experts failed to

"rule out." *Id*. This is permissible expert testimony. *Supra* at 9-11.

*First*, Plaintiffs erroneously argue "Seidman opines that Montero's subjective

hearing difficulty is not the 'result of cochlear injury from noise-exposures'".

PltfsMot. 36. In fact, Seidman opines "*there is no evidence*" of such noise-related

injury. Ex49, Seidman-Report 14 (emphasis added). This distinction is critical

given Plaintiffs' burden of proof.

Plaintiffs repeatedly point to Seidman's testimony that, hypothetically, noise

exposure *could* have had some impact on Montero's hearing. PltfsMot. 36-37. But

that is beside the point, because Seidman does not offer an affirmative-causation

opinion (largely because Montero's hearing is normal). Seidman simply opines that

Plaintiff's experts' opinions are unsupported by the facts.

Plaintiffs' experts ignore voluminous evidence that *Montero has no hearing loss*, and they point to no evidence of *noise-related* hearing loss. Seidman notes the absence of evidence of a "notch" in Montero's audiogram results. Ex49, Seidman-Report 3. According to Seidman's research, his extensive experience examining audiologic reports, and published literature, noise-induced hearing loss often presents as a "notch" in audiograms such that an audiologist typically would see the patient's hearing thresholds decrease near the 4,000 Hz frequency, but then recover to the patient's expected hearing thresholds near 8,000 Hz. Ex49, Seidman-Report 3 (citing Zadeh, et al., *Extended high-frequency hearing enhances speech perception in noise*, 116 PROC. NAT'L ACAD. SCIS. 23753 (2019)). This distinctive pattern was not present in Montero's audiograms. Ex50, Seidman-Dep. 99:11-15.

*Second*, Seidman explains that Hall and Packer failed to consider an "extensive list of medications" that "*might* be responsible for some of his alleged symptoms." Ex49, Seidman-Report 18 (emphasis added). As Plaintiffs acknowledge, Seidman is not opining that medications caused any hearing loss, PltfsMot. 39-40, so his testimony is admissible.

*Third*, Seidman explains that "[t]innitus can also occur after head trauma, such as traumatic brain injury ('TBI')", Ex49, Seidman-Report 5, and that Montero had been diagnosed with TBI, *id.* 12-13, a factor Hall did not consider. This critique is proper and admissible. *Abilify*, 299 F. Supp. 3d at 1368. Seidman does not opine

on "the existence or extent of Montero's TBI," PltfsMot. 40-41; instead, he relies on Montero's diagnoses by other qualified medical professionals.   Ex49, Seidman-Report 12 ("The [VA] examiner, Dr. Saranga, diagnosed Mr. Montero with having had a TBI in the past and mild neurocognitive disorder.")).

### C.     Seidman Did Not Opine on Whether the CAEv2 Is Defective.

Seidman does not opine as to whether the CAEv2 was defective.   PltfsMot. 41.   Plaintiffs elicited testimony from Seidman on issues like defect and company responsibility.   Ex50, Seidman-Dep. 17:20-23; 404:7-18.   Defendants do not intend to offer such testimony from Seidman at trial.

## VII.   PAPPAS AND GOULD.

Pappas is a board-certified otolaryngologist and neurotologist with over 25 years of clinical experience.   Gould is an audiologist.   Pappas and Gould conducted Palanki's IME and analyzed Palanki's medical examination, noise exposure and hearing protection usage history, and the scope and etiology of Palanki's test results and reported symptoms.   Ex55, Pappas-Gould-Report.   Plaintiffs incorrectly argue that because Pappas and Gould concluded that Palanki has normal hearing and did not identify a *single* cause of Palanki's symptoms, they should not be permitted to opine on *any* possible causes of Palanki's symptoms or test results.   PltfsMtn. 42-46.

Initially, Pappas conducted a proper differential diagnosis of Palanki. Ex56, Pappas-Dep. 256:22–257:1 ("I'm trying to give a differential diagnosis for anything that I find that's abnormal on his tests before and the tests that we [Pappas and Gould] performed."); *id.* 256:16–259:12 (differential diagnosis for abnormal DPOAE results); *id.* 182:6–22 (differential diagnosis for tinnitus complaints). Pappas and Gould determined that certain potential causes could not be ruled out, including head injury, aging, and noise exposure between 2020 and 2021. They could reliably rule out noise exposure during the time period he used the CAEv2. Ex56, Pappas Dep. 182:7-22; *id.* at 174:20-22; Ex55, Pappas-Gould Report 23-24, 33-35. An "expert's 'differential analysis need not rule out all possible alternative causes, [] it must at least consider other factors that could have been the sole cause of the plaintiff's injury.' The expert must provide 'more than subjective beliefs or unsupported speculation' for rejecting alternative causes." ECF 1680 at 32. Pappas and Gould have provided far more than "subjective beliefs or unsupported speculation"—their opinions are based on an extensive review of Palanki's records, deposition testimony, the literature, and decades of experience.

Moreover, Plaintiffs misstate the law and burden of proof. *Supra* at 9-11. Pappas and Gould reliably identify possible alternate causes of Palanki's reported symptoms and test results. As they explain, "Palanki first reported tinnitus in September 2017, two years after he stopped using the CAEv2. It is widely accepted

in medicine that tinnitus occurs at the time of the noise exposure.  It is our medical opinion that Mr. Palanki's reported tinnitus is not due to noise exposure while using the CAEv2."   Ex55, Pappas-Gould-Report 33.  This opinion is based on their knowledge of the relevant medical literature as applied to their review of Palanki's medical records, military records, and deposition testimony.[8] *Id.* 28-31.

Pappas and Gould likewise provide reliable opinions regarding possible alternate causes of Palanki's abnormal DPOAE results in 2021.  That Pappas and Gould's differential diagnosis was unable to identify the specific cause of Palanki's abnormal DPOAE results does not render those opinions "speculative," as Plaintiffs suggest.  PltfsMot. 44.  Instead, they provide a detailed analysis of Palanki's three available DPOAE results, and explain that "[a]ge, noise, head trauma, and ototoxicity are all possible causes for absent DPOAEs," but that "damage occurred within the time frame between" 2020 and 2021, "and not from the use of an earplug six years in the past." Ex55, Pappas-Gould-Report 20-23; *see also id.* 33.

Plaintiffs do not contend that any of these are *not* possible causes of Palanki's reduced/absent DPOAEs based on medical literature.  Instead, they only complain

---

[8] Lustig agrees that "[t]he timeline of the auditory injury is also important, including when it started, and the nature of any symptom progression of hearing loss and tinnitus over time. Any temporal relationship between the noise exposure, particularly if repeated, and the onset of the symptoms should be consistent." Ex57, Lustig-Palanki-Report 12.

that "Palanki's specific results are not attributed to any *one* of these factors to a reasonable degree of medical certainty."  PltfsMot. 44 (emphasis added).  But this is not Defendants' burden.  "So long as the defense specific causation expert's opinion is a product of her specialized knowledge or training and is reliably grounded, it should be admissible to rebut the plaintiffs' specific causation expert."  *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2017 WL 6350554, at *3 (S.D. W.Va. Dec. 12, 2017); *supra* at 9-11.

Similarly, Pappas and Gould appropriately opine, based on accepted medical principles[9] and extensive review of Palanki's medical records, that Palanki's history of head trauma is a possible alternative cause of Palanki's reported hearing difficulty or tinnitus, and abnormal DPOAE or AzBio results.  Ex55, Pappas-Gould-Report 22-24, 27-28.  As Plaintiffs note, "Pappas does not opine that the 1990 accident 'caused' the [DPOAE and AzBio] results".  PltfsMot. 45.  Instead, these opinions directly rebut Lustig's opinion that Palanki "has no credible evidence of head trauma, or concussive events." Ex57, Lustig-Palanki-Report 13.

Moreover, that the records from Palanki's 1990 accident do not mention TBI, concussion, MRI, or a CT scan, does not prevent Pappas from providing a reliable

---

[9] There is no dispute that head trauma can lead to auditory issues—Lustig agrees. Ex58, Lustig-Dep. 42:7–21, 56:11–57:1, 381:9–12, 381:13–382:1 (testifying that head trauma can lead to tinnitus and hearing loss).

opinion based on a multitude of medical records and deposition testimony that head trauma is a possible cause of Palanki's DPOAE results and AzBio scores.  Ex59, D-PALANKI-5;  Ex60,  D-PALANKI-21;  Ex61,  D-PALANKI-72;  Ex62,  D-PALANKI-74;  Ex63,  D-PALANKI-110  (records  discussing  history  of  head injury/TBI).   As  Pappas  explained,  Palanki's  1990  records  show  "a  very characteristic drawing of a blunt trauma to the head," and "[i]t doesn't matter what year it was drawn or how recent or far off it was drawn. [I]t signifies that this was a blunt trauma to his head."  Ex56, Pappas-Dep. 281:23-282:17; *see also* Ex60, D-PALANKI-21 at 11.

Pappas and Gould likewise explain that given Palanki is almost 50 years old, aging is a possible cause of difficulty hearing in noise and AzBio scores, as well as his reduced or absent OAEs.  Ex55, Pappas-Gould-Report 23-24.  These opinions are supported by their review of the literature combined with their specialized knowledge and experience.  *Id.*  Pappas and Gould are not providing a specific causation opinion that Palanki's head traumas are more likely than not the cause of his reported symptoms, but are providing reliable and supported opinions (both scientifically and factually) of possible alternate causes of these symptoms that Palanki's expert failed to appropriately consider and rule out. *Davol*, 2020 WL 6605612, at *12; *see also* Ex55, Pappas-Gould-Report 24 ("Given the above reasoning, it is our opinion that no clinician could find to any reasonable degree of

medical or scientific certainty that Mr. Palanki's reduced Az Bio results in 2021 could be attributed to his use of the CAEv2.").

While Pappas and Gould reached the conclusion that Palanki does not have hearing loss, they conducted a differential diagnosis and appropriately identify alternate causes of Palanki's reported hearing difficulty (including AzBio results), abnormal DPOAEs, and tinnitus. Ex55, Pappas-Gould-Report 20-24, 30-31. Pappas and Gould's opinions are supported by over 30 years of collective clinical experience and review of scientific literature, as applied to their review of Palanki's military records, medical records, and deposition transcripts in this case. Each of their opinions are offered "to a reasonable degree of medical and scientific certainty", *id.* 36, and surpasses the bar for reliable expert testimony.

## VIII. NON-RETAINED MEDICAL WITNESSES.

Plaintiffs provide no reason to exclude the testimony of Defendants' ten Non-Retained Case-Specific Medical Expert Witnesses. PltfsMot. 47-50. Plaintiffs' concerns are academic—none of these witnesses' testimony qualifies as "expert." Defendants disclosed these witnesses as non-retained hybrid experts "out of an abundance of caution"; their testimony will be limited to "only ... the facts and opinions, set forth in their depositions." Ex64, 8/9/2021 Disclosure. Defendants do not believe that any of this testimony strays beyond "personal knowledge from providing medical care, involving consultation, examination, or treatment of a

patient plaintiff," *id.*, meaning that all of it is "lay" testimony not subject to the requirements of Rule 26(a)(2)(B)-(C).  Treating physicians "may offer lay opinion testimony when the opinion is based on [their] experience as a physician and [is] clearly helpful to an understanding of [their] decision making process in the situation"; thus, "courts in the Eleventh Circuit and elsewhere find that treating physicians are not 'expert' witnesses if they testify about observations based on personal knowledge, including the treatment of a party." *Jacobson v. R.J. Reynolds Tobacco Co.*, 2013 WL 12094891, at *2 (S.D. Fla. Aug. 26, 2013); *see also Wademan v. United States*, 2017 WL 7794322, at *3 (S.D. Fla. May 17, 2017).

Moreover, Defendants' disclosures satisfy Rule 26.  Non-retained experts need provide only "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify."  Fed. R. Civ. P. 26(a)(2)(C).  Rule 26(a)(2)(C) requires disclosures "considerably less extensive than the report required by Rule 26(a)(2)(B)"; indeed, "[c]ourts must take care against requiring undue detail".  Fed. R. Civ. P. 26 advisory committee's note (2010); *see also Triolo v. United States*, 2019 WL 5704659, at *2 (M.D. Fla. Nov. 5, 2019) (holding that Rule 26(a)(2)(C) does not require that experts actually provide the "reasons" or "basis" for their opinions—discussing the "how and why" is not required).  Here, the disclosures make clear that each witness will testify to their experiences treating the relevant plaintiff and their opinions related to

that treatment, as sets forth in their depositions.   Ex64, 8/9/2021 Disclosures. "[R]equiring an additional summary [] is unwarranted," where, as here, a party "states that he does not intent to elicit any testimony or opinions from Mr. Gordon beyond those already given at his deposition." *Pelaez v. Govt. Employees Ins. Co.*, 2020 WL 4458966, at \*2 (M.D. Fla. May 7, 2020).

Nor is *Arch Specialty Ins. Co. v. BP Invest. Ptrs., LLC*, 2020 WL 5848317, at \*4 (M.D. Fla. Oct. 1, 2020), PltfsMot. 49, persuasive to the contrary.   That case held any failure to comply with Rule 26(a)(2)(C) harmless, where (as here), the plaintiff did not show any harm from the disclosures. *Id.* \*4.   Its remark that a one-paragraph disclosure falls "brutally short of satisfying" the Rule, *id.*, derives from *Ruckh v. CMS II LLC*, 2016 WL 7665191, at \*4 (M.D. Fla. Dec. 21, 2016), a much different case.   In *Ruckh*, the purported expert's short disclosure indicated that she "may ... testify regarding any subjects on which Defendants' experts may testify"—in other words, "almost any issue in the action". *Id.*   The court in that case properly rejected the witness's disclosure for covering such unlimited territory, *id.*, but the same problem is not found here, where each witness's opinions are cabined to those explored in depositions. *Pelaez*, 2020 WL 4458966, at \*2.[10]

---

[10] If the Court finds that more detail is needed, Defendants request seven days to supplement those disclosures. *E.g.*, *O'Brien v. NCL (Bahamas) Ltd.*, 2017 WL

Finally, Plaintiffs' passing criticism of the substance of these witnesses' testimony is no reason for exclusion. The only "example" Plaintiffs discuss is Saranga, whose opinions would pass muster even if they were subject to Rule 702. Saranga is a medical doctor who is board certified in psychiatry and traumatic brain injury, has been in private practice for over 15 years, and has spent nearly a decade treating hundreds of veterans through the VA. Ex66, Saranga-Dep. 20:8-21:21. As part of his veterans' practice, he "evaluate[s] if [patients] have a diagnosis of traumatic brain injury and if they have any residual symptoms from that," as well as conducts an "exam for mental health," including PTSD. *Id.* 23:15-24:5. His testimony as disclosed in his deposition is not "simply regurgitat[ing] notes" from an evaluation, PltfsMot. 49; rather, he personally examined Montero and performed both TBI and mental health analyses as part of his exam, concluding that Montero had TBI and PTSD, and evaluating the symptoms of each. *E.g.*, Ex66, Saranga-Dep. 39:16-40:10, 44:9-45:7, 80:2-83:8. Saranga is qualified to present the results of this exam, and Plaintiffs do not show how allowing him to do so could be unduly prejudicial.

---

8315925, at *8 (S.D. Fla. Aug. 25, 2017) (allowing supplementation); *Sweat v. U.S.*, 2015 WL 8270434, at *3 (M.D. Fla. Dec. 8, 2015) (same).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny

Plaintiffs' motion to exclude Defendants' expert's opinions.

Dated:  October 8, 2021

Respectfully submitted:

*/s/ Charles F. Beall, Jr.*
Larry Hill
Florida Bar No. 173908
lhill@mhw-law.com
Charles F. Beall, Jr.
Florida Bar No. 66494
cbeall@mhw-law.com
Haley J. VanFleteren
Florida Bar No. 1003674
hvanfleteren@mhw-law.com
MOORE, HILL & WESTMORELAND, P.A.
350 West Cedar Street
Maritime Place, Suite 100
Pensacola FL 32502
Telephone: (850) 434-3541

*/s/ Robert C. "Mike" Brock*
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
mnomellini@kirkland.com

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company,*
*3M Occupational Safety LLC, Aearo*
*Technologies LLC, Aearo Holding,*
*LLC, Aearo Intermediate, LLC and*
*Aearo, LLC*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Judge Herndon on July 12, 2021 conveyed the Court's direction that the parties' *Daubert* motions are limited to 1350 words per new expert and 1350 words per new issue with an existing expert.  This memorandum responds to Plaintiffs' arguments regarding eight experts (counting the ten non-retained medical witnesses as one expert), yielding a word limit of 10,800 words.  Pursuant to Local Rule 7.1(F) and this Court's direction, counsel for Defendants certify that this memorandum contains 10,772 words, excluding the case style, tables of contents and authorities, signature block, and certificates of compliance with the Local Rules.

Dated:  October 8, 2021                    Respectfully submitted,


                                           */s/ Robert C. Brock*
                                           Robert C. "Mike" Brock
                                           KIRKLAND & ELLIS LLP
                                           1301 Pennsylvania Avenue, N.W.
                                           Washington, D.C. 20004
                                           Telephone:  (202) 389-5991
                                           mike.brock@kirkland.com

                                           *Counsel for Defendants*
                                           *3M Company,*
                                           *3M Occupational Safety LLC,*
                                           *Aearo Technologies LLC,*
                                           *Aearo Holding, LLC,*
                                           *Aearo Intermediate, LLC and*
                                           *Aearo LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 8, 2021, a true and correct copy of the foregoing:

## DEFENDANTS' RESPONSE TO PLAINTIFFS' OMNIBUS MOTION AND MEMORANDUM OF LAW TO EXCLUDE DEFENDANTS' GROUP C EXPERT OPINIONS AND TESTIMONY

was served as follows:

☒ **[E-Mail]** By causing the above document to be sent via electronic mail to the parties at the email addresses listed below. I am aware that service is presumed invalid if the email transmission is returned as undeliverable.

| | |
|---|---|
| Bryan F. Aylstock, Lead Counsel<br>Douglass A. Kreis<br>Neil D. Overholtz<br>Jennifer M. Hoekstra<br>Aylstock, Witkin, Kreis & Overholtz, PLLC<br>17 East Main Street Suite 200<br>Pensacola, FL 32502<br>Tel.: (850) 202-1010<br>Email: baylstock@awkolaw.com<br>Email: dkreis@awkolaw.com<br>Email: noverholtz@awkolaw.com<br>Email: jhoekstra@awkolaw.com<br><br>*Counsel for Plaintiff Guillermo Camarillorazo*<br>Case No. 7:20-cv-00098<br><br>*Counsel for Plaintiff Theodore Finley*<br>Case No. 7:20-cv-00170<br><br>*Counsel for Plaintiff Carlos Montero*<br>Case No. 7:20-cv-00067<br><br>*Counsel for Plaintiff Joseph Palanki* | Shelley V. Hutson, Co-Lead Counsel<br>Emily B. Marlow<br>Marcela J. Arevalo<br>Clark, Love & Hutson, GP<br>440 Louisiana Street<br>Suite 1600<br>Houston, TX 77002<br>Tel.: (713) 757-1400<br>Email: shutson@triallawfirm.com<br>Email: emarlowe@triallawfirm.com<br>Email: bgreif@triallawfirm.com<br>Email: marevalo@triallawfirm.com<br><br>*Counsel for Plaintiff Guillermo Camarillorazo*<br>Case No. 7:20-cv-00098<br><br>*Counsel for Plaintiff Joseph Palanki*<br>Case No. 3:19-cv-02324 |

| | |
|---|---|
| Case No. 3:19-cv-02324<br><br>*Counsel for Plaintiff Carter Stelling*<br>Case No. 7:20-cv-00143 | |
| Christopher A. Seeger, Co-Lead Counsel<br>David R. Buchanan<br>Caleb A. Seeley<br>Maxwell H. Kelly<br>Parvin K. Aminolroaya<br>Seeger Weiss LLP<br>55 Challenger Road, 6th Floor<br>Ridgefield Park, NJ 07660<br>Tel.: (212) 584-0700<br>Email: cseeger@seegerweiss.com<br>Email: dbuchanan@seegerweiss.com<br>Email: cseeley@seegerweiss.com<br>Email: mkelly@seegerweiss.com<br>Email: paminolroaya@seegerweiss.com<br>Email: MDL2885@seegerweiss.com<br><br>*Counsel for Plaintiff Carter Stelling*<br>Case No. 7:20-cv-00143 | Michael A. Burns, Co-Liaison Counsel<br>Caroline L. Maide<br>Mostyn Law Firm<br>3810 W. Alabama Street<br>Houston, TX 77027<br>Tel.: (713) 714-0000<br>Email: epefile@mostynlaw.com<br>Email: maburns@mostynlaw.com |
| Evan D. Buxner,<br>Plaintiffs' Executive Committee<br>Gori Julian & Associates<br>156 North Main Street<br>Edwardsville, IL 62025<br>Tel.: (618) 659-9833<br>Email: evan@gorijulianlaw.com | Brian H. Barr, Co-Liaison Counsel<br>Winston Troy Bouk<br>Troy A. Refferty<br>Levin, Papantonio, Thomas, Mitchell, Rafferty, & Proctor, P.A.<br>316 S Baylen St. Ste 600<br>Pensacola, FL 32502<br>Tel.: (850) 435-7045<br>Email: bbarr@levinlaw.com<br>Email: tbouk@levinlaw.com<br>Email: trafferty@levinlaw.com |
| Keith M. Jensen<br>Keith M. Jensen PC | Thomas W. Pirtle<br>Buffy K. Martines |

| | |
|---|---|
| 1024 N. Main Street<br>Fort Worth, TX 76105<br>Tel.: (817) 334-0762<br>Email: kj@jensen-law.com<br><br>*Counsel for Plaintiff Guillermo*<br>*Camarillorazo*<br>Case No. 7:20-cv-00098 | Laminack Pirtle & Martines<br>5020 Montrose Blvd, 9th Fl.<br>Houston, TX 77006<br>Tel.: (713) 292-2750<br>Email: tomp@lpm-triallaw.com<br>Email: buffym@lpm-triallaw.com<br><br>*Counsel for Plaintiff Guillermo*<br>*Camarillorazo*<br>Case No. 7:20-cv-00098 |
| Jonathan M. Sedgh<br>Panagiotis V. Albanis<br>Paul J. Pennock<br>Morgan & Morgan<br>850 3rd Avenue, Suite 402<br>Brooklyn, NY 11232<br>Tel.: (212) 738-6839<br>Email: jsedgh@forthepeople.com<br>Email: palbanis@forthepeople.com<br>Email: ppennock@forthepeople.com<br><br>*Counsel for Plaintiff Guillermo*<br>*Camarillorazo*<br>Case No. 7:20-cv-00098 | Katherine L. Cornell<br>Pulasaki Law Firm<br>2925 Richmond Avenue, Suite 1725<br>Houston, TX 77098<br>Tel.: (713) 664-4555<br>Email: kcornell@pulaskilawfirm.com<br><br>*Counsel for Plaintiff Guillermo*<br>*Camarillorazo*<br>Case No. 7:20-cv-00098 |
| Thomas J. Henry<br>Roger L. Turk<br>Thomas J. Henry Law PLLC<br>521 Starr Street<br>Corpus Christi, TX 78401<br>Tel.: (361) 985-0600<br>Email: tjh.3m@thomasjhenrylaw.com<br>Email: rlt.3m@thomasjhenrylaw.com<br><br>*Counsel for Plaintiff Theodore Finley*<br>Case No. 7:20-cv-00170 | Nicole Corinne Berg<br>Ashley Barriere<br>Kathryn Lee Couey<br>Keller Lenkner LLC<br>150 N. Riverside Plaza<br>Suite 4270<br>Chicago, IL 60606<br>Tel.: (312) 741-5220<br>Email: ncb@kellerlenkner.com<br>Email:<br>ashley.barriere@kellerlenkner.com<br>Email:<br>kathryn.couey@kellerlenkner.com |

|  | *Counsel for Plaintiff Carlos Montero*<br>Case No. 7:20-cv-00067 |
|---|---|
| Alexandra M. Walsh<br>1050 Connecticut Avenue<br>Suite 500<br>Washington, DC 20036<br>Tel.: (202) 780-4127<br>Email: awalsh@alexwalshlaw.com<br><br>*Counsel for Plaintiff Carlos Montero*<br>Case No. 7:20-cv-00067 | Jason M. Milne<br>Clark Love & Hutson<br>757 W. Meadow Side Drive<br>Saratoga Springs, UT 84045<br>Tel.: (385) 447-1041<br>Email: jmilne@triallawfirm.com<br><br>Counsel for Plaintiff Joseph Palanki<br>Case No. 3:19-cv-02324 |
| Matthew S. Hosen<br>Quinn Emanuel Urquhart<br>1109 1st Avenue, Suite 210<br>Seattle, WA 98101<br>Tel.: (206) 905-7000<br>Email: matthosen@quinnemanuel.com<br><br>*Counsel for Plaintiff Joseph Palanki*<br>Case No. 3:19-cv-02324 | Muhammad S. Aziz<br>Abraham Watkins Nichols<br>800 Commerce Steet<br>Houston, TX 77055<br>Tel.: (713) 222-7211<br>Email: jdean@abrahamwatkins.com<br><br>*Counsel for Plaintiff Joseph Palanki*<br>Case No. 3:19-cv-02324 |

DATED:  October 8, 2021             */s/ Robert C. Brock*                  
                                    Robert C. "Mike" Brock