**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| | Judge M. Casey Rodgers |
| This Document Relates to: *Camarillorazo, 7:20-cv-00098* *Finley, 7:20-cv-00170* *Montero, 7:20-cv-00067* *Palanki, 3:19-cv-02324* *Stelling, 7:20-cv-00143* | Magistrate Judge Gary R. Jones **[FILED UNDER SEAL]** |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANTS' OMNIBUS MOTION TO EXCLUDE PLAINTIFFS'**
**GROUP C PUTATIVE EXPERT OPINIONS UNDER *DAUBERT* AND**
**RULE 702 AND INCORPORATED MEMORANDUM**

FILED USDC FLND PN
OCT 8 '21 PM 3:35

# TABLE OF CONTENTS

Introduction .................................................................................................1

Argument.....................................................................................................2

I.   Plaintiffs' Experts' Specific-Causation Opinions Are Reliable and Admissible............................................................................................2

    A. Camarillorazo ............................................................................2

    B. Finley .........................................................................................8

    C. Montero ....................................................................................15

    D. Palanki.....................................................................................24

    E. Stelling ....................................................................................29

II.  Plaintiffs' Hearing Testing Experts' Opinions Are Admissible. ...............36

    A. Eddins' Opinions Regarding hMIRE Testing Should be Permitted Given the Additional Data Provided. ...............................................................36

    B. Crane's Opinions Should Not Be Excluded. .........................................43

    C. Hall's Opinions Should Not Be Excluded. ...........................................47

    D. Djalilian's HHL Opinions Are Admissible. .........................................49

III. Attorney Mouthpiece Arguments...............................................................51

    A. Crane's Anticipated Testimony Does Not Include Legal Conclusions or State-Of-Mind Opinions. .......................................................................51

B. Djalilian's Anticipated Testimony Does Not Include Legal Conclusions or Defendants' State-Of-Mind. ..............................................................51

C. Packer Should be Permitted to Testify Regarding Facts Upon Which He Relied. ......................................................................................................53

IV. Other Reliable and Admissible Opinions....................................................53

A. McKinley's Rebuttal Opinions to Flamme-Stephenson Are Reliable. .53

Conclusion ............................................................................................................56

# TABLE OF AUTHORITIES

## Cases

*Chapman v. Procter & Gamble Distrib., LLC*,
766 F.3d 1296, 1308 (11th Cir. 2014) ............................................................ 2, 12

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ..................................................................................1

*Garcia v. Scottsdale Ins. Co.*,
2019 WL 1318090 (S.D. Fla. Mar. 22, 2019)........................................................8

*Guinn v. AstraZeneca Pharm. LP*,
602 F.3d 1245 (11th Cir. 2010)......................................................................... 2, 18

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*,
609 F.3d 1183 (11th Cir. 2010).......................................................................... 2, 34

*Hendrix v. Evenflo Co.*,
255 F.R.D. 568, 578 (N.D. Fla. 2009) .................................................................48

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
2021 WL 2028682 (N.D. Fla. May 11, 2021) ............................................ 14, 45

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
2021 WL 4132269 (N.D. Fla. Sept. 12, 2021)............................................ 35, 50

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
2021 WL 765019 (N.D. Fla. Feb. 28, 2021)............................................... passim

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
2021 WL 830309 (N.D. Fla. Mar. 4, 2021) ................................................ 13, 51

*In re Trasylol Prods. Liab. Litig.*,
2010 WL 8354662 (S.D. Fla. Nov. 23, 2010)......................................................18

*In re Wright Med. Tech. Inc., Conserve Hip Implant Prods. Liab. Litig.*,
127 F. Supp. 3d at 1306 (N.D. Ga. 2015) ............................................................39

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) ........................................................................................13

*McDowell v. Brown*,
392 F.3d 1283, 1297 (11th Cir. 2004) ................................................................45

*Parks v. Ethicon, Inc.*,
2020 WL 6118774  (S.D. Cal. Oct. 16, 2020) .....................................................45

*Taylor v. Novartis Pharms. Corp.*,
2013 WL 85168 (S.D. Fla. Jan. 7, 2013) .............................................................15

*Trafton v. Sunbury Primary Care, P.A.*,
   689 F. Supp. 2d 198 (D. Me. 2010) .......................................................45
*U.S. v. Estelan*,
   156 F. App'x 185 (11th Cir. 2005) ........................................... 21, 23

**Statutes**

Fed. R. Civ. P. 26(a)(2)(C) ..........................................................................1
Fed. R. Evid. 702 .......................................................................................1

## INTRODUCTION

Defendants 3M Company and Aearo (hereinafter collectively "Defendants") have moved to exclude, in whole or in part, the testimony and opinions of Group C Plaintiffs'[1] experts Dr. Moises Arriaga ("Arriaga"), Dr. Benjamin Crane ("Crane"), Dr. Hamid Djalilian ("Djalilian"), Dr. David Eddins ("Eddins"), Dr. James Ezelle ("Ezelle"),[2] Dr. James Hall ("Hall"), Dr. Lawrence Lustig ("Lustig"), Richard McKinley ("McKinley"), Dr. Mark Packer ("Packer"), and Dr. Christopher Spankovich ("Spankovich") pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).[3] For the reasons stated herein, Defendants' motion should be denied.[4]

---

[1] The Group C "Plaintiffs" include Guillermo Camarillorazo ("Camarillorazo"), Theodore Finley ("Finley"), Carlos Montero ("Montero"), Joseph Palanki ("Palanki"), and Carter Stelling ("Stelling").

[2] Ezelle is a non-retained treating physician of Plaintiff Finley, disclosed in accordance with Pretrial Order No. 70 and Fed. R. Civ. P. 26(a)(2)(C), whose area of expertise is psychiatry and neuropsychiatry. *See* PX1(Ezelle Disclosure).

[3] Defendants challenge, in whole or in part, the general expert opinions of Crane, Djalilian, Eddins, Hall, and McKinley. Defendants also challenge, in whole or in part, the case-specific opinions of Arriaga (Camarillorazo, Finley), Ezelle (Finley), Hall (Montero), Lustig (Palanki, Stelling), Packer (Montero), Spankovich (Camarillorazo, Finley, Stelling).

[4] References to Defendants' Omnibus Motion to Exclude Plaintiffs' Group C Putative Expert Opinions Under *Daubert* and Rule 702 and Incorporated Memorandum (Doc. 2042) are abbreviated herein as "Def-Mot".

## ARGUMENT

**I.     Plaintiffs' Experts' Specific-Causation Opinions Are Reliable and Admissible.**

Plaintiffs' experts' specific-causation and diagnosis opinions satisfy *Daubert* and should not be excluded. Plaintiffs' experts properly employ the differential etiology method. A reliable differential diagnosis "need not rule out all possible alternative causes, [but] it must at least consider other factors that could have been the sole cause of the plaintiff's injury." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014). Although an expert need only provide "a reasonable explanation" supporting their exclusion of an alternative sole cause, that explanation must be based on "more than subjective beliefs or unsupported speculation." *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010); *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1197 (11th Cir. 2010) ("*Hendrix II*").

### A.     *Camarillorazo*

#### 1.     *Spankovich's Differential Diagnosis is Reliable.*

##### i.     *Other Hearing Protection Devices ("HPDs")*

Spankovich reasonably finds that the CAEv2 was Camarillorazo's "primary HPD" from 2003 to 2019, which coincides with his first early warning sign for a

standard threshold shift in 2008 and his tinnitus onset in 2007-2008.[5] Spankovich expressly acknowledges that the CAEv2 was not the "sole" HPD Camarillorazo used, but states he is not "aware of any material defects" in the other HPDs Camarillorazo used less frequently than the CAEv2.[6]

Spankovich bases his opinion as to defects in Camarillorazo's other HPDs on much more than Google.[7] His opinion is based on his knowledge, experience, research, and review of publications and other documents regarding the attenuation, Noise Reduction Rating ("NRR"), and any known defects in those products.[8] As Spankovich stated, the length of time between first CAEv2 use and onset date could be due to "the noise sources he was around" or a "combination of those different factors that are likely relative to when injury occurred relative to use of the product."[9]

Spankovich adequately explained why the temporal relationship of Camarillorazo's primary use of the CAEv2 and his injury onset are "reliable evidence of causation." *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 765019, at *13 (N.D. Fla. Feb. 28, 2021). In line with this Court's previous

---

[5] PX2(Spankovich-(Camarillorazo)-5-13, 17).
[6] *Id.* at 12.
[7] Def-Mot-13-14.
[8] PX3(Spankovich-Dep-(9/3/2021)-379:14-387:9).
[9] *Id.* at 282:3-20.

rulings, Spankovich provides more than "unsupported speculation" as to why he ruled out other HPDs which Camarillorazo used less frequently and have no evidence of defect. Doc. 1910 at 37.

### ii.     Head Injuries

Based on all relevant records and testimony,[10] Spankovich rules out head injuries as there is no evidence of temporal proximity between any significant head injury and tinnitus.[11] Spankovich considered "multiple instances in which [Camarillorazo] injured his head," including a possible loss of consciousness in 2011, years following his tinnitus onset.[12]

Spankovich explains that while head trauma can be causative of tinnitus, it is generally "transient in nature," temporally associated with the injury, and "tends to be limited to more severe [traumatic brain injury ("TBI")],"[13] and specifically "blast exposure relative to the noise."[14] And that even "[h]ead injury resulting in concussion does not commonly have tinnitus as a side effect and tinnitus is not listed among common side effects in concussion assessment tools, such as the SCAT3."[15]

---

[10] PX2(Spankovich-(Camarillorazo)-Ex.C).

[11] *Id.* at 11-13; PX4(Spankovich-(Camarillorazo)-Rebuttal-2).

[12] PX2(Spankovich-(Camarillorazo)-13).

[13] *Id.*

[14] PX4(Spankovich-(Camarillorazo)-Rebuttal-2).

[15] *Id.*

As a clinical audiologist, Spankovich's "current clinical case load is heavily weighted toward differential diagnosis" of hearing loss and tinnitus, which requires consideration of head trauma.[16] Spankovich does not base or "extrapolate" his head injuries opinions on a sports-concussion assessment tool ("SCAT3").[17] He merely cites to the absence of tinnitus as a side effect to bolster his opinion.[18]

Moreover, the 2011 incident is not "the only specific head injury" Spankovich rules out.[19] As explained at length, he considered all records of possible head injuries, but neither the records, nor Camarillorazo's testimony, demonstrate a relative reporting of tinnitus.[20] As this Court has twice found under similar circumstances, Spankovich reliably ruled out head trauma that was not temporally related to the auditory injuries at issue. *In re 3M*, 2021 WL 765019, at *14; Doc. 1910 at 45.

### iii.   Sleep

Defendants again attempt a failed argument:  Spankovich's sleep opinions are unreliable because he "failed to perform any analysis of Camarillorazo's individual sleep disturbances."[21] Camarillorazo reported that his tinnitus "affects his sleep" and

---

[16] PX2(Spankovich-(Camarillorazo)-3).
[17] Def-Mot-15.
[18] PX5(Spankovich-Dep-(9/2/2021)-303:20-304:4).
[19] Def-Mot-16; PX2(Spankovich-(Camarillorazo)-13).
[20] PX5(Spankovich-Dep-(9/2/2021)-310:22-322:5).
[21] Def-Mot-16.

"works in conjunction with the nightmares."[22] Spankovich's "focus" is how Camarillorazo's tinnitus affects his sleep.[23] And he acknowledges that tinnitus is likely not the only contributing factor, but that it "is exacerbating it."[24]

As this Court has previously found, Spankovich reliably draws on "his clinical experience treating and managing symptoms of tinnitus patients—including veterans" like Camarillorazo, with sleep disorders, and "scientific literature linking tinnitus with sleep difficulties" in forming his opinions as to Camarillorazo's tinnitus and its exacerbation of his sleep difficulties. Doc. 1910 at 46 (citing expert reports and testimony). Defendants' complaint that Spankovich cannot "even state the number of hours Camarillorazo presently sleeps"[25] necessitates rejection again, as Spankovich is not required to "quantify, with absolute certainty, the extent to which [Camarillorazo's] tinnitus impacts his sleep." Doc. 1910 at 46 (citing *Daubert*, 509 U.S. at 590).

### 2.    *Arriaga's Differential Diagnosis is Reliable.*

Arriaga also considers and rules out Camarillorazo's history of mild head injury without formally diagnosed TBI.[26] Arriaga rules out the 2008-2009 car

---

[22] PX2(Spankovich-(Camarillorazo)-17).
[23] PX5(Spankovich-Dep-(9/2/2021)-331:13-332:8).
[24] *Id.* at 332:9-12.
[25] Def-Mot-17.
[26] PX6(Arriaga-(Camarillorazo)-15, 23); PX7(Arriaga-(Camarillorazo)-Rebuttal-2-3).

accident as Camarillorazo was never diagnosed with TBI "with respect to this accident or otherwise."[27] And further, Camarillorazo's "audiograms show that he began to experience a decrease in hearing sensitivity in his left ear prior to the car crash."[28]

Arriaga considered the testimony Defendants cite but it has no impact on his opinions.[29] Arriaga noted that most of the records deny previous loss of consciousness and the neurologist who completed the formal TBI evaluation found it was not a TBI.[30] And further, that tinnitus associated with loss of consciousness or concussion is rare and usually resolves quickly.[31] And thus, despite Defendants' assertions otherwise,[32] Arriaga explained that for Camarillorazo, in the context of his current injury, it would not matter whether an analysis of any perceived tinnitus was done at the time of the accident or not.[33] Thus, Arriaga reasonably rules out any possible loss of consciousness or head injury as a "relevant contributor."[34] *See* Doc. 1910 at 45.

---

[27] PX7(Arriaga-(Camarillorazo)-Rebuttal-2).
[28] *Id.*
[29] PX8(Arriaga-Dep-(9/12/2021)-141:2-12).
[30] *Id.* at 139:20-142:13.
[31] *Id.* at 59:8-16.
[32] Def-Mot-18.
[33] PX8(Arriaga-Dep-(9/12/2021)-63:24-64:9).
[34] *Id.* at 140:24-150:12.

### B.   *Finley*

#### 1.   *Arriaga's Differential Diagnosis is Reliable.*

Defendants argue Arriaga does not reliably exclude Finley's:  (1) exposure to noise while not wearing hearing protection; or (2) TBIs.[35] To the contrary, Arriaga clearly provides reliable bases for the exclusion of these factors. Defendants' disagreement with his conclusions should be left to cross-examination. *In re 3M*, 2021 WL 765019, at *8 (citing *Garcia v. Scottsdale Ins. Co.*, 2019 WL 1318090, at *2 (S.D. Fla. Mar. 22, 2019)).

Arriaga expressly rules out "any alleged [] lack of use of the CAEv2."[36] As to the instances of "surprise enemy fire" to which Defendants refer, Arriaga explained that based on Finley's testimony and statements, these instances were "very rare" and that Finley would have placed the CAEv2 in his ears, if not placed already, "as soon as he saw what was coming."[37] And while Finley may have been exposed to a "brief burst" of rounds from the gun turret without his ear plugs inserted, any estimation of the exact number of rounds would require speculation.[38] And that based on Finley's relevant audiograms, he does not "see anything to make [him] think that unprotected noise exposure to that right ear, from the middle gun turret

---

[35] Def-Mot-18-20.
[36] PX9(Arriaga-(Finley)-Rebuttal-1).
[37] PX8(Arriaga-Dep-(9/12/2021)-219:8-222:18).
[38] *Id.* at 223:23-224:2.

was a big factor."[39] Thus, Arriaga has a reliable basis for excluding noise exposure without hearing protection as causative.

As to TBIs and head trauma, Arriaga finds "none of the events described in the medical records required specific treatment of concussion and head trauma beyond treating a laceration with super glue when his head struck a stairwell."[40] And specifically with regard to the two rocket-propelled grenade ("RPG") strikes, the improvised explosive device ("IED") explosion on a separate vehicle in his convoy, and the blast exposure from a 120mm mortar, "he was not close enough to suffer bodily injury requiring medical hospitalization or evacuation from the theatre of military operations."[41]

He further opines that Finley's description of "feeling stunned and dazed" is consistent with "acoustic trauma" from which the CAEv2 "claimed to provide appropriate protection."[42] And again that "[c]oncussion as a cause of hearing loss and tinnitus is uncommon and usually of brief duration."[43]

Defendants disagree with Arriaga's characterization of the severity of Finley's head injuries, but they cannot point to records that contradict Arriaga's opinions.[44]

---

[39] *Id.* at 224:22-225:2.
[40] PX10(Arriaga-(Finley)-26).
[41] *Id*.
[42] *Id*.
[43] PX10(Arriaga-(Finley)-26-27).
[44] Def-Mot-20-21.

With citation to their own expert, Crawford, Defendants dispute Arriaga's opinion that hearing loss and tinnitus associated with concussion is generally brief.[45] Similarly to experts Lustig and Spankovich, Arriaga has adequately explained his opinion as to the temporal and limited association between auditory injury and head trauma on the basis of "scientific literature and his own clinical experience." *See* Doc. 1910 at 45.[46]

## 2.  *Spankovich's Differential Diagnosis is Reliable.*

Defendants make the same arguments regarding Spankovich's diagnosis of Finley, that he:  (1) did not consider Finley's possible exposure to machine gun fire without hearing protection, and (2) did not adequately rule out TBI.[47] As with Arriaga, Spankovich considered all of Finley's sworn testimony,[48] including his testimony that on the "extremely rare" occasion he did not have earplugs in while driving and he started "taking combat," he would "pop them in" immediately.[49] Spankovich also considered Finley's testimony that he was ordered to wear his hearing protection, which was exclusively the CAEv2 in combat, when "something

---

[45] *Id.*
[46] PX10(Arriaga-(Finley)-26, Ex.A); PX8(Arriaga-Dep-(9/12/2021)-58:17-59:16).
[47] Def-Mot-20-21.
[48] PX11(Spankovich-(Finley)-Ex.C).
[49] PX12(Finley-Dep-(12/2/2020)-276:13-277:4).

loud was happening" and he always did.[50] Thus, in considering Finley's exclusive CAEv2 combat use and military noise exposure, Spankovich reliably finds that the "lack of attenuation provided by the CAEv2 caused [] Finley's noise-induced auditory injuries."[51]

Defendants also take issue with Spankovich's opinion that tinnitus "tends to be limited to more severe TBI,"[52] arguing that he was required to conduct "testing" on "Finley's TBI."[53] Spankovich rules out TBIs and head injuries as Finley's history does not support a "mild brain injury or mild head injury" as causative.[54] As to the loss of consciousness Defendants specifically cite, Spankovich again explained that a mild head injury is "very unlikely" to create a "constant tinnitus perception."[55] Thus, Spankovich again reliably rules out head trauma that was not temporally related to the auditory injuries at issue; "testing" was not required. *In re 3M*, 2021 WL 765019, at *14; Doc. 1910 at 45.

Lastly, Defendants incorrectly argue Spankovich does not reliably rule out Finley's history of headaches.[56] Spankovich expressly opines, "[t]here is no

---

[50] *Id.* at 81:18-82:2, 84:9-13, 120:5-122:19, 123:20-128;1; PX11(Spankovich-(Finley)-5).

[51] PX11(Spankovich-(Finley)-13-14).

[52] *Id.* at 9.

[53] Def-Mot-21.

[54] PX5(Spankovich-Dep-(9/2/2021)-104:5-107:12).

[55] *Id.* at 106:13-107:8.

[56] Def-Mot-21.

evidence that migraines cause chronic tinnitus."[57] Spankovich explained that headaches, whether due to migraine or a standard headache, can "exacerbate" the perception of tinnitus, but they cannot cause it.[58] His experience and knowledge in performing differential diagnoses of tinnitus certainly qualifies him to so opine.[59] As he reasonably finds that migraines could not be the "sole cause" of Finley's tinnitus, Spankovich's differential diagnosis is sound. *In re 3M*, 2021 WL 765019, at *12 (citing *Chapman,* 766 F.3d at 1309).

### 3. *Arriaga's Opinion That Finley Has Hyperacusis or Misophonia is Admissible.*

As to hyperacusis and misophonia, Arriaga opines that Finley's otoacoustic emission corroborates cochlear damage[60] and that "injured cochlea will recruit and make normal intensity sounds painful."[61] "This can produce hyperacusis with sensitivity to loud sounds and misophonia."[62] Arriaga further opines that Finley's testing provides objective support for his subjective symptoms.[63] Arriaga explained in detail the state of the literature regarding hyperacusis and misophonia and how the conditions relate to Finley's specific symptoms, his auditory system, and his

---

[57] PX13(Spankovich-(Finley)-Rebuttal-2).

[58] PX5(Spankovich-Dep-(9/2/2021)-322:11-22).

[59] PX11(Spankovich-(Finley)-3).

[60] PX10(Arriaga-(Finley)-28).

[61] *Id.*

[62] *Id.*

[63] *Id.*

toxic noise exposure.[64] Arriaga has diagnosed misophonia in his clinical practice, but it is a recently recognized condition and is "not very common."[65]

The misophonia "testing" Defendants argue was required is a recent observational study which included review of diagnoses, audiological testing, and questionnaires.[66] Arriaga's methodology includes these factors, as he relies on Finley's complete medical history, testing, symptoms, and Arriaga's extensive experience and knowledge concerning hyperacusis and misophonia gained through thirty years in otology and neurotology.[67] Although "legitimate debate" may exist, his methodology is reliable. *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 830309, at *4 (N.D. Fla. Mar. 4, 2021) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999)).

### 4. *Spankovich's Opinion That Finley Has Hyperacusis or Misophonia is Admissible.*

Spankovich, the former Director of the Tinnitus and Hyperacusis Program at the University of Florida, who has researched and presented on misophonia extensively, similarly provides reliable hyperacusis and misophonia opinions as to

---

[64] PX8(Arriaga-Dep-(9/12/2021)-272:3-292:19).

[65] *Id.* at 291:20-292:20.

[66] PX14(Inge Jager, et al., *Misphonia: Phenomenology, Comorbidity and Demographics in a Large Sample*, Plos One (Apr. 15, 2020)).

[67] PX10(Arriaga-(Finley)-28, Ex.A, Ex.B); PX8(Arriaga-Dep-(9/12/2021)-272:3-292:19).

Finley objectively based on his symptoms and testing.[68] Spankovich does not offer a "new theory" that misophonia is caused by noise exposure[69] but explains that Finley's "noise-induced injuries created his sound sensitivity in general. And then the elements surrounding his sound sensitivity contributed to his misophonic response."[70] As with Arriaga, Spankovich also reliably opines as to hyperacusis and misophonia.

**5.   *Arriaga Can Opine That Hearing Loss Exacerbates Finley's Mental Health Issues.*[71]**

Again, as this Court has held previously, Arriaga's opinion that Finley's auditory injuries "aggravate" his sleep disorder, post-traumatic stress disorder ("PTSD"), anxiety, and depression, is not based on speculation, but on his own extensive clinical experience treating and managing patients with auditory injuries, especially service members and veterans.[72] *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 2028682, at *5-7 (N.D. Fla. May 11, 2021); Doc. 1910 at 46. Accordingly, the opinion is admissible.

---

[68] PX11(Spankovich-(Finley)-2,8, Ex.A); PX5(Spankovich-Dep-(9/2/2021)-38:7-51:2).

[69] Def-Mot-24.

[70] PX5(Spankovich-Dep-(9/2/2021)-43:8-12).

[71] Regarding Ezelle, Plaintiffs do not intend to call him to opine on the cause of Finley's hearing loss or tinnitus nor on whether his mental health is worsened by hearing loss or tinnitus.

[72]        PX10(Arriaga-(Finley)-5,10,15,24-25,28);        PX15(Arriaga-2-4,23-25); PX8(Arriaga-Dep-(9/12/2021)-273:14-21).

### C. *Montero*

#### 1. *Hall's Differential Diagnosis Was Proper.*

In reaching his conclusions about Montero, Hall conducted a proper differential diagnosis, consistent with his audiological practice. With little to no critique, Defendants mischaracterize Hall's methodology, contending that he failed to account for certain potential causes. But, as confirmed by both his report and deposition, Hall *did* in fact consider each potential cause Defendants claim he ignored. *Taylor v. Novartis Pharms. Corp.*, 2013 WL 85168, at *7 (S.D. Fla. Jan. 7, 2013) (admitting differential diagnosis where expert's deposition testimony reflected that he "considered and rejected other causes" of plaintiff's injuries).

For example, Defendants claim "Hall's report does not even discuss Montero's use of other HPDs."[73] That claim is belied by even a cursory review of Hall's report, in which Hall specifically considers other HPDs used by Montero,[74] and then explains why he excluded those HPDs as potential causes of Montero's injuries—namely, because the evidence shows Montero suffered hearing loss and

---

[73] Def-Mot-28.
[74] PX16(Hall-(Montero)-3).

tinnitus during the period he relied primarily on the CAEv2s.[75] His deposition is similar.[76]

Hall also considered TBI as part of his differential diagnosis, contrary to Defendants' assertion.[77] He explained why, based on his expertise, it was far more likely Montero's injuries were caused by toxic noise exposure. He noted that hearing loss and tinnitus typically are not associated with TBIs.[78] Hall testified that he was aware of a possible causal connection only between "severe TBI" and tinnitus, which would involve an extended loss of consciousness[79]—something Montero (thankfully) did not suffer during his service.[80] Hall further noted the absence of evidence Montero ever suffered the "moderate or severe" TBI required to cause hearing loss.[81]

---

[75] *See e.g.*, PX16(Hall-(4-5) (Montero's "decreased hearing sensitivity occurred during the time frame—2003 through 2016—when Mr. Montero was exposed repeatedly to loud noises in the military while relying on CAEv2 for hearing protection"); *id.* at 3 (when Montero used the one-sided orange triple-flange pre-molded earplugs and yellow foam earplugs, audiograms showed "consistent hearing sensitivity with little or no change across test frequencies"); *see also* PX17(Hall-(General)-79-80) (discussing the effectiveness of other HPDs).

[76] *See* PX18(Hall-Dep-(8/26/2021)-314:1-8) (testifying Montero used CAEv2 as his "primary hearing protection device" and only "occasionally" used foam earplugs); *id.* at 393:12-20 (noting Montero's "occasional use" of foam earplugs).

[77] PX18(Hall-Dep-(8/26/2021)-404:21-22).

[78] *Id.* at 390:10-15.

[79] *Id.* at 263:5-7, 264:4-9; *id.* at 264:9-23.

[80] PX19(Montero-Dep-(12/1/2020)-184:8-185:1-2); *id.* at 217:3-4.

[81] PX18(Hall-Dep-(8/26/2021)-405:3-5).

Defendants do not, because they cannot, point to any evidence Montero suffered a moderate or severe TBI. In fact, Montero was never contemporaneously diagnosed with a TBI at any time during his military career, and earlier TBI screens actually concluded that Montero did not have a TBI.[82] The sole evidence regarding possible TBI comes from Montero's medical board/disability process,[83] where he was evaluated based on incidents seven to ten years prior to when Montero experienced an impact to his head (while wearing a helmet).[84]

Defendants also fault Hall for failing to consider auditory processing disorder ("APD") as the cause for Montero's injuries. Again, the record shows otherwise. Hall noted that APD might result from a TBI, but then explained that a TBI was far from the most likely explanation for that condition.[85] Hall explained that, although Montero's injuries are not consistent with APD, he nonetheless considered APD before ruling it out as the most likely cause of Montero's condition.[86]

Finally, Defendants fault Hall for failing to use generic, age-adjusted hearing dysfunction tables in assessing the cause of Montero's diminished hearing. But Hall

---

[82] *See, e.g.*, PX20(C_A_MONTERO-45531-VA-013416); PX21(C_A_MONTERO-45531-VA-011306).

[83] Because these records were part of the medical board/disability process, there are no admissible documents indicating that Montero may have suffered a TBI.

[84]   PX19(Montero-Dep-(12/1/2020)-109:23-110:3,   179:14-16,   284:18-285:1); PX48(Hall-Dep-(8/26/2021)-Ex.26).

[85] PX18(Hall-Dep-(8/26/2021)-186:7-14).

[86] *Id.* at 381:19-382:4.

was very clear in his deposition that it would be inappropriate to use such data to reach an individualized conclusion about why a specific person's hearing thresholds have decreased.[87] Moreover, even if Montero's age could have contributed to the current state of his hearing—a conclusion the science does **not** support—"a reliable differential diagnosis need not rule out *all* possible alternative causes" that may have contributed to a plaintiff's present condition. *Guinn*, 602 F.3d at 1253 (11th Cir. 2010) (emphasis added). What's critical is that an expert "consider other factors that could have been the *sole* cause of the plaintiff's injury." *Id.*; *see In re Trasylol Prods. Liab. Litig.*, 2010 WL 8354662, at *12 (S.D. Fla. Nov. 23, 2010) (where a plaintiff's age might have contributed to a plaintiff's condition, that at most affects "the weight that the jury should give the expert's testimony and not the admissibility of that testimony").[88]

At trial, Defendants may try to persuade the jury that Montero's hearing issues were caused by factors other than the CAEv2s. But Defendants should not now be

---

[87] *E.g.*, PX18(Hall-Dep-(8/26/2021)-267:3-8) ("the problem with a table or correction factor is it's an average that's applied to individuals"); *id.* at 266:19-267:2 (noting age-adjusted hearing charts are "controversial").

[88] Defendants also contend that Hall fails to address evidence suggesting Montero has "consistently good hearing sensitivity." Def-Mot-28. But as Hall explained, "[g]ood hearing sensitivity isn't normal hearing sensitivity and it isn't normal auditory function." PX18(Hall-Dep-(8/26/2021)-371:3-10).

permitted to exclude reliable and relevant expert evidence based on a flat mischaracterization of the record, including Hall's report and deposition.

### 2.    *Packer's Differential Diagnosis Was Proper.*

#### i.    *HPDs*

Although Defendants contend that Packer failed to consider "adverse evidence" in his analysis of Montero's use of other HPDs, that contention again is belied by the record. To begin, Defendants argue that because Montero's use of other HPDs during the relevant time period was "infrequent," and because Montero's exposure to loud noises was "also infrequent," Montero "likely used other HPDs, rather than the CAEv2, a substantial percentage of the time he was exposed to significant noise."[89] Putting aside the obvious logical flaw in this reasoning, this position is contradicted by Montero's testimony, which makes clear that he primarily used the CAEv2 for hearing protection after they were issued to him.[90] Montero's testimony is consistent with the logical reading of Packer's report, which identifies the CAEv2 as Montero's "primary source of hearing protection" during the relevant time period.[91]

---

[89] Def-Mot-33.

[90] PX19(Montero-Dep-(12/1/2020)-211:9-17).

[91] PX22(Packer-(Montero)-34).

Defendants also incorrectly argue that Montero suffered hearing loss while he was using other HPDs. This argument appears to be based on a misunderstanding of the relevant timeline. Packer opines that a comparison of Montero's 1995 reference audiogram and his ***2002 audiogram***—not his 2000 audiogram—show slight hearing loss in the left ear at 2000 Hz and 6000 Hz.[92] Because Montero started using the CAEv2 in 2001, this evidence supports—not contradicts—Packer's conclusion that Montero's hearing injuries were caused by the CAEv2.

Although Montero's 2000 audiogram shows one single frequency change of 15dB from 0db in the right ear at 6000 Hz, this is "consistent with his 15db threshold on the right at 6000 Hz in 1992,"[93] which is the earliest audiogram in evidence for Montero. Furthermore, Packer explained at his deposition that one cannot base a medical judgment on a single frequency change in isolation. Looking at Montero's "hearing over time, [the 1995 0 dB measurement] seems to be an outlier."[94] This is especially likely, given that the only shift on the 2000 audiogram was at 6000 Hz.[95] After Montero started using the CAEv2, however, he had several significant shifts at different levels.[96] Again, this evidence supports—not contradicts—Packer's

---

[92] *Id.* at 19.
[93] *Id*.
[94] PX23(Packer-Dep-(8/20/2021)-93:13-14).
[95] *Id*. at 93:3-94:12.
[96] *Id*.

conclusion. This case therefore is unlike the cases relied upon by Defendants, in which an expert cherry-picked favorable facts while ignoring contrary evidence.

### ii.    Age

Packer also appropriately ruled out age-related hearing loss (presbycusis) as a likely cause of Montero's hearing injuries because the onset of Montero's hearing injuries occurred at such a young age.[97] Defendants do not argue that Packer is unqualified to offer opinions regarding the age at which age-related hearing injuries develop. Nor do they offer evidence showing that age-related hearing injuries typically develop at the age Montero's hearing injuries first developed. Instead, Defendants try to characterize Packer's conclusion that Montero's early-onset hearing loss is inconsistent with presbycusis as improper *ipse dixit* testimony.

However, expert testimony regarding what is typical in a given field—when supported by an expert's "training, observations, and experiences"—are admissible under *Daubert*. *U.S. v. Estelan*, 156 F. App'x 185, 197 (11th Cir. 2005). Indeed, Defendants themselves quote almost identical expert testimony from their own expert in the very same section of their brief.[98] Specifically, Defendants' expert Seidman states: "Montero's hearing as tested falls in the range of what I would

---

[97] PX22(Packer-(Montero)-35).
[98] Def-Mot-32 n.7.

typically see in a normal 15- to 25-year-old person."[99] Seidman does not offer any more explanation for this assertion. Defendants cannot move to exclude Packer's opinion regarding what is typical in his experience while simultaneously relying on Seidman's opinion of what is typical in his experience.

Furthermore, although Defendants contend that Packer failed to elaborate on the basis of his opinion that Montero's early-onset hearing loss is inconsistent with presbycusis when asked, Defendants never asked Packer about that portion of his opinion. Indeed, the deposition testimony cited by Defendants relates to Packer's reference to his general knowledge and experience reviewing nomograms,[100] which Packer identifies as an alternative basis for excluding presbycusis as a likely cause of Montero's hearing injuries and which Plaintiffs address below. Defendants therefore fail to undermine the reliability of Packer's conclusion that Montero's early-onset hearing loss is inconsistent with presbycusis.

Defendants also attack Packer's alternative reference to nomograms as a basis for excluding presbycusis as a likely cause of Montero's hearing injuries. Specifically, Defendants argue that "[a]pplying OSHA's age-correction metrics to

---

[99] PX24(Seidman-(Montero)-13). Indeed, Seidman updated his reliance materials to include the OSHA age-correction table only two days before his deposition. PX25(Seidman-Dep-(9/1/2021)-89:21-91:7). Yet Defendants contend that Seidman was able to adequately evaluate Montero's hearing loss for his report, without the benefit of such tables.
[100] PX23(Packer-Dep-(8/20/2021)-50:15-51:8).

Montero's July 2021 audiogram demonstrates that Montero performs better than expected at many frequencies and, at worst, is only fourteen Db from what is expected," his hearing injuries are likely attributable to his age.[101] This argument misses the mark.

Packer does not rely on his familiarity with nomograms to conclude that Montero's current hearing loss levels are consistent or inconsistent with other 50-year-olds. Rather, Packer relies on his familiarity with nomograms to conclude that the *onset* of Montero's hearing injuries was generally inconsistent with the nomograms relied upon by those in his field. Packer testified that he used nomograms extensively in his field and that—based on his familiarity with various nomograms used in practice—hearing loss at the levels exhibited by Montero in his thirties and forties was not consistent with presbycusis.[102] Defendants do not identify any evidence contradicting that conclusion or undermining the reliability of Packer's methods.

---

[101] Def-Mot-30.

[102] PX23(Packer-Dep-(8/20/2021)-51:2-8). Defendants imply that Packer testified that he relied only on anecdotal evidence from his work with specific patients at the VA. Def-Mot-30. However, Packer makes clear that he used and relied on nomograms throughout his extensive experience. PX23(Packer-Dep-(8/20/2021)-38:4-14). As discussed above, experts may offer opinions based on their "training, observations, and experiences." *Estelan*, 156 F. App'x at 197.

### iii. Packer Can Testify Regarding Already Existing Conditions.

Although the Court previously excluded expert testimony opining that plaintiffs "may, or will, develop certain medical conditions (including dementia) in the future,"[103] Montero already had been diagnosed with PTSD.[104] Packer's testimony relating to PTSD therefore does not fall within the scope of the Court's prior order, and Defendants do not identify any other basis for excluding such testimony.

### D. Palanki

#### 1. Lustig's Differential Diagnosis of Palanki is Reliable and Admissible.

##### i. Lustig Considered and Ruled Out Head Injuries.

Lustig applies a reliable methodology in excluding TBI as the cause of Palanki's injuries.[105] Lustig reviewed Palanki's medical and military records, deposition testimony, and conducted an in-person examination and interview as part of his evaluation of Palanki. Defendants point to three alleged head injuries as potential alternative causes, but Lustig considered and ruled out each one.

Primarily, Defendants argue that Lustig failed to consider head trauma from a 1990 motor vehicle accident. However, Lustig discussed this event with Palanki and

---

[103] *In re 3M*, 2021 WL 765019, at *34.
[104] PX19(Montero-Dep-(12/1/2020)-289:21-25).
[105] PX26(Lustig-(Palanki)-13); PX27(Lustig-(Palanki)-Rebuttal-2).

24

expressly ruled it out because there was no evidence of any tinnitus or hearing loss concurrent with that accident, nor was there any indication of TBI, concussion/post-concussive symptoms, loss of consciousness, or other head injury beyond facial lacerations.[106] Lustig also considered that Palanki commenced Army basic training two months later without any mention of a TBI, hearing injury, or need for a medical waiver.[107] Lustig considered and ruled out the 1990 accident stating "[t]here's not a shred of evidence from his medical records that he sustained traumatic brain injury, skull fracture, etc.,"[108] nor any "data that he had any auditory complaints following that accident."[109]

Defendants argue that Lustig incorrectly states that there is no medical record of the 1990 accident, but as Lustig testified, he did review those records and they "corroborated" his original conclusion.[110] Likewise, Lustig does not ignore Palanki's ex-wife's testimony, but rather relies on his medical training and experience, as well as the differential diagnosis conducted, wherein he evaluated both the records and Palanki himself.[111] In his review, Lustig noted the absence of any record suggesting

---

[106] PX28(Lustig-Dep-(8/17/2021)-384:11-389:16).
[107]    PX26(Lustig-(Palanki)-13);    PX28(Lustig-Dep-(8/17/2021)-200:23-202:11, 386:1-389:16).
[108] PX28(Lustig-Dep-(8/17/2021)-389:6-9).
[109] *Id.* at 391:6-13.
[110]   PX28(Lustig-Dep-(8/17/2021)-385:13-21);   *see also*   PX27(Lustig-(Palanki)-Rebuttal-2).
[111] PX28(Lustig-Dep-(8/17/2021)-391:16-393:19).

that there was a TBI associated with Palanki's accident, and the absence of any auditory complaint associated with the accident to rule out this 1990 event as an alternative cause of Palanki's injuries.[112]

Lustig also considered and ruled out Palanki's other alleged head injuries. Regarding a 2010 motor vehicle accident, Lustig considered that Palanki "did not experience head trauma, a concussion, muffled hearing, or tinnitus."[113] And Lustig considered other "head hits" that he concluded were "minor" because none of the events "lead to any evidence of traumatic brain injury" or "were in any way associated with auditory complaints."[114] Lustig considered and provided scientifically reasoned explanations for his opinion that head injury does not explain Palanki's hearing injuries. Accordingly, his differential diagnosis is reliable. *See* Doc. 1910 at 30.

### ii.     *Lustig Considered and Ruled Out Other HPDs.*

Defendants argue that Lustig lacks a factual foundation to exclude other HPDs as an alternative cause of Palanki's injuries.[115] However, Lustig applied a reliable differential etiology to identify that Palanki's noise exposures while wearing the

---

[112] *Id*. at-388:18-393:19.

[113] PX26(Lustig-(Palanki)-13);     *see*     PX29(J_F_Palanki-006890-91)     (Patient "awake," "alert," "oriented," and "denies head injury.").

[114] PX28(Lustig-Dep-(8/17/2021)-393:20-394:6).

[115] Def-Mot-37-38.

CAEv2 are the most likely cause of Palanki's injuries.[116] Lustig reviewed Palanki's military service records and discusses Palanki's use of hearing protection, including foam earplugs, over-the-ear muffs, and the CAEv2, at length.[117] Lustig further considered Palanki's testimony that the CAEv2 was his primary hearing protector from 2005 through 2015,[118] and that Palanki used the CAEv2 as his hearing protection when exposed to hazardous noise from a motor pool, other military-industrial noises, and during weapons qualification.[119]

Contrary to Defendants' argument, Lustig considered the performance of other hearing protectors,[120] including real-ear attenuation at threshold ("REAT") data.[121] From 2005 through 2015, CAEv2 was Palanki's primary HPD.[122] And Lustig identified a temporal relationship between Palanki's CAEv2 use (2005-2015) and audiometric evidence of a significant threshold shift (2009), and the subjective onset of Palanki's hearing loss (2010-2012) and tinnitus (2014-2015).[123]

Having identified and explained a temporal relationship between the cause and effect of Palanki's injuries and offering more than "unsupported speculation" as

---

[116] PX26(Lustig-(Palanki)-16).
[117] *Id.* at 7-8.
[118] *Id.* at 8-10.
[119] *Id.* at 17.
[120] PX30(Lustig-16-20).
[121] *See, e.g.*, PX30(Lustig-Ex.C).
[122] PX26(Lustig-(Palanki)-8); PX28(Lustig-Dep-(8/17/2021)-225:16-227:15).
[123] PX26(Lustig-(Palanki)-9).

a basis for ruling out other hearing protectors, Lustig's opinions satisfy Rule 702 and *Daubert*. *See* Doc. 1910 at 44.

### iii.    Lustig Considered and Ruled Out Age.

Lustig considered age-related hearing loss as an alternative explanation for Palanki's hearing complaints, and properly ruled it out. Defendants' argument that Palanki is 49 years old today misses the mark. Palanki entered the military at 19 years old.[124] Lustig identified a significant threshold shift following Palanki's use of the CAEv2 in 2009—at which time Palanki was only 37.[125] Moreover, Lustig interviewed Palanki and reviewed Palanki's records before concluding that the lack of family history of hearing loss or tinnitus weighs against genetics as a cause of his condition.[126] Accordingly, Lustig properly ruled out age and genetics as alternative causes of Palanki's injuries.

### iv.    Lustig Properly Considered Timing.

Defendants argue that the timing of Palanki's symptoms do not "match the timing of his CAEv2 use."[127] To support this claim, Defendants unduly focus on Palanki's 2016 audiogram. However, Lustig considered that Palanki used the CAEv2 from 2005-2015 and experienced a threshold shift in 2009, along with

---

[124] *Id.* at 4.
[125] *Id.* at 14.
[126] *Id.* at 12; *see* PX28(Lustig-Dep-(8/17/2021)-370:8-375:5).
[127] Def-Mot-39.

subjective complaints of hearing loss in 2010-2012, and tinnitus in 2014-2015.[128] Defendants' argument that Lustig "ignores" adverse data and "agrees" that Palanki first reported tinnitus in 2017 is simply incorrect. Lustig testified that based on interviews with Palanki, review of deposition testimony, reports from Palanki's family, and medical records that Palanki reported noticing intermittent tinnitus around 2014-2015.[129]

Throughout the course of Palanki's 10-year CAEv2 usage, he experienced subjective hearing injuries and tinnitus that began initially concurrent with his CAEv2 usage.[130] Furthermore, Lustig relied not only on "self-reports of symptoms,"[131] but also on pure tone audiometry, distortion product otoacoustic emissions ("DPOAE"), and AzBio speech in noise testing in concluding that Palanki's auditory injuries were caused by his use of the CAEv2 from 2005 to 2015.[132]

### E.   *Stelling*

Lustig and Spankovich's opinions related to Stelling are reliable and admissible.

---

[128] PX26(Lustig-(Palanki)-9).

[129] PX28(Lustig-Dep-(8/17/2021)-246:18-248:17).

[130] *Id.* at 239:20-248:12.

[131] Def-Mot-40.

[132]   PX28(Lustig-Dep-(8/17/2021)-394:12-396:20,398:15-399:19);   PX27(Lustig-(Palanki)-Rebuttal-1-2); PX26(Lustig-(Palanki)-11, 17).

1. ***Lustig Conducted a Proper Differential Diagnosis of Stelling.***

Defendants argue that Lustig's differential diagnosis of Stelling is unreliable based on his evaluation of Stelling's head injuries and the timing of his auditory injuries. Both arguments lack merit. Lustig applied a reliable methodology that has been repeatedly endorsed by the Court, *see, e.g.* Doc. 1910 at 42-47; *In re 3M*, 2021 WL 765019 at *13, and considered both factors identified by Defendants as part of his thorough evaluation of Stelling's injuries before concluding that Stelling's hearing loss and tinnitus were caused by the CAEv2.

i. ***Lustig Considered and Ruled Out Head Injuries.***

Defendants argue that Lustig failed to rule out Stelling's "serious IED explosion and associated TBI."[133] To the contrary, Lustig considered Stelling's medical records and expressly ruled out head trauma, concussions, and TBI.[134] As he testified, Lustig considered not only that Stelling "had a TBI screening" in 2015, but also that "he subsequently underwent further evaluation which ruled out TBI."[135] Lustig also explained that "[d]uring his service and following his second deployment, Mr. Stelling denied mTBI."[136] Lustig rejected the theory that any IED

---

[133] Def-Mot-43.

[134] PX31(Lustig-(Stelling)-5, 17); PX32(Lustig-(Stelling)-Rebuttal-2).

[135] PX28(Lustig-Dep-(8/17/2021)-45:4-14, 49:19-50:4); PX33(C_J_Stelling_VA-000908) ("[D]id the Veteran sustain a TBI during OEF/OIF deployment? No").

[136] PX32(Lustig-(Stelling)-Rebuttal-2); *see* PX34(C_J_Stelling_VA-001069) (denial of mTBI during post-deployment health assessment).

exposures are responsible for Stelling's auditory injuries because "Stelling was always wearing hearing protection during th[ese] exposures, and he did not encounter a significant enough blast to cause auditory damage. The one occasion where he bumped his helmeted head on the roof of the vehicle was not accompanied by any tinnitus or symptoms suggesting mTBI."[137] Lustig also considered that "Stelling's reports of IED encounters indicate no loss of consciousness, no physical injuries, and no concurrent muffled hearing or ringing in the ears."[138] Accordingly, Lustig provided scientifically reasoned explanations that support ruling out potential TBI of Stelling's auditory injuries.

### ii.   *Lustig Considered the Timing of Stelling's Injuries.*

Defendants argue that Lustig failed to properly consider the timing of Stelling's injuries.[139] However, Lustig does not "brush aside,"[140] any timing concerns, but fully and expressly considered the timing of the onset of Stelling's auditory injuries as part of his differential diagnosis, and reliably concluded that the onset of Stelling's injuries supports his causation opinion.

---

[137] PX32(Lustig-(Stelling)-Rebuttal-2).
[138] *Id.* at 3; *see* PX28(Lustig-Dep-(8/17/2021)-56:3-58:1).
[139] Def-Mot-44.
[140] *Id.* at 45.

Lustig considered that Stelling experienced noise trauma, audiometric threshold shifts, and tinnitus onset concomitant with his use of the CAEv2. For example, Lustig observed that "Stelling was exposed to significant noise at the time he was wearing the defective CAEv2, and this coincided temporally with the onset of his perceived difficulty hearing in noise and the onset of his tinnitus."[141]

Defendants argue that because Stelling had hearing tests showing a threshold of 30 dB at one frequency before he used the CAEv2, there can be no causal link between subsequent use and subsequent hearing loss. But Lustig expressly considered that "Stelling joined the military with only a mild hearing loss at a single frequency - 4000hz (30 dB threshold) and without auditory complaints or tinnitus."[142] Lustig then concluded that "[a]fter being exposed to noise from weapons fire during training in Germany while using the CAEv2, [Stelling] then experienced a worsening in his pure tone thresholds, difficulty hearing in noise, and tinnitus, a common outcome following noise trauma to the ear."[143] Lustig also testified that the "30 decibel number goes away when he gets to Germany"[144] and that Stelling's

---

[141] PX31(Lustig-(Stelling)-16).
[142] *Id.* at 15.
[143] *Id.*
[144] PX28(Lustig-Dep-(8/17/2021)-74:21-76:2, 84:8-20).

military audiograms are consistent with noise trauma, and reflect a shift at 6 and 8 kHz at the same time he used the CAEv2.[145]

Similarly, as to tinnitus, Lustig notes that Stelling's "tinnitus was first detected during his second tour in Iraq in 2008, after approximately 12 months of combat training in Germany where the CAEv2's was Mr. Stelling's primary if not exclusive hearing protector."[146] Defendants' argument that there is a "mismatch in timing" because tinnitus was not "reported" until 2014 is belied by Defendants' own motion for summary judgment which argues that Stelling testified to tinnitus onset during his second deployment, concurrent with CAEv2 use.[147]

Accordingly, Lustig's differential diagnosis is reliable and admissible.

### 2. *Spankovich Considered and Ruled Out Head Injuries.*

Defendants argue that Spankovich's differential diagnosis of Stelling is unreliable because he did not rule out Stelling's head injuries.[148] Not so. Spankovich expressly discussed head and neck trauma with Stelling, who denied that any such event was connected to an alteration in his hearing or tinnitus.[149] Spankovich further considered that Stelling has no TBI diagnosis, and that Stelling's "minor direct head

---

[145] *Id.* at 93:15-94:17, 113:7-114:9.
[146] PX31(Lustig-(Stelling)-19); PX28(Lustig-Dep-(8/17/2021)-118:14-121:3).
[147] *Stelling*, 7:20-cv-00143, Doc. 34 at 3.
[148] Def-Mot-45.
[149] PX35(Spankovich-(Stelling)-10).

injury" is inconsistent with the type of blast-related TBI that has been associated with hearing damage or tinnitus.[150] Spankovich expressly testified that he ruled out these head injuries as causing Stelling's hearing loss.[151] Spankovich also explained his differential diagnosis process,[152] including how Stelling's "asymmetrical perceived hearing deficits (worse in the left ear) in his records is a well-known sign of damage related to firing a long-barreled firearm by a right-handed shooter."[153]

### 3. *Spankovich's Opinion That 2021 Testing Reflects Hearing Loss Caused by the CAEv2 is Admissible.*

Defendants move to preclude Spankovich from testifying that Stelling's 2021 DPOAE and pure tone audiogram results reflect damage caused by the CAEv2. But Spankovich's opinion that Stelling's auditory injuries were caused by the CAEv2 is supported by his differential diagnosis. As the Court has repeatedly held, a plaintiff's injury can be "linked" to an alleged defect in the CAEv2 through the differential etiology—a medical process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining. Doc. 1910 at 30 (quoting *Hendrix II*, 609 F.3d at 1195). As he has reliably done with a number of other plaintiffs, Spankovich properly and reliably conducted

---

[150] PX36(Spankovich-(Stelling)-Rebuttal-2).

[151] PX3(Spankovich-Dep-(9/3/2021)-606:10-19, 612:3-613:12).

[152] *See generally* PX35(Spankovich-(Stelling)).

[153] *Id.* at 13.

a differential etiology to connect the CAEv2 to Stelling's auditory injuries, including a thorough evaluation of Stelling's available medical and service records and completed a telehealth consultation.[154]

Specifically, the absence of a baseline for Stelling's DPOAE or ultra-high frequency results does not render Spankovich's differential methodology unreliable. Spankovich provides reasoned explanations for ruling out non-noise and non-CAEv2 causes of Stelling's auditory injuries. The reliability of the tests themselves have not been challenged by Defendants, have been repeatedly affirmed by the Court,[155] and are also relied on by Defendants' experts as evidence of Stelling's current hearing status.[156]

Defendants argue that Spankovich failed to consider Stelling's occupational noise exposures and aging.[157] This argument is meritless. Spankovich explained how he concluded that Stelling's audiograms reflect auditory damage that is consistent

---

[154] *See generally* PX35(Spankovich-(Stelling)).

[155] *See, e.g.*, *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 4132269, at *5 & n.22 (N.D. Fla. Sept. 12, 2021).

[156] *See, e.g.*, PX37(Jones-LaBorde-(Stelling)-12-13) ("These [DPOAE] results are indicative of outer hair cell dysfunction of the cochlea in the affected frequency ranges previously mentioned with abnormal or absent emissions. These results are consistent with Mr. Stelling's pure tone audiometry and current hearing sensitivity.").

[157] Def-Mot-45-46. Defendants also state that Spankovich failed to consider "other reasons." *Id.* at 46. This argument fails for vagueness. Regardless, Spankovich ruled in the inadequate protection provided by the CAEv2 and ruled out all non-military-noise potential causes of hearing loss.

with the impulse noises Stelling experienced while wearing the CAEv2, and inconsistent with the steady-state noise of his post-military welding exposures and inconsistent with any evidence of congenital or hereditary hearing loss.[158] Because Spankovich considered and provided a scientifically supported reason to rule out non-military occupational exposures[159] and age-related[160] potential alternative causes of Stelling's hearing loss, Spankovich's conclusion that Stelling's 2021 hearing tests reflect auditory injury caused by the CAEv2 is reliable and admissible.

## II.  Plaintiffs' Hearing Testing Experts' Opinions Are Admissible.

### A.  *Eddins' Opinions Regarding hMIRE Testing Should be Permitted Given the Additional Data Provided.*

Defendants seek exclusion of Eddins' opinions on the grounds that the surrogate earplug differs from the CAEv2, attenuates noise differently, and is not accepted in the scientific community.[161] These arguments should be rejected.

#### 1.  *Eddins' Technique Has Been Accepted by the Scientific Community and by Defendants.*

At the outset, Plaintiffs note that Defendants' argument regarding Eddins' technique not being accepted by the scientific community is blatantly false. First, the

---

[158] PX3(Spankovich-Dep-(9/3/2021)-504:13-509:5).

[159] *Id.* at 507:19-509:5 (concluding Stelling's hearing changes were "inconsistent" with occupational exposure from three years welding).

[160] *Id.* at 506:10-14 ("Q. So you ruled out age-related hearing loss as a potential cause of Mr. Stelling's hearing loss at 8,000 hertz. Correct? A. Yes.").

[161] Def-Mot-47-51.

use of surrogate earplugs in testing attenuation is commonplace in the audiology community. Indeed, ANSI 12.71-2018 describes the guidelines for making MIRE measurements with surrogate earplugs.[162] Eddins has specifically pointed to numerous peer-reviewed publications where surrogate plugs were created and used in MIRE.[163] For example, the surrogate earplug used by Neitzel et al. (2006) to make MIRE measurements for the Aearo/3M foam earplug was modified by "inserting a hollow plastic core running through the length of the foam earplug," a process analogous to Eddins' use of a plastic stem with a hollow core running its length and CAEv2 ear tips.[164]

Finally, Defendants themselves championed the technology for using surrogate earplugs.[165] Eddins' report illustrates several instances where Defendants created surrogate plugs for testing—including the testing done by Berger, Voix, and Kieper as early as 2007 on foamies.[166] Ironically, despite the use of this technology in the testing of previous (and subsequent plugs – including the CAEv4) and despite the fact that the use of surrogate plugs for MIRE testing is commonplace, there is no evidence that Defendants created a surrogate plug for testing the CAEv2. As a result,

---

[162] PX38(Eddins-46).
[163] *Id.* at 47.
[164] *Id.*; PX39(Richard Neitzel, et al., *Variability of Real-World Hearing Protector Attenuation Measurements*, 50 Ann. Occup. Hyg. 679, 679-691 (2006)).
[165] PX38(Eddins-45).
[166] *Id.* at 46.

Eddins was hired to create a surrogate plug—one with almost identical specifications—in order to complete the testing that Defendants should have undertaken on their own.[167] Defendants' argument that the technique Eddins employed is not accepted when Defendants used it multiple times and should have used it on the CAEv2 should not be afforded any weight.

### 2. Eddins' Surrogate Earplug is Nearly Identical to the CAEv2 in Every Respect and Any Differences Are Not Only Insignificant But Also Benefit Defendants.

Defendants argue the surrogate earplug is different from the CAEv2 in that the surrogate 1) has a stem made of different material, 2) has a narrower stem, 3) has a different center of mass ("COM"), 4) is lighter in weight, and 5) is shorter than the CAEv2.[168] Defendants overstate the differences and miss the point. Eddins recreated the CAEv2 (a task Defendants themself should have undertaken) in order to conduct MIRE testing, and he did so with such great precision that every aspect of the surrogate plug is nearly identical to the CAEv2.[169] Any differences Defendants point to are insignificant and were made to the benefit of Defendants. Further, the differences in the surrogate, at best, go to weight, not admissibility, of the testimony.

---

[167] *Id.* at 48.
[168] Def-Mot-47-50.
[169] PX38(Eddins-48-55).

*In re 3M*, 2021 WL 765019, at *16-17; *see In re Wright Med. Tech. Inc., Conserve Hip Implant Prods. Liab. Litig.*, 127 F. Supp. 3d at 1306, 1325 (N.D. Ga. 2015).

First, the PR48 used by Eddins in the surrogate is hard, stiff plastic.[170] Like Delrin, it cannot be changed in shape, length, or any other characteristic when used in an earplug. Moreover, in terms of hardness, PR48 and Delrin are remarkably similar with PR48 at 85 Shore D compared to Delrin at 86 Shore D.[171] The quoted specifications of PR48's tensile modulus and tensile strength—which Defendants compare to Delrin—are used to indicate extreme conditions beyond which the product could fail as determined in materials engineering tests.[172] When the material is used as the adaptor stem of an earplug for REAT or MIRE testing, the forces applied to the material (*e.g.*, during insertion, removal, loosening, or ear canal displacement) are orders of magnitude away from these product limits.[173] Put another way, the differences in tensile strength and tensile modulus between PR48 and Delrin are not significant because the materials are not being used anywhere near the extreme specifications provided by the product manufacturer. Simply put, both materials are so stiff that any differences are immaterial.[174]

---

[170] *Id.* at 48.
[171] PX40(Eddins-Dep-(8/25/2021)-93:14-102:20).
[172] *Id.* at 104:13-106:1.
[173] *Id.*
[174] *Id.*

Second, the surrogate plug's diameter is roughly 4.6% less when compared to the CAEv2.[175] The diameter differences of the original and surrogate adaptor stems at the medial (4.8%; 0.0066 inches or 0.168 mm) and lateral (4.6% 0.0084 inches or 0.213 mm) flanges is minuscule—roughly equal to the width of a human hair.[176] This difference does not affect the reliability of Eddins' methodology, and Defendants' challenge to Eddins' conclusions may be explored on cross-examination. Importantly, because Plaintiffs have alleged that the stem is too wide, any difference that rendered the surrogate plug narrower than the CAEv2 works to Defendants' benefit.[177]

Third, Defendants argue that the surrogate earplug's COM is at the center of the earplug, while the COM of the CAEv2 "is 0.185 mm closer to the yellow end[.]"[178] Most notably, this statement is incorrect as the COM of the CAEv2 is actually shifted 0.52% toward the olive end of the plug.[179] Nevertheless, those dimensions are roughly the width of a human hair and will not increase or decrease the propensity of the earplug to loosen.[180] Further, even assuming the differences affect earplug fit or function (they do not), that would benefit Defendants because

---

[175] PX38(Eddins-48, 52).
[176] *Id.* at 52.
[177] *Id.*
[178] Def-Mot-49.
[179] PX38(Eddins-51).
[180] PX40(Eddins-Dep-(8/25/2021)-116:18-117:21).

an earplug with the COM at the exact center of the plug is less likely to loosen during movement than one with the COM closer to either end.[181]

Fourth, Defendants note that the surrogate is 4.46% lighter than the CAEv2. Once again, this difference is insignificant.[182] However, engaging in the same exercise as above, if we assume the difference is significant (it is not), then the surrogate earplug would have a slightly smaller mass outside of the ear canal than the original CAEv2, meaning the surrogate would be slightly less likely to loosen during activity.[183] In other words, if anything, the measures of activity-related loosening of the surrogate found in Eddins' report should be considered conservative estimates of the expected loosening of the CAEv2, slightly under-estimating expected loosening and once again, resulting in a benefit to Defendants.

Fifth, the surrogate was determined to be 0.17% shorter (0.002 mm) (less than the width of a human hair) than the CAEv2.[184] Eddins determined that this difference was insignificant.[185] More importantly, however, 0.002mm is less than the variability that Defendants allowed in their CAEv2 samples.[186] In other words, some CAEv2s are, in fact, shorter than the surrogate. Thus, it can be inferred that

---

[181] PX38(Eddins-52).

[182] *Id.*

[183] *Id.*

[184] *Id.*

[185] *Id.*

[186] *Id.*

Defendants concluded, and Eddins agreed, that such a difference from sample to sample and between the surrogate earplug and the CAEv2 is negligible.

### 3. The hMIRE Testing Evaluates Differences in Attenuation, Not Absolute Values of Attenuation.

Finally, Defendants argue that the surrogate earplug attenuates differently and thus, those opinions should be excluded.[187] However, the fact that the earplug attenuates differently at some frequencies is irrelevant in the hMIRE recordings.[188] Attenuation measures using hMIRE are "difference" values obtained by subtracting attenuation after activity from attenuation before activity.[189] The absolute value of the attenuation is removed by subtraction of the two values. The differences noted by Defendants are, therefore, irrelevant. As opposed to attenuation, the measure that is critical for comparison of the plugs is the test-retest of the hMIRE measurement.[190] Eddins demonstrated the test-retest measurement was around 1-2 dB, far better than other reports in peer-review literature, including the 2007 study by Berger, et al., which was 5-10 dB and deemed acceptable by Defendants.[191] Thus, Eddins' opinions are admissible.

---

[187] Def-Mot-50-51.
[188] PX40(Eddins-Dep-(8/25/2021)-150:3-156:9).
[189] PX38(Eddins-54).
[190] *Id.* at 55.
[191] *Id.*

## B.     *Crane's Opinions Should Not Be Excluded.*

Crane is a well-qualified expert and the reliability of his opinions is essentially unchallenged. This Court should reject all of Defendants' arguments to exclude his testimony.

### 1.  Design Opinions

Crane is qualified to opine about Defendants' design and safer alternatives. He has comparable clinical experience to experts who have been permitted to opine on the CAEv2's design (and alternative designs). And, Crane has additional expertise in engineering and medical device development.

Crane is a medical doctor with a degree in bioengineering.[192] He did his otolaryngology residency at UCLA before working as an otolaryngologist at UCLA and a veteran's hospital.[193] He did a fellowship at Johns Hopkins in otolaryngology and neurology.[194] Crane is now head of the otology division of the otolaryngology department at the University of Rochester.[195] He is a tenured professor in otolaryngology, neuroscience, and biomedical engineering.[196] He performs academic research related to hearing loss and tinnitus.[197]

---

[192] PX41(Crane-1).
[193] *Id.*
[194] *Id.* at 2.
[195] *Id.* at 1.
[196] *Id.*
[197] PX42(Crane-Dep-(9/10/2021)-77:18-78:8).

Crane has treated patients for hearing loss and tinnitus for more than 20 years—including some active military and numerous veterans.[198] He has substantial experience inventing and testing medical devices,[199] and he has taught a course on detecting defects in medical devices.[200] He works with audiologists to custom fit ear plugs for patients.[201] While he has not conducted formal REAT testing, he performs similar tests with his patients.[202]

This Court has permitted several experts to testify on design issues, based on their clinical experience in sizing and fitting hearing devices for patients. *See, e.g.*, *In re 3M*, 2021 WL 765019, at *37 (Arriaga), *38 (Bielefeld), *39 (Lustig), *39 (Spankovich). Crane has comparable experience to these experts, plus additional experience inventing and testing medical devices, treating military veterans, doing academic research on hearing issues, and teaching courses related to medical devices, as laid out above.[203] Crane also is an engineer, so a limitation imposed on some other experts should not apply to Crane. *See id.* (precluding testimony from an engineering perspective). He is qualified to opine on all aspects of product design.

---

[198] PX41(Crane-2); PX42(Crane-Dep-(9/10/2021)-90:2-91:4, 93:2-20).
[199] PX41(Crane-3-5); PX42(Crane-Dep-(9/10/2021)-83:1-16, 84:19-85:10).
[200] PX42(Crane-Dep-(9/10/2021)-87:3-22).
[201] PX41(Crane-7); PX42(Crane-Dep-(9/10/2021)-86:1-9, 109:2-13).
[202] PX42(Crane-Dep-(9/10/2021)-278:3-12, 280:9-21).
[203] *See* citations *supra* nn. 198-202.

## 2. *Quality-of-Life Issues*

Crane also is qualified to opine about the impact of hearing loss and tinnitus on quality-of-life, mental health, and socioeconomic issues. The Court allowed a similar opinion by another otolaryngology expert, Dr. Packer. *In re 3M,* 2021 WL 2028682, at *5-6). That Crane is not a board-certified psychologist does not preclude him from explaining how hearing issues impact mental health and quality of life. *See McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004) (a physician "need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline"); *Parks v. Ethicon, Inc.,* 2020 WL 6118774, at *3 (S.D. Cal. Oct. 16, 2020) (surgeon may testify about impact of plaintiff's injuries on mental health and quality of life); *Trafton v. Sunbury Primary Care, P.A.*, 689 F. Supp. 2d 198, 203 (D. Me. 2010) (same as to family practitioner).

Crane treats patients for issues related to anxiety, mental health, and work-related impacts of hearing difficulties.[204] He routinely prescribes medication for depression and other mental health issues.[205] Crane has researched the link between

---

[204] PX42(Crane-Dep-(9/10/2021)-42:2-45:25, 49:16-50:8, 50:16-51:4, 198:1-14, 204:3-11, 206:18-207:3).
[205] *Id.* at 43:1-44:9.

PTSD and tinnitus.[206] His report demonstrates extensive scientific research on the impacts of hearing loss and tinnitus on quality of life.[207]

Crane testified that "as a physician, we treat the whole patient."[208] He has the education, experience, and knowledge needed to address the impact of hearing difficulties on patients' lives.

### 3. Warnings

Crane is well qualified to opine about the adequacy of Defendants' warnings. Defendants do not contend otherwise but assert he is unqualified to opine about Defendants' "duty," due to lack of military experience.

Crane's opinions are based on warnings issues that would impact any user—not just the military.[209] As he testified, "a lot of products that can be used [generally], can also be used by the military."[210] But if military-specific experience is needed to opine about warnings, Crane has that, too. He has served on three Department of Defense review panels.[211] Hearing loss and tinnitus were among the issues those

---

[206] *Id.* at 73:11-74:3.

[207] PX41(Crane-17-18, 25).

[208] PX42(Crane-Dep-(9/10/2021)-43:9-10).

[209] *See* PX41(Crane-68-69).

[210] PX42(Crane-Dep-(9/10/2021)-120:24-25).

[211] PX41(Crane-7).

panels addressed.[212] As noted, he has treated numerous active military and veterans for hearing-related issues.[213]

In addition to this military experience, Crane's report reveals extensive knowledge of military and other federal regulations.[214] That analysis and Crane's analysis of labeling issues further refute the assertion that his opinions are based on insufficient facts or data.[215]

### C.   *Hall's Opinions Should Not Be Excluded.*

Hall is an audiologist with over 40 years of experience in clinical, research, and academic settings.[216] He is a founding member of the American Academy of Audiology who has authored over 200 peer-reviewed publications and ten textbooks. He also is a consultant for the auditory study component of the Long-Term Impact of Military-Relevant Brain Injury Consortium Chronic Effects of Neurotrauma Consortium (LIMBIC-CENC), a multi-site prospective longitudinal study funded by the DoD and VA.[217]

---

[212] PX42(Crane-Dep-(9/10/2021)-116:6-118:17).
[213] PX42(Crane-2); PX42(Crane-Dep-(9/10/2021)-90:2-91:4, 93:2-20).
[214] PX42(Crane-35-37, 42-43).
[215] *Id.* at 35-37, 42-43, 55-59.
[216] PX17(Hall-1-2).
[217] *Id.*

Hall has general opinions and case-specific opinions as to Montero.[218] He is a well-qualified expert who used reliable methodologies.

### 1. Design Qualifications

Defendants do not challenge any opinions in the "Summary of Opinions" section of Hall's general report.[219] Instead, Defendants argue that Hall is unqualified to opine about the CAEv2's design flaws and safer alternative earplugs.[220] An expert may opine based on "any combination of knowledge, skill, experience, training, or education; he need not be a leading authority in the field." *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009) (internal quotations omitted). Gaps in an expert's qualifications generally go to the weight, not the admissibility, of his testimony. *Id.*

As a clinical audiologist, Hall regularly advises patients on the selection and use of HPDs.[221] He has extensive experience designing custom molded earplugs, particularly musicians' plugs that utilize filters to selectively attenuate sound.[222] Each plug is dispensed with a label providing the NRR and filter-specific attenuation data.[223] Hall has experience using REAT testing—*i.e.*, measuring patients'

---

[218] *See also* Argument section I.C. *supra*.
[219] *See* PX17(Hall-80-81).
[220] Def-Mot-54; *see* PX17(Hall-79-80).
[221] PX18(Hall-Dep-(8/26/2021)-69:14-18, 71:17-72:8).
[222] *Id.* at 67:17-68:8, 69:10-18, 71:14-72:1.
[223] *Id.* at 71:14-72:1.

unoccluded and occluded thresholds in a sound treated room—to confirm custom earplugs' fit and effectiveness.[224] Thus, Hall has comparable experience to several experts whom this Court has permitted to testify about the CAEv2's design issues. *See, e.g.*, *In re 3M*, 2021 WL 765019, at *36-39.

### 2.   *Alleged Cherry-Picking*

Defendants also argue that Hall's design opinions should be excluded because he relies primarily on one test plus the Flange Memo.[225] Defendants misrepresent Hall's testimony and ignore his list of materials considered, which references numerous studies by Aearo, the military, and third parties.[226] His opinions are based upon "a review of internal Defendants documents and test results, including—not only, but including that test, 015, and the flange report."[227]

### 3.   *Hidden Hearing Loss ("HHL")*

Hall will not opine about "hidden hearing loss" for Group C trials.

### D.   *Djalilian's HHL Opinions Are Admissible.*

This Court concluded that there is "reliable evidentiary support demonstrating the biological plausibility of Plaintiffs' experts' HHL opinions" that HHL occurs in

---

[224] *Id.* at 68:9-69:9, 74:17-22.
[225] Def-Mot-55.
[226]   PX18(Hall-Dep-(8/26/2021)-86:21-89:6);   PX43(excerpt   from   Hall-Ex.C highlighting various references to CAEv2 studies in Hall's materials considered list, with certain exemplars appended).
[227] PX18(Hall-Dep-(8/26/2021)-85:2-15).

humans, and that HHL may be caused by damaged neurons or synapses, and held those opinions admissible. *In re 3M*, 2021 WL 4132269, at *4. Although the Court limited the circumstances in which a "specific causation opinion for HHL" may be proffered, *In re 3M,* 2021 WL 4132269, at *5 n.22, Djalilian proffers no specific causation opinion.[228] Rather, Djalilian gives general opinions concerning HHL in the broader context of discussing noise-induced hearing loss ("NIHL").[229]

Defendants' arguments decontextualize and confuse this Court's orders. Defendants seek to apply rulings that govern *case-specific* causation opinions, to Djalilian's *general* expert opinions.[230] Defendants rely on the Court's initial HHL order—entered six months before the Court's fuller hearing and order on the issue, and since retracted in part[231]—to argue that Djalilian cannot diagnose HHL, despite the fact that Djalilian in his opinions does not diagnose HHL.[232] Djalilian's anticipated general expert testimony regarding HHL is permissible and would fit in any trial where a case-specific opinion regarding HHL is made, and Defendants' motion should be denied.

---

[228] *See* PX44(Djalilian-1).
[229] *See id.* at 11-13.
[230] Def-Mot-56 (citing Doc. 1933).
[231] *In re 3M,* 2021 WL 4132269, at *1 n.6.
[232] Def-Mot-56 (citing Doc. 1680).

### III.   Attorney Mouthpiece Arguments

#### A.   *Crane's Anticipated Testimony Does Not Include Legal Conclusions or State-Of-Mind Opinions.*

Crane will not testify in the form of legal conclusions and will not give state-of-mind opinions. However, the Court should permit him to opine about industry standards and applicable regulations. *See In re 3M*, 2021 WL 765019, at *41 (permitting opinions about design, testing, labeling, and industry standards). Likewise, Crane should be permitted to opine about the information available to Defendants (*id.* at *41-42), including documents Defendants and their employees possessed concerning problems with the CAEv2.[233]

#### B.   *Djalilian's Anticipated Testimony Does Not Include Legal Conclusions or Defendants' State-Of-Mind.*

Defendants challenge Djalilian's expert opinions on (1) the CAEv2's safety and efficacy, (2) the notice to Defendants of issues with the product, and (3) the relationship between those two conclusions and the claims in Defendants' advertising and requirements in Defendants' contracts.[234] This Court has previously permitted expert testimony on just these issues, including "problems [experts] identified with the design, fitting, testing, and labeling of the CAEv2,"[235] and

---

[233] *See id.* at 58.
[234] *Id.* at 58-59.
[235] *In re 3M*, 2021 WL 765019, at *41.

51

whether "the CAEv2 conformed to the performance specifications in the MPID."[236]
The portions of Djalilian's testimony that Defendants challenge are proper
"commentary on evidence that explains the factual bases of [his] opinions related to
the CAEv2's development, efficacy, and warnings/instructions," which this Court
has previously permitted. *In re 3M*, 2021 WL 765019, at *41.

Similarly, Djalilian may offer opinions relating to Defendants' policy of
improperly stopping tests and discarding their results, and such opinions are not
improper state-of-mind testimony. When defense counsel raised the fact that the 015
test contains data for only eight subjects, Djalilian testified to "the practice of the E-
A-RCal lab to stop the test before it was completed to make a decision whether the
test should be completed or not. And this [practice] was in the deposition testimony
of Berger and Kieper."[237] Djalilian's discussion of the impact of that policy,
including that "the 015 was an incomplete test because they intended it to be an
incomplete test," is merely an explanation of Aearo's testing practices, as admitted
by Defendants' employees'—not improper state-of-mind testimony.[238]

---

[236] *In re 3M,* 2021 WL 830309, at *6.
[237] PX45(Djalilian-Dep-(9/1/2021)-276:4-277:13).
[238] *Id*.

### C.   *Packer Should be Permitted to Testify Regarding Facts Upon Which He Relied.*

Although the Court previously excluded opinions regarding Defendants' state-of-mind as inappropriate speculation, Packer's testimony regarding perceptions relevant to his analysis are not speculation and should not be excluded. When Defendants challenged Packer regarding whether his conclusions were consistent with Montero's behavior (*e.g.*, Montero's denial of hearing issues/tinnitus on certain records), Packer offered testimony regarding his impressions of Montero based on first-hand discussions.[239] Defendants cannot question Packer regarding whether his opinions are consistent with Montero's behavior and then prevent Packer from testifying regarding his own perceptions of Montero's behavior. Packer's testimony regarding his own impressions and experiences should not be excluded as speculation.

## IV.   **Other Reliable and Admissible Opinions**

### A.   *McKinley's Rebuttal Opinions to Flamme-Stephenson Are Reliable.*

Defendants' argument regarding McKinley is misdirected.[240] McKinley's rebuttal report simply points out the lack of sources and validation in the Flamme-

---

[239] PX23(Packer-Dep-(8/20/2021)-207:11-14) ("But [Montero] is also very stoic. And if you talk to Mr. Montero … you have to pull information out of him. He's not really forthcoming. He's more reserved.").

[240] Def-Mot-60-62.

Stephenson report.[241] Yet, Defendants argue that McKinley does not have sources to validate his opinions. This logic is backwards. It is not McKinley's responsibility to validate the Flamme-Stephenson report or provide sources by which their report can be validated.

First, Defendants argue that McKinley must present specific data to establish that the noise levels in the Flamme-Stephenson report are inaccurate.[242] On the contrary:  it is the responsibility of Flamme and Stephenson to establish that their data is accurate. While they claim that the majority of their data comes from the Army's Health Hazard Assessment (HHA), it is unclear where the remaining data comes from.[243] As such, McKinley is unable to decipher or verify the data without a source.

Second, Defendants assert that McKinley cannot opine on the attenuation properties of helmets without supporting data.[244] As McKinley testified, all helmets at issue attenuate noise to some degree.[245] However, the Flamme-Stephenson report failed to include any attenuation whatsoever in their calculations of noise exposure. The attenuation of helmets should have been considered.[246] McKinley's rebuttal

---

[241] PX46(McKinley-(Rebuttal)-1-5).
[242] Def-Mot-60-61.
[243] PX46(McKinley-(Rebuttal)-1).
[244] Def-Mot-61.
[245] PX47(McKinley-Dep-(8/31/21)-27:4-32:23).
[246] PX46(McKinley-(Rebuttal)-2).

report is once again criticizing the lack of data in the Flamme-Stephenson report.[247] Without the inclusion of that data, McKinley is unable to ascertain whether the calculations of noise exposure in the Flamme-Stephenson report are accurate.

And finally, Defendants argue that McKinley's criticisms about the acoustical properties of sand should be excluded.[248] McKinley takes issue with Flamme-Stephenson's conclusion that sandbags are reflective or would increase noise levels in the bunker. As McKinley stated in his deposition, sandbags will primarily absorb energy and not reflect it.[249] Once again, Flamme-Stephenson have provided no data to support their assertion that sandbags would be reflective or have any different properties than loose sand, and it is not McKinley's duty to provide sources to validate the Flamme-Stephenson report.[250] At bottom, McKinley is a world-renowned expert in acoustics and noise in the military. His experience, skill, and knowledge allow him to criticize the lack of references in the Flamme-Stephenson report, and without those references, there is no way for McKinley to ascertain whether their calculations and conclusions are accurate. As such, McKinley should be permitted to opine on the lack of reliable sources and methodology.

---

[247] *See generally id.*
[248] Def-Mot-61-62.
[249] PX47(McKinley-Dep-(8/31/21)-76:7-17).
[250] PX46(McKinley-(Rebuttal)-3-4).

## <u>CONCLUSION</u>

For these reasons, the Court should deny Defendants' motion.


<u>Date</u>:  October 8, 2021                    Respectfully submitted,

                                                    */s/ Bryan F. Aylstock*
                                                    Bryan F. Aylstock, Lead Counsel
                                                    Florida State Bar No. 078263
                                                    AYLSTOCK, WITKIN, KREIS & OVERHOLTZ,
                                                    PLLC
                                                    17 East Main Street, Suite 200
                                                    Pensacola, FL 32502
                                                    Tel.: (850) 202-1010
                                                    baylstock@awkolaw.com
                                                    **Plaintiffs' Lead Counsel**

                                                    Shelley V. Hutson, Co-Lead Counsel
                                                    (Admitted Pro Hac Vice)
                                                    Texas State Bar No. 00788878
                                                    CLARK, LOVE & HUTSON, PLLC
                                                    440 Louisiana Street, Suite 1700
                                                    Houston, TX 77002
                                                    Tel.: (713) 757-1400
                                                    shutson@triallawfirm.com
                                                    **Plaintiffs' Co-Lead Counsel**

                                                    Christopher A. Seeger, Co-Lead Counsel
                                                    (Admitted Pro Hac Vice)
                                                    New Jersey State Bar No. 042631990
                                                    SEEGER WEISS LLP
                                                    77 Water Street, 8th Floor
                                                    New York, NY 10005
                                                    Tel.: (212) 587-0700
                                                    cseeger@seegerweiss.com
                                                    **Plaintiffs' Co-Lead Counsel &**
                                                    **Counsel for Plaintiff Carter Stelling**

Keith M. Jensen
Texas Bar No. 10646600
JENSEN & ASSOCIATES
1024 N. Main Street
Fort Worth, TX 76164
817-334-0762
kj@jensen-law.com
***Counsel for Plaintiff Guillermo***
***Camarillorazo***

Russell W. Endsley
Texas State Bar No. 24026824
Roger L. Turk
Texas State Bar No. 00788561
THOMAS J. HENRY LAW, PLLC
521 Starr Street
Corpus Christi, TX 78401
361-985-0600
361-985-0601 (fax)
rwe.3m@thomasjhenry.com
rlt.3m@thomasjhenry.com
***Counsel for Plaintiff Theodore Finley***

Muhammad S. Aziz
(Admitted Pro Hac Vice)
Texas Bar No. 24043538
ABRAHAM WATKINS NICHOLS, AGOSTO,
AZIZ & STOGNER
800 Commerce Street
Houston, TX 77055
713-222-7211
713-225-0827 (fax)
maziz@awtxlaw.com
***Counsel for Plaintiff Joseph Palanki***

Nicole Berg
Illinois State Bar No. 6305464
(Admitted Pro Hac Vice)
KELLER LENKNER, LLC
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
312-741-5220
ncb@kellerlenkner.com
***Counsel for Plaintiff Carlos Montero***

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH COURT'S WORD LIMIT</u>

I hereby certify that the foregoing contains 10,513 words, which is fewer words than Defendants used in Defendants' Omnibus Motion to Exclude Plaintiffs' Group C Putative Expert Opinions Under *Daubert* and Rule 702 and Incorporated Memorandum.

*/s/ Bryan F. Aylstock*

59

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 8, 2021, I caused a copy of the foregoing to be filed through the Court's CM/DOC. system, which will serve all counsel of record.

*/s/ Bryan F. Aylstock*