## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to: *Guillermo Camarillorazo*, 7:20cv098 *Joseph Palanki*, 3:19cv2324 *Theodore Finley*, 7:20cv170 *Carlos Montero*, 7:20cv067 *Carter Stelling*, 7:20cv143 | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## ORDER[1]

This Order resolves certain of the parties' respective omnibus motions to exclude expert testimony and opinions, in whole or in part, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), for the Trial Group C cases.[2]  *See* ECF Nos. 2042, 2051.

---

[1] The Court assumes the parties' familiarity with the nature of this multidistrict litigation, the claims and defenses, and the current evidentiary record.  Thus, this Order sets out only what is necessary to explain the Court's rulings.

[2]  The following expert challenges will be addressed by separate Order:  Dr. David Eddins; Drs. Moises Arriaga, Christopher Spankovich and James Ezelle's case-specific opinions for Finley; Drs. James Hall, III and Mark Packer's case-specific opinions for Montero; Drs. Lawrence Lustig and Spankovich's case-specific opinions for Stelling; Dr. David Eddins; Drs. Derek Jones and Jennifer LaBorde; Dr. Douglas Jacobs' case-specific opinions for Finley and Montero; Dr. Robert L. Collins; and Dr. Michael Seidman.

## I.      Legal Standard

Rule 702, as explained by *Daubert* and its progeny, governs the admissibility of expert testimony.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Under Rule 702 and *Daubert*, district courts must act as "gatekeepers" to ensure the reliability and relevancy of expert testimony.  *Id.* (quoting *Daubert*, 509 U.S. at 589).  Expert testimony is reliable and relevant—and, therefore, admissible—when the following criteria are met: (1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is "sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *Id.*  The Eleventh Circuit refers to these criteria separately as "qualification, reliability, and helpfulness," *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate," *Quiet Tech. DC-8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).  The party offering the expert has the burden of showing, by a preponderance of the evidence, that each of these requirements is met.  *Rink*, 400 F.3d at 1292.

To meet the qualification requirement, a party must show that its expert has sufficient "knowledge, skill, experience, training, or education to form a reliable

opinion about an issue that is before the court." *Hendrix ex. Rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (citing Fed. R. Evid. 702) ("*Hendrix II*"), *aff'g* 255 F.R.D. 568 (N.D. Fla. 2009) ("*Hendrix I*"). Importantly, if a "witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments). The qualifications standard for expert testimony is "not stringent" and "[s]o long as the witness is minimally qualified, objections to the level of [his] expertise [go] to credibility and weight, not admissibility." *Hendrix I*, 255 F.R.D. at 585.

To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue. *Frazier*, 387 F.3d at 1261-62. The reliability analysis is guided by several factors, including: (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique is generally accepted in the relevant community. *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786. "[T]hese factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal

court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech.*, 326 F.3d at 1341.  The court's focus must be on the expert's principles and methodology, not the conclusions they generate.  *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786.  The test for reliability is "flexible" and courts have "broad latitude" in determining both how and whether this requirement is met.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999).

Finally, to satisfy the helpfulness requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985).  Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004).  Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).

"Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded [under Federal Rule of Evidence] 403." *Frazier*, 387 F.3d at 1263 (internal citations excluded).  "Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or

needlessly time consuming," or if it is otherwise unfairly prejudicial. *Id*. "Indeed, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Id*. "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, . . . district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Id*.

When scrutinizing the reliability, relevance, and potential prejudice of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate factfinder. *Frazier*, 387 F.3d at 1272. The court's gatekeeping role "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). Only the jury may determine "where the truth in any case lies" and the court "may not usurp this function." *Frazier*, 387 F.3d at 1272. Thus, a court may not "evaluate the credibility of opposing experts" or the persuasiveness of their conclusions, *Quiet Tech.*, 326 F.3d at 1341; instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence," *Frazier*, 387 F.3d at 1272.

## II. Plaintiffs' Experts

Defendants move to exclude the testimony and opinions, in whole or in part, of 10 experts proffered by Plaintiffs. This Order addresses Defendants' challenges

to Drs. Christopher Spankovich and Moises Arriaga's specific causation opinions for Camarillorazo, Dr. Lawrence Lustig's specific causation opinion for Palanki, general opinions offered by Drs. Benjamin Crane, Hamid Djalilian and James Hall, III, and rebuttal opinions from Richard McKinley.

### A.   Differential Etiologies

Defendants move to exclude the specific causation opinions of Drs. Christopher Spankovich, Moises Arriaga, and Dr. Lawrence Lustig on various grounds. Briefly, each expert relied primarily on the differential etiology method to link Plaintiffs' injuries to an alleged defect in the CAEv2. "Differential etiology is a medical process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining." *Hendrix II*, 609 F.3d at 1195. "A reliable differential etiology is performed in two steps." *Id*. "First, the expert must compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Id*. (internal quotes omitted). "Second, the expert must eliminate all causes but one" by "appl[ying] the facts of the patient's case to the list created in the first step in order to form an opinion about the actual cause of the patient's symptoms." *Id*. at 1197. The expert must provide scientifically reasoned explanations for rejecting alternative hypotheses, and "the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Id*. While a "differential analysis need not rule

out all possible alternative causes, [ ] it must at least consider other factors that could have been the sole cause of the plaintiff's injury." *Chapman v. Procter & Gamble Distrib.*, LLC, 766 F.3d 1296, 1309 (11th Cir. 2014) (internal quotes omitted).

### 1.    Camarillorazo

Drs. Christopher Spankovich and Moises Arriaga conducted differential analyses for Camarillorazo.

### a.    Dr. Christopher Spankovich

Defendants challenge Dr. Spankovich's specific causation opinion for Camarillorazo on grounds that he is not qualified to rule out prior head injuries as a cause of Camarillorazo's tinnitus, failed to reliably rule out other hearing protectors and head injuries, and has no methodology or factual basis for attributing Camarillorazo's sleep difficulties to his tinnitus.  The Court disagrees.

As to qualifications, Dr. Spankovich is amply qualified to rule out head injuries as a cause of Camarillorazo's tinnitus.  While he is not a physician or neurotrauma specialist, and thus cannot diagnose traumatic brain injuries/concussions, that is not what he did here.  Instead, he considered Camarillorazo's military records and self-reported incidents of head trauma in light of his extensive specialized knowledge on the causes of tinnitus, as well as his

clinical experience diagnosing and treating tinnitus patients.[3]  Given the breadth of Dr. Spankovich's knowledge and experience in the field of audiology, he is qualified to offer his general opinion that "concussive events" do not commonly cause hearing loss or tinnitus, *see* Spankovich Dep. (Sept. 2, 2021), ECF No. 2042-1 at 20, 23, and his specific opinion on the absence of a relationship between Camarillorazo's tinnitus and any head trauma.  Objections to his level of expertise go to weight, not admissibility.  *See Hendrix I*, 255 F.R.D. at 585.

Dr. Spankovich also reliably ruled out head injuries and other hearing protectors as a cause of Camarillorazo's injuries.  As to the former, Dr. Spankovich offered a reasoned explanation for his opinion that Camarillorazo's prior head trauma was not the cause of Camarillorazo's tinnitus.  Again, Dr. Spankovich explained that "minor head injuries" like those reportedly experienced by Camarillorazo are "not commonly related to" tinnitus.[4]  *See* Spankovich Rep., ECF

---

[3] Dr. Spankovich is a tenured professor and Director of Audiology Education in the Department of Otolaryngology-Head and Neck Surgery at the University of Mississippi Medical Center.  He has a doctorate in hearing sciences with a minor in molecular physiology, a doctorate in audiology, and a master's degree of public health in behavioral science health education.  Dr. Spankovich also maintains an active clinical practice that is "heavily weighted toward differential diagnosis of acquired forms of hearing loss," and evaluating and managing tinnitus and sound sensitivity.  *See* Spankovich Rep. (Camarillorazo), ECF No. 2042-2 at 4.

[4] Defendants make much of the fact that one of the many references Dr. Spankovich cited in connection with his opinion is a Sport Concussion Assessment Tool 3 (SCAT3) commonly used to evaluate athletes for concussions, not head injuries sustained by servicemembers.  However, this was not the sole, or even primary, basis for Dr. Spankovich's opinion that minor head injuries and concussions do not generally cause tinnitus.  Rather, he applied his specialized knowledge of audiologic and medical literature on the etiology of tinnitus, his review of "literature studying head injuries in the population of military service members," his own research on the effect of military noise exposure on tinnitus, and his clinical experience diagnosing and treating tinnitus.  *See*

No. 2042-2 at 14; Spankovich Dep. (Sept. 2, 2021), ECF No. 2042-1 at 19, 23 (same regarding concussions). Moreover, he observed that none of Camarillorazo's incidents of head trauma coincided temporally with the onset of his tinnitus in 2007 or 2008. Indeed, the most serious incident—one in which Camarillorazo briefly lost consciousness and suffered memory loss—occurred in 2011, at least three years after Camarillorazo first reported symptoms of hearing injury. Having relied on the nature and timing of Camarillorazo's prior head trauma as the factual basis for ruling out head injuries as the cause of Camarillorazo's hearing loss and tinnitus, Dr. Spankovich's differential etiology included adequate consideration of head trauma.

The same is true for Dr. Spankovich's consideration of other hearing protectors that Camarillorazo wore during his military service as a potential cause of his injuries. According to Dr. Spankovich, Camarillorazo's primary earplug was the CAEv2 from 2003 to 2015,[5] Camarillorazo reported having first perceived the

---

Spankovich Dep. (Sept. 2, 2021), ECF No. 2042-1 at 26; *see also* Spankovich Rep. (Camarillorazo), ECF No. 2042-2 at 4-5, 17. Moreover, he explained that he only referenced SCAT3 to show that at least one standardized concussion assessment tool does not identify hearing loss or tinnitus as signs or symptoms of a concussion. In the Court's view, Dr. Spankovich's citation to SCAT3 for this very limited proposition is well within the bounds of relevance and reliability under Rule 702 and *Daubert*. Defendants' SCAT3 challenge is more appropriately addressed during cross-examination. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").

[5] Before Camarillorazo was first issued the CAEv2 in 2003, he wore triple-flange earplugs and/or earmuffs during basic and advanced training. After the CAEv2 became his primary hearing protector, he still wore CVC helmets inside tanks (when available), earmuffs while working in, on and traveling in certain vehicles (when available), and "very rarely," the blue quad-flange earplug. *See* Spankovich Rep. (Camarillorazo), ECF No. 2042-2 at 13. Drawing on his knowledge and

onset of hearing loss and tinnitus around 2007 or 2008, and Camarillorazo's audiometric and military records support his report that the symptoms arose around 2008.   *See* Spankovich Rep., ECF No. 2042-2 at 6-7.   Given the temporal relationship between the onset of Camarillorazo's hearing loss and tinnitus and his use of the CAEv2, Spankovich concluded that a lack of noise attenuation from the CAEv2 caused his hearing injuries.   This is an adequate and reliable basis for ruling out other hearing protectors as part of his differential diagnosis for Camarillorazo. *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 3:19md2885, 2021 WL 765019, at *12 (N.D. Fla. Feb. 28, 2021).

Finally, Dr. Spankovich's report and deposition testimony provide a scientifically reasoned explanation for his opinion that Camarillorazo's tinnitus causes sleep difficulties.   More specifically, Dr. Spankovich drew on his own clinical experience treating and managing symptoms of tinnitus patients, together with an explanation of how that experience informed his opinion, as well as scientific literature linking tinnitus with sleep difficulties.   He did not ask Camarillorazo to quantify the exact number of hours of sleep he loses to tinnitus, but that has no

---

experience with hearing protection devices, Dr. Spankovich researched these different products to determine the relative attenuation provided by each, and reviewed the scientific literature for evidence that material defects had been reported for any of them. *See* Spankovich Dep. (Sept. 3, 2021), ECF No. 2042-3 at 10-14.   He found no such evidence. *Id.*   This explanation provides reliable support for Dr. Spankovich's conclusion that the other hearing protectors afforded adequate protection to Camarillorazo. *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 3:19md2885, ECF No. 1910 at 37 (finding same regarding Dr. Eric Bielefeld's opinion that there was no "evidence to suggest that the CVC or other devices that [a plaintiff] wore failed him]).

bearing on the reliability of his specific causation opinion.  Dr. Spankovich properly focused on the specific nature of Camarillorazo's sleep symptoms—i.e., his inability to fall asleep because he is "actively perceiving" the tinnitus—and how those symptoms differ from the kinds of symptoms associated with other causes of sleep difficulties, such as sleep apnea or nightmares.  *See* Spankovich Dep. (Sept. 2, 2021), ECF No. 2042-1 at 31.  This satisfies Rule 702 and *Daubert*.

In sum, Dr. Spankovich has provided more than "subjective beliefs or unsupported speculation" for his opinions regarding the cause of Camarillorazo's hearing loss, tinnitus, and related symptoms.  *See Hendrix II*, 609 F.3d at 1197. Therefore, his differential etiology for Camarillorazo is reliable and admissible.

### b.    Dr. Moises Arriaga

Defendants argue that Dr. Arriaga's specific causation opinion for Camarillorazo lacks a reliable basis for ruling out head trauma as a cause of his tinnitus.  This is incorrect.  Based on Camarillorazo's medical and service records, Dr. Arriaga concluded that none of his prior head injuries were of a nature and severity capable of producing hearing injuries, and none of them were immediately followed by the onset of tinnitus.  Of particular significance to Dr. Arriaga was Camarillorazo's traumatic brain injury (TBI) assessment in 2017, which noted that he had no history of concussions or recurring headaches, and found him negative for TBI.  Dr. Arriaga explained that where a person is "diagnosed as not having met the

criteria for TBI," or has experienced mild TBI from which he fully recovers, it is "highly unlikely and improbable" that a brain injury is the cause of his auditory dysfunction. *See* Arriaga Dep. (Sept. 12, 2021), ECF No. 2042-9 at 8-9. This scientifically reasoned explanation, clearly "founded on more than subjective beliefs or unsupported speculation," is all that Rule 702 and *Daubert* require. *See Hendrix II*, 609 F.3d at 1197. To the extent Defendants believe Dr. Arriaga should have assigned greater weight to particular instances of head trauma, that may present fodder for cross-examination, but it is not grounds for exclusion of Dr. Arriaga's specific causation opinion for Camarillorazo.

### 2. Palanki—Dr. Lawrence Lustig

Dr. Lawrence Lustig conducted a differential etiology for Palanki. Defendants argue that Dr. Lustig's opinion fails to adequately account for Palanki's head injuries, other hearing protectors, age, and the timing of his symptoms. The Court disagrees. First, Dr. Lustig expressly considered and ruled out Palanki's prior head trauma because he has no history of head injuries "severe enough" to cause hearing difficulties, such as "major concussive events" or head injuries followed "immediately" by symptoms of auditory dysfunction. *See* Lustig Rep., ECF No. 2042-37 at 14; Lustig Dep., ECF No. 2042-30 at 40-41. This scientifically reasoned explanation, not premised on subjective beliefs or unsupported speculation, *see Hendrix II*, 609 F.3d at 1197, is an adequate basis for ruling out head trauma as a

cause of Palanki's hearing injuries.  Defendants may disagree with Dr. Lustig's assessment of the severity of Palanki's injuries, but that is a matter for the jury, not a basis for exclusion of his opinions under Rule 702.

Dr. Lustig also adequately considered other hearing protectors that Palanki used during his service.  He acknowledged that Palanki wore only foamies, single-sided triple-flange earplugs, and/or over-the-head ear muffs between 1990 and 2005, and from 2015 to 2019.  However, according to Dr. Lustig, Palanki predominantly wore only the CAEv2 from 2005 to 2015, and it was during that period—more so than any other—that he was exposed to substantial military noise, experienced significant threshold shifts in hearing, and first perceived the onset of tinnitus.  Dr. Lustig also explained there was no evidence that any of the other hearing protectors worn by Palanki were defective or otherwise failed him.  *See* Lustig Rep., ECF No. 2042-37 at 17; Lustig Dep., ECF No. 2042-30 at 22-23.  Having identified and explained a temporal relationship between the cause and effect of Palanki's alleged injuries, and offered more than "unsupported speculation" as a basis for ruling out other hearing protectors, Dr. Lustig's opinion satisfies Rule 702 and *Daubert*.

The same is true for Dr. Lustig's consideration of Palanki's age.  More specifically, Dr. Lustig ruled out presbycusis based on Palanki's relatively young age when his auditory symptoms first manifested (early to mid-30s), the fact that Palanki's hearing loss is asymmetrical (age-related hearing loss is generally

symmetrical), the absence of a family history of hearing loss (early onset presbycusis has a "strong genetic component"), and the existence of other explanations for the hearing loss (noise exposure).  *See* Lustig Dep., ECF No. 2042-30 at 37, 39.  This scientifically reasoned explanation, which is supported by an adequate factual basis, is all that Rule 702 and *Daubert* require.

Lastly, Defendants challenge Dr. Lustig's construction of the timeline of Palanki's auditory injuries and, in particular, the extent to which he relies on Palanki's subjective reports of symptoms.  However, even a cursory review of Dr. Lustig's report reveals that he demonstrably considered an entire body of evidence, including Palanki's service and medical records, in developing his timeline, and provided a detailed analysis of the facts that led to his conclusions.  Any alleged weaknesses in the factual underpinnings of those conclusions go to the weight and credibility of Dr. Lustig's opinion, not its admissibility.  *See Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1285 (11th Cir. 2015); *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) ("[I]n most cases, objections to the inadequacies of [expert evidence] are more appropriately considered an objection toing to the weight of the evidence rather than its admissibility.").

## B.     Dr. Benjamin Crane

Dr. Benjamin Crane is a board-certified otolaryngologist and neurotologist, and a full professor of otolaryngology, neuroscience and biomedical engineering at

the University of Rochester.  He maintains an active clinical practice diagnosing and treating "the full range" of audiological issues, and, of particular relevance here, has more than 20 years of experience treating noise-induced hearing loss and tinnitus in veterans.  *See* Crane Rep., ECF No. 2042-20 at 3.  Dr. Crane offers general opinions relating to, among other things, noise-induced hearing dysfunction, hearing protection devices, Defendants' design, testing and labeling process for the CAEv2, and the availability of safer alternative designs.  Defendants challenge certain aspects of Dr. Crane's opinions on qualifications and reliability grounds, and characterize other aspects of his opinions as impermissible legal conclusions and state-of-mind opinions.

### 1.     Qualifications to opine about the CAEv2's design or safer alternative designs

Dr. Crane offers an opinion that "the CAEv2's defective design makes it difficult or impossible for users to obtain and maintain a good fit, which drastically compromises or eliminates [its] ability to attenuate noise."  *See id*. at 60.  He also opines that "several safer alternative" designs and technologies were available when the CAEv2 was on the market, all of which "could eliminate or substantially reduce" the risks of user injuries.  Defendants argue that Dr. Crane is not qualified to offer these opinions because he has never designed, tested, patented, researched, or published on commercial hearing protection devices, never designed a product

specifically for the military, and did not personally conduct tests on the CAEv2.  The

Court disagrees.

The record reflects that Dr. Crane is a medical doctor, a tenured professor *and*

an engineer, a first in this litigation.[6]   In his clinical practice, he routinely

recommends hearing protectors and also designs "custom-molded" earplugs (with

filters) for his patients.  *See* Crane Dep., ECF No. 2042-21 at 20, 28-29; Crane Rep.,

ECF No. 2042-20 at 8.  He has personally developed and tested a number of medical

devices, and teaches courses on the pathophysiology of the ear, neuroscience,

bioengineering and biomedical engineering to undergraduate, graduate and medical

students.  Given Dr. Crane's knowledge and professional experience, he is qualified

to opine on the CAEv2's design, as well as safer alternative designs, both from an

engineering perspective and as a clinician.  Based on his report, however, he does

not appear to have meaningfully drawn on his engineering expertise in analyzing the

design questions presented here.  Thus, Dr. Crane's opinions regarding the design of

the CAEv2 and/or safer alternative designs will be limited to testimony regarding

how the CAEv2's design prevented proper fit and seal, and comparing the CAEv2's

design with that of other hearing protection devices in terms of fit and seal, as well

as the relative level of attenuation provided by each, from a clinical perspective.  *See*

---

[6] In addition to his medical doctorate, Dr. Crane holds an undergraduate degree in bioengineering and a Ph.D. in neuroscience.

*In re 3M*, 2021 WL 765019 at *37 (citing *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 612 (S.D. W. Va. 2013) (finding urogynecologist's "experience with pelvic floor disorders and the use of mesh to treat such disorders qualifies him to render opinions" related to the product's design and materials "notwithstanding his lack of expertise in the particular areas of product design or biomaterials").

### 2.    Qualifications to opine about mental health or the socioeconomic impact of hearing issues

Dr. Crane also offers general opinions describing various correlative consequences of hearing loss, including socioeconomic, mental health, and other quality of life effects. Defendants argue that Dr. Crane is unqualified and lacks a foundation for these opinions because he is not an economist or board-certified psychiatrist or psychologist, and has no training in economics and mental health disorders. Again, the Court disagrees. Dr. Crane's extensive background and experience diagnosing and treating in the field of audiology provide him with sufficient expertise to review the scientific literature and offer an opinion on the correlative consequences of hearing loss. *See In re 3M*, 2021 WL 765019, at *16 (same regarding audiologist's qualifications); *id.* at *34 (allowing otolaryngologist/neurotologist/otologist to offer opinions on non-medical correlative consequences of noise-induced hearing loss); see also *See Smith v. United States*, No. 3:95cv445, 2012 WL 1453570, at *40 (S.D. Ohio Apr. 26, 2012) (aerospace medicine physician "eminently qualified" to opine on correlative

physiological effects of levels of carbon monoxide on pilots based on his 40 years'

clinical experience and review of relevant literature and studies).

### 3. Opinions about what information 3M should have provided to the military

Defendants argue that Dr. Crane lacks supporting facts or data to support his

opinion that they had a "duty to disclose" certain information to the military.  The

Court disagrees.  Dr. Crane has been involved in the design, development and testing

of medical devices, and he routinely advises patients on hearing protection device

selection.  This professional experience, together with his specialized education and

board certifications in otolaryngology and neurotology, provides an adequate

knowledge base for his opinion on what information a reasonable manufacturer

should have provided to a consumer, like the military, regarding an earplug, like the

CAEv2, from a clinical perspective.  He has also articulated a sufficient factual basis

for that opinion as his report clearly explains the relevant conclusions, as well as the

bases for those conclusions, and connects the conclusion to his broader opinions on

the completeness and accuracy of the CAEv2's label and warnings.

### 4. Legal and State-of-Mind Opinions

Defendants also challenge portions of Dr. Crane's opinions as impermissible

legal conclusions or state-of-mind opinions.  As discussed in a prior Order, which

the Court incorporates by reference here, questions of law are not the proper subject

of expert testimony. *See In re 3M*, 2021 WL 765019 at *40-42. This rule requires

exclusion of expert testimony about "the meaning of a statute or regulation or about whether someone violated the law . . . [,] the meaning of legal terms or the legal effect of statutes or laws." *See id*. at 40 (internal marks omitted). It also precludes an expert's use of terminology with distinct and specialized legal import. *See id*. "However, a qualified expert may testify about the industry standards of care, which may be reflected in regulations and statutes, and he can testify about how a reasonable operator in the industry would comply with these statutes and regulations." *Id*. at 41.

Applying these principles here, Dr. Crane will be permitted to offer opinions—within the sphere of his clinical expertise—on the alleged problems with the design, fit and/or seal of the CAEv2, and on whether Defendants adhered to the general industry standard of care for hearing protector labels, from a clinical perspective. *See id*. at *39; *see also Arevalo v. Coloplast Corp*., 2020 WL 3958505, at *20-21 (N.D. Fla. July 7, 2020). He may not, however, testify that the CAEv2 is "unreasonably dangerous and defective," or that Defendants had a "duty to disclose . . . and warn" about the safety and efficacy of the CAEv2, because those terms "carry special meaning under the law and are contingent upon application of the appropriate standard of care." *See id*. at *41 (citing *Tillman v. C.R. Bard, Inc*., 96 F. Supp. 3d 1307, 1325-26 (M.D. Fla. 2015). With that said, he may use different words—that is, words that are not legal terms of art—to convey the same opinion.

He is also precluded from offering opinions as to his interpretation of the EPA's regulatory requirements related to the labeling of hearing protectors, as to whether Defendants violated EPA regulations, or as to whether Defendants had a legal "duty to remove" the CAEv2 from the market.

Defendants also object that Dr. Crane "repeatedly opines" on their state of mind by offering opinions as to what they "knew" about various alleged defects and decided not to reveal to consumers. The Court agrees that testimony of this nature is improper and must be excluded. Experts may testify about whether information contained in Defendants' internal documents indicated certain risks to users of the CAEv2, but they may not opine about Defendants' knowledge, intent or motives. *See In re 3M*, 2021 WL 765019, at *42; *see also Tillman*, 96 F. Supp. 3d at 1333 (permitting expert to opine "on what information and knowledge was available to [the defendant]," but excluding opinion on defendant's "intent, motive, or what it should have done with that information"); *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 443 (E.D.N.Y. 2011).

## C.    Dr. Hamid Djalilian

Dr. Hamid Djalilian is board-certified in otolaryngology and neurotology, and now serves as a professor of clinical otolaryngology and Director of the Division of Neurotology and Skull Base Surgery at the University of California Irvine Medical Center. Dr. Djalilian offers general opinions describing the anatomy and physiology

of the human auditory system, and the nature, etiology, diagnosis, treatment/management, effects and prevention of hearing loss.  He also opines that, among other things, the CAEv2 is defective and "can lead to" noise-induced hearing loss and tinnitus, and 3M acted "unreasonably" with respect to its testing, labeling, warnings and sale of the CAEv2.  Defendants challenge certain portions of Dr. Djalilian's opinions as unreliable and unhelpful, and characterize other opinions as impermissible legal conclusions and state-of-mind opinions.

### 1.    Hidden Hearing Loss

As part of his opinion on the etiology and effects of hearing loss, Dr. Djalilian discusses the pathophysiological bases and functional impacts of a category of auditory dysfunction called hidden hearing loss.  He does not, however, offer a specific causation opinion diagnosing a particular plaintiff with hidden hearing loss. Defendants move to exclude Dr. Djalilian's hidden hearing loss opinion as unreliable because he does not opine on the mechanistic basis for this condition to an absolute certainty, and unhelpful because he did not diagnose any plaintiff with the condition.

Consistent with the Court's prior rulings on hidden hearing loss, which are incorporated by reference here, Dr. Djalilian's opinions on the existence, pathophysiological bases, and functional impacts of hidden hearing loss are reliable under Rule 702 and *Daubert*.  *See In re 3M Combat Arms Prods. Liab. Litig.*, 3:19md2885, 2021 WL 4132269 (N.D. Fla. Sept. 12, 2021).  Nevertheless, the

admissibility of those opinions will depend on their helpfulness and fit in the context of a particular case. In cases where an individual plaintiff has been reliably diagnosed with hidden hearing loss based on a measurable indicator of hidden auditory dysfunction—whether by Dr. Djalilian himself, or by another medical or audiological expert—Dr. Djalilian's general expert testimony about hidden hearing loss will be admissible to provide relevant context and insights on the condition. *See id*. at *4-5. However, Dr. Djalilian's hidden hearing loss opinions must be excluded as unhelpful and misleading in cases where the plaintiff has not been reliably diagnosed with hidden hearing loss based on a measurable indicator of hidden auditory dysfunction. *See id*. at 4-6.

### 2.   Legal and State-of-Mind Opinions

Defendants challenge portions of Dr. Djalilian's opinions as impermissible legal conclusions or state-of-mind opinions. As already discussed, questions of law and opinions speculating about Defendants' state of mind are not proper subjects of expert testimony. *See In re 3M*, 2021 WL 765019 at *40-42. Consistent with those rules, Dr. Djalilian may opine on how various aspects of the CAEv2's design prevented proper fit and seal due to variability in the anatomy of the human ear and ear canal, including whether its risks outweighed any potential benefits. He may also offer opinions about whether Defendants adhered to industry standards of care and/or their own internal corporate standards. However, he may not couch his

opinions in legal terms by, for example, testifying that the CAEv2 is "defective," that "3M knowingly misrepresented [its] efficacy," that 3M "failed to warn" users of risks, that certain advertisements were "fraudulent," or that Defendants "did not fulfill the terms of the" military purchasing contracts.[7]   As with Dr. Crane, Dr. Djalilian may use different words—that is, words that are not legal terms of art—to convey the same opinion.   Relatedly, Dr. Djalilian may testify about whether Defendants' internal documents reflected certain information about the CAEv2 or Defendants and/or the military's actions, but he is precluded from offering opinions about Defendants' knowledge, intent, beliefs or motivations.  *See id.*; *see Tillman*, 96 F. Supp. 3d at 1333; *Deutsch*, 768 F. Supp. 2d at 443.

### D.    Dr. James Hall, III

Dr. James Hall is an audiologist and professor with 40 years of clinical, teaching, research, and administrative experience in the field of audiology.  Dr. Hall offers general opinions describing, among other things, the anatomy and physiology of hearing, assessments of auditory function, types of hearing loss and related

---

[7] *See, e.g.*, Djalilian Rep., ECF No. 2042-57 at 40 ("3M knowingly misrepresented the CAEv2's efficacy"); *id*. at 40-41 (stating that the CAEv2 is "defective" and "unreasonably hazardous"); *id*. at 42 ("3M [a]cted [u]nreasonably"); id. at 45 ("3M failed to warn the users in several areas"); Djalilian Dep., ECF No. 2042-58 at 9 ("[I]f you say it's one size fits all and it actually doesn't, then it's deemed fraudulent in your advertising."); *id*. at 12 ("3M . . . did not fulfill the terms of the contract.").

disorders, and hearing protection devices.[8]  Defendants argue that Dr. Hall lacks the qualifications to opine about hearing protectors, ignores testing that contradicts his opinion, and is barred from offering hidden hearing loss ("HHL") opinions. Plaintiffs represent that Dr. Hall will not opine about HHL in the Trial Group C trials; therefore, Defendants' HHL challenge is denied as moot.  The Court addresses the remaining arguments in turn.

Defendants argue that Dr. Hall is not qualified to offer an opinion regarding the CAEv2's alleged design flaws and safer alternatives because he has never designed, tested, or published on commercial hearing protection devices, never worked with a government agency to develop a hearing protector, and did not personally conduct tests on or fit patients with the CAEv2.  The Court disagrees.

As a clinical audiologist, Dr. Hall routinely advises patients on the use and selection of commercial hearing protectors, and designs, fits and tests custom-molded earplugs (with filters), for his patients.  Thus, he is qualified to offer opinions regarding how the CAEv2's design prevented proper fit and seal, and comparing the CAEv2's design with that of other hearing protectors in terms of fit and seal, from a clinical perspective.  *See, e.g.*, *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 765019, at *37-39.  As with other experts, Dr. Hall's opinions regarding

---

[8] Dr. Hall also offers a case-specific causation opinion for Montero, the reliability of which is challenged by Defendants and will be addressed in a separate order.

the hearing protector design may not exceed the scope of his training and experience-based expertise in ensuring earplugs fit an individual user's ear anatomy. *See Bouton v. Ocean Props., Ltd*., No. 9:16cv80502, at *15 (S.D. Fla. Oct. 23, 2017).

Defendants also argue that Dr. Hall's opinions are unreliable because he cherry-picks data and ignores evidence that contradicts his position about the effectiveness of the CAEv2. This argument is readily rejected. It is clear from Dr. Hall's testimony and list of materials considered that he reviewed a host of evidence in reaching his opinions, including Defendants' internal documents, emails, test results and marketing materials, schematics for the CAEv2, and a body of scientific references spanning 35 pages. *See* Hall Dep., ECF No. 2199 at 25; Hall Rep., ECF No. 2199-18 at 144-179. To the extent Defendants believe Dr. Hall should have assigned greater weight to particular documents or tests, that is a matter for the jury, and does not impact the reliability or admissibility of his opinion under *Daubert*.

### E.   Richard McKinley

Richard McKinley is a bioacoustics engineer who has been permitted to offer general opinions related to, among other things, acoustics, hearing protector design (including safer alternatives to the CAEv2), testing and labeling, ANSI standards, hearing conservation in the military, and the MPID, in the Trial Group A and B cases. For Trial Group C, McKinley offers additional opinions in rebuttal of those of Defendants' experts, Drs. Gregory Flamme and Mark Stephenson ("Flamme-

Stephenson").  Defendants argue that certain of McKinley's rebuttal opinions are unreliable.

In their case-specific expert reports, Flamme-Stephenson report sound pressure levels for various military weapons systems to which Camarillorazo, Finley and Stelling were exposed.[9]  McKinley's chief criticism here is that it is impossible to properly analyze or verify the accuracy of the data provided because Flamme-Stephenson did not identify all of their sources.  Defendants claim McKinley cannot reliably offer this opinion at trial because he has no data of his own to establish that Flamme-Stephenson's noise levels are inaccurate.  This is incorrect.  As a rebuttal expert, McKinley's role is to critique the analysis and opinions of another expert. *See Navelski v. Int'l Paper Co*., 244 F. Supp. 3d 1275, 1302-03 (N.D. Fla. 2017) (citing *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006)) ("The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party."); *In re Cessna 208 Series Aircraft Prod. Liab. Litig.*, No. 2:05md1721, 2009 WL 1649773, at 1 (D. Kan. June 9, 2009) ("[E]xpert opinions which assess or critique another expert's substantive testimony . . . is proper rebuttal.").  There is no requirement that he provide independent sound pressure

---

[9] *See* Flamme-Stephenson Rep. (Camarillorazo), ECF No. 2042-59 at 5-6; Flamme-Stephenson Rep. (Finley), ECF No. 2051-18 at 6; Flamme-Stephenson Rep. (Stelling), ECF No. 2051-19 at 16.

measurements refuting Flamme-Stephenson's numbers (though, of course, his testimony may be more persuasive with that information). *See id.* (citing *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("[Rebuttal] experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of [the other side's] experts."). Here, McKinley identified alleged shortcomings with Flamme-Stephenson's reports (failure to cite sources) and provided a reasoned explanation for his criticisms (inability to analyze or validate Flamme-Stephenson's data). This is proper expert rebuttal.

McKinley also identified an alleged shortcoming with respect to Flamme-Stephenson's characterization of the noise exposure level and potential hearing injury for service members at non-shooter positions on or near a Stryker vehicle when its weapon system is being fired. According to McKinley, there is no indication that Flamme-Stephenson accounted for the noise attenuation that would be provided by service members' helmets—whether PICVC, CVC or standard Kevlar, all of which "affect the overall noise levels" entering a wearer's ear. *See* McKinley Dep., ECF No.2199-48 at 10-11. Defendants argue McKinley's criticism is unreliable because he offered no data establishing "how, if at all," the helmets worn by the Group C plaintiffs during their service affected attenuation. Again, Defendants are incorrect. "A rebuttal expert can testify as to the flaws that [he]

believes are inherent in another expert's report that implicitly assumes or ignores certain facts." *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 0:09cv61490, 2011 WL 2295269, at *5 (S.D. Fla. June 8, 2011) (citing *KW Plastics v. U.S. Can Co.*, 199 F.R.D. 687, 692 (M.D. Ala. 2000). That is what McKinley did here. To the extent Defendants believe McKinley should have gone further and evaluated the attenuation levels provided by particular helmets, that criticism goes to the weight of McKinley's opinion, not it's admissibility.

Last, McKinley criticizes Flamme-Stephenson's apparent "inappropriate" assumption about the acoustical properties of sandbags in calculating Finley's noise exposure while working in and around mortar pits. *See* McKinley Rebuttal Rep., ECF No. 2042-60 at 3-4. In McKinley's view, Flamme-Stephenson's report "appears to suggest that the sandbags used in the mortar pit would increase the level and duration of" impulse noise when, in fact, "sand tends to absorb acoustic energy" and thus would be unlikely to significantly increase noise exposure levels. *See id*. Defendants argue McKinley's criticism is unreliable because he did not refute Flamme-Stephenson's assumptions with independent data establishing the acoustical absorption rate of sand and/or sandbags. Yet again, Defendants are wrong. McKinley identified an allegedly flawed assumption inherent in Flamme-Stephenson's report, and explained the scientific principles that supported his opinion, based on his undisputed expertise in acoustics and military noise. This

meets the standard for proper expert rebuttal.  Disagreements with his assessment of Flamme-Stephenson's mortar pit noise calculations may present fodder for cross-examination, but they are not grounds for exclusion of McKinley's rebuttal opinion.

## III. Defendants' Experts

Plaintiffs move to exclude the testimony and opinions, in whole or in part, of 10 experts proffered by Defendants.  This Order addresses Plaintiffs' challenges to various opinions from Drs. Gregory Flamme and Mark Stephenson, Dr. James Crawford's design defect opinions and his case-specific opinions as to Camarillorazo and Finley, Dr. Douglas Jacob's opinions for Camarillorazo, Drs. Dennis Pappas and Dianna Gould's opinions for Palanki, and opinions from non-retained case-specific medical expert witnesses.

### A. Drs. Gregory Flamme and Mark Stephenson ("Flamme-Stephenson")

Drs. Gregory A. Flamme and Mark R. Stephenson ("Flamme-Stephenson") are audiologists who work as consultants with Stephenson and Stephenson Research and Consulting, LLC ("SASRAC").  They jointly offer a number of case-specific opinions regarding the cause of Plaintiffs Camarillorazo, Finley, and Stelling's

hearing impairments.  Plaintiffs challenge several aspects of Flamme-Stephenson's

opinions, which the Court addresses in turn.[10]

### 1.  Inconsistent Implementation of Hearing Conservation Programs Opinion

Flamme-Stephenson offer case-specific opinions that Camarillorazo, Finley,

and Stelling's hearing impairments were not caused by the CAEv2, but rather are

attributable, at least in part, to the inconsistent implementation of the Department of

Defense ("DoD") and the Army's hearing conservation programs.  *See* Flamme-

Stephenson Rep. (Camarillorazo), ECF No. 2051-17 at 57-58; Flamme-Stephenson

Rep. (Finley), ECF No. 2051-18 at 50-51; Flamme-Stephenson Rep. (Stelling), ECF

No. 2051-19 at 58-59.   The Court previously excluded this substantially similar

portion of their specific causation opinions for Trial Group A Plaintiffs Estes and

Baker and Trial Group B Plaintiffs Sloan and Wayman.  *See In re 3M Combat Arms*

*Earplug Prod. Liab. Litig.*, No. 3:19md2885, 2021 WL 830309, at *5 (N.D. Fla.

Mar. 4, 2021); *In re 3M*, ECF No. 1910 at 14-15; *see also In re 3M Combat Arms*

*Earplug Prod. Liab. Litig.*, 3:19md2885, 2021 WL 684183, at *1-2 (N.D. Fla. Feb.

11, 2021) (excluding generalized opinions regarding the success or failure of the

military's hearing conservation efforts, and the military's "culture" of compliance

---

[10] Plaintiffs moved to exclude Flamme-Stephenson's opinion on chemical warfare exposure in the case-specific report for Stelling. ECF No. 2051 at 17-18. Defendants thereafter withdrew this opinion; therefore, Plaintiffs' challenge is denied as moot. ECF No. 2196 at 13.

or non-compliance with safety and hearing protection programs and regulations). Consistent with those rulings, Flamme-Stephenson will not be permitted to testify that any military program was "inconsistently implemented" or otherwise failed, either as a general matter or as to Camarillorazo, Finley, and Stelling specifically. *See In re 3M*, 2021 WL 830309, at *5; *In re 3M*, ECF No. 1910 at 14.  They are also precluded from testifying that the military's failure to conduct an annual audiogram contributed in any way to Plaintiffs' injuries, as there is no medical evidence to support that opinion.  *See In re 3M*, 2021 WL 830309, at *5; *In re 3M*, ECF No. 1910 at 14.  As audiologists, Flamme-Stephenson may speak about the importance of training on and fitting of earplugs. *See In re 3M*, 2021 WL 830309, at *5; *In re 3M*, ECF No. 1910 at 14.  However, neither they, nor any other expert, will be allowed to testify that the military's "poor safety culture" or failure to provide "adequate and effective training" contributed to Plaintiffs' injuries, as testimony of that nature would be unhelpful.[11]

---

[11] Flamme-Stephenson do not opine that the military's "poor safety culture" or failure to provide "adequate and effective training" *caused* Plaintiffs' injuries.  Consequently, this testimony is especially unhelpful to the jury and must be excluded. *See In re 3M*, 2021 WL 830309, at *5 (citing *Coggon v. Fry's Elec., Inc.*, 2019 WL 2137465, at *3 (N.D. Ga. Feb. 6, 2019) ("[E]xpert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves.")); *see also* Flamme-Stephenson Rep. (Camarillorazo), ECF No. 2051-17 at 57; Flamme-Stephenson Rep. (Finley), ECF No. 2051-18 at 50; Flamme-Stephenson Rep. (Stelling), ECF No. 2051-19 at 58.

2.      **Exposure to Burn Pits**

In Flamme-Stephenson's case-specific report for Stelling, they opine that ototoxin exposures cannot be ruled out as a potential cause of Stelling's tinnitus due to his "history of burn pit exposures." Flamme-Stephenson Rep. (Stelling), ECF No. 2051-19 at 35, 61. Plaintiffs argue that this opinion is unreliable and unhelpful because there is "no scientifically established causal link between burn pit exposures and tinnitus" and any marginal probative value is outweighed by the danger of unfairly confusing and misleading the jury. ECF No. 2051 at 16-17. The Court agrees.[12] No evidence has been presented establishing a causal relationship between burn pit exposure and tinnitus.

In support of their burn pit opinion, Flamme-Stephenson cite to a single study, which showed that over 50% of the surveyed service members and veterans that reported exposure to burn pits also reported intermittent or constant tinnitus. Flamme-Stephenson Rep. (Stelling), ECF No. 2051-19 at 35. The study, however, does not analyze whether there is a causal link between burn pit exposure and tinnitus. ECF No. 2051 at 16; *see generally* ECF No. 2051-23. Stephenson

---

[12] In the case-specific reports for Camarillorazo and Finley, Flamme-Stephenson mention that Camarillorazo had burn pit exposures from 2003-2013 and that Finley denied having any exposure to burn pits. *See* Flamme-Stephenson Rep. (Camarillorazo), ECF No. 2051-17 at 34; Flamme-Stephenson Rep. (Finley), ECF No. 2051-18 at 31. It is unclear if Flamme-Stephenson opine that burn pit exposures cannot be ruled out as a potential cause of Camarillorazo or Finley's tinnitus. Nevertheless, any opinion related to burn pit exposures being a potential cause of tinnitus for any Plaintiff is excluded as unreliable.

acknowledges that a causal relationship between the two has never been shown, only a correlation.[13]

Defendants point to Flamme's testimony describing a DoD meeting in 2003 arguably establishing that burn pits are "biologically plausible causes" of tinnitus. ECF No. 2196 at 14. However, no facts or data from this DoD meeting are cited or disclosed in Flamme-Stephenson's expert reports.[14]   Additionally, Flamme-Stephenson do not know what ototoxins, if any, each Plaintiff was exposed to in connection with the burn pit exposures. *See* Stephenson Dep., ECF No. 2051-20 at 5. Instead, Flamme-Stephenson rely solely on a "generalized description of what was characteristically disposed of in burn pits" and opine that it is "reasonable to assume that there could be chemicals in the burn pit that were ototoxic." *Id.* at 4-5. Other than Flamme's testimony that burn pits typically included JP8 fuel, Styrofoam, and polystyrene, Flamme-Stephenson do not provide any *evidence* of what materials are typically disposed of in burn pits or what ototoxins are generally found in burn pits.[15]   Given this scientific landscape, Flamme-Stephenson cannot

---

[13] Stephenson Dep., ECF No. 2051-20 at 7; *see, e.g.*, *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1307 (N.D. Fla. 2018) (discussing the "well-established" Bradford Hill analysis that guides a scientific inquiry into whether an observed association represents a "true cause-effect relationship").

[14] *See* Flamme-Stephenson Rep. (Stelling), ECF No. 2051-19; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

[15] ECF No. 2196 at 14; *see Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) ("[I]f an expert opinion does not have a 'valid scientific

opine with any degree of reliability that Camarillorazo, Finley, or Stelling's tinnitus could be caused by exposure to burn pits.   Consequently, Flamme-Stephenson's opinion that they are unable to rule out burn pit exposure as a cause of tinnitus has virtually no probative value, while presenting a substantial danger of unfairly confusing and misleading the jury regarding the science.   The opinion must be excluded on reliability, helpfulness, and 403 grounds.

### 3.   Cigarette Use

Flamme-Stephenson identify tobacco as a "risk factor that interacts with noise exposure" and opine that "tinnitus has been associated with smoking and cannot be ruled out as a potential cause of [Finley and Stelling's] tinnitus" due to their history of cigarette smoking.[16]   Other than Flamme-Stephenson's unsupported statement that smoking is a risk factor for tinnitus, no evidence has been presented that tobacco is ototoxic such that it could be a cause of any Plaintiff's tinnitus. *See, e.g.*, Flamme-Stephenson Rep. (Stelling), ECF No. 2051-19 at 58.   Indeed, the Court has previously concluded that cigarette smoke and nicotine are, "at most," marginally

---

connection to the pertinent inquiry' it should be excluded because there is no 'fit.'" (quoting *Daubert*, 509 U.S. at 591-92)); *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005) ("[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained.").

[16] Flamme-Stephenson Rep. (Finley), ECF No. 2051-18 at 50, 55; Flamme-Stephenson Rep. (Stelling), ECF No. 2051-19 at 58, 61. Defendants withdrew Flamme-Stephenson's cigarette use opinion for Camarillorazo. ECF No. 2196 at 15.

relevant to the issues in this litigation. *See* Order, ECF No. 1330 at 12.  Flamme-Stephenson have offered no evidentiary basis for altering that conclusion.

Defendants argue that Flamme-Stephenson rely on a study that confirms a "connection" between smoking and tinnitus.  *See generally* Amanda M. Staudt, et al., *Association of Organic Solvents and Occupational Noise on Hearing Loss and Tinnitus Among Adults in the U.S., 1999-2004*, INT'L ARCHIVES OF OCCUPATIONAL & ENVTL. HEALTH (2019).  However, while the study's participants were asked questions about their exposure to smoking, the study itself does not analyze or discuss whether there is even an association between smoking and tinnitus.  *Id.*  And neither the study's authors, nor Flamme-Stephenson, performed any well-established scientific analysis of whether the "connection" reflects a true causal relationship.  *Id.*  Consequently, any limited probative value of this evidence is outweighed by the risk of unfair prejudice and confusing the jury on the relationship between tobacco and any Plaintiff's injuries.  The opinion thus must be excluded on reliability, helpfulness, and 403 grounds.

### 4.    Bone Conduction

In Camarillorazo, Finley, and Stelling's case-specific reports, Flamme-Stephenson opine that they cannot rule out that these Plaintiffs' hearing impairments were caused by blast injury to the cochlea through the bone conduction pathway. *See* Flamme-Stephenson Rep. (Camarillorazo), ECF No. 2051-17 at 31-32; Flamme-

Stephenson Rep. (Finley), ECF No. 2051-18 at 28-29; Flamme-Stephenson Rep. (Stelling), ECF No. 2051-19 at 32-33. According to Flamme-Stephenson, injury through bone conduction can occur when impulses from weapons or blasts produce substantial skull vibrations and intracranial pressures. Flamme-Stephenson Rep. (Finley), ECF No. 2051-18 at 28. Due to the Plaintiffs' exposure to blasts, in part from IEDs, Flamme-Stephenson opine that "blasts can be expected to be sufficiently intense to damage the cochlea through skull vibration or damage to the central nervous system directly." *Id.* at 28-29; Flamme-Stephenson Rep. (Camarillorazo), ECF No. 2051-17 at 32; Flamme-Stephenson Rep. (Stelling), ECF No. 2051-19 at 33. Plaintiffs argue that Flamme-Stephenson fail to provide scientific evidence to support that Plaintiffs' injuries could be caused by bone conduction and that these opinions are unreliable and should be excluded. ECF No. 2051 at 20-22. The Court agrees.

Flamme-Stephenson support their bone conduction opinion with a study that investigated how bone-conducted impulsive sound is transmitted through the human head. *See* Flamme-Stephenson Rep. (Camarillorazo), ECF No. 2051-17 at 31. The study finds that "when exposed to high acoustic impulse noise, such as from a weapon, the impulse is transmitted to the cochlea through the bones and bone conduction pathways." ECF No. 2051-25 at 2. Defendants argue that this study demonstrates that energy can reach the cochlea by transmission from bone

conduction and that this fact alone means that bone conduction can cause damage to the cochlea. ECF No. 2196 at 17.   However, the study explicitly refutes this argument by concluding that it is "unknown at this time, whether such vibrations and acoustic levels inside the head can lead to cochlear or neurological damage in the case of repeated exposure." ECF No. 2051-25 at 2.

Flamme-Stephenson also attempt to support their opinion with sound pressure, intracranial pressure, and skull vibration recordings taken by SASRAC during a breacher training activity sponsored by the Walter Reed Institute.  Flamme-Stephenson Rep. (Camarillorazo), ECF No. 2051-17 at 31.  This material is wholly inadequate. Federal Rule of Civil Procedure 26(a)(2)(B)(i) requires that an expert's written report contain "a complete statement of all opinions the witness will express and the basis and reasons for them."  Here, Flamme-Stephenson do not provide any facts or data from the breacher training activity, aside from a few graphs without data on either axis, and Flamme testified that results from the study are not published.[17]  Thus, there is no way for Plaintiffs, or the Court, to evaluate the reliability of SASRAC's work.  Flamme-Stephenson offer only their *ipse dixit*, which the Supreme Court has admonished courts against admitting into evidence.

---

[17] Flamme Dep., ECF No. 2051-21 at 9; ECF No. 2051 at 21; *see United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) ("[T]he witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." (quoting Fed. R. Evid. 702)).

*See Joiner*, 522 U.S. at 146.   Flamme-Stephenson's failure to provide scientific evidence cannot be cured by the fact that their bone conduction opinions may be somewhat consistent with those of other experts.   ECF No. 2196 at 16; *see In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000) (experts "may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon").   In short, Flamme-Stephenson cannot opine with any degree of reliability that Camarillorazo, Finley, or Stelling's hearing impairments could be caused, in part, by blast energy to the cochlea through the bone conduction pathway.   The opinions related to bone conduction must be excluded on reliability, helpfulness, and 403 grounds.

### 5.    Lack of Effective Quiet

In Camarillorazo, Finley, and Stelling's case-specific reports, Flamme-Stephenson also opine that these Plaintiffs likely did not have access to effective quiet, which could have exacerbated their exposures to noise.   Flamme-Stephenson Rep. (Camarillorazo), ECF No. 2051-17 at 36-37; Flamme-Stephenson Rep. (Finley), ECF No. 2051-18 at 31-32; Flamme-Stephenson Rep. (Stelling), ECF No. 2051-19 at 36.   According to Flamme-Stephenson, exposures to effective quiet "represent auditory rest periods that permit the auditory system to recover from prior exposures."   Flamme-Stephenson Rep. (Camarillorazo), ECF No. 2051-17 at 36. Effective quiet is the highest noise level that neither produces a temporary threshold

shift nor interferes with recovery from a previous temporary threshold shift.  *Id.*
Plaintiffs argue that the effective quiet opinion is unreliable and should be excluded
because there is insufficient scientific evidence to establish that exposure to effective
quiet would have prevented Plaintiffs' hearing impairments.  ECF No. 2051 at 22-
24.  The Court agrees.  The articles cited by Flamme-Stephenson do not identify lack
of effective quiet as a cause or contributor of hearing injury.  *See generally* ECF No.
2051-26; ECF No. 2051-27.   Flamme acknowledges that "the issues that drive
recovery from [temporary threshold shift] for a human are complicated, and it's not
been studied well."  Flamme Dep., ECF No. 2051-21 at 7.  Stephenson testified that
he studied effective quiet and has a publication explaining the potential harm of not
experiencing effective quiet after a temporary threshold shift.  Stephenson Dep.,
ECF No. 2196-20 at 4.  This opinion, too, is mere *ipse dixit* because no results or
facts from Stephenson's study have been provided for the Court's review.  *See
Frazier*, 387 F.3d at 1261.   Flamme-Stephenson's opinion that Plaintiffs'
deprivation of effective quiet exacerbated the harm to their auditory system is
unreliable and must be excluded.

### 6.    Battle of Sadr City

In Stelling's case-specific report, Flamme-Stephenson describe the
operational and combat conditions in Sadr City, Iraq during Operation Gold Wall.
Flamme-Stephenson Rep. (Stelling), ECF No. 2051-19 at 11-12.  Stelling allegedly

served in Sadr City during this operation, and Flamme-Stephenson describe in detail the "intense urban combat" that took place in Sadr City during this time.[18]  When describing the ground operations in Sadr City, Flamme-Stephenson cite to a blog post and a RAND publication.[19]  Plaintiff argues that, as audiologists, Flamme-Stephenson do not have the expertise to describe or opine on combat operations in Sadr City, Iraq and that such opinions should be excluded.  ECF No. 2051 at 24-25.  The Court agrees.  Flamme-Stephenson do not have any expertise related to historical accounts of combat activities and military tactics.  Additionally, Flamme-Stephenson do not explain how the sources of information on which they rely on are of the type experts in their field would "reasonably rely on" in forming their opinions on Stelling's hearing impairments.  *See* Fed. R. Evid. 703.  An expert cannot be used as a "vehicle for a factual narrative."[20]  Factual narratives about Sadr City that are unrelated to Stelling's personal experience must be excluded.

---

[18] *Id.* at 11-14. "During this period, insurgents attempted to thwart wall building efforts by placing IEDs along the roads[.]" *Id.* at 12. "Abrams tanks would fire 120 mm rounds down streets[.]" *Id.* "If an IED was found, it was reported they would shoot them with canister rounds . . . ." *Id.* Flamme-Stephenson include multiple images of Sadr City in the report. *Id.* at 13-14.

[19] *See* John Spencer, *Stealing the Enemy's Urban Advantage: The Battle of Sadr City*, MOD. WAR INST. (Jan. 31, 2019), https://mwi.usma.edu/stealing-enemys-urban-advantage-battle-sadr-city/; David E. Johnson, et al., *The 2008 Battle of Sadr City: Reimagining Urban Combat*, RAND CORP. (2013).

[20] *Ohio State Troopers Ass'n v. Point Blank Enters. Inc.*, 2020 WL 1666763, at *15 (S.D. Fla. Apr. 3, 2020); *see also United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012) ("If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion, then the expert . . . thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement.").

### B.     Dr. James Crawford

Dr. James Crawford is a board-certified otolaryngologist and neurotologist. He previously served as a physician in the United States Army for 24 years, and now runs the Idaho Ear Clinic and also serves as an assistant professor of surgery at the Uniformed Services University. Crawford offers general expert opinions related to the DoD and Army's hearing conservation efforts, as well as medical causation opinions for Camarillorazo and Finley. Plaintiffs challenge several aspects of Crawford's opinions, which the Court addresses in turn.

### 1.     Design Defect

During Crawford's case-specific deposition on September 14, 2021, he opined that the CAEv2 is not defective. Crawford Dep., ECF No. 2051-31 at 117:15-21 ("The device is not defective, correct, but there is more than that."). Plaintiffs argue that this opinion is mere *ipse dixit* because it is not included in Crawford's general or case-specific reports. ECF No. 2051 at 26. The Court agrees. In December 2020, Crawford testified that he did not have an opinion on whether the CAEv2 was defectively designed and that he was not provided with any documents that would allow him to make such a determination. Crawford Dep., ECF No. 2051-30 at 89:16-90:4. Crawford admits that he has not reviewed any design-related documents for the CAEv2 since his December 2020 deposition. Crawford Dep., ECF No. 2051-31 at 120:2-121:20. Crawford also testified that his opinion is based on military studies

that were done on the attenuation of the CAEv2 and his personal use of the plug. *Id.* at 118:4-8. This is wholly inadequate. Federal Rule of Civil Procedure 26(a)(2)(B)(i) requires that an expert's written report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Here, Crawford did not include the opinion that the CAEv2 is not defective in his reports or provide any supporting facts for it.[21] Thus, there is no way for Plaintiffs, or the Court, to evaluate the reliability of Crawford's opinion. Crawford essentially offers only his *ipse dixit*, which the Supreme Court has admonished courts against admitting into evidence. *See Joiner*, 522 U.S. at 146. Because Crawford's design defect opinion was not properly disclosed and is not supported by a reliable factual basis or methodology, it is not admissible in this litigation.

### 2. CAEv2 Did Not Cause Plaintiffs' Hearing Loss

In the case-specific reports, Crawford opines that Camarillorazo and Finley's hearing loss does not result from their use of the CAEv2 or any purported defect of the plug. Crawford Rep. (Camarillorazo), ECF No. 2051-32 at 17; Crawford Rep. (Finley), ECF No. 2051-33 at 20. Plaintiffs argue that Crawford's opinion lacks

---

[21] *Frazier*, 387 F.3d at 1261 ("[T]he witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." (quoting Fed. R. Evid. 702)); *see also Cooper v. S. Co.*, 390 F.3d 695, 728 (11th Cir. 2004) ("Because the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, [] compliance with the requirements of Rule 26 is not merely aspirational.").

foundation because he has not examined the alleged defect of the CAEv2. ECF No. 2051 at 27. The Court disagrees. Crawford opines that exposure to high noise levels, misuse of the CAEv2, failure to wear hearing or double hearing protection, and ototoxic agents "better explain [Plaintiffs'] hearing loss than an alleged defect in the CAEv2." Crawford Rep. (Camarillorazo), ECF No. 2051-32 at 5; Crawford Rep. (Finley), ECF No. 2051-33 at 23. Defendants argue that these alternative causes could not have been prevented by a properly functioning CAEv2. ECF No. 2196 at 24. The Court agrees. The fact that Crawford did not examine the alleged defect of the CAEv2 to determine whether it contributed to Plaintiffs' injuries goes to the weight of his opinion but not admissibility. *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 372 (M.D. Fla. 2018) ("If [d]efendants believe that the basis for [the expert's] opinions is insufficient, they can explore that with [the expert] on cross examination and argument for the benefit of the trier of fact.").

### 3. Availability of Hearing Aids

Crawford opines that Camarillorazo and Finley's hearing loss is amenable to rehabilitation with hearing aids, which are available at no cost through the military health care system. Crawford Rep. (Camarillorazo), ECF No. 2051-32 at 19; Crawford Rep. (Finley), ECF No. 2051-33 at 6. Plaintiffs argue that Crawford's opinion that hearing aids are available at no cost violates the collateral source rule.

ECF No. 2051 at 27. The Court agrees.[22] Under Texas law, the collateral source rule "precludes any reduction in a tortfeasor's liability because of benefits received by the plaintiff from someone else—a collateral source." *Haygood v. De Escabedo*, 356 S.W.3d 390, 394-95 (Tex. 2011). In other words, Defendants cannot benefit from insurance or aid that Plaintiffs might receive for their hearing impairments.[23] This does not preclude Defendants from offering evidence that hearing aids could mitigate Plaintiffs' damages claims for diminished earning capacity. However, Texas's collateral source rule bars Crawford from testifying that hearing aids may be obtained at no cost through the military health care system.[24]

---

[22] Plaintiffs argue this opinion violates the Court's Order in EHK excluding evidence of Veteran's Affairs disability determinations. ECF No. 1729 at 3. Although instructive, the Court's prior Order is not dispositive in this case because Kentucky and Georgia law governed in EHK. *Id.* at 2. Here, Texas law governs Camarillorazo and Finley's cases. ECF No. 2196 at 24.

[23] *See Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 934 (Tex. 1980) ("[A] wrongdoer should not have the benefit of insurance independently procured by the injured party, and to which the wrongdoer was not privy."); *see also Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 582 (Tex. Ct. App. 1992) ("Medical insurance, disability insurance, and other forms of protection purchased by a plaintiff, as well as gifts a plaintiff receives are easily identifiable as 'independent' sources of income that are subject to the collateral source rule.").

[24] ECF No. 2196 at 24-25. Defendants assert that evidence of a collateral source may be admissible under Texas law for purposes other than to mitigate damages. *Id.* at 25. In support of their argument, Defendants cite to two cases; however, evidence of a collateral source was not admitted in either case. *In re DCP Operating Co.*, No. 07-18-00416-CV, 2019 WL 1908147, at *6 (Tex. Ct. App. Apr. 29, 2019) ("Although DCP questioned [Plaintiff] about his crop loss claims, DCP did not ask whether he received any compensation for the losses from a third party and DCP did not offer the loss statement into evidence."); *Perez v. Boecken*, SA-19-CV-00375-XR, 2020 WL 3074420, at *13 (W.D. Tex. June 10, 2020) ("Neely does not offer evidence of 'benefits received by [Plaintiff] from someone else.'" (citing *Haygood*, 356 S.W.3d at 394)).

### 4.    Alternative Causes of Camarillorazo and Finley's Hearing Impairments

In Camarillorazo's case-specific report, Crawford opines that with "all the other cofactors and confounders it is not possible to attribute [Camarillorazo's] hearing loss to the CAEv2." Crawford Rep. (Camarillorazo), ECF No. 2051-32 at 20. In Finley's case-specific report, Crawford opines that Finley has numerous conditions and exposures that cannot be ruled out as the cause of his tinnitus, including migraines, blows to the head, medications, use of marijuana,[25] and exposure to pressure waves from low-level blasts. Crawford Rep. (Finley), ECF No. 2051-33 at 23. Both Plaintiffs argue that Crawford's opinions are inadmissible because he cannot opine to a reasonable degree of medical certainty that any of these alleged cofactors or conditions caused or contributed to their hearing injuries. ECF No. 2051 at 27, 30. Plaintiffs are incorrect. A defense expert "may offer evidence of potential alternative causes of [an] injury without needing to prove those alternative-cause theories with certainty or probability."[26] Crawford's reports state that he holds

---

[25] The Court previously excluded this similar portion of Crawford's specific causation opinion for Trial Group B Plaintiff Adkins. ECF No. 1910 at 9-10. Consistent with the Court's prior ruling, which is incorporated by reference, Crawford will not be permitted to testify that Finley's use of marijuana cannot be ruled out as a cause of Finley's tinnitus. *Id.*

[26] *Waite v. All Acquisition Corp.*, 194 F. Supp. 3d 1298, 1309 (S.D. Fla. 2016) (quoting *Woodruff v. R.J. Reynolds Tobacco Co.*, No. 3:09-CV-12594, 2015 WL 506281, at *1 (M.D. Fla. Feb. 6, 2015)); *see also Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1070 (11th Cir. 2014) ("The defendant's alternative cause theories 'need not be proved with certainty or more probably than not.' And to require them to be proved 'would unduly tie a defendant's hands in rebutting a plaintiff's case where . . . plaintiff's expert testifies that no other cause could have caused plaintiff's injury.'" (quoting *Wilder v. Eberhart*, 977 F.2d 673, 676 (1st Cir. 1992)));

his rebuttal opinions to a reasonable degree of medical certainty. *See* Crawford Rep. (Camarillorazo), ECF No. 2051-32 at 3; Crawford Rep. (Finley), ECF No. 2051-33 at 3. This satisfies Rule 702 and *Daubert*.

Camarillorazo also argues that Crawford's opinion is mere speculation because Crawford did not rule in or rule out other causes of Camarillorazo's hearing impairments.[27] However, Crawford does "rule in" multiple causes or contributors, including significant noise exposure, misuse of the CAEv2, and head trauma that, in Crawford's opinion, are the more likely causes of Camarillorazo's hearing impairments. Crawford Rep. (Camarillorazo), ECF No. 2051-32 at 20. To the extent Camarillorazo believes there are relevant additional factors that Crawford should have considered, that criticism may be appropriately addressed through cross-examination and competing expert testimony. *See Quiet Tech.*, 326 F.3d at 1345.

### 5.    Medications

According to Crawford, Camarillorazo has been prescribed seventeen medications, including sildenafil, piroxicam, and Percocet, to treat his various health conditions. Crawford Rep. (Camarillorazo), ECF No. 2051-32 at 17. Crawford

---

*Bormaster v. Henderson*, 624 S.W.2d 655, 659 (Tex. Ct. App. 1981) ("[T]his court does not read *Lenger v. Physician's General Hospital, Inc.*, 455 S.W.2d 703 (Tex. 1970), as requiring appellees' rebuttal expert medical testimony be based on a reasonable medical probability.").

[27] ECF No. 2051 at 28. *See E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 559 ("[The expert's] failure to rule out other causes of the damage renders his opinion little more than speculation.").

opines that five of the medications are associated with hearing loss and sixteen of the medications are associated with tinnitus; therefore, these ototoxic medications cannot be ruled out as a contributing cause of Camarillorazo's hearing impairments. *Id.* at 17, 19. Camarillorazo argues that this opinion is unreliable, unhelpful, and substantially more prejudicial than probative because Crawford has not identified a scientifically established causal link between any of these medications and hearing impairments. ECF No. 2051 at 28-29. The Court agrees. No valid scientific evidence has been presented to show that these medications are ototoxic such that they could cause Camarillorazo's hearing impairments. *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d at 1307 (discussing the "well-established" Bradford Hill analysis that guides a scientific inquiry into whether an observed association represents a "true cause-effect relationship").

Defendants point to three articles and argue that Crawford cites an "extensive" body of scientific literature in support of his opinion. ECF No. 2196 at 27. One of the articles discusses an association between chemotherapeutic agents, ototoxic antibiotics, and tinnitus.[28] However, *none* of the medications mentioned in this article appear on the list of medications allegedly taken by Camarillorazo. *Id.*; *see* Crawford Rep. (Camarillorazo), ECF No. 2051-32 at 17. Another article merely

---

[28] *See generally* Marilyn F. Dille, et al., *Tinnitus Onset Rates from Chemotherapeutic Agents and Ototoxic Antibiotics: Results of a Large Prospective Study*, J. AM. ACAD. AUDIOLOGY (2010).

states that sildenafil *might* play a causal role in hearing loss, and the last article states that piroxicam "has been noted to cause tinnitus in 0.2% of patients taking the medication, which is reversible on cessation of the medication."[29] The scientific evidence that Crawford relies on falls woefully short of demonstrating a causal relationship between any of the medications taken by Camarillorazo and hearing impairments.[30] Consequently, Crawford's opinion that medications taken by Camarillorazo cannot be ruled out as a contributing cause of his hearing impairments is unreliable and must be excluded, and Defendants should have known that.

### 6.      Head Trauma and Traumatic Brain Injury ("TBI")

Plaintiffs also challenge Crawford's opinion that head trauma and TBI contributed or cannot be ruled out as a cause of Camarillorazo and Finley's hearing impairments. ECF No. 2051 at 29, 31. Specifically, Crawford opines that Camarillorazo's repeated head traumas cannot be ruled out as a cause of Camarillorazo's hearing loss and tinnitus and that Finley's "TBIs and repeated blast exposures have likely contributed to his hearing loss, tinnitus and other function,

---

[29] David M. Vernick & James H. Kelly, *Sudden Hearing Loss Associated with Piroxicam*, AM. J. OTOLOGY 97, 97 (1986); *see also* Gerald McGwin, Jr., *Phosphodiesterase Type 5 Inhibitor Use & Hearing Impairment*, ARCH OTOLARYNGOL HEAD NECK SURG. 136(5): 488, 488 (2010).

[30] At his deposition, Crawford testified there is also a study that confirmed a cause-effect relationship between Percocet and hearing loss. Crawford Dep., ECF No. 2051-31 at 196:19-197:10. This testimony is mere *ipse dixit* because Crawford did not identify the study or otherwise provide any facts or data from it. *See Frazier*, 387 F.3d at 1261.

social and professional limitations."[31] Plaintiffs argue that Crawford's methodology is unreliable because he failed to "rule out any other potential causes" of Camarillorazo and Finley's hearing impairments. ECF No. 2051 at 30, 31. The Court disagrees.

As an initial matter, Crawford's opinions are not akin to the excluded opinions of Dr. House in EHK that a plaintiff's head injuries were "more likely than not" the cause of his tinnitus without considering *any* other potential causes, including noise exposure. ECF No. 1680 at 24. Crawford's opinions are distinguishable because he *does* consider Camarillorazo and Finley's noise exposure, among other alternatives, as a possible cause of their injuries, and unlike Dr. House, Crawford does not opine that head trauma is the sole cause of Camarillorazo or Finley's hearing impairments.

Crawford cited scientific literature showing that there is a causal connection between even mild TBI and auditory dysfunction.[32] Medical records reflect that Camarillorazo sustained head trauma, including a vehicle rollover accident where he reportedly lost consciousness for ten minutes and did not know where he was when

---

[31] Crawford Rep. (Camarillorazo), ECF No. 2051-32 at 20; Crawford Rep. (Finley), ECF No. 2051-33 at 26. The Court notes that Crawford does not opine that Camarillorazo had a TBI or that a TBI is the cause of Camarillorazo's hearing loss and tinnitus.

[32] *See* Renata M. Knoll, et al., *Patient-Reported Auditory Handicap Measures Following Mild Traumatic Brain Injury*, LARYNGOSCOPE 1, 1 (2019). "Classification of TBI ranges from mild to severe based on duration of loss of consciousness or mental status change, posttraumatic amnesia, and imaging findings." *Id.* "Subjective hearing loss, tinnitus, and hyperacusis were associated with a significant handicap in patients with a history of [mild TBI]." *Id.* at 5. "Our findings suggest that [mild TBI] patients suffer from long-term and bothersome auditory symptoms[.]" *Id.*

he woke up. Crawford Rep. (Camarillorazo), ECF No. 2051-32 at 17. Camarillorazo has never been diagnosed with a TBI, but factual disputes about the severity of his head traumas go to the weight of Crawford's opinion and not admissibility. *In re Disposable Contact Lens Antitrust*, 329 F.R.D. at 372.

According to medical records, Finley, too, has a history of head trauma. Crawford Rep. (Finley), ECF No. 2051-33 at 26. Finley struck his head on stairs while not wearing a helmet and lost consciousness, became severely dazed after being thrown against a hard object in his vehicle due to RPG blasts, and lost consciousness for two minutes after falling during a run on his deployment. *Id.* at 18. In 2015, Finley was diagnosed with a mild TBI by the VA. *Id.*

Given the scientific landscape and Camarillorazo and Finley's history of head trauma, Crawford's opinions that he cannot rule out head trauma as a cause of Camarillorazo's hearing impairments and that Finley's history of TBI and neurotrauma contributed to his hearing impairments are reliable.

### 7.     Failure to Wear Hearing Protection

Crawford opines that Finley's "failure to wear his hearing protection while on driving missions and likely in other combat situations more likely explains his hearing loss than any defect in the CAEv2." Crawford Rep. (Finley), ECF No. 2051-33 at 30. Finley asserts that Crawford's opinion is based solely on videos taken by soldiers in Finley's company and nearby infantry units, which show soldiers

experiencing significant noise exposure without wearing hearing protection, but not Finley. ECF No. 2051 at 30. Defendants point out, however, that Finley testified he did not wear hearing protection while driving his vehicle or on patrol unless enemy contact was expected and he never wore double hearing protection at any time. Crawford Rep. (Finley), ECF No. 2051-33 at 21-22; Finley Dep., ECF No. 2196-28 at 274:21-275:18. Thus they argue that Finley's testimony forms a reasonable and reliable basis for Crawford's opinion. ECF No. 2196 at 29. The Court agrees. *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1361 (N.D. Ga. 2017) (explaining that expert testimony is reliable "so long as the expert relies upon record evidence and identifies the facts on which he relies"). Based on Finley's testimony, Crawford identifies specific examples where Finley was exposed to high noise levels, including military vehicles, which could lead to hearing loss without single or double level hearing protection. Crawford Rep. (Finley), ECF No. 2051-33 at 22. While Finley's testimony is a reliable basis for Crawford's opinion, the combat videos are an improper presentation of hearsay evidence. Crawford Rep. (Finley), ECF No. 2051-33 at 23. Crawford cannot use the videos to support his opinion that Finley did not wear hearing protection. *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.").

### C.    Dr. Douglas Jacobs (Camarillorazo)

Dr. Douglas Jacobs is a psychiatrist and part-time associate professor at Harvard Medical School, with more than 45 years of clinical experience evaluating and treating psychiatric patients in private practice.  Dr. Jacobs opines there is no evidence that Camarillorazo's alleged hearing loss and tinnitus have "negatively impact[ed] . . . [his] psychiatric status," and that his mental health symptoms instead are attributable to work stressors and marital problems.  *See* Jacobs Rep., ECF No. 2051-39 at 6.  Plaintiffs argue that Jacobs did not apply any expertise or methodology in forming his largely speculative opinions, and that his testimony would be unhelpful because his report is devoted "almost entirely" to reciting content from Camarillorazo's medical and service records.   Subject to certain limitations, the Court disagrees.

Dr. Jacobs has offered a minimally sufficient basis and methodology for his opinions regarding Camarillorazo's psychiatric status.  He demonstrably reviewed Camarillorazo's medical and service records, and explained how and why their contents support his conclusion that work stressors and marital problems are the cause of Camarillorazo's mental health symptoms.  Of particular note to Dr. Jacobs, the records contained no indication that Camarillorazo had ever previously told a health care provider that his psychiatric symptoms were triggered or exacerbated by any alleged hearing injuries.  Observations of this nature are fairly within the scope

of a psychiatrist's expertise.    Factual disagreements with the bases and persuasiveness of Dr. Jacobs' conclusions about the source of Camarillorazo's psychiatric symptoms bear on their weight, not admissibility.

With that said, Dr. Jacobs' testimony will be limited in several respects.  He is wholly unqualified to, and may not, offer any opinion on the existence or cause of Camarillorazo's hearing injuries, or otherwise report on what is documented in Camarillorazo's medical records with respect to their etiology.[33]  *See In re 3M*, ECF No. 1910 at 22-23 (finding same regarding Dr. Jacobs' purported "report" on the "documented" etiology of a plaintiff's tinnitus).    Dr. Jacobs is not an otolaryngologist, neurotologist or audiologist, and he has no specialized training or experience in those fields.  He has never before reviewed medical records and formed an opinion on the etiology of a patient's hearing injuries, and he did not perform any independent assessment of causation for Camarillorazo's alleged hearing injuries.  *See id*.  Thus, Dr. Jacobs lacks any reliable basis for commenting on the cause of Camarillorazo's hearing problems.  He is also precluded from referencing disability benefits and the availability of tools for managing hearing loss

---

[33] *See, e.g*., Jacobs Dep. (Sep. 8, 2021), ECF No. 2196-43 at 6 (My testimony is that severe tinnitus, you know, would be unbearable."); *id*. at 23 ("I'm just saying that in the record, you know, there's no evidence of severe tinnitus.").

and/or tinnitus (e.g., hearing aids).  Last, on Rule 403 grounds, he may not use the term "sedative hypnotics" to refer to Ambien.[34]

### D.     Drs. Dennis Pappas and Dianna Gould

Dr. Dennis Pappas, a neurotologist, and Dr. Dianna Gould, an audiologist, jointly offer opinions that Palanki has normal hearing and did not otherwise suffer noise-induced auditory injury while in the military.  Additionally, Dr. Pappas is not convinced that Palanki has tinnitus, but opines that even he does, it began in 2017 and thus is not attributable to Palanki's alleged use of the CAEv2 from 2005 to 2015. Plaintiffs argue that Pappas-Gould's hearing loss and tinnitus opinions must be excluded because they are not supported by a differential analysis, and that the doctors failed to consider and rule out potential causes of Palanki's reduced distortion product otoacoustic emissions ("DPOAEs") and speech-recognition-in-noise results.   The Court disagrees, subject to a few limitations.

Pappas-Gould's differential analysis began where all such analyses begin— by identifying the medical condition or symptoms (i.e., the "salient clinical findings") at issue.   *See Hendrix II*, 609 F.3d at 1195.   They performed a comprehensive medical examination of Palanki, which included an otoscopy, tympanometry, acoustic reflex testing, audiometry, behavioral testing (e.g., speech reception, word recognition), tinnitus matching and masking, distortion product

---

[34] *See e.g.*, Jacobs Rep. (Camarillorazo), ECF No. 2051-39 at 19.

otoacoustic emissions, and auditory brainstem response.  Based on the test results, Pappas-Gould concluded that Palanki does not have hearing loss.  Given this clinical finding, Pappas-Gould did not differentially analyze potential causes of Palanki's alleged hearing loss—in their opinion, there is no hearing loss to consider.

Pappas-Gould reached a similar conclusion about tinnitus.  Dr. Pappas does not believe Palanki has tinnitus given various "inconsisten[cies]" in Palanki's descriptions of his symptoms, the alleged timing of their onset, and his subjective tinnitus testing results.  Consequently, Dr. Pappas testified at his deposition that he has no opinion on the cause of Palanki's "hypothetical" tinnitus.  *See* Pappas Dep. (Aug. 30, 2021), ECF No. 2051-46 at 8.  He added that "if [] Palanki has tinnitus, it began in 2017" and any number of factors—including noise, aging, head trauma, and ototoxicity—would have to be considered "if you want to complete a differential."  *See id*. at 9.  However, as with Palanki's hearing loss, Pappas-Gould did not differentially analyze those factors because, in their view, there is no tinnitus to consider.

Although Defendants do not have the burden to prove causation, Pappas-Gould's hearing loss and tinnitus opinions are causation opinions, which must be supported by a reliable methodology.  *See In re 3M*, 2021 WL 765019, at *7-9 (finding the same regarding opinions of defense expert, Dr. John House, on the cause of two plaintiffs' alleged hearing injuries).  Here, Pappas-Gould's opinion that

Palanki has normal hearing and no tinnitus are supported by a reliable methodology (the initial step of a differential diagnosis) and an adequate factual basis (medical examination, records review).  Accordingly, the doctors will be permitted to offer and explain the bases for those opinions at trial.  In connection with that testimony, they also may generally discuss potential causes and risk factors for hearing loss and tinnitus.  However, neither doctor may offer any opinion on the specific cause of Palanki's alleged hearing loss or tinnitus (that is, they may not rule in or out potential causes, such as noise) because neither reached the causation step in their analysis for those conditions.

As to Palanki's abnormal DPOAEs, Dr. Gould testified that it "happened between 2020 and 2021," but "there is no way for [her] to know . . . [or] determine" the cause and any opinion she gave on the issue would be "speculative."  *See* Gould Dep. (Sept. 10, 2021), ECF No. 2051-47 at 8-9.  She may so testify at trial, but she will be held to this position, in that she may not offer an opinion on the specific cause of Palanki's abnormal DPOAEs at trial because she did not—and in her view, could not—differentially analyze the issue.[35]

Dr. Pappas, in contrast, did further analyze the issue.  While he concluded that the "etiology [of Palanki's] DPOAE dysfunction is unknown," he did offer

_____

[35] Dr. Gould did not differentially analyze Palanki's speech testing deficits either. Therefore, she may not offer an opinion on the cause of those deficits at trial.

scientifically reasoned explanations for why that dysfunction may be attributable to Palanki's prior head trauma, age and/or noise that occurred after Palanki's use of the CAEv2.[36]  *See, e.g.*, Pappas-Gould Rep. (Palanki), ECF No. 2051-45 at 22-24.  He offered a similar opinion regarding Palanki's speech testing results.  *See id*. at 24-25 (concluding "that no clinician could find to any reasonable degree of medical or scientific certainty that Palanki's [speech testing] results in 2021 could be attributed to the CAEv2").  He ruled out the CAEv2 as a cause based on his view of the timeline of Palanki's DPOAE dysfunction and speech-in-noise deficits, which he concluded only became abnormal between 2019 and 2021, and thus postdates Palanki's use of the CAEv2 by several years.[37]  Because Dr. Pappas has provided more than "subjective beliefs or unsupported speculation" for his opinion on potential causes of Palanki's DPOAE dysfunction, the opinion is sufficiently reliable under Rule 702 and *Daubert*.  Alleged weaknesses in his opinion are properly addressed through cross-examination and competing expert testimony.  *See Quiet Tech.*, 326 F.3d at 1345.

---

[36] Dr. Pappas did *not* offer an adequate scientific basis for ruling in ototoxic medications as a possible cause of Palanki's abnormal DPOAEs.  To the contrary, at his deposition, Dr. Pappas conceded that no "particular medicine" on Palanki's medication list "stands out to [him]" as having the potential to cause ototoxicity.  *See* Pappas Dep. (Sept. 10, 2021), ECF No. 2051-47 at 17-18.  Consequently, he will not be permitted to testify that ototoxicity is a potential cause of Palanki's condition.

[37] In 2019, Palanki "demonstrated an abnormal DPOAE response" at 3,000 Hz in his right ear.  *See* Pappas-Gould Rep., ECF No. 2051-45 at 22.  According to Dr. Pappas, this "was either an anomaly or outlier indicative of some sort of temporary shift in cochlear function" because it normalized the following year.  *See id*. at 22-23.

### E.    Non-Retained Case-Specific Medical Expert Witnesses

In August 2021, Defendants disclosed a list of treating physicians and other medical providers as non-retained case-specific medical expert witnesses for individual Trial Group C plaintiffs.   *See* Def. Disclosure, ECF No. 2051-10. Defendants concede that "none of these witnesses' testimony qualifies as 'expert'" and represent that "their testimony will be limited to 'only . . . the facts and opinions' set forth in their depositions."   *See* Def. Resp., ECF No. 2196 at 54.   Plaintiffs challenge Defendants' disclosure of these individuals as hybrid fact and expert witnesses on various grounds, and argue that they should be limited to providing fact testimony.   The Court addresses only the narrow issues necessary to resolve the challenge.

Treating physicians and similar health care professionals ("treaters") may testify as either a lay witness or an expert witness; however, in order to testify as an expert witness, a treater must provide the disclosures required under Rules 26(a)(2)(B) or 26(a)(2)(C).   Non-expert treater testimony "presents special evidentiary problems" because while treaters are permitted to describe their own observations and decisions in the course of providing care to a patient, their testimony risks going "beyond that sphere and purport[ing] to provide explanations of scientific and technical information not grounded in their" personal knowledge and experience. *See Williams v. Mast Biosurgery USA, Inc*., 644 F.3d 1312, 1316-

17 (11th Cir. 2011).  Courts must be "vigilant" in ensuring that non-expert treaters testify only as to matters within the scope of their care for a particular patient.  *See id*. (instructing courts to ensure the reliability requirements in Rule 702 are not "evaded through the simple expedient of proffering an expert in lay witness clothing.") (internal quotes omitted); *Wilson v. Taser Int'l, Inc*., 303 F. App'x 708, 712 (11th Cir. 2008).  This generally means that non-expert treaters may not offer opinions on causation (unless a causation determination was necessary for treatment), opinions involving other hypotheticals, and/or opinions based on facts gathered or learned outside the course of treatment.  *See, e.g.*, *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) (citations omitted) (treating physician's diagnosis of jaw fracture was permissible lay opinion but testimony as to cause of fracture (blow to side of face) was impermissible because it was unnecessary to clinical decision-making).

As an initial matter, four of the witnesses disclosed by Defendants—Kendall Nutt and Drs. Douglas Holmes, Vinay Saranga, and Rebekah Tripp—are not treaters at all.  Rather, each of these witnesses was contracted to perform compensation and pension examinations for one of the Group C plaintiffs in connection with that plaintiff's respective application for VA disability benefits.[38]   The Court has

---

[38] *See* Nutt Dep. (Mar. 12, 2021) (Stelling), ECF No. 2051-53; Holmes Dep. (Jan. 29, 2021) (Montero), ECF No. 2051-54; Saranga Dep. (Jan. 27, 2021) (Montero), ECF No. 2051-55; Tripp Dep. (Feb. 5, 2021) (Palanki), ECF No. 2051-56.

previously excluded "all information in VA disability documents and related testimony" under Rule 403 to avoid unfair prejudice and confusion with respect to the claims and defenses in this litigation, which are centered on the plaintiff's military service and alleged injuries during that service.  *See Adkins v. 3M*, No. 7:20cv012, ECF No. 62 at 4-5; *Blum v. 3M*, No. 7:20cv122, ECF No. 76 at 4.  These four witnesses' testimony falls within that prohibition.  Consistent with the Court's prior ruling, their testimony is excluded under Rule 403.

Four other witnesses disclosed by Defendants—Drs. David Rosario-Rivera, Piper Christie Glick, and Melanie V. Ottenbacher, and Felicia Graf—testified subject to *Touhy* authorization letters limiting the scope of their testimony to matters within their personal knowledge and expressly prohibiting them from "provid[ing] opinion testimony, such as hypothetical questions or expert testimony without additional justification and approval" from the Government.[39]  At these witnesses' depositions, the Government permitted them to provide lay testimony (both facts and lay opinions) based on observations and decisions made during the course of their treatment of a particular plaintiff.  In other words, the witnesses gave traditional

---

[39] *See* Rosario-Rivera Dep. (Feb. 8, 2021), ECF No. 2051-49 at 6; Glick Dep. (Mar. 19, 2021), ECF No. 2051-50 at 5; *see also* Ottenbacher Dep. (Mar. 17, 2021), ECF No. 2051-51 at 6; Graf Dep. (Feb. 25, 2021), ECF No. 2051-52 at 5-6; Nutt Dep. (Mar. 12, 2021), ECF No. 2051-53 at 5.  Kendall Nutt also testified subject to *Touhy*; however, her testimony has been excluded under Rule 403 because she examined a plaintiff (Stelling) in connection with a VA disability benefits application.

treater testimony.  Consistent with the *Touhy* authorizations, their testimony will be similarly limited at trial.  Expert testimony is impermissible; however, lay testimony regarding their care and treatment of a plaintiff is admissible.  Because no expert testimony will be given, no written disclosures were required under Rule 26(a).[40] Subject to these limitations, the testimony of Graf and Drs. Rosario-Rivera, Glick and Ottenbacher is admissible.

**SO ORDERED**, on this 18th day of October, 2021.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[40] *See, e.g.*, *Jacobson v. R.J. Reynolds Tobacco Co.*, No. 1:12cv23781, 2013 WL 12094891, at *2 (S.D. Fla. Aug. 26, 2013) (finding that where a physician's "testimony is limited to his treatment decisions and their outcomes, [and] lay[ing] a foundation for the documentary evidence recording those decisions and outcomes . . [,] he is a lay opinion witness not subject to the expert disclosure requirements of Rule 26(a)(2)").