1

**UNITED STATES DISTRICT COURT**
2             **NORTHERN DISTRICT OF FLORIDA**
               **PENSACOLA DIVISION**
3

                         )
4   IN RE: 3M COMBAT ARMS      )
    EARPLUG PRODUCTS         )
5   LIABILITY LITIGATION,     )
                         )
6   This Document Relates to:   ) Case No: 3:19md2885
    Sloan, 7:20cv1            )
7   Montero, 7:20cv67        )
    Hensley, 7:20cv93        )
8   Palanki, 3:19cv2324      )
    Camarillorazo, 7:20cv98    )
9   Stelling, 7:20cv143      )
    Wayman, 7:20cv149        )
10   Finely, 7:20cv170        ) October 22, 2021
                         ) 10:30 AM
11   _____ )

12          **TRANSCRIPT OF TELEPHONIC MOTION HEARING**
         **BEFORE THE HONORABLE GARY JONES**
13                **MAGISTRATE JUDGE**
           **(Pages 1 through 61)**
14

  <u>APPEARANCES</u>: (By telephone)
15

  For the Plaintiffs:      Aylstock, Witkin, Kreis & Overholtz
16                    By:  BRYAN F. AYLSTOCK
                     Attorney at Law
17                      baylstock@awkolaw.com
                17 E. Main Street, Suite 200
18                 Pensacola, Florida 32502

19                 Seeger Weiss, LLP
                By:  DAVID R. BUCHANAN
20                      Attorney at Law
                     dbuchanan@seegerweiss.com
21                 55 Challenger Road, 6th Floor
                Ridgefield Park, New Jersey 07660
22

23

24            *LISA C. SNYDER, RPR, CRR*
         **Official United States Court Reporter**
25     **111 North Adams Street, Tallahassee, FL 32301**
       **(850)567-1374 * lisasnydercr@gmail.com**

```
 1   Appearances continued:

 2   For the Defendants:        Moore, Hill & Westmoreland, LLP
                                By:  CHARLES FRANKLIN BEALL, JR.
 3                                   Attorney at Law
                                     cbeall@mhw-law.com
 4                              P.O. Box 13290
                                Pensacola, Florida 32591
 5

 6   For Witness Berger:        Philip A. Bates, PA
                                By:  PHILIP A. BATES
 7                                   Attorney at Law
                                     pbates@philipbates.net
 8                              25 W. Cedar Street, Suite 550
                                Pensacola, Florida 32502
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       **P R O C E E D I N G S**

2           (Call to Order of the Court at 10:30 AM on Friday,

3     October 22, 2021.)

4               THE COURT:  Good morning, everyone.  This is Judge

5     Jones.

6               We have a court reporter on the line, so before we

7     begin I am going to announce the case and going to ask the

8     lawyers who are going to speak at the hearing to identify

9     themselves in the beginning for the court reporter.  And then

10    when you speak, if you would state your name again so the court

11    reporter will be able to accurately transcribe.

12              Just to review the bidding, I set this hearing on

13    plaintiff's expedited motion to authorize remote testimony from

14    Elliott Berger and Brian Myers.

15              This was filed in the main 3M case, that's 3:19md2885,

16    under ECF Number 2190.

17              The defendants did file a response.

18              And the motion does relate to -- let's see -- one,

19    two, three, four, five, six, seven, eight individual cases.

20              For the record, the motion does relate to Case Number

21    7:20cv98, 7:20cv170, 7:20cv67, 3:19cv2324, 7:20cv143, 7:20cv93,

22    7:20cv1, and lastly, 7:20cv149.

23              Finding out who is representing whom, first let me ask

24    you who is appearing on behalf of the plaintiff this morning?

25              MR. AYLSTOCK:  Good morning, Your Honor.  This is

1    Brian Aylstock.  Myself, with some help from maybe Mr. Buchanan,

2    will be handling the argument today.

3            THE COURT:  Okay.  Good morning to both of you.

4            Who is appearing on behalf of the defendants?

5            MR. BEALL:  Good morning, Your Honor.  This is Charles

6    Beall on behalf of the defendants.

7            THE COURT:  Okay.  Good morning.

8            MR. BEALL:  For the court reporter, it's B-e-a-l-l.  I

9    should spell my name for the court reporter.

10           THE COURT:  I guess you stepped off the trial for a

11   moment, right?

12           MR. BEALL:  I got the morning off.  I was actually

13   happy to be here.

14           MR. AYLSTOCK:  Your Honor, just for the record, I did

15   speak with Mr. Philip Bates, who represents Elliott Berger, and

16   made him aware of the hearing as well.

17           THE COURT:  I was going to mention that.

18           Also, there is the motion by Mr. Bates on behalf of

19   Mr. Berger.  And this was erroneously filed in the main case,

20   and it was then refiled as a miscellaneous case in Case Number

21   3:21mc61.

22           I assume, Mr. Bates, you are on the line as well?

23           MR. BATES:  Yes, Your Honor.  I am on the line.

24           THE COURT:  Okay.  Good morning.

25           MR. BATES:  Good morning, sir.

1          THE COURT:  And, again, just to review the bidding,

2     there are two related, but slightly different, motions going on.

3     The plaintiffs want to use the remote testimony of Elliott

4     Berger and Brian Myers under Rule 43(a) of the Federal Rules of

5     Civil Procedure.

6          And Mr. Bates represents Mr. Berger individually, and

7     Mr. Bates has filed a motion to quash individually on behalf of

8     Mr. Berger, raising issues of -- that this would be burdensome

9     to Mr. Berger.

10          So, you know, how I am going to proceed is I am going

11     to first hear from the plaintiffs.  I will give the defendants a

12     chance to tell me their position.  And Mr. Bates can tell me the

13     individual position of his client, Mr. Berger.

14          And before we begin, Mr. Aylstock, I am interested in

15     really two things, you know: first, your legal argument why both

16     of these witnesses should be permitted to testify remotely under

17     Rule 43(a).  But as sort of an analogue to that, I want you to

18     address the issue -- and this really relates maybe a little more

19     to Mr. Berger than to Mr. Myers -- we are talking about, it

20     looks like seven or eight trials.  And if the Court was to

21     permit remote testimony -- I mean, there has to be an end to it

22     at some point.

23          You know, if we were talking about Mr. Berger

24     testifying one more time, remotely, it might be -- I wouldn't

25     say easier, but maybe not as controversial.  But, you know, you

1   are asking for Mr. Berger to essentially testify at every

2   remaining bellwether trial.  And it seems to me, if the Court

3   was to permit any measure of remote testimony by Mr. Berger,

4   there ought to be a way to have Mr. Berger testify at a trial,

5   or trials, and record that testimony, and then use that recorded

6   trial testimony at other trials.

7         So, that's a second issue I want you to address,

8   Mr. Aylstock.  If the Court was to do something along those

9   lines, tell me whether you would agree with it, not agree with

10  it.  If you don't think that is a good idea, tell me why.  And

11  tell me how, if at all, you think that might prejudice your

12  respective clients' positions.

13        MR. AYLSTOCK:  Yes, Your Honor.  If it's okay, I will

14  start with the legal argument, and then I will address the

15  second issue.

16        THE COURT:  Yeah.

17        MR. AYLSTOCK:  A starting place, legally, is your very

18  order from the Baker case.  Of course, that's Doc 133 that you

19  issued on May 28, 2021.

20        You addressed the legal standard in great detail as to

21  whether or not Mr. Berger and Mr. Myers' remote depositions

22  could take place in that case.

23        You pointed out a slight procedural error, which we

24  tried to avoid in this proceeding by, as an initial matter,

25  asking the Court to grant us authorization to proceed with the

1   contemporaneous transmission for Mr. Berger and Mr. Myers.

2           As the Court noted, and nothing has changed in your

3   order, both of these individuals are outside the subpoena power

4   of the Court, and Rule 45 is the only option for live testimony

5   by either of these witnesses.

6           You also, citing the *Actos* decision, on Page 14 of the

7   Order aptly noted that, quote, "There is little doubt that live

8   testimony by contemporaneous transmission offers the jury better

9   quality evidence than a videotaped deposition," end quote.

10          And on Page 16, you also noted that this modern

11  technology, that has now become really common place in the COVID

12  era, is really not discernibly different from live testimony.

13          That observation is even more true for some of the

14  sworn testimony that has taken place after Baker, and in the

15  Baker case itself by Mr. Berger, in particular, but also in the

16  Adkins case.

17          There was sworn testimony given by Mr. Berger in both

18  cases and reading that trial testimony would be far inferior to

19  even a deposition, which you noted was inferior to the live

20  testimony.

21          The standard, of course, is good cause and compelling

22  circumstances to permit the contemporaneous transmission.  As

23  you noted, the Court does have wide discretion on that.

24          You cited *the Vioxx* decision, by Judge Fallon out of

25  the Vioxx MDL, on Page 12 for some of those factors.

1          We also noted, in fact, in the lead-up to your order,

2     that several cases, including the *Aoki* case out the Eastern

3     District of California, the *Warner* case, as well as the *Matoski*

4     case, that distance alone, geography itself, the inability to

5     get the witness live can itself be good cause.

6          That, of course -- those, of course, were non-MDL

7     cases, but when it comes to MDL cases, it really is the *Vioxx*

8     factors that control.  And those, as you noted in your order,

9     are, number one, control over the witness exerted by the

10    defendant.

11         Here we have Mr. Myers who is a current employee of

12    the defendant.  Clearly, they have complete control over

13    Mr. Myers.

14         Mr. Berger is, and as of the time of our request, as

15    of the time of Ms. Sierra Elizabeth's email saying that they

16    were no longer going to permit Mr. Berger to testify, and as of

17    October 5th, when Mr. Berger was also specifically requested to

18    appear either live or by remote transmission in the Stelling

19    meet and confer by Mr. Buchanan -- he was a paid consultant,

20    being paid upwards of $500 an hour in order to be a paid

21    consultant to 3M.

22         So, it is our position that they still have control

23    over Mr. Berger.  And, in fact, Mr. Berger is going to be

24    testifying next week in the Blum case, so clearly they have

25    control over Mr. Berger.  And, Mr. Berger, by his own admission,

1    is retired and apparently available to testify, except for one

2    day where he is receiving an award, which can certainly be

3    worked around.

4           So, the first factor under the *Vioxx* factor is clearly

5    met.

6           The second, I think, is admitted -- I would be

7    surprised if it's not -- the complex nature of the litigation.

8    As Your Honor noted, this is the largest MDL in history.

9    Extraordinarily complex and the management of this case has been

10   very -- you know, a lot of effort has gone in by Your Honor, as

11   well as Judge Rodgers, and the multiple -- Judge Herndon, and

12   other magistrates or other special magistrates as well.  This is

13   a very complex litigation, and it's been -- a lot of effort has

14   been made by the Court to move the litigation forward.

15          And part of the moving of the litigation forward, of

16   course, is bellwether cases, bellwether selection.  The

17   defendants have selected some cases; the Court has randomly

18   selected some; the plaintiffs have randomly selected some.  And,

19   of course, the purpose of these bellwether cases is to provide

20   information to both parties so that that information can be

21   analyzed and assist the parties in determining whether or not

22   resolution of this case in advisable.

23          So these bellwethers, there are a number of them

24   coming up; as Your Honor noted, seven trials coming up in very

25   short order.  But when you consider the fact that there are now

1   nearly 300,000 individuals that are really relying upon what

2   both parties are doing to determine whether or not their case

3   can one day be resolved, or how this litigation could proceed if

4   it's not resolved, the importance of these bellwethers cannot be

5   understated, particularly in light of Your Honor's observation

6   that this live transmission, live testimony, is so far superior

7   than a video deposition.  So that factor is clearly met.

8         Here the third factor is also met.  The tactical

9   advantage that we really see by 3M's refusal to allow either of

10  these individuals to testify, either in person or remote, it's

11  of -- it's not insignificant that this email from Ms. Elizabeth

12  from October 1st was before Mr. Berger had ceased to consult

13  for -- or by his own declaration, for 3M.

14        He was still a consultant.  He was still being paid

15  $500 an hour.  He had literally just gotten off the stand in

16  the -- I am not even sure if he was off the stand by then in the

17  Adkins' trial where he was examined.

18        It was also October 5th, in the Stelling meet and

19  confer, where Mr. Buchanan again requested him.  Other trials

20  were going on.  It was certainly understood by us that

21  Mr. Berger could be available.  He was their consultant.  And up

22  until that email, we had no indication whatsoever that 3M was

23  going to decide that Mr. Berger could no longer -- or Mr. Myers

24  for that matter -- would not be involved in any trials.

25        The practical effect of that, Your Honor, is that

1   there will be no live witness by 3M at any of these trials, no

2   live corporate witness.

3         Yes, they have their experts to try to spin the

4   documents that they were not a part of, and reinterpret them,

5   and so on and so forth.  But, unlike the plaintiff who needs to

6   appear at trial, undergoes vigorous cross-examination, and then

7   in each trial up to this point, 3M has taken the additional step

8   of then playing inconsistencies in the video testimony, in their

9   case-in-chief, from what plaintiff may have said -- or perceived

10  inconsistencies.  We will not have the opportunity to do any of

11  that.

12        3M wants a trial by tape for the plaintiffs'

13  case-in-chief, and not a live human at the trial video, or

14  otherwise, on behalf of 3M.

15        Our preference, of course, would be to have multiple

16  live witnesses from 3M -- Mr. Keefer, Mr. Warren, all of these

17  folks who were involved in the decision-making.  But to not have

18  the key decision-makers when it comes to the testing that was

19  performed, this testing in 2000, the decision to retest, and

20  then to withhold that testing from the military and proceed over

21  the next 15 years with selling this product is clearly done to

22  provide a tactical advantage to 3M under those *Vioxx* factors.

23        So that is certainly one of the things that we think

24  weighs heavily in our favor when it comes to those *Vioxx*

25  factors.

1          I have lost my notes here.  *Vioxx* factor -- I'm sorry

2     I am rambling.  But the other *Vioxx* factor, Your Honor, also

3     weighs in our favor.  If I could find it in your order -- hold

4     on.

5          THE COURT:  Is that the prejudice?

6          MR. AYLSTOCK:  Yeah, I'm sorry.  Here we are.

7          So, the lack of any true prejudice, that's exactly

8     right.

9          So the prejudice, as I just pointed out, is really as

10    to the plaintiff.  The defendant here, Mr. Myers, is clearly

11    available at any time.  He can sit in his office in Minneapolis,

12    at 3M headquarters, and provide the contemporaneous

13    transmission.

14          Mr. Berger is retired, by his own declaration, so

15    other than this one incident where he needs off for a day, by

16    his own declaration, he can sit at his home.  He can go to a

17    place in Indianapolis.  So there is really no prejudice.

18          Then, of course, the flexibility needed to manage the

19    complex multi-district litigation, that's clearly met here.

20          So, as the Court noted in your order, there was a lot

21    of nuanced changes in Mr. Berger's testimony as of when you

22    issued your order in Baker.  You even said that his testimony

23    has evolved.

24          And since the Baker order, Mr. Berger testified in

25    Baker and it has evolved even more.  In fact, at this point,

1    Mr. Berger and Mr. Myers really have testimony that are at polar

2    odds with one another.  They point fingers at each other.

3    Mr. Berger says, Mr. Myers was the one who had the authority to

4    allow me to provide the technical information.  These

5    inconsistencies between these two key players need to be

6    explored.

7            Furthermore, in the Baker case, Mr. Berger admitted

8    that, in fact, if the law is as Judge Rodgers interprets it, as

9    it relates to the EPA regulations, that 3M violated the law.

10   That was an additional evolution of his testimony.

11           Then in the Adkins' case, Mr. Berger's testimony

12   evolved even further where he said, on questioning from 3M's

13   counsel, that, yes, he did tell Ohlin.  And it wasn't a nuanced

14   he told Ohlin about the flanges.  It was: "Yes; I told Ohlin."

15           So now, for example, in the Stelling case, 3M has

16   designated that very different testimony, from his prior

17   testimony where he explained, Well, I told Ohlin about the

18   concept of the fold flange, and so this evolution of the

19   testimony is not only at odds with Mr. Myers; it's at odds with

20   his own prior testimony.

21           And, as Your Honor noted in the Baker decision, it

22   would severely prejudice the plaintiff not to be able to explore

23   those nuanced inconsistencies, given that his fact deposition

24   was taken now almost two years ago.  That was a deposition that

25   was done before a lot of this information came out, certainly

1   before his many inconsistencies.  And his post -- his

2   depositions following that were either 30(b)(6) depositions,

3   which were on behalf of 3M, not Mr. Berger, and, by the way,

4   where Mr. Berger was designated by 3M.  It's not as though we

5   have any right to designate which deponent we get to depose.  So

6   this idea Mr. Berger has been deposed on many days, well, that's

7   3M's own doing.

8           Then he was deposed, of course, with regard to his

9   very -- you know, couple-page expert report, but that's limited

10  to his expert testimony.

11          So a lot has happened and nothing has changed since

12  the Court has found that Mr. Berger would prejudice Mr. Baker if

13  he were not to -- allowed to explore those nuances.

14          Since then, he would even more prejudice these

15  plaintiffs if those additional changes and nuances in his

16  testimony were not permitted to be explored.

17          So all of those factors weigh in favor of, certainly,

18  Mr. Berger.

19          And I want to address Mr. Myers because we, of course,

20  are aware that Mr. Myers -- Your Honor had addressed this

21  before -- and in EHK it is true that we had the opportunity to

22  call Mr. Myers.  We did not.  We were, as Your Honor is aware,

23  under some time limitations and we had some witness limitations

24  and, yes, we decided not to, ultimately, call him.

25          Since that time, Mr. Myers' testimony has been played

1    in multiple trials.  And when it comes to the inconsistencies

2    now between Mr. Berger saying things like, Well, this policy

3    about retesting and telling -- marketing about what the testing

4    is, that wasn't made by me.  That was -- I don't know who that

5    is; we haven't had the opportunity to explore that with

6    Mr. Myers.  And Mr. Myers -- by the way, it was 3M who asked for

7    him to appear by contemporaneous remote transmission in the

8    choice of law hearing.

9              I had the opportunity to cross-examine him in that,

10   but that hearing, and the transmission, that was 3M's request to

11   do it that way.  And it went off without a hitch.  So there is

12   really no prejudice.  And there is good reason, particularly

13   given Mr. Berger and Mr. Myers' very key role in determining

14   what should go to Ohlin.

15             Mr. Myers, by the way, was the primary contact for

16   Ohlin, along with Mr. Moses.  Mr. Moses was deposed as well, now

17   a couple of years ago, so a lot of this information really would

18   be -- if all we had were these videos, which Judge Rodgers and

19   Your Honor has acknowledged are sometimes difficult for juries

20   to watch without the benefit of live testimony, would be a

21   severe prejudice.

22             We certainly think we have met the legal standard for

23   remote transmission -- one or both.

24             And that kind of brings me to your question, which is,

25   you know, there are seven or eight trials, and do you need -- do

1   we need or are we requesting Mr. Berger and Mr. Myers at every

2   single one of these trials?  And the answer to that is no.

3            What we have asked the Court to do is to allow the

4   subpoena under Rule 45 and leave it to the trial teams of those

5   individual cases which of those expert -- which of those very

6   key witnesses they want to explore.

7            For example, in the Palanki trial, I have spoken to

8   their counsel, and it may be Mr. Myers who they would prefer

9   over Mr. Berger.

10           In other trials, there may be -- particularly given

11  the inconsistencies between Mr. Myers and Mr. Berger, both

12  might -- of them might be needed because they are clearly in a

13  way pointing the finger at each other, and the jury should be

14  able to assess the credibility with live testimony.

15           So it's not as though we are asking -- and I want to

16  make this clear -- for both Mr. Myers and Mr. Berger to be at

17  every trial that's upcoming, these seven or eight trials.

18           What we are asking the Court do is to allow us the

19  discretion, because we didn't want to run afoul of the

20  procedural error that you noted in Baker, to serve those

21  subpoenas at convenient times for these witnesses that are under

22  the control of 3M.

23           And with regard to your question as to recorded trial

24  testimony, I do think that that could be an effective option.  I

25  did, in fact, bring up this issue of de bene esse depositions

1  with Judge Rodgers in the Adkins trial, or maybe it was after

2  trial -- in fact, I think it was after trial, the Thursday after

3  the jury had it.  And the Judge indicated that she was certainly

4  open to the idea as to experts.  She had previously indicated as

5  such in her CMCs, but she indicated that she would not allow

6  that for Mr. Berger as a fact witness, or I think Mr. Brock she

7  also said.  So she made that distinction between experts and

8  fact witnesses like Mr. Berger.

9           I do think that that could be an option, but I also

10  don't want to run afoul of what Judge Rodgers indicated, at

11  least orally.  And it wasn't on a motion; it was more of a

12  conversation, so that may not be her thinking at this point.

13          But I think when it comes to these upcoming trials,

14  there is -- yes, there's seven of them.  But when you consider

15  it as to Mr. Berger being at 3M Aearo for over 40 years, then

16  becoming a consultant, he is getting paid $500 an hour.  He will

17  be paid that when he comes next week, presumably.  And he is

18  retired.  This is not really much of an inconvenience, given the

19  number of soldiers who have made claims for hearing loss and

20  tinnitus as the result of what now multiple juries have found to

21  be culpable conduct on behalf of 3M, and specifically

22  Mr. Berger.

23          And I don't think it should be lost that Mr. Berger

24  did testify at each and every one of those trials.  And although

25  we didn't win all of them, it's clear that jurors, when they see

1   him testify live, are assessing his credibility and finding his

2   testimony incredible, because otherwise the defendants would

3   not -- they would have found for the defendants on the case.

4          And to hamstring us with a video deposition that is

5   years old, or trial testimony that literally we have to read,

6   and then further prejudice us by allowing 3M to read that

7   testimony, trial testimony, on answers that are very, very clean

8   question and answer: "Did you tell Ohlin?  Yes," without our

9   ability to really impeach him with multiple statements where he

10  said something that, at least on its face, seems very different

11  is extremely prejudicial.

12         So I think one way to handle it, Your Honor, would be

13  to say that the trial team maybe -- I do know for a fact that

14  the trial teams on these seven don't need both witnesses on each

15  case.  I don't want to preclude any trial team, because these

16  folks are highly skilled lawyers, from saying in this particular

17  case if Mr. Berger says X, and Mr. Myers says the polar

18  opposite -- which we think we would be able to establish from

19  having live testimony from both, particularly where Mr. Myers is

20  an employee and can provide that testimony from the comfort of

21  his office at 3M headquarters.

22         THE COURT:  Okay.  Thank you.

23         Let me ask you -- before I hear from Mr. Beall, let me

24  ask you one question about the use of recorded -- so if one or

25  both of these witnesses testified, as Mr. Berger did, remotely

1    in one of the trials, I assume the technology would be Zoom.

2              MR. AYLSTOCK:  Yes.

3              THE COURT:  Yeah.  And you can record live testimony

4    with Zoom.  We all know that.  Would there be a problem -- I am

5    not saying, you know, what my decision is going to be, but I am

6    just exploring some options.  If, let's use Mr. Berger for an

7    example, testified in the next trial, or the next two trials,

8    something like that, via Zoom, and his testimony was to be

9    recorded, could that testimony adequately be used in trials

10   after that?  And then I wonder, you know, because live -- a live

11   recorded Zoom appearance is better than just a prophylactic

12   video because it is evident when someone is testifying by remote

13   means at trial that you are testifying at a trial.

14             Would that sort of let the cat out of the bag then?

15   You know, you are in trial four, and that trial team has

16   permission from the Court to use his -- Mr. Berger's recorded

17   testimony from another trial, does that tell the jury that there

18   is a bunch of these trials going on?  Is that something that the

19   parties and/or the Court should worry about?  Or, based on the

20   technology, would you be able to present Zoom testimony --

21   recorded live Zoom testimony without the jury knowing the format

22   in which the witness was testifying?

23             MR. AYLSTOCK:  Yeah.  It's a good question, Your

24   Honor.  And the Judge actually brought up this issue in the Blum

25   case, specifically.  And what she found, and she actually cited

1    to a case that Mr. Beall had presented to her on a different

2    issue.

3              In the welding rod litigation, the MDL judge there

4    said, given the circumstances of this MDL, and the way that the

5    testimony is, it's just impossible to try to keep from the jury

6    that there are other cases.  In fact, indeed, it's misleading to

7    do so.

8              So she has indicated in the Blum case, and cases going

9    forward, that while we are not to -- I don't know the exact

10   quote -- but, you know, make a huge deal out of it; if it comes

11   up, there is absolutely nothing wrong, or prejudicial, with

12   indicating that, Look, this isn't the first time Mr. Berger --

13   or Mr. Brock is where it came up in Adkins -- has testified.

14             And so I think the judicial finding by Judge Rodgers

15   at this point is even if the jury did figure out this was in a

16   different case, that that is not something that can be avoided

17   and is not unduly prejudicial in any event.

18             The first part of your question, could this testimony

19   be adequately used?  I would say, yes, but.  And, the but is, I

20   do think that if Your Honor were to order something like this,

21   we would need to ensure that we had maybe some kind of a

22   different camera crew.  Because the problem with a Zoom.gov is

23   the cameras in the courtroom.  There is a very wide shot of the

24   judge and her staff.  There is a shot of -- a wide shot of the

25   lawyer questioning and then there is the witness.  And it

1   becomes -- it's just -- it would be hard to watch, as well,

2   particularly with either of these witnesses that are going to be

3   document intensive because of the cross-examinations based upon

4   their statements in those documents.

5           So I think it can be done.  But it would need to be

6   done in a way where perhaps there were additional unobtrusive

7   cameras that were set up in the courtroom, and there was a feed

8   such that the exhibits that are being shown could be spliced

9   in -- the way it's worked with Mr. Berger in the Baker case is

10  the exhibits were kind of shown to him, but the --

11          There would need to be some technologically different

12  things done to make the presentation anywhere close to what it

13  would be as if it were a live transmission under Rule 45.

14          THE COURT:  Okay.  Let me -- I will come back to you.

15  Let me hear from Mr. Beall.

16          MR. BEALL:  Thank you, Your Honor.

17          May it please the Court.

18          Obviously, we have addressed this issue in a different

19  context in Baker, so I don't want to plow up old ground too

20  much.  But I do want to go over the basic law and ground rules

21  again, which the Court is aware of.

22          The standard for authorizing remote testimony under

23  Rule 43(a) is "good cause and compelling circumstances."

24          It's an exception that should be invoked cautiously to

25  live testimony.

1           And as the advisory committee notes made clear, "The

2    most persuasive showings of good cause and compelling

3    circumstances are likely to arise when a witness is unable to

4    attend trial for unexpected reasons, such as illness or accident

5    or the like."

6           What that, I think, makes clear is that this is

7    supposed to be a case-by-case, what is the particular reason in

8    this case why this has to occur.

9           And I would just note at the outset that the very

10   nature of the relief requested in the motion filed and before

11   you right now refutes the argument completely.  Because this is

12   not a, Hey, we have to have this person in Stelling for this

13   particular reason.  It is specifically a request -- a blanket

14   request -- or two witnesses to be available for seven cases over

15   three months, with no apparent justification for any particular

16   case as to why it's necessary -- an open-ended request.

17          And while Mr. Aylstock says that they don't expect to

18   have both witnesses at every trial, he also made clear that they

19   want, essentially, a blank check so that the trial teams can

20   make those decisions, and those decisions can, as the Court is

21   well aware, be made not just today or tomorrow, but the day

22   before these people are supposed to testify.

23          So essentially he wants -- they asked the Court to

24   make a blanket ruling for all category B and C cases.  And I

25   don't think it's a stretch to suggest that you will have the

1   same motion pending in front of you for Group D cases once this

2   is over and you were to grant the relief requested.

3          So that's the first thing that this motion takes a

4   shotgun approach to what is supposed to be a very specific

5   case-by-case analysis.

6          Second thing to observe about their motion is that

7   they don't even address the foreseeability issue.  The idea that

8   these witnesses were unexpectedly unavailable to be testifying

9   live in court is not something that they didn't know.

10  Obviously, they knew that, which is precisely why in the

11  pretrial discovery process they allocated basically 20 percent

12  of their time to taking depositions by video of Mr. Berger and

13  Mr. Myers, for the very reason of being able to pick and choose

14  the greatest stitch in that testimony and play it to the jury.

15         And, indeed, we have three days of deposition

16  testimony by Mr. Myers.  Yes, there was a 30(b)(6) involved, but

17  it was three days.  Mr. Berger had six days.  And Mr. Berger not

18  only has that, he has four, and soon to be five, trial

19  testimonies under his belt they have access to as well.

20         So they were well-aware at the time that he was going

21  to -- that these witnesses were not going to be available.

22         In fact, their depositions, even with live testimony,

23  have been played in every single one of these trials.  In fact,

24  this morning we received the disclosure for the video for Mr.

25  Myers to be played in the Blum case.

1    Mr. Berger is -- I think the jury is sometimes

2 confused by why do we keep seeing all of these depositions from

3 Mr. Berger and then he shows up and appears in person.  And that

4 is an example.  These depositions were taken as trial

5 preservation deposition as much as for discovery.

6    As the Court knows, many times during the depositions

7 they are asked questions to "Tell the jury this, Mr. Berger,"

8 or, "Tell the jury, this," so these were done for that very

9 reason.

10    So the only good cause they really argue here is

11 twofold; one is, Hey, we would rather have live testimony.

12 That's better than videotaped, but that's a nonstarter.  Yes, I

13 don't think anybody disagrees with the concept that in-person

14 live testimony is preferrable.  Remote live testimony is maybe

15 the second best.  But that doesn't mean that you can't do

16 testimony by a videotaped deposition because that's what we are

17 doing in every one of these cases.

18    So much of the case right now is simply being played

19 to the jury because that's the necessities of a multidistrict

20 litigation bellwether process.  So that's exactly what is

21 happening right now.

22    They want a perfect trial, but the rules don't allow

23 for a perfect trial.  They require simply a fair trial.  And if

24 both sides are -- by definition, by necessity both sides are

25 putting in videotaped testimony of depositions in every case so

1  far.  There have been multiple depositions played by both sides

2  over a period of days.  So the suggestion that we can't have the

3  testimony that was preserved for this very purpose two years ago

4  played is, I think, a nonstarter.

5          The other good cause argument they try to make, which

6  I don't think the rule even contemplates because it really

7  should go more to what's about a particular case, is they say

8  that there is, like, new admissions, new testimony, new theories

9  that they want to be able to explore.

10          Like, for example, with Mr. Berger, they cite a single

11  admission that they say changed across the first four trials,

12  but they have questioned Mr. Berger for nine days so far on

13  that.  They cannot continue to get that many bites at the apple.

14  There is just nothing there.

15          They do have, in fact, his trial testimony.  So even

16  though they would rather play a video deposition than read trial

17  testimony, to the extent that is allowed under the rules, the

18  trial testimony is there.  So if they need a new admission from

19  Mr. Berger, and the Court allows it, then they have the canned

20  trial testimony to read as well.

21          And, Judge, you know, I've been around long enough at

22  least to know that when I first started practicing 25 years ago,

23  one of my jobs was to go to court and to read testimony to

24  juries.  It's not the best way to do it, but it can be done.

25  And the jury is still able to see Mr. Berger, to judge his

1    credibility, because they will see hours and hours of his video
2    depositions that were preserved for this very purpose.

3           For Mr. Myers, there is no concept of new testimony.
4    They basically say there is a new theory -- they want to test
5    new things.  There is nuanced changes in Mr. Berger's testimony
6    that they want Mr. Myers to respond to.  But that's not good
7    cause.  I think it's fair to say that every party in any case,
8    and I think this is certainly no different for us, we'd like to
9    go back and redo some depositions.  I think that's not a big
10   shock to anybody.  I suspect the plaintiffs would as well.  We
11   would like to ask additional questions; we'd like to ask newly
12   phrased questions.  But you don't get to do that under the
13   rules.

14          You have the right to take the depositions during the
15   discovery period, to preserve that testimony.  And that's
16   exactly what they did here, and there is no reason to venture
17   from that, especially because they were able to explore these
18   issues in great detail at these depositions.

19          So, for example, whether Mr. Meyers was the contact
20   with Mr. Ohlin, they knew that.  And they asked him in three
21   days of depositions about his interactions with Doug Ohlin.  So
22   there is no issue there.

23          And the new theory on discontinuation, I should add,
24   that they cite was something that was taken from Dr. Casali's
25   testimony in the EHK case, and that arose only over our

1 objection, only when the Court ruled that the door had been

2 opened for it.  So that's not a new theory at all.

3         You have already recognized with Mr. Berger -- and I

4 will let Mr. Bates primarily address Mr. Berger's current

5 situation because I think that's more appropriate.  But he

6 cannot be expected to testify into perpetuity, but that's

7 essentially what they want to have here.  They want to have

8 these witnesses available for these seven trials -- or, I guess,

9 six trials, and then into the future in Group D, and whatever.

10 And that's, I think, impossible to continue to do at this point.

11 They have all they need to do to get the testimony in.

12         As far as the -- you, of course, recognized in Baker

13 the issue with Mr. Myers.  Nothing has changed.  There has not

14 been a single thing that changed with Mr. Myers besides what you

15 ruled in Baker.  There has been no new document produced, no new

16 smoking guns that they need to ask him about, nothing of that

17 nature.  The situation now with Mr. Myers is exactly the way it

18 was back when you made your initial ruling on that issue in May

19 of this past year -- of this year.  So, those issues don't

20 apply.

21         The *Vioxx* factors is what they want to go back to, but

22 we don't think the *Vioxx* factors -- you need to get there or

23 they apply, because, again, they have not shown any sort of

24 compelling reason they need this testimony, other than they

25 really would like it for their trial preservation.  They think

1    it's fun to be able to cross-examine them in person.  It is way

2    more fun to do that, of course, but I think that's not the

3    reason.

4         If the *Vioxx* factors are applied, and they are not

5    like a point system, we do think that they do favor precluding

6    this testimony.

7         First, the control over the witnesses; as the Court is

8    aware, Mr. Berger's consulting agreement with 3M has ended.  He

9    is now officially fully retired.  He is no longer under our

10   control.  Obviously, he is a former employee.  He is close with

11   people at 3M.  I am not going to suggest he is hostile to 3M.

12   But he is certainly someone we have no control over whatsoever

13   at this point in getting him to come testify, which is why we

14   indicated to the Court that his testimony is unlikely in future

15   trials on our behalf.  So that doesn't apply.

16        Mr. Myers is, of course, an employee, but at the same

17   time, Mr. Myers is a high-ranking employee and he cannot be

18   expected to be a professional witness at the plaintiffs' beck

19   and call.

20        The idea of a tactical advantage here -- and I guess I

21   should say the second factor is the fact that this is a

22   multi-district litigation.  That's sort of a nonfactor factor,

23   because that's true for every MDL ever, so I think that factor

24   has the least amount of weight.

25        The idea of a tactical advantage here, that we are

1   doing this for a tactical advantage, they really can't point to

2   any tactical advantage.  They say that we don't want them to

3   testify.  Well, keep in mind we spent all this time preparing

4   for their depositions for this very purpose, so they could be

5   used in perpetuity.  And we have had to continue to prepare

6   people for trial, witnesses for trial, and now they want us to

7   continue to do that, to put somebody out in Minnesota or Indiana

8   to be there for their preparation, for their testimony, to

9   monitor the whole process.  We should not be required to do

10  that.  There's no tactical advantage to doing that.  It's simply

11  that we agreed to abide by the rules.  Depositions are

12  depositions.

13          They are playing other depositions of company

14  witnesses.  We can't stop it.  So they have those depositions to

15  play.  They have enough deposition testimony.  So there is no

16  prejudice to the plaintiffs here at all.  They've got more

17  testimony from these two witnesses to pick and choose from than

18  virtually any two witnesses you can imagine in a case of this

19  nature.

20          And that their testimony is not case specific; there

21  is nothing in Mr. Stelling's case that you can't -- they

22  couldn't have gotten from that deposition.  It's not like any of

23  these witnesses have anything to say about their current medical

24  conditions, or the like.

25          We have spent all this time following the Court's

1    directions to have these witnesses available, to preserve their

2    testimony, which is exactly what was done during the discovery

3    period.  So we need to make sure they cannot continue to have

4    additional bites at the apple.  That's exactly what I think they

5    are doing.

6            Finally, let me address the last item that you raised

7    and that is the idea of sort of taping a trial testimony to be

8    one more chance, or something like that.  And I would say a

9    couple of things about that -- maybe three.

10           One, as Mr. Aylstock pointed out, and I appreciate

11   that, Judge Rodgers did comment at that discussion at the Atkins

12   trial that she views experts as a very different situation from

13   a fact witness and would not authorize that for a fact witness.

14   And Mr. Berger, while he has a hybrid of testimonies, he has

15   never testified as an expert in these cases.  So that's number

16   one.

17           Number two, the issue has not been briefed and that

18   was not part of their request.  And to the extent the Court is

19   even inclined to go that direction, we think that opens up a

20   whole new area of relief requested that would need to be briefed

21   and addressed and not to do so on the fly.

22           But I do want to make two other points about that

23   concept just to show the prejudice.  One is, as the Court is

24   well aware, we have, for example, time constraints in these

25   cases.  So, you, know, we are limited to how much time we are

1   allowed to spend with any particular witness just by virtue of

2   that.  And it would be unfair to sort of force us to do a full

3   cross or full direct of Mr. Berger or Mr. Myers in any

4   particular case to be used down the road.  That's just one very

5   practical concern.

6          The other part of that is really what they were trying

7   there is to do a backdoor and reopen discovery to take another

8   deposition.  That's what they are really asking for when they

9   want to preserve this testimony.  As the Court is aware,

10  whenever we have requested additional depositions, we have

11  rarely been granted that relief.  Usually if we have, it's been

12  under very narrow grounds when something brand-new has come up

13  that could not have been foreseen, so, for example, a brand-new

14  opinion by an expert or something of that nature.  Those are the

15  very limited circumstances the Court has done that.  And that's

16  why we cannot basically allow this idea of taping trial

17  testimony to be a new deposition for use down the road.

18         They had, again, nine days of deposition, and four,

19  soon to be five, days of trial testimony from Mr. Berger to pick

20  and choose from, and we should not be using taped trial

21  testimony as a backdoor way to reopen discovery with more

22  depositions of Mr. Berger or Mr. Myers.

23         We would again ask to be able to brief that issue to

24  the extent the Court is inclined that way.  We don't think you

25  should reach it because, again, they have not, from the outset,

1  met their burden under the rule, and, therefore, the motion

2  should be denied.

3          THE COURT:  Thank you, Mr. Beall.

4          Mr. Bates, let me hear from you.  You represent

5  Mr. Berger individually, and you filed what is now called a

6  motion to quash, but in its prior filing it was a motion for

7  protective order.  You don't want the Court to force your client

8  to appear remotely.  So let me hear from you why you think I

9  shouldn't do that.

10          MR. BATES:  Thank you, Judge.

11          First of all, and obviously, I am new to this MDL.  I

12  cannot just by some sort of memory recount what Judge Rodgers,

13  or anyone else, may have said or done throughout the history of

14  this litigation.

15          I will even say that when we were trying to decide how

16  to address the issues that are before the Court today, I

17  struggled -- since my client is not an employee of 3M or its

18  affiliates, I struggled with even what the approach might be

19  because my client hadn't been served with a subpoena.  And,

20  otherwise, he is retired man and at this time, I think, or at

21  least for the last week or 10 days, traveling with his wife

22  attending to some family issues.

23          So I thought, Well, what do I do?  Do I just wait to

24  be served with a subpoena?  And the answer to that was that

25  isn't the best way to go because that's not going to give us, or

1   anyone else, an opportunity, meaningfully, to come to you and

2   say, Wait a minute.  We just got this subpoena.  And if I were

3   you, I would say, Well, didn't you know this was coming?  And I

4   would have to say, Yes, I did, because I saw those motions under

5   Rule 43 before the Court.

6           So we are here today, first, to say this isn't

7   technically a motion to quash, although I suppose that's the

8   only way to really get it in front of Your Honor.

9           I even had -- depending on whether I was talking to

10  the clerk's office in Pensacola or Tallahassee or Gainesville,

11  it wasn't real clear how I was supposed to get it filed and in

12  front of the Court.  That has all worked out, and for the

13  Court's indulgence, I am grateful.

14          Secondly, Mr. Berger, regardless of what his history

15  may have been as an employee of 3M, he is most certainly a

16  retired man now.  And when I initially got into this, I thought

17  to myself, Well, I certainly hope -- and I was listening to

18  Mr. Aylstock's argument about, Well, he's retired now.  He can

19  show up anytime.  He doesn't have anything else to do.

20          I hope the others don't feel that prerogative with

21  respect to my schedule if and when the good Lord allows me to

22  retire.  I hope that retirement means I don't want to respond to

23  someone else's calendar just because I don't technically have a

24  job that I have to report to.

25          This issue of these next trials, first of all,

1    Mr. Berger, albeit retired, is going to be here this week or

2    next for -- I guess it's the Blum trial that's going on right

3    now, or getting ready to start.  And it's not like he's just

4    drawn a line through this and said, "I am not going to be

5    there."

6              Now I can't tell you right now at whose behest he is

7    going to be here, but I do know he is going to be here.  And one

8    of the things that has occurred to me is, Look, while he is

9    here, y'all video him here.  Get your testimony, or your nuances

10   or whatever subtilties in his testimony you think are so

11   crucial.  Let's get those addressed.  Put them on tape if you

12   can.  I don't know how that could be handled.

13             But I do know that the notion that he should wait to

14   see if he is actually going to be subpoenaed, and if so, on what

15   date and at what time, so that he has no way to plan his day,

16   week, month or year, because he might be called, there is a

17   certain arrogance to that that I suggest the Court should

18   reject.

19             Put a different way, if he is to appear in November,

20   he won't know that.  After today's hearing, if Your Honor rules

21   from the bench, he will only know that he has to wait and see if

22   he gets served with a subpoena, if I understand the procedure

23   correctly.  And I am not saying I do.  I could be corrected and

24   I would defer.

25             As I understand, the motions today are merely to say,

1   If we decide we want to call Mr. Berger, then we will serve him

2   with a subpoena and he will have to appear at the designated

3   time, or be available during a period of time for remote

4   testimony for which he will have to prepare, or otherwise not

5   prepare and try to explain why he doesn't recall.

6           So we are not talking about him just being available

7   for a casual appearance during his retirement because he has

8   nothing else to do.  We are talking about him having the

9   next -- I guess I don't know how long these bellwether trials

10  are scheduled.  I think they are out in December, January,

11  February, into March, I suppose.  And then I don't know what

12  else.

13          Is he supposed to sit and just wait for people to

14  decide: A, whether he will appear; B, during what week or weeks

15  he needs to basically stay home and wait for him to be called?

16  And, if he is then decided -- it's decided he is going to be

17  called, to reacquaint himself with the case so that it doesn't

18  come off like he is not telling the truth when he doesn't

19  remember.  He has got to prepare.  And then maybe they call him;

20  maybe they don't.

21          It's -- I suggest that Mr. Berger did not retire at

22  age 70 to be a slave to this multi-district litigation and

23  bellwether trials for the indeterminate future.

24          Now, I understand that it is nice to have live

25  testimony.  I haven't tried near as many cases as the others on

1    the phone, but I certainly have tried a few.  And it is

2    certainly preferrable to put on a live witness or, at least in

3    this instance, a remote live witness.  But I also suggest that

4    there is a rule under Rule 43 that is not open-and-shut

5    applicable, and I would refer to Mr. Beall's arguments about

6    when it should be applicable.

7              For years, decades -- you know, I have been doing this

8    awhile, and as long as I can recall, if you have witnesses that

9    are not within the subpoena power of the Court, you take their

10   deposition to introduce it, and I would suggest they have got

11   plenty of that.

12             Now, what happens this week, or next, whenever it is

13   that he appears?  That might be the perfect opportunity to bring

14   this in for a landing as far as Mr. Berger is concerned so that

15   he can get on with his life or, in this instance, get on with

16   his retirement.

17             I suppose that they would like him to be live.  What

18   if he is ill?  What if he happens to be planning a family

19   vacation, as he is in November?  What if he is not served with a

20   subpoena?  What if it goes on forever?  I suggest that it would

21   be a poor move by the plaintiffs not to do what we are

22   suggesting ought to be done; that is, plan to be able to produce

23   him, his testimony, by some sort of device that preserves his

24   testimony now.

25             I think it is a short-sighted notion to say that he

```
1    should be, as I said earlier, a slave to this litigation ad
2    infinitum.  It would make more sense, especially given his age
3    and his retirement, to preserve his testimony now for what's
4    coming.  And the best time to do that would be, I would say,
5    this month, if it has not already been accomplished.
6              So those are my remarks.  I am grateful for the
7    Court's indulgence to my pleading issues and appearance today.
8              THE COURT:  Thank you, Mr. Bates.
9              Mr. Aylstock, let me give you a brief opportunity to
10   respond, if indeed there is anything you wish to add.
11             MR. AYLSTOCK:  Yes, sir, Your Honor.  Thank you.
12   There is.
13             First, I guess I will start with Mr. Bates' argument
14   on this issue of him being fully retired.  He is coming next
15   week.  Presumably he is being paid.  He is still under the
16   control of 3M.
17             One of the things I would like to know, I suppose, is
18   3M's paid for Mr. Fallon's lawyer, Falco's lawyer.  Are they
19   paying for Mr. Bates' [sic] lawyer?  If so, that indicates, as
20   well, their control.
21             And, furthermore, we are not asking Mr. Berger to come
22   because he is retired.  We are asking him to come because he is
23   the designer and the guy who did the test results of an earplug
24   that allegedly harmed at least 480,000 soldiers over 15 years.
25   So that's why we need him.
```

1          Your Honor -- on this issue of prejudice, Your Honor

2    found prejudice on page 13 of the Baker order.  So the argument

3    that all of a sudden there is no prejudice to not having him

4    live, as we have indicated, is not only belied by the facts and

5    the fact that now his testimony is even more changed, but it's

6    belied by Your Honor's own order.

7          With regard to him testifying previously; this idea he

8    testified for nine days, that's not accurate.  He testified as a

9    30(b)(6) witness, yes, but that was at 3M's bidding.

10         So the ifs, ands, or buts, let me address those.  We

11   are not going for Mr. Berger or Mr. Bates, who is presumably

12   being paid by 3M, to wait and see.  What we have done is exactly

13   what the Court asked us to do and we should have done in Baker,

14   and that was when we found out from Ms. Elizabeth that 3M was

15   not going to produce him voluntarily, even though he was

16   currently under that contract with 3M, we petitioned this Court

17   for leave to file the subpoenas.

18         The Court -- I fully expect, as we have seen in this

19   MDL, the Court would impose deadlines on each trial to say if

20   Mr. Myers or Mr. Berger needs to come, you need to promptly say

21   when.  So we are not asking him to wait and see or hold aside

22   months at a time.  There would be specific deadlines that could

23   be, and should be, imposed by the Court, and that's not a

24   problem.  We would be able to tell him when he would appear.  We

25   will certainly work around any other issues, just like we did in

1   the Baker case.

2           Now turning to Mr. Beall's argument, he started out by

3   saying, Look, there is no specific reason why you need Berger or

4   Myers.  Well, yes, there is.  Mr. Stelling was harmed, we

5   allege, by the very earplugs designed by Mr. Berger, by the very

6   same man who decided not to tell Ohlin and has no documentation

7   that he did tell Ohlin.  And but for any of that, Mr. Stelling

8   would never have been harmed because he would have never got the

9   earplugs.

10          Mr. Myers was the project manager over those same

11  earplugs.  So do we have a specific reason?  Absolutely we have

12  a specific reason.

13          With regard to this idea that we have to show

14  foreseeability; first of all, let me talk about this a little

15  bit.  The text of the rule says nothing about foreseeability.

16  The foreseeability comes in the 1996 amendment to the committee

17  notes, well before this remote testimony was even really a

18  thing.  And in the RFC case, at Star 3, that court specifically

19  said that appears to be a relic of a 1996 amendment to the

20  committee notes.  And, really, if you look at it in context,

21  it's talking about a person under the control of the proponent

22  of the request to make this contemporaneous transmission.

23  Because that -- when you look at the cases that the defendants

24  cite in their briefs, the *Christians of California* case, that

25  was a witness who was allied with the moving party.  He said he

1    might come to the US but didn't.  So maybe that was foreseeable.

2              In the *Nehemiah versus Ford Motor Company,* the witness

3    was an expert of the moving party.  And in the *Purdue* case which

4    they cite, the movant took no depos until one month before the

5    close of discovery.  So the issue of foreseeability, first of

6    all, doesn't even apply.  It's not part of the rule.  It's

7    certainly not part of the *Vioxx* factors.

8              And when you think about the *Vioxx* factors, think of

9    this: Judge Fallon was overseeing an MDL involving Merck and a

10   painkiller in New Orleans.  The witnesses were in New Jersey.

11   Everybody knew going in that those depositions -- they are

12   outside the subpoena power of the court.  It was absolutely

13   foreseeable that some of those witnesses wouldn't -- in fact,

14   really all of them that were requested and found to be needed by

15   contemporaneous transmission by Judge Fallon were going to be

16   outside of the subpoena power of the court, and they had been

17   deposed.  So this foreseeability thing is really not a thing.

18   It's certainly not in the *Vioxx* factors.

19             And with regard to -- even if it were a factor, which

20   it's not, it's certainly not foreseeable that Mr. Berger would

21   change his testimony in very substantive ways time after time,

22   trial after trial.

23             Now, the issue of reading his testimony, let's talk

24   about that for a minute.  I think everybody knows that that is

25   way less effective than an actual live witness, either by video

1    or otherwise.  But how would the reading of the testimony work

2    with the exhibits, the demonstratives that are being used?  It's

3    really unfair to suggest that now we just get to read his

4    testimony to do this.

5              In EHK, 3M brought Mr. Berger to Pensacola.  We

6    subpoenaed him when he was here, and we got him in our

7    case-in-chief.  He has been brought.  He is coming again.  He is

8    clearly within their control.  It's clear prejudice.

9              And with regard to the issue of -- that Mr. Beall

10   raised about the time constraints in response to Your Honor's

11   question about maybe we could use the opportunity of a trial to

12   record his testimony, there are time constraints.  And with

13   regard to this particular trial coming up, we are certainly

14   under some time constraints on both sides, I believe, to do

15   that.

16             But one of the things that I did propose to Judge

17   Rodgers in the context of these de bene esse depositions is we

18   could potentially do it in her courtroom live without a jury.

19   And that could potentially be done -- I think the Judge

20   indicated if it could be done in December, she might be able to

21   do it in December.  Obviously, she's not available until the end

22   of November.

23             So, we are certainly willing to do whatever the Court

24   would want us to do.  I think it's critical that we do get both

25   of these witnesses that are both in the control of 3M.  I do

1    believe, based upon their paying for Mr. Fallon and Mr. Falco's

2    lawyer, that 3M is paying Mr. Bates.  So, if they are paying

3    Mr. Bates, they must have some control over him.

4            For all of those reasons, I think in this unique

5    circumstance, with the largest MDL in history, and the

6    importance that we all know that these bellwether trials have,

7    that a minor inconvenience of six or seven days out of their

8    lives, when they were working or are still working for 3M for

9    decades and decades, overseeing a product that involves hundreds

10   of thousands of plaintiffs, justifies the need to have them

11   testify remotely.

12           THE COURT:  Thank you, Mr. Aylstock.

13           It's an interesting issue.  I see the dynamics going

14   on here.  Here is what I am going to do, and here are the

15   reasons why.

16           You know, I have to read Rule 43(a) not in a vacuum.

17   I have got to take account of that this is, indeed, an MDL and

18   the particular individuals plaintiffs are asking to subpoena so

19   they can testify via remote means.  And I say that as a

20   qualifier because what I am not saying is, Oh, this is an MDL,

21   and that means each side, whenever they want -- I guess you have

22   to get permission from the Court -- but on any witness, under

23   43(a) you can simply subpoena them and have them show up to the

24   nearest available courthouse and testify.  I am not saying that.

25           But the reality is Mr. Berger and Mr. Myers, but

1    Mr. Berger in particular, are very important witnesses.  You

2    know, Mr. Berger was -- I think I used the word "a key witness"

3    in this case.  He was involved in the development of the

4    earplug.  But early on in the case when discovery was

5    percolating, he was the main guy.  He was the 30(b)(6).  3M made

6    the decision to ride on his shoulders as one of their primary

7    spokespersons.

8            Mr. Berger, although according to his affidavit he

9    says he is no longer consulting, has been paid a boatload of

10   money, so he is not just a fact witness.  He is not some guy

11   that just happened to be there when they were developing these

12   earplugs.

13           I know he has testified live in all of the trials, but

14   the one where he testified remotely -- and I recognize, because

15   no one knows where this MDL is heading, you know, three years

16   from now are we going to be talking about, you know, we are on

17   trial number 412 in this case?  You know, are these like the

18   tobacco cases that they go on forever?  I don't know the answer

19   to that question, but I do know right now we are in the

20   bellwether process.  And I don't want to lose sight of the

21   purpose of the bellwether process, and that is so that both

22   sides can have an opportunity of fairly representing --

23   presenting representative cases.

24           You know, we have some defense picks and plaintiff

25   picks and Court picks.  There are some differences among the

1    plaintiffs.  But these trials are supposed to be the opportunity

2    for the parties to sort of air out their best arguments so each

3    side can assess the strengths and weaknesses of their respective

4    positions.

5              And, in my view, not having or depriving the jury of

6    the benefit of the testimony of these witnesses live, albeit by

7    remote means, really deprives the jury of getting the full

8    picture here.

9              I know my decision is guided by Rule 43, and as

10   Mr. Beall correctly points out, it is a focused and limited

11   inquiry.  It is not a blanket inquiry.

12             Certainly, if you looked at the collection of cases

13   where courts in MDLs, and just individual cases, have dealt with

14   43(a), it is probably not as restrictive as the comments to the

15   rules would suggest, and that is because technology has moved

16   forward.

17             We have all become better and more agile since the

18   pandemic hit.  This case is a primary example.  We were -- not

19   we, but you all went forward and were able to take discovery in

20   the middle of a pandemic, and, you know, develop testimony, and,

21   you know, did a pretty good job.  There have been some quirks in

22   the system, but, for the most part, it's worked pretty well.

23             The knee-jerk reaction to, Oh, my gosh, how are we

24   going to do testimony remotely? isn't that compelling now as it

25   might have been a number of years ago.  So that certainly makes

1    me lean towards permitting the remote testimony of these

2    witnesses.

3                I am not blind to the *Vioxx* factors.  I know they were

4    used by Judge Fallon.  But there is a lot of wisdom in looking

5    at the *Vioxx* factors.  Some of them, as Mr. Beall pointed out,

6    are nonfactors, you know, for example, the complex multiparty,

7    multistate nature of the litigation.  It's an MDL.  Of course

8    that's important.

9                But one of the most important factors in the *Vioxx*

10   factors is the apparent tactical advantage as opposed to any

11   real inconvenience to the witness.  And, in my view, that is

12   precisely what's going on here.

13               3M has made the strategic decision that they believe

14   presenting the testimony of Mr. Berger, who two years ago they

15   thought was going to be their main guy -- they think it doesn't

16   help them.  And that is one of the reasons why 3M, in my view,

17   is resisting having Mr. Berger, in particular, and Mr. Myers

18   maybe to a certain degree, not present their testimony live.

19   You know, maybe Mr. Berger has helped 3M.  Maybe he hasn't.  I

20   am not sure.  But certainly in my view, he may not have been the

21   type of witness that 3M envisioned early on in the case.

22               And you have a real asymmetry here.  You know, the

23   plaintiffs, they come to trial.  They are subject to live

24   cross-examination.  And 3M, for tactical reasons -- they are

25   entitled to make the best strategic decisions the lawyers think

1    will be the best for their client.  But we have now had six or

2    seven trials and you know there is no -- there is no live

3    witnesses.

4              The only live person that has shown up has been

5    Mr. Berger, and if you take Mr. Berger out of the equation we

6    are going to have trials where it's a bunch of lawyers for 3M

7    putting spin on what they think the evidence shows without an

8    opportunity for the plaintiffs to try to cross-examine them and

9    develop facts different from what is being suggested to the

10   jury.

11             So I think it is prejudicial to the plaintiffs not to

12   have the opportunity of having Mr. Berger testify.  I understand

13   he provides testimony on a lot of facts dealing with the

14   development of the earplug and the testing, and all of that.

15   And there is probably somewhat less testimony as a pure expert.

16             But, you know, it's not lost on me he is a consultant.

17   This is not some guy who just worked at 3M his whole career and

18   he's now retired and he's being burdened by being dragged back

19   into this.  He is a consultant.  He made the decision to accept

20   the arrangement with 3M.  As I mentioned, he was paid a lot of

21   money.  And now either he, or 3M, or both, have decided they

22   don't want to do it anymore.  To me that's not a compelling

23   reason to allow him to sort of unilaterally drop out of this

24   litigation.

25             So I am going to grant the plaintiffs' request to

1    allow both Mr. Berger and Mr. Myers to be subpoenaed under Rule
2    43(a) so that they can appear remotely at the trials referenced
3    in the motion, but subject to the following guidelines, because
4    I do have to be cognizant, in particular, of any burden on
5    Mr. Berger because he is more of a third party than Mr. Myers
6    is.  And that is that the testimony of Mr. Berger, when he will
7    present his testimony by remote means, will be after he is
8    subpoenaed, will be coordinated with Mr. Berger's counsel, and
9    then with Mr. Myers', with 3M's counsel, in order to provide
10   both deponents with plenty of advance notice.  And I will expect
11   counsel to work with both deponents so that their testimony
12   would be presented with the least inconvenience to each of them.
13          So this is not going to be, you know, you subpoena
14   Mr. Berger and the plaintiffs says Berger testifies Tuesday
15   morning, you know, at 9 o'clock.  Be at the courthouse, or
16   wherever the remote testimony is being taken, and Mr. Berger has
17   some personal conflict at the time.  I would expect that
18   counsel, to the extent you are able to within the confines of an
19   ongoing trial, be able to present the testimony so it is the
20   least inconvenient for the two deponents.
21          In addition, I am going to require that the plaintiffs
22   give as much advance notice as reasonably possible as to when
23   the testimony, if at all, would be used in a particular trial.
24          Now, one of the thoughts that I had had was to
25   simply -- let's -- I am trying to think of what's the next trial

```
 1    after Blum.
 2              MR. AYLSTOCK:  Palanki and Camarillorazo, Your Honor.
 3              THE COURT:  Okay.  So, Palanki.  One of the thoughts
 4    was -- because it would be presented via Zoom in the
 5    courtroom -- that would be the remote transmission, or maybe you
 6    pick something else.  As I mentioned, Zoom has the ability, of
 7    course, to record that testimony.
 8              Initially I was thinking you would record their
 9    testimony in maybe the first two trials in November, and then
10    for the trials after that you could simply use that testimony.
11    But I am not ordering that at this point.
12              Mr. Beall has raised enough concerns about the details
13    of how that would happen that I do think it ultimately is an
14    issue that the parties and the Court would have to think
15    through, and the Court might need to have briefing on that
16    issue.
17              But what I would like you all to do is, at least for
18    the first two trials, assuming you are going to use Zoom, to
19    activate the Zoom recording feature, or however you do that, so
20    that we do have a recording of the testimony from the first two
21    trials.  And then at that point, after those first two trials --
22    and I will deal with the idea of those two trials in a moment --
23    after you have the recorded testimony, if in, let's say, the
24    subsequent trials the plaintiffs want to have, quote, live
25    testimony from both Mr. Berger and Mr. Myers at those trials,
```

1   and the defendant and/or Mr. Berger's independent lawyer believe

2   there is a compelling argument why that recorded testimony can

3   and should be used in subsequent trials, you all know how to

4   file motions.  You can file a motion.  And if the defendants

5   want that to happen, and the plaintiffs do not want that to

6   happen, a motion can be filed.  It can be briefed.  And the

7   Court can resolve it.

8           There may be a chance that if that testimony is

9   recorded, that both sides agree for trials after that that using

10   the recorded testimony works.  But there maybe be specific

11   details, and possibly technological reasons, why one or both

12   sides would not want to use the recorded testimony.  And we have

13   touched on a few of -- how to shield the jury from the fact that

14   the witness is testifying in another case.  And then there may

15   be specific reasons in an individual case why the recorded

16   testimony would not be appropriate to use in those cases.

17          And I say that because -- and I said this in my Baker

18   order -- certainly the testimony of Mr. Berger has evolved.

19   That is certainly one of the other reasons why I believe the

20   plaintiff should have an opportunity to present their live

21   remote transmission testimony to the jury.

22          I mean, just on the issue of whether Mr. Berger told

23   Dr. Ohlin about the test results, I think it evolved from, "I

24   talked to Dr. Ohlin regularly."  I think he originally said, "I

25   have been unable to identify anything in writing, but I talked

1   to him on a regular basis.  But I may have talked to him.  I

2   don't recall.  It was so long ago," to I think most recently he

3   said, "Yeah, I told him."  I know he didn't say exactly that,

4   but that was sort of the gist.

5           So the testimony, you know, certainly has evolved, and

6   that is, in my view, one of the important reasons also to allow

7   the remote -- live remote transmission testimony of Dr. Berger

8   and Brian Myers as well.

9           Just to be clear, this doesn't mean it's a blanket

10  ruling that any witness for any reason can be presented -- can

11  be presented live.  Nor does my ruling mean this is going to be

12  the modus operandi for the Group D cases.  So this motion that's

13  been filed -- I identified the cases at the beginning of the

14  hearing -- are all Group B and Group C cases.  They are not

15  Group D cases.

16          And as I said in the Baker order, this MDL does not

17  mean that Mr. Berger has to testify in perpetuity.  There is

18  certainly going to have to be accommodations at some point down

19  the road to present testimony to a jury, but, you know, that is

20  not -- this is not the time to end that.

21          So, I am going to grant the plaintiffs' motion.

22  Dr. Berger's motion to quash, as Mr. Bates points out, it's

23  really premature.  He hasn't been served, so I am interpreting

24  that as motion for protective order.  And I am going to deny

25  that.

1          But the subpoenas that will be issued, and the

2    testimony of Dr. Berger that will be presented, will be subject

3    to the guidelines and safeguards that I just enumerated: that

4    there will be good faith and reasonable efforts to give as much

5    advanced notice and to coordinate the presentation of his

6    testimony by remote transmission so that it does not burden or

7    over -- is not a total inconvenience to Mr. Berger.

8          I understand he is retired, so he probably doesn't

9    have the same business deadlines that others might have, but he

10   does have a personal life.  And, you know, he is -- his mission

11   in life is not to be at the beck and call of the day and time

12   when the plaintiffs want him to testify.  So I really expect

13   counsel to attempt to work that out in a reasonable manner.

14         And then we will look down the road about the recorded

15   testimony.

16         So the next trial, I guess, is Palanki, so I am going

17   to direct that you record the remote transmission testimony of

18   Dr. Berger and Mr. Myers in the Palanki case.

19         What's up directly after that?

20         MR. AYLSTOCK:  Camarillorazo is going on at the same

21   time in Tallahassee, Your Honor.

22         THE COURT:  That's Judge Walker's case.

23         So why don't you record the testimony in both of those

24   cases?  Use the Zoom feature.  You hit record, and you've got

25   people that will be able to do that so we will have full

1    recorded testimony from both of those witnesses.

2           And then in the subsequent trials I am not ordering

3    the plaintiffs to use that recorded testimony, but you then have

4    real recorded testimony.  Both sides can assess whether they

5    would want to use it or not want to use it.

6           And to the extent there is disagreement on that, that

7    can be presented to the Court and the Court can then make a very

8    particularized determination of whether it makes sense to be

9    able to use the recorded testimony, or if it's really not a

10   great idea.

11          Now, the recorded testimony, of course, you know the

12   witness isn't sitting in the courtroom on the witness stand.

13   They are remote.  So the jury just gets to see that.  But based

14   on the questioning of counsel, and depending on what the answers

15   are, and that kind of thing, it might not be appropriate to use

16   the recorded testimony, or it might be a great surrogate to use

17   in subsequent trials.  I just don't know.  You have to do it so

18   both sides, and the Court if necessary, can look at it and see,

19   if there is resistance to using it, what is the problem.

20          Because, as Mr. Beall pointed out, we don't have full

21   briefing on that.  That is not relief that the plaintiffs asked

22   for in their motion.  And it was simply an idea I thought of.

23   So we will have to fully explore that if necessary down the road

24   after those first two trials.

25          What is the trial after --

1          MR. BEALL:  Your Honor?

2          THE COURT:  Go ahead, Mr. Beall.

3          MR. BEALL:  I just wanted to -- on that last topic, in

4     addition to not being part of the relief requested, I, frankly,

5     have never looked into the rules and don't know the rules about

6     when it's proper to record a federal court proceeding.  I know

7     that's a hot-button topic among the judiciary and has been for

8     years.  To the extent the Court is directing that the parties

9     essentially record the trial testimony, I would ask the Court to

10    allow a chance to look into that and to brief it if necessary.

11    I want to make sure we don't -- give us a chance to at least

12    address that part of your ruling.  I know you have not issued a

13    written ruling yet -- I assume it will follow -- and I wanted to

14    make sure that we can look at that before we make that the

15    actual law in this particular case.  I just wanted to make sure

16    we are not -- we have -- we are not -- we know what we are doing

17    and doing it correctly.

18         THE COURT:  Cameras in the courtroom and all of that,

19    which is probably not a problem, but, you know, there may be

20    some other evidentiary issues that none of us are really

21    addressing at this point.  So I guess that's a point well-taken.

22         So I will not make that part of my ruling that the

23    parties have to record Palanki and Camarillorazo.  But what I

24    will ask the parties to do is to discuss it, and if both sides

25    do not mutually agree that there is no problem in doing it, I am

```
 1    going to ask the parties by -- today is Friday -- by Thursday of
 2    next week to file a brief on that issue, in -- either in support
 3    of or in opposition to recording.
 4            So at this point, without knowing more, I don't want
 5    to order the parties to record testimony.  And there is some
 6    problem in doing that with regard to recording the federal
 7    proceedings.  I don't think it's a problem if the Judge grants
 8    permission, but I don't know.  So I will rely on the parties to
 9    enlighten me on that.
10            But there also might be some evidentiary roadblocks to
11    using recorded testimony from one trial to another.  I am not
12    talking about how you shield the jury from the fact that the
13    testimony is from another trial.  There may be other evidentiary
14    roadblocks that we have not discussed.  And, obviously, I have
15    not thought about.
16            Mr. Aylstock, I haven't heard from you on the
17    recording.  What is your view on recording the testimony of
18    Dr. Berger and Mr. Myers in the next two trials that are
19    scheduled?
20            MR. AYLSTOCK:  I don't see why we wouldn't.  And,
21    ultimately, I don't think it would be ordering the parties to do
22    it because we don't have control of Zoom.gov.  I think it's
23    simply the record function would need to be applied by the court
24    personnel on both of those when it happened.  And, you know,
25    happy to brief it, but I don't see any harm in recording it.
```

1          The use of it, of course, can be briefed, and

2   whether -- but it would be a shame to lose that opportunity.

3   If, in fact, it doesn't get recorded in real time, then it's

4   gone, whereas it's not -- I mean, we don't have our own -- the

5   way I understand your order, we are not going to have our own

6   cameras in the courtroom.  The Zoom.gov will record it.  So it's

7   really not up to us.  It's just a suggestion to the Court's --

8          THE COURT:  That's a good point, that, you know, I am

9   not ordering the parties to record it.  It's going to be on

10  Zoom.gov, so it will be coordinated by court personnel.

11         So for those two trials the record function on Zoom of

12  Dr. Berger and Mr. Myers' testimony, to the extent they testify,

13  will be activated.  And then, Mr. Beall, to the extent you

14  believe there are problems with doing that, or legal issues you

15  believe the Court should address before doing that, I will rely

16  on you to file a motion and a brief before that happens so the

17  Court can address it.

18         But in the absence of you filing a motion educating

19  the Court on why we should not record, we will go ahead and

20  activate the recording feature on Zoom.gov.

21         I am not taking any position with regard to whether

22  the testimony can and should be used in trials after these two

23  trials.  But we would then have two recorded, live remote

24  transmission testimonies of these witnesses.  And if that turned

25  out to be a viable option down the road, we would have that

 1   available.  If it doesn't, no harm, no foul.

 2          MR. BEALL:  Judge, just to make sure I understand the

 3   last nuance there, a couple minutes ago you talked about the

 4   briefing on Thursday on this issue.

 5          Are you now saying it is going to be recorded unless

 6   we affirmatively file a brief to stop it, in which case is

 7   Thursday the deadline for that?

 8          THE COURT:  Well, Thursday is actually -- the deadline

 9   would theoretically be when we turn the recording on, but

10   certainly you wouldn't want to wait until then.

11          When is Palanki scheduled to start?

12          MR. BEALL:  November the 1st or 2nd, whatever that

13   Monday is.

14          THE COURT:  That's not next week.  It's the week after

15   next.

16          MR. BEALL:  Exactly.  It's 10 days from today on both

17   of them.

18          THE COURT:  Okay.  So then, yeah, let's stick with

19   that Thursday deadline.  So if you believe -- you 3M defendants

20   believe that the testimony in Palanki and Camarillorazo should

21   not be recorded, you will need to file something by Thursday,

22   and I can take a look at it, or Judge Rodgers can take a look at

23   it.

24          Just so you are clear, you don't need to -- if you are

25   concerned about the evidentiary use of that testimony in

1  subsequent trials, you do not need to brief that.  You will have

2  an opportunity to do that as those trials go forward.

3          This is simply if you think there is a legal

4  impediment to the recording of that testimony.  That's what I

5  need to hear about no later than Thursday.

6          MR. BEALL:  Understood.  Thank you.

7          THE COURT:  Okay.  Mr. Aylstock, anything else on

8  behalf of the plaintiffs?

9          MR. AYLSTOCK:  Nothing from us, Your Honor.

10         Thank you.

11         THE COURT:  Okay.  Mr. Beall, anything else on behalf

12 of your clients?

13         MR. BEALL:  Nothing from me, Your Honor.

14         THE COURT:  And, Mr. Bates, anything else on behalf of

15 Mr. Berger?

16         MR. BATES:  As I understand your ruling, he is to wait

17 for a subpoena; and, secondly, that your ruling today is without

18 prejudice to his coming back to Your Honor after he is called,

19 or not, and testifies, or not, in the two cases starting in

20 November?

21         THE COURT:  Yes.

22         You know, if they subpoena your client -- I am not

23 sure your client has to wait for the subpoena -- but they have

24 got to subpoena him.  Your client, after he gets subpoenaed, and

25 after they have made good-faith, reasonable efforts to

1    coordinate with his schedule when he would testify -- you know,

2    if it turns out they want him to testify and that's the morning

3    of his mother's funeral, by all means you can file a motion for

4    protective order and the Court would address that promptly.

5         But I'm somewhat hopeful we will not get to that point

6    in that the trial lawyers representing the plaintiffs in each of

7    these particular cases will operate both in good faith, be

8    reasonable, and take into account your client's particular

9    schedule.

10        Like, for example, I know from your affidavit that

11   your client is supposed to go to North Carolina to receive an

12   award for something on a day.  That would certainly not be

13   appropriate if they tried to force your client to testify on the

14   day he was to get that award.

15        MR. BATES:  I was referring, Your Honor, to the trials

16   after the two trials that start in November.  There are trials,

17   I think, in December, January, and February.

18        Is your ruling without prejudice to our coming back to

19   Your Honor with respect to those later trials, depending what

20   happens with the November trials?

21        THE COURT:  Well, you know, it's open in that regard,

22   and that is why from those first two trials the testimony is

23   going to be recorded.

24        If there is a compelling argument that the recorded

25   testimony would be as good as the live testimony, you know, you

```
 1    can file and 3M may come back and say, you know, We're in trial

 2    number five down the road from here, and on behalf of our

 3    client -- or 3M comes back and says, This is crazy, having him

 4    show up remotely.  They have got the live testimony.  It's been

 5    the same in the last three trials.  There is really no change,

 6    no nuance here, and try to convince the Court that I should do

 7    something different for those -- for those later trials.  So I

 8    am not precluding that.

 9              So the motion right now is to have permission under

10    43(a) to subpoena your client and Mr. Myers for these trials,

11    and that permission is granted and subject to the caveat that

12    the parties make good-faith and reasonable efforts to coordinate

13    the time, date, and place of the presentation of the remote live

14    testimony.

15              MR. AYLSTOCK:  We will certainly do that, Your Honor,

16    and coordinate through Mr. Bates and Mr. Beall.

17              I guess to shortcut things, are either of you in a

18    position to accept service of the subpoena, or should we track

19    them down?  And I think one idea would be we can probably -- you

20    know, the subpoena needs to have a date and time.  I would like

21    to be able to coordinate that with you in advance, and then

22    serve it on counsel as opposed to the witness.  But, of course,

23    that's up to y'all.

24              MR. BEALL:  I can't do that right now, Brian.  I

25    certainly can't agree to that without talking to the higher-ups
```

```
 1   in my chain of command.  So, as for Mr. Berger, I will defer to
 2   Mr. Bates.
 3            MR. BATES:  As to Mr. Berger, I am not authorized to
 4   accept anything on his behalf at this time.
 5            THE COURT:  Mr. Aylstock, what I thought you would --
 6   and I knew that was going to be the answers.  So what I thought
 7   you would do on your subpoena is you would put the date of --
 8   the trial date, where they are to show up for remote
 9   transmission, you know, the local courthouse or wherever is
10   going to be the facility where they would testify from, and you
11   would simply put on the subpoena the exact date and time of
12   appearance will be coordinated with the witness through counsel,
13   you know, something along those lines.  But I understand on a
14   subpoena you have got to put a date and time certain.
15            MR. AYLSTOCK:  Yeah.  We will be happy to do that.  I
16   just didn't want an objection that if, you know -- and certainly
17   we will coordinate if there is any issue with either of the
18   witnesses.  That sounds like a reasonable way to proceed.  I
19   didn't want an objection.  If we put a TBD that usually doesn't
20   work.  I wanted to give specificity and so forth.
21            THE COURT:  I think that would work.
22            Okay.  Thank you all very much.
23            Have a good day.
24       (Proceedings concluded at 12:19 PM on Friday, October 22,
25   2021.)
```

1                          * * * * * * * *

2              I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.
3   Any redaction of personal data identifiers pursuant to the
   Judicial Conference Policy on Privacy are noted within the
4   transcript.

5

6   /s/ Lisa C. Snyder                      10/25/2021

7   Lisa C. Snyder, RPR, CRR                Date
   Official U.S Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25