## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to: *Guillermo Camarillorazo*, 7:20cv098 *Joseph Palanki*, 3:19cv2324 *Theodore Finley*, 7:20cv170 *Carlos Montero*, 7:20cv067 *Carter Stelling*, 7:20cv143 | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## ORDER[1]

This Order resolves the parties' remaining motions to exclude expert testimony and opinions, in whole or in part, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993), for the Trial Group C cases. *See* ECF Nos. 2042, 2051.

### I.    Legal Standard

Rule 702, as explained by *Daubert* and its progeny, governs the admissibility of expert testimony. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Under Rule 702 and *Daubert*, district courts must act as "gatekeepers" to ensure the reliability and relevancy of expert testimony. *Id.* (quoting *Daubert*, 509 U.S. at

---

[1] The Court assumes the parties' familiarity with the nature of this multidistrict litigation, the claims and defenses, and the current evidentiary record. Thus, this Order sets out only what is necessary to explain the Court's rulings.

589).  Expert testimony is reliable and relevant—and, therefore, admissible—when the following criteria are met: (1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is "sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *Id.*  The Eleventh Circuit refers to these criteria separately as "qualification, reliability, and helpfulness," *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate," *Quiet Tech. DC-8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).  The party offering the expert has the burden of showing, by a preponderance of the evidence, that each of these requirements is met.  *Rink*, 400 F.3d at 1292.

To meet the qualification requirement, a party must show that its expert has sufficient "knowledge, skill, experience, training, or education to form a reliable opinion about an issue that is before the court." *Hendrix ex. Rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (citing Fed. R. Evid. 702) ("*Hendrix II*"), *aff'g* 255 F.R.D. 568 (N.D. Fla. 2009) ("*Hendrix I*").  Importantly, if a "witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis

for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments). The qualifications standard for expert testimony is "not stringent" and "[s]o long as the witness is minimally qualified, objections to the level of [his] expertise [go] to credibility and weight, not admissibility." *Hendrix I*, 255 F.R.D. at 585.

To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue. *Frazier*, 387 F.3d at 1261-62. The reliability analysis is guided by several factors, including: (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique is generally accepted in the relevant community. *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786. "[T]hese factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech.*, 326 F.3d at 1341. The court's focus must be on the expert's principles and methodology, not the conclusions they generate. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. The test for reliability is "flexible" and courts have "broad

latitude" in determining both how and whether this requirement is met. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999).

Finally, to satisfy the helpfulness requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985). Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).

"Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded [under Federal Rule of Evidence] 403." *Frazier*, 387 F.3d at 1263 (internal citations excluded). "Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming," or if it is otherwise unfairly prejudicial. *Id*. "Indeed, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Id*. "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors,

and, therefore, . . . district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Id.*

When scrutinizing the reliability, relevance, and potential prejudice of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate factfinder. *Frazier*, 387 F.3d at 1272. The court's gatekeeping role "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). Only the jury may determine "where the truth in any case lies" and the court "may not usurp this function." *Frazier*, 387 F.3d at 1272. Thus, a court may not "evaluate the credibility of opposing experts" or the persuasiveness of their conclusions, *Quiet Tech.*, 326 F.3d at 1341; instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence," *Frazier*, 387 F.3d at 1272.

## II.   **Defendants' Experts**

Plaintiffs move to exclude the testimony and opinions, in whole or in part, of the following experts proffered by Defendants—Drs. Derek Jones, Jennifer LaBorde, Douglas Jacobs, Robert Collins, and Michael Seidman.   The Court addresses the challenges in turn.

## A.      Drs. Derek Jones and Jennifer LaBorde

Drs. Derek Jones and Jennifer LaBorde ("Jones-LaBorde") have worked together for twenty years in the Department of Otolaryngology and Audiology at the Medical Center Clinic in Pensacola, Florida. Dr. Jones is the Chairman of the Ear, Nose, and Throat and Facial Plastic Surgery Department and Dr. LaBorde is the Director of Audiology at the clinic. They jointly offer a case-specific opinion regarding Plaintiff Stelling's hearing impairments, and Dr. LaBorde alone offers a general opinion regarding the etiology of hearing loss, tinnitus, and other hearing disorders. Plaintiffs challenge several aspects of Drs. Jones and LaBorde's opinions, which the Court addresses in turn.

### 1.  Impairment Ratings

Jones-LaBorde opine that Stelling has a 0% permanent impairment rating for hearing loss based on the 1996 Florida Uniform Permanent Impairment Rating Schedule ("FUPIRS"). Jones-LaBorde Rep. (Stelling), ECF No. 2051-13 at 9, 23. In the Trial Group A and B cases, the Court excluded Jones-LaBorde's substantially similar FUPIRS-based opinions under Rules 702 and 403 "because they [were] unhelpful, and any probative value [was] substantially outweighed by a danger of confusing the jury." *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19md2885, 2021 WL 765019, at *11 (Feb. 28, 2021); *see also* ECF No. 1910 at 23-24. So too here. "FUPIRS is a [disability rating] tool designed for setting

workers' compensation benefits for Florida workers" and is not typically used in any other context. *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 765019, at *11. In short, Stelling's FUPIRS permanent impairment rating does "not have a valid scientific connection to the pertinent inquir[ies]" in this litigation, and thus, grappling with the limitations of the FUPIRS method will unduly complicate the jury's role. *Id.* Consistent with the Court's prior rulings regarding FUPIRS, Jones-LaBorde's permanent impairment rating opinion for Stelling is excluded.

Jones-LaBorde also use other handicap and compensation schemes[2] to opine that Stelling has a 0% hearing impairment rating, and Dr. LaBorde discusses these same schemes in her general report. Jones-LaBorde Rep. (Stelling), ECF No. 2051-13 at 18; LaBorde Rep., ECF No. 2051-12 at 8-10. Neither Dr. Jones nor Dr. LaBorde uses these impairment rating formulas in their clinical practice, and Dr. Jones conceded in his deposition that hearing impairment rating schemes were developed for workers' compensation and social security cases. Jones Dep., ECF No. 2051-15 at 30:20-33:18; LaBorde Dep., ECF No. 2051-14 at 40:5-42:14. Thus,

---

[2] American Medical Association's Binaural Hearing Impairment (estimating hearing disability/handicap); ASHA Task Force for Definition of Hearing Handicap (determining hearing handicap for workers' compensation purposes); and Alabama, Kentucky, and Indiana's workers' compensation statutes. *See* W. Dixon Ward, *The American Medical Association/American Academy of Otolaryngology Formula for Determination of Hearing Handicap*, 22 AUDIOLOGY 313, 313 (1983) ("[A]ll formulae to rate handicap are based on assumptions of a more or less arbitrary nature. A dozen such assumptions are shown to underly the formula of the American Medical Association/American Academy of Otolaryngology.").

Jones-LaBorde's opinions based on other impairment rating schemes do not have a valid scientific connection to Plaintiff's case and must be excluded. *See Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1231 (11th Cir. 2009) (quoting *Daubert*, 509 U.S. at 591–92).

## 2. Other Hearing Disorders

In her general report, Dr. LaBorde discusses several hearing disorders, including central auditory processing disorder, hyperacusis, and misophonia. LaBorde Rep., ECF No. 2051-12 at 15-16. She does not, however, diagnosis a particular plaintiff with these disorders nor does she opine that any plaintiff has been diagnosed with such disorders. *Id.*; LaBorde Dep., ECF No. 2051-14 at 93:19-25. Plaintiffs move to exclude Dr. LaBorde's opinion as unhelpful because central auditory processing disorder, hyperacusis, and misophonia are not at issue in any of the cases in which she is involved. ECF No. 2051 at 13-14. In the Court's view, the admissibility of these opinions will depend on their helpfulness and fit in the context of a particular case and trial. In cases where an individual plaintiff has been reliably diagnosed with central auditory processing disorder, hyperacusis, or misophonia— whether by Dr. LaBorde herself, or by another medical or audiological expert—Dr. LaBorde's general expert testimony about these disorders will be admissible to provide relevant context and insights on the conditions. However, Dr. LaBorde's central auditory processing disorder, hyperacusis, and misophonia opinions must be

excluded as unhelpful and misleading in cases where the plaintiff has not been reliably diagnosed with these conditions.

## B.    Dr. Douglas Jacobs

Dr. Douglas Jacobs is a psychiatrist and part-time associate professor at Harvard Medical School, with more than forty-five years of clinical experience evaluating and treating psychiatric patients in private practice. Dr. Jacobs offers case-specific opinions regarding how Plaintiffs Finley and Montero's hearing injuries impact their mental health. Plaintiffs challenge several aspects of Dr. Jacobs' opinions, which the Court addresses in turn.

### 1.    Finley's Hearing Impairments and Mental Health[3]

Dr. Jacobs offers opinions about Finley's tinnitus diagnosis and concludes that his tinnitus symptoms were "described totally differently" after the start of this litigation. Jacobs Rep. (Finley), ECF No. 2051-37 at 53. Finley moves to exclude Dr. Jacobs' opinions regarding Finley's tinnitus diagnosis and symptoms because he is not an otolaryngologist, neurotologist, or audiologist. ECF No. 2051 at 36. The Court agrees and also finds the opinions unhelpful. Dr. Jacobs is unqualified to, and thus may not, offer any opinion on the existence or cause of Finley's hearing injuries,

---

[3] In his case-specific report for Finley, Dr. Jacobs rebuts Drs. Axelrad, Pollock, Arriaga, and Spankovich's opinions. *See* ECF No. 2051-37 at 5-6. Plaintiffs have withdrawn their designations of Finley's case-specific experts Drs. Axelrad and Pollock. ECF No. 2051-36 at 2. Thus, the relevance and helpfulness of Dr. Jacobs' opinions will depend on the evidence presented at trial.

or otherwise report on what is documented in Finley's medical records with respect to their etiology. *See* ECF No. 1910 at 22-23; *see also* ECF No. 2218 at 53. Additionally, merely restating and comparing how Finley's tinnitus symptoms are described in his medical records would be unhelpful and inadmissible under Rule 403 because it does not provide any insight or analysis beyond what the jury can read from the records themselves. However, Dr. Jacobs has offered a minimally sufficient basis and methodology for his opinion regarding the impact of Finley's hearing impairments on his mental health issues. He reviewed Finley's medical and service records and explained how and why their contents support his conclusion that Finley's hearing impairments are not the cause of, nor do they worsen, his mental health issues. Jacobs Rep. (Finley), ECF No. 2051-37 at 5. Observations of this nature are fairly within the scope of Dr. Jacobs' expertise. Last, Dr. Jacobs' rebuttal opinion that this litigation, rather than Finley's hearing injuries, has exacerbated Finley's mental health issues is excluded consistent with the parties' joint stipulation. *See* ECF No. 82-8 at 4.

### 2. Montero's Tinnitus and PTSD

Dr. Jacobs opines there is no evidence that Montero's alleged tinnitus has caused or worsened his PTSD. Jacobs Rep. (Montero), ECF No. 2051-34 at 5. Montero argues that Dr. Jacobs did not apply any expertise or methodology in forming his opinion, and that his testimony would be unhelpful because his report is

devoted to reciting content from Montero's medical and service records. ECF No. 2051 at 31-35. Subject to certain limitations, the Court disagrees.

Dr. Jacobs has offered a minimally sufficient basis and methodology for his opinion regarding the absence of a relationship between Montero's tinnitus and PTSD. He demonstrably reviewed Montero's medical and service records and explained how and why their contents support his conclusion that Montero's tinnitus is not the cause of, either initially or in aggravation of, his PTSD. Of particular note to Dr. Jacobs, the records contained no indication that Montero had ever previously told a health care provider that his PTSD symptoms were triggered or exacerbated by his tinnitus. Jacobs Rep. (Montero), ECF No. 2051-34 at 5. Observations of this nature are fairly within the scope of a psychiatrist's expertise. Factual disagreements with the bases and persuasiveness of Dr. Jacobs' conclusions about Montero's tinnitus and PTSD bear on their weight, not admissibility. To the extent Dr. Jacobs did not consider why Montero may have been reluctant to report his tinnitus and PTSD while he was still serving, that criticism may be appropriately addressed through cross-examination. *See Quiet Tech. DC-8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003).

With that said, Dr. Jacobs' testimony will be limited in several respects. He is wholly unqualified to, and thus may not, offer any opinion on the existence or cause of Montero's hearing injuries, or otherwise report on what is documented in

Montero's medical records with respect to their etiology. *See* ECF No. 1910 at 22-23; *see also* ECF No. 2218 at 53. Dr. Jacobs is not an otolaryngologist, neurotologist or audiologist, and he has no specialized training or experience in those fields. Thus, Dr. Jacobs lacks any reliable basis for commenting on the existence or cause of Montero's tinnitus.

Additionally, during his deposition, Dr. Jacobs testified there is no evidence that Montero's PTSD and tinnitus have negatively impacted his life, Jacobs Dep., ECF No. 2051-35 at 153:14-16, however, this opinion was not included in Dr. Jacobs' report or otherwise previously disclosed. Rule of Civil Procedure 26(a)(2)(B)(i) requires that an expert's written report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." If a party fails to provide information as required by Rule 26(a), that party "is not allowed to use that information to supply evidence at a trial, unless the failure was substantially justified or is harmless." *Hughes v. GEICO Gen. Ins. Co.*, 2017 WL 7000273, at *2 (M.D. Fla. Aug. 31, 2017), *decision clarified on reconsideration*, 2018 WL 490506 (M.D. Fla. Jan. 19, 2018). Here, Dr. Jacobs failed to include his opinion about how PTSD and tinnitus generally impact Montero's life in his report, and Defendants have not shown that the failure was substantially justified or is entirely harmless. Thus, Dr. Jacobs may not testify at trial about how PTSD and tinnitus impact Montero's life. Last, Dr. Jacobs is precluded from referencing Montero's marital

issues, including alleged instances of domestic disputes and abuse, because testimony of this nature is highly prejudicial and not relevant to how Montero's tinnitus impacts his PTSD. Jacobs Rep. (Montero), ECF No. 2051-34 at 7.

## C. Dr. Robert L. Collins[4]

Dr. Robert L. Collins is a board-certified neuropsychologist with a clinical practice at the Neurocognitive Specialty Group in Houston, Texas. He offers a case-specific opinion regarding Finley's cognitive and psychiatric impairments. Specifically, Dr. Collins opines that Finley does not have a neurocognitive disorder and that Finley possibly engaged in symptom amplification and overreporting.[5] Collins Rep. (Finley), ECF No. 2051-40 at 12, 19.

First, Finley moves to exclude Dr. Collins' opinions because he failed to apply a reliable methodology and significant portions of his report merely summarize Finley's medical records. ECF No. 2051 at 39. The Court disagrees. Dr. Collins' opinions are based on Finley's neuropsychological and psychiatric records, an in-person neuropsychological evaluation, and his experience and expertise, which is

---

[4] In his report, Dr. Collins rebuts Drs. Axelrad and Pollock's opinions. *See* ECF No. 2051-40. Plaintiffs have withdrawn their designations of these case-specific experts. ECF No. 2051 at 41. Thus, the relevance and helpfulness of Dr. Collins' opinions will depend on the evidence presented at trial.

[5] Finley asserts that Dr. Collins must prove intent in order to diagnose Finley as a malingerer. ECF No. 2051 at 39. However, Dr. Collins did not diagnose Finley as a malingerer in his report, and Dr. Collins testified that he is not diagnosing Finley with malingering. ECF No. 2196-48 at 155:25-156:6. Dr. Collins therefore will not offer that opinion.

enough under Rule 702. Finley next argues that the validity tests performed by Dr. Collins are unreliable and lack a credible scientific foundation; however, Finley does not provide any facts or scientific literature to support this assertion. The Court notes that Finley's case-specific experts also conducted performance validity measures during their evaluations of Finley and that such measures are routinely used in the neuropsychology field to determine whether test performance is accurate. Collins Rep. (Finley), ECF No. 2051-40 at 4, 11-15. To the extent Finley asserts that Dr. Collins used unreliable validity tests, nowhere does he explain how or why a particular test is flawed. Finley's arguments that Dr. Collins disregarded certain test results and cherry-picked testing data may be properly addressed through cross-examination. *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 372 (M.D. Fla. 2018) ("If [d]efendants believe that the basis for [the expert's] opinions is insufficient, they can explore that with [the expert] on cross examination and argument for the benefit of the trier of fact."). Last, Finley asserts that Dr. Collins violated the parties' agreed testing protocol by using a white noise machine during Finley's neuropsychological evaluation. ECF No. 2051 at 40. However, the protocol for Finley's evaluation is silent as to whether use of a white noise machine is permitted, and Dr. Collins testified that using a white noise machine is standard practice in neuropsychological evaluations. *See* ECF No. 2051-42 at 2-4; ECF No. 2196 at 42. To the extent Finley believes that the white noise machine improperly

altered the testing environment, this argument would go to the weight of Dr. Collins'
opinions rather than admissibility. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422
(5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an
expert's opinion affect the weight to be assigned that opinion rather than its
admissibility and should be left for the jury's consideration."). Dr. Collins is also
permitted to base his opinions on the behavioral observations he made during
Finley's evaluation. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts
or data in the case that the expert has been made aware of or personally observed.").

### D.    Dr. Michael Seidman

Dr. Michael Seidman is a board-certified otolaryngologist and neurotologist.
He currently serves as the Director of Otologic/Neurotologic Surgery and the
Medical Director of Wellness for AdventHealth Celebration in Kissimmee, Florida
and is a professor of Otolaryngology-Head and Neck Surgery at the University of
Central Florida. Dr. Seidman offers a medical causation opinion for Plaintiff
Montero. Montero challenges several aspects of Dr. Seidman's opinions, which the
Court addresses in turn.

### 1.    Hearing Difficulty is Unrelated to Noise Exposure

Dr. Seidman opines that Montero's hearing difficulty is not the result of
cochlear injury from noise exposure. Seidman Rep. (Montero), ECF No. 2051-43 at
16. Montero argues that Dr. Seidman's opinion is inadmissible because it is mere

speculation and not based on scientifically valid principles, reasoning, or methodology. ECF No. 2051 at 42. Specifically, Montero points to Dr. Seidman's deposition testimony that noise "could have" contributed to the changes in Montero's hearing over time but that he cannot say for certain how much change is due to noise as opposed to other factors such as age or genetics. Seidman Dep., ECF No. 2051-44 at 97:19-101:3. The Court disagrees with Montero because Dr. Seidman's opinion is that there is no evidence of a noise-related injury and Montero's hearing is normal for his age. ECF No. 2196 at 47. Dr. Seidman's opinion is based on Montero's audiometric testing records, an in-person IME conducted by Dr. Seidman, and Dr. Seidman's experience and expertise, which is enough under Rule 702.

There is one aspect of Dr. Seidman's noise exposure opinion that must be excluded, however. During his deposition, Dr. Seidman pointed to the absence of a "noise notch" as evidence that Montero does not have a noise-related hearing injury. Seidman Dep., ECF No. 2051-44 at 106:1-20. However, no "noise notch" opinion was included in Dr. Seidman's report or otherwise previously disclosed. Rule of Civil Procedure 26(a)(2)(B)(i) requires that an expert's written report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." If a party fails to provide information as required by Rule 26(a), that party "is not allowed to use that information to supply evidence at a trial, unless the failure

was substantially justified or is harmless." *Hughes v. GEICO Gen. Ins. Co.*, 2017 WL 7000273, at *2 (M.D. Fla. Aug. 31, 2017), *decision clarified on reconsideration*, 2018 WL 490506 (M.D. Fla. Jan. 19, 2018). Here, Dr. Seidman failed to include his opinion regarding the noise notch in his report, and Defendants have not shown that the failure was substantially justified or is entirely harmless. *See* Seidman Rep. (Montero), ECF No. 2051-43 at 5. Therefore, Dr. Seidman will not be permitted to testify at trial about the absence of a noise notch in Montero's audiograms.

## 2. Montero's Hearing Scores Are Normal for His Age

Dr. Seidman opines that Montero's hearing loss is "essentially non-existent and no worse than expected for his age." Seidman Rep. (Montero), ECF No. 2051-43 at 18. Montero argues that this opinion is inadmissible because Dr. Seidman did not analyze the level of hearing loss that is expected for someone of Montero's age. ECF No. 2051 at 43. The Court disagrees. Dr. Seidman reviewed Montero's audiometric testing records, conducted an in-person IME, and found that Montero's results were as good, if not better, than an average fifty-year-old without noise-induced hearing loss. Seidman Rep. (Montero), ECF No. 2051-43 at 16; ECF No. 2196 at 45. Dr. Seidman's opinion is based on his decades of experience assessing and treating patients' hearing loss, *Jones v. Novartis Pharms. Corp.*, 235 F. Supp. 3d 1244, 1256 (N.D. Ala. 2017) ("Experts are permitted to draw conclusions from a set of observations that are based on their extensive and specialized experience."),

together with age-correction tables published by OSHA, which detail the levels of age-related hearing loss that can be expected for different ages. ECF No. 2051 at 43. Montero's challenge to the bases and sources of Dr. Seidman's opinion impact the weight, and not the admissibility, of his opinion, and thus are more appropriately addressed during cross-examination.[6] *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 372 (M.D. Fla. 2018) ("If [d]efendants believe that the basis for [the expert's] opinions is insufficient, they can explore that with [the expert] on cross examination and argument for the benefit of the trier of fact.").

### 3. Medications

Dr. Seidman opines that Montero has been prescribed ototoxic medications that "might be responsible" for his hearing injuries. Seidman Rep. (Montero), ECF No. 2051-43 at 20. Montero argues that Dr. Seidman has no scientific basis on which to opine that such medications contributed to his hearing injuries. ECF No. 2051 at 45. The Court agrees. No valid scientific evidence has been presented to show that Montero's medications are or were ototoxic such that they could have contributed to or caused his hearing impairments. *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d at 1307 (discussing the "well-established" Bradford Hill analysis

---

[6] Even if Dr. Seidman had not relied on the OSHA tables to form his opinion, this argument would go to the weight of his opinion rather than admissibility. *Id.*; *see Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").

that guides a scientific inquiry into whether an observed association represents a "true cause-effect relationship"). In fact, Dr. Seidman does not cite to *any* scientific literature in support of his opinion. Seidman Rep. (Montero), ECF No. 2051-43 at 20. Moreover, Dr. Seidman only opines that the medications "*might*" be responsible for Montero's hearing problems, and he testified that it is not his opinion that the medications caused Montero's hearing issues. *Id*. (emphasis added); Seidman Dep., ECF No. 2051-44 at 399:20-401:10. Consequently, Dr. Seidman's opinion that ototoxic medications might be responsible for Montero's hearing injuries is unreliable and unhelpful and must be excluded under Rules 403 and 702.

### 4.    Head Trauma and Traumatic Brain Injury ("TBI")

Dr. Seidman opines that Montero's tinnitus is likely caused by Montero's past TBI and history of head trauma. Seidman Rep. (Montero), ECF No. 2051-43 at 17. Montero argues that Dr. Seidman's opinion is inadmissible because he is not qualified to opine on the existence or extent of Montero's TBI.[7] The Court disagrees because Dr. Seidman is not diagnosing Montero with a TBI or offering any opinions regarding the severity of Montero's TBI. ECF No. 2196 at 49. Instead, Dr. Seidman relies on Montero's medical records reflecting a history of head traumas and a formal TBI diagnosis in 2017. Seidman Rep. (Montero), ECF No. 2051-43 at 13-14, 17. Dr.

---

[7] ECF No. 2051 at 46; Seidman Dep., ECF No. 2051-44 at 379:17-19 ("I'm not an expert in TBI."). Montero does not challenge Dr. Seidman's opinion that there is a relationship between head trauma and tinnitus.

Seidman properly relied on that diagnosis as a factual basis for his opinion on the relationship between Montero's tinnitus and head trauma. *Haller v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1295 (M.D. Fla. 2009) ("[T]he Court does not deem it necessarily fatal that an expert medical witness has relied on medical records alone to reach a specific causation opinion."). Any objections to Dr. Seidman's level of expertise with TBIs goes to the weight of his opinion, not admissibility. *See Hendrix*, 255 F.R.D. at 585.

### 5.    CAEv2 Did Not Contribute to Hearing Injuries

According to medical records, Montero experienced temporary tinnitus after experiencing an IED blast in 2007. Seidman Rep. (Montero), ECF No. 2051-43 at 16. Dr. Seidman opines that Montero's tinnitus following the IED blast cannot be attributed to any alleged defect in the CAEv2. *Id.* Montero argues that Dr. Seidman has no scientific basis for this opinion because he has not evaluated the alleged defect of the CAEv2 and his report contains no opinions on whether the CAEv2 is defective. ECF No. 2051 at 47. The Court disagrees. Due to Montero's proximity to the IED blast, Dr. Seidman opines that Montero was likely exposed to an impact noise of more than 140 dBP peak regardless of the hearing protection he used, Seidman Rep. (Montero), ECF No. 2051-43 at 17, and accordingly, in Dr. Seidman's opinion, the tinnitus Montero experienced after the IED blast could not have been prevented by a properly functioning CAEv2. *Id.* The fact that Dr. Seidman did not

examine the alleged defects in the CAEv2 to determine whether those defects contributed to Montero's tinnitus goes to the weight of his opinion not its admissibility. *In re Disposable Contact Lens Antitrust*, 329 F.R.D. at 372.

## III.   Plaintiffs' Experts

Defendants move to exclude the testimony and opinions, in whole or in part, the following experts proffered by Plaintiffs—Drs. Moises Arriaga, Christopher Spankovich, James Ezelle, James Hall, Mark Packer, and Lawrence Lustig.

Briefly, each expert relied primarily on the differential etiology method to link Plaintiffs' injuries to an alleged defect in the CAEv2. "Differential etiology is a medical process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining." *Hendrix II*, 609 F.3d at 1195. "A reliable differential etiology is performed in two steps." *Id*. "First, the expert must compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Id*. (internal quotes omitted). "Second, the expert must eliminate all causes but one" by "appl[ying] the facts of the patient's case to the list created in the first step in order to form an opinion about the actual cause of the patient's symptoms." *Id*. at 1197. The expert must provide scientifically reasoned explanations for rejecting alternative hypotheses, and "the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Id*. While a "differential analysis need not rule

out all possible alternative causes, [ ] it must at least consider other factors that could have been the sole cause of the plaintiff's injury." *Chapman v. Procter & Gamble Distrib.*, LLC, 766 F.3d 1296, 1309 (11th Cir. 2014) (internal quotes omitted).

### 1.    Finley

Drs. Moises Arriaga and Christopher Spankovich conducted differential etiologies for Finley.[8]

### a.    Drs. Moises Arriaga and Christopher Spankovich

Defendants challenge Drs. Arriaga and Spankovich's specific causation opinions for Finley on multiple grounds. More specifically, Defendants argue that the doctors' opinions are unreliable because: (a) neither provided a reliable basis for ruling out Finley's TBIs or his noise exposure while not wearing hearing protection; and (b) both lack a methodology and factual basis for opining that Finley has hyperacusis or misophonia. They also argue that Dr. Spankovich failed to adequately consider and rule out Finley's history of headaches as the source of his tinnitus, and that Dr. Arriaga cannot opine that Finley's hearing loss exacerbates his mental health issues. These arguments fail.

---

[8] Dr. James Ezelle, Finley's treating psychiatrist, offered opinions related to Finley's mental health. Plaintiffs have represented that they "do not intend to call" Dr. Ezelle as a witness in Finley's case. *See* Pl. Mot., ECF No. 2199 at 19 n.71. Therefore, Defendants' motion to exclude Dr. Ezelle's opinions is **DENIED AS MOOT**.

Each doctor ruled out unprotected noise exposure because Finley reported being vigilant about using hearing protection and was only exposed to noise without it on "extremely rare" occasions for the few seconds it took to "very efficiently and very quickly" insert the CAEv2, which would have resulted in "negligible to limited" unprotected exposure. *See* Spankovich Dep. (Sept. 2, 2021), ECF No. 2199-6 at 19-20; *see also* Arriaga Dep. (Sept. 12, 2021), ECF No. 2042-9 at 22. Regarding TBIs, the doctors concluded from Finley's medical records and deposition testimony that none of Finley's prior head traumas were sufficiently severe to produce hearing injuries. None of them required specific treatment beyond using super glue to close a laceration after he struck his head on a concrete stairwell. At least one previous doctor diagnosed Finley with a mild TBI from which he fully recovered.[9] According to Dr. Arriaga, and as discussed above, it is "highly unlikely and improbable" that a TBI is the cause of a person's hearing injuries where the TBI is mild and the person fully recovers. *See* Arriaga Dep. (Sept. 12, 2021), ECF No. 2042-9 at 12. Dr. Spankovich reached a similar conclusion, having also observed that none of Finley's head traumas coincided temporally with the onset of his hearing

---

[9] Dr. James Ezelle, Finley's treating psychiatrist—who has no expertise in diagnosing or treating either TBIs or auditory injuries, *see* Ezelle Dep., ECF No. 2042-13 at 4, 18-19 (testifying that he was not a neurologist or audiologist)—also testified that Finley "probably did" previously suffer a TBI, given his current issues with "adaptability," *see id*. at 19. This testimony does not undermine the reliability of the opinions of Dr. Arriaga (a board-certified otolaryngologist and neurotologist) that Finley's prior head trauma did not cause his hearing injuries.

loss and tinnitus.  *See* Spankovich Dep. (Sept. 2, 2021), ECF No. 2199-6 at 29-31,

83.  Relatedly, Dr. Spankovich ruled out Finley's history of headaches as the source

of his tinnitus because headaches (whether standard headaches, migraines, or just

being hungover) "can potentially exacerbate the perception of tinnitus" but they "do

not *cause* tinnitus."  *See id*. at 84. (emphasis added).  Because the doctors provided

more than "subjective beliefs or unsupported speculation" for their conclusions

about unprotected noise exposure, head trauma, and/or headaches, *see Hendrix II*,

609 F.3d at 1197, their differential analyses of these factors are reliable and

admissible.

Drs. Arriaga and Spankovich also offered reliable methodologies and factual

bases for opining that Finley has hyperacusis and misophonia.  Hyperacusis and

misophonia are forms of sound sensitivity.  Hyperacusis is a disorder of loudness

perception where ordinary environmental sounds are perceived as unbearably loud

and certain sounds evoke physical discomfort or pain.[10]  Misophonia is a disorder in

which specific sounds or types of sounds trigger abnormally strong emotional

reactions.[11]  Here, Drs. Arriaga and Spankovich opine that Finley suffers from both

---

[10] *See* Christopher Spankovich, *Tinnitus and Sound Sensitivity*, *in* AUDIOLOGY TREATMENT 328-61 (Jason A. Galster ed., 2019), ECF No. 2042-18 at 9.

[11] *See id*. at 10; *see also* Inge Jager *et al*., *Misophonia: Phenomenology, comorbidity and demographics in a large sample*, PLOS ONE 15(4), Art. No. e0231390 (Apr. 15, 2020), ECF No. 2199-15 at 3.

conditions.  Defendants argue that the doctors lack any reliable basis for their opinions.  This is incorrect.

Both doctors relied on Finley's reported auditory, physical and emotional symptoms, together with the results of his otoacoustic emissions and acoustic reflex testing confirming the existence of the type of noise-induced cochlear damage that can impact sound sensitivity, and his audiometry results (Uncomfortable Loudness Levels (UCL)/Loudness Discomfort Levels (LDL) and Most Comfortable Loudness Levels (MDL)) corroborating his complaints of sound sensitivity.  The doctors' opinions also were grounded in their specialized knowledge and clinical experience diagnosing hyperacusis and misophonia, as well as scientific literature on the disorders, which each doctor analyzed and discussed in the context of Finley's constellation of symptoms, his auditory system, and noise exposure history.  This evidence—including Finley's self-reported symptoms, several objective and behavioral measures of auditory dysfunction, and a body of peer-reviewed scientific support—provides a reliable factual basis for the doctors' opinions, which each reliably analyzed as part of their differential etiologies.  Any alleged inadequacies in Dr. Arriaga and Spankovich's analyses may be properly tested on cross-examination and through competing expert testimony.  *See Quiet Tech*, 326 F.3d at 1345.

Last, Defendants argue that Dr. Arriaga lacks qualifications, a reliable methodology and a factual basis for opining that Finley's hearing loss exacerbates his mental health issues.  The Court disagrees.  Dr. Arriaga's extensive training and experience in otology and neurotology, along with his decades in clinical practice treating and managing auditory injuries of patients with comorbid sleep and mental health symptoms, provide him with ample expertise to evaluate the evidence in Finley's case and offer his opinion that auditory injuries aggravate Finley's sleep disorder, PTSD, anxiety and depression.  *See, e.g.*, *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19md2885, ECF No. 1910 at 46 (allowing an otolaryngologist/neurotologist and an audiologist to offer opinions that "[a plaintiff's] tinnitus exacerbates his sleep disturbances, PTSD and anxiety symptoms").  Dr. Arriaga articulated scientifically reasoned explanations of how his experience and the record evidence informed his opinion, as well as scientific literature linking both hearing loss and tinnitus with sleep difficulties and exacerbation of PTSD, anxiety and depression.  *See* Arriaga Rep. (General), ECF No. 2199-16 at 23-27; Arriaga Rep. (Finley), ECF No. 2199-11 at 25-26, 29.  This is sufficient under Rule 702 and *Daubert*.

### 2. Montero

Drs. James Hall and Mark Packer conducted differential etiologies for Montero.

### a.   Dr. James Hall

Defendants challenge Dr. Hall's specific causation opinion for Montero on grounds that he did not reliably rule out other hearing protectors, head injuries and age as potential causes of his hearing injuries.  The Court disagrees.   Regarding other hearing protectors, Dr. Hall acknowledged that Montero wore only single-sided, triple-flanged earplugs and foamies in basic training and from 1996 to 2001. However, according to Dr. Hall, the CAEv2 was Montero's "predominant and nearly exclusive hearing protection" while he was "exposed repeatedly to loud noises in the military" from 2001 to 2018, and it was within that period that Montero began experiencing a pattern of "decreased hearing sensitivity" (between 2003 and 2016) and "chronic tinnitus" (2010-2012).  *See* Hall Rep. (Montero), ECF No. 2199-17 at 5-6, 8.  Given the temporal relationship between the onset of Montero's alleged hearing injuries and his use of the CAEv2, Dr. Hall concluded that a lack of noise attenuation from the CAEv2 caused his hearing injuries.  This is an adequate and reliable basis for ruling out other hearing protectors.  *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19md2885, 2021 WL 765019, at *12 (N.D. Fla. Feb. 28, 2021).

Dr. Hall also reliably ruled out head injuries as a cause of Montero's injuries, based on Montero's medical and service records.  He concluded that Montero has never suffered head trauma of a nature and severity capable of producing permanent

hearing injuries.  *See* Hall Dep., ECF No. 2199-19 at 98-101.  While Montero was diagnosed with a mild TBI arising from his exposure (at some distance) to an IED blast, Dr. Hall explained that he did not lose consciousness, require medical treatment, or experience more than "momentary" and "transient" auditory symptoms in connection with that incident.[12]  *See id*. at 99.  This scientifically reasoned explanation, not premised on subjective beliefs or unsupported speculation, is an adequate basis for ruling out head trauma as a cause of Montero's hearing injuries. Defendants may disagree with Dr. Hall's assessment of the severity of Montero's head trauma, but that is a matter for the jury.

The same is true for Dr. Hall's consideration of Montero's age.  More specifically, Dr. Hall ruled out presbycusis (age-related hearing loss) because of the relatively young age when Montero's auditory symptoms first manifested and the fact that "[t]he pattern of his audiological findings . . . is not consistent with the aging process."  *See id*. at 104.  This scientifically reasoned explanation, which is supported by an adequate factual basis, is all that Rule 702 and *Daubert* require.

### b.    Dr. Mark Packer

Defendants challenge Dr. Packer's specific causation opinion for Montero on grounds that he did not reliably rule out age and other hearing protectors as causes

---

[12] Following the IED blast, Montero reportedly "noticed" tinnitus "for approximately 24 hours."  *See* Hall Rep. (Montero), ECF No. 2199-17 at 8.

of his hearing injuries, and they seek exclusion of Dr. Packer's future prognosis opinions for dementia and PTSD as speculative, and other portions of his opinions as impermissible state-of-mind opinions.  As to other hearing protectors, the Court disagrees.  Based on his interview with Montero, and his review of Montero's medical and service records, Dr. Packer concluded that Montero did not experience hearing-related problems following his military noise exposures while wearing foamies, single-ended, triple-flanged earplugs, and/or communication headsets for hearing protection between 1992 and 2001.  Rather, according to Dr. Packer, Montero's primary earplug was the CAEv2 from 2001 to 2018, which coincides temporally with "persistent" and "significant shifts from his baseline hearing" in both ears ear since 2002 (left ear) and 2006 (right ear), and also with his first perception of "steady" tinnitus in 2010.  *See* Packer Rep. (Montero), ECF No. 2199-23 at 24, 26.  In Dr. Packer's view, to the extent Montero wore other hearing protectors between 2001 and 2018, this use occurred too infrequently to attribute his hearing problems to those devices, particularly since the other devices demonstrably provided him adequate protection from hazardous noise in the past.  *See id*. at 35-36.  Having identified and explained a temporal relationship between the cause and effect of Montero's alleged injuries, and offered more than "unsupported speculation" as a basis for ruling out other hearing protectors, Dr. Packer's opinion satisfies Rule 702 and *Daubert*.

The same is true for Dr. Packer's consideration of Montero's age.  Dr. Packer ruled out presbycusis due to Montero's relatively young age when his hearing loss first manifested (in his 30s) and the nearly two decades long trend of demonstrated auditory damage that followed.  Dr. Packer explained that Montero's age of onset and pattern of hearing loss are inconsistent with the aging process, based on his extensive education and clinical experience, including his knowledge and experience with nomograms used to broadly predict age-related hearing threshold changes.  This is an adequate basis for ruling out natural aging as the cause of Montero's hearing problems.  Alleged weaknesses in the bases and sources of Dr. Packer's opinion impact its weight, not admissibility, and thus are more appropriately addressed during cross-examination.  *See Viterbo v. Dow Chem. Co*., 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."); *In re Wright Med. Tech. Inc., Conserve Hip Implant Prod. Liab. Litig*., 127 F. Supp. 3d 1306, 1325 (N.D. Ga. 2015).

Regarding future prognosis opinions on dementia and PTSD, the Court agrees with Defendants, but only in part.  Consistent with the Court's prior ruling on the issue, *see In re 3M*, 2021 WL 765019, at *34, which is incorporated by reference here, Dr. Packer may not testify that Montero "is at a higher risk for dementia based

on the early age of the onset of his auditory injuries," *see* Packer Rep. (Montero),
ECF No. 2199-23 at 37.  Dr. Packer has previously acknowledged that this opinion
is essentially speculative and that current scientific literature has not established a
causal relationship between dementia and noise-induced auditory injuries.  *See In re
3M*, 2021 WL 765019, at *34.  As to PTSD, however, Dr. Packer has not offered
future prognosis opinions at all.  According to Montero's records, on which Dr.
Packer relied, Montero has been formally diagnosed with PTSD.  *See* Packer Rep.
(Montero), 2199-23 at 28.  Dr. Packer properly relied on that diagnosis as a factual
basis for his opinion on the relationship between Montero's tinnitus and PTSD, and
he properly analyzed the impact of that diagnosis in the context of his extensive
training and experience in otology, neurotology and psychology.  *See In re 3M
Combat Arms Earplug Prod. Liab. Litig.*, 3:19md2885, 2021 WL 2028682, at *5-6
(N.D. Fla. May 11, 2021) (same regarding Dr. Packer's opinion on the relationship
between McCombs' tinnitus and PTSD).  Consequently, there is an adequate and
reliable basis for his opinions related to Montero's PTSD.

Last, Defendants argue that Dr. Packer impermissibly opines on Montero's
state-of-mind by offering opinions as to why (1) certain of Montero's medical
records do not reference hearing issues/tinnitus; (2) Montero continued using the
CAEv2 despite experiencing fit issues; and (3) Montero has not sought treatment to
mitigate the effects of his tinnitus.  The Court agrees that Dr. Packer generally may

not speculate about Montero's knowledge, intent, and/or motives. *See generally In re 3M*, 2021 WL 765019, at *42. However, Dr. Packer may describe his own impressions of Montero formed during his in-person examination and their discussion of Montero's medical and service history. Moreover, to the extent that Defendants question Dr. Packer about Montero's behavior with respect to alleged fit problems with the CAEv2 and/or his alleged hearing injuries, Dr. Packer may properly respond with his assessment of that behavior based on his own first-hand observations of Montero, the information reported in Montero's medical and service records, and his vast clinical experience treating service members with hearing injuries.

### 3.    Stelling

Drs. Lawrence Lustig and Christopher Spankovich conducted differential etiologies for Stelling.

### a.    Dr. Lawrence Lustig

Defendants argue that Dr. Lustig's specific causation opinion for Stelling fails to adequately account for Stelling's head injuries and the timing of his auditory symptoms. The Court disagrees. As to head injuries, Dr. Lustig reviewed Stelling's medical records related to head trauma, interviewed him about specific incidents, and ruled out all of the incidents as potential causes of Stelling's auditory dysfunction. More specifically, Dr. Lustig concluded that none of Stelling's prior

head traumas were of a nature and severity capable of producing hearing injuries, and none of them were immediately followed by the onset of hearing loss or tinnitus. Of particular significance to Dr. Lustig was Stelling's TBI assessment in 2015. While Stelling initially screened positive for a TBI, he subsequently underwent a full TBI evaluation, which resulted in a medical determination that Stelling had not suffered a TBI.  *See* Lustig Dep. (Aug. 17, 2021), ECF No. 2199-29 at 14, 16-17. Dr. Lustig was entitled to rely on that determination as part of his differential diagnosis.  Because Dr. Lustig provided a scientifically reasoned explanation for ruling out head trauma as a cause of Stelling's auditory injuries, his analysis satisfies *Daubert*.  Defendants' disagreement with Dr. Lustig's assessment of the severity of Stelling's prior head injuries is more appropriately addressed through cross-examination and the presentation of competing expert testimony.

Dr. Lustig also adequately considered and addressed the timing of Stelling's auditory symptoms relative to his use of the CAEv2.  Dr. Lustig acknowledged that Stelling's military entrance audiogram in March 2006 reflected a 30 decibel threshold at one frequency in one ear, but explained that Stelling's hearing was otherwise normal and that the 30 decibel response "[went] away completely" when Stelling was retested six months later.  *See* Lustig Dep. (Aug. 17, 2021), ECF No. 2199-29 at 24.  According to Dr. Lustig, Stelling reportedly then used the CAEv2 as his primary hearing protector while exposed to significant military noise from 2007

to 2010, which coincides temporally with his first perception of tinnitus in 2008 and of difficulties hearing in noise around that same time. *See* Lustig Rep. (Stelling), ECF No. 2199-32 at 13-14, 16-17. In light of this pattern, and the absence of documented pre-military noise exposure, Dr. Lustig concluded that a lack of noise attenuation from the CAEv2 was the cause of Stelling's alleged hearing injuries. Any alleged weaknesses in the factual underpinnings of those conclusions go to the weight and credibility of Dr. Lustig's opinion, not its admissibility. *See Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1285 (11th Cir. 2015); *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) ("[I]n most cases, objections to the inadequacies of [expert evidence] are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.").

### b.    Dr. Christopher Spankovich

Defendants argue that Dr. Spankovich did not adequately rule out head trauma as a possible cause of Stelling's hearing injuries. They also move to preclude Dr. Spankovich from testifying that Stelling's 2021 hearing test results reflect damage caused by the CAEv2 because, by 2021, Stelling had not worn the CAEv2 in more than a decade and any number of factors could have caused his hearing to change in the interim. As to the former, Dr. Spankovich offered a scientifically reasoned explanation for his opinion that head trauma did not cause Stelling's hearing loss and tinnitus. Like Dr. Lustig, Dr. Spankovich found it significant that Stelling

underwent a formal TBI evaluation that resulted in a medical determination that he had never suffered a TBI. Dr. Spankovich was entitled to rely on that determination as part of his differential diagnosis. He also relied on Stelling's other medical and service records which, in his view, established that Stelling has never suffered head trauma of a nature and severity capable of producing hearing injuries. This scientifically reasoned explanation, not premised on subjective beliefs or unsupported speculation, *see Hendrix II*, 609 F.3d at 1197, is an adequate basis for ruling out head trauma as a cause of Stelling's injuries.

As to Dr. Spankovich's reliance on pure tone audiogram and distortion product otoacoustic emissions conducted in 2021, Defendants' objections are readily rejected. The Court begins by observing that Defendants are not challenging the scientific reliability of the 2021 tests; rather, they disagree only with Dr. Spankovich's assessment of those exams and the conclusions that he draws from them. Significantly, Stelling's 2021 hearing tests are but one piece of the puzzle that Dr. Spankovich considered in differentially analyzing Stelling's alleged auditory injuries, along with Stelling's prior known audiological exams, medical records, and noise exposure history, as well as the relevant audiologic and medical literature. Dr. Spankovich provided scientifically reasoned explanations for ruling out genetics, presbycusis, post-military noise exposures, other hearing protectors, and numerous other factors as potential causes of the alleged auditory damage reflected in

Stelling's test results, including the 2021 exams.   This satisfies *Daubert*. Defendants' disagreement with Dr. Spankovich's conclusions about the 2021 exams may present fodder for cross-examination, but it is not a valid basis for excluding his opinions.

## IV.   Conclusion

Based on the foregoing, the parties' omnibus motions to exclude expert opinions under Rule 702 and *Daubert* in the Trial Group C cases, ECF Nos. 2042 and 2051, are **GRANTED IN PART and DENIED IN PART**, consistent with this Order.  All *Daubert* challenges for the Group C cases have now been resolved.

**SO ORDERED**, on this 16th day of November, 2021.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**