# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG LITIGATION
LIABILITY LITIGATION

This Document Relates to:
*James Beal*
Case No. 7:20-cv-00006

*Denise Kelley*
Case No. 7:20-cv-00153

*Jonathon Vaughn*
Case No. 7:20-cv-00134

*Luke Vilsmeyer*
Case No. 7:20-cv-00113

*Steven Wilkerson*
Case No. 7:20-cv-00035

CASE NO.: 3:19-MD-2885-MCR-GRJ

Chief Judge M. Casey Rodgers
Magistrate Judge Gary Jones

**PUBLIC VERSION - REDACTED**

## DEFENDANTS' OMNIBUS MOTION TO EXCLUDE PLAINTIFFS' GROUP D PUTATIVE EXPERT OPINIONS UNDER *DAUBERT* AND RULE 702 AND INCORPORATED MEMORANDUM

Defendants 3M Company and Aearo move pursuant to Rule 702 and *Daubert* to exclude the testimony and opinions, in whole or in part, of Plaintiffs' putative experts Moises Arriaga, Eric Bielefeld, Hamid Djalilian, Eric Gershwin, Lawrence Lustig, and Christopher Spankovich.  Specifically, Defendants move to exclude:

1.    Djalilian's causation and diagnosis opinion regarding Kelley.

2.      Gershwin's opinion that ████████████████ are not a potential cause of Kelley's hearing issues.

3.      Arriaga's causation and diagnosis opinion regarding Vilsmeyer.

4.      Spankovich's causation and diagnosis opinion regarding Vilsmeyer.

5.      Bielefeld's causation and diagnosis opinion regarding Vaughn.

6.      Lustig's causation and diagnosis opinion regarding Vaughn.

7.      Djalilian's causation and diagnosis opinion regarding Wilkerson.

8.      Spankovich's causation and diagnosis opinion regarding Wilkerson.

Defendants' Motion is based upon the attached Memorandum in Support; the complete files and records of this action; and such other matters and arguments as may come before the Court.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    DJALILIAN'S DIFFERENTIAL DIAGNOSIS REGARDING KELLEY IS UNRELIABLE. ...........................................................7

II.    GERSHWIN'S REBUTTAL OPINIONS REGARDING KELLEY ARE UNRELIABLE AND IRRELEVANT.................................12

III.   ARRIAGA'S CAUSATION OPINION REGARDING VILSMEYER IS UNRELIABLE.................................................13

IV.   SPANKOVICH'S VILSMEYER CAUSATION OPINIONS SHOULD BE EXCLUDED. ..............................................21

    A.    Hearing Loss Opinions Should Be Excluded.....................................21

    B.    Tinnitus Causation Opinions Should Be Excluded............................23

        1.    Vilsmeyer Had Tinnitus Before He Used The CAEv2.............................................................23

        2.    Spankovich Does Not Rule Out Alternative Causes Of Progressive Or Worsening Tinnitus. ......................24

            a.    ██████████████. ...................................24

            b.    ████████████████████████. ...............................24

V.    BIELEFELD'S DIFFERENTIAL ETIOLOGY OF VAUGHN IS UNRELIABLE.................................................26

    A.    ███. ..................................27

    B.    █████████. ..................................29

VI.   LUSTIG'S CAUSATION OPINION REGARDING VAUGHN IS UNRELIABLE.................................................31

VII.  DJALILIAN'S OPINIONS ABOUT WILKERSON SHOULD BE EXCLUDED.................................................34

A.     Djalilian's  Opinions  Relating ▮▮▮▮▮▮ Should  Be
       Excluded. ...................................................................34

B.     Djalilian's Differential Diagnosis Is Otherwise Unreliable.
       ....................................................................................36

       1.     ▮▮▮▮▮▮▮▮▮▮▮▮▮. ...........................................37

       2.     HPDs. ................................................................38

       3.     Occupational Noise. .........................................38

C.     ▮▮▮▮▮▮▮. .....................................................................39

VIII.  SPANKOVICH'S OPINIONS ABOUT WILKERSON
       SHOULD BE EXCLUDED. ..........................................39

A.     Spankovich's  Opinion  That  Any  CAEv2  Defect  Caused
       Wilkerson's Alleged Injuries Should Be Excluded. ...........39

B.     Spankovich's Differential Diagnosis Is Unreliable. ...........40

       1.     HPDs. ................................................................40

       2.     ▮▮▮▮▮. ..............................................................41

       3.     Occupational Noise. .........................................41

       4.     ▮▮▮▮▮▮. ............................................................42

C.     ▮▮▮▮▮▮. .......................................................................43

D.     ▮▮▮▮▮▮▮. .....................................................................43

E.     Vocational Opinion. ......................................................44

CONCLUSION ...................................................................44

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advent Sys. Ltd. v. Unisys Corp.*,
  925 F.2d 670 (3d Cir. 1991) .................................................................29

*Barber v. United Airlines*,
  17 F. App'x 433 (7th Cir. 2001) ..........................................................20

*Brown v. Burlington N. Santa Fe Ry. Co.*,
  765 F.3d 765 (7th Cir. 2014) ...............................................................37

*Cates v. Whirlpool Corp.*,
  2017 WL 1862640 (N.D. Ill. May 9, 2017).........................................20

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ..................................................16, 33, 46

*EEOC v. Freeman*,
  778 F.3d 463 (4th Cir. 2015) ...............................................................20

*Fernandez v. Spar Tek Indus., Inc.*,
  2008 WL 2185395 (D.S.C. May 23, 2008) ..........................................29

*Hendrix ex rel. G.P. v. Evenflo Co.*,
  609 F.3d 1183 (11th Cir. 2010) .....................................................*passim*

*Guinn v. AstraZeneca Pharms. L.P.*,
  602 F.3d 1245 (11th Cir. 2010) .....................................................*passim*

*Harris v. Brush Wellman Inc.*,
  2007 WL 5960181 (S.D. Miss. Oct. 30, 2007)....................................29

*Johnson v. Manitowoc Boom Trucks, Inc.*,
  484 F.3d 426 (6th Cir. 2007) ...............................................................16

*Kilpatrick v. Breg*,
  613 F.3d 1329 (11th Cir. 2010) ..............................................................7

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)..............................................................................12

*McDowell v. Brown*,
   392 F.3d 1283 (11th Cir. 2004) ...........................................................................12

*Moore v. Int'l Paint, L.L.C.*,
   547 F. App'x 513 (5th Cir. 2013) ..............................................................11, 17, 44

*Quattry v. Covington Specialty Ins. Co.*,
   2019 WL 7423548 (M.D. Fla. Oct. 30, 2019) ....................................................12

*Rimbert v. Eli Lilly and Co.*,
   2009 WL 2208570 (D.N.M. July 21, 2009), *aff'd*, 647 F.3d 1247
   (10th Cir. 2011)..................................................................................................11

*Scott v. Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016) .........................................................................12

*Zurich Am. Ins. Co. v. Hardin*,
   2020 WL 1150981 (M.D. Fla. Mar. 10, 2020) ............................................35, 36

## Rules

Fed. R. Civ. P. 26 ....................................................................................................44

Fed. R. Civ. P. 26(2)(B)(i) ................................................................................43, 44

Fed. R. Civ. P. 26(a)................................................................................................35

Fed. R. Civ. P. 26(a)(2)(B)(ii)................................................................................35

Fed. R. Civ. P. 37(c)(1)...........................................................................................36

Fed. R. Evid. 702 .............................................................................................29, 41

**MEMORANDUM IN SUPPORT OF MOTION**

Plaintiffs' putative Group D experts' specific causation opinions should be excluded, including because they failed to conduct proper differential diagnoses.[1] Differential diagnosis requires the expert to compile a "comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration" and "eliminate all causes but one." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1195 (11th Cir. 2010). An "expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Id.* at 1197; *see also Kilpatrick v. Breg*, 613 F.3d 1329, 1342–43 (11th Cir. 2010). The expert must "take serious account" of alternative causes, and provide "a reasonable explanation as to why he or she has concluded that any alternative cause suggested by the defense was not the sole cause of the plaintiff's injury." *Guinn v. AstraZeneca Pharms. L.P.*, 602 F.3d 1245, 1253 (11th Cir. 2010).

## I. DJALILIAN'S DIFFERENTIAL DIAGNOSIS REGARDING KELLEY IS UNRELIABLE.

Djalilian does not "take serious account" of Kelley's ████████████

████████, which can cause ███████████. Ex1, Psillas, *Audiological Patterns*,

---

[1] Internal quotation marks, citations, modifications (such as ellipses or brackets), and deposition objections are omitted from quotes unless otherwise indicated.

Audiol Neurotol (2021). ███████████████████████████

███████████████████████████████████

███████████████████████████████ Ex2,

Chatham Report 2. ████████████████████████

████████████████████████:



• ███████████████████████████ ██████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████

Kelley's facts are inconsistent with noise-induced ██████████. Kelley's military responsibilities involved processing supplies and equipment in warehouse and office settings. Ex5, Kelley Dep. 205:23-206:19. All her military audiology reports through March 1, 2011, ████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████ Ex7, D_A_Kelley-VA-001974. Notably, Kelley was pregnant and assigned to clerical work indoors and without significant exposure to noise prior to that audiogram. Ex5, Kelley Dep. 255:3-256:9, 358:15-23. Moreover, noise-

induced ██████████ typically leads to a "noise notch," meaning worsening thresholds at 3000 to 6000 Hz followed by a return to the normal range at 8000 Hz. Ex8, Humes, *Noise and Military Service* 21-22 (2006). ████████████

████████████ Ex9, Djalilian-Kelley Report 7 & ExD; Ex10, 11/17/2021 IME Audiometry Results; Ex11, Kelley Audiograms.

Djalilian cursorily dismissed ████████████████. Djalilian admits that ████████████████ *often* are associated with ██████████—a commonly accepted condition called ██████████████. Ex12, Yuen, ██████████ *in patients with systemic lupus erythematosus*, Lupus, 30(6):937-945 (2021); Ex13, Djalilian-Kelley Rebuttal 3 (citing Yuen article). But he asserts that "Kelley has ████████████████████████

████████████" and ████████████████████

██████ Ex9, Djalilian-Kelley Report 27. That is untrue. And Kelley's lack of testing underscores that ██████████████ cannot be ruled out.

Djalilian's rebuttal report does not fill the holes in his original one. The rebuttal report claims that Kelley "*did not and does not have any symptoms that would be* ████████████████████." Ex13, Djalilian-Kelley Rebuttal 3 (emphasis added). This conclusion ignores ████████████

████████████. Djalilian reached these conclusions only by ignoring evidence—ostensibly because he could not "extract" "useful

information" from the evidence, Ex14, Djalilian Dep. 212:15-213:15—as

demonstrated by the following examples.

- Djalilian would not agree—despite clear evidence—that █████████ ██████████████████████ *Id.* 158:12-18.

- When asked to agree that ████████████████████████████,
  Djalilian blithely asserted counsel would "need to ask those questions [of] a
  ██████████ expert." *Id.* 147:14-17.

- Defense counsel called Judge Herndon after Djalilian refused to answer basic
  questions like whether ████████████████████████████
  ███████ Ex15, 1-21-2022 Email from Horowitz to Judge Herndon; Ex14,
  Djalilian Dep. 242:18-243:12.   Even after Judge Herndon observed that
  Djalilian needed to more directly answer the question, Djalilian quibbled with
  the definition of ██████. Ex14, Djalilian Dep. 157:23-158:1, 161:10-12.

- He seized on an innocuous typo in a medical record—the word ██████ was
  misspelled as ███████████
  ████████████████████ Ex3, D_A_Kelley-VA-000187—to
  disclaim the ability to discern the record's meaning. Ex14, Djalilian Dep.
  190:11-18.

- Djalilian claimed a medical record about █████████████████
  ███████████████████████
  ████████████ *Id.* 189:12-19.

- Djalilian co-authored an article stating that ███████████████
  █████████████████████████████
  █████████████████████████████
  Djalilian now disclaims his own article, stating, "had I known that [] someone
  is going to show this to me in deposition fifteen years later [] maybe I would
  have paid paid attention and changed these words or something," adding, "I
  just don't know what deserves means." Ex14, Djalilian Dep. 119:12-120:5.

Djalilian's refusal to acknowledge evidence indicating ███████████

███████ falls short of the "serious account" required by Eleventh Circuit

precedent. *Guinn*, 602 F.3d at 1253.   A differential diagnosis "that inexplicably ignores material facts and relies only on selective evidence does not lead to a reliable opinion." *Rimbert v. Eli Lilly and Co.*, 2009 WL 2208570, at *20 (D.N.M. July 21, 2009), *aff'd,* 647 F.3d 1247 (10th Cir. 2011); *see also Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013).

Plaintiffs may contend that Djalilian ruled out ██████ when he opined that Kelley does not have ████████████████████████████████ and rather, ██████████████████████████████ Ex13, Djalilian Rebuttal 2.  This argument fails because ████████████████████



████████████████████, Ex9, Djalilian-Kelley Report 7; (ii) ████████ ████████████████████████████, *id.*; and (iii) ████████████ ████████████████████

Given "multiple risk factors that could have been the sole cause of" Kelley's hearing injuries, there is "substantial doubt" about Djalilian's differential analysis—particularly because he ignored those factors and is "unable to determine the relative risk of each factor." *Guinn*, 602 F.3d at 1257.  His opinions should be excluded.

## II.  GERSHWIN'S REBUTTAL OPINIONS REGARDING KELLEY ARE UNRELIABLE AND IRRELEVANT.

More than a month *after* the December 3, 2021 deadline for Kelley to disclose expert witnesses, Kelley disclosed a new expert witness, Eric Gershwin, ostensibly to rebut the opinions of Defendants' experts.  Rebuttal opinions "must meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016).  Gershwin falls short of these standards.

Gershwin purports to rule out ███████████████████ as a potential cause of Kelley's alleged hearing injuries, Ex18, Gershwin Rebuttal 7, despite Kelley's ██████████████████████████████. *Supra* at 8.  Gershwin's opinions should be disallowed because he did not employ "the same level of intellectual rigor that characterizes the practice of an expert" in his field. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).  Methodologies used "solely for purposes of litigation" are not reliable. *Quattry v. Covington Specialty Ins. Co.*, 2019 WL 7423548, at *9 (M.D. Fla. Oct. 30, 2019).

No ███████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████. Nor would

Gershwin have done so had he been treating Kelley instead of opining in this litigation.  In his clinical practice, Gershwin rules out ██████████████ ███████████████████ only after "a careful history and physical exam, along with selected laboratory testing."  Ex17, Wallace, ███████████████████████ ████████████████████████████████████████████████ ████; *see also* Ex18, Gershwin Report, ExA at 3 (relying on Wallace article).  To diagnose patients, Gershwin ordinarily ████████████████████████████ ████████████████████████████████████████████████ ███████████████████████ Ex19, Gershwin Dep. 58:6-62:22.  He also orders a battery of tests, ███████████████████████████████████████████ ████████████████████████████████. *Id.* 71:8-74:9.

For Kelley, Gershwin purports to rule out ██████████████████ with no testing, even though ██████████████████████████████████████████ ███████████████ *Id.* 64:12-21; 80:13-22.  Gershwin (who admits that he would ordinarily run such tests and perform an examination anyway) cannot show that he is applying principles and methods as comparable experts would in the field, and his opinions should be excluded.

## III.   ARRIAGA'S CAUSATION OPINION REGARDING VILSMEYER IS UNRELIABLE.

Vilsmeyer served almost seven years in the military and deployed twice to combat zones *before* he began using the CAEv2 in 2006.  Ex20, Vilsmeyer Dep.

87:20–24,  95:11–13,  116:6–24.  ████████████████████████████

████████████████████████████████████████████████████████

████████████ *id.* 144:19–25; 148:8–13, ██████████████████████

███████████████████████████ In 2010, █████████████████████

█████████████████████████ *Id.* 156:16-22; 162:16-20; 164:18-20. ████████████

████████████████████████████████████████████████████████

██████████ *Id.* 160:20–161:2; Ex21, L_F_Vilsmeyer-DOD Medical Records--001684. ██████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████. Ex22, L_F_Vilsmeyer-VA-000862-863; Ex23, L_F_Vilsmeyer VA 003411; Ex24, L_F_Vilsmeyer DOD Medical Records 000303; *see also* Ex20, Vilsmeyer Dep. 221:21-222:1.

Arriaga purports to "rule out" these potential causes of Vilsmeyer's ██████ ███████████ because, he says, Vilsmeyer's ███████████ are not temporally associated with his pre-2006 noise exposure, █████████████████████████. Ex25, Arriaga-Vilsmeyer Rebuttal 2.  But the record contradicts this chronology, and Arriaga has no medical or scientific basis to say otherwise.

The record establishes that Vilsmeyer's ██████████████ began *before* he began using the CAEv2. ██████████████████████████████

████████████████████████████████████████████████████████

14

██████████████████████████. Ex26, Arriaga-Vilsmeyer Report 8. Vilsmeyer's audiology expert, Spankovich, concedes that the cause of ██████████████████████ ██████████████████ before 2006 "could have been a factor relative to noise." Ex27, Spankovich Dep. 104:2–7; *see also id*. 107:23–108:5.

Nevertheless, Arriaga contends that ███████████████████████████ ██████████████████ Ex28, Arriaga Dep. 90:22-92:1, 92:2-17; Ex26, Arriaga-Vilsmeyer Report 29–30. Arriaga's only basis for this conclusion is that ██████████



████████████████████████████████████ Ex28, Arriaga Dep. 76:22-77:12; *see also* Ex26, Arriaga-Vilsmeyer Report 8 (Vilsmeyer audiograms).

Arriaga offered no authority for these arbitrary criteria, which allow Arriaga to ignore Vilsmeyer's pre-2006 ████████████ and "rule out" pre-CAEv2 noise exposure as a cause. The third criterion is flatly inconsistent with Arriaga's view that "temporary threshold shifts are indicative of permanent hair cell damage caused by toxic noise." Ex25, Arriaga-Vilsmeyer Rebuttal 1. No professional organization, learned treatise, or medical journal supports these criteria. Nor has Arriaga referred to these criteria in any other case in this MDL. His criteria exist nowhere but in *this*

*case* and thus are unreliable. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995); *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434-35 (6th Cir. 2007).

Moreover, Vilsmeyer's █████ also began *before* he began using the CAEv2 in 2006. ████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████ Ex29, L_F_Vilsmeyer-VA-000633. ████████████████████

████████████████████████████. Ex30, L_F_Vilsmeyer-DOD Medical Records-001357.

Notwithstanding these contemporaneous reports, Arriaga contends that ████

████████████████████████████████████████

████████████████████████████████████████

████ Ex25, Arriaga-Vilsmeyer Rebuttal 3.  The sole bases Arriaga offers for that characterization are that: (1) ███████████████████████████

████, Ex28, Arriaga Dep. 66:3-19 ("…████████████████

████████████"), and (2) Vilsmeyer said so, *id*. ("And I'm relying on how he's describing it ████████  Neither of these bases passes muster.

*First*, while ██████████████████████████████

██████████████████████.  Ex31, L_F_Vilsmeyer-DOD  Touhy

Response-000017.  As late as 2015, ███████████████████████████████████.

Ex32, L_F_Vilsmeyer-DOD Touhy Response-000010.  ███████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

    *Second*, Arriaga cannot simply disregard Vilsmeyer's contemporaneous statements in favor of statements made more than fifteen years later in the context of litigation.  *See, e.g.*, *Moore*, 547 Fed. App'x at 515 ("When an expert's testimony is not based upon the facts in the record but on altered facts and speculation designed to bolster [a party's] position, the trial court should exclude it.").  That is especially true because Vilsmeyer admits that he "struggle[s] a bit with [his] memory" and is "really bad with dates."  Ex20, Vilsmeyer Dep. 137:13-23; 239:19-25.

    *Third*, in multiple contemporaneous medical records, Vilsmeyer reported that ██████████████████████████████████████████████████████████, when he was *not* wearing the CAEv2.  Ex33, L_F_Vilsmeyer-DOD Medical Records-000271 (██████████████████████████████████████████████████████████ ██████████████████████████████████████████████  *see also* Ex21, L_F_Vilsmeyer-DOD Medical Records--001684; Ex20, Vilsmeyer Dep. 160:24–161:2.

    Yet Arriaga "rules out" ████████████████ as a cause of Vilsmeyer's ████████ ████████ because Vilsmeyer said otherwise.  Ex25, Arriaga-Vilsmeyer Rebuttal 3.

Arriaga does not provide any scientific or clinical reason to discount Vilsmeyer's contemporaneous reports and rely instead on a decade-old recollection given during litigation.  His only attempt at an explanation—that ███████████████████

███████████████████████████████████████████

████████████████████, Ex28, Arriaga Dep. 54:13-55:5—is "unsupported speculation".  *Hendrix*, 609 F.3d at 1197.

    *Fourth*, ██████████████████████████████████████,

which has nothing to do with noise at all—let alone any allegedly defective HPDs.

██████ is not solely caused by noise exposure.  Experts agree that in most patients,

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████

    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



. Arriaga, however, rules out █████

████████████████████ because ██████████████████████████

███████████████████████ Ex25, Arriaga

Vilsmeyer Rebuttal Report 2.  That is simply wrong and contradicted by the record.

Vilsmeyer experienced ██████████████████████,

years *after* he stopped using CAEv2.  Ex22, L_F_Vilsmeyer-VA-000862-63; Ex38,

L_F_Vilsmeyer-VA-003410-11; *see also* Ex20, Vilsmeyer Dep. 221:21-222:1.

This timing corresponds with ████████████████████████

███████████████████████████████████████████. Ex20, Vilsmeyer Dep. 190:15-191:4, 192:3-194:6, 195:8-25.

████████████████████████████████████████████████

███████████████████████████. Ex22, L_F_Vilsmeyer-VA-000862-863;  Ex23, L_F_Vilsmeyer VA 003411; Ex24, L_F_Vilsmeyer DOD Medical Records 000303; Ex22, L_F_Vilsmeyer-DOD Medical Records-000870, 977. ███████████████

██████████████████████████████████. Ex69, L_F_Vilsmeyer-VA-001014-1016. ██████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████. Ex22,  L_F_Vilsmeyer-DOD  Medical Records-000855-856; Ex22, L_F_Vilsmeyer-DOD Medical Records-000870.

"[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data." *EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (Agee, J., concurring) (collecting cases); *see also Barber v. United Airlines*, 17 F. App'x 433, 437 (7th Cir. 2001); *Cates v. Whirlpool Corp.*, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017).   Here, Arriaga ignores record evidence showing a temporal relationship between Vilsmeyer's hearing problems and ████████████████████. His differential etiology is unreliable, and should be excluded.

## IV.   SPANKOVICH'S VILSMEYER CAUSATION OPINIONS SHOULD BE EXCLUDED.

Spankovich's opinions should be excluded because he did not apply any reliable methodology to ruling out alternative causes of Vilsmeyer's claimed ███████ ███████ and ████████████ and other evidence inconsistent with his results-driven conclusions.

*First*, Spankovich's ████████ opinions should be excluded because they are based on a temporal assessment that ignores Vilsmeyer's documented ██████ ██ *years before* he ever used the CAEv2 and do not reliably rule out alternative causes, ████████████████████████████████.

*Second*, Spankovich's ██████ opinions should be excluded because uncontroverted medical evidence and admissions show that Vilsmeyer's t██████ onset also occurred *years before ever using the CAEv2.*  And any worsening or progression of ██████ is explained by alternative causes, including: ████████ ████████████████████████████ Ex39, L_F_Vilameyer-000002; Ex20, Vilsmeyer Dep. at 258:5-259:4; and (ii) ████████████████████ ████████████████, *supra* at 18-20.

### A.   ████████ Opinions Should Be Excluded.

Spankovich opines that Vilsmeyer's noise-induced ████████ manifested in ████████.  Ex40, Spankovich Report 13.  But Vilsmeyer's ████████ began *before* he first used CAEv2 in 2006.  All but one of ████████████████

███████████████████████████████████████, Ex26, Arriaga-Vilsmeyer Report 8, and Spankovich agrees that "[n]oise is a factor" he would "consider relevant" to ████████████ in that time.  Ex27, Spankovich Dep. 104:2–7; *see also id*. 107:23–108:5.

Moreover, Spankovich does not reliably rule out alternative causes for any additional ████████ post-CAEv2 use.  For example, Vilsmeyer was exposed to significant noise ████████ where he admittedly did not use CAEv2s, ████████ ███████████████████████████████████, also while not wearing the CAEv2s.  *Supra* at 13-15, 21.  Spankovich does not reliably rule out these apparent and straightforward causes of ████████, and instead says that Vilsmeyer "denied that the changes in hearing or ██████ perception were tied to any specific event."  Ex40, Spankovich-Vilsmeyer Rep. 7; *see also* Ex27, Spankovich Dep. 161:9-162:4.  But this does not "take serious account of other potential causes." *Guinn*, 602 F.3d at 1253.

Additionally, Spankovich offers no reliable methodology to rule out ████████ █████████████████████████████████████████████████████ Ex41, Tepe, █████████████████████████████████████ ████████████ (2020); █████████████████████████████████████ █████████████████████████████████████ The Court previously ████████████████████████████████████████████



Here, there is contemporaneous evidence of ████████ ████████, including before Vilsmeyer began wearing the CAEv2. *See* Ex29, L_F_ Vilsmeyer-VA-000634 (March 6, 2004 post-deployment health assessment); Ex30, L_F_ Vilsmeyer-DOD Medical Records-001358 (February 25, 2006 post-deployment health assessment).  Air Force documents indicate how much ████████ ████████.  Ex43, Proceedings of the 2011 AFMS Medical Research Symposium 12.

Spankovich did not mention, let alone reliably rule out, ████ in his initial or rebuttal report.  While he claims that he ruled out "████████ ████████," he does not explain why or how he did so.  Ex27, Spankovich Dep. 26:11-15.

**B.**    ████████ **Causation Opinions Should Be Excluded.**

**1.    Vilsmeyer Had** ████████ **Before He Used The CAEv2.**

As a gating issue, Vilsmeyer developed ████ *years before* he ever used the CAEv2.  *Supra* at 16.  To the extent his ████ could be related to ████████, Spankovich does not and cannot reliably rule out that the ████ was caused by noise exposures having nothing to do with the CAEv2.  He instead simply states that Vilsmeyer showed "████████" in 2006.  Ex44, Spankovich-

Vilsmeyer Rebuttal 3.  The failure to reliably address this temporal contradiction alone requires exclusion.  *Hendrix*, 609 F.3d at 1195.  Spankovich opines that Vilsmeyer's ███████████████████████████████████████████████."  Ex27, Spankovich Dep. 39:9-40:15.  But there is no record support for this, and the contemporaneous medical records reflect that ██████ began before CAEv2 use, and any marked progression came later and is attributable to other causes.

### 2. Spankovich Does Not Rule Out Alternative Causes Of Progressive Or Worsening ██████

#### a. ████████████████████.

Vilsmeyer's ███████████████████████████ is a glaring alternative cause for ████████████████, which Spankovich disregards on the basis that Vilsmeyer "did not tie" his ██████ "to that specific event that that was the thing that did it all"; Vilsmeyer "doesn't feel that that was an event that significantly altered his hearing or ██████ in a permanent way."  Ex27, Spankovich Dep. 65:24-66:20; 77:5-78:4; *see also* Ex40, Spankovich-Vilsmeyer Report 6-7.  That is factually false, *supra* at 17, and does not "take serious account of other potential causes."  *Guinn*, 602 F.3d at 1253.

#### b. ███████████████████████



The spike in Vilsmeyer's ████████████████████████—years *after* he stopped using the CAEv2 and ████████████████████████ ████████████████████████████████████████. *Supra* at 19-20. ████████

███████████████████████████████████████. *Supra* at 18-

20.  Spankovich does not provide "a reasonable explanation" to exclude ██████

██████ as the cause of Vilsmeyer's symptoms.  *Guinn*, 602 F.3d at 1253.

Spankovich admitted that ██████████████████████ can amplify

a patient's ██████ symptoms.  Ex27, Spankovich Dep. 53:25-54:7.  But he did not

consider ███████████████████████████████████

███████████████████████████████████████

███████████████████████████.  In rebuttal, Spankovich claims

to have ruled out ████████████ on three unreliable bases.

*First*, he opines that ████████████████████████████

████████████████████."  Ex44, Spankovich Rebuttal 2; *see also*

Ex27, Spankovich Dep. 52:13-54:5.  Spankovich identifies no objective, reliable, or

accepted methodology at all as to how he determined that ████████████████

██████ were not ████████████ aside from his ipse dixit.  *Guinn*, 602 F.3d at 1256.

*Second*, Spankovich relied on the ████████████████████

███████████████████████████████████████

██████████████ Ex44, Spankovich Rebuttal Rep. at 3.  Ex27, Spankovich Dep.

49:8-14; 61:15-62:4.  But Spankovich's reliance on the ██████████████ is

inherently unreliable because he ignored ██████████████████ (and does not

even seem to be aware they existed) and otherwise fails to provide any baseline by which to compare the ██████. Ex27, Spankovich Dep. 48:16-18; 49:1-2.

*Third*, ruling out ████████████████████████████████████████ ████████████████████████████████████████████ is unsupported by data or any methodology.  Spankovich admits that the binary presence or absence of ████████ cannot alone indicate the presence or absence of ████████.  *Id.* 57:12-18.  Spankovich's dismissal of the ████████ issue is based on circular reasoning.  He claimed he "did not have to rule [████████] out based simply on [████████████████], because it did not have ████████████████████████████████████████████."  *Id.* 58:24-59:3.  That is insufficient.  Spankovich failed to offer a "reasonable explanation" as to why he ruled out ████████ and his differential etiology opinion should be excluded.  *Guinn*, 602 F.3d at 1253.

## V.   BIELEFELD'S DIFFERENTIAL ETIOLOGY OF VAUGHN IS UNRELIABLE.

There is uncontested evidence that Vaughn's claimed ████ began around the same time he experienced ████████████████████ during his 2008 tour in Iraq.  Bielefeld purports to rule out ██ based on a mistaken understanding of the record ***he acknowledged*** during his deposition. Ex45, Bielefeld Dep. 97:7-13.  And he freely admits he did not consider ████████ based on an unsupported view that "████████████████████."  *Id.*

33:11-17.  Bielefeld is wrong on both the facts and the science.  Because Bielefeld did not "provide reasons for rejecting alternative hypotheses using scientific methods and procedure" or eliminate those hypotheses "on more than subjective beliefs or unsupported speculation," he did conduct a reliable differential etiology and his opinions should be excluded.  *Hendrix, Inc.*, 609 F.3d at 1197.



█    █.

Vaughn experienced ████████████████████

████████████████████████████████

████████████████████. Ex46, Vaughn Dep. 315:20-316:4; *id.* 255:5-22 ("I really didn't notice [████ that much until that one ██ ████. And it just stayed after that and didn't go away.").

Subsequently, ███████████████████████

████████████████████. Ex47, J_W_Vaughn-VA Touhy 2327-2330; Ex48, J_W_Vaughn-VA Touhy 3670-3673; Ex49, J_W_Vaughn-VA Touhy 4548-4551.  Any differential etiology of his ████ symptoms must take those ███████████████

████████████████████████████

████████████████████████████

"significantly" increase the likelihood that ████ will occur or get worse. *Id.* 842-

43; *see also* ████████████████████████████████████████████

████████████████████████████████████████████

Bielefeld admits he failed to rule out that Vaughn's ████ could have made his

preexisting ████ worse.  Asked, in "conducting your differential diagnosis of his

████ did you rule out ██████████████████ … that could have

made his preexisting ████ worse", Bielefeld responded, "***I don't believe that I***

***did.***"  Ex45, Bielefeld Dep. 107:5-11 (emphasis added).  That failure alone renders

Bielefeld's differential etiology unreliable.

Worse, Bielefeld's treatment of Vaughn's TBIs regarding the *onset* of his

████ is based on an admittedly erroneous reading of Vaughn's medical records.

At his deposition, Bielefeld admitted the sole reason he ruled out ███ as a potential

alternative cause of Vaughn's ████ was because Bielefeld mistakenly believed

the medical records did not include a formal diagnosis of ██████████████:

> Q.     And so in issuing your opinions in your report, the reason that you ruled out ████████████████████████
> ██████████████████████████████████████
> ██████ Is that fair?
>
> A.     I would say that that is fair.

*Id.* 75:5-13.  Bielefeld is flat wrong on this critical assumption:  Vaughn was, in fact,

██████████████████████.  Ex49, J_W_Vaughn-VA Touhy 4548-4551.

Confronted with that medical record, Bielefeld admitted his error:

Q.    Do you agree with me that ███████████████████████████
████████████████████████████████████████████████████

A.    Yes.

Ex45, Bielefeld Dep. 97:7-13; *see also id.* 90:9-22.

As the rationale for Bielefeld's differential etiology is contradicted by the record, it should be excluded. "An opinion based on false assumptions is unhelpful in aiding the jury in its search for the truth, and is likely to mislead and confuse" and so fails Rule 702. *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 682 (3d Cir. 1991); *see also Fernandez v. Spar Tek Indus., Inc.*, 2008 WL 2185395, at *6 (D.S.C. May 23, 2008); *Harris v. Brush Wellman Inc.*, 2007 WL 5960181, at *7 (S.D. Miss. Oct. 30, 2007).

**B.**    ████████████████████

Bielefeld's differential etiology is also unreliable because he failed to consider

████████████████████████████████████████████████████

███████████████████████████████████████. Ex46, Vaughn

Dep. 351:17-24; *see supra* at 18-19.

█████████████████████████████████████████████████

████████████████████████████████. Ex52, J_W_Vaughn-001241-

44; Ex46, Vaughn Dep. 255:5-22, 295:10-20, 307:21-308:4, 319:24-320:5.   The

timing of Vaughn's ████████████████████████████████████

██████████████████████████. Ex53, Sanchez & Rocha, █████████

29



But Bielefeld did not consider ▓▓▓▓▓▓▓ in his report, much less rule it out via any "reasonable explanation." *Guinn*, 602 F.3d at 1253; *see also* Ex45, Bielefeld Dep. Tr. 138:14–19.   Bielefeld belatedly opined in his deposition that "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓," Ex45, Bielefeld Dep. Tr. 33:11-17, a statement that is both absent from his report and contradicted by existing science.   *See* Ex53, Sanchez & Rocha, *Diagnosis and management* 1090; Ex54, Michiels, *Diagnostic Criteria* 2, 4, 7.   Ample scientific literature establishes that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).

Bielefeld admits that "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, Ex45, Bielefeld Dep. 174:13-175:7—all underscoring that his differential etiology lacks reliability.

Nor did Bielefeld reliably rule out ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Bielefeld speculated that ▓▓▓▓▓▓ did not exacerbate Vaughn's hearing issues because Vaughn cannot ▓▓▓▓▓▓▓. Ex45, Bielefeld Dep. 141:6-14.   But this

rationale is also absent from Bielefeld's report, and the standalone ability to

████████████████████████████████████████.  Ex54, Michiels,

*Diagnostic Criteria* 8; *see also* Ex27, Spankovich Dep. 57:12-59:14.  Bielefeld's

failure to consider ███████████ means that he cannot reliably opine as to why

Vaughn's ██████ may have worsened, and his ██████ opinions should be excluded.

## VI.    LUSTIG'S CAUSATION OPINION REGARDING VAUGHN IS UNRELIABLE.

Lustig commits the same error as Arriaga, *supra* at 16-17—he does not

reliably rule out that Vaughn's ██████ was caused by noise ***before*** he wore the

CAEv2.  There are multiple records, ***including Vaughn's own handwritten notes***,

establishing that Vaughn developed ██████ before ever entering the Army. Ex56,

VAUGHN-J-MDL2995-35PRAIL-00134-136.

Vaughn ████████████████ in 2004, two years before he joined the

military in 2006, Ex46, Vaughn Dep. 97:24-98:1, 159:20-25.  From 1999 to 2005,

Vaughn worked at several jobs in noisy environments—including as a s██████

████████████████████████████ Ex46, Vaughn Dep. 85:10-87:21.

Vaughn explained in his own words what health conditions he had when he filled

out his ████████ application in September 2004:



Ex56, VAUGHN-J-MDL2995-35PRAIL-00134, 136.  Thus, two years before he
ever entered the military or used the CAEv2, Vaughn repeatedly admitted that he
had "████████". *Id.*

Like Arriaga did with Vilsmeyer, Lustig ignores this contemporaneous, documentary evidence in favor of Vaughn's later self-serving statements. *See* Ex57, Lustig Dep. 67:2-13 (█████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

Lustig does nothing to "seriously account" for Vaughn's ██████████

██████. In his deposition, Lustig asserted that "████████████████████

█████████████████████████, *id.* 69:10-21, without providing any literature, evidence, or other support for that claim.  Lustig also speculates that if Vaughn had ██████ in 2004, ██████████████████████████████

███████████████████████████████████." Ex57, Lustig Dep. 68:2-11.  But Vaughn did not write that in his 2004 handwritten note.  Instead, he wrote that he had ████████████ sometimes—the same description he used to describe his █████ in 2006. *Compare* Ex46, Vaughn Dep. 252:24-253:6 *with* Ex56, VAUGHN-J-MDL2995-35PRAIL-00136.  Moreover, Lustig concedes there is ***no*** documentary evidence suggesting that Vaughn "wasn't experiencing ██████████

██████ before joining the Army." Ex57, Lustig Dep. 70:11-20.

Lustig's attempts to ignore Vaughn's 2004 documentary admissions that he had "██████████" before ever joining the military is just the sort of "unsupported speculation" that *Daubert* guards against.  *Hendrix*, 609 F.3d at 1197.  Lustig does

not seriously account for or rule out that Vaughn had ████ before ever joining the

military or using the CAEv2, and Lustig's differential etiology should be excluded.

## VII.  DJALILIAN'S OPINIONS ABOUT WILKERSON SHOULD BE EXCLUDED.

### A.  Djalilian's Opinions Relating To Genetics Should Be Excluded.

Djalilian's differential diagnosis for Wilkerson should be excluded for several

reasons, including because he relies on material Wilkerson intentionally withheld

from Defendants in discovery.  Defendants repeatedly tried to explore Wilkerson's

████████████████████████████████████████████████.  When

Defendants requested that Wilkerson ███████████████, he refused, and the

Court denied Defendants' motion to compel.  Wilkerson ECF 30.  When Defendants

deposed Wilkerson's cousin ████████, the witness invoked privilege.  Ex58,

Powell Dep. 42:8-14.  And when responding to discovery on November 19, 2021,

Wilkerson stated that he is █████████████████████████████

███████" and does not ████████████████████  Ex59,

Wilkerson RFA Responses Nos. 2-3.

Djalilian's report and testimony wrongly relies on ███████ information

Wilkerson withheld from Defendants.  Djalilian purports to rule out ████████

█████ as a cause because a ████████████████████████

████████████████████████████████████████████████

███████████████████."  Ex60, Djalilian-Wilkerson Report 25-

26.  But Djalilian did not cite any support for this statement and his reliance materials did not reference any ▮▮▮▮▮▮.  *Id.*  During a meet and confer with Judge Herndon, Wilkerson's counsel refused to identify the basis for Djalilian's opinion and represented that Wilkerson did not have any ▮▮▮ in his possession, custody, or control.  *See* Ex61, 12-27-2021 Email from Cornell to Castiglia.  Thereafter, Djalilian testified that his only basis for ruling out ▮▮▮ was a November 1, 2021 statement from Wilkerson:

> Q. Okay. How did you become aware of ▮▮▮▮▮▮?
>
> A. Mr. Wilkerson told me.
>
> Q. Mr. Wilkerson told you during the November 1 in-person examination that you conducted?
>
> A. That is correct.
>
> Q. Okay. Other than what Mr. Wilkerson told you, do you have any other sources of information concerning ▮▮▮▮▮▮?
>
> A. No. In terms of ▮▮▮, I just know it from Mr. Wilkerson. …

Ex14, Djalilian Dep. 378:15-379:8.

Wilkerson's provision of ▮▮▮ information to his expert but not Defendants mandates exclusion. *Zurich Am. Ins. Co. v. Hardin*, 2020 WL 1150981, at *3 (M.D. Fla. Mar. 10, 2020).  Experts' reports must contain "the facts or data considered by the witness in forming them," Fed. R. Civ. P. 26(a)(2)(B)(ii), and if "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party

35

is not allowed to use that information or witness ...  unless the failure was substantially justified or harmless." *Id.* at 37(c)(1).  There is no substantial justification or harmlessness here: by withholding this crucial evidence and simultaneously conveying it to his expert, Wilkerson prejudiced Defendants' right to challenge Djalilian's opinions.  His opinions ruling out ████████████████ should be excluded.  Fed. R. Civ. Proc. 37(c)(1).  Because Djalilian cannot properly rule out ████████████████, his differential diagnosis is deficient and should be barred.

Separately, these opinions are unreliable because they depend on Wilkerson's lay interpretation of records that Djalilian never reviewed.  ████████████████ ████████████████, Ex14, Djalilian Dep. 379:9-12; did not ████████████████ ████████████████ *id.* 380:12-15; and "couldn't tell" exactly which ████████████████, *id.* 380:16-381:8.  As a result, his differential diagnosis should be excluded.  *Hendrix*, 609 F.3d at 1202 (explaining that ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████

**B.    Djalilian's Differential Diagnosis Is Otherwise Unreliable.**

Djalilian's "differential diagnosis" should also be excluded for failing to apply any recognized methodology. According to Djalilian, a significant hearing change

"depends on the circumstance and stuff" and he is "just looking at the gestalt of it." Ex14, Djalilian Dep. 347:15-349:3. Rather than identify a "singular rule" or apply "the military criteria," Djalilian purported to apply the "nuanced clinician with a lot of experience criteria." *Id.* 351:4-16. Regardless of Djalilian's experience, without any metric for evaluating ▇▇▇▇▇ his opinions lack a reliable methodology. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 776 (7th Cir. 2014).

▇   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

Djalilian testified that Wilkerson ▇▇▇▇▇▇▇▇▇▇▇ as a result of the CAEv2 usage," Ex14, Djalilian Dep. 342:21-343:8, and that "it's possible" that Wilkerson ▇▇▇▇▇▇▇▇▇▇, *id.* 341:1-342:7. But any opinions on this score should be excluded because Djalilian did not disclose them in his case-specific expert report. ECF 2218 at 41-42.

Additionally, any such opinions are unreliable because Djalilian does not know if the CAEv2 caused those injuries, and did not rule out pre-existing causes. He "did not make a specific calculation" to determine what proportion of Wilkerson's ▇▇▇▇ is attributable to the CAEv2. Ex14, Djalilian Dep. 336:10-337:4. Asked whether Wilkerson would have ▇▇▇▇ if he never used the CAEv2, Djalilian admitted: "[w]e don't know the answer to that question" because "we don't know the extent of damage that was there." *Id.* 377:7-378:2. Djalilian also admitted that Wilkerson's ▇▇▇▇▇▇▇▇▇▇▇

███████ *before* he started using the CAEv2, *id.* 318:7-12, which, if accurate, "probably was – you know, at some point noise exposure", *id.* 337:5-15. Djalilian acknowledged that "it's possible that ████████████████████████." *Id.* 342:8-15.

### 2.  HPDs.

Djalilian does not reliably rule out other HPDs used by Wilkerson. Although Djalilian testified that Wilkerson used "nondefective earplugs" after his service, his analysis of those earplugs was deficient. Ex14, Djalilian Dep. 361:5-362:10. For example, "[t]here were no internal company documents that were available" for Wilkerson's other HPDs. *Id.* 362:23-363:6. "All [Djalilian] can say is none of them have been pulled of the market, they're still using them." *Id.* 361:22-362:10.

### 3.  Occupational Noise.

Djalilian ruled out Wilkerson's postmilitary occupational noise exposures because "it's too short a time for noise to be causing damage from the type of noise that he's being exposed to". Ex14, Djalilian Dep. 364:23-366:12. According to Djalilian, Wilkerson has "████████████████████ sort of off and on in the last six, seven years. And even based on Dr. Neitzel's papers, his own paper, says forty years of exposure." *Id.* 367:21-369:13.

But Djalilian failed to reliably apply the principles behind limits set by bodies like OSHA and NIOSH. While these limits assume that workers have forty-year

exposures, the prevailing theory is that most ██████████ occurs during the first several years of exposure.   Ex62, ISO 1999; Ex63, ANSI S3.44.   As Flamme explained, "even though the goal of the damage risk criterion … is to avoid a certain amount of hearing impairment after 40 years, … [i]t's actually a logarithmic process where the greatest change occurs in the first couple of years."   Ex64, Flamme Dep. 118:6-22.   Djalilian's attempt to rule out several years of ██████████ noise is unreliable and his differential diagnosis should be excluded.



██ ██████████.

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██. Djalilian's ██████████ opinions are irrelevant and should be excluded.

## VIII. SPANKOVICH'S OPINIONS ABOUT WILKERSON SHOULD BE EXCLUDED.

### A. Spankovich's Opinion That Any CAEv2 Defect Caused Wilkerson's Alleged Injuries Should Be Excluded.

Spankovich lacks a reliable basis for opining that the CAEv2 caused Wilkerson's purported injuries, Ex67, Spankovich-Wilkerson Report 12, because Spankovich "did not" perform any fit testing, or "any type of specific testing", on Wilkerson.   Ex27, Spankovich Dep. 206:16-207:15, 211:21-24.   Nor did Spankovich

measure the length and width of Wilkerson's ear canals. *Id.* 221:15-222:16. Instead, Spankovich relied on tympanometry as a measurement of Wilkerson's ear canal ***volume***. *Id.* 214:17-216:11. But Spankovich conceded—even if tympanometry suggests volume—two ear canals can have the same volume but different widths and depths. Ex66, Spankovich Dep2. 250:11-16. Without verifying whether the CAEv2 fit Wilkerson, Spankovich has no basis to opine that the CAEv2 did not provide adequate hearing protection.

### B.    Spankovich's Differential Diagnosis Is Unreliable.

Spankovich's differential diagnosis opinion should be excluded for failing to reliably rule out alternative causes.   Ex67, Spankovich-Wilkerson Report 8. Spankovich conceded other factors such as age and post-military noise exposures "independently" contribute to Wilkerson's ███████. Ex27, Spankovich Dep. 255:11-18, 268:16-19. Wilkerson's ██████ independent of the CAEv2 "may have an independent component … that can exacerbate perception of █████ *Id.* 340:9-22. Yet Spankovich never took the "additional step of trying to break down the percentage of the post use, relative to noise/age interaction, age alone, or additional noise exposure." *Id.* 274:7-23.

### 1.    HPDs.

Spankovich lacks a basis to rule out other HPDs Wilkerson used.  Although Spankovich stated he has "not seen any records of evidence that" the other HPDs

Wilkerson used "are defective in any nature", Ex27, Spankovich Dep. 352:10-353:1, he did not identify the manufacturer of the other HPDs Wilkerson used, which included triple-flange earplugs, foamies, earmuffs, and a headset, *id.* 355:3-8, 355:22-356:13, 358:18-25.  While he purportedly became familiar with NRRs "in general," *id.* 356:14-24, he could provide only "a rough idea what the attenuation tends to be" for devices used by Wilkerson, *id.* 358:18-25.  Extrapolating from his rough ideas relating to non-specific HPDs cannot satisfy Rule 702.

### 2. █████████

Defendants' argument that Djalilian's opinions should be excluded for failing to rule out █████████████ applies equally to Spankovich. *Supra* at 34-36.  Spankovich "believe[s] there might have been" ███████████████ ████████████ but acknowledged that he was "assuming" and does not "know the results of it or anything."  Ex27, Spankovich Dep. 324:12-18.  He has not reviewed ████████████████████████████████████ ████████████████." *Id.* 325:8-11, 326:1-6.

### 3. Occupational Noise.

Spankovich purported to "consider[]" Wilkerson's "non-military noise exposure."  Ex67, Spankovich-Wilkerson Report 13-14.  But Spankovich acknowledged ████████████████████████████ after he stopped using the CAEv2s, *id.* 14, and that Wilkerson's post-military noise

exposures "would be factors that more than likely have contributed" "to the ███████████████████." Ex27, Spankovich Dep. 300:3-301:2. Spankovich neglected to review the corporate-representative depositions of companies where Wilkerson worked as ███████████████████████, which he acknowledged "may have some relevance." *Id.* 297:6-301:19. Spankovich's failure to rule out Wilkerson's occupational noise exposures renders his differential diagnosis unreliable.

        **4.**     [2]

       Spankovich purportedly ruled out "████████████████████████ █████████████████████ when he used the CAEv2. Ex67, Spankovich-Wilkerson Report 14. The only support Spankovich provided for those opinions is Wilkson's denial of "████████████████████." *Id.* 11; *see id.* 8 (same).

       Wilkerson's lay determination is contradicted by multiple medical records that document ████████████████████████████████████ ████ Ex68, Wilkerson Dep. Ex. 14 at Wilkersons-MDL2885-30PPR-01689. As Spankovich admits, ████████████████████████████████████ ████ Ex27, Spankovich Dep. 87:15-88:4.

---

[2] Defendants incorporate their Group C *Daubert* argument that Spankovich is not qualified to offer opinions relating to ████████. ECF 2042 at 15.

Spankovich's opinions relating to head injuries improperly depends solely on Wilkerson's lay assertions.  To the extent Spankovich used any expertise to rule out ██████████, the opinion was not disclosed as required by Rule 26(2)(B)(i) and should be excluded on that basis.

C.   .

Spankovich opines that Wilkerson's alleged injuries cause him ████████ ████████  Ex27, Spankovich Dep. 340:23-341:1. But Spankovich admits that Wilkerson ██████████████████████████████████████████████████ ████████████████████████████. *Id.* 342:17-343:2.  Moreover, Spankovich "didn't talk specifically" with Wilkerson "about the █████████████████████ ████████████████████████that is attributable to his alleged injuries. *Id.* 344:6-24.   Spankovich's ████████  opinion "is not supported by a reliable methodology and thus is inadmissible."  ECF 1680 at 24.

D.   ████████████

Spankovich noted Wilkerson's reports that his alleged injuries "can ████████████████████████."  Ex67, Spankovich-Wilkerson Report 12.  But Wilkerson disclaimed any "plan to offer evidence at trial with regard to any████ ██████████████████████████████."  *Supra* at 39.  Any ████ ████ opinions are irrelevant.

E.     **Vocational Opinion.**

Expert reports are required to contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(2)(B)(i).  Spankovich did not opine that Wilkerson's alleged injuries reduced his job opportunity or economic productivity; that is "not something that [he] dive[s] into in [his] report."  Ex27, Spankovich Dep. 367:21-368:11.  Because Spankovich did not disclose vocational opinions pursuant to Rule 26, any such opinions should be excluded.

## CONCLUSION

Defendants respectfully request that the Court exclude the opinions of Plaintiffs' experts as described herein.

Respectfully submitted:

*/s/ Charles F. Beall, Jr.*
Larry Hill
Florida Bar No. 173908
lhill@mhw-law.com
Charles F. Beall, Jr.
Florida Bar No. 66494
cbeall@mhw-law.com
Haley J. VanFleteren
Florida Bar No. 1003674
hvanfleteren@mhw-law.com
MOORE, HILL & WESTMORELAND, P.A.
350 West Cedar Street
Maritime Place, Suite 100
Pensacola FL 32502
Telephone: (850) 434-3541

*/s/ Robert C. "Mike" Brock*
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
mnomellini@kirkland.com

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company,
3M Occupational Safety LLC, Aearo
Technologies LLC, Aearo Holding,
LLC, Aearo Intermediate, LLC and
Aearo, LLC*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Judge Herndon on July 12, 2021 conveyed the Court's direction that the parties' *Daubert* motions are limited to 1350 words per new expert and 1350 words per new issue with an existing expert.  This motion seeks to exclude, in whole or in part, six Plaintiffs' experts, yielding a word limit of 8,100.  Pursuant to Local Rule 7.1(F) and this Court's direction, counsel for Defendants certify that this memorandum contains 8,035 words, excluding the case style, motion (which is less than 500 words), tables of contents and authorities, signature block, and certificates of compliance with the Local Rules.

 Dated:  February 4, 2022                    Respectfully submitted,


                                             */s/ Robert C. Brock*
                                             Robert C. "Mike" Brock
                                             KIRKLAND & ELLIS LLP
                                             1301 Pennsylvania Avenue, N.W.
                                             Washington, D.C. 20004
                                             Telephone:  (202) 389-5991
                                             mike.brock@kirkland.com

                                             *Counsel for Defendants*
                                             *3M Company,*
                                             *3M Occupational Safety LLC,*
                                             *Aearo Technologies LLC,*
                                             *Aearo Holding, LLC,*
                                             *Aearo Intermediate, LLC and*
                                             *Aearo LLC*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)

Pursuant to Local Rule 7.1(B), counsel for Defendants certify that they held a conference to discuss the relief sought in this motion with Plaintiffs' counsel on February 2, 2022.  Plaintiffs' counsel represented that they would not agree on February 2, 2022.

Dated:  February 4, 2022                    Respectfully submitted,

*/s/ Robert C. Brock*
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 389-5991
mike.brock@kirkland.com

*Counsel for Defendants*
*3M Company,*
*3M Occupational Safety LLC,*
*Aearo Technologies LLC,*
*Aearo Holding, LLC,*
*Aearo Intermediate, LLC and*
*Aearo LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 4, 2022, a copy of the foregoing was filed on the Court's CM/ECF system, which will serve all counsel of record.

Dated:  February 4, 2022                        Respectfully submitted,

*/s/ Robert C. Brock*
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
mike.brock@kirkland.com

*Counsel for Defendants 3M Company,*
*3M Occupational Safety LLC, Aearo*
*Technologies LLC, Aearo Holding,*
*LLC, Aearo Intermediate, LLC and*
*Aearo, LLC*

1