**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | | |
|---|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG | ) | Case No. 3:19md2885 |
| PRODUCTS LIABILITY LITIGATION, | ) | |
| | ) | Pensacola, Florida |
| | ) | February 16, 2022 |
| | ) | 3:02 p.m. |
| | ) | |
| | ) | |
| _____ | ) | |

**TWENTY-SECOND CASE MANAGEMENT CONFERENCE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-33)

**A P P E A R A N C E S**

**JUDGE DAVID R. HERNDON** (ret.)

**FOR THE PLAINTIFFS:**    Aylstock, Witkin, Kreis & Overholtz, PLLC
By: **BRYAN F. AYLSTOCK**
*baylstock@awkolaw.com*

**JENNIFER HOEKSTRA**
*jhoekstra@awkolaw.com*
17 E Main Street, Suite 200
Pensacola, Florida  32502

## A P P E A R A N C E S

**FOR THE PLAINTIFFS:**   Clark Love & Hutson, GP
By:  **SHELLEY HUTSON**
*bgreif@triallawfirm.com*
440 Louisiana Street, Suite 1600
Houston, Texas   77002

Seeger Weiss LLP
By: **CHRISTOPHER A. SEEGER**
*cseeger@seegerweiss.com*

**DAVID R. BUCHANAN**
*dbuchanan@seegerweiss.com*
55 Challenger Rd, 6th Floor
Ridgefield Park, NJ   07660


**FOR THE DEFENDANTS:**   Kirkland & Ellis, LLP
By:  **ROBERT C. BROCK**
*mike.brock@kirkland.com*
1301 Pennsylvania Avenue NW
Washington, D.C.   20004

Kirkland & Ellis, LLP
By:  **MARK J. NOMELLINI**
*mnomellini@kirkland.com*

**HARIKLIA KARIS**
*hkaris@kirkland.com*
300 N Lasalle
Chicago, Illinois   60654

Dechert, LLP
By:  **JAY L. BHIMANI**
*jay.bhimani@dechert.com*
633 W 5th Street, Suite 4900
Los Angeles, California   90071

Moore, Hill & Westmoreland, PA
By:  **CHARLES F. BEALL, JR.**
*cbeall@mhw-law.com*
350 W Cedar Street, Suite 100
Pensacola, Florida   32502

```
09:45    1                    P R O C E E D I N G S
09:47    2          (Court called to order at 3:02 p.m.)
03:02    3          THE COURT:  Good afternoon.
03:02    4          MR. NOMELLINI:  Good afternoon.
03:02    5          THE COURT:  And welcome to our -- I believe it's our
03:02    6   22nd Case Management Conference in MDL2885, the Combat Arms
03:02    7   Earplug Product Liability Litigation.
03:02    8          We're here for, as I said, the case management
03:02    9   conference, and let me identify those who are here at counsel
03:02   10   table.  There are a number of people who are present by Zoom
03:02   11   and a greater number who are present via telephone.  I am not
03:02   12   going to take the time to identify all of those folks.  I do
03:02   13   appreciate them being here for the CMC.  However, there are two
03:03   14   important people on Zoom I do want to introduce, that is Judge
03:03   15   Gary Jones and Judge Dave Herndon.
03:03   16          Thank you both for being here.  I see you on the Zoom,
03:03   17   and I appreciate you being here.
03:03   18          Counsel table for the plaintiffs, Mr. Aylstock, Ms.
03:03   19   Hutson, Mr. Seeger, Ms. Hoekstra.  For the defense, I have Mr.
03:03   20   Nomellini, Mr. Brock, Mr. Bhimani, and Ms. Karis I believe is
03:03   21   here, and then Mr. Beall also present.
03:03   22          My understanding, for plaintiffs, obviously, Mr.
03:03   23   Aylstock, you're lead counsel, I'll be hearing from you, and
03:03   24   then you can identify anybody else that you believe needs to
03:03   25   provide input to the Court on the issues to be discussed today.
```

03:03  1       My understanding for the defense is, Mr. Nomellini,

03:03  2  you are the 3M spokesperson for today; is that correct?

03:03  3       **MR. NOMELLINI:**  That's correct.

03:03  4       **THE COURT:**  Thank you.

03:03  5       Let me take a moment here at the beginning and go off

03:03  6  script for just a minute before we get started with the CMC to

03:03  7  make a comment about Neil Overholtz.

03:04  8       As most everyone here knows, Neil passed away

03:04  9  unexpectedly last week at the age of 49.  His passing was a

03:04  10 tremendous loss certainly for his family but also the Aylstock

03:04  11 Witkin law firm, also for our legal community, but also for

03:04  12 this MDL.

03:04  13      Neil has been a part of this MDL from the beginning.

03:04  14 He was an integral member of the plaintiffs' leadership team.

03:04  15 I believe he was also well liked and respected by many on the

03:04  16 defense side of the courtroom.

03:04  17      And I just want to say to everyone that I believe that

03:04  18 Neil's untimely and very tragic death is a poignant reminder to

03:04  19 all of us that there are far more important things in life

03:04  20 than, you know, the big case or the next trial or even the next

03:04  21 verdict.  And I just think we should all keep that in mind and

03:04  22 remember that.  I know the stakes in this litigation are high,

03:05  23 but I do think his passing is a reminder to all of us that

03:05  24 there are far more important things in life than litigation.

03:05  25 So please keep that in mind and also please keep the Overholtz

03:05  1   family in mind and in your thoughts.

03:05  2          Mr. Aylstock, you may have something else to add to

03:05  3   those comments.

03:05  4          **MR. AYLSTOCK:**  Yeah, I do, Your Honor.  Obviously,

03:05  5   it's a huge loss to this case, to the firm, to really all of us

03:05  6   here.  And I just want to acknowledge all the kind words from

03:05  7   the defense bar and very much heartfelt condolences.

03:05  8          We're going to have a very informal celebration of

03:05  9   Neil's life and what he loved over at a local establishment

03:05  10  following the CMC.  I've invited the defense, and I know some

03:05  11  of them came really more for that, which is touching.  But the

03:05  12  Court staff and everyone is invited.  It's an open celebration

03:05  13  of his life.

03:05  14         **THE COURT:**  All right.  Thank you for doing that.  And

03:06  15  I do plan to attend and so do some of my staff.

03:06  16         **MR. NOMELLINI:**  And I would just say for the defense

03:06  17  side, to a person, on our side he was greatly admired and

03:06  18  respected by everybody, and he'll be greatly missed.

03:06  19         **MR. AYLSTOCK:**  Thank you, Mark.

03:06  20         **THE COURT:**  Thank you.

03:06  21         Okay.  Let me start the CMC with -- it's not a state

03:06  22  of the union address, but it's a little bit of just state of

03:06  23  affairs in terms of where we are from the perspective of the

03:06  24  bench in the MDL and a little bit -- this is historical

03:06  25  perspective and then and bringing it forward.

| | | |
|---|---|---|
| 03:06 | 1 | The MDL was assigned to this Court and to me back in |
| 03:06 | 2 | April of 2019, so it's been pending nearly three years; 34 |
| 03:06 | 3 | months I think it's been pending.  In that time, we've had |
| 03:07 | 4 | obviously a lot of activity.  There have been corporate and |
| 03:07 | 5 | military/government discovery, and the bellwether process. |
| 03:07 | 6 | We've had discovery of case specific. |
| 03:07 | 7 | In ten months, we've had 11 trials, 14 verdicts -- |
| 03:07 | 8 | nine for the plaintiffs, five for the defendants.  We have five |
| 03:07 | 9 | more trials scheduled between March and May of this year, which |
| 03:07 | 10 | means by May of this year, 2022, the parties will have 16 |
| 03:07 | 11 | trials and 19 verdicts in 14 months, which is rather |
| 03:07 | 12 | astonishing in terms of the effort and amount of information |
| 03:07 | 13 | that you all have and will have by the last trial in May. |
| 03:07 | 14 | As you all know, the main reason we're here today to |
| 03:07 | 15 | is to talk about the Wave process.  The Wave orders have -- one |
| 03:07 | 16 | has been entered, it was entered in November.  It required 500 |
| 03:08 | 17 | cases to begin a discovery process.  Dispositive motions were |
| 03:08 | 18 | due in July. |
| 03:08 | 19 | There were four plaintiffs in that Wave process who |
| 03:08 | 20 | requested to be removed from Wave 1 and included in an upcoming |
| 03:08 | 21 | Wave 2 discovery order, which is happening, and that order will |
| 03:08 | 22 | be entered February 22nd, so a very short time away from now. |
| 03:08 | 23 | That will require another 500 cases to be worked up in |
| 03:08 | 24 | discovery.  Those dispositive motions will be due in October. |
| 03:08 | 25 | The third Wave Order will be entered in May.  And so |

03:08  1   at that point in May there will be 1500 cases that will be in

03:08  2   discovery in one of those three Wave processes.

03:08  3          I've entered transition orders.  Three orders have

03:09  4   been entered requiring nearly 50,000 case to transition from

03:09  5   the administrative docket to the active docket.  One was

03:09  6   entered in August of 2021, then in September, and then more

03:09  7   recently in January.  I intend -- just to telegraph this now, I

03:09  8   intend to enter another transition order in early March

03:09  9   requiring roughly another 25,000 cases to transition.

03:09  10         84 percent of the cases that were included in

03:09  11  Transition Order 1 and 2 have transitioned to the active

03:09  12  docket.  The remaining 16 percent of cases were either

03:09  13  dismissed or they were not transitioned.  And those that were

03:09  14  not transitioned are subject to dismissal and will be

03:09  15  dismissed.

03:09  16         I'm actually getting a report -- I've requested that

03:10  17  report and will be dismissing those cases consistent with my

03:10  18  transition orders that have been entered.

03:10  19         As of February 14th, 16 percent of the cases that were

03:10  20  included in the third transition order have transitioned to the

03:10  21  active docket.  Obviously, I anticipate that that percentage

03:10  22  will increase as the cases continue to transition in accordance

03:10  23  with that order.

03:10  24         As of yesterday, we have 42,337 cases on the active

03:10  25  docket and then another 234,905 cases on the admin docket, for

03:10  1   what I calculate to be a grand total of 277,242 cases between

03:10  2   the two dockets.

03:10  3          So let me mention a couple of things that I'm

03:11  4   concerned with, and this will give you all an opportunity to

03:11  5   address these with me when you make your presentations to me

03:11  6   regarding where we are in the Wave processes.

03:11  7          First of all -- and this is a concern I have largely

03:11  8   on the plaintiffs' side of the house.  I am concerned with -- I

03:11  9   requested a report from BrownGreer, and I was shocked at the

03:11  10  number of plaintiffs who have yet to submit a census form

03:11  11  despite an order requiring it.

03:11  12         And I know I'm going, again, a little off script here

03:11  13  in terms of, you know, this was a discussion about Wave.  But

03:11  14  in preparing for the CMC, I thought, you know, look I would

03:11  15  look at sort of broader scale.  And the number of plaintiffs

03:11  16  who have yet to submit a census form is 55,119.  That's 49,127

03:12  17  on the admin docket and a shocking 5,992 on the active docket.

03:12  18         In turn, that means 22,242 plaintiffs have submitted

03:12  19  census forms.  So it's doable, it's very doable.  This really

03:12  20  caught me by surprise.  I had no idea that we had this number

03:12  21  of plaintiffs that had yet to submit census forms despite the

03:12  22  fact that I reinstated the requirement for a census form --

03:12  23  there's an order that required it in July, and I waived the

03:12  24  verification requirement for the census forms so that it would

03:12  25  be easier for the plaintiffs to submit these forms, and still,

03:12    1    again, 55,000 have not.

03:12    2          Mr. Aylstock, I'm going to ask you to speak to this in

03:13    3    a minute.  I don't know what to make of that other than that

03:13    4    these plaintiffs' lawyers representing the plaintiffs within

03:13    5    this number, 55,000, aren't interested in this litigation.

03:13    6          So I'm also concerned with the number of plaintiffs --

03:13    7    and this is going to be veterans, and I'll talk about this in a

03:13    8    minute -- who have yet to obtain their DD-214s and to submit

03:13    9    those DD-214s.

03:13    10          There was an order to do that back in October of 2019.

03:13    11    That was part of the census form record production requirement.

03:13    12    That got suspended.  But still it's shocking to me that, in a

03:13    13    case with the number of veterans that we have in this

03:13    14    litigation, that we have 28,500 plaintiffs who have a DD-214,

03:14    15    so it's doable, they've submitted it.  But that means 248,742

03:14    16    have no DD-214.

03:14    17          Now, that number 248,742 is a total plaintiff number,

03:14    18    so that would include civilian plaintiffs and it would include

03:14    19    active duty plaintiffs who will not have a DD-214, but that's a

03:14    20    fraction of that number.  So most of these plaintiffs are

03:14    21    veterans.

03:14    22          Look, when I left the Army, I got my DD-214.  I lost

03:14    23    it, like probably most other veterans.  And when I was, you

03:14    24    know, looking for my Lowe's discount, I asked the Veterans

03:14    25    Administration to please send me my DD-214, and I got it in

03:14    1   about four weeks.  So I want to hear about this as well.  We're

03:14    2   going to talk about it.

03:14    3          Now, there are also a number of plaintiffs who have no

03:15    4   DOEHRS data.  And this falls in a different category in my mind

03:15    5   because I understand and in fact know from discussions with the

03:15    6   DoD, the DOJ, the Veterans Administration that, when you

03:15    7   request as a veteran your data, whether it's through the

03:15    8   National Archives or through My HealtheVet or wherever you're

03:15    9   requesting your information, you are probably not getting a

03:15   10   complete file, particularly of the DOEHRS data.

03:15   11          So, Mr. Aylstock, I'm going to ask you to address

03:15   12   something that I believe is happening in a positive way in

03:15   13   regards to the DOEHRS data that should lead to far more, if not

03:15   14   100 percent -- I mean, that's the aim -- of the plaintiffs

03:15   15   receiving their DOEHRS data hopefully very soon, thanks to a

03:15   16   lot of good work that's taking place.

03:15   17          So I put that in a separate category.  But for now, to

03:16   18   deal with these concerns, my plan -- I'm going to hear from

03:16   19   you, Mr. Aylstock, but my plan is to enter a dismissal of those

03:16   20   cases with no census forms, or I want you to tell me why I

03:16   21   shouldn't.  Because those lawyers were told a long time ago or

03:16   22   ordered a long time ago to submit those census forms, and again

03:16   23   I waived the verification requirement.  And they were told they

03:16   24   were subject to dismissal if they didn't comply with the time

03:16   25   requirement.

03:16   1          And as for the DD-214s, my intent is to enter an order

03:16   2   requiring all of the veterans to submit their DD-214s within

03:16   3   some period of time.  So I want to hear from you about that.

03:16   4          I am no longer -- look, three years.  And I had this

03:16   5   discussion back in, I believe it was July, that led to the

03:16   6   order reinstating the census requirement.  I had a discussion

03:16   7   with Ms. Lanier here in the courtroom where I pushed really

03:17   8   hard on particularly the census form issue, and still I don't

03:17   9   think the needle has moved very much at all.

03:17   10          So before we get into the Wave, let me put you on the

03:17   11   spot.  I know you were not necessarily prepared for this, but I

03:17   12   would like to hear from you on those two issues -- the census

03:17   13   form issue why those 55,000 cases should not be dismissed and

03:17   14   then the DD-214 issue.

03:17   15          MR. AYLSTOCK:  So, I'll start with the census, Your

03:17   16   Honor.  I think there's several things going on.  One is PTO 81

03:17   17   does cover this.  It did give varying lengths of time to

03:17   18   different firms based upon the size of their caseload.

03:17   19          THE COURT:  Right.  But I've looked at that, and those

03:17   20   deadlines, for the most part, have passed.

03:17   21          MR. AYLSTOCK:  For the most part, but not for the all

03:18   22   part.

03:18   23          THE COURT:  Before I enter dismissals, I will

03:18   24   certainly make sure I'm not dismissing a case that has still

03:18   25   got time to comply.

03:18    1    **MR. AYLSTOCK:** There's another thing going on, Your

03:18    2    Honor, and that has to do with the dismissal process from the

03:18    3    administrative docket.  There's certain claimants who have

03:18    4    decided, for whatever reason, not to continue with their claim.

03:18    5    There's a process by which they seek a dismissal on the

03:18    6    administrative docket, and it takes some time to deal with the

03:18    7    clerk's office to get those dismissals entered.

03:18    8    Under PTO 81, the timing of submission of those census

03:18    9    forms, as I understood it, is dependent on the number of active

03:18    10    cases, and that's a bit of a moving target, if you have cases

03:18    11    that you have submitted to be dismissed but the dismissal has

03:18    12    not yet been effectuated.  So, because that's a little bit of a

03:18    13    moving target, that is another issue, and so that has to kind

03:19    14    of be sorted out.

03:19    15    **THE COURT:** What about the ones that have just ignored

03:19    16    the order?

03:19    17    **MR. AYLSTOCK:** Yes.  Well, there may be cases in that

03:19    18    category, there may be law firms in that category.  We

03:19    19    certainly did disseminate PTO 81.  I know everybody is

03:19    20    responsible for reading the Court's order.

03:19    21    I think, given the complexities of the dismissal

03:19    22    process and perhaps upload issues or other things, I would urge

03:19    23    the Court to do a show cause order why they shouldn't be

03:19    24    dismissed or cured within a certain period of time.  It is,

03:19    25    after all, a discovery tool, and I don't see any prejudice.

03:19    1           **THE COURT:** Well, it's a court order.

03:19    2           **MR. AYLSTOCK:** I appreciate that.

03:19    3           **THE COURT:** It is a discovery tool, you know, in one

03:19    4   respect, but this was the subject of a court order that

03:19    5   required them to do that to facilitate efficient discovery.

03:20    6   And that, for 55,000 plaintiffs, has not happened.

03:20    7           **MR. AYLSTOCK:** It hasn't happened yet.

03:20    8           **THE COURT:** And I have a difficult time understanding

03:20    9   that given my efforts to impress upon the plaintiffs the need

03:20   10   to do this repeatedly. Again, this is not the first time we've

03:20   11   had this discussion.

03:20   12           **MR. AYLSTOCK:** My understanding is that a significant

03:20   13   portion, more than 10,000, perhaps as many as 20,000 are not

03:20   14   due yet pursuant to PTO 81. So that's a huge hunk.

03:20   15        We did, as a plaintiffs bar, collectively rallied the

03:20   16   troops to get 222,000 in.

03:20   17           **THE COURT:** Right, and I commend you for that.

03:20   18           **MR. AYLSTOCK:** And it was and is a huge effort to be

03:20   19   able to do that.

03:20   20           **THE COURT:** But you really shouldn't have to do that.

03:20   21   I mean, these are big lawyers. This is not a class action.

03:21   22   Come on, I mean, these are officers of the Court.

03:21   23           **MR. AYLSTOCK:** I do understand.

03:21   24           **THE COURT:** They have brought these cases. They

03:21   25   joined the litigation. Whether they're in the admin docket or

03:21  1    the active docket, they're still subject to my orders, and they

03:21  2    just don't get a pass.

03:21  3          **MR. AYLSTOCK:**  And all I'm suggesting is the show

03:21  4    cause process would be, in my view, much more fair because, in

03:21  5    addition to those things I identified, some of these are active

03:21  6    duty, they may be on mission, they may --

03:21  7          **THE COURT:**  Well, that's different and that's fair.

03:21  8    But I don't know.  Three years on a mission?  That's a long

03:21  9    time.

03:21  10         **MR. AYLSTOCK:**  But, respectfully, the Court's order

03:21  11   hasn't been three years.  It's been a while.  But if there

03:21  12   could be a short cure period, ten days, two weeks something

03:21  13   like that, cure it or show cause, and if you don't show cause,

03:22  14   then you're out.  That I think would help alleviate some of the

03:22  15   issue with regard to the dismissals on the administrative

03:22  16   docket taking some time to be processed, because presumably it

03:22  17   would be better to get them dismissed administratively than

03:22  18   have a court order.

03:22  19         **THE COURT:**  Frankly, I thought that the transition

03:22  20   process and those orders would get the attention of lawyers as

03:22  21   far as the census forms but also the DD-214s.  I don't think

03:22  22   anybody wants to pay $420, whatever it is now, per case if you

03:22  23   haven't done these things that I've required you to do because

03:22  24   you're going to be subject to dismissal after having paid your

03:22  25   $420 per head.

03:22  1      **MR. AYLSTOCK:**  The 214s are a little bit different

03:22  2  issue.  Some of it stems from the fact that the DoD, in

03:23  3  conjunction with the plaintiffs leadership and the defense --

03:23  4  and Judge Herndon had initially told all of us to tell all of

03:23  5  the folks out there with cases to not inundate the DoD or the

03:23  6  VA with all of these requests given the volume, and it would be

03:23  7  handled -- not even through the archives, they told us don't go

03:23  8  to the archives, don't go to the local VA, but let it all flow

03:23  9  through DOEHRS or through *Touhy*.  That obviously changed.  But

03:23  10  it certainly was a very strong message that we complied with at

03:23  11  the request of DoD, with Judge Herndon and Your Honor's input,

03:23  12  so that we could streamline the process and let the government

03:23  13  do its work.

03:23  14      Our understanding is the government's work, other than

03:23  15  DOEHRS, which is I think a real bright spot that I'd like to

03:23  16  talk about at some point, has fairly completed its work through

03:23  17  the centralized process.

03:23  18      **THE COURT:**  I don't think that DoD is intending to

03:23  19  produce any more DD-214s, and so I need to enter an order

03:24  20  that's going to set a time frame for these DD-214s to be

03:24  21  obtained and produced.

03:24  22      **MR. AYLSTOCK:**  I think as well the data that you're

03:24  23  receiving from BrownGreer may be incomplete, not because it's

03:24  24  not in there, but the DD-214s are part of a longer record in a

03:24  25  lot of these cases.  So they need to be pulled out, separately

03:24    1    identified.  If they're not uploaded -- some firms may have

03:24    2    them but have not uploaded them yet.  Obviously, that

03:24    3    requirement was initial, it was suspended.

03:24    4         So, if there could be some period of time for us to

03:24    5    get our act together, as it were, to do that, I don't think

03:24    6    that it will require a lot of time, but it will take some time.

03:24    7    And given the very clear message we had sent out earlier not to

03:24    8    do this, if there could be a period of months so that we could

03:24    9    get those requests out, you know, it will take some time for

03:24    10   each individual to go --

03:24    11        **THE COURT:**  It's not going to be months and months.

03:25    12   It's just not.  I'm going to think about the time frame.  Like

03:25    13   I said, I got mine in four weeks.  I understand the DoD is

03:25    14   going to get hit with tens of thousands of requests at one

03:25    15   time, so it may require a discussion with them to get a feel

03:25    16   for what it may involve in terms of a turnaround time.  But,

03:25    17   like you said, many of these law firms may actually have the

03:25    18   DD-214 and have just not uploaded it.

03:25    19        **MR. AYLSTOCK:**  That's absolutely probably correct,

03:25    20   Your Honor.

03:25    21        **THE COURT:**  So I will consider your request and then

03:25    22   also confer with the DoD about what they think is reasonable in

03:25    23   a response time given -- I mean, it's almost 250,000 plaintiffs

03:25    24   is what number I'm showing.

03:26    25        Now, again, some of those people may have their

03:26   1   DD-214s and just haven't uploaded them.

03:26   2         **MR. AYLSTOCK:**   And some may be uploaded but not

03:26   3   identified because they're part of a larger record.

03:26   4         **THE COURT:**   Right, and that may be.  And if that's the

03:26   5   case then, when I enter the order, those lawyers can tell me

03:26   6   that.

03:26   7         **MR. AYLSTOCK:**   Exactly.

03:26   8         **THE COURT:**   But they're going to have to do that work.

03:26   9   They're going to have to look into their files or look into

03:26   10  their portal and tell me that the DD-214 is there and

03:26   11  BrownGreer just missed it because it's part of a larger file.

03:26   12        So let's talk about DOEHRS, let's talk about something

03:26   13  positive for a minute.

03:26   14        **MR. AYLSTOCK:**   Yes, I'm happy to do so, Judge.  Thanks

03:26   15  to Judge Herndon's help and our colleagues on the other side,

03:26   16  and particularly Ms. Roitman, we have been able to communicate

03:26   17  with the DoD, and they have agreed to supply the DOEHRS

03:26   18  database data, which is the audiometric data, the 2215s and

03:26   19  2216s for the entirety of this MDL, everybody with a filed

03:27   20  case.  We, working through BrownGreer and an awful lot of

03:27   21  effort over on their side as well, have disseminated the needed

03:27   22  information.

03:27   23        The government wanted it by service branch, and some

03:27   24  people switched branch, and so it gets a little convoluted or

03:27   25  complicated.  But long story short, those spreadsheets were

03:27  1   submitted, I believe it was February 4th, if memory serves.

03:27  2   And we haven't heard yet back on a time frame, but we have had

03:27  3   positive feedback from the government that they do intend to

03:27  4   produce all of that information.

03:27  5        We'll be working with BrownGreer to ensure that it

03:27  6   gets transferred hopefully seamlessly into Centrality so it can

03:27  7   be available to both sides for litigation purposes or whatever

03:27  8   other use that can be done.  And that I think will go a very

03:27  9   long way, along with the 214s and the census form to really

03:27  10  having the cases in a position where, when they're transitioned

03:28  11  or when they hit a wave, they'll be much further down the road.

03:28  12        **THE COURT:**  All right.  So, at my request, I believe

03:28  13  Judge Herndon -- well, he probably did it even before I

03:28  14  requested -- has been in contact with the DOJ and the DoD about

03:28  15  the DOEHRS data.

03:28  16        And, Judge Herndon, I don't know if you've heard back

03:28  17  from Mr. Kowalski.

03:28  18        **JUDGE HERNDON:**  As of yesterday, he said that he was

03:28  19  waiting on some information from the DoD and hoped to have that

03:28  20  today, but I haven't heard from him yet today.

03:28  21        **MR. AYLSTOCK:**  Ms. Hoekstra corrected me, it's 241,000

03:28  22  soldiers or servicemembers that were on that list.  Obviously

03:28  23  not everybody in this MDL is a servicemember so --

03:28  24        **THE COURT:**  Right.

03:28  25        **MS. HOEKSTRA:**  Sorry --

03:28    1       **MR. AYLSTOCK:** Go ahead and fix it.

03:28    2       **MS. HOEKSTRA:** Just to add some details. Part of the

03:28    3 distinction in discussion with the government was there had to

03:28    4 be a pending *Touhy* request. So we went based off individuals

03:29    5 who had submitted a pending *Touhy* request, deduped it, made

03:29    6 sure we removed anyone who had dismissed their cases and

03:29    7 provided the information in the format that the government

03:29    8 wanted, which led us to about 241,000 individual servicemembers

03:29    9 as opposed to a larger number.

03:29   10       That means there may be an opportunity to request

03:29   11 additional when and if information is confirmed. But at this

03:29   12 point, that was the most secure number to -- or information to

03:29   13 give the DoD and DOJ so that they wouldn't be offended when we

03:29   14 had incomplete information or inaccurate data.

03:29   15       **THE COURT:** Okay. Thank you for that. And that

03:29   16 number is in addition to the 1 percent?

03:29   17       **MS. HOEKSTRA:** Correct.

03:29   18       **THE COURT:** Because the DOEHRS data had been provided

03:29   19 for that 14- or 1500 cases?

03:29   20       **MR. AYLSTOCK:** Correct.

03:29   21       **THE COURT:** All right. Well, thank you, Judge

03:29   22 Herndon, for reaching out to the government. And hopefully

03:29   23 we'll hear something positive back soon from them in terms of a

03:29   24 turnaround time.

03:30   25       **MR. AYLSTOCK:** One housekeeping matter, Your Honor,

1    based upon the comments you made at the start of the conference

2    about the transition orders.

3            There are, just so you're aware -- it's a relatively

4    small percentage, but there are certain Minnesota residents or

5    Delaware residents who, instead of transitioning their cases to

6    the federal court, given the lack of diversity, have served

7    their cases in Minnesota state court.  So just so Your Honor is

8    aware of that issue perhaps when the dismissals get entered.

9    They may have a pending case.  They may have transitioned.  But

10   because, in our view, there's -- well, there's no diversity,

11   they may have gone to Minnesota.

12           **THE COURT:**  Do we have any -- I mean, I don't know

13   what number that might be.  Is it several thousand?

14           **MR. AYLSTOCK:**  I would guess far less than that.  We

15   had a few in our firm's inventory that we did that for, but it

16   was a handful.  And we haven't surveyed the landscape to see if

17   others are in that boat, but we can certainly work with Mr.

18   Burns and Mr. Paul to crosscheck and figure that out.

19           **THE COURT:**  Well, I'd like for you all to do that.

20           Mr. Nomellini, do you have a sense of that?

21           **MR. NOMELLINI:**  Yes.  I don't get the sense that it's

22   a large number, Your Honor.  We can work with Mr. Aylstock to

23   provide a report on that, but I don't get the sense that it's

24   an overwhelming volume.

25           **MR. AYLSTOCK:**  I would agree with Mr. Nomellini.  And

1    because Minnesota has a little bit strange rule about service

2    without filing it, they may have better information on it than

3    even Mr. Paul or we would.

4        **THE COURT:**  I would ask that you all get together and

5    confer about this.  And if you can, I would appreciate a list

6    of those cases so that I can crosscheck with what we have and

7    make sure that they're off our rolls, so to speak.

8        **MR. NOMELLINI:**  We will do that.

9        **THE COURT:**  We don't need any more.  We have enough.

10   So if they're not really here, we need to make sure that

11   they're off of our docket.

12       **MR. AYLSTOCK:**  Right.

13       **THE COURT:**  I appreciate you all doing that.

14       Okay.  Mr. Nomellini, is there anything you would like

15   to add to the discussion I've just had with Mr. Aylstock?

16       **MR. NOMELLINI:**  Just that we agree with Your Honor's

17   comments with respect to Pretrial 81.  The census form schedule

18   there is painstakingly set forth, and we believe that

19   plaintiffs who do not meet that schedule should be dismissed.

20       With respect to the DD-214s, we agree that they should

21   be submitted within some period of time.

22       **THE COURT:**  All right.  Thank you.

23       Before we move into the Wave discussion, let me just

24   throw one other thing out there.  I do have another concern,

25   and that is with the amount of cases potentially being

03:33   1   dismissed, only after a considerable amount of time and expense

03:33   2   has been spent in a Wave process.

03:33   3   So we know just from the bellwether process that -- I

03:33   4   think the number is 29 percent of the bellwether plaintiffs

03:33   5   dismissed their cases either during or -- right before or

03:33   6   during discovery.  And I'm not suggesting that that pattern is

03:33   7   going to hold throughout the grand scheme.  If it did, we'd be

03:33   8   talking about 80,000 cases being dismissed either before or

03:33   9   during discovery, which, in my opinion, is just completely

03:33   10  unacceptable.

03:33   11  So I'm in tuned to this.  I'm going to be watching for

03:34   12  this because I'm the one -- it's my orders that are putting

03:34   13  these cases into discovery process.  And if I begin to see a

03:34   14  significant number being dismissed during the Wave process or

03:34   15  right before the end of the Wave process, I'm going to take

03:34   16  note of that, and there may be something more significant

03:34   17  entered in terms of an order requiring a threshold level of

03:34   18  proof before a case can be transitioned into a Wave order.  So

03:34   19  keep that in mind.

03:34   20  I'm not on the cusp of entering any such order right

03:34   21  now, but I'm also not inclined to have you all spend the amount

03:34   22  of time, money, and effort that's being spent on these Wave

03:35   23  cases only to have them fall out.

03:35   24  And I also am not inclined to start remanding cases to

03:35   25  my colleagues around the country after you all having spent

03:35  1   significant amounts of time in discovery and me spending a

03:35  2   significant amount of time and judicial resources on rulings

03:35  3   and dispositive motions, *Daubert* motions and the like, only to

03:35  4   have them dismissed when they get to another district.

03:35  5          That doesn't make sense to me that you all would spend

03:35  6   that kind of time and effort on the plaintiffs' side only to

03:35  7   dismiss a case on remand, but time will tell, I guess.

03:35  8          So I'm just telegraphing to you that I'm looking at

03:35  9   this.  And depending on what I see as part of the Wave process,

03:36  10  I may be entering some order in the future requiring a

03:36  11  threshold level of proof.  And I don't think with what I'm

03:36  12  dealing with -- what you all are dealing with but what I'm

03:36  13  dealing with as a judge in trying to manage this massive

03:36  14  litigation that any appellate court would look twice at me

03:36  15  taking that kind of action under these circumstances.

03:36  16         All right.  Let's talk about Wave.

03:36  17         Bryan, from your standpoint, how is that -- or I don't

03:36  18  know if there's else on your team who wants to address it.  But

03:36  19  how is the first wave going?  I understand from Judge Herndon

03:36  20  that -- I should have said this first.  Accolades are due all

03:36  21  the way around.  I mean, he's praising the efforts on both

03:36  22  sides to work things out.  I'm pleased that I haven't and Judge

03:36  23  Jones even hasn't been pulled into disputes at this point.

03:37  24         **MR. AYLSTOCK:**  A lot of -- yes, and I would echo the

03:37  25  -- and commend my colleagues on the other side of the aisle

03:37    1    that we have been working well together.  There have been bumps

03:37    2    in the road, to be fair, I'm sure on both sides, but they're

03:37    3    ones that can be worked out, and everybody has been

03:37    4    professional in so doing, and hopefully we can keep any real

03:37    5    disputes to a minimum.  So it's working.

03:37    6    **THE COURT:**  How about the DME process and the protocol

03:37    7    and the testing?  I know you negotiate about that.  Go ahead.

03:37    8    **MR. AYLSTOCK:**  There have been some issues, I think

03:37    9    largely because it's just getting off the ground, but there

03:37    10    have been some issues with regard to the request for a

03:37    11    plaintiff to travel exorbitant distances and things like that.

03:38    12    So some of those may bubble up to Your Honor or Judge Jones or

03:38    13    Judge Herndon.

03:38    14    For example, there's a person in Pace who was asked to

03:38    15    go to Miami for their DME, and that didn't make a lot of sense

03:38    16    given that Dr. LaBorde is right here.  Things like that where

03:38    17    -- we understand that there is an obligation for our clients to

03:38    18    do some travel, and I think Judge Jones had indicated three

03:38    19    hours was probably about where it could be.  But the DMEs

03:38    20    traditionally, or at least at this point, have been one per

03:38    21    state, and some states like Florida are pretty darn big.

03:38    22    So there's been issues with that.  There's been issues

03:38    23    with clients getting to the DME and the doctor not doing a DME

03:38    24    and they're sent home, things like that.

03:38    25    **THE COURT:**  Well, that shouldn't happen.

03:38  1       **MR. AYLSTOCK:**  I'm sure they would agree, none of that

03:38  2   should have happened.  So it is absolutely a lot of effort to

03:39  3   get all of this done.  And I know we're getting the plane off

03:39  4   the ground, and I'm hopeful that Wave 2 would be smoother.  I

03:39  5   didn't come into this -- I'm not trying to throw stones, but

03:39  6   you asked and there have been issues with the DME.

03:39  7       And there's been issues with -- some of the testing

03:39  8   that is done we may have some issues with that we'll address

03:39  9   with Judge Herndon given the range of the testing, was an

03:39  10  example that we talked about this morning.  And happy to get

03:39  11  into more detail on it but I --

03:39  12      **THE COURT:**  No, I don't need you to get now into more

03:39  13  detail.  I didn't specifically identify this as -- I mean,

03:39  14  obviously, in general the Wave process was to be discussed

03:39  15  today, but I don't need to get into specific disputes.

03:39  16      All I would say is, if this DME protocol, the testing,

03:39  17  the logistics of it, if there are serious issues, then, you

03:40  18  know, Judge Jones and I aren't looking for work, but I'd rather

03:40  19  deal with it sooner rather than later.  I don't want to get too

03:40  20  far into the Wave period to hear, well, we need another 60 days

03:40  21  or another 90 days because we just couldn't get this done.

03:40  22  That I don't want.

03:40  23      **MR. AYLSTOCK:**  Yeah, and we would oppose that,

03:40  24  obviously.

03:40  25      We've had scheduling issues where we've confirmed a

03:40   1    DME and like within hours, *Yes, our client can do it*, and then

03:40   2    we hear back a couple of weeks later that, *No, that slot was*

03:40   3    *filled.*  So things like that.

03:40   4          But I know from the other side they're willing to work

03:40   5    with us on that and we're willing to work with them, but I

03:40   6    don't think that extending deadlines is the answer to problems

03:40   7    with the DME.

03:40   8          THE COURT:  Well, Judge Herndon has his hands full, so

03:40   9    I'm starting to get the sense that maybe I need to appoint a

03:41   10   DME special master.  I mean, I'm kidding, but --

03:41   11          MR. AYLSTOCK:  Hopefully not.

03:41   12          THE COURT:  Do I need someone to assist me in

03:41   13   hand-holding in this DME process?  I certainly knew this was

03:41   14   going to be the most complex part of the Wave process.  I did.

03:41   15   I mean, it's unique, and it's got to be a challenge within the

03:41   16   time frame you all have.  But I also believe it's doable.

03:41   17          Mr. Nomellini, you are looking like you're wanting to

03:41   18   stand up and speak.

03:41   19          MR. NOMELLINI:  Yes, Your Honor.  I agree with Mr.

03:41   20   Aylstock, people have been working very hard on both sides.

03:41   21          On the DME, my statistics -- and these change every

03:41   22   day, by the way -- is that there are 32 complete, 146

03:41   23   scheduled, 171 dates offered.  I think on about 30 we've gotten

03:41   24   no response.

03:42   25          With the amount of volume, you know, yes, of course,

03:42   1   there are issues that have come up, they're inadvertent.  And

03:42   2   when they come up, we work with plaintiffs, we identify them,

03:42   3   and we take mitigating steps, one of which is we've instituted

03:42   4   a notice of DME to be filed in MDL Centrality, and it includes

03:42   5   the details of the plaintiff, the provider, and location, date

03:42   6   and time, test expected to be performed.

03:42   7        And then for the testing issues, we make sure all the

03:42   8   providers have a receipt of PTO 56, CMO 31 which lists the

03:42   9   tests.  So whenever an issue comes up, we appreciate anybody

03:42   10  bringing it up so that we can make sure everybody is on the

03:42   11  same page.

03:42   12       THE COURT:  Okay.  Well, I don't want to invite

03:42   13  trouble or a problem, but I am asking you to let myself or

03:42   14  Judge Jones -- first Judge Herndon, but then if it can't be

03:43   15  resolved, so that we can resolve it for you and so that you're

03:43   16  not in a log jam.  That's what I don't want to see in terms of

03:43   17  the DME because there's obviously a lot of plaintiffs that have

03:43   18  to get through this process and I know the defendants want the

03:43   19  examinations done.

03:43   20       Judge Herndon, do you have anything to offer on the

03:43   21  DME front?

03:43   22       JUDGE HERNDON:  No.  I noticed a few issues that Mr.

03:43   23  Aylstock mentioned with respect to distance, but by and large

03:43   24  it seems to be working quite well.  I would say, if there's

03:43   25  issues with respect to distance, that we need to find that out

| | | |
|---|---|---|
| 03:43 | 1 | a lot quicker than later and get it resolved because that |
| 03:43 | 2 | shouldn't be a hard thing to resolve. |
| 03:43 | 3 | MR. AYLSTOCK:  The other thing that might be helpful |
| 03:43 | 4 | is if we could get some of these scheduled on weekends or |
| 03:43 | 5 | evenings.  It's obviously tough for -- a lot of these folks |
| 03:43 | 6 | work.  And at this point, we haven't really been offered that. |
| 03:44 | 7 | So that would be helpful along with locations that are closer. |
| 03:44 | 8 | And then if we can just have confirmations -- if we confirm a |
| 03:44 | 9 | date, it really needs to be, *Okay, we're good to go*, as opposed |
| 03:44 | 10 | to waiting a couple of weeks to say, *Well, no, that date is no* |
| 03:44 | 11 | *longer available*, or something like that. |
| 03:44 | 12 | THE COURT:  I'm not going to required weekends or |
| 03:44 | 13 | evenings.  Now, if the defense examiners are willing to do |
| 03:44 | 14 | that, then that's fine.  But I wouldn't do that just as a |
| 03:44 | 15 | matter of convenience to the plaintiffs.  I understand they |
| 03:44 | 16 | work, you know, most everybody works, but this is just sort of |
| 03:44 | 17 | part of the fact of litigation. |
| 03:44 | 18 | With that said, if your examiners are not able to get |
| 03:44 | 19 | the plaintiffs in and visits get extended and that becomes a |
| 03:45 | 20 | burden, that's something I would want to know, and I may be |
| 03:45 | 21 | inclined to require something extraordinary like that if you |
| 03:45 | 22 | can't get your examiner to get the plaintiff in. |
| 03:45 | 23 | Mr. Nomellini, what is your response to this? |
| 03:45 | 24 | MR. NOMELLINI:  Certainly we're open to working with |
| 03:45 | 25 | the plaintiffs on this.  We can talk about weekends and |

03:45  1    evenings.  Many clinics may not be able to accommodate it, but

03:45  2    it's certainly something we're open to depending on the clinic.

03:45  3         And there are also -- I think there are about 30

03:45  4    instances where we have not received a response from the

03:45  5    plaintiff to an offer for a DME.  That's also something we're

03:45  6    working through with plaintiff.

03:45  7         **MR. AYLSTOCK:**  And if we could get that list from

03:45  8    leadership, we could help corral that, and I'm happy to.

03:45  9         **MR. NOMELLINI:**  Absolutely.

03:45  10        **THE COURT:**  Yes, please, Mr. Nomellini, get that

03:46  11   together and provide it to Mr. Aylstock or Ms. Hoekstra, and

03:46  12   they can perhaps help facilitate getting you those responses.

03:46  13        **MR. NOMELLINI:**  Yes.  And similarly on depositions, a

03:46  14   lot of activity going on.  Again, these numbers change

03:46  15   regularly, but I think my number is 308 so far, 135 already

03:46  16   scheduled for February in addition to 22 for March.

03:46  17        Same kind of issues come up on both sides, sometimes

03:46  18   we have a date nailed down and the plaintiff does not appear,

03:46  19   but these are things that we work through with plaintiffs.

03:46  20        **THE COURT:**  Well, that shouldn't happen either.

03:46  21        **MR. AYLSTOCK:**  Agreed.

03:46  22        **THE COURT:**  If there's a lot of that where plaintiffs

03:46  23   aren't appearing for depositions or doctors are cancelling

03:46  24   DMEs, you're not going to get your DME and your plaintiff's

03:46  25   case is going to be dismissed.

03:46  1     **MR. AYLSTOCK:**  Understood, Your Honor.  We've had --
03:47  2  and this has been somewhat addressed, but there's been
03:47  3  different providers of the Zoom service and Golkow has been
03:47  4  really the provider that we've been using primarily in this
03:47  5  case and they've been using Veritext.

03:47  6          Golkow provides a breakout room for free always and,
03:47  7  frankly, is cheaper, and we would like Veritext to do that for
03:47  8  our plaintiffs as well because these are Zoom depositions.  And
03:47  9  they have indicated they will only do it for an upcharge, and I
03:47 10  don't know that that's right or fair.  But we've had a few
03:47 11  logistical issues with Veritext, I think it's fair to say.

03:47 12     **MR. NOMELLINI:**  Your Honor, I'm not familiar with it,
03:47 13  but I'm happy to discuss it.

03:47 14     **THE COURT:**  It sounds like something that should be
03:47 15  worked out.  I really would hate to have to get in the weeds on
03:47 16  this one and order it.  How about you all talk about it at your
03:48 17  level and see if it can't be worked out, whatever those issues
03:48 18  are.

03:48 19     **MR. AYLSTOCK:**  Sounds good.

03:48 20     **THE COURT:**  And of course involve my good friend,
03:48 21  Judge Herndon, if you would, please.

03:48 22     **MR. NOMELLINI:**  I think the bottom line from my
03:48 23  perspective is that, with the number of cases we have going on,
03:48 24  by and large, things are going well, and we're working hard
03:48 25  with plaintiffs to resolve these issues when they come up.

03:48   1   Sometimes the plaintiff is nonresponsive or sometimes there's
03:48   2   an issue with the DME provider, but we've been working through
03:48   3   it.
03:48   4           THE COURT:  And that's the feedback I'm getting.  I've
03:48   5   heard very positive comments about some of the firms that 3M
03:48   6   has hired, new firms that are involved in the Wave process and
03:48   7   that they are working very hard and are very accommodating and
03:48   8   trying to get through the Wave process, and so I've only heard
03:49   9   positive.  Now, maybe you all are -- or Judge Herndon is trying
03:49   10  to keep me away from the devils in the detail kind of disputes
03:49   11  you're having.  If so, he's doing a good job at it, because I
03:49   12  thought everything was just proceeding very smoothly.
03:49   13          MR. AYLSTOCK:  Thanks to Judge Herndon it's very much
03:49   14  largely positive, and we do appreciate them working with us.
03:49   15  But there are issues and we're working through them.
03:49   16          The authorization issues are also out there.  We've
03:49   17  negotiated with the other side a protocol so we do provide
03:49   18  blank authorizations and so forth.  And we've worked out a way
03:49   19  so that, when their provider or their ordering company MRC gets
03:49   20  the documents, that they go in and there's a certain period of
03:49   21  time that lawyers have to review the documents and redact or
03:49   22  assert a claw-back and so forth.
03:50   23          So that is also happening, and there's very short
03:50   24  turnarounds on that.  So, for everybody listening, just be
03:50   25  aware of those turnarounds, and we'll certainly continue to

03:50   1    disseminate that.

03:50   2            **THE COURT:**  Okay, please disseminate that.  And to the

03:50   3    extent you need assistance from the Court, Judge Jones and I

03:50   4    are here.  Even if it's with your own sort of population, if

03:50   5    you need help getting that word out or the impression made of

03:50   6    the importance of it, we can do that.

03:50   7            **MR. AYLSTOCK:**  Thank you, Judge.

03:50   8            **THE COURT:**  Judge Jones, anything from your

03:50   9    standpoint?  I know you've been involved a little bit in the

03:50   10   past on the DME protocol issue.

03:50   11           **JUDGE JONES:**  No, I haven't seen any issues.  I'm

03:50   12   happy about that.  We had a couple of issues about a year ago,

03:51   13   but I think they were very specific issues.

03:51   14           **THE COURT:**  Yeah, okay.  Well, again, just don't let

03:51   15   something sort of fester and just get it to us if it needs to

03:51   16   be dealt with sooner rather than later.

03:51   17           **MR. NOMELLINI:**  We will do that, Your Honor.

03:51   18           **THE COURT:**  All right.  As I said earlier, the next

03:51   19   Wave Order will be entered on the 22nd.  Those cases have been

03:51   20   identified, at least for me, and we'll issue that order.  And I

03:51   21   presume, as more Wave Orders are entered, the process will get

03:51   22   smoother, I hope.  It's understandable and not surprising that

03:51   23   the first process would be the most challenging in terms of

03:51   24   getting things in place in terms of the machine.

03:51   25           Anything else that needs to be discussed?  I don't

03:52    1    have anything else from my standpoint.

03:52    2          **MR. AYLSTOCK:**  Not from the plaintiffs, Your Honor.

03:52    3          **THE COURT:**  Mr. Nomellini?

03:52    4          **MR. NOMELLINI:**  Not from defendants, Your Honor.

03:52    5          **THE COURT:**  Judge Jones or Judge Herndon, anything

03:52    6    else?

03:52    7          **JUDGE HERNDON:**  Nothing else, thank you.

03:52    8          **THE COURT:**  Okay.  Thank you all very much.  I

03:52    9    appreciate the input and updates.  And those of you who are

03:52    10    going to attend the gathering in memory of Neil, I'll see you

03:52    11    there.

       12          **MR. AYLSTOCK:**  Thank you, Judge.

       13          *(Proceedings concluded at 3:52 p.m.)*

       14          --------------------

       15    *I certify that the foregoing is a correct transcript from the*

       16    *record of proceedings in the above-entitled matter.  Any*
*redaction of personal data identifiers pursuant to the Judicial*

       17    *Conference Policy on Privacy are noted within the transcript.*

       18

       19    *s/Donna L. Boland*              *2-24-2022*
*Donna L. Boland, RPR, FCRR*      *Date*

       20    *Official Court Reporter*

       21

       22

       23

       24

       25