# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG LITIGATION
LIABILITY LITIGATION

This Document Relates to:
 *James Beal*
 Case No. 7:20-cv-00006

 *Denise Kelley*
 Case No. 7:20-cv-00153

 *Jonathon Vaughn*
 Case No. 7:20-cv-00134

 *Luke Vilsmeyer*
 Case No. 7:20-cv-00113

 *Steven Wilkerson*
 Case No. 7:20-cv-00035

CASE NO.: 3:19-MD-2885-MCR-GRJ


Chief Judge M. Casey Rodgers
Magistrate Judge Gary Jones

**PUBLIC VERSION - REDACTED**

## DEFENDANTS' RESPONSE TO PLAINTIFFS' OMNIBUS MOTION AND MEMORANDUM OF LAW TO EXCLUDE DEFENDANTS' GROUP D EXPERT OPINIONS AND TESTIMONY

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................6

I. CHATHAM. .......................................................................................7

    A. The Court Should Reject Kelley's Improper Attempts to Shift Her Burden of Proving Causation onto Defendants....................8

    B. As a Defense Expert, Chatham Was Not Required to Conduct a "Differential Etiology."......................................................10

II. CRAWFORD..................................................................................12

    A. General Opinions............................................................................12

        1. ████████████████████ ...............................................12

        2. Internal Company Documents. ...................................................13

        3. Prevalence of Hearing Loss in the Military. ..............................14

        4. Synaptopathy...............................................................................15

    B. Kelley. ............................................................................................15

        1. Crawford Was Not Required to Examine the CAEv2....................................................................................15

        2. Crawford's Causation Analysis Is Proper.................................17

        3. Crawford is Qualified to Opine that ████████ ████████████. .......................................................18

    C. Wilkerson. ......................................................................................19

        1. CAEv2..........................................................................................19

        2. No-Cost Hearing Aids..................................................................20

        3. ████████████████████ (████). .................20

4.     ███████████████ ...................................................................21

III.    JACOBS. ..............................................................................................22

    A.     Vaughn. ..................................................................................22

    B.     Wilkerson. ..............................................................................25

IV.    PAPPAS. ..............................................................................................27

V.     FLAMME & STEPHENSON. .............................................................29

    A.     Army Hearing Conservation Program. ...............................29

    B.     ████████████ ...................................................................30

    C.     ████████ ...........................................................................31

    D.     ████████████ ...................................................................33

    E.     ████████████ ....................................................................35

    F.     ███████████ ......................................................................36

VI.    PHILLIPS. ............................................................................................38

    A.     CAEv2 Causation Opinions. ...............................................38

    B.     ██████. ................................................................................42

    C.     ██████ ................................................................................43

    D.     ████████ ...........................................................................44

    E.     █████ ..................................................................................45

    F.     ████████████████ .............................................................46

VII.   JONES AND LaBORDE. ......................................................................46

CONCLUSION ...............................................................................................49

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re AndroGel Antitrust Litig. (No. II)*,
    888 F. Supp. 2d 1336 (N.D. Ga. 2012)................................................................41

*United States ex rel. Armfield v. Gills*,
    2012 WL 12918274 (M.D. Fla. July 6, 2012) ....................................................26

*Aycock v. R.J. Reynolds Tobacco Co.*,
    769 F.3d 1063 (11th Cir. 2014) ....................................................................6, 43

*Chapman v. Procter & Gamble Distrib., LLC*,
    766 F.3d 1296 (11th Cir. 2014) ..........................................................................42

*City of Milwaukee v. NL Industries*,
    762 N.W.2d 757 (Wis. Ct. App. 2008)..............................................................20

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).................................................................................*passim*

*Dugas v. 3M Co.*,
    2016 WL 7327666 (M.D. Fla. Mar. 30, 2016) ..................................................28

*Garcia v. Scottsdale Ins. Co.*,
    2019 WL 1318090 (S.D. Fla. Mar. 22, 2019) ....................................................27

*Gussack Realty Co. v. Xerox Corp.*,
    224 F.3d 85 (2d Cir. 2000) .................................................................................41

*Leitinger v. DBart, Inc.*,
    736 N.W.2d 1 (Wis. 2007)..................................................................................20

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001) ...........................................................................27

*Murphy v. Columbus McKinnon Corp.*,
    963 N.W.2d 837 (Wis. Ct. App. 2021)..............................................................15

*United States v. Beasley*,
    72 F.3d 1518 (11th Cir. 1996) ...........................................................................28

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ...........................................................................12

*United States v. Minter*,
    2014 WL 12792618 (N.D. Ga. June 17, 2014)...................................................28

*United States v. Young*,
    2020 WL 4692389 (N.D. Ala. June 1, 2020) .....................................................28

**Rules**

Fed. R. Civ. P. 403 ...............................................................................................22, 23

Fed. R. Civ. P. 702 ...................................................................................................42

## INTRODUCTION

Plaintiffs' motion to exclude Defendants' Group D experts mischaracterizes the experts' opinions, ignores their qualifications and the methodologies they actually use, and selectively quotes and misinterprets deposition testimony.  At most, Plaintiffs' points are suitable for "[v]igorous cross-examination" and "presentation of contrary evidence"—not exclusion.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).  Plaintiffs' motion should be denied.[1]

Plaintiffs again err in arguing that Defendants' experts should be excluded for not opining to a reasonable degree of certainty as to what caused Plaintiffs' alleged hearing injuries.  PltfsMot. 8-16.  The Court previously rejected this argument, holding that a "defense expert may offer evidence of potential alternative causes of an injury without needing to prove those alternative-cause theories with certainty or probability."  ECF 2218 at 45-46 & n.26 (collecting cases).  The "defendant's ability to present alternate causes is of paramount importance in allowing for an adequate defense."  *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069-70 (11th Cir. 2014).  The Court also rejected Plaintiffs' argument that a defense expert's opinion was "mere speculation because [he] did not rule in or rule out other causes of

---

[1] Internal quotation marks, citations, modifications, and deposition objections are omitted from quotes unless otherwise indicated.  This memorandum uses *supra* and *infra* to cross-reference the pages containing relevant authorities.

[Plaintiff's] hearing impairments", holding that the expert's opinion was sufficient by ruling in other causes or contributors that he opined were more likely causes of hearing loss.  ECF 2218 at 46.

Plaintiffs again cite cases that are irrelevant and discuss what *plaintiffs'* experts must do to establish causation, not how defendants' experts are constrained. PltfsMot. 9, 12-13.  For example, the Eleventh Circuit in *Allison v. McGhan Med. Corp.* ruled inadmissible the *plaintiff's* experts' causation testimony because their opinions were insufficient.  184 F.3d 1300, 1315 (11th Cir. 1999).  Defendants incorporate their prior argument on this issue, ECF 2196 at 9-11, and ask the Court to re-affirm its prior holdings.

## I.   CHATHAM.

Chatham is a board-certified rheumatologist and medical professor with decades of experience diagnosing and treating ███████████████████.   Ex1, Chatham Report 1.  Chatham properly evaluated Kelley's medical history— including ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ cannot, as Kelley's expert Djalilian concludes, be ruled out as a cause of Kelley's ██████████.  *Id.* 2.

**A.      The Court Should Reject Kelley's Improper Attempts to Shift Her Burden of Proving Causation onto Defendants.**

Plaintiffs' argument that Chatham "fails to sufficiently opine as to a *causal impact*" and establishes only an "association" between ████████████████████ ████████████████, PltfMot. 11-12, misunderstands that *Kelley—not Defendants*—bears the burden of proof and a defense expert need not establish the cause of a Plaintiff's alleged injuries. *Supra* at 6-7.

Moreover, Kelley's own experts acknowledge that ████████████████ ████████████. Djalilian ruled out ████████████████ not because these cannot cause ████████, but because he believes Kelley does not have ██ ████████████████████████████████. *See* Ex2, Djalilian-Kelley Report 27.  Gershwin admits that ████████████████████████████ ████████████████████." Ex3, Gershwin-Kelley Report 3.

Chatham's opinions rely on record facts and reliable methodologies to present alternative causes of Kelley's alleged injuries.  He opines that Kelley's audiograms evidence "██████████████████████████████████████ ████████████████████████████████████████ ████████████████████████" Ex1, Chatham Report 2. Her ████████████████████████████████████████ ████████████ *Id.*

8

Chatham reviewed Kelley's medical history, noting that ***three*** of Kelley's

treating physicians, at different times, ██████████████████████████████████

████████████████████████████████████████████████. *Id.* He

identified in Kelley's medical history ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████ *Id.*[2] He noted various

other █████████████████████████████████████████████████████████

███████████████████████████. *Id.* He noted that one of Kelley's physicians had

████████████████████████████████████████████████. Ex1, Chatham

Report at 8.

These facts and his vast experience led Chatham to opine that Djalilian

improperly ruled out ████████████████████████████████████████████

███████████████ *Id.* This opinion is supported by both the records and common sense.

As Plaintiffs admit, the tests recommended by her treating physicians were ████████

---

[2] Plaintiffs claim Chatham "readily concedes" that █████████████████ each "have
possible alternative causes." PltfsMot. 10. But Chatham evaluated the host of
████████████████████████████ not in isolation and out of context. Ex4,
Chatham Dep. 53:19-23 (noting Kelley ████████████████████████████████
█████████████████████████████████████; 54:25-55:7 (emphasizing the need to put
Kelley's ███████████████ in "context").

███████████████████████████ PltfsMot. 8-9.  While Plaintiffs assert that Kelley ████████████████████████████ and Chatham must have been ████████████████████████, PltfsMot. 11, Kelley admitted she *was* ████████████████████. Ex5, Kelley Dep. 186:12-14, 190:16-191:2.[3]  Djalilian cannot "rule out" ██████████████ when Kelley has not been tested for them, ██████████████████████████████████ ████████████████████████████████.

Finally, Chatham's opinions are not equivocal.  PltfsMot. 11. Chatham opines "to a reasonable degree of medical certainty" that Kelley's alleged ████████████ ████████████████████████ and that it is not possible to rule ████ out as Dr. Djalilian did."  Ex1, Chatham Report 7.  Accordingly, his opinions are admissible.

### B.    As a Defense Expert, Chatham Was Not Required to Conduct a "Differential Etiology."

Plaintiffs  assert  that  Chatham's  identification  of  ████████████████ ████████████████  represents "clearly diagnostic opinions that require a proper differential  etiology,"  PltfsMot.  9,  attempting  to  make  Chatham's  opinion  into

---

[3] Plaintiffs have recently produced a previously-redacted document that bears on this issue, which is subject to an ongoing dispute between the parties.

something it is not. Chatham—as a *defense* expert—can present potential alternative causes without performing a differential etiology. *Supra* at 6-7.

Kelley's claim that this Court "recently recognized the importance of the differential etiology to defense expert opinions in finding certain challenged opinions of 3M expert Crawford admissible," PltfsMot. 9 (citing ECF 2218 at 49), mischaracterizes the Court's opinion. This Court distinguished Crawford's opinions from those "of Dr. House in *EHK* that a plaintiff's ███████ were 'more likely than not' the cause of his ████ without considering *any* other potential causes, including noise exposure." ECF 2218 at 49. Crawford's opinions were "distinguishable" and not excluded because, "unlike Dr. House, Crawford d[id] not opine that ████████ is the sole cause of Camarillorazo or Finley's ██████ ████." *Id.*

Similarly, Chatham did *not* purport to identify the *sole* cause of Kelley's alleged ██████. Rather, he thoroughly reviewed her medical history and identified multitudinous evidence supporting ████████ as an alternative cause. His opinion is like Crawford's in *Camarillo* and *Finley*, and unlike House's in *EHK*, and should be admitted consistent with the Court's Group C opinion. *Id.* 45-46.

## II.    CRAWFORD.

Crawford is a highly credentialed neurotologist with more than two decades of experience, including at the Madigan Army Medical Center, the Hearing Conservation Program at Ft. Lewis, WA, and the Executive Committee of the Hearing Center of Excellence.   Ex8, Crawford-Kelley Report 1-3.   Crawford exhaustively reviews both Kelley's and Wilkerson's medical histories and properly evaluates whether the CAEv2 caused their alleged ██████████.   *Id.* 8-25; Ex9, Crawford-Wilkerson Report at 7-16.

### A.    General Opinions.

#### 1.    ████████████████████.

Plaintiffs argue for the exclusion of Crawford's opinions that "95% of people with ██████ develop coping strategies and have no significant problem with their ██████"; that "[t]hose who do struggle often have associated ████████████ ████████████" and that ██████ generally "does not cause ████████ ████████████████████████████████████." PltfsMot. 6; Ex10, Crawford-General Report 13.  Plaintiffs argue that Crawford's opinions are mere "anecdotal evidence," unsupported by "any peer-reviewed literature or scientific studies." PltfsMot. 6.  But studies do show that ████████ conditions can exacerbate ████████████.  *E.g.*, Ex39, Languth, ████████████ (2011).  And a witness may be "qualified as an expert by … experience." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004); ECF 1680 at 72-73.

Crawford reaches his opinions via "extensive experience managing patients with ████"— Crawford is an expert in ██████ coping strategies and ██████████ issues as a result of treating thousands of patients with ██████, and his opinions appropriately arise out of that expertise.   Ex10, Crawford-General Report 13.

### 2.   Internal Company Documents.

Plaintiffs are also wrong to argue that Crawford cannot opine that internal company documents are not typically relied on by clinicians because are not subject to peer review.  Crawford has decades of experience and appropriately opines about the sources clinicians use when making medical determinations.  His opinion that relying on company documents is inconsistent with the methods of physicians in the field is supported by that experience and the fact that case histories and physical examinations are the typical means of diagnosing a patient.  Ex11, Corbridge, *Essential ENT* 1-11 (2011) (medical professionals conduct comprehensive evaluations of their patients by collecting case histories and conducting examinations).   Nor is Plaintiffs' experts' methodologies having been held admissible a barrier to Crawford's opinions, PltsfMot. 6-7; Crawford may still appropriately call into question the weight to be accorded to Plaintiffs' expert's testimony.

Plaintiffs at best should be permitted to explore their disagreement with Crawford in cross-examination.  Indeed, Plaintiffs' experts opine about the sources

they consider to diagnose and treat patients—*e.g.*, Ex12, Spankovich-General Report 24-43—and Crawford should be permitted to do the same.

### 3.    Prevalence of Hearing Loss in the Military.

Crawford's opinions that noise-induced hearing loss is common in the military are relevant and well-supported.  PltfsMot. 7.  The Army recognizes that "hazardous noise exists as one of the primary occupational hazards in the Army" with "[t]he risk of NIHL [noise-induced hearing loss] in Soldiers [reaching] the highest rate in over 30 years," Ex13, S-GEN-5 at 10, and that "[n]oise-induced hearing loss is … [o]ne of the most prevalent OH impairments for soldiers and civilians who work in the military."  Ex14, S-GEN-69 at 8 (DA PAM 40-501, § 2-3(b)(5)).  Indeed, Plaintiffs' own experts agree that noise-induced hearing loss is common in the military, *e.g.*, Ex15, █████████████████████████████████ ██████, and Crawford's opinion is also supported by his extensive experience, *supra* at 12.

Nor is Crawford's opinion comparable to that of Fallon, who the Court held could opine about his personal experiences, but not about the percentage of "all servicemembers" who did not properly wear hearing protection.  ECF 1651 at 13. Crawford is not purporting to wrongly extrapolate from one experience.  Rather, he is simply opining that hearing problems are a common risk to military service; an

opinion that Plaintiffs' own experts agree with and that is well-supported in the military's own literature.

Crawford's opinions have direct relevance here.  For example, a "risk-utility balancing test" applies to ████████████████████████████████.  Under that test, "the plaintiff must show that the foreseeable risks presented by a product design could reasonably have been limited by the net utility and costs of an alternative design."  *Murphy v. Columbus McKinnon Corp.*, 963 N.W.2d 837, 846 (Wis. Ct. App. 2021).  The prevalence of hearing loss is relevant to that test and  the "net utility" of the CAEv2 and any alternative design.

### 4.    Synaptopathy.

Plaintiffs argue for exclusion of Crawford's "opinions regarding synaptopathy."  PltfsMot. at 5.  But Plaintiffs are not pursuing a hidden hearing loss (HHL) theory in the relevant Group D cases.  Further, Crawford's testimony about the reliability of HHL theories from a practitioner's perspective is fully consistent with the Court's prior rulings, which addresses the admissibility of Plaintiffs' HHL opinions in other cases.

### B.    Kelley.

### 1.    Crawford Was Not Required to Examine the CAEv2.

Plaintiffs assert that Crawford was required to examine the CAEv2, PltfsMot. 14, but the Court previously rejected this argument, holding that "[t]he fact that Crawford did not examine the alleged defect of the CAEv2 to determine whether it

contributed to Plaintiffs' injuries goes to the weight of his opinion but not admissibility." ECF 2218 at 43. That holding should apply here because an inspection was unnecessary for Crawford's opinion that Kelley's ████████ is not noise induced. Ex8, Crawford-Kelley Report 21-25. Crawford explains that "Kelly's ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" that would "indicate ████████ due to noise exposure," and Kelley also developed ████████ proximate to indoor desk duty while ████████, not noise exposure. *Id.* 22.

Crawford also did not need to examine the CAEv2 to determine that Kelley's ████████ is consistent with ████████████████████ and/or ████████. Kelley's audiograms showed ████████ ████████████████ ████████████—including "████████████████████████████████████████████████████████████████████ *Id.* 23.

These conclusions are bolstered by Kelley's medical history, which demonstrates that ████████████████████████████████████████████████████████████████████████████████████████████████ *Id.* As for ████████, Crawford explains that Kelley's ████████████████████████████



██████████████████████████ *Id.* Kelley's ████████

██████████████████████████████████████

████████████████████████████████ *Id.* 24.

Moreover, Crawford observes that Kelley's "recent audiograms ████████

███████████████████████████ *Id.* None of this

analysis is dependent on Crawford examining the CAEv2.

Nor did Crawford need to examine the CAEv2 to determine that Kelley's

expert, Djalilian, improperly ruled out alternative causes. *Id.* 24-25. Among other

things, Crawford points out that Djalilian "fails to acknowledge" that Kelley's

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ as alternative causes do not depend on the CAEv2's design.

## 2. Crawford's Causation Analysis Is Proper.

The Court has already rejected Plaintiffs' argument Crawford's opinions

should be excluded because Crawford "cannot opine to a reasonable degree of

medical certainty that any of the[] alleged ████████████████████

██████████████████████████████████████████

PltfsMot. 14.  *Supra* at 6-7.  Moreover, Crawford *did* rule out noise (and other potential factors) as a cause of Kelley's ███████████.  *Supra* at 16-17.  Based on Kelley's records and his own experience treating soldiers, Crawford concludes, to a "reasonable degree of medical and scientific certainty," that ███████████████ are potential alternative causes.  *Supra* at 16-17.  Crawford's opinion  relies on record facts and reliable methodologies, and is consistent with *Daubert* and the Court's Group C opinion.  ECF 2218 at 45-46.

### 3.   Crawford is Qualified to Opine that Kelley's ███████ Are Consistent with an ████████████████.

Kelley asserts that Crawford "should not be permitted to opine" on "whether Kelley has ████████████████████████████████" because Kelley has never formally been ████████████████████████, and Crawford "is not an ██████████████████████████████████".  PltfsMot. 15.  But it is well within Crawford's expertise to identify ██████████████████████; "over the course of a 15 year career," Crawford has treated "hundreds and hundreds" of such patients.  Ex75, Crawford Dep. 14:3-14.  Moreover, if rendering an opinion on the relationship between ███████████████████████████████████████ ████████████████████████████, then Kelley's argument requires the exclusion of her expert, Djalilian, who does not have those qualifications.  *See* Ex2, Djalilian-Kelley Report 27.

Moreover, Kelley *admits* that she was diagnosed with ███████████. *Supra* at 10.   And whether there was a formal diagnosis is no help to Kelley's argument.  Kelley's experts, Djalilian and Gershwin, purport to e████████ ████████ as a potential alternative cause of ███████ *despite* the fact that Kelley's doctors recommended ██████████████████. *Supra* at 9. ████████████████████ *undermines* her experts' conclusions and *bolsters* Crawford's.  Crawford's opinions have a sufficient foundation.

**C.   Wilkerson.**

**1.   CAEv2.**

Plaintiffs' argument against Crawford's alternative causation opinion should be rejected for the same reasons as for Kelley and in the Court's Group C *Daubert* opinion.  ECF 2218 at 41-43; *supra* 6-7, 17-18.  Such an inspection is unnecessary for Crawford's opinion that alternative causes better explain Wilkerson's ██████ ███.

By reviewing Wilkerson's audiograms, Crawford determined Wilkerson's ██████████████████████████████ when Wilkerson allegedly used the CAEv2.   Ex9, Crawford-Wilkerson Report 16.   Whatever hearing protection device Wilkerson used during this period was working for Wilkerson.  Crawford also explains that Wilkerson's alleged ████████ could have been caused by several other factors, including (1) noise exposure prior to and after

Wilkerson's use of the CAEv2; (2) ████████; (3) ████████████; and (4) ████. *Id.* 16-18. None of these alternative causes depends on the CAEv2's design.

### 2. No-Cost Hearing Aids.

Wisconsin's collateral source rule has exceptions, including (1) for impeachment purposes; and (2) a limited use of the evidence where collateral sources overlap with non-collateral issues related to the collateral source. *See Leitinger v. DBart, Inc.*, 736 N.W.2d 1, 9 (Wis. 2007); *City of Milwaukee v. NL Industries*, 762 N.W.2d 757, 780-81 (Wis. Ct. App. 2008). Crawford will not offer evidence that hearing aids are available through the VA at no cost to Wilkerson unless Plaintiffs open the door. *City of Milwaukee*, 762 N.W.2d at 780-81.

### 3. ████████████████████████



Plaintiffs assert that Wilkerson was not diagnosed with ████, PltfsMot. 16, but that is irrelevant given that he experienced ████████ that could have caused his alleged ████████████. Crawford considered that Wilkerson ████ ████████████████████████████████████ ████████████████ Ex9, Crawford-Wilkerson Report 15-16. Scientific literature supports ████████████████████ ████████ Ex17, Knoll, *Patient-Reported* ████████████ ████████████████, THE LARYNGOSCOPE 00:1-7 (2019); Ex18, Henry, *Noise Outcomes in Servicemembers Epidemiology (NOISE) Study*, EAR &

HEARING, 42:4, 870-885 (2021).   "[F]actual disputes about the severity of [the Plaintiff's] ███████████ go to the weight of Crawford's opinion and not admissibility."  ECF 2218 at 50.

**4.**  ███████████

Despite Plaintiffs' arguments, PltfsMot. 16, Crawford properly opines that Wilkerson's ████████████████████████████████████████████ ███████, are possible alternative causes of Wilkerson's ████████████████ The Court previously excluded ██████ opinions because the experts did "not know what ████████ if any, each Plaintiff was exposed to in connection with the ████████ ████████ and there was no evidence of ████████████████████████████ ████ ECF 2218 at 33. ████████████████████, with studies demonstrating that it causes ████████.  Ex19, Tepe, ████████████████████████████████ ████████████████████ 2020); Ex20, Guthrie, ████████████████████ ████████████████████████████████████████████████ (2014).

In his Post-Deployment Health Assessment, Wilkerson indicated that he was concerned about his exposure to ████████████████████████████████████ ████████████████  Ex21, D-Wilkerson-277.  Crawford should be allowed to opine about those exposures as an alternative basis for Wilkerson's hearing issues.

## III.   JACOBS.

### A.   Vaughn.

The Court should reject Plaintiffs' criticisms of Jacobs' opinions that (i)

Vaughn's ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████. PltfsMot. 20-22.   Jacobs is a

psychiatrist with 40 years of experience and an Associate Professor of Psychiatry at

Harvard Medical School who is more than qualified to offer these opinions regarding

███. Ex22, Jacobs-Vaughn Report 1-3.

Plaintiffs' attacks on these opinions at best go to weight, not admissibility.

First, Plaintiffs argue that Jacobs' ████████████████████████ are

inadmissible because "restating and comparing how Vaughn's symptoms are

described in his medical records would be unhelpful and inadmissible under Rule

403." PltfsMot. 20.   But Jacobs does not merely restate records, rather, he applies

his considerable expertise treating █████ to discuss how Vaughn's ████████

██████████████████. Ex22, Jacobs-Vaughn Report 40-48.   This is helpful

testimony.   ECF 1680 at 117 (experts may rely "on evidence that explains the factual

bases of their opinions").   Likewise, that Jacobs has not treated veterans with █████

at best goes to weight, PltfsMot. 21; Jacobs has treated countless persons with ██████ and so is qualified to offer the opinions he provides here.  And Plaintiffs' quibbles with the record, *e.g.*, "Jacobs ignores or discounts Vaughn's testimony," again are only fodder for cross-examination.  *Id.*

Second, the same goes for Jacobs' opinions regarding Vaughn's ██████ ██████ *Id.*  Plaintiffs again quibble with the record, suggesting that Vaughn may not have connected ████████████████████████ ██████ *Id.*  But the Court has already ruled Jacobs may appropriately note the absence of significant records, permitting him to testify that that Camarillorazo's "records contained no indication that Camarillorazo had ever previously told a health care provider that ████████████████████ ████████████." ECF 2218 at 52-53.  As the Court noted, "[o]bservations of this nature are fairly within the scope of a psychiatrist's expertise." *Id.*; *see also* Ex23 Jacobs Dep. 47:11-21 (noting that in his experience, Jacobs would expect patients to disclose conditions affecting their ████████████).  The same is true here, and Plaintiffs' contrary view of the record is no basis for exclusion under *Daubert*.  Nor can Plaintiffs attack Jacobs for not being a ████████t," PltfsMot. 18—████████████████████████

---

[4] https://www.ncbi.nlm.nih.gov/books/NBK207191/box/part1_ch3.box16/

██████████████████████████████████████████████████

██████████████   Ex22, Jacobs-Vaughn Report 42, and as Jacobs more fully

explained at his deposition, he regularly treats███████████ as a symptom of the

underlying disorder, including ████████████████. Ex23, Jacobs Dep.

127:20-128:16.

Third, Plaintiffs' attack on Jacobs' ████████████ is only more of the

same.  Plaintiffs' argument that the record "refutes [Jacobs'] position" is ripe for

cross-examination.  Jacobs explains that in his four decades of experience, "it is quite

common for people with ████████████████████████████

████████████████████████████   Ex22, Jacobs-Vaughn Report

42. *Frazier*, 387 F.3d at 1261.  And Jacobs also analyzes symptoms like Vaughn's

████████████████████████ and the absence of medical records connecting this

███████████████ *Id.*  Again, such analysis is helpful testimony.  ECF 2218 at

52-53.

Finally, Jacobs' opinion that Vaughn's ████████████████████████

████████████████ is plainly within Jacobs' expertise.  PltfsMot. 22.  As a

---

[5] Plaintiffs' contention that Vaughn testified that he would "love to go to a game"
but for ████████████████████████████. Vaughn clarified that he did
not know whether he could "go to a game" because of all his other █████████████
██████████████   Ex24, Vaughn Dep. 333:17-334:19.

treating psychiatrist, Jacobs has extensive experience treating and managing █████

███████, and has knowledge of how symptoms can interact if the underlying

██████ is not treated.  And he rightly points out that Vaughn ███████████████

████████████████████████████████████████████████████████

██████████████  Ex23, Jacobs Dep. 67:24-68:11.  Scientific literature also

demonstrates that evidence-based intervention and/or treatment can significantly

reduce ████████████.  Ex22, Jacobs-Vaughn Report 43, note 4.  And Plaintiffs'

refrain that Jacobs only summarizes absent medical records is again unpersuasive:

"[o]bservations of this nature are fairly within the scope of a psychiatrist's

expertise."  ECF 2218 at 52-53.  Jacobs' Vaughn opinions should be admitted.

### B.   Wilkerson.

Plaintiffs' attacks on Jacobs' Wilkerson opinions fare no better.  Plaintiffs

cherry-pick portions of Jacobs' deposition testimony to argue that Jacobs cannot

opine that there is no evidence that Wilkerson's ███████████████████████.

PltfsMot. 17.  Plaintiffs misleadingly cite to partial testimony to argue that Jacobs

"doesn't even know what facts he would need to make that determination" of

whether a Plaintiff's ██████ would exacerbate █████████████████ *id.*, based on

a question Jacobs did not understand.  Ex23, Jacobs Dep. 104:3-7.  When the

question was clarified, Jacobs explained exactly what evidence he would need to

make that determination.  *Id.* 104:9-23.

Plaintiffs also claim that Jacobs "disregarded Wilkerson's testimony" that "he believes his ███████████████████████████████████████████ ███████ PltfsMot. 17.  But Jacobs did not "discount [Wilkerson's] testimony;" instead, he "reviewed it very carefully" and analyzed whether his complaints are supported in the medical records.  Ex23, Jacobs Dep. 195:5-12.  This Court previously ruled these analyses are sufficient.  ECF 2290 at 11.

Plaintiffs similarly distort Jacobs' opinions about Wilkerson's ████████ ███████████████████████████████████████████ ███████████████████████ PltfsMot. 17-18.  This again runs contrary to the Court's Group C Order—Jacobs is allowed to explain how medical records supported his conclusions about ████████████████, and such analysis is "within the scope of [his] expertise."  ECF 2290 at 11.  Jacobs' observations provide a factual basis for his opinions that Jacobs' ████████████ do not exacerbate his ████████████ ███████, which are admissible.  ECF 1680 at 115 (expert may "explain the basis of admissible opinions through commentary on documents").

Plaintiffs' attack that Jacobs is not a ████████████ or a vocational expert is similarly misplaced.  PltfsMot. 18-19.  Jacobs has experience analyzing ████████████ ████████████████████, *supra* at 23-24, and he need not be a ████████████████ ████████████████████ to render opinions about general aspects of Wilkerson's ████████████████.  *E.g.*, *United States ex rel. Armfield v. Gills*, 2012 WL

12918274, at *2 (M.D. Fla. July 6, 2012); *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001). Jacobs has "40 years of experience understanding what impacts people's employment," and ███████████████████████ a part of his job. Ex23, Jacobs Dep. 128:2-7; 213:24-214:2. Plaintiffs also ignore that Jacobs is offering rebuttal opinions to Wilkerson's experts who opine that his ████████████████ ████████, among other things, are impacted by his ████████████████. Jacobs' rebuttal opinion identifies evidence that Wilkerson's experts failed to consider and so is helpful to the jury.

Finally, Plaintiffs argue that Jacobs' opinion about the effect of Wilkerson's ████████████████ on his life is "unconditionally broad." PltfsMot. 19 (citing ECF 1910 at 16-17). But the cited order only limited an expert's opinion because the expert had not described any reliable factual basis for his conclusion. ECF 1910 at 16-17. Here, Jacobs looked at Wilkerson's medical diagnoses, including ██████ ██████████, among other facts and analyzed how those diagnoses intersected with his life. Ex23, Jacobs Dep. 224:19-225:14. Plaintiffs' argument at best goes to weight and not admissibility. *See Garcia v. Scottsdale Ins. Co.*, 2019 WL 1318090, at *2 (S.D. Fla. Mar. 22, 2019); *see also* ECF 2290 at 11.

## IV.   PAPPAS.

Pappas is an experienced practicing neurotologist who offers opinions on several alternative causes of Vaughn's symptoms, one of which is that certain

symptoms are exaggerated because Vaughn's audiograms showed ███████

████████████████████████████████████████████████████████████

██████ Vaughn's audiogram by Pappas and his audiogram by Dr. Lustig shortly

thereafter.  Ex25, Pappas-Vaughn Report 42-43.

Plaintiffs argue that "a doctor offering an expert opinion about whether or not

they believe a plaintiff is telling the truth" is not permissible testimony.  PltfsMot.

24 (citing *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996)).  But district

courts in this circuit regularly credit physicians' opinions that symptoms may be

exaggerated.  *United States v. Young*, 2020 WL 4692389, at *26 (N.D. Ala. June 1,

2020); *United States v. Minter*, 2014 WL 12792618, at *10 (N.D. Ga. June 17, 2014).

Pappas' opinion is nothing like *Beasley*; there, the Eleventh Circuit barred an expert

from testifying that a defendant "was a psychopath who had no conception of the

truth."  72 F.3d at 1528.  That is a far cry from a physician applying their experience

to analyze unusual differences in test results, like Pappas does.  *Cf. Dugas v. 3M Co.*,

2016 WL 7327666, at *7 (M.D. Fla. Mar. 30, 2016) ("[N]othing prevents an expert

from offering an opinion, which, if believed, undermines a factual narrative given

by a lay witness.").  Pappas is not "calling [Vaughn] a liar," Ex26, Pappas Dep.

96:13-17; rather, he is opining that the Vaughn-Lustig audiogram may be inaccurate

because its ████████████████ " results fall "outside of the accepted test-retest

variability." Ex25, Pappas-Vaughn Report 42. This is a proper opinion based on Pappas' clinical training and experience and should be admitted.

Plaintiffs' remaining challenges to Pappas' opinions are moot. Plaintiffs contend that Pappas will opine on "when and how Vaughn received a military career-ending ███████████████████████████ PltfMot. 23. But Defendants represent that Pappas will not rely on any assessment of credibility related to that ██████████ at trial. Similarly, Plaintiffs' arguments regarding any ████████████████████████████████████████████████ ██████████████████. PltfsMot. 24-25. Pappas' report briefly references Vaughn's ████████████████, Ex25, Pappas Report 9, but does not rely on this for any specific causation opinion.

## V.   FLAMME & STEPHENSON.

### A.   Army Hearing Conservation Program.

The Court should not exclude testimony that the military's implementation of its hearing conservation programs contributed to Vilsmeyer's and Wilkerson's ██████████████ PltfsMot. 25. The Court has repeatedly permitted these experts to testify on "the importance of training on and fit of earplugs." *E.g.*, ECF 1690 at 13; ECF 1910 at 14-15. These experts should be allowed to testify on the training and fitting that Plaintiffs received, including the extent to which they might have

obtained an inadequate fit with the CAEv2 independent of any alleged defect or flaw in the CAEv2.

These experts do ***not*** "blame the military for Plaintiffs' injuries," (PltfsMot. 25), and their opinions fully comply with the Court's prior orders. ECF 1690 at 13. Pointing out "multiple procedural and recording errors" in Vilsmeyer's audiometric evaluations, PltfsMot. 26, is not an assignment of blame, but instead is necessary and helpful to the jury and relevant to (i) explain the factual basis for expert opinions regarding testing results, adequate baseline comparisons, and/or retests or confirmation of results; and (ii) in assessing the weight to afford other experts' audiogram-based opinions.

**B.**  ████████████████



Expert opinions about ████████████ in these cases do not suffer from previous deficiencies identified by the Court. *See* ECF 2218 at 32-33. They opine that ██ ████████ cannot be ruled out as a potential cause of Vilsmeyer's ██████ because Vilsmeyer was exposed to a ████████████████████████████████ ████████████████████████████████████████ Ex19, Tepe, *Acquired CAPD* 840; Ex20, Guthrie, █████████████████████████ ██ ; Ex76, VA Research Currents, █████████████████████ ████████████████████████ (2014) (Guthrie study "definitively link[s] ██ ████████████████████████"). Contemporaneous records show that

Vilsmeyer was exposed to ███████████████████████████████████
███████████████████████ Ex27, L_F_Vilsmeyer-VA-000634; Ex28,
L_F_Vilsmeyer-DOD Medical Records-001358.  Likewise, Wilkerson "indicate[d]
that he was worried about his health because ████████████████████████████
███████████████████████████████ Ex29, 1/11/2022 Flamme
Dep. 170:6-15; *see also* Ex21, D-Wilkerson-277. And the Air Force has publicly
reported a precise formula for use of ████████████████████████████████
████████████████████████████████████████████████████████ Ex30,
Proceedings of the 2011 AFMS Medical Research Symposium 12.

    The lack of an exact quantification of █████████████, PltfsMot. 27, is not
grounds for exclusion.  Experts may offer evidence of potential alternative
causes without needing to prove those alternative-cause theories with certainty or
probability. *Supra* at 6-7.  Expert opinions that Plaintiffs' known exposure to ███
cannot be ruled out as an alternative cause are based on scientific literature
establishing a causal relationship and the record in these cases.  Ex31, Flamme-
Stephenson-Vilsmeyer Report 35, 62; Ex34, Flamme-Stephenson-Wilkerson Report
29, 58.

    **C.**    ██████████

    Plaintiffs next challenge Flamme and Stephenson's opinions that Wilkerson's
██████████████████████████████, contending that "[n]o scientific literature

establishing a causal link between ████████████████ is cited in the Flamme and

Stephenson report." PltfsMot. 28. That is wrong. Flamme and Stephenson list in

their materials considered new data regarding █████████████ that SASRAC

and a scientist from NIOSH analyzed—and presented at NHCA this month. Ex32,

Flamme, ████████████████████████████████████ (2022). This

presentation answered the question: "At the population level, ████████████████

████████████████████████████████████████ *Id.* 4. The study

used "descriptive statistic and logistic regression" models and analyzed data from

the NHANES database, and found a "4-fold increased odds of moderate trouble

████████████████████████████ *Id.* 5-10. Significantly, even

Wilkerson's own expert recognizes a link between █████████████ Djalilian

in a 2012 paper, Ex33, D-Gen-3406, concluded that a ████████████████

████████████████████████████████████████████████

████████████ *Id.* 4; *see also id.* 5 ("Another finding of the current study was a

positive association of ████████████████████████████████████

████ ). Nor need Flamme & Stephenson have exactly "how many ████…

Wilkerson ████ during specific time periods." PltfsMot. 28. Flamme and

Stephenson consider Wilkerson's ████████████ , "which is well above the

threshold for not only ████ , but also moderately problematic bothersome



█████," Ex29, 1/11/2022 Flamme Dep. 132:3-23; Ex34, Flamme-Stephenson-Wilkerson Report 29, and which is a reliable basis to support their opinions.

**D.**   ████████████

Plaintiffs' contention that there is insufficient evidence showing a causal relationship between ████████████████████ is baseless. PltfsMot. 28-30. Plaintiffs ignore the Yurgil article on which Flamme and Stephenson rely. Ex35, Yurgil, ██████████████████ ███████████████████ (2016). That article describes how ████████████████

████████████████████

████████████████████

████████████████████

████████████████████

█████" Ex36, Theodoroff, ████████████

████████████████████

██████████ 72 (2015); Ex37, Greene, ████████

████████████████ 2018 (similar); Ex31 Flamme-Stephenson-Vilsmeyer Report 30. Likewise, Plaintiff's expert McKinley agrees that ████████████████████

Ex38, McKinley, ████████████ (2009). Flamme's

and Stephenson's opinions on ██████████████████████████████ are thus reliably based on scientific literature and theory.

Flamme's and Stephenson's reliance on the Walter Reed breacher training studies is also reliable. The Court previously found there were insufficient "facts or data from the breacher training activity" in the report. ECF 2218 at 37. But here, Flamme and Stephenson produced with their Group D report the raw data supporting the graphs and waveforms from the breacher training. Ex34, Flamme-Stephenson-Wilkerson Report 30; Ex29, 1/11/2022 Flamme Dep. 266:10-23. That Plaintiffs did not evaluate that data and ask related questions at deposition was a strategic choice, not an argument under *Daubert*.

Finally, Plaintiffs only challenge the opinions on hearing impairment caused by ██████████ as it relates to ██████████████, not other mechanisms. Separate from bone conduction, there is no question that ████████████████████████ ████████████████████████████████████ *E.g.*, Ex36, D-Gen-67 ("██ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████); Ex40, D-Gen-2739 (██████████████████████itus). These unchallenged opinions are admissible.

**E.** ████████████.

The Court should not exclude opinions that Wilkerson and Vilsmeyer did not have ███████████████████████████████████████████ Ex34, Flamme-Stephenson-Wilkerson Report 30. Stephenson has published scholarship from his time at the Air Force ████████████████████████ Ex41, 9/10/2021 Stephenson Dep. 58:16-59:9. This publication is listed on his CV, Ex42, (Stephenson CV) 8, and is supportive of his opinions, which the Court did not previously have access to. Ex43, Stephenson, ███████████████████ ███████████████████████████████████ (1980).

The article concludes—consistent with Flamme's and Stephenson's report— that "███████████████████████████████████████ ████████████████████████████████████████ ██████████████████ *Id.* 1. Stephenson explains: without "████████ ██████████████████████████████████████," so "█████████████████████████████████████████ ████████████████████████████████████████ ███████████████████ Ex41, 9/10/21 Stephenson Dep. 58:16-59:9.

The NIOSH and the Army provide similar guidance. ████████████ ████████████████████████████████████████ ████████" Ex44, D-Gen-1417 at 60. But "████████████████████

█████████████████████████████████████████████████████

████████████████████████ *Id.*  And the Army's health hazard assessment also explains

that the ████████████████████████████████████████████████

██████████████████████████████ Ex45, 2020 TG351A HHA.  This data

provide a reliable basis for opinions about ██████████████.

     **F.**    ██████████████████

Finally, the Court should reject any suggestion that these experts are not

qualified to opine on the relationship between ████████████████████.  PltfsMot.

32.  The Court has allowed non-physician audiologists to offer causation opinions,

ECF 1910 at 32-33, and Flamme has testified at length in prior trials about ████████

████████████████████████████*E.g.*, Ex46, 1/25/22 *Sloan-Wayman* Tr.

101:8-19; 159:9-171:20.  As Flamme explained, "if you are doing work in the area

of hearing science or clinical work, it's very important that you be able to identify

some potential signs of these other disorders that you may not diagnose but that are

related to … the ones you might actually work with," including ████████████

████████ Ex47, 9/14/2021 Flamme Dep. 515:13-516:16.  Plaintiffs' arguments about

these experts' opinions, which are offered to a reasonable degree of scientific

certainty, Ex34, Flamme-Stephenson-Wilkerson Report, 59, 63-64, at best go to

weight, not admissibility.  Because Plaintiffs present no other reason to exclude

Flamme' and Stephenson's opinions as to Wilkerson's ████ in particular, those opinions should plainly be admitted.

The same is true for Vilsmeyer. Plaintiffs wrongly argue that Flamme and Stephenson "complete[ly] disregard [] the temporal sequence of events." PltfsMot.31. Before even joining the military, Vilsmeyer suffered ████████ He first complained of ████ after deployments in 2004 and again in 2006, *before* he began using the CAEv2. Ex27, L_F_Vilsmeyer-VA-000633; Ex48, L_F_Vilsmeyer-VA-004714; Ex28, L_F_Vilsmeyer-DOD Medical Records-001357; Ex31, Flamme-Stephenson-Vilsmeyer Report 56. After a ████████ ████████████████ ████████ Ex49, L_F_Vilsmeyer-DOD Medical Records-000271; Ex50, L_F_Vilsmeyer-DOD Medical Records-001684; Ex31, Flamme-Stephenson-Vilsmeyer Report 56. His ████████████, years after he stopped using the CAEv2, at a time when ████████████████ ████████████████████████. Ex51, L_F_Vilsmeyer-DOD Medical Records-000855-856, 870. Vilsmeyer has had ██ ████████████████ Ex31, Flamme-Stephenson-Vilsmeyer Report 56, 61-62.

Such a " ████████████████ ████████████████



Ex35, Yurgil,

843-43 (2019).  Reliance on Vilsmeyer's history of ▮▮▮▮▮ is a key element of a methodologically reliable and admissible opinion here.  Ex31 Flamme-Stephenson-Vilsmeyer Report 62.  There is no basis to exclude their ▮▮▮▮▮ and this Court should deny motions to exclude these highly probative, data-driven and scientifically-based opinions as it has done repeatedly in the ▮ context before.  *E.g.*, ECF 2218 at 48-50; ECF 2290 at 19-20.

## VI.   PHILLIPS.

Phillips is an ENT with 25 years of clinical experience diagnosing and treating patients with ▮▮▮▮▮.  Phillips's opinions are the product of precisely the same types of facts, data, and methodologies that the Court has repeatedly found to be relevant, reliable, and admissible.

### A.   CAEv2 Causation Opinions.

Phillips's opinion that the CAEv2 did not cause or worsen Vilsmeyer's ▮▮▮▮▮ is rooted in the application of his expertise and experience to a robust examination of the record and sequence of events.  The Court has repeatedly found these types of opinions reliable and admissible when offered by experts on both sides.  *E.g.*, ECF 1680 at 37-39 (Plaintiff's expert reliably based opinion on

"temporal relationship" between injuries and CAEv2 use); ECF 1680 at 38 (denying motion to exclude Packer where he "expressly noted that Baker's injuries



").

The record chronology is critical. Vilsmeyer served as as artilleryman for 8 years before ever using the CAEv2. He developed and reported ███████ after each of his combat deployments before CAEv2 use (Iraq 2004, Afghanistan 2006)— during which he was exposed ████████████████████████████ ████████████████████████ Ex27, L_F_Vilsmeyer-VA-000633; Ex48, L_F_Vilsmeyer-VA-004714; Ex28, L_F_Vilsmeyer-DOD Medical Records-001357; Ex53, L_F_Vilsmeyer-DOD Medical Records-000087; Ex54, L_F_Vilameyer-000002 [*sic*]; Ex55, Vilsmeyer Dep. 51:1-6; Ex56, Phillips-Vilsmeyer Report 16, 38. Likewise, he has suffered ████████ "since joining [the] Army," Ex57, L_F_Vilsmeyer-VA-003227, which is supported by his early audiograms, Ex56, Phillips-Vilsmeyer Report 40. Phillips relies on this chronology to rule out the CAEv2 as causing the onset of Vilsmeyer's ████████████. *Id.* 29, 40.

Moreover, Vilsmeyer's worsening symptoms are temporally and causally connected with events and exposures that have nothing to do with the CAEv2:

Vilsmeyer's ████████████████████████████████

████████████████████████████████████████████

████████████████, while he was ***not wearing the CAEv2***.  Ex55, Vilsmeyer Dep. at

258:5-259:4, 160:24-161:2, 162:16-23; Ex58, L_F_Vilsmeyer-VA-001016; Ex49,

L_F_Vilsmeyer-DOD  Medical  Records-000271;  Ex50,  L_F_Vilsmeyer-DOD

Medical Records--001684.

████████████████████████████████████████████

████████  Ex55, Vilsmeyer Dep. 190:15-191:4; 192:3-194:6.  Then in 2019, ***years***

***after*** Vilsmeyer stopped using the CAEv2, he again ████████████████████

████████████████████████████  Ex51, L_F_Vilsmeyer-VA-000862-

63;  Ex59,  L_F_Vilsmeyer-VA-003410-11;  Ex55,  Vilsmeyer  Dep.  221:21-222:1;

Ex58,  L_F_Vilsmeyer-VA-001014-1016.  ████████████████████████

████████████████████████  Ex51,  L_F_Vilsmeyer-DOD

Medical Records-000855-856, 870.  These records support Phillips's conclusion that

Vilsmeyer ████████████████████████, which is unrelated to noise exposure

and thus could not have been caused by any alleged defect on the CAEv2.  Ex60,

Shore, ████████████████████████████████ (2008); Ex56, Phillips-

Vilsmeyer Report 5-7, 30-31, 38-39.

Phillips's opinion ruling out the CAEv2 based on the chronology does *not*

depend on teasing out Vilsmeyer's specific noise exposures or noise dose while

wearing the CAEv2, or the CAEv2's noise attenuating properties.  Rather, he has identified documented causative factors that each occurred simultaneously with the initial onset, and dramatic spikes, in ███████████, a methodology this Court has endorsed.  *E.g.*, ECF 1864 at 41; ECF 1910 at 39 (permitting Plaintiff's expert Dimmick to testify that exposure to motorcycle noise could be ruled out despite testimony admitting she could not quantify the amount of motorcycle noise).

Phillips also considered available information regarding noise exposures reflected in Vilsmeyer's records.  Ex61, (Phillips Dep.) at 74:13-18.[6]  He referred to published noise levels and NRRs.  *See, e.g.*, *id.* at 80:7-81:13; 86:16-21; Ex56 (Phillips Report) at 34-37.  Relying on that information, as well as other experts' testimony, is a common and accepted practice.[7]  *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94–95 (2d Cir. 2000).  Spankovich does the same thing:  his opinion is based on "different noise exposures," even though Spankovich "can't give you an exact value of an attenuation" or other measure for this exposure.  Ex62, Spankovich Dep. 122:17-123:5.   The Court has repeatedly allowed similar opinions from

---

[6]  Phillips's reliance on documentary evidence is particularly important because he is forbidden under the IME Protocol from taking a medical history.  Ex56, Phillips-Vilsmeyer Report 45-46.

[7]  Phillips does not "contradict[]" his own opinions.  PltfsMot. 34.  In any event "contradictory expert testimony is grounds for cross-examination, not exclusion." *In re AndroGel Antitrust Litig. (No. II)*, 888 F. Supp. 2d 1336, 1356 (N.D. Ga. 2012).

Plaintiffs' experts ruling in and out different noise exposures and HPDs.  ECF 1680 at 37-39.  In short, "[g]iven these scientifically reasoned explanations for ruling out" the CAEv2, "which are not based on subjective beliefs or unsupported speculation, Dr. [Phillips's] differential etiology satisfies Rule 702 and *Daubert*."  ECF 1910 at 39-40.

**B.**  ████████

Plaintiffs argue that ██████████████████████████████ ████████

████████████████████████████████████████████████████████

PltfsMot. 35.  That is incorrect:  the literature Phillips cites makes clear that ████

may present in individuals with ████████████████.  *See* Ex63, Oleksiak,

████████████████████████████████████████████████████

████ 999, JRD (2012) (more than 1/3 of those with abnormal ████████████████

████████████████████████████).[8]

Plaintiffs' observation that no medical doctor has *diagnosed* Vilsmeyer with

████ misses the point and confuses the burden of proof.  Phillips opines that ████

cannot be *ruled out* as a cause, while Arriaga and Spankovich failed to consider

████ as a possible cause.  Ex56, Phillips-Vilsmeyer Report 41; *Chapman v.*

*Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1311 (11th Cir. 2014) (failure to

---

[8] The deposition testimony to which Plaintiff points, *see* PltfsMot. 35 n.122, in no way suggests that ██████████████████████████████████.

"analyze or consider" alternative causes affects reliability of differential diagnosis). Defendants' experts can rebut Plaintiff's causation theory "without needing to prove those alternative-cause theories with certainty or probability."  ECF 2218 at 45-46; *Aycock*, 769 F.3d at 1069-70 (reversing for "improperly shift[ing] the burden of proof" onto defendants to show "alternative causes … to a reasonable medical certainty").  Plaintiff is free to cross-examine Phillips on these opinions, but they should not be excluded.

**C.**  ▮



This Court previously excluded an opinion about ▮ because (1) the authority cited showed "only a correlation" between ▮ ▮; and (2) the experts did ▮ ▮ ECF 2218 at 32-33.  Neither rationale applies here.

Phillips's opinion is based on (1) literature establishing that ▮ interacts with noise to cause ▮ ▮.  Ex56, Phillips-Vilsmeyer Report 43; Ex27, L_F_Vilsmeyer-VA-000634; Ex28, L_F_Vilsmeyer-DOD Medical Records-001358.  Phillips cites Tepe, which explains: "[s]everal studies have linked ▮ ▮ ▮ Ex19, Tepe, *Acquired* ▮ 840; Ex20, Guthrie, ▮



█████.[9]  The article notes that both animal experiments and epidemiological studies "have documented that the risk of noise-related ████████ increases with ████████," and describes a biological mechanism for this causal relationship. *Id.* 840. Indeed, Spankovich acknowledges that jet fuel (like JP-8) has an ████████████████████████████." Ex64, Spankovich, *Chapter 7:* ████████████████████████████ at 4, THE NOISE MANUAL (6th ed. 2018).  Plaintiff's apparent disagreement with this conclusion is for cross-examination.

**D.** ████████.

Plaintiff claims ████████████████████████████ ████████████. PltfsMot. 37.  A longitudinal study published on February 7, 2022, however, showed that "frequent use of ████████████ ████████████████████████████." Ex65, Curhan, ████████████████████████████ 5 (2021).  Phillips's opinions are consistent with this Court's "Science Day" order that NSAID use is relevant where it "coincides" with Plaintiff's ████████ and Plaintiff "continues to use these medications."  ECF 1330 at 6.  During the 2019 spike in his

---

[9] Plaintiff claims the Tepe article shows only a relationship to CAPD.  That would not undermine Phillips's conclusion because he opines that CAPD cannot be ruled out in this case.

██████ discussed above, Vilsmeyer began taking a large dose of ██████ "a few times a day."  Ex66, D-VILSMEYE-0191; Ex67, D-VILSMEYER-0194.  That use continues today, and Vilsmeyer admits he "████████████████████."  ECF 1330 at 6; Ex55, Vilsmeyer Dep. 200:19-21.

**E.** ██████

Plaintiff argues that the court should exclude ██████ opinions based on the "timeline" of Vilsmeyer's injuries.  But Plaintiff gets the "timeline" wrong, misstates the temporal relationship between Vilmeyer's ████████, and ignores the science.   The Court should find ████ alternative cause opinions reliable and admissible here, as it has before.  ECF 2218 at 48-50; ECF 2290 at 19-20 (denying motion to exclude "opinion on the relationship between Montero's ████████ ████ ").

*First*, the "onset" of Vilsmeyer's ██████ was *not* in "2008 or 2009." PltfsMot. 38.  As described previously, Vilsmeyer reported ██████ several years before that, well before he began using the CAEv2.  *Supra* at 39.

*Second*, all of Vilsmeyer's ██████—including the pre-military ones—are relevant because "████████████████████" an opinion Plaintiff does not challenge.  Ex56, Phillips-Vilsmeyer Report 31; Ex52 Clifford, ████████ ████ 843-43.  ██████████████████████████████

███████████████████████████████████████ Ex35, Yurgil, *Prospective Associations*.

    *Third*, Vilsmeyer's medical and military records show that his ███████

████████████████████████████████████████████████████████

Ex49, L_F_Vilsmeyer-DOD Medical Records-000271; Ex50, L_F_Vilsmeyer-DOD Medical Records-001684.

    *Fourth*, Vilsmeyer's ████████████████████████████ is independently relevant to Phillips's opinion that Vilsmeyer █████████████

██████████—another opinion that Plaintiff does not challenge. Ex56, Phillips-Vilsmeyer Report 30-31; Ex55, Vilsmeyer Dep. 120:8-121:14.

    The Court should deny the motion to exclude Phillips's ████████████

    **F.**   **████████████████████████**

    Defendants will not elicit affirmative opinions from Phillips on ████

██████

## VII.  JONES AND LaBORDE.

    Plaintiffs' attempt to exclude Jones/Laborde's ███████████████████

████ PltfsMot. 38-39. Initially, Plaintiffs make assertions about ████████

████████████████████████████████, but improperly base them on information they continue to withhold from Defendants. *Wilkerson* ECF 70 at 3-5; ECF 2718 at 34-36.

Plaintiffs also wrongly suggest that Jones/Laborde must identify "definitive" ███████ testing to offer opinions about such testing. PltfsMot. 39. That is wrong—tests need not be "definitive" to opine about their value. "So long as there is reliable evidentiary support demonstrating that the expert's proposed mechanism is at least plausible, disputes over the relative merits of his opinion should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from a jury's scrutiny." ECF 1933 at 4-5.

As Laborde explained, some ████████████████████ are unknown but others are scientifically confirmed and testable. Ex68, Laborde Dep. 19:18-20:6. The literature cited confirms that, despite having practical limitations, "███████ ████████████████████████ Ex69, Angeli, ██████████████████████ (2005). Although "strict genotype-phenotype correlations" are "difficult to define," ███████ "play[s] an important role" for patients with sensorineural ███████ and screenings may be recommended to adults with a family history of ███████. Ex70, King, ████████████████████████████ ████████████ (2012). As "there are no certainties in science," *Daubert*, 509 U.S. at 590, the Court should not exclude opinions about ███████ based on the definitiveness of such tests' results.

Moreover, Jones/Laborde never stated that "there is no proper … test to actually perform." PltfsMot. at 39. Jones submitted a declaration in support of defendants' motion to compel a specific ███████████████████████████, *Wilkerson* ECF 23 Ex3, which tests for a variety of ██████████████████████. Wilkerson refused to undergo such testing and Wilkerson's experts opted not to perform any genetic testing. And even if Plaintiffs were right that testing is nondefinitive, that would only underscore the inability of Wilkerson's experts to rule out ████████ Jones/Laborde should be allowed to rebut Wilkerson's experts who purport to rule out ██████████.

Plaintiffs' argument against ██████████████████████████████. PltfsMot. 40-41. Far from "admit[ting] that there is not one single study that shows the benefit of ██████████████████████," PltfsMot. 40, Laborde merely testified that she could not "think of a study right now," while on the stand in *Sloan/Wayman*. Ex71, 1/26/21 Sloan-Wayman Tr. 308:5-309:3. Studies recognize that hearing aids "can often provide relief from the internal sound of █████" by "[a]ugmenting the reception and perception of external noise." Ex72, American Tinnitus Association, Hearing Aids, https://www.ata.org/managing-your-████/treatment-options/hearing-aids. Jones/Laborde also analyze "Treatment Of ██████████████████," and identify specific tools such as "sound generators or masking noise[s]" based on specific testing they conducted for Wilkerson's █████

levels.  Ex73, Jones-Laborde-Wilkerson Report 19 (emphasis added).  They do so based on their "experience treating people with ███████ complaints like Mr. Wilkerson." *Id.* 19.  Laborde, for example, has "dispens[ed] over 3,500 hearing aids" during her over twenty years' experience managing audiological patients.  *Id.* 2.  This experience supports the experts' opinions.  *E.g.*, ECF 1680 at 72-73.

Plaintiffs finally argue that Laborde's personal experience with hearing aids is undisclosed.  PltfsMot. 40-41.  But Laborde's report states that she "has worn hearing aid amplification for over twenty years" and she uses her "personal experience … for an understanding of patient experience, effects of ███████ on daily leaving, as well as a compassionate and encouraging approach to rehabilitation."  Ex72, Jones-Laborde-Wilkerson Report at 2.  Nor is this testimony unfairly prejudicial, as Plaintiffs experts have testified about their personal experience with ███████  *E.g.*, Ex74, 1/19/22 Sloan/Wayman Tr. 297:3-23 (Spankovich); Ex16, 6/10/21 Baker Tr. 164:7-165:13 (Lustig).

## CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' motion to exclude Defendants' expert's opinions.

49

Respectfully submitted:

*/s/ Charles F. Beall, Jr.*
Larry Hill
Florida Bar No. 173908
lhill@mhw-law.com
Charles F. Beall, Jr.
Florida Bar No. 66494
cbeall@mhw-law.com
Haley J. VanFleteren
Florida Bar No. 1003674
hvanfleteren@mhw-law.com
Moore, Hill & Westmoreland, P.A.
350 West Cedar Street
Maritime Place, Suite 100
Pensacola FL 32502
Telephone: (850) 434-3541

*/s/ Robert C. "Mike" Brock*
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
mnomellini@kirkland.com

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC and Aearo, LLC*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Judge Herndon on July 12, 2021 conveyed the Court's direction that the parties' *Daubert* motions are limited to 1350 words per new expert and 1350 words per new issue with an existing expert.  This memorandum responds to Plaintiffs' arguments regarding seven experts, yielding a word limit of 9,450 words.  Pursuant to Local Rule 7.1(F) and this Court's direction, counsel for Defendants certify that this memorandum contains 9,302 words, excluding the case style, tables of contents and authorities, signature block, and certificates of compliance with the Local Rules.

Dated:  February 25, 2022                    Respectfully submitted,

/s/ Robert C. Brock
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 389-5991
mike.brock@kirkland.com

*Counsel for Defendants*
*3M Company,*
*3M Occupational Safety LLC,*
*Aearo Technologies LLC,*
*Aearo Holding, LLC,*
*Aearo Intermediate, LLC and*
*Aearo LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 25, 2022, a true and correct copy of the foregoing:

**DEFENDANTS' RESPONSE TO PLAINTIFFS' OMNIBUS MOTION AND MEMORANDUM OF LAW TO EXCLUDE DEFENDANTS' GROUP D EXPERT OPINIONS AND TESTIMONY**

was served as follows:

⊠　　**[E-Mail]** By causing the above document to be sent via electronic mail to the parties at the email addresses listed below. I am aware that service is presumed invalid if the email transmission is returned as undeliverable.

| | |
|---|---|
| Bryan F. Aylstock, Lead Counsel<br>Douglass A. Kreis<br>Jennifer Hoekstra<br>Bobby J. Bradford<br>Daniel J. Thornburgh<br>Caitlyn P. Miller<br>Ephraim S. Geisler<br>Aylstock, Witkin, Kreis &<br>Overholtz, PLLC<br>17 East Main Street, Suite 200<br>Pensacola, FL 32502<br>Tel.: (850) 202-1010<br>Email: baylstock@awkolaw.com<br>Email: dkreis@awkolaw.com<br>Email: JHoekstra@awkolaw.com<br>Email: bbradford@awkolaw.com<br>Email: dthornburgh@awkolaw.com<br>Email: cmiller@awkolaw.com<br>Email: sgeisler@awkolaw.com<br><br>*Counsel for Plaintiff Denise Kelley*<br>Case No. 7:20-cv-00153-MCR-GRJ | Shelley V. Hutson, Co-Lead Counsel<br>Amanda Hunt<br>Clark, Love & Hutson PLLC<br>440 Louisiana Street<br>Suite 1600<br>Houston, TX 77002<br>Tel.: (713) 757-1400<br> Email: shutson@triallawfirm.com<br> Email: ahunt@triallawfirm.com<br><br>*Counsel for Plaintiff Steven Wilkerson*<br>Case No. 7:20-cv-00035 |

| | |
|---|---|
| *Counsel for Plaintiff Jonathon Wade Vaughn*<br>Case No. 7:20-cv-00134<br><br>*Counsel for Plaintiff Luke F. Vilsmeyer*<br>Case No. 7:20-cv-00113<br><br>*Counsel for Plaintiff Steven Wilkerson*<br>Case No. 7:20-cv-00035<br><br>*Counsel for Plaintiff James E. Beal*<br>Case  No. 7:20-cv-00006 | |
| Christopher A. Seeger, Co-Lead Counsel<br>Caleb A. Seeley<br>David R. Buchanan<br>Maxwell H. Kelley<br>Parvin Aminolroaya<br>Seeger Weiss LLP<br>55 Challenger Road, 6th Floor<br>Ridgefield Park, New Jersey  07660<br>Tel.: (212) 584-0700<br>Email: cseeger@seegerweiss.com<br>Email: cseeley@seegerweiss.com<br>Email: dbuchanan@seegerweiss.com<br>Email: mkelly@seegerweiss.com<br>Email: paminolroaya@seegerweiss.com<br>Email: MDL2885@seegerweiss.com | Michael A. Burns, Co-Liaison Counsel<br>Mostyn Law Firm<br>3810 W. Alabama Street<br>Houston, TX  77027<br>Tel.: (713) 714-0000<br>Email: epefile@mostynlaw.com<br>Email: maburns@mostynlaw.com |
| Taylor C. Bartlett<br>William L. Garrison, Jr.<br>Jeanie Sleadd<br>Discovery & ESI Subcommittee<br>Heninger Garrison Davis LLC<br>2224 1st Avenue North<br>Birmingham, AL 35203<br>Tel.: (205) 326-3336<br>Email: taylor@hgdlawfirm.com<br>Email: lewis@hgdlawfirm.com<br>Email: jsleadd@hgdlawfirm.com | Katherine E. Charonko,<br>Discovery & ESI Subcommittee<br>Bailey & Glasser LLP<br>209 Capitol Street<br>Charleston, WV  25301<br>Tel.: (304) 345-6555<br>Email: kcharonko@baileyglasser.com |

| | |
|---|---|
| Virginia E. Anello,<br>Discovery & ESI Subcommittee<br>Douglas & London<br>59 Maiden Ln, 6th Floor<br>New York, NY 10038<br>Tel.: (212) 566-7500<br>Email: vanello@douglasandlondon.com | J. Nixon Daniel, III<br>Discovery & ESI Subcommittee<br>Beggs & Lane<br>501 Commendencia Street<br>Pensacola, FL 32502<br>Tel.: (850) 469-3306<br>Email: jnd@beggslane.com |
| Brian H. Barr, Co-Liaison Counsel<br>Winston Troy Bouk<br>Levin, Papantonio, Thomas, Mitchell,<br>Rafferty, & Proctor, P.A.<br>316 S Baylen St. Ste 600<br>Pensacola, FL 32502<br>Tel.: (850) 435-7045<br>Email: bbarr@levinlaw.com<br>Email: tbouk@levinlaw.com | John J Foley<br>Trent B Miracle<br>Simmons Hanly Conroy - IL<br>One Court Street<br>Alton, IL 62002<br>Tel: (618) 259-2222<br>Email: jfoley@simmonsfirm.com<br>Email: tmiracle@simmonsfirm.com<br><br>Daniel Patrick Blouin<br>Simmons Hanly Conroy - New York<br>112 Madison Avenue 7th Floor<br>New York, NY 10016<br>Tel: (212) 784-6423<br>Email: dblouin@simmonsfirm.com<br><br>*Counsel for Plaintiff Denise Kelley*<br>Case No. 7:20-cv-00153-MCR-GRJ |
| Quinn Robert Wilson<br>Gerardo L. Guerra<br>Onder Law Llc - St Louis MO<br>110 E Lockwood AvenueSecond Floor<br>St Louis, MO 63119<br>Tel: (314) 963-9000<br>Email: wilson@onderlaw.com<br>Email: guerra@onderlaw.com<br><br>*Counsel for Plaintiff Jonathon W. Vaughn*<br>Case No. 7:20-cv-00134 | Evan D Buxner<br>Gori Julian & Associates - IL<br>156 North Main Street<br>Edwardsville, IL 62025<br>Tel: (618) 659-9833<br>Email: evan@gorijulianlaw.com<br><br>*Counsel for Plaintiff Jonathon W. Vaughn*<br>Case No. 7:20-cv-00134 |

| | |
|---|---|
| Thomas P Cartmell<br>Wagstaff & Cartmell - Kansas City MO.<br>4740 Grand Avenue Suite 300<br>Kansas City, MO 64112<br>Tel: (816) 701-1100<br>Email: tcartmell@wcllp.com<br><br>*Counsel for Plaintiff Jonathon W. Vaughn*<br>Case No. 7:20-cv-00134 | Keith M Jensen<br>Keith M Jensen Pc - TX<br>1024 N Main Street<br>Fort Worth, TX 76105<br>Tel: (817) 334-0762<br>Email: kj@jensen-law.com<br><br>*Counsel for Plaintiff Steven Wilkerson*<br>Case No. 7:20-cv-00035 |
| Joseph L Messa , Jr<br>Michael J O'Neill<br>Ashley Beth Diliberto<br>Messa & Associates - PA<br>123 South 22nd Street<br>Philadelphia, PA 19103<br>Tel: (215) 568-3500<br>Email: jmessa@messalaw.com<br>Email: moneill@messalaw.com<br>Email: adiliberto@messalaw.com<br><br>*Counsel for Plaintiff Luke F. Vilsmeyer*<br>Case No. 7:20-cv-00113 | Ashlea G. Schwarz<br>Richard M. Paul , III<br>Paul LLP<br>601 Walnut Street, Suite 300<br>Kansas City, MO 64106-1410<br>Tel.: (816) 984-8100<br>Fax: (816) 984-8101<br>Email: Ashlea@PaulLLP.com<br>Email: rick@PaulLLP.com |
| Jason M. Milne<br>Clark, Love & Hutson PLLC<br>757 W. Meadow Side Drive<br>Saratoga Springs, UT 84045<br>Tel.: (385) 447-1041<br>Email: jmilne@triallawfirm.com<br><br>*Counsel for Plaintiff Luke F. Vilsmeyer*<br>Case No. 7:20-cv-00113 | Richard N. Laminack<br>Thomas W. Pirtle<br>Buffy K. Martines<br>Laminack Pirtle & Martines<br>5020 Montrose Blvd, 9th Fl.<br>Houston, TX 77006<br>Tel.: (713) 292-2750<br>Email: rickl@lpm-triallaw.com<br>Email: buffym@lpm-triallaw.com<br>Email: tomp@lpm-triallaw.com<br><br>*Counsel for Plaintiff Steven Wilkerson*<br>Case No. 7:20-cv-00035 |

| | |
|---|---|
| Katherine L. Cornell<br>Pulaski Law Firm PLLC<br>2925 Richmond Ave., Suite 1725<br>Houston, TX 77098<br>Tel.: (713) 664-4555<br>Email: kcornell@pulaskilawfirm.com<br><br>*Counsel for Plaintiff Steven Wilkerson*<br>Case No. 7:20-cv-00035 | |

DATED:  February 25, 2022        */s/ Robert C. Brock*_____
                                             Robert C. "Mike" Brock