**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to:<br>*Wilkerson*, 7:20cv0035<br>*Vilsmeyer*, 7:20cv0113<br>*Kelley*, 7:20cv0153<br>*Vaughn*, 7:20cv0134<br>*Beal*, 7:20cv0006 | Judge M. Casey Rodgers<br>Magistrate Judge Gary R. Jones |

**ORDER[1]**

This Order resolves certain of the parties' respective omnibus motions to exclude expert testimony and opinions, in whole or in part, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), for the Trial Group D cases of Plaintiffs Steven Wilkerson and Luke Vilsmeyer.[2]

**I.    Legal Standard**

Rule 702, as explained by *Daubert* and its progeny, governs the admissibility of expert testimony.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

---

[1] The Court assumes the parties' familiarity with the nature of this multidistrict litigation, the claims and defenses, and the current evidentiary record.  Thus, this Order sets out only what is necessary to explain the Court's rulings.

[2] The following expert challenges will be addressed by separate Order:  Dr. Antony Joseph; Drs. Hamid Djalilian, Eric Gershwin, James Crawford, and W. Chatham's case-specific opinions for Kelley; Drs. Lawrence Lustig, Eric Bielefeld, and Dennis Pappas's case-specific opinions for Vaughn; and Dr. Douglas Jacobs's case-specific opinions for Wilkerson and Vaughn.

Under Rule 702 and *Daubert*, district courts must act as "gatekeepers" to ensure the reliability and relevancy of expert testimony. *Id.* (quoting *Daubert*, 509 U.S. at 589). Expert testimony is reliable and relevant—and, therefore, admissible—when the following criteria are met: (1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is "sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* The Eleventh Circuit refers to these criteria separately as "qualification, reliability, and helpfulness," *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate," *Quiet Tech. DC-8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). The party offering the expert has the burden of showing, by a preponderance of the evidence, that each of these requirements is met. *Rink*, 400 F.3d at 1292.

To meet the qualification requirement, a party must show that its expert has sufficient "knowledge, skill, experience, training, or education to form a reliable opinion about an issue that is before the court." *Hendrix ex. Rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (citing Fed. R. Evid. 702) ("*Hendrix II*"), *aff'g* 255 F.R.D. 568 (N.D. Fla. 2009) ("*Hendrix I*"). Importantly, if a "witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for

the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments). The qualifications standard for expert testimony is "not stringent" and "[s]o long as the witness is minimally qualified, objections to the level of [his] expertise [go] to credibility and weight, not admissibility." *Hendrix I*, 255 F.R.D. at 585.

To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue. *Frazier*, 387 F.3d at 1261-62. The reliability analysis is guided by several factors, including: (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique is generally accepted in the relevant community. *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786. "[T]hese factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech.*, 326 F.3d at 1341. The court's focus must be on the expert's principles and methodology, not the conclusions they generate. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. The test for reliability is "flexible" and courts have "broad latitude" in determining both how and whether this requirement is met. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999).

Finally, to satisfy the helpfulness requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985). Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).

"Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded [under Federal Rule of Evidence] 403." *Frazier*, 387 F.3d at 1263 (internal citations excluded). "Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming," or if it is otherwise unfairly prejudicial. *Id*. "Indeed, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Id*. "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, . . . district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Id*.

When scrutinizing the reliability, relevance, and potential prejudice of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate factfinder. *Frazier*, 387 F.3d at 1272. The court's gatekeeping role "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). Only the jury may determine "where the truth in any case lies" and the court "may not usurp this function." *Frazier*, 387 F.3d at 1272. Thus, a court may not "evaluate the credibility of opposing experts" or the persuasiveness of their conclusions, *Quiet Tech.*, 326 F.3d at 1341; instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence," *Frazier*, 387 F.3d at 1272.

## II.    Plaintiffs' Experts

In Wilkerson and Vilsmeyer's cases, Defendants move to exclude the specific causation testimony and opinions, in whole or in part, of Drs. Moises Arriaga, Hamid Djalilian, and Christopher Spankovich on various grounds.  Briefly, each expert relied primarily on the differential etiology method to link Plaintiffs' injuries to an alleged defect in the CAEv2.  "Differential etiology is a medical process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining." *Hendrix II*, 609 F.3d at 1195.  "A reliable differential etiology is performed in two steps." *Id*.  "First, the expert must compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Id*. (internal quotes omitted).  "Second, the expert must eliminate

all causes but one" by "appl[ying] the facts of the patient's case to the list created in the first step in order to form an opinion about the actual cause of the patient's symptoms." *Id*. at 1197. The expert must provide scientifically reasoned explanations for rejecting alternative hypotheses, and "the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Id*. While a "differential analysis need not rule out all possible alternative causes, [ ] it must at least consider other factors that could have been the sole cause of the plaintiff's injury." *Chapman v. Procter & Gamble Distrib.*, LLC, 766 F.3d 1296, 1309 (11th Cir. 2014) (internal quotes omitted).

### 1.     Wilkerson

Drs. Christopher Spankovich and Hamid Djalilian conducted differential analyses for Wilkerson. Defendants challenge both doctors' specific causation opinions for Wilkerson on grounds that they failed to reliably rule out genetics, civilian occupational noise, and other hearing protectors as a cause Wilkerson's auditory injuries. Defendants also argue that Dr. Spankovich: (i) lacks a reliable basis for ruling in the CAEv2 as a cause of Wilkerson's injuries; (ii) failed to reliably rule out head injuries; (iii) has no reliable methodology for attributing Wilkerson's sleep difficulties to his tinnitus; and (iv) should be precluded from offering undisclosed vocational opinions.[3] Last, they argue that Dr. Djalilian's opinions are unreliable because they

---

[3] Defendants also incorporated their Group C *Daubert* argument that Dr. Spankovich is not qualified to rule out prior head injuries as a cause of a plaintiff's hearing problems. For the reasons

are not the product of "any recognized methodology." *See* Def. Mot., ECF No. 2718-30 at 36.[4]  The Court disagrees.

Defendants first argue that both doctors' opinions related to genetics should be excluded because the opinions are improperly based on Wilkerson's lay interpretation of genetic-testing results and information that was withheld from them in discovery. As to the latter, Defendants have not shown that Wilkerson improperly hid or otherwise withheld genetics testing or family history information from them during discovery. Briefly, the record reflects that Wilkerson's cousin (Justin Powell), and the cousin's son, were born deaf.  At some point, Powell underwent genetic testing to determine whether his congenital deafness was hereditary.  *See* Justin Powell Dep., ECF No. 2812-16 at 8-9.  Several other extended family members were tested too, but not Wilkerson.  Powell, who is not a party to this litigation, declined to produce or disclose his genetic test results or any other medical records to Defendants.[5]  Significantly, there is no evidence that Wilkerson or Plaintiffs' experts ever had possession, control, or

---

stated in the Court's first *Daubert* Order for Group C, ECF No. 2218 at 7-8, which are incorporated by reference here, Dr. Spankovich is "amply qualified" to offer general opinions regarding whether head injuries commonly cause hearing problems and specific opinions on the relationship, if any, between Wilkerson's alleged head injuries and his hearing problems.

[4] Defendants' remaining arguments—challenging both doctors' "mental health" opinions, Dr. Spankovich's undisclosed "vocational" opinion and Dr. Djalilian's hidden hearing loss opinion—are moot.  Plaintiffs represent that Dr. Djalilian will not offer HHL opinions, Dr. Spankovich will not offer testimony regarding lost wages or economic productivity, and neither doctor will offer opinions that Wilkerson's auditory injuries caused or exacerbate his diagnosed mental health conditions.  To be clear, this ruling does not preclude Dr. Spankovich from discussing his properly disclosed opinions as to the impact of Wilkerson's hearing loss and/or tinnitus on his garden-variety stress and anguish, as well as safety and quality of life issues (e.g., trouble hearing alarms in the workplace).

[5] Notably, Defendants never sought leave of court to obtain them.

even physical access to Wilkerson's family members' genetic test results.[6]  Wilkerson *did* timely disclose the two relatives with congenital deafness,[7] but he did not volunteer to Defendants—and was *never asked* by them during discovery—that those relatives (and others) had undergone genetic testing for congenital deafness or that he knew the results of the testing.  Thus, this is not a situation where Wilkerson intentionally failed to produce discoverable documents or information responsive to a discovery request. There were no responsive documents to produce, and no family history questions posed by Defendants that went unanswered.  "That [Defendants] did not evaluate the data and ask related questions at deposition was a strategic choice, not an argument under *Daubert*."  *See* Def. Resp., ECF No. 2816-80 at 34.  Because Wilkerson did not withhold evidence, Defendants' procedural challenge to the bases for Drs. Spankovich and Djalilian's genetics opinions is rejected.

Defendants' challenge to the substantive reliability of the doctors' opinions ruling out genetics as a cause of Wilkerson's auditory injuries is also rejected.  Both doctors gathered a detailed family history from Wilkerson and understood from him that two extended family members were born deaf due to a genetic disorder, but the carrier of the genetic abnormality was not Wilkerson's blood relative.  Consistent with their standard clinical practice, both doctors relied on that information as the foundation

---

[6] *See* Email from Cornell to Castiglia, ECF No. 2718-61 at 2-3 (representing that "Mr. Wilkerson does not have any documents in his possession, custody or control related to" his family members' genetic testing for congenital deafness).

[7] *See* Wilkerson Dep., ECF No. 2812-13 at 6.

for their analyses.[8]   In the doctors' view, Wilkerson's report was corroborated by the fact that Wilkerson was born with normal hearing, which eliminates the possibility that his hearing loss is caused by the specific genetic abnormality that causes congenital deafness.[9]   Moreover, the doctors explained that the nature and pattern of Wilkerson's acquired hearing loss—in particular, an "acute, large change consistent with an acoustic trauma event" in 2012—are inconsistent with how genetic hearing loss presents.   *See* Spankovich Dep., ECF No. 2812-1 at 83-85.   These scientifically reasoned explanations, not premised on subjective beliefs or unsupported speculation, are reliable bases for ruling out genetics as a cause of Wilkerson's injuries.   Alleged weaknesses in the bases and sources of Drs. Spankovich and Djalilian's genetics opinions impact their weight, not admissibility, and thus are more appropriately addressed during cross-examination.   *See Viterbo v. Dow Chem. Co*., 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").

---

[8] The scientific literature cited by Defendants supports this approach.  *See* Simon I. Angeli et al., *Etiologic diagnosis of sensorineural hearing loss in adults*, 132(6) OTOLARYNGOLOGY-HEAD & NECK SURGERY 890 (2005) ("Angeli 2005"), ECF No. 2816-72 at 6 ("[T]he most effective tool to identify hereditary hearing loss [is] the characterization of the family history.").

[9] Again, the scientific literature cited by Defendants supports Plaintiffs' experts' assessment. *See* Peter J. King et al., *Etiologic Diagnosis of Nonsyndromic Genetic Hearing Loss in Adult vs Pediatric Populations*, 147(5) OTOLARYNGOLOGY-HEAD & NECK SURGERY 932 (2012) ("King 2012"), ECF NO. 2816-73 at 2 ("[T]hose with congenital vs adult-onset hearing loss are usually considered distinct populations during clinical evaluation, [although] our knowledge of genetic contributions to hearing loss continues to rapidly expand.").

Both doctors also provided an adequate basis for ruling out other hearing protectors and non-military occupational noise.   According to Dr. Spankovich, Wilkerson's pre-CAEv2 audiograms (encompassing periods when he primarily wore foamies and triple-flange earplugs around both military and civilian noise) reflected "some slight elevated thresholds" and variability at a few frequencies but "pretty normal" hearing sensitivity overall.  *See id*. at 70, 73.  However, Wilkerson almost exclusively wore the CAEv2 from 2010 to 2013, and it was during that period that he was exposed to substantial military noise (most notably, "significant acoustic trauma events" in the summer of 2012), experienced a "very, very large shift" in his hearing, and first perceived the onset of tinnitus.  *See id*. at 66-67.  In Wilkerson's post-CAEv2 years, he wore foamies, triple-flanges, or earmuffs for civilian occupational noise exposures.   His hearing loss worsened, but at a much slower pace, which Dr. Spankovich attributes to the residual effects of the 2012 acoustic trauma and the interaction between subsequent noise- and age-related changes.  The only "large, robust change" reflected in Wilkerson's records occurred immediately after his noise exposures while wearing the CAEv2.  *See id*. at 70.  In any event, Dr. Spankovich explained there is no evidence that any of the other hearing protectors worn by Wilkerson before or after the CAEv2 were defective or otherwise failed him.  *See id*. at 91.  Dr. Djalilian reached substantially the same conclusions for substantially the

same reasons.[10]  Having identified a temporal relationship between the cause and effect of Wilkerson's alleged injuries, and offered more than "unsupported speculation" as a basis for ruling out other hearing protectors and civilian occupational noise, Drs. Spankovich and Djalilian's analyses satisfy Rule 702 and *Daubert*.  *See Hendrix II*, 609 F.3d at 1197.

Defendants' Dr. Spankovich-specific challenges fare no better.  To begin with, Dr. Spankovich articulated reliable bases for ruling in the CAEv2's alleged defects as the cause of Wilkerson's injuries.  He explained that various aspects of the CAEv2's design prevent proper fit and seal (e.g., opposing flanges contacting the tragus), and that these alleged design defects present a risk of auditory injury to users.  *See* Spankovich Rep. (Wilkerson), ECF No. 2819-67 at 13-14; Spankovich Dep., ECF No. 2812-11 at 56.  Based on tympanometry measurements and military records, Dr. Spankovich determined that Wilkerson has an average-sized ear canal, and from images of the CAEv2 inserted in Wilkerson's ear, Dr. Spankovich observed that the CAEv2's outer flanges compressed "very prominently" against Wilkerson's tragus. *See* Spankovich Dep., ECF No. 2812-11 at 56-59, 98.  He also noted Wilkerson

---

[10] *See, e.g.*, Djalilian Rep. (Wilkerson), ECF No. 2812-15 at 4-5, 25-26 (non-military noise exposures, other hearing protectors and pre-CAEv2 audiograms); Djalilian Dep., ECF No. 2812-14 at 83 ("slight shift" in hearing before using CAEv2); *id*. at 93-95 (vigilant use of non-defective hearing protectors by Wilkerson during occupational noise exposures in environments with "very strict" enforcement of "very robust" hearing conservation programs); *id*. at 93, 96 (post-military deterioration in hearing fits pattern of age-related, not noise-induced, hearing loss accelerated by the acoustic damage that occurred between 2010 and 2013); *id*. at 97 (the "major damage" to Wilkerson's hearing happened between 2010 and 2013 when he wore the CAEv2).

reported there were "a number of" instances where the CAEv2 "perceptibl[y] loosen[ed]" while he wore it. *See id*. at 98. Taken together, this evidence—that is, evidence that Wilkerson actually experienced at least two of the alleged fit defects while wearing the CAEv2—provides a reliable basis for Dr. Spankovich's opinion that Wilkerson "would have fit issues and seal issues" with the CAEv2. *See id*. at 56. The fact that Dr. Spankovich did not take molds/digital impressions of Wilkerson's ear canal or generate a personal attenuation rating may bear on the weight of his opinion, but not its admissibility.

Regarding head injuries, Wilkerson testified that he has never been diagnosed with a TBI and that a medical provider in 2017 told him they found "no evidence of any kind" that he had ever suffered a TBI. *See* Wilkerson Dep., ECF No. 2812-13 at 20. Defendants have offered no evidence to the contrary. Moreover, Defendants have cited no medical or military records indicating that Wilkerson ever sustained any head or neck trauma before, during or after his service, much less trauma of a nature and severity capable of producing permanent hearing injuries. *See* Def. Mot., ECF No. 2718-70 at 42-43. The absence of evidence that Wilkerson has actually suffered any head/neck injuries is a reliable basis for ruling out such injuries as a cause of his auditory injuries. *See* Spankovich Rep., ECF No. 2718-67 at 12, 15.

Dr. Spankovich also provides a scientifically reasoned explanation fo his opinion that Wilkerson's tinnitus causes sleep difficulties. More specifically, Dr. Spankovich drew on his own clinical experience treating and managing symptoms of tinnitus

patients, together with an explanation of how that experience informed his opinion, as well as scientific literature linking tinnitus with sleep difficulties.  He did not ask Wilkerson to quantify the exact number of hours of sleep he loses to tinnitus but that has no bearing on the reliability of the doctor's specific causation opinion.  Dr. Spankovich properly focused on the specific nature of Wilkerson's sleep symptoms— i.e., his inability to fall asleep because of his tinnitus—and how those symptoms differ from the kinds of symptoms associated with other causes of sleep difficulties, such as sleep apnea.  *See* Spankovich Dep., ECF No. 2812-11 at 88-89.  This satisfies Rule 702 and *Daubert*.

Last, Defendants' challenge to the reliability of Dr. Djalilian's methodology is easily rejected.  Dr. Djalilian's approach—a traditional differential analysis—was explicitly disclosed in his expert report and otherwise readily apparent from the report and his deposition testimony.  He conducted clinical and standardized evaluations of Wilkerson, reviewed two decades of Wilkerson's medical and military records, and considered voluminous litigation materials (including deposition transcripts for Wilkerson and his family members, internal corporate documents from 3M/Aearo, and testing and case-specific reports from experts for both sides) and scientific literature. *See, e.g.*, Djalilian Rep. (Wilkerson), ECF No. 2812-15 at 29-32; Djalilian Rep. (General), ECF No. 2042-57 at 94-139.  In his report and deposition testimony, Dr. Djalilian explained precisely how this evidence supported his opinion that inadequate noise attenuation due to the allegedly defective design of the CAEv2 is the primary

cause of Wilkerson's hearing loss and tinnitus.  In so doing, he demonstrably identified and ruled out a multitude of alternative potential causes of Wilkerson's auditory injuries, including those discussed above and an extensive list of others.  *See, e.g.*, Djalilian Rep. (Wilkerson), ECF No. 2812-15 at 22-27.  On this record, there can be no reasonable dispute that Dr. Djalilian's specific causation opinion is sufficiently grounded in his expertise as an otolaryngologist and his analysis of the relevant evidence to render his methodology reliable.

### 2. Vilsmeyer

Drs. Moises Arriaga and Christopher Spankovich conducted differential analyses for Vilsmeyer.  Defendants argue that the doctors' specific causation opinions are unreliable because neither doctor: (a) reliably ruled out a 2010 IED blast or somatosensory influences as potential causes of Vilsmeyer's auditory problems; or (2) adequately accounted for the timing of Vilsmeyer's auditory injuries relative to his use of the CAEv2.  They also argue that Dr. Spankovich failed to adequately consider and rule out Vilsmeyer's exposure to kerosene-based jet propulsion fuel (JP-8) as a cause of his auditory injuries.  These arguments fail.

To begin with, Dr. Arriaga expressly considered and ruled out the 2010 IED blast as a cause of Vilsmeyer's tinnitus because he already had been suffering from permanent and progressively worsening tinnitus for nearly two years before the blast occurred, his pre-2010 audiograms documented temporary threshold shifts indicative of the sort of auditory damage (i.e., damage to hair cells and synaptic connections) that

produces tinnitus, and his position in the enclosed troop compartment of a mine-resistant armored vehicle at the time protected him from any "extreme intensity" sound from the blast. *See* Arriaga Rep. (Vilsmeyer), ECF No. 2718-26 at 11. Dr. Spankovich reached a similar conclusion, having also observed that Vilsmeyer did not perceive any significant increase in his hearing loss or tinnitus relative to the IED blast, which was corroborated by pure-tone audiometry performed after the 2010 deployment showing no change in Vilsmeyer's hearing sensitivity. *See* Spankovich Dep., ECF No. 2812-11 at 22-26, 36, 44-45. These scientifically reasoned explanations, not premised on subjective beliefs or unsupported speculation, are reliable bases for ruling out the 2010 IED blast as a cause of Vilsmeyer's auditory injuries.

The same is true for the doctors' consideration of somatic tinnitus. Somatic tinnitus refers to tinnitus that is influenced by somatosensory neural information from cervical spine, shoulder girdle, and/or temporomandibular disorders.[11]  More specifically, it "occurs when pain signals travel from the neck, shoulder, or jaw, to the brain via spinal or mandibular nerves, and in the process project onto the nearby auditory pathway." Def. Motion, ECF No. 2718-70 at 18. Here, both doctors acknowledged Vilsmeyer's history of head, neck and/or shoulder injuries, but explained that none of those injuries coincided temporally with the onset of his "permanent and constant" tinnitus in 2008-2009. *See* Arriaga Rebuttal (Vilsmeyer),

_____

[11] Sarah Michiels et al., *Somatosensory Tinnitus Diagnosis: Diagnostic Value of Existing Criteria*, 43(1) EAR & HEARING 143, 143 & 147 (2022), ECF No. 2718-34 at 2, 6 ("Michiels 2022").

ECF No. 2718-25 at 3-4; Spankovich Dep., ECF No. 2812-11 at 45.  The doctors also observed there is no evidence or indication that Vilsmeyer can modulate his tinnitus symptoms by moving or applying pressure to his head, neck, or jaw,[12] which is a key—although not necessarily defining—characteristic of somatic tinnitus.[13]  Additionally, Vilsmeyer's elevated pure-tone audiometric thresholds and his abnormal otoacoustic emissions provide objective evidence of noise-induced cochlear damage, which, Dr. Spankovich explained, generally is not present with somatic tinnitus.  *See* Spankovich Rebuttal (Vilsmeyer), ECF No. 2718-44 at 3; Spankovich Dep., 2812-11 at 18-19, 45-46.  These are adequate and reliable bases for ruling out somatosensory sources as the cause of Vilsmeyer's tinnitus.

Defendants also challenge Drs. Arriaga and Spankovich's construction of the timeline of Vilsmeyer's auditory injuries.  In Defendants' view, "[t]he record establishes that [Vilsmeyer's] hearing loss and tinnitus began *before* he began using the CAEv2"; therefore, his alleged auditory injuries cannot have been caused by the CAEv2.  *See* Def. Mot., ECF No. 2718-70 at 13.  This argument fails.  As to tinnitus, both doctors explained that Vilsmeyer first perceived the onset of "chronic" and

---

[12] *See* Arriaga Dep., ECF No. 2718-7 at 38; Spankovich Dep., ECF No. 2812-11 at 45.

[13] *See* Michiels 2022, ECF No. 2718-34 at 5-6 (finding "[t]innitus modulation by voluntary movements of or pressure on certain areas of the head or neck was present in 74.2% [of study] participants with large somatic influence but also in 44.7% of participants with no somatic influence"); *see also* Susan Shore et al., *Neural mechanisms underlying somatic tinnitus*, 166 PROGRESS IN BRAIN RSCH. 107-123 (2007), ECF No. 2718-35 at 2 ("Somatic tinnitus is clinically observed modulation of the pitch and loudness of tinnitus by somatic stimulation.").

"permanent" tinnitus that has "gradually" and "significant[ly] worsen[ed] . . . over time" in 2008-2009. *See* Spankovich Dep., ECF No. 2812-11 at 21; *see also* Arriaga Rep. (Vilsmeyer), ECF No. 2718-25 at 4; Arriaga Dep., ECF No. 2812-7 at 6, 20. Before then, Vilsmeyer never experienced more than "transient" and unobtrusive auditory noise. *See* Arriaga Rebuttal (Vilsmeyer), ECF No. 2718-25 at 4; Arriaga Dep., ECF No. 2812-7 at 45-46; Spankovich Rebuttal (Vilsmeyer), ECF No. 2718-44 at 4; Spankovich Dep., ECF No. 2812-11 at 13-14. Regarding hearing loss, Dr. Arriaga explained that there was "an awful lot of fluctuation" in Vilsmeyer's audiograms—in both directions (i.e., both positive and negative threshold shifts), none of which were permanent—in the years before and shortly after he began using the CAEv2, so he ended up "essentially being in the normal range" during that period. *See* Arriaga Dep., ECF No. 2812-7 at 26. However, in October 2009, Vilsmeyer's first permanent threshold shift and noise notch appeared, coinciding with his special forces urban training while wearing the CAEv2. His audiograms were "consistently abnormal . . . in both ears going forward," *see id*. at 22, during a period when he wore the CAEv2 for almost of all of his noise exposure. Dr. Spankovich reached the same conclusions for substantially the same reasons. *See* Spankovich Rebuttal (Vilsmeyer), ECF No. 2718-44 at 4-5; Spankovich Dep., ECF No. 2812-12 at 27-30 (fluctuation in audiograms); *id*. at 31-33 & 40-41 (significant shifts occurred during early years that CAEv2 was worn). These scientifically reasoned explanations for the doctors' respective opinions concerning the timeline of Vilsmeyer's auditory injuries are clearly "founded on more

than subjective beliefs or unsupported speculation," and thus satisfy Rule 702 and *Daubert*. *Hendrix II*, 609 F.3d at 1197. Any alleged weaknesses in the factual underpinnings of the doctors' conclusions go to the weight and credibility of their opinions, not the admissibility.

Last, Defendants argue that Dr. Spankovich offered no reliable methodology for ruling out Vilsmeyer's exposure to kerosene-based jet propulsion fuel (JP-8) as a cause of his auditory injuries. The Court has already found that no scientifically reliable evidence has been presented in this litigation establishing a causal relationship between burn pit/JP-8 exposure and noise-induced sensorineural hearing loss and tinnitus. *See, e.g., In re 3M*, ECF No. 2218 at 32-34. None of the scientific literature cited in connection with the instant briefing compels a contrary conclusion. At most, that literature indicates that jet fuel has been "linked" to central auditory processing disorder (which Vilsmeyer does not have), and recommends further research on the issue.[14] Because the scientific landscape remains largely unchanged since the Court last ruled on this issue, JP-8/burn pit opinions from either side remain inadmissible on reliability, helpfulness, and 403 grounds. *See id*.

---

[14] *See* Victoria Tepe et al., *Acquired Central Auditory Processing Disorder in Service Members & Veterans*, J. Speech, 63 LANGUAGE & HEARING RSCH. 834, 840 (Mar. 2020), ECF No. 2816-20 at 8 (citing studies that discuss an association and potential "synergistic effect" between jet fuel, other organic solvents, noise and central auditory processing disorder); O'neil W. Guthrie et al., *Exposure to Low Levels of Jet-Propulsion Fuel Impairs Brainstem Encoding of Stimulus Intensity*, 77 J. OF TOXICOLOGY & ENV'T HEALTH, 261 (2014), ECF No. 2816-21 at 17 (finding "significant CAPD" following exposure to jet fuel and noise in rats).

## III.   Defendants' Experts

In Wilkerson and Vilsmeyer's cases, Plaintiffs move to exclude the testimony and opinions, in whole or in part, of Drs. James Crawford, Gregory Flamme, Mark Stephenson, Stan Phillips, Derek Jones, and Jennifer LaBorde.

### A.   Dr. James Crawford

Dr. James Crawford offers general expert opinions regarding hearing loss and tinnitus, as well as medical causation opinions for Wilkerson.   Plaintiffs challenge several aspects of Dr. Crawford's opinions, which the Court addresses in turn.

### 1.   Synaptopathy

Plaintiffs argue for exclusion of Dr. Crawford's "opinions regarding synaptopathy." *See* Pl. Mot., ECF No. 2716-47 at 9.   None of the Group D plaintiffs are pursuing a hidden hearing loss ("HHL") claim; therefore, general HHL opinions are excluded on relevance grounds.   With that said, Plaintiffs' experts have, in the past, offered opinions that a plaintiff now suffers from accelerated age-related hearing loss due to cochlear synaptopathy caused by noise damage sustained while the plaintiff wore the CAEv2.   Here, Dr. Djalilian testified to that effect as part of his specific causation opinions in Wilkerson's case.   *See* Djalilian Dep., ECF No. 2812-14 at 88-89, 96.   If Dr. Djalilian offers that same opinion at trial, Defendants may rebut it with Dr. Crawford's opinions on the absence of a demonstrated relationship between synaptopathy and accelerated age-related hearing loss.

### 2.      Tinnitus and Mental Health Issues

Dr. Crawford also may offer his opinion on the relationship between tinnitus and mental health issues (including coping skills), with one limitation.  According to Dr. Crawford's expert reports, this opinion is not based on any peer-reviewed scientific literature or studies.  Rather, he drew on his own specialized knowledge in the field of otolaryngology and his "extensive" clinical experience treating and managing symptoms of tinnitus patients, and he explained how that knowledge and experience informed his opinion.  *See, e.g.*, Crawford Rep. (General), ECF No. 2716-7 at 15.  While this is an adequate basis for the opinion, it does limit the scope of Dr. Crawford's testimony at trial.  He may discuss tinnitus and mental health issues only in terms of his personal observations while treating patients.  He must not generalize those opinions beyond his own patient population.[15]

### 3.      Internal Company Documents

Dr. Crawford's opinion that internal company documents are not the type of documents generally relied on by clinicians is admissible.  Expert witnesses may testify regarding prevailing industry standards and practice.  *See In re 3M*, No. 3:19md2885, ECF No. 1680 at 116-17.  Testimony about the information that the medical/audiological community typically considers when assessing potential causes of injury satisfies the rule.  Plaintiffs may properly challenge Dr. Crawford's internal

---

[15] *See, e.g.*, Crawford Rep. (General), ECF No. 2716-7 at 15 ("95% of people with tinnitus develop coping strategies and have no significant problems with their tinnitus.").

company documents opinion through "vigorous cross-examination" and the "presentation of contrary evidence." *See Quiet Tech*., 326 F.3d at 1341.

### 4.  Prevalence of Hearing Loss in the Military

Dr. Crawford's opinion that "[n]oise-induced hearing loss is common in the military" is also admissible.  This is a statement of undisputable fact, not an expert opinion.[16]  So long as Dr. Crawford does not stray into sweeping testimony about the failure of the Army's hearing conservation efforts or any purported culture of non-compliance with the Army's programs and regulations governing safety and hearing protection, he may reference the prevalence of noise-induced hearing loss in the military.  *See In re 3M*, 3:19md2885, ECF No. 1651 at 1-8, 15-18.

### 5.  Design Defect

Regarding whether the CAEv2's alleged defects contributed to a plaintiffs' hearing problems, Dr. Crawford's opinions are admissible, in part.  Dr. Crawford previously acknowledged that he has not reviewed any information about the CAEv2's design, testing, efficacy, marketing, or sale in connection with his work in this case. *See id.*, ECF No. 2218 at 41-42.  Therefore, he may not offer opinions in those areas or otherwise base his causation opinions on them.  *See id*.  Nonetheless, Dr. Crawford

---

[16] *See, e.g*., Army Hearing Program, *Special Text 4-02.501* (Feb. 1, 2008), ECF No. 2816-14 at 11 ("Whether in peacetime or wartime, hazardous noise exists as one of the primary occupational hazards in the Army."); *id*. ("The risk of [noise-induced hearing loss] in Soldiers has reached the highest rate in over 30 years."); Dep't of the Army Hearing Conservation Program, *Pamphlet 40-501* (Dec. 10, 1998), ECF No. 2816-15 at 9 ("Noise is one of the most common health hazards soldiers and civilians face in the workplace and during training.").

may explain why he concluded that a plaintiff's auditory injuries are not attributable to the CAEv2 based on record evidence regarding the plaintiff's noise exposures, other potential causes of auditory damage, and the timeline of any alleged injuries. *See, e.g.*, Crawford Rep. (Wilkerson), ECF No. 2716-21 at 16-18.

### 6.     No-Cost Hearing Aids for Wilkerson

Consistent with prior rulings on the issue, Dr. Crawford is precluded from testifying that Wilkerson may obtain hearing aids at no cost through the military health care system unless Plaintiffs open the door. *See In re 3M*, ECF No. 2218 at 43-44; *see also Leitinger v. DBart, Inc*., 302 N.W.2d 1, 9 (Wis. 2007) ("A limited exception [to the collateral source rule] has been recognized when the evidence is offered for impeachment purposes.").

### 7.     Wilkerson's Head Trauma

Dr. Crawford's opinion that head trauma cannot be ruled out as a cause of Wilkerson's hearing loss and tinnitus satisfies Rule 702 and *Daubert*.  Scientific literature supports the proposition that head trauma short of a TBI can cause auditory dysfunction, and Dr. Crawford provided scientifically reasoned explanations for ruling in Wilkerson's "multiple head injuries" as a potential cause of his auditory dysfunction. *See* Crawford Rep. (Wilkerson), ECF No. 2716-21 at 17-18, 20-21.   Plaintiffs' disagreement with Dr. Crawford's assessment of the severity and/or long-term impact of Wilkerson's head trauma goes to the weight of his opinion, not its admissibility.

### 8.   Wilkerson's JP-8 Exposure

As already discussed, and incorporated by reference here, no scientifically reliable evidence has been presented in this litigation establishing a causal relationship between burn pit/JP-8 exposure and noise-induced sensorineural hearing loss and tinnitus.   Consequently, Dr. Crawford's JP8 opinion is excluded on reliability, helpfulness, and 403 grounds.

### B.   Drs. Mark Stephenson and Gregory Flamme

Drs. Gregory Flamme and Mark Stephenson ("Flamme-Stephenson") co-authored joint reports on specific causation for both Vilsmeyer and Wilkerson. Plaintiffs challenge several aspects of Flamme-Stephenson's opinions, which the Court addresses in turn.

### 1.   Inconsistent Implementation of Hearing Conservation Programs

As with prior bellwether plaintiffs, Flamme-Stephenson offer opinions that Vilsmeyer and Wilkerson's hearing impairments were not caused by the CAEv2 but rather are attributable, at least in part, to the inconsistent implementation of the Department of Defense and the Army's hearing conservation programs.  *See, e.g.*, Flamme-Stephenson Rep. (Vilsmeyer), ECF No. 2716-32 at 62; Stephenson Dep., ECF No. 2716-30 at 16.  The Court has repeatedly excluded substantially similar portions of the doctors' specific causation opinions in prior bellwether cases.  *See In re 3M*, 3:19md2885, ECF No. 2218 at 30-31 (collecting rulings).   Consistent with those

rulings, Flamme-Stephenson will not be permitted to testify that any military program was "implemented inadequately" or otherwise failed, either as a general matter or as to Vilsmeyer and Wilkerson specifically. *See id*. They are also precluded from testifying that the military's failure to conduct an annual audiogram contributed in any way to the plaintiffs' injuries, as there is no medical evidence to support that opinion. *See id*. As audiologists, Flamme-Stephenson may speak about the importance of training on and fitting of earplugs. *See id*. Additionally, they may note the fact that an annual audiogram is missing from a plaintiff's military health record, and just as Plaintiffs' experts have done, they may identify perceived errors reflected in a plaintiff's audiometric records.[17] However, neither they, nor any other expert, will be allowed to testify that any perceived errors in the audiograms, the military's "poor safety culture," or its failure to provide "adequate and effective training" caused or contributed to Plaintiffs' injuries. *See id*.

## 2.    Effective Quiet & Bone/Tissue Conduction

Also as with prior bellwether plaintiffs, Flamme-Stephenson opine that they cannot rule out that Vilsmeyer and Wilkerson's ears did not have "sufficient time to recover" between temporary threshold shifts while on deployment, which could have exacerbated the hazard posed by subsequent exposures to noise. *See* Flamme-Stephenson Rep. (Vilsmeyer), ECF No. 2716-32 at 37-38; Flamme-Stephenson Rep.

---

[17] *See, e.g.*, Djalilian Dep., ECF No. 2812-14 at 83-87.

(Wilkerson), ECF No. 2716-31 at 32. The Court has already found that Flamme-Stephenson's so-called "effective quiet" opinion lacks a reliable scientific basis, *see In re 3M*, 3:19md2885, ECF No. 2218 at 38-39, and now incorporates that ruling by reference in Vilsmeyer and Wilkerson's cases. Because Defendants have not offered any additional scientific evidence that would support reconsideration of the prior ruling, Flamme-Stephenson's effective quiet opinions are excluded.

The same is true for Flamme-Stephenson's bone/tissue conduction opinions. The Court has already found that those opinions lack a reliable scientific basis, *see id*. at 36-38, and now incorporates that ruling by reference in Vilsmeyer and Wilkerson's cases. Based on the scientific literature provided in connection with the instant briefing, it appears that the potential impacts of bone/tissue-conducted sound transmission on hearing damage risk are still being explored and current research has not yet shown a causal relationship between them. Therefore, Flamme-Stephenson's bone/tissue conduction opinions must be excluded.

### 3. Burn Pits

As already discussed, and incorporated by reference here, no scientifically reliable evidence has been presented in this litigation establishing a causal relationship between burn pit/JP-8 exposure and noise-induced sensorineural hearing loss and tinnitus. Consequently, Flamme-Stephenson's opinion is excluded on reliability, helpfulness, and 403 grounds.

### 4.    Head Trauma

Flamme-Stephenson offer opinions that head trauma cannot be ruled out as a cause of Vilsmeyer and Wilkerson's auditory injuries.   Plaintiffs challenge those opinions on qualifications, reliability, helpfulness and 403 grounds.   These challenges fail.   First, Flamme-Stephenson are not physicians or neurotrauma specialists, and thus cannot (and must not, in this litigation) diagnose traumatic brain injuries/concussions in connection with their opinions.   However, the doctors' specialized knowledge and experience in the field of audiology qualify them to offer opinions on the relationship between head trauma and auditory injury.   *See id.* at 7-8 (finding same regarding audiologist's opinion on the absence of a relationship between a plaintiff's tinnitus and any head trauma).   Second, Flamme-Stephenson provided scientifically reasoned explanations for ruling in head trauma as a potential cause of Vilsmeyer and Wilkerson's hearing problems.   *See* Flamme-Stephenson Rep. (Vilsmeyer), ECF No. 2716-32 at 64; Flamme-Stephenson Rep. (Wilkerson), ECF No. 2716-31 at 60-61, 65-66.   To the extent that Plaintiff disagree with Flamme-Stephenson's construction of the timeline of these plaintiffs' head trauma relative to the onset of the plaintiffs' auditory symptoms, that is matter for cross-examination and the presentation of contrary evidence.   Flamme-Stephenson's head trauma opinions bear on causation and their relevance is not substantially outweighed by a danger of unfair prejudice.   Therefore, they are admissible.

### 5.     Wilkerson's Tobacco Use

Plaintiffs also challenge Flamme-Stephenson's opinion that Wilkerson's tobacco use cannot be ruled out as a cause of his hearing loss and/or tinnitus.  *See* Flamme-Stephenson Rep. (Wilkerson), ECF No. 2716-31 at 31, 49, 66.  Because "Defendants have never demonstrated a scientifically reliable evidentiary basis for their experts' assertion that tobacco can cause auditory injuries," Flamme-Stephenson's tobacco use opinion is excluded.[18]  *Wilkerson v. 3M*, 7:20cv035, ECF No. 116 at 7.

### C.     Dr. Stan Phillips

Dr. Stan Phillips offered specific causation opinions for Vilsmeyer.  Plaintiffs challenge the reliability of Dr. Phillips' opinion that the CAEv2 did not cause or worsen Vilsmeyer's hearing loss and tinnitus, and argue that he failed to reliably rule in central auditory processing disorder, toxin exposures, NSAIDs and head trauma as causes of Vilsmeyer's hearing injuries.[19]

Regarding CAEv2 causation, Dr. Phillips' opinions are admissible, in part.  Like Dr. Crawford, Dr. Phillips admittedly did not review any information about the

---

[18] The Court incorporates by reference its prior rulings regarding Flamme-Stephenson's tobacco use opinions.  *See, e.g.*, *Wilkerson v. 3M*, 7:20cv035, ECF No. 116 at 7; *In re 3M*, 3:19md2885, ECF No. 2218 at 34-35.

[19] Plaintiffs also seek exclusion of Dr. Phillips' opinion that lipo-flavonoid supplements may reduce Vilsmeyer's tinnitus symptoms.  Defendants represent that they will not elicit affirmative opinions from Dr. Phillips on lipo-flavonoids.  *See* Def. Resp., ECF No. 2816-80 at 46.  Accordingly, this motion is denied as moot.  Defendants are cautioned to advise Dr. Phillips not to volunteer this opinion during his testimony.

CAEv2's design, testing, efficacy, marketing, or sale in connection with his work in this case. *See* Phillips Dep., ECF No. 2716-38 at 7-8, 12-13. Therefore, he may not offer opinions in those areas or otherwise base his causation opinions on them. *See In re 3M*, 3:19md2885, ECF No. 2218 at 41-42 (finding same as to physician who was not provided any documents that would allow him to reliably evaluate the CAEv2's design). Nonetheless, Dr. Phillips may explain why he concluded that the CAEv2 did not cause or worsen Vilsmeyer's auditory injuries based on medical and military service records documenting other "causative factors"—e.g., pre- and post-military noise exposures, neck and shoulder injuries, and chronic NSAID use—that occurred "simultaneously with the initial onset [of], and dramatic spikes [in,]" Vilsmeyer's auditory symptoms. *See* Def. Resp., ECF No. 2816-80 at 41.

Dr. Phillips' opinion that central auditory processing disorder (CAPD) is a potential cause of Vilsmeyer's injuries lacks *any* factual basis, much less a reliable one. CAPD is a deficit in the brain's ability to filter and interpret incoming auditory signals, which, much like the phenomenon of hidden hearing loss, may manifest as difficulty understanding speech in noise and may be experienced despite normal audiometric thresholds.[20] Auditory deficits of this nature can occur as a result of blast-related traumatic brain injuries.[21] Notably, there are tests for CAPD that help identify "the

---

[20] *See* Sarah M. Theodoroff et al., *Hearing Impairment & Tinnitus: Prevalence, Risk Factors, and Outcomes in US Service Members and Veterans Deployed to the Iraq and Afghanistan Wars*, 37 EPIDEMIOLOGIC REV. 71 (2015), ECF No. 2816-37 at 3.

[21] *See id.*

nature and severity of" a patient's specific auditory processing deficits.[22]   Dr. Phillips,

however, did not perform, request, or review CAPD testing for Vilsmeyer, and his

report does not even acknowledge that CAPD testing is available.   Moreover, no

medical professional has ever diagnosed Vilsmeyer with CAPD.   The only support Dr.

Phillips cites for his CAPD-opinion is scientific literature confirming that CAPD "can

occur following brain injuries and/or blast exposure."   *See* Phillips Rep. (Vilsmeyer),

ECF No. 2716-37 at 43.   Without CAPD testing and/or a specific analysis of

Vilsmeyer's alleged blast exposures/brain injuries relative to his auditory symptoms,

Dr. Phillips' CAPD-opinion is wholly speculative and unhelpful, with only nominal

relevance, which is substantially outweighed by the danger of unfair prejudice,

confusing the issues, and misleading the jury.

As to burn pits/JP-8 exposure, Dr. Phillips' opinion is excluded on reliability,

helpfulness, and 403 grounds.   As already discussed, and incorporated by reference

here, no scientifically reliable evidence has been presented in this litigation establishing

a causal relationship between burn pit/JP-8 exposure and noise-induced sensorineural

hearing loss and tinnitus.

Regarding NSAIDs as a potential cause of Vilsmeyer's tinnitus, Dr. Phillips'

opinion is admissible.   Plaintiffs argue that this opinion is unhelpful and unreliable

because NSAIDS have only been shown to be associated with temporary tinnitus, and

---

[22] *See* Michael Oleksiak et al*., Audiological issues and hearing loss among Veterans with mild traumatic brain injury*, 49 J. REHAB. RSCH. & DEV. 995 (2012), ECF No. 2816-66 at 6, 8.

not the "chronic, progressive tinnitus" at issue in Vilsmeyer's case. *See* Pl. Mot., ECF No. 2716-47 at 41. The Court disagrees. As explained in a prior order, NSAID use (other than Naproxen) is "arguably relevant" to a plaintiff's hearing loss and/or tinnitus claims where the plaintiff's use of the medication "coincided" with his hearing loss or tinnitus diagnosis and he continues to use NSAIDs today. *See Vilsmeyer v. 3M*, 7:20cv113, ECF No. 98 at 2 (quoting *In re 3M*, 3:19md2885, ECF No. 1330 at 6). Here, Vilsmeyer's medical records document a "significant increase" in tinnitus in 2019, *see id.,* ECF No. 61-1 at 3, during a time when he was reportedly consuming large doses of NSAIDs "a few times a day," *see id.*, ECF No. 61-2 at 2, and he continues to use the NSAIDs today, *see id*., Vilsmeyer Dep., ECF No. 61-3 at 6. Based on this evidence, Dr. Phillips opined that NSAIDs cannot be ruled out as a potential cause of Vilsmeyer's worsening tinnitus. *See* Phillips Rep. (Vilsmeyer), ECF No. 61-4 at 36. This scientifically reasoned explanation, which is supported by an adequate factual basis, satisfies Rule 702 and *Daubert*.

Dr. Phillips' opinion that head trauma cannot be ruled out as a cause of Vilsmeyer's tinnitus likewise satisfies Rule 702 and *Daubert*. He offered scientific literature showing there is a causal connection between even mild TBI and auditory dysfunction, *see id*. at 11-13, and provided a scientifically reasoned explanation for ruling in Vilsmeyer's "multiple TBIs" as a cause of his auditory dysfunction (i.e., Vilsmeyer's contemporaneous report of worsening tinnitus after blast induced TBI), *see id*. at 18, 33. Plaintiffs' disagreement with Dr. Phillips' assessment of the severity

and/or long-term impact of Vilsmeyer's head trauma goes to the weight of his opinion, not its admissibility.

###     D.     Drs. Derek Jones and Jennifer LaBorde

Drs. Derek Jones and Jennifer LaBorde ("Jones-LaBorde") co-authored a joint report on specific causation for Wilkerson.   Plaintiffs challenge Jones-LaBorde's opinions regarding the need for genetic testing to rule out genetic abnormalities, the effectiveness of hearing aids for minimizing or eliminating the perception of tinnitus, and Dr. LaBorde's personal use of hearing aids.   Taking the last challenge first, the Court has already ruled on this issue.   The motion is granted as to testimony from Dr. LaBorde that merely bolsters her properly disclosed expert opinions by reference to her personal experience using hearing assistive devices and/or the impact of her own hearing impairments on her daily life.  *See Wilkerson v. 3M*, 7:20cv035, ECF No. 116 at 4-5.    Personal use testimony of this nature is not based on scientific principles, reasoning or methodology, and it is irrelevant, unhelpful and unfairly prejudicial in the context of this litigation.  *See id*. at 5.   Jones-LaBorde, however, may offer expert opinions regarding the effectiveness of hearing aids for tinnitus management.   The doctors' specialized knowledge with respect to hearing disorders, and their decades of clinical experience recommending hearing aids for tinnitus patients, is an adequate basis for this opinion.   Plaintiffs' disagreement with Jones-LaBorde's assessment of the effectiveness of managing tinnitus in this manner is more appropriately addressed through cross-examination and the presentation of competing expert testimony.

Jones-LaBorde's opinion that genetic abnormalities cannot be ruled out is admissible, with certain limitations. More specifically, Jones-LaBorde may explain their opinion that the "history and the nature of" Wilkerson's hearing loss, and "the progression and the frequencies that are involved" are consistent with "adult-onset progressive sensorineural hearing loss," which can have a genetic component. *See* Jones Dep., ECF No. 2716-42 at 5. They may also explain why genetic testing would be "helpful" here "to further investigate" whether Wilkerson carries any known genetic markers for adult-onset hearing loss, and what it would mean if he was a carrier. *See id*. at 4-5. What Jones-LaBorde may not do is testify that genetic testing is "necessary" or would be dispositive on the issue of genetics, or suggest that Wilkerson's failure to undergo genetic testing impugns his credibility. Both doctors conceded that genetic testing is "not definitive" because not all of the genes involved in hearing loss are known and testable. *See id*. at 5; LaBorde Dep., ECF No. 2716-41 at 5. The scientific literature reflects a similar conclusion and views genetic testing as a potentially "valuable supplement" to clinical diagnoses based on history and physical, audiologic testing, and radiographic imaging."[23] However, the "role" of DNA analysis in the diagnostic evaluation of adult-onset hearing loss is currently "limited" and "yet to be

---

[23] *See* King 2012, ECF No. 2816-73 at 4.

defined,"[24] such that it is "not practical" or "justified" in most cases.[25]  Jones-LaBorde may not suggest anything different to the jury.

**IV.    Conclusion**

Based on the foregoing, the parties' omnibus motions to exclude expert opinions under Rule 702 and *Daubert* in the Trial Group D cases for Vilsmeyer and Wilkerson, ECF Nos. 2716 and 2718, are **GRANTED IN PART and DENIED IN PART**, consistent with this Order.   The remaining expert challenges will be resolved by separate order.

**SO ORDERED**, on this 8th day of March, 2022.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[24] *See id*. at 5.

[25] *See* Angeli 2005, ECF No. 2816-72 at 5.