# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to: *Wilkerson*, 7:20cv0035 *Vilsmeyer*, 7:20cv0113 *Kelley*, 7:20cv0153 *Vaughn*, 7:20cv0134 *Beal*, 7:20cv0006 | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

# ORDER[1]

This Order resolves the parties' respective omnibus motions to exclude expert testimony and opinions under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), for the Group D case of Plaintiff Denise Kelley.[2] *See* ECF Nos. 2716, 2718. Drs. Hamid Djalilian and M. Eric Gershwin offer opinions on behalf of Kelley; Drs. James Crawford and W. Winn Chatham offer opinions for Defendants. The expert challenges here focus on the questions of whether an autoimmune condition should be considered as a potential cause of

---

[1] The Court assumes the parties' familiarity with the nature of this multidistrict litigation, the claims and defenses, and the current evidentiary record. Thus, this Order sets out only what is necessary to explain the Court's rulings. The Order also incorporates by reference the applicable legal standard set forth in prior similar orders. *See, e.g.*, *In re 3M*, 3:19md2885, ECF Nos. 2845 at 105 & 2290 at 1-5.

[2] Drs. Lawrence Lustig, Eric Bielefeld, Dennis Pappas, and Douglas Jacobs's case-specific opinions for Vaughn, another Group D case, will be addressed by separate order.

Kelley's hearing loss and, if so, whether the various experts reliably ruled in or out potential autoimmune issues in connection with their case-specific opinions.

Notably, the basic scientific premise underlying the expert opinions on this issue—i.e., that certain autoimmune conditions can lead to hearing loss—is not in dispute, at least not by the actual experts.[3] While autoimmune-induced sensorineural hearing loss ("AIHL") is "uncommon" and its underlying pathophysiology is not well understood, the medical and scientific community appear to agree that it occurs and that it often, though not always, manifests relatively rapidly, progressively and bilaterally (but may initially present unilaterally and/or fluctuate) over a period of weeks or months in patients with comorbid autoimmune disease.[4] There are no specific diagnostic tests or criteria for AIHL.[5] Diagnoses are typically made based on clinical presentation and otological history, physical and audiological examinations, immunological laboratory findings (including biomarkers for certain

---

[3] *Compare* Gershwin Rep. (Kelley), ECF No. 2812-28 at 4 (explaining that "[t]here are a number of immune-mediated inner-ear diseases, which can lead to loss of hearing"), *and* Djalilian Dep., ECF No. 2812-14 (agreeing that autoimmune disorders can cause sensorineural hearing loss), *with* Chatham Rep. (Kelley), ECF No. 2716-14 at 4-5 ("Hearing loss caused by an autoimmune disorder is a well-documented phenomenon."), *and* Crawford Rep. (Kelley), ECF No. 2716-20 at 8-9 (describing characteristics and diagnosis of "immune-mediated hearing loss").

[4] *See* Erick Yuen et al., *Hearing loss in patients with systemic lupus erythematosus: A systematic review and meta-analysis*, SAGE 30(6): 837-45 (2021), ECF No. 2718-12 at 9. The Court will use the term "AIHL" to describe all autoimmune-related forms of hearing loss, including those the experts variously refer to as "immune-mediated inner ear disease," "autoimmune inner ear disease," and "autoimmune hearing disorder."

[5] *See* Patrizia Mancini et al., *Hearing loss in autoimmune disorders: Prevalence and therapeutic options*, AUTOIMMUNITY REV. 17:644-52 (2018) ("Mancini 2018"), ECF No. 2716-19 at 2.

autoimmune diseases), exclusion of other known causes of sensorineural hearing loss, and by a positive response to steroid treatment.[6] This is the broad framework through which the parties' experts assessed autoimmune disease as a potential cause of Kelley's hearing loss.

The historical record on this issue is fairly straightforward. Kelley has never been formally diagnosed with an autoimmune disease. However, two treating physicians previously considered the possibility of systemic lupus erythematosus ("lupus") based on Kelley's various presenting symptoms (e.g., placenta abruption, rash), and another treater recorded a clinical "impression" of autoimmune thyroiditis in 2013.[7] All three treaters referred Kelley for antibody testing—two for antinuclear antibodies, one for antithyroid antibodies—which can help detect potential autoimmune issues.[8] Kelley never had those antibody tests performed. Defendants' experts provided scientifically reasoned explanations why those facts are significant

---

[6] *See* George Psillas et al., *Audiological Patterns in Patients with Autoimmune Hearing Loss*, Audiology & Neurotology (2021), ECF No. 2718-1 at 4; Mancini 2018, ECF No. 2716-19 at 6-7.

[7] *See* Kelley Medical Record dated June 7, 2018, ECF No. 2718-3 at 2 (lupus); Kelley Medical Record dated November 20, 2013, ECF No. 2716-16 at 4 (chronic thyroiditis).

[8] *See* Kelley Medical Record dated June 7, 2018, ECF No. 2718-3 at 2 (referencing current and prior referrals for antinuclear antibody testing); Gershwin Dep., ECF No. 2812-29 at 34 (discussing serum thyroid antibody test ordered on November 20, 2013).

here in light of Kelley's medical history;[9] Plaintiffs' experts provided scientific reasons why the facts should not be considered significant.[10]

Kelley's symptomology over the years, based on her medical records, is similarly straightforward and largely undisputed, although the diagnostic conclusions to be drawn from this evidence are hotly contested in this litigation. At various times, Kelley has reportedly experienced uncommon pregnancy complications, persistent rashes (including eczema, malar facial rash, circular lesions, and keratoderma) and nail dystrophy that have been nonresponsive to conventional treatment, allergic rhinitis, fatigue, joint/limb pain and swelling (including hip, knee, and wrist pain, swelling and numbness), chronic headaches, memory loss, iron deficiency anemia, and vitamin D deficiency. The parties' experts agree that symptoms of this nature can be caused by a multitude of medical or environmental conditions, some autoimmune-induced, like lupus, and some not. Plaintiffs' experts provided scientifically reasoned explanations for their conclusion

---

[9] *See, e.g.*, Chatham Rep. (Kelley), ECF No. 2716-14 at 4 (explaining why lupus and autoimmune thyroid disease cannot be ruled out on the basis of Kelley's medical records alone, as evidenced, in part, by the fact that three treating physicians were concerned enough about her symptoms to prescribe antibody testing for the conditions).

[10] *See, e.g.*, Djalilian Dep., ECF No. 2812-14 at 46 (explaining that antinuclear antibody tests are non-specific, do not diagnose lupus and can be positive due to aging, certain medications, and non-autoimmune illness); *id*. at 62 (explaining that Kelley would "more likely than not" be "gravely ill, dead or near dead" if she had untreated lupus from the time the first antinuclear antibody test was prescribed); Gershwin Dep., 2812-29 at 30-31 (antithyroid antibody testing was never "clinically indicated" because Kelley's medical records repeatedly show "normal" thyroid dimensions, volume, and function, as well as "multiple normal" thyroid stimulating hormone" and T4 (Thyroxine) levels, and no continuous prescription for thyroid replacement therapy).

from the records that Kelley's symptoms are not autoimmune-related,[11] whereas Defendants' experts explained their conclusion that lupus and autoimmune thyroid disease cannot be ruled out without further diagnostic testing.[12]

In terms of Kelley's documented pattern of hearing loss, her military audiograms were essentially normal and invariable between October 2004 and March 2010.[13] In early 2011, audiograms documented slight threshold shifts at a few frequencies, but still essentially normal hearing. On August 25, 2011, at a time when Kelley had not been exposed to military noise for nearly six months, her audiogram documented significant shifts in her hearing thresholds across all frequencies in both ears. Kelley's next audiogram was nearly two years later, after she left the military. At that time, her hearing thresholds had improved but still reflected mild hearing loss at select frequencies in both ears. Subsequent audiograms, both before and during this litigation, showed continued improvement in Kelley's hearing thresholds, although a mild hearing loss is still reflected at some

---

[11] *See, e.g.*, Gershwin Rebuttal (Kelley), ECF No. 2812-28 at 3-8 (detailing Kelley's 11 years of physical examinations, blood tests, and urinalyses with no clinically significant biomarkers or symptoms of lupus or autoimmune thyroid disease); Gershwin Dep., ECF No. 2812-29 at 16-17, (discussing how untreated lupus or thyroid disease would be "pretty clinically manifest" after 11 years); Djalilian Dep., ECF No. 2812-14 at 40-62 (same and providing non-autoimmune explanations for each of Kelley's symptoms).

[12] *See, e.g.*, Chatham Rep., ECF No. 2716-14 at 4-10 (explaining that the constellation of symptoms and conditions consistent with lupus and/or autoimmune thyroid disease in Kelley's medical history, her prior treaters' similar assessment of her history, and her demographic risk factors make it impossible to rule out lupus or autoimmune thyroid disease on the basis of her medical records alone); Crawford Rep., ECF No. 2716-20 at 25 (same).

[13] This is also the period when Kelley wore the CAEv2 during military noise exposures.

frequencies. The parties' experts disagree about whether this audiometric evidence demonstrates the rapid, bilateral, and progressive (though sometimes fluctuating) pattern of hearing loss typically found with AIHL; however, both sides' experts provided scientifically reasoned and supported explanations for their respective opinions on the issue.[14]

The Court structured its *Daubert* analysis in this way for Kelley's case to illustrate what must by now be a fairly obvious conclusion—the parties' experts approached their respective analyses of autoimmune disease as a potential cause of Kelley's hearing loss in substantially the same way based on substantially the same evidence (including Kelley's medical, audiometric, and service records). With limited exceptions discussed more fully below, all four experts (Drs. Hamid Djalilian and M. Eric Gershwin for Plaintiffs, and Drs. James Crawford and W. Winn Chatham for Defendants) provided detailed explanations of the facts and scientific literature that informed their opinions. The differences here—framed as reliability problems in the parties' briefing—are not (for the most part) methodological, at least not from a *Daubert* perspective. Rather, there is

---

[14] *Compare* Crawford Rep., ECF No. 2716-20 at 25 (Kelley's hearing loss developed bilaterally over weeks or months, has demonstrated considerable fluctuation, particularly at the lower frequencies, and lacks a noise notch, which is consistent with AIHL), *and* Chatham Dep., ECF No. 2716-13 at 4 (same), *with* Djalilian Rebuttal (Kelley), ECF No. 2812-24 at 3 (Kelley's hearing loss was not rapid or progressive, has "consistently" improved since the Aug. 2011 audiogram without the assistance of steroids, is near normal in the lower frequencies, and reflects auditory injury primarily at the frequencies corresponding to noise damage), *and* Djalilian Dep., ECF No. 2812-14 at 61-62 (same).

fundamental disagreement on the clinical judgments to be drawn from the evidentiary record, and the competing expert opinions (again, for the most part) do have scientific and evidentiary support. Consequently, except as limited below, it is for the jury to "decide among the conflicting views." *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999) (citing *Daubert*, 509 U.S. at 596); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005) ("A district court may not exclude an expert because it believes one expert is more persuasive than another expert.").

With that said, certain aspects of certain experts' opinions must be excluded. First, Drs. Chatham and Crawford must confine their testimony regarding autoimmune issues to their opinions that lupus and autoimmune thyroid disease cannot be ruled out as potential causes of Kelley's hearing loss. While there is a minimally sufficient factual and scientific basis for their opinions as to these two specific conditions, there is no such basis for their vague and sweeping references to the "wide variety" of systemic autoimmune conditions, issues, or problems in existence, to "potentially autoimmune symptoms" not specific to lupus or autoimmune thyroid disease, and to the possibility of AIHL presenting "in the

absence of any systemic autoimmune disorder."[15]  Testimony of this nature is excluded as unreliable, unhelpful, and substantially more prejudicial than probative.

Somewhat relatedly, Drs. Chatham and Crawford also are precluded from offering opinions that lupus and autoimmune thyroid disease cannot be ruled out as potential causes of Kelley's tinnitus.  Dr. Chatham, at his deposition, conceded that he "[does not] have an opinion about the tinnitus" alleged in Kelley's case.  *See* Chatham Dep., ECF No. 2716-13 at 6.  More significantly, no scientific evidence has been presented establishing that either condition is even associated with, much less can cause, tinnitus.  The doctors' unsupported statements to that effect in their reports do not satisfy Rule 702 and *Daubert*.[16]

A few additional comments.  Plaintiffs challenge Dr. Chatham's opinions as "equivocal" and unhelpful because he stops short of formally diagnosing Kelley with lupus or autoimmune thyroid disease, and of opining that either condition *did* cause Kelley's hearing loss.  In their view, his AIHL opinions are "nothing more than a criticism of" the opinions of their expert, Dr. Djalilian, have virtually no probative value, and pose a substantial risk of confusing the jury as to the science and Kelley's medical history.  The Court disagrees.  To begin with, Dr. Chatham is primarily a

---

[15] *See, e.g.*, Chatham Rep. (Kelley), ECF No. 2716-14 at 5-6; Crawford Rep. (Kelley), ECF No. 2716-20 at 25.

[16] *See* Chatham Rep. (Kelley), ECF No. 2716-14 at 4 ("[AIHL] is sometimes accompanied by tinnitus"); Crawford Rep. (Kelley), ECF No. 2716-20 at 8 ("Immune-mediated hearing loss . . . is also often associated with tinnitus.").

rebuttal expert whose role, by definition, is to contradict or rebut the methodology and opinions of another expert. *See Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1302 (N.D. Fla. 2017).[17] Plaintiffs' expert, Dr. Djalilian, offered affirmative opinions ruling out autoimmune disease as a cause of Kelley's hearing loss. *See* Djalilian Rep. (Kelley), ECF No. 2812-23 at 28. It is entirely permissible for Dr. Chatham to offer opinions, record evidence, and scientific literature that contradicts or rebuts the opinions, methodology, and/or assumptions of Dr. Djalilian.[18] *See Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*, No. 0:18cv63130, 2020 WL 1666763, at *9 (S.D. Fla. Apr. 3, 2020).

The fact that Dr. Chatham's opinions on AIHL are not definitive diagnoses does not compel their exclusion. A defense expert "may offer evidence of potential alternative causes of [an] injury without needing to prove those alternative-cause theories with certainty or probability." *See In re 3M*, 3:19md2885, ECF No. 2218 at 45 & n.26 (collecting cases). Here, Dr. Chatham's ultimate conclusions—that

---

[17] *See also Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) ("The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party."); *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 396 (M.D. Fla. 2018) ("[R]ebuttal and reply reports may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert."); *Van Alfen v. Toyota Motor Sales, U.S.A., Inc.*, No. 2:11cv08120, 2012 WL 12930456, at *7 (C.D. Cal. Nov. 9, 2012) ("[N]othing constrains an expert preparing a rebuttal report from taking a different approach than the initial expert, from employing a different methodology, or from reframing an issue addressed in the initial report before analyzing it.").

[18] Indeed, Plaintiffs have a rebuttal expert of their own, Dr. Gershwin, whose report is a virtual line-by-line critique of Dr. Chatham's work in this case. *See* Gershwin Rep. (Kelley), ECF No. 2812-28 at 2-8.

lupus and autoimmune thyroid disease cannot be ruled out without further diagnostic testing—are largely a function of the factual record and, in particular, Kelley's failure to obtain the antibody testing prescribed by three different treating physicians. In other words, Dr. Chatham (and Dr. Crawford, for that matter) did not just pluck those two conditions from the scientific ether.[19]

Kelley, of course, is entitled to accept or decline any medical testing or treatment for any reason or no reason at all. But the evidentiary record is what it is, and Plaintiffs may not use Rule 702 and *Daubert* as cover to hide from its scientifically reliable implications. Drs. Chatham and Crawford's opinions regarding lupus and autoimmune thyroid disease are supported by scientifically reasoned explanations and an adequate factual basis, as opposed to "subjective beliefs or unsupported speculation." *See Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1197 (11th Cir. 2010). Drs. Djalilian and Gershwin's opinions are too. Except as limited above, the alleged weaknesses in the doctors' opinions may be tested on cross-examination and through competing expert testimony, but are not a basis for exclusion under Rule 702.[20]

---

[19] *See, e.g., In re 3M*, 3:19md2885, ECF No. 2845 at 28 (excluding physician's speculative central auditory processing disorder opinion for lacking factual basis); *id*., ECF Nos. 2218 at 32-34 & 2845 at 18 (same as to burn pits).

[20] Plaintiffs challenge to Dr. Crawford's qualifications also is not a basis for excluding his opinions. Dr. Crawford is a board-certified otolaryngologist and neurotologist who has treated "hundreds and hundreds" of patients with autoimmune-mediated hearing loss "over the course of [his] 15-year career." *See* Crawford Dep., ECF No. 2716-22 at 5. His report and deposition testimony explain how that specialized training and experience informed his analyses of the

Based on the foregoing, the parties' omnibus motions to exclude expert opinions under Rule 702 and *Daubert* in the Group D case of Kelley, ECF Nos. 2716 and 2718, are **GRANTED IN PART and DENIED IN PART**, consistent with this Order. The remaining expert challenges for Plaintiff Jonathan Vaughn's case will be resolved by separate order.

**SO ORDERED**, on this 19th day of March, 2022.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

evidence in Kelley's case, which is all that Rule 702 and *Daubert* require. Objections to his level of expertise go to weight and credibility, not admissibility. *See Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009).