UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to:<br>*Wilkerson*, 7:20cv0035<br>*Vilsmeyer*, 7:20cv0113<br>*Kelley*, 7:20cv0153<br>*Vaughn*, 7:20cv0134<br>*Beal*, 7:20cv0006 | Judge M. Casey Rodgers<br>Magistrate Judge Gary R. Jones |

**ORDER**[1]

This Order resolves the parties' respective omnibus motions to exclude expert testimony and opinions under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), for the Group D cases of Plaintiff Jonathan Vaughn.

**I.      Legal Standard**

Rule 702, as explained by *Daubert* and its progeny, governs the admissibility of expert testimony. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Under Rule 702 and *Daubert*, district courts must act as "gatekeepers" to ensure the reliability and relevancy of expert testimony. *Id.* (quoting *Daubert*, 509 U.S. at 589).

---

[1] The Court assumes the parties' familiarity with the nature of this multidistrict litigation, the claims and defenses, and the current evidentiary record. Thus, this Order sets out only what is necessary to explain the Court's rulings.

Expert testimony is reliable and relevant—and, therefore, admissible—when the following criteria are met: (1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is "sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* The Eleventh Circuit refers to these criteria separately as "qualification, reliability, and helpfulness," *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate," *Quiet Tech. DC-8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). The party offering the expert has the burden of showing, by a preponderance of the evidence, that each of these requirements is met. *Rink*, 400 F.3d at 1292.

To meet the qualification requirement, a party must show that its expert has sufficient "knowledge, skill, experience, training, or education to form a reliable opinion about an issue that is before the court." *Hendrix ex. Rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (citing Fed. R. Evid. 702) ("*Hendrix II*"), *aff'g* 255 F.R.D. 568 (N.D. Fla. 2009) ("*Hendrix I*"). Importantly, if a "witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments).

The qualifications standard for expert testimony is "not stringent" and "[s]o long as the witness is minimally qualified, objections to the level of [his] expertise [go] to credibility and weight, not admissibility." *Hendrix I*, 255 F.R.D. at 585.

To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue. *Frazier*, 387 F.3d at 1261-62. The reliability analysis is guided by several factors, including: (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique is generally accepted in the relevant community. *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786. "[T]hese factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech.*, 326 F.3d at 1341. The court's focus must be on the expert's principles and methodology, not the conclusions they generate. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. The test for reliability is "flexible" and courts have "broad latitude" in determining both how and whether this requirement is met. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999).

Finally, to satisfy the helpfulness requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985).

Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).

"Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded [under Federal Rule of Evidence] 403." *Frazier*, 387 F.3d at 1263 (internal citations excluded). "Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming," or if it is otherwise unfairly prejudicial. *Id*. "Indeed, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Id*. "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, . . . district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Id*.

When scrutinizing the reliability, relevance, and potential prejudice of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate factfinder. *Frazier*, 387 F.3d at 1272. The court's gatekeeping role "is not intended to supplant the adversary system or the role

of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). Only the jury may determine "where the truth in any case lies" and the court "may not usurp this function." *Frazier*, 387 F.3d at 1272. Thus, a court may not "evaluate the credibility of opposing experts" or the persuasiveness of their conclusions, *Quiet Tech.*, 326 F.3d at 1341; instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence," *Frazier*, 387 F.3d at 1272.

## II. Vaughn's Experts

Defendants move to exclude the specific causation testimony and opinions, in whole or in part, of Drs. Eric Bielefeld and Lawrence Lustig on various grounds. Briefly, each expert relied primarily on the differential etiology method to link Vaughn's injuries to an alleged defect in the CAEv2. "Differential etiology is a medical process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining." *Hendrix II*, 609 F.3d at 1195. "A reliable differential etiology is performed in two steps." *Id*. "First, the expert must compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Id*. (internal quotes omitted). "Second, the expert must eliminate all causes but one" by "appl[ying] the facts of the patient's case to the list created in the first step in order to form an opinion about the actual cause of the patient's symptoms." *Id*. at 1197. The expert must provide scientifically reasoned explanations for rejecting alternative hypotheses, and "the elimination of those hypotheses must be founded on more than subjective beliefs or

unsupported speculation." *Id*. While a "differential analysis need not rule out all possible alternative causes, [ ] it must at least consider other factors that could have been the sole cause of the plaintiff's injury." *Chapman v. Procter & Gamble Distrib.*, LLC, 766 F.3d 1296, 1309 (11th Cir. 2014) (internal quotes omitted).

### 1.   Dr. Eric Bielefeld

Dr. Eric Bielefeld, an audiologist, offers case-specific opinions that the CAEv2 did not adequately protect Vaughn during military noise exposures, which resulted in hearing loss and tinnitus. Defendants argue that Dr. Bielefeld's opinions are unreliable because he failed to reliably rule out somatosensory influences and traumatic brain injury (TBI) as potential causes of Vaughn's auditory injuries. The Court disagrees.

First, Dr. Bielefeld adequately considered somatic tinnitus, although the condition may not be discussed at trial for other reasons. Somatic tinnitus refers to tinnitus that is influenced by somatosensory neural information from cervical spine, shoulder girdle, and/or temporomandibular disorders/injuries. *See* ECF No. 2845 at 15. Here, Dr. Bielefeld concluded that somatosensory influences were not "in play" here because Vaughn already had been suffering from noise-induced tinnitus for nearly two years before his shoulder girdle injury occurred, his tinnitus onset coincided with documented noise-induced hearing loss during the same period, and there is no evidence that he can modulate his tinnitus symptoms with movement or pressure. *See* Bielefeld Dep., ECF No. 2812-34 at 9; Bielefeld Rep., 2812-30 at 21. These are adequate and reliable bases for ruling out somatic tinnitus.

Defendants are precluded from offering evidence or argument regarding somatic tinnitus at trial, however. No medical professional has ever diagnosed Vaughn with somatic tinnitus, and Dr. Dennis Pappas, Defendants' sole specific causation expert for this case, did not discuss the condition as a potential cause of Vaughn's auditory symptoms. Indeed, Dr. Pappas never once even mentioned somatic tinnitus in connection with his analysis or opinions here. Because there will be no expert testimony at trial that Vaughn's tinnitus may be caused by somatosensory neural information, there is not a scientifically reliable and good faith evidentiary basis for any lawyer argument that Vaughn suffers from somatic tinnitus. Defense counsel cannot themselves, by argument or otherwise, differentially diagnose the condition or otherwise suggest it cannot be ruled out as a potential cause of Vaughn's auditory injuries.[2] Argument to that effect, or any reference to somatic tinnitus at all, is excluded as unreliable, irrelevant, unhelpful, unfairly prejudicial, and confusing and misleading for the jury, in the context of the evidentiary record in this case.

Dr. Bielefeld also provided an adequate basis for ruling out TBIs. Based on Vaughn's medical and service records, Dr. Bielefeld concluded that none of his prior

---

[2] *See, e.g.*, *In re Silica Prod. Liab. Litig.*, 398 F. Supp. 2d 563, 634 (S.D. Tex. 2005) (lamenting "the mess that results when lawyers practice medicine and doctors practice law"); *see also Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (stating that "lay person[s] . . . [are] simply not qualified to interpret raw medical data in functional terms"); *Kern v. Brown*, 4 Vet. App. 350, 353 (1993) (finding attorney "not qualified to provide an explanation of the significance of the clinical evidence" and the question of whether the plaintiff contracted a condition during his service was "a medical judgment that can only be made by medical professionals"); *Seavers v. Acting Comm'r Soc. Sec.*, 2022 WL 443698, at *5 (N.D. Ind. Feb. 14, 2022) (stating that medical results "must be interpreted by those trained in the art, not judges or lawyers[,]" who are "not qualified to make medical diagnoses").

head trauma was of a nature and severity capable of producing hearing injuries, and that his "permanent and persistent" tinnitus began before the incidents of head trauma occurred. *See* Bielefeld Dep., ECF No. 2812-34 at 7. Dr. Bielefeld acknowledged that Vaughn had previously been diagnosed with a TBI, but he explained that the diagnosis was later "seemingly . . . discredited" or "significantly called into question" by a subsequent neuropsychological examination in which it was determined that Vaughn's cognitive deficits were attributable not to any concussive event/TBI but to his "prominent" psychiatric symptoms, PTSD, and sleep difficulties. *See id*. at 12; *see also* Rippeth Neuropsychological Evaluation, ECF No. 2812-32. This scientifically reasoned explanation, clearly "founded on more than subjective beliefs or unsupported speculation," satisfies Rule 702 and *Daubert*. *See Hendrix II*, 609 F.3d at 1197. To the extent Defendants believe Dr. Bielefeld should have assigned greater weight to particular medical records or instances of head trauma, that may present fodder for cross-examination, but it is not grounds for exclusion of Dr. Bielefeld's specific causation opinion for Vaughn.

### 2.  Dr. Lawrence Lustig

Dr. Lawrence Lustig also offers specific causation opinions for Vaughn. Defendants argue only that Dr. Lustig did not reliably rule out pre-military occupational noise exposure as a cause of Vaughn's tinnitus because, they maintain, he "ignore[d]" 2004 employment records in which Vaughn indicated he sometimes experienced "[r]inging in ears." This is incorrect. Dr. Lustig explicitly considered

Vaughn's pre-military employment records and observed "conflicting entries" related to tinnitus, in light of the records referenced by Defendants, and subsequent ones expressly reporting "no . . . tinnitus." *See* Lustig Rep., ECF No. 2812-36 at 23, 26. Vaughn told Dr. Lustig (and testified at his deposition) that he did not have ringing in his ears before entering the military; rather, he first perceived the onset of tinnitus that "became progressively higher in loudness and pitch and more constant" in "late 2006 while at Fort Leonard Wood." *See id*. at 22. In Dr. Lustig's view, taking Vaughn's account and his records together, he never experienced more than "mild, intermittent, and insignificant" auditory noise before the military. *See id*. at 17. It was not until after military noise exposures while wearing the CAEv2, which provided inadequate hearing protection, that Vaughn developed the "severe," permanent, fluctuating, and sometimes physically "painful" tinnitus that he continues to have today. *See id*. at 22, 25; *see* Lustig Dep., ECF No. 2812-37 at 20-22. This scientifically reasoned explanation, not premised on subjective beliefs or unsupported speculation, are reliable bases for ruling out pre-military occupational noise exposure as a cause of Vaughn's tinnitus. *See Hendrix II*, 609 F.3d at 1197. Alleged weaknesses in the bases and sources of Dr. Lustig's opinion impact its weight, not admissibility, and thus are more appropriately addressed during cross-examination. *See Viterbo v. Dow Chem. Co*., 826 F.2d 420, 422 (5th Cir. 1987).

**III.   Defendants' Experts**

Vaughn moves to exclude certain opinions offered by Drs. Dennis Pappas and Douglas Jacobs.

**A.    Dr. Dennis Pappas**

Dr. Dennis Pappas, a neurotologist, offers opinions on several alternative causes of Vaughn's alleged hearing loss and tinnitus. Vaughn's two challenges to Dr. Pappas's opinions are largely moot. Defendants represent that Dr. Pappas will not offer any opinion on burn pits; therefore, Vaughn's motion on that basis is denied as moot. Additionally, Vaughn seeks exclusion of Dr. Pappas's opinion that questions about the source and timing of Vaughn's "military career-ending shoulder injury (and VA disability for that injury)" raise questions about Vaughn's truthfulness regarding the severity and effects of tinnitus on his life. *See* Pl. Mot., ECF No. 2716-47 at 27. Defendants represent that Dr. Pappas will not offer "any assessment of [Vaughn's] credibility related to that shoulder injury at trial." *See* Def. Resp., ECF No. 2816-60 at 29. In that respect, Vaughn's motion also is denied as moot.

With that said, it appears from both the record and the briefing that some clarity is in order regarding the extent to which Dr. Pappas may offer "assessment[s] of credibility" at all. *See id.* The Court agrees that Dr. Pappas may identify inconsistencies in Vaughn's various test results, and between those results and Vaughn's descriptions of his auditory symptoms. Dr. Pappas also may explain why he concluded that one or more of the test results contains "inaccuracies," from a medical

perspective. *See* Pappas Rep., ECF No. 2716-28 at 44-45. Beyond that, Dr. Pappas is precluded from offering opinions, assessments, or observations about Vaughn's credibility or truthfulness because testimony of that nature would not be based on any scientifically reliable methodology and would impermissibly invade the role of the jury. *See United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996); *Fylling v. Royal Caribbean Cruises, Ltd.*, No. 1:18cv21593, 2020 WL 3272481, at *3 (Mar. 12, 2020) ("[A]n expert opinion that Plaintiff is exaggerating symptoms or lying would usurp the role of the fact-finder."); *see also United States v. Hill*, 749 F.3d 1250, 1258-61 (10th Cir. 2014) (collecting cases). This includes *any* commentary about the documents that Vaughn submitted to the VA and/or DoD in connection with his Medical Evaluation Board case. *See* Pappas Rep., ECF No. 2716-28 at 45. It also includes any suggestion that the validity tests performed in connection with Vaughn's neuropsychological testing in 2010 raise questions about his truthfulness here or the validity of the testing results in this case. *See id*.

    **B.**    **Dr. Douglas Jacobs**

Dr. Jacobs offers opinions, among others, that Vaughn's alleged cognitive difficulties, social isolation, and sleep difficulties "are more likely than not due to" his severe PTSD, chronic pain, and/or sleep apnea, not hearing loss or tinnitus. *See* Jacobs Rep., ECF No. 2716-26 at 5. He also opines that most of Vaughn's symptoms "would likely be improved" with consistent, evidence-based treatment for his PTSD. *Id*. Vaughn argues that Dr. Jacobs did not apply any reliable methodology or expertise in

reaching these opinions, and that his testimony would be unhelpful because he merely summarizes the contents of medical records, which the jury can read for themselves. The Court disagrees, for the most part.

Dr. Jacobs has offered a minimally sufficient basis and methodology for his cognitive difficulties and social isolation opinions. He demonstrably reviewed Vaughn's medical and service records, and explained how and why their contents support his conclusion that Vaughn's alleged cognitive difficulties and social isolation are attributable to his PTSD and chronic pain. Of particular note to Dr. Jacobs, the records contained no indication that Vaughn had ever previously told a health care provider that his cognitive/psychological symptoms were triggered or exacerbated by his any alleged auditory injuries. Observations of this nature are fairly within the scope of a psychiatrist's expertise. Factual disagreements with the bases and persuasiveness of Dr. Jacobs's conclusions on these issues bear weight, not admissibility.

As to sleep difficulties, Dr. Jacobs's opinion is admissible to the limited extent that he explained how Vaughn's records reflect mental health or other external factors (e.g., PTSD, chronic pain, sleep apnea) cause or contribute to Vaughn's sleep problems. In all other respects, including Dr. Jacobs's assessment of whether there is support in Vaughn's records for the proposition that tinnitus impacts his sleep, these opinions are excluded.

Dr. Jacobs's opinion that Vaughn's PTSD symptoms "would likely" improve with consistent, evidence-based treatment also are admissible, subject to a limitation.

*See* Jacobs Rep., ECF No. 2716-26 46. Dr. Jacobs must confine his testimony to potential improvements in Vaughn's mental health symptoms only (including nightmares). His opinions about the availability and potential effectiveness of treatments for sleep apnea and/or tinnitus are beyond the scope of his expertise, however, and thus may not be provided in this case.

Last, Dr. Jacobs's opinions regarding the consistency of reporting of Vaughn's auditory symptoms in his medical records are excluded. He is wholly unqualified to, and may not, offer any opinion on the existence or cause of Vaughn's hearing injuries, or otherwise report on what is documented in Vaughn's medical records with respect to their etiology. *See, e.g.*, *In re 3M*, 3:19md2885, ECF No. 2218 at 53-54. Dr. Jacobs is not an otolaryngologist, neurotologist or audiologist, and he has no specialized training or experience in those fields. He has never before reviewed medical records and formed an opinion on the etiology of a patient's hearing injuries, and he did not perform any independent assessment of causation for Vaughn's alleged hearing injuries. *See id*. Thus, Dr. Jacobs lacks any reliable basis for commenting on the cause of Vaughn's hearing problems. Moreover, merely restating what is reported in Vaughn's medical records would be unhelpful because it does not provide any insight or analysis beyond what a jury can read from the records themselves.

## IV.   Conclusion

Based on the foregoing, the parties' omnibus motions to exclude expert opinions under Rule 702 and *Daubert* in the Trial Group D case for Vaughn, ECF Nos. 2716

and 2718, are **GRANTED IN PART and DENIED IN PART**, consistent with this Order.

    **SO ORDERED**, on this 1st day of April, 2022.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**