# EXHIBIT 1



*Thurgood Marshall Federal Judiciary Building, Washington, DC*

# 2021 Year-End Report on the Federal Judiciary

A century ago, in the summer of 1921, President Warren G. Harding appointed former President William Howard Taft as Chief Justice of the United States. Taft had spent a lifetime in public service, ultimately reaching the White House. Yet he expressed trepidation in taking on this new and different challenge. Taft told Harding that he was gratified by the appointment but "trembled to think whether I can worthily fill the position and be useful to the country." He voiced a concern that might cross the mind of any good judge when first donning a judicial robe.

Chief Justice Taft is remembered best for his service as Chief Executive, but he nonetheless left an enduring mark on the courts. During his nine-year tenure, he proved visionary on a matter of vital concern to the entire Judiciary: safeguarding and fortifying the independence of the Branch. Taft knew that no one seriously questioned that judges "should be independent in their judgments." Decisional independence is essential to due process, promoting impartial decision-making, free from political or other extraneous influence. But Taft recognized that courts also require ample institutional independence. The Judiciary's power to manage its internal affairs insulates courts from inappropriate political influence and is crucial to preserving public trust in its work as a separate and coequal branch of government.

In a New Year's message to his brother Horace in December 1921, Taft wrote that he was "going to pursue a policy (I don't know how successful) of trying to come in touch with the Federal Judges of the country, so that we may feel more allegiance and do more teamwork." He sought to harness the power of collaboration and collective effort as a means of addressing common court problems of inconsistent procedures, uneven workload, congestion, and delay. Taft sought to supplant the prevailing culture of isolation in which each judge was—in his words—left to "paddle his own canoe."

Once you get past the image of "Big Bill" paddling a canoe, consider that he knew well how to navigate the halls of Congress. Having served as President from 1909 to 1913—and Governor-General of the Philippines and Secretary of War before that—Taft had a great deal of knowledge about both politics and public administration. He had incomparable experience in working with Congress and securing its support. He threw his considerable political heft into creating the mechanisms of self-governance for federal courts across the country.

From the start of taking office, Chief Justice Taft campaigned for a governing body within the Judiciary to focus on administration of the Judiciary's work. He envisioned that "executive direction" would come from a corps of the most experienced judges, drawn from across the Nation. His energetic efforts immediately bore fruit. Early in 1922, Congress enacted a law championed by Taft providing for a "Conference of Senior Judges," which later became the Judicial Conference of the United States. That Conference, initially composed of the chief judges from each circuit and presided over by the Chief Justice, was charged by law with ensuring efficient administration of justice in the courts and creating managerial policy for the Judiciary.

In later years, Congress fortified the Judiciary's institutional independence. It enacted the Rules Enabling Act of 1934, which empowered the Judiciary to develop its rules of procedure with a mechanism for expedited congressional review. Congress also authorized the establishment of Circuit Judicial Councils and the Administrative Office of the U.S. Courts. And Congress empowered the Judicial Conference and the Circuit Judicial Councils to respond to



*Chief Justice William Howard Taft (front row, second from right) and the nine senior federal circuit judges as members of the Conference of Senior Judges in 1926.*



*The Judicial Conference of the United States, September 2019 (portrait of Chief Justice Taft in center rear).*

complaints of judicial misconduct. Those innovations have enabled the Judicial Conference to more effectively perform its administrative, budget, and regulatory work. At the same time, consistent with the principles of checks and balances embedded in our constitutional structure, Congress has continued to exercise oversight of the Judiciary's operations, promoting a useful dialogue characterized by mutual respect in matters of administration. This century-old relationship, reflecting inter-branch comity and deference, has served both branches well.

Next year will mark the centennial of the creation of the Judicial Conference, and its role has never been more vital. When Chief Justice Taft presided over the first session, the most pressing issues were court congestion and workload management. Today, the agenda is much more varied and intensive, demanding the time and energy of 25 different committees with portfolios ranging from the rules of procedure to budget, security, conduct and disability, information technology, and space utilization.

Like most organizations, the Judicial Conference has devoted a great deal of attention over the past two years to addressing two emergent national threats: the pandemic and cybersecurity. But the Conference must contend with many other issues as well. I would like to highlight three topics that have been flagged by Congress and the press over the past year. They will receive focused attention from the Judicial Conference and its committees in the coming months.

The first is a matter of financial disclosure and recusal obligations. Beginning this past September, the *Wall Street Journal* published a series of articles stating that, between 2010 and 2018, 131 federal judges participated in a total of 685 matters involving companies in which they or their families owned shares of stock. That was inconsistent with a federal ethics statute, 28 U.S.C. §455, which requires that a judge recuse in any matter in which the judge knows of a personal financial interest, no matter how small. Let me be crystal clear: the Judiciary takes this matter seriously. We expect judges to adhere to the highest standards, and those judges violated an ethics rule. But I do want to put these lapses in context.

According to the *Wall Street Journal*'s own data, the 685 instances identified amount to a very small fraction—less than three hundredths of one percent—of the 2.5 million civil cases filed in the district courts in the nine years included in the study. That's a 99.97% compliance rate. For most of the judges involved (a total of 83 of the 131), the *Journal* reported one or two lapses over the nine-year period. Those sorts of isolated violations likely entailed unintentional oversights in which the judge's conflict-checking procedures failed to reveal the financial conflict. But for those judges who had multiple violations, or professed ignorance of the ethics rule, there is a more serious problem of inadequate ethics training. New judges are schooled on the ethical duties they assume as part of their initial judicial training curriculum. A small number apparently did not take sufficient note and are now learning the lesson. Significantly, for all the conflicts identified, the *Journal* did not report that any affected the judge's consideration of a case or that the judge's actions in any of those cases—often just routine docket management—actually financially benefited the judge.

Still, this context is not excuse. We are duty-bound to strive for 100% compliance because public trust is essential, not incidental, to our function. Individually, judges must be scru-

pulously attentive to both the letter and spirit of our rules, as most are. Collectively, our ethics training programs need to be more rigorous. That means more class time, webinars, and consultations. But it also requires greater attention to promoting a culture of compliance, even when busy dockets keep judicial calendars full. Our systems of conflict checking should make the most of technology to help prevent the kinds of problems that can impair the public's confidence in the independence of the courts. Computers cannot be blamed for errors judges and their clerical staffs have made, but the information systems that help courts catch and prevent conflicts are due for a refresh. They need to be refined to ensure that different ways of spelling or listing the same stock holding—such as by company name, subsidiary, or ticker symbol—are picked up by automated checks regardless of how they are identified by a litigant or judge. This refresh may require additional funding from Congress, but it will be money well spent.

The Administrative Office is already working with the Judicial Conference's committees—including Codes of Conduct, Financial Disclosure, and Judicial Conduct and Disability—with jurisdiction to address these problems. Among the steps underway, the Administrative Office and committee staff have begun a review of the current case-management software to improve automated detection of potential conflicts. They have also begun to enhance the ethics training and refresher courses to ensure that judges are both aware of their obligations and know how to use the conflict-checking tools effectively. The bottom line is that the Conference is taking the concerns seriously and has committed itself to the careful labor of addressing them.

The second topic is the continuing concern over inappropriate behavior in the judicial workplace. In 2017, I directed the creation of the Federal Judiciary Workplace Conduct Working Group, consisting of judges and senior judicial administrators, to address allegations of serious misconduct within the judicial workplace. In my 2018 Year-End Report, I summarized the Working Group's findings and recommendations. Briefly stated, the Working Group recognized the seriousness of several high-profile incidents, but found that inappropriate workplace conduct is not pervasive within the Judiciary. Nevertheless, new protections could help ensure that every court employee enjoys a workplace free from incivility and disrespect. The Working Group made more than 20 recommendations in three primary areas, proposing that the Judiciary: (1) revise its codes of conduct and other published guidance to delineate more clearly the principles of appropriate behavior; (2) strengthen and streamline its internal procedures for identifying and correcting misconduct; and (3) expand its training programs to raise awareness of conduct issues. It also recommended that employees have multiple channels to raise their concerns, and endorsed prohibitions on any retaliation for calling out misconduct. The Judicial Conference adopted those recommendations in 2019, and the Working Group remains in place to continue to monitor the progress.

The Judicial Conference, with the assistance of the Administrative Office and the Working Group, will continue to oversee reform efforts to ensure they achieve the objective we all seek. I appreciate that Members of Congress have expressed ongoing concerns on this important matter, and the Judicial Conference and its committees remain fully engaged.

Over the past year, the Conference has tailored its model Employee Dispute Resolution Plan to Federal Public Defenders' Offices. The Administrative Office has begun expanding the staff of its Office of Judicial Integrity, and it has overseen the creation of a national network of resources—including a Director of Workplace Relations in every federal circuit—to support judicial employees and address complaints. These enhancements provide robust mechanisms for reporting and addressing instances of misconduct. They also provide additional avenues for employees to express their views so that we can learn from all perspectives in striving for an exemplary workplace.

The third agenda topic I would like to highlight is an arcane but important matter of judicial administration: judicial assignment and venue for patent cases in federal trial court. Senators from both sides of the aisle have expressed concern that case assignment procedures allowing the party filing a case to select a division of a district court might, in effect, enable the plaintiff to select a particular judge to hear a case. Two important and sometimes competing values are at issue. First, the Judicial Conference has long supported the random assignment of cases and fostered the role of district judges as generalists capable of handling the full range of legal issues. But the Conference is also mindful that Congress has intentionally shaped the lower courts into districts and divisions codified by law so that litigants are served by federal judges tied to their communities. Reconciling these values is important to public confidence in the courts, and I have asked the Director of the Administrative Office, who serves as Secretary of the Judicial Conference, to put the issue before the Conference. The Committee on Court Administration and Case Management is reviewing this matter and will report back to the full Conference. This issue of judicial administration provides another good example of a matter that self-governing bodies of judges from the front lines are in the best position to study and solve—and to work in partnership with Congress in the event change in the law is necessary.

Chief Justice Taft was prescient in recognizing the need for the Judiciary to manage its internal affairs, both to promote informed administration and to ensure independence of the Branch. He understood that criticism of the courts is inevitable, and he lived through an era when federal courts faced strident calls for reform, some warranted and some not. As President of the American Bar Association, Taft had observed:

> The agitation with reference to the courts, the general attacks on them, . . . all impose upon us, members of the Bar and upon judges of the courts and legislatures, the duty to remove, as far as possible, grounds for just criticism of our judicial system.

As Chief Justice, Taft took vital steps to ensure that the Judicial Branch itself could take the lead in fulfilling that duty. The Congress of his era appreciated the Judiciary's need for independence in our system of separate and co-equal branches, and it provided a sound structure for self-governance. Since that time, the Judicial Conference has been an enduring success. It is up to the task of addressing the three topics I have highlighted, as well as the many other issues on its agenda. The centennial of the Judicial Conference this year represents 100 years of progress, and the Judiciary should be proud of its accomplish-

ments. But there is still plenty of work to be done, and it will be done.

I am grateful to the judicial officers and staff of the Judicial Conference and its 25 committees for their devotion to the cause of justice. They provide essential support to the judges and court employees across the country who, under the challenges posed by the pandemic, diligently handle a relentless flow of cases with impartiality and care.

Once again, I am privileged and honored to thank all of the judges, court staff, and other judicial branch personnel throughout the Nation for their outstanding service.

Best wishes to all in the New Year.

John G. Roberts, Jr.
Chief Justice of the United States
December 31, 2021

# Appendix
# Workload of the Courts

In the 12-month period ending September 30, 2021, the number of cases filed in the Supreme Court fell slightly compared to the prior year, as did new cases in the U.S. courts of appeals, U.S. district courts, probation offices, and pretrial services system. New filings in the bankruptcy courts fell by nearly a third.

## The Supreme Court of the United States

The total number of cases filed in the Supreme Court decreased from 5,411 filings in the 2019 Term to 5,307 filings in the 2020 Term. The number of cases filed in the Court's *in forma pauperis* docket decreased 12 percent from 3,930 filings in the 2019 Term to 3,477 filings in the 2020 Term. The number of cases filed in the Court's paid docket increased 24 percent from 1,481 filings in the 2019 Term to 1,830 filings in the 2020 Term. During the 2020 Term, 72 cases were argued and 69 were disposed of in 55 signed opinions, compared to 73 cases argued and 69 disposed of in 53



signed opinions in the 2019 Term. The Court also issued three per curiam decisions in argued cases during the 2020 Term.

## The Federal Courts of Appeals

In the regional courts of appeals, filings fell eight percent from 48,190 to 44,546. Appeals by pro se litigants, which amounted to 48 percent of filings, decreased nine percent. Appeals of administrative agency decisions fell 11 percent to 6,356 and filings of original proceedings fell 32 percent to 3,576. Total civil





appeals dropped nine percent to 23,256. Criminal appeals rose 10 percent to 10,625, and bankruptcy appeals rose 18 percent to 733.

## *The Federal District Courts*

The federal district courts docketed 344,567 civil cases. This represents a 27 percent decrease from the prior year. Once again, an unusually large number of filings were associated with an earplug products liability multidistrict litigation (MDL) centralized in the Northern District of Florida, which consolidated more than 202,814 filings in 2020 and 83,654 filings in 2021. Excluding those MDL filings, total civil case filings fell 3 percent in 2021. Cases involving diversity of citizenship (i.e., disputes between citizens of different states) dropped 41 percent to 166,848, and personal injury cases dropped 45 percent to 141,682, mainly because of the MDL cases included in these categories.  Federal question cases (i.e., actions under the Constitution, laws, or treaties of the United States in which the United States is not a party) decreased two percent. Cases with the United States as defendant fell 11 percent, primarily reflecting fewer prisoner petitions. Cases with the United States as plaintiff fell four percent, extending a trend from last year of fewer new actions related to defaulted student loans.

## *The Bankruptcy Courts*

Bankruptcy courts docketed 434,540 new filings, representing a 29 percent reduction from last year and a 44 percent reduction from the year ended September 30, 2019. Each of the 90 bankruptcy courts received fewer petitions. The reduction is primarily attributable to the





COVID-19 pandemic in the form of state lockdown orders that decreased personal expenditures, new and increased government benefit payments, and moratoriums on evictions and certain foreclosures. Consumer (i.e., non-business) petitions, which amounted to approximately 96 percent of bankruptcy petitions, decreased 29 percent. Business petitions declined 28 percent. Petitions filed under Chapter 7 were lower by 24 percent, those filed under Chapter 11 were lower by 31 percent, and those under Chapter 13 were lower by 39 percent.

## *Pretrial Services, Federal Probation, and Supervised Release System*

A total of 122,458 persons were under post-conviction supervision on September 30, 2021, a reduction of four percent from last year. Of that number, 108,932 were serving terms of supervised release after leaving correctional institutions, a decrease of three percent.

Cases activated in the pretrial services system, including pretrial diversions, fell five percent to 76,723.