# EXHIBIT 5

# GUIDELINES AND BEST PRACTICES

# FOR LARGE AND MASS-TORT MDLS

# BOLCH JUDICIAL INSTITUTE, DUKE LAW SCHOOL

## (SECOND EDITION)

Duke Law School
September 2018

# FOREWORD†

The Duke Law Center for Judicial Studies held a series of bench-bar MDL conferences in 2013, 2014, 2015, and 2016.  The conferences revealed a growing and large number of cases centralized in a few mass-tort MDLs.  These mass-tort MDLs present enormous challenges to transferee judges assigned to manage them.  There is little official guidance and no rules specific to the management of mass-tort MDLs, often requiring the transferee judge to develop procedures out of whole cloth. Under the auspices of the Duke Law Judicial Studies Center, which has now become the Bolch Judicial Institute, volunteer judges and practitioners have been examining the various procedures adopted by MDL transferee judges with a view to developing and providing more uniform guidance.

Following a bench-bar conference on May 2-3, 2013, more than thirty-five practitioners, equally balanced between plaintiff and defense lawyers, and judges drafted a report containing standards and best practices governing large and mass-tort MDLs.  The Center issued the report on December 19, 2014.  The report has been forwarded to every transferee judge assigned a large or mass-tort MDL.

On October 27-28, 2016, the Judicial Studies Center held a bench-bar conference on Emerging Issues in Mass-Tort MDLs.  Four teams consisting of thirty practitioners, equally balanced between plaintiff and defense lawyers, and seven judges volunteered to update and add new sections to the 2014 MDL STANDARDS AND BEST PRACTICES, which have been renamed GUIDELINES AND BEST PRACTICES.

Teams were formed, and team leaders selected in early 2017.  In February 2017, the teams prepared outlines of new chapters and updates. They submitted drafts in the fall and winter, which were circulated among the team members, who reviewed and revised the drafts in accordance with the comments.  The revised drafts were then submitted to seven judges for their comment in early 2018.  The teams reviewed the judges' comments and revised their drafts.

The second edition revises and updates the 2014 MDL GUIDELINES AND BEST PRACTICES, adding: (1) new sections to Chapter 1 on the information individual plaintiffs should submit on filing a claim; (2) a new Chapter 3 on lead counsel duties, including guidance on the extent of fiduciary duties owed by the plaintiff steering committee and lead counsel to all plaintiffs; (3) a new Chapter 4 on the role of non-leadership counsel; and (4) a new Chapter 8 on settlement review and claims-processing administration.

The second edition of the MDL GUIDELINES AND BEST PRACTICES is the culmination of a process that began in October 2016.  Although the Bolch Judicial Institute retained editorial control, this iterative drafting process provided multiple opportunities for the volunteers on the four teams to confer, suggest edits, and comment on the draft. Substantial revisions were made during the process.  Many compromises, affecting matters on which the 30 volunteer contributors hold passionate views, were also reached.  But the draft should not be viewed as

---

†Copyright ©2018, All Rights Reserved.  This document does not necessarily reflect the views of Duke Law School or its faculty, or any other organization including the Judicial Conference of the United States or any other government unit.

i

representing unanimous agreement, and individual volunteer contributors may not necessarily agree with every recommendation.

The second edition of the MDL GUIDELINES AND BEST PRACTICES is posted on the Bolch Judicial Institute at https://judicialstudies.duke.edu/conferences/publications/.

John K. Rabiej, Deputy Director
Bolch Judicial Institute, Duke Law School

Malini Moorthy, Chair, Advisory Council, Distinguished Lawyers' Conferences
Dena Sharp, Vice-Chair, Advisory Council, Distinguished Lawyers' Conferences

## ACKNOWLEDGEMENTS

The 2018 updated MDL BEST PRACTICES is the work product of more than thirty practitioners and seven federal judges.  Eight of the practitioners assumed greater drafting responsibility and served as team leaders, including:

### TEAM LEADERS

| | | |
|---|---|---|
| James Bilsborrow<br>Weitz & Luxenberg | Mark Chalos<br>Lieff Cabraser<br>Heimann & Bernstein | Brenda Fulmer<br>Searcy Denney Scarola Barnhart<br>& Shipley |
| Michelle Mangrum<br>Shook Hardy & Bacon | Steven Marshall<br>Venable | Ellen Relkin<br>Weitz & Luxenberg |
| Kaspar Stoffelmayr<br>Bartlit Beck Herman Palenchar<br>& Scott | Sean Wajert<br>Shook Hardy & Bacon | |

### CONTRIBUTORS

| | | |
|---|---|---|
| James Beck<br>Reed Smith | Paul Boehm<br>Williams & Connolly | Maya Eaton<br>Sidley Austin |
| Gretchen Eoff<br>Garden City Group | Yvonne Flaherty<br>Lockridge Grindal Nauen | Amy Gernon |
| Mara Cusker Gonzales<br>Quinn Emanuel<br>Urquhart & Sullivan | Steve Herman<br>Herman Herman & Katz | Alyson Jones<br>Butler Snow |
| Allan Kanner<br>Kanner & Whiteley | Altom Maglio<br>Maglio Christopher<br>& Toale | Mary Massaron<br>Plunkett Cooney |
| Debbie Moeller<br>Shook Hardy & Bacon | Mark Myhra<br>Boston Scientific | Andrew Myers<br>Wheeler Trigg O'Donnell |
| Christopher Ritchie<br>The Huntington<br>National Bank | Alan Rothman<br>Arnold & Porter | Susan Sharko<br>Drinker Biddle & Reath |
| Rebecca K. Wood, Sidley Austin<br>LLP until June 2017 | Amy Zeman<br>Girard Gibbs | Kenneth Zucker<br>Pepper Hamilton |

We thank Patrick Bradley, Leah Brenner, Matthew Eible, and Calypso Taylor, the four Duke Law, Bolch Judicial Institute Fellows, who edited, proofread, cite checked, and provided valuable comments and criticisms.  In particular, we gratefully acknowledge the extensive and superb editing suggestions submitted by James Beck, Reed Smith, which markedly improved the document's clarity.  We also thank Douglas Smith, Kirkland & Ellis, for his thorough review and excellent edits.

The feedback and input of the judiciary have been invaluable in identifying best practices, exploring the challenges faced by judges, and the viability of the proposed standards and best practices. The ways in which these standards and best practices have benefitted from the candid assessment of the judiciary cannot be understated. It is with the greatest of thanks that we recognize the contributions of the thirteen judges, who attended the 2016 MDL conference and the seven judges who reviewed early drafts and provided comments and suggestions.

Bolch Judicial Institute<br>Duke Law School

TABLE OF CONTENTS

Chapter 1 - Management of Transferred Cases ...................................................................1

   MDL Guideline 1 ...................................................................................................................2

Chapter 2 - Selection and Appointment of Leadership..................................................29

   MDL Guideline 2 ................................................................................................................29

   MDL Guideline 3 ................................................................................................................34

   MDL Guideline 4 ................................................................................................................42

Chapter 3 – Lead Counsel Duties .....................................................................................51

   MDL Guideline 5 ................................................................................................................51

   MDL Guideline 6 ................................................................................................................51

   MDL Guideline 7 ................................................................................................................53

   MDL Guideline 8 ................................................................................................................54

   MDL Guideline 9 ................................................................................................................55

Chapter 4 – Role of Non-Leadership Counsel..................................................................59

   MDL Guideline 10 .............................................................................................................59

   MDL Guideline 11 .............................................................................................................60

 Chapter 5 – Establishment and Use of Common Funds .................................................64

   MDL Guideline 12 .............................................................................................................67

Chapter 6 – Federal/State Coordination ..........................................................................81

   MDL Guideline 13 .............................................................................................................81

Chapter 7 – Resolution and Remand ................................................................................93

   MDL Guideline 14 .............................................................................................................94

Chapter 8 – Settlement Review and Claims-Processing Administration.....................108

   MDL Guideline 15 ...........................................................................................................108

   MDL Guideline 16 ...........................................................................................................109

   MDL Guideline 17 ...........................................................................................................109

   MDL Guideline 18 ...........................................................................................................111

   MDL Guideline 19...........................................................................................................112

# INTRODUCTION

## THE ASCENDANCY AND CONCENTRATION OF MDLs CONSIDERED

MDL litigation serves as yet another example of the innovation that has arisen in the last century, as we have struggled to address the problems of complex litigation – particularly those involving hundreds or even thousands of alleged victims of a single or similar set of wrongs. Each of these innovations has required the development of not only new doctrine but also, inevitably, responses to new litigation strategies by counsel and the development of new skillsets within the judiciary. Recognizing this, the JPML and the Federal Judicial Center provide judges with outstanding training and guidance on how to manage and handle their assignments in a large majority of MDLs.   In fact, improvements developed by the JPML have streamlined the MDL process so that most MDLs run extremely efficiently and smoothly from beginning to end.

Just as class actions evolved from their original anticipated scope and now address a broad and diverse variety of claims, so too MDL now encompasses a broad, diverse set of cases. When the Center for Judicial Studies launched this project in 2013, we were aiming to address a perceived need to provide guidance to a growing number of judges designated to handle their first MDL.  But we discovered that judicial training and more uniform practice and procedure were particularly needed in a minority of MDLs, which involved mass torts.

MDL has proven a robust procedural tool:  Over 90% of MDLs are – contrary to the popular conception – relatively small cases, often involving the coordination of only a few cases and a handful of counsel representing a few dozen plaintiffs.  But, over 90% of plaintiffs in MDLs are not in these small MDLs – but instead are in a small number of massive, complex cases, with thousands of plaintiffs.  This explains the very differing perspectives with MDL: most judges will encounter a relatively simple MDL, while most victims are involved in the handful of gargantuan mass-tort MDL cases.  But recognizing this diversity also lends itself to the challenge of providing a singular set of best practices and consolidated wisdom to new judges and lawyers.

It is this challenge that this report seeks to fill.  The feedback from lawyers and judges who attended earlier Duke conferences was instrumental in determining that we have succeeded. At the same time, we hope that this report will promote a wider discussion within the judiciary of the recent influx of mass-tort MDLs and its impact on the overall pending civil case load. Bringing into the discussion the many judges and committees of the Judicial Conference who have devoted years of study and attention to mass torts, the many potential problems mass torts raise, and various strategies to address them would substantially enrich the discourse.

<u>Statistics on MDL</u>

Many in the bench and bar know that the number of cases in MDLs has grown, but few are aware of the rate of recent growth.[1]  More than 40% of the civil cases pending in the nation's

---

[1] One reason lies in the way the official court statistics are reported.  The Administrative Office of United States Courts reports statistics on the pending civil caseload in U.S. district courts in Table C-3A of the Judicial Business

federal courts are consolidated in multidistrict litigations. In 2017, these MDL cases make up 42% of the pending civil caseload. In 2002, that number was 16%.[2] Removing an estimated 73,749 prisoner and social security cases from the total, cases that typically (though not always) require relatively little time of Article III judges, the 168,372 pending actions in MDLs represented 52% of the pending civil cases as of June 2018.[3]

Not only is the overall number of actions in MDLs growing, these actions are becoming more concentrated in a small number of mass-tort MDLs, primarily products liability, and particularly pharmaceutical and health-care cases. Of the MDLs pending in August 2018, 90% of them were consolidated in only 24 MDLs – predominantly product liability. Each of the 24 MDLs consisted of 1,000 or more civil actions, for a total of over 152,000 cases.[4] Although the MDL transfer is for pretrial management only, 96% of the individual actions consolidated in MDLs are terminated by the MDL transferee judges.[5]

Thus, a small number of MDL judges – selected by the JPML − effectively resolve over 40% of the nation's pending civil cases. The public data does not indicate whether the cases in

---

data and aggregates the number of pending actions in MDLs (124,202 in 2017) along with other unspecified actions under the catch-all category "Other Personal Injury" (125,035 in 2017), without highlighting MDL's overwhelming predominance. The increase and decline in the number of pending asbestos cases for 15 years also effectively masked the steady rise of non-asbestos cases consolidated in MDLs. In 2008, the number of pending asbestos cases consolidated in a single MDL peaked at 82% of all consolidated actions in MDLs and has declined to a few thousand in 2014. As the number of pending asbestos cases declined, however, the number of pending non-asbestos cases continues to increase, initially offsetting and later significantly surpassing the decline in asbestos cases.

[2] From 1998-2002, the number of civil cases pending in federal court fluctuated in a narrow range from 250,000 to 265,000 cases, and pending actions in MDLs represented 15% to 16% of the federal pending caseload. From 2003 to 2014, the number of pending actions in MDLs increased steadily, spiking in the last four years. There were 168,372 pending actions in MDLs, or 42% of the 397,226 civil cases pending in federal court as of August 15, 2018. Table C, U.S. District Courts—Civil Cases Commenced, Terminated, and Pending During the 12-Month Periods Ending September 30, 2012 and 2013, 2009 and 2010, 2007 and 2008, 2005-2006, 2003 and 2004, 2001 and 2002, and 1998 and 1999, Judicial Business of the United States Courts, Annual Reports of the Director, Administrative Office of the United States Courts; Cumulative Summary of Multidistrict Litigation: United States Judicial Panel on Multidistrict Litigation, Statistical Analysis of Multidistrict Litigation Fiscal Year 2013, 2011, 2009, 2007, 2006, 2004, and 2001.

[3] For the 12-month period ending June 30, 2018, the number of civil case pending in U.S. courts was 397,226. Table C, U.S. District Courts – Civil Cases Commenced, Terminated, and Pending During 12-Month Period Ending June 30, 2017 and 2018. Administrative Office of U.S. Courts. As of August 15, 2018, there were 168,372 pending cases in MDL litigation. U.S. Judicial Panel on Multidistrict Litigation, MDL Statistics Report – Distribution of Pending MDL Dockets by District. The most recent publically available data on the number of pending cases by nature of suit covered the 12-month period ending September 30, 2017. It showed a total of 73,749 prisoner and social security cases pending. Table C-3A, U.S. District Courts – Civil Cases Pending, by Nature of Suit and District, During the 12-Month Period Ending September 30, 2017. Administrative Office of U.S. Courts.

[4] As of August 15, 2018, there were 168,372 actions pending in 214 MDLs. It is recognized that these figures provide a statistical snapshot at one point in time, which may be exceptional. The 214 MDLs had originally consisted of 484,487 actions, and over the years many individual actions have been disposed of. MDL Statistics Report – Distribution of Pending MDL Dockets by District, United States Judicial Panel on Multidistrict Litigation (August 15, 2018).

[5] MDL transferee judges terminated 486,136 out of 502,736 consolidated civil actions as of September 30, 2017. Table S-20, Cumulative Summary of Multidistrict Litigation During the 12-Month Periods Ending September 30, 2011 through 2013, Judicial Business of the United States Courts, Annual Report of the Director, Administrative Office of the United States Courts.

MDLs are terminated by pretrial dispositive motions or as part of voluntary dismissals resulting from global settlement agreements.[6] Anecdotal evidence suggests that a large majority are settled.

The emergence of the MDL process as an effective case-dispositive engine achieved through global settlements has made it the preferred procedural vehicle to dispose of mass torts. Judges handling these large mass-tort MDLs are faced with an unprecedented set of management issues.  The relatively small number of judges who have been assigned a mass-tort MDL have dealt with these serious issues largely on their own and have developed disparate approaches − some effective, some not so effective − to dispose of the cases without the benefit of rules or a set of best practices.

Prior Work Toward Synthesizing Practices, Improving Understanding

Although the size and number of most mass-tort MDLs is a new phenomenon, the judiciary is no stranger to the mass-tort challenge.  The judiciary has long recognized the impact that large-scale litigation can have on the courts and has identified and grappled with serious issues raised in handling mass-tort cases.  The historical work of different Judicial Conference committees on mass tort offers a rich history of lessons that may be mined to provide useful insights and guidance in today's effort to develop a national mass-tort MDL strategy.

In 1998, the Advisory Committee on Civil Rules confronted the centralization issue of its day, which consisted of two mass torts involving asbestos and breast implant actions. Chief Justice Rehnquist established a Working Group on Mass Torts to examine the growing mass-tort problem, which accounted for 15% of the pending U.S. caseload. The Working Group heard from practitioners about many issues including: (1) whether some mass-tort cases would have been filed at all but for a "highway" effect created by a procedural vehicle; (2) whether the procedures adopted by courts in mass-tort cases allow actions that would typically be terminated by pretrial dispositive motions in other contexts avoid such scrutiny and disposition; (3) whether questionable cases are swept up with meritorious cases and awarded part of the settlement proceeds at the expense of cases with merit; (4) whether the process to select the judges to handle these large cases was appropriate; (5) whether the process to select lead counsel was appropriate; (6) whether *Daubert*-like issues could be handled more efficiently; and (7) whether more court supervision is required in the allocation of settlement proceeds.

At the same time, the committees have recognized the need for efficiency and the high cost of prosecuting a mass-tort lawsuit.  The committees also recognized that mass-tort procedural vehicles may permit claimants with meritorious claims to file and prosecute actions that have been too expensive to file as single actions. The Working Group submitted a comprehensive report of more than 500 pages to Chief Justice Rehnquist, which identified many questions and issues arising in mass-tort cases and contained a score of detailed legislative proposals and rules amendments.

---

[6] The Administrative Office of the United States Courts maintains the Court Management/Electronic Case Filing system for the federal courts.  They can mine the electronic dockets and produce a data report on the types of terminations, either by dispositive motion or by voluntary dismissal.  A chair of a Judicial Conference Committee may request the AO to perform a "special run" to provide such data.

The judiciary's work on mass torts has been dormant since 1999.  Further study was deferred because asbestos cases were considered to be unique and believed to be an aberration — unlikely to be ever repeated.  Time, technology changes, and the large increase in "inventories" of plaintiff-claimants have altered the landscape.  With the surge in mass-tort MDLs, it is important to ask whether the vexing issues surrounding the mass-tort class actions of the last 20 years persist in the MDL context and whether the disparate approaches the bench and bar have taken to this point are adequate to handle the present and future case load and variety both fairly and efficiently.  Experienced judges and lawyers have an important opportunity to take a leadership role in understanding and evaluating the handling of MDL cases, particularly in the mass-tort area.

The *MDL Guidelines and Best Practices* are intended to provide concrete guidance to judges and lawyers handling an MDL.  They also establish a useful starting point to begin a discussion with a broader group of judges, practitioners, and experts experienced in mass-tort litigation on whether additional practices or procedures are appropriate to address the influx of mass-tort MDLs.

# CHAPTER 1

# MANAGEMENT OF TRANSFERRED CASES

The fundamental judicial management goals for cases transferred into an MDL proceeding should largely mirror those in any civil action – to manage discovery and otherwise efficiently prepare the cases for trial, taking care to identify pretrial opportunities to resolve key issues or to achieve settlements.  Because an MDL proceeding is by definition a collection of multiple cases, additional core considerations come into play, as specified by the MDL statute: (1) convenience of the parties; and (2) promotion of the just and efficient conduct of transferred actions.[7]

Once the Judicial Panel on Multidistrict Litigation (JPML) has ordered the transfer of cases, authority to direct the MDL proceeding resides exclusively with the transferee judge; the JPML plays no ongoing role in supervising the litigation.[8]  Accordingly, the transferee judge should approach the proceeding knowing that the JPML has entrusted him or her with considerable authority and responsibility.[9]  Typically, the transferee judge has the burden of steering multiple (sometimes thousands of) cases from other district courts affecting citizens nationwide,[10] and the burdens and ramifications of that task should not be underestimated.

Judges and counsel alike shared the view that a successful MDL is no longer synonymous with a global settlement.  Instead, a far more complex idea of success has emerged in which the transferee judge is charged with creating an efficient resolution.[11]  This may be through a global settlement, inventory settlement, or a series of settlements by injury type.  It may be through motion practice.  But, it may also be through remand.  Increasingly judges and counsel are not only recognizing that remand is a viable option when pretrial matters are complete and no resolution has been reached, but that it may be on the table from the first days of the MDL, with judges setting end-dates for resolution and working backwards to set the case-management

---

[7] 28 U.S.C. § 1407; *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 241 F.R.D. 185, 192 (S.D.N.Y. 2007) ("courts must begin their analysis by looking at the language of a statute" and "do their job of reading the statute as a whole" (citing *Lexecon v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998)); Federal Judicial Center, *Manual for Complex Litigation* (Fourth) § 20.13 (2004) (hereinafter abbreviated "*MCL*").

[8] *MCL* § 20.132.

[9] *See In re Asbestos Prods. Liab. Litig. (No. VI)*, 771 F. Supp. 415, 421 (J.P.M.L. 1991) ("The Panel has neither the power nor the disposition to direct the transferee court in the exercise of its powers and discretion in pretrial proceedings.").  The authority of the transferee judge, however, is not boundless.  For example, while the *Manual for Complex Litigation* suggests that the transferee judge has the authority to vacate or modify any order of a transferor court, *MCL* § 20.132, at least one Court of Appeals disagrees.  *See In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 441 (3d Cir. 2009) ("there is nothing in the rules adopted by the Joint Panel on Multidistrict Litigation that authorizes a transferee judge to vacate or modify the order of a transferor judge. Moreover, we do not believe that Congress intended that a 'Return to Go' card would be dealt to parties involved in MDL transfers").

[10] *MCL* § 20.133; *see, e.g.*, *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 273 (E.D.N.Y. 2006) ("Orders issued by a federal transferee court remain binding if the case is sent back to the transferor court, as well as where the federal case is remanded to state court subject to subsequent state rulings.") (internal citations omitted).

[11] As one colorful attorney remarked, "I know what a successful MDL is, but I'm even clearer on what is unsuccessful – one that goes beyond my life expectancy.  My clients don't understand this [delay] – especially the 10% that go bankrupt as a result of the litigation.  My clients are hurt, they lose their job, and go bankrupt.  Another 10% die waiting for justice.  I know, because I do the bankruptcy court forms and the probate forms."

schedule.  This is unsurprising given that many judges believed that they are clearly given the message that they are to move as quickly as possible, in contrast to only a few years ago when the common view was that cases should go at their own pace.  Many judges also believed that the ability to resolve cases efficiently was an important factor in JPML selection; judges who warehouse cases do not get selected.

> **MDL GUIDELINE 1:**  The transferee court, in consultation with the parties, should articulate clear objectives for the MDL proceeding and a plan for pursuing them. The objectives of an MDL proceeding should usually include: (1) the elimination of duplicative discovery; (2) avoiding conflicting rulings and schedules among courts; (3) reducing litigation costs;  (4) saving the time and effort of the parties, attorneys, witnesses, and courts; (5) streamlining key issues; and (6) moving cases toward resolution (by trial, motion practice, or settlement).[12]

All participants in an MDL proceeding should have a clear understanding of its objectives and the steps envisioned for achieving them.  The transferee judge should take the lead in developing this vision for the proceeding, but consultation with the parties (particularly about priorities) is critical.  To be sure, as in any litigation, parties' positions on planning issues may be motivated by strategic partisanship.  For example, plaintiffs' counsel may urge that all efforts should focus on obtaining discovery from defendants and on pursuing settlement. Conversely, defendants may want to prioritize the briefing of dispositive motions.  The ultimate burden of articulating goals and plans will reside with the transferee judge, taking account of counsels' ideas and adding some of its own.

No two MDL proceedings are alike, and goals/plans in MDL proceedings therefore vary. In some, the transferee court may discern a consensus that some or all cases are ripe for settlement, such that efforts in the proceeding should be focused on facilitating that objective. But in most cases, plaintiffs and defendants will not agree on that point (at least at the early stages), so the parties' efforts will likely focus initially on discovery and other pretrial activities.

An MDL proceeding should not be viewed as a place to "warehouse" cases indefinitely. The development of goals and plans should therefore be driven by a desire to move the cases to resolution as soon as possible, whether by motion practice, settlement, or trial/remand.  As discussed below, some cases in the proceeding may be tried before the transferee court, but it should be assumed that most cases will be tried before the transferor court after remand consistent with the MDL statute.

> BEST PRACTICE 1A: Within 30 days after designation by the JPML, the MDL transferee judge should issue an order scheduling an initial conference.

The initial conference is an important event in the life of an MDL proceeding.  It affords the court an opportunity to initiate discussions with counsel about the objectives for the MDL proceeding and to set the tone for how counsel should collaborate in pursuing those objectives. As stated by the *Manual for Complex Litigation*, the initial conference should not be "a

---

[12] *MCL* § 20.112.

perfunctory exercise" and requires attention to a wide range of issues.[13]  The *Manual* contains a thorough checklist of items the court should consider including on the agenda.[14]

>  BEST PRACTICE 1B: The transferee judge should formulate a management plan that advances the purposes of the MDL statute.[15]

The management plan should set forth the steps that will be taken to advance the objectives of the MDL proceeding and what the court and counsel intend to accomplish.  In some instances, it may be advisable to adopt only a partial plan, with additional elements deferred pending evolution of the matter.  The court and parties should be vigilant to spot developments that require modification of the plan.  Normally, the transferee court will memorialize the plan in the form of one or more case-management orders.[16]

The management plan should include measures to reduce duplicative discovery and allow efficient prosecution of cases that ultimately may be remanded for trial, as discussed in subsequent best practices in this chapter.  The plan should also have provisions addressing the handling of tag-along actions (cases consolidated in the MDL after the initial JPML consolidation order):  (1) instructions for including tag-along actions in centralized proceedings automatically; (2) declarations that rulings on common issues apply to tag-along actions without separate motion and order; and (3) provisions making discovery already taken available to the parties in tag-along actions.[17]

Both judges and counsel strongly supported the emerging practice of setting an end-date for the MDL, then working back into a trial schedule.  This end-date should of course be set after the transferee judge has become educated about the case and consulted with counsel about their understandings and expectations.

>  BEST PRACTICE 1B(i):  The transferee judge should schedule regular status conferences.

In most proceedings, case management is aided greatly by regular status conferences.[18]  In smaller cases, periodic or telephonic conferences may be sufficient.  But in large and mass-tort MDLs, monthly conferences are normally desirable initially.  Such gatherings provide the court an opportunity to gauge the parties' progress in achieving the proceedings' objectives and help ensure that the court and all counsel are informed of significant developments.[19]  To ensure maximum participation, such conferences should be scheduled with ample advance notice.  As the litigation matures, less frequent conferences may be necessary.

Counsel presenting matters at a status conference presumably should attend in person, but other counsel may be afforded the option of monitoring by phone.  Specifically, the judge may

---

[13] *Id.* § 11.21.
[14] *Id.*
[15] *Id.* § 20.132.
[16] A collection of sample case management orders can be found at *MCL* § 40.2.
[17] *MCL* § 20.132.
[18] *Id.* § 11.22.
[19] *Id.*

allow non-leadership counsel to monitor by phone.  While leadership appointees typically are required to attend in person early in the litigation, these requirements may subside later in the case.  Likewise, judges in remote areas may downwardly adjust these practices, balancing the benefit of in-person attendance with the cost.

The court should require leadership counsel to prepare and distribute detailed status reports in advance of a conference and to confer with the court in preparing an agenda.[20] The purpose of these documents is to keep all participants in the MDL proceeding well informed. The court should consider creating an official website for the proceeding, on which these documents (as well as status conference reports and significant orders) can be viewed.[21]

Although the court may find beneficial a preconference in-chambers meeting with leadership counsel to preview certain issues, it is important to conduct the conference itself on the record to promote both transparency and clarity.[22]  In planning such conferences, the court and counsel should be mindful of the federal-state coordination considerations discussed in Chapter 4.

BEST PRACTICE 1B(ii):  The court should consider the use of magistrate judges or special masters.

Depending on the size and complexity of the MDL proceeding, the transferee judge may wish to designate a magistrate judge or appoint a special master to assist with specified case-management functions.[23]  In making this decision, the court should be guided by its normal delegation practices – that is, the extent to which it is comfortable delegating case-administration responsibilities.   In some MDL proceedings, transferee courts have appointed multiple special masters, each with a specified area of responsibility.[24]  In other MDL proceedings, however, special masters have been used more sparingly.[25]

The use of magistrate judges and special masters may be critical to avoiding delays in addressing time-consuming matters, such as disputes over privileged-document designations or technical electronic discovery issues.  However, the court should avoid over-delegation, as it can make management and coordination more difficult and add unduly to the parties' expenses. Further, the timing of such appointments should be consistent with the articulated objectives for

---

[20] *Id.*

[21] For example, see the official website for MDL No. 1657, *In re Vioxx Prod. Liab. Litig.,* at http://vioxx.laed.uscourts.gov.  A sample order for creating a website can be found at *MCL* § 40.3.

[22] *MCL* § 11.22.

[23] *Id.* § 10.14.

[24] *See, e.g.,* Order Appointing Special Masters, *In re Actos (Pioglitezone) Prod. Liab. Litig.,* MDL No. 2299, 6:11-md-02299-FRD-PJH (M.D. La. Apr. 11, 2012) (appointing special master and two deputy masters at outset of MDL proceeding).  In some MDL proceedings, the courts have appointed counsel pursuant to Fed. R. Civ. P. 53 to assist *pro se* litigants, but they typically are not authorized to exercise decision-making authority.  *See, e.g.,* Order Appointing Pro Se Curator, *In re Vioxx Prods. Liab. Litig.,* MDL No. 1657 (E.D. La. Feb. 12, 2008) (available at http://vioxx.laed.uscourts.gov).

[25] In the seven pelvic repair system product liability MDL proceedings that have been assigned for simultaneous administration by Judge Joseph R. Goodwin (S.D. W.Va.), no special masters have been appointed.  Over 42,000 cases have been transferred into those proceedings.

4

the proceeding.  For example, to avoid diverting the parties' energies from identified priorities, the court may wish to defer appointing a settlement master until the court believes it is timely to begin addressing settlement options.

> BEST PRACTICE 1B(iii): The transferee judge should give priority to deciding issues broadly applicable to multiple claimants in the MDL.

The transferee judge should endeavor to keep the MDL proceeding moving by promptly resolving pending motions.[26]  Clear, concise, and prompt resolution of motions allows counsel to advise their clients about risks and expectations and may bring about an expedient global resolution of the MDL.[27]  If multiple motions present substantially similar issues, the transferee judge may consider deciding one motion and order the remaining parties to show cause why that ruling should not apply to them as well.[28]

> BEST PRACTICE 1C:  At an early juncture, the parties and the transferee judge should collaboratively develop a discovery plan.

One of the most important (and daunting) jobs facing an MDL judge is the "efficient conduct of discovery."[29]  Thus, it is important for a transferee judge to engage counsel leadership at an early stage to develop a workable discovery plan.[30]

The transferee judges broadly reported finding the input of the parties on case management and particularly discovery very helpful in creating an approach that was proportionate and cost-saving.  In particular, the judges reported focusing on those issues that the parties identified as important to either resolving the case or preparing the cases for trial.  Given these goals, the judges recommended focusing first on general or generic discovery.  The judges generally reported that individual discovery into the claims of specific individuals could become a morass or black hole.  As a result, they preferred to hold off on individual discovery until a pool of cases had been selected to act as bellwethers.

However, defense counsel expressed concern that individual-specific checks needed to be incorporated into the litigation process at some point.  In particular, they reported that once general discovery was complete, some judges expected the case to settle and applied pressure to defendants to do so.  Yet, many bellwether cases are resolved because the initial fact sheets are found to be wrong.  Defense counsel expressed concern that if these initial reports are wrong, so too a claims form completed in connection with a settlement would be wrong, resulting in an undeserved payment.  Moreover, defense counsel argue that given these errors it is difficult to

---

[26] U.S. Judicial Panel on Multidistrict Litigation & Federal Judicial Center, *Ten Steps to Better Case Management: A Guide for MDL Transferee Judges*, at 4 (2d ed. 2014).
[27] *Id.*
[28] *Id.* at 5.
[29]  *In re MI Windows & Doors, Inc., Prods. Liab. Litig.*, 857 F.Supp.2d 1374, 1375 (J.P.M.L. 2012).
[30] 1-4 *ACTL Mass Tort Litigation Manual* § 4.02 ("If courts and counsel understand the discovery dynamics of a particular mass tort, they are more likely to establish a workable discovery schedule.").

know what the actual (rather than reported) plaintiff-class composition is, making settlement more difficult.[31]

Recognizing this concern and the value of bifurcated discovery, a transferee judge may consider engaging in clearer telegraphing from the outset about the discovery plan.  Specifically, in creating the case-management calendar and discovery timelines, the judge may consider clearly identifying both phases of discovery and explaining that both may well be necessary for all parties to come to a settlement agreement.

Others pointed to the practice of designating or having parties select a lead discovery counsel on each side. Counsel speaking in favor of this approach noted that it has been helpful whether the judge is involved directly, or whether a magistrate judge or special master is selected to try to resolve matters so that only the most contentious need to be escalated to the judge. Counsel indicated that the important feature in these structures is having a designated set of individuals that have the desire and skill to work collaboratively to resolve discovery disputes and the management skills to ensure that the discovery timeline is met and achieved.

Finally, the transferee judges found a clear consensus that a transferee judge needs to "do everything at once – the endgame, the start game, putting together a great PSC, and a discovery plan.  And it needs to be realistic – it cannot focus just on your MDL but also needs to take into account the cases in the state system.  You need to avoid duplication of effort to the extent possible, and if there is going to be conflicting activity you need to reach out to the state judges right away, so that either they can adjust or you can."  The judges recognized that this puts a heavy burden on the transferee judge in the early days of the MDL as the judge is just getting up to speed, but they felt that creating a solid infrastructure as part of a complete litigation plan is essential to success.

> BEST PRACTICE 1C(i):  The discovery plan should synchronize the production of information with other phases of the litigation and otherwise facilitate the efficient flow of information.

In many MDL proceedings, much of the discovery effort will be focused on defendants' production of documents and data on common issues.  In some instances, it may be most efficient for defendants to proceed with a single, rolling production of responsive documents as they are located and processed.  However, in many cases, the court and parties find "phased" production efforts preferable.  For that reason, "transferee judges frequently adopt staggered discovery plans that appear to both prioritize discovery into core matters and relevant matters that can be easily identified, retrieved, and produced first and allow for adaptation in future

---

[31] In particular, counsel noted the parallel to *Walmart v. Dukes*, in which the Supreme Court held that defendants have a due process right to present individual evidence and defenses as to each claim.  Counsel argue that if these rights exist even where commonality of claims sufficient to satisfy Rule 23 has been established, then surely they should have at least as great an opportunity in MDL where no such commonality is required.  They also note that to the extent erroneous or false claims are paid, this diverts funds from actual victims—a point made by the court in *Dukes*.

stages to account for discoveries in earlier stages."[32]  For example, in an MDL proceeding in which product identification is an overarching issue, the transferee judge might consider "establish[ing] an early focus on evidence of product exposure."[33]

This approach is endorsed by the *Manual for Complex Litigation*, which provides that "[f]or effective discovery control, initial discovery should focus on matters – witnesses, documents, information – that appear pivotal.  As the litigation proceeds, this initial discovery may render other discovery unnecessary or provide leads for further necessary discovery."[34]  The failure to phase discovery in this manner may result in either needless and expensive discovery or insufficient discovery to support the schedule of other aspects of the MDL proceeding (e.g., dispositive motions, development of expert testimony).[35]

> BEST PRACTICE 1C(ii): At an early stage, the transferee judge should consider adopting privilege and confidentiality protocols, including issuing a Fed. R. Evid. 502(d) order.

The *Manual for Complex Litigation* counsels that "[a]ttention should be given at an early conference . . . to any need for procedures to accommodate claims of privilege or for protection of materials from discovery as trial preparation materials, as trade secrets, or on privacy grounds."[36]  Failure to address such issues "may later disrupt the discovery schedule."[37]  In particular, the court should develop protocols by which parties may assert privileges and other protections (e.g., confidentiality) and by which those assertions may be tested.[38]

Increasingly, transferee judges are issuing orders under Fed. R. Evid. 502(d) to "facilitate the discovery of relevant information and expedite the discovery process by allowing the parties to conduct discovery in a coordinated and efficient fashion, as well as conserving judicial resources."[39]  Under these orders, any party disclosing purportedly privileged or protected

---

[32] S. Todd Brown, *Plaintiff Control & Domination in Multidistrict Mass Torts*, 61 Clev. St. L. Rev. 391, 399 (2013).  For example, in *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, & Products Liability Litigation* (C.D. Cal.), the MDL court issued an order providing as follows:  "It is expected that discovery on foundational issues during Phase I will enable the parties to develop a more narrowly tailored discovery plan for subsequent phases of this litigation and to be more focused, economical and efficient in subsequent phases of discovery."  Order No. 5 at 5, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, MDL No. 2151 (C.D. Cal. July 20, 2010).
[33] 1-4 *ACTL Mass Tort Litigation Manual* § 4.02.
[34] *MCL* § 11.422 (2004); *see also* Francis E. McGovern, *Symposium Mass Torts: Toward a Cooperative Strategy for Federal and State Judges in Mass Tort Litigation*, 148 U. Pa. L. Rev. 1867, 1875-76 (2000) ("The . . . Manual provide[s] for rule-like 'waves' of discovery that would instruct a standardized management process.").
[35] *See* Brown, *supra* note xx, at 399 ("Pursuing multiple lines of discovery at once is, of course, permissible, but doing so may not be viewed as efficient at the outset, particularly in cases that are consolidated shortly after the triggering event gave rise to the action.").
[36] *MCL* § 11.43.
[37] *Id.*
[38] *Id.* § 11.431.
[39] *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 2100, No. 3:09-md-02100-DRH-PMF, 2010 U.S. Dist. LEXIS 1961, at *3 (S.D. Ill. Jan. 11, 2010).  A sample confidentiality order can be found at *MCL* § 40.27.

information in the discovery process does not waive the applicable privilege or protection.[40] These orders, which set forth the procedures for challenging particular privilege, protection, or confidentiality claims, expedite production, reduce costs, and avoid the burden on the court of document-by-document adjudication – especially in complex MDL proceedings in which the volume of potentially protected materials is large.[41]  Notably, the parties in MDL proceedings frequently stipulate to the issuance of these orders; hence, "courts are saved the time and expense of litigating such matters."[42] These orders are often complemented by "claw back" orders that permit a party to obtain the return of inadvertently produced privileged or protected documents.[43]

BEST PRACTICE 1C(iii):  The transferee judge should adopt deposition guidelines.

At an appropriate time, the transferee court should consult with counsel to develop an order establishing guidelines for the scheduling and conduct of depositions.[44]  Among other things, the order should specifically address how the court wishes to handle disputes that may arise while a deposition is in progress.

One approach for reducing duplicative discovery activity and streamlining trials is videotaping key depositions for use at subsequent trials.[45]  This option is far more efficient than hauling in key witnesses to remote locations to provide testimony that would likely be similar – if not identical – to prior testimony in previous cases, duplicating discovery efforts that the MDL system is designed to prevent.[46]  Thus, the transferee judge may wish to include in the deposition-protocol order provisions urging the parties to keep the depositions free of needless objections so that jurors are not distracted when they are ultimately presented with the testimony.

Special consideration should be given to the videotaping of "apex" depositions – that is, the depositions of high-ranking corporate officers who have little firsthand information about the

---

[40] Fed. R. Evid. 502(d) states: "A federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court – in which event the disclosure is also not a waiver in any other federal or state proceeding."  *MCL* § 11.432.

[41] *Id.*; *see also* Patrick S. Kim, *Third-Party Modification of Protective Orders Under Rule 26(c)*, 94 Mich. L. Rev. 854, 866 n.71 (1995) ("Protective orders also encourage parties to comply willingly with discovery requests, making the discovery process more efficient.").

[42] Kim, *supra* note xxxv, at 866 n.71.

[43] *See, e.g., In re Bridgestone/Firestone Prod. Liab. Litig.*, 129 F. Supp. 2d 1207, 1219 (S.D. Ind. 2001) (case-management order).

[44] A sample set of deposition guidelines can be found in *MCL* § 40.29.

[45] *MCL* § 20.132; *see also id.* § 11.452 ("in dispersed litigation," videotaped depositions "can avoid multiple live appearances by the same witness"); David F. Herr & Nicole Narotzsky, *The Judicial Panel's Role in Managing Mass Litigation*, SN066 ALI-ABA 249 (2008) ("Consider other means of reducing duplicative discovery activity and expediting later trials by measures such as videotaping key depositions or testimony given in bellwether trials, particularly of expert witnesses, for use at subsequent trials in the transferor courts after remand.").

[46] Videotaped depositions are important because it may not be possible for the parties to secure the live attendance of witnesses at trial in all locations.  *See Weco Supply Co. v. Sherwin-Williams Co.*, No. 1:10-CV-00171 AWI BAM, 2013 U.S. Dist. LEXIS 1572, at *13 (E.D. Cal. Jan. 2, 2013) ("[I]f there is an indication that the deponent will be unable to testify at trial, a videotaped deposition may be necessary.").

issues underlying the lawsuit.[47]  Such depositions are permitted in limited circumstances,[48] as courts have recognized that "high level executives are vulnerable to numerous, repetitive, harassing, and abusive depositions, and therefore need some measure of protection from the courts."[49]  When permitted, videotaping should be considered to avoid the need for repeated depositions of such witnesses.

> BEST PRACTICE 1C(iv): At an early juncture, individual claimants should be required to produce information about their claims.

In non-MDL cases, plaintiffs are required to produce information about their claims from the outset, and that requirement should not change simply because a claim becomes part of an MDL proceeding. Such a balanced approach will ensure that both sides obtain information critical to claims or defenses. Moreover, development of plaintiffs' individual claims is vital to the establishment of a fair and informative bellwether trial process and is indispensable to any settlement discussions in which the parties may engage. In fact, settlement talks are often delayed because the parties have not anticipated the time needed to assemble information necessary to assess the strengths and weaknesses of the global litigation and examine the potential value of individual claims. Finally, requiring plaintiffs at an early juncture to produce information verifying their basic factual allegations addresses concerns that MDL proceedings invite unsubstantiated claims.

Until the parties and the transferee court determine the process by which cases might be selected for bellwether trials (if any) in the MDL proceeding (as discussed below) or early remand to transferor courts for trials, there is ordinarily no need for full case development of all cases (e.g., plaintiff depositions, case-specific expert discovery). Rather, each claimant should initially be required to engage in streamlined, cost-effective paper discovery to the maximum extent possible.

---

[47] *In re Welding Fume Prods. Liab. Litig.*, MDL No. 1535, No. 1:03-cv-17000, 2010 U.S. Dist. LEXIS 34117, at *23-24 (N.D. Ohio Apr. 7, 2010) (citing *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 205 F.R.D. 535, 536 (S.D. Ind. 2002)).

[48] Under the "apex doctrine," before proceeding with the deposition of a high-level executive, a party must show that the executive:  (1) possesses special or unique information relevant to the issues being litigated; and (2) the information cannot be obtained by a less intrusive method, such as through written discovery or by deposing lower-ranking employees.  *In re C. R. Bard Inc. Pelvic Mesh Repair Sys. Prod. Liab. Litig.*, MDL No. 2187, 2014 U.S. Dist. LEXIS 89147, at *13 (S.D. W. Va. June 30, 2014).

[49] *In re Bridgestone/Firestone*, 205 F.R.D. at 536; *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, No. M 07-1827, 2011 U.S. Dist. LEXIS 85608, at *18 (N.D. Cal. Aug. 1, 2011) ("Numerous courts have concluded that so-called 'apex depositions' should be carefully scrutinized to avoid the potential for abuse.").

BEST PRACTICE 1C(v): In large mass-tort MDLs, a court should, on the parties' request, consider issuing a case management order approving plaintiff and defendant fact sheets, which can provide information useful for case management, relevant to selecting bellwether trials, and valuable for conducting settlement negotiations.  Fact sheets also help to uncover cases that should not have been centralized in the first instance.

Fact sheets are one of the most useful and efficient initial mechanisms for obtaining individual discovery in large mass-tort MDLs. These are court-approved, standardized forms that seek basic information about plaintiffs' claims and defendants' knowledge about aspects of those claims — for example, what injury a plaintiff claims to have sustained as a result of using the product, or a defendant's representative's contacts with providers of allegedly harmful pharmaceuticals. Plaintiff fact sheets spare defendants the expense of tailoring countless interrogatories to individual claimants[50] while allowing plaintiffs' attorneys to fulfill early discovery obligations with relative ease. It is also common in mass-tort MDL proceedings for the parties to negotiate (and for the court to approve) defendant fact sheets.[51] However, fact sheets will be meaningful only if plaintiffs, defendants, and their counsel devote appropriate time and attention to this project. Fact sheets should be deemed a form of discovery governed by the relevant Federal Rules of Civil Procedure, requiring the same level of completeness and verification.

Fact sheets can serve multiple purposes. The parties and court should give careful consideration to the purpose plaintiff and defense fact sheets are to serve in their MDL, given the needs of the litigation. Fact sheets sharpen assessments of the propriety and focus of a bellwether process. They also can provide an efficient mechanism to assist the parties and the court in assessing whether certain claims may be candidates for expedited resolution through voluntary withdrawal, dispositive motions, or through a settlement process.

Streamlined plaintiff fact sheets (one to two pages) are appropriate in some MDLs to identify quickly some cases that should not have been added to the cases centralized in the MDL in the first instance. In other MDLs, including large mass torts, more extensive plaintiff fact sheets (five to twenty pages) can serve a broader purpose, providing some useful information to the court and parties to inform selection of bellwether trials and settlement negotiations. If only a few core questions are required to be completed, the same fact sheet can serve both purposes.

Targeted plaintiff fact sheets can be particularly useful in the largest mass-tort MDLs,

---

[50] *See* JOHN H. BEISNER & JESSICA D. MILLER, ELIMINATE THE TORT, NOT THE MASS: A MODEST PROPOSAL FOR REFORMING HOW MASS TORTS ARE ADJUDICATED 4 (Wash. Legal Found. 2009), http://www.wlf.org/upload/beisner09.pdf (expressing concern about the quality of mass-tort claims filed in MDL proceedings, noting that "[t]his problem is compounded by the fact that many of the claims are not developed by the filing counsel — they effectively were purchased from other attorneys who advertised to attract claimants in their home markets with no intention of ever litigating the claims themselves"); MCL § 22.83; *see also* Elizabeth J. Cabraser & Katherine Lehe, *Uncovering Discovery*, 12 SEDONA CONF. J. 1, 8 n.40 (2011) ("The use of 'fact sheets' to streamline discovery by replacing formal interrogatories with supposedly less onerous, more fact-oriented formats is now a common practice in mass tort multidistrict litigation.").

[51] *See, e.g.*, Pretrial Order No. 6: Plaintiff Fact Sheets and Defendant Fact Sheets at ¶ 12, *Bextra & Celebrex Marketing Sales Practices & Prods. Liab. Litig.*, MDL No. 1699 (N.D. Cal. Feb. 13, 2006).

many of which involve personal injury claims allegedly caused by pharmaceuticals or medical devices. In such cases, the plaintiff fact sheet should provide sufficient information to permit the parties and the court to determine: (1) product identity (if not covered in a preliminary product identification disclosure); (2) exposure, alleged injury, and any adverse consequences; (3) date of injury and of notice or discovery of defendant(s)' alleged wrongful conduct; and (4) authorizations for the release of relevant medical and pharmacy records and other relevant fact sources (such as employers, where wage-related claims are asserted).

Similarly, requiring the collection of plaintiffs' medical records (in personal injury cases) or employment histories (in employment cases) is another straightforward way that a transferee judge can encourage a robust exchange of key information at a relatively early stage. This information can help defendants verify the answers provided in the fact sheets and can shed light on the potential causes of the plaintiffs' injuries.

As part of the parties' preparation and negotiation of proposed fact sheets, they should create protocols or proposed orders governing the form and scope of authorizations and records-collection procedures. Parties should work to reach agreement on, and to obtain court endorsement of, authorization forms, when and how they may be used, the timeframe and subject-matter scope of permissible records collection, how records will be collected and made available, and how collection costs will be divided.[52] Addressing these issues early in an MDL facilitates uniformity and efficiency during this important early information-gathering phase and obviates unnecessary disputes and delay.

> BEST PRACTICE 1C(vi): When plaintiff fact sheets are used, defendant fact sheets may also serve an important purpose.

In MDLs employing a plaintiff fact sheet, the defendant may also be directed to reciprocate by providing the plaintiff with a defendant fact sheet after an agreed upon period of time. Like the content of the plaintiff fact sheet, the content of a defendant fact sheet will vary based on the claims involved in the MDL and should be negotiated by the parties to facilitate the early exchange of information. For example, if streamlined plaintiff fact sheets are agreed upon by the parties, the defendant's fact sheet should be equally streamlined. Conversely, some large mass-tort MDLs will likely call for more extensive defendant fact sheets. The parties should also discuss the content and timing of defendant fact sheets concurrently with their discussion of plaintiff fact sheets.

The parties should consider to what extent the defendant should be required to produce fact sheets for individual plaintiffs, providing basic information the defendant may have about the claimant, her physicians (in product liability injury cases), or her claim. The utility and practicability of individualized information in defendant fact sheets depends upon a number of factors, including the nature of plaintiffs' allegations, the pre-suit relationship (if any) between plaintiffs and defendant, any contacts or relationship between defendant and plaintiffs' physicians, the likelihood of defendant possessing plaintiff-specific documents or information, and the accessibility and potential relevance of any such documents or information.

---

[52] *See, e.g.*, Pretrial Order No. 22, Service of Plaintiff Fact Sheets and Defendant Fact Sheets at ¶¶ 6–7, *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, MDL No. 2740 (E.D. La. Mar. 10, 2017).

11

In large mass-tort MDLs involving alleged harmful pharmaceuticals or medical devices, the defendant fact sheet typically would provide sufficient information regarding contacts and communications with the plaintiff's medical provider(s), including: (1) identification of the representatives who met with or called upon such provider(s); (2) the dates of contact; (3) existence of "call notes" or similar documents that summarize the contacts with the physician(s); and (4) payments, honoraria, reimbursements, or other financial arrangements with such provider(s).

> BEST PRACTICE 1C(vii): In large mass-tort MDLs, particularly those involving competing brands or versions of a similar pharmaceutical drug, the court should consider issuing a case management order requiring a product identification disclosure sheet that quickly identifies cases that should not have been centralized in the first instance.

Within mature large mass-tort MDLs, a variety of case management techniques have identified individual cases that should not have been centralized in the first instance, sometimes because the plaintiff did not use the product at issue in the litigation. A streamlined "product identification" verification (one to two pages) can be used in large mass-tort MDLs to identify quickly cases that do not belong. The order would require early verification of whether and when plaintiff used the product at issue; this verification should be relatively streamlined and not burdensome. The purpose of such a verification is not to replace a fact sheet or impose any undue burden on the plaintiff but to ensure that the individual case is properly centralized in the MDL. This technique can be especially useful in large prescription product MDLs in which multiple manufacturers may have produced different versions of the drug or medical device. The court should consider dismissing or remanding to the transferor court those cases in which claimants are unable to provide adequate, timely verification of product usage.

> BEST PRACTICE 1C(viii): Standardized interrogatories may serve as an alternative to fact sheets.

An alternative to fact sheets is standardized interrogatories or document requests, which are less costly and onerous than individually-tailored interrogatories and document requests. Standard document requests can also be included within or annexed to a form fact sheet. In personal injury product liability MDLs, requiring plaintiffs to produce documents that demonstrate proof of product use and injury can help the parties and court focus resources on viable cases.[53]

---

[53] See, e.g., Pretrial Order No. 18, Plaintiff Fact Sheet and Defendant Fact Sheet & Ex. A (Plaintiff Fact Sheet) at 6, *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, MDL No. 2740 (E.D. La. Feb. 14, 2017); MDL Order No. 10 [Dkt. 251], Order Concerning Early Disclosure of Product Identification Information, *In re Zofran (Ondansetron) Prods. Liab. Litig.*, MDL No. 2657 (D. Mass. May 26, 2016) ("The Court has concluded that production of [product identification] information at a relatively early stage in the litigation may assist in the preservation and collection of additional evidence; is not likely to be unduly burdensome; is not likely to result in unfairness to any party; and may help resolve certain issues in this litigation in a timely manner."); Pre-Trial Order No. 27, Plaintiff Fact Sheets and Defendant Fact Sheets at ¶ 2, *In re* Xarelto *(Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592 (E.D. La. Apr. 22,

Especially as a proceeding matures, the transferee judge may consider the entry of *Lone Pine* orders requiring all plaintiffs to submit an affidavit of support from an independent physician.[54] These orders are particularly important in an MDL proceeding involving disparate theories of causation — or when multiple alternative potential causes of the alleged injuries exist. In some MDL proceedings, courts have required defendants to prepare fact sheets for each plaintiff that provide basic information they may have about the claimant or their claim.

BEST PRACTICE 1C(ix): The court should enforce reasonable deadlines for submitting fact sheets, excusing late submissions only on an appropriate showing.

The transferee judge should articulate clear expectations and impose clear timelines for completing plaintiff and defendant fact sheets, together with clear procedures and timelines for addressing deficiencies.[55] Unless such procedures and deadlines are adhered to and enforced, counsel handling multiple claims may fall far behind in fulfilling that obligation. While the obligation to provide a timely, complete fact sheet falls solely on counsel of record for the individual MDL plaintiff or defendant, the court should expect the PSC and defense counsel to cooperate and share information regarding fact sheet compliance status to enable the PSC to communicate with counsel for individual plaintiffs with the goal of reducing deficiencies and motion practice.

Although deadlines may be extended upon a showing of good cause or agreement of the parties, timely and substantial compliance with fact sheet requirements, including completion of "core criteria," should be the norm. Case management orders should include procedures for dismissing claims due to substantial noncompliance with fact sheet requirements and deadlines.

BEST PRACTICE 1C(x): The transferee judge should consider, in addition to deadlines for the completion of fact sheets, a case management order detailing the process for handling late or incomplete fact sheets.

Anticipating that some fact sheets will not be filed or will be incomplete, the parties should agree ahead of time on the process for addressing deficiencies. Such a process usually should include sending a non-compliance or deficiency notice letter, short (but reasonable)

---

2016) (requiring "records of proof of use and proof of injury within 90 days from the date Plaintiff's complaint was filed").

[54] Byron G. Stier, *Resolving the Class Action Crisis: Mass Tort Litigation as Network*, 2005 UTAH L. REV. 863, 927–28; *see* McGovern, *supra* note xxii, at 1888–89 ("[In the Fen/Phen litigation, the parties] cooperated extensively with each other in the discovery process in order to reduce their transaction costs. Innovative processes, including the MDL-standardized fact sheets . . . provided models for discovery . . . ."); *see also* Order # 12, Case Management (PFS) at ¶ A.2, *In re Zimmer Nexgen Knee Implant Products Liability Litigation*, 2016 WL 3281032 (N.D. Ill. June 10, 2016) (*Lone* Pine order imposed after difficulties arose in managing bellwether process); In *re* Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig., MDL No. 2100 (S.D. Ill. Mar. 3, 2010) ("A completed PFS, which requires that each Plaintiff sign the Declaration in Section XIII, shall be considered to be interrogatory answers and responses to requests for production under the Federal Rules of Civil Procedure, and will be governed by the standards applicable to written discovery under the Federal Rules of Civil Procedure.").

[55] *See generally, e.g.*, Case Management Order 12 (PFS), *supra* note 6; Case Management Order 18 (DFS), *In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices & Prods. Liab*. Lit., MDL 2100 (S.D. Ill. Mar. 3, 2010).

13

windows for correction of any alleged deficiency (typically ten to thirty days), and a schedule for motion practice for unresolved compliance issues. Several MDL courts have effectively addressed motions to dismiss through a two-tiered process: first, motions to dismiss without prejudice, followed by a short grace period during which the party can re-file; and second, motions to dismiss with prejudice.[56] While cases are ideally decided on the merits, efficiency is a primary basis for an MDL, and the fact sheet process is a critical component of the effective management of the litigation. The transferee judge should deal with fact sheet non-compliance directly and promptly, including through a well-defined process culminating in motions to dismiss.

Because one benefit of having court-approved fact sheets is elimination of disputes as to whether certain questions are appropriate in a particular MDL, courts should consider ways in which enforcement of fact sheet obligations might be streamlined, including modifying typical meet-and-confer requirements for discovery motions in favor of a well-defined procedure for addressing fact sheet compliance issues in the order implementing the fact sheets.

> BEST PRACTICE 1C(xi): Once it is demonstrated that individual fact sheets have been filed with material, inaccurate information, the court should consider requiring that answers be supported with some minimal amount of additional evidence supporting the claim or defense at issue.

Plaintiff fact sheets, including streamlined fact sheets, in many cases provide sufficient information to support the plaintiffs' claims. However, there have been reported opinions in the largest mass-tort MDLs, usually involving allegedly harmful pharmaceuticals or medical devices, in which large numbers of fact sheets have been submitted with material, inaccurate information.[57] Although the defendant can verify individual claims after receiving medical records authorizations and conducting discovery, doing so takes substantial time in MDLs that consist of thousands of claims. Meanwhile, the cases remain active.

When fact sheets have been submitted with inaccurate information, the court should consider requiring that all individual parties submit some minimum quantum of evidence. If no such evidence is available, the court should provide individuals an opportunity to explain the absence of the evidence.

---

[56] *See In re Ethicon, Inc. Pelvic Repair System Prods. Liab. Litig.*, No. 2:14-cv-20042, 2015 WL 5786776, at *2 (S.D. W. Va. Sept. 30, 2015); *In re Cook Medical Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2:14-cv-30296, MDL No. 2440, 2015 WL 4458971, at *2 (S.D. W. Va. July 17, 2015); Order No. 7, *In re Mirena IUD Prods. Liab. Litig.*, No. 13-MD-2434 (CS) (S.D.N.Y. Aug. 15, 2013); Order No. 7A, *In re Mirena IUD Prods. Liab. Litig.*, No. 13-MD-2434 (CS) (S.D.N.Y. Apr. 24, 2014).

[57] *See e.g.*, *In re Orthopedic Bone Screw Prods. Liab. Litig.*, No. MDL 1014, 1997 WL 704719 (E.D. Pa. July 24, 1997).

BEST PRACTICE 1D: Class actions may require a different approach to discovery because of the need to resolve class-certification issues as early as practicable.[58]

In class actions, resolution of the class-certification question usually requires extensive discovery related to class certification, which may "include the depositions of the named plaintiffs and the exchange of expert reports."[59]  This represents a departure from the ordering of discovery generally followed in individual actions, in which depositions and expert development generally occur much later in the discovery process.  Accordingly, often the most efficient practice is for the transferee court to rule on pending motions to dismiss or for summary judgment before addressing class certification.[60]

A transferee judge presiding over a class action must also grapple with the interplay between merits-based discovery and discovery designed to aid resolution of class-certification issues.  As the Supreme Court explained in *Wal-Mart Stores, Inc. v. Dukes*, because "[a] party seeking class certification must affirmatively demonstrate his compliance with" Rule 23, "'sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.'"[61]  In other words, the "'rigorous analysis'" required for class certification will frequently "entail some overlap with the *merits* of the plaintiff's underlying claim."[62]  Accordingly, class-certification discovery will inevitably overlap with merits-based discovery.[63]  In an MDL proceeding encompassing both individual and class action suits, this may be a seamless process, as merits-based discovery is usually already underway by the time the parties address class certification.[64]  The transferee judge will likely want to coordinate between the individual and putative class actions to manage discovery in an efficient manner.

---

[58] In the *Zurn Pex Plumbing* MDL proceeding arising out of the defendants' design and choice of brass plumbing fittings, the MDL court bifurcated discovery and directed the parties to "focus first on the issue of class certification."  *In re Zurn Pex Plumbing Prods. Liab. Litig.*, No. 08-1958 ADM/RLE, 2009 U.S. Dist. LEXIS 47636, at *1 (D. Minn. June 5, 2009).

[59] *In re Glaceau Vitaminwater Mktg. & Sales Practice Litig.*, MDL No. 2215, 2013 U.S. Dist. LEXIS 98570, at *10-11 (E.D.N.Y. July 10, 2013).

[60] Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges,* 9 (Federal Judicial Center, 3d ed. 2010).

[61] *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (citation omitted).

[62] *Id.* (citation omitted, emphasis added).

[63] *MCL* § 11.422 ("matters relevant to . . . a motion [for class certification] may be . . . intertwined with the merits").

[64] *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 258 F.R.D. 167, 174 (D.D.C. 2009) (rejecting proposal to bifurcate class certification and merits discovery; "Even if plaintiffs' proposed class is not certified, discovery into merits-based evidence is not necessarily wasted; the information 'may be valued circumstantial evidence' if litigation continues absent certification.") (citation omitted).

BEST PRACTICE 1D(i): Typically, the transferee judge will assess the propriety of class certification in all cases pending in the MDL proceeding and oversee all discovery necessary to carry out that purpose, although alternatives should be considered.[65]

This recognition comports with the JPML's practice of frequently listing class certification as a common issue that makes Section 1407 transfer appropriate.[66]  As the JPML has explained, "matters concerning class action certification should be included in the coordinated or consolidated pretrial proceedings in order to prevent inconsistent rulings and promote judicial efficiency."[67]  In short, this approach to class certification has received the greatest support from the courts and usually comports with the principles of efficiency that undergird the MDL process.

However, in an MDL proceeding comprised of numerous state-law-based class actions, the question is far more difficult and controversial.  Very little consensus exists at this point.  Some judges take the approach that where there are state-by-state class actions, rather than national class actions, there are so many differences in law that the decision should be left to the originating courts.  Judges taking this approach argue that the differences in reliance, standing, etc. are very real and may shift the settlement or trial result substantially, but that the MDL court can simply focus on the general discovery issues and then remand the cases rather than attempting to settle.  But, others raise questions about whether this approach disadvantages defendants, who might be able to defeat certification and thus convert the cases from opt-out to opt-in claims—reducing the exposure at issue and in turn substantially shifting the negotiation dynamics.

Other judges suggest that whether to weigh in on certification should be driven by a weighting approach, looking at whether the key claims are predominantly state law claims (sales and marketing, for example) or federal law (for example, antitrust and RICO).  This approach accepts that lawyers often file complaints with multiple counts, but attempts to discern what the focus of the litigation is with respect to the relief sought.  This balancing can obviously be criticized as too subjective and uncertain, but proponents argue that these are the types of decisions judges are routinely called upon to make.  Instead, the more fundamental objection from counsel seems to be that in order to litigate and reach a settlement, parties need to have certainty about class certification, particularly where there is a mix of federal-only and joint state-federal complaints filed.

---

[65] A second approach is for the MDL court to rule on class certification in selected "bellwether" cases and then ask the MDL Panel to remand the remaining actions to their respective transferor courts.  And on the opposite end of the spectrum is a third approach, under which the MDL court oversees certain discovery related to class certification, but leaves the task of ruling on motions for class certification wholly to the transferor courts.

[66] *In re MI Windows & Doors, Inc., Prods. Liab. Litig.*, 857 F. Supp. 2d 1374, 1375 (J.P.M.L. 2012).

[67] *In re Piper Aircraft Distribution System Antitrust Litig.*, 405 F. Supp. 1402, 1403-04 (J.P.M.L. 1975); *see also MCL* 4th § 22.33 ("Centralization under Section 1407 is thus necessary in order to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings (such as those regarding class certification), and conserve the resources of the parties, their counsel and the judiciary.") (internal quotation marks and citation omitted).

One approach that some transferor courts have taken is to decide class certification only in certain "bellwether" cases, leaving that determination to be made in the other cases by the transferor courts after remand.[68]  The rationale is that the transferor courts may be better equipped to address the state law issues.  Before taking this approach, the transferee court should consider the efficiencies of requiring multiple other federal judges to replicate the factual knowledge developed by the transferee court in making the "bellwether" class rulings and inquire whether the transferor courts actually possess experience with the state laws at issue.

Finally, some counsel have argued that the transferee court should decide all of the class certification issues.  Allowing the transferor judges to decide these matters on remand creates a situation in which different results may create very different outcomes for otherwise similarly-situated plaintiffs.  Moreover, the MDL may be better suited to process hundreds or thousands of individual actions, to the extent that certification is denied.  Others note that there is little reason to expect that the federal district judge in one district will be substantially better at determining Rule 23 certification than the transferee judge — while he may be more familiar with that particular state's law, it would not be difficult for the parties to brief the matter and get the transferee judge up to speed, since the familiar Rule 23 standard will still apply.

> BEST PRACTICE 1E: The transferee judge should confer with the parties to determine whether holding bellwether trials would advance the litigation.

Concerns continue to be expressed that some MDLs are best managed by focusing on the statutory mandate to conduct pretrial proceedings with an eye toward remand instead of holding bellwether trials and resolving by settlement within the MDL proceedings.  Accordingly, the transferee judge should determine as a threshold matter whether bellwether proceedings would be beneficial.

As part of the decision to move forward with bellwether proceedings, transferee judges recommend resolving pending motions to remand, acting on outstanding motions, and allowing early science hearings to help clarify what types of cases and claims are at issue.[69] The judge may also ask the parties to provide an early science tutorial, which some transferee judges reported finding more instructive than *Daubert* hearings. Judges suggest that this was very helpful to do before the creation of the bellwether-selection process to help the judge know enough about the cases and science to control the jockeying among attorneys and select the right process and parameters for the cases.

---

[68] *See, e.g., In re Light Cigarettes Marketing and Sales Practices Litig.*, 271 F.R.D. 403 (D. Me. 2010) (denying class certification in each of four single-state bellwether class actions); *In re Light Cigarettes Marketing and Sales Practices Litig.*, 856 F. Supp. 2d 1330 (J.P.M.L. 2012) (denying motion to vacate conditional remand order sending several non-bellwether class actions back to transferor courts for class certification rulings and other further proceedings).

[69] "Your ultimate responsibility is to resolve pretrial issues in a timely and expeditious manner.  This responsibility certainly includes resolution of jurisdictional issues, important evidentiary disputes, class certification issues, and, perhaps most important, motions to dismiss and for summary judgment." Ten Steps to Better Case Management, a Guide for Multidistrict Litigation Transferee  Judges, United States Judicial Panel on Multidistrict Litigation & Federal Judicial Center (2014, 2d ed.).

In some MDL proceedings, the individual cases may be too dissimilar for bellwether trials to provide any useful insight into the larger claims pool. Remand following pre-trial proceedings may well be the most appropriate course in such situations. Otherwise, motion practice, mediation, summary trials, mini-trials, or joint trials of multiple cases may better serve the parties' goals than a traditional bellwether trial.

Determining whether and which cases should serve as bellwethers can be difficult. Counsel must provide the judge with sufficient information describing the nature of claims, extent of injuries, and other pertinent data so that the judge can make an informed decision and develop a protocol with an initial set of cases.

"Bellwether" cases, or test cases focused upon individual claims, have been an important case-management tool in many MDL proceedings involving numerous individual claims. A bellwether is the first sheep that leads the flock — and thus that is the role a court should keep in mind in thinking about bellwether cases. Bellwethers may suggest answers to litigants' major questions: How well or poorly would these facts play to a jury? How credible and persuasive are the experts? Is the key evidence admissible? These types of questions can have more impact than the amount of the verdict, and will drive the outcomes in motion practice and trial — and it is in the shadow of those expectations that settlement values will be reached, if settlement is to occur. It is important for the parties and the court to know how the cases will fare.

But the bellwether process also means obtaining a sufficient number of outcomes to provide guidance, given the variety of fact patterns, claims, and defenses anticipated. In asbestos litigation, the first ten verdicts were for the defense, but these early results did not foretell the overall litigation trend. The case-management plan should provide for a sufficient number of cases so that early outliers (in either direction) can be identified as such and the true path of litigation discerned to the maximum extent possible.

Bellwethers need not go all the way to trial. Many bellwether cases resolve themselves along the way, whether because of errors in the plaintiff or defendant fact sheet, individualized factors that strengthen or weaken the case during discovery that were not anticipated at the outset, the parties' decision to settle particular cases, the plaintiff's decision to voluntarily dismiss, or because of the court's early rulings. These cases should not be regarded as failures. Instead, they can be important data points that help the lawyers better understand the reality of the cases — which may vary considerably from the hypothetical plaintiff or hypothetical defenses that have been the idealized subject of early negotiations. Indeed, the reasons these cases drop out — gamesmanship, good advocacy, plaintiffs disappearing, defendants settling cases, the outcome of preliminary or dispositive motions — all potentially provide insight into how the broader pool of cases may fare. Yet, recognizing this, it is important that the judge select a larger pool of cases, anticipating that some will resolve at a variety of points in the bellwether litigation process.

Bellwether trials may provide useful information to the parties regarding the likely outcome of other cases at trial, such as: (a) how well or poorly the parties' fact and expert witnesses perform in a trial setting; and (b) decisions on key legal issues and the admissibility of key evidence. As recognized by the *Manual for Complex Litigation*, the purpose of bellwether

trials is to "produce a sufficient number of representative verdicts" to "enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis, and what range of values the cases may have if resolution is attempted on a group basis."[70] As such, the bellwether process will be valuable only if the cases selected for trial are truly representative of the whole (or of one or more distinct categories of cases that comprise the whole).[71]

Of course, recognizing this purpose opens the door to strategic manipulation by the parties. The transferee judge must carefully consider how the bellwether selection process will work, and how to address cases that drop out of the pool, to minimize the influence of strategic behavior and enhance the value of the bellwether process. Later in the process, counsel may strategically settle cases as they are proved to be particularly strong or weak compared to the expected baseline.

The judge will also need to consider whether to broaden the pool of potential bellwether cases. For example, through *Lexecon*[72] waivers or trying cases in their originating district (unless barred by the Ninth Circuit ruling,[73] which prevents inter-circuit assignment solely for these purposes), the transferee judge may be able to obtain authority to try cases not filed in the transferee district.

In addition, the judge should be alert to the origin of the bellwether cases — is the case one in which the plaintiff is represented by counsel not active in the MDL; or does the case include someone from the Plaintiff Executive Committee, a PSC member, or another attorney active in the MDL?  If the PSC is unable to control the litigation of a bellwether case, it may not treat the result as being indicative. Some cases are outliers with unique causation issues, damages, or defenses — particularly in pharmaceutical cases — and thus careful attention must be paid to selecting cases that will advance the goals of the MDL as a whole. Conversely, it may well be that some of the best cases were not filed by the MDL leadership. As discussed in this section, there are many ways of selecting the bellwether cases to balance the competing needs of the bellwether MDL process.

---

[70] MCL § 22.315; *see also In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09-md-2087 BTM(KSC), 2012 U.S. Dist. LEXIS 118980, at *56 (S.D. Cal. Aug. 21, 2012) ("The bellwether cases should be representative cases that will best produce information regarding value ascertainment for settlement purposes or to answer causation or liability issues common to the universe of plaintiffs.").
[71] Only when a "representative . . . range of cases" is selected may "individual trials . . . produce reliable information about other mass tort cases." MCL § 22.315; *see also In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 2100, 2010 U.S. Dist. LEXIS 108107, at *4, *6–7 (S.D. Ill. Oct. 8, 2010) (it is "critical to a successful bellwether plan that an honest representative sampling of cases be achieved" because "[l]ittle credibility will be attached to this process, and it will be a waste of everyone's time and resources, if cases are selected which do not accurately reflect the run-of-the-mill case"); Eldon E. Fallon et al., *Bellwether Trials In Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2343 (2008) ("the trial selection process should . . . illustrate the likelihood of success and measure of damages" of all cases in the litigation and "[a]ny trial-selection process that strays from this path will likely resolve only a few independent cases and have a limited global impact").
[72] *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).
[73] *See In re Motor Fuel Temperature Sales Practices Litig.*, 711 F.3d 1050, 1053 (9th Cir. 2013) ("Only severe or unexpected over-burdening, as happens when a judge dies or retires, when the district is experiencing a judicial emergency or when all judges are recused because of a conflict, will warrant bringing in a visiting judge.").

Case selection should be attuned to the goals of the parties and court in pursuing a bellwether process. For example, are counsel trying to determine the distribution and range of claims, or how particular types of claims will fare through the litigation process (and, the damages that will be awarded, if any)? Given these goals, the judge should create a selection process that will identify cases conducive to those aims and should communicate selection criteria to counsel. For example, does the judge want the parties to propose their strongest cases, or does the judge want to see cases that explore certain contested issues?

Usually, a judge should be skeptical of the value provided by trying one side's "strong" cases that may not be representative of the broader claims; for example, cases with a particularly sympathetic plaintiff or a case with a strong non-merits defense, such as the statute of limitations. While both approaches may be appropriate, they simply serve different goals. If a bellwether process of some type will be used, plaintiffs' counsel may urge the use of a case-selection committee on the plaintiffs' side. The committee members will inform themselves about the particular cases on file to find the cases they believe are representative. This information, in turn, helps guide the settlement negotiations, which can otherwise be untethered from the reality of the filed cases.

In designing a selection process, the judge should bear in mind its likely consequence. For example, allowing the parties to nominate and then strike each other's picks yields different results from a judge ordering, "here are the types of claimants and categories I do or do not want to see; bring me your nominees and I will make the final selection." Random selection results in yet another type of sample set. Some parties caution that random selection does not necessarily lead to representative cases. One judge solved this problem by randomly selecting ten cases to go first, then allowing the lawyers to challenge the cases' representativeness — obtaining the benefit of random selection while minimizing the risk of outliers.

One approach that has garnered substantial support is employing a grid or categorization of the cases based upon the earlier litigation process. This technique involves placing claims in different buckets based on certain characteristics — for example, plaintiff age, injury type, injury severity, date of injury in relation to evolving science, and so on. Then, the parties select twenty cases that fall within each of those categories. That pool of cases can then be developed such that one-off anomalies do not skew the results, but the size of the pool is small enough to allow counsel to focus on those cases. As MDL settlements have moved toward global grid settlements or smaller settlements by claims type, the grid bellwether approach also supports the development and testing of potential settlement categories.[74] If the MDL does not end in a settlement, the grid approach can help clarify the remand packet with materials specific to each claim type.

Counsel strongly support judges taking an active role in articulating the criteria by which cases would be selected, recognizing that attorneys might otherwise act strategically in their nominations and strikes of cases. Judges likewise agree that "parties sometimes don't want what

---

[74] Settlements are discussed in more detail in Chapter 5. As discussed there, most settlements are global grid settlements. However, defense counsel have increasingly urged settlement on other bases, whether by firm-inventory settlements or by claim settlements (effectively global settlements of a particular type of claim).

they ask for," so a strong hand from the judge may often be necessary to maximize the value of early cases.

If the parties do not settle in the shadow of the bellwether trials, the bellwether materials — such as deposition cuts and key rulings — will be helpful to the judge in preparing a trial package for remand. These materials, in many instances, add significant value for the parties and the judiciary.

> BEST PRACTICE 1E(i): The transferee court should adopt a strategy for facilitating the availability of the broadest possible pool of candidates from which to select bellwether cases.

If the decision is made to conduct bellwether trials, the transferee judge should take steps to ensure that an appropriate pool of cases is available for selection as bellwether trial candidates. Under the U.S. Supreme Court's decision in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,[75] a transferee judge may only conduct trials of cases originally filed in that court. Often, some subset of the cases pending in a MDL proceeding will qualify, but that subset may not be representative of the entire MDL case pool. Thus, trials of cases selected from that pool may be of limited value.

For that reason, the transferee court should consider adopting one of three commonly-used options for facilitating the broadest possible pool of candidates to select as bellwether cases.[76] The first is to request that parties sign "*Lexecon* waivers" — that is, waivers of the right to object to venue before the MDL court. This option is attractive to many judges because it allows selection for bellwether trial of any case in which the parties have executed such a waiver.[77] Claimants are often willing to give such waivers because they (and their counsel) want the opportunity for an early trial. These waivers are sometimes resisted by parties — particularly by claimants who wish to maintain their right to try their cases in the venue where they were originally filed, and defendants who may want to try the cases in a venue other than the MDL.[78] If this approach is selected, the request for waivers should be made early to ensure that a clearly defined pool of cases are available for trial in the MDL court's district.

Because *Lexecon* waivers require parties to divest themselves of fundamental protections of personal jurisdiction and venue, a transferee judge should carefully ensure that the waivers are voluntary and the scope "clear and unambiguous" before trying out-of-district bellwethers.[79] As illustrated by *In re DePuy Orthopaedics, Inc.*,[80] a proceeding to try bellwethers founded on ambiguous *Lexecon* waivers may invite scrutiny that risks invalidating tried cases, when parties challenge venue and personal jurisdiction. The source of the dispute in that case — an alleged

---

[75] 523 U.S. 26 (1998).
[76] MCL § 20.132.
[77] *Id.*
[78] Accordingly, parties should consider whether they wish to attach conditions to such waivers, such as choice of law, permitting or prohibiting consolidation, or agreeing only to try compensatory damages or certain claims.
[79] Such waivers may also address topics such as choice of law, consolidated trials, and bifurcation of damages or issues.
[80] 870 F.3d 345 (5th Cir. 2017).

"blanket" *Lexecon* waiver — reinforces the care with which these waivers must be negotiated and drafted at the outset.

A second option is for the MDL court to enter an order allowing for direct filing of cases in the MDL court with a later determination of venue issues.[81] Such orders allow the court to select any case for a potential bellwether trial and then at that point ask the parties to waive any jurisdictional or venue objections to conducting a trial in the MDL proceeding. This option has the benefit of not requiring the judge to urge all parties in all cases to execute a waiver, which can be a daunting undertaking. Once the bellwether trial process is complete, the transferee judge may either keep the non-bellwether cases in the MDL district or transfer them to another federal venue based on the parties' views.

The third option is for the MDL judge to conduct bellwether trials in the districts in which the selected cases were originally filed, thereby avoiding the *Lexecon* problem. This option may be the least convenient for the transferee court because it requires the judge to apply to sit by designation in another jurisdiction and requires the court to shift the base of operations from the MDL venue. In addition, the U.S. Court of Appeals for the Ninth Circuit has held that an MDL judge can only use this procedure upon a showing of need for additional judges in the transferor district, which might not be satisfied in the typical MDL setting.[82] To date, no other circuit has considered the question.

> BEST PRACTICE 1E(ii): One strategy for facilitating the broadest pool of candidates from which to select bellwether cases is to consider remanding select cases back to the transferor districts for trial.

Instead of the transferee judge handling all bellwether trials dependent upon obtaining appropriate *Lexecon* waivers, the judge should consider remanding representative cases back to the transferor districts for trial. Not only would this practice mitigate the risk of a single transferee judge exerting outsized influence on the proceedings, but it also would provide a wider range of information on the strength and weaknesses of individual cases adjudicated by juries and judges in different jurisdictions. Moreover, these bellwether trials would better reflect the jurisdictional variations in underlying substantive law. The downsides, of course, include the loss of efficiency germane to the transferee judge's central administration of the MDL and the possibility for conflicting legal rulings, though the latter might provide useful information for settlement purposes. To make this approach workable, the transferee judge should ensure that the transferor judges receive information sufficient to acquaint them with the pretrial developments that had unfolded in the transferee court. In this context, the transferee judge should consider handling the first bellwether proceedings. Rulings on substantive motions by the transferee judge would provide added information for subsequent proceedings remanded to transferor districts.

The transferee judge would need to coordinate carefully with the transferor districts reasonable timetables so that prompt trials could be held.[83] Persuading other districts to coordinate trial schedules can be difficult, but the alternative of wholesale remand of all MDL

---

[81] MCL § 20.132.  Such an order should not alter filing-fee requirements.

[82] *See supra* note 73. Direct filing must be consistent with constitutional limits on personal jurisdiction.

[83] *See infra* BEST PRACTICES 18E–18E(iii), 18F.

cases, absent settlement, provides a significant incentive for the transferor judges to agree to resolve their bellwether trials promptly.

> BEST PRACTICE 1E(iii): The transferee judge and the parties should establish a process that requires collaborative selection of bellwether trial cases.[84]

In designing a trial-selection protocol, the transferee judge should be mindful that bellwether trials are most beneficial if they: (a) produce decisions on key issues applicable to other cases in the proceeding (including on *Daubert* issues, cross-cutting summary-judgment arguments, and the admissibility of key evidence); and (b) help the parties assess the strengths and weaknesses of various types of claims pending in the MDL proceeding. To that end, the key is to select cases that are representative of the entire claimant pool (or of specified categories in that pool).

The most popular methods are: (1) random selection of cases from the entire case pool; and (2) selection of cases by the parties (usually with strikes).

The *Manual for Complex Litigation* endorses random selection as the preferred means of identifying representative cases: "To obtain the most representative cases from the available pool, a judge should direct the parties to select test cases randomly from the entire pool or from a limited group of cases that the parties agree are typical of the entire mix."[85] Some MDL judges have embraced this approach and adopted random selection methods for identifying test-trial candidates. For example, in *In re Baycol Products Litigation*, the court's selection program included all cases filed in the District of Minnesota involving Minnesota residents plus a minimum of 200 additional cases selected at random from all MDL filed cases.[86] And in *In re Prempro Products Liability Litigation*, 15 cases were randomly drawn from a hat.[87] However, some commentators have expressed the view that random selection will rarely result in the selection of representative cases.[88]

---

[84] *See, e.g.*, Joint Bellwether Plan, *In re Hydroxycut Mktg. & Sales Practices Litig.*, (S.D. Cal. Mar. 19, 2012) (providing that each party will pick an equal number of trial candidates, subject to veto from the other side, that will then be tried alternately); Pretrial Order #10 at 2, *In re Levaquin Prods. Liab. Litig.*, (D. Minn. Mar. 8, 2011) (the "[c]ourt, upon recommendation by the parties, designated six individual plaintiffs . . . as possible bellwether" candidates and then allowed parties to take turns choosing cases to be tried); Case Management Order No. 9 at 2–3, *In re Fosamax Prods. Liab. Litig.*, (S.D.N.Y Jan. 31, 2007) (providing that each party will pick 12 cases to fill the bellwether trial pool, with the Court picking an additional case; from that pool, plaintiffs, defendants and the court will each pick a trial case and the court "will randomly select the order in which each of the three cases will be tried"); Order Re: Bellwether Trial Selection at 2, *In re Prempro Prods. Liab. Litig.*, (E.D. Ark. June 20, 2005) (selecting fifteen cases at random for the bellwether trial pool and then the directing the "parties must 'meet and confer'" to "together select" five cases that involve representative plaintiffs for trial).
[85] MCL § 22.315.
[86] *See* Pretrial Order No. 89, *In re Baycol Prods. Litig.*, (D. Minn. July 18, 2003); *see also In re Norplant Contraceptive Prods. Liab. Litig.*, No. 4:03-cv-1507-WRW, 1996 WL 571536, at *1 (E.D. Tex. Aug 13, 1996) ("[f]ollowing random selection of the twenty-five bellwether trial plaintiffs").
[87] *See* Order re: Bellwether Trial Selection at 2, *In re Prempro Prods. Liab. Litig.*, MDL No. 1507 (E.D. Ark. June 20, 2005.
[88] FED. JUDICIAL CTR., NAT'L CTR. FOR STATE COURTS, U.S. JUDICIAL PANEL ON MULTIDISTRICT LITIG., COORDINATING MULTIJURISDICTION LITIGATION: A POCKET GUIDE FOR JUDGES 12 (2013), https://www.fjc.gov/sites/default/files/2014/Coordinating-Multijurisdiction-Litigation-FJC-2013.pdf [hereinafter

Another approach is to give the parties input into the bellwether trial selection process. For example, in *In re Vioxx Products Liability Litigation*,[89] the PSC and Defendant's Steering Committee were each permitted to designate for trial five bellwether cases involving the most serious condition allegedly caused by Vioxx. Each side was given two strikes with the remaining cases set for trial on a rotating basis, starting with one of the plaintiff's selections.[90] As Judge Eldon Fallon noted in an article published after the *Vioxx* settlement, the alternate-selection approach used in *In re Vioxx* is preferable to allowing "only one side" to select bellwether trial cases, which "opens the door for the inequitable stacking of overtly unfavorable and possibly unrepresentative cases, as well as creating an atmosphere of antagonism."[91] Further, allowing "both sides of coordinating attorneys [to] make selections by exercising alternating picks" is "the most useful approach" to bellwether trial selection because it "institutes fairness and attorney participation, while maintaining efficiency and placing the burden of ensuring representative cases on those with the most stake in the trial selection process."[92] Such collaborative approaches give the parties "better control over the representative characteristics of the cases selected" and are therefore more likely to result in bellwether cases that are typical of the litigation pool.[93]

Judge Fallon took a different approach, however, more recently in the Xarelto® MDL, creating a bellwether pool consisting of cases selected by the plaintiffs, the defense, and randomly, and then randomly picking the bellwether trial cases from a pool, which was created through a strike process by the parties.

Another approach is to give the parties input but vest the ultimate selection with the court. In *In re: DePuy Orthopaedics, Inc.*, the parties initially selected four cases each as bellwether trial candidates and certain case specific discovery ensued. The parties then filed submissions setting forth which cases each party thought should be designated as a case to be tried in a bellwether trial. The parties were encouraged to agree upon cases to be designated, but if they could not, the court, after reviewing the submissions, would pick a primary and a backup bellwether trial case for two back-to-back bellwether trials.

Some judges are critical of allowing the parties too much latitude to select cases because advocates may be inclined to pick cases they are most likely to win, without regard to their cases' representativeness.[94] To address this concern, the transferee judge may consider selecting bellwether trials only if both sides consent. Under this approach, outlier cases favoring one side would be unlikely to be selected. This option places the responsibility on the parties, who have better knowledge about the cases than the transferee judge, to select useful, representative

---

COORDINATING MULTIJURISDICTION LITIGATION] ("Selecting cases randomly . . . is unlikely to produce a representative set of verdicts that will assist the parties in reaching a global settlement.").

[89] 501 F. Supp. 2d 789, 791 (E.D. La. 2007).

[90] *Id.*

[91] Fallon et al., *supra* note 71, at 2350.

[92] *Id.* at 2364.

[93] *In re Yasmin & Yaz*, 2010 U.S. Dist. LEXIS 108107, at *7 (S.D. Ill. Oct. 1, 2010).

[94] COORDINATING MULTIJURISDICTION LITIGATION, *supra* note 88, at 12 ("Allowing attorneys complete freedom to choose bellwethers is unlikely to produce a representative set of verdicts that will assist the parties in reaching global settlement.").

bellwether trials. If an agreement cannot be reached, the transferee judge may consider interviewing each side to identify the key issues presented and the critical evidence to be presented. The interview process, coupled with the judge's final decision-making authority (over which cases she selects for trial and the order in which they will be tried), encourages parties to put forward representative cases. And because the interview would be focused on a case's representativeness, it should uncover valuable information to enhance the bellwether process.

Bellwether trials selected randomly or by the litigants may not provide a truly representative cross-section of all cases. But a hybrid approach could combine random selection, litigant input, and the judge's selection to arrive at a representative sample of cases for bellwether trial. In *In re Testosterone Replacement Therapy Products Liability Litigation*, Judge Kenelly began by randomly choosing 100 cases. Each side then picked 16 cases. After some preliminary discovery, the court selected the eight cases that would proceed to trial. (Alternatively, eight cases could be selected by the parties' mutual consent.) This hybrid approach allows parties to participate in the selection process, provides some assurance that claims are representative, and avoids concerns with other approaches while yielding what could be a representative stable of cases.

Cases should generally not be consolidated for trial. At the bellwether stage, the goal should be to achieve valid tests, not to resolve large numbers of claims. Consolidation can tilt the playing field, undermining the goal of producing representative verdicts. As one transferee judge recognized in rejecting a proposal to hold a three-plaintiff bellwether trial, "[u]ntil enough trials have occurred so that the contours of various types of claims within the . . . litigation are known, courts should proceed with extreme caution in consolidating claims."[95] Consolidated bellwether trials may confuse juries, who are charged with wading through large quantities of complicated evidence to determine claims that may present different issues. Not only do some defense attorneys argue that consolidated bellwethers are unfair for their clients,[96] but these trials may not further settlement when attorneys for one side question verdict accuracy. For example, this can occur when a jury awards each plaintiff a similar verdict despite substantial differences between claims. On the other hand, a court should consider whether consolidated trials may provide useful information in certain cases, consistent with due process concerns, when the differences among the plaintiffs do not lead to ambiguous results.[97]

---

[95] *See In re Levaquin Prods. Liab. Litig.*, No. 08-1943, 2009 U.S. Dist. LEXIS 116344, at *9–11 (D. Minn. Dec. 14, 2009) (internal quotation marks and citations omitted); *see also* Pretrial Order # 71 at 2, *In re C.R. Bard Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2187 (S.D. W. Va. Mar. 7, 2013) (denying plaintiffs' motion to consolidate three plaintiffs' cases or, in the alternative, "seat three juries in a single trial but deliberate separately and render separate verdicts" as the first bellwether trial in product-liability litigation involving pelvic implant surgery); *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 3:09-md-2087-BTM(KSC), 2012 U.S. Dist. LEXIS 93282, at *50–52 (S.D. Cal. June 28, 2012) ("The selection of *individual* plaintiffs by the parties with oversight from the court is similar to approaches taken by other courts in designating representative bellwether cases for trial.") (emphasis added); *In re* Yasmin & Yaz, 2010 U.S. Dist. LEXIS 108107, at *9 n.3 (providing that plaintiffs for inclusion in the bellwether pool "must be selected . . . *individually*") (emphasis added); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 644 (E.D. La. 2010) (noting that six bellwether trials of individual plaintiffs were conducted during the course of litigation).

[96] Attorneys holding this view should consider conditioning *Lexecon* waivers to preclude consolidation.

[97] *See*, e.g., Order Consolidating Bellwether Cases For Trial, *In re: DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Lit., MDL 2244*, (N.D. Tex., January 18, 2016) (consolidating five cases for bellwether trial); *see also*

As discussed previously, to enhance the selection process, the transferee judge should require plaintiffs to: (1) provide court-approved fact sheets; and (2) submit medical and employment record authorizations to collect basic information about plaintiffs' claims.[98] Defendants should likewise provide basic information regarding individual plaintiffs' cases (e.g. detailer information or other relevant basic factual information about the individual plaintiff or her claims). The availability of such information should facilitate selection of more representative cases for trial. Indeed, sampling information from these sources may aid the court and the parties in defining what constitutes a representative case and in drawing distinct categories of cases within the pool pending in the proceeding. Irrespective of the chosen bellwether selection method, the parties should have a reasonable amount of and time for discovery in the selected cases to ensure that no party is subjected to unfair surprise or otherwise disadvantaged.

> BEST PRACTICE 1E(iv): The transferee judge should adopt rules that will minimize the risk that parties will attempt to "game" the bellwether trial-selection process to result in test trials of cases that are not representative of the entire case pool.

Although there may be good-faith reasons for settling or for voluntarily dismissing a test case, there are also instances in which the parties do so to manipulate the takeaways from the bellwether process.[99] For example, defendants could offer to settle what they view as a strong bellwether case for the plaintiffs. Conversely, plaintiffs could dismiss what they view as weak bellwether cases. If the transferee judge has elected a random selection of cases, there is little that can be done about such tactics, beyond mandating dismissal with prejudice, unless the judge adopts a different procedure to select replacement cases.[100] Such strategic behavior can be mitigated by, for example, allowing plaintiffs to choose the replacement for any bellwether case

---

*In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, No. 4:08-MD-2004, 2010 WL 797273 (M.D. Ga. Mar. 3, 2010) (finding consolidation appropriate with the significant common issues of the manufacturer's knowledge of risks and proper curative treatment versus what was disclosed to physicians, along with other common evidence including expert testimony on "research, development, design, testing, manufacturing, quality control, and product evaluation-as well as general evidence on anatomy, biostatistics, bioengineering, the Food and Drug Administration's 510(k) process, and [Defendant's] corporate knowledge."). *But see, In re Repetitive Stress Injury Litigation*, 11 F.3d 368, 373-74 (2d Cir. 1993) (granting mandamus to reverse consolidation); *Guenther v. Novartis Pharmaceutical Corp.*, 2012 WL 5398219, at *2 (Mag. M.D. Fla. Oct. 12, 2012) ("[The MDL] Panel has repeatedly rejected attempts to consolidate cases for trial and has ordered multi-plaintiff case complaints be severed because the claims of individual plaintiffs were not suited for consolidation"), adopted, 2012 WL 5305995 (M.D. Fla. Oct. 29, 2012); *In re Levaquin Prods. Liab. Lit.*, 2009 WL 5030772, at *3-4 (D. Minn. Dec. 14, 2009) (three-plaintiff consolidation improper due to different prescribing physicians notwithstanding plaintiff's promise to call "nearly twenty generic witnesses"); *In re Baycol Prods. Liab. Lit.*, 2002 WL 32155269, at *2 (D. Minn. July 5, 2002) (the "same basic set of facts" is absent where plaintiffs "went to different doctors or teams of doctors and medical facilities and providers"); *In re Consolidated Parlodel Litigation*, 182 F.R.D. 441, 447 (D.N.J. 1998) ("predominance of individual . . .causation and marketing evidence" precludes consolidation); *In re Diet Drugs*, 1999 WL 554584, at * 4 (E.D. Pa. July 16, 1999) (joinder of plaintiffs improper where "plaintiffs [had] not purchased or received diet drugs from an identical source, such as a physician, hospital or diet center").
[98] MCL § 22.83.
[99] COORDINATING MULTIJURISDICTION LITIGATION, *supra* note 88, at 12 ("Permitting plaintiffs to dismiss cases on the eve of trial also can distort the information provided by bellwether trials."); In re *FEMA Trailer Formaldahyde Prods. Liab. Litig.*, 628 F.3d 157, 163-64 (5th Cir. 2010) (discussing a party's "manipulate[ing] the integrity of the court's bellwether process" through voluntary dismissal of selected cases).
[100] *See FEMA Trailers*, 628 F.3d at 164 (affirming with prejudice dismissals).

that defendants choose to settle rather than take to trial, or allowing defendants to select the replacement for any bellwether case that plaintiffs choose to dismiss.

A court can more effectively adopt rules and procedures to address gaming the system in an MDL proceeding in which the parties participate in the selection of bellwether cases. For example, if the transferee judge allows each side to select a bellwether case from among four nominees by the other side (i.e., plaintiffs would pick the bellwether case from among four nominees by defendants, and vice versa), and one party chooses to dismiss or settle the case selected by the other party, the acting party could either lose their right to pick their own case, or the other party could be invited to choose the replacement case from among the entire case pool.

Even if a bellwether case is voluntarily dismissed before trial, the dismissal itself can be of significant predictive value, particularly if the court has made pretrial rulings. The rulings themselves, regardless of the fate of the particular case, place parties in a better position to gauge the direction of the litigation. While bellwether verdicts can be explained away, and a negotiating spin placed on them by either side, a court's ruling (e.g., on a *Daubert* or summary judgment issue) remains. Moreover, repeated voluntary dismissals or eve-of-trial settlements may be an important signal that the acting side lacks confidence in certain types of cases, or that those cases may be candidates for dispositive motions.

In planning case management, it must be remembered that every MDL proceeding is different —what is a best practice in one MDL may be irrelevant, or even counterproductive, in another. Ultimately, collaboration among counsel and the court is the most essential ingredient in a successful MDL proceeding. Effective MDL management depends on cooperation among counsel to a greater degree than in other civil litigation matters due to the magnitude and complexity of what is ordinarily at stake in MDL cases. Proper case management is a shared responsibility among the court and counsel, and the court should hold counsel accountable for fulfilling their duties in that regard.[101]

> BEST PRACTICE 1E(v): The transferee judge should consider using bellwether alternatives, including mini-trials and mediation.

The ultimate goal of bellwether trials is to inform the parties of the value of claims. While a full-blown merits trial on an individual case offers one data point of claim value, methods short of bellwether trials can furnish useful information for lawyers, often at less cost. *Daubert* rulings, for example, give litigants a strong sense for what types of claims will make it to the jury. Pretrial rulings on motions *in limine* indicate whether critical evidence will be admissible at trial. In addition to developing information for litigants through pretrial procedures, courts can employ bellwether alternatives specifically designed to uncover the value of claims.

One such approach is to encourage parties to agree to "summary trials." Summary trials involve impaneling a jury from the federal jury pool to hear an abbreviated presentation of evidence.  Summary trials often last no more than a day and end with a nonbinding verdict.

---

[101] *See* Pretrial Order No. 1 at 1–2, *In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on Apr. 20, 2010*, MDL No. 2179, (E.D. La. Aug. 10, 2010) ("The Court expects, indeed insists, that professionalism and courteous cooperation permeate this proceeding from now until this litigation is concluded.").

Summary trials may be limited to the lawyers' presentation of only the key evidence that would be heard at trial, or they may involve live testimony by the most critical witnesses. Although this option may be unpalatable to litigants who demand the "real thing," summary trials are a less expensive alternative to bellwethers that can quickly generate helpful information. Because "real juries" are involved, parties may walk away with an accurate sense for how their claims will be received.

Mini-trials, a similar tool, are nonbinding trials on single issues — most often liability, causation, or damages. Mini-trials present another opportunity to efficiently generate information about a spectrum of claims, as they typically include groups of cases consolidated under Rule 42. Although this type of adjudication is quick and inexpensive, mini-trials may be of limited value to the parties. Some defense lawyers point to the fact that a finding on liability based on a presentation entirely divorced from assessing causation may be unpersuasive. There is also no opportunity to appeal adverse rulings, which may diminish the rulings' predictive value.

In addition to bellwether alternatives, the transferee judge can consider appointing a special master or settlement judge to oversee settlement negotiations. This judicial initiative can help both sides, removing the fear that the party suggesting settlement first will relinquish negotiating power. Further, it brings both sides to the negotiating table, over the reluctance of some of the individual plaintiffs or defendants. Judicial involvement will not always be necessary; but it may prove essential after a significant breakdown in trust between the parties. One example of a judicially-supervised settlement resulted in a global agreement after the parties worked with a settlement master to construct a grid that provided the values of different types of claims.

Settlement talks will only prove fruitful if they occur after both sides have enough information to accurately assess claim values. But the transferee judge should exercise great caution not to appoint a special master or settlement judge too early in the proceedings, when sufficient information has not yet been gathered on the strength and weaknesses of the claims. A premature appointment may inappropriately signal a judicial predilection towards settlement.[102]

---

[102] *See infra* BEST PRACTICES 18B–18B(iii).

# CHAPTER 2

## SELECTION AND APPOINTMENT OF LEADERSHIP

One of the first challenges in presiding over multidistrict litigation with many parties and separate counsel is the appointment of counsel to lead the litigation. Multidistrict litigation involves numerous parties with common or similar interests but with separate counsel. It is necessary to establish a leadership structure for the plaintiffs, and sometimes for the defendants as well, to ensure the effective management of the litigation. The leadership team is responsible for coordinating discovery and other pretrial work in the cases. They develop the proof necessary for trial, draft motions, work with experts, and communicate with the other side and the court. They must be able to manage all aspects of the litigation. Determining the appropriate leadership structure and selecting the right lawyers to fill the positions is one of the first and most important case-management tasks.

Behind these managerial roles lies another role for plaintiffs' leadership: funding the litigation. In large and mass-tort MDLs, this cost can be exceedingly high; for example, in *Vioxx*, the leadership fronted $41 million. Experienced transferee judges often report underestimating the extent to which finances impacted not only the appointment dynamics, but also the litigation process. Because new entrants often cannot fund (or are perceived as unable to fund) the periodic assessments in addition to their own litigation costs, finance can reinforce the repeat-player dynamic prevalent within committee appointments. Concerned by the unintended overhang of plaintiff financing, a number of judges have begun to explore ways in which the appointment process can be tailored to improve not only demographic diversity but also cognitive and skill-set diversity, as well as enhancing the overall quality of representation afforded by the appointed counsel.

This chapter focuses on the staffing and appointment practices that transferee judges have found effective in enhancing the MDL process. The chapter defines its task capaciously, focusing not only upon the appointment selection but the expectations for the MDL leadership, which will set the parameters and structure for the litigation process. As with the other chapters, the primary focus is on large and mass-tort MDLs, in order to provide the transferee judge with the broadest menu of appointment techniques from which to select in deciding what will work for any given MDL, with the expectation that in simpler cases, the transferee judge may simply select a smaller subset of these options.

> GUIDELINE 2: In an MDL action with many parties with separate counsel, the transferee judge should establish a leadership structure for the plaintiffs, and sometimes for the defendants, to promote the effective management of the litigation.

> BEST PRACTICE 2A: The transferee judge should assess the needs of the litigation in establishing an appropriate leadership structure.

There are many different ways to structure the leadership team; what works for one MDL may be too unwieldy or too streamlined for another. Several factors contribute to the determination of the roles that need to be established and filled by qualified counsel, including

the nature of the claims, the number of cases, and the variety and complexity of interests involved.  The goal is to ensure that the litigation will be managed efficiently and effectively without jeopardizing fairness to the parties.[103]

> BEST PRACTICE 2B: In determining the appropriate leadership structure, the type of cases included in the MDL is often the most important consideration.

Sometimes a fairly simple structure, consisting of a lead counsel and a liaison counsel, is all that is required.  Consumer, securities fraud, and employment class actions in which the plaintiffs generally assert the same or similar claims often fall into this category.[104]  Sometimes the plaintiffs in these types of cases have divergent interests, and separate leadership teams (or at least separate representation on a committee) will be necessary to ensure that the interests of each group are fairly represented.[105]  Similarly, antitrust MDLs often include claims on behalf of both direct and indirect purchasers who must be separately represented.[106]  When separate leadership structures are required, the transferee judge may decide to appoint counsel who will be responsible for coordinating among the teams to ensure that duplication of effort is minimized.[107]

Mass tort and common disaster litigation tend to be the largest MDLs.  Mass-tort litigation can be composed of thousands or even tens of thousands of individual personal-injury lawsuits, third-party payor class actions, and cases brought on behalf of governmental entities. Courts often appoint a single leadership structure for the plaintiffs in these cases, although the committees tend to be larger than in other types of cases.  Instead of, or in addition to, lead and liaison counsel, courts sometimes appoint an executive committee, assigning specific responsibilities to each member (such as overall leadership of the case, communication with the court, communication with other plaintiffs' counsel, and coordination with lawyers prosecuting related cases in state court).[108]

---

[103] Federal Judicial Center, *MCL* § 10.221 (2004); Federal Judicial Center & National Center for State Courts, *Managing Multidistrict Litigation in Products Liability Cases: A Pocket Guide for Transferee Judges* § 4 (2011).
[104] *See, e.g.,* Initial Case Management Order, *In re Wells Fargo Wage and Hour Employment Practices Litigation* (No. III), MDL 2266, No. 4:11-md-02266 (S.D. Tex. Feb. 24, 2012) (ECF No. 45); Order, *In re Swisher Hygiene, Inc., Securities and Derivative Litigation,* MDL 2384, No. 3:12-md-2384-GCM (W.D.N.C. Oct. 18, 2012) (ECF No. 34); Order Appointing Interim Co-Lead Class Counsel, *In re 5-Hour Energy Marketing and Sales Practices Litigation*, MDL 2438, No. 2:13-mo-02438-PSG-PLA (C.D. Cal. Nov. 8, 2013) (ECF No. 25).
[105] *See In re Facebook, Inc., IPO Securities & Derivative Litigation*, 288 F.R.D. 26 (S.D.N.Y. 2012); Order No. 2: Adopting of Organization Plan and Appointment of Counsel, *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation,* MDL 2151, No. 8:10-ml-02151-JVS-FMO (C.D. Cal. May 14, 2010) (ECF No. 169) (appointing separate leadership structures for personal injury and economic loss plaintiffs, and ensuring that both consumers and non-consumers were represented).
[106] *See, e.g.,* Case Management Order No. 2, *In re Aluminum Warehousing Antitrust Litigation*, MDL 2481, No. 1:13-md-02481-KBF (S.D.N.Y. March 6, 2014) (ECF No. 216).
[107] *See* Order for Appointment of Lead and Liaison Counsel and Preliminary Scheduling Order at 1-2, *In re Target Corporation Customer Data Security Breach Litigation*, MDL 2522, No. 0:14-md-02522-PAM (D. Minn. May 15, 2014) (ECF No. 64).
[108] Court Order: Plaintiffs' Steering Committee, *In re Actos (Pioglitazone) Products Liability Litigation*, MDL 2299, 6:11-md-2299-RFD-PJH (W.D. La. Apr. 13, 2012) (ECF No. 560).

Common disaster litigation (like the BP oil spill case) often involves the greatest diversity of interests found in MDLs. The plaintiffs may include private individuals, businesses, emergency responders, and governmental entities, and the claims can vary from personal injury to environmental clean-up to economic losses. A single leadership structure may suffice for these cases as well, although each interest should be represented on a committee.[109]

The bottom line is that there is no one-size-fits-all solution. The challenge lies in balancing the competing goals of adequately staffing and funding the litigation, while ensuring efficiency and controlling costs. The greatest challenge is often to ensure that decisions can be made without delay caused by the need to consult numerous people, while still giving all interested members of the litigation team the opportunity to provide input.

The transferee judge should also keep in mind that leadership needs may change over time. As the case progresses, it may be appropriate to add attorneys to a committee who have been particularly dedicated to the litigation and have contributed to the work on the same level as committee members.[110] It may also become necessary to appoint counsel or committees to serve specific purposes that the judge and parties did not anticipate at the commencement of the litigation. For example, it may become apparent that a proposed class action will have subclasses that require separate representation. If the parties wish to discuss settlement, the judge may decide to appoint lawyers on each side to conduct settlement negotiations, particularly in mass tort or common disaster cases where there are many individual claims and lead counsel need to focus on the ongoing litigation.[111]

> BEST PRACTICE 2C: The transferee judge typically should appoint lead counsel and liaison counsel for the plaintiffs, and often a supporting committee when the litigation is especially large or complex or composed of divergent interests.

> BEST PRACTICE 2C(i):   In cases involving numerous defendants it may be necessary to appoint a leadership team for the defense as well.

While the responsibilities of the defendants' representatives are normally limited to receiving and distributing information and coordinating positions on non-substantive matters, the appointment of a defendants' liaison counsel or other similar representative is often helpful in simplifying the litigation and expediting motion practice. The role of a defense leadership team in multi-defendant cases is often one of coordination, in contrast to the more substantive and strategic role of plaintiffs' leadership. In many cases, it can be extremely beneficial to have leadership on the defense side, in order to carry out an information-distribution function. This function is often bidirectional, disseminating information to all defendants and providing a single point of contact to coordinate with the court and plaintiffs' counsel about logistics, scheduling, and other organizational matters. While defense leadership can coordinate responses between

---

[109] Edward F. Sherman, *The BP Oil Spill Litigation and Evolving Supervision of Multidistrict Litigation Judges*, 30 Miss. C. L. Rev. 237, 240-41 (2011).

[110] Second Amended Court Order: Plaintiffs' Steering Committee, *In re Actos (Pioglitazone) Products Liability Litigation*, MDL 2299, 6:11-md-2299-RFD-PJH (W.D. La. June 13, 2013) (ECF No. 2856).

[111] Case Management Order Number 6 (Unified Case Management Plan) at 6-7, *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, MDL 2385, No. 3:12-md-02385-DRH-SCW (S.D. Ill. Oct. 3, 2012) (ECF No. 42).

defendants, streamlining arguments and filings, the leadership does not bind other defendants in their responses.

Although some courts appoint firms to serve in leadership positions, it is usually preferable to appoint individual lawyers who can be held accountable and ensure that the case receives consistent attention of a senior partner, rather than risking an excessive degree of delegation to less experienced attorneys.

> BEST PRACTICE 2C(ii): The transferee judge should designate lead counsel who will act for all parties whom they are appointed to represent and are responsible for the overall management of the litigation.  The judge should specify at the outset responsibilities assigned to lead counsel, as well as the structure of the entire leadership team and their respective duties.

Typical responsibilities include working with opposing counsel to develop and implement a litigation plan, initiating and conducting discovery, retaining experts, presenting written and oral argument to the court, directing the work of other plaintiffs' counsel, and engaging in settlement discussions.  Lead counsel may also serve as the trial attorneys, or may designate other counsel to serve as the principal attorneys at trial.  Depending on the size and complexity of the case, it may be appropriate to appoint more than one individual to serve as lead counsel.  At the same time, the number should not be so large that it defeats the purpose of appointing someone to lead the litigation.  Appointing a committee to support lead counsel is usually more effective than staffing the litigation with numerous co-lead counsel, which can lead to delays in decision making and unnecessary duplication of effort.

> BEST PRACTICE 2C(iii): Although every case is different, the transferee judge should not appoint more than three attorneys to serve as lead counsel in any matter, in light of the potential for inefficiencies and ineffective decision making.

> BEST PRACTICE 2C(iv): The transferee judge should consider the appointment of liaison counsel to serve an administrative role.  If the court appoints a liaison, it should specifically define the roles and duties of the liaison at the outset ─ including responsibility for communications between the court and other counsel, maintaining records of all orders, filings and discovery, and ensuring that all counsel are apprised of developments in the litigation.  An important aspect of the liaison's role is coordinating with and supporting the clerk of court.

Liaison counsel often has offices in the same location as the court, though that is not necessarily a requirement.  Appointing as liaison counsel an attorney who has practiced before the transferee judge can be helpful, since the attorney will already be familiar with the local rules, the judge's practices and preferences, and other court-specific procedures.  It is rarely necessary to appoint more than one individual to serve as liaison counsel, and it may be possible to appoint a liaison that is recommended by plaintiffs' counsel.  If there are numerous defendants, it may be appropriate to appoint a liaison counsel to coordinate and speak for defendants as well.

BEST PRACTICE 2D: The transferee judge should consider establishing a steering committee, executive committee, or management committee, if the litigation involves numerous complex issues, if there is a substantial amount of work to be done, or if the plaintiffs have different interests that require separate representation.

The type, size, and composition of the committee (or committees) will depend on the number and requirements of the cases composing the MDL.  In many cases, a committee will be necessary to support lead counsel in prosecuting the case.  Committee members can perform many functions, from consulting with lead counsel on overall case strategy to developing and implementing a litigation plan, managing discovery, preparing briefs, and presenting argument to the court.  The committee members may represent different interests in the litigation or bring important skills to the table.  For a proposed class action, for example, a committee may include counsel who represent the interests of subclasses.

In mass-tort MDL cases it is often helpful to establish multiple committees.  An executive committee, if formed, will typically consist of three to five attorneys who work closely with lead counsel on managing the litigation.  Limiting the number of lead counsel and executive committee positions helps to ensure that there is a manageable number of individuals whose buy-in is required for key litigation decisions.

In contrast, the plaintiffs' steering committee is far more variable in size depending on the needs of the particular case.  In some cases, the judge may decide not to appoint a steering committee, particularly if the case is simple and manageable, to avoid creating too much infrastructure and hindering rather than expediting or improving case management.  In other cases — particularly those that are complex, have highly divergent individual fact patterns or a number of competing plaintiff typologies, or multiple defendants — a steering committee can ensure that adequate litigation resources are available to the plaintiffs.

Plaintiffs' steering committees are often composed of a broader set of attorneys who each focus on specific aspects of the day-to-day litigation, such as discovery, documents, technology, briefing, science, coordination with state litigation, and trial counsel.[112]  The court will thus often seek to ensure that the steering committee members collectively bring diverse skill sets and relevant substantive expertise to bear upon the case.  But the judge should also recognize that an important function of the steering committee in large and mass-tort MDLs is to finance the litigation.  This recognition should shape not only the criteria for selection, but also is increasingly a factor in considering the appropriate size of the committee.

As noted above, the size of the steering committee is highly variable.  Many MDLs proceed efficiently with no committee or only a half-dozen committee members.  But particularly large and complex mass-tort MDLs may require a larger steering committee to ensure that the plaintiffs are not at a disadvantage in funding pretrial discovery and have

---

[112] Case Management Order No. 14, *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, MDL 2385, No. 3:12-md-02385-DRH-SCW (S.D. Ill. October 29, 2012) (ECF No. 53); Court Order: Plaintiffs' Steering Committee, *In re Actos (Pioglitazone) Products Liability Litigation*, MDL 2299, 6:11-md-2299-RFD-PJH (W.D. La. Apr. 13, 2012) (ECF No. 560).

sufficient personnel and financial resources to match the defendants. Only in exceptional cases should more than 20 attorneys be appointed to serve on a steering committee, although there are rare cases in which this is necessary and the imposition of an arbitrary limit may have undesirable consequences.

In large and mass-tort MDLs, the various leadership roles can be filled by counsel with different roles in a way that will satisfy all the needs of the litigation. For example, the co-lead counsel may provide the strong administrative and communication skills that are required to manage the litigation, while a steering committee may be composed of attorneys with specific skills and the ability to commit substantial time to the ongoing work of the case. A separate executive committee may include attorneys who can offer essential financial support or who have a significant percentage of the filed cases but will not actively participate in the day-to-day work. In particularly large and complex mass-tort MDLs, it may also be appropriate to establish separate science and discovery committees, and perhaps a law-and-motions committee.[113] Typically, the need for these committees and their staffing are determined by plaintiffs' counsel.

Finally, experienced transferee judges who have managed MDLs with and without state court liaisons have reported that they find that the appointment of a state court liaison greatly improves the MDL process, particularly in complex MDLs with a variety of state court matters. They report that while they post materials on the MDL website to keep state court judges and counsel updated on the MDL's progress and use many of the coordination techniques described in Chapter 4, a state court liaison adds additional value. Typically, one state court liaison is appointed for plaintiffs and one for the defense side. These liaisons are responsible for affirmatively reporting to the transferee judge on the progress of state court litigation, so that the transferee judge hears of updates promptly without having to proactively reach out to the state courts. Even more important for many judges is the role of the liaison in providing an "early warning" about developments in the state court litigation, so that the judge has insight into the personalities and conflicts, and is therefore well positioned to head issues off before they become problems. Beyond this single point of contact, appointing counsel to the MDL committees that have cases in both jurisdictions can provide additional sources of information or adjuncts to the appointed liaisons. (The issues of state-federal coordination are discussed in more detail in Chapter 4.)

> **GUIDELINE 3**: The transferee judge should select lead counsel, liaison counsel, and committee members as soon as practicable after the JPML transfers the litigation.[114]

Because the cases will have already experienced some delay when they arrive in the transferee court, it is important to start the process immediately. There may be motions pending that were filed before the transfer, responses to complaints due, and outstanding discovery requests. Putting a leadership structure in place promptly will allow the plaintiffs to take an

---

[113] Case Management Order No. 3, *In re DePuy Orthopaedics, Inc. ASR Hip Implant Products Liability Litigation*, MDL 2197, No. 1:10-md-02197-DAK (N.D. Ohio Jan. 26, 2011).

[114] Judicial Panel on Multidistrict Litigation & Federal Judicial Center, *Ten Steps to Better Case Management: A Guide for Multidistrict Litigation Transferee Judges* 2 (2d ed. 2014); *Managing Multidistrict Litigation in Products Liability Cases* §§ 3(b) & 4; *MCL* § 22.62.

organized approach to early case-management tasks and give defense counsel someone to communicate with about open issues.

> BEST PRACTICE 3A: Holding the initial conference at the earliest practicable time after the order transferring cases is issued allows the transferee court to promptly set in motion the procedure for appointment of counsel.[115]

> BEST PRACTICE 3A(i): The initial case-management order should inform counsel that the leadership structure will be discussed at the initial case-management conference and direct them to be prepared to identify case-specific issues that may inform the appropriate structure.[116] Counsel who intend to seek a leadership position should be required to attend.[117]

While attending to the leadership issues early, it is also important that the transferee judge take the time to carefully frame the proceedings, select the most appropriate leadership structure, and set up the necessary institutional support for the case to proceed smoothly. The most successful MDLs will move forward expeditiously, without delay but also without a rush that overlooks proper planning. Judges recognize the balance between needing to quickly get a team in place to move the litigation forward and wanting to have more time to get to know the attorneys and their work product before making the critical decision of which attorneys will lead the litigation.

> BEST PRACTICE 3A(ii): The transferee judge should take steps to ensure a smooth process for administration of the MDL by confirming that the clerk of court is prepared for and capable of handling the possible (indeed likely) influx of filings that follow transfer of the cases by the JPML,[118] and issuing initial orders that address the filing procedures for counsel to follow before the leadership team is appointed.

As noted in the previous chapter, prior to commencing the application process, the court should ensure that the clerk of the court has the resources for and is otherwise prepared for the inundation of filings that accompany the MDL generally and the appointment process in particular. Transferee judges note that courts should consider the extent to which counsel from outside the jurisdiction may be filing, because those attorneys often have issues with electronic filing and login credentials, court-specific filing procedures, and pro hac vice requirements.

---

[115] *Managing Multidistrict Litigation in Products Liability Cases* § 3(b).

[116] Preliminary Order on Practice and Procedure Upon Transfer Pursuant to 28 U.S.C. § 1407(a) at 2-3, *In re Monsanto Company Genetically-Engineered Wheat Litigation,* MDL 2473, No. 1:13-md-02473-KHV-KMH (D. Kan. Feb. 3, 2014) (ECF No. 11).

[117] Pretrial Order No. 1 (Practice and Procedure Order Upon Transfer Pursuant to 28 U.S.C. § 1407(a)) at 4, *In re ConAgra Peanut Butter Products Liability Litigation*, MDL 1845, No. 1:07-md-01845-TWT (N.D. Ga. Aug. 10, 2007) (ECF No. 20).

[118] *See generally* Judicial Panel on Multidistrict Litigation & Federal Judicial Center, *Ten Steps to Better Case Management: A Guide for Multidistrict Litigation Transferee Court Clerks* (2d ed. 2014).

BEST PRACTICE 3A(iii): At this stage, the transferee judge should consider appointing an interim liaison counsel[119] or encourage counsel to select a proposed liaison counsel prior to the conference, although the formal appointment will be subject to court approval.[120]

The conference gives the transferee judge an opportunity to observe counsel's demeanor and professionalism, get a sense of their leadership qualities, and assess the level of cooperation among counsel. The judge can solicit proposals for the appropriate leadership structure for the litigation and obtain input from counsel about the key substantive and procedural issues that may arise in the course of the litigation, which may impact the type of leadership roles that will be necessary.

One approach some judges have taken is to appoint leadership for a one-year term. While the transferee judge always has the power to add, rescind, or otherwise modify an appointment, a one-year appointment forewarns counsel that if they do not diligently perform their tasks, their appointment will not be renewed. Some judges recommend continuing with annual appointments, while others suggest that after the first year the attorneys' "true colors" have appeared and work habits have developed sufficiently that the enhanced certainty of a standing appointment is preferable.

But others have expressed the view that a longer interim appointment, followed by the usual standing appointment is preferable. Proponents of this approach argue that it takes the judge, and even counsel to a certain extent, months to understand the dynamics within the cases sufficiently well to understand what blocks of plaintiff interests exist. Delaying the appointment process can be helpful in assuring that the various interest groups are each represented. This allows the court to better ensure that not only those structural conflicts requiring separate counsel are represented, but that less serious but equally meaningful conflicts are represented ─ and in turn that any settlement is more likely to fairly and adequately compensate all plaintiffs.

In underscoring these different approaches, the goal is not only to present two potential ways of timing the appointment of counsel, but to identify the underlying normative challenges that transferee judges are attempting to address in their selection. As a result, the hope is that a transferee judge will be able to assess the needs of the particular MDL, including how mature or advanced the cases within the MDL are, and select an appointment structure that in the context of that MDL will maximize the extent to which all plaintiffs have a voice at the table and that appointed counsel are incentivized to offer exemplary representation to those individuals.

---

[119] Pretrial Order No. 1 at 2, *In re Oral Sodium Phosphate Solution-Based Products Liability Action*, MDL 2066, No. 1:09-SP-80000 (N.D. Ohio July 16, 2009) (ECF No. 12).

[120] Initial Case Management Order at 5-6, *In re Lidoderm Antitrust Litigation*, MDL 2521, No. 3:14-md-2521-WHO (N.D. Cal. Apr. 25, 2014) (ECF No. 21); *Managing Multidistrict Litigation in Products Liability Cases* § 4.

BEST PRACTICE 3B:  Following the conference, the transferee judge should issue an order describing the leadership structure, the procedures for counsel to follow if they intend to seek appointment to any of the roles identified in the order, and the criteria that the transferee judge intends to use in selecting counsel to fill the roles.[121]

Historically, private ordering has been the predominant form of appointment and selection, with lawyers agreeing to who should be appointed lead counsel and to committees and presenting a "slate" of lawyers to the court for consideration.[122]  However, in recent years, some scholars and many transferee judges have begun to question the results of the private-ordering process.[123]  Judges have complained that as leadership appointments have increasingly become the path to substantial common benefit fund awards, the monetary stakes of appointment have generated substantial dysfunction in the incentives of counsel, leading to competitive behaviors that may not result in the appointment of the best possible counsel.

In light of these concerns, many within the MDL community have begun to press for checks by the transferee judges to correct for these systemic misalignments.  Many transferee judges ─ and even those who have in the past used the private-ordering process ─ expressed the view that they now see the appointment of counsel as selecting a fiduciary for the class, which will substantially impact the course of the litigation.  Thus, while valuing private ordering and the input of the other plaintiffs' attorneys, there is increasing support for the view that the transferee judge should treat the lawyers' self-selection as one of many considerations in selecting the best leadership team possible.

Some courts still prefer that counsel endeavor to organize a leadership structure themselves; this may take the form of a proposed leadership slate for the court's review and approval with the opportunity for objections.[124]  But most courts now insist on a competitive process and require individual applications.

Whatever approach the judge chooses, the court's expectations should be made clear early in the process so that counsel understand them.  In selecting a selection mechanism and in turn appointing a leadership team, courts should be mindful of the benefits of diversity of all types.  In particular, the strong repeat player dynamic that has historically existed reduces fresh outlooks and innovative ideas, and increases pressure to go along with the group and conform, all of which may negatively impact the plaintiffs whose cases are being pursued in the MDL.  At the same time, leadership needs repeat players who understand the ropes.  Thus a balanced team, with diversity of skills, expertise, prior casework and role, and demographics, should be sought.

---

[121] Pretrial Order No. 1 at 12-14, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010, MDL 2179, No. 2:10-md-02179-CJB-SS (E.D. La. August 10, 2010) (ECF No. 2).

[122] *See MCL* § 21.272.

[123] Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*, N.Y.U. L. REV. (forthcoming 2015) (draft at 25-27), available at http://ssrn.com/abstract=2437853; Jaime Dodge, *[forthcoming Emory cite]*.

[124] *Managing Multidistrict Litigation in Products Liability Cases* § 4(a); *see also* Procedural Order at 3, *In re Neurografix ('360) Patent Litigation*, MDL 2432, No. 13-md-02432-RGS (D. Mass. Apr. 5, 2013) (ECF No. 3).

BEST PRACTICE 3B(i): The transferee judge should set a schedule that will ensure that leadership is in place within three to four months after the creation of the MDL, or even sooner, to avoid unnecessary delay in proceeding with litigation of the case.

BEST PRACTICE 3C: The judge's primary responsibility in the selection process is to ensure that the lawyers appointed to leadership positions are capable and experienced and that they will responsibly and fairly represent all plaintiffs, keeping in mind the benefits of diversity of experience, skills, and backgrounds.[125]

BEST PRACTICE 3C(i): The transferee judge should develop a straightforward and efficient process for counsel to apply for appointment. The process should reflect the need to avoid unnecessary divisiveness, while encouraging professionalism and honesty. The description of the application and selection process should be filed in the public docket in a manner that provides timely notice to all who may be interested in applying.

The selection process will require the transferee judge to consider the qualifications of each individual applicant, as well as the litigation needs, the different skills and experience that each of the lawyers seeking appointment will bring to the role, and how the lawyers will complement one another. The goal is to establish a diverse team capable of working together to efficiently manage a highly complex proceeding. Moreover, transferee judges repeatedly suggested that they found that those counsel who lacked ego or the ability to "strut" were often incredibly value team members, able to move the MDL to resolution through a combination of leadership, political savvy, and communication skills.

BEST PRACTICE 3C(ii): Counsel should submit written applications that describe their qualifications to serve in the positions they seek to fill.

The applications do not need to be lengthy, but they should all include the same information to facilitate comparison.[126] For an MDL involving class actions, counsel should address the considerations for appointment of interim class counsel set forth in Federal Rule of Civil Procedure 23(g).[127] If the class action involves federal securities claims, counsel must follow the procedures for the appointment of a lead plaintiff outlined by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3).

Some courts prefer to use traditional motion practice, with an opening brief, an opposition, and a reply. Some courts make their selections based on single submissions from counsel to streamline the process and avoid ad hominem attacks. Other courts find it helpful for counsel to file short responsive briefs explaining why they should be appointed over other applicants for the same position.

---

[125] *MCL* § 10.22.

[126] Professor Samuel Issacharoff & Hon. R. David Proctor, *Selection and Compensation of Counsel in Multi-District Litigation* at 17 (2012 Transferee Judges Conference Oct. 23, 2012) (on file with author).

[127] Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges* 7-8 (Federal Judicial Center, 3d ed. 2010).

BEST PRACTICE 3C(iii):  The transferee judge should direct counsel to identify cases in which they have served in a similar leadership capacity, describe their experience in managing complex litigation and their knowledge of the subject matter, and provide information about the resources they have available to contribute to the litigation.[128]

The transferee judge should strongly consider requiring applicants to identify ongoing professional commitments such as other lead-counsel appointments that will compete for their attention and resources, because some courts have found that prominent attorneys may obtain an appointment and then delegate their principal duties to subordinates.  In large and mass-tort MDLs, counsel should offer some background on their clients, including where the clients are located and the law that will govern their claims,[129] and offer a plan for keeping other plaintiffs' counsel updated on developments as the case progresses.

In addition to reviewing the submitted applications, there are many ways for a judge to learn more about the individuals who are vying for appointment.  Judicial colleagues ─ and more recently special masters ─ are a valuable source of information for a transferee judge about the competence and professionalism of counsel who have appeared before them.[130]  The transferee judge may want to require applicants to provide the names of judges and special masters who are familiar with their work in other MDL cases for this purpose.

BEST PRACTICE 3C(iv): In appropriate cases, the transferee judge should conduct interviews of counsel (on the record during an in-court hearing) that have submitted applications for leadership positions, in order to assess the applicants' demeanor and skills.[131]

The value of viewing counsel in a courtroom setting to see how they comport themselves and relate to each other and court staff, and of allowing the judge to inquire about concerns specific to the litigation, is a relatively contentious subject.  Many judges are of the opinion that it is very helpful to see the candidates, particularly those who have not appeared before the court before.  They state that the appearance is but one of many datapoints, but an important one.  Some attorneys express concern that these appearances favor those attorneys whose specialty is in-court appearances, such as motion practice or trial specialists.  But judges who use this approach indicate that they still look to create a team that possesses all of the skills necessary to the litigation, and that the appearance is simply helpful in assessing the in-court skills of those who will be involved in trial or motion practice.  For attorneys who work behind the scenes, these judges will still observe their interactions with other counsel, but will also use the opportunity to inquire about particular areas of concern and substantive skills, putting less weight

---

[128] *MCL* § 22.62.

[129] Order at 2, *In re Actos (Pioglitazone) Products Liability Litigation,* MDL 2299, No. 6:11-md-02299-RFD-PJH (W.D. La. Feb. 13, 2012) (ECF No. 32).

[130] *Ten Steps to Better Case Management* at 2; *see also* Hon. Stanwood R. Duval, Jr., *Considerations in Choosing Counsel for Multidistrict Litigation Cases and Mass Tort Cases*, 74 La. L. Rev. 391, 394 (Winter 2014).

[131] Case Management Order Number 1: Initial Conference Order and Procedural Matters at 14, *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, MDL 2385, No. 3:12-md-02385-DRH-SCW (S.D. Ill. Aug. 17, 2012) (ECF No. 4).

on "star-quality."  Some transferee judges have also suggested that the in-person interview helps them assess potential new entrants, whether by identifying which new entrants who have applied are ready for a first appointment or by pressing repeat players for information about junior partners who may bring unique skills and diversity to the MDL.

In questioning applicants, many counsel suggest exploring the assertions made by counsel in their application.  For example, sometimes counsel are listed on complaints with a large number of other firms in order to pool clients and allow each to appear to have a larger number of cases.

Another common complaint involves counsel who are already serving in a number of other MDLs, raising questions among other plaintiffs' counsel about whether those individuals can "really" be actively involved in the leadership of that many cases — or will instead be delegating work to junior partners because they are spread too thin to be heavily involved in each case.  This is not to say that there is no value to be added by a "heavyweight"; rather, it is to say that the transferee judge should know what the individual will contribute in order to ensure a properly well-rounded team.  It may also be that by asking the question, the judge finds that the apparent conflict does not exist — for example, the other cases do not require a significant time commitment (i.e., have settled) or are related cases that raise similar issues or involve the same defendant and counsel (and thus would bring unique value to leadership).  The suggestion here is simply that the judge look beyond the face of the application, asking hard questions about the individual's contributions to the team in order to get the most accurate picture possible of the ways the team will come together.

Finally, a number of attorneys also suggested that judges ask more questions about financing.  While the ability of an attorney to meet his or her assessment has always been a concern, with new finance mechanisms emerging some attorneys believe that there is a greater need to explore how the attorney will finance the litigation.  The concern is not with whether an attorney has a cash reserve or is instead using a credit line, but with mechanisms for funding in which the funder has a voice in the litigation process, the litigation costs, or settlement sign-off.  Some attorneys see the potential for the development of an undisclosed principal/agent problem in the years to come.

Some judges also informally accept input from defense counsel since they often face the same plaintiffs' lawyers in multiple cases; however, judges should be appropriately skeptical in assessing defense counsel's opinions.  The transferee judge may also appoint lead and liaison counsel first, and then request that they submit a proposal for the membership of any committees the judge has determined will be necessary.[132]

---

[132] Order No. 4, *In re Mirena IUD Products Liability Litigation*, MDL 2434, No. 7:13-md-02434-CS-LMS (S.D.N.Y. May 22, 2013) (ECF No. 103).

BEST PRACTICE 3C(v): The transferee judge should ensure that the selection process is as transparent as possible by providing a general statement of the goals and considerations that guided the selection.

Transparency in the selection process is essential. There is often intense competition among counsel for appointment. Not only do lawyers have legitimate concerns about whether their clients' interests will be adequately represented and whether the litigation will be handled effectively, there is usually a direct correlation between a leadership position and compensation.[133] Leadership roles also confer prestige and experience, can increase the lawyer's chance of future appointments, and may help attract future clients.[134] Because the attorneys designated will be responsible for representing the interests of numerous parties who did not select them as counsel, articulating the basis for the appointments will help instill confidence in their leadership.

Requiring applicants to file their applications in the public docket, rather than submitting them in camera, will encourage professionalism and honesty and avoid the appearance of unfairness. Sensitive information, such as counsel's ability to assist with financing the litigation, may be submitted in camera. Some courts find that the interest in allowing for candid discourse with the court and avoiding the creation of ill will and hostile competition favor in camera submissions. If the transferee judge is not familiar with the attorneys who are seeking appointment, a hearing will usually be informative.[135] When there is little or no competition, it may be appropriate to make appointments without a hearing. There is no single right approach. The judge need only ensure all interested and qualified attorneys have had an opportunity to apply and that the judge has enough information to make an informed decision.

BEST PRACTICE 3C(vi): Even if counsel are able to agree upon a leadership structure themselves, the transferee judge should establish a procedure for the selected lawyers to submit written applications to ensure that they are qualified to lead the litigation.[136]

Although private ordering among counsel can streamline the selection process, it may be susceptible to abuse. For example, a proposed leadership group may include members who are not fully committed to the litigation but are included because their resumes make the group's application more appealing. Counsel may have also entered into improper arrangements to secure a leadership position.[137] The proposed leadership team may exclude lawyers who would bring useful skills or new perspectives to the litigation. The judge will therefore still need to take an active role in the formal appointment process.[138] Courts have a fundamental obligation to ensure that the proceedings will be fairly and efficiently conducted, regardless of the private arrangements among the parties. Independent review will ensure the integrity of the leadership

---

[133] Issacharoff & Proctor, *supra*, note 111, at 3.

[134] *Id.* at 4.

[135] *Id.* at 23; *Managing Multidistrict Litigation in Products Liability Cases* § 4(a).

[136] *MCL* § 22.62; *Managing Multidistrict Litigation in Products Liability Cases* § 4(a); Order No. 2, *In re Mirena IUD Products Liability Litigation*, MDL 2434, No. 7:13-md-02434-CS-LMS (S.D.N.Y. May 3, 2013) (ECF No. 65).

[137] *MCL* § 22.62.

[138] *See* Issacharoff & Proctor, *supra* note 111, at 15.

structure and prevent difficulties that could arise later in the litigation if self-appointed counsel become unwilling or unable to perform their duties or incur excessive fees and costs.[139]

> **GUIDELINE 4:** As a general rule, the transferee judge should ensure that the lawyers appointed to the leadership team are effective managers in addition to being conscientious advocates.

In selecting counsel, different factors may be more important depending on the nature of the litigation. Appointing lawyers with diverse perspectives and experience will create a well-rounded and effective team. At least some of the lawyers the transferee judge appoints should have past experience in leading multidistrict litigation. However, lawyers with a history of impressive positions may have spent more time seeking appointments than doing the actual work in the case. Assessing counsels' commitment to the litigation, their past management successes, and their ability to marshal the resources necessary to effectively prosecute the claims are therefore crucial aspects of the selection process.

> **BEST PRACTICE 4A:** In the order appointing counsel, the transferee judge should clearly define the role and responsibilities of each appointed individual within the leadership structure.

The *Manual for Complex Litigation* provides a sample order that outlines the responsibilities of lead and liaison counsel for the plaintiffs and liaison counsel for the defendants.[140] The sample order includes the appointment of a plaintiffs' steering committee but does not allocate any specific responsibilities to its members, instead directing that the members "shall from time to time consult with plaintiffs' lead and liaison counsel in coordinating plaintiffs' pretrial activities and preparing for trial."[141] Since the role that committee members play can be somewhat fluid depending on the course of the litigation, it is usually appropriate to simply note that the committee will assist lead counsel as directed and leave it to lead counsel to assign specific tasks to committee members as they become necessary.[142]

> **BEST PRACTICE 4B:** The transferee judge should appoint lead counsel who have excellent management skills.

The need for lead counsel to have excellent management skills cannot be overstated. Lead counsel must be able to manage a large, complex litigation involving numerous parties with potentially divergent interests. Some lawyers are high-profile litigators or experienced trial attorneys but ineffective leaders. It is critical to appoint individuals who have the proven ability to perform the administrative tasks necessary to effectively manage all of the moving parts of the case. They must also be team players who can work cooperatively with colleagues, opposing

---

[139] *MCL* § 10.224; *Managing Multidistrict Litigation in Products Liability Cases* § 4(a).
[140] *See MCL* § 40.22 (Sample Order re: Responsibilities of Designated Counsel); *see also id.* at § 10.221 (describing the typical roles of liaison counsel, lead counsel, and committees).
[141] *Id.* § 40.22.
[142] *Id.* § 10.222.

counsel, and the court.[143]  Keeping all lawyers involved in the litigation informed of developments in the case can be a demanding task, particularly in large and mass-tort MDLs, and lead and liaison counsel must therefore have excellent communication skills and a strong work ethic.[144]

> BEST PRACTICE 4C: The transferee judge should appoint committee members who have some demonstrated leadership ability because they too must communicate and establish effective working relationships with numerous other lawyers.[145]

Political, personal, and economic differences among counsel can easily disrupt the proceedings.[146]

> BEST PRACTICE 4C(i):  It is essential that the transferee judge appoint a leadership team that is composed of lawyers with a demonstrated track record of successfully working with others, building consensus, and amicably managing disagreements. The transferee judge should be mindful of the importance of harmony among the leadership team, and between the leadership team and both the court and opposing counsel.

> BEST PRACTICE 4C(ii): The transferee judge should appoint lead counsel who are sufficiently experienced and respected to manage multidistrict litigation.

Lead counsel should have prior experience in managing multidistrict and other complex litigation or have demonstrated sufficient skill and experience to manage a complex proceeding. While it may be helpful for committee members to also have some multidistrict litigation experience, they may have other skills or experience that are equally valuable to the litigation, such as class-action expertise, prior litigation of the same claims, experience with federal practice and procedure, electronic discovery, or brief-writing skills.[147]  Each case requires different talents, and new attorneys may bring fresh perspectives to the litigation.[148]

> BEST PRACTICE 4C(iii):  The transferee judge may take into account whether counsel applying for leadership roles have worked together in other cases, their ability to collaborate in the past, divide work, avoid duplication, and manage costs.

The selection of lawyers who have worked together previously may be desirable, in that they have already developed a working relationship and are both to a certain extent vouching for one another.  Moreover, they may have already developed certain systems for handling workflow and comparative advantages that will help expedite the case relative to a leadership committee working together for the first time.  Judges should also be attuned to the potential for negative repeat player dynamics to develop, however.  In considering an application by counsel who have

---

[143] Duval, *supra* note 115, at 392.
[144] *Id.* at 394.
[145] *MCL* § 10.21.
[146] *Ten Steps to Better Case Management* at 3.
[147] Issacharoff & Proctor, *supra* note 111, at 10, 24.
[148] *Id.* at 24; *Managing Multidistrict Litigation in Products Liability Cases* § 4(a); *see also* Duval, *supra* note 115, at 392-93.

previously worked together, the judge may wish to solicit the input of previous MDL judges the proposed counsel appeared before.  The judge should also consider the degree to which each of the counsel has individually been involved in the case in a meaningful way, as well as the risk they will form a coalition that minimizes the input or assignments given to other attorneys, or otherwise wield power in a way that is not most favorable to the plaintiffs as a whole or to other plaintiffs' lawyers.  Counsel may also have developed personal and professional conflicts and antagonisms with other lawyers that would compromise their abilities to effectively manage or contribute to the present litigation, which should be considered in selection.[149]

> BEST PRACTICE 4D: The transferee judge should appoint counsel who have the commitment and resources to effectively serve in the leadership role for which they are selected.  The judge should confirm that the leadership team as a whole will be able to effectively handle the demands of the litigation.[150]

> BEST PRACTICE 4D(i):  The transferee judge should recognize the practical reality that the leadership team may need to finance the litigation but should not allow it to overshadow the need to appoint a functional and diverse team.

In many MDLs the leadership team bears the financial burden of funding the litigation. This burden can be significant in cases that take several years to reach trial or resolution or that involve a great deal of expert work.  Financial resources should not be the primary reason for this decision, however.

> BEST PRACTICE 4D(ii):  In making its selection decision, the transferee judge should consider the other demands on the applicants' time, including the number of other MDLs in which they are serving in leadership positions.

Multidistrict litigation requires consistent and dedicated oversight and management, and those serving in leadership roles must be able and willing to make the litigation a priority throughout the course of the proceedings.  While some lawyers have many other lawyers and staff members available in their firms, that fact alone does not ensure that they will be able to devote the necessary time and energy to the litigation.  Even lawyers with significant resources at their disposal can overextend themselves.

> BEST PRACTICE 4D(iii):  The transferee judge should consider the number, type, and nature of the applicant's cases in mass tort and common disaster litigation.

Although, as a practical matter, it may be difficult to accurately ascertain the strength of the applicant's cases early in the litigation, lawyers with cases of significant value (whether because of the number, type, or quality of cases) will have a significant incentive to prosecute the litigation as vigorously as possible.  The transferee judge may also consider the location of the applicant's clients because creating a leadership group that represents clients with claims in a variety of states will ensure that the differing interests are adequately represented and that unique state law issues are being given the requisite attention.  Caution should be exercised when

---

[149] *MCL* § 10.224.
[150] Issacharoff & Proctor, *supra* note 111, at 12.

assessing this factor, however, as it could incentivize lawyers to prematurely file cases in multiple jurisdictions.[151]  Also, the most experienced and effective lawyers may not have the largest number of cases.

> BEST PRACTICE 4D(iv): The transferee judge should inquire as to whether an applicant has a significant number of cases pending in related state litigation and the applicant's views about the effective coordination of those cases with the MDL proceedings.

Substantial state and federal cases have raised a concern for some judges that the applicant will have to split its attention and resources between the federal and state proceedings. But there are advantages as well, which transferee judges at times underestimate.  For example, an applicant with a number of state cases could be a good candidate to serve as a liaison with the state litigation or on a settlement committee.  Thus, the transferee judge should inquire about the nature and extent of the counsel's state litigation commitments and counsel's view on the effective coordination of the state and federal proceedings, then make an individualized assessment about whether the attorneys' participation will aid or detract from the MDL proceeding.

> BEST PRACTICE 4E:  The transferee judge should take into account whether the leadership team adequately reflects the diversity of legal talent available and the requirements of the case.[152]

Mass-tort MDL cases affect a large and diverse group of people, and ensuring diversity in the leadership of the cases will enhance public trust in the courts and will improve the likelihood of consideration of diverse ideas and perspectives that MDLs require. Litigants and the civil justice system benefit from the diversity of leadership.[153]  Indeed, the same way that diversity improves companies' bottom lines, litigants and the civil justice system benefit from diversity of leadership.[154]  Yet historically, women and minority lawyers have not been appointed to leadership positions at rates proportionate to their representation in the plaintiffs' bar generally. It cannot be said that there are not enough talented individuals with the education, background and experience to effectively lead MDL litigation to permit greater diversity.[155]

---

[151] *Id.* at 18; *see also* Duval, *supra* note 115, at 393-94.

[152] *See* Duval, *supra* note 115, at 393.

[153] *See, e.g.,* Katherine W. Phillips, *How Diversity Makes Us Smarter*, SCIENTIFIC AMERICAN (Sept. 16, 2014), available at: http://www.scientificamerican.com/article/how-diversity-makes-us-smarter/.

[154] *See, e.g.,* Katherine W. Phillips, *How Diversity Makes Us Smarter*, SCIENTIFIC AMERICAN (Sept. 16, 2014) available at: http://www.scientificamerican.com/article/how-diversity-makes-us-smarter/.

[155] *See, generally,* Jaime Dodge, *Facilitating Judging: Organizational Design in Mass-Multidistrict Litigation*, 64 EMORY L.J. ___ (2014) (noting the "deep bench" of qualified, MDL attorneys but presenting empirical data showing a continuing gender gap in appointments); *see also* Elizabeth J. Cabraser, *Where Are All the Women in the Courtroom*?, Feb. 28, 2014, available at http://www.liefcabraser.com/blog/2014/02/where-are-all-the-women-in-the-courtroom.shtml (noting anecdotally a persistent gender gap in representation, despite outstanding outcomes obtained by female attorneys in recent MDL cases).

Repeat player dynamics continue to persist, restricting diversity across MDL leadership.[156]  Research shows that having a mix of experienced and new players enhances creativity and innovation, leads to better decisionmaking and problem solving, and promotes discussion of novel concepts raised by those who historically have not been in leadership.[157]

Whatever application process is used, the court should bear in mind the value of diversity of all types as a component of obtaining the best possible representation for plaintiffs.  Judges should seek to appoint a diverse group, with respect to not only prior experience and skills, but also gender, race and national origin, age, and sexual orientation. Counsel may in turn consider this in deciding not only which individuals from the firm should seek appointment, but also ─ to the extent slates are still utilized ─ in selecting the slate.

In addition to demographic diversity, the judge should be mindful of creating a team with diversity of experience, balancing the benefits of selecting leadership members who have worked well together in the past with the benefits of having a leadership team that brings different experiences that can be brought to bear in the litigation.  The judge should also seek to ensure a variety of skill sets within the leadership team and the need for heightened financial resources in the executive committee.

Given the lack of commonality requirements in MDLs that are not class actions, substantially different claims may all be included in the same MDL.  In these cases, particularly when there are significant differences among identifiable groups of plaintiffs, the judge should ensure that the leadership is comprised of attorneys that reflect these variations in claims.[158]  In multidistrict litigation that is likely to involve the application of multiple states' laws, geographic diversity may be an important consideration as well.

By taking early control of the process through which counsel are appointed to leadership positions and clearly communicating the criteria for appointment, the court can ensure that composition of the plaintiffs' leadership team reflects the needs of the case and the available talent from a diverse pool.  The court should ensure that slates or, later in the litigation, formation of committees or allocation of work assignments, do not lead to the exclusion of attorneys who bring valuable skills, resources, or perspectives to the litigation.

---

[156] Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*, N.Y.U. L. REV. (forthcoming 2015) (draft at 25-27), available at http://ssrn.com/abstract=2437853 presenting empirical study of repeat players in MDLs and noting gender gap within those repeat players); Jaime Dodge, *Facilitating Judging: Organizational Design in Mass-Multidistrict Litigation*, 64 EMORY L.J. ___ (2014) (presenting empirical data on PEC, PSC, and defense-side appointments, and noting a persistent but narrowing gender gap).

[157] Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*, N.Y.U. L. REV. (forthcoming 2015) (draft at 25-27), available at http://ssrn.com/abstract=2437853.

[158] See generally ALI, *Principles of the Law of Aggregate Litigation*, section 2.07 (describing structural conflicts necessitating judicial intervention).  *See also* Roger H. Transgrud, *Aggregate Litigation Reconsidered*, 79 GEORGE WASHINGTON L. REV. 293, 303-05 (summarizing debate around structural conflicts of interest between plaintiffs).

BEST PRACTICE 4F:  Attorneys seeking to serve in leadership positions may have entered into financial arrangements that could raise conflicts of interest.  The transferee judge should guard against the possible negative implications of these types of agreements among counsel.

Side agreements regarding leadership positions or the apportionment of fees can affect how appointed counsel conduct themselves during the litigation and the positions they take.[159]  Before appointing counsel to a leadership role, the transferee judge may want to direct the applicants to disclose any financial arrangements they have with other counsel to ensure that the appointments are appropriate and will not give rise to conflicts of interest or otherwise negatively impact the litigation.[160]

BEST PRACTICE 4G:  The transferee judge should create a process at the outset of the case for the contemporaneous submission and review of all counsels' time and expenses.

Periodic review of time records will allow lead counsel and the transferee judge to monitor the cost of the litigation, identify and eliminate unreasonable billing practices, and, if necessary, establish a budget for the litigation.[161]  The time records should include descriptions of the work performed, the hourly billing rate for each attorney and staff member, and any expenses incurred.[162]  The transferee judge can either direct lead counsel to submit a proposed process for monitoring and approving time records and expenses or outline a procedure for counsel to follow.[163]  The court may choose to task lead counsel, liaison counsel, or a designated committee member with collecting and reviewing the time records for all counsel on a monthly or quarterly basis. [164]

In large and mass-tort MDLs, some courts find it helpful to appoint a CPA early in the litigation to assist the committee with tracking fees and costs,[165] while other courts in large-scale MDL cases appoint a special master or magistrate judge to the role.  Doing so helps to ensure that lawyers who are submitting fees and costs use an agreed-upon submission process and remain updated on the financial picture of the litigation and the standards used for approving fees and costs.  If the fees and expenses are being approved or disapproved rather than merely

---

[159] *MCL* §§ 10.224, 22.62; *see also In re Fine Paper Antitrust Litig.*, 98 F.R.D. 48, 70-76 (E.D. Pa. 1983) (describing agreements to influence the organizational structure of the leadership team that resulted in rampant inefficiency and overbilling), *aff'd in part, rev'd in part*, 751 F.2d 562 (3d Cir. 1984).

[160] Issacharoff & Proctor, *supra* note 111, at 16; *see also* Order Setting Initial Conference at 11, *In re Nexium (Esomeprazole) Products Liability Litigation*, MDL 2404, No. 2:12-ml-02404-DSF-SS (C.D. Cal. Jan. 23, 2013) (ECF No. 4) (requiring "full disclosure of all agreements and understandings between or among counsel (whether formal or informal, documented and undocumented" to "consider whether such arrangements are fair, reasonable, and efficient").

[161] *MCL* § 14.214.

[162] Pretrial Order No. 9, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010, MDL 2179, No. 2:10-md-02179-CJB-SS (E.D. La. Oct. 8, 2010) (ECF No. 508).

[163] *See id.* at 2-3.

[164] *MCL* § 40.23 (Sample Order re: Attorneys' Time and Expense Records).

[165] Case Management Order No. 10 Appointing Accounting Firm, *In re Effexor (Venlafaxine Hydrochloride) Products Liability Litigation*, MDL 2458, No. 2:13-md-02458-CMR (E.D. Pa. June 4, 2014) (ECF No. 112).

collected and reviewed, the court may also want to incorporate a secondary review by a special master or magistrate judge to ensure fairness. Many courts require counsel to submit the time records or reports summarizing the fees and expenses to the court on a periodic basis, though it is important to guard against the communication of litigation strategy to the court or defense counsel. The *Manual for Complex Litigation* provides a sample order.[166]

> BEST PRACTICE 4H: In large and mass-tort MDLs, the transferee judge should encourage the leadership team to provide work for the common benefit of the cases to other attorneys who are qualified and available to perform the work, unless doing so would create inefficiency in the prosecution of the claims. The transferee judge should inform the leadership team at the outset if it does not want them to assign work to other counsel.

In most cases, courts expressly authorize other counsel to perform work on the case so long as the work has been assigned and is supervised by lead counsel. Even though they are not part of the leadership structure, additional plaintiffs' counsel can bring different and necessary skills and experience to the litigation and provide the support the leadership team needs to accomplish all the required tasks in the case. At the same time, lead counsel must ensure that distributing work does not lead to inefficiency and unnecessary expense. The number of attorneys participating should not be disproportionate to the needs of the case.

> *Best Practice* 4H(i): The transferee judge should inform the leadership team that the roles and primary responsibilities of lead counsel, liaison counsel, and committee members should not be delegated to other attorneys without prior permission of the court.

Many courts include a provision in the order appointing counsel instructing that leadership appointments are of a personal nature and that other lawyers, including those in the appointed lawyers' law firms, may not perform the key functions assigned to the appointed lawyers without court approval.[167] It is appropriate for the members of the leadership team to draw on the skills and experience of others in their firm in performing certain aspects of their roles, and they may and should delegate some responsibility for the day-to-day tasks to their colleagues. These tasks may include conducting or overseeing facets of offensive or defensive discovery, performing legal research, drafting motions, and working with experts. The appointed attorney must, however, remain ultimately responsible for and participate actively in the ongoing prosecution of the case, direct strategy, and communicate and coordinate with the other members of the leadership team.

---

[166] *MCL* § 40.23.
[167] Case Management Order No. 6 at 3, *In re Effexor (Venlafaxine Hydrochloride) Products Liability Litigation*, MDL 2458, No. 2:13-md-02458-CMR (E.D. Pa. Oct. 31, 2013) (ECF No. 33).

BEST PRACTICE 4I: The transferee judge should direct the leadership team to implement a process for communicating key events, deadlines, and other important information to all plaintiffs' counsel.

The leadership team is responsible for keeping all counsel apprised of developments in the litigation. The judge may want to include a process for doing so in a case management order to ensure that all counsel are aware of the procedures that have been adopted. In smaller MDLs the process can be informal, but in large and mass-tort MDLs, in particular, a more formal process is usually necessary. The litigation team may assign the responsibility for communicating updates to liaison counsel or to a particular committee member, or it may assign each committee member a group of attorneys to keep updated.

BEST PRACTICE 4J: The transferee judge should create a process for receiving regular input from the leadership team and ensuring that the litigation is progressing in an effective and efficient manner.

Many courts hold regularly scheduled status conferences for this purpose, often requiring the members of the leadership team to attend, including trial counsel once trial is imminent or underway.[168] The judge may want to instruct counsel for both sides to meet in advance of the conference and submit an agenda and status conference report a few days before the conference.[169] The conferences will allow the judge to keep track of discovery, motion practice, and any unexpected developments and ensure that the litigation is not subject to unnecessary delays.[170] The judge will also be able to confirm that the leadership structure is working properly and assess whether any new members should be appointed.

Holding these conferences in open court and having a court reporter present to record scheduling changes or substantive discussions and rulings will promote transparency. Some courts allow counsel that are not part of the leadership team to participate by telephone, using a teleconference system that restricts participation to those who have obtained preapproval to speak. Sometimes informal off-the-record conferences are more productive, and one option is to combine the two by holding a short off-the-record meeting with lead and liaison counsel before the monthly conference in open court.[171] The transferee judge may also wish to allow for a "blind" (but not anonymous) process for providing written comments, perhaps initially screened by a special master or magistrate judge before bringing any issues and possible changes to the court's attention.

---

[168] *Managing Multidistrict Litigation in Products Liability Cases* § 3(b); *see also In re Vioxx*, 760 F. Supp. 2d at 643 (noting that the court held monthly status conferences in open court and posted notices and transcripts of the conferences on a website dedicated to the litigation).

[169] Managing Multidistrict Litigation in Products Liability Cases § 3(b); *see also* Case Management Order No. 1 at 10, *In re Atlas Roofing Corporation Chalet Shingle Products Liability Litigation*, MDL 2495, No. 1:13-md-02495-TWT (N.D. Ga. Jan. 16, 2014) (ECF No. 15).

[170] Duval, *supra* note 115, at 394-95.

[171] *Managing Multidistrict Litigation in Products Liability Cases* § 3(b).

BEST PRACTICE 4K: The transferee judge should not hesitate to reconstitute the leadership team if it becomes necessary.

The transferee judge should make sure that the appointed lawyers are the ones doing the work, that they are giving appropriate consideration to managing the case efficiently, and that they are using fair and reasonable methods for assigning and assimilating work.[172]  Some courts appoint members of the leadership team for limited terms, requiring them to reapply, along with any new applicants, on an annual basis.[173]  This approach helps to ensure that they continue to fulfill their duties and offers an established procedure for replacing those who do not.[174]  The transferee judge may also want to require lawyers seeking reappointment to provide their time records for their work on the case and identify the specific tasks they have performed over the prior year.[175]  Requiring counsel to reapply on an annual basis may be more disruptive than beneficial in some cases, and other procedures, like holding regular status conferences, can be implemented to achieve the same accountability.  By staying closely attuned to the progress of the litigation, the judge will be able to address problems as they arise.

---

[172] Issacharoff & Proctor, *supra* note 111, at 14, 15.

[173] *Managing Multidistrict Litigation in Products Liability Cases* § 4(a); *see also* Pretrial Order No. 8 at 2, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010, MDL 2179, No. 2:10-md-02179-CJB-SS (E.D. La. Oct. 8, 2010) (ECF No. 506).

[174] Issacharoff & Proctor, *supra* note 111, at 14.

[175] Duval, *supra* note 115, at 393; *see also* Case Management Order Number 4: Appointing Plaintiffs' Leadership Positions at 3-4, *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, MDL 2385, No. 3:12-md-02385-DRH-SCW (S.D. Ill. Sept. 27, 2012) (ECF No. 36).

# CHAPTER 3

## LEAD COUNSEL DUTIES

A court should appoint lead counsel, liaison counsel, and plaintiffs' executive or steering committees to perform certain functions on behalf of all plaintiffs in an MDL or other similar complex, coordinated, or consolidated proceeding consistent with *Best Practice* 2D. The court must specify the existence, nature, and scope of duties that may be owed by such appointed counsel to plaintiffs in the litigation, including plaintiffs who are counsel's retained clients.

> GUIDELINE 5: Plaintiffs' lead counsel in an MDL does not have a fiduciary relationship with all plaintiffs in the case, notwithstanding a perception sometimes expressed to the contrary.

Despite contrary statements, the better view is that the authority of lead counsel, including liaison counsel and plaintiffs' executive or steering committees' members in an MDL, emanates solely from the court. MDL leadership appointments are distinguished from the typical attorney-client situation, in which the lawyer's authority arises from a formal retainer agreement between the attorney and the plaintiff.

Although reasonable attorney/client agreements may limit the scope of the lawyer's responsibility, it is ordinarily the case that the lawyer will undertake any and all actions reasonably necessary to achieve the desired results and objectives of the litigation. By contrast, in an MDL court-appointed counsel situation, lead counsel's authority—and concomitant responsibility—is often defined not in terms of the ultimate goals sought by plaintiffs, or by the law governing attorney-client relationships but only in terms of the procedural responsibilities conferred by the MDL court. These steps are generally set forth in an appointment order, which describes the services that lead counsel are asked and directed to perform.

> GUIDELINE 6: Lead counsel owes an obligation to the court to comply with all directions set out in the court's appointment order and must resolve any conflicts with obligations owed to counsel's retained clients that might otherwise interfere with lead counsel's ability to carry out the court's directions.

Ultimately, appointment of lead counsel protects the interests of the MDL plaintiffs as a whole. The primary purpose of counsels' role is to further the interests of judicial efficiency and economy for the collective benefit of those involved in the MDL. To the extent that each plaintiff has particular facts creating divergent interests, such plaintiffs are being simultaneously represented by privately-retained counsel, who remain obligated to protect their own clients' interests, diverse or not, as in any other case.[176]

---

[176] Retention of separate counsel by individual plaintiffs is an important distinction between a class action and an MDL coordinated or consolidated proceeding. The class action device generally presumes that the absent class members will not have their own independent economically viable claims and are therefore made parties to the litigation only by virtue of the class certification order, without individual representation. In class actions, the only attorneys representing absent plaintiffs' interests are Class Counsel.

Therefore, to the extent that lead counsel owes a duty or other obligation to plaintiffs whom they do not formally represent, such duties are: (1) limited to the specific actions that lead counsel is court appointed and authorized to undertake; and (2) owed, not to any one individual plaintiff, but to the common and collective interests of the plaintiffs as a whole.

BEST PRACTICE 6A: The court should delineate in its appointment order the responsibilities of lead counsel in sufficient detail for counsel to advise individually-retained clients of the duty owed to the court, which is superior to any duty owed to the individually-retained client.

Appointed counsel can play various roles, including "lead counsel," "liaison counsel," "plaintiff steering committee member," and "plaintiff's executive committee member." Each position has different responsibilities, which may impact the rights of individual plaintiff clients of the lead counsel in the MDL.

In accepting appointment, lead counsel assumes the responsibility to address and resolve any potential conflicts with their individually-retained clients. Lead counsel must meaningfully disclose to their clients how their appointment as lead counsel will impact the clients' interests. Because decisions of lead counsel take priority over the interests of an individual client, it is essential that the court's appointment order fully inform counsel of what the court expects of counsel so that counsel can advise their clients of potential issues consistent with BEST PRACTICE 2C(ii).

A lawyer's appointment as lead counsel does not excuse any conflict of interest as to his or her own clients that would otherwise be impermissible or noncompliant with the relevant rules of professional conduct and legal obligations of attorneys to their clients. Lead counsel is responsible for ensuring that obligations to the court under the appointment order can be simultaneously discharged with obligations to individually-retained clients.

BEST PRACTICE 6B: Lead counsel has a duty to perform functions affecting all plaintiffs in an MDL in a fair, honest, competent, reasonable, and responsible way.

Lead counsel has a duty to perform appointed functions in a fair, honest, competent, reasonable, and responsible way, but there is no "fiduciary" relationship with all plaintiffs in the traditional sense. The origin and nature of the relationship between lead counsel and MDL plaintiffs is judicially created, and thus differs in significant respects from common-law fiduciary relationships of agency or trust. Imposition of strict fiduciary standards to an entire MDL would be extremely burdensome for lead counsel and the court to adhere to and enforce.

Under the common law, an agency relationship is generally consensual, whereby the principal retains the right to direct and control the agent's actions, as well as power to terminate the agency. An MDL does not possess these hallmarks of traditional agency. Except for lead counsel's individually-retained clients, no underlying offer and acceptance of power of attorney or agency exists between such appointed counsel and other MDL plaintiffs. Such a relationship

is unnecessary, and would likely conflict with, that between each litigant and his or her own privately-retained attorney.

Lead counsel is ordinarily left to their good judgment and discretion in carrying out assigned tasks, and is not subject to the instruction or control of one or more of the MDL plaintiffs or their counsel. Nor does any single plaintiff, or the plaintiffs collectively, have the power to terminate lead counsel's authority to act. Only the court can alter or rescind the appointment.

Unlike privately-retained counsel, who assume as to their own clients a fiduciary relationship of trust concerning deposits, advances, and settlement proceeds, lead counsel in the typical MDL will rarely be in possession or control of plaintiff funds or other property. This remains true relative to lead counsel's litigation costs and expenses. When appointed counsel advances or incurs expenses for the common benefit of plaintiffs, appointed counsel are, at that point, simply spending their own money. Only when lead counsel seeks reimbursement is a claim made against any plaintiff funds — and such claim are almost invariably subject to court approval. MDL settlement funds are generally placed into a Qualified Settlement Fund, with an independent escrow agent, whereas most judgment or settlement proceeds are deposited into the attorney's trust account for subsequent accounting and distribution.

Finally, a strict traditional common-law duty of loyalty could not practically be imposed upon lead counsel. A fiduciary duty to hundreds or thousands (or more) of MDL plaintiffs – all with their own counsel − would create an endless series of inquiries and disputes over the extent to which potential or actual "conflicts" might exist between lead counsel, his or her retained clients and, on the other hand, every other plaintiff in the MDL. Such disputes would undermine, if not eliminate entirely, the MDL-related efficiencies and economies that justified creating the lead counsel position in the first place. A strong lead counsel role is also necessary to avoid depriving plaintiffs as a whole of the most knowledgeable, skilled, and experienced counsel and by "balkanizing" the plaintiffs into so many sub-groups that effective organization would be impossible.

> **GUIDELINE 7:** Lead counsel should not disclose information provided under a condition of confidentiality, including settlement discussions subject to confidentiality conditions, to plaintiffs or their retained counsel.

As with the duty of loyalty, it would be impractical and unwise to require lead counsel to reveal sensitive strategic concerns, confidential settlement negotiations, and other information provided under a condition of confidentiality to all plaintiffs in the litigation (or their counsel).The *Manual for Complex Litigation* explicitly recommends that lead counsel "use their judgment" in advising MDL plaintiffs and their attorneys of progress of the litigation, as "too much communication [of confidential information] may defeat the objectives of efficiency and economy." Nevertheless, lead counsel has an obligation to regularly communicate with non-lead counsel as to developments in the MDL so that non-lead counsel are properly informed and can effectively represent their respective clients.

Informational needs in complex multi-plaintiff litigation differ from single-party litigation, in at least two respects. First, in ordinary litigation, the attorney is retained to act as the plaintiff's agent, and whatever information acquired in the course of the representation "belongs" to the client. In an MDL, by contrast, lead counsel acquires information not as any particular plaintiff's agent, but because the court has directed or authorized the attorney to undertake a certain function.

Second, in a typical case, almost always the client has no interest or incentive to reveal attorney-client privileged information. An individual plaintiff divulging such confidences also does not hurt others. In an MDL, by contrast, individual litigants — and their privately-retained counsel — often, regardless of good or bad faith, perceive some advantage to themselves or a particular sub-group of plaintiffs in disseminating information more broadly.  Such information, if learned by MDL defendants, can easily prejudice plaintiffs' overall position.

Individual MDL plaintiffs, or their privately-retained counsel, frequently ask lead counsel for periodic status reports, especially disclosure of settlement negotiations. Defendants, however, typically demand confidentiality for such discussions, and will discontinue the negotiations in the event of a breach. Until a settlement is actually reached, the value of such information to individual plaintiffs is of limited utility, whereas the risks and consequences of compromise are considerable and potentially severe. All settlements ultimately negotiated by lead counsel require consent of the settling plaintiffs to be binding, and such consent will require full and transparent notice and other disclosure – but only after the negotiators have reached a deal.

When settlement confidences are compromised, for whatever reason, the consequences extend beyond the plaintiff or lawyer who divulged the information to other plaintiffs with cases pending in the litigation. While different circumstances warrant different levels of disclosure to plaintiffs and their privately-retained counsel so that they can determine whether to participate, pre-agreement disclosure should not be unlimited or ongoing, given the prejudicial nature of unauthorized disclosure to the very plaintiffs whose collective interests lead counsel was appointed by the court to advance.

Deliberate withholding litigation information from plaintiffs and their retained counsel, including plaintiffs who are lead counsel's clients, must be carefully circumscribed. Court orders should specify such circumstances.  Lead counsel cannot unfairly exploit their interests under a cloak of confidentiality. Thus, all plaintiffs should receive equal notice of cut-off date for cases for settlement inclusion, and lead counsel may not advantage their personal clients.

> GUIDELINE 8: Absent a compelling reason, lead counsel should not disclose confidential information, including confidential settlement discussions, to their own individually-retained clients.

Both traditional fiduciary standards and professional rules of conduct recognize exceptions to the general duties of disclosure if such revelations would violate a "superior duty" owed to another. Lead counsel is generally not obligated to share — and, for the reasons outlined above, generally should refrain from sharing — confidential and sensitive information gained by

virtue of their court-appointed position with even privately-retained clients, absent some compelling reason to do so.

Lead counsel is not privy to information received in their court-appointed role as the representative of their own clients. Instead, the court has placed lead counsel in that role; a role that is not intended to advance the interests of lead counsel's clients. Lead counsel serves the collective interests of all plaintiffs, and must prosecute and protect the common and collective interests of plaintiffs as a whole.

> GUIDELINE 9: Lead counsel must disclose to individually-retained clients their role as lead counsel.

A lawyer is barred not only from representing interests that are adverse to a client's interests but also, under some state ethical rules, from representing a client if the lawyer's professional judgment on the client's behalf might be adversely affected by the lawyer's own personal interests. Both traditional fiduciary responsibility and the professional rules of conduct impose affirmative obligations to inform clients about significant developments or decisions affecting their interests, as well as a general duty of full disclosure regarding anything related to the representation, when asked.

> BEST PRACTICE 9A: As soon as possible after appointment, lead counsel should advise individually-retained clients how the appointment may implicate the clients' interests, including participation in decision-making dealing with selection of bellwether trials, allocation of common-benefit funds, litigation management strategy, and settlement negotiations.

Lead counsel's involvement in selecting bellwether trials, allocating common-benefit funds, and making general strategic-litigation management and settlement decisions, may implicate the interests of lead counsel's individually-retained clients. Lead counsel must advise their own clients that in making these decisions, their duty to the court to act for the common and collective interest of all plaintiffs will come first.

Lead counsel must fully and meaningfully inform individually-retained clients of the implications of each of these decisions as soon as possible, so that the client can make an informed decision whether to continue the representation. For example, if expenses incurred in presenting a bellwether trial are treated as shared expenses to be paid from the common benefit fund, lead counsel should inform clients of the possible allocation.

Lead counsel should explain if the value of individual cases can be maximized in an MDL, to reduce expenses, including expenses of the individually-retained client, that would otherwise lower a net recovery in any settlement. Disclosure should also explain that neither lead counsel, nor any individual plaintiff's counsel, can compel the defendant to negotiate "globally" with all similarly-situated, or all, plaintiffs on a uniform or transparent basis. Individually-retained clients should also be told that lead counsel cannot prevent a defendant from offering favorable "inventory" settlements to some but not all parties, from making offers to bellwether or

test plaintiffs whose cases are set for trial, or from otherwise making offers or refusing to make offers to any one or more individual plaintiffs or plaintiff's counsel.

> BEST PRACTICE 9B: When considering an inventory or global settlement, lead counsel should fully inform individually-retained clients of the implications of the lead counsel appointment.

When lead counsel negotiate an individual settlement for their own clients, or a multi-plaintiff proposed settlement on behalf of their own clients and other plaintiffs in the MDL, lead counsel's duties to their privately-retained clients can conflict with the requirements of their lead counsel role.

A proposed settlement negotiated by lead counsel must, like any other settlement, be structured to bind no plaintiff unless:  (1) each participating plaintiff receives affirmative and fully informed consent; or (2) a class action proceeding involving public review of the settlement agreement with absent parties protected by court approval, notice, and the right to opt out. In MDLs questions frequently arise with respect to:

- Lead counsel's negotiation of a settlement on behalf of their own clients (whether on an "inventory" basis or for some subset of individual clients) in the absence of similar settlements offered to all, or virtually all, other plaintiffs' counsel or plaintiffs;
- Lead counsel's negotiation of a settlement on behalf of their own clients simultaneously with a "global" settlement they are negotiating as lead counsel on behalf of other plaintiffs;
- Lead counsel's negotiation of a "global" settlement that arguably favors lead counsel's own clients; or
- Lead counsel's negotiation of a "global"-type settlement that excludes some of lead counsel's own clients or affords them less compensation than they arguably otherwise could have been attained.[177]

> BEST PRACTICE 9C: Lead counsel must remain faithful to their obligations to the court as delineated in the appointment order when engaging in confidential settlement discussions for individually-retained clients.

If lead counsel opens settlement negotiations for only lead counsel's own individually-retained clients, a potential conflict arises between retained clients' interests and interests of the rest of the plaintiffs. The concern exists that lead counsel will be influenced by generous settlement terms for lead counsel's individually-retained clients when making settlement demands for the MDL plaintiffs as a whole. Resignation from the lead counsel position is the surest way to avoid any appearance of impropriety, but resignation is not typical nor necessary in most instances.

---

[177] In all cases, lead counsel's settlement-related obligations to their own clients is subject to the usual ethical rules concerning joint settlements, including the aggregate settlement rule.  *See* Principles of the Law of Aggregate Litigation §§ 3.15-17 (ALI 2010).

So long as lead counsel faithfully carries out their functions and responsibilities on behalf of all plaintiffs, as delineated in the appointment order, lead counsel can continue to serve effectively in both roles, even though lead counsel may also be able to secure an advantage for their own clients.

> BEST PRACTICE 9D: Should the court ever have a concern that a settlement negotiated on behalf of lead counsel's individually-retained clients might violate the terms of the court's order appointing lead counsel, the court should order lead counsel to disclose the settlement terms in camera to a Special Master appointed for this purpose or, if desired, to the court itself.

Should lead counsel succumb to conscious — or even only "structural" — collusion, in considering disqualification, the court must consider the loss to the plaintiffs of the knowledge, skill, experience, and insight possessed by lead counsel, both generally and as uniquely gained in the particular litigation. There is a potential risk that automatic disqualification of lead counsel who enters into client-favorable settlement agreements could encourage a defendant to enter into an early settlement with lead counsel, perhaps at a premium, in order to deprive the MDL plaintiffs of the most highly skilled representation. Such issues must be carefully weighed in considering disqualification of lead counsel.

Judicial review of "side agreement" settlements by lead counsel may be provided for in the court's appointment order as a safeguard and means to eliminate the appearance of collusion while retaining the services of the lead counsel. Such review should be conducted *in camera*, maintaining any confidentiality provisions, ideally by a Special Master so that the judge charged with deciding the merits of subsequent cases is not "tainted" with knowledge of the parties confidential settlement posture.

> BEST PRACTICE 9E: Lead counsel should maximize the common and collective interests of all plaintiffs in negotiating a global settlement consistent with appointment.

Even though lead counsel is negotiating a "global"-type settlement for all or a large majority of the plaintiffs, counsel continues to owe an undivided duty of loyalty to their own clients and must, within that framework, seek to maximize the recoveries of their own clients even if that might arguably work to the prejudice of other plaintiffs. Lead counsel's obligation to their own clients ordinarily will not preclude them from simultaneously attempting to achieve the best possible settlement for MDL plaintiffs generally,

Lead counsel participates in global settlement negotiations not by virtue of their own clients' cases but because the court appointed lead counsel to participate in such discussions on behalf of all plaintiffs. Although in such negotiations lead counsel would be drawing upon the knowledge and perspectives gained from the representation of their own clients, the appointment order should specify lead counsel's obligation, in that capacity, to maximize the common and collective interests of the plaintiffs as a whole.

The policy of such provisions is to allow lead counsel's clients to obtain the full benefit of their representation by particularly knowledgeable and skillful counsel without conferring an undue advantage solely attributable to their attorney's appointment as "lead counsel." Such an appointment premium would come at the expense of other plaintiffs in the litigation represented by other counsel.

> BEST PRACTICE 9F: Consistent with existing attorney-client relationships, the court should consider entering an order authorizing confidential settlement negotiations.

Lead counsel in settlement negotiations acts in accordance with the court's appointment order for the common and collective good of the plaintiffs. Disclosing the substance of the negotiations to lead counsel's individually-retained clients could adversely affect the settlement. Provided that such individually-retained clients consent after prior notice, a court order that expressly authorizes confidentiality obviates any disclosure concern of lead counsel and provides lead counsel an effective response to clients' or other lawyers' requests to disclose confidential information.

# CHAPTER 4

## ROLE OF NON-LEADERSHIP COUNSEL

In a mass-tort MDL, lead counsel make up a fraction of the lawyers representing plaintiffs. Non-leadership counsel have a limited role in key decisions affecting overall strategy and settlement. Because lead counsel effectively controls the litigation, non-leadership counsel, who continue to be bound by canons of ethics to act in the best interests of their clients, face difficult problems when they disagree with lead counsel's actions and decisions. If lead counsel negotiate a global settlement, non-leadership counsel and their clients make the final decision regarding whether to participate. But, as a practical matter, rejecting the offer at that time may not seem feasible.

MDL decision-making benefits whenever lead counsel can create a process for considering input from non-leadership counsel without being subject to inefficient second-guessing. Lead counsel should engage non-leadership counsel in candid discussions early in the litigation about the case's strengths and weaknesses, including *Daubert* issues critical to acceptance of the plaintiffs' scientific position.  Part of lead counsel's role is to educate non-leadership counsel about the MDL's parameters, its risks, and the general strategy being adopted, and to update counsel throughout the course of the litigation as circumstances change.

GUIDELINE 10: Lead counsel should establish processes that build consensus among non-leadership counsel as to key decisions that lead to settlement.

Lawyers representing individually-retained clients keep their duty to advocate for their clients' best interests. Although having the power to accept or reject a proposed settlement, as a practical matter their bargaining position weakens the longer lead counsel are in command of the MDL. At a minimum, they should be informed of all significant actions taken in the MDL consistent with BEST PRACTICE 4I.  Ideally, non-leadership counsel should be able to provide input on key decisions consistent with BEST PRACTICE 10B.

BEST PRACTICE 10A: Lead counsel should provide equal opportunity to all willing and able counsel to participate in discovery and other MDL tasks.

Equal opportunity for non-leadership counsel to perform discovery tasks enhances consensus-building consistent with BEST PRACTICE 4H. Compensation for such work should be commensurate with the compensation leadership counsel receive for the same type of work consistent with BEST PRACTICES 12G(ii) and 12H.

BEST PRACTICE 10B: Where the court is advised of issues that create potential conflicts among counsel, it should institute measures that permit non-leadership counsel to provide input.

Disagreements among lead and non-leadership counsel commonly arise at certain, discrete decision points in an MDL , including:  (1) selection of bellwether trial counsel; (2) decisions to pursue or abandon claims/theories in discovery and bellwether trials; and (3)

resources (discovery, trial packages, experts)  provided to lawyers preparing individual cases.  In consultation with lead counsel, the court should develop a process whereby non-leadership counsel can report issues or concerns to the court on a regular basis (perhaps quarterly). The court may seek explanation from lead counsel as to how these matters are being handled.

In some instances, concern about resources being made available to non-leadership lawyers may not arise until the coordinated proceedings near conclusion, when remand is imminent for non-bellwether cases moving forward on an individual basis. The court should provide an avenue at an earlier stage in the litigation to address the steps lead counsel are taking to provide the necessary resources for post-remand litigation.

Settlement strategy also has a high conflict potential, but due to the nature of most mass-tort negotiations, open vetting is difficult. Settlement negotiations are typically confidential, and disclosure of ongoing discussions would likely jeopardize their success. If significant acrimony arises, the court could consider appointing a settlement master, or conduct private discussions with lead counsel  or others specifically tasked with carrying out settlement discussions. Alternatively, the court could designate a liaison counsel to act as an intermediary, communicating concerns of non-leadership counsel.

> **GUIDELINE 11:** The court and lead counsel should develop practices to identify potential conflicts and disagreements early on between non-leadership counsel and lead counsel.

Court appointment authorizes lead counsel to manage the MDL on behalf of all plaintiffs and their retained counsel. Ideally, lead counsel performs these functions to maximize the common and collective good of all plaintiffs. Inevitably, disagreements over strategy, selection of bellwether trials, allocation of common benefit funds, etc., will cause conflicts, which must be kept under control. In so doing, the court must balance two important concerns: ensuring that real problems with lead counsel performance are addressed; while at the same time preventing complaints about lead counsel from being used to jockey for position or for other improper purposes. Requests to remove leadership counsel should be entertained only for very serious and acute problems.

Consistent with BEST PRACTICE 2C(iv), the court may appoint special liaison counsel to be alert for potential conflicts and disagreements. The roles and duties of such liaison should be specified at the outset — including responsibility for communications between the court and other counsel, maintaining records of all orders, filings, and discovery, and ensuring that all counsel are apprised of developments in the litigation.

> BEST PRACTICE 11A: The court should issue a case-management order delineating the roles and obligations of lead counsel, any liaison counsel, and plaintiffs' counsel in individual cases.

Potential conflicts and misunderstandings between lead and non-leadership counsel can best be avoided if their respective roles and responsibilities are clearly delineated in an early case-management order. The order should provide that non-leadership lawyers continue to have

all of their normal obligations to their clients' interests and must comply with all court orders applicable to those clients.

The roles and duties of appointed leadership may also be specified in the initial solicitation of applications and in the resultant appointment orders. Lawyers seeking leadership appointments should be required to provide the court and other counsel with specifics on how they will fulfill their obligations to work with others during the litigation and how they will provide timely and adequate communication and support to non-leadership counsel.

BEST PRACTICE 11B: A transferee judge should be alert throughout the MDL proceedings for potential and emerging disagreements and conflicts between lead and non-lead counsel.

Many problems arising from disagreements between lead and non-leadership counsel can be avoided, or at least addressed, by active case management. Regularly scheduled status conferences, frequent conferences with liaison counsel, and attention to status reports can timely identify most potential conflicts and disagreements between lead counsel and non-leadership counsel.

Consistent with BEST PRACTICE 1B(i), the court should schedule regular status conferences. At the start of the MDL, or if the court anticipates conflicts between lead and non-leadership counsel, a monthly conference schedule is advisable. Key rulings and discussion should be on the record, and conference transcripts should be posted on the court's website or made available by plaintiffs' counsel to non-leadership counsel.

The court should require leadership counsel to prepare and distribute detailed status reports to all non-leadership counsel in advance of each conference, to confer with the court in preparing an agenda, and to distribute detailed reports to all non-leadership counsel afterward. Such documents should keep all participants in the MDL proceeding well-informed, consistent with BEST PRACTICE 4I. The court and lead counsel should also consider regular reports to non-leadership counsel about key expert opinions on causation, periodically updating lists of all counsel's inventory, and providing information on the status of company witness depositions and document production. Lead counsel should also provide *pro se* plaintiffs with a point of contact on the Plaintiff Steering Committee to whom they can direct questions.

Many MDLs have benefitted from the court creating an official website for the proceeding on which these documents (as well as status conference reports and significant orders) can be viewed consistent with BEST PRACTICE 12F. Similarly, lead counsel should consider developing a file-sharing option for non-leadership counsel to obtain MDL materials, key orders, and transcripts. Timely and adequate information about the MDL proceedings provides the means for non-leadership counsel to fulfil their responsibilities and obligations to their respective clients.

BEST PRACTICE 11C: The court should consider a reappointment process for lead counsel as a means of discovering serious conflicts, if any, between lead and non-leadership counsel.

A formal reappointment process at specified intervals, corresponding to logical points in the development of the MDL can provide opportunities for non-leadership lawyers to comment (positively as well as negatively) on the performance of leadership. Regardless of outcome, the reappointment process provides a good opportunity for the court and non-leadership counsel to receive a formal report from lead counsel on how leadership has performed its duties and for the court to address any concerns raised by comments received from non-leadership counsel. The court can also reiterate its expectations for lead counsel, which sends an important message to all parties.

The court can use the reappointment process to facilitate airing of non-leadership counsel's grievances (if any) with lead counsel, overcoming any reluctance to criticize the management of the MDL. At the same time, the reappointment process serves as an opportunity to remind non-leadership counsel that their obligations to their clients may require them to raise issues that, they believe, may prejudice their clients' interests.

The reappointment process should not occur so frequently as to impede leadership's management of the litigation, but often enough to be meaningful. Under BEST PRACTICES 3A(iii) and 4(K), reappointment after the first twelve months is usually too soon to evaluate lead counsel's performance, particularly in larger MDLs. In smaller litigation, that timing can be about right.

Many mass-tort MDLs take years to resolve. Leadership does not remain static, and circumstances beyond the control of individual lead counsel may have significant impacts. The MDL workload burden may grow to the point that lead counsel cannot continue to devote the time and financial resources necessary to allow them to continue in a leadership role, or it may shrink to the point that leadership imposes significant missed-opportunity costs. Some lawyers may not have the continuing ability or interest to fulfill true leadership roles. All of these issues may not become apparent to the court until the litigation has been underway for some time. A reappointment process ensures timely airing of these sorts of problems.

Further, non-leadership counsel may become heavily involved in the work of the MDL, or from related litigation develop a particular expertise valuable to the MDL. Such circumstances justify appointing additional lead counsel during the course of the MDL, although the appointment may not have been appropriate at the outset of litigation. A reappointment process establishes a set framework that the court can use to make necessary adjustments to accommodate changed circumstances. Lead counsel with insufficient ongoing personal involvement may have to be replaced, as may senior lead counsel when more junior lawyers are doing the actual work. Advancing more junior attorneys not only benefits those lawyers by bolstering their resumes, which can facilitate future appointments, but also is a vehicle to foster greater diversity in MDL representations.

BEST PRACTICE 11D: As part of the reappointment process, the court should require lead counsel to report on their exercise of MDL obligations, including communication with non-leadership lawyers.

Lead counsel seeking reappointment should provide information not only on how effective they have been but also on their interaction with non-leadership counsel. The reappointment process is a convenient point for inviting comment from lawyers not personally seeking leadership positions to comment on the performance of lead counsel. These steps provide the court an opportunity to address issues before they become acute. These opportunities can also estop non-leadership lawyers from raising last-minute, disruptive complaints at very late stages. Such belated complaints undermine judicial management of litigation in reliance on lead counsel's work, and generally diminishes the confidence of all parties in the MDL process. Requiring airing of grievances during the reappointment process can be a valuable tool to ward off such disruptive tactics.

# CHAPTER 5

## ESTABLISHMENT AND USE OF COMMON FUNDS

A perennial challenge for a transferee judge managing a large or mass-tort MDL is the issue of compensating plaintiffs' counsel, who almost exclusively work on contingency. Litigation can last years and require the investment of millions of dollars in law-firm time, resources, and out-of-pocket expenses.  During the litigation, some attorneys will devote themselves nearly entirely to the case from the outset, particularly those who are appointed to the steering committee or as liaison counsel, while others (for example, those whose clients file cases well after commencement of the litigation and establishment of the MDL) will benefit from the work done by other counsel.  Similarly, leadership counsel often agree to "front" the bulk of the costs and expenses of the litigation, assuming a significant expense and risk of nonpayment, while other plaintiffs and their counsel reap the benefits of those expenditures.

To address this equitable problem, MDL courts have recognized an inherent authority to establish and operate common funds, to assess parties and their counsel, and to apportion and distribute the pooled monies.  As its name suggests, a common benefit fund (CBF) is meant to compensate attorneys for the costs borne and work performed for the common benefit of all plaintiffs and their counsel.  Hence, the primary theory underlying such funds is the common benefit doctrine, which holds that persons who obtain the benefits of a lawsuit without contributing to defraying its costs are unjustly enriched at the successful litigant's expense.

The transferee court has a variety of powers and doctrines at its disposal in creating and overseeing a CBF.  For example, the ability to assess common benefit attorneys' fees is recognized as within the courts' inherent managerial authority.[178]   It is well settled that a court's power to consolidate and manage litigation necessarily implies a corollary authority to appoint lead or liaison counsel and plaintiffs' steering committees and to ensure that they are properly

---

[178]*See Boeing Co. v. Van Gemert*, 444 U.S. 473, 478 (1980); *see also MCL* § 14.121 (4th ed. 2004) (discussing American Rule and common-benefit exception in complex cases). The doctrine has been articulated and applied in a series of Supreme Court decisions, including *Central R.R. & Banking v. Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 164 (1939); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970); *Boeing*, 444 U.S. 472; and *Blum v. Stenson*, 465 U.S. 886, 900 (1984).  Traditionally, the "American Rule" required prevailing litigants to pay their own attorney's fees.  In multi-party litigation, the American Rule can inequitably benefit those who avoid sharing the full burden and expense of litigation by relying on the work of others.  The common benefit doctrine is based in the power of equity in doing justice between a party and the beneficiaries of his litigation. *See Sprague*, 307 U.S. at 166; *MCL* § 14.121.  In *Sprague*, the Court emphasized the Court's historic equitable power to spread the costs among others who were similarly situated and benefited from the plaintiff's efforts.  307 U.S. at 166-67.  The common benefit doctrine was initially applied to attorney fee awards in class actions where an attorney, on behalf of an individual plaintiff, recovers a fund for the benefit of a group of individuals.  4 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 13:76 (4th ed. 2002).  But its application is not limited to the class action context.  "As class actions morph into multidistrict litigation, as is the modern trend, the common benefit concept has migrated into the latter area.  The theoretical bases for the application of this concept to MDLs are the same as for class actions, namely equity and her blood brother, quantum meruit." *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 647 (E.D. La. 2010).  Thus, "MDL courts have consistently cited the common fund doctrine as a basis for assessing common benefit fees in favor of attorneys who render legal services beneficial to all MDL plaintiffs." *Id.*

compensated for their work.[179]  Courts also have found the related authority to assess common benefit attorneys' fees in the terms of agreements entered into among plaintiffs' counsel and between plaintiffs' counsel and defendants.[180]  As the Fifth Circuit explained in the seminal *Florida Everglades* air disaster case: "[I]f lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation."[181]

Typically, the transferee judge creates the architecture for the CBF at the outset of litigation, but it will usually remain unfunded until much later in the litigation process, when cases are resolved through trial or settlement.  This means that the court usually will defer setting the precise percentage of settlement proceeds that will fund the CBF until the MDL is resolved or settled when the value of the common benefit work is known.  (In some instances, a defendant's partial settlement or partial payment may fund the common benefit fund prior to the end of the case).  The CBF's function is to compensate plaintiffs' counsel for their work based on their relative contributions to the outcome of the case.  Its purpose is to ensure that all who benefit from the CBF will have contributed proportionately to the costs of the litigation, which is particularly important in a mass-tort MDL where the value of bellwether trials often exceeds the value of the particular claims being tried.

---

[179]*See Vincent v. Hughes Air West. Inc.*, 557 F.2d 759, 773-75 & n.15 (9th Cir. 1977); *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1014-15 (5th Cir. 1977); *McAlister v. Guterman*, 263 F.2d 65, 69 (2d Cir. 1958).  Courts have used this inherent authority to compensate common benefit counsel in complex litigation. *See, e.g., In re Diet Drugs Prods. Liab. Litig.* , 582 F.3d 524, 546–47 (3rd Cir. 2009); *In re Genetically Modified Rice Litig.*, 4:06 MD 1811 CDP, 2010 WL 716190, at *4 (E.D. Mo. Feb. 24, 2004) ("An MDL court's authority to establish a trust and to order compensations to compensate leadership counsel derives from its 'managerial' power over the consolidated litigation, and, to some extent, from its inherent equitable power."), *aff'd*, __ F.3d___, 2014 WL 4116482 (8th Cir. Aug. 22, 2014); *see also MCL* § 22.62.  At least one commentator has opposed a court's inherent authority to oversee a common benefit fund:   "[T]he judicially created quasi-class action contravenes Article III of the Constitution, deprives litigants of their due process and jury trial rights, violates the Rules Enabling Act, impermissibly expands the scope of judicial authority under the multidistrict litigation statute, and does an end-run around the requirements of the class action Rule 23.  Moreover, private settlement agreements consummated as quasi-class actions may, if unchecked, violate the spirit if not the letter of the court's *Amchem* and *Ortiz* decisions." Linda S. Mullenix, *Dubious Doctrines: The Quasi-Class Action*, 80 U. CIN. L. REV. 389, 412 (2011).  This view appears to be a minority opinion and one that, to date, has not been shared by any court.

[180]*See* Jeremy T. Grabill, *Judicial Review of Private Mass Tort Settlements*, 42 SETON HALL L. REV. 123, 124 (2012); *see also In re Sulzer Orthopedics, Inc.*, 398 F.3d 778, 780 (6th Cir. 2005); *In re Vioxx Products Liab. Litig.*, 574 F. Supp. 2d 606, 609 & n.8 (E.D. La. 2008), *on reconsideration in part on other grounds*, 650 F. Supp. 2d 549 (E.D. La. 2009).  Courts should therefore be aware that any matters addressed by agreement of the parties that expressly confer authority on the court may result in future challenges and rulings bearing on the parties' interests, such as attorney's fees—*e.g.*, a court's consideration of the receipt of a contingency fee as a ground to reduce an award of attorney's fees.  *See In re Sulzer Orthopedics*, 398 F.3d at 780.  But such an interpretation is not always clear.  Despite a court's contrary view, plaintiffs' attorneys have not always agreed that the settlement agreement terms vested the courts with the authority to impose contingency fee caps. *See* Morris A. Ratner, *Achieving Procedural Goals Through Indirection: The Use of Ethics Doctrine to Justify Contingency Fee Caps in MDL Aggregate Settlements*, 26 GEO. J. LEGAL ETHICS 59, 73 (2013) ("It is safe to assume at this point that lawyers involved in mass torts are on notice of this issue.  It will be interesting to see whether such awareness limits the ability of court-appointed common benefit counsel to negotiate global agreement terms that both render individually-retained counsel's fees vulnerable to caps, and prompt widespread participation in MDL aggregate settlements.").

[181] *In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1016.

Despite the widespread use of CBFs, the implementation of these funds in any particular case is often hotly disputed.  If the transferee court does not, at the outset, establish a process to implement a fund or funds (if and when monies become available), disagreements among counsel can arise, both during the MDL and certainly at the resolution or remand of individual cases.  If the issue is left unresolved, the transferee judge invites avoidable disharmony at the MDL's conclusion, and may be confronted with a Gordian Knot, which is not easily undone.

Litigation funding is a complex matter and one that varies with the needs of the case.  In addition to CBFs, the plaintiffs' leadership team usually establishes a "housekeeping fund," which it uses to pay communal litigation expenses like expert fees, filing charges, document depository costs, and deposition fees.  (These expenses are distinct from "held," such as travel expenses and copying costs, which are incurred for the common benefit but carried by the attorneys until a settlement is reached.)  The housekeeping fund is funded with periodic assessments paid by the leadership team (the Plaintiff Executive Committee (PEC) or Plaintiff Steering Committee (PSC)).  The court typically has no involvement in creating or overseeing the housekeeping fund.

In some cases the court may establish a joint housekeeping fund, funded by assessments to both the plaintiffs' leadership team and the defendants, to pay common expenses like special master fees.  When the court creates a joint housekeeping fund, the assessments should be sufficient to cover the recurring expenses with a cushion for unexpected expenses.  The court will likely want to establish a process for documentation, submission, and judicial or special-master review of all claims against the housekeeping fund.  The court should, with input from the parties, select a bookkeeper or accountant and a bank to manage the fund.  All documentation and yearly audit reports should be maintained throughout the MDL and contained in the final accounting.  Before creating and implementing a joint housekeeping fund, the court should consult with the lead plaintiff and defense attorneys.  In most cases a joint housekeeping fund is not necessary because common expenses can simply be apportioned and paid directly to the provider by defense counsel and the PSC.  A joint housekeeping fund may be useful in some cases, and thus is noted here as one potential feature that a transferee judge may consider in structuring the MDL process.

In lengthy and complex cases, the transferee judge may choose to establish a fund to make interim reimbursement payments to plaintiffs' counsel for costs and expenses incurred during the course of the litigation.[182]  This fund is separate from the housekeeping fund and is intended to defray expenditures by lead counsel who "front" the bulk of the costs and expenses of the litigation.  The court should assess plaintiffs' counsel ratably and place the proceeds in this fund for periodic distribution.  Such reimbursements can greatly ease the financial burden on firms that have invested substantially in the litigation, but who will receive no compensation until settlement, which may be years in the future.

---

[182] *See, e.g.*, *Mills*, 396 U.S. at 389 (having proven defendant's liability, "petitioners [sh]ould have been entitled to an interim award of litigation expenses and reasonable attorney's fees"); *see also generally In re: Diet Drugs*, 2002 WL 32154197 (E.D. Pa. Oct. 3, 2002) (noting that a CBF was established to pay, *inter alia*, "the out-of–pocket and pre-settlement litigation expenses of plaintiffs' counsel approved by the court for reimbursement").

GUIDELINE 12: The transferee judge should consider setting aside a portion of the anticipated monetary proceeds from a settlement to establish a common benefit fund (CBF) for the purpose of paying reasonable attorneys' fees, costs, and expenses from that fund.

This standard uses the term "anticipated" intentionally.  It reflects in part the forward-looking nature of CBFs – that at the outset of the litigation, the judge needs to set parameters and provide guidance for common benefit work, if it expects to utilize a CBF upon completion of the case.  (While CBFs are usually unnecessary in most "small" MDL cases, courts have found them to be beneficial in the large and mass-tort MDLs that are the focus of this report.)

But "anticipated" also refers to the fact that cases may be resolved in favor of the defendant.  One aspect of the MDL process is determining whether the allegations are true.  The litigation may be resolved through motion practice that results in a dismissal by the court, or rulings that effectively end the litigation.  The scope of the MDL may also be narrowed as particular types of claims are determined to be without legal merit.  When there is no recovery by the plaintiffs, there will be no common benefit funding.  Instead, plaintiffs' counsel will bear the loss of sunk costs and invested time; it is not expected that the judge will order reimbursement from the MDL parties to the leadership team members and other attorneys that bore these costs.  (This potential outcome underscores the risk of MDL finance and its consequences for leadership appointments, as discussed in more detail in Chapter 2.)

Even if the claims survive motion practice, the MDL may not result in a settlement.  If the cases are instead remanded, this creates yet another dynamic for the MDL judge.  Typically, the MDL judge will remand with a directive that a certain percentage of any recovery by the plaintiff be paid to the CBF.  But there is a risk of underfunding or overfunding because the transferee judge cannot know what percent of the remanded cases will resolve favorably and thus how large the CBF will become.

Sometimes some of the cases in the MDL are resolved early, whether through individual or small-group settlements, or through trials.  Establishing a CBF early in the case will avoid later complications arising from staggered resolutions of the constituent cases.  One transferee judge who did not implement a CBF protocol early in the case observed that failing to deduct a common benefit assessment from early-settled cases created a "horrible" situation where the later-settling plaintiffs had to either bear the whole burden or claw back monies from the early-settling plaintiffs and their counsel.  Requiring the defendant to make up the shortfall was not a viable alternative, because the defendant would likely compensate by decreasing the settlement offers made to the later-settling plaintiffs.

These preliminary remarks are simply intended to place into context the discussion of the CBF that follows—and the importance of careful consideration by the transferee judge of whether and how the fund will operate, early in the case.

BEST PRACTICE 12A: As early as practicable in the litigation, the transferee judge should consider planning and establishing any common benefit funds to be employed in the course of the litigation or in the event of settlement.  In doing so, the court should communicate its expectations and provide guidance to the parties with regard to the purpose and operation of these funds and invite the participation of counsel.[183]

Transferee courts often establish a framework for implementation and operation of a CBF early in the life of the MDL.[184]  Providing this guidance early allows counsel to effectively manage the process and minimizes conflict at the end of the litigation.  Courts find it useful to obtain the counsels' input, both to ensure that counsel have a sense of ownership over the process and to clarify the court's expectations.  Allowing counsel the opportunity to ask questions about the procedures and to suggest modifications should curtail later disputes.

BEST PRACTICE 12B:  At the outset of the case, the transferee judge should issue a "common benefit fund order" or "assessment order."  The order should establish parameters for how the common benefit fund will be funded, define the compensable functions of counsel, determine the method of compensation, specify what records must be kept, and create guidelines for allowable fees and expenses.[185]

The court's order should establish rules for the documentation of attorney time, costs, expenses, and procedures for counsel to submit claims to the fund and for those claims to be reviewed.   The order will typically provide for later payment of common benefit costs and common benefit attorney's fees to court-appointed counsel and to others who advanced costs or performed services for the common benefit.

---

[183] See MCL § 14.215; see also In re Zyprexa Products Liab. Litig., 467 F. Supp. 2d 256, 267 (E.D.N.Y. 2006) ("[I]t has been a common practice in the federal courts to impose set-asides in the early stages of complex litigation in order to preserve common-benefit funds for later distribution.").  While some courts maintain that it would be premature to establish a common benefit fund early in the litigation before an opportunity for discovery and an accounting, the prevailing view of courts and the Manual of Complex Litigation is that "[e]ven if no common benefit compensation had yet been earned, there [is] a need to put a holdback method into place promptly." In re Zyprexa Products Liab. Litig., 467 F. Supp. 2d 256, 267 (E.D.N.Y. 2006).

[184] The Third Circuit Task Force Report recommended "that in the traditional common-fund situation and in those statutory fee cases that are likely to result in a settlement fund from which adequate counsel fees can be paid, the district court, on motion or its own initiative and at the earliest practicable moment, should attempt to establish a percentage fee arrangement agreeable to the Bench and to plaintiff's counsel." THIRD CIRCUIT TASK FORCE REPORT, COURT AWARDED ATTORNEY FEES, 108 F.R.D. 237, 255 (1986).

[185] See generally Leonard A. Davis & Phillip A. Garrett, Case Time and Cost Management for Plaintiffs in Multidistrict Litigation, 74 La. L. Rev. 483, 495-96 (Winter 2014); see also Case Management Order Number 16 (Establishing Common Benefit Fee and Expense Fund), In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation, MDL 2385, No. 3:12-md-02385-DRH-SCW (S.D. Ill. Nov. 13, 2012) (ECF No. 61).

BEST PRACTICE 12C: The transferee judge should consider what actions should be taken to address common benefit work that benefits parties in parallel state litigation.

Parallel state litigation presents a significant complication for the CBF. There is a substantial question as to whether the MDL court has jurisdiction over state court parties, with many transferee judges concluding that they lack the authority to order state plaintiffs and their counsel to contribute to the CBF. The court may consider addressing this issue with the state judges early in the litigation, and encourage those judges to enter orders requiring participation in the CBF as a condition for accessing MDL discovery. At a minimum, the court should discuss issues of protocol and fairness with state judges to facilitate resolution of any eventual dispute.[186]

One approach that has been used to side-step this problem is for the federal court to order the defendant to pay into the MDL's CBF for not only the MDL cases it settles but also the state cases; the defendant will effectively reduce its offer to state court plaintiffs to cover this amount. But because this approach takes the common benefit payment off the top, a state court plaintiff may end up bearing a greater share of the assessment relative to his attorney as compared with a similarly situated federal court plaintiff.

When defendants agree to a global settlement of both federal and state litigation, the parties may include a provision in the settlement agreement that establishes a common benefit award. Making the assessment a matter of contract avoids the jurisdictional issue. Of course, this option is only available when the defendant is willing to enter into this type of global settlement, rather than offering a federal settlement and a separate state court settlement.[187]

When federal and state cases settle separately, state court parties and counsel may object to paying for common benefit assessments. As one attorney explained, "We don't want your discovery, your rulings, or anything else − and don't charge us for it − I am litigating this case on my own." For this reason, some common benefit orders presume that state court parties have benefited from the work of plaintiffs' counsel in the federal litigation, but allow the counsel objecting to the assessment to show that he or she really did litigate the case without utilizing the common benefit work.

The opposite problem can also arise. In some MDLs, state court lawyers may have done substantial work. State court plaintiffs' counsel often have a substantial head start on discovery

---

[186] State courts have generally followed the federal courts' lead in the establishment of common benefit funds. For example, a Rhode Island court overseeing state Kugel Mesh product liability litigation established a plaintiffs' steering committee, designated liaison counsel, and ordered that 12% of the anticipated recovery be set aside for the common benefit fund (8% for attorney's fees and 4% for costs and expenses). Decision, *In re: All Individual Kugel Mesh Cases*, No. PC-2008-9999, 2009 WL 3328368 (R.I. Super., Aug. 11, 2009). Attorneys who filed dozens of cases after the court appointed the PSC and liaison counsel challenged the procedures on constitutional grounds, but the court rejected their challenges while affording them the opportunity to be heard at the appropriate time. *Id.*

[187] In the *Vioxx* litigation, for example, a significant number of cases was filed and consolidated in both federal and state courts. When the federal and state cases settled for an aggregate amount of $4.85 billion, the federal court ordered that $315,250,000 (or 6.5%) be set aside as a common benefit fund for attorneys' fees and expenses, to be distributed by order of the federal court. *See In re: Vioxx Products Liability Litig.*, 760 F. Supp. 2d 640, 662 (E.D. La. 2010).

and because they often reach trial first, their results may be informing the MDL settlement talks. Because they are working on contingency, these attorneys may not have kept detailed time records.  If their cases had no link to the MDL, they were under no obligation to review the transferee judge's orders on recording time and expenses, and they may have even done the work before any orders were entered.  This can create a substantial problem for the federal transferee judge, as these attorneys have clearly contributed common benefit work but do not have records that satisfy the requirements for receiving awards from the CBF.

One emerging approach involves sending regular notices out to the state court attorneys, acknowledging that they may be doing important work that will benefit the MDL and that they should submit their hours to the MDL.  The notice explains that a presumption will operate against hours that are not submitted contemporaneously, such that attorneys who may want to seek common benefit funds should err toward submitting now.  Judges who have used this approach say that the notices have agitated state counsel, but they keep sending out the notices and the attorneys "think we don't mean it − but at the end of the day, I'll review the hours, and then require them to tell me why they didn't read our orders or pay attention."  While the judges are optimistic that this approach helps legitimize the process, they note that the approach is too new for any firm conclusion.

The same judges also report that they have found it difficult to coordinate with state court judges on these issues, because the judges generally take the view that "my people don't want to do that, I'm not going to force them to do it − we can wait until we are closer to settlement to deal with that," and do not understand why contemporaneous time records are essential to an MDL common benefit assessment.  The *Toyota* MDL provides some corroboration of the difficulties in coordination. There, the Texas state court judge ordered a common benefit assessment percentage that was lower than the MDL percentage; as a result, Texas attorneys wanted to pay the lower percentage and opposed any effort to assess them the higher percentage.

Still other state court judges noted that they do not believe under their state law they even have the authority to order parties to pay into a CBF.  One judge noted that under his state's law, he cannot order the party to pay, and he cannot order the party's attorney to pay a portion of his contingency fee.  This state of law may again suggest the need for an agreed-upon contractual provision rather than a court-imposed order.

The hip implant cases provide an exemplar of the range of approaches possible in dealing with state court parties.  In the *DePuy* MDL, a plaintiff who wanted to participate in the global settlement had to agree to pay 1%, and his counsel had to agree to pay 5% to the CBF.[188]  In contrast, in another hip implant case, the New Jersey state case had moved forward before the MDL began, and plaintiffs' counsel in the MDL therefore benefitted from the work product of

---

[188] *See* Order Regarding Registration of ASR Related Cases and Claims 9-10, *In re: DePuy Orthopaedics, Inc. ASR Hip Implant Products Liability Litigation*, MDL 2197, No. 1:10-md-02197-DAK (N.D.Ohio Nov. 22, 2013) (ECF No. 637).

the state counsel.  There, the MDL common benefit assessment expressly excluded the New Jersey cases.

Many judges have lauded efforts to contractualize common benefit assessments as avoiding jurisdictional issues, while still allowing the judge to determine the common benefit amount in order to preserve the legitimacy of the assessment.  More broadly, the judges noted that caution should be used if the transferee judge is going to offer any percentage range guidance early in the litigation.  An order suggesting too high of a common benefit assessment may increase the tension between state and federal counsel, decreasing the potential for cooperation and increasing the likelihood of inefficient duplication as the state counsel seek to avoid paying a high assessment.  Ordering too low of an assessment may hurt the MDL by disincentivizing counsel from performing common benefit work, in turn delaying litigation.  Thus, the transferee judge must find the "magic figure" that motivates counsel to work collaboratively to resolve the case.  Some suggest that this is easier once the litigation has progressed enough that the transferee judge can make an informed determination about the extent of work that will likely be necessary to resolve the case.

Because discovery and other work product may be shared among plaintiffs' counsel in the federal and state court litigation, the judge may consider including provisions to reimburse costs and award fees to counsel who have performed common benefit work in state court proceedings, and to collect a percentage of settlements and judgments from state court cases.  The order should also address issues such as settlement confidentiality, if necessary.[189]

> BEST PRACTICE 12C(i): Early in the case and to the extent practicable, the transferee judge should establish a transparent procedure for the later allocation of common benefit funds to reduce the potential for disputes among counsel and to encourage counsel to cooperate and avoid duplication of effort.

Early in the litigation, if not in the initial case management orders, the transferee judge should issue clear guidelines regarding the types of expenses that will (and will not) be reimbursed by the CBF and the contemporaneous record-keeping requirements for common benefit hours.  The transferee judge may solicit proposed orders regarding the CBF.  Because the dynamics of litigation funding incentivize self–policing by counsel, judges can often accept proposals with little modification.

Establishing an allocation process that is transparent will help create a fair and open environment for all interested attorneys to perform work for the common benefit of all claimants and create a factual record for the eventual applications for common benefit fees.[190]  As a general

---

[189]  For an example, see the *Mirena* litigation orders.

[190] *See In re Vioxx Products Liab. Litig.*, MDL 1657, 2014 WL 31645, at*5 (E.D. La. Jan. 3, 2014); *see also* Fallon, 74 LA. L. REV. at 381 ("The total amount of the common benefit fund should be reasonable under the circumstances, and the method for distributing it should be fair, transparent, and based on accurately recorded data.").  Two decisions provide good examples of a transparent and non-transparent process.  In *In re High Sulfur Content Gasoline Products Liability Litigation,* the lead plaintiffs' counsel in a class action persuaded the district court, during an *ex parte* hearing and without the benefit of supporting data, to divide a lump-sum attorney's fee award among more than six dozen plaintiffs' lawyers.  517 F.3d 220, 223 (5th Cir. 2008).  At that same hearing, the court

matter, clear guidelines and housekeeping directives at the outset of the litigation about how time will be reported, what will be compensable, and the like are almost always helpful in providing clear expectations and in turn reducing conflict.  However, the extent to which an allocation methodology, percentage caps, or other case-specific guidance can or should be provided early in the case is more variable.  In some cases, there may be sufficient prior case developments, such that the transferee judge can comfortably set these expectations.  But, in many cases, it will take time for the case to progress to the point that the transferee judge and even the parties know what work will be important, how much will be required to settle the case, and other key input variables.  In those cases, some caution may be warranted as premature rulings followed by revisions can undermine the very normative goals the judge is seeking to further − to say nothing of potentially limiting the extent to which counsel will trust that this is the final set of guidelines and be able to conform their practices accordingly.

> BEST PRACTICE 12C(ii):  The transferee judge should inform counsel early in the litigation that if they wish to be paid attorney's fees from the common benefit fund they must keep detailed and contemporaneous records of their work and periodically submit reports to the court or a designee, such as a special master or accountant.[191]

The transferee judge should establish procedures to ensure the fairness of the allocation process.  The court should require counsel to keep contemporaneous billing records/timesheets and periodically submit time and expense reports; the court should also provide a process to review the reasonableness of the submitted time and expenses, and create a process by which an impartial arbiter can review the initial findings.  The court  should consider entering an order that any MDL attorney who wishes to make a claim against the anticipated CBF must first obtain PSC approval before performing the work absent exigent circumstances or court approval.[192]

Because the time records can be voluminous, some courts appoint a bookkeeper, accountant, or similar professional to review the records and provide periodic reports to the court; costs are borne by plaintiffs' counsel's housekeeping fund.[193]  Appointed bookkeepers, accounting firms, and special masters can play valuable roles in ensuring accurate review and resolution of any objections or disputes, as well as identifying any matters that must be resolved

---

"accepted [l]ead [c]ounsel's proposed order sealing the individual awards; preventing all counsel from communicating with anyone about the awards; requiring releases from counsel who accepted payment; and limiting its own scope of review of objections to the allocation." *Id.* at 223-24.  Because "the record [was] bereft of factual information essential to ... appellate review," and because the sealing of the record "protect[ed] no legitimate privacy interest that would overcome the public's right to be informed," the Fifth Circuit vacated the award. *Id.* at 229-30.  In contrast, in *In re Diet Drugs*, the court held that the fee allocation process was sufficiently transparent. 582 F.3d 524, 538-39 (3d Cir. 2009).

[191] *See* Christopher A. Seeger, James A. O'Brien III, *Administrative Housekeeping and Ethical Matters in Mass Tort MDLs and Class Actions*, 13 SEDONA CONF. J. 171, 173-74 (2012).

[192] *See, e.g.,* Order No. 5 (Organization of Plaintiffs' Counsel, Protocols for Common Benefit Work and Expenses) 6, MDL 2434, No. 7:13-md-02434-CS-LMS (N.D. Ohio July 10, 2013) (ECF No. 207) ("Counsel are forewarned that no application for approval to incur common benefit fees, costs, or expenses will be considered by this Court unless counsel have first obtained approval from Lead Counsel.").

[193] *See Evans v. TIN, Inc.*, No. 11-2067, 2013 WL 4501061, at *5 (E.D. La. Aug. 21, 2013); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 643 (E.D. La. 2010); *see also* Pretrial Order #6 at 4, *In re Vioxx Prods. Liab. Litig.*, MDL 1657, 2:05-md-01657-EEF-DEK (E.D. La. Apr. 8, 2005) (ECF No. 245).

by the court.  For example, the judge may appoint a CPA early in the litigation with whom the judge meets every month to review the hours billed for incongruities.  Alternatively, the judge may appoint a special master, whose decisions the judge reviews if an attorney requests, which serves a similar function in making contemporaneous determinations about the hours reported − catching problems while they are easier to spot, but also allowing for corrective prospective action rather than allowing the amount in dispute to continue to accrue and escalate the monetary stakes.

Generally, parties and judges prefer contemporaneous reporting requirements, even though valuation is often best reserved until the case is resolved.  But the form that this takes can vary.  The key normative principle is that the individual selected to monitor the lawyers' work should be someone familiar enough with the case to spot not simply egregious errors (billing 30 hours in a day), but work that does not align with the needs of the case.  At the same time, the selected individual should ideally be close enough to the legal profession to spot those more subtle reporting "errors" but not in a position that requires them to maintain the parties' favor.  Although this makes a judge's immediate supervision laudable, judges looking for a similar but less personally labor-intensive system might create a similar system in which a magistrate judge does a first-round review, paring down what the judge must review directly.  Again, there is no single formula; rather the right approach is one that addresses these concerns within the unique resource constraints, needs, and competing demands of each MDL.

These practices encourage attorneys to maintain adequate and contemporaneous records and allow the court an opportunity to timely detect any problems or issues.[194]  The contemporaneous records are the evidence the court will use to determine how to allocate fees.  Counsel who fail to maintain contemporaneous and accurate time records throughout the course of a MDL do so at their own peril as the absence of such records could result in forfeiture of the attorney's fee claim.

> BEST PRACTICE 12D:  When individual cases in the MDL begin to settle, or when a global settlement or other final resolution is reached, the transferee judge should determine an appropriate assessment to be made from the gross recovery in each case. The transferee judge should order the defendant to withhold the specified percentage of the recovery from settlement proceeds and deposit that amount into the CBF under the court's direction.

Courts typically establish a percentage that ranges from 3% to 6% of the gross amount of the settlement.  (In some cases, usually involving smaller settlements, the percentage may be as high as 12%.)  The appropriate percentage depends upon the circumstances of the case, so this range should not be considered exclusive.  Of course, the court should invite counsel's input as to the appropriate percentage and should also examine precedent from other MDL courts as applied to the facts and circumstances of the particular MDL.  In soliciting counsel input, the judge should be aware that the CBF is drawn from the contingency fees of the individual, originating attorneys.  Because these monies are not added to the defendant's payout, and

---

[194]*Id.*; *see also* MCL § 14.214.

because they are disproportionately going to the plaintiffs' leadership, the judge should carefully consider proposals made by plaintiffs' counsel.[195]

The determination of the assessment percentage often is made after there is a global settlement or judgment, when the transferee judge has a firm grasp of the value of the PSC work and the level of expenses. The court may want to make this determination earlier, however, if individual cases begin to settle or are resolved through trial.

BEST PRACTICE 12D(i):  If a settlement is subject to a common benefit assessment, the assessment should parallel the regular fees and costs allocation.

Specifically, to the extent possible, the plaintiff should bear a share of the costs, but typically the attorney's fee portion should come from the plaintiff's individual attorney's share of the award rather than the plaintiff's. This allocation is intended to preserve the original allocation of fees and costs between the attorney and client, reducing the extent to which the plaintiff must bear extra fees for additional attorneys while the individual attorney is able to reduce the time spent on the matter without a concurrent decrease in compensation.

In the large and mass-tort MDL context, settlements typically involve a complicated opt-in resolution of individual personal injury claims. Most claimants have retained their own attorneys and entered into contingent-fee agreements with their attorneys.[196]  Courts at times cap the amount of those contingent-fee contracts to prevent overcompensation and eliminate the inconsistency of fees for attorneys doing roughly the same work.[197]  The capping of contingent fees in large and mass-tort MDLs, however, has not been without criticism.[198]

The CBF assessments are calculated by multiplying the gross settlement proceeds by the common benefit percentage, e.g., 4% of total gross settlement proceeds. The assessment is typically deducted from the portion of the settlement allocated to the claimant's primary attorney.[199]  As a result, individual claimants' attorneys who rely on the efforts of common

---

[195] Some judges noted that they were surprised to learn that not all plaintiffs' attorneys, even those in leadership, will necessarily push for higher assessments. While many do support a high percentage for obvious reasons, some counsel worry that high assessments have created a cottage industry of "making work" that does not directly inure to the benefit of the group. These attorneys argue that the primary compensation for leadership should come from the resolution of their own cases, with the common benefit merely serving to offset free-riding but not becoming the primary focus of an attorney's efforts. These attorneys typically favor an assessment closer to the 3% end of the spectrum. This report does not make a judgment about the right number, which is of course, case-specific, but instead merely flags a point for transferee judges that their colleagues found surprising.

[196] *See In re Vioxx*, 760 F. Supp. 2d at 653.

[197] *See, e.g.*, *In re Vioxx Prods Liab. Litig.*, 574 F. Supp. 2d 606 (E.D. La. 2008) (capping plaintiffs' counsels' contingent fees at 32%); *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 496 (E.D.N.Y. 2006) (capping plaintiffs' counsels' contingent fees at 35%).

[198] *See* Aimee Lewis, Note, *Limiting Justice:  The Problem of Judicially Imposed Caps on Contingent Fees in Mass Actions*, 31 Rev. Litig. 209 (2012).

[199] *In re Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 457 (E.D. Pa. Apr. 8, 2008) *aff'd*, 582 F.3d 524 (3d Cir. 2009); *see also In re Zyprexa Prods Liab. Litig.*, 467 F. Supp. 2d 256, 266 (E.D.N.Y. 2006) ("The Court of Appeals for the Second Circuit has sanctioned a common benefit fund derived from a fixed percentage of fees earned by individual *attorneys*.").

benefit counsel to litigate the case and create a recovery will not receive a windfall, and claimants will not be effectively charged twice.

The CBF assessment also covers the MDL costs.  Where possible, the CBF order should specify the percentage of the assessment that is allocated to fees and the percentage that is allocated to costs, so that the costs may be apportioned by the claimant and the individual attorney as specified in their retention agreement.

> BEST PRACTICE 12E: The transferee judge should request all interested parties to make submissions concerning the procedures the judge should use to award interim or final attorney's fees.[200]

Before any CBF distributions are made, the transferee judge should give all parties the opportunity to be heard and to seek appropriate information on the CBF distributions.[201]  The transferee judge should also permit objections and, in appropriate circumstances, allow objectors to take limited discovery.[202]

> BEST PRACTICE 12F: When determining the CBF amount, the court should decide what method for calculating the amount is most appropriate for the particular settlement.

Courts generally use one of three methods for determining the amount of fees to award to counsel who performed common benefit work: the *percentage method* (designating a percentage of the settlement fund as the common benefit fee); the *lodestar method* (multiplying the reasonable hours expended on the case by the reasonable hourly rate); or the *blended method* (designating a percentage and then comparing that amount to the amount derived using the lodestar method, as adjusted by a multiplier analysis).

---

[200] 582 F.3d at 538-39.

[201] *In re Genetically Modified Rice Litig.*, 4:06 MD 1811 CDP, 2010 WL 716190, at *7 (E.D. Mo. Feb. 24, 2010).

[202] Finally, the court required the auditor and plaintiffs' liaison counsel to submit volumes of data reflecting the time and money that class counsel spent on the diet drugs litigation—data that the court put on the public record and used to support the fee award that it ultimately granted.

BEST PRACTICE 12F(i): Although the percentage method is appropriate in many cases, the transferee judge should consider using a blended method to ensure that the fee award is reasonable.[203]

The majority of courts use the percentage method in common fund cases, with many using a lodestar multiplier as a cross-check for reasonableness (i.e., a blended approach).[204]  In most cases, the percentage method aligns the interests of common benefit lawyers with that of their clients; the greater the recovery, the greater the fee award.  This method can be efficiently administered by the courts and eliminates knotty issues of lodestar inequities.[205]  On the other hand, the percentage method might result in a windfall to common benefit lawyers who achieve a substantial recovery with little effort.  The percentage method may also undercompensate counsel in cases where a small recovery is achieved due to circumstances beyond the control of the lawyers, such as a limited-fund situation or the absence of a critical mass of injured claimants sufficient to support the litigation effort.  By contrast, using the lodestar method may penalize counsel who negotiate an early settlement even though they were able to achieve substantial savings on litigation expenses.  To avoid the potential shortcomings of the percentage and lodestar methods, many courts use the blended method to determine a reasonable fee.[206]

---

[203] As the Third Circuit Task Force observed, "[g]iven the substantial problems with the lodestar approach generally, the Task Force is highly skeptical about the use of the lodestar even as a cross-check when awarding a percentage of the common fund." TASK FORCE REPORT, at 422.  Accordingly, the Third Circuit Task Force concluded that the percentage fee, "tailored to the realities of the particular case, remains superior to any other means of determining a reasonable fee for class counsel." *Id.* at 355; *see also In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009) ("In common fund cases such as this one, the percentage-of-recovery method is generally favored.") (citation omitted); 6 BROMBERG & LOWENFELS ON SECURITIES FRAUD § 8:18 (2d ed.) (noting that after Task Force Report, "most courts returned to a percentage of recovery or settlement formula with some latitude in the percentage").  For the same reasons, the percentage fee method has been approved by the Supreme Court as well as several courts of appeals. *See, e.g., Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988) ("[T]he [Supreme] Court . . . explicitly described a percentage calculation as a 'reasonable fee' in [common fund] cases.") (citing *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984)); *accord Camden Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) ("After reviewing *Blum*, the [Third Circuit] Task Force Report, and the foregoing cases from other circuits, we believe that the percentage of the fund approach is the better reasoned in a common fund case.") (collecting cases).

[204] *See* NEWBERG ON CLASS ACTIONS § 1:18 (5th ed. database updated June 2014) ("The majority of state and federal courts use a percentage of fund method, with or without a lodestar cross-check, to calculate fee awards"); *see also* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 832 (2010) (finding that 69% of judges use the percentage of fund method with or without the lodestar cross-check); Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 267 (2010) (finding that the lodestar cross-check is becoming more commonly used, with roughly 42.8% of courts using both lodestar and percentage methods between 2003-2008, whereas approximately 24.3% of courts used both between 1993-2002).

[205] *See Turner v. Murphy Oil USA, Inc.*, 422 F. Supp. 2d 676, 682 (E.D. La. 2006) ("As the Federal Judicial Center has noted, '[i]n practice the lodestar method is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation. In addition, the lodestar method creates inherent incentive to prolong the litigation until sufficient hours have been expended.'  *MCL* § 14.121 (2004).  In light of the problems that have emerged with the lodestar method, the majority of Courts of Appeals have adopted the percentage-fee method in common-fund cases, either as a primary or secondary method of calculating fees.").

[206] *See* Fallon, 74 LA. L. REV. at 384; *see also In re Diet Drugs*, 582 F.3d at 545 n.25; *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-51 (9th Cir. 2002).

BEST PRACTICE 12G: In determining the amount of fees to be paid to individual attorneys from the CBF, the transferee judge will need to determine the customary hourly rate.  In large and mass-tort MDLs, the judge may find it appropriate to use a national rate for certain purposes.

In calculating attorney's fee awards, courts typically use either the customary rate an attorney charges clients hourly or the hourly rates charged by attorneys of similar skill in the court's locale.  Some courts have used standardized rates when awarding attorney's fees in common fund cases to ensure that all counsel are compensated fairly.  A seminal case in this regard was the *Agent Orange* litigation, in which the court established flat hourly rates for partners and associates and awarded fees to all counsel using those rates.[207]  In a lengthy discussion, the Second Circuit noted that courts should normally use the hourly rate charged by attorneys in the area but approved the use of a national hourly rate under the circumstances, which included the length of the litigation and the large number of attorneys from across the country who were involved.[208]

Courts have also used national rates for a more limited purpose, such as in performing a lodestar crosscheck on a percentage of the fund fee award.[209]  By using standardized rates, a court can more accurately compare the multiplier in the case before it with the multipliers awarded in other cases.[210]

BEST PRACTICE 12G(i): The transferee court may also award fees at current rates, rather than historical rates, if the litigation has spanned many years, although the practice is disfavored in limited-fund cases.

District courts have the discretion to compensate prevailing parties for delays in the payment of fees by awarding fees at current rather than historical rates, in order to adjust for inflation and loss of use of those funds.[211]  As the Supreme Court has explained, "compensation received several years after the services were rendered . . . is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be

---

[207]*In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1296, 1349-50 (E.D.N.Y. 1985), *aff'd in part, rev'd in part on other grounds*, 818 F.2d 226 (2d Cir. 1987).

[208] 818 F.2d at 231-34.

[209] *See, e.g., Martin v. FedEx Ground Package System, Inc.*, No. C 06-6883 VRW, 2008 WL 5478576, at *6-7 (N.D. Cal. Dec. 31, 2008) (using the *Laffey* matrix, a widely recognized compilation of attorney and paralegal rate data, to establish standardized rates based on attorneys' years of experience and then adjusting for California's higher cost of living).

[210]*See id.* at *6 ("Standardized hourly rates result in a meaningful comparison among multipliers in various cases.  If the standardized rates are lower than actual rates billed by attorneys, then a comparison of multipliers in many cases will indicate a higher standard multiplier.  Thus, counsel need not worry whether the standardized rates reflect their actual billing practices; the court seeks only to compare lodestar multipliers calculated at the same standardized hourly rates across many common fund cases.").

[211]*See Fischel v. Equitable Life Assurance Society of U.S.*, 307 F.3d 997, 1010 (9th Cir. 2002); *Murray v. Weinberger,* 741 F.2d 1423, 1433 (D.C. Cir. 1984) ("Current market rates have been used in numerous cases to calculate the lodestar figure when the legal services were provided over a multiple-year period and when use of the current rates does not result in a windfall for the attorneys.").

the case with private billings."[212]  There have been exceptions to this prevailing practice.  In certain circumstances, such as a limited-fund settlement, it may be more appropriate for a court to use historical rates to calculate the fee award.[213]

> BEST PRACTICE 12G(ii):  The transferee court should appoint a common-fund fee committee, comprised of members of the plaintiffs' leadership team, or designate a special master or magistrate judge, to make fair and impartial allocation recommendations to the court, although the court retains ultimate control over the allocation and distribution of funds. [214]

Distribution of the CBF to attorneys who performed common benefit work should be done in a manner that promotes fairness and efficiency.  Although the court is, of course, the final arbiter, it should avail itself of the experience and insights of the PSC, or some subset thereof, whose members have stewarded the litigation efforts and who have observed the common benefit efforts of other non-PSC attorneys throughout the entire arc of the litigation. The court may request that the PSC make a proposal for allocating fees among the attorneys who performed common benefit work.[215]  In the *Guidant Defibrillator* litigation, the court established a "fee and cost allocation committee" to make a proposal to the court about the allocation of attorney's fees and costs among all counsel who were entitled to share in the CBF.[216]

Special masters can assist the court with the allocation of common benefit funds, particularly when a MDL proceeding has progressed over a period of years through dispositive motions, fact and expert discovery, substantive hearings, multiple bellwether trials, and potentially interlocutory appellate review.[217]  Courts have appointed special masters to oversee the disbursement of attorney's fees from a settlement fund, including conducting hearings on disputed matters and issuing recommendations to the court on their findings.[218]  Some courts

---

[212]*Missouri v. Jenkins,* 491 U.S. 274, 283 (1989).

[213]*See Fanning v. Acromed Corp.*, 1014, 2000 WL 1622741, at *8 n.19 (E.D. Pa. Oct. 23, 2000) ("In apportioning the gross fee among Petitioners, the court will refer to the historical lodestar rather than the current lodestar. . . . the court is confronted with a limited fund and a percentage of recovery that is less than the current or historical lodestars. Here, it seems most equitable for the court to use the actual, historical lodestar in allocating the award.").

[214] *See, e.g.,* Amended Order No. 25: Common Benefit Order, *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices & Products Liability Litigation*, MDL 2151, No. 8:10ML2151-JVS(FMOx) (C.D. Cal. June 9, 2013) (ECF No. 3754).

[215]*See* Fallon at 387-88 (describing the process used by the allocation committee appointed by the court in the *Vioxx* litigation to gather information and make a recommendation).

[216]*In re Guidant Corp. Implantable Defibrillator Prods. Liab. Litig.*, No. 05-1708, 2008 WL 451076, at *1 (D. Minn. Feb. 15, 2008).

[217] *See, e.g.,* Order Appointing Special Masters, *In re Actos (Pioglitazone) Products Liability Litigation*, MDL 2299, No. 6:11-md-02299-RFD-PJH (W.D. La. Apr. 11, 2012) (ECF No. 532).  The appointment of a special master is typically unnecessary in cases involving a small number of plaintiffs' law firms, and should be considered only in those complex cases where the number of counsel is so great and their efforts so varied and potentially obscured that individual contributions may have escaped the district court's notice.

[218] In the *Zyprexa* litigation, for example, the court appointed four special masters to oversee settlement negotiations and administer settlement agreements, and the court gave the special masters the discretion to order reductions or increases in the amount of attorney's fees awarded to claiming counsel. *In re Zyprexa Products Liab. Litig.*, 594 F.3d 113, 116 (2d Cir. 2010);  Courts have also appointed special masters to address disputes over the allocation of attorney's fees.  *See In re Vioxx Products Liab. Litig.*, 760 F. Supp. 2d 640, 662 (E.D. La. 2010); *Turner v. Murphy*

appoint an accounting firm or similar professional to provide accounting services such as compiling submissions and providing reports to the court.[219]

Ultimately, the transferee judge must decide the appropriate allocation. Even when presented with a reasonable recommendation from the PSC or a special master that is undisputed, the court must reach an independent conclusion that the allocation is fair and reasonable. Judge Fallon, who presided over the *Vioxx* litigation, summarized his approach to issuing a ruling on the allocation of attorney's fees:

> At this point the court had before it the report of the allocation committee; the transcript and documents compiled by the allocation committee; the depositions, briefs, and transcript compiled by the Special Master, as well as his report; and the data showing the hours logged, costs expended, and the nature of the work performed. The court prepared a summary chart listing the name of each fee applicant, a cross column for each category of work performed by the applicant, and the total time logged in performing that task. The categories included such things as: preparing pleadings; taking or assisting in depositions; participating in written discovery; writing briefs; arguing motions; preparing for trial; participating in trials, appeals, or settlement negotiations; and administration and committee leadership. Each category was assigned a number with categories such as participating in trials, participating in settlement negotiation, taking depositions, writing briefs, and committee leadership having a larger number. A total of these numbers generally revealed the individuals who performed the most significant work in resolving the litigation.[220]

> BEST PRACTICE 12H: Courts should explain their reasoning for the allocation to further the goal of transparency, to provide feedback to interested parties, and to ensure that any reviewing court has a sufficient record.[221]

The transferee judge should endeavor to create a complete and well-documented record, as well as a detailed explanation for the court's allocation decisions. The court should permit, and indeed require, counsel to brief any disputes, and it should issue written or on-the-record opinions citing the reasons for the method and amount of allocation and legal precedent. Some

*Oil USA, Inc.*, 582 F. Supp. 2d 797, 799 (E.D. La. 2008) (appointing a special master to allocate fees from the common benefit fund after the PSC was unable to achieve agreement). In *Turner*, the special master implemented a process that required attorney-fee applicants to submit ten-page affidavits in support of their requested fee awards, allowed five-page challenge affidavits in response, and gave counsel an opportunity to serve limited written discovery (consisting of five interrogatories and two requests for production) on other applicants, and notice depositions. 582 F. Supp. 2d at 803-04. The special master also held a hearing after issuing his preliminary report at which counsel were allowed to call up to two witnesses and present five-minute closing arguments. *Id.* at 806.
[219]*See* Davis & Garrett, *supra* note 60, at 495-96; *In re Vioxx Products Liability Litigation*, 760 F. Supp. 2d 640, 643-44 (E.D. La. 2010).
[220]Fallon, 74 LA. L. REV. at 388-89.
[221] "The court awarding [attorney's fees] should articulate reasons for the selection of the given percentage sufficient to enable a reviewing court to determine whether the percentage selected is reasonable." *MCL* § 24.121, at 206.

settlement agreements contain a provision that requires any plaintiff accepting the settlement to also waive objection to the court's fee determinations.[222]

> BEST PRACTICE 12H(i):  In imposing fee assessments, the transferee judge should promote fairness among counsel, compensate counsel who made the recovery possible, and suppress perverse incentives among non-performing counsel. This may include imposing fees on attorneys representing individual clients who opt out, yet use MDL discovery materials or otherwise enjoy the fruits of common benefit counsels' efforts. It may also include extending the fee structure to non-MDL participants, if the defendant agrees to a global settlement.[223]

Another issue the court may face is whether plaintiffs represented by non-leadership counsel should be charged with some of the discovery costs.  As the Supreme Court has observed, "[t]o allow the others to obtain full benefit from the plaintiffs' efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiffs' expense."[224]  However, in determining whether to impose fees on non-participating plaintiffs' counsel, and if so to what extent, the court should consider the work product created. Depending upon the timing of the settlement and other factors, the work product may be of more or less value to non-participating counsel.

When a defendant enters into a global settlement of claims filed in different courts (for example, if some lawsuits have not been incorporated into the MDL), the other courts generally have attempted to adhere to the MDL's procedures (including the establishment of a CBF) for the sake of efficiency and fairness.[225]  Again, the court should be careful to assess the contribution of all attorneys, as state-court attorneys may have made a meaningful contribution that was not − at the time undertaken − submitted to the MDL.

---

[222]*Id.* at 380-81.

[223]*See generally In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977) (requiring those who benefit from lead counsel's work to consolidated litigation to bear a portion of the fee award and reducing their contingent fee liability to their non-participating attorneys accordingly).

[224]*Mills v. Elec Auto-Lite Co*., 396 U.S. 375, 392 (1970).

[225]*See, e.g., Roberts v. Johnson & Johnson*, No. MID-L-009782-06, 2010 WL 7504814 (N.J. Super. Ct. Law Div., Aug. 11, 2010) ("Order Approving the Settlement") (ordering CBF payments be made in accordance with orders of federal MDL court).

# CHAPTER 6

## FEDERAL/STATE COORDINATION

MDLs are no longer islands.  A transferee judge increasingly confronts the reality of other proceedings and actions, moving forward outside the MDL court's jurisdiction.  Case-management strategies must therefore account for the impact of developments in parallel state court litigation, as well as the specter of regulatory or agency actions.  The degree to which coordination is possible and the contours of that interaction are driven by case-specific factors − the individuals and personalities involved, the degree of overlap in players between state and federal cases, the procedural devices available in and degree of flexibility available to judges in each of the applicable states for coordination, the extent to which state cases are likely to reach trial during the pendency of the MDL and the degree to which they will be perceived as helpful or distinguishable from the MDL cases, to name just a few.  (Indeed, in some jurisdictions there is no trial judge assigned until a month before trial, so there is little potential for intercourt coordination.  In these cases, the transferee judge may focus on mechanisms for facilitating coordination by counsel themselves, which are also detailed in this chapter.)

The path taken by any transferee judge will therefore always be a unique one.  This chapter explores the extent to which judges and attorneys have found coordination to be helpful in prior cases and present some of the varied ways that this coordination can occur.  The *MDL Pocket Guide for Judges* is a good resource in this regard, which this chapter does not seek to duplicate.  Instead, this chapter is intended as a companion that provides judges' and attorneys' wisdom and words of caution about the ways in which that guidance has been implemented in prior cases.

> **GUIDELINE 13**:  Effective coordination between the federal and state courts in an MDL action promotes cooperation in scheduling hearings, conducting and completing discovery, facilitates efficient distribution of and access to discovery work product, avoids inconsistent federal and state rulings on discovery and privilege issues, if possible, and fosters communication and cooperation among litigants and courts that may facilitate just and inexpensive determination.

The strongest proponents of consolidation have long advocated "inter-system" cooperation and interaction between MDLs and parallel state proceedings starting sooner, rather than later.[226]  The *Manual for Complex Litigation* has regularly encouraged federal judges to communicate "informally" with their colleagues at the state level.[227]  Those who support "inter-system" collaboration have suggested a variety of tools, including joint scheduling, joint discovery plans, a common discovery master, and joint settlement initiatives.[228]  Such

---

[226] *See* Judicial Panel on Multi-District Litigation and Federal Judicial Center, *Ten Steps to Better Management:  A Guide to Multi-District Litigation for Transferee Judges* (2014), p. 7.

[227] *See Manual for Complex Litigation (Second),* §31.31 (1985); *Manual for Complex Litigation (Fourth)*, §31.312 (2004); *see also* Catherine R. Borden, Emery G. Lee, III, *Beyond Transfer:  Coordination of Complex Litigation in State and Federal Courts in the 21st Century*, 31 Rev. Litig. 997, 1005 (2012).

[228] *See* Schwarzer, Weiss, and Hirsch, *Judicial Federalism in Action:  Coordination of Litigation in State and Federal Courts*, 78 Va. L. Rev. 1689 (1992); Borden and Lee, *supra*.

coordination requires communication and cooperation among the courts themselves, among counsel, and between counsel and courts.

Communication is an essential component of the cooperation process in part because of the degree to which state laws and state judicial norms vary. State judges may be in a position to cooperate fully with the MDL, coordinating to the greatest extent possible. But other judges may be concerned about changing the speed with which the cases on their docket move forward based upon requests from a third-party (i.e., the MDL judge). Some state judges may wish to limit what they view as ex parte communications with another judge, while others inform the parties that they will be communicating with the MDL judge (and, if applicable, other judges with parallel cases) and then includes this notation in an order to avoid any later confusion. Still other judges' participation may be impacted by the numerosity of similar cases upon their own docket − does the judge just have a single parallel case or hundreds of parallel cases (whether as the result of individual filings or a state coordination rule akin to the federal MDL statute)?

Achieving the goal of reducing discovery costs and duplication in MDL litigation that is accompanied by related actions in state courts, such as mass tort and consumer cases, depends upon effective coordination. Coordination is an action as well as a principle, and requires ongoing effort throughout the course of the proceedings. If state court actions are pending in many districts or states, communication among judges is a concrete way to demonstrate the reality of federal-state coordination and inter-judicial collegiality. It also gives a role and voice to counsel who may be active in the state court proceedings, but may not have sought, or obtained, leadership appointments in the MDL itself.

The way in which this communication and coordination is manifested can take a variety of forms. In good economic times, some federal judges have been able to arrange in-person meetings with their state counterparts, going to visit each individual court, as a mechanism to show respect for the state judge, enhance relationship building, and in turn foster trust and understanding between the courts. Other judges have convened joint hearings, which have in turn permitted this opportunity for in-person interaction and discussion before the hearing. Others have merely coordinated on matters, formally or informally; for example, some transferee judges have set up periodic teleconferences in which all the parallel court judges participate to make sure that the cases are moving along at about the same pace and, if not, ensuring the judges are aware of the divergence and the impact it may have on the parties' actions in their own cases. So long as each court retains its independence to determine procedural and substantive matters for itself, there should be no problem with such communications. But, at a minimum, most MDL judges have found that having a website updated with new orders within hours is a helpful way to communicate with state judges and state parties, particularly in cases in which more formal coordination is not favored for the strategic reasons described above.

BEST PRACTICE 13A: The transferee judge should set a cooperative tone early in the litigation by engaging in outreach and communications with state court judges, by specifying the time and manner in which counsel are to report on the existence, status, and progress of related actions in other jurisdictions, and by encouraging and facilitating ongoing coordination.

The coordination "best practices" highlighted in this chapter have been effective aids to courts in achieving functional inter-jurisdictional coordination. As the MDL court undertakes this process, it should seek to create mechanisms for bidirectional information sharing with the parallel cases with respect to not only the case itself, but also the judicial expectations (whether driven by statutory provisions, normative considerations, or case-specific exigencies) about how the cases will proceed. The "5C's" − communication, cooperation, civility, coordination, and candor − are helpful touchstones in framing one's approach.[229]

BEST PRACTICE 13B: In issuing the initial scheduling order, the newly appointed transferee judge should consider including provisions tailored to facilitate effective federal-state coordination.

Possessing up-to-date information on the status and progress of related state court proceedings is the first step to effective federal-state coordination. Federal-state coordination should be included as a discussion item on the agenda provided in the initial conference order.

BEST PRACTICE 13B(i): The transferee judge should direct liaison counsel for plaintiffs and defendants to provide a report on the existence and status of related state court litigation, either in writing in advance of the initial conference or orally at the conference itself to inform this discussion. Counsel should be requested to provide contact information for the state court judges before whom related proceedings are pending.

As lawyers have grown accustomed to substantial levels of coordination, transferee judges have found that the appointment of appointed liaison counsel is "essential in most MDLs." Most judges prefer to appoint one from the plaintiffs' side and one from the defense side. In addition, state court judges may also decide to appoint liaisons; typically these are counsel who have cases before the state court and are actively involved in the federal MDL as well.

---

[229] For the genesis of this wisdom, see Francis McGovern, *Toward a Cooperative Strategy for Federal and State Judges in Mass Tort Litigation*, 148 Penn. L. Rev. 1867 (2000) and Francis McGovern, *Rethinking Cooperation Among Judges in Mass Tort Litigation*, 44 UCLA L. Rev. 1851 (1997).

BEST PRACTICE 13B(ii):  Similar reports by liaison counsel should be made a feature of every subsequent status conference, so that the transferee judge is apprised, on an ongoing and current basis, of hearing schedules, discovery activities, trial dates, and other important events and rulings in the state courts. These recommendations can be scaled based upon the needs of the particular litigation.

In MDLs with few parallel cases, the lead or liaison counsel may be responsible for these tasks and may often simply apprise the judge of "no action" in the state courts during these conferences.  In contrast, in some MDLs there can be a large number of cases in state court − in some cases even approaching the number of individual cases in the MDL.  In these cases, the judge may consider appointing a state-federal liaison counsel to focus exclusively on these tasks and provide regular and timely updates to the MDL court, the state courts, the PEC, and state court counsel.

BEST PRACTICE 13B(iii):  Counsel should be advised at the initial conference that such communications between the MDL judge and state court judges will take place.  While counsel should be given the opportunity to object, there will rarely be a well-founded objection to such communications, which have become a familiar feature of multi-jurisdictional proceedings.

Many MDL judges initiate communication with the state court judges themselves, by telephone or email, to introduce themselves and to invite ongoing communications.  State judges have commented that in some jurisdictions their resources are limited such that, for example, a letter is highly likely to go unanswered because the judge does not have a secretary, while a call from the transferee judge would be immediately answered.  Some judges prefer email communications, while others acknowledge never checking the account; thus there is no single "right" communication method to reach every judge.  As such, the transferee judge may want to consider trying different, successive methods of outreach, rather than assuming an unanswered communication is a sign that the state judge is unwilling to communicate.

Counsel may, or may not, actively desire such coordination.  While coordination saves time and money, there may, literally, be competing considerations.  Many judges have noted that particularly at the outset, they underestimated the extent to which plaintiffs' counsels' concerns about common benefit assessments would color their perceptions of state-federal coordination.

BEST PRACTICE 13C:  In an MDL action with parallel court actions, state and federal judges should communicate informally as needed to correct perceived duplication and should explore whether formal measures may, or may not, be efficient or justified.

Enthusiasm for tightly-knit or formal cooperation between state and federal judges has waxed and waned.  Achieving an optimal level of coordination is an art, rather than a science, and informal coordination may, in a given litigation, be all that is necessary or feasible. In the literature, examples of thorough-going coordination have typically been limited to state courts in

the same jurisdiction as the federal transferee court.[230]  Additionally, not all states have corresponding mass consolidation statutory counterparts.  Coordination even with the many that do may be difficult.[231]  The circumstances of a particular litigation landscape may weigh for, or against, a high degree of coordination.

The following considerations should be kept in mind.  First, the organization of a federal MDL – by itself – is complex and demanding.  It presents the transferee judge with "difficult management, intellectual, and personal challenges."[232]  If a judge must layer on top of those challenges an ongoing coordination with state court cases, the burdens may overwhelm and delay judicial administration.  Second, there are federalism concerns raised by intensive and formal interaction, e.g., will state court judges yield their superior knowledge of state law and their own notions of effective procedure – for example, early trials – to their federal counterparts?[233]  Third, some judges have expressed concerns about *ex parte* communications with state court colleagues.[234]  But inter-judicial communication among courts charged with managing similar cases, involving the same defendants and often the same lawyers, may be highly useful to avoid scheduling conflicts (such as for hearings and trials) even if additional coordination is not accomplished.

More commonly, the concern is with the extent to which joint hearings may be conducted.  Many judges have taken the view that such joint hearings are proper and effective methods of allowing the attorneys to present evidence, so long as each judge then decides the motion on his or her own.  (To this end, each judge must be permitted to ask questions and otherwise remain unrestricted in his or her ability to obtain the information necessary to a ruling; failure to do so may result in due process objections, as well as a perception of disrespect by the judge who was not afforded the opportunity to question counsel.)  However, some judges have expressed hesitation about whether such a joint hearing is proper.  While clarification about the legality of these innovative procedures would be helpful, in the interim, it is sufficient for our purposes to simply note that this is an area in which courts have taken both approaches and that a transferee judge will want to assess the developing state and federal law at the time, to determine whether a joint hearing would be both efficient and permissible.

---

[230] *See* Schwarzer, Weiss and Hirsch, *supra*, for case studies.

[231] At least fifteen states have enacted analogues to the MDL statute and consolidation scheme.  They are: California, Cal. Civ. Proc. Code §§404-404.9, Colorado, Colo. R. Civ. P. 42.1(g) (2014) (amended by C.O. 0013), Connecticut, Conn. Gen. State §51-347b (West 2014), Illinois, Ill. Sup. Ct. R. 384, Maryland, Md. R. 2-327(d), Massachusetts, Mass. Trial Ct. R. XII, New Hampshire, N.H. Super. Ct. R. 113, New Jersey, N.J. Super. Tax & Surrogate's Ct. Civ. R. 4:38-1, 4:60-1, New York, N.Y. Comp. Codes R & Regs. Tit. 22, §202.69 (West 2014), Oklahoma, Okla. Const. art. VII, §§4, 6, Oregon, Ore. R. Civ. P. 32L(1)(L), Pennsylvania, Pa. R. Civ. P. No. 213, Texas, Tex. R. Jud. Admin. §13.10, Virginia, 108Va. Code Ann. §§8.01-267 to 8.01-267.9 (Lexis 2014), and West Virginia, W. Va. Code §56.9-1 (LexisNexis 2014).  For a discussion of the statutes in these states, *see* Yvette Ostolaza, Michelle Hartmann, *Overview of Multidistrict Litigation Rules at the State and Federal Level*, 26 REV. LITIG. 47, 69-75 (2007).  *See also* Mark Herrmann et al., STATEWIDE COORDINATED PROCEEDINGS: STATE COURT ANALOGUES TO THE FEDERAL MDL PROCESS (West 2d ed. 2004).

[232] *Ten Steps to Better Case Management, supra*, p. v.

[233] *Schwarzer, et al., supra*, pp. 1743-48.

[234] *See* Borden and Lee, *supra*, at 1017-18.

BEST PRACTICE 13D:  If multiple jurisdictions are involved, the transferee judge should consider procedures or mechanisms to facilitate state/federal court coordination, to provide periodic reports to each of the courts, to assist in coordinating discovery and hearing schedules, and to schedule joint federal-state court status conferences and hearings.

Many cases involve parallel federal and state court proceedings, and coordination with the state litigation will ensure that the cases are conducted as efficiently as possible.  Counsel in the federal and state cases can, for example, conduct joint depositions of expert witnesses that will provide testimony and reports in both proceedings.[235]  A number of transferee judges have noted that at the outset, they did not anticipate the extent to which procedural variation between states and between state and federal procedure would impact coordination (e.g., differences in the length of depositions or number of interrogatories). While these differences should be resolved through party negotiation, it is helpful for the judges to be aware of these dynamics, which may lead not only to conflict between the parties but also to opposition to coordination by certain interest groups.

Major hearings can be coordinated, such as *Daubert* proceedings.[236]  As discussed in the prior section, there may be some variation in the extent to which state or federal law permits joint hearings.  However, lesser forms of coordination are possible as well.  For example, counsel noted that inconsistent deadlines between state court and federal court proceedings could be substantially disruptive at best, and result in strategic gaming at worst.  One additional word of caution from state judges related to a sense that while coordination was permissible and helpful, that requests from transferee judges to delay ruling on a motion, delay a trial, or to discuss particular motions' legal merit in advance could be viewed as improper.  Some judges expressed a generalized concern with incorporating ex parte requests to change the court's ruling, while others expressly noted state law mandates − for example, a Texas mandate to get all asbestos cases to trial in six months conflicted with a transferee judge's request to stay the case for many years.  Thus, while coordination can be helpful, the transferee judge should be aware of and sensitive to potential well-reasoned bases for state court judges to oppose certain requests.  Indeed, being aware of these potential minefields at the outset, a transferee judge may approach consolidation in a more considered manner and avoid unintentionally damaging the relationship with the state court judge.

A transferee judge may want to designate a member of the committee to serve as a liaison or else direct lead or liaison counsel to communicate regularly with counsel in the state litigation.[237]  Judges may also consider appointing a special master to assist in coordination with the state court litigation.[238]

---

[235] *Managing Multidistrict Litigation in Products Liability Cases* § 6(a); *see also* Case Management Order No. 12 Regarding Expert Deposition Discovery at 2, *In re Phenylpropanolamine (PPA) Products Liability Litigation*, MDL 1407, No. 2:01-md-1407-BJR (W.D. Wash. Dec. 23, 2002) (ECF No. 1298).
[236] Pretrial Order 143 Regarding *Daubert* Proceedings on Stroke, *In re Avandia Marketing, Sales Practices and Product Liability Litigation*, MDL 1871, No. 2:07-md-01871-CMR (E.D. Pa. Oct. 21, 2011) (ECF No. 1878).
[237] *MCL* § 10.225.
[238] *MCL* § 20.312; *see also* Francis E. McGovern, *Toward a Cooperative Strategy for Federal and State Judges in Mass Tort Litigation*, 148 U. Pa. L. Rev. 1867, 1886-87 (2000).

BEST PRACTICE 13E:  The MDL judge should direct designated counsel (typically, lead or liaison counsel for each side) to provide information on the status of related state court actions in the written status conference report submitted several days before each regularly scheduled status conference.

The transferee judge will often find it helpful to delegate certain information functions to attorneys, relieving the burden from the court while expanding the available pool of information at the judge's disposal.  Such a report should include information on the number and location of recently-filed state court cases; trial dates, discovery deadlines, status conferences, and other key dates in such actions; and the status of removal and remand motions.  The transferee judge or the designated state court liaison counsel can assure ongoing communication by disseminating these status reports to all courts and counsel.

During the pendency of an MDL, the transferee judge also may be expected to coordinate with state courts handling parallel state actions.  Such coordination may include the creation of nationwide discovery plans; the entry of consistent evidence-preservation orders; the coordination of a national calendar; encouraging state-federal cooperation; and familiarization with state courts, specifically their practices for consolidating cases and case management.[239]  It is especially important in the multiple-class-action context to coordinate efforts between the transferee judge and state courts because unilateral action by a single court to certify a class or assert nationwide jurisdiction may undermine coordination efforts among all courts.[240]  It is also important that attempts by the transferee judge to coordinate the litigation are not perceived as attempts to dominate state courts.[241]  To that end, clear communication between the transferee judge and state courts is essential.  In some cases communication may be facilitated through the appointment of a special master[242] or advisory committees.[243]  Transferee judges may consider initiating cooperative efforts with state judges during the initial MDL stages, because early cooperation may help avoid potential conflicts later on in the process.[244]

---

[239] *MCL* § 20.311.  Some states have adopted procedures for assigning complex multiparty litigation to a single judge or panel or have created courts to deal with complex business cases.  *Id.*  The transferee judge may consider becoming familiar with such efforts in order to take advantage of efficiencies presented by state court innovations.
[240] *Id.*
[241] *Id.*
[242] *Id.*
[243] *MCL* § 20.312.
[244] *Id.*  Transferee judges may look to the silicone gel breast implant and diet drug litigations as models for state-federal cooperation.  *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, MDL No. 926; *In re Diet Drugs*, MDL No. 1203.  In those cases, the transferee judge took the lead in implementing a comprehensive state-federal discovery plan while state judges presided over individual trials and settlements.  *See MCL* § 20.312.  The parties achieved the economies of consolidated discovery and developed information about the value of individual cases, providing a basis for aggregated settlements and judgments.  *Id.*

BEST PRACTICE 13F:  The transferee judge should provide accessible, up-to-date information on the status and progress of the MDL proceedings, including the status and progress of coordination with the state courts, and specific pages for each MDL on the district court's website.  The MDL-specific site should provide a calendar, access to important orders, hearing transcripts, and a list of key events.[245]

As noted above, status conferences may be held jointly between the MDL court and one or more state courts.  As the *Manual for Complex Litigation,* § 20.313 describes the federal-state coordinated pretrial process:

State and federal judges have often worked together during the pretrial process.  They have jointly presided over hearings on pretrial motions, based on a joint motions schedule, sometimes alternating between state and federal courthouses.

Telephonic access via a toll-free number can facilitate participation by interested counsel and by multiple judges, while minimizing the cost and inconvenience of travel.  Video conferencing has also been used successfully where facilities are available.

BEST PRACTICE 13G:  In MDL and state court proceedings, the judges should consider holding joint pretrial hearings, including joint status conferences in a variety of jurisdictions, co-presiding over each conference with the state court judge in that jurisdiction.

For example, MDL courts and state judges have convened joint *Daubert/Frye* hearings so that oral argument by counsel, and testimony by experts whose qualifications are being challenged under the *Daubert* and *Frye* standards, need not appear and argue or testify more than once.  Other courts have even allowed for the judges to meet for presentations by the lawyers outside the motion context; for example, for presentations on the applicable science issues or bringing the judges up to speed on key issues in the case.  Teleconferencing and video conferencing can be used to facilitate such joint hearings if it is not practicable for all judges to be present in person.  However, as noted before, some judges have expressed a procedural concern with joint hearings, although there is ample precedent and support in the *Manual on Complex Litigation* at § 20.313.

At least at the federal level, this may be abated by the recent *Arkison* decision.  In *Arkison*, the appellant argued that while an Article III judge ultimately ruled on a particular issue de novo, the judge might have given practical deference or otherwise been swayed by a non-Article III judge − there, a bankruptcy judge.  The Supreme Court upheld the validity of the process, holding that so long as the district court judge indicated he was reviewing the case de novo, this was sufficient.  By extension, while the reasoning of the state court judges in their questioning at oral argument may influence the Article III judge, this should not create any constitutional hurdle.  For this reason, counsel should be encouraged to cite to the specific law of each jurisdiction in briefing a motion, even if it will be heard in a joint hearing.

---

[245] *See MCL* § 40.3.  For a current example, *see, e.g.*, The Eastern District of Louisiana's official court website for MDL-2179 Oil Spill by the Oil Rig "Deepwater Horizon," http://www.laed.uscourts.gov/OilSpill/OilSpill.htm.

The high cost of experts may also be reduced, and expert deposition scheduling difficulties reduced, by suggesting the use of common experts, coordinated expert disclosures, and expert discovery.[246]

> BEST PRACTICE 13H:  The transferee judge can also promote coordination through its supervision of the litigation process; for example, the court may encourage the parties to establish a common discovery-product depository (now most frequently a password-protected online collection rather than a physical depository) to avoid duplicative efforts.

Even if coordination is not possible between the judges, the parties may themselves coordinate − for example, creating a document depository, issuing joint deposition notices, and the like.  However, the transferee judge may still have a role in facilitating these private attempts at coordination.  In particular, federal/state coordination may be hindered by concerns that privilege may be lost or waived by production of information, or discovery rulings, in one jurisdiction.  Federal Rule of Evidence 502 now protects parties from the production of privileged information, without the need to show mistake or inadvertence; privileged documents that have been produced may be "clawed-back."[247]  Rule 502(d) orders are controlling in state courts under Rule 502(g).

> BEST PRACTICE 13I:  If no party requests the court to issue a Rule 502(d) order, the transferee judge should consider raising the matter on its own.

> BEST PRACTICE 13J:  When feasible without causing discovery delays, the transferee judge should coordinate with state court colleagues to set uniform schedules in related federal and state proceedings for document production, production of privilege logs, and resolution of privilege disputes and other objections.

Conflicts can arise between counsel, particularly when clear understandings are not reached in advance with respect to issues like what rules will govern the length of a jointly noticed deposition, the allocation of that time, and the order in which counsel will question the witness. The transferee judge does not have power over parties that are not before it − and, while technically it may issue an order applicable to parties that appear in both cases (namely the defendant), or exert informal pressure over counsel that appear in both cases, this approach is disfavored.  Instead, the better approach for the transferee court may simply be to ask questions of the parties to ensure that they have reached agreement on these issues, rather than issuing direct orders.

---

[246] See "Ten Steps to Better Case Management: A Guide for MDL Transferee Judges" (Judicial Panel on Multidistrict Litigation/Federal Judicial Center 2014), § VII.  Coordinate with Parallel State Court Cases.
[247] For a recent example of such a common benefit order, see "Amended Order No. 25:  Common Benefit Order," MDL No. 2151 in Toyota Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation (C.D. Cal. 2003), http://court.cacd.uscourts.gov/Cacd/RecentPubOp.nsf/Toyota?OU

If the court believes a more aggressive role would be valuable, a number of options exist. One approach is for the MDL court and state courts to appoint a single special master, who then has the authority to coordinate discovery across all of the cases. Transferee judges that have used joint appointments report that it can be incredibly helpful in ensuring that discovery proceeds smoothly, but note that it takes the right case, right parties, and right situation for a joint appointment to be feasible.

Transferee judges should also be sensitive to the reality that discovery may be proceeding at a different pace or with different depth in the state courts. On the one hand, the MDL process will (in most cases) have triggered a months-long delay in the federal cases, while the state cases continued moving forward. On the other hand, the MDL may have substantially greater resources than the state litigation, particularly if the first state cases moving forward are single-plaintiff cases prosecuted by firms with only one or a handful of clients with similar claims. This disconnect may be particularly true when the state lawyers want to move ahead with their cases outside of the MDL process; typically, in these cases, the state lawyers report having no desire to have years of discovery, but simply want to move their cases forward to trial.

While some transferee judges have reported a perception that state court trials are disruptive, others have noted that it is not a problem − it is just a different way forward. In most cases, state court trials will have moved forward as a result of counsel's strategy, but it will give the parties some additional information. In some cases, it will be helpful and provide some insight as one of many potential bellwether data points. In other cases, the result is seen as an outlier by both sides whether for factual, legal, or decisionmaker-based reasons, and yields less information. In many cases the state verdict will either have no effect or simply provide a data point to the MDL leadership. Under this view, state court trials should be viewed not as a universal problem, but instead as a moment to revisit the MDL's path. Has the state verdict increased or decreased the parties' preference for a settlement end-game, rather than other potential paths to resolution? What steps can the court take to help the parties move toward resolution in light of these inputs?

Both counsel and transferee judges have expressed the unified warning that while coordination can be helpful, at the end of the day the parties' buy-in is driven by the different strategy decisions of plaintiffs' and defense counsel, by the differing procedural and substantive rules of the courts, and the shadow of fees and assessments. Thus, as the transferee court begins considering its own discovery rulings and the potential for state coordination, considering these pragmatic factors that will drive the attorneys can assist the judge in anticipating potential objections or conflicts, rather than being caught off-guard or pressed into a purely responsive mode.

BEST PRACTICE 13K:  Discovery decisions should be made available to all courts.

BEST PRACTICE 13L:  In an MDL involving multiple jurisdictions, the transferee judge should consider the *joint* appointment of a special master among multiple courts to review disputed documents *in camera* and issue a report and recommendation to all courts.

MDL courts may appoint special masters under Fed. R. Civ. P. 53 with the specific duty of facilitating federal/state coordination.  This was done in MDL No. 926, *The Silicone Gel Breast Implants Litigation.  See Manual for Complex Litigation*, § 20.311.  Similar coordination may also be introduced by cooperating with the state courts to appoint a common special master with a particular function, such as discovery.  For example, in *In re Bextra & Celebrex Marketing, Sales Practices and Products Liability Litigation*, MDL-1699, the MDL transferee court and the New York state judge presiding over New York State coordinated proceedings jointly appointed a retired federal district judge to serve as a joint discovery special master.  This special master's duties expanded, to include mediation and settlement, as the litigation progressed.  In ruling on matters, the special master should issue rulings with citations applicable to each affected jurisdiction, in order to facilitate review by the applicable judges − and if necessary, appeal.

BEST PRACTICE 13M:  The transferee judge may appoint a "state court liaison" or "state/federal liaison" from among plaintiffs' (or defendants') counsel who are active in the MDL, in order to provide transparency by submitting periodic reports on the status and progress of state court proceedings and to assist in assuring that discovery work product is made appropriately available to those who are litigating in state courts.

Typically, access to MDL discovery and work product is provided under a "common benefit" or "assessment order" that spreads the costs of common benefit discovery, experts, and other work product on a contingent basis, among all plaintiffs' counsel.

Anecdotes exist about transferee judges that have attempted to pressure plaintiffs' counsel into moving their cases into federal court, into the MDL.  It may therefore be appropriate to mention at this juncture that there are strong reasons that attorneys may maintain cases in state court, even while participating in earnest in the MDL.  For example, the case may be one as to which there is no basis for federal jurisdiction.  Or, it may be one as to which the attorney believes the particular client will obtain a better result in state court; an attorney's ethical obligation to pursue the best strategy for each client is not abridged even in aggregation, and this decision should be respected.  Likewise, defendants may have valid reasons for aggressively pursuing claims in state court, opposing removal, or opposing global settlement.

Far from these reports of transferee judges "punishing" state court lawyers by not appointing them to leadership positions, experienced transferee judges report that they actually prefer to have some attorneys in leadership who have cases in both courts, because it helps the judge to know what is going on in parallel cases.  Moreover, if the parties move toward settlement as the MDL's endpoint, this overlap may be helpful in exploring the viability of and

objections to a global settlement.  In addition, the transferee judge may also consider using joint committees on targeted issues, like fees or settlement, drawn from both the federal and state courts.

> BEST PRACTICE 13N: The transferee judge should consider issuing a deposition protocol order that assigns a specific percentage of deposition time to state counsel.

Participation by state court counsel in MDL depositions ensures that these depositions are complete and non-duplicative.  Depositions may be "cross-noticed" in the MDL and state cases.  A joint federal-state counsel committee can be appointed to take responsibility for the scheduling and conduct of depositions.  Some MDL courts have facilitated scheduling discovery coordination by including in the court-appointed leadership structure counsel who are active in both the MDL and state cases.  As noted previously, the transferee judge's order will not bind the state parties but instead would only govern the federal counsel's treatment of the state parties.  If the transferee judge anticipates that greater certainty is necessary for the parties, the judge may consider coordination with the state court judges on the appointment of the same special master for discovery, such that a single individual would then be empowered to resolve discovery disputes.  If this approach is taken, the special master should be encouraged to cite to the law of each applicable court in order to facilitate review by the court.

The Federal Judicial Center, the National Center for State Courts, and the National Judicial College, often working jointly, have collected and developed materials to assist and support federal and state judges in achieving effective case management over complex litigation, including the management of MDLs in coordination with related state proceedings.  These materials include the comprehensive *Manual for Complex Litigation, Fourth* (Federal Judicial Center 2004), which addresses coordination in §§ 20.3-20.33 and 22.4.  Other shorter, topic-specific guides available on the Federal Judicial Center website include *Managing Class Action Litigation:  A Pocket Guide for Judges;* the *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide; Coordinating Multijurisdiction Litigation: A Pocket Guide for Judges* (2013) [248] (prepared by a committee composed equally of federal and state judges), and a listing of state-federal judicial education programs.

---

[248] Also available at http://multijurisdictionlitigation.wordpress.com.

# CHAPTER 7

# RESOLUTION AND REMAND

At one time, success for a large or mass-tort MDL judge was based solely on whether a global settlement was reached under his or her watch.  Although global resolution remains a goal of most MDLs, for today's MDL judge, strategic planning and efficient management of the process at every stage is the touchstone of success.  Likewise, resolution of the case increasingly includes the possibility of not only settlement, but also dismissal or remand.  This broader conception presents a robust set of challenges and strategic determinations for today's MDL judges.  Balancing the court's role in the settlement process with its simultaneous role in adjudicating motions and other matters in the MDL is complex and requires the court to consider many important questions.  At what point in the process should the court inquire about settlement talks?  Should the judge allow the settlement hurdles to be a factor in the sequencing of discovery or motions?  Should the parties themselves decide whether a private mediator would further the goals of negotiation, or should the judge appoint a special master for settlement (and if so, when in the process)?  These questions are among the many now confronted by transferee judges and are the focus of this chapter.

Most cases transferred pursuant to 28 U.S.C. § 1407 are still resolved in the transferee court so that there is no need for large numbers of cases to be transferred back at the completion of the MDL proceedings.[249]  When this is possible, efficiency is served because district courts around the country are spared extensive work on cases in which they have little or no background.  In some MDLs, decisions on dispositive motions or other developments may cause individual cases or categories of cases to be dismissed or resolved at an early stage.[250]  Indeed, for defendants, early motion practice is seen as a potential mechanism for the resolution of the case, while later measures like *Lone Pine* orders can help root out spurious claims.  Particularly in the larger or mass-tort MDLs involving thousands of individual cases, which are the primary focus of this report, the resolution of a large number of MDL cases usually occurs at a later stage, in a global settlement or in a series of settlement agreements with various lawyers, often (but not always) after the court has presided over one or more trials, and in some cases, only after the door has been closed on the filing of new lawsuits, to the extent that is feasible under the individual facts presented.[251]  In the right case the threat of an impending order can help to spur

---

[249] As of September 30, 2013, only 13,432 of the 241,108 civil actions transferred by the JPML for pretrial proceedings had been *remanded* to their home districts for trial.  United States Judicial Panel on Multidistrict Litigation, Statistical Analysis of Multidistrict Litigation Fiscal Year 2013, at 6, *available at* http://www.jpml.uscourts.gov/sites/jpml/files/JPML_Statistical_Analysis_of_Multidistrict_Litigation-2013_1.pdf.

[250] *See, e.g., In re Rezulin Prods. Liab. Litig.*, 441 F. Supp. 2d 567, 579 (S.D.N.Y. 2006); *In re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d 791, 826 (N.D. Ohio 2004), *aff'd sub nom. Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861 (6th Cir. 2006).

[251] Deborah R. Hensler, *Has the Fat Lady Sung? The Future of Mass Toxic Torts*, 26 REV. LITIG. 883, 896, 903 (2007) (noting that half of the thirty-five product-related mass personal injury litigations that arose between 1960 and the late 1990s and were examined by the Federal Judicial Center, were consolidated and transferred to one federal court under 28 U.S.C. § 1407; two-thirds (twenty-two) of these litigations "resulted in aggregate settlements, including both class and non-class global settlements that were intended to resolve all current claims against the defendant(s) (and sometimes future claims as well), and more limited group settlements that resolved all current (and sometimes future) claims represented by one or a few law firms") (citing Thomas Willging, Fed. Judicial Ctr.,

settlement − as happened in the recent NFL concussion settlement, when the judge's notice that she was ready to issue an order that neither side would like was enough to incentivize settlement talks.  This creates a difficult balance for the judge to strike, between properly facilitating or even nudging settlement and creating a disfavored sense of a strong-armed or premature settlement.

But courts are now mindful of and prepared for the possibility of remand if cases are not otherwise resolved.  There is no longer a stigma attached to remanding cases when they are ready for trial if the parties are not ready to settle.  Indeed, this was the original legislative directive in creating the MDL device.  As a mechanism to keep counsel keenly focused on moving the cases forward, some transferee judges now set end dates for their MDLs, at which point any cases not resolved are remanded.[252]

Today's transferee judge is continually assessing what the case needs to move forward. This involves unique considerations at every stage of the litigation.  This chapter therefore explores the techniques judges are using not only to resolve cases in the MDL, but best practices in managing the remand process.

> GUIDELINE 14:  The transferee judge should endeavor to use the MDL forum to resolve or streamline the litigation before remand to the district courts.

> BEST PRACTICE 14A:  Remand of remaining cases to transferor courts should not begin until the court has taken steps: (1) to preside over discovery, decide on motions, and conduct such trials that are needed to position the cases for potential resolution; (2) to explore and consider all possibilities for resolution of the cases; and (3) to prepare cases that do not resolve for trial in the transferor courts.

The transferee judge has the authority to enter an order suggesting that the JPML remand a matter prior to the conclusion of pretrial proceedings.[253]  A court's discretion to suggest remand generally turns on the question of whether the case will benefit from further coordinated proceedings as part of the MDL.[254]  Thus, the question of whether and when to remand cases must be considered individually in every MDL.

---

*Mass Torts Problems & Proposals, A Report to the Mass Torts Working Group* (1999), at 88-91, *available at* http://www.fjc.gov/public/pdf.nsf/lookup/MassTApC.pdf/$ file/ MassTApC.pdf)).
[252] For example, after the JPML transferred the *Actos Products Liability Litigation* (MDL No. 2299) to the Western District of Louisiana by order dated December 29, 2011, Judge Doherty directed that remand procedures would begin for all cases still pending as of December 2016—five years from the MDL's creation.
[253] MDL Panel Rule 10.2(a) (allowing the Panel to remand an action to the transferor district court "[u]pon suggestion of the transferee judge or on the Panel's own initiative").
[254] *In re Baycol Prods. Litig.*, No. 03-0037 (MJD/SRN), MDL No. 1431, 2008 WL 6259241, at *13 (D. Minn. Sept. 9, 2008); *In re Bridgestone/Firestone, Inc., ATX, ATX II, & Wilderness Tires Prods. Liab. Litig.,* 128 F.Supp.2d 1196, 1197 (S.D. Ind. 2001) (citing *In re Air Crash Disaster*, 461 F.Supp. 671, 672–73 (J.P.M.L. 1978)); *In re Aetna UCR Litig.*, No. 07-cv-3541, 2010 WL 3762281 at * 1 (D.N.J. Sept. 20, 2010).

Although there is no bright-line rule as to when remand is best, one of the key principles of multidistrict litigations is the accrual of judicial expertise,[255] and the MDL environment provides a unique opportunity for the court and parties to hear and be heard on critical *Daubert* expert issues and dispositive motions applicable across cases, to test a sample of cases at trial, and to consider settlement on a broad basis while the federal cases remain together in one venue, before one judge. Thus, although some courts, at the request of the parties, have elected to remand cases to transferor courts for trial as soon as the cases are trial-ready, to achieve the full benefits of the MDL process – both for the parties and for the court system as a whole – in most complex cases, courts should not suggest remand if continued consolidation of cases would: (1) eliminate duplicative discovery; (2) prevent inconsistent pretrial rulings in transferor courts; or (3) conserve resources of both the parties and the court system as a whole.[256] However, if and when the MDL process reaches a point where it is no longer moving the litigation, remand should be strongly considered.

More commonly, courts have utilized alternative available mechanisms to close the gap between remand and continued MDL consolidation. At one end of the spectrum, courts are increasingly using *Lone Pine* orders to screen meritless cases and continuing to use *Lexecon* waivers to try cases in the MDL court − expanding what can be done to dispose of cases within the MDL. (See Chapter 1 for additional discussion of case-management techniques.) At the other end of the spectrum, there has been increasing interest in the potential for coordinated remand of cases, in an attempt to expand the benefits of the MDL into the courts that will try the cases.

> BEST PRACTICE 14B:  In most situations, the time to raise settlement will be after sufficient time has passed to ensure a degree of certainty about both the nature and scope of the claims at issue.

Whether, when, and how an MDL will lead to a global settlement will vary from case to case. Sometimes, key legal rulings can be essentially dispositive of the litigation, and there is no need for settlement. Occasionally, other factors unique to the claims or the parties lead to an early resolution. In some cases, the parties may request that the MDL court facilitate settlement discussions early. When that happens, the MDL court should do so, but should be mindful to keep the litigation schedule on track in case early settlement efforts are unsuccessful. MDL courts that allow the parties to conduct settlement discussions early have sometimes imposed limitations, such as allowing 20-30 days for settlement talks to be conducted, but indicating to the parties that the case would proceed thereafter. Other courts have a stronger presumption against halting the pretrial process for settlement talks unless the parties indicate that a settlement is truly imminent. Some judges who contributed to the discussion of this chapter noted that they would look to the likelihood and potential size of the settlement in terms of covered plaintiffs − recognizing that parties may not engage in a global settlement, but instead settle cases in bunches

---

[255] *Walsh v. Nortel Networks Corp.*, No. 05 Civ. 2344 (LAP), 2007 WL 1946546, at *3 (S.D.N.Y. June 28, 2007) (a remand is "not warranted where it would require another court to make its own way up the learning curve, resulting in just that duplication of efforts that the multidistrict system is designed to avoid." (internal quotation marks omitted); *In re Baycol Prods. Liab. Litig.*, 2008 WL 6259241, at *13 ( "The accrual of judicial expertise is central to the multi-district litigation process.").

[256] *See, e.g., In re Aredia & Zometa Prods. Liab. Litig.*, No. 06-md-1760, 2010 WL 5387695, at *2 (M.D. Tenn. Dec. 22, 2010); *In re Bridgestone/Firestone, Inc.*, 128 F. Supp. 2d at 1198.

− permitting delay only when there were serious discussions likely to lead to the settlement of many hundreds or thousands of cases.

More broadly, there was consensus that MDLs can be on dual tracks – settlement and trial – because discovery supports both objectives. Thus, the variation in approaches was more a question of degree – in what the judge's threshold is for staying litigation at the parties' request, and how long that stay should be, given the competing desires at work – than substance.

In many MDLs, meaningful settlement discussions are not possible until completion of discovery and extensive testing of the parties' contentions through decisions on dispositive and *Daubert* motions. In some MDLs, it is necessary to conduct several trials of individual cases that educate each side on the strengths and weaknesses of their positions and the relative value of different fact patterns present in individual cases. And because defendants may be reluctant to entertain any settlement that will simply invite the filing of new claims, in some MDLs, settlement will not be possible until sufficient time has passed after the events that triggered the litigation, so that the door has closed on the filing of new claims. Courts can promote the settlement process by advancing the litigation so that factual and expert development occurs and the cases become ripe for settlement discussions.[257]

Finally, the transferee judge will need to consider the extent to which procedural mechanisms promoting closure are appropriate and advisable. In some MDLs, a defendant's uncertainty about the statute of limitations or other limits on future suits can be a substantial hurdle to settlement; offering guidance on such issues may therefore help facilitate a settlement. But, it should also be noted that due to differing state statutes of limitations, the transferee judge may not be able to issue a one-size-fits-all ruling.

In other MDLs, a long tail exists, such that the consideration is not whether the limitations period has expired, but whether newly filed cases should still be brought within the MDL or instead be litigated entirely in the originating court. A number of judges noted that a dual-system approach worked well in resolving these cases: aggressive motion practice regarding weak claims and tag-along issues on the front end; remanding late-filed cases, while giving the originating court the remand packet and the plaintiff's counsel the benefit of the common benefit work. This approach permitted the benefits of the consolidation, but did not preserve the consolidation when it no longer serves a common goal.

Defendants noted particular concern with cases in which the defendant agreed to settle in order to obtain closure, only to discover that the plaintiffs had brought the case prematurely and new claims were being raised under the "two-injury rule," which allowed a new round of litigation. More recently, defendants have resolved MDL litigation only to encounter not only claims by federal regulators, agencies, and state and federal attorneys general, but also follow-on shareholder litigation related to the MDL claims. Both plaintiffs' attorneys and defense counsel noted a trend back toward inventory settlements with individual firms and settlements by injury

---

[257] *See generally* RICHARD A. NAGAREDA, MASS TORTS IN A WORLD OF SETTLEMENT (The University of Chicago Press 2007).

class,[258] rather than a single-minded focus upon global settlements in light of these background considerations. However, other clients continue to prefer global settlements, in which closure can be obtained at least with respect to personal-injury claims. Thus, no one-size-fits-all endgame exists among defendants or particular types of claims.[259]

The court's decisions about how to address these strategic considerations and tensions will have substantial repercussions for the settlement pattern and in turn the outcomes for individual claimants, and should be undertaken with great care.

BEST PRACTICE 14B(i): The court is usually uniquely situated to play a role in facilitating settlement discussion.

If and when the MDL reaches the stage where resolution may be possible, counsel in a leadership role on each side should be heard on how to proceed – whether through direct negotiation or appointment of a settlement master. The resolution process presents challenges. The MDL court must be aware of counsel's actual interest and involvement in the process (e.g., does counsel have significant clients or is counsel working only the common benefit process?). In addition, the timing should be ripe for settlement − if the judge moves too early, counsel may feel that they have not yet obtained the information they need for settlement, which may include seeing a few cases move forward. Other judges prefer to create the structure for settlement at the outset, so that the MDL process can be sequenced toward providing what the parties need for either remand or settlement, making those needs the guiding MDL principle.

Attorneys noted that they too appreciated having a judge that was allowing the parties' needs in terms of settlement or remand to drive the sequencing and timing of discovery and motion practice. However, they also expressed opposition to having a judge push for a global settlement in most cases, believing that the counsel leading an MDL typically each have decades of experience in mass-claims litigation and have a good sense of when the case is ready to settle and by and large have the motivation to settle when the time is right. Thus, while the parties want the judge's support in sequencing motions or creating a mechanism for settlement, many expressed a sentiment that it is more the exception than the rule that the judge should be aggressively pushing for a settlement, particularly because the strategic considerations driving settlement are often appropriately expressly kept out of the courtroom and away from the judge.

---

[258] Counsel noted that there were a variety of patterns, such that no assumption can be made from the outside about the settlement pattern—particularly where there is no class settlement and thus the terms are not publicly available. In some cases the best claims were settled first as a mechanism to disincentivize pursuit of the lower-value claims, or to resolve cases with the best lawyers leaving the less-skilled lawyers. In other cases, the weakest claims were settled first to clear the liability from the books, or to generate momentum within the class for settlement. A number of counsel from both sides of the aisle noted that this structure can be problematic, but it can also prevent redistribution from the strongest to weakest claims, which often functionally occurs in a global settlement.

[259] See, e.g., Carrie Johnson, Merck Agrees to Blanket Settlement on Vioxx, THE WASH. POST, Nov. 10, 2007. But defendants do not always insist on global settlements. See, e.g., In re Zyprexa Prods. Liab. Litig, 424 F. Supp. 2d 488, 490 (E.D.N.Y. 2006) (noting that in 2005 the defendant, Eli Lilly & Company, entered into a partial settlement with certain individual plaintiffs); Jef Feeley & Naomi Kresge, Bayer's Yasmin Lawsuit Settlements Rise to $402.6 Million, BLOOMBERG NEWS (July 31, 2012), available at http://www.bloomberg.com/news/2012-07-31/bayer-s-yasmin-lawsuit-settlements-rise-to-402-6-million.html (noting agreement by Bayer to settle 1,877 cases of the more than 12,000 lawsuits filed prior to that date, and offering opinion of commentator that settlements "indicate[] they are making progress to putting these Yaz suits over the vein clots behind them.").

However, it was in the implementation of these broad principles that more disagreement arose as to what is best − and thus it is here that the transferee judge's own judgment and assessment of the particular MDL's needs came into play.  For example, should *Lone Pine* orders be used early in the case to help establish at an early phase what cases are truly at issue, or should these be used as an end-game once a settlement is contemplated or even as a post-settlement mechanism for cases that don't qualify for the settlement (i.e., where counsel have completed discovery and a few trials have been held, but the parties are still far enough apart in settlement that the transferee judge is considering remand)?  In making these decisions, the transferee judge should be aware of the unique dynamics of MDL settlements to avoid any unintended strategic consequences resulting from his or her rulings, including principal-agent issues that arise in any aggregate settlement.  In addition, while corporate defendants, particularly large ones, will have made considered decisions about how much litigation risk they choose to retain through insurance vehicles that may include SIRs, deductibles, ceilings on coverage, and increasingly complex captive programs, it is also likely that outside insurance companies will be the real party in interest for at least some of the litigation exposure.[260]  In other cases, claims traders may have purchased claims, or third-party litigation financers may have demanded a right to participate in litigation and settlement decisions.  This area is quickly evolving and varies greatly from case to case.  The key takeaway is that successful resolution will require the real stakeholders − a set of actors that increasingly may not include the actual plaintiffs themselves − to be present and obtaining their buy-in.[261]

> BEST PRACTICE 14B(ii):  At the appropriate time, the court may consult with counsel on whether the appointment of a settlement master or mediator would be helpful to the settlement process.

Depending on the particular litigation, settlement discussions may be far more difficult to facilitate in an MDL than in an individual case.  Often, when the litigation reaches a point when it is ripe for such discussions, the parties will discuss settlement with no or minimal court involvement.  Nevertheless, the court should be prepared to confer with counsel for both sides to

---

[260] While it is generally recognized that litigation costs to companies have been on the rise over the last several decades—including from payment of settlements and verdicts to plaintiffs and their attorneys, as well as fees paid to the attorneys retained to defend the companies—so too have complex insurance-programs companies use that can involve the retention of greater risk by these corporate defendants.  These programs may include higher self-insured retentions and deductibles and captive insurance programs that are meant to keep certain risks entirely in-house.  *See, e.g.,* Robert Ceniceros, *Captive Insurance Use May Rise with Firming Insurance Prices,* BUSINESS INSURANCE (Sep. 4, 2011) (generally noting the increased use of captive insurance for product liability insurance).  Further, companies that budget and account for the costs they face through litigation do not always disclose to what extent their insurance programs are covering their litigation exposure, nor the extent to which these costs may affect future premiums.  *See, e.g.,* Feeley & Kresge, *supra* note 14 ("The $610.5 million Bayer set aside this quarter is to pay the company's costs beyond what insurance will cover for legal fees and accords, including cases that haven't been settled, a spokesman, Guenter Forneck, said in a telephone interview today. Bayer isn't disclosing the amount of its insurance coverage.").

[261] Counsel have reported that as a result they do not necessarily invite plaintiffs into early meetings, finding that the meetings can be more efficient and less costly.  In raising this point, they sought to convey to transferee judges that this should not be presumed to signal the unimportance of the clients or otherwise be taken as a warning sign; instead, it is simply part of the evolving process of mass-tort settlements.

hear their concerns and help create a settlement mechanism or process that is reasonable and acceptable to the parties, if requested or otherwise appropriate.

In some cases, this will involve appointing a special master or mediator who has the requisite experience to deal with these complexities.  Some judges confessed to not understanding, early in their MDL careers, why a mass-claims settlement specialist was needed − a feeling echoed by some counsel.  However, these comments were typically paired with a later understanding by the transferee judges that mass-claims settlement facilities are highly specialized types of funds, which require a high degree of expertise to not only design but to reality test.

Some experienced counsel likewise expressed the view that they "know how to settle cases" and typically only needed a mediator in certain cases, and in these cases they retained them without needing the court's "interference."   Others saw greater value in mediation and in a court raising the issue, noting cases in which the parties were tactically unwilling to talk settlement, but then resolved the case after the court broached the subject.[262]  Despite these differences, counsel recognized that bringing in a third-party neutral can have a substantial legitimating function, both as to the global settlement itself and as to the particular resulting allocations.  Indeed, some plaintiffs' counsel indicated that the special master's work in helping to design the fund and then "blessing" the allocation served an insurance type of function, insulating the plaintiffs' attorney from any ethical questions or challenges that might otherwise be raised about their representation of individual clients or through the PEC or PSC in representing the claimants as a whole.

Thus, for a variety of reasons, specialized mass-claims neutrals can play a role in helping the parties reach a settlement from the outset or be retained (even after an agreement in principle) to help structure the resulting settlement facility.

The court should give careful consideration to the different roles of a mediator, arbitrator, and special master − and the very different consequences for finality and appeal − in deciding which of these neutrals to appoint.  Deciding what role the neutral is to fill, and therefore what type of appointment/retention to use, the judge should collaborate with the parties.

Even if the determination is made that a special master should be appointed, the parties should have an active voice in the selection process.  In some cases, it may be useful for a court to suggest several potential settlement masters and invite comment from each side, so that in the end the parties jointly choose the special master they believe will best allow them to successfully explore their settlement options.   Alternatively, the transferee judge may allow the parties to jointly suggest a short list from which the judge will then endeavor to select.   Likewise,

---

[262] One transferee judge observed that judges used to be lawyers, and know what's going on—the hidden agendas, the elephants in the room and a desire that lawyers "just be honest with us about what's happening, what's blocking resolution."  Yet, many lawyers took the view that these were matters for discussion with the neutral, who could then share the relevant information with the judge without contaminating the judge's rulings on the merits—or risking the perception of overlap.  Thus, while they expressed a willingness to talk with the other side openly to the extent possible, particularly within the small MDL community, and to work creatively, they felt that using a neutral for the role allowed both the greater expertise of the neutral in resolving these problems, and preserved the sanctity of the judicial role.

although mediators are formally hired by the parties and counsel, the judge may offer input or otherwise collaborate in the process if appropriate.

If parallel state court litigation exists, the federal and state courts should consider appointing the same settlement master or mediator so that that person is best positioned to see all moving parts of the litigation.

> BEST PRACTICE 14B(iii):  Once a settlement discussion process is underway, the court should be prepared to step back and let the discussions proceed.  However, the court should require sufficient reporting from the parties to confirm progress is in fact occurring and whether the court can assist the process.

Once settlement discussions are underway, the court should consider how to help foster the process without inserting itself into it unless necessary.  If a special master is coordinating the discussions, the court should enter an order consistent with Rule 53(b)(2)(B) that sets forth the circumstances in which the settlement master may communicate ex parte with the court.[263] Through these orders, courts can confer authority on the special master to implement measures necessary for mediation and to advise the court on any orders deemed necessary to facilitate the process.[264]  In an MDL with significant parallel state court coordinated litigation, the reporting may include the state coordination judges as well.

> BEST PRACTICE 14B(iv):  Courts generally should not stay discovery or other pretrial proceedings while the settlement process is under way.  However, if all parties agree that a stay would be in the interest of the process, courts may consider staying proceedings during the pendency of settlement discussions.

In most mass-tort MDLs, in order to avoid causing prejudice to cases that are not similarly situated and to keep the pressure on the parties and counsel that is conducive to discussions, it will usually be a best practice for the transferee judge not to stay discovery or other pretrial proceedings while settlement discussions are ongoing, unless and until the parties inform the court that a settlement is imminent.  Note that in MDLs involving class actions, in which uncertainty around class certification may be the driver of successful settlement talks, for example, the dynamics maybe different.  In such cases, upon joint request of the parties, courts should consider staying proceedings during the pendency of settlement discussions, usually after the parties provide an agreed schedule for the court to evaluate progress.

---

[263] *See, e.g., In re: Fosamax Prods. Liab. Litig.*, No. 06-md-1789, ECF No. 1096 (S.D.N.Y. Nov. 22, 2011) (order appointing special master and providing that the special master was "authorized to conduct any proceedings permissible under Rule 53 that are necessary to resolve all or any part of this multidistrict litigation in a fair and efficient manner"); *In re Oral Sodium Phosphate Solution-Based Prods. Liab. Action*, 09-SP-80000, MDL No. 2066, 2009 WL 2601395, at *2-3 (N.D. Ohio Aug. 24, 2009) ("The Special Master may communicate ex parte with the Court at the Special Master's discretion, without providing notice to the parties, in order to assist the Court with legal analysis of the parties' submissions.  The Special Master may also communicate ex parte with the Court, without providing notice to the parties, regarding logistics, the nature of his activities, management of the litigation, and other appropriate procedural matters.").

[264] *See, e.g, In re: Avandia Mktg., Sales Practices and Prods. Liab. Litig.*, No. 07-md-01871 (CMR), MDL No. 1871, Pretrial Order No. 122, ECF No. 894 (E.D. Pa. Nov. 23, 2012).

BEST PRACTICE 14B(v):  If significant parallel state court litigation exists, the transferee court should consider, after consultation with counsel, reaching out to state courts with significant case volumes to discuss coordination of settlement efforts.

In truly large-scale litigation involving hundreds or even thousands of cases pending in multiple courts – often in one federal MDL, in one or more state coordinations, and other state courts where several cases (or fewer) may be pending – there is no hard and fast rule as to which court will have proceeded fastest or furthest at the time settlement discussions begin in earnest. It is inevitable that parallel state court litigation and the MDL will proceed at different speeds in different settings.  At times, state cases will move ahead of the MDL, particularly if the MDL is created only after individual cases have already been pending in state courts for some time. However, with capable counsel and MDL judges, the MDL will in all likelihood have been set up quickly, and MDLs have shown themselves capable of catching up and moving very quickly toward one or more initial trials.  Stated simply, virtually every MDL presents a different dynamic as to when a case proceeds to verdict first, and when more cases end up being tried while a litigation is active.  Regardless of which litigation has moved more quickly or further into the process, the state court cases and claims can be included in the settlement if the state jurisdiction permits.  MDL courts should consider reaching out to the state courts early to facilitate this process.

As noted earlier, the federal and state courts should consider appointing the same settlement master or mediator so that that person is best positioned to see all moving parts of the litigation.  Even if this degree of cooperation is not possible or desirable, the transferee judge should discuss with counsel at what point and how the state court parties and judges should be informed of the settlement talks.

If a settlement is reached, a new set of considerations is triggered.  To the extent that the settlement contemplates that the transferee judge will retain jurisdiction to deal with any issues arising in the settlement's implementation, appropriate provision is made for the disposition of litigation related to the state court claimants, which respects both legal limitations upon jurisdiction and the parties' preferences.   As noted in the common benefit fund chapter, financial considerations may substantially impact the extent to which state court litigators and their clients will participate in the MDL settlement.

BEST PRACTICE 14B(vi):  If the parties reach an agreement to resolve all or a substantial portion of the cases, and the parties so request, the court should be prepared to take an ongoing role in implementing and enforcing the settlement agreement.

In the event cases do settle in whole or in part, the court may be asked to take an ongoing role in implementing the settlement.  There are several reasons for this, including the knowledge and experience the court and its personnel have with the litigation and the transferee court's ability to facilitate the settlement less expensively than might be possible otherwise.  If a successful settlement will remove some or even many cases from the dockets that would otherwise need additional individual attention, the transferee court should entertain such requests

and, where it deems it appropriate to do so, play some role in resolving disputes that arise with respect to the enforcement of the settlements either directly or through a United States magistrate judge or a court-appointed special master.

> BEST PRACTICE 14B(vii): In the MDLs that include class actions, the court should ensure that counsel consider from the outset of any settlement proceedings the requirements of Rule 23 of the Federal Rules of Civil Procedure.

Rule 23, which provides the procedural mechanism and requirements for class certification in federal courts,[265] requires court approval for the settlement of the claims of a certified class.[266] In MDLs involving class actions (e.g., in consumer protection or securities cases), regardless of whether the class is certified solely for settlement or for trial, courts may only approve a proposed settlement "after a hearing and on finding that it is fair, reasonable, and adequate."[267] "To determine whether a proposed settlement is fair, reasonable, and adequate, the court must examine whether the interests of the class are better served by the settlement than by further litigation."[268] Courts tasked with reviewing and either approving or disapproving a class settlement should ensure that counsel are mindful of the requirements and complexities imposed by Rule 23.[269]

> BEST PRACTICE 14C: In appropriate cases, courts should consider utilizing the Intercircuit Assignment Procedure to facilitate MDL proceedings.

Even if global settlement is reached, there are usually some cases in the MDL that will continue. When appropriate, courts should consider utilizing the Intercircuit Assignment Procedure to facilitate MDL proceedings.[270] By this procedure, a transferee judge may be assigned to try a MDL case in another circuit. It has been used when only one case remained and all others had been resolved in order to take advantage of the knowledge the transferee judge acquired during the course of the MDL and to prevent the remaining case from languishing in the transferor court.[271]

---

[265] FED. R. CIV. P. 23.

[266] FED. R. CIV. P. 23(e).

[267] FED. R. CIV. P. 23(e)(2).

[268] MCL § 21.61 (2004).

[269] See id. at §21.6, for a detailed discussion of the requirements imposed on courts by Rule 23 in the context of MDL settlements involving class actions.

[270] But see In re Motor Fuel Temperature Sales Practices Litig., 711 F.3d 1050, 1054 (9th Cir. 2013) ("By signing a Certificate of Necessity for the cases in question, I would, in effect, be removing the judges to whom the cases were originally assigned and transferring them to an out-of-circuit judge. I'm aware of no authority empowering the chief judge of the circuit to re-assign cases pending before other judges, or to remove cases from the district's assignment wheel. Only if the presiding judge is recused or unable to serve, and the local district is unable to reassign the case according to its local procedures, will the chief judge of the circuit be called upon to bring in a judge from outside the district. For me to sign a Certificate of Necessity in the absence of such circumstances would constitute a serious encroachment on the autonomy of the district courts and also interfere with the random assignment of cases.").

[271] See Novell, Inc. v. Microsoft Corp., No. 04-cv-01045 (JFM), ECF No. 35 (D. Utah July 18, 2011) (holding that there was a necessity for the designation and assignment of the transferee court judge from the District of Maryland MDL to be the trial court judge under an intercircuit assignment for this action set for trial in the District of Utah, the district in which the case was filed).

BEST PRACTICE 14D:  For remands of more than a handful of cases, the transferee judge should put in place a well-considered and organized procedure for remanding and transferring cases rather than simply remanding all cases at once.

Staggering remands over time so that the cases are remanded in waves is the preferred practice to remanding cases all at once.[272]  Remanding in waves minimizes the burden on any individual court and allows the transferee judge to retain jurisdiction over some or most of the cases while the remanded cases begin to be litigated in their home district courts.  The transferee judge would be able to adjust its remand procedures as cases are received and handled in the transferor courts, and to continue to be alert to the possibility for settling some or all of the cases.  MDL courts have adopted a variety of systems for staggering remands, including, for example, remanding the earliest filed cases first[273] and remanding cases for which liaison counsel provided petitions of remand upon a magistrate judge's determination that the cases were eligible.[274]

More broadly, judges and counsel continue to struggle with ways to make the litigation of tens of thousands of cases manageable.  Transferee judges noted that in remanding cases back to originating courts, they at times received pushback from the originating judge, given that the MDL court had far more knowledge of the case.[275]  Yet, it is of course impossible for a single court to try tens of thousands of cases in a timely manner.  While there remain calls for statutory change or a rules change, in the interim, judges are looking to Judge Robreno's innovation in asbestos.  Faced with a litigation that because of its unique nature involved a substantial number of cases and anticipated new filings, even by large personal injury standards, against many defendants,[276] Judge Robreno was able to secure additional resources to spread the workload,

---

[272] *See, e.g., In re: Prempro Prods. Liab. Litig.*, No. 03-cv-1507 (BRW), ECF No. 2208 (E.D. Ark. Feb. 23, 2010) (employing first of nine suggestions of remand orders); *In re: Orthopedic Bone Screw Prods. Liab. Litig.*, No. 12-md-01014 (RB) (E.D. Pa.) (employing a rolling remand process resulted in a number of recommendations for remand, issued regularly from 1997 to 2001 and typically including fewer than 100 cases); *In re: Showa Denko K.K. L-Tryptophan Prods. Liab. Litig. II*, No. 90-cv-00865 (MJP) (D.S.C.) (remanding 412 cases in six waves spread across four years); *In re: Latex Gloves Prods. Liab. Litig.*, No. 10-md-01148 (EL) (E.D. Pa.) (remanding 502 cases in several waves over two years); *In re: Aredia & Zometa Prods. Liab. Litig.*, No. 06-md-1760 (TJC) (M.D. Tenn.) (remanding cases in waves of 10-30 before any bellwether trials conducted for trials in other districts).

[273] *In re: Fosamax Prods. Liab. Litig.*, No. 06-md-1789, ECF No. 1473 (S.D.N.Y. Oct. 3, 2013); *In re: Orthopedic Bone Screw Prods. Liab. Litig.*, No. 12-md-01014 (RB), ECF No. 150745 (E.D.Pa. July 14, 1997).

[274] *In re: Phenylpropanolamine (PPA) Prods. Liab. Litig.*, MDL 1407, ECF No. 2526 (W.D. Wash. Mar. 23, 2004).

[275] So too, judges reported that state judges were very pleased when a global settlement was reached that would cover cases on their docket.  This all seems to suggest a general sense that MDL is providing an incredibly efficient service not only to the parties and counsel, but also to the court systems in conserving resources.  As such, there is a general sense that further innovation, particularly through rules or statutes that permit consolidation or coordination to extend through trial in some form—without denying due process to either the defendant or individual litigants—should be explored.  Yet, thus far, no clear answer has emerged.  For example, some suggest grouping similar cases together for trial, while others suggest having joint trials of dissimilar cases so that the jury sees a range of cases from weak to strong in making their decision.  Still others suggested using retired judges to try the cases as special masters, so that they benefit from a smaller group of adjudicators while still allowing individual trial.  But, for now until there is a rule change or consensus around the best approach, the transferee judge must innovate within our existing toolbox.

[276] The reasons why there are so many asbestos cases are beyond the scope of this best practices report, but unquestionably include the widespread use of the product and long latency period for the underlying disease, as well as the keen attention paid to these cases by the plaintiffs' bar.  One court commentator writing in a November 2010 publication of the Office of Court Research for the California courts described the challenges facing the court

including using a number of magistrate judges to do intensive pretrial mediations and meetings. This team approach is credited with having substantially improved resolution of cases, as well as creating more successful remands in the cases in which settlement did not occur.[277]  The work of Judge Barbier in issuing opinions on bifurcated groups in the *Deepwater Horizon* MDL and masterful use of magistrate judges was also commended as an exemplary practice, but also as an example of the way in which mass-tort MDLs are overloading particular judges in ways that it is difficult for any amount of innovation by the transferee judge to overcome, absent structural change.

BEST PRACTICE 14D(i):  In preparation for remand, the court should consider using *Lone Pine* proceedings or other methods to cull meritless cases and ensure that only the viable cases may ultimately be eligible for remand.

As discussed in Chapter 1, courts can reduce discovery costs while ensuring appropriate access to discovery facts relevant to the potential merit of the individual cases by requiring Plaintiff Fact Sheets instead of formal interrogatories at an early stage in the litigation.  Often the parties freely agree that the issue is protecting the claimants' rights, including the statute of limitations.

*Lone Pine* orders require each plaintiff in a mass-tort MDL to submit a report setting forth evidence sufficient to document the basis for his or her personal-injury claims.[278]  It has been recognized that the "basic purpose of a *Lone Pine* Order is to identify and cull potentially meritless claims and streamline litigation in complex cases involving numerous claimants[.]"[279]  Thus, although *Lone Pine* orders can be issued at any time, courts often implement *Lone Pine* proceedings at or near the end of the MDL, post-settlement or prior to remand, to weed out truly meritless cases and cases that claimant and counsel are not prepared to pursue, and to ensure that the transferor courts receive only viable cases.[280]  When deciding whether to issue a *Lone Pine* order, the court should weigh the circumstances of the particular litigation, including: (1) how mature it is; (2) whether there is an actual showing that spurious or non-meritorious cases exist; (3) availability of other procedures provided for by statute; and (4) the type of injury alleged and its cause.[281]  The court should be mindful that certain plaintiffs in personal injury cases may not

---

system nationwide as follows: "The RAND Institute for Civil Justice estimated that 730,000 asbestos claims had been filed nationally through 2002 and that nearly as many claimants had yet to come forward.  The Congressional Budget Office estimated that another 1.7 million claims would be made over the next three decades nationwide.  Others have suggested that the number of claims yet to be filed in the United States could reach as high as 2.6 million."  Michael Corriere (Principal Management Analyst, Superior Court of San Francisco), *Improving Asbestos Case Management In The Superior Court Of San Francisco*, *available at* http://www.courts.ca.gov/documents/asbestos-final1112.pdf.

[277] Similarly, many judges and attorneys favored the idea of transferring related cases to the same district or, at minimum, same circuit in order to allow for the development of binding precedent for related cases without the delay inherent to assigning multiple MDLs to the same judge or creating an industry-wide MDL.

[278] *See Lore v. Lone Pine Corp.*, No. L-33606-85, 1986 WL 637507, at *1-2 (N.J. Super. Law Div. Nov. 18, 1986).

[279] *Baker v. Chevron USA, Inc.*, No. 05-cv-227 (SSB), 2007 WL 315346, at *1 (S.D. Ohio Jan. 30, 2007).

[280] *See, e.g., In re: Fosamax Prods. Liab. Litig.*, No. 06-md-1789, ECF No. 1243, at 7 (S.D.N.Y. Nov. 20, 2012); *see also Adinolfe v. United Tech. Corp.*, Nos. 12-16396, 12-16397 (11th Cir. Oct. 6, 2014)..

[281] *See, e.g., id.*; *In re Digitek Prod. Liab. Litig.*, 264 F.R.D. 249, 256 (S.D. W.Va. 2010).

yet have experienced the injury or harm alleged, or may have only mild conditions or complications.

In appropriate cases, courts have utilized *Lone Pine* proceedings on more than one occasion in order to streamline the litigation as needed at different stages throughout the pendency of the MDL.[282]  Courts that issue more than one *Lone Pine* order should consider varying what is required of plaintiffs by each order such that the burden imposed on plaintiffs is appropriately balanced with the benefits that *Lone Pine* provides, including to plaintiffs with claims that are more likely to be meritorious.[283]

> BEST PRACTICE 14E:  The transferee court can greatly assist transferor courts when suggesting remand to the JPML by providing a remand packet that summarizes the key activities and rulings that have taken place since the cases were coordinated.

To foster consistency and efficiency in the transferor courts, transferee courts should provide a remand packet to the JPML when suggesting remand.[284] Remand packets, which are generally entered with the suggestion of remand in the form of a case-management or pretrial order, have been recognized as particularly valuable to transferor courts because they encapsulate and describe the relevant proceedings and suggest a path for the transferor courts going forward.   A well-considered and carefully crafted remand packet will allow the court (with litigants' input) to describe many aspects of the litigation, minimizing the time and effort spent by transferor courts trying to determine which party is more accurately describing the orders entered by the MDL court and what took place in the MDL.  The packet must make clear what discovery has been completed.  Without the continuity of discovery, the MDL process will be undermined.  There have been many fine examples of remand packets in recent years.[285]

Topics addressed in remand packets may include information about: lead and liaison counsel and the composition of the Plaintiffs' Steering Committee; the status of any common benefit funds; the steps that have been taken to facilitate settlement discussions; the history of pleadings in the case; results of bellwether trials conducted, including appeals, discovery orders, generic and case-specific fact discovery conducted by the parties at the time of remand, including document discovery and depositions, as well as confidentiality rulings; results of dispositive motions; settlement and bankruptcy proceedings; and the case-specific issues that remain to be decided by transferor courts.

---

[282] *See, e.g.,  In re: Avandia Mktg., Sales Practices and Prods. Liab. Litig.*, No. 07-md-0871 (CMR), MDL No. 1871, ECF No. 885 (E.D. Pa. Nov. 15, 2010); *id.,* ECF No. 2161 (E.D. Pa. Feb. 29, 2012).

[283] *See, e.g., id.*, ECF No. 885 (E.D. Pa. Nov. 15, 2010) (requiring plaintiffs to produce a physician's certification of use and injury); *id.*, ECF No. 2161 (E.D. Pa. Feb. 29, 2012) (requiring, at a later stage in the litigation, that plaintiffs provide case-specific expert reports).

[284] District courts facing remanded trials may also be directed to PACER or the MDL's website for relevant orders and other case documents.

[285] *In re Aredia and Zometa Prods. Liab. Litig.*, No. 06-md-1760, ECF No. 4695 (M.D. Tenn. June 3, 2011); *In re: Seroquel Prods. Liab. Litig.*, No. 06-md-1769, ECF No. 1640 (M.D. Fla. May 13, 2010); *In re: Prempro Prods. Liab. Litig.*, No. 03-cv-1507, 2010 WL 703151 (E.D. Ark. Feb. 23, 2010); *In re: Phenylpropanolamine (PPA) Prods. Liab. Litig.*, No. 01-md-01407, ECF No. 2668 (W.D. Wa. May 19, 2004); *In re: Orthopedic Bone Screw Prods. Liab. Litig.*, No. MDL 1014, 1998 WL 118060 (E.D. Pa. Jan. 12, 1998); *In re: Silicone Gel Breast Implants Prods. Liab. Litig.*, No. 92-cv-10000, ECF No. 1467 (N.D. Ala. Mar. 26, 1996).

BEST PRACTICE 14E(i):   The transferee court should be prepared to answer questions from the transferor courts to which cases are remanded.

No matter how thorough a remand packet is, transferor courts may need to contact the transferee court that oversaw discovery and coordinated the cases to inquire about discrete issues that arise.  These communications should be encouraged, either in writing or orally.  It may be that the litigants would like to be privy to these discussions.  Whether and to what extent this should be permitted is up to the discretion of the transferor and transferee courts.  However, when judges decide to communicate outside the litigants' presence, parties' counsel should be informed when such communication involves any substantive or procedural issue.

BEST PRACTICE 14E(ii):   The transferee judge should consider how, in the context of the specific litigation, remand procedures may minimize the burdens on the transferor courts and litigants after cases are transferred and remanded.

Depending on the individual circumstances presented by the litigation, a court can consider other ways to minimize the burdens on the parties and transferor courts upon remand.[286] Some courts have done so by suggesting procedures for coordination in transferor courts when many cases are expected to go back to the same district.  Examples include:  sending all cases in the same district to the same judge[287] and designating lead and liaison counsel to coordinate the discovery and pretrial efforts.[288]  Courts should consider procedures of this nature on a case-by-case basis.

BEST PRACTICE 14E(iii):  MDL courts should issue rulings with the expectation that transferor courts will follow their rulings upon remand, but should clarify any potential conflicts their rulings may have with state law in the transferor courts.

As a general proposition, transferor courts should not modify orders issued by transferee courts following remand.  Transferor courts generally apply the law of the case doctrine in instances of remand.  Under this doctrine, when a court decides on a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.  Accordingly, once the transferee judge decides an issue of law, that ruling should be adhered to by the

---

[286] *See, e.g., In re: Seroquel Prods. Liab. Litig.,* 06-md-01769, ECF No. 1640, at 20 (M.D. Fla. May 13, 2010) (providing recommendations to district courts, including a recommendation to the District of Massachusetts about the most efficient way to deal with remanded cases in the section called "Transfer to 'Home' Districts," which explained that the majority of the cases that had been transferred to the MDL as member-cases were originally filed in the District of Massachusetts, even though the plaintiffs did not reside in Massachusetts, plaintiffs' counsel had never explained the reason for filing the cases in Massachusetts, and the Court had been unable to discern the reason on its own:  "In the Court's view, the most efficient way to handle these and other cases on remand is to transfer them to the district in which they should have been filed.  Doing so would not only ease the District of Massachusetts' burden of handling thousands of cases after remand, but would, in most cases, allow transferor courts to avoid interpreting and applying the law of states other than those in which they sit.").

[287] *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, No. 92-cv-10000, ECF No. 1473 (N.D. Ala. Apr. 2, 1996).

[288] *In re: Seroquel Prods. Liab. Litig.*, No. 06-md-1769, ECF No. 1640, at 20 (M.D. Fla. May 13, 2010).

transferor court.  Transferor courts should deviate from rulings of transferee courts only rarely, for example, when a significant change in circumstances occurred.[289]

To be sure, if the transferee judge anticipates marked differences in facts or state law in the transferor court upon remand, the judge has the ability to clarify the scope of its ruling for the transferor court.[290]  When issuing rulings, the transferee judge can leave open certain items that can only be fairly determined by each individual remand court.

> BEST PRACTICE 14F:  The transferee judge should be prepared to see that every MDL has an "end-game" such that it may be ended when no additional activity in the transferee court will be required.

A successful MDL will usually involve either: (1) the resolution of all cases; or (2) remand of cases with specific direction as to how the substantial activities that have taken place in the MDL provide a roadmap to see the cases through to completion.  Eventually all MDL proceedings will be completed such that the JPML can end the MDL.  Usually, an MDL remains open long after significant action in it has been completed.  This is because there is almost always clean-up that needs to be done.  If there is doubt about whether there is activity that remains to be completed in the MDL, or whether the transferee court can continue to add value, it will usually be the best practice to keep the MDL proceedings open.  When an MDL is ready to be closed, the court should seek the parties' input on whether doing so is appropriate; if so, the court can effect closure by directing the clerk to close the MDL and all its member cases and to notify the JPML of the closure.[291]

---

[289] *See MCL* § 20.133 (2004) ("Although the transferor judge has the power to vacate and modify rulings made by the transferee judge [after remand], subject to comity and 'law of the case' considerations, doing so in the absence of a significant change of circumstances would frustrate the purposes of centralized pretrial proceedings."); *In re: Silicone Gel Breast Implant Prods. Liab. Litig.*, No. 92-cv-10000, Order No. 30 at 1, n.2, ECF No. 1467 (N.D. Ala. Mar. 26, 1996); *In re: Ford Motor Co.*, 591 F. 3d 406, 411-12 (5th Cir. 2009).

[290] *See, e.g.*, *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2001 WL 497313, at *6 (E.D. Pa. May 9, 2001) (stating that "there is some flexibility left to the transferor court with regard to the admissibility of expert testimony, especially regarding the extent to which state law may bear upon a *Daubert* issue pertinent to a witness who appeared here and whose expert testimony has been challenged").

[291] *See, e.g.*, *In re: Standard & Poor's Rating Agency Litig.*, No. 13-md-02446 (JMF), ECF No. 94 (S.D.N.Y. Jun. 3, 2014).

# CHAPTER 8

## SETTLEMENT REVIEW AND CLAIMS-PROCESSING ADMINISTRATION

**GUIDELINE 15:** If the parties indicate a willingness to negotiate settlement, the MDL judge should facilitate negotiations, but judges should not impose settlement negotiations on unwilling parties.[292]

The transferee judge "must guard against the temptation to become an advocate — either in favor of the settlement because of a desire to conclude the litigation, or against the settlement because of the responsibility to protect the rights of those not party to it."[293] A transferee judge should facilitate settlement negotiations as soon as the parties indicate a willingness to settle unless the judge determines the request is frivolous or intended for dilatory purposes.

BEST PRACTICE 15A: If the parties have indicated a willingness to begin settlement negotiations, a settlement master can play a valuable role at the appropriate stage.

A settlement master can serve as an effective liaison between the parties and the court in helping the court to understand the full complexion of the plaintiffs' claims, how they may break down among injury categories, and other key factors that differentiate them; what issues in litigation need to be addressed and rulings entered, such as preemption or the statute of limitations issues, which will impact a defendant's settlement posture; and whether a *Lone Pine* order is needed for the parties to have meaningful settlement discussions.

A settlement master can facilitate communication between the parties and reduce barriers that could impede unsupervised discussions. A settlement master may ultimately guide both the court and the parties along a path leading toward settlement.

BEST PRACTICE 15B: The parties should consider appointment of a settlement master as soon as they are willing to begin settlement negotiations.

Once the parties are willing to begin settlement negotiations, they should consider recommending one or more settlement masters to the court. Timing will depend on the circumstances, but as a general matter, prior to a settlement master's appointment, major preliminary legal challenges (preemption, *Daubert*, and the like) will have been addressed, and liability discovery of the defendant, general causation, and expert discovery will have largely been completed. Defendants cannot be expected to consider settlement seriously without meaningful case-specific discovery from plaintiffs, such as from PFSs, production of medical records, and other methods of exploring plaintiffs' individual claims. Often, defendants will require an opportunity to raise individual dispositive motions based on such evidence.

Prompt appointment of a settlement master when parties are willing to negotiate should be the norm. In appropriate circumstances, settlement masters can be appointed from an MDL's outset, such as when the MDL is dealing with an ongoing violation and injunctive relief is

---

[292] Committee Note, Fed. R .Civ. P. 16(c) (1983).
[293] MCL § 13.14.

sought.  Early appointment can result in the parties agreeing on the settlement master, rather than taking up time later.

Appointment of a settlement master should be a collaborative process between the court and the parties, where each may suggest an individual to be considered by the others. Ultimately, however, the court selects the settlement master. The court should afford the parties an opportunity to request rescission of a settlement master's appointment on an appropriate showing.

GUIDELINE 16: The parties must advise the MDL court upon reaching a settlement agreement and must provide the court with information concerning the settlement, which information will differ based on whether the settlement is a global or inventory settlement.

The MDL court must be advised when a settlement will dispose any claims before it. A settlement's structure dictates the amount of information the court will require, because different types of settlement warrant different levels of court involvement. The two main types of MDL settlements are "global" and "inventory" settlements. The former describes a settlement designed to resolve all cases within the scope of the MDL; the latter describes the settlement of only cases brought by certain plaintiffs' counsel.

In a global settlement, agreement is reached with plaintiffs' leadership, and commonly extends to state actions and unfiled claims. Examples of global settlements include the *Vioxx*, *Pradaxa*, and *Guidant Implantable Defibrulators* MDLs. Key features of a global settlement are: (1) use of a settlement matrix to achieve horizontal and vertical equity (i.e., similarly situated claimants are treated the same and those with greater proof of signature injuries receive greater compensation); (2) plaintiff participation percentages to go into effect; and (3) designated plaintiffs' counsel selected to manage the settlement program.

An inventory settlement is one in which one or more plaintiffs' firms negotiates a settlement with the defendant involving only clients represented by the settling firm(s). Examples of recent inventory settlements include the *TVM*, *Avandia*, and *Yaz* (VTE injury) litigations. The terms and values of inventory settlements vary depending on the number of plaintiffs and quality of claims in a particular inventory.

GUIDELINE 17: For global settlements, which will resolve an entire MDL, the court should ensure the integrity and transparency of the process that led to the settlement agreement, including the claims process.

More than ninety percent of cases centralized in mass-tort MDLs are finally resolved, either on motion or by settlement. Judicial approval is required for settlements that dispose of class actions and certain antitrust actions. Global MDL settlements, which effectively terminate the MDL and thus affect the rights of the remaining non-parties to the settlement, should be examined by the MDL court pursuant to its oversight authority to facilitate and ensure the fairness of the overall settlement process. For inventory settlements, the court may rely on the parties to execute their settlement agreement unless the court's assistance is sought.

BEST PRACTICE 17A: Upon reaching a global settlement, the parties should provide the transferee judge with information concerning the allocation model specified by the settlement (including eligibility criteria), distribution system, minimum participation rate, and provisions accounting for any distributions for extraordinary circumstances.

A transferee judge overseeing a global settlement does not need to know all the details of a settlement, but must have information sufficient to determine that the agreement and claims process are not unfair.[294]

Global settlements (and inventory settlements, with which the court is not generally involved) establish eligibility criteria to determine whether a plaintiff is entitled to settlement compensation. Usually, additional medical information is then used to determine the amount of compensation available to each individual. For example, medical risk factors for the injury at issue independent of the defendant's product may preclude or reduce a plaintiff's recovery from a settlement fund.

In many large MDLs, the parties employ a matrix grid to develop a "point system" that allocates an aggregate settlement amount among eligible plaintiffs according to objective criteria. A points system typically begins by categorizing relevant injuries by severity, often after plaintiffs are evaluated by medical experts. Base points are assigned to specific injuries, and adjusted for objective criteria, including age and health history, that are relevant to the injuries at issue in the litigation.

The completed matrix provides an easy-to-comprehend grid, which informs claimants of the basis for their settlement amount. The more detailed and sophisticated the matrix, the greater the likelihood of eligibility disputes. The less detailed the matrix, the greater the likelihood that the relative size of claimants' awards will not reflect relevant differences in their circumstances.

BEST PRACTICE 17B: The parties should advise the transferee judge of any minimum percentage or number of cases disposed of by a global settlement.

Typical settlements of large MDLs enable the defendant to abandon the settlement if the percentage or number of cases settled does not reach a minimum "participation threshold," which may be as high as ninety-five percent of the eligible population. Often, a settlement also sets minimum numbers or percentages concerning sub-categories of cases, typically the most serious.[295]

BEST PRACTICE 17C: The parties should advise the transferee judge of any reserve allocated in the settlement to pay for extraordinary injuries.

A certain percentage of the settlement amounts is often placed in an Extraordinary Injury Fund ("EIF") to compensate plaintiffs who can demonstrate unique circumstances justifying a higher settlement distribution. This reserve, often equal to ten percent of the aggregate settlement

---

[294] Principles of the Law, Aggregate Litigation § 3.17 (2010).
[295] Calculation of thresholds should account for deceased claimants, whose estates may not be closed for many years, by accepting releases from heirs or other family members, even if not technically binding.

amount, can be either part of the total settlement or a bonus. If the reserve is part of the settlement, it should be exhausted. A bonus need not be, with the excess usually reverting to the settling defendant.

Special masters are routinely engaged to assist with the allocation process or hear appeals from plaintiffs who are unhappy with their allocation amounts. Special master involvement ensures an independent review of claims.

GUIDELINE 18: The transferee judge should review the claims process to help facilitate claims processing and settlement distribution.

Distribution of settlement proceeds to a large number of eligible claimants in an MDL can take several years. Two factors are the principal causes of delay: (1) time necessary to review submitted claims, to verify that criteria are met, to resolve eligibility disputes, and to make proper allocations; and (2) time consumed in resolving liens against the individual settlement payouts, typically health care liens (including Medicare).

The transferee judge should also consider requiring the parties to provide regular statistical reports on the progress of the settlement administration, including but not limited to the number or percentage of plaintiffs who obtain recovery from the settlement proceeds. The information can assist the judge in addressing any delays incurred in distributing the settlement proceeds.

BEST PRACTICE 18A: In a large MDL involving many claimants, a Qualified Settlement Fund ("QSF") provides significant administrative convenience for the court and parties and offers favorable tax advantages to the parties.

After the parties agree to a settlement, a defendant typically deposits settlement monies in an escrow account, making funds available for disbursement to settlement-eligible plaintiffs who have accepted their settlement allocations and executed the required settlement documents.

A QSF is a fund, account, or trust established under Treasury Regulations.[296] The funds deposited into the QSF are the sole property of the QSF. The QSF is responsible for investing and for paying income taxes on fund earnings. Distributions to claimants can be made only in accordance with the settlement agreement. This arrangement prevents claimants for whose benefit the fund is created from taking constructive receipt of settlement monies before they are disbursed. This option is particularly attractive to claimants who would otherwise lose eligibility for Medicaid and other needs-based government benefits.

The QSF option affords claimants the ability to address complications that can arise from receipt of settlement monies, such as on public assistance and other income-dependent benefits, and to decide in what form to accept payments (i.e., lump-sum payments or periodic payments

---

[296] Under I.R.S. § 468B and Treasury Regulation 1.468B-1(c), each QSF must: (1) be created by a court or other governmental authority and be subject to continuing court supervision; (2) resolve claims related to the subject of the lawsuit; and (3) qualify as a trust under state law or have its assets otherwise segregated from other assets of the transferor.

over time). The settling defendant receives immediate tax deductions and benefits associated with making settlement payments.

> BEST PRACTICE 18B: The parties should file a joint or unopposed motion or stipulation asking the court to establish a QSF and appoint a QSF Administrator to manage funds, handle ongoing claims resolution, and work with the plaintiffs and their counsel to determine the QSF's payout structure.

The QSF Administrator can be the plaintiffs' counsel, but frequently it is more appropriate to appoint an independent, qualified professional. The QSF Administrator manages the funds, handles ongoing claim resolution, and works with the parties to determine the trust's payout structure. The QSF administrator is typically paid based on a pre-established agreement with plaintiffs' counsel from principal in the QSF, interest earned on the QSF, or as a portion of the MDL common-benefit fund (or a combination thereof).

Occasionally, a QSF can be created by other means, such as a court order approving a settlement agreement that requires a QSF. And because a QSF is subject to the continuing supervision of a court, the documents creating the QSF often provide for the court's review of the process, which is flexible enough to permit the court as much supervision as is deemed appropriate and desired depending on the mechanics of a particular settlement.

> GUIDELINE 19: The transferee judge and parties should collaborate in addressing lien resolution (including Medicare and Medicaid) and instituting methods to minimize delays caused by such resolution, especially health care liens.

MDLs that involve personal injury claims require parties and courts to address healthcare liens, a challenging and not well-understood aspect of MDL settlement administration. Attention to healthcare liens early in the settlement process can streamline the settlement timeline, allow claimants to receive payment more quickly, reduce settlement-related disputes, conserve judicial resources, and reduce the parties' expenses.

The parties' and the court's involvement in an MDL does not end when a settlement is reached. Typically, bringing all settlement administration processes to final conclusion -- the settlement "tail" -- can be quite lengthy, although no specific data on settlement tails is readily available. MDLs involving consumer claims generally have shorter settlement tails. Time spent administering settlements can be reduced with up-front planning of settlement mechanics that anticipates lien issues and payment complications.

A lien is a legal claim possessed by a healthcare insurer that paid for a plaintiff's treatment for the alleged injury that is the subject of a settlement. The lien holder is entitled to reimbursement of the cost of such treatment from a plaintiff's recovery. The healthcare insurer may be the federal or a state government that provided coverage under Medicare, Medicaid, or some other program. The insurer also may be a private insurance carrier that provided coverage. The lien may be rooted in federal law, state law, contractual agreement between a plaintiff and insurer, or a combination of these sources.

The Medicare Secondary Payer Act, enacted in 1980, attempts to reduce Medicare costs by designating Medicare as a "secondary" payer when a third-party payer or other form of

"primary" insurance is available.[297] Medicare has what is frequently referred to as a "super lien," that is both a subrogation right and an independent priority right of reimbursement. The government has reimbursement rights against virtually everyone involved in a personal injury claim, including the beneficiary, the defendant, and attorneys representing the beneficiary.

Medicare is not required to notify anyone of its right to reimbursement, nor need it make a request for reimbursement to enforce its right to recovery. Instead, the controlling statute[298] requires that providers of liability insurance (including self-insurance and thus litigation defendants), no fault insurance, and workers' compensation insurance affirmatively determine the enrollment status of each claimant with whom a settlement or other award in resolution of a claim is made. They must also report certain information about those claims to Medicare to ensure that Medicare's interest is protected.[299]

The Medicare Program is made up of Parts A through Part D. Medicare Parts A & B are often referred to as "federal" or "traditional" Medicare. Medicare Part C Plans (referred to as "Medicare Advantage Plans") allow Medicare beneficiaries to enroll in a private plan as an alternative to traditional Medicare. Such plans provide the same benefits as Medicare Part A and Part B and may also include prescription drug coverage. Part C plans are provided by private insurers. These plans must offer at least the same benefits as traditional Medicare but can do so with different rules, costs, and coverage restrictions.

Circuit court case law from the Third and Eleventh Circuits accord Part C private providers ("Medicare Advantage Organizations") the same secondary payer rights as Medicare under Parts A and B, notably not having to notify anyone of a right to reimbursement or to make a request for reimbursement in order to enforce a right to recovery.[300] Medicare Part D is delivered through private companies that contract with the Centers for Medicare & Medicaid Services ("CMS") to provide prescription drug benefits.

Medicaid is a government-sponsored health insurance program providing coverage to qualifying low-income individuals, including parents, children, and the disabled.[301] The program is funded by federal and state governments but is administered by individual state agencies. States have discretion to determine Medicaid eligibility criteria, so Medicaid beneficiary demographics can vary significantly from state to state. There are currently 52 Medicaid agencies administering 52 separate Medicaid lien recovery programs. Resolution of Medicaid liens is required by state and federal law.

Other governmental providers also assert healthcare liens. The lien rights of military and other federal government entities providing health insurance coverage to potential plaintiffs stem

---

[297] *See* 42 U.S.C. § 1395(y)(b) (2012).

[298] Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007 ("MMSEA"), 42 U.S.C. § 1395y(b) & (b)(8).

[299] *See id.* § 1395(y)(b)(8).

[300] *See* Humana Medical Plans, Inc. v. Western Heritage Ins. Co., 832 F.3d 1229 (11th Cir. 2016); *In re Avandia*, 685 F.3d 353 (3d Cir. 2012).

[301] 42 U.S.C. §§ 1396(a), (k) (2012).

from the Federal Medical Care Recovery Act ("FMCRA").[302] These federal entities are typically granted an independent right of recovery against a third party responsible for a member's medical care along with a right of subrogation, assignment, and ability to intervene or join the plan member plaintiff's claim.[303]

Private health insurance companies may also assert healthcare liens. Private health insurance is provided primarily by employers and individually purchased policies. Lien and subrogation rights are a mixture of contract, state law, federal law (including the Employment Retirement Income Security Act ("ERISA")), judicial decisions, and other considerations (such as whether a private health plan is fully self-insured). The process for resolving private lien interests has been evolving significantly and can benefit from court supervision and oversight.

BEST PRACTICE 19A: The transferee judge overseeing a global settlement should designate representatives from both sides to create a healthcare lien resolution process. The responsibilities and respective duties of these representatives (and subcommittees, as needed) should be specified at the outset and assigned at the earliest possible time.

All parties benefit from addressing healthcare liens early on in the settlement process, because the risks of non-compliance[304] are magnified by large numbers of plaintiffs and claims.

Usually, the first step toward lien resolution is for all plaintiffs to submit their personal indemnifying information, dates of injury, healthcare plans, and medical treatment to identify possible liens. The second step is verification of entitlement ("VOE"), to determine the extent that particular plaintiffs received healthcare benefits from particular plans during relevant time periods. The claims and medical records of identified plaintiffs are reviewed to ensure that lienholders are repaid only for expenses actually incurred and directly related to alleged injuries for which settlement compensation is being paid. The final lien amount is determined using various strategies, depending on the type of lien at issue.

Because resolving healthcare liens can take months, even years, the court-designated representatives should design a lien resolution plan as expeditiously as possible. The parties should consider engaging a Lien Resolution Administrator to facilitate the entire lien resolution process. Professional Lien Resolution Administrators reduce the workload for firms looking to conserve resources, and ensure efficient healthcare lien handling by persons with knowledge, experience, and well-established connections for dealing with the various lienholders' recovery agents, such as the 52 separate state Medicaid lien recovery programs. A Lien Resolution Administrator also ensures a transparent, uniform lien resolution process, so that similarly-situated participating plaintiffs achieve similar outcomes.

---

[302] *See* 42 U.S.C. §§ 2651-2653 (2012).
[303] Such providers include the U.S. Department of Veterans Affairs ("VA"), TRICARE, and Indian Health Service ("IHS").
[304] Both parties and attorneys can be liable for failure to report. *See e.g.,* 42 U.S.C. § 1395y(b)(2)(B)(iii); 42 C.F.R. § 411.24(c)(2) (allowing for a penalty of $1,000 per day for failure to report a settlement involving a Medicare beneficiary and allowing Medicare to bring an action for double damages against any responsible entity for repayment).

Medicare liens are often resolved under a "global model," which avoids the time delays and costs associated with resolving thousands of claims on a traditional case-by-case basis. Construction of a global model requires analysis of the routine costs associated with the medically-accepted standard of care for the treatment and care of the injuries at issue in a particular MDL. This data is then used to determine a uniform reimbursement value for all claims in any injury category.

There are 52 separate state Medicaid lien recovery programs, which complicates the resolution of Medicaid liens.  One advantage of using an experienced Lien Resolution Administrator is that they should already have well established connections with these recovery programs.

Resolving Medicare Part C and other private liens in mass litigations, presents additional difficulties because, unlike federal Medicare and state Medicaid programs, there is no centralized system through which a Lien Resolution Administrator or the parties can affirmatively identify whether liens exist in favor of one of the thousands of potential private health plans. Many private insurers hire private recovery contractors to manage lien claims. The court-designated representatives should consider establishing a Private Resolution Program ("PLRP") to verify and resolve the complexities of private lien payment. An experienced Lien Resolution Administrator can assist in untangling these complexities and help identify the necessary recovery contractors needed in order to have an effective PLRP.

BEST PRACTICE 19B: The transferee judge should assist the parties in the healthcare lien process by issuing orders, as needed, requiring periodic reporting.

The transferee judge can shorten the healthcare lien resolution timeline by requiring periodic reporting from the parties and lien administrator and by assisting, when needed, in advancing the process.

If the parties choose to use a Lien Resolution Administrator, they should seek a court order naming that administrator, thereby permitting the administrator to communicate directly with Medicare and other lienholders. Such an order should also authorize disclosure and exchange of settling plaintiffs' protected health information.

115

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Thank you to our Sponsors!**

The Bolch Judicial Institute gratefully acknowledges the financial support of its sponsors. The Institute's law-reform conferences and other related programs rely on the generosity of sponsors' donations.

### Sponsors

Ankura Consulting
Dechert LLP
Garden City Group
Garretson Group
Huntington Bank
David Ichel Dispute Resolution
Western Alliance Bank

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Advisory Council**
**Distinguished Lawyer Conferences**
**Bolch Judicial Institute**

| | | |
|---|---|---|
| Robert Hunter<br>Altec, Inc. | Jocelyn Hunter<br>Home Depot | Adam Moskowitz<br>The Moskowitz Law Firm |
| Malini Moorthy<br>Bayer | Ted Mayer<br>Hughes Hubbard & Reed LLP | Frederick Baker<br>Motley Rice LLC |
| Robert Heim<br>Dechert LLP | Jocelyn Larkin<br>Impact Fund | Dianne Nast<br>NastLaw LLC |
| Sheila Birnbaum<br>Dechert LLP | Kimberly Justice<br>Kessler Topaz Meltzer<br>& Check LLP | Sheila Brodbeck<br>Pfizer, Inc. |
| Munjot Sahu<br>Eli Lilly | Chilton Varner<br>King & Spalding | Peter Prieto<br>Podhurst Orseck PA |
| Carrie Hazard<br>Endo International PLC | Mark Filip<br>Kirkland & Ellis LLP | Chris Seeger<br>Seeger Weiss LLP |
| JoAnn Lee<br>Exxon Mobil | Elizabeth Cabraser<br>Lieff Cabraser Heimann<br>& Bernstein LLP | John Beisner<br>Skadden Arps Slate Meagher<br>& Flom LLP |
| Anthony Walsh<br>GE's Power & Water | Kirkland Hicks<br>Lincoln Financial Group | Barney Shultz<br>State Farm Insurance |
| Dena Sharp<br>Girard Gibbs LLP | Brad Lerman<br>Medtronic | Phillip Wittmann<br>Stone Pigman Walther<br>& Wittmann LLC |
| Leah Lorber<br>GlaxoSmithKline | James Grasty<br>Merck | Jody Porter<br>Toyota Motor<br>North America, Inc. |
| Adam Levitt<br>DiCello Levitt &<br>Casey | | |