**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG    )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,   )
                           )    Pensacola, Florida
                           )    April 19, 2022
                           )    10:05 a.m.
                           )
                           )
_____)

**CONFERENCE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-51)

**A P P E A R A N C E S**

**SPECIAL MASTER HON. DAVID R. HERNDON** (ret.)
**SPECIAL MASTER ADRIANE THEIS**

**FOR THE PLAINTIFFS:**    Aylstock, Witkin, Kreis & Overholtz, PLLC
                     by:  **BRYAN F. AYLSTOCK**
                        *baylstock@awkolaw.com*
                     17 E Main Street, Suite 200
                     Pensacola, Florida  32502

**A P P E A R A N C E S**

**FOR THE PLAINTIFFS:**     Clark Love & Hutson, GP
                            by:  **SHELLEY HUTSON**
                                 *bgreif@triallawfirm.com*

                                 **W. MICHAEL MORELAND**
                                 *mmoreland@triallawfirm.com*
                            440 Louisiana Street, Suite 1600
                            Houston, Texas  77002

                            Seeger Weiss LLP
                            by: **MAX KELLY**
                                *mkelly@seegerweiss.com*
                            55 Challenger Rd, 6th Floor
                            Ridgefield Park, NJ  07660


**FOR THE DEFENDANTS:**     Kirkland & Ellis, LLP
                            by:  **MARK J. NOMELLINI**
                                 *mnomellini@kirkland.com*
                            300 N Lasalle
                            Chicago, Illinois   60654

**P R O C E E D I N G S**

**JUDGE RODGERS:**  Good morning.

**MR. AYLSTOCK:**  Good morning, Judge.

**JUDGE RODGERS:**  So, Mr. Nomellini is here for 3M.
It's good to see you again.

**MR. NOMELLINI:**  Thank you, Judge.

**JUDGE RODGERS:**  And Mr. Aylstock, Ms. Hutson, and Mr.
Moreland, good morning to you all.

On Zoom I have Judge Herndon, Judge Jones, and Adriane
Theis as well.

Thanks for coming and being here in person.

Let me talk to you about the purpose of this
get-together.  Let me say first that the discussion this
morning pertains to the Wave process, the cases that are moving
through the Wave processes.

The bellwethers are, in my view, completely separate
from this discussion.  The bellwethers are practically or
nearly completed, those trials.  All the challenges have been
raised in those cases, pursuant to *Daubert* expert challenges,
and the Court has made its rulings in regards to those
challenges.

One of the things that I have observed as part of the
bellwether process that is informing some of my decision-making
in the Wave process is that there appear to be cases in the
bellwether process going to trial where all of the audiograms

1    for the plaintiffs are normal.  And I say "normal" and I will

2    define that as 15 dB or greater in terms of the threshold, not

3    25.  So, erring in this discussion on the side of sort of the

4    expert testimony that is reliable in terms of the 15 dB

5    threshold, recognizing there's controversy and dispute about

6    that in the industry.

7         So, using that as the sort of barometer starting at 15

8    dB, there are plaintiffs who have normal audiograms and

9    continue to have normal audiograms during the time they wear

10   the plug and they are exposed to noise and it is not until much

11   later that those individuals undergo an audiogram that shows

12   auditory injury or hearing loss.

13        As I said, we've had the challenges to hidden hearing

14   loss opinions, cochlear synaptopathy.  The Court has made its

15   rulings, and I am not revisiting those rulings.  But I do have

16   some concern going forward with the Wave cases about proof of

17   injury for those plaintiffs, again, those who have normal

18   audiograms, as defined, 15 dB as the starting point for injury,

19   normal, so below 15 dB while wearing the plug and exposed to

20   noise, and it is not until much later that there's evidence of

21   hearing loss after the noise exposure.

22        I have not heard an expert to date say or opine that

23   with noise-induced hearing loss that the injury occurs at any

24   time other than the time of the noise exposure.

25        And so, my thoughts are, again with regards to all of

         1    these cases moving through the discovery Waves, at great

         2    expense to both sides, that this issue be addressed early on.

         3    And I know we're already into the second Wave, and the third

         4    order will be coming out in May.  But it's my intent to address

         5    this now rather than later, meaning rather than waiting on

         6    summary judgment.  I know the first Wave, it's probably going

         7    to have to be something addressed on summary judgment.  But for

         8    the other Waves, my intent is to require proof of auditory

         9    injury at the time the person wore the plug and was exposed to

        10    noise early in the Wave process.

        11             Now, as I sit here now, I can't tell you and I cannot

        12    quote line by line expert opinions and what every case-specific

        13    expert has said in these cases on this issue, and there may be

        14    something that I am missing and that I do not recall.

        15             And we'll talk about that, if you'd like, Mr.

        16    Aylstock, in just a moment.

        17             But, to the extent there is something, whether it's --

        18    an example that I can think of is if there's an opinion about

        19    accelerated age-related hearing loss and that that may be proof

        20    of injury even though the person has normal audiograms at the

        21    time they wore the plug and were exposed to noise.  I'm not

        22    sure that's been the opinion.  But if that is an opinion that

        23    the plaintiffs would intend to rely on, then I'm going to hold

        24    a *Daubert* hearing and get this resolved once and for all to my

        25    satisfaction that there is proof of injury in these cases.

1           And I am not talking about tinnitus.  Tinnitus is

2    totally separate, not a part of this discussion.  This is

3    simply -- not simply.  This is only hearing loss.

4           Now, of course, we have hidden hearing loss, and I

5    have a *Daubert* ruling on hidden hearing loss, as you know, with

6    some focus on cochlear synaptopathy.  And I granted 3M's motion

7    in part and denied it in part.

8           If a plaintiff has an opinion of an expert supported

9    by objective medical testing such as OAEs in support of the

10   hidden hearing loss opinion, then I've allowed it.  But that's

11   been the exception more than the rule.  But for Wave cases, it

12   may be that that's what plaintiffs' lawyers are doing now.  I

13   don't know.

14          But the way I'm looking at it right now is, early in

15   the Wave process a plaintiff is either going to have to have

16   one of two things.  And again, if we have to have a *Daubert*

17   hearing to flesh this out and let me decide on the reliability

18   of the opinions based on the science, then we can do that.  But

19   right now it would be proof of audiograms with greater than 15

20   dB evidence of hearing loss at the time the person wore the

21   plug and was exposed to noise; or a hidden hearing loss opinion

22   supported by objective tests.

23          So, Mr. Aylstock, is there something I'm missing in

24   terms of sort of the expert opinions and proof of injury,

25   something that I'm missing from their testimony where we have

 1    normal audiograms at 15 dB?

 2         **MR. AYLSTOCK:**  I don't know that you're missing

 3    anything.  I know Your Honor has observed all of the trials, to

 4    the extent possible, and presided over many of them.

 5         I appreciate what you said about tinnitus being

 6    completely separate, because that is, in our view, a completely

 7    separate animal, and we believe the science supports that.

 8         **JUDGE RODGERS:**  Well, let me stop just for a moment

 9    there.  It is separate.  And so everybody needs to be clear

10    that is not a part of this discussion.

11         However -- and again, I'm not sure of all the opinions

12    that have been given by every expert in the case, but I'm not

13    sure the science would support an opinion that says you have

14    tinnitus, normal audiogram, you have tinnitus, and then you

15    have an abnormal audiogram later after you leave the military

16    or at a time you're not exposed to noise and an opinion that

17    the tinnitus somehow led to the hearing loss on the audiogram.

18    I don't think I've heard that yet, and I'm not sure it would be

19    supported by the science in any event.

20         But if that's something you think your experts have

21    either said or are intending to opine about, then that would be

22    a subject of a *Daubert* hearing, and I would need to get that

23    set and resolved.

24         **MR. AYLSTOCK:**  I don't know that those are the

25    opinions that we've seen.  And one of the things that we do

1   have the benefit now of, in fact, from Wave 1, for those that

2   remain in Wave 1, 96 percent of the Wave 1 plaintiffs supplied

3   full Rule 26 reports as of today.

4          So, one of the things that I think might be helpful to

5   this discussion -- and I haven't seen all of them; I know my

6   firm's and some about some other firms.  But it would be my

7   belief, Your Honor, that, in Wave 1, that the experts who have

8   opined for those cases either have a tinnitus opinion, which is

9   separate, or would have objective evidence in the way of OAEs

10  or some other objective test that would fit neatly within your

11  hidden hearing loss order or would have this over 15 dB.

12         I don't know that it -- as I stand here right now, I

13  don't believe that in Wave 1 we're going to see this problem be

14  manifest.  Now, I could be wrong about that, and I'm happy to

15  review all of them and see.

16         Certainly they have their right, and I'm sure they'll

17  challenge every single expert, like they always do, through the

18  Rule 26 process.  And I don't disagree that, if it is a

19  significant proportion of cases in Wave 2, maybe it needs to be

20  addressed -- or in Wave 1, rather, maybe we need to address it

21  in Wave 2 or 3.

22         I do think that, with regard to some of the

23  bellwethers -- Mr. Wayman, for example, of course, he had his

24  severe tinnitus and he had a hidden hearing loss opinion, he

25  had objective evidence of --

1      **JUDGE RODGERS:**  Well, I allowed that.  And so that

2   would make it over this hump, that type of case would make it

3   over this hump.

4      Now, Mr. Nomellini, let me stop and say this doesn't

5   preclude you all from raising any challenges you intend to

6   raise.  And this, frankly, would be a process, to the extent I

7   put it into place, requiring proof of injury along these lines

8   for hearing loss, it really would not be a process the

9   defendants would be a part of.

10      I mean, you're obviously there, you're on the

11   sidelines, you're watching it.  But it is something that I

12   would put into place and that I would ensure you all had met

13   this threshold before I let your case proceed.  And so this is

14   not an opportunity for the defendants to challenge.  That will

15   come at its own time.

16      Now, Wave 1 is a little different because -- I'm going

17   to let that play out on summary judgment because of where we

18   are in that process now.  That was my intent anyway was to just

19   let this issue play out on summary judgment so the defendants

20   would be a part of that process in Wave 1.

21      But for the other Waves -- which we're already in 2,

22   and then 3 will be right around the corner.  My intent was to

23   require this threshold level of proof much earlier on.  So in

24   Wave 2, my intent would have been, by July 5th, which is the

25   end of fact discovery, and for Wave 3 it would have been within

1    45 days, which is at the end of your written discovery period.

2              Because you've got the audiograms; if you don't,

3    you're in trouble.  Surely you've got the audiograms.  If

4    you're identified for a Wave, you're going to have to have the

5    audiograms.  You've got the census forms.  And I really think

6    that's all you need.  Absent a hidden hearing loss opinion, I

7    think that's all you need.  You've got the audiograms and

8    you've got your census forms that show when the person wore the

9    plug and when they were exposed to noise.

10             **MR. AYLSTOCK:**  The additional I think very important

11   fact that is necessary is the plaintiff's deposition.  That,

12   obviously, is a cross-examination that fleshes out some of

13   the --

14             **JUDGE RODGERS:**  I disagree.  I don't need the

15   plaintiff's deposition to make a decision.  I don't see the

16   need for a plaintiff's deposition on this.  The audiogram is

17   what it is.

18             **MR. AYLSTOCK:**  Well, sometimes -- and I'm harkening

19   back to some of the bellwethers cases.  I know this isn't a

20   bellwether discussion, but it's kind of arisen out of, as

21   you've said, what you've seen.

22             A lot of times with regard to the audiograms -- and

23   we've seen this from this very stand -- the audiograms are a

24   snapshot.  They're important information, our experts certainly

25   don't dispute that.  However, they don't tell the whole story

with regard to frequencies above 8,000 or 6,000 hertz as it
relates to the military.  They only have that particular
snapshot.

So I don't disagree in concept, Your Honor, with what
you're saying.  We do not --

**JUDGE RODGERS:**  But the thing is you don't have -- the
audiogram, it is what it is.  And if it doesn't show beyond
6,000 hertz, so if it doesn't show the extreme higher
frequencies, you can't create that.  It doesn't exist.

**MR. AYLSTOCK:**  That's true.  However -- and we've seen
even in the defense DMEs when they do OAEs and then plaintiffs
also have an opportunity to do that, sometimes people will not
be able to hear correctly.  They may have a, quote/unquote,
"normal audiogram", but they simply can't -- they can't
communicate like a normal person.

When we do the objective tests, or sometimes when 3M
does the objective tests like OAEs, speech-in-noise, and so
forth, that stuff comes to the fore.

So, to require this before that testing can be
performed I think, in my opinion, would be premature.  And I
think what we'll see, if we do this examination of Wave 1, is,
in fact, that where there is an opinion with a, quote/unquote,
"normal audiogram", you're going to have either the fundamental
requirements of the hidden hearing loss opinion that Your Honor
set forth, or maybe it's a tinnitus only case.  I do not

1    believe that in these we're going to see a large percentage and

2    probably very small that would claim that there's some kind of

3    a latent injury.

4          In these bellwether cases, there's certainly -- with

5    regard to these OAEs, there's a threshold.  You can lose about

6    80 percent of them, I think was the testimony of some of our

7    witnesses, maybe Dr. Spankovich, of those hair cells before you

8    fall off the cliff, as it were, and all of a sudden have

9    problems hearing that we -- we have redundancies in those hair

10   cells.

11         So some of what may be happening is -- and again, we

12   recognize that we would need objective evidence of this to put

13   fore in a Rule 26 report to withstand a *Daubert* challenge that

14   we know is coming.  But I do think that when you get that

15   testing and there's maybe 70 percent, 75 percent, or maybe

16   there was testing with a normal audiogram, for example, in

17   Vielsmeier where he had an OAE prior to the litigation and it

18   showed fairly normal, had a little bit of changes, but then

19   after the present day or closer to present day it's now fallen

20   off the cliff.

21         **JUDGE RODGERS:**  But if I'm allowing you to provide the

22   hidden hearing loss opinion in lieu of an abnormal audiogram at

23   the time the person wore the plug and was exposed to noise --

24   if I'm allowing the hidden hearing loss opinion, why do I need

25   a deposition?

1    **MR. AYLSTOCK:**  Because, in order -- the sequence is

2    that the depositions typically happen before the DME and then

3    the plaintiff examination, if there is one.  So, by backing

4    that out -- now, we may still have a valid tinnitus case

5    because a lot of these folks, as you've seen, have a

6    combination of injuries.

7        So all Your Honor would be doing is, not necessarily

8    winnowing out a bad case, you would be disallowing a claim

9    before we have the evidence necessary under Rule 26 -- some of

10   it, again, comes from the DMEs and we've seen that where the

11   DMEs absolutely show this -- without the benefit of the Rule

12   26.

13       **JUDGE RODGERS:**  So are the DMEs all including OAE

14   testing?

15       **MR. AYLSTOCK:**  Not all of them, but many of them do.

16   And where they are out there, we have certainly used them in

17   these bellwether trials.  Certainly the plaintiffs as well have

18   the right to go get --

19       **JUDGE RODGERS:**  Well, there's no question you all have

20   the right to do that, and that's really what typically does

21   happen, and that's what I was anticipating would happen is you

22   all would need to line up your hidden hearing loss opinions in

23   these cases.  It just might have to be done earlier on.

24       I don't know that I want to wait for a DME to see

25   whether your plaintiff is injured.  It's your requirement to

 1     provide proof of injury.  It's not just we're going to wait

 2     until the defendants do their testing to see if it shows proof

 3     of injury.

 4              **MR. AYLSTOCK:**  No, I do understand that, Your Honor.

 5     But, for example, if we have somebody who definitely has a

 6     tinnitus claim, to back that up and then provide a report, or

 7     whatever Your Honor is contemplating, before we have the

 8     benefit of all the information doesn't winnow any cases; it

 9     just winnows a claim that may, in fact, be valid.  All I'm

10     suggesting --

11              **JUDGE RODGERS:**  I don't agree with that.  I wouldn't

12     winnow a claim that wasn't a valid claim.  I don't think I have

13     to wait for a defense medical exam to decide whether your

14     client is injured or not.

15              **MR. AYLSTOCK:**  No, I don't dispute that.  All I'm

16     suggesting is that, if it's a problem in Wave 1 -- we have all

17     of the information to know whether it's a problem in Wave 1.  I

18     don't believe it is.  I don't have all of the information.  The

19     defendants have all of the expert reports at their access.  And

20     maybe it's a large percentage and it needs to be addressed

21     earlier.  If it's not --

22              **JUDGE RODGERS:**  I feel like it does need to be

23     addressed earlier, Mr. Aylstock, because of the numbers.  All

24     of these Wave cases, if they continue and they make it through

25     *Daubert* and summary judgment, they're going to be remanded to

1    94 districts throughout this country, and it's going to be an

2    extreme burden on the judiciary.  And I feel a responsibility

3    to make sure that I'm not sending cases out to other districts

4    and other judges that really don't need to go.  And I also

5    don't feel like I want to rule on *Daubert* challenges and

6    summary judgment motions for cases that really shouldn't be

7    here.  That's an enormous amount of work for me.

8         We're three years into this litigation.  And to

9    require a threshold level of proof for hearing loss -- not

10   tinnitus, different animal, in terms of sort of objective proof

11   of injury.  But to require it for hearing loss I just don't

12   think is unreasonable at all, because I think the science does

13   support that there is -- you know, there's a hidden hearing

14   loss opinion that I've allowed under certain circumstances, and

15   then other than that, there is objective proof through an

16   audiogram.

17        But it certainly wouldn't be enough for a plaintiff

18   to, in deposition or in an affidavit form, to say, *I wore this*

19   *plug, I was exposed to noise, and I can't hear.*  That's not

20   going to be enough.

21        **MR. AYLSTOCK:**  I'm certainly not saying anything

22   you're contemplating is unreasonable.  All I'm suggesting is

23   that, if someone also has a tinnitus claim, that, one, they be

24   excluded from this process so that once -- I mean, the claim is

25   going to proceed under the tinnitus theory and not require

 1    additional information from the plaintiff until the full Rule

 2    26 report.  That is a heavy burden.

 3            The good news and what I think is important for the

 4    Court to know is that, out of those Wave 1 -- and I have some

 5    statistics and charts, if Your Honor is interested.  I know

 6    you're probably already informed by our Master.  But with

 7    regard to Wave 1, it was a very successful endeavor, and we

 8    worked hard with the Masters as well as --

 9            **JUDGE RODGERS:**  I haven't seen any of that data, so I

10    would like to, if you have it.

11            **MR. AYLSTOCK:**  I do, if -- I can pass it up or put it

12    on the ELMO.

13            **JUDGE RODGERS:**  Does Mr. Nomellini know what you're

14    showing me?

15            **MR. AYLSTOCK:**  Yes.  We made these charts with Mr.

16    Nomellini's data that we exchanged yesterday.

17            **JUDGE RODGERS:**  Okay, very good.

18            **MR. AYLSTOCK:**  So he may not have it graphically but

19    it certainly has it.

20            **MR. NOMELLINI:**  Thank you.

21            **MR. AYLSTOCK:**  May I pass this up?

22            **JUDGE RODGERS:**  Yes.

23            Mr. Nomellini, does -- maybe the chart you're not

24    familiar with, but do you have any reason to believe this is

25    not your data?

1              **MR. NOMELLINI:**  I have no reason to believe -- it

2      looks very familiar, Your Honor.

3              **JUDGE RODGERS:**  Okay.

4              **MR. AYLSTOCK:**  So, what this represents is that, with

5      regard to the plaintiff depositions that were completed, the

6      vast majority sat for their deposition.  And, in fact, those

7      that didn't end up sitting for their deposition, most all of

8      them were dismissed prior to their deposition.

9              Of those that proceeded through deposition, the vast

10     majority of those, 96.5 percent I believe submitted full Rule

11     26 reports to the defendants.  It would be my belief that the

12     vast, vast majority of those would not have an issue where it

13     was solely hearing loss without this audiogram.

14             And what I'm suggesting to Your Honor is that, if

15     you're contemplating moving forward without an examination of

16     Wave 1 -- which would be my first position, let's look and see

17     how we did in Wave 1 with the reports -- but that we limit it

18     to those cases where there is not a tinnitus opinion, because

19     that one is going forward, but it's solely a hearing loss

20     opinion where, as Your Honor put it, there's a normal

21     audiogram.

22             **JUDGE RODGERS:**  But why would I allow the hearing loss

23     -- in a combination case, why would I allow the hearing loss to

24     go forward?  It's separate and apart from tinnitus.  It's a

25     separate injury.

1           **MR. AYLSTOCK:**  And I'm not suggesting you allow it to

2     go forward.  But to accelerate Your Honor's already very

3     aggressive timetable where -- I don't think there's any dispute

4     that on both sides we're working extremely hard to meet Your

5     Honor deadline.  But to create another deadline that would then

6     accelerate it for cases that are going to proceed without all

7     of the information that they will have at a Rule 26 report

8     would be putting the cart before the horse a little bit, where

9     this may just be a glitch that happened in some of the

10    bellwether trials but it's not a pervasive problem in the

11    Waves.

12          **JUDGE RODGERS:**  Well, this data would demonstrate that

13    it's not, although I don't know what these expert reports say.

14    I don't know what those opinions are.

15          You're telling me there are quite a few that are now

16    under the umbrella of the permissible hidden hearing loss order

17    that I've -- sort of how I've defined that for purposes of

18    admissibility.

19          **MR. AYLSTOCK:**  They may be.  And really where I think

20    Your Honor may be focused is those cases where there's not a

21    gap in the audiograms.  We've certainly tried and won

22    bellwether cases where a soldier has an audiogram, it's clean

23    or normal, is exposed to noise, doesn't get his routine

24    audiogram, and then years later gets the audiogram.  So there's

25    this gap.  It's unlike a situation --

1           **JUDGE RODGERS:**  No, that's different, that's different

2     than having normal 15 dB -- normal audiograms during the time

3     frame that the soldier wore the earplug and was exposed to

4     noise.  So, during that time frame, whether it's 2006, '07, or

5     '08, there's a series of audiograms and those are all normal

6     and he's wearing the plug and he's exposed to noise.  That's a

7     problem.

8           **MR. AYLSTOCK:**  And then -- well, it is a problem if,

9     in fact, then he or she stops wearing the plug and then is --

10    and then progresses or -- we're not --

11          **JUDGE RODGERS:**  I'm not sure I agree with you on that.

12          **MR. AYLSTOCK:**  Well, here's the issue, Judge.  With

13    regard to this plug, the issue is the variability.  It is the

14    most variable plug ever made or ever tested in Mr. Berger's

15    lab.  Every jury has heard that.

16          And it's not to say that you wear this plug and it

17    won't protect you ever.  So the fact that there are --

18          **JUDGE RODGERS:**  No, I don't disagree with that, Mr.

19    Aylstock.  I'm sorry, but I don't disagree with that.

20          But if they had stopped wearing the plug -- right?

21          **MR. AYLSTOCK:**  That's what I'm trying to narrow in --

22          **JUDGE RODGERS:**  Okay, yeah.

23          **MR. AYLSTOCK:**  -- and identify that, and I accept it

24    as an issue that either Your Honor would need to rule on on

25    *Daubert* or we need to decide --

1      **JUDGE RODGERS:**  I don't want to rule on it on *Daubert*.
2    That's too late.  This is too obvious of a deficiency, in my
3    mind.  I don't want to wait for *Daubert*.  It's expensive for
4    both sides and it's extremely time consuming for me, when it
5    doesn't need to wait for that.

6      **MR. AYLSTOCK:**  I misspoke.  I meant have a *Daubert*
7    hearing early so that we can address it.

8      I don't believe -- and I would certainly need to
9    consult with our folks on the Science Committee -- that the
10   leadership says there's a, quote, "latency" here.  I don't
11   think this is a latent injury in the classic sense like
12   mesothelioma or --

13     **JUDGE RODGERS:**  I haven't heard an expert, per se, say
14   this.  I think the experts -- and I think Dr. Bennett may have
15   been one -- where I've heard an opinion about accelerated
16   age-related hearing loss, I believe there was evidence of
17   auditory injury reflected on an audiogram, whether it was a
18   temporary shift or it was permanent shift or something, but
19   there was some evidence objectively to support that.

20     My concern would be, again, normal audiograms at 15 dB
21   being the number and an accelerated age-related hearing loss
22   opinion without any evidence of auditory damage at the time the
23   person wore the plug and no hidden hearing loss opinion.

24     **MR. AYLSTOCK:**  Right.  And all I'm suggesting is that,
25   if there's also a tinnitus opinion, that we let the process

1   play out such that, if there is OAEs on a DME or an IME, that

2   they're not frontloaded to create an additional burden on the

3   primarily the plaintiffs because we have to come forward when

4   we know and the Court knows that the case is going forward, if,

5   in fact, that --

6           **JUDGE RODGERS:**  I'm sorry, I don't follow you when

7   you're asking me about excluding the tinnitus.  Are you saying

8   tinnitus only cases?  Or are you saying tinnitus also with a

9   hearing loss claim together?

10          **MR. AYLSTOCK:**  Well, I'm just thinking of it from

11  practically as a lawyer doing this.  If we have a client who

12  says, I have a tinnitus claim, and it's in the medical records,

13  we certainly have where -- or whatever, we have the proof

14  necessary to move forward on a tinnitus claim, it may be our

15  intent at that point in time to simply proceed as a tinnitus

16  claim, which is certainly consistent with the Court's orders

17  and, frankly, the science that you can have tinnitus without

18  hearing loss.

19          **JUDGE RODGERS:**  Correct.

20          **MR. AYLSTOCK:**  It may not be until later in the

21  process that the OAEs are given or there's some other objective

22  evidence consistent with Your Honor's hidden hearing loss that

23  we learn that say, oh, okay, this guy also can't hear

24  speech-in-noise, he's also got some cochlear damage as

25  evidenced by --

1          **JUDGE RODGERS:**  I'm not waiting until the defense

2     medical examination to determine that, Mr. Aylstock.  Your

3     tinnitus only claims for sure will be excluded from this

4     process, and frankly, I don't know that you even have to have a

5     medical record to support it.  It certainly would help you, but

6     there just is no objective testing for tinnitus.  I know the

7     defendants don't like to hear that, but it is what it is.  And

8     not everybody reports it.  It's an unusual phenomenon,

9     depending on the severity of it.

10          So, tinnitus is, again, that's for another day.  If I

11     could think of a way to sort of test the tinnitus cases early

12     on, I would do it.  And I can't.  And again, a medical record

13     is not --

14          So, Mark, don't ask me about that because a medical

15     record is not going to be required.  But hearing loss is

16     different.

17          **MR. AYLSTOCK:**  Well, what if we did this, Judge:  What

18     if we -- whatever the certification process Your Honor is

19     contemplating for those cases that also have a tinnitus claim,

20     before full Rule 26 reports, that that be a gate, so to speak,

21     that Your Honor puts in place but such that a full *Daubert*

22     opinion or decision or review doesn't have to happen but it

23     affords those plaintiffs the opportunity to see if they have

24     that objective testing, without imposing, frankly, yet another

25     earlier deadline on hundreds of cases that is going to be very

1    difficult to be met.

2           We have collectively lifted heaven and earth to comply

3    with our Court's order.  We've done, in my view, a very good

4    job.  Your Honor noted in I think it was CMO 35 or 32 that in

5    the bellwether process there were 29 percent that went away.

6    In this process, we're at 19 percent in Wave 1 that have gone

7    away, 19 and change.

8           So we're about a third better than what Your Honor had

9    expressed some concern on.  And we're all working very hard to

10   get everybody tested, to get everybody those reports, and while

11   we're also working on Your Honor's other orders.  And to put

12   one more on cases, again, the tinnitus cases that we already

13   know are proceeding, in an accelerated thing would be very

14   difficult for us to do.

15          **JUDGE RODGERS:**  Well, I just don't understand that,

16   Mr. Aylstock.  I mean, they have a separate claim for hearing

17   loss, and that claim should be subject to the same test as a

18   hearing loss only case.

19          **MR. AYLSTOCK:**  Correct.

20          **JUDGE RODGERS:**  Now, tinnitus, no, again.

21          **MR. AYLSTOCK:**  The only question is when.  Should it

22   happen after the objective testing that's going to take place

23   at the DME or the IME, or should it happen in an accelerated

24   format where I don't know that it accomplishes any particular

25   goal that wouldn't be accomplished a month later because it

1     would allow us to proceed and comply with Your Honor's

2     deadlines for Wave 2 and 3 without the additional earlier

3     deadline.  Because to get this testing, we have to get these

4     people to audiology clinics and things like that, and we're

5     already scrambling to do.

6            And in Wave 2 -- I've got some data here as well on

7     that.  In Wave 2 we're doing very well.  We already have 324

8     depositions scheduled, 21 plaintiff depositions complete.

9     We're working on DMEs and everything else that are being

10    scheduled.

11           We now have a DME portal through BrownGreer so that

12    these people can know when they click the button that that's

13    their time.  They're going to be scheduled for these DMEs.

14    Many, if not most, will have this testing.

15           And to accelerate it -- and sometimes when the testing

16    is done on the DME, really it's a waste of time and money, our

17    client's time and money and -- well, our money and the client's

18    time because of the nature of the beast, to do another OAE when

19    we already have the OAE results.

20           So I think that, consistent with rule one in saving

21    parties' resources, postponing it -- not letting it get to the

22    full Rule 26, but have a certification process immediately

23    following the objective testing and before motion practice and

24    all that would just be more efficient, Your Honor.  That's all.

25           **JUDGE RODGERS:**  But I guess I'm not clear on whether

 1    you're having your own IMEs done or you're just relying on the

 2    defense medical exams.

 3          **MR. AYLSTOCK:**  It's some of both, Your Honor.

 4    Sometimes --

 5          **JUDGE RODGERS:**  But I'm not comfortable saying you can

 6    wait for a defense medical exam to give me proof of injury for

 7    a plaintiff's case.  You need to have your own IME done, then.

 8          And then it may be that you come to me and -- or I

 9    speak with Adriane and we decide that, if you have an IME done

10    and that IME shows the injury, then there isn't a DME.  I don't

11    know.  I mean, it does seem redundant to me.  These are

12    objective tests.  These are reliable, honorable experts who --

13    you know, I haven't seen one yet that I don't believe was

14    trustworthy and saying what they believed to be the case, and

15    they certainly aren't making up objective test results.

16          **MR. AYLSTOCK:**  Right.  And we don't always know.  In

17    fact, I think -- I don't know if it's ten days or five days,

18    but there's a time limit before the DME where they disclose

19    what tests are going to be done on that DME.  So we don't even

20    know necessarily what they're going to do until after the DME

21    is done, and that, of course, is done prior to the plaintiff's

22    expert report.  So it's a chicken and the egg thing.

23          I think, getting back to my primary point, if we look

24    at Wave 1 Rule 26 reports, I think this is a -- it might be a

25    very minor problem, but I don't know that it's justified to

1    create a whole other layer of administrative certification on

2    all of the cases.  If, in fact, I'm wrong about that, I think

3    Your Honor certainly is well within your right -- and I

4    understand the motivation to try to -- none of us want to spend

5    money on cases that aren't going to make it through.  We've

6    been charged costs and that's not fun to write a check to 3M.

7    Of course, we don't get our costs back.

8            So we've all worked hard when these Wave orders come

9    out to do as much as we can initially with these individuals,

10   some of whom -- a lot of whom, unfortunately, suffer from

11   pretty bad PTSD, other issues in their lives.  And my view is

12   the process here has worked very well, if not great, with

13   regard to the numbers that have complied with your Court's

14   orders.  It's far and above any other mass tort I've ever been

15   in with regard to the number of cases making it through the

16   Waves and submitting full Rule 26 reports.

17           So I don't disagree that it could be a problem in the

18   future.  I don't disagree that it might be a minor problem now.

19   I would just suggest that, from what limited knowledge I have,

20   it is not a major problem, and it's one that can be solved

21   without involving additional court resources in ruling on

22   *Daubert* motions and things like that.

23           If, in fact, there is a substantial or even a

24   significant minority of Rule 26 reports that have a latency

25   issue, I don't disagree with Your Honor that Your Honor should

1    have an early *Daubert* hearing and let's put that to bed once

2    and for all.

3         Speaking for our cases, we're not contending in the

4    AWKO expert reports that this is a latent problem and that you

5    can have an audiogram that is clean following use of exposure

6    to noise and use of the plugs and then have no exposure to

7    noise or what have you, have another audiogram that is bad

8    without some sort of objective hidden hearing loss opinion.

9    That is not in our expert reports, to my knowledge.  I haven't

10   looked at every single one of them, but that's not what --

11        **JUDGE RODGERS:**  Well, you've had cases like that,

12   though.

13        **MR. AYLSTOCK:**  Well, in that -- well, I know the

14   *Kelley* case definitely had an issue involved in that.  *Kelley*

15   was a little bit of an anomaly for a lot of reasons.  But even

16   in that case, we had the jury out for five hours, they asked

17   for Dr. Djalilian's -- our case-specific expert's direct

18   testimony, it wasn't provided in time, and in fact that will be

19   the first defense verdict we're going to appeal, because we

20   view it that the trial court made some significant errors that,

21   with all due respect, should not have been made.  So we will be

22   appealing that case.  And if the Eleventh Circuit agrees with

23   us, we'll be retrying that case.

24        Ms. Kelley also had tinnitus as well as part of her

25   claim.  It wasn't as significant of a feature, I guess, as it

 1    could have been, but she also had a tinnitus claim.

 2              So Your Honor's certification process, in our view,

 3    wouldn't preclude Ms. Kelley from going forward or --

 4              **JUDGE RODGERS:**  On tinnitus.

 5              **MR. AYLSTOCK:**  Well, with regard to Dr. Djalilian's --

 6              **JUDGE RODGERS:**  Well, let me tell you, as I said when

 7    I first started the hearing, the bellwether --

 8              **MR. AYLSTOCK:**  I understand.

 9              **JUDGE RODGERS:**  -- process is --

10              **MR. AYLSTOCK:**  Separate.

11              **JUDGE RODGERS:**  It's separate, it's behind us, in

12    terms of the challenges that have been made, the rulings that

13    have been made.  They're not subject to reconsideration or

14    anything like that.  So any comments I make right now about the

15    Wave cases going forward, I'm not going backwards and

16    considering anything for any bellwether case based on anything

17    we discuss here today.

18              What I would say about Dr. Djalilian, with that

19    opinion, is perhaps that would be -- if the opinion is what I

20    recall on hearing loss, not tinnitus, then that would be the

21    type of opinion that I would think would be the proper subject

22    of a *Daubert* hearing.

23              **MR. AYLSTOCK:**  I don't -- I'm not here to disagree

24    with you at all.  And having that hearing earlier would be

25    better for all of us.  If we're going to lose, I'd rather lose

 1    now than later.  If we're going to win, then we know.

 2            What I'm suggesting and my belief is that there will

 3    not be, if we look at Wave 1, many at all opinions like that in

 4    Wave 1.  I could be wrong.

 5            And so I don't know that we need a certification

 6    process yet.  But if we do, I would urge it to be a little bit

 7    later in the process to give us the chance to have -- to

 8    marshal the expert reports because, you know, we would require

 9    expert testimony.  All of these practitioners have busy

10    practices, they're setting aside times for Wave depositions.

11    And we've talked with the Master about that and trying to

12    figure out how long --

13            **JUDGE RODGERS:**  I wouldn't need a full expert report.

14    Again, this is not -- this would be a sort of minimal threshold

15    level of proof.  It would not be the full assault that you're

16    going to get later from 3M.  And I say that kindly.

17            **MR. AYLSTOCK:**  That gives me some comfort, Judge,

18    because "assault" is a strong word, but we've been handling a

19    lot of work from the other side.

20            **JUDGE RODGERS:**  So, what I would envision for, say,

21    hidden hearing loss, is that the testing have been done.

22    You're going to have to do the testing.  You can't just rely on

23    the defense to do your testing for you.  I think that's a

24    mistake, and it probably is going to be a mistake if I put this

25    process in place, because I just don't think that that's

1    sufficient.  And it may be that their testing is redundant,

2    then.  Maybe your client doesn't need to sit through your OAE

3    testing and then sit through the defendant's OAE testing.

4    These are objective tests, and my understanding these aren't

5    riggable.

6            But, in any event, what I would contemplate is, the

7    testing has been done, you have the proof of the abnormal

8    OAEs -- let's just use that -- there's some other tests out

9    there that --

10           **MR. AYLSTOCK:**  Speech-in-noise and speech-in -- yeah.

11           **JUDGE RODGERS:**  Right.  So you have evidence of -- you

12   have the test results.  And then what I would envision is

13   nothing more than a statement of an expert just to say this

14   testing was done, it shows this, it's my opinion that, you

15   know, this is proof of injury through noise while wearing the

16   CAEv2.  That's it.

17           I don't need a full blown expert report.  I don't need

18   the expert deposition.  That will come later, and then they'll

19   have the ability to challenge later the full challenge.  But

20   that's all I would envision.

21           And as far as the audiograms, I don't need an expert

22   report.  I'm well versed enough in audiograms.  I can read

23   them.  If I applied the 15 dB, I can look at an audiogram and

24   tell whether someone has an abnormality greater than that at a

25   time -- and I have the census forms or the Rule 26 report maybe

1    that at the time they wore the plug and they were exposed to

2    noise.

3            **MR. AYLSTOCK:**  That -- well, Your Honor has given me

4    some comfort, because I was envisioning something more than a

5    certification.

6            The only thing I would say about that is, you know,

7    with regard to a statement from an expert proceeding along that

8    here was the use based upon the forms in front of me and the

9    information, sometimes things in deposition -- memories are

10   refreshed of plaintiffs or things change in deposition.  And I

11   wouldn't want that expert crossed on sort of a preliminary

12   certification opinion at trial.

13           We've certainly seen that where, you know, it becomes

14   kind of, you know, a point where Your Honor is trying to

15   accomplish something that is correct but it becomes in trial a

16   trial trap for us.  And so --

17           **JUDGE RODGERS:**  Well, I won't require it under penalty

18   of perjury.

19           **MR. AYLSTOCK:**  Or to be used at trial.

20           **JUDGE RODGERS:**  Or to be used at trial.  If I put this

21   into place, this is in no way intended to be used as a weapon

22   later in the case.  I wouldn't allow that.

23           **MR. AYLSTOCK:**  In that case, I've said all I can say.

24   And again, I don't disagree with anything you're saying with

25   regard to if this is a significant problem.  It may be much

1    worse than I think, and if it is, I'm in favor of addressing it
2    earlier rather than later.
3         **JUDGE RODGERS:**  Even if it's not a significant
4    problem, if it's -- I mean, these are real cases that require
5    real time and real money.  So, if it's one or ten or 500 or
6    50,000, I feel the same about it.
7         **MR. AYLSTOCK:**  So, with regard to figuring out which
8    ones fall in that bucket, we wouldn't be required to do a
9    certification that they would fall outside that bucket?  That
10   could be done objectively based upon the audiograms that are
11   there and the information that we have?
12        **JUDGE RODGERS:**  Correct, for the audiograms.  Now, the
13   hidden hearing loss, I'm not well versed enough in OAE reading
14   to -- you'd have to give me a statement.  I don't need a
15   report, but I need something from your expert saying these are
16   the test results, they're abnormal.  That's all I would need.
17   So I don't need a full report.  But it's not something I can
18   look at on my own and -- now, we can hire a court expert that
19   can review all of this, if you would prefer.
20        **MR. AYLSTOCK:**  I agree with Your Honor.  Audiograms,
21   I'm actually pretty good at it now, too.  I think they're
22   objective, you know where it is, and you can plot it.  So I
23   don't know that we need any of that.
24        I'm just suggesting that we limit it to those that are
25   going to fall in that bucket.  And we can met and confer if

1   they think one falls in that bucket and we don't, and we have

2   the benefit on the Masters who are on the Zoom to help us work

3   through that.  We've certainly worked through a lot of issues,

4   so I don't know that we need a court expert to tell us

5   objectively what's there.

6        **JUDGE RODGERS:**  Well, we can see how that -- if that

7   need comes to fruition, if that becomes an issue where you all

8   are just constantly arguing about whether something is met or

9   not met.  But that's not what I'm envisioning here.  This isn't

10  intended to be adversarial.  This is intended as a management

11  tool for me.

12       And if cases get dismissed, does that benefit 3M?

13  Well, sure.  I mean, that's just the nature of this beast.  If

14  cases make it through, does that benefit you all?  Absolutely.

15  Or if they don't fall in these buckets, that definitely

16  benefits you.  But this is something I feel I need to do to

17  properly manage the litigation based on some of what I've seen

18  and heard.

19       **MR. AYLSTOCK:**  One final point on what you've seen and

20  heard and I've seen and heard in those bellwethers.  We have

21  had tinnitus cases where the tinnitus makes it difficult for

22  them to hear.  It's a little different from an audiogram

23  showing, but sometimes people can perceive that they can't hear

24  as well because the tinnitus and they --

25       **JUDGE RODGERS:**  That's different.

1          **MR. AYLSTOCK:**  And thank you for saying that.  I

2     wouldn't want, if a case, for example, proceeded as a tinnitus

3     only case, the plaintiff to be precluded from saying, *it makes*

4     *it hard for me to hear.*

5          **JUDGE RODGERS:**  That's different.  The injury is the

6     tinnitus.  The difficulty hearing is a function of the

7     tinnitus, not a function of actual hearing loss.

8          **MR. AYLSTOCK:**  And sometimes it's confusing to the

9     individual to distinguish between the two, so there is some

10    bleedover.

11         **JUDGE RODGERS:**  But to me it's not complicated when

12    you look at the tests and you look at the timeframes.  And so I

13    would not preclude a plaintiff who had a hearing loss claim

14    excluded going forward with the tinnitus claim and testifying

15    that his or her tinnitus makes it difficult for him or her to

16    hear.

17         **MR. AYLSTOCK:**  Right.

18         **JUDGE RODGERS:**  That's just a subjective perception

19    that is not something that I can look at and decide as a matter

20    of law it should or shouldn't be here.  That's just a person's

21    subjective -- but they would have to have the tinnitus.  But

22    it's not as though you're going to have an expert on the stand

23    saying this person has hearing loss as an injury.  It's the

24    tinnitus that's the injury that is interfering with that

25    person's perception of sound.

 1        **MR. AYLSTOCK:**  Correct, that's how I view it as well,

 2   Judge.

 3        **JUDGE RODGERS:**  But not the dead hair cells.

 4        All right, Mr. Nomellini, is there anything that you

 5   would like to chime in on here?

 6        **MR. NOMELLINI:**  Nothing to add to that, Your Honor.

 7        Could I, though, address a Wave discovery issue with

 8   respect to the government?  And not pertaining to any

 9   particular Wave, but just Waves 1 through 3?

10        **JUDGE RODGERS:**  Okay.

11        **MR. NOMELLINI:**  So, some history here, to go back to

12   the bellwether process just for illustrative purposes only.

13        There was a point in that process where Your Honor,

14   Judge Herndon, and plaintiffs participated as well, we had a

15   series of successful calls with the government.  Judge Herndon

16   was involved.  You may recall Gary Feldon was somebody who was

17   involved.  And as a result of that process, it generated a lot

18   of key evidence.  I think both sides have used it during these

19   trials.

20        Prior to that, there was kind of a stall from the

21   government, and Your Honor and Judge Herndon kind of shook that

22   loose.  So, as Your Honor said, the bellwether process is

23   behind us, so looking forward now to the Waves.

24        Thursday we have a call with the government set up.  I

25   think Judge Herndon is going to participate.  And we anticipate

1    addressing all of the Waves.  We hope to -- we think we have a

2    similar kind of fundamental stall with the government, and we

3    hope to put in place something similar.  Judge Herndon has been

4    terrific in trying to get something going.

5            We have two main issues.  They're pretty -- they

6    essentially cover the waterfront of discovery.  One is

7    depositions.

8            We've had various calls with the government and Judge

9    Herndon, and we thought we were getting some progress from

10   them.

11           **JUDGE RODGERS:**  Mr. Nomellini, can I stop you just a

12   moment, please.  Don't I have a response?  You filed a motion

13   to compel --

14           **MR. NOMELLINI:**  Yes.

15           **JUDGE RODGERS:**  -- against the government.  So, when

16   you say depositions, that leads me to think you're heading in

17   this direction.  And I'm waiting on their response.  I know

18   they asked -- I don't know if it's been filed.  Has it been

19   filed?

20           **MR. AYLSTOCK:**  It was filed this morning, Your Honor.

21           **MR. NOMELLINI:**  They did respond, they did respond.

22           **JUDGE RODGERS:**  Okay.  Well, I haven't looked at that

23   yet and I don't have them here.  So I want to be careful that

24   I'm not hearing argument --

25           **MR. NOMELLINI:**  Understood.

1         **JUDGE RODGERS:**  -- and they're not present.

2         **MR. NOMELLINI:**  Let me then put aside Wave 1, if

3    that's helpful for those purposes.

4         **JUDGE RODGERS:**  Okay.

5         **MR. NOMELLINI:**  Because this pertains equally to all

6    -- well, let's talk about Wave 2 and Wave 3, okay?

7         **JUDGE RODGERS:**  Okay.

8         **MR. NOMELLINI:**  We need to go towards some kind of

9    process with the government where we're getting some progress

10   in terms of, you know, having calls, having some

11   predictability, getting some depositions going forward.  And I

12   think something similar to what we had in the bellwether

13   process I think would help to achieve that.

14        We're also continuing to get documents produced by the

15   government across the Waves, pertaining to all three Waves.

16   The most recent letter from Maj. Wald was on April 8th, and it

17   pertained to documents pertaining to Wave 1, Wave 2, Wave 3.

18        So we need to -- and everybody is working hard on

19   this, Judge Herndon is working on it.  We need to get some kind

20   of process for depositions and documents with the government

21   for the Waves.

22        I think the parties are moving quickly, and Judge

23   Herndon has been very helpful, Special Master Theis has been

24   very helpful.  We're moving very rapidly.  The government is

25   not necessarily moving at our pace.  They did not move at our

```
1    pace in the bellwether process.  It took a lot of work.  We got
2    some progress out of them.
3            And we need to, going forward, work as best as we can
4    to have some kind of regular process so that we get from the
5    Wave process something similar to the discovery that we had
6    that was so critical to the bellwether process.  And I think
7    our call Thursday will hopefully be the first step in that
8    direction.
9            I don't know if Judge Herndon has anything to add to
10   that, but that's where I see things right now.
11           **JUDGE RODGERS:**  Okay.  I don't think I was aware of
12   the call, but that's good that you have a call.
13           Judge Herndon, do you have anything to add?  Again, I
14   haven't read the response to the motion yet.
15           **JUDGE HERNDON:**  No.  It's pretty much business as
16   usual.  I mean, the government approach, I hate to say it, is
17   kind of the ho-hum approach, so it's, you know -- I don't think
18   DOJ is doing anything to push the Department of Defense.  I
19   don't think they're responsible for the pace and the speed at
20   which the Department of Defense works.
21           They say -- and we have no way of knowing for sure,
22   but they say that this isn't the only piece of litigation that
23   they're having to produce documents for, et cetera, and they
24   have a small shop in terms of resources and numbers of people,
25   and they say they're working at the pace that they can to
```

1    produce these things.

2           But, to the extent that -- for example, depositions, I

3    don't know if there's a way to identify these people sooner,

4    but that seemed to be the biggest problem in Wave 1.  And I

5    haven't read the government's response yet, but I suspect that

6    will be a part of that response.

7           But it's kind of, as Mr. Nomellini has said, it's

8    pretty much the way it worked out as we went through the

9    bellwether process and it just hasn't changed.

10          I always thought -- and I can't get Jacqui Snead to

11   change this.  I always thought that we were better off when we

12   had direct access to the Department of Defense, but they shut

13   that down, did that early on in the bellwether process.

14          **JUDGE RODGERS:**  No question that was preferable, in my

15   opinion, than having to funnel everything through DOJ.

16          Well, Judge Herndon, maybe you and I can talk after

17   this hearing or before Thursday.

18          **JUDGE HERNDON:**  Sure.

19          **JUDGE RODGERS:**  I have some things that I would maybe

20   like for you to share with them for me, because they're not

21   even talking to me directly any longer.

22          **JUDGE HERNDON:**  I'm happy to have you join our call.

23          **JUDGE RODGERS:**  Well, I don't know that that would

24   participate if I did.  Haven't they taken the position that

25   they can't communicate directly with me, not even DoD, but I

1    think DOJ is saying that?

2              **JUDGE HERNDON:**  I don't recall that to be the case.

3    You may be right.  I just may not be remembering that.

4              **JUDGE RODGERS:**  Well, I thought that was -- I know

5    DoD, but I also thought DOJ was taking that position in case

6    things got adversarial.

7              **JUDGE HERNDON:**  Well, they definitely took that

8    position if there was a motion pending.  For example, if you

9    were going to have a call with them about the subject matter of

10   the motion to compel that's currently pending, that's my

11   recollection as that's the times they didn't want to -- thought

12   it was inappropriate to have a conversation with you outside

13   the normal course of business.  So I don't know that that's the

14   case.  It really hasn't come up.  With respect to just general

15   planning into the future, that might be something different.

16   We can certainly explore that with them on Thursday.

17             **JUDGE RODGERS:**  Okay.  Well, Thursday for me is out

18   because I don't think I'm going to get a ruling out on that

19   motion before Thursday.

20             **JUDGE HERNDON:**  I wouldn't expect you to.

21             **JUDGE RODGERS:**  So I guess that shuts me out of that

22   meeting since the motion is pending.  But you and I can talk.

23   They can't stop that.

24             **JUDGE HERNDON:**  I would hope not.

25             **JUDGE RODGERS:**  All right, Mr. Nomellini, I will take

1    what you have represented here under advisement, and I'm going

2    to talk more with Judge Herndon.

3           And I appreciate the frustration.  I understand.  I'm

4    just not sure what I can do about it yet, but I appreciate it.

5           **JUDGE HERNDON:**  It's somewhat similar with respect to

6    the DOEHRS data.

7           **JUDGE RODGERS:**  Which is totally stalled as well,

8    right?

9           **JUDGE HERNDON:**  Yeah.  My view of that is the

10   Department of Defense is still -- I mean, we've presented on --

11   to the credit of Mr. Aylstock and Justin Witkin, they presented

12   a plan to the Department of Defense that would be very easy.

13   And every time I ask, I'm just told that they haven't made the

14   policy decision to do what it is they want.  They've conceded

15   it, in essence, that they can do it, and that the script, if

16   you will, that plaintiffs put together to produce those DOEHRS

17   data for everybody is a workable thing.

18          The last I heard, the hang-up was, well, analyzing

19   whether utilizing that script will take a day, a week, a month,

20   a year, or whatever of computer time.  And that just was their

21   hang-up, and I just can't get any answer out of them.

22          But once again, I'm going through the Department of

23   Justice, I'm not talking directly with DoD, so that's the

24   problem.

25          **MR. NOMELLINI:**  On a happy note, Your Honor, I think

1    at the last hearing Mr. Aylstock and I were talking about the

2    DME scheduling process.

3            I think with Special Master Theis's leadership and I

4    know Bryan and Mike Moreland who participated, we've got

5    something set up now that works pretty darn well in terms of

6    scheduling and is actually an automated system.

7            **JUDGE RODGERS:**  That's great, because that was

8    something that I think Ms. Branscome and someone else said was

9    going to happen a couple of years ago.  So I'm happy to hear

10   that it's finally in place.  Very good.

11           **MR. AYLSTOCK:**  It is in place.  I was informed that

12   for a lot of cities in Wave 2, including like New York City,

13   there's still not any ability to schedule because folks -- they

14   don't have their audiologist lined up yet.

15           So, it looks great, we've tested it, we beta tested

16   it, but it still is going to require additional work because

17   it's -- you know, one of the things that happens is, if things

18   don't get done early, we can't be expected to schedule all the

19   DMEs the last week of the discovery period.

20           And I think with regard to the government's position

21   -- I don't, obviously, speak for the government -- that was one

22   of their things is that some of the requests -- and we agree

23   with the government on this -- are general discovery, which is

24   well closed.  Others were it was months after Your Honor's

25   order on Wave 1 before the *Touhy* request even came in.

1          So it's our position, of course, that Wave 1 is done,

2    discovery is over for that, and we've submitted our paperwork.

3    But just wanted to comment on --

4          **JUDGE RODGERS:**  Did you all submit a response to the

5    motion to compel?

6          **MR. AYLSTOCK:**  We did, Your Honor.

7          **JUDGE RODGERS:**  Okay.  Well, I have that enjoyable

8    reading ahead of me later today.

9          Mr. Nomellini, did you wish to speak at all to the

10   discussion Mr. Aylstock and I had?  I said it really wasn't

11   something you all would be directly involved in, but you

12   certainly have an interest in it.  So, if there's something

13   that stood out that you want to address with me, I'll hear it.

14   I can't imagine you all would object to the process.

15         **MR. NOMELLINI:**  Yes, Your Honor, I was listening, and

16   thank you.  I would agree with what Your Honor said in terms of

17   the distinction between hearing loss and tinnitus cases, that

18   is, even if somebody has a tinnitus claim, you know, and then

19   they meet the requirements to pursue that claim, that doesn't

20   bootstrap them into a hearing loss claim.

21         **JUDGE RODGERS:**  Other than the issue that Mr. Aylstock

22   raised about *my tinnitus interferes with my ability to hear*

23   *sometimes*.  That wouldn't be precluded based on --

24         **MR. NOMELLINI:**  As Your Honor said, somebody

25   subjectively saying that, that's their subjective experience.

1    Whether there's objective backup is another story.

2              **JUDGE RODGERS:**   Right.

3              **MR. AYLSTOCK:**   I'm trying to think forward with remand

4    trials and the record and a new judge not familiar with these

5    issues, and that made me think of we have certainly seen cases

6    and the science certainly supports that there can be either a

7    temporary threshold shift or even a dB shift of 10 dB that

8    could indicate -- if it's temporally related to the tinnitus,

9    could indicate that noise was a factor in the tinnitus.

10              So I'm just hyper-concerned based upon what I've seen

11   in these bellwether trials that things get used at subsequent

12   trials.  And if an order comes out with regard to this, I

13   wouldn't want there to be a suggestion -- because I don't think

14   it's supported by the science and we have certainly won cases

15   where there was a 10 dB shift and all of a sudden a judge not

16   understanding the background says we can't talk about

17   audiograms in a tinnitus case.

18              **JUDGE RODGERS:**   Oh, that wouldn't -- I didn't think

19   anything I said here today -- or shouldn't have been

20   interpreted to mean that.  But I understand your concern about

21   going forward, and I can make that clear in any order.

22              And also, before I enter an order -- there are folks

23   who would probably shoot me for saying this -- but before I

24   enter any such order, I can get your input and Mr. Nomellini's

25   input to make sure that I haven't left something out that might

1     rear its head years from now.

2              **MR. AYLSTOCK:**  Certainly concerned about that.

3              And another thought that occurred to me with regard

4     to, you know, the buckets, here is the bucket the order might

5     apply to, as opposed to an adversarial process, a certification

6     that, look, we have met the audiogram of above 25 -- or 15

7     rather, sorry.  I'm making 3M's argument.

8              **JUDGE RODGERS:**  Working for 3M.

9              **MR. AYLSTOCK:**  Yeah, sorry.  I take that back.  Move

10    to strike, Your Honor.

11             -- or if it falls outside that bucket, simply a

12    statement from the lawyer that would have reviewed the

13    audiogram -- the audiometric data and consistent with what the

14    plaintiff has averred, and we have met the criteria as opposed

15    to a big meet-and-confer process and overburdening our Masters

16    yet again about silly little fights about that.

17             I think it's objective, and we would be willing to do

18    that -- and I'm probably speaking out of school but -- do it

19    that way as opposed to a big meet-and-confer process putting 3M

20    kind of in the middle --

21             **JUDGE RODGERS:**  I don't really see the need for the

22    meet and confer.  If you all really thought that was a great

23    idea, maybe.  I'm not sure how long it would last and I would

24    put up with it because I have an idea of what it would evolve

25    into.

1            **MR. AYLSTOCK:**  I said it and I take it back.

2            **JUDGE RODGERS:**   I don't think I need -- and I don't

3      really need the statement of the lawyer.  I just need you or

4      your lawyers, the lawyers for these plaintiffs, when they get

5      identified for a Wave, that they submit their proof.  And

6      that's what I'm looking for.

7            Now, if the hidden hearing loss -- it's going to be

8      accompanied by a statement by an expert that's very brief and

9      that cannot be used against the expert at trial, but it is just

10     a statement that tells me this expert has this opinion, period,

11     not all the reasons for it, but the testing has been done and

12     supports the opinion.

13            The other thing is -- I hope it's clear -- I'm not

14     intending to put this requirement on any case that has not

15     moved into a Wave.  So it's not as though I'm going to make

16     this a requirement for every case on the docket.  But every

17     case on the docket is subject to being called into a Wave.

18     It's a random process, as you know --

19            **MR. AYLSTOCK:**  Understood, Your Honor.

20            **JUDGE RODGERS:**   -- with some consideration of the

21     number of cases a firm has , that sort of thing.

22            So, my thinking is, if you're out there, you're not in

23     a Wave right now but you're out there which means your case is

24     subject to being called in a Wave, you need to get your ducks

25     in a row.

1          **MR. AYLSTOCK:**  That's the message we've been

2     preaching, Judge.

3          **JUDGE RODGERS:**  Because once they get identified for a

4     Wave, the Wave comes crashing down.  No.  I mean then it's full

5     steam ahead, and they need to be ready from day one, which is

6     why I'm not sure I'm going to set off the requirement as long

7     as you want me to.  I'll look back at it again, I'll talk to

8     Adriane about it, talk to my law clerks and think some more on

9     it.  But I think after three years in litigation -- and I know

10    every case wasn't filed at the same time, but they've all been

11    filed for a while, most of them, and they should have the

12    audiograms.

13         **MR. AYLSTOCK:**  We're very hopeful that our call on

14    Thursday will result in some positive DOEHRS data because that

15    has been a -- we didn't have that in these first three Waves,

16    but that is a critical component, but hopefully we'll get that

17    squared away.

18         **JUDGE RODGERS:**  Well, it's a problem for both sides.

19    Obviously, there are things that 3M wants from the government,

20    and these audiograms are --

21              **MR. AYLSTOCK:**  We've been working together on it.

22         **JUDGE RODGERS:**  -- important for your clients.

23         **MR. AYLSTOCK:**  Exactly.  And Ms. Roitman and Mr.

24    Witkin have certainly done everything possible and we will keep

25    pushing, but that's certainly a consideration in future Waves,

 1    not in these Waves.  But we understand Your Honor and look

 2    forward to working on that project as well.

 3              **JUDGE RODGERS:**  All right.  Thank you.

 4              Anything else?  Let me see if --

 5              Judge Jones, you have any observations, anything you'd

 6    like to add?

 7              **JUDGE JONES:**  I did have three things to say.  First,

 8    with regard to the certification process, you know, we have to

 9    maintain our 30,000 foot view and, you know, the devil is in

10    the details.  But from the Court's perspective, from a

11    management viewpoint, we can't have, you know, 10,000 summary

12    judgment motions and *Daubert* hearings.

13              On the other hand, I recognize from the plaintiffs'

14    side that these types of certification orders -- there's, you

15    know, a little bit of a knee jerk pushback to it.  But, you

16    know, if we maintain our 30,000 foot view on this, if

17    ultimately somewhere in the future there is resolution in this

18    MDL, I think it's going to be necessary -- I'm not suggesting

19    that 3M is chomping at the bit to resolve these cases.  But

20    without some certification process as just a basic proposition,

21    it makes it difficult to bring the cases to resolution.

22              So I really think, not just because of the size of the

23    cases, but because of the issues that Judge Rodgers talked

24    about and Mr. Aylstock talked about, there's got to be some

25    fine tuned certification process that allows this MDL to really

1    focus on the cases that have objective merit so there is some

2    hope or possibility for common ground that there can be some

3    hope of resolution.

4            And then my only other comment was on the call that

5    Judge Herndon is going to have.  There's the pending, you know,

6    motion to compel.  To the extent that it would move things

7    along outside of, you know, a meet and confer and negotiation

8    process, if you were at loggerheads with the government,

9    certainly I would be willing, in some kind of very summary

10   cursory fashion, to resolve disputes with the government by,

11   you know, a quick telephone hearing, both sides argue their

12   position, not a lot of briefing on issues, and I would issue a

13   ruling, and maybe that moves things along, with a caveat -- and

14   I'm not talking about the government, I understand they're not

15   here.  But I suspect, if we did something like that and my

16   ruling was adverse to the government, they're going to

17   challenge everything I do to Judge Rodgers, which doesn't make

18   it more efficient, which creates a whole other layer of review.

19           But if there was some way to do that, that's something

20   maybe we ought to think about down the road.  Just my thought.

21           **JUDGE RODGERS:**  Well, I appreciate that.  I'd love to

22   take you up on it.

23           **JUDGE HERNDON:**  That's very helpful.  Because at some

24   point -- I can't imagine either of these parties just settling

25   on the fact the government is not going to produce records.  So

1   some sort of litigation -- if they don't sort of step it up and
2   don't produce these records, some sort of litigation by way of
3   compel or whatever through the jury process is going to be
4   necessary.  So that might be a very helpful step, sort of a
5   stopgap.
6           **JUDGE RODGERS:**  Well, Dave, you're having this call
7   Thursday and, yeah, so perhaps you can sort of broach this with
8   the DoD while this motion to compel is pending because they
9   don't know what I'm going to do with it.  I probably shouldn't
10  talk any more about this, but you and I can talk about it after
11  the hearing.
12          But yeah, Gary, that sounds like a good idea and maybe
13  something they'll go for.
14          Anything else, Judge Herndon, from you that you'd like
15  to add?
16          **JUDGE HERNDON:**  No, ma'am.  Thanks very much.
17          **JUDGE RODGERS:**  Adriane?
18          **MS. THEIS:**  Nothing from me, thank you.
19          **JUDGE RODGERS:**  I know you have thoughts.
20          Remind me, either side or Adriane or even Faith, I
21  don't remember in my head right now -- I don't have the dates
22  for the Wave deadlines other than what I said a minute ago
23  which were Wave 2.  I know July 5th is the end of fact
24  discovery.  So would that include the DMEs as well?  Or is that
25  after fact discovery?

1  **MS. THEIS:**  That include -- the DMEs happen before the

2 close of fact discovery.

3  **JUDGE RODGERS:**  But as far as 45 days, that would

4 obviously only be the written discovery as far as the Wave 3

5 that I referenced?  I'm pretty sure that's the case.

6  **MR. AYLSTOCK:**  I think that's right, Judge.

7  **MS. THEIS:**  Yes.

8  **JUDGE RODGERS:**  Well, maybe it's something I consider

9 requiring -- well, let me think about it.

10  The problem with requiring the certification at the

11 end of fact discovery is that's a lot of time and money that

12 goes into all that fact discovery perhaps when it's not

13 necessary.  But let me think about it and I will let you know.

14  I think that's all I have.  Anything else from anyone?

15  **MR. AYLSTOCK:**  Not from the plaintiffs, Judge.

16  **JUDGE RODGERS:**  Well, it's good to see everyone.

17 Thank you for being here, and I'll be in touch on this.

18   ***(Proceedings concluded at 11:23 a.m.)***

19     ---------------------

20 *I certify that the foregoing is a correct transcript from the*
  *record of proceedings in the above-entitled matter.  Any*

21 *redaction of personal data identifiers pursuant to the Judicial*
  *Conference Policy on Privacy are noted within the transcript.*

22

23
  *s/Donna L. Boland     4-19-2022*

24 *Donna L. Boland, RPR, FCRR  Date*
  *Official Court Reporter*

25