IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG LITIGATION LIABILITY LITIGATION<br><br>This Document Relates to:<br>  *All Cases* | CASE NO.: 3:19-MD-2885-MCR-GRJ<br><br>Judge M. Casey Rodgers<br>Magistrate Judge Gary Jones |

# DEFENDANTS' MOTION FOR A CASE MANAGEMENT ORDER REQUIRING NON-WAVE PLAINTIFFS TO PRODUCE CERTAIN MEDICAL RECORDS

## INTRODUCTION

It is established MDL practice to require personal injury plaintiffs to provide access to basic medical information to allow the parties to vet claims. Requiring plaintiffs' counsel to conduct basic diligence to determine whether claims are even plausible also necessarily limits the number of claims filed. Procedures preventing the filing of implausible claims facilitate equitable and timely resolution prospects. Defendants request that the Court implement this critical step to align with established principles of records access, as it has become increasingly and acutely apparent that departing from established MDL practices in this and other areas has contributed to an unprecedented and unmanageable number of unvetted claims which impede fair adjudication and timely resolution of claims.

This important vetting process was contemplated in this MDL and addressed by the Court's initial Census Order requiring plaintiffs to produce a number of medical records. But access to those records for the vast majority of plaintiffs was abruptly cut off when only one month later the Court suspended indefinitely the deadlines for completion of the initial census requirements, based on reported burden to the government. *See* CMO No. 6, MDL Dkt. 836.

After the Court's November 2019 order eliminating the requirements that plaintiffs' attorneys perform any vetting of claims, provide any initial discovery disclosure, or provide access to basic medical records, the number of cases increased

exponentially from about 2,700 prior to the Court's suspension of the production deadlines[1] to a peak of more than 280,000 cases. And the suspension of all initial census document requirements relieved more than 99.5 percent of those claimants of any obligation to produce *any* medical records substantiating their claims. The lack of any requirement that plaintiffs provide access to basic medical information is one of several orders that have contributed to the creation of an MDL with more than twice as many claims as the other 182 pending MDLs combined.[2] Defendants have repeatedly sought to remedy the lack of vetting mechanisms in this MDL, including through the filing of a motion to enforce another standard litigation requirement, the payment of filing fees. Defs. Mot. to Require Payment of Filing Fees, MDL Dkt. 2941. The indefinite suspension of standard MDL procedures and the continued deprivation of core merits information is antithetical to fundamental fairness. The enormous number of unvetted cases also prevents the efficient adjudication of claims and presents an obstacle to resolution of this litigation.

This vetting deficit should be addressed now. Defendants request that the Court issue a case management order requiring plaintiffs' counsel to access and

---

[1] 11/22/2019 Hr'g Tr. at 4, MDL Dkt. 840.

[2] *See MDL Statistics Report – Distribution of Pending MDL Dockets by Actions Pending* (May 16, 2022), U.S. Judicial Panel on Multidistrict Litigation, https://bit.ly/3aoCkDu ("*MDL Statistics Report*").

3

produce medical records available online through the MyHealth*e*Vet and TRICARE portals. Those records are maintained by the government and accessible to all veterans for free. This Court has recently recognized that the MyHealth*e*Vet portal is "easily accessible to a veteran and/or a representative with the veteran's credentials through a direct electronic download" and requires no action by the government or other third parties. CMO No. 40 at 2, MDL Dkt. 2911. Requiring the production of this limited set of documents is consistent with the Court's repeated recognition of the manifest relevance of medical records; is similar to the Court's order requiring production of the DD214 forms; will provide information fundamental to the assessment and defense of pending claims; will not burden the federal government (and instead aligns with the government's suggested path for obtaining responsive records); and will provide all parties with critical information about the plausibility of the pending claims in this MDL.

## ARGUMENT

**I.    THE LACK OF BASIC MEDICAL INFORMATION IN THIS MDL IS INCOMPATIBLE WITH ESTABLISHED MDL PRACTICE AND FUNDAMENTAL FAIRNESS.**

**A.    Early Access To Medical Records Is A Core Tenet Of MDL Practice.**

Reflecting the importance of medical records in establishing a baseline substantiation of plaintiffs' claims, MDL courts across the country have required basic access to records at the outset of the litigation, before discovery, shortly after

4

a plaintiff files a claim. And virtually all of the top ten largest MDLs nationwide require the production of medical records and/or the authorization of medical release forms in the earliest stages of the case. *See MDL Statistics Report*, https://bit.ly/3aoCkDu (listing MDLs by number of claims). In the *C-Qur Mesh* MDL, for example, "[e]ach Plaintiff in a case filed or transferred into this MDL" is required to complete, "contemporaneous with the submission of a [Plaintiff Profile Form]," all "hard copies or electronic files of all medical records in their possession, custody, or control" that relate to the mesh implant, care, and treatment, as well as "authorizations for the release of medical, insurance, employment, Medicare/Medicaid, military, income," and other records. Fourth Am. CMO No. 3G, *In re: Atrium Medical Corp. C-QUR Mesh Prods. Liab. Litig.*, No. 16-md-2753-LM (D.N.H. Aug. 3, 2017) at Dkt. 44-4. In the *Juul Labs.* MDL, the court required every personal injury plaintiff to complete a plaintiff fact sheet that "include[d] document requests and a variety of written authorizations for the release" of medical and other records. CMO No. 8 at 2, *In re Juul Labs Inc. Marketing, Sales Pracs., and Prods. Liab. Litig.*, No. 19-MD-2913 at Dkt. 406. That order was recently expanded to require all personal injury plaintiffs both (i) to produce "all medical records in counsel's possession" and (ii) to affirmatively request and produce medical records that were not already in their possession regarding any medical

5

treatments for injuries alleged to be caused by JUUL use. *In re Juul Labs Inc.,* Dkt. 2928 at 8.

Other examples abound. In the *Xarelto* MDL, plaintiffs were required to produce documents and an executed medical records authorization within 60 days of "the date… each Plaintiffs' case is filed" or "transferred to [the MDL] Court." CMO No. 1, *In re: Xarel (Rivoroxaban) Prods. Liab. Litig.* (E.D. La. May 4, 2015), Dkt. 891 at 4. And in the *Cook Medical IVC* MDL, in addition to extensive profile and fact sheets, all plaintiffs are required to produce within 30 days of joining the MDL "hard copies or electronic files of all medical records in their possession," including "records that support product identification and the alleged injury," along with authorizations for medical, insurance, and employment and other records. CMO No. 2, *Cook Medical, Inc. IVC Filters Mktg., Sales Practices, & Prods. Liab. Litig.,* No. 1-14-ml-02570-RLY-TAB (S.D. Ind. Dec. 16, 2016); *see also* Fourth Am. CMO No. 4, *Cook Medical, Inc.,* Dkt. 13046 at 2 (similar). *Accord* Plaintiff Fact Sheet, *In re: Roundup Prods. Liab. Litig.* (N.D. Cal. Sept. 28, 2018) at Dkt. 1918 (requiring plaintiffs to list extensive information on the fact sheet—including "all healthcare providers where you have received treatment over the last 25 years for any type of cancer" or for "conditions, procedures, or medications" identified elsewhere on the form (a list that includes common issues like eczema, ulcers,

smoking, diabetes, and obesity)—along with executed medical, employment, tax record, and other authorizations (internal parentheses omitted)).

Even in MDLs that involved staging—such as where some claims proceed to discovery and others do not—MDL courts have required the early production of certain important documents from all plaintiffs. In the *Proton-Pump Inhibitor* case, for example, the MDL court divided the plaintiffs into multiple stages—with defendants able to pursue case-specific discovery in "Stage 1 Cases," but not in "Stage 2 Cases" or "Mixed Stage 1/Stage 2 Cases." *In re Proton-Pump Inhibitor Prods. Liab. Litig.*, CMO No. 9 (D.N.J. Feb. 5, 2018) at Dkt. 119. But *all plaintiffs* are required to provide medical authorizations, psychological injury authorizations where applicable, employment authorizations, and others. And *all plaintiffs* are required to complete the over-25-page fact sheet and produce medical or other records substantiating "use of the PPI product," as well as all pharmacy and insurance records related to purchase of the product, all medical records related to the product, and "all documents" relating to alleged injuries, "including but not limited to, medical bills, medical records, hospital records, rehabilitation center records, treatment center records, employment records," among others. *Id.* at 41, 42. Likewise, in the *Pinnacle Hip Implant* MDL, where the Court phased the production of certain medical records and other documents as well as authorizations for all medical records by the first letter of the plaintiffs' last name, production of

medical records was required. CMO No. 5, *In re: DuPuy Orthopaedics Inc., Pinnacle Hip Implant Prods. Liab. Litig.*, No. 3:11-MD-2244-K (N.D. Tex. June 20, 2012) at Dkt. 151. *Accord* Guidelines & Best Practices for Large & Mass-Tort MDLs, Bolch Jud. Instit., Duke Law School (2d ed. Sept. 2018), https://bit.ly/3ObeMAz, at 11 ("[R]equiring the collection of plaintiffs' medical records (in personal injury cases)" is a "straightforward way that a transferee judge can encourage a robust exchange of key information at a relatively early stage.").[3]

### B. The Court Nonetheless Cut Off Defendants' Access To Medical Information For The Overwhelming Majority of Cases In This MDL.

Plaintiffs indisputably understood that some early, pre-discovery production would be required upon the filing of a claim in this MDL. At the outset of this litigation, plaintiffs agreed to produce a number of documents alongside the initial census form, which included "[a]ny audiograms or other hearing tests performed on

---

[3] There are of course exceptions. In the *Zantac* MDL—pending in the Southern District of Florida before Judge Rosenberg—complete medical record collection proceeded only as to bellwether plaintiffs that were selected from a "registry" of claimants (the vast majority of which had not yet filed claims). But when the registry was formed at the outset of the litigation, the court recognized that claims that are "*still being investigated and developed*" should "remain *unfiled*." Pretrial Order No. 15 at 2, *In re: Zantac (Ranitidine) Prods. Liab. Litig.*, No. 20-MD-2924 (S.D. Fla. April 2, 2020) at Dkt. 547 (emphasis added). And the court directed that immediate collection could begin for records that "reflect use of the product or diagnosis of the alleged injury" for all claimants in the registry. *Id.* at 14.

Plaintiff outside of the military," "[r]ecords relating to any disability benefits Plaintiff applied for and/or received as a result of hearing loss, tinnitus or other hearing injury," and military records related to the Plaintiff's service and audiological exams. Pretrial Order No. 18, MDL Dkt. 775-2 (Exhibit B). The Court likewise recognized the importance of producing such documents and memorialized the obligation to produce in its Order Governing Initial Census Requirements For Filed Cases. *See* Pretrial Order No. 18, MDL Dkt. 775.

That process was stopped when, only a month after the Court entered its order governing initial census requirements, it stayed deadlines with respect to the required initial records production, citing "the difficulty in obtaining records from the military." 11/22/2019 Hr'g Tr. at 4:18-19, MDL Dkt. 840; CMO No. 6, MDL Dkt. 836. The Court had indicated that the initial production deadline would be "redefine[d]" due to government burden, recognizing that the records were "need[ed] to move this litigation forward." 11/22/2019 Hr'g Tr. at 4:25-5:5, MDL Dkt. 840. But the ensuing order instead indefinitely "suspended" the "production of Initial Census Documents… until further order." CMO 6, MDL Dkt. 836 at 1. The further order never came. As a result, the vast majority of plaintiffs in the MDL are under *no* obligation to produce *any* medical records, regardless of how easy they are to access.

9

The upshot is a wholesale lack of vetting for most of the claims in this MDL. The bellwether trials and Wave process to date have provided information on only a small percentage of plaintiffs, with the rest completely relieved of any obligation to produce any medical records to assess the plausibility of their claims. The lack of vetting is confirmed by the filing of thousands of duplicate actions, where a single plaintiff is named in two or more separate complaints. Plaintiffs' leadership counsel conceded that many of the claims in the litigation were "yet-to-be vetted," 6/17/2019 CMC Hr'g Tr. at 18-19, MDL Dkt. 469, and—almost a year later—admitted that "the vast majority" of claims that had yet to be transitioned to the active docket "are being investigated still" by counsel, 3/4/2020 Hr'g Tr. at 66:16-67:7, MDL Dkt. 1027.

Indeed, to this day, counsel for the vast majority of plaintiffs have yet to obtain and evaluate basic records regarding the plausibility of the pending claims. For example, plaintiffs' counsel concededly have audiograms only for a small percentage of plaintiffs and thus could not have confirmed whether a plaintiff suffers from any hearing impairment, a fact that only underscores why the Court should order plaintiffs to access and produce easily accessible medical records from MyHealth*e*Vet and the TRICARE portal. That hundreds of thousands of claims were filed and remain pending without any review of minimal information about whether a plaintiff has any hearing loss at all or whether the timing of any

impairment could plausibly be connected to CAEv2 use even under plaintiffs' theory of liability is stunning. And even if certain government DOEHRS records may be produced in the future (a fact that is far from certain), that would not obviate the need to perform basic vetting as to medical records that are currently available free of charge.

Time is of the essence. This swollen docket has remained unchecked for too long. Plaintiffs' counsel have acknowledged that, in addition to filing hundreds of thousands of claims without audiograms or other proof of hearing loss, they filed claims without considering medical records that could conclusively dispose of any CAEv2 injury claims. For example, medical records show that hearing loss only occurred before plaintiffs ever used the CAEv2, hearing loss only occurred years after a plaintiff left the military, hearing loss was attributable to noise exposure that the plaintiff concedes was without any hearing protection device, and hearing loss was caused by conditions that could not be noise-related. There is no reason why this critical information, which should have been collected long ago, should not be acquired and produced now.

Dealing with unvetted claims undermines the entire purpose of an MDL, which is to "promote the just and efficient" resolution of large and complex disputes. 28 U.S.C. §1407(a). Foreclosing the central avenue to reasonably assess and winnow claims through production of easily accessible medical records has created

an obstacle to resolution, whereas requiring the production of easily accessible medical records for the expansive non-vetted docket in this MDL would promote just and efficient resolution.

## II. RECENT DEVELOPMENTS CONFIRM THE NEED FOR THE MEDICAL RECORDS REQUESTED IN THIS MOTION.

Recent events have underscored the need for medical records to expedite the vetting and winnowing of pending claims in this MDL. In the last four months alone—since the Court required that certain plaintiffs pay filing fees, serve unverified census forms, and produce proof of military service—nearly 30,000 claims have been dismissed by the Court. There are more than 10,000 additional plaintiffs who have failed to comply with Case Management Order 40 by the most recent May 23, 2022 deadline but have nonetheless not yet been dismissed. And more than 95,000 plaintiffs are still not required to pay a filing fee, while another 33,000 still have months longer to do so, and more than 30,000 plaintiffs will have up to an additional six months to produce proof of military service.

Although the Court has declined to enter a more expedited schedule for the payment of filing fees to "accommodate the indispensable work of the Clerk's Office," MDL Dkt. 2953 at 1, there is no reason to further delay commencement of at least a preliminary assessment of the vast majority of claims in this MDL. The fact that there has been no vetting of the claims in this litigation is manifest.

Plaintiffs have chosen not to obtain medical records that are readily available free of charge with no involvement of the government.

In active Wave cases, the production of medical records has undercut any facial plausibility for many claims. Currently available records through Wave discovery already indicate a substantial number of plaintiffs who *do not any have hearing loss*, even according to the most liberal definitions of hearing loss. Among those plaintiffs who do have proof of some hearing loss, a large number experienced that hearing loss *before* they allegedly used the CAEv2 earplugs or did not experience any hearing loss until *after* they were discharged from the military. Many plaintiffs who experienced some hearing loss during their military service did so when they were exposed to noise *without wearing any hearing protection*. Furthermore, multiple plaintiffs who experienced some hearing loss while they were allegedly using the CAEv2 have hearing loss that *could not have been caused by noise exposure*—for example, they have hearing loss attributable to middle ear issues, inner ear disorders, and growths—let alone noise exposure while allegedly wearing the CAEv2. Neither plaintiffs nor defendants have any way to assess the plausibility of claims unless and until they have access to basic medical information.

## III. REQUIRING THE PRODUCTION OF EASILY ACCESSIBLE MEDICAL RECORDS IS A FAIR AND EFFICIENT INITIAL SOLUTION.

The Court should adopt the bare minimum solution to this critical information deficiency by requiring plaintiffs' counsel to obtain medical records easily accessible through the MyHealth*e*Vet and TRICARE portals. This approach would impose at most a minimum burden on plaintiffs, and no burden on third parties, including the government.

Defendants appreciate the challenges to date of obtaining some records from the government, but that is no reason to continue to depart from established MDL practice and relieve plaintiffs of any and all obligations to produce medical records, even those easily accessible online. The narrow set of documents requested in this motion—medical records easily accessible *online* through the MyHealth*e*Vet and TOL portals—requires *no* participation by the government.

Nor is there a significant burden on plaintiffs. This Court has acknowledged that online portals like MyHealth*e*Vet are easy to access. In fact, in Case Management Order No. 40, the Court required the use of MyHealth*e*Vet to obtain military service information in the DD214 form, explaining that records on the portal are "easily accessible to a veteran and/or a representative with the veteran's credentials." MDL Dkt. 2911 at 2. And the Court found dismissal appropriate when plaintiffs failed to obtain that information, observing that the required records were

14

"readily and easily accessible to every veteran (and/or a legal representative with the veteran's credentials) on the VA's health management portal, MyHealth*e*Vet." MDL Dkt. 3076 at 3-4; *see also* MDL Dkt. 3077 (same). Just as with the DD214 form, medical records on the MyHealth*e*Vet and TRICARE portals are available "through a direct electronic download." MDL Dkt. 2911 at 2. There is "[n]o request for the information required." *Id.*

Precisely because these records are so easy to access, the government has repeatedly implored plaintiffs to obtain them from free online sources. The government has expressly explained that the MyHealth*e*Vet and TRICARE portals provide plaintiffs with "convenient access to their records while lessening the burden on the non-party federal agencies." Ex. 1, Oct. 19, 2021 Ltr. from J. Kolsky to B. Aylstock et al. at 2. For that reason, the government "defer[red] further action" on defendants' *Touhy* requests until plaintiffs' counsel identified which plaintiffs, if any, were "unable to access records" through online sources and "specified the records they could not access." *Id.* Plaintiffs' counsel have nevertheless refused to obtain and produce these records for the overwhelming majority of plaintiffs. The Court should take steps now to encourage the vetting of claims in this MDL.

## CONCLUSION

For the foregoing reasons, the Court should require within 90 days that all non-Wave plaintiffs produce medical records available to them on MyHealth*e*Vet

15

and the TRICARE Online Patient Portal and otherwise in their possession or be subject to dismissal.

Dated: June 15, 2022

Respectfully submitted,

/s/ Robert C. Brock
Robert C. "Mike" Brock
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5991
mike.brock@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
mnomellini@kirkland.com

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC and Aearo, LLC*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Pursuant to Local Rule 7.1(F), counsel for Defendants certify that this memorandum contains 3,300 words.

| | |
|---|---|
| Dated: June 15, 2022 | */s/ Robert C. Brock*<br>Robert C. "Mike" Brock<br>KIRKLAND & ELLIS LLP<br>1301 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004<br>Telephone:  (202) 389-5991<br>mike.brock@kirkland.com<br><br>*Counsel for Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC and Aearo LLC* |

2

## CERTIFICATE OF CONFERENCE

I hereby certify that on June 14, 2022, Defendants' counsel conferred with Plaintiffs' counsel on this issue pursuant to the Court's Local Rule 7.1(B).

| | |
|---|---|
| Dated:  June 15, 2022 | */s/ Robert C. Brock*<br>Robert C. "Mike" Brock<br>KIRKLAND & ELLIS LLP<br>1301 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004<br>Telephone:  (202) 389-5991<br>mike.brock@kirkland.com<br><br>*Counsel for Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC and Aearo LLC* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY this 15th day of June 2022, a true and correct copy of the foregoing was electronically filed via the Court's CM/ECF system, which will automatically serve notice of this filing via e-mail to all registered counsel of record.

| | |
|---|---|
| Dated:  June 15, 2022 | /s/ Robert C. Brock<br>Robert C. "Mike" Brock<br>KIRKLAND & ELLIS LLP<br>1301 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004<br>Telephone: (202) 389-5991<br>mike.brock@kirkland.com<br><br>*Counsel for Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC and Aearo LLC* |