# EXHIBIT 22

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF FLORIDA**

**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| | Hon Judge M. Casey Rodgers |
| This Document Relates to All Cases | Magistrate Judge Gary R. Jones |

**RULE 26 EXPERT REPORT OF MOISES ARRIAGA, MD**

The following report is provided pursuant to Rule 26 of the Federal Rules of Civil Procedure. All the opinions that I offer in this Report I hold to a reasonable degree of medical or scientific certainty. My *curriculum vitae* is attached as **Exhibit A**, my testimony history is attached as **Exhibit B**, and my reliance materials are attached as **Exhibit C**. The materials I have relied on in forming my opinions in this report are included in this report and included in my reliance list.

**I.     QUALIFICATIONS**

This narrative summary highlights my relevant qualifications according to formal training, clinical experience, military experience, teaching experience, peer-reviewed publications, book and chapter publications, medicolegal experience and national society leadership. Additionally, my curriculum vitae, attached as Exhibit A, lists additional qualifications I have to serve as an expert in this case.

I obtained my undergraduate degree from Brown University in 1982 and then graduated from Brown University Medical School in 1985. After a one-year general surgery internship at the

Ochsner Foundation in New Orleans, Louisiana, I completed my residency training in Otolaryngology – Head and Neck Surgery at the University of Pittsburgh in 1990. I then completed a clinical fellowship in Otology and Neurotology at the House Ear Clinic in Los Angeles in 1991. During that fellowship training, which focused on the clinical and surgical training by William House, MD, Howard House, MD, and Derald Brackmann, MD, I was taught by Aram Glorig, MD, who many consider the father of forensic otology.

Following my fellowship, I was Active Duty in the United States Air Force from 1991 through 1996. This time period covered the first Persian Gulf War and its aftermath. From 1991 through 1996, I served as Chief of Otology and Neurotology at Wilford Hall USAF Medical Center at Lackland AFB, San Antonio, Texas and served on the Faculty at the School of Aerospace Medicine at Brooks Air Force Base, Texas. My clinical duties during that time included the full scope of otology and neurotology medical and surgical practice as well as participating in the USAF Hearing Conservation Program. I also evaluated and treated active duty and recently separated service members as well as military veterans who resided in San Antonio regarding noise induced hearing loss, acoustic trauma, noise-induced tinnitus, appropriate hearing protection devices, hearing profiles and medical board profiles regarding occupational hearing loss and vestibular injury. During that time, I would see hundreds of patients annually with noise-induced auditory symptoms (a conservative estimate would be 5,000 patients during my active duty practice) and make decisions and clinical recommendations about acute treatment, including medications, surgery, and sound avoidance; chronic treatment, including amplification, environmental controls, hearing implants, and dietary changes; and preventative strategies, including reviewing the NRR of HPD to formulate clinical recommendations. An inherent part of all my clinical encounters was the differential diagnosis technique in which I would consider multiple potential causes of auditory symptoms like vascular, congenital, inflammatory, toxic noise, toxic chemicals and drugs, inflammatory, metabolic, and neoplastic conditions. Once the differential diagnosis process was completed, I would proceed with clinical recommendations and treatment. To expand treatment options for hearing impaired active duty personnel, veterans and their dependents, I started the first Air Force cochlear implant program and performed the first cochlear implant at a military hospital in San Antonio. This program continues today.

As the Director of Neurotology for the Air Force at Wilford Hall USAF Medical Center, I was responsible for planning and completing the education of Air Force Otolaryngology Residents in Otology and Neurotology including an understanding of ear anatomy, physiology, and acoustic principles of sound. Noise-induced hearing loss, tinnitus, and vertigo were a critical part of the curriculum including teaching residents to understand NRR and make recommendations for HPD based on such ratings. To expand the availability of well-trained personnel, I started the first temporal bone dissection course in the San Antonio Air Force Residency Training program with national faculty teaching. This course continues annually. I started the USAF Physician Assistant residency program in San Antonio to train PAs in Otolaryngology. An essential part of the curriculum was training physician assistants to understand the anatomy and physiology the ear,

2

sound, hearing protection devices and NRR of devices, as well as learning to evaluate and treat service members experiencing noise-induced hearing loss including the use of HPD for its prevention and the role of NRR in selecting the appropriate device. At some Air Force bases, these Otolaryngology PAs were the only providers that the service members would see regarding noise-induced ear issues; thus, there was special emphasis on hearing conservation principles.

During my active duty service, I participated in the hearing conservation program by regularly lecturing hearing conservation technicians on the principles of noise-induced hearing loss, noise, hearing protection, and NRR ratings. I was on the faculty of the School of Aerospace Medicine at Brook Air Force Base in San Antonio and lectured physicians in the flight surgeon courses on principles of otology, differential diagnosis of hearing loss and tinnitus and ear trauma, including noise. During that time I worked closely with the military hearing conservation registry and developed protocols for medical and radiological evaluation of asymmetrical hearing during hearing conservation audiograms. I worked with Lt. Col Theresa Schulz from DoD Hearing Conservation Registry to identify features to facilitate the differential diagnosis of noise-induced hearing loss versus other conditions. As a capstone to that work, we submitted a manuscript to Ear and Hearing, "Industrial Hearing Conservation and Cerebellopontine Angle Tumors." A related manuscript with Lt. Col David Carrier, "Cost Effective Evaluation of asymmetric sensorineural hearing loss with focused MRI" was published by Otolaryngology- Head and Neck Surgery (see CV). The goal was to develop an efficient mechanism for the differential diagnosis of noise-induced versus pathology-induced hearing loss and tinnitus.

During my active duty service, I received the Air Force Achievement Medal, the Air Force Meritorious Service Medal, and was promoted to Lieutenant Colonel two years prior to usual eligibility (below-the zone).

From 1994 through 2000, I served on the American Academy of Otolaryngology, International Federation of Otolaryngology Societies (IFOS) Committee on Prevention of Hearing Impairment. The IFOS is the global organization for otolaryngology. In 2017, I served on the National Committee on Health Policy Age-Related Hearing Loss Measure Development Group.

Upon completion of my military service, I entered private practice of Otology and Neurotology at Pittsburgh Ear Associates, while serving on the clinical faculty of the University of Pittsburgh involved with training residents. I founded the Allegheny General Hearing and Balance Center. With the significant heavy industry and mining in the Western Pennsylvania area, I would see at least 1,000 patients annually with noise induced hearing loss or tinnitus in whom the differential diagnosis process was used to determine causes, treatment, and prevention of hearing loss. In those patients I routinely relied on NRR to make clinical recommendations for HPD. In addition to an active clinical and surgical practice, I regularly examined medical-legal claimants petitioning for hearing loss related to occupational noise exposure in the mining, steel, and railroad industry. I was co-director of a course in 1998, "Medico-Legal Assessment of Hearing

3

Loss," sponsored by Allegheny General Hospital CME department and held in Hilton Head, South Carolina. The course was attended by defense attorneys, plaintiff attorneys, workman compensation judges, physicians involved as expert witnesses and national faculty, including Robert Dobie, MD and Theresa Schulz. As part of the Pennsylvania legal education process, I provided a seminar in 2001 titled "Hearing Loss for Workman's Compensation Judges," which was sponsored by the Commonwealth of Pennsylvania Department of Labor and Industry, January 2001.

In 2005, I returned to my home state of Louisiana where I joined the faculty of the Louisiana State University Health Sciences Center as Clinical Professor of Otolaryngology and Neurosurgery. I am the Bullington Professor of Hearing Research and I direct the Hearing and Balance Centers at the Our Lady of the Lake Medical Center in Baton Rouge, Louisiana, the Hearing and Balance Center at Culicchia Neurological in New Orleans, Louisiana and the Cochlear Implant program at Children's Hospital New Orleans. In addition to a robust clinical practice, I founded and directed the LSU Neurotology Fellowship Training program which is one of 18 accredited neurotology fellowships in the United States. South Louisiana also has significant industry and noise-intensive hobbies resulting in at least 1,000 consultations annually in whom the diagnosis is partially, or entirely, noise-related hearing loss. I routinely rely on NRR to make clinical recommendations for HPD.

Recommending and evaluating hearing protection was a central component of my otology and neurotology clinical practice as an active-duty Air Force Physician and has been as a civilian otologist and Neurotologist in Pennsylvania and Louisiana. In order to sell an HPD in this country, it must be labelled with a Noise Reduction Rating (NRR). The NRR informs users how much noise is being reduced. The higher the NRR, the greater the protection. This requirement to test and label is required by the EPA and the Noise Control Act. As part of my medical practice, I advise clients to protect their hearing by avoiding toxic noise and by wearing HPDs whenever they might be exposed to toxic noise. I also advise patients and make recommendations to patients about the type, frequency, and application of hearing protection in noisy work and recreational environments. In order to do so, I include consideration of the frequency and intensity of sound exposures and the role of hearing protection, as well as the NRR labelling on hearing protection devices as a daily component of my otologic clinical activities. I advise patients to, among other things, compare products by reviewing the NRRs. The manufacturers reported NRR is an important indicator for protection and relied upon by my patients and by me in giving advice.

Throughout my career, I have been active in National Medical Organizations and Journal publications including serving on various committees of the American Academy of Otolaryngology Head and Neck Surgery, American Otological Society, Society of Military Otolaryngologists, and I am Past President of the American Neurotology Society and the Otosclerosis Study Group. From 1994 through 2000, I served on the American Academy of Otolaryngology, International Federation of Otolaryngology Societies (IFOS) Committee on Prevention of Hearing Impairment. The IFOS is the global organization for otolaryngology. In 2017, I served on the National Committee on Health Policy Age-Related Hearing Loss Measure Development Group. I was appointed by the Governor of Louisiana as a board member of the Louisiana Commission for the Deaf.

I have served as Assistant Editor of Otology and Neurotology and serve as a peer-reviewer for Laryngoscope, Otolaryngology- Head and Neck Surgery, JAMA Otolaryngology, Neurosurgery and Skull Base Surgery. I also serve as a senior examiner for the American Board of Otolaryngology, which involves examining graduating otolaryngologists and neurotologists for board certification.

Hearing loss prevention and restoration has been a career-long passion for me. It is important for my patients to protect their hearing and be informed how to avoid loss. I routinely advise my patients to avoid hazardous noise, whether recreationally or industrial, and make sure they wear HPDs when avoiding hazardous noise is not possible. The combination of noise avoidance and HPDs makes noise induced hearing loss preventable.

I have participated in innovative strategies to reverse noise-induced and other hearing loss nationally and internationally. I was part of the research team on the TICA (Totally Implantable Cochlear Amplifier), the first governmentally approved (European) totally implantable hearing aid. I was the first surgeon to implant the Esteem (Envoy) implant during Phase I clinical trials in the United States. This implant was ultimately approved by the FDA and is available under the Esteem brand name. During its development, I had multiple visits with the product engineers in Minnesota and they had visits with me in Pittsburgh for purposes of re-designing the device, which included addressing issues of: acoustic feedback, acoustical sealing, hermetic sealing, physical properties of sound vibration to the inner ear, inner ear noise levels, inner ear physical sound measurement, selecting and positioning biologically acceptable materials, utilizing mathematical studies, *in vitro* studies and both cadaver specimens and living subject volunteers.

I have participated in clinical trials of bone-anchored hearing devices, and I published the first case of simultaneous cochlear implant with acoustic tumor removal. I have participated in clinical trials of cochlear implant modifications, and trials of the Ear Lens hearing aid in which we place a contact lens on the tympanic membrane and use a mini-laser to restore the type of high frequency hearing loss typically caused by noise-induced trauma.

As part of my Louisiana clinical practice since 2005, I have continued hearing loss medicolegal activity by participating in cases as a treating physician where I have been deposed on behalf of both plaintiffs and defense. I have also testified as an expert in depositions and at trial in the Testimony Summary, attached as Exhibit B. I have given opinions similar to what I am giving in this case to industry, state and federal government entities, and to judges and juries throughout the country. My methodology used in this case is the same methodology I use when I am consulting and giving opinions to industry or governmental entities.

My curriculum vitae lists over 125 publications in peer-reviewed journals, seven textbooks, 40 textbook chapters, 30 book reviews, 40 national and international course faculty or course director presentations, and over 150 national and international lectures or visiting professorships. I am co-editor of the most popular textbook on ear surgery worldwide, which is undergoing its 5th edition. Included in my CV are articles and presentations related to noise-induced hearing loss and military aspects of otology and neurotology.

Based on my experience, training, knowledge of the relevant science and literature, experience with military protocol and standards, and review and analysis of the documents and testimony in this case, I believe I possess the necessary qualifications and experience to review and opine on cases of military noise-induced auditory damage including hearing loss, tinnitus, ear trauma and the role of hearing protection including military noise induced hearing loss, hearing protectors including the design and effectiveness of hearing protection, and the clinical symptoms and hearing outcomes of their appropriate and erroneous implementation.

## II. ASSIGNMENT AND METHODOLOGY

In formulating my opinions and preparing this report, I reviewed scientific literature, corporate documents from Aearo (who was later acquired by 3M and collectively referred to herein as "3M"), sample products, government and military documents, depositions of government agencies, and depositions of 3M employees. The corporate documents, sample products, government and military documents and depositions were supplied to me by counsel. A list of 3M corporate documents, government and military documents, literature, and depositions reviewed for this report is attached as Exhibit C; all other materials reviewed are listed at the end of this report. All opinions I have are to a reasonable degree of medical and scientific certainty. I understand discovery is still ongoing in this case, and I reserve my right to amend my opinions if further information is provided in any form including, but not limited to depositions, corporate documents, government and military documents, and the expert reports of both Plaintiff and Defense experts.

## III.    BACKGROUND

### A.    Sound and Hearing

"Sound is generated by vibrations and is carried through the air around us in the form of pressure waves. It is only when a sound pressure wave reaches the ear that hearing may take place." (Martin, F.N., Clark, J.G., 2019. Introduction to Audiology. Pearson, New York, NY, p.17.) As will be explained in more detail below, during the act of hearing, sound waves are collected by the outer ear and directed through the external auditory canal to the tympanic membrane (the eardrum). The tympanic membrane is attached to the first of three tiny connected bones known as the ossicles. When the eardrum vibrates, it causes the bones to move in succession, thus converting the sound waves into mechanical energy. The third ossicle is connected to a fluid-filled structure known as the cochlea. When the ossicles move, they cause vibrations of the fluid in the cochlea. In the cochlea are millions of hairlike cells. As the fluid movement passes over these hairlike cells, they vibrate at frequencies of up to 20,000 times per second. This vibration is then transmitted to the brain through the auditory nerve as an electronic signal that is interpreted as sound. Below is an illustration of the anatomy of the ear.



Note: Arrows indicate course of sound waves.

Copyright © 2009 by Saunders, an imprint of Elsevier, Inc. • Ferri's Netter Patient Advisor

(Netter, F.H., 2011. Atlas of Human Anatomy. Saunders Elsevier, Philadelphia, PA.) The sound waves necessary for hearing can be described by various objective characteristics including wavelength, frequency, amplitude and intensity. Wavelength is the minimum distance in which a sound wave repeats itself. Frequency is the number of complete waves or cycles produced in a unit of time. Frequency is typically measured in Hertz (the number of waves or cycles per second) and kiloHertz (kHz), the number of thousands of waves or cycles per second. If 300 complete sound waves are produced in one second, then the frequency of the sound wave is 300 Hz. Normal human hearing occurs in frequencies from 20 to 20,000 Hz.

Amplitude is a measure of the maximum displacement of particles by a sound wave. In a graphic representation, amplitude describes the height of the sound wave. The greater the amplitude of a wave, the more energy it has and the louder it sounds. A shorter amplitude translates to a softer sound. Intensity is the amount of acoustic energy within each sound.

Sounds may also be described by the subjective manner in which they are perceived by humans. The perception of frequency is called pitch. Sounds with shorter wavelengths have a higher frequency and are associated with higher pitches. Sounds with longer wavelengths have a lower frequency and are associated with low pitches. Loudness is the perception of intensity. The more intense a sound, the louder it will be. The intensity of a sound is often measured in sound pressure level (SPL).

Below is a blank audiogram with labels added to show the relationship of frequency, pitch, and loudness.



Another important concept in hearing is impedance. Impedance is the opposition to the flow of energy from the medium itself. In most listening situations, the medium through which sound is transmitted is air. Because air offers the lowest impedance, sound can travel a great distance through air without losing much energy. However, the medium through which sound travels can also be a liquid or solid. Liquids and solids have a higher impedance than air. The greater the impedance of an object, the smaller the amplitude of the waves transmitted through the object. In other words, when sound energy hits a solid object, much of the energy is reflected away and very little is transmitted through the solid.

### B.    Relevant Anatomy

The external, or outer ear, is the portion of the auditory system visible on the outside of the human body. It is composed of the pinna and the external auditory canal, commonly known as the ear canal. The pinna is a skin-covered cartilaginous framework which projects outward from opposite sides of the head. The pinna's ridges and depressions include the concha, the large cavity near the ear canal entrance, and the tragus, the small, thick cartilaginous protrusion in front of the ear canal. Below is an image showing the surface anatomy of the pinna and its primary landmarks.



(Cummings, 2021. Otolaryngology: Head and Neck Surgery. Elsevier, Philadelphia, PA.) The anatomy of the pinna helps humans localize sounds in the vertical plane, meaning it helps a listener determine whether a sound is coming from near the ground or from above the horizon.

The external auditory canal is an air-filled passageway that leads from the pinna to the tympanic membrane (the eardrum). The external auditory canal is composed of cartilage and bone and lined by a thin-layer of skin that includes cells that secrete cerumen, also known as earwax. Individual ear canals contain variances in shape, angle, size, and length.

The external auditory canal ends at the tympanic membrane (ear drum), which seals off the middle ear from the external environment and is considered to be the boundary between the outer ear and middle ear. The tympanic membrane is a four-layered concave membrane connected directly to the malleus (commonly known as the hammer), the first of the three ossicle bones. The malleus is then connected to the incus (commonly known as the anvil), which is then connected to the stapes (commonly known as the stirrup). All of the ossicle bones are found within the air-filled space referred to as the middle ear. After traveling through the external auditory canal, sound waves strike the tympanic membrane, causing it to vibrate back and forth, which then causes the ossicle bones to move back and forth. In this way, the acoustic energy of sound waves is converted into mechanical energy - the physical movement of the ossicles.

The process of hearing then moves to the inner ear, which contains the cochlea. The cochlea is a spiral, three chambered snail-like structure in the inner ear within a bony matrix. The interior

of the cochlea consists of three fluid-filled canals that run parallel to one another: the scala vestibuli, the scala media, and the scala tympani. The third and final bone in the ossicle chain is the stapes, which is connected on one end to the incus and on the other end is in direct contact with the cochlea through an opening referred to as the oval window. As the stapes moves in and out of the oval window of the cochlea, it compresses and expands the fluid inside the cochlea and creates pressure waves. This creation of pressure waves by the movement of the stapes transforms the mechanical energy to fluid vibration and is the second transformation of energy necessary in hearing. When the fluid inside the cochlea vibrates due to the movement of the stapes, a thin elastic membrane that runs the entire length of the cochlea vibrates up and down. This membrane is called the basilar membrane. The basilar membrane is tonotopically organized, meaning that different sections of the basilar membrane respond to different frequencies of sound. The portion of the basilar membrane at the base of the cochlea is tuned to high frequencies, while the portion of the basilar membrane near the apex of the cochlea is tuned to low frequencies. As the waves progress down the basilar membrane, they reach their peak at the part of the membrane that responds to the frequency of the sound wave created by the original stimulus. The tonotopic organization of the cells within the cochlea permits the auditory system to process sounds of different frequency content, which in turn allows a human being to recognize complex sounds (such as speech or music) based on their patterns of frequency.

The translation of the movement of the basilar membrane into electrical impulses occurs in the organ of Corti. The organ of Corti is the receptor organ for hearing and resides on top of the basilar membrane in the scala media. Below is an illustration showing a cross section of the cochlea, the basilar membrane and the organ of Corti.



11

(Flint, W.F., Haughey, B.H., Lund, V.J., Robbins, K.T., Thomas, J.R., Lesperance, M.M., 2021. Cummings Otolaryngology: Head and Neck Surgery. Elsevier, Philadelphia, PA.) The organ of Corti extends from the anterior part of the vestibule and coils for about two and a half turns around the modiolus, the bony portion of the cochlea. Disruption of either the architecture or metabolism of the organ of Corti can lead to injury and hearing loss.

Within the organ of Corti are three rows of approximately 12,000 to 15,000 outer hair cells (OHC) and one row of approximately 3,000 inner hair cells (IHC). Below is an image from an electron microscope showing the three rows of OHC and the one row of IHC.



(Flint, W.F., Haughey, B.H., Lund, V.J., Robbins, K.T., Thomas, J.R., Lesperance, M.M., 2021. Cummings Otolaryngology: Head and Neck Surgery. Elsevier, Philadelphia, PA.) The inner hair cells are the primary sensory receptors for hearing and the outer hair cells are responsible for cochlear amplification. Located on top of each hair cell are bundles of hair-like projections called stereocilia.

12



(Flint, W.F., Haughey, B.H., Lund, V.J., Robbins, K.T., Thomas, J.R., Lesperance, M.M., 2021. Cummings Otolaryngology: Head and Neck Surgery. Elsevier, Philadelphia, PA.) The bundles of stereocilia are interconnected by an array of fine fibers, called cross-links, which are further classified as side links and tip links. Side links reside in the lateral side of the stereocilia bundles and they allow the stereocilia to move as a unit during deflection of the bundle. Each tip link runs from the top of the stereocilia to its taller counterpart in the next row. When the basilar membrane vibrates in response to acoustic stimulation, this causes movement of the hair cells and the stereocilia. Stretching of the tip links during this process opens transduction channels, which, in turn, causes the release of neurotransmitters to propagate the auditory signal to the auditory nerve. The auditory nerve neurons then deliver the elecro-chemical signals to the brain, where it can be analyzed and interpreted.

### C.    Hearing Loss

Hearing loss can be divided into three main categories: conductive, sensorineural, and mixed (a combination of the other two). Conductive hearing loss occurs when sound is blocked from traveling through the external ear and middle ear before reaching the inner ear. Conductive hearing loss can be caused by a blockage of the ear canal from ear wax or a foreign body, a hole in the ear drum, an infection of the outer ear (otitis externa) or middle ear (otitis media), bony

13

lesions or fixation of the ossicles. Most causes of conductive hearing loss can be medically or surgically corrected.

Sensorineural hearing loss (SNHL) occurs when there is damage to the inner ear. SNHL can be divided into two main categories: (1) sensory hearing loss in which there is damage to or deficiencies in the cochlear hair cells in the organ of Corti, and the less common (2) retrocochlear hearing loss in which there is damage to the neural pathway to the auditory cortex. Cochlear SNHL can be due to many causes, including presbycusis (age-related changes of the cochlea and eighth cranial nerve), acoustic trauma or hazardous noise exposure, genetic factors, inner ear infections, auto-immune disorders, ototoxic medications (including aminoglycoside antibiotics, chemotherapeutics, antimalarials, loop diuretics and non-steroidal anti-inflammatory drugs), Meniere's disease, ototoxic substances like industrial solvents, and cochlear otosclerosis. Cochlear hair cells do not reproduce or regenerate. As a result, damage or destruction of hair cells is permanent and cannot be reversed by surgery or medicine.

Conductive hearing loss can generally be distinguished from sensorineural hearing loss by comparing air-conduction and bone-conduction hearing threshold levels. In air conduction testing, earphones are placed on the patient and pure tones are transmitted directly into the ear. Starting at a low decibel level, the level of the pure tones are increased until the patient identifies the sound. In bone conduction testing, an oscillator is placed behind the patient's ear, and sounds are transmitted through bone vibration to the cochlea, bypassing the external or middle ear. If the cause of the patient's hearing loss is a blockage or dysfunction in the external or middle air (a conductive hearing loss), that will manifest itself with elevated hearing thresholds on air conduction testing and normal hearing thresholds on bone conduction testing. Patients with sensorineural hearing loss will have elevated hearing thresholds on both air conduction and bone conduction testing.

### 1.     Noise-Induced Hearing Loss

Noise-Induced Hearing Loss (NIHL) is the second most common form of sensorineural hearing loss after presbycusis and it is almost entirely preventable by avoiding excessive noise (where possible) and by wearing appropriate hearing protection devices. "Without doubt, chronic noise exposure and the resulting cochlear trauma cause hearing loss and tinnitus." (Le, T.N., Straatman, L.V., Lea, J., Westerberg, B., 2017. Current insights in noise-induced hearing loss: a literature review of the underlying mechanism, pathophysiology, asymmetry, and management options. J. of Otolaryngology, 41–55.)

"Depending on the level of the sound exposure, either reversible or permanent damage can occur to the peripheral auditory end organ, the cochlea. Reversible loss, typically referred to as temporary threshold shift (TTS), results from exposures to moderately intense sounds, such as might be encountered at a live music event or by using noisy power tools. Hearing problems associated with TTS include elevated thresholds, particularly for the higher mid frequency region, which includes the 3- to 6-kHz frequencies. TTS is often accompanied by other symptoms such as tinnitus, loudness recruitment, muffled sounds, or diplacusis. Depending on the level and duration of the exposure and the size of the TTS, recovery from TTS can occur over periods that range from

minutes to hours or days." (Flint, W.F., Haughey, B.H., Lund, V.J., Robbins, K.T., Thomas, J.R., Lesperance, M.M., 2021. Cummings Otolaryngology: Head and Neck Surgery. Elsevier, Philadelphia, PA.)

"If threshold shifts do not fully recover, the remaining permanent change in hearing is referred to as a *permanent threshold shift* (PTS). Permanent elevation in hearing thresholds is a consequence of irreversible damage to the critical elements of the cochlea, which occurs either immediately or develops over a period of days or weeks after the noise exposure ends, in parallel with the formation of toxic free radicals in the cochlea that drive a delayed apoptotic cell death." (Flint, W.F., Haughey, B.H., Lund, V.J., Robbins, K.T., Thomas, J.R., Lesperance, M.M., 2021. Cummings Otolaryngology: Head and Neck Surgery. Elsevier, Philadelphia, PA.)

NIHL can be caused by (1) acoustic trauma, which is a single brief exposure to a very intense sound (such as from explosions or gunfire) that results in a sudden, usually painful loss of hearing; or (2) long-term, continuous exposure to less intense levels of sound. The violent changes in air pressure associated with acoustic trauma can cause direct mechanical damage to the tympanic membrane, ossicles or organ of Corti. Long-term, continuous noise can slowly destroy structures in the cochlea.

Below is an audiogram showing the classic " boilermaker's 4 kHz notch" consistent with early or moderately advanced NIHL. At the frequency levels of 250 Hz to 2,000 Hz, hearing is in the normal range. However, in the higher frequencies, the hearing dips, reaching a nadir of moderate hearing loss at 4,000 Hz. The hearing then returns towards normal at 8,000 Hz. This is the typical early or moderate presentation because the typical patient with NIHL initially presents with a high-frequency loss that spreads to other frequencies as the noise exposure continues. (LePrell, C.G., Henderson, D., Fay, R.R., Popper, A.N., 2012. Noise-Induced Hearing Loss: Scientific Advances. Springer, London.)



(Flint, W.F., Haughey, B.H., Lund, V.J., Robbins, K.T., Thomas, J.R., Lesperance, M.M., 2021. Cummings Otolaryngology: Head and Neck Surgery. Elsevier, Philadelphia, PA.) In chronic, long-term NIHL, there are typically two stages of loss. First, the middle to high frequencies exhibit hearing loss, then the higher and lower frequencies begin to be affected.

Loud noises that cause NIHL primarily damage the IHCs and the OHCs of the organ of Corti. The characteristic pathologic feature of NIHL is the loss of hair cells, particularly the prominent loss of outer hair cells at the basal turn, while loss of inner hair cells was limited. As discussed above, the basilar membrane (which runs the length of the cochlea) is tonotopically organized, meaning that different sections of the basilar membrane respond to different frequencies of sound. Below is an illustration of the cochlea with the frequencies labeled. The basal turn roughly corresponds with the 4,000 Hz frequency, which explains why the 4 kHz notch appears on the audiogram as a result of NIHL.

16



Stereocilia are also susceptible to acoustic trauma. After acoustic overexposure, a variety of forms of changes to the stereocilia have been described including flopping, bending, separation, falling, collapsing, shrinking, breaking, detaching, and loss. Additionally, the cross-links of the stereocilia can break due to stretching as the stereocilia become disarrayed. Finally, degeneration of the auditory nerve follows the loss of outer hair cells.

With sufficient intensity and duration of noise, not only the hair cells but the entire organ of Corti can be disrupted. This can be due to mechanical destruction due to short exposure to extreme noise intensities or metabolic decomposition after noise exposure over a longer period of time. (Le, T.N., Straatman, L.V., Lea, J., Westerberg, B., 2017. Current insights in noise-induced hearing loss: A literature review of the underlying mechanism, pathophysiology, asymmetry, and management options. J. of Otolaryngology, 41–55.)

## 2.      Asymmetrical Sensorineural Hearing Loss

Asymmetrical Sensorineural Hearing Loss (ASNL) is a condition in which hearing in one of a patient's ear is worse than the hearing in the other ear. The medical literature contains numerous technical definitions of ASNHL that include "variations in the audiometric frequencies of interest, magnitude of hearing loss, and speech recognition", but none of the definitions have been universally accepted. (Durakovic, N., Valente, M., Goebel, J.A., Wick, C.C., 2019. What Defines Asymmetric Sensorineural Hearing Loss?  ENT Today.) ASNHL is often associated with individuals who shoot long guns, but not pistols or handguns. "The left ear of right-handed shooters often exhibit more hearing loss because it is slightly closer to and receives a direct exposure from the muzzle of a rifle or shotgun while the right ear is partially protected by the head shadow effect." (Stewart, M., et. al., 2017. NHCA Position Statement: Recreational Firearm Noise.) Below is an audiogram showing the shooter's notch:



In this example, the patient is left-handed, meaning that his left ear is closest to the gun and benefitting from the head shadow effect while the right ear is closer to the impulse noise and less protected.

Asymmetrical SNHL may also be the result of a retrocochlear lesion (i.e., vestibular schwannoma). Asymmetric hearing could require radiologic follow-up unless the history indicates a reasonable explanation like firearm use. (Le, T.N., Straatman, L.V., Lea, J., Westerberg, B., 2017. Current insights in noise-induced hearing loss: a literature review of the underlying mechanism, pathophysiology, asymmetry, and management options. J. of Otolaryngology, 41–55.)

### 3.   Noise Induced *Hidden* Hearing Loss - Cochlear Synaptopathy

Traditionally, it was believed that temporary threshold shifts in hearing that recover to baseline in the hours, days, or weeks following exposure were merely transient phenomena that did not represent any long-term damage. This belief was based, in part, on the idea that outer hair cells are among the most vulnerable elements in the cochlea and that cochlear nerve fibers degenerate if, and only long after, the loss of their peripheral hair cell targets. (Liberman, M.C., Kujawa, S.G., 2017. Cochlear synaptopathy in acquired sensorineural hearing loss: Manifestations and mechanisms. Hear Res., 138–147.) However, studies by Kujawa and Liberman have shown that animals exposed to low-levels of sound had a loss of the synaptic connections between auditory nerve fibers and the inner hair cells (IHCs), even though they did not have significant damage or loss to the hair cells themselves. (Kujawa S.G., Liberman M.C., 2006. Acceleration of

18

age-related hearing loss by early noise exposure: evidence of a misspent youth. J. of Neurosci., 2215–2223.)

Noise exposures causing large, but reversible/temporary threshold shifts (TTS) can nevertheless cause rapid (in minutes to hours) loss of up to approximately 50% of the synapses between cochlear neurons and the IHCs they contact. (Fernandez, K.A., Guo, D., Micucci, S., De Gruttola, V., Liberman, M.C., Kujawa, S.G., 2020. Noise-Induced Cochlear Synaptopathy With and Without Sensory Cell Loss. Neuroscience, 43–57.) As discussed above, the Inner Hair Cells (IHCs) are the actual sensory receptors that communicate with neurons from the auditory nerve. Below is an illustration adapted by Dr. Liberman showing hair cells in a normal ear and hair cells in an ear that suffered cochlear synaptopathy. Under normal conditions, each inner hair cell is normally contacted by approximately 20 auditory nerve fibers. (Id.) After noise trauma consistent with cochlear synaptopathy, many of those synaptic connections are lost.



Figure 1. In the normal ear, each inner hair cell sends signals to the brain via numerous type-I spiral ganglion neurons (top schematic). In the synaptopathic ear (bottom schematic) many of the synaptic contacts between type-I neurons and inner hair cells have degenerated, thus many of the surviving spiral ganglion cells are silenced. The type-II spiral ganglion neurons innervating outer hair cells are unaffected, but the signals they carry likely have more to do with pain sensation than with hearing per se. Drawings are adapted from Liberman [1].

Loss of that synaptic connection will disrupt the communication with the auditory nerve and disrupt hearing. As long as the IHCs remain intact, audiograms are not sensitive to the loss of neurons, so cochlear synaptopathy does not show up on an audiogram. This is why cochlear synaptopathy is referred to as "Hidden Hearing Loss." Additionally, only certain structures of the nerve fibers (the synaptic boutons and the peripheral axons) die initially. The spiral ganglion cell bodies and central axons can survive for decades. In the Kujawa and Liberman studies, the animals who had experienced a temporary threshold shift had a much-faster rate of age-related hearing loss than animals not exposed. "Cochlear synaptic and neural loss has been observed in every mammalian model of noise- and age-related hearing loss studied thus far." (Fernandez, K.A., Guo, D., Micucci, S., De Gruttola, V., Liberman, M.C., Kujawa, S.G., 2020. Noise-Induced Cochlear Synaptopathy With and Without Sensory Cell Loss. Neuroscience, 43–57.) Review of temporal bones of humans with clear noise exposure histories, some with audiometric notches consistent with noise exposure, can show peripheral axon and/or ganglion cell loss in cochlear regions without IHC loss.

Patients with cochlear synaptopathy often complain of difficulty hearing (especially with regards to understanding speech), tinnitus, and hyperacusis. Cochlear synaptopathy is not medically or surgically treatable.

### D.    Impact of NIHL

Studies on the nature of auditory processing deficits "indicate that the listening difficulties faced by an individual with high-frequency sensorineural hearing loss are much more than just the loss of audibility resulting from their higher hearing thresholds. Rather, in many cases, it is a pervasive and life-changing difficulty in hearing everyday sounds, the most important of which is speech. These difficulties are exacerbated in less-than-ideal listening conditions such as the presence of background noise or reverberation." (LePrell, C.G., Henderson, D., Fay, R.R., Popper, A.N., 2012. Noise-Induced Hearing Loss: Scientific Advances. Springer, London.) "Hearing loss limits an individual's ability to communicate with the surrounding world, which can lead to increased social stress, depression, embarrassment, poor self-esteem, and relationship difficulties." (Le, T.N., Straatman, L.V., Lea, J., Westerberg, B., 2017. Current insights in noise-induced hearing loss: a literature review of the underlying mechanism, pathophysiology, asymmetry, and management options. J. of Otolaryngology, 41–55.) Studies have also demonstrated an association between hearing loss and declines in cognition, memory, and attention."    Additionally, occupational NIHL is associated with an increased risk for work-related injuries.

Difficulties understanding speech are particularly problematic for Service Members who often must rely on communication for safe and effective operational planning and execution. Sound is often the first source of information a Service Member has before direct contact with the enemy. Hearing and listening are fundamental to the instruction, teamwork, and reporting skills that are necessary to accomplish any mission.

The effect of hearing loss on speech perception has two components. The first component is the loss of audibility, which causes elevated thresholds for any kind of external sound. The second component is the difficulty understanding speech in noise at suprathreshold sound levels. This second component is referred to as "distortion" or "clarity loss." (Phatak, S., 2009. Consonant recognition loss in hearing impaired listeners, J Acoust Soc. Am.)

The vowel sounds in speech tend to be louder and lower in pitch or frequency. Consonants provide clarity to the vowels that are used in all words. Unfortunately, for sufferers of NIHL who have difficulty hearing high-pitched sounds, several consonants are high-pitched. Below is an illustration of an audiogram showing the frequency and intensity of various vowels and consonants.



Normal audiogram, showing hearing thresholds for the right (blue circles) and left (red x's) ears. Normal thresholds are at or below 25 dB (shaded rectangle). The frequency and loudness of normal conversational sounds is shown in grey letters. Vowels tend to be lower in frequency and louder, while the consonants, which carry the majority of meaning of words, tend to be of higher frequency and softer.

Graphic 55824 Version 4.0

Individuals with hearing loss at higher frequencies common with NIHL complain of a loss of perceived clarity of speech and greater difficulty following speech in the presence of background noise.

In addition to difficulties understanding speech, NIHL can also result in problems with loudness recruitment, hyperacusis, performance of mental tasks, depression, anxiety, irritability,

isolation, fatigue, and cognitive decline. Loudness recruitment is a phenomenon that is observed with almost all cases of outer hair cell loss. (Pichora-Fuller, M.K., MacDonald, E., 2017. Sensory Aging: Hearing. in: Reference Module in Neuroscience and Biobehavioral Psychology.) This phenomenon refers to an abnormally large increase in the perceived loudness of a sound caused by a slight increase in its intensity. Combinations of harmonic and frequency distortion and loudness recruitment often make the use of hearing aids difficult. (Martin, F.N., Clark, J.G., 2019. Introduction to Audiology. Pearson, New York, NY.) Hyperacusis is a highly debilitating and rare disorder characterized by an increased sensitivity to certain frequencies and volume ranges of sound. A person with hyperacusis has difficulty tolerating everyday sounds.

### E.      Tinnitus

Tinnitus is the subjective perception of sound in the absence of an external source. Sufferers report hearing different and sometimes variably changing sounds like ringing, hissing, roaring, crickets, screeching, sirens, whooshing, static, pulsing, ocean waves, buzzing, and clicking. The degree and the impact of tinnitus on an individual person vary widely for the different kinds of tinnitus and also from person to person. For many sufferers, tinnitus can be bothersome, disabling, and persistent. As to it being bothersome and disabling, some of the more common complaints from tinnitus are insomnia, impaired understanding of speech, depression, impaired concentration, and problems with both work and family life. (Tunkel, D.E., et. al., 2014. Clinical Practice Guideline: Tinnitus, Otolaryngology – Head and Neck Surgery, S1–S40.)  In some instances, tinnitus has led to suicide. Research has also shown hyperacusis to be a common symptom among patients with tinnitus. (Moller, A.R., Langguth, B., DeRidder, D., Kleinjung, T., 2011. Textbook of Tinnitus. Springer, New York, NY.) As to its persistence, in one study, 27% of tinnitus sufferers report experiencing it for more than 15 years and 36% report near constant symptoms. (Chandraekhar, S.S., 2020. Tinnitus: Current Understanding of an Age-Old Problem. Otolaryngol. Clin. N. Am., xv–xvi.)

Tinnitus is a significant problem among Service members and Veterans. Noise-induced tinnitus and hearing loss are so pervasive they have remained in the top two service-connected disabilities for Veterans receiving compensation for more than a decade. (Theodorff, S.M., Konrad-Martin, D., 2020. Noise: Acoustic Trauma and Tinnitus, the US Military Experience. Otolaryngol. Clin. N. Am., 543–553.) While a key risk factor for tinnitus is hearing loss, many with tinnitus have normal hearing, and conversely, many with hearing loss do not report tinnitus. (Cummings, 2021. Otolaryngology: Head and Neck Surgery. Elsevier, Philadelphia, PA.) There is no known cure for tinnitus and there is evidence that treatments for tinnitus are less effective after tinnitus has persisted for more than 5 years.  (Moller, A.R., Langguth, B., DeRidder, D., Kleinjung, T., 2011.  Textbook of Tinnitus.  Springer, New York, NY.)

Various classifications for tinnitus have been proposed, including subjective versus objective and primary versus secondary.  With objective tinnitus, actual sounds are generated within the body and conducted to the ear, but there is no external source of that sound.  With subjective tinnitus, the sounds are truly phantom with no actual source.  Objective tinnitus may be

caused by joints, muscles, turbulent blood flow or otoacoustic emissions and may be heard by others using auscultation. Objective tinnitus is very rare. Subjective tinnitus can only be heard by the afflicted individual and is often described as ringing, hissing or buzzing.

### 1. Tinnitus Pathophysiology and Causes

Theories regarding the etiology of tinnitus initially focused on intracochlear causes, specifically damage to the outer hair cells following acoustic trauma, head trauma or ototoxic medications. However, more recent studies suggest a far more complex etiology. "The perception of tinnitus is often associated with elevated hearing thresholds, but an important caveat is that noise-induced tinnitus can occur in the absence of hearing loss measured through conventional pure-tone audiometry and by itself, is suggestive of pathologic injury to the auditory system." (Theodorff, S.M., Konrad-Martin, D., 2020. Noise: Acoustic Trauma and Tinnitus, the US Military Experience. Otolaryngol. Clin. N. Am., 543–553.) While cochlear dysfunction may account for some forms of tinnitus, it is also believed that many forms of tinnitus are caused by activation of neural plasticity in response to intense sound exposure. "Activation of neural plasticity may change many neural processes, re-route information, alter the relation between inhibition and excitation, and change temporal coherence of activity in the population of neurons that may be involved in different forms of tinnitus." (Flint, W.F., Haughey, B.H., Lund, V.J., Robbins, K.T., Thomas, J.R., Lesperance, M.M., 2021. Cummings Otolaryngology: Head and Neck Surgery. Elsevier, Philadelphia, PA.) "Accumulating evidence suggests that tinnitus developed as a perceptual consequence of noise exposure may be an indicator of underlying auditory injury and maladaptive compensatory mechanisms within the central auditory pathways. The prevailing view that 'tinnitus is a symptom of hearing loss' is therefore misleading and does not tell the whole story." (Theodorff, S.M., Konrad-Martin, D., 2020. Noise: Acoustic Trauma and Tinnitus, the US Military Experience. Otolaryngol. Clin. N. Am., 543–553.)

### 2. Tinnitus, Depression, PTSD, and Anxiety

The unknowns around tinnitus along with the difficulty in identifying a known cause or effective treatment can contribute to a sufferer's distress. Depression has been reported in 48% to 60% of tinnitus sufferers. (Tunkel, D.E., et. al., 2014. Clinical Practice Guideline: Tinnitus, Otolaryngology – Head and Neck Surgery, S –S40.) Like many aspects of tinnitus, the precise relationship between tinnitus and depression is poorly understood. Depression may affect the severity or tolerance of tinnitus, tinnitus may predispose individuals to depression, or tinnitus may be an independent comorbidity in depressed patients. We know that psychological disorders and tinnitus have the potential to exacerbate one another. Hinton and his colleagues reported that in patients with PTSD, traumatic episode recall could be linked to, or provoked by, tinnitus. (Hinton, D.E., Chhean, D., Pich, C., Hofmann, S.G., Barlow, D.H., 2006. Tinnitus Among Cambodian Refugees: Relationship to PTSD Severity. J. of Traum. Stress, 541–546.) The investigators reported that flashbacks and intrusive memories contributed to tinnitus exacerbation. (Id.) "When present concurrently in an individual, [the effects of PTSD and tinnitus] can be staggering,

reducing dynamic range, exacerbating startle responses, and producing aversive and uncontrollable physical and emotional responses to sound." (Fagelson, M.A., 2007. The association between tinnitus and posttraumatic stress disorder. J. of Audiology, 107–117.) Halford and colleagues reported in a study that tinnitus measured by a subjective scale was significantly associated with elevated anxiety trait and depressive tendency, although there was a low level of direct correlation between those variables. (Halford, J.B., Anderson, S.D., 1991. Anxiety and Depression in Tinnitus Sufferers, J. of Psychosomatic Res., 383–390.) They believed that the causal relationship between anxiety and depression and tinnitus severity to be bi-directional. Tinnitus is an arousal-reactive symptom, meaning that it increases as anxiety increases. (Hinton, D.E., Chhean, D., Pich, C., Hofmann, S.G., Barlow, D.H., 2006. Tinnitus Among Cambodian Refugees: Relationship to PTSD Severity. J. of Traum. Stress, 541–546.) In turn, as tinnitus worsens, a positive feedback loop may result, leading to increased anxiety and distress.

### 3. Tinnitus and Sleep

Insomnia and sleep disturbance in tinnitus sufferers is a serious health problem that decreases quality of life. "The prevalence of disturbed sleep in persons with tinnitus varies from 25% to 77%. (Moller, A.R., Langguth, B., DeRidder, D., Kleinjung, T., 2011. Textbook of Tinnitus. Springer, New York, NY.) Although insomnia occurs more frequently in individuals with recent onset tinnitus, "tinnitus and insomnia become more pronounced the longer a patient suffers from these conditions."

### 4. Treatment of Tinnitus

Tinnitus has been known to spontaneously resolve in some sufferers, but the largest spontaneous improvement is seen in patients with short duration tinnitus, younger age and longer intervals between pre- and post-assessment. (Tunkel, D.E., et. al., 2014. Clinical Practice Guideline: Tinnitus, Otolaryngology – Head and Neck Surgery, S1–S40.) For those patients in which tinnitus does not spontaneously resolve, many different treatments are in use with varying degrees of success. The goal of eliminating the symptoms is rarely achieved, so treatment often involves reducing some of the effects of tinnitus so that the patient regains some quality of life. Recommended treatment options for tinnitus include: hearing amplification by hearing aid, Cognitive Behavioral Therapy, sound therapy, Tinnitus Retraining Therapy, neuromonic therapy, antidepressants, anticonvulsants. (Tunkel, D.E., et. al., 2014. Clinical Practice Guideline: Tinnitus, Otolaryngology – Head and Neck Surgery, S1–S40.)

### F.    Diagnosis of Auditory Dysfunction

A thorough history and physical exam is the cornerstone of excellent patient care and the first step towards arriving at a differential diagnosis for a patient with auditory dysfunction. Below is a

general list of steps taken and information reviewed and obtained in a typical diagnostic exam for auditory dysfunction. This list is not compulsory or necessarily comprehensive; it is more of a guideline. Experienced clinicians should exercise their own medical judgment in determining what aspects of the exam to do and what aspects not to do.

- Chief Complaint
  - Description of symptoms, including symmetry and severity
  - Onset of symptoms, including identification of precipitating event
  - Progression of symptoms
  - Frequency of symptoms
- Past Medical History
  - Prior audiograms
  - Prior auditory complaints
  - Noise exposure history
  - History of using HPDs
  - Comorbidities
  - Other illnesses, injuries, conditions or surgeries related to the ear or hearing
    - Inner ear disease
    - Ear infections
    - Cerumen impaction
    - Auto-immune issues
    - Dementia
    - Concussions or TBI
  - Other illnesses, injuries, conditions or surgeries not related to the ear or hearing
    - Surgeries, including those under general anesthesia
    - Cancer treated with chemotherapeutics
    - Infections treated with IV antibiotics
    - Congestive heart failure and/or chronic kidney disease treated with loop diuretic medication
    - Metabolic disorders, including diabetes mellitus and hypothyroidism
    - Stroke, diabetes or heart disease
    - Hypertension and high cholesterol
  - Medications
    - Ototoxic drugs
    - NSAIDs/Narcotics
    - Anti-malarial
    - Diet supplements
  - Alcohol, tobacco and illicit drugs
  - Relevant family history
- History of Present Illness
  - Relevant noise exposure
    - Military

26

- ■ Occupational
- ■ Recreational
- ○ History of wearing ear protection.
  - ■ When he wore hearing protection
  - ■ What kind of hearing protection did he wear
  - ■ How was he using them
- ● Review of Medical Records
  - ○ Medical records
  - ○ Audiograms
- ● Physical Exam
  - ○ Presentation
  - ○ Vital signs
  - ○ Exam of head, neck, outer ears, ear canals and tympanic membranes
  - ○ Weber exam
  - ○ Rinne exam

After performing a thorough history and physical for patients with auditory dysfunction, I engage in the differential diagnosis process to identify the most likely etiology of my that dysfunction. I rely on my education, training and years of practice/experience in considering all etiologies and conditions that might be causing the condition (rule in) and then eliminate potential causes (rule out) based on the information referenced above. In performing this analysis, it is important to consider the temporal relationship of symptoms to the injuries.

### G.    Noise in the Military

The Department of Defense (DoD) has implemented measures to ensure soldier safety in general, and rules and regulations to safeguard soldier's hearing in particular. These regulations apply from the acquisition phase of equipment, through training, and into combat operations.

In the late 1970s, the DoD mandated surveys of noise-hazardous environments and, subsequently, for noise dosimetry. The requirements for all DoD Hearing Conservation Programs ("HCPs") are enshrined in DoD Instruction Number 6055.12, "DoD Hearing Conservation Program (HCP)" ("DoDI 6055.12"). (DODI 6055.12.) DoDI 6055.12.4 establishes a duty "to protect all DoD personnel from hearing loss resulting from occupational noise exposure through a continuing, effective, and comprehensive Hearing Conservation Program (HCP)." First and foremost, DoDI 6055.1.6.3 establishes a requirement that all DoD hearing conservation programs must accurately assess the sound pressure levels and TWA in all potentially noise hazardous areas. The instruction further requires in DoDI 60551.6.2 that an HCP program be implemented whenever DoD personnel are exposed to continuous noise levels greater than 85 dB TWA or impulse noises of 140 dB TWA. Steady state noise Impulse noise is defined as noise consisting of single bursts with ad duration of less than one second. Steady state noise lasts longer than one second and is continuous in nature.

27

In the first instance, hazardous noise levels should be abated to safe levels with engineering controls; the Instruction specifies that steady state noise levels should remain below 85 dB TWA in all occupied spaces whenever occupied, if possible. Hearing protectors should be employed as a permanent measure, "only if engineering controls are not technologically, economically, or operationally possible."

When HPDs are indicated, DoDI 6055.12.6.6.4 mandates that they must be capable of attenuating worker noise exposure below 85 dB TWA. DoD personnel have the right to choose among approved HPDs, "unless medically contraindicated or inappropriate for a particular hazardous noise exposure," even if they are not locally stocked. (DoDI 6055.12.6.6.5.) Preformed earplugs, like the CAEv2, are to be fitted only "under the supervision of personnel specifically trained to fit earplugs," and their fit is to be examined by "medically trained personnel" at least once a year. (DoDI 6055.12.6.6.7.) The Instruction was amended in 2010. At that point, the DoD mandated that all personnel routinely working in designated hazardous noise areas shall receive annual training on various issues, including the the "advantages, disadvantages, and attenuation of various hearing protectors:; "[i]nstructions on selection, fit, use, and care of hearing protectors and the "[m]andatory requirement of assigned protective equipment, and administrative actions that may follow for failure to wear." (DoD Instruction 6055.12, 2010.)

EPA rules found in 40 CFR Part 211, subpart B, require manufacturers to identify the Noise Reduction Rating for each HPD. The NRR provides consumers (including Service Members) with information regarding the HPD's effectiveness in reducing the level of noise entering a user's ears and was proposed to simplify complex attenuation data for the general public.

Although not all Military personnel have daily exposure to gunfire, nearly all Military personnel are going to be exposed to loud noises at some point. Through the noise surveys mandated by the HCPs, we have a general idea of noise exposures, although the actual exposure of the individual will vary based on factors like proximity to the noise source and reflective surfaces. Additionally, noise that repeats, like from a machine gun, needs to be evaluated as an impulse noise and a steady state noise. Virtually all military weapon systems produce impulse noise that exceeds 140 dBP, thus requiring the use of HPDs. Small caliber firearms like rifles, pistols and shotguns have peak sound pressure levels in the 150 to 175 dBP range. (Jokel, C., Yankaskas, K., Robinette, M.B., 2019. Noise of military weapons, ground vehicles, planes and ships. J. Acoust. Soc. Am., 3832–3838; Yong, J.S., Wang, D., 2015. Impact of noise on hearing in the military. Military Medical Res.)

A grenade at 50 feet has a sound level dBP of 164. (Noise and Military Service) Large caliber weapons like the M3 MAAWS recoilless rifle, the M72A3 light antitank weapon, and 105mm and 155mm towed howitzers have peak sound pressure levels in the 178 to 190 range for the gunner. (Noise and Military Service, 2006.) Noise surveys also show the peak sound levels for steady state noise. For example, for the occupants of most wheeled military vehicles, the noise reaches into the mid- to high-90 dBA range, while the noise for occupants of most tracked vehicles

can exceed 110 dBA. (Jokel, C., Yankaskas, K., Robinette, M.B., 2019. Noise of military weapons, ground vehicles, planes and ships. J. Acoust. Soc. Am., 3832–3838.) The steady state noise associated with a rotary wing aircraft tends to be in the high-90 to low-100 dBA range, while for some helicopters the noise can reach close to 115 dBA. (Jokel, C., Yankaskas, K., Robinette, M.B., 2019. Noise of military weapons, ground vehicles, planes and ships. J. Acoust. Soc. Am., 3832–3838.) For fixed wings, the noise level for the occupants can be 105 - 122 dBA. (Jokel, C., Yankaskas, K., Robinette, M.B., 2019. Noise of military weapons, ground vehicles, planes and ships. J. Acoust. Soc. Am., 3832–3838.) In ships, berthing spaces and ready rooms can range from 87 to 102 dBA, mess decks can be 92 - 94 dBA, and engine rooms can be 85 - 118 dBA. (Jokel, C., Yankaskas, K., Robinette, M.B., 2019. Noise of military weapons, ground vehicles, planes and ships. J. Acoust. Soc. Am., 3832–3838.)

### H.    Noise-Induced Hearing Loss is Preventable

The Department of Defense's Hearing Center of Excellence actively promotes the idea that Noise-Induced Hearing Loss and Tinnitus are Preventable in educational materials like the following:



3M also agrees with and promotes this important safety principle in marketing material that declares that "Noise Induced Hearing Loss is 100% Preventable!" (3M_MDL000716257.) 3M's website further states that "NIHL is entirely preventable, and reliable hearing protection is the key." The CAEv2 inventor, Elliott Berger, has endorsed the idea that with the use of appropriate HPDs, NIHL is preventable, stating: "When properly and consistently worn, hearing protectors can effectively attenuate noise and prevent hearing loss. That much is clear." (Development and Validation of a Field-MIRE Approach for Measuring Hearing Protector Attenuation, Berger, Viox, Keiper and Le Cocq, 3M_MDL000233892.)

In that regard, Mr. Berger agrees with Charles Jokel of the Army Public Health Center and his colleagues who wrote: "Even though "military operations can be noise-hazardous, most situations can be made non-hazardous through the use of hearing protection." (Jokel, C., Yankaskas, K., Robinette, M.B., 2019. Noise of military weapons, ground vehicles, planes and ships. J. Acoust. Soc. Am., 3832–3838.)

There are several different types of HPDs that have been available to Service Members over the years. Passive HDPs (as opposed to electronic HPDs) can be both linear and non-linear. Linear earplugs provide the same amount of noise attenuation at all times. Non-linear ear plugs allow quiet sounds to pass to the inner ear while shutting out transmission of high-level noise, like from gunfire and explosions. (Jokel, C., Yankaskas, K., Robinette, M.B., 2019. Noise of military weapons, ground vehicles, planes and ships. J. Acoust. Soc. Am., 3832–3838.) The non -linear effect is obtained through a filter or through electronic means.

Expandable foam plugs are made of a formable material designed to expand and conform to the shape of each person's ear canal, thereby sealing the ear and blocking noise from entering. The advantages of foam plugs include that they are small, light and easily carried, they are convenient to use with other personal protection equipment (including ear muffs), they are more comfortable for long-term wear in hot, humid work areas and are convenient for use in confined areas. Various sizes are available and they do not require fitting by a trained personnel.

According to the National Institute for Occupational Safety and Health (NIOSH), pre-molded plugs are made from silicone, plastic, or rubber and are manufactured as either "one-size-fits-most" or are available in several sizes. Many pre-molded plugs are available in sizes for small, medium or large ear canals. Pre-formed earplugs typically have a single, triple, or quad flange design. Pre-formed earplugs have many of the same advantages as foam plugs. However, because they are pre-formed, they do not fit as wide a variety of ear canals as foam plugs. They may also be more difficult to get a seal. The Combat Arms Earplug Version 2 (CAEV2) at issue in this case was promoted as a "one-size-fits most" and did not require ear canal sizing across all military. (3M_MDL000322304; 3M_MDL000322306 "fits most"; 3M_MDL000345123 "fits many") Pre-formed earplugs can be fitted with non-linear filters, as was done with the CAEV2.

Ear muffs usually consist of a band that applies springlike pressure to two ear cups with soft cushions that seal against the outer ear and block out external noise. The ear cups are lined with sound-absorbing materials to absorb sound energy. Ear muffs are generally designed so that one size fits most head sizes and they are easy to use. The disadvantages of ear muffs are that they are less portable and heavier, they are more uncomfortable in hot, humid work areas, are more inconvenient for use in confined work areas and may interfere with the wearing of glasses.

Canal caps resemble earplugs on a flexible plastic or metal band that are worn over the head, behind the neck or under the chin. They can be put on and taken off quickly, but they do not provide as much protection as other devices and are not as comfortable. Ear muffs can also have communication circuitry or be active models. Active models can have microphones and external audio devices. There can be volume controls to amplify sounds from outside the earmuffs. Some active systems have both hearing protection and communications built into the earmuff. These systems provide ear protection as well as allowing situational awareness through radio connections and ear-level stereo microphones. They are called Tactical Communication and Protective Systems (TCAPS).

Although NIHL and tinnitus are the number one and two disability according to the VA, most soldiers do not in fact suffer from them upon separation from the military. A study of the 570,332 veterans returning from serving in Iraq and Afghanistan, revealed that 7.78% were diagnosed with hearing loss alone, 6.54% with tinnitus alone and 6.24% with both hearing loss and tinnitus. (Swan, A.A., Nelson, J.T., Swiger, B., Eapen, B.C., Packer, M., Pugh, M.J., 2017. Prevalence of hearing loss and tinnitus in Iraq and Afghanistan Veterans: A Chronic Effects of Neurotrauma Consortium Study. Hear Res.) Those numbers can and should be improved. With the help of good HCPs and accurate assessments of hearing protection, soldiers can leave the military with their hearing intact, but they need good, functioning ear plugs that include appropriate instructions for use.

## III. The CAEv2

### A. Background on the Combat Arms Earplug

This case concerns the Combat Arms Earplug version 2 ("CAEv2"), an earplug that was manufactured and sold by 3M Corporation, a subsidiary of 3M. As its name suggests, the CAEv2 (pictured below) was the second in a series of five earplugs developed, manufactured and sold by 3M.



(3M_MDL000320257.) Development of the Combat Arms earplugs began in the 1990s. 3M's first version was an attempt to house a special non-linear filter developed by ILS within the body of 3M's pre-existing Ultrafit earplug. (3M_MDL000425673.) This plug was eventually known as the CAEv1. (3M_MDL000188671; 3M_MDL000779978 at 25.) In 1997, 3M, with assistance from ISL, designed a single earplug combining non-linear and linear functions.

(3M_MDL000013024.) They designed two prototypes—a single-ended version and a dual-ended version. The single-ended prototype allowed users to twist the filter in order to change between the open and closed modes of protection. (3M_MDL000013024.) The dual-ended prototype had a non-linear plug on one end and a linear plug on the other. (3M_MDL000006631.) After some additional changes to the filter, this became the earplug that was ultimately marketed and sold by 3M as the CAEv2. (3M_MDL000006631.) The dual-ended CAEv2 was comprised of two Ultrafit earplug tips with a filter located between the two sides of the plug. The filter is housed in a stiff plastic stem. This earplug was the second of five earplugs in the Combat Arms series sold by 3M and 3M, the first four of which are pictured below:



**Figure 1 - Four versions (left-to-right) of the CAE**

(3M_MDL000259868, which shows, from left to right, the CAEv1, CAEv2, CAEv3, and CAEv4.) In 1997, the Department of Defense ("DOD") Hearing Conservation Working Group was chaired by Dr. Douglas Ohlin. ( 3M_MDL000188689.) Dr. Ohlin, who would go on to work for 3M, approved the purchase of the plugs. (3M_MDL000188689.) Dr. Ohlin would go on to promote the plug as a 3M employee, leading his supervisors in marketing to comment that his service to the brand was "well worth" what they paid him. (Moses 30(b)(6) 10/17/19 Depo at 379:8–380:21.) Despite Dr. Ohlin's approval, 3M never developed formal specifications for the CAEv2 prior to selling the plug to the military. (3M_MDL000527305; Ohlin 4/24/13 Depo at 130:6–131:10, 241:5–6) On May 18, 1999, Dr. Ohlin requested a price quote from 3M for 1,000 pairs of the CAEv2 to be purchased by the Army's Southern European Command. (CTRL_3M_Touhy00000135.) The first official purchase order for the CAEv2 was dated July 22, 1999, and was shipped to CHPPM at Aberdeen Proving Ground. (3M_MDL000393647.) After this initial purchase, all branches of the military began to order the CAEv2. (3M_MDL000393647.) 3M then began selling the CAEv2 and its consumer equivalent products in both civilian and military military markets. (30(b)(6) 10/17/19 Depo at 38:13–40:14, 51:5–24.)

33

3M's various consumer versions of the plug included the AOSafety plug, the Browning Duo, and the ARC Plug, marketed to welders and pictured below:



(3M_MDL000320257.) All of these dual ended 3M Earplugs were identical to the CAEv2, other than the colors of the flanges, marketing, and packaging. (Myers 30(b)(6) 10/18/19 Depo at 61:16–65:14 (related products functionally same as CAEv2).)

At the time of its inception, the CAEv2 (and its functionally identical consumer versions, discussed below) was the first ever dual ended earplug, and it remains the only dual ended earplug ever sold. (Ohlin 4/24/13 Depo at 233:19-24.) The two sides of the plug were designed for two different purposes. The CAEv2's yellow or open end was designed to intend "non-linear" protection against impulse noise. The  yellow end of the plug housed a filter that was intended to allow low-level noise pass through without attenuation, while increasing the attenuation as the level of the noise increased. (3M_MDL000188689; 3M_MDL000345123 at A-9.) In other words, this end was supposed to allow users to hear low-level noises like voices or footsteps, while still protecting from impulse noise (*e.g.*, gunfire) in order to allow for communication and "situational awareness." (3M_MDL000188689; 3M_MDL000345123 at A-9.) The green or "closed end," on the other hand, provided "linear" protection. The closed end functioned like a conventional passive earplug intended to protect against steady-state or constant noise like vehicles or machinery. (3M_MDL000188689; 3M_MDL000345123 at A-9.)

During the development of the CAEv2, issues were raised concerning the size of the stem. Armand Dancer, a French scientist at ISL informed Mr. Berger that he was concerned about the size of the filter and stem housed in the CAEv2 prototypes. He informed Berger that he thought the diameter of the stem was "too big" and asked if the diameter could be decreased. (3M_MDL000013024.) In a 2015 email, Ted Madison, a 3M audiologist, acknowledged that that the "structure of the stem" of the CAEv2 could cause the CAEv2 to "behave differently in the earcanal" and lead to lower attenuation. (3M_MDL000008430.) Despite these concerns about the relatively wide and stiff stem of the CAEv2, and despite the variability in the morphology of the human ear canal described in this report, 3M also chose to develop and market the CAEv2 as a "one size fits all" or "one size fits most" product. (3M_MDL000020020; 3M_MDL000011968.)

As early as 1997, the U.S. government considered a single ended but dual purpose (steady state and impulse noise protection) design as an option for a military earplug. (3M_MDL000425673.) In fact, all subsequent versions of the CAE, 3M abandoned the dual sided design. Instead, in 2005, 3M next developed the CAEv3, a single sided earplug with a "pistol grip" rotating switch that allowed soldiers to switch between linear and nonlinear hearing protection. (3M_MDL000348518; 3M_MDL000738814.) This design change meant that users no longer had to remove the plug in order to switch between two different modes of protection, and also allowed users to test the fit of the plug in the closed mode before changing it to open mode. The CAEv3 also abandoned the "one size fits most" approach touted by the CAEv2 in 3M's marketing to the military. (3M_MDL000348518.) Notably, the CAEv3 also had a thinner diameter than the CAEv2. (Elliott Berger 9/25/20 Depo at 23:9–15.) The CAEv3 is pictured below:



(3M_MDL000348518.)                    (Fallon00283.)

Beginning in 2007, 3M further developed the CAE with the CAEv4. The CAEv4 was similar to the CAEv3, but featured a lower profile bottle cap switch, rather than the rotating pistol grip. (3M_MDL000259866.) Like the CAEv3, the CAEv4 came in multiple sizes and had a single sided design as seen below:



(3M_MDL000351438.)

In 2012, 3M further continued the CAE product line with the development of the CAEv4.1. (3M Combat Arms 4.1 Ear Plugs - Overview.) The CAEv4, pictured below, had a further modified rocker switch and also featured a concha clip to hold the plug securely within the ear canal. (3M_MDL000313359.)



(3M_MDL000352049.)

### B.     The Testing and Labeling of the CAEv2

The EPA has required manufacturers of hearing protection devices ("HPDs") to provide consumers with information about the noise protection characteristics of new products. (42 U.S.C. § 4907(b); 44 Fed. Reg. 56120 (Sept. 28, 1979) (codified at 40 C.F.R. §§ 211, *et seq.*) The EPA's regulations require manufacturers to affix a label to a hearing product that includes an NRR, among other content, form, and placement requirements. (40 C.F.R. §§ 211.104(a), 211.105, 211.106, 211.107, 211.204, 211.204-1(b), 211.204-2, 211.204–3, 211.204–4.) The NRR is derived from REAT testing and measures the product's effectiveness in reducing noise. The higher the number, the greater the noise protection. NRR labels allow consumers to compare NRRs among competing products and select the appropriate HPD for the appropriate activity. (Rawool V.W., *Hearing*

36

Conservation, 2012.) In fact, 3M's own employees have acknowledged the importance of NRRs in the labeling of HPDs.

Per the EPA's regulations, HPDs "[m]ust be labeled at the point of ultimate purchase or distribution to the prospective user" and "meet or exceed the [NRR] values determined by the procedure in § 211.206 and explained in § 211.211(b)." (40 C.F.R. § 211.210-1(a).) Manufacturers like 3M "must satisfy the regulations . . . before distributing [the product] in commerce." (40 C.F.R. § 211.210-2.) REAT testing is thus required for HPDs before they are sold. (Id.; 40 C.F.R. §§ 211.206-1, 211.206-2, 211.207.)

3M violated the EPA's regulations with regard to the CAEv2, including but not limited to 40 C.F.R. § 211.210-2, by failing to perform any testing on the CAEv2 prior to its initial sale to the military. Because documents clearly demonstrate that 3M sold the CAEv2 to the military before testing it, the labels did not and could not have contained the required NRR.

In November 1999, Elliott Berger wrote in an internal 3M email that it "occurred" to him that it had "no [testing] data on the actual version" of the earplug being sold in the United States. By that time, the CAEv2 had been distributed to soldiers for four months. (3M_MDL000257805.) Two months later, 3M began REAT tests on the CAEv2. (3M_MDL000313390.)

When 3M did begin testing the plug, the results were poor for the CAEv2. In fact, subsequent testing revealed an alarming degree of variability in the plug's performance, even under laboratory conditions. From December 1999 to January 2000, 3M tested both ends of the earplug using "Method A" REAT testing under ANSI S3.19. This Method A REAT testing was performed by having a trained experimenter (Ronald Kieper) insert the plug into a test subject's ear, rather than having a test subject insert the plug into their own ear, rendering this testing particularly far afield from real world performance of the plug. Testing of the yellow end of the CAEv2 (Test 213016) resulted in a -2 NRR. (3M_MDL000188143.) For reasons that are unclear from a safety perspective, 3M took the liberty of rounding the -2 up to a 0 when labeling and advertising the plug. (3M_MDL000425527.) When they tested the green end of the CAEv2 (Test 213015), they stopped testing after only eight of ten subjects were tested, when the estimated NRR was calculated at 11. (3M_MDL000313390; 3M_MDL000728812.) This test demonstrated that the CAEv2 provided a small percentage of the protection that a soldier might have been afforded with another preformed earplug, like the Ultrafit. The practice of stopping tests of hearing protectors was part of an ongoing pattern at 3M, wherein 3M's scientists would regularly stop tests prior to all ten subjects being tested as required by ANSI 12.6-1974 in order to calculate an interim NRR before completing the test. (3M_MDL000208204, 3M_MDL000629986, 3M_MDL000480086.) Ronald Kieper would send emails asking whether he should "proceed with subject #10" based on the estimated NRR value of a given product. (3M_MDL000336479.)

3M's own scientists, who at the time were directly supervised by the marketing department, (3M_MDL000015373; 3M_MDL000014897.) corresponded about the results of testing the CAEv2. Elliott Berger, the Director of 3M's acoustics lab, and Ronald Kieper memorialized the findings revealed when testing the green end of the CAEv2 (Test 213015) and the subsequent retest of the green end in a report titled "How Folding the Flanges Back Affects REAT Results of

the UltraFit Earplug End of the Combat Arms Plug" ("the Flange Report"). (3M_MDL000728811–3M_MDL000728816.) In May 2000, Elliott Berger sent a draft of the Flange Report to his boss, Brian Myers, 3M's Vice President of Marketing for Hearing Conservation Products, and asked, "Should I share this with Ohlin? It looks like the existing product has problems unless instructions are revised." (3M_MDL000258590.) The Flange Report discussed three different design defects that prevented the earplug from providing consistent hearing protection during the study:

1.      3M found the length of the Ultrafit end was "too short for proper insertion," making it "difficult . . . to insert the plug deeply," especially for individuals with "medium and larger" ear canals. (3M_MDL000728812.)

2.      "The geometry of the ear canal opening sometimes prevented the deep plug insertion," inhibiting proper fit. (3M_MDL000728812.)

3.      The earplug "imperceptibly" loosens due to the basal edge of the third flange of the outward facing plug pressing against the ear, folding up, and then returning to its original shape once the inward pressure on the plug is released. (3M_MDL000728812.)

3M's scientists also documented in the Flange Report that the defects identified in the testing demonstrated that the CAEv2 provided both "variable" and "low" amounts of protection, regardless of which end was used. (3M_MDL000728812.) Deposition testimony from key members of the 3M lab describe trying to get higher test results, including Berger's admission that the NRR obtained in Test 213015 was far below the "anticipated values of protection" for the CAEv2. (30(b)(6) 11/13/19 Depo at 276:3–277:4.) Richard Knauer, 3M's Senior Technical Director for Passive Hearing Protection, stated that the military expected an NRR for the CAEv2 "up closer to where the UltraFit was," in the range of 20. (Knauer 12/17/19 Depo at 117:10-17; Berger 12/10/19 Depo at 559:5–13.) Several other witnesses conceded that an 11 NRR was unacceptable. (Myers 12/12/19 Depo at 275:5–276:1; Fallon 09/03/20 Depo at 197:24–199:13.) Jeffrey Hamer, 3M's Global Laboratory Manager for Hearing Protection, testified that the NRR of 11 for the closed end would be "insufficient." (Hamer 10/17/15 Depo at 174:11–15.)

Faced with a preliminary "insufficient" NRR of 11, 3M set out to retest the closed end of the plug in hopes of raising the NRR enough to sell the CAEv2. (3M_MDL000005365; Kieper 12/19/19 Depo at 162:17–166:16.) 3M did this despite outwardly representing that 3M does not support retesting the  same product multiple times, "because this is prohibited by the EPA." (3M_MDL000332847) Jeffrey Hamer also initially testified that 3M's policy was to never stop a labeling test if the numbers are too variable or too low. (Jeff Hamer 10/7/15 Depo at 104:25–105:23.) Despite statements to the contrary, documents reveal that stopping labeling tests when NRR values were too low was part of a regular process across multiple product lines at 3M. (3M_MDL000208204; 3M_MDL000336479; 3M_MDL000649705.) Documents also reveal that 3M marketers applied intense pressure on the scientists in the lab to report higher NRR values.

(3M_MDL000019705.) In an email directed at the main marketer for the CAEv2, Dr. Ohlin stated, "[t]he old guard at 3M has always believed that the classic foam and the one size Ultrafit were the ultimate in earplug protection. The lab would use every legal trick in the book to get the highest NRRs possible." The practice of manipulating NRRs at 3M apparently dates back as far as 1993, when they received a significant fine from the EPA for misreporting the NRR of other hearing protective devices. (3M_MDL000024833; 3M_MDL000024833 (4/7/99), "The Department of Justice and U.S. Environmental Protection Agency (EPA) announced today that Cabot Safety Corp of Southbridge, Massachusetts . . . will pay a $900,000 civil penalty to settle allegations they inaccurately labeled hearing protection devices [in violation of] the Noise Control Act of 1972.") In relation to the CAE, Dr. Ohlin specifically testified that Berger was "pressured" to report a high NRR. (Ohlin 4/24/13 Depo at 179:9–24.)

Kieper retested the green end of the plug (Test 213017) and did not follow the standard instructions for inserting a preformed earplug. Instead, he inserted the plug into subjects' ears by rolling back the flanges of the opposite facing end of the plug. (3M_MDL000005366; 3M_MDL000728812.) Kieper's retest with this altered plug configuration doubled the NRR to 22. (3M_MDL000005365.) Kieper claimed that the manipulation of the opposing flange allowed him to create a "long, stiff quasi-stem for the experimenter to grasp" (3M_MDL000728812) and thus get "a deeper and more consistent fit." (3M_MDL000728812.) Berger and Kieper also noted that when the product was altered in this way, the outer flange would not contact the "subjects' conchae" and thus would not "compromise" the fit. In deposition testimony, 3M laboratory staff admitted that the manner in which the green end of the plug was tested was "improper" because the plug's two ends should not have been tested in two different ways and the flanges were never designed to be folded. (Hamer 10/17/15 Depo at 165:20–166:1, Jeff Hamer 10/7/15 Depo at 163:19–164:08.)

The low and variable NRR result for the CAEv2  in 3M's laboratory is particularly concerning in light of the well known phenomenon of degraded real world performance of HPDs. Two decades before the Flange Report was written, Mr. Berger opined that laboratory tests (which include the REAT testing described in the Flange Report), "overestimate the [real world] performance of HPDs, due to the unrealistic, optimized manner in which experimental subjects can wear these devices for short duration tests." (Berger, EARLOG5, 1980.) One way of addressing the inaccuracies in laboratory data is to use subject fit (or "Method B") testing, which evaluates both the instructions and the product itself, and better imitates real world use. In fact, 3M acknowledged that ANSI S3.19 1974 is "problematic." (3M_MDL000314375.) In 1999, the year before the Flange Report was written, Mr. Berger published an article called "So, How Do You Want Your NRRs - Realistic Or Sunny Side Up?" in which he noted that subject fit testing provided more accurate information about real world performance of HPDs, and stated that "The U.S. Military now requires testing to the new Method B." Despite this, there is no evidence that

3M ever provided Method B testing data on the CAEv2 to the United States Military. (3M_MDL000439465.)

3M did eventually perform Method B testing on the CAEv2 (actually testing on the closed end of the identical ARC plug). It revealed an NRR of just 4.4, showing that the plug functionally offered no protection. (3M_MDL000313220.) The data from the test shows several subjects with extremely variable results, indicative of a poor fitting earplug. When he was deposed, the current head of the Army Hearing Program acknowledged that he had not seen the results of the Method B testing of the CAEv2, and agreed that the 4.4 NRR was "concerning." (Merkley 2.26.20 Depo at 411:12–17.)

A review of the data from several additional REAT tests on the CAEv2 confirm the findings detailed in the Flange Report. Subsequent experimenter-fit testing of the CAEv2 also continued to show low NRRs and alarmingly variable results on both ends of the plug. A subsequent test on the open end of the CAEv2 (Test 215009) once again resulted in a negative NRR and showed huge variability in attenuation levels among the ten subjects. (3M_MDL000535879; 3M_MDL000481953; 3M_MDL000528844) There have been three additional REAT tests on the closed end, leading the experimenter fitter to document that the data was "significantly different" between the subjects or within subjects' own tests. (3M_MDL000481953.) For example, in 2005, 3M conducted test number 215508 on the closed end of the plug using a professional fitter. (3M_MDL000018620.) Although there were only five test subjects, this test resulted in an NRR of 14.8, which like the 213015 test, was far below the 22 appearing on the packaging. (3M_MDL000018620.) In 2007, 3M conducted another experimenter fit test on three test subjects, again with poor results. This time, the test yielded a 14.2 NRR. (3M_MDL000195585.) Despite these test results, the NRR for the closed end of the CAEv2's label remained at 22. In fact, it appears that only once was anyone able to achieve an NRR value of over 20 outside 3M's laboratory. (3M_MDL000005607.) This set of testing, performed by Michael and Associates, resulted in a 23 NRR on the closed end of the plug. However, this testing was done using experimenter fit, not subject fit. (3M_MDL000005607.) Like 3M's testing, it is not indicative of the plug's real world performance.

3M never disclosed the Flange Report or its findings to the military or consumers during the 15 years the product was on the market. 3M also never disclosed the results of its subject fit test of the CAEv2 that resulted in an NRR of 4.4, which represents virtually no protection at all. Fortunately, however, the Flange Report was uncovered in litigation brought against 3M by a competitor in October of 2015. (Hamer 10/07/15 Depo at 149:18–157:8.) Specifically, a 3M employee was confronted with the report at a deposition. (Hamer 10/07/15 Depo at 149:18–157:8.) The employee confirmed that he had never seen the report, and the very next day 3M immediately discontinued sales of the CAEv2. (3M_MDL000332111.) Internal emails confirm that the reason for the immediate discontinuation was that 3M could not sell the CAEv2 with the "current NRR

on the package." (3M_MDL000332061–3M_MDL000332063; Myers 12/12/19 Depo at 352:16–353:16.) Shortly after the CAEv2 was abruptly discontinued by 3M, the U.S. Department of Justice began its investigation of 3M for allegations, including that it manipulated the testing of the CAEv2 to get a higher NRR. The U.S. The Department of Justice investigation report concluded that if 3M had known about the findings in the Flange Report, the military may not have purchased the CAEv2. (CID File0002.) 3M ultimately settled with the United States Department of Justice for $9,100,000.

IV.    **OPINIONS**

A.    **The CAEv2 is Defective, Unreasonably Dangerous And Can Cause NIHL and Tinnitus**

Based on my education, training, and experience and my review of the documents, data and depositions in this case, and for the reasons stated above and below, it is my opinion to a reasonable degree of medical and scientific certainty that the CAEv2 as designed is defective and unreasonably dangerous.  It is also my opinion that the CAEv2' design defects and 3M's negligence, misrepresentations, and failure to warn of the CAEv2's inadequate hearing protection, caused or was a substantial factor in causing service members and consumers' NIHL and tinnitus.

As a preliminary matter, it is my opinion that one of the most--if not the most--important design characteristics of an earplug is its ability to fit users. Earplugs that do not form or maintain a good fit or seal will provide little to no protection from hazardous noises. This characteristic is particularly dangerous because people may expose themselves to hazardous noise while wearing poorly fitted earplugs, believing they are protected from hazardous noise. Therefore, in order to be safe for human use, an earplug must be designed to allow for a proper fit and seal.

As discussed above, the CAEv2 was the first earplug of its kind. There had never been a dual-ended earplug before the CAEv2 was designed and developed in the late 1990s. Although the purpose of the dual ended design may have been a good one --namely to provide linear and non-linear protection through one plug,  the CAEv2's design was doomed to fail from the very start.

3M's first REAT test of the CAEv2 revealed the CAEv2's design was a failure. The CAEv2's protection was abysmal, so much so that 3M scientists terminated the test. In fact, the results were so bad that 3M's lab director and the CAEv2's inventor, Elliott Berger, declared that the CAEv2's test data were more "variable" than he had *ever* seen "for a solid plug that requires a good acoustical seal in the ear" (Berger 10/8/2015 Depo at 106:9–14.)

After the test, 3M queried: Why were the results so bad? Berger and 3M's expert fitter (Ronald Kieper) answered the question and memorialized their findings in the Flange Report. They documented the CAEv2's design problems which prevented proper fit and seal.  Specifically,

Berger and Kieper identified three design "problems" with the CAEv2: (1) The CAEv2 as designed was too short for proper insertion; (2) the CAEv2 as designed was stiff and did not conform to the geometry of some ears; and (3) the CAEv2 is designed as a dual ended earplug and with the necessary deep insertion to get a good seal, the opposing flanges come in contact with the ear and loosen the earplug in a manner that is not noticeable to the user. (3M_MDL000728811–16.)

All three design defects identified contribute to the CAEv2's inability to consistently fit and maintain a seal. The short stem prevents users from obtaining deep insertion necessary for proper seal, especially in medium and larger ears. The CAEv2's stiff stem prevents conformance to the geometry of some ear canals. And the dual-end design of the plug causes its opposing flanges to press against the ear and then loosen when the flange returns to its original shape.

My review of the data from the initial testing of both ends of the CAE2 (Tests 213015 and 213016) shows that Kieper—who has conducted over 2,200 full tests and been hailed for achieving 3M's "high" NRRs—could not consistently fit and seal the CAEv2 to the ears of most test-subjects. (3M_MDL000259134; Kieper 12/19/19 Depo at 92:15–93:14; 3M_MDL000019514; 3M_MDL000019339) I have also reviewed Dr. John Franks' analysis of the data from these tests, which is consistent with my conclusions. (Franks' Report at 92-154.)

Tests 213015 and 213016 were REAT tests performed in a quiet room. The subjects were told to sit completely still while Kieper tried to achieve a "best fit" of the CAEv2. (Kieper 10/9/2015 Depo at 66:6-69:13) Data from both tests reveal multiple individuals with "big" differences between attenuation levels received at multiple frequencies. (3M_MDL000019514; 3M_MDL000019339) In total, six of ten subjects tested had large variations of attenuation levels at different frequencies in one or more trials, indicative of a poor fit. (3M_MDL000019514; 3M_MDL000019339) Franks Report at paras 131–154.) Mr. Kieper was asked about this intra-subject variability, and he agreed that certain subjects had worse fits and "big" variations in the CAEv2's attenuation on both ends. (Kieper 10/9/2015 Depo at 107:3–108:21,109:20–110:7)

This test data is concerning for CAEv2 users because it is well known that users who fit themselves at work or while engaged in real-world activities are not able to consistently achieve as deep an insertion of the plug as professional fitters can under lab conditions. This is extraordinarily concerning for service members who often engage in vigorous activity near hazardous noise.

I also reviewed 3M's subsequent test data of the CAEv2. Limited testing data is available, but overall this data supports the conclusion that the CAEv2 is defective and does not fit well or provide an adequate seal on either end. Although REAT testing is not designed to determine an NRR for a non-linear HPD, it is useful to determine whether the earplug fits well. This is particularly true for the CAEv2, where both ends of the plug have identical flanges. Again, large variations in attenuation levels at various frequencies tend to show the HPD does not have proper fit and seal. As stated above, the data from the original REAT test for the CAEv2's open end (Test

42

213016) showed huge variability in the attenuation data. 3M performed another ten-person REAT test on the open end (test 215009) in June 2004. Once again, the data showed that three test-subjects had very high variability in their attenuation levels in at least one trial. (3M00089665; 3M_MDL000019281.)

Three additional tests on the CAEv2's closed end (Tests 215508, 215512, 215516) included a total of 13 subjects. (3M_MDL000481953.) All three tests reported NRRs substantially lower than the 22 NRR on the CAEv2's label (15,16, and 17 respectively). Mr. Kieper reported that subject-test data were "significantly different, either from trial 1 to trial 2 or from the other persons in the test." (3M_MDL000481953) Rather than Mr. Kieper and others at 3M realizing that the continued variable results over multiple tests proved that the CAEv2 was not properly fitting large numbers of subjects, even in their own lab with their own expert fitter, 3M dismissed the results and "removed" the data, calling it "aberrant." The fact that 3M used "Test Panels" to try to inflate its NRRs on products, but continued to see poor results for the CAEv2 should have caused further concern about the low NRRs. (Berger 10/08/2015 Depo at 81:19–82:10; 152:21-153:2; Kieper 10/09/ 2015 Depo at 46:12–55:9)  Just as 3M buried Test 213015 and the Flange Report, 3M never shared the results of any of these additional REAT tests with the military or consumers.

The most damning test as far as further proof of the CAEv2's defects, however, is 3M's Test 213030 – the "subject fit" test of the closed end that was closer to a "real world" test of the CAEv2 in the sense that it involved test subjects inserting the CAEv2 in their own ears, without any assistance from Mr. Kieper, the professional earplug fitter. (3M_MDL000313220.) Subject fit testing was developed to approximate the "real world attenuation" of an HPD. (ANSI S12.6-1997 Section 0.5.) Therefore, this test, more than all other testing performed on the CAEv2, is the most valid estimate of the protection service members and other users of the CAEv2 received in the real world.  In addition, this test included 20 subjects, so it was by far the largest test 3M performed on the CAEv2 in terms of the number of subjects. In my opinion, this test should have been done much sooner than six years after the CAEv2 was first sold. In fact, because of the novel nature of the dual ended CAEv2, it should have been subject fit tested before the product was ever sold to the military and consumers.

 In my opinion, Test 213030 was another red flag that something was terribly wrong with the CAEv2.  Its NRR(sf) was 4.4, which provides very little protection against hazardous noise. In fact, because of the logarithmic nature of the decibel scale, it is even less than ten percent of the noise protection provided by a 22 NRR. Therefore, although 3M labeled and advertised the CAEv2 with an NRR of 22, its own test in its own lab found that the CAEv2 had an NRR of 4.4(sf), at least 90 percent less protection. At least seven of the 20 test subjects had a poor fit of the device in both trials. Several other subjects had variable attenuation levels indicating poor fit. The bottom line is that this result was confirmation to 3M that the CAEv2 was defective and needed to be discontinued. Test 213030 should also have been immediately disclosed to the military. Instead,

43

this test, like Test 213015 and the Flange Report, never saw the light of day outside of 3M's laboratory.

I also considered the other tests of the CAEv2, mostly tests by the military (the Army test, the Air Force Research Lab test)  and the Michael & Associates test), when forming my opinions. The Air Force study resulted in a closed end NRR of 15, well below 3M's advertised 22 NRR. (Hobbs, Hudson, McKinley, Brungart, 2009. Wideband Hearing, Intelligibility, and Sound Protection (WHISPr): Tactical Headset Evaluation. Air Force Research Laboratory) The Amy study did not calculate an NRR, but the data reflects a large number of subjects with big variations in their attenuation levels.  (3M_MDL000005607.) The Michael & Associates study reported an NRR of 23 on the closed end --the only study of the CAEv2 with an NRR even close to the 3M NRR.  (3M_MDL000005607.)

Nearly all REAT tests resulted in NRRs much lower than a 22 NRR and reflect highly variable findings indicative of a poor-fitting device. Indeed, Test 213030 confirms the CAEv2 does not protect service members and consumers from real-world hazardous noise.

I also find the comparison of the data from Tests 213014 and 213015 and Dr. Franks' analysis of that data to be further evidence revealing the CAEv's defective design. These tests were both experimenter fit tests. This comparison is relevant and telling because the product tested in Test 213014 (UltraFit Plus - single ended) was virtually identical to the CAEv2's closed end, with the exception of the stem connecting the ends of the CAEv2 being more rigid than the stem in the UltraFit Plus. The tips are both triple flange UltraFit-type tips and are virtually identical. This is a comparison analysis of two HPDs that are virtually the same other than the stems.  An analysis of this data is also very interesting and telling because five of the subjects participated in both tests. (3M_MDL000534450; 3M_MDL000019514)

In analyzing the testing data of the five subjects who were involved in both tests, four of the subjects (KJC, GWG, BAK, JMW) received much less attenuation when tested wearing the CAEv2 as opposed to the UltraFit Plus. (3M_MDL000534450.) Although the opposing flanges of the CAEv2 causing imperceptible loosening could be a contributing defect that led to these poor results for the CAEv2, these results also suggest that a wider, stiffer stem might also contribute. As mentioned previously, Armand Dancer from ISL told 3M well before the CAEv2 was ever launched that he thought the stem proposed for the CAEv2 was too wide and would cause "fitting" problems. (3M_MDL000013024) 3M ignored Mr. Dancer and, in fact, made the stem even larger.

It is my opinion that the comparison of these two studies with virtually identical earplugs other than the stems is important for two reasons.  First, the fact that four out of the five people who were tested wearing both products had such poor attenuation with the CAEv2 when compared to the UltraFit Plus is further evidence that the CAEv2 was defective as designed and incapable of providing adequate protection to users. Second, this data suggests that Mr. Dancer may have been correct that a larger stem might make the CAEv2 harder to fit and the fact that it is less flexible

44

might make it more difficult to conform to the geometry of some ears—just as was mentioned in the Flange Report.

In sum, based on my education, experience, training, and my review of the literature, documents, data, and depositions in this case, it is my opinion that there is overwhelming evidence that the CAEv2 has a series of design defects discussed above that make the device unable to consistently be fit or maintain a seal. The dual end design as well as the wide, fat stem, are among the defects that cause the CAEv2 to be unable to provide adequate noise protection for users. Because a proper fit and seal are the most important characteristics for earplugs as far as safety, the fact that the CAEv2 cannot be consistently fit with a good seal, makes the device unreasonably dangerous. CAEv2 subjects in laboratory tests consistently get abysmal protection, and it is well known and accepted that the protection afforded by an HPD will be even worse in the real world.

Finally, it is my opinion that the defective and unreasonably dangerous CAEv2 caused or was a substantial factor in causing service members and consumers to suffer NIHL and tinnitus Continuous noise exposure of 85dB or more, and impulse noise exposure of 140 dB or more can cause damage to the ear that may result in hearing loss. It is my opinion that when the CAEv2 was worn as intended and promoted by 3M, in or around hazardous sound when service members needed protection, the CAEv2 did not adequately protect users as required and represented. Because the CAEv2 failed to protect users when alternative, available plugs would have, the CAEv2 must be considered when performing a differential etiology of user's NIHL and tinnitus.

## B.      The CAEv2's Risks Outweigh Its Benefits

Based on my education, training, experience, as well as the relevant literature, documents, and testimony, it is my opinion to a reasonable degree of medical and scientific certainty that the CAEv2's risks far outweighed any of its benefits. 3M hoped the CAEv2 would benefit the military and consumers by providing situational awareness and protection from continuous noise all in one earplug. The truth was, however, that the CAEv2 was only mildly effective as far as allowing situational awareness. (3M_MDL000259866) The benefit that the CAEv2 offered in that regard was minimal, at best. On the other hand, as discussed throughout this report, the risk of suffering severe hearing damage while wearing the CAEv2 in a military environment or other environment with hazardous noise was much too great. The fact that these earplugs were so difficult to fit on a consistent basis and that they could imperceptibly loosen at any time, as discussed above, made the attendant risks far greater than any minimal benefit the CAEv2 offered.

## C.      3M Had A Duty To Test The CAEv2 Before Selling It, But It Failed To Do So

HPD manufacturers must REAT test their devices in order to provide purchasers with an NRR *before* the HPD is sold. (40 C.F.R. § 211.210-2; 40 C.F.R.§§ 211.206-1, 211.206-2, 211.207.) This is not only an EPA requirement, but the duty of a reasonable manufacturer of HPDs.

Physicians like me rely on manufacturers of HPDs to test their devices for safety and to provide information about the level of protection the device provides so that we can make appropriate HPD recommendations for our patients. In my clinical practice, I would never suggest or recommend that a patient use an untested HPD, especially around highly hazardous noise like those that are commonplace in the military. HPDs are not all the same; some work better than others. But the only way for an HPD manufacturer to know for sure if its device is safe and effective is to test the product. That has been the standard of care for over forty years

3M had no idea whether the CAEv2 was safe and effective when it started selling it because it had never tested it. It did not "occur" to 3M that it did not have any data on the earplug until four months after it started selling the earplugs to the military. (3M_MDL000257805.) Therefore, men and women in the military were wearing the CAEv2 for several months before 3M even bothered to test the plugs to see if they worked.

3M's failure to test its CAEv2 before selling it was unreasonable and a breach of 3M's duty of care, especially because the CAEv2 was a unique dual-ended design that had never been used before. Gary Warren, 3M's President of Global Safety Products, agreed and testified that a safety device manufacturer should test its products to understand the risks before selling and that it would be wrong if 3M sold a product without knowing how it performed. (Warren 1/23/2020 Depo at 98:4–99:1.)

If 3M would have acted reasonably and according to the standard in the industry, it would have  tested the CAEv2 before selling it to the military, and it would have discovered its defective design before service members were put in harm's way.  Unfortunately, 3M chose not to and, as a result service members and other users were left without adequate hearing protection that would protect them from hazardous noise and severe hearing damage.

> **D.      Once 3M Tested The CAEv2 And Learned Of Its Defects, It Had A Duty To Stop Selling The Product And To Tell The Military**

Once 3M tested the CAEv2 in January of 2000, it discovered the defects documented in the Flange Report. Despite meticulously documenting the defects, 3M did not take any further action to ensure that service members or other users were not in harm's way.

As a physician for over 30 years who evaluates and recommends hearing protection for my patients, I have always had to rely on HPD manufacturers to timely and adequately test their devices, to withdraw or discontinue their products that they find to be unreasonably dangerous, and to warn about the risks that are inherent in their devices. The military and ordinary consumers have to rely on manufacturers just the same. That is why it is so critical for manufacturers to timely test their products and to inform users of all risks.

In this case, 3M had knowledge of the CAEv2's defects in the late 1990s, yet it decided to proceed full steam ahead with sales of the earplugs. As discussed above, it was not until the Flange Report was uncovered in 3M's litigation with a competitor that the company pulled the product.

A reasonable HPD manufacturer would have, and should have, ceased sales of the CAEv2 immediately upon learning of the "problems" during testing. 3M should have discontinued sales just like it did in 2015, the day after the Flange Report was uncovered, and 3M also should have told the military and users about the discovered defects and risks associated with the CAEv2. By failing to do so, it is my opinion that 3M breached its duty of care and allowed countless service members and consumers to suffer severe hearing injuries, including NIHL and tinnitus.

### E.      3M Failed To Adequately Warn Of The CAEv2's Risks

HPD Manufacturers are required to inform users of a device's NRR and also provide "instructions as to the proper insertion of the device." In addition, manufacturers of HPDs have the duty and obligation to warn users of the significant risks associated with using the device about which the manufacturer knows. 3M's former President of North America Safety Products, Gary Warren, agreed that 3M was obligated to warn of known risks:

> Q: Because it's important for folks using a device, any device, but particularly a device designed to enhance their safety, to know of risks so they can properly protect themselves, correct?
> A: Yes.
> ***
> THE WITNESS:  Again, if there were risks that
> were known, then, yes, I think we have an obligation to do that.

(Warren 1/23/20 Depo at 97:16–98:2), 129:11–131:6 ("It was our responsibility to educate those gatekeepers, you know, in terms of how to properly use the plug and so forth.")  As stated above, because doctors, audiologists, risk managers, directors of hearing conservation programs, and consumers are all involved in trying to protect their own or the hearing of others, they have to rely on manufacturers like 3M to be forthright and to provide accurate and complete safety information about their products. As a physician in private practice, in my earlier roles as Chief of Otology and Neurotology in the United States Air Force, and in my work with the Air Force Hearing Conservation program, I have regularly reviewed and evaluated manufacturers' safety information related to HPDs in order to educate and recommend appropriate hearing protection for my patients. Physicians like me, audiologists, directors of hearing conservation programs, etc. cannot do our jobs and protect the hearing of others without adequate safety information and warnings from the manufacturers. There are multiple options of hearing protectors in the marketplace and not all are alike. For users and those recommending HPDs to be able to make an

informed decision about which HPD will protect the user's hearing best, and to adequately weigh the risks and benefits of the device, manufacturers must not withhold critical safety information.

With respect to the CAEv2, it is my opinion based on my education, training, and experience and my review of the documents, data and depositions in this case, that 3M did not provide adequate safety information and warnings related to the device. 3M not only misrepresented the NRR and failed to warn of the accurate NRR, but it failed to warn about the risks and dangers that users faced when using the device. 3M had ample opportunity to provide this information over the 15-year life cycle of the CAEv2, but it failed to do so time and again.

### 1. 3M Failed To Warn The Military And Consumers That It Was Selling The CAEv2 Without The Required Testing

In 1999, before 3M made its first ever sale of the CAEv2, 3M had a duty to make sure all purchasers were informed that it had not tested the CAEv2. My opinion in this regard involves a relatively short time period, but it is very important. The military was purchasing hearing protection at a critical time period for its troops, and it had the right to know that these early purchases were of a product that had not yet undergone the required testing. Providing this information was critical because 3M was asking the military to purchase a product that was novel- the first ever dual ended earplug. Had the military known the CAEv2 was not tested, this product might never have seen the light of day. Indeed, when the testing was conducted, it showed major defects in the design. 3M breached its duty to warn in this regard and decided to launch the product without the necessary testing and warning. It is my opinion to a reasonable degree of medical and scientific certainty that service members and consumers suffered hearing damage as a result of the defective CAEv2, as well as 3M's failure to adequately warn.

### 2. Once It Tested The CAEv2, 3M Failed To Warn About The Dangers And Defects Discovered

It was not until several months after 3M started selling the CAEv2 to the military that it first learned of the extensive "problems" with the earplugs. Although a reasonable manufacturer who is concerned about safety should know about these "problems" (defects) before selling the device, 3M should have either stopped selling the device or made sure that it warned purchasers of the risks from these problems.

Based on my education, training, experience, including my experience evaluating and recommending HPDs, it is my opinion to a reasonable degree of medical certainty that once 3M learned about the CAEv2's design defects and the dangers posed by those defects, 3M should have

warned the military and users as follows: (1) that the CAEv2 is too short for proper insertion which might make proper fit and seal of the device difficult or impossible; (2) that testing of the device showed that it is difficult to fit and to maintain a proper seal of the CAEv2, which could lead to little or no hearing protection; (3) that the geometry of the ear canal opening in some individuals prevents the deep insertion necessary for a proper fit and seal of the CAEv2; (4) that the dual ended design of the CAEv2 can lead to loosening of the earplug if the non-inserted earplug compresses against the ear of the user. This loosening may not be noticed by the user; (5) that the NRR of 22 was the result of testing the device with the flanges on the non-inserted plug folded back during insertion. This method of insertion was not the intended method when the CAEv2 was designed; (6) when the CAEv2 was tested according to the manufacturer's instruction for insertion (without the flanges on the non-inserted earplug folded back), the NRR was 11; (7) that multiple tests of the CAEv2 has shown variable and inconsistent levels of attenuation and difficulty obtaining good fit and seal.

These warnings, as well as the additional warnings mentioned above and below should have been provided by 3M to the military and to users. These warnings needed to be included on a label or a package insert or in some other manner that all purchasers and users would have access to. It should be noted, however, that 3M not only failed to provide the above necessary warnings; it failed to provide the military *any* label or warnings or instructions at all until 2005 or 2006, and only to purchasers of blister packs thereafter. This was not only a violation of the EPA regulations, but a violation of 3M's duty to use care to adequately warn users when selling an HPD.

With respect to 3M's choice to label the closed end of the CAEv2 with an NRR of 22, it is also my opinion that doing so was more likely than not misleading, a violation of the EPA regulations, and a breach of 3M's duty to accurately label the CAEv2 with the level of protection it would provide. As stated previously, and I cannot emphasize enough, the NRR is the single most important factor physicians and hearing conservation workers and purchasers rely on when determining whether to use a HPD. Therefore, it is absolutely critical for this data point to be accurate. It was unreasonable and misleading for 3M to label the CAEv2 with the 22 NRR because it was achieved in a test with the flanges folded back and 3M never instructed users that it was mandatory to fold back the flanges while inserting the earplugs. Further, 3M knew users in the real world were not, in fact, rolling back the flanges when inserting the CAEv2 and, therefore, the proper and accurate NRR for the product was the NRR of 11 achieved in the initial testing of the product.

Some 3M witnesses have implied that the Wallet Card or the Fitting Tip somehow provided users with sufficient warnings or adequate safety information or instructions for the safe use of the CAEv2 (*E.g.* Myers 30(b)(6) 10/18/19 Depo at 225:4-10). I have reviewed both and strongly disagree with those assertions. As an initial matter, it is hard to know from the documents and testimony I have reviewed who (as far as military users) actually received either the wallet card or

the fitting tip. I have not seen evidence that either of these was widely distributed or seen. But, as a practical matter, it is not important because both the Wallet card and the Fitting Tip are grossly inadequate as far as warning about the CAEv2's defects or providing safety information on instructions for the safe use of the product.

In sum, based on my education, training, and experience, it is my opinion that 3M's sales of the CAEv2, an already dangerous product, without adequate warnings as described in this report above and below, made the CAEv2 even more dangerous and were a substantial contributing cause to NIHL and tinnitus.  These warnings needed to be provided and be accurate so that the military and other purchasers, as well as physicians, audiologists and others whose job it is to evaluate and recommend HPDs would be able to understand the risks of using the CAEv2 and be able to make an informed decision about its use.

F.      **There Were Safer Alternative Designs Available That Would Have Reduced or Eliminated the Harms Caused By The CAEv2**

After reviewing the materials in this case, including those cited throughout this report, it is my opinion that there were safe, effective and reasonable alternative designs to the CAE2  that could have been developed, sold and and marketed during the time period in question that would not have needlessly endangered people or carried the similar likelihood of risk of serious injury. These alternative designs were feasible, comparable in materials from a cost standpoint, and would have eliminated or substantially reduced the hearing loss and tinnitus injuries and damages suffered by Service Members. These safer alternatives would not have suffered from the same problems that 3M knew about no later than July 2000, as articulated in their own Flange Report. Specifically, the Flange Report concedes that the CAE2 was unreasonably dangerous because it was too short for proper insertion, which led to the plug "imperceptibly" loosening; the geometry of some ear canals made it too difficult to insert the plug deeply, especially "medium and larger earcanals"; and as Dr. Berger admitted in his deposition, the opposing flanges and the hard plastic stem made it too difficult to get a deep and consistent seal."  (Berger Oct. 8, 2015 Deposition at page 1009, lines 6-13).

Multiple safer alternatives that provided level-dependent protection without the design flaws of the CAE2 were available or could have been available at the time.  Aero's first version of the Combat Arms Earplug had a linear filter that could have provided level-dependent protection, but because it was only one-sided, it did not have the  fitting and loosening problems of CAE2. The CAE1 was not dual-functioning, but it could have been paired with a traditional linear design set of earplugs, like inexpensive foam plugs or 3M UltraFit flange plugs to serve the same purpose of the CAE2 without the problems. If consumers or the military desired one set of plugs to perform both linear and non-linear functions, there were several options, including the Surefire Sonic

50

Defenders EP3, EP4 and EP7, Moldex Battleplugs and Combat Arms Generation 4.  All of those plugs had a switch to move from the linear to non-linear function.  Images of some of those plugs taken from a Hearing Center of Excellence poster can be seen below.  (2018-DOD's HCE-Selection of passive hearing protection, downloaded- https://pueblo.gpo.gov/DOD/pdfs/HCE-856.pdf)





According to the information provided, all of these plugs had greater performance characteristics compared to the CAE2 but did not have fit or opposing flange problems of the CAE2.  Also, none of them were difficult to place in "medium and larger earcanals."  For these reasons, it is my opinion based on my experience, education and training that appropriate, safer alternative designs to the CAE2 were available.

Signed This 9th Day of October 2020

MOISES ARRIAGA, M.D.