# EXHIBIT 23

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| *This Document Relates to All Cases* | Hon Judge M. Casey Rodgers<br>Magistrate Judge Gary R. Jones |

**RULE 26 EXPERT REPORT OF**
**MARK D. PACKER, M.D., COL. (ret), USAF, MC, FS**

The following report is provided pursuant to the Federal Rules of Civil Procedure 26. All the opinions I offer herein I hold to a reasonable degree of medical or scientific certainty. My curriculum vitae is attached as Exhibit A, my testimony history is attached as Exhibit B, and my reliance materials are attached as Exhibit C. The materials I have relied on in forming my opinions in this report are included in this report and my reliance list.

This report summarizes my knowledge, expertise, experience, leadership, and functional understanding of hearing conservation in the military, noise-induced hearing loss ("NIHL"), tinnitus, the diagnosis, treatment, and impact of NIHL and tinnitus on servicemembers, and attempts and efforts to prevent those injuries. This report also presents background information and my opinions on the Combat Arms Version 2 ("CAEv2"). My opinions include but are not limited to: (1) the CAEv2 is unreasonably dangerous and can cause NIHL and tinnitus; (2) 3M was negligent in testing, marketing and selling the CAEv2; (3) 3M failed to adequately warn about the CAEv2's dangers; (4) 3M failed to train and instruct purchasers and users of the CAEv2; and (5) that there were safer alternative designs of the CAEv2. This is my report and does not represent the opinions of the Air Force, the United States Military, or the United States Government. Much of this report is based on my education, training, experience, and practice as a Board-Certified physician in the fields of otology/neurotology.

## I. QUALIFICATIONS

I am currently the Medical Director of Neurotology at Mercy Hospital in St. Louis, Missouri. After obtaining my Bachelor of Science degree from the University of Utah in 1990, I obtained my Medical Degree from the Uniformed Services University of the Health Sciences

(USUHS) in Bethesda, MD in 1995 through a direct commission in the United States Air Force. While at USUHS, I was elected into the Alpha Omega Alpha Medical Honor Society, Gamma Chapter. I completed an internship in General Surgery at Wright State University, Wright Patterson Air Force Base in 1996. I attended the School of Aerospace Medicine Primary Course at Brooks Air Force Base in Texas. While there, I trained in concepts and administration of the Air Force Hearing Conservation Program, which included a specific focus on environmental and occupational noise, noise mitigation and abatement, and the importance of engineering modifications and human protection via hearing protection devices (HPDs).

I then served as a Flight Surgeon with the 16th Operations Support Squadron at Hurlburt Field, Florida. My duties included supervision of bioenvironmental engineering personnel in administration of the hearing conservation program. My duties also included noise hazard identification and analysis, hazardous noise area surveys, noise source surveys, noise control, education in the use and capabilities of HPDs, occupational audiometric analysis, and medical evaluation board processing.  I was attached to the 15th Special Operations Squadron where part of my duties included medical didactic and field training of pararescue journeymen, combat controllers, and tactical training with all branches of special forces units. This included an understanding of HPDs and their specific uses for tactical training. I was familiar with the use and fitting techniques for foam earplugs ("foamies"), flange hearing protectors, custom molded ear plugs, and David Clarke headsets. My duties also included understanding and training as to physiologic environmental stressors such as altitude, heat, cold, noise, vibration, barotrauma, and regional public health and infectious disease requirements for rapid response deployment to any area of the world. I also was engaged in collecting and providing morphometric data for the development and modification of Bose Active Noise Cancelling Headsets.

From 1998 through 2002, I completed a four-year residency in Otolaryngology, Head and Neck Surgery at Wilford Hall Medical Center.  From 2002 through 2006, I served as Chief Otolaryngology Element of the 3rd Medical Group at Elmendorf Air Force Base, Alaska.  My clinical duties included the full scope of otolaryngology medical and surgical practice as well as participating in the Air Force Hearing Conservation Program by lecturing to technicians on hearing conservation, evaluating active duty and recently separated service members hearing profiles, and performing medical board profiles regarding occupational hearing loss and vestibular injury. During this time period, I deployed to Guam as a flight surgeon attached to a Barksdale, Louisiana

B52 squadron from the 2nd Bomb Wing, during which time I was directly responsible for flight, flight line, and hearing conservation duties. During my deployment, I was exposed to noise hazardous settings that necessitated the use of HPDs, and I assessed the safety and efficacy of those devices on behalf of myself and my squadron.

In 2006, I entered training as a Fellow in Otology/Neurotology/Cranial Base Surgery at The Ohio State University.  I successfully completed my fellowship in 2008 and received board certification in Otology/Neurotology in 2010. During my fellowship, I was responsible for medical school and resident education, full scope otology/neurotology clinical practice, as well as clinical and bench research related to diseases of the ear.  I also assisted in implanting the first three auditory brainstem implants at The Ohio State Medical Center.

From 2008 through 2013, I served as the Chief of Neurotology and Cranial Base Surgery and as an Otolaryngologist at Lackland Air Force Base.  From 2008 to 2009, my practice included the full range of Otology and Neurotology issues from diagnosis to treatment, including surgery for hearing loss, tinnitus, full scope hearing rehabilitation, infectious diseases of the ear, as well as cranial base pathology and the lateral skull base approaches for access to the middle and posterior cranial fossae. I also worked at Brooke Army Medical Center, which was also a tertiary care center for wounds from the global War on Terror. My practice at Brooke Army Medical Center included the diagnosis and treatment of NIHL sustained by soldiers at war.  I was also responsible for residency training. I delivered and supervised grand rounds and was responsible for directing surgical temporal bone dissection courses for resident surgical training.  I conducted humanitarian otologic surgery missions in South and Central America to establish contingency medical and surgical skills and support local hearing restoration efforts.

In 2009, I was selected by the Air Force Surgeon General to serve as the Interim Director of the Department of Defense (DoD) Hearing Center of Excellence (HCE).  In 2011, I was appointed as the permanent Executive Director of the HCE. I served as the Executive Director until 2016.  The HCE was legislated by Congress in the National Defense Authorization Act and directed to partner with the Department of Veterans Affairs (VA), institutions of higher education, and other mission-minded public and private organizations. HCE's primary responsibilities include developing a data registry to track hearing loss and auditory injuries across the Armed Forces and to share the registry data with the VA; encourage and facilitate hearing health research; develop best practices and clinical education; standardize acquisition of supplies, including HPDs,

across service branches; and enhance the coordination and delivery of VA rehabilitation benefits and services to former Service members.

As Director of the HCE, I advised the Assistant Secretary of Defense for Health Affairs and the Surgeons General of the Uniformed Services on hearing health-related matters and developed and executed the HCE's Congressional mandate to oversee the prevention, diagnosis, mitigation, treatment, and rehabilitation of hearing loss and auditory system injury. I established the concept of operations for the HCE and executed the concept by staffing and directing the five HCE directorates to accomplish our mandate.  I directly assisted each directorate in their missions and developed the partnerships with the VA and other private and academic entities to ensure hearing readiness and improve the hearing health and quality of life for service members and veterans.  We developed the HCE's Comprehensive Hearing Health Program with core tenets consisting of Education, Protection, and Monitoring. The Protection component involved developing DoD policy guiding acquisition and distribution of qualified products, including HPDs and tactical communication and protection devices (TCAP). These efforts were coordinated with subject matter experts from DoD research labs, the DoD Hearing Conservation Working Group, and senior military and civilian leadership.

Program elements included annual fitting and counseling for service members with HPDs, emphasizing the importance of proper wear and use of HPDs whenever exposed to hazardous noise.  We also proposed the hearing protection Qualified Products List, which included identification of quality HPDs for service member's use with coordination of Defense Logistics and VA Acquisition and Logistics processes to contract and supply HPDs, and coordinated proposals to centrally fund HPDs. This Qualified Products List included active and passive devices, linear and non-linear products including hand formed, multi flanged earplugs, muffs, and headsets. We pulled in experts from various service branches to determine requirements for particular services and specialties and worked with the HCE chartered collaborative auditory vestibular research network (CAVRN), which included US Army Aeromedical research lab, the Army Research Lab at Aberdeen Proving Grounds, the Walter Reed Military Medical Center Auditory Research Center, the Navy Submarine Medical Research Lab, the Air Force Research Lab, the Naval Marine Medical Center San Diego auditory research lab,  the San Antonio Military Medical Center's Institute of Surgical Research and Joint Center for Battlefield Health and Trauma, and the VA National Center for Rehabilitative Auditory Research. This effort attempted

to define the appropriate measures for HPDs and match that to products that were available with the goal of creating an approved list of HPDs for centralized contracting, distribution, and education. This analysis included the review of the strengths and weaknesses of specific manufacturers' HPDs, the noise reduction rating (NRR) represented by the manufacturers, and their qualities in an attempt to assist various services determine the best products for the needs of their troops.

During this time period, we examined and considered innovative ways to customize and improve hearing protection as well as HPD priority, access, development, and technology. I served on the Defense Medical Research and Development Joint Programmatic committees for Military Operational Medicine, Clinical Rehabilitative Medicine, and the Human Performance Optimization Health Science Advisory Committee to prioritize and program Department of Defense funding in neurosensory research lines, which included hearing protection. We also worked with and facilitated CAVRN associated labs, institutions of higher education, and other mission-minded public and private organizations to focus on prioritized research requirements. As an example of this coordination, we worked with entities developing finite element and laser mapping of ear canal morphology, information technology solutions capable of data basing such information, companies with capabilities for 3-D printing customized ear protection for service members, and military/veterans logistics specialists to make such devices available on a large scale.

In development of the congressionally mandated Joint Hearing Loss and Auditory System Injury Registry (JHASIR), I worked with owners of disparate military health information databases and systems, including the DoD Trauma Registry, the Defense Medical Data Center, the Theater Medical Data System, the Defense Occupational and Environmental Health Registry System, the Enterprise Clinical Audiology Application, the VA Clinical Data Warehouse, and the Denver Acquisition and Logistics Center. We developed an Auditory Injury Module within the Joint Theater Trauma Registry, as well as with services to modify and streamline data entry for military data systems. We advised working groups to develop specificity to questions entered into the pre- and post-deployment questionnaires, the annual hearing conservation points of care, the accession and exit medical standards working groups, and the VA clinical data managers to add questions related to exposure, hearing protection devices, education, and tinnitus. We also worked to develop public service announcements, educational materials, and advocacy to ensure military

audiologists and VA audiologists understood and had tools to promote hearing loss prevention and hearing conservation and to ensure that data to be collected into the JHASIR would be clean, concise, and reliable.

I helped to develop and participate in State of the Science (SoS) conferences that focused on highly prevalent or problematic hearing related topics.  In November 2011, the DoD Blast Injury Research Program Coordinating Office (PCO), in collaboration with the Hearing Center of Excellence (HCE) and the VA, hosted an International State-of-the-Science (SoS) Meeting on Blast-Induced Tinnitus to review current knowledge regarding the cause, diagnosis, and treatment of tinnitus and to identify research gaps for further investigation. On behalf of the HCE, I helped organize, host and speak at the meeting. This was a landmark event in collaboration with academia and research centers to address tinnitus in the military including etiology diagnostics and treatment.

In August 2011, I was asked to serve as the US Team Chief to the NATO Human Factors in Medicine (HFM) Exploratory Team (ET) 117.  We proposed NATO collaborative efforts to focus on the Treatment, Rehabilitation and Reintegration of Soldiers with Severe Injuries to the Hearing System. With acceptance of our proposal, I co-chaired the NATO HFM Science and Technology Organization (STO) 229 effort, Optimizing Hearing Loss Prevention and Treatment, Rehabilitation and Reintegration of Soldiers with Hearing Impairment, March 2012 - 2016.  This work included the development of standardized data collection for hearing loss prevention, hearing related injuries and hearing related outcomes observation. The achieved goal included, among other things, eliminating poorly gathered and incorrect data, and bringing consistencies towards gathering and reporting data on hearing loss prevention, hearing related injuries, and hearing outcomes of hearing loss management.  I was the US Representative for the NATO Combat Clothing and Individual Equipment and Protection NOISE working group, 2015.   I also coordinated efforts and initiate collaborations with the Medical Director of the UK's Defense Medical Services in relation to hearing loss prevention, tinnitus, hearing injury, and hearing rehabilitation.  In addition, I worked with military medical specialists from the Israeli Defense Force on HPD development.

While serving as Executive Director of the HCE, we worked with 3M as they developed the Exercise in Communications and Hearing Operations (ECHO) one-day training program for hearing health professionals, policy makers, and senior military leaders. The program's goal was

to increase basic understanding of military noise exposure and personal hearing protective gear and to highlight the tenet of communication through the direct context of field experience with hearing protection.

I helped launch and was a member of the DoD Epidemiology and Economic Burden of Hearing Loss Study ("DEEBoHLS") project team. The mission of the DEEBoHL was to examine the rates of hearing impairment and noise-induced hearing injury, examine relevant noise exposures, and determine the cost burden of hearing impairment and noise-induced hearing injury to the DoD and servicemembers. We also specifically studied the impacts of hearing loss and noise-induced hearing injury on the quality of life of servicemembers and the barriers to worker performance related to hearing loss among veterans in common post-military occupations. As a result of this effort, we developed a Markov model that estimates the costs of hearing loss over the service life cycle of servicemembers. This included the cost associated with hearing conservation programs, personnel, HPDs, hearing rehabilitation devices, and other treatments.

I realize that extending the understanding of the microanatomy and physiology of hearing is critical to hearing preservation and treatment. To this end, I presented policy recommendations to senior military leadership and health affairs towards linking temporal bone specimen collection in the military with the temporal bone registry. This effort would enable researchers to identify the microscopic effect of noise trauma which could be coordinated with the well documented occupational and clinical audiometry across a service member's history. I also worked with the City College of New York to develop a supercomputer micro electromechanical system to model intracochlear fluid dynamics. This could further be applied to computer-based assessment of HPDs if critical injury thresholds are better understood.

To further the understanding of critical injury thresholds, the HCE convened a two day conference at Lincoln Laboratories for a group of over 50 experts from Harvard, M.I.T., Mass. General Hospital, Walter Reed Army Hearing Program, Naval Research NIHL program, Military Operational Medicine research awardees, and the University of Pittsburgh Medical Center among other institutions. I directed the discussion related to the science of synaptopathy, continuous noise dosimetry, microcomputer modeling of cochlear forces and the current state of hearing diagnostics. This was an effort to establish longitudinal collaboration with the goal of identifying and linking noise hazard in real time (dosimetry) with more timely (boothless audiometry) and/or more sensitive testing (electophysiological or behavioral testing capable of identifying subclinical

cochlear damage) of individuals with known noise history (occupational hearing registry) and prospective methodology to directly correlate findings with human pathology (temporal bone registry).

The meeting was met with exceptional enthusiasm. Dr. Sharon Kujawa, and Dr. Charlie Liberman, who first identified and led the science of synaptopathy, have continued interacting with the military through the HCE. Military personnel with NIHL generally have detailed hearing histories, serial audiometry and would be well suited for dosimetry, early injury diagnostics and synaptopathy screening diagnostic development. These efforts translate the science of synaptopathy and will help improve hearing conservation programs and HPD development. It also explains the common experience of military otologists and audiologists treating noise exposed service members that have no objective, or mild injury but yet have more significant trouble hearing than would be expected for the mild loss; or who have tinnitus and hyperacusis without hearing loss; or who have more rapidly progressive hearing loss then one would expect for their ages.

Throughout my time in the HCE, I continued treating service members as a neurotologist in diagnostic, treatment and surgical rehabilitation. This included responsibilities for resident training, education and research development. I directed surgical temporal bone dissection labs, didactic and clinic-based education and grand rounds participation. Clinical responsibilities included caring and treating for service members injured at war that were relocated for stateside rehabilitation. I was involved in cutting edge medicine involving service members with blast injuries, conductive hearing loss and traumatic ear injuries. This included the use of novel hearing rehabilitation devices such as the Soundbite and the Vibrant Sound Bridge for conductive hearing losses caused by trauma at war. I was also certified to implant two middle ear implants and coordinated lab training and certification for all DoD neurotologists to implant the Ototronix Maxum and the Envoy Esteem. These products fit a niche gap in hearing restoration between when hearing aids fail to adequately meet patients' needs but cochlear implant indications are not yet met. At the time, I was the only neurotologist to qualify for the Esteem. I have also worked with the Earlens which is a similar, but non-surgical direct drive system with recent FDA approval.

In 2016, I was awarded the Air Force Legion of Merit by the Air Force Surgeon General. This award is given for exceptionally meritorious conduct in the performance of outstanding services and achievements.

8

I retired from the Air Force with the rank of Colonel in 2016. Since that time, I have worked in private practice and served as the Medical Director of Neurotology at St. John's Mercy Hospital in St. Louis, MO. Throughout my military and civilian experience, I have studied, diagnosed and treated NIHL and tinnitus in service members and veterans.  I have routinely treated patients with hearing loss due to a variety of causes, including noise trauma, ototoxicity, age, congenital loss, genetics, head trauma, ear infections, auto-immune disorders, neoplastic disorders and metabolic conditions, among others.  I routinely produce a differential diagnosis of a patient's hearing loss which includes ruling in and ruling out causes of hearing loss in order to direct treatment.

I have examined and treated soldiers exposed to impulse, blast noise, and long-term noise exposure.  I have also seen patients with dizziness, PTSD and TBI from blast exposure.  I treat patients with hearing loss and tinnitus who also have depression, which is a frequent comorbidity. I have referred such patients for further treatment to psychiatry or psychology.

I regularly discuss HPDs with my patients who are exposed to noise in work or recreational activities. I advise them to evaluate the HPD's noise reduction rating, which is disclosed on the device's label in accordance with the Noise Control Act and EPA regulations. I advise patients that a higher NRR means stronger noise protection and that this is a measure that should be relied on when selecting HPDs.

I have also routinely treated patients with tinnitus.  In treating such patients, it is routine for me to review the general causes of tinnitus, explain the current understanding of the mechanisms that generate tinnitus and explore possible causes with each patient.  I review possible treatment options with those patients and make treatment recommendations.

I have authored over 30 publications in peer-reviewed journals, including 5 publications in which I served as a Special Editions editor.  I have also authored 12 chapters in textbooks.

Since 2011, I have been awarded multiple grants for research into issues related to NIHL and tinnitus. This includes grants for novel techniques for the management of tinnitus, research into pharmaceutical development for prophylactic measures to reduce NIHL, tinnitus reorganization training for management for combat related tinnitus, alternative tinnitus management techniques to find an objective measurement of tinnitus, the development of a multi scale electromechanical simulation of cochlear fluid dynamics the goal for which was to develop a better model for evaluating effectiveness of HPDs and other subjects in my field.  I have also given more than 100 local, national and international presentations on issues related to this field.

9

## II.    ASSIGNMENT AND METHODOLOGY

In formulating my opinions and preparing this report, I reviewed scientific literature, corporate documents from Aearo and 3M, which acquired Aearo in 2007 (collectively referred to herein as "3M"), sample products, government and military documents, depositions of government agencies, and depositions of 3M employees. A list of the corporate documents, sample products, government and military documents and depositions that were supplied to me by counsel are included in **Exhibit C**. I understand discovery is still ongoing and I reserve the right to amend my opinions if further information is provided in any form including, but not limited to depositions, corporate documents, government and military documents, and the expert reports of both Plaintiff and Defense experts.

## III.    HOW WE HEAR

Sound is both a physical and a perceptual phenomenon. In the perceptual sense, sound is an auditory experience called hearing. In the physical sense, sound is produced when air molecules are set into vibration and generate pressure waves through a medium (*e.g.*, air, water). The fluctuations in pressure create sound waves, which are physical input that is the basis of human hearing. The simplest sound wave is a pure tone. A pure tone can be characterized by its frequency, wavelength, phase, amplitude, and intensity.

### A.  Frequency

The frequency of a sound refers to the number of cycles of a pure tone that take place at a given location and length of time. Pitch is the perceptual correlate of frequency. High frequencies are associated with treble or high pitches and low frequencies with bass or low pitches. The frequency is measured in cycles per second, or hertz. A person with good hearing can hear a range of sounds between 20 Hz and 20,000 Hz. The period of a pure tone is the inverse of frequency and is the time it takes to complete one cycle of the puretone. (Plack, 2018)

### B.  Wavelength

The wavelength of a sound wave is the physical distance covered by a complete cycle of the wave. The wavelength of a sound is a simple function of the frequency of the sound, because the speed of sound in a medium, in this case air, is constant. It is the speed of sound divided by the frequency of the sound wave. Higher frequencies are caused by shorter wavelengths and lower frequencies result from longer wavelengths. (Plack, 2018)

### C.  **Phase**

Phase is the point reached on the pressure cycle at a particular time. Phase covers a range of 360 degrees and its measurements are relative. When two sounds are added together the effect they have on hearing depends on their relative phase. Adding two pure tones with the same frequency that have no phase delay between them, meaning the peaks of the waveforms coincide, will result in a combined waveform that has a high amplitude. (Plack, 2018)

### D.  **Amplitude & Intensity**

A sound wave's amplitude is the magnitude of its pressure variations or displacement, measured with respect to the deviation from atmospheric pressure. (Plack, 2018) A sound wave with a higher amplitude sounds louder. Amplitude can be used to describe the pressure at the peak of the waveform or the average over time of the pressure variations squared-the root mean square pressure. Intensity is the sound energy passing through a given area every second. The intensity of a sound wave is proportional to the square of the root mean square pressure, such that $I=kP2$where I is the intensity, P is the root mean square pressure, and k is a constant. In other words, for a given medium, pressure and volume velocity are always proportional: Volume velocity (V) equals pressure (P) divided by the acoustic impedance (Z) of the medium (impedance is the opposition offered by the molecules to imposed pressure). Intensity (I) can thus be easily calculated, as it is proportional to pressure squared. Just as frequency (physical) is correlated with pitch (perceptual), acoustic intensity correlates with loudness: The more intense a sound, within limits of audibility, the louder it will be.

Since the surface area of a sphere is proportional to the square of its radius, sound intensity (power per unit area) is inversely proportional to the square of the distance from the sound source. This is known as the inverse square law. Recall that intensity is proportional to pressure squared; sound pressure is thus inversely proportional to distance (not its square). If the distance is doubled, the intensity will be one fourth as great, and the pressure will be halved. The general rule that sound pressure is inversely proportional to distance must be modified by two additional factors. First, even in an unbounded medium, there is some conversion (dissipation) of sound energy to heat through friction as it radiates out. This effect is greater for higher frequencies. Second, in enclosed spaces such as factories, there is considerable reflection of sound from interior walls; in such reverberant environments, sound pressure may drop off much less rapidly as distance increases than would be predicted by the inverse square law.

It is essential to remember the distinction between acoustic and perceptual variables, as the perceptual variable is not perceived linearly. In hearing-impaired persons, for example, the relationship between intensity and loudness may be abnormal. Soft sounds audible to normal listeners may be inaudible to impaired listeners, while more intense sounds may be equally loud to both normal and impaired listeners. This abnormally rapid growth of loudness for a given increase in intensity is called recruitment.

IV.    **THE DECIBEL SCALE**

Using pressure and intensity to measure sounds humans hear can be problematic, because we perceive such an enormous range of pressures and intensities. A sound near the greatest sound that can be heard (pain threshold) is approximately one million times as intense as the softest sound we can hear (absolute threshold of hearing). We specify intensity on logarithmic units called decibels (dB). To get to the dB, an intensity scale, in which increments of intensity roughly correspond to increments in sensation, is used so that the large range of intensities can be represented by a narrower range of numbers. The scale is created by taking the logarithm (to the base of 10) of the ratio of sound intensity to a certain reference intensity. Because the units in the resulting scale, called bels, are very large, decibels (1/10th of a bel) are used. Decibels (dB) can be expressed in Intensity Level (dB IL) or Sound Pressure Level (dB SPL) and their equations are:

$$\text{dB IL} = 10 \log 10 \, (\text{sound intensity/reference intensity})$$

$$\text{dB SPL} = 20 \log 10 \, (\text{sound pressure/reference pressure})$$

However, the decibel scale used when discussing hearing thresholds on the audiogram is a third scale called Hearing Level (dB HL). dB HL was determined by finding the dB SPL required to barely stimulate the hearing of an average normal-hearing individual at various frequencies. The pressure needed to barely hear at a particular frequency varies, such that less pressure is needed for middle frequencies and more pressure is needed to just barely hear lower and higher frequencies. The lowest sound intensity of each frequency is referred to as 0 dB HL on the audiogram in which audiologists use to graphically depict hearing sensitivity.

The dB HL scale is used when measuring hearing thresholds in humans. The threshold, or the softest dB HL level that is heard 50 percent of the time, is evaluated from 250-8000 Hz in octave steps. Interoctaves of 750, 1500, 3000, and 6000 Hz are also evaluated, particularly when there is greater than a 20 dB HL difference between adjacent octaves. This is often the case with steeply sloping hearing losses. Remember that the softest dB SPL level normal hearing listeners

could detect was averaged for each frequency and called 0 dB HL, and since it is an average amongst the group a range from -10 to 25 dB HL is accepted as the range of "normal hearing".

## V.   ANATOMY AND PHYSIOLOGY OF THE AUDITORY SYSTEM

In all mammals, including humans, the auditory system involves the outer ear, middle ear, inner ear, and the central auditory pathways to the brain. As sound waves move throughout the air, they can enter into the human auditory system first by entering the outer ear, traveling by acoustical energy as molecules vibrate or funnel into the ear canal. This acoustic energy hits the eardrum, which actively starts moving and in turn transforms acoustic energy into mechanical energy. The mechanical energy from the middle ear causes movement within the fluid of the inner ear creating hydromechanical energy. As the fluid moves across hair cells within the inner ear, an electric energy is generated. That energy will give rise to bioelectrical energy which is transmitted to the brain and is interpreted as sound.



(U.S. Army Public Health Command, 2014. Readiness through Hearing Loss Prevention: (Technical Guide 250). Available at https://phc.amedd.army.mil/PHC%20Resource%20Library/ TG250.pdf)

### A.  <u>Outer Ear</u>

The outer ear consists of a cartilaginous flange called the auricle (or pinna) and the external auditory meatus (or ear canal). The pinna is formed of external folds, ridges, and depressions of molded cartilage projecting out from opposite sides of the head. This includes the deep center portion of the pinna, called the concha, or the large bowel near the ear canal entrance. The structure

13

and various folds of the pinna act as somewhat of a funnel to get sound waves into the narrower ear canal. These structures facilitate the localization of sounds coming from in front, behind, below or above the head. The pinna is specifically designed to transmit more high-frequency components from an elevated source than from the same source at ear level, which allows humans to obtain important cues about the elevation of a sound source.



(3M_MDL000464853)

The pinna and ear canal form a complex acoustic cavity or tube, beginning at the concha and extending inward at a slight upward angle for approximately 1 inch (2.5 cm) in adults. Although it appears to be round, the canal is actually elliptical and averages about 9 mm in height and 6.5 mm in width. (Martin et al., 2012) The outermost portion of the ear canal consists of cartilage containing glands and lined with hair and the innermost portion is bony, with a very thin layer of skin. The ear canal is lined with a few layers of skin and is highly vascularized, especially the area nearest to the eardrum. This means there is an abundant flow of blood and the area can be quite sensitive.

The ear canal is often thought of as an open cavity enclosed on one end, by the eardrum. Because of its structure, the ear canal has a particular resonant frequency or natural frequency at which it vibrates most easily. In humans, the ear resonates somewhere between 2000 Hz and 5000 Hz, giving an increase in pressure of about 10-20 dB. (Pickles, 2013) The resonant frequency of each ear changes slightly depending on size and shape of the ear canal.

**B.  Middle Ear**

The middle ear is an air-filled cavity where sound waves are converted into mechanical energy. This occurs at the eardrum, which is a thin, concave, nearly transparent membrane. It is the common boundary between the outer ear and middle ear. The eardrum is about 90 mm$^2$ and

consists of three layers: the outer layer is made of skin, the inner layer is tough, fibrous, connective tissue. The third layer, which is within the middle ear space, is lined with mucous membrane. The third layer of the eardrum is connected to a chain of three small bones called ossicles--the malleus, incus and stapes--that are suspended from the bony wall of the middle ear cavity.



(Purves D, Augustine GJ, Fitzpatrick D, et al., editors. Neuroscience. 2nd edition. Sunderland (MA): Sinauer Associates; 2001. The External Ear. Available from: https://www.ncbi. nlm.nih.gov/books/NBK10908/)

As sound moves through the ear canal, it strikes the eardrum and causes it to vibrate and buckle which results in movement of the ossicular chain. The innermost ossicle, the stapes, has a footplate that is in direct contact with the fluid-filled inner ear through a small opening called the "oval window." The ossicular chain is about 2 to 6 mm in length and acts like a single unit when transmitting most sounds.

The movement of the eardrum and the ossicles provides energy transformation that is needed to convert sound energy from acoustic waves to mechanical energy. Because the sound is going from an air-filled middle ear to a fluid-filled inner ear, the middle ear must provide a boost of pressure to overcome this. This is done in three different ways: first, the area of the eardrum is 17 times larger than the area of the stapes footplate on the oval window. Because of this difference between the mass and area between these two structures, this increases the pressure. Second, the ossicles within the middle ear act as a lever (similar to that of a dolly), with the malleus being 1.3 times larger/longer than the incus, which creates a mechanical advantage. Lastly, as the tympanic membrane moves from acoustic energy striking it, it does not move as one whole system, but rather

segmentally, which creates a boost in sound pressure level getting to the cochlea at the site of the oval window. In engineering terms, the middle ear acts as an impedance-matching transformer, similar in principle to the transformers used to connect electronic devices of different impedances (*e.g.*, antenna or cable to a television set). The difference in area between the tympanic membrane and the oval window of the inner ear and the lever ratio generated by the ossicles together give a 31.9 dB increase in sounds by the time they reach the inner ear. (Pickles, 2013) It is this transformer and the ear canal resonance combined with the inability of the inner ear to respond to very high and very low frequencies that determine the normal human sensitivity curve (or minimum audibility curve), with best hearing between 1 and 5 kHz and none outside the 20 Hz to 20 kHz range.

The stapedius and tensor tympani are small muscles connected to the malleus and stapes, respectively. These muscles contract in response to loud or startling noise. This response, called the acoustic reflex, stiffens the ossicular chain, which increases impedance and decreases the conduction of low-frequency sound to the inner ear.

### C. **Inner Ear**

The footplate of the stapes fits into the oval window of the cochlea, or the fluid-filled inner ear. As the stapes footplate moves, it creates pressure waves in the fluids of the cochlea, which also displace the membranes within the structure. The cochlea is a small shell-shaped portion of the body labyrinth that contains the organ of Corti, which is the sensory organ for hearing. The basilar membrane, which is tonotopically organized, runs the entire length of the cochlear duct on which the organ of Corti resides. This membrane changes in width and stiffness as it goes from base to apex, with it being narrow and tight at the base and wide and loose at the apex. (Yost, 2008) The area in which the wave displacement occurs along the basilar membrane provides the brain with information regarding the frequency and level of the sound. Higher pitched sounds, or tones with shorter wavelengths show maximum displacement near the basal end, whereas tones of low frequencies, or long wavelengths show maximum displacement near the apical end. If a complex sound is heard, displacement will occur at multiple places along the basilar membrane. This tonotopic organization permits the inner ear to segregate sounds of different frequency content, which enable the listener to recognize those complex sounds (*e.g.*, speech) based on the frequency patterns.



As the basilar membrane moves up and down in response to the movement of the inner ear fluid, the inner and outer hair cells that are within the organ of Corti become "sheared." The inner hair cells are the primary sensory receptors for hearing and the outer hair cells are responsible for actively sharpening the pressure wave in the cochlea. The outer hair cells, when stimulated, expand and contract in length, which change in the biomechanical vibratory pattern and create a highly sensitive cochlear response. (Yost, 2008). The hair cells and their stereocilia or the thin hair-like structures sit on top of the basilar membrane and underneath the tectorial membrane. When the basilar membrane moves, the tectorial membrane also moves, which then causes the shearing or deflection of the stereocilia of the outer hair cells due to the attachment they form to the tectorial membrane. The shearing of the inner hair cells most likely occurs due to the fluid movement between the stereocilia and the tectorial membrane. (Yost, 2008). As the stereocilia bend, ion channels open in the body of the hair cells. When the ion channels open, it allows for ionic transportation that is necessary for neural transduction.

**D.  Auditory Nerve & Central Auditory System**

Auditory nerve fibers act as a direct synaptic pathway between the hair cells in the cochlea and the cochlear nucleus in the brainstem. The human ear has about 30,000 auditory nerve fibers, with about 90% of them synapsing on inner hair cells. The signal is transmitted along the auditory nerve to the brainstem auditory centers, and projections are further sent to the cerebral cortex. The auditory cortex consists of core areas and surrounding regions which are tonotopically organized and housed within the temporal lobe. (Pickles, 2013) Sounds heard in only one ear are represented and elicit cortical activity in both hemispheres of the brain. This binaural representation aids in localization of sounds through the comparison of interaural timing and intensity differences and allows humans to perceive location in azimuth, distance, and elevation of incoming sounds.

Injuries or lesions on one side of the brain may drastically impair localization. Additionally, if the brain does not receive adequate stimulation from all frequencies, as is the case with hearing loss, the organization of the auditory cortex can change and have lasting effects on one's ability to process speech sounds. (Sharma et al., 2018)

## VI.   HEARING LOSS

Hearing losses can be divided into two primary categories based on the site of lesion: (1) conductive, and (2) sensorineural. A third category, mixed hearing losses, result from concomitant conductive and sensorineural dysfunction. Conductive hearing loss occurs when sound conduction to the inner ear is impeded by the external ear, the middle ear, or both (Isaacson et al., 2003). Conductive losses are commonly caused by complete blockage of the ear canal by cerumen (ear wax) or foreign bodies, outer ear infection (*otitis externa*) and/or middle ear infection (*otitis media*), eardrum perforation and erosion or fixation of the ossicles. Because these conditions are generally amenable to medical or surgical intervention, they tend to be temporary and reversible. As discussed in more detail below, conductive hearing losses are characterized by normal hearing thresholds on bone conduction testing, with elevated hearing thresholds on air conduction tests.

By contrast, elevated hearing thresholds on both air conduction and bone conduction tests demonstrate a sensorineural hearing loss (SNHL). SNHL includes two subcategories: (1) cochlear (*sensori*) pathologies, and (2) retrocochlear (*neural*) pathologies, which involve damage in the neural pathway to the auditory cortex. Retrocochlear pathologies, which occur when sound enters the ear normally but is not organized in a way that the brain can understand due to inner ear or nerve damage, are uncommon relative to cochlear pathologies. (Shearer 2017)

Cochlear dysfunction, which accounts for most cases of SNHL, is primarily caused by the loss of hair cells within the organ of Corti. A variety of conditions and exposures may result in cochlear SNHL, including:

- Age-related sensory hearing loss, which is caused by the progressive loss of cochlear hair cells beginning at the base of the cochlea and developing toward the apex, resulting in bilateral deterioration of hearing that begins in the high frequencies and progresses to lower frequencies. Age-related hearing loss, or *presbycusis*, is the most common cause of SNHL.
- Ototoxic medications, including:
  - non-steroidal anti-inflammatory drugs (NSAIDs), which cause transient SNHL;

- aminoglycoside antibiotics, which cause bilateral SNHL and vestibular dysfunction;
- chemotherapeutics, which cause permanent high-frequency ($\geq 2000$ Hz) SNHL;
- loop diuretics;
- antimalarials (*e.g.*, chloroquine);
- certain anticonvulsants;
- certain antivirals;
- certain antifungals;
- tricyclic antidepressants;
- anti-anxiety medications; and
- industrial solvents.

- Auto-immune disorders that cause progressive, bilateral SNHL and possible vertigo or disequilibrium, which generally resolve with administration of oral steroids.
- Inner ear infection (*labyrinthitis*) secondary to bacterial or viral infection, which result in sudden hearing loss.
- Meniere's disease, which causes low-frequency SNHL that progresses into higher frequencies as the disease evolves, along with sudden, asymmetric fluctuating hearing loss, aural fullness, tinnitus, and episodic vertigo.
- Cochlear otosclerosis.
- Hazardous noise exposure, which is particularly relevant to members of the armed forces and will be discussed in greater detail in the following section of this report.

Cochlear hair cells do not regrow after permanent injury and degeneration, and there are no medical or surgical treatments that can repair them. SNHL is thus permanent. In the quest to develop better diagnostic, rehabilitative and treatment options for SNHL, it is necessary to understand the underlying sequence of events that lead to cochlear damage. The intracochlear microcellular anatomy, acoustic signal transduction, cellular respiration, cell signaling, physiological maintenance and physiological shifting of cellular gradients to initiate afferent auditory processing is becoming better understood. Methods for determining such function have largely been based on animal modeling with some human translation through correlation with post-mortem human temporal bone specimens. Animal modeling is 1) necessary, as cochlear sampling causes immediate deafness, and there are no imaging techniques with adequate resolution for such

cochlear analysis; and 2) reasonable, as some transcription factors are highly conserved across species (Mulvaney et al., 2012), and inflammatory cascades and apoptotic pathways are comparable offering translational impact of modeling therapeutic solutions in animals. Progressive animal modeling with mouse, rat, guinea pig, chinchilla, rabbit, cat, and non-human primate species have correlated ototoxic, noise, and presbycusic events with histochemical temporal bone analyses.

## VII.   NOISE-INDUCED HEARING LOSS

Noise exposure is the most common form of acquired SNHL. Exposures to both impulsive and/or steady state noise can manifest as temporary threshold shifts (TTS) that seemingly improve with time, or permanent threshold shifts (PTS) that remain.  In fact, significant intracochlear damage can exist with normal or near normal behavioral, or electrophysiological testing (Valero et al., 2017, McGill 1976, Schuknecht 1955). Patients that complain of tinnitus, hyperacusis and difficulty hearing can have normal or near normal audiometry.   Behavioral and electrophysiological analyses are thus lag indicators of intracochlear damage. Animal studies assessing noise impact on hearing in TTS and PTS noise-induced models have determined that the most vulnerable structures affected by noise are the Inner Hair Cells (IHC) (Fu 2010, Jin 2011, Kobel 2017), synaptic junctions between IHC and spiral ganglion neurons (SGN) (Kobel 2017), synaptic connection between Auditory Nerve Fibers (ANF) and Inner Hair Cells. (Kujawa 2019) These findings have been coined synaptopathy and are suspected to be responsible for "hidden hearing loss" or poorer than expected hearing function hidden behind normal audiometry. Synaptopathy can explain why younger listeners with significant noise exposure histories but normal audiometry experience poor cochlear function. (Kumar 2012, Hope 2013)

Cochlear synaptopathy, or "hidden hearing loss," has been identified as the earliest manifestation of noise related trauma.  In the past, TTS was thought to be milder reversible damage to hearing thresholds and a less worrisome form of the same cochlear injuries that lead to PTS. However, incidence of transient hearing loss experienced at early ages have been shown to accelerate age-related hearing loss notwithstanding an ostensibly full recovery. (Le et al., 2017, Kujawa et al., 2006) The recovery of hearing in these circumstances are "probably a result of reversible uncoupling of the outer hair cell stereocilia from the tectorial membrane and/or reversible central gain increase and associated hyperacusis and tinnitus." (Le et al. 2017) However, even when previous hearing thresholds are recovered, "there can be considerable damage to the

ribbon synapses, the degeneration manifest in cochlear synaptopathy. Cochlear synaptopathy results in loss of connections between the inner hair cells and their afferent neurons in the acute phase of noise-induced cochlear trauma and is most likely a result of glutamate excitotoxicity causing damage to the post-synaptic terminals. These synaptopathic mechanisms, similar to synaptopathic disease in certain types of auditory neuropathy, are involved in and likely contribute to NIHL. (Le et al., 2017)

Because there is no marker of synaptopathy, correlating histories of noise exposure, clinical experience of poorer than expected hearing performance associated with tinnitus and/or hyperacusis and faster than expected progression of hearing loss are symptoms suggesting an underlying synaptopathy. There is a need for non-invasive tests for synaptopathy. (Hickox 2016) Such testing would be useful to explain symptoms and quantify underlying damage, as well as improve risk analysis when coupled with noise dosimetry and longitudinal audiometry. (Tepe 2017) Attempts to correlate underlying synaptic damage with behavioral and electrophysiological testing are being evaluated. Use of audiometry, high frequency sweep audiometry, distortion product otoacoustic emissions, speech in noise testing, word recognition in noise, with time compression or reverberation, medial olivocochlear reflex testing, electrocochleagraphy, and wave I amplitude of the auditory brainstem responses have all been conducted to this end.  Further research is needed to translate animal modeling, to quantify exposure risk, to understand longitudinal expectations, and to validate non-invasive testing.

 Science is clear that exposure to damaging noise can disrupt the most fragile component of the inner ear, the synaptic junction between the inner hair cells and the afferent auditory nerve. That these exposure related injuries manifest clinically is evident in temporally related subjective symptoms of damage, tinnitus and muffled hearing, as well as occasional TTS and PTS.  These findings correlate to the clinical   military medical experience observed by DoD and VA audiologists and otolaryngologists that military members exposed to damaging noise, regardless of objective evidence of hearing loss, can have significant difficulty due to bothersome tinnitus, as well as trouble hearing in noise and more difficulty than would be expected understanding normal conversations.  It is also a common experience that hearing declines in these members at a faster than expected rate following their exposures. In my opinion this is  a direct real world human translation of synaptopathic science.

The characteristic pathological feature of permanent threshold shift (PTS) is structural damage in the cochlea, including diffuse degeneration of outer hair cells and nerves in the area sensitive to 3000-6000 Hz (the second quadrant of the basal turn). With sufficient intensity and duration of noise, sensory hair cells and the entire organ of Corti may be disrupted. There are two mechanisms that destroy the organ of Corti: metabolic decompensation after noise exposure over an extended period of time or, less commonly, mechanical destruction by shorter exposure to extreme noise intensities. (Le et al., 2017)

Metabolically induced changes include swollen nuclei of the outer hair cells, swollen mitochondria, stereocilia disruption, cytoplasmic vesiculation, and vacuolization. Metabolic overstimulation of the cellular elements within the organ of Corti results in the generation of reactive oxygen species (ROS) within hair cells during and after insult. (Le et al., 2017; Yong et al., 2015; Ryan et al., 2016) This leads to the activation of stress signaling pathways (*e.g.*, JNK MAP kinase cascade), resulting in cell damage, apoptosis and/or necrosis. (Ryan et al., 2016) ROS persist for several days after overstimulation, spreading apically from the basal end of the organ of Corti and expanding the area of cell death. (Le et al., 2017) Overexposure can also result in glutamate excitotoxicity, where high levels of glutamate overstimulate postsynaptic cells resulting in swelling of dendrites and cell bodies. (Le et al., 2017) Acoustic overstimulation can also cause increased free calcium ($Ca^{2+}$) in outer hair cells, which can also trigger apoptotic and necrotic cell death. (Le et al., 2017)



The organ of Corti can also result from exposure to high level, short duration noise (> 140 dB SPL) can stretch delicate inner ear tissues beyond their elastic limits, resulting in mechanical disruption of the stereocilia, disassociation of the organ of Corti from the basilar membrane,

disruption of cell junctions, and mixing of endolymph and perilymph. (Kurabi et al. 2017; Le et al. 2017; Yong et al., 2015) This process, called "acoustic trauma," can result from limited exposures to impulse noise - in some cases, just one exposure is enough. Following acoustic trauma, hearing may recover over the course of several weeks or months; however, some degree of hearing loss is generally permanent.

### A.  Individual Susceptibility to NIHL

Individual susceptibility to NIHL varies widely and depends on a number of individual characteristics, some of which are inherent (*endogenous*) and others are external (*exogenous*). External factors that impact an individual's susceptibility to NIHL include the combination of noise exposure and coincident use of certain ototoxic medications, which results in more hearing loss than would be expected for either agent individually. Other exogenous agents that may potentiate NIHL include chemical asphyxiants (*e.g.*, carbon monoxide, hydrogen cyanide); elevated body temperature; vibration with concurrent elevated body temperature; smoking; and electromagnetic fields.

Endogenous factors that predispose individuals to or protect them from NIHL are the subject of great interest in civilian and military research. In general, the human research on inherent susceptibility to NIHL has been inconclusive. Studies show that women tend to have better hearing than their male counterparts, but it is unclear whether that difference is caused by gender alone. Research has not conclusively established a link between race/ethnicity and susceptibility to NIHL, nor between age and susceptibility to NIHL. However, several animal studies suggest that genetic factors predisposing an individual to age-related hearing loss may also render him/her more susceptible to NIHL. (Ohlemiller et al., 2000) Additionally, some animal studies have identified the specific gene that increases predisposition to NIHL, and other studies suggest there may be a genetic basis for resistance to NIHL. (Holme et al., 2003; Yoshida et al., 2000)

### B.  Deficits Resulting from NIHL

One of the most noticeable deficits that results from NIHL is speech misperception. Vowels are relatively powerful, low frequency (< 1500 Hz) sounds that alert the listener to speech. Consonant sounds, which are predominantly high frequency (> 1500 Hz), surround vowel sounds and have subtle differences that give meaning to speech. High frequency losses common to NIHL create difficulty hearing and discriminating between consonant sounds. Consequently, individuals

with NIHL commonly experience a loss of speech clarity without a perceived loss of intensity. This problem is exacerbated by background noise and reverberant environments.

Sound localization may suffer as a result of NIHL. As sounds enter each ear, they stimulate cortical activity on both sides of the brain. Comparing interaural differences in the timing, intensity, and phase of the sound in each ear allows the hearer to determine the vertical elevation of the sound source and to identify which ear is closer to it.  Hearing loss in one or both ears impairs this localization function.

Additionally, as a result of NIHL and the loss of outer hair cells, quiet sounds may be difficult to hear, but more intense sounds may still be heard, sometimes as clearly as before the hearing loss. This causes the hearer to experience a phenomenon called *recruitment*, wherein an abnormally rapid growth of loudness is perceived. Hazardous noise exposure is also a major cause of hyperacusis, a rare auditory disorder in which a person's hearing becomes extraordinarily sensitive.

NIHL is the most prevalent risk factor for triggering the development of tinnitus. (Ryan et al., 2016; International State of the Science Meeting on Blast-Induced Tinnitus) For some, tinnitus is a benign condition; however, a significant portion of people who suffer from tinnitus experience distress that can be extreme. (Ryan et al. 2016) Due to the prevalence of tinnitus among the demographic cohorts involved in this litigation, an in-depth discussion of the subject follows.

**VIII.    TINNITUS**

Tinnitus is the perception of sound that has no external sound source. The sound is commonly described as "ringing in the ears," buzzing, hissing, whistling, and/or humming. Tinnitus may localize to one ear (unilateral), both ears (bilateral), or may instead be perceived in the head (Hu et al., 2015).  It may be transient or persistent (lasting $\geq$ 6 months), and persistent tinnitus may be constant or intermittent. (Hu et al., 2015) Tinnitus is usually associated with some degree of hearing loss and some tinnitus patients may have unsuspected or unnoticed hearing loss. (Tunkel) In addition, tinnitus can and often *does* exist in the absence of clinically significant hearing loss.

Tinnitus is distinct from "somatosounds," which result from acoustic events generated within the body--specifically, vibratory activity in the head or neck that is transmitted via bone conduction to the cochlea and causes the perception of sound. Because these events can be detected

and, in some cases objectified, by an examiner, this phenomenon is referred to as "objective," "physical," and "somatic" tinnitus. (Hofmann 2013)

### A. Physiology of Tinnitus

Though the mechanisms that give rise to tinnitus are not completely understood, research indicates that insult to the peripheral auditory system is where the condition originates. After peripheral injury, decreased sensory input causes a discontinuity in the spontaneous activity across auditory nerve fibers, resulting in reduced lateral inhibition and changes in the auditory cortex tonotopic map. Tinnitus is commonly discussed as a "release from inhibition," caused by an alteration in the normal balance between excitatory and inhibitory nerve transmission brought about by loss of inhibition (disinhibition), leading to an increased firing rate. (Henry et al., 2016)

### B. Causes of Tinnitus

There are multiple causes and numerous aggravating co-factors associated with tinnitus. Most cases of tinnitus are "primary" – that is, idiopathic or caused by SNHL. Secondary tinnitus, which is rare by comparison, arises from an identifiable organic condition or a specific underlying cause other than SNHL, including cerumen impaction, middle ear diseases (*e.g.*, otosclerosis or Eustachian tube dysfunction), cochlear abnormalities (*e.g.*, Meniere's disease), and auditory nerve pathology (*e.g.*, vestibular schwannoma). Secondary tinnitus is managed with treatment of the underlying condition.

Although primary tinnitus may be idiopathic or may result from any form of sensorineural hearing loss (*e.g.*, presbycusis, ototoxic medication), the most prevalent and direct cause of tinnitus is loud noise exposure. (Hu et al., 2015) The risk for developing tinnitus is significantly greater for individuals with a history of military service as compared to the civilian population. (Moore, et al., 2015) Military occupational specialties commonly involve long-term exposure to continuous noise, or exposure to a combination of impulses and continuous noise, which are also known to cause tinnitus. Tinnitus induced by noise exposure is often described as high-pitched.

Transient tinnitus commonly occurs after hazardous noise exposure and may be the first indication of auditory injury. After an acute acoustic trauma, tinnitus is reported in the initial stages in 90% of cases and often persists even when the hearing loss is temporary. (Shargorodsky et al., 2010) Many military occupational specialties may involve proximity to extremely loud noise that can cause acoustic trauma and lead to the onset of tinnitus. (Moore et al., 2019)

## IX.    NOISE IN MILITARY SERVICE

Hearing is the sentinel sense, which enables the detection, localization and identification of potential hazards, and facilitates communication. In many settings, occupational and otherwise, the inability to hear can be a liability. Many workplaces include tasks that are considered hearing critical--*i.e.*, tasks that require the ability to detect, recognize and localize sounds and/or understand speech, which can only be performed to a specified level of accuracy by a normal-hearing person using the sense of hearing alone. (Tufts et al., 2009)  Occupations with hearing-critical components include, *e.g.*, law enforcement, firefighting, air traffic control, manufacturing, mining, and radio operation. Additionally, for many military occupational tasks, the ability to hear is absolutely critical.

Auditory fitness for duty (AFFD) refers to the possession of hearing abilities sufficient for safe and effective job performance. In military settings, combat readiness depends in part on the auditory fitness of service members. For example, the ability to detect sounds (e.g., footsteps, loose cartridges) and localize their source is fundamental to safety in combat. Responding safely and effectively depends on the ability to identify the source of the sound by differentiating enemy vehicles and weapons from friendlies. (FALLON00008; USAPHC TG 250, 2014; Nakashima et al, 2013; Tufts et al., 2009) These functions are particularly important in maintaining the safety and mission effectiveness of the U.S. Armed Forces.



(USAPHC TG 250, 2014)

Accordingly, applicants to military service are subject to an intensive battery of tests, including audiological testing, at Military Entrance Processing Stations (MEPS). Those who cannot meet medical standards due to medical conditions, including hearing loss, are disqualified from service. Throughout most of the 21st century and until 2018, the medical standards for appointment, enlistment, or induction in the military services disqualified individuals with an average hearing loss of $\geq 30$ dB across several frequencies or $\geq 35$ dB hearing loss at any single frequency. (Tufts et al., 2009; DODI 6130.03, 2010) Applicants who rely on hearing aids and those with a history of certain ear conditions are also generally disqualified (DODI 6130.03, 2010; DODI 6130.03, 2018)

Hearing loss is one of the top five conditions for which military applicants are medically disqualified, and for which accession waivers are sought. (Gubata et al., 2013; AMSARA, 2013) Accession waivers are only granted when a condition is unlikely to impact an individual's suitability for military duty, so recipients of medical waivers for hearing loss are assigned to Military Occupational Specialties (MOS) that do not involve hearing critical tasks.

Noisy equipment and processes are common in military operations, making hazardous noise exposure one of the most common occupational health hazards faced by service members. (GAO at 3; Jokel et al., 2015) The risk of auditory damage that results from hazardous noise exposure depends on its sound pressure level, frequency, type and duration. Using these factors, noise is broadly divided into one of two categories: (1) steady state (or "continuous") noise, which lasts one second or longer and varies little over time (*e.g.*, jet engines), and (2) impulse noise, which involves a sharp rise and rapid decay lasting 1 second or less (*e.g.*, weapons fire). Due to the qualitative differences in these noises, they discussed and regulated separately.

### A. **Steady-State Noise**

Prolonged exposure to intense, steady state noise is believed to cause NIHL as a result of repeated temporary threshold shifts that incrementally fail to recover back to baseline. (Royster, 2017) Department of Defense Instruction 6055.12 states that continuous or intermittent noise with an 8-hour time-weighted average at or above 85 dBA is hazardous; it mandates the use of HPDs in those situations. (DODI 6055.12)

Nearly all ground and air transportation platforms expose passengers and crew to continuous noise in excess of 85 dBA. The noise level of trucks and other wheeled transports increases with increased speed and payload (Army in Europe Regulation 40-501, 2018). The noise

27

level in wheeled vehicles is generally below 85 dBA at low to medium speeds, increasing to the mid-to high-90 dBA range with increased load and speed. Tracked vehicles create more noise than wheeled vehicles, often reaching levels in excess of 110 dBA while in motion. Integrated weapons systems, including mortars, missiles, and machine guns, may compound vehicular noise.  (AE 40-501; Jokel et al., 2019)

Sound levels in rotary wing aircraft range from the high-90 to low-100 dBA, and reach 105 dBA to 122 dBA in the cabin noise of fixed wing aircraft. (Jokel et al., 2019) On the flight deck of aircraft carriers, crew are exposed to noise levels that reach up to 148 dBA for tactical aircraft. At fixed-base installations, fewer personnel are adjacent to the aircraft and, as such, they are less likely to face hazardous noise exposure. Below deck, personnel on board aircraft carriers are exposed to around the clock noise that measures between 87 and 102 dBA in berthing spaces and ready rooms. (Jokel et al., 2019) Noise levels measure 92-94 dBA in the mess deck and reach up to 105 dBA in the lower aft of the ship where laundry facilities are located. (Jokel et al., 2019) On other classes of ships, engine rooms routinely measure in excess of 85 dBA, with diesel-powered engine rooms reaching up to 118 dBA. (Jokel et al., 2019)

### B. Impulse/Impact Noise

Impulse noise is the product of a release of pressure (*e.g.*, gunfire) and impact noise is generated by the forceful collision of two solid objects (*e.g.*, a hammer to a nail). (Davis et al., 2017; Smalt et al., 2017) Notwithstanding the nominal distinction, high-level, short duration noises are commonly referred to as "impulse" noise. Impulse noise creates several special hazards to the auditory system and is generally considered more damaging than steady state noise for a number of reasons: (1) the middle ear muscles cannot contract and reduce the input to the cochlea due to the short duration of impulsive noise, (2) the non-linear shape of the cochlea may "interact with the noise to increase the hazard, (3) the high peak levels associated with impulse noise may cause rapid mechanical failure, and (4) high-level acoustic impulse noise can be transmitted to the cochlea through bone conduction pathways. (Davis et al., 2017)

Because impulsive sounds cause mechanical damage to the ear, the noise duration is not as important as its maximum sound pressure level (SPL). (Yong et al., 2015) Unlike steady state noise, a single unprotected exposure to impulse noise may result in irreversible damage. (Jokel et al., 2019) As such, the DoD's definition of potentially hazardous noise includes "exposure to

impulse or impact noise levels of 140 dBP peak or greater, regardless of duration. (DODI 6055.12, 2004; DODI 6055.12, 2010; DODI 6055.12, 2019)

Virtually all military weapon systems produce impulse noise that exceeds 140 dBP, necessitating the use of HPDs. Service members routinely use large caliber weapon systems, including mortars, missiles, howitzers, and crew-served weapons, which can emit noise over 180 dBP. Military personnel may also be exposed to loud impulse noise caused by exploding ordnance, including improvised explosive devices (IEDs), which have peak sound levels similar to those associated with large caliber weapons. (Jokel et al., 2019) Blasts may be accompanied by supersonic shockwaves caused by the outward movement of explosion fragments, which may break the seal between the HPD and the skin, leading to increased hearing damage. (Jokel et al., 2019; Amrein et al., 2012)

Small arms, such as pistols, shotguns, rifles, machine guns and 40-mm grenade launchers have relatively modest peak sound levels that are generally within the mitigation capability of standard-issue HPDs. But, due to the large number of rounds that may be fired by an individual, the noise hazard associated with small arms fire remains a serious concern.

The risks associated with impulse noise were thought to be correlated with the number of rounds, peak sound pressure level ("dBP"), and B-duration (*i.e.*, the amount of time it takes for the SPL to decrease 20 dB from the peak) (Jokel et al., 2019). For over 20 years, these metrics were used to calculate the number of rounds to which an individual could be exposed depending on the weapon and hearing protection. (MIL-STD 1474D; Jokel et al., 2019). In 2015, the DoD adopted MIL-STD 1474E, which has two impulse noise criteria: one depends on the overall energy or the noise produced by the weapon (using a dBA value associated with the impulse, that integrates the exposures to estimate the risk for a given mission). The other criterion uses an electro-acoustical model of the acoustic energy transmitted into the cochlea to calculate a number of Auditory Risk Units (ARUs) associated with the sound. The allowable number of rounds ("ANOR") value is a function of the ARUs. (Jokel et al., 2019).

In the military, the great majority of NIHL occurs during training and other garrison activities. (3M_MDL000028418; ctrl3m000001127; Gates 05/29/20 Depo at 177:9-178:3; Merkley 02/26/20 Depo at 258:12-260:9) Approximately 13% of military personnel have permanent hearing loss following basic training with ballistic weapons shooting. (Jokel et al., 2019) Indoor firing ranges are commonly used for training and weapons qualification at military

installations. The reverberant properties of the indoor range result in a substantially louder environment than exist in outdoor ranges. Even in partially covered ranges, sound waves reflect off the ground, walls, and/or overhead surfaces. Although the reflected sounds have lower peak levels, the reflection affects the B-duration, increasing it 10 to 20 times over the pressure envelope duration experienced at outdoor ranges. Several shooters at a large indoor range firing nearly simultaneously create persistent noise that continues longer than the one second typically used to distinguish impulse noise from steady-state noise. (Jokel et al., 2019)

## X.    DIAGNOSIS OF AUDITORY DYSFUNCTION

As a practicing otologist/neurotologist, I use the filtering method of differential diagnosis to determine the etiology of an injury or symptom. This methodology is essentially a process of determining a condition's potential causes, then using clinically available information to evaluate and eliminate possible causes. This process is an essential aspect of my daily clinical practice and has been routinely used in the care and treatment of thousands of patients--including civilians, service members and veterans--throughout my career. I also used this method to form the opinions in each of my Plaintiff-specific expert reports.

For patients with hearing loss and/or tinnitus,  I consider all etiologies and conditions that might be causing my patient's symptoms or injuries (rule in) and then eliminate potential causes (rule out) based on the patient's medical history, occupational and recreational history, family history, sound exposures, HPD use, and trauma, in addition to my physical examination, testing, and review of the available data. This information allows me to determine the etiology of the injury by ruling out potential causes of hearing loss and/or tinnitus.

### A.  **Medical History**

A complete medical history begins with identification of the patient's chief complaint (e.g., hearing loss, tinnitus, both hearing loss and tinnitus, vertigo, etc.), including detailed  information about the timing, severity and progression of symptoms.

- Description of symptoms, including the symmetry and severity
- Onset of symptoms, including identification of precipitating event
- Progression of symptoms
- Frequency of symptoms, including aggravating and mitigating factors

Other detailed information, including the patient's ability to hear in quiet settings and situations with disruptive background noise, should also be obtained.

A current and past medical-surgical history, including age and current medications, with particular focus on history of

- Ear surgery, ear injury, or chronic ear infections
- Traumatic brain injury (TBI), concussion, or other head trauma
- Cancer treated with chemotherapeutics
- Infection requiring intravenous (IV) antibiotic treatment
- Congestive heart failure and/or chronic kidney disease treated with loop diuretic medication
- Surgery under general anesthesia
- Use of prescribed narcotic medications
- Use of non-steroidal anti-inflammatory drugs (NSAIDs)
- Metabolic disorders, including diabetes mellitus and hypothyroidism
- Stroke, diabetes or heart disease
- Hypertension and high cholesterol

To determine the cause, or *etiology*, of auditory dysfunction, occupational background is a uniquely important aspect of the patient history. Individuals with a history of employment in industrial settings, construction, and/or the military are screened for exposure to ototoxic chemicals and hazardous noise, and additional information regarding the use of personal protective equipment (PPE), including HPDs, is obtained.

For patients with a history of military service, relevant information includes military occupational history, participation in Hearing Conservation Programs, pre-deployment prophylactic antimalarial medication use, and exposure to solvents or agents known to cause medical conditions resulting in auditory dysfunction.

The patient's social history is discussed specifically, hobbies that involve hazardous levels of noise (*e.g.*, hunting, target shooting, riding motorcycles, and performing or listening to loud music), tobacco use, caffeine intake, and narcotic substance abuse. Family history is obtained to assess hereditary hearing problems and susceptibility to hearing loss.

**B.  Otoscopy**

External ear pathologies are characterized by conductive hearing losses caused by occlusion blocking sound from moving normally through the external ear canal. The physical exam begins by using an otoscope to visually inspect the pinna and the external auditory canal to identify

any anatomical anomalies, lesions or infections processes, and cerumen or obstructing material. Many outer ear conditions are diagnosed using otoscopy, including cerumen (ear wax) or foreign body blockages of the ear canal, outer ear infections (*otitis externa*), and benign, bony growths (*exostoses* and *osteomas*) that interfere with the migration of cerumen and cause blockage. Cysts or tumors are generally visible during the otoscopic exam.

The mobility, color and surface anatomy of the tympanic membrane are also assessed during otoscopy and/or binocular microscopy, which uses a binocular operating microscope for a more detailed view of the eardrum. Normal tympanic membrane is translucent, convex and intact. Perforation of the tympanic membrane, caused by chronic middle ear infections (*otitis media*) or trauma, will cause a hole to form in the surface anatomy. A perforated eardrum reduces the available surface for sound transmission to the ossicles, thereby resulting in a conductive hearing loss.

A *pneumatic otoscopy* is used to evaluate the mobility of a patient's eardrum and the aeration of the middle ear in response to pressure changes. For this exam, an otoscope with a pneumatic attachment is inserted into the patient's ear canal and the tympanic membrane is visualized as a puff of air is released. A normally functioning eardrum moves in response to pressure. An immobile eardrum manifests in a conductive loss, generally caused by a perforation, a middle ear infection (*otitis media*), or tympanosclerosis.

### C.  Pure Tone Air Conduction Tests

Pure tone air conduction audiometry tests the hearing sensitivity of the entire auditory system by presenting pure tone signals to the ear through earphones and varying the intensity of the signals until the level is identified at which the patient is just able to hear the sound. Otolaryngologists routinely rely on audiologists (and trained personnel working under their supervision) to administer audiometric testing, including pure tone air conduction tests. These tests are administered in quiet rooms, so as to avoid sound masking by ambient noise. The patient is provided earphones ("earbuds") or supra-aural earphones ("over-the-ear" headphones), through which pure tones at frequencies across the range of human hearing (typically 250 to 8000 hertz) are presented to each ear. Each tone is played for 1 to 2 seconds. Patients are instructed to raise their hand or finger or press a button while they hear a tone, and to lower their hand/finger or release the button when it stops. (3M_MDL000322497; Saunders et al., 1990)

The purpose of a pure tone air conduction test is to determine the patient's hearing threshold level ("HTL"): an intensity level at which a sound is audible, and below which it is not. In order to identify the threshold at each frequency, the tones are presented in a sequence designed to estimate the lowest level to which the participant responds correctly on at least 50% of presentations (e.g., level changes of 5 dB up after each failure to respond and 10 dB down after each response).

Pure tone air conduction tests are an integral part of military and occupational hearing surveillance programs and are critical to the clinical evaluation of auditory dysfunction. Serial audiometric testing, which is common among occupationally noise-exposed persons, provides critical information on the etiology of auditory dysfunction and substantial insight on the extent of injury. The vast majority of patients with a military background were subject to intermittent hearing exams that included pure tone air conduction testing (along with an otoscopy and history of noise exposure). Identifying the etiology of hearing loss is relatively straightforward when an individual is exposed to a single hearing hazard (*e.g.*, ear infection, noise) that is "bracketed" by pre- and post-event audiometric testing. Determining etiology of hearing loss is somewhat more complicated in cases of simultaneous exposure to more than one hearing hazard. Nevertheless, serial audiograms provide a snapshot of the individual's hearing at a moment in time, as well as insight into the trajectory of hearing loss. This data, in combination with the detailed patient history, provides a reliable basis for determining the relative contribution of one or more simultaneous exposures.

Hearing loss that results from hazardous noise exposure is typically characterized by substantial hearing threshold increases at 3000, 4000, and 6000 Hz, followed by improved thresholds at higher frequencies. On audiograms, this results in a signature "noise notch," illustrated below.

33



(Sataloff et al., 2006) Noise-induced hearing loss and the signature "noise notch" audiogram may result from shorter exposures to high-intensity impulse noise (≥ 140 dBP) and/or prolonged exposure to less intense (≤ 85 dBA) continuous noise. (Sataloff et al., 2006) This clinical hallmark can be used to distinguish NIHL from other forms of SNHL (e.g., presbycusis). Generally, a detailed case history along with the noise-notch pattern of hearing loss leads to an NIHL diagnosis.

"Asymmetry of hearing loss after weapon noise exposure is well recognized." (Cox et al., 1995.)  This occurs because the source of the noise--the weapon --is in closer proximity to one ear than the other. For the right-handed shooter, the weapon's impulse noise reaches the left ear at a higher intensity than the right ear, which is slightly shielded by the head. (Le et al., 2017.) This commonly results in asymmetrical hearing loss.  (Le et al., 2017) Asymmetrical SNHL may also be the result of a retrocochlear lesion (acoustic neuroma/vestibular schwannoma)--a potentially serious finding that may indicate investigation with MRI. (Le et al., 2017; Sheppard et al., 1996; Cox et al., 1995) However, in the absence of other clinical indications, patients with substantial asymmetry who report a history of military service and considerable weapons noise exposure will not require imaging. (Le et al., 2017; Sheppard et al., 1996; Cox et al., 1995) Rather, a clinically reliable and cost-effective diagnosis of noise-induced asymmetrical hearing loss can be reached where a thorough occupational history and serial audiology clearly demonstrate that the hearing loss is, in fact, noise-induced. (Le et al., 2017; Sheppard et al., 1996; Cox et al., 1995)

### D. **Bone Conduction**

In the private clinical setting, AC tests are followed by bone conduction (BC) tests, which provide additional information about the etiology of hearing loss and/or confirm the NIHL diagnosis. Bone conduction testing is done by striking a tuning fork and placing at various points on the patient's skull, causing the sound signal to be transmitted to the cochlea as bone vibrations. BC testing bypasses the function of the outer and middle ear, thereby isolating and testing the functionality of the inner ear and the central nervous system. Such testing is used diagnostically to identify conductive hearing loss, which affects the middle and/or outer ear. (Saunders 1990; 3M_MDL000322497) In the clinical setting, otologists commonly use tuning forks to perform basic bone conduction testing.

The Rinne test enables real-time comparison of bone conduction and air conduction hearing thresholds. To perform this test, a 512-Hz tuning fork is struck and the butt is placed firmly on the patient's mastoid bone, thereby conducting sound to the patient's ear through the skull bones. The patient indicates when the sound of the tuning fork can no longer be heard, at which time the tuning fork is moved adjacent to the ear canal. A patient with normal hearing or a sensorineural loss will hear sound when the tuning fork is adjacent to the ear canal, but a patient with a conductive loss will not. (Isaacson et al., 2003)

Weber's test is performed by softly striking a 512-Hz tuning fork and placing it midline on the head (*e.g.*, scalp, forehead, teeth, or nasal bones), resulting in stimulation of the auditory system via bone conduction. If the tone is heard primarily in one ear, asymmetry of hearing loss is indicated. For purely conductive asymmetric losses, the sound will be heard in the worse ear. Conversely, asymmetric losses caused by SNHL cause the sound to be heard in the better ear. If the hearing loss is conductive, the sound will be heard best in the affected ear. If the loss is sensorineural, the sound will be heard best in the normal ear. For patients without asymmetric hearing loss, the sound remains midline. (Isaacson 2003)

Audiologists commonly opt to perform bone conduction tests using a calibrated bone oscillator that is located on the mastoid bone and held there by a strap. The oscillator delivers pure tones directly to the skull at the same frequencies tested in pure tone air conduction testing. Otolaryngologists and audiologists compare the results of pure tone bone conduction tests with air conduction hearing thresholds to determine the site of lesion--*i.e.*, conductive or sensorineural. Conductive pathologies are indicated by air conduction thresholds that are significantly elevated

(>15 dB) compared to bone conduction thresholds (known as the "air-bone gap"). A mixed hearing loss is indicated where the air-bone gap is observed concurrently with elevated bone conduction thresholds.  (Baiduc et al., 2013)

### E.  Tinnitus

Clinical evaluation of tinnitus involves a targeted patient history and physical exam that are substantially similar to the elements described above. In order to identify secondary tinnitus--*i.e.*, tinnitus with an organic and potentially treatable underlying cause--the following additional details are obtained during the patient history:

- Laterality: Unilateral tinnitus may indicate focal auditory lesions (*e.g.*, vestibular schwannoma or vascular tumor) that warrant additional evaluation (Tunkel). However, a plurality of individuals with NIHL (up to 47%) present with unilateral tinnitus that, like asymmetrical hearing loss, tends to be more prevalent on the left side (Le et al., 2017).

- Pitch: Tinnitus associated with Ménière's disease has been described as a low-pitched sound, patulous Eustachian tube causes a loud rushing sound during inhale (IOM (2006) at 117; Sataloff at 185). By contrast, noise-induced tinnitus is commonly described as high-pitched (id.).

- Pulsatile nature: Pulsatile tinnitus is a somatosound associated with cardiovascular disease and vascular lesions that warrant additional follow-up (Tunkel; Hofmann 2013). Primary tinnitus is non-pulsatile.

Patient reports of tinnitus presence, onset, change over time, loudness and annoyance are the primary means of diagnosis. Among those patients who experience clinically significant tinnitus, clinical needs vary. The level of intervention is determined by evaluation of patient needs. This can be achieved efficiently using patient questionnaires, *e.g.*, Tinnitus Impact Screening Interview (TISI), an 8-question interview completed in the clinical setting, and the Tinnitus Handicap Inventory (THI), a self-administered questionnaire that results in a 0 to 100 index score placing a patient in one of four handicap ranges (no handicap, mild handicap, moderate handicap, severe handicap). In some cases, it may be helpful to measure tinnitus loudness, pitch and maskability, which can be done using a clinical audiometer.

Additional otologic testing that may be undertaken, as indicated, includes but is not limited to:

### 2. Tympanometry

Tympanometry provides an objective measurement of middle ear function. The test is performed by inserting into the ear canal an airtight probe equipped with a speaker, an air pump, and a microphone. The probe seals the ear canal and the air pump modulates the pressure while the speaker emits a low-frequency pure tone (typically, 226 Hz). The microphone records the sound that is reflected by the eardrum.

Tympanometry permits a distinction between sensorineural and conductive hearing loss, when evaluation is not apparent via Weber and Rinne testing.

### 3. Speech Audiometry

In addition to testing pure tones, clinical hearing evaluations include testing with speech sounds. These tests are intended to estimate the degree of difficulty a hearing-impaired individual may have with speech communication, and to confirm the validity of pure-tone test results and thereby distinguish cochlear disorders (*i.e.*, hearing loss caused by dysfunction of the cochlea) from retrocochlear disorders (*i.e.*, hearing loss caused by dysfunction of the auditory nerve or brainstem).  (Schoepflin 2012)

### 4. Otoacoustic Emissions

Functioning outer hair cells in the cochlea of a healthy ear emit low-intensity sounds at the frequencies to which they are tuned. These sounds, called Otoacoustic Emissions (OAEs), occur spontaneously and can be evoked by delivering acoustic stimuli (brief clicks or longer puretones) to the ear and recording the resulting "echo." To do this, a probe is inserted into the ear canal, where a speaker plays the auditory stimulus and a microphone records the resulting OAEs.

OAEs may be evoked using two puretones that create distortion product OAEs (DPOAEs) which are mathematically related to the stimulus frequencies and sensitive to minor changes in cochlear physiology (Baiduc et al., 2013). DPOAEs are rarely present when hearing loss exceeds 60 dB HL, and are reduced in cases of mild to moderate hearing losses. Transient Evoked Otoacoustic Emissions (TEOAE), which use a very brief click or tone pip, are used to screen infants for hearing loss, assess cochlear function and validate other testing.

### 5. Auditory Brainstem Response Testing

Retrocochlear pathologies can be identified using the Auditory Brainstem Response (ABR) test, which uses small electrodes to measure electrical activity in the brainstem and auditory nerve following the delivery of auditory stimuli (Baiduc et al., 2013). Within 15 milliseconds of the

37

stimulus delivery, the ABR is recorded as a "waveform" with seven peaks that represent neural activity. Computers measure and analyze the waves to identify any increase in latency--*i.e.*, the length of time between stimulus delivery and neurological response--indicating a retrocochlear lesion.

## XI.    TREATMENT OF AUDITORY DYSFUNCTION

NIHL and tinnitus are permanent and progressive conditions. There are no cures for these conditions, which are not amenable to medical or surgical treatment. Treatment for NIHL is essentially limited to hearing aids, which are designed to increase the volume of sound at frequencies impacted by hearing loss, but they do not repair the damage sustained by the auditory system. (Baiduc et al., 2013) Amplification can also be used to manage NIHL-related tinnitus by treating the hearing loss and mitigating the annoyance of tinnitus. Hearing aids can improve hearing in some situations, but they cannot completely and seamlessly compensate for NIHL. For example, many hearing aid users struggle to understand speech in noisy environments as a result of loudness recruitment and other distortions, which are exacerbated by hearing aids. In addition to these inadequacies, personal reservations and social stigma deter potential hearing aid users (Baiduc et al., 2013).

Sound therapy uses broadband noise sound generators, hearing aids, or combination devices to promote habituation (*i.e.*, an adaptation process of the auditory system that reduces the perceived signal intensity of the tinnitus as well as an individual's reaction to it) by reducing the contrast between the tinnitus and environmental sound, providing sounds that are soothing to induce a sense of relief from stress or tension caused by tinnitus, or providing sounds that are interesting with the goal of distracting the patient's attention away from the tinnitus.

Cognitive behavioral therapy is also used in the treatment of tinnitus. This approach integrates behavioral interventions including relaxation techniques and instruction on sleep hygiene with cognitive skills to identify negative thoughts that result in distress and restructure them in a manner considered more accurate or helpful. This approach, originally developed for treatment of depression and anxiety, and has been shown to be effective in the treatment of tinnitus-related distress.

Tinnitus Retraining Therapy seeks to habituate the patient to the tinnitus sound by using directive therapy to neutralize negative emotional reactions to the tinnitus and using sound therapy

to decrease the perceived contrast between the background noise and the patient's tinnitus-related neuronal activity.

There is no FDA-approved medication for the treatment of tinnitus nor are there any medications that can diminish the perceived loudness of tinnitus. Medications for the treatment of comorbid conditions, including anxiety, depression and insomnia, are prescribed to reduce overall suffering. (International State of the Science Meeting on Blast-Induced Tinnitus)

XII.    **IMPACT OF AUDITORY DYSFUNCTION**

Hearing impairment has numerous negative consequences, including depression, anxiety, irritability, isolation, fatigue and cognitive decline.

Communication interference caused by hearing loss substantially affects social integration, functional ability and self-image, leading to increased social stress, embarrassment, and poor self-esteem (Le et al., 2017; Baiduc et al., 2013).  Some individuals who suffer from hearing loss try to minimize or overcome their impairment by listening strenuously and/or guessing to fill in missing information, which results in misunderstanding and embarrassment (Sataloff).  Marital and other close relationships are particularly impacted by the communication detriment caused by hearing loss (Sataloff; Le). Efforts to overcome these difficulties and to hide the resulting frustration result in fatigue and irritability (Sataloff).

Hearing loss significantly impacts workplace safety and productivity (Baiduc et al., 2013). Difficulty hearing alarms, warning signals, and the cries of co-workers can increase workplace accidents, injuries and fatalities (Tufts et al., 2009; Baiduc et al., 2013). In fact, each dB of hearing loss increases the likelihood of workplace injuries requiring hospitalization (Baiduc et al., 2013). Employees with hearing loss are much more likely than their normal hearing counterparts to experience mental distress requiring sick leave (Tufts et al., 2009). Hearing loss is also associated with declines in cognition, memory and attention (Le et al., 2017).

Noise induced hearing loss and tinnitus have long been associated with co-morbid psychiatric conditions such as anxiety, social isolation and depression, and have a known correlation to elevation of stress related to cardiovascular disease (Hahad 2019).  The World Health Organization attributes 1.5 million health life years lost in Western Europe to the elevated metal stress, inflammation and oxidative stress from the annoyance, cognitive impairment, and sleep disturbances associated with long-term low-level noise exposure.  (Hahad, Oxid Med Cell Longev Nov 2019).  Noise induced mental stress linked to increased stress hormone levels, blood pressure

elevation, and tachycardia which lead to cerebrovascular disease, stroke, arterial hypertension, ischemic heart disease, and myocardial infarction.  More recently hearing loss has been associated with cognitive decline and dementia.  Correction of hearing loss has also been shown to benefit cognitive decline, and early intervention is recommended (Jafari, Ageing Res Rev Dec 2019).

Several systematic reviews of the literature have linked tinnitus to psychiatric disorders, with a high prevalence of anxiety and depression seen.  Pinto et al reviewed 16 articles from a search identifying 153 published between 2000-2012 showing a high prevalence of psychiatric disorders in tinnitus-affected patients, especially anxiety and depression (Pinto, J Laryngol Otol Aug 2014).  Similarly, Ziai et al found 15 of 53 articles relevant for review also showing a strong association between tinnitus, depression, and anxiety, and recommended all tinnitus patients be screened for psychiatric disorders (Ziai Int Tinnitus J Jun 2017). Another systematic review of 117 published scientific papers revealed a 45% lifetime prevalence of anxiety disorders in the tinnitus population. In this Pattyn et al also recommend screening for psychiatric disorders in moderate severe tinnitus (Pattyn Hear Res Mar 2016). In the VA Martz et al found that 116,358 of 769,934 OEF/OIF/OND Veterans, in a retrospective analysis, were shown to have been diagnosed with tinnitus by the VA.  Of these, depression co-occurred in 21%, anxiety in 8%, and both anxiety and depression in 17%.  (Martz Ear Har Nov/Dec 2018).

The strong association between dementia, cognitive impairment and hearing loss is becoming better understood.  A prospective cohort of 37,898 older men followed for a mean 11.1 years showed that 18.3% of men with hearing loss were more likely to develop dementia than men free of significant hearing loss (Ford, Maturitas. Jun 2018). This systemic meta-analysis showed an aggregated hazard of dementia of 1.49 (95% CI), and noted that earlier hearing loss in mid-life may account for up to 9.1% of dementia cases world-wide.  Osler et al, in an attempt to assess the effect of hearing loss occurring early in life with the later development of dementia, examined a cohort of 942,567 Danish men that were followed from conscription at age 19 in which they identified 59,834 men with a diagnosis of hearing loss (Osler, Eur J Epidemiol Feb 2019). Dementia was more highly associated with hearing loss diagnosed prior to age 60 (HR 1.9), than hearing loss diagnosed after age 60 (HR 1.15).  They recommended early diagnosis stating that correction of hearing loss may improve mental decline.  Another assessment looked at three prospective cohort studies analyzing the association of hearing loss with Alzheimer's disease, and one assessing the association of hearing loss with mild cognitive impairment (Zheng Neurol Sci.

40

Feb 2017).  A relative risk for Alzheimer's disease developing in subjects with hearing loss was shown to be 4.87 in three studies, and relative risk of 2.82 for the development of cognitive impairment overall in subjects with hearing loss was shown.  Like tinnitus, psychiatric diagnoses prevalent in hearing loss.  Specifically, symptoms of depression were associated with occupational noise-induced hearing loss in 53% (Deng, Noise Health Jan-Feb 2019).  The duration of noise-induced hearing loss was also associated with significant elevation of cortisol levels, and poor indices on standardized testing for tinnitus and sleep

The association of hearing loss in general and noise-induced hearing loss and tinnitus specifically and their association with depression, anxiety, cognitive decline and other chronic cardiovascular stress related disease is well recognized.  Prevention, early identification, and adequate rehabilitation are helpful in mitigating or avoiding these complications of hearing loss and tinnitus.  Jafari recommends hearing amplification to alleviate hearing handicap, depression and tinnitus, as well as to improve cognition, social communication and quality of life.  Hearing aids may ameliorate cognitive decline by improving audibility independent of the association of hearing loss on social isolation or depression (Dawes, PLoS One 2015). Hearing conservation and prevention efforts with adequate noise abatement and hearing protection, as well as advocacy for and early treatment of hearing loss and tinnitus appear to be the best courses of action to diminish the deleterious psychological and cognitive effect of long-term hearing loss and tinnitus.

## XIII.   NOISE-INDUCED HEARING LOSS & TINNITUS ARE PREVENTABLE

Even in the presence of the significant noise hazards present in military settings, NIHL is preventable. In fact, the National Institute of Deafness and other Communications Disorders (NIDCD), which is a part of the National Institute of Health clearly proclaims "NIHL is the only type of hearing loss that is completely preventable."

3M not only agrees, but also claims NIHL is entirely preventable in order to increase sales of its HPDs. For example, 3M's marketing materials declare that "Noise Induced Hearing Loss is 100% Preventable!" (3M_MDL000716257) 3M's website further states that "NIHL is entirely preventable, and reliable hearing protection is the key." The CAEv2 inventor, Elliott Berger likewise acknowledges that NIHL is preventable, stating: "When properly and consistently worn, hearing protectors can effectively attenuate noise and prevent hearing loss. That much is clear." (3M_MDL000233892)

The Department of Defense agrees. To that end, in 1978, the DoD issued an Instruction establishing a uniform hearing conservation program. The Instruction has evolved since it was first adopted in 1978 but every iteration has included the following elements: (1) hearing surveillance programs for occupationally noise-exposed personnel, (2) noise hazard identification, and (3) noise abatement strategies. (Nelson et al., 2017)

Since 1987, the Instruction has required each branch of the military to create its own Hearing Conservation Program for personnel exposed to hazardous noise, which is defined as:

1. Continuous and intermittent noise that has an 8-hour time-weighted average (TWA) noise level of 85 decibels A-weighted (dBA), or above. Implementation may also be started regardless of the duration of noise exposure. Those criteria apply only to energy in the frequency range from 20 to 16,000 Hertz (Hz).

2. Impulse noise sound pressure levels (SPLs) of 140 decibels (dB) peak, or greater.

3. Upper sonic and ultrasound acoustic radiation exposures occur under special circumstances that require specific measurement and hazard assessment calculations.

Additionally, since 1996, the Department of Defense has required all military personnel--not just those exposed to hazardous noise--to have a reference audiogram at basic training prior to noise exposure. (DODI 6055.12 (2004) at § 6.8.3.)

By 2004, 42% of the active duty Air Force and more than 14,000 civilian employees were enrolled in the Air Force's Hearing Conservation Program. (Humes et al., 2006) As of 2005, the Navy had 285,000 sailors and 67,000 Marines enrolled in the Navy's Hearing Conservation Program, and in 2012, the Marine Corps began requiring annual audiograms for all Marines. (Nelson et al., 2017). In 2003, the Army's Hearing Conservation Program covered 77% of active duty soldiers (approximately 375,000 individuals), and 53,986 civilians. Then, in September 2006, the Army implemented a "hearing readiness monitoring" regime that rapidly increased enrollment in its Hearing Conservation Program to include 100% of its active duty force as of 2017. (Nelson et al., 2017)

Under DODI 6055.12, all personnel assigned to occupations that involve routine hazardous noise exposure must have an audiogram before placement, periodically (at least annually) thereafter, and upon leaving an occupation in a hazardous noise area. 6.8 Subsequent audiograms

are compared to the reference audiogram to monitor for a Significant Threshold Shift—that is, a change in hearing thresholds of either ear averaging 10 dB at 2000, 3000 and 4000 Hz.

When an STS is identified, the service member must be sent for medical evaluation with an audiologist, otolaryngologist or other physician to perform follow-up testing and to determine if additional medical evaluation is necessary. For personnel with a positive STS (decrease in hearing threshold from the reference audiogram), at least two follow-up audiograms must be administered to establish the permanency and the severity of the hearing loss. If the positive STS is present on both follow-up audiograms, it is considered a permanent threshold shift (PTS) and a new baseline hearing threshold is established. If the follow-up audiograms show that hearing improved and the STS is absent, the hearing loss is considered a temporary threshold shift (TTS).

Reference audiograms and subsequent hearing tests are uniformly recorded on Department of Defense forms (DD Form 2215 and 2216, respectively), which are centrally maintained in the Defense Occupational and Environmental Health Readiness System – Hearing Conservation ("DOEHRS-HC") database. This data can be obtained by audiologists and physicians responsible for evaluating service-connected disability claims on behalf of the U.S. Department of Veterans Affairs, and by civilian healthcare providers who use it for clinical treatment purposes.

Despite the DoD's concerted effort at hearing surveillance and auditory injury identification, there are limitations to this testing regime. Subclinical injury can occur below the threshold of hearing sensitivity and may, therefore, go undetected. Additionally, military exposures and/or hearing losses may not be evaluated because (1) service members don't want to let team down and they know substantial hearing loss may result in medical separation or change in job specialty code; (2) service members may not have access (or convenient access) to testing facilities in a timely manner; and/or (3) changing HCP regulations over time/between branches. Consequently, loss of auditory function is often compensated for and put off.

The DoD Instruction requires the services to strategically mitigate noise hazards according to the following hierarchy: (1) engineering controls, (2) administrative controls, and (3) personal protective equipment. (DODI 6055.12; Nelson et al., 2017) DoD policy dictates that engineering controls—*i.e.*, procuring quieter equipment, improving noise reduction technology, and/or building barriers to deflect noise—are the primary means of eliminating hazardous noise exposure. "Where engineering controls are undertaken, the design objective shall be to reduce steady-state

43

levels to below 85 dBA, regardless of personnel exposure time, and to reduce impulse noise levels to below 140 dB peak SPL." (DODI 6055.12)

It is well-understood that "engineering out" the noise is not always feasible, particularly in the military setting. In such cases, administrative controls (i.e., policies, procedures and shift design) are implemented to minimize exposure. For example, the Army may implement a limitation on tracked vehicle travel distance to protect personnel against long exposures to hazardous noise. (Jokel et al., 2019) Administrative controls are not always feasible in military settings, including training and combat scenarios, which generally do not adhere to the typical civilian workday. Where engineering and administrative controls are inadequate or unworkable, personal protective equipment such as HPDs are used to mitigate the impact of hazardous noise exposure. Although noise hazards are prevalent in military settings, most hazardous noise can be mitigated to a non-hazardous level through the use of hearing protection.

## XIV.   HEARING PROTECTION DEVICES (HPD)

Hearing protection devices are used to significantly reduce the amount of sound coming into the ear.  HPDs can provide protection against continuous noise and impulse noise and thereby provide protection against NIHL and tinnitus.  (Ramakers et al., 2016.; Theodorff, et al., 2015) The best type of hearing protection removes noise from entering the ear. Typically, they provide the most protection from high frequency noise and protection against low frequency noise.  There are numerous types of HPDs.  These include passive (linear and nonlinear) devices as well as electronic systems (tactical and non-tactical).  It is crucial to protect against both continuous and impulse noises while allowing situational awareness so that soldiers can detect low-level sound, communicate and recognize and identify sounds. It is well documented that "Soldiers will develop noise-induced hearing loss if no protector is worn or when their hearing protectors are fitted poorly, used inconsistently or improperly, or provide inadequate noise reduction." (Vause et al., 2001)

Hearing protection is crucial in the military environment to protect against continuous and impulse noises that soldiers encounter daily.  The continuous noise producers include helicopters, generators, tanks, armored vehicles, etc.  Impulse noises include machine guns, pistol fire and mortar rounds.  It is important to protect against the above while allowing situational awareness. Soldiers also must be able to communicate effectively and accurately.

Hearing Protection Devices can significantly reduce the decibel level that passes into the circuitry of the ear. HPDs reduce noise exposure levels and the risk of hearing loss.  Essentially,

they significantly reduce or eliminate the amount of sound reaching the ears. Hearing protection devices try to reduce a persons' noise exposure by reducing the amount of Decibels (dBs) they are being subjected to by noise reduction.  The amount of reduction a certain HPD can produce is called a Noise Reduction Rating.

### A.  Types of Hearing Protection Devices

HPDs can be both passive and electronic. Passive devices can be both linear and nonlinear. Linear earplugs provide the same amount of noise attenuation at all times. The noise attenuation of non-linear earplugs varies depending on the level of ambient noise:  attenuation increases with increased ambient noise. (CTRL_3M_Touhy00000021)

"Non-Linear earplugs are protectors that permit low level speech to be heard with very little reduction at the ear (about 2-3 dB) while providing almost the attenuation of standard earplugs at the high noise levels produced by rifles, howitzers, and mortars. The non-linear effect is obtained by placing a small aperture inside the earplug which allows the particle velocity of low level sound (speech) to enter the ear, while creating turbulence at the entrance to the aperture thereby attenuating high-level impulse noise as well as a normal earplug." (DOD00000059)

The main categories of HPDs are:

### 1.  Foam Plugs ("Foamies")

Foam plugs are typically a quarter to half inch piece of foam/fiber that are rolled and inserted into the ear canal where they expand filling the ear canal and conforming to the unique shape of the ear canal.  The foam helps seal the ear canal and blocks noise from entering the ear. They are available in a variety of sizes (small, medium and large) so they do not require fitting by trained personnel.  They are comfortable and inexpensive.

### 2.  Pre-Formed (Molded/Pre-Molded) Ear Plugs

Pre-formed earplugs are typically flanged earplugs which are made with single, triple or quad flanges that provide flexibility and seal off the ear canal wall from noise.  They can be made from a variety of materials (rubber, plastic, silicone, foam) and there are numerous styles and sizes. They need to work in a way that creates an individual fit for different size ears.  If fit and insertion is proper, they provide effective protection. Examples of pre-formed plugs are included in the chart below:



### 3. Ear Muffs

Earmuffs are cushions that block noise from entering the ear by creating an airtight seal against the head and outer ear. This decreases the amount of sound that is transmitted to the ear. They are easy to fit and designed to universally fit most individuals. They are often worn with foam ear plugs for double protection. Earmuffs provide noise protection and easily be taken on and off. Individuals also typically get noise protection even if they have not received instruction on how to properly use them.

### 4. Active (Electronic) Ear Muffs

Earmuffs can also have communication circuitry or be active models. Active models can have microphones and external audio devices. There can be volume controls to amplify sounds from outside the earmuffs. Some active systems have both hearing protection and communications built into the earmuff. These systems provide ear protection as well as allowing situational awareness through radio connections and ear-level stereo microphones. They are called Tactical Communication and Protective Systems (TCAPS).

### B. Importance of Fit and Selecting the Right HPD

One of the most important features of an HPD is comfort as well as proper fit and ease-of-use. (3M_MDL000409110) Testing can be performed to determine the actual noise reduction for each user. This is called a Personal Attenuation Rating (PAR). According to 3M, "predicting individual performance from group average is not possible" because derating does not account for

an individual's differences. (3M_MDL000409110) There is a lot of real-world variability for HPDs. This is especially true for military service members.

Selecting and fitting the appropriate hearing device is complicated in the military setting, as one must look at the environment, the use of HPDs with other protective equipment and the soldier's need for communication and situational awareness. They must also look at how Soldiers will use the HPDs. "All hearing protectors require an air-tight seal in the ear canal to block sound from reaching the inner ear. Like a cork in a bottle, an earplug must fit the ear canal perfectly to keep sound from leaking around the plug and into the ear canal." (3M_MDL000369525) If a Hearing Protection Device does not fit properly because of lack of proper instruction in using it or it is improperly designed, it can cause more damage than no hearing protection device at all as the soldier believes they have protection when they do not actually have adequate protection. In order to get good hearing protection, you must have a good fit and seal between the skin of the ear and the HPD. If the air leaks through the seal, the HPD will not be as effective. It is also well known that HPDs show a great deal of variability in their "real world" performance as compared to laboratory measurements. (Berger, 2003. Hearing Protection Devices, in *The Noise Manual* (5th ed.) 421-23)

3M is aware that NRR values obtained in the laboratory setting do not translate to the real world. (3M_MDL000464853 at 26; "[Noise Reduction Ratings] are based upon an optimized fitting scenario in a controlled laboratory environment that bears little resemblance to the conditions under which workers wear HPDs on a daily basis, in what is often referred to as the real world." (3M_MDL000464853) Berger also states that, in "[n]o less than 22 studies conducted in 7 countries in over 90 industries with over 2,900 subjects have found a significant disparity between the amount of protection afforded between laboratory results and those achieved in the workplace." (3M_MDL000345123) This is especially true for a soldier due to their day to day duties when they are on the move, riding on tanks, working in raining, cold, hot, humid, sweating conditions. "The degree of noise reduction depends on the quality of fit." (3M_MDL000369525) The Combat Arms Earplug at issue in this case was promoted as a "one-size-fits most" and did not require ear canal sizing across all military. (3M_MDL000426573)

## XV.    BACKGROUND:  THE COMBAT ARMS EARPLUG

The Combat Arms Earplug version 2 ("CAEv2")—the earplug at issue here—was manufactured and sold by 3M. The CAEv2 is dual-ended and ultimately consists of two earplugs: one "closed" end (green) and one "open" end (yellow).



(3M_MDL000345123 at 31, A-9; 3M_MDL000393840) There had never been a dual-ended earplug like the CAEv2 before 3M sold it, and there has never been another similar dual-ended earplug since 3M stopped selling it. It was the only one ever.

The CAEv2's yellow or "open" end was intended to provide "non-linear" protection. It had a hole in the tip, and housed a filter that was intended to allow low-level noise to pass through without attenuation, while increasing the attenuation as the level of  noise increased. (3M_MDL000188689; 3M_MDL000345123 at A-9) In other words, this end was supposed to allow low-level noises (*e.g.*, voices) to be heard while simultaneously protecting the wearer from impulse noise (*e.g.*, gunfire such as that encountered on the firing range in training) in order to allow for communication and "situational awareness."  The green or "closed" end on the other hand, was designed to provide "linear" protection. It was a conventional earplug intended to provide a constant level of protection and protect the wearer from steady-state or continuous  noise (*e.g.*, tanks, generators, etc.).

The CAEv2 was the second of five earplugs in 3M's Combat Arms series.



**Figure 1 - Four versions (left-to-right) of the CAE**

(3M_MDL000259868; the fifth earplug, version 4.1, not shown) The other versions of the Combat Arms earplugs included non-linear filters, but none of them were dual ended like the CAEv2. A discussion of 3M's development of each plug—with emphasis on the development, testing, and claims 3M made related to the CAEv2—is below. (3M_MDL000259866)

## A.  The Original Combat Arms Earplug Version 1 (CAEv1)

For several decades, researchers have studied non-linear hearing technology in an effort to protect users from loud, impulse noise while also allowing low-level, continuous noise to be heard. The documents produced in this litigation show that as far back as the 1990s, 3M worked with The French-German Institute in Saint-Louis ("ISL") to research and design nonlinear HPDs. (3M_MDL000712631)

In the late 1990s, ISL designed an acoustic valve known as a "non-linear filter" and inserted it in 3M's UltraFit earplug. (3M_MDL000188671; 3M_MDL000779978 at 25) This single-ended, triple-flange plug became "version 1" of the Combat Arms Earplug (CAEv1):



(3M_MDL000005686) The CAEv1 was introduced in 2000 and is also known as the "European Nonlinear Plug" ("ENLP") or "French plug." (3M_MDL000006623; CTRL_3M_Touhy00000298)

3M conducted a ten subject Real-Ear Attenuation at Threshold ("REAT") test on the CAEv1 and calculated an NRR of 8. (3M_MDL000006630; 3M_MDL000039506) The Army conducted Blast overpressure testing on this "French No. 1" plug in 1996. The Army found it performed "better" than other non-linear plugs. (3M_MDL000014064; 3M_MDL000014089; 3M_MDL000014158)

In early 2007, 3M discontinued the CAEv1 due to low sales and because 3M's new version, CAEv3, was on the market. (3M_MDL000692589)

**B.**  **The Design And Development Of Version 2 (CAEv2)**

Development of the CAEv2 began in the 1990s. In 1997, 3M and ISL designed a single earplug combining non-linear and linear functions. (3M_MDL000013024) The single-ended prototype allowed users to twist the filter in order to change between the open and closed modes of protection.  3M and ISL also designed a dual-ended prototype that had a non-linear plug on one end and a linear plug on the other. (3M_MDL000006631) After modifying the filter, this dual-end design became the earplug that was ultimately marketed and sold by 3M as the CAEv2. (3M_MDL000006631)  During development in 1997, however, Armand Dancer, a scientist at ISL who worked with 3M to design and develop the CAEv2, had concerns about the design of the stem and filter. (3M_MDL000013024) Specifically, he was concerned that the diameter of the stem was

too large and, as a result, would lead to fitting problems. (3M_MDL000013024) Dancer recommended that the diameter of the stem be reduced from its current diameter, but 3M actually increased the diameter of the stem in the final design rather than following Dancer's recommendation. (Berger 30(b)(6) 9/25/2020 Depo. at 204:17-206:14; 3M_MDL000017774; 3M_MDL000013027)

Doug Ohlin of the U.S. Army's Hearing Conservation Program was "interested" in ISL's "bidirectional" design, and the French Army believed 3M's UltraFit (the same triple-flange plug used in the CAEv1) was the "best vehicle" for ISL's filter. (3M_MDL000425673) The DoD Hearing Conservation Working Group, which Ohlin chaired, gave the DoD approval to purchase the CAEv2. (3M_MDL000188689)

Neither Ohlin nor the DoD, however, provided formal specifications for the CAEv2. (3M_MDL000527305; Ohlin 4/24/2013 Depo. at 130:6–131:10, 241:5–6). Although the DoD was "interested" in a single earplug combining linear and non-linear functionalities, 3M developed, designed, and tested the plug. (3M_MDL000425673; 3M_MDL000434810). 3M then "came up with the [CAEv2's] design," which it intended to sell to the military as well as non-military users. (3M_MDL000259188) ISL's patents, which 3M licensed, covered the design, but 3M considered itself to be the CAEv2's "creator." (3M_MDL 000277773; 3M_MDL000343622).

In April 1999, before 3M sold the CAEv2 to the DoD, Ohlin asked 3M if it could "shorten the plug" to fit into the Army's carrying case. (30(b)(6) 12/12/19  Depo at 504:5–505:19). 3M decided to shorten the stem by 0.184 inches without additional military involvement. (3M_MDL000393831). 3M then began selling the CAEv2 and "feature identical" products to both civilians and the military. (30(b)(6) 10/17/19 Depo at 38:13–40:14, 51:5-24).

3M sold millions of CAEv2s to the military and consumers for fifteen years until it was abruptly discontinued in October 2015. (3M_MDL000332111).

**C.  <u>The Tip Technology in the CAEv2: UltraFit and UltraFlex</u>**

The "tips" are the part of the CAE earplugs that are inserted in users' ears.  3M has over the years had multiple products that have similar "UltraFit- type" tips. Tips from single ended earplugs are the tips that ended up on the CAEv2.  Specifically, the yellow end of the CAEv2 was an Ultrafit tip (modified to house a filter), and the green end was the UltraFlex tip (which was also modified from the UltraFit). (30(b)(6) 09/25/20 Depo at 25:4–26:6; 3M_MDL000017784)

Robert Falco of 3M invented and patented the UltraFit, the single ended plug,  in 1989. (3M_MDL000779978) During the early 1990s, 3M used this design to design additional tips (30(b)(6) 09/25/19 Depo at 32:3–7) For example, 3M modified the UltraFit to include a sound channel, creating a tip called the UltraTech. (30(b)(6) 09/25/20 Depo at 50:22–51:4) This open channel inside the tip allowed for the placement of a non-linear filter. In short, the UltraTech was similar to the modified UltraFit used for the CAEv2's yellow end, but the notable difference was 3M used a hard-plastic adapter stem in the CAEv2. (Id. at 65:2–24.)

The diameter of the hard adapter stem used in the CAEv2 was problematic. Dancer and Hamery of ISL told Aearo that "the increase in diameter of the prototype plug because of the surrounding stem" could cause "fitting problems" referring to a prototype plug with a diameter of 4.2mm (3M_MDL000013027) In fact, 3M actually increased the diameter of the stem for the CAEv2 from 4.2mm to 4.45mm. (Id..; 3M_MDL000017784)

Another variation on the UltraFit tip was the UltraFlex tip. 3M's NRR testing of the UltraFlex yielded NRRs of 24.1, 24.2, and 27.4. (3M_MDL000320306-08) Despite using a modified UltraFlex in the CAEv2, the green end of the CAEv2 never achieved those protective levels. (30(b)(6) 09/25/20 Depo at 194:15–196:3) Berger testified about the differences between these two tips, including that the original "UltraFlex earband didn't have the rubber stem cut off" and "also had an adapter that was of a different shape and a lower diameter than the adapter used in the [CAEv2]." (Id. at 197:21–198:7) Specifically, the original UltraFlex tip design has an adapter stem that barely breached the third and largest flange, whereas the UltraFlex used in the CAEv2 has an adapter stem that pushed further into the largest flange and noticeably deeper into the plug. Another problem was Aearo's choice of stem adapter for the CAEv2. Aearo could have used the "more flexible" material from the UltraFlex band in the CAEv2, but it did not do so. (30(b)(6) 09/25/20 Depo at 189:16–23, 201:21–202:1). The problems resulting from these modifications are set forth in the Flange Report. (3M_MDL000728812)

Another tip Aearo designed was the UltraFit Plus. Berger testified the UltraFit Plus was based on the UltraFlex tip. (30(b)(6) 09/25/20 Depo at 227:24–228:23) The UltraFit Plus used a flexible vinyl material called Unichem Vinyl. (3M_MDL000605262) Compared to the CAEv2, the UltraFit Plus had a longer and more flexible stem. (30(b)(6) 09/25/20 Depo at 254:15–255:1) Thus, though both the green end of the CAEv2 and the UltraFit Plus used the same UltraFlex tip, the UltraFit Plus was superior because it had a thinner, more flexible stem, and was not a dual-

ended design. (Id. at 254:15–255:1, 256:1–256:9) The UltraFit Plus also yielded better NRR results than the green end of the CAEv2. Test 213014 of the UltraFit Plus Plug produced a greater NRR than what was achieved in the 213015 test even though they had the same tip. (3M_MDL000534450) The UltraFit Plus was designed circa March 1999, so it was available when Aearo designed the CAEv2. (30(b)(6) 09/25/20 Depo at 227:24–228:23)

Several years after the CAEv2 went to market with these problematic tips, Berger finally admitted that the inflexible adapter stem posed a problem and required redesign. Berger stated "the principal reason for discomfort is the plastic insert in the earplug stem," and he recognized that "if the filter were smaller in diameter" then the "diameter of the plastic insert [could be] smaller as well." (3M_MDL000192859)

### D. Version 3 (CAEv3)

Aearo recognized "there [were] a number of problems that need[ed] to be addressed" with the CAEv2, which prompted them to go back to the drawing board and design a "New & Improved (N&I) CAE." (3M_MDL000362403) In December 2005, Aearo entered into a Prototype Agreement with the U.S. Army to design and develop the "Improved Combat Arms Earplug." (3M_000689903) This eventually became known as "version 3" ("CAEv3").

When redesigning the CAEv2, Aearo returned to the CAEv2's single-ended but dual mode design, with just one Ultrafit type tip like the CAEv1. The CAEv3 contains a similar filter  and linear/non-linear technology as the CAEv2, but switches mode with a "rotating plastic dial that opens and closes the sound pathway, providing lower or higher amounts of protection, depending on the position of the dial." (3M_MDL000259868)



(3M_MDL000259883) According to 3M marketing documents, this model was an improvement because it allowed for "easier selection" of attenuation modes and "less protrusion from ear" compared to the dual-ended design. (3M_MDL000002067; 3M_MDL000020024)

Some relevant changes that were made to develop the CAEv3 included producing a new filter with a smaller diameter "in an attempt to correct" problems with inserting the plug and user

discomfort. (3M_MDL000259885; 3M_MDL000259889) Other modifications included changing the stem length, enlarging holes in the filter, and using slotted stainless steel disks as filters. (3M_MDL000259885–3M_MDL000259899)

The CAEv3 also came in multiple different sized tips—small, medium, and large. (3M_MDL000259886–3M_MDL000259887)



(3M_MDL000259906) This was an improvement from the CAEv2's "one-size-fits-all approach." The CAEv3 plugs ranged in size from 0.456 inches to 0.624 inches wide. All three sizes had a similar total length (approximately 0.84 inches from end to end), but employed varying flange measurements and arrangements to achieve that length, as depicted below:



SMALL              MEDIUM              LARGE

(3M_MDL000259908)

According to 3M testing, the CAEv3, when properly fitted, "provided slightly-higher levels of protection in the open position than the earlier versions"—an NRR of 7. (3M_MDL000259883–3M_MDL000259885; 3M_MDL000259907) The closed position, akin to the green end of the CAEv2, provided an NRR of 21. (3M_MDL000259907; 3M_MDL000259883–3M_MDL000259885)

This plug was on the market from approximately 2007 to approximately 2010, when it was replaced with the version 4. (3M_MDL000020024)

## E. **Version 4 (CAEv4)**

Version 4 ("CAEv4") was developed from approximately 2007 to 2009. Like the CAEv3, it was single-ended and came in three different sizes. (3M_MDL000019712; 3M_MDL000259900) Instead of a twisting dial, there is a "rocker arm assembly that opens and closes the sound channel." (Id.)



(3M_MDL000259900) According to 3M marketing documents, the CAEv4 was an improvement because there is "less protrusion from the ear," the plug is "easier to insert correctly for a good seal," and the user "can select protection while plug is in the ear." (3M_MDL000013575; 3M_MDL000020025; 3M_MDL000612663–3M_MDL000612664)

The final version of the CAEv4 produced an NRR of 7 for the open position and an NRR of 23 for the closed position. (3M_MDL000259900–3M_MDL000259904; 3M_MDL000259907) This was achieved by modifying the fitting instructions to instruct users to choose the "smallest tip to provide a good seal/fit." (3M_MDL000259904; 3M_MDL000259913–3M_MDL00025914)

The CAEv4 has been on the market from approximately 2009 to the present. (3M_MDL000020024)  In December 2010, 3M recalled the large CAEv4 after discovering that "the attenuation . . . may increase in the open position after multiple disassemblies and reassemblies." (3M_MDL000499202) When 3M abruptly discontinued the CAEv2 in 2015, they directed consumers that "[t]he replacement is the Single Ended Combat Arms Earplugs, Generation 4." (3M_MDL000013574)  In 2017, 3M again ordered a limited recall of specific lots of small and large size CAEv4 earplugs due to a raw material issue that could result in more attenuation than indicated when used in the open mode. (3M_MDL000616416)

## F. **Version 4.1 (CAEv4.1)**

Next came the generation 4.1 ("CAEv4.1"), which was developed around 2011. (3M_MDL000358291) Like the CAEv4, it was single-ended and came in small, medium, and large

tip sizes. (3M_MDL000783336) Berger described how each additional version of the Combat Arms Earplug included "improvements each time," and that the CAEv4.1's primary advantages and innovations were a "switch button" and "retainer clip." (3M_MDL000277926; 3M_MDL000523220; 3M_MDL000804574)



(3M_MDL000783336)

The CAEv4.1 "comprise[d] an easier-to-use rocker-switch mechanism, with better and more definitive tactile feedback that can be operated even while wearing protective gloves." (3M_MDL000523220) It also offered "a new retaining device that fits in the concha of the external ear to help ensure the product remains seated," and "a smaller stem that inserts in the earplug tip for enhanced comfort." (Id.) Finally, the plug contained "a non-reflective and replaceable tether cord." (Id.)

The CAEv4.1 produced an NRR of 8 in the open position and 20 in the closed position. (3M_MDL000278456) Also notable is that the "sell sheet" for the CAEv4.1 contained step-by-step instructions about "ensuring proper fit and use," including information about a "quick and easy fit check" called "the pump test." (Id.) "The seal can be tested by gently pumping the plug in and out of the ear canal while the rocker switch is in the Closed Mode position. When a proper acoustic/pneumatic seal is present, the pumping motion will cause the pressure changes in the ear, which the wearer should be able to detect. When the rocker switch is in the Open Mode position the wearer may notice little or no pressure change when the pump test is performed. If no difference can be detected between the Open and Closed Modes, the plug is probably not sealing the ear. Also, the user's voice should sound louder and deeper when they speak or hum." (Id.)

The plugs were sold primarily to the French military from 2014 to 2018. (3M_MDL000523220) Thereafter, they were introduced at trade shows for other applications. (3M_MDL000490754) 3M sells the CAEv4.1 commercially to this day. (*See https://mremountain.com/products/3m-peltor-combat-arms-4-1-earplugs?variant=1280829652 9954.*)

### G. 3M Sold the CAEv2 to the Military and Consumers Without Conducting REAT Testing and Without Properly Labeling The Product, in Violation of EPA Labeling Regulations

Since the late 1970s, EPA regulations have required HPD manufacturers to provide consumers with information about the noise protection characteristics of new products. (42 U.S.C. § 4907(b); 44 Fed. Reg. 56120 (Sept. 28, 1979) (codified at 40 C.F.R. §§ 211, *et seq.*) The regulations require manufacturers to affix a label to an HPD that includes an NRR, among other content, form, and placement requirements. (40 C.F.R. §§ 211.104(a), 211.105, 211.106, 211.107, 211.204, 211.204-1(b), 211.204-2, 211.204-3, 211.204-4) As stated above, the NRR is derived from REAT testing and measures the product's effectiveness in reducing noise. The higher the number, the greater the noise protection. NRR labels allow consumers to compare NRRs among competing products. A sample NRR label is below, prominently displaying the NRR for the consumer's benefit:



Figure - 1

(40 C.F.R. § 211.108)

The Noise Control Act defines "product" to include "any manufactured article or goods or component thereof." (42 U.S.C. § 4902) There is an exception for "military weapons or equipment which are designed for combat use," but the CAEv2 was not designed exclusively for combat. Because the CAEv2 was designed for both military and commercial users, it is subject to the Noise Control Act and accompanying EPA regulations. (40 C.F.R. § 211,210-1(a) (stating that HPDs "[m]st be labeled at the point of ultimate purchase or distribution to the prospective user" and "meet or exceed the [NRR] values determined by the procedure" set forth in other regulations; 40

C.F.R. § 210-2)  REAT testing is thus required for HPDs before they are sold. (Id.; 40 C.F.R. §§ 211.206-1, 211.206-2, 211.207) 3M executives agree, stating "an EPA label should be placed on all hearing protection packaging," including for the CAEv2, and "there is no exception for the US military." (3M_MDL000446689)

In the case of the CAEv2, however, 3M ignored these regulations and sold the plugs to the military without testing or providing an EPA compliant label and without any instructions. Because 3M sold the CAEv2 to the military before testing it, the plugs were shipped without the required NRR. On May 18, 1999, Ohlin requested a price quote from 3M for 1,000 pairs of the CAEv2 to be purchased by the Army's Southern European Command. (CTRL_3M_Touhy00000135) The first official purchase order for the CAEv2 was dated July 22, 1999 and was shipped to CHPPM at Aberdeen Proving Ground. (3M_MDL000393647) Orders were received from all branches of the military thereafter. (3M_MDL000393647)

In November 1999, after supplying the CAEv2 to the Army for four months, it "occurred" to 3M that it had "no [testing] data on the actual version" of the earplug being sold in the United States. (3M_MDL000257805) 3M did not begin any REAT tests on the CAEv2 until December of 1999. (3M_MDL000313390) Therefore, soldiers wore the CAEv2 to protect their hearing from hazardous noise before 3M had even tested the plugs.

### H.  Testing Showed the CAEv2 had "Problems"

Shortly after it "occurred" to 3M that it had not conducted any safety testing on the CAEv2 that service members were already using, Elliot Berger, 3M's Manager in the Acoustical Engineering Department, directed 3M's acoustical lab technician (Ronald Kieper) to REAT test the closed and open ends of the plug. (3M_MDL000257805; Kieper 12/19/19 Depo at 111:25–113:1) From December 1999 to January 2000, 3M tested both ends using "Experimenter Fit" REAT testing under ANSI S3.19. Testing of the open end (Test 213016) resulted in a -2 NRR. (3M_MDL000188143) When it advertised and labeled the plug, however, 3M claimed the NRR was 0 (rather than -2). (3M_MDL000425527) Testing of the closed end (Test 213015) was halted after 8 of 10 subjects were tested, which 3M determined resulted in an NRR of 11. (3M_MDL000313390; 3M_MDL000728812) These tests demonstrated that the CAEv2 had significant design problems making it difficult to insert, seal, and keep the plugs in place.

Berger prematurely terminated Test 213015 after eight of ten subjects were tested because the interim NRR at that point was only 10.9, which was unacceptably low. (3M_MDL000313390;

Kieper 12/19/19 Depo at 166:10-16) In fact, Berger admitted the NRR obtained in Test 213015 was far below the "anticipated values of protection" for the CAEv2. (30(b)(6) 11/13/19 Depo at 276:3–277:4)  According to Richard Knauer, 3M's Senior Technical Director for Passive Hearing Protection, the military expected an NRR for the CAEv2 "up closer to where the UltraFit was," in the range of 20. (Knauer 12/17/19 Depo 117:10–17; Berger 12/10/19 Depo at 559:5–13) Several other witnesses conceded that an 11 NRR was unacceptable. (Myers 12/12/19 Depo at 275:5–276:1; Fallon 09/03/20 Depo at 197:24–199:13) Jeffrey Hamer, 3M's Global Laboratory Manager for Hearing Protection, testified as follows:

> Q: Wouldn't it be a big problem for 3M if it had to list the NRR on the closed end
>
> of its Combat Arms Version 2 as being 11 rather than 22?
>
> A: I would think that would be insufficient.

(Hamer 10/17/15 Depo at 174:11–15)

Because the original REAT testing revealed an unacceptable NRR of 11 for the closed end of the CAEv2 and would have created a problem as far as selling the plugs, 3M decided to "retest" the closed end. (3M_MDL000005365; Kieper 12/19/19 Depo at 162:17–166:16) The details of the original test that was abandoned, Test 213015, and the later retest of the CAEv2, Test 213017, were documented by Kieper and Berger in an internal report titled "How Folding the Flanges Back Affects REAT Results of the UltraFit EarPlug End of the Combat Arms Plug" ("Flange Report"). (3M_MDL000728811–3M_MDL000728816)

The Flange Report memorialized three different design defects that prevented the earplug from providing consistent hearing protection during the study. First, Berger and Kieper documented that the length of the Ultrafit end was "too short for proper insertion," making it "difficult . . . to insert the plug deeply," especially for individuals with "medium and larger" ear canals. (3M_MDL000728812) Second, "the geometry of the ear canal opening sometimes prevented the deep plug insertion," inhibiting proper fit. Third, the earplug "imperceptibly" loosened due to the basal edge of the third flange of the outward facing plug pressing against the ear, folding up, and then returning to its original shape once the inward pressure on the plug is released. (3M_MDL000728812) These defects identified in the testing demonstrated the CAEv2 provided "variable" and "low" amounts of protection, regardless of which end was used. (3M_MDL000728812)

These findings related to the CAEv2 were so concerning to Berger that he sent a draft of the Flange Report in May 2000 to his boss, Brian Myers, 3M's Vice President of Marketing for Hearing Conservation Products, and asked, "Should I share this with Ohlin? It looks like the existing product has problems unless instructions are revised." (3M_MDL000258590) As stated previously, Ohlin worked for the military and was 3M's main contact with the military about the CAEv2. Based on my review of the documents and testimony, 3M evidently decided not to "share" the problems with CAEv2 with Ohlin or the military. Rather, 3M decided to maintain the instructions used for the CAEv2 and to proceed full speed ahead with selling the product.

Even though Berger ordered retesting on the closed end of CAEv2, he did not retest the open end of the plug. This is true even though he and Kieper both conceded that the defects seen with the closed end of the plug could apply to the open end of the plug as well. (Berger 12/11/2019 Depo at 415:14–25; Kieper 12/19/19 Depo at 213:16–21) In addition, the individual results of Test 213016 showed large variances in the attenuation the plug was providing subjects consistent with a plug that has a problem being fit and sealed, just like in Test 213015. Yet, Berger chose to accept the results of Test 213016, presumably because the company got the low NRR it and the military desired on the open end. (Knauer 12/17/19 Depo at 40:4–20)

The details of the "retest" of the closed end  (Test 213017) are also detailed in the Flange Report. This time, Kieper altered the CAEv2's configuration when he inserted the plug into subjects' ears by rolling back the flanges of the outward facing end. (3M_MDL000005366; 3M_MDL000728812) Kieper's retest with the altered plug configuration doubled the NRR to 22. (3M_MDL000005365) Nonetheless, 3M has confirmed this modification was "improper" because the flanges were not designed to be folded. (Hamer 10/17/15 Depo at 165:20–166:1)

The Flange Report provides additional details about this retest. By changing the configuration of the plug, it was easier to create "a long, stiff quasi-stem for the experimenter to grasp" and, thus, get "a deeper and more consistent fit." (3M_MDL000728812) Berger and Kieper also noted that when the product was altered in this way, the outer flange would not contact the "subjects' conchae" and thus would not "compromise[] the fit." This is important because Kieper—an expert at fitting earplugs—specifically noted that when the plug was inserted as intended, without its flanges folded back, the flanges would compromise fit. (3M_MDL000728812)

These problems with the CAEv2 should have been especially concerning to 3M given its prior communication with the co-developer of the CAEv2 that the size of stem used in the CAEv2 could lead to problems for users. In fact, during the development of the CAEv2, Armand Dancer, a French scientist at ISL informed Elliott Berger about his concerns about the size of the filter and the stem in the prototypes. He informed Berger that the diameter of the stem was "too big" and asked if the diameter could be decreased. (3M_MDL000013024) Dancer recommended a diameter in the range of 3mm to 3.6mm. The CAEv2 has a stem diameter of 4.45mm. (3M_MDL000340512; CAEv4 Rocker Stem_3M_MDL000825699) 3M's Ted Madison also internally acknowledged that the "structure of the stem" containing the filter could cause the CAEv2 to "behave differently in the earcanal" and lead to lower attenuation. (3M_MDL000008430)

In summary, 3M had the results of testing that showed the CAEv2 had "problems" (in Berger's words) by the beginning of 2000. Four months later, 3M retested the closed end of the plug attempting to get a more marketable NRR, but did nothing to fix the problems and did nothing to inform or warn the military or consumers about the problems. This is true, even though 3M had been warned about the potential for problems by the one who helped develop the product.

### I.   It Was Improper for 3M to Retest the Closed End of the CAEv2 with the Flanges Folded Back

As discussed above, when Berger was faced with the test results for the first eight subjects on the closed end of the CAEv2, he terminated Test 213015 and four months later he retested the closed end by folding back the yellow flanges. (Berger 10/08/15 Depo at 106:2–108:25; 3M_MDL000728812) On the open end, however, he completed Test 213016 and never did a retest on that end. (3M_MDL000188143; Berger 10/08/15 Depo at 129:7–21; Kieper 12/19/19 Depo at 101:20–102:15, 105:9–14)

According to 3M documents, "products should be tested as they are designed to be worn." (3M_MDL000427651) The CAEv2 was designed as a dual-ended earplug with all flanges folded down, as designed. (3M_MDL000449441) Richard Falco, 3M's Project Engineer, agreed that the CAEv2 was not designed to be worn with the flanges folded back. (Falco 2/12/20 Depo at 648;18–653:8) According to Jeffrey Hamer, 3M's Global Laboratory Director, 3M's retesting of the CAEv2 with its flanges folded back was improper:

> Q: Okay. Would it be fair to say that if they did not test the open mode with the
>    flange rolled back, but they did test the closed end with the flange rolled back,

> that that would be improper because the two tests were using the product in two
> different ways?
>
> A: My opinion is that testing the product with the flange rolled back is improper.

(Hamer 10/07/15 Depo at 165:20–166:1)

> Q: And so the labeling test that 3M is using for the closed end of the Combat Arms
> Version 2 actually involves using the plug in a different configuration than is
> advertised or shown in the plug; right? It involves folding back that flange
>
> A: It appears so.
>
> Q: So really, the labeling test that 3M's using for Combat Arms Version 2 for the
> green end is not the appropriate test; isn't that true?
>
> A: It appears so.

(Hamer 10/07/15 Depo at 163:24–164:8) Indeed, unlike its procedure for testing the CAEv2's green end, 3M did not fold back the opposing flanges when testing the plug's yellow end. (Berger 10/08/15 Depo at 146:22–147:12; Ohlin 04/24/13 Depo at 192:19–23) 3M thus "utilized two different methods." (CID File0028 ("Moldex stated that the testing in this case is key because 3M utilized two different methods which does not meet the ANSI requirements."))

Second, as further acknowledged by Hamer, it was improper for 3M to terminate Test 213015 after testing only eight subjects simply because Kieper found the CAEv2 did not fit well and Berger was disappointed by the results:

> Q: And 3M never stops a labeling test for any – if it thinks the numbers aren't – are
> looking too variable or too low?
>
> A: Correct.
>
>  . . .
>
> Q: If the product doesn't fit right, can you stop a labeling test?
>
> A: No.

(Hamer 10/07/15 Depo at 104:25–105:3, 136:10–12) Other evidence confirms 3M should not have stopped a labeling test like Test 213015 without testing all subjects; nor should it have retested the same product with new fitting instructions. (3M_MDL000237670; Berger 10/08/15 Depo at 39:18–40:25, 86:9–87:25; Hamer 10/07/15 Depo at 87:5–89:9, 104:25–105:23)

ANSI S3.19-1974 section 3.2.3 says "3.2.3 Listeners who satisfy other requirements of this standard and who do obtain an adequate fit with the test item (3.3.3.1) may not be dismissed for

reporting small amounts of protection.  In reporting the results, listeners for whom an adequate fit cannot be obtained should be noted, but should not be included in the evaluation." (ANSI S3.19-1974 Section 3.2.3)

Documents and testimony in this case reflect that 3M has a longstanding practice of halting REAT tests used for HPD labeling when the company is not satisfied with the results, followed by retesting the plug until desired NRR results are obtained. (3M_MDL000004550–3M_MDL000004552; 3M_MDL000208205; 3M_MDL000321562–3M_MDL000321563; 3M_MDL000434769; Berger 12/10/19 Depo at 166:21–168:1; Kieper 12/19/19 Depo at 351:14–353:6, 403:5–404:2) This practice contradicts 3M's own policy, which states that it "goes without saying" that "multiple testing attempts with the same product are not allowed because this is prohibited by the EPA." (3M_MDL000014573–3M_MDL000014639; 3M_MDL000332847; Kieper 12/19/19 Depo at 253:14–255:8) In fact, 3M's predecessor company paid a $900,000 civil penalty to resolve alleged violations of EPA testing and labeling protocols due to similar testing practices. (3M_MDL000024833–3M_MDL000024843; Berger 10/08/15 Depo at 92:7–93:10) This evidence shows 3M's improper testing of the CAEv2 was a pattern and practice. (Kieper 12/19/19 Depo at 314:14–21)

### J.   Subsequent Testing Confirmed the Problems with the CAEv2

Test 215009 in June 2004 was another 10-subject test on the open end of the plug that once again led to a negative NRR (-1) rounded up to 0. (3M_MDL000481953; 3M_MDL00089665) This test was a "dual protection study" in which three subjects (CLC, BAK, TLS) had large variability in their attenuation values just like 3M had seen in the prior labeling test on the open end (Test 213016). 3M never reported these findings to the military.

Starting in 2005, 3M did several tests of the open and closed ends comparing the CAEv2 to new design prototypes used for Version 3. (3M_MDL000259866; 3M_MDL000481953) These development tests involved either three or five subjects and were not conducted pursuant to the same protocol as 3M's labeling tests. (3M_MDL000481953) The NRRs for three of these tests (Tests 215508, 215512, 215516) were 15, 16 and 17, respectively - all much lower than the advertised NRR for the closed end. (3M_MDL000481953) In these tests, Kieper continued to observe that "some of the individual's data [were] significantly different, either from trial 1 to trial 2 or from the other persons in the test" and that 3M considered this data "aberrant." (3M_MDL000481953) The data from 3M's additional testing of the CAEv2 continued to show

wide variability in attenuation experience both intra- and inter-subject. Rather than report that information, Kieper and Berger "removed" the aberrant data to make the results reflect "what [they] expect[ed] to obtain in a full, 10-subject test." (3M_MDL000481953)

In 2006, 3M tested the closed end of the Arc plug (an identical plug branded for consumer use) pursuant to ANSI S12.6-1997, Method B, Subject Fit testing. (3M_MDL000313220; 3M_MDL000473611) Test 213030 was a "subject fit" test, meaning that the subjects inserted the plugs in their own ears (without folding back the flanges) and no expert fitter inserted the plug in the ears of the 20 subjects. This type of test more accurately reflects "real world" attenuation. (Berger, E., 2003. Hearing Protection Devices, in: Berger E., Royster, L., Royster, J., Driscoll, D., Layne, M. (Ed.) The Noise Manual (5th edition). American Industrial Hygiene Assn., Fairfax, VA, 414-416; Myers 12/13/19 Depo at 516:24–517:23) This test generated an extremely low NRR of 4.4. (Myers 12/13/19 Depo at 494:19–498:10) Several test subjects did not have a good fit and the NRR rose to 10.5 if four of the test subjects were excluded. (3M_MDL000313220) Again, this testing more closely resembled the fitting done by soldiers in the field than prior testing with a professionally trained fitter. 3M never disclosed the results of Test 213030 to the military. (Myers 12/13/19 Depo at 516:24–517:23)

There were non-3M tests of the CAEv2. The Air Force Research Laboratory tested both the open and closed ends in January 2009 pursuant to ANSI S12.6-1997 (Method A Experimenter-Supervised Fit).   (Hobbs, Hudson, McKinley and Brungart, Air Force Research Laboratory, "Wideband Hearing, Intelligibility, and Sound Protection (WHISPr): Tactical Headset Evaluation" (January 2009)) This fitting technique is different than experimenter fit testing in that the subject inserts the plugs with some input from the expert fitter. It is difficult to determine from the report what assistance the expert fitter provided during this test but, regardless, this test would not be considered "real world" fitting like a subject-fit test. There are no individual test results available from this test so it is difficult to determine the variability of the data or whether some subjects were not able to be properly fit. But, the published NRR on the closed end is 15, far less than the labeled NRR, and the NRR was 3 on the open end. As part of the CID investigation, Mr. Hobbs "stated that 3M should have told the US Government about the slippage issues with the CAE. Mr. Hobbs stated that the US Government would not have found out any of the issues regarding slippage through their own tests nor were they looking for that issue during the test." (CID File

0241)  Hobbs testified that he stands behind the statements he gave in that investigation. (Hobbs 7/16/20 Depo at 242:4–18)

The U.S. Army Aeromedical Research Laboratory conducted REAT testing on both ends of the CAEv2 in 2014 pursuant to ANSI S12.6-2008, (Method A Trained Subject Fit). (3M_MDL000005607) This was a 20-subject test where the NRRs were not calculated. Dr. Franks' analysis also found that multiple subjects (at least six) obtained a poor fit with the CAEv2 when wearing both ends of the plug.  (Rule 26 Expert Report of John R. Franks, Ph.D., para 132-135) This study further supports the problems with fit and seal and loosening revealed in the Flange Report.

The subsequent testing of both the open and closed ends of the CAEv2 supports that the plug is difficult to fit, seal, and to keep seated in users' ears. 3M's subject-fit test, Test 213030, most closely represents the protection service members and consumers received in the real world, and those results were clearly unacceptable. Rather than inform the military or consumers about the concerning tests results, however, 3M buried the studies and marched forward with promoting and selling the plugs.

### K. The Flange Report was Never Disclosed to the Military, Consumers, or Distributors of the CAEv2

The documents and testimony support that the CAEv2 had problems with fit, seal, and loosening. However, 3M never shared the Flange Report or the test results described therein with the military or consumers. (Berger 12/10/19 Depo at 206:7–14)

Berger testified that he told a military employee (Doug Ohlin) about folding back the flanges during testing and how "rolling back the flanges would be important for some people." (30(b)(6) 11/13/19 Depo at 337:8–18; Berger 10/08/15 Depo at 109:6–110:15) But 3M never disclosed that the plug was too short for proper insertion, that the plug was difficult to insert in most ear canals, or that the plug could imperceptibly loosen in all ear canals. (30(b)(6) 11/13/19 Depo at 295:14–25; Berger 12/10/19 Depo at 82:9–-22, 212:2–213:9; Berger 12/12/19 Depo at 151:8–21) 3M also never told the military that users must fold back the flanges to obtain the claimed 22 NRR, or that the NRR without doing so would be 11—only a small fraction of the claimed protection. (Berger 12/10/19 Depo at 83:3–18; McNamara 03/11/20 Depo at 152:20–153:9) Nor did 3M communicate any of this information to non-military consumers. (Myers 12/12/19 Depo at 352:16–353:24)

Likewise, there is no evidence that the Flange Report was shared with any of the distributors who distributed the CAEv2 to the U.S. Military or base stores. Brock Sales distributed hundreds of thousands of CAEv2 plugs. (BROCK00000085) Yet, no one at 3M ever told Brock about the risks identified in the Flange Report, including that the plug loosened imperceptibly to the subject. (Brock 9/10/20 Depo at 99:16–102:16)

Only in the context of a separate litigation in 2015 was the Flange Report shared outside the company. (Hamer 10/07/15 Depo at 149:8–157:8) After the Flange Report was shown to a witness in a patent lawsuit filed by 3M in 2015, 3M discontinued sales of the CAEv2 the very next day. (3M_MDL000332061; 3M_MDL000332111; Hamer 10/07/15 Depo at 149:18–157:8)

**L. 3M Did Not Provide Instructions for Use with the CAEv2 for Years, and When It Did, the Instructions Were Not Adequate to Cure the CAEv2's Defects**

As previously stated, Berger emailed his boss (Brian Myers) four months after learning about Test 213015. (3M_MDL000258590) Berger advised that the CAEv2's "problems" could be cured only by "changing the instructions." Shockingly, though, 3M sold the CAEv2 to the military without any instructions whatsoever from 1999 to 2005. (30(b)(6) 10/18/19 Depo at 178:20–179:12, 198:7–199:13; 3M_MDL000056553; Berger 12/10/19 Depo at 224:6–226:12) When a package insert with instructions were included with some plugs starting in or around December 2005 (30(b)(6) 10/18/19 Depo at 200:17–202:12, 212:6–15), the instructions were inadequate to cure the defects in the plugs that 3M knew about , including that some users must fold back the opposing flanges to achieve proper fit, that the stem was too short for proper insertion, that the plug did not fit certain ear canal geometries, and that the plug could imperceptibly loosen. (30(b)(6) 10/18/19 Depo at 251:25–254:7, 255:20–257:16; Hamer 12/18/19 Depo at 299:4–300:22, 323:11–22, 300; Myers 12/13/19 Depo at 685:4-686:5)

3M has represented that it did not provide instructions for use when selling "bulk" packages of the CAEv2 to the military. (Berger 12/10/19 Depo at 224:6-226:12; Moses 12/5/19 Depo at 162:21–164:7) This is significant because most military sales were bulk sales, meaning the CAEv2 plugs were shipped in boxes containing 50 pairs—totaling 100 plugs—inside a plastic bag. (Moses 12/5/19 Depo at 181:5–17; Myers 10/18/19 Depo at 81:2–8, 85:14–19) Corporate witnesses confirmed they could not identify any instructions for use inside the bulk-shipment box or on the box. (30(b)(6) 10/18/19 Depo at 198:7–199:13; Berger 12/10/19 Depo at 226:2–12) As a result, thousands of service members did not receive written instructions from 3M in the ordinary course of receiving and using the plugs. (Cimino 12/11/19 Depo at 209:15–209:5; Moses 12/5/19 Depo

at 162:21–164:17, 171:13–174:20; Myers 10/18/19 Depo at 205:6–13) As stated previously, 3M's failure to include instructions for use of the CAEv2 was a violation of EPA regulations which provide that "[i]n the case of bulk packaging and dispensing," supporting information including "[i]nstructions as to the proper insertion" of the earplug "must be affixed to the bulk container or dispenser in the same manner as the [NRR] label." 40 C.F.R. § 211.204-4,

One of 3M's largest distributors, Brock Sales Company, did include instructions written by 3M with some of its bulk package shipments. (BROCK_00000083; Brock Tr. 111:15–114:13) But, these instructions failed to state anything about the findings identified in the Flange Report, including that some users must fold back the opposing flanges to achieve proper fit, that the stem was too short for proper insertion, that the plug did not fit certain ear canal geometries, and that the plug could imperceptibly loosen.

Several years after selling the CAEv2 to the military, 3M started providing written instructions for use on a package insert in "blister packs" containing one pair of the plugs. (30(b)(6) 10/18/19 Depo at 178:20–179:12, 212:6–15; 3M_MDL000080183) Retail stores on military bases began selling blister packs in late 2005 (30(b)(6) 10/18/19 Depo at 200:17–202:12; 3M_MDL000148609), but few soldiers purchased them. (Moses 12/5/19 Depo at 181:5–17) Therefore, it is likely that very few service members actually saw the package insert inside the blister packs. Putting that issue aside, though, the insert in the blister packs merely recommended that users fold back the outward-facing flanges to "improve" fit, but did not include any information about the difficulty fitting the plugs, that the labeled attenuation values were the result of improper testing, or that the plugs could loosen imperceptibly. (3M_MDL000042065; Hamer 12/18/19 Depo at 299:4–300:22, 318:24–321:11; Santoro 12/3/19 Depo at 306:1–22) There was nothing on the insert sheet that warned users that the CAEv2 was too short for proper insertion, especially in users with medium and larger ear canals or that ear-canal geometry prevents deep insertion in some users. (30(b)(6) 10/18/19 Depo at 251:25–254:7; Myers 12/13/19 Depo at 676:5–20) There was also nothing on the insert informing users that initial testing generated an 11 NRR that would not protect against loud noises. (Myers 12/13/19 Depo at 685:4–686:4) To the extent the blister-pack insert told users to "grasp the plug by the stem and insert it into the ear canal" and then "adjust the plug for best sealing performance," this generic instruction did not advise users that the CAEv2 is "unusual," difficult to fit and seal, and that it loosens imperceptibly. (3M_MDL000434769; Hamer 12/18/19 Depo at 323:15–22)

I am aware that certain versions of the CAEv2 were accompanied by either a "wallet card" or a "fitting tip." (30(b)(6) 11/13/19 Depo at 295:1–10; Berger 12/10/19 Depo at 82:24–83:7) The wallet card and fitting tip did not provide users with information about the CAEv2's defects, and confirm that the military was not aware of all the critical information about the problems with the plugs.

The wallet card was created by 3M and Ohlin in late 2004. (3M_MDL000017330; CTRL_3M_Touhy00000712; McNamara 3/11/20 Depo at 435:24-436:5) The final version of the wallet card states, "[f]or very large ear canals, fold opposing plug back," and it shows the green flanges folded back. (3M_MDL000229331) The card also depicts the plug inserted in an ear without the flanges folded back and recommends using the standard "tug test" to assess fit:



(3M_MDL000229331) A draft of the wallet card was reviewed by several 3M employees, and they testified that they did not revise the instructions. (CTRL_3M_Touhy00000712; Berger 12/10/19 Depo at 205:1–9, 212:2–213:9; McNamara 03/11/20 Depo at 435:24–440:15; Myers 12/12/19 Depo at 745:15–748:13) In contrast to the Flange Report, the wallet card recommends folding back the flanges only "for very large ear canals." (3M_MDL000229332; 30(b)(6) 11/13/19 Depo at 346:9–23, 373:12–374:6; McNamara 03/11/20 Depo at 439:13–441:24) The wallet card is also silent as to other issues discussed in the Flange Report, including that fitting the plugs--especially in medium and larger ear canals-- is difficult, that the geometry of the ear canal opening prevented deep plug insertion, that the opposing flanges could cause imperceptible loosening, and that the 22 NRR was only obtainable if the flanges were folded. (3M_MDL000728812; Berger 12/10/19 Depo at 218:4–15; Berger 12/11/19 Depo at 545:8–19; Hamer 12/18/19 Depo at 80:19–24; Murphy 01/29/20 Depo at 309:7–310:18; Myers 12/12/19 Depo at 335:6–336:6, 338:18--339:13, 344:6–345:9)

The "fitting tip" was 3M's creation. (3M_MDL000042065) It is just what it sounds like: a tip for users on how to "improve" fit of the plug. (Hamer 12/18/19 Depo at 299:5–300:22, 318:24–

321:11) As stated above, the fitting tip was displayed on a package insert that contained instructions for use, among other information. The language of both the military and consumer fitting tips is identical: "Fitting is easier if the ear is pulled upward and outward during insertion and is also improved if the sealing rings of the outward directed plug are rolled back upon themselves." (3M_MDL000425527; 3M_MDL000425680)

It appears that a fitting tip was provided on commercial packaging, such as the AO Safety Indoor/Outdoor plugs for civilian markets, as early as 2000:



(3M_MDL000425527) But, as mentioned above, the military was not provided these inserts with "bulk" CAEv2 sales and it was only when 3M began selling individual blister packs in 2005 that inserts were included. (3M_MDL000042065; 3M_MDL000456241; 3M_MDL000573846; Moses 10/17/19 Depo at 128:4–129:2; Santoro 12/03/19 Depo at 182:17–184:18)

**INSTRUCTIONS FOR USE:**
Determine the proper end (green or yellow) for insertion depending upon your application needs. Grasp the earplug by the stem and insert into earcanal. Adjust plug for best sealing performance.

⚠ **CAUTION:**
Remove slowly with twisting motion to gradually break the seal. Rapid removal may damage eardrum.

**Fitting tips:**
1  ing is easier if ear is pulled upward and outward during insertion and is also improved if the sealing rings of the outward directed plug are rolled back upon themselves. Some individuals with smaller earcanals may experience discomfort with the dual-ended Combat Arms Earplug due to their restricted canal opening. A single-sided version of the Combat Arms Earplug is also available and will often times provide greater comfort for smaller earcanals. Single-Sided Combat Arms Earplug - NSN # 6515-01-512-6072.

(3M_MDL000042067; 3M_MDL000425680) The fitting tip was removed in March 2012, meaning there was no instruction to fold back the flanges at all from 2012 to discontinuation of the CAEv2 in 2015. (30(b)(6) 10/18/19 Depo at 314:3–317:5; 3M_MDL000193296–3M_MDL000193301)

The fitting tip provides additional evidence that 3M did not inform the military about the CAEv2's problems. Even if the military knew about the fitting tip before 2005, the tip merely recommended folding the flange back for comfort and "improved" fit, not as a requirement to

obtain the claimed protection or to avoid imperceptible loosening. (30(b)(6) 10/18/19 Depo at 251:24–252:5, 405:8–406:11; Berger 12/10/19 Depo at 220:10-18; Hamer 12/18/19 Depo at 323:11–22; Myers 12/12/19 Depo at 338:18–25)

Neither the wallet card nor the fitting tip contained adequate instructions to protect soldiers and marines from the dangers associated with the CAEv2. 3M knew from its testing and the Flange Report that the CAEv2 had problems with being properly fit, properly sealed and with imperceptible loosening. 3M also knew that the only way to achieve the advertised 22 NRR was by folding back the flanges and having the plugs inserted by a professional fitter. The wallet card and the fitting tip simply do not convey the risks associated with the CAEv2 or that the protection on the label was only achieved when the flanges were folded back - information that the military and consumers needed to know.

**M. 3M Misrepresented NRRs for Both Ends of the CAEv2**

Although the testing of the CAEv2 revealed problems with fitting, sealing, and imperceptible loosening, 3M made multiple misrepresentations to both the military and consumers about how effective both ends of the CAEv2 were at providing hearing protection. 3M did so by providing inaccurate NRRs. 3M represented to the military and consumers alike that the NRR of the open end was 0 and the closed end was 22. They made this claim on the EPA-required label, among other places:



(3M_MDL000425527; 3M_MDL000573846) This same NRR information was repeatedly communicated to the military and consumers in sales sheets, advertisements, written correspondence, and oral conversations. (30(b)(6) 10/17/19 Depo at 216:8–217:25; 3M_MDL000002663; 3M_MDL000042067; 3M_MDL000425680; McNamara 03/11/20 Depo at 413:10–415:9; Santoro 12/03/19 Depo at 235:7–236:18; Warren 01/23/20 Depo at 174:9–25, 178:20–180:12)

3M decided to label the green, closed end of the CAEv2 as providing an NRR of 22 without including any sort of instruction or warning that the labeled level of protection could only be achieved if the configuration of the plug was altered by folding back the flanges. (Berger 10/08/15 Depo at 112:2–113:1, 146:22–147:12; Madison 12/10/19 Depo at 114:12–115:23) The label did not disclose that without folding the flanges, the plugs could be 90% less protective, delivering an NRR around 11. (3M_MDL000728812; McNamara 03/11/20 Depo at 152:20–153:9) As mentioned, Test 213030, conducted using Method B, yielded an even lower NRR of 4.4, which was also never shared with the military. (3M_MDL000313220; Myers 12/13/19 Depo at 489:6–501:1, 516:24–517:23, 623:10–25)

Labeling the product in this manner most certainly made users believe that the CAEv2 would protect their hearing without the need to modify or alter the product—a fact that 3M knew to be false. (3M_MDL000023410; Hamer 10/07/15 Depo at 162:9–164:12, 174:11–24) It most certainly influenced the military's decision to purchase the CAEv2 and some consumers' decisions to purchase commercial equivalents. (3M_MDL000259198–200 ("Users focus on NRR rating as an indicator of hearing protector performance…Many users want higher NRRs"); 3M_MDL000440368 at 30 ("There is evidence that purchasing decisions are often based on NRR alone."))

With respect to the other side of the CAEv2, the yellow end, 3M also misrepresented the NRR. At all times while the CAEv2 was on the market, the yellow, open end of the CAEv2 was labeled as having an NRR of 0. The internal documents from the company reveal that although the initial REAT test on the yellow end of the plug (Test 213016) resulted in an NRR of -2, 3M rounded it up to 0. (3M_MDL000188143; 3M_MDL000259907; Berger 10/08/15 Depo at 261:5–7)

There were multiple other REAT tests subsequently done on the yellow end by 3M that yielded NRRs higher than 0. Specifically, below is a listing of all of 3M's REAT testing on the yellow open end of the CAEv2 from its internal document titled "The Development of the Combat Arms Earplug, Version 1 through Version 4." (3M_MDL000259866) The NRRs for each study are highlighted below, demonstrating the variability and inconsistency of 3M's testing results.

| Test ID and N | Date | Ver. | Position | NRR |
|---|---|---|---|---|
| 213016* {10} | Jan. 2000 | 2 | Open | 0 (-2)** |
| 215009 {10} | June 2004 | 2 | Open | 0 (-1)** |
| 215507 {5} | June 2005 | 2 | Open | 4 |
| 215511 {5} | June 2005 | 2 | Open | 6 |
| 215515 {5} | Sept. 2005 | 2 | Open | 5 |
| 215012 {10} | April 2006 | 2 | Open | 5 |

** - Note that when the real-ear test results compute to a negative number for the NRR, they choose to label the device with a 0. (3M_MDL000259907)

The first two REAT studies resulted in negative NRRs (-2 and -1), rounded up to 0 by the 3M, and the four additional studies all resulted in NRRs much higher than 0 (4, 6, 5, 5). (Berger 10/08/15 Depo at 162:11–163:24) The negative-value NRRs suggest the CAEv2 was actually amplifying sounds. (3M_MDL000034896 ("Values less than 0 make no sense and are typically not reported"); CTRL3M000000942 (indicating a -2 NRR "is equivalent to hearing amplification not protection")) 3M suspected the negative NRRs were the result of "the low mean attenuation values and the large [standard deviations] of the test data," (3M_MDL000259881), but 3M thought a 0 NRR was a more "suitable" NRR because "lower attenuation is more desirable." (3M_MDL000259910)

The positive NRRs, on the other hand, suggest that the yellow end of the plug—which was advertised and marketed as providing an NRR of 0 was actually attenuating low-level sounds much more than advertised. 3M advertised "hear-through protection," stating that the yellow end allowed "lower-level sounds to pass without interruption." (3M_MDL000042067; 3M_MDL000425680)

Ultimately, in July 2010, Berger and Kieper stated internally (ten years after the product had been on the market): "We are unsure of the 'correct' REAT for the open end of the CAE Ver. 2 and, in fact, Figure 15 graph suggests that later REAT tests are the more appropriate." (3M_MDL000259878) I have not seen any evidence to suggest 3M ever told the military or customers about these subsequent tests or that it was "unsure" of the actual NRR with the CAEv2 or that subsequent testing suggested that the higher value NRRs were "more appropriate," even though the CAEv2's was advertised as providing an NRR of 0.

This information should have been shared with the military and consumers so that such purchasers could have considered whether the risks of these plugs outweighed their potential benefit.

In 2015, when the CAEv2 was abruptly pulled from the market, Brian Myers of 3M admitted that "we cannot distribute this [product] with the current NRR on the package." (3M_MDL000332061; 3M_MDL000332090; Myers 12/12/19 Depo. at 352:16-353:16). Based on my review of documents and testimony in this case, at no time during the life of the CAEv2 or at the time of its discontinuation was an accurate NRR for either the open or closed end provided to service members or consumers. (3M_MDL000574437; Myers 12/12/19 Depo at 354:9–356:14)

### N. 3M Misrepresented to the Military And Consumers That the CAEv2 was Safe for Use on the Firing Range and Battle

The military expected that the CAEv2 would protect soldiers' hearing from weapons fire. The 2006 Medical Procurement Item Description (MPID) includes as a "salient characteristic" that the "[e]ar plugs shall be designed to provide protection from the impulse noises created by military firearms." (3M_MDL000000055). In certifying the product conformed to the MPID, 3M represented to the government that the plug was safe for use on the range. (3M_MDL000000057). In addition, the CAEv2 was marketed and sold to the military as well as consumers as safe for use on both indoor and outdoor shooting ranges. (3M_MDL000010065 ("[CAEv2] is ideal for outdoor shooting" and "[f]or hundreds or thousands of rounds fired at indoor reverberant ranges it will provide good protection"); 3M_MDL000163130 ("range, hunting, military"); 3M_MDL000619485 ("The ARC and Combat Arms Earplug . . . could both be used on a gun range."); 3M_MDL000716271 ("the ultimate shooter's earplug" that is "ideal for an outdoor range"); 3M_MDL000716271 (advertising that yellow end "limit[s] harmful noise from gunfire – ideal for an outdoor range")) Indeed, one commercial variant was even called the "Indoor/Outdoor Range" plug. (3M_MDL000425526; Murphy 01/29/20 Depo at 98:6–99:13)

Disturbingly, 3M's internal documents and deposition testimony reveal that 3M's scientists knew that, in fact, the CAEv2 did not protect users on the range. (3M_MDL000005528; 3M_MDL000010140 ("[T]he CAE is not the optimal choice for a gun range, and . . . is probably inadequate for indoor gun ranges."); Madison 12/10/19 Depo at 219:19–221:20; Murphy 01/29/20 Depo at 341:5–348:11)

I reviewed multiple marketing and promotional pieces for the CAEv2. One 2005 brochure ("sell sheet") directed to the military states that the yellow end "provide[s] instant protection from

high-level noises like weapons fire and explosions. It's that easy. It's that quick." (3M_MDL000005685; 3M_MDL000286137) Another brochure circa 2007 promises "High Impulse Noise Blocked Instantly" and touts the experience of "a soldier in Iraq" that the "Combat Arms earplugs work great in this environment." (3M_MDL000002065–3M_MDL000002066) Other marketing pieces also promised protection against weapons noise and stated: "When needed, the plug's filter reacts to afford instant protection from impact noises such as weapons fire or improvised explosive devices. Combat Arms earplugs provide protection from blasts that can critically damage hearing." (3M_MDL000193307 ("Noise-Activated Attenuation for Instant Protection Against Weapon Noise"); 3M_MDL000570625 ("sell sheet" stating "Insert YELLOW plugs for weapons fire"); 3M_MDL000716271 (advertising that yellow end "limit[s] harmful noise from gunfire – ideal for an outdoor range"))

This is consistent with the testimony of 3M officials about the company's misrepresentations to consumers and the military, whether in advertisements or during base visits. (McNamara 03/11/20 Depo at 292:13–293:17) One employee went so far as to call it "marketing hype" when 3M claimed the CAEv2 was "ideal for an outdoor range" and "the ultimate shooter's earplug." (Murphy 01/29/20 Depo at 331:21–333:15) Another employee testified that he personally "never went to the range . . . with a Combat Arms," opting for an electronic headset instead. (Gavin 01/29/20 Depo at 151:2–5)

3M's Internal documents reveal that top marketing managers and scientists inside 3M were convinced that the open mode of the CAE plugs was not safe and effective on gun ranges.  Jason Jones, a Marketing Manager at 3M, was asked how much protection a later version of the CAEv2 using the same filter and technology would provide against impulse noise in response to a question by a customer; he replied, "If you are at the range shooting and the guns are going off a lot (every 30 seconds, etc.), the open position of the combat arms plug is NOT going to provide protection. Your ear cannot take a 110 db blast every 30 seconds." (3M_MDL000008474–3M_MDL000008476; Jones 6/19/20 Depo at 251:7-20). Elliott Berger then responded and said: "At indoor ranges with many weapons firing more protection than can be provided by the CAE is required. We have no experimental data one way or the other on this issue." (3M_MDL000008473–3M_MDL000008474). Berger responded, "I also agree that the CAE is not the optimal choice for a gun range, and as I said in my original comments is probably inadequate for indoor gun ranges." (3M_MDL000008470) Ted Madison added, "I'm not sure CAEs make

74

sense in this application…. [F]or qualifying on a shooting range where the user is likely to have exposure to a large number of shots fired, I would recommend a level-dependent 'tactical' electronic headset. If the number of shots being fired is very high, I would recommend a tactical headset worn together with foam earplugs." (3M_MDL000008471)

Ultimately, the 3M decided it needed to make a change to the labels for the Combat Arms plugs to add an "impulse noise warning." (3M_MDL000587314) Unfortunately, the label change did not actually occur until some two years later in 2016—after the CAEv2 and other versions of the Combat Arms plugs had already been worn on ranges by hundreds of thousands of troops and after the CAEv2 had been discontinued. (3M_MDL000587314; Madison 12/10/19 Depo at 266:16–267:4) Madison testified that a soldier's complaint gave rise to action within the company to add an "impulse noise warning" to the label. (Madison 12/10/19 Depo at 246:7–267:4) He drafted the following text to be added to the label:

> When worn according to the User Instructions, these hearing protectors help reduce exposure to both *continuous* noises, such as industrial noises and noises from vehicles and aircraft, as well as very loud *impulse noises*, such as gunfire. It is difficult to predict the required and/or actual hearing protection obtained during exposure to impulse noises. For gunfire, the weapon type, number of rounds fired, proper selection, fit and use of hearing protection, proper care of hearing protection, and other variables will impact performance. If your hearing seems dulled or you hear a ringing or buzzing after any noise exposure (including gunfire), or for any other reason you suspect a hearing problem, your hearing may be at risk.

(3M_MDL000587314) Fallon reviewed Madison's suggested warning and agreed with the addition. (3M_MDL000280956) This was similar to the language in the 2014 letter from Fallon to the military, though there is no evidence the label was ever changed in the interim. (3M_MDL000082841) Madison testified that he does not know if the language he suggested ever made it into the labels for later versions of the Combat Arms plugs, but he agrees that it never made it into the CAEv2 label. (Fallon 09/03/20 Depo at 352:23–353:20; Fallon 09/04/20 Depo at 496:22–497:3; Madison 12/10/19 Depo at 266:16–267:4)

I was unable to locate language in any label for any version of the CAEv2 that recommended or advised against using the open end of the Combat Arms earplugs on the range or in battle.  And, deposition testimony supports the opposite—that the military and consumers never

knew. (Babeu 03/10/20 Depo at 173:11–176:6, 391:15–18; Madison 12/10/19 Depo at 223:6–12; McNamara 03/11/20 Depo at 301:1–7, 303:1–305:21; Merkley 02/26/20 Depo at 426:6–11; Murphy 01/29/20 Depo at 98:6–99:13, 349:19–352:11)

The fact that the non-linear end of the plug could allow for communication and detection of combat sounds, but also protect from impulse noises from weapons, was obviously very important to the military in deciding to provide the CAEv2 as hearing protection for the troops. (3M_MDL000000055) And the military relied on 3M's representations and certification regarding whether the plugs were safe and effective for hearing protection for soldiers who would obviously be exposed to frequent gunshot noise. (3M_MDL000000057; CID File0224; McNamara 02/26/20 Depo at 311:3–312:14) 3M, therefore, should have informed the military that the open end was not safe for use on ranges or in gun battles. (McNamara 03/11/20 Depo at 293:23–294:15; Merkley 02/26/20 Depo at 424:9–425:16, 426:6–14; Murphy 1/29/20 Depo at 354:2-12). Based on the record and evidence, if 3M had done so, it would have impacted the military's decision about whether or not to provide the CAEv2 to the troops. (Babeu 03/10/20 Depo at 176:3–6; CID File0036; CID File0038; CID File0214; CID File0222; CID File0239; CID File0243)

## O. __The Department Of Justice Investigated 3M For Making False Claims To The U.S. Government And Found That The Military Did Not Know About The CAEv2's Testing Defects__

In 2016 and 2017, the United States Department of Justice investigated 3M for False Claims Act violations. (CID File0001–CID File0004) The investigation was prompted by a qui tam complaint brought by a whistleblower, 3M's competitor Moldex-Metric. (CID File0001) The allegations were essentially that 3M violated ANSI testing requirements when testing the CAEv2 and that 3M knew the CAEv2 did not meet the military's requirements and therefore defrauded the government by selling the plugs to the military. (CID File0001–CID File0002; Complaint in *United States ex rel. Moldex-Metric, Inc. v. 3M Co.*, 3:16-1533 (May 12, 2016)) The complaint specifically alleged that 3M manipulated testing in order to get a higher NRR for the plugs, but did not instruct the military how to use the product in order to get the advertised protection. (Complaint in *United States ex rel. Moldex-Metric, Inc. v. 3M Co.*, 3:16-1533 (May 12, 2016), at 8–14) The complaint also alleged that the testing done on the CAEv2 violated ANSI standards that apply to REAT testing. (Complaint in *United States ex rel. Moldex-Metric, Inc. v. 3M Co.*, 3:16-1533 (May 12, 2016) at 7, 9, 11, 13)

The report of the investigation by the U.S. Army Criminal Investigation Command (CID Report) summarizes interviews with approximately 15 witnesses. (CID File0002–CID File0004) All government witnesses testified they did not know about the manipulation of the plugs during the testing or that the hearing protection was not as claimed. (CID File0240) Essentially all witnesses testified that if they had known, it would have been very important in the military's decision about whether to use the plugs and how to advise and instruct soldiers. (CID File0038; CID File0040; CID File0214; CID File0225; CID File0236–CID File0237; CID File0239) Some witnesses testified the military would not have purchased the CAEv2 had it known the testing of the was not as claimed. (CID File0214; CID File0222)

Consider the testimony of Chuck Jokel, an employee of the Army Hearing Program at Aberdeen Proving Ground, and LTC Marty Robinette, the Chief of the Army Hearing Program. (CID File0234) They were shown the Flange Report and the differences in the NRRs based on folding back the flanges on the CAEv2 versus not doing so. (CID File0236) They both agreed 3M needed "to be on the level with the US Government" so the military "can take appropriate remediation steps for the service members, including advising soldiers on the proper way to fit the earplugs." Jokel and Robinette agreed that 3M "should have leveled with them about the data so that they could inform the wearer of any issues, so they could have made informed decisions." (CID File0237)

They also noted that the testing showed that the flanges should "always be pulled back," and that 3M "should have informed the military of this problem, so that the military could [have] advised the soldiers of the slippage problem." (CID File0237) Finally, they testified that had the US Government known of the slippage issue, they would have insisted on instructions saying the "flanges must always be folded back" - adding that there "was no practical way that soldiers could determine the size of their ear canals."

Commander Joel Bealer, the Deputy Director of Safety and Occupational Health, was also interviewed. (CID File0238) Commander Bealer addressed the testing of the CAEv2 by the Air Force. He testified that the Air Force Laboratory did not test for imperceptible slippage, but he noted that had they known about the issues with the plugs, they would have changed the way the testing was handled. (Id.) He ultimately testified that "3M owed it to the military to tell them of any potential problems." (CID File0239)

The interview of Brian Hobbs, an Audiologist in the Navy and Marine Corps Public Health Center, was also informative. Hobbs was involved with the Air Force testing of the CAEv2. (CID File0240) He confirmed that the testing did not look at the "efficacy" of the plugs.  He stated that he was not made aware of any problems with the plugs and, thus, would not have told anyone to fold the flanges back for testing. (CID File0240) He would not have been comfortable instructing subjects that way because he would not have known what the outcome would have been for folded back flanges versus unfolded; when he was told that there was instruction to fold the flanges back for a large ear canal, "he questioned the definition of a large ear canal." (CID File0240) He agreed with others that 3M should have told the US Government about the "slippage issues" and reiterated that the US Government would not have found out about that issue during its testing. (CID File0241)

The CID Report ultimately concludes that had the US Government known about 3M's initial test results showing that the CAEv2 was too short for proper insertion and did not perform well in certain individuals, the Government may not have purchased the plugs. (CID File0002) According to the Report, 3M entered into a settlement agreement with the US Department of Justice on July 23, 2018 and agreed to pay $9,100,000. (CID File0002)

**P.   3M Finally Discontinued the CAEv2 After the Flange Report was Discovered**

3M never revealed the Flange Report or its findings to the military or anyone else during the entire 15 years that the CAEv2 was on the market. (Dkt. 1280 at 15) Fortunately for soldiers and consumers, however, the Flange Report was eventually discovered in litigation 3M was involved in with Moldex. Specifically, 3M employee Jeffrey Hamer was confronted with the Flange Report at his deposition. (Hamer 10/07/15 Depo at 149:18–157:8) Hamer confirmed that he knew nothing about the report or its findings. The very next day, 3M demanded in internal emails that all sales of the CAEv2 be discontinued. (3M_MDL000332111)

Brian Myers sent an internal email on October 8, 2015, instructing that the CAEv2 was "immediately" discontinued. (3M_MDL000332111) Internal emails from later that month admitted that the CAEv2 could not be distributed "with the current NRR on the package," so "sadly it won't be a phase out but an abrupt stop." (3M_MDL000332061–63; Myers 12/12/19 Depo at 352:16–353:16) He instructed 3M employees to "dispose of" remaining inventory and "cancel" pending orders. (3M_MDL000332061–3M_MDL000332070) At his deposition, Myers testified:

Q: And your instruction back to Luis [at 3M's manufacturing plant] was what?

A: My e-mail said: "Please dispose of them."

Q: Okay. And you understood that to mean destroy them, right?

A: To get rid of them, yes.

. . .

Q: And disposing of them, that would mean make sure they don't get used, right?

A: That was my intention.

Q: You didn't want them to be used in your plant, right?

A: No.

(Myers 12/12/19 Depo at 360:16–361:12)

Even though 3M told its own employees to "immediately" stop selling the CAEv2 and to dispose of them so they could no longer be used, 3M never told the military to stop using the plugs and dispose of their inventory. (Madison 12/10/19 Depo at 305:8–307:20) All 3M did was publish a "product notification" in November 2015 stating that "3M has made the decision to discontinue" the CAEv2 "effective immediately." (3M_MDL000013574–3M_MDL000013577; 3M_MDL000549104) In fact, Myers was asked about this and testified as follows:

Q: When did you tell the military, sir, that Hey, you shouldn't use these anymore, the NRR of 22 can't be used with this product? When did you tell them that?

. . .

A: Again, I don't know that there was any announcement or communication on that.

. . .

Q: When did you tell the people about the problems with these or that the NRR of 22 should not be assumed for the product? . . .

A: Again, I don't recall any – any announcement.

(Myers 12/12/19 Depo at 362:25–363:21)

Q: Okay. And so at what point in time, sir, in 2015 or 2016 or 2017 or 2018 or 2019 did the company communicate to the millions of people or hundreds of thousands of people in possession of these [earplugs] that you shouldn't use this with an expectation that it's going to provide you with an NRR of 22?

. . .

A: I don't know that we did.

(Myers 12/12/19 Depo at 366:10–19)

In July of 2018, following the Department of Justice investigation and findings, the military took steps to "verify . . . that any 3M Dual-Ended Combat Arms Earplugs [were] not being used for hearing protection purposes" because "these earplugs were found to be defective" and "inventory may remain." (CTRL_3M_Touhy00002040) According to the Chief of Occupational Health Operations at the Office of the Surgeon General, the CAEv2 was "found to be defective and did not protect the wearer to the advertised level of protection," and "there is a risk of hearing loss should individuals continue to use these earplugs." (CTRL_3M_Touhy00002253–55)

## XVI.   OPINIONS

The CAEv2 was a novel hearing protector when 3M designed and developed it in the late 1990s. I am not aware of a dual ended earplug before the CAEv2 or that there has been one since. 3M, nevertheless, promoted and then sold the CAEv2 to the military without first testing it to see if it actually worked. When the CAEv2 was finally tested, its "problems" as Berger described it, were revealed but never fixed.

Given the many problems with the CAEv2 and 3M's failures to remedy those problems, as discussed above and below, it is my opinion to a reasonable degree of medical and scientific certainty that the CAEv2 is unreasonably dangerous due to 3M's failure to properly design and test the product, properly evaluate and act after uncovering problems with fit and seal and performance of the CAEv2, and properly warn and inform the military and consumers about the CAEv2's risks.  For all of these reasons, it is my opinion that the CAEv2 did not perform as would have been expected by a reasonable user of the earplug and the risks outweigh the benefits.

It is also my opinion that the CAEv2's design defects and 3M's negligence, misrepresentations, and failure to warn of the CAEv2's inadequate hearing protection, caused or was a substantial factor in causing NIHL and tinnitus suffered by Service Members and consumers. It is well known that continuous noise exposure of 85dB or more, and impulse noise exposure of 140 dB or more can cause damage to the ear that may result in hearing loss. When the CAEv2 was worn as intended and promoted by 3M, in the sound environments where service members needed protection, the CAEv2 did not protect users as required and represented. Because the CAEv2 failed to protect users when alternative, available plugs would have, the CAEv2 must be considered when performing a differential etiology of user's NIHL and tinnitus.

### A.  The CAEv2 is Unreasonably Dangerous and Can Cause NIHL and Tinnitus

#### 1.  The CAEv2 Has Design Defects That Make It Difficult to Properly Fit and It Imperceptibly Loosens Even If Proper Fit Is Achieved

As stated above, HPDs will not protect users if they do not fit. 3M's own internal documents and marketing materials recognize as much. (3M MDL000416820 at slide 12; 3M_MDL000409110) Indeed, the inventor of the CAEv2 and 3M's own employee concedes "the degree of noise reduction depends on the quality of the fit." (Berger, E.H., *Custom Hearing Protection: Have it Your Way ...Maybe*, Industrial Hygiene News, May/June 2011)  If an HPD does not fit well, it will not seal to the ear and thus not protect the user. (P490 (Earlog 5) ("For maximum protection the device must make a virtual airtight seal with the canal or the side of the head. Inserts must accurately fit the contours of the ear canal.")

The Flange Report documents multiple design defects that prevented the CAEv2 from adequately fitting users, which made it difficult, if not impossible, for the CAEv2 to maintain the air-tight seal necessary to protect service members and consumers. (3M_MDL000728811– 3M_MDL000728816) The Flange Report expressly states the CAEv2 is "too short for proper insertion," which made it difficult for the experimenter to insert the plug deeply into some subjects' ear canals, "especially those subjects with medium and larger canals." (3M_MDL000728812) In addition, the CAEv2 does not fit in the "geometry" of some ear canals. Finally, even if the CAEv2 is properly inserted, "the basal edge of the third flange" of the outward facing plug can "press[] against the subject's ear canal," folding up, and then return to its original shape once the inward pressure on the plug is released, causing the plug to loosen "imperceptibly" to the user. (3M_MDL000728812)  These design flaws—documented by Berger and Kieper (3M's expert fitter) when  identified by Kieper when the CAEv2 was first tested—demonstrate the CAEv2 is difficult to fit and/or maintain a proper seal. It is therefore defectively designed and unreasonably dangerous.

The foregoing fit problems are especially concerning when recognizing that an earplug is tested in a laboratory but will be worn in the real world. First, Kieper was an expert fitter and not even he could properly fit the CAEv2 or ensure that the plug maintained a proper seal in many test subjects. (Kieper 12/19/19 Depo at 92:15–93:14 (Kieper has conducted over 2200 full tests)) Kieper's performance reviews identify "his skills in fitting subjects" as "undoubtedly, in large part, responsible for the high NRRs [3M] continue[s] to achieve on many of [its] earplugs."

(3M_MDL000259134) in a controlled test setting. Based on my education, training, and experience and the published literature, it is more likely than not that any user will not be able to consistently replicate the fit and seal achieved by an expert fitter such as Kieper in a controlled test setting. If an expert experimenter cannot obtain proper fit in a laboratory, neither an ordinary consumer nor a servicemember on the range or on the battlefield stands a chance of consistently obtaining proper fit and seal when inserting the plug, or maintaining proper fit and seal due to the CAEv2 propensity for "imperceptible loosening." It is well established that hearing protection measured in a laboratory is greater than real-world protection. (Berger, The Naked Truth About NRRs, Earlog 20, 2000) Therefore, the fit problems observed by Berger and Kieper in the laboratory should have been a red flag that the CAEv2 was defective and would ultimately not protect consumers and military users.

Second, it is important to note that although Kieper did notice that the CAEv2 was difficult to fit in people, he used his decades of experience to achieve what he thought was a "best fit" (a seal) before he started the tests. It was Kieper's job for all REAT testing to provide an expert fit and satisfy himself that the plugs were perfectly inserted before conducting any testing. (Kieper 12/19/19 Depo at 439:17–440:8) Kieper testified that for Test 213015 he "believe[s] that the fit obtained on each subject, each fit was the best that could be gotten at that time." (Kieper 12/20/19 Depo at 911:24–912:9) But Kieper did more than just assume that he was able to achieve a "best fit" with each subject, he visually inspected the fit, played a fitting noise, and then confirmed with the test subject to ensure that he had achieved a "best fit" and good seal each time he ran a test. (Kieper 12/19/19 Depo at 105:18–106:9, 207:25–208:4) But, even after fitting the plug to his satisfaction, the plugs failed to attenuate as expected. This is important evidence that supports the danger of these plugs because if the expert fitter cannot get a good fit even after professional insertion, and inspection, soldiers and civilian users certainly will not be able to do so consistently either.

Third, even if proper fit and seal could be obtained in the real world, the CAEv2 loosens "imperceptibly." Experts in NIHL and hearing protection know that preformed earplugs can loosen over time and may occasionally need to be reseated. Users must therefore rely on their "feel" of fit and "sense" of hearing to perceive such loosening.  But Kieper observed that users do not perceive when the CAEv2 loosens. (3M_MDL000728812) This was so even though subjects sat perfectly still and were not allowed to move their heads during testing. This is partially because

the opposing flanges apply slight pressure against the ear that affects the seal without alerting either a user or an experimenter, even upon visual inspection and the playing of a fitting noise. This risk of a hearing protective device loosening as a result of being put under pressure by coming into contact with a user's ear was known to 3M. (3M_MDL000846273 ("EPA Regulatory Analysis Supporting the Noise Labeling Requirements for Hearing Protectors, August 1979")) But with the CAEv2, this risk is accentuated when wearing the yellow end because there is no vacuum effect and users were told to expect noises to sound louder (3M_MDL000716855; FALLON00318) Brian Myers of 3M specifically found the CAEv2's open end lacks the distinctive "plugged up" feeling typically associated with earplugs, so users might not "feel like they are working." (3M_MDL000398074) Thus, a consumer or service member might believe the CAEv2 is properly fit but in fact receive little to no protection from hazardous noise at the gun range or in battle. The fact that these plugs "imperceptibly loosen," makes the risks associated with using them even greater than an ordinary plug that a user knows will not stay seated in the ear, because with the CAEv2, this design defect is latent or hidden. And this is definitely not something that an ordinary consumer would expect from its earplug.

An earplug that is difficult to consistently fit and seal is unreasonably dangerous, because when used as intended it will not provide the protection necessary to prevent NIHL or tinnitus. An earplug that is not just difficult to insert, but too short for proper insertion and incompatible with common ear geometries is unreasonably dangerous because it will not provide the necessary protection to prevent damage when used in a high noise environment.  In my opinion and based on my experience, a personal protective device that loosens without notice and/or in a manner that is difficult to discern is also unreasonably dangerous, especially when used in an environment with substantial hazardous noise, like a military environment.

Given the defects identified when 3M first tested the product and for the additional reasons set forth throughout this report, it is my opinion to a reasonable degree of medical and scientific certainty that the CAEv2 was unreasonably dangerous and was capable of causing or contributing to cause NIHL and tinnitus in service members and consumers who were exposed to hazardous noise when wearing the plug. Additionally, for these reasons, the CAEv2 failed to perform as safely as a reasonable consumer would expect when using it as intended or in a reasonably foreseeable manner.

## 2. Internal 3M Data Demonstrates that the CAEv2 was Defective and Unreasonably Dangerous

Data from Tests 213015 and 213016 also show the CAEv2 was defectively designed and unreasonably dangerous. In fact, Berger admitted at his deposition that "[w]hen we looked at the data, they were more variable than we had ever observed for a solid plug that requires a good acoustical seal in the ear." (Berger 10/8/2015 Depo at 106:9–14) Data from the open end (Test 213016) also indicate Kieper had serious difficulty getting the CAEv2 to fit and seal in the subjects' ears. Individual data from these tests reveal the design defect that makes it difficult for CAEv2 users to obtain an adequate fit and seal, existed for both ends of the device. (30(b)(6) 11/13/19 Depo at 290:9–22)

I have reviewed the data from Tests 213015 and 213016 and also reviewed the analysis of the data of Dr. John Franks, a psychoacoustics expert with over 35 years of experience performing and evaluating REAT testing. I agree with Berger that the data from these tests are extremely variable. In fact, the majority of the ten subjects who participated in these tests, had variability in their results indicative of the inability to get a good fit and seal with the plug.

As stated in Dr. Franks report, there are huge variations in attenuation levels for several subjects in Tests 213015 and 213016. (Rule 26 Expert Report of John R. Franks, Ph.D., para 132-135, 138-150) One subject identified as TRS, had results revealing that when testing the CAEv2's closed end at 500 Hz, his attenuation was -4 dB in trial one, 25 dB in trial two, and 24 dB in trial three. His levels at 1000 Hz were likewise asymmetric: 0 dB in trial one, 26 dB in trial two, and 22 dB in trial three. (3M_MDL000019514; (Rule 26 Expert Report of John R. Franks, Ph.D., para 133) These significant variations in attenuation levels show TRS could not obtain adequate fit in trial one of the REAT testing on the closed end. Similar examples exist for the open end of the plug. GWG's results show she did not obtain adequate fit in trials two or three. (3M_MDL000019339; (Rule 26 Expert Report of John R. Franks, Ph.D., paras 138-141) In trial two, she had -1dB at 250 Hz, -2 dB at 50 Hz, and -1 Db at 1000 Hz, which all indicate amplification, not attenuation. (3M_MDL000019339) GWG's attenuation levels in trial one, however, were 3 dB at 250 Hz, 8 dB at 500 Hz, and 18 dB at 1000 Hz - which is 19 dB lower than in trial one. (3M_MDL000019339; Rule 26 Expert Report of John R. Franks, Ph.D., ¶¶ 138-141) Variance between trials one and three were similarly large. Such variations indicate that GWG did not have an adequate fit during the second and third trials on the open end. (3M_MDL000019339;

Rule 26 Expert Report of John R. Franks, Ph.D., para 141) These are just a few examples that show the CAEv2 was very difficult to fit and to maintain a seal. In fact, Dr. Franks's analysis of the data shows that six out of the ten subjects in Tests 213015 and 213016 (GWG, TLS, TRS, and RTM in open end test and BAK, TRS, and JMW in the closed end test) had inadequate fit of the CAEv2 during at least one trial. (3M_MDL000019514;3M_MDL000019339; Rule 26 Expert Report of John R. Franks, Ph.D., ¶ 154)

The data reflects and Dr. Franks also pointed out that the subjects who were not able to be fit properly in one or more of their trials, had small, medium, and extra-large ear canals. This finding from the individual data seems to suggest that the design defects leading to difficulty with fitting and maintaining a good seal apply to all ear canal sizes.(Rule 26 Expert Report of John R. Franks, Ph.D., para 135)

Kieper's testimony supports Franks's analysis. According to Kieper, GWG had "big" variances in attenuation levels at 1000, 2000, and 3150 Hz. (Kieper 10/9/2015 Depo at 107:3–108:21) Kieper also conceded that it was "apparent" GWG had a worse fit with the open end of the plug in his second trial compared to his first trial. (Kieper 10/9/2015 Depo at 109:20–110:7) Finally, Kieper testified that TRS was likely not fit as well with the earplug in the second trial as he was in the first trial. (Kieper 10/9/2015 Depo at 110:22–111:20)

The significant variability in these data is additional evidence that the CAEv2 is defective because it is too difficult to properly fit and/or to maintain a seal in ear canals of all sizes. These results are particularly concerning because users in the real world will generally not fit the CAEv2 as well as an expert fitter in a laboratory setting. It is therefore my opinion to a reasonable degree of medical and scientific certainty that the data from Tests 213015 and 213016 provide additional support that the CAEv2 was unreasonably dangerous as designed and capable of causing or contributing to can cause NIHL and/or tinnitus in service members and consumers who used either end of the CAEv2 when exposed to hazardous noise.  Additionally, for these reasons, the CAEv2 failed to perform as safely as a reasonable consumer would expect when using it as intended or in a reasonably foreseeable manner.

### 3. 3M's Subsequent Testing of the CAEv2 Continued to show the Defects with the Plugs

As discussed previously above, in addition to Tests 213015 and 213016, 3M conducted additional testing that reinforced the defective design of the CAEv2. Most notably, in June 2006, 3M completed Test 213030—a REAT test of the CAEv2's closed end conducted according to the ANSI S12.6-1997 Method B standard. (3M_MDL000313220) That test generated an extremely low NRR of 4.4, and that test was the only "real world" test 3M performed. (3M_MDL000313220; Kieper 12/20/19 Depo at 571:22–572:7)

Method B is a type of REAT test that provides for a "subject-fit method" and "was developed to approximate the real-world attenuation achieved in actual hearing conservation programs." (ANSI S12.6-1997 Section 0.5) ANSI recognizes that "human factors considerations must be included in the laboratory model if valid field estimates are to be obtained." Method B thus calculates an NRR based on the attenuation a test subject achieves when fitting their hearing protector according to the manufacturer's written instructions and without any assistance from the experimenter. (ANSI S12.6-1997 at Section 9)

Test 213030 reinforces the concerns revealed in the initial testing and the Flange Report. First, a 4.4 NRR shows the CAEv2 provides almost no protection when users fit the plug themselves according to the provided instructions. I agree with LTC Merkley that an NRR of 4.4 would be concerning given noise exposure in the military. (Merkley 2/26/20 Depo at 411:8–17) As Elliott Berger testified, this result indicates that even in a lab setting, for some users, the CAEv2 is not providing much protection at all. (Berger 12/11/19 Depo at 641:16–642:25) According to 3M, even an 11 NRR is "quite low." (3M_MDL000019514) Further, the data shows that seven of the test subjects had extremely variable attenuation demonstrating poor fit and seal in both trials and several others had a poor fit in one trial.   (3M_MDL000313220)

This subject-specific data is further confirmation of the inability to properly fit and seal the CAEv2 as a result of the design defects- only this study also confirms just how bad the protection is in more of a real-world fitting. The Flange Report mentioned that "it was difficult for the experimenter to insert the plug deeply into some subjects' ear canals, especially those subjects with medium and larger earanals." (3M_MDL000019514) For Test 213030, 3M tested 20 subjects, none of which had ear canal sizes that were larger than a medium. (3M_MDL000019514) Even so, subjects like DJS and LLE reported almost no attenuation at all, suggesting they could not

achieve a proper seal. Others like JJS and KAC reported wide variations in attenuation between trials. These results reinforce prior findings that tests of the CAEv2 reported "individual results [that] were quite variable." (3M_MDL000019514)

These troubling results should have immediately been disclosed to the military, as the results showed that even in a laboratory, users were not able to adequately fit the plug using standard fitting instructions (*i.e.*, without the opposing flanges rolled back upon insertion).

3M's additional "experimenter fit" studies on both ends of the CAEv2 were limited, yet they also confirmed that the CAEv2 provided variable and inconsistent attenuation results and, further, that the protection of the closed end was far less than the 22 NRR advertised on the label.

The data from the REAT testing supports that the CAEv2 was defectively designed and unreasonably dangerous for its intended uses and, further, that it could cause NIHL and/or tinnitus in users exposed to hazardous noises.

### 4.   A Comparison of Test 213014 and Test 213015 Supports that the Design of the CAEv2 is Defective

I have reviewed data from the CAEv2's Test 213014 and Test 213015 as well as Dr. Franks' analysis of that test data. A comparison of the data from these two studies is telling with respect to whether or not the CAEv2 is defective when compared to other similar products.

Test 213014 was a July of 1999 REAT test pursuant to ANSI S3.19-1974 performed on 3M's single sided linear earplug called the UltraFit Plus (just six months before the original REAT tests on the CAEv2). The UltraFit Plus earplug tip (the insertion end of the plug) is virtually identical to the tips used on the open and the closed end of the CAEv2. The only difference between the UltraFit Plus and the CAEv2 is that the stem connecting the ends of the CAEv2 is a wider, more rigid tube, whereas the UltraFit Plus stem is thinner and more flexible. A comparison and analysis of the REAT test data from these two studies is revealing because these two plugs use the same insertion tips, yet the results as far as the levels of attenuation are very different.

Five of the test subjects 3M used in Test 213014 (UltraFit Plus) were also used in Test 213015, the test on the closed end of the CAEv2 - the one that was abandoned by 3M after 8 subjects were tested because the NRR was so low. (3M _MDL000534450) When Dr. Franks looked at the five subjects who were tested using both products, four of the subjects (KJC, GWG, BAK, JMW) received much less attenuation when tested wearing the CAEv2 without the flanges rolled back. Although imperceptible loosening cannot be ruled out, this data suggests that the

stiffer stem used in the CAEv2 is another design feature that made fitting and sealing the CAEv2 difficult. (30(b)(6) 09/25/20 Depo at 194:15–196:3; 197:21–198:7;189:16–23; 201:21–202:1)

The Flange Report addressed the difficulty of inserting the plug and found that the geometry of some ears prevented the deep insertion needed to fit the plug. From a medical and scientific standpoint, it  makes sense that a more rigid and stiff plug would be more difficult to conform to ear canals than a more flexible stem. This supports my opinion that the large, rigid stem in the CAEv2 contributes to the inability to consistently fit and maintain a seal with this plug.

3M knows that larger inflexible stems can cause fitting problems.  As stated previously, Armand Dancer, a scientist at ISL and someone who 3M consulted with on the design of the CAEv2, specifically told 3M in 1997 that an adapter stem that is too large - greater than 4.2 mm in diameter- would cause fitting problems and be unsuitable for most ears. (3M_MDL000013024) Although Dancer warned 3M about the stem issue, 3M ultimately ended up actually making the stem on the CAEv2 even larger. In 2015, Ted Madison, an audiologist at 3M opined that the CAEv2's stem structure could cause the plug to "behave differently in the earcanal" leading to lower attenuation. (3M_MDL000008430) Berger, credited by some as the inventor of the CAEv2, admitted that the inflexible adapter stem posed a problem and required redesign:"the principal reason for discomfort is the plastic insert in the earplug stem," and he recognized that "if the filter were smaller in diameter" then the "diameter of the plastic insert [could be] smaller as well." (3M_MDL000192859)

It is my opinion based on the findings comparing Tests 213014 and 213015, as well as reviewing the information related to the size and stiffness of the CAEv2 in comparison to the stem of other better performing products, that the CAEv2's wide, stiff stem makes it difficult for the CAEv2 to properly fit earcanals and is design defect among others that makes the CAEv2 unreasonably dangerous.

### 5. Statistical Analysis of 3M's Testing Supports That the Design Of The CAEv2 Was Defective

I have also reviewed the analysis conducted by Dr. David Madigan. This analysis examined the NRRs, subject-level NRRs, and variability in the attenuation determined in the labeling tests conducted by 3M of the CAEv2 (opposing flanges unfolded versus folded), subsequent versions of the Combat Arms, and several UltraFit earplugs.

As Dr. Madigan's analysis reflects, when compared to the REAT tests of the CAEv2's closed end with the flanges folded and the tests of the CAEv3, the CAEv4, and the UltraFit, the REAT test of CAEv2's closed end without folded flanges produced a lower NRR; individual-NRRs that are statistically significantly lower; and within subject variability that are statistically significantly larger for all but one of the comparison products. In short, when the closed end of the CAEv2 was tested as it was worn, with the flanges unfolded, 3M's own testing showed greater variability and lower attenuation than the other products intended for similar uses that 3M tested.

It is my opinion that the 213015 test should have been a major red-flag for 3M. The UltraFit was a triple-flange pre-formed earplug that 3M sold for nearly a decade before the CAEv2 was created. Both Richard Knauer, 3M's Senior Technical Director for Passive Hearing Protection, and Berger have testified that the military expected an NRR for the CAEv2's green end to be in the same range as the NRR for the UltraFit. (Berger 12/10/19 Depo at 559:5–13; Knauer 12/17/19 Depo at 117:10–17) But 3M's labeling testing demonstrates that the CAEv2-when used without folding the flanges -  provided less subject level NRR and greater within-subject variability than the UltraFit. These results should have further demonstrated to 3M that the CAEv2 should not have been sold until the source of the problems had been identified and corrected.

### B.   The Risk of Danger From the Design Of The CAEv2 Outweighs the Benefits

Based on my education, training, experience, and my review of all the documents, data and depositions in this case, it is my opinion that the CAEv2 was unreasonably dangerous as described fully above, and that the risks associated with use of the CAEv2 outweigh any benefits received by users.

The purported benefits included: (1) protection from continuous noise while using the green end; (2) situational awareness/hear-through on the yellow end while also providing protection from impulse noises; and (3) both functions in a single plug which might increase the likelihood of use. (3M_MDL000569956) Admittedly, situational awareness is important for dismounted soldiers and marines as well as consumers. But, a plug that inconsistently fits or seals, if at all, and is loose will not provide adequate protection from hazardous noise. Given the CAEv2's design defects, this plug did not provide reliable situational awareness *or* protection, making the product useless.  Its inconsistent fit and inability to achieve or maintain a seal meant that users who were exposed to dangerous sounds and were vulnerable to damage from impulse noise from firearms and continuous hazardous noise when riding in vehicles or working near

89

generators, etc. In addition, the fact that the plug loosened imperceptibly, made the danger from the defect essentially unavoidable.

Given these defects in the CAEv2, it was substantially likely that wearing them over the course of a military career would result in NIHL and/or tinnitus. Because there were other safer options for non-linear and linear hearing protection available, as discussed more fully below, it is my opinion that the risks of wearing the CAEv2 far outweighed any purported benefit users may have received.

### C.  **A Reasonable Manufacturer Of a Hearing Protective Device Would Have Tested The CAEv2 Before Selling It**

HPDs like the CAEv2 are safety devices. Therefore, it is very important for HPDs to be tested to make sure they work. As a hearing health professional and conservation practitioner in the military, and as an otologist in the civilian world, I have routinely recommended and advised soldiers and patients on hearing protection. I have to rely on manufacturers to adequately test the HPDs to make sure they are safe, and I have to rely on their reported product efficacy (e.g., NRR ratings), so that I can make well informed recommendations to the service members and patients that look to for guidance on how to protect their hearing. In addition, medical professionals, audiologists, military decision makers, occupational safety professionals, and leaders in noise industries rely on the label and the ratings provided by hearing protection device manufacturers in their decision making in selecting appropriate hearing protection for patients, users, military members, etc.

With respect to the CAEv2, though, 3M failed to test the CAEv2 before selling it to the military. It was not until four months after the first sale to the military that it "occurred to" 3M that it had not tested the CAEv2. Based on my experience in the military and in private practice, 3M's failure to test and label the CAEv2 before selling it was a violation of the industry standards, to REAT test HPDs before selling them. Gary Warren, 3M's President of Global Safety Products agrees:

> Q: And a safety device  manufacturer should test its products to understand the risks before they actually sell it and make money, fair?
>
> A: Yes.
>
> Q: Because if you see a product without knowing what the risks are, then needless harm can happen in the end user, fair?
>
> . . .

> A: Again, I would say that if we – if we sold a product without, you know, knowing how it performed, then, yes, absolutely.
>
> Q: That would be wrong?
>
> A: Yes.

(Warren 1/23/2020 Depo at 98:4–99:1) (3M_MDL000718635 (Berger stating "[o]ne other issue we need to be alert to that has bitten us in the past -- is selling products for which we do not have US REAT data.")) Beyond 3M's duty, its failure to test the CAEv2 before selling it violated EPA regulations. As stated previously, EPA regulations require HPD manufacturers to REAT test their products and label their products with an NRR. (40 C.F.R. §§ 211, *et seq.*) Testing is required before selling the product. (40 C.F.R. § 211.210-2) These regulations are clearly designed for safety and to protect users, and 3M ignored these regulations.

Because the CAEv2's dual-ended design was the first of its kind, it was especially important for 3M to test the plugs to make sure they would work.  Had 3M done the required testing and learned of the CAEv2's design defects before selling the plugs, 3M could have and should have redesigned the plugs or not sold them at all.  By failing to do so, service members and consumers wore defective earplugs and suffered NIHL and tinnitus.

It is also my professional opinion, based on my education, training, and experience, that if 3M tested the CAEv2 earplug prior to distribution, achieved the variable and poor results that they subsequently did, and informed the military and/or consumers of the NRR achieved, then the military and the consumer would more likely than not have purchased or used the CAEv2 earplugs because it would not provide the hearing protection necessary to avoid hearing loss and tinnitus.

**D. A Reasonable Manufacturer Would Have Stopped Selling The CAEv2 After Its Testing Revealed The CAEv2's Defects And Told The Military And Users About The Risks**

As discussed above, the CAEv2 was shown to be defectively designed when 3M conducted its first REAT testing of the product in January of 2000—after it had already been purchased by the military.  The design defects that caused the CAEv2's highly variable and low attenuation were memorialized in the Flange Report and can be seen upon examination of the subject-level data from Tests 213015 and 213016.

In 2000, when 3M learned of the problems with the CAEv2, 3M had the duty to stop selling the plugs until it made sure that the plugs were safe. 3M's Global Laboratory Director, Jeffrey

Hamer, agreed that it would have been wrong to sell the CAEv2 without solving the known issues with the plug:

> Q: You know that they were testing the plug and that because of its structure and design, in some cases the fit was being pulled out by the other end of the plug from the end being inserted; right?
>
> A: In --In this design, yes.
>
> Q: And don't you think that you should stop selling it until you figure out whether or not this is a problem?
>
> A: I do not know that this Is the design that we have on the market.
>
> Q: I'll rep- - - I'm unaware of any changes. I can tell you that much. Assuming there have -- don't you think in 2000 when 3M found this problem with this plug pulling out, they should have stopped and figured out what it was and stopped selling it until they solved it?
>
> A: I don't know that they didn't.
>
> Q: If they didn't, don't you think that would have been wrong?
>
> A: If they did not, yes.

(Hamer 10/7/15 Depo at 175:9–176:7) But 3M never stopped selling the CAEv2 for 15 years, until the product was suddenly discontinued the day after 3M was confronted with the Flange Report was discovered in litigation. 3M, thus, breached its duty as an HPD manufacturer and needlessly subjected users to NIHL and tinnitus.

3M should have halted sales in 2000 when it discovered the CAEv2's defects, just like it did in 2015. This is especially true because the CAEv2 defects that were described and noted in the laboratory were problems with fit, seal and loosening, which the company knew or should have known would be even more of a problem in the real world. 3M also knew that a 10.8 NRR on the closed end of the plug would not provide adequate protection to the military or to civilians in a real world setting and that if the NRR was 10.8 in a lab, it would be much lower in a real-world environment. In fact, it was well known by 3M's management running its laboratory (Berger) that pre-molded earplugs' performance in the laboratory would be considerably worse in the real world.

Two decades before the failed CAEv2 REAT test, Berger opined that laboratory tests, like a REAT test, "significantly overestimate the [real world] performance of HPDs, due to the unrealistic, optimized manner in which experimental subjects can wear these devices for short

duration tests." (Berger, EARLOG5, 1980) In fact, as early as 1980, 3M recognized that laboratory testing related "poorly" to the real world.  (The Performance of Hearing Protectors in Industrial Noise Environments by Elliott Berger in  EARLOG4, 1980; Methods of Fit Testing Hearing Protectors, with Representative Field Test Data,  Elliott H. Berger, Jeremie Voix, Lee D. Hager) Berger has more recently written that "although the database has grown substantially larger since appearance of the earliest studies and summary reports, the conclusions remain the same: real-world performance of HPDs, especially earplugs, demonstrates less attenuation and greater variability than currently standardized laboratory tests would predict." (Scientific Basis of Noise-induced Hearing Loss, Chapter 29, International Review of Field Studies of Hearing Protector Attenuation at p. 375 (Berger, Franks and Lindgren (1996)) Indeed, as discussed above,  the results of the CAEv2's Method B testing were much worse than the 10.8 NRR in the laboratory.

Armed with this knowledge, a reasonable HPD manufacturer would have immediately conveyed the problems with the plugs to users upon discovering them. It would have been reasonable for 3M to have further investigated the problems with the plug or to have redesigned the plug at that point. But, it was not at all reasonable for the company to storm forward with sales. Instead of burying the January 2000 experimenter fit test that resulted in a rounded NRR of 11, retesting it with a post-manufacturing alteration, and reporting only the retest to the military, 3M should have immediately ceased sales of the product and recalled the product that had already been shipped. Doing so would have prevented countless men and women in the armed services and consumers from suffering NIHL and tinnitus.

### E.  3M Failed to Adequately Warn

The CAEv2 was required to be labeled according to EPA regulations. (40 C.F.R. §§ 211.210-1(a), 211.10-2) Part B of the regulations applies specifically to HPDs and requires that earplugs like the CAEv2 are labeled with an accurate NRR and with "instructions as to the proper insertion or placement of the device." HPD manufacturers should also warn users and intermediaries about dangers associated with using the hearing protector, especially if the hazards are latent or unknown to them. 3M's senior executive and former President of North America Safety Products, Gary Warren, confirmed that 3M was aware of the duty to warn of known risks:

> Q: Because it's important for folks using a device, any device, but particularly a
> device designed to enhance their safety, to know of risks so they can properly
> protect themselves, correct?

A: Yes.

. . .

THE WITNESS:  Again, if there were risks that were known, then, yes, I think we
have an obligation to do that.

(Warren 1/23/20 Depo at 97:16–98:2), 129:11–131:6 ("It was our responsibility to educate those
gatekeepers, you know, in terms of how to properly use the plug and so forth."); 30(b)(6) 10/17/19
Depo at 280:7–15 (Q: You'd expect decision-makers to rely on a company's representations in
their marketing materials about the performance and safety capabilities of hearing protectors,
right? . . . A: They should be able to count on those – on the claim that we make."), 281:16–282:5
("I would think it's likely that they would read those claims and, yes, rely on them"); Madison
12/10/19 Depo at 346:20–347:4 ("I agree the manufacturer's information needs to be accurate."))

The obligation to properly label its HPDs should have been well known to 3M because its
predecessor company was fined $900,000.00 by the Department of Justice for violating EPA
labeling regulations. The Department of Justice's findings  stated:

Correct labeling and adequate testing are absolutely necessary for the safety of the
public…EPA's regulations under the Noise Control Act are designed to assist
workers and consumers by requiring product information about ear plug or ear muff
noise protection capacity to help prevent hearing loss due to workplace or
environmental noise.

(3M_MDL000024833)

As a physician in the military and in private practice, I have personally utilized and
reviewed warning labels so that I can gain information about the safety, risks, and information
about HPDs. At the HCE, I worked with all branches of the Military to develop a qualified or rated
products list of hearing protection devices for the purpose of guiding military leadership, hearing
conservation teams, and military units towards making informed decisions about which HPDs to
offer to ensure appropriate protection and features for various military tasks. The single most
important factor related to any HPD's function is the protection rating, the NRR. The NRR serves
as a benchmark for mathematical calculations of protection against known noise sources and is a
measure that could not be compromised when other product related variables might be tolerated.
Making informed decisions to protect the service men and women that serve to protect our country
was the ultimate mission of the HCE. We relied on industry leaders to develop and provide

dependable HPDs trusting that their products would deliver the protection that they promoted and printed on the NRR label.

In addition, I am not able to properly weigh the risks and benefits of using an HPD or recommend an HPD to my patients if the manufacturer does not provide all of the important warnings and risk information on the HPD's label. When at the HCE, I worked on HPD acquisition, and the government needed this information to evaluate HPD safety. Audiologists and directors of hearing conservation programs in companies around the country likewise need this information for the same reasons, as do consumers who buy HPDs on the market. Accordingly, HPD manufacturers should not only provide accurate information about protection and instructions for using the HPD in a safe manner, but the manufacturer must also identify all significant risks associated with the HPD on its label.

As stated more fully below, it is my opinion based on my education, experience, training, and my review of the documents and testimony in this case, that 3M failed to warn that:

- Testing has shown that the CAEv2 may be difficult to fit or seal which may lead to little or no hearing protection;
- It received test results that showed problems with the CAEv2 and that it manipulated testing data
- the CAEv2 is too short for proper insertion and, as a result, may be difficult to properly fit or seal;
- The geometry of the ear canal opening in some individuals prevents the deep insertion needed for proper fit and seal of the CAEv2;
- The large, inflexible stem can make the CAEv2 difficult to fit and seal depending on ear canal geometry and size;
- the dual ended design of the CAEv2 can lead to loosening if the non-inserted earplug is in contact with the user's ear;
- the labeled NRR (22) on the CAEv2 was achieved only by folding back the flanges;
- When the CAEv2 was tested pursuant to the instructions for use (without the flanges folded back on the non-inserted earplug) the NRR was 11; and
- the CAEv2's yellow end may not be sufficient to protect soldiers from repeated, high intensity impulse noises (gunshots) and, therefore, should not be used on the outdoor range.

**1. 3M Did Not Warn the Military and Consumers Before REAT Testing That the CAEv2 was Being Sold Without the Required Testing**

As discussed above, even though the CAEv2 was an untested dual-ended earplug, the first ever marketed and sold, and the last one ever marketed and sold, 3M decided to start selling the CAEv2 to the military without first REAT testing it to make sure the plugs would work and be safe for users. This was a clear violation of 3M's duty as a manufacturer of hearing protection and of the law, and it was also inappropriate and unreasonable not to warn the military and users that it was selling the device without the necessary testing before doing so. Warren, 3M's former Senior Executive agreed, and testified:

> Q:  Well, are there any tests listed here prior to January of 2000, the 016 and 017 tests?
>
> A:  Again, I've never seen this before, I don't know how to read this chart, but if I look over on the date, it looks like there are -- well, no, it doesn't look like there's anything dated before January of 2000.
>
> Q:  But if the company had been selling the product prior to testing the product, you would agree that would have not been appropriate, correct? The Combat Arms version 2, that is?
>
> A:  Yes.

(Warren 1/23/20 Depo at 117:8-22)

It simply is undisputed that 3M had the duty to test the CAEv2 before selling to the military and consumers, and the military and users also had the right to know that the CAEv2 had never been tested before it was promoted and sold. Without that information, the military was unable to make an informed decision about whether to acquire the CAEv2 for its troops. Had the military been told that the safety testing required to determine the NRR had not yet been completed, the military and users may have decided against using the CAEv2 until the testing was done, or at all. Regardless, they had the right to know and 3M's failure to tell the military led to women and men in the armed services being provided and wearing defective hearing protection that had not been tested.

2. **For the First Several Years And Through Most Channels Thereafter the CAEv2 was Sold to the Military Without the Required Label, Or Any Warnings of Its Risks, Or Any Instructions For Its Safe Use**

As discussed above, 3M had a duty to label the CAEv2, provide instructions for use, and warn the military and consumers when selling the product. Nonetheless, as also explained above, 3M did not do so when it first sold the CAEv2 to the military and for several years thereafter. (30(b)(6) 10/18/19 Depo at 178:20–179:12, 198:7–199:13; 3M_MDL000056553; Berger 12/10/19 Depo at 224:6–226:12) In fact, 3M failed to provide any of this required information to the military for at least five or six years – from 1999 until late 2005.  (30(b)(6) 10/18/19 Depo at 200:17–202:12, 212:6–15) Based on my experience educating others and recommending HPDs at the HCE, this early time period was critical for the military to determine whether to acquire these plugs. This was also an opportunistic time for 3M as the U.S. entered a war with Afghanistan in October of 2001 in response to the terrorist attack on the World Trade Center the month prior. This war was extended to Iraq in March of 2003. This escalation in military manpower and operations led to an increase in noise threat for military members in training and in battle. 3M's claims that its novel HPD would not only provide linear protection but also situational awareness was no doubt appealing.  At this time, more than ever, the military needed and should have been provided all the information about the safety and efficacy of the CAEv2.  The military needed this information to vet the safety of the CAEv2, yet 3M denied it this information.  Non-disclosure of this information to the Military contributed to the CAEv2 being unreasonably dangerous and caused service members to suffer NIHL and/or tinnitus.

3. **At All Times the CAEv2 Was on the Market, 3M Failed to Warn The Military and Consumers About The Findings In The Flange Report**

When 3M got around to testing the CAEv2 (Tests 213015 and 213016), it learned that its design was defective and could not be properly fit or maintain a proper seal in most users. Nevertheless, 3M chose to sell the CAEv2 rather than redesign or simply discontinue it. The military and consumers had the right to know about the CAEv2's design defects or "problems," as Berger called them, that 3M uncovered. These findings were memorialized in the Flange Report and should have been shared before selling the CAEv2 to the military, so that the military could make an informed decision about whether to purchase the plugs. Once 3M decided to sell the

CAEv2 to the military and to consumers, the fitting problems and the problem maintaining a proper seal needed to be disclosed on the label or packaging of the product.

First, 3M should have warned users that testing of the CAEv2, showed that the CAEv2 is difficult to fit and to maintain a seal which could lead to little or no hearing protection.  The military and users should know this

Second, 3M had a duty to warn or inform the military and consumers of the CAEv2 that its closed end was "too short for proper insertion" and thus obtaining proper fit and seal may be difficult or not possible. 3M learned this design characteristic caused fitting problems in multiple subjects in Tests 213015 and 213016 and in further testing thereafter. This information was especially important for users, because this was a finding by an expert earplug fitter in a laboratory environment. 3M should have realized that users in the real world environment would not be able to obtain a fit like an expert fitter in a laboratory, at least on a consistent basis. The CAEv2 users needed to be warned about this fitting defect and the inherent risk uniquely associated with the CAEv2 that was known to 3M. Without this information, the military and users of the plugs would not be able to make an informed decision about whether they should purchase or accept the risk of using these plugs. (CID File0237)

Third, for the same reasons stated above, 3M had the duty and obligation to inform the military and consumers that the "geometry of the ear canal opening"  "prevents" deep insertion of the CAEv2 and the ability to obtain a proper seal in some individuals.  3M needed to warn the military and users of this because the testing of the CAEv2 revealed that this plug would actually not fit, seal, or stay seated in some ear canals as a result of its design.  This unique design characteristic (compared to other earplugs like foamies) could lead to little or no protection for service members and consumers.  Therefore, the military and all users needed to be warned about this known risk of danger associated with the CAEv2.

Fourth, 3M had the duty and obligation to warn and inform the military and consumers that this dual-ended plug had a unique design characteristic that could cause "imperceptible loosening" of the plug, thereby leading to little or no protection. It was also important for 3M to actually warn about the mechanism of this dangerous characteristic - that is, that the flange on the outward facing plug could press against the ear canal opening, fold up and subsequently return to its original shape, causing the plug to loosen imperceptibly to the user. This defect was a hidden or latent defect that would be unknown to users and intermediaries and, therefore, it was  critical that users be told

about this.. The warning and information about this unique and dangerous characteristic was necessary so that the military and users could understand the risks of danger associated with wearing this earplug.

Fifth, 3M had the duty and obligation to inform the military and consumers that the NRR of 22 was only achieved by folding back the flanges and that failing to do so could lead to much less protection - specifically that testing of the device according to the instructions for use on the label resulted in an NRR of only 11.  3M chose to advertise an NRR of 22 for the CAEv2, yet failed to tell users that the claimed NRR was only achieved by manipulating the configuration of the plug and that doing so was mandatory to achieve the stated protection.  Without this important information, users could not get the protection claimed and this added to the risk of unreasonable danger from wearing these plugs.

In sum, 3M failed to warn the military and consumers about any of the CAEv2's dangerous defects. These warnings discussed above and throughout this report needed to be provided in writing with the product on a label or in a package insert or in another manner that would reasonably ensure that users had access to this critical safety information. 3M did, in fact, put "Caution[s]" and "Warning[s]" in CAEv2 package inserts and promotional materials, so the company was clearly capable of providing warnings about its earplug. (3M_MDL000005445) Instead, 3M buried Test 213015 and the Flange Report and stormed forward with selling this dangerous and defective product. Doing so was a violation of 3M's duty as an HPD manufacturer. The lack of proper warnings made the CAEv2 even more unreasonably dangerous. In my opinion, had the military been warned about these dangerous characteristics, the military likely would not have purchased the CAEv2, and soldiers and marines would have been able to obtain adequate protection for their hearing. This is true, in part, because there were other safer alternatives available (as discussed more fully below). Physicians and audiologists recommending HPDs also needed this important information so that they could weigh the risks and benefits of recommending these dangerous plugs.

> **4. The Fitting Tip and The Wallet Card Did Not Make the CAEv2 Safe for Use, Nor Did They Adequately Inform the Military and Consumers about the CAEv2's Dangers**

Neither the "Fitting Tip" nor the Wallet Card adequately warned or informed the military and consumers about the CAEv2's design defects or dangers.

First and foremost, it is important to again point out that I have not seen any evidence that the "Fitting Tip" was provided to military users for at least five years after 3M started selling the CAEv2 to the military. Further, it seems that only soldiers or marines who purchased the plugs (as opposed to having them provided by the military free of cost) would have had access to the package insert and exposure to the Fitting Tip. As to the wallet card, it was not created until 2004, and I have not seen evidence that suggests that the wallet card was widely dispersed to all service members.

Even if the Fitting Tip and the wallet card were seen by many users, neither one provided adequate warnings or information about the CAEv2's dangers. The Fitting Tip is simply that - a tip - that says fitting may be "improved" if the flanges are rolled back and does not say that doing so is required, or that the NRR of 22 could only be achieved if the flanges were rolled back. Nor does it say anything about the fitting difficulty due to the plug's short stem, that the plug would simply not fit in certain ear canal geometries, or that the plug could imperceptibly loosen. An adequate instruction would have mentioned all of these fitting problems. The same is true for the wallet card, but to make matters worse it misstates the Flange Report. The tip notes that the CAEv2's opposing flanges should be folded back only for "very large" ear canals. It did not mention any fitting issues due to ear canal geometry or that imperceptible loosening could apply to all sized ear canals.

Thus, even if users saw the fitting tip or the wallet card, the information contained therein did not adequately warn about the dangerous characteristics of the CAEv2. Moreover, because the folding back the flanges does not cure the CAEv2's other design defects, the plug was unreasonably dangerous with or without the fitting tip and wallet card.

   **5. 3M Failed to Warn About and Misrepresented the CAEv2's NRR of 22 On Its Label and In Its Marketing Materials**

The NRR listed on 3M's label and marketing pieces for the closed end of the CAEv2 was always 22. In my opinion, the NRR of 22 was false and misleading and 3M violated the standard of care for an HPD manufacturer and EPA regulations by labeling the CAEv2 with that misleading NRR. 3M should not have labeled the CAEv2's closed end as providing a 22 because that NRR was achieved in a test where the CAEv2's opposing flanges were folded. As mentioned, however, the CAEv2's instructions for use never required users to fold the flanges. (Hamer 12/18/19 Depo at 318:1–14; Santoro 12/13/19 Depo at 306:1–22) More importantly, 3M knew the CAE2 was not

being worn in the real world with flanges folded back.  In fact, multiple 3M witnesses testified that they had never seen or heard of the flanges being folded back on the CAEv2 before this litigation. (30(b)(6) 10/17/19 Depo at 298:23-299:18; Knauer 12/17/19 Depo at 93:24-94:10) Many 3M witnesses who were selling the CAEv2 to the military, some for years, were asked in depositions about folding the flanges back, and did not even understand what it meant or how to fold back the CAEv2's opposing flanges. (Cimino 12/11/19 Depo at 227:16–228:20; Murphy 1/29/20 Depo at 291; 293:1, 296:17–297:8; Moses 12/5/19 Depo at 197:14–199:12; Santoro 12/3/19 Depo at 296:9–20) The fact that 3M continued doing REAT testing on the CAEv2 years after labeling the product with an NRR of 22 without folding the flanges back also makes it clear that 3M knew that folding the flanges back was not the way the CAEv2 was designed to be worn. Accordingly, it was unreasonable and inappropriate for 3M to label and advertise the CAEv2 as providing an NRR of 22, when it knew it had only obtained an NRR of 10.8 in the laboratory.

When 3M tested the CAEv2 the way that men and women in the service and consumers were wearing the plugs, the REAT test revealed an NRR of 10.8, only 10% of the NRR of 22 that it was promoting. (McNamara 3/11/20 Depo at 152:2–153:9) Clearly, 3M had a duty to either inform the military of the true NRR of 10.8 from the halted Test 213015, or to complete a REAT test on the closed end and report that before selling it to the military and to consumers. Based on my experience with HPDs, I think it is highly unlikely that the military, or consumers for that matter, would purchase plugs for constant noise that only provided an NRR of 10.8 or anything close to that NRR. An NRR of 10.8 would not compete in the military or consumer marketplace because many other HPDs have much higher NRRs. Although service members might be willing to use the CAE2 with a slightly lower NRR on the closed end due to the purported "situational awareness" benefit, in my opinion an NRR as low as 10.8 on the closed end would not be marketable. (Berger 12/11/19 Depo at 559:5–13; Knauer 12/17/19 Depo at 117:10–17) Nevertheless, because the military and consumers were not told the correct NRR for the product, they were left to rely on the false NRR when choosing the plugs, and, as a result countless users suffered severe hearing damage.

**6. 3M Misrepresented That the Open End of the CAEv2 Was Appropriate For Use On Gun Ranges Or In Battle And Failed To Warn The Military And Consumers That The Open End Of the CAEv2 Was Not Appropriate For Such Use**

3M misrepresented that the CAEv2 was protective from weapons fire on gun ranges and in battle. 3M also falsely claimed that the plug was "ideal for" outdoor ranges and would provide "instant protection" from weapons fire. Internally, however, 3M scientists knew that the open end of the CAEv2 was inadequate to protect against frequent gunfire. Yet, 3M never told users that it was dangerous to wear the open end on the range or in battle and, as a result, countless soldiers suffered NIHL and tinnitus.

Service members and consumers wore the open end of the CAE2 to gun ranges for over fifteen years. But, 3M's most senior scientists knew that the open end of the CAEv2 was not safe for use on gun ranges. Berger admitted that the CAEv2 "is not the optimal choice for a gun range" and "is probably inadequate" for indoor gun ranges. Another 3M executive admitted that he "wouldn't recommend the CAEv2 at a gun range if there is "frequent" gun fire. Although the marketing department considered changing the language to use for "infrequent gunshot noise", 3M worried that this change in language "could cause concern for potential users." (3M_MDL000473502) This is exactly the type of safety information that 3M should have provided to users of the plugs. Yet, there is no evidence that 3M ever told anyone (the military or consumers) anything other than that the CAEv2 would protect against weapons fire.

Based on my experience while in the military, including my work with the HCE, the military relies on manufacturers' representations about the protection their HPDs provide. I, along with doctors and audiologists throughout the country, rely on manufacturers' representations when recommending hearing protection for patients. Users rely on those same representations when choosing hearing protection. Therefore, it is very important for manufacturers of HPDs to inform users truthfully about the protection provided by the device and to avoid exaggerating the protection an HPD provides to users.

3M knew that service members were wearing the open end of the CAEv2 when exposed to gunfire on ranges and in battle. 3M was obligated and had a duty to warn users that the CAEv2 was unsafe for use in the vicinity of frequent weapons fire, instead of continuing to misrepresent that the plugs were safe for use on gun ranges and in battle where gunshots are frequent. By failing

to do so, men and women in the military and other users relied on 3M's misrepresentations and suffered NIHL and tinnitus.

**F.   3M Knew the CAEv2's Dual-Ended Design was Difficult to Fit and Use, Yet 3M Failed To Provide Adequate Training and Instructions to the Military and Users**

As stated previously, the CAEv2 was the first dual-ended earplug ever sold to service members and consumers. Its dual-end design was unlike any pre-existing earplug. Indeed, 3M retested the CAEv2 after terminating its labeling test because, according to Berger, "there is a learning effect as the experimenter better understands how to insert this unusual earplug." (3M_MDL000434769) Given 3M's knowledge that the CAEv2 was difficult to fit and seal—as memorialized in the Flange Report—3M had a duty to train and instruct the military and users about this "unusual" earplug.

This is especially true because 3M knew users did not understand how to use the CAEv2. More than five years after selling the CAEv2 to the military, 3M acknowledged "the troops [did] not understand[] the purpose of our plugs or how they work" and that "an instruction guide with ear pair" should be included. (3M_MDL000620089) Other emails show that 3M "continue[d] to hear that the soldiers don't understand how the plugs should be used or how to properly wear them." (Santoro 12/3/19 Depo at 301:4-302:14) Not even 3M's marketing and sales team knew how to use this product. (Cimino 12/11/19 Depo at 227:16–228:20; Moses 12/5/19 Depo at 197:14–199:12; Murphy 1/29/20 Depo at 291:22–293:1, 296:17–297:8; Santoro 12/3/19 Depo at 296:9–20) Despite the "problems" fitting and sealing these unusual earplugs (3M_MDL000258590), 3M did not adequately train or instruct either the military itself or users about how to use the plug safely. As a result, thousands of service members and consumers were never advised about the CAEv2's problems or how to use the plug safely, thus increasing their risk for suffering NIHL and tinnitus.

It is my opinion that 3M could have and should have provided the military—including service members and audiologists—as well as other users detailed instructions and training and warnings about the CAEv2's problems with fit, seal, and imperceptible loosening. 3M could have instructed the military and users that folding back the flanges in testing helped achieve higher NRRs in a laboratory setting, but that other design problems, such as imperceptible loosening and the failure of the plugs to fit the ear canal geometry of some users, persist outside the laboratory. 3M could have provided detailed training with this information as well. Given 3M's knowledge of the significant fitting and sealing problems with the CAEv2, 3M had a duty to provide this

information and instruct the military and users. Unfortunately for all users, 3M failed to do so, causing thousands of users to remain in the dark about the CAEv2's dangers.

**G. There Were Safer Alternative Designs Available That Would Have Reduced or Eliminated the Harms Caused By The CAEv2**

During the time the CAEv2 was on the market, there were numerous other, safer HPDs on the market that provided noise reduction to safe levels but did not have the design flaws described above. These alternative designs would have eliminated or substantially reduced the hearing loss, injuries and damages suffered by service members. These alternative designs were cost effective and feasible, and they would have prevented the HPD from being unreasonably dangerous. These designs did not have the CAEv2 flaws described in the Flange Report—i.e., opposing flanges and a large, inflexible inner stem that made it difficult to get a "deep and consistent seal to get proper protection." (Berger 10/08/15 Depo at 109:6-13)

When determining a safer alternative design for HPDs, numerous factors should be considered. Simply reviewing REAT measurements to determine whether a device is a safer alternative design would be inappropriate. This is particularly true where one is looking at experimenter fit data, which attempts to show optimal performance versus real world performance where actual users wear the HPDs for extended periods of time. Factors that are often overlooked in evaluating HPDs include, but are not necessarily limited to:

1. Comfort. Crucial in the real world, as it impacts compliance.

2. Utilization. Earplugs may be incorrectly inserted or adjusted.

3. Fit. This must be done for each ear or performance can be affected.

4. Compatibility. Must be matched to the user.

5. Readjustment. Since HPDs can work loose, users must be advised of the need for readjustment.

6. Deterioration. HPDs must be maintained and repaired as necessary. (Berger et al., 2003)

One particularly concerning aspect of the CAEv2, which is relevant to the evaluation of safer alternative designs, is the imperceptible loosening that occurred in the lab setting. The fact that the CAEv2 could loosen in the minutes it takes to perform REAT testing is highly problematic as REAT testing subjects sit immobile in a laboratory. The fact that a plug could loosen in minutes with little to no motion indicates a problem that will worsen as users move around, talk, chew, or undertake any physical activity. This problem of loosening is compounded by the fact that such

loosening was "imperceptible" to the users. The perception of loosening will generally prompt HPD users to readjust their plugs, as is set forth above. However, when loosening is imperceptible, there is no trigger to cause the HPD user to readjust the plug. Unfortunately, the imperceptibly loosened plug provides no guidance to the user that there is a fit issue that must be addressed. This is particularly true on the yellow end of the CAEv2, which was designed to allow sound to pass unimpeded (this is the goal of the plug/ISL filter) up to certain levels. Consequently, when the yellow end is working as designed, a user will not be able to discern sound differences caused by a loose fit from those caused by a secure fit, because in both cases, lower level sounds are reaching the ear canal unimpeded. Thus, any HPD that does not have the defect of imperceptible loosening will have a significant advantage over one that suffers from this defect.

Another issue with the CAEv2 is the rigidity of the stem. Typically, for an earplug to work, it must conform to the ear canal of the user. For this reason, most earplugs are made exclusively with softer materials that will conform to the unique curvature and shape of the individual user's ear canal. The white plastic insert of the CAEv2 was made of Delrin, a plastic known for its tensile strength and stiffness. Its manufacturer, Dupont, describes Delrin as "the ideal material in parts designed to replace metal." Because of the stiffness of the Delrin, it is not able to conform to the curves and contours of various individual ear canals. Instead, it maintains its shape, which will prevent it from conforming to any ear canal, other than one that is straight. If hard material like Delrin is used in the stem of an earplug, placement is critical. For instance, is the hard material inserted deep within the ear canal versus exterior to ear canal. Flexibility is very important with respect to comfort, fit and seal.

I am familiar with several safer earplugs that were on the market at the same time as the CAEv2. For protection against steady-state noise, there were numerous foam and pre-molded flanged earplug alternatives which could provide adequate protection against steady state noise hazards, but which did not have the CAEv2's design problems of achieving and maintaining a proper seal. These are listed in the 2006 CHPPM Technical Guide 41. (3M_MDL000345123)

There existed alternative designs for nonlinear devices that provided noise hazard protection against impulse noise, which are desired for dismounted combat service members and in various live fire training exercises, where communication and situational awareness are beneficial.

The non-linear filter developed by ISL in 1996/1997 was similar to an earlier nonlinear earplug called the "Gunfender," which was used by the British military. (3M_MDL000016506). The ISL non-linear filter was first utilized in the Aearo/3M CAEv1, which was sold to the European military market. CAEv1 came to market in 1999. CAEv1 utilized the same ISL non-linear filter later used in the CAEv2, which was incorporated into the preexisting Aearo/3M UltraFit earplug design. (3M_MDL000259866) A similar "version one" single sided CAE earplug utilizing the ISL filter and the UltraFit earplug was available to the DoD in 2003 and this version is also in noted in the TG41 in 2006. (3M_MDL000345123) This was a safer alternative for use in impulse noise environments, because it allowed for situational awareness but it did not have the sealing problems of the CAEv2. Contrary to the CAEv2, the CAEv1 had a flexible stem and was single sided without an opposing flange which could "imperceptibly loosen" the plug.

3M's Combat Arms versions 3 and 4 and 4.1 were also single ended earplugs utilizing the ISL filter, but these had a "switch" which allowed them to be used for both steady state and impulse noise environments. They came in multiple sizes and the version 4 was based on a 1998 Aearo/3M patent for a "selective nonlinear earplug" granted in 2000. (3M_MDL000338061; 3M_MDL000351438)

These were safer alternatives which did not have the design problems of the CAEv2. The 2018 Hearing Center of Excellence poster gives several examples of acceptable nonlinear devices, including multiple versions of the Surefire Sonic Defender and the Moldex Battle Plugs. (HCE-Selection of passive hearing protection) These were safer alternatives for both steady-state protection and impulsive noise protection, and they did not suffer from the same design flaws that plagued the CAEv2.  Finally, custom molded earplugs are also safer alternatives and can even have nonlinear filters placed in them.

Mark Packer, M.D.