# EXHIBIT 1

UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
FLORIDA PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to All Cases | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## DECLARATION OF MICHAEL CIARAMITARO IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' JULY 1, 2022 MOTION TO COMPEL

I, Michael Ciaramitaro, declare and state as follows:

1. My name is Michael Ciaramitaro, and I am the Vice President of Technical Operations for International Litigation Solutions, Inc. ("ILS"). ILS is a full-service electronic discovery company. ILS specializes in, among other things, forensic collection of electronically stored information ("ESI") from various computing systems, including email systems, social media, computers, flash drives, and mobile telephones. I know the facts and opinions contained in this declaration from my own experience and knowledge except where stated otherwise and will testify to the matters herein if called upon to do so.

**Qualifications**

2. I hold a Bachelor of Science degree in Business Management from the Pepperdine Graziadio School of Business and Management.

1

3.  I have over 20 years of experience in computer forensics and electronic discovery and have provided testimony in dozens of matters pertaining to collecting and analyzing ESI. My areas of expertise in data collection includes email, social media, cloud data, computers, and mobile devices. I offer consultation as a digital forensic expert in matters involving product liability, trade secrets, intellectual property theft, computer use investigations, and other legal matters involving electronic data.

4.  I obtained my EnCase Certified Examiner (EnCE[1]) through Guidance Software in 2002 and have maintained my knowledge in computer forensics through hundreds of hours of classroom training over the course of the last 20 years.

5.  From September 2001 to August 2007, I was a Senior Manager of Quality Assurance at Guidance Software, Inc., a company that develops industry-leading computer forensics software products. As a Quality Assurance senior manager, I became an expert in computer forensic software validation and testing.

6.  From March 2008 to August 2010, I was a Senior Forensic Investigator for Online Security, Inc., a Los-Angeles based electronic discovery company. From October 2010 to March 2011, I was a Senior Associate, Forensic

---

[1] EnCE certification is a widely respected credential for forensic professionals. It certifies proficiency in the use of EnCase, which was a pioneering tool for forensic collection and examination and remains a key component of most forensic professionals' tool kits.

2

Technology Services for Price Waterhouse Coopers. From 2011 to present, I have held the titles of Senior Vice President or Director of Forensics at FRONTEO, Teris, DiscoveryReady, Inventus, and ILS.

7. In the course of my career in computer forensics, I have obtained a mastery in industry-standard practices for conducting forensic data collections and investigations on all standard types of ESI including Webmail, Email, Social Media, Cloud Storage, Mobile phones, and computing devices in part through thousands of hours spent on legal matters.

**Collection of Hearing Health Data Generally**

8. ILS is the retained electronic discovery consultant for Plaintiffs in the instant action. ILS has previously collected and produced ESI, including email, text messages, and social media data, from Plaintiffs in the action. Plaintiffs' counsel requested that ILS evaluate the process and feasibility of collecting electronic hearing health data from Plaintiffs' smartphones, tablets, Apples Watches, hearing aids, and other electronic devices (collectively referred to as "hearing health data" or "Electronic Hearing Health Data").

9. In connection with that request, I have reviewed i) Defendants' First Set of Requests for Production to Plaintiff Justin Tompkins, particularly Defendants' Request for Production Number 10 ("RFP No. 10"); and ii) a 14-page document entitled "Hearing Health Data Navigation & Capture," prepared by

Defendants' ESI consultant Consilio, purporting to provide instructions for how a lay person can self-collect Electronic Hearing Health Data from Apple iOS devices.

10. In my experience, collecting Electronic Hearing Health Data is a unique litigation request and not something I have been previously asked to collect in the thousands of ESI collections I have performed to date. However, as a forensic collection specialist, I have experience in evaluating and colleting from unique and emerging electronic data sources, including iOS Health data that tracks steps and flights climbed. Accordingly, I can competently evaluate the technical feasibility of complying with Defendants' RFP No. 10.

11. I am not qualified to opine on the veracity or reliability of any hearing health data captured by an electronic device, or the possible relevance or significance to the instant litigation, as this is outside of my expertise.

**Forensic Collection of Electronic Hearing Health Data**

12. In connection with my evaluation of Defendants' RFP No. 10, I performed a forensic collection of a test iOS device that had Apple Health Data enabled for at least a two-year period and collected all available health data, including "Environmental Sound Levels" and "Headphone Audio Levels."

13. Apple describes the "Environmental Sound Levels" as "sounds in your environment measured in A-Weighted decibels (dB)" recorded when the

Noise App on an Apple Watch is synced to the iOS device. "Environmental Sound Levels" are captured for iPhone users who also have an Apple Watch with the Noise App configured.



14. Apple describes the "Headphone Audio Levels" data as representing the "volume of your headphone audio measured in A-weighted decibels (dB)."

5

And that "These measurements are most accurate when using Apple or Beats headphones" and that "Audio played through other headphones or speakers connected via a wire can be **estimated** based on the volume of your device." By Apple's own description only Apple or Beats headphones are considered "most accurate" and that all other audio attachments are "estimated."



6

15. I used Cellebrite and Elcomsoft Phone Breaker to collect and analyze the test Electronic Hearing Health Data. Both are industry standard forensic collection and investigation tools that I routinely use to collect and analyze data from iOS devices. Because functionality of these tools changes routinely, the methodology and format of the forensic data reflects how the tool functioned at the time of my collection in mid July 2022. Accordingly, aspects of my declaration could change in the future if the Cellebrite or Elcomsoft tools change their underlying technology or if Apple changes the format or type of health data captured by iOS devices (which occurs frequently in my experience).

16. I do not own an active Android device or any hearing aids, so I was not able to perform sample forensic collections from those type of devices. Based on my experience previously collecting from Plaintiffs in the instant action, I expect that a significant portion of Plaintiffs from whom Defendants seek hearing health data will have Android devices.

17. The iOS Electronic Hearing Health Data that I collected from a test iOS device contained data for approximately a two-year period (from June 1, 2020 through the date of collection). Although I have used the device for more than three years, the Electronic Hearing Health Data only went back to May and June 2020, respectively.

18. I have not been able to locate industry information regarding

whether iOS devices automatically purge data exceeding a certain storage level or time period, nor do I know whether any hearing health data ever existed on my device from an earlier time period. I did not locate any setting within the iOS device to disable auto-data deletion of health data.

19. Upon reviewing the collected data, I observed that the iOS system only captured Headphone Audio Levels decibel data when my device was connected to an external output device (e.g., headphones, Bluetooth speakers, built-in automobile speakers, home audio speaker system). I noticed that the collected data, however, did not distinguish which external source registered the decibel reading (e.g., my in-home stereo system versus my Bluetooth headphone) when viewed through Elcomsoft. I observed that the Headphone Audio Levels visible in the phone identifies the connected device by the name associated with the device (which can vary and are typically auto-generated names that are not always descriptive of the device), meaning that this data exists on the phone although it was not displayed by the tools I used to forensically collect the data.[2]

20. During the collection, I observed that the Summary page of the "Headphone Audio Levels" application built into my iOS device states that "Headphone Audio levels . . . are most accurate when using Apple or Beats

---

[2] While the iOS devices do list the Headphone Type in the Show More Data sections of the Health Application, I note that Consilio's 14-page instructions do not instruct the Plaintiff to click on the links that would result in a screenshot of this information.

headphones." I did not use either Apple or Beats headphones and do not know whether that affected the accuracy of the recorded Db data.

**Challenges, including Privacy Concerns, in Forensically Collecting Hearing Health Data from Individual Plaintiffs**

21. To determine which Plaintiffs possess hearing health data, Plaintiffs' counsel, likely with a technical consultant's assistance, would need to conduct interviews with each Plaintiff to determine whether they may have relevant hearing health data on their devices. This would be a time consuming and logistically challenging process, as many individuals do not know whether their devices track audio level information and would need technical assistance in determining and collecting this data if it exists.

22. The interview process would be particularly challenging for Plaintiffs with non-iOS devices because those devices will have greater variations and require more technical investigation to identify if potentially relevant data exists.

23. Once Plaintiffs' counsel determined that potentially relevant hearing health data existed on an iOS device, forensically collecting the hearing health data from the iOS devices would take approximately the same amount of time as collecting other data from an iOS device (e.g., text messages, photos). A forensic collector, likely with Plaintiff's counsel's participation, would need to

9

meet with the Plaintiff to obtain access to their device or iCloud backup. This meeting could be done virtually. In my experience, scheduling these sessions can be time consuming because Plaintiffs often have busy schedules (e.g., work, school, medical appointments, family obligations) that make it difficult to set aside time to work with a forensic collector.

24.     Both the Cellebrite and Elcomsoft tools that I relied on collect additional health data along with the hearing health data and cannot be set to only collect the hearing data. Specifically, the tools also collect the following Health data stored in the iOS devices: Activity (e.g., exercise tracker, step count), Body Measurements (e.g., weight, body fat percentage, body mass index), Menstrual Cycle Tracking, Heart (e.g., blood pressure, heart rate), Mindfulness (tracked through linked meditation applications), Mobility (e.g., step length, walking speed), Nutrition (tracked through linked nutrition applications), Respiratory (tracked through linked health applications), Sleep, Symptoms, Vitals, and Other Data (manually input by iOS user). After collecting all available Health data, the forensic collector or an eDiscovery professional will likely need to separate the non-hearing health data so that only the hearing data is made available for attorney review. Collecting this personal health data may implicate privacy concerns for individual Plaintiffs and the data will need to be treated with care by the eDiscovery professionals who handle the data (including proper storage and/or

deletion of the non-hearing data and compliance with the Health Insurance Portability and Accountability Act (HIPPA), if applicable).

25. Depending on the format required for attorney review and production to Defendant, custom software may need to be developed to parse the health databases collected from the iOS device before loading to a review platform, which would further increase time and costs. If the non-hearing health data is not separated before attorney review, non-hearing data may require either extensive redaction before production, or custom production formatting after review so that only the hearing data is produced.

26. Android device collection and hearing aid collection would both involve separate, customized collection processes, to be determined on a case-by-case basis. It is my understanding that Android devices capture some hearing health data and that some hearing aids may electronically track audio levels, but each device and hearing aid type would need to be evaluated individually.

27. Neither Android devices nor hearing aids would be amenable to remote collection. Specifically, hearing aid devices would require inspection of the physical device, while Android devices would require either i) an in-person collection; or ii) physical shipment of a specialized computer outfitted with forensic software followed by a forensic collector remotely assisting the Plaintiff to collect the data which then must be shipped back to the collector. Accordingly,

collecting from both Android and hearing aids would involve additional time and costs compared to iOS devices.

**Defendants' Proposed Plaintiff Self-Collection of Electronic Hearing Health Data**

28. Based on discussions with Plaintiffs' counsel and review of documentation from Defendants' consultant Consilio, I understand that Defendants have proposed that Plaintiffs could self-collect Apple iOS data. I have reviewed the instructions Consilio has provided to perform that self-collection. Defendants' instructions only contemplate Apple iOS device self-collections and do not address the other data sources identified in RFP No. 10 (e.g., hearing aids or Android smartphones, tablets, or wearable devices).

29. Based on my experience working with Plaintiffs for the last several years, performing the tasks outlined by Consilio will likely challenge the average Plaintiffs' technical capabilities or aptitude. First, the instructions require knowledge of the Settings and Health Application features in the iPhone (which are not necessarily familiar to all iOS users). Second, the instructions require the Plaintiff to take multiple screenshots from their device in a process that requires multiple clicks to access different pages from the Health Application, viewing many pages with similar appearance and taking screenshots at each page, and needing to scroll potentially several times through a page, taking screenshots

throughout while scrolling. The possibilities for human error, confusion, and frustration with the process are high, and I would expect it likely that the screenshots captured would contain inaccuracies and missing data resulting in incomplete productions and possibly having to reperform the instructions until they are followed correctly.

30. I also note that Apple iOS devices only make visible to a front-end user data from a limited time period from the current date, making the data already not fully responsive to RFP No. 10, which requests data from one year before the Plaintiff first used the 3M Combat Earplugs at issue in the case to present. I also note that at least one data source in the Health Application does not display the year, but only the day and month, which would further add to the confusion and utility of the data (e.g., the "Show All Data" from the "Headphone Notifications" section as requested on page 11 of the Consilio document).

31. Based on my experience, most Plaintiffs would require assistance from their counsel or a technical consultant (at an hourly rate) to walk them through the self-collection process—a time consuming and burdensome task as the person assisting the Plaintiff would have difficulty remotely viewing the device and the screenshots captured and might even need to be physically present with the Plaintiff in order to follow the steps outlined by Consilio.

32. Additionally, depending on how much hearing data is stored on a

particular Plaintiff's phone, the number of screenshots captured may be too large in size to deliver to the email address provided by Consilio on page 14 of the instructions, which would also complicate matters and likely require further technical assistance in delivering the data to Defendants via a shared drive link or other methodology.

**General Observations Relevant to Forensic and Self-Collection of Hearing Health Data**

33. Neither collection method described above provides complete information regarding these hearing health notifications. Specifically, the collection methods cannot with certainty identify the specific individual who used the device when the hearing health notification registered (e.g., the owner of the phone versus the owner's child or spouse). Moreover, the collection methods do not identify where the phone was physically located vis-à-vis the person(s) using the device when the hearing data registered (e.g., if the person(s) was physically far from the device and/or a connected speaker and had turned up the volume intentionally to listen from another room). Finally, neither collection method provides any information regarding whether a person viewed the hearing health notification and/or took any action in response to a headphone or noise alert level (e.g., whether anyone turned down the audio volume following an alert from the iOS device).

34. I am aware that iOS devices and some Android devices have "facial recognition" tools that can be used to unlock a locked Smartphone device, but whether that type of access was used to unlock a device is not available for collection by any forensic or self-collection tool that I am familiar with through my industry experience. I also note that Smartphone facial recognition unlocking tools can be bypassed by entering a numeric passcode. For these reasons too, it is not possible to ascertain with certainty the person who physically controlled the device responsible for registering any Electronic Hearing Health Data.

35. I swear under penalty of perjury that the foregoing is true and correct.

DATED: July 15, 2022

Michael Ciaramitaro
Vice President of
Technical Operations
International Litigation
Services, Inc.
2525 Main Street, Suite 450
Irvine, California 92614
Tel: 949-407-8341
mciaramitaro@ilsteam.com

# EXHIBIT A

# Michael Ciaramitaro

## Summary and Highlights of Experience

Michael Ciaramitaro leads the Digital Forensics department at ILS offering expert level consultation in support of the Identification, Preservation, Collection and Analysis phases of the EDRM. He has been influencing trends and technologies in the area of digital forensics and data collections for roughly 20 years with a specialty in streamlining operations and reducing time and costs associated with the collection and investigation of traditional and emerging data types.

He has provided expert testimony on many legal matters offering his expertise on subjects ranging from defensible and sound data mapping, data collections and the use of best practices. Michael has offered CLE's and lectures on topics including emerging technologies, social media and web data, mobile device investigations, CCPA and other computer forensic and electronic discovery topics, to Fortune 500 and AM law 100 organizations around the country.

Mr. Ciaramitaro has been a keynote speaker for electronic discovery groups on many occasions and often presents to AM Law 100 and Fortune 500 organizations on the discipline of Data collection, litigation readiness, Tips and Tricks to Data Mapping and other eDiscovery and Computer Forensic topics. He has recently been published with the Metropolitan Corporate Counsel publication and other publications.

## Work History

**Vice President of Technical Operations, ILS Team**  2020 - Present

Mr. Ciaramitaro has been practicing in the field of digital forensics for almost 20 years offering a wealth of experience in knowledge of collections and computer investigations. He is a thought leader in the industry and has provided training to law firms and legal professionals. Moreover, Mr. Ciaramitaro has thousands of hours of case matter investigations with testimony experience in support of collections and computer investigations.

**US Director, Digital Forensics, Inventus**  2018 - 2020

Mr. Ciaramitaro is skilled in the forensic preservation, collection, and analysis of electronically stored information in support of civil and criminal investigations for law firms and corporate managers. He is trained in the leading forensic software and hardware utilities such as EnCase, FTK, Mandiant Redline, Aid4Mail, X1 Discovery, Internet Evidence Finder, Cellebrite and more. Mr. Ciaramitaro has thousands of hours of case matter investigations.

**Director of Forensic Advisory Services, DiscoverReady & *Teris LLC***  2017 - 2018

Mr. Ciaramitaro led a team of forensic examiners nationally and has been integral in helping his clients obtain TRO's, favorable evidentiary hearing ruling and settlements through his consultation and explanation of computer investigation findings. He has working knowledge of the complex and heavily regulated mechanisms of international data preservations and collections. Mr. Ciaramitaro has a strong knowledge of Computer Forensic Methodology and Evidence Handling Procedures with extensive formal classroom training, certification in Computer Forensics and Electronic Discovery and thousands of hours of field experience. He is an expert in PC hardware and software across both Windows and MAC operating systems and has a track record for managing concurrent projects on schedule and within budget. In recent years Mr. Ciaramitaro has led the trend in remote, defensible and cost-effective preservation of data from Computers, Cloud Storage and Server based Structured Databases.

**Senior Vice President, *FRONTEO***  2011 – 2017

Mr. Ciaramitaro is skilled in the forensic preservation, collection and analysis of electronically stored information in support of civil and criminal investigations for law firms and corporate managers. He is trained in the leading forensic software and hardware utilities such as EnCase, FTK, Mandiant Redline, Aid4Mail, X1 Discovery, Internet Evidence Finder, Cellebrite and more. Moreover, Mr. Ciaramitaro has thousands of hours of case matter investigations dealing with Servers, Laptops, Desktops, removable media, optical media and mobile phones/PDAs. Mr. Ciaramitaro has worked closely with attorneys assisting with planning electronic discovery demands, deposition questions, technical interrogatories, expert declarations and other computer forensic case matter strategies. Mr. Ciaramitaro has successfully managed the harvesting, processing and hosting of data to online review platforms while providing client support and project management for multiple civil and corporate projects. He has strong knowledge of Computer Forensic Methodology and Evidence Handling Procedures with hundreds of hours of formal classroom training in Computer Forensics, Incident Response and Electronic Discovery matters.

# Michael Ciaramitaro

## Work History (continued)

**Senior Associate Forensic Technology Services,** *PriceWaterhouseCoopers (PwC)*                     2010 – 2011

Mr. Ciaramitaro collected and segregated user created files and emails to prepare data for client review. He normalized various email database types to PST format including recovery from corruption. He performed de-duplication on user files and email data, Index and search data sets and, extracted responsive material for client review, created document load files and uploaded responsive data sets to online review platforms. Mr. Ciaramitaro worked very closely with clients and review staff to compose an effective and time sensitive review schedule. Mr. Ciaramitaro crafted and executed complex keyword search expressions and date ranges to effectively target responsive data sets and created search queries, data fields and other online repository customizations to meet the client's online review needs.

**Senior Forensic Investigator, Adaptable Technology Resources**                                                 2008 – 2010

Mr. Ciaramitaro harvested electronically stored information from desktops, laptops, RAID Arrays, CDs, removable media and mobile phone devices. He is proficient in the use of hardware and software based write blocking devices as well as in the practice of using chain of custody and acquisition reports that have been approved by law enforcement and large corporations. He worked directly with clients providing consultation in crafting of investigative analysis and valuing case facts as they pertain to electronic discovery and ESI investigations. Mr. Ciaramitaro worked at client site on long term examination of ESI and presented findings to local law enforcement and Beverly Hills attorney for a large well-known religious organization. He is highly skilled in conducting in-depth forensic investigations, including recovering files, analyzing web logs, registry records and other operating system artifacts. Mr. Ciaramitaro crafted reports designed to describe the technical findings of the forensic investigation and answer the hypothesis presented by the client and managed eDiscovery cases from data culling, hosting and presentation to client based on discovery demands. Mr. Ciaramitaro responded to discovery demands by clients related to the collection and examination of electronically stored information and managed case fact and evidence intake, delegated analysis and composed findings reports of significant evidence from several analyses and presented to client.

**Senior Manager of QA, Guidance Software / OpenText**                                                             2002 – 2008

Mr. Ciaramitaro performed digital forensic analysis, including acquisitions (Windows, Crossover, DOS, and Linen), email analysis, file and disk hash, signature analysis, GREP keyword searching, EnScript execution and report building. He understands digital evidence handling, reconstruction of digital evidence through CRC verification and image hash validation and data mapping by use of Info2 and MFT entries. He implemented and maintained EnCase Enterprise environment of over 200 nodes consisting of Windows, Linux, Unix and AS/400 machines. Furthermore, he maintained eDiscovery setup and investigations of NSF and PST files as well as live Domino and Exchange Server databases. Mr. Ciaramitaro executed advanced operating system training and performed hands on administration in all Windows, Linux and Unix systems. He prepared and administered project control guidelines using industry standard evidence handling guidelines. Mr. Ciaramitaro planned annual operating QA Budget (over $1 million) for management approval and tracked spending to ensure department stayed on budget each quarter.

# Michael Ciaramitaro

## Education

- Pepperdine University, Bachelor of Science Business Management
- EnCase® EnCE Certified (Active since 2004)
- CompTIA A+ Certification
- EnCase intermediate computer forensic methodology Training
- EnCase Advanced File Systems Training
- EnCase Network Intrusion Training
- American Management Association – Leadership Skills for Managers

## Case Testimony & Affidavits

- Adrian Holley, et al., v Gilead Sciences Inc. - Declaration
- The County of Suffolk, New York v. Purdue Pharma L.P - Declaration
- 3M Combat Arms Earplug Products Liability Litigation – Declarations and court testimony
- Monat Hair Care Products MDL – Declaration
- Henry Jong, Chris Young, KATHRYN COWAN vs. KAISER FOUNDATION HEALTH PLAN, INC. – Declaration
- Endurance Am. Ins. Co. v. Cheyenne Partners – Court Appointment Subject Matter Expert
- John Bagley v Ocean Direct, LLC - Declaration
- JENSEN FAMILY TRUST – Declaration
- Powers Steel and Wire Products Inc. V. John Walsh, et al. – Declaration and Expert Testimony
- Bonamar vs. Turkin – Declaration and Deposition
- Public Safety Personnel Retirement System v Orlich - Declaration and Deposition
- Zoel Holding Company, Inc. vs. Eden - Declaration and Deposition
- Insight Direct USA vs. James Michael Leary – Declaration
- Medtronic USA, Inc., Minnesota corporations, vs. Eric Funderburk and Nevro Corp., Declaration
- Somarakis, Inc., vs. Matthew Hildebrand – Declaration
- MACY'S INC. vs. MARTHA STEWART LIVING OMNIMEDIA, INC vs. J.C. Penney Corporation Inc. – Declaration
- TIBCO SOFTWARE INC., vs. RAPIDMINER INC. TARLOCK SAGOO, PETER LEE, STEVE RUGGIERI – Declaration
- MATTHEW MATTSON vs. SNOQUALMIE INDIAN TRIBE – Declaration
- Ogulnick V. Butler – Declaration
- BNY Mellon v. Lyell Wealth Management – Declaration