# EXHIBIT 1

Veena Vats, M.D.

```
 1                    UNITED STATES DISTRICT COURT
 2                   NORTHERN DISTRICT OF FLORIDA
 3                         PENSACOLA DIVISION
 4
                                       )
 5    IN RE:  3M COMBAT ARMS           ) Case No:
      EARPLUG PRODUCTS LIABILITY       ) 3:19-md-02885
 6    LITIGATION                       )
                                       )
 7    This Document Relates to:        )Judge M. Casey Rodgers
      Sawyer Aubrey                    )Mag. Judge Gary R. Jones
 8                                     )
      Case No:                         )
 9    7:20-cv-75257-MCR-GRJ            )
                                       )
10
11
12
13                  VIDEOCONFERENCE DEPOSITION
14                     OF VEENA VATS, M.D.
15
16           Witness Location:  Gilbert, Arizona
                        June 8, 2022
17                        5:00 p.m.
18
19
20
21
22
23
      REPORTED BY:
24    SHELLEY E.D. PEARCE, RPR
      Arizona Certified Reporter
25    Certificate No. 50301
```

Veena Vats, M.D.

```
 1          THE VIDEOCONFERENCE DEPOSITION OF VEENA VATS,
 2   M.D., was taken on June 8, 2022, commencing at 5:00
 3   p.m., before Shelley E.D. Pearce, RPR, a Certified
 4   Reporter in the State of Arizona.
 5
 6                      APPEARANCES
 7
     For the Plaintiff:
 8
          DOUGLAS & LONDON, P.C.
 9        (Appearing via videoconference)
          Virginia E. Anello, Esq.
10        59 Maiden Lane
          6th Floor
11        New York, New York 10038
          888.727.0450
12        vanello@douglasandlondon.com
13
     For the Defendant:
14
          GORDON REES SCULLY MANSUKHANI, LLP
15        (Appearing via videoconference)
          Michael Klatt, Esq.
16        900 South Mopak Expressway
          Building 1, South 430
17        Austin, Texas 78746
          512.391.0197
18        mklatt@grsm.com
19
20
21
22
23
24
25
```

1    research that in Aubrey's case because he had no symptoms

2    of temporomandibular joint dysfunction, so I had no reason

3    to suspect that as a problem for him or a medical

4    diagnosis for him, and it is not a known cause of

5    tinnitus.

6         Q.   Do you know whether there's any medical

7    literature linking TMJ or temporomandibular joint

8    dysfunction and tinnitus?

9         A.   I did not --

10             MS. ANELLO:  Form.

11             THE WITNESS:  -- note any and, furthermore, in

12   the defendants' expert report, he admits that Sawyer

13   Aubrey doesn't have symptoms of temporomandibular joint

14   dysfunction, and that the fact that the defendants' expert

15   actually brings up temporomandibular joint dysfunction as

16   a possible diagnosis and cause of his tinnitus doesn't

17   make any sense.  You can't rule that in if it's not even

18   been diagnosed in a patient.  So it's -- it's almost like

19   he threw that diagnosis in there just to call his ear pain

20   something even though the patient has no -- no symptoms of

21   temporomandibular joint.

22   BY MR. KLATT:

23        Q.   Well, it's possible a patient can have

24   undiagnosed TMJ, correct?

25        A.   If he had symptoms of it.

Veena Vats, M.D.

```
 1    diagnosed with it.  So I'm asking you the more general
 2    proposition, that simply because a patient hasn't been
 3    diagnosed with a condition does not in any way mean the
 4    patient doesn't have it, correct?
 5         A.   Well, I don't --
 6              MS. ANELLO:  Form --
 7              THE WITNESS:  -- think I said that he didn't --
 8    that he couldn't have TMJ because he's never been
 9    diagnosed with it.  I didn't say that.  I said that he
10    couldn't have TMJ because he doesn't have the symptoms of
11    it.
12    BY MR. KLATT:
13         Q.   Well, I thought you said that the re- -- one of
14    the reasons you didn't recognize it is you say he's never
15    been diagnosed with it.
16              MS. ANELLO:  Form.
17    BY MR. KLATT:
18         Q.   Did I understand that?
19         A.   I'll have to check exactly what I said, but I --
20    I didn't mean to say that.
21         Q.   Okay.  But, as you said earlier, you didn't do
22    any examination yourself of plaintiff that would have
23    ruled in or ruled out TMJ, correct?
24              MS. ANELLO:  Form.
25              THE WITNESS:  I did not examine the person,
```

Veena Vaies, M.D.

1    Sawyer Aubrey, one-on-one.

2            I have seen in plenty of cases that that ENT

3    doctors often will use TM joint dysfunction as a diagnosis

4    of exclusion; meaning, that if they cannot come up with a

5    good reason in their mind to explain the patient's

6    otalgia, they'll simply call it joint pain, and they'll

7    call it TM dysfunction, and I feel that's a failure.

8            I think, in Mr. Aubrey's case, he has ear pain.

9    It occurs with his tinnitus, and it is related to his

10   tinnitus.  It is not caused by joint pain.

11   BY MR. KLATT:

12       Q.   Is severe ear pain in conjunction with tinnitus

13   a frequent finding in your practice?

14       A.   I see it occasionally.

15       Q.   When you say "occasionally," in approximately

16   what percentage of your patients with tinnitus have severe

17   ear pain with their tinnitus?

18       A.   I can't say.  I say some patients have pain with

19   their tinnitus.  I don't have a percentage for you.

20       Q.   What did you mean when you said just then that

21   you see it occasionally?

22       A.   I've seen it before.

23       Q.   But it's not a normal finding in someone with

24   tinnitus, correct?

25            MS. ANELLO:  Form.

Veena Vaeb, M.D.

1          THE WITNESS:  I've seen it before.

2   BY MR. KLATT:

3      Q.   Would you say the majority of your patients with

4   tinnitus have severe pain in their ears when they have

5   tinnitus?

6      A.   The majority of patients with tinnitus don't

7   have severe pain, fortunately for them.

8      Q.   Are you offering the opinion in this case that

9   Mr. Aubrey has age-accelerated hearing loss?

10     A.   I think, based on the trends in his audiograms

11  that we date back to January 2008, all the way up to his

12  latest audiogram in March of 2022, I think that we can

13  recognize threshold shifts over at least two different

14  frequencies; and, then, ultimately, on his March 2022

15  audiogram, you can see that he really does have hearing

16  loss across two different frequencies in the right ear

17  and, then, in one frequency in the left ear, and that this

18  is accelerating his hearing loss.

19     Q.   In his 2008, 2009, (3) 2011, 2013, and 2018

20  audiograms, Mr. Aubrey had perfectly normal hearing,

21  didn't he?

22          MS. ANELLO:  Form.

23          THE WITNESS:  He had hearing with thresholds

24  less than 20, and you can't say it was perfectly normal.

25  That's not the way you describe hearing tests.  You

Veena Vaes, M.D.

1   describe them as thresholds less than 20.

2   BY MR. KLATT:

3        Q.   Which is within your normal range, correct?

4        A.   Less than 20 is within normal range for hearing.

5        Q.   And so -- so every single audiogram, 2008, 2009,

6   three audiograms in 2011, an audiogram in 2013, and an

7   audiogram in 2018 in Mr. Aubrey were within the normal

8   range based on your own definition, correct?

9        A.   When I look at hearing tests -- and I described

10  this before -- the nice thing that physicians get to do is

11  develop relationships with the patient, and so they get to

12  see those patients over time and, fortunately, here, we've

13  been afforded that as well.

14        We're able to see his audiograms and their

15  trends over time.  So we can see the trends in his

16  threshold changes.  And those threshold changes, although

17  in 2008, it begins in some thresholds at zero hearing

18  level, they change and, in some cases as even defined by

19  the military, he has a 10-decibel shifts.  So as we see

20  those shifts occur, again, over time, you see that his

21  hearing is progressing, and he's having these temporary

22  threshold shifts that ultimately do result in true hearing

23  loss in 2022.

24        Q.   Show me one single abnormal hearing finding in

25  any of Mr. Aubrey's audiograms for the 10-year period from

Veena Vaes, M.D.

```
1    2008 to 2018.

2        A.   So that's not what physicians do.

3        Q.   That's not my question.

4             I'm asking you, according to your -- according

5    to your definition of normal being 20, point out to me one

6    single finding in all the audiograms that Mr. Aubrey

7    underwent from 2008 to 2018, any abnormal findings,

8    according to your definition of abnormal.

9        A.   Well, that's misleading.

10            MS. ANELLO:   Form.

11   BY MR. KLATT:

12       Q.   Well, I'm just asking you.  Point out the

13   abnormal finding.

14            MS. ANELLO:   Form.

15            THE WITNESS:   That's misleading because in order

16   to look at a hearing test, you don't look at snapshots.

17   Each one of these hearing tests on those individual dates

18   are snapshots in time.  And a good physician is not going

19   to look at snapshots in time individually.  They're going

20   to put those together and look at the trends over time.

21            And what you want to be is a good clinician, and

22   that's what I'm going to do to be, and I'm going to show

23   that he's got threshold shifts, and they change and they

24   worsen over time.  We see that.  And, then, finally, he

25   has the true hearing loss seen as those temporary
```

Veena Vacas, M.D.

```
 1   threshold shifts ultimately resulted in hearing loss.

 2   BY MR. KLATT:

 3       Q.   What are -- do you know of any other ENT besides

 4   yourself that would look at the 2008 through 2018

 5   audiograms and say that that is anything other than

 6   absolutely normal hearing?

 7            MS. ANELLO:  Form.

 8            THE WITNESS:  I think if you ask any ENT to look

 9   at the trends in the hearing loss, they would see that.

10   They would see that he's going from zero decibels to 10 to

11   15 and then into 25.  They'll see that.  I think ENTs are

12   good physicians.  I think they'll see that.

13   BY MR. KLATT:

14       Q.   The change is between 2018 and 2022, correct?

15   That's where you see the change.

16       A.   I see a change at 2009 to 2011.  There's a 10

17   threshold shift, non [audio static], but also a 4k in the

18   left ear.  I see that in the right ear as well at 4k.  I'm

19   not ignoring those.  I see a 10-decibel shift in the right

20   ear between 2009 and 2013.  I see a 15-decibel shift at 6k

21   in the right ear.

22       Q.   Where?

23       A.   Between 2008 and 2009 at 6k.

24       Q.   And that's before he even wore the CAEv2

25   earplugs.
```

Veena Vaes, M.D.

1          Why not?

2          A.   I'm going to give my opinion on the use of the

3     Combat 2 earplugs because those are the ones that were

4     clearly in question and the ones that were clearly shown

5     to be defective.

6          Q.   So it's your testimony that a soldier cannot

7     undergo hearing loss or tinnitus if he's using any other

8     type of hearing protection other than CAEv2 earplugs?  Is

9     that your testimony?

10          MS. ANELLO:  Form.

11          THE WITNESS:  I think hearing loss is

12     preventable if the right kind of hearing protection is

13     routinely used, and defective earplugs are not going to be

14     protective.

15     BY MR. KLATT:

16          Q.   And if he was wearing hand-formed earplugs

17     during that January 2008 to February 2009 time period,

18     then those hand-formed earplugs were defective because of

19     that hearing loss he sustained during that time, correct?

20          MS. ANELLO:  Form.

21          THE WITNESS:  I hadn't finished my thought.  You

22     kind of cut me off.  Can you repeat the question?

23     BY MR. KLATT:

24          Q.   He sustained a 15-decibel shift between

25     January 2008 and February 2009.  There's testimony here he

Veena Vaes, M.D.

```
1        A.   I don't know.

2        Q.   -- yeah, it depends.  If he was using the

3   hand-formed earplugs prior to February 2nd, 2009, then his

4   hearing loss can be attributed to them and not the CAEv2s,

5   correct?

6             MS. ANELLO:  Form.

7             THE WITNESS:  Well, no, because this is a

8   progression --

9             MS. ANELLO:  Wait.

10            THE WITNESS:  -- that we're seeing.

11            MS. ANELLO:  Sorry.  I lost internet for a

12  second.  I'm back.

13            THE WITNESS:  Okay.  So we're seeing the changes

14  even at 4k at 2009 to 2011.

15  BY MR. KLATT:

16       Q.   I'm asking about the change between January 8,

17  2008, and February 2nd, 2009, Doctor.  That's the

18  significant threshold shift, in your opinion, correct?

19       A.   That's a 15-decibel shift.

20       Q.   And that's significant in your opinion --

21            MS. ANELLO:  Form.

22  BY MR. KLATT:

23       Q.   -- correct?

24       A.   I didn't say that.  I said it's a 15-decibel

25  shift.
```

Veena Vats, M.D.

1      Q.   Okay.  So a 15-decibel shift is not a

2   significant shift, in your opinion; is that correct?

3           MS. ANELLO:  Form.

4   BY MR. KLATT:

5      Q.   I'm just -- I just -- I'm confused now.

6           Is a 15-decibel shift between audiograms a

7   significant threshold shift or is it not?

8      A.   It's a temporary threshold shift.

9      Q.   Is it significant?

10     A.   It's a temporary threshold shift.  Those are the

11  terms I prefer to use because that's going to indicate

12  that he may have some kind of underlying hearing damage.

13     Q.   And you would agree with me that Mr. Aubrey's

14  hearing thresholds on the audiograms before 2022 were

15  within normal limits, correct?

16          MS. ANELLO:  Form.

17          THE WITNESS:  They were less than 20 decibels

18  but, again, if you look at the trends, you can see the

19  threshold shifts of 10 decibels, which is significant even

20  with military standards.

21          MR. KLATT:  Okay.  Object, nonresponsive.

22          Just please listen to my question.

23  BY MR. KLATT:

24     Q.   Mr. Aubrey's hearing thresholds on the

25  audiograms he underwent before 2022 are within normal

Veena Vats, M.D.

```
 1    limits; yes or no?

 2              MS. ANELLO:  Form, asked and answered.

 3              You can answer again.

 4              THE WITNESS:  So they -- I'll just repeat my

 5    answer.  The trends in the hearing tests show changes in

 6    thresholds that are 10 decibels or more -- 10 decibels,

 7    which is consistent with temporary threshold shift.

 8    BY MR. KLATT:

 9         Q.   You said in your report in this case the hearing

10    thresholds on the audiograms before 2022 are within normal

11    limits, didn't you?

12         A.   You have which page I said that on?

13         Q.   Yeah.  You said it on page 16.

14         A.   So then I say -- and I qualify that and I say

15    [as read]:  They do show greater thresholds in the higher

16    frequency.

17              So I'm showing you that there are changes.

18    There are threshold shifts.  So you have to be able to

19    recognize that.

20         Q.   But you would agree that all the hearing

21    thresholds on Mr. Aubrey's audiograms before 2022 are

22    within normal limits, correct?

23         A.   They're less than 20 decibels.

24         Q.   Which, according to your definition, is within

25    normal limits, correct?
```

Veena Vats, M.D.

1    A.   If you look at them individually, they are less

2    than 20 decibels, and they appear to be within -- they

3    appear to be less than 20.  So there's no discernable

4    hearing loss if you look at them individually.  But if you

5    look at them the way a real clinician will do it, which is

6    look at them over trend, then you will see those

7    thresholds shifts and you will recognize that there's a

8    problem brewing, which is, again, seen in 2022.  Don't

9    look at the hearing tests individually.  Look at them over

10   time.

11   Q.   The hearing thresholds on Mr. --

12        [Simultaneous crosstalk].

13        The hearing thresholds on Mr. Aubrey's

14   audiograms before 2022 are within Dr. Veena Vats' normal

15   limits, correct?

16        MS. ANELLO:  Form --

17        THE WITNESS:  If you want to --

18        MS. ANELLO:  Asked and answered.

19        [Simultaneous crosstalk]

20        THE WITNESS:  -- first sentence, that's what's

21   written.

22   BY MR. KLATT:

23   Q.   I'm sorry.  That's what?

24   A.   If you want to look at the first part of that

25   sentence that's separated by a comma, that's what [sic]

Veena Vats, M.D.

```
1   written -- that's what's written on page 16, but if you

2   read the rest of the sentence, then you see what I have

3   written as well.

4        Q.   Is there any individual audiogram finding in

5   Mr. Aubrey before 2022 that is outside of Dr. Veena Vats'

6   normal limits?

7             MS. ANELLO:  Form.

8             THE WITNESS:  If you look at the tests

9   individually, all the thresholds are less than 20, but if

10  you look at them in consecutive, then you can see the

11  threshold shift.

12  BY MR. KLATT:

13       Q.   You testified previously under oath that if the

14  hearing threshold is 20 or below, that is within your

15  definition of a normal limit, correct?

16            MS. ANELLO:  Form.

17  BY MR. KLATT:

18       Q.   I'm sorry?

19       A.   I have testified to that.

20            MS. ANELLO:  Can we take a break right now?

21  We've been going for an hour and --

22            THE WITNESS:  Yeah.

23            MS. ANELLO:  -- 15-ish.

24            MR. KLATT:  Yeah, sure.

25            THE WITNESS:  I'll take 10 minutes.
```

```
 1      A.    That's article [sic] number 2, right?

 2      Q.    That's, yes, Exhibit No. 2.

 3      A.    So PDF page 22 or page 22?

 4      Q.    Page 22 of the report, and let me get that PDF

 5   page for you, if you need it.

 6      A.    I have it, number 27 on the PDF page.

 7      Q.    And -- yeah.  So referring to Exhibit 2, and

 8   we're referring, specifically, to your report, page 22 of

 9   your report.  It's page 27, as you said, of the PDF

10   document, correct?

11      A.    Correct.

12      Q.    And you talk about alternative hearing

13   protection devices on that page, correct?

14      A.    Yes.

15      Q.    And you say [as read]:  For example, between

16   2009 and 2011, the following hearing protection devices

17   were available or could have been available:  The red foam

18   earplugs he had previously used, triple flange earplugs,

19   the Sonic Defender SureFire EP3, the Sonic Defender

20   SureFire EB4, Combat Arms Earplugs Version 1 in

21   combination with the UltraFit, the Combat Arms Earplugs

22   Version 3, and the Combat Arms Earplugs Version 4.

23            Do you see that?

24      A.    Yes.

25      Q.    Have you reviewed any internal company documents
```

Veena Vaes, M.D.

```
 1    from the manufacturers of those earplugs relating to those

 2    specific earplugs that you identified there?

 3         A.   No.

 4         Q.   Have you reviewed any testing by the

 5    manufacturers of those earplugs that you list there on

 6    page 22 of your report?

 7         A.   The only thing I've seen regarding these

 8    earplugs is what they are -- what kinds of sounds they

 9    block out and that was delineated in the Packer report,

10    and he describes -- there's a -- there's a visual on

11    there, I think, like, a picture on there that describes

12    these different earplugs and what these earplugs are good

13    for.  Are they good for situational awareness?  Are

14    they -- that kind of thing.  So that's where I've most

15    recently seen descriptions of these earplugs.

16         Q.   You've seen no internal company testing or any

17    internal company documents from the manufacturers of any

18    of those?

19         A.   Correct.

20         Q.   You haven't reviewed any noise reduction rating

21    values for real ear attenuation at threshold testing

22    relating to any of those hearing protection devices on

23    page 22 of your report, correct?

24         A.   That's correct.

25         Q.   Is it your testimony that if a soldier uses any
```

Veena Vats, M.D.

1    of those earplugs listed on page 22 of your report that we

2    just listed, that there's no way that they would sustain

3    hearing loss or tinnitus?

4         A.   I think these are the plugs and the earplugs

5    that have not been removed from the military.  So --

6         Q.   Different question.

7              Is it your testimony that if a soldier wears any

8    of those earplugs, they will not, under any circumstances,

9    sustain hearing loss or tinnitus?

10             MS. ANELLO:  Form.

11             THE WITNESS:  I don't have an opinion on

12   those -- on that.  I have an opinion that -- on the

13   Combat 2.

14   BY MR. KLATT:

15        Q.   But you say these are safer alternatives,

16   correct?

17        A.   Because they have -- I believe these are safer

18   alternatives because the Combat 2s are the ones that have

19   been discontinued by the military.

20        Q.   And that's your sole basis for saying these are

21   safer alternatives, correct?

22             MS. ANELLO:  Form.

23             THE WITNESS:  It's my opinion that I would use

24   an earplug -- I would rely on an earplug that's not been

25   discontinued by the military.

Veena Vaez, M.D.

```
 1   BY MR. KLATT:

 2       Q.   But my question is, your sole basis for saying

 3   that these are safer alternatives is that it's your

 4   understanding these are still available; whereas, the

 5   CAEv2 earplugs have been withdrawn.  That's the basis for

 6   your opinion that these are safer alternatives, correct?

 7       A.   I believe the usage of those earplugs has not --

 8   excuse me -- has not been in question as the Combat 2s

 9   have been.  So I would say try use these earplugs that

10   have not been discontinued by the military.

11       Q.   Do you have any other basis other than the

12   discontinuation for saying these earplugs are safer

13   alternatives to the CAEv2 earplugs?

14            MS. ANELLO:  Form.

15            THE WITNESS:  Again, I mention that in the

16   Packer article, those earplugs are described and the kind

17   of noise that they're indicated for, so I can rely on the

18   Packer article.

19   BY MR. KLATT:

20       Q.   You didn't review any of the data yourself that

21   the Packer article was based on, correct?

22       A.   I read the Packer article and some of the

23   references that he discusses in there.

24       Q.   And Packer nowhere says that these alternatives

25   that you list here would prevent hearing loss and tinnitus
```

Veena Vats, M.D.

```
 1   in soldiers who use them under all circumstances, correct?
 2           MS. ANELLO:  Form.
 3           THE WITNESS:  I don't know if I came across that
 4   phrase in the Packer article.  I'd have to check for that.
 5   BY MR. KLATT:
 6      Q.   Is it your belief that there are certain
 7   circumstances that soldiers encounter, particularly in
 8   combat, where the noise is so intense that regardless of
 9   hearing protection used, they can sustain hearing loss and
10   tinnitus or hearing loss or tinnitus?
11           MS. ANELLO:  Form.
12           THE WITNESS:  I can't make an opinion on that.
13   I mean, I've never been in combat myself, so not quite
14   sure how loud those noises can get.  I know what the
15   noises -- noise levels are from those machine guns and
16   Humvees and vehicles, but I can't make an opinion on how
17   loud some of those blasts are.  I don't know if they've
18   ever even been measured.
19   BY MR. KLATT:
20      Q.   Well, certainly in your research in this case
21   you read that there's certain sound impulses that military
22   personnel can experience that are so intense that there's
23   no level of hearing protection or even double hearing
24   protection that could prevent hearing loss or tinnitus,
25   correct?
```

Veena Vaos, M.D.

```
 1   STATE OF ARIZONA  )

                      )   ss.

 2   COUNTY OF MARICOPA)

 3          BE IT KNOWN that the foregoing deposition was

 4   taken before me, SHELLEY E.D. PEARCE, Certified Reporter

 5   No. 50301, for the State of Arizona; that the witness

 6   before testifying was duly sworn by me to testify to the

 7   whole truth; that the questions propounded by counsel and

 8   the answers of the witness thereto were taken down by me

 9   in shorthand and thereafter transcribed by me, and that

10   the foregoing pages of printed matter contain a full,

11   true, and accurate transcript of all proceedings and

12   testimony had and adduced upon the taking of said

13   deposition all to the best of my skill and ability.

14          ( ) Pursuant to request, notification was

15   provided that the deposition is available for review and

16   signature.

17          (x) Review and signature was waived.

18          I FURTHER CERTIFY that I am in no way related to

19   any of the parties hereto, nor am I in any way interested

20   in the outcome hereof.

21          DATED at Gilbert, Arizona, this 13th day of

22   June, 2022.

23
                      SHELLEY E.D. PEARCE, RPR/CSR

24                    Arizona Certified Reporter

                        Certificate No. 50301

25
```