**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *All Wave 1 Cases* | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## PLAINTIFFS' OMNIBUS MOTION AND MEMORANDUM OF LAW TO EXCLUDE DEFENDANTS' EXPERT OPINIONS AND TESTIMONY

# TABLE OF CONTENTS

I.   INTRODUCTION....................................................................................1

II.  LEGAL STANDARD.............................................................................2

III. ARGUMENT .........................................................................................5

   A.  James Crawford, M.D. ....................................................................5

      1.  Crawford cannot opine that noise-induced tinnitus and hearing loss must occur simultaneously. ......................................................................5

      2.  Crawford's testimony that tinnitus is not a significant problem in 95% of people should be excluded......................................................................5

      3.  Crawford's opinion that noise-induced hearing loss does not affect low frequencies should be excluded...........................................................6

      4.  Crawford cannot testify that DD2215 or DD2216 forms accurately identify the type of hearing protection worn by Plaintiffs. ....................7

      5.  Crawford's testimony concerning test-retest variability should be excluded. ..........................................................................................8

      6.  Crawford cannot testify about the prevalence of hearing loss in patients with diabetes. .................................................................................9

      7.  Crawford's testimony regarding the ototoxicity of salicylates, marijuana, and solvents should be excluded............................................................9

      8.  Crawford cannot testify that somatic tinnitus is "widespread." ............11

      9.  Crawford's testimony regarding military rates of hearing loss and tinnitus should be excluded..................................................................................12

      10.Crawford cannot testify that ruptured eardrums commonly occur while wearing hearing protection. ................................................................12

   B.  Jennifer LaBorde, Au.D. ...............................................................13

      1.  LaBorde cannot opine that noise-induced tinnitus and hearing loss must occur simultaneously. ......................................................................13

      2.  LaBorde's testimony that hearing injury from blasts is unrelated to noise-induced hearing loss should be excluded. ............................................14

   C.  Karthik Rajasekaran, M.D..............................................................16

      1.  Opinions outside Rajasekaran's report must be excluded.....................16

2. Rajasekaran is not an expert in HPDs and should not be permitted to offer HPD-related opinions. .........................................................................17

3. Rajasekaran is not an expert in diagnosing the causes of hearing loss and tinnitus and should not be permitted to opine on these topics...............18

4. Rajasekaran's opinions relative to cochlear synaptopathy, hidden hearing loss, and otoacoustic emissions are mere ipse dixit and must be excluded. ....................................................................................................18

5. Rajasekaran's opinions concerning tobacco, alcohol, and substances in fuel should be excluded. ........................................................................19

6. Rajasekaran's opinions concerning ototoxic medications should be excluded or limited. ...............................................................................20

7. Rajasekaran should not be permitted to testify that there are no known causes of tinnitus. ..................................................................................21

D. Richard Liberman, Ph.D. ................................................................................21

1. Liberman's diagnosis opinions should be excluded because he is not a medical professional. .............................................................................21

2. Liberman should not be permitted to offer his unsupported TBI and ototoxicity opinions. ...............................................................................24

E. John Bertelson, M.D. ......................................................................................25

1. Bertelson is not qualified to opine on hearing loss, tinnitus, PTSD, or servicemember-specific issues................................................................25

2. Bertelson's opinions are unsupported, uncertain, contradictory, and otherwise unreliable. ...............................................................................27

3. Bertelson's opinions based on irrelevant expertise and anecdotes lack fit and will not help the jury. .....................................................................30

F. W. Chatham, M.D. ..........................................................................................31

G. Kenneth Billheimer, Au.D. ............................................................................32

1. Billheimer is not qualified to opine about ANSI S3.19 and ANSI S12.6 testing....................................................................................................32

2. Billheimer's opinions, which are based on cherry-picked data and lack critical analysis, are unreliable. ............................................................34

3. Billheimer's opinions relying on hand-picked tests and ignoring real-world performance are unhelpful to the jury. ........................................39

H. Jennifer Tufts, Ph.D. .................................................................40

   1. Tufts is not an audiologist and is not otherwise qualified to opine on ANSI testing. .............................................................................40

   2. Tufts's opinions are unreliable because she agreed to serve as an expert years before reviewing any documents and she applied no discernable standards. ..........................................................................42

I. Richard Neitzel, Ph.D. ...............................................................45

   1. Neitzel impermissibly offers attenuation opinions based on the excluded Michael report. ....................................................................46

   2. Neitzel's ototoxicity opinions should be excluded because they are unsupported and unhelpful. ....................................................46

     a. Burn pits .........................................................................46

     b. Ototoxic medications .....................................................47

     c. Ototoxic exposures ........................................................48

J. Gregory Flamme, Ph.D.; Mark Stephenson, Ph.D.; Steve Tasko, Ph.D.; and William Murphy, Ph.D. .................................................................49

   1. SASRAC's opinion that the DoD determines the specifications for the hearing protectors it includes in the DoD hearing conservation program should be excluded. ..................................................................50

   2. SASRAC's opinion that there is no scientific basis to determine that an HPD caused Plaintiffs' hearing damage, aside from using audiogram data, should be excluded. ........................................................51

   3. SASRAC's burn pits and JP-8 causation opinions should be excluded. ..........................................................................................52

   4. SASRAC's opinion that tobacco use causes hearing impairments should be excluded. ........................................................................53

   5. The Court should exclude SASRAC's opinion that a lack of effective quiet contributed to Plaintiffs' hearing injuries. ...................................54

   6. Murphy's opinions should be excluded. .................................55

K. E. Scott Elledge, M.D. ...............................................................60

   1. Elledge is unqualified to offer general opinions. ....................61

   2. Elledge's opinions are not based on sufficient facts, data, analysis, and methodology. ..........................................................................64

3.  Elledge's opinions are not relevant and will not assist the jury. ...........66

L.  Dennis Driscoll ...................................................................................66

M.  Stan Phillips, M.D. ............................................................................67

N.  Defendants' experts' opinions should be excluded or limited consistent with the Court's adjudication of other arguments made throughout this omnibus motion and in prior rulings ..........................................................68

IV.  CONCLUSION ..................................................................................72

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison v. McGhan Med. Corp.*,
  184 F.3d 1300 (11th Cir. 1999)....................................................................... 4, 24

*Arevalo v. Coloplast Corp.*,
  2020 WL 3958505 (N.D. Fla. July 7, 2020) ...................................................... 35

*Barber v. United Airlines, Inc.*,
  17 Fed. App'x 433 (7th Cir. 2001)..................................................................... 59

*Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*,
  402 F.3d 1092 (11th Cir. 2005)........................................................................... 39

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .................................................................................. *passim*

*Doctors Licensure Grp., Inc. v. Cont'l Cas. Co.*,
  2011 WL 13182969 (N.D. Fla. Sept. 26, 2011)................................................. 63

*E.E.O.C. v. Freeman*,
  778 F.3d 463 (4th Cir. 2015)............................................................................. 59

*Feliciano v. City of Miami Beach*,
  844 F.Supp.2d 1258 (S.D. Fla. 2012) .................................................................. 3

*Flury v. Daimler Chrysler Corp.*,
  427 F.3d 939 (11th Cir. 2005).............................................................................. 2

*Ford v. Carnival Corp.*,
  2010 WL 9116184 (S.D. Fla. Mar. 4, 2010).......................................... 23, 24, 48

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ............................................................................... 4, 16, 28

*Hendrix ex rel. G.P. v. Evenflo Co.*,
  609 F.3d 1183 (11th Cir. 2010)............................................................................ 2

*In re Abilify (Aripiprazole) Prod. Liab. Litig.*,
  299 F.Supp.3d 1291 (N.D. Fla. 2018)........................................................... 4, 52

*Jones v. Novartis Pharm. Corp.*,
  235 F.Supp.3d 1244 (N.D. Ala. 2017)............................................................... 23

*Kilpatrick v. Breg, Inc.*,
  613 F.3d 1329 (11th Cir. 2010).......................................................................... 34

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................... 2, 3, 28, 42

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) ........................................................................ 24

*McDowell v. Brown*,
  392 F.3d 1283 (11th Cir. 2004) ..................................................... 32, 39, 49, 66

*McGee v. Evenflo Co.*,
  2003 WL 23350439 (M.D. Ga. Dec. 11, 2003) .................................................. 48

*Navelski v. Int'l Paper Co.*,
  244 F.Supp.3d 1275 (N.D. Fla. 2017) ...................................................... *passim*

*Neelu Aviation, LLC v. Boca Aircraft Maintenance, LLC*,
  2021 WL 4991256 (S.D. Fla. Aug. 24, 2021) .................................................... 58

*PODS Enters., Inc. v. U-Haul Int'l, Inc.*,
  2014 WL 12628664 (M.D. Fla. 2014) ................................................................ 59

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
  326 F.3d 1333 (11th Cir. 2003) ....................................................................... 2, 3

*Rink v. Cheminova, Inc.*,
  400 F.3d 1286 (11th Cir. 2005) ....................................................................... 2, 3

*Sanchez v. Bos. Sci. Corp.*,
  2014 WL 4851989 (S.D. W. Va. Sept. 29, 2014) ........................................ 39, 44

*Seamon v. Remington Arms Co.*,
  813 F.3d 983 (11th Cir. 2016) ..................................................................... 32, 41

*U.S. v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ............................................................... *passim*

*United States v. Rouco*,
  765 F.2d 983 (11th Cir. 1985) .......................................................................... 67

## Rules

Fed. R. Civ. P. 26(a)(1)(B) ..................................................................................... 1

Fed. R. Civ. P. 26(a)(2)(B) ............................................................................... 1, 16

Fed. R. Civ. P. 26(a)(2)(C) ..................................................................................... 1

Fed. R. Civ. P. 37(c)(1) ......................................................................................... 57

Fed. R. Evid. 403 ......................................................................................... *passim*

Fed. R. Evid. 702 ............................................................................................. *passim*

Fed. R. Evid. 703 ...................................................................................................... 1

Wave 1 Plaintiffs[1] submit this motion and incorporated memorandum of law to exclude the opinions and testimony of Defendants' designated experts.

## I.   <u>INTRODUCTION</u>

On May 11, 2022, Defendants disclosed 18 expert witnesses[2] pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).[3] As detailed below, Defendants' experts fail to meet the requirements for admissible expert testimony under *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702, 703, and 403. Plaintiffs move to exclude the opinions and testimony of general experts Dr. Crawford, Dr. LaBorde, Dr. Rajasekaran, Dr. Liberman, Dr. Bertelson, Dr. Chatham, Dr. Billheimer, Dr. Tufts, Dr. Neitzel, Drs. Flamme and Stephenson and Tasko and Murphy, Dr. Elledge, Mr. Driscoll, and Dr. Phillips because each fails to satisfy *Daubert* and Rules 702, 703, and 403.[4]

---

[1] The Wave 1 Plaintiffs include all individuals identified in Case Management Order No. 31, Ex. A, whose cases have not been dismissed. *See* Dkt. 2304-1.

[2] *See* PX1(Expert-Witness-Disclosures).

[3] Defendants' disclosures erroneously cite Fed. R. Civ. P. 26(a)(1)(B), which governs initial disclosures, instead of Fed. R. Civ. P. 26(a)(2)(B), which governs expert disclosures for expert witnesses who must provide a written report. Given the substance of the disclosures, Plaintiffs interpret the general experts to be Rule 26(a)(2)(B) expert witnesses who must provide a written report. Defendants did not disclose any Rule 26(a)(2)(C) experts.

[4] Plaintiffs also move to exclude, via preservation motion filed simultaneously, the general expert opinions of the foregoing experts, along with the opinions of Dr. Casali and Dr. Kytomaa (who adopted their prior reports from Groups A-D and did not offer new opinions in Wave 1).

## II.  <u>LEGAL STANDARD</u>

*Daubert* provides the analytical framework for determining whether expert testimony is admissible under Federal Rule of Evidence 702. *See Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). Rule 702 requires trial courts to perform a "gatekeeping" function to ensure that expert testimony is reliable and relevant. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The proponent of expert testimony must prove its admissibility by a preponderance of the evidence. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010).

Expert testimony is reliable and relevant when it satisfies the criteria of "qualification, reliability, and helpfulness"—"(1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is 'sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Navelski v. Int'l Paper Co.*, 244 F.Supp.3d 1275, 1286 (N.D. Fla. 2017). These are "distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

To be qualified, an expert must "ha[ve] sufficient 'knowledge, skill, experience, training, or education' to form a reliable opinion about an issue that is before the court." *Navelski*, 244 F.Supp.3d at 1286. "This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *Feliciano v. City of Miami Beach*, 844 F.Supp.2d 1258, 1262 (S.D. Fla. 2012) (internal quotation marks omitted).

To be reliable, "an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *Navelski*, 244 F.Supp.3d at 1286 (citing *U.S. v. Frazier*, 387 F.3d 1244, 1261-62 (11th Cir. 2004)). Relevant factors include whether: (1) "the scientific technique can be or has been tested"; (2) "the theory or technique has been subjected to peer review or publication"; (3) "the technique has a known or knowable rate of error"; and (4) "the technique is generally accepted in the relevant community." *Id.* (citing *Daubert*, 509 U.S. at 593-94). Such factors are illustrative, not exhaustive. *See Quiet Tech.*, 326 F.3d at 1341; *Rink*, 400 F.3d at 1292 (courts "have substantial discretion in deciding how to test an expert's reliability"). Although reliability is a flexible inquiry, *Kumho Tire*, 526 U.S. at 141-42, the analytical focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

To be helpful, "expert testimony must be relevant to an issue in the case and offer insights beyond the understanding and experience of the average citizen." *Navelski*, 244 F.Supp.3d at 1287. Relevant expert testimony "advances a material aspect of the proposing party's case and 'fits' the disputed facts." *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F.Supp.3d 1291, 1305 (N.D. Fla. 2018). When "too great an analytical gap" exists between the facts and the proffered opinion, the expert opinion does not "fit." *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997)).

Ultimately, a court's gatekeeping "role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999). Even if expert testimony satisfies the admissibility requirements of *Daubert* and Rule 702, it may still be excluded under Rule 403 if its probative value "is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming." *Frazier*, 387 F.3d at 1263. Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," a trial court must carefully "weigh[] possible prejudice against probative force under Rule 403." *Id.*

## III.   ARGUMENT

### A.   James Crawford, M.D.

#### 1.   *Crawford cannot opine that noise-induced tinnitus and hearing loss must occur simultaneously.*

In his report, Crawford contends that tinnitus "rarely" occurs in the absence of hearing loss and that tinnitus is not a precursor to noise-induced hearing loss (NIHL) that occurs later in time.[5] The Noise Manual, Army Hearing Program Pamphlet 40-501, and 3M's Technical Bulletins all reach the opposite conclusion, citing studies demonstrating that tinnitus is an "early indicator" and "warning sign" of noise-induced auditory injury, "showing up before a loss of hearing is obvious."[6] As unfounded *ipse dixit*, Crawford's testimony flies in the face of established scientific consensus that tinnitus can precede NIHL, in violation of Rule 702. His unsubstantiated opinion warrants exclusion.

#### 2.   *Crawford's testimony that tinnitus is not a significant problem in 95% of people should be excluded.*

Citing nothing, Crawford claims that "95% of people with tinnitus develop coping strategies and have no significant problem with their tinnitus."[7] Yet Crawford offers no explanation of how he arrived at his anecdotal opinion—much less any

---

[5] PX2(Crawford-Rpt.)-4, 21.
[6] PX3(P-GEN-2523)-2; PX4(P-GEN-6343)-84; PX5(S-GEN-96)-3 ¶ 2-7.a.2. (As a general rule, Plaintiffs' citations are to the internal pagination of each document, not the ECF pagination, Bates numbers, or trial exhibit pagination.)
[7] PX2(Crawford-Rpt.)-4.

underlying data to back it up. *See Frazier*, 387 F.3d at 1261 ("Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express. … The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"). Indeed, the Court has already excluded *in limine* Crawford's identical testimony as lacking "a reliably supported and properly disclosed scientific basis." *Beal*, Dkt. 130 at 12 & n.5. The Court should do the same here.

### 3. *Crawford's opinion that noise-induced hearing loss does not affect low frequencies should be excluded.*

Also lacking support is Crawford's opinion that NIHL does not affect low frequencies.[8] The ACOEM Guidance Statement—co-authored by Crawford—dooms his made-for-litigation opinion. It states that noise can affect low frequencies up to 40 decibels.[9] Crawford admitted as much in prior reports, stating that "[i]f the noise continues, the thresholds will increase in a broad range of frequencies."[10] Indeed, the Army Hearing Program Pamphlet 40-501 expressly states that hazardous noise can cause hearing loss that "will progress into the middle and lower

---

[8] PX2(Crawford-Rpt.)-12.
[9] PX6(Mirza 2018)-498 (discussing how "[n]oise exposure" can "produce a loss" up to "40 dB in lower frequencies").
[10] PX7(Crawford-*Beal*-Rpt.)-4.

frequencies."[11] Peer-reviewed literature agrees.[12] Having failed to adduce contrary evidence, Crawford has no reliable basis to offer testimony that directly contradicts his own publications, prior reports, as well as peer-reviewed studies and Army regulations. It should be excluded under Rule 702.

### 4. *Crawford cannot testify that DD2215 or DD2216 forms accurately identify the type of hearing protection worn by Plaintiffs.*

Crawford suggests that DD2215 or DD2216 forms reliably identify the type of hearing protection devices (HPDs) issued or used by individual plaintiffs.[13] Crawford's opinion contradicts an official government report from the DoD, which states that "[i]t is not possible to completely and accurately account for Service member usage of HPDs. The DoD currently does not have the capability to capture and document each HPD type, subtype, feature, production and issue dates, and manufacturer that an individual Service member might use … throughout their military career."[14] Even Hearing Conservation Program (HCP) managers have expressed "concerns" about the reliability and accuracy of HPD data on these forms.[15] Given these concerns, Crawford himself has conceded under oath that these

---

[11] PX8(S-GEN-60)-3 ¶ 2-2.b.

[12] *E.g.*, PX9(Joseph 2018)-19 (concluding "[b]lasts yielded low-frequency hearing loss" in study of military personnel).

[13] PX2(Crawford-Rpt.)-14-16.

[14] PX10(P-GEN-4201)-9.

[15] PX10(P-GEN-4201)-9-10.

forms do not accurately report HPD use.[16] Absent a reliable foundation for this misleading and contradictory opinion—and here there is none—Crawford's testimony warrants exclusion under Rules 702 and 403.

### 5. *Crawford's testimony concerning test-retest variability should be excluded.*

Crawford baldly declares that the "generally accepted test-retest variability between two screening audiograms is +/– 10-15 dB."[17] This opinion is belied by Army standards, which prescribe +/– 5-10 decibels as test-retest variability for such audiograms.[18] Without providing any objective source or rationale for departing from the military's well-established protocol for acceptable variability among Army screening audiograms, Crawford's opinion fails under Rule 702.

So too does Crawford's opinion that the "generally accepted test-retest variability between two diagnostic audiograms is +/– 5 dB."[19] He cites no authority for his novel proposition, much less any consensus statement from audiologic organizations. This is precisely the type of bare-bones assertion Rule 702 prohibits.

---

[16] PX11(*Adkins*-9/30/21-Trial-Tr.)-116:13-118:19.

[17] PX2(Crawford-Rpt.)-16.

[18] PX12(DoD-Tri-Service-Hearing-Technician-Certification-Course)-10 (hearing technician training presentation stating "[n]ormal (expected) test-retest variability [is] 5-10 dB").

[19] PX2(Crawford-Rpt.)-16.

### 6. *Crawford cannot testify about the prevalence of hearing loss in patients with diabetes.*

Crawford likewise fails to provide any support for his opinion that "[h]earing loss is twice as prevalent in individuals with diabetes as it is in age-matched individuals without diabetes."[20] The one study Crawford does cite for his opinions about metabolic disorders makes no such assertion.[21] What remains is sheer speculation, forbidden under Rule 702.

### 7. *Crawford's testimony regarding the ototoxicity of salicylates, marijuana, and solvents should be excluded.*

Crawford recites various drugs that *can cause* hearing loss or tinnitus, including salicylates.[22] But the paper Crawford cites states only that salicylates (which include aspirin) "*might* induce mild to moderate hearing loss when used in high doses."[23] What's more, hearing loss and tinnitus symptoms from salicylates are transient, "disappear[ing] within 24 to 72 hours after cessation of the drug."[24] It is not surprising, then, that salicylates appear nowhere on Defendants' list of alleged ototoxic drugs. *See* Dkt. 1330. Because Crawford's opinion hinges on possibility—not probability—it is speculative and unhelpful, failing Rule 702's threshold for

---

[20] PX2(Crawford-Rpt.)-25.

[21] PX2(Crawford-Rpt.)-26; *see* PX13(Coelho 2020)-519.

[22] PX2(Crawford-Rpt.)-23-24.

[23] PX2(Crawford-Rpt.)-24; PX13(Coelho 2020)-520 (emphasis added) (distinguishing salicylates from aminoglycosides, antibiotics, and cancer drugs).

[24] PX13(Coelho 2020)-520.

admissibility. *See, e.g.*, Dkt. 2290 at 18-19 (excluding expert's opinion that "medications '*might*' be responsible for [plaintiff's] hearing problems"); *see also Beal*, Dkt. 130 at 9 (excluding "all medications and/or other drugs not previously found to be ototoxic by the Court" in Dkt. 1330).

Crawford also vaguely posits that "certain illicit drugs" are ototoxic, without identifying them specifically or pointing to any evidence to support his opinion.[25] For this reason alone, his testimony should be excluded as unhelpful under Rule 702. *See Beal*, Dkt. 142 at 14 (excluding Crawford's testimony regarding "nonspecific" painkillers); *see also Beal*, Dkt. 130 at 9 (excluding opioids/opiates and unspecified painkillers). To the extent Crawford intends to opine that marijuana can cause tinnitus, the Court should exclude his testimony as unreliable, unhelpful, and misleading under Rules 702 and 403, just as it did previously. *See* Dkt. 1910 at 9-10 (finding a lack of scientifically reliable evidence to support Crawford's marijuana causation opinion).

Likewise, Crawford's opinion that unspecified "toxic solvents" can cause hearing loss warrants exclusion.[26] This Court has already held that there is no scientifically reliable causal connection between such chemical exposures and hearing injury. *Beal*, Dkt. 142 at 14.

---

[25] PX2(Crawford-Rpt.)-23.
[26] PX2(Crawford-Rpt.)-24.

### 8. *Crawford cannot testify that somatic tinnitus is "widespread."*

Next, Crawford opines that "[s]omatic tinnitus is widespread among tinnitus sufferers," suggesting that somatic tinnitus is more common than, and mistaken for, noise-induced tinnitus.[27] This testimony is both false and misleading. Even the studies Crawford cites belie his opinion. Somatic tinnitus is a subtype of subjective tinnitus due to a disorder of non-auditory musculoskeletal structures of the cervical spine or temporomandibular area.[28] It is unrelated to—and less common than—noise-induced tinnitus.[29] In fact, noise-related pathologies must be ruled out to make a diagnosis of somatic tinnitus.[30] Because Crawford's opinion would mislead the jury to believe that tinnitus is more likely somatic than noise-induced, this testimony warrants exclusion under Rules 702 and 403.

Additionally, in all cases where the individual plaintiff has not been reliably diagnosed with somatic tinnitus, this general opinion is unhelpful, does not fit, and would serve only to confuse the jury. *See* Dkt. 2290 at 8-9 (excluding opinions about hearing disorders including hyperacusis and misophonia "in cases where the plaintiff has not been reliably diagnosed with these conditions"). Thus, Crawford's somatic-tinnitus opinion should be excluded.

---

[27] PX2(Crawford-Rpt.)-27.
[28] PX14(Michiels 2018)-2; PX15(Ralli 2016)-111-12.
[29] PX14(Michiels 2018)-2; PX16(Michiels 2018)-2.
[30] PX14(Michiels 2018)-2-3.

### 9.   *Crawford's testimony regarding military rates of hearing loss and tinnitus should be excluded.*

Crawford also maintains that NIHL among military servicemembers commonly occurs "at higher rates than considered appropriate" under HCPs.[31] While this Court has allowed Crawford to opine in *general* that such injuries are "common in the military," Dkt. 2845 at 21, he cannot opine about "military rates of hearing loss and average hearing thresholds of Army veterans" or measure a plaintiff's hearing loss against "average" military data, *see Beal*, Dkt. 130 at 12-13. Yet that is precisely what Crawford does here in suggesting that Plaintiffs "have significant threshold shifts at higher rates than considered appropriate in industrial hearing conservation programs."[32] As this Court has already concluded, Crawford's opinion is not only unhelpful; it is irrelevant, misleading and "substantially more prejudicial than probative." *Beal*, Dkt. 130 at 12-13; *see Navelski*, 244 F.Supp.3d at 1286; *Frazier*, 387 F.3d at 1263.

### 10.   *Crawford cannot testify that ruptured eardrums commonly occur while wearing hearing protection.*

Finally, Crawford testified at his deposition that ruptured eardrums are common from blast exposures, even when wearing earplugs.[33] But Crawford not

---

[31] PX2(Crawford-Rpt.)-5, 31.

[32] PX2(Crawford-Rpt.)-31.

[33]   PX17(Crawford-Dep.)-77:6-23   (discussing   "TM   [tympanic   membrane] perforation" in "up to 60 to 70 percent of blast exposures").

only failed to disclose this opinion in his report; he admitted it was based solely on his "personal experience" and was unsupported by any underlying patient data or cited medical literature.[34] As utterly unreliable *ipse dixit*, Crawford's testimony demands exclusion.

### B.   Jennifer LaBorde, Au.D.

#### 1.   *LaBorde cannot opine that noise-induced tinnitus and hearing loss must occur simultaneously.*

LaBorde offers the same unsupported opinion as Crawford, professing that tinnitus "is not likely to occur in the absence of noise-induced hearing loss" and that tinnitus is "not indicative of or predictive of more severe, permanent injuries to the auditory system."[35] LaBorde's testimony, like Crawford's, should be excluded. Again, publications such as the Noise Manual, Army Hearing Program Pamphlet 40-501, and 3M's Technical Bulletins all reach the opposite conclusion, concluding that tinnitus is an "early indicator" and an "early warning sign" of noise-induced auditory injury, and that "[d]amage to the inner ear resulting from unprotected, high-intensity noise exposure can lead to a perceived ringing."[36] As LaBorde herself affirmed under oath, "[t]innitus and other symptoms can give you an indication that something is happening in the auditory system *before* permanent hearing loss."[37] Because

---

[34] PX17(Crawford-Dep.)-77:24-79:2.

[35] PX18(LaBorde-Rpt.)-14, 20.

[36] PX3(P-GEN-2523)-2; PX4(P-GEN-6343)-84; PX5(S-GEN-96)-3 ¶ 2-7.a, 2-7.a.2.

[37] PX19(*Kelley*-4/5/22-Trial-Tr.)-2089:17-25 (emphasis added).

LaBorde's opinion contradicts her prior sworn testimony and ignores established evidence that tinnitus can precede NIHL, her testimony is not only misleading; it fails to satisfy Rule 702's threshold for reliability.

### 2. *LaBorde's testimony that hearing injury from blasts is unrelated to noise-induced hearing loss should be excluded.*

LaBorde further opines that hearing loss and tinnitus from blast exposure are not due to noise injuring the cochlea, but instead are caused by pressure or force injuring the brain.[38] This opinion finds no support in the literature she cites. Significantly, none of these studies analyzed the relationship between blast exposure and hearing protective devices, nor the role of noise exposure from blasts on cochlear damage, hearing loss, or tinnitus. Moreover, none of the study authors concluded—as LaBorde does—that noise from blast exposure does not injure the cochlea.

Effgen (2015) is a paper presentation of an animal study measuring the effects of primary blast on rat tissue tolerance.[39] It did not evaluate cochlear injury, let alone hearing loss or tinnitus.[40] Tate (2013) reported a small pilot study measuring biomarkers and neurocognitive functioning of breachers undergoing a 2-week training exercise; again, there was no analysis of hearing loss or tinnitus.[41] Boutté

---

[38] PX18(LaBorde-Rpt.)-17-18, 21.

[39] PX20(Effgen 2015)-724 (exposing slices of rat brains, "[o]rganotypic hippocampal slice cultures," to blast exposures).

[40] PX20(Effgen 2015)-725 (discussing brain cell death and the hippocampus).

[41] PX21(Tate 2013)-1620, 1622-23 (analyzing blood samples and neurocognitive performance for 19 breachers).

(2021) is a retrospective cohort study measuring serum biomarkers in Army and law enforcement personnel who conducted breaching, shooting, or grenade-throwing exercises; it found no increased correlation between biomarkers and deafness, nor did it assess the effect of noise exposure and cochlear injury or assess the role of hearing protection.[42]

Indeed, Carr (2020) undermines LaBorde's opinion that blast exposure does not result in cochlear injury or NIHL. Carr was a matched cohort study investigating the incidence of tinnitus in Army men who served from 1999 to 2013 and whose Military Occupational Specialties (MOS) were "a proxy for occupational exposure to explosive blast."[43] Although the study did not measure hearing loss, it found moderately elevated levels of tinnitus in the exposed group.[44] The authors suggested this association was due to a lack of adequate hearing protection, concluding: "In the near term, this study points to opportunities for providers to monitor closely hearing conservation programs *and for developers to enhance hearing protection and mitigate the elevated risk for tinnitus in these occupational blast-exposed populations*."[45]

---

[42] PX22(Boutté 2021)-2-7.

[43] PX23(Carr 2020)-2-3. It is notable that the study spanned the same period when the CAEv2 was in widespread use.

[44] PX23(Carr 2020)-6, 10 (noting that future "studies could explore annual hearing assessment results in conjunction with MOS").

[45] PX23(Carr 2020)-11 (emphasis added).

Worse, LaBorde ignores a plethora of published studies demonstrating that noise from blast exposures can—and does—cause auditory damage to the cochlea's hair cells, resulting in both tinnitus and sensorineural hearing loss at both higher and lower frequencies.[46]

At bottom, LaBorde's conclusion does not square with the data she claims supports it, leaving "too great an analytical gap" between her opinion and the evidence proffered. *Joiner*, 522 U.S. at 146. This is precisely the type of untethered *ipse dixit* Rule 702 forbids. Accordingly, LaBorde's testimony should be excluded.

### C.   Karthik Rajasekaran, M.D.

Defendants have disclosed Karthik Rajasekaran, M.D., FACS, an otolaryngologist and neurotologist, as a general expert witness.[47] Many of Rajasekaran's opinions must be excluded as: lacking qualifications, unreliable, unhelpful, inadmissible under FRE 403, and/or in direct conflict with this Court's prior orders.

#### 1.   *Opinions outside Rajasekaran's report must be excluded.*

At deposition, Rajasekaran suggested that he may attempt to offer opinions at trial not contained within his expert report.[48] This is clearly improper. *See* Fed. R.

---

[46] *E.g.*, PX9(Joseph 2018)-1; PX24(Joseph 2020)-1; PX25(Perez 2000)-1249; PX26(Gates 2000).

[47] PX27(Rajasekaran-Rpt.)-2.

[48] PX28(Rajasekaran-Dep.)-85:4-87:20.

Civ. P. 26(a)(2)(B)(i) (requiring "a complete statement of all opinions the witness will express and the basis and reasons for them"); *e.g.*, Dkt. 2218 at 41-42 (excluding opinion that "was not properly disclosed" in expert report). Rajasekaran should not be permitted to offer any opinions not disclosed in his general expert report, including, without limitation, opinions concerning: the CAEv2, 3M's conduct, military fault, military HCPs, safer alternative designs, damages, or any individual plaintiff.[49]

### 2. *Rajasekaran is not an expert in HPDs and should not be permitted to offer HPD-related opinions.*

At his deposition, Rajasekaran made clear he's "certainly not an expert" in "hearing protection device[s]" or "what makes the best hearing device for protection."[50] Accordingly, Rajasekaran should not be permitted to offer any opinions concerning HPDs, including, without limitation, those that relate to the fit or seal of any HPD.[51]

---

[49]  PX28(Rajasekaran-Dep.)-14:1-10, 17:10-19:18, 84:17-20, 90:3-12, 107:14-108:18, 130:6-14, 167:4-9; *see* PX27(Rajasekaran-Rpt.)-1-22.

[50] PX28(Rajasekaran-Dep.)-16:7-17:4, 91:14-16, 107:2-23, 165:4-15 (deferring to his audiologist on matters such the appropriate HPD and its fit).

[51] PX27(Rajasekaran-Rpt.)-9-10.

### 3. *Rajasekaran is not an expert in diagnosing the causes of hearing loss and tinnitus and should not be permitted to opine on these topics.*

Rajasekaran's report discusses various alleged causes of hearing loss and tinnitus.[52] Yet Rajasekaran admits he *doesn't diagnose the causes* of hearing loss or tinnitus in his clinical practice, stating: "that's not really my area of expertise."[53] Absent relevant experience in diagnosing the causes of hearing loss and tinnitus, Rajasekaran is unqualified to offer any opinions on these topics.

### 4. *Rajasekaran's opinions relative to cochlear synaptopathy, hidden hearing loss, and otoacoustic emissions are mere ipse dixit and must be excluded.*

Rajasekaran should not be permitted to opine on cochlear synaptopathy or hidden hearing loss (HHL). Rajasekaran states: "[i]n my professional experience, [HHL] is not a widely accepted diagnosis. As such, I do not diagnose patients with [HHL] in my practice."[54] But as pointed out above, Rajasekaran doesn't diagnose the cause of patients' hearing loss.[55] Moreover, any such opinions are unreliable, unhelpful, and misleading because prior to this litigation, Rajasekaran had no education, training, or experience *whatsoever* relative to cochlear synaptopathy or

---

[52] PX27(Rajasekaran-Rpt.)-5-12, 19-22.
[53] PX28(Rajasekaran-Dep.)-103:20-105:1.
[54] PX27(Rajasekaran-Rpt.)-11-12.
[55] PX28(Rajasekaran-Dep.)-103:20-105:1.

HHL.[56] Rajasekaran testified, "I did not even know anything about this until I started writing this report."[57]

As to otoacoustic emissions (OAEs), Rajasekaran cites no authority for his assertions that:

> OAE tests are not considered to be hearing tests that can help determine hearing loss like traditional audiograms; they also cannot definitively indicate whether auditory injury is present. Moreover, OAE testing is difficult to perform without interference from external noise and movement. There are many possible causes of reduced or absent OAEs and OAE testing alone cannot diagnose hearing loss.[58]

Because this testimony amounts to mere *ipse dixit* by Rajasekaran, it lacks a reliable methodology and cannot withstand *Daubert* scrutiny.

### 5. *Rajasekaran's opinions concerning tobacco, alcohol, and substances in fuel should be excluded.*

Rajasekaran's opinion that "[e]nvironmental factors" such as fuel, tobacco, and alcohol cause hearing loss should be excluded as unreliable, unhelpful, and pursuant to FRE 403.[59] Such opinions lack scientific support[60] and directly conflict

---

[56] PX28(Rajasekaran-Dep.)-175:11-177:21.

[57] PX28(Rajasekaran-Dep.)-177:8-10.

[58] PX27(Rajasekaran-Rpt.)-19.

[59] PX27(Rajasekaran-Rpt.)-8.

[60] None of the articles cited by Rajasekaran establish a causal relationship between tobacco, alcohol use or abuse, or substances in gasoline, referring solely to mere associations and possibilities. *See* PX29(Vyskocil 2012)-802, 804-05, 807-08 (finding (1) "[f]urther studies with sufficient data on the exposure of workers to ethyl benzene are necessary to make a definitive conclusion about ototoxicity," and the same as to "xylene isomers"; (2) "other human studies are necessary to further support the current incomplete evidence" concerning the potential ototoxicity of

with numerous prior orders of the Court. *See* Dkt. 2218 at 32-36, 45 & n.25; Dkt. 2845 at 23, 25, 27, 29; Dkt. 1910 at 9-10; *Wilkerson*, Dkt. 116 at 7; *Beal*, Dkt. 142 at 14, 17-18, 21.

Accordingly, all such opinions should be excluded.

### 6. *Rajasekaran's opinions concerning ototoxic medications should be excluded or limited.*

Rajasekaran contends that certain medications, including salicylates (*e.g.*, aspirin), can cause hearing loss or be associated with tinnitus.[61] But Rajasekaran cites no authority for such opinions.[62] Absent any new scientific authority, such

---

toluene in humans; (3) xylene polymers may possibly be ototoxic in certain studies involving rats, but "[o]nly one human study was identified" and it showed "no ototoxic effect after short-term exposure"; and (4) finding no evidence of "otoxicity of nicotine"); PX30(Emamifar 2016)-28 (referencing in rheumatoid-arthritis study a higher risk of hearing impairment in passive smokers, but when citations are tracked to their conclusion—including PX31(Dikici 2009), PX32(Cruickshanks 1998)-1715—demonstrate a mere potential "association between cigarette smoking and hearing loss" in individuals aged 48-92 years, while referencing a number of studies reaching the opposite conclusion); PX33(Smith 2004)-513 (identifying only a correlation or association between brainstem auditory evoked potentials (BAEPs) and lifelong alcohol consumption, with age considered a major confounding factor); PX34(Park 2019)-63, 67 (showing, at most, a possible association between "hazardous drinking" and a risk of hearing loss in Korean men, based on self-reporting of factors beyond mere alcohol intake).

[61] PX27(Rajasekaran-Rpt.)-7, 21. To the extent Rajesekan does not allege a causal relationship between any medication and tinnitus, he should be precluded from offering this causation opinion at trial.

[62] PX27(Rajasekaran-Rpt.)-7, 21. At deposition, Rajasekaran admitted that except for the antibiotics he specifically identified (aminoglycosides and vancomycin), there is no evidence of ototoxic side effects in any other classes of antibiotic medications. PX28(Rajasekaran-Dep.)-154:3-15. Further, Rajasekaran's review of the literature regarding vancomycin was incomplete and inconsistent with this

opinions should be excluded or limited consistent with this Court's prior orders regarding ototoxicity. *See, e.g.*, Dkt. 1330; *see also supra* at 9-10.

      **7.**      *Rajasekaran should not be permitted to testify that there are no known causes of tinnitus.*

Any opinion by Rajasekaran that there are no known causes of tinnitus[63] must be excluded as lacking a reliable scientific methodology or basis, conflicting with Defendants' experts' prior opinions (including in the bellwether cases), unhelpful, and because the probative value of this testimony is substantially outweighed by the danger of confusing the issues or misleading the jury under FRE 403.

    **D.**    **Richard Liberman, Ph.D.**

      **1.**      *Liberman's diagnosis opinions should be excluded because he is not a medical professional.*

Liberman is a researcher associated with the Harvard Medical School who has focused on, among other things, cochlear synaptopathy. He intends to offer various opinions about that type of inner ear damage that confirm much of what Plaintiffs have noted for the Court (and contradict what Defendants have argued to the contrary). For example, Liberman will opine that research shows one can conclude

---

Court's prior order. *Compare* PX28(Rajasekaran-Dep.)-154:20-156:12, *with* Dkt. 1330 at 5-6. Rajasekaran also concedes he does not know the dosage level at which NSAIDs could potentially cause auditory injury. PX28(Rajasekaran-Dep.)-157:11-158:14.

[63] *See generally* PX27(Rajasekaran-Rpt.)-20-22. Rajasekaran's own report references several causes of tinnitus, including acoustic neuromas and temporomandibular joint disorder (TMJ). PX27(Rajasekaran-Rpt.)-22.

cochlear synaptopathy has measurable effects on hearing if an individual exhibits audiometric thresholds above 20 dB in any frequency on an audiogram (including extended high frequencies at 10 kHz and above) at any point from months to years after an acoustic trauma event.[64]

He also opines that he believes, based on his research, that cochlear synaptopathy causes problems with discriminating speech in noisy environments (even with audiograms similar to individuals who do not have speech discrimination problems) and can lead to tinnitus in the absence of permanently-elevated thresholds.[65]

The deficiencies in his opinions arise from the fact that Liberman is not a medical professional, does not personally diagnose patients as part of his job as a researcher and professor, and does not know how to do a differential diagnosis.[66] Nevertheless, he intends to opine that one cannot "diagnose cochlear synaptopathy in living humans," cannot "diagnose noise-induced 'hidden' hearing loss in someone with normal audiometric thresholds," and cannot "conclude that a hearing loss that progresses later in life can be attributed to noise exposure that occurred years earlier" (*i.e.*, diagnose noise-related hearing loss acceleration).[67] Each of these opinions

---

[64] PX35(Liberman-Dep.)-92:9-95:16, 98:10-101:3.
[65] PX35(Liberman-Dep.)-72:2-13, 145:14-151:14.
[66] PX35(Liberman-Dep.)-32:7-21, 269:2-271:16.
[67] PX36(Liberman-Rpt.)-21 (Opinions 1, 6, and 7, respectively).

draws from the fundamental premise that one cannot draw a causal link between— *i.e.*, diagnose—a patient's hearing issues and either cochlear synaptopathy or HHL except in certain situations. *See*, *e.g.*, *Ford v. Carnival Corp.*, 2010 WL 9116184, at *2 (S.D. Fla. Mar. 4, 2010) (witness precluded from offering specific-causation opinion where they were not qualified in that area of medicine); *see also Jones v. Novartis Pharm. Corp.*, 235 F.Supp.3d 1244, 1277 (N.D. Ala. 2017), *aff'd in part*, 720 F. App'x 1006 (11th Cir. 2018) (excluding general- and specific-causation opinions that did not stem from reliable differential diagnosis). As the Court has done with multiple other of Defendants' non-medical professional expert witnesses, it should likewise exclude these diagnosis opinions because they are outside the scope of Liberman's expertise. *See, e.g.*, Dkt. 1701 at 28.

Further supporting exclusion is Liberman's testimony under oath that his definition of "diagnosis" for the purposes of his opinions is *not* a differential diagnosis, but rather a single test or combination of objective tests that a medical professional can use to identify "definitively diagnose" a condition in one fell swoop.[68] Yet he conceded that medical professionals may nevertheless diagnose hard-to-identify conditions (such as Ménière's disease) through a "constellation of phenomena" and "measurable results" and a differential diagnosis rather than one

---

[68] PX35(Liberman-Dep.)-34:2-40:4.

objective test.[69] Liberman's diagnosis opinions therefore fail for the additional reason that they impose a higher standard for diagnosis than what medical professionals routinely employ for the patients they treat. This requires exclusion. *See*, *e.g.*, *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) (excluding medical causation opinion that did "not follow the basic methodology that scientists use to determine causation" in that field); *see also Allison*, 184 F.3d at 1319 (excluding opinion testimony based on methodology that "was not generally accepted by the scientific community").

### 2. *Liberman should not be permitted to offer his unsupported TBI and ototoxicity opinions.*

In his report, Liberman states offhand that some head injuries can cause hearing issues.[70] At deposition, however, he confirmed that this is not his area of research and he has no idea what level or type of traumatic brain injury (TBI) can possibly cause such symptoms.[71] Accordingly, he admits he has no expert basis to offer such opinions, requiring their exclusion. *See Ford*, 2010 WL 9116184, at *2.

Similarly, during cross-examination, Defendants' attorney tried to elicit a number of previously-undisclosed opinions from Liberman, one of which centered on the types of exposures that lead to ototoxic reactions.[72] Liberman's report,

---

[69] PX35(Liberman-Dep.)-35:23-36:8.

[70] PX36(Liberman-Rpt.)-20.

[71] PX35(Liberman-Dep.)-199:9-200:10.

[72] PX35(Liberman-Dep.)-264:12-265:14 (opining about "ototoxic drugs, including

however, does not identify any ototoxicity opinions—he mentions only once that he has done some minor research into the issue.[73] At deposition, he once again confirmed that he does not view himself as an expert in that topic and does not discuss it at all in his report, requiring exclusion of this category of testimony as well.[74]

### E.   John Bertelson, M.D.

This Court should exclude John Bertelson's opinions because he is not qualified to give them, they are unreliable, and they do not fit the case.

### 1.   *Bertelson is not qualified to opine on hearing loss, tinnitus, PTSD, or servicemember-specific issues.*

Bertelson's opinions should be excluded because he is not qualified by knowledge, skill, experience, training, or education to offer them. *See* FRE 702. Bertelson is a neurologist who specializes in neuroimaging and cognitive diseases such as Alzheimer's and dementia.[75] He works primarily with psychiatrists at Senior Adults Specialty Healthcare.[76] Yet, he seeks to opine on hearing loss, tinnitus, PTSD, and servicemember-specific issues.

---

aminoglycoside antibiotics" and "a number of drugs that are given in treatment of various conditions," that "cause hearing loss and hair cell damage").

[73] PX36(Liberman-Rpt.)-1 (only mention of "ototoxicity").

[74] PX35(Liberman-Dep.)-267:20-268:20.

[75] PX37(Bertelson-Rpt.)-1, Ex.B; PX38(Bertelson-Dep.)-31:15-24.

[76] PX38(Bertelson-Dep.)-29:3-30:22.

Bertelson is not qualified to offer opinions diagnosing the cause of hearing loss or tinnitus, even as they relate to TBI. His writings are only relevant to his TBI opinions in "very limited amounts," including only a "couple pages about imaging findings and finding … traumatic brain injury."[77] Glaringly, none of his publications or presentations specifically relate to the hearing-related topics included in his general report.[78] He has no experience, training, or education in otology or hearing protection,[79] is unfamiliar with Noise Reduction Ratings (NRR),[80] would refer a patient for a hearing loss diagnosis unless it was "obvious," and would need help to understand the contributing factors for tinnitus.[81] He does not even ask patients about hearing loss or tinnitus when diagnosing a 10-year-old TBI.[82]

In addition, Bertelson is not qualified to opine about PTSD because he lacks knowledge, training, or experience in the diagnosis and treatment of PTSD. He simply parrots the opinions of others in his report—only to backtrack from those opinions in his deposition.[83]

---

[77] PX38(Bertelson-Dep.)-39:15-40:2 (admitting no relevant publications as to TBI "in terms of tinnitus and hearing loss").

[78] PX38(Bertelson-Dep.)-40:8-21.

[79] PX38(Bertelson-Dep.)-31:4-9, 37:1-20.

[80] PX38(Bertelson-Dep.)-37:15-17.

[81] PX38(Bertelson-Dep.)-107:11-108:5.

[82] PX38(Bertelson-Dep.)-84:20-85:8.

[83] PX37(Bertelson-Rpt.)-8-9; PX38(Bertelson-Dep.)-97:9-98:16 (limiting his opinion to the fact that those with PTSD would be "more likely to be bothered by … tinnitus," not that there is a "causal effect between PTSD and tinnitus"), 99:3-5 (offering "that author's opinion").

Nor is Bertelson qualified to offer opinions that are servicemember-specific. Bertelson opines that TBI "likely increase[s] the risk of tinnitus and hearing loss in military personnel,"[84] that blast exposure is "the most common cause of tinnitus and PTSD (and TBI) in servicemembers with combat deployments,"[85] and that TBI "is a common injury in servicemembers."[86] But Bertelson does not routinely treat current or former servicemembers, has never been employed by the VA, and has never served in the military.[87] He has no understanding of the military's diagnostic process for confirming a TBI,[88] or how often military members receive head CTs or brain MRIs for mild TBIs—opining only that it "probably" depends[89]—and he lacks experience reviewing military records.[90] Bertelson is, therefore, unqualified to offer these servicemember-specific opinions.

### 2.    *Bertelson's opinions are unsupported, uncertain, contradictory, and otherwise unreliable.*

Bertelson's opinions are unreliable because they are unsupported, speculative, internally contradictory, and based on a cherry-picked literature.

---

[84] PX37(Bertelson-Rpt.)-7.
[85] PX37(Bertelson-Rpt.)-8.
[86] PX37(Bertelson-Rpt.)-9.
[87] PX38(Bertelson-Dep.)-32:4-14.
[88] PX38(Bertelson-Dep.)-73:10-13.
[89] PX38(Bertelson-Dep.)-70:7-13.
[90] PX38(Bertelson-Dep.)-69:18-25.

Bertelson's wholly unsupported opinions should be excluded. *See Joiner*, 522 U.S. at 146 (holding *ipse dixit* opinions unreliable). Bertelson professes that TBI "is a common injury in servicemembers,"[91] but his sole support is an article about head injuries generally, not traumatic brain injuries.[92] His explanation of "common medical knowledge" cannot save his opinion because he has no education or experience treating servicemembers.[93] This is not the only instance of Bertelson expecting his *ipse dixit* to satisfy the jury.[94] When asked why he did provide a statistical basis for his opinion that there are "various pathophysiological mechanisms in the blast-injured population which may account for tinnitus," he responded that he was not an otologist and was not asked specifically to speak about noise trauma.[95]

Bertelson is uncertain of other opinions. *Kumho Tire*, 526 U.S. at 155 (affirming exclusion of expert opinions when not offered "with any certainty"). Although his report states that blast exposure is the "most common cause" of tinnitus, PTSD, and TBI in servicemembers with combat deployments,[96] he

---

[91] PX37(Bertelson-Rpt.)-9.
[92] PX37(Bertelson-Rpt.)-3-4 (78% of *head injuries* in 2009 were classified as mild) (citing French 2010); PX38(Bertelson-Dep.)-70:14-72:7 (conflating head injury and TBI in his opinion but admitting they are different).
[93] PX38(Bertelson-Dep.)-68:24-69:11.
[94] PX38(Bertelson-Dep.)-89:18-90:3.
[95] PX38(Bertelson-Dep.)-94:2-24; PX37(Bertelson-Rpt.)-7.
[96] PX37(Bertelson-Rpt.)-8.

backtracked in his deposition. Bertelson attributed this opinion to "th[e] author" and said he would not state it so "strong[ly]."[97] He added that while tinnitus, PTSD, and TBI are "commonly seen with blast exposure," different articles state different things, so he cannot identify the most common cause with certainty.[98] He also failed to explain how to rule in or rule out a TBI. Instead, he spoke generally to the "mechanism of injury," noting that it would be based on reporting "certain symptoms" and the individual demonstrating "certain findings in a timely manner after the TBI."[99] Such speculative, uncertain opinions are both unreliable and unhelpful.

Bertelson also contradicts himself. He opines that the most common cause of tinnitus in servicemembers is blast exposure,[100] but then insists that he will not opine about the most likely causes of hearing loss or tinnitus.[101] He states in his report and deposition that mild TBI and concussion are interchangeable.[102] But later he clarifies that when he opined that "[r]outine head CT and brain MRI are usually normal in the setting of mild TBI," he should have "use[d] the term 'concussion' instead of

---

[97] PX38(Bertelson-Dep.)-95:2-12.
[98] PX38(Bertelson-Dep.)-95:12-19; *see also* PX38(Bertelson-Dep.)-98:17-99:5 (asserting that overlapping neural networks damaged by TBI are the cause of an association between tinnitus and PTSD but then opining that that is only another author's opinion).
[99] PX38(Bertelson-Dep.)-86:20-87:12.
[100] PX37(Bertelson-Rpt.)-8.
[101] PX38(Bertelson-Dep.)-93:9-16.
[102] PX37(Bertelson-Rpt.)-9; PX38(Bertelson-Dep.)-80:6-8.

'mild TBI.'"[103] Because it is both unhelpful and untethered to any reliable methodology, this testimony mandates exclusion.

### 3. Bertelson's opinions based on irrelevant expertise and anecdotes lack fit and will not help the jury.

Because Bertelson's expertise in neuroimaging and cognitive diseases has minimal relevance to this litigation, several of his opinions should be excluded because they lack fit. For example, Bertelson cites his experience with former NFL players suffering from contact-induced TBIs to support his opinion on "repeated low level pressure blast waves."[104] But his anecdotal experience with another mechanism of injury—tackling on a football field—lacks relevance to servicemembers who did not sustain physical blows. This testimony should be excluded.

Even when discussing a subject where he does have expertise, Bertelson's testimony is unhelpful. For instance, Bertelson opines that the interaction between specific imaging findings and blast exposure is uncertain,[105] and he does not mean to suggest that all plaintiffs who have been cleared of a TBI should undergo some type of neuroimaging to confirm a nondiagnosis.[106]

Finally, besides not expressing any opinion on the causes of hearing loss or tinnitus, Bertelson does not intend to offer any opinions regarding the CAEv2,

---

[103] PX37(Bertelson-Rpt.)-9; PX38(Bertelson-Dep.)-103:3-17.
[104] PX37(Bertelson-Rpt.)-5; PX38(Bertelson-Dep.)-74:3-75:21.
[105] PX38(Bertelson-Dep.)-78:9-22.
[106] PX38(Bertelson-Dep.)-79:4-10.

warnings, the safety and effectiveness of the device, safer alternative designs, whether the military has done right or wrong, or 3M's conduct.[107] Thus, none of his opinions touch on the pertinent issues in this litigation.

### F.    <u>W. Chatham, M.D.</u>

W. Chatham, M.D., is a clinical immunologist/rheumatologist who offers general opinions regarding hearing loss caused by autoimmune disorders.[108] Chatham previously offered case-specific opinions in *Kelley*. In that case, the Court explained, Chatham was "primarily a rebuttal witness" who contradicted the methodology and opinions of plaintiff's experts. Dkt. 2898 at 8-9. Thus, based on the plaintiff's medical history, Chatham was allowed to opine that "lupus and autoimmune thyroid disease cannot be ruled out as potential causes of [plaintiff's] hearing loss." *Id.* at 7.

But in *Kelley*, the Court excluded several of Chatham's opinions that amounted to nothing more than "vague and sweeping references" to autoimmune conditions, issues, symptoms, and manifestations, finding them "unreliable, unhelpful, and substantially more prejudicial than probative." *Id.* at 7-8. In his new capacity as a general expert—without a specific record to provide support for an opinion regarding autoimmune disorders as a potential cause of hearing injury—

---

[107] PX38(Bertelson-Dep.)-58:6-59:25.
[108] PX39(Chatham-Rpt.)-2-3.

Chatham's opinions are nothing more than vague and sweeping references completely disconnected from the facts of any case. Without specific facts implicating a potential autoimmune issue, Chatham's opinions are neither relevant nor helpful—*i.e.*, they do not "logically advance[] a material aspect of the case" and should be excluded. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004).

### G.  Kenneth Billheimer, Au.D.

The Court should exclude Kenneth Billheimer's opinions in their entirety because he is not qualified to give them, they are unreliable, and they do not "fit" the case. Billheimer, an audiologist, reviewed certain testing on the CAEv2 earplugs, and he plans to opine about the device's NRR.[109]

#### 1.  *Billheimer is not qualified to opine about ANSI S3.19 and ANSI S12.6 testing.*

Billheimer is an audiologist and was a military hearing conservation officer from 1978 to 1988.[110] While Billheimer has tested patients' hearing, he has never conducted the tests on which he opines. This point is critical because *Daubert* requires that an expert be "qualified to testify competently regarding the matters he intends to address." Dkt. 1680 at 103 (quoting *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016)).

---

[109] *E.g.*, PX40(Billheimer-Rpt.)-13.
[110] PX40(Billheimer-Rpt.)-1.

The EPA uses the American National Standards Institute (ANSI) S3.19-1974 test to determine an earplug's NRR. For this test, the experimenter inserts the earplugs into the subject's ears.[111] Another testing methodology, ANSI S12.6, requires the subject to insert the earplugs.[112] Both tests constitute Real-Ear Attention at Threshold (REAT) testing.[113] The ANSI S3.19 test was standard when the CAEv2 hit the market, and it remains the EPA's required test for labeling.[114]

Billheimer has never performed testing pursuant to ANSI S3.19 or S12.6.[115] And while his opinions cite NRR calculations, Billheimer has never performed REAT testing to calculate an NRR.[116] Billheimer insists that his lack of experience "doesn't make any difference,"[117] but it falls to this Court to make that decision.

Billheimer is not an expert in EPA or Army regulations, and he is not an acoustician or acoustical engineer.[118] He retired from the military long before its use of the CAEv2, and he had no experience with the device until this case.[119] He has written few published articles, and none that relate to REAT testing.[120] He has never

---

[111] PX40(Billheimer-Rpt.)-2.
[112] PX40(Billheimer-Rpt.)-3.
[113] PX40(Billheimer-Rpt.)-4.
[114] PX40(Billheimer-Rpt.)-4.
[115] PX41(Billheimer-Dep.)-62:17-64:1.
[116] PX41(Billheimer-Dep.)-68:7-9.
[117] PX41(Billheimer-Dep.)-62:20-63:1.
[118] PX41(Billheimer-Dep.)-23:16-24:3, 25:8-14.
[119] PX41(Billheimer-Dep.)-32:11-18, 34:18-35:14.
[120] PX41(Billheimer-Dep.)-38:8-25.

designed an earplug.[121] Billheimer was never deployed as a soldier, and he has never observed soldiers training for combat in Iraq or Afghanistan—places where the CAEv2 was widely used.[122]

Based on the foregoing, Billheimer lacks the necessary expertise. *See* FRE 702. While he has performed hearing tests, he has not performed the ANSI tests at issue; he has no expertise on EPA and Army regulations; and he was unfamiliar with the CAEv2 before this litigation. Therefore, Billheimer is qualified only to opine about the results of testing on the CAEv2 from a clinician's perspective. *See, e.g.*, Dkt. 1680 at 111 (limiting ENT expert's opinions on "REAT testing of the CAEv2" to "the scope of his experience-based expertise" "as a clinician").

### 2. *Billheimer's opinions, which are based on cherry-picked data and lack critical analysis, are unreliable.*

Billheimer's opinions are also unreliable. It appears that Billheimer made up his mind to support 3M before even evaluating the evidence; he only reviewed the testing provided by 3M's attorneys, and he failed to consider numerous reasons why various tests lacked credibility.

Courts routinely exclude experts who ignore important information in forming their opinions. *See, e.g.*, *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1338 (11th Cir. 2010). Further, "the reliability of the methodology used to form an opinion is

---

[121] PX41(Billheimer-Dep.)-49:18-24.
[122] PX41(Billheimer-Dep.)-172:13-20.

questionable when the expert 'cherry picks' data in order to support his preferred conclusion." *Arevalo v. Coloplast Corp.*, 2020 WL 3958505, at *7 (N.D. Fla. July 7, 2020). That is precisely what Billheimer has done here, aided by counsel.

Billheimer agreed to support 3M's case before reviewing any case-related materials. He testified that 3M asked him to be an expert about 60 days before his deposition (taken on June 14, 2022); he agreed to be a 3M expert about ten days later; and he received the "first batch" of documents from 3M "a couple of days" thereafter.[123] Billheimer then backtracked and claimed that he "did review some of the documents" before agreeing to be 3M's expert.[124] But he does not recall how many documents he reviewed, or which documents, before agreeing to be an expert.[125]

Billheimer relied almost exclusively on information provided by 3M's counsel.[126] He did not know whether he had reviewed all of the testing conducted by 3M on the CAEv2, but he said that having all of the testing information would not have changed his opinion.[127] Billheimer did not perform a REAT test on the

---

[123] PX41(Billheimer-Dep.)-25:15-26:12.
[124] PX41(Billheimer-Dep.)-26:13-23.
[125] PX41(Billheimer-Dep.)-26:24-28:15 (testifying repeatedly "I don't recall").
[126] PX41(Billheimer-Dep.)-16:19-18:16.
[127] PX41(Billheimer-Dep.)-19:17-20:17.

CAEv2.[128] He also did not review any depositions, so he does not know what Elliott Berger or anyone else said about 3M's testing.[129]

The biggest omission from Billheimer's report is any analysis of ANSI S3.19 testing that 3M abandoned. Billheimer was aware of the aborted Test 213015, but he had not seen the details.[130] Billheimer claimed that the study was stopped because the data was "variable."[131] But Billheimer has not seen the lab notes for the testing, and he has not asked 3M for them.[132] The Flange Report states that the test was stopped because of variability *and* because "the NRR was quite low (11)."[133]

Billheimer agreed that he would not recommend an earplug with an NRR of 11 for a patient who would be exposed to military-level noise.[134] So, even though 3M stopped a test that—by Billheimer's admission—produced poor results, he did not factor that into his analysis.[135]

Instead, Billheimer relied on the replacement study, Test 213017, which 3M rigged by folding back the opposing flanges to achieve a better fit. Billheimer accepted 3M's manipulation to achieve more desirable results. He agreed that

---

[128] PX41(Billheimer-Dep.)-33:4-34:4.
[129] PX41(Billheimer-Dep.)-56:9-57:9.
[130] PX41(Billheimer-Dep.)-103:24-105:4.
[131] PX41(Billheimer-Dep.)-105:24-107:5.
[132] PX41(Billheimer-Dep.)-214:1-216:11.
[133] PX42(P-GEN-1)-2.
[134] PX41(Billheimer-Dep.)-216:21-217:10.
[135] *See generally* PX40(Billheimer-Rpt.).

experimenters folded back the flanges on multiple test subjects, and that it is inappropriate for 3M to manipulate test results.[136] Yet, he said he is "definitely okay with that," when asked about achieving the 22 NRR by folding back the flanges.[137] Billheimer's report fails to address 3M's halted test or its rigging of the next test by folding back the flanges.[138] Billheimer's failure to consider the aborted '015 test or the manipulation of the '017 test renders his opinions about 3M's NRR results unreliable.

Billheimer's efforts to further support the 22 NRR rating are also unreliable. For instance, he cites a test by Michael & Associates, which supposedly achieved an NRR of 23.[139] This Court has excluded that testing from evidence, based on hearsay and Rule 403, and has further precluded Defendants from using the report "for any purpose with any witness," including "in examining experts on the bases for their opinions about the CAEv2." Dkt. 2244 at 1-2; *see Baker*, Dkt. 118. Billheimer did not read the protocols for the Michael study, and he did not know that patients with variable data had been excluded.[140]

Billheimer also relied on Test 215512, which claimed an NRR of 21 per ANSI S3.19 testing. Yet he knew nothing about the study and even testified: "I don't know

---

[136] PX41(Billheimer-Dep.)-254:13-256:8.
[137] PX41(Billheimer-Dep.)-257:24-258:4.
[138] *See generally* PX40(Billheimer-Rpt.).
[139] PX40(Billheimer-Rpt.)-5.
[140] PX41(Billheimer-Dep.)-134:7-135:25.

why it's on my reliance list" and "I won't offer any[] [opinion] about it."[141] The test report shows that the NRR was actually 16 "[w]ith TGN's data included."[142] Billheimer agreed that an earplug with a 16 NRR could be dangerous when used with military-level noise.[143] Yet he made no effort to determine why TGN's data was excluded.[144] Thus, there is no reliable independent support for the manipulated 22 NRR that 3M achieved.

Billheimer's opinions about testing not done pursuant to ANSI S3.19 are also unreliable, for reasons that vary by test. For example:

- Billheimer did not know that several participants were excluded from the WHISPr study due to improper fit.[145]
- Billheimer did not realize that 50% of participants in the Abel study found the CAEv2 to be uncomfortable—which he agreed is important.[146]
- The Johnson blast study finished with only four participants, which Billheimer agreed was an insufficient number.[147]

There are other examples, but the key point is that Billheimer's report simply laid out testing results without critically analyzing them. Thus, his opinions are unreliable.

---

[141] PX41(Billheimer-Dep.)-114:23-115:13.

[142] PX41(Billheimer-Dep.)-115:14-19; PX43(D-GEN-270)-1.

[143] PX41(Billheimer-Dep.)-116:13-117:20.

[144] PX41(Billheimer-Dep.)-115:14-23.

[145] PX41(Billheimer-Dep.)-95:20-97:9.

[146] PX41(Billheimer-Dep.)-143:7-146:18.

[147] PX41(Billheimer-Dep.)-167:3-168:14.

### 3. Billheimer's opinions relying on hand-picked tests and ignoring real-world performance are unhelpful to the jury.

Conclusions reached only from testing provided by counsel are not helpful to the jury. *See Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (excluding unsubstantiated opinions as unhelpful to the jury); *Sanchez v. Bos. Sci. Corp.*, 2014 WL 4851989, at *22 (S.D. W. Va. Sept. 29, 2014) (MDL court excluding opinions based on reports that were chosen by counsel).

Ultimately, Billheimer concludes that the CAEv2's "linear and nonlinear ends perform as expected."[148] Relying on cherry-picked testing results to determine the CAEv2's general effectiveness is the type of "large analytical leap" that *Daubert* forbids. *See McDowell*, 392 F.3d at 1299. Developing general opinions based solely on a subset of testing ignores other testing and real-world performance. For instance, Billheimer did not know that the Army conducted an investigation under the False Claims Act and concluded that the government might not have purchased the CAEv2 if it had known the product was "too short for proper insertion."[149] Nor did he know that the Air Force had called the CAEv2 defective and discontinued its use.[150]

---

[148] PX40(Billheimer-Rpt.)-14.
[149] PX41(Billheimer-Dep.)-120:8-122:12; PX45(P-GEN-9)-2.
[150] PX41(Billheimer-Dep.)-123:2-124:14; PX46(Air-Force-Memo)-1.

Without consideration of the CAEv2's real-world performance, Billheimer's opinions are both unreliable and unhelpful, and therefore should be excluded.

### H.   Jennifer Tufts, Ph.D.

This Court should exclude Jennifer Tufts, a purported testing expert, for similar reasons. Tufts opines based on a highly curated set of documents—all of which 3M provided—that there is somehow no evidence the CAEv2 is defective.[151] She then claims that the CAEv2 "compares favorably" to other earplugs, without clarifying whether this is a general opinion or based solely on the limited materials she has reviewed.[152] This Court should exclude her opinions because she is not qualified, her opinions—based on cherry-picked data—are unreliable, and her ultimate conclusions are unhelpful to the jury.

### 1.   *Tufts is not an audiologist and is not otherwise qualified to opine on ANSI testing.*

Tufts is not a doctor of audiology.[153] She majored in math and music and got her post-graduate degrees in "communications disorders" with an audiology focus.[154] She has not conducted studies under ANSI S3.19, the EPA labeling standard.[155] She has not done any REAT testing to calculate an NRR.[156] She has not

---

[151] PX47(Tufts-Rpt.)-20.
[152] PX47(Tufts-Rpt.)-20.
[153] PX48(Tufts-Dep.)-16:4-11.
[154] PX47(Tufts-Rpt.)-1.
[155] PX48(Tufts-Dep.)-21:20-22:3.
[156] PX48(Tufts-Dep.)-22:7-15.

tested the CAEv2.[157] Tufts was never enlisted in the military, has not shot a gun recreationally for 25 years, and has not shot a gun with the CAEv2 in her ears.[158]

Tufts worked from 1999-2001 in the testing lab Michael & Associates, but she remembers little about what she did.[159] She does not know or remember the testing protocols used, whether she was ever a test subject using the CAEv2, whether any data gathered was used in labeling, or what her personal role was in the testing.[160] She has not worked for any other NVLAP accredited labs.[161] Tufts does not know why the EPA requires ANSI S3.19 studies, and she was unsure whether there was an exception to the ANSI S3.19 standards for the military.[162]

Again, the issue is whether the expert is qualified to give the specific opinions she is offering. Dkt. 1680 at 103 (quoting *Seamon*, 813 F.3d at 988). Tufts may cite her general experience studying hearing protectors.[163] But she has not demonstrated the knowledge, skill, experience, training, or education necessary to opine about ANSI tests and what they show about the effectiveness of HPDs. *See* FRE 702.

---

[157] PX48(Tufts-Dep.)-24:7-14.
[158] PX48(Tufts-Dep.)-45:8-11, 51:3-5, 227:3-5.
[159] PX48(Tufts-Dep.)-69:6-12.
[160] PX48(Tufts-Dep.)-71:6-72:20, 75:14-21, 76:10-77:5.
[161] PX48(Tufts-Dep.)-81:12-15.
[162] PX48(Tufts-Dep.)-86:3-7, 89:4-90:15.
[163] PX47(Tufts-Rpt.)-2.

### 2. *Tufts's opinions are unreliable because she agreed to serve as an expert years before reviewing any documents and she applied no discernable standards.*

Tufts's opinions also suffer from serious reliability issues. She agreed to support 3M years before reviewing any documents; she made no effort to gain insight into the tests on which she relies; and it is unclear what standards she is applying—which is particularly glaring because Tufts disclaims any interest in NRRs or variability.

Tufts agreed to be an expert for 3M in 2019.[164] She did not issue an expert report until May 2022, and she does not know why it took so long.[165] Tufts relied solely on documents provided by 3M's counsel.[166] She believes that she first received those documents in April 2022.[167] Thus, Tufts agreed to support 3M's case as an expert years before she ever reviewed any case-related documents.[168]

The general purpose of the *Daubert* inquiry "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Surely, the field of

---

[164] PX48(Tufts-Dep.)-32:15-22.
[165] PX48(Tufts-Dep.)-33:17-34:16.
[166] PX48(Tufts-Dep.)-35:11-21.
[167] PX48(Tufts-Dep.)-36:19-24.
[168] PX48(Tufts-Dep.)-38:15-39:7.

science demands more "intellectual rigor" than agreeing to support a position years before learning what, exactly, it is you are supporting.

Again, Tufts relied solely on select testing documents provided by 3M. When those documents raised questions, she did not search for answers. Rather, she was "taking a little bit on faith" that the tests were done following proper procedures.[169] Tufts employed so much "faith," it bordered on willful blindness. For instance, she is a good friend of Elliott Berger's. She has known him for more than 20 years, they have had dinners together, they authored a book chapter together, and they have exchanged poetry over e-mail.[170] Yet, despite being an expert in litigation involving the CAEv2, Tufts claimed not to know that Berger invented the device.[171]

As noted above, Berger halted the ANSI S3.19 labeling test, Test 213015, due to high variability and a low NRR of 11.[172] Tufts has not asked Berger about this abandoned test, nor has she reviewed his deposition or that of Ron Kieper.[173] Thus, she does not know what Berger and Kieper said about why they stopped the test, or that Berger testified that a plug with an NRR of 11 would provide insufficient protection.[174] Tufts testified that if a test falls "outside the bounds of expectations,

---

[169] PX48(Tufts-Dep.)-250:4-8.
[170] PX48(Tufts-Dep.)-124:22-128:24, 134:4-21.
[171] PX48(Tufts-Dep.)-99:10-19.
[172] PX42(P-GEN-1)-2.
[173] PX48(Tufts-Dep.)-99:21-102:23, 155:5-17.
[174] PX48(Tufts-Dep.)-103:4-104:11.

then it would probably be a good idea to investigate what's going on."[175] Yet she failed to do that as an expert.

The same concept applies to other testing that Tufts considered. For instance, when she issued her report, she had no idea that several subjects were excluded from the WHISPr study because they could not get a good fit.[176] Nor did she know—or seem to care—that Michael & Associates excluded test subjects whose data was more than two standard deviations away from the mean.[177]

Because Tufts had only the information that 3M's counsel provided her, she did not have a complete picture, nor did she seek one. Thus, her opinions are unreliable. *See Sanchez*, 2014 WL 4851989, at *22.

Finally, her opinions are unreliable because it is unclear what standard, if any, she applied in determining that the CAEv2 was not defective.[178] Tufts agreed that the primary purpose of REAT testing is to determine the attenuation and variability of an earplug.[179] Yet, that seemingly uncontroversial statement contradicts her own testimony as to what she considers relevant.

---

[175] PX48(Tufts-Dep.)-106:24-107:7.
[176] PX48(Tufts-Dep.)-171:5-172:21.
[177] PX48(Tufts-Dep.)-244:13-246:14.
[178] *See* PX47(Tufts-Rpt.)-20.
[179] PX48(Tufts-Dep.)-208:7-13.

The NRR is the standard measure of attenuation.[180] Yet, Tufts does not consider the NRR to be important. She claims that it "doesn't really tell you a whole lot about the product."[181] She would not agree that an earplug with an NRR of 30 was necessarily better than an earplug with an NRR of 1.[182] Tufts also considers variability in testing to be unrelated to the protection provided by the earplug. When asked if she would testify that "variability is not relevant to how well the device performs," she responded, "I guess that's right."[183]

So, if Tufts does not consider the NRR or variability to be important, then what is she relying on to conclude—from test results—that the CAEv2 is not defective? That much is unclear, and her opinions should be excluded as unreliable and unhelpful.

## I.     Richard Neitzel, Ph.D.

Neitzel is an industrial hygienist whose opinions the Court previously excluded—and should do so again in the following respects.

---

[180] *See* PX40(Billheimer-Rpt.)-4.
[181] PX48(Tufts-Dep.)-105:4-5.
[182] PX48(Tufts-Dep.)-106:1-11.
[183] PX48(Tufts-Dep.)-92:19-24.

### 1. *Neitzel impermissibly offers attenuation opinions based on the excluded Michael report.*

For the first time, Neitzel offers opinions that various tests show the CAEv2 attenuate well.[184] One of the bases for his opinion is the Kevin Michael report that this Court has previously excluded in all respects, including as a basis for expert opinions.[185] *See* Dkt. 2244; *Baker*, Dkt. 118. Neitzel's CAEv2 attenuation opinions are therefore inadmissible to the extent they rely on the Michael report.

### 2. *Neitzel's ototoxicity opinions should be excluded because they are unsupported and unhelpful.*

Neitzel offers general opinions that some chemicals can, in some instances for some people, be ototoxic. These opinions, however, are neither helpful nor admissible for the following reasons, and should therefore be excluded.

#### a. *Burn pits*

Neitzel offers opinions that exposure to burn pits might lead to ototoxic reactions.[186] At deposition, however, he confirmed he did not and could not identify any research, anywhere, indicating there is a proven link between burn pit exposure and hearing issues.[187] Given he has no basis for such opinions and this Court has previously excluded other experts' attempts to generally link burn pit exposure to

---

[184] PX49(Neitzel-Rpt.)-24-35.
[185] PX49(Neitzel-Rpt.)-28; PX50(Neitzel-Dep.)-130:8-132:7.
[186] PX49(Neitzel-Rpt.)-2, 42-43.
[187] PX50(Neitzel-Dep.)-165:20-167:11.

hearing issues, *see, e.g.*, Dkt. 2218 at 32-34; Dkt. 2845 at 25, 29, Neitzel's burn pit opinions should be excluded.

###### b.  *Ototoxic medications*

At his deposition, Neitzel confirmed that, as an industrial hygienist, he does *not* advise clients about ototoxic medications except that they should be aware their workers' medication use *may* have ototoxic effects.[188] He also confirmed he does not advise individuals about ototoxicity from medications.[189] Moreover, he confirmed multiple times that ototoxicity for a specific individual is something a doctor assesses and identifies, and that such an analysis requires specific inquiry into the patient's exposure levels, individual biology, and actual symptoms from the medication.[190] This testimony makes clear Neitzel (a) does not have expertise in ototoxic medications (as opposed to ototoxic exposures in the workplace); and (b) does not provide helpful opinions, given that he confirmed a medical professional must perform a differential diagnosis to opine on medications' actual effects on an individual; *i.e.*, provide a causation opinion that is relevant and useful in these cases. *See* Dkt. 1701 at 25-28 (precluding Neitzel from offering medical "opinions [that] speak to the specific cause of Plaintiffs' hearing injuries" because

---

[188] PX50(Neitzel-Dep.)-13:8-20:4.
[189] PX50(Neitzel-Dep.)-17:22-19:16.
[190] PX50(Neitzel-Dep.)-16:10-18:9, 20:6-21:13, 22:4-16.

he "has no medical training" and "fail[ed] to apply a proper … differential etiology"); Dkt. 1910 at 27 (similar).

Neitzel's ototoxic medication opinions should therefore be excluded.[191] *E.g.*, *Ford*, 2010 WL 9116184, at *2 ("It is clear from the record that [forensic toxicologist] Dr. Hearn is not an expert on pulmonary medicine. As such, Dr. Hearn is unqualified to diagnose the medical causation of Plaintiff's specific injuries."); *see also McGee v. Evenflo Co.*, 2003 WL 23350439, at *9 (M.D. Ga. Dec. 11, 2003), *aff'd*, 143 F. App'x 299 (11th Cir. 2005) (if substantive testing is necessary to make a specific determination, but the expert does not perform any such testing, that violates the *Daubert* standard) (collecting citations).

### c.   *Ototoxic exposures*

More generally, Neitzel offers opinions that some types of chemical exposures can be ototoxic.[192] However, he confirmed at deposition that: not every worker is actually exposed to such chemicals in workplaces with them; even where there is exposure, it will not always be ototoxic; and ototoxicity depends on an individual's biology, length of exposure, and symptoms.[193] He further confirmed that medical

---

[191] PX49(Neitzel-Rpt.)-35-43.
[192] PX49(Neitzel-Rpt.)-41-43.
[193] PX50(Neitzel-Dep.)-145:13-148:22.

professionals are best situated to determine whether an individual's hearing issues are due to ototoxic exposures.[194]

Put simply, Neitzel offers nothing helpful because his opinions do not "fit" any particular case; as he concedes, it is necessary for a case-specific ENT or audiologist who specifically examines the plaintiff in question to offer ototoxicity opinions based on a differential diagnosis. *See McDowell*, 392 F.3d at 1299 (explaining that expert testimony is unhelpful to the trier of fact unless a "fit" exists between the "offered opinion and the facts of the case"). Therefore, Neitzel's general ototoxicity opinions should be excluded in their entirety.

## J.   Gregory Flamme, Ph.D.; Mark Stephenson, Ph.D.; Steve Tasko, Ph.D.; and William Murphy, Ph.D.

Defendants submit a general report authored by Drs. Flamme, Murphy, Stephenson, and Tasko, all of whom work for Stephenson and Stephenson Research and Consulting (SASRAC).[195] Flamme & Stephenson have previously submitted multiple reports in this MDL.[196] Tasko is a scientist specializing in acoustics and communications disorders, and Murphy is a physicist and former supervisor of the hearing loss prevention team at NIOSH.

---

[194] PX50(Neitzel-Dep.)-24:3-14, 140:9-141:20.
[195] PX51(SASRAC-Rpt.)-4, 9, 14, 17.
[196] *See, e.g.*, Dkt. 2218 at 29.

### 1. *SASRAC's opinion that the DoD determines the specifications for the hearing protectors it includes in the DoD hearing conservation program should be excluded.*

As "Opinion 3," SASRAC opines that the DoD "is responsible" for identifying both dangerous noise exposures and the necessary characteristics of hearing protectors to avoid loss, and that hearing protection manufacturers lack visibility into this process.[197] These experts lack the qualifications to offer these opinions, and the opinions are unreliable and unhelpful. First, none of these experts has experience with procuring personal protective equipment (PPE) during the relevant time period (1999 to 2015). Nor are any of the four legal experts who could speak to the legal duties or obligations under law or imposed by contract. These individuals have also not worked for a PPE manufacturer that sold products to either the DLA, base stores, or directly to military units.[198] Regardless of qualifications, it is unhelpful and highly confusing to the jury for SASRAC to offer opinions regarding the duties of hearing protection manufacturers. SASRAC offers no methodology for these opinions. They simply state that military doctrine and health hazard assessments are classified and cite the 2006 MPID, despite the military's purchase of the CAEv2 through numerous procurement pathways as early as 1999.[199] Similarly, SASRAC offers no admissible basis for their opinion as to Dr.

---

[197] PX51(SASRAC-Rpt.)-82-83.
[198] PX51(SASRAC-Rpt.)-4-22.
[199] PX51(SASRAC-Rpt.)-82.

Ohlin's state of mind based solely on the hearsay statements of Marc Santoro.[200] *See* Dkt. 1680 at 114-20. These opinions should therefore be excluded.

### 2. *SASRAC's opinion that there is no scientific basis to determine that an HPD caused Plaintiffs' hearing damage, aside from using audiogram data, should be excluded.*

SASRAC's "Opinion 7," that "[t]here is no scientific basis upon which to determine a hearing protector's role in preventing tinnitus or other auditory outcomes beyond hearing sensitivity measured using the audiogram," is unhelpful, unreliable, and contradicts prior Court rulings.[201] SASRAC experts disregard other reliable testing presented at all prior bellwether trials, including DPOAE and ABR testing, *see* Dkt. 1933 at 11, and admissions from 3M's own employees and experts that audiograms do not capture the full extent of hearing damage.[202] Allowing this testimony would only confuse the jury about what types of evidence they could rely upon in determining causation, and it should therefore be excluded. *See Frazier*, 387 F.3d at 1263 ("[E]xpert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.").

---

[200] PX51(SASRAC-Rpt.)-82.

[201] PX51(SASRAC-Rpt.)-118.

[202] *See, e.g.*, PX52(P-GEN-122)-2 ("There is more and more evidence that damage to the ears can occur even when TTS does not occur.").

Opinion 7 also includes a list of auditory dysfunction "risk factors" that "can have strong relationships" with tinnitus.[203] To the extent these "strong relationships" are not causal relationships, they should be excluded as unhelpful and likely to confuse the jury. The Court has previously excluded testimony on several of these risk factors, including burn pits, JP-8, and tobacco use, each of which is discussed below. Additionally, SASRAC's opinion that "military service," "military deployments," "male gender," and "Higher Service-Connected VA disability rating" have a "strong relationship" with tinnitus confuses association with causation and demonstrates that their general testimony to these ends will only serve to confuse the jury in Defendants' misguided attempt to shift the blame to the military.[204]

### 3. *SASRAC's burn pits and JP-8 causation opinions should be excluded.*

SASRAC experts again opine that exposures to burn pits and JP-8 cannot be ruled out as a potential cause of Plaintiffs' tinnitus.[205] The Court has excluded substantially similar opinions in prior bellwether cases, and should do so here on reliability, helpfulness, and 403 grounds. Dkt. 2845 at 23, 25; Dkt. 2218 at 32-34.

No causal relationship between military burn pit/JP-8 exposures and tinnitus has been established. *See, e.g.*, *id.*; *In re Abilify*, 299 F.Supp.3d at 1306-07. The three

---

[203] PX51(SASRAC-Rpt.)-118-19.
[204] PX51(SASRAC-Rpt.)-119.
[205] PX51(SASRAC-Rpt.)-118-19.

additional rat studies cited by SASRAC—Mattie (2011), Fechter (2007) and Guthrie (2014)—do not change this fact.[206] None of these JP-8 exposure studies analyzed burn pit exposures, and none analyzed whether there was a causal relationship between JP-8 exposure and auditory injury in humans. Thus, these opinions should be excluded on reliability grounds.

Such testimony is also unhelpful here, where SASRAC is not offering the opinion that burn pit exposures caused Plaintiffs' tinnitus, and instead argues that such exposures cannot be ruled out as a cause in general. The Court should therefore exclude this testimony as unreliable, unhelpful, and on 403 grounds.

### 4. *SASRAC's opinion that tobacco use causes hearing impairments should be excluded.*

SASRAC experts again opine that tobacco use is "a risk factor" for Plaintiffs' hearing damage.[207] The Court excluded substantially similar opinions offered in prior bellwether trials, finding that cigarette smoke and nicotine "are, at most, marginally relevant" to the issues in this litigation. Dkt. 1330 at 12; Dkt. 2845 at 27 & n.18 (citing Dkt. 2218 at 34-35). No scientific literature establishing a causal link between smoking and tinnitus is cited in the SASRAC report. Further, this testimony is especially unhelpful and confusing to the jury here where SASRAC experts are only offering the opinion that tobacco use has a "relationship" with tinnitus, not that

---

[206] PX71(Mattie 2011); PX72(Fechter 2007); PX73(Guthrie 2014).
[207] PX51(SASRAC-Rpt.)-118-19, 143.

it caused a Plaintiff's tinnitus.[208] The opinion should therefore be excluded on reliability, helpfulness, and 403 grounds.

### 5.     *The Court should exclude SASRAC's opinion that a lack of effective quiet contributed to Plaintiffs' hearing injuries.*

SASRAC experts seek to offer the general opinion that Plaintiffs may have lacked sufficient time to recover from prior temporary threshold shifts while in the military, thereby exacerbating the hazard posed by subsequent exposures to noise.[209] However, there remains insufficient scientific evidence to establish the concept that "effective quiet" would have prevented Plaintiffs' hearing impairments, and there is no reliable methodology to determine whether Plaintiffs actually lacked effective quiet.[210] The Court excluded substantially similar case-specific opinions offered in prior bellwether cases, but never as a general matter. Dkt. 2218 at 38-39 (excluding effective-quiet opinions in *Camarillorazo*, *Finley*, and *Stelling*); Dkt. 2845 at 24-25 (excluding effective-quiet opinions in *Vilsmeyer* and *Wilkerson*).

Further, Defendants fail to offer any additional scientific evidence as to whether "effective quiet" would have prevented any Plaintiffs' hearing impairments. Indeed, Tasko agreed that this is an area of research where "work needs to be done."[211] The additional "effective quiet" paper referred to in SASRAC's report,

---

[208] PX51(SASRAC-Rpt.)-119.
[209] PX51(SASRAC-Rpt.)-147-48.
[210] *See* PX53(Flamme-Dep.)-76:23-78:10; PX54(Tasko-Dep.)-42:23-45:4.
[211] PX54(Tasko-Dep.)-44:20-45:4.

Schaal (2019), compares noise levels during flight operations and non-operational time periods in off-duty areas aboard an aircraft carrier.[212] Schaal provides no evidence that "effective quiet" would have prevented any Plaintiff's hearing damage, and the study was "limited to a small sample size on just one aircraft carrier during a single week."[213] This testimony should be excluded on reliability, helpfulness, and 403 grounds.

### 6.   *Murphy's opinions should be excluded.*

The Court should strike Murphy as a testifying expert witness, or in the alternative, strike all of his opinions concerning the efficacy of the CAEv2,[214] because he intentionally hid the existence of highly relevant CAEv2 REAT test data and did not consider such data in forming his general opinions.

On February 6, 2020, Defendants served the CDC with a *Touhy* request seeking Murphy's deposition testimony and documents concerning NIOSH's testing of the CAEv2.[215] On July 23, 2020, the Director of the CDC denied Defendants request to depose Murphy and instead stated that Murphy would provide a declaration limited to NIOSH's "published" testing on the CAEv2.[216] A week later, Murphy submitted a declaration stating that he had "not been authorized to address

---

[212] PX51(SASRAC-Rpt.)-147; PX55(Schaal 2019)-331.

[213] PX55(Schaal 2019)-334.

[214] PX51(SASRAC-Rpt.)-92-118.

[215] PX56(D-GEN-1643)-4-7.

[216] Dkt. 1317-2 at 3.

any testing [he] conducted that was not published or that did not concern the CAEv2," and then proceeded to describe only impulse noise testing he conducted with the CAEv2 on manikins, *i.e.*, acoustical test fixtures.[217]

In August 2020, Defendants subpoenaed Murphy consistent with Pretrial Order No. 50,[218] and in October 2020, entered into a stipulation with the CDC whereby the CDC agreed to produce CAEv2 test data "from the four relevant, reliable, unpublished studies within the CDC's possession."[219] The Court authorized Murphy's *Touhy* deposition,[220] and Murphy's *Touhy* deposition occurred on January 15, 2021. Attorneys for the government limited the scope of Murphy's *Touhy* deposition to the impulse/manikin testing described in Murphy's declaration.[221]

After his *Touhy* deposition, Murphy was hired by SASRAC and began working on the 3M litigation. On June 6, 2022, Plaintiffs served a deposition notice and document requests on Murphy seeking, among other requests, "[a]ll raw data from any testing performed on CAEv2, whether REAT, MIRE, sound localization, impulsive noise or other testing."[222] Defendants responded on June 17, 2022, stating that "Dr. Murphy has already produced data responsive to this request."[223]

---

[217] PX57(Murphy-Decl.)-3-5.
[218] Dkt. 1340.
[219] Dkt. 1446.
[220] Dkt. 1472.
[221] PX58(Murphy-1/15/21-Dep.)-9:22-11:2, 56:19-58:2.
[222] PX59(Murphy-Notice-of-Dep.)-7.
[223] PX60(Murphy-Dep.-Ex.1)-6.

Murphy's general expert deposition took place on June 28, 2022. He initially testified that he did not have any raw data on the CAEv2, and that he returned all CAEv2 raw data in his possession to NIOSH.[224] He also testified that as of June 17, 2022, when Defendants responded to Plaintiffs' document requests in connection with his Wave 1 deposition, he possessed only impulse/manikin data and handwritten notes from Major Mark Little.[225] However, later in his deposition, Murphy revealed for the first time in this litigation that he had conducted ANSI S12.6 "Method A" REAT testing on both ends of the CAEv2 in or around 2001 while working at NIOSH.[226] He recalled that in his REAT testing, the green end provided highly variable results, similar to those Aearo obtained in Test 213015.[227] He also backtracked and testified that the raw data underlying this REAT testing was in his possession as of June 17, 2022, but that he gave it to NIOSH instead of producing it in this litigation.[228] Murphy testified that he did not share such data with Defendants' counsel, but was then improperly instructed not to answer Plaintiffs' counsel's follow-up question: Did Murphy discuss the topic of this data with Defendants' counsel?[229] Lastly, Murphy testified that he did not consider his own

---

[224] PX61(Murphy-Dep.)-23:4-24:14.
[225] PX61(Murphy-Dep.)-30:6-40:11.
[226] PX61(Murphy-Dep.)-81:22-88:7.
[227] PX61(Murphy-Dep.)-92:1-94:7.
[228] PX61(Murphy-Dep.)-97:4-99:23, 102:21-105:14.
[229] PX61(Murphy-Dep.)-105:12-106:17, 106:22-107:2.

CAEv2 REAT test data in forming his opinions, nor was it included on his materials considered list.[230]

To start, Murphy's intentional removal of important CAEv2 REAT test data contained on a fax, with or without guidance from Defendants' counsel, is a discovery violation that is not substantially justified or harmless. *See* Fed. R. Civ. P. 37(c)(1). He continued to cover up the existence of this test data early on in his deposition by giving evasive, rambling answers to simple questions.[231] Murphy's failure to disclose independent CAEv2 testing that is unfavorable for Defendants has significantly prejudiced Plaintiffs and is likely to confuse and mislead the jury. Indeed, a major theme of Defendants' liability defense is that no independent tests of the CAEv2 showed that the earplug was ineffective.[232] In short, Murphy acted in bad faith and should be stricken as a testifying expert witness on Rule 403 grounds. *See Frazier*, 387 F.3d at 1263 ("Because of the powerful and potentially misleading effect of expert evidence … expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403."); *Neelu Aviation, LLC v. Boca Aircraft Maintenance, LLC*, 2021 WL 4991256, at *3 (S.D. Fla. Aug. 24, 2021) ("A court enjoys broad discretion in applying the Rule 403 balancing test.").

---

[230] PX61(Murphy-Dep.)-102:21-103:23; PX51(SASRAC-Rpt.)-App'x-C.
[231] PX61(Murphy-Dep.)-7:2-14:21, 33:5-37:16.
[232] *See, e.g.*, PX62(*Beal*-5/9/22-Trial-Tr.)-186:2-15.

Courts also exclude as unreliable expert testimony that "cherry-picks" relevant data and produces a misleadingly favorable conclusion. *See, e.g.*, *PODS Enters., Inc. v. U-Haul Int'l, Inc.*, 2014 WL 12628664, at \*4 (M.D. Fla. 2014) (expert opinion excluded as unreliable due in part to "blind acceptance of and reliance on one-sided data from [defendant]"); *E.E.O.C. v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (Agee, J., concurring) (collecting cases where "courts have consistently excluded expert testimony that 'cherry-picks' relevant data"); *Barber v. United Airlines, Inc.*, 17 Fed. App'x 433, 437 (7th Cir. 2001) (affirming exclusion of expert who "did not adequately explain why he ignored certain facts and data," accepted only testimony and data that suited his theory, and "cherry-picked" supporting facts). Here, Defendants acknowledge that the ANSI S12.6 test data that Murphy failed to disclose and produce in connection with his expert deposition is central to this case. *See* Dkt. 1317 at 3 ("Dr. Murphy's unpublished findings regarding the CAEv2 are no less relevant to Plaintiffs' allegation that the CAEv2 provided insufficient attenuation than are his published findings."). Because Murphy's CAEv2 efficacy opinions rely on cherry-picked test data, the Court should exclude these opinions as unreliable.

Finally, should the Court decide not to exclude Murphy's testimony in its entirety, Plaintiffs should be permitted to cross-examine Murphy at trial regarding

this REAT testing and his failure to turn it over, as this goes towards Murphy's credibility.

### K.    E. Scott Elledge, M.D.

E. Scott Elledge, M.D., was an Army otolaryngologist at Fort Bragg from 1991 to 1994.[233] He asserts that the military's hearing conservation protocols are inadequate to protect servicemembers' hearing and that the Army prioritized "medical readiness" over hearing conservation.[234] He also claims that the military extensively tests HPDs before issuing them to servicemembers.[235] The Court should not permit Elledge to testify at trial because his opinions are speculative and unreliable, as they are outside his area of expertise and not based on any methodology. The Court previously held that expert opinions regarding the implementation and adequacy of the Army HCP are limited to the witness's personal experience at a particular military installation during a specific period of time. Dkt. 1651 at 3-4, 14-15. Accordingly, Elledge's opinions are limited to the implementation and adequacy of the Army HCP at Fort Bragg from 1991 to 1994— a time period that predates *both* the earplug at issue in this litigation *and* the existence of enforceable hearing conservation regulations in the Army. *Compare Estes*, Dkt. 124 at 2, 5-6 (permitting HCP fact witness to testify about her experiences at Fort

---

[233] PX63(Elledge-Rpt.)-1.
[234] PX63(Elledge-Rpt.)-8.
[235] PX63(Elledge-Rpt.)-9.

Benning from 2013-2016 because she overlapped with the plaintiff, who served there from 2012-2014). As such, his opinions lack the "fit" required for admissibility.[236]

### 1. *Elledge is unqualified to offer general opinions.*

An expert must "ha[ve] sufficient 'knowledge, skill, experience, training, or education' to form a reliable opinion about an issue that is before the court." *Navelski*, 244 F.Supp.3d at 1286. Elledge offers opinions "about military hearing conservation programs [under DODI 6055.12 (1996), DA PAM 40-501 (1998), and Special Text 4-02.501 (2008)[237]], their strengths and weaknesses, and *how they actually operate*."[238] He claims to be qualified to offer these opinions based on his "knowledge and background as the former head of Otolaryngology at a military installation."[239]

"[I]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably

---

[236] In addition, where state law does not permit apportionment for government fault, such opinions should be excluded as unhelpful. *See Sloan*, Dkt. 109 at 8 (indicating that testimony about the military's alleged failure to fit, train, or instruct is permissible only where state law allows for apportionment, as in *Wayman* under Colorado law, and is impermissible when apportionment does not appear on the verdict form, as in *Sloan* under Kentucky law).

[237] PX63(Elledge-Rpt.)-4-6.

[238] PX63(Elledge-Rpt.)-1 (emphasis added).

[239] PX63(Elledge-Rpt.)-1.

applied to the facts." *Frazier*, 387 F.3d at 1261 (quoting FRE 702 advisory committee's note (2000 amends.)). Elledge's experience with military hearing conservation is limited to the "medical evaluation and treatment phase" of the Army HCP at Fort Bragg from 1991 to 1994.[240] This experience is not a sufficient basis for Elledge's opinions in this case. He admits he has not participated in a military HCP since he left the service in 1994[241] and has no prior experience creating, evaluating, or consulting on military or civilian HCPs.[242] Even while he was in the Army, Elledge was not involved in the creation, evaluation, modification, day-to-day implementation, or enforcement of the HCP at Fort Bragg.[243]

Elledge asserts that the guidelines in effect during his service at Fort Bragg are "very similar" to the regulations implemented later, but he did not actually compare them.[244] Elledge has failed to demonstrate how his experience is reliably applied to military regulations adopted after he left the service. *See Daubert v. Merrell Dow Pharm., Inc.* (on remand), 43 F.3d 1311, 1316 (9th Cir. 1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough").

---

[240] PX64(Elledge-Dep.)-40:2-13, 90:14-91:1, 113:24-114:12 (agreeing he lacks personal experience with annual fittings and earplug trainings).

[241] PX64(Elledge-Dep.)-40:9-13.

[242] PX64(Elledge-Dep.)-60:1-61:9.

[243] PX64(Elledge-Dep.)-44:15-46:2, 46:17-49:12, 50:4-52:5.

[244] PX64(Elledge-Dep.)-85:2-17.

An expert who admits he lacks expertise in a discipline is not allowed to provide opinion testimony in that area. *Doctors Licensure Grp., Inc. v. Cont'l Cas. Co.*, 2011 WL 13182969, at \*4-5 (N.D. Fla. Sept. 26, 2011). Elledge testified repeatedly that he is "not a hearing conservationist."[245] Accordingly, Elledge is not qualified to opine on the strengths, weaknesses, and "actual[] operat[ion]" of military-wide hearing conservation protocols implemented after he left Fort Bragg and the Army in 1994.[246]

Elledge also opines that "hearing protection devices used by the military and issued to servicemembers were thoroughly tested by the military before they were used" and that military "hearing conservation programs did not rely on manufacturer testing, but relied on the testing conducted by the military itself."[247] Critically, however, Elledge has no experience in military procurement and was never involved in the military acquisition of earplugs.[248] He was never involved in any HPD testing or procurement-related evaluation of earplugs during his military service.[249] In fact, Elledge admits that he does not "know the timing of the testing versus when [earplugs are] actually given to soldiers,"[250] nor is he "an expert on the decision-

---

[245] PX64(Elledge-Dep.)-70:16-71:19, 72:2-7.
[246] PX63(Elledge-Rpt.)-1.
[247] PX63(Elledge-Rpt.)-9.
[248] PX64(Elledge-Dep.)-79:8-18.
[249] PX64(Elledge-Dep.)-80:5-81:15, 81:24-82:2.
[250] PX64(Elledge-Dep.)-214:3-10.

making to select an earplug."[251] Yet he speculates at length regarding the military's supposed disregard for NRR information and its alleged practice of performing its own testing on HPDs before distribution.

> ### 2.   *Elledge's opinions are not based on sufficient facts, data, analysis, and methodology.*

Elledge's report recites various military HCP regulations adopted after his service that are padded with a narrative of personal experiences that predate the CAEv2 by at least five years. It ends with a conclusion paragraph that contains essentially the following opinions:

- HPDs are the least effective method for protecting hearing because they require individual fitting, training, and consistent usage;
- those factors make it "likely impossible" for HCPs to adequately conserve servicemembers' hearing; and
- the military prioritizes medical readiness over hearing conservation.[252]

However, Elledge testified that:

- he is not familiar with the specific fitting and training procedures utilized by the military;[253]
- he did not perform any scientific analysis or review data related to rates of earplug usage among servicemembers;[254]
- he does not know whether or to what extent rates of HPD use among servicemembers changed after his military service;[255]
- he did not review any internal 3M documents related to CAEv2 design, testing, or marketing;[256]

---

[251] PX64(Elledge-Dep-.)-218:13-14.

[252] PX63(Elledge-Rpt.)-10.

[253] PX64(Elledge-Dep.)-166:5-19, 177:2-25.

[254] PX64(Elledge-Dep.)-116:16-117:15.

[255] PX64(Elledge-Dep.)-117:9-15.

[256] PX63(Elledge-Rpt.)-App'x-1-2.

- he did not review any testing data or published literature evaluating the efficacy of HPDs in particular combat scenarios;[257] and
- he did not consider any documents in the public domain about Army hearing conservation other than the regulations and publications provided by Defendants' attorneys.[258]

Elledge's opinions are based solely on his recollection of HCP protocols at Fort Bragg approximately three decades ago—approximately five years before the CAEv2 was introduced—and the unverified assertion that those protocols are "very similar to" the hearing conservation regulations implemented in the following years.[259] These opinions are simply personal impressions lacking meaningful review of available information. They are based "[j]ust [on] conversations" with unspecified military healthcare providers and patients.[260] Allowing Elledge to opine about the circumstances throughout the Army based on limited personal accounts and information relayed to him by unspecified third parties several years before the introduction of the CAEv2 "would be to sanction [his] use as a vehicle for introducing hearsay testimony." Dkt. 1651 at 5-6. These *ipse dixit* opinions lack the indicia of reliability that are necessary for admission of expert opinion testimony. Consistent with the Court's prior rulings, his opinions should be excluded. *Id.* (excluding opinions "based on unspecified conversations with unidentified

---

[257] PX63(Elledge-Rpt.)-App'x-1-2.

[258] PX64(Elledge-Dep.)-82:17-25.

[259] PX64(Elledge-Dep.)-85:2-17.

[260] PX64(Elledge-Dep.)-88:22-89:10, 109:24-110:11, 114:14-115:12.

servicemembers and audiologists" and forbidding experts from "opin[ing] about circumstances throughout the entire Army based on limited personal accounts").

> **3.** ***Elledge's opinions are not relevant and will not assist the jury.***

Expert testimony, like all evidence, must be relevant. *McDowell*, 392 F.3d at 1298. "To meet this requirement, the expert testimony must be relevant to the task at hand, … *i.e.*, that it logically advances a material aspect of the case." *Id.* at 1298-99. For the reasons stated above, the only reliable opinions Elledge is qualified to offer relate to his personal experience and observations of the Army HCP at Fort Bragg from 1991-1994. *See* Dkt. 1651 at 2-3. However, hearing conservation protocols in effect at a single military installation five or more years before the CAEv2 was available have virtually no relationship to the pertinent facts. Instead, an impermissible analytical gap exists between hearing conservation practices from the early 1990s (which were governed by an unenforceable guideline, TB MED 501) and an analysis of the strengths, weaknesses, and actual operation of the Army HCP following the implementation of DA PAM 40-501 (1998) (which was the first enforceable Army hearing conservation regulation).[261]

## L.  **Dennis Driscoll**

Driscoll, an acoustical engineer, seeks to offer opinions that nonmilitary noises, both occupational and recreational, pose significant risks to Plaintiffs'

---

[261] PX65(McIlwain 2008)-2169-70; PX66(Humes 2006)-183.

hearing.[262] To reach this opinion, he relies on numerous estimated noise levels listed in his report.[263] But Driscoll's opinions should be excluded as unhelpful because, unlike his "close call" case-specific opinion in *Hensley*, Dkt. 1910 at 13, here, Driscoll performed no analysis of any Plaintiff's noise exposures.[264] Rather, his role in Wave 1 is to "quantify [] potential nonmilitary noise[s]" by preparing a "comprehensive list" of noise estimates.[265] As Driscoll is simply "parroting" information contained in various literature and databases, his opinions should be excluded as unhelpful. Dkt. 1910 at 13; *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985) (expert testimony must offer insights "beyond the understanding and experience of the average citizen").

### M.   Stan Phillips, M.D.

Phillips's proffered expert testimony is not helpful, nor does it fit the context of a particular case. *See* Dkt. 2290 at 4, 8-9. Phillips offers the general opinion that "[s]omatic (also called somatosensory) tinnitus is a subtype of subjective tinnitus in which changed somatosensory information from the shoulder girdle, cervical spine, or jaw area causes or changes a patient's tinnitus."[266] Phillips's general report does

---

[262] PX67(Driscoll-Rpt.)-1, 30.
[263] PX67(Driscoll-Rpt.)-6-30.
[264] PX68(Driscoll-Dep.)-21:11-22:11, 23:7-13, 24:22-25:14, 31:21-32:17, 39:22-41:16, 83:21-84:9, 87:18-89:23, 94:15-95:3, 117:8-25, 133:18-135:2, 152:3-16.
[265] PX68(Driscoll-Dep.)-25:18-26:7.
[266] PX69(Phillips-Rpt.)-4.

not purport to diagnosis any plaintiff with somatic tinnitus; he considered no individual's medical history or records, and he simply opines that somatic tinnitus is a subtype that exits.[267] In the vast majority of cases, somatic tinnitus is not presented as an alternative cause of a plaintiff's tinnitus. And with good reason: even the central paper on which Phillips relies concludes that "cases where the somatosensory system is the main cause of the tinnitus exists [*sic*] but are rare."[268] In all cases where the individual plaintiff has not been reliably diagnosed as having tinnitus with a somatic cause, this general opinion is unhelpful, does not fit, and would serve only to confuse the jury. *See* Dkt. 2290 at 8-9. Accordingly, the opinion should be excluded.

### N.    Defendants' experts' opinions should be excluded or limited consistent with the Court's adjudication of other arguments made throughout this omnibus motion and in prior rulings.

Defendants' experts' opinions should be excluded or limited consistent with the Court's determinations regarding the other arguments made throughout this omnibus motion. Plaintiffs move the Court to extend its rulings on the foregoing challenges to all of Defendants' Wave 1 experts who now offer (or attempt to offer) those same or substantially similar expert opinions in the Wave 1 cases.

---

[267] PX70(Phillips-Dep.)-25:22-27:23; *see generally* PX69(Phillips-Rpt.).
[268] PX16(Michiels 2018)-8.

Additionally, consistent with the Court's prior orders, none of Defendants' experts should be allowed to opine or testify on certain matters, including:[269]

- *Military and Army Hearing Conservation*

  o A purported "widespread" culture of compliance or non-compliance with military or Army safety and hearing conservation program requirements. *See* Dkt. 1651 at 3-8.

  o Military- or Army-wide success or failure of hearing conservation efforts. *See id.*

  o That anything the military did placed Plaintiffs "at greater risk of sustaining a hearing impairment" or otherwise caused their injuries. *See* Dkt. 1690 at 13.

  o The Defendants' or the military's state of mind. *See id.* at 15; Dkt. 1701 at 29-30.

- *General Prohibitions on Narrative or Legal Testimony*

  o Mouthpiece opinions. *See, e.g.*, Dkt. 1780 at 7-11.

  o Narrative testimony, including summaries of corporate documents, witness testimony, military records, and medical records not tied to ultimate opinions. *See, e.g.*, Dkt. 1701 at 28-31 & n.24.

  o Summaries of historical facts, unaccompanied by a differential analysis of their significance in a plaintiff's case, pertaining to

---

[269] The Court has made clear that it "will not reconsider its prior *Daubert* rulings and the parties may not brief *Daubert* issues previously considered and adjudicated by the Court." Dkt. 3072 at 9. Accordingly, Plaintiffs included the following matters in their preservation motion filed simultaneously. For the avoidance of doubt, should Defendants argue that these matters go beyond the scope of preservation in extending the Court's prior rulings to new experts, Plaintiffs move herein to exclude these matters on a global basis.

recreational and occupational noise (e.g., hunting, fireworks, concerts, power tools). *See, e.g.*, *Beal*, Dkt. 142 at 19-21.

o Opinions regarding the Army's responsibilities under the DoD regulations that amount to testimony on the Army's legal duties under the law. *See* Dkt. 1701 at 20-22.

o Opinions that Defendants were not required to abide by the product labeling requirements set forth in the Noise Control Act or that the CAEv2's label complied with EPA regulations and federal law. *See* Dkt. 1701 at 23-24.

- *Opinions Contingent on Certain Qualifications*

o Diagnoses of TBI/concussion from non-physicians or non-neurotrauma specialists (including but not limited to audiologists). *E.g.*, *Beal*, Dkt. 142 at 16.

o Opinions on the existence of or cause of hearing loss/tinnitus from a non-otologist, non-neurotologist, non-audiologists (*e.g.*, mechanical engineer, psychiatrist, industrial hygienist). *See, e.g.*, Dkt. 1910 at 12, 22; Dkt. 1780 at 6-7; Dkt. 1701 at 25-28.

- *Opinions Contingent on Certain Testing or Diagnoses*

o HHL opinions without objective diagnostic testing. *See, e.g.*, Dkt. 1933 at 15-16 & n.28.

o Opinions that a plaintiff is capable of hearing and discerning speech in noisy environments where the expert did not conduct or rely upon a Speech-in-Noise (SIN) test or other objective measure of hearing in noisy environments. *See* Dkt. 1680 at 25-27.

o General testimony re: Unspecified Neurocognitive Disorder (UND) absent a diagnosis. *See, e.g.*, Dkt. 1910 at 21-22.

o General hidden hearing loss (HHL) or cochlear synaptopathy opinions in cases where the plaintiff is not pursuing a HHL claim. Dkt. 2845 at 19.

- That central auditory processing disorder (CAPD) is a potential cause of a plaintiff's injuries, absent CAPD testing or diagnosis. *See, e.g.*, Dkt. 2845 at 28-29.

- Vague and sweeping references to a 'wide variety' of systemic autoimmune conditions, issues, or problems; 'potentially autoimmune symptoms' not specific to particular diagnosed conditions (*e.g.*, lupus or autoimmune thyroid disease); the possibility of autoimmune-induced sensorineural hearing loss presenting 'in the absence of any systemic autoimmune disorder'; and that lupus and autoimmune thyroid disease cannot be ruled out as potential causes of tinnitus. Dkt. 2898 at 7-8.

- *Ototoxicity*

  - Opinions regarding alcohol, cigarette smoke (tobacco use), marijuana, and/or illicit substances. *See, e.g.*, Dkt. 1910 at 9-10; *Beal*, Dkt. 142 at 14, 17-18, 21.

  - Opinions regarding burn pits, JP-8 and other fuels, smoke from oil fires, fuel exhaust, other chemical exposures (*e.g.*, carbon monoxide, metal-working fluids, paints, 'dust-off' cleaner), sand, and/or dust. *See, e.g.*, *Beal*, Dkt. 142 at 14, 17-18, 21.

  - Opinions regarding non-ototoxic medications (prescription and over-the-counter) not identified as cochleotoxic in Dkt. 1330 (including but not limited to nonspecific painkillers, antidepressants, opioids). *See, e.g.*, Dkt. 2290 at 18-19.

- *Other*

  - Opinions that blast exposures or shock waves cause hearing injuries independent from noise injuring the cochlea, including via bone/tissue conduction. *See, e.g.*, Dkt. 2218 at 35-38; Dkt. 2845 at 25.

  - Testimony regarding personal use of hearing aids or similar technology that merely bolsters an expert's opinions by reference to their personal experience using hearing assistive devices and/or the impact of their own hearing impairments on her daily life. *See, e.g.*, *Beal*, Dkt. 142 at 19.

71

- That a plaintiff may obtain hearing aids at no cost through the military health care system. *See, e.g.*, Dkt. 2218 at 43-44; Dkt. 2845 at 22.

- Opinion that hearing loss/tinnitus does not adversely effect the plaintiff's daily life, absent a methodology or reliable factual basis to support the claim that these conditions do not affect the plaintiff's sleep, ability to concentrate, PTSD, etc. *See, e.g.*, Dkt. 1910 at 16-17.

- The designation of non-retained case-specific medical expert witnesses, including a plaintiff's treating physicians and Compensation and Pension (C&P) examiners. *See* Dkt. 2218 at 58-61.

Accordingly, Plaintiffs move the Court to extend all of its prior rulings in the Group A, Group B, Group C, and Group D *Daubert* Orders, *see* Dkt. 1651, 1680, 1690, 1701, 1780 (Group A), Dkt. 1910 and 1933 (Group B), Dkt. 2218 and 2290 (Group C), Dkt. 2845 and 2898, *Beal*, Dkt. 142 (Group D), to all of Defendants' Wave 1 experts who now offer (or attempt to offer) those same or substantially similar expert opinions in the Wave 1 cases.

## IV.  CONCLUSION

For these reasons, Plaintiffs respectfully request the Court grant Plaintiffs' motion.

Date:  July 21, 2022        Respectfully submitted,

*/s/ Bryan F. Aylstock*
Bryan F. Aylstock, Lead Counsel
Florida State Bar No. 078263
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel.: (850) 202-1010
baylstock@awkolaw.com

Shelley V. Hutson, Co-Lead Counsel
(Admitted Pro Hac Vice)
Texas State Bar No. 00788878
CLARK, LOVE & HUTSON, GP
440 Louisiana Street, Suite 1600
Houston, TX 77002
Tel.: (713) 757-1400
shutson@triallawfirm.com

Christopher A. Seeger, Co-Lead Counsel
(Admitted Pro Hac Vice)
New Jersey State Bar No. 042631990
SEEGER WEISS LLP
77 Water Street, 8th Floor
New York, NY 10005
Tel.: (212) 587-0700
cseeger@seegerweiss.com

**Counsel for Plaintiffs**

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B), (C)</u>

Pursuant to Local Rule 7.1(B), counsel for Plaintiffs certify that they conferred with Defendants' Remand Leadership and Special Master Adriane Theis on July 12, 2022, regarding the foregoing motion but were unable to resolve the issue with Defendants.

*/s/ Bryan F. Aylstock*

## CERTIFICATE OF COMPLIANCE
## WITH COURT'S WORD LIMIT

Pursuant to Dkt. 3072, I hereby certify that the foregoing contains 15,087 words and complies with the Court's directive that *Daubert* challenges to general experts have no more than 1,350 words per expert report (*i.e.*, the total word count for the omnibus brief is 17,550 = 1,350 words multiplied by 13, the number of challenged general expert reports). Pursuant to the parties' stipulation on June 14, 2022, Defendants consented to an additional 2,000 words to be used for the *Daubert* challenge to the joint report of Flamme, Stephenson, Tasko, and Murphy (not to exceed 3,350 words for that section of the brief).

*/s/ Bryan F. Aylstock*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 2022, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Bryan F. Aylstock*