# PX28

1

2

UNITED STATES DISTRICT COURT

3

NORTHERN DISTRICT OF FLORIDA

4

PENSACOLA DIVISION

5

- - -

6

7  _____  :
                                   : Case No. 3:19-md-2885
8  IN RE:                          :
                                   :
9  3M COMBAT ARMS EARPLUG          :
   PRODUCTS LIABILITY              :
10 LITIGATION                      : Judge M. Casey Rodgers
   _____  :
11                                 :
   This Document Relates to:       : Magistrate Judge
12                                 :
   All Wave 1 Cases                : Gary R. Jones
13 _____  :

14

15              Friday, June 24, 2022

16

17      Remote videotaped deposition of KARTHIK

   RAJASEKARAN, M.D., held at the location of the

18

   witness, commencing at 10:08 a.m., on the above

19

   date before Nancy J. Taguinot, RPR, CCR(NJ),

20

   Registered Professional Reporter and Notary Public.

21

22

                    - - -

23

24

25

```
 1             R E M O T E   A P P E A R A N C E S

 2    On behalf of the Plaintiff:

 3         CLARK, LOVE & HUTSON, PLLC
           BY:  MICHAEL MORELAND, ESQUIRE
 4         440 Louisiana Street, Suite 1700
           Houston, Texas 77002
 5         TEL:  (713)757-1400
           EMAIL:  MMoreland@triallawfirm.com
 6
      On behalf of the Defendant:
 7
           DECHERT LLP
 8         BY:  JENNA C. NEWMARK, ESQUIRE
           Three Bryant Park
 9         1095 Avenue of the Americas
           New York, New York 10036
10         TEL:  (212)698-3500
           EMAIL:  jenna.newmark@dechert.com
11

12         DECHERT, LLP
           BY:  NOAH BECKER, ESQUIRE
13              and
           STEFANIE TUBBS, ESQUIRE
14         Cira Centre
           2929 Arch Street
15         Philadelphia, Pennsylvania 19104-2808
           TEL:  (215)994-4000
16         EMAIL:  noah.becker@dechert.com
                   stefanie.tubbs@dechert.com
17

18    ALSO PRESENT:

19         JAMES VONWIEGEN, Videographer

20                       -   -   -

21

22

23

24

25
```

Karthik Rajasekaran, M.D.

```
 1          Q.     So you have had no conversations about

 2   the Combat Arms Earplugs at all?

 3          A.     That's correct.

 4          Q.     Other than you lawyers?

 5          A.     Yeah.  Even with my lawyers, most of

 6   the conversation's about just the hearing, ringing,

 7   mechanisms of hearing.  More so the medical --

 8   medical opinions about hearing.  I can't say that

 9   we really even talked about the Combat Arm

10   Earplugs.

11          Q.     If I refer to the Combat Arms Earplugs,

12   Version 2, as the Combat Arms Earplugs, can we have

13   an agreement you understand what I'm talking about?

14          A.     Yeah.  I understand what they are, yes.

15   I don't know the specifics about it, but I do

16   understand what they are.

17          Q.     Are you familiar with the concept of

18   fit when it comes to hearing protection devices?

19          A.     Could you explain?  Do you mean like

20   how to wear hearing protection?  Is that what you

21   mean?

22          Q.     Correct.

23          A.     Yes.

24          Q.     Is proper fit important for the hearing

25   protection devices to work effectively?
```

Karthik Rajasekaran, M.D.

```
 1          it, I suspect it's not going to be -- it's not

 2          going to be effective.  I don't really know

 3          how -- I mean, there's -- there's so many

 4          factors, it's hard for me to give a yes or no

 5          answer to that question.

 6   BY MR. MORELAND:

 7          Q.     Okay.  So you can't give me the opinion

 8   that if the hearing protection device does not fit

 9   appropriately in the patient, it would not work

10   effectively.  You're just not able to answer that.

11          A.     That's correct.

12                 MS. NEWMARK:  Objection.

13   BY MR. MORELAND:

14          Q.     Are you familiar with the concept of

15   seal as it's related to hearing protection device?

16                 MS. NEWMARK:  Objection.  Vague.

17                 THE WITNESS:  Yeah.  I -- my level of

18          expertise is really about hearing, ringing --

19          the fitting, I have -- I have a whole team of

20          people who are experts in that, even figuring

21          out what's the best type of hearing protection,

22          because there's multiple different types.  Not

23          every hearing protection is suitable for every

24          patient.

25                 So I'm not -- I'd be the last guy to --
```

Karthik Rajasekaran, M.D.

```
1              probably not the last guy, but I'm certainly
2              not an expert in -- in what makes the best
3              hearing device for protection or hearing
4              protection device.
5    BY MR. MORELAND:
6         Q.    And you mentioned you had a vast array
7    of team members to assist you in that.  You did not
8    discuss this litigation with them; correct?
9         A.    That's correct.
10        Q.    I assume, based on your answers thus
11   far, that you have no opinion on the merits of any
12   particular plaintiff's claim; is that true?
13        A.    I honestly haven't even seen any of the
14   claims, so I wouldn't even know what they are.
15        Q.    So can you answer my question?  You
16   would have no opinion on any --
17        A.    Yes.  I have no opinion.
18        Q.    Okay.  Thank you.
19              Do you agree with me that there may be
20   some service members that were injured as a result
21   of the Combat Arms Earplugs?
22              MS. NEWMARK:  Object to form.  Calls
23        for speculation, foundation.
24              MR. MORELAND:  Form is fine, Jenna.
25              MS. NEWMARK:  I can make -- I can
```

```
 1         specify what the objections are.

 2              MR. MORELAND:  You're an excellent

 3         coach.

 4    BY MR. MORELAND:

 5         Q.    Doctor, can you answer that question?

 6         A.    Could you repeat that question, please?

 7         Q.    Yes, sir.

 8              Do you agree with me that there may be

 9    some service members that were injured as a result

10    of the Combat Arms Earplugs?  Are you able to

11    answer that question?

12         A.    No.  I cannot answer the question.

13              MS. NEWMARK:  Objection.

14    BY MR. MORELAND:

15         Q.    Do you have any understanding of how

16    many case are pending against 3M?

17         A.    No.

18         Q.    Have you done any independent research

19    into the litigation against 3M?

20         A.    No.

21         Q.    Do you understand that there are

22    hundreds of thousands of lawsuits pending against

23    3M?

24         A.    Now that you've told me, yes; but prior

25    to you telling me, no.
```

Karthik Rajasekaran, M.D.

```
1        Q.      Okay.  And you have no opinion one way

2   or the other as to whether or not the Combat Arms

3   Earplugs could have played a role in any of these

4   service members' hearing loss; is that fair?

5        A.      Yeah.  I have no opinion.

6               MS. NEWMARK:  Objection.

7   BY MR. MORELAND:

8        Q.      Could you repeat the answer?

9        A.      I said, I have no opinion.  I don't

10   really even know where to begin.  I haven't seen

11   any of those documents.  I don't know anything

12   about them.

13       Q.      And would the same be true for

14   tinnitus?

15       A.      As it relate to these Combat Arm

16   Earplugs you mean?

17       Q.      Yes, sir.

18       A.      Yeah.  I have no opinion.

19       Q.      All right.  Now, you are obviously a

20   physician; true?

21       A.      Yes, sir.

22       Q.      And you utilize robotic surgeries in

23   your practice; correct?

24       A.      That's one of the many things, yes.

25       Q.      Okay.  Do you -- do you have
```

Karthik Rajasekaran, M.D.

```
 1          that this is a case I'm -- that they need my
 2          opinion for, then yes, then I would go.
 3   BY MR. MORELAND:
 4          Q.     Okay.  Do you intend to offer any
 5   opinions that are specific to a particular
 6   plaintiff?
 7          A.     I don't know anything about -- if that
 8   was -- if that was relevant and I saw the cases
 9   and -- I honestly don't know anything beyond
10   what -- why I'm here today.  But if -- if my team
11   said, listen, we'd like you to be a witness for
12   this particular case, and I presume then I would
13   have to review the case and understand the case and
14   then -- and they thought I would be a good fit for
15   this, then, yes.  And if I thought it was a good
16   fit, then yes.
17          Q.     Okay.  But as of right now you've not
18   been asked to evaluate any specific plaintiff's
19   claim?
20          A.     Correct.
21          Q.     Okay.  And I think you told me this
22   already, but the report that you provided your
23   lawyers in this case, that's the scope of the
24   expert testimony that you are willing to give; is
25   that true?
```

Karthik Rajasekaran, M.D.

```
 1        A.      Yes.

 2        Q.      And can we agree that your expert

 3   report opinion contains -- excuse me.  Strike that.

 4                Can we agree that your expert report

 5   contains all of your opinions as they relate to

 6   this litigation?

 7        A.      Could you say that again, please?

 8        Q.      Yes.

 9                Can we agree that the reports you've

10   given, or the report that we're going to talk about

11   here in just a minute, it's 22 pages, it's dated

12   May 11th, 2022.  Do you know what I'm talking

13   about?

14        A.      Yes.

15        Q.      Okay.  I think you maybe testified

16   earlier you have a copy of it in front of you.

17        A.      Yes.

18        Q.      Does this report contain all of the

19   opinions that you would give at trial related to

20   this litigation?

21        A.      There could be other -- other things

22   that are relevant.  I don't know what I'd be asked

23   in trial.  If -- if it's in my scope, then I would

24   discuss it.

25                This was just a broad overview of
```

Karthik Rajasekaran, M.D.

 1   hearing, tinnitus; but, you know, I'm a practicing

 2   clinician.  There are other things that may be

 3   relevant if I'm asked; and if I do have an opinion,

 4   I would -- I would offer that opinion.

 5        Q.    Let me ask you this:  Because I --

 6   that's a fair -- that's a fair answer.  And I'm not

 7   trying to be tricky.  I'm trying to understand.

 8   Because I get -- this is the only opportunity that

 9   all the plaintiffs in this litigation have to take

10   your deposition and go through your report.  Okay?

11              I'm trying to make sure that all of the

12   opinions related to this litigation that you hold

13   are contained within this report.  Does that make

14   sense?

15        A.    Right.  Yes, it makes sense.  I'm

16   saying there are other opinions too.  I mean, if

17   you're asking do I have a different opinion than

18   what I've discussed on the -- on the report?  Is

19   that what you're asking?

20        Q.    No.

21        A.    Then the answer to that question is

22   it's hard for me to answer that.  I -- you know,

23   our residency is five years.  I've tried to

24   summarize five years of training, actually, six

25   years of training in 20 pages.  So there's probably

Karthik Rajasekaran, M.D.

1   more things that I could discuss.  I just provide a

2   very, very broad overview of the things that I have

3   knowledge about as it relates to hearing and

4   tinnitus.

5       Q.    Okay.  So would it be fair for me to

6   say that you have opinions regarding the 3M

7   litigation that are not covered in this 22-page

8   report?

9           MS. NEWMARK:  Objection.  Misstatements

10          testimony.

11          THE WITNESS:  I guess I don't know

12          anything about a 3M litigation.  All I can --

13          all I can talk about is my medical knowledge on

14          hearing and tinnitus.  And if there's some

15          other question about specifics about hearing or

16          tinnitus, or any of the other main topics I

17          discuss in my report, I can still have an

18          opinion -- I didn't -- I wasn't able to write

19          everything in 22 pages.  I mean, it would be

20          like a 500-page document.

21   BY MR. MORELAND:

22       Q.    Are there any materials that you rely

23   upon other than what's included in your report in

24   coming to your conclusions?

25       A.    My clinical experience.

1    Humans make mistakes; is that fair?

2         A.    That's fair, yes.

3         Q.    Do you intend to offer an opinion on

4    the design of the Combat earplugs?

5         A.    No, sir.

6         Q.    Do you intend to offer any opinions on

7    the manufacture of the Combat earplugs?

8         A.    No.

9         Q.    Do you intend to opine on the adequacy

10   of any of the warnings that were related to the

11   Combat earplugs?

12        A.    No.

13        Q.    Have you ever, like, personally seen a

14   pair of Combat earplugs?

15        A.    No.

16        Q.    So I assume then that you've never

17   fitted a patient with them or had an audiologist of

18   yours fit a patient with them?

19        A.    The audiologists do.  That's part of my

20   team and my work flow.

21        Q.    Okay.  Has one of your audiologists

22   ever fitted a patient for Combat Arms Earplugs,

23   Version 2?

24        A.    I'd have to ask them.  I haven't really

25   discussed anything about this case with them, so I

1    wouldn't know.

2        Q.    Are you aware, sitting here today, that

3    those are no longer on the market?

4        A.    Now that you told me, yes.  I didn't

5    know.

6        Q.    Okay.  Were you aware -- are you aware

7    of the fact that the Air Force has found the Combat

8    earplugs to be defective?

9            MS. NEWMARK:  Object to form.

10        Argumentative and calls for a legal conclusion

11        and foundation.

12            THE WITNESS:  This is really outside my

13        scope.  Like I -- I'm through and through a

14        clinician.  Earplugs and technology is not

15        something that I have -- that I -- you know, I

16        have a team for that purpose.  They keep --

17        they are aware what's available, what's not,

18        what the new requirements are, et cetera, et

19        cetera.

20    BY MR. MORELAND:

21        Q.    And I appreciate that.  But my question

22    is, sitting here today, are you aware of the fact

23    that the Air Force found the Combat Arms Earplugs

24    to be defective?

25        A.    I was not aware of that.

Karthik Rajasekaran, M.D.

1    small grants that I have that's to help

2    underrepresented patients.  That's just an

3    application that I -- that's maybe two hours of

4    work and then I get money and then I use that to

5    help patients who can't pay for things.  Sometimes

6    it's hearing aids.  I don't make that

7    determination, I just have that money for people

8    who can't do it.

9           Then there's other things where I have,

10   again, research fellows or residents who use -- I

11   am the principal investigator, like, the senior

12   person.  They do it.  I help guide them to do the

13   project.

14          So it's about surrounding yourself with

15   the right team, the right resources, and then

16   making time in the day to be efficient.  So I would

17   say I'm probably very efficient in how I do things.

18   More efficient than I was five years ago, and I'm

19   still trying to be even -- even more, so.

20      Q.    What percentage of your practice is

21   related to diagnosing causes of noise-induced

22   hearing loss?

23      A.    I don't diagnose causes, but a good

24   portion of my practice is dedicated to hearing --

25   hearing loss, tinnitus, like, ear-related

Karthik Rajasekaran, M.D.

```
 1    complaints.  So any patient that -- like, part of
 2    what I do is head and neck cancer.  So as part of
 3    the comprehensive care that we provide at Penn,
 4    patients get a hearing test before they get
 5    chemotherapy.  So I have to help patients
 6    understand the implications of those hearings tests
 7    both before and after treatment.
 8              Then I -- like, about once a month or
 9    so I have a clinic where I see patients who don't
10    have good insurances.  An overwhelming part of that
11    practice is hearing-related complaints.
12              So I -- I don't go into -- I don't --
13    because there's not much that I can really help in
14    terms of why something happened.  I don't --
15    that's -- that's really not my area of expertise.
16    My area is to help them understand where they are
17    now and what we can do to help them or if we can
18    help them at all.
19              Sometimes they may -- their hearing
20    loss is profound and then I have -- like, I don't
21    do cochlear implantation.  I have one of my
22    partners do that, if they meet the criteria.  Or
23    there's -- you know, there's a whole variety of
24    causes and I help -- I help try to understand and
25    counsel patients on, like, their hearing-related
```

Karthik Rajasekaran, M.D.

```
 1   complaints.
 2        Q.     And then if I heard correctly, part of
 3   your -- part of the time you spend helping treat --
 4   helping treat patients who have hearing loss or
 5   tinnitus that are -- I think the word you used was
 6   underserved; is that correct?
 7        A.     Yes.  Like, are -- maybe that's the
 8   wrong word.  They have Medicaid insurance.  So not
 9   very good.  Like -- so one would assume they have
10   lower-paying income jobs.  Put it that way.
11        Q.     Okay.  Now, the only reason I asked is,
12   candidly, I think that's a noble cause and I'm
13   grateful that there's folks like you doing that.
14        A.     I appreciate.  Thank you.
15        Q.     All right.  So -- so -- all right.  Do
16   you -- can you give me a rough estimate of how many
17   of the patients you treat are either service
18   members or -- or veterans?
19        A.     I wouldn't know.  I honestly don't
20   know.  I don't work in the VA, so.  But, I mean --
21   I honestly don't know.
22        Q.     I guess then that's not -- probably not
23   a standard question you would ask a patient?
24        A.     No.  It doesn't matter to me.  I --
25   often the way I figure it out is they come in with
```

Karthik Rajasekaran, M.D.

1   place, and I document that too.  And then I tell

2   them, look -- you know, if I feel like they're not

3   protecting their ears or even if they are, I tell

4   them, look.  The audiologist is going to talk to

5   you more about this because there are certain

6   recommendations as to the types and things like

7   that and per noise there's certain parameters as to

8   how -- the types of earplugs and -- or hearing

9   protection.

10          And I tell them I am by far the

11   farthest from an expert on this, but they should

12   really listen to what the audiologist has to say

13   about it.

14      Q.    Okay.  So would it be fair for me to

15   say that you are not an expert in hearing

16   protection devices?

17      A.    Not in the types of devices, no.

18      Q.    And if you were to have to have -- or

19   if a patient required a more in-depth conversation

20   about a hearing protection device, you would defer

21   that to your competent audiologist team member; is

22   that fair?

23      A.    Yes.

24      Q.    I'm going to run through just a couple

25   of types of hearing protection devices and -- and I

Karthik Rajasekaran, M.D.

```
1    want you to tell me if you intend to offer any

2    opinions on each ones.  Is that okay?

3         A.    Sure.  Yes.

4         Q.    So SureFire Sonic Defenders EP3?

5         A.    No opinion.

6         Q.    Okay.  SureFire Sonic Defenders EP4?

7         A.    No opinion.

8         Q.    EP7?

9         A.    No opinion.

10        Q.    Moldex BattlePlugs?

11        A.    No opinion.

12        Q.    UltraFit?

13        A.    They all have interesting names, but I

14   have no opinion.

15        Q.    Okay.  And I think you already said

16   this, but all -- the same is true of the Combat

17   Arms Earplugs; true?

18        A.    Correct.  I have no opinion.

19        Q.    I am at a point where I'm about to

20   start going through -- I got a little bit of other

21   background, but then I'm going to get into the

22   report.  I'm happy to keep going forever,

23   actually --

24             MS. NEWMARK:  No.  We'll take a break.

25        We'll take a -- 10 minutes?
```

Karthik Rajasekaran, M.D.

```
 1        A.      I don't know.

 2        Q.      Hearing loss?

 3        A.      I don't know.

 4        Q.      Cochlear synaptopathy?

 5        A.      I don't know.

 6        Q.      Do you know whether or not 3M conducted

 7   any clinical trials relating to the safety and

 8   efficacy of the Combat Arms earplugs?

 9        A.      I don't know.

10        Q.      Do you know whether or not 3M did any

11   kind of study with safety and efficacy as end

12   points?

13             MS. NEWMARK:  Object to form.

14             THE WITNESS:  I don't know.

15             MR. MORELAND:  Okay.  I'm going to mark

16        your expert report as Exhibit 3 to the

17        deposition.

18                      -   -   -

19             (Whereupon, Exhibit 3 was marked for

20        identification.)

21                      -   -   -

22             (Whereupon, Exhibit 3 was shown on the

23        screen.)

24                      -   -   -

25   BY MR. MORELAND:
```

Karthik Rajasekaran, M.D.

```
 1        A.      Yes.

 2        Q.      Okay.

 3                You also mentioned some common

 4   medications, as you characterized them, that have

 5   ototoxic side affects.  Do you see that?

 6        A.      Yes.

 7        Q.      Okay.  Are there particular types of

 8   antibiotics that this would not be true of?  Any

 9   classes of antibiotics that this would not be true

10   of?

11        A.      It's hard to say.  We only know the

12   ones that we've -- that -- the ones we've

13   identified.  There could be ones on the market that

14   we haven't -- we don't know about that's causing

15   hearing loss.

16        Q.      Well, are there any that you know do

17   not or at least there have been -- there's been no

18   testing to prove that they have?

19        A.      I -- I don't know.

20        Q.      Okay.  With respect to vancomycin, is

21   there a body of literature that suggesting

22   vancomycin is not ototoxic?

23        A.      Not ototoxic?  I mean, they're

24   generally -- we do think it does cause ototoxicity.

25        Q.      That's not what I asked you, Doctor.
```

Karthik Rajasekaran, M.D.

```
 1                  Are you aware of any body of literature
 2     that suggests or has found that vancomycin is not
 3     ototoxic?
 4          A.     Is not?  I'm not aware.
 5          Q.     Okay.  And so you would not have
 6     considered any study that came to the conclusion
 7     that vancomycin was not ototoxic; fair?
 8                  MS. NEWMARK:  Object to form.
 9          Misstates prior testimony, foundation.
10                  THE WITNESS:  No, that's not what I
11          said.  I -- usually when coming with --
12          coming -- like, the body of the literature that
13          I usually refer to considers -- these are
14          usually, like, reviews.  They -- they look at
15          all the body.  Like, the studies that prove and
16          disprove and they provide an assessment based
17          on the literature.  So that's how I generally
18          get my opinions.
19     BY MR. MORELAND:
20          Q.     Okay.  But you told me you're unaware
21     of any literature that says vancomycin is not
22     ototoxic; right?
23          A.     Yes.  I'm unaware of that, yeah.
24          Q.     Okay.  So, I mean, I'm -- how could you
25     have considered something you were unaware of?  Is
```

Karthik Rajasekaran, M.D.

1   that -- I mean, that seems -- I'm not trying to

2   trick you.  It's an easy question.

3        A.     No, I'm saying --

4               MS. NEWMARK:  Object to form.

5               THE WITNESS:  Yeah.  I'm saying I

6        didn't go through all those papers.  There

7        could have been this paper referenced in the

8        articles that I used to make this judgment or

9        this decision and -- yes.  So I -- sometimes in

10       these articles there -- they have already

11       referenced -- they reference all the studies,

12       and I don't go through all the studies.

13              MS. NEWMARK:  Counsel, can we just take

14       a five-minute break?  I'm just going to run to

15       the restroom.

16              MR. MORELAND:  Sure.

17              MS. NEWMARK:  Okay.  We go off the

18       record.

19              THE VIDEOGRAPHER:  The time is 2:22.

20       We're off the record.

21                        -  -  -

22              (Whereupon, a recess was taken from

23       2:22 p.m. until 2:29 p.m.)

24                        -  -  -

25              THE VIDEOGRAPHER:  The time is 2:29.

Karthik Rajasekaran, M.D.

```
 1          We're back on the record.
 2   BY MR. MORELAND:
 3     Q.     We just got back from a short break.
 4   Doctor, are you ready to go?
 5     A.     Yes.
 6     Q.     Did you get an opportunity to speak
 7   with any of your lawyers during that break?
 8              MS. NEWMARK:  Objection.
 9              THE WITNESS:  Yes.
10   BY MR. MORELAND:
11     Q.     Let's talk about NSAIDs.  In your
12   practice, the patients that you treat for hearing
13   loss, how often is the hearing loss caused by
14   NSAIDs?
15     A.     No way of telling.  NSAIDs are very
16   commonly prescribed for -- like, people -- not
17   even -- I apologize.  They're not prescribed.
18   People take NSAIDs for a whole variety of things.
19   They have a headache, ibuprofen.  So there's no way
20   of being able to quantify that or make an
21   association.
22     Q.     Okay.  At what dosage level would an
23   NSAID cause hearing loss?
24     A.     Again, we don't -- we don't have that
25   data.
```

Karthik Rajasekaran, M.D.

```
1          Q.      Would the -- would the recommended

2    daily dosage cause hearing loss?

3                  MS. NEWMARK:  Objection to form.

4                  THE WITNESS:  Again, we don't know.

5    BY MR. MORELAND:

6          Q.      I mean, could I take 400 milligrams of

7    Advil after this deposition and potentially have

8    hearing loss?

9          A.      We don't know.

10         Q.      I guess I'm asking, is that possible?

11         A.      Hypothetically, yes.

12         Q.      And that would include ibuprofen and

13   aspirin?

14         A.      Yes.

15         Q.      The last sentence on page 7.  I just

16   want to make sure that I'm understanding the

17   relationship here.  Is the -- is the medication --

18   are the ototoxic medications in and of themselves

19   ototoxic or is it a progression of processing

20   through the kidneys and then the kidney disease or

21   failure can lead to hearing loss?  Does that make

22   sense?

23                 MS. NEWMARK:  Object to form.

24                 THE WITNESS:  I think I know what

25        you're asking.  But I -- I can answer how I
```

1    earplugs?

2         Q.     Correct.

3         A.     Yes.

4         Q.     And if you look at the top of page 10.

5         A.     Yes.

6         Q.     What's the first full sentence there?

7         A.     "Proper fit and training on any hearing

8    protection device is critical to ensure that the

9    devices function as designed and users are getting

10   consistent attenuation."

11        Q.     And my recollection, and correct me if

12   I'm wrong, is that you would defer to your

13   audiologist on fit; is that accurate?

14        A.     On making sure that it appropriately

15   fits, yes.

16        Q.     Okay.  And you would defer to your

17   audiologist on whether fit could impact hearing

18   loss, you would also defer to your audiologist; is

19   that correct?

20             MS. NEWMARK:  Object to form.

21        Misstates prior testimony and vague.

22             THE WITNESS:  I mean, I would -- I

23        would -- that's a -- I don't really know how to

24        answer that question.  I mean, if a -- if a

25        patient came and told me, look, this is not

Karthik Rajasekaran, M.D.

```
 1   workplace they'll often have hearing conservation
 2   programs; is that correct?
 3        A.    Yes.
 4        Q.    And which occupations are you familiar
 5   with that have conservation programs?
 6        A.    Offhand, I don't -- I don't know.
 7        Q.    Do you know whether or not the military
 8   has a conservation program?
 9        A.    I'm not sure.
10        Q.    Okay.  Let's move onto trauma-induced
11   hearing loss.  And the first cause that you have
12   listed in your report is barometric.  Do you see
13   that?
14        A.    Yes.
15        Q.    Okay.  How many patients have you
16   treated who have hearing loss due to barometric
17   trauma?
18        A.    I wouldn't know the exact number, but a
19   small percentage.
20        Q.    Is barometric trauma a common cause of
21   hearing loss in your practice?
22        A.    No.  I mean, as we talked about another
23   page, it's -- yeah, no.  It's -- it's not common.
24        Q.    Okay.  And the examples you gave were
25   during air travel; right?
```

Karthik Rajasekaran, M.D.

1        Q.      And you could have a mild TBI without

2    hearing loss; true?

3        A.      True.

4        Q.      With respect to mild TBIs, in your

5    experience, if there is hearing loss, is it

6    temporary in nature?

7        A.      Typically, yes.

8        Q.      And -- and I apologize.  I'm kind of

9    going slowly through the report, but I think

10   ultimately that's good news for everybody.

11              Let's talk briefly about hidden hearing

12   loss.  It's on page 11 at the bottom.

13       A.      Yes.

14       Q.      And do you agree that cochlear

15   synaptopathy is real?  It is something that can

16   happen to a patient?

17              MS. NEWMARK:  Object to form.  Calls

18        for speculation.

19              THE WITNESS:  That -- currently, the

20        literature does not -- it is not something I

21        treat or see in my practice.  All that I'm

22        aware of are mouse models.  So currently no, I

23        don't believe in that.

24   BY MR. MORELAND:

25       Q.      Understanding that you don't believe in

Karthik Rajasekaran, M.D.

```
 1   it, it is a diagnosis in your area of expertise; is
 2   that true?
 3        A.    It's actually not a diagnosis.  Like,
 4   there are no ICD-9 or -10 codes for that.
 5        Q.    Well, setting aside insurance, can a
 6   person be diagnosed with cochlear synaptopathy?
 7        A.    No.
 8        Q.    Okay.  If you look on page 12 at the
 9   very top, you say, "Hidden hearing loss is not a
10   widely accepted diagnosis."  Do you see that?
11        A.    Yes.
12        Q.    So I guess my question is, if it's not
13   widely accepted, is it accepted at all?
14        A.    I don't know.  I think the people doing
15   the papers, they seem to accept it.  So there's --
16   they're starting to do some research on it and
17   those people are, therefore, perhaps accepting it,
18   but -- which I why I didn't write it is not a
19   conclusive statement.
20        Q.    And that's really what I was getting
21   at, is -- in your report you say it's not a widely
22   accepted diagnosis, but you understand or you
23   appreciate that there are doctors making that
24   diagnosis; is that fair?
25        A.    I actually don't know of any doctors
```

Karthik Rajasekaran, M.D.

```
 1    making that diagnosis.  I am only aware of some
 2    people doing research on this.
 3         Q.    Okay.  Okay.
 4               Is that a topic of conversation amongst
 5    you and your colleagues?
 6         A.    No.
 7               MS. NEWMARK:  Objection.
 8               THE WITNESS:  I did not even know
 9         anything about this until I started writing
10         this report and I came across this.  It's --
11         it's in it's infancy, as far as I can tell.
12    BY MR. MORELAND:
13         Q.    Did you search PubMed for hidden
14    hearing loss?
15         A.    Yes.
16         Q.    Did you search PubMed for cochlear
17    synaptopathy?
18         A.    I may have.
19         Q.    Did you do any other type of literature
20    search for cochlear synaptopathy?
21         A.    No.
22               MS. NEWMARK:  Object to form.
23    BY MR. MORELAND:
24         Q.    Are you critical of the authors that
25    are doing the work and have found in the animal
```

Karthik Rajasekaran, M.D.

```
 1              C E R T I F I C A T E

 2

 3          I, Nancy J. Taguinot, RPR, CCR(NJ),

 4   Registered Professional Reporter and Notary Public,

 5   certify that the foregoing is a true and accurate

 6   transcript of the remote deposition of said

 7   witness, who was first duly sworn by me on the date

 8   and place hereinbefore set forth.

 9

10          I further certify that I am neither

11   attorney nor counsel for, nor related to or

12   employed by, any of the parties to the action in

13   which this remote deposition was taken, and

14   further, that I am not a relative or employee of

15   any attorney or counsel employed in this action,

16   nor am I financially interested in this case.

17

18

19

20

21

22          Nancy J. Taguinot, RPR, CCR(NJ)
            Notary Public
23

24

25
```