# PX38

John Bertelson, M.D.

```
 1                UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF FLORIDA

 2                   PENSACOLA DIVISION

 3   IN RE: 3M COMBAT ARMS       § CASE NO.:

     EARPLUG PRODUCTS LIABILITY  § 3:19-md-2885

 4   LITIGATION                  §

                                 §

 5                               §

     This Document Relates to:   § Judge M. Casey Rodgers

 6   All Wave 1 Cases            §

                                 §

 7                               §

                                 § Magistrate Judge

 8                               § Gary R. Jones

 9

10

11   ******************************************

12        REMOTE VIDEOCONFERENCED DEPOSITION OF

13             JOHN BERTELSON, M.D.

14                JUNE 24, 2022

15   ******************************************

16

17

18

19

20

21

22

23

24

25   Job No. 310339
```

John Bertelson, M.D.

```
1            REMOTE VIDEOCONFERENCED DEPOSITION OF JOHN

2   BERTELSON, M.D., produced as a witness at the

3   instance of the Plaintiffs, and remotely duly sworn

4   by agreement of all counsel, was taken in the

5   above-styled and numbered cause on June 24, 2022,

6   from 1:03 p.m. to 3:57 p.m., before Karen L. D.

7   Schoeve, RDR, CRR, RSA, reported remotely by

8   computerized machine shorthand, pursuant to the

9   Federal Rules of Civil Procedure, Pretrial Order No.

10  13, Pretrial Order No. 35, Pretrial Order No. 60,

11  and the Stipulation Regarding Expert Discovery for

12  Wave Cases, and the provisions stated on the record

13  or attached hereto.

14

15            REPORTER'S NOTE:  Please note that due to the

16  quality of a Zoom videoconference and transmission

17  of data and overspeaking causes audio distortion

18  which disrupts the process of preparing a

19  videoconference transcript.

20

21            Quotation marks are used for clarity and do

22  not necessarily reflect a direct quote.

23

24

25
```

```
 1              A P P E A R A N C E S
 2
        **********************************************
 3
                   ALL PARTIES APPEARED
 4                 REMOTELY VIA ZOOM
 5      **********************************************
 6
    FOR THE PLAINTIFFS:
 7
        JENNIFER M. HOEKSTRA, ESQUIRE
 8      AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
        17 East Main Street, Suite 200
 9      Pensacola, Florida 32502
        T: 850.202.1010
10      F: 850.916.7449
        jhoekstra@awkolaw.com
11
12  FOR DEFENDANTS 3M COMPANY, 3M OCCUPATIONAL SAFETY
    LLC, AEARO TECHNOLOGIES LLC, AEARO HOLDINGS, LLC,
13  AEARO INTERMEDIATE, LLC and AEARO, LLC:
14      DIANA CLOUGH BENTON, ESQUIRE
        KIRKLAND & ELLIS LLP
15      609 Main Street
        Houston, Texas 77002
16      D: 713.836.3461
        T: 713.836.3600
17      diana.benton@kirkland.com
18
    ALSO PRESENT:
19
20      Melissa Bardwell, Videographer
          Litigation Services
21
22  CERTIFIED STENOGRAPHIC COURT REPORTER:
23      Karen L. D. Schoeve
        Certified Realtime Reporter
24      Registered Diplomate Reporter
        Realtime Systems Administrator
25
```

John Bertelson, M.D.

```
 1                    You are an assistant professor where?

 2        A.    At UT, in Austin.

 3        Q.    And what is your current practice?

 4        A.    So I have a different practice -- oh, I'm

 5   sorry.

 6        Q.    I was going to say, what is the name of

 7   your current practice, but if you have more than

 8   one, we can identify them.

 9        A.    Yeah.  So my main office is -- is with a

10   psychiatrist, and that practice is called Senior

11   Adults Specialty Healthcare.

12        Q.    And what other practices do you

13   participate in?

14        A.    UT, and that's at the University of Texas,

15   here in Austin.  Texas Tech.  I go to Texas Tech an

16   average of one day a month.  And then -- oh, I'm

17   sorry.

18        Q.    No, no, go ahead.

19        A.    And the last one is just sort of a

20   placeholder for future clinic developments called

21   the Bertelson Clinic, but right now I don't see

22   patients outside of those three places that I just

23   mentioned.

24        Q.    Okay.  And I'm sorry.  You said you spend

25   about one day a month at Texas Tech; is that
```

John Bertelson, M.D.

1    accurate?

2         A.    That's right.

3         Q.    And does that include both teaching and

4    clinical time with patients?

5         A.    Yes.

6         Q.    And about how many days per month do you

7    spend at UT Austin?

8         A.    UT is every Tuesday.

9         Q.    So four times a week -- or four times a

10   month?

11        A.    Four to five, yeah.

12        Q.    Okay.  And is the remainder of your time

13   spent at Senior Adults Specialty?

14        A.    It is.  There's a research part of that

15   practice, and it's kind of the same entity.  So I

16   sometimes do clinical trials over there, and then I

17   spend some time doing chart review and -- just like

18   what we're doing today.

19        Q.    Okay.  How often -- or how much time do

20   you spend seeing patients at the Senior Adults

21   Specialty Clinic?

22        A.    Two and a half days a week.

23        Q.    Dr. Bertelson, are you familiar with a

24   differential diagnosis?

25        A.    Yes.

John Bertelson, M.D.

```
 1        Q.   And is that -- is that something that you
 2   perform in your normal clinical practice?
 3        A.   Yes, it is.
 4        Q.   Dr. Bertelson, you do not have any sort of
 5   degree in otology; is that accurate?
 6        A.   That's correct.
 7        Q.   In your medical training, have you ever
 8   worked in an otology clinic?
 9        A.   No.
10        Q.   So you're not intending to offer any
11   opinions today related to an otological review of
12   any information; is that accurate?
13        A.   Correct.  Only as it may overlap with
14   medicine.
15        Q.   You indicated earlier that you were
16   involved in research or clinical trials currently?
17        A.   That's correct.
18        Q.   What is that research focussed?
19        A.   The cognitive disorders.  Alzheimer's
20   disease and other cognitive disorders.
21        Q.   Would you agree with me that the majority
22   of your specialty or research focus has been in
23   Alzheimer's or dementia?
24        A.   Yes.
25        Q.   Do you have any other research special- --
```

John Bertelson, M.D.

```
 1   specializations?
 2        A.    In terms of research -- I've published a
 3   number of articles and chapters on neuroimaging.
 4        Q.    How often do you see or treat veterans or
 5   service members in your clinical practice?
 6        A.    I don't routinely see veterans or service
 7   members in practice.
 8        Q.    Have you ever been employed by the VA?
 9        A.    No.
10        Q.    Have you ever been in the military?
11        A.    No.
12        Q.    Do you have any family members in the
13   military?
14        A.    Not presently.
15        Q.    Can you explain the differential diagnosis
16   or the history of a patient approach that you take
17   in your clinical practice?
18        A.    Sure.
19              So a patient presents to the -- to the
20   office or the hospital.  We first try to determine
21   why they're coming to see me.  That's called the
22   chief complaint.  Then generally move on to the
23   history, which is a discussion of the symptoms and
24   concerns they have related to the chief complaint.
25              We gather information about past
```

John Bertelson, M.D.

```
 1          Q.   Doctor, you have never designed or

 2   manufactured hearing protection devices; is that

 3   correct?

 4          A.   That's correct.

 5          Q.   You've never consulted with anyone who's

 6   designed or manufactured hearing protection devices;

 7   is that accurate?

 8          A.   I'm sure I have not, yeah.

 9          Q.   Have you ever recommended hearing

10   protection to any of your patients in your medical

11   practice?

12          A.   I don't -- I may have.  I don't -- I don't

13   remember ever doing so, but I may have at some point

14   in my 20 years of practice.

15          Q.   Okay.  Are you familiar with the term

16   "NRR," or noise reduction rating?

17          A.   No.

18          Q.   Have you ever seen the Combat Arms

19   Version 2?

20          A.   I don't think so.

21          Q.   You've never even seen a picture of the

22   earplug?

23          A.   If I have, I don't remember ever having

24   done so.

25          Q.   Do you have an understanding of how to
```

John Bertelson, M.D.

```
 1          Q.   No.  I was going to say it says it twice,
 2     so I'm not sure if I was making that up or someone
 3     else.
 4               That was published in 2020; is that
 5     accurate?
 6          A.   That's right.
 7          Q.   And who are the individuals that you
 8     coauthored that publication with?
 9          A.   So they're all neurologists and
10     neuroimagers.  Pat Capone, I believe he's retired
11     now.  He's a neurologist in Virginia.
12               And Bela Ajtai is a neurologist in
13     Buffalo, New York, where I did my fellowship, and
14     that's where I met him.
15          Q.   Okay.  Would you agree with me that -- are
16     there any of the publications you've written
17     yourself, either peer-reviewed or the book chapters,
18     that specifically are relevant to the TBI issue that
19     you discussed in your expert report?
20          A.   Only in very limited amounts.  I believe
21     in the "Neuroimaging of Dementia" chapter, I believe
22     we talked -- I think we've got a couple pages about
23     imaging findings and finding injury that -- you
24     know, traumatic brain injury.
25               But in terms of tinnitus and hearing
```

John Bertelson, M.D.

1   loss, and directly with this litigation, I don't

2   think so.

3        Q.   Okay.  You've given a variety of invited

4   presentations, posters, and abstracts.  I'm looking

5   now at pages 7, 8, and 9 of your CV.  Do you see

6   where I'm at?

7        A.   I do.

8        Q.   Are any of those publications specifically

9   relevant to the topics discussed in your general

10  expert report?

11       A.   There may, again, be some indirect, and

12  there may be some references.  I'm sure there's

13  discussion, several of those, about brain injury and

14  imaging of brain injury.  But no, not as it were

15  pertaining to the symptoms that we're talking about

16  today, or that I believe we'll be talking about

17  today.

18       Q.   Are there any publications or

19  presentations on your CV that address specifically

20  acoustic exposure or blast exposure?

21       A.   I don't think so, no.

22       Q.   I'm looking now at Exhibit C to your

23  report.  Do you see where I'm at?  Exhibit C to your

24  disclosure, page 17 of Exhibit 2?

25       A.   I do.

John Bertelson, M.D.

```
 1        Q.   And there are no other defense expert
 2   reports listed as part of your references or
 3   material considered; is that accurate?
 4        A.   Yeah.  I don't think defense or expert
 5   reports are in there.
 6        Q.   And you're not here today to offer any
 7   opinions about the Combat Arms Version 2; is that
 8   correct?
 9        A.   Correct.
10        Q.   And you don't intend to offer any opinions
11   at trial about the Combat Arms Version 2?
12        A.   Correct.
13        Q.   And you understand that we're entitled to
14   know all of your opinions relating to the Combat
15   Arms Version 2 litigation as issued in your report?
16        A.   Yes.
17        Q.   And you would agree with me that there
18   were no opinions about 3M or 3M's conduct in your
19   report?
20        A.   Yeah, that's correct.
21        Q.   And you don't intend to offer any opinions
22   at trial about whether the Combat Arms Version 2 was
23   defectively designed?
24        A.   That would be correct.
25        Q.   And you don't intend to offer any opinion
```

John Bertelson, M.D.

1    at trial about whether soldiers used the Combat Arms

2    Version 2 properly?

3         A.    Correct.

4         Q.    And you don't intend to offer any opinion

5    at trial as to whether or not 3M properly warned

6    soldiers about the risks of using the Combat Arms

7    Version 2?

8         A.    Correct.

9         Q.    You don't intend to offer any opinions

10   about the Combat Arms Version 2 being a safe and

11   effective form of hearing protection?

12        A.    Correct.

13        Q.    You don't intend to offer any opinions as

14   to whether or not there were safer alternative

15   designs for hearing protection that soldiers could

16   have used other than the Combat Arms?

17        A.    Correct.

18        Q.    You don't intend to offer any opinions at

19   trial about whether the military has done anything

20   right or wrong in relation to the Combat Arms?

21        A.    Correct.

22        Q.    And you don't intend to offer anything at

23   trial as to whether 3M has done anything right or

24   wrong in relation to Combat Arms?

25        A.    Correct.

John Bertelson, M.D.

```
 1   to --
 2        Q.   Okay.
 3        A.   Right, so they don't necessarily align.
 4        Q.   Okay.  Is there a specific section of your
 5   report that focuses in or has the literature
 6   citations that align with your first opinion listed
 7   here on page 10 of your report?
 8        A.   Well, if I understand the question
 9   correctly, it's the first and second sections in my
10   report that would go along with that Bullet Point
11   Number 1.
12        Q.   And when you're saying "first and second
13   sections," you're referring to, "The definition of
14   traumatic brain injury (TBI) and various subtypes of
15   TBI," page 3 of your report, page 2 of the .pdf,
16   and, "The etiology of traumatic brain injury," at
17   page 3 of your report, page 4 of the .pdf.
18                  Is that accurate?
19        A.   Yeah.  But again, I really didn't use the
20   bullets at the end to align exactly with the
21   sections.  So there certainly could be an overlap
22   throughout her report, and per that information
23   supports each of those bullets.
24        Q.   Okay.  You then had Number 2 under your
25   Summary/Conclusions for your opinions.  It
```

John Bertelson, M.D.

```
 1    indicates, "Traumatic brain injury, especially mild
 2    TBI, is a common injury in servicemembers.  TBI in
 3    this population can be caused by blast and non-blast
 4    related events."
 5              Is there any specific portion of your
 6    report above that that correlates to that opinion?
 7         A.   Sure.  I can quote you a line from Section
 8    Number 2, which speaks to that, and some of that is
 9    just kind of, you know, common sense --
10         Q.   Okay.
11         A.   -- common medical knowledge.
12         Q.   Number 3 under your summary and
13    conclusions for your opinions is, "Routine head CT
14    and brain MRI are usually normal in the setting of
15    mild TBI."
16              Do you see where I'm at?
17         A.   I do.
18         Q.   Are you familiar with review of military
19    medical records?
20         A.   Am I familiar with the review of military
21    medical records?
22         Q.   Yes, sir.
23         A.   I don't know how that would be
24    fundamentally different than the review of
25    nonmilitary medical records.
```

John Bertelson, M.D.

```
 1        Q.   Okay.  Are you aware of how often members

 2   of the military undergo head CTs or brain MRIs while

 3   deployed?

 4        A.   I'm sure it depends on where they're

 5   deployed to, would speak to the access, for example,

 6   to CTs and MRIs.

 7        Q.   Do you have any opinion or understanding

 8   of how often military members receive head CTs or

 9   brain MRIs for mild TBIs?

10        A.   I don't know the frequency, and it

11   probably depends on where they're located and who

12   they're complaining -- who they're making their

13   complaints to.

14        Q.   Okay.  And I'm sorry.  In relation to

15   Opinion Number 2 -- we were in Section 2 of your

16   report -- on the bottom of page 3, page 4 of the

17   .pdf, you have a sentence here that the "United

18   States Department of Defense statics for 2009

19   indicate that at least 78 percent of the reported

20   head injuries were classified as mild."

21             Do you see where I'm at?

22        A.   I do.

23        Q.   And then you went on to reference

24   Figure 1.  Is that the figure that's at the top of

25   page 4 of your report?
```

John Bertelson, M.D.

```
 1        A.    Yes.

 2        Q.    And that is citing to the French 2010

 3   article; is that accurate?

 4        A.    That's right.

 5        Q.    And was that chart modified in any way

 6   when it was taken from the French article?

 7        A.    No, other than the size.  I cut it

 8   directly from the article.

 9        Q.    Okay.  You then went on and discussed

10   that, that number of 78 percent extrapolated to --

11   "it is likely that more than 85 percent of

12   military-related head injuries in 2009 would have

13   been classified as mild."

14              Do you see that right there?

15        A.    I do.

16        Q.    Did you extrapolate that number yourself,

17   or is that taken directly from French?

18        A.    I don't know if I did the math myself or

19   if I took that from French, but -- and I don't

20   remember exactly where that came from, but I would

21   imagine they're pretty comparable.

22        Q.    You're not intending as part of this to

23   advise the jury that all mild head injuries are the

24   same as mild TBIs; is that correct?

25        A.    Well, they -- and I'm not sure I
```

1    understand the question.  A mild -- I mean, a head

2    injury doesn't have to be a TBI.  A head injury

3    could be trauma to the scalp, to the nose, any

4    trauma to the head itself.  A TDI would be trauma to

5    the brain.

6              So they would be -- they would be

7    potentially different.

8    Q.   Okay.  Opinion Number 3 of your report

9    deals with, I guess, the mechanisms behind -- and

10   I'm sorry.  I'm going back and forth because I'm

11   trying to figure out if the headers here are your

12   opinions or if the six bullets in your

13   Summary/Conclusions are your opinions that you're

14   offering.

15   A.   I mean, everything in the report is my

16   opinion.  I don't -- I -- I summarize the -- as you

17   see there, the points that I thought were maybe

18   particularly relevant to a jury of the audience

19   reviewing my report.  Then I would consider the

20   entire document to include my opinions.

21   Q.   Okay.  You understand that a portion of

22   your report is essentially a summary of science

23   literature that's available relating to TBI,

24   correct?

25   A.   Correct.  But the whole report is a

John Bertelson, M.D.

```
 1    summary of that same information.

 2        Q.   So you're not offering any specific

 3    opinions about traumatic brain injury as it relates

 4    to the Combat Arms Earplug; is that accurate?

 5        A.   Correct.

 6        Q.   And you're not offering any opinions about

 7    traumatic brain injuries as it relates to any

 8    specific soldier; is that correct?

 9        A.   That's correct.

10        Q.   And you have no understanding of the

11    diagnostic process in the military for confirming a

12    TBI?

13        A.   No.  If I can go back to your last

14    question, though, I don't know if I may in the

15    future be asked to speak about a particular

16    individual service member, but I've not been asked

17    to do so at this time.

18        Q.   Okay.  And in relation to one of these at

19    least, you issued no case-specific reports; is that

20    accurate?

21        A.   That's correct.  That's correct.

22        Q.   So if we're looking at page 4 of your

23    report, page 5 of the .pdf, you're talking about

24    select mechanisms of injury associated with brain

25    trauma.
```

John Bertelson, M.D.

```
 1              Do you see where I'm at?
 2       A.   I do.
 3       Q.   And you state that some literature
 4  suggests that exposure to repeated low-level
 5  pressure blast waves can result in evidence of brain
 6  injury, even in the absence of a diagnosed TBI; is
 7  that accurate?
 8       A.   Yes.  I didn't see that on this page you
 9  just showed me, but that does sound accurate from
10  what I read and what I wrote.
11       Q.   Okay.  And you have a citation here for --
12  and I'm going to pronounce it incorrectly --
13  Boutte 2021.
14              Do you see where I'm at on your
15  report, on page 5 --
16       A.   Yes.
17       Q.   -- of the .pdf?
18       A.   Yes.
19       Q.   Do you have any other references or
20  sources for that opinion other than Boutte 2021?
21       A.   I don't have any other references.  I have
22  some clinical experience that's at least indirect,
23  that I'm happy to speak to.
24       Q.   And what is that clinical experience?
25       A.   So I've evaluated a number of retired NFL
```

John Bertelson, M.D.

1    football players who have reported a number of

2    concussions during their professional experience,

3    academic experience, and many report taking hits

4    that don't always produce concussive sort of

5    symptoms.  They may have kind of what I'll call

6    subconcussive injuries or a hit to the head without

7    necessarily experiencing any symptoms.

8              So I guess as I'm -- as I just spoke,

9    then, that doesn't speak to pressure blast waves or

10   serologic injury or brain injury.

11             So I'm sorry if I took on a bit of a

12   tangent.  I apologize.

13        Q.   No, that's okay.  I wanted to ask you

14   about the NFL concussion references later, anyhow.

15             You're offering an opinion that

16   there's literature supporting -- or suggesting that

17   exposure from low-level pressure blast waves can

18   cause a brain injury even in the absence of a

19   diagnosed TBI; is that accurate?

20             MS. BENTON:  Object to form.

21        A.   Yes.

22             THE WITNESS:  Sorry.

23        Q.   (BY MS. HOEKSTRA)  But you're not

24   suggesting in your report that all plaintiffs with a

25   medical history of low-level pressure blast waves

John Bertelson, M.D.

1    trying to get more information about the sentence in

2    your report that I've highlighted here, which says

3    that, "Certain chronic imaging findings, such as

4    encephalomalacia involving the temporal poles or

5    orbitofrontal structures, are relatively specific to

6    TBI."

7              Do you see where I'm at right there?

8         A.   I do.

9         Q.   What interaction do those specific imaging

10   findings have in relation to blast exposure?

11        A.   I mean, they -- those findings could be --

12   could occur whether the individual is injured in a

13   blast or not.  Those particular structures are

14   sensitive and susceptible to being injured

15   because -- and for one reason and one big reason,

16   because of the location inside the skull.  They're

17   right next to bony structures.

18              And as -- as the -- as forces are

19   imparted upon the head and the brain, as there can

20   be disruption of the brain within the skull evolves,

21   it can cause damage to those two structures, in

22   particular.

23        Q.   You also have an opinion here that, "By

24   definition, the scans of patients with concussion do

25   not demonstrate evidence of acute intracranial

1    trauma."

2              Do you see that there?

3        A.   I do.

4        Q.   You're not suggesting that all plaintiffs

5    who have been cleared of a TBI undergo some type of

6    neuroimaging to confirm a nondiagnosis, are you?

7        A.   If I understand correctly, I would say

8    that, no, I wouldn't expect that everyone who was

9    felt not to have had a TBI had a brain scan to come

10   to that determination.

11       Q.   What is the purpose of this section of

12   your report?  Are you offering an opinion that

13   individuals must undergo neuroimaging in order to

14   confirm a traumatic brain injury?

15       A.   No.  The purpose of the report -- sorry,

16   the purpose of that section is -- is to provide

17   education about -- about TBI and the most common

18   form of TBI, which is a concussion.  It isn't

19   intended to advise when a brain scan should or

20   shouldn't be done.

21       Q.   Okay.  Are you offering any opinions about

22   the relationship between hearing loss and mild

23   concussions?

24       A.   Yes.

25       Q.   Are you offering any opinions about the

John Bertelson, M.D.

```
 1   relationship between tinnitus and mild concussions?
 2       A.   Yes.  And I would clarify that it's -- the
 3   term would either be "mild TBI" or a "concussion."
 4   I don't use the term "mild" before the word
 5   "concussion."
 6       Q.   You're taking the position that a
 7   concussion is a mild TBI?
 8       A.   That's correct.
 9       Q.   Are you offering an opinion as to whether
10   there's any diagnostic tool or testing that is
11   required to confirm whether or not someone has a
12   mild TBI?
13       A.   No.  Mild TBI is usually diagnosed
14   clinically without diagnostic tests.
15       Q.   In Section 5 of your report at the top of
16   page 6, page 7 of the .pdf, you have an opinion
17   relating to, "Symptoms commonly seen following brain
18   injury."
19            Do you see where I'm at?
20       A.   I do.
21       Q.   You note that, "Symptoms such as
22   headaches, hearing loss, tinnitus, disorders of
23   taste and smell, fatigue, sleep disturbance, and
24   cognitive dysfunction can occur with varying
25   frequency due to mild, moderate, and severe brain
```

John Bertelson, M.D.

```
 1   hearing loss and tinnitus in the report.  So yes, I
 2   have.
 3        Q.   Okay.  Would you agree with me that it's
 4   difficult to attribute, to a degree of medical
 5   certainty, a TBI as a cause of any tinnitus or
 6   hearing loss symptoms unless there was specific
 7   testing done at the time of the noise exposure to
 8   diagnose an individual with a TBI?
 9             MS. BENTON:  Object to form.
10        A.   No.  And that was -- I got this -- no.
11   Can you ask the question again?
12        Q.   (BY MS. HOEKSTRA)  Would you agree with me
13   that it's difficult to attribute, to a degree of
14   medical certainty, a TBI as a cause of tinnitus or
15   hearing loss from a patient unless there was a
16   specific TBI diagnosis made at the time of the noise
17   or blast exposure?
18             MS. BENTON:  Object to form.
19        A.   No, I wouldn't agree with that.
20        Q.   (BY MS. HOEKSTRA)  In your clinical
21   practice, how often do you diagnose someone with a
22   TBI that occurred more than 10 years in the past?
23        A.   From my NFL players, I do that quite a
24   bit.
25        Q.   Okay.  What percentage of your clinical
```

John Bertelson, M.D.

```
1    practice is that?
2        A.   I'll see -- right now -- it goes in waves.
3    It comes in fits and starts.  I'm seeing right now
4    maybe -- maybe one or two a month.
5        Q.   Okay.  And of those one or two a month,
6    how many are also suffering from hearing loss or
7    tinnitus?
8        A.   So I don't ask about that, but -- and it
9    depends on their ages, of course, too.  But I can
10   tell you that tinnitus, in particular, is not an
11   uncommon symptom for football players to report, in
12   addition to their other symptoms.
13       Q.   With your NFL players, are you using an
14   MRI or a CT scan to diagnose them with a TBI that
15   occurred a decade or more in the past?
16       A.   No.
17       Q.   Are you doing any neurologic or
18   neuroimaging scans?
19       A.   When I can, I do.  And in terms of other
20   neurological tests, we will order neuropsychological
21   tests.  So there are diagnostic studies that I will
22   frequently order.
23       Q.   Are you aware of how normal it is for a
24   patient with normal hearing and no potential TBI
25   incident to have had an MRI or a CAT scan?
```

John Bertelson, M.D.

```
 1        A.   Sure.  People have MRIs or CAT scans for
 2   many reasons other than TBI.
 3        Q.   Are you offering an opinion that the only
 4   way to rule out a mild TBI as a potential factor for
 5   a patient with hearing loss or tinnitus is to
 6   undergo an MRI or a CAT scan?
 7        A.   No.
 8        Q.   What other testing could be done to rule
 9   out a TBI?
10        A.   It's difficult to rule out a TBI.  It's
11   very difficult.  Or a diagnosis of TBI is usually,
12   as I said earlier, is usually based clinically.  It
13   is hard to rely on a TBI.
14        Q.   Is it -- are you offering an opinion that
15   any individual complaining of hearing loss or
16   tinnitus who may have had a TBI incident, that that
17   is the only cause of their hearing loss or tinnitus?
18             MS. BENTON:  Object to the form.
19        A.   No, no.
20        Q.   (BY MS. HOEKSTRA)  How would you rule out
21   the TBI?
22        A.   Well, as I said, it's very difficult to
23   rule out -- are you saying rule out the TBI
24   occurred?
25        Q.   Yeah.
```

John Bertelson, M.D.

```
1        A.   It's very difficult to rule out a TBI,
2   because it's dependent on, as you saw from earlier
3   in the chapter -- or the document, it's based on the
4   mechanism of injury and the individual reporting
5   certain symptoms or being observed to demonstrate
6   certain findings in a timely manner after -- after
7   the TBI.
8             So it's -- I mean, you're very
9   dependent on what they tell you or what someone says
10  about them.  In terms of ruling it out, if they're
11  by themselves, it's very difficult sometimes to say
12  one way or the other.
13       Q.   Okay.  Would you agree with me that a mild
14  TBI does not cause sustained hearing loss and
15  tinnitus issues?
16       A.   It can.
17       Q.   Under what circumstances?
18       A.   Especially if it is recurring, TBI, if
19  there's more than one, that would be -- I would
20  consider a significant risk factor for persistent
21  symptoms across the board, persistent symptoms of
22  any sort associated with a TBI, including tinnitus
23  and hearing loss.
24       Q.   Okay.  Looking at Section 6 of your
25  report, where you're discussing the long-term
```

John Bertelson, M.D.

```
 1   opinion here in your report that, "An earlier review
 2   article suggested that the only predictor of
 3   persistent symptoms supported by consistent evidence
 4   was when compensation or litigation were factors,"
 5   from Carroll in 2004.
 6              Do you see where I'm at there?
 7       A.   I do.
 8       Q.   Are you intending to offer an opinion that
 9   plaintiffs with TBI are somehow faking the diagnosis
10   for compensation or due to litigation?
11       A.   I believe that some individuals who have
12   had a TBI are speaking to persistence of the
13   symptoms because -- either directly or indirectly as
14   a result of litigation.
15       Q.   Do you think that it's possible to fake a
16   TBI?
17       A.   Yes.
18       Q.   Okay.  You go on to say -- or have an
19   opinion here that, "Symptoms of a moderate or severe
20   brain injury are more likely to be permanent than
21   those which are caused by a single, mild TBI."
22              Do you see that there?
23       A.   I do.
24       Q.   Do you have any citation or any literature
25   in your materials considered that supports that
```

John Bertelson, M.D.

```
1    point, specifically?
2        A.   No.  But I don't think it's necessary,
3    because I think it's a pretty well-established fact.
4        Q.   But you're arguing that someone's hearing
5    loss or tinnitus could be related to a mild TBI; is
6    that accurate?
7        A.   Yes.
8        Q.   And what specific citations are you
9    relying on to support that opinion?
10       A.   Let's go down earlier -- later in the
11   article -- or in the report, and then there are
12   statements speaking to about tinnitus and hearing
13   loss as a result of the TBI.
14       Q.   You're talking about Section 7 of 8, I
15   guess, of your report; is that accurate?
16       A.   And maybe 9, too, but yeah.
17       Q.   Okay.
18       A.   Yeah, probably mostly 7 and 8.
19       Q.   Section 7 is, "Tinnitus and hearing loss
20   in the otherwise normal population."
21            Do you see where I'm at there?
22       A.   I do.
23       Q.   You offer an opinion here that, "Tinnitus
24   is an extremely common phenomenon, estimated to
25   occur transiently in about 1 in 10 adults."
```

John Bertelson, M.D.

```
 1                    THE WITNESS:  Could we take a break a
 2      minute?  I'm getting -- at least for two seconds so
 3      I could have some sips of water?
 4                    MS. HOEKSTRA:  Okay, but you can --
 5      you can have a drink whenever.  That's fine by me.
 6      You can stop whenever you want, sir.
 7                    THE WITNESS:  (Drank water.)  Thank
 8      you.
 9           Q.   (BY MS. HOEKSTRA)  Doctor, do you intend
10      to offer any opinions about what the most likely
11      causes of hearing loss are?
12           A.   No.
13           Q.   Are you intending to offer any opinions
14      about what the most likely causes of tinnitus are?
15           A.   No.  Especially not in terms of the
16      general population.
17           Q.   On page 7 of your report, page 8 of the
18      .pdf here, you list noise trauma as one of the most
19      common pathophysiological mechanisms in the
20      blast-injured population.
21                    Is that accurate?
22           A.   Yeah.  I'm looking for that.  I'm looking
23      for where you said I said that.  If you could
24      highlight it, if you don't mind?
25                    Oh, down there.  Yes, I'm sorry.
```

John Bertelson, M.D.

1    Uh-huh.

2        Q.    Sorry.  You intend to offer opinions about

3    the various pathophysiological mechanisms in the

4    blast-injured population which account for tinnitus;

5    is that accurate?

6        A.    Or which may account for tinnitus, yes.

7        Q.    Do you agree that one of those mechanisms

8    is noise trauma; is that correct?

9        A.    Yes.

10       Q.    You don't list any percentages or numbers

11   associated with noise trauma; is that correct?

12       A.    That's correct.

13       Q.    Okay.  You do offer some percentages and

14   increased risk valuation for blast exposure above.

15   Do you see where I'm highlighting up there?

16       A.    I do.

17       Q.    Is there a reason you didn't offer any

18   percentages or numbers associated with noise trauma?

19       A.    Well, because the -- Number 1, I'm not an

20   otologist.  And Number 2, I was asked to speak to

21   brain injury, in particular, and not specifically

22   noise trauma.

23             And so I was trying to focus my report

24   and statistics on things related to brain injury.

25       Q.    On page 8 of your report, you indicate

John Bertelson, M.D.

1    that -- where'd it go . . .

2                  Sorry, I'm looking for the blast

3    exposure -- that, "the most common cause of tinnitus

4    and PTSD (and TBI) in service members with combat

5    deployments is blast exposure."

6                  Do you see that there?

7         A.   I see that, yeah.  At least according to

8    that author.  But yes, I see that.

9         Q.   Are you intending to offer that opinion?

10        A.   Yeah, um -- I don't know that my personal

11   opinion would be that strong, but I was referencing

12   that article.  And in terms of -- my opinion would

13   be that -- that tinnitus and PTSD and TBI, you know,

14   are commonly seen with blast exposure.

15                 But in terms of is it the most common

16   cause, I can't speak to that definitively, because

17   I'm sure you find articles and authors who say a

18   variety of things that may have different lists and

19   different hierarchies.

20        Q.   Understood.

21                 On page 9 of your report, page 10 of

22   the .pdf, you issued an Opinion Number 4 there that,

23   "Tinnitus and hearing loss are well-known symptoms

24   of traumatic brain injury, especially TBI caused by

25   explosions."

John Bertelson, M.D.

1        A.    Yes.   That's pertaining to that reference,
2   yes.
3        Q.    Okay.   But you also go on to note that the
4   literature does not consistently identify an
5   association between PTSD and tinnitus; is that
6   accurate?
7        A.    Yes.   That was referring to another
8   author, but that's right.
9        Q.    Are you intending to offer an opinion that
10   there is consistent identification between -- sorry,
11   consistent association between PTSD and tinnitus?
12        A.    Well, it wouldn't be consistent, because
13   not every article would indicate that.   But I would
14   offer an opinion that individuals with PTSD would be
15   at a higher likelihood of reporting tinnitus.
16        Q.    So you go on to indicate that it should
17   not be unexpected that patients with PTSD would
18   likely be more bothered with tinnitus than patients
19   without PTSD.
20              Is that accurate?
21        A.    That's right.
22        Q.    But you're not suggesting somehow that
23   there's a causal effect between PTSD and tinnitus;
24   is that accurate?
25        A.    Well, I mean, I would say that PTSD would

John Bertelson, M.D.

```
 1   make someone who may have tinnitus more likely to
 2   report -- it would make them more likely to be
 3   bothered by the tinnitus, and as I mentioned in the
 4   report earlier, that some people who have -- I mean
 5   that many people have tinnitus just randomly in the
 6   normal population, and if they had PTSD, I would
 7   expect them to be more bothered by that normal
 8   baseline tinnitus than someone who didn't have PTSD.
 9        Q.   I appreciate the clarification you're
10   making about PTSD's exacerbation.  I believe my
11   initial question was that you were not intending to
12   offer an opinion that an individual's PTSD causes
13   their tinnitus.
14        A.   Correct.  I mean, I would stand by my last
15   statement.  But otherwise, I would agree with what
16   you said, yes.
17        Q.   You did indicate that there were some
18   overlapping neural networks, potentially damaged by
19   TBI, that could serve as an association between
20   tinnitus and PTSD.
21             Do you see where I'm at in your report
22   there?
23        A.   Yes.
24        Q.   Are you intending to impart an opinion
25   that overlapping neural networks damaged by TBI are
```

John Bertelson, M.D.

```
 1    the cause of an association between tinnitus and
 2    PTSD?
 3         A.   I wasn't planning on being more specific
 4    about that concept other than what I've written
 5    right there as that author's opinion.
 6         Q.   You would agree with me that tinnitus can
 7    exist separately from PTSD?
 8         A.   Yes.
 9         Q.   You would agree with me that tinnitus can
10    exist separately from a TBI?
11         A.   Yes.
12         Q.   And you would agree that there are
13    patients with tinnitus that could be wholly
14    unaffected by their PTSD?
15         A.   Well, kind of by definition, if you have
16    PTSD, you are affected by your PTSD.
17         Q.   I'm sorry.  I said that their tinnitus
18    would be unaffected by their PTSD.
19         A.   Oh.  Then if you could ask it again,
20    please, because I think I got off the subject.
21         Q.   No problem.
22              Would you further agree with me that
23    even patients with tinnitus, who also have PTSD, may
24    have tinnitus that is unaffected by their PTSD?
25         A.   Yes.
```

John Bertelson, M.D.

1   findings of any abnormality within the brain on the

2   CT or MRI.

3       Q.   And, sorry, to go back to my initial

4   question before we went there, which was that

5   Opinion 3, "Routine head CT and brain MRI are

6   usually normal in the setting of mild TBI," is there

7   a specific citation that you're relying on for that

8   outside of your 20 years of expertise and clinical

9   practice?

10      A.   And I probably should -- now that I'm

11  reading it that way, I should probably in that line

12  right there use the term "concussion" instead of

13  "mild TBI."

14              So I would suggest that as concussion

15  instead of mild TBI.  So I would make that -- I

16  would make that clarification.

17      Q.   Understood.

18              And the section that we were just

19  discussing, which had complicated versus

20  uncomplicated TBIs contained within it?

21      A.   Um-hum.

22      Q.   The only cite that I see in there is

23  Carroll 2004 -- I lost it again.

24              Is that the source that you have for

25  that position, or is there another citation that you

John Bertelson, M.D.

```
 1                    Is that correct?

 2        A.   Yes.

 3        Q.   Dr. Bertelson, are you aware if there's a

 4   cure for tinnitus?

 5        A.   I believe it would depend on what the

 6   cause of the tinnitus is.

 7        Q.   Okay.  You're aware that there's no known

 8   medical cure to repair dead hair cells in an

 9   individual's ear; is that correct?

10        A.   That would be my understanding, yes.

11        Q.   Dr. Bertelson, you do not diagnose hearing

12   loss as part of your practice; is that correct?

13        A.   I might suspect it, but I wouldn't make

14   the formal -- I mean, sometimes it's obvious.  If

15   they can't hear, you can diagnose hearing loss, but

16   otherwise, I would refer out, at least for the

17   nuances of suspected hearing loss.

18        Q.   Okay.  Is it fair to say that you do not

19   diagnose tinnitus as part of your clinical practice?

20        A.   Well, not necessarily.  I mean, tinnitus

21   is a symptom, and any physician can make a diagnosis

22   of tinnitus if a patient tells you the symptoms that

23   are associated with tinnitus.

24             I might refer out for help with

25   understanding what contributing factors might be
```

John Bertelson, M.D.

1    associated with it, but I would be comfortable

2    making a diagnosis with tinnitus.

3         Q.   Is it fair to say that your role is not

4    that of diagnosing tinnitus, generally, though?

5         A.   Not generally; that's correct.

6         Q.   You do not perform audiograms in your

7    clinical practice; is that accurate?

8         A.   That's correct.

9         Q.   How often would you say that you read --

10   either read or review audiograms as part of your

11   clinical practice?

12        A.   So I might review one or two a month, but

13   I don't create a formal read -- or formal

14   interpretation of the audiogram.

15        Q.   Okay.  Could you tell me what the

16   relationship is between audiograms that you may

17   review in a patient's medical file and your clinical

18   role in diagnosing or treating them for a TBI?

19        A.   It's -- I mean, it's one record that I

20   will get, and I do usually -- or I really would

21   always defer to the interpreting clinician as to

22   what the audiogram means.

23             But if it's part of a stack of records

24   that I get on either a clinical patient or a

25   football player, I'll look at it and -- I mean, I

```
 1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF FLORIDA
 2                  PENSACOLA DIVISION
 3   IN RE: 3M COMBAT ARMS       § CASE NO.:
     EARPLUG PRODUCTS LIABILITY  § 3:19-md-2885
 4   LITIGATION                  §
                                 §
 5                               §
     This Document Relates to:   § Judge M. Casey Rodgers
 6   All Wave 1 Cases            §
                                 §
 7                               §
                                 § Magistrate Judge
 8                               § Gary R. Jones
 9
10   ********************************************
11      REMOTE VIDEOCONFERENCED DEPOSITION OF
12             JOHN BERTELSON, M.D.
13                JUNE 24, 2022
14   ********************************************
15
16            CERTIFIED STENOGRAPHIC
17           COURT REPORTER'S CERTIFICATE
18
19       I, Karen L. D. Schoeve, Registered Diplomate
20   Reporter, Certified Realtime Reporter, and Realtime
21   Systems Administrator, residing in the State of
22   Texas, do hereby certify that the foregoing
23   proceedings were reported remotely by me and that
24   the foregoing transcript constitutes a full, true,
25   and correct transcription of my stenographic notes,
```

John Bertelson, M.D.

1  to the best of my ability and hereby certify to the

2  following:

3      By agreement of all attending attorneys, the

4  witness, JOHN BERTELSON, M.D., was remotely duly

5  sworn by the officer and that the transcript of the

6  oral deposition is a true record of the testimony

7  given by the witness;

8      That the original deposition was delivered to

9  JENNIFER M. HOEKSTRA, custodial attorney;

10     That a copy of this certificate was served on

11 all parties and/or the witness shown herein on

12 _____.

13     I further certify that pursuant to FRCP No.

14 30(f)(i) that the signature of the witness was

15 requested by the witness or a party before the

16 completion of the deposition and the signature is to

17 be returned within 30 days from date of receipt of

18 the transcript.

19     If returned, the attached Changes and

20 Signature Page contains any changes and the reasons

21 therefor.

22     That pursuant to information given to the

23 deposition officer at the time said testimony was

24 taken, the following includes counsel for all

25 parties of record:

John Bertelson, M.D.

1

2    FOR THE PLAINTIFFS:

3         JENNIFER M. HOEKSTRA, ESQUIRE
          AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
4         17 East Main Street, Suite 200
          Pensacola, Florida 32502
5         T: 850.202.1010
          F: 850.916.7449
6         jhoekstra@awkolaw.com

7

     FOR DEFENDANTS 3M COMPANY, 3M OCCUPATIONAL SAFETY
8    LLC, AEARO TECHNOLOGIES LLC, AEARO HOLDINGS, LLC,
     AEARO INTERMEDIATE, LLC and AEARO, LLC:

9

          DIANA CLOUGH BENTON, ESQUIRE
10        KIRKLAND & ELLIS LLP
          609 Main Street
11        Houston, Texas 77002
          D: 713.836.3461
12        T: 713.836.3600
          diana.benton@kirkland.com

13

14

15        I further certify that I am neither counsel

16   for, related to, nor employed by any of the parties

17   in the action in which this proceeding was taken,

18   and further that I am not financially or otherwise

19   interested in the outcome of the action.

20

21

22

23

24

25

John Bertelson, M.D.

```
 1        Subscribed and sworn to on this the 27th day
 2   of June, 2022.
 3
 4
 5
 6
 7
 8
     _____
 9   Karen L.D. Schoeve, RDR, CRR
     Realtime Systems Administrator
10   NCRA Exp. Date:  09-30-24
     Litigation Services
11   Firm Registration No. 726
     3960 Howard Hughes Parkway, Suite 700
12   Las Vegas, Nevada 89169
     T: 877.370.3777
13   F: 917.591.5672
14
15
16
17
18
19
20
21
22
23
24
25   Job No. 310339
```