# PX41

1                    UNITED STATES DISTRICT COURT

                     NORTHERN DISTRICT OF FLORIDA

2                         PENSACOLA DIVISION

3

                              - - -

4

5     IN RE:  3M COMBAT ARMS       :    CASE NO.

      EARPLUG PRODUCTS LIABILITY   :    3:19-MD-2885

6     LITIGATION                   :

      _____  :

7     This Document Relates to:    :

                                   :

8     All Wave 1 Cases             :

9

                              - - -

10

                     Tuesday, June 14, 2022

11

                              - - -

12

13          Remote videotaped stenographic deposition of

14    KENNETH D. BILLHEIMER, Au.D., conducted at the location

15    of the witness in Palm Springs, California, commencing

16    at approximately 9:03 a.m., on the above date, before

17    Rosemary Locklear, a Registered Professional Reporter,

18    Certified Realtime Reporter and California CSR (#13969).

19

20

21                              - - -

22

23

24              GOLKOW LITIGATION SERVICES

            877.370.3377 ph | 971.591.5672 Fax

25                  deps@golkow.com

```
 1    APPEARANCES:   (All appearances via remote technology)
 2
 3            AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
              BY:   DANIEL J. THORNBURGH, ESQUIRE
 4            DThornburgh@awkolaw.com
              17 East Main Street, Suite 200
 5            Pensacola, Florida 32502
              (850) 202-1010
 6            Appearing on behalf of the Plaintiffs
 7
 8            KIRKLAND & ELLIS, L.L.P.
              BY:   PAUL SAMPSON, ESQUIRE
 9            paul.sampson@kirkland.com
              60 East South Temple
10            Salt Lake City, Utah 84111
              (801) 877-8100
11                   and
              KIRKLAND & ELLIS, L.L.P.
12            BY:   F. CHADWICK MORRISS, ESQUIRE
              chad.morriss@kirkland.com
13            1301 Pennsylvania Avenue, N.W.
              Washington, DC 20004
14            (202) 389-5000
              Appearing on behalf of the Defendants
15
16
    ALSO PRESENT:
17
18
              SEAN McALEER, Video Operator
19
              BRIAN MARBUT, CourtCom, L.L.C., Trial
20            Technologist
21
22                               - - -
23
24
25
```

Kenneth D. Billheimer, Au.D.

```
 1            MR. SAMPSON:  Go ahead, Doctor.  Go ahead,
 2    Dr. Billheimer.  I object to the form.
 3            THE WITNESS:  Well, I just want to respond to
 4    that and say that I'm also a brave veteran of the U.S.
 5    Army so --
 6            MR. THORNBURGH:  Yeah.  Yeah.  But you're --
 7            THE WITNESS:  -- put that on the record.
 8    BY MR. THORNBURGH:
 9    Q.     But you're not on the side of the plaintiffs;
10    you're on the side of this corporation.
11    A.     But I'm still a brave veteran.
12           And that said, I have been retained or asked to
13    offer an opinion and this is what I've done.
14    Q.     And --
15           MR. SAMPSON:  You cut him off again a minute
16    ago.  Please be careful not to.  Let him -- let him
17    finish his answers, please.  Thank you.
18    BY MR. THORNBURGH:
19    Q.     Dr. Billheimer, you've reviewed and relied on
20    some materials in this matter; correct?
21    A.     That's correct.
22    Q.     And the materials that you relied upon are
23    materials that were provided to you by 3M or 3M's
24    lawyers.
25    A.     3M's lawyers.  That's correct.
```

1    Q.      And do you expect and hope that 3M or 3M's

2    lawyers provide you with the complete and accurate

3    picture of the full story concerning the Combat Arms and

4    problems with the Combat Arms, as known by 3M?

5            MR. SAMPSON:  Objection to form.

6    BY MR. THORNBURGH:

7    Q.      Can you answer that question, Dr. Billheimer?

8    A.      Do I have to answer the question?

9    Q.      Yeah.  So from time to time --

10   A.      Can you --

11   Q.      I'm sorry.  Just for a second.

12   A.      If you can --

13   Q.      From time to time, there may be objections.

14   Unless Mr. Sampson instructs you not to answer the

15   question, you still need to answer it subject, of

16   course, to the objection, but you still need to answer

17   the question.  Okay?

18   A.      Noted.

19   Q.      And so you relied on information, documents,

20   provided to you by 3M.

21   A.      That's correct.

22   Q.      And did you trust that 3M and 3M's lawyers were

23   providing you with the complete and accurate picture of

24   the story?

25           MR. SAMPSON:  Objection to form.

```
 1              THE WITNESS:  I can't -- I don't know how to
 2   respond to that.
 3              I was supplied with documents and I reviewed
 4   them.
 5   BY MR. THORNBURGH:
 6   Q.    Well, let me ask you this question:  In forming
 7   your opinions in this case, do you agree with me that
 8   it's important for you to have a full understanding of
 9   the testing that was done and also what 3M knew
10   internally about problems associated with its earplug?
11              MR. SAMPSON:  Objection to form.
12              THE WITNESS:  I would agree that I -- that I
13   needed the documents that were given to me.  I also did
14   my own research to ensure that in fact there wasn't
15   something that I didn't see.  I looked at other -- I
16   looked at other -- other -- just research in general.
17   So --
18              MR. THORNBURGH:  Yeah.  I don't think that was
19   my question, though.
20              THE WITNESS:  Okay.  Repeat your question,
21   please.
22   BY MR. THORNBURGH:
23   Q.    Do you agree with me that it was important in
24   forming your opinion to understand what 3M knew
25   internally concerning problems associated with its
```

```
 1   earplug?

 2   A.      No, I don't.  I don't.  I don't think that I

 3   needed to know what was internally because my review was

 4   of the literature on the Combat Arms earplug.

 5          So although I did review some internal

 6   documents, which you know; however, independent of those

 7   documents, I could come to an opinion without internal

 8   documents on research on this particular -- on the

 9   Combat Arms earplug and come up with an opinion that it

10   was effective and there was no problems with the

11   attenuation in the earplug.

12   Q.      Okay.  We're going to get to that opinion in a

13   moment, but first --

14   A.      I'm sure we will.

15   Q.      First I want to talk to you about what you

16   considered and what you didn't consider.

17          Is it fair to say that you didn't consider all

18   of the internal testing that was performed by 3M?

19   A.      I don't know that because I don't know what all

20   of the internal testing is.

21   Q.      Okay.

22   A.      I looked at the documents I was given and the

23   internal testing I was given --

24   Q.      Sure.

25   A.      -- to review.
```

1    Q.      Sure.

2            To the extent that 3M had additional internal

3    studies that were performed by it, would you have

4    expected that those internal studies be provided to you

5    by 3M or 3M's counsel?

6    A.      I don't -- I don't know how to answer that

7    question.

8    Q.      Would it --

9    A.      I'm sorry.

10   Q.      Would it matter to you at all that 3M didn't or

11   3M's counsel did not provide you with all of the

12   internal company studies that were performed on the

13   Combat Arms earplug?

14           MR. SAMPSON:  Objection to form.

15           THE WITNESS:  In that it wouldn't -- it wouldn't

16   change my opinion as I formed it, I would say I would

17   like to have had all the documents that --

18           MR. THORNBURGH:  Okay.

19   BY MR. THORNBURGH:

20   Q.      Did you --

21   A.      -- I was given.

22   Q.      Sure.  Sorry.  I thought you were done answering

23   the question.

24           MR. THORNBURGH:  Can you read back that

25   response, Madam Court Reporter.  I just want to make

```
 1              That's clear in the regulations, Army, Navy, and
 2    Air Force.
 3    Q.      Okay.  Let's talk about that just briefly,
 4    because are you suggesting to the Court or to the ladies
 5    and gentlemen of the jury that the military, including
 6    the Army, did not request REAT studies from 3M?
 7    A.      I don't know that.  I'm not saying that.
 8    Q.      Okay.
 9    A.      They may have requested it.  I'm just saying
10    that that's not the -- that's not the data they document
11    or that they use to determine whether or not there's --
12    the effectiveness of the Combat Arms earplug or any
13    other earplug, for that matter.
14    Q.      Do you --
15    A.      The regulations are clear.
16    Q.      Did you -- you did look at the -- let me ask you
17    this question first, Doctor:  You don't hold yourself
18    out as an expert in the EPA regulations, do you?
19    A.      I do not.
20    Q.      You don't hold yourself out as an expert in the
21    EPA's Noise Control Act; correct?
22    A.      I don't.
23    Q.      Have you ever performed REAT testing?
24    A.      I have.
25    Q.      Okay.  And have you -- do you hold yourself out
```

Kenneth D. Brinnehmer, Aa.D.

```
 1   as an expert in the Army's procurement policies and

 2   regulations?

 3   A.        No, I don't.

 4   Q.        So is it fair to say that you will not be

 5   offering any opinions concerning the Medical Procurement

 6   Item Description, the MPID, as well as whether or not 3M

 7   complied with those requirements, as laid out in the

 8   MPID?

 9   A.        Could you repeat that, please?

10            MR. SAMPSON:  Objection.  Form.

11            MR. THORNBURGH:  I'll break the question up in

12   two parts.

13   BY MR. THORNBURGH:

14   Q.        First, you don't hold yourself out as an expert

15   in the Medical Procurement Item Description that

16   controlled the agreement between 3M and the Army;

17   correct?

18   A.        That's correct.

19   Q.        And, therefore, you will not be offering

20   opinions at trial concerning whether or not 3M complied

21   with the MPID requirements.

22   A.        Explain to me what you mean, please.  I don't

23   understand the -- there's an acronym in there.

24   Q.        Well, I asked you whether or not you're going to

25   offer opinions concerning 3M's compliance or lack of
```

1    compliance concerning the Medical Procurement Item

2    Description that was entered into between 3M and the

3    military.

4    A.      That's correct.

5    Q.      Correct that you will not be offering that

6    opinion; right?

7    A.      Yes.

8    Q.      You're not an acoustician; correct?

9    A.      That's correct.

10   Q.      You're not an acoustical engineer?

11   A.      That's correct.

12   Q.      You don't hold yourself out as an expert in

13   acoustical engineering; correct?

14   A.      I do not.

15   Q.      Who approached you to -- in this matter to ask

16   whether or not you would serve as an expert on behalf of

17   3M?

18   A.      I don't recall who the person was who initially

19   called me.

20   Q.      How long -- when was that initial call?

21   A.      It would be approximately two months ago.  And I

22   just don't recall who it was.

23   Q.      So approximately 60 days ago somebody reached

24   out to you and asked if you'd be an expert and represent

25   3M; is that correct?

1    A.      About 60 days ago somebody reached out to me to

2    check my qualifications and asked me if I would offer an

3    opinion.  That's correct.

4    Q.      Okay.  And when did you sign an agreement with

5    3M or 3M's lawyers to act as an expert in this matter?

6    A.      I don't recall that date either.

7    Q.      Approximately, Doctor.

8    A.      Probably 50 days ago.

9    Q.      And when did you receive the first batch of

10   records from 3M's counsel or 3M?

11   A.      I don't recall that date either, but shortly

12   thereafter.  So let's say a couple of days.

13   Q.      Okay.  So fair to say that before you reviewed

14   the studies and the other materials provided to you by

15   3M, you had already agreed to be 3M's expert.  Yes or

16   no, sir?

17   A.      No, that's not correct.  It's not correct.  I --

18   that isn't correct because I did review some of the

19   documents.

20           And the reason for that, of course, is I need

21   to -- I needed to review the documents to form an

22   opinion on -- to see if I was even interested in doing

23   this.  So I did review some documents.

24   Q.      Well, I asked you, sir, when you first received

25   a call and you said 60 days ago.

```
1    A.       You did ask me that.

2    Q.       Then I asked you -- then I asked you, "When did

3    you sign the agreement to act as an expert for 3M?"

4             You said, "50 days ago."

5             Then I said, "When did you receive the first

6    batch of documents?"

7             And you said, "Shortly thereafter."

8    A.       You are correct.

9    Q.       You -- all right.

10            You understand you're under oath, too, Doctor;

11   right?

12   A.       I understand I'm under oath and I understand

13   what "under oath" means, so understand that I'm telling

14   the truth.

15   Q.       Okay.

16   A.       I erred on -- that I did not -- that I -- when I

17   said I did not look at the documents before accepting

18   the case.

19   Q.       Okay.  So if you received the first call 60 days

20   ago and then 10 days later you signed the contract,

21   approximately, how many documents did you review within

22   that ten-day period before you decided to act as an

23   expert witness?

24   A.       I don't recall.

25   Q.       Approximately.
```

Kenneth D. Billheimer, Aa.D.

```
 1   A.      I don't recall.

 2   Q.      Which documents?

 3   A.      I don't recall.

 4   Q.      Which studies?

 5   A.      I don't recall.

 6   Q.      Which internal company memos?

 7   A.      I don't recall.

 8   Q.      Is it fair to say that you did not review all of

 9   the materials that are identified on your material

10   reliance list before you -- before you agreed to be an

11   expert for 3M?

12   A.      That's fair to say.

13   Q.      Did you review the flange report before or after

14   you agreed to act as an expert witness for 3M?

15   A.      I don't recall.  I don't recall.

16   Q.      Is there something that would refresh your

17   recollection?

18   A.      Do you want to suggest something?

19   Q.      No.  I'm asking you, is there some email or

20   other source that you could go to to refresh your

21   recollection on whether or not you reviewed the flange

22   report before you signed the agreement to act as 3M's

23   expert?

24           MR. SAMPSON:  I'll just caution you here,

25   Dr. Billheimer, I'm not going to allow him to get into
```

1    be coming in.

2    Q.      What screens do you have up in front of you,

3    Dr. Billheimer?

4    A.      I have this Zoom screen.  That's it.

5    Q.      Okay.  I'm going to ask you that you communicate

6    with me and not communicate with anybody else during

7    the -- during your deposition.  Okay?

8    A.      Okay.

9    Q.      Dr. Billheimer, I understand that you -- pardon.

10   Let me ask it better.

11           When did you retire from your service?

12   A.      From military service or from --

13   Q.      Military service.

14   A.      Military service is approximately 1988.

15   Q.      And you would agree with me that would be more

16   than a decade before the Combat Arms Version 2 earplug

17   was on the market.

18   A.      That's correct.

19   Q.      Okay.  So you had no involvement with the Combat

20   Arms Version 2 earplug before your -- you had no --

21   strike that.

22           You had no involvement with the Combat Arms

23   Version 2 earplug while you were in the military.

24   A.      That's correct.

25   Q.      Have you ever used the Combat Arms Version 2

```
 1   earplug?

 2   A.      I have.

 3   Q.      Under what circumstances?

 4   A.      I tested the earplug.

 5   Q.      And when did you test the earplug?

 6   A.      I tested it about three times in the last two

 7   months under -- under varying conditions.

 8   Q.      Okay.  Let's talk about that.

 9           You didn't include any of that information

10   within your expert report; correct?

11   A.      I did not.

12   Q.      You provided no test data concerning any of the

13   two or three times that you tested the earplug within

14   the last two months; correct?

15   A.      I put the earplug in my ear.  I don't know that

16   we'll call that a test, but I had it in my ear.

17   Q.      You called that a -- you called that a test.

18   That's all I'm --

19   A.      I called it a test.

20   Q.      It's not a true test; right?

21   A.      It's not a REAT.

22           MR. SAMPSON:  Objection.  Form.

23           THE WITNESS:  It's not a REAT.

24   BY MR. THORNBURGH:

25   Q.      It's not a real-ear attenuation at threshold
```

```
 1   test; right?
 2   A.      Not at all.
 3   Q.      It didn't test attenuation; correct?
 4   A.      No.
 5   Q.      It didn't provide you with meaningful
 6   information concerning whether or not the Combat Arms
 7   earplug had any leaks that would allow sound to pass
 8   around the earplug; correct?
 9   A.      It did.
10   Q.      It provided that information?
11   A.      It did.
12   Q.      It was -- was it recorded using attenuation
13   data?
14   A.      No.
15   Q.      Okay.  So is -- to the -- is -- did your test
16   involve simply putting the earplug in your ear?
17   A.      That's correct.
18   Q.      And is the first time you put the Combat Arms
19   Version 2 earplug in your ear in the context of this
20   litigation?
21   A.      Yes.
22   Q.      Prior to this litigation, you'd never put the
23   Combat Arms Version 2 earplug in your ears; correct?
24   A.      That's correct.
25   Q.      You'd also, likewise, never put the Combat Arms
```

Kenneth D. Brinnehmer, Aa.D.

```
 1   Version -- the Combat Arms Version 2 earplug in anybody

 2   else's ears.

 3   A.      That's correct.

 4   Q.      Never observed the Combat Arms Version 2

 5   earplugs in any test subject's ears or patient's ears

 6   before this litigation; correct?

 7   A.      That's correct.

 8   Q.      I assume that it's also correct that the first

 9   time you held the Combat Arms Version 2 earplug in your

10   hands was in the context of this litigation.

11   A.      That's correct.

12   Q.      Was that before or after you signed the

13   agreement to be 3M's expert?

14   A.      It was after.

15   Q.      Did you take it apart?

16   A.      Repeat that, please.

17   Q.      Did you take the Combat Arms Version 2 earplug

18   apart?

19   A.      No, I didn't.

20   Q.      Did you record any data that you acquired within

21   the last two months after you put the Combat Arms

22   Version 2 earplug in your ear?

23   A.      No, I did not.

24   Q.      Did you make any notes or observations that you

25   codified in a memo of any kind?
```

```
 1   A.       It would have been in that instance the

 2   musicians' earplug, the Etymotic Research ER-15, ER-25

 3   with the silicone Westone mold.

 4   Q.       How many times have you performed REAT testing

 5   on different earplugs?

 6   A.       Okay.  So keep in mind that I've been practicing

 7   for 40 years.  So, conservatively, 500.

 8   Q.       You have not published any of your REAT results

 9   in any peer-reviewed article, have you?

10   A.       That's correct.

11   Q.       You've never been published on REAT results,

12   REAT testing, in any peer-reviewed article; correct?

13   A.       Specifically on REAT testing for an earplug, no.

14   Q.       That's what I asked; right?

15   A.       No.

16   Q.       Have you ever done impulse testing using a

17   manikin or ATF?

18   A.       No, I have not.

19   Q.       And you likewise have never published any

20   research concerning manikin testing or ATF testing and

21   earplugs; correct?

22   A.       That's correct.

23   Q.       In fact, in your Curriculum Vitae you identified

24   two publications during your entire career; correct?

25   A.       That's correct.
```

1    A.       Repeat the last --

2    Q.       Have you --

3    A.       -- phrase.

4    Q.       Have you ever been employed by the DOD Hearing

5    Center for Excellence?

6    A.       No.

7    Q.       Or Hearing Center of Excellence.

8    A.       No.

9    Q.       And when I say "qualified product list," do you

10   know what I'm referring to?

11   A.       No.

12   Q.       In this case, did you review and consider the

13   qualified product list in rendering any of your

14   opinions?

15   A.       No.

16   Q.       Have you ever -- do you hold any patents?

17   A.       No.

18   Q.       Have you ever designed a hearing plug?

19   A.       No.

20   Q.       Or an earplug?

21   A.       No.

22   Q.       Do you hold yourself out as an expert in the

23   design of earplugs?

24   A.       No.

25   Q.       Is it fair to say that you will not be offering

Kenneth D. Brilhmeyer, Au.B.

```
 1   answer the question is that violating that is --

 2   shouldn't be done.

 3           MR. THORNBURGH:  Right.

 4   BY MR. THORNBURGH:

 5   Q.      And --

 6   A.      I mean --

 7   Q.      -- is it -- based on my review -- there's no

 8   question pending.

 9           But based on my review of your report and your

10   materials considered, is it fair -- is it a fair

11   understanding that you did not review or consider any of

12   the depositions that were conducted of 3M's former or

13   current employees?

14   A.      That's correct.  I didn't review any of that.

15   Q.      Okay.  Did you have any discussions with any of

16   3M's current or former employees?

17   A.      No.

18   Q.      So you did not review the deposition of Elliott

19   Berger or depositions or trial testimony of Elliott

20   Berger.

21   A.      That's correct.

22   Q.      You did not review the deposition testimony of

23   Ron Kieper.

24   A.      That's correct.

25   Q.      You did not review the deposition testimony of
```

1    Brian Myers.

2    A.      That's correct.

3    Q.      Or Mr. Knauer.

4    A.      That's correct.

5    Q.      Or Mr. Hamer, Jeff Hamer?  Did you review that

6    deposition?

7    A.      No.

8    Q.      So you didn't consider any of those depositions.

9    A.      I didn't review any depositions.

10   Q.      Would you agree with me that as a military

11   audiologist for the Hearing Conservation Program, that

12   when recommending hearing protection to the soldiers who

13   you are treating or seeing or advising, that it's

14   important to know how variable an earplug might be?

15   A.      I think in the education, in the education of

16   the soldiers, which is done on an annual basis, I think

17   it's important to instruct them to properly insert the

18   earplug or the hearing protector, and during the course

19   of that discussion perhaps discuss and it would be

20   important to discuss that they're not going to get the

21   full benefit or noise attenuation if they don't place

22   the earplug as instructed during their training.

23   Q.      Did you -- do you -- how variable was the Combat

24   Arms Version 2 earplug?

25           MR. SAMPSON:  Objection.  Form.

Kenneth D. Brinnehmer, Au.D.

```
 1   BY MR. THORNBURGH:

 2   Q.      And is it fair to say that it doesn't matter to

 3   you that he testified about that?

 4   A.      Doesn't --

 5           MR. SAMPSON:  Objection.  Form.  Foundation.

 6   BY MR. THORNBURGH:

 7   Q.      Doesn't concern you?

 8   A.      I have no opinion.

 9   Q.      Are you aware that Jeff Hamer testified that

10   when 3M decided to roll back flanges on some or all of

11   the test subjects' ears in Study 213017, that that was

12   inappropriate?

13           MR. SAMPSON:  Objection.  Form.  Foundation.

14   Vague.

15           THE WITNESS:  No.

16   BY MR. THORNBURGH:

17   Q.      Do you hold yourself out as an expert, more of

18   an expert, on this type of testing than 3M, who

19   manufactured this product?

20   A.      I hold myself out as an expert.  I could

21   certainly conduct the testing that 3M did.

22   Q.      Do you --

23   A.      So I'm capable, so I think that my

24   qualifications are comparable.

25   Q.      Well, you've never actually done that testing.
```

```
 1   A.      It doesn't make any difference.

 2   Q.      Oh, it doesn't.

 3   A.      It makes absolutely no difference.

 4   Q.      Makes no difference.

 5   A.      Absolutely not.

 6   Q.      Makes no difference that 3M is the manufacturer

 7   of earplugs, yet you've never manufactured a single

 8   earplug.

 9   A.      I told you I don't manufacture earplugs.

10   Q.      And --

11   A.      You asked me that question earlier.

12   Q.      It makes no difference that 3M has conducted

13   thousands and thousands and thousands of testing under

14   3.19, yet you've never conducted a study under ANSI

15   3.19.

16           MR. SAMPSON:  Objection.  Form.  Foundation.

17           THE WITNESS:  No, not at all.  A real -- a REAT

18   test is a REAT test.  Whether you -- whether you do it

19   using four frequencies, ten frequencies, it doesn't make

20   any difference.  The application of the standard is

21   easily applied.

22           MR. THORNBURGH:  Okay.

23   BY MR. THORNBURGH:

24   Q.      Easily applied, yet you've never applied it

25   under Standard 3.19 or 12.16 [sic].
```

```
 1   A.       I have never conducted a 3.19 or a 12.6 test.

 2   Q.       Were you aware that when 3M conducted a 12.6

 3   study, the largest study that it had ever conducted,

 4   that it found that the Noise Reduction Rating was a

 5   2. -- 4.7?

 6   A.       Repeat that.

 7            MR. SAMPSON:  Objection.  Form.  Foundation.

 8            THE WITNESS:  I don't -- I didn't -- I don't

 9   think I understood what you just said.

10   BY MR. THORNBURGH:

11   Q.       Did you -- I didn't see in your reliance list

12   that you reviewed Study 213030.

13   A.       That's correct.

14   Q.       So you have no idea what Study 213030 said or

15   found.

16   A.       That's correct.

17   Q.       And to you, that's okay, that 3M's counsel or 3M

18   didn't provide that study to you.

19   A.       I -- because I don't know what it is, I can't

20   answer your question.

21   Q.       Because it was not provided to you, you are

22   unable to consider it.

23   A.       Again, not knowing what it -- what I -- I can't

24   say that I understand your question.  You're asking me

25   to comment on something I haven't seen.
```

```
 1              MR. THORNBURGH:  There was a long enough pause

 2    for me to think he was done.

 3              MR. SAMPSON:  He was talking when you started

 4    talking.  Let him answer the question.

 5              THE WITNESS:  Ask me the question again now.

 6    BY MR. THORNBURGH:

 7    Q.      The REAT testing that you claim you have done in

 8    your office did not calculate Noise Reduction Ratings.

 9    A.      That's correct.

10    Q.      So you are comparing what the label said about

11    an NRR to what your REAT analysis of a single patient

12    did or did not confirm.

13    A.      So what I was observing when I saw the hearing

14    protector was the 3.19 measurement.

15              What I would do in terms of REAT testing would

16    be a variation of the 12.6.  So, in fact, it is --

17    whether it's a -- whether it's an ANSI test or it's not

18    an ANSI test, a REAT test is still a REAT test.

19    Q.      By variation of a 12.6 you mean instead of doing

20    12 -- 20 test subjects, testing them two times, you

21    would test one subject.

22    A.      One subject --

23    Q.      That's a significant -- yeah.  Okay.

24    A.      One subject, one time.  You're correct.  Open

25    and closed thresholds.  It's still a REAT test.
```

1  not trying to be -- I'm not trying to surprise you.

2  This is -- I'm just showing you the document that you

3  didn't see.

4       You would agree with me, Dr. Billheimer, that a

5  4.4 under 12.6 Method B would not provide adequate

6  protection to soldiers who are exposed to loud military,

7  steady-state noises.

8  A.    I would agree with you that any earplug with an

9  NRR of 4.4, not just this earplug, under Method B, which

10  typically has low attenuation values, would not be

11  adequate protection for some things in the military they

12  would be exposed to.  I would agree with that.

13       I would also take that a step further and tell

14  you that the Air Force and the Navy used 12.6 Method A.

15       The Army says Method B is okay in their

16  regulations, but I can tell you from my own experience

17  in the U.S. Army the subjects are taught to put the

18  earplugs in, so you're looking at Method A testing.  So

19  this doesn't apply to the military.

20  Q.    Dr. Billheimer, did you read any of the

21  testimony of any of the individuals involved in the

22  WHISPr study?

23  A.    I didn't read the testimony.  I read the WHISPr

24  study but I --

25  Q.    Did you --

Kenneth D. Billheimer, Au.D.

```
 1  A.      -- didn't read the testimony.

 2  Q.      Did you -- did you know that Brian Hobbs and

 3  Rich McKinley testified?

 4  A.      No, I did not know that.

 5  Q.      I mean --

 6  A.      They're two of the authors.  I didn't know that.

 7  Q.      So you didn't consider the testimony provided by

 8  Brian Hobbs or Rich McKinley; right?

 9  A.      Because I didn't read it.

10  Q.      Why didn't you read it, Dr. Billheimer?

11  A.      Because I haven't seen it.  I haven't been --

12  wasn't given to me.

13          MR. THORNBURGH:  Go ahead and pull that down,

14  Mr. Marbut.

15  BY MR. THORNBURGH:

16  Q.      Does it concern you that 3M didn't provide you

17  with the testimony of the authors of the WHISPr study?

18  A.      No, not at all.

19          I looked at the WHISPr study, which is a

20  scientific experiment by a well-respected military lab.

21  I had no need to read the testimony even if they had

22  given me the testimony.

23  Q.      Do you know how many test subjects were excluded

24  from the WHISPr study because a proper fit could not be

25  achieved?
```

```
 1              MR. SAMPSON:  Objection.  Form.  Foundation.
 2              THE WITNESS:  I'm not aware of that.
 3   BY MR. THORNBURGH:
 4   Q.      Do you -- do you -- why aren't you aware of
 5   that, Dr. Billheimer?
 6   A.      It's not in the study, as I recall.
 7   Q.      Well, the authors of the study testified about
 8   it.
 9   A.      I just told you I haven't seen the testimony.
10   Q.      Wouldn't that be important information for you
11   to consider when evaluating the safety and efficacy of
12   the study -- of the earplug in terms of the WHISPr
13   study?
14   A.      Well, first of all, I don't know what they
15   testified.  So if they testified that it was an
16   effective hearing protector, and I quote, works as
17   advertised, then I wouldn't even need to see that
18   because I've read it myself.
19   Q.      Well, Mr. Bill -- Dr. Billheimer, Rich McKinley
20   did not testify to that.
21              MR. SAMPSON:  Objection.  Form.  Foundation.
22              THE WITNESS:  It doesn't -- it doesn't make any
23   difference.
24              What I -- what I just said, and maybe it wasn't
25   clear, is I read the study and the study basically shows
```

1   Q.      All right.  Did you jump on a phone after your

2   Internet went out?

3   A.      No.  No.

4   Q.      Okay.

5           MR. THORNBURGH:  Go ahead -- let's go -- so what

6   do we have marked as exhibits so far?  We've got

7   Exhibit 1 through 4; is that right?

8           MR. SAMPSON:  Through 3, I think.

9           TRIAL TECHNOLOGIST:  That's correct, 3.  Four

10  would be 131, P-GEN-131, would be the --

11          MR. THORNBURGH:  Okay.  Yeah.  All right.  Yeah.

12          Let's go ahead and mark as Exhibit 3 to the

13  deposition --

14          MR. SAMPSON:  No.  Exhibit 4, Dan.

15          MR. THORNBURGH:  Sorry.

16          -- Exhibit 4 to the deposition P-GEN-131.

17          (Exhibit Billheimer-4 was marked for

18  identification.)

19  BY MR. THORNBURGH:

20  Q.      Dr. Billheimer --

21          MR. THORNBURGH:  If we can go to Page 2,

22  Mr. Marbut.

23  BY MR. THORNBURGH:

24  Q.      Dr. Billheimer, have you reviewed Exhibit 4

25  before, before today's deposition?

```
 1   A.       Have I -- no, I have not.

 2   Q.       Okay.  So this is another document that wasn't

 3   provided to you and, therefore, not considered by you;

 4   correct?

 5   A.       That's correct.

 6   Q.       And you -- do you see on the left-hand column it

 7   has test I.D. numbers and then on the third column it

 8   has versions?

 9   A.       I do.

10   Q.       Okay.  And so I want to just talk with you about

11   Version -- the Version 2 studies that are identified on

12   this report.

13   A.       Okay.

14   Q.       You clearly haven't reviewed all of the studies

15   that are identified here on this report; is that

16   correct?

17   A.       That's correct.

18   Q.       And is there a reason why?

19   A.       Well, I was asked to review the independent

20   research documents, so I wasn't asked to.  That would be

21   the reason why.

22   Q.       Okay.  Well, if we look at this report, do you

23   see there's a Study 213015?

24   A.       I see that.

25   Q.       Okay.  And that's the study that was stopped
```

1    because there were -- there were problems with the

2    earplugs, in fitting the earplug in certain individuals'

3    ears?

4    A.      That was the study that was stopped.

5    Q.      But it was stopped due to fitting; right?

6    A.      It was the REAT measurement that was stopped.

7    Q.      Well, you understand that it was -- why it was

8    stopped?

9    A.      It was stopped --

10           MR. SAMPSON:  Objection.  Form.  Foundation.

11           THE WITNESS:  Again, some of the data was

12   variable, and it was stopped for that reason.

13           MR. THORNBURGH:  Right.

14   BY MR. THORNBURGH:

15   Q.      And you understand -- did you review the flange

16   report?

17   A.      I did.

18   Q.      And is it your understanding that one of the

19   reasons why it was so variable was it was difficult for

20   the experimenter to fit the earplug in certain

21   individual ears?

22   A.      I don't recall that note being made in -- made

23   on this 015.

24   Q.      Do you recall that the reason why it was stopped

25   was -- and the reason why there were fitting issues was

1    because, number one, it was too short to fit?

2          MR. SAMPSON:  Objection.  Form.  Foundation.

3          THE WITNESS:  I'm not sure -- I'm not sure that

4    this study was stopped for that reason.

5          The study was stopped because of the variable,

6    looking at what was the cause of the variability in the

7    measurements.

8    BY MR. THORNBURGH:

9    Q.    But you understand from looking at the flange

10   report that one of the reasons why they couldn't get a

11   proper fit was because the earplug was too short.

12   A.    Improper --

13         MR. SAMPSON:  Objection.  Form.  Foundation.

14         Sorry.

15         Objection.  Form.  Foundation.

16         THE WITNESS:  It was -- it was -- I did read

17   that.

18         MR. THORNBURGH:  Okay.

19   BY MR. THORNBURGH:

20   Q.    And do you understand that it was stopped

21   because the result of an 11 was quite low?

22         MR. SAMPSON:  Objection.  Form.  Foundation.

23         THE WITNESS:  I'm sorry.  Repeat that, please.

24   BY MR. THORNBURGH:

25   Q.    Do you have an understanding that one of the

Kenneth D. Brinnehmer, Ph.D.

1  reasons why it was also stopped was because the result

2  of an 11 NRR was quite low?

3        MR. SAMPSON:  Objection.  Form.  Foundation.

4        THE WITNESS:  It was stopped because the data

5  was variable.

6        At the time the study was stopped, I sincerely

7  doubt that the NRR had been calculated because they were

8  collecting raw data from REAT measurements.

9  BY MR. THORNBURGH:

10 Q.     Did you not -- did you not -- did you -- you

11 didn't -- you don't have an understanding that they were

12 calculating the NRR as the study was progressing?

13 A.     I don't know how you could calculate the

14 study -- the NRR until the data is collected.

15 Q.     As a scientist, you should wait until the data

16 is collected to calculate the NRR; right?

17 A.     Not necessarily.  No, not at all.

18 Q.     Sure.

19        Do you see that there are -- with respect to the

20 closed end of the studies, there are about five studies

21 that were conducted internally?

22 A.     In reference to the closed?  I don't know what

23 those studies are.  I see numbers there but -- I'm

24 assuming those are Combat Arms earplugs because you're

25 telling me.  I don't know what those studies are because

Kenneth D. Brinnehner, Aa.B.

```
 1   A.       Yes.  Because of the decibel scale, yes.

 2   Q.       Yeah.  And so what's the difference in

 3   protection between an earplug that provides a 21 versus

 4   one that provides an NRR of a 16?

 5   A.       It's a significant increase.

 6   Q.       So it's a --

 7   A.       It's a --

 8   Q.       It's a significant difference in protection from

 9   a 21 to a 16.  I won't ask you to do the math because I

10   know it's not easy, but it's a significant difference.

11   A.       It is.

12   Q.       And how does this document -- why did you rely

13   on this document and what are you going to testify at

14   trial concerning this document, if anything?

15           MR. SAMPSON:  Objection.  Form.

16           THE WITNESS:  I don't know why TGN's data was

17   not included, so I would need more information.

18           It's perfectly -- you can exclude data.  They

19   disclosed it.  I can't answer your question because I

20   don't know.

21           MR. THORNBURGH:  Well, that wasn't my question.

22   BY MR. THORNBURGH:

23   Q.       My question was, why is this on your reliance

24   list, number one?

25   A.       I don't know.  I can't answer that question.  I
```

1    don't know why it's on my reliance list.

2    Q.      And, number two, what are you going to testify

3    at trial concerning this Study 512 and this Exhibit 5,

4    D-GEN-270, at trial?

5            MR. SAMPSON:  Objection.  Form.

6    BY MR. THORNBURGH:

7    Q.      If anything.

8    A.      I'm sorry?

9    Q.      If anything.  I don't know that you're going to

10   offer an opinion about this.  That's why I'm asking the

11   question.

12   A.      I won't offer anything about it because there's

13   not enough information here.

14   Q.      Okay.  You do see that while it was reported to

15   be a 21 NRR in Exhibit 4, with TGN's data included, the

16   NRR was a 16.

17   A.      I see that.

18           I guess what I'm not seeing is why TGN's data

19   was not included.

20   Q.      Well, did you ask defense counsel to provide you

21   with documentation and tell you why TGN's data was

22   not --

23   A.      I did not.

24   Q.      Why not?

25   A.      Can't answer your question.  I don't know why I

1  would not.

2  Q.    Why don't -- why can't you answer my question?

3  This is on your reliance list.

4  A.    Because I don't have an answer for your

5  question.

6  Q.    Why not?

7  A.    I would ask you -- I just told you I don't have

8  an answer for your question.

9  Q.    Why didn't you ask 3M's counsel or 3M for

10  information concerning why TGN's data was not included?

11  A.    If you tell me why TGN's data was included now,

12  maybe I can give you an answer.

13  Q.    Doctor, would you agree with me that, in terms

14  of labeling, it's inappropriate to inflate, erroneously

15  inflate, NRR results?

16        MR. SAMPSON:  Objection.  Vague.

17        THE WITNESS:  To erroneously and deceptively.

18  BY MR. THORNBURGH:

19  Q.    And --

20  A.    Yes.

21  Q.    -- you would agree with me that to erroneously

22  or deceptively inflate NRR results, that could place

23  patients or consumers, rather, at risk of suffering

24  needless harm.

25        MR. SAMPSON:  Objection.  Foundation.

Kenneth D. Brinnehmer, Aa.D.

```
 1              THE WITNESS:  It would show the consumer a
 2    reduced NRR.
 3    BY MR. THORNBURGH:
 4    Q.      Well, but by being deceptive about the true NRR
 5    value, that could place people at risk of suffering
 6    harm; right?
 7              MR. SAMPSON:  Objection.  Foundation.
 8              THE WITNESS:  It would -- it depends on what
 9    they were exposed to.
10    BY MR. THORNBURGH:
11    Q.      Well, let's say they were being exposed to a
12    large, steady-state noise above 85 decibels for greater
13    than eight hours.
14    A.      How far above 85?
15    Q.      Anything above 85.
16    A.      It could be -- could be effective.
17    Q.      It could also place that person at risk of
18    suffering an injury.
19    A.      A 16 NRR could, depending upon the sound
20    pressure.  You're right.
21    Q.      And by inflating, deceptively inflating, NRR
22    values, that could place people, consumers, including
23    our service members who are exposed routinely to loud
24    noises, at risk of suffering harm.
25              MR. SAMPSON:  Objection.  Foundation.
```

Kenneth D. Billheimer, Au.D.

```
1   Q.      All right.  And ten years before the Combat Arms
2   was -- more than ten years before the Combat Arms was
3   introduced and sold to the military.
4   A.      That's correct.
5   Q.      Dr. Billheimer, this was not on your reliance
6   list and so I assume you've never seen this document?
7   A.      That's correct.
8   Q.      Did you have any understanding that the
9   Department of Army Criminal Investigation Command
10  investigated whether or not 3M had provided the Army
11  with the 3.19 study that was Study 015, which was
12  stopped prematurely?
13  A.      Not aware of that.
14  Q.      You didn't know that?
15  A.      I'm not aware of this document.
16  Q.      Huh.
17          You testified a moment ago that 3.19 studies
18  don't matter to the Army, and so I want to -- I want to
19  direct your attention --
20  A.      I didn't -- I didn't say that.  I didn't say
21  that they don't matter; I said the Army uses 12.6.
22  Q.      Okay.  So you're not saying that 3.19 labeling
23  studies by manufacturers are not important to the Army.
24  A.      I'm not saying that they're not important to the
25  Army; I'm saying that they don't use it as their
```

1   standard.

2   Q.      Okay.  You see that this Number 1 says,

3   "Offense:  31 USC 3729," a Civil False Claims Act?

4   A.      I see that.

5   Q.      Okay.  Were you aware that there was a Civil

6   False Claims Act brought and investigated by the Army?

7   A.      I was not.

8           MR. SAMPSON:  Objection.  Foundation.

9   BY MR. THORNBURGH:

10  Q.      You -- were you aware that this investigation

11  began in 2016?

12  A.      No.

13          MR. SAMPSON:  Objection.  Form.  Foundation.

14  BY MR. THORNBURGH:

15  Q.      Not aware?

16  A.      No, not aware.

17  Q.      And do you see that the -- again, the date is

18  December 13th, 2018.  You see that; right?

19  A.      Yes, I do.

20          MR. THORNBURGH:  And, Mr. Marbut, if you scroll

21  down to the next page and highlight and pull that out.

22  BY MR. THORNBURGH:

23  Q.      You see that it says [as read], "During the

24  course of this investigation, numerous interviews and

25  record reviews were conducted reference" -- let me start

```
1    over.
2            "During the course of this investigation,
3    numerous interviews and record reviews were conducted
4    reference the testing results and contracting process.
5    Interviews of US Government personnel confirmed that had
6    they known about the February 2000 test results (i.e.
7    that the CAE was too short for proper insertion in
8    users' ears and, therefore, did not perform well in
9    individuals) on the CAE, they may not have purchased the
10   items."
11           You see that?
12   A.      I do.
13   Q.      And, again, this is 2018, after all of those
14   what you call independent studies that you rely on to
15   support your opinion that the project was safe and
16   effective; right?
17   A.      This is -- repeat your question.  I'm sorry.
18   Q.      This is -- this is a document that was created
19   during this investigation or following this
20   investigation that postdates all of the independent
21   studies that you rely on.
22   A.      I would say yes.
23   Q.      Okay.
24           MR. THORNBURGH:  And, Mr. Marbut, if you could
25   pull up -- give me one second -- P-GEN-2586.
```

```
 1   BY MR. THORNBURGH:

 2   Q.      You talked about the Air Force a moment ago and

 3   their standards.

 4           Do you see that this document is dated

 5   July 30th, 2019?

 6   A.      I do.

 7   Q.      Well after all of those results --

 8   A.      Right.

 9   Q.      -- independent studies, that you state the Air

10   Force conducted and which form the basis of your opinion

11   that the product was safe and effective?

12   A.      Is there -- I'm sorry.  Was there a question

13   there?  I --

14   Q.      Yeah.  This is well after the studies that you

15   rely on to support your opinion.

16   A.      Yes.

17   Q.      And if you go to the first paragraph -- well,

18   first off, you see it says [as read], "Memorandum, civil

19   personnel.  Subject," you see the subject line?

20   A.      I do.

21   Q.      [As read]  "Removal of 3M Dual-Ended Combat

22   Earplugs from Inventory; National Item Number (NIIN),"

23   and it has the NIIN number?

24   A.      I see that.

25   Q.      Okay.  And it goes on to say -- why don't you go
```

1    ahead and read the next paragraph for me.

2    A.      [As read]  "Please verify with all shops on

3    Hearing Conservation Program and all shops that use

4    hearing protection that any 3M Dual-Protected Combat Arm

5    earplugs are not being used for hearing protection

6    purposes.  These earplugs were found to be defective.

7    The Air Force stopped purchasing these items from 3M in

8    2016, however inventory may remain."

9    Q.      Doctor, this was not on your reliance list

10   either so is it fair to say that this is another

11   document you didn't consider?

12   A.      It wasn't on my reliance list.

13   Q.      Did you know about this document?

14   A.      I did not.

15   Q.      Does it concern you that 3M's counsel failed to

16   provide this document to you --

17   A.      Not --

18   Q.      -- for your consideration?

19   A.      Not with the information you've just given me,

20   these earplugs were found to be defective.  By who?

21   Q.      Well --

22   A.      There's not enough information here for me to

23   draw any conclusions based on what you've just shown me.

24   Q.      Did you read the depositions of any of the Army

25   personnel who were deposed in this matter?

1          Do you see that?

2    A.    Yes.

3    Q.    And you identify in this section some of the

4    REAT testing that you relied on as the basis or -- which

5    helped form the basis of your opinion; right?

6    A.    That's correct.

7    Q.    And one of the studies you identify is a study

8    by Dr. Kevin Michael.

9    A.    That's correct.

10   Q.    And, Dr. Billheimer, did you read Dr. Michael's

11   deposition from 2015?

12   A.    I have not.

13   Q.    Did you read the protocol that was followed by

14   Dr. Michael in this 2012 REAT testing that you rely on?

15   A.    I read the standard.

16   Q.    Okay.  Do you know -- that wasn't my question.

17         My question was, did you read Dr. Michael's

18   protocol for the study?

19   A.    I don't recall.  If I had it as a document, the

20   answer to that question is yes.  If I didn't have it a

21   document, I did not.

22   Q.    Other than the report, there's no protocol

23   that's attached or identified in your reliance list.

24   A.    Okay.  Then I didn't read it.

25   Q.    So you didn't consider Dr. Michael's deposition

```
 1   and you also didn't consider the study protocol;

 2   correct?

 3   A.      The study protocol, we're talking about the --

 4   Q.      That --

 5   A.      -- testing of the Combat Arms earplug.

 6   Q.      The testing that was undertaken by Dr. Michael.

 7   A.      Right.  Using ANSI 3.19.

 8   Q.      Well, did you -- did you read the protocol that

 9   Dr. Michael followed, not the ANSI standard, but the

10   protocol --

11   A.      I did not.

12   Q.      -- that he actually followed?

13   A.      I did not.  The reference was ANSI 3.19.

14   Q.      Okay.  Do you know what Dr. Michael did with

15   data that was highly variable?

16   A.      I didn't read the report.

17   Q.      Do you know what Dr. Michael did with respect to

18   excluding test subjects whose data was highly variable?

19   A.      I didn't read the report.

20   Q.      Okay.  So is it fair to say, then, that you

21   didn't know that, to the extent that a test subject's

22   test data was highly variable, that that test subject

23   was excluded from the study?

24   A.       It's fair to say that the study was done using

25   ANSI 3 -- S3.19 and the NRR was 23.
```

 1    participants, you're reducing your ability to identify

 2    variability.

 3            MR. SAMPSON:  Objection.  Form.

 4            THE WITNESS:  Yes.

 5            MR. SAMPSON:  Vague.

 6    BY MR. THORNBURGH:

 7    Q.      And the Abel study also didn't calculate the

 8    NRR; correct?

 9    A.      Again, it's a Canadian study and they don't use

10    that calculation.

11    Q.      That wasn't my question.

12            My question was, they didn't -- they did not

13    calculate the NRR.

14    A.      No, they did not.

15    Q.      Did you calculate the NRR?

16    A.      I did not.

17    Q.      Why not?  You're an American doctor.

18    A.      I didn't calculate the NRR -- I looked at the

19    study and I looked at the purpose of the study.  I

20    looked at the raw data.

21            The study was to determine gender differences

22    and if there were variations in attenuation on multiple

23    fittings.

24    Q.      Okay.  And -- but you didn't calculate the NRR.

25    A.      I did not.

1   Q.      You could have; right?

2   A.      I could have.

3   Q.      You didn't.

4   A.      I did not.

5   Q.      Who helped edit this paper, Dr. Billheimer?

6   A.      I'm sorry.  Repeat that.

7   Q.      Who helped edit this publication?

8   A.      There are two.

9           MR. SAMPSON:  Objection.

10          THE WITNESS:  There's Dr. Abel and Dr. Quan Lam.

11  BY MR. THORNBURGH:

12  Q.      Who else helped edit this paper?

13  A.      Pull it down to the end because --

14          MR. SAMPSON:  Objection.  Form.

15          Hold on a second.  Hold on.  Hold on, Doctor.

16  Let me object and then you can answer.

17          Objection.  Form.  Mischaracterization.

18  BY MR. THORNBURGH:

19  Q.      Can you answer the question?

20  A.      If you show me the bottom of this paper, I'll

21  answer your question.

22  Q.      Sitting here right now, do you know the answer

23  to the question?

24  A.      You're putting the word "edit" in there.

25  Q.      Did you help -- did --

1    A.      And I don't think anywhere is the word "edit,"

2    so I think you're putting words in my mouth, or want to.

3    Q.      I didn't.  I just asked you the question.

4    A.      Ask me the question again.

5    Q.      Do you know who may have -- who else may have

6    helped edit this paper?

7    A.      I don't know --

8            MR. SAMPSON:  Objection.  Characterization.

9            THE WITNESS:  I don't know that anybody helped

10   edit this paper.

11   BY MR. THORNBURGH:

12   Q.      Well, did you read the --

13   A.      So the answer is no.

14   Q.      Did you read the testimony of Elliott Berger?

15           MR. SAMPSON:  Asked and answered I think like 15

16   times.

17   BY MR. THORNBURGH:

18   Q.      To find the answer to this question?

19   A.      I did not read the testimony of Mr. Elliott

20   Berger.

21           MR. THORNBURGH:  Mr. Marbut, if you'd turn to

22   Page 4 of Exhibit 10.

23   BY MR. THORNBURGH:

24   Q.      You see this Table III?

25   A.      Table III.  I do.

```
 1  Q.      Are you aware that 50 percent of the test

 2  subjects felt that the Combat Arms earplug was either

 3  very uncomfortable or uncomfortable?

 4  A.      I read the data.

 5  Q.      So you're aware that 50 percent of the test

 6  subjects felt like -- felt that the Combat Arms

 7  Version 2 earplug was either very uncomfortable or

 8  uncomfortable.

 9  A.      Let me look at the percentage.  I'm aware that

10  it occurred.

11          Very uncomfortable.

12  Q.      And go over to the total.

13  A.      Yes.  Yes, I see that.

14  Q.      If you -- yeah.

15          You agree that in terms of earplugs, comfort is

16  an important issue that should be considered when

17  designing an earplug.

18  A.      I agree.

19  Q.      And are you aware that more than 50 percent of

20  the study participants found that they either wouldn't

21  wear these earplugs or would wear them for less than an

22  hour?

23  A.      Yes.

24          MR. THORNBURGH:  And if you turn to next page,

25  Mr. Marbut, Page 5 of Exhibit 10.
```

```
 1   A.      I did.  I've read the whole report.

 2   Q.      And what was the recommendation of -- by Johnson

 3   Blast or, sorry, by Dan Johnson and the other

 4   individuals involved in the study?

 5   A.      I just don't recall.  I've read the entire study

 6   but I -- several times.  I don't recall what the final

 7   recommendations were, with the exception of moving the

 8   filter in the study because it was towards the end and

 9   more towards what would be the middle.

10           MR. THORNBURGH:  Mr. Marbut, if you could turn

11   to 140.

12   BY MR. THORNBURGH:

13   Q.      Let me ask you this question:  How many test

14   subjects were tested using the French Number 1 plug?

15   A.      To the best of my recollection, it started out

16   at 27.

17   Q.      How many completed the study on the French

18   Number 1 plug?

19   A.      Four.

20   Q.      And --

21   A.      All -- completed all levels of the study.

22           MR. THORNBURGH:  And if we turn to Page 144,

23   Mr. Marbut.

24   BY MR. THORNBURGH:

25   Q.      Do you see it says, "not enough subjects" -- on
```

1  the second paragraph, "not enough subjects were exposed

2  to provide a definitive answer"?

3  A.      I see that.

4          MR. SAMPSON:  Oh, there it is.  Yeah.

5  BY MR. THORNBURGH:

6  Q.      And do you agree that -- with the conclusion

7  here that there were not enough studies or study

8  subjects involved in this study who were exposed to the

9  impulse noises to provide a definitive answer concerning

10 the protective -- the ability of the French Number 1

11 filter to or the ISL filter to be protective?

12 A.      I'll agree with it's not enough subjects were

13 exposed to provide a definitive answer, period.  I'll

14 agree with what it says.

15 Q.      And if we turn to your expert report, number

16 one, you don't -- you don't -- you didn't identify that

17 statement or that conclusion in your expert report, did

18 you?

19 A.      I did not.

20 Q.      And if we turn back to Page 10 of your expert

21 report, you include some data on Page 10.

22         Do you see that?

23 A.      I do.

24 Q.      And do you see that, if we look at the line

25 showing 100 shots for the French Number 1 plug --

```
 1              I don't know -- I don't know the answer to that
 2     question nor do I think you know it.
 3     Q.      I think I've talked to a lot of soldiers who
 4     have told me how many rounds they fire at a firing
 5     range.
 6              Dr. Billheimer --
 7              MR. SAMPSON:  Are you -- are you testifying,
 8     Dan?
 9     BY MR. THORNBURGH:
10     Q.      Dr. Billheimer -- Dr. Billheimer --
11              MR. THORNBURGH:  I got your objection.
12     BY MR. THORNBURGH:
13     Q.      Dr. Billheimer, did you ever -- have you ever
14     deployed?
15     A.      No.
16     Q.      Were you ever in combat?
17     A.      No.
18     Q.      Any -- ever observe soldiers who are training up
19     to go into combat in Iraq or Afghanistan?
20     A.      No.
21     Q.      Ever sit on the firing range and observe
22     soldiers training up for war?
23     A.      Yes.
24     Q.      Okay.  Under what circumstance?
25     A.      I was in the military on the firing range, not
```

1    Q.      So I'll represent to you that the lab notes as

2    it relates to the 015 study have not been produced to us

3    in this litigation, and I did not see lab notes for 015

4    in your materials considered.

5    A.      Okay.  Then I have not reviewed it.

6    Q.      Okay.  As a scientist, you understand that

7    conducting, when you're conducting testing of this

8    nature, that lab notes should be kept and maintained in

9    the ordinary course of business.

10   A.      Yes.

11   Q.      It would be inappropriate to intentionally purge

12   lab notes with respect to lab studies that are

13   conducted, from a scientific perspective.

14   A.      And what you're referring to as a lab note is a

15   written note, memo?

16   Q.      Yeah.

17   A.      Yes.  I --

18   Q.      Memorial -- sure.

19   A.      I agree.

20   Q.      Kept -- which are kept -- you know how it's

21   done; right, Doctor?

22           Notes are kept contemporaneously with the study

23   concerning test subjects and the results of those test

24   subjects; right?

25   A.      Yes.  I just wanted to be clear on what you're

Kenneth D. Brillhart, Aa.D.

1    asking.  That's correct.

2    Q.      And you agree that best practices, scientific

3    practices, require that a company maintain -- well,

4    number one, keep and maintain lab notes.

5           MR. SAMPSON:  Objection.  Form.  Foundation.

6           THE WITNESS:  Yes, I agree with you.

7    BY MR. THORNBURGH:

8    Q.      And you would agree with me it would be

9    inappropriate for a company who -- to intentionally

10   purge its lab notes with respect to studies it performed

11   in order to --

12          MR. SAMPSON:  Objection to form.

13          I'm sorry.

14   BY MR. THORNBURGH:

15   Q.      -- in order to keep things confidential?

16          MR. SAMPSON:  Sorry, Dan.

17          Objection.  Form.  Foundation.

18          THE WITNESS:  Repeat the question, please.  I'm

19   not sure that I --

20   BY MR. THORNBURGH:

21   Q.      It would be inappropriate for any -- for any

22   scientist or company to purge its lab notes.

23   A.      Yes.

24          MR. SAMPSON:  Same objections.

25

1    BY MR. THORNBURGH:

2    Q.      And did you ask 3M to provide you with the lab

3    notebook as it relates to or the lab notes as it related

4    to Study 015?

5           MR. SAMPSON:  Objection.  Foundation -- form.

6    Foundation.

7           THE WITNESS:  As it relates to Study 015, is

8    this correct?  Is this --

9           MR. THORNBURGH:  Yes.  The study in front of

10   you.

11          THE WITNESS:  I did not.

12   BY MR. THORNBURGH:

13   Q.      In any regard, when you reviewed the data from

14   Study 213015, you agree with me that the data showed

15   highly variable results.

16   A.      The data shows variability, yes.

17   Q.      And you would -- you wouldn't recommend an

18   earplug -- when you were in the Army, you wouldn't

19   recommend an earplug -- strike that.  Let me ask a

20   better question.

21          You wouldn't recommend an earplug to any of your

22   patients today that had an NRR of 11 and that high

23   variability if that patient was going to be routinely

24   exposed to loud, steady-state or impulse noises; right?

25          MR. SAMPSON:  Objection.  Asked and answered, I

1   believe.

2          THE WITNESS:  No.

3   BY MR. THORNBURGH:

4   Q.      Like if this was the only data that you had, you

5   wouldn't, based on this data, recommend this earplug to

6   your patient if that patient was going to be exposed to

7   loud, routinely exposed to loud, steady-state and

8   impulse noises; right?

9          MR. SAMPSON:  Objection.  Form.  Foundation.

10          THE WITNESS:  With an NRR of 10.9, no.

11   BY MR. THORNBURGH:

12   Q.      Did you look at -- did you know that when the

13   green side of the Combat Arms Version 2 earplug was

14   being tested in Study 213015, that there was another

15   study that was happening contemporaneously with it

16   called Study 213016 of the yellow end of the Combat Arms

17   Version 2 earplug?

18   A.      I'm aware of both studies.

19   Q.      You're aware that they were happening at the

20   same time, aren't you?

21   A.      Not aware of that.

22          MR. THORNBURGH:  Well, Mr. Marbut, can you pull

23   up D-GEN-1568 and put it side by side with Exhibit 17.

24          We'll mark D-GEN-1568 as Exhibit 18.

25          MR. SAMPSON:  The last one was 18, I think, or

```
 1   one soldier's -- or sorry -- more than one test

 2   subject's flanges were folded back.

 3           MR. SAMPSON:  Objection.  Form.  Foundation.

 4           THE WITNESS:  Ears are plural, yes.  Correct.

 5   BY MR. THORNBURGH:

 6   Q.      Well, it's not talking about plural ears; it's

 7   talking about subjects, plural.

 8   A.      That's correct.

 9   Q.      So more than one test subject; right?

10   A.      It would suggest that.

11           MR. SAMPSON:  Objection.  Form.  Foundation.

12   BY MR. THORNBURGH:

13   Q.      It goes on to say, "The folded-back flanges and

14   the hard plastic stem provided a long, stiff, quasi-stem

15   for the experimenter to grasp and allowed for a deeper

16   and more consistent fit of the solid plugs" --

17           Plural; right?

18   A.      Yes.

19   Q.      -- "for test 213017"; right?

20   A.      Yes.

21   Q.      "When folded back in that way, the yellow

22   flanges" --

23           Plural; right?

24   A.      Correct.

25   Q.      -- "neither touched the subjects'" --
```

```
 1              Plural; right?

 2    A.        Yes.

 3    Q.        -- "conchae nor compromised the fit of the solid

 4    earplugs," plural; right?

 5    A.        That's correct.

 6    Q.        Certainly, this suggests to you, does it not,

 7    that potentially more than one test subject had the

 8    flanges folded back during Study 213017?

 9              MR. SAMPSON:  Objection.  Form.  Foundation.

10              THE WITNESS:  I didn't write the memo.  It's

11    plural, so that's the suggestion.

12    BY MR. THORNBURGH:

13    Q.        That's how you would interpret it; right?

14    A.        Yes.

15    Q.        That would be a reasonable interpretation, based

16    on the language that's used in this memo.

17              MR. SAMPSON:  Objection.  Foundation.

18              THE WITNESS:  Again, subjects is plural so I

19    think it's pretty obvious.

20    BY MR. THORNBURGH:

21    Q.        It goes on to say, "Table 1" -- well, Doctor,

22    let me ask you this question:  Do you agree that it

23    would be inappropriate for 3M to manipulate a study in

24    order to get the test results they wanted?

25    A.        I think it would be --
```

Kenneth D. Brinnehmer, Aa.D.

```
 1          MR. SAMPSON:  Objection.

 2          Hold on.

 3          Objection to form.  Foundation.

 4          Now go ahead.  Sorry.

 5          THE WITNESS:  Can I answer?

 6          MR. THORNBURGH:  Yes.

 7          MR. SAMPSON:  Yeah.  Yeah.

 8          THE WITNESS:  Yes.

 9  BY MR. THORNBURGH:

10  Q.     It goes on to say, "Table 1 and 2 of the" --

11  strike that.

12          It goes on to say, "The initial" -- this is the

13  third sentence in the last paragraph under "Results."

14          "The initial test 213015" --

15          MR. SAMPSON:  Can you blow that up?  Sorry.

16          MR. THORNBURGH:  Yeah.  I'm sorry.  I'm not even

17  looking at it because I can't read it.

18          And I'm not doing that on purpose, Doctor.

19          MR. SAMPSON:  No.  No.  You're good.

20          Oh, I see where you are.  I didn't --

21  BY MR. THORNBURGH:

22  Q.     [As read]  "The initial test 213015 was stopped

23  after eight subjects because the individual results were

24  variable and the NRR was quite low (11).  Ten subjects

25  were tested in 213017.  The means from the test are from
```

1   .6 to 4.5 dB higher at all test frequencies and the

2   standard deviations are .6 to 4.9 dB lower than those

3   test -- of test 015."

4          Did I read that reasonably well?

5   A.     Yes.

6   Q.     The two standard deviation NRR obtained from the

7   test is 22 dB; right?

8   A.     That's correct.

9   Q.     How many -- but is the -- is the 22 in Test 017,

10  that only -- that result only occurred because some --

11  because -- let me strike that.  Let me ask a better

12  question.

13         The 22 was achieved by 3M by folding back one or

14  more of the test subjects' flanges; right?

15  A.     The flanges were folded back because it aided

16  the experimenter in placing the earplug into the

17  subjects' ear.  That seems intuitive to me.

18         So the earplug was properly placed into the ear

19  with the flange folded back, which yielded the data from

20  017 that I'm looking at right now, an NRR of 22.

21  Q.     Yeah.  And so I think I -- I still wanted you to

22  answer the question I asked.

23  A.     Ask me the question again, please.

24  Q.     The 22 was achieved by 3M by folding back the

25  flanges on one or more of the test subjects in Study

1    017.

2    A.      That's what the report said.

3    Q.      And you're okay with that.

4    A.      I'm definitely okay with that.

5    Q.      And --

6    A.      There are -- there are two things here.

7    Q.      There's not a -- there's not a question pending,

8    Doctor.

9    A.      Oh, sorry.

10          MR. SAMPSON:  Well, it -- was it in response to

11   the previous question, I guess?  If it was, then I think

12   you should have the opportunity to answer.

13          MR. THORNBURGH:  No.  He answered the question.

14          MR. SAMPSON:  I know, but were you -- were you

15   elaborating on your answer, Doctor?

16          THE WITNESS:  No.

17          MR. SAMPSON:  Okay.

18          I relent, then.

19          MR. THORNBURGH:  Sometimes it just makes it

20   easy, Paul.

21          I'm going to show you two more exhibits really

22   quick, Doctor, and then I'll be done.

23          Let's go to P-GEN-11 -- I'm sorry -- P-GEN-122.

24   I'm sorry.  That's not right.

25          P-GEN-1175.

```
 1   STATE OF CALIFORNIA            )

 2   COUNTY OF LOS ANGELES          )

 3            I, ROSEMARY LOCKLEAR, a Certified Shorthand

 4   Reporter of the State of California, duly authorized to

 5   administer oaths pursuant to Section 2025 of the

 6   California Code of Civil Procedure, do hereby certify

 7   that

 8            KENNETH D. BILLHEIMER, Au.D., the witness in

 9   the foregoing deposition, was by me duly remotely sworn

10   to testify the truth, the whole truth and nothing but

11   the truth in the within-entitled cause; that said

12   testimony of said witness was stenographically reported

13   by me, a disinterested person, and was thereafter

14   transcribed under my direction into typewriting and is a

15   true and correct transcription of said proceedings, to

16   the best of my ability.

17            I DO FURTHER CERTIFY that I am neither a

18   relative nor employee nor attorney nor counsel of any of

19   the parties to this action, and that I am neither a

20   relative nor employee of such attorney or counsel, and

21   that I am not financially interested in the action.

22

23

24   ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969

25   Dated:  June 17, 2022
```