# PX48

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF FLORIDA

3                    PENSACOLA DIVISION

4    ************************

5    IN RE:  3M COMBAT ARMS       Case No.

     EARPLUG PRODUCTS             3:19-md-2885

6    LIABILITY LITIGATION

                                  Judge M. Casey

7    This Document Relates        Rodgers

     to:

8                                 Magistrate Judge

     All Wave 1 Cases             Gary R. Jones

9

     ************************

10

11

12          Remote via Zoom Videotaped

13   Deposition of JENNIFER TUFTS, Ph.D., held

14   at the location of the deponent, commencing at

15   9:04 a.m., on the 23rd of June, 2022, before

16   Maureen O'Connor Pollard, Registered

17   Diplomate Reporter, Realtime Systems

18   Administrator, Certified Shorthand Reporter,

19   Notary Public.

20

21                  – – –

22

            GOLKOW LITIGATION SERVICES

23      877.370.3377 ph | 917.591.5672 fax

               deps@golkow.com

24

```
 1   APPEARANCES:
 2
     AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
 3   BY:   DANIEL THORNBURGH, ESQ.
           17 East Main Street, Suite 200
 4         Pensacola, Florida 32502
           850-202-1010
 5         dthornburgh@awkolaw.com
           Representing the Plaintiffs
 6
 7   KIRKLAND & ELLIS LLP
     BY:   F. CHADWICK MORRISS, ESQ.
 8         1301 Pennsylvania Avenue, NW
           Washington, DC 20004
 9         202-389-5996
           chad.morriss@kirkland.com
10         Representing the Defendant and
           the Deponent
11
12   KIRKLAND & ELLIS LLP
     BY:   COLE CARTER, ESQ.
13         300 North LaSalle
           Chicago, Illinois 60654
14         312-862-1951
           cole.carter@kirkland.com
15         Representing the Defendant and
           the Deponent
16
17
     Also Present:
18
           Brian Marbut, Document Tech
19
           Danny Ortega, Videographer
20
21
22
23
24
```

Jennifer Tufts, Ph.D.

1          A.     I did that for three years, and

2     then had seen patients as part of my training

3     before that.

4          Q.     Are you a doctor of audiology?

5          A.     An Au.D., no.

6          Q.     So you're not a doctor of

7     audiology, correct?

8          A.     I'm a Ph.D., not an Au.D.,

9     which is -- if I'm understanding you

10    correctly, then you're referring to the Au.D.

11    degree, and I don't have that degree.

12         Q.     You understood me perfectly.

13         A.     Okay.

14         Q.     You don't hold yourself out as

15    an expert in EPA regulations, correct?

16         A.     In EPA regulations?

17         Q.     Right.

18         A.     No.

19         Q.     You don't hold yourself out as

20    an expert in the Noise Control Act, correct?

21         A.     No, I don't hold legal

22    opinions.

23         Q.     You don't -- well, you

24    qualified that.

1    report?

2          A.     Yes.

3          Q.     Have you ever worked as a

4    consultant for 3M outside of this litigation?

5          A.     No, I haven't.

6          Q.     Have you ever worked as a

7    consultant for any earplug or hearing

8    protection device manufacturer?

9                 MR. MORRISS:  Daniel, is that

10          limited to litigation or just in

11          general?

12                MR. THORNBURGH:  I'm sorry,

13          outside of this litigation.

14                THE WITNESS:  Outside of this

15          litigation have I consulted for other

16          hearing protection companies?

17    BY MR. THORNBURGH:

18          Q.     Yes.

19          A.     No.

20          Q.     Have you -- outside of this

21    litigation, have you ever performed labeling

22    studies under ANSI S3.19 on behalf of a

23    manufacturer?

24          A.     I've not done labeling studies.

1    Q.    Have you ever done a labeling

2    study under ANSI S3.19?

3    A.    Not a labeling study.

4    Q.    Have you ever on behalf of a

5    manufacturer -- strike that.  Let me ask a

6    better question.

7          On behalf of a manufacturer,

8    have you ever conducted -- and what I mean by

9    "on behalf," at a manufacturer's request have

10   you ever conducted any REAT study using

11   either method, 3.19 or 12.16 -- sorry 12.6?

12   A.    Not for the purposes of

13   evaluating a noise reduction rating or

14   anything of that nature.  I have done

15   retests.

16   Q.    And we'll talk about that in a

17   few moments.

18          MR. THORNBURGH:  Mr. Marbut, if

19   you could pull back up Exhibit 1, please.

20          Go back to -- Mr. Marbut, go

21   back to the schedule.

22   Q.    Number 7 asks for "Any

23   communications between you and counsel for

24   the Defendants, to the extent that such

Jennifer Tuers, Ph.D.

1    materials, including, but not limited to,

2    protocols, notes, minutes, data, memorandum

3    or reports concerning any testing on the

4    Combat Arms Version 2" earplug, you know, as

5    examples of that types of testing, "(REAT

6    testing), conducted by or on behalf of" you.

7            Have you done any REAT testing

8    ever on the Combat Arms Version 2 earplug?

9        A.    No, I haven't.

10       Q.    And is it fair to say that you

11   were not asked to perform REAT testing on the

12   Combat Arms Version 2 earplug in your role as

13   an expert for 3M?

14       A.    That's correct.

15            MR. THORNBURGH:  Mr. Marbut,

16       pull down -- I just want to see the...

17       Q.    Number 9 asks for All

18   materials, including notes, reports or

19   memorandum, detailing any conversation you

20   have had with 3M or Aearo employees or

21   consultants.

22            I know that you've known some

23   individuals at 3M for quite some time and

24   you've communicated with those individuals

1    more than two years ago, is that fair?

2         A.    Yes.

3         Q.    And when did you sign the

4    retainer agreement to be an expert in this

5    case?

6         A.    I'd have to look back at my

7    records.

8         Q.    Can you give me an approximate

9    date?

10        A.    I wouldn't want to give you the

11   wrong date, so --

12        Q.    Was it 2020, 2021, 2022?  What

13   year was it approximately?

14        A.    Guessing, 2019.

15        Q.    Okay.  So you -- it's your

16   belief that you -- so is it fair to say based

17   on that response that you spoke with somebody

18   at 3M, so one of the law firms that

19   represents 3M, back in 2019 to be an expert

20   in this litigation and signed a retainer

21   agreement back in 2019?

22        A.    To the best of my recollection.

23        Q.    Okay.  And am I correct that

24   the first expert report that you issued in

1  this litigation is the expert report that you

2  have in your possession which we'll -- or has

3  been marked as Exhibit Number 2?

4      A.    The expert report, if in fact

5  that's Exhibit 2, then yes.

6      Q.    Why is it that several year --

7  or three or so years later after you were

8  first retained that you first drafted or

9  issued an expert report?

10          MR. MORRISS:  Let me just

11      object.

12          Anything that requires her to,

13      you know, reveal communications with

14      counsel would be objectionable, and I

15      would ask her not to respond, but --

16  BY MR. THORNBURGH:

17      Q.    And I'm not asking for any

18  communications you've had with 3M's counsel,

19  I'm just asking why is it -- why is it

20  that -- to the extent you can answer the

21  question without revealing those

22  communications, why is it that three years

23  later you're finally for the first time

24  issuing an opinion and expert report?

1            MR. MORRISS:  That's my point.
2       Her communications would be with
3       counsel in that interim.
4            So, Jen, you can answer the
5       question as long as it doesn't have
6       you reveal any communications with us.
7            So that if the only explanation
8       you can give is based on a
9       conversation with me or Nick or other
10      lawyers at Kirkland, then you
11      shouldn't answer it.  If you've got
12      some other answer that doesn't involve
13      a communication with one of us, then
14      you can respond.
15           THE WITNESS:  So the answer is
16      I don't know.
17  BY MR. THORNBURGH:
18      Q.    Okay.
19           MR. MORRISS:  That's generally
20      what happens; the lawyers do a lot of
21      talking and the witness just has the
22      answers.
23  BY MR. THORNBURGH:
24      Q.    Do you -- as part of your

Jennifer Paris, Ph.D.

1    expert report you have an Exhibit A, which

2    are materials that you reviewed as part of

3    your rendering an opinion in this case,

4    correct?

5          A.     Yes.

6          Q.     And there are some documents,

7    some of which are 3M Company documents, that

8    are identified in that Exhibit A to your

9    report, correct?

10         A.     Yes.

11         Q.     And is it true that you relied

12   on 3M's lawyers to provide you with relevant

13   internal company documents?

14               MR. MORRISS:  Object to form.

15               THE WITNESS:  Yes.

16   BY MR. THORNBURGH:

17         Q.     And is it fair to say that you

18   did not consider any internal company

19   documents that were not produced to you by

20   3M's counsel?

21         A.     That's correct.

22         Q.     And to the extent that you were

23   not provided with certain internal company

24   documents, you therefore could not rely on

Jennifer Pierce, Ph.D.

1    those internal company documents, right?

2         A.    If I haven't seen a document, I

3    can't rely on it.

4         Q.    So you did not consider any

5    internal company document that's not provided

6    and identified on Exhibit A of your expert

7    report, correct?

8         A.    To the extent that this is

9    comprehensive, yes.

10            Can you repeat the question so

11   I can make sure I answered it correctly?

12        Q.    Yes.

13            The question was, you did not

14   consider any internal company document that

15   was not provided to you and, therefore, is

16   not identified in your report or as part of

17   Exhibit A to your report, right?

18        A.    Right.

19        Q.    When did you first receive

20   those documents?

21        A.    I'd have to look back and see

22   when that was, but -- so my report is dated

23   May 11th, I believe, so it would probably

24   have been in April.

Jennifer Pierce, Ph.D.

```
 1    witness for -- strike that.
 2              When did you -- is it -- with
 3    respect to the documents identified in your
 4    report or identified in your materials list,
 5    were all of those documents provided to you
 6    by 3M's counsel?
 7         A.    Yes.
 8         Q.    And would all of those
 9    documents -- both the internal documents and
10    those that aren't internal documents, those
11    would have been provided to you also in April
12    of 2022, right?
13         A.    Again, to the extent that my
14    recollection is correct that it was April.
15         Q.    So all -- just so the record is
16    clear, it's your testimony, based on your
17    recollection, that all of the
18    materials/documents identified in your
19    May 2022 expert report or on the Exhibit A to
20    your expert report, those were all provided
21    to you, number one, by 3M or 3M's counsel,
22    and provided to you this year in April of
23    2022?
24         A.    Yes.
```

```
 1            Q.    So it's fair, then, for me to
 2   say that you agreed to be an expert witness
 3   for 3M, signed a retainer agreement with 3M's
 4   counsel before you ever reviewed any of the
 5   materials or documents identified in your
 6   expert report and on your reliance list?
 7            A.    Yes.
 8                  MR. MORRISS:  Objection.
 9   BY MR. THORNBURGH:
10            Q.    I got an objection so I just
11   want to make sure I ask that question
12   cleanly.
13                  It's your testimony that you
14   didn't review the materials identified in
15   your expert report or on Exhibit A of your
16   expert report until after you were retained
17   by 3M's counsel, correct?
18            A.    It's possible that I ran across
19   the 40-501 pamphlet just in the course of,
20   you know, my normal work.  But in terms of
21   any other documents that weren't already, you
22   know, publicly available, no.
23                  MR. THORNBURGH:  Mr. Marbut,
24         can you pull up Exhibit Number 2,
```

1    you just described of putting earplugs in

2    your -- these earplugs in your ears.

3         A.    Not this time.

4         Q.    Have you ever gone to the

5    firing range and shot guns with the Combat

6    Arms Version 2 earplugs in your ears?

7         A.    No, it wasn't Version 2.

8         Q.    So it's fair to say that you

9    have never shot a gun at a range with

10   Version 2 Combat Arms earplug in your ears?

11        A.    That's fair.

12        Q.    And when you said that you put

13   the Combat Arms in your ears a decade ago,

14   was it Version 2, or was it a different

15   version?

16        A.    It would have been -- again,

17   when I say "a decade ago," you know, it was a

18   while ago.  It probably would have been

19   Versions 2 and 3.

20        Q.    And was that -- Version 2 and

21   Version 3 that you put in your ear, did you

22   do that at the same time?

23        A.    I honestly can't remember.

24        Q.    Did you do that with Elliott

1          A.     I'll say I can't remember.

2     It's been so long.

3          Q.     When was the last time you shot

4     a gun recreationally?

5          A.     Probably 25 years ago.  I mean,

6     that's approximate.  It's been a long time,

7     put it that way.

8                MR. THORNBURGH:  Mr. Marbut, if

9          you could pull up the Rule 26 expert

10         disclosure for Dr. Tufts, and we'll

11         mark that as Exhibit Number 3.

12                   -      -      -

13              (Whereupon, Tufts Exhibit

14         Number 3 was marked for

15         identification.)

16                   -      -      -

17    BY MR. THORNBURGH:

18         Q.     Dr. Tufts, I'll represent to

19    you this is a -- what we call defendants'

20    disclosure of your -- you as an expert

21    witness in this case.

22                Have you seen this before?

23         A.     Disclosure of -- I'm not

24    recalling it right now, but I may have.

1          Q.     And your Ph.D. from

2     Pennsylvania State University as well, right?

3          A.     That's correct.

4          Q.     And you received that in 2001?

5          A.     That's correct.

6          Q.     You worked at Michael's lab for

7     a period of time, correct?

8          A.     Yes.

9          Q.     When did you work for Michael's

10    lab?  I think it's on the last page of your

11    curriculum vitae, page 16.  1999 to 2001?

12         A.     Yes.

13         Q.     And you state on your CV that

14    while you were at Michael's -- or Michael &

15    Associates, Inc., you "evaluated real-ear

16    attenuation at threshold according to ANSI

17    S3.19 and ANSI S12.6-1997 for commercial

18    hearing protection devices."

19                Did I read that correctly?

20         A.     Yes.

21         Q.     And when you were with Michael

22    lab, what was your role?

23         A.     My role was as a lab assistant,

24    and I also participated in some test panels.

1          And so I'm pretty sure I was a

2    test panel subject for some S3.19 tests, but

3    I wouldn't recall what the devices were.

4          Q.    And was that Kevin Michael?

5          A.    Yes.

6          Q.    And so do you know what the

7    protocol was at Michael & Associates,

8    Incorporated for selecting test subjects for

9    ANSI S3.19 labeling studies?

10         A.    I don't know what his policy

11   was or how he developed the test panels.

12         Q.    And are you telling the ladies

13   and gentlemen of the jury and the Court that

14   regardless of his protocols for choosing test

15   subjects, you as an employee of the lab would

16   from time to time be a test subject in ANSI

17   S3.19 labeling studies?

18         A.    Probably.  The timeline is

19   fuzzy to me, it's just been -- it's been so

20   long.  But, you know, I wouldn't have been

21   able to be a test subject in any tests I

22   conducted or vice-versa.

23         Q.    Was it Michael & Associates'

24   policy to allow employees or family members

1    of employees of the lab to be test subjects

2    on labeling studies it was conducting on

3    behalf of manufacturers of hearing protection

4    devices?

5         A.    Well, again, I'm not sure what

6    his policies were or how he developed his

7    test panels.

8         Q.    But you were an employee and

9    also test subject in some ANSI labeling

10   studies, right?

11        A.    Well, again, the timeline is --

12   you know, it's hard for me to say if all of

13   my test subject participation was over by the

14   time I was a lab assistant or whether I

15   continued to participate in some tests.  So

16   yeah, I mean, it's hard for me to say.

17        Q.    Were you ever a test subject

18   for any studies done by Michael's lab

19   regarding the Combat Arms Version 2 earplug?

20        A.    I wouldn't recall that.

21        Q.    Do you know if 3M's Classic

22   E.A.R. foamy product -- do you know what I

23   mean by that name?

24        A.    Yes, I do.

Jennifer Parks, Ph.D.

```
 1    recruiting test subjects or developing the
 2    test panel, so, you know, it's kind of fuzzy
 3    on who walked into the lab to be tested.
 4         Q.    Outside of Michael's lab, when
 5    else have you conducted ANSI 3.19 labeling
 6    studies?
 7         A.    I haven't conducted any studies
 8    for the purpose of labeling hearing
 9    protection devices.
10         Q.    Does that include Michael &
11    Associates?
12         A.    I understood the question to be
13    outside of with Michael & Associates.
14         Q.    Sorry, I just wasn't -- yeah,
15    that was my question, but did you also do --
16    did you do or conduct labeling studies while
17    you were at Michael's?
18         A.    I'm not sure whether the data
19    that I collected was used in, you know --
20    whether it culminated in an NRR that went on
21    a hearing protector package.  I know that's
22    what he's in the business of doing, and I was
23    conducting some of the tests.  But I don't
24    know what he necessarily -- you know, what
```

Jennifer Tufts, Ph.D.

1    happened after the data were collected.

2         Q.    Were you the fitter of the

3    earplugs in these labeling studies conducted

4    at Michael & Associates?

5         A.    So again, my recollection is

6    fuzzy from that time ago, but I would have

7    been following the stipulations of S3.19 and

8    S12.6.

9         Q.    That wasn't my question.

10             My question was, when you were

11   employed at Michael & Associates from 1999 to

12   2001, would you insert the earplugs as the

13   experimenter into test subjects' ears while

14   conducting labeling tests?

15        A.    If that was what the particular

16   test protocol called for.

17        Q.    Do you have a recollection of

18   whether or not you did that?

19        A.    If the test protocol called for

20   it, then I would have done that.

21        Q.    Do you have a specific

22   recollection of ever being the fitter of

23   earplugs in an ANSI S3.19 labeling study?

24        A.    As I said, my memory regarding

Jennifer Pintar, Ph.D.

```
 1    the details of what I was doing at Michael,

 2    you know, the testing, is fuzzy.  But if I

 3    was doing an S3.19 test, then I would have

 4    been following the stipulations in that

 5    document.

 6         Q.    After you left Michael &

 7    Associates, did you have involvement as the

 8    tester in any ANSI 12.6 studies?

 9         A.    For labeling purposes, do you

10    mean?

11         Q.    No.  Because I said 12.6, so

12    I'm not talking about labeling.

13         A.    Okay.  Can you repeat the

14    question then?

15         Q.    Yes.

16               After you left Michael &

17    Associates, what experience, if any, did you

18    have as a tester in ANSI 12.6 testing?

19         A.    I've conducted studies using

20    12.6 or modifications of 12.6.

21         Q.    How many studies have you

22    conducted using a non-modified 12.6 REAT

23    test?

24         A.    I'd have to look at the
```

Jennifer Pierce, Ph.D.

1    REAT test per ANSI S3.19 or 12.6 where you

2    then calculated out the NRR?

3              MR. MORRISS:  Object to form.

4    BY MR. THORNBURGH:

5         Q.    Correct?

6         A.    I've not performed an S3.19

7    labeling study where I calculated the NRR.

8    I've performed S12.6 or modified tests, but

9    have not calculated the NRR related to those

10   data.

11        Q.    Thank you.

12              After you left Michael &

13   Associates, did you work for any labs that

14   were NVLAP accredited?

15        A.    No.

16        Q.    Okay.  I want to turn to your

17   report.  And if we turn to page 3, you have a

18   section concerning REAT testing.

19        A.    Yes.  I see that.

20        Q.    Okay.  And you identify a

21   number of materials that you reviewed in

22   reaching your opinions concerning the REAT

23   testing that was done either by 3M or 3M's

24   predecessor, or by various other labs,

1          understood your question.

2     BY MR. THORNBURGH:

3          Q.     You understand that -- do you

4     have an understanding as to why the EPA

5     requires S3.19 labeling studies?

6          A.     Not anymore.  I mean, I

7     understand where the intent came from.

8          Q.     You would agree with me, if you

9     want to determine whether or not there's a

10    problem with a plug, with an earplug, one of

11    the ways you do it is you test it in an

12    environment under a situation where you

13    remove as much variability from the study as

14    possible to determine whether or not there's

15    an issue with the plug?

16               MR. MORRISS:  Form.

17               THE WITNESS:  With the plug per

18         se.

19    BY MR. THORNBURGH:

20         Q.     So you agree with that, right?

21         A.     I'm sorry, maybe I'm getting

22    tired, but can you just state that?  There's

23    too many pieces.

24         Q.     It's only 11:00 o'clock your

Jennifer Tufts, Ph.D.

1          form.

2                    And you cannot instruct her she

3          has to answer yes or no.

4                    THE WITNESS:  So my

5          understanding is that any hearing

6          protection device sold to -- sold

7          commercially in the US has to be

8          labeled with an NRR that's been

9          calculated from S3.19 data.

10    BY MR. THORNBURGH:

11          Q.      That's actually commercially or

12    to the military as well, right?

13          A.      I understand that there's an

14    exception for the military.  I don't know the

15    details.  But my understanding is that the

16    NRR is required on hearing protection devices

17    that are sold commercially.

18          Q.      Are you going to be offering

19    opinions at trial that the -- note there's an

20    exception with respect to selling the

21    military earplugs with respect to whether or

22    not testing under S3.19 is required?

23          A.      Am I going to be --

24          Q.      Your testimony a moment ago was

 1    that there's an exception when not selling to

 2    the -- commercially but when selling to the

 3    military.  Are you going to offer opinions at

 4    trial with respect to this exception that you

 5    believe exists?

 6         A.    I'm not sure how to answer the

 7    question.  And again, I'm not trying to be

 8    difficult.  I don't know the details of the

 9    exception.  My understanding is that one

10    exists.

11         Q.    What's the basis for your

12    understanding that one may exist?

13         A.    I had read a document related

14    to -- I'm trying to remember what it was --

15    related to the development of the litigation.

16         Q.    Was it a litigation document?

17    Was it a document drafted by the lawyers?

18         A.    I'd have to look back and see.

19    I don't know what you mean by "litigation

20    document."

21         Q.    You said that you read a

22    document that -- about the development of the

23    litigation.  What document are you referring

24    to?

Jennifer Tufts, Ph.D.

```
 1    concerned.
 2                    So, I mean, you test an earplug
 3    one day and it's variable, and you test it
 4    the next day and you get more consistent
 5    results.  I mean, I don't place a whole lot
 6    of stock in, you know, what a particular test
 7    or a particular standard deviation, it's --
 8    the variability -- the major contributor to
 9    the variability comes about due to the person
10    wearing the hearing protector, potentially
11    the training they've received, and their
12    motivation.
13                    So the devices themselves, I
14    just don't want to cross defective devices.
15         Q.    You don't want to what?  I'm
16    sorry.
17         A.    I don't want to cross defective
18    devices.
19         Q.    My question was a lot different
20    than your answer.
21                    My question was, are you going
22    to tell the jury that variability is not
23    relevant to how well the device performs?
24         A.    I guess that's right, because I
```

1          A.      No, I don't.

2          Q.      On page 6 you talk about your

3     review of REAT tests.  Do you have -- is it

4     your belief that you have reviewed all of the

5     REAT testing that was conducted internally at

6     3M concerning the Combat Arms Version 2

7     earplug?

8          A.      I wouldn't know the answer to

9     that.

10         Q.      You state that you reviewed

11    Study 015 and Study 017.  Do you know what I

12    mean when I say "Study 015 and Study 017"?

13         A.      I do.

14              MR. THORNBURGH:  And if we can,

15         Mr. Marbut, let's pull up Study 015,

16         which is S-GEN-16, I believe.

17         Q.      Is it your understanding that

18    Study 015 was intended to be a labeling study

19    performed under ANSI S3.19?

20              MR. MORRISS:  And, Daniel, do

21         we have that loaded as an exhibit and

22         did you mark it as an exhibit?

23              MR. THORNBURGH:  Mr. Marbut,

24         let's load that and mark it.  I think

Jennifer Parcs, Ph.D.

1    labeling study conducted under S3.19,

2    correct?

3          A.    I understand that it's .015

4    and -- or, sorry, 015, and it was conducted

5    according to S3.19, yes.

6          Q.    And it was intended to be a

7    labeling study, correct?

8          A.    Well, I don't know what they

9    were doing, but, I mean, I suppose.

10         Q.    You understand that Elliott

11   Berger is the inventor of the Combat Arms

12   Version 2 earplug, right?

13         A.    No.

14         Q.    Do you understand that he

15   has -- his colleagues have held him out as

16   the inventor of the Combat Arms Version 2

17   earplug?

18               MR. MORRISS:  Object to form.

19               THE WITNESS:  I don't know.

20   BY MR. THORNBURGH:

21         Q.    Have you read the deposition

22   transcript or trial transcripts of Elliott

23   Berger?

24         A.    No, I haven't.

1      Q.    Did you know that Elliott

2  Berger has testified a number of times about

3  the testing that was performed by him and

4  others at Aearo?

5      A.    I haven't read the transcripts,

6  but I would imagine that's one of the things

7  he's testifying about.

8      Q.    Do you know -- well, let me ask

9  you this question.

10           Why didn't you review the

11 transcript of Elliott Berger, who was

12 involved in the testing of these earplugs?

13     A.    Why did I not review it?

14     Q.    Yeah, I mean --

15     A.    It wasn't available.

16     Q.    What do you mean, it wasn't

17 available?

18     A.    I didn't have it on my list.

19     Q.    Why didn't you have it on your

20 list?

21     A.    That's not a question I can

22 answer.

23     Q.    Are you saying that it wasn't

24 provided to you by 3M's counsel?

1          A.      You're talking about a verbatim

2     transcription of his testimony?

3          Q.      I'm talking about the

4     deposition transcripts of Elliott Berger

5     where he was under oath and testified about

6     the 015 testing and the 017 testing and other

7     testing performed by Aearo.  Have you

8     reviewed his testimony?

9          A.      No.  I've just reviewed the

10    test results.

11         Q.      And you didn't review the

12    testimony because it wasn't provided to you,

13    correct?

14         A.      To my recollection, no.

15         Q.      It's not identified on your

16    reliance list, correct?

17         A.      Well, if it is, I'm not aware.

18         Q.      You didn't consider at all any

19    of the testimony of Elliott Berger concerning

20    the testing that was performed by him or at

21    his direction while he worked for 3M or

22    Aearo, correct?

23         A.      That's correct.

24         Q.      Are you aware that Elliott

Jennifer Parks, Ph.D.

1    Berger testified that Study 015 was intended

2    to be a labeling test under S3.19?

3         A.    I haven't reviewed his

4    testimony, so I wasn't aware of that.

5         Q.    Did you review the testimony of

6    Ron Kieper?

7         A.    I did not.

8         Q.    Do you know who Ron Kieper is?

9         A.    I know of him.

10        Q.    How do you know of Ron Kieper?

11        A.    How do I know him?

12        Q.    Yes.

13        A.    I don't -- I'm not acquainted

14   with him, I've never met him, but I

15   understand that he was an employee and was

16   involved with the testing, the internal

17   testing I reviewed.

18        Q.    And you have not considered the

19   testimony by Ron Kieper concerning the

20   internal testing conducted on the Combat Arms

21   Version 2 earplug by him and Elliott Berger,

22   correct?

23        A.    Correct.

24        Q.    And you didn't review it

Jennifer Parcs, Ph.D.

1    because it wasn't provided to you by defense

2    counsel, correct?

3         A.    To the best of my knowledge.

4         Q.    Do you know why Study 015 was

5    stopped prematurely before they tested all

6    ten subjects?

7         A.    Well, I haven't reviewed their

8    testimony so I don't know what they would

9    have said about why it was stopped.

10        Q.    Are you aware Elliott Berger

11   testified that the Combat Arms Version 2

12   earplug was the most variable earplug he had

13   ever tested?

14        A.    No.  I didn't review his

15   testimony.

16        Q.    And most variable earplug ever

17   tested means it was more inconsistent,

18   provided more inconsistent performance of any

19   earplug Mr. Berger had ever tested.  Are you

20   aware that he's testified to that?

21        A.    No, I'm not aware of that.

22        Q.    Are you aware that Elliott

23   Berger testified that inconsistent hearing

24   protection devices that provided an NRR of a

1    10.9 would not -- was not what they expected

2    and is not what the military would have

3    purchased?  Are you aware of that testimony?

4         A.    No, I'm not aware of it.  I

5    haven't reviewed his verbatim transcript.

6         Q.    Are you aware that Elliott

7    Berger testified that an 11 NRR would have

8    been insufficient to provide protection to

9    military service members who were routinely

10   exposed to loud military noises?

11        A.    No.

12        Q.    Do you disagree with that

13   testimony, that an earplug with an NRR of an

14   11 would have been inadequate for military

15   service members exposed to -- routinely

16   exposed to high, loud military noises?

17        A.    I don't necessarily agree with

18   that.

19        Q.    So you don't agree with -- to

20   the extent that Elliott Berger has testified

21   that an 11 NRR would not provide adequate

22   protection to military service members

23   exposed routinely to loud steady state

24   noises, you have a disagreement with Elliott

Jennifer Farcas, Ph.D.

1    Berger in that regard?

2         A.    I'm not sure whether I disagree

3    with him or not.

4              You know, an NRR doesn't really

5    tell you a whole lot about the product.  So,

6    you know, an NRR of 11, you know, I'd have to

7    test the product on an individual to

8    determine whether it would be adequate to

9    protect them.

10        Q.    So you'll take the position at

11   trial that an NRR does not tell you about the

12   performance of a product, correct?

13        A.    I'll say it doesn't tell you a

14   lot.

15        Q.    It's your opinion that the NRR

16   does not provide important information about

17   the performance of a product.  That's your

18   opinion, correct?

19        A.    Does not provide important

20   information?  I mean, the only thing it

21   really tells me is that it was tested

22   according to S3.19.  It doesn't really tell

23   me anything about how -- about the product

24   itself.

1    Q.    So in your opinion, it makes no

2    difference if a product has an NRR of a 1 or

3    a product has an NRR of a 30, that

4    information does not provide you as an expert

5    with sufficient information about the

6    performance of the hearing protection device?

7    A.    It can't.  It can't.  There are

8    hearing protection devices that we can't even

9    test appropriately due to the technology that

10   could give me an NRR of 1, and I wear them in

11   the field and I'm well protected.

12          So, you know, I would never

13   take an NRR and -- I guess I should never say

14   never, but I'm not going to take an NRR of 1

15   and then say in a given situation that I'm

16   not going to be protected.  It just doesn't

17   give you the information that you need to

18   make that evaluation.

19   Q.    Do you know from any source why

20   015 was stopped?

21   A.    So my understanding is that it

22   was stopped because of the test results were

23   anomalous.

24   Q.    In your opinion, is it okay for

1    a manufacturer to stop an S3.19 labeling

2    study if they're not getting the results that

3    they desired?

4         A.     Well, I think if you have a

5    test that's sort of outside the bounds of

6    expectations, then it would probably be a

7    good idea to investigate what's going on.

8         Q.     You testified that you heard

9    from some source why the 015 study was

10   stopped prematurely.  Where did you get that

11   understanding from?

12        A.     So I can't remember whether --

13   you know, I had access to the Flange Report,

14   and so I can't remember whether it was in

15   that document or somewhere else.

16        Q.     And you understand from the

17   Flange Report that Elliott Berger believed

18   that an 11 NRR was quite low, right?

19        A.     Well, I would have to look at

20   the Flange Report, because I don't remember

21   the NRR of 11 being discussed specifically.

22   You know, I'd have to just look and see.

23        Q.     In your opinion, it doesn't

24   matter, right, because an 11 NRR doesn't mean

Jennifer Parks, Ph.D.

1    results is these design characteristics which

2    resulted in imperceptible loosening, right?

3                MR. MORRISS:  Object to form.

4                THE WITNESS:  It seems as

5         though -- without, you know, being

6         able to get into their minds, it seems

7         as though they were looking for, you

8         know, and investigating what happened

9         with the test.  And whether or not

10        this is the only reason for those

11        results, I mean, I don't know what was

12        in their minds.

13   BY MR. THORNBURGH:

14        Q.    One way for you to understand

15   what was inside their heads would have been

16   for you to read their sworn testimony, right?

17        A.    Probably.

18        Q.    And you didn't do that, did

19   you?

20        A.    I did not review their

21   testimony, no.

22        Q.    And you've known Elliott Berger

23   for how many years?

24        A.    I've known Elliott Berger for

Jennifer Tufts, Ph.D.

1    20 years or more.

2         Q.    And you've had a professional

3    relationship with Elliott Berger for 20 or

4    more years, correct?

5         A.    Yes, yes.

6         Q.    And you spoke with Elliott

7    Berger routinely for 20-plus years, right?

8         A.    No, not routinely.

9         Q.    Well, you certainly had many

10   dinners with Elliott Berger, right?

11        A.    I think, you know, when I say

12   that I've known him for 20 years, you know,

13   probably the first ten years, you know, we

14   didn't communicate much at all.  But then

15   after that we've communicated.

16        Q.    You've had dinner with Elliott

17   Berger, right?

18        A.    Yes.

19        Q.    You've gone to conferences with

20   Elliott Berger, right?

21        A.    I've gone to conferences that

22   he was at.

23        Q.    You've spoken with Elliott

24   Berger on the phone, right?

1          A.      I'm sure I have.

2          Q.      You've written e-mails to

3    Elliott Berger, right?

4          A.      Yes.

5          Q.      You've drafted book chapters

6    together, haven't you?

7          A.      We drafted a book chapter

8    together.

9          Q.      Did Elliott Berger ever tell

10   you that the Combat Arms Version 2 earplug

11   would imperceptibly loosen as a result of

12   these design characteristics described in the

13   Flange Report?

14              MR. MORRISS:  Object to form.

15              THE WITNESS:  We --

16   BY MR. THORNBURGH:

17         Q.      Yes or no.

18         A.      We didn't talk about the Combat

19   Arms earplug.

20         Q.      You've never spoken with

21   Elliott Berger about the Combat Arms Version

22   2 earplug?

23         A.      I haven't.

24         Q.      You got involved in this

Jennifer Pitts, Ph.D.

1    litigation in 2019, right?

2          A.    Correct.

3          Q.    You've spoken with Elliott --

4                MR. MORRISS:  Objection.

5    BY MR. THORNBURGH:

6          Q.    You've spoken with Elliott

7    Berger since 2019 when you got involved in

8    this litigation, right?

9          A.    Yes, I have.

10         Q.    You understood and knew at that

11   time that Elliott Berger was involved in the

12   development of the Combat Arms Version 2

13   earplug, correct?

14         A.    I'm not sure who developed --

15   how involved he was in developing the plug,

16   but I understood that he was a part of this,

17   yes.

18         Q.    And despite that, Elliott

19   Berger and you never discussed the 015 study

20   or the flange result, right?

21         A.    That's correct.

22         Q.    He's never shared this

23   information with you?  That's what you're

24   telling the ladies and gentlemen of the jury?

Jennifer Tufts, Ph.D.

```
 1                    MR. MORRISS:  Object to form.

 2                    THE WITNESS:  That's correct.

 3     BY MR. THORNBURGH:

 4          Q.     Then it goes on to say, "For

 5     test 213017, the yellow flanges" -- actually,

 6     before we get there, in fact, you and Elliott

 7     Berger had more than a professional

 8     relationship, didn't you?

 9          A.     What do you mean by that?

10          Q.     You and Elliott Berger were

11     very close friends.

12          A.     I would call him a close

13     colleague.

14          Q.     He was a close friend of yours,

15     wasn't he?

16          A.     In terms of -- what do you -- I

17     would call him a close colleague.  We -- a

18     close friend is somebody that I'm going to go

19     grab a cup of coffee with after this.

20          Q.     A cup of coffee with, you

21     grabbed drinks with him, you would exchange

22     poetry together?

23          A.     Oh, yeah, we exchanged some

24     sound poems, yes.
```

 1                  THE WITNESS:  I was going to

 2          say, I've glanced at the whole thing.

 3   BY MR. THORNBURGH:

 4          Q.     Okay.  Do you see on page 2, on

 5   January 6, 2014 Elliott Berger writes, "Funny

 6   you should write.  Thinking of you too.  I

 7   did a bunch of work on your data and never

 8   finished.  Let me look at it today since I

 9   too need to get cooking, but there is so much

10   else on the stove.

11                  "Say, do you remember the poem

12   'The Sound of Night' by Maxine Kumin?  Well

13   it has now been committed to memory.  I will

14   enjoy reciting it to you in March.  After

15   running it through my head about 100 times it

16   makes great sense, sounds lovely, and

17   educates me about some unusual words I have

18   never used (prink wide lipped).  Great fun.

19   Thanks."

20                  Do you see that?

21          A.     Yes, I do.

22          Q.     And this is you and Elliott

23   Berger being friends and Elliott Berger

24   talking about how he's looking forward to

1    an understanding that after 015 was stopped,

2    another study was started called 017, right?

3         A.    Yes.

4         Q.    And you have an understanding

5    that study -- in Study 017 Ron Kieper, the

6    experienced fitter of earplugs, including

7    Combat Arms Version 2 earplugs, folded back

8    some or all of the flanges in Study 017?  Are

9    you aware of that?

10              MR. MORRISS:  Object to form.

11              THE WITNESS:  I'm aware of 017,

12         and I've also read the contemporaneous

13         notes where he mentions that one

14         subject had the flanges folded back.

15   BY MR. THORNBURGH:

16        Q.    Well, you're aware that both --

17   I guess you're not aware that Ron Kieper

18   testified he wasn't sure if it was one or

19   more than one, Elliott Berger testified he

20   wasn't sure if it was one or more than one,

21   right?

22        A.    Right, I wasn't aware of that.

23        Q.    And we know -- you know from

24   the Flange Report that when they wrote the

Jennifer Tufts, Ph.D.

1    Flange Report they talked plurally as if more

2    than one test subject's flanges were folded

3    back, right?

4         A.    I mean, I'd have to look back

5    at the Flange Report, but I think the Flange

6    Report was -- the text of it was sort of

7    equivocal with respect to how many people had

8    folded the flanges back, and the

9    contemporaneous notes mention one person.

10        Q.    Are you aware that when asked

11   at his deposition, Jeff Hamer testified that

12   it was inappropriate to fold back the flanges

13   in Study 017?

14             MR. MORRISS:  Object to form.

15             THE WITNESS:  I've not reviewed

16        his testimony, so I don't know what he

17        has said.

18   BY MR. THORNBURGH:

19        Q.    Are you aware, Ms. Tufts, that

20   when asked at his deposition, Jeff Hamer

21   testified that the right thing to do would

22   have been to go back to the drawing board and

23   redesign the Combat Arms Version 2 earplug?

24             MR. MORRISS:  Object to the

1    including the chapter and likely this

2    Leadership Advisory Team, so I'm not sure

3    what the particular date has to do with the

4    question.

5         Q.     Well, even after -- you're

6    telling the ladies and gentlemen of the jury

7    that even after you got involved in this

8    litigation in 2019, a lawsuit related to

9    testing that was performed by Elliott Berger

10   and decisions that were made by Elliott

11   Berger when he was an employee at 3M

12   concerning the Combat Arms Version 2 earplug,

13   despite all that, you haven't had any

14   conversations with Mr. Berger, number one,

15   about the Combat Arms Version 2 litigation,

16   right?

17        A.     Correct.

18        Q.     And number two, never until

19   April of 2022 -- at no time prior to April of

20   this year did Elliott Berger ever provide you

21   with a copy of the Flange Report or have a

22   discussion with you concerning the results of

23   015, 017, or the memo that we call the Flange

24   Report, right?

1          Q.     Why don't you know the answer

2     to that question?

3          A.     Because there's nothing in the

4     WHISPr Study report about that.

5          Q.     But you knew Rich McKinley had

6     testified about WHISPr, right?

7          A.     I don't know -- I haven't

8     reviewed his transcript testimony, but, you

9     know, given that he's an author of the study,

10    I would imagine.

11         Q.     So you knew that Rich McKinley

12    had provided testimony, you knew that he was

13    one of the authors of WHISPr, yet you didn't

14    review any of his sworn testimony in this

15    case, correct?

16         A.     That's right.  I just reviewed

17    his report.

18         Q.     You haven't considered any of

19    his testimony, correct?

20         A.     Correct.

21         Q.     You have no idea what Rich

22    McKinley testified to concerning the WHISPr

23    Study and their findings, correct?

24         A.     What he's testified to?

Jennifer Pierce, Ph.D.

```
 1            Q.      Right.
 2            A.      I believe that he has testified
 3     that subjects were excluded.
 4            Q.      Where do you have that -- where
 5     did you -- what's the source of that belief?
 6            A.      In my deposition preparation.
 7            Q.      So the first time you heard
 8     that there were individuals who were excluded
 9     from the study for not getting a good fit was
10     when you were preparing for this testimony
11     after you had already issued your expert
12     report?
13            A.      Yeah, I -- yes.
14            Q.      And that would also be after 3M
15     has paid you thousands and thousands of
16     dollars?
17            A.      Yes.
18            Q.      And despite that, have you
19     asked for a copy of the transcripts?
20            A.      I have not asked for a copy of
21     the transcripts.
22            Q.      Did you know that Brian
23     Hobbs -- I think you testified that you
24     didn't know that Brian Hobbs had testified in
```

Jennifer Tufts, Ph.D.

1           privilege, too, and to the extent her

2           knowledge about this comes from

3           communications with counsel, then I

4           would object to her testifying about

5           it.  But outside of that, then she can

6           answer.

7      BY MR. THORNBURGH:

8           Q.    Let me ask a better question in

9      light of that objection.

10               Dr. Tufts, before you issued

11     your report in this case, were you aware that

12     the Department of the Army, Criminal

13     Investigation Command launched an

14     investigation about information that was

15     withheld from it concerning the Combat Arms

16     Version 2 earplug?

17               MR. MORRISS:  Object to form.

18               You can answer.

19               THE WITNESS:  I wasn't aware of

20          anything associated with this memo

21          here.

22     BY MR. THORNBURGH:

23          Q.    Were you aware that Brian

24     Hobbs, one of the authors of WHISPr, was

1    investigated -- was interviewed as part of

2    this investigation?

3         A.    I've glanced at this, but I

4    don't recall the details on it, so I would

5    need to --

6         Q.    When was the first time you

7    glanced at the P-GEN-9, which is what we call

8    the CID report, or the criminal investigation

9    division report?

10         A.    This one right here, I thought

11    this was 10.

12         Q.    Exhibit 10, but it's P-GEN-9 is

13    the exhibit number at the bottom.

14         A.    Okay.

15         Q.    When was the first time you saw

16    Exhibit 10?

17         A.    So this would have been within

18    the last -- within the last couple weeks.

19         Q.    Okay.  Before you wrote on

20    page 7 concerning the WHISPr Study, did you

21    know that Brian Hobbs was interviewed as part

22    of this investigation by the Army concerning

23    information that was withheld from it?

24         A.    No, I didn't.

Jennifer Pierce, Ph.D.

1        Q.    Is it fair to say that you did

2    not become aware of the WHISPr Study until

3    you were preparing for the deposition?

4        A.    Well, I was aware of the WHISPr

5    Study when I was --

6        Q.    I'm sorry, I withdraw that

7    question.  I asked a poor -- I didn't ask the

8    right question.

9            Is it fair -- is it a fair

10   understanding that you were not aware of the

11   Criminal Investigation Command report and

12   findings until you began to prepare for the

13   deposition?

14       A.    That's correct.

15       Q.    After you had already issued

16   your opinions and report?

17       A.    Yes.

18       Q.    And so after you wrote on

19   page 7 about the WHISPr Study -- when you

20   were writing your report, particularly on

21   page 7, concerning the WHISPr Study, you did

22   not know that Brian Hobbs had been

23   interviewed as part of this Criminal

24   Investigation Command Civil False Claims Act

Jennifer Pattis, Ph.D.

1    would help.

2              Yes, okay, I see.

3         Q.    Okay.  And you see that this is

4    after the WHISPr Study and the other studies

5    that you cite to and rely on to support your

6    opinion that the Combat Arms Version 2

7    earplug is safe and effective, right?

8         A.    Right.

9         Q.    It's dated July 30, 2019,

10   correct?

11        A.    Yes, mm-hmm.

12        Q.    And this is the same year that

13   you got involved in this lawsuit?

14        A.    Yes, I believe so.

15        Q.    When you got involved in this

16   lawsuit in 2019, were you provided with this

17   2019 Air Force letter?

18        A.    No.

19        Q.    I did not see this on your

20   reliance list, correct?

21        A.    I don't believe it's there, no.

22        Q.    And you don't talk about this

23   in your report, correct?

24        A.    Correct.

Jennifer Pacsi, Ph.D.

1        Q.     Is it fair for me then to

2   assume that you did not know about this 2019

3   Air Force letter until after you wrote your

4   report?

5        A.     That's correct.

6        Q.     And is this the first time you

7   saw this letter?

8        A.     This is -- I believe I've

9   glanced at this in preparation for this

10  deposition.

11       Q.     Okay.  So the first time you

12  saw this would have been after you had

13  already issued your report as you were

14  preparing for your deposition?

15       A.     Yes.

16       Q.     You see it says, "Please verify

17  with all shops on the Hearing Conservation

18  Program and all shops that use hearing

19  protection that any 3M Dual-Ended Combat

20  Earplugs are not being used for hearing

21  protection purposes.  These earplugs were

22  found to be defective.  The Air Force stopped

23  purchasing these items from 3M in 2016,

24  however inventory may remain."

Jennifer Parks, Ph.D.

```
 1                    Did I read that correctly?
 2       A.      Yes.
 3       Q.      Is it fair for me to understand
 4  that despite the CID report and despite the
 5  Air Force letter, this has no impact and has
 6  not altered or changed your opinion in any
 7  way?
 8       A.      No, it hasn't.
 9       Q.      In fact, you think that the 015
10  study was a good study and didn't demonstrate
11  that the product was defective?
12                    MR. MORRISS:  Object to form.
13                    THE WITNESS:  I don't think
14           that anything I've seen -- any of the
15           tests that I've seen suggest that the
16           Combat Arms Version 2 is defective.
17  BY MR. THORNBURGH:
18       Q.      Including Study 015, right?
19       A.      That's right.
20       Q.      You think that was a good study
21  and supports the safety of the Combat Arms
22  Version 2 earplug?
23                    MR. MORRISS:  Object to form.
24                    THE WITNESS:  So I'm not sure
```

Jennifer Pierce, Ph.D.

```
1                MR. MORRISS:  Object to form.
2       Asked and answered.
3                THE WITNESS:  I'm just not
4       clear on what data they're talking
5       about.
6  BY MR. THORNBURGH:
7       Q.    Well, you understand they're
8  talking about the data that they would obtain
9  from running a test in Study 017, right?
10      A.    Not necessarily.
11      Q.    Okay.  So maybe it would be
12 helpful if you -- well, one way to figure out
13 what they meant would be to read their
14 testimony, right?
15      A.    Having not read it, I don't
16 know.
17      Q.    On the break, did you ask
18 Mr. Morriss or 3M's counsel to provide you
19 with the transcripts after this deposition is
20 complete so you can --
21               MR. MORRISS:  Hang on, hang on.
22      That's privileged.  You don't get to
23      ask her about communications she had
24      with us.
```

1          Foundation.

2                   THE WITNESS:  I think you asked

3          two different things there.

4     BY MR. THORNBURGH:

5          Q.    Let me break it down for you,

6     because I think that's reasonable.

7                   Are you going to testify and

8     offer the opinion at trial that it is okay

9     under ANSI 3.19 to throw out data if you

10    don't get the result you want?

11                  MR. MORRISS:  Object to form.

12         Foundation.

13                  THE WITNESS:  I just don't have

14         any reading of S3.19 that says that I

15         have to use this or that piece of

16         data.

17    BY MR. THORNBURGH:

18         Q.    Put 3.19 out, just put it aside

19    for a moment.

20                  As a scientist -- and that's

21    what you are, right?  You hold yourself out

22    as a scientist, don't you?

23         A.    I do.

24         Q.    As a scientist, do you have

Jennifer Tufts, Ph.D.

1          refer to the actual protection values

2          that are measured.  It could refer to,

3          you know, the ability to generate a

4          fit consistently.  I don't want to

5          put -- I'm not in Mr. Kieper's mind.

6    BY MR. THORNBURGH:

7          Q.     You understand that REAT

8    testing, the purpose of it is to capture the

9    mean attenuation and the variability from the

10   test, right?

11         A.     The purpose of REAT testing?

12         Q.     Yes.

13         A.     In general, yes.

14         Q.     Under ANSI 3.19, a manufacturer

15   is to test for mean attenuation and

16   variability.  Those are the data points that

17   are important under ANSI 3.19, right?

18              MR. MORRISS:  Object to form.

19              THE WITNESS:  Yes.

20   BY MR. THORNBURGH:

21         Q.     Okay.  In light of the fact

22   this is a labeling test under ANSI 3.19,

23   isn't a reasonable interpretation of the

24   comments here that if a subject's attenuation

Jennifer Tufts, Ph.D.

1        Q.     Okay.  So I've got to break
2   that down a little bit.
3               You've never served in any
4   branch of the military, correct?
5        A.     I have not.
6        Q.     You're not going to offer any
7   opinions at trial, are you, about the
8   obligations of 3M when it comes to its
9   dealings with the military when the military
10  and 3M negotiated the contract which governed
11  the sale by 3M of the Combat Arms to the
12  military, right?
13       A.     It was a long question.  Can
14  you rephrase it?
15       Q.     Yeah.
16              You're not holding yourself out
17  as an expert in military procurement of the
18  Combat Arms Version 2 earplug, are you?
19       A.     No, I'm not.
20       Q.     And you've never worked within
21  the military as a military service member who
22  has negotiated those contracts, right?
23       A.     No, I've not -- I've been a
24  contractor with military audiology, but I

1          Q.     And did you review the

2    testimony of Kevin Michael from 2015

3    concerning this document D-GEN-250, which

4    we'll mark as Exhibit 16?

5                     -      -      -

6                (Whereupon, Tufts Exhibit

7          Number 16 was marked for

8          identification.)

9                     -      -      -

10         A.     No, I haven't reviewed his

11   testimony.

12   BY MR. THORNBURGH:

13         Q.     When you worked for Michael &

14   Associates, was it typical when doing an

15   S3.19 study to exclude test subjects whose

16   data was more than two standard deviations

17   away from the mean of certain frequencies?

18         A.     So as I said, my recollection

19   of that time is fuzzy, so I don't recall a

20   particular policy that he had with respect to

21   that.

22         Q.     Were you aware that with

23   respect to the data contained within the

24   March 28, 2012 letter from Michael's, marked

Jennifer Pates, Ph.D.

1    as Exhibit 12, that Michael's -- Mr. Michael

2    testified that if a subject's data is more

3    than two standard deviations away from the

4    mean at certain frequencies that person's

5    data would be excluded?

6                    MR. MORRISS:  Form.

7           Foundation.  Misstates testimony.

8                    THE WITNESS:  So are you asking

9           me if I'm aware of that in his

10          testimony?

11   BY MR. THORNBURGH:

12          Q.    Yes.

13                Did you consider that testimony

14   at all before you reached your opinion about

15   the reliability of Exhibit 12?

16          A.    No.

17          Q.    Wouldn't that be important

18   information to know whether or not

19   Mr. Michael was excluding data of test

20   subjects who had high variability?

21                    MR. MORRISS:  Form.

22          Foundation.

23                    THE WITNESS:  Would it be

24          important?

1    BY MR. THORNBURGH:

2        Q.    Yeah, wouldn't that be

3    important in weighing the reliability of the

4    data contained in Exhibit 12 to know whether

5    or not Mr. Michael was excluding test

6    subjects' data if the test subjects' data

7    showed that there was -- that the test

8    subjects' data was excluded if there was more

9    than two standard deviations away from the

10   mean at certain frequencies?

11            MR. MORRISS:  Form and

12        foundation.

13            THE WITNESS:  I mean, I don't

14        see it as particularly important.

15   BY MR. THORNBURGH:

16        Q.    You agree with me that one of

17   the things that S3.19 study is attempting to

18   understand and determine is the variability

19   of the plug, right?

20        A.    I mean, S3.19 is really trying

21   to tell us what the optimal performance of

22   the plug would be, so the data that -- the

23   data that you get in such a test, there's

24   no -- if you've got a subject whose data are

Jennifer Pates, Ph.D.

1           tells me a lot about the protocol.

2           The accreditation of the lab tells me

3           that the policies have been vetted.

4                  And so to that extent, you

5           know, I'm naturally taking a little

6           bit on faith there that the

7           accreditation process and that the

8           S3.19 was followed.

9                  And I have to do the same thing

10          if I'm reviewing a study.  But the

11          difference being that usually in a

12          study, you don't have well-known

13          protocol that's laid out ahead of

14          time, so I have to look -- I have to

15          look at all the specific details, and

16          I do have to take on faith that those

17          details that the person -- that the

18          scientist has provided are accurate.

19                 So to the extent that Michael &

20          Associates is performing a test that's

21          protocol is well-known and has been --

22          his lab has been accredited multiple

23          times, so I do have to take that on

24          faith, but I don't need to investigate

Jennifer Parks, Ph.D.

```
1                    C E R T I F I C A T E
2                    I, MAUREEN O'CONNOR POLLARD, LSR
3       #473, Registered Diplomate Reporter and
4       Notary Public in and for the State of
5       Connecticut, do hereby certify that there
6       remotely came before me on the 23rd day of
7       June, 2022, the person hereinbefore named,
8       who was duly remotely sworn to testify to the
9       truth of their knowledge concerning the
10      matters in this cause, and their examination
11      reduced to typewriting under my direction and
12      is a true record of the testimony.
13                   I further certify that I am
14      neither attorney for or related or employed
15      by any of the parties to the action, and that
16      I am not a relative or employee of any
17      attorney or counsel employed by the parties
18      hereto or financially interested in the
19      action.
20                   In witness whereof, I have
21      hereunto set my hand and seal this 28th day
22      of June, 2022.
23      _____
                MAUREEN O'CONNOR POLLARD, License #473
24              Registered Diplomate Reporter
```