# PX50

```
 1            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF FLORIDA
 2               PENSACOLA DIVISION
 3   IN RE:                        ) CASE NO.
                                   ) 3:19md2885-MCR-GRJ
 4   3M COMBAT ARMS EARPLUG        )
                                   )
 5   PRODUCTS LIABILITY LITIGATION ) Judge M. Casey
                                   ) Rodgers
 6   _____ )
                                   )
 7   All Wave 1 Cases              ) Magistrate Judge
                                   ) Gary R. Jones
 8   _____ )
 9
10
11
12
                   Friday, June 24, 2022
13
14
15
16
17         Remote Video-Recorded Oral Deposition
     of RICHARD L. NEITZEL, Ph.D., held at the
18   location of the witness commencing at
     10:01 a.m. EDT, on the above date, before
19   Michael E. Miller, Fellow of the Academy of
     Professional Reporters, Certified Court
20   Reporter, Registered Diplomate Reporter,
     Certified Realtime Reporter and Notary
21   Public.
22
23                   __ __ __
24            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
25               deps@golkow.com
```

```
 1    REMOTE APPEARANCES:
 2        QUINN EMANUEL URQUHART & SULLIVAN LLP
          BY:  ADAM B. WOLFSON, ESQUIRE
 3            adamwolfson@quinnemanuel.com
          865 South Figueroa Street
 4        10th Floor
          Los Angeles, California 90017
 5        (213)443-3000
          Counsel for Plaintiffs
 6
 7        QUINN EMANUEL URQUHART & SULLIVAN LLP
          BY:  MATTHEW HOSEN, ESQUIRE
 8            matthosen@quinnemanuel.com
          1109 First Avenue
 9        Suite 210
          Seattle, Washington 98101
10        (206)905-7000
          Counsel for Plaintiffs
11
12        KIRKLAND & ELLIS LLP
          BY:  TABITHA DE PAULO, ESQUIRE
13            tabitha.depaulo@kirkland.com
          609 Main Street
14        Suite 4700
          Houston, Texas 77002
15        (713)835-3600
          Counsel for Defendants
16
17        KIRKLAND & ELLIS LLP
          BY:  F. CHADWICK MORRISS, ESQUIRE
18            chad.morriss@kirkland.com
          1301 Pennsylvania Avenue NW
19        Washington, D.C. 20004
          (202)879-5000
20        Counsel for Defendants
21
22
23
24
25
```

```
 1    REMOTE APPEARANCES:

 2         DECHERT LLP

           BY:  CRAIG J. CASTIGLIA, ESQUIRE

 3             craig.castiglia@dechert.com

           Cira Centre

 4         2929 Arch Street

           Philadelphia, Pennsylvania 19104

 5         (215)994-4000

           Counsel for Defendants

 6

 7    TRIAL TECHNICIAN:

 8         RAY MOORE

           Precision Trial Inc.

 9

10    VIDEOGRAPHER:

11         WILLIAM GEIGERT

           Golkow Litigation Services

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          Q.     Sir, you're not an audiologist,
 2   and therefore you also do not perform
 3   differential diagnoses in that role, right?
 4          A.     That is correct, yes.
 5          Q.     You've never diagnosed a
 6   patient with ototoxicity before, right?
 7          A.     I don't do any diagnoses, no.
 8          Q.     Okay.  When an industrial
 9   hygienist in their ordinary job duties is
10   advising a company or workplace on risk
11   mitigation, is it typical for you to provide
12   advice on ototoxic medications?
13          A.     So as part of my role as an
14   industrial hygienist, I try to inform
15   companies, employers as well as workers of
16   all the hazards that might be present in the
17   workplace, and so in the context of a hearing
18   conservation program, noise is what we
19   typically focus on.
20                 But there's increasing
21   recognition that ototoxic exposures are also
22   a risk to hearing loss, so yes, that is
23   something that I advise on and recommend that
24   employers consider and protect against.
25                 With regards to medications,
```

Richard Neitzel, Ph.D.

```
 1    those are one type of ototoxic exposure.  As
 2    a hygienist, I tend to focus more on
 3    hazardous chemicals, for instance, in the
 4    workplace that might be ototoxic.
 5         Q.    As an industrial hygienist,
 6    you're advising workplaces or employers on
 7    how to reduce potential ototoxic exposures
 8    from chemicals in their workplace.  You're
 9    not advising them on what types of
10    medications their workers should or should
11    not take, right?
12              MS. DE PAULO:  Object to form.
13         A.    So when I communicate
14    information about protecting workers'
15    hearing, I do mention ototoxic substances.
16    Again, I focus primarily on chemicals because
17    that's what workers tend to have exposures to
18    in the workplace, but medications are
19    something that we know can be ototoxic, and
20    so that is typically something I communicate
21    as well.
22              Again, not making any specific
23    comments towards a particular individual and
24    whatever medications they might be taking.
25    BY MR. WOLFSON:
```

Richard Neitzel, Ph.D.

```
 1          Q.    You are -- you are not -- you
 2    are saying -- in your role as an industrial
 3    hygienist you say there are medications that
 4    people can take that can be ototoxic; is that
 5    what you're telling me?
 6                MS. DE PAULO:  Object to form.
 7          A.    Yeah, I would say maybe to draw
 8    an analogy, if we have workers who are
 9    exposed to heat stress, for instance, as an
10    industrial hygienist, I notify the employers,
11    they need to be aware if the worker is taking
12    medication that might raise their blood
13    pressure or make them unable to handle heat.
14                So in the same sense, for
15    workplace noise-exposed individuals, I would
16    recommend that the employer consider or at
17    least be aware of the possible presence of
18    medications that could cause a hearing loss
19    and could put their workers at risk.
20    BY MR. WOLFSON:
21          Q.    Okay.  But the person who is
22    actually going to determine whether a worker
23    has risk from the specific medications that
24    they take is not an industrial hygienist
25    advising a workplace, but rather their
```

Richard Neitzel, Ph.D.

```
 1    medical providers, audiologists,

 2    otolaryngologist, that type of person, right?

 3         A.    Yes.  So I think the key here

 4    is we have parallel and complementary roles.

 5    I'm informing both the workers and the

 6    employers about the potential risks, and then

 7    the worker, as a patient, can interact

 8    directly with a physician to talk about the

 9    risk at their individual personal level.

10         Q.    But are you telling employers,

11    your workers, if they take the following

12    medications, they're at risk for ototoxicity?

13         A.    Yes.  At a broad level, making

14    them aware that there are classes of

15    medications that could put their workers at

16    risk.  Again, not making any inferences about

17    an individual, but just educating, typically

18    the management who are responsible for these

19    workers' health.

20         Q.    So what you're providing in

21    your role, day-to-day role as an industrial

22    hygienist, is the idea that there is this

23    concept of ototoxicity that you should be

24    aware of?

25         A.    Absolutely.
```

```
 1                    MS. DE PAULO:  Object to form.
 2      (BY MR. WOLFSON)
 3          Q.     And with respect to
 4      medications, you're not making
 5      recommendations like for or against certain
 6      types of medication in terms of ototoxicity,
 7      but rather just telling employers you should
 8      be aware that if your workers use certain
 9      types of medications, there's a potential
10      risk for ototoxicity?
11          A.     Precisely.  So again, trying to
12      raise awareness among supervisors,
13      management, but workers themselves just to
14      recognize that this is another risk factor
15      that they should be aware of.
16                    It may not be relevant to many
17      of them who are not taking medications that
18      fall on that list, but for workers who are on
19      that list, we certainly want to be aware of
20      that, you know, potential complicating factor
21      in preventing hearing loss in them.
22          Q.     Are you taking looks at
23      employers' lists of employees and the
24      medications they take and making specific
25      recommendations to employers about specific
```

Richard Neitzel, Ph.D.

1    employees' ototoxicity rates?

2         A.    No, that information would be

3    protected, nothing that I want to see.  So

4    I'm, again, making advisory statements,

5    recommendations, warnings perhaps, but

6    leaving any individual consideration or

7    intervention to, you know, the employer and

8    the employee or the employee and their

9    physician.

10        Q.    So, for example, you've never

11   reported to a company that hired you to

12   design their hearing conservation program

13   that too many employees are on opioids or

14   ototoxic medications that are affecting their

15   hearing, right?

16        A.    No, I've never had access to

17   that information at an individual level.

18        Q.    And you've never, for example,

19   advised a company that heroin or cocaine

20   usage might lead to hearing issues among

21   their employee base, right?

22        A.    I'm just recalling, I don't

23   think I've made that recommendation,

24   particularly around illicit drugs, of course,

25   which are a sensitive topic in the workplace.

Richard Neitzel, Ph.D.

1    I tend to focus more on recognized

2    prescription medications that are ototoxic.

3         Q.    You telling people don't take

4    Advil because it might affect your hearing?

5         A.    No, I wouldn't classify it that

6    way.  I would say more that if you are, for

7    instance, a heavy user of nonsteroidal

8    antiinflammatory drugs, there are potential

9    impacts on your hearing.

10              Of course, every individual has

11    to balance that, and maybe in communication

12    with their physician, decide what's best for

13    them.

14              And again, that's not a

15    conversation that I want to be or am a part

16    of.

17         Q.    And also, a big part of that is

18    that it's very specific to the individual,

19    isn't it?

20              MS. DE PAULO:  Object to form.

21         A.    So in the case of medications,

22    absolutely that's specific to the individual.

23    In the case of other hazardous substances in

24    the workplace, which frankly, a greater

25    number of people are likely exposed to,

Richard Neitzel, Ph.D.

```
1    that's, you know, not a conversation that's
2    restricted to patient-physician, but
3    something I want to educate the entire
4    workforce, including management, about.
5    BY MR. WOLFSON:
6         Q.    Well, sticking with medications
7    real quick, the likelihood for a medication
8    causing ototoxicity, in other words,
9    chemical-based hearing issues, is the amount
10   of the dosage of that medication, the length
11   of time of use of that medication, and the
12   individual biology of the person using it
13   among other things, right?
14        A.    Yes, and that is going to vary
15   by medication and by person, as you say.
16        Q.    All right.  So knowing that
17   some medications sometimes reflect some
18   ototoxic qualities doesn't tell us how those
19   medications will actually affect the specific
20   person using them unless we analyze the
21   specific person using them, right?
22             MS. DE PAULO:  Object to form.
23        A.    Yeah, I would say that's a bit
24   of an oversimplification in that for some
25   medications, and I'm thinking, for instance,
```

```
 1    cisplatin is an antineoplastic drug or

 2    aminoglycoside antibiotics, those questions

 3    are much smaller.  There's much less

 4    uncertainty there.  We could say, you know,

 5    if a person took this, the likelihood is much

 6    greater than perhaps for other medications

 7    that there's not such a rich literature

 8    available on.

 9              So again, I don't think we

10    should treat all medications equally, but I

11    do agree that things like the dosage, the

12    length of use and the individual's particular

13    biology are important characteristics.

14    BY MR. WOLFSON:

15         Q.    And the amount of time of using

16    even medications that have a more robust

17    research literature attached to them,

18    sometimes it's about whether you are

19    currently using that medication that

20    determines whether you are likely to have an

21    ototoxic reaction, right?

22         A.    I would say for some

23    medications that's true, for some, you know,

24    it may be an "ever taken it."  Again, coming

25    back to things like vincristine or
```

Richard Neitzel, Ph.D.

 1    aminoglycosides, you know, you wouldn't need

 2    to be taking those now to have suffered an

 3    impact previously that's still with you.

 4        Q.    But in general, though, what

 5    you need to do in order to determine whether

 6    a medication has created ototoxicity for a

 7    user is to specifically examine that user and

 8    conduct something like a differential

 9    diagnosis, right?

10            MS. DE PAULO:  Object to form.

11        A.    Yes.  So if we wanted to make

12    as definitive a statement as we could that

13    this medication led to ototoxicity in this

14    particular worker, absolutely, a physician is

15    going to be involved and make that

16    determination.

17            On the flip side, you know,

18    coming back to industrial hygiene, for all of

19    these other ototoxic substances, we may have

20    much more information about how much workers

21    are exposed to, how long they've been exposed

22    to.  It's no longer sort of a

23    medical-specific situation, and in that case,

24    the hygienist can and should make input into

25    the process.

1    offered with my opinion.

2    BY MR. WOLFSON:

3        Q.    But your opinion isn't offering

4    any insight into whether a specific

5    individual suffered ototoxicity from using

6    specific medications at any specific point in

7    time, right?

8        A.    Not -- not from a medical

9    perspective, no.  And my understanding is for

10   these wave -- or this wave of plaintiffs

11   here, that my opinions are being applied

12   potentially to 500 different plaintiffs, so

13   obviously that individual analysis isn't --

14   isn't occurring at this point.

15       Q.    And in your experience, sir,

16   are physicians who specifically look at

17   patients and perform a differential diagnosis

18   unaware or incapable of assessing ototoxicity

19   as a cause of a someone's hearing issue?

20           MS. DE PAULO:  Object to form

21       and foundation.

22       A.    So for the instance -- for

23   instance, the otolaryngologists that I have

24   worked with in my career, I think to a one,

25   they are very aware of ototoxic medications,

Richard Neitzel, Ph.D.

1    can pull it up, I can confirm.

2              But again, it's the presence of

3    not just the handwritten notes but the

4    comments on the report itself that raise

5    concerns for me for 015 that I didn't have

6    for 016.

7    BY MR. WOLFSON:

8         Q.    All right.  Sir, so we're here

9    looking at page 28 of your report, and you've

10   mentioned the Michael and Associates

11   laboratory test of the Combat Arms version 2.

12             That forms a basis of your

13   opinion that you intend to provide to the

14   jury?

15        A.    Not the entire basis, but it is

16   a piece of the puzzle, absolutely.

17        Q.    Sir, you understand that the

18   court has excluded not only this report from

19   being shown but any sort of testimony based

20   on this report?

21             MS. DE PAULO:  Object to form.

22             That's irrelevant to the opinion he's

23             offering, what the court has done with

24             the evidence at trial.

25             ///

1    BY MR. WOLFSON:

2         Q.    Are you aware of this, sir?

3         A.    I have seen the report.  I'm

4    not aware of any judgments related to it, no.

5         Q.    Sir, do you intend to offer an

6    opinion to the jury that the Michaels -- the

7    Kevin Michael report shows that the Combat

8    Arms version 2 works?

9         A.    So my interpretation of the

10   Michael report, again, not knowing any of the

11   judgment circumstances you've mentioned, is

12   that it does confirm that the NRR of the

13   device is, you know, in this case slightly

14   higher than what the manufacturer reported.

15             To my knowledge, this is the

16   only other S3.19 test that's ever been done

17   on this particular earplug, so I do, you

18   know, include this in my consideration of all

19   the evidence available.

20         Q.    So the answer to my question

21   is:  Yes, you intend to tell a jury that the

22   Michael report supports your opinion that the

23   Combat Arms version 2 works?

24         A.    I think the way you phrased

25   that is how I would strive to do that.  It

```
 1    supports it.  It's not the only bit of
 2    supporting evidence, but it's one piece of
 3    this whole mosaic that documents that the
 4    Combat Arms works.
 5              Of course, if the judge or the
 6    court instructed me not to speak to that, you
 7    know, I would adhere to the ruling.
 8         Q.   Okay.  And, sir, if -- just
 9    going back to something you just said a
10    moment ago.  If you are unable, disallowed
11    from providing that sort of testimony about
12    the Michael report, you agree with me that
13    there are only two tests that were performed
14    according to the S3.19 protocol that -- well,
15    actually, I'm sorry.  Let me take a step
16    back.
17              You agree with me that the only
18    test that provides a complete S3.19 protocol
19    test of the Combat Arms version 2 green end
20    is the 017 test, right?
21              MS. DE PAULO:  Objection --
22         A.   That's the only one I'm aware
23    of.
24              THE WITNESS:  Sorry, Tabitha.
25              ///
```

1    and ototoxic, we're still looking for that

2    notch.

3          Q.     Because of the noise?

4          A.     Because of the noise and

5    because those seem to be frequencies that are

6    targeted at least by some ototoxic agents as

7    well.  It's just kind of our vulnerable range

8    of our hearing, if you will.

9          Q.     Okay.  So if someone -- so if

10   someone exhibits a noise notch, am I

11   understanding you that just based on your

12   understanding of the research, that someone

13   who then tried to figure out the cause of

14   their hearing, they would have to look at

15   noise in addition to other potential causes,

16   such as ototoxicity?

17               MS. DE PAULO:  Object to form.

18         A.     Yeah.  So from a hearing

19   conservation program or an industrial hygiene

20   perspective, if we have people turning up

21   with noise notches in their audiograms,

22   immediately we suspect noise, but we also

23   need to screen for ototoxics as well.

24               And in, you know, analyzing, as

25   researchers have done, the associations

Richard Neitzel, Ph.D.

 1    between noise only and noise plus ototoxic

 2    agents and audiometric outcomes, we're able

 3    to see the associations there.

 4    BY MR. WOLFSON:

 5         Q.    Okay.  But in order to make an

 6    actual diagnosis, you need to actually look

 7    at those sorts of things and, you know,

 8    someone who actually does a diagnosis would

 9    be looking at all the different potential

10    causes, fair?

11              MS. DE PAULO:  Form.

12         A.    Yeah.  So to do a proper

13    differential or a full differential

14    diagnosis, they would need to know not only

15    the noise exposure.

16              As I said, my perception of

17    much of the hearing community is that people

18    are aware of ototoxic medications.  They may

19    not necessarily think about ototoxic

20    exposures in the workplace, but they should.

21    BY MR. WOLFSON:

22         Q.    But just going back to the --

23    what originally started these questions

24    though:  If someone exhibits a noise notch,

25    at least as an industrial hygienist, the

```
 1    that recognizes, specific to the military,

 2    both lots of different chemicals, but lots of

 3    different exposure scenarios too.

 4              So as an industrial hygienist,

 5    I don't immediately assume we're going to

 6    find styrene in any workplace.  I know that's

 7    more likely to be found in shipyards, for

 8    instance.  So it's going to be a combination

 9    of what's the work environment, what are they

10    doing, and what are some of these more

11    recognized ototoxic agents that might be

12    present.

13       Q.    Now, in terms of figuring out

14    whether an ototoxic exposure likely -- I'm

15    sorry, an exposure to a chemical had an

16    ototoxic effect, we need to actually look

17    into the specific amounts and circumstances

18    of that exposure in whatever workplace or

19    environment it happened, fair?

20       A.    Yeah.  Excuse me.  Yeah, I

21    think a major effort that's required here is

22    often exposure reconstruction, where we're

23    trying -- you know, after the fact, we're

24    trying to figure out how much were they

25    exposed to, for how often and how long.  So
```

Richard Neitzel, Ph.D.

```
1    that is a key part of understanding.
2         Q.    Okay.  So, you know, the fact,
3    for example, that there's lead in a specific
4    work environment, we can't draw any
5    conclusions as to whether it had an ototoxic
6    effect on someone without taking a specific
7    history of that person's exposure to and
8    symptoms following that exposure to the lead?
9              MS. DE PAULO:  Object to form.
10        A.    So some of that information
11   isn't necessarily part of the history per se.
12   You know, thinking about this from a medical
13   perspective, which I'm assuming you are.
14              So, for instance, if an
15   industrial hygienist is doing their job well,
16   they should have records of what that worker
17   was exposed to, so ideally we can do our best
18   to really well characterize that aspect of
19   their exposure but collecting measurements,
20   not just asking someone did you ever work in
21   a factory that had lead, for instance.
22   BY MR. WOLFSON:
23        Q.    Right.  And, yeah, that's
24   basically my question.
25              For someone specifically, the
```

```
 1    fact that there might be lead somewhere or

 2    styrene somewhere or whatever other types of

 3    chemicals may have ototoxic effects out

 4    there, that's not the -- that's not the crux

 5    of the question.

 6              The question is:  Were they

 7    exposed to these materials, how long were

 8    they exposed and what happened after they

 9    were exposed; is that fair?

10              MS. DE PAULO:  Object to form.

11        A.    Yeah, so I think just to make

12    sure I'm understanding you correctly.  So we

13    don't always have records of how often, how

14    long, how much exposure did people have.

15    That's the gold standard we're shooting for.

16              In some cases, I would say in

17    many cases, we don't have specific

18    measurements made on a particular worker.  So

19    we can't say that Jane was exposed to this

20    amount of lead.

21              So in that case as an

22    industrial hygienist, I draw on other

23    available information to make inferences

24    about what Jane's exposure was given that I

25    don't have direct data on her.
```

```
 1     BY MR. WOLFSON:

 2         Q.    Okay.  But what you're doing is

 3     specific analysis to Jane in your example,

 4     rather than just there was lead or there was

 5     styrene at this plant at this particular

 6     time?

 7         A.    I would say it kind of depends

 8     on the end goal here.  So if it's a specific

 9     case of Jane having lost hearing, then

10     absolutely, we want to look at Jane's

11     specific results or as close to that as we

12     can get.

13              If we're looking at a whole

14     cohort or group of people, then we might be

15     less interested in individuals and just

16     understanding as a group these people have

17     hearing loss, and it appears that they have,

18     you know, exposures to ototoxins in their

19     careers.

20              But you're right, for

21     diagnostic purposes on an individual, we

22     would ideally have Jane's specific data.

23         Q.    Okay.  Or, you know, in your

24     example, examples of other folks who were

25     also in the same environment and their
```

Richard Neitzel, Ph.D.

1    uncertainties around ototoxics,

2    particularly -- you know, some more than

3    others.

4    BY MR. WOLFSON:

5        Q.    Okay.  So let's see.  Now, you

6    offer some opinions about what you call burn

7    pits.

8              Are you familiar with that?

9        A.    Yes.

10       Q.    All right.  Now, burn pits,

11   what do you understand those are?

12       A.    So my understanding -- I have

13   never seen one in person -- but these are

14   pits that military bases, you know, often

15   sort of forward deployed or in combat areas

16   use as a way to dispose of waste because they

17   don't, of course, have a well-developed waste

18   collection system like we have living in a

19   city.

20       Q.    Okay.  And you cite a bunch of

21   materials that you say that there is a

22   potential ototoxic connection between burn

23   pit exposure and hearing issues?

24       A.    So to clarify this, there are a

25   number of studies on some of the agents that

Richard Neitzel, Ph.D.

```
 1    I mention here on page 42, so things like
 2    fuels and paints, chemicals, et cetera.  So
 3    those studies are well established.
 4              Studies on burn pits
 5    specifically are relatively wear -- rare, I
 6    should say.  But again, the notion or the
 7    concept that these materials are being burned
 8    in these burn pits I think has been well
 9    established in the small existing literature.
10        Q.    Yeah.  But the existence of
11    materials, again, is not in and of itself
12    enough to conclude that there is an ototoxic
13    level of those materials or they are
14    presented in a way that leads to ototoxicity,
15    fair?
16              MS. DE PAULO:  Object to the
17         form.
18        A.    So I would say with the
19    available literature, which again, is
20    limited.  This is a new phenomenon for study.
21    Again, there's been lots of studies
22    documenting that people nearby are going to
23    be exposed to some of these potentially
24    ototoxic agents.
25              What I think has not been done
```

Richard Neitzel, Ph.D.

1    at this point is to link those individuals to

2    health outcomes to say, you know, soldier X

3    lived near burn pit Y and developed this

4    health outcome.  So the research has not

5    reached that point yet.

6    BY MR. WOLFSON:

7         Q.    In fact, none of the research

8    that you've cited in your report links

9    exposure to burn pits to hearing loss or

10   tinnitus, fair?

11        A.    Fair.  And I will say this is

12   often how things evolve in environmental

13   health.  We identify a potentially

14   problematic chemical or any other hazard, and

15   we explore how common that hazard is in the

16   environment and conduct perhaps some

17   preliminary studies on health impacts, which

18   already exist in the ototoxic literature for

19   these things.  And then we do larger studies

20   to directly connect the exposures to the

21   health impact.

22             So it's an iterative process

23   and we're not to the endpoint yet for this

24   particular issue.

25        Q.    Okay.  But, sir, in like, for

Richard Neitzel, Ph.D.

```
1                    CERTIFICATE
2             I, MICHAEL E. MILLER, Fellow of
     the Academy of Professional Reporters,
3    Registered Diplomate Reporter, Certified
     Realtime Reporter, Certified Court Reporter
4    and Notary Public, do hereby certify that
     prior to the commencement of the examination,
5    RICHARD L. NEITZEL, Ph.D. was duly sworn by me
     to testify to the truth, the whole truth and
6    nothing but the truth.
7             I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
8    testimony as taken stenographically by and
     before me at the time, place and on the date
9    hereinbefore set forth, to the best of my
     ability.
10
              I DO FURTHER CERTIFY that pursuant
11   to FRCP Rule 30, signature of the witness was
     requested by the witness or other party
12   before the conclusion of the deposition.
13            I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor attorney
14   nor counsel of any of the parties to this
     action, and that I am neither a relative nor
15   employee of such attorney or counsel, and
     that I am not financially interested in the
16   action.
17
18   _____
     MICHAEL E. MILLER, FAPR, RDR, CRR
19   Fellow of the Academy of Professional Reporters
     NCRA Registered Diplomate Reporter
20   NCRA Certified Realtime Reporter
     Certified Court Reporter
21   Notary Public
22   Dated: June 29, 2022
23
24
25
```