# PX61

```
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF FLORIDA
 2                 PENSACOLA DIVISION

 3   IN RE:  3M COMBAT ARMS      )   Case No.:
     EARPLUG PRODUCTS LIABILITY  )   3:19-md-2885
 4   LITIGATION                  )
                                 )   Judge M. Casey
 5   -------------------------   )   Rodgers
                                 )   Magistrate Judge
 6   THIS DOCUMENT RELATES TO:   )   Gary R. Jones
                                 )
 7   All Wave 1 Cases            )

 8
                        -  -  -
 9

10   REMOTE VIDEOTAPED DEPOSITION OF WILLIAM MURPHY, PH.D.

11                TUESDAY, JUNE 28, 2022

12                        -  -  -

13

14            Remote videotaped deposition of WILLIAM

15   MURPHY, PH.D., held remotely at the location of the

16   witness, commencing at approximately 10:03 a.m., on

17   the above date, before Juliana F. Zajicek, Registered

18   Professional Reporter, Certified Shorthand Reporter

19   and Certified Realtime Reporter.

20

21

22                        -  -  -

23            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
24                 Deps@golkow.com
```

```
 1                 A P P E A R A N C E S :
               (ALL PARTIES APPEARED REMOTELY)
 2

 3   ON BEHALF OF THE PLAINTIFF:

 4        THE MONSOUR LAW FIRM
          404 North Green Street
 5        Longview, Texas 75601
          903-999-9999
 6        BY:  DOUGLAS C. MONSOUR, ESQ.
               doug@monsourlawfirm.com
 7
                      -and-
 8
          AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
 9        17 East Main Street, Suite 200
          Pensacola, Florida 32502
10        850-202-1010
          BY:  DOUGLASS A. KREIS, ESQ.
11             dkreis@awkolaw.com

12                    -and-

13        QUINN EMANUEL
          865 South Figueroa Street, 10th Floor
14        Los Angeles, California 90017
          213-443-3000
15        BY:  MATTHEW HOSEN, ESQ.
               matthosen@quinnemanuel.com
16

17

18

19

20

21

22

23

24
```

```
 1              A P P E A R A N C E S :
              (ALL PARTIES APPEARED REMOTELY)
 2


 3   ON BEHALF OF THE DEFENDANTS:


 4        DECHERT LLP
          US Bank Tower
 5        633 West 5th Street, Suite 4900
          Los Angeles, California 90071-2032
 6        213-808-5715
          BY:  ALLIE OZUROVICH, ESQ.
 7             allie.ozurovich@dechert.com;
               CRAIG J. CASTIGLIA, ESQ.
 8             craig.castiglia@dechert.com


 9                -and-


10        DECHERT LLP
          35 West Wacker Drive, Suite 3400
11        Chicago, Illinois 60601-1608
          312-646-5823
12        BY:  CHRISTOPHER BURRICHTER, ESQ.
               christopher.burrichter@dechert.com
13


14   ON BEHALF OF THE CDC/OCOO/OGC:


15        HHS OFFICE OF THE GENERAL COUNSEL
          PUBLIC HEALTH DIVISION
16        CDC/ATSDR BRANCH
          12501 Ardennes Avenue, Suite 301
17        Rockville, Maryland 20852
          301-443-8068
18        BY:  L. MICHAEL RAFKY, ESQ.
               ejv9@cdc.gov
19


20   ALSO PRESENT:


21        KINGREY SULLENS, Legal Assistant,
               The Monsour Law Firm PC
22
     THE VIDEOGRAPHER:
23
          ZACH HONE,
24        Golkow Litigation Services
```

```
 1        A.    My name is William James Murphy.

 2        Q.    And what do you do for a living?

 3        A.    I am currently a senior scientist with

 4   Stephenson and Stephenson Research and Consulting.

 5        Q.    And when did you join them?

 6        A.    I joined them on January 4 of 2022.

 7        Q.    And when did you come to an agreement with

 8   them that you would start on January 4th of 2022?

 9        A.    Because I was a government employee with

10   the National Institute for Occupational and Health

11   which is part of the Centers for Disease Control and

12   Prevention and in the Department of Health and Human

13   Services, I was a commissioned officer starting in

14   1992, and -- or 1993, actually February 8, and had

15   decided -- made a decision back in August or

16   September that I was going to separate from the Public

17   Health Service at 29 years-ish of service.  And so

18   my -- my plan was to exit from -- or retire from

19   NIOSH, retire from the Public Health Service and then

20   start work with Stephenson and Stephenson Research and

21   Consulting.

22             In terms of a specific date that I decided

23   to do that, I -- I don't have an answer for a specific

24   date.
```

1        Q.      When did you and Stephenson and Stephenson

2    agree that you would become an employee of Stephenson

3    and Stephenson, ballpark?

4        A.      So I worked with Mark Stephenson and Carol

5    Stephenson while they were employees to the National

6    Institute for Occupational Safety and Health.  I

7    worked with other members of SASRAC, that's the

8    acronym for Stephenson and Stephenson.

9               Specifically when did I make a decision,

10   it had to have been somewhere between August of 2021

11   and when I actually signed papers to join SASRAC in

12   January 4 of 2022.

13       Q.      When did you sign the papers?

14       A.      January 4.

15       Q.      All right.  So here is my question.

16              You didn't just show up on January 4th of

17   2022, at some point in time you agreed with the folks

18   at SASRAC, Hey, I'm coming on board.  What I want to

19   know is when was that?

20       A.      Well, as I just answered you, it was

21   sometime between September of 2021 and 2022 when I

22   started.

23       Q.      That's a pretty broad time period.  I want

24   you to be a little more specific.

```
 1        A.    I can't be more specific.  That's what I

 2   know.

 3        Q.    Do you have any communications between you

 4   and SASRAC about that?

 5        A.    Much of my communication was via phone.  I

 6   don't have -- I don't have a specific, I applied for

 7   this job and I am accepting an offer for working with

 8   them.

 9        Q.    Right.  But, I mean, it could be an

10   e-mail, Hey -- Hey, Mark, looking to leave NIOSH, do

11   you got anything that I can work on, anything like

12   that?

13        A.    No.

14        Q.    When did you first start talking to

15   Stephenson and Stephenson about joining them?

16        MS. OZUROVICH:  Object to the form.

17   BY THE WITNESS:

18        A.    What does that mean?  She objected to the

19   form.  Is there something I need to do?

20        MS. OZUROVICH:  Oh, you can answer.  Sorry.

21   It's just -- I'm just preserving the record,

22   Dr. Murphy.  Go ahead.

23   BY THE WITNESS:

24        A.    So in my research work collaborating with
```

1 Dr. Flamme, particularly Dr. Flamme and -- and Tasko,

2 work that I was doing with them while they were

3 employees of Western Michigan University, they were

4 conducting a research study examining the assumptions

5 of the contraction of the middle ear muscle system in

6 anticipation of firing a weapon.  There was a whole

7 series of laboratory studies that started with methods

8 and protocol development in 2013 and then they started

9 conducting human subject research on this in 2014 and

10 2015 and were continuing on with this.

11            I don't remember exactly when Dr. Flamme

12 separated from Western Michigan University and took a

13 position with SASRAC, but the work that they were

14 doing was trying to understand issues for damage risk

15 criteria for high-level impulse noise.

16            And because one of the things that they

17 are interested in and -- and are continuing to work on

18 is this issue of damage risk criteria, it is something

19 that is of interest to me and an area in which I knew

20 that I would not be able to do research in at the

21 National Institute for Occupational Safety and Health.

22 BY MR. MONSOUR:

23     Q.    That's all fine and dandy, but what

24 question were you answering there, Dr. Murphy?  I have

```
1    no idea.

2         A.    I'm sorry.  I don't understand your point,

3    your question.

4         Q.    I don't understand your answer.  What were

5    you talking about?

6         MS. OZUROVICH:  Object to the form.

7    BY THE WITNESS:

8         A.    I conduct research, have conducted

9    research in impulse noise and in hearing protection

10   and in assessing impulse noise.  SASRAC has been

11   involved in doing the same.

12   BY MR. MONSOUR:

13        Q.    Right.  So when did you start talking to

14   them about joining them?  That's the question.

15        A.    When did I --

16        Q.    I'm not asking you the first time you ever

17   had a conversation with Greg Flamme.  I'm wanting to

18   find out when did you first talk -- start talking to

19   these guys about coming on board.  It is not that

20   tricky.

21        MS. OZUROVICH:  Object to the form.

22   BY THE WITNESS:

23        A.    I have answered your question, sir.

24   BY MR. MONSOUR:
```

William Murphy, Ph.D.

```
1        Q.    No, you haven't.

2        A.    Well, I believe that I have.

3        Q.    Well, why don't you try again.

4        MS. OZUROVICH:  Object to the form.

5   BY MR. MONSOUR:

6        Q.    When did you first start talking to Greg

7   Flamme and Mark Stephenson and anybody else at SASRAC

8   about coming on board and working with them as a

9   scientist?

10       MS. OZUROVICH:  Asked and answered.

11             Go ahead, Dr. Murphy.

12       MR. MONSOUR:  He didn't answer it.

13  BY THE WITNESS:

14       A.    I've given you the indication in terms of

15  something of the timeline.  I don't remember when

16  Dr. Flamme separated from Western Michigan and joined

17  SASRAC.  I would need to look at his curriculum vitae

18  and understand what it is that, you know, when he

19  actually joined.

20  BY MR. MONSOUR:

21       Q.    So you started talking to Flamme about

22  joining SASRAC when he joined SASRAC, is that what you

23  are saying?

24       A.    No, no.
```

William Murphy, Ph.D.

```
1          Q.     You are not?

2          A.     No.

3          Q.     Then what are you saying?

4          A.     I am trying to give you something of a

5   timeline.  I don't remember specifically when my

6   decision -- I -- I can tell you when my decision was

7   to separate from the government and that was sometime

8   in August of 2021.

9                 And then the question is what would I be

10  doing following that.  Would I just be a retiree of

11  the U.S. Public Health Service.  I could have done

12  that.  I'm retiree from the U.S. Public Health

13  Service.  Or I could continue to do work with SASRAC.

14  In other words, in my retired status after I had

15  separated, I would be employed by SASRAC, and that's

16  what I have done.

17         Q.     Is the -- so the first time they talked to

18  you about coming on board, would that have been after

19  August of 2021?

20         A.     That is the first time it was seriously

21  entertained.

22         Q.     Okay.  When was it not seriously

23  entertained before, when was it just casually brought

24  up, give me some ideas?
```

William Murphy, Ph.D.

1      A.    When was it not serious entertained, it

2  would have been before August of 2021.

3      Q.    I agree.  Give me a ballpark about when

4  the earliest that would have been?

5      A.    Again, I don't remember when Dr. Flamme --

6  Flamme joined SASRAC.  I know that SASRAC was formed

7  in 2015 or 2016 because Dr. Stephenson, Dr. Mark

8  Stephenson and Dr. Carol Stephenson, the two Ss in

9  SASRAC, that they retired from NIOSH as civil servants

10  in December 31st of 2015.  And the reason I remember

11  that date is because we had a going away party at --

12  at NIOSH and that would have been their effective date

13  for retirement.

14      Q.    Okay.

15      A.    So it would be somewhere perhaps between

16  2015 and 2020 -- or 2021 when I -- when I made that

17  decision.

18      Q.    All right.

19      A.    I'm sorry I can't be more specific than

20  that.  I -- it was not something that I -- that I

21  have.

22      Q.    When did they first start talking to you

23  about being an expert in the 3M litigation, the 3M

24  Earplug Litigation involving the Combat Arms

1    testing exclusive of myself and in the course of that

2    they may have been provided something, but I can't

3    tell you the answer to that for sure.

4         Q.    Okay.  Request No. 10:

5              "All raw data for any testing performed on

6    CAEv2, whether REAT, MIRE, sound localization,

7    impulsive noise or other testing."

8              Do you have anything responsive to that?

9         A.    The raw data that I would have had while I

10   was an employee at NIOSH is the property of NIOSH.

11        Q.    Okay.  The question is, though, do you

12   have it?

13        A.    I have already answered that.

14        Q.    Is the answer you don't have any?

15        A.    The answer is I do not have any raw data

16   on the Combat Arms Version 2.

17        Q.    Okay.  When did you last have some raw

18   data on the Combat Arms Version 2?

19        A.    So I have had discussions with Mr. Rafky

20   to make sure that I was being compliant with things,

21   because I was working for two years, from March

22   of 2020 to March 1st of 2022 when I officially

23   separated and even today I'm still working on things

24   in terms of writing articles and papers and analyzing

William Murphy, Ph.D.

```
1    data, not the Combat Arms data, but those raw data
2    that had been returned when I separated from the
3    government on February 28, or March 1st, I went to --
4    physically went to the Taft building for NIOSH on
5    February 28 to turn in the data -- I don't know in
6    data acquisition -- the -- it is a rundant --
7    redundant array of independent devices.  It is RAID
8    array, and it was four hard drives that had data that
9    I had used to do analysis and such.  That was turned
10   in on February 28.
11        Q.    Okay.  Real quick, so you started --
12        A.    Those data still exist at NIOSH and if the
13   government chooses to provide those to you, they
14   can -- they can do that.  That's up to them.
15        Q.    You had -- you officially separated from
16   the government in March of 2022?
17        A.    Correct, that is my official -- March 1st
18   of 2022 is my official retirement date.  And what
19   the -- in the military, in the uniform services, of
20   which the US Public Health Service Commission Corps is
21   one of eight uniformed services in the United States,
22   you earn annual leave and the annual leave when you
23   get to that point where you are ready to retire, you
24   have two options, one is to enter what's called
```

William Murphy, Ph.D.

1  subset of those documents include documents related to

2  the Combat Arms Earplugs."

3          Do you see that?

4      A.    I do.

5      Q.    And that was as of June 17 of 2022.

6          So can you tell me what did you have in

7  your possession from NIOSH that involved the Combat

8  Arms Earplugs on June 17th of 2022?

9      A.    So the documents included the 213016 and

10  the 213017 test reports that were produced by Elliott

11  Berger and -- and Aearo Laboratory.  There was a cover

12  letter to Major Mark Little that was accompanying

13  that.  I had two copies of each of those.  There was a

14  research paper by Dr. Armand Dancer and Pascal Hamery

15  that was about nonlinear earplugs, and I believe it

16  was presented in a National Hearing Conservation

17  Association meeting in 1998.

18          Excuse me.  There was a presentation from

19  Dr. Douglas Ohlin, formerly with the -- he has since

20  deceased, formerly with the Center for Health

21  Promotion and Preventive of Medicine.  It was a -- it

22  was a printout of a presentation that Dr. Ohlin gave.

23  I don't remember the actual meeting.  I wasn't at the

24  meeting.  I wasn't at the meeting that Dr. Dancer

William Murphy, Ph.D.

```
 1   presented his work.  And there was a handwritten note

 2   by Major Little that was in his file.

 3            So these files were things that I had

 4   received from Major Little -- well, I'm not really

 5   sure how you'd say if it is from Major Little, he

 6   didn't formally hand them off to me, but these were

 7   files that were remaining from his yearlong stationing

 8   at NIOSH.  He -- he had joined us in 2001 and returned

 9   to a different post in the Army in 2002.

10       Q.    Okay.  So Major Little had some

11   handwritten notes?

12       A.    Yeah.  And really it was a schedule

13   saying, Okay, we -- these are things that he wanted

14   to -- to plan on testing or -- or to conduct.

15       Q.    Major Little was going to do some testing

16   on the Combat Arms Version 2?

17       A.    Yes, and he did.  That was part of my

18   deposition in January of 2021.

19       Q.    And if I'm thinking of the same one, it

20   looked like an e-mail, and you just had different guns

21   and different types and then you had little numbers

22   next to them and there was a whole page of basically

23   just impulse measurements, if I remember that

24   correctly?
```

William Murphy, Ph.D.

```
1       A.    Yes.

2       Q.    Is that -- is that it?  Is there -- was

3  there any more to it than that?

4       A.    I'm just trying to think of what else

5  might have been in that.  Honestly, I did not spend

6  time in that.  There is such a greater wealth of

7  information that was duplicative of what Major Little

8  had that was in -- in the files that I was able to

9  review in preparation for this testimony and -- and as

10  well as reviewing the information on -- in trial and

11  what have you, so.

12       Q.    Yes.  So let -- let me see -- it's a --

13             (Discussion off the stenographic

14              record.)

15  MR. MONSOUR:  Zach, Touhy file Exhibit 1.  There

16  we go.

17  BY THE WITNESS:

18       A.    I remember that.

19  BY MR. MONSOUR:

20       Q.    Okay.  Dr. Murphy, I'm putting up --

21  MR. MONSOUR:  We'll mark this as -- we'll mark

22  this -- it says Exhibit 1 on it, but, Madam Court

23  Reporter, if you'll mark this one as Exhibit 3.

24             (WHEREUPON, a certain document was
```

```
 1                   marked William Murphy, Ph.D.

 2                   Deposition Exhibit No. 3, for

 3                   identification, as of 06/28/2022.)

 4   BY MR. MONSOUR:

 5        Q.    This is an e-mail from William Murphy to

 6   Elliott Berger and some other people, cc'd are a John

 7   Franks and Mark Little.  It is dated 10/23 of 2001,

 8   "Impulse peak levels."

 9             Is this the document that you are talking

10   about?

11        A.    It is one of those.

12        Q.    Okay.  Do you have any other --

13        MR. MONSOUR:  And you can scan down, Zach, so

14   Dr. Murphy can see this.

15   BY THE WITNESS:

16        A.    I'm familiar with the document.

17   BY MR. MONSOUR:

18        Q.    Okay.  Are there any other -- is there any

19   other document or any other data that you had about

20   the CAEv2 testing other than this?  I'm talking about

21   in the NIOSH files?

22        A.    In the things that were returned to NIOSH,

23   this is a summary of recordings that were collected by

24   Major Little and I from a test that we did in
```

William Murphy, Ph.D.

```
 1    September of '20 -- no, not '20 -- September of 2001.

 2    We had received at NIOSH the ISL fixture I want to say

 3    in January of 2001 and when Major Little joined us,

 4    this was a -- something that was of interest to him.

 5    It was something that was of interest to Doug Ohlin

 6    because he provided the -- the test materials that

 7    were used for the -- this particular test.  And you've

 8    received in my deposition in January of 2021 the

 9    summary results that were presented at a couple of

10    different meetings.

11         Q.    Okay.  Is this -- does this document

12    reflect the only testing that you have performed on

13    the CAEv2?

14         A.    It does not.

15         Q.    What other testing have you done

16    personally on the CAEv2?

17         A.    So this reflects a test that was conducted

18    in Aurora, Indiana.  In my electronic files it would

19    be listed under Rising Sun, Indiana.  The actual

20    physical location where we were at was somewhere

21    between Aurora and Rising Sun and I wrote down Rising

22    Sun because the -- the person's home where we were

23    doing the testing, I considered it to be Rising Sun,

24    incorrect.
```

William Murphy, Ph.D.

1          That's the -- this is the first test.  The

2   second series of impulse noise tests that were

3   collected with the Combat Arms Version 2 earplug was

4   in, I want to say May of 2 -- 19 -- 2002 and it was

5   part of a Health Hazard Evaluation that NIOSH

6   conducted.  Major Little had joined me in that Health

7   Hazard Evaluation.  It was with the Fort Collins

8   Police Services Department in Fort Greeley,

9   Colorado -- or Greeley, Colorado -- I'm sorry, Fort

10  Collins Colorado.  I get the areas mixed up.

11          We did the testing with Dr. Randy Tubbs,

12  Captain Randy Tubbs with the U.S. Public Health

13  Service.  Mark and I did the noise capturing, the

14  testing with -- at the indoor firing range we tested

15  ten different pistols and two -- well, ten different

16  weapons, eight of which were pistols, two of which

17  were shotguns.  At the outdoor firing range we tested

18  four pistols, one shotgun and two higher caliber

19  rifles, a Colt AR-15 and an H & K, Heckler & Koch,

20  which I don't remember the number.  I'm not that

21  familiar with all of the different models of guns.  I

22  do know that it was a .223 caliber rifle.

23          So we tested the Combat Arms with an

24  acoustic test fixture, like what we did for the work

1    in Aurora and did it at an indoor and an outdoor

2    firing range.

3            In 2015, and we are talking specifically

4    about the Combat Arms Version 2, in 2015, you know,

5    now I've got several more years, 13, 14 more years of

6    experience working in impulse noise, we had developed

7    an acoustic standard, Mr. Elliott Berger and myself

8    and several others in the hearing protection

9    community, and we used that acoustic standard, the

10   ANSI S12.42-2010 standard to evaluate a -- a variety

11   of hearing protection devices in the NIOSH impulse

12   noise laboratory which uses, instead of a firearm, it

13   uses an acoustic shock tube.

14           Ah, let me think.  I don't remember

15   specifically which products -- so those -- those were

16   tests that were done with impulse noise.  We were

17   comparing to acoustic test fixtures, the GRAS 45CB

18   test fixture, one that was owned by NIOSH, and one

19   that was owned by Western Michigan University.

20           There are measurements that were conducted

21   at the U.S. Army Aeromedical Research Laboratory and

22   since I don't have access to those files any longer, I

23   don't have my database that I had that information in,

24   there were measurements done possibly in 2004, again

1    in 2006 and maybe in 2010.

2              The measurements in 2010 were done with a

3    Combat Arms Version 4 earplug and we evaluated three

4    different fixtures.

5        Q.    Hold on.  Time out.  Time out.  I don't

6    want to get confused.  Let's talk about the Version 2

7    exclusively and then we'll move on to 4 or any other

8    ones, okay?

9              So all I want to know is at this point in

10   time --

11       A.    Sure.

12       Q.    -- when -- just times where William Murphy

13   Ph.D. has actually hands-on done testing on the Combat

14   Arms Version 2.  I've got --

15       A.    I'm trying to give you -- if you give

16   me --

17       Q.    -- the first one that was mentioned in

18   Exhibit 3 that's in front -- in front of your screen

19   right now, correct?

20       A.    Yep.

21       Q.    That's the first time.

22              The second time was in May of '02 with

23   Dr. Little and a Captain Tubbs and it was part of a

24   Health Hazard Evaluation, correct?

William Murphy, Ph.D.

```
 1        A.    Correct.

 2        Q.    And then I think you said the third time

 3   was in 2015?

 4        A.    In the exhibits that were provided in the

 5   Touhy declaration, there were -- there was a study

 6   that was conducted, which is -- that's one that you

 7   have up on the -- on the screen right now.

 8        Q.    Right.

 9        A.    There was a presentation to the American

10   Industrial Hygiene Association.  And that one

11   described measurements that were done in Fort Collins.

12   And if I were to be able to see that -- that

13   particular presentation, I could refresh my memory and

14   tell you whether or not it included any of the shock

15   tube measurements that were conducted at Fort Rucker

16   at the U.S. Army Aeromedical Research Laboratory.

17        Q.    Okay.  And real quick, so if I can -- if I

18   can get that, the testing that was done with Captain

19   Tubbs and Major Little, the Health Hazard Evaluation,

20   where was that one done at?

21        A.    Fort Collins.

22        Q.    That's Fort Collins.

23              And then there is other testing, is it at

24   USAARL?
```

William Murphy, Ph.D.

```
 1        A.    Correct.

 2        Q.    And when was the testing done on the

 3   Combat Arms Version 2 involving you at USAARL, what

 4   year would that have been?

 5        A.    There were -- as I recall, there were

 6   three different trips that I had made to USAARL over

 7   the course of a decade.  I -- I don't remember

 8   particularly which time I went there.  I'd need to

 9   actually look at the -- the file and tell you whether

10   or not it would give me the information.

11        Q.    Okay.

12        A.    In 2002 or -- 2002, 2004, and, again, I --

13   I honestly don't remember all of these dates --

14        Q.    I'm trying to get as best as you recall.

15        A.    I have -- I have -- right, I have acoustic

16   shock tube data that were reported in the presentation

17   and that acoustic shock tube data, instead of looking

18   at what I called noise reduction, and that's what --

19   that's what this document is showing, internal peak

20   levels versus external peak levels, and that would be

21   noise reduction.

22              In the USAARL measurements that were done,

23   let's just -- like I said, 2002, 2004 perhaps, I

24   don't -- I don't remember the act -- the actual dates
```

1    of those things.  I do remember the data that I have

2    on those.  And --

3         Q.    Okay.  Let me ask you this:

4               Generally speaking, what did the data

5    show?

6         A.    The third octave band data -- I mean, do

7    you -- do you have the -- the document that was --

8    the -- the presentation that was shared and provided

9    to you -- well, I'm not going to ask.  I know you have

10   that.  If you can put that up on the screen, then I

11   can tell you what the data show.

12               (Discussion off the stenographic

13                record.)

14   BY MR. MONSOUR:

15        Q.    Is it a -- okay.  Let me ask you this --

16        A.    The PowerPoint.

17        Q.    -- is it a PowerPoint that involves you

18   and a Chucri Kardous?

19        A.    Correct.

20        Q.    Okay.  Can we --

21               (Discussion off stenographic record.)

22        MR. MONSOUR:  Touhy folder Exhibit 2.  There you

23   go.

24               (WHEREUPON, a certain document was

```
  1              Is -- is this it?

  2      A.    Yep.

  3      Q.    Okay.  And this is a document entitled --

  4      MR. MONSOUR:  We'll mark this as exhibit -- what

  5  exhibit number are we on?

  6      THE VIDEOGRAPHER:  This will be 6.

  7      MR. MONSOUR:  Six.

  8                  (WHEREUPON, a certain document was

  9                   marked William Murphy, Ph.D.

 10                   Deposition Exhibit No. 6, for

 11                   identification, as of 06/28/2022.)

 12  BY MR. MONSOUR:

 13      Q.    This document, just so I can identify it,

 14  it says:  "Impulse Peak Insertion Loss for Hearing

 15  Protection Devices Tested with an Acoustic Shock

 16  Tube."

 17      A.    Yes.

 18      Q.    And the authors are William J. Murphy,

 19  Pamela S. Graydon, Matthew Strobel and Katrina

 20  Freeland, correct?

 21      A.    Yes.

 22      Q.    Okay.  All right.  Any other testing that

 23  you've done specifically on the CAEv2?

 24      A.    In work that Major Little and I were doing
```

William Murphy, Ph.D.

```
 1    in 2001 and 2002, I was in the process of developing a

 2    new real-ear attenuation at threshold system for the

 3    NIOSH Hearing Protection Device Laboratory, and one of

 4    the things that we were doing was testing different

 5    products and doing real-ear attenuation tests of

 6    people and we did not have a formal study, but those

 7    tests were conducted and there were about 12 tests

 8    with the green side and I think nine tests with the

 9    yellow side of the earplug.

10        Q.    Okay.  And where are those results

11    recorded?

12        A.    Those results are with the government.

13        Q.    Okay.

14        A.    In my preparation for my Touhy deposition,

15    I presented that information to Mr. Rafky and to

16    Ms. Brandy Vaughn, at one time it was Brandy Anderson,

17    and I believe the person at the DOJ was a Jacqueline

18    Snead.  Is that -- somebody might be able to correct

19    me.  I don't see Mr. Rafky on here.

20        MR. RAFKY:  No, I am on, Bill.  Jackie Snead is

21    the -- I believe she is the lead DOJ attorney.

22        THE WITNESS:  Okay.  Thank you, Michael.

23    BY THE WITNESS:

24        A.    I presented that information to them in
```

William Murphy, Ph.D.

1   various draft versions of my -- I don't know what you

2   call it -- a deposition document, my -- my responsive

3   to the -- to the Touhy request.

4   BY MR. MONSOUR:

5       Q.   Okay.  All right.  So was that -- that was

6   produced to us in your Touhy depo response?

7       A.   The REAT data were not.

8       Q.   Okay.  The REAT data were not.

9            What was your REAT data for the Combat

10  Arms Version 2 version that you did?

11      A.   I am not sure if I can answer that.  That

12  is something that you'd have to get approval from

13  Michael for me to discuss.

14      Q.   He hasn't objected yet, so --

15      MR. RAFKY:  I'm sorry.  Can you -- can you

16  repeat the question?

17      MR. MONSOUR:  Sure.

18  BY MR. MONSOUR:

19      Q.   When you were testing, when you were doing

20  REAT testing on the Combat Arms Version 2, identify,

21  if you would, the type of REAT testing that you were

22  and the results of the REAT testing?

23      MR. RAFKY:  Actually, I would object to that

24  question given it is not really -- I don't think it is

1   covered by the expert report that was filed for

2   Dr. Murphy's deposition here today.

3       MR. MONSOUR:  I don't understand what you are

4   saying.

5       MR. RAFKY:  I think it is outside the scope of

6   the expert testimony that he is giving.

7       MR. MONSOUR: Well, I -- I beg to disagree,

8   unless you've got a government objection, I'm going to

9   ask him these questions.  I think he is -- I mean, if

10  he has done testing on a product, I need to know what

11  the results are.

12      MR. RAFKY:  Okay.  Well, I'll go ahead and put

13  my objection on the record.

14          But go ahead, Dr. Murphy.

15  BY MR. MONSOUR:

16      Q.   Okay.  So what type of REAT testing did

17  you do on the CAEv2 and what were the results?

18      A.   So at that time I can tell you that it was

19  not S3.19, 1974 testing.  The subjects involved in the

20  tests were given an instruction.  I personally don't

21  remember what instruction was provided other than, you

22  know, to reach over, grab your ear and insert the

23  earplug.

24          The testing -- and -- and let me -- let me

1    preface this and say that because we were developing

2    our data acquisition system, our REAT system, we never

3    presented the data.  The system may have been

4    completely functional.  I don't know for sure.  In

5    other words, there is -- trying to figure out

6    what's -- what's going on and whether you worked all

7    of the bugs out of the software and -- and the data

8    acquisition, that's certainly a thing that we were

9    trying to do at that point in time.

10           The first study that I recall that we

11   published data from was something in 2004, '5, '6 when

12   the tests were taken using what I would call the NIOSH

13   HPD lab data acquisition system in our REAT

14   laboratory.  And it did not cover any of the Combat

15   Arms Earplug Version 2, Version 3, 4, whatever.  It

16   didn't have any of those.  It used different earmuffs

17   and earplugs in that testing.

18           Now, you've asked me what were the results

19   from the tests.  I don't remember specific results.  I

20   can tell you that out of the 12 persons there were

21   perhaps two of them that didn't get high levels of

22   attenuation.

23           The testing that we conducted with them,

24   you asked me what kind of testing.  At that point in

```
1    time we were looking at -- not combat -- the ANSI

2    S12.6-1997 document or standard and that describes in

3    it an Informed-User-Fit and a Naive-Subject-Fit or an

4    untrained user fit.

5            And the persons who were involved in the

6    testing, some of them were persons working in my

7    section at the time and one of those persons was me.

8    So I would not have counted as a naive subject.  It

9    would have been then a Method A type test.  But,

10   again, we were providing the persons with the

11   protectors and presuming that they knew how to insert

12   an earplug.

13       Q.    Okay.  So would that be what is called the

14   experimenter supervised under the ANSI 12.6?

15       A.    That would be correct, Method A.

16       Q.    Okay.  Method A.

17            So how many people did you test?  You said

18   12?

19       A.    There are 12 tests in the attenuation data

20   for the green side and there are nine tests for the

21   attenuation data for the yellow side.

22            I can tell you that from what I recall,

23   you know, prior to working on my deposition document

24   for the Touhy request, is I reviewed that.  I was able
```

William Murphy, Ph.D.

1    to go back through and dig out, you know, which

2    results were mine and I was able to test myself twice,

3    and this is more explanation than you want, but in my

4    testing the way that we designed the data acquisition

5    software, I wanted to make sure that I didn't have

6    multiple tests from a subject that could be confused

7    with a different test that was being conducted in --

8    in the laboratory.  In other words, you want to make

9    sure that when you -- you've tested, you know, today,

10   that I pair my test today with an occluded and an

11   unoccluded test of that product.  And if we were doing

12   multiple represitions -- multiple repetitions of a

13   test, that the two unoccluded tests, which is what was

14   required in ANSI 12.6-1997, with two occluded tests,

15   and that these two tests are paired very specifically.

16            In the development of our software, the

17   reason I would say that there -- that I showed up in

18   the data twice is because I lied to my system in order

19   to debug it, you know, I didn't want to have to go and

20   build a whole another study setup to do it, but I, you

21   know, tricked my software to make it so that I was,

22   you know, William Murphy in one case and a -- a

23   different name that I used in a different case.

24            So it was a way to get multiple tests

```
 1  without having to bring somebody else in and -- and

 2  mess with -- with, you know, doing all of the

 3  recruiting and all of the -- all of the stuff that we

 4  had with that.

 5      Q.   So you are two of the data points is what

 6  you are saying?

 7      A.   I think so, yeah.

 8      Q.   Okay.  All right.  And you are

 9  certainly -- you certainly know how to fit an earplug,

10  right?

11      A.   I think I can.

12      Q.   I mean, you should be one of the best,

13  right?

14      A.   What do you mean by best?

15      Q.   I don't know.  I mean, you probably -- of

16  all of the people that are on this Zoom call right

17  now, wouldn't you think you know more about fitting

18  earplugs than all of us?

19      MS. OZUROVICH:  Object to the form.

20  BY THE WITNESS:

21      A.   I probably have more experience than

22  anyone on the call.

23  BY MR. MONSOUR:

24      Q.   Okay.  That's all I'm trying to point out.
```

William Murphy, Ph.D.

```
 1              When you did your ANSI S12.6-1997 Method A

 2   testing, what was the mean minus 2 standard deviations

 3   on the green end?

 4        A.    I don't know.

 5        Q.    What was the mean minus --

 6        A.    That is, I do not recall what those values

 7   were.  I don't have those data at hand.  I -- I

 8   haven't looked at them in recent months.

 9        Q.    Okay.  What about the yellow NRR, what was

10   the mean minus 2 standard deviations that you

11   calculated on that?

12        A.    Do you mean the -- do you mean the --

13   the -- the yellow end of the earplug?

14        Q.    Yes.

15        A.    What is the mean minus 2 standard

16   deviations?

17        Q.    Yes.

18        A.    Because what I know about the earplug and

19   what I know about how the Noise Reduction Rating is

20   calculated, the -- when you have at low frequencies in

21   this case for the Combat Arms Earplug, that you have

22   low attenuation values, particularly essentially zero

23   at, say, 125, 250, 1 -- 500 hertz, the mean minus 2

24   standard deviation value could be negative, it may
```

William Murphy, Ph.D.

1    have been a negative as what we've seen in the 213016

2    tests conducted in the E-A-RCAL Laboratory, with an

3    Experimenter-Fit you had a negative, was it 2

4    something, I'd have to pull up the actual document.

5         Q.    It is my understanding.

6         A.    It was minus 2 is what it was rated at.

7              And I can tell you that the data that we

8    collected at NIOSH looking at the nonlinear side of

9    the earplugs, it would have essentially been --

10   resulted in a zero for a mean minus 2 standard

11   deviation or it might have been positive, it might

12   have been negative, but it would have been close to

13   zero.

14        Q.    Okay.  What would it have been

15   approximately for the green end?

16        A.    That I don't remember.  As I said, there

17   are two persons in that -- or two ex -- two test

18   datasets that had low attenuation and that will

19   increase the standard deviation that is being

20   subtracted, so, you know, you might have had something

21   like what we see in the 213015 tests, you might have

22   something like what we've seen in the Fort Rucker U.S.

23   Army Aeromedical Research Laboratory tests that

24   Dr. Ahroon and I think it might be Efrem Reeves --

```
 1        Q.     Yeah.

 2        A.     -- that they conducted.  I don't

 3   remember --

 4        Q.     What NRR did they get?

 5        A.     I'm sorry.  You'd have to open up the

 6   value and -- and -- open up the report and we can find

 7   it.

 8        MS. OZUROVICH:  Hey -- hey, Doug, I don't know

 9   if you are close on this line of questioning, but we

10   have been going for like an hour and ten if you want

11   to take a break.

12        MR. MONSOUR:  Yeah, I was -- I went 50 on my

13   first time so I was trying to go a little longer on

14   this one to keep us on schedule.  Give me a few more

15   minutes and then let's take a break.

16        MS. OZUROVICH:  Sure.

17   BY MR. MONSOUR:

18        Q.     Are you okay with that Dr. Murphy?

19        A.     Yeah.

20        Q.     Okay.

21        A.     My back teeth aren't floating quite yet,

22   but I'm getting there.

23        Q.     Okay.  All right.  Well, I -- I feel you.

24   I get it, I get it.
```

1      MR. MONSOUR:  Hint, hint, Mr. Rafky, I want to

2   get this.

3   BY MR. MONSOUR:

4      Q.    What do I need to request to ask for this

5   data?  How would we identify it?

6      MS. OZUROVICH:  Object to the form.

7   BY THE WITNESS:

8      A.    Okay.  Am I supposed to answer that?

9      MS. OZUROVICH:  Go ahead, yep.

10   BY THE WITNESS:

11      A.    There are a couple of documents that I

12   think I can find or I can certainly point to in the

13   papers that were returned to the government.

14   Particularly there was a fax that was sent by me to

15   Lieutenant Colonel Lorraine Babeu, who is an Army

16   audiologist -- was an Army audiologist at that time

17   and I believe at that time she was stationed at

18   Aberdeen Proving Ground in the HRED division, Human

19   Research Engineering Directive -- Directorate I

20   believe it is.

21          I had faxed her a printout from my

22   database.  So there were -- we collected the data with

23   the laboratory system and it was a program that was

24   written in Visual Basic and it was linked to a

William Murphy, Ph.D.

 1   Microsoft Access database, and in the Microsoft Access

 2   database is where the raw data exists in terms of, you

 3   know, each of these persons' tests.

 4           There is a spreadsheet that I had created

 5   sometime maybe after the -- my initial knowledge that

 6   there was litigation, there was some question about

 7   the Combat Arms Earplugs and particularly after I had

 8   been contacted by Kirkland & Ellis, Mr. Nicholas

 9   Wasdin, to potentially be deposed in this process.

10           And I looked at the data that I had, I had

11   the USAARL data at that time from a report that was

12   published, I had in the files that NIOSH had that

13   Mr. -- or Captain -- or not Captain -- Major Mark

14   Little had received from Elliott Berger, which is the

15   016 and the 017 test reports.  I had those.  I had my

16   own data and I was doing some comparison of those.

17           And somewhere along the way Ms. Vaughn or

18   Mr. Rafky had instructed me not to spend any more time

19   doing analysis on those datasets.

20           So I -- I don't know if I've answered your

21   question.  There is a fax, there is a database and

22   there is an Excel spreadsheet.  The Excel spreadsheet

23   is probably the -- the cleanest one, and I can tell

24   you the printout and the fax was boogered in terms of

William Murphy, Ph.D.

```
 1   we had, you know, subject number, we had subject

 2   trial, and then the tests that were conducted at 125

 3   up to 8 kilohertz, but the -- the database was built

 4   with the intent that you could incorporate data from

 5   63 hertz, 125, 250, 500, 1, 2, 3, 150, 3150, 4,000,

 6   and 6,300, and 8,000 in the anticipation that the

 7   database might be used for ANSI 3.19 testing in

 8   anticipation that it might be used to compare or do

 9   tests according to the European standard which

10   includes a 63 hertz test.

11       Q.    Okay.  So I'm going to make this request

12   probably to Mr. Rafky or -- or somebody -- somebody

13   else, but I basically need to look for faxes from you

14   to Lorraine Babeu who worked at Aberdeen Proving

15   Ground?

16       A.    Yes, sir.

17       Q.    I need to ask for your all REAT testing

18   results, that's in an Excel spreadsheet?

19       A.    Yes, there is an Excel spreadsheet.

20       Q.    And can you tell me the year that this

21   testing was done?  Maybe that will help us.

22       A.    It was when Major Little was with us, so

23   2001, 2002.

24       Q.    2001, 2002.  Okay.
```

William Murphy, Ph.D.

```
 1   you ever performed REAT testing on the Combat Arms

 2   Version 2?

 3        A.   I'm just trying to recall and make sure

 4   that I can answer that correctly, and I believe the

 5   answer is yes.

 6        MR. MONSOUR:  Okay.  Now let's take a break.

 7   How about 10 minutes, Allie, is that okay?

 8        MS. OZUROVICH:  Yeah, or let's go off the

 9   record.

10        THE VIDEOGRAPHER:  Off the record, the time is

11   12:25.

12                  (WHEREUPON, a recess was had

13                   from 12:25 to 12:45 p.m.)

14        THE VIDEOGRAPHER:  Back on record.  The time is

15   12:45.

16   BY MR. MONSOUR:

17        Q.   Okay.  We are back on the record after a

18   short break.

19             Are you ready to go, Dr. Murphy?

20        A.   I am.

21        Q.   Okay.  Dr. Murphy, on the REAT testing

22   that we just discussed that you performed on the

23   Combat Arms Version 2, was -- was the data from that

24   REAT testing information that was in your possession
```

1   on June 17 of 2022?

2        A.    I had the fax in my possession, the f-a-x,

3   the fax in my possession at the time, yes.

4        Q.    Okay.  And so since June 17th of 2022,

5   you've returned that fax to the government?

6              Correct?

7        A.    Yes.

8        Q.    Okay.  And you can't remember if the

9   fax -- if the document that you just returned to the

10  government within the past two weeks had an NRR

11  calculated on it?

12       A.    As I said before, it does not have an NRR.

13       Q.    Does it have a -- does it have a mean

14  minus 2 standard deviations on it?

15       A.    In the Access database that we developed

16  and in the Visual Basic program that we developed, the

17  query that would have been written to estimate things

18  like a mean minus 2 standard deviations, it may be

19  listed in the query.  I don't remember.  Frankly --

20       Q.    Okay.

21       A.    -- it's not -- it's not information that I

22  referred to in preparing for and trying to understand

23  this case.

24       Q.    I understand.  That's not my question.

1           My question was:  Did that query with

2    regard to the green end have a number that was

3    calculated to determine the mean minus 2 standard

4    deviations?

5        A.    Because I don't have -- because I don't

6    have it in my possession, I can't answer your

7    question.

8        Q.    Well, but you have a memory.

9        A.    Because I don't have it in my possession,

10   I can't answer your question.

11       Q.    What do you remember the document saying

12   with regard to the query concerning the mean minus 2

13   standard deviations, from your memory, what was the

14   number?

15       A.    From what I've said, I don't recall

16   whether there was a mean minus 2 standard deviations

17   calculated.  There were raw attenuation values for the

18   various trials at each of the frequencies for the

19   subjects and their trials and the frequencies were

20   125, 250, 500, 1000, 2000, 4000 and 8000 hertz.  And

21   the query was not fully functional because there are

22   handwritten notes that I had to go back at the time

23   that I sent the fax that I had to go back and dig out

24   of the dataset in order to make sure that Colonel

1    Babeu was receiving 125 to 8,000 hertz.  Things were

2    shifted.  It was -- it was messed up, so it would

3    indicate that there are handwritten attenuation values

4    that point to what frequency they should be.

5        Q.    Did the fax to Ms. Babeu, did it talk

6    about the performance of the plug?

7        A.    It said these are the data that we have

8    for attenuation.  It said something to the effect of

9    it's preliminary data, it is not anything that I'm

10   going to stand beside, it is not any evaluation that

11   NIOSH has officially conducted.

12       Q.    Okay.  Was this data ever shared with

13   counsel for 3M?

14       A.    No.

15       Q.    Was it ever discussed with counsel for 3M?

16       MS. OZUROVICH:  Object.

17           Do not answer that question, Dr. Murphy.

18   That's attorney/client privilege and violates the

19   stipulation we have.

20   BY MR. MONSOUR:

21       Q.    I'm not asking you what was said.  All I

22   want to know is was -- was this data, any aspect of

23   this data that I don't have, was it ever conveyed to

24   counsel for 3M?

William Murphy, Ph.D.

1      MS. OZUROVICH:  I am going to instruct you not

2  to ask -- answer that, Dr. Murphy.  It is going into

3  the substance in and of itself by asking that

4  question.

5      MR. MONSOUR:  All -- all I want to find out,

6  Allie, is if any of the contents of this data from

7  this REAT testing that he performed, if any of the

8  results from it or interpretations of it were conveyed

9  to you, not what it was, but if that happened at any

10 level.  I'm entitled to that.

11     MS. OZUROVICH:  I am going to instruct him not

12 to answer that.

13     MR. MONSOUR:  Okay.  Well, I'm just going to

14 tell you, full -- full -- I'm going to ask the court

15 to make him answer that question which might require a

16 second deposition.  I just -- I want to throw that out

17 there, Allie.

18     MS. OZUROVICH:  I understand.  I appreciate you

19 previewing that for me, Doug.

20     MR. MONSOUR:  Okay.

21 BY MR. MONSOUR:

22     Q.   All right.  Are you going to take your

23 counsel's advice and not answer that question,

24 Dr. Murphy?

 1        A.    On the advice of my counsel, I am not

 2   going to answer that question.

 3        Q.    Okay.  Fair enough.

 4              How did you transmit the documents that

 5   were in your possession or the data that was in your

 6   possession that was the subject of Exhibit 2 to your

 7   deposition e-mail, how did you get that data back

 8   to NIOSH?

 9        A.    The deposition to e-mail, what -- what are

10   we talking about here?

11        Q.    Exhibit 2 to your deposition, there is an

12   e-mail chain that we went through earlier talking

13   about these NIOSH documents.

14        MR. MONSOUR:  Can we pull it up.

15   BY MR. MONSOUR:

16        Q.    Do you remember this, we talked about it

17   earlier?

18        A.    Yes.

19        Q.    How did you get whatever data you had back

20   to NIOSH?

21        A.    I physically drove to the facility and

22   handed the file folders with the printed out data to

23   David Byrne.  David Byrne was my supervisor at NIOSH.

24        Q.    Okay.  When I was asking you about your --

William Murphy, Ph.D.

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, JULIANA F. ZAJICEK, a Registered

 4   Professional Reporter and Certified Shorthand

 5   Reporter, do hereby certify that prior to the

 6   commencement of the examination of the witness herein,

 7   the witness was duly remotely sworn by me to testify

 8   to the truth, the whole truth and nothing but the

 9   truth.

10              I DO FURTHER CERTIFY that the foregoing is

11   a verbatim transcript of the testimony as taken

12   stenographically by me at the time, place and on the

13   date hereinbefore set forth, to the best of my

14   availability.

15              I DO FURTHER CERTIFY that I am neither a

16   relative nor employee nor attorney nor counsel of any

17   of the parties to this action, and that I am neither a

18   relative nor employee of such attorney or counsel, and

19   that I am not interested directly or indirectly in the

20   outcome of this action.

21

22

23              Juliana F. Zajicek

24              JULIANA F. ZAJICEK, Certified Reporter
```