# PX68

Dennis Driscoll

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF FLORIDA
2                      PENSACOLA DIVISION
               CASE NO. 3:19-md-2885-MCR-GRJ
3
4     IN RE:  3M COMBAT ARMS              :
      EARPLUG PRODUCTS LIABILITY         :
5     LITIGATION                          :
                                          :
6                                         :
      This Document Relates to:          :
7     All Wave 1 Cases                    :
                                          :
8                                         :
9
10
11
12                    Remote deposition of DENNIS
13    DRISCOLL taken in the above-entitled matter
14    before Suzanne J. Stotz, a Certified Shorthand
15    Reporter (License No. 11942), Certified
16    Realtime Reporter, Registered Professional
17    Reporter, and Notary Public of the State of
18    Colorado, on Wednesday, June 15, 2022,
19    commencing at 10:06 a.m. MDT.
20
21
22
23
24
25

```
1    A P P E A R A N C E S:

2

3    FOR THE PLAINTIFF:

4         (Via Videoconference)
          QUINN EMANUEL URQUHART & SULLIVAN, LLP
5              1109 First Avenue, Suite 210
               Seattle, Washington 98101
6              (206) 905-7004
               matthosen@quinnemanuel.com
7         BY:  Matthew Hosen, Esq.
8              - and -
9         (Via Videoconference)
          QUINN EMANUEL URQUHART & SULLIVAN, LLP
10             865 S. Figueroa St., 10th Floor
               Los Angeles, California 90017
11             (213) 443-3084
               adamwolfson@quinnemanuel.com
12        BY:  Adam B. Wolfson, Esq.
13             - and -
14        (Via Videoconference)
          AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
15             17 East Main Street Suite 200
               Pensacola, Florida 32502
16             (850) 202-1010
               DThornburgh@awkolaw.com
17        BY:  Daniel Thornburgh, Esq.
18

19   FOR THE DEFENDANT AND THE WITNESS:
20        (Via Videoconference)
          DECHERT, LLP
21             35 West Wacker Drive, Suite 3400
               Chicago, Illinois 60601
22             (312) 646-5823
               christopher.burrichter@dechert.com
23        BY:  Christopher Burrichter, Esq.
24             - and -
25
```

Dennis Driscoll

```
1    A P P E A R A N C E S (Continued):

2

3         (Via Videoconference)
          KIRKLAND & ELLIS, LLP
4              300 North LaSalle
               Chicago, Illinois 60654
5              (312) 862-3986
               simon.gottlieb@kirkland.com
6         BY:  Simon Gottlieb, Esq.

7

8

9

     ALSO PRESENT:

10

          Jim Lopez, Videographer

11

          Evan Wolfe, Trial Technician

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Dennis Driscoll

1      A.      Not since the last deposition, no.

2      Q.      Okay.  Have you looked at any

3  additional test data on the Combat Arms 2?

4      A.      No, sir.

5      Q.      So I want to talk about some of the

6  opinions that you're offering and not offering,

7  so I'm going to go through -- I've got about

8  20-something bullet points on this; so this is

9  going to get a little redundant, so let's just

10  get through this.

11              Mr. Driscoll, is it true that

12  you're not offering any opinions about the

13  noise exposures that military service members

14  received while they were in the military?

15      A.      That's correct.

16              MR. BURRICHTER:  Objection to form.

17  BY MR. HOSEN:

18      Q.      And is it also true that you are

19  not going to be offering any opinions about the

20  noise levels of military noise that Wave 1

21  plaintiffs encountered while they were in the

22  military?

23      A.      Correct.

24      Q.      And that would include things like

25  the M4 assault rifle.

Dennis Driscoll

```
 1              You're not going to offer an
 2   opinion about the noise level for that, right?
 3        A.    Right.
 4        Q.    You're not going to offer any
 5   opinions about the noise level of military
 6   vehicles, like an RG-31, right?
 7        A.    Right.
 8        Q.    And you're not going to offer any
 9   opinions about, like, mortar blasts or the
10   noise level of IED explosions, right?
11        A.    That's correct.
12        Q.    Okay.  Have you ever been on a
13   military firing range?
14        A.    Yes, sir.
15        Q.    When was that?
16        A.    Oh, gosh.  Probably in the 1970s.
17        Q.    Were you -- were you in the
18   military?
19        A.    No.  My father was car- -- career
20   military, and he was a special forces training
21   instructor at Fort Bragg.
22        Q.    Okay.
23        A.    And he had taken me a handful of
24   times out to the firing range.  So this was
25   during the Vietnam War, so there was 700,000
```

Dennis Driscoll

1    troops based at Fort Bragg.  It was designed to

2    hold about 100,000.

3              So there was quite a bit of

4    activity at that period of time, late '60s

5    early '70s.

6         Q.    Okay.  Let's see.  Okay.

7              Now, you are not going to be

8    offering any opinions at trial that a

9    nonmilitary noise exposure caused any hearing

10   loss or tinnitus to any Wave 1 plaintiff; is

11   that true?

12        A.    I will not be talking about

13   causation.  Just quantifying risk.

14        Q.    Okay.  So would that be a yes?

15        A.    Yes.

16        Q.    And you're not going to be offering

17   any opinions about dealing with the audio

18   metric data of any Wave 1 plaintiff; is that

19   true?

20        A.    Yes.

21        Q.    You're not going to be offering --

22              MR. BURRICHTER:  Objection to form.

23   BY MR. HOSEN:

24        Q.    You're not going to be offering any

25   opinions at trial about whether a Wave 1

Dennis Driscoll

```
1   plaintiff failed to wear a hearing protection

2   device around harmful noise?

3        A.    Correct.

4        Q.    You're not going to be offering any

5   opinions at trial about any Wave 1 plaintiff

6   did not follow the correct fitting instructions

7   for a hearing protection device that were in

8   accordance with the manufacturer's fitting

9   instructions; is that true?

10       A.    Yes.

11       Q.    You've never -- well, let me just

12  ask you:  Have you ever met or spoken with any

13  Wave 1 plaintiff to your knowledge?

14       A.    No.

15       Q.    So you have no idea where any of

16  the Wave 1 plaintiffs served; is that correct?

17       A.    I have not seen any documents, so

18  that's correct.

19       Q.    And you don't know where any of the

20  Wave 1 plaintiffs -- when they served, right?

21       A.    That's correct.

22       Q.    You have no idea what noises any of

23  the Wave 1 plaintiffs were exposed to, right?

24       A.    That's correct.

25       Q.    You have no idea how long any of
```

Dennis Driscoll

1    the Wave 1 plaintiffs were exposed to those

2    noises, the duration of those exposures, right?

3         A.     That's right.

4         Q.     And you have no idea what hearing

5    protection any of those Wave 1 plaintiffs used

6    when they were exposed to those noises, right?

7         A.     Right.  Again, I have not seen any

8    documents relative to the Wave 1 plaintiffs.

9         Q.     Okay.  And you're going to my next

10   question.

11              You did not review any medical or

12   military records of any Wave 1 plaintiff; is

13   that true?

14        A.     That's true.

15        Q.     Okay.  So to the extent -- and I

16   want to talk -- now we're going to shift over

17   to nonmilitary for a second.

18              To the extent the Wave 1 plaintiff

19   was around nonmilitary noise, you don't know

20   exactly how loud that noise was that they were

21   exposed to; is that true?

22              MR. BURRICHTER:  Objection to form.

23              THE WITNESS:  I'm not sure how to

24        answer that.

25              My role was to really quantify a

Dennis Driscoll

1           potential nonmilitary noise, so I put

2           together a comprehensive list of different

3           sources, some different nonmilitary

4           occupational exposures.

5                   Whether they are applicable to

6           specific Wave 1 plaintiffs, I can't say at

7           this point.

8    BY MR. HOSEN:

9        Q.    So in your -- in your report -- as

10   a matter of fact, let's get your report in the

11   record now so we have - so we have that.

12                  MR. HOSEN:  Evan, could you please

13          pull up Tab 0C.

14   BY MR. HOSEN:

15       Q.    And I just want to make sure, sir,

16   that you're able to -- to see this.

17                  And do you have access to the

18   folder that is going to have -- well, first,

19   let me ask you:  Can you see this on the

20   screen?

21       A.    I can see it.  I do not have a

22   folder.

23                  MR. BURRICHTER:  Counsel, can I

24          just make one note here?

25                  MR. HOSEN:  Yes.

Dennis Driscoll

1   plaintiff is using a type of equipment where

2   you have the noise levels from the 1970s, are

3   you saying that those -- those noise levels are

4   still applicable today for equipment, let's

5   say, that was -- that was used in the early

6   2000s?

7              MR. BURRICHTER:  Objection to form.

8              THE WITNESS:  If I had the

9        opportunity -- if I had the opportunity to

10       look at a specific machine or type of

11       model that a person was exposed to, I

12       could answer that more definitively.

13             I think the data I'm presenting is

14       still representative.  A lot of equipment,

15       from my experience, may be modernized; but

16       it still can generate comparable noise

17       levels even --

18   BY MR. HOSEN:

19       Q.     Okay.

20       A.     -- even from 40, 50 years ago.

21       Q.     And just to confirm, so if we're

22   talking about a lawnmower or a chain saw, you

23   don't know what particular brand and model and

24   year of that chain saw that a Wave 1 plaintiff

25   used, right?

Dennis Driscoll

1      A.      As I said, I haven't seen any
2  plaintiff documents; so I can't -- that's true,
3  yes.
4      Q.      And there can be differences in the
5  noise levels that are generated by different
6  types of chain saws, correct?
7      A.      I think the order of magnitude
8  would be comparable, more than likely; but it
9  could be higher or it could be lower.  By how
10  much -- I wouldn't expect it to be
11  significantly different.  It depends on the use
12  of it, the maintenance of it.  There's a lot of
13  factors that can affect it.
14          But, again, my data is just
15  presenting represented -- represented noise
16  levels for those individual sources that I'm
17  citing.
18      Q.      So to the extent that you cite
19  papers and research that others have done to
20  get these noise levels that you list in your
21  report, you're relying on the work that other
22  people have done to get those noise levels,
23  right?
24      A.      Not entirely.  You know, I combine
25  the scientific data with my experience of over

Dennis Driscoll

1  have a sound level meter and let's say there's

2  an engine running, I'm 3 feet away, and I

3  measure what the average level is over, say,

4  15 to 30 seconds, that would be a noise level.

5          If I'm mechanic working on that

6  engine, I would want to know all the different

7  noise levels that I'm exposed to throughout the

8  duration of a task or even a day.  So that

9  would be their average noise exposure for the

10  day, where you're going to have a combination

11  of all the noise levels that they have

12  throughout their duration of that exposure

13  period.

14      Q.      So would a person's noise exposure,

15  would that be the amount of actual noise that

16  actually gets into their ears?

17          MR. BURRICHTER:  Objection to form.

18          THE WITNESS:  Well, potentially, if

19      they're not wearing ear protection or some

20      other obstruction, like a helmet, yes.

21  BY MR. HOSEN:

22      Q.      Okay.  Now, you're not offering an

23  opinion about the actual level of noise that

24  reached a person -- that -- that reached a

25  Wave 1 plaintiff's ears, right?

Dennis Driscoll

1      A.      Not a specific plaintiff, no.

2              I'm quantifying the noise levels

3      for these nonmilitary sources.

4              Some of the research that I've

5      cited are actual noise exposure measurements

6      conducting -- conducted, like, on construction

7      workers or railroad workers.

8              So there is quite a bit of data to

9      quantify what those jobs have as far as the

10     daily average noise exposure.  That's in my

11     report.

12     Q.      And so --

13     A.      I don't know what jobs these

14     plaintiffs had, so I'm trying to include as

15     much comprehensive data as I can for the end

16     user of my report.

17     Q.      Well, there are a lot of factors

18     that can affect someone's noise exposure,

19     right, aside from -- aside from the actual

20     level of the noise being generated, right?

21     A.      Yes.

22     Q.      And you don't have any of that

23     information for any of the Wave 1 plaintiffs,

24     right?

25     A.      Without looking at their documents,

Dennis Driscoll

1    I can't say that; so the answer's yes.

2        Q.    So if a Wave 1 plaintiff used a

3    tractor after he got out of the military,

4    you're not going to come into trial and offer

5    an opinion about the noise level generated by

6    that tractor, right?

7              MR. BURRICHTER:  Objection to form.

8              THE WITNESS:  As I sit here now, I

9        don't think so.  So I -- that's true.

10   BY MR. HOSEN:

11       Q.    Okay.  And -- and you couldn't come

12   into court and offer the opinion that a

13   plaintiff received a harmful noise exposure

14   from that tractor noise, right?

15       A.    Given the information today, that's

16   correct.

17       Q.    Now, part of the work that you've

18   done in your career involved conducting noise

19   surveys, right?

20       A.    Correct.

21       Q.    Can you explain what a noise survey

22   is?

23       A.    Sure.  There's many types of noise

24   surveys.  You can do area measurements where

25   you're documenting the noise level at specific

Dennis Driscoll

```
 1        Q.     So I want to get into some of the
 2    specifics, like, professions that you talk
 3    about in your report.
 4               MR. HOSEN:  Can we go to PDF page 7
 5        of Exhibit 2.
 6               Okay.  Can we zoom in on this
 7        table.
 8               Yep.  There you go.
 9    BY MR. HOSEN:
10        Q.     Now, the first one you list is
11    semitruck driver.
12               Do you see that?
13        A.     Yes, sir.
14        Q.     And we see under eight-hour daily
15    average exposure, you have some numbers listed
16    here; and then in parentheses it says, you
17    know, either windows open or windows closed,
18    radio off, radio on.
19               Do you see that?
20        A.     I do.
21        Q.     So what you're saying here is that
22    for a semitruck driver, the noise level that
23    they're going to be exposed to is going to
24    depend, to some extent, on whether their window
25    is opened or closed and whether their radio is
```

Dennis Driscoll

```
 1   on or off; is that true?

 2        A.     Correct.   There's different factors

 3   listed that affect their exposure.

 4        Q.     And I mean, in fact, aside from

 5   whether the window's up or down, the radio's on

 6   or off, there are a lot of other factors to go

 7   into determining what their noise exposure is,

 8   right?

 9        A.     It's very possible, yes.

10        Q.     Well, I mean, in the -- in the

11   actual literature that you cite here, it goes

12   over some of the those factors, doesn't it?

13        A.     Yes.   I recall that.

14        Q.     Okay.

15             MR. HOSEN:  Let's pull up -- let's

16        pull up Tab 13.

17   BY MR. HOSEN:

18        Q.     Mr. Driscoll, is this one of the

19   exhibits that you rely on for those truck

20   driver noise levels?

21        A.     Yes.

22        Q.     Okay.

23             MR. HOSEN:  If we go to page 3 --

24        just for the record, I'll enter this as

25        Exhibit 5.
```

Dennis Driscoll

1   of the tire, as well as the road surface

2   conditions?

3              Do you agree with that?

4        A.    I do.

5        Q.    Okay.  Would you agree that driving

6   on a wet surface is going to expose a driver to

7   a higher noise exposure than dry -- than on a

8   dry surface?

9        A.    It potentially can, yes, again,

10  depending on the window open or window closed

11  position.

12       Q.    Okay.  And would you agree that

13  driving on flat terrain is going to be noisier

14  than driving on hilly terrain, all else being

15  equal?

16       A.    I really don't know that.  I don't

17  recall.  I don't recall.

18       Q.    Okay.  Well, do you -- so you

19  don't -- you don't have any opinion one way or

20  the other whether or not the type of terrain

21  that you drive on is going to affect the noise

22  level?

23              MR. BURRICHTER:  Objection to form.

24              THE WITNESS:  Terrain can

25       definitely affect the noise level.

Dennis Driscoll

1            If they're going downhill, they

2      might be using their jack breaks.  That

3      will have a big affect on their noise

4      exposure.

5            If they're using a lower gear,

6      that's going to have a pretty significant

7      affect going downhill.

8            Flat surfaces, I think -- I'm

9      thinking about my own experience of being

10     near all these vehicles.  I live close to

11     I-70 in the mountains.  So I see these --

12     it's a major thoroughfare for

13     tractor-trailer traffic across country.

14           The loudest noise I see from them

15     is going downhill in low gears from my

16     experience, but I don't -- I don't know

17     what the research paper says specifically

18     about it.  Maybe you'll show me.

19  BY MR. HOSEN:

20     Q.    So for all those factors that you

21  just listed, would you agree that that is all

22  information that you would want to know in

23  order to evaluate whether a truck driver was

24  exposed to a harmful level of noise?

25           MR. BURRICHTER:  Objection to form.

Dennis Driscoll

```
 1              THE WITNESS:  In the context you're
 2      describing it, yes.  In the context of my
 3      report, I'm reporting dissymmetry samples
 4      taken on 400 or more truck drivers.
 5              So all of these factors are more
 6      than likely, in my opinion, to work out in
 7      the wash, so to speak, statistically
 8      because you're going to have all the
 9      different related conditions and factors
10      affecting their noise exposure.
11              So I have a lot of confidence in
12      Dr. Seshagiri's reported data.  I know him
13      personally, and so I can confidently
14      accept the exposure ratings that he has
15      quantified for those jobs.
16  BY MR. HOSEN:
17      Q.     This was a study from 1998, right,
18  March 1998?
19      A.     Yes.
20      Q.     Have the cabs that are used in
21  semitrucks, have they changed at all since
22  1998?
23      A.     I don't know.
24              MR. BURRICHTER:  Objection to form.
25
```

Dennis Driscoll

```
1              It will be data and information
2        that will be passed on to a medical
3        professional that might be making a
4        causation determination.
5   BY MR. HOSEN:
6        Q.     But do -- yeah.
7        A.     You're taking -- you're taking
8   information about noise-induced hearing loss
9   cited in the document; whereas, I'm looking at
10  the noise exposures and recording those in my
11  report so that the medical professional or
12  expert on both sides to look at the data and
13  make a decision for themselves.
14  BY MR. HOSEN:
15       Q.     So I understand that what you're
16  reporting in your report, but you do not know
17  the noise exposure levels for any of the
18  semitruck driver Wave 1 plaintiffs, correct?
19       A.     At this point that's true, yes.
20       Q.     Okay.  Do you know the --
21       A.     But they could potentially be on
22  the magnitude that is cited in the document.
23       Q.     But you could be speculating,
24  right?
25       A.     It could be an informed estimate of
```

Dennis Driscoll

1    what their exposure is.

2              You know, 400 samples is pretty

3    significant.

4         Q.    So would you -- wouldn't you want

5    to know about a condition of the tread on their

6    tires?

7         A.    I mentioned it earlier.  If you do

8    enough sampling, you get statistically

9    significant results.

10             At 400 samples, I have no doubt,

11   from my experience, you're going to have

12   statistically significant results to quantify

13   what the reasonable estimate of noise exposure

14   would be for a truck driver --

15        Q.    And --

16        A.    -- under the conditions cited.

17        Q.    And wouldn't you want to know

18   whether any improvements were made to a Wave 1

19   plaintiff's truck in terms of how quiet the cab

20   is before you gave any opinion about whether

21   they were exposed to harmful noise?

22             MR. BURRICHTER:  Objection to form.

23             THE WITNESS:  As I mentioned, I'm

24        not looking at any specific plaintiff data

25        or record; so there's a point where you

Dennis Driscoll

1    depends both on the level of noise and the time

2    of exposure during a working day."

3                And then it says, "When assessing

4    potential noise exposure, it is important to

5    consider how long welding operations last."

6                Do you see that?

7        A.      Yes.

8        Q.      And so, sir, you would agree that

9    an important factor in determining whether

10   someone is being exposed to a harmful level of

11   noise is how long they are around specific

12   levels of noise while welding, correct?

13       A.      That's true.  But also, what other

14   noise sources they're exposed to throughout the

15   day because that's what's going to affect their

16   total average --

17       Q.      Right.

18       A.      -- for the day.

19       Q.      Right.  And you don't have any of

20   that information for any of the Wave 1

21   plaintiffs, right?

22       A.      No.  I haven't seen the records --

23               MR. BURRICHTER:  Objection.

24               THE WITNESS:  -- of the Wave 1

25       plaintiffs --

Dennis Driscoll

1        page, Evan, bottom paragraph starting with
2        "several factors..."
3    BY MR. HOSEN:
4        Q.     And it reads here -- it reads here,
5    "Several factors make it difficult to draw
6    comparisons between these kinds of studies.
7    First, the exchange rate has an effect, with
8    the 3 dB exchange rate almost always producing
9    higher exposure levels than the 5 dB exchange
10   rate.
11                "Second, the length of the work
12   shift, of course, increases the exposure level.
13                "And third, the amount of time each
14   worker expense on each piece of equipment also
15   has an effect."
16                Do you see that?
17       A.     Yes, I do.
18       Q.     So in regards to the second and
19   third factors here, you would agree that the
20   length of a worker's shift as well as the
21   amount of time each worker spends on each piece
22   of equipment, that is important information
23   that you need to know in order to determine
24   that worker's noise exposure level and whether
25   they're being exposed to a harmful level of

1    noise, true?

2                MR. BURRICHTER:  Objection to form.

3                THE WITNESS:  It's -- it's

4        definitely the important piece of

5        information whether it's all the

6        information you need, that's debatable;

7        but it's very helpful to know what the

8        length of time a tool was used and how --

9        how loud it was at that time of operation.

10               That would be where you're

11       constructing a noise exposure estimate or

12       profile on a person, which is not what I'm

13       doing here.  I'm just recording how loud

14       these sources are based on these studies.

15   BY MR. HOSEN:

16       Q.    And you would also want to know how

17   much time a piece of equipment was idling,

18   true --

19               MR. BURRICHTER:  Objection to form.

20               THE WITNESS:  Again, if I was

21       trying to --

22   BY MR. HOSEN:

23       Q.    -- noise exposure?

24       A.    Again, if I was trying to construct

25   a noise exposure estimate for a person, that

Dennis Driscoll

1    would be the piece of information I would need

2    or would be helpful, yes.

3         Q.    You would want to know whether --

4    if we're talking about a forklift or a piece of

5    factory equipment like that, you would want to

6    know if there was an insulated cab that

7    would -- that would reduce the amount of noise

8    reaching someone's ears, right?

9              That would be important to know?

10             MR. BURRICHTER:  Objection to form.

11             THE WITNESS:  If that's the work

12        environment for any particular plaintiff,

13        yes.

14             In general, I'm just reporting how

15        loud these sources are and relying on --

16        relying on acceptable data to present in

17        the report.

18   BY MR. HOSEN:

19        Q.    Okay.  Let's look at --

20             MR. HOSEN:  If we can go to the

21        next page.

22             Actually -- yeah, yeah.  Okay.

23   BY MR. HOSEN:

24        Q.    On this page, it references --

25             MR. HOSEN:  Actually, I'm sorry.

Dennis Driscoll

```
 1   BY MR. HOSEN:
 2        Q.    Okay.  Let's pull up -- okay.
 3              And then you say here -- not the
 4   next sentence, but the sentence after that, you
 5   say, "The report to Congress only provided
 6   summary results, unfortunately omitting the
 7   detailed SPLs and noise exposure results."
 8              Do you see that?
 9        A.    Yes.
10        Q.    And so you would agree, sir, that
11   this 1996 study, it didn't provide enough
12   details to be able to effectively determine
13   what someone's noise exposure would be working
14   inside of a specific train, true?
15              MR. BURRICHTER:  Objection to form.
16              THE WITNESS:  Not completely.
17   BY MR. HOSEN:
18        Q.    Okay.  Well, let's look at the
19   report.  Let's look at this FRA report.
20              MR. HOSEN:  If we go to Tab 10,
21        Evan.
22              And this would be Exhibit 10,
23        submitted as Exhibit 10.
24
25
```

Dennis Driscoll

```
 1                  REPORTER'S CERTIFICATE
 2   STATE OF COLORADO              )
                                    ) ss.
 3   COUNTY OF DOUGLAS              )
 4            I, SUZANNE STOTZ, do hereby certify
 5   that I am a Certified Shorthand Reporter, a
 6   Registered Professional Reporter, and a Notary
 7   Public within the State of Colorado; that
 8   previous to the commencement of the
 9   examination, the deponent was duly sworn by me.
10            I further certify that this
11   deposition was taken in machine shorthand by me
12   at the time and place herein set forth, that it
13   was thereafter reduced to typewritten form, and
14   that the foregoing constitutes a true and
15   correct transcript of the proceedings had.
16            I further certify that I am not
17   employed by, related to, nor of counsel for any
18   of the parties herein, nor otherwise interested
19   in the result of the within litigation.
20            In witness whereof, I have affixed my
21   signature this 16th day of June, 2021.
22   _____
23        Suzanne J. Stotz, CRR, RPR
24        My commission expires:  July 10, 2023
25        Notary ID:  20194025684
```

```
 1              —   —   —   —   —

                    E R R A T A

 2              —   —   —   —   —

 3

 4      PAGE    LINE    CHANGE

 5      43       13        change "noise" to "microphone"
                           _____
 6          REASON:        Transcription error
                           _____
 7      53       15        change "Arrow" to "Aearo"
                           _____
 8          REASON:        Transcription error
                           _____
 9      53       21        change "Arrow" to "Aearo"
                           _____
10          REASON:        Transcription error
                           _____
11      60      15; 16     change "Langford" to "Lankford"
                           _____
12          REASON:        Transcription error
                           _____
13      72       13        change "wall apart" to "law part"
                           _____
14          REASON:        Transcription error
                           _____
15      76       16        change "bests" to "best is"
                           _____
16          REASON:        Transcription error
                           _____
17      76       19        add "in" between "is" and "the" (is in the OSHA...)
                           _____
18          REASON:        Transcription error
                           _____
19      89       3         change "dissymmetry" to "dosimetry"
                           _____
20          REASON:        Transcription error
                           _____
21      159      16        change "workshops" to "work groups"
                           _____
22          REASON:        Transcription error
                           _____
23      160      2         change "noise" to "hearing"
                           _____
24          REASON:        Transcription error
                           _____
```

Case 3:19-md-02885-MCR-HTC   Document 3319-69   Filed 07/21/22   Page 29 of 31

```
 1              -   -   -   -   -

                E  R  R  A  T  A

 2              -   -   -   -   -

 3

 4     PAGE    LINE    CHANGE

 5     171      4        change "asymmetry" to "dosimetry"

 6         REASON:        Transcription error

 7     171      19       change "dissymmetry" to "dosimetry"

 8         REASON:        Transcription error

 9     174      21       change "dissymmetry" to "dosimetry"

10         REASON:        Transcription error

11

12         REASON:

13

14         REASON:

15

16         REASON:

17

18         REASON:

19

20         REASON:

21

22         REASON:

23

24         REASON:
```

Case 3:19-md-02885-MCR-HTC   Document 3129-69   Filed 07/21/22   Page 31 of 31

1

2                ACKNOWLEDGMENT OF DEPONENT

3

4              I, _Dennis P. Driscoll_____, do

5     hereby certify that I have read the

6     foregoing pages, and that the same is

7     a correct transcription of the answers

8     given by me to the questions therein

9     propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14    _Dennis P. Driscoll_____  _July 6, 2022_

15    WITNESS NAME                  DATE

16

17

18    Subscribed and sworn

      to before me this

19    _6th_ day of _July_____, 20_22_.

20    My commission expires: _11/22/2022_

21    _Deborah Jal_____

22    Notary Public              DEBORAH JACKSON
                                 NOTARY PUBLIC
23                               STATE OF COLORADO
                                 NOTARY ID 20104050400
                                 MY COMMISSION EXPIRES 11/22/2022
24