## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *All Wave 1 Cases* | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## PLAINTIFFS' MOTION TO PRESERVE *DAUBERT* AND RULE 702 MOTIONS AND ARGUMENTS PREVIOUSLY RULED UPON

Pursuant to the parties' stipulation and the Court's directive, Plaintiffs submit the following omnibus *Daubert* preservation motion. Dkt. 3072 at 9. On May 11, 2022, Defendants disclosed eighteen (18) general experts[1] pursuant to Federal Rule of Civil Procedure 26(a)(2)[2] in the above-captioned Wave 1 cases.[3] Defendants disclosed as general expert witnesses: John Bertelson, Kenneth Billheimer, John Casali, Walter Winn Chatham, James Crawford, Dennis Driscoll, Scott Elledge, Gregory Flamme, Harri Kytomaa, Jennifer LaBorde, M. Charles Liberman, William

---

[1] *See* PX1 to Wave 1 Plaintiffs' Omnibus *Daubert* Motion, filed simultaneously.

[2] Defendants' disclosures erroneously cite Fed. R. Civ. P. 26(a)(1)(B), which governs initial disclosures, instead of Fed. R. Civ. P. 26(a)(2)(B), which governs expert disclosures for expert witnesses who must provide a written report. Given the substance of the disclosures, Plaintiffs interpret the general experts to be Rule 26(a)(2)(B) expert witnesses who must provide a written report. Defendants did not disclose any Rule 26(a)(2)(C) experts.

[3] The Wave 1 plaintiffs include all individuals identified in Case Management Order No. 31, Ex. A, whose cases have not been dismissed. *See* Dkt. 2304-1.

Murphy, Richard Neitzel, Stan Phillips, Karthik Rajasekaran, Mark Stephenson, Steve Tasko, and Jennifer Tufts. Defendants also disclosed dozens of case-specific experts.

Several of these general expert witnesses have previously offered opinions in the bellwether cases in Groups A, B, C, and/or D. In particular, two experts adopted their prior reports in full (Casali, Kytomaa). Several other experts (Crawford, Flamme, LaBorde, Neitzel, Stephenson) have updated their prior general reports. Others who previously offered case-specific opinions only now offer a general opinion (Chatham, Driscoll, Phillips). The remaining general experts are new experts offering new opinions, but they remain subject to some aspects of the Court's prior *Daubert* rulings (Bertelson, Billheimer, Elledge, Liberman, Murphy, Rajasekaran, Tasko, Tufts). All of the case-specific experts offer new case-specific opinions concerning one or more of the Wave 1 Plaintiffs; some of these case-specific experts have previously offered case-specific opinions (Crawford, Phillips, Pappas) and others are new to the litigation. But given the nature of this litigation, these case-specific opinions often overlap with or are similar to opinions given in other prior Group A, B, C and/or D bellwether cases, and these experts too remain subject to some aspects of the Court's prior *Daubert* rulings.

Plaintiffs have previously moved under *Daubert* and Rule 702 to exclude the general expert opinions of Casali, Crawford, Flamme, Kytomaa, LaBorde, Neitzel,

and Stephenson in prior Group A, Group B, Group C and/or Group D *Daubert* briefing. *See* Dkt. 1595 (Group A), Dkt. 1863 (Group B), Dkt. 2051 (Group C); Dkt. 2716 (Group D). Plaintiffs have also previously moved under *Daubert* and Rule 702 to exclude the case-specific expert opinions of Chatham, Crawford, Driscoll, Flamme, LaBorde, Neitzel, Pappas, Phillips, and Stephenson in prior Group A, Group B, Group C and/or Group D *Daubert* briefing. Dkt. 1595 (Group A); Dkt. 1863 (Group B); Dkt. 2051 (Group C); Dkt. 2716 and *Beal*, Dkt. 90 (Group D). The Court has already ruled on these motions and has excluded the opinions of the above-referenced expert witnesses in whole or in part. *See* Dkt. 1651, 1680, 1690, 1701 and 1780 (Group A); Dkt. 1910 and 1933 (Group B); Dkt. 2218 and 2290 (Group C); Dkt. 2845 and 2898, *Beal*, Dkt. 142 (Group D).

To the extent the Court previously granted Plaintiffs' Group A, Group B, Group C, and/or Group D *Daubert* motions and excluded these general or case-specific experts' opinions in whole or in part, the opinions should also be excluded in the Wave 1 cases for the same reasons. Plaintiffs wish to preserve their prior arguments and respectfully request that the Court heed its prior decisions granting plaintiffs' Group A, Group B, Group C, and Group D *Daubert* motions and excluding, in whole or in part, the expert opinions of the above-referenced expert witnesses.

For instance, the following expert testimony has been excluded:

- **<u>Casali:</u>** (1) Defendants' or the military's state of mind; (2) any alleged duties, responsibilities, or policies of the military; (3) the military's policies and instructions on hearing conservation, or the military's compliance or noncompliance therewith; (4) federal or military procurement generally or the specific procurement process for the CAEv2; (5) legal opinions or interpretations of the MPID, or whether Aearo or the CAEv2 "complied with" or "satisfied" the MPID; and (6) the reasonableness or infeasibility of any provision of the MPID, who was responsible for a particular provision, or whether Aearo was required to comply with a particular provision. Dkt. 1690 at 14-16; Dkt. 1910 at 6-7.

- **<u>Chatham:</u>** (1) vague and sweeping references to a "wide variety" of systemic autoimmune conditions, issues, or problems; (2) "potentially autoimmune symptoms" not specific to particular diagnosed conditions (*e.g.*, lupus or autoimmune thyroid disease); (3) the possibility of autoimmune-induced sensorineural hearing loss presenting "in the absence of any systemic autoimmune disorder"; and (4) that lupus and autoimmune thyroid disease cannot be ruled out as potential causes of tinnitus. Dkt. 2898 at 7-8.

- **<u>Crawford:</u>** (1) the Army-wide success or failure of hearing conservation efforts; (2) the Army-wide implementation of the hearing program and/or applicable regulations, including any suggestion that the Army failed its servicemembers by not following the aspirational best practices from the Center of Hearing Excellence; (3) the Army's alleged emphasis on its own testing over NRR values; (4) his opinion that the military took responsibility for instructing and training soldiers on hearing protection, and did not rely on manufacturers' instructions or training; (5) his "understanding" regarding whether servicemembers were provided instructions or individually fitted when given hearing protection; (6) what the military audiologist community, medical staff or the military, more broadly, knew or understood about various propositions; (7) the alleged need for "individual fit testing" and personal attenuation ratings for servicemembers; (8) "HEAR" training materials; (9) vague and sweeping references to a "wide variety" of systemic autoimmune conditions, issues, or problems; (10) "potentially autoimmune symptoms" not specific to particular diagnosed conditions

(*e.g.*, lupus or autoimmune thyroid disease); (11) the possibility of autoimmune-induced sensorineural hearing loss presenting "in the absence of any systemic autoimmune disorder"; (12) that lupus and autoimmune thyroid disease cannot be ruled out as potential causes of tinnitus; and (13) general hidden hearing loss (HHL) or cochlear synaptopathy opinions in cases where the plaintiff is not pursuing a HHL claim; (14) any relationship between tinnitus and mental health issues (including coping skills) that goes beyond his personal observations while treating patients, including generalizing beyond his own patient population; (15) opinions about the CAEv2's design, testing, efficacy, marketing, or sale, including that the CAEv2 is not defective; (16) that a plaintiff may obtain hearing aids at no cost through the military health care system; (17) opinions that non-ototoxic medications cannot be ruled out as a cause of injuries; (18) opinions regarding burn pits, JP-8 and other fuels, smoke from oil fires, fuel exhaust, other chemical exposures (*e.g.*, carbon monoxide, metal-working fluids, paints, "dust-off" cleaner), sand, dust, cigarette smoke (tobacco use), alcohol, nonspecific painkillers, and marijuana use; and (18) that central auditory processing disorder (CAPD) is a potential cause of a plaintiff's injuries, absent CAPD testing or diagnosis. Dkt. 1651 at 1-8, 16-18; Dkt. 1910 at 7-10; Dkt. 2218 at 41-51; Dkt. 2845 at 19-23; Dkt. 2898 at 7-8; *Beal*, Dkt. 142 at 11-14.

- **Driscoll:** (1) any diagnosis of the cause of an individual plaintiff's hearing loss or tinnitus, including opinions that a plaintiff does not have hearing-related issues as a result of their military service or the CAEv2; (2) any interpretation of audiogram results; (3) "mouthpiece" opinions that merely restates what is reported in records or other experts' reports; and (4) the Army-wide success or failure of hearing conservation efforts, including that the Army Hearing Program "performed as intended," either as a general matter or as to a plaintiff specifically. Dkt. 1780 at 6-11; Dkt. 1910 at 11-13.

- **Flamme and Stephenson:** (1) any Department of Defense program was implemented inadequately or failed; (2) that the military not conducting audiograms contributed to a Plaintiff's injuries; (3) that anything the military did put Plaintiffs "at greater risk of sustaining a hearing impairment" or otherwise caused their injuries; (4) that any military program was "inconsistently implemented" or otherwise failed, either as a general matter or as to any particular plaintiff; (5) that

the military's "poor safety culture" or failure to provide "adequate and effective training" contributed to Plaintiffs' injuries; (6) opinions regarding burn pits, JP-8 and other fuels, vehicle or truck exhaust fumes, smoke from oil fires or rubber, other chemical exposures (*e.g.*, carbon monoxide, metal-working fluids, paints, "dust-off" cleaner), sand, dust, cigarette smoke (tobacco use); (7) their "effective quiet" opinion that a plaintiff's ears did not have "sufficient time to recover" between temporary threshold shifts, which could have exacerbated the hazard posed by subsequent noise exposures; (8) their bone/tissue conduction opinions; and (9) opinions on "intense urban combat" and similar factual narratives or historical accounts of combat activities and military tactics. Dkt. 1690 at 13-14; Dkt. 1910 at 14-15; Dkt. 2218 at 29-40; Dkt. 2845 at 23-27; *Beal*, Dkt. 142 at 15-18.

- **Kytomaa:** (1) general causation or the specific cause of any individual plaintiff's hearing-related problems; (2) Dr. Eddins and Juneau's silicone ear replicas or their testing methods; (3) opinions regarding REAT or MIRE testing; and (4) the opinions in §§ 2.3 and 2.4 of his report. Dkt. 1690 at 16-17; Dkt. 1910 at 24-26.

- **LaBorde:** (1) testimony concerning "other hearing disorders" in cases where the plaintiff has not been reliably diagnosed with these conditions; (2) permanent impairment ratings based on the 1996 Florida Uniform Permanent Impairment Rating Schedule (FUPIRS) or "other impairment rating schemes" as referenced by the Court, including those "developed for workers' compensation and social security cases"; (3) general testimony about central auditory processing disorder, hyperacusis, and/or misophonia in cases where the individual plaintiff has not been reliably diagnosed with the condition; (4) personal-use testimony that merely bolsters her opinions by reference to her personal experience using hearing assistive devices and/or the impact of her own hearing impairments on her daily life; (5) testimony that genetic testing is 'necessary' or dispositive on the issue of genetics, or that a plaintiff's failure to undergo genetic testing impugns their credibility; (6) summaries of historical facts, unaccompanied by a differential analysis of their significance in a plaintiff's case, pertaining to recreational and occupational noise (*e.g.*, hunting, fireworks, concerts, power tools); (7) opinions regarding alcohol abuse, cigarette smoke (tobacco use), nonspecific painkillers, or chemical exposures (including "dust-off" cleaner); and (8) that central auditory processing

disorder (CAPD) is a potential cause of a plaintiff's injuries, absent CAPD testing or diagnosis. Dkt. 1680 at 27-30; Dkt. 1910 at 23-24; Dkt. 2290 at 6-9; Dkt. 2845 at 31-33; *Beal*, Dkt. 142 at 19-23.[4]

- **Neitzel:** (1) opinions or testimony on the Army's overall implementation of its hearing-related programs and the impact that has on soldiers, including that: (a) the Army did not consistently or uniformly implement hearing protection device training and fitting requirements; (b) failing to do so impacted the efficacy of its hearing programs and placed soldiers at risk of hearing-related injuries; and (c) that Army safety culture and safety climate related to hearing conservation were not as strong as they should or could be and likely undermined hearing loss prevention efforts; (2) Army hearing program's implementing regulations and policy guidance; (3) whether or not the Army Hearing Program was up to par with industry standards; (4) opinions regarding the Army's responsibilities, including for health and safety and their responsibility to train soldiers on proper use and fit of the CAEv2, under the DoD regulations; (5) interpreting the Noise Control Act, including that Defendants were not required to abide by the product labeling requirements and EPA regulations and that the CAEv2's label complied with EPA regulations and federal law; (6) that the CAEv2's packaging and instructions are "clear and conspicuous" to a "reasonable user"; (7) any diagnosis of the cause of an individual plaintiff's hearing loss or tinnitus, including opinions that a plaintiff does not have hearing-related issues as a result of the CAEv2. Dkt. 1701 at 1-28; Dkt. 1910 at 27.

- **Pappas:** (1) opinions, assessments, or observations about a plaintiff's credibility or truthfulness, beyond identifying inconsistencies in test results and between those test results and a plaintiff's descriptions of their auditory symptoms; (2) any commentary about the documents that a plaintiff submitted to the VA and/or DoD in connection with a Medical Evaluation Board case; and (3) any suggestion that validity tests from neuropsychological testing raise questions about a plaintiff's truthfulness or the validity of the testing results in this case. Dkt. 2934 at 10-11.

---

[4] *See also* Dkt. 1680 at 27-30.

- **<u>Phillips:</u>** (1) opinions about the CAEv2's design, testing, efficacy, marketing, or sale; (2) that central auditory processing disorder (CAPD) is a potential cause of a plaintiff's injuries, absent CAPD testing or diagnosis; (3) burn pit and JP-8 exposure. Dkt. 2845 at 27-29.

In addition to the above, the Court has also made clear that none of Defendants' expert may opine or testify on certain matters, including without limitation:

- A purported "widespread" culture of compliance or non-compliance with Army safety and hearing conservation program requirements. Dkt. 1651 at 3-8.

- Army-wide success or failure of hearing conservation efforts. *See id.*

- That anything the military did placed Plaintiffs "at greater risk of sustaining a hearing impairment" or otherwise caused their injuries. *See* Dkt. 1690 at 13.

- The Defendants' or the military's state of mind. *See id.* at 15; Dkt. 1701 at 29-30.

The Court should impose the same limitations on all of Defendants' Wave 1 experts.

Similarly, the Court has excluded certain opinions and testimony that apply with equal force to all experts in this litigation—old and new experts, general and case-specific alike:

- *General Prohibitions on Narrative or Legal Testimony*

  o Mouthpiece opinions. *See, e.g.*, Dkt. 1780 at 7-11.

  o Narrative testimony, including summaries of corporate documents, witness testimony, military records, and medical records not tied to ultimate opinions. *See, e.g.*, Dkt. 1701 at 28-31 & n.24.

- Summaries of historical facts, unaccompanied by a differential analysis of their significance in a plaintiff's case, pertaining to recreational and occupational noise (e.g., hunting, fireworks, concerts, power tools). *See, e.g.*, *Beal*, Dkt. 142 at 19-21.

- Opinions regarding the Army's responsibilities under the DoD regulations that amount to testimony on the Army's legal duties under the law. *See* Dkt. 1701 at 20-22.

- Opinions that Defendants were not required to abide by the product labeling requirements set forth in the Noise Control Act or that the CAEv2's label complied with EPA regulations and federal law. *See* Dkt. 1701 at 23-24.

- *Opinions Contingent on Certain Qualifications*

  - Diagnoses of TBI/concussion from non-physicians or non-neurotrauma specialists (including but not limited to audiologists). *E.g.*, *Beal*, Dkt. 142 at 16.

  - Opinions on the existence of or cause of hearing loss/tinnitus from a non-otologist, non-neurotologist, non-audiologists (*e.g.*, mechanical engineer, psychiatrist, industrial hygienist). *See, e.g.*, Dkt. 1910 at 12, 22; Dkt. 1780 at 6-7; Dkt. 1701 at 25-28.

- *Opinions Contingent on Certain Testing or Diagnoses*

  - HHL opinions without objective diagnostic testing. *See, e.g.*, Dkt. 1933 at 15-16 & n.28.

  - Opinions that a plaintiff is capable of hearing and discerning speech in noisy environments where the expert did not conduct or rely upon a Speech-in-Noise (SIN) test or other objective measure of hearing in noisy environments. *See* Dkt. 1680 at 25-27.

  - General testimony re: Unspecified Neurocognitive Disorder (UND) absent a diagnosis. *See, e.g.*, Dkt. 1910 at 21-22.

- General hidden hearing loss (HHL) or cochlear synaptopathy opinions in cases where the plaintiff is not pursuing a HHL claim. Dkt. 2845 at 19.

- That central auditory processing disorder (CAPD) is a potential cause of a plaintiff's injuries, absent CAPD testing or diagnosis. *See, e.g.*, Dkt. 2845 at 28-29.

- Vague and sweeping references to a "wide variety" of systemic autoimmune conditions, issues, or problems; "potentially autoimmune symptoms" not specific to particular diagnosed conditions (*e.g.*, lupus or autoimmune thyroid disease); the possibility of autoimmune-induced sensorineural hearing loss presenting "in the absence of any systemic autoimmune disorder"; and that lupus and autoimmune thyroid disease cannot be ruled out as potential causes of tinnitus. Dkt. 2898 at 7-8.

- *Ototoxicity*

  - Opinions regarding alcohol, cigarette smoke (tobacco use), marijuana, and/or illicit substances. *See, e.g.*, Dkt. 1910 at 9-10; *Beal*, Dkt. 142 at 14, 17-18, 21.

  - Opinions regarding burn pits, JP-8 and other fuels, smoke from oil fires, fuel exhaust, other chemical exposures (*e.g.*, carbon monoxide, metal-working fluids, paints, "dust-off" cleaner), sand, and/or dust. *See, e.g.*, *Beal*, Dkt. 142 at 14, 17-18, 21.

  - Opinions regarding non-ototoxic medications (prescription and over-the-counter) and other substances not identified as cochleotoxic in Dkt. 1330 (including but not limited to nonspecific painkillers, antidepressants, opioids). *See, e.g.*, Dkt. 2290 at 18-19.

- *Other*

  - Opinions that blast exposures or shock waves cause hearing injuries independent from noise injuring the cochlea, including via bone/tissue conduction. *See, e.g.*, Dkt. 2218 at 35-38; Dkt. 2845 at 25.

○ Testimony regarding personal use of hearing aids or similar technology that merely bolsters an expert's opinions by reference to their personal experience using hearing assistive devices and/or the impact of their own hearing impairments on her daily life. *See, e.g.*, *Beal*, Dkt. 142 at 19.

○ That a plaintiff may obtain hearing aids at no cost through the military health care system. *See, e.g.*, Dkt. 2218 at 43-44; Dkt. 2845 at 22.

○ Opinion that hearing loss/tinnitus does not adversely affect the plaintiff's daily life, absent a methodology or reliable factual basis to support the claim that these conditions do not affect the plaintiff's sleep, ability to concentrate, PTSD, etc. *See, e.g.*, Dkt. 1910 at 16-17.

○ The designation of non-retained case-specific medical expert witnesses, including a plaintiff's treating physicians and Compensation and Pension (C&P) examiners. *See* Dkt. 2218 at 58-61.

Accordingly, Plaintiffs move the Court to heed its prior rulings in the Group A, Group B, Group C, and Group D *Daubert* Orders, *see* Dkt. 1651, 1680, 1690, 1701, 1780 (Group A), Dkt. 1910 and 1933 (Group B), Dkt. 2218 and 2290 (Group C), Dkt. 2845 and 2898, *Beal*, Dkt. 142 (Group D), to the extent that: (1) the Court granted the motions by Group A plaintiffs, Group B plaintiffs, Group C plaintiffs, and/or Group D plaintiffs to exclude the opinions of Defendants' experts, and (2) any of Defendants' Wave 1 experts now offer (or attempt to offer) those same or substantially similar expert opinions in the Wave 1 cases.

Finally, to the extent Plaintiffs made additional *Daubert* arguments concerning the above-described expert witnesses which were denied by the Court,

including without limitation the following, Plaintiffs seek to preserve these arguments for appellate purposes:

- Motion to exclude the opinions of Flamme and Stephenson that rely upon the Auditory Hazard Assessment Algorithm for Humans (AHAAH). *See* Dkt. 1595 at 5-10.

- Motion to exclude the causation opinions of Flamme and Stephenson that do not apply a differential diagnosis or similar reliable methodology. *Id.* at 10-12.

- Motion to exclude the opinions of Kytomaa that rebut Dr. Richard McKinley and Dr. Stephen Armstrong's opinions related to Aearo's testing with the Acoustical Resistance Checker and its quality assurance processes, as well as the material composition of the CAEv2. *Id.* at 12-14.

- Motion to exclude the opinions of Crawford that relate to the following: the Hearing Center of Excellence, the regulations governing the Army Hearing Program, and the importance of training and instruction relating to, and fitting of, hearing protection devices; medical readiness and hearing conservation in the Army; and his personal experiences and observations of the "significant gaps in the training and fitting of hearing protection devices." *Id.* at 15-22.

- Motion to exclude the opinions of Casali that relate to military procurement, the MPID, whether the CAEv2 conformed to the performance specifications of the MPID, and AHAAH. *Id.* at 22-26.

For each of these reasons, in accordance with the Court's prior instructions to the parties and for purposes of preservation, the Wave 1 Plaintiffs hereby assert and incorporate herein by reference all of plaintiffs' prior Group A, Group B, Group C, and Group D *Daubert* motions and all of plaintiffs' related arguments. Dkt. 1595; Dkt. 1863; Dkt. 2051; Dkt. 2716; *Beal*, Dkt. 90. Plaintiffs move the Court to heed

its prior rulings in its Group A, Group B, Group C, and Group D *Daubert* Orders, *see* Dkt. 1651, 1680, 1690, 1701, and 1780 (Group A), Dkt. 1910 and 1933 (Group B), Dkt. 2218 and 2290 (Group C), Dkt. 2845 and 2898, *Beal*, Dkt. 142 (Group D), to the extent that (1) the Court granted the Group A, Group B, Group C, or Group D plaintiffs' motions to exclude the opinions of Defendants' experts, and (2) any of Defendants' experts now offer (or attempt to offer) those expert opinions in the Wave 1 cases.

## <u>CONCLUSION</u>

Plaintiffs respectfully move this Court to grant each of the above-referenced *Daubert* motions in the Wave 1 cases. Nevertheless, Plaintiffs understand this Court will enter orders in the Wave 1 cases consistent with those entered in the Group A, Group B, Group C, and Group D bellwether cases. Plaintiffs move on each of these *Daubert* motions for preservation purposes. Plaintiffs further ask the Court to heed its prior decisions granting plaintiffs' Group A, Group B, Group C, and Group D *Daubert* motions.

<u>Date</u>: July 21, 2022                    Respectfully submitted,

                                         */s/ Bryan F. Aylstock*
                                         Bryan F. Aylstock, Lead Counsel
                                         Florida State Bar No. 078263
                                         AYLSTOCK, WITKIN, KREIS & OVERHOLTZ
                                         17 East Main Street, Suite 200
                                         Pensacola, FL 32502

Tel.: (850) 202-1010
baylstock@awkolaw.com

Shelley V. Hutson, Co-Lead Counsel
(Admitted Pro Hac Vice)
Texas State Bar No. 00788878
CLARK, LOVE & HUTSON, PLLC
440 Louisiana Street, Suite 1700
Houston, TX 77002
Tel.: (713) 757-1400
shutson@triallawfirm.com

Christopher A. Seeger, Co-Lead Counsel
(Admitted Pro Hac Vice)
New Jersey State Bar No. 042631990
SEEGER WEISS LLP
77 Water Street, 8th Floor
New York, NY 10005
Tel.: (212) 587-0700
cseeger@seegerweiss.com

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B), (C)</u>

Pursuant to Local Rule 7.1(B), counsel for Plaintiffs certify that they conferred with Defendants' Remand Leadership and Special Master Adriane Theis conferred on July 12, 2022, regarding the foregoing motion but were unable to resolve the issue with Defendants.


*/s/ Bryan F. Aylstock*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

I hereby certify that this motion complies with the word limit of Local Rule

7.1(F) and contains 3,550 words.

*/s/ Bryan F. Aylstock*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2022, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Bryan F. Aylstock*