**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *All Cases* | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## MEMORANDUM IN SUPPORT OF RICHARD VALLE'S EMERGENCY MOTION ON BEHLAF OF ALL PLAINTIFFS FOR  PRELIMINARY INJUNCTION AGAINST DEFENDANT 3M COMPANY

1

# **INTRODUCTION**

3M is attempting to halt this MDL in its tracks by invoking an argument that may seem familiar at first blush: once a debtor has filed for bankruptcy, all related litigation in other tribunals must come to a halt, so that the bankruptcy court can efficiently resolve all claims affecting the insolvent entity in a single proceeding. But 3M's litigation strategy is anything but ordinary and in fact seeks to misappropriate the bankruptcy process in a cynical attempt to give a *non-debtor* a second bite at issues that have already been litigated and resolved. That attempt is wasteful, not efficient, and does not further any legitimate interest of the debtors (the Aearo entities), let alone a legitimate interest of an independently liable non-debtor (3M). Fortunately, 3M's superficial appeals to bankruptcy conventional wisdom are not actually supported by bankruptcy law. And this Court has well-established authority to put a halt to 3M's tactical gamesmanship.

The Constitution vests "judicial power" in federal courts that wield jurisdiction over specified "cases" and "controversies." U.S. Const. Article III, § 2, Cl. 2. And Congress vested this Court with exclusive statutory jurisdiction to oversee pretrial proceedings over diverse "civil actions" related to the CAEv2 earplugs manufactured and sold by Defendants. 28 U.S.C. § 1407; MDL Dkt 1.

Since April 3, 2019, this Court has tirelessly wielded its jurisdiction to issue myriad rulings that effect hundreds of thousands of Plaintiffs, including movant

Richard Valle.   The Court has ruled—which is to say, exercised its jurisdiction—on 24 *Daubert* motions, 263 motions in *limine*, 42 motions for summary judgment, all deposition designations in preparation for 16 bellwether trials, and 6 post-trial motions.   It has itself presided over six bellwether trials, including two with final judgments that are on appeal to the *only* intermediate appellate court with jurisdiction to review the decisions of this tribunal, the United States Court of Appeals for the Eleventh Circuit.

Now, some three years into this MDL, this Court's jurisdiction is under collateral attack.   Unsatisfied with scores of this Court's careful rulings, and unwilling to press their claims of error to the Eleventh Circuit, Defendants seek refuge in an Article I tribunal, the United States Bankruptcy Court for the Southern District of Indiana (the "Bankruptcy Court").   Defendants Aearo Technologies LLC and certain of its affiliates (the "Aearo Debtors") have filed a petition for Chapter 11 bankruptcy.   *See* MDL Dkt.  3328.   None of the Defendants, including 3M— a *non-debtor*—even attempt to mask their brazen intentions in the Bankruptcy Court. They claim this Court has presided over an *unfair* MDL and issued *erroneous* decisions that overstate Plaintiffs' right to relief.   So they ask the Bankruptcy Court to institute a claims process to value Plaintiffs' claims "on a scientific basis based on a fair and complete evidentiary record."   Ex. A, Informational Brief of Aearo Technologies, LLC at 12, 43-50, 56-57 (hereafter "Ex. A, Infor. Br.").   Defendants

3

invite the Bankruptcy Court to reapply the "Federal Rules of Evidence, including Rules 702 and 703" and issue *Daubert* decisions that *directly conflict* with this Court's rulings.  *Id.* at 56.  And to "resolve summary judgment" motions in their favor based on defenses this Court has already *rejected* time and again.  *Id.*

This Court need not sit idly by while its Article III and statutory jurisdiction are impugned.  Our Republic's very first Congress enacted the All Writs Act in 1789. That provision of federal law empowers this Court to issue "all writs necessary or appropriate in aid of [its] jurisdiction."  28 U.S.C. § 1651.  As ancient and modern precedent confirms, that broad power was tailor made for this situation, where a defendant—dissatisfied with judgments it disagrees with—seeks not to exercise its appellate rights but instead to relitigate matters anew in another tribunal.  It is no slight to the competence of the Bankruptcy Court to conclude that 3M is not free to revisit and undermine this Court's adjudicatory authority.

Mr. Valle recognizes that this Court previously denied his hurried motion for an *ex parte* temporary restraining order on the ground that he failed to show irreparable harm.  MDL Dkt 3343.  This more complete motion shows that attacks on a Court's properly vested jurisdiction undermine the integrity of the judicial process.  Under binding precedent, that is irreparable harm as a matter of law.  And 3M's threat to imminently abrogate this Court's jurisdiction irreparably harms Mr. Valle even under traditional principles of equity.  3M supports a motion that will be

heard in the Bankruptcy Court on August 15 to stay Mr. Valle and every other Plaintiff from pursuing CAEv2 related cases against 3M in this or any other federal court.  If that motion is granted, it will assure that this Court cannot protect its jurisdiction going forward.  In our adversarial system, this Court cannot rule on disputed matters if parties are forbidden from filing briefs and making arguments.

Robbing this Court of its constitutional and statutory jurisdiction will work an especially cruel hardship on Mr. Valle and similarly situated Plaintiffs.  Mr. Valle is a Wave 1 Plaintiff whose case is almost ready for trial.  He has been deposed; undergone a Defense Medical Examination; retained an expert who submitted a Rule 26 report and sat for a deposition; filed dispositive and *Daubert* motions against the Defendants; and is now opposing Defendants' dispositive and *Daubert* motions. Halting his case against *non-debtor* 3M so that he can start the entire process anew in a different tribunal imposes costs for which the law lacks an adequate remedy. The gross inefficiency of 3M's attempted jurisdiction strip is especially problematic in the context of this bankruptcy proceeding, because Mr. Valle is *entitled by law* to an Article III court's adjudication of his claims.

Section 157(b)(5) of the Bankruptcy Code provides unequivocally that personal injury claims "shall be tried in the district court in which the bankruptcy court is pending, or in the district court in which the claim arose."  11 U.S.C. § 157(b)(5).  And of course, once a CAEv2 personal injury case is in district court,

it is a near certainty that it will be tagged and transferred by the JPML *back to this Court* for all pretrial proceedings. *See* MDL Dkt. 1. An Article III Court always has the power under the All Writs Act to prevent another tribunal from second guessing its jurisdiction. But wielding that statutory authority should be all but automatic when 3M seeks years of wrangling, delay, and expense *relitigating* in Bankruptcy Court matters this Court has already decided, only for the Bankruptcy Court to then yield—as required by black-letter bankruptcy law—to an Article III tribunal, roundtripping Mr. Valle's matter right back to where it currently sits.

For these reasons, Mr. Valle now moves for a preliminary injunction preventing 3M from (i) relitigating matters in Bankruptcy Court that this Court has already adjudicated and (ii) supporting an injunction against any Plaintiffs from litigating CAEv2 matters against 3M in this Court or following a remand for trial. To be clear, Mr. Valle is not asking the Court to enjoin any debtors in bankruptcy, as such entities are shielded by operation of the automatic stay. But 3M is not a debtor in bankruptcy, has no ability to sidestep this Court's authority,[1] and should be enjoined from making a mockery of Congress's unambiguous decision to vest this MDL Court with jurisdiction to issue judgments that 3M prefers to defy.

---

[1] 3M may continue to argue that the automatic stay applies to it, but that specious argument has been rejected by both this Court and the Bankruptcy Court. *See* Ex. C, Tr. July 27, 2022 Bankr. Hrg. at 103:8-105:22 ("Well I guess you may teach me because I disagree with you, but I don't know if you're going to have an apt student here. The stay doesn't automatically apply to random people.").

## BACKGROUND

Parties who disagree with Court orders but respect the rule of law have two options: file a motion for reconsideration or file a notice of appeal.

For three-and-a-half years, this Court has successfully steered this MDL, through a global pandemic no less, to complete sixteen bellwether trials, prepare over a thousand cases for remand, and transfer tens of thousands of cases to the active docket. Despite this, on July 26, 2022, the Aearo Debtors filed a Chapter 11 bankruptcy case in an attempt to abolish the Court's rulings in this case. 3M ignores the history of this case and portrays this litigation as "the failure of the largest MDL in U.S. history." Ex. A Infor. Br. at 1. A constant refrain from 3M is the "colossal docket" where "standard MDL early vetting tools . . . were curtailed or abandoned," *id.* at 3, 29-33, and exempted "from basic filing requirements." *Id.* at 33. 3M also seeks to blame the Plaintiffs' attorneys for an "extensive marketing campaign" to reach the claimants in this MDL. *See id.* at 25-29.

All of this revisionist history—blaming this Court and Plaintiffs' attorneys—is a legally irrelevant mirage.[2] The overwhelming majority of the management and

---

[2] The Aearo Debtors seek to sabotage the MDL by falsely accusing the Court of improper conduct. *See e.g.* Ex. A, Infor. Br. at 43 ("The frenetic bellwether cadence, coupled with the cascading effects of substantial evidentiary errors and false narratives, tainted the trials from the start."); *id.* at 7 ("[S]ome of the most basic tools of MDL practice, including medical records releases and production, along with filing requirements, were eliminated or suspended early on, reducing any chance of success an MDL might otherwise offer."). Ex. C, Tr. July 26, 2022 Bankr. Hrg. at

progression issues of which Defendants complain are of their own making.   In the first year of this MDL, 3M negotiated and signed a tolling agreement—the supposed death knell of the MDL—relieving the Plaintiffs of the requirement to file their cases on the active docket in exchange for detailed case information contained on the Census Form, certain documents within their possession, and the obligation to request official records from the government.   *See, e.g.*, Ex. B, Tolling Agmt. Between Plaintiff's Counsel and Defendants (signed by Mark Nomellini, Kirkland & Ellis "[f]or Defendants," August 26, 2019).   In other words, 3M not only agreed to suspend the "gatekeeping mechanism" it now claims is improperly lacking, it was a willing participant.   Unsurprisingly, the Aearo Debtors and 3M have not relayed their freely chosen litigation decisions to the Bankruptcy Court.[3]   Ex. A, Infor. Br at

---

110:1-7 ("And I'm also informed that there are communications between where apparently Judge Rodgers is listening into this and we're now, you know, getting messages about it is that she apparently has said that she might be prepared to do. And they're not coming through any formal line of communication and so I'm very concerned about that.   I think everybody should be concerned about that."); *id.* at 42:20-43:2 ("We have one case before one MDL judge, and they're saying, oh, let's tag-along the bankruptcy so that judge has it too, *when the heart of our problem comes out of her court*.   And it's regardless of whether she did what right or she did wrong.   It's we're you know, it's in the fact is indifferent to it.   The fact is we've got a docket that's broken and a case that's broken.") (emphasis added).

[3] This Court, however, has intimate familiarity with the history of this litigation and the actions of the parties.   Defendants have therefore found no success with trying to cast blame on others in this Court.   *See, e.g.*, MDL Dkt. 2953 at 1 (explaining that the creation of the administrative docket was "in small part for the benefit of Defendants [ ] who were clamoring for data about individual claimants at the time").

33.  Furthermore, as detailed in a prior plaintiffs' filing, the requirement to produce records was suspended and replaced with a tiered approach due to difficulties associated with obtaining records from the government.  *See* MDL Dkt. 3255. Defendants were aware of these difficulties and were, in fact, part of the negotiations between the parties, the Court, and the government.  *Id.*[4]

3M no longer likes the decisions it freely made.  And it can barely mask its utter disdain for this Court's rulings and prior juries' verdicts.  So it has embraced a new strategy: Ask the Bankruptcy Court to *disregard* the Court's Orders in search of a second bite at the apple and  different outcomes.  For instance, five pages of the Informational Brief filed on the *first day* of the Aearo Debtors' bankruptcy disputes the Court's rulings on the admissibility of the Air Force Letter, the Michaels testing, and the applicability of the Government Contractor Defense.  Ex. A, Infor. Br at 45-50.  The Court has issued multiple substantive rulings on the evidentiary issues,[5] and those rulings, as well as the Government Contractor Defense, are currently on appeal

---

[4] Although 3M complains about the lack of medical records, the difficulties with obtaining medical records from the government will not somehow resolve upon transfer to the Bankruptcy Court.  Moreover, as this Court knows, "[t]he Department of Defense has recently put a process in place for a contractor to obtain and produce DOEHRS data for individual plaintiffs, which will fulfill the informational needs with respect to non-Wave plaintiffs at this stage of the litigation."  MDL Dkt. 3344.
[5] *See, e.g.*, Air Force Letter: *Estes*, 7:20-cv-137, Dkt. 205 at 4; *Baker*, 7:20-cv-39, Dkt. 129-1; 209 at 4; Michaels testing: *Baker*, Dkt. 118; MDL Dkt. 2244; *see also Baker*, Dkt. 187.

at the Eleventh Circuit.  *See 3M Co., et al. v. Estes, et al.*, Nos. 21-13131, 21-13133, 21-13135; *3M Co., et al. v. Baker*, No. 21-12517.

3M does not hide its disrespect for this Court's rulings.  *See, e.g.*, Ex. A, Infor. Br. at 43 ("[T]he MDL court gutted defenses and barred key evidence in the 16 bellwether cases (some with multiple plaintiffs), which were tried in an unprecedentedly compressed time span—an average of one trial per month.").  It invites the Bankruptcy Court to "resolve the claims" "on a scientific basis *based on a fair and complete evidentiary record*."  Ex. A, Infor. Br at 57 (emphasis added).  The Debtors' counsel reiterated the point to the Bankruptcy Court: "We would propose, ultimately as part of an estimation process, that the estimation be based on scientifically calculated allocations and determinations of liability."  Ex. B, 7/26/22 Bankr. Tr. at 23:4-7.  The barely veiled subtext of 3M's assault on this Court's jurisdiction is that the MDL has defied basic science, conducted an unfair process, and predicated its judgments on an incomplete record.

The affront to this Article III Court's judicial power is as brazen as it is lawless.  *Even if* this Court had misapplied the law, a litigant is not free to undermine the integrity of the judicial process by running to a new tribunal and seeking a do over.  And of course, 3M's gross mischaracterization of this deftly managed MDL is nothing but tendentious advocacy over disputed issues that juries and this Court correctly resolved against the company.  For instance, the Informational Brief baldly

represents that "[m]ost plaintiffs have no proof that they ever used the Combat Arms," largely premised on a section of the DD 2215 Reference Audiogram titled "Personal Hearing Protection – Type Used." *Id.* at 37 ("These forms therefore provide a reliable record of a soldier's hearing protection over time.").  The expert and fact testimony elicited over the past two years, however, makes clear that the DD 2215 is anything but reliable, and in no way accurately proves whether a servicemember used the CAEv2. *See, e.g.* Ex. C, 4/13/21 *Estes*, *Hacker*, *Keeer* Trial Tr. at 47:9-51:18) (Packer) (testifying as to the various ways the DD 2215 could have been filled out and stating "I think there would be probably rare occurrences where somebody might have actually placed Combat Arms in the comment box on that box"); Ex. E, 9/23/21 *Adkins* Trial Tr. at 278:5 (Ohama) (testifying that the "accuracy could be questioned" as to the form DD 2215s).

The Informational Brief then goes on to completely misrepresent the complicated, nuanced science that has been heavily litigated in this case to baldly proclaim "Most Plaintiffs have no Hearing Loss," based solely on the World Health Organization (WHO) hearing loss criteria.  Ex. A, Infor. Br at 39-41.  But WHO provides just one standard for hearing loss, a standard that does not account for shifts and is not followed by many other hearing-related organizations, including American Speech Language Hearing ("ASHA") and the American Academy of Audiology.  Whether a particular plaintiff suffers from hearing loss is an issue that

has been the subject of expert debate, a debate resolved by juries, consistent with the Seventh Amendment. *See, e.g.* Ex. F, 11/3/21 Camarillorazo Trial Tr. at 710:14-711:711 (Spankovich) (testifying that slight hearing loss is sustained at 15 to 25 dB as defined by the ASHA and the American Academy of Otolaryngology Head and Neck Surgery).  Notably, 3M's summary of applicable hearing loss measurements also flouts the Court's Order on Hidden Hearing Loss. *See* MDL Dkt. 1933.  This Court, having ruled on so many *Daubert* motions, presided over six bellwether trials, and participated in two "Science Days,"[6] has a thorough understanding of both the complexity of the science in this case and the flippant manner in which the Informational Brief ignores it.

3M's motives are not in dispute.  It wants to wipe out the scientific and evidentiary rulings that the Court and the parties have tirelessly litigated; it wants to sidestep this Court's summary judgment decisions on 3M's meritless defenses; and it wants to undo multiple jury verdicts and final judgments against it.  It seeks to achieve these aims not through an appeal (which 3M will not win), but through what is tantamount to a complete do over in a different court that 3M simply hopes will see things differently from this tribunal.  To state the obvious, if 3M had prevailed on its various arguments before this Court, or if it thought it had strong odds of

---

[6] Which resulted in, *e.g.*, an Order from the Court dictating, according to reliable scientific authority, which medications experts could present as "ototoxic" in their causation opinions.  MDL Dkt. 1330.

identifying reversible error by this Court on appeal, it would not be smearing the work of this Court and attempting to relitigate the same issues in another forum. 3M's position is simply that, if the Court and juries do not rule in its favor, the process is illegitimate. This Court should not countenance such a flagrant disregard for its constitutional and statutory authority. To protect its jurisdiction, this Court should grant Mr. Valle's motion.

## LAW AND ANALYSIS

### I.  Preliminary Injunction Standard

The standard for an injunction under the All Writs Act is less demanding than that of a traditional preliminary injunction under Rule 65. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004). "Whereas traditional injunctions are predicated upon some cause of action, an All Writs Act injunction is predicated upon some other matter upon which a district court has jurisdiction. Thus, while a party must 'state a claim' to obtain a 'traditional' injunction, there is no such requirement to obtain an All Writs Act injunction—it must simply point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior. The requirements for a traditional injunction do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns." *Id.* "Proceedings in other courts that involve the

same facts as already issued judgments and orders, or that could result in the issuance of an inconsistent judgment, threaten the jurisdiction of the district court enough to warrant an injunction." *Id.* at 1104. *See also In re NTE Connecticut, LLC,* 26 F.4th 980, 987 (D.C. Cir. 2022) (Federal courts have "inherent power under the All Writs Act" to preserve their "prospective jurisdiction."). And even if Mr. Valle needed to satisfy the traditional injunction standard, his motion should be granted.

## II. Mr. Valle is certain to succeed on the merits because 3M cannot deny that it seeks to undermine this Court's jurisdiction.

"The All Writs Act, 28 U.S.C. § 1651(a), confers 'extraordinary powers' upon federal courts." *In re Managed Care Litig.*, 236 F. Supp. 2d 1336, 1339 (S.D. Fla. 2002). The Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. "Th[e] [Supreme] Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Tel. Co.*, 434 U.S. 159, 172, (1977). "This statute has served since its inclusion [ ] in the original Judiciary Act as a legislatively approved source of procedural instruments designed to achieve 'the rational ends of law.'" *Harris v. Nelson*, 394 U.S. 286, 299 (1969). As the Eleventh Circuit explained, "[t]he court's power to protect its jurisdiction

includes the power to enjoin a dissatisfied party bent on re-litigating claims that were (or could have been) previously litigated before the court from filing in both judicial and non-judicial forums, as long as the injunction does not completely foreclose a litigant from any access to the courts." *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1295 n.15 (11th Cir. 2002); *see New York Life Ins. Co. v. Deshotel*, 142 F.3d 873, 879 (5th Cir. 1998).

That power was created for precisely this situation. 3M cannot and does not dispute that it plans to argue in Bankruptcy Court that this Court's myriad orders, decisions, and final judgments should be reconsidered and overruled. Though dissatisfied litigants usually try 3M's gambit by attempting to relitigate adverse federal-court decisions in state court, the All Writs Act provides ample authority to enjoin the maneuver when tried in another federal tribunal. *See, e.g.*, *New York Life Ins. Co.*, 142 F.3d at 879. In *In re Managed Care Litigation*, for instance, the MDL court relied on the All Writs Act to enjoin an MDL defendant from proceeding with pursuing a settlement in another federal jurisdiction. 236 F. Supp 2d 1336, 1343 (S.D. Fla. 2002). In response to the defendant's argument that the court should assume that all federal judges will follow the law, the court explained "the JPML vested in this Court the authority to streamline pretrial proceedings in these actions, while concomitantly directing the appropriate resolution of all claims," and that "[i]n order to follow the JPML's mandate, an injunction preventing [defendant] from

proceeding with the settlement is necessary from the standpoint of the proper administration of justice." *Id.*; *see In re Am. Honda Motor Co., Inc.*, *Dealerships Relations Litig.*, 315 F.3d 417, 441 (4th Cir. 2003) (injunction pursuant to All Writs Act "was necessary to vindicate the district court's exclusive jurisdiction to resolve interpretive questions under the MDL Settlement Agreement"); *Liles v. Del Campo*, 350 F.3d 742, 746 (8th Cir. 2003) (holding that the All Writs Act provides that federal courts may issue injunctions related to proceedings in other federal courts).

The need to draw upon the All Writs Act is particularly acute for an MDL court, such as this one, where the litigation has significantly progressed.  Congress established MDLs through 28 U.S.C. § 1407 to avoid wasted resources and conflicting judgments in high stakes, complex cases, so it is especially critical for MDL courts to exercise their authority and quash competing, duplicative litigation. *See, e.g.*, *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 337 (2d Cir. 1985) ( *"*[T]he jurisdiction of a multidistrict court is 'analogous to that of a court in an *in rem* action . . . where it is intolerable to have conflicting orders from different courts.'") (citing 17 C. Wright & A. Miller & E. Cooper, Fed. Practice & Procedure § 4225 at 105 n.8 (Supp. 1985)).  As the *Vioxx* MDL court explained, a justification for an MDL court to enjoin another proceeding "is that complex litigation cases are sufficiently similar to *in rem* proceedings so as to permit injunctions on cases actually *in personam* in nature." *In re Vioxx Prod.*

*Liab. Litig.,* 869 F. Supp. 2d 719, 726 (E.D. La. 2012) (Fallon, J).  The court went on to state "[t]he theory behind the *in rem* analogy is that when complex litigation has reached the point of sufficient advancement, and there has been substantial investment of time and resources, in essence, a res is created."  *Id.*

This MDL has certainly "reached the point of sufficient advancement" with a "substantial investment of time and resources."  *In re Vioxx Prod. Liab. Litig.,* 869 F. Supp. 2d at 726.  It would make a mockery of these extensive proceedings for 3M, as an independent, non-debtor defendant that is not a debtor in a bankruptcy case, to seek conflicting rulings associated with the CAEv2 in Bankruptcy Court.  But that attack on this Court's jurisdiction is certain absent injunctive relief.

The Bankruptcy Code does not create any exemption that shelters non-debtors from the All Writs Act or requires this Court to yield its authority to prevent attacks on its jurisdiction by non-debtors.  If anything, this Court's need to protect its own jurisdiction is more pronounced in this context, because it implicates separation-of-powers concerns.  When a litigant attempts an end-run around a federal court's jurisdiction by attempting to relitigate in another Article III tribunal of equal dignity, it undermines the integrity of the judicial process.  But the Bankruptcy Court is an Article I tribunal; it cannot constitutionally wield the "judicial power of the United States."  U.S. Const. Art. III, Sec. 1; *Stern v. Marshall,* 564 U.S. 462, 484 (2011).  Permitting a litigant to abrogate this Court's jurisdiction in favor of a tribunal in a

different branch of government would undermine this Court's crucial "role in implementing the separation of powers," which the framers designed into our constitutional system to safeguard the peoples' cherished liberties. *Id.* at 483.

It is blackletter law that that this Court may issue an injunction to stop collateral attacks on its jurisdiction in parallel *federal court* proceedings. It follows *a fortiori* that 3M may not seek to sidestep this Court's jurisdiction in favor of an Article I tribunal. 3M can point to no authority that eliminates this Court's powers under the All Writs Act when the collateral attack comes from a non-debtor in a bankruptcy court.

## III.    Plaintiff, along with all of the MDL plaintiffs, faces irreparable harm if the Court does not enjoin 3M.

Even if Mr. Valle needed to show traditional irreparable harm to obtain an All Writs Act injunction, he easily meets that standard. 3M seeks to undermine this Court's jurisdiction, second guessing existing rulings and *enjoining* Mr. Valle from participating in his own case in this Court. It is irreparable harm to require litigants to *relitigate* issues that have already been decided by a court of competent jurisdiction. It only exacerbates that harm to prevent the litigant from participating in his own Article III case or controversy. That is precisely why "in aid of jurisdiction" injunctions under the All Writs Act routinely issue in situations such as this. Stated conversely, if the need to relitigate issues were *not* irreparable harm,

then an All Writs Act injunction could effectively never be justified. *Klay*, 376 F.3d at 1100.

Mr. Valle's status as a personal injury tort victim only makes this case stronger than the typical one—in which a dissatisfied litigant flees to another tribunal. That is because the dissatisfied litigant here, 3M, is attempting to whisk Mr. Valle and every other Plaintiff away to a court *that lacks statutory authority* to adjudicate his case. Section 157(b)(5) requires the district court to "order that personal injury tort or wrongful death claims shall be tried in the district in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending." *See generally In re Roman Cath. Church for Archdiocese of New Orleans*, 2021 WL 3772062, at *2 (E.D. La. Aug. 25, 2021).[7]   3M would relegate Plaintiff to the Bankruptcy Court for years. But to what end? Plaintiff will not consent to a bankruptcy court adjudication of his claim*, cf. Marshall,* 564 U.S. at 478-79, and thus will be *entitled* by statute to an Article III adjudication. And is there any doubt what will transpire when his case at long last returns to federal court? It will, alongside countless other cases, be tagged and transferred by the JPML back to this

---

[7] Plaintiff recognizes that Section 157(b)(5) is procedural and not jurisdictional. *See Stern v. Marshall*, 564 U.S. 462, 478-79 (2011). For avoidance of doubt, Plaintiff confirms he will <u>not</u> consent to the Bankruptcy Court's jurisdiction for final adjudication of his claims.

Court for pre-trial adjudication.  Attempts to undermine this Court's jurisdiction should never be countenanced.  But that is doubly so when the effort offers only an expensive detour on the path to justice that inevitably runs back to this Court.

The looming hearing on August 15 illustrates the definiteness of Plaintiff's injury; it is not a hypothetical scenario.  A preliminary injunction is thus necessary to prevent 3M from arguing in favor of staying proceedings against it in this Court.  Without this equitable relief, Plaintiff will likely irrevocably lose the ability to invoke the Court's Orders and will be forced to start his case afresh, right when it is ready to be remanded for trial.

## IV.   Balance of Hardships

Any threatened injury to Plaintiff clearly outweighs the harm to 3M, who would merely be required to continue with litigation in this forum.  3M can produce *no authority* that requiring a non-debtor to litigate in a forum, which 3M consented to, is a hardship by any measure.  To be sure, 3M believes it could benefit from avoiding a forum where it has been losing and relitigating legal and factual issues already decided by this Court.  But the inability to obtain a do-over is not cognizable irreparable harm.  By contrast, Plaintiff will lose the ability to draw on the extensive scientific and evidentiary rulings developed in the MDL.  As detailed *supra* Section III, Plaintiff will likely be forced to go to the Bankruptcy Court only to end up where he started, thus enduring significant delay with his case.

And to the extent 3M wants to argue the stay applies to it, this Court is best equipped to decide the parameters of the automatic stay. The Court has unparalleled knowledge of the parties, the issues, the science, and the law—more so than the parties themselves. 3M has no plausible justification as to why the Bankruptcy Court—and not this Court—should rule on the scope of the stay.

## V.      The preliminary injunction would serve the public interest.

The preliminary injunction would also serve the public interest. Instituting the stay would prevent 3M from improperly gaming the system to erase the litigation and the Court's work over the past several years. On the other hand, allowing 3M, a non-debtor, to proceed with its charade of invoking the automatic stay would create devastating precedent for future torts actions.[8] The Court should not allow 3M to simply wipe away the litigated record in these cases to the detriment of innocent claimants, like Plaintiff, because 3M is displeased with the results. Allowing such action to stand will signal to future tortfeasors that they can simply escape the civil

---

[8] 3M has justified its contemptible bankruptcy ploy by dismissing the tort system and large MDLs. As the Aearo Debtors (and 3M's lawyers in this action, Kirkland & Ellis) explained, "Lawyers, scholars, and judges have long raised questions about the utility of large MDLs to resolve mass tort claims, as aggregations of untested claims have become a magnet for frivolous lawsuits that otherwise may never have filed and inevitably result in the compensation of claims with little or no merit. The Combat Arms MDL exemplifies these problems." Exhibit A, Infor. Br. at 11-12. 3M actually supported consolidation of claims arising out of the CAEv2. *See* JPML Dkt. 98. It is only now that 3M has lost 13 of 19 bellwether trials with significant jury verdicts that it claims the MDL should be stayed so that another forum, with *no* experience with the facts of this case, should resolve the outstanding 233,000 claims.

justice system by having a related entity file bankruptcy—and not even the specific defendant itself—and extend the stay to the defendant without imposition of any bankruptcy obligations. That is a dangerous precedent to set, and one this Court should not sanction.

**VI.    No evidentiary hearing is required here, but an expedited hearing for oral argument is necessary.**

Finally, while courts sometimes order expedited discovery and an evidentiary hearing prior to entry of a preliminary injunction, neither is necessary when there are no issues of material fact in controversy that the court must resolve prior to ruling on a motion for preliminary injunction. *McDonalds Corp. v. Robertson*, 147 F.3d 1301, 1302 (11th Cir. 1998) ("Because no issues of material fact were in controversy when the district court ruled on the motion for preliminary injunction, we find that the district court acted well within its discretion and did not err in declining to hold an evidentiary hearing."); *Poarch Band of Creek Indians v. Hidreth*, 656 Fed.Appx. 934, 942 (11th Cir. 2016) (affirming preliminary injunction: "Thus, no material facts necessary to the legal determination on which the district court based its decision were in dispute, and no evidentiary hearing was required.").

Here, there are no relevant issues of material fact in dispute:  this motion is based on the evidentiary record consisting of the Court's prior labor and rulings in this MDL, and the actions Debtors (and 3M) are taking in a separate court to try to frustrate the instant proceedings.  None of these relevant facts require further

supplementation through discovery, nor does the Court need to hear witness testimony in an evidentiary hearing to preserve the record on which Plaintiff's requested preliminary injunction would be based.  Any request by 3M to delay resolution of this motion through expedited discovery and/or an evidentiary hearing should therefore be denied.

## <u>CONCLUSION</u>

For these reasons, and as detailed herein, Plaintiff respectfully asks this Court to enjoin 3M and any party acting on 3M's behalf, from filing any motion, action, proceeding, brief, or other judicial filing that seeks to enjoin parties from pursuing CAEv2-related claims against 3M in this MDL or in district courts where MDL cases have been remanded.  Given the imminent harm, Plaintiff respectfully asks for an expedited briefing schedule such that any opposition be due within 7 days and a hearing to follow within 2 days.

Dated:  August 3, 2022                    */s/ Ashley C. Keller*

Ashley C. Keller (Bar #1029118)
ack@kellerpostman.com
Nicole C. Berg (Pro Hac Vice)
ncb@kellerpostman.com
Ashley Barriere (Pro Hac Vice)
ashley.barriere@kellerpostman.com
Frank G. Dylewski (Pro Hac Vice forthcoming)
frank.dylewski@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois  60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

***Counsel for Plaintiff Richard Valle***

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH LOCAL RULES 7.1(F) AND 56.1(E)</u>

I hereby certify that this motion complies with the word limit of Local Rules

7.1(F) and 56.1(E) and contains 5,819 words.

*/s/ Ashley C. Keller*
Ashley C. Keller

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH LOCAL RULES 7.1(B) AND 7.1(B), (C)</u>

Pursuant to Local Rule 7.1(B), counsel for Plaintiff and 3M company conferred on August 3, 2022, regarding the foregoing motion but were unable to resolve the issues with 3M Company.

*/s/ Ashley C. Keller*
Ashley C. Keller

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 3, 2022, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Ashley C. Keller*
Ashley C. Keller